# EXHIBIT C

▨ REVIEW

# Physicians and the Pharmaceutical Industry
## Is a Gift Ever Just a Gift?

Ashley Wazana, MD

THERE ARE FEW ISSUES IN MEDICINE that bring clinicians into heated discussion as rapidly as the interaction between the pharmaceutical industry and the medical profession.[1-4] More than $11 billion is spent each year by pharmaceutical companies in promotion and marketing, $5 billion of which goes to sales representatives.[5,6] It has been estimated that $8000 to $13 000 is spent per year on each physician.[7,8] The attitudes about this expensive interaction are divided and contradictory. One study[9] found that 85% of medical students believe it is improper for politicians to accept a gift, whereas only 46% found it improper for themselves to accept a gift of similar value from a pharmaceutical company. Most medical associations have published guidelines to address this controversy. Perhaps the intensity of the discussion is related to the potential consequences were it confirmed that gifts influence prescription of medication that results in increasing cost or negative health outcomes.

This article addresses the question by way of a critical examination of the evidence. Two review articles[10,11] have addressed the factors affecting drug prescribing, but only 1 has focused on the impact of the physician-industry interaction on the behavior of physicians.[12] This article critically examines the literature and highlights articles with rigorous study methods.

## METHODS

Studies were identified by searching MEDLINE for articles from 1994 to the present, using the expanded Medical Sub-

See also p 391.

**Context**   Controversy exists over the fact that physicians have regular contact with the pharmaceutical industry and its sales representatives, who spend a large sum of money each year promoting to them by way of gifts, free meals, travel subsidies, sponsored teachings, and symposia.

**Objective**   To identify the extent of and attitudes toward the relationship between physicians and the pharmaceutical industry and its representatives and its impact on the knowledge, attitudes, and behavior of physicians.

**Data Sources**   A MEDLINE search was conducted for English-language articles published from 1994 to present, with review of reference lists from retrieved articles; in addition, an Internet database was searched and 5 key informants were interviewed.

**Study Selection**   A total of 538 studies that provided data on any of the study questions were targeted for retrieval, 29 of which were included in the analysis.

**Data Extraction**   Data were extracted by 1 author. Articles using an analytic design were considered to be of higher methodological quality.

**Data Synthesis**   Physician interactions with pharmaceutical representatives were generally endorsed, began in medical school, and continued at a rate of about 4 times per month. Meetings with pharmaceutical representatives were associated with requests by physicians for adding the drugs to the hospital formulary and changes in prescribing practice. Drug company–sponsored continuing medical education (CME) preferentially highlighted the sponsor's drug(s) compared with other CME programs. Attending sponsored CME events and accepting funding for travel or lodging for educational symposia were associated with increased prescription rates of the sponsor's medication. Attending presentations given by pharmaceutical representative speakers was also associated with nonrational prescribing.

**Conclusion**   The present extent of physician-industry interactions appears to affect prescribing and professional behavior and should be further addressed at the level of policy and education.

*JAMA. 2000;283:373-380*                                              www.jama.com

ject Headings *conflict of interest* and *drug industry*, limiting the search to articles in English while excluding review articles, letters, and editorials; each identified study was cross-referenced; a database of 400 articles gathered by the Medical Lobby for Appropriate Marketing[13] was searched; and 5 key informants were sought for their bibliographies on the topic.

A total of 538 studies that provided data on any of the main study questions were targeted for retrieval. Of the 29 studies that were published in peer-reviewed journals and identified as potentially relevant (containing quantita-

tive data on 1 of 3 facets of physician-industry interactions), 10 were from MEDLINE and 19 from other sources. The data extractor (A.W.) was not blinded to the authors of the studies.

Those with an analytical design (having a comparison group) were considered to be of higher methodological quality.

**Author Affiliation:** McGill University, Montreal, Quebec.
**Corresponding Author and Reprints:** Ashley Wazana, MD, Psychiatry Postgraduate Education, McGill Research and Training Building, 1033 Pine St W, Montreal, Quebec, Canada PQ H3A 1A1 (e-mail: cxwz@musica.mcgill.ca).

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

PHYSICIANS AND THE PHARMACEUTICAL INDUSTRY

**Table 1.** Interaction, Attitudes, and Impact of the Interaction Between the Medical Profession and the Pharmaceutical Industry*

| Study, y | Site | Population (n) | Interactions | Measure |
|---|---|---|---|---|
| | | *Prepost Study* | | |
| Bowman and Pearle,[14] 1988 | Washington, DC | Physicians attending CME (150) | CME | Impact on prescribing |
| | | *Cohort Studies* | | |
| Spingarn et al,[15] 1996 | Philadelphia, Pa | Internal medicine residents (22 case, 53 control) | Teachings | Impact on prescribing |
| Orlowski and Wateska,[16] 1992 | Cleveland, Ohio | Hospital physicians | Travel, CME | Impact on prescribing |
| | | *Case-Control Studies* | | |
| Chren and Landefeld,[17] 1994 | Cleveland, Ohio | Faculty physicians (36 case, 69 control) | PR, meals, travel, honoraria, research | Frequency and impact on formulary addition requests |
| Bowman,[18] 1986 | Washington, DC | 2 CME with different sponsors (5, 6) | Honoraria | Impact on content |
| | | *Cross-sectional Studies* | | |
| Gibbons et al,[19] 1998 | Washington, DC | Physicians and residents (268) | Gifts, samples, meals, travel, teachings | Attitudes |
| Sandberg et al,[20] 1997 | Chicago, Ill | Fourth-year medical students (205) | Gifts | Frequency and impact on attitudes |
| Mahood et al,[21] 1997 | Canada | Family medicine program directors (16) | Samples, teachings, CME, research | Frequency |
| Hopper et al,[22] 1997 | Detroit, Mich | Primary care residents (28) and faculty (14) | PR, gifts | Attitudes |
| Sergeant et al,[23] 1996 | Ontario | Family medicine residents (262) | PR, gifts, meals, CME | Frequency and attitudes |
| Caudill et al,[24] 1996 | Kentucky | Primary care physicians (1603) | PR, promotional material | Frequency, attitudes, and impact on attitudes and prescribing |
| Strang et al,[25] 1996 | Canada | Physicians (550) | PR, gifts, samples, meals, travel | Frequency and attitudes |
| Hodges,[26] 1995 | Toronto, Ontario | Psychiatry clerks and residents (105) | PR, gifts, samples, teachings, CME | Frequency, attitudes, and impact on attitudes |
| Ziegler et al,[27] 1995 | California | Internal medicine residents (27) | PR, teachings | Frequency, attitudes, and impact on knowledge |
| Andaleeb and Tallman,[28] 1995 | Pennsylvania | Faculty physicians and osteopathic practitioners (95) | PR | Impact on attitudes |
| Poirier et al,[29] 1994 | Pennsylvania | Physicians chair of P&T committee (26) | PR, gifts, samples, meals, promotional material | Attitudes |
| Thomson et al,[30] 1994 | New Zealand | Family physicians (67) | PR, gifts, samples, CME, promotional material, travel | Frequency, attitudes, and impact on attitudes |
| Brotzman and Mark,[31] 1993 | United States | Family medicine residents (122 case, 143 control) | PR, meals, CME | Impact on attitudes |
| Reeder et al,[32] 1993 | United States | Emergency medicine chief residents (87) | PR, gifts, samples, meals, travel, teachings | Frequency and attitudes |
| Keim et al,[33] 1993 | United States | Emergency residents (1385) and directors (80) | PR, gifts, meals, travel, teachings | Frequency and attitudes |
| Banks and Mainous,[34] 1992 | Kentucky | Faculty physicians (169) | PR, gifts, samples, meals, travel, CME | Attitudes |
| Brotzman and Mark,[35] 1992 | United States | Family medicine program directors (328) | PR, samples, teachings, gifts, promotional material | Frequency |
| Bucci and Frey,[36] 1992 | United States | Family practice program directors (325) | PR, gifts, samples, meals, CME, teachings | Frequency and attitudes |
| Lichstein et al,[37] 1992 | United States | Internal medicine program directors (444) | PR, meals, samples, travel, CME | Frequency and attitudes |
| McKinney et al,[38] 1990 | Minnesota | Internal medicine residents and faculty (425) | PR, gifts | Frequency and attitudes |
| Lurie et al,[39] 1990 | United States | Internal medicine residents and faculty (484) | PR, meals, travel, honoraria, research | Frequency, attitudes, and impact on formulary requests |
| Peay and Peay,[40] 1988 | Adelaide, Australia | Physicians (59 case, 29 control) | PR | Impact on prescribing |
| Bower and Burkett,[41] 1987 | United States | Family medicine physicians (317) | PR | Impact on prescribing |
| Haayer,[42] 1982 | Twente, Holland | Family medicine physicians (118) | PR | Impact on prescribing |

*PR indicates pharmaceutical representative; CME, continuing medical education; and P&T, pharmacy and therapeutics.

 ©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

## RESULTS

A total of 29 studies[14-42] were identified (TABLE 1). Of these, 16 addressed the extent of the physician-industry interaction, 16 identified the attitudes of physicians toward the interaction, and 16 evaluated the effect of the interaction on the practitioner.

### Interaction Between Medical Professionals and the Pharmaceutical Industry

All 16 studies[*] identified (TABLE 2) used self-reporting cross-sectional survey designs, and all but 1[17] used a mailed survey. The response rate ranged from 30%[24] to 100%.[21] Most authors claimed that the response rate was consistent with that obtained in similar studies and that a self-report design would tend to underreport the actual frequency of interaction because of underestimates in recall or a social desirability bias.

Interactions with the industry were found to start as early as medical school[26] and to continue well into practice. Most physicians met with pharmaceutical representatives about 4 times a month,[25,27,30-32] and the frequency tended to stabilize during residency. Residents do not differ significantly from faculty[38,39] in the frequency with which they experience this interaction. Thomson et al[30] found decreased availability of peer physicians ($r = 0.36$, $P<.05$) and a positive attitude toward the pharmaceutical representative ($r = 0.39$, $P<.05$) to be the only predictors of the number of contacts.

The frequency with which physicians benefit from industry-sponsored meals[39] and samples[39] decreases as they enter practice, while frequency of receiving honoraria,[39] conference travel,[25] and research funding[25] increases. Both populations frequently use promotional material.[23] One study found that residents receive 6 gifts a year,[26] with no comparable data for physicians. All interactions were generally permitted except for lunch rounds,[21] pharmaceutical representative speakers,[21,37] and promotional material,[21,36] which were more controver-

sial. As many as 85% of programs had policies on interactions.[21,23,33,35-37]

### Attitudes Toward the Interaction

All 16 studies[†] reported here (TABLE 3) used a self-report design with similar rates of response and limitations.

Residents and physicians have similar attitudes about pharmaceutical representatives. They believe that representatives provide accurate information about their drugs[25] and are equivocal in their beliefs that representatives could provide accurate information on established or alternative drugs.[24-26,38] Most believe that representatives prioritize product promotion above patients' welfare[25] and are likely to use unethical practices.[22,33] Residents are less likely than physicians are to endorse the influence of the interaction on their behavior.[‡]

Most deny that gifts could influence their behavior[19,24,26,32,34,38] and are equivocal about the ethics of such a practice,[22,33] with residents more likely to admit that without gifts, their interactions with pharmaceutical representatives would be reduced.[24,26,38] Similarly, respondents agree that conference[37] and lunch rounds[27] attendance would decrease without industry-paid meals. Samples, continuing medical education (CME), and conference travel funding are felt to exert more influence (40% to 55%) than promotional material does (22%).[19,29,34] Each interaction elicited ethical concerns; travel funding generated the most concern (48%[29] to 75%[19]). Most physicians also agree that pharmaceutical representative speakers should be banned.[24,38] Residents' opinions are divided.[24,26] Programs with concerns about these interactions were more likely to be military, nontraditional, or to have another source of funding.[37]

### Effect of Interaction

Sixteen studies§ were identified (TABLE 4) that assessed the impact of the physician-industry interaction on the knowledge, attitudes, and prescribing practice of physicians. Studies used cross-sectional, case-control, or preinteraction and postinter-

action methods to assess the impact of particular interactions.

### Interactions With Pharmaceutical Representatives

There was an independent association between meetings with pharmaceutical representatives and formulary addition requests for the drug of the representative's company, both with respect to control physicians who did not meet representatives and with respect to requests for other companies' drugs.[17,39] Most of the requested drugs presented little or no therapeutic advantage over existing formulary drugs, but the merit of the requests was not related to interactions with the pharmaceutical industry. This, as well as the strength, consistency, specificity, and independence of the results, make it unlikely that the interaction occurred because the physician was already convinced of that drug's influence.[17]

Interactions with pharmaceutical representatives were also found to impact the prescribing practice of residents and physicians[39] in terms of prescribing cost,[24] nonrational prescribing,[42] awareness, preference and rapid prescribing of new drugs,[40] and decreased prescribing of generic drugs.[41] These findings were independent of other variables in all but 1 study,[41] in which such an analysis was not done.

Attitudinal outcomes were examined in matched residency programs with and without restrictions on interactions. Exposure to pharmaceutical representatives was highly associated with a perception of the benefits of such an interaction and the appropriateness of other interactions. Whether exposure to pharmaceutical representatives or to critical faculty role models influences residents' attitudes remains unknown.[31] There were other correlates of positive attitudes,[24,28,30] but the directionality of these latter associations is not as clear as with the above quasi-experimental study.[31]

### Gifts

Receiving a gift[20] and the number of gifts received[26] correlated with the belief that pharmaceutical representatives have no

---

[*]References 17,20,21,23-27,30,32,33,35-39.

[†]References 19, 22-27, 29, 30, 32-34, 36-39.
[‡]References 22, 24, 25-27, 29, 33, 34, 38, 39.
[§]References 14-18, 20, 24, 26-28, 30, 31, 39-42.

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

PHYSICIANS AND THE PHARMACEUTICAL INDUSTRY

**Table 2.** Interaction Between the Medical Profession and the Pharmaceutical Industry*

| Measure | Residents | Physicians |
|---|---|---|
| **Overall** | | |
| Policy, % of programs | Limited,[21,23,33,35-37] 25[21] to 86[33] | |
| **Interaction with PR** | | |
| Interaction | 51% of residents[23] (83% of programs [1-3/wk])[32] | 85%[30] to 87%[17] |
| Frequency | 0.25/mo[26] to 3.1/mo[38] (higher than in fourth year)[26] Brief: 1.5/mo[39] to 8.7/mo[27] Extended: 0.3/mo[39] to 3.5/mo[27] | 3 to 4/mo (NS)[30,38] Brief: 1.6/mo[39] Extended: 0.6/mo (NS)[39] |
| Policy, % of programs Permitted ad lib Limited Prohibited | 84[30,37] 64[33] to 79[36] 34[33] | |
| **Gifts** | | |
| Interaction | 80% of medical students received a book[20] (90% of programs[32]) | |
| Frequency | 6/y (average value $60)[26] | |
| Policy, % of programs Permitted | 86 to 89[35,36] | |
| **Samples** | | |
| Interaction | 66% of residents (66% of programs[32]) | 86%[25] |
| Frequency | 2/y[26] to 2.4/y[39] (interns, 4.8/y; $P<.02$)[26] | 1.3/y (fewer than residents; $P<.001$)[39] |
| Policy, % of programs Permitted | 71 to 94[35-37] | |
| **Promotional Material** | | |
| Interaction | 91% of residents education items[23] 52% of residents seeking drug information from PR[27] (82% of programs)[35] | |
| Frequency | | 5.4% Daily 31% Weekly 48% Monthly 14% Yearly[19] |
| Policy, % of programs Permitted | 43[36], 62[21] | |
| **Industry-Paid Meals** | | |
| Interaction | 80% of residents [26] (80% of programs[32]) | 41%[20] |
| Frequency | 14/y[26] to 15/y[39] (interns, 31/y; $P<.05$) | 2.3/y (fewer than residents; $P<.001$)[39] |
| Policy, % of programs Permitted | 88[36] | |
| **Conference Travel** | | |
| Interaction | 3% of residents [26] | 42%[25] |
| **Lunch Rounds and PR Speakers** | | |
| Interaction | 54% of programs[32] | |
| Frequency | Attended lunch rounds (20/y)[27] | |
| Policy, % of programs Permitted | 38 lunch rounds[21] 38 to 86 PR speakers[21,35,37] | |
| **CME Funding** | | |
| Policy, % of programs Permitted | 88[36,37] | |
| **Honoraria** | | |
| Frequency | | 1.2/y[20] |
| **Research Funding** | | |
| Frequency, % | | 54%[25] |
| Policy, % of programs Permitted | 69[36] | |

*PR indicates pharmaceutical representative; CME, continuing medical education; and NS, not significantly different from residents. Blank spaces indicate data do not apply or were not collected.

impact on prescribing behavior; receiving gifts of high relevance to practice was also associated with a positive attitude.[30] The former association was independent of the student's ability to recall the donor.

### Samples

Accepting samples was associated with awareness, preference and rapid prescription of a new drug,[40] and a positive attitude toward the pharmaceutical representative.[30]

### Industry-Paid Meals

There was an independent association between benefiting from sponsored meals and formulary addition requests for any drug[39] that was clearly dose-related.[17]

### Funding for Travel or Lodging to Attend Educational Symposia

Accepting funding to attend a symposium was independently associated with increased formulary addition requests for the sponsor's drug.[17] This interaction was also found to impact hospital prescribing practices 2 years after 2 groups of physicians accepted all-expenses-paid trips to a drug-sponsored symposium. This occurred despite the continued prescribing of the 2 drugs that the new ones were to replace and the lack of concern about the interaction among all but 1 beneficiary.[16] The physicians were not randomly selected, thus raising the unlikely possibility that physicians more partial to the sponsor's drug chose to participate. It is nonetheless striking to note that the changes occurred at an institutional level.

### Pharmaceutical Representative Speakers

Resident exposure to pharmaceutical representative speakers at lunch rounds was associated with dissemination and learning of inaccurate information about the sponsor's and competitor's drug.[27] Attendance at rounds given by a physician pharmaceutical representative was associated with appropriate and inappropriate treatment decisions by attending residents, independent of

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

variables including the resident's memory of the presenter's affiliation.[15] Although not a randomized trial, the factors leading to attendance seemed unrelated to the outcome.[15]

## CME Sponsorship

Drug company CME, sponsorship affected presentation content in that the sponsor's drug was always preferentially highlighted, although the same drugs were discussed in each event.[18] Changes in prescribing practice (self-reported) in favor of the sponsor's drug were also found.[14] The participants were not randomized, but it is unlikely that their self-selection reflected a bias for the sponsor's drug. The consistent findings across all events also minimize the lack of control groups. These were findings in settings where industry guidelines were applied.

## Honoraria, Research Funding, Employment

Accepting a drug company honorarium to present data on a new therapy and receiving research support were independently associated with a formulary addition request for the sponsor's drug as well as any drug.[17,39] One study examined the impact of employment but did not find it significant.[13]

## COMMENT

### Limitations

MEDLINE was not personally searched before 1994 and other databases were not searched. However, 1 of the studies examined[12] searched MEDLINE and HEALTH from 1978 to 1993, and the methods ensured a thorough exploration of the published literature.

### Industry-Physician Interaction

Residents and physicians interact with the pharmaceutical industry frequently and in multiple settings and fashions, beginning as early as medical school. Residents benefit more from drug-sponsored meals, whereas physicians receive more honoraria, conference travel, and research funding. Both meet equally often with pharmaceutical representatives.

**Table 3.** Attitudes Toward the Physician–Pharmaceutical Industry Interactions*

| Measure | Residents | Physicians |
|---|---|---|
| **Interaction With PR** | | |
| Knowledge and technique | | |
| Adequate/accurate knowledge overall | | 20%[29] to 35%[25] |
| of their drug | | 85%[25] |
| of new drugs | 32%[26]; LS, 2.8[38] | 2.8[38] to 3.6[24] |
| of established drugs | 25%[26]; LS, 2.9[38] | LS, 2.7[38] to 3.5[24] |
| of alternatives | | 19%[25] |
| Fairly portray their product | | 20%[25] |
| Provide misleading information | 44%[27] | |
| May use unethical practice | 74%[33]; LS, 3.2[22] | LS, 3.7 (P = .04)[22] |
| Goal is product promotion | | 92%[25] |
| Value | | |
| PR support CME | 77%[26]; LS, 4.0[38] | LS, 3.9[24] to 4.2[38] |
| Positive | 29% to 85%[26,27,32]; LS, 2.4[38] to 3.7[22] | LS, 2.1 to 3.7[22,30,38] |
| Influence behavior | 25% to 49%[23,26,27,33,39]; LS, 1.8[22] to 2.5[38] | 58%[34] to 76%[25]; LS, 1.75 to 3.2[22,24,38] |
| Concerned about influence | | 52% to 68%[25] |
| Too much contact | LS, 2.8[22] | LS, 3.4 (P = .003)[22] |
| Plan to interact with PR in the future | 76.1%[23] | |
| Policy | | |
| Should be allowed to interact with PR | 82.3%[23] | |
| **Gifts** | | |
| Influence behavior | 8% to 27%[19,26,32]; LS, 1.7[38] | 8 to 13%[19,26]; LS, 1.6 to 1.8[24,38] |
| Inappropriate/unethical | 4% to 49%[19,33] | 4% to 88%[19,29] |
| Ethical for gifts with/without patient benefit | LS, 3.9/LS, 2.8[22] | LS, 4.0/LS, 2.5[22] |
| Leads to higher costs of drugs | 35.9%[23] | |
| Would maintain same contact without gifts | 45%[26]; LS, 2.8[39] | LS, 2[24] to 4.0[39] (P<.05) |
| **Samples** | | |
| Inappropriate | 12%[33] to 33%[19] | 33%[19] to 60%[29] |
| Influential | 55%[19] | 42%[34] to 55%[19] |
| Should be offered | | 86%[25] |
| **Promotional Material** | | |
| Useful | 58.4%[25] | |
| Influential | 22%[19] | 22%[19] |
| Inappropriate | | 12%[19] to 60%[29] |
| **Industry-Paid Meals** | | |
| Influential | 24%[19] | 24%[34,19] |
| Unethical | 33%[19] | 12%[27] to 33%[19] |
| CME attendance would decline without | | |
| Should be allowed | | 21%[25] |
| **Conference Travel** | | |
| Inappropriate | 39%[33] to 75%[19] | 48% to 75%[29,19,30] |
| Influential | 42%[19] | 42%[19] |
| Partial/full funding should be allowed | | 47%/15%[25] |
| **Lunch Rounds and PR Speakers** | | |
| Appropriate | 10%[19] to 11%[27] | 10%[19] |
| Influential | 12%[19] | 12%[19] |
| Attendance would be same without lunch | 0%[27] | |
| Should be banned | 10%[26]; LS, 3.7[39] | LS, 3.5[39] to 4.2[24] |
| **CME Funding** | | |
| Influential | | 40%[34] |
| Content should be chosen by physicians | 92.5%[23] | |

*Results for residents and physicians do not significantly differ when identified by P values. LS indicates Likert scale: "strongly agree"-5, "agree"-4, "neutral"-3, "disagree"-2, "strongly disagree"-1. PR indicates pharmaceutical representative; CME, continuing medical education. Blank spaces indicate data do not apply or were not collected.

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

PHYSICIANS AND THE PHARMACEUTICAL INDUSTRY

Physicians and residents were similarly skeptical of the motives and comprehensive knowledge of pharmaceutical representatives but expressed a similar lack of concern about the influence of gifts, promotional material, meals, and lunch rounds. They had similar concerns about pharmaceutical representative speakers, CME funding, and conference funding; physicians were more concerned than were residents about the influence of representatives. All admitted that contact with representatives and attendance at educational events would decline were it not for gifts and meals.

## Outcome of Interaction

Although some positive outcomes were identified (improved ability to identify the treatment for complicated illnesses), most studies found negative outcomes associated with the interaction. These included an impact on knowledge (inability to identify wrong claims about medication), attitude (positive attitude toward pharmaceutical representatives; awareness, preference, and rapid prescription of a new drug), and behavior (making formulary requests for medications that rarely held important advantages over existing ones; nonrational prescribing behavior; increasing prescription rate; prescribing fewer generic but more expensive, newer medications at no demonstrated advantage.)

No study used patient outcome measures. Studies demonstrating an effect on research findings[43-47] were excluded because they were not limited to physicians or to clinical activity. Some detected an influence of some interactions using self-report measures but were limited by the aforementioned biases and were less informative than the analytic studies reporting specific outcomes. However, most of these studies examined only 1 interaction or the effect of 1 intervention at a time, even if the effect of these interactions was posited as being cumulative. One study gave a high estimate for the effect of 2 interactions but had not entered this finding into the regression analysis.[17]

Most studies found a significant association that was consistent and strong for all interactions examined and which was biologically plausible and coherent with

**Table 4.** Effect of Physician–Pharmaceutical Industry Interactions on the Practitioner*

| Interaction | Outcome | Findings |
|---|---|---|
| Interaction with PR | Attitude | Exposure to PR associated with positive perception of PR ($\beta$ = .638; $P$ = .02) (R),[31] perception of appropriateness of other interactions ($r$ = 0.706; $P$ = .02) (R)[31]<br>Perceived support by PRs ($r$ = 0.384; $P$<.01),[28] the availability ($r$ = 0.30; $P$<.001) and applicability ($r$ = 0.30; $P$<.001) of PR information and of the PRs themselves ($r$ = 0.54; $P$<.001),[24] and receiving practical prescribing information[30] associated with positive perception of PR (P) |
| | Formulary request | "Request made at suggestion of PR in the last year" (R, 4%; P, 20%)[39]<br><br>Contact with PR associated with increased likelihood of request for PR's drug vs those who did not meet PR (OR, 3.4; 95% CI, 1.8-6.6), and vs request for other company's drug (OR, 4.9; 95% CI, 3.2-7.4) (P)[17] |
| | Prescribing | Frequency of contact associated with change of practice (R, $r$ = 0.049, $P$ = .003; P, $r$ = 0.016, $P$ = .003),[29] higher prescribing cost ($r$ = 0.155; $P$<.01) (P),[24] and rapid prescription of a new drug ($r$ = 0.35; $P$<.002) (P)[40]<br>Relying on PR associated with decreased likelihood of prescribing generic by 66% (P)[41] and less rational prescribing ($r$ = 0.195; $P$<.03) (P)[42] |
| Gifts | Attitudes | Receiving a gift[20] and number of gifts received ($r$ = 0.24; $P$<.04)[26] are associated with belief that PRs have no impact on behavior (R)<br>Receiving high-relevance gifts is associated with positive attitude toward gifts (P)[30] |
| Samples | Attitudes | Positive attitude toward the PR (P)[30] |
| | Prescribing | Awareness, preference, and rapid prescription of a new drug ($r$ = 0.35; $P$<.002) (P)[40] |
| Industry-paid meals | Formulary request | Increased likelihood of request for any drug ($r$ = 0.089; $P$ = .03)[39]; 8% of requesting physicians vs 3% of controls "occasionally" shared meals; 14% vs 1% "often" shared meals (P<.01) (P)[17] |
| Conference travel | Formulary request | Increased likelihood of request for sponsor's drug (OR, 7.9; 95% CI, 1.1-55.6) vs controls who did not benefit (P)[17] |
| | Prescribing | 4.5- to 10-fold increase in preconference prescribing rate of sponsor drug (compared with 2.5- to 3.5-fold national rate increase) (P)[16] |
| PR speakers | Knowledge | Learning of inaccurate information (only 26% able to identify inaccurate claims) (R)[27] |
| | Prescribing | Appropriate treatment for complications of discussed illness (OR, 8.4; 95% CI, 2.1-38.9) (R)[15]<br>Inappropriate treatment (higher cost, more invasive) for milder forms of the discussed illness (100% vs 79% of those not in attendance; $P$ = .03) (R)[15] |
| CME funding | Content | More frequent mention (2.5 to 3 times) of positive effects of sponsor's medication and negative or equivocal effects of competitor's drug (P<.05) (P)[18] |
| | Prescribing | Highest increase (5.5% to 18.7%) in the rate of prescription of the drugs made by the CME sponsor, while decrease or smaller increase in rate of competitor's drug (P<.05) (P)[14] |
| Honoraria | Formulary request | Increased likelihood of request for any drug ($r$ = 0.178; $P$ = .003),[39] from those who benefit "occasionally" (OR, 4.0; 95% CI, 1.0-16.8) and "often" (OR, 29.1; 95% CI, 3.4-246.6) (P)[17]<br>Increased likelihood of request for sponsor's drug vs controls who did not benefit (OR, 3.9; 95% CI, 1.2-12.7), and vs request for other company's drug (OR, 2.2; 95% CI, 1.1-4.2) (P)[17] |
| Research funding | Formulary request | Increased likelihood of request for any drug ($r$ = 0.102; $P$<.05)[39]; 61% of requesting physicians vs 29% of controls benefited ($P$ = .002) (P)[17]<br>Increased likelihood of request for sponsor's drug (OR, 9.5; 95% CI, 2.6-35.7) vs controls who did not benefit (P)[17] |

*CME indicates continuing medical education; PR, pharmaceutical representative; P, physicians; R, residents; S, students; OR, odds ratio; and CI, confidence interval.

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

other theories[48] (TABLE 5). Dose response was demonstrated in all interactions in which it was examined. Some studies were even able to establish specificity by identifying a stronger endorsement of a company's product, although nonspecific outcomes (eg, decreased prescription of non-generic products, more expensive and less rational treatment) are just as meaningful. The independence of the association was established with a matched analysis or multivariate analysis in all but CME and gifts, although, the bias in the case of CME funding seems small. Nonetheless, the temporal direction of the association was established for only 4 interactions: an increase in the physician prescribing rate of the CME sponsor's drug[14]; an increase in hospital prescribing rate of the conference travel sponsor's drug[16]; increased nonrational prescribing choice of the sponsor's drug after related resident teaching given by physician pharmaceutical representatives[15]; and an association between interactions with pharmaceutical representatives and positive attitudes toward them.[31] This latter association is limited by the possibility of a confounder responsible for the differences in attitudes among the 2 groups of residents. The causal directions of all other studies are not as clear, suggesting that interactions could have followed the outcomes. Chren and Landefeld[17] argue that their findings demonstrate the impact of interactions with pharmaceutical representatives, honoraria, and sponsored research. There are no ideal data to date, but the literature points to important concerns

for 3 interactions with physicians: pharmaceutical representative speakers, CME sponsorship, and conference travel. Many less rigorous studies also detected the impact of the interactions with pharmaceutical representatives. These outcomes occurred despite physicians' forgetting the sponsors' names[15,20] or physicians' beliefs that they could not be influenced.[16]

## Policy Implications

Several professional societies,[53-57] have developed guidelines to modulate the interaction between physicians and the pharmaceutical industry. Despite the guidelines' recommendation that students and residents should be informed about them, there was a lack of awareness. Among residents, only 23%[23] to 50%[32] knew about them, whereas 62% of physicians knew of at least 1 guideline.[19] Also, enrollment in a program with guidelines affected whether they would accept gifts, but having read the national guidelines and awareness of the program's policy did not.[23] Enrollment in a program with guidelines also affected the frequency of and attitude toward these interactions.[31] Whether it was the guidelines themselves or the presence of critical faculty who served as role models that influenced the interactions cannot be elucidated from these studies. Only a few training programs have proposed their own guidelines (35% of US internal medicine programs,[37] 58% of US family medicine[35] programs, 61% of US emergency medicine programs,[33] and 25% of Canadian

family medicine programs[21]) and fewer distribute these guidelines[21] or give formal instruction on them.[23]

Finally, most such guidelines allow for physician–pharmaceutical representative interaction whereas subsidies for travel and other amenities at a symposium can only be given to residents. This article questions the adequacy of the guidelines for many of the above interactions, specifically, the lack of guidelines regarding resident–pharmaceutical representative interaction, the efficacy of the guidelines for industry-sponsored CME events, and the allowance of industry-sponsored conference travel for residents despite the fact that these have been disallowed for physicians. This is of great concern in terms of travel scholarships, for which residents have conference subschedules designed by a group of mentors hired by the same industry sponsor and are immersed in this group for the duration of the conference. Concerns about CME could be addressed by prioritizing the Association of American Medical Colleges guidelines and concerns by other authors.[58] Also, the American College of Physicians' suggestion that physicians should be guided in making decisions about their activities by whether they would be willing to have their interactions known does not address the fact that physicians do not always comprehend how interactions affect them.

Another attempt to address growing concern about physician-industry interaction has been the introduction of practical training. Twenty-five percent[37] to

| | Consistency† | Strength | Specificity‡ | Dose-Response | Biological Plausibility§ | Coherence | Temporal Relationship | Experiment[31] |
|---|---|---|---|---|---|---|---|---|
| Interaction with PR | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Gifts | Yes | Yes | . . . | Yes | Yes | Yes | . . . | Yes |
| Samples | Yes | Yes | . . . | Yes | Yes | Yes | . . . | . . . |
| Industry-paid meals | Yes | Yes | . . . | Yes | Yes | Yes | . . . | . . . |
| PR speakers | Yes | Yes | . . . | . . . | Yes | Yes | Yes | . . . |
| CME funding | Yes | Yes | . . . | . . . | Yes | Yes | Yes | . . . |
| Conference travel | Yes | Yes | Yes | Yes | Yes | Yes | Yes | . . . |
| Honoraria | Yes | Yes | Yes | Yes | Yes | Yes | . . . | . . . |
| Research funding | Yes | Yes | Yes | Yes | Yes | Yes | . . . | . . . |

**Table 5.** Hill Criteria for Causality and Industry-Physician Interactions[48]*

*Ellipses indicate data were not collected. CME indicates continuing medical education.
†More than 1 study found an effect for each interaction.
‡Only 1 study examined specificity and defined it as increased likelihood of choosing product of sponsor over competition in association with interaction.[25]
§Mechanism: for gifts, meals, honoraria, and travel subsidy[49]; interaction with pharmaceutical represtative (PR)[50-52]; research funding[43-47]; the mechanisms for all other interactions are reviewed in the text.

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

PHYSICIANS AND THE PHARMACEUTICAL INDUSTRY

75%[21] of programs taught about industry marketing techniques and critical appraisal of industry product claims. Yet these attempts left many residents wanting: family medicine, psychiatry, emergency medicine, and internal medicine residents wanted more teaching[26,33,38] both in medical school (45%) and residency (60.6%).[21] Reports of some programs that have been implemented are optimistic,[9,22,33,59-62] However, 2 of the studies are older[9,60] and another program[62] was conducted infrequently. Also, only short-term effects on attitude and knowledge were examined, leaving the impact on long-term behavior unknown. Clearly, there is a need for systematic interventions. Positive changes in prescription patterns and physician knowledge[40,63,64] associated with such alternatives as academic detailing and industry-independent drug information mailings suggest other avenues for action.

**Funding/Support:** No financial assistance was obtained in the preparation of this article.
**Acknowledgment:** I would like to thank Joel Lexchin, MD, for his meticulous and invaluable contribution in the preparation of this article.

## REFERENCES

1. Erola JA. We need dialogue and discussion, not a new Berlin Wall. *CMAJ.* 1994;150:955-956.
2. Guyatt G. Academic medicine and the pharmaceutical industry. *CMAJ.* 1994;150:951-953.
3. Waud DR. Pharmaceutical promotions—a free lunch? *N Engl J Med.* 1992;327:351-353.
4. Woolfard RF. Addressing the pharmaceutical industry's influence on professional behaviour. *CMAJ.* 1993;149:403-404.
5. Wolfe SM. Why do American drug companies spend more than $12 billion a year pushing drugs? *J Gen Intern Med.* 1996;11:637-639.
6. Woosley RL. Centers for education and research in therapeutics. *Clin Pharmacol Ther.* 1994;55:249.
7. Drake D, Uhlman M. *Making Medicine, Making Money.* Kansas City, Mo: Andrews & McMeel; 1993.
8. Randall T. Kennedy hearings say no more free lunch—or much else—from drug firms. *JAMA.* 1991;265:440, 442.
9. Palmisano P, Edelstein J. Teaching drug promotion abuses to health profession students. *J Med Educ.* 1980;55:453-455.
10. Hemminki E. Review of literature on the factors affecting drug prescribing. *Soc Sci Med.* 1975;9:111-116.
11. Smith MC. Drug product advertising and prescribing. *Am J Hosp Pharm.* 1977;34:1208-1224.
12. Lexchin J. Interactions between physicians and the pharmaceutical industry. *CMAJ.* 1993;149:1401-1407.
13. Medical Lobby for Appropriate Marketing. Bibliography on pharmaceutical promotion. Available at: http://www.camtech.net.au/malam/bibliogr.htm. Accessed December 13, 1999.
14. Bowman MA, Pearle DL. Changes in drug prescribing patterns related to commercial company funding of continuing medical education. *J Contin Educ Health Prof.* 1988;8:13-20.
15. Spingarn RW, Berlin JA, Strom BL. When pharmaceutical manufacturers' employees present grand rounds, what do residents remember? *Acad Med.* 1996;71:86-88.
16. Orlowski JP, Wateska L. The effects of pharmaceutical firm enticements on physician prescribing patterns. *Chest.* 1992;102:270-273.
17. Chren MM, Landefeld CS. Physicians' behavior and their interactions with drug companies. *JAMA.* 1994;271:684-689.
18. Bowman MA. The impact of drug company funding on the content of continuing medical education. *Mobius.* 1986;6:66-69.
19. Gibbons RV, Landry FJ, Blouch DL, et al. A comparison of physicians' and patients' attitudes toward pharmaceutical industry gifts. *J Gen Intern Med.* 1998;13:151-154.
20. Sandberg WS, Carlos R, Sandberg EH, Roizen MF. The effect of educational gifts from pharmaceutical firms on medical students' recall of company names or products. *Acad Med.* 1997;72:916-918.
21. Mahood S, Zagozeski C, Bradel T, Lawrence K. Pharmaceutical policies in Canadian family medicine training. *Can Fam Physician.* 1997;43:1947-1951.
22. Hopper JA, Speece MW, Musial JL. Effects of an educational intervention on residents' knowledge and attitudes toward interactions with pharmaceutical representatives. *J Gen Intern Med.* 1997;12:639-642.
23. Sergeant MD, Hodgetts PG, Godwin M, Walker DM, McHenry P. Interactions with the pharmaceutical industry. *CMAJ.* 1996;155:1243-1248.
24. Caudill TS, Johnson MS, Rich EC, McKinney WP. Physicians, pharmaceutical sales representatives and the cost of prescribing. *Arch Fam Med.* 1996;5:201-206.
25. Strang D, Gagnon M, Molloy W, et al. National survey of the attitudes of Canadian physicians towards drug-detailing by pharmaceutical representatives. *Ann R Coll Physicians Surg Can.* 1996;29:474-478.
26. Hodges B. Interactions with the pharmaceutical industry. *CMAJ.* 1995;153:553-559.
27. Ziegler MG, Lew P, Singer BC. The accuracy of drug information from pharmaceutical sales representatives. *JAMA.* 1995;273:1296-1298.
28. Andaleeb SS, Tallman RF. Physician's attitudes toward pharmaceutical sales representatives. *Health Care Manage Rev.* 1995;20:68-76.
29. Poirier TI, Giannetti V, Giudici RA. Pharmacists' and physicians' attitudes toward pharmaceutical marketing practices. *Am J Hosp Pharm.* 1994;51:378-381.
30. Thomson AN, Craig BJ, Barham PM. Attitudes of general practitioners in New Zealand to pharmaceutical representatives. *Br J Gen Pract.* 1994;44:220.
31. Brotzman GL, Mark DH. The effect on resident attitudes of regulatory policies regarding pharmaceutical representative activities. *J Gen Intern Med.* 1993;8:130-134.
32. Reeder M, Dougherty J, White LJ. Pharmaceutical representatives and emergency medicine residents. *Ann Emerg Med.* 1993;22:105-108.
33. Keim SM, Sanders AB, Witzke DB, Dyne P, Fulginiti JW. Beliefs and practices of emergency medicine faculty and residents regarding interactions with the biomedical industry. *Ann Emerg Med.* 1993;22:1576.
34. Banks JW III, Mainous AG III. Attitudes of medical school faculty toward gifts from the pharmaceutical industry. *Acad Med.* 1992;67:610-612.
35. Brotzman GL, Mark DH. Policies regulating the activities of pharmaceutical representatives in residency programs. *J Fam Pract.* 1992;1:54-57.
36. Bucci KK, Frey KA. Involvement of pharmacy faculty in the development of policies for pharmaceutical sales representatives. *J Fam Pract.* 1992;34:49-52.
37. Lichstein PR, Turner RC, O'Brien K. Impact of pharmaceutical company representatives on internal medicine residency programs. *Arch Intern Med.* 1992;152:1009-1013.
38. McKinney WP, Schiedermayer DL, Lurie N, Simpson DE, Goodman JL, Rich EC. Attitudes of internal medicine faculty and residents toward professional interaction with pharmaceutical sales representatives. *JAMA.* 1990;264:1693-1697.
39. Lurie N, Rich EC, Simpson DE, et al. Pharmaceutical representatives in academic medical centers. *J Gen Intern Med.* 1990;5:240-243.
40. Peay MY, Peay ER. The role of commercial sources in the adoption of a new drug. *Soc Sci Med.* 1988;26:1183-1189.
41. Bower AD, Burkett GL. Family physicians and generic drugs. *J Fam Pract.* 1987;24:612-616.
42. Haayer F. Rational prescribing and sources of information. *Soc Sci Med.* 1982;16:2017-2023.
43. Stelfox HT, Chua G, O'Rourke K, Detsky AS. Conflict of interest in the debate over calcium-channel antagonist. *N Engl J Med.* 1998;338:101-106.
44. Cho MK, Bero LA. The quality of drug studies published in symposium proceedings. *Ann Intern Med.* 1996;124:485-489.
45. Rochon PA, Gurwitz JH, Simms RW, et al. A study of manufacturer-supported trials of nonsteroidal antiinflammatory drugs in the treatment of arthritis. *Arch Intern Med.* 1994;154:157-163.
46. Anderson JJ, Felson DT, Meenan RF. Secular changes in published clinical trials of second-line agents in rheumatoid arthritis. *Arthritis Rheum.* 1991;34:1304-1309.
47. Davidson RA. Source of funding and outcome of clinical trials. *J Gen Intern Med.* 1986;1:155-158.
48. Hill AB. The environment and disease. *Proc R Soc Med.* 1965;58:295-300.
49. Landefeld CS, Chren MM. Drug companies and information about drugs: recommendations for doctors. *J Gen Intern Med.* 1996;11:642-644.
50. Avorn J, Chen M, Hartley R. Scientific versus commercial sources of influence on the prescribing behavior of physicians. *Am J Med.* 1982;73:4-8.
51. Hemminki E. Content analysis of drug-detailing by pharmaceutical representatives. *Med Educ.* 1977;11:210-215.
52. Wade VA, Mansfield PR, McDonald PJ. Drug companies' evidence to justify advertising. *Lancet.* 1989;2:1261-1263.
53. Canadian Medical Association. Physicians and the pharmaceutical industry (update 1994). *CMAJ.* 1994;150:256A-256F.
54. Royal College of Physicians and Surgeons of Canada. Guidelines for support of continuing medical education by industry. Available at: http://rcpsctest.medical.org/english/public/policy/cme_e.html. Accessed December 8, 1999.
55. Council on Ethical and Judicial Affairs, American Medical Association. Gifts to physicians from industry. *JAMA.* 1991;265:501.
56. Guidelines for faculty involvement in commercially supported continuing medical education. *Acad Med.* 1992;67:615-621.
57. American College of Physicians. Physicians and the pharmaceutical industry. *Ann Intern Med.* 1990;112:624-626.
58. Bickell NA. Drug companies and continuing medical education. *J Gen Intern Med.* 1995;10:392-394.
59. Anastasio GD, Little JM. Pharmaceutical marketing. *Pharmacotherapy.* 1996;16:103-107.
60. Daniel EE, Leedham L. Effect on student attitudes of a program of critical evaluation of claims for drugs. *J Med Educ.* 1966;41:49-60.
61. Ferguson RP. Training the resident to meet the detail men. *JAMA.* 1989;261:992-993.
62. Shear NH, Black F, Lexchin J. Examining the physician-detailer interaction. *Can J Clin Pharmacol.* 1996;3:175-179.
63. Berings D, Blondeel L, Habraken H. The effect of industry-independent drug information on the prescribing of benzodiazepines in general practice. *Eur J Clin Pharmacol.* 1994;46:501-505.
64. Soumerai SB, McLaughlin TJ, Avorn J. Improving drug prescribing in primary care. *Milbank Q.* 1989;67:268-317.

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University Library, on December 23, 2006

▦ ORIGINAL CONTRIBUTION

# Empirical Evidence for Selective Reporting of Outcomes in Randomized Trials
## Comparison of Protocols to Published Articles

An-Wen Chan, MD, DPhil

Asbjørn Hróbjartsson, MD, PhD

Mette T. Haahr, BSc

Peter C. Gøtzsche, MD, DrMedSci

Douglas G. Altman, DSc

S ELECTIVE PUBLICATION OF STUD- ies with statistically significant results has received wide- spread recognition.[1] In con- trast, selective reporting of favorable outcomes within published studies has not undergone comparable empirical investigation. The existence of out- come reporting bias has been widely suspected for years,[2-12] but direct evi- dence is limited to case reports that have low generalizability[13-15] and may them- selves be subject to publication bias.

Our study had 3 goals: (1) to deter- mine the prevalence of incomplete out- come reporting in published reports of randomized trials; (2) to assess the as- sociation between outcome reporting and statistical significance; and (3) to evaluate the consistency between pri- mary outcomes specified in trial pro- tocols and those defined in the pub- lished articles.

## METHODS

In February 2003, we identified proto- cols and protocol amendments for ran- domized trials by reviewing paper files from clinical studies approved by the Scientific-Ethical Committees for Co- penhagen and Frederiksberg, Den- mark, in 1994-1995. This period was

**Context** Selective reporting of outcomes within published studies based on the na- ture or direction of their results has been widely suspected, but direct evidence of such bias is currently limited to case reports.

**Objective** To study empirically the extent and nature of outcome reporting bias in a cohort of randomized trials.

**Design** Cohort study using protocols and published reports of randomized trials approved by the Scientific-Ethical Committees for Copenhagen and Frederiksberg, Denmark, in 1994-1995. The number and characteristics of reported and unre- ported trial outcomes were recorded from protocols, journal articles, and a survey of trialists. An outcome was considered incompletely reported if insufficient data were presented in the published articles for meta-analysis. Odds ratios relating the completeness of outcome reporting to statistical significance were calculated for each trial and then pooled to provide an overall estimate of bias. Protocols and published articles were also compared to identify discrepancies in primary outcomes.

**Main Outcome Measures** Completeness of reporting of efficacy and harm out- comes and of statistically significant vs nonsignificant outcomes; consistency between primary outcomes defined in the most recent protocols and those defined in pub- lished articles.

**Results** One hundred two trials with 122 published journal articles and 3736 out- comes were identified. Overall, 50% of efficacy and 65% of harm outcomes per trial were incompletely reported. Statistically significant outcomes had a higher odds of being fully reported compared with nonsignificant outcomes for both efficacy (pooled odds ratio, 2.4; 95% confidence interval [CI], 1.4-4.0) and harm (pooled odds ratio, 4.7; 95% CI, 1.8-12.0) data. In comparing published articles with protocols, 62% of trials had at least 1 primary outcome that was changed, introduced, or omitted. Eighty-six percent of survey responders (42/49) denied the existence of unreported outcomes despite clear evidence to the contrary.

**Conclusions** The reporting of trial outcomes is not only frequently incomplete but also biased and inconsistent with protocols. Published articles, as well as reviews that incorporate them, may therefore be unreliable and overestimate the benefits of an intervention. To ensure transparency, planned studies should be registered and proto- cols should be made publicly available prior to trial completion.

*JAMA. 2004;291:2457-2465*                                        www.jama.com

**Author Affiliations:** Centre for Statistics in Medi- cine, Institute of Health Sciences, Oxford, England (Drs Chan and Altman), Nordic Cochrane Centre, Copen- hagen, Denmark (Drs Hróbjartsson and Gøtzsche and Ms Haahr), University Health Network, University of Toronto, Toronto, Ontario (Dr Chan). **Corresponding Author:** An-Wen Chan, MD, DPhil, Centre for Statistics in Medicine, Institute of Health Sciences, Old Road, Headington, Oxford, England OX3 7LF (anwen.chan@utoronto.ca).

©2004 American Medical Association. All rights reserved.

SELECTIVE REPORTING OF OUTCOMES IN RANDOMIZED TRIALS

**Table 1.** Hierarchy of Levels of Outcome Reporting

| Levels of Outcome Reporting | Reported Data | Data Sufficient for Inclusion in Meta-analysis |
|---|---|---|
| Full | No. of participants per group<br>Effect size<br>Precision or precise *P* value for<br>    continuous data (see Box)* | Yes |
| Incomplete | | |
|   Partial | Effect size or precision (± sample size<br>    and/or *P* value)† | No |
|   Qualitative | *P* value (± sample size)† | No |
|   Unreported | None | No |

*Precise *P* value enables the calculation of the standard error if the treatment effect and sample sizes are given.
†Items in parentheses indicate "optional" data, ie, those not necessary or not sufficient on their own to meet the requirements for the particular definition.

chosen to allow sufficient time for trial completion and publication. A randomized trial was defined as a prospective study assessing the therapeutic, preventative, adverse, pharmacokinetic, or physiological effects of 1 or more health care interventions and allocating human participants to study groups using a random method. Pharmacokinetic trials measured primarily the kinetics of drug metabolism and excretion; physiological trials, with the exception of preventative trials, examined the effect of interventions on healthy volunteers rather than in the intended disease or at-risk population. Studies were included if they simply claimed to allocate participants randomly or if they described a truly random sequence of allocation. Pseudorandom methods of allocation, such as alternation or the use of date or case numbers, were deemed inadequate for inclusion.

Trials with at least 1 identified journal article were included in our study cohort. Publication in journals was identified by contacting trialists and by searching MEDLINE, EMBASE, and the Cochrane Controlled Trials Register using investigator names and keywords (final search, May 2003). For each trial, we included all published articles reporting final results. Abstracts and reports of preliminary results were excluded.

For each published trial, we reviewed the study protocol, any amendments, and all published articles to extract the trial characteristics, the number and nature of reported outcomes (including statistical significance, completeness of reporting, and specification as primary/secondary), as well as the number and specification of unreported outcomes. Data from amendments took precedence over data from earlier protocols.

An outcome was defined as a variable that was intended for comparison between randomized groups in order to assess the efficacy or harm of an intervention. We prefer the term "harm" rather than "safety" because all interventions can be potentially harmful. Unreported outcomes were those that were specified in the most recent protocol but were not reported in any of the published articles, or that were mentioned in the "Methods" but not the "Results" sections of any of the published articles. Their statistical significance and the reasons for omitting them were solicited from contact authors through a prepiloted questionnaire. We initially asked whether there were any outcomes that were intended for comparison between randomized groups but were not reported in any published articles, excluding characteristics used only for assessment of baseline comparability. We subsequently provided trialists with a list of unreported outcomes identified from our comparison of protocols with published articles. Double-checking of outcome data extraction from a random subset of 20 trials resulted in corrections to 21 of 362 outcomes (6%), 15 of which were in a single trial.

We classified the level of outcome reporting in 4 groups based on data pro-

vided across all published articles of a trial (TABLE 1). A fully reported outcome was one with sufficient data for inclusion in a meta-analysis. The nature and amount of data required to meet this criterion vary depending on the data type (BOX 1). Partially reported outcomes had some of the necessary data for meta-analysis, while qualitatively reported outcomes had no useful data except for a *P* value or a statement regarding the presence or absence of statistical significance. Unreported outcomes were those for which no data were provided in any published articles despite having been specified in the protocol or the "Methods" sections of the published articles.

We defined 2 additional terms to describe relevant composite levels of reporting (Table 1). *Reported outcomes* were defined as those with at least some data presented (full, partial, and qualitative). *Incompletely reported outcomes* were defined as those that were inadequately reported for meta-analysis (partial, qualitative, and unreported).

Analyses were conducted at the trial level and stratified by study design using Stata 7 (Stata Corp, College Station, Tex). Efficacy and harm outcomes were evaluated separately. The reasons given by trialists for not reporting outcomes were tabulated, and the proportion of unreported and incompletely reported outcomes per trial was determined.

For each trial, we tabulated all outcomes in a 2 × 2 table relating the level of outcome reporting (full vs incomplete) to statistical significance ($P<.05$ vs $P≥.05$). Outcomes were ineligible if their statistical significance was unknown. An odds ratio was then calculated from the 2 × 2 table for every trial, except when any entire row or column total was zero. If the table included a single cell frequency of zero or 2 diagonal cell frequencies of zero, we added 0.5 to all 4 cell frequencies.[16,17] Odds ratios greater than 1.0 meant that statistically significant outcomes had a higher odds of being fully reported compared with nonsignificant outcomes. The odds ratios from each trial were pooled using a random-

effects meta-analysis to provide an overall estimate of bias. Exploratory meta-regression was used to examine the effect of funding source, sample size, and number of study centers on the magnitude of bias. Sensitivity analyses were conducted to assess the robustness of the odds ratios when (1) nonresponders to the survey were excluded; (2) pharmacokinetic and physiological trials were excluded; and (3) the level of reporting was dichotomized using a different cutoff (fully or partially reported vs qualitatively reported or unreported).

Finally, we evaluated the consistency between primary outcomes specified in the most recent trial protocols (including amendments) and those defined in the published articles. Primary outcomes consisted of those that were defined explicitly as such in the protocol or published article. If none was explicitly defined, we used the outcome stated in the power calculation. We defined major discrepancies as those in which (1) a prespecified primary outcome was reported as secondary or was not labeled as either; (2) a prespecified primary outcome was omitted from the published articles; (3) a new primary outcome was introduced in the published articles; and (4) the outcome used in the power calculation was not the same in the protocol and the published articles. A discrepancy was said to favor statistically significant results if a new statistically significant primary outcome was introduced in the published articles or if a nonsignificant primary outcome was omitted or defined as nonprimary in the published articles. Discrepancies were verified by 2 independent researchers, with disagreements resolved by consensus. Double-checking resulted in major corrections for 3 of 259 primary outcomes (1%).

## RESULTS

We identified 1403 applications submitted to the Scientific-Ethical Committees for Copenhagen and Frederiksberg, Denmark, in 1994-1995 (FIGURE 1). We excluded 1129 stud-

---

**Box 1. Data Required for Meta-analysis of Fully Reported Outcomes**

**For Unpaired Continuous Data**
Sample size in each group
and
Magnitude of treatment effect (group means/medians or difference in means/medians)
and
Measure of precision or variability (confidence interval, standard deviation, or standard error for means; interquartile or other range for medians) or the precise $P$ value*

**For Unpaired Binary Data**
Sample size in each group
and
Either the numbers (or percentages) of participants with the event for each group, or the odds ratio or relative risk with a measure of precision or variability (confidence interval, standard deviation, or standard error) or the precise $P$ value*

**For Paired Continuous Data**
Sample size in each group
and
Either the raw data for each participant, or the mean difference between groups and a measure of its precision or variability or the precise $P$ value

**For Paired Binary Data**
Sample size in each group
and
Paired numbers of participants with and without events

**For Survival Data**
Either a Kaplan-Meier curve or similar, with numbers of patients at risk over time, or a hazard ratio with a measure of precision and sample size in each group

*Sample sizes, treatment effect, and precise $P$ value enable the calculation of a standard error if a measure of precision or variability is not reported.

---

**Figure 1.** Identification of Published Articles of Randomized Trials Approved by the Scientific-Ethical Committees for Copenhagen and Frederiksberg, Denmark: 1994-1995



©2004 American Medical Association. All rights reserved.

SELECTIVE REPORTING OF OUTCOMES IN RANDOMIZED TRIALS

**Table 2.** Characteristics of the Included Trials (N = 102)

| Characteristic | Trials, No. (%) |
|---|---|
| **Study design** | |
| Parallel-group | 70 (69) |
| Crossover | 30 (29) |
| Other* | 2 (2) |
| **Intervention** | |
| Drug | 77 (75) |
| Surgery/procedure | 11 (11) |
| Counseling/lifestyle | 12 (12) |
| Equipment | 2 (2) |
| **Study centers** | |
| Single | 53 (52) |
| Multiple | 49 (48) |
| **Funding** | |
| Full industry | 56 (55) |
| Partial industry | 17 (17) |
| Nonindustry | 22 (22) |
| None declared | 7 (7) |

*Split-body (n = 1) and factorial (n = 1) trials.

**Figure 2.** Total Number of Outcomes per Trial



ies, primarily because they were not randomized trials or were amendments to studies submitted before 1994. Thirty files (2%) could not be located; it is unclear whether they would have been eligible for inclusion. We found 274 randomized trial protocols, but 172 (63%) were never begun or completed, or were unpublished according to our literature searches and survey of trialists. The final cohort consisted of 102 trials with 122 published articles. Published articles for 48 of the 102 trials were identified by literature search alone, as the trialists did not respond to our request for information (Figure 1).

Trial characteristics are shown in TABLE 2. The majority were of parallel-group design, and most investigated drug interventions. One half were funded solely by industry, and one half were multicenter studies. Published articles for 39% of the trials listed con-

tact authors located at centers outside of Denmark. The median sample size was 151 (10th-90th percentile range, 28-935) for parallel-group trials, and 16 (10th-90th percentile range, 7-43) for crossover trials.

All but 3 trials were published in specialty journals rather than in general medical journals—the latter being defined as those publishing articles from any clinical field. Fifteen trials had more than 1 published article. The publication year of the first article from each of the 102 trials ranged from 1995 to 2003. Two appeared in 1995-1996; 13 in 1997; 52 in 1998-1999; 27 in 2000-2001; 7 in 2002; and 1 in 2003.

Across the 102 trials, we identified 3736 outcomes (median, 27 per trial; 10th-90th percentile range, 7-79) from the protocols and the published articles (FIGURE 2). Ninety-nine trials measured efficacy outcomes (median, 20; 10th-90th percentile range, 5-63 per trial), and 72 trials measured harm outcomes (median, 6; 10th-90th percentile range, 1-31 per trial).

**Prevalence of Unreported Outcomes**

Only 48% (49/102) of trialists responded to the questionnaire regarding unreported outcomes, 86% (42/49) of whom initially denied the existence of such outcomes prior to receiving our list of unreported outcomes. However, all 42 of these trials had clear evidence of unreported outcomes in their protocols and in the published articles. None of the responders added any unreported outcomes to the list we subsequently provided.

Among trials that measured efficacy or harm outcomes, 71% (70/99) and 60% (43/72) had at least 1 unreported efficacy or harm outcome, respectively (ie, outcomes missing in "Results" sections of published articles but listed in the protocols or in the "Methods" sections of the published articles). In these trials, a median of 4 (10th-90th percentile range, 1-25; n=70 trials) efficacy outcomes and 3 (10th-90th percentile range, 1-18; n=43 trials) harm outcomes were unreported.

Among 78 trials with any unreported outcome (efficacy or harm or both), we received only 24 survey responses (31%) that provided reasons for not reporting outcomes for efficacy (23 trials) or harm (10 trials) in their published articles. The most common reasons for not reporting efficacy outcomes were lack of statistical significance (7/23 trials), journal space restrictions (7/23), and lack of clinical importance (7/23). Similar reasons were provided for harm data.

**Prevalence of Incompletely Reported Outcomes**

Ninety-two percent (91/99) of trials had at least 1 incompletely reported efficacy outcome, while 81% (58/72) had at least 1 incompletely reported harm outcome. Primary outcomes were specified for 63 of the published trials, but for 17 (27%) of these trials at least 1 primary outcome was incompletely reported. The median proportion of incompletely reported outcomes per trial was 50% (10th-90th percentile range, 4%-100%) for efficacy outcomes and 65% (10th-90th percentile range, 0%-100%) for harm outcomes (TABLE 3). Incomplete reporting was common even when the total number of measured trial outcomes was low, and was more common for crossover trials than for parallel-group trials (Table 3).

**Association Between Completeness of Reporting and Statistical Significance**

Forty-nine trials could not contribute to the analysis of reporting bias for efficacy outcomes because they had entire rows or columns that were empty in the 2×2 table (analogous to a trial assessing mortality but with no observed deaths); 54 trials were similarly noncontributory for harm outcomes. Included trials were similar to excluded trials, except the former had a lower proportion of crossover trials and a higher number of eligible outcomes per trial. Six hundred ten of 2785 efficacy outcomes (22%) and 346 of 951 harm outcomes (36%) were ineligible for analysis because their statistical sig-

©2004 American Medical Association. All rights reserved.

nificance was unknown; only 11 trial-ists provided information about whether their unreported outcomes were statistically significant.

The odds ratio for outcome reporting bias in each trial is displayed in FIGURE 3. The pooled odds ratio (95% confidence interval) for trials of any design was 2.4 (1.4-4.0) for efficacy outcomes and 4.7 (1.8-12.0) for harm outcomes (TABLE 4). Thus, the odds of a particular outcome being fully reported was more than twice as high if that outcome was statistically significant. Stratifying by study design, or excluding survey nonresponders or physiologic/pharmacokinetic trials, had no important impact on the odds ratios (Table 4). Dichotomizing the level of reporting differently by combining fully reported with partially reported outcomes increased the degree of bias (Table 4). Exploratory meta-regression analysis did not reveal any significant associations between the magnitude of bias and the source of funding, sample size, or number of study centers.

## Consistency Between Primary Outcomes in Protocols and Published Articles

Formal protocol amendments involving study outcomes were submitted to the ethics committee for approval for 7 trials. Most changes involved secondary outcomes, with a primary outcome being formally amended in only 2 trials. Primary outcomes were defined for 82 of the 102 trials (80%), either in the protocol or in the published articles. Among 63 trials defining primary outcomes in their published articles, 39 (62%) defined 1 primary outcome, 7 (11%) defined 2, and 17 (27%) defined more than 2.

Overall, 51 of the 82 trials (62%) had major discrepancies between the primary outcomes specified in protocols and those defined in the published articles (TABLE 5). Specific examples of major discrepancies are shown in BOX 2. For 26 trials, protocol-defined primary outcomes were reported as nonprimary in the published articles,

while for 20 trials primary outcomes were omitted. For 12 trials, outcomes that had been predefined as nonprimary in the protocol were called primary in the published articles. For 11 trials, new primary outcomes that were not even mentioned in the protocol appeared in the published articles. None

**Table 3.** Median Proportion of Incompletely Reported Efficacy and Harm Outcomes per Trial, by Study Design

| Trial Design | No. of Trials | Efficacy Outcomes | No. of Trials | Harm Outcomes |
|---|---|---|---|---|
| | | **Incompletely Reported Outcomes per Trial, Median Percentage (10th-90th Percentile Range)** | | |
| All | 99 | 50 (4-100) | 72 | 65 (0-100) |
| Parallel-group | 68 | 38 (4-78) | 57 | 50 (0-100) |
| Crossover | 29 | 98 (0-100) | 14 | 100 (0-100) |
| Other | 2 | 91 (82-100) | 1 | 71 (NA) |

Abbreviation: NA, not available because cannot be calculated.

**Figure 3.** Odds Ratios for Outcome Reporting Bias Involving Efficacy and Harm Outcomes



Black squares indicate odds ratios; horizontal lines, 95% confidence intervals; diamonds and dashed lines, pooled odds ratios. The size of each square reflects the statistical weight of a trial in calculating the pooled odds ratio, and the relative sizes of the squares are accurate within each plot only.

**Table 4.** Pooled Odds Ratio for Outcome Reporting Bias (Fully vs Incompletely Reported Outcomes), by Study Design and Sensitivity Analyses

| Trial Population | Efficacy Outcomes | | Harm Outcomes | |
|---|---|---|---|---|
| | No. of Trials* | OR (95% CI)† | No. of Trials* | OR (95% CI)† |
| All trials | 50 | 2.4 (1.4-4.0) | 18 | 4.7 (1.8-12.0) |
| Parallel-group trials | 38 | 2.8 (1.5-5.4) | 17 | 5.3 (2.0-14.0) |
| Crossover trials | 11 | 1.4 (0.63-3.2) | 0 | NA‡ |
| Excluding survey nonresponders | 16 | 1.8 (0.73-4.7) | 5 | 3.2 (0.81-13.0) |
| Excluding physiologic/ pharmacokinetic trials | 45 | 2.7 (1.6-4.8) | 18 | 4.7 (1.8-12.0) |
| Fully/partially reported vs qualitatively/ unreported outcomes | 35 | 3.1 (1.7-5.9)§ | 15 | 7.6 (2.3-25.0)§ |

Abbreviations: CI, confidence interval; NA, not available; OR, odds ratio.
*Trials were excluded if an odds ratio could not be calculated due to entire rows or columns being empty in the 2 × 2 table.
†Except for the bottom row, an OR >1 indicates that statistically significant outcomes (P<.05) have higher odds of being fully reported compared with nonsignificant outcomes.
‡Cannot be calculated.
§An OR >1 indicates that statistically significant outcomes (P<.05) have a higher odds of being fully or partially reported compared with nonsignificant outcomes.

©2004 American Medical Association. All rights reserved.

SELECTIVE REPORTING OF OUTCOMES IN RANDOMIZED TRIALS

**Table 5.** Proportion of Trials With Major Discrepancies in the Specification of Primary Outcomes When Comparing Protocols and Published Articles

| Discrepancy in Published Articles Relative to Protocols | Trials With Discrepancies for ≥1 Primary Outcome, No. (%)* |
|---|---|
| Primary outcomes specified in protocols (n = 76 trials) | |
|   Any change to protocol-defined primary outcome | 40 (53) |
|     Reported as nonprimary in published articles | 26 (34) |
|     Omitted from published articles | 20 (26) |
| Primary outcomes specified in published articles (n = 63 trials) | |
|   Any new primary outcome defined in published articles | 21 (33) |
|     Changed from nonprimary in protocol to primary in published articles | 12 (19) |
|     Not mentioned in protocol | 11 (17) |
| Any discrepancy in primary outcome (n = 82 trials)† | 51 (62) |

*Trials often defined >1 primary outcome in protocols and published articles.
†Primary outcomes defined in either protocols or published articles.

---

**Box 2. Examples of Major Discrepancies Between Trial Protocols and Published Articles in the Specification of Primary Outcomes***

Outcome (eg, percentage of patients with severe cerebral bleeding) changed from primary to secondary

Outcome (eg, mean pain intensity) changed from primary to unspecified

Prespecified primary outcome (eg, event-free survival rate) omitted from published reports

Outcome (eg, overall symptom score) changed from secondary to primary

Outcome (eg, percentage of patients with graft occlusion) listed as a new primary outcome (ie, not mentioned in the protocol)

*Specific details of primary outcomes omitted to maintain anonymity.

---

of the published articles for these trials mentioned that an amendment had been made to the study protocol. Sixty-one percent of the 51 trials with major discrepancies were funded solely by industry sources, compared with 49% of the 51 trials without discrepancies.

Among the 51 trials with major discrepancies in primary outcomes, 16 had discrepancies that favored statistically significant primary outcomes in the published articles, while 14 favored nonsignificant primary outcomes (see the "Methods" section for definition of "favored"). Eleven trials had several discrepancies that favored a mixture of significant and nonsignificant results, while for 10 trials the favored direction was unclear due to a lack of survey data about statistical results for unreported primary outcomes.

When published, 38 trials reported a power calculation, but 4 calculations were based on an outcome other than the one used in the protocol. In another 6 cases, there was a power calculation presented in a published article but not in the protocol.

## COMMENT

To our knowledge, this study represents the first empirical investigation of outcome reporting bias in a representative cohort of published randomized trials. The cohort was restricted only by the geographic location of the ethics committee, although many studies involved sites in other countries. A unique feature of the study was our unrestricted access to trial protocols, which provided an unbiased a priori description of study outcomes. Protocols and published reports of systematic reviews have been compared previously,[18,19] but similar assessment of primary research has been limited to case reports.[20-22] a pilot study that required permission from researchers to access their ethics protocols,[2] and a recent study of nonindustry trials con-

ducted by a large oncology research group.[23] Other studies have compared published articles with final reports submitted to drug approval agencies.[24,25]

### Inadequate Outcome Reporting

We found that incomplete outcome reporting is common. On average, more than one third of efficacy outcomes and one half of harm outcomes in parallel-group trials were inadequately reported; the proportions were much higher in crossover studies due to unreported paired data. Even primary outcomes were often incompletely reported. Furthermore, the majority of trials had unreported outcomes, which would have been difficult to identify without access to protocols. Such poor reporting not only prevents the identification and inclusion of many essential outcomes in meta-analyses but also precludes adequate interpretation of the results in individual trials.

Our findings are likely underestimates due to underreporting of omitted outcomes by trialists, with 86% of survey responders initially denying the existence of unreported outcomes despite clear evidence to the contrary. This surprisingly high percentage suggests that contacting trialists for information about unreported outcomes is unreliable, even despite our simply worded questionnaire. We also reviewed all primary and secondary published articles for a trial; if only the primary article had been reviewed, more trial outcomes would have been classified as unreported.

The adoption of evidence-based reporting guidelines such as the revised CONSORT statement[26] for parallel-group trials should help improve poor outcome reporting. The guidelines advise reporting "for each primary and secondary outcome, a summary of results for each group, and the estimated effect size and its precision."[26]

### Complete Outcome Reporting and Statistically Significant Results

Statistically significant outcomes had more than a 2-fold greater odds of being fully reported compared with nonsig-

©2004 American Medical Association. All rights reserved.

nificant outcomes. As an example, an odds ratio of 2.4 corresponds to a case in which 71% of significant outcomes are fully reported, compared with only 50% of nonsignificant outcomes. The degree of bias observed was robust in sensitivity analyses and was not associated with funding source, sample size, or number of study centers. The magnitude of outcome reporting bias is similar to that of publication bias involving entire studies, which was found to be an odds ratio of 2.54 in a meta-analysis of 5 cohort studies.[27]

It should be noted that the estimated magnitude of outcome reporting bias in each trial varied widely (Figure 3); the pooled odds ratio therefore cannot be applied to reliably predict the degree of bias for a given study.

Many trials were excluded from the analysis because odds ratios could not be meaningfully calculated due to empty rows or columns in the $2 \times 2$ table. For example, if a trial did not have any fully reported outcomes, then it was not possible to compare fully reported outcomes with incompletely reported ones. Trials were therefore more likely to be included in the analysis if they had variability in the level of reporting and/or statistical significance across outcomes, such that fewer cells were empty in the $2 \times 2$ table. Accordingly, we found that included trials had a higher number of eligible outcomes and that fewer crossover trials were included, as these often did not contain any fully reported outcomes.

**Unacknowledged Changes to Primary Outcomes**

The purposes of prespecifying primary outcomes are to define the most clinically relevant outcomes and to protect against "data dredging" and selective reporting.[8,28] Also, the primary outcome will generally be used for the calculation of sample size. This protective mechanism is no longer functional if predefined outcomes are subsequently changed or omitted. Despite incorporating into our analyses the few protocol amendments relating to outcomes that were submitted to the eth-

ics committee, we found that 62% of the trials had major discrepancies for primary outcomes.

Although there is little doubt that making major changes to primary outcomes after trial commencement creates the potential for bias, the rationale behind such changes is not always clear. A preference for statistically significant results is one obvious explanation, but since few trialists provided us with the statistical significance of unreported outcomes, we could rarely ascertain whether changes to primary outcomes were made in favor of statistically significant results. Evidence of such bias was observed in one third of the trials with discrepancies in our sample, but many of the remaining trials contained discrepancies that favored a combination of significant and nonsignificant results, while others contained discrepancies that favored unclear directions or nonsignificant results alone.

A second explanation for the occurrence of discrepancies favoring nonsignificant outcomes could be that our analysis did not distinguish which treatment group was favored by the significant difference, and significant results may have been omitted if they favored the control treatment. A third explanation is that the results for other outcomes in the trial may have influenced whether statistical significance was considered important for a particular outcome. For example, an outcome may have been omitted if it was inconsistent with other trial outcomes.

It is also possible that we misclassified some changes as favoring nonsignificant primary outcomes because of our rigid cutoff of $P=.05$ used to distinguish between significant and nonsignificant results, as researchers may regard a P value of .06 as sufficiently interesting to report. In addition, nonsignificance may sometimes have been the desired result, particularly for harm outcomes or equivalence trials.

Furthermore, some of the apparent changes may be attributable to deficiencies in protocols rather than to biased actions of researchers. For example, in 4 of 10 trials in which the

specification of outcomes was changed from unspecified to primary, no primary outcomes were defined in the protocol. In addition, researchers may not have realized that the protocol specifies how the data will be analyzed, and that the term "primary" should refer only to prespecified primary outcomes rather than to outcomes chosen post hoc as having the most importance or interest.

Finally, it is possible that some of the discrepancies occurred for valid reasons. After trial commencement, the omission of a predefined primary outcome can be justified if a logistical obstacle impedes its measurement or if new evidence invalidates its use as a reliable measure. However, the potential for bias still exists whenever changes are made to prespecified outcomes after trial recruitment begins. The reporting of protocol amendments in published articles must therefore be routine to enable a critical evaluation of their validity, as endorsed by the revised CONSORT statement and by other individuals.[29-31] Failure to do so has been described by one journal editor as a "breach of scientific conduct."[32] Unfortunately, none of the trial reports in our cohort acknowledged that major protocol modifications were made to primary outcomes, despite the fact that an agreement between the Danish Medical Association and the Association of the Danish Pharmaceutical Industry explicitly states that "the data analyses upon which the publication is based must be in agreement with the trial protocol, which must describe the statistical methods" (our translation).[33]

**Study Limitations**

The survey response rate was relatively low. The number of unreported outcomes identified would therefore be underestimated. Missing data on statistical significance also necessitated the exclusion of many outcomes from our calculation of odds ratios. However, the questionnaires constituted a secondary source of data, as we relied primarily on more objective information from protocols and published articles. Fur-

SELECTIVE REPORTING OF OUTCOMES IN RANDOMIZED TRIALS

thermore, we assume that trialists would have been more likely to respond if their outcome reporting was more complete and less biased. Any response bias would thus result in conservative estimates of reporting deficiencies in our cohort.

## Implications for Practice and Research

Outcome reporting bias acts in addition to the selective publication of entire studies and has widespread implications. It increases the prevalence of spurious results, and reviews of the literature will therefore tend to overestimate the effects of interventions. The worst possible situation for patients, health care professionals, and policy-makers occurs when ineffective or harmful interventions are promoted, but it is also a problem when expensive therapies, which are thought to be better than cheaper alternatives, are not truly superior.

In light of our findings, major improvements remain to be made in the reporting of outcomes in randomized trials as published. First, protocols should be made publicly available—not only to enable the identification of unreported outcomes and post hoc amendments[30,31,34] but also to deter bias. Ideally, protocols should be published online after initial trial registration and prior to trial completion. Although journals constitute one obvious modality for protocol publication, academic and funding institutions should also take responsibility in providing further venues for disseminating research information.[35]

Second, deviations from trial protocols must be described in the published articles so that readers can assess the potential for bias. Third, journal editors should not only consider routinely demanding that original protocols and any amendments be submitted with the trial manuscript but that this material should also be provided to peer reviewers and preferably be made available at the journal's Web site.[20,21,36]

Finally, trialists and journal editors should bear in mind that most individual trials may well be incorporated

into subsequent reviews. Outcomes that are mentioned in published articles, but are reported with insufficient data, may not always matter when interpreting a single trial report, but they can have an important impact on meta-analyses. Unreported outcomes are even more problematic for both trials and reviews. It is therefore crucial that adequate data be reported for prespecified outcomes independent of their results. The increasing use of the Internet by journals may help to provide the space needed to accommodate such data.[36]

In summary, we found that the reporting of trial outcomes in journals is frequently inadequate to provide sufficient data for interpretation and meta-analysis, is biased to favor statistical significance, and is inconsistent with primary outcomes specified in trial protocols. These deficiencies in outcome reporting pose a threat to the reliability of the randomized trial literature.

**Author Contributions:** Dr Chan had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analyses.
*Study concept and design; analysis and interpretation of data:* Chan, Hróbjartsson, Gøtzsche, Altman.
*Acquisition of data:* Chan, Hróbjartsson, Haahr, Gøtzsche.
*Drafting of the manuscript:* Chan, Gøtzsche, Altman.
*Critical revision of the manuscript for important intellectual content:* Chan, Hróbjartsson, Haahr, Gøtzsche, Altman.
*Statistical expertise; study supervision:* Altman.
*Obtained funding:* Chan, Gøtzsche.
*Administrative, technical, or material support:* Haahr, Gøtzsche, Altman.
**Funding/Support:** Dr Chan was supported by the Rhodes Trust. Dr Altman is supported by Cancer Research UK.
**Role of the Sponsor:** Neither the Rhodes Trust nor Cancer Research UK had any role in any aspect of the study or the manuscript.
**Acknowledgment:** We thank the Scientific-Ethical Committees for Copenhagen and Frederiksberg, who made our study possible by providing access to the trial protocols and by offering administrative support. We also thank the researchers who responded to the questionnaires.

## REFERENCES

1. Song F, Eastwood AJ, Gilbody S, Duley L, Sutton AJ. Publication and related biases. *Health Technol Assess.* 2000;4:1-115.
2. Hahn S, Williamson PR, Hutton JL. Investigation of within-study selective reporting in clinical research: follow-up of applications submitted to a local research ethics committee. *J Eval Clin Pract.* 2002;8:353-359.
3. Bunn F, Alderson P, Hawkins V. Colloid solutions for fluid resuscitation [Cochrane Review on CD-ROM]. Oxford, England: Cochrane Library, Update Software; 2002; issue 4.

4. Hahn S, Williamson PR, Hutton JL, Garner P, Flynn EV. Assessing the potential for bias in meta-analysis due to selective reporting of subgroup analyses within studies. *Stat Med.* 2000;19:3325-3336.
5. Williamson PR, Marson AG, Tudur C, Hutton JL, Chadwick D. Individual patient data meta-analysis of randomized anti-epileptic drug monotherapy trials. *J Eval Clin Pract.* 2000;6:205-214.
6. Davey Smith G, Egger M. Meta-analysis: unresolved issues and future developments. *BMJ.* 1998; 316:221-225.
7. Tannock IF. False-positive results in clinical trials: multiple significance tests and the problem of unreported comparisons. *J Natl Cancer Inst.* 1996;88:206-207.
8. Mills JL. Data torturing. *N Engl J Med.* 1993;329: 1196-1199.
9. Felson DT, Anderson JJ, Meenan RF. Time for changes in the design, analysis, and reporting of rheumatoid arthritis clinical trials. *Arthritis Rheum.* 1990; 33:140-149.
10. Chalmers I. Underreporting research is scientific misconduct. *JAMA.* 1990;263:1405-1408.
11. Gøtzsche PC. Methodology and overt and hidden bias in reports of 196 double-blind trials of nonsteroidal antiinflammatory drugs in rheumatoid arthritis [published correction appears in *Control Clin Trials.* 1989;10:356]. *Control Clin Trials.* 1989;10:31-56.
12. Pocock SJ, Hughes MD, Lee RJ. Statistical problems in the reporting of clinical trials: a survey of three medical journals. *N Engl J Med.* 1987;317:426-432.
13. West RR, Jones DA. Publication bias in statistical overview of trials: example of psychological rehabilitation following myocardial infarction [abstract]. In: Proceedings of the Second International Conference on the Scientific Basis of Health Services and Fifth International Cochrane Colloquium; October 8-12, 1997; Amsterdam, the Netherlands.
14. McCormack K, Scott NW, Grant AM. Outcome reporting bias and individual patient data meta-analysis: a case study in surgery [abstract]. In: Abstracts for Workshops and Scientific Sessions, Ninth International Cochrane Colloquium; October 9-13, 2001; Lyon, France.
15. Felson DT. Bias in meta-analytic research. *J Clin Epidemiol.* 1992;45:885-892.
16. Whitehead A. *Meta-analysis of Controlled Clinical Trials.* Chichester, England: John Wiley & Sons Inc; 2002:216.
17. Deeks JJ, Altman DG, Bradburn MJ. Statistical methods for examining heterogeneity and combining results from several studies in meta-analysis. In: Egger M, Davey Smith G, Altman DG, eds. *Systematic Reviews in Healthcare: Meta-analysis in Context.* 2nd ed. London, England: *BMJ* Books; 2001: 285-312.
18. Higgins J, Thompson S, Deeks J, Altman D. Statistical heterogeneity in systematic reviews of clinical trials: a critical appraisal of guidelines and practice. *J Health Serv Res Policy.* 2002;7:51-61.
19. Silagy CA, Middleton P, Hopewell S. Publishing protocols of systematic reviews: comparing what was done to what was planned. *JAMA.* 2002;287:2831-2834.
20. Goldbeck-Wood S. Changes between protocol and manuscript should be declared at submission. *BMJ.* 2001;322:1460-1461.
21. Murray GD. Research governance must focus on research training. *BMJ.* 2001;322:1461-1462.
22. Siegel JP. Editorial review of protocols for clinical trials. *N Engl J Med.* 1990;323:1355.
23. Soares HP, Daniels S, Kumar A, et al. Bad reporting does not mean bad methods for randomised trials: observational study of randomised controlled trials performed by the Radiation Therapy Oncology Group. *BMJ.* 2004;328:22-24.
24. Melander H, Ahlqvist-Rastad J, Meijer G, Beermann B. Evidence b(i)ased medicine—selective reporting from studies sponsored by pharmaceutical in-

 ©2004 American Medical Association. All rights reserved.

dustry: review of studies in new drug applications. *BMJ.* 2003;326:1171-1173.

**25.** Hemminki E. Study of information submitted by drug companies to licensing authorities. *BMJ.* 1980; 280:833-836.

**26.** Moher D, Schulz KF, Altman DG. The CONSORT statement: revised recommendations for improving the quality of reports of parallel-group randomised trials. *Lancet.* 2001;357:1191-1194.

**27.** Dickersin K. How important is publication bias? a synthesis of available data. *AIDS Educ Prev.* 1997; 9:15-21.

**28.** International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use. ICH Harmonised Tripartite Guideline: statistical principles for clinical trials E9. February 1998. Available at: http://www.ich.org /MediaServer.jser?@_ID=485&@_MODE=GLB. Accessed March 15, 2004.

**29.** Altman DG, Schulz KF, Moher D, et al. The revised CONSORT statement for reporting randomized trials: explanation and elaboration. *Ann Intern Med.* 2001;134:663-694.

**30.** Godlee F. Publishing study protocols: making them more visible will improve registration, reporting and recruitment. *BMC News Views.* 2001;2:4.

**31.** Lassere M, Johnson K. The power of the protocol. *Lancet.* 2002;360:1620-1622.

**32.** Siegel JP. Editorial review of protocols for clinical trials. *N Engl J Med.* 1990;323:1355.

**33.** Agreement on cooperation on clinical trials between physicians and the pharmaceutical industry [in Danish]. Available at: http://www.dadlnet.dk. Accessed September 12, 2003.

**34.** Hawkey CJ. Journals should see original protocols for clinical trials. *BMJ.* 2001;323:1309.

**35.** Lynch CA. Institutional repositories: essential infrastructure for scholarship in the digital age. *Assoc Res Libr Bimonthly Rep.* 2003;226:1-7. Available at: http://www.arl.org/newsltr/226/ir.html. Accessed March 3, 2004.

**36.** Chalmers I, Altman DG. How can medical journals help prevent poor medical research? some opportunities presented by electronic publishing. *Lancet.* 1999;353:490-493.

> Seize the moment of excited curiosity on any subject to solve your doubts; for if you let it pass, the desire may never return, and you may remain in ignorance.
> —William Wirt (1772-1834)

©2004 American Medical Association. All rights reserved.



Online article and related content
current as of June 10, 2009.

# Problems With the Interpretation of Pharmacoeconomic Analyses: A Review of Submissions to the Australian Pharmaceutical Benefits Scheme

Suzanne R. Hill; Andrew S. Mitchell; David A. Henry

*JAMA*. 2000;283(16):2116-2121 (doi:10.1001/jama.283.16.2116)

http://jama.ama-assn.org/cgi/content/full/283/16/2116

| | |
|---|---|
| Correction | Contact me if this article is corrected. |
| Citations | This article has been cited 92 times.<br>Contact me when this article is cited. |
| Topic collections | Statistics and Research Methods; Drug Therapy; Drug Therapy, Other<br>Contact me when new articles are published in these topic areas. |
| Related Articles published in the same issue | Pharmacoeconomic Analyses: Making Them Transparent, Making Them Credible<br>Drummond Rennie et al. *JAMA*. 2000;283(16):2158.<br><br>April 26, 2000<br>*JAMA*. 2000;283(16):2179. |
| Related Letters | Problems in Pharmacoeconomic Analyses<br>Michael Stafford et al. *JAMA*. 2000;284(15):1922. |

Subscribe
http://jama.com/subscribe

Permissions
permissions@ama-assn.org
http://pubs.ama-assn.org/misc/permissions.dtl

Email Alerts
http://jamaarchives.com/alerts

Reprints/E-prints
reprints@ama-assn.org

Downloaded from www.jama.com at Harvard University on June 10, 2009

■■■ ORIGINAL CONTRIBUTION

# Problems With the Interpretation of Pharmacoeconomic Analyses
## A Review of Submissions to the Australian Pharmaceutical Benefits Scheme

Suzanne R. Hill, PhD, FAFPHM

Andrew S. Mitchell, M.Med Sci

David A. Henry, MBChB, FRCP

**C**APPED HEALTH BUDGETS AND rising drug costs have led to a high level of interest in the use of economic analysis for decisions about the purchase and subsidization of new pharmaceutical products.[1] Economic analysis has been adopted by a number of agencies, including national governments and managed health care organizations.[2] The aim of pharmacoeconomic analysis is to relate any improved health outcomes with new drugs (compared with established treatments) to the net costs associated with their use. The results tend to be used to make decisions about the availability, purchase, and pricing of new drugs.

Recognizing the importance of this emerging discipline and the potential for bias, a number of commentators have published guidelines designed to improve the quality of pharmacoeconomic analyses.[3-5] Particular concerns have been the accuracy of the clinical assumptions that underpin economic models and the nature of relationships between commercial sponsors and consultants who are responsible for carrying out the analyses.[5-8]

In Australia, a satisfactory pharmacoeconomic analysis is required for listing new drugs on the federal government's Schedule of Pharmaceutical Benefits.[9] Since the introduction of this requirement in 1993, more than 300 submissions containing pharmacoeconomic analyses have been submitted by the pharmaceutical industry and subjected to detailed appraisal. This article describes the problems that were

**Context**  Pharmacoeconomic analyses are being used increasingly as the basis for reimbursement of the costs of new drugs. Reports of these analyses are often published in peer-reviewed journals. However, the analyses are complex and difficult to evaluate.

**Objective**  To describe the nature of problems encountered in the evaluation and interpretation of pharmacoeconomic analyses used as a basis for reimbursement decisions.

**Data Sources**  All major submissions to the Department of Health and Aged Care (DHAC) by the pharmaceutical industry for funding made under the Australian Pharmaceutical Benefits Scheme. Specifically, the DHAC's database of submissions that were received between January 1994 and December 1997 were reviewed.

**Study Selection**  Of a total of 326 submissions, 218 had serious problems of interpretation and were included in the analysis. The nature of the serious problems reviewed were classified as estimates of comparative clinical efficacy, comparator issues, modeling issues, and calculation errors.

**Data Extraction**  All submissions in the DHAC's database were reviewed and data were extracted if both the DHAC evaluators and technical subcommittee considered problems to have a significant bearing on the decisions of the parent committee.

**Data Synthesis**  Of a total of 326 submissions, 218 (67%) had significant problems and 31 had more than 1 problem. Of the 249 problems identified, 154 (62%) related to uncertainty in the estimates of comparative clinical efficacy, and 71 (28.5%) related to modeling issues, which included clinical assumptions or cost estimates, used in the construction of the economic models. There were 15 instances of disagreement over the choice of comparator, and serious calculation errors were found on 9 occasions. Overall, 159 problems (64%) were considered to be avoidable.

**Conclusions**  Significant problems were identified in these pharmacoeconomic analyses. The intensive evaluation process used in the Australian Pharmaceutical Benefits Scheme allowed for identification and correction of pharmacoeconomic analysis problems, but the resources that are required may be beyond the capacity of many organizations, including peer-reviewed journals.

*JAMA. 2000;283:2116-2121*                                                www.jama.com

**Author Affiliations:** Discipline of Clinical Pharmacology, School of Population Health Sciences, Faculty of Medicine and Health Sciences, The University of Newcastle, New South Wales (Drs Hill and Henry); and Pharmaceutical Evaluation Section, Pharmaceutical Benefits Branch, Department of Health and Aged Care, Woden, Australian Capital Territory (Mr Mitchell), Australia.
**Corresponding Author and Reprints:** David A. Henry, FRCP, Discipline of Clinical Pharmacology, Level 5 Clinical Sciences Bldg, Newcastle Mater Misericordiae Hospital, Waratah, NSW 2298, Australia (e-mail: mddah@mail.newcastle.edu.au).

**For editorial comment see p 2158.**

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University on June 10, 2009

encountered during the evaluation and interpretation of the submissions evaluated between 1994 and 1997. The intention of this article is to discuss the implications of these findings for decision makers and journal editors who have to deal routinely with pharmacoeconomic analyses.

## METHODS

The Australian Pharmaceutical Benefits Scheme and the process for evaluating drugs have been described previously.[10-12] Subsidization of prescription drugs for use in the community (excluding public hospitals) is a Commonwealth (federal) government function. The Pharmaceutical Benefits Scheme is a comprehensive, publicly funded insurance program that reimburses pharmacists for the costs of a selected range of prescription drugs. There is a system of co-payments, and drugs are placed in different categories of access, based on evidence of their comparative effectiveness and cost-effectiveness in defined patient groups. Decisions to place new drugs in the Pharmaceutical Benefits Scheme are made by the federal health minister on the advice of a statutory committee, the Pharmaceutical Benefits Advisory Committee (PBAC). This is made up of family medicine practitioners, specialist physicians, clinical pharmacologists, pharmacists, and a consumer representative. The PBAC receives advice from a technical economics subcommittee comprising individuals with expertise in the fields of health economics, decision analysis, clinical epidemiology, and biostatistics.

Pharmaceutical companies make submissions in support of listing new drugs (or altered indications for existing drugs) to the Department of Health and Aged Care (DHAC). The companies follow guidelines issued by the DHAC,[9] which lay out a detailed format for presenting the necessary data. Analysts, who may be employees of the company or external consultants, prepare the submissions.

Each submission is subjected to detailed evaluation by staff at the DHAC and their consultants. Typically, such an evaluation takes up to 2 person-weeks and involves checking the literature search used in compiling the submission, verification of trial results, validation of key assumptions in models, and confirmation of resource costs according to a manual of Australian costs. Evaluators rerun literature searches, check original clinical sources, and frequently run computer models that are provided by the sponsors. Members of the technical subcommittee of PBAC review the sponsor's submission and the departmental evaluation. The subcommittee produces a summary document outlining key issues and the implications these have for recommendations made by the parent committee. The PBAC considers the sponsor's submission, evaluation, report from the subcommittee, sponsor's response to the evaluation, and views of its members when making its final recommendation to the federal health minister.

The DHAC maintains a database of all applications evaluated since 1994 (TABLE 1). We reviewed submissions received between January 1994 and December 1997.

We regarded problems in the submissions as "significant" if both the evaluators and technical subcommittee considered that the problem could have a significant bearing on the decisions of the parent committee. For instance, a positive recommendation for listing a new drug might be negated if the supporting data did not provide persuasive evidence of superior efficacy (compared with the established treatment), or where correction of a spreadsheet error made a cost-effectiveness ratio unattractive. To categorize the problems we used an article by O'Brien[13] describing some of the difficulties encountered during the conduct of pharmacoeconomic analyses. O'Brien listed 7 serious issues, and we modified these to produce the categorization given in TABLE 2.

The database of submissions and the committee reports were scrutinized by 2 of authors (S.R.H. and D.A.H.). If a problem was noted in the committee report, it was categorized according to Table 2. Differences of opinion between the investigators were resolved by consensus.

Where appropriate, confidence intervals (CIs) for the proportions were calculated using the normal approximation.

In compiling this review we were bound by the secrecy provisions of the Australian National Health Act (1953, § 134A). The secrecy provisions of the act prevent the publication of detailed information that might reveal an individual drug, so we are able to identify drugs only by their clinical indications.

## RESULTS

In the period 1994-1997, the PBAC reviewed 326 major applications. Of these, 182 were applications for new listings on the Pharmaceutical Benefits Scheme, and 51 were applications for major changes in indications, conditions of use, or prices applying to drugs that were already listed. The remainder were resubmissions (where a submission has been rejected previously) or a review of the basis of its pricing negotiations requested by manufacturers.

**Table 1.** Information Held in Database of Submissions to the Australian Pharmaceutical Benefits Scheme

| Category | Details |
|---|---|
| Administrative | Dates of meetings at which the drug was reviewed, type of application |
| About the application | Drug name, indication, comparator, category, type of clinical data used (eg, randomized controlled trial, observational study) use of meta-analysis, outcome measures used in the clinical data and economic analysis |
| Outcomes to the evaluation | Cost-effectiveness ratios, estimates of cost (per patient and to the Pharmaceutical Benefits Scheme) |
| Final outcome of the process | Pharmaceutical Benefits Advisory Committee recommendation |

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University on June 10, 2009

PROBLEMS WITH PHARMACOECONOMIC ANALYSES

**Table 2.** Categorization of Types of Problems Identified in Pharmacoeconomic Analyses Submitted (N = 218) to the Australian PBS, 1994-1997*

| Nature of Problems | Details of Problems | No. (%) of Problems |
|---|---|---|
| Estimate of comparative clinical efficacy (n = 154) | Availability of trials | 12 (4.8) |
| | Poor-quality trials | 31 (12.4) |
| | Analysis of interpretation of trial results | 32 (12.9) |
| | Use of surrogate outcomes | 15 (6.0) |
| | Determining therapeutic equivalence | 64 (25.7) |
| Comparator issues (n = 15) | Uncertainty about choice of comparator or inappropriate comparator | 15 (6.0) |
| Modeling issues (n = 71) | Technical aspects of the model | 24 (9.6) |
| | Unsubstantiated assumptions | 15 (6.0) |
| | Uncertainty about costs | 32 (12.9) |
| Calculation errors (n = 9) | Errors that introduced serious inaccuracies in the estimation of the cost-effectiveness ratios | 9 (3.6) |
| **Total** | | **249 (100)** |

*PBS indicates Pharmaceutical Benefits Scheme. Some submissions had more than 1 problem. Percentages do not sum to 100 because of rounding.

## Sources of Clinical Data

Of 326 submissions, 279 (86% [95% CI, 82%-89%]) contained economic analyses based on the results of randomized trials. A total of 238 submissions (73% [95% CI, 68%-78%]) contained head-to-head trial comparisons of the new agent and the chosen comparator. In 41 cases the comparisons between the new drug and comparator were made by considering the results of 2 sets of a trials with a common reference, usually placebo. Twenty-six submissions were based on quasi-experimental designs, and 21 were based on uncontrolled data. In all, 64 submissions (19.6%; 95% CI, 15%-24%) based their estimates of comparative clinical effectiveness on the results of meta-analyses. Of these, 17 were published meta-analyses; during the last year of this survey (1997), 2 of these were drawn from the Cochrane Library.

## Overview of the Database

Of 326 submissions, 218 (67% [95% CI, 62%-72%]) were considered to have presented serious problems of interpretation. Thirty-one submissions had more than 1 problem. The proportion of submissions with problems did not change over time: 69.7% in 1994, 69.2% in 1995, 63.1% in 1996, and 65.9% in 1997. A total of 249 serious problems were identified; the numbers in each category are summarized in Table 2. Overall, 159 problems (64%; 95% CI,

58%-70%) were considered to have been avoidable during the planning and conduct of the pharmacoeconomic analysis.

## Problems With Estimates of Comparative Clinical Efficacy

Problems in this category reflected uncertainty about the magnitude of any clinical benefit of the new drug compared with existing agents. The weight given to this reflects the priority the PBAC gives to establishing the comparative clinical performance of new drugs before making a judgement regarding their economic performance.

**Availability of Trials.** In a number of submissions, including those relating to drugs for Parkinson disease, breast cancer, and ovarian cancer, no randomized trial was available, and data from uncontrolled studies were used to estimate comparative cost-effectiveness. The magnitude of benefit of each drug had to be inferred from uncontrolled comparisons of series of patients receiving the drug of interest or the comparator. In some cases, data from a case series involving the new agent were compared with the outcomes from the single arm of a randomized controlled trial involving the comparator.

In a further group that included drugs for the treatment of chemotherapy-induced vomiting, glaucoma,

asthma, intermittent claudication, and bacterial vaginosis, difficulties arose because of incomplete presentation of potentially relevant trials. Literature searches performed by the evaluators identified randomized trials that were relevant to the clinical comparison in the economic analyses, but had not been mentioned by the sponsor. The data from these trials modified, and in some cases contradicted, the claims made by the sponsor.

**Poor-Quality Trials.** In 31 submissions that included treatments for cancer, insomnia, osteoporosis, and osteoarthritis, the key clinical trials had serious methodological flaws. For example, a submission for a new drug claimed that it had a lower rate of adverse effects, but this was based on an open-label trial with an inadequate sample size and unblinded assessment of subjective outcomes.

**Analysis and Interpretation of Trial Results.** The statistical analyses carried out in submissions were often complex and involved a range of meta-analytic techniques, subgroup analyses, or reanalyses of clinical trial data. Problems included inappropriate subgroup analysis, inappropriate adjustment of event rates, and problems with statistical pooling of data.

Approximately 20% of submissions used meta-analyses of the results of several randomized trials to estimate the comparative clinical benefit of the new drug. In 3 instances, involving drugs for diabetes, osteoporosis, and human immunodeficiency virus (HIV) infection, difficulties were encountered when interpreting pooled data from crossover trials.

In a group of submissions including drugs to treat psychosis and eradicate *Helicobacter pylori*, problems arose while linking the evidence from the randomized trials to the proposed indication. This was because the proposed use was for "second-line" treatment (at a higher proposed price), whereas the trials had been conducted in a "first-line" setting. It was not clear that patients with more severe or "resistant" disease would respond in the same way

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University on June 10, 2009

as those who had been included in the randomized trials.

A number of submissions, including drugs for cancer, asthma, prevention of thromboembolic disease, and treatment of respiratory tract infections, were based on claims that the new products were superior to the comparators. The trials were considered to be of a satisfactory standard, but evaluators disagreed with the sponsors' claims. There were 2 common explanations—the trials were insufficiently powered to show differences between 2 active treatments, or the demonstrated differences in outcomes were considered to be clinically insignificant.

Use of Surrogate Outcomes. Evaluation was sometimes hampered by reliance on surrogate outcomes. Examples included submissions for drugs for dementia that used measures of cognitive function rather than measures of social coping; drugs for Paget disease of bone, where biochemical tests were used rather than symptoms or measures of disability; and urinary flow rates and lower urinary tract symptom scores in men undergoing treatment for benign prostatic hypertrophy, rather than reduction in surgery or prevention of progression to renal failure.

Determining Therapeutic and Dose Equivalence. The most frequent problem involved determining whether the available data for a new product supported the manufacturer's claim that the product was therapeutically equivalent to a comparator. There were also difficulties in determining therapeutically equivalent doses. The latter is important during price setting by cost minimization analysis.

In many cases, including drugs for hypercholesterolemia, Paget disease, and hormone replacement therapy, the uncertainty was because trials were too small to exclude clinically significant differences or were conducted over too short a time. In assessing dose equivalence, difficulties arose because of the design of the comparative trials, for example, a comparison of fixed doses of 1 product with variable doses of the comparator.

## Choice of Comparator

The Australian guidelines request sponsors to use as comparator the "treatment most likely to be replaced" by the new therapy. There were 15 examples, involving drugs for Parkinson disease, epilepsy, infectious diseases, and osteoporosis, in which there were disagreements regarding the correct choice of comparator. In some cases, no comparator was nominated, and no comparative data were provided. In other cases, the comparator that was nominated was the least prescribed and most expensive alternative.

When there are no randomized trials that directly compare the new drug and the comparator, the Australian guidelines advise companies to base their submission on the results of an indirect comparison. This involves 2 sets of trials, with placebo or another active drug as a common reference. Assessing equivalence or superiority in this situation has proved difficult because of confounding at study level and variation in the baseline severity of disease in the control groups of the respective trials. Examples of this type of problem include anticonvulsant drugs and drugs for Parkinson disease and HIV infection.

## Modeling Issues

Technical Aspects of Model. These problems involved examples such as discounting costs but not benefits (*discounting* is the technique used in economic evaluation to calculate the present values of costs and consequences of an intervention, given that the effects of the intervention may occur in the future rather than the present[14]), failing to relate costs and outcomes appropriately, and uncertainties arising from extrapolating benefits seen in a short-term trial over the lifetime of the patient. More recent submissions have used models based on willingness-to-pay studies and time-trade-off analyses. Problems identified in this group in particular have included inappropriate questionnaire design and inadequate sample size.

Unsubstantiated Assumptions. Two main issues emerged in this group. In

submissions that involved preventive treatments in osteoporosis, hypertension, and hypercholesterolemia the models provided estimates of benefit that were biologically implausible and unsupported by controlled clinical data. The second problem was the derivation of utility estimates from insignificant or uncertain clinical data. This was evident in several submissions for cancer therapies and also for drugs used in the treatment of symptoms of relatively benign conditions, such as minor infections.

Estimation and Incorporation of Costs. In some instances, cost offsets were unduly optimistic, without supporting data, or benefits and associated cost savings were overestimated because of inappropriate or truncated analyses. Lack of transparency in the calculation of costs and outcomes was a significant problem, despite the fact that the submissions usually contained copies of spreadsheets or models.

## Calculation Errors

These problems included failure to calculate an incremental ratio correctly, unbalanced numbers of patients assigned to alternative treatments in a model, and simple spreadsheet errors that resulted in a product being erroneously portrayed as dominant.

## COMMENT

Establishing a formal link between measures of costs and outcomes of drug therapy is an appealing approach to drug purchasing decisions. This comes closer to the notion of a true "market" than alternatives, such as leaving manufacturers to obtain the highest prices from poorly informed purchasers or government control of profits as practiced in the United Kingdom.[15] The variations seen in the prices of very similar drugs in many countries[16] reflect a degree of market failure. This arises when purchasers or insurers use imperfect tools to assess the community's needs, the extent to which a range of drugs meets these needs, and at what price. There are strong arguments for linking purchasing and pricing decisions to the therapeutic perfor-

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University on June 10, 2009

PROBLEMS WITH PHARMACOECONOMIC ANALYSES

mance of drugs; this is the central argument for the use of pharmacoeconomic analysis. Our experience indicates that even when operating under a prescriptive regime, with clear guidelines underpinned by strong legislation, problems frequently arose during the conduct and interpretation of pharmacoeconomic analyses.

The bulk of problems concerned the interpretation of comparative clinical data. Drug development programs mainly are designed to meet the needs of drug regulatory authorities. Standards for evaluating efficacy, toxicity, and manufacturing quality are well established.[17,18] These represent an attempt to balance the need for adequate evidence on efficacy, safety, and quality with the desire of the community for rapid access to important new drugs and the commercial interest of manufacturers in obtaining licensing approval as soon as possible. Pharmacoeconomic data are used in an environment that is competitive and market driven. The desire of manufacturers is to show new products in the most favorable light and establish an advantage over their competitors. Unfortunately, the highest-quality data are sometimes suboptimal for performing analyses of comparative efficacy and costs.[19] The Australian guidelines provide a rationale for choosing the most appropriate comparator when conducting pharmacoeconomic analyses. Typically, it is the drug most likely to be replaced by a new product. This depends on local factors, and high-quality comparative trials of the new drug and this comparator may not be available. The unsuitability of the available data and the desire of companies to get their drugs to market sometimes lead to claims of superiority over competitors that are not supported after close examination of the clinical data.

Our impression is that analysts involved in the design and conduct of pharmacoeconomic analyses can have difficulty substantiating claims made by companies regarding the comparative clinical performance of their products. We found that estimates of clinical performance were sometimes based on uncontrolled studies, including case series, comparisons of single arms from different trials, or inadequately conducted comparative trials. Companies often relied on indirect comparisons, made through 2 sets of trials with a common comparator (eg, placebo). The Australian guidelines encourage the use of such evidence when direct comparative trials are unavailable; however, estimates of comparative performance are highly likely to be confounded by factors that are unequally distributed between the different study populations. Flawed estimates of comparative clinical performance were sometimes used to justify a claim for higher prices. Some of these claims violated well-established rules of epidemiological and statistical inference.

We believe that our experiences revealed no basic intention to deceive. The occasional failure to present relevant trials became less common after the guidelines made full disclosure a requirement. Where there were errors, for instance simple numerical miscalculations, or mistakes in transcribing probabilities into a decision tree, they were readily detected by examination of the spreadsheets and probably reflected inadequate quality control. Most of the problems related to interpretation of clinical data. It seemed that company employees had optimistic views of their product's performance, and analysts had to make do with suboptimal and poorly designed studies when making inferences regarding comparative clinical performance. Complex modeling techniques do not overcome fundamental deficiencies in clinical data.

Despite these concerns, which have been voiced in other review articles,[6,8,20] the use of economic analyses as an aid to making decisions about allocating resources in health care is increasing. A number of jurisdictions now have published guidelines for economic analysis, and organizations such as health maintenance organizations and national and provincial governments are considering results of analyses when making assessments about new pharmaceuticals and health technologies.[21,22]

In light of our experience, do we support the widespread use of pharmacoeconomics in decision making? Overall our answer is yes, but this requires important qualification. Clearly, there are many methodologic issues that need to be considered in the evaluation of these analyses. Initially, we were surprised at the number of submissions that had significant methodologic problems. Over time we formed the view that this was not unexpected given the nature of the process, which requires a complicated synthesis of data from a variety of sources. The problems we report here had the potential to distort the estimate of the cost-effectiveness ratio for each product and therefore the decisions that were based on the interpretation of this parameter. It should be noted that other factors are considered in the decision-making process, such as clinical need, equity of access, "rule of rescue" (*rule of rescue* is the desire of most societies to spend large amounts of money to save individuals who are in extreme danger; applied to drugs, it means accepting some cost-ineffective interventions for patients with rare catastrophic illnesses who have no other treatment options), and the total cost to the health care system, so that a flawed evaluation did not necessarily lead to the drug being rejected for subsidy.

The evaluation process that identified these problems was demanding and required (typically) close examination of the data by several staff members with training in clinical epidemiology and health economics. Sometimes identification of key issues required examination and reanalysis of source data; sometimes it required examination of a spreadsheet. Because we were working within a national program for reimbursement of pharmaceuticals (annual expenditure >Aus $3 billion) it was possible to direct the resources needed to evaluate these analyses fully. In many cases, the analyses were corrected to allow a recommendation about reimbursement to be made by the parent committee.

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University on June 10, 2009

In our view, any agency or organization that wishes to make formal use of pharmacoeconomic data must appreciate the intensity of the evaluation process that is necessary to ensure that decisions are based on accurate data. We doubt whether any conventional peer-review process is adequate. Such concerns have been expressed by others, and a recently published article and editorial have pointed to possible bias in the qualitative conclusions in pharmacoeconomic analyses published by academic investigators.[7,23-26] Published pharmacoeconomic analyses are subject to the same constraints as any scientific study. They have to comply with journal space requirements that limit the presentation of relevant data. Complex models and calculations and details of assumptions and methods have to be truncated to comply with journal and editorial requirements. Referees are seldom provided with the computer models, and most will not have the time or inclination to run them. A 10-page manuscript is in stark contrast to the 2- and 3-volume (400-page) submissions containing the details of the economic evaluations that are routinely evaluated for the Australian Pharmaceutical Benefits Scheme.

As mentioned earlier, we do not believe that the problems identified in the review were deliberately introduced. Most of the problems were the result of the intrinsically complex nature of economic analyses and genuine differences of opinion about how to interpret the results of clinical trials. This makes it important for full details of analyses to be available to reviewers, readers, and decision makers, so that they can make informed judgments regarding analysis validity. In our view, conventional publication in peer-reviewed journals is not a realistic means of meeting this requirement.

**Funding/Support:** This work was supported by a grant from the Commonwealth Department of Health and Aged Care.

## REFERENCES

**1.** Pausjenssen AM, Detsky AS. Guidelines for measuring the costs and consequences of adopting new pharmaceutical products: are they on track? *Med Decis Making.* 1998;18(suppl 2):S19-S22.
**2.** Mullins CD, Ogilvie S. Emerging standardization in pharmaco-economics. *Clin Ther.* 1998;20:1194-1202.
**3.** Drummond MF, Jefferson TO, on behalf of the BMJ Economic Evaluation Working Party. Guidelines for authors and peer reviewers of economic submissions to the *BMJ. BMJ.* 1996;313:275-283.
**4.** Task Force on Principles for Economic Analysis of Health Care. Economic analysis of health care technology: a report on principles. *Ann Intern Med.* 1995; 123:61-70.
**5.** Kassirer JP, Angell M. The Journal's policy on cost-effectiveness analyses. *N Engl J Med.* 1994;331:669-670.
**6.** Udvarhelyi IS, Colditz GA, Rai A, Epstein AM. Cost-effectiveness and cost-benefit analyses in the medical literature: are the methods being used correctly? *Ann Intern Med.* 1992;116:238-244.
**7.** Schulman K, Sulmasy DP, Roney D. Ethics, economics, and the publication policies of major medical journals. *JAMA.* 1994;272:154-156.
**8.** Freemantle N, Maynard A. Something rotten in the state of clinical and economic evaluations? *Health Econ.* 1994;3:63-67.
**9.** Commonwealth Department of Human Services and Health. *Guidelines for the Pharmaceutical Industry on Preparation of Submissions to the Pharmaceutical Benefits Advisory Committee Including Major Submissions Involving Economic Analyses.* Canberra: Australian Government Publishing Service; 1995.
**10.** Henry D. Economic analysis as an aid to subsidisation decisions: the development of the Australian Guidelines for Pharmaceuticals. *Pharmacoeconomics.* 1992;1:54-67.
**11.** Drummond MF. Basing prescription drug payment on economic analysis: the case of Australia. *Health Aff (Millwood).* 1992;11:191-196.
**12.** Sketris IS, Hill S. The Australian national publicly subsidized Pharmaceutical Benefits Scheme: any lessons for Canada? *Can J Clin Pharmacol.* 1998;5:111-118.
**13.** O'Brien B. Economic evaluation of pharmaceuticals: Frankenstein's monster or vampire of trials [review]? *Med Care.* 1996;34(12 suppl):DS99-DS108.
**14.** Gold MR, Siegel JE, Russell LB, Weinstein MC, eds. *Cost-effectiveness in Health and Medicine.* New York, NY: Oxford University Press; 1996.
**15.** Freemantle N, Henry DA, Maynard A, Torrance GW. Promoting cost-effective prescribing: Britain lags behind. *BMJ.* 1995;310:955-956.
**16.** Industry Commission. *The Pharmaceutical Industry.* Canberra: Australian Government Publishing Service; 1996. Appendix H, Report 51.
**17.** Horwitz RI, Singer BH, Makuch RW, Viscoli CM. Can treatment that is helpful on average be harmful to some patients? a study of the conflicting information needs of clinical inquiry and drug regulation. *J Clin Epidemiol.* 1996;49:395-400.
**18.** Kessler DA, Feiden KL. Faster evaluation of vital drugs. *Sci Am.* March 1995:26-32.
**19.** Fayers PM, Hand DJ. Generalisation from phase III clinical trials: survival, quality of life, and health economics. *Lancet.* 1997;350:1025-1027.
**20.** Drummond M, Brandt A, Luce B, Rovira J. Standardizing methodologies for economic evaluation in health care: practice, problems and potential. *Int J Technol Assess Health Care.* 1993;9:26-36.
**21.** Battista RN, Hodge MJ. The development of health care technology assessment: an international perspective. *Int J Technol Assess Health Care.* 1995;11:287-300.
**22.** Baladi JF, Menon D, Otten N. Use of economic evaluation guidelines: 2 years' experience in Canada. *Health Econ.* 1998;7:221-227.
**23.** Jefferson T, Demicheli V. Are guidelines for peer-reviewing economic evaluations necessary? a survey of current editorial practice. *Health Econ.* 1995;4:383-388.
**24.** Jefferson T, Demicheli V, Entwistle V. Assessing quality of economic submissions to the *BMJ. BMJ.* 1995;311:393-394.
**25.** Friedberg M, Saffran B, Stinson TJ, Nelson W, Bennett CL. Evaluation of conflict of interest in economic analyses of new drugs used in oncology. *JAMA.* 1999; 282:1452-1457.
**26.** Krimsky S. Conflict of interest and cost-effectiveness analysis [editorial]. *JAMA.* 1999;282: 1474-1475.

©2000 American Medical Association. All rights reserved.

Downloaded from www.jama.com at Harvard University on June 10, 2009

## SPECIAL ARTICLES

# Association of Funding and Findings of Pharmaceutical Research at a Meeting of a Medical Professional Society

Thomas E. Finucane, MD, Chad E. Boult, MD, MPH, MBA

**PURPOSE:** To evaluate the association between funding and findings of pharmaceutical research presented at an annual meeting of a medical professional society.
**METHODS:** We reviewed the abstracts of all papers and posters presented at the annual meeting of a medical professional society. Two independent raters classified each study of a drug (n = 48) as either positive (favoring the drug studied) or negative, and as either funded by a pharmaceutical company or not. We computed $\kappa$ and chi-squared statistics to evaluate the agreement between the raters, as well as the association between the results and the sponsorship of the study.
**RESULTS:** Thirty studies of drugs (63%) were supported by pharmaceutical companies, all of which reported positive results. Of the 18 studies (37%) not supported by pharmaceutical companies, 67% reported positive results. The association between pharmaceutical funding and positive findings was statistically significant ($P = 0.0007$).
**CONCLUSION:** At this scientific meeting, research funding from pharmaceutical companies was associated with study findings that supported the use of drugs marketed by pharmaceutical sponsors. We emphasize further study of this relation and suggest three principles—full disclosure, policies against "outcome bias," and educational opportunities—that may help manage industry-academia conflicts of interest that could otherwise jeopardize the credibility of pharmaceutical research presented at scientific meetings. **Am J Med. 2004;117: 842–845.** ©2004 by Elsevier Inc.

Many studies of commercial products are submitted for possible presentation at the annual meetings of medical professional societies. Those that are accepted and presented earn scientific credibility and are often cited in commercial promotional materials designed to influence the prescribing behavior of physicians (1). The results of one to two thirds of such presentations are later published in journals. Similar to articles published in journals, presentations at meetings may be vulnerable to scientific bias resulting from conflict between scientific impartiality and the financial interests of the study's funders.

Intense debate in the past decade has helped to define several potential conflicts of interest confronting academic institutions (2–3) and scientific investigators (4–9) who have financial relationships with companies that market the products that they study. A systematic review of 1664 English-language articles and a meta-analysis of data from 37 articles described the extent of such financial relationships as widespread, the effects on the quality as slight, and the outcomes of company-sponsored research as substantial (10,11). Peer-reviewed articles about company-sponsored studies are more likely to report outcomes favorable to the commercial sponsors than are articles about non–company-sponsored studies (odds ratio [OR] = 3.6; 95% confidence interval [CI]: 2.6 to 4.9) (10). Similarly, a review of 3351 articles not restricted to the English language reported that studies sponsored by pharmaceutical companies were more likely to report outcomes favoring the sponsor than were studies with other types of sponsors (OR = 4.1; 95% CI: 3.0 to 5.5) (11).

Although there is extensive literature dealing with conflict of interest and potential scientific bias in journal articles, there is a dearth of quantitative studies addressing the extent of industry support for research presented at scientific meetings of medical professional societies, as well as examining the association of such support with the quality or outcomes of the studies presented. This lack may be attributable, at least in part, to the paucity of available data on such presentations. Nevertheless, thousands of studies, many of which are industry sponsored, are presented annually as lectures and posters at scores of medical professional society meetings. We therefore un-

From the Division of Geriatric Medicine and Gerontology (TEF), Department of Medicine, Johns Hopkins School of Medicine, and Division of Health Services Research (CEB), Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland.
Requests for reprints should be addressed to Thomas E. Finucane, MD, Division of Geriatric Medicine and Gerontology, John R. Burton Pavilion, 5505 Hopkins Bayview Circle, Baltimore, Maryland 21224, or tfinucan@jhmi.edu.
Manuscript submitted March 2, 2004, and accepted in revised form May 20, 2004.

0002-9343/04/$–see front matter
doi:10.1016/j.amjmed.2004.05.029

dertook the present study as a preliminary investigation of the possible association between funding by pharmaceutical companies and the outcomes of drug studies presented at the annual scientific meeting of one medical professional society.

## METHODS

We reviewed the abstracts of all the reports presented as posters or lectures at the annual scientific meeting of a clinically oriented U.S. medical professional society. We selected for analysis all abstracts that reported results about the effectiveness or safety of drugs. Two experienced raters independently classified each abstract according to its findings. A third experienced rater was available to adjudicate any discordant classifications. The study was classified as "positive" if the abstract concluded that a drug was safe, effective, or superior to another drug in safety or effectiveness, or "negative" if the conclusion was that a drug caused unacceptable adverse effects, failed to produce hypothesized therapeutic effects, or led to adverse events or therapeutic effects that were statistically indistinguishable from or less desirable than an alternative drug.

To classify each study with regard to industry support, the raters classified each abstract according to two criteria. They classified a study as industry supported if there was acknowledgment of receipt of a grant from a pharmaceutical company, or if at least one author was affiliated with a pharmaceutical company or a private research corporation that was supported by the pharmaceutical industry. To clarify the source of support for the 17 studies that met neither criterion, their authors were contacted by telephone or e-mail and asked "What organization funded the study?" If the authors denied having received pharmaceutical support (n = 9) or did not respond (n = 4), the studies were classified as not industry supported.

This study was "exempt" from detailed review by the Institutional Review Board of the Johns Hopkins Bloomberg School of Public Health.

### Data Analysis

Agreement between the raters was assessed with the $\kappa$ statistic. The chi-square test was used to evaluate the association between study results and sponsorship.

## RESULTS

Of the 619 abstracts submitted for possible presentation at the meeting, the conference reviewers rated 526 as scientifically suitable for presentation: 481 as posters and 45 as lectures. Of the 520 studies presented (six were withdrawn by their authors for unspecified reasons), 48 reported results of studies on the safety or effectiveness of medications. Most were nonrandomized observational studies (n = 20) or randomized clinical trials (n = 20).

The level of agreement between the two raters in classifying the findings (positive or negative) and source of funding (industry supported or not) for the 48 studies was complete ($\kappa = 1.0$). Thirty (63%) of the 48 studies were industry supported, and all 30 reported results that were favorable to a drug marketed by the pharmaceutical sponsor. Eighteen (37%) of the studies were not industry supported; of these, 12 (67%) had positive results and six (33%) had negative results. The association between industry support and the reporting of results favorable to a product of the sponsor was statistically significant ($P = 0.0007$). The same association was evident among subgroups composed of randomized clinical trials ($P < 0.05$) and observational studies ($P < 0.05$).

Of the 30 industry-supported studies, three (10%) acknowledged grant support in their abstracts. Another 23 studies (77%) named a pharmaceutical company as the institutional affiliation of one or more of the authors. Four studies (13%) named a private research corporation or university as the institutional affiliation of one or more authors, which, according to the authors, received study support from the manufacturer of the drug studied.

## DISCUSSION

These data show a strong association between pharmaceutical funding and the findings of studies of drugs presented at the annual scientific meeting of a medical professional society. All of the industry-supported studies reported results that were favorable to the sponsor; many will probably be published later as articles in scientific journals.

Three well-known forms of bias may have contributed to the findings reported here. "Positive outcome" bias is the tendency for reviewers and editors to select for presentation or publication studies that report positive findings. This bias can affect both the selection of abstracts for presentation at scientific meetings (12) and the selection of manuscripts for subsequent publication in scientific journals (13).

A second set of biases may result from the efforts of pharmaceutical companies to promote their products, which may be in conflict with the scientific impartiality among institutional decision-makers (3) and individual investigators (10). These efforts may include supporting biased study designs (e.g., those that include nonequivalent comparison interventions) (14,15), controlling access to and analysis of study data, and censoring or "spinning" the results (16–18).

A third potential bias may stem from conflicts between investigators' duty to conduct research objectively and

their desire for professional recognition (e.g., by granting agencies and academic promotion committees) and financial reward. In some cases, the scientific objectivity of investigators may be threatened by their opportunities to publish "positive studies" and to receive industry funding, equipment, supplies, stock options, consultancies, and membership in speakers' bureaus and advisory boards.

An alternate explanation for the observed association between funding and findings involves the sequence in which drugs are tested. For instance, the findings presented at meetings of professional societies may come from studies of drugs that have shown effectiveness and safety in premarketing trials, while further studies of less successful drugs may have been curtailed.

Factors that limit the inferences that can be drawn from our study include the sample size (data from only one meeting of one professional society), the inability to rule out definitively pharmaceutical support of six negative studies, and incomplete information on the quality of the studies that were presented and on the abstracts that were rejected or withdrawn from presentation at the meeting.

A strong relation between pharmaceutical support and the outcomes of drug studies pervades the printed scientific literature (10). Therefore, our finding of an analogous relation at the annual meeting of one medical professional society suggests the possibility that the same association may exist at other meetings. To help manage the conflicts of interest inherent in research conducted collaboratively by industry and academia, professional societies (19,20), academic organizations (21), governmental agencies (22), journal editors (23), and industry representatives (24) have published general guidelines. For example, some journals refuse to publish such collaborative studies if the investigators lacked complete access to all of the data. Similarly, the American College of Physicians–American Society of Internal Medicine's 2002 position paper on organizational issues related to physician-industry relations recommends that medical professional societies "develop and enforce explicit policies that preserve the independent judgment and professionalism of their members and maintain the ethical standards and credibility of the society" and "conduct professional meetings in a highly principled manner" and that product promotion activities (e.g., displays and sponsored lectures) be located and identified as "independently organized and separate from official scientific sessions" (20).

A recent review revealed, however, that fewer than half of U.S. academic institutions, federal sponsors of research, and peer-reviewed journals enforce the guidelines promulgated to help manage these complex relationships (10). The degree to which medical professional societies adhere to such guidelines in selecting research for presentation at their annual meetings has not been reported.

If the association we observed between industry funding and the reporting of positive findings at scientific meetings is widespread, it could have adverse consequences for consumers, physicians, insurers, and professional societies. We propose three principles that medical professional societies may wish to consider adopting to maintain the integrity of presentations about commercial products at their scientific meetings.

## Full Disclosure

In the review process, the authors, reviewers, and judges of studies of commercial products would disclose their financial relationships with companies that market the products studied (25). Abstracts would include addenda stating who designed the study, collected and managed the data, conducted the analyses, and reported the results. Reviewers and judges would acknowledge actual and potential conflicts of interest or recuse themselves from the selection process when appropriate. Studies selected for presentation as lectures or posters would disclose the authors' financial and operational relationships with the companies that market the products studied. Medical professional societies would disclose their financial relationships with private companies as well. Such disclosure may help to manage conflicts of interest, although by itself such disclosure would be insufficient. For maximal effect, disclosure would be conducted in the context of well-publicized high ethical standards, clear distinctions between acceptable and unacceptable behaviors, systematic monitoring of adherence, and sanctions to ensure compliance (26).

## Policies Against "Outcome Bias"

Professional societies would adopt and communicate to their members, reviewers, judges, and editors clear policies promoting acceptance of abstracts on the basis of scientific merit, without regard for whether the study outcomes were positive or negative.

## Educational Opportunities

Professional societies would offer lectures, panel discussions, and debates at their annual meeting to acquaint their members with the challenges of recognizing and understanding conflict of interest and scientific bias in research findings that may influence their teaching and patient care.

## ACKNOWLEDGMENT

The authors gratefully acknowledge the assistance of David McCaffrey in collecting, classifying, and managing the data.

## REFERENCES

1. Wyatt J. Use and sources of medical knowledge. *Lancet*. 1991;338: 1368–1373.

2. Angell M. Is academic medicine for sale? *N Engl J Med*. 2000;342: 1516–1518.

3. Johns MM, Barnes M, Florencio PS. Restoring balance to industry-academia relationships in an era of institutional financial conflicts of interest: promoting research while maintaining trust. *JAMA*. 2003;289:741–746.

4. Thompson DF. Understanding financial conflicts of interest. *N Engl J Med*. 1993;329:573–576.

5. Stelfox HT, Chua G, O'Rourke K, Detsky AS. Conflict of interest in the debate over calcium-channel antagonists. *N Engl J Med*. 1998; 338:101–106.

6. Korn D. Conflicts of interest in biomedical research. *JAMA*. 2000; 284:2234–2237.

7. DeAngelis CD, Fontanarosa PB, Flanagin A. Reporting financial conflicts of interest and relationships between investigators and research sponsors. *JAMA*. 2001;286:89–91.

8. Friedberg M, Saffran B, Stinson TJ, et al. Evaluation of conflict of interest in economic analyses of new drugs used in oncology. *JAMA*. 1999;282:1453–1457.

9. Bodenheimer T. Uneasy alliance—clinical investigators and the pharmaceutical industry. *N Engl J Med*. 2000;342:1539–1544.

10. Bekelman JE, Li Y, Gross CP. Scope and impact of financial conflicts of interest in biomedical research: a systematic review. *JAMA*. 2003; 289:454–465.

11. Lexchin J, Bero LA, Djulbegovic B, Clark O. Pharmaceutical industry sponsorship and research outcome and quality: systematic review. *BMJ*. 2003;326:1167–1170.

12. Callaham ML, Wears RL, Weber EJ, et al. Positive-outcome bias and other limitations in the outcome of research abstracts submitted to a scientific meeting. *JAMA*. 1998;280:254–257.

13. Scherer RW, Dickersin K, Langenberg P. Full publication of results initially presented in abstracts. A meta-analysis. *JAMA*. 1994;272: 158–162.

14. Safer DJ. Design and reporting modifications in industry-sponsored comparative psychopharmacology trials. *J Nerv Ment Dis*. 2002;190:583–592.

15. Johansen HK, Gotzsche PC. Problems in the design and reporting of trials of antifungal agents encountered during meta-analysis. *JAMA*. 1999;282:1752–1759.

16. Rennie D. Thyroid storm. *JAMA*. 1997;277:1238–1243.

17. Nathan DG, Weatherall DJ. Academia and industry: lessons from the unfortunate events in Toronto. *Lancet*. 1999;353:771–772.

18. McCarthy M. Company sought to block paper's publication. *Lancet*. 2000;356:1659.

19. Coyle SL. Physician-industry relations. Part 1: individual physicians. *Ann Intern Med*. 2002;136:396–402.

20. Coyle SL. Physician-industry relations. Part 2: organizational issues. *Ann Intern Med*. 2002;136:403–406.

21. Association of American Medical Colleges, Task Force on Financial Conflicts of Interest in Clinical Research. Protecting subjects, preserving trust, promoting progress, II: principles and recommendations for oversight of an institution's financial interests in human subjects research. Available at: http://www.aamc.org/members/coitf/2002coireport.pdf. Accessed May 12, 2004.

22. Office of Human Research Protections. Financial relationships in clinical research: issues for institutions, clinical investigators, and IRBs to consider when dealing with issues of financial interests and human subject protection. Available at: http://ohrp.osophs.dhhs.gov/nhrpac/mtg12-00/finguid.htm. Accessed May 12, 2004.

23. International Committee of Medical Journal Editors. Uniform requirements for manuscripts submitted to biomedical journals. Available at: http://www.icmje.org. Accessed May 12, 2004.

24. Pharmaceutical Research and Manufacturers of America. PhRMA principles on conduct of clinical trials and communication of clinical trial results. Available at: http://www.phrma.org/publications/policy//2003-11-20.871.pdf. Accessed May 12, 2004.

25. Alpert JS, Furman S, Smaha L. Conflicts of interest: science, money, and health. *Arch Intern Med*. 2002;162:635–637.

26. Rodwin MA. Physicians' conflicts of interest. The limitations of disclosure. *N Engl J Med*. 1989;321:1405–1408.