UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | |
| | Judge Patti B. Saris |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Magistrate Judge Leo T. Sorokin |
| | **UNREDACTED VERSION FILED UNDER SEAL** |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
TESTIMONY OF PFIZER'S NON-RETAINED EXPERTS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.     The Clinical Experience Of Pfizer's Non-Retained Experts
       Is Relevant And Admissible ................................................................................... 3

       A.     The Clinical Experience Of Treating Physicians Is Admissible To Rebut
              Plaintiffs' Claims Of Inefficacy .................................................................. 3

       B.     Kaiser Does Not Require DBRCTs When Making Formulary Decisions Or
              Promulgating Prescribing Guidelines And Considers Clinical Experience As
              Relevant Evidence ....................................................................................... 7

       C.     Testimony From Treating Physicians Is Relevant To The Issue Of Causation ..... 13

II.    Plaintiffs' Procedural Objections To The Testimony Of Non-Retained Experts Are
       Without Merit ........................................................................................................ 14

       A.     Pfizer's Non-Retained Experts Were Timely Disclosed ........................................ 15

       B.     Pfizer's Non-Retained Experts Were Not Required to Produce Sanitized Patient
              Records ........................................................................................................ 16

III.   Plaintiffs' Motion to Exclude Testimony of Patient Y Should Be Denied ........................ 19

IV.    Plaintiffs' Motion To Exclude Testimony From Unidentified Kaiser Physicians and
       Insureds Should Be Denied .................................................................................... 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ................................................4

*Finley v. Marathon Oil Co.*, 75 F.3d 1225 (7th Cir. 1996)................................................15

*Hartwell v. Danek Medical, Inc.*, 47 F. Supp. 2d 703 (W.D. Va. 1999) ........................................4

*Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Products Liability Litigation),
    ___ F. Supp. 2d ___, 2009 WL. 4260857 (E.D.N.Y. Dec. 1, 2009)...............................4, 6

*Laplace-Bayard v. Batlle*, 295 F.3d 157 (1st Cir. 2002)................................................15

*Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49 (1st Cir. 2001)................................................15

*In re Neurontin Marketing, Sales Practices, & Products Liability Litigation*,
    433 F. Supp. 2d 172 (D. Mass. 2006) ........................................................3

*In re Neurontin Marketing & Sales Practices Litigation*,
    244 F.R.D. 89 (D. Mass. 2007)........................................................3

*In re Neurontin Marketing, Sales Practices, and Products Liability Litigation*,
    612 F. Supp. 2d 116 (D. Mass. 2009) ........................................................5

*In re Neurontin Marketing & Sales Practices. Litigation*, ___ F. Supp. 2d ___,
    2010 WL. 53568 (D. Mass. Jan. 8, 2010) ........................................2, 7, 10

*NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776 (7th Cir. 2000)........................................15

*Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir. 1994) ...........................4

*Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*,
    No. 6:09-cv-5003, 2009 WL. 2231686 (M.D. Fla. July 20, 2009)........................................7

*Prentiss & Carlisle Co. v. Koehring-Waterous Division of Timberjack, Inc.*,
    972 F.2d 6 (1st Cir. 1992)........................................................15

*Primus v. United States*, 389 F.3d 231 (1st Cir. 2004) ................................................15

*Santiago-Diaz v. Laboratorio Clinico y de Referencia Del Este*,
    456 F.3d 272 (1st Cir. 2006)........................................................15

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
    No. 2:06-cv-5774, 2009 WL. 2043604 (D.N.J. July 10, 2009) ........................................7

*In re St. Jude Medical, Inc.*, 522 F.3d 836 (8th Cir. 2008) .............................................................6

*In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83 (Ct. App. 2009) ......................................................6

*Vista Healthplan, Inc. v. Amgen, Inc.*, No. CV 07-3711, 2007 WL 4144893
    (C.D. Cal. Nov. 13, 2007) ..........................................................................................................6

### <u>RULES & STATUTES</u>

21 U.S.C. § 396 ...............................................................................................................................4

Fed. R. Civ. P 26 ...........................................................................................................................15

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in opposition to Plaintiffs' Motion *in Limine* to Exclude Testimony of Defendants' Non-Retained Experts.

## PRELIMINARY STATEMENT

Pfizer has proffered several treating physicians as fact witnesses and indicated that it may seek to ask them opinion questions as non-retained experts. These physicians will testify that they prescribed Neurontin because, in their clinical experience, Neurontin has been effective in treating certain patients for various off-label conditions. Each of these physicians has testified on similar issues in this and other Neurontin litigation. This Court recognized over three years ago that Pfizer has a right to present the testimony of these experts to rebut Plaintiffs' aggregate claims that Neurontin was totally ineffective in treating all off-label conditions and has stated that it would permit such testimony. (*See* 9/27/06 Hr'g Tr. at 37:12-16.) Nevertheless, Plaintiffs now move to exclude the testimony of these non-retained experts on both procedural and substantive grounds. Their arguments are all without merit.

Plaintiffs' principle argument for exclusion of this highly relevant testimony is their now oft-repeated mantra that efficacy may only be proven by "gold standard evidence": a double-blind, randomized, placebo-controlled clinical trial ("DBRCT"). The flaw in Plaintiffs' argument is exposed by remarks of Les Zendle, MD, the Associate Medical Director of the Southern California Medical Group, made during a 2000 Permanente roundtable discussion:

> Evidence-based medicine means so many different things to different people. To some people, it means that you don't do something unless you have double-blind randomized control studies that prove something works. Of course, if we only did things when we had double-blind randomized control studies, we wouldn't do a whole lot. It's also used as a reason to withhold certain things or to not do things or to cut costs.[1]

Indeed, the evidence shows that Kaiser does not require DBRCT when making formulary decisions or promulgating guidelines. The evidence likewise demonstrates that Kaiser relies

---

[1] The *Permanente Medicine Roundtable: Defining Our Practice Principles*, Permanente J. Winter 2000 at 45, 48 available at http://xnet.kp.org/permanentejournal/winter00pj/winter00.pdf.

upon the clinical experience of its physicians when making such decisions.

Moreover, Kaiser's argument misapprehends the burden of proof. Plaintiffs are required to prove inefficacy; Pfizer is not required to prove efficacy. Thus, Pfizer does not need "gold standard" evidence to prove the propriety of an off-label prescription, because physicians routinely prescribe off-label, as the standard of care, on the basis of their clinical experience, case reports, and other evidence.

In addition, it is undisputed in this case that physicians are influenced by their own clinical experience as well as the clinical experience of their colleagues when deciding to prescribe off-label. Such evidence is, therefore, relevant to rebut Plaintiffs' causation theory, which seeks to attribute almost all off-label prescriptions to alleged promotion. Indeed, this Court has commented on the dearth of individual physician testimony that supports the Plaintiffs' theory of causation:

> Still, despite over a decade of Neurontin-related litigation, which I have presided over as the multi-district litigation judge, no evidence has been presented of any doctor who states that she relied on a misrepresentation or omission in prescribing Neurontin for an off-label indication. Many doctors have not met with Pfizer sales representatives or attended its "educational seminars." Even those that have been detailed deny reliance . . . .

*In re Neurontin Mktg. & Sales Practices. Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *10 (D. Mass. Jan. 8, 2010). No wonder Kaiser is desperate to keep the jury from hearing physician testimony: whenever a physician testifies in this or other Neurontin litigation, he or she contradicts the central premise of Plaintiffs' case. The testimony of these physicians offers a powerful rebuttal to Plaintiffs' aggregate claims of inefficacy and causation and should, therefore, be admitted.

Finally, Plaintiffs' procedural objections to this evidence must be rejected. The witnesses were timely disclosed in accordance with the Federal Rules. There was no requirement to identify non-retained experts at the same time as exchange of reports from retained experts. Nor was Pfizer required to produce years of medical records from non-retained physician witnesses. For all these reasons, as discussed below, Plaintiffs' motion to exclude the testimony of Pfizer's

non-retained experts should be denied.

## ARGUMENT

**I.     The Clinical Experience Of Pfizer's Non-Retained Experts Is Relevant And Admissible**

**A.     The Clinical Experience Of Treating Physicians Is Admissible To Rebut Plaintiffs' Claims Of Inefficacy**

Plaintiffs' arguments that the clinical experience of Pfizer's non-retained experts is inadmissible are without merit.  As this Court has previously recognized: "[Defendants] have a right to show that they had doctors who were genuinely telling them that [Neurontin] was great for their patients, and they have a right to rebut [Plaintiffs'] case, and I'm going to let them put on doctors who say it was terrific."  (9/27/06 Hr'g Tr. at 37:12-16.)

Plaintiffs' argument for exclusion rests on their continued misapprehension of their burden of proof in this litigation.  They suggest that clinical experience is only anecdotal evidence of Neurontin's efficacy and is inadmissible because it does not go toward the "gold standard" for proving efficacy – a double-blind, randomized, placebo-controlled clinical trial ("DBRCT").  (Pl. Mem. at 9-11.)  However, Pfizer does not have the burden of proving efficacy.  Rather, as this Court has held, Plaintiffs have the burden of proving inefficacy.  *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) ("For all of their claims, plaintiffs will be required to prove . . . that they were injured (i.e., suffered economic loss) by virtue of the Neurontin's inefficacy for that condition."); Report and Recommendation on Defs.' Mot. to Dismiss [269] at 22 ("It is simply not enough to claim that Neurontin had not been proven to be effective; rather, Plaintiffs must allege that it was *ineffective*."(emphasis added)) , *adopted in relevant part*, *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 433 F. Supp. 2d 172 (D. Mass. 2006).  Plaintiffs' demand for "gold standard" evidence from Pfizer is, therefore, an improper attempt to flip the parties' respective burdens of proof.

Moreover, the dichotomy that Plaintiffs attempt to create – where only DBRCTs are relevant and clinical experience is irrelevant – is not supported by the law, is inconsistent with the factual record in this case, and inconsistent with Kaiser's own internal policies and actual

3

practices.  Initially, any suggestion that the efficacy issues in this case are governed by the same standard required for FDA approval for on-label indications, and any attempt to shift the burden of proof to Pfizer to demonstrate Neurontin's efficacy for the relevant off-label uses under that standard, must be rejected.  The FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label because it advances an important public policy.  *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").[2]

Indeed, physicians frequently properly prescribe off-label even in the absence of the "gold standard" evidence Plaintiffs demands for purpose of this litigation (but which they do not require when making formulary decisions or promulgating prescribing guidelines).  Physicians often make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition.  In fact, prescribing off-label based is often the standard of care, especially for certain indications, such as neuropathic pain, where there is little or no "gold standard" evidence supporting the effectiveness of any medication.  As Judge Weinstein recently observed: "'[O]ff-label uses of prescription drugs are a mainstay of the industry – an estimated 21% of drug use overall[.]'"  *Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), ___ F. Supp. 2d ___, 2009 WL 4260857, at *16 (E.D.N.Y. Dec. 1, 2009) (alteration in original) (citation omitted).  "Some off-label uses of a prescription drug may be medically necessary."  *Id.*; *see also Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 705 n.3 (W.D. Va. 1999).[3]  Plaintiffs' argument, however, presumes that no medication

---

[2] *See also Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994) ("[T]he FDA permits doctors to prescribe drugs for 'off-label' uses."); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("[T]he 'FDA itself recogniz[es] the value and propriety of off-label use.'" (citation omitted)).

[3] No one disputes that DBRCTs are at the top of the pyramid of available evidence when

*(cont'd)*

should be prescribed off-label absent "gold standard" evidence, and would actually hold that a physician's exercise of the standard of care resulted in improper prescriptions. This absurd suggestion should be rejected.

Plaintiffs' confusion of the burden of proof likewise drives their misguided comparison of their arguments to exclude physician testimony about clinical experience with Pfizer's motions to exclude adverse event reports ("AERs") in product liability cases. (*See* Pl. Mem. [2351] at 12-15.) In products liability cases, plaintiffs must reliably prove both that the medication at issue *can* cause an adverse effect (generic causation) in some patients and that it *did* cause the *specific* plaintiffs' injury (specific causation). *See In re Neurontin Mktg., Sales Practices, and Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 123 (D. Mass. 2009) (emphasis added). In contrast in this case, Plaintiffs have undertaken the burden to prove that Neurontin is *always* ineffective for *every* patient. Plaintiffs' analogy to the inappropriate use of anecdotal evidence in product liability litigation confuses both *who* has the burden of proof and *what* the proponent seeks to prove. Moreover, Defendants do not seek to rely solely upon the testimony of individual treating physicians, but to present such testimony against the backdrop of the analysis of available scientific evidence as testified to by Defendants' retained experts.[4]

In fact, Plaintiffs' attempt to extrapolate from negative studies to the entire patient population illustrates the flaw in their argument. A study that concluded that a drug failed to effectively treat a given condition in a particular subpopulation when administered using a specified regimen does not by any stretch establish that drug's inefficacy for treating the condition in all other circumstances. For example, a negative study conducted at one dose does not mean that the drug is ineffective at every dose. The fact that the drug did not show a

_____

*(cont'd from previous page)*
analyzing cause and effect of pharmaceutical products and that DBRCTs are required to obtain FDA approval. However, by definition, off-label prescribing, widely accepted as a beneficial medical practice, lacks FDA approval. As a result, off-label prescribing is often based upon evidence other than DBRCTs.

[4] Defendants disagree with Plaintiffs' characterization of the evidence that supports the efficacy of Neurontin for off-label uses, but will address such arguments in Defendants' opposition to Plaintiffs separate motions to exclude Defendants' efficacy experts.

statistically significant effect where symptoms were severe does not mean it would not show such an effect in patients with mild or moderate symptoms.  It is precisely because of these inherent limits in efficacy studies that off-label prescribing is a widely accepted practice, and a practice well-informed by clinical experience.

Although Pfizer disputes that Plaintiffs' attempts to prove inefficacy in the aggregate are proper, Pfizer has a due process right to rebut Plaintiffs' proffer with appropriate individual counterexamples and other proofs.  As another court has explained in a similar case where a third-party payor sought to recover from a pharmaceutical manufacturer for alleged off-label prescriptions, "even if Plaintiff can adequately support causation with such [aggregate] proof, [the defendant] will still require physician testimony to defend itself from Plaintiff's claims." *Vista Healthplan, Inc. v. Amgen, Inc.*, No. CV 07-3711, 2007 WL 4144893, at *6 (C.D. Cal. Nov. 13, 2007).[5]  Similarly Judge Weinstein recently explained that the determination regarding whether a drug is effective for a particular patient, or whether it is more effective or safer than alternative medicines for that patient, is an inherently individual issue:

> Several of the criteria for "medical necessity" are context-sensitive, rather than one-size-fits-all.  Because each patient presents a unique set of symptoms and indications, and each patient may respond differently to any given medication, it requires a highly specific, individual analysis to determine, for example, whether there exists for a given patient another "effective and more conservative or substantially less costly treatment."  "Due to the illnesses' heterogeneity, different people respond differently to different . . . drugs.  Which drug will work best for a new patient is often unknown until he or she tries it; thus clinical decision-making about . . . medications almost inevitably is based on "'trial and error.'"

*Hood*, 2009 WL 4260857, at *59 (citation omitted); *see also In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 101 (Ct. App. 2009) (noting that whether an alternative drug was would have been as safe and as effective for a particular patient "was a patient-specific issue, incorporating the

---

[5]  Other courts have similarly recognized that a defendant has the right to rebut aggregate claims with individual counterexamples.  *See, e.g., In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008) (noting that even if state law permitted plaintiffs to rely on aggregate proof of causation, defendants could not be precluded from presenting individual evidence "negating a plaintiff's direct or circumstantial showing of causation").

patient's medical history, treatment needs, and drug interactions").[6]

Thus, not only have other courts held that individual clinical experience of physicians was both relevant and admissible if presented by the defendant, several have held that the absence of such evidence was fatal to a plaintiff's claim.[7]

**B.   Kaiser Does Not Require DBRCTs When Making Formulary Decisions Or Promulgating Prescribing Guidelines And Considers Clinical Experience As Relevant Evidence**

The "DBRCT vs. clinical experience" dichotomy that Kaiser seeks to erect for this litigation is even more absurd when compared to what Kaiser does in real life.  On January 8, 2010, this Court granted Pfizer's motion for summary judgment as to Coordinated TPPs Guardian and Aetna, finding that they had produced insufficient evidence of causation, but denied Pfizer's motion as to Kaiser.  *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010).  The Court distinguished Kaiser from Guardian and Aetna based upon Kaiser's proffer of evidence that it relied upon information from Pfizer when making formulary decisions and promulgating prescribing guidelines.  *See id.*  While Pfizer disputes the sufficiency of such evidence, Kaiser's theory of liability requires that the jury understand the type of evidence actually considered by Kaiser when making such decisions.  On this point the record is clear:  Kaiser does not require DBRCTs as a condition of placing a drug on its formulary and Kaiser recommends the use of

---

[6] The testimony that Defendants have designated from treating physicians specifically addresses Plaintiffs' argument that any efficacy of Neurontin must be attributed to the placebo effect.  As the treating physicians testified, the frequency and consistency with which patients benefited was too high to be explained by the placebo effect alone.  (*E.g.*, Fitzsimmons Dep. at 44:19-45:06 (Exh. A to Armstrong Decl.); Esper Dep., at 35:03-35:18 (Exh. B to Armstrong Decl.).

[7] *See, e.g., Pa. Employees Benefit Trust Fund v. Astrazeneca Pharm. LP*, No. 6:09-cv-5003, 2009 WL 2231686, at *6 (M.D. Fla. July 20, 2009) (holding the TPPs seeking to recover for off-label promotion of Seroquel failed to adequately plead causation, explaining that the plaintiffs' "claims would require onerous individualized inquiries into the specifics of each patient's medical history and the circumstances of each patient's alleged injury"); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *15 (D.N.J. July 10, 2009) (dismissing the plaintiffs claims and noting that "TPP plaintiffs do not identify even a single beneficiary who took Temodor or the Intron Franchise Drugs for an off-label use and they fail to describe circumstances under which any named plaintiffs received no benefit from the Subject Drugs").

drugs for off-label conditions even in the absence of DBRCTs. Thus, Kaiser is arguing that Defendants should be held to a higher standard of proof that it requires when making decisions about formulary access. Kaiser's position on the admissibility of clinical experience is irreconcilable with the theory of liability that saved it from summary judgment.







Giving credence to Kaiser's argument that only DBRCTs are meaningful would also lead to the unavoidable conclusion that Kaiser misleads its members on its website On its website, Kaiser provides its members with "interactive tools and other resources" so that its members can "live healthier." (Exh. H to Armstrong Decl.) Kaiser's website contains numerous articles where it recommends the use of anticonvulsants, including Neurontin and gabapentin, for treatment of chronic pain, cancer pain, and other conditions. (*Id.*)

For example, if a Kaiser member clicked on the "Drugs and natural medicines" link of the Health and Wellness tab on Kaiser's site, he or she would be taken to a Kaiser Permanente

---

[8] *In re Neurontin*, 2010 WL 53568, at *3.

[9] *Id.*

page that reads: "Look up prescription and nonprescription drugs, vitamins, herbs, and other dietary supplements, including how to use them, side effects, interactions, and more." (*Id.*) A click on this page takes a Kaiser patient-subscriber to Kaiser's "drug encyclopedia," where patients can find information on medications. (*Id.*) Someone who clicked on "Pain Originating From a Nerve" under "Conditions: P" in the Drug Encyclopedia would be taken to a page that reads as follows:

> **Drugs for managing Pain Originating From a Nerve**
> Please click on a drug name to see more information
> - Gabapentin Oral
> - Neurontin Oral

(*Id.*) These are the only two drugs listed in Kaiser's Drug Encyclopedia under "Pain Originating from a Nerve." The article on gabapentin states, under "other uses": "Gabapentin may also be used to treat other nerve pain conditions (e.g., diabetic neuropathy, peripheral neuropathy, trigeminal neuralgia)." (*Id.*)

Kaiser's website also has a Health Encyclopedia, where members can "[r]esearch health conditions for information on prevention, treatment options, and more." (*Id.*) An article on "Anticonvulsants for chronic pain" advises Kaiser patient-subscribers that anticonvulsant drugs (including Neurontin) may "be used to treat other painful conditions, such as postherpetic neuralgia and fibromyalgia." (*Id.*) The article explains: "Experts do not know exactly how anticonvulsants work to reduce chronic pain. They may block the flow of pain signals from the central nervous system." Significantly, the article notes that "[e]ven though gabapentin and pregabalin *are the only drugs that have proved to help some types of chronic pain*," certain other drugs "may also be effective in reducing chronic pain." (*Id.* (emphasis added).) Another article indicates that anticonvulsants (including Neurontin) are used to control cancer pain and explains that "[a]nticonvulsants help reduce pain related to the nervous system (neuropathic pain). Some have fewer side effects than tricyclic antidepressants." (*Id.*) An article on the use of anticonvulsants for chronic low back pain advises Kaiser members that anticonvulsants, including Neurontin, "can reduce some persistent low back pain with fewer side effects than

11

tricyclic antidepressants." (*Id.*)

The testimony of Kaiser representatives and physicians in this litigation likewise makes clear that Kaiser does not require DBRCTs when making formulary decisions, and that it considers the experience of treating physicians.





[10] The position now advanced by Kaiser in this litigation, which would preclude the jury from hearing any testimony from individual prescribing physicians, must be rejected.

### C.   Testimony From Treating Physicians Is Relevant To The Issue Of Causation

The testimony from treating physicians is also relevant to the issue of causation.  It is undisputed that a physician's decision to prescribe a drug off-label is influenced by his or her own clinical experience, as well as the experience of colleagues.



Kaiser argues that only the testimony of Kaiser physicians is admissible on the issue of causation.  (Pl. Mem. [2351] at 6 n.6.)  Initially, the testimony of any treating physician on this point serves to rebut the false assumptions made by Kaiser's experts Prof. Rosenthal and

---

Dr. Hartman, whose aggregate models are not based upon Kaiser-specific data.[11]  In any event, the testimony of the treating physicians in this litigation and other cases is remarkably consistent ███████████████████████████████████████.  Over and over again, physicians ████████████████████████ have testified that they prescribed Neurontin for off-label uses based upon successful use of it in their clinical practice and that they continue to prescribe gabapentin to this date.[12]

Kaiser also argues that the testimony cannot be admitted to show what a "reasonable" physician would do on the grounds that it would constitute expert testimony.  (Pl. Mem. [2351] at 6 n.6.)  First, the testimony is offered to show what real physicians did do, and continue to do, which is the relevant inquiry for causation.  That a physician was influenced by his positive clinical experience with Neurontin is evidence of alternative causation, regardless of the reasonableness of his actions.  Second, as discussed in Section II below, Rule 26 specifically allows Pfizer to elicit opinion testimony from non-specially retained experts.  It would clearly be proper to ask these witnesses whether they believed their actions in prescribing Neurontin, based upon years of clinical experience, was reasonable.

In short, testimony about the prescribing experience of real physicians, as opposed to statistical abstractions that Plaintiffs seek to reduce this case to, is relevant to counter Plaintiffs' attempt to attribute virtually every off-label prescription every written to alleged promotion, ignoring other factors (such as clinical experience) that represent significant alternative causes – causes not accounted for in the aggregate models that Plaintiffs' experts seek to rely upon.

## II.  Plaintiffs' Procedural Objections To The Testimony Of Non-Retained Experts Are Without Merit

Plaintiffs' procedural arguments to exclude Pfizer's non-retained experts are based on misguided attempts to apply rules and orders that govern only retained experts.  Plaintiffs'

---

[11] As noted in Pfizer's motion to exclude Prof. Rosenthal [2316, 2317] and Dr. Hartman [2319, 2320], their failure to develop a model specific to Kaiser requires exclusion of their testimony.

[12] See Memorandum in Support of Defendants' Motion *in Limine* to Exclude the Testimony of Meredith Rosenthal [2317] at 5.

14

twisting of the law and their mischaracterization of this Court's orders must be rejected.

### A.      Pfizer's Non-Retained Experts Were Timely Disclosed

Plaintiffs first claim that Pfizer's disclosure of its non-retained experts in its witness list of November 23, 2009 was untimely, arguing that this Court's November 4, 2008 Scheduling Order [1488] required Pfizer to disclose the identity of these experts by December 15, 2008. However, that order required only that "Defendants' *expert reports* [be] served by" December 15, 2008, and later that "[*a*]*ll* expert depositions" – both defense and plaintiff – be completed by January 31, 2009. (*Id.* (first emphasis added).) Because Plaintiffs themselves admit that Pfizer's non-retained experts were not required to serve expert reports (*see* Pl. Mem. [2351] at 4-5), these witnesses were not bound by the November 4, 2008 order. Nothing else in that order sets requirements for the disclosure of non-retained experts. The Federal Rules provide only that, in the absence of any controlling court order, expert testimony must be disclosed "at least 90 days before the date set for trial." Fed. R. Civ. P 26(a)(2)(C)(i). Because neither the November 4, 2008 Scheduling Order nor any other order specifically addressed disclosure of non-retained experts, disclosure was subject only to this Court's deadline for filing of witness lists, November 23, 2009 [2172], with which Pfizer indisputably complied.[13]

Plaintiffs' assertion that the timing of Pfizer's disclosure of these non-retained experts prevented Plaintiffs from conducting depositions is likewise without merit. Each of these non-

---

[13] Although Plaintiffs cite a panoply of cases excluding untimely disclosed expert testimony, each of these cases likewise concerned experts who were required to serve a report (Pl. Mem. at 5 & n.5), and thus none of them are applicable Pfizer's non-retained experts. *See Prentiss & Carlisle Co. v. Koehring-Waterous Div. of Timberjack, Inc.*, 972 F.2d 6, 8-9 & n.1 (1st Cir. 1992) (citing prior version of Rule 26 and affirming exclusion of expert testimony by defendant's employee); *Lohnes v. Level 3 Commc'ns, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (affirming district court's exclusion of untimely affidavit of retained expert); *Primus v. United States*, 389 F.3d 231, 234-36 (1st Cir. 2004) (affirming district court's exclusion of untimely designated retained expert whom plaintiff allegedly had "difficulties securing"); *Laplace-Bayard v. Batlle*, 295 F.3d 157, 162 (1st Cir. 2002) (affirming exclusion of retained expert whose report and C.V. were served only three days before trial); *Santiago-Diaz v. Laboratorio Clinico y de Referencia Del Este*, 456 F.3d 272, 276 (1st Cir. 2006); (upholding preclusion of retained expert's testimony where deficient report was served more than seven months late); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785-86 (7th Cir. 2000) (affirming opinions of retained expert beyond the scope of original expert report); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) (affirming exclusion of retained expert's untimely disclosed rebuttal report).

retained experts has already been deposed, either in the MDL consumer litigation or in *Clark v. Pfizer Inc*[14] in Pennsylvania state court.  When Pfizer disclosed these non-retained experts in its witness list and Supplemental Rule 26 Disclosure on November 23, 2009,[15] it promptly produced transcripts of these witnesses' prior depositions to Plaintiffs, thus providing Plaintiffs with notice of the basis of the witnesses' testimony.  (Armstrong Decl. ¶ 24.)  Additionally, Plaintiffs could have sought the depositions during the one-month window set by this Court.  (Procedural Order [2172] at 1.)  Because Plaintiffs completely ignored that opportunity, the prejudice they now claim, if any, is self-inflicted.  Similarly baseless is Plaintiffs' claim that these non-retained experts should have been disclosed by the expert report deadline so that they could be deposed during the expert discovery period.  (Pl. Mem. [2351] at 4.)  Plaintiffs did not even depose any of Pfizer's *retained* medical experts during that period, and their claims that they would have deposed these non-retained experts are simply not to be credited.[16]

## B.    Pfizer's Non-Retained Experts Were Not Required to Produce Sanitized Patient Records

Plaintiffs further attempt to exclude the testimony of Pfizer's non-retained experts by arguing that these experts were required to produce sanitized patient records setting forth the

---

[14] *Clark v. Pfizer Inc.*, No. 1819 (Pa. C.P. Ct.).  Plaintiffs' counsel in *Clark*, Sacks & Weston, is also counsel to several consumer plaintiffs in the MDL, including Charles D. Girard, Sr., Tuwanda Shakoor, and Cynthia K. Myers.

[15] Plaintiffs' claim that they "can only guess which of Pfizer's 28 proposed witnesses" it may seek to elicit opinion testimony from (Pl. Mem. [2351] at 7) is disingenuous.  On November 23, 2009, Pfizer also served Plaintiffs with its First Supplemental Disclosure (Exh. J to Armstrong Decl.), which described witnesses by category.  Pfizer's disclosures clearly stated from which fact witnesses it might seek to elicit opinion testimony in their capacity as non-retained experts.  In addition, before filing their witness lists on the date scheduled by this Court, the parties exchanged preliminary witnesses lists and conferred about their proposed witness lists.  During this "meet and confer" it was made plain to Plaintiffs' counsel which witnesses Pfizer considered to be non-retained experts.  (Armstrong Decl. ¶ 23.)

[16] Plaintiffs argue that although they did not depose any of Pfizer's retained medical experts, they would have deposed these non-retained experts because no reports were produced for them, and depositions would allow them to discover the basis of the experts' opinions.  (Pl. Mem. [2351] at 4 n.4.)  Plaintiffs claim is belied by their conduct.  Here, Plaintiffs were promptly provided deposition testimony of the non-retained experts following Pfizer's disclosure.  Plaintiffs not only knew the nature of the opinions that would be sought and the bases for those opinions, they were aware of the exact testimony that Pfizer would seek to introduce.  Notwithstanding this, Plaintiffs subsequently ignored the one-month window for depositions set by this Court.

factual bases of their testimony concerning Neurontin's efficacy for off-label uses. As an initial matter, the records of the plaintiff-patient who was treated by the physician in the litigation where the physician was deposed were clearly available to the plaintiffs' attorneys in that litigation. Plaintiffs' suggestion that examination of the physicians took place without access to any medical records is without merit. And, while Plaintiffs asked Pfizer's counsel to provide them with copies of the deposition transcripts and exhibits, they never requested sanitized copies of the patient's medical records. (Armstrong Decl. ¶ 24.)

Further, Plaintiffs' argument that disclosure of patient records was required relies on a mischaracterization of this Court's September 27, 2006 order, which provided as follows:

> After hearing, I conclude that the burden, expense and invasion of privacy of the proposed discovery outweighs its likely benefit. See Fed. R. Civ. P. 26 (b)(2). This conclusion is based on the supplemental record not available before the Magistrate Judge and a fuller explanation of plaintiff's theory of the case. If either party intends to call a treating physician to give an opinion on effectiveness, sanitized patient records shall be produced to the extent the physician is relying on his experience with treating that patient (as opposed to a clinical trial). . . .

(9/27/06 Electronic Order) Contrary to Plaintiffs' gloss in their brief, the statement in this order about the sanitized patient records of a specific patient ("that patient") was not issued as a response to any effort by Pfizer (or Plaintiffs) to obtain an evidentiary ruling on the admissibility of testimony on efficacy by treating physicians. (Pl. Mem. [2351] at 7.) Rather, this statement was entered along with the Court's denial of Pfizer's motion to compel Kaiser to produce *all* patient records for Kaiser members prescribed Neurontin. (Electronic Order, Sept. 27, 2006.) At the hearing on that issue, Pfizer argued that denying all access to patient records would severely prejudice both Pfizer's physician testimony concerning specific examples of Neurontin's effectiveness for off-label uses, as well as its cross-examination of Kaiser physicians and other experts testifying for Plaintiffs. (9/27/06 Hr'g Tr. at 18:23-21:13.) Accordingly, even though the Court ultimately denied Pfizer's motion, it held that Pfizer had the right to rebut Plaintiffs' aggregate proof with individual physician evidence. (*Id.* at 37:12-16.) The Court ordered, as a limited carve-out to its denial of Pfizer's motion, that Plaintiffs' patient records be produced to

17

the extent they had been specifically relied upon by experts. (9/27/06 Order)

Thus, while the Court found that, in general, "the burden, expense and invasion of privacy of [producing all patient records] outweigh[ed] its likely benefit" (*id.*), it nevertheless required Plaintiffs, where applicable, to produce the patient records upon which Kaiser physicians – whether testifying for Pfizer or for Plaintiffs – purported to rely. This order was not intended as a hurdle to the testimony of non-retained experts who might be called by Pfizer.

Moreover, the broad construction given by Kaiser to this Court's order leads to an unreasonable interpretation. Rule 26 recognizes the distinction between retained experts, who are subject to special discovery rules, and non-retained experts. Non-retained experts are usually fact witnesses with special expertise, such that a strict demarcation cannot be drawn between their factual testimony and opinions related to their factual testimony. A treating physician is the classic example. In testifying about why a physician treated a patient the way he or she did, he will, of necessity, have to address matters of opinion. In providing that non-retained experts are not required to provide reports, Rule 26 recognizes that it would be unfair to preclude access to a fact witness or limit his or her testimony to exclude relevant opinions. Nor would it be fair to burden a non-party fact witness with disclosure obligations simply because he or she possesses expertise in the subject matter of his or her testimony.

Here, the non-retained physicians' opinions concerning Neurontin's efficacy for off-label indications are not grounded in the records of specific, identifiable patients, but rather in each physician's aggregate clinical experience prescribing Neurontin to multiple patients for off-label use. Accordingly, it is unlikely that these physicians could recall the names of all the patients to whom they had prescribed Neurontin. It would be grossly unfair to impose on these non-parties the obligation to search, redact and produce all of their patient records for almost a ten year period when Kaiser, both a party and a corporate entity with vastly greater resources than an individual physician, successfully resisted having to produce its patient records. Requiring physicians to undertake such a Herculean effort would effectively prevent them from these important witnesses from testifying at all, thereby undermining Pfizer's "right to rebut

18

[Plaintiffs'] case" with such testimony, as recognized by this Court.   (9/27/06 Hr'g Tr. at 37:12-16.)  The Court's order cannot reasonably be construed to impose such a burden.

### III.   Plaintiffs' Motion to Exclude Testimony of Patient Y Should Be Denied

Plaintiffs also seek to exclude testimony of a specific patient ("Patient Y") designated by Pfizer as a witness.   Although the patient has been identified only as Patient Y, in order to preserve his privacy, his testimony has previously been referred to by Pfizer in connection with the Class Plaintiffs' motion for reconsideration of this Court's class certification decision. Kaiser and its counsel were, therefore, aware of this witness and the nature of his testimony prior to the date on which witness lists were exchanged.  Patient Y's testimony is relevant because it serves to rebut many of the absolute and incorrect assumptions upon which Plaintiffs' case is based.  Patient Y was a 55-year old male bipolar patient admitted to the hospital on May 29, 2007 for "suicidal ideation with thoughts of shooting himself with a gun."  On June 1, 2007, he began taking Neurontin for withdrawal symptoms.  Believing that Neurontin was not helping, he discontinued it on June 4, 2007.   His condition deteriorated and, on June 5, 2007, his doctor noted: "Perhaps the Neurontin was helping more with shoulder pain and withdrawal than we had thought."  He was restarted on Neurontin and discharged on June 7 with a prescription for Neurontin 300 mg three times per day.  (Patient Y Medical Records (Exh. Q to Armstrong Decl.).)  Not only is Patient Y's story illustrative of the type of individual experience that informs the prescribing decisions of physicians, it demonstrates the complexity of the comorbid conditions that afflict bipolar and other patients.  As a result, Plaintiffs' reliance upon IMS survey data to disaggregate among conditions is inherently flawed.

### IV.   Plaintiffs' Motion To Exclude Testimony From Unidentified Kaiser Physicians and Insureds Should Be Denied

For the reasons discussed above, the experience of individual physicians and patients is highly relevant to the issues in this case.  Pfizer incorporates by reference its prior arguments made in Defendants' Motion to Compel Identification of Names and Addresses of Potential Trial Witnesses [2181, 2182] and Defendants' Objection to Magistrate Judge's Order Denying Motion

to Compel Identification of Names and Addresses of Potential Trial Witnesses [2267]. Pfizer reserves its right to call any such witnesses that it may be able to identify prior to trial.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' Motion *in Limine* to Exclude Testimony of Pfizer's Non-Retained Experts.

Dated: January 22, 2010                    Respectfully submitted,

                              SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP

                              By:     /s/ Mark S. Cheffo
                                      Mark S. Cheffo

                              Four Times Square
                              New York, NY 10036
                              Tel: (212) 735-3000

                              SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP

                              By:     /s/ Raoul D. Kennedy
                                      Raoul D. Kennedy

                              Four Embarcadero Center
                              San Francisco CA 94111
                              Tel: (415) 984-6400

                                      -and-

                              WHEELER TRIGG O'DONNELL LLP

                              By:     /s/ James E. Hooper
                                      James E. Hooper

                              1801 California Street
                              Suite 3600
                              Denver, CO 80202-2617
                              Tel: (303) 244-1800

                                      -and-

WHITE AND WILLIAMS LLP

By:     /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 22, 2010.

/s/ David B. Chaffin
David B. Chaffin

21