UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 <br><br> Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: <br><br> THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and <br><br> AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris <br> Mag. Judge Leo T. Sorokin |

**PLAINTIFF KAISER'S OPPOSITION TO DEFENDANTS' MOTION
*IN LIMINE* TO EXCLUDE THE TESTIMONY OF KAY DICKERSIN, PH.D.**

I.      INTRODUCTION ................................................................................................. ii

II.     DR. DICKERSIN'S OPINIONS ARE THE PRODUCT OF
        GENERALLY-ACCEPTED SCIENTIFIC PRINCIPLES,
        SYSTEMATICALLY APPLIED TO THE RELEVANT EVIDENCE ............... 1

        A.      Dr. Dickersin Is Eminently Qualified to Render Her Opinions ................ 1

        B.      Dr. Dickersin's Report Is Well-Grounded In the Scientific
                Literature .................................................................................................... 2

        C.      Dr. Dickersin Thoroughly Examined the Relevant Evidence ................... 4

        D.      Dr. Dickersin's Findings Were Recently Published In The *New
                England Journal of Medicine* .................................................................... 8

III.    PFIZER'S CRITICISMS OF DR. DICKERSIN'S REPORT ARE
        UNTENABLE .................................................................................................... 10

        A.      Dr. Dickersin's Opinions Will Assist the Jury ....................................... 10

        B.      Dr. Dickersin May Testify That Defendants' Actions Are
                Consistent With An Intent To Distort The Scientific Literature ............. 11

        C.      Defendants Coined the Term "Publication Strategy" To Describe
                Their Improper and Illegal Off-Label Marketing Effort ......................... 13

        D.      Dr. Dickersin's Use of Four Adjectives To Describe The Severity ·
                of the Scientific Misconduct Chronicled in Her Report Does Not
                Render Her Opinions Inadmissible .......................................................... 14

        E.      Dr. Dickersin Properly Included Defendants' Unpublished
                Nociceptive Pain Trials In Her Analysis ................................................. 15

IV.     CONCLUSION .................................................................................................. 19

## TABLE OF AUTHORITIES

### CASES

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .................................................................................................. 18

*In re Blech Sec. Litig.*,
  No. 94 Civ. 7696, 2003 U.S. Dist. LEXIS 4650 (S.D.N.Y. Mar. 26, 2003) ..................... 10, 12

*Millette v. Adams*,
  No. 1:07-CV-00119, 2008 WL 3927798 (E.D. Cal. Aug. 25, 2008) ....................................... 12

*Ruiz-Troche v. Pepsi Cola*,
  161 F.3d 77 (1st Cir. 1998) ........................................................................................ 10

*United States v. Shay*,
  57 F.3d 126 (1st Cir. 1995) ........................................................................................ 10

### RULES

Fed. R. Civ. P. 704(a) ................................................................................................. 12

Fed. R. Evid. 702 ................................................................................................. 10, 12

Fed. R. Evid. 704(b) ................................................................................................. 13

### TREATISES AND ARTICLES

DeAngelis, Catherine *et al, Clinical trial registration: a statement from the*
  *International Committee of Medical Journal Editors,* 364 *Lancet* 911 (2004) ......................... 17

DeAngelis, *et al., Is this Clinical Trial Fully Registered?*
  *A Statement from the International Committee of Medical Journal Editors,*
  293:23, JAMA, 1 (2005) ............................................................................................. 18

U.S. Department of Health and Human Services, FDA, CDER, *Guidance for*
  *Industry, Investigators, and Reviewers, Exploratory IND Studies,* dated January 2006 .......... 17

Vedula, *et al., Outcome Reporting in Industry-Sponsored Trials of Gabapentin*
  *for Off-Label Use*, 361;20, New England Journal of Medicine, 1963 (2009) ......................... 8, 9

Wager, *et al.*, Good publication practice for pharmaceutical companies,
  19:3 *Current Medical Research and Opinion*, 149 (2003) ...................................................... 18

## I.   INTRODUCTION

Kaiser's expert on publication bias, Dr. Kay Dickersin, is eminently qualified to offer the opinions presented in her report.  Her opinions are the product of generally-accepted scientific principles, systematically applied to the relevant evidence.  Indeed, the substance of her report was peer-reviewed and recently published in the prestigious *New England Journal of Medicine*.  Kaiser respectfully submits that as Dr. Dickersin's report was good enough to survive peer review at one of the world's most prestigious medical journals, it is sufficiently reliable to be presented to the trier of fact.  Defendants' criticisms of Dr. Dickersin's report are misdirected and unavailing.  The motion should be denied.

## II.   DR. DICKERSIN'S OPINIONS ARE THE PRODUCT OF GENERALLY-ACCEPTED SCIENTIFIC PRINCIPLES, SYSTEMATICALLY APPLIED TO THE RELEVANT EVIDENCE

### A.   Dr. Dickersin Is Eminently Qualified to Render Her Opinions

Kay Dickersin, Ph.D. is a professor in epidemiology at the Johns Hopkins Bloomberg School of public health where she serves as the director of the Center for Clinical Trials.  Dr. Dickersin is also the director of the US Cochrane Center, one of 13 worldwide centers participating in the Cochrane Collaboration,[1] and has served as a director of a Cochrane center since 1994.  At Johns Hopkins, Dr. Dickersin oversees the clinical trials curriculum and teaches graduate level courses on clinical trials, systematic reviews and meta-analysis.  Dr. Dickersin's published research has focused on clinical trial methodologies, systematic reviews, publication bias, trial registries and evidence-based healthcare.  She has authored numerous journal articles

---

[1] The Cochrane Collaboration is an independent organization dedicated to synthesizing high quality research into systematic reviews to further the availability of evidence-based healthcare.  Pfizer's experts have cited Cochrane as the "highest level of evidence on which to base clinical treatment decisions," and have lauded Cochrane's reports as relying "wholly on randomized clinical trials – universally considered the most reliable source of medical evidence."  Exhibit A to accompanying Declaration of Elana Kather ("Decl."), Expert Report of Shawn J. Bird, M.D., at 6.  *Accord* Decl. Exhibit B, Report of Gary J. Brenner, M.D., Ph.D. ("Brenner Report") at 4.

-1-

and book chapters on these subjects, including, most recently, a peer-reviewed article in the New

England Journal of Medicine arising out of her expert work in this litigation, and she has been

invited to lecture on these topics all over the world.  Dr. Dickersin has been a peer-reviewer for

many journals—including premier publications the *New England Journal of Medicine*, the

*Journal of the American Medical Association* and *The Lancet*—and has served on multiple

editorial and advisory boards for major journals in the field of clinical trials, including both

*Clinical Trials* and *Trials*, as well as the *British Medical Journal*.  Contrary to Pfizer's

assertions, Dr. Dickersin has also functioned as a principal investigator for federally-funded trials

in both ophthalmology and women's health.  She has been honored for her research

contributions, including election to the Institute of Medicine in 2007 and the American

Epidemiological Society in 1999.  She currently serves as President of the Society for Clinical

Trials and co-chairs the World Health Organization's ("WHO") Scientific Advisory Group to the

International Clinical Trials Registry Platform.  Presently, Dr. Dickersin sits on both WHO's

Expert Advisory Panel on Clinical Practice Guidelines and Research Methods and Ethics, and its

Advisory Group on Clinical Trial Registration and Results.  In the past, she has served on many

other international and national advisory boards, data and safety monitoring committees, and

national research councils and committees.[2]  As should be clear from the foregoing, Dr.

Dickersin is eminently qualified to offer expert opinion as to the propriety and effect on the

medical literature of Defendants' selective publication strategy.

### B.    Dr. Dickersin's Report Is Well-Grounded In the Scientific Literature

Dr. Dickersin's expert report in this litigation was served on Pfizer on August 15, 2008.

*See* Reporting and other biases in studies of Neurontin for migraine, psychiatric/bipolar

---

[2] Dr. Dickersin's *curriculum vitae*, setting forth the foregoing, was attached as Exhibit C to her report.

disorders, nociceptive pain, and neuropathic pain ("Dickersin Report") (*See* Exhibit 117 to Dkt. No. 1761). For her work in preparing her report, Dr. Dickersin did not accept compensation. Rather, funds equivalent to what she would have received were donated to Johns Hopkins University to be used to support the development of teaching materials related to publication bias.

In her August 2008 report, Dr. Dickersin describes the internationally held ethical and scientific imperative to communicate knowledge gained from biomedical research. *See* Dickersin Report, at 7-8. She identifies, defines and discusses seven types of reporting bias identified by *multiple* researchers in her field, including: publication bias, selective outcome reporting bias, multiple (duplicate) publication bias, location bias, language bias, time lag bias, and citation bias. *See id.* at 8-17. After describing and defining these various biases, Dr. Dickersin discusses the impact that such biases can have on the biomedical literature:

> The term *bias* is a statistical term and may not convey to most people the seriousness of the practical implications. The biomedical literature is the basis of evidence-based healthcare. If the literature is biased, then physicians' knowledge of a drug's efficacy, and prescription writing based on that knowledge, is likely to be wrong. The end result of reporting biases is that patients may be harmed, and resources wasted. Moreover, if reporting biases are deliberate, they represent unethical behavior and scientific misconduct. When reporting biases favor commercial interests, and industry withholds or manipulates data from trials it has sponsored, ethical issues are of particular concern.

*Id.* at 17 (internal citations omitted). Dr. Dickersin's review of reporting bias and its effects is based on her extensive knowledge and expertise in this field as well as a review of the relevant published literature. Dr. Dickersin cites over 60 references from the biomedical literature to support this review and discussion. *See* Dickersin Report, at 53-57.

## C.   **Dr. Dickersin Thoroughly Examined the Relevant Evidence**

Dr. Dickersin examined, analyzed, and summarized *all* 21 clinical trials conducted by

Pfizer in the areas of migraine, bipolar disorder, neuropathic, and nociceptive pain.  Not one of

Pfizer's experts even claims to have reviewed and analyzed all these trials.  In reviewing each

trial, Dr. Dickersin relied on the underlying study protocols and research reports (often thousands

of pages long), journal submissions, *all* publications (including posters, abstracts and journal

articles), internal email and memoranda discussing the trial results, as well as marketing

assessments for the various indications.  In total, Dr. Dickersin reviewed all Defendant-generated

publications, 20 research reports, and 144 additional documents, including e-mails, memoranda

and draft manuscripts related to the clinical trials she reviewed.  *See* Appendix B to Dickersin

Report.  The results of her analysis of each trial are contained in a 149-page appendix containing

eight different tables for each indication that summarize the following:

- Table of Citations – Lists documents summarizing research results;

- Summary of Reporting Biases – Notes key reporting biases observed in each study based on comparison between published reports and internal study protocols and research reports;

- Comparison of Study Reports by Authors and Funding Source – Indicates where authorship was not properly acknowledged and where new authors were added to the publications;

- Comparison of Study Reports by Participant Inclusion/Exclusion Criteria – Notes information about study population, including inclusion criteria, enrollment dates, and number of study sites;

- Interventions and Run-in Phase – Description of intervention, including dosages, use of run-in, design characteristics, and length of follow-up;

- Risk of Bias – Summarizes key trial design and operational items acknowledged to increase the risk of bias in clinical trials;

- Primary Outcome and Number of Patients Assessed –
  Description of primary outcome and type of analysis
  performed, including whether and when patients were
  excluded from analyses;

- Comparison of Study Reports by Results and Conclusions –
  Direct comparison of Results section of report and
  Conclusions and Discussion sections.

*See* Appendix A to Dickersin Report; *see also id.* at 18-19.  Based on this complete, trial-by-trial

analysis, Dr. Dickersin highlights the specific instances of reporting bias found in each study.

*See* Dickersin Report at 23-32.  Not a single Defendant-sponsored study was free of bias, and

most studies contained multiple forms of bias.  *See id.*

In her report, Dr. Dickersin provided several case studies of suppression and "spinning"

of study results.  *See* Dickersin Report, at 33-47.  In each of these cases, as with the rest of her

report, Dr. Dickersin compared the underlying study protocols and research reports with all

published results purportedly arising from the research, examined email and other

correspondence, reviewed drafts of manuscripts submitted, and examined peer-reviewer

comments on those manuscripts.  Based on her review, Dr. Dickersin states:  "Taken both

individually and together, these cases reflect clear intent to suppress information, deceive the

medical community, and manipulate messages regarding the results of biomedical research.  This

represents a distortion of knowledge that is inexcusable and unethical."  Dickersin Report, at 33.

The voluminous documents cited by Dr. Dickersin as examples of publication bias cannot

be presented within the applicable page limits.  However, the following excerpts from documents

and correspondence authored by Defendants' employees concerning the publication of the

Reckless and POPP studies—which Defendants ineptly contend Dr. Dickersin should have counted as evidence of a *lack* of publication bias—are both illustrative and illuminating:[3]

- "The results, if positive, will therefore be publicized;"

- "Although I would love to publish SOMETHING about 945-224…we should take care not to publish anything that damages Neurontin's marketing success;"

- "If there is no threat to the marketing of gabapentin, or maybe even some benefit (to correct misperceptions about the negative outcome), it might be worth pursuing a publication;"

- "We would need to have 'editorial' control, but would certainly involve Dr. Reckless [the lead investigator of protocol 945-224], asking for his expert comment;"

- "What is critical is that -224 is NOT submitted to any publication until we know WHEN the 2 UK studies are going to be published;"

- "We must delay publication of -224, as its results are not positive;"

- "I think that we can limit the potential downsides of the 224 study by delaying the publication for as long as possible;"

- "[I]t will be important [] how WE write up the study. We are using a medical agency to put the paper together which we will show to Dr. Reckless. We are not allowing him to write it up himself."

- "This [protocol 945-224] is the negative study we were talking about…As you can imagine, I am not in a hurry to publish it;"

- "The team agrees that this [negative] study should not be pushed for publication."

- "The delay created by completion of the substudy [of the negative protocol 945-271] would allow us to optimise timing between the release of the two studies [the other being the negative protocol 945-224];"

---

[3] Pfizer argues that "Dr. Dickersin concedes that her report miscalculates the number of published articles because it failed to account for the POP [sic] study [protocol 945-271] published in August, 2008." Def. Mem. at 13. Dr. Dickersin's report was served on August 15, 2008, 16 days *before* the article was published. More importantly, Pfizer neglects to mention that the POPP study was not published until *seven years* after its completion (*see* Dickersin Report, at 39-40)—several years after Neurontin went off-patent, after its publication could no longer negatively affect Pfizer's bottom line. This long overdue publication of negative results is itself a manifestation of the publication biases discussed by Dr. Dickersin in her report.

- "I am sure that everyone can appreciate our desire to 'take our time' to review it [the negative protocol 945-271] carefully;" and

- "I assume that we would like to maximize the time interval between the [negative] Reckless paper and the [negative] POPP study."

*See* Dickersin Report, at 33-40. Defendants' expressly articulated and successfully executed

plan to distort and delay the publication of critical negative trial results is a compelling example

of the publication bias found by Dr. Dickersin.

As a further example, in reaching her conclusion that the results of protocol 945-306 (the

"Serpell" study) were spun, Dr. Dickersin relied, in part, on an e-mail exchange between Pfizer

employees and Medical Actions Communications (a third-party vendor hired by Pfizer), whose

*subject line* was "spinning Serpell." *See* Dickersin Report, at 42-44. Not surprisingly, the e-mail

chain discussed ways that the negative Serpell results could be spun favorably.

Finally, Dr. Dickersin, *the director* of the U.S. Cochrane Group, reviewed

correspondence between Pfizer and Cochrane, and concludes:

> For bipolar disorders, migraine, and neuropathic pain, Pfizer was
> approached by systematic reviewers affiliated with the Cochrane
> Pain, Palliative and Supportive Care Review Group, and asked to
> provide data from unpublished trials and for published variables
> where additional information was needed to conduct the review. I
> reviewed documents indicating that Pfizer was not willing to
> provide these data but did not want to appear noncompliant.

*Id.* at 48. Pfizer's refusal to cooperate in the very reviews intended to identify and address

publication bias—which its own experts now put forward as a primary basis of their opinions as

to Neurontin's efficacy (*see* n.1, *supra*)—is perhaps the best example of the ripple effect on the

biomedical literature and prescribing physicians of Defendants' withholding and distortion of

clinical trial data.

**D.**      **Dr. Dickersin's Findings Were Recently Published In The *New England Journal of Medicine***

Based on this exhaustive review, Dr. Dickersin was able to draw, *inter alia*, the following conclusions:

- "There is ample evidence of *reporting bias* across the studies and indications I reviewed," and that these reporting biases are "arguably the most insidious;"

- "Publication was rare when the final study results were 'negative;'"

- "In nearly every case, published studies focused on *analysis of selective population*;"

- "By and large, published reports were consistent in accurately stating their *a priori* choice of primary outcome, as described in the protocol.  However, more focus was frequently placed on secondary outcomes;"

- "In the studies I reviewed, a rationale for negative results (for example, high response rate in the placebo group) was frequently invoked and repeated in subsequent articles;"

- "I observed evidence of *ghost authorship* by a company engaged in medical writing.  Only rarely was the writing by an unnamed author even acknowledged…the ghost authors were frequently asked to 'spin' or frame the message;"

- "I observed several examples of citing only studies with positive results, or of implying the cited studies all had positive findings when they did not."

*Id.* at 22-23 (italics in original).

Dr. Dickersin's analysis of Defendants' internal research reports and published studies was the subject of a recent article published in the prestigious *New England Journal of Medicine*. *See* Vedula, *et al.*, *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361;20, New England Journal of Medicine, 1963 (2009) (attached as Exhibit C to the accompanying Declaration).  The published abstract closely tracks her expert report:

BACKGROUND

There is good evidence of selective outcome reporting in published reports of randomized trials.

METHODS

We examined reporting practices for trials of gabapentin funded by Pfizer and Warner-Lambert's subsidiary, Parke-Davis (hereafter referred to as Pfizer and Parke-Davis) for off-label indications (prophylaxis against migraine and treatment of bipolar disorders, neuropathic pain, and nociceptive pain), comparing internal company documents with published reports.

RESULTS

We identified 20 clinical trials for which internal documents were available from Pfizer and Parke-Davis; of these trials, 12 were reported in publications. For 8 of the 12 reported trials, the primary outcome defined in the published report differed from that described in the protocol. Sources of disagreement included the introduction of a new primary outcome (in the case of 6 trials), failure to distinguish between primary and secondary outcomes (2 trials), relegation of primary outcomes to secondary outcomes (2 trials), and failure to report one or more protocol-defined primary outcomes (5 trials). Trials that presented findings that were not significant ($P \geq 0.05$) for the protocol-defined primary outcome in the internal documents either were not reported in full or were reported with a changed primary outcome. The primary outcome was changed in the case of 5 of 8 published trials for which statistically significant differences favoring gabapentin were reported. Of the 21 primary outcomes described in the protocols of the published trials, 6 were not reported at all and 4 were reported as secondary outcomes. Of 28 primary outcomes described in the published reports, 12 were newly introduced.

CONCLUSIONS

We identified selective outcome reporting for trials of off-label use of gabapentin. This practice threatens the validity of evidence for the effectiveness of off-label interventions.

*Id.* at 1963.

Not only are Dr. Dickersin's opinions shared by her three co-authors, who are also experts in the field,[4] as part of the submission process, her methods and conclusions were also peer-reviewed. Publication and peer review serve as independent indicia of the reliability of a

---

[4] Dr. Dickersin was joined on the paper by S. Swaroop Vedula, M.D., M.P.H., Roberta W. Scherer, Ph.D., and Lisa Bero, Ph.D. of the Department of Clinical Pharmacy and Institute for Health Policy Studies at the University of California at San Francisco. *Id.* at 1963.

scientific technique and demonstrate a measure of acceptance of the methodology within the

scientific community. *See Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 84 (1st Cir. 1998) (reversing

a district court's evidentiary ruling excluding expert testimony as scientifically unreliable, where

the expert relied on a study published in a "prestigious, peer-reviewed medical journal"). Kaiser

respectfully submits that if Dr. Dickersin's opinions are reliable enough to pass peer review at

one of the world's most prestigious medical journals, they are reliable enough to present to the

trier of fact.

## III.    PFIZER'S CRITICISMS OF DR. DICKERSIN'S REPORT ARE UNTENABLE

Threatened by the findings of the eminently qualified Dr. Dickersin, Pfizer predictably

seeks to discredit her opinions. Yet in Pfizer's entire brief, it does not point to *a single piece of*

*relevant evidence* that Dr. Dickersin neglected to consider in the course of her work. Pfizer's

specific criticisms of Dr. Dickersin's report are equally unavailing.

### A.      Dr. Dickersin's Opinions Will Assist the Jury

Pfizer argues that Dr. Dickersin's testimony will not "assist the trier of fact to understand

the evidence or determine a fact in issue" (Fed. R. Evid. 702), as required for admission. Pfizer

is wrong.

To determine whether an expert's testimony will assist the trier of fact, courts consider

"whether the untrained layman would be qualified to determine intelligently and to the best

degree the particular issue without enlightenment from those having a specialized understanding

of the subject matter involved." *United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995). In

complex cases, expert testimony may help a jury understand unfamiliar terms and concepts. *See*

*In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2003 U.S. Dist. LEXIS 4650, at *53 (S.D.N.Y. Mar.

26, 2003) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)) (permitting an

expert to testify in a securities case regarding particular practices that deviate from the norm,

what effects they may have on the market, and whether the defendants would have been aware of these effects).

For fifteen years, Defendants have managed to mislead physicians—and apparently *their own experts*—concerning the true state of Neurontin research. Indeed, the Court itself appears reluctant to wade into this complicated area without the help of expert testimony, and scheduled the upcoming trial at least in part so that it could have the benefit of that guidance.[5] *A fortiori*, a lay jury—who, unlike the Court, has *not* "been with this case since 1996" (*see* n.5, *supra*)—is ill-equipped to determine, without the benefit of expert opinion, whether Pfizer's excuses for suppressing and "spinning" study results have a legitimate basis, or are mere pretext. Lay jurors should not be deprived of the expert assistance the Court itself finds necessary to decide the complicated scientific issues presented by this case.

**B.      Dr. Dickersin May Testify That Defendants' Actions Are Consistent With An Intent To Distort The Scientific Literature**

Much of Defendants' brief is devoted to the argument that Dr. Dickersin may not opine as to their mental state. As corporations, not individuals, Defendants have no mental state *per se*. Unlike an individual, who can testify as to his or her *actual* state of mind, the intent of a corporation can only be deduced from the words and actions of its employees. While some of the documents on which Dr. Dickersin bases her opinions openly declare their authors' intent (*see* Section II(C), *supra*), much of the data manipulations performed by Defendants are more subtle (*e.g.*, writing up a study that failed as to the primary endpoint as a success based on a

---

[5] *See* Transcript of Sept. 18, 2009 Motion Hearing, at 90:2-13 ("[I]f anything, this has been overkill. She says, 'Read Footnote 16 in the Hartman report.' It took me two full days just to read the briefs without the exhibits, and I've been with this case since 1996. So I need some way to cut through this and have some jury just make some – and I can sit and listen and understand.")

secondary endpoint), and require the assistance of an expert in clinical trials to explain their significance.

Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Accordingly, in complex cases such as this, expert testimony may help a jury understand unfamiliar terms and concepts. *See, e.g. In re Blech Sec. Litig.*, 2003 U.S. Dist. LEXIS 4650, at *53. Where, as here, expertise is required to appreciate the significance of a party's actions, an expert may offer an opinion that the party's actions are *consistent* with a particular intentional act or motivation. *See Millette v. Adams*, No. 1:07-CV-00119, 2008 WL 3927798, at *9 (E.D. Cal. Aug. 25, 2008) (allowing expert testimony comparing the victim's injury to those seen in "execution-style slayings," based on the expert's background and experience in examining knife wounds). Dr. Dickersin proposes to do no more. *See* Dickersin Report, at 33 ("Taken both individually and together, these cases *reflect* clear intent to suppress information, deceive the medical community, and manipulate messages regarding the results of biomedical research. This *represents* a distortion of knowledge that is inexcusable and unethical.") (emphasis added). Accordingly, Dr. Dickersin should be permitted to testify that Defendants' actions were *consistent* with deliberate scientific misconduct,[6] reserving to the jury the ultimate question. *See* Fed. R. Civ. P. 704(a) ("Except as provided in

---

[6] Pfizer complains that an article referenced by Dr. Dickersin says only that its failure to publish negative study findings "'*should* be treated as scientific misconduct,'" and that "the failure to publish a study violates no law or regulation." Defs. Mem. at 10 (quoting Iain Chalmers, *Under-reporting research Is Scientific Misconduct*, 263 J. Am. Med. Ass'n 1405 (1990) (emphasis added by Pfizer). Pfizer cites no authority for the implicit premise of this argument—unless ethical guidelines and standards can be found in statutes and regulations, they do not exist. To state the argument is to refute it.

subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not

objectionable because it embraces an ultimate issue to be decided by the trier of fact.").[7]

**C.     Defendants Coined the Term "Publication Strategy" To Describe Their Improper and Illegal Off-Label Marketing Effort**

Remarkably, Pfizer complains that "Dr. Dickersin testified that she never even heard the

term 'publication strategy' before beginning her work in this case." Defs. Mem. at 7.  That is

because Defendants *coined* this term to describe their effort to end-run the applicable regulatory

requirements.  As alleged by Kaiser in the operative complaint:

> Certain members of Parke-Davis' Regulatory Department opposed
> the pursuit of a "publication strategy," stating that seeking FDA
> approval for bipolar disorder through appropriate clinical studies
> was the correct way to proceed.  That recommendation was not
> followed.  [¶]  On March 22, 1995, the Parke-Davis Marketing
> Council met in Lyons, France, and recommended that Parke-Davis
> pursue a "publication strategy" instead of following the formal
> regulatory approval channels with regard to psychiatric indications
> for Neurontin. . . . In May 1995, a formal Parke-Davis Marketing
> Assessment report recommended that the company implement this
> publication strategy for various psychiatric indications.

Third Coordinated Amended Complaint (Dkt. No. 583), ¶¶ 25-26, 28.

Dr. Dickersin is an expert on *proper* scientific practices, not terms coined by Defendants

to describe their uniquely *improper*—and illegal—marketing effort.  Dr. Dickersin's hitherto

lack of familiarity with the term "publication strategy" is merely a reflection of its audacity, and

in no way calls her opinions regarding the ethics of that strategy into question.

---

[7] The exception to this rule is illuminating.  Fed. R. Evid. 704(b) provides that: "[n]o expert
witness testifying with respect to the mental state or condition of a defendant *in a criminal case*
may state an opinion or inference as to whether the defendant did or did not have the mental state
or condition constituting an element of the crime charged or of a defense thereto.  Such ultimate
issues are matters for the trier of fact alone." (Emphasis added.)  The clear implication of this
section is that while such testimony is inadmissible in criminal cases, it *is* admissible in civil
matters.

**D.     Dr. Dickersin's Use of Four Adjectives To Describe The Severity of the
Scientific Misconduct Chronicled in Her Report Does Not Render Her
Opinions Inadmissible**

Defendants seize on a handful of words contained in Dr. Dickersin's 354-page report to

argue that she "repeatedly employs inflammatory and hyperbolic language to describe her

observations with regard to the particular Neurontin studies she was provided . . . ." Defs. Mem.

at 3.  Specifically, Defendants complain of the following four words contained within the

following four statements:

- Reporting bias occurs when the dissemination of research
  findings is influenced by the nature and direction of the
  results. There is extensive, even *shocking*, evidence of
  reporting biases in the studies of Neurontin that I reviewed
  for this report.  (Dickersin Report, Executive Summary, at
  4 (emphasis added)).

- The documents I reviewed represent a remarkable
  assemblage of evidence of reporting biases that amount to
  outright *deception* of the biomedical community, and
  suppression of scientific truth concerning the effectiveness
  of Neurontin for migraine, bipolar disorders, and pain.
  (Dickersin Report, Executive Summary, at 4 (emphasis
  added)).

- Published reports from studies of Neurontin frequently
  placed undue weight on an outcome.  This form of selective
  outcome reporting bias is particularly *insidious* in that it
  takes advantage of the fact that most clinicians are
  untrained in recognizing and understanding most forms of
  bias and have little time to devote to reading an article in
  detail.  (Dickersin Report, at 22 (emphasis added)).

- The documents I reviewed on clinical trials of Neurontin
  for migraine prophylaxis, as well as treatment of bipolar
  disorders, nociceptive, and neuropathic pain, indicate a
  clear and *deliberate* pattern of reporting biases, including
  but not limited to publication bias, selective outcome
  reporting; selective analyses; multiple publication; location
  bias; time lag bias; and citation bias.  (Dickersin Report,
  Conclusion, at 52 (emphasis added)).

Each of these four statements summarize the results of Dr. Dickersin's review. The adjectives employed are descriptive of the severity of Defendants' scientific misconduct, in Dr. Dickersin's opinion, which she is eminently qualified to give.[8] Defendants cite no authority for the proposition that an expert is not permitted to make informed, qualitative assessments of the degree to which a party has adhered or failed to adhere to accepted scientific norms. Dr. Dickersin's opinions are admissible, with or without the four words out of 354 pages of which Defendants complain.

### E. Dr. Dickersin Properly Included Defendants' Unpublished Nociceptive Pain Trials In Her Analysis

Pfizer claims that Dr. Dickersin should have ignored multiple trials in the area of nociceptive pain, because Pfizer describes them as "exploratory." Defs.' Mem. at 13. Pfizer disavows any ethical requirement to publish data gleaned from these multiple, completed, double-blind, randomized, controlled trials, because they studied gabapentin in combination with other drugs, and the combinations "were never produced and never marketed." *See* Defs. Mem. at 13 ("The fact that the drug combinations were never produced, let alone marketed, explains why the results of the trials were never published."). This is a mere tautology, as it is illegal to market a drug or drug combination unless and until the manufacturer provides the FDA with multiple controlled trials establishing its efficacy in treating the corresponding condition(s). By definition, studies which *fail* to show efficacy *never* result in approval to market. Accordingly, what Pfizer's argument boils down to is that *drug companies are never under any obligation to publish the results of negative efficacy trials*. While this "standard" may comport with Pfizer's

---

[8] Indeed, the third statement explains exactly what Dr. Dickerson means by "insidious." As with the other adjectives, Defendants quarrel with the word, but do not dispute the accuracy of its usage.

-15-

behavior, it violates the expressly articulated policy of the most respected medical journals. *See* discussion below, *supra.*

The sole support offered by Pfizer for its contention that it was entitled to suppress the results of these trials is their retained expert, Dr. Field, who provides no support for this notion other than her say-so. *See* Decl. Exh. D (Field Report), at 27 ¶ 2 ("development of these combination drugs was not pursued, thus explaining why the results were never formally published"). Pfizer's motive for seeking to remove the nociceptive pain trials from Dr. Dickersin's analysis is clear, as it argues that once the nociceptive trials are removed, its publication rates are within an acceptable range. *See* Defs.' Mem. at 13.

Pfizer's selective re-do of Dr. Dickersin's analysis is as indefensible as its decision to withhold the studies from publication. As an initial matter, Pfizer illegally marketed Neurontin as a treatment for nociceptive pain. In this very case, Pfizer proffers expert opinion that Neurontin is effective for nociceptive pain, based on a one-paragraph analysis of only the *published* literature. *See* Brenner Report, at 4-5. The *primary* endpoint of all but one of the unpublished nociceptive pain trials involving Neurontin was efficacy. *See* Dickersin Report, Appendix A, Nociceptive Pain Table 7. Pfizer's claim that these multiple, unpublished, nociceptive pain trials investigating Neurontin's efficacy for nociceptive pain are "irrelevant" to the question of whether it biased the literature on the subject cannot be taken seriously. The *NEJM,* which peer-reviewed Dr. Dickersin's analysis and conclusions, did not share Pfizer's criticism of Dr. Dickersin's inclusion of these trials in her work, nor did they require their

removal; her published analysis of these so-called "exploratory" trials is contained in her *NEJM* article.[9]  *See* Decl. Exh. C, at 1967-68.

The need to publish data from *all* clinical trials is not solely the belief of Dr. Dickersin—as Pfizer would have the Court believe—it is a generally-accepted ethical principle.  In a 2004 editorial simultaneously published in leading medical journals across the world, the International Committee of Medical Journal Editors (ICMJE) (comprised, *inter alia*, of the editors of the *Journal of the American Medical Association, NEJM, The Lancet*, Medline, and the *Annals of Internal Medicine)* declared, as a condition of consideration for publication, the required registration of *all* clinical trials.  *See* DeAngelis, Catherine *et al, Clinical trial registration: a statement from the International Committee of Medical Journal Editors,* 364 *Lancet* 911 (2004).  The ICMJE requires the registration of all clinical trials because "the research enterprise has an obligation to conduct research ethically and to report it honestly.  Honest reporting begins with revealing the existence of *all* clinical trials, even those that reflect unfavorably on a research sponsor's product."  *Id.* (emphasis added).  *See also* DeAngelis, *et al., Is this Clinical Trial Fully*

---

[9] The nociceptive pain studies in question are not exploratory trials under any of the internationally recognized definitions of such trials.  For example, the FDA defines exploratory trials as "usually involv[ing] very limited human exposure and hav[ing] no therapeutic or diagnostic intent."  U.S. Department of Health and Human Services, FDA, CDER, *Guidance for Industry, Investigators, and Reviewers, Exploratory IND Studies*, dated January 2006, at 3.  Available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/U CM078933.pdf.  The International Conference of Harmonisation (ICH) defines exploratory trials as "those intended to be conducted early in Phase I, involve limited human exposure, have no therapeutic intent, and are not intended to examine clinical tolerability."  *Guidance on Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals*, dated October 29, 2009, at 8.  Pfizer's nociceptive marketing assessment makes clear that "clinical trials should be powered for the primary endpoint, efficacy."  Decl. Exh. E (Neurontin Combination Market Assessment) at Pfizer_MPierce_0000835.  Since the nociceptive pain trials were powered for the primary endpoint of efficacy, and were clearly not Phase I trials, they are not "exploratory" trials by any generally accepted definition.

*Registered?  A Statement from the International Committee of Medical Journal Editors,* 293:23,

JAMA, 1 (2005).  The World Medical Association's Declaration of Helsinki on the Ethical

Principles for Medical Research Involving Human Subjects similarly provides that:

> Authors have a duty to make publicly available the results of their
> research on human subjects and are accountable for the
> completeness and accuracy of their reports. They should adhere to
> accepted guidelines for ethical reporting. Negative and
> inconclusive as well as positive results should be published or
> otherwise made publicly available.

*Declaration of Helsinki - Ethical Principles for Medical Research Involving Human Subjects,* ¶

30.[10]  The Cochrane Collaboration agrees:

> Many clinical trials, especially those with negative or inconclusive
> results, may fail to be published in medical journals. This risks the
> unethical use of healthcare resources and participants in trials. To
> prevent this, ethics committees should promote prospective
> registration of clinical trials and thus ensure that trial results can
> subsequently become publicly available.

*Cochrane Collaboration statement on registering clinical trials prospectively*, dated July 26,

2004.[11]

While Pfizer proffers Dr. Field's *ipse dixit* to support its right to selectively publish

results, Dr. Field's *published* work calls for guidelines that "cover companies' responsibility to

endevour to publish results of all studies."  Wager, *et al.*, Good publication practice for

pharmaceutical companies, 19:3 *Current Medical Research and Opinion*, 149 (2003).  Dr.

Field's unsupported, paid-for opinion, which directly contradicts her published opinion, provides

no basis to exclude Dr. Dickersin's testimony.  *See, e.g., General Elec. Co. v. Joiner*, 522 U.S.

136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a

---

[10] Available at: http://www.wma.net/en/30publications/10policies/b3/index.html.
[11] Available at: http://cochrane.org/news/articles/2004.07.26.htm.

district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

## IV.    CONCLUSION

Because Dr. Dickersin's opinions are the product of reliable principles and methods, and Defendants' criticisms of her report are misdirected and unavailing, the motion to exclude her testimony should be denied.

Dated:  January 22, 2010                          Respectfully submitted,


                                                  By:    /s/ Linda P. Nussbaum
                                                         Linda P. Nussbaum

                                                  KAPLAN FOX & KILSHEIMER LLP
                                                  Linda P. Nussbaum, Esq.
                                                  850 Third Avenue, 14th Floor
                                                  New York, New York 10022

                                                  *Attorneys for Plaintiffs Kaiser Foundation*
                                                  *Health Plan, Inc. and Kaiser Foundation*
                                                  *Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*