UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES<br>        PRACTICES, AND PRODUCTS<br>        LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY<br>OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS)<br>and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | MDL Docket No.  1629<br><br>Master File No. 04-10981<br><br>Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**PLAINTIFF KAISER'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS *IN LIMINE* TO EXCLUDE THE TESTIMONY
<u>OF MEREDITH ROSENTHAL AND RAYMOND S. HARTMAN</u>**

855571.1

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................... 1

II. THE COURT HAS ALREADY DETERMINED THAT DR. ROSENTHAL'S REPORT IS SUFFICIENTLY RELIABLE TO SUPPORT A JURY FINDING ............................................................................... 2

III. DR. HARTMAN PROPERLY UTILIZED THE NDTI DATA IN MAKING HIS CALCULATIONS ......................................................................... 3

IV. DR. HARTMAN'S ASSUMPTIONS ARE REASONABLE AND WELL-GROUNDED ............................................................................................ 5

    A. Kaiser May Recover the Full Purchase Price As to Indications For Which Neurontin Is Proven Ineffective ...................................................... 5

    B. Kaiser's Alternative Damages Theory Takes Into Account the Cost of Alternative Medications ......................................................................... 7

V. THE COMPLAINT CLAIMS DAMAGES FOR BOTH KAISER AND ITS SUBSIDIARIES ............................................................................................ 11

VI. CONCLUSION .................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Bigelow v. RKO Radio Pictures, Inc.*,
   327 U.S. 251 (1946) ............................................................................................................. 9, 10

*City of Chicago v. Reliable Truck Parts Co., Inc.*,
   822 F. Supp. 1288 (N.D. Ill. 1993) ............................................................................................. 10

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
   79 F.3d 182 (1st Cir. 1996) .................................................................................................. 10, 11

*Desiano v. Warner-Lambert Co.*,
   326 F.3d 339 (2d Cir. 2003) ......................................................................................................... 7

*Hannigan v. Sears Roebuck & Co.*,
   410 F.2d 285 (7th Cir. 1969),
   *cert. denied*,
   392 U.S. 902 (1969) ................................................................................................................... 10

*In re Neurontin Marketing and Sales Practices Litig.*,
   --- F. Supp. 2d --- 2010 WL 53568 (D. Mass. Jan. 8, 2010) ...................................................... 2

*Mitchell v. Maynard*,
   80 F.3d 1433 (10th Cir. 1996) ................................................................................................... 12

*Rice v. Hamilton Air Force Base Commissary*,
   720 F.2d 1082 (9th Cir. 1983) ................................................................................................... 12

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ............................................................................................................. 9, 10

*U.C. Castings Co. v. Knight*,
   754 F.2d 1363 (7th Cir. 1985) ................................................................................................... 10

I.      **INTRODUCTION**

In denying summary judgment against Kaiser[1] only two weeks ago, the Court found that "Dr. Rosenthal's report would support a jury finding that it is more likely true than not true that the Coordinated Plaintiffs did, in fact, suffer harm as a result of Defendants' fraudulent marketing of Neurontin." If Professor Rosenthal's report is sufficient to support a jury verdict as to the fact of damage, it is sufficiently reliable to come into evidence.

Defendants attack Dr. Hartman's use of NDTI data as inconsistent with a Kaiser internal survey concerning the percentage of Neurontin prescriptions written for bipolar disorder. However, the survey involved only one of four ICD-9 codes for bipolar disorder, and is fully consistent with the NDTI numbers.

Pfizer argues that Dr. Hartman erred in assuming that Kaiser may recover the full purchase price of its Neurontin prescriptions. Kaiser may recover the full cost of prescriptions written to treat those conditions as to which Kaiser proves Neurontin is ineffective.

As to Kaiser's alternative damages theory, which applies only to any indications for which Kaiser is unable to prove that Neurontin is ineffective, Pfizer argues that Dr. Hartman's report is insufficient with respect to calculating the cost of less expensive, alternative drugs. As to each indication, Dr. Hartman calculated a weighted average cost of the corresponding alternative drug, based on the amounts actually spent by Kaiser on each of those drugs, taking into account the relative frequency with which each drug is prescribed. Pfizer's nitpicking at the composition of the list, or the means by which the weighted averages were calculated, goes to the

---

[1] "Kaiser" is Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals. Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries: Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

weight to be afforded Dr. Hartman's testimony, not its admissibility.  Accordingly, Pfizer's motions should be denied.

## II.   THE COURT HAS ALREADY DETERMINED THAT DR. ROSENTHAL'S REPORT IS SUFFICIENTLY RELIABLE TO SUPPORT A JURY FINDING

Two weeks ago, the Court found that "Dr. Rosenthal's report would support a jury finding that it is more likely true than not true that the Coordinated Plaintiffs did, in fact, suffer harm as a result of Defendants' fraudulent marketing of Neurontin."[2]  In this, effectively Pfizer's third *Daubert* motion directed to Prof. Rosenthal's report, Defendants level no new challenges at Prof. Rosenthal's analysis; they merely repeat their prior challenges, which have already been briefed and argued *ad nauseum*, the only new element being the Court's recent decisions on class certification and summary judgment.  Although the Court most recently held that "the Coordinated Plaintiffs cannot rely *solely* on Dr. Rosenthal's report as the silver bullet to establish causation" (*id*. at 10), the clear implication of that statement is that any Coordinated Plaintiffs who survived summary judgment *may* rely on her report, *plus* some other evidence, "to establish causation."  *Id*.  The Court went on to find that Kaiser alone had provided sufficient additional evidence.  *Id*. at *11-12.

Far from excluding Prof. Rosenthal's report, as Defendants had urged, the Court appeared to find it extremely helpful, although insufficient, *in itself*, to establish causation:

> Plaintiffs have presented evidence, largely through the report of their expert, Dr. Meredith Rosenthal, that *shows that Pfizer's marketing of Neurontin for off-label indications caused a sharp increase in the number of prescriptions that the Plaintiffs paid for or reimbursed*.  The charts produced by Dr. Rosenthal offer a visual and compelling depiction of Plaintiffs' evidence. Chart C.3, reproduced here, shows a sharp increase in off-label prescriptions for Neurontin, beginning around 1996.  During the same time

---

[2] *In re Neurontin Marketing and Sales Practices Litig*., --- F. Supp. 2d ---, 2010 WL 53568, *9 (D. Mass. Jan. 8, 2010) ("MSJ Opinion").

855571.1                                    -2-

> period, Neurontin on-label prescriptions as an adjunctive epilepsy therapy remain roughly static.
>
> Dr. Rosenthal's report also details Pfizer's expenditures on marketing of Neurontin during the same time period. Dr. Rosenthal found a high correlation between Pfizer's promotional marketing and off-label prescriptions for Neurontin. As an example, Dr. Rosenthal's Chart E.1 shows the correlation between promotional efforts for psychiatrists and bipolar use of Neurontin by psychiatrists. If Plaintiffs can prove that Pfizer engaged in a fraudulent marketing campaign by suppressing material adverse information about Neurontin's efficacy for off-label uses, *Dr. Rosenthal's report would support a jury finding that it is more likely true than not true that the Coordinated Plaintiffs did, in fact, suffer harm as a result of Defendants' fraudulent marketing of Neurontin*. For example, in the psychiatric area, the Plaintiffs argue that the fraudulent marketing caused virtually all the off-label prescriptions, in areas such as bipolar use.

MSJ Opinion, 2010 WL 53568 at *9 (citations omitted, emphasis added).

The Court has much to rule upon, without having to rule upon the same arguments concerning Prof. Rosenthal's report twice in the space of less than one month. If Professor Rosenthal's report is sufficient to support a jury verdict as to the fact of damage, it is sufficiently reliable to come into evidence.

### III.   DR. HARTMAN PROPERLY UTILIZED THE NDTI DATA IN MAKING HIS CALCULATIONS

As Kaiser's expert, Dr. Rena Conti, explains, "NDTI data are the academic, government and industry standard for the estimation of national prescription medication use linked to specific diagnoses and related to promotional activities." Rebuttal Declaration of Rena Conti, Ph.D. ("Conti Reb. Dec.," Dkt. No. 1186) at 4. Pfizer complains that this "academic, government, and industry standard data" (*id*.)—on which Pfizer *itself* relied to track the success of its Neurontin off-label marketing effort—contains "unacceptably wide margins of error." Defs. Mem. at 3. As Dr. Conti responded to this criticism previously, "when examining prescription trends over time using NDTI data, it is standard practice in peer-reviewed literature not to provide margins of

855571.1                                         -3-

error because doing so will not affect the observed trends.  Dr. Grabowski himself does not provide margins of error in the charts provided in his report which utilize the same NDTI data to show prescribing trends over time." Conti Reb. Dec., at 1.  *See also id*. at 5 (providing greater detail).

Next, Pfizer argues that the NDTI cannot be extrapolated to Kaiser, because "Kaiser conducted an extensive survey to determine its own drug utilization and found that its Neurontin prescriptions for bipolar comprised only approximately 4 percent.  In contrast, for the period 1999 through 2003, Dr. Hartman estimates Kaiser's bipolar utilization at 16.6 percent of its total Neurontin prescriptions, based on the NDTI data." Defs. Mem. at 4.  However, as Kaiser's former Drug Use Manager Northern California, who helped collect the data included on the chart on which Pfizer relies explains:

> The data represented in KAIS—001107 was collected in late 2001 (and covers approximately 6 months preceding its collection), and represents a subset of Kaiser patients in the Northern California region who were prescribed Neurontin.  The data only includes patients: (a) from the Northern California region; (b) who had never taken Neurontin before for any indication; (c) the diagnosis was picked up during an incomplete data collection based on ICD-9 codes, and (d) the patient filled the prescription within twenty-four hours of the prescription being written.  That is, the data does not include, among others, any refill prescription, nor any prescriptions filled outside the twenty-four hour window.
>
> When collecting this data, we were focused on the paucity of Neurontin on-label epilepsy usage, and not on the presence of bipolar usage (or usage for other indications).
>
> We only collected data for ICD-9 code 296.7 (bipolar disorder, unspecified), and did not collect data for ICD-9 code 296.4 (bipolar affective disorder, manic), ICD-9 code 296.5 (bipolar affective disorder, depressed), ICD-9 code 296.6 (bipolar affective disorder, mixed state (psychiatry)), nor any other ICD-9 codes that might be associated with bipolar disorder.  Because our data collection, among other things, focused on only one of several possible ICD-9 codes, the collection (and the 4% figure in KAIS—001107) does not accurately represent, and instead substantially

> understates, the percentage of Kaiser members who were prescribed and taking Neurontin for bipolar disorder at that time.
>
> Given the limitations of our data collection, I would not characterize the data represented in KAIS—001107 as an "extensive survey [by Kaiser] to determine its own drug utilization."

Declaration of Ambrose Carrejo, Pharm.D. (filed herewith), ¶¶ 5-8.

Based on a comparison of this chart and the NDTI data, Pfizer argues that "Dr. Hartman overstates Kaiser's bipolar prescriptions by a factor of four." Defs. Mem. at 4. However, as the chart relied upon by Pfizer includes only one of four ICD-9 codes specific to bipolar disorder, this data tends to confirm, rather than undermine, the applicability of the NDTI data to Kaiser insureds.[3]

## IV. DR. HARTMAN'S ASSUMPTIONS ARE REASONABLE AND WELL-GROUNDED

### A. Kaiser May Recover the Full Purchase Price As to Indications For Which Neurontin Is Proven Ineffective

Pfizer complains that "Dr. Hartman's damages model assumes, simplistically, that Plaintiffs are entitled to the entire amount they paid for off-label Neurontin prescriptions, even if Kaiser's policyholders benefited from the medication, and even if Kaiser would otherwise have paid more for a different medication." Defs. Mem. at 6. Throughout this litigation, the Coordinated Plaintiffs, including Kaiser, have consistently maintained two alternative damages theories: (1) for those indications as to which the trier of fact concludes Neurontin is *ineffective*, a complete refund of amounts paid by Kaiser for Neurontin prescriptions to treat those indications that would not have been written but for Defendants' fraud; and (2) for those indications as to which the trier of fact concludes that Neurontin is not completely ineffective,

---

[3] It also bears noting that for the fourth quarter of 2004, during which the data were collected, Dr. Hartman calculates Kaiser's share of Neurontin bipolar prescriptions based on the NDTI data as 12.8%, not 16.6%, as argued by Defendants. *See* Defs. Mem. at 4; Exhibit G to Motion.

but materially less effective than represented by Defendants, the difference between (a) the amount paid by Kaiser for Neurontin prescriptions to treat those indications that would not have been written but for Defendants' fraud, and (b) the amount that *would* have been paid by Kaiser for a less expensive, alternative drug.

As to Kaiser's *primary* damages theory, Defendants' criticisms are misdirected entirely, and reflect their continuing failure to "get it." If Kaiser succeeds in proving, for example, that Neurontin is ineffective in treating bipolar disorder, *there is no possibility* that any of "Kaiser's policyholders benefited from the medication." Defs. Mem. at 6. That is what it *means* to prove inefficacy. *See, e.g.*, Memorandum of Law in Support of Plaintiff Kaiser's Motion *In Limine* to Exclude Testimony of Dr. Andrew Slaby (Dkt. No. 2386) at 5-8; Kaiser's Motion *In Limine* to Exclude Testimony of Pfizer's Non-Retained Experts (Dkt. No. 2351) at 9-15. For the same reason, for those indications as to which Kaiser succeeds in proving inefficacy, Kaiser *is* "entitled to the entire amount they paid for off-label Neurontin prescriptions, . . . even if Kaiser would otherwise have paid more for a different medication." Defs. Mem. at 6. As the Court clarified in the following colloquy with Kaiser's counsel at the recent summary judgment hearing:

> THE COURT: I understand their damages model because theirs is quite straightforward: "It's snake oil. We shouldn't have to pay a penny for it," okay. And so it's easy, it gets around some of the issues that you have."
>
> MS. NUSSBAUM: But we have both. We have the snake oil, but we say, assuming, arguendo, the Court finds or a jury finds that it's not snake oil, then --
>
> THE COURT: I see, you have an alternative --
>
> MS. NUSSBAUM: Exactly. And that's in Dr. Hartman's report. In our complaint we have the alternative theory.

Transcript of Sept. 18, 2009 Motion Hearing ("MSJ Transcript"), at 61:21-62:6.  Accordingly, Kaiser's criticisms are wholly inapplicable as to those indications for which Kaiser proves that Neurontin is ineffective.

### B. Kaiser's Alternative Damages Theory Takes Into Account the Cost of Alternative Medications

To the extent Pfizer's criticisms are directed at Kaiser's alternative theory, they are equally misguided.  Kaiser may recover on its alternative theory even if Neurontin was not completely ineffective in treating the conditions at issue, but *less* effective as a general matter than Defendants represented, as the Court has already held:

> Plaintiffs argue that their injury is based on the fact that there were "cheaper and more optimal alternatives" to Neurontin for off-label indications.  In *Desiano*, the Second Circuit explicitly acknowledged as valid the plaintiff TPPs' argument that the defendant pharmaceutical company's "fraud directly caused economic loss to them as purchasers, since they would not have bought Defendants' product, rather than available *cheaper alternatives*, had they not been misled by Defendants' misrepresentations."  326 F.3d at 349 (emphasis added).

MSJ Opinion, 2010 WL 53568 at *12 (citing *Desiano v. Warner-Lambert Co*., 326 F.3d 339 (2d Cir. 2003).

Pfizer is incorrect that Dr. Hartman's model does not adequately account for the cost of less expensive, alternative drugs that would have been prescribed by Kaiser physicians in lieu of Neurontin, but for Defendants' fraud.  In denying summary judgment against Kaiser, the Court explained at length the special role played by Kaiser's Drug Information Service:

> [A] 2008 Kaiser internal review found that during the period from 1994-2008, at least 95% of prescriptions written by PMG physicians were in compliance with the Kaiser formulary.
>
> For a drug to be placed on Kaiser's formulary, a PMG physician typically makes a proposal, which is then considered by the P & T committee.  Once such a request is made, a drug information specialist is assigned to prepare a drug monograph.  This monograph is distributed to members of the P & T committee.

> In addition, there are physician consultants for various therapeutic categories that are asked to review the monograph and provide their recommendation for formulary status.
>
> Neurontin was added to Kaiser's formulary in September 1994 with a restriction limiting its use to, or in consultation with, a PMG neurologist.  In 1997, Neurontin's formulary status was expanded to include prescriptions by PMG pain clinic physicians for the treatment of Reflex Sympathetic Dystrophy.  In 1999, the P & T committee voted to expand restrictions to include prescriptions by psychiatrists for the treatment of bipolar affective disorder.  For each of these three changes to the Kaiser formulary, Kaiser's Drug Information Service ("DIS") prepared monographs summarizing the available studies and other information for Neurontin related to the particular indication in question.  At the time of each P & T Committee vote, Kaiser alleges that its DIS did not have access to studies known to Pfizer that showed Neurontin's negative or negligible effects in patients with RSD and bipolar disorder.

*Id*. at *2 (citations omitted).

As these excerpts make plain, Kaiser's Drug Information Service exercises considerable influence over the prescribing decisions of Kaiser-affiliated physicians.  *See id*. at *11 ("Because DIS drug monographs for Neurontin, prepared by Kaiser and used by Kaiser's P & T committee, directly influenced Kaiser's decision to expand its formulary, a reasonable inference can be drawn that Kaiser was directly injured by Pfizer's misrepresentations about Neurontin.").

The list of less expensive, alternative drugs on which Dr. Hartman based his alternative damages analysis was prepared by Mirta Millares, Pharm.D., Kaiser's Manager for Drug Information Services and Pharmacy Outcomes Research.  *See* Dec. 5, 2008 Declaration of Mirta Millares (attached as Exh. 146 to the Declaration of Linda P. Nussbaum (Dkt. No. 1746)), ¶¶ 1, 4-5.  For each indication, on a quarterly basis, Dr. Hartman calculated the weighted average price that Kaiser would have paid for the corresponding alternative medications, based on the amounts actually spent by Kaiser on each of these drugs, which takes into account the relative frequency with which each is prescribed.  *See* Table 1:  Kaiser Average Cost of Prescription for Alternative

Therapies.[4]  For each indication, Dr. Hartman then calculated Kaiser's alternative damages by subtracting the weighted average cost of the corresponding alternative treatments from the amounts actually paid by Kaiser for Neurontin prescriptions.  *See* Hartman Report, at 12 n.16.

At the recent summary judgment hearing, the Court noted that "assuming you can prove a fraud, you don't have to be as precise in your damage model."  MSJ Transcript, at 78:23-24.  And in denying summary judgment as to Kaiser, the Court found that the predicate for invoking this relaxed standard of proof had been sufficiently satisfied.  *See* MSJ Opinion, at *9 ("Dr. Rosenthal's report would support a jury finding that it is more likely true than not true that the Coordinated Plaintiffs did, in fact, suffer harm as a result of Defendants' fraudulent marketing of Neurontin.").

Indeed, the Supreme Court has long held that once the *fact* of injury is shown, a relaxed standard for the *measure* of damages then applies.  "The most elementary conceptions of justice and public policy require that the wrongdoer bear the risk of the uncertainty which his own wrong has created."  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946).[5]  In *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931), the Supreme Court upheld a jury verdict under the Sherman Act, stating, "It is true that there was uncertainty as to the extent of damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had

---

[4] This spreadsheet was produced to Defendants along with Dr. Hartman's report.  As it contains information on the prices paid by Kaiser, it is being filed under seal.  The calculations resulting in the $89,175,677 global alternative damages figure presented by Dr. Hartman in fn. 16 of his report are presented at Tab 2 of this document.

[5] Defendants seek to preempt Kaiser's invocation of *Bigelow*, arguing, *inter alia*, that "*Bigelow* did not address a situation where direct evidence actually existed and was available, but was ignored by the plaintiff and his experts."  Defs. Mem. at 5.  Throughout this litigation, Kaiser, the other Plaintiffs, and their experts have always used the best data available to them, for which they have paid dearly.  If the bar of proof is set so high that regardless of effort, ingenuity, or expense, no plaintiff can ever clear it, it will be the legal system that has failed, not Plaintiffs.

sustained some damage, and the measure of proof necessary to enable the jury to fix the amount." The Court went on to say that "uncertain damages" are precluded only where they are "not the certain result of the wrong," but no such rule applies "to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount...." *Id.* Put another way, "If the damage is certain, the fact that its extent is uncertain does not prevent a recovery." *Id.* at 566.

The First Circuit, citing *Story Parchment*, has stated that "there is a clear distinction between the relatively high measure of proof necessary to establish that a plaintiff has sustained some damage and the relatively low measure of proof necessary to enable the jury to fix the amount." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 200 (1st Cir. 1996) (internal quotation omitted). The plaintiff need only "produce evidence from which the jury can make a just and reasonable inference." *Id.*; *see also U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1373 (7th Cir. 1985) ("[O]nly a reasonable basis of computation is required for the submission of damages to the jury.") (quoting *Hannigan v. Sears Roebuck & Co.*, 410 F.2d 285, 293 (7th Cir. 1969), *cert. denied*, 392 U.S. 902 (1969)). The *Story Parchment/Bigelow* principle has often been applied to fraud cases. *See, e.g.*, *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F. Supp. 1288, 1294 (N.D. Ill. 1993) (once the fact of injury is shown, the jury may estimate damages on "any reasonable basis").

Dr. Hartman is an economist, not a Pharm.D. Dr. Hartman's reliance on Ms. Millares, who is both a Pharm.D. and the Director of Kaiser's influential Drug Information Service, to provide a list of cheaper, alternative medications listed on Kaiser's formulary—which has a 95% physician compliance rate—was eminently reasonable. Dr. Hartman's calculation of a weighted average cost of the alternative drugs identified for each indication, based on their actual usage by

Kaiser insureds, as the corresponding "but for" price was equally reasonable, especially given "the relatively low measure of proof necessary to enable the jury to fix the amount" of Kaiser's damages. *Coastal Fuels*, 79 F.3d at 200. Pfizer's nitpicking at the composition of the list, or the means by which the weighted averages were calculated, go to the weight to be afforded Dr. Hartman's testimony, not its admissibility.

## V. THE COMPLAINT CLAIMS DAMAGES FOR BOTH KAISER AND ITS SUBSIDIARIES

Pfizer argues that Dr. Hartman overstates Kaiser's damages, because he includes prescriptions paid for by subsidiaries that Pfizer claims are not in this case. This argument—which Pfizer raises for the first time on the eve of trial, after nearly six years of litigation—fails because the "Parties" section of the Third Coordinated Amended Complaint (Dkt. No. 583) defines Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals as *including* the non-California subsidiaries Pfizer claims are excluded,[6] and discovery requests and responses in

---

[6] Specifically, the complaint alleges:

> As of December 2004, Kaiser Foundation Health Plan, Inc. had 8.2 million members in nine states and the District of Columbia, with over 6 million members in California. The remaining members are in Colorado, Georgia, Maryland, Virginia, Oregon, Washington, Hawaii, Ohio and the District of Columbia. Kaiser Foundation Health Plan, Inc. offers its members pharmacy benefits that include coverage of Neurontin. Kaiser Foundation Health Plan, Inc. owns and operates its own in-house pharmacies in the same nine states in which it has members and the District of Columbia. These pharmacies purchase prescription drugs, including Neurontin, and dispense these drugs directly to Kaiser Foundation Health Plan, Inc. members. . . . From 1994 to the present, Kaiser Foundation Health Plan, Inc. has paid tens of millions of dollars for excessive prescriptions of Neurontin caused by Defendants' wrongful acts.
>
> Kaiser Foundation Hospitals is a not-for-profit California corporation which owns and operates thirty hospitals in California, Oregon and Hawaii and contracts with Kaiser Foundation Health Plan, Inc. to provide or arrange for hospital services for Kaiser

this case have not distinguished among these entities.  Courts have repeatedly rejected this type of gamesmanship.  *See, e.g., Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) ("[A] party not properly named in the caption of a complaint may still be properly before the court if the allegations in the body of the complaint make it plain the party is intended as a defendant...."); *Rice v. Hamilton Air Force Base Commissary*, 720 F.2d 1082, 1085 (9th Cir. 1983) (noting and affirming prior holding that "the question of whether a defendant is properly in a case is not resolved by merely reading the caption of a complaint. Rather, a party may be properly in a case if the allegations in the body of the complaint make it plain that the party is intended as a defendant.").  Accordingly, Dr. Hartman properly calculated the full scope of damages sought by the operative complaint.

## VI.   CONCLUSION

For the foregoing reasons, Pfizer's motions should be denied.

Dated:  January 12, 2010                                    Respectfully submitted,


                                                            By:    */s/ Linda P. Nussbaum*
                                                                   Linda P. Nussbaum

                                                            KAPLAN FOX & KILSHEIMER LLP
                                                            Linda P. Nussbaum, Esq.
                                                            850 Third Avenue, 14th Floor
                                                            New York, New York 10022

                                                            *Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals*

---

Foundation Health Plan, Inc. members in each state in which Kaiser Foundation Health Plan, Inc. operates.  From 1994 to the present, Kaiser Foundation Hospitals has paid tens of millions of dollars for excessive prescriptions of Neurontin caused by Defendants' wrongful acts.

Third Coordinated Amended Complaint (Dkt. No. 583), ¶¶ 7-8.

-13-

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*