UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

In re:  NEURONTIN MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY LITIGATION

---

THIS DOCUMENT RELATES TO:

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC., 04 CV 10739 (PBS)

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**UNREDACTED VERSION
FILED UNDER SEAL**

---

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. MICHAEL MCLEAN

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in opposition to Plaintiffs' Motion *in Limine* to Exclude Testimony of Dr. Michael McLean [2388].

### PRELIMINARY STATEMENT

The central premise of Plaintiffs' motion to exclude five of Pfizer's retained experts is that no expert should be allowed to testify regarding the scientific evidence supporting the efficacy of Neurontin for various off-label conditions at issue in this litigation other than double-blind randomized control trials ("DBRCTs").[1]  Plaintiffs' argument is flawed for several reasons.  Initially, Plaintiffs' motion represents a continued effort by Plaintiffs to improperly shift their burden of proof to the Defendants in this action.  It is not Pfizer's burden to prove, using evidence that would satisfy the standard of the Food and Drug Administration ("FDA") for

---

[1] It is worth noting that the standard advocated by Kaiser could almost never by met by product liability plaintiffs in pharmaceutical litigation, including the plaintiffs in the Neurontin cases pending before this Court. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 185 (D. Mass. May 5, 2009) (noting that "most epidemiological studies are 'observational,' not experimental like [DBRCTs]"); *see also id.* at 132 (observing that there is no absolute requirement for epidemiologic proof when other methods are available).  For the reasons discussed herein, the standard is especially inappropriate in a case such as this where it is not Pfizer's burden to prove efficacy, but Plaintiffs' burden to *inefficacy*.

drug approval, that Neurontin is effective.  Rather, it is Plaintiffs' burden to prove that Neurontin is *ineffective* for the conditions at issue.  And, given Plaintiffs' choice to rely upon aggregate evidence, they must prove either (1) that Neurontin is ineffective for a specific condition for *all* patients or (2) that Neurontin is no more effective and no safer for treatment of a specific condition for *all* patients.

This is a tall hurdle for Plaintiffs, especially given the fact that Kaiser continues to recommend Neurontin to its physicians and patient-subscribers for off-label uses.  It is little wonder that Plaintiffs keep trying to improperly re-frame the issue.  Plaintiffs would have the jury in this case act as if it were a committee to the FDA, advising it on the issue of whether Neurontin should be approved for certain indications.  But that is not the jury's charge.  Instead, the central issue in this case, the one that the jury will be asked to decide, is whether Plaintiffs' alleged damages were proximately caused by Defendants' alleged fraudulent promotion of Neurontin.  To answer this question, the jury will need to understand why off-label prescribing is widely accepted as a beneficial medical practice by the FDA, the medical community, and even third-party payors such as Kaiser.  They will need to hear from Defendants' experts about the type of evidence supporting the prescribing decisions of physicians (decisions that physicians, including Kaiser physicians, continue to make to this day).  Significantly, the evidence clearly demonstrates:

(1)    Kaiser did not during the relevant time frame and does not now require DBRCTs to support its formulary decisions or prescribing guidelines,

(2)    Kaiser believed that off-label uses for Neurontin were not supported by DBRCTs when it decided to relax formulary restrictions,

(3)    Kaiser continues to recommend Neurontin for certain off-label uses, without regard to the availability of DBRCT evidence, and

(4)    Kaiser relies upon the clinical experience of its prescribing physicians when making decisions about formulary restrictions and prescribing guidelines.

Indeed, as observed by Les Zendle, MD, the Associate Medical Director of the Southern

California Medical Group, during a 2000 Permanente roundtable discussion:

> Evidence-based medicine means so many different things to different people. To some people, it means that you don't do something unless you have double-blind randomized control studies that prove something works. Of course, if we only did things when we had double-blind randomized control studies, we wouldn't do a whole lot. It's also used as a reason to withhold certain things or to not do things or to cut costs.[2]

In short, Kaiser does not require DBRCT when making formulary decisions or promulgating guidelines. The evidence likewise demonstrates that Kaiser relies upon the clinical experience of its physicians when making such decisions. Kaiser's contrary position advocated in its motion to exclude must be rejected.

Once Plaintiffs' central premise is rejected, as it must be, it is clear that Plaintiffs have not advanced any legitimate grounds for the exclusion of Dr. McLean's testimony. Dr. McLean is a board certified neurologist and Associate Professor of Neurology at Vanderbilt University. (McLean Report at 1, Armstrong Decl. Exh. A.) He received Ph.D and M.D. degrees from the University of Virginia in 1976 and 1978, respectively. (*Id.*) After training in internal medicine and completing his residency training in neurology, he has worked in the Department of Neurology at Vanderbilt University since 1986. (*Id.*) He has been involved in clinical trials of antiepileptic drugs, including gabapentin, which resulted in publications in peer-reviewed journals and epilepsy textbooks. (*Id.* at 1-2.) He has also lectured internationally regarding the treatment of neuropathic pain with antiepileptic drugs. (*Id.* at 2-3.)

Plaintiffs do not challenge Dr. McLean's credentials. Nor do they challenge his experience as a clinician. Instead, Plaintiffs claim Dr. McLean should be excluded because his efficacy opinion is not solely reliant on the results of DBRCT. As he explains in his report, Dr. McLean's opinions are based upon his review of the medical literature, consensus guidelines, and his own experience – clinical, scientific and educational. (*Id.* at 15-20) Plaintiffs operate under the mistaken assumption that the fact that their experts "rely *solely* on the results of

---

[2] The *Permanente Medicine Roundtable: Defining Our Practice Principles*, Permanente J. Winter 2000 at 45, 48 available at http://xnet.kp.org/permanentejournal/winter00pj/winter00.pdf.

DBRCTs in rendering their efficacy opinions," precludes every expert from relying on any source other than a DBRCT. (Pl. Mem. [2388] at 7, emphasis in original). As discussed below, such a narrow construction of the role of expert testimony in this case impermissibly inverts the respective burdens of proof and fundamentally misconstrues the role of expert opinion testimony in this trial.

## ARGUMENT

### I.   The Use of Multiple Sources of Scientific Evidence is Proper Methodology for the Basis of a Clinical Opinion

Plaintiffs' argument rests on the false premise that, in order to be admissible, the opinions expressed by Dr. McLean must be based on the regulatory standard for efficacy, which Plaintiffs assert requires double-blind randomized placebo-controlled clinical trials ("DBRCT").[3]   In their effort to exclude Dr. McLean, Plaintiffs ask this Court to substitute the incorrect "FDA standard" for marketing approval rather than employing the methodology regularly employed by clinicians in evaluating the scientific evidence for the clinical efficacy of Neurontin.   However, Dr. McLean is not a company seeking to obtain FDA approval to market a medicine. Dr. McLean is providing an opinion regarding Neurontin's efficacy from a clinical perspective, not a regulatory perspective.   The information that a physician uses to determine whether a drug is effective for a particular patient by necessity differs from that submitted by a company to obtain FDA approval to market a medicine for a certain indication.   Accordingly, Dr. McLean appropriately relies on a variety of evidence, not limited to DBRCTs, in forming his opinion that

---

[3] As a threshold matter, nowhere do the FDA regulations state that efficacy is established only with DBRCTs.   FDA regulations state that "[r]eports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs."   21 C.F.R. § 314.126.   Under FDA regulations, an "adequate and well-controlled" study, which forms the primary – not the only – basis for efficacy, has characteristics that include using "a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect," and allows for the following types of controls: (1) Placebo concurrent control, (2) dose-comparison concurrent control, (3) no treatment concurrent control, (4) active treatment concurrent control, or (5) historical control.   21 C.F.R. § 314.126(b)(2).   More importantly, for the reasons discussed above, Plaintiffs' argument relying on the regulatory regime for obtaining regulatory approval for the marketing of a new drug simply misses the point.

Neurontin can offer enhanced benefit to patients at doses above 1800 mg/day.

### A.   FDA Standards For New Drug Approval Do Not Govern Admissibility Of Expert Testimony On The Efficacy Of A Drug For Off-Label Uses

The dichotomy that Plaintiffs attempt to create – where only DBRCTs are relevant and clinical experience is irrelevant – is not supported by the law, is inconsistent with the factual record in this case, and inconsistent with Kaiser's own internal policies and actual practices. Any suggestion that the efficacy issues in this case are governed by the same standard required for FDA approval for on-label indications, and any attempt to shift the burden of proof to Pfizer to demonstrate Neurontin's efficacy for the relevant off-label uses under that standard, must be rejected.[4] The FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label because it advances an important public policy. *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").[5]

In addition, physicians frequently and properly prescribe off-label even in the absence of the "gold standard" evidence that Plaintiffs demand for purpose this litigation (but which they do not require when making formulary decisions or promulgating prescribing guidelines). Physicians often make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition. In fact, prescribing

---

[4] Pfizer does not have the burden of proving efficacy. Rather, as this Court has held, Plaintiffs have the burden of proving inefficacy. *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) ("For all of their claims, plaintiffs will be required to prove . . . that they were injured (i.e., suffered economic loss) by virtue of the Neurontin's inefficacy for that condition."). Plaintiffs seek not merely to flip this burden by requiring Pfizer to prove efficacy, but also to require Pfizer to meet that invalidly-applied burden by supposed "gold standard" evidence.

[5] *See also Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994) ("[T]he FDA permits doctors to prescribe drugs for 'off-label' uses."); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("[T]he 'FDA itself recogniz[es] the value and propriety of off-label use.'" (citation omitted)).

off-label is often the standard of care, especially for certain indications, such as neuropathic pain, where there is little or no "gold standard" evidence supporting the effectiveness of any medication. As Judge Weinstein recently observed: "'[O]ff-label uses of prescription drugs are a mainstay of the industry – an estimated 21% of drug use overall[.]'" *Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), ___ F. Supp. 2d ___, 2009 WL 4260857, at *16 (E.D.N.Y. Dec. 1, 2009) (alteration in original) (citation omitted). "Some off-label uses of a prescription drug may be medically necessary." *Id.; see also Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 705 n.3 (W.D. Va. 1999).[6] Plaintiffs' argument, however, presumes that no medication should be prescribed off-label absent "gold standard" evidence, and would actually hold that a physician's exercise of the standard of care resulted in improper prescriptions. This absurd suggestion should be rejected.

## B. Kaiser Does Not Require DBRCTs When Making Formulary Decisions Or Promulgating Prescribing Guidelines And Considers Clinical Experience As Relevant Evidence

Kaiser's arguments are inconsistent with its own internal policies and practices. As discussed in Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409],[7] Kaiser does not require DBRCTs when making formulary decisions or promulgating prescribing guidelines. This fact is critical given that Kaiser's theory of causation in this action is tied directly to its formulary decision-making process. *See In re Neurontin Mktg. & Sales Practices Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010).

[black redaction box]

---

[6] No one disputes that DBRCTs are at the top of the pyramid of available evidence when analyzing cause and effect of pharmaceutical products. However, by definition, off-label prescribing, widely accepted as a beneficial medical practice, lacks FDA approval. As a result, off-label prescribing is often based upon evidence other than DBRCTs.

[7] Defendants incorporate Section I of such opposition herein by reference.



<hr />

[8] In support of this opposition, Defendants rely upon the exhibits attached to the Declaration of Katherine Armstrong in Support of Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2410].  In order to avoid burdening the Court with multiple copies of the same set of exhibits, such exhibits are cross-referenced herein.

[9] *In re Neurontin*, 2010 WL 53568, at *3.

[10] *Id.*

███████████████████████████

Further, Kaiser's website contains numerous articles where it recommends the use of anticonvulsants, including Neurontin and gabapentin, for treatment of chronic pain, cancer pain, and other conditions. (Exh. H [2410-9] to 1/22/10 Armstrong Decl.) Kaiser's position that only DBRCTs are relevant to the issue of efficacy is irreconcilable with its own internal documents and the public guidance that it provides to physicians and its members.

## II.   Dr. McLean's Opinion That Neurontin Can Offer Enhanced Benefits At Doses Above 1800 Mg/Day Is Based On A Reliable And Generally Accepted Methodology

Once the central premise of Plaintiffs' *Daubert* motion falls, all that remains of their motion fails to rise to the level of a *Daubert* challenge. Plaintiffs ask this Court to accept the opinions of their experts over Defendants' regarding the proper weight and interpretation to be given to the available scientific evidence, but that is not the role of the Court on a *Daubert* motion. As this Court has explained:

> The Court must, however, keep in mind the Supreme Court's admonition that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts." "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 131-32 (D. Mass. 2009) (citations omitted).

A.    **Dr. McLean Properly Relied Upon The Generally Accepted Principle That "Titration To Effect" Determines The Proper Dose For Individual Patients**

Plaintiffs argue that that Dr. McLean's report provides "[n]o stated methodology" for his opinions.  (Pl. Mem. [2388] at 4.)  To the contrary, Dr. McLean clearly explained his methodology, which recognizes that the proper dose for individual patients is determined through the process of "titration to effect," and is not dictated by clinical studies that examine "dose proportional efficacy."  (McLean Report at 4-5.)  Plaintiffs and their dosing expert, Dr. Alldredge, purport to disagree with this methodology, but that does not make it unreliable. *See Neurontin*, 612 F. Supp. 2d at 131-32.  Moreover, as discussed below, Dr. Alldredge went dramatically off-script during his deposition and essentially endorsed Dr. McLean's methodology.

As Dr. McLean explains, DBRCTs and other clinical trials that analyze a drug's dose-proportional efficacy are used to demonstrate that a prescription drug is effective for particular indications, and such studies can "provide a range of doses in which efficacy for individual patients can be expected to occur."  (McLean Report at 4.)  But "dose proportionality in such studies cannot predict the most effective dose for every single patient."  (*Id.*)  The operating principle when determining the proper dose of an effective drug for individual patients is not dose proportionality, but "titration to effect or limiting side effects."  (*Id* at 5.)  In other words, "[t]he dose is gradually increased over weeks to months in an effort to achieve the greatest possible benefit.  The patient and prescriber work together in the process of titrating to optimize the outcome."  (*Id.* at 9.)

With respect to Neurontin, Dr. McLean explains that determining the proper dose for any given patient "is a complex and highly individualized matter" for two basic reasons.  (*Id.* at 4.)  First, as Dr. Alldredge concedes, "[Neurontin's] absorption is non-linear over a range of doses."  (*Id.*; *see also* 1/31/09 Alldredge Dep. at 173:2-8, Armstrong Decl. Exh. B.)  In other words, "the fraction of a dose taken orally, that is absorbed in the body, declines as the size of the individual dose gets larger."  (1/31/09 Alldredge Dep. at 173:2-8.)  Second, "the rate and amount of

9

absorption can differ significantly between individuals." (McLean Report at 4.)  In other words, poor absorbers will require higher doses to get the same effect.  Indeed, Dr. Alldredge concedes that "in adults, maintenance doses of antiseizure medications can vary fivefold or more, and doses need to be individualized based on clinical response."  (1/31/09 Alldredge Dep. at 165:19-22.)  Moreover, because Neurontin "is reported to be associated predominantly with mild-to-moderate adverse events, . . . it is good medical practice to titrate to maximal efficacy." (McLean Report at 4.)

For these reasons, Dr. Alldredge's assumption "that dose-proportional efficacy is the principal determinant of dosing for individual patients in clinical practice is a fallacy . . . ." (*Id.*) Likewise, Dr. Alldredge's assumption that DBRCTs "have established and delimited the useful range of doses in clinical practice is also a fallacy . . . ." (*Id.* at 4-5.)  Plaintiffs' *Daubert* arguments are based on these same fallacies.

Moreover, Dr. Alldredge's opinions do not refute or even directly confront Dr. McLean's conclusions or methodology.  Dr. Alldredge merely opines that dose-response information obtained from DBRCTs can provide guidance regarding the "*optimal* dosages" that are "*most likely*" to benefit patients.  (Alldredge Report at 6 (emphasis added), Armstrong Decl. Exh. C.) With respect to Neurontin, he opines that "dose-response information is *of value* in guiding its clinical use."  (*Id.* at 7.)  And he ultimately concludes "[t]here is *insufficient evidence* to demonstrate enhanced efficacy of [Neurontin] at doses above 1800 mg per day." (*Id.* at 30.)  In short, Dr. Alldredge's opinions address the wrong issue:  whether there is sufficient evidence to support increasing the dose range on the FDA-approved product label.

When questioned at his deposition about the real efficacy issues in this case, Dr. Alldredge made critical admissions that confirm Dr. McLean's analysis and methodology in significant respects.  For example, Dr. Alldredge admitted that doctors in clinical practice should titrate to effect, rather than simply titrating to the FDA-approved dosage limit.

> There are no a priori dosing restrictions on any of the commonly used antiseizure drugs.  Drug doses can continue to be increased as long as the patient derives

incremental benefit in seizure frequency or severity, and is able to tolerate any medication-related adverse effects.

(1/31/09 Alldredge Dep. at 165:22-166:3.) Indeed, Dr. Alldredge admitted that it is a "common error" in clinical practice for doctors to "stop titrating the dose when they get to the FDA approved dosage limit" if the patient has "had a partial response to that point" and is "continuing to tolerate the medicine." (*Id.* at 166:9-21.)

With respect to Neurontin, Dr. Alldredge wrote a chapter for a 1996 textbook in which states: "Therapy with gabapentin . . . should be titrated according to patient response" (*Id.* at 169:22-170:3), rather than "according to the package insert," (*id.* at 170:8-10). Dr. Alldredge's textbook chapter further states that "*[d]aily doses up to 3600 milligrams* [of gabapentin], divided three times a day, have been well tolerated and *are sometimes required*." (*Id.* at 170:3-5.) The relevant language remained unchanged in later editions of the same textbook, including a 2006 edition. (*Id.* at 173:13-174:24.) Foreclosing any argument that Dr. Alldredge's admissions in this textbook chapter could be attributed to insufficient information, Dr. Alldredge also gave the following present-tense testimony during his January 2009 deposition, after having reviewed all of the studies on which his opinions and proposed trial testimony are based:

> A.   I think that some patients do derive incremental benefit *up to 3600 milligrams per day*, yes.
>
> * * *
>
> A.   I believe that there may be individuals who do need doses *up to 4800 milligrams per day*.

(*Id.* at 170:18-20, 176:14-15.)

Even without competing expert testimony, Dr. Alldredge's admissions alone would be catastrophic to Plaintiffs' sweeping and absolute claim that doses above 1800 mg/day are never appropriate for any patient under any circumstances. Accordingly, in response to Pfizer's summary judgment motion, Kaiser submitted a supplemental affidavit from Dr. Alldredge [1762] that seeks to retreat from these admissions and contort their plain meaning so that they can coexist with Plaintiffs' theories, which they still do not support. This supplementation was

wholly improper.[11]  Regardless, Dr. Alldredge's opinions fail to show that Dr. McLean's methodology was in any way unreliable.

In sum, Dr. McLean's opinions are based on a reliable and generally accepted methodology recognizing that "titration to effect," rather than "dose proportional efficacy," is the operating principle for determining the proper dose of an effective drug for individual patients.

**B.   Plaintiffs' Criticisms Of The Particular Scientific Evidence Dr. McLean Considered Do Not Raise Admissibility Issues Under *Daubert***

Plaintiffs' particular criticisms are all based on the assumption that Dr. McLean is required to follow a methodology based on the principle of dose-proportional efficacy and that he can only consider DBRCTs.  As discussed above, Plaintiffs' assumptions are incorrect.

For example, Plaintiffs argue that Dr. McLean ignored the "proper hierarchy of evidence," ignored one of the only four purportedly "relevant" DBRCTs, and cited the remaining three as positive when they are purportedly "negative." (Pl. Mem. [2388] at 10-12.)  Plaintiffs' argument ignores Dr. McLean's stated methodology, which recognizes the importance of DBRCTs for determining whether a drug should be approved by the FDA for particular indications, but rejects Plaintiffs' notion that DBRCTs dictate the proper dose for effective drugs in individual patients.  Likewise, Plaintiffs characterize these four DBRCTs as being "negative" based on Dr. Alldredge's view that a "positive" result would require a finding of "dose-proportional efficacy."  Dr. McLean has explained that this is a "fallacy." (McLean Report at 4.) Consistent with his stated methodology, Dr. McLean did not just consider DBRCTs, but also

---

[11] The First Circuit has "repeatedly held that a party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed." *Abreu-Guzmán v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001); *see also Jones v. Flowserve FCD Corp.*, 73 F. App'x 706, 709 (5th Cir. 2003) (holding that a supplemental affidavit of expert, offered in opposition to a motion for summary judgment, was properly excluded where the supplemental affidavit expressed opinions that exceeded the expert's Rule 26 disclosure); *Phillips v. Emerson Elec. Co.*, No. Civ. 02-179-P-C, 2003 WL 21011349, at *4 (D. Me. May 5, 2003) (striking plaintiff's new expert opinions: "[I]t is not permissible for Plaintiff to interject new expert opinions . . . in opposition to a summary judgment motion when Plaintiff had an obligation to provide those opinions in the context of discovery, prior to the summary judgment deadline . . . ."), *aff'd*, 2003 WL 21276388 (D. Me. May 29, 2003).

properly considered and based his opinions upon additional peer-reviewed studies of gabapentin, as well as evidence-based consensus guidelines, and his own clinical experience. (*See id.* at 15-20.)

Plaintiffs further criticize Dr. McLean's reliance on the Neurontin package insert, which states that "[t]he dose can . . . be titrated up . . . to a daily dose of 1800 mg," and notes that additional benefit at higher doses "was not demonstrated" by clinical studies, but goes on to state that higher doses up to 2400 mg/day "have been well tolerated in long-term clinical studies," and that doses up to 3600 mg/day also "have been well tolerated." (Pl. Mem. [2388] at 12-14 (citing McLean Report at 9-11).) Plaintiffs profess amazement at this argument, but they fail to explain why the FDA would include information about higher doses being "well tolerated" unless it contemplated that prescribing doctors would titrate above 1800 mg/day for some of their patients. Plaintiffs' assumption that the FDA's decision not to change the dose range on the label should be construed as a finding that no patient could ever benefit from higher doses is belied by their own expert. Dr. Alldredge testified that it is a "common error" in clinical practice for doctors to "stop titrating the dose when they get to the FDA approved dosage limit" if the patient has "had a partial response to that point" and is "continuing to tolerate the medicine." (1/31/09 Alldredge Dep. at 166:9-21.) Thus, Dr. Alldredge concedes that "[t]herapy with gabapentin . . . should be titrated according to patient response" (*Id.* at 169:22-170:3), rather than "according to the package insert," (*id.* at 170:8-10).

## C.      Dr. McLean Was Not Required To Produce Sanitized Medical Records

Plaintiffs also seek to exclude Dr. McLean on the grounds that he has not produced sanitized medical records in support of opinions based upon his clinical experience. Plaintiffs' argument relies on a mischaracterization of this Court's September 27, 2006 order, which provided as follows:

> After hearing, I conclude that the burden, expense and invasion of privacy of the proposed discovery outweighs its likely benefit. See Fed. R. Civ. P. 26 (b)(2). This conclusion is based on the supplemental record not available before the Magistrate Judge and a fuller explanation of plaintiff's theory of the case. If either party intends to call a treating physician to give an opinion on effectiveness,

13

sanitized patient records shall be produced to the extent the physician is relying on his experience with treating *that patient* (as opposed to a clinical trial). . . .

(9/27/06 Electronic Order, emphasis added.)  Significantly, the order was entered into as part of an order denying Pfizer's request for discovery of Kaiser patient medical records and intended to ameliorate the prejudice that Pfizer would experience if Kaiser was allowed to provide its experts with access to such records to support their testimony.

Here, Pfizer's experts do not rely solely upon their clinical experience.  And it is well established that a physician such as Dr. McLean is allowed to base his opinion, in part, upon his clinical experience, if, as here, it is confirmed by reliable scientific evidence.  *See In re Vioxx Prods. Liability Lit.*, 401 F. Supp. 2d 565, 579 (E.D. La. 2005); *see also id.* at 580 (noting that one expert's opinion was "based on his 35 years of clinical experience in the [field] of gastroenterology" and the other expert's opinion was "based on his experience as a prescribing physician.")  Dr. McLean's opinions concerning Neurontin's efficacy for off-label indications are not grounded in the records of specific, identifiable patients, but rather in his cumulative clinical experience from treating pain patients over many years.  The use of the phrase "that patient" in the Court's order suggests that the Court was referring to specific patient records relied upon by a physician and did not intend to prevent a physician from testifying about his experience treating pain patients over the course of his career.

In any event, Plaintiffs' argument should be rejected because Plaintiffs did not seek any discovery of Defendants' medical experts.  The basis for the opinions of Defendants' experts were clearly disclosed in their expert reports, consistent with Rule 26.  Plaintiffs never sought to depose Defendants' medical experts.  Likewise, Plaintiffs did not seek any production of documents from Defendants' medical experts until January 27, 2009, when they served subpoenas on Defendants' experts.  Defendants and their experts objected on the grounds, *inter alia*, that the subpoena, which was served only three days before the deadline for completion of expert discovery, was untimely.  (*See* Armstrong Decl. Exh. D.)  If Plaintiffs believed they were entitled to additional documents, their remedy was to bring a timely motion – not to wait until

the eve of trial and then seek to exclude Pfizer's witnesses. *Cf. Nolan v. Thompson*, 521 F.3d 983, 987 (8th Cir. 2008).   Plaintiffs should not be allowed to rely upon their own failure to pursue discovery as a basis for excluding Defendants' evidence.

**III.     Dr. McLean's Testimony Is Relevant To The Issue Of Causation**

Dr. McLean's testimony is independently admissible because he explains that clinicians determine the proper Neurontin dose for their patients through a "highly individualized" process (McLean Report at 4) that involves "gradually increase[ing] [the dose] over weeks to months in an effort to achieve the greatest possible benefit.  The patient and prescriber work together in the process of titrating to optimize the outcome."   (*Id.* at 9.)   This testimony is independently admissible on the issue of causation, because it rebuts Plaintiffs' claim that virtually all off-label Neurontin prescriptions were caused by Defendants' alleged promotion.   (*See* Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409] at 13-14.)

**CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude the testimony of Dr. McLean.

Dated: January 26, 2010                          Respectfully submitted,

                                                 SKADDEN, ARPS, SLATE, MEAGHER
                                                     & FLOM LLP

                                                 By:     /s/ Mark S. Cheffo
                                                         Mark S. Cheffo

                                                 Four Times Square
                                                 New York, NY 10036
                                                 Tel:  (212) 735-3000

15

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:  /s/ Raoul D. Kennedy
     Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

     -and-

WHEELER TRIGG O'DONNELL LLP

By:  /s/ James E. Hooper
     James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

     -and-

WHITE AND WILLIAMS LLP

By:  /s/ David B. Chaffin
     David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 26, 2010.

     /s/ David B. Chaffin
     David B. Chaffin

16