# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3                        ---oOo---
 4
 5   In re: NEURONTIN MARKETING, SALES
     PRACTICES AND PRODUCTS LIABILITY
 6   LITIGATION
                                                    /
 7
     THIS DOCUMENT RELATES TO:              MDL Docket
 8   HARDEN MANUFACTURING CORPORATION;      No. 1629
     LOUISIANA HEALTH SERVICE INDEMNITY
 9   COMPANY, dba BLUECROSS/BLUESHIELD OF   Master File
     LOUISIANA; INTERNATIONAL UNION OF      No.  04-10981
10   OPERATING ENGINEERS, LOCAL NO. 68
     WELFARE FUND; ASEA/AFSCME LOCAL 52
11   HEALTH BENEFITS TRUST; GERALD SMITH;
     and LORRAINE KOPA, on behalf of
12   themselves and all others similarly
     situated, v. PFIZER INC. and
13   WARNER-LAMBERT COMPANY
                                                    /
14
     THE GUARDIAN LIFE INSURANCE COMPANY OF
15   AMERICA v. PFIZER INC. and
16   AETNA, INC. v. PFIZER INC.
                                                    /
17
18
19       VIDEOTAPED DEPOSITION OF BRIAN K. ALLDREDGE
20              SATURDAY, JANUARY 31, 2009
21
22
23
24   Job No.: 187702
25   Pages 1 - 215
```

## Page 2

SUPEREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In re: NEURONTIN PRODUCT        Index No.
LIABILITY LITIGATION    765000/06 MSF

THIS DOCUMENT APPLIES TO:
ALL CASES
_____/

Videotaped deposition of BRIAN K. ALLDREDGE, taken on behalf of Defendants, at Davis Polk & Wardwell, 1600 El Camino Real, Menlo Park, California 94025, commencing at 9:08 a.m., Saturday, January 31, 2009, before Kenneth T. Brill, CSR No. 12797, RPR, CRR..

## Page 3

INDEX
INDEX OF EXAMINATIONS
Examination by Ms. Harris.....................7
Examination by Mr. Himmelstein................208

EXHIBITS MARKED FOR IDENTIFICATION
| Alldredge No. | Description | Page |
|---|---|---|
| 1 | Amended Notice of Deposition of Brian K. Alldredge | 9 |
| 2 | Print-out from UCSF Clinical Pharmacy web page, Bates range Alldredge_000001 - 000006 | 15 |
| 3 | Expert Consultant Report prepared by Brian Aldredge, PharmD | 75 |
| 4 | Document with heading "Pfizer / Greene & Hoffman", Bates range Alldredge_000007 - 000008 | 91 |
| 5 | Correspondence dated August 5, 2008, Bates range Alldredge_000080 and 000081 | 105 |
| 6 | Subpoena in a Civil Case addressed to Brian Alldredge | 114 |
| 7 | Document entitled "Guidance for Industry, Exposure-Response Relationships - Study Design, Data Analysis, and Regulatory Applications | 154 |
| 8 | Article entitled Antiseizure Medication Disorder, Commentary by Brian K. Alldredge, PharmD | 163 |

## Page 4

EXHIBITS MARKED FOR IDENTIFICATION
| Alldredge No. | Description | Page |
|---|---|---|
| 9 | Chapter 50 of Textbook of Therapeutics: Drug and Disease Management, Sixth Edition | 168 |
| 10 | Chapter 52 of Textbook of Therapeutics Drug and Disease Management, Seventh Edition | 171 |
| 11 | Chapter 62 of Textbook of Therapeutics Drug and Disease Management, Eighth Edition | 171 |
| 12 | Epilepsy Foundation document with heading Specific Medications, Medicine Identification Chart | 175 |
| 13 | Document entitled Neurontin 1997 Tactical Plan | 190 |
| 14 | Meeting summary from 12/1/1999 IntraMed Educational Group, Bates range WLC_CBU_175636 through 175641 | 192 |
| 15 | Meeting Summary of March 15, 2000 Parke-Davis meeting at Westin Hotel in Denver, CO | 195 |
| 16 | McLean Abstract dated December 4, 1998 re: Gabapentin, Bates range MCLEAN 0012596-0012640 | 199 |
| 17 | Document with heading "HFD-120 Labeling Version #2 dated May 16, 2002, Bates range Pfizer_MYoder_0000814 - 0000847 | 204 |

## Page 5

APPEARANCES:

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
BY: BARRY R. HIMMELSTEIN, ESQUIRE
Embarcadero Center West
275 East Battery Street, 30th Floor
San Francisco, CA 94111-3339
(415) 956-1000
bhimmelstein@lchb.com
Representing the Plaintiffs


DAVIS POLK & WARDWELL
BY: KIMBERLEY D. HARRIS, ESQUIRE
    CHRISTOPHER J. ROCHE, ESQUIRE
450 Lexington Avenue
New York, NY 10017
(212) 450-4859
kim.harris@dpw.com
christopher.roche@dpw.com
Representing the Defendants


--oOo--


ALSO PRESENT: Alan Dias, Videographer

162

1  A. No, I didn't.
2  Q. So you're not offering an expert opinion
3  on whether there is any enhanced efficacy at 1800
4  milligrams or above for conditions other than
5  epilepsy or neuropathic pain?
6  A. That's correct.
7  Q. You mentioned previously that in order for
8  you to be able to prescribe medicine in California,
9  at one point there was a list of specific
10 medications you could prescribe.
11 A. Mm-hmm.
12 Q. Did that list have dosages attached to the
13 specific drugs listed?
14 A. No, it didn't.
15 Q. Do you know why there wasn't any
16 restriction as to dosages?
17 A. Yeah, I -- I suspect that it's because
18 there is a range of doses that are effective for any
19 individual patient.
20 Q. And there's a belief that you have the
21 judgment to dose appropriately based on your
22 clinical experience; correct?
23 A. Yes.
24 Q. Would you agree that it may also be
25 because a clinician requires flexibility in

163

1  determining the appropriate dose for an individual
2  patient?
3  A. I think a clinician does deserve some
4  flexibility, yes.
5  Q. You agree, don't you, that physicians and
6  clinicians like yourself should titrate
7  antiepileptic drugs to individual patients based on
8  their individual response?
9  A. Yes.
10    ---
11     (Whereupon the document was marked,
12      for identification purposes, as
13      Alldredge Exhibit Number 8.)
14    ---
15 BY MS. HARRIS:
16 Q. Dr. Alldredge, I'm handing you a document
17 we marked as Alldredge Exhibit number 8.
18 A. Okay.
19 Q. Do you recognize this document?
20 A. Yes.
21 Q. Can you identify it for the record?
22 A. It's a commentary that I wrote for the
23 AHRQ Web M -- Web M&M site that we were talking
24 about earlier today.
25 Q. Can you please turn to Page 2 of the

164

1  document, and by page numbers, I mean the pages in
2  the upper right-hand corner.
3     MR. HIMMELSTEIN: You mean lower left?
4     THE WITNESS: Lower left-hand corner?
5  BY MS. HARRIS:
6  Q. Oh, okay, do you know what, I'm looking at
7  a different printed version than you are. I'll look
8  at the one that you're looking at.
9     So just so we're all on the same page for
10 the record, it's Page 2 in the lower left-hand
11 corner of the document.
12 A. Oh, okay, mm-hmm.
13 Q. There's some bold text on that page that
14 says Case and Commentary, Part II?
15 A. Mm-hmm.
16 Q. And the two sentences above that read:
17 Examples of some of the more common dosing errors
18 made with antiseizure medications are given in Table
19 1.
20    And it continues to say: Additional
21 information on appropriate dosing of antiseizure
22 drugs in adults is given in Table 2..
23    Did I read that correctly?
24 A. Yes.
25 Q. Let's turn to Table 1, which is, I

165

1  believe, on Page 5 -- 6 --
2  A. Yes.
3  Q. -- of the document. And, again, that
4  Table 1 is titled How to Avoid Common Errors in
5  Monitoring and Dosing of Antiseizure Drugs; correct?
6  A. Correct.
7  Q. And you drafted this chart?
8  A. Yes.
9  Q. Okay. If you turn to Page 7, one of the
10 common errors you cite is, quote, withholding
11 further -- dose escalations in patients with a
12 partial response and good medication tolerability
13 due to fear of exceeding the usual or maximal dose.
14 A. Correct.
15 Q. Did I read that correctly?
16 A. Yes.
17 Q. Could you please read the comment that you
18 wrote next to that?
19 A. Yes. It says, in adults, maintenance
20 doses of antiseizure medications can vary fivefold
21 or more, and doses need to be individualized based
22 on clinical response. There are no a priori dosing
23 restrictions for any of the commonly used
24 antiseizure drugs. Drug doses can continue to be
25 increased as long as the patient derives incremental

VERITEXT CORPORATE SERVICES (800) 567-8658

### Page 166

1  benefit in seizure frequency or severity, and is
2  able to tolerate any medication related adverse
3  effects.
4      Q. By maximal dose, that's on the left side
5  in the description of the common error, are you
6  referring to the maximum dose that's approved on the
7  label?
8      A.. Yes.
9      Q. So you're basically saying that it's a
10 common error in treating patients with epilepsy that
11 doctors stop titrating the dose when they get to the
12 FDA approved dosage limit; correct?
13     A. In patients who have had a partial
14 response to that point and in whom they are
15 continuing to tolerate the medicine, yes.
16     Q. Because the solution is to continue to
17 titrate upwards until you get to maximum effect; is
18 that correct?
19     A. It's because some patients may respond to
20 that strategy. Some may not, but some may. And
21 it's a good idea to try it.
22     Q. How do you define incremental benefit?
23     A. Progressive improvements in the medical
24 condition as the dose of the drug is escalated.
25     Q. Which would mean a reduction in the number

### Page 167

1  of seizures?
2      A. Yes. Or the severity of the seizures,
3  yes.
4      Q. Okay. And what is a maintenance dose?
5      A.. A maintenance dose is the dose that one
6  takes chronically on a daily basis for a long period
7  of time.
8      Q. Do you still agree with the statements
9  that you wrote in this web article?
10     A.. In general, yes.
11     Q. Okay. If you look at Table 2 on the same
12 Page 7 --
13     A.. Mm-hmm.
14     Q. -- that table is the appropriate dosing of
15 seizure medicines; correct?
16     A. Yes. Purportedly, yes.
17     Q. And under Gabapentin in Table 2, you list
18 the usual maintenance dose as 900 to 3600 milligrams
19 daily; correct?
20     A. Correct.
21     Q. So in this article you considered that to
22 be the appropriate dosage range for Gabapentin;
23 correct?
24     A. Yes.
25     Q. And that's because some patients may

### Page 168

1  respond to doses up to 3600 milligrams per day;
2  correct?
3      A. Can you ask that question again?
4      Q. That's the appropriate range of dosing in
5  your view because some patients may continue to
6  receive incremental benefit up to 3600 milligrams
7  per day?
8      A. Yes, that is possible, yes.
9      Q. You can put that one aside. Go to the
10 next one.
11         - - -
12         (Whereupon the document was marked,
13         for identification purposes, as
14         Alldredge Exhibit Number 9.)
15         - - -
16 BY MS. HARRIS:
17     Q. Dr. Alldredge, I'm handing you an exhibit
18 we've marked as Alldredge Exhibit number 9.
19         Do you recognize this document?
20     A. Yes.
21     Q. Can you identify it for the record,
22 please.
23     A. Yeah. Looks like a chapter on seizure
24 disorders authored by me in the textbook of
25 therapeutics from 1996.

### Page 169

1      Q. Can you please turn to Page 1013. Am I
2  correct that there's a heading on Page 1013 that
3  describes antiel- -- antiepileptic drugs?
4      A. Yes.
5      Q. And it states underneath the heading that
6  clinical pharmacokinetic features of the common
7  antiepileptic drugs are summarized in Table 50.9;
8  correct?
9      A. Yes.
10     Q. And if you turn to the next page of this
11 chapter, Page 1014, that Table 50.9, is listed;
12 correct?
13     A. Yes.
14     Q. And under Gabapentin --
15     A. Mm-hmm.
16     Q. -- for the adult daily dose, you again
17 list 900 to 3600 milligrams per day; correct?
18     A. Yes.
19     Q. If you turn to Page 1021, there is a
20 narrative discussion of Gabapentin; correct?
21     A. Mm-hmm, yes.
22     Q. And in the second column on that page you
23 write "Therapy with Gabapentin can be titrated to an
24 effective dose rapidly giving 300 milligrams on the
25 first day, 300 milligrams twice on the second day,

170

1  and 300 milligrams three times on the third day.
2  Thereafter, therapy should be titrated according to
3  patient response. Daily doses up to 3600
4  milligrams, divided three times a day, have been
5  well tolerated and are sometimes required.
6      Did I read that correctly?
7  A. Yes.
8  Q. You don't say that the therapy should be
9  titrated according to the package insert; correct?
10 A. Correct.
11 Q. Because it's important to look at actual
12 clinical response when titrating appropriately;
13 correct?
14 A. Yes, that's part of the decision, yes.
15 Q. And in some patients, as we've discussed,
16 that means titrating Gabapentin to 3600 milligrams
17 per day; correct?
18 A. I think that some patients do derive
19 incremental benefit up to 3600 milligrams per day,
20 yes.
21 Q. Okay. You can put that aside.
22 A. Okay.
23 Q. How many years have you participated in
24 drafting that particular chapter of this textbook?
25 A. How many editions of it?

171

1  Q. Yes.
2  A. I'm not sure, maybe -- I'm actually not
3  sure. I could look on my C.V.
4  Q. Do you recall drafting that chapter in the
5  19 -- looking for a date. Let me put it this way,
6  in the seventh and eighth editions of that textbook?
7  A. No, I don't recall.
8  Q. Why don't I show them to you quickly, just
9  so we can confirm that.
10        ---
11      (Whereupon the documents were
12      marked, for identification purposes, as
13      Alldredge Exhibit Numbers 10 and 11.)
14        ---
15 BY MS. HARRIS:
16 Q. Dr. Alldredge, I'm going to hand you two
17 exhibits we've marked as Alldredge number 10 and
18 Alldredge number 11 respectively.
19 A. Okay.
20 Q. Do you recognize these documents? And
21 please take your time to review them.
22 A. Yes, I do.
23 Q. Am I correct that Alldredge Exhibit number
24 10 is the seventh edition of the textbook we were
25 just reviewing?

172

1  A. Yes.
2  Q. And in the seventh edition you again
3  authored the chapter on seizure disorders; is that
4  correct?
5  A. Yes.
6  Q. And if you turn to Page 1116, the chart we
7  previously discussed appears on Page 1116 of the
8  seventh edition; correct?
9  A. Yes.
10 Q. And under Gabapentin, the adult daily dose
11 is again described as 900 to 3600 milligrams;
12 correct?
13 A. Yes.
14 Q. If you turn to Page 1123 of that chapter
15 in the bottom right corner, you again note, quote,
16 Thereafter, therapy should be titrated according to
17 patient response. Daily doses of 3600 milligrams
18 and above have been well tolerated, and are
19 sometimes required, end quote; is that correct?
20 A. Correct.
21 Q. You also note right at the bottom of that
22 paragraph that daily doses above 3600 milligrams
23 should be divided into four doses to improve
24 absorption; is that correct?
25 A. Yes.

173

1  Q. Why is that?
2  A. Gabapentin absorption -- the fraction of a
3  dose taken orally; that is, absorbed in the body,
4  declines as the size of the individual dose gets
5  larger.
6  Q. Is that's what's called nonlinear
7  absorption?
8  A. Yes.
9  Q. Which means that even though you're taking
10 twice as much drug, you may not be getting twice as
11 much effect; is that correct?
12 A. Yes.
13 Q. If I could turn your attention to
14 Alldredge Exhibit number 11, am I correct that that
15 is the eighth edition of this same textbook?
16 A. Yes.
17 Q. Please turn to Page 1632. You again
18 authored this chapter on -- hold on one second -- on
19 seizure disorders; correct?
20 A. Yes, I was a coauthor, yes.
21 Q.. And if you turn to Page 1632?
22 A. Mm-hmm.
23 Q. The table on that page which is titled
24 dosage forms, normal maintenance dose and
25 interver -- interval for the newer anticonvulsants

### Page 174

1  includes Gabapentin; correct?
2     A.  Correct.
3     Q.  And again lists the maintenance dose as
4  900 to 3600 milligrams a day; correct?
5     A.  Correct.
6     Q.  And in the text above that table, you
7  again write that therapy should be titrated
8  according to patient response when referring to
9  Gabapentin; correct?
10    A.  Correct.
11    Q.  You also note that daily doses of
12 3600 milligrams and above have been well-tolerated
13 and are sometimes required; correct?
14    A.  Correct.
15    Q.  And again you note that doses above
16 3600 milligrams should be divided into four doses;
17 correct?
18    A.  Correct.
19    Q.  Do you recall being involved in any other
20 editions of this textbook?
21    A.  No.
22    Q.  The eighth edition is copyrighted in 2006;
23 correct?
24    A.  Yes.
25    Q.  Do you believe that that's the most recent

### Page 175

1  version of this textbook?
2     A.  I don't know.
3     Q.  Okay.  I believe you've testified that
4  you're on the professional advisory board for the
5  Epilepsy Foundation; correct?
6     A.  Yes.
7     Q.  And you're also a member of the executive
8  committee?
9     A.  Yes.
10    Q.  I'm going to hand you a document we've
11 marked as Alldredge Exhibit number 12.
12              - - -
13         (Whereupon the document was marked,
14          for identification purposes, as
15          Alldredge Exhibit Number 12.)
16              - - -
17 BY MS. HARRIS:
18    Q.  Do you recognize this document?
19    A.  No, I don't.
20    Q.  I'll represent to you that it's a
21 print-out from the Epilepsy Foundation website.
22 This particular page lists medicine information for
23 Neurontin; correct?
24    A.  Yes.
25    Q.  If you look in the middle of the text it

### Page 176

1  notes, quote, people with hard to control seizures
2  may need doses of up to 4800 milligrams daily to
3  achieve control, end quote.
4         Did you know that the Epilepsy Foundation
5  includes this kind of information on its website?
6     A.  In general, this kind of information,
7  yeah.  But I didn't know about that specific
8  sentence.
9     Q.  Before starting your expert work in this
10 matter, did you look at the materials that the
11 Epilepsy Foundation publishes about Gabapentin?
12    A.  No.
13    Q.  Do you disagree with that statement?
14    A.  I believe that there may be individuals
15 who do need doses up to 4800 milligrams per day.
16         MS. HARRIS:  I believe we have to change
17 the tape.  So why don't we take a short break.
18         THE WITNESS:  Okay.
19         THE VIDEOGRAPHER:  This is the end of disk
20 number two, Volume I, we're off the record at
21 1:30 p.m.
22         (Recess taken.)
23         THE VIDEOGRAPHER:  This is the beginning
24 of disk number three, Volume I, we are back on the
25 record at 1:49 p.m.

### Page 177

1         You may proceed.
2  BY MS. HARRIS:
3     Q.  Dr.. Alldredge, you previously testified
4  that you have no expertise in marketing; correct?
5     A.  Correct.
6     Q.  And you don't consider yourself an expert
7  in marketing?
8     A.  Correct.
9     Q.  And that you also have no expertise in
10 economics?
11    A.  Correct.
12    Q.  Okay.  If I could ask you to turn to your
13 report again on Page 2.  The last sentence on Page 2
14 states, quote:  The effect was to increase Neurontin
15 sales, to increase Parke-Davis/Pfizer profits and to
16 increase the expenditures of payers, including
17 patients..
18         Did I read that correctly?
19    A.  Yes.
20    Q.  And then if you turn to Page 55, you
21 repeat a version of that sentence at the bottom of
22 Page 55 as follows, quote:  The likely effect of the
23 marketing practices/materials cited above was to
24 increase Neurontin sales, increase
25 Parke-Davis/Pfizer profits, and to increase the