UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin<br><br>**UNREDACTED VERSION FILED UNDER SEAL** |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. GARY BRENNER

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in opposition to Plaintiffs' Motion *in Limine* to Exclude Testimony of Dr. Gary Brenner [2383].

## PRELIMINARY STATEMENT

The central premise of Plaintiffs' motion to exclude five of Pfizer's retained experts is that no expert should be allowed to testify regarding the scientific evidence supporting the efficacy of Neurontin for various off-label conditions at issue in this litigation other than double-blind randomized control trials ("DBRCTs").[1]  Plaintiffs' argument was rejected over forty years ago by Dr. Louis Lasagna, the father of the placebo-controlled clinical trial, when he wrote that "a doctrinal insistence on literal and complete adherence to the [fundamental] principles [of clinical investigation] *under all circumstances* can be achieved only by a cavalier

---

[1] It is worth noting that the standard advocated by Kaiser could almost never by met by product liability plaintiffs in pharmaceutical litigation, including the plaintiffs in the Neurontin cases pending before this Court. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 185 (D. Mass. May 5, 2009) (noting that "most epidemiological studies are 'observational,' not experimental like [DBRCTs]"); *see also id.* at 132 (observing that there is no absolute requirement for epidemiologic proof when other methods are available).  For the reasons discussed herein, the standard is especially inappropriate in a case such as this where it is not Pfizer's burden to prove efficacy, but Plaintiffs' burden to prove **inefficacy**.

dismissal of useful data or by the practice of self-delusion."[2] (Emphasis original.)

Indeed, Plaintiffs' argument is flawed for several reasons. Initially, Plaintiffs' motion represents a continued effort by Plaintiffs to improperly shift their burden of proof to the Defendants in this action. It is not Pfizer's burden to prove, using evidence that would satisfy the standard of the Food and Drug Administration ("FDA") for drug approval, that Neurontin is effective. Rather, it is Plaintiffs' burden to prove that Neurontin is *ineffective* for the conditions at issue. And, given Plaintiffs' choice to rely upon aggregate evidence, they must prove either (1) that Neurontin is ineffective for a specific condition for *all* patients or (2) that Neurontin is no more effective and no safer for treatment of a specific condition for *all* patients.

This is a tall hurdle for Plaintiffs, especially given the fact that Kaiser continues to recommend Neurontin to its physicians and patient-subscribers for off-label uses. It is little wonder that Plaintiffs keep trying to improperly re-frame the issue. Plaintiffs would have the jury in this case act as if it were a committee to the FDA, advising it on the issue of whether Neurontin should be approved for certain indications. But that is not the jury's charge. Instead, the central issue in this case, the one that the jury will be asked to decide, is whether Plaintiffs' alleged damages were proximately caused by Defendants' alleged fraudulent promotion of Neurontin. To answer this question, the jury will need to understand why off-label prescribing is widely accepted as a beneficial medical practice by the FDA, the medical community, and even third-party payors such as Kaiser. They will need to hear from Defendants' experts about the type of evidence supporting the prescribing decisions of physicians (decisions that physicians, including Kaiser physicians, continue to make to this day). Significantly, the evidence clearly demonstrates:

    (1)    Kaiser did not during the relevant time frame and does not now require DBRCTs to support its formulary decisions or prescribing guidelines,

---

[2] Louis Lasagna, Dep't of Pharmacology & Experimental Therapeutics & the Div'n of Clinical Pharmacology of the Dep't of Medicine, Johns Hopkins University, *The Controlled Clinical Trial Theory and Practice*, 1 J. of Chronic Disease 353, 353 (April 1955).

(2)     Kaiser believed that off-label uses for Neurontin were not supported by DBRCTs when it decided to relax formulary restrictions,

(3)     Kaiser continues to recommend Neurontin for certain off-label uses, without regard to the availability of DBRCT evidence, and

(4)     Kaiser relies upon the clinical experience of its prescribing physicians when making decisions about formulary restrictions and prescribing guidelines.

Indeed, as observed by Les Zendle, MD, the Associate Medical Director of the Southern California Medical Group, during a 2000 Permanente roundtable discussion:

> Evidence-based medicine means so many different things to different people. To some people, it means that you don't do something unless you have double-blind randomized control studies that prove something works. Of course, if we only did things when we had double-blind randomized control studies, we wouldn't do a whole lot. It's also used as a reason to withhold certain things or to not do things or to cut costs.[3]

In short, Kaiser does not require DBRCTs when making formulary decisions or promulgating guidelines. The evidence likewise demonstrates that Kaiser relies upon the clinical experience of its physicians when making such decisions. Kaiser's contrary position advocated in its motion to exclude must be rejected.

Once Plaintiffs' central premise is rejected, as it must be, it is clear that Plaintiffs have not advanced any legitimate grounds for the exclusion of Dr. Brenner's testimony. Dr. Brenner is an attending physician at Massachusetts General Hospital and an assistant professor at Harvard Medical School. (Brenner Report at 1, Armstrong Decl. Exh.A.) He received M.D. and Ph.D. degrees from the University of Rochester in 1995. (*Id.*) He is board certified in anesthesiology and pain medicine. Since 2000, he has worked in the Department of Anesthesia and Critical Care at Massachusetts General while simultaneously teaching in the medical school at Harvard. (*Id.*) His research, focusing on the mechanisms of pain, has been funded by awards from the National Institutes of Health and has resulted in numerous publications in peer-reviewed

---

[3] The *Permanente Medicine Roundtable:  Defining Our Practice Principles*, Permanente J. Winter 2000 at 45, 48 available at http://xnet.kp.org/permanentejournal/winter00pj/winter00.pdf.

3

scientific and medical journals and contributions to medical texts. (*Id.* at 2.)

Plaintiffs do not challenge Dr. Brenner's credentials.   Nor do they challenge his experience as a clinician.  Instead, Plaintiffs claim Dr. Brenner should be excluded because his efficacy opinion is not solely reliant on the results of DBRCT.   As he explains in his report, Dr. Brenner's opinions are based upon his review of the medical literature, consensus guidelines, opinions of other experts, including his colleagues, and his own experience – clinical, scientific, and educational.  (*Id.*)  Plaintiffs operate under the mistaken assumption that the fact that their experts "rely *solely* on the results of DBRCTs in rendering their efficacy opinions," precludes every expert from relying on any source other than a DBRCT.  (Pl. Mem. [2384] at 7, emphasis in original).  As discussed below, such a narrow construction of the role of expert testimony in this case impermissibly inverts the respective burdens of proof and fundamentally misconstrues the role of expert opinion testimony in this trial.

For all the reasons discussed below, Plaintiffs have not put forth any basis to exclude Dr. Brenner's opinions.

## ARGUMENT

I.   **The Use of Multiple Sources of Scientific Evidence is Proper Methodology for the Basis of a Clinical Opinion**

Plaintiffs' argument rests on the false premise that, in order to be admissible, the opinions expressed by Dr. Brenner must be based on the regulatory standard for efficacy, which Plaintiffs assert requires double-blind randomized placebo-controlled clinical trials ("DBRCT").[4]  In their

---

[4] As a threshold matter, nowhere do the FDA regulations state that efficacy is established only with DBRCTs.  FDA regulations state that "[r]eports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs." 21 C.F.R. § 314.126.  Under FDA regulations, an "adequate and well-controlled" study, which forms the primary – not the only – basis for efficacy, has characteristics that include using "a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect," and allows for the following types of controls: (1) Placebo concurrent control, (2) dose-comparison concurrent control, (3) no treatment concurrent control, (4) active treatment concurrent control, or (5) historical control.  21 C.F.R. § 314.126(b)(2).  More importantly, for the reasons discussed above, Plaintiffs' argument relying on the regulatory regime for obtaining regulatory approval for the marketing of a new drug simply misses the point.

effort to exclude Dr. Brenner, Plaintiffs ask this Court to substitute the incorrect "FDA standard" for marketing approval rather than employing the methodology regularly used by clinicians in evaluating the scientific evidence for the clinical efficacy of Neurontin.  However, Dr. Brenner is not a company seeking to obtain FDA approval to market a medicine.  Dr. Brenner is providing an opinion regarding Neurontin's efficacy from a clinical perspective, not a regulatory perspective.  The information that a physician uses to determine whether a drug is effective for a particular patient by necessity differs from that submitted by a company to obtain FDA approval to market a medicine for a certain indication.  █████████████████████████████

█████████████    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Accordingly, Dr. Brenner appropriately relies on a variety of evidence, not limited to DBRCTs, in forming his opinion that Neurontin is effective for the treatment of neuropathic pain conditions.  In addition to DBRCTs, this evidence includes medical literature (including meta-analyses), consensus guidelines, the opinions of other experts, and his clinical, scientific and educational experience. (Brenner Report at 2, 4-5.)   All of these forms of scientific evidence are generally accepted in the medical profession as providing the clinical basis that a medicine is effective (and safe) in treating a disease.   These generally accepted sources of clinical information coupled with Dr. Brenner's personal clinical experience reliably form the bases for his opinion that Neurontin is effective in treating neuropathic pain.

## A.    FDA Standards For New Drug Approval Do Not Govern Admissibility Of Expert Testimony On The Efficacy Of A Drug For Off-Label Uses

The dichotomy that Plaintiffs attempt to create – where only DBRCTs are relevant and clinical experience is irrelevant – is not supported by the law, is inconsistent with the factual record in this case, and inconsistent with Kaiser's own internal policies and actual practices.

Any suggestion that the efficacy issues in this case are governed by the same standard required for FDA approval for on-label indications, and any attempt to shift the burden of proof to Pfizer to demonstrate Neurontin's efficacy for the relevant off-label uses under that standard, must be rejected.[5] The FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label because it advances an important public policy. *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").[6]

In addition, physicians frequently and properly prescribe off-label even in the absence of the "gold standard" evidence that Plaintiffs demand for purpose of this litigation (but which they do not require when making formulary decisions or promulgating prescribing guidelines). Physicians often make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition. In fact, prescribing off-label is often the standard of care, especially for certain indications, such as neuropathic pain, where there is little or no "gold standard" evidence supporting the effectiveness of any medication. As Judge Weinstein recently observed: "'[O]ff-label uses of prescription drugs are a mainstay of the industry – an estimated 21% of drug use overall[.]'" *Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), ___ F. Supp. 2d ___, 2009 WL 4260857, at

---

[5] Pfizer does not have the burden of proving efficacy. Rather, as this Court has held, Plaintiffs have the burden of proving inefficacy. *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) ("For all of their claims, plaintiffs will be required to prove . . . that they were injured (i.e., suffered economic loss) by virtue of the Neurontin's inefficacy for that condition."). Plaintiffs seek not merely to flip this burden by requiring Pfizer to prove efficacy, but also to require Pfizer to meet that invalidly-applied burden by supposed "gold standard" evidence.

[6] *See also Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994) ("[T]he FDA permits doctors to prescribe drugs for 'off-label' uses."); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("[T]he 'FDA itself recogniz[es] the value and propriety of off-label use.'" (citation omitted)).

*16 (E.D.N.Y. Dec. 1, 2009) (alteration in original) (citation omitted). "Some off-label uses of a prescription drug may be medically necessary." *Id.*; *see also Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 705 n.3 (W.D. Va. 1999).[7] Plaintiffs' argument, however, presumes that no medication should be prescribed off-label absent "gold standard" evidence, and would actually hold that a physician's exercise of the standard of care resulted in improper prescriptions. This absurd suggestion should be rejected.

**B.      Kaiser Does Not Require DBRCTs When Making Formulary Decisions Or Promulgating Prescribing Guidelines And Considers Clinical Experience As Relevant Evidence**

Kaiser's arguments are inconsistent with their own internal policies and practices. As discussed in Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409],[8] Kaiser does not require DBRCTs when making formulary decisions or promulgating prescribing guidelines. This fact is critical given that Kaiser's theory of causation in this action is tied directly to its formulary decision-making process. *See In re Neurontin Mktg. & Sales Practices Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010).



---

[7] No one disputes that DBRCTs are at the top of the pyramid of available evidence when analyzing cause and effect of pharmaceutical products. However, by definition, off-label prescribing, widely accepted as a beneficial medical practice, lacks FDA approval. Thus, logically, off-label prescribing is often based upon evidence other than DBRCTs.

[8] Defendants incorporate Section I of such opposition herein by reference.

[9] In support of this opposition, Defendants rely upon the exhibits attached to the Declaration of Katherine Armstrong in Support of Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2410]. In order to avoid burdening the Court with multiple copies of the same set of exhibits, such exhibits are cross-referenced herein.





### C.     Kaiser Continues To Recommend Neurontin For The Treatment Of Neuropathic Pain

Kaiser's position in this litigation that there is no valid evidence supporting the use of Neurontin to treat neuropathic pain is inconsistent with its public statements regarding the use of Neurontin. The guidelines that Kaiser adopted in 1999 are essentially the same as the guidelines in effect today, which recommend gabapentin as "*the* second-line agent in the management of [neuropathic pain]." (May 2007 Kaiser Permanente Medical Care Program, Management of Neuropathic Pain in Adults, Exh. F [2410-7] to 1/22/10 Armstrong Decl. at 3, emphasis added.) The guidelines are based, in part, on the clinical experience of the Kaiser Permanente Care Management Institute's Pain Management Advisory Group. (*Id.*)





In addition, Kaiser's website contains numerous articles where it recommends the use of anticonvulsants, including Neurontin and gabapentin, for treatment of chronic pain, cancer pain, and other conditions.   (Exh. H [2410-9] to 1/22/10 Armstrong Decl.)[12]   In fact, someone

_____

[10] *In re Neurontin*, 2010 WL 53568, at *3.

[11] *Id.*

[12] Kaiser cannot distance itself from its own public admissions about Neurontin by attempting to attribute such statements to a third-party vendor, Healthwise.  Initially, Kaiser actively contracted with Healthwise to provide it with content for its website.  Second, these are not links to a wholly separate website.   Instead, Kaiser's members are directed to articles on Kaiser's website with the Kaiser Permanente logo prominently displayed at the top of each page.  In 1999, Kaiser openly touted its collaboration with Healthwise and indicated that its physicians would be involved in actively reviewing the material provided by Healthwise. (Armstrong Decl. Exh. C.)  Likewise, according to a 2004 Kaiser press release, Kaiser "showcase[d] [its] online health programs" in order to encourage enrollment. (Armstrong Decl. Exh. D.)  Promoting its website, Kaiser states that it features "online drug and medical encyclopedias ***reviewed and approved by Kaiser Permanente physicians***."  (*Id.*, emphasis added) Another Kaiser press release tells people to "[c]lick to kaiserpermanente.org for physician-approved health information." (Armstrong Decl. Exh. E.)  "Kaiser invite[d] everyone – members and nonmembers alike – to access trustworthy, up-to-date, physician-approved health information by visiting [its] redesigned Web site . . . ."  (*Id.*)  And Kaiser represents on its website that the material provided by Healthwise is both accurate and current. (Armstrong Decl. Exh.F.)

Further, the fact that the articles are accompanied by a disclaimer telling people to consult their physician does not make Kaiser's statements any less inconsistent with its allegations in this lawsuit. Moreover, imbedded within the disclaimer in each article is a "How this information was developed" link

*(cont'd)*

researching "Pain Originating From a Nerve" in Kaiser's Drug Encyclopedia is taken to a page that reads:

> **Drugs for managing Pain Originating From a Nerve**
> Please click on a drug name to see more information
> • Gabapentin Oral
> • Neurontin Oral

(*Id.*)  These are the only two drugs listed in Kaiser's Drug Encyclopedia under "Pain Originating from a Nerve."  The article on gabapentin states, under "other uses":  "Gabapentin may also be used to treat other nerve pain conditions (e.g., diabetic neuropathy, peripheral neuropathy, trigeminal neuralgia)."  (*Id.*)  Similarly, articles in Kaiser's on-line Health Encyclopedia advises Kaiser's members that Neurontin may be used to treat chronic plain, explaining:  "Experts do not know exactly how anticonvulsants work to reduce chronic pain.  They may block the flow of pain signals from the central nervous system."  Significantly, the article notes that "[e]ven though gabapentin and pregabalin *are the only drugs that have proved to help some types of chronic pain*," certain other drugs "may also be effective in reducing chronic pain."  (*Id.* (emphasis added).)  Another article indicates that anticonvulsants (including Neurontin) are used to control cancer pain and explains that "[a]nticonvulsants help reduce pain related to the nervous system (neuropathic pain).  Some have fewer side effects than tricyclic antidepressants."  (*Id.*)  An article on the use of anticonvulsants for chronic low back pain advises Kaiser members that anticonvulsants, including Neurontin, "can reduce some persistent low back pain with fewer side effects than tricyclic antidepressants."  (*Id.*)

Likewise, in a 2005 article published in American Family Physicians, Kaiser doctors Maizels and McCarberg explained that "[o]f the second-generation antiepileptic drugs, gabapentin (Neurontin) has the best documented efficacy in the treatment of neuropathic pain."  *See* Maizels & McCarberg, *Antidepressants and Antiepileptic Drugs for Chronic Non-Cancer*

---

*(cont'd from previous page)*
which takes readers to an article telling Kaiser members to trust information from Healthwise. (Armstrong Decl. Exh. F.)

*Pain*, 71 Am. Fam. Physician 483, 485-87 (Feb. 1, 2005) (Armstrong Decl. Exh. G). The position now advanced by Kaiser in this litigation is fundamentally inconsistent with its actual practices and must be rejected.

### D.     Plaintiffs' Arguments Depend Upon A Flawed Interpretation Of The Available DBRCTs

Not only is Plaintiffs' attempt scientifically flawed and procedurally void, their reliance on their experts' interpretation of the DBRCT is unavailing. Even if DBRCT were the only relevant form of evidence, their argument is predicated on the validity of their experts' analysis interpretation of the available data from DBRCTs. However, as Pfizer expert Dr. Robert Gibbons makes clear in his expert report,[13] this reliance is misplaced. For instance, Plaintiffs' re-interpretation of the results of protocol 945-210 is based on their assumption that any treatment affect is due to unblinding. As a result, Plaintiffs claim to have "corrected this corruption," and allege that, as corrected, protocol 945-210 "provides no basis of any clinical efficacy of gabapentin over placebo in reducing pain." (Pl. Mem. [2483] at 9.) As Dr. Gibbons points out, however, the evidence relied upon by Plaintiffs in support of this allegation of unblinding is rife with errors. (Gibbons Report at 4, Armstrong Decl. Exh. H). Plaintiffs' expert Dr. Jewell relied on "several key assumptions about the data, each of which is flawed," including that "[t]he time trends for both placebo and gabapentin are linear over time," that "[t]he research sites differ in pain levels at baseline but otherwise all sites had the same rate of change over time," that "[t]he effect of the missing data produced by excluding patients with side effects is ignorable based solely on the overall effects of treatment, time and site," and "[t]hat patients who experienced treatment related CNS side-effects actually improved following the emergence of the side-effect." (Gibbons Rep. at 4.) A closer look at each of these misplaced assumptions reveals that Plaintiffs' "unblinding hypothesis is not in any way supported by the[ ] data." *Id.* at 8. The statistically significant evidence of decreased pain evidenced by protocol 945-210 does, in fact, support the efficacy of the gabapentin for pain, contrary to Plaintiffs' assertions.

---

[13] Plaintiffs have not sought to exclude the opinions of Dr. Gibbons.

(Gibbons Rep. at 7-8.)

The above analysis is provided by way of example.  Dr. Gibbons engages in a detailed review of the reports provided by Plaintiffs' experts Jewell, Perry and McCrory.  He concludes, for example, that "Dr. Perry's conclusion that gabapentin is not effective for the treatment of neuropathic pain is squarely contradicted by the data, which clearly supports the efficacy of the drug relative to placebo."  (Gibbons Reports at 2.)  He further concludes that "the data provide overwhelming evidence that the effects of gabapentin on pain are will beyond anything that is consistent with chance expectations."  (*Id.* at 15.)  Thus, Plaintiffs' assertion that there is no DBRCT evidence to support the efficacy of Neurontin is based upon their experts' flawed interpretation of the data and provides no basis for the exclusion of Pfizer's experts.

## II.    Dr. Brenner's Opinion That Neurontin Is Effective In Treating Neuropathic Pain Is Based On Reliable And Generally Accepted Methodology

Once the central premise of Plaintiffs' *Daubert* motion falls, all that remains of their motion fails to rise to the level of a *Daubert* challenge.  Plaintiffs ask this Court to accept the opinions of their experts over Defendants' regarding the proper weight and interpretation to be given to the available scientific evidence, but that is not the role of the Court on a *Daubert* motion.  As this Court has explained:

> The Court must, however, keep in mind the Supreme Court's admonition that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts."  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."
>
> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct.  As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.  In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the

> evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 131-32 (D. Mass. 2009) (citations omitted).

**A.    Dr. Brenner Properly Considered The Totality Of The Medical Evidence, Including Relevant Meta-Analyses**

Part and parcel with their "DBRCT or nothing" approach, Plaintiffs argue that Dr. Brenner's opinion should be excluded because he does not perform his own meta-analysis of DBRCT results.  Thus, Plaintiffs characterize his testimony as a "regurgitat[ion] [of] opinions offered by others he considers more expert then [sic] himself."  (Pl. Mem. [2384] at 11.)  However, Dr. Brenner is neither regurgitating the opinions of others, nor is he deferring to opinions of those who are "more expert" than he is.  Rather, as Dr. Brenner explains, meta-analyses are among the type of evidence routinely relied upon in his field.  (Brenner Report at 4.)  Dr. Brenner's opinions are supported by a report published by the Cochrane Collaboration, titled "Gabapentin for acute and chronic pain (Review)."  (*Id.*)  He indicates that the Cochrane Collaboration is one of the most respected groups performing this type of analysis (*id.*), a proposition that Plaintiffs' expert does not dispute.  (Pl. Mem. [2384] at 12.)  Plaintiffs have not cited any support for their novel argument that reliance upon published meta-analyses performed by others renders expert testimony inadmissible under *Daubert*.  As this Court has observed: "Meta-analysis 'systematiz[es] the time-honored approach of reviewing the literature.'"  *In re Neurontin*, 612 F. Supp. 2d at 126 (citation omitted, alteration in original).  That Plaintiffs' expert is critical of the Cochrane report is no basis for exclusion of Dr. Brenner's testimony.  *See id.* at 131 (observing that it is the role of the jury, not the court, to decide between conflicting expert testimony).

The Cochrane Collaboration recently re-issued its report and conclusion that "[t]here is evidence to show that gabapentin is effective in neuropathic pain" and that two-thirds of patients can expect to achieve good pain relief.  (The Cochrane Collaboration, *Gabapentin for acute and chronic pain* (Review) at 1 (2010), Armstrong Decl. Exh. I.)  The authors re-issued their report

even though the report makes clear that they "are aware of unpublished trial data for Gabapentin which could affect the results of this review." (*Id.*)

In addition, Dr. Brenner did not rely exclusively upon the Cochrane review. Rather, his opinion was also based upon "other meta-analyses [that] have supported the efficacy of gabapentin for the control of neuropathic pain, [as well as] consensus statements from respected medical organizations or groups of individuals." (Brenner Report at 4.) As Dr. Brenner notes, "[t]hese consensus recommendations come from review of the medical literature by individuals with expertise in pain treatment, many of whom are also considered thought-leaders in the field of pain medicine, and reflect the expertise and clinical experience of the group." (*Id.*)

**B.    Dr. Brenner's Opinions Are Properly Informed By His Clinical Opinions**

While Dr. Brenner does not rely exclusively upon his clinical experience to support his opinions, his opinions are properly informed by such experience. As Dr. Brenner makes clear in his expert report, the treatment of neuropathic pain is made difficult by "limitations in the tools available for the treatment of . . . patients," a limitation "due in part to an incomplete understanding of the physiology and pathophysiology of pain." (Brenner Rep. at 5.) As a result of these limitations, each pain patient is treated on an individualized basis, with numerous factors – such as the nature of the pain, co-morbidities, other medications, patient compliance and addiction history – "considered in light of the balance between the likely effectiveness and the potential adverse effects of a medication." (Brenner Rep. at 7.)

Indeed, as Dr. Brenner makes clear, "[i]n many patients with pain the underlying etiology and mechanism(s) of the pain is obscure." (Brenner Rep. at 6.) The limited "tool box" of options to treat this obscure pain, the problems of co-morbidity and the presence of serious side-effects in alternative treatments (such as opioids), and gabapentin's safety relative to those alternatives, reside at the heart of gabapentin's appeal. (Brenner Rep. at 6-7.) This is true of many of the drugs that Plaintiffs have offered as alternatives to gabapentin. (Brenner Rep. at 9-10.) Plaintiffs ignore the relevance of Dr. Brenner's opinion regarding these alternative treatments altogether. As Dr. Brenner explains at length, each of these alternative treatments

15

possesses serious limitations that destroy any general applicability. (*Id.* at 9-10.)

The obscure nature of the origin of neuropathic pain, and the highly individualized nature of many pain patients' response to drugs, means that treatment often requires a "regime" of medications used in combination to combat the pain. In fact, it is "often necessary to 'trial' multiple medications before an efficacious regimen of medications with an acceptable risk-benefit profile is found." (*Id.* at 7.) Again, Dr. Lasagna observed over forty years ago:

> If . . . a physician used Drug A on a patient known to have a disease [where past experience indicates a uniformly poor prognosis in the untreated case] and the patient is quickly and completely restored to permanent good health, the event is one of major importance. To criticize such a felicitous physician, who calls the case to the attention of his colleagues, because of a lack of placebo controls, or for not having a large series of similar cases, represents a naive display of pharmacologic Philistinism.

L. Lasagna, *supra* note 2, *The Controlled Clinical Trial Theory and Practice* at 355.





Such an individualized approach is at odds with Plaintiffs' approach of choice. As Dr. Shawn Bird, also a Pfizer expert, confirmed in his expert report, "[f]or many disorders there are no effective drugs, or those that are effective have burdensome side-effects." (Bird Report at 3.)[15]  In those instances, patients often derive benefits from drugs even without any DBRCT-proven benefit. (*Id.*)  Under Plaintiffs' approach, a patient whose pain did not respond to one of their alternative drugs, or who could not tolerate the alternative drugs due to side effects, would be left without treatment options.

C.      **Dr. Brenner Was Not Required To Produce Sanitized Medical Records**

Plaintiffs also seek to exclude Dr. Brenner on the grounds that has not produced sanitized medical records in support of opinions based upon his clinical experience.  Plaintiffs' argument relies on a mischaracterization of this Court's September 27, 2006 order, which provided as follows:

> After hearing, I conclude that the burden, expense and invasion of privacy of the proposed discovery outweighs its likely benefit.  See Fed. R. Civ. P. 26 (b)(2). This conclusion is based on the supplemental record not available before the Magistrate Judge and a fuller explanation of plaintiff's theory of the case.  If either party intends to call a treating physician to give an opinion on effectiveness, sanitized patient records shall be produced to the extent the physician is relying on his experience with treating *that patient* (as opposed to a clinical trial). . . .

(9/27/06 Electronic Order, emphasis added.)  Significantly, the order was entered into as part of an order denying Pfizer's request for discovery of Kaiser patient medical records and intended to ameliorate the prejudice that Pfizer would experience if Kaiser was allowed to provide its experts with access to such records to support their testimony.

---

<sup>14</sup>

[black redaction bar]

[15] Dr. Bird's Report is attached to the Declaration of Katherine Armstrong submitted in support of Pfizer's Opposition to Plaintiffs' Motion in Limine to Exclude Testimony of Dr. Shawn Bird.

Here, Pfizer's experts do not rely solely upon their clinical experience. And it is well established that a physician such as Dr. Brenner is allowed to base his opinion in, part, upon his clinical experience, if, as here, it is confirmed by reliable scientific evidence. *See In re Vioxx Prods. Liability Lit.*, 401 F. Supp. 2d 565, 579 (E.D. La. 2005); *see also id.* at 580 (noting that one expert's opinion was "based on his 35 years of clinical experience in the [field] of gastroenterology" and the other expert's opinion was "based on his experience as a prescribing physician.") Dr. Brenner's opinions concerning Neurontin's efficacy for off-label indications are not grounded in the records of specific, identifiable patients, but rather in his cumulative clinical experience from treating pain patients over many years. To require Dr. Brenner to search for, redact and produce thousands of medical charts, while Kaiser did not have to produce even a random sample of its patient records, makes no sense. The use of the phrase "that patient" in the Court's order suggests that the Court was referring to specific patient records relied upon by a physician and did not intend to prevent a physician from testifying about his experience treating pain patients over the course of his career.

In any event, Plaintiffs' argument should be rejected because Plaintiffs did not seek any discovery of Defendants' medical experts. The basis for the opinions of Defendants' medical experts were clearly disclosed in their expert reports, consistent with Rule 26. Plaintiffs' never sought to depose Defendants' medical experts. Likewise, Plaintiffs did not seek any production of documents from Defendants' medical experts until January 27, 2009, when they served subpoenas on Defendants' medical experts. Defendants and their experts objected on the grounds, *inter alia*, that the subpoena, which was served only three days before the deadline for completion of expert discovery, was untimely. (*See* Armstrong Decl. Exh. K.) If Plaintiffs believed they were entitled to additional documents, their remedy was to bring a timely motion – not to wait until the eve of trial and then seek to exclude Pfizer's witnesses. *Cf. Nolan v. Thompson*, 521 F.3d 983, 987 (8th Cir. 2008). Plaintiffs should not be allowed to rely upon their own failure to pursue discovery as a basis for excluding Defendants' evidence.

### III.   The Testimony Of Dr. Brenner Is Relevant To The Issue Of Causation

Dr. Brenner's testimony is independently admissible because he explains the reasons why physicians prescribe off-label and the factors that influence a physician's prescribing decisions. Such evidence is independently admissible on the issue of causation, because it rebuts Plaintiffs' claim that virtually all off-label Neurontin prescriptions were caused by Defendants' alleged promotion. (*See* Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409] at 13-14.)

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude the testimony of Dr. Brenner.

Dated: January 26, 2010                    Respectfully submitted,

                                           SKADDEN, ARPS, SLATE, MEAGHER
                                             & FLOM LLP

                                           By:    /s/ Mark S. Cheffo
                                                  Mark S. Cheffo

                                           Four Times Square
                                           New York, NY 10036
                                           Tel:  (212) 735-3000

                                           SKADDEN, ARPS, SLATE, MEAGHER
                                             & FLOM LLP

                                           By:    /s/ Raoul D. Kennedy
                                                  Raoul D. Kennedy

                                           Four Embarcadero Center
                                           San Francisco CA 94111
                                           Tel:  (415) 984-6400

                                                  -and-

WHEELER TRIGG O'DONNELL LLP

By:    /s/ James E. Hooper
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

       -and-

WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and*
*Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 26, 2010.

                    /s/ David B. Chaffin
                    David B. Chaffin