UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------
In re:   NEURONTIN MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY LITIGATION
------------------------------------------------------------
THIS DOCUMENT RELATES TO:

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC., 04 CV 10739 (PBS)
------------------------------------------------------------

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**UNREDACTED VERSION
FILED UNDER SEAL**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. ALAN RAPOPORT

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in opposition to Plaintiffs' Motion *in Limine* to Exclude Testimony of Dr. Alan Rapoport [2379].

### PRELIMINARY STATEMENT

The central premise of Plaintiffs' motion to exclude five of Pfizer's retained experts is that no expert should be allowed to testify regarding the scientific evidence supporting the efficacy of Neurontin for various off-label conditions at issue in this litigation other than double-blind randomized control trials ("DBRCTs").[1] Plaintiffs' argument is flawed for several reasons. Initially, Plaintiffs' motion represents a continued effort by Plaintiffs to improperly shift their burden of proof to the Defendants in this action. It is not Pfizer's burden to prove, using evidence that would satisfy the standard of the Food and Drug Administration ("FDA") for

---

[1] It is worth noting that the standard advocated by Kaiser could almost never by met by product liability plaintiffs in pharmaceutical litigation, including the plaintiffs in the Neurontin cases pending before this Court. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 185 (D. Mass. May 5, 2009) (noting that "most epidemiological studies are 'observational,' not experimental like [DBRCTs]"); *see also id.* at 132 (observing that there is no absolute requirement for epidemiologic proof when other methods are available). For the reasons discussed herein, the standard is especially inappropriate in a case such as this where it is not Pfizer's burden to prove efficacy, but Plaintiffs' burden to *inefficacy*.

drug approval, that Neurontin is effective. Rather, it is Plaintiffs' burden to prove that Neurontin is *ineffective* for the conditions at issue. And, given Plaintiffs' choice to rely upon aggregate evidence, they must prove either (1) that Neurontin is ineffective for a specific condition for *all* patients or (2) that Neurontin is no more effective and no safer for treatment of a specific condition for *all* patients.

This is a tall hurdle for Plaintiffs, especially given the fact that Kaiser continues to recommend Neurontin to its physicians and patient-subscribers for off-label uses. It is little wonder that Plaintiffs keep trying to improperly re-frame the issue. Plaintiffs would have the jury in this case act as if it were a committee to the FDA, advising it on the issue of whether Neurontin should be approved for certain indications. But that is not the jury's charge. Instead, the central issue in this case, the one that the jury will be asked to decide, is whether Plaintiffs' alleged damages were proximately caused by Defendants' alleged fraudulent promotion of Neurontin. To answer this question, the jury will need to understand why off-label prescribing is widely accepted as a beneficial medical practice by the FDA, the medical community, and even third-party payors such as Kaiser. They will need to hear from Defendants' experts about the type of evidence supporting the prescribing decisions of physicians (decisions that physicians, including Kaiser physicians, continue to make to this day). Significantly, the evidence clearly demonstrates:

(1) Kaiser did not during the relevant time frame and does not now require DBRCTs to support its formulary decisions or prescribing guidelines,

(2) Kaiser believed that off-label uses for Neurontin were not supported by DBRCTs when it decided to relax formulary restrictions,

(3) Kaiser continues to recommend Neurontin for certain off-label uses, without regard to the availability of DBRCT evidence, and

(4) Kaiser relies upon the clinical experience of its prescribing physicians when making decisions about formulary restrictions and prescribing guidelines.

Indeed, as observed by Les Zendle, MD, the Associate Medical Director of the Southern

California Medical Group, during a 2000 Permanente roundtable discussion:

> Evidence-based medicine means so many different things to different people. To some people, it means that you don't do something unless you have double-blind randomized control studies that prove something works. Of course, if we only did things when we had double-blind randomized control studies, we wouldn't do a whole lot. It's also used as a reason to withhold certain things or to not do things or to cut costs.[2]

In short, Kaiser does not require DBRCT when making formulary decisions or promulgating guidelines. The evidence likewise demonstrates that Kaiser relies upon the clinical experience of its physicians when making such decisions. Kaiser's contrary position advocated in its motion to exclude must be rejected.

For nearly thirty years, Pfizer expert Dr. Alan Rapoport has specialized in diagnosing and treating headache and migraine pain. During that time Dr. Rapoport has participated in hundreds of clinical trials, lectured extensively around the globe, founded and administered an inpatient headache unit at Greenwich Hospital in Greenwich, Connecticut, and founded and administered the New England Center for Headache in Greenwich, Connecticut. (*See Curriculum Vitae* of Alan M. Rapoport, M.D at 2-4; Rapoport Report at 2, Armstrong Decl. Exh. A.) During the course of his clinical career, Dr. Rapoport has treated over 20,000 patients for migraine and headache pain. (Rapoport Report at 4.) In addition, Dr. Rapoport has authored or co-authored nine books, and published over two hundred articles or posters on headache and migraine pain and treatment. (*Id.* at 1.) Finally, Dr. Rapoport has taught at Yale University School of Medicine, Columbia University, and now at the David Geffen School of Medicine at UCLA. In sum, Dr. Rapoport's credentials are unimpeachable, and his experience in the treatment of migraine and headache pain is unsurpassed.

Kaiser does not challenge Dr. Rapoport's qualifications or experience. And, no matter how they might characterize their motion, it is not based upon failure to apply a *reasonable* methodology, but upon an alleged failure to use a single and exclusive methodology that

---

[2] The *Permanente Medicine Roundtable: Defining Our Practice Principles*, Permanente J. Winter 2000 at 45, 48 available at http://xnet.kp.org/permanentejournal/winter00pj/winter00.pdf.

3

Plaintiffs claim is the only method that produces relevant evidence. Plaintiffs' argument finds no support in *Daubert*. Dr. Rapoport is not required to use the same method as Plaintiffs' expert. Instead, his testimony must be based upon methods reasonably employed by experts in his field. As discussed below, Dr. Rapoport employs the methodology of a clinical practitioner and researcher and that methodology is absolutely consistent with other practitioners and, indeed, even with the practice of Kaiser's own member doctors. As Dr. Rapoport explains:

> Here is where my experience in the ability to evaluate gabapentin and [Plaintiffs' expert] Dr. McCrory's diverge. Dr. McCrory, by his own admission, is a specialist in trial design and evaluation, not . . . a clinician. He analyzes studies and concentrates on data, and I care for patients with migraine who are in severe pain and concentrate on their improvement. Although I have participated in well over 150 clinical trials on headache, and helped write the protocols for some, and evaluate trials in papers I review for publication, most of my life has been spent caring for migraineurs in the clinic. . . . Thousands of those patients have taken gabapentin for headache, either prescribed by me or others. For the last 20 years, 90% of my clinical time was taken up primarily with the care of difficult to treat migraine patients. Many of these patients improved for the first time when placed on gabapentin. With my 36 years of clinical experience and being boarded in both headache medicine and neurology, I bring a very different expertise to treating the headache patient than Dr. McCrory.

(Rapoport Report at 4.)

Kaiser's motion confuses the regulatory standard and methods for assessing effectiveness for purposes of marketing approval and on-label use, with the clinical standard and methods used by physicians for assessing effectiveness for purposes of treatment by off-label use. Dr. Rapoport's testimony is not offered to show that Neurontin should have been FDA-approved for migraine. Instead, Dr. Rapoport will testify that doctors can and do choose to prescribe Neurontin off-label to help treat migraine based upon the same kinds of evidence relied upon by physicians for many, if not most, off-label prescribing decisions. Accordingly, Kaiser's arguments present no valid basis for Dr. Rapoport's exclusion, and its motion should be denied.

## ARGUMENT

### I.    The Use of Multiple Sources of Scientific Evidence is Proper Methodology for the Basis of a Clinical Opinion

Plaintiffs' argument rests on the false premise that, in order to be admissible, the opinions

4

expressed by Dr. Rapoport must be based on the regulatory standard for efficacy, which Plaintiffs assert requires double-blind randomized placebo-controlled clinical trials ("DBRCT").[3] In their effort to exclude Dr. Rapoport, Plaintiffs ask this Court to substitute the incorrect "FDA standard" for marketing approval rather than employing the methodology regularly employed by clinicians in evaluating the scientific evidence for the clinical efficacy of Neurontin. However, Dr. Rapoport is not a company seeking to obtain FDA approval to market a medicine. Dr. Rapoport is providing an opinion regarding Neurontin's efficacy from a clinical perspective, not a regulatory perspective. The information that a physician uses to determine whether a drug is effective for a particular patient by necessity differs from that submitted by a company to obtain FDA approval to market a medicine for a certain indication. Accordingly, Dr. Rapoport appropriately relies on a variety of evidence, not limited to DBRCTs, in forming his opinion that Neurontin is effective for the treatment of migraine.

### A. FDA Standards For New Drug Approval Do Not Govern Admissibility Of Expert Testimony On The Efficacy Of A Drug For Off-Label Uses

The dichotomy that Plaintiffs attempt to create – where only DBRCTs are relevant and clinical experience is irrelevant – is not supported by the law, is inconsistent with the factual record in this case, and inconsistent with Kaiser's own internal policies and actual practices. Any suggestion that the efficacy issues in this case are governed by the same standard required for FDA approval for on-label indications, and any attempt to shift the burden of proof to Pfizer to demonstrate Neurontin's efficacy for the relevant off-label uses under that standard, must be

---

[3] As a threshold matter, nowhere do the FDA regulations state that efficacy is established only with DBRCTs. FDA regulations state that "[r]eports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs." 21 C.F.R. § 314.126. Under FDA regulations, an "adequate and well-controlled" study, which forms the primary – not the only – basis for efficacy, has characteristics that include using "a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect," and allows for the following types of controls: (1) Placebo concurrent control, (2) dose-comparison concurrent control, (3) no treatment concurrent control, (4) active treatment concurrent control, or (5) historical control. 21 C.F.R. § 314.126(b)(2). More importantly, for the reasons discussed above, Plaintiffs' argument relying on the regulatory regime for obtaining regulatory approval for the marketing of a new drug simply misses the point.

rejected.[4] The FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label because it advances an important public policy. *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").[5]

In addition, physicians frequently and properly prescribe off-label even in the absence of the "gold standard" evidence that Plaintiffs demand for the purpose of this litigation (but which they do not require when making formulary decisions or promulgating prescribing guidelines). Physicians often make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition. In fact, prescribing off-label is often the standard of care, especially for certain indications, such as neuropathic pain, where there is little or no "gold standard" evidence supporting the effectiveness of any medication. As Judge Weinstein recently observed: "'[O]ff-label uses of prescription drugs are a mainstay of the industry – an estimated 21% of drug use overall[.]'" *Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), ___ F. Supp. 2d ___, 2009 WL 4260857, at *16 (E.D.N.Y. Dec. 1, 2009) (alteration in original) (citation omitted). "Some off-label uses of a prescription drug may be medically necessary." *Id.*; *see also Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 705 n.3 (W.D. Va. 1999).[6] Plaintiffs' argument, however, presumes that no

---

[4] Pfizer does not have the burden of proving efficacy. Rather, as this Court has held, Plaintiffs have the burden of proving inefficacy. *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) ("For all of their claims, plaintiffs will be required to prove . . . that they were injured (i.e., suffered economic loss) by virtue of the Neurontin's inefficacy for that condition."). Plaintiffs seek not merely to flip this burden by requiring Pfizer to prove efficacy, but also to require Pfizer to meet that invalidly-applied burden by supposed "gold standard" evidence.

[5] *See also Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994) ("[T]he FDA permits doctors to prescribe drugs for 'off-label' uses."); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("[T]he 'FDA itself recogniz[es] the value and propriety of off-label use.'" (citation omitted)).

[6] No one disputes that DBRCTs are at the top of the pyramid of available evidence when
*(cont'd)*

medication should be prescribed off-label absent "gold standard" evidence, and would actually hold that a physician's exercise of the standard of care resulted in improper prescriptions. This absurd suggestion should be rejected.

### B. Kaiser Does Not Require DBRCTs When Making Formulary Decisions Or Promulgating Prescribing Guidelines And Considers Clinical Experience As Relevant Evidence

Kaiser's arguments are inconsistent with its own internal policies and practices. As discussed in Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409],[7] Kaiser does not require DBRCTs when making formulary decisions or promulgating prescribing guidelines. This fact is critical given that Kaiser's theory of causation in this action is tied directly to its formulary decision-making process. *See In re Neurontin Mktg. & Sales Practices Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010).



---

*(cont'd from previous page)*
analyzing cause and effect of pharmaceutical products. However, by definition, off-label prescribing, widely accepted as a beneficial medical practice, lacks FDA approval. Thus, logically, off-label prescribing is often based upon evidence other than DBRCTs.

[7] Defendants incorporate Section I of such opposition herein by reference.

[8] In support of this opposition, Defendants rely upon the exhibits attached to the Declaration of Katherine Armstrong in Support of Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2410]. In order to avoid burdening the Court with multiple copies of the same set of exhibits, such exhibits are cross-referenced herein.



## II. Dr. Rapoport's Opinion That Neurontin Is Effective In Treating Migraine Is Based On Reliable And Generally Accepted Methodology

Once the central premise of Plaintiffs' *Daubert* motion falls, all that remains of their motion fails to rise to the level of a *Daubert* challenge. Plaintiffs ask this Court to accept the opinions of their experts over Defendants' regarding the proper weight and interpretation to be given to the available scientific evidence, but that is not the role of the Court on a *Daubert* motion. As this Court has explained:

> The Court must, however, keep in mind the Supreme Court's admonition that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court,

should be the one to "decide among the conflicting views of different experts." "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."

*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 131-32 (D. Mass. 2009) (citations omitted).

### A. Dr. Rapoport Employs The Methodology Of An Imminently-Qualified Practitioner, Teacher And Researcher

Dr. Rapoport is a board certified neurologist, with a certified subspecialty in Headache Medicine. In rendering his opinions in this case, Dr. Rapoport draws upon his thirty year experience treating over 20,000 patients for headache and migraine pain, during which time he has also participated in hundreds of clinical trials and lectured extensively on the subject of headaches and migraine pain. Dr. Rapoport also founded and administered headache centers at two hospitals. (*See Curriculum Vitae* of Alan M. Rapoport, M.D at 2-4; Rapoport Report at 2.) During the course of his clinical career, Dr. Rapoport has treated over 20,000 patients for migraine and headache pain. (Rapoport Report at 4.) In addition, Dr. Rapoport has authored or co-authored nine books, and published over two hundred articles or posters on headache and migraine pain and treatment. (*Id.* at 1.) Finally, Dr. Rapoport has taught at Yale University School of Medicine, Columbia University, and now at the David Geffen School of Medicine at UCLA.

Dr. Rapoport's opinion in this case is both clear and amply supported: At 2400 mg, gabapentin "is appropriate, effective, tolerable, easy to use and safe for use" in the treatment of

9

migraine pain. (Rapoport Report at 7.) Further, he makes equally explicit that this opinion is based on a wealth of sources, including his

> extensive clinical experience of 36 years in private practice and teaching at major medical institutions, [his] knowledge of the literature relating to the treatment of headache, [his] review of literature relating to the use of gabapentin in treating headache, and [his] review of Dr. McCrory's report.

(Rapoport Report at 2.) From this experience, as well as his review of the literature, Dr. Rapoport determined that "gabapentin has few drug interactions, and mild side effects, and, at dosages around 2400 mg/day, it is an effective migraine preventive medication." (*Id.* at 7.) As Dr. Rapoport notes, "[w]ithout it in my armamentarium, I would not have been as effective a headache specialist as I have been since it has been available. " (*Id.* at 8.)

Although Plaintiffs do not dispute his credentials, they nonetheless allege that Dr. Rapoport's opinion – born of decades clinical experience – is worthless and unreliable. (Pl. Mem. [2380] at 10.) In doing so, they accuse Dr. Rapoport of "ignore[ing] negative data," "[b]urying [his] head in the sand," and "fraudulently misrepresent[ing]" the results of a study. (*Id.* at 10-11.) None of these accusations survive even rudimentary scrutiny.

In support of his opinion, Dr. Rapoport reviewed the relevant literature and described the following studies supporting the use of gabapentin to treat migraine. In the first, the Matthew report (a study which he helped to design and on which he is listed as the second author), gabapentin, at a 2400 mg/day dose, was an effective and well tolerated migraine prevention medication. (Rapoport Report at 2-3.) Similarly, in an article by Spira, selected patients with "a very severe and relentless type of headache . . . responded well to gabapentin 2400 mg." (*Id.* at 3.) In the Spira paper, 133 patients with Chronic Daily Headache (a major component of which is migraine) from 12 centers in Australia were enrolled in a DBRCT cross-over study. 74% of the patients either had migraine or migraine plus tension-type headache. The study showed a statistically significant improvement in headache free days in patients treated with gabapentin, as compared to placebo. (*Id.*) Dr. Rapoport cites several other papers that also support the efficacy of Neurontin for treating migraine. (*Id.* at 3.)

10

Beyond their implausible "only DBRCTs are relevant" methodological argument, the only criticism that Plaintiffs lodge against Dr. Rapoport is his alleged failure to consider certain negative studies. However, Plaintiffs' emphasis on "negative studies" is, misplaced. A "negative" study at most shows that a drug failed to effectively treat a given condition in a particular subpopulation when administered using a specified regimen. It does not by any stretch establish the drug's inefficacy for treating the condition in all other circumstances. For example, a negative study conducted at one dose does not mean that the drug is ineffective at every dose. The fact that a drug did not show a statistically significant effect where symptoms were severe does not mean it would not show such an effect in patients with mild or moderate symptoms. It is precisely because of these inherent limits in efficacy studies that off-label prescribing is a widely accepted practice, and a practice well-informed by clinical experience.

Thus, Plaintiffs' accusations that Dr. Rapoport ignored DBRCT measuring efficacy at dosages smaller than 2400 mg are inapposite. For instance, there was simply no reason for him to discuss the allegedly "negative" results presented in either RR4301-0006 (879-200), or RR995-00085 (945-217): Both measured gabapentin efficacy at dosages well below 2400 mg (900 mg and 1800 mg per day, respectively). (*See* McCrory Report at 7- 9, Armstrong Decl. Exh. C) In the only study he discusses relevant to Dr. Rapoport's opinion, Plaintiffs' own expert concedes that study No. 945-220 showed statistically significant positive correlations at 2400 mg dosage. (*See* McCrory Report at 10-12.) Not only have Plaintiffs failed produce any DBRCT or other evidence challenging Dr. Rapoport's opinion of gabapentin's efficacy at 2400 mg, Dr. McCrory acknowledged that he was unaware at the time of his report of an independent study, published in the "well-respected journal" Neurology, that "report[ed] a statistically significant benefit to migraine" from gabapentin. (McCrory Dep. at 150:9-14, 151:2-9, Armstrong Decl. Exh. D.)

Moreover, even if one were to accept Plaintiffs' assertion that there is no relevant evidence save for DBRCT – and as Pfizer explained above, such an assertion is scientifically and procedurally baseless – Plaintiffs' argument for Dr. Rapoport's exclusion under Daubert is

11

entirely predicated on Dr. McCrory's statistical re-evaluation of selected DBRCT. But Dr. McCrory has not offered some inviolable interpretation of the data. Indeed, Dr. Robert Gibbons, an expert for Pfizer, mining the same data as Dr. McCrory and analyzing the conclusions Dr. McCrory derived from that data, determined that, "even if [Gibbons] restrict[ed] the analysis to the three studies selected by McCrory, [Gibbons'] analysis reveal[ed] a trend in favor of gabapentin that approaches statistical significance." (Gibbons Report at 16.)[9] Further, Dr. Gibbons' noted that Dr. McCrory's analysis relied on "clearly unreasonable and overly restrictive assumption[s]," which both cloud and constrict the reliability of his conclusions. (Id. at 14.) As rebuttal testimony to Dr. Rapoport, Dr. McCrory's report is poor in both fit and execution.

### B. Dr. Rapoport's Opinions Are Properly Informed By His Clinical Opinions

While Dr. Rapoport does not rely exclusively upon his clinical experience to support his opinions, there can be no question that Dr. Rapoport's decades of experience as a clinician is a legitimate and proper component of his expert opinion on the treatment of headache and migraine pain with Neurontin. As noted above, Dr. Rapoport has cared for over 20,000 patients at his headache center, and treated thousands of those patients with gabapentin. (*See* Rapoport Rep. at 4.) Indeed, Dr. Rapoport's reliance on clinical and actual experience is not only permissible, it is – in combination with "literature, . . . well-documented studies and less well-documented case reports, anecdotal reports, word of mouth, randomized trials, open trials, double-blind controlled randomized trials and information gleaned from meetings, textbooks, symposia, supplements to journals, and courses" – absolutely essential when treating complex and individualized forms of pain – like migraine – for which there are limited FDA-approved treatments. (*Id.* at 4-5.)

As Dr. Rapoport explains, the use of off-label medications to treat migraine is common in

---

[9] Dr. Gibbons' Report is attached as Exhibit H to the Declaration of Katherine Armstrong submitted in support of Defendants' Opposition to Plaintiffs' Motion *in Limine* to Exclude Testimony of Dr. Gary Brenner.

his field of expertise in part because there are so few options. (*Id.* at 4.) There are only four FDA-approved medications for migraine prevention, each of which possesses significant limitations and the risk of serious side-effects. (*Id.* at 5.) For instance, of the anticonvulsants that are FDA-approved for preventive treatment of migraine may, Divalproex sodium (one of Plaintiffs' alternative drugs) carries with it the risk of significant weight gain, tremor, hair loss, or endocrine problems. (*Id.*) Topiramate, also an anti-convulsant (and another of Plaintiffs' alternative drugs), carries with it the risk of cognitive and psychological problems, paresthesias, weight loss, kidney stones, oligohydrosis, and glaucoma. (*Id.*) Consideration of these prohibitive side-effects does not even take into account the fact that many of the FDA-approved drugs have been prescribed and abandoned before a headache specialist like Dr. Rapoport is ever consulted. (*Id.*) Nor does it account for the fact that co-morbid illness – such as diabetes or hypertension – often plays a large role in the determination of what medication is used. (*Id.*)

Similar caveats exist with regard to the drugs recommended by Plaintiffs as alternatives to gabapentin. Five of the seven drugs on Plaintiffs' list are beta blockers, some of which are indicated for migraine prophylaxis (timilol and propranolol) and some of which are not (*e.g.*, metroprolol). (Rapoport Rep. at 6-7.) All of these beta blockers, however, are contraindicated in patients with asthma, diabetes, depression, or low blood pressure. (*Id.* at 6.) For any patient suffering from any of these co-morbidities, the elimination of the beta-blockers leaves few available prescription treatments.[10] As Dr. Rapoport notes, "[i]n contrast [to the above drugs], gabapentin has few drug interactions and mild side effects and, at dosages around 2400 mg/day, it is an effective migraine preventive medication." (*Id.* at 7.) Dr. Rapoport's opinion regarding gabapentin is based upon this combination of proven benefits at 2400 mg and the limited risk posed by the drug. (*Id.* at 7.) Plaintiffs themselves provide few viable alternatives.

---

[10] Plaintiffs also assert that over-the-counter remedies are preferable alternatives. But as Dr. Rapoport and common sense both make clear, "most migraineurs would have tried and failed on available over-the-counter medications before a physician would have tried . . . gabapentin." (Rapoport Rep. at 7.)

Thus, to the extent that Dr. Rapoport opines that the literature "clearly shows the value of gabapentin as a daily preventive medication for migraine," that opinion is confirmed by his clinical observation that gabapentin "seemed to work at higher doses in the 2400 mg range." (*Id.* at 2; *id.* at 7.) Plaintiff offers no challenge to Dr. Rapoport's conclusion that "gabapentin at 2400 mg a day is an effective and well tolerated migraine preventive medicine." (*Id.* at 2.)



The individualized approach required to treat migraine patients – or any patient – is at

odds with Plaintiffs' approach of choice. Under Plaintiffs' approach, a patient whose condition did not respond to one of their alternative drugs, or who could not tolerate the alternative drugs due to side effects, would be left without viable treatment options.

### C. Dr. Rapoport Was Not Required To Produce Sanitized Medical Records

Plaintiffs also seek to exclude Dr. Rapoport on the grounds that has not produced sanitized medical records in support of opinions based upon his clinical experience. Plaintiffs' argument relies on a mischaracterization of this Court's September 27, 2006 order, which provided as follows:

> After hearing, I conclude that the burden, expense and invasion of privacy of the proposed discovery outweighs its likely benefit. See Fed. R. Civ. P. 26 (b)(2). This conclusion is based on the supplemental record not available before the Magistrate Judge and a fuller explanation of plaintiff's theory of the case. If either party intends to call a treating physician to give an opinion on effectiveness, sanitized patient records shall be produced to the extent the physician is relying on his experience with treating *that patient* (as opposed to a clinical trial). . . .

(9/27/06 Electronic Order, emphasis added.) Significantly, the order was entered into as part of an order denying Pfizer's request for discovery of Kaiser patient medical records and intended to ameliorate that the prejudice that Pfizer would experience if Kaiser was allowed to provide its experts with access to such records to support their testimony.

Here, Pfizer's experts do not rely solely upon their clinical experience. And it is well established that a physician such as Dr. Rapoport is allowed to base his opinion in, part, upon his clinical experience, if, as here, it is confirmed by reliable scientific evidence. *See In re Vioxx Prods. Liability Lit.*, 401 F. Supp. 2d 565, 579 (E.D. La. 2005); *see also id.* at 580 (noting that one expert's opinion was "based on his 35 years of clinical experience in the [field] of gastroenterology" and the other expert's opinion was "based on his experience as a prescribing physician.") Dr. Rapoport's opinions concerning Neurontin's efficacy for off-label indications are not grounded in the records of specific, identifiable patients, but rather in his cumulative clinical experience from treating thousands of headache patients over many years. To require Dr. Rapoport to search for, redact and produce thousands of medical charts, while Kaiser did not

have to produce even a random sample of its patient records, makes no sense. The use of the phrase "that patient" in the Court's order suggests that the Court was referring to specific patient records relied upon by a physician and did not intend to prevent a physician from testifying about his experience treating pain patients over the course of his career.

In any event, Plaintiffs' argument should be rejected because Plaintiffs did not seek any discovery of Defendants' medical experts. The basis for the opinions of Defendants' medical experts were clearly disclosed in their expert reports, consistent with Rule 26. Plaintiffs' never sought to depose Defendants' medical experts. Likewise, Plaintiffs did not seek any production of documents from Defendants' medical experts until January 27, 2009, when they served subpoenas on Defendants' experts. Defendants and their experts objected on the grounds, *inter alia*, that the subpoena, which was served only three days before the deadline for completion of expert discovery, was untimely. (*See* Armstrong Decl. Exh. E.) If Plaintiffs believed they were entitled to additional documents, their remedy was to bring a timely motion – not to wait until the eve of trial and then seek to exclude Pfizer's witnesses. *Cf. Nolan v. Thompson*, 521 F.3d 983, 987 (8th Cir. 2008). Plaintiffs should not be allowed to rely upon their own failure to pursue discovery as a basis for excluding Defendants' evidence.

### III.    The Testimony Of Dr. Rapoport Is Relevant To The Issue Of Causation

Dr. Rapoport's testimony is independently admissible because he explains the reasons why physicians prescribe off-label and the factors that influence a physician's prescribing decisions. Such evidence is independently admissible on the issue of causation, because it rebuts Plaintiffs' claim that virtually all off-label Neurontin prescriptions were caused by Defendants' alleged promotion. (*See* Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409] at 13-14.)

### CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude the testimony of Dr. Rapoport.

Dated: January 26, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ Mark S. Cheffo
     Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ Raoul D. Kennedy
     Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400

  -and-

WHEELER TRIGG O'DONNELL LLP

By:  /s/ James E. Hooper
     James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800

  -and-

17

WHITE AND WILLIAMS LLP

By: /s/ David B. Chaffin
David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 26, 2010.

/s/ David B. Chaffin
David B. Chaffin