UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | :  MDL Docket No. 1629 :  :  Master File No. 04-10981 : |
| THIS DOCUMENT RELATES TO: | :  : Judge Patti B. Saris : |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | :  Magistrate Judge Leo T. Sorokin :  : |

**UNREDACTED VERSION
FILED UNDER SEAL**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. SHAWN BIRD

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in opposition to Plaintiffs' Motion *in Limine* to Exclude Testimony of Dr. Shawn Bird.[1]

## PRELIMINARY STATEMENT

The central premise of Plaintiffs' motion to exclude five of Pfizer's retained experts is that no expert should be allowed to testify regarding the scientific evidence supporting the efficacy of Neurontin for various off-label conditions at issue in this litigation other than double-blind randomized control trials ("DBRCTs").[2]  Plaintiffs' argument was rejected over

---

[1] Having been given leave to re-file their *Daubert* motions directed at certain of Defendants' efficacy experts, Plaintiffs still failed to file their memorandum of law in support of their motion directed specifically at Dr. Bird.  While they filed a document titled "Memorandum of Law in Support of Plaintiff Kaiser's Motion *in Limine* to Exclude Testimony of Dr. Shawn Bird [2382], Document 2382 is simply their re-filed omnibus and overlength brief that this Court previously denied leave to file.  This response, therefore, is directed at Exhibit E [2357-6] to Plaintiffs' Motion for Leave to Re-File.

[2] It's worth noting that the standard advocated by Kaiser could almost never by met by product liability plaintiffs in pharmaceutical litigation, including the plaintiffs in the Neurontin cases pending before this Court.  *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 185 (D. Mass. May 5, 2009) (noting that "most epidemiological studies are 'observational,' not experimental like [DBRCTs]"); *see also id.* at 132 (observing that there is no absolute requirement for epidemiologic proof when other methods are available).  For the reasons discussed herein, the standard is especially inappropriate in a case such as this where it is not Pfizer's burden to prove efficacy, but Plaintiffs' burden to prove *inefficacy*.

forty years ago by Dr. Louis Lasagna, the father of the placebo-controlled clinical trial, when he wrote that "a doctrinal insistence on literal and complete adherence to the [fundamental] principles [of clinical investigation] *under all circumstances* can be achieved only by a cavalier dismissal of useful data or by the practice of self-delusion."[3]  (Emphasis original.)

Plaintiffs' argument is flawed for several reasons.  Initially, Plaintiffs' motion represents a continued effort by Plaintiffs to improperly shift their burden of proof to the Defendants in this action.  It is not Pfizer's burden to prove, using evidence that would satisfy the standard of the Food and Drug Administration ("FDA") for drug approval, that Neurontin is effective.  Rather, it is Plaintiffs' burden to prove that Neurontin is *ineffective* for the conditions at issue.  And, given Plaintiffs' choice to rely upon aggregate evidence, they must prove either (1) that Neurontin is ineffective for a specific condition for *all* patients or (2) that Neurontin is no more effective and no safer for treatment of a specific condition for *all* patients.

This is a tall hurdle for Plaintiffs, especially given the fact that Kaiser continues to recommend Neurontin to its physicians and patient-subscribers for off-label uses.  It is little wonder that Plaintiffs keep trying to improperly re-frame the issue.  Plaintiffs would have the jury in this case act as if it were a committee to the FDA, advising it on the issue of whether Neurontin should be approved for certain indications.  But that is not the jury's charge.  Instead, the central issue in this case, the one that the jury will be asked to decide, is whether Plaintiffs' alleged damages were proximately caused by Defendants' alleged fraudulent promotion of Neurontin.  To answer this question, the jury will need to understand why off-label prescribing is widely accepted as a beneficial medical practice by the FDA, the medical community, and even third-party payors such as Kaiser.  They will need to hear from Defendants' experts about the type of evidence supporting the prescribing decisions of physicians (decisions that physicians, including Kaiser physicians, continue to make to this day).  Significantly, the evidence clearly

---

[3] Louis Lasagna, Dep't of Pharmacology & Experimental Therapeutics & the Div'n of Clinical Pharmacology of the Dep't of Medicine, Johns Hopkins University, *The Controlled Clinical Trial Theory and Practice*, 1 J. of Chronic Disease 353, 353 (April 1955).

demonstrates:

(1) Kaiser did not during the relevant time frame and does not now require DBRCTs to support its formulary decisions or prescribing guidelines,

(2) Kaiser believed that off-label uses for Neurontin were not supported by DBRCTs when it decided to relax formulary restrictions,

(3) Kaiser continues to recommend Neurontin for certain off-label uses, without regard to the availability of DBRCT evidence,

(4) Kaiser relies upon the clinical experience of its prescribing physicians when making decisions about formulary restrictions and prescribing guidelines, and

(5) The alternative medicines used by Kaiser for its damages analysis are not universally supported by DBRCTs for the conditions at issue.

Indeed, as observed by Les Zendle, MD, the Associate Medical Director of the Southern California Medical Group, during a 2000 Permanente roundtable discussion:

> Evidence-based medicine means so many different things to different people.  To some people, it means that you don't do something unless you have double-blind randomized control studies that prove something works.  Of course, if we only did things when we had double-blind randomized control studies, we wouldn't do a whole lot.  It's also used as a reason to withhold certain things or to not do things or to cut costs.[4]

In short, Kaiser does not require DBRCT when making formulary decisions or promulgating guidelines.  The evidence likewise demonstrates that Kaiser relies upon the clinical experience of its physicians when making such decisions.  Kaiser's contrary position advocated in its motion to exclude must be rejected.

Not only is Plaintiffs' central premise fundamentally flawed, Plaintiffs misrepresent the methodology used by Dr. Shawn Bird, a board certified neurologist and Associate Professor of Neurology at the University of Pennsylvania, to arrive at his opinions that Neurontin is effective in treating neuropathic pain and related forms of chronic pain.  Dr. Bird clearly explains that

---

[4] The *Permanente Medicine Roundtable:  Defining Our Practice Principles*, Permanente J. Winter 2000 at 45, 48 available at http://xnet.kp.org/permanentejournal/winter00pj/winter00.pdf.

most of the available alternatives for the treatment of neuropathic pain during the time period relevant to this litigation were not FDA approved, and instead found acceptance in clinical practice through clinical experience and published literature, including literature reporting the results of non-Level 1 investigations, supporting their efficacy. Indeed, because there is little or no "gold standard" evidence supporting the effectiveness of drugs used to treat neuropathic pain, off-label prescribing is the standard of care. Thus, Neurontin's effectiveness for neuropathic pain and related forms of chronic pain is supported by the same types of evidence generally accepted and relied upon by practitioners like Dr. Bird.

Moreover, Dr. Bird's methodology for searching the literature is described in his report, which provides a thorough review of the literature and clearly sets forth the basis for his opinions that Neurontin is "effective and safe for neuropathic pain." Dr. Bird did not "single out" any studies, nor did he omit from his report the "Reckless (945-225) and POPP (945-271)" studies. Contrary to plaintiffs' assertions, Dr. Bird did indeed explain his rationale for the basis of his opinions, including his review of the "Gorson" study and the "unpublished studies: 945-224, -271, and -1008."

Finally, Dr. Bird properly bases his opinions on his clinical experience in treating neuropathic pain with Neurontin. As his Curriculum Vitae makes clear, Dr Bird has over twenty years of experience diagnosing and treating patients with nerve disorders, including patients with neuropathic pain. It is a generally accepted principle that once the FDA determines that a drug or device can be marketed, a physician's use of that product in clinical practice is not restricted to on-label indications. It is also generally accepted that the efficacy of a medicine often is recognized by practicing physicians even in the absence of positive DBRCTs. Dr. Bird's opinions are not "*ipse dixit*," as Plaintiffs claim, because they are properly based on scientific literature and clinical experience. Plaintiffs' arguments to the contrary confuse the regulatory standard and methods for assessing effectiveness for purposes of marketing approval and on-label use, with the clinical standard and methods used by physicians for assessing effectiveness for purposes of treatment by off-label use. Likewise, Plaintiffs operate under the

mistaken assumption that the fact that their experts "rely *solely* on the results of DBRCTs in rendering their efficacy opinions," precludes every expert from relying on any source other than a DBRCT. (Pl. Mem. [2382] at 7, emphasis in original). As discussed below, such a narrow construction of the role of expert testimony in this case impermissibly inverts the respective burdens of proof and fundamentally misconstrues the role of expert opinion testimony in this trial.

For all the reasons discussed below, Plaintiffs have not put forth any basis to exclude Dr. Bird's opinions.

## ARGUMENT

### I.     The Use of Multiple Sources of Scientific Evidence is Proper Methodology for the Basis of a Clinical Opinion

Plaintiffs' argument rests on the false premise that, in order to be admissible, the opinions expressed by Dr. Bird must be based on the regulatory standard for efficacy, which Plaintiffs assert requires double-blind randomized placebo-controlled clinical trials ("DBRCT"). In their effort to exclude Dr. Bird, Plaintiffs ask this court to substitute the incorrect "FDA standard" for marketing approval rather employing the methodology regularly employed by clinicians in evaluating the scientific evidence for the clinical efficacy of Neurontin. However, Dr. Bird is not a company seeking to obtain FDA approval to market a medicine. Dr. Bird is providing an opinion regarding Neurontin efficacy from a clinical perspective, not a regulatory perspective. The information that a physician uses to determine whether a drug is effective for a particular patient by necessity differs from that submitted by a company to obtain FDA approval to market a medicine for a certain indication.



Similarly, although he places strong emphasis on

randomized clinical trials, Dr. Bird relies on "a variety of levels of evidence, not limited to [DBRCTs]" in forming his opinion that Neurontin is effective for the treatment of neuropathic pain conditions.  In addition to DBRCTs, this evidence includes case reports, case series, meta-analyses, peer-reviewed medical literature and medical textbooks.  All of these forms of scientific evidence are generally accepted in the medical profession as providing the clinical basis that a medicine is effective (and safe) in treating a disease.  These generally accepted sources of clinical information coupled with Dr. Bird's personal clinical experience reliably form the bases for his opinion that Neurontin is effective in treating neuropathic pain.

### A.     FDA Standards For New Drug Approval Do Not Govern Admissibility Of Expert Testimony On The Efficacy Of A Drug For Off-Label Uses

The dichotomy that Plaintiffs attempt to create – where only DBRCTs are relevant and clinical experience is irrelevant – is not supported by the law, is inconsistent with the factual record in this case, and is inconsistent with Kaiser's own internal policies and actual practices. Any suggestion that the efficacy issues in this case are governed by the same standard required for FDA approval for on-label indications, and any attempt to shift the burden of proof to Pfizer to demonstrate Neurontin's efficacy for the relevant off-label uses under that standard, must be rejected.[5] The FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label because it advances an important public policy. *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").[6]

---

[5] Pfizer does not have the burden of proving efficacy.  Rather, as this Court has held, Plaintiffs have the burden of proving inefficacy. *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) ("For all of their claims, plaintiffs will be required to prove . . . that they were injured (i.e., suffered economic loss) by virtue of the Neurontin's inefficacy for that condition."). Plaintiffs seek not merely to flip this burden by requiring Pfizer to prove efficacy, but also to require Pfizer to meet that invalidly-applied burden by supposed "gold standard" evidence.

[6] *See also Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994) ("[T]he FDA permits doctors to prescribe drugs for 'off-label' uses."); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531
*(cont'd)*

In addition, physicians frequently and properly prescribe off-label even in the absence of the "gold standard" evidence that Plaintiffs demand for the purpose of this litigation (but which they do not require when making formulary decisions or promulgating prescribing guidelines). Physicians often make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition.  In fact, prescribing off-label is often the standard of care, especially for certain indications, such as neuropathic pain, where there is little or no "gold standard" evidence supporting the effectiveness of any medication. As Judge Weinstein recently observed: "'[O]ff-label uses of prescription drugs are a mainstay of the industry – an estimated 21% of drug use overall[.]'" *Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), ___ F. Supp. 2d ___, 2009 WL 4260857, at *16 (E.D.N.Y. Dec. 1, 2009) (alteration in original) (citation omitted).  "Some off-label uses of a prescription drug may be medically necessary." *Id.*; *see also Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 705 n.3 (W.D. Va. 1999).[7]  Plaintiffs' argument, however, presumes that no medication should be prescribed off-label absent "gold standard" evidence, and would actually hold that a physician's exercise of the standard of care resulted in improper prescriptions.  This absurd suggestion should be rejected.

**B.      Kaiser Does Not Require DBRCTs When Making Formulary Decisions Or Promulgating Prescribing Guidelines And Considers Clinical Experience As Relevant Evidence**

Kaiser's arguments are inconsistent with its own internal policies and practices.  As discussed in Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony of Pfizer's Non-

---

*(cont'd from previous page)*

U.S. 341, 350 (2001) ("[T]he 'FDA itself recogniz[es] the value and propriety of off-label use.'" (citation omitted)).

[7] No one disputes that DBRCTs are at the top of the pyramid of available evidence when analyzing cause and effect of pharmaceutical products.  However, by definition, off-label prescribing, widely accepted as a beneficial medical practice, lacks FDA approval.  Thus, logically, off-label prescribing is often based upon evidence other than DBRCTs.

Retained Experts [2409],[8] Kaiser does not require DBRCTs when making formulary decisions or promulgating prescribing guidelines. This fact is critical given that Kaiser's theory of causation in this action is tied directly to its formulary decision-making process. *See In re Neurontin Mktg. & Sales Practices Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010).



---

[8] Defendants incorporate Section I of such opposition herein by reference.

[9] In support of this opposition, Defendants rely upon the exhibits attached to the Declaration of Katherine Armstrong in Support of Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2410]. In order to avoid burdening the Court with multiple copies of the same set of exhibits, such exhibits are cross-referenced herein.



**C.    Kaiser Continues To Recommend Neurontin For The Treatment Of Neuropathic Pain**

Kaiser's position in this litigation that there is no valid evidence supporting the use of

Neurontin to treat neuropathic pain is inconsistent with its public statements regarding the use of Neurontin.  The guidelines that Kaiser adopted in 1999 are essentially the same as the guidelines in effect today, which recommend gabapentin as "*the* second-line agent in the management of [neuropathic pain]."  (May 2007 Kaiser Permanente Medical Care Program, Management of Neuropathic Pain in Adults, Exh. F [2410-7] to 1/22/10 Armstrong Decl. at 3, emphasis added.) The guidelines are based, in part, on the clinical experience of the Kaiser Permanente Care Management Institute's Pain Management Advisory Group.  (*Id.*)



---

[10] *In re Neurontin*, 2010 WL 53568, at *3.

[11] *Id.*

In addition, Kaiser's website contains numerous articles where it recommends the use of anticonvulsants, including Neurontin and gabapentin, for treatment of chronic pain, cancer pain, and other conditions.   (Exh. H [2410-9] to 1/22/10 Armstrong Decl.)[12]   In fact, someone researching "Pain Originating From a Nerve" in Kaiser's Drug Encyclopedia is taken to a page that reads:

> **Drugs for managing Pain Originating From a Nerve**
> Please click on a drug name to see more information
> - Gabapentin Oral
> - Neurontin Oral

(*Id.*)  These are the only two drugs listed in Kaiser's Drug Encyclopedia under "Pain Originating from a Nerve."  The article on gabapentin states, under "other uses":  "Gabapentin may also be used to treat other nerve pain conditions (e.g., diabetic neuropathy, peripheral neuropathy, trigeminal neuralgia)." (*Id.*)   Similarly, articles in Kaiser's on-line Health Encyclopedia advises Kaiser's members that Neurontin may be used to treat chronic plain, explaining:   "Experts do not know exactly how anticonvulsants work to reduce chronic pain.  They may block the flow of

---

[12] Kaiser cannot distance itself from its own public admissions about Neurontin by attempting to attribute such statements to a third-party vendor, Healthwise.  Initially, Kaiser actively contracted with Healthwise to provide it with content for its website.  Second, these are not links to a wholly separate website.  Instead, Kaiser's members are directed to articles on Kaiser's website with the Kaiser Permanente logo prominently displayed at the top of each page.  In 1999, Kaiser openly touted its collaboration with Healthwise and indicated that its physicians would be involved in actively reviewing the material provided by Healthwise.  (Exh. C to Declaration of Katherine Armstrong submitted in support of Pfizer's Opposition to Plaintiffs' Motion in Limine to Exclude Testimony of Dr. Gary Brenner ("Armstrong-Brenner Decl."))  Likewise, according to a 2004 Kaiser press release, Kaiser "showcase[d] [its] online health programs" in order to encourage enrollment.  (Armstrong-Brenner Decl. Exh. D.)  Promoting its website, Kaiser states that it features "online drug and medical encyclopedias *reviewed and approved by Kaiser Permanente physicians*." (*Id.*, emphasis added)  Another Kaiser press release tells people to "[c]lick to kaiserpermanente.org for physician-approved health information."  (Armstrong-Brenner Decl. Exh. E.)  "Kaiser invite[d] everyone – members and nonmembers alike – to access trustworthy, up-to-date, physician-approved health information by visiting [its] redesigned Web site . . . ."  (*Id.*)  And Kaiser represents on its website that the material provided by Healthwise is both accurate and current. (Armstrong-Brenner Decl. Exh. F.)

Further, the fact that the articles are accompanied by a disclaimer telling people to consult their physician does not make Kaiser's statements any less inconsistent with its allegations in this lawsuit.  Moreover, imbedded within the disclaimer in each article is a "How this information was developed" link which takes readers to an article telling Kaiser members to trust information from Healthwise. (Armstrong-Brenner Decl. Exh. F.)

pain signals from the central nervous system." Significantly, the article notes that "[e]ven though gabapentin and pregabalin *are the only drugs that have proved to help some types of chronic pain*," certain other drugs "may also be effective in reducing chronic pain." (*Id.* (emphasis added).) Another article indicates that anticonvulsants (including Neurontin) are used to control cancer pain and explains that "[a]nticonvulsants help reduce pain related to the nervous system (neuropathic pain). Some have fewer side effects than tricyclic antidepressants." (*Id.*) An article on the use of anticonvulsants for chronic low back pain advises Kaiser members that anticonvulsants, including Neurontin, "can reduce some persistent low back pain with fewer side effects than tricyclic antidepressants." (*Id.*)

Likewise, in a 2005 article published in American Family Physicians, Kaiser doctors Maizels and McCarberg explained that "[o]f the second-generation antiepileptic drugs, gabapentin (Neurontin) has the best documented efficacy in the treatment of neuropathic pain.." *See* Maizels & McCarberg, *Antidepressants and Antiepileptic Drugs for Chronic Non-Cancer Pain*, 71 Am. Fam. Physician 483, 485-87 (Feb. 1, 2005) (Armstrong-Brenner Decl. Exh. G). The position now advanced by Kaiser in this litigation is fundamentally inconsistent with its actual practices and must be rejected.

In addition to showing the inconsistency between Kaiser's litigation position and its real-world actions, the above-described decisions and actions underscore the invalidity and artificiality of the purported methodological requirements to which Kaiser seeks to hold Pfizer's experts. Kaiser's doctors, applying the accepted methodology of clinicians, made and continue to make, determinations about Neurontin's efficacy in the treatment of neuropathic pain based on all types of available scientific evidence. Kaiser's doctors, applying the accepted methodology of clinicians, concluded and continue to conclude that Neurontin and many other medications are efficacious for off-label uses on the basis of non-Level 1 evidence. Dr. Bird's methodology is 100% consistent with the methodology applied by Kaiser doctors every day.

### D.   Plaintiffs' Arguments Depend Upon A Flawed Interpretation Of The Available DBRCTs

Not only is Plaintiffs' attempt scientifically flawed and procedurally void, their reliance on their experts' interpretation of the DBRCT is unavailing. Even if DBRCT were the only relevant form of evidence, their argument is predicated on the validity of their experts' analysis interpretation of the available data from DBRCTs. However, as Pfizer expert Dr. Robert Gibbons makes clear in his expert report,[13] this reliance is misplaced. For instance, Plaintiffs' re-interpretation of the results of protocol 945-210 is based on their assumption that any treatment effect is due to unblinding. As a result, Plaintiffs claim to have "corrected this corruption," and allege that, as corrected, protocol 945-210 "provides no basis of any clinical efficacy of gabapentin over placebo in reducing pain." (Pl. Mem. at 9.) As Dr. Gibbons points out, however, the evidence relied upon by Plaintiffs in support of this allegation of unblinding is rife with errors. (Gibbons Report at 4, Armstrong-Brenner Decl. Exh. H). Plaintiffs' expert Dr. Jewell relied on "several key assumptions about the data, each of which is flawed," including that "the time trends for both placebo and gabapentin are linear over time," that "the research sites differ in pain levels at baseline but otherwise all sites had the same rate of change over time," that "the effect of the missing data produced by excluding patients with side effects is ignorable based solely on the overall effects of treatment, time and site," and "that patients who experience treatment related CNS side-effects actually improved following the emergence of the side-effect." (Gibbons Rep. at 4.) A closer look at each of these misplaced assumptions reveals that Plaintiffs' "unblinding hypothesis is not in any way supported by the[ ] data." (*Id.* at 8.) The statistically significant evidence of decreased pain evidenced by protocol 945-210 does, in fact, support the efficacy of gabapentin for pain, contrary to Plaintiffs' assertions. (Gibbons Rep. at 7-8.)

The above analysis is provided by way of example. Dr. Gibbons engages in a detailed review of the reports provided by Plaintiffs' experts Jewell, Perry and McCrory. He concludes,

---

[13] Plaintiffs have not sought to exclude the opinions of Dr. Gibbons.

for example, that Dr. Perry's conclusion that gabapentin is not effective for the treatment of neuropathic pain is squarely contradicted by the data, which clearly supports the efficacy of the drug relative to placebo.  (Gibbons Reports at 2.)  He further concludes that "the data provide overwhelming evidence that the effects of gabapentin on pain are well beyond anything that is consistent with chance expectations." (*Id.* at 15.)  Thus, Plaintiffs' assertion that there is no DBRCT evidence to support the efficacy of Neurontin is based upon their experts' flawed interpretation of the data and provides no basis for the exclusion of Pfizer's experts.

## II.    Dr. Bird's Opinion That Neurontin Is Effective In Treating Neuropathic Pain Is Based On Reliable And Generally Accepted Methodology

Once the central premise of Plaintiffs' *Daubert* motion falls, all that remains of their motion fails to rise to the level of a *Daubert* challenge.  Plaintiffs ask this Court to accept the opinions of their experts over Defendants' regarding the proper weight and interpretation to be given to the available scientific evidence, but that is not the role of the Court on a *Daubert* motion.  As this Court has explained:

> The Court must, however, keep in mind the Supreme Court's admonition that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts."  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct.  As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.  In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 131-32 (D. Mass. 2009) (citations omitted).  Plaintiffs' arguments, at best, present material for cross

examination, but they do not in any way support exclusion.

### A.      Dr. Bird Properly Considered Published and Unpublished Studies

A major flaw in plaintiffs' attack on Dr. Bird is their emphasis on "negative studies." A "negative" study at most shows that a drug failed to effectively treat a given condition in a particular subpopulation when administered using a specified regimen. It does not by any stretch establish the drug's inefficacy for treating the condition in all other circumstances. For example, a negative study conducted at one dose does not mean that the drug is ineffective at every dose. The fact that a drug did not show a statistically significant effect where symptoms were severe does not mean it would not show such an effect in patients with mild or moderate symptoms. As Dr. Lasagna observed over forty years ago:

> If one studies a new diuretic drug in patients with "intractable" congestive failure which is refractory to the usual therapeutic procedures, a successful outcome is most impressive. A negative result is less easily interpreted. One cannot say that the new drug is completely without effect, because such patients are by definition refractory to digitalis and mercurials, which would thus also qualify as "inactive drugs" in these same patients. Therefore, a negative result in such a difficult therapeutic situation should usually be followed up by studies in less severely ill patients. It is rare to come up with a superdrug, and it would be unfortunate to miss a compound of moderate potency.

L. Lasagna, supra note 3, The Controlled Clinical Trial Theory and Practice at 362.

It is precisely because of these inherent limits in efficacy studies that off-label prescribing is a widely accepted practice, and a practice well-informed by clinical experience. Plaintiffs' apparent view that the existence of "negative" studies of gabapentin in neuropathic pain is determinative is, therefore, incorrect.

Plaintiffs also are wrong in suggesting that that Dr. Bird somehow failed to address "unpublished negative" clinical trials. Plaintiffs claim that Dr. Bird "omits from his discussion the negative Reckless (945-224) and POPP (945-271) DBRCT studies." (Pl. Mem. [2357-6] at 9.) This is a flat misrepresentation of Dr. Bird's report, which states, "With regard to the three studies of chronic neuropathic pain that [Dr. Perry] states are 'unpublished' (945-224, 945-271 and 945-1008), two in fact have been detailed in the peer-reviewed literature (945-224 in

Backonja 2003; 945-271 in Gorh 2008). (Bird Report at 12, Armstrong Decl. Exh. A.) Dr. Bird

also discusses the results of study 945-224 in detail:

> The data from protocol 945-224 (Reckless 2000) was detailed in the literature
> (Backonja 2003).   This was a multicenter trial of 328 patients with painful
> diabetic neuropathy treated with 600, 1200, and 2400 mg per day of gabapentin
> versus placebo. . . .   Mean pain scores decreased from baseline in all groups, but
> there were no significant differences between the treatment groups and placebo.
> The authors speculate that the unusually high response rate (27%) in the placebo
> group in this particular study obscured the clinical benefits of gabapentin.

(*Id.*)  Plaintiffs' claim that Dr. Bird does not address these studies is thus demonstrably false.

Earlier in his report, Dr. Bird discusses the extensive Level 1 evidence supporting

gabapentin's efficacy in the treatment of neuropathic pain.  Specifically, he notes that:

> Six randomized clinical trials (RCT) compared gabapentin with placebo and 2
> RCTs compared gabapentin with amitriptyline, and antidepressant shown in
> previous RCTs to be effective in neuropathic pain.  These eight studies considered
> together provide more than sufficient evidence for a physician to conclude that
> gabapentin is effective for the treatment of neuropathic pain.  The placebo-
> controlled trials showed that gabapentin was statistically better than placebo for
> pain.   The trials that compared gabapentin with amitriptyline showed no
> difference (*i.e.*, gabapentin is as effective as amitriptyline).

(Bird Report at 5.)   Dr. Bird then details the extensive additional evidence supporting

gabapentin's efficacy in neuropathic pain.  (*Id.* at 5-9.)  Dr. Bird's opinion is that the totality of

evidence, including both positive and negative studies, supports gabapentin's efficacy in

neuropathic pain.  This opinion is fully consistent with Kaiser's own position on the efficacy in

neuropathic pain of, *inter alia*, amitriptyline, which Kaiser posits as an efficacious alternative

treatment despite the existence of multiple negative studies in treatment of neuropathic pain.  *See*,

*e.g.*, L. Robinson et al., *Trial of Amitriptyline for Relief of Pain in Amputees: Results of a*

*Randomized Controlled Study*, 85 Arch. Phys. Med. Rehabil. 1 (2004) (reporting that "[o]ur

findings do not support the use of amitriptyline in the treatment of" phantom limb pain); D.

Cardenas et al., *Efficacy of Amitriptyline for Relief of Pain in Spinal Cord Injury: Results of a*

*Randomized Controlled Study*, 96 Pain 375 (2002) (reporting no statistically significant benefit

of amitriptyline in treatment of neuropathic pain associated with spinal cord injury).

In addition to extensive medical literature, Dr. Bird also identifies and discusses several leading medical texts supporting Neurontin's efficacy in neuropathic pain. (Bird Report at 8-9.) For example, Dr. Bird notes that the most recent edition of <u>Current Therapy in Neurologic Disease</u> states that "[t]he first-line medication of the neuropathic pain associates with small fiber neuropathy is gabapentin." (*Id.* at 8.) The authors of each of these medical treatises have, like Dr. Bird, considered the totality of available evidence of Neurontin's efficacy in neuropathic pain, and has concluded, like Dr. Bird, that Neurontin has demonstrated efficacy. Plaintiffs' untenable position apparently is that leading medical texts on the treatment of neuropathic pain—that is, the books clinicians rely upon to evaluate efficacy and treat patients with neuropathic pain—do not apply valid methodology.

In short, Plaintiffs' motion at best presents a basis for cross-examining Dr. Bird's interpretation of the totality of evidence. It does not present any valid methodological criticism, much less any basis for exclusion. Nor does Plaintiffs' suggestion that the "negative" studies on which Plaintiffs' experts rely somehow require further discussion by Dr. Bird as a predicate to admissibility of his testimony. Dr. Bird identified and discussed each of the "negative" studies in his report. If Plaintiffs believed there was any deficiency or ambiguity in Dr. Bird's discussion of those studies, they were free to depose him about these issues. Plaintiffs' failure to use this available and obvious discovery device to ask the follow-up questions they claim Dr. Bird should have spontaneously answered does not render his testimony unreliable.

**B.     Dr. Bird's Opinions Are Properly Informed By His Clinical Experience**

While Dr. Bird does not rely exclusively upon his clinical experience to support his opinions, his opinions are properly informed by such experience. After discussing the available scientific evidence, including DBRCTs, systematic reviews, and authoritative treatment guidelines, Dr. Bird discusses his clinical experience with gabapentin in treatment of neuropathic pain. Dr. Bird notes that gabapentin is, in his experience, "well tolerated by most patients," and that patients usually respond best if started at a dose of 300 mg daily, then slowly titrated up until pain relief occurs. (Bird Report at 9.) Doctor Bird then discussed the consistency between his

clinical experience and the published literature, noting for example that his experience treating neuropathic pain patients with gabapentin is in agreement with recommendations provided in several published articles and treatment guidelines. (*Id.*) Dr. Bird's clinical experience provides important and admissible support for his opinion that the totality of evidence establishes Neurontin's efficacy in treating neuropathic pain.



Once again, Plaintiffs' real-world actions are at odds with their litigation position. As

Dr. Bird explained: "[F]or many disorders there are no effective drugs, or those that are effective have burdensome side-effects." (Bird Report at 3.) In those instances, patients often derive benefits from drugs even without any DBRCT-proven benefit. (*Id.*) Under Plaintiffs' approach, a patient whose pain did not respond to Plaintiffs' proposed alternative drugs, or who could not tolerate the alternative drugs due to side effects, would be left without treatment options. Kaiser doctors—real clinicians treating real patients—do not in fact follow this approach. Indeed, it would appear that the "methodology" to which Plaintiffs seek to hold Pfizer's experts exists nowhere outside of this litigation.

**C.    Dr. Bird Was Not Required To Produce Sanitized Medical Records**

Plaintiffs also seek to exclude Dr. Bird on the grounds that he has not produced sanitized medical records in support of opinions based upon his clinical experience. Plaintiffs' argument relies on a mischaracterization of this Court's September 27, 2006 order, which provided as follows:

> After hearing, I conclude that the burden, expense and invasion of privacy of the proposed discovery outweighs its likely benefit. See Fed. R. Civ. P. 26 (b)(2). This conclusion is based on the supplemental record not available before the Magistrate Judge and a fuller explanation of plaintiff's theory of the case. If either party intends to call a treating physician to give an opinion on effectiveness, sanitized patient records shall be produced to the extent the physician is relying on his experience with treating *that patient* (as opposed to a clinical trial). . . .

(9/27/06 Electronic Order, emphasis added.) Significantly, the order was entered into as part of an order denying Pfizer's request for discovery of Kaiser patient medical records and intended to ameliorate the prejudice that Pfizer would experience if Kaiser was allowed to provide its experts with access to such records to support their testimony.

Here, Pfizer's experts do not rely solely upon their clinical experience. And it is well established that a physician such as Dr. Bird is allowed to base his opinion in, part, upon his clinical experience, if, as here, it is confirmed by reliable scientific evidence. *See In re Vioxx Prods. Liability Lit.*, 401 F. Supp. 2d 565, 579 (E.D. La. 2005); *see also id.* at 580 (noting that one expert's opinion was "based on his 35 years of clinical experience in the [field] of

gastroenterology" and the other expert's opinion was "based on his experience as a prescribing physician.") Dr. Bird's opinions concerning Neurontin's efficacy for off-label indications are not grounded in the records of specific, identifiable patients, but rather in his cumulative clinical experience from treating pain patients over many years. The use of the phrase "that patient" the Court's order suggests that the Court was referring to specific patient records relied upon by a physician and did not intend to prevent a physician from testifying about his experience treating pain patients over the course of his career.

In any event, Plaintiffs' argument should be rejected because Plaintiffs did not seek any discovery of Defendants' medical experts. The basis for the opinions of Defendants' experts were clearly disclosed in their expert reports, consistent with Rule 26. Plaintiffs' never sought to depose Defendants' experts. Likewise, Plaintiffs did not seek any production of documents from Defendants' experts until January 27, 2009, when they served subpoenas on Defendants' experts. Defendants and their experts objected on the grounds, *inter alia*, that the subpoena, which was served only three days before the deadline for completion of expert discovery, was untimely. (*See* Armstrong Decl. Exh. B.) If Plaintiffs believed they were entitled to additional documents, their remedy was to bring a timely motion – not to wait until the eve of trial and then seek to exclude Pfizer's witnesses. *Cf. Nolan v. Thompson*, 521 F.3d 983, 987 (8th Cir. 2008). Plaintiffs should not be allowed to rely upon their own failure to pursue discovery as a basis for excluding Defendants' evidence.

**III.    The Testimony Of Dr. Bird Is Relevant To The Issue Of Causation**

Dr. Bird's testimony is independently admissible because he explains the reasons why physicians prescribe off-label and the factors that influence a physician's prescribing decisions. Such evidence is independently admissible on the issue of causation, because it rebuts Plaintiffs' claim that virtually all off-label Neurontin prescriptions were caused by Defendants' alleged promotion. *See* Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409] at 13-14.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude the testimony of Dr. Bird.

Dated: January 26, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    <u>/s/ Mark S. Cheffo</u>
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    <u>/s/ Raoul D. Kennedy</u>
        Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

      -and-

WHEELER TRIGG O'DONNELL LLP

By:    <u>/s/ James E. Hooper</u>
        James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

      -and-

WHITE AND WILLIAMS LLP

By:   /s/ David B. Chaffin
      David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 26, 2010.

/s/ David B. Chaffin
David B. Chaffin