UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin<br><br>**UNREDACTED VERSION FILED UNDER SEAL** |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
*IN LIMINE* TO EXCLUDE TESTIMONY OF DR. ANDREW SLABY**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in opposition to Plaintiffs' Motion *in Limine* to Exclude Testimony of Dr. Andrew Slaby [2385].

**PRELIMINARY STATEMENT**

Kaiser's Motion in Limine seeking to exclude the testimony of Dr. Andrew Slaby is based on Kaiser's application of a purported methodology that exists only in the assertions of Kaiser's lawyers and retained experts. [1]  As shown below, Dr. Slaby employs the methodology of a practitioner and teacher of psychiatry, and that methodology is entirely consistent with the methodology employed in leading psychiatric texts, in the practice of psychiatrists throughout the United States and, perhaps most tellingly, in the practice of Kaiser's own physicians.

---

[1] Plaintiffs base their motion to exclude five of Pfizer's retained experts, including Dr. Slaby, on the false premise that only one form of scientific evidence of Neurontin's efficacy for off-label uses is admissible, namely randomized, double-blind, placebo controlled clinical trials ("RCTs").  In Neurontin products liability cases pending before this Court, the Court has decided that RCTs are neither the exclusive nor a requisite form of scientific evidence to establish medical causation between Neurontin and its alleged effects.  *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 185 (D. Mass. May 5, 2009) (noting that "most epidemiological studies are 'observational,' not experimental like [DBRCTs]"); *see also id.* at 132 (observing that there is no absolute requirement for epidemiologic proof when other methods are available).  For the reasons discussed herein, the standard is especially inappropriate in a case such as this where it is not Pfizer's burden to prove efficacy, but Plaintiffs' burden to prove *inefficacy* for each medical use as to which they premise their claims.

Accordingly, Kaiser's arguments present no valid basis for Dr. Slaby's exclusion, but instead create, at best, material for cross examination.

Dr. Slaby, an eminently well-qualified academic and clinical psychiatrist and epidemiologist, has been designated to testify on the pharmacological treatment of bipolar disorder, and to evaluate available evidence concerning Neurontin's off-label use by psychiatrists to treat bipolar disorder. Dr. Slaby 's opinions include the following.

- Bipolar disorder is a serious psychiatric condition that presents particular treatment difficulties owing to the diversity of individual patients' clinical presentations and the variability in their responses to available pharmacological treatments (Slaby Report at 9, Armstrong Decl. Exh. A);

- Among available medications commonly used for treatment of bipolar symptoms, there is no single optimal treatment because (i) all treatments (including, for example, lithium, which has been approved for bipolar disorder since the early 1970s) have associated adverse effects that are intolerable in some patients, (ii) even the most effective treatments do not work for all patients, and (iii) effective agents often do not provide complete relief of all bipolar symptoms (*Id.* at 3);

- For these reasons, psychiatrists are obliged to, and commonly do, utilize a wide variety of off-label options for the treatment of bipolar disorder, few if any of which have been conclusively established effective by "Level 1" evidence, but for which efficacy is supported by Level 2 or 3 evidence and by clinical experience (*Id.* at 1, 5);

- In view of the variety of symptoms experienced by bipolar patients, and the common presence of comorbid psychiatric conditions (such as anxiety disorders), the treatment of bipolar disorder often entails combination of different therapeutic agents to address each of a given patient's symptoms (*e.g.*, one or more agents to treat mania, and one or mare agents to treat anxiety) (*Id.* at 11-12);

- "[T]he totality of the evidence, based on randomized, controlled trials and lesser levels of evidence that clinicians should and do loot to, indicates that gabapentin has a role as an adjunctive agent in the management of bipolar disorder" (*Id.* at 14.);

- Because of its relatively favorable safety profile, and the near absence of significant drug-drug interactions, Neurontin is in some instances a preferable treatment choice over other available therapeutic agents (*Id.* at 11).

Each of these opinions is based on Dr. Slaby's application of the methodology he has employed for more than thirty years as a psychiatric clinician and academic.

Dr. Slaby's opinions are, furthermore, vitally important to the jury's evaluation of Plaintiffs' claims that (i) Neurontin is ineffective in all bipolar patients for whom it is prescribed,

and (ii) all or nearly all prescriptions for bipolar disorder written by Kaiser doctors were the result of purported improper promotion by Pfizer, rather than the exercise of independent clinical judgment by Kaiser doctors based on the considerations and sources of information described by Dr. Slaby. Put simply, Dr. Slaby is entitled to opine, applying the methodology of a psychiatric clinician, that available evidence supports Neurontin's use in the treatment of some bipolar patients, and that psychiatric clinicians regularly and reasonably choose Neurontin as a treatment for some bipolar patients based on their sound clinical judgment.

Plaintiffs' argument for exclusion of Dr. Slaby's opinions rests primarily on the false premise that, in order to be admissible, the opinions expressed by Dr. Slaby must be based on the regulatory standard for efficacy, which Plaintiffs assert requires randomized, double-blind, placebo-controlled clinical trials.[2] In their effort to exclude Dr. Slaby, Plaintiffs ask this court to substitute the incorrect "FDA standard" for marketing approval rather than employing the methodology regularly employed by clinicians in evaluating the scientific evidence for the clinical efficacy of Neurontin. Dr. Slaby, however, does not opine, and has no need to opine, on whether Neurontin meets the FDA standard for approval for treatment of bipolar disorder. Instead, Dr. Slaby offers opinions on whether Neurontin is an appropriate treatment choice based on the considerations commonly applied by clinicians. Accordingly, Dr. Slaby appropriately relies on a variety of evidence, not limited to RCTs, in forming his opinion that, from a clinical perspective, Neurontin is an effective and useful agent for the treatment of some patients who suffer from bipolar disorder.

---

[2] FDA regulations do not state that efficacy can be established only with RCTs. FDA regulations state that "[r]eports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drugs." 21 C.F.R. § 314.126. Under FDA regulations, an "adequate and well-controlled" study, which forms the primary – not the only – basis for efficacy, has characteristics that include using "a design that permits a valid comparison with a control to provide a quantitative assessment of drug effect," and allows for the following types of controls: (1) Placebo concurrent control, (2) dose-comparison concurrent control, (3) no treatment concurrent control, (4) active treatment concurrent control, or (5) historical control. 21 C.F.R. § 314.126(b)(2). More importantly, for the reasons discussed above, Plaintiffs' argument relying on the regulatory regime for obtaining regulatory approval for the marketing of a new drug simply misses the point.

Tellingly, Kaiser clinicians - who continue to prescribe and recommend Neurontin for the off-label uses Plaintiffs challenge in this suit - do not now and apparently never have employed the methodology that Kaiser now insists Dr. Slaby must apply.   Indeed, as observed by Les Zendle, MD, the Associate Medical Director of the Southern California Medical Group, during a 2000 Permanente roundtable discussion:

> Evidence-based medicine means so many different things to different people.  To some people, it means that you don't do something unless you have double-blind randomized control studies that prove something works.  Of course, if we only did things when we had double-blind randomized control studies, we wouldn't do a whole lot.  It's also used as a reason to withhold certain things or to not do things or to cut costs.[3]

In short, Kaiser does not require RCT when making formulary decisions or promulgating guidelines, and Kaiser doctors do not require such evidence when they regularly decide to prescribe Neurontin and other medications off-label.  Kaiser's contrary position in its present motion does not reflect any valid methodology that Kaiser clinicians, or any other clinicians, ever have applied outside of the courtroom.  The Court should, accordingly, reject Kaiser's attempt to apply this invented-for-litigation methodology to Dr. Slaby, and should deny Kaiser's motion.

## ARGUMENT

I.   **The Use of Multiple Sources of Scientific Evidence is Proper Methodology for the Basis of a Clinical Opinion**

A.   **FDA Standards For New Drug Approval Do Not Govern Admissibility Of Expert Testimony On The Efficacy Of A Drug For Off-Label Uses**

The dichotomy that Plaintiffs attempt to create – where only DBRCTs are relevant and clinical experience is irrelevant – is not supported by the law, is inconsistent with the factual record in this case, and is inconsistent with Kaiser's own internal policies and actual practices.  Any suggestion that the efficacy issues in this case are governed by the same standard required for FDA approval for on-label indications, and any attempt to shift the burden of proof to Pfizer

---

[3] The *Permanente Medicine Roundtable:  Defining Our Practice Principles*, Permanente J. Winter 2000 at 45, 48 available at http://xnet.kp.org/permanentejournal/winter00pj/winter00.pdf.

to demonstrate Neurontin's efficacy for the relevant off-label uses under that standard, must be rejected.[4]  The FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label because it advances an important public policy.  *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").[5]

In addition, physicians frequently properly prescribe off-label even in the absence of the "gold standard" evidence that Plaintiffs demands for purpose of this litigation (but which they do not require when making formulary decisions or promulgating prescribing guidelines). Physicians often make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition.  In fact, prescribing off-label is often the standard of care, especially for certain indications, such as neuropathic pain, where there is little or no "gold standard" evidence supporting the effectiveness of any medication.  As Judge Weinstein recently observed: "'[O]ff-label uses of prescription drugs are a mainstay of the industry – an estimated 21% of drug use overall[.]'"  *Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), ___ F. Supp. 2d ___, 2009 WL 4260857, at *16 (E.D.N.Y. Dec. 1, 2009) (alteration in original) (citation omitted).  "Some off-label uses of a prescription drug may be medically necessary."  *Id.*; *see also Hartwell v. Danek Med., Inc.*, 47

---

[4] Pfizer does not have the burden of proving efficacy.  Rather, as this Court has held, Plaintiffs have the burden of proving inefficacy.  *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) ("For all of their claims, plaintiffs will be required to prove . . . that they were injured (i.e., suffered economic loss) by virtue of the Neurontin's inefficacy for that condition.").  Plaintiffs seek not merely to flip this burden by requiring Pfizer to prove efficacy, but also to require Pfizer to meet that invalidly-applied burden by supposed "gold standard" evidence.

[5] *See also Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994) ("[T]he FDA permits doctors to prescribe drugs for 'off-label' uses."); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) ("[T]he 'FDA itself recogniz[es] the value and propriety of off-label use.'" (citation omitted)).

F. Supp. 2d 703, 705 n.3 (W.D. Va. 1999).[6]  Plaintiffs' argument, however, presumes that no medication should be prescribed off-label absent "gold standard" evidence, and would actually hold that a physician's exercise of the standard of care resulted in improper prescriptions.  This absurd suggestion should be rejected.

**B.  Kaiser Does Not Require DBRCTs When Making Formulary Decisions Or Promulgating Prescribing Guidelines And Considers Clinical Experience As Relevant Evidence**

Kaiser's arguments are inconsistent with its own internal policies and practices.  As discussed in Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2409],[7] Kaiser does not require DBRCTs when making formulary decisions or promulgating prescribing guidelines.  This fact is critical given that Kaiser's theory of causation in this action is tied directly to its formulary decision-making process.  *See In re Neurontin Mktg., Sales Practices, and Prods. Liab. Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010).



---

[6] No one disputes that DBRCTs are at the top of the pyramid of available evidence when analyzing cause and effect of pharmaceutical products.  However, by definition, off-label prescribing, widely accepted as a beneficial medical practice, lacks FDA approval.  As a result, off-label prescribing is often based upon evidence other than DBRCTs.

[7] Defendants incorporate Section I of such opposition herein by reference.



This is but one of several instances where Kaiser's doctors' real-world practices are in irreconcilable conflict with Kaiser's litigation claims.  Kaiser's clinicians never have applied the

---

methodology that Kaiser claims in the present motions is the one and only methodology that Dr. Slaby should have used in assessing Neurontin's efficacy, but instead apply methods that are fully consistent with Dr. Slaby's.

## II.   Dr. Slaby's Opinion That Neurontin Is Effective In Treating Bipolar And Other Mood Disorders Is Based On Reliable And Generally Accepted Methodology

Once the central premise of Plaintiffs' *Daubert* motion falls, all that remains of their motion fails to rise to the level of a *Daubert* challenge. Plaintiffs ask this Court to accept the opinions of their experts over Defendants' regarding the proper weight and interpretation to be given to the available scientific evidence, but that is not the role of the Court on a *Daubert* motion. As this Court has explained:

> The Court must, however, keep in mind the Supreme Court's admonition that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts." "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 131-32 (D. Mass. 2009) (citations omitted). Kaiser's arguments, at best, present material for cross examination, but they provide no valid basis for exclusion of Dr. Slaby's opinions.

### A.   Dr. Slaby Is, and Employs the Methodology of, an Eminently Well-Qualified Practitioner and Professor of Psychiatry

Dr. Slaby is a psychiatrist with more than thirty years of clinical experience. (*See* Slaby

*Curriculum Vitae,* Armstrong Decl. Exh. A.)  He has served as the Director of Psychiatry at the Regent Hospital in New York City, as a clinical professor of psychiatry at the New York University School of Medicine, and in a variety of other academic and clinical roles. Throughout his career he has researched, written, and lectured on subjects such as emergency psychiatry, epidemiology, suicidology, and other related psychiatric matters.  He has authored or edited some thirty books, and literally hundreds of articles in the field of psychiatry, several of which have been published in multiple languages.  In his clinical practice in New York City, Dr. Slaby regularly treats patients with bipolar, anxiety, and substance-abuse disorders.  Under Rule 702 of the Federal Rules of Evidence, Dr. Slaby is qualified to testify as an expert due to his extensive knowledge, skill, experience, training, and education in the pharmacological treatment of bipolar disorder.  Kaiser's claim that Dr. Slaby is somehow unqualified or incapable of properly applying the methodology of a psychiatrist flies in the face of common sense.

**B.    Dr. Slaby Provides A Thorough Explanation Of The Universally Recognized Methodology He Utilized In Opining That Neurontin Is Effective In Treating Bipolar Disorder And Comorbid Anxiety Disorders**

Plaintiffs complain that Dr. Slaby did not sufficiently explain the methodology he utilized in rendering his ultimate opinion that the totality of all of the available evidence supports Neurontin's efficacy in treating at least some subpopulations of patients with bipolar and other mood disorders.  Kaiser chose not to depose Dr. Slaby.  Had Kaiser done so, it would have had ample opportunity to clarify any supposed ambiguities or shortcomings in Dr. Slaby's approach. Nonetheless, Dr. Slaby's multiple expert reports and supplemental declaration in this matter thoroughly describe his methodology, and show that his opinions are "(1) [ ] based upon sufficient facts or data, (2) [ ] the product of reliable principles and methods, and (3) [result from the application of] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Dr. Slaby's report additionally satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 587 (1993) and its progeny.  *See, e.g., Beaudette v. Louisville Ladder, Inc.,* 462 F.3d 22, 25-26 (1st Cir. 2006) (quoting *Daubert*) (*Daubert* requires an

examination of "'(1) whether the theory can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline.'") Dr. Slaby's methodology is accepted, utilized, and tested every day by practicing clinicians, including Kaiser clinicians, and is frequently applied in the publication of case reports detailing treatment regimes. Indeed, Kaiser's own bipolar expert, Dr. Barkin, has employed the same methodology in a publication advising clinicians against the use of risperidone in a certain subset of bipolar patients based on Dr. Barkin's own clinical experience with risperidone.[9]

Dr. Slaby's ultimate conclusion is simply that Neurontin is effective in treating some subpopulations of patients with bipolar and other mood disorders. (Slaby Report at 3.) He reached that conclusion by the accepted manner employed by clinical physicians. Succinctly stated, Dr. Slaby's conclusion is based on the premise that:

> Physicians develop algorithms to guide selection of treatments in which interventions supported by Level-1, -2, and -3 evidence are prioritized based on efficaciousness for various subpopulations of patients. Such algorithms suggest that a physician try interventions that may affect a greater number of patients early in his or her treatment of a particular patient. But they also suggest that physicians try interventions that may be effective for smaller patient subpopulations after first choice interventions fail entirely or alone in providing remission of symptoms. Generally the efficacy of first choice options (those for larger groups or more modal patients) is supported by Level-1 evidence. Those chosen later may be supported by Level-2 or Level-3 evidence.

(Slaby Report at 5.) In other words, Dr. Slaby's methodology is premised on the basic tenet that a clinician's primary responsibility is to identify the relief that provides the greatest relief to his individual patient.

His methodology reflects that of psychiatrists experienced in treating bipolar disorder, for whom the "goal is to provide, as much as is reasonably possible, relief to patients suffering from

---

[9] *See* Barkin, Pais & Gaffney, *Induction of Mania by Risperidone Resistant to Mood Stabilizers [sic]*, Journal of Clinical Psychopharmacology 17(1) 57-58 (1997) (warning that the authors' experience in the clinical application of risperidone indicated it could induce mania in some bipolar patients, and advising clinicians to use caution in risperidone's use on that basis).

medical disorders." (*Id.* at 4.)  As a result, Dr. Slaby examined the totality of the published Level-1, -2, and -3 evidence available, and determined not that Neurontin is <u>always</u> effective in treating <u>all</u> bipolar or mood disorder patients, but simply that there are good medical grounds to conclude – as Kaiser's own physicians do –  that it is effective in treating <u>some</u> patients.  Dr. Slaby's methodology of forming opinions based on a review of available scientific and medical literature has been accepted as a valid methodology for expert clinicians by courts throughout the United *States.  See, e.g., Benedi v. McNeil-P.P.C., Inc.*,  66 F.3d 1378, 1384 (4th Cir. 1995) (affirming a decision finding the application of literature review to be a reliable expert methodology, and noting that such methodologies cannot be deemed unreliable "in light of the medical community's daily use of the same methodologies in diagnosing patients"); *Brasher v. Sandoz Pharmaceuticals Corp.* 160 F. Supp. 2d 1291, 1298 (N.D. Ala. 2001) (listing "medical literature reviews" as "recognized and accepted scientific methodologies").

Dr. Slaby's general methodology and specific opinions regarding Neurontin are supported and applied by the psychiatric community as a whole.  For example, the 2009 edition of Kaplan & Sadock's *Comprehensive Textbook of Psychiatry*, while recognizing possible limitations in Level 1 evidence regarding Neurontin's use as a monotherapy in bipolar disorder, recommends use of Neurontin for bipolar disorder on the basis of non-Level 1 evidence supporting its efficacy:

> [A]djunctive gabapentin as a maintenance treatment with other anticonvulsants (carbamazepine, valproate, and lamotrigine) or mood stabilizers ***certainly deserves consideration for bipolar depressed patients with anxiety and social phobia or the profound sleep disturbance associated with a comorbid PTSD***.  If the patient has comorbid alcoholism, and the benzodiazepines are to be avoided, gabapentin would appear to be a safe and easy-to-use alternative, especially because it is renally excreted and not metabolized in the liver.

*Kaplan & Sadock's Comprehensive Textbook of Psychiatry* at 1783 (B.J. Sadock, et al. eds. Lippincott Williams & Wilkins 2009) ("Kaplan & Saddock's") (emphasis added).  Kaiser's untenable position apparently is that leading psychiatric texts do not apply valid psychiatric methodology.[10]

---

[10] Upon any degree of scrutiny, it is apparent that it is Kaiser's experts' purported methodology
*(cont'd)*

Published medical literature likewise employs a methodology fully consistent with Dr. Slaby's. For example, in Carta, et al, *Special Review:   The Clinical Use of Gabapentin in Bipolar Spectrum Disorders*, 75 J. of Affective Disorders 83 (2003) ("Carta (2003)"), the authors reviewed available evidence concerning gabapentin's efficacy in treatment of bipolar disorder, concluding that, "[a]lthough failing to show clear antimanic efficacy in randomized trials, gabapentin still remains a clinically useful agent when it comes to combination treatment in refractory and comorbid patients." *Id.* at 83. The authors' stated methodology for determining gabapentin's efficacy was materially indistinguishable from Dr. Slaby's, and included review of both Level 1 and non-Level 1 evidence. *Id.* at 84-85. The authors specifically considered "negative" controlled studies, including the Pande and Frye studies on which Kaiser relies. *Id.* at 88. The authors then discussed the limitations of those controlled studies – identifying the same limitations that are discussed in Dr. Slaby's report – and concluded, like Dr. Slaby, that gabapentin "may be a valuable tool particularly in patients with comorbid psychiatric disorders." *Id.* at 89. Once again, Kaiser's untenable position apparently is that the authors of this article, as well as the editors and peer-review board for the journal in which it was published, either do not know or for some reason decline to apply accepted psychiatric methodology in evaluation Neurontin's efficacy.

In contrast to leading treatises, published medical literature, and Kaiser's own physicians, Kaiser and its litigation expert, Dr. Jeremy Barkin, assert that doctors should utilize only RCT evidence in determining which drugs to prescribe their patients (apparently ignoring the methodological contradiction illustrated by his article on mania supposedly induced by risperidone).   There is no evidence that any physician bases, nor that any reputable medical authority recommends basing, prescribing decisions exclusively on RCT results. Indeed, in the context of bipolar disorder, Kaiser suggests that a number of drugs should be utilized for the

_____

*(cont'd from previous page)*
that is inconsistent with accepted practice. Leading texts, and Kaiser's own member doctors' practices, are fully consistent with Dr. Slaby's methodology and opinions.

treatment of bipolar disorder despite the existence of negative DBRCT data for those drugs. As discussed above, Kaiser in 2002 approved removals of formulary restriction for both Neurontin and topiramate despite the absence of positive, and the existence of negative, DBRCT for each drug.

Additionally, citing the University of North Carolina at Chapel Hill's *Prescribing Better Outcomes* findings on antiepileptic drugs in the treatment of bipolar, Kaiser touts lamotrigine as efficacious in treating and maintaining remission for outpatient adults with primary diagnoses of bipolar I disorder. (*See* Kaiser's Mot. for Summary Judgment, Ex. 5.) The same UNC report, however, warns that Level 1 "[e]vidence of efficacy is less clear" in the context of bipolar II, and that Level 1 evidence does not support a conclusion that lamotrigine is effective in treating acute mania or mixed episodes. Despite the lack of DBRCT evidence to support its use across the complete bipolar spectrum, Plaintiff's expert asserts that lamotrigine can and should be considered an effective treatment in all but acute cases. (Barkin Report [1457-11] at 5.)

## C.  Kaiser's Characterization Of The Relevant DBRCT Evidence Is Misleading At Best, And Fails To Account For Positive Data Showing Neurontin's Efficacy In Treating Bipolar Patients

Kaiser's assertions that only RCTs can support prescribing medications for bipolar patients, that only four relevant studies exist pertaining to use of Neurontin in treatment of bipolar patients, and that all four such studies mandate a finding of inefficacy, are false and misleading. In 2003, a comprehensive "special review" of the medical evidence of Neurontin's effectiveness in treatment of bipolar disorders, including the Pande (2000), Frye (2000) and other RCTs cited by Kaiser as some sort of dispositive proof of inefficacy in all cases, concluded that:

> On the basis of the available literature, GBP [Neurontin] may have a role only as adjunctive treatment of bipolar patients showing components of depression, anxiety, and impulsiveness. Thus, it may be a valuable tool particularly in patients with comorbid psychiatric disorders. A further potential use may be in patients affected by concomitant substance abuse. Additional studies are needed to confirm these findings. Future studies should be carried out using appropriate methods and instruments capable of measuring the specific symptomatic components which may benefit from the use of GBP.

Carta (2003) at 89 (emphasis added).

Further, at least one RCT study showed gabapentin's efficacy in a subset of bipolar patients. See Vieta, et al., *A Double Blind, Randomized, Placebo-Controlled, Prophylaxis Study of Adjunctive Gabapentin for Bipolar Disorder*, J. Clin. Psychiatry 67:3, 473-77 (March 2006) ("Vieta (2006)").  The remainder of the studies cited by Kaiser do not conclude – as Kaiser suggests – that Neurontin is ineffective in all bipolar patients.  Instead, each negative study cited by Kaiser carries explicit caveats limiting its findings.  Multiple studies considered by Dr. Slaby have shown Neurontin's efficacy in treating a variety of conditions which are both comorbid with, and carry many of the same symptoms as, bipolar disorder.

### 1.    Kaiser Mischaracterizes The Vieta Study As Showing Neurontin's Inefficacy In Treating Bipolar Patients

Kaiser asserts that four RCT studies have been conducted involving Neurontin's use in the treatment of bipolar disorder.  These include Guille (1999), Pande (2000), Frye (2000), and Vieta (2006).  Kaiser flatly misrepresents the results of Vieta (2006) by claiming that that study established Neurontin's inefficacy.   The Vieta study actually found, and reported as its conclusion, that "despite the apparent lack of acute efficacy of gabapentin, *this study suggests that this drug is likely to provide some benefits in the long-term outcome of the disorder*, confirming what some clinicians and open-label studies have suggested before."  Vieta (2006) at 477 (emphasis added).  Kaiser attempts to pretend this result away based on the fact that one subpopulation of the bipolar individuals treated with Neurontin in the study did not experience a statistically significant improvement in the primary efficacy parameter.  Kaiser provides no justification as to why the positive subpopulation results of the Vieta study must be wholly ignored in favor of the neutral results of another population, or why a study with at least partially favorable results should be classified as negative.  Dr. Slaby's approach incorporates the totality of the evidence from the studies, including the favorable evidence in the Vieta study.  Kaiser, incredibly, suggests that Dr. Slaby's methodology is invalid because he refuses to ignore, as Kaiser would have its experts and the Court ignore, Level 1 evidence supporting Neurontin's efficacy.

14

2.     **The Remainder Of DBRCT Studies Involving Neurontin's Application To Bipolar Disorder Explicitly Describe Study Limitations That Foreclose The Conclusion That Any Of The Studies Establishes That Neurontin Is Not Effective For Any Type Of Patient With Any Symptom Of Bipolar Disorder**

Kaiser, both in its motion *in limine* and through its expert, Dr. Barkin, asserts that all DBRCT studies examining Neurontin's use in the treatment of bipolar patients produced negative results. But RCTs, like all scientific tests, test only what they purport to test. Each study cited by Kaiser examined specifically defined sub-categories of patients; none of them purported to study all, or even a representative cross-section or sample, of the general population of bipolar patients. The 2000 Pande study, for example, examined treatment-refractory bipolar patients – the only patients allowed into the study were patients who had previously tried other bipolar medications, including some of the medications that Kaiser's experts identify as effective bipolar treatments, but who had ***not*** experienced adequate relief of their symptoms. Likewise, the study published by Dr. Mark Frye, *A Placebo Controlled Study of Lamotrigine and Gabapentin Monotherapy in Refractory Mood Disorders*, as its title suggests, studied only treatment-refractory bipolar I or II patients. The same is true of the Guille study presented to the 1999 American Psychiatric Association annual meeting. In addition, 92% of the patients studied in the Frye study were difficult to treat rapid-cycling bipolar sufferers, a much higher percentage than that found in the general population. *See* Frye at 612. For these reasons, the "failed" studies established only that Neurontin did not produce a statistically significant improvement in patients who were proven non-responders or incomplete responders to other recognized bipolar medications.

Given the differences between the patients studied by the authors of the Pande, Frye, and Guille study and the general bipolar patient population, it is not surprising that the authors of each study explicitly warned against generalizing the results of their studies to other bipolar patients – precisely what Kaiser would have the Court do here. The Pande study, for example, states that while its results did not show Neurontin's efficacy (i.e., as an add-on therapy in treatment-refractory bipolar patients), further research may support the hypothesis that that the

15

drug has an anxyiolotic effect beneficial to some bipolar patients. *See* Pande at 253. Similarly, the authors of the Frye study specifically noted that the limitations inherent in their study prevented its broad application to Neurontin's use in all bipolar patients, concluding: "The degree of efficacy [of Neurontin] in a more homogenous and typical population of patients who were less severely ill remains to be explored." *See* Frye at 612.

Dr. Slaby's multiple reports and proposed testimony in this case recognize the caveats and limitations in the available studies:

> [A successful study] does not establish that a drug will be effective for every patient in the particular subpopulation that was studies, let alone every patient with the condition that was studies. Similarly a study that does not show efficacy does not prove that a product is not an effective treatment for the studied condition. . . . . Even a failed study that is properly designed and carried out and that is not otherwise methodologically flawed demonstrates only that the drug was not effective for the majority of the population studied. It does not preclude the possibility that the drug is effective for specific subpopulations or for unidentified subgroups of the studies population.

(Slaby Report at 7.) In order to prove that a drug is never effective, for anyone, the objective undertaken by Kaiser in this case, everyone would need to be studied. (Slaby Report at 8.) Ultimately, the absence of established efficacy by DBRCT studies does not indicate that the drug may not be effective in single instances or for a large subpopulation that may have not been represented at all or in sufficient numbers. (Slaby Report at 7.)

Again, Kaiser apparently disagrees with the validity of Dr. Slaby's methodology. However, Kaiser's criticisms of his approach are hardly threshold issues suitable for resolution prior to trial. Instead, they cut to the heart of this case and should be resolved through the examination of Dr. Slaby and his counterpart, Dr. Barkin.

> **3.    Dr. Slaby Relies On Extensive Additional Evidence, Including Level 1 Evidence, Supporting Neurontin's Efficacy In Treatment Of The Symptoms Of Bipolar Disorder**

With the exception of a single study, the evidence reviewed by Dr. Slaby encompasses that reviewed by Plaintiffs' own bipolar and epidemiology expert, Dr. Jeffrey Barkin. [11]

---

[11] Plaintiffs make much of the fact that Dr. Slaby does not reference the Guille study from 1999, *(cont'd)*

Dr. Slaby additionally reviewed DBRCT studies of Neurontin's use in treating anxiety disorders, panic disorders, and social phobia, all psychiatric disorders which commonly occur in patients with bipolar disorder, and which are characterized by symptoms that substantially overlap with the symptoms of bipolar disorder. (Slaby Report at 11-13); *see also* Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 2004) at 384 (citing social phobia and panic disorder as disorders associated with bipolar I); Kaplan & Sadock at 1794 (25% of bipolar individuals have one or more comorbid Axis I condition). Dr. Slaby accurately notes that Neurontin has been shown in a number of DBRCT studies to be efficacious in the treatment of such associated disorders. *See e.g.,* Pande, et al., *Treatment of Social Phobia With Gabapentin: A Placebo Controlled Study*, J. Clin. Psychopharmacol, 19:341-48 (1999); Pande, et al., *Placebo-controlled Study of Gabapentin Treatment of Panic Disorder*, J. Clin. Psychopharmacol. 20: 467-71 (2000).

Dr. Slaby's opinion that Neurontin's efficacy in treating such comorbid conditions can and should be considered when constructing a treatment regime for a bipolar patient finds support in relevant learned treatises. Kaplan & Saddock's *Comprehensive Textbook of Psychiatry*, for instance, states: "Specific therapeutic attention to comborbid symptoms in bipolar disorder is crucial to a patient's successful management, as bipolar illness has more comorbidities than any other major psychiatric condition." *Kaplan & Saddock* at 1794. The treatise goes on to state, however, that clinicians treating bipolar patients with comorbidities rarely have the benefit of DBRCT studies to support their decisions:

> Virtually all of the approaches to these comorbid conditions are off-label, and each has almost always been explored only in individuals with the primary

---

*(cont'd from previous page)*
which Dr. Barkin briefly discusses in his expert report. Dr. Barkin's discussion of Guille (1999) is limited to an analysis of a poster referencing the study and its findings, which was displayed at the Annual Meeting of the American Psychiatric Association in 1999. The abstract of the study states it "did not find adjunctive gabapentin to be efficacious treatment for refractory mania, but cannot address efficacy for [non-refractory] bipolar disorder." Plaintiffs' accusation that Dr. Slaby's failure to discuss Guille somehow taints his report is hyberbolic and disingenuous given the Guille authors' explicit caveat that gabapentin may well be effective in treating some forms of bipolar disorder in some patients.

> condition (as opposed to in bipolar patients who also have the comorbidity). *This leaves the clinician with a wide range of indirect inferences to be drawn about the potential applicability of treating those conditions in bipolar patients based on evidence drawn from other populations.*

*Id.* (emphasis added).   The textbook explicitly suggests Neurontin as a treatment option in various bipolar patients, including those with comorbidities.   *Id.* at 1745, 1790, 1795, 3021. Dr. Slaby's reasoning and methodology is consistent with the methods and reasoning underlying the analyses of Neurontin's utility in treating bipolar patients in textbooks, peer-reviewed special scientific reviews, and Kaiser's own formulary and prescribing decisions, which have reached conclusions similar to his own.

## III.    The Testimony Of Dr. Slaby Is Relevant To The Issue Of Causation

Dr. Slaby's testimony is independently admissible because he explains the reasons why physicians prescribe off-label and the factors that influence a physician's prescribing decisions. Such evidence is independently admissible on the issue of causation, because it rebuts Plaintiffs' claim that virtually all off-label Neurontin prescriptions were caused by Defendants' alleged promotion.  (*See* Defendants' Opposition to Plaintiff's Motion to Exclude Testimony of Pfizer's Non-Retained Experts [2410] at 13-14.)

## CONCLUSION

Kaiser's motion to exclude the testimony of Dr. Andrew Slaby should be denied because he is eminently qualified by education, training, and experience to testify to his opinions on the subjects disclosed in his report; and because his methods and reasoning are consistent with the accepted and widely-practiced methods and reasoning of clinical psychiatrists evaluating the off-label use of medications for treatment of bipolar patients, including Kaiser's own.

18

Dated: January 26, 2010        Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:     /s/ Mark S. Cheffo
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:     /s/ Raoul D. Kennedy
        Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

      -and-

WHEELER TRIGG O'DONNELL LLP

By:     /s/ James E. Hooper
        James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

      -and-

WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
          David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and*
*Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 26, 2010.

/s/ David B. Chaffin
David B. Chaffin