# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: | Master File No. 04-10981 |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Judge Patti B. Saris |
| | Magistrate Judge Leo T. Sorokin |

**DEFENDANTS' PROPOSED REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF KAY DICKERSIN, PH.D.**

Pursuant to Federal Rules of Evidence 401, 402, 403, 702 and 703, Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") submit this reply memorandum in further support of their motion *in limine* [2304] to exclude the testimony of Dr. Dickersin.

## INTRODUCTION

Plaintiffs go to great lengths in their attempt to rehabilitate the expert report and opinions of Dr. Dickersin. *See generally* Plaintiffs' Opposition Memorandum [2413]. In doing so, they misstate the case law upon which they rely, mischaracterize the testimony of Pfizer's experts, rely upon ethics guidelines that were not even written when the events relevant to Dr. Dickersin's opinion occurred, and improperly substitute the peer-review process at the *New England Journal of Medicine* for the evidentiary requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and the Federal Rules of Evidence. As discussed more thoroughly below, Dr. Dickersin's opinion is deeply flawed, highly subjective, and inadmissible.[1]

As explained in detail in Pfizer's moving brief, the mere identification of what she construes as scientific "study bias" does not demonstrate any intentional pattern of deception.

---

[1] Plaintiffs devote nearly eight pages of their opposition to Dr. Dickersin's qualifications. Pfizer does not challenge Dr. Dickersin's qualifications. The issue here is not about qualifications, but rather the applicability of Dr. Dickersin's opinions to Plaintiffs' claims and, further, the sweeping conclusions that she purports to draw.

Indeed, although Plaintiffs place inordinate emphasis on the fact that "Dr. Dickersin's analysis of Defendants' internal research reports and published studies was the subject of a recent article . . . in the *New England Journal of Medicine*" (Pl. Opp. at 8.), that peer-reviewed publication actually **undermines** Dr. Dickersin's opinions here. Rather than observing any "clear intent to suppress information" (Expert Report of Kay Dickersin at 33), the article expressly states that the authors could not conclude "that selective reporting was a decision made by employees of Pfizer and Parke-Davis."[2]

A side-by-side examination of the two documents reveals that Dr. Dickersin's expert report reaches far beyond the data and methods upon which she normally relies, including company emails and internal memoranda. Exacerbating this over-reach, Dr. Dickersin's conclusions are driven by the inclusion in her analysis of clinical trials she concedes were never a part of the "publication strategy" she so harshly criticizes. In the end, Dr. Dickersin's opinions regarding ethics and scientific conduct fail to rise above the personal and subjective, are unreliable, and incorporate evidence not properly relied upon by an expert in her field. As such, her opinions should be barred.

## I. Dr. Dickersin's Testimony Regarding Intent and/or Motive Is Inadmissible

Plaintiffs claim that, because Pfizer is a corporation with no mental state, this somehow frees Dr. Dickersin to opine about Pfizer's "intent" to deceive the scientific community. In doing so, Plaintiffs run roughshod over the law upon which they rely. The prohibition on expert testimony regarding motive and intent applies equally to individuals and corporations. Indeed, as Pfizer's opening brief [2305] made clear, district courts have repeatedly excluded expert evidence regarding motive and intent of *pharmaceutical* corporations. (*See* Pfizer Memorandum at 5-6.) For instance, in *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531 (S.D.N.Y. 2009), the district court held – in a similar context – that any "[i]nferences

---

[2] S. Swaroop Vedula *et al.*, "Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use," 361; 20 *New England Journal of Medicine*, 1963, 1969 (2009)

about the intent or motive of [Warner-Lambert, Glaxo-Wellcome and] others lie outside the bounds of expert testimony." *Id.* at 546-47 & n.4. Likewise, in *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 164 (S.D.N.Y. 2004), the district court held that plaintiffs' expert was precluded from testifying "as to the knowledge, motivations, intent, state of mind, or purposes of **Merck**, its employees, the FDA or FDA officials." *Id.* at 192 (emphasis added). Finally, in *In re Diet Drugs Products Liability Litigation*, No. MDL 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001), the district court excluded "any proffered *expert* testimony concerning the intent of [defendant pharmaceutical corporation] AHP or any other entity . . . on the basis that the question of intent is to be determined by the jury, not experts." *Id.* at *2; see also In re Baycol Prods. Liab. Litig.*, 532 F. Supp. 2d 1029, 1067 (D. Minn. 2007). In each case, the district courts excluded all expert testimony regarding the intent or motive behind the business decisions of pharmaceutical companies. Plaintiffs offer no explanation for why this case merits deviation from this settled prohibition.

On the contrary, Plaintiffs choose to ignore these cases, and instead argue that, in a "complex case such as this . . . expert testimony is necessary to appreciate the significance of [Pfizer's] actions." Pl. Opp. at 12.[3] In doing so, Plaintiffs cite *Millette v. Adams*, No. 1:07-CV-0019, 2008 WL 3927798, at *9 (E.D. Cal. Aug. 25, 2008), and argue that Dr. Dickersin should be permitted to testify that Defendants' actions were "*consistent* with a particular intentional act or motivation." (Pl. Opp. at 12.) Plaintiffs misread and misapply *Millette*. In fact, *Millette* does not even involve admissibility pursuant to the Federal Rules of Evidence. It involved federal *habeas corpus* petition from a state court proceeding. *Millette*, 2008 WL 3927798, at *1, *9.

---

[3] Plaintiffs rely on *In re Blech Security Litigation*, No. 94 Civ. 7696, 2003 U.S. Dist. LEXIS 4650 (S.D.N.Y. March, 26, 2003). But *Blech* is highly context-specific: "[p]articularly in ***complex cases involving the securities industry***, expert testimony may help a jury understand unfamiliar terms and concepts." *Id.* at *53. Plaintiffs do not elaborate on why this Court should take counsel from courts determining the necessity and admissibility of unrelated expert testimony in securities cases rather than the litany of courts that have excluded – in pharmaceutical cases – *exactly* the kind of testimony Plaintiffs seek to offer here

3

Although the federal court in *Millette* never issued a ruling as to the admissibility of evidence, any such ruling would have sounded under California law.[4]

Even if *Millette* were, somehow, relevant – and it clearly is not – to the extent that any evidentiary reasoning can be extracted, the decision supports Pfizer's motion to exclude. As the *Millette* court noted in *dicta*, the state trial court based its admission of a treating doctor's "expert testimony" that a knife wound resembled that of an "execution-style" killing on the administering doctor's experience in treating "150 to 200 cases involving knife wound injuries" over the course of his career. *Millette*, 2008 WL 3927798, at *8. As Dr. Dickersin concedes, she has no such extensive experience from which to draw, because her testimony involves an "area of reporting biases that I haven't personally collected data in, *ever before*." (Dickersin Dep. at 48:11-18 (emphasis added).) Further, as the state court in *Millette* acknowledged, testimony "imput[ing] subjective knowledge or intent" is inadmissible where – as here – it "does 'nothing more than inform the jury how [the expert] believe[s] the case should be decided.'" *Millette*, 2008 WL 3927798, at *8.

### A. Dr. Dickersin's Testimony Regarding Ethics and Misconduct Is Inadmissible

Neither Dr. Dickersin nor Plaintiffs have offered any evidence that Defendants' actions during the relevant periods deviated in any way from either the best industry practices or any generally accepted code of ethics or scientific conduct. (Pfizer Mem. at 10.) In response, Plaintiffs charge that "the need to publish data from all clinical trials is not solely the belief of Dr. Dickersin," and introduce a 2004 joint resolution simultaneously published in *The Lancet* and other medical journals, introducing an agreement by a committee of medical journal editors to begin requiring *registration* – not full publication – of all clinical trials by September, 2005. *See* De Angelis, *et al.*, Comment, "Clinical Trial Registration: A Statement from the International Committee of Medical Journal Editors," 364 Lancet 911 (2004). Plaintiffs' attempt to validate

---

[4] As the *Millette* court noted, "the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding." 2007 WL 3927798, at *9.

4

Dr. Dickersin's impermissible ethics and scientific conduct opinions fails on multiple fronts: the joint resolution post-dates the clinical studies at issue here by as much as sixteen years and, even if it did not, the resolution falls short of supporting Dr. Dickersin's contention that the failure to publish the results of a clinical trial, standing alone, constitutes either unethical action or scientific misconduct. Of the articles, statements, and editorials proffered by Plaintiffs in their opposition, in fact, only one suggests that all clinical trial results should be published, and ***none*** of the articles, statements and editorials pre-date 2003.

As a result, Plaintiffs' arguments and evidence do not rebut Pfizer's contention that Dr. Dickersin's conclusions regarding ethics and scientific misconduct are inadmissible. Dr. Dickersin clearly states that such a failure, ***standing alone***, constitutes "scientific misconduct." (Dickersin Rep. at 8.) As a result, Plaintiffs' reference to the joint resolution is nothing but a smokescreen intended to obscure the fact that Plaintiffs have not provided – and cannot provide – a scintilla of evidence that full publication of all clinical trials was mandated by any generally accepted code of ethics or conduct at the time the clinical trials were conducted. *Cf. In re Baycol*, 532 F.Supp. 2d at 1053 ("Personal views on corporate ethics and morality are not expert opinions."). Tellingly, none of the clinical trials cited by Dr. Dickersin as evidence of Defendants' "strategic" failure to publish post-date that 2004 joint resolution,[5] and several pre-date those standards by ten-to-sixteen years. (*See* Dickersin Rep. at 61 (noting the last enrollment date of the Wessely Report as 1988).) This is ***not*** to say that clinical trial registration does not constitute good public policy. It may. But Dr. Dickersin's opinions regarding scientific conduct are nothing more than her personal, highly subjective, retroactive views of what conduct ***should*** pass muster as ethical. Plaintiffs have offered no evidence that Defendants were not, at all times, acting in accordance with contemporaneous "standards of good publication practice" or any generally accepted code of ethics or scientific conduct. (*See* Report of Elizabeth Field

---

[5] All but one of the clinical trials in Dr. Dickersin identifies as evidencing publication bias for failure to publish were completed by September 2001. (*See* Dickersin Rep. at Migraine Table 2, Neuropathic Pain Table 2, and Nociceptive Pain Table 2.)

[2414-5] at 27.) Dr. Dickersin's opinions here as to both ethics and scientific misconduct are inherently personal, subjective, and standardless. *Cf. Harnett v. Ulett*, 466 F.2d 113, 118 (8th Cir. 1972); *Baycol*, 532 F. Supp. 2d at 1053.

In any event, Dr. Dickersin's ethics opinions are inadmissible because the issue in this case is whether Pfizer's conduct comported with the governing legal standards, not ethical standards.

> While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is not relevant to these lawsuits.

*Rezulin*, 309 F. Supp. 2d at 544.

## B. Dr. Dickersin's Inclusion of the Nociceptive Pain Trials Renders her Conclusions Unreliable

Initially, Plaintiffs do not dispute that, absent the nociceptive pain trials they claim were properly included in Dr. Dickersin's analysis, that the "publication rates [for gabapentin] are within an acceptable range." (Pl. Opp. at 16.) As a result, Plaintiffs' rationalization of Dr. Dickersin's inclusion of the gabapentin-naproxen and gabapentin-hyrocodone trials for nociceptive pain in her analysis of Defendants' alleged publication bias is understandable. It is also unavailing. Dr. Dickersin *herself* states that there is no evidence of any "publication strategy" by Defendants for nociceptive pain. (*See* Dickersin Rep. at 21.) Instead, Dr. Dickersin notes that the development of gabapentin for treatment of nociceptive pain "focused on regulatory approval/patent issues." (*Id.*)[6]

At the heart of Plaintiffs' allegations are what they allege to be a "uniquely *improper* – and illegal – marketing effort" implemented by Defendants to increase sales of Neurontin. (Pl.

---

[6] Plaintiffs attempt to minimize Dr. Dickersin's admission that the nociceptive pain trials were not a part of any "publication strategy" by asserting that Pfizer expert Dr. Gary Brenner opined that "Neurontin is effective for nociceptive pain." (Pl. Opp. at 16.) This is just one mischaracterization in a litany of mischaracterizations. Dr. Brenner clearly states that, while there are studies suggesting that gabapentin is effective in treating peri-operative pain, the studies "do not allow good separation of which type(s) of pain, nociceptive and/or inflammatory, gabapentin is affecting." (*See* Report of Dr. Gary Brenner [2430-2] at 4-5.)

6

Opp. at 13.) By definition, any clinical trials and indications that were not a part of that publication strategy cannot be probative of whether that strategy caused Plaintiffs to reimburse for off-label Neurontin prescriptions. And yet, Plaintiffs offer no explanation for how or why clinical trials their own expert admits were *excluded* from that alleged "uniquely improper – and illegal – marketing effort" can nonetheless be *included* by that expert in an allegedly empirical analysis proffered to prove the existence and effect of that "marketing effort." *Id.* The inclusion of these reports not only renders Dr. Dickersin's opinion unreliable but calls into question the objectivity and impartiality of her report.[7]

### C. The Article Published in the New England Journal of Medicine Reveals the Limitations and Inadmissibility of Dr. Dickersin's Testimony

Plaintiffs place great weight on the fact that "Dr. Dickersin's analysis of Defendants' internal research reports and published studies was the subject of a recent article . . . in the prestigious *New England Journal of Medicine*." (Pl. Opp. at 8.) They argue that this is "independent indicia" of reliability. (*Id* at 9.) And there is no disputing the journal's well-earned reputation. To the extent that Plaintiffs argue that "[t]he published abstract" of the *NEJM* article "closely tracks her expert report" (Pl. Opp. at 8), however, they gloss over significant differences between the two documents. Most importantly, the *NEJM* article explicitly *rejects* Dr. Dickersin's conclusion that Defendants intentionally deceived the scientific community. Instead of the inflammatory conclusions concerning motive and intent that course throughout Dr. Dickersin's expert report – including her conclusions that Defendants engaged in a "clear and deliberate pattern of reporting bias[]" or displayed a "clear intent to suppress information" (Dickersin Rep. at 52; 33) – the *NEJM* article expressly states that the authors "cannot be certain

---

[7] Plaintiffs allegation that Defendants' disavow any obligation to publish the results of negative trials misses the point. Plaintiffs have offered *no evidence* that nociceptive pain trials were part of any marketing campaign, legal or illegal. As a result, Plaintiffs essentially argue that they can prove the existence and effect of a publication strategy with analysis that includes studies that were not part of that publication strategy.

7

that selective reporting was a decision made by employees of Pfizer and Parke-Davis."[8] This difference highlights the central contention of Pfizer's moving brief: evidence of publication bias is *not* evidence of an intent to deceive. Although Plaintiffs would clearly prefer that the *NEJM* article serve as a kind of clearinghouse for Dr. Dickersin's conclusions here, the differences between the documents instead highlight the highly suspect conclusions in her expert report.

The differences between the *NEJM* article and Dr. Dickersin's expert report are not confined to contradictory conclusions, however. For instance, the *NEJM* article, unlike Dr. Dickersin's expert report, does not consider any internal memoranda or emails.[9] The fact that this evidence – which Plaintiffs repeatedly rely upon to bolster Dr. Dickersin's allegedly empirical analysis[10] – was not included in the analysis Dr. Dickersin performed for the *NEJM* article supports Pfizer's contention that the emails and memoranda are *not* typical of the materials traditionally relied upon in Dr. Dickersin's field of expertise. (*See* Pfizer Mem. at 7.) Indeed, it is incontrovertible that the emails and memoranda cannot constitute "facts or data" of a "type reasonably relied upon by experts in [Dr. Dickersin's] particular field in forming opinions or inferences" if Dr. Dickersin's *actual* academic publications on these very same issues exclude that evidence from consideration. Fed. R. Evid. 703. At a minimum, the distinctions between the expert report and the peer-reviewed article beg the question of whether Dr. Dickersin holds the conclusions she submits to peer-reviewed journals to a higher standard of reliability than the conclusions she has proffered on behalf of Plaintiffs.

---

[8] S. Swaroop Vedula *et al.*, "Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use," 361; 20 *New England Journal of Medicine*, at 1969.

[9] This is true, even though "Pfizer agreed to waive any confidentiality claims concerning documents reviewed as part of [Dr. Dickersin's] expert report. As a result, all of the documents reviewed for this article have had their confidentiality claims waived." *See* Supplemental Appendix to: S. Swaroop Vedula, *et al.*, "Outcome Reporting In Industry-Sponsored Trials of Gabapentin For Off-Label Use," N Engl J Med 2009;361:1963-71.

[10] *See* Pl. Opp. at 4-5.

8

Finally, Plaintiffs claim that Dr. Dickersin's opinions are "shared by her three co-authors" from the *NEJM* article, each of whom "are also experts in the field." (Pl. Opp. at 9.) It should be noted that at least one of those co-authors "receiv[ed] fees from plaintiffs' lawyers" in this litigation. Vedula *et al.*, *supra*, at 1970. It should also be noted that Plaintiffs' attorneys were thanked for "provid[ing] assistance in collating, clarifying and verifying information regarding the trials included in th[e] study." *Id.*

### D.   Dr. Dickersin's Reliance Upon the Emails and Memoranda Renders Her Opinion Inadmissible

Plaintiffs make no effort to explain how these emails and memoranda constitute a reliable foundation for Dr. Dickersin's opinions. As noted above, the extent of Dr. Dickersin's reliance on the emails and memoranda for her conclusions about intent and motive is evidenced by the fact that the *NEJM* article ***does not*** conclude that any purported publication bias resulted from intentional acts of deception by Defendants. In fact, Dr. Dickersin implicitly concedes that, absent the internal emails and memoranda, she could not have reliably concluded that Defendants' actions evidenced any "intent" to manipulate scientific evidence. (Dickersin Dep. at 264:17-25 ("I'm not an expert at discerning the intent of a corporation. But when I read a memo from a person, I can read whether it says they intend to do something or not.").)

Dr. Dickersin's reliance on the emails and memoranda is troubling. First, the emails and memoranda are not items that require an expert's explanation. Second, Dr. Dickersin concedes that she possesses no special expertise beyond that of a lay juror in interpreting the emails and memoranda. (*See* Pfizer Mem. at 7; Dickersin Dep. at 266:4-15.) And third, Plaintiffs offer no legitimate reason why a lay juror could not read the emails and memoranda and understand the ramifications of the actions detailed in them. As a result, any interpretation by Dr. Dickersin of the emails and memoranda means that she is unquestionably – and impermissibly – "repeat[ing] facts or opinions stated by other potential witnesses or in documents produced in discovery." *Rezulin*, 309 F. Supp. 2d at 546.

9

Dr. Dickersin's decision to reach beyond the resources she normally relies upon in her academic work creates significant risk of undue prejudice to Pfizer, and an equal risk that her testimony will unduly confuse or mislead the jury. Tellingly, Dr. Dickersin makes no effort to distinguish those portions of her report that are the product of her supposedly empirical analysis of the clinical trials from those portions of her report that rely upon the emails and memoranda for their conclusions. By basing her "expert" testimony on evidence more properly considered by the jury, Dr. Dickersin does not merely usurp the jury's role, she impermissibly frames that evidence to fit Plaintiffs' allegations and offers it to the Court in the guise of objective scientific opinion. *See Rezulin*, 309 F. Supp. 2d at 541 ("[E]xperts should not be permitted to 'supplant the role of counsel in making argument at trial and the role of the jury in interpreting the evidence.' Examples of 'expert' testimony that courts have excluded on this basis include . . . views as to the motivations of parties.") (citation omitted).

## CONCLUSION

For the foregoing reasons, and those more fully set forth in their moving memorandum, Defendants respectfully requests this Court grant its motion to exclude the testimony of Dr. Kay Dickersin.

Dated: January 27, 2010                    Respectfully submitted,

                                                                         SKADDEN, ARPS, SLATE, MEAGHER
                                                                          & FLOM LLP

                                                                          By:   /s/ Mark S. Cheffo
                                                                                Mark S. Cheffo

                                                                          Four Times Square
                                                                          New York, NY 10036
                                                                          Tel: (212) 735-3000

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:    /s/ Raoul D. Kennedy
       Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400

-and-

WHEELER TRIGG O'DONNELL LLP

By:    /s/ James E. Hooper
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800

-and-

WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 27, 2010.

/s/ David B. Chaffin
David B. Chaffin

11