# EXHIBIT 1

# Filed Under Seal

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | : MDL Docket No. 1629 : : Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | : : Judge Patti B. Saris |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | : : Magistrate Judge Leo T. Sorokin : |
| | **UNREDACTED VERSION FILED UNDER SEAL** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY
OF MEREDITH ROSENTHAL AND RAYMOND S. HARTMAN**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in support of their Motions in Limine to Exclude the Testimony of Meredith Rosenthal and Raymond S. Hartman.

## ARGUMENT

**I.   Kaiser Has Failed To Meet Its Burden Under *Daubert* To Show That Prof. Rosenthal's Testimony Is Reliable And Admissible**

In its opening memorandum, Pfizer set forth several very specific reasons why Prof. Rosenthal's opinions in this matter do not satisfy the requirements of Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993). Plaintiffs, in their joint response to Pfizer's separate motions directed at the testimony of Prof. Rosenthal and Dr. Hartman, devoted less than a page and a half to Prof. Rosenthal. (Pl. Opp. [2419] at 2-3.)  Plaintiffs failed to respond to a single argument raised by Pfizer, which included, among others:

- Prof. Rosenthal does not purport to measure the impact of alleged *fraudulent* promotion; she only correlates alleged promotional spending with off-label prescriptions. (Def. Mem. [2361] at 3-4, 7-10.)

- Prof. Rosenthal assumed that essentially all off-label prescriptions included in her model would not have been written in the absence of promotion (thereby assuming her conclusion), an assumption that is contradicted by the record in this action. (*Id.* at 4-5.)

- Prof. Rosenthal admits that she can not measure the impact of publications or alleged peer-to-peer marketing and, therefore, her opinions have nothing to do with the enterprise conduct alleged by Kaiser to support its RICO claim. (*Id.* at 12.)

- Contrary to standard econometric theory, Prof. Rosenthal has omitted all non-promotional factors from her regression models. (*Id.* at 16-17.)

- Contrary to standard econometric practice, as well as her own practice outside litigation, Prof. Rosenthal failed to include a time trend in order to account for other potentially causative variables, such as physician and patient experience with a drug, word of mouth communications and "secular trends" such as developments or trends in uses of different types of drugs over time. (*Id.* at 17-19.)

- Prof. Rosenthal's analyses were results driven. She included or excluded variables from her regression analyses based on whether her models were producing results consistent with her pre-conceived assumptions. (*Id.* at 19-20.)

But perhaps most importantly, Prof. Rosenthal did not attempt to develop a model that was in any way specific to Kaiser. (*Id.* at 10-11.) Throughout this litigation, Kaiser's counsel, counsel for the other TPPs and this Court have recognized that Kaiser is not like other TPPs who have appeared in this litigation. Plaintiffs' counsel has repeatedly described Kaiser as "unique." (*Id.*) That being the case, there is absolutely no reason to believe that Prof. Rosenthal's calculations can be reliably extrapolated to Kaiser. Prof. Rosenthal has not offered any opinion that such an extrapolation is appropriate. And Dr. Hartman testified that he believes that Kaiser's drug utilization patterns would *not* be typical of the industry. (1/27/09 Hartman Dep. [2321-3] at 444:18-22.)

Without responding to any of these arguments, Kaiser argues only that this Court has determined that Prof. Rosenthal testimony is admissible. (Pl. Mem. [2419] at 2-3.) However, Plaintiffs cite only a part of this Court's January 8 decision. After the passage quoted by Plaintiffs, the Court went on to hold:

> While Plaintiffs' position has strong intuitive appeal, trial courts have almost uniformly held that in a misrepresentation action involving fraudulent marketing of direct claims to doctors, a plaintiff TPP or class must prove through

> individualized evidence that the misrepresentation caused specific physicians, TPPs, or consumers to rely on the fraud, and cannot rely on aggregate or statistical proof. . . .
>
>      . . . .
>
>      To prevail, a TPP must demonstrate that it relied on a misrepresentation or omission, or provide a reliable methodology to calculate the percentage of the doctors who prescribed Neurontin based on Defendants' alleged fraud. Accordingly, the Coordinated Plaintiffs cannot rely solely on Dr. Rosenthal's report as the silver bullet to establish causation.

*In Re Neurontin Mktg, & Sales Practices Litig.*, ___ F. Supp. 2d ___, 2010 WL 53568, at *9-10 (D. Mass. Jan. 8, 2010).

Significantly, Pfizer's earlier motion for summary judgment was directed at all of the disparate sales and marketing plaintiffs in this action – the proposed Class TPPs, the proposed Class consumer plaintiffs, and all three Coordinated TPPs. Now the focus is on Kaiser's claims and Kaiser has failed utterly to show how Dr. Rosenthal's model has anything to do with it. Not only does the record indicate that Kaiser's drug utilization patterns differ substantially from the industry, Dr. Rosenthal's causation analysis does not purport to measure the direct impact theory alleged by Kaiser at all. She did not attempt to measure causation based upon the theory asserted by Kaiser; that is, that it would have made different formulary decisions. She did not account for formulary placement at all. (Rosenthal Dep. [2318-3] at 991:12-17.)

Plaintiffs assert that they can rely upon Prof. Rosenthal plus other evidence. (Pl. Mem. [2419] at 2.) The problem is that there is no way to put the different pieces together. Kaiser asserts that, after its DUAT initiative, Neurontin utilization went down by 34 percent. But Prof. Rosenthal does not consider that statistic at all and she certainly did not perform any kind of causation analysis for it. It is not known how that number disaggregates between indications, what drugs were prescribed instead of Neurontin, what cost savings, if any, were experienced by Kaiser as a result, whether physicians switched back to gabapentin once generic was available (suggesting other drugs were not, in fact, more effective for the patients), and what other factors might have accounted for the reduction (such as pressure from Kaiser on physicians to reduce

3

costs).  It is simply impossible for Kaiser to put the pieces together because they did not obtain Kaiser-specific opinions from either Dr. Rosenthal or Dr. Hartman and did not provide them with the data to render such opinions.[1]

Finally, Plaintiffs place too much emphasis on Prof. Rosenthal's Exhibit 1A.  It is important to understand what Exhibit 1A is and is not.  First, it is not a chart of promotional spending versus prescriptions.  The promotion line represents a calculation of "promotion stock" by Prof. Rosenthal so that each point on the line represents that quarter's spend plus every prior quarter's spend depreciated by a factor selected by Prof. Rosenthal.  (Rosenthal Report, Attachment F at 3.)  Below is Prof. Rosenthal's Exhibit E1 with a dotted line added reflecting the actual promotional spend (according to Prof. Rosenthal's data).  The dotted line comes from Professor Rosenthal's Attachment D3.[2]

---

[1] As discussed in Pfizer's opening brief, Dr. Hartman was provided aggregate Neurontin numbers from Kaiser, but otherwise borrows Prof. Rosenthal's industry estimates in order to arrive at his damage estimates for Kaiser.

[2] Pfizer does not concede the accuracy of Prof. Rosenthal's promotional spending data, which comes from IMS data.  However, the charts depicted above utilize the same data source as Dr. Rosenthal, except that they also reflect generic gabapentin prescriptions after 2004.

EXHIBIT 1A



Second, Prof. Rosenthal's Exhibit E1 is not a graphic depiction of the results of Prof. Rosenthal's flawed regression model and, as such, shows neither correlation nor causation. It is simply a chart showing two inputs to Prof. Rosenthal's model. The only reason the lines appear correlated is that Prof. Rosenthal has arbitrarily adjusted the scale of the left and right axes so that one line is superimposed on top of the other. That the scale is arbitrary, rather than driven by any economic principle, is demonstrated by the fact that Prof. Rosenthal uses a different scale on each of her charts in order to achieve the same optical illusion. When the scale is normalized across charts, Prof. Rosenthal's Exhibit E1 looks like this:

5



(12/15/08 Keeley Report [2318-7] ¶54 & Exh. 1A.)

In short, even putting aside the numerous methodological flaws and unsubstantiated assumptions built into Prof. Rosenthal's regression analysis, Exhibit E1 would not demonstrate causation or even correlation. It certainly does not answer the criticisms of Prof. Rosenthal's model. And because it is not based upon data specific to Kaiser or which reflects Kaiser's direct injury theory, it neither proves nor even illustrates anything relevant to Kaiser.

## II. Kaiser Has Failed To Meet Its Burden Under *Daubert* To Show That Dr. Hartman's Testimony Is Reliable And Admissible

### A. Prof. Hartman's Damages Analysis Is Not Based Upon Kaiser Data, But Inappropriately Attempts To Extrapolate From Industry Data Without Any Basis For Doing So

Initially, as noted in Pfizer's opening memorandum, Dr. Hartman's damages calculations

are inherently tied to Prof. Rosenthal's estimates and, therefore, to the extent her testimony is excluded, his must be also.

Second, it is clear that Dr. Hartman did not undertake a Kaiser specific damage analysis and, as discussed above, there is no basis to believe that industry data can be extrapolated to Kaiser. Kaiser feebly attempts to justify Dr. Hartman's use of industry data by arguing that its own drug utilization estimates, which differ dramatically from Dr. Hartman's, are not "representative" of Kaiser's own usage. [3]   However, both Kaiser's internal estimate and Dr. Hartman's estimate is based upon a sample of data. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Plaintiffs' after-the-fact nit-picking of the sampling methodology for their own internal survey does not justify their reliance on an even less representative survey for this litigation. Kaiser's drug utilization survey was conducted prior to its undertaking its Neurontin DUAT initiative and presumably was motivated by a desire to obtain meaningful information about its drug utilization patterns. Kaiser presumably included those ICD-9 codes that were most relevant. Nor is there any support for Kaiser's assertion that its own drug utilization survey significantly underestimates bipolar usage. Had it altered its sampling methodology to include other more specific bipolar ICD-9 codes, it would have had to expand its sampling for the other indications in the same manner. While the absolute counts might have changed, there is no reason to believe

---

[3] Pfizer assumes that the year 2004 in footnote 3 of Kaiser's response is a typo and not an attempt to mislead the Court into believing that its drug utilization estimates took place after its DUAT initiative. The correct year, as testified to by Mr. Carrejo, was 2001. And, because the data is for the last 6 months in 2001 (Carrejo Decl. [2421] ¶ 5), the corresponding percentage from Dr. Hartman's chart is 13.6 percent, almost 3½ times Kaiser's internal estimate.

[4] *See* 3/13/08 Grabowski Report [2318-8] ¶ 45; NDTI Precision Table [2318-10]. Plaintiffs cite the rebuttal declaration of Dr. Conti (whom Pfizer has separately moved to exclude), that NDTI data are routinely relied upon to examine prescribing trends over time. (Pl. Mem. [2419] at 3-4.) Whether this is true of not, it does not change the fact that, given the way they are being used here to disaggregate among different indications, they have by far too large a margin of error to be acceptable in a court of law.

that the percentage would have.

Even more importantly, Kaiser's internal drug utilization survey shows that it has access to data and the ability to determine its own drug utilization patterns. Indeed, at a hearing on September 27, 2006, this Court observed:

> With respect to Kaiser, they should make a good-faith and diligent effort to find out – and I don't know how burdensome it is – what percentage went for diagnoses like bipolar, what went for – not with names, numbers – what Neurontin prescriptions were for bipolar, what were for the various indications.

(9/27/06 Hr'g Tr., at 50:25-51:5)  The Court the had the following exchange with counsel:

> THE COURT: . . . [I]f in fact you don't prescribe Neurontin for bipolar, that's one theory of damages that's out the window for you, and I don't think you should be able to rely on the industrywide data. Whereas it might be fully appropriate for the class if it's something like Aetna with 21 million people. There's a culture, right? People in a medical group may have uniform practices or not. I don't know.
>
> . . . .
>
> THE COURT: . . . [I]t's just in Kaiser, and I don't know if there's another HMO opt-out that's like you, where it might be more acceptable to have the data. So at this point, I think we'll just rely on Kaiser. And you're going to check and put an affidavit in as to what it would take to find out whether there's a computer base that basically correlates – this does not get into patient information – just how many prescriptions were for bipolar as opposed to for epilepsy.
>
> [Coordinating TPP Counsel]: Your Honor, I could tell you we've had those discussions with the appropriate people, and we will submit an affidavit, but that is not in the computerized records.
>
> THE COURT: And also what it would take to do a sampling. I mean, you're going to have that problem coming up on the damage theory anyway if you don't want to rely just on the industrywide data.
>
> [Coordinating TPP Counsel]: I think, your Honor, we'd be happy to rely on the industrywide data, and it will be typical of our experience as well.
>
> THE COURT: Are you going to be attacking it in a Daubert kind of hearing?
>
> [Pfizer's Counsel]: Oh, absolutely we're going to attack it, and we want a statistically valid sample from their data. And what they're saying is, if we successfully challenge it, then, you know, they've lost in effect.
>
> THE COURT: They might lose.

(*Id.* at 55:11-57:2.)  Kaiser made the choice to rely upon industrywide data knowing that it had the ability to conduct drug utilization surveys of its own data, that it has conducted such surveys in the past and that industry data is not typical of its own utilization patterns.  Kaiser chose not to provide its experts with Kaiser-specific data.  That Kaiser sought to avoid the expense that this might entail is insufficient justification to allow them to introduce expert testimony that is completely unreliable because it depends on bad data.

Kaiser cannot excuse its failure to offer expert testimony that is specific to it by relying upon *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) and its progeny.  First, the reliance on industry, rather than Kaiser-specific data, afflicts both Prof. Rosenthal's causation opinion, as well as Dr. Hartman's damages calculation.  *Bigelow* does not apply to causation.  Second, *Bigelow* applies to situations where data is not available for more precise damage calculations.  It does not allow a plaintiff to ignore data specific to it in favor of less reliable data simply because it does not want to incur the expense of doing a proper damage assessment.  Third, *Bigelow* still requires that there be a fair and reasonable basis for damages.  Where, as here, Kaiser insists that it is unique and its expert has testified that he would expect Kaiser's drug utilization to be different than the industry, Kaiser has provided no reasonable basis upon which its experts should be allowed to ignore Kaiser-specific data and extrapolate from industry data.  (Def. Mem. [2361] at 5.)  Finally, as this Court noted, Kaiser must be able to segregate damages "caused by unlawful conduct from damages caused by lawful conduct."  *In re Neurontin*, 2010 WL 53568, at *10.  Kaiser cannot recover for prescriptions that were not caused by the alleged wrongful conduct and its inability to reliably disaggregate is fatal to its claim.

### B.     Dr. Hartman's "But For" Assumptions Are Groundless

Dr. Hartman's testimony must also be excluded based upon his inability to account for amounts that Kaiser would have expended on alternative drugs in the "but for" world.  Plaintiffs argue that as an economist, rather than a pharmacist, Dr. Hartman was not required to conduct

such analysis.[5] But there is both an economic and medical component to this question. Kaiser is correct that it must show that the alternative drugs are as effective and as well tolerated as Neurontin, which is a medical issue. And, as discussed in Defendants' opening memorandum, Kaiser cannot make this showing on an aggregate basis. (Def. Mem. [2363] at 10-11.) Kaiser must also show what physicians *would* have prescribed, which requires an understanding of the prescribing patterns of physicians. Dr. Hartman assumed that Kaiser had surveyed its physicians to arrive at its list, but there is no evidence that this was done. (1/27/09 Hartman Dep. [2321-3] at 436:3-22).[6] For example, while Kaiser relied upon the University of North Carolina's report that identified three anticonvulsants effective in the treatment of bipolar I disorder, *In Re Neurontin*, 2010 WL 53568, at *13, only two of these drugs (carbamazepine and valproic acid) appear on Kaiser's alternative drug list (12/5/08 Millares Decl. ¶ 4, Exhibit 146 to Nussbaum Decl. [1746]) The third, lamotrigine, does not. Why? Because lamotrigine was not available as a generic until 2005. Neither medical nor economic testimony can justify Kaiser's selection of the *cheapest* alternative drugs it can identify without respect to what doctors would have actually prescribed in the "but for" world.

## C.     Dr. Hartman Includes Damages For Entities Not Parties To This Litigation

Kaiser does not dispute the proposition that a parent cannot recover damages sustained by its subsidiaries. Instead, it argues that its subsidiaries were included in the description of the parties in paragraphs 7 through 8 of the Third Amended Coordinated Complaint [583]. But

---

[5] Kaiser continues to cling to its theory that it can recover the entire prescription price. However, the theory that this Court allowed Kaiser to proceed on was the *Desiano* model, which requires Kaiser to show that Pfizer's alleged "'fraud directly caused economic loss to them as purchasers, since they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations.'" *In Re Neurontin*, 2010 WL 53568, at *12 (quoting *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349 (2d Cir. 2003). In any event, for the reasons discussed in Pfizer's opposition to Plaintiffs' motions to exclude Pfizer's efficacy experts, one cannot prove through negative studies that a drug is always ineffective in every patient.

nowhere in the quoted passage does Kaiser indicate that it is bringing the action on behalf of its subsidiaries.  It indicates incorrectly that Kaiser Foundation Health Plan, Inc. has operations in other states, but it only identifies the parent corporation as a party.  Kaiser cannot amend its complaint on the eve of trial by dropping footnotes in its pre-trial filings.

<u>**CONCLUSION**</u>

For all of the forgoing reasons, Pfizer requests that this Court issue an order granting the relief sought in Pfizer's motions.

Dated: January 27, 2010          Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    <u>/s/ Mark S. Cheffo</u>
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    <u>/s/ Raoul D. Kennedy</u>
       Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

-and-

WHEELER TRIGG O'DONNELL LLP

By:    <u>/s/ James E. Hooper</u>
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

-and-

WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and*
*Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 27, 2010.

/s/ David B. Chaffin
David B. Chaffin