UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | : MDL Docket No. 1629 : : : Master File No. 04-10981 : |
| THIS DOCUMENT RELATES TO: | : : : : Judge Patti B. Saris : |
| ALL PRODUCT LIABILITY ACTIONS | : : Magistrate Judge Leo T. Sorokin : |

**DEFENDANTS' OPPOSITION TO PRODUCT LIABILITY PLAINTIFFS' MOTION TO STRIKE THE SUPPLEMENTAL EXPERT REPORT OF ROBERT D. GIBBONS, PH.D., DATED JANUARY 5, 2010**

Defendants Pfizer Inc and Warner-Lambert Company LLC (together, "Pfizer" or "Defendants"), by counsel, respectfully submit this opposition to the Product Liability Plaintiffs' Motion to Strike the Supplemental Expert Report of Robert D. Gibbons, Ph.D., dated January 5, 2010. As more fully set forth below, Dr. Gibbons' January 2010 Supplemental Report added an additional person-time sensitivity analysis to his prior gabapentin study – the very sensitivity analysis that Plaintiffs and their expert Dr. Greenland stood up in court at last year's *Daubert*[1] hearing and criticized Dr. Gibbons for *not* doing. Plaintiffs' counsel were informed last September that Dr. Gibbons was performing this additional analysis. Dr. Gibbons' supplemental report does not change his primary analysis or alter the opinions he will offer in this case

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

regarding gabapentin and suicide. Most importantly, this additional analysis – analysis Dr. Greenland admits he has not done – confirms that Dr. Greenland's criticism of Dr. Gibbons was unfounded. Accordingly, Plaintiffs' motion to strike should be denied in all respects.

## PRELIMINARY STATEMENT

In the course of this litigation Plaintiffs have filed a seemingly endless litany of discovery and evidentiary motions concerning Dr. Gibbons. Many of these have attacked Dr. Gibbons both personally and professionally and sought to impugn his reputation as an esteemed biostatistical researcher on suicide. After a string of unsuccessful discovery motions charging Dr. Gibbons with all manner of unsubstantiated wrongdoing, the *Bulger* plaintiff filed a *Daubert* challenge against Dr. Gibbons. Plaintiff's motion resulted in a two-day evidentiary hearing last July where Dr. Sander Greenland testified for plaintiff. Dr. Gibbons testified defending his analysis. Following the sudden dismissal of *Bulger*, the Court directed the Plaintiffs to renew their *Daubert* challenge to Dr. Gibbons in a cross-cutting motion in the pending product liability cases. On September 10, 2009, Pfizer informed the Court and Plaintiffs' counsel that Dr. Gibbons was submitting his gabapentin paper to a peer review journal and that he had performed "at least one additional sensitivity analysis to the six sensitivity analyses he discussed at the *Daubert* hearing in July." (Exhibit A, 9/10/2009 Email).[2] Pfizer reiterated in its October 23, 2009 Opposition to Plaintiffs' renewed *Daubert* challenge that Dr. Gibbons had undertaken this additional sensitivity analysis, and stating its position that a renewed *Daubert* challenge to Dr. Gibbons was premature at that juncture. (Defs. Opp. To Motion to Exclude [2142]).

---

[2] As the Court may recall, Dr. Gibbons is the only expert in this litigation to subject his general causation opinions to the scrutiny of academic peer review. Dr. Gibbons' draft gabapentin manuscript remains in the peer review process. Despite the fact that Plaintiffs continue to somehow assert that Dr. Gibbons' 11 AED study "was submitted for publication and rejected," (Pls. Mem. [2368] at 2), that article was published in the prestigious Archives of General Psychiatry in December 2009. (Exh. B, Gibbons Article.). Why Plaintiffs' counsel continues to perpetuate the myth this Dr. Gibbons' AED study was "rejected" is difficult to fathom.

2

At the July 2009 *Daubert* hearing, the Court ruled that Dr. Gibbons could testify in *Bulger* with respect to his analysis of the FDA Alert and meta-analysis and his peer-reviewed published study of 11 AEDs in a bipolar cohort.[3] At the hearing, the Court questioned whether the absence of the person-time sensitivity analysis in the gabapentin study, which was done for the published 11 AED study but not included in Dr. Gibbons' March 19, 2009 report (which did include a number of other sensitivity analyses), rendered the gabapentin study unreliable.

Following the *Daubert* hearing, Dr. Gibbons undertook the additional sensitivity analysis that Plaintiffs' counsel and Dr. Greenland criticized him for not having previously performed with respect to the gabapentin study. Simply put, Dr. Gibbons prepared his January 2010 Supplemental Report to respond to Dr. Greenland's criticisms and in order to determine if those criticisms had any merit. This additional person-time sensitivity analysis now makes clear that Dr. Greenland's criticisms of the gabapentin study are unsupported by the data Dr. Gibbons reviewed – data that Dr. Greenland and Plaintiffs' counsel had in their possession long before they raised this criticism in the first place. One should really step back and ask why Plaintiffs' counsel and Dr. Greenland failed to do this analysis before publicly criticizing Dr. Gibbons' work. Remarkably, at the *Daubert* hearing, Dr. Greenland acknowledged that he *could* have

---

[3] Plaintiffs' counsel's attempt to blatantly re-write the record, claiming the Court has limited Dr. Gibbons "to critiquing the FDA Alert," (Pls. Mem. at 4), is also demonstrably untrue. Indeed, in their renewed *Daubert* motion filed on October 9, 2009, Plaintiffs then acknowledged that "[i]n hearings on July 21 and 23 and August 28, 2009, the Court indicated that it would permit Dr. Gibbons to testify regarding his opinions of the FDA Study and Statistical Analysis of eleven anti-epileptic drugs (including gabapentin, the generic Neurontin), and those in his peer-review paper submitted for publication by Dr. Gibbons regarding those eleven drugs and bipolar disorder. Accordingly, this Motion . . . [is] more generally directed to the March 19, 2009 supplemental report on the gabapentin study . . . ." (Plaintiffs' Motion to Exclude Dr. Robert Gibbons [2121] at 2). At the end of the *Daubert* hearing, the Court indicated that, in addition to his critique of the FDA Alert, Dr. Gibbons' opinions as set forth in the published 11 AED Study were also admissible, noting that "the defendants have met their burden of reliability with respect to the bipolar study. It's been admitted in a peer review. Both experts agree the methodology is sound. Both experts agree that the database is sound, and both experts agree that there were appropriate sensitivity analyses with the exception that Professor Greenland said it would have been better if he had looked at a direct correlation between when the person committed suicide and the amount of time on the drug." (Exh. C. 7/23/09 *Daubert* Hr'g Tr. at 65:8-16).

3

done the person-time analysis he criticized Dr. Gibbons for failing to perform, but that "I didn't have the time. That's a very time-intensive piece of work . . . . And it takes a lot of time to do that, and *I would have refused. I don't have the time to do that.*" (Exh. D., 7/21/09 *Daubert* Hr'g Tr. at 90:5-12). Plaintiffs now seek to preclude Dr. Gibbons from doing the analysis they, and their expert, refused to do.[4] Ultimately, Dr. Greenland speculated that this person-time sensitivity analysis would make Dr. Gibbons' opinion more reliable. Dr. Gibbons has now done that analysis and shown that Dr. Greenland's critique was unfounded.

## ARGUMENT

Federal Rule of Civil Procedure 26(e)(2) provides that a party has a duty to supplement "information included in [an expert's] report and to information given during the expert's deposition." The only time limitation set forth under Rule 26(e)(2) is that "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Dr. Gibbons' January 5, 2010 Supplemental Report was served before the parties' pretrial disclosure deadline in *Shearer v. Pfizer, Inc.*, No. 1:07-cv-11428 (D. Mass, filed August 3, 2007), the next product liability case now scheduled for trial. Furthermore, in early September 2009, counsel for Pfizer informed the Court and Plaintiffs that Dr. Gibbons had performed an additional sensitivity analysis with respect to his gabapentin study.

Plaintiffs' counsel once again seek to rehash the entire history of Dr. Gibbons' involvement in this litigation. They again raise issues regarding the timing of earlier reports and expert disclosures that the Court has repeatedly made clear it has no interest in revisiting. Pfizer will focus on Dr. Gibbons' gabapentin-specific study and the criticisms raised at the *Daubert*

---

[4] At the *Daubert* hearing, the Court recognized, with respect to the sensitivity analysis Dr. Gibbons had not previously done for the gabapentin study: "At the end of the day, this might help Pfizer or hurt Pfizer. You can't know whether that assumption, if done in person-hours, actually ends up being the same as with the bipolar or ends up being differently." (Exh. C, 7/23/09 *Daubert* Hr'g Tr. at 6:16-19).

hearing – criticisms that Dr. Gibbons has now put to rest with the additional sensitivity analysis set forth in his January 2010 Supplemental Report.

## I.     Dr. Gibbons' Gabapentin Study and Dr. Greenland's Criticism

In his March 19, 2009, Supplemental Expert Report, Dr. Gibbons included a series of sensitivity analysis with respect to his gabapentin cohort study. (Exh. C, 7/23/09 *Daubert* Hr'g Tr. at 6:5-12). As Dr. Gibbons explained at the *Daubert* hearing, a sensitivity analysis is simply a means of "to test the robustness of the findings of the overall analysis" of a study. (Exh. C, 7/23/09 *Daubert* Hr'g Tr. at 24:22-25). It is not the primary analysis. Although Dr. Gibbons performed a number of sensitivity analyses for the gabapentin study, he did not perform a person-time sensitivity analysis because he did not think it was necessary based on the design of that particular study. (Exh. C., 7/23/09 *Daubert* Hr'g Tr. at 36:16-37:18, 51:10-52:23).

In his May 31, 2009, Expert Report (Exh. E, 5/31/2009 Greenland Expert Report), Dr. Greenland offered a scathing critique of Dr. Gibbons' work. Among other things, Dr. Greenland charged that Dr. Gibbons "engage[s] in deceptive rhetoric (often couched in statistical jargon), and includes a number of claims that are false when interpreted in any manner reasonably consistent with common and scientific usage." (*Id.* at 1). Dr. Greenland concludes that Dr. Gibbons' analyses are "unreliable and invalid for scientific analysis, and are instead advocacy tracts for gabapentin." (*Id.*) Dr. Greenland dedicated an entire section of his expert report to Dr. Gibbons' failure to conduct a person-time sensitivity analysis. (*Id.* at 11-15.) At the time, Dr. Greenland alleged that, without this analysis, "we still cannot see whether the suicide attempts occurred when patients were on or off gabapentin," and "we are left with complete uncertainty." (*Id.* at 14).

At the *Daubert* hearing, Dr. Greenland was much more circumspect in his criticisms, acknowledging that Dr. Gibbons "did a sensitivity analysis that went as far as, I suppose, he

5

thought he could with the data he had," but offered his personal opinion that "one could do more." (Exh. D, 7/21/09 *Daubert* Hr'g Tr. at 56:18-25). Dr. Greenland further opined that "I would have liked to have seen him do that [sensitivity analysis] to address my concerns more in depth," and vaguely alleged that the failure to do the additional person-time sensitivity analysis made Dr. Gibbons' report "less reliable." (Exh. D, 7/21/09 *Daubert* Hr'g Tr. at 57:15-16, 88:25-89:7).

## II.    Dr. Gibbons' Additional Person-Time Sensitivity Analysis

Dr. Gibbons' January 2010 Supplemental Report sets forth four new paragraphs (¶¶ 22-25) explaining the sensitivity analysis he did for the AED study and the additional sensitivity analysis he has now performed for the gabapentin cohort. Dr. Gibbons states that "[a] similar analysis to that described [in the 11 AED study] has now been performed on the previously described gabapentin cohort" and that this additional person-time analysis "revealed a significant overall effect of gabapentin use on suicide attempts . . . indicating reduced risk of suicide attempts while patients are receiving treatment with gabapentin" (Gibbons Supp. Rep. [2367-2] at ¶ 23). Dr. Gibbons goes on to explain that, in those patients who took only gabapentin (and no other AED, lithium, antidepressant or antipsychotic) there were only six suicide attempts, and *"[a]ll 6 of those suicide attempts were off drug (6/42240) and none occurred during months in which a prescription for gabapentin was filed (0/14539)."* (*Id.*) (emphasis added). Dr. Gibbons concludes that:

> The results of this sensitivity analysis clearly reveal that Dr. Greenland's previous objections regarding how I defined exposure time in my analysis of the gabapentin cohort was without force. Had he conducted even the simplest analysis of the 6 suicide attempts made in those patients who only took gabapentin using the data that have been in his possession since November of 2008, he would have realized that his criticism of my analysis was invalid. The suicide attempts were not clustered during the time patents had actually filled a

6

> prescription for gabapentin. Just the opposite, in the purest monotherapy group, there were no suicide attempts during the time patients had actually filled a prescription for gabapentin. In all other analyses, the rate of suicide attempts were lower when patients filled prescriptions for gabapentin relative to those months in which they did not.

(*Id.* at ¶ 24). The final paragraph of Dr. Gibbons' January 10, 2009, Supplemental Report merely reiterates verbatim his prior opinion in this case, namely, that "that there is no increased risk of suicidal thinking and behavior for gabapentin overall, and if anything, protective effects for psychiatric patients who are at increased suicidal risk." (*Id.* at 16.) In other words, nothing in the January 2010 report changes or adds to Dr. Gibbons' opinions, nor does it add any new arguments or theories of general causation.[5]

Tellingly, none of the cases cited by Plaintiffs stands for the proposition that a supplemental expert report which only supplements – and does not add an entirely new argument to – an expert opinion merits exclusion. As numerous courts have noted, both the duty to supplement expert reports, and this Court's inherent power to exclude the testimony of those who do not honor that duty, are aimed at avoiding "'the heavy burden placed on a cross-examiner confronted by an opponent's expert whose testimony had just been revealed for the first time in open court.'" *Licciardi v. TIG Ins. Group*, 140 F.3d 357, 363 (1st Cir. 1998) quoting *Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 7 (1st Cir. 1985). That burden is not at issue here.

The cases relied on by Plaintiffs are no different. In *DuFresne v. Microsoft Corp.*, No. 02-11778, 2006 U.S. Dist. LEXIS 57423 (D. Mass. Apr. 28, 2006), the district court excluded a supplemental report from the plaintiff's expert because the report marked "the first time [he]

---

[5] At the final pretrial conference held in *Bulger* on July 20, 2009, the Court commented, with respect to Dr. Gibbons' March 2009 Supplemental Report that "it looked when I was reading it as if all he did was – it wasn't new as much as a sensitivity analysis." (Exh. F, 7/20/09 *Daubert* Hr'g Tr. at 48:4-8).

assert[ed] that Defendants' products infringe the patent-in-suit under the doctrine of equivalents." *Id.* at 20. Likewise, in *Sheek v. Asia Badger*, 235 F.3d 687 (1st Cir. 2000), the First Circuit saw "no reason to disturb" a trial court's decision to exclude portions of an expert's report where he sought to offer previously undisclosed arguments and theories ***at trial***. *Id.* at 694.[6] Contrary to Plaintiffs' representations, the decision to exclude expert testimony, in whole or in part, is neither "ordinary" nor "mandatory." For instance, even in *Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188 (1st Cir. 2006), which Plaintiffs cite in arguing that exclusion of Dr. Gibbons' expert report is "mandated," the First Circuit overturned and remanded for reconsideration the district court's exclusion of expert testimony. See *id.* at 198.

In summary, Plaintiffs have not shown any dilatory behavior, nor have they made any showing of harm or prejudice with respect to trial preparation for *Shearer* or any other cases. Only when criticisms regarding the absence of this person-time sensitivity analysis were publicly raised by Plaintiffs and Dr. Greenland did Dr. Gibbons feel the need to defend his work and perform the sensitivity analysis at issue. Dr. Greenland freely acknowledges that he would have refused to do this analysis even if asked by Plaintiffs' counsel. Apparently he was never asked to do so. Dr. Gibbons, on the other hand, should be applauded for taking Dr. Greenland's criticism head on and addressing it, letting the chips fall where they may. As Judge Sorokin has previously recognized in these cases, "the scientific understanding of Neurontin continues to

---

[6] Even more attenuated is *Lubanski v. Coleco Industries Inc.*, 929 F.2d 42 (1st Cir. 1991), where the court excluded ***physical*** rebuttal evidence that was not disclosed before trial. There, the First Circuit merely refused to overrule the trial court's exclusion because "'[t]he determination of what constitutes proper rebuttal evidence [lies] within the sound discretion of the [district court].'" *Id.* at 47 (second and third alterations in original) (quoting *Hickock v. G.D. Searle & Co.*, 496 F.2d 444, 447 (10th Cir. 1974)).

develop." (10/14/09 Order [2125] at 3). Dr. Gibbons has the right to conduct additional research to defend himself against Dr. Greenland's unfounded criticisms.

## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that Plaintiffs' Motion to Strike the Supplemental Expert Report of Robert D. Gibbons, Ph.D., dated January 5, 2010, be denied.

Dated:  January 28, 2010                     Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:   /s/ Mark S. Cheffo
      Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000


        -and-
WHITE AND WILLIAMS LLP

By:   /s/ David B. Chaffin
      David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 28, 2010.

                                      /s/ David B. Chaffin
                                      David B. Chaffin