# EXHIBIT C

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4    IN RE:                                    )
                                                ) CA No. 04-10981-PBS
 5    NEURONTIN MARKETING, SALES PRACTICES,)    Pages 1 - 72
      AND PRODUCTS LIABILITY LITIGATION       )
 6
 7
 8
 9
                       DAUBERT HEARING - DAY TWO
10
                 BEFORE THE HONORABLE PATTI B. SARIS
11                   UNITED STATES DISTRICT JUDGE
12
13
14
15                                  United States District Court
                                    1 Courthouse Way, Courtroom 19
16                                  Boston, Massachusetts
                                    July 23, 2009, 9:10 a.m.
17
18
19
20
21
22              LEE A. MARZILLI
              OFFICIAL COURT REPORTER
23           United States District Court
             1 Courthouse Way, Room 7200
24              Boston, MA  02210
                 (617)345-6787
25
```

Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
       ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4  and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
6  FOR THE DEFENDANTS:
7      DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
   100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
8
       MARK S. CHEFFO, ESQ. and STEVE NAPOLITANO, ESQ.,
9  Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
   Square, New York, New York, 10036.
10
       RICHARD M. BARNES, ESQ., Goodell DeVries, Leech & Dann,
11 LLP, One South Street, 20th Floor, Baltimore, Maryland,
   21202.
12
   ALSO PRESENT: Chuck Vaughn, Trial Graphix.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
   WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
3
4  Robert Gibbons
5    BY MR. BARNES:     5
     BY MR. ALTMAN:           38
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              PROCEEDINGS
2      THE CLERK: In Re: Neurontin Marketing, Sales
3  Practices, and Products Liability Litigation, Civil Action
4  No. 04-10981, will now be heard before this Court. Will
5  counsel please identify themselves for the record.
6      MR. FINKELSTEIN: Andrew Finkelstein, Finkelstein
7  & Partners. Good morning.
8      MR. FROMSON: Kenneth Fromson. Good morning,
9  Judge.
10     MR. ALTMAN: Keith Altman. Good morning, your
11 Honor.
12     MR. CHEFFO: Mark Cheffo from Skadden Arps, your
13 Honor. Good morning.
14     MR. NAPOLITANO: Steve Napolitano from Skadden
15 Arps for Pfizer. Good morning.
16     MR. BARNES: Rick Barnes from Goodell DeVries,
17 your Honor.
18     THE COURT: There's a slight problem here. How am
19 I going to see the witness?
20     MR. BARNES: He's going to be up in front of
21 the -- I can put him anywhere you want, your Honor.
22     THE COURT: Yes, he's got to be on the witness
23 stand. It's just too awkward otherwise.
24     MR. BARNES: Well, I want him to actually spend
25 time just drawing --

Page 5

1      THE COURT: I know, but then they can't see. It's
2  a ridiculous location.
3      (Discussion off the record.)
4              ROBERT GIBBONS
5  having been first duly sworn, was examined and testified as
6  follows:
7      THE COURT: I don't want to go through his
8  credentials.
9      MR. BARNES: I understand that.
10     THE CLERK: Would you please state your name and
11 spell it for the record.
12     THE WITNESS: Robert Gibbons, G-i-b-b-o-n-s.
13 DIRECT EXAMINATION BY MR. BARNES:
14 Q. Good morning. Dr. Gibbons, you are here today in
15 response to a Daubert motion. Do you understand that?
16 A. I do.
17 Q. First, I'd like to start, you have a small binder in
18 front of you that I've placed in front of you. Exhibit A is
19 the November 2008 report in the Bulger case, correct?
20 A. Correct.
21 Q. And Exhibit B is a copy of your March 19, 2009
22 supplemental report?
23 A. Correct.
24 Q. Doctor, would you tell us what changed between your
25 March 2009 report and the report that was served back in

Page 6

1  November.
2  A. There were a series of additional sensitivity
3  analyses --
4       (Discussion off the record.)
5  Q. Okay, Doctor, my question is, quite briefly, what
6  changed between your November report and the March report?
7  Just briefly advise the Judge.
8  A. Briefly, there were a series of additional sensitivity
9  analyses that were conducted and reported on here.
10 Q. Did your March 2009 supplemental report change in any
11 way the opinions you expressed in your November report?
12 A. No, they did not.
13 Q. Doctor, there has been some references in the trial
14 that there was a May report that you filed. Did you file a
15 May report, supplemental report in this case?
16 A. I believe there -- I believe there was a May report
17 that --
18 Q. Did you file a report in May after your March report, a
19 litigation report?
20 A. I don't recall. I --
21 Q. The record will reflect it. That's fine.
22       THE COURT: So let me understand. There was a May
23 report, but as I understand it, it was the previous May. Is
24 that right?
25       MR. BARNES: Yes, it's the previous May.

Page 7

1       THE COURT: It was the previous May. So when
2  people are referring to a May report, it wasn't subsequent
3  to this March 2009 report, is that right?
4       MR. BARNES: That is correct.
5       THE COURT: But there is a new article that was
6  disclosed in around the May 2009 time frame, right?
7       MR. BARNES: After it was accepted for
8  publication, it was disclosed right after it was accepted
9  for publication.
10      THE COURT: Right. So what's in play today is a
11 November 2008 report, a March 2009 supplemental report, and
12 an article that was accepted for publication somewhere in
13 the vicinity of April and May of 2009?
14      MR. BARNES: Correct, your Honor. That's the
15 chronology.
16      THE COURT: Right?
17      MR. BARNES: Yes.
18      THE COURT: And so whatever that May 2008 report
19 is is --
20      MR. BARNES: History.
21      THE COURT: History.
22      MR. BARNES: Correct.
23      THE WITNESS: I'm sorry. I misunderstood the
24 question to be May of 2009, and that was what was confusing
25 to me.

Page 8

1       THE COURT: Well, it was confusing to me because
2  people were referring to multiple things and this kept
3  changing. I thought this would just be November of 2008,
4  and the stuff kept coming when I saw it last.
5       MR. BARNES: That I wanted to try and clear it up
6  this morning. Thank you, your Honor. That's what we wanted
7  to do.
8  Q. Doctor, and Exhibit C is the report that was accepted
9  for publication in the Archives of General Psychiatry as
10 Exhibit C to your notebook?
11 A. Yes, it is.
12 Q. Okay. Doctor, I want to talk to you briefly about the
13 conduct of the study of eleven antiepileptic drugs in a
14 bipolar population. What hypothesis were you testing in
15 that study which ended up being published in the Archives of
16 General Psychiatry?
17 A. I was testing the hypothesis that the eleven
18 antiepileptic drugs were associated with increases in the
19 risk of suicide attempts in patients with the highest risk
20 of those suicide attempts; namely, bipolar depressed
21 patients.
22 Q. Did you also look at gabapentin separately in the
23 course of this work?
24 A. Yes, I did. There was an additional cohort of 131,000
25 patients that were treated with gabapentin that had one year

Page 9

1  prior to and one year post-initiation of treatment, and I
2  looked at that as well.
3  Q. Doctor, there's been some confusion as to the
4  differences between your published paper and the reports
5  that were submitted in March and November. So I want you to
6  come forward briefly. I want you to explain to the Court
7  the studies and the design of the studies, what you did.
8  And Mr. Napolitano will help you move the boards to a place
9  where everyone in the courtroom can have access to it, if
10 you would please step down.
11      THE WITNESS: I conducted these two studies to
12 better understand the implications of the FDA alert and the
13 meta-analyses that were conducted by the FDA. The first
14 cohort I looked at were defined in terms of an index episode
15 of bipolar depression. There were 47,000 patients, a little
16 more, that had an episode of bipolar depression that had one
17 year prior to the episode and one year after the episode
18 where they had continuous enrollment in one of the managed
19 care plans that is contained in the PHARMetrics database.
20 So these patients were continuously enrolled.
21      Once they had their bipolar depression episode,
22 there was a period of time in which they may have not had
23 treatment.
24      THE COURT: When you say treatment, you're just
25 referring to taking Neurontin?

Page 22

1  disorder, there was evidence again of statistically
2  significant protective effects, significant decreases in the
3  post period relative to the pre period.
4       So what we're starting to see is a coherence of
5  findings across these different studies showing that in the
6  psychiatric populations, where people are at increased risk
7  of suicide attempt relative to the general population, that
8  risk decreases with treatment with antiepileptic drugs in
9  general, and gabapentin in particular.
10      And in those nonpsychiatric cohorts, there doesn't
11 appear to be any kind of harmful effect. The rates before
12 and after initiation of treatment are identical.
13      MR. BARNES: Slide 2 gives the figures, your
14 Honor. I think we have it up.
15 Q. Would you just review with the Court the statistics on
16 bipolar and major depressive disorder and other psych.
17 A. Okay, so overall there was no increased risk in the
18 total population. When broken down by the psychiatric
19 indications or the individual indications, we found that
20 there were statistically significant decreases in the risk
21 associated with bipolar disorder after initiation of
22 gabapentin relative to before, similar to the effect that we
23 found in the bipolar cohort.
24      THE COURT: Did you do all the same sensitivity
25 analyses for the gabapentin study as the bipolar?

Page 23

1       THE WITNESS: I did six sensitivity analyses for
2  the bipolar cohort and six sensitivity analyses for the
3  gabapentin. Some were the same and a couple were different
4  because these are different kinds of cohorts.
5       THE COURT: You were criticized apparently when
6  you first submitted the paper for not doing some things, and
7  then you did it, and then they accepted the paper. Whatever
8  you were criticized for, did you do that with the gabapentin
9  study?
10      THE WITNESS: No, I did not because you can't do
11 it in the gabapentin study. So in this study --
12      THE COURT: Have you ever submitted the gabapentin
13 study for peer review?
14      THE WITNESS: No, I haven't done that. The
15 gabapentin study I did for the purpose of this litigation,
16 so I have not submitted it for a publication. I'd like to
17 down the road, but I didn't feel that it was appropriate to
18 do so while this was the focus of an ongoing litigation.
19 Q. Explain to the Court and everyone the -- I think --
20      THE COURT: Yes, I want to understand.
21      MR. BARNES: Let me help you with that.
22      THE COURT: I want to understand. I was told
23 yesterday that some of the sensitivity analyses that you did
24 for bipolar were not done for gabapentin.
25      MR. BARNES: Can I focus this for you?

Page 24

1       THE COURT: Yes.
2  Q. We had a lot of discussion with Dr. Greenland about the
3  person-time analysis, which is a sensitivity analysis which
4  tests the robustness of the results you reached in November.
5  You did three sensitivity analyses. The one that seemed to
6  have the most interest was the person-time analysis which
7  you did in the bipolar AED paper, did not do in the
8  gabapentin paper. Can you explain to the Judge why you
9  decided it was not necessary to do it in the gabapentin
10 paper?
11 A. So let me explain the motivation for doing that
12 analysis. First of all, in my analysis, when you define a
13 cohort in terms of a diagnosis, the natural course of the
14 disease is associated with decreases in suicide attempt
15 rates over time.
16 Q. Is that the regression to the mean?
17 A. Some people describe that an regression towards the
18 mean; some people describe it as the natural course of the
19 disorder.
20 Q. Briefly define a sensitivity analysis to make sure we
21 understand what it is.
22 A. Okay, a sensitivity analysis is an alternate change in
23 the model specification or in the definition of the cohort
24 to test the robustness of the findings of the overall
25 analysis. So this sensitivity analysis addressed three

Page 25

1  issues: One, it addressed the issue of whether or not the
2  same results would be obtained if we counted multiple
3  suicide attempts within individuals, or just said we're
4  going to create a binary variable: You either didn't make a
5  suicide attempt or you made one or more suicide attempts.
6  Q. Is that multiple counting?
7  A. That would be multiple counting. So this analysis
8  tests whether or not multiple counting is a factor.
9  Q. So that's the five suicide attempts on the same
10 patient? You tested that?
11 A. That would be an example of that. Yes, I did.
12      The second piece of the person-time analysis
13 adjusts for the natural decrease over time or the regression
14 towards the mean effects because it builds in a person-time
15 function. It builds in a monthly change in the overall rate
16 and allows that rate to either increase or decrease in the
17 population. And then once it's adjusted for that, it then
18 compares what's left over in terms of whether or not it's
19 related to taking an antiepileptic drug or not.
20      And then the final piece of this is that it
21 addresses the question raised by Dr. Greenland of whether or
22 not -- how I defined exposure. So in my overall analysis, I
23 defined exposure by the initiation of taking an antiepileptic
24 drug; and then, to be conservative, I attributed every
25 suicide attempt that was made following the initiation of an

Page 34

1  really strong inferences about that.
2          That's a very different thing than creating a
3  patchwork quilt out of lots of much smaller randomized
4  controlled trials that were not designed to look at
5  suicidality and did not prospectively measure suicidality.
6  So that's one type of observational information. Is it not
7  important? Of course it's important.
8  Q. Explain the difference between the meta-analysis and --
9          THE COURT: But you can't say that the FDA is
10 wrong with this PHARMetrics study in the sense you're
11 comparing different apples and oranges as a sense of -- I
12 understand you have your separate lamotrigine/Topiramate
13 argument. Fair game, all right.
14         THE WITNESS: It's a whole different thing.
15         THE COURT: All right, you know, we've been there
16 done that. But this is just another piece of the puzzle.
17 It's looking at different things, different database,
18 different symptoms. Right?
19         THE WITNESS: That's both true and -- let me
20 expand on that. I'm not saying that the FDA got this all
21 wrong. The FDA identified a hint of a signal, which they
22 interpreted in terms of --
23 Q. Based on eleven antiepileptic drugs?
24 A. Based on eleven antiepileptic drugs as a whole, which
25 they said, you know, "We think there's a signal here." The

Page 35

1  signal is about suicidal thoughts. It's dominated by
2  suicidal thoughts. It really has very little to do with
3  suicidal attempts. There were only 38 of them. You can't
4  learn too much about that. It has no information really
5  about suicide completions -- there were only four of
6  those -- and it has very little information about the
7  subject of this case, the drug Neurontin. The drug
8  Neurontin, there were --
9          THE COURT: No, I understand, you have your
10 separate criticism.
11         THE WITNESS: And I'm not even criticizing. So it
12 suggests an association. Well, if there is this
13 association --
14 Q. Between what?
15 A. Between taking an antiepileptic drug and suicidality of
16 some form, if we move up the food chain and we look at a
17 harder suicidality event -- namely, a suicide attempt that
18 was of sufficient severity to be recorded in a medical
19 claims database, meaning that probably the person ended up
20 in an emergency room or had some contact with the medical
21 establishment -- and we look in an enriched population who
22 are at the highest risk of suicidality -- namely, bipolar
23 patients who are at a hundred times greater risk of the end
24 point that we really care about, which is completed
25 suicide -- and we see that there are 670 or more suicide

Page 36

1  attempts in this database, if the FDA meta-analysis is
2  telling us that there really is a signal there, we should
3  see a lot more suicide attempts associated with the exposure
4  to these eleven antiepileptic drugs relative to those people
5  who did not get exposed to those eleven antiepileptic drugs.
6  And we should see that the rate after you start the drug
7  goes up relative to the rate before. And when we then focus
8  on gabapentin, for which the FDA meta-analysis has very
9  little information, we should see that once you start taking
10 gabapentin, that the rate should increase significantly, and
11 in fact none of those things happened.
12         So these analyses help us understand the
13 relationship between antiepileptic drugs in general and
14 suicidality, and gabapentin in particular and suicidality,
15 that is hinted at by the FDA meta-analysis.
16         THE COURT: Another criticism was that you didn't
17 correlate when someone tried to commit suicide with whether
18 they were actually on gabapentin at that moment or on an
19 AED. Is that right?
20         THE WITNESS: That was a criticism, but I
21 absolutely did that.
22         THE COURT: I just want to understand.
23         THE WITNESS: The person-time analysis is looking
24 at those months that a person was on an antiepileptic drug
25 and comparing them to those months where the person was not

Page 37

1  on an antiepileptic drug.
2          THE COURT: So it did correlate with, if you had
3  the suicide attempt, whether you were on or off the
4  gabapentin?
5          THE WITNESS: That's correct.
6          THE COURT: Excuse me, the AED. But you did not
7  do that in the gabapentin?
8          THE WITNESS: I did not do that analysis.
9          THE COURT: I just want to understand the baby
10 steps.
11         THE WITNESS: Absolutely. And the important thing
12 is that when I did do that analysis, the protective effects
13 of antiepileptic drug therapy increased; they didn't
14 decrease. And that's because I'm no longer attributing the
15 suicide attempts that occurred after a person was taking the
16 antiepileptic drug to the antiepileptic drug. It
17 demonstrates the conservative nature of the analysis that I
18 performed.
19         THE COURT: All right, you need to wrap up because
20 I need to give him a cross. I need to be out at 11:00.
21         MR. BARNES: Yes, your Honor.
22 Q. One last question, Dr. Gibbons. In your opinion, to a
23 reasonable degree of scientific certainty, do you have an
24 opinion that the methodology you employed in the gabapentin
25 study is valid and reliable and reflects the methodology

### Page 50

1  attempts for any of these patients in any of your
2  calculations?
3  A. I'm not sure I understand your question.
4  Q. Well, if we agree that a person didn't actually attempt
5  suicide on five consecutive days --
6  A. Sir, you and I do not agree on --
7  Q. Okay, but if the person didn't attempt suicide on five
8  consecutive days, you did another analysis where you only
9  counted one suicide attempt no matter how many they had,
10 correct?
11 A. I did one analysis that used the medical claim record
12 that stated the number of suicide attempts that that patient
13 had made, and another sensitivity analysis that said, well,
14 what would happen if we simply say a person had made either
15 no suicide attempt or one or more suicide attempts, to see
16 whether or not the effect of multiple counting had any
17 effect on the inferences that are drawn from that analysis.
18 Q. But you never used the actual number of suicide
19 attempts per person, correct?
20 A. Sir, I don't know what the actual number of suicide
21 attempts are. I don't know if every other day was a real
22 suicide attempt and the middle days were not real or that
23 every single one of them. It's not beyond the realm of
24 possibility that in a few obscure cases, somebody made a
25 suicide attempt every day.

### Page 51

1  Q. And you would agree that your results are completely
2  dependent on numbers of suicide attempts, correct?
3  A. I disagree with that. My results and my sensitivity
4  analysis clearly show that looking at the numbers of suicide
5  attempts versus the binary decision of whether or not a
6  person made a suicide attempt or not give a virtually
7  identical result. So in fact my conclusions are invariant
8  to the question of whether or not those multiple suicide
9  attempts are real or not.
10 Q. I just have a couple more questions, Dr. Gibbons. You
11 said you did your sensitivity analysis when you adjusted for
12 the person-time issue, correct?
13 A. I'm not following your question.
14 Q. We talked about the person-time issue where somebody
15 was on or off the drug, and you said you did a sensitivity
16 analysis to calculate that, correct, to look at that issue,
17 correct?
18 A. I did a person-time analysis, yes.
19 Q. When you did that analysis, you stopped when a person
20 had their first suicide, correct?
21 A. That's correct. That's the way that analysis works.
22 Q. They could have had more suicides after that, correct?
23 A. That is true.
24 Q. And when you did that for gabapentin, those results
25 were no longer significant, correct, statistically

### Page 52

1  significant, correct?
2  A. I'm not following -- when I did that for gabapentin? I
3  did that for the overall cohort.
4  Q. You also did it for the gabapentin group as well,
5  didn't you?
6  A. Not to my knowledge. I don't know what you're
7  referring to.
8  Q. Okay, Dr. Gibbons, I'm holding in my hand the output
9  that you provided to us of your analysis, SuperMix? That's
10 what I think you used to do this, correct?
11 A. That's correct.
12      THE COURT: What's SuperMix?
13      THE WITNESS: SuperMix is a statistical software
14 package that does this kind of analysis.
15 Q. Okay. And on the last page you provided the results of
16 your SuperMix calculation, correct?
17 A. I'm not really sure what you're referring to, and that
18 doesn't seem -- that analysis does not ring a bell. The
19 analyses are -- I'm not sure what that -- I'm not sure what
20 that actually is.
21      The gabapentin, there weren't really enough
22 patients in the bipolar cohort to do a meaningful
23 person-time analysis for gabapentin alone.
24 Q. Do you see here, this is your printout, it says --
25      THE COURT: Sometimes if you fold it over.

### Page 53

1  Everyone has that problem. It's good to get in practice for
2  next week.
3  Q. Do you see right here, it says "PHARMetrics AED data,
4  gabapentin only"?
5      MR. BARNES: May I have a copy of it? Again, I've
6  never seen this one before.
7      MR. ALTMAN: This I do have a copy of.
8      THE COURT: This is what's not going to happen
9  next week because everyone's going to show up with a pile of
10 documents in the morning, and we're going to go through in
11 the order, and if it's not in that pile, you don't get to
12 use it.
13     MR. BARNES: Can the witness look at the entire
14 document?
15     THE COURT: Sure. You can stand and look over his
16 shoulder. This is really informal. This is a Daubert
17 hearing, it's fine.
18     (Witness examining document.)
19 A. This appears to be one of the analyses that looked
20 at -- appears to be an analysis of looking at gabapentin by
21 itself, adjusting for concomitant medications, prior suicide
22 attempts. It looks to be like a logistic regression
23 analysis. This isn't something that I've described in my
24 report or relied upon in my opinion.
25     THE COURT: What does it show?

Page 62

1  he put sugar in it, and it's got pie crust. The other
2  problem, though, is, he went into his spice cabinet. He's
3  got a bunch of spices that don't have labels. He doesn't
4  know what's in the pie. That's the problem. He's making
5  the conclusion that this is going to taste like pie.
6      THE COURT: How could I possibly exclude the
7  bipolar study?
8      MR. ALTMAN: Because he says it merely suggests a
9  possibility.
10     THE COURT: He's going to have to say that on the
11 stand, but how could I -- that it's possible that it's
12 protective, but it is not showing an increased risk.
13     MR. ALTMAN: It's not reliable if it suggests a
14 possibility, but I think he should also have to -- if your
15 Honor is going to let it in, I think he should also have to
16 put some of these limitations in.
17     THE COURT: Well, sure, you can cross on that.
18 I'm allowing in the bipolar study.
19     Now, let's get to the one I'm more concerned
20 about, which is the gabapentin.
21     MR. ALTMAN: Well, the gabapentin --
22     THE COURT: Listen, I thought that -- I never met
23 Professor Greenland. He was totally credible. He's such an
24 academic. He could be Hollywood cast for an academic, okay?
25 He's totally believable. He's a lovely man, but he hedged

Page 63

1  everything he said. So, I mean, if I can say this, that
2  Professor Gibbons is a far more polished witness. Now, he's
3  certainly got a bias. He's been paid for by Pfizer, so I
4  have some greater level of concern about the gabapentin
5  paper than I do the bipolar paper because it is generated
6  for litigation. And I've got serious concerns about the
7  issue of not measuring -- of assuming patient exposure
8  years.
9      So that is what I am thinking about, okay, not --
10 it sort of hasn't panned out, the whole issue of which
11 medications he called in for. He says he did. You said he
12 didn't. Maybe he missed Xanax, but he got Haldol. You
13 know, that goes to the weight of it, not its admissibility.
14     My only concern, let me just say as I'm sitting
15 through it all, that using that database is standard in the
16 industry; using the methodology of before and after on the
17 database is standard in the industry. The issue is -- you
18 know, I'm being rushed to do this within a week by both
19 sides. They put stuff forward late. You raised a Daubert
20 motion two weeks ago. This is not the way it ideally should
21 happen, but I'm dealing with the deck of cards I've been
22 handed, all right?
23     So my big concern is, based on my knowledge of
24 case and my knowledge of Neurontin and the entire record, is
25 whether or not measuring that sensitivity analysis that was

Page 64

1  required for the paper in the gabapentin study undermines
2  its reliability. That is my concern, so I can just tee it
3  right up. I need you to bring this home, not apple pies. I
4  want to understand: Did Mr. Greenland really say, if you
5  looked at the doctrine of completeness, that he agreed with
6  the full methodology of the gabapentin study?
7      MR. ALTMAN: No, I don't believe --
8      THE COURT: I would like to see a transcript of
9  that deposition before I make a ruling because my
10 instinct -- this is where I'm leaning towards -- is, when
11 you do the opening statements on Monday, you can refer to
12 the bipolar study if you do so with the limitations that
13 Dr. Gibbons himself put on it. It's possible protective,
14 possible. It's got to refer to the fact that this is a
15 different study from the FDA, but why he -- you have expert
16 testimony that makes you think that the FDA study isn't
17 reliable. And I don't want you mentioning, not mentioning
18 the gabapentin study until I get to see a full deposition
19 transcript because I've got huge concerns about not doing
20 the same thing for the both studies. Maybe he didn't have
21 time. I have serious problems with assuming that if you
22 have a prescription for 30 days, you had it for a year.
23     MR. BARNES: Your Honor, we have a half an hour.
24 We could have Dr. --
25     THE COURT: No, we're not. This is over. I am

Page 65

1  out of here. Now, I want to see the deposition transcript,
2  and then I'll make my final ruling.
3      MR. BARNES: I probably did not cover this issue
4  because it was covered in the hearing on the methodology.
5      THE COURT: I'm not reopening this transcript.
6  This is what I've got. It's over. I want to read the
7  deposition transcript. Right now it's a direct order. In
8  opening statements, I am finding that the defendants have
9  met their burden of reliability with respect to the bipolar
10 study. It's been admitted in a peer review. Both experts
11 agree the methodology is sound. Both experts agree that the
12 database is sound, and both experts agree that there were
13 appropriate sensitivity analyses, with the exception that
14 Professor Greenland said it would have been better if he had
15 looked at a direct correlation between when the person
16 committed suicide and the amount of time on the drug. He
17 says he did it. I can't resolve that right here, and that's
18 a ground for cross-examination.
19     You cannot mention the bigger study, if you will,
20 on the entire gabapentin cohort at this point because I have
21 not made a final ruling. And at this point I am profoundly
22 worried about the core assumption here, which is that if you
23 were prescribed it once, you were on it for a year. And I
24 want to see because I am worried about that last quote from
25 Dr. Greenland which basically looked as if he said he had no