# EXHIBIT D

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4   IN RE:                                  )
                                             ) CA No. 04-10981-PBS
 5   NEURONTIN MARKETING, SALES PRACTICES,)   Pages 1 - 124
     AND PRODUCTS LIABILITY LITIGATION      )
 6

 7

 8

 9           FINAL PRETRIAL CONFERENCE - DAY TWO
                            AND
10                     DAUBERT HEARING

11          BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
12

13

14

15
                              United States District Court
16                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts
17                            July 21, 2009, 9:15 a.m.

18

19

20

21

22
                         LEE A. MARZILLI
23                    OFFICIAL COURT REPORTER
                   United States District Court
24                 1 Courthouse Way, Room 7200
                        Boston, MA  02210
25                       (617) 345-6787
```

Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
      ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4  and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
6  FOR THE DEFENDANTS:
7     DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
      100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
8
      MARK S. CHEFFO, ESQ. and STEVE NAPOLITANO, ESQ.,
9  Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
   Square, New York, New York, 10036.
10
      RICHARD M. BARNES, ESQ. and WARREN HONG, ESQ.,
11 Goodell DeVries, Leech & Dann, LLP, One South Street,
   20th Floor, Baltimore, Maryland, 21202.
12
   ALSO PRESENT: Chuck Vaughn, Trial Graphics.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
3  WITNESS           DIRECT  CROSS  REDIRECT  RECROSS
4
   Sander Greenland
5
      BY MR. ALTMAN:    42
6     BY MR. BARNES:         72
7
8
...
25

Page 4

1              PROCEEDINGS
2     THE CLERK: In Re: Neurontin Marketing, Sales
3  Practices, and Products Liability Litigation, Civil Action
4  No. 04-10981, will now be heard before this Court. Will
5  counsel please identify themselves for the record.
6     MR. FINKELSTEIN: Andrew Finkelstein, Finkelstein
7  & Partners, on behalf of Dr. Egilman. Judge, Dr. Egilman
8  happens to be here today, so I just wanted to introduce you.
9  Yesterday you said you hadn't seen him.
10    MR. FROMSON: Good morning, Judge. Kenneth
11 Fromson, Finkelstein & Partners.
12    MR. ALTMAN: Good morning, your Honor. Keith
13 Altman, Finkelstein & Partners.
14    MR. CHEFFO: Your Honor, Mark Cheffo, Skadden
15 Arps.
16    MR. NAPOLITANO: Good morning, your Honor. Steve
17 Napolitano from Skadden Arps.
18    MR. BARNES: Rick Barnes from Goodell DeVries in
19 Baltimore.
20    MR. CHAFFIN: Good morning, your Honor. David
21 Chaffin for Pfizer.
22    THE COURT: The two of you are the hard workers?
23    MR. HONG: Warren Hong from Goodell DeVries in
24 Baltimore.
25    MR. VAUGHN: Charles Vaughn from Trial Graphics.

Page 5

1     THE COURT: Thank you. So today we're going to
2  begin the hearing on the statistics, and I reject the
3  plaintiffs' proposed jury questionnaire as well as
4  defendants'. I'm thinking of a question that looks
5  essentially like this: "This case involves suicide. Would
6  this topic cause you so much stress and discomfort that you
7  would be unable to listen to the evidence or be fair?" I'm
8  going to basically give people an out. If they say "yes,"
9  they don't sit on the jury. So I'm not going to ask people
10 if they ever thought about suicide. It's a little
11 intrusive. And I'll ask people orally some of these other
12 questions, which is, for example, ever taken Neurontin, and
13 some of these other, whether anyone close to you ever tried
14 to commit suicide, et cetera? So then you can see who they
15 are and use peremptories, if you choose to, but I'm not
16 going to ask people to expose their innermost thoughts and
17 medical conditions.
18    So let's just get on to the Daubert hearing.
19    MR. ALTMAN: Good morning, your Honor. Today we
20 are here in an attempt to strike the testimony of Dr. Robert
21 Gibbons under Daubert, Joyner, and progeny and Rule 702. Is
22 your screen on, your Honor?
23    THE COURT: Yes.
24    MR. ALTMAN: And Rule 702. Rule 702 governs the
25 testimony of experts, and in order for testimony to be

Page 54

1   THE WITNESS: Yes.
2   THE COURT: But since you as well as other experts
3   actually use this database, that's always a limitation in
4   using this database, right?
5   THE WITNESS: Yes.
6   THE COURT: All right, so since everybody uses
7   this database, as I understand it, for some studies, when
8   you use the database, how do you account for that
9   limitation, which is, you can't know if someone actually
10  took their prescription?
11  THE WITNESS: First of all, you recognize that
12  limitation in the discussion and try to take account of it
13  as part of your uncertainty about what the actual effects of
14  the drug are. In a randomized trial, when you have a
15  placebo-controlled trial, you use what they were assigned to
16  take, and that's called a "intent-to-treat analysis." So
17  you say what you're analyzing is intention to treat because
18  even in a randomized trial, you can't be sure what they were
19  taking when they went home. But in an observational study
20  like this, you also can't be sure. And unlike in a
21  randomized trial, even the intention to treat has not been
22  randomly assigned. It's been given on the basis of --
23  THE COURT: I understand. The FDA did the gold
24  standard, right?
25  THE WITNESS: What's that?

Page 55

1   THE COURT: The FDA study is the gold standard,
2   right, because it has a placebo as the comparison, right?
3   THE WITNESS: Yes.
4   THE COURT: This isn't the gold standard?
5   THE WITNESS: Right.
6   THE COURT: Everyone in the field knows that,
7   right?
8   THE WITNESS: Yes.
9   THE COURT: But still people use it?
10  THE WITNESS: Yes.
11  THE COURT: So there are going to be certain
12  limitations every time someone uses this database?
13  THE WITNESS: Yes.
14  THE COURT: So you've used it, Gibbons uses it.
15  So is there ways in which he has not tested for those
16  limitations? In other words, when you use it, the same
17  problem arises for you.
18  THE WITNESS: Yes. I would -- well, in using
19  databases like this, a procedure that my colleagues and I
20  have used is to compare -- is to do a more -- it's a more
21  involved comparison, taking the comparisons of the
22  post-prescription rates of whatever it is, in this case
23  suicide attempts, to the pre-prescription rates, taking that
24  ratio for each drug, and then comparing the ratios across
25  the drugs. So it's taking a ratio of ratios instead of

Page 56

1   taking simply the ratios and using them directly as he did.
2   So you could say it's a more involved, we'd like to think a
3   more sophisticated way of trying to approach these data to
4   try and account for the fact that some of these limitations
5   are present.
6   Now, another important factor is to try and do an
7   analysis that's based on actual real exposure time or closer
8   to it, our best estimate of it, as opposed to simply calling
9   the time after a prescription "exposure time."
10  THE COURT: So that is a concern. As I
11  understand, one of your big criticisms is that once you
12  prescribe Neurontin, the presumption is that the patient
13  took it for a year, right?
14  THE WITNESS: Right.
15  THE COURT: But, now, the other side claims, well,
16  he did a sensitivity analysis to account for that. Did he
17  adequately do it?
18  THE WITNESS: He did a sensitivity analysis that
19  went as far as, I suppose, he thought he could with what he
20  had, but one could do more. And one of the things he just
21  didn't do apparently, according to the -- let me turn to my
22  report where I quote where he says he didn't get around to
23  it, "and I would have liked to have seen to it."
24  Q.  I'm sorry, I believe that's Page 14 you're referring
25  to.

Page 57

1   THE COURT: Of what?
2   MR. ALTMAN: Oh, I'm sorry. It's his expert
3   report, which should be Tab No. 4, Dr. Greenland's May 31
4   report.
5   THE WITNESS: Yes, the part where in Page 14 of my
6   report of May 31 of 2009, Mr. Altman asks, "Did you run any
7   analyses for the gabapentin studies to look at whether a
8   person was on or off the drug at the time of the attempt?"
9   Dr. Gibbons replies "No." Mr. Altman asks, "Why not?"
10  Dr. Gibbons replies, "Didn't get around to it." Mr. Altman
11  replies, "So I think it's safe to say you don't know what
12  effect that has on these numbers if you would have looked at
13  it that way, correct?" And Dr. Gibbons says, "That's
14  correct."
15  So I would have liked to have seen him do that to
16  address my concerns in more depth.
17  THE COURT: So do you view that as creating such a
18  fundamental flaw that the conclusions are unreliable?
19  THE WITNESS: It's one of the contributors. There
20  are other things in my report I list, but there are many
21  things like this.
22  THE COURT: You list a gazillion things, so --
23  THE WITNESS: True.
24  THE COURT: Let me put it this way: My job isn't
25  to say whether there are some different ways different

Page 86

1  clinical trials, which you describe at Page 2 of your May 31
2  report, correct?
3  A.  Correct.
4  Q.  There is all sorts of issues in taking a randomized
5  controlled trial, in your view, and applying it generally to
6  other populations, correct?
7  A.  Correct.
8  Q.  And there's all sorts of ascertainment biases, correct,
9  in clinical trials?
10  A.  There can be.
11  Q.  Sure.  And in fact, if you take a meta-analysis of
12  these limited clinical trials, you compound the issues, in
13  your view, correct?
14  A.  No.
15  Q.  Well, you've written extensively about issues and the
16  abuses and uses of meta-analyses, correct?
17  A.  Yes.  I mean, you don't have to compound the problems.
18  You can do a meta-analysis carefully and not compound the
19  problems.
20  Q.  But it's prone to that in your writings?
21  A.  It has happened.  People do that.
22  Q.  Sure.  Let me move on from that.  Let me go back to
23  this issue here.  So Dr. Gibbons has accounted for the
24  on-and-off issue on his paper.  In his report, Dr. Gibbons
25  makes --

Page 87

1        THE COURT:  Well, does he in his paper, in his
2  report?
3        MR. BARNES:  No.  We're going to go to the report
4  now, okay.
5        THE COURT:  All right.
6  Q.  Now, Dr. Greenland, we're on the report now.
7  Dr. Gibbons made a judgment that the issue of this person
8  time analysis he would not adjust for in the same manner in
9  which he did with the AED study, correct?
10  A.  I don't recall.
11  Q.  Okay.  Well, I think I will help you.  In your report
12  you talk about it being different, okay?  And so I guess my
13  point to you, sir, is that your counsel had PHARMetrics data
14  since November, and whether or not this accounting for the
15  person time analysis made a material difference, you did not
16  yourself test this question, did you?
17  A.  Correct.
18  Q.  And you have the competence and technical expertise to
19  have taken the data from the PHARMetrics database --
20        THE COURT:  You have to do baby steps now.  So
21  Gibbons did not do the person time analysis, sensitivity
22  analysis for his report?
23        MR. BARNES:  Not the one that he used in the
24  bipolar, yes.  It's a different study.  He did not do that.
25        THE COURT:  The gabapentin one that goes across

Page 88

1  all indications?
2        MR. BARNES:  Correct.
3        THE COURT:  So there was not the sensitivity
4  analysis done?
5        MR. BARNES:  Not the person time logistic
6  regression analysis.  He made a choice not to do that, which
7  he'll explain to you on Thursday.
8        THE COURT:  And this person time logistic
9  regression analysis is the one that was required by the
10  peer-review journal, is that right?
11        MR. BARNES:  I don't know.  I think it came from a
12  suggestion from a colleague at Harvard.
13        THE COURT:  Do you know?
14        THE WITNESS:  I don't recall.
15        THE COURT:  In your view, is it critical to do
16  this person time logistic regression analysis?
17        THE WITNESS:  I think it helps.  I mean, the paper
18  looks better to me than the expert report.  That's the way I
19  put it.
20        THE COURT:  You know, it's not -- you know, you've
21  got to see where I'm coming from.  It's not just a question
22  of "looks better."  I have this gatekeeper role.  I just
23  want to know, is it junk science if you don't do it?
24        THE WITNESS:  Right.  Well --
25        THE COURT:  I mean, just putting it as bluntly as

Page 89

1  you can, is it unreliable if you don't do it?
2        THE WITNESS:  It reduces -- see, for me, it's a
3  matter, and this is where I always get into trouble with the
4  court to say, look, I operate on matters of degrees.  I
5  don't know the law, but I can only say there's matters of
6  degrees.  It's less reliable if you don't do it, less
7  reliable.
8        THE COURT:  I don't care about less reliable
9  because that you can all fight about in court.  Is it
10  unreliable if you don't do it?
11        THE WITNESS:  It's unreliable anyway.  To draw a
12  causal conclusion, regardless of what he did -- I don't care
13  if he, you know, looked at chicken end trails or whatever he
14  did, it's unreliable to draw a causal conclusion from it,
15  causal or protective, in other words.
16        THE COURT:  By which you mean, protective it's
17  unreliable?
18        THE WITNESS:  Yes, that's unreliable no matter
19  what he did.  There's nothing I could do that could make it
20  reliable.
21        MR. BARNES:  I don't want to interrupt, your
22  Honor.  I'm sorry.
23  Q.  My point to you, Dr. Greenland, is that you've raised
24  an issue.  Counsel has data on the PHARMetrics data that's
25  been given to him in November, and whether or not in the

## Page 90

1  gabapentin study, this theoretical issue that you've raised
2  could have been tested by yourself to see if it made a
3  difference in that gabapentin cohort, correct?
4  A.  Yes.
5  Q.  And you did not take the time to test whether
6  Dr. Gibbons' judgment as of necessity for a person time
7  analysis meaningfully changed the results?
8  A.  I didn't have the time. That's a very time-intensive
9  piece of work, as can be witnessed by the size of the
10 invoices that Dr. Gibbons submitted. And it takes a lot of
11 time to do that, and I would have refused. I don't have the
12 time to do that.
13 Q.  Okay, let's go to -- you make another claim at page --
14 I'll do one more of these criticisms, and you have many
15 criticisms, so I have time for maybe two or three, so let me
16 go to one more. At Page 6, sir, of your expert report from
17 May, you state that there are divergences between
18 Dr. Gibbons' report regarding the conclusiveness of the
19 PHARMetrics data. Remember that?
20 A.  Yes.
21     MR. BARNES: And down on Page 7, it's in that
22 heading, so I'm going to focus you on Page 7, your Honor.
23 And I gave you a binder, and I believe that would be Tab A,
24 if you want to join me.
25 Q.  And on Page 7 you write -- are you on Page 7, sir?

## Page 91

1  A.  Yes.
2     MR. BARNES: Okay, and, your Honor?
3     THE COURT: Yes.
4  Q.  You write that "A suicide attempt can lead to the
5  identification of the psychiatric disorder that in turn
6  leads to treatment. It is not uncommon to find patients who
7  have a suicide attempt --"
8  A.  Excuse me. Where are you, please?
9  Q.  We're on Page 7.
10 A.  7, okay.
11 Q.  And there's your quote there, okay, it starts with --
12 A.  Oh, my quote of Gibbons.
13 Q.  Yes, yes.
14 A.  So this is Gibbons speaking.
15 Q.  He's talking about, "It's not uncommon to find patients
16 who have a suicide attempt diagnosis of depression or
17 bipolar disorder initiate treatment on the same day. While
18 this suicide attempt is not the consequence of initiating
19 treatment, it can inflate the rate of suicide attempts
20 observed prior to the initiation of treatment."
21     What you're saying is that the primary analysis
22 might inflate the number of suicide attempts before the
23 index date and deflate the number after the index date.
24 Okay, is that a fair statement, as I understand your
25 criticism?

## Page 92

1  A.  Yes.
2  Q.  Did you look at Dr. Gibbons' sensitivity analysis that
3  looked at that precise issue to see if it made a difference?
4  A.  Yes.
5  Q.  Where is that found in Dr. Gibbons' supplemental
6  report?
7  A.  I don't know. Can you point me to it?
8  Q.  Well, I think I can. You are aware he looked at that,
9  correct?
10 A.  Yes. He's discussing it right there.
11 Q.  Okay, let me see if we can find it. Why don't we go to
12 Table 2.
13 A.  Wait. Of what?
14 Q.  Of his supplemental report.
15 A.  Which one? Which tab?
16 Q.  It is the tab in your notebook, B.
17 A.  Yes.
18 Q.  Okay, sir? And for your convenience, I have Table 2
19 and for your Honor's convenience up on the screen. All
20 right, have you seen this before?
21 A.  Yes.
22 Q.  Okay. This table talks about "Suicide attempt rates
23 per 100,000 (Sic) person years before and after treatment of
24 gabapentin by diagnosis," correct?
25 A.  Yes.

## Page 93

1  Q.  And I want you to look at the column "Attempts Before,"
2  and I want you to look at the number 456, all right? Are
3  you aware that the number 456 includes the time before up to
4  the date of the prescription under his methodology, correct?
5  A.  Okay.
6  Q.  Okay. So these are 456 suicide attempts before date of
7  the prescription -- I'll say RX for prescription --
8  including date, all right, of prescription, all right? And
9  how many patients were in his study, sir? There's 131,000?
10 A.  Right.
11 Q.  So there are 456 suicide attempts out of 131,000-plus
12 patients in the cohort, correct?
13 A.  Yes.
14 Q.  The primary analysis was done on this number, correct,
15 in Table 2, right?
16 A.  Okay, yes.
17 Q.  All right, let's go to Table 2C. This is the
18 sensitivity analysis, correct, sir?
19 A.  Okay.
20 Q.  And let's read what it is, all right? Table 2 is
21 "Suicide attempt rate per 100,000 person years --"
22     THE COURT: It's 1,000. You keep saying --
23     MR. BARNES: I'm sorry, your Honor. You did take
24 college stat and I didn't, so let's do it again.
25 Q.  "Suicide attempt rate per 1,000 person years before and

24 (Pages 90 to 93)