# EXHIBIT F

```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4    IN RE:                            )
                                        ) CA No. 04-10981-PBS
 5    NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 -
      AND PRODUCTS LIABILITY LITIGATION )
 6

 7

 8

 9              PRETRIAL CONFERENCE (Draft)

10         BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
11

12

13

14
                              United States District Court
15                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts
16                            July 20, 2009, 9:15 a.m.

17

18

19

20

21

22
                     LEE A. MARZILLI
23                OFFICIAL COURT REPORTER
                United States District Court
24              1 Courthouse Way, Room 7200
                    Boston, MA  02210
25                   (617)345-6787
```

## Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
       ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4  and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
       KENNETH S. SOH, ESQ. and DARA GRISBEE HEGAR, ESQ.,
6  The Lanier Law Firm, 126 East 56th Street, 6th Floor,
   New York, New York, 10022.
7
8  FOR THE DEFENDANTS:
9      DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
   100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
10
       KATHRINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
11 Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
   Square, New York, New York, 10036.
12
       WILLIAM S. OHLEMEYER, ESQ., Boies, Schiller & Flexner,
13 575 Lexington Avenue, 7th Floor, New York, New York, 10022.
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1              PROCEEDINGS
2      THE CLERK: In Re: Neurontin Marketing, Sales
3  Practices, and Products Liability Litigation, Civil Action
4  No. 04-10981, will now be heard before this Court. Will
5  counsel please identify themselves for the record.
6      MR. FINKELSTEIN: Good morning, your Honor.
7  Andrew Finkelstein, Finkelstein & Partners, on behalf of
8  Dr. Egilman.
9      MR. FROMSON: Good morning, your Honor. Kenneth
10 Fromson, Finkelstein & Partners.
11     MR. ALTMAN: Good morning, your Honor. Keith
12 Altman, Finkelstein & Partners.
13     MS. ARMSTRONG: Good morning, your Honor.
14 Katherine Armstrong from Skadden Arps.
15     MR. CHEFFO: Good morning, your Honor. Mark
16 Cheffo from Skadden Arps.
17     MR. OHLEMEYER: Good morning, Judge. Bill
18 Ohlemeyer, Boise Schiller.
19     MR. GOODELL: Good morning, your Honor. Charlie
20 Goodell, Goodell DeVries.
21     THE COURT: You're representing?
22     MR. GOODELL: Pfizer.
23     MR. CHEFFO: Good morning, your Honor. Rick
24 Barnes for Pfizer as well, Goodell DeVries in Baltimore.
25     MR. CHAFFIN: Good morning, your Honor. David

## Page 4

1  Chaffin.
2      MR. SOH: Ken Soh for the plaintiffs, your Honor.
3      MS. HEGAR: Dara Hegar, Lanier law firm.
4      THE COURT: Are you all going to be here next
5  week? That's huge. All right.
6      So we start with basics. Next Monday we will be
7  impaneling a jury. The one thing I probably didn't tell you
8  is, to make matters more complicated, I am sitting with the
9  First Circuit by designation for four cases in the morning.
10 And so I'm not sure a hundred percent when that's going to
11 finish, and what I'm thinking of doing is asking the jury
12 clerk to bring in a group of people for a 2:00 o'clock
13 impanelment. That might be just as easy for you all, it's a
14 Monday morning, rather than just having all the jurors
15 sitting downstairs stewing and annoyed until I'm done with
16 the First Circuit. So they will have eaten lunch. We will
17 impanel. I do not expect that it should take longer than
18 three hours, but what it essentially does mean is that you
19 need to block off your afternoon. So that's for starters.
20     The second thing is, I was thinking -- I saw
21 somewhere on the list -- you were possibly on the same page
22 with me -- of ten jurors. Given the fact that we were going
23 into three weeks, I could possibly lose some. So if that's
24 so, it's essentially five peremptories a side. The way I do
25 things, there are no back challenges. So I'll first ask

## Page 5

1  plaintiffs to exercise their challenges, then defendants.
2  We'll strike people. We'll put people in the box for those
3  empty seats. The next time around defendants go first. The
4  defendants will challenge, then plaintiffs will challenge,
5  and so on until you use up your peremptories. But I don't
6  let you go back. In other words, if you've already passed
7  on a juror, you're stuck with the juror.
8      Because it's vacation time, I wanted to play out a
9  procedure for you. One of the things that annoys me no end,
10 but there seems to be no clear solution, is when I get my
11 pool of 50 jurors and half of them say, "I don't want to
12 serve because I'm going on vacation." I was thinking of
13 giving the jury clerk essentially a questionnaire to be
14 filled in under oath so that we don't bring up jurors who
15 have already prepaid vacation plans. I'm thinking about
16 that. The problem is, it's too easy an out for people.
17 It's a three-week trial which would be hard for people
18 anyway. So another way to do it is to simply ask for more
19 people, and then just have everybody who's got a vacation
20 plan come up and swear to me, and then just let them go.
21 Judge Gertner tried a technique which I really liked a lot,
22 which she had them fill it in under oath, a questionnaire
23 downstairs, and basically gave the -- I think brought up the
24 questionnaires, I okayed them so it was a judge's blessing,
25 and then we either sent them to another court or we

Page 46

1  really looking hard to find fault with one or the other so I
2  could rule with that, but actually there's fault on both
3  sides, that I didn't hear about it till two weeks ago and
4  that you kept changing it. So I think it's a pox on both
5  your houses, but it leaves me with a bind in trying to
6  figure out what the right thing to do is.
7      MR. BARNES: One other point to help your Honor:
8  The idea between the report and the published paper, the
9  report is for litigation, and it involves more than simply
10 the issue of what was published in the published paper.
11 Dr. Gibbons' expert report not only talks about the -- that
12 statement about possible --
13     THE COURT: Can I tell you, once it's in a
14 peer-review journal, it has a little blessing, a little
15 slick halo over it, which doesn't mean that it's right or
16 not, but at least it satisfies one big Daubert thing. As
17 soon as it's for litigation only based on stuff that I'm
18 only seeing for the first time, I've got a little question
19 mark, a red flag --
20     MR. BARNES: But, remember, the litigation report
21 goes to all the things he has reviewed, not just the report.
22     THE COURT: I'm warning, I'm warning, that's all.
23 Okay, so I'm not ruling yet. I'm just concerned.
24     You said somewhere that you didn't get discovery
25 on the bipolar.

Page 47

1      MR. ALTMAN: Your Honor, let me just make one
2  comment to answer one of your questions, and then if I can
3  take a couple minutes for the history. I asked Dr. Gibbons
4  in his deposition exactly the question you want to ask, and
5  the question was, "Dr. Gibbons, if an expert were to read
6  your report and paper and conclude that Neurontin is
7  protective of suicide, would that be correct?" And he said
8  "no."
9      THE COURT: I understand, that's a very strong
10 point for you, but my point to you is, I'm not overruling
11 Judge Sorokin's ruling. It's not clearly erroneous. It was
12 done based on failure of discovery. I understand that he
13 did not write an opinion, but, frankly, that was because I
14 said to him, "I need something fast because if you don't
15 allow this or deny it one way or another, I've got to do a
16 Daubert hearing," you know, like, "I've got to get to this,
17 so please don't wait for three weeks because I'm right up
18 against the back of it." I mean, I read the whole thing
19 over Memorial Day weekend. I thought it was more of a
20 discovery matter than it was a substantive matter. I
21 referred it to him. I'm not overturning this, but I do have
22 to get into the weeds.
23     MR. ALTMAN: Your Honor, one of the issues is
24 whether Dr. Gibbons' supplemental report exceeds the scope
25 of the Court's order in the first place, which has never

Page 48

1  been clear. Your Honor said that --
2      THE COURT: I allowed that November report, and so
3  to the extent there's new stuff in the March, that may go
4  beyond it. But it looked when I was reading it as if all he
5  did was -- it wasn't new as much as a sensitivity analysis.
6      MR. ALTMAN: Well, he went and he fixed a bunch of
7  mistakes in his original report, which through a lot of hard
8  work we found. He added a bunch of sensitivity analyses.
9  But one of the very telling things is that --
10     THE COURT: Did you have discovery into the
11 sensitivity analyses?
12     MR. ALTMAN: We did, but after his depositions,
13 we kept going -- we never even knew there was a sensitivity
14 analysis. Dr. Gibbons said, "I turned over everything --"
15     THE COURT: I don't think that they were pure on
16 this. That having been said, at this point I'm not going to
17 resolve this on discovery sanctions. So now I'm in the
18 merits.
19     MR. ALTMAN: That's fine. The one issue that is
20 very clear is, we never got -- Dr. Gibbons' original papers
21 he submitted to the journal was rejected.
22     THE COURT: Right.
23     MR. ALTMAN: And --
24     THE COURT: Did you get that original paper?
25     MR. ALTMAN: We got the original paper way back,

Page 49

1  but at his second deposition -- in the middle of his first
2  deposition he received the rejection. I give them the
3  benefit of the doubt, he didn't know about it. I mean,
4  literally on the first day of his first deposition, he got
5  the rejection letter that day. We didn't know about it, we
6  didn't find out about it. At the second deposition, which
7  took place because we didn't get stuff, he told us he had
8  received a letter that they asked him to revise --
9      THE COURT: You told me all this.
10     MR. ALTMAN: Okay. He then went and changed his
11 paper and revised his paper right after the second
12 deposition, never told us that it had been revised. We
13 didn't even see the version that was ultimately accepted for
14 publication until after his third deposition, when they
15 wouldn't even let us ask him questions about it. He went
16 and he changed his March report, goes and fixes a bunch of
17 errors in his first report. Then he puts a bunch of things
18 about the sensitivity analyses --
19     THE COURT: Did you not get deposition into the
20 sensitivity report?
21     MR. ALTMAN: We did for the sensitivity but not
22 about his final peer-reviewed published paper because he had
23 done it on March the 15th. He had submitted that to the
24 journal on April the 20th. We took his deposition. They
25 got us to agree to certain topics because we didn't even