1

```
         UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS
         MDL Docket No. 1629/Master File No. 04-10981

------------------------------X

IN RE: NEURONTIN MARKETING        MDL Docket No. 1629

SALES PRACTICES, AND PRODUCTS     Master File No.

LIABILITY LITIGATION              04-10981

------------------------------X


    VIDEOTAPED DEPOSITION OF ALBERT CARVER

              New York, New York

                 July 12, 2007









Reported by:
Amy A. Rivera, CSR, RPR
```

42

A. Carver
1
2  Q.  Does Kaiser have a website?
3  A.  Yes, we do.
4  Q.  And how long has Kaiser had this
5  website?
6  A.  For several years. I'm sorry. I
7  don't know the exact year in which the website was
8  launched.
9  Q.  Who creates or decides its content?
10 A.  The content of the website generally
11 is under the health plan leadership.
12 Q.  And how often is the content of the
13 website changed?
14 A.  Not frequently enough. I don't know
15 the schedule of changing the website, but it's
16 been a fairly stable website in terms of the types
17 of content. But I can't tell you the frequency of
18 updating or editing specific components of the
19 website.
20 Q.  Can Kaiser access its old web pages?
21 A.  I'm not sure that I understand that
22 question.
23 Q.  I guess to the extent there was
24 material posted on the website in the past which
25 is no longer visible on the website, does Kaiser

43

A. Carver
1
2  have access to an archive of that sort of
3  information?
4  A.  I believe we would have, yes.
5  Q.  Have responsive documents been
6  produced from the website?
7       MS. NUSSBAUM:  That is a legal
8  question and I don't think that, you know, the
9  witness is a lawyer. If you want to ask him about
10 the document production here, you know, in general
11 he's a 30(b)(6) witness. He is prepared to
12 respond to that.
13 Q.  In response to the defendant's request
14 for production of documents, was the website then
15 passed -- web pages searched?
16 A.  Could I ask a question of
17 clarification? What do you mean by "website"?
18 Q.  You indicated that Kaiser has a
19 website; correct?
20 A.  I did.
21 Q.  And which website were you referring
22 to?
23 A.  I was referring to a website that's a
24 public website, and from your line of questioning,
25 I'm not sure that that's what you were -- I'm now

44

A. Carver
1
2  confused as to what you are meaning by the
3  "website."
4  Q.  In addition to the public website,
5  does Kaiser maintain internal websites?
6  A.  Yes, we do.
7  Q.  So then I guess returning to the
8  question, I guess first were documents that are
9  either currently visible on Kaiser's website or
10 otherwise were previously posted to that website
11 during the relevant period searched in response
12 for -- to the defendant's requests for productions
13 of documents?
14 A.  I believe they were.
15 Q.  What's the basis for that belief?
16 A.  The basis for the belief is that your
17 request for documents and information came to our
18 legal counsel. I believe that --
19      MS. NUSSBAUM:  I would ask you not to
20 give any specific advice or discussion that you
21 had with counsel with respect to their request.
22 Q.  Does anyone at Kaiser have knowledge
23 of whether the public website, including its
24 previously posted content, was searched except
25 information derived from Kaiser's legal counsel?

45

A. Carver
1
2  A.  I do not know whether or not previous
3  versions of publicly-available information on the
4  website were searched or not.
5  Q.  But the currently available website
6  was -- public website was searched?
7       MS. NUSSBAUM:  To the best of your
8  knowledge.
9  A.  To the best of my knowledge, all the
10 information has been provided from all of our
11 current public -- all of our current sources of
12 information.
13 Q.  And that's information you obtained
14 from legal counsel, is that right?
15      MS. NUSSBAUM:  I'm unclear now, when
16 you say that's information that you obtained from
17 your legal counsel, would you rephrase that
18 question?
19      MR. JAMES:  In stating that the public
20 website has been searched, does he have any basis
21 for that belief other than information from legal
22 counsel?
23 Q.  Is there anyone at Kaiser, other than
24 Kaiser's legal counsel, who would know whether
25 information relating to Kaiser's public website

12 (Pages 42 to 45)

```
                                                                  210
 1
 2              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 3           MDL Docket No. 1629/Master File No. 04-10981
 4

 5   ------------------------------X

 6   IN RE: NEURONTIN MARKETING      MDL Docket No. 1629

 7   SALES PRACTICES, AND PRODUCTS   Master File No.

 8   LIABILITY LITIGATION            04-10981

 9   ------------------------------X

10

11       VIDEOTAPED DEPOSITION OF ALBERT L. CARVER

12                  New York, New York

13                   July 13, 2007

14

15

16

17

18

19

20

21   Reported by:
     Amy A. Rivera, CSR, RPR
22

23

24

25
```

```
                                            439
 1              A. Carver
 2        MS. NUSSBAUM:  If you know.
 3     A.   I do not know.
 4     Q.   Is this something that keeps you awake
 5  at night?
 6     A.   It is not.
 7        (Kaiser-22 marked nor identification.)
 8     Q.   Have you had a chance to review this
 9  document?
10     A.   I have.
11     Q.   Is this -- whose website is this?  If
12  you look at the upper right-hand corner --
13        MS. NUSSBAUM:  If you know.
14     A.   I don't know.
15        MS. NUSSBAUM:  Does counsel want to
16  represent where this document came from?
17     A.   I've never seen the document, so I
18  really do not know.
19     Q.   Have you heard of the website
20  kaiserpermanente.org?
21     A.   Yes, I have.
22     Q.   And whose website is that?
23        MS. NUSSBAUM:  If you know.
24     A.   I don't know the legal owner of it.
25     Q.   Do you know who maintains this
```

```
                                            440
 1              A. Carver
 2  website?
 3     A.   I don't.
 4     Q.   Does -- do the plaintiffs have a
 5  separate public website you know which is not
 6  kaiserpermanente.org?
 7     A.   I do not believe so.  Are you talking
 8  about a public website?
 9     Q.   Yes.
10     A.   That's to the public, external?
11     Q.   Exactly.
12     A.   I believe there's just one website.
13     Q.   And it's kaiserper.org?
14     A.   Yes, kp.org.
15     Q.   Do you know if the two are equivalent?
16        MS. NUSSBAUM:  The witness testified
17  he doesn't know what website this is and he didn't
18  know where you got this document, what he's aware
19  of is kp.org.
20     Q.   Are you aware of a site called kp.org,
21  but not a site called kaiserper.org?
22     A.   Yes, from a technical issue I don't
23  know what it's called.
24     Q.   The logo in the upper left-hand corner
25  of this document, is that the logo, the Permanente
```

```
                                            441
 1              A. Carver
 2  Medical Group's logo, or is it a logo associated
 3  with some other Kaiser entity, or you know,
 4  something that you've never seen before?
 5     A.   No, this a logo for Kaiser Permanente,
 6  the umbrella organization.
 7     Q.   So for both the plaintiffs and the
 8  Permanente Medical Group, is that correct?
 9     A.   That's correct.  I cannot tell from
10  this logo that's been used whether or not this is
11  part of the Permanente Medical Group context or
12  not.  But certainly the logo up there belongs to
13  the umbrella, I guess, branding of our
14  organization.
15     Q.   If I were to represent to you that my
16  colleague seated here had printed this document
17  from the worldwide web from this address in the
18  upper right-hand corner, would you have any reason
19  to doubt that?
20     A.   No, I wouldn't.  If you're asserting
21  that, I wouldn't doubt it.
22     Q.   If this were a publicly accessible
23  document at an address called
24  kaiserpermanente.org, would you be concerned about
25  the content of this document?
```

```
                                            442
 1              A. Carver
 2        MS. NUSSBAUM:  Objection.  It calls
 3  for his personal speculation.  As to whether or
 4  not he'd be concerned about the document, I'm not
 5  going to let him answer that.  I don't know what
 6  that means.
 7     Q.   You can answer the question, if you
 8  understand it.
 9        MS. NUSSBAUM:  What does "concern"
10  mean?
11     Q.   If you have a comment as to the
12  meaning of the word concern, you're free to answer
13  the question?
14        MS. NUSSBAUM:  Why don't you define it
15  using of the word concern.  I'm not going to have
16  him answer the question until you articulate a
17  question that can be answered.
18     Q.   Do you understand what the term
19  "concern" means?
20     A.   Could we reask the question, please?
21        MR. JAMES:  Could you read back the
22  question?
23        (Record read.)
24        MS. NUSSBAUM:  I ask you to define the
25  term concern as you're using it --
```

447

A. Carver

1
2  supervise the content of the remainder of the
3  website?
4      A.   I'm sorry, I do not know.
5      Q.   Do you know who does manage the
6  content of the plaintiff's public website?
7          MS. NUSSBAUM: Are you referring to
8  the kp.org website, and you want to know who
9  manages the content of that website, if he knows?
10         MR. JAMES: Yes.
11     A.   There is a manager that's responsible,
12 her name is not coming to my mind at this second,
13 but I'm be happy to provide it to you as soon as
14 it does, or through counsel.  There is a manager
15 of the -- of this particular website.
16     Q.   Would you personally feel compelled to
17 take some action if you learned that Permanente
18 Group's public website was advising visitors that,
19 "People who took Gabapentin for chronic pain said
20 they felt one-third less pain while they were
21 taking Gabapentin"?
22         MS. NUSSBAUM: Objection.  I'm going
23 to ask the witness not to answer that.
24     Q.   You can answer.
25         MS. NUSSBAUM: No, first of all, it's

448

A. Carver

1
2  an unintelligible question.
3          Second of all, it's a question that
4  calls for the witness' personal opinion, which is
5  totally irrelevant in the action.
6          Third, we have not been able to
7  identify whose website this is.
8          Fourth, we have not been able to
9  identify this is a small piece of something, what
10 this is, who it's available to, what its purpose
11 is.  I think that your question is highly
12 misleading and I will not have the witness answer
13 it.  I don't think it's capable of being answered
14 and it would simply be speculation and
15 hypothetical.
16         MR. JAMES: Are you directing the
17 witness not to answer the question?
18         MS. NUSSBAUM: I think that there's
19 not a question that's capable of being answered
20 without speculation, a hypothetical question and
21 having to do with his personal feelings about
22 something which is totally irrelevant in this
23 action.
24     Q.   Do you understand that questions
25 relating to the witness' personal feelings are a

449

A. Carver

1
2  basis for counsel directing the witness not to
3  answer?
4          MS. NUSSBAUM: I didn't say that.  You
5  want to ask a question that's capable of being
6  answered, we will see if that's possible.  You
7  want to identify this document and not give a
8  misleading few pages of something that there's no
9  testimony as to where it comes from or who
10 contained the content or anything else, then I'm
11 happy to address appropriate questions.  The
12 witness has been answering questions now for two
13 full days.
14         MR. JAMES: To be clear, you're not
15 asserting the attorney-client privilege over the
16 response?
17         MS. NUSSBAUM: Excuse me?
18         MR. JAMES: Attorney-client privilege
19 is not in any way implicated by my question, is
20 that correct?
21         MS. NUSSBAUM: I don't even understand
22 your question, so how can I know whether or not it
23 implicates attorney-client privilege?  I have no
24 idea if it's written by attorneys or supervised by
25 attorneys or anything else.  The present question

450

A. Carver

1
2  is not capable of being answered.  Do you want to
3  ask a question that's capable of being answered,
4  you know, he'll attempt to answer it as he's been
5  doing for two full days here.
6      Q.   If you turn to the second page of the
7  document, do you have any familiarity with who
8  Shannon Erstadt is, at the bottom?
9      A.   I'm sorry, I do not.
10     Q.   Actually at this point, flipping over
11 to the third page, do you have any understanding
12 of what the company Healthwise, Incorporated is?
13     A.   I do from personal experience in that
14 Healthwise is in the business of producing general
15 health information.  I was a recipient of the
16 Healthwise -- a document called the Healthwise
17 Handbook at my home a few years ago, and it had
18 information regarding just a number of simple
19 little things regarding medical conditions and
20 their management, so, it was really intended --
21 the document that I received, which actually was a
22 booklet, was intended to be, to assist individual
23 patients or members -manage really minor
24 conditions such as if you have a cough or if you
25 have a sore throat or something of that -- that