UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629  Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:  THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Judge Patti B. Saris  Magistrate Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
EMERGENCY MOTION FOR CONTINUED DEPOSITION OF
NICHOLAS WIEDER AND ADDITIONAL RELIEF**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum of law in support of their Emergency Motion for Continued Deposition of Nicholas Wieder and Additional Relief.

## PRELIMINARY STATEMENT

In opposition to Pfizer's motion for summary judgment, Kaiser offered a declaration from Dr. Nicholas Wieder in which he stated that "[i]n or around September 1999, I recommended removal of all formulary restrictions and guidelines for Neurontin," a recommendation he indicates was accepted by the P&T Committee. (Exh. A, Wieder Decl. ¶ 8.) He further stated: "Had I known at that time that Neurontin was no more effective and did not have a better safety profile than existing, less expensive treatments for reflex sympathetic dystrophy and neuropathic pain, I would not have recommended that the [sic] expansion of the formulary status of Neurontin in 1997 or again in 1999." (*Id.* ¶ 9.)   This Court specifically relied upon Dr. Wieder's declaration in denying Pfizer's motion for summary judgment as to Kaiser. (Mem. & Order [2309] at 8.)

On November 12, 2009, this Court entered a Procedural Order, setting this case for trial on February 22, 2010 and permitting the deposition of any person identified as a witness for the first time in summary judgment papers. (Procedural Order [2172] ¶ 4.)  Pursuant to this Court's order, Pfizer sought the deposition of Dr. Wieder and promptly noticed his deposition for

December 18, 2009.[1]  Kaiser refused to produce Dr. Wieder for deposition, making the wholly untenable argument that Pfizer was not entitled to depose him because Kaiser had not listed him as a trial witness,[2] forcing Pfizer to move to compel Dr. Wieder's deposition.[3]  On December 17, 2009, the Court granted Pfizer's motion as to Dr. Wieder.  (December 17, 2009 docket entry.)

After causing unjustified delay in scheduling of Dr. Wieder's deposition, Kaiser refused to make him available until January 12, 2010, due to a pre-planned vacation.  When Pfizer was finally able to deposed Dr. Wieder, the obstructionist tactics of Kaiser's counsel prevented Pfizer from taking a full and fair deposition of Dr. Wieder.  In particular, counsel for Pfizer sought to question Dr. Wieder regarding websites maintained by Kaiser and on which it provides information to its members about various drugs and medical conditions.

More specifically, Kaiser's website contains information articles written by Healthwise, a not-for-profit organization focused solely on "developing consumer health content to help people make health decisions." (Exhibit G.) In 1999, Kaiser partnered with Healthwise to develop information to educate Kaiser's members about various diseases and conditions and the drugs and other therapies available to treat them.  (Exhibit F.)  As a result of this partnership, Kaiser's website, which purports to provide its members with interactive tools and other resources so that its members can live healthier lives (Exhibit D), contains numerous articles where it recommends the use of anticonvulsants, including Neurontin and gabapentin, for treatment of chronic pain, cancer pain, and other conditions.  (Exhibits C & D.)

For example, if a Kaiser member clicked on the "Drugs and natural medicines" link of the Health and Wellness tab on Kaiser's site, he or she would be taken to a Kaiser Permanente page that reads:  "Look up prescription and nonprescription drugs, vitamins, herbs, and other

---

[1] Exhibit A [2244-2] to Def. Mem. in Support of Emergency M. to Compel Depositions of Kaiser Witnesses [2244].

[2] Exhibit G [2244-8] to Def. Mem. in Support of Emergency M. to Compel Depositions of Kaiser Witnesses [2244].

[3] Def. Emergency M. To Compel Depositions Of Kaiser Witnesses [2243].

dietary supplements, including how to use them, side effects, interactions, and more."
(Exhibit D)   A click on this page takes a Kaiser patient-subscriber to Kaiser's "drug
encyclopedia," where patients can find information on medications.  (*Id.*)  Someone who clicked
on "Pain Originating From a Nerve" under "Conditions: P" in the Drug Encyclopedia would be
taken to a page that reads as follows:

> **Drugs for managing Pain Originating From a Nerve**
> Please click on a drug name to see more information
> - Gabapentin Oral
> - Neurontin Oral

(*Id.*)  These are the ***only*** two drugs listed in Kaiser's Drug Encyclopedia under "Pain Originating
from a Nerve."

But when Pfizer's counsel sought to question Dr. Wieder on these statements made on
Kaiser's website to its members to assist them in making healthcare decisions – statements
wholly inconsistent with the positions taken by Kaiser in this litigation – Kaiser's counsel
refused to allow the witness to even look at Kaiser's website on a computer screen connected to
the internet and instructed him not to answer questions about articles that appeared on Kaiser's
website.  Counsel's motivations in taking the unprecedented and unsupportable step of directing
his client not to even gaze at the Kaiser's publicly available website are as transparent as they are
troubling.  The allegations made by Kaiser to this Court regarding the inefficacy of Neurontin –
allegations that it hopes to repeat in front of a jury far removed from its patient base – are
irreconcilable with the physician-authored articles on its website encouraging Kaiser's 9 million
members to discuss with their physicians the use of Neurontin or gabapentin for the treatment of
various conditions including chronic pain.  In short, Kaiser tells this Court one thing and its
doctors and patients another.[4]  Faced with the prospect of a Kaiser board-certified physician

---

[4] Pfizer has filed this motion under seal in order to comply with the Protective Order in this action.
However, the matters discussed in this motion are plainly not proprietary and there is no legitimate reason
for Kaiser to designate them "Confidential."  Pfizer sought Kaiser's consent to publicly file this motion,
rather than partially under seal, but Kaiser refused.  Its only motive for doing so is to avoid public
scrutiny of the embarrassing testimony given by Dr. Wieder, in which he exposes the contradictions
between Kaiser's statements to its members and its allegations in this lawsuit and accuses Kaiser of
*(cont'd)*

specializing in pain management having to admit that Kaiser is either misleading this Court or misleading its patients, Kaiser's counsel's sought to cut-off this line of questioning.  Indeed, when Pfizer's counsel was finally able to question the witness about a few examples counsel had printed out from Kaiser's website and brought to the deposition, Dr. Wieder testified for over 20 minutes that Kaiser is misleading its members, rather than concede the bogus foundation of Kaiser's litigation claims.

Even more troubling, questioning revealed that Dr. Wieder's declaration in this action, submitted in opposition to Pfizer's motion for summary judgment, was highly misleading in every respect and patently false with respect to one key statement in the declaration (that is, Dr. Wieder's sworn statement that he recommended removal of all restrictions and guidelines for Neurontin.)

The actions of Kaiser's counsel in instructing Dr. Wieder not to answer questions was wholly improper and, as a result, Pfizer should be allowed to resume Dr. Wieder's deposition at Kaiser's cost and in a location convenient for Pfizer's counsel.  In addition, Dr. Wieder's declaration should be stricken.

## ARGUMENT

**I.   Plaintiffs Should Be Ordered To Produce Dr. Wieder For A Continued Deposition To Respond To Questions That He Was Improperly Instructed Not To Answer**

In order to lay the foundation for his questions, Pfizer's counsel accessed the internet during Dr. Wieder's deposition, and asked him to look at Kaiser's website reached by typing in the URL "www.kp.org."  At the first attempt by Pfizer's attorney, Kaiser's counsel objected: "[U]nless there is going to be a be a foundation that you're actually on the internet right now, Mark." (Wieder Dep. at 330:20-21.)[5]  The following exchange then took place:

> Q.    Doctor, you could find this [kp.org] on the internet; right?

---

*(cont'd from previous page)*
misleading its members.  Pfizer has by separate motion sought to unseal this motion.

[5] Excerpts from the rough transcript of Dr. Wieder's deposition are attached as Exhibit B to the Declaration of Mark. S. Cheffo.

[Kaiser's attorney]:   No, he's not going to be doing any demonstrations either.  No, he's not.  The whole thing is a little bit silly.

Q.        Maybe for you.  But Doctor, do you have any reason to believe I'm not on the internet here?

[Kaiser's attorney]:   There's no – Don't answer the question.   Don't answer the question.

Q.        Doctor, do you have any reason –

[Kaiser's attorney]:  Do not answer the question, this line of questioning.

Q.        Under what basis?

[Kaiser's attorney]:  On the basis you're wasting everybody's time at this point.

Q.        Is that an appropriate objection?

[Kaiser's attorney]:  Yes, it is.  At times, there is.  Yes.

Q.        I'm trying to lay a foundation for your – the website, the Kaiser Permanente website and you're stopping me from doing that after you just said there is no foundation?

[Kaiser's attorney]:  I said the whole thing is a little bit silly and ridiculous. Something is either on the web or it's not.  And there's no reason –

(*Id.* at 331:4-332:12.)

Given counsel's refusal to allow the witness to even look at Kaiser's website, Pfizer's counsel asked if Kaiser would stipulate that certain print-outs were authentic pages from Kaiser's website.  Kaiser's counsel refused to stipulate and he refused to allow the witness to answer any foundation questions.

Q.        Are you going to stipulate that those are appropriate documents?

[Kaiser's attorney]:  What do you mean by "appropriate"?

Q.        They are authentic documents?

[Kaiser's attorney]:  He's not an employee of Kaiser Permanente.

Q.        Are you going to stipulate or not?

[Kaiser's attorney]:  To what?  What's the request.

Q.        That those are authentic documents off the website?

[Kaiser's attorney]:  No. . . .   And we're not going to have this witness take his time –

    . . . .

Q.        . . . Would you do this if I ask you to?

[Kaiser's attorney]:  No.  He won't.  He's been instructed by his counsel not to be wasting our time this way.  There are many different ways to deal with something that's very simple between lawyers in terms of figuring out whether something is on the web or not. . . .

(*Id.* at 332:13-333:15)

Counsel for Pfizer again tried to question the witness regarding Kaiser's website, by directing him to the results of a Google search for the words "Kaiser Permanente formulary." Once again, Kaiser's counsel refused to allow him to answer any questions:

Q.        Doctor, do you have -- I've typed in here -- I've typed in here Kaiser Permanente formulary in Google and typed search.  What comes up?

[Kaiser's attorney]:  I instruct you not to answer.

Q.        Do you recognize this page?

[Kaiser's attorney]:  I instruct you not to answer.

Q.        Have up ever seen this page before?

[Kaiser's attorney]:  I instruct you not to answer.  And I don't know what you mean when you're saying "this page."  Are you pointing at some screen, or are you pointing . . . at an exhibit?

Q.        Let's look at it with the video.  The screen.  Doctor, there's a screen that says Https//memberskaiserpermanente, and it goes on.  Have you ever seen that screen before?

[Kaiser's attorney]:  Instruct him not to answer.

    . . . .

Q.        Okay.  Doctor, what does that web -- what does that website say?

    . . . .

[Kaiser's attorney]:  I want to know what the "that" is in the question. You're talking about --

    . . . .

> Q.   No, it's the screen.  I'm pointing to the screen.
>
> [Kaiser's attorney]:  I instruct him not the answer.

(*Id.* at 333:22-336:10.)

Counsel for Pfizer asked the witness how he would access Kaiser's website, was told by Dr. Wieder to type in kp.org, which Pfizer's counsel did.  (*Id.* at 336:12-337:9.)  When the witness was asked simply whether the screen that appeared from this search was "the screen that you usually see when you type that [kp.org] in?" Dr. Wieder was again instructed not to answer. (*Id.* at 337:10-12.)  Pfizer's counsel also asked the witness to log in using his ID and password and to find the articles on the website regarding the use of anticonvulsants for cancer pain and lower back pain.  He was instructed not to do so.  (*Id.* at 339:22-340:1.)

The discomfiture of Kaiser's attorneys is, perhaps, understandable given that Kaiser's website contains numerous statements that directly contradict the allegations being asserted by Kaiser in this lawsuit.  Notwithstanding efforts by counsel for Kaiser to obstruct Pfizer's questioning of the witness, Pfizer's counsel showed Dr. Wieder printouts previously obtained from Kaiser's website where Kaiser recommended the use of anticonvulsants, including Neurontin and gabapentin, for treatment of chronic pain, neuropathic pain and other syndromes. The only way that Dr. Wieder was able to reconcile the statements on the website with the allegations made by Kaiser in this litigation was to characterize the statements on Kaiser's website – ***statements made by Kaiser to its patient-subscribers to help them make decisions about their healthcare*** – as misleading.  For example, when asked about Kaiser's website article recommending the use of anticonvulsants (including Neurontin) for cancer pain, Dr. Wieder gave the following testimony:

> Q.   Let's take them one at a time.  Read the one for cancer pain and tell me if there is anything wrong or inaccurate in it.
>
> A.   There is something misleading about it.
>
>         . . . .
>
> It's, this – it suggests that anticonvulsants are sometimes used generally for cancer pain.  It's like saying using your heels stop a car.

. . . .

Q.     So that's misleading statement on the Kaiser Permanente website?

A.     Well, it's misleading statement by Healthwise, if this is by Healthwise.   I'm assuming it is.   But it's misleading to suggest that anticonvulsants are generally used for cancer pain.

. . . .

Q.     Okay.  In exhibit 17, what if anything else is misleading?

A.     It's misleading to have a list of medications that appear to have equal prominence as if all of them are equal to the other.  It's misleading to suggest that there is something specific about the way anticonvulsants work in regard specifically to cancer pain.  It's misleading to suggest that it is commonly used in the section, "Why It is Used."  It's misleading to use the word "well" in "How Well it Works."  The side effect profile seems relatively accurate.  And the USDA – FDA warning seems accurate.  It's misleading to use the word "drug encyclopedia" when we don't really – we don't – it's a language that's not usually our website language, so it looks like it's something from somewhere else.  I don't know if we have a drug encyclopedia but it's not a term I've used with ours.  It's misleading to put the Tegretol at the top of the list in the beginning examples and at the end say, it's not generally used in cancer pain.  It seems contradictory, and it seems to reflect a lack of care that's taken with this overall.  It's misleading to – well that's enough.  That's enough misleading stuff.

(*Id.* at 345:4-348:17.)

Although Dr. Wieder attempted to distance Kaiser from the statements on Kaiser's website by attributing them to Healthwise, the articles do not appear on Healthwise's website, but Kaiser's.  These are not links to a completely different website; each click takes the reader to another page within Kaiser's website.   Kaiser clearly chose to put the information that Dr. Wieder characterizes as misleading on its website and to provide that information to its patient-subscribers.  Indeed, any Kaiser patient clicking on the "Health & Wellness" tab on the Kaiser website is greeted with the following message: "Live healthy.  Discover information, interactive tools, and other resources to help you live healthier."  (Exhibit D.)  Under the same tab, they are directed to Kaiser's "Health Encyclopedia," where they can "[r]esearch health conditions for information on prevention, treatment options, and more."  (*Id.*)  The physician-authored articles characterized as misleading by Dr. Wieder came from Kaiser's Health

8

Encyclopedia.

Kaiser teamed up with Healthwise in 1999 "to help 8.5 million Kaiser Permanente members make better health decisions." (Exhibit F.)   Announcing their partnership, Kaiser stated: "'The results of our pilot demonstrated that providing Healthwise self-care information increased member satisfaction, improved member access to Kaiser Permanente services and increased member confidence in making medical decisions. . . .   With that kind of success, it made good sense to integrate the Healthwise information into all our member health education initiatives." (*Id.*)  Kaiser Permanente members are provided with the Healthwise handbook, a special edition reviewed by over 300 Kaiser Permanente physicians and staff and customized for Kaiser members. (*Id.*)   A Kaiser member who clicks on the "How this information was developed" link at the end of a Healthwise article is directed to another article on the Kaiser website entitled, "Healthwise helps you make better health decisions." (Exhibit E.)  The article includes stories titled "Patricia used the Healthwise Knowledgebase to save her own life" and "World-class heart doctor Robert Kloner, MD, PhD, is in your corner." (*Id.*)  Kaiser patient-subscribers are told that "Robert Kloner is one of 295 experts who review Healthwise information *for accuracy and currency*.  He helps us help you make better health decisions on heart-related issues." (*Id.*, emphasis added.)  Healthwise reports that its information is:

- **Evidence-based**:  Unifies the best medical science to be used in combination with clinical expertise and patients' personal preferences.

- **Reviewed by experts**:   Ensures high-quality, credible consumer health content.

- **Referenced**:  Identifies gold-standard medical textbooks and journals that are the basis of our content.

- **Up to date**:  Keeps pace with changes in medical science.

(Exhibit G.)  The article on Anticonvulsants for Chronic Pain, for example, was reviewed by no less than five physicians:  the author, two editors, a primary medical reviewer and a specialist medical reviewer. (Exhibit D.)

Notwithstanding Kaiser's representation to its members that the Healthwise articles

published on its website were both accurate and current, and provided to help Kaiser members make better health decisions, Dr. Wieder continued in his deposition to denigrate the information as misleading. For example, when questioned about the Kaiser website article on the use of anticonvulsants (including Neurontin) to treat lower back pain, Dr. Wieder testified:

> Q.    What, if anything is misleading on that exhibit, talking about anticonvulsants and chronic low back pain?

> A.    It's – some of them are similar. It's misleading to suggest that anticonvulsants for chronic low back pain is a standard and common treatment. It's misleading, again, to order the examples in the way they are as if they have equal emphasis. It's misleading to describe a sentence "How It Works" when the topic is titled "Chronic Low Back Pain," but then the description of how it works talks about brain electrical activity. It's just another example of how poorly conceived and lacking they are in any real expectation that this would be used in any kind of significant way. It's misleading that – the comment about persistent low back pain with fewer side effects is – suggests that all anticonvulsants can reduce some persistent low back pain to the advantage of all tricyclics antidepressants with fewer side effects than all anti- – tricyclic antidepressant. Its misleading to use the phrase "How Well It Works" when it doesn't work very well. It may work, but it gives a false sense that it works very well  especially when it – the title of the paragraph is "How Well It Works" and the third sentence says, "This type of medicine is not well-studied as a chronic pain treatment." So that's contradictory. In addition –

> . . . .

> Okay.   The pregabalin can cause swelling in some people including swelling of the face or lips. Really, the thing that bothers most people is the leg swelling, which can be really devastating. And the other thing is that the -- what's misleading is that the citations are from the American Geriatric Society, which presumably is something that discusses chronic low back pain for geriatric patients and it's misleading to put this without identifying that -- at least in the title, that this is primarily based on geriatric patients, and it's misleading that there is no geriatrician in the credits for the reviews when the citation is from the American Geriatric Society. And it's also misleading that there is no pain doctor or physiatrist or anybody who actually predominantly sees low back pain as a primary part of their practice. And it's also misleading to not identify -- well it's okay.   The Healthwise issue is another one -- no one would be reasonably -- would  reasonably think that it wasn't a Kaiser document. It's a little misleading to me. I know when I look at things, I see Healthwise, it seems like a strange name to me. So I know, but a patient wouldn't think that. They would think somehow if – it's an imprimatur of some type, which it's not. So those are the misleading things. And you asked me if there are any half truths, and I would say

if there are there are, that means there's half lies, in which case it's as we say, [garnished] anyway. It's nothing.

(*Id.* at (349:10-352:6.)

Regarding the physician-authored article on Kaiser's website regarding burning mouth,

Dr. Wieder provided the following testimony:

> [A.]   What's misleading is that the title is -- under Healthwise is "National Organization for Rare Disorders, Inc." It sounds as if it's some kind of benevolent society for rare disorders, maybe even NIH related. It has a similar ring to some of the more official government, and my impression is -- I don't know who they are. I don't know if they're a patient support organization or not. It doesn't sound like the ones that I know. So that's a little bit misleading. The other things that are misleading about it. . . . The standard therapies are informative until you get to the medications, because even with Elavil and Klonopin, including Neurontin, those are -- really there is no good study for any of them. And there's no -- it's hard to say any of them would help except for helping people sleep. So it's deceiving in the sense that, you know, it might help do more things than is suggested, although they seem to be clear about that they're designed to reduce pain or the perception of pain. But mostly, really, they're more sedation, and the -- one of the proofs of that is that they all have to be taken at bedtime. And many patients with this disorder have problems at bedtime, and so it's really mostly for sleep and for anxiety.
>
>         . . . .
>
> It's interesting to me also that the − it's − combined with the misleading National Organization for Rare Disorders, Inc., is that when they look in their resources, the National Organization for Rare Disorders is not one of the resources that they use, which means that it's not really a resource, even though it appears to be.

(*Id.* at 355:6-357:9.)

Regarding the article on Kaiser's website about the use of anticonvulsants for hot flashes,

Dr. Wieder testified:

> A.      I can't comment on this in any way other than as just as a patient because I don't treat hot flashes.
>
>         . . . .
>
> . . . But what's misleading about it is that the only name there is Neurontin, and yet how it works is clearly something different. And how it works to improve hot flashes is not fully understood. It's misleading because you could put almost anything in there, you know, how clouds work to improve hot flashes not fully understood. I mean, how anything -- so it's a little misleading. And then, after it

tells you it's not understood and its misleading, then it tells you it may be used to treat it. Well, again, holy water may be used to treat it. Good conversation may be used to -- so it's a little misleading. Anything is treat -- baldness is treatable, you know, it's not curable. . . .

(*Id.* 357:18-358:12.)

He likewise testified that the physician-authored article on Kaiser's website regarding the use of anticonvulsants for chronic pain was misleading:

> [A.]   Next is anticonvulsants for chronic pain. I have all the same misleading statements.
>
> . . . .
>
> . . . It's misleading – the part that's misleading is that chronic pain encompasses any single type of pain that may last for longer than a certain period of time. . . . It's misleading because the title suggests that anticonvulsants can be used for any type of pain of any dura – of any long duration of any type. So from – who knows what it means. It could mean from my shoulder that's been hurting for three months to my headache, to my cancer around my pancreas, to my prostate. I have no idea what "Anticonvulsants For Chronic Pain" means. So it's very misleading. It suggests hey, if you have pain . . . we welcome all comers. . . .
>
> . . . .
>
> I'm sorry. It's misleading – no, I take that back. Oh, and Anne Poinier is here again. She must be quite an expert in many, many areas. I'm saying that sarcastically. But I, again – she's the primary reviewer, and now it makes me – she may very well have a full pain practice of patients with chronic pain, tremors and hot flashes. I don't know. But I just – all of a sudden, I'm seeing her name everywhere. Unless she's very ambitious and wants to be on everything, I would start to think about it. You know, I honestly don't know her at all. I don't even know who she is.

(*Id.* 359:4-361:17.)

Similarly, Dr. Wieder gave the following testimony about the article on Kaiser's website concerning primary orthostatic tremor:

> [A.]   Standard therapies, it's misleading because the way that it's worded suggests that people who haven't responded to anything suddenly respond favorably to gabapentin. I think it would have been  more accurate if they had simply included it in  additional drug therapies, which I think, you know, maybe would have not been accurate or been kind of borderline accurate, but it would have been borderline accurate equally about primidone and about valproic acid and other things. In fact, it helps some people. It doesn't help some. It's odd to me that it was singled out for a separate sentence on its own, describing some

affected individuals responded favorably after being treated with an anti-seizure drug called gabapentin, as if it's this thing we didn't know anything about it and now -- it's just -- it differentiates in a way that's misleading. And then otherwise, I think that, you know, it's information that's available elsewhere. And so that part is not misleading. And again, the other misleading part is this -- this corporation that has – National Organization for Rare Disorders, Inc., and yet is not one of the resources. That's very suspicious. Why aren't they one of the resources? What – why do they call themselves that and what do they do? Why are they in this? And they do have a email there, and I don't know anything more about them. And that would be it.

(*Id.* at 362:1-363:5.)[6]

Due to the objections and instructions not to answer interposed by Kaiser's counsel, Pfizer was precluded from fully exploring this topic with Dr. Wieder at this deposition. It was clearly improper for Kaiser's counsel to instruct Dr. Wieder not to respond to questions. Federal Rule of Civil Procedure 30 provides:

> An objection at the time of the examination – whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition – must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

Fed. R. Civ. P. 30(c)(2). The rules do not permit an attorney to instruct a witness not to answer on the ground that the attorney thinks his opponent's questions are "silly," as Kaiser's counsel did here.[7] "None of the reasons given by counsel . . . for instructing the witness not to answer

---

[6] That Dr. Wieder was intent on adhering to the lawsuit party line is evident from other aspects of his testimony. For example, instead of reviewing any documents in his possession regarding Neurontin or any information on Kaiser's website about Neurontin, Dr. Wieder reviewed the report of Plaintiffs' expert John Abramson while on vacation. (Wieder Dep. at 43:6-44:10, 46:7-15, 52:18-53:14, 54:3-55:9.) Engaging in Orwellian doublespeak, he testified that the words "effective" and "efficacy" mean different things, but he couldn't explain what they mean. (*Id.* at 397:22-398:8.) Not wanting to concede Neurontin's effectiveness for *anything*, he testified that he would prescribe a tricyclic antidepressant for post-herpetic neuralgia (an off-label use) before prescribing Neurontin. Dr. Wieder did not even know that Neurontin has an FDA approved indication for post-herpetic neuralgia. (*Id.* at 246:18-248:20.)

[7] Research has found no cases where a court held that it was proper to instruct a witness not to look at an internet site or to answer questions about an internet site.

fall within the category where an answer would cause some serious harm, i.e. the answer would reveal trade secrets, privileged material, or other confidential material." *Paparelli v. Prudential Ins. Co. of Am.*, 108 F.R.D. 727, 731 (D. Mass. 1985); *see also Calzaturficio S.C.A.R.P.A. S.P.A., v. Fabiano Shoe Co.*, 201 F.R.D. 33, 40 (D. Mass. 2001) (noting that counsel was not entitled to instruct a witness not to answer questions). Kaiser's counsel did not interpose a privilege objection to any of the questions, nor did he raise any issues regarding trade secrets or confidentiality. Pfizer does not believe the its questions called for confidential information (*see* note 4), but even it they had, it still be insufficient reason to instruct a witness not to answer where this Court has already entered a protective order governing the discovery of proprietary information. In any event, Counsel's remedy under the rule was to seek an immediate protective order, not to resort to self help. *See Paparelli*, 108 F.R.D. at 731; *Calzaturficio*, 201 F.R.D. at 40.

Counsel's wholly improper instructions to the witness precluded Pfizer's counsel from thoroughly questioning Dr. Wieder on inconsistencies between the public statements on Kaiser's websites and its allegations in this litigation. Pfizer's opportunity to depose the witness was further impaired when the witness left immediately after Kaiser's counsel concluded his questions (which consumed almost 90 minutes of deposition time) and Pfizer's counsel was not permitted to ask even ten minutes of follow-up questions. (Wieder Dep. at 523:18-524:24.) It is no answer for Kaiser to invoke the seven-hour limitation on depositions when Kaiser's counsel impeded Pfizer's attorney from asking questions and obtaining direct answers from the witness, deposition time was taken up discussing wholly improper objections by counsel, Kaiser's attorneys made numerous speaking objections (*e.g.,* Wieder Dep. at 39:5-13, 41-5-9, 51:20-22, 99:18-100:12), and the witness provided rambling and non-responsive testimony (*e.g.*, *id.* at 405:13-408:16). Rule 30 provides that "[t]he court *must* allow additional time consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." Fed. R. Civ. P. 30(d)(1)(emphasis added). Here, fairness requires that Pfizer be allowed additional time to complete its examination of Dr. Wieder.

It would not be a sufficient remedy for Kaiser to concede authenticity of articles appearing at specific web addresses (URLs) now.  Pfizer also sought to question Dr. Wieder about the content of such websites.  Accordingly, Pfizer seeks the following relief:

(1)     Plaintiffs should be required to produce Dr. Wieder for an additional two hours for the continuation of his deposition.

(2)     Kaiser should be required to reimburse Pfizer for expenses and attorneys' fees incurred in connection with the continued deposition of Dr. Wieder.

(3)     The continued deposition of Dr. Wieder should take place in New York or Boston.  With respect to the location of the deposition, reimbursement of costs is insufficient remedy.  Given that the need to continue the deposition was caused solely by the conduct of Kaiser's counsel, Pfizer's attorneys should not have to spend nearly two days traveling to and from California while Pfizer's counsel are preparing for trial.

(4)     Kaiser should be required to identify for Pfizer's counsel the URLs of all websites through which Kaiser provides information to its members and provide counsel for Pfizer access to the password protected portions of those websites.  For example, Pfizer's counsel is aware of the website kaiserpermante.org (or kp.org), but they may be others.  Some articles are available to the public; others appear only as an abstract and direct the viewer to log-in to read the complete articles.  There is no legitimate reason not to provide Pfizer's counsel with access to medical articles published on Kaiser's website.[8]

(5)     Kaiser should be required to provide Pfizer's counsel access to the "portal" of information made available to its physicians.  During his deposition, Dr. Wieder testified that "[t]here is, there is a physician portal that most people use" and that if he wanted to learn about gabapentin, he would go to the physician portal.

_____

[8] Pfizer is not, by this motion, seeking any personal information about Kaiser patients or Kaiser financial information.

(Wieder Dep. at 436:24-437:7.)  Dr. Wieder's declaration was provided by Kaiser in this litigation specifically to support its arguments that it takes an active role in managing drug utilization by physicians.  In light of that, Pfizer is entitled to know what information is provided to physicians through the physicians portal and to question Dr. Wieder about it.

(6)     Given Dr. Wieder's repeated testimony that the content of Kaiser's website was misleading, Kaiser should be directed to take steps to preserve the content on its websites as it existed on January 11, 2010, before making any alterations.

## II.     The Declaration Of Dr. Wieder Submitted By Kaiser In Opposition To Summary Judgment Should Be Stricken

In his declaration, offered by Kaiser in opposition to Pfizer's motion for summary judgment, Dr. Wieder declared under penalty of perjury as follows:

> I am informed and believed that in or around September 1994, the Southern California Regional P&T Committee ("P&T Committee") voted to accept Neurontin to the formulary for use by or in consultation with a neurologist. In or around September 1997, as a practicing pain specialist, I recommended expansion of the formulary restrictions to include prescribing by pain clinic physicians for the treatment of reflex sympathetic dystrophy.  I am informed and believe that the P&T Committee adopted this recommendation.  In or a around September 1999, I recommended removal of all formulary restrictions and guidelines for Neurontin.  I am informed and believed that in or around September 1999, the P&T Committee adopted this recommendation.

(Wieder Decl. ¶ 8.)    Initially, Dr. Wieder's declaration gives the decidedly misleading impression that he played an important role in advising the P&T committee.  But, although he testified regarding decisions made by the P&T Committee in 1994, he was not even with Kaiser Southern California medical group at the time.  (*Id.* at 268:22-24, 270:13-15.)  When he signed his declaration, he had no independent recollection of documents that might have informed him about the activities of the 1994 P&T Committee, nor was he shown any.  He was simply "reminded" by someone of what happened.  (*Id.* at 271:12-16.)

Moreover, Dr. Wieder has never presented to the P&T Committee and has no more than a vague understanding about how its makes decisions regarding formulary placement.  (Wieder

Dep. at 221:22-222:4.)  His only role in "advising" the P&T Committee was to respond to an email inquiry sent out by the P&T Committee to all specialists within a certain area.  (*Id.* at 269:18-270:8.)  Regarding the 1997 formulary decision, Dr. Wieder described his role as follows:

> Q.     In or around September 1997, there was an action by the P&T committee with respect to Neurontin and reflex sympathetic dystrophy; is that fair?
>
> A.     Yes.
>
> Q.     Did you present at the P&T committee in 1997?
>
> A.     No.
>
> Q.     Did you initiate the suggestion that reflex sympathetic dystrophy should be something that's included on the formulary?
>
> A.     No.
>
> Q.     Did someone else raise that and ask you to  comment on it?
>
> A.     Yes
>
> Q.     Who?
>
> A.     I don't recall who.  In general, a request  is made, and then Drug Information Systems gives us all the literature and gives us what the nature of the discussion is, and then we review it.
>
> Q.     How did you make the recommendation in 1997?
>
> A.     By email. . . .  [Y]es, by email, but more than just me  giving it. There's a discussion that goes on.
>
>            . . . .
>
> Q.     Okay.  But there are a lot of other people who were involved in this decision; is that fair?
>
> A.     I don't know how many, but there – certainly more than me and –
>
> Q.     It doesn't discuss any of them in your declaration, does it?
>
> A.     No, it doesn't.
>
>            . . . .
>
> Q.     So, in fact, what – do you know the history about reflex sympathetic dystrophy with – before it got to the P&T committee and before it got to you?

A.      In what – what do you mean the history?  In what way?

Q.      Well, in other words, do you know whose idea it initially was, who . . . suggested it?

A.      No.  I don't know.

Q.      Do you know who was supporting it, who was against it?

A.      I don't recall that at all.

Q.      Your – the basis of your involvement was that you received some material in an email saying that the P&T committee was going to consider this, do you have a view on it?

A.      Do I have a view on it, and I also talked with other people who took care of pain patients and talked with my department, and so it was through conversation and through my own personal view.

(*Id.* at 273:10-274:12, 275:1-7, 276:12-277:8.)  Dr. Wieder learned of the P&T Committee's decision through a "download."  He has no knowledge regarding what they discussed or how they came to their decision.  (*Id.* at 283:20-284:16.)

The "recommendation" and P&T action described in Dr. Wieder's declaration for September 1999 resulted from the same process.  (*Id.* at 285:13-24.)  Dr. Wieder did not make an independent recommendation to remove formulary restrictions and guidelines.  He could not even say that it would have been his role to do so.  (*Id.* at 286:13-19.)  And, once again, Dr. Wieder did not know about the specifics of the P&T Committee's decision making process.  He does not know what information they reviewed or relied upon or what factors influenced their decision.  (*Id.* at 288:6-13; 290:4-18.)  Clearly, Dr. Wieder's "recommendation" did not play the pivotal role in the decision of the P&T Committee that his declaration would leave one to believe.  In fact, Drug Information Services had recommended removing restrictions at least three months prior to September 1999, something Dr. Wieder could not even recall if he was aware of.  (*Id.* at 386:19:388:19.)[9]

---

[9] In fact, one wonders why the P&T Committee was soliciting the "personal opinions" of treating physicians when Kaiser has taken the position in this lawsuit that these types of decisions can only be based upon the existence of double-blind, randomized clinical trials and that no consideration should be given to clinician experience.

Even more disturbing, Dr. Wieder directly contradicted his sworn declaration. Dr. Wieder's declaration states, unequivocally, that he "recommended removal *of all formulary restrictions and guidelines* for Neurontin" and that his recommendation was adopted by the P&T Committee.  (Wieder Decl. ¶ 8 (emphasis added).)  When shown the actual minutes of the P&T Committee, which make clear that it did not recommend removal of guidelines, but only restrictions, and that it adopted guidelines that are still in place today, Dr. Wieder tried to fix the false statement in his declaration by inserting a comma after the fact:

> Q.    So when you wrote here – when you wrote here in your sworn declaration that you recommend removal of all formulary guidelines and restrictions for Neurontin under oath – Do you remember that?
>
> A.    I think I've said yes.
>
> Q.    That's wrong, isn't it?
>
> A.    Why was – why is it wrong?
>
> Q.    Well, doesn't this say that they're going to be recommending the removal of formulary restrictions but adding guidelines?
>
> . . . .
>
> A.    The formulary restrictions, like I said, when I looked – when I read that, my reading of it was in relationship to the restrictions.  And my – I knew there were guidelines because I was, you know – I was involved in DUAT, working with the guidelines.  So I knew that there had been guidelines there.
>
> Q.    Well, Doctor, you went through a whole litany of things that are misleading.  I mean, isn't it misleading, don't you think, to say, in or about September 1999, I recommended removal of all formulary restrictions and guidelines, no caveats for Neurontin – hold on – and you also said, I am informed and believe that in or about September 1990, the P&T committee accepted this recommendation?
>
> . . . .
>
> Q.    Is that accurate?
>
> . . . .
>
> A.    I recommend removal of all formulary restrictions, *comma*, and guidelines for Neurontin.  That's one way to read it.
>
> Q.    Where's the comma?

> A.    There isn't.  But I'm just saying that in reading it, that's what – I – again, what I told you before about the grammar element.

(*Id.* at 409:21-411:15 (emphasis added).)   This Court specifically relied upon Dr. Wieder's declaration in denying Pfizer's motion for summary judgment as to Kaiser.  (Mem. & Order [2309] at 8.)  Dr. Wieder's deposition testimony is irreconcilable with his declaration, which should be stricken.

## CONCLUSION

For all of the forgoing reasons, Pfizer requests that this Court issue an order granting the relief sought in Pfizer's motion:

Dated: January 18, 2010                    Respectfully submitted,

                                            SKADDEN, ARPS, SLATE, MEAGHER
                                               & FLOM LLP

                                            By:    /s/ Mark S. Cheffo
                                                   Mark S. Cheffo

                                            Four Times Square
                                            New York, NY 10036
                                            Tel:  (212) 735-3000

                                            SKADDEN, ARPS, SLATE, MEAGHER
                                               & FLOM LLP

                                            By:    /s/ Raoul D. Kennedy
                                                   Raoul D. Kennedy

                                            Four Embarcadero Center
                                            San Francisco CA 94111
                                            Tel:  (415) 984-6400

                                                   -and-

WHEELER TRIGG O'DONNELL LLP

By:   /s/ James E. Hooper
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

-and-

WHITE AND WILLIAMS LLP

By:   /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 18, 2010.

/s/ David B. Chaffin
David B. Chaffin