# EXHIBIT I, Part 1

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3
 4    ------------------------------)
 5    In re: NEURONTIN MARKETING,   )MDL Docket No. 1629
 6    SALES PRACTICES AND PRODUCTS  )
 7    LIABILITY LITIGATION          )Master File No.
 8    ------------------------------)04-10981
 9    THIS DOCUMENT RELATES TO:     )
10     THE GUARDIAN LIFE INSURANCE  )Judge Patti B. Saris
11     COMPANY OF AMERICA v. PFIZER )
12     INC., 04 CV 10739 (PBS)      )Magistrate Judge Leo
13    ------------------------------)T. Sorokin
14
15
16          Videotaped Deposition of
17     NICOLAS WIEDER, D.O., at 300 S. Grand Avenue,
18     Los Angeles, California, commencing at
19     9:22 p.m., Tuesday, January 12, 2010, before
20     Janice Schutzman, CSR No. 9509.
21
22
23
24     Job No: 234602
25     PAGES 1 - 536
```

1

1    Q.  And therefore they're pushing down more
2  specificity?
3    A.  A lot more specificity, right.  Right.
4    Q.  Because you could -- you know a lot more
5  about the treatment or disease end point if you said   09:59AM
6  something more specific than low back pain?
7        MR. SOBOL:  Objection.
8        THE WITNESS:  Well, also that -- for
9  instance --
10       MR. SOBOL:  Motion to strike.        09:59AM
11  BY MR. CHEFFO:
12    Q.  Okay.  For instance?
13    A.  Do I continue?
14       MR. SOBOL:  I'm going to move to strike it
15  anyway because you're not answering the question.      10:00AM
16       THE WITNESS:  Okay.  Well --
17  BY MR. CHEFFO:
18    Q.  You can answer.
19    A.  For instance, when -- if there's a -- if
20  someone goes to the primary care doctor and they      10:00AM
21  have diabetes, that's one code.  But if they
22  complain about a diabetic neuropathy on that visit,
23  that's a different code.  And that different code
24  means it's a more complicated case.
25        So my understanding is that when there's    10:00AM
38

1   if someone came in for back pain, they -- is that
2   how they would be coded even if they treated them
3   for back pain and you saw them for a few other
4   things at the meeting?
5           MS. NUSSBAUM:  Objection.  You know, this   10:01AM
6   is really hypothetical.  It's speculative.  He's not
7   here as an expert witness.
8           MR. CHEFFO:  This is a fact question.
9           MS. NUSSBAUM:  It's not a fact witness.
10  You're saying if a hypothetical patient came in with   10:01AM
11  these hypothetical symptoms, how would you
12  hypothetically code the patient?  How he is he
13  supposed to know.  I really think we should move on.
14          MR. CHEFFO:  Okay.  I know your objection.
15  BY MR. CHEFFO:                          10:02AM
16      Q.  You can answer.
17      A.  Can you repeat the question.
18      Q.  Sure.
19          In the past, if a patient came in with back
20  pain, four, five years ago, and you treated them for   10:02AM
21  back pain and other pains that they were
22  experiencing, how would it typically be coded?
23          MR. SOBOL:  Objection.
24          MS. NUSSBAUM:  Objection.
25          THE WITNESS:  What are my choices?       10:02AM

                              40

```
 1    BY MR. CHEFFO:
 2       Q.  You can answer.  They'll tell you when --
 3           MS. NUSSBAUM:  If you can't answer --
 4    BY MR. CHEFFO:
 5       Q.  -- not to answer.                    10:02AM
 6           MS. NUSSBAUM:  -- tell him that you can't
 7    answer.
 8           MR. CHEFFO:  It's -- let's not lead the
 9    witness because I think the record will be clear.
10    BY MR. CHEFFO:
11       Q.  You can answer the question if you
12    understand it.
13       A.  It depends on the history and the physical
14    examination that you give.  We don't decide when the
15    patient walks in with the complaint what the coding    10:02AM
16    is.
17       Q.  Okay.  And I understand that.
18           A patient comes in and they present to you
19    their main problem's low back pain.  Okay?  This is
20    four, five years ago, let's say 2004, 2005 period.     10:02AM
21    And they talk about low back pain, and they talk
22    about some other pain that they may have as a result
23    of their low back pain.  Their knee was bothering
24    them.
25           How typically would that get coded for        10:02AM
                              41
```

1    ICD-9 purposes if the main purpose of their
2    complaint was low back pain but they mentioned
3    ancillary or you treated ancillary pain?
4         MR. SOBOL:  Objection.
5         MS. NUSSBAUM:  And I'll ask you not to          10:03AM
6    speculate, so only if you know the answer.  If you
7    know --
8         THE WITNESS:  I -- I --
9         MS. NUSSBAUM:  -- with certainty.
10        THE WITNESS:  It depends on the               10:03AM
11   examination, and it -- that's -- it can't be
12   answered the way that you're asking the question.
13   It just can't be.
14   BY MR. CHEFFO:
15       Q.  Patients who have -- who you've treated      10:03AM
16   with low back pain, do they typically also have
17   other problems, other pain problems?
18       A.  Sometimes they do, sometimes they don't.
19       Q.  Okay.  And for those that do, do you
20   attempt to treat them?                             10:03AM
21       A.  It depends what -- if it's within my scope
22   of practice.
23       Q.  And if it's within your scope of practice
24   and you treat them, how is it coded?
25        MR. SOBOL:  Objection.                         10:03AM
                           42

1    were.  Those are the -- all the -- we know what
2    those documents were.  And I don't have access to my
3    computer right now.  And I don't have a secretary.
4        Q.  That's easier.  If you know what they are,
5    you can just tell me.                    10:13AM
6        A.  Well, I don't know offhand because I didn't
7    really take note of them in any serious way.
8            MS. NUSSBAUM:  Mr. Cheffo, I think that the
9    notice that you served here requested copies of
10   documents that were reviewed by the witness.  The    10:13AM
11   witness has testified that he's produced to you
12   copies of documents that were reviewed by him.
13           I think that any other documents that were
14   not reviewed by this witness would be attorney work
15   product and not subject to production.        10:13AM
16           MR. CHEFFO:  You can make that objection.
17   BY MR. CHEFFO:
18       Q.  What other documents did you receive but
19   not read completely?
20           MS. NUSSBAUM:  That misstates his        10:13AM
21   testimony.  His testimony was anything that he read
22   at all, that he reviewed at all, he's produced.
23   BY MR. CHEFFO:
24       Q.  You read the headings of some documents --
25       A.  Yes.

                            52

```
 1    would have liked to have seen back in August of
 2    2008?
 3          MR. SOBOL:  Objection, asked and answered.
 4          THE WITNESS:  I thought I did answer it,
 5    actually.                              10:37AM
 6    BY MR. CHEFFO:
 7      Q.  Did you?
 8      A.  Yeah, I thought I said -- I thought I said
 9    that --
10          MR. SOBOL:  Well, you've answered it.     10:37AM
11          THE WITNESS:  Yeah.
12    BY MR. CHEFFO:
13      Q.  You can answer it again.  If you did, I
14    don't recall your answer.
15          MR. SOBOL:  Objection, asked and answered.   10:37AM
16          THE WITNESS:  Well, we can -- I guess we
17    can review it.
18    BY MR. CHEFFO:
19      Q.  Go ahead.  You can answer.
20          MR. SOBOL:  Objection, asked and answered.   10:38AM
21          THE WITNESS:  So what am I -- I don't know
22    what --
23    BY MR. CHEFFO:
24      Q.  You can answer unless you're directed not
25    to.                                  10:38AM
```

                                    75

```
 1          MR. SOBOL:  Right.
 2          THE WITNESS:  Okay.
 3          MR. SOBOL:  Just so that you know.
 4          THE WITNESS:  It's the format.  I don't
 5   know -- I don't understand this.           10:38AM
 6          MR. SOBOL:  If he asks a question --
 7          THE WITNESS:  Yeah?
 8          MR. SOBOL:  -- even if he just says go
 9   ahead --
10          THE WITNESS:  Yeah?
11          MR. SOBOL:  -- I have to -- I still lodge
12   an objection so it appears after his question that
13   my objection exists there.
14          THE WITNESS:  Oh, I see.  All right.
15          MR. SOBOL:  Okay?  What I'll -- I will jump   10:38AM
16   all over you if it's something that I think that
17   you --
18          THE WITNESS:  Yeah.
19          MR. SOBOL:  -- shouldn't be testifying --
20          THE WITNESS:  Right.
21          MR. SOBOL:  -- about.  There will be no
22   mistake about that.
23          THE WITNESS:  Okay.
24          MR. SOBOL:  You don't have to worry about
25   that.                           10:38AM
```
                                76

1        THE WITNESS:  Okay.
2        MR. SOBOL:  Okay?
3        THE WITNESS:  The reason I'm hesitating is
4   because my impression is, is that -- you know, after
5   you do anything, it takes some time to be sure that     10:38AM
6   what you're saying is true.  And so would I have
7   liked to have seen it?  Yeah.  But I also trust that
8   probably there was a good reason that maybe there --
9   some of this stuff had to be verified.  This was an
10  opinion.  I don't know.  I don't know why I wasn't     10:38AM
11  shown that.
12        If it was ready to be shown to me and it
13  was absolutely accurate, yeah, I would have liked to
14  have seen it.  But -- so I feel that now, there's
15  probably been enough time over the last two years     10:38AM
16  for this to be looked at by a bunch lawyers, looked
17  at it by -- and so the reason I'm getting it now is
18  because, you know what, we've looked at it.  We
19  didn't want to show it to you before.  We didn't
20  want to -- if -- this is a patient issue, so of     10:39AM
21  course if we -- you know, if it was -- if we were
22  sure of it, then we would have just given it to
23  everybody.  But we have to -- we have our own due
24  diligence to do, and so we weren't sure until now,
25  and now we're showing it.                10:39AM

                                77

1    for.
2        Q.  Okay.  And then there's something called
3    off-label --
4        A.  Right.
5        Q.  -- use; right?                    10:47AM
6        A.  Right.
7        Q.  Off-label use is a common practice in
8    medicine?
9        A.  Yeah.
10       Q.  There's nothing inherently wrong with    10:47AM
11   off-label use, is there?
12       A.  There's nothing illegal about it.
13       Q.  There's nothing wrong with it, is there?
14           MS. NUSSBAUM:  Objection.  The witness has
15   answered the question.                   10:48AM
16   BY MR. CHEFFO:
17       Q.  Is there anything wrong with off-label use?
18           MR. SOBOL:  Objection.
19           THE WITNESS:  There can be.
20   BY MR. CHEFFO:                           10:48AM
21       Q.  But inherently, is all off-label use bad?
22           MR. SOBOL:  Objection.
23           THE WITNESS:  It's impossible to answer
24   that, but inherently off label means you shouldn't
25   use it.  So it's an exception to do it, and it has    10:48AM
                          86

1  that it is appropriate in certain situations for
2  physicians to write prescriptions for off-label
3  uses?
4          MR. SOBOL:  Objection.
5          THE WITNESS:  When the evidence is strong.    10:51AM
6  When the evidence is trustworthy and strong,
7  absolutely.
8  BY MR. CHEFFO:
9      Q.  Okay.  And is there any restriction today
10  on a physician's ability to write a prescription for    10:52AM
11  any purpose for Neurontin or gabapentin?
12      A.  No.
13          MR. CHEFFO:  Okay.  Let's take a break.
14          THE VIDEOGRAPHER:  Off the record, 10:53.
15          (Recess taken.)                    11:04AM
16          THE VIDEOGRAPHER:  The time is 11:06 a.m.
17  We are back on the record.  This is disc No. 2 in
18  the deposition of Dr. Nicolas A. Wieder.
19          All parties may continue.
20  BY MR. CHEFFO:                        11:05AM
21      Q.  Doctor --
22          MR. SOBOL:  Had you finished your last
23  answer before we broke?
24          THE WITNESS:  Yeah, I wanted to actually --
25  there was something that -- everything ended kind of    11:05AM

```
 1    abruptly for the break, and there was a question you
 2    asked.  I just want to make sure about something.
 3    Can you repeat the -- just the last question again?
 4         MR. CHEFFO:  In a few minutes, the court --
 5         THE WITNESS:  Sure.
 6         MR. CHEFFO:  -- can read it, I guess.
 7         (Record read as follows:
 8         "QUESTION:  And is there any
 9      restriction today on a physician's
10       ability to write a prescription for any      10:52AM
11       purpose for Neurontin or gabapentin?")
12         THE WITNESS:  So the question was what
13    restriction.
14         No, there isn't, but depending on what you
15    mean by "restriction."  What do you mean by      11:05AM
16    restriction?
17    BY MR. CHEFFO:
18      Q.  Well, is there any restriction?
19      A.  There's not a physical license restriction,
20    but, you know, it's a little bit like, that was      11:05AM
21    then, this is now.  Now, that this information is
22    out, there may be a lot of -- you know, we
23    continually review the medications that we have and
24    the evidence that we have because everything we do
25    is based on evidence.                      11:06AM
```

92

1       The biggest example is the Vioxx from
2   before, and how we really saved a lot of patients'
3   lives by looking at the evidence and not approving
4   it.
5       And so now that we're -- this has only been   11:06AM
6   recent -- you know, this information that you were
7   talking about, had I had it before -- this is only
8   recent information.  So I just read this during New
9   Year's -- just a few days ago.
10      So the question is, now will there be?        11:06AM
11      MR. CHEFFO:  Okay.  I'm going to move to
12  strike because that's clearly not responsive.
13  BY MR. CHEFFO:
14      Q.  But I'll ask you this:
15      Today, as of today, there's absolutely no      11:06AM
16  restriction whatsoever on any doctor to write a
17  prescription for gabapentin for any purpose, right,
18  Neurontin?
19      MR. SOBOL:  Objection.
20      THE WITNESS:  The -- there --
21  BY MR. CHEFFO:
22      Q.  Is there?
23      MR. SOBOL:  Objection.
24      THE WITNESS:  Our license allows us to
25  write a prescription for anything for any purpose.     11:06AM
                              93

1   BY MR. CHEFFO:
2       Q.   And does -- is there any restriction that
3   Kaiser imposes on a doctor today for any Kaiser
4   doctor to prescribe gabapentin or Neurontin for any
5   purpose?                           11:07AM
6           MR. SOBOL:  Objection.
7           THE WITNESS:  You can't prescribe it for a
8   heart attack.  I mean, you're -- I know it sounds
9   silly, but the question isn't specific.
10  BY MR. CHEFFO:                     11:07AM
11      Q.   Is that true?  You can't prescribe it for a
12  heart attack?
13      A.   Well, ethically, you can't.  So it's not
14  just the bounds of -- it's not just the bounds of
15  what your license does, but there's an ethical      11:07AM
16  consideration as well.
17      Q.   Well, let's start with the license.  Let's
18  start with the bounds of reason, and then let's talk
19  about Kaiser.
20          By licensing, you're not prohibited from    11:07AM
21  prescribing gabapentin for any purpose; right?
22      A.   Above all, do no harm.
23          MR. SOBOL:  Objection.
24          I have to say, you -- the conversation --
25  that the question and answer is too conversational   11:07AM
                        94

1   and it doesn't afford me the opportunity to object
2   before the answers are given or the questions are
3   posed.  So I would request that there be a pause so
4   that I can do that.
5         So I object.                      11:08AM
6         You may answer now.
7   BY MR. CHEFFO:
8         Q.  Does Kaiser impose any restrictions that
9   you're aware of on a physician's ability to
10  prescribe Neurontin or gabapentin for any purpose?      11:08AM
11        MR. SOBOL:  Objection.
12        THE WITNESS:  Currently as of today?
13        MS. NUSSBAUM:  If you know.
14        MR. CHEFFO:  Well, you know what?  Please
15  stop leading the witness.  Okay.  This is a very      11:08AM
16  easy question.  Okay?  We -- everything is if he
17  knows.
18  BY MR. CHEFFO:
19        Q.  You're -- you work at Kaiser, don't you?
20        A.  Yes.                          11:08AM
21        Q.  You prescribe Neurontin, don't you?
22        A.  Yes.
23        Q.  Something within your expertise, isn't it?
24        MR. SOBOL:  Objection.
25        THE WITNESS:  Yes.                   11:08AM
                         95

1   BY MR. CHEFFO:
2       Q.  Would you know if there's any restrictions
3   on it?
4           MR. SOBOL:  Objection.
5           THE WITNESS:  I may not know if there are      11:08AM
6   restrictions on it now, but as of up until now, no.
7   BY MR. CHEFFO:
8       Q.  Up until --
9           MR. SOBOL:  Objection.  Motion to strike.
10  BY MR. CHEFFO:                              11:08AM
11      Q.  When was the last time you were in your
12  office?
13      A.  A couple days ago.
14      Q.  Was there any restrictions on gabapentin or
15  Neurontin?                                  11:08AM
16          MR. SOBOL:  Objection.
17          THE WITNESS:  I didn't -- I don't know of
18  any, no.
19  BY MR. CHEFFO:
20      Q.  That would have been communicated to you,      11:09AM
21  wouldn't it?
22          MR. SOBOL:  Objection.
23          THE WITNESS:  This is a very special and
24  unusual and unique situation, and so the question is
25  really, if it hasn't -- I don't know.  If it hasn't    11:09AM
                        96

1    been, I guarantee you right now that there's a
2    process going on because there's a process for all
3    the things we do based on evidence, that this stuff
4    is being reviewed right now.
5         So the question is, I don't know if outside   11:09AM
6    of me, someone has already decided that.  So that, I
7    don't know.
8    BY MR. CHEFFO:
9       Q.  You have no idea; right?
10      A.  I don't have any idea.                11:09AM
11      Q.  Let me say -- are you aware of your --
12          MR. SOBOL:  No, I -- I'm going --
13          MR. CHEFFO:  You can't keep interrupting
14   the questions.
15          MR. SOBOL:  Yes, I can.  If I'm not        11:09AM
16   afforded the opportunity to either move to strike --
17          MR. CHEFFO:  Well, he's your witness.
18          MR. SOBOL:  -- or object --
19          MR. CHEFFO:  Just object.
20          MR. SOBOL:  -- I'm afforded the opportunity   11:09AM
21   to do that, and I'm going to insist upon it.  And
22   I'm sorry.
23          MR. CHEFFO:  You can insist, but you can't
24   keep interrupting the questions.  Just say objection
25   and move to strike.  We don't need a speech after     11:09AM
                              97

```
 1   every question or "if you know."  That's improper.
 2        MR. SOBOL:  I haven't once said "if you
 3   know."  And all I'm trying to do is either object or
 4   move to strike.  And I move to strike.
 5        MR. CHEFFO:  Okay.              11:10AM
 6   BY MR. CHEFFO:
 7     Q.  Now --
 8        MR. SOBOL:  You may ask another question.
 9        MR. CHEFFO:  Could you read back the last
10   question?
11        (Record read as follows:
12        "QUESTION:  You have no idea;
13   right?
14        "ANSWER:  I don't have any idea.
15        "QUESTION:  Are you aware --")      11:09AM
16        THE REPORTER:  And then the colloquy
17   started.
18   BY MR. CHEFFO:
19     Q.  Do you know when this lawsuit was filed,
20   Doctor?                          11:10AM
21     A.  I don't remember.
22     Q.  Would it refresh your recollection if I
23   told you it was over five years ago?
24     A.  This particular one?
25     Q.  Yes, sir.                    11:10AM
```
                                98

```
 1      A.  Okay.
 2      Q.  Do you know that?
 3          MR. SOBOL:  Objection.
 4          THE WITNESS:  I don't know that.
 5   BY MR. CHEFFO:                    11:10AM
 6      Q.  Did you have any idea when the lawsuit was
 7   filed?
 8      A.  I didn't remember --
 9          MR. SOBOL:  Objection.
10          THE WITNESS:  I didn't remember it.  It     11:10AM
11   wasn't -- I didn't take note of it, quite honestly.
12   BY MR. CHEFFO:
13      Q.  Did you know, yes or no?
14          MR. SOBOL:  Objection.
15          THE WITNESS:  I don't remember if it was in   11:11AM
16   the documents that I read.  If they were, then yes,
17   I knew, but I don't remember.  I didn't remember it.
18   BY MR. CHEFFO:
19      Q.  So if Kaiser filed this lawsuit making
20   these allegations five years ago, you would expect   11:11AM
21   that somebody at Kaiser would actually know about
22   that, wouldn't you?
23          MR. SOBOL:  Objection.
24          MS. NUSSBAUM:  Objection.
25          What allegations are you talking about?  I   11:11AM
```
                                99

 1   think you need to clarify your --
 2   BY MR. CHEFFO:
 3       Q.  You can answer --
 4          MS. NUSSBAUM:  -- question.
 5   BY MR. CHEFFO:
 6       Q.  -- the question.
 7       A.  I don't -- but I don't really under- -- so
 8   it's -- I don't understand really the -- what --
 9   you're talking about the allegations that I -- are
10   you talking about the allegations I signed the          11:11AM
11   declaration for?
12       Q.  No.  If there were allegations that were
13   similar to the claims that are in Dr. Abramson's
14   report that were in a lawsuit that was filed five
15   years ago, wouldn't you expect that people at Kaiser   11:11AM
16   would be aware of those allegations?
17          MR. SOBOL:  Objection.
18          MS. NUSSBAUM:  Oh, objection.  I've asked
19   you to clarify.  In other words, are you asking was
20   he aware of --                           11:12AM
21          MR. CHEFFO:  You know, you can't do that.
22          MS. NUSSBAUM:  -- underlying facts --
23          MR. CHEFFO:  You can't do what you're
24   doing.
25          MS. NUSSBAUM:  -- like the whistle-blower   11:12AM
                        100

```
 1    case that were --
 2            MR. CHEFFO:  You can't --
 3            MS. NUSSBAUM:  -- in the complaint?
 4            MR. CHEFFO:  You can't do what you're
 5    doing.                              11:12AM
 6            MS. NUSSBAUM:  Well, no, because what
 7    you're doing is tying things --
 8            MR. CHEFFO:  Ms. Nussbaum --
 9            MS. NUSSBAUM:  -- to the complaint --
10            MR. CHEFFO:  -- what you're doing seems    11:12AM
11    very clear.
12            MS. NUSSBAUM:  -- as if it's a fact.
13            MR. CHEFFO:  I'm cautioning you that what
14    you're doing is sanctionable.  Okay?  You can't lead
15    the witness, and you can't do it.  If you want to    11:12AM
16    continue to do it, the record will be clear, but I'm
17    putting you on notice.
18    BY MR. CHEFFO:
19        Q.  You can answer the question, Doctor.
20        A.  Ask me the question again.        11:12AM
21            MR. CHEFFO:  You can read it back.
22            (Record read as follows:
23            "QUESTION:  If there were
24    allegations that were similar to the
25    claims that are in Dr. Abramson's        11:11AM
                                 101
```

1    report that were in a lawsuit that was
2    filed five years ago, wouldn't you
3    expect that people at Kaiser would be
4    aware of those allegations?")
5           THE WITNESS:  And so can you show me which    11:12AM
6    ones in the Abramson's lawsuit are you referring to?
7    BY MR. CHEFFO:
8       Q.  Well, now, that you've been coached by --
9       A.  I didn't understand the question.  I
10   actually didn't understand fully the question you    11:12AM
11   were asking.
12      Q.  You read this 120-page report; right?
13      A.  Yeah.
14      Q.  And you said there were certain claims or
15   statements in here that troubled you; right?    11:12AM
16      A.  Yes, yes.
17      Q.  Okay.  To the extent that those same claims
18   that Dr. Abramson pointed out were in a lawsuit, in
19   a legal document filed -- right?
20      A.  Okay.                     11:13AM
21      Q.  -- by Kaiser, you'd expect that Kaiser --
22          MS. NUSSBAUM:  Wait a minute.  That assumes
23   something not in evidence.  That assumes --
24          MR. CHEFFO:  Are you going to continue
25   to --
                          102

1        MS. NUSSBAUM:  -- this witness has seen the
2    complaint.
3        MR. CHEFFO:  Are you going to continue to
4    do what you're doing?
5        MS. NUSSBAUM:  Well, I don't think you        11:13AM
6    should mislead the witness.
7        THE WITNESS:  Let me clarify something.
8    What was --
9        MR. SOBOL:  No, you're not -- there's no
10   question before you.                  11:13AM
11       THE WITNESS:  Okay.
12       MR. SOBOL:  There's no question before you.
13       MR. CHEFFO:  Again, it's going to be clear.
14   I'm not going -- you know, I'm not going to yell and
15   scream.  I'm just cautioning you, what you're doing   11:13AM
16   is sanctionable.  You can continue to try and
17   prevent him from testifying, but the record's going
18   to be clear.
19       THE WITNESS:  The allegations I was
20   embarrassed by have nothing to do with a lawsuit.     11:13AM
21   They have nothing to do with the lawsuit.
22       The allegations I was embarrassed by was
23   the allegations regarding certain practitioners who
24   I believed to be above reproach who I felt acted
25   unethically.  That's what embarrassed me.        11:13AM

                             103

1   somehow -- are you -- is this a person who has
2   seizures?  You think -- what's going on?  Why -- so
3   I might ask them.
4      Q.  Okay.
5      A.  But as the other hat, which is looking at a   11:32AM
6   region and practices of medications, if they asked
7   me that, I would say there's no evidence for the use
8   of Neurontin.  And I mean, it's --
9      Q.  I'm not --
10     A.  In that case --                       11:32AM
11        Q.  I don't know why this is really so
12   different.
13         You're -- you have an obligation to
14   patients, right, as a doctor?
15     A.  Because it seems like such --          11:32AM
16        MR. SOBOL:  Objection.
17        THE WITNESS:  It seems like such a strange
18   scenario to me.
19        MR. SOBOL:  Objection.
20   BY MR. CHEFFO:
21     Q.  I understand.
22        MR. SOBOL:  I want to say something.  I'm
23   not -- there's no question before him right now.
24        Just listen to the question and answer only
25   the question that's put in front of you.         11:33AM
                        123

1       THE WITNESS:  Okay.
2       MR. SOBOL:  Otherwise we will be here for
3  about three days, okay, because we'll just have
4  conversations --
5       THE WITNESS:  Okay.
6       MR. SOBOL:  -- and no question and answer.
7       THE WITNESS:  All right.
8  BY MR. CHEFFO:
9     Q.  If there was a situation where you were
10  convinced, okay, that the doctor was taking an        11:33AM
11  unjustified, inappropriate course of action by
12  prescribing gabapentin or Neurontin for a patient
13  that would potentially put the patient at severe
14  risk and also have no legitimate purpose, there are
15  things that you could and would do; isn't that        11:33AM
16  right?
17       MR. SOBOL:  Objection.
18       THE WITNESS:  I would -- there's certainly
19  many things I could do.
20  BY MR. CHEFFO:                                        11:33AM
21     Q.  Okay.  What are they?
22     A.  Some of them would be reasonable, and some
23  of them would be unreasonable.
24       The most reasonable thing would be to have
25  a discussion with the doctor about the rationale for  11:34AM
                        124