# EXHIBIT I, Part 2

1    A.  Yes.
2    Q.  The chief of the department could suspend
3    privileges if they thought there was an emergent
4    patient care issue?
5    A.  I don't know -- I don't even know if that's   11:35AM
6    possible for the chief of the department.  I think
7    that's a completely different process.
8    Q.  If the chief of the department thought that
9    if a doctor was putting a patient in severe
10   jeopardy, what could they do?                     11:35AM
11   A.  I don't know.  I might -- I suspect that
12   they would bring it up the line.
13       MS. NUSSBAUM:  Don't speculate.  I mean,
14   he's only asking if you know the answer.  If you
15   don't know --                                     11:35AM
16       THE WITNESS:  I don't know the exact
17   answer.
18       MS. NUSSBAUM:  If it calls for speculation,
19   please don't answer.
20   BY MR. CHEFFO:                                    11:35AM
21   Q.  Is it your expectation that -- under this
22   area, you have confidence in the Kaiser hospital
23   system; right?
24   A.  Yes.
25   Q.  Is it your expectation that there's some      11:35AM

126

1   system that if the chief of a department and the
2   executives at Kaiser made a determination that a
3   doctor's course of action -- they believed it was
4   going to put a patient at severe risk, is it your
5   expectation that they could do something to prevent   11:36AM
6   that patient -- that doctor from continuing and to
7   help the patient?
8       A.  Yeah.  That is my expectation.  That's --
9   yeah.  I agree.
10      Q.  And to your knowledge, has any doctor ever   11:36AM
11  been prevented by anybody at Kaiser from writing a
12  prescription for gabapentin for neuropathic pain?
13          MR. SOBOL:  Objection.
14          THE WITNESS:  I don't know of any.
15  BY MR. CHEFFO:                         11:36AM
16      Q.  Has any doctor ever been prevented for any
17  patient from providing a prescription for idiopathic
18  pain?
19          MR. SOBOL:  Objection.
20          THE WITNESS:  I don't know.          11:36AM
21  BY MR. CHEFFO:
22      Q.  Has any doctor ever been told or
23  discouraged from provi- -- from writing a
24  prescription for migraines?
25          MS. NUSSBAUM:  That's a dual question.     11:37AM

127

```
 1          MR. CHEFFO:  You know what?
 2          MS. NUSSBAUM:  No, I --
 3          MR. CHEFFO:  Objection.  Do I need to pull
 4   out the Federal Rules for you?
 5          MS. NUSSBAUM:  Well, I think you're        11:37AM
 6   saying --
 7          MR. CHEFFO:  I'm not here -- he seems to
 8   understand everything.  You're the only one that
 9   doesn't seem to, but it's obviously what you're
10   doing, Ms. Nussbaum.  Now, I'm going to continue      11:37AM
11   asking it.  You have two ways of proceeding.  I
12   don't think I need to educate you.  You can either
13   say objection, you can ask it to be read or you can
14   direct him.  You can't keep interrupting.
15          MS. NUSSBAUM:  Would you repeat the          11:37AM
16   question.
17          MR. CHEFFO:  I'll withdraw the question.
18          MS. NUSSBAUM:  No, I want that question
19   repeated.
20          Please repeat the question.              11:37AM
21          (Record read as follows:
22          "QUESTION:  Has any doctor ever
23     been told or discouraged from writing a
24     prescription for migraines?")
25          MS. NUSSBAUM:  Okay.  Do you want to know      11:37AM
                              128
```

1    been told?  Do you want to know discouraged?  And
2    can you define what you mean by "discouraged"?
3    BY MR. CHEFFO:
4        Q.   You can answer the question.
5        A.   I don't know.  Either one, I don't know.        11:37AM
6        Q.   Do you have any patients that are taking
7    Neurontin or gabapentin at doses above
8    1,800 milligrams a day?
9        A.   Yes, I do.
10       Q.   More than one?                          11:38AM
11       A.   I don't know.  But I know of at least one.
12       Q.   In your past clinical experience, have you
13   had patients that have taken doses above
14   1,800 milligrams?
15       A.   Yeah.                                11:38AM
16           MR. SOBOL:  Objection to form.
17   BY MR. CHEFFO:
18       Q.   So when you said you had one, you just have
19   one current patient?
20       A.   There's one I can think of.  I don't --    11:38AM
21   I -- it's -- there's one that I can think of.  But I
22   don't know -- I couldn't say for sure, but I know
23   there's at least one.
24       Q.   And in the past there's been others?
25       A.   There's been at least one in the past      11:38AM
                              129

1   listen to what people say is the use for the
2   medication.  And I -- there's the drug index, the
3   drug information index.  I look at the formulary, at
4   our formulary.  So I have a lot of different sources
5   for it.                              11:48AM
6       I don't not look for it, but you're
7   suggesting somehow that there's some special place
8   that it -- the only -- there's only one place that
9   it exists, and it doesn't.  It exists --
10      Q.  Well --
11      A.  It's kind of ubiquitous.  The information
12  is ubiquitous.
13      Q.  I think many doctors would think there's
14  one place, but let's -- let me ask you this
15  question.                            11:49AM
16      A.  Why would you think that?
17      Q.  Let me ask you this question.  Why --
18          MR. SOBOL:  He deserved the comeback, but
19  let him ask the questions.
20  BY MR. CHEFFO:                       11:49AM
21      Q.  With respect to TCAs, what are they
22  approved for by the FDA?
23      A.  My impression is that they are approved for
24  antidepression.
25      Q.  Anything else?                 11:49AM
                    139

1      Q.  Now, let's get back to -- do you believe
2    that patients taking Neurontin for conditions other
3    than seizure are at risk?
4          MR. SOBOL:  Objection.
5          THE WITNESS:  At risk of?               12:05PM
6    BY MR. CHEFFO:
7      Q.  As a result of the medicine.
8          MR. SOBOL:  Objection.
9          THE WITNESS:  I believe they're at risk
10   from the result of the process by which the medicine   12:05PM
11   got approved, absolutely.
12   BY MR. CHEFFO:
13     Q.  Do you believe that -- have you seen
14   patients who have received benefit from Neurontin?
15         MR. SOBOL:  Objection.               12:05PM
16         THE WITNESS:  I want to continue to --
17   answering the last one if I might.
18   BY MR. CHEFFO:
19     Q.  Well, why don't you answer my question
20   first.                             12:05PM
21         MS. NUSSBAUM:  I think the witness is
22   saying he didn't complete his prior answer.
23         THE WITNESS:  One of the aspects of medical
24   care, I think, that's underappreciated is that when
25   we're treating patients, it's not just the       12:05PM
                          155

```
 1      Q.  When you say "benefited," they've lessened
 2   their neuropathic pain?
 3      A.  They've -- their overall pain experience.
 4   And that's what I was trying to say, their overall
 5   pain experience has been reduced.          12:10PM
 6      Q.  And you've had patients that have been on
 7   Neurontin for a long period of time; right?
 8      A.  I personally haven't, but I've had --
 9        THE REPORTER:  Excuse me.  I'm sorry.
10   Could you --
11   BY MR. CHEFFO:
12      Q.  You've had patients that are on Neurontin
13   for a long period of time?
14      A.  I personally haven't, but I've inherited
15   patients who have been on Neurontin, and I've      12:10PM
16   continued them.  And so I don't know what you mean
17   by a long period of time, but I've had those
18   patients.
19      Q.  As we discussed earlier, if you believe
20   that a medicine was absolutely not working at all or  12:10PM
21   posed some risk, you would take them off it; right?
22        MS. NUSSBAUM:  Objection, first as a dual
23   question.
24        MR. CHEFFO:  Okay.  Your objection's fine.
25   BY MR. CHEFFO:
                        161
```

```
 1      Q.  Go ahead.  If you -- you can answer it if
 2   you understand it.
 3      A.  Repeat it again.
 4      Q.  Sure.  You have --
 5         Why don't you read it back, please.        12:11PM
 6         (Record read as follows:
 7         "QUESTION:  As we discussed
 8   earlier, if you believe that a medicine
 9   was absolutely not working at all or
10    posed some risk, you would take them         12:10PM
11    off it; right?")
12         MS. NUSSBAUM:  I'd asked that you split
13   that into two questions.  It's two different
14   questions.
15         THE WITNESS:  If I believe a patient was   12:11PM
16   not -- if medication was not working, I might not
17   necessarily take them off.
18         If I believe that a medication posed some
19   risk, then I likely, depending on what we think
20   risk -- what we -- if we agree that there's a     12:11PM
21   significant risk, then I would try to take them off,
22   yes.
23   BY MR. CHEFFO:
24      Q.  Let's take the first one.
25         You would keep a patient on a medication   12:11PM
```

162

1      A.   So Neurontin might be one of them.
2      Q.   -- there'd be a period of time, one or two
3    visits, where you might leave them on; right?
4      A.   One or two visits or more.  But yes, there
5    may be a period.  I don't know exactly.          12:14PM
6      Q.   And if you've been treating a patient for
7    seven, eight, nine, ten visits, you would have to
8    believe that it was doing some benefit for them?
9      A.   I would -- I mean, in general.  It
10    specifically doesn't always happen, but in general,   12:14PM
11    I would hope that, yeah.
12      Q.   And there have been patients who have
13    treated with you for pain who have been on Neurontin
14    for seven, eight, nine, ten visits; right?
15          MS. NUSSBAUM:  Well, wait a minute.  That's  12:14PM
16    assuming an awful lot of facts.  If you want to ask
17    him --
18          MR. CHEFFO:  You know what you're doing?
19          MS. NUSSBAUM:  -- a question, he'll give an
20    answer.                          12:15PM
21    BY MR. CHEFFO:
22      Q.   Go ahead, Doctor.
23      A.   I'm sorry.  Repeat the question.
24          MR. CHEFFO:  What you're doing is
25    absolutely improper.  And I'm going to have to make   12:15PM
                              166

1    a motion if you continue it.
2         Please read the question back.
3         MS. NUSSBAUM:  I don't think it's --
4         MR. CHEFFO:  Making an objection to
5    basically say if you ask a question when I just did    12:15PM
6    ask a question.
7         MS. NUSSBAUM:  Yeah, when you ask a
8    question that's assuming facts that aren't in
9    evidence --
10         MR. CHEFFO:  I don't know what objection    12:15PM
11    that is.  I don't know where that is in the Federal
12    Rules or even what you're talking about, but I'm not
13    going to engage anymore.
14         Let's just read the question back.
15         THE WITNESS:  Do you have two different    12:15PM
16    cuff links?
17         MR. CHEFFO:  I don't know.  Do I?
18         THE WITNESS:  They're different ones, yeah.
19         MR. CHEFFO:  No, I don't.
20         THE WITNESS:  You don't?  That one looks --
21    okay.  Now, it's just the light.  I'm sorry.  It
22    looks different.  That one looks dark now and that
23    one looks light.  That's fine.  It's the light.
24         (Record read as follows:
25         "QUESTION:  And there have been    12:14PM
                        167

1  patients who have treated with you for
2  pain who have been on Neurontin for
3  seven, eight, nine, ten visits;
4  right?")
5      MR. SOBOL:  Objection to form.          12:16PM
6      THE WITNESS:  There been patients who I've
7  seen in successive visits who have stayed on
8  Neurontin.
9  BY MR. CHEFFO:
10     Q.  And there are patients who you've seen in     12:16PM
11 successive visits who you continued to fill
12 prescriptions for; right?
13     MR. SOBOL:  Objection.
14     THE WITNESS:  There were -- those patients,
15 by and large, are patients who I tried to get off if  12:16PM
16 I didn't think it was helping, and they insisted on
17 staying on.  And since I didn't think it was doing
18 anything either way one way or the other, some
19 patients I kept on.
20     I don't know -- you know, honestly, I don't  12:16PM
21 know if that was a mistake or not.  I just didn't
22 feel I was doing them any harm, and I felt like I
23 was making progress in other areas.  And, you know,
24 is it possible some people feel a benefit from
25 medications even if I don't think so?  Sure.  Of     12:16PM
                              168

1    antidepressants, TCAs --
2        A.   Yeah.
3        Q.   -- are the most cost-effective agents, but
4    second-generation antiepileptic drugs are associated
5    with fewer safety concerns in the elderly?          01:25PM
6        A.   As a categoric question, the answer would
7    have to be no.  It's impossible to answer it.  The
8    answer would have to be no.  There's no way to --
9    that -- each individual drug has its own cost
10   profile, safety profile, so the answer would be no.   01:25PM
11           MS. NUSSBAUM:  And I would note for the
12   record, Mr. Cheffo, if you're reading statements
13   from some kind of document and then asking whether
14   or not the witness agrees, perhaps you want to mark
15   the document and let him see the document so he can   01:25PM
16   look at it in context.
17   BY MR. CHEFFO:
18       Q.   Do you agree that the transmission of
19   painful stimuli through the spinal column and CNS is
20   modulated by excitatory and inhibitory          01:25PM
21   neurotransmitters as well as actions at sodium and
22   calcium channels?
23       A.   Sure.
24       Q.   Do you agree that antidepressants and
25   antiepileptic drugs are thought to relieve pain     01:26PM

                         188

1   view.
2       Q.  It's outside your area of expertise?
3       A.  It's -- I don't have a personal view.
4       Q.  Do you believe that second-generation
5   antiepileptic drugs are better tolerated, cause less   01:26PM
6   sedation and fewer CNS effects -- side effects?
7           MS. NUSSBAUM:  Objection, that's a compound
8   question.
9           And again, I would ask if you want to show
10  the witness a document that you're reading from, it   01:27PM
11  might move the questioning along.
12          MR. CHEFFO:  Speaking objections are
13  inappropriate.
14  BY MR. CHEFFO:
15      Q.  You can answer.
16      A.  Repeat the question again.
17      Q.  Do you believe that second generation
18  agents are better tolerated -- second-generation
19  antiepileptic agents are better tolerated, cause
20  less sedation, and have fewer central nervous system   01:27PM
21  side effects?
22      A.  It's too broad a class of drugs for me to
23  answer specifically, so it would have to be I don't
24  know.
25      Q.  Do you agree that nociceptive pain usually   01:27PM

                        190

1  comparable efficacy in patients with neuropathic
2  pain?
3      MR. SOBOL:  Objection.  At this point, your
4  question said this author, but you haven't put the
5  document in front of the witness, so I think you      01:32PM
6  need to strike that if you're now going to have the
7  witness answer.
8      MR. CHEFFO:  Okay.  Now you --
9      MR. SOBOL:  I will instruct him not to
10  answer until you put the document in front of him      01:32PM
11  unless --
12      MR. CHEFFO:  Tom --
13      MR. SOBOL:  -- you withdraw the question.
14      MR. CHEFFO:  -- I'm going to reread the
15  question.  Do you want to keep --      01:32PM
16      MR. SOBOL:  No.
17      MR. CHEFFO:  -- objecting when I'm agreeing
18  with you?
19  BY MR. CHEFFO:
20      Q.  Do you agree that antiep- -- sorry.      01:32PM
21          Do you agree that antidepressants and
22  antiepileptic drugs have comparable efficacy in
23  patients with neuropathic pain?
24      A.  It's impossible to answer in such general
25  classifications.  I think it is a comment that      01:33PM
                    196

1        MR. SOBOL:  Object to form.
2        THE WITNESS:  -- show me what you're
3    talking about.
4    BY MR. CHEFFO:
5        Q.  I want to ask you first generally.  Forget   01:54PM
6    about your affidavit.
7        A.  I don't feel comfortable answering it
8    generally.
9        Q.  Well, I'm asking a question.
10       A.  Okay.                           01:54PM
11       Q.  Do you have an understanding, as you sit
12   here today, about how formulary decisions are made
13   by Kaiser or the P&T committee, whoever makes those
14   decisions?
15       A.  I have --                       01:54PM
16       MR. SOBOL:  Objection to the form.
17       THE WITNESS:  I have a general
18   understanding.  I don't have a strict nuts and
19   bolts -- I'm not -- I don't have the expert nuts and
20   bolts bird's eye view of it.            01:55PM
21   BY MR. CHEFFO:
22       Q.  Do you know how they would view a
23   recommendation from you or from DUAT?
24       MS. NUSSBAUM:  Who's the "they" that you're
25   referring to?                          01:55PM
                   219

```
 1   possible that a recommendation might not be followed
 2   in the same strict way.
 3   BY MR. CHEFFO:
 4       Q.  You just told me -- two minutes ago, I
 5   thought you said you remember a specific situation      01:56PM
 6   where DUAT made a recommendation.  It wasn't
 7   implemented.  Right?
 8       A.  No.
 9           MR. SOBOL:  Objection.  Misstates the
10   testimony.                        01:56PM
11           THE WITNESS:  I don't think I said that.
12   BY MR. CHEFFO:
13       Q.  Okay.  Are you aware of any --
14           THE REPORTER:  I'm sorry.  Misstates the
15   testimony?
16           MR. SOBOL:  Yes.
17   BY MR. CHEFFO:
18       Q.  Are you aware of any situation where DUAT
19   made a recommendation and it was not followed by the
20   P&T committee?                      01:56PM
21       A.  No.
22       Q.  And am I correct that you don't know what
23   the steps are -- once the recommendation is made by
24   DUAT, you don't know how it ultimately gets to the
25   P&T committee?                      01:57PM
```

221

```
 1          MR. SOBOL:  Objection.
 2          MS. NUSSBAUM:  I --
 3          MR. CHEFFO:  Just object.  We don't need a
 4    whole speech.
 5    BY MR. CHEFFO:
 6       Q.  Go ahead.
 7       A.  I don't know the specific steps.  If I -- I
 8    know it gets there, but I don't know how -- you're
 9    asking me how it gets there.  I don't know
10    specifically how it gets transported there, who does   01:57PM
11    it, under what -- you know, how it gets done.
12       Q.  And in the areas of pain, your specialty,
13    do you ever present to the P&T committee?
14       A.  I've never presented to the P&T committee.
15       Q.  However the information gets there, is that   01:57PM
16    done through the chair, Dr. Hyatt, from the DUAT
17    committee?
18       A.  I don't know the -- I don't know.
19       Q.  Fair enough.  I mean, I don't mean to
20    interrupt you, but if you don't know, I just want to   01:57PM
21    kind of keep --
22       A.  Drug Information Systems is really a key
23    player.  They have all the -- you know, the
24    doctorate experts, and they are a presence
25    throughout these committees.  I don't know exactly   01:57PM
```

222

```
 1    if they do it, but I know a lot of information
 2    sharing is done by them.  But the bottom line, to
 3    answer your question is, I don't know exactly how
 4    it's done.
 5        Q.  It's not through you?              01:58PM
 6        A.  It's not through me personally, absolutely
 7    not, no.
 8        Q.  And Drug Information, that's an entity -- a
 9    Kaiser function; right?
10        A.  I think so, yeah.  They -- they're -- as    01:58PM
11    far as I know.
12        Q.  And as you said, they're integrated in all
13    of these processes?
14        A.  The ones that I'm involved with, they have
15    been integrated.                          01:58PM
16           MS. NUSSBAUM:  Can you define what you're
17    saying is integrated?
18    BY MR. CHEFFO:
19        Q.  And who's the main person that you dealt
20    with at DIS?                              01:58PM
21        A.  The main people that I deal with are the
22    ones who either come into the meeting and present
23    the information or give us the -- if there are
24    articles that we need to review, we ask them for
25    them, and it could be -- it could be an assortment   01:58PM
```

223

1    Abramson before; right?
2        A.  No, I didn't.  The only one I knew was
3    Rapoport.
4        Q.  You never heard of Abramson, did you?
5            MR. SOBOL:  Objection, asked and answered.   02:03PM
6            MR. CHEFFO:  Well, I asked if he knew him.
7    BY MR. CHEFFO:
8        Q.  You don't --
9        A.  I don't know him personally, no.
10       Q.  And you never heard of him, did you, before   02:03PM
11   this?
12       A.  The name sounds familiar, but it's such
13   a -- it's a common name so -- I mean, not Smith
14   but --
15       Q.  Where does he practice?                02:03PM
16       A.  I don't know.
17       Q.  How long has he been in practice?
18       A.  I don't know.
19       Q.  What articles has he published?
20       A.  I don't know.                          02:03PM
21       Q.  Has he been censured by any medical
22   institutions?
23           MR. SOBOL:  Objection.
24           THE WITNESS:  I don't know.
25   BY MR. CHEFFO:
                        228

1    the things that Dr. Wilder had said when you heard
2    them back in 1989 about epilepsy?
3        A.  You know, actually didn't -- in his case, I
4    actually didn't question because I knew people who
5    knew him and they respected him as well.  I think in    02:07PM
6    his work -- his clinical work was probably good.
7        Q.  So what's your beef with him?
8        A.  I knew --
9            MR. SOBOL:  Objection to the form.
10   BY MR. CHEFFO:                              02:07PM
11       Q.  Go ahead.
12           MR. SOBOL:  The question is, do you have a
13   beef with him.
14           MR. CHEFFO:  No, that wasn't the question.
15           THE WITNESS:  Well, what do you mean by    02:07PM
16   "beef"?  Okay.
17   BY MR. CHEFFO:
18       Q.  I think you know what that means, but I'll
19   rephrase it.
20           You seemed to have taken issue with    02:07PM
21   Dr. Wilder after you read this report from
22   Dr. Abramson who you had never heard of before?
23           MR. SOBOL:  Objection.
24           THE WITNESS:  I knew of Wilder's CME group.
25   I mean, I knew he was involved with the CME    02:07PM
                          233

```
 1      Q.  What's the name of the CME organization?
 2      A.  The exact name is in the document.
 3      Q.  Okay.  So you knew he was affiliated with
 4   it, and that was something that caused you to either
 5   be interested in the CME or find the information       02:10PM
 6   helpful?
 7      A.  I thought it gave it more stature, yeah.
 8      Q.  And what did you find out about this doctor
 9   that caused you to have some concerns?
10      A.  Well, specifically, I'd just like to          02:10PM
11   read --
12          MR. SOBOL:  Objection, asked and answered.
13   BY MR. CHEFFO:
14      Q.  Well, I'm going to let you do it, but I
15   want to understand, as you sit here today, you        02:10PM
16   basically said you were very troubled; right?
17          MR. SOBOL:  Objection, asked and answered.
18          THE WITNESS:  I'd like to --
19   BY MR. CHEFFO:
20      Q.  Well, Doctor, I mean --
21      A.  -- read it, yeah.
22      Q.  My -- here's why I'm asking you, because
23   you said it left such an impression with you, the
24   details, such that you would consider changing your
25   conduct based on it; right?                           02:10PM
```

                                 236

```
 1          MS. NUSSBAUM:  I think --
 2          MR. SOBOL:  Objection.
 3          MS. NUSSBAUM:  -- that misstates the
 4    testimony earlier today.
 5          THE WITNESS:  Yeah.  That -- that's not      02:10PM
 6    what I said about -- that's one of the things that
 7    disappointed me, but that's not what I said.
 8    BY MR. CHEFFO:
 9      Q.  Well, you said you were embarrassed; right?
10      A.  I was embarrassed.  I was embarrassed      02:11PM
11    for -- yeah, because --
12      Q.  Okay.
13      A.  I was embarrassed for myself.
14      Q.  Tell me why -- what were the -- if you were
15    embarrassed and you just read this report a few      02:11PM
16    weeks ago, what specifically embarrassed you?
17          MR. SOBOL:  Objection.  This is like the
18    fourth time you've asked him that today.
19          THE WITNESS:  I was embarrassed at someone
20    I trusted.  I was embarrassed that I would look like   02:11PM
21    an idiot when these things, I assume, become public.
22    BY MR. CHEFFO:
23      Q.  Well, again, what would become public?
24      A.  The way that the evidence for Neurontin had
25    been presented.  I had trusted the literature, I had   02:11PM
                            237
```

1      Q.  Doctor, now, without looking at the report,
2  can you remember any specifics about this
3  misrepresentation or any articles specifically?
4         MR. SOBOL:  Objection, asked and answered.
5  BY MR. CHEFFO:
6      Q.  Yes or no?  Can -- do you need to look at
7  the document to have the specifics, or do you
8  remember any of them?
9         MR. SOBOL:  Objection, asked and answered.
10        THE WITNESS:  For your level of        02:13PM
11  questioning, I need to look at the document.
12  BY MR. CHEFFO:
13     Q.  Now, are you aware one way or the other
14  whether anybody else at Kaiser knew of this Abramson
15  report?                        02:14PM
16     A.  I -- no, I'm not aware.
17     Q.  Is it your expectation that if someone on
18  the P&T committee or your chief of anesthesiology
19  had this, this is the kind of information he should
20  have shared or she should have shared with you?        02:14PM
21        MS. NUSSBAUM:  Objection.
22        MR. SOBOL:  Objection.
23        MS. NUSSBAUM:  You're asking him to
24  speculate.
25        THE WITNESS:  All I know is this -- I do        02:14PM
                        239

1       Is it a big deal for me not to know what

2  you mean?

3    Q.  No.  All you have to do is just say yes or

4  no.

5    A.  Then I don't -- then I guess I don't know    02:15PM

6  what you mean.

7    Q.  Okay.

8    A.  The answer would be no.

9    Q.  Do you know what the U.S. package insert

10  is?                      02:15PM

11    A.  Yeah.  It's a package insert that's put

12  into -- alongside the medication.

13    Q.  And what kind of information is in it?

14    A.  Similar to the PDR.

15    Q.  What's in the PDR?           02:15PM

16      MR. SOBOL:  Objection.

17      THE WITNESS:  We talked --

18      MS. NUSSBAUM:  Asked and answered this

19  morning.

20      THE WITNESS:  We talked about that.     02:15PM

21  BY MR. CHEFFO:

22    Q.  Is it the same information?

23    A.  Similar information.

24      MS. NUSSBAUM:  He said similar.

25  BY MR. CHEFFO:           02:15PM

241

```
 1          MS. NUSSBAUM:  Can we just clarify, are you
 2   using gabapentin and Neurontin interchangeably now
 3   in your last series of questions?
 4          MR. CHEFFO:  Not unless they can be.  I
 5   don't know what that means.                02:17PM
 6          MS. NUSSBAUM:  Well, that's what I'm asking
 7   you.  Are you using them separately, or are you
 8   using them interchangeably?
 9          MR. CHEFFO:  I think I'm pretty specific
10   usually when I -- I don't know how to answer that,   02:17PM
11   Linda.  You'll have to read the record.  I don't
12   know all the questions I asked right now but --
13   BY MR. CHEFFO:
14      Q.  Is there a difference?  In other words,
15   have you, in the last few years, read either the      02:17PM
16   Neurontin or gabapentin label?
17      A.  No.  The difference -- gabapentin is the
18   chemical name, and Neurontin is the trade name.  The
19   generic is called gabapentin.
20      Q.  Okay.  How do the labels between gabapentin  02:17PM
21   and Neurontin differ?
22      A.  I don't know.
23      Q.  Is there different information in them?
24      A.  I'm sure there is.  They -- I'm sure there
25   is because the -- it has to include things like dye,   02:17PM
                          243
```

1     Q.  Okay.  You told me earlier that you would
2  do some literature reading and that's how you get
3  your information --
4     A.  Yeah, that's right.  That's one of the
5  ways.                          02:22PM
6     Q.  If you need to know right now, like --
7     A.  I'd call Drug Information Systems.
8     Q.  And what would you say to them?
9     A.  If I needed to know, which I wouldn't -- I
10  don't see a situation in which I would absolutely    02:22PM
11  need to know, unless, you know, in the rare
12  circumstances that I was being --
13        MS. NUSSBAUM:  Just answer the question.
14        MR. CHEFFO:  No, no, don't interrupt his
15  conversation.
16        THE WITNESS:  In the rare circumstance that
17  I was being deposed, I would need to know --
18        THE REPORTER:  I'm sorry.  Everybody's
19  speaking at the same time.
20        MR. CHEFFO:  I don't stop him in the middle  02:22PM
21  of the --
22  BY MR. CHEFFO:
23     Q.  Go ahead.
24     A.  Except for the rare circumstance in which I
25  was being deposed, I actually don't really need to    02:22PM

249

1   BY MR. CHEFFO:
2       Q.   Okay.  You prescribed a TCA by itself?
3       A.   Yeah.
4       Q.   You don't know if that's on label or off
5   label; right?                              02:23PM
6       A.   That's right.  There are different issues
7   with -- again, the TCAs are a different issue.
8       Q.   And then you next prescribe a cocktail
9   which includes a TCA and gabapentin for postherpetic
10  neuralgia; right?                          02:24PM
11          MS. NUSSBAUM:  I don't --
12          MR. SOBOL:  Objection.
13          MS. NUSSBAUM:  I think that misstates the
14  testimony.
15  BY MR. CHEFFO:
16      Q.   Is that right, Doctor?
17      A.   What I said was when someone comes in with
18  postherpetic neuralgia, I try to do the best I can
19  to -- depending if they're in severe pain, I try to
20  give them some kind of cocktail that will give them   02:24PM
21  some relief in the hope that also it reduces the
22  neuropathic pain process and, hopefully, buy time so
23  I can also include other interventions if necessary.
24      Q.   And when you gave that cocktail, what did
25  it include?                                02:24PM

                        251

```
 1        MS. NUSSBAUM:  Asked and answered.
 2        THE WITNESS:  It might include Neurontin,
 3   as I said before.
 4   BY MR. CHEFFO:
 5     Q.  Along with a tricyclic?           02:24PM
 6     A.  Yes, it might.
 7     Q.  And before you made those --
 8        MS. NUSSBAUM:  Along with a narcotic was
 9   the prior testimony.
10        THE WITNESS:  And along with a narcotic.    02:24PM
11   BY MR. CHEFFO:
12     Q.  And before you made those prescriptions,
13   did you go to determine whether those were off-label
14   or on-label uses?
15     A.  So you're asking me --            02:24PM
16     Q.  I'm just trying to find out, when the
17   patient came in --
18     A.  -- as an individual physician, not as one
19   who tries to look at guidelines and set policy for a
20   region; right?  I just want to be clear about that.    02:25PM
21     Q.  Yeah, when a patient came in and you wrote
22   those prescriptions --
23     A.  Well, it makes a difference.  It makes a --
24   it's a big difference.
25     Q.  You treat patients differently whether    02:25PM
```
                              252