UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :

In re:  NEURONTIN MARKETING, SALES        :   MDL Docket No. 1629
        PRACTICES AND PRODUCTS         :
        LIABILITY LITIGATION             :   Master File No. 04-10981

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :

THIS DOCUMENT RELATES TO:             :   Judge Patti B. Saris
                                              :
                                              :   Magistrate Judge Leo T.
                                              :   Sorokin

*Shearer v. Pfizer Inc., et al.*              :   **UNREDACTED**
Case No. 1:07-cv-11428-PBS         :   **VERSION FILED**
                                              :   **UNDER SEAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE
SPECIFIC CAUSATION TESTIMONY OF DRS. GLENMULLEN AND KRUSZEWSKI**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

THRESHOLD SCRUTINY OF EXPERT TESTIMONY ................................................... 3

ARGUMENT ......................................................................................................................... 5

I.    The "Differential Diagnosis" And Other Methods Employed By Plaintiff's Experts Are Fallacious And Unreliable ........................................................................ 5

    A.    Dr. Glenmullen's "Differential Diagnosis" Is Based on Two Logical Fallacies ..................................................................................................... 6

        1.    Dr. Glenmullen Relies on Circular Reasoning ............................... 6

        2.    Dr. Glenmullen Relies on Invalid *Post Hoc* Inferences ............... 8

        3.    Dr. Glenmullen Fails to Adequately Consider Other Potential Causes ............................................................................................. 10

    B.    Dr. Kruszewski Misapplies Bradford Hill Criteria and His "Differential Diagnosis" Is Conclusory and Speculative ............................. 10

        1.    Dr. Kruszewski Misapplies Bradford Hill Criteria ....................... 10

        2.    Dr. Kruszewski's "Ruling In" of Other Causes Is Unreliable ...... 12

        3.    Dr. Kruszewski's "Ruling Out" of Other Causes Is Wholly Arbitrary ........................................................................................ 14

II.    Plaintiff's Expert Testimony Is Not Helpful To The Jury On The Question Of Causation ....................................................................................................................... 15

III.    Plaintiff's Experts' Theory Of Causation Through "Prozac Withdrawal Plus Neurontin" Is Speculative And Unreliable ..................................................................... 17

    A.    Plaintiff's "Prozac Withdrawal Plus Neurontin" Theory Is Unreliable ............... 17

    B.    The Application of Plaintiff's "Prozac Withdrawal Plus Neurontin" Theory Is Unsupported and Speculative ............................................................. 17

CONCLUSION ............................................................................................................................ 19

CERTIFICATE OF SERVICE ................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*In re Agent Orange Product Liability Litigation*, 611 F. Supp. 1223 (E.D.N.Y. 1985),
  *aff'd*, 818 F.2d 187 (2d Cir. 1987)...................................................................................3-4

*Allison v. McGhan Medical Corp.*, 184 F.3d 1300 (11th Cir. 1999)................................................4

*Beer v. Upjohn Co.*, 943 S.W.2d 691 (Mo. App. 1997) ...............................................................16

*Booth v. Varian Associates*, 334 F.2d 1 (1st Cir. 1964) .................................................................7

*Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118 (D. Ariz. 2001).......................................................5, 10

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001) .....................................................7

*Daniels v. New York, New Haven & Hartford Railroad Co.*, 67 N.E. 424 (Mass. 1903) ............16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........................1, 3, 5, 6, 15,
                                                                                                                            17, 19

*Dunn v. Sandoz Pharmaceuticals Corp.*, 275 F. Supp. 2d 672 (M.D.N.C. 2003)...........................5

*Flebotte v. Dow Jones & Co.*, No. 97-30117-FHF, 2001 WL 35988081 (D. Mass.
  Feb. 7, 2001).................................................................................................................................4

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ...................................................................15

*Goebel v. Denver & Rio Grande Western Railroad Co.*, 215 F.3d 1083 (10th Cir. 2000).......4, 19

*Haggerty v. Upjohn Co.*, 950 F. Supp. 1160 (S.D. Fla. 1996), *aff'd mem.*, 158 F.3d 588
  (11th Cir. 1998) ......................................................................................................................5, 10

*Henry v. St. Croix Alumina, LLC*, No. 1999-0036, 2009 WL 982631 (D.V.I. Apr. 13,
  2009).......................................................................................................................................9, 11

*Hochen v. Bobst Group, Inc.*, 290 F.3d 446 (1st Cir. 2002)..........................................................15

*Jorgensen v. Massachusetts Port Authority*, 905 F.2d 515 (1st Cir. 1990)..................................15

*Koken v. Black & Veatch Construction, Inc.*, 426 F.3d 39 (1st Cir. 2005) .....................................6

*Mancuso v. Consolidated Edison Co. of New York, Inc.*, 967 F. Supp. 1437 (S.D.N.Y.
  1997)......................................................................................................................................7, 13

*Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748 (8th Cir. 2006)......................................9, 10, 13

*McClain v. Metabolife International, Inc.*, 401 F.3d 1233 (11th Cir. 2005)....................................8

*McLendon v. Georgia Kaolin, Co.*, 841 F. Supp. 415 (M.D. Ga. 1994) ........................................5

*Milward v. Acuity Specialty Products Group, Inc.*, Civ. Act. No. 07-11944-GAO,
  2009 WL 3400288 (D. Mass. July 31, 2009) ...................................................15

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*, No.
  04-cv-10981-PBS, 2009 WL 3756328 (D. Mass. Aug. 14, 2009) .................3, 4, 6, 12, 14

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*, 612 F.
  Supp. 2d 116 (D. Mass. 2009) ...........................................................10, 11

*Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293 (8th Cir. 1996) ...........................5

*Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63 (D. Mass. 2000) ................................8, 11

*Porter v. Whitehall Laboratories, Inc.*, 791 F. Supp. 1335 (S.D. Ind. 1992), *aff'd*,
  9 F.3d 607 (7th Cir. 1993) ..................................................................5

*Reinhardt v. Gulf Insurance Co.*, 489 F.3d 405 (1st Cir. 2007) ................................15

*Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996) .........................4, 5, 14, 15, 17

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77 (1st Cir. 1998) ..........4, 15

*Sindler v. Litman*, 887 A.2d 97 (Md. Ct. Spec. App. 2005) ....................................16

*United States v. 33.92356 Acres Of Land*, 585 F.3d 1 (1st Cir. 2009) ...........................3

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) ...................................4, 7

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000) .................................................4

*Whiting v. Boston Edison Co.*, 891 F. Supp. 12 (D. Mass. 1995) ...............................8

**Statutes**

Fed. R. Evid. 702 ..........................................................................18

**Other Authorities**

FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE – REFERENCE
  GUIDE ON MEDICAL TESTIMONY 464 (2d ed. 2000) ...........................................7

Joseph Glenmullen, THE ANTIDEPRESSANT SOLUTION: A STEP-BY-STEP GUIDE TO SAFELY
  OVERCOMING ANTIDEPRESSANT WITHDRAWAL, DEPENDENCE, & ADDICTION (Free
  Press 2004) ...............................................................................17

A. Bradford Hill, *The Environment & Disease: Association or Causation?*, 58 PROC.
  ROYAL SOC'Y MED. 295 (1965) ........................................................10-11

## PRELIMINARY STATEMENT

Plaintiff Linda Shearer seeks to recover for the suicide of her husband, Hartley Shearer, in 2002, which she claims was caused by Mr. Shearer's use of Neurontin. Mr. Shearer was a 57-year-old video artist diagnosed with a variety of psychiatric disorders, including depression, obsessive compulsive disorder, anxiety, attention deficit disorder, and narcissistic personality disorder. Mr. Shearer also suffered profound health problems, including a stroke in 1999 that left him significantly paralyzed on the left side of his body. Mr. Shearer never fully recovered from his stroke and required assistance with day-to-day living. He also sought psychiatric treatment for a variety of issues relating to his stroke. This difficult change in Mr. Shearer's physical ability created understandable strain and conflict between Mr. and Mrs. Shearer. In 2000, Mr. Shearer was hospitalized for severe lower back pain, endocarditis and an emergency splenectomy. His severe pain was initially treated with narcotic medications but he suffered serious side-effects. In October 2000 he was prescribed Neurontin to alleviate his severe pain. On February 7, 2002, shortly after a telephone argument with Mrs. Shearer, Mr. Shearer committed suicide by gunshot. He left a signed note stating: "Linda has left me powerless by hanging up on me for the last time. I love you both Ivor and Linda. But this is it – Hartley Shearer."

Plaintiff proffers the opinion testimony of two psychiatrists, Dr. Joseph Glenmullen, M.D., and Dr. Stefan P. Kruszewski, M.D., who opine that Neurontin was a substantial factor in causing Mr. Shearer's suicide. They also suggest that Mr. Shearer may have run out of his prescription for Prozac shortly before his death, and that the combined effect of Prozac withdrawal along with taking Neurontin may have caused Mr. Shearer to commit suicide. As set forth below, the testimony of these experts fails to meet the stringent requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702.

Although Drs. Glenmullen and Kruszewski label their analysis a "differential diagnosis," they have conducted nothing of the sort. As this Court has recognized, differential diagnosis requires a valid methodology both to "rule in" potential causes of an injury and to then "rule out"

unlikely causes.  Yet here, Dr. Glenmullen purports to rule out Mr. Shearer's depression, anxiety, and anger as causes of his suicide by stating that these symptoms were actually caused, or exacerbated, by Neurontin.  This is wholly circular – the point of differential diagnosis is to consider whether alternative causes of an injury could have caused the injury *independent of the suspected cause*.  By asserting that Neurontin was the root of Mr. Shearer's psychiatric problems, Dr. Glenmullen has failed to consider other potential causes in isolation and has instead assumed what he sought to prove.  Moreover, Dr. Glenmullen's assertion that Neurontin caused these psychiatric conditions because they supposedly manifested after Mr. Shearer took Neurontin is not only unsupported by the record, it commits the logical fallacy of *post hoc, ergo propter hoc*.

Likewise, Dr. Kruszewski purports to "rule in" potential causes by making a list of Mr. Shearer's risk factors for suicide, but ignores well-recognized risk factors, such as Mr. Shearer's long-standing frustrations with his physical limitations.  Instead, Dr. Kruszewski finds that Mr. Shearer had "protective factors" for suicide owing to his "stable marriage" and lack of "ongoing relationship problems at the time of his suicide," even though Mr. Shearer's suicide note implied long-standing marital issues.  Dr. Kruszewski even considers Mrs. Shearer's arrest for domestic violence against Mr. Shearer to be a *protective* factor for suicide, because this "domestic issue[] . . . did not result in his act of self-harm."  Nor does Dr. Kruszewski employ any valid methodology for ruling out the other risk factors he identifies.  He simply states that he considered the risk factors and concluded that Neurontin was the cause.

Plaintiff's experts' opinion that Neurontin was a "substantial factor" in causing Mr. Shearer's suicide would not be helpful to the jury for two reasons.  First, simply listing Neurontin as one of "a number of things [that] increased his risk" for suicide (Deposition of Dr. Joseph Glenmullen ("Glenmullen Dep.") at 146:18-23, Ex. A)[1] fails to show that Mr. Shearer would not have committed suicide had he not been taking Neurontin, even if all these other "things" were still present.  Second, Plaintiff's experts ignore the controlling standard of

---

[1] All documents cited herein as "Ex. __" are attached as exhibits to the accompanying Declaration of Mark S. Cheffo.

proximate causation, which presumes that suicide is a superseding cause unless the defendant's conduct created "delirium or frenzy" or an "uncontrollable impulse" that caused the decedent to commit suicide. Neither Dr. Glenmullen nor Dr. Kruszewski offers any such testimony, absent which their opinions are irrelevant.

Finally, Plaintiff's experts' "Prozac withdrawal plus Neurontin" theory must be rejected. Drs. Glenmullen and Kruszewski speculate that if Mr. Shearer had stopped taking Prozac five days before his suicide, it would have lowered his serotonin level, which, combined with Neurontin's alleged effect of lowering serotonin, could have caused his suicide. However, Dr. Glenmullen admitted that this theory has not been studied in <u>any</u> capacity, let alone peer-reviewed or generally accepted. Moreover, its application here is speculative at best, because Dr. Glenmullen admitted that Prozac withdrawal does not normally occur until *two or three weeks* after the patient stops taking the drug, and both of Plaintiff's experts have admitted that there is no evidence Mr. Shearer had any symptoms of Prozac withdrawal.

## FACTUAL BACKGROUND

Pfizer refers the Court to the statement of facts included in its concurrently filed Motion for Summary Judgment.

## THRESHOLD SCRUTINY OF EXPERT TESTIMONY

"[T]he trial judge is charged with a gatekeeping responsibility over expert testimony: 'the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. 33.92356 Acres Of Land*, 585 F.3d 1, 7 (1st Cir. 2009) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). "Vigilant exercise of this gatekeeper role is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background and approach." *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 04-10981, 2009 WL 3756328, at *3 (D. Mass. Aug. 14, 2009). The Court should be "particularly wary of unfounded expert opinion" where, as here, "causation is the issue." *In re Agent Orange Prod.*

3

*Liab. Litig.*, 611 F. Supp. 1223, 1249 (E.D.N.Y. 1985) (Weinstein, J.), *aff'd*, 818 F.2d 187 (2d Cir. 1987). The burden of satisfying these "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), falls to "'the party offering the expert, and admissibility must be shown by a preponderance of the evidence.'" *Flebotte v. Dow Jones & Co.*, No. 97-30117, 2001 WL 35988081, at *1 (D. Mass. Feb. 7, 2001) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

Although this Court has held that *Daubert*'s four-factor test may not be perfectly applicable to "psychiatric and psychological testimony as to the causes of an individual's suicide," *In re Neurontin*, 2009 WL 3756328, at *5, it did not suggest that a plaintiff's proffer of social science evidence warrants softening or diluting *Daubert*'s core requirement of reliability. To the contrary, the Court affirmed that "[t]he ultimate task is . . . to determine whether the expert testimony is 'based upon sufficient facts or data and is the product of reliable principles and methods, and if the principles and methods have been applied reliably to the facts of the case.'" *Id.* (citation omitted). Indeed, the First Circuit has prohibited trial judges from "abdicat[ing] the responsibility for making [reliability and relevance] judgments by delegating them to the scientific community." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). Reliability thus remains controlling "even when the proposed testimony is 'soft,' as opposed to 'hard' science." *In re Neurontin*, 2009 WL 3756328, at *5. Accordingly, even though "'professional experience, education, training, and observations,'" may have more relevance in evaluating social science expert evidence, *id.* at *4 (citation omitted), "credentials and a subjective opinion" cannot justify "an expert's testimony" that "it is so." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987); *see also Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("[A]n expert, no matter how good his credentials, is not permitted to speculate.").

Thus, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). "The adjective

'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Indeed, a core rule of evidence is that "speculation is unreliable . . . and is inadmissible." *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003). This requires the expert to "adhere to the same standards of intellectual rigor that are demanded in [his] professional work." *Rosen*, 78 F.3d at 318.

Finally, *Daubert* carefully distinguishes between the threshold reliability inquiry that Plaintiff must satisfy and the role of cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky *but admissible* evidence. . . . These conventional devices . . . are the appropriate safeguards *where* the basis of scientific testimony *meets the standards* of Rule 702." *Daubert*, 509 U.S. at 596 (emphasis added). As the highlighted language shows, the Plaintiff must first satisfy her burden of demonstrating that the proffered evidence is admissible. *See McLendon v. Georgia Kaolin Co.*, 841 F. Supp. 415, 418 (M.D. Ga. 1994) (recognizing that "these devices are only sufficient safeguards where the scientific testimony meets the standards of Rule 702"); *see also Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297 (8th Cir. 1996) ("cross-examination at trial" cannot "take the place of scientific peer review"); *Porter v. Whitehall Labs., Inc.*, 791 F. Supp. 1335, 1345 (S.D. Ind. 1992) ("[A]n expert's opinion must have *some* basis other than hypothesis before the opinion may have the privilege of being assailed by cross-examination."), *aff'd*, 9 F.3d 607 (7th Cir. 1993).

## ARGUMENT

### I.   The "Differential Diagnosis" And Other Methods Employed By Plaintiff's Experts Are Fallacious And Unreliable

Courts considering similar pharmaceutical suicide claims have rejected expert testimony as unreliable that "did not fully explore other potential causes of [the victim's] suicide. *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1136 (D. Ariz. 2001); *accord Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1166 (S.D. Fla. 1996), *aff'd mem.*, 158 F.3d 588 (11th Cir. 1998). This Court has

recognized "differential diagnosis" as a valid method of ruling out other potential causes in suicide cases. *See In re Neurontin*, 2009 WL 3756328, at *12. Although Plaintiff's experts have couched their opinions as "differential diagnoses," they have employed that technique only in name, for their opinions are merely a hodge-podge of speculation, logical fallacy, and misapplication of established techniques. As such, they must be excluded.

### A.     Dr. Glenmullen's "Differential Diagnosis" Is Based on Two Logical Fallacies

This Court evaluates a purported differential diagnosis as follows:

> "A medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor (1) objectively ascertains, to the extent possible, the nature of the patient's injury, . . . (2) '"rules in"' one or more causes of the injury using a valid methodology, and (3) engages in 'standard diagnostic techniques by which doctors normally rule out alternative causes' to reach a conclusion as to which cause is most likely."

*In re Neurontin*, 2009 WL 3756328, at *13 (citation omitted).   Dr. Glenmullen commits two well-recognized logical fallacies in attempting to rule out alternate causes of Mr. Shearer's suicide: (1) circular reasoning, or assuming what he has sought to prove; and (2) *post hoc, ergo propter hoc*, or "after this, therefore because of this."   These twin logical flaws show that Dr. Glenmullen's opinion fails *Daubert*'s core demand for "'reasoning or methodology underlying the testimony [that] is scientifically valid.'"   *Koken v. Black & Veatch Constr., Inc.*, 426 F.3d 39, 47 (1st Cir. 2005) (quoting *Daubert*, 509 U.S. at 592-93).

#### 1.     Dr. Glenmullen Relies on Circular Reasoning

Dr. Glenmullen acknowledges risk factors for suicide other than Neurontin, including Mr. Shearer's underlying anger, anxiety, and depression (Expert Report of Dr. Joseph Glenmullen ("Glenmullen Report") at 28-29, Ex. B), all of which had been identified and treated *prior* to Mr. Shearer's first use of Neurontin.   (Dr. Catapano-Friedman Records ("C-F") at 17DCR-2-4, Ex. C; Williamstown Med. Assocs. Records ("WMA") at 30WMA-56, Ex. D.)   Dr. Glenmullen then immediately and illogically concludes that none of these problems could be substantial factors in causing Mr. Shearer's suicide, because each of these problems was caused by Neurontin.   (Glenmullen Report at 28-29; Glenmullen Dep. at 21:4-22:25 (opining that Mr.

Shearer's psychiatric problems as observed by Dr. Catapano-Friedman were all attributable to Neurontin).) This is classic circular reasoning. *See Booth v. Varian Assocs.*, 334 F.2d 1, 5 (1st Cir. 1964) (stating that assuming the truth of the "point at issue" is improper circular reasoning).

To exclude other potential causes, a differential diagnosis must evaluate whether those causes were, *independent of the agent at issue*, sufficient to explain or account for the individual's injury. *See* FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE – REFERENCE GUIDE ON MEDICAL TESTIMONY 464 (2d ed. 2000) ("FJC Manual") ("[T]he clinician must verify or validate the diagnostic hypothesis" by assessing whether the facts of the patient's case "sufficiently match those expected" from the cause under consideration).[2] The expert cannot rule out those other potential causes unless he "offer[s] an explanation for why the proffered alternative cause was not the sole cause" of the individual's injury. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001); *see also* FJC Manual at 464-65. Thus, if the expert simply concludes at the outset that the agent at issue is responsible for all of those other potential causes, as Dr. Glenmullen has here, he has not made a differential diagnosis at all, because he has not considered the other potential causes independently. *See* FJC Manual at 468 ("[T]he physician must usually consider and assess alternative and more specific causal models before accepting a particular model as the preferred explanation."). Rather, he employed circular reasoning by assuming the very fact he sought to prove. *See Mancuso v. Consol. Edison Co. of N.Y., Inc.*, 967 F. Supp. 1437, 1450 (S.D.N.Y. 1997) (rejecting expert's circular reasoning in case involving alleged toxic exposure). Having failed to properly evaluate and rule out potential alternative causes, Dr. Glenmullen instead "simply picks the cause that is most advantageous to [Plaintiff]'s claim." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

---

[2] *See also* FJC Manual at 477 ("In general, if a patient is not subject to other known risk factors for a disease, it is more likely that the external cause is a factor in causing the patient's illness.").

**2.      Dr. Glenmullen Relies on Invalid *Post Hoc* Inferences**

Dr. Glenmullen next attempts to justify one logical error with another, claiming that Mr. Shearer's psychological problems manifested severely after he was prescribed Neurontin, thus indicating they were caused by the Neurontin.  Notwithstanding the fact that Mr. Shearer's medical records show that he suffered from these problems *before* he ever took Neurontin (*see* January 14, 2010, Deposition of Dr. Stefan P. Kruszewski ("Kruszewski Dep.") at 79:22-80:16, Ex. E; C-F at 17DCR-1-6), Dr. Glenmullen's "false inference that a temporal relationship proves a causal relationship" is a classic *post hoc* fallacy.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 143 (11th Cir. 2005); *see also, e.g., Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 70 (D. Mass. 2000) (excluding expert testimony and granting summary judgment where the expert's opinion "in a classic illustration of the *post hoc ergo propter hoc* fallacy, rests on the temporal proximity between the installation of the [defendant's product] and the onset of [plaintiff's] disease"); *accord Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 23 n.52 (D. Mass. 1995).

The great flaw in Dr. Glenmullen's *post hoc* fallacy here is that it fails to consider causes other than Neurontin as potential sources of Mr. Shearer's increasing anger, anxiety, and depression.  Indeed, immediately prior to Mr. Shearer's first Neurontin prescription, he had been hospitalized for severe back pain, endocarditis and a splenectomy, directly on the heels of attempting to recover from a massive stroke.  (*See* Glenmullen Report at 13-18.)  Dr. Glenmullen suggests that because Mr. Shearer was able to cope with his stroke, he should have been able to cope with these additional medical problems as well, but for Neurontin.  (*Id.* at 30; *see also* Glenmullen Dep. at 41:16-42:15.)  Yet this ignores Mr. Shearer's statement that he was "very traumatized" by these new medical problems (C-F at 17DCR-4, Ex. C) and fails to consider the obvious possibility that these additional medical problems – in conjunction with the continuing and permanent effects of his stroke – simply proved too much for him.  Moreover, Dr. Glenmullen fails to note that those hospital records, quoted in his own report, show that Mr. Shearer felt on the "*edge of breakdown*" and "expresse[d] feelings of depression" *before* he was

ever prescribed Neurontin. (Brigham & Women's Hosp. Records ("BWH") at 00374-37BWH-00394-97, Ex. F (emphasis added); Glenmullen Report at 18.)

Further, Dr. Glenmullen improperly assumes that because Neurontin allegedly *can* cause depression and mood disorders, it *must* have caused them for Mr. Shearer. (*See, e.g.*, Glenmullen Report at 28-29.) Courts have properly rejected such attempts to infer specific causation from general causation.[3] *See Henry v. St. Croix Alumina, LLC*, No. 1999-0036, 2009 WL 982631, at *9 (D.V.I. Apr. 13, 2009) (excluding expert medical causation opinion and observing that "[e]vidence that such exposure *could have* caused plaintiffs' documented injuries in the abstract is manifestly different from evidence that it *did* cause those injuries" (emphasis added) (citation omitted)). Moreover, Dr. Glenmullen's opinion in this regard requires ignoring important evidence, such as Dr. Catapano-Friedman's observation of Mr. Shearer's anger, anxiety, and depression *before* he ever took Neurontin. (C-F at 17DCR-1-4; Dep. of Dr. Lisa Catapano-Friedman ("C-F Dep.") at 144:22-145:2, Ex. G.) Indeed, Dr. Glenmullen ignores Dr. Catapano-Friedman's testimony about why people like Mr. Shearer commit suicide. (C-F Dep. at 155:14-157:12.) In an attempt to save his speculation about causation, Dr. Glenmullen is forced to suggest that Dr. Catapano-Friedman's clinical observation of Mr. Shearer's anger, anxiety, and depression over a two-year period must be discounted, simply because she did not have "the benefit of the warnings" that Neurontin could cause Mr. Shearer's symptoms. (Glenmullen Dep. at 19:25-20:20.) Dr. Glenmullen has no reliable basis to substitute his reading of the paper record for Dr. Catapano-Friedman's in-person counseling over a two-year period. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006) ("Expert testimony is inadmissible if it is . . . contrary to the facts of the case.").

---

[3] Pfizer denies that there is sufficient evidence of general causation; however, it is not, by this motion, seeking to re-argue this Court's prior decision on this issue. It does not need to: The law is clear that an expert cannot simply leap from evidence of general causation to an opinion regarding specific causation.

3.     **Dr. Glenmullen Fails to Adequately Consider Other Potential Causes**

Dr. Glenmullen finishes his "differential diagnosis" by making conclusory assertions that anything he cannot attribute to Neurontin was not a substantial factor in causing Mr. Shearer's suicide. (*See, e.g.*, Glenmullen Report at 29-32 (discussing Mr. Shearer's stroke, marital issues, financial problems, attention deficit disorder, and compulsive traits).) Yet the exclusion of these other factors requires Dr. Glenmullen to strain the facts. For instance, even though Mr. Shearer's suicide note stated that his suicide was due, in part, to issues surrounding his relationship with Mrs. Shearer, Dr. Glenmullen concluded that Mr. Shearer's marital problems could not have been a substantial factor because the Shearers "had a loving, decades-long marriage" and their "marital issues were within normal limits." (Glenmullen Report at 31.) Dr. Glenmullen's opinion is "contrary to the facts of the case," *Marmo*, 457 F.3d at 757, as it ignores both that Mr. Shearer was treated by Dr. Catapano-Friedman for his anger toward Mrs. Shearer and that Mr. Shearer had sought marital counseling for their problems for many years. (C-F at 17DCR-2; C-F Dep. at 85:10-12; WMA at 30WMA-84-86.) Dr. Glenmullen likewise ignores ██████████████████████████████████████████████████████████████████ By disregarding this contrary evidence in the factual record, Dr. Glenmullen has "not fully explore[d] other potential causes of [the victim's] suicide," *Cloud*, 198 F. Supp. 2d at 1136, and his testimony is inadmissible. *Id.*; *accord Haggerty*, 950 F. Supp. at 1166.

B.     **Dr. Kruszewski Misapplies Bradford Hill Criteria and His "Differential Diagnosis" Is Conclusory and Speculative**

1.     **Dr. Kruszewski Misapplies Bradford Hill Criteria**

The Bradford Hill criteria are "nine factors which researchers often consider when judging whether an observed association is truly causal." *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 132-33 (D. Mass. 2009); *see also* A. Bradford Hill, *The Environment & Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295

(1965).  Dr. Kruszewski purports to employ these factors to answer the question, "[w]as Neurontin a significant contributory factor that caused Mr. Shearer's suicide death?" (*See* Expert Report of Dr. Stefan P. Kruszewski ("Kruszewski Report") at 13, Ex. I.)  However, as this Court has recognized, the Bradford Hill criteria are used to evaluate arguments for *general* causation, *see In re Neurontin*, 612 F. Supp. 2d at 133.  Because these criteria are a "'tool for determining whether an epidemiological study establishes causation,'" *id.* (citation omitted), they cannot be employed to determine specific causation, because epidemiological studies do not show specific causation.  Dr. Kruszewksi's attempt to conflate general and specific causation is per se unreliable, for it is axiomatic that "[e]vidence that . . . exposure could have caused plaintiffs' documented injuries in the abstract is manifestly different from evidence that it did cause those injuries." *See Henry*, 2009 WL 982631, at *9.

Dr. Kruszewski's exposition of his Bradford Hill analysis of specific causation only reinforces his error.  Indeed, for eight of Bradford Hill's nine factors, he refers only to general causation evidence, largely parroting the opinions of Plaintiff's experts on that point.  (*See* Kruszewski Report at 13-14.)  None of this analysis even addresses Mr. Shearer's circumstances. Dr. Kruszewski mentions Mr. Shearer with respect to only one factor, temporality, reasoning that causation is likely because "Mr. Shearer was taking Neurontin for a lengthy period and Neurontin was one of the last prescriptions that Mr. Shearer filled prior to his suicide." (*Id.* at 13.)  Temporal association may be an appropriate indicator of general causation when examining an association observed in multiple discrete cases, but with respect to one incident in a specific case, temporal association is simply the same invalid, *post hoc* reasoning that rendered Dr. Glenmullen's opinion inadmissible.  *See supra* Point I.A.2.  Dr. Kruszewski's Bradford Hill analysis thus amounts to an improper attempt to use general causation as a proxy for specific causation, *see Henry*, 2009 WL 982631, at *9, combined with fallacious inferences of causation based on "temporal proximity." *See Polaino*, 122 F. Supp. 2d at 70.

### 2.      Dr. Kruszewski's "Ruling In" of Other Causes Is Unreliable

Dr. Kruszewski apparently concluded Neurontin was a substantial factor simply because he put more items in the "protective factor" column than in the "risk factor" column. But Dr. Kruszewski does not use any "valid methodology" to rule in other potential causes. *In re Neurontin*, 2009 WL 3756328, at *13. To the contrary, his evaluation of "risk factors" and "protective factors" in Mr. Shearer's personal history is, at best, wholly arbitrary. (*See* Kruszewski Report at 14-15.)

Dr. Kruszewski ignores and mischaracterizes Mr. Shearer's well-recognized suicide risk factors. For instance, instead of ruling in the Shearers' financial strain from mounting medical bills and college expenses, Dr. Kruszewski simply sets the bar lower, deeming the fact that Mr. Shearer was "not socioeconomically impoverished" to be a protective factor. (Kruszewski Report at 15.) Similarly, Dr. Kruszewski labels Mr. Shearer's *lack* of diagnosis for "bipolar disorder I, severe anxiety, agoraphobia, panic or psychotic depression" as a protective factor (*id.*), as though every disease the decedent *did not* have should be counted as a protective factor. Conversely, Dr. Kruszewski fails to mention Mr. Shearer's diagnosis with obsessive compulsive disorder, anxiety, attention deficit disorder, and likely diagnosis of narcissistic personality disorder as risk factors. Finally, even though Dr. Kruszewski labels Mr. Shearer's depression as a risk factor, he gives it a slanted treatment, by opining that Mr. Shearer was "*successfully treated* for depression" (*id.* at 14 (emphasis added)), despite evidence that Mr. Shearer continued to suffer from depression up until the time of his suicide. (Catapano-Friedman Records at 3-6.)

Additionally, Dr. Kruszewski ignores the adverse effects of Mr. Shearer's long-standing and well-documented history of anger management issues, including anger toward his wife following his stroke. Instead, Dr. Kruszewski finds that Mr. Shearer's "stable marriage for 35 years" was a protective factor for suicide. (Kruszewski Report at 14.) Moreover, Dr. Kruszewski somehow unearths a second protective factor on this point, citing Mr. Shearer's lack of "ongoing relationship problems at the time of his suicide." (*Id.* at 15) This second finding is woefully myopic, if not disingenuous, especially in light of Dr. Kruszewski's own

acknowledgement of Mr. Shearer's "argument with [Mrs. Shearer] . . . shortly before his suicide" (*id.* at 14), which is Dr. Kruszewski's only allusion to a risk related to Mr. Shearer's persistent anger issues.

Dr. Kruszewski stretches the record even thinner by attempting to characterize Mr. Shearer's anger management issues with his wife as a *protective factor*. He describes Mr. Shearer's marital problems as "previous domestic issues with his wife which did not result in his act of self-harm." (Kruszewski Report at 14.) This is circular reasoning, because the very question at issue is whether these marital problems contributed to Mr. Shearer's act of self-harm. *See Mancuso*, 967 F. Supp. at 1450 (rejecting expert's circular reasoning). Dr. Kruszewski makes the same error by deeming Mr. Shearer's medical issues a *protective factor*, because they did not result in him "act[ing] to hurt himself in the period from 1999 up until his suicide," where the very question at issue is whether those medical issues caused Mr. Shearer to commit suicide. (Kruszewski Report at 15.) Under Dr. Kruszewski's reasoning, *anything* in an individual's personal history up to the point of suicide could be a protective factor – even planning an uncompleted suicide attempt – because no matter how traumatizing or damaging it may have been, one can always conclude that it "did not result in self-harm." Indeed, if applied consistently, Dr. Kruszewski's reasoning would require treating Mr. Shearer's Neurontin use as a protective factor, since he used the drug for over fifteen months before his death, and no percipient witness has testified that he ever expressed suicidal thoughts during that time period.

At deposition, Dr. Kruszewski attempted to justify his disregard of Mr. Shearer's anger management issues by opining that these issues were newly manifested after Mr. Shearer began taking Neurontin. (Kruszewski Dep. at 81:5-16.) However, he was forced to concede that Mr. Shearer had documented anger problems before he took Neurontin. (*Id.* at 84:12-17 ("Q: So there's no doubt that this anger manifests itself prior to the Neurontin? . . . . A: I would concur with that, yes."); *accord id.* at 83:18-21.) By his own admission, his opinion is thus "contrary to the facts of the case." *Marmo*, 457 F.3d at 757.

### 3.   Dr. Kruszewski's "Ruling Out" of Other Causes Is Wholly Arbitrary

Dr. Kruszewski's opinion also fails the second prong of this Court's test for differential diagnosis, because he does not employ *any* methodology to rule out other potential causes, let alone the "standard diagnostic techniques" required by the Court. *See In re Neurontin*, 2009 WL 3756328, at *13 (quotation omitted). Instead, Dr. Kruszewski simply lists what he determines as Mr. Shearer's risk factors and protective factors for suicide and then proclaims "[f]rom the above differential diagnosis applied to my analysis of factors in his suicide autopsy, I am able to conclude, within a reasonable degree of medical and psychiatric certainty, that Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide." (Kruszewski Report at 16.)

While Dr. Kruszewski's report refers to an "analysis," it contains none – he offers only conclusions. *See Rosen*, 78 F.3d at 319 ("[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." (quotation omitted)). Although Dr. Kruszewski goes to some lengths to recite all of the evidence he considered in forming his opinion, such as the "medical, social, adaptational, pharmaceutical, circumstantial events . . . proximate to the time that [Mr. Shearer] decided to end his life" (*see* Kruszewski Report at 15), he never explains *why* he did not consider these other events to be sufficient to cause Mr. Shearer's suicide. Nowhere does Dr. Kruszewski discuss by what method or criteria he ruled out Mr. Shearer's severe medical problems, or his pre-existing depression or anger, as independently sufficient causes of Mr. Shearer's suicide, thus failing the requirements for a reliable differential diagnosis. *See In re Neurontin*, 2009 WL 3756328, at *13; FJC Manual at 464, 468. Even at deposition, Dr. Kruszewski was unable to defend his methodology. Instead, Dr. Kruszewski was left to claim that this is all just "part of the art of suicidology," the mysteries and methods of which he was unable to articulate. (Kruszewski Dep. at 64:14-25.)

For all his speculation and his appeals to the "art" and multi-factorial nature of suicide, Dr. Kruszewski never addresses the methods he purportedly used in his "differential diagnosis" to evaluate specific causation. *See In re Neurontin*, 2009 WL 3756328, at *13 (requiring differential diagnosis to employ """standard diagnostic techniques by which doctors normally

rule out alternative causes'""" (citation omitted).).  Instead, Dr. Kruszewski "simply picks the cause that is most advantageous to [Plaintiff]'s claim," and then, resting solely on "credentials and a subjective opinion," *Viterbo*, 826 F.2d at 424, purports to state his opinion "within a reasonable degree of medical and psychiatric certainty." (Kruszewski Report at 16.) This Court should not accept such "unscientific speculation," even where it is "offered by a genuine scientist." *Rosen*, 78 F.3d at 318.  Indeed, "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'" *Ruiz-Troche*, 161 F.3d at 81 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  Because there is "'simply too great an analytical gap between the data and the opinion proffered,'" *id.*, Dr. Kruszewski's testimony must be excluded.

## II.   Plaintiff's Expert Testimony Is Not Helpful To The Jury On The Question Of Causation

Plaintiff's experts ignore the controlling causation standards, rendering their testimony unhelpful to the jury.  "'The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue.'" *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir. 2002) (quotation omitted).  Expert opinion "can only assist the trier of fact if it has 'a valid scientific connection to the pertinent inquiry.'" *Milward v. Acuity Specialty Prods. Group, Inc.*, Civ. Act. No. 07-11944-GAO, 2009 WL 3400288, at *2 (D. Mass. July 31, 2009) (O'Toole, J.) (quoting *Daubert*, 509 U.S. at 592).

First, Drs. Glenmullen and Kruszewski purport to conclude that Neurontin was a "substantial factor" in causing Mr. Shearer to commit suicide.  (Glenmullen Report at 31; Kruszewski Report at 16.)  But as set forth more fully in Point I of Pfizer's Motion for Summary Judgment, incorporated here by reference, Plaintiff must show not only that Pfizer's conduct was a substantial factor, but also that it "'was a but-for cause of [her] injury.'" *Reinhardt v. Gulf Ins. Co.*, 489 F.3d 405, 412 (1st Cir. 2007) (quoting *Jorgensen v. Mass. Port Auth.*, 905 F.2d 515, 524 (1st Cir. 1990)).  To address this standard, Drs. Glenmullen and Kruszewski would have to opine that all of the other risk factors in Mr. Shearer's life would have been insufficient to cause

his suicide but for Neurontin. Any such opinion would be wholly arbitrary, particularly in light of the undisputed fact that Mr. Shearer was on a number of psychotropic drugs prior to his suicide – including Trazodone, Prozac, Ativan, Provigil, Zyprexa, and Ritalin[4] – many of which have been associated with the risks of depression and suicide. The only drug found in Mr. Shearer's system was benzodiazepine (*see* Mass. Medical Examiner Records at 420CM-3-9, Ex. K), which Plaintiff's expert Dr. Trimble claims increases the risk of depression and suicide. (Deposition of Dr. Michael Trimble ("Trimble Dep.) at 98:8-17, Ex. L; Expert Report of Dr. Michael Trimble ("Trimble Report") at 18, Ex. M.)

Second, Drs. Glenmullen and Kruszewski fail to address the standard required to hold a defendant liable for the suicide of another. As set forth more fully in Point II of Pfizer's Motion for Summary Judgment, incorporated here by reference, Massachusetts law presumes that an individual's choice to commit suicide operates as an intervening and superseding cause relieving the defendant of liability. *See Daniels v. New York, N.H. & H.R. Co.*, 67 N.E. 424, 426 (Mass. 1903). To overcome this presumption, Plaintiff must proffer competent expert evidence that Mr. Shearer's Neurontin use created "delirium or frenzy" or an "uncontrollable impulse" that caused him to commit suicide. *Id.* Neither expert offers any such opinion.

A court evaluating similar expert testimony that a prescription medication had caused an individual's suicide by reducing his GABA levels found no admissible evidence of specific causation, because the expert did not testify that the decedent "was insane or that an insane irresistible impulse caused his suicide." *Beer v. Upjohn Co.*, 943 S.W.2d 691, 695 (Mo. Ct. App. 1997); *see also Sindler v. Litman*, 887 A.2d 97, 121 (Md. Ct. Spec. App. 2005) (summary judgment proper absent expert opinion that decedent was "insane or otherwise was in a mental state such that she did not realize the nature and risk of her act of suicide or that she had an uncontrollable impulse"). This Court should rule likewise.

---

[4] (*See* Hart's Pharmacy Records ("Hart's") at 26HPH-15-17, Ex. J.)

**III.   Plaintiff's Experts' Theory Of Causation Through "Prozac Withdrawal Plus Neurontin" Is Speculative And Unreliable**

    **A.   Plaintiff's "Prozac Withdrawal Plus Neurontin" Theory Is Unreliable**

Dr. Glenmullen and Dr. Kruszewski suggest that Mr. Shearer's suicide may have been caused by a combination of Neurontin and Prozac withdrawal. (*See* Glenmullen Report at 32; Kruszewski Report at 14.) There is no reliable scientific basis for any such opinion, which fails each of *Daubert*'s criteria. *See Daubert*, 509 U.S. at 590. Dr. Glenmullen based his hypothesis in this regard on his own book, "The Antidepressant Solution"[5] (*see* Glenmullen Dep. at 168:16-169:12), which he acknowledged had not been peer-reviewed (*id.* at 136:5-10), and which did not even address the joint effect of Prozac withdrawal with the use of other medications. (*Id.* at 13:24-14:16 (noting that book discusses antidepressant withdrawal generally).) Nor is there any other reliable authority for this theory, as Dr. Glenmullen admitted that he had not published his opinion on this issue, and that "[t]o the best of my knowledge, there haven't been more detailed studies of . . . interactions . . . between . . . Neurontin and SSRI's." (*Id.* at 212:2-11.) There is thus no indication that the theory of medical causation through "Prozac withdrawal plus Neurontin" is generally accepted, can be tested, or has a known rate of error. Drs. Glenmullen and Kruszewski are left with only a speculative hypothesis, but "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen*, 78 F.3d at 319.[6]

    **B.   The Application of Plaintiff's "Prozac Withdrawal Plus Neurontin" Theory Is Unsupported and Speculative**

Even if Plaintiff's experts' "Prozac withdrawal plus Neurontin" theory were not already unreliable, there is no competent factual basis for applying it here. (*See, e.g.*, Kruszewski Dep.

---

[5] Joseph Glenmullen, THE ANTIDEPRESSANT SOLUTION: A STEP-BY-STEP GUIDE TO SAFELY OVERCOMING ANTIDEPRESSANT WITHDRAWAL, DEPENDENCE, & ADDICTION (Free Press 2004).

[6] Dr. Glenmullen's only support for his theory of a combined reaction between Neurontin and Prozac withdrawal was his conclusion, "*based on all I've learned doing these cases*, that Pfizer hasn't adequately warned the psychiatric profession of the potential interactions between Neurontin and SSRI's." (Glenmullen Dep. at 172:25-173:8 (emphasis added).) Dr. Glenmullen's individual case experience as a retained expert patently fails as reliable evidence of a novel, as-yet-undocumented neuro-chemical causal association. Nor did Dr. Kruszewski identify any reliable scientific evidence supporting his hypothesis of a joint interaction between Neurontin and Prozac as the cause of Mr. Shearer's death.

at 114:21-115:3 ("[W]e don't have the clinical evidence that [Mr. Shearer] was specifically in Prozac withdrawal.").)   For instance, while Dr. Glenmullen testified that antidepressant withdrawal may occur "if the drug's got a really short half life" (Glenmullen Dep. at 15:8-16:2), he later admitted, citing *his own book*, that "[t]he half life of Prozac is four to six days," which is "a very long half life." (*Id.* at 169:6-18.) As Dr. Glenmullen testified, the "typical onset of withdrawal symptoms would normally be two to three weeks" after the last use. (*Id.* at 171:19-172:4.) In fact, because Mr. Shearer would not have run out of Prozac until five days before his suicide – even if he was taking it as directed – "half the [Prozac] would be available" in Mr. Shearer's system at the time of his suicide (Kruszewski Dep. at 118:1-15), continuing to have an effect on raising his serotonin levels.   Thus, it is not possible that Mr. Shearer was in Prozac withdrawal at the time of his suicide.

Moreover, Dr. Glenmullen observed that "there's very good data" showing that identified symptoms of Prozac withdrawal occur in "only 14 percent of patients." (Glenmullen Dep. at 176:18-177:5.) As Dr. Kruszewski testified, "there's no specific evidence that we have in the medical records that refer to any of those [symptoms]." (Kruszewski Dep. at 156:5-13; *see also id.* at 117:5-19 ("I don't think I have any evidence that [withdrawal symptoms were] reported.").) Dr. Glenmullen was likewise agnostic concerning the manifestation of any symptoms of Prozac withdrawal. (Glenmullen Dep. at 174:6-19 ("Whether or not it was causing any symptoms, I can't tell you.").)   This admitted lack evidence for the already-unreliable Prozac withdrawal theory renders the testimony of Plaintiff's experts inadmissible. *See* Fed. R. Evid. 702 (expert opinion must be based on "sufficient facts or data").

Neither Dr. Glenmullen nor Dr. Kruszewski would testify with any consistency as to whether they actually believed that Mr. Shearer's suicide was caused in any way by Prozac withdrawal.   For instance, although Dr. Kruszewski's report suggested an opinion on Prozac withdrawal (Kruszewski Report at 14), when was specifically asked at deposition whether Mr. Shearer was in Prozac withdrawal at the time of his death, he testified:

> Again, I don't know.  I believe that he may have run out of Prozac, and obviously
> if he ran out of Prozac, the serotonin levels that would have been increased due to
> his taking [an SSRI] would have fallen, and in my opinion would have fallen even
> more because he was taking something that decreased his serotonin levels.

(Kruszewski Dep. at 113:2-10.)  Yet he later testified that "*I've speculated in my report* and I believe he ran out of [Prozac]."  (*Id.* at 124:4-11 (emphasis added).)

Similarly, although Dr. Glenmullen's report stated fairly emphatically that Mr. Shearer "would have been in Prozac withdrawal with fluctuating serotonin levels" (Glenmullen Report at 32), when asked at deposition whether it was his "opinion Mr. Shearer was or was not in Prozac withdrawal," Dr. Glenmullen only hemmed and hawed: "Well, he was definitely – assuming the prescription records reflect how he took it, he was, his Prozac level was definitely going down." (Glenmullen Dep. at 171:19-25.)  Dr. Glenmullen later reversed his opinion again, stating that he would "stand by what I said on page 32 of my report" about Mr. Shearer's Prozac withdrawal, but that by withdrawal, he only meant "that the Prozac is going down.  *Whether or not it was causing symptoms, I can't tell you.*"  (*Id.* at 174:6-19 (emphasis added).)

"[A]n expert, no matter how good his credentials, is not permitted to speculate."  *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000).  Dr. Kruszewski's admission that his opinion on Prozac withdrawal is only "speculat[ion]" requires the exclusion of his opinions, notwithstanding that he couches them in the language of "reasonable degree of medical certainty."  Likewise, Dr. Glenmullen's admission that he had no knowledge of whether Mr. Shearer experienced any symptoms of Prozac withdrawal proves that his opinion is mere "unsupported speculation" and must be excluded as such.  *See Daubert*, 509 U.S. at 590.  Expert testimony, like that of Drs. Kruszewski and Glenmullen here, that refuses to state an opinion with any clarity or consistency is simply not helpful to the jury and thus fails Rule 702.

## CONCLUSION

For the foregoing reasons, this Court should exclude the expert testimony of Dr. Glenmullen and Dr. Kruszewski.

19

Dated: February 2, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By: /s/ Mark S. Cheffo
    Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000

-and-

BOIES, SCHILLER & FLEXNER LLP

By: /s/ William S. Ohlemeyer
    William S. Ohlemeyer

333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200

-and-

WHITE AND WILLIAMS LLP

By: /s/ David B. Chaffin
    David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 2, 2010.

/s/ David B. Chaffin
David B. Chaffin

20