# EXHIBIT A

Volume: I
Pages: 1-218
Exhibits: 1-8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MDL DOCKET NO. 1629
MASTER FILE NO. 04-10981

* * * * * * * * * * * * * * * * * * * *

IN RE: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION, :

---------------------------------------

THIS DOCUMENT RELATES TO: : JUDGE PATTI B. SARIS

SHEARER VS. PFIZER, ET AL; 1:07-CV-11428-PBS : MAGISTRATE JUDGE LEO T. SOROKIN

* * * * * * * * * * * * * * * * * * * *

AUDIO-VISUAL DEPOSITION OF JOSEPH GLENMULLEN, M.D., a witness called on behalf of Pfizer, Inc., pursuant to the provisions of the Federal Rules of Civil Procedure, before Lisa McDonald Valdario, (CSR #130093), a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, held at the Hotel Tria, 220 Alewife Brook Parkway, Cambridge, Massachusetts 02138, on Monday, January 11, 2010, commencing at 9:02 a.m.

Job No.: CS234482

APPEARANCES:

FINKELSTEIN & PARTNERS
The Injury Attorneys
1279 Route 300
P.O. Box 1111
Newburgh, NY 12551
BY: Kenneth B. Fromson, Esquire
kfromson@lawampm.com
1.800.law.ampm
1.800.634.1212 ext.2755
Attorney for the Plaintiff

JACOBY & MEYERS
1279 Route 300
P.O. Box 1111
Newburgh, New York 12551
BY: Shareef Rabaa, Esquire
srabaa@jmlawyer.com
800.890.3090 ext. 2653
Attorney for the Plaintiff

LANIER LAW FIRM
6810 TM 1960 WEST
HOUSTON, TEXAS 77069
BY: Kenneth S. Soh, Esquire
kss@lanierlawfirm.com
713.659.5200
Attorney for the Plaintiff

BOIES, SCHILLER & FLEXNER, LLP
333 Main Street
Armonk, New York 10504
BY: William S. Ohlemeyer, Esquire
wohlemeyer@bsfllp.com
and Lisa M. Nousek, Esquire
lnousek@bsfllp.com
914.749.8200
Attorneys for Pfizer, Inc.

APPEARANCES CONTINUED:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Four Times Square
New York, New York 10036
BY: Catherine B. Stevens, Esquire
Catherine.Stevens@skadden.com
212.735.3353
Attorney for Pfizer, Inc.

ALSO PRESENT: George Dobrentey, videographer

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSEPH GLENMULLEN, M.D. | | | | |
| BY MR. OHLEMEYER | 6 | | | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Williams College press release | 199 |
| 2 | Pharmacy record from Little's Pharmacy | 199 |
| 3 | Group of reports | 199 |
| 4 | Dr. Catapano-Friedman's records for Linda Shearer | 199 |
| 5&6 | Dr. Glenmullen's invoices | 199 |
| 7 | Article on Neurontin | 199 |
| 8 | Study of the Effect of Neurontin and GABA in Humans | 199 |

***ATTORNEY FROMSON RETAINED EXHIBITS***

PROCEEDINGS

VIDEO OPERATOR: Good morning. My name is George Dobrentey of Veritext, New Jersey. Today's date is January 11, 2010 and the time is 9:02 a.m. This deposition is being held at the Hotel Tria in Cambridge, Massachusetts. In re: Neurontin Marketing Sales and Product Liability Litigation, in the U.S. District Court for the District of Massachusetts, M.D.L. No. 1629.

The name of the witness is Joseph Glenmullen. At this time, the attorneys will identify themselves and their parties they represent, after which our court reporter, Lisa Valdario of Veritext, New Jersey will swear in the witness, and we can proceed.

MR. FROMSON: On behalf of the plaintiffs, Kenneth Fromson with Finkelstein & Partners. Along with me today is associate, Shareef Rabaa.

MR. OHLEMEYER: Bill Ohlemeyer from Boies, Schiller & Flexner representing Pfizer.

MS. STEVENS: Catherine Stevens from Skadden Arps for Pfizer.

MS. NOUSEK: Lisa Nousek with Boies, Schiller & Flexner for Pfizer.

JOSEPH GLENMULLEN, M.D.

they're doing rotations like the emergency room, or primary care medicine, or intensive care, but once they move into psychiatry proper, no, they're not doing physical exams.
Q And what are histories?
A Histories are basically kind of the oral history that you take from a patient, and again, if you were seeing them in a medical setting, the focus would be more their medical history, whereas once you move into psychiatry, it would be what's called a psychiatric history; family history, past psychiatric history, the history of the present illness. Those are sort of buzz words for different aspects of the assessment that you do.
Q Why do you do that?
A It's really trying to be comprehensive and collect as much information as possible up front when you meet someone, and then keep augmenting that as you go along.
Q Then what do you do with it?
A Well, that's really the basis on which you make a diagnosis and what's called a formulation in psychiatry. So for example, just to take one piece, say past psychiatric history, there is a very wide spectrum from patients who've never been

seen before by a psychiatrist or mental health professional, and have no psychiatric history, to someone who has an extensive psychiatry history with multiple hospitalizations, maybe suicide attempts, multiple medications that they've been on at different points in time. So those are just two extremes for that one subset of the whole evaluation.

That obviously affects your perceptions of the person and their condition, and the diagnosis that you ultimately give them and the treatment that you assign them.
Q I'm not trying to belabor it, but then what is a diagnosis?
A Well, in all of medicine, the history and all of the examination that you do, and again, in medicine there tends to be more objective exams, x-rays, EKG's. In psychiatry, there is not a lot of that. There's psych testing. There's a few things that we do. But when you put it all together, you're trying to arrive at kind of a formulation of why is this person here, what's wrong, so-to-speak, what are we trying to treat, what are we trying to solve, and then that informs your choices about treatment.

You know, if someone's depressed, you're going to consider antidepressant psychotherapy, other forms of treatment that might address what's underlying their depression. If they're psychotic, you're going to be considering a different class of medications and different types of more intensive, in terms of what's called least restrictive environments for the patient because they're in much more jeopardy.
Q Can you tell me just a little bit about the book, To Die Well?
A To Die Well is my most recent book. I'm the second author on it. The first author is Sidney Wanzer. He's a primary care physician who had been in private practice in Concord, Massachusetts for decades, and then the last decade of his career, he came to work at the Harvard University Health Services where I worked for 20 years, and in particular, he became the chief of the law school health services where I was. I was the psychiatrist to the Harvard Law School for about 20 years. So he was my boss for about 10 years, and he was an expert in death and dying issues. He published a number of landmark papers, and I said to him a number of times, you know, you

really ought to write a book on this. These are really interesting issues. I think they're really interesting too. I picked up from him, and literature that he would recommend, some of the issues.

So long story short, after he retired, he decided he would do the book and he thought it would really help him to get it done if he had a co-author, and so we did it together.
Q I might have misheard, but did you say you were the psychiatrist to the law school?
A I was the psychiatrist to the Harvard Law School for 20 years.
Q I've got to ask a follow-up question on that. Was that a teaching position or a counseling position?
A That was a counseling position, in Pound Hall.
Q For students.
A It was student, staff and faculty. I was basically the shrink to the law school for 20 years. It was a good job.
Q In the death and dying issue, did you ever run across an author by the name of Bill Colby?
A Doesn't ring a bell off the top of my head.
Q And then, tell me a little bit about The Antidepressant Solution, a Step by Step Guide to

Page 14

Overcoming Antidepressant Withdrawal Dependence and Addiction.
A Right. So that was the second book on antidepressants that I wrote. It was kind of a sequel to one of the chapters in the first book, Prozac Backlash. Prozac Backlash, as you may know, described in 2000, half the book was devoted to side effects that I didn't feel patients were adequately informed of.
There was a chapter on withdrawal. It described a very vivid case of Paxil withdrawal, and it described how I got that patient off of Paxil, but I got a lot of requests after the book from clinicians and for patients saying could you give us more general guidelines for anybody on any antidepressant at any doze.
And I would help various people and various clinicians, and eventually I realized it was a pretty big need. So that's why I wrote the second book, Antidepressant Solutions, which is essentially like a cookbook kind of menu for doctors and patients to follow how to taper safely off antidepressants. It covered the whole gamut of antidepressants then on the market.
There's a lot of tables and graphs, and sort

Page 15

of recommended schedules for dropping the dose, and then in particular, how to be very flexible about that because it's so individual from patient to patient.
Q What are the risks? I should ask it this way, are there risks of antidepressant withdrawal?
A Very serious risks.
Q What are they?
A So people can get quite sick, quite ill. They can miss work if they don't understand what's going on. One risk is that it will be misinterpreted as their underlying condition and they'll be put back on the drugs for the wrong reason so-to-speak.
Perhaps the most serious risk is that the FDA warning for antidepressant induced suicidality is very specific about a time frame and says that the greatest windows of vulnerability is whenever the dose changes up or down. The down covers the whole of antidepressant withdrawal.
So it's actually very important with those drugs that people take them as prescribed, that they don't forget them when they go away for a long weekend because that can throw you into antidepressant withdrawal if the drug's got a really short half life, and that their doctors and

Page 16

they know how to differentiate withdrawal from recurrence, and how to taper them safely.
Q And the previous book was called Prozac Backlash, Overcoming the Dangers of Prozac, Zoloft, Paxil and other antidepressants.
A Right.
Q What are the dangers of Prozac?
A Well, first of all, it wasn't just Prozac. It was all the SSRI's basically in 2000. And the book was divided in two. The first half were, if I remember correctly, four categories of side effects that in 2000 I didn't think patients were being told enough about. This is all pre the European, and then FDA warnings about antidepressants and suicidality.
So there is a chapter on what are called extra-parameteral side effects. There is a chapter on withdrawal which we just talked about in some detail. There is a chapter on sexual side effects which were not well-publicized in 2000, but shortly thereafter became very well-publicized, and there was a chapter on antidepressant suicidality, which I was by no means the first person to have raised that issue. It had come up back in the late '80s, early '90s

Page 17

with Prozac, but it had kind of been swept under the carpet on at least this side of the Atlantic. I kind of reopened it, and then as you know, starting in 2003, we started to get international and ultimately FDA warnings about that.
The book is not antidrug, and the second half of the book is kind of how doctors and patients could make a reasonable assessment of when this is an appropriate thing to do, and when it may not be the first thing that should be done.
And actually, you may be aware that an article just came out in JAMA last week. It's a metanalysis of antidepressants, and it came to the conclusion that antidepressants are really only effective for people with severe depression, and that's basically the advise I was giving in 2000 in Prozac Backlash; that if you have mild depression, which is actually the majority of people given the drugs, they shouldn't be the first thing you and your doctor do. If you have severe depression, they should very seriously be considered as part of your treatment regimen, and if you have moderate depression, you're kind of in a grey zone.
Q And the last, the fourth book, novel,

autobiography?
A Neither. It's a collection of cases. It's kind of an Oliver Sax-ish collection of psychotherapy cases before I ever wrote anything about medications.
Q Now, as understand it, doctor, you've been asked by the plaintiffs in this case to prepare an opinion and a report in regards to Hartley Shearer's suicide, is that correct?
A Correct.
Q And I have been provided with a copy of a report that's dated November 30, 2009 addressed to Mr. Fromson.
A Correct.
Q And have you had a chance to take a look at that recently, that report?
A I have.
Q And is it complete and accurate?
A It is.
Q Do you have any additions or revisions that need to be made to it to make it complete and accurate?
A Nothing specific.
Q Okay. Let me ask you a couple questions about how you went about preparing the report. We've asked Mr. Fromson to produce some material and he has,

and am I correct, doctor, and if you know the answer, the material that's been produced this morning are the materials that the Fromson lawyers or the Lanier lawyers provided to you in advance of your preparation of the opinion?
A Correct.
Q And do you recall about when you were provided with that material?
A I think they would have come in the fall of 2009. I think I was contacted about the case, the specific case around September, and the materials came between then and when the report was written at the end of November.
Q All right. And do you have any sense how much time you spent going through that material?
A I actually brought two invoices.
Q Oh, okay.
A They're in the loose material.
Q All right. What, if anything, did you do to prepare for today's deposition?
A I've reread the report a few times. I always go back through the medical records and the depositions and refamiliarize myself with everything. I met last night with Mr. Fromson.
Q Is there anything in the medical records or the

depositions that you thought was either incomplete or inaccurate, or didn't make sense to you in the context of everything else you had read?
MR. FROMSON: Objection. Form. Go ahead.
A I think the only thing that comes to mind, and it's in my report, is that I have a commentary, and in my experience this is not uncommon in cases of medication-induced suicidality, that in my estimation, some of Dr. Catapano-Friedman's assessments of Hartley Shearer were misperceptions so-to-speak because she couldn't have appreciated the effect of Neurontin on his mood, and behavior, and personality, and I think she misread some of that as, in particular, a narcissistic personality disorder.
I think if she'd had the benefit of the warnings, that probably wouldn't have happened. But other than that, I can't think of anything off the top of my head that didn't seem to fit a typical case, so-to-speak.
Q Now, Dr. Catapano-Friedman actually saw Mr. Shearer?
A Correct.
Q On how many occasions, do you recall?
A I don't. I probably added it up at the time. I

think she was seeing him roughly once a month, but there may have been an early period where it was more frequent than that.
Q And what was the purpose of her visits with Mr. Shearer?
A Well, she began seeing him after he'd had the stroke in January of 1999. In my report, I put in that it was Dr. Edwards his neurologist in South Bennington, Vermont who recommended that he see a psychiatrist, and the initial, what's called chief complaint per her report in the deposition was anger; particularly venting with his wife Linda.
And then I believe she ends up seeing them sometimes together. I think she treated Linda individually at times. But one of the things that's very interesting I think in the case is that because she was a psychiatrist, she was one of the people most talking to him and documenting things about him. And there is a very distinct change in her notes pre and post the Neurontin.
The emphasis is on his frustration would be one word with the stroke in the first half of the meetings. Her emphasis on that is a little more anger than what some of his friends and family describe, but I think they're all talking about

Page 22

the same thing, frustration/anger over the stroke, and then what you see, when he comes back after the fall of 2000 events and being put on Neurontin, is that there's a very distinct shift to panicky anxiety and being depressed. And particularly in her notes, the panicky anxiety. And part of my expert assessment of the case is that that was a significant portion of the mood and behavioral changes in Mr. Shearer on Neurontin, and you don't see that in her notes before that.

Her notes are one of the best. I mean, there's also other places in the medical records that I cite, but her notes are in many ways one of the best documentations of that change.

Again, as I said, she, and I have seen this in many other antidepressant, antipsychotic, other cases like this that I do, you see that the treating doctors at the time without warnings may misinterpret that as a personality disorder or some other change, some other set of circumstances in the person's life, because they're without the benefit of warnings that these kinds of mood and behavioral changes can occur with drugs that make people suicidal as antecedents to the suicidality.

Page 23

Q Well, let's back up for a second.

Doctor Catapano-Friedman was providing effective clinical care for Mr. Shearer's mental disorders, wasn't she?

MR. FROMSON: Objection. Form.

A I think yes, with the caveat that without the Neurontin warnings, she wasn't able to factor in the role of Neurontin, and I think certainly looking back on it, things could have been done very differently with a warning that Neurontin could have the effects that it does now that we have the FDA warning.

So I think she was, I presume she's a competent psychiatrist. I don't have any questions with the treatment she was giving him prior to the Neurontin. I presume she would have, you know, potentially done things differently, or at least considered the Neurontin with the warnings that we have now.

I know as myself, as an expert looking at the case, that for example, one juncture in time when things could have been done very, very differently, had there been a Neurontin warning, was the episode where Mr. Shearer kind of lost it at night, and had an argument with his wife, and I

Page 24

guess was kind of, said something kind of rude and insensitive to her and she kind of, trying to settle him down slapped him in the face. He called the police. The police came. The police arrested her. They charged her.

You know, at the next meeting with Dr. Catapano, he describes this very out of character behavior and this very dramatic situation. And she makes a change in his medications. What does she do, she adds another medication. She adds Zyprexa for his new, you know, emotion lability, his new mood and behavioral changes.

In retrospect, looking at that, one would say that was a really a marker of the mood and behavioral changes. Nothing like that had ever happened before. On Neurontin, and again, I've seen this over and over with antidepressants, antidepressants make people anxious. What did the doctors do before they had warnings, they add an antianxiety agent. What do we do now, we take them off the antidepressant. And in retrospect, the better thing to do would have been to try Mr. Shearer off the Neurontin.

Q My question, doctor, I think was a little narrower than that. In your opinion, was Dr.

Page 25

Catapano-Friedman -- strike that.

In your opinion, was Hartley Shearer obtaining effective clinical care from mental, physical and substance abuse disorders to the extent he had any of them?

MR. FROMSON: Objection. Form.

A My answer would be yes --

Q Okay. Thank you.

A -- with the limitations imposed by no Neurontin warnings.

Q Did he have easy access to a variety of clinical interventions and support for help seeking?

A Yes.

Q He had access, however, to highly lethal means of suicide, didn't he?

A Correct.

Q Now, you said something, I thought it was a little curious. You said Mr. Shearer lost it. As I recall the incident you described, his wife was the one who slapped him and who the police took out of the home that evening, not Mr. Shearer, isn't that right?

A No, if you look at the descriptions of it, she can't remember exactly what it was, but he was overwrought is the word that's used over

started the Neurontin, where it says his pain is gone. So he's on a cocktail of three pain medications, including the Neurontin, which appear to have worked, and allowed them to wean him off of the narcotic. And the quote says, "but patient complains of anxiety." And as I say, I think that's kind of prophetic, so-to-speak, that Neurontin is one of three drugs that seems to have worked with his pain, but there is, it's commented that he's anxious.

I have a couple more quotes on the next page, also from the Brigham, I presume. Yeah, it says here on the 18th, that's four days later, that he's had an alteration in self-concept.

On October 23, feels panicky when he can't -- oh, feels "dependent on Linda," and "feels panicky when he can't reach her." Now, that is very new. That's not being documented in the medical records in the year and a half following the stroke. He's had a stroke. He's had a hemiparesis. He's had catastrophic medical set of situations, but there is no descriptions that he feels panicky when he can't reach his wife.

Here is an October 21 note; very depressed

tonight. October 24 note, quite depressed and panicky.

Q Now, he's in the hospital, correct?

MR. FROMSON: Are you done with your answer?

A Correct. Well, no.

Q Let's just take it to that point. At that point he's in the hospital.

A Right.

Q And when he arrived at the hospital, before he was prescribed Neurontin, the nurses did an assessment of him, didn't they?

A Right.

Q And that's like the history we talked about, more or less?

A Right.

Q And before he was prescribed Neurontin, he told them that he felt on the edge of a breakdown, didn't he.

A Correct.

Q That he expressed feelings of depression concerning his disease process, didn't he?

A I think you're quoting from my report. Let me just try to find it. Yeah.

Q And the, they note that he was going to be seen by the neurology and the pain service.

A And that he hoped to return to baseline self care with assistance, which he ultimately was able to do.

Q Who wouldn't, right?

A Right. But there is nothing in that, of this panicky anxiety, which we're now going to see right through to his suicide.

And he's in severe pain at the time of this quote, which is gone by the time of the next quote.

Q Because of the Neurontin?

A Well, because of everything.

Q Because of the medication that the pain service prescribed to him.

A Right. And the point is, when the pain is gone, what's left? They're describing him as very anxious, and it goes on and on; panicky when he can't reach his wife. What is that about? When he didn't experience that for a year and a half post stroke.

Q That's your testimony, doctor, that post stroke, Mr. Shearer never demonstrated any anxiety or panic, which I think you defined for me as elevated anxiety, about his wife's absence or inability to meet his needs?

MR. FROMSON: Objection to form. Misstates his testimony.

A I'm not necessarily saying there was never any anxiety. If you find a quote from me with panic, I'm certainly happy to look at that, but there is a distinct change in the records that this now becomes a consistent theme, particularly panicky about being able to reach his wife and where she is, which is very prominent at the time of the suicide.

Q And that change in the records corresponds to a variety of medical events separate and apart from the prescription of Neurontin.

MR. FROMSON: Hold on. Are we focusing on these October notes when you say the records?

Q Well, that's my question. I'm taking the answer the doctor gave me and I'm asking a follow-up question. You say there is a change in the records, and my question is, you're telling me that it corresponds or follows the Neurontin prescription. I'm asking whether it also follows a number of other significant medical events.

MR. FROMSON: Objection as to form.

A Yes. And that's, you know, obviously something I considered and very important in trying to parse

Page 42

this case. And the critical thing, as I articulate in the report, is that the three, he recovers from the three medical events. They're no where near as catastrophic as the stroke a year and a half earlier. They don't have the long term consequences that the stroke did. And he coped so well with the stroke, that to a reasonable degree of medical certainty, his character, which is what carried him through the stroke, would certainly have carried him through these three events which were not as catastrophic, but for the Neurontin, and I think you raise a very important point, and it was an important one for me as an expert evaluating the case to think through, and it's articulated in multiple places in the report.

Q Well, with respect, I mean that's speculation in a sense, isn't it?

MR. FROMSON: Objection. Leading.

A Not at all. I mean I'm a psychiatrist. I, in my clinical practice, and I use the same methodology in evaluating this case, I have to look at the whole man's history. This guy is described by everybody as a fighter, as strong, as someone who doesn't give up.

His recovery in the medical records is

Page 43

described as remarkable from a dense hemiparesis, so it's not at all speculation, to a reasonable degree of medical certainty, absent Neurontin, he would have coped fine with the medical events in the fall of 2000, and that question in parsing that out is crucial.

Q Well, he wasn't exactly coping well with the events that followed his stroke and were compounded by the medical events in October of 2000, was he?

A I don't agree with that.

Q He was seeing a psychiatrist because of his anger, right?

A Well, to me --

Q Right? Was he or wasn't he seek a psychiatrist?

A He was seeing a psychiatrist. That's doesn't --

Q One of the reasons he was seeing her --

MR. FROMSON: Excuse me, Bill. You have to give the witness an opportunity to answer the question.

MR. OHLEMEYER: We're not going to sit here all day and listen to a narrative.

Q He was seeing a psychiatrist following the stroke prior to October 2000, right?

MR. FROMSON: Hold on, doctor, excuse me.

Page 44

You've asked the same question now that you just said, and he said right, and then you cut him off.

MR. OHLEMEYER: Yeah, because he answered the question.

MR. FROMSON: Do you want to allow him to answer the question?

MR. OHLEMEYER: No, he answered the question.

MR. FROMSON: You have to let him finish his answer.

MR. OHLEMEYER: You can ask him anything you want when I'm done.

MR. FROMSON: You asked him the question. You have to let him finish.

MR. OHLEMEYER: And he answered it. No, he answered it. He said right.

MR. FROMSON: You have to let him finish. You're not the judge today. I'm not either. You have to let him finish, and then we'll deal with your objection. So if you've completed your answer, that's fine. If you need to complete your answer, please let us know. Right?

Now, I would suggest we have the question read back. Let the doctor give his answer. Or you could withdraw the question and move on, Bill.

Page 45

MR. OHLEMEYER: I'll ask a different question.

Q Was Hartley Shearer seeing a psychiatrist prior to October of 2000?

A That's not an indication that he wasn't coping well with the stroke.

Q That wasn't my question, doctor. Was he seeing a psychiatrist?

A I think your question was whether or not he was coping well with the stroke, and then you threw in --

Q You're not listening to my question.

A -- the psychiatrist.

Q Was Dr. Shearer seeing a psychiatrist following his stroke?

MR. FROMSON: Just objection as that form. I don't know that Hartley was a doctor.

Q Was Mr. Shearer seeing a psychiatrist following his stroke?

A He'd seen them before and he saw them after.

Q What reasons was he seeing them before his stroke?

A He had ADD, and there's other issues in the notes too.

Q And one of the reasons he was seeing a psychiatrist following his stroke was because of

Page 134

of foundation.
A I don't recall if it was that or the Prozac. I just don't recall, and I don't recall the controlling relationship that you're mentioning.
Q She was taking Ritalin, Buspar, beta blocker at the same time of her suicide, isn't that right?
MR. FROMSON: Objection as to form and lack of foundation.
A Don't recall.
Q There is another case though where it wasn't the depression, it wasn't the substance abuse, it wasn't the controlling relationship, it wasn't the needy and dependent personality, it wasn't the concurrent medications, it was the Prozac that caused or contributed to cause the suicide, in your opinion, isn't that right?
MR. FROMSON: Objection to form and lack of foundation.
A Because of a strong fact pattern that you've left out.
Q Can you identify for me a fact pattern in which you've concluded that prescription medication didn't cause somebody's suicide?
A Not specifically, but I've definitely rejected cases on that basis.

Page 135

Q What's the difference in a clinical trial and a case report?
MR. FROMSON: Sorry, can I have the question read back?
MR. OHLEMEYER: Strike that. I'll rephrase that.
Q What's a clinical trial, doctor?
A A clinical trial is typically a drug company study of a new drug or new indication in patients.
Q The ideas and opinions of a witness, even one with your background, education and experience, are different than the results of a clinical trial, aren't they?
A I'm not sure what you mean.
Q Well, I'm not sure what you mean, is why I ask the question, because in one of your books, you include a disclaimer that says, "This book contains the ideas and opinions of the author. It is not sold to render medical or health services. The individuals referenced in the book were not participating in clinical trials, were not submitted as case reports."
What does that mean?
A Was the disclaimer like somewhere up at the front of the book?

Page 136

Q It's your book, doctor.
MR. FROMSON: That's argumentative, Bill.
A Actually, why don't you show it to me if you want to ask me a question about it.
Q Well, let me ask you this, were either of your books peer reviewed?
A They were reviewed by colleagues.
Q Were they peer reviewed?
A They weren't peer reviewed in the sense that a journal article is, but it's a book.
Q When is the last time you submitted a paper to a peer reviewed journal?
A I haven't.
Q Have you ever published a study in a peer review journal?
A No.
Q You ever testified on behalf of a pharmaceutical company or defendant in a lawsuit being brought by somebody claiming to have, somebody claiming their spouse or child committed suicide as a result of prescription medication?
A Never been asked by a pharmaceutical company to review a case.
Q Tell me about the law firm of Vickery & Waldner.
MR. FROMSON: Objection as to form as it's

Page 137

overbroad. Go ahead.
A It's a law firm in Houston, Texas.
Q What do you do for them?
MR. FROMSON: Objection as to form and lack of foundation that he does something for them.
Q Do you do anything for them -- strike that.
What's your relationship with Vickery & Waldner?
MR. FROMSON: Objection as to form. Lack of foundation.
A I wouldn't say I have a relationship with them. I think that some of the Zoloft cases were their cases. I've reviewed cases for them. I've been an expert for them.
Q And you've never once, for Vickery & Waldner, not prepared a report that indicated the decedent was a member of a vulnerable subpopulation whose suicide was caused by the prescription medication they were taking, isn't that right?
A Never once what?
Q Never once refused to prepare a report indicating that the decedent was a member of a vulnerable subpopulation whose suicide was caused by the prescription medication they were taking.
MR. FROMSON: Objection as to form.
A I don't recall specifically whether or not I've

MR. OHLMEYER: I know. I want to make sure we're clear.

Q You're telling me, you're going to tell the jury, that in hindsight, you're going to diagnose this man or not diagnose him in contrast to his psychiatrist, his treating psychiatrist, based on your review of her medical records.

A I'm not criticizing her for making the mistake. I've seen this many times in other cases where the contemporaneous treating physicians, without a warning, misinterpret the drug induced effect as a worsening of the underlying condition or a new condition. It's classic.

Q Nothing else going on in his life could have worsened his underlying mood or behavioral problems?

MR. FROMSON: Objection as to form.

Q In October of 2002.

A I think that misstates my differential diagnosis, that a number of things increased his risk factors, were significant events in his life, but the one at the top of the list as a substantial contributing factor is the Neurontin.

Q And your basis for that opinion is you see things in medical records that post date the Neurontin

prescription, that your opinion or your claim is aren't in the medical records before Neurontin.

MR. FROMSON: Objection.

A Again, I think we discussed this this morning. I'm not saying that they never appeared. For example, he had anxiety before this. But this particular panicky anxiety around where his wife was becomes much more prominent theme and he becomes more depressed. That's the mood and behavioral changes right out of the FDA warning, classic and exemplified in this case.

Q And my question doctor is, none of that occurred prior to Neurontin?

MR. FROMSON: Objection as to form. Asked and answered.

A You keep trying to use categorical terms which I have not used. I'm not saying that none of it was present before. What I'm saying is that there is a distinct change.

Q And I want to know, but for the temporal relationship between Neurontin and those distinct changes as you've described them, how do you attribute them to Neurontin as opposed to the underlying mood or behavioral disorders?

A A large part of it, which we just discussed, is

the temporality. He'd had underlaying depression and anxiety for a very long time. He coped with a stroke, a hemiparesis, recovering from that, big changes in his life without severe depression, without suicidality, without suicide attempts.

To a reasonable degree of medical certainty, you don't extrapolate these mild to moderate conditions that he's had on and off for decades that have never caused him to commit suicide. It would be much less likely and arbitrary to try to pin them on that than to say this drug, now with a warning, a statistically significant metanalysis, signals, adverse event reports, and a fact pattern that fits it, is just being reasonable, looking at the data.

Q You're looking at the data and you're reaching a judgment. I'm just trying to test your judgment, doctor, which I think we've established is fair.

A Oh, absolutely. Sure.

Q And I want to make sure I understand this. People with severe depression, people with suicidality, people who -- sorry, people without severe depression, people without suicidality, and people who don't make prior suicide attempts commit suicide everyday in this country, don't they?

MR. FROMSON: Objection as to form. Lack of foundation, that they do it everyday, and it's compound.

A Well, now I think you're -- I can't really respond to an artificial hypothetical like that because we don't know what else might have been going on in the life of somebody who attempts or commits suicide.

Q You really don't know what else might have been going on in Mr. Shearer's mind on the day he decided to commit suicide either, do you.

A I guess I don't really know what you're trying to get at. We have voluminous records in this case.

Q Well, we also -- well, we have voluminous records. One thing we have in this case that you don't have in every case is a note, don't we.

A Yes.

Q What's the significance of a suicide note?

A The significance of a suicide note is just that he took the time to write a note before he killed himself.

Q That's all?

A Well, if you ask me to sit back and think about it a little more, it looks as though it was written that morning. It looks as though it's still part

infallible, right?
A Sure.
Q All right. So regardless of how strongly-held your opinion is, regardless of how well-documented and supported you believe it to be, conceding that none of us are infallible, what would I have to show you, or what could I show you that might cause you to believe that you don't feel as strongly or that you might actually be wrong?
MR. FROMSON: Objection as to form.
A That's where I think I've answered you a number of times today. I don't know. I'm certainly open to you showing me anything to consider.
Q Take a look at page 7 of your report for me.
A Okay.
Q You see where it says, "The report's divided into two parts?"
A Right.
Q See the first bullet point?
A Oh, yes.
Q You kind of cut and pasted that from another report, didn't you.
A You're correct.
Q So that --
A It should have said medication-induced

suicidality. Well, actually, I shouldn't so readily agree with that. I might have accidentally just typed that wrong.
Q It's because you do a lot of thinking about, writing about, and testifying about antidepressants, right?
A It's just a typo.
Q Based in part on your prior experience with antidepressants.
A Well, actually, since you're getting into this much detail, if you look earlier on page 2, I actually was very careful to use the word psychiatric medication-induced suicidality. I talk about my writings on antidepressants. I think there is a couple of places where I use the phraseology medication-induced, and obviously, I should have used it there. It's not a big deal. It's a typo.
And actually, if you notice, part one actually says mood stabilizer induced suicidality. So there really is just a typo.
Q Doctor, let me ask you again about antidepressants. Am I correct, in your writing you advocate careful monitoring of anyone beginning to take antidepressants, right?

A Right.
Q And regardless of the antidepressant, and regardless of the relationship -- strike that -- regardless of the warning, you believe that adults can become as vulnerable as children when they deteriorate while taking antidepressants, isn't that right?
A That's my opinion.
Q An increase in the dose of an antidepressant runs the risk of antidepressant-induced deterioration, isn't that right?
A Correct.
Q Just as a decrease or a termination of the antidepressants runs the same risk, right?
A Correct.
Q What antidepressants cause the worst withdrawal symptoms?
A Effexor, Paxil. I think there is a list in there. There is a table.
Q Prozac?
A No. It's at the bottom of the list.
Q How long does Prozac stay in your body after you stop taking it?
A You know, I was looking for a copy of that last night. So if you can just hand it to me.

Q And we're referring to your book, The Antidepressant Solution?
A Right. There is a table with half lives in here.
Q I'll even hand it to you with my flags.
A Thank you.
Q Kind of the Vince Lombardi School of Trial Practice.
MR. FROMSON: Show him the playbook.
A Here it is: Worst Offenders. The half life of Prozac is four to six days. It takes 25 days for it to be 90 percent eliminated, which is obviously several weeks.
Q What does a half life of four to six days mean?
A That's a very long half life. It means it takes four to six days for half the drug to be gone, and then half again, and half again, and half again. It takes five half lives to eliminate most of the drug.
Q What's the half life of Neurontin, do you know?
A Off the top of my head, I don't. It would be on the label.
Q How many days -- in your opinion -- or strike that. What's your testimony as to whether and when Mr. Shearer stopped taking Prozac prior to his suicide?

A Well, it would be the same as what I put in the report, that if he took it as prescribed, the last prescription for seven days was on January 26, which would leave him without the medication for six days prior to his death.
Q Which according to your book means half of the medicine would have still been in his body.
A Right. Four to six days. Right, about 50 percent is gone.
Q Now, likewise, in that same book, you point out that impulsivity, suicide attempts, suicide thoughts, poor judgment, are all symptoms of antidepressant withdrawal, isn't that right?
A Do you want to show me the quote?
Q Sure. Table on page 35. My list is not exclusive. Yours is much longer.
A So what is your quote from it?
Q That impulsivity, suicide attempts, suicidal thoughts, poor judgment are symptoms you list of antidepressant withdrawal.
A Suicide attempt, impulsivity, looks like it. What were the others?
Q Poor judgment; suicidal thoughts.
A Suicidal thoughts is definitely here. I don't see poor judgment, but it's not a big deal.

Q And that book contains some case studies?
A Right.
Q What are case studies?
A Just examples of individual patients.
Q Where you've observed those kinds of events and effects?
A Where I've observed withdrawal. I can't remember if I -- I think I describe a case of someone who becomes suicidal.
Q In fact, in those case studies, all but one of them experienced mild to severe withdrawal symptoms by day six, isn't that right?
A Well, my recollection, I don't believe there is a Prozac case in here. I think most of the cases were Paxil cases, and I think there is an effexor case.
I say that Prozac withdrawal, because of the long half life, would be much more attenuated.
Q So on the 7th day, or the 6th day, after he stopped taking Prozac, if he stopped taking Prozac, is your opinion Mr. Shearer was or was not in Prozac withdrawal?
A Well, he was definitely -- assuming the prescription records reflect how he took it, he was, his Prozac level was definitely going down.

I say in here, typical onset of withdrawal symptoms would normally be two to three weeks. And that's where the interaction with Neurontin could have changed things.
Q You don't know that.
MR. FROMSON: Objection. Form. Argumentative.
Q What is the interaction between Prozac withdrawal and the ingestion of Neurontin?
A Well, I don't think -- as I said in the report, and as I think I testified earlier today, it's the influence of the Neurontin, the separate influence of Neurontin on serotonin release which obviously exaggerates whatever was going on just because the Prozac had been stopped.
Q Well, you say that, but I want you to tell me what the basis of that opinion is. Has that been observed in any studies?
MR. FROMSON: Which part, that Neurontin reduces serotonin or that Neurontin with Prozac interaction?
MR. OHLMEYER: The latter, the interaction.
MR. FROMSON: Okay. Do you understand the question?
A I think so. The interaction is a reasonable

concern when you know that this is a drug that targets serotonin, meaning the Prozac, and that here is a separate drug that can also affect serotonin. I actually think, based on all I've learned doing these cases, that Pfizer hasn't adequately warned the psychiatric profession of the potential interactions between Neurontin and SSRI's.
Q Well, that's your opinion.
A Right.
Q Have you published that anywhere?
A No.
Q Have you done any research to determine whether your hypothesis is correct or incorrect?
A Well, the medical literature repeatedly says that Neurontin can affect biogenic amines. Most anti, virtually all antidepressants affect biogenic amines. Lots of people are on Neurontin concurrent with an SSRI. Doctors ought to know that.
Q Has the suicide rate in this country increased or decreased since Neurontin became widely prescribed for conditions other than epileptic seizures?
A I don't know the figures.
Q I'm still trying to understand though whether your

Page 174

opinion is, and maybe I just haven't read your report carefully enough, that Mr. Shearer was or was not in Prozac withdrawal at the time of his suicide.
MR. FROMSON: So is that the question?
MR. OHLMEYER: That's the question.
MR. FROMSON: Object as to form. Asked and answered.
A I'll stand by what I said on page 32 of my report. He would have been in Prozac withdrawal with fluctuating serotonin levels that would have been altered by Neurontin's affect on changing serotonin levels in the brain.
What I mean by that is that the Prozac is going down. Whether or not it was causing symptoms, I can't tell you. If you're -- if that's what you're trying to parse out, and the bottom line is the concern, the very reasonable concern that the Neurontin is influencing that.
Q And am I right, the only basis you have for suggesting Mr. Shearer wasn't taking Prozac was pharmacy records?
A Right.
Q Which presupposes or assumes that he was taking his medicine as directed.

Page 175

A Well, prior weeks he's filling it very regularly.
Q Well, that's not my question.
A Well, again, to a reasonable degree of medical certainty, people who repeatedly fill a prescription on time, why would they go back if they're not bothering to take it.
Q Maybe their wife's taking it.
A Yeah, I mean, to a reasonable degree of medical certainty, he's filling his prescriptions on a very regular basis. He's only refilling them because he's taking it, and then as best we can tell, there's no more prescription for that last week.
Q Mr. Shearer took his -- he filled his Neurontin prescriptions on a regular basis, isn't he?
A I think that's right.
Q Never once missed one, did he.
MR. FROMSON: Objection. Form. Lack of foundation.
Q Do you know?
A Those never, I wouldn't want to agree with that without actually looking at the records.
Q Can you point me to any complaint in the medical records where Mr. Shearer complained to any of his doctors about side effects or problems he was

Page 176

experiencing that he attributed to Neurontin?
A There is actually a suggestion of it in Dr. Sullivan's record where he says that the patient wants to have a trial off of it, but then for whatever reason, he doesn't actually go off it, and his son says that there was a concern about side effects to it.
Q He actually refilled it right on time, didn't he, two and a half weeks later?
A That may be true. I'm clear that he didn't stop it. I couldn't tell you the exact timing of rescription.
Q And the discussion he was having with Dr. Sullivan concerned erectile dysfunction and its possible interaction with something else that he was taking, didn't it.
A I don't recall that.
Q What percent of patients who are in Prozac withdrawal have symptoms? Strike that. I want to make sure I understand what you're saying. Are you telling me that Prozac does or doesn't cause withdrawal symptoms?
MR. FROMSON: You mean not taking Prozac?
MR. OHLMEYER: Yes.
A So actually, there's very good data on that, and

Page 177

it's in my book on page 84 because there have been systematic studies comparing Effexor, Paxil, Zoloft, and Prozac, and only 14 percent of patients on Prozac develop withdrawal symptoms if they stop the dose abruptly.
Q What were Mr. Shearer's Prozac withdrawal symptoms?
A Oh, I haven't alleged that he had any.
Q It's possible he didn't have any.
A Sure.
Q He might have been one of the 86 percent who don't have symptoms.
A Sure. And he may have been more vulnerable to them because of the interaction with Neurontin.
Q You think people should have the right to end their lives?
Strike that. That's a poor question.
Do you think a decision to end one's life can ever be made rationally?
A Well, I presume you're referring to, To Die Well, which supports the Oregon law, which is a very carefully crafted law to avoid abuses, that does allow patients and doctors, I think with all kinds of safeguards, including a second opinion, in rare cases where comfort measures are not ensuring

Page 210

Q Let me hand you what we've marked as Exhibit 7.
A This is an article on Neurontin's affect on gamma-aminobutyric acid on patients with epilepsy.
Q When was that article written? Let me see if I can -- it was received for publication in 1995, is that right, at the bottom of the page?
A Right.
Q So that's 15 years old, right?
A Right.
Q Let me hand you what we've marked as Exhibit 8.
A This is a study of the effect of Neurontin and GABA in humans.
Q When was that study published?
A I'm not sure I can tell from this.
Q Do you recall how and when you were provided with this? Looks like an abstract, right? That the right way to describe it? Or maybe just a short article.
A Well, I think it was just one of the loose things that I had.
MR. FROMSON: All right, counsel. I feel obliged to represent, there's a Bates number on there for Pfizer, which means it was provided to plaintiff's counsel by defendant's counsel.
Q That's a better question. Is there anything that

Page 211

you've reviewed in connection with your research and work on these Neurontin cases that was not provided to you by plaintiff's counsel?
A Well, all the background in other drugs and other warnings not.
Q Understood.
A I think I knew about the mood stabilizer hearing, the alerts and the warnings when they came out publicly.
Q I want to make sure, you keep saying mood stabilizer. It was AED.
A Right. Psychiatrists think of them more as mood stabilizers.
Q But the FDA described it as an antiepileptic drug class.
A Yeah, right.
Q You mentioned earlier a hypothesis, or opinion, or theory, I'm not trying to quibble with you, about the relationship between Prozac withdrawal and Neurontin?
A Can you do the question again?
Q Yeah. Yeah. You mentioned earlier in a discussion we were having about a relationship between Prozac withdrawal and Neurontin, the ingestion of Neurontin?

Page 212

A Right.
Q Is that something that's been studied and published somewhere in the literature?
MR. FROMSON: Objection. That was asked and answered. Go ahead.
A What's been published in the literature as we've discussed so far today is Neurontin's affect on biogenic amines like serotonin. To the best of my knowledge, there haven't been more detailed studies of the, of interactions so-to-speak between, say, Neurontin and SSRI's.
Q So your opinion is a, what's the word, an inference based on the studies published on Neurontin and what you know about SSRI's?
A It's a reasonable conclusion concern, yes.
Q But it's not something you've prepared and published in any --
A No.
MR. OHLEMEYER: Let's take a very short break.
VIDEO OPERATOR: Time is 2:43 p.m. and we are off the record.
(Recess taken.)
VIDEO OPERATOR: The time is 2:47 p.m. and we are back on record.

Page 213

Q Doctor, I just have one other question for you, and I appreciate your time this morning and this afternoon.
What, if you could talk directly to the fact finder in a case like this, the group of people who would have to decide what to make of all this.
A The jury?
Q Jury or the judge, whoever was making the decisions, you know, what would you tell them is the most important piece of evidence, or the most important factor, the most important thing that they should look at in order to understand and fully credit your opinion?
MR. FROMSON: Objection as to form. Lacks foundation. It's an improper hypothetical.
A Can you make it plural because I'm not sure it would be one thing?
Q For sure.
A Even though I'm not testifying on the general causation side, obviously, the metanalysis, the signals, the adverse event reports, the biological plausibility. One has to reach or concur with the conclusion that Neurontin can make people suicidal to then go on to look at the specific causation