UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES<br>          PRACTICES AND PRODUCTS<br>          LIABILITY LITIGATION | :  MDL Docket No. 1629<br>:<br>:  Master File No. 04-10981 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :

| | |
|---|---|
| THIS DOCUMENT RELATES TO:<br><br>*Shearer v. Pfizer Inc., et al.*<br>Case No. 1:07-cv-11428-PBS | :  Judge Patti B. Saris<br>:<br>:  Magistrate Judge Leo T.<br>:  Sorokin |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 2

SUMMARY JUDGMENT STANDARD ................................................................... 5

ARGUMENT ............................................................................................................... 7

I.     All Of Plaintiff's Claims Fail Because Plaintiff Cannot Establish Cause In Fact .............. 7

      A.    There Is No Competent Evidence That Neurontin Use Caused Mr. Shearer To Commit Suicide ..................................................................................... 7

      B.    There Is No Competent Evidence That Mr. Shearer Would Not Have Been Prescribed Neurontin Had a Suicide Warning Been Included on the Label ............ 9

      C.    Plaintiff's Fraud Allegations Cannot Save Her Failure-To-Warn Claims ............. 12

II.    All Plaintiff's Claims Fail Because Plaintiff Cannot Establish Proximate Causation ............................................................................................................... 13

III.   Plaintiff's Implied Warranty, Strict Liability, And Fraudulent Concealment Claims Should Be Dismissed As Duplicative Of Her Negligent Failure-To-Warn Claim ......................................................................................................................... 16

IV.   Plaintiff Cannot Prove Essential Elements of Her Express Warranty Claims ................... 18

V.    Plaintiff's Chapter 93A Claim Fails Because She Did Not Give Prior Notice to Pfizer ......................................................................................................................... 20

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Baghdady v. Lubin & Meyer, P.C.*, 55 Mass. App. Ct. 316,
770 N.E.2d 513 (App. Ct. 2002) ........................................................................................8

*Bardige v. Performance Specialists*, No. 0602586, 2007 WL 3012673 (Mass. Super. Ct.
Sept. 26, 2007), *aff'd*, 74 Mass. App. Ct. 99, 904 N.E.2d 464 (App. Ct. 2009) ....................8

*Beer v. Upjohn Co.*, 943 S.W.2d 691 (Mo. Ct. App. 1997).........................................................15

*Bratton v. CSX Transport, Inc.*, 586 F. Supp. 2d 12 (D. Mass. 2008)........................................6

*Brooks v. Manzaro*, No. 062501A, 2008 WL 5146863 (Mass. Super. Ct. Dec. 1, 2008) .........20

*Canavan's Case*, 432 Mass. 304, 733 N.E.2d 1042 (2000).........................................................8

*Chamian v. Sharplan Lasers, Inc.*, No. 200000171, 2004 WL 2341569 (Mass. Super. Ct.
Sept. 24, 2004) ...........................................................................................................9, 10

*Cottam v. CVS Pharmacy*, 436 Mass. 316, 764 N.E.2d 814 (2002) ............................................9

*Daniels v. New York, New Haven & Hartford. Railroad*,
183 Mass. 393, 67 N.E. 424 (1903) .............................................................................. 13-16

*DeNovellis v. Shalala*, 124 F.3d 298 (1st Cir. 1997) ...................................................................6

*Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 825 N.E.2d 554 (App. Ct. 2005) ........................14

*Doe v. Senechal*, 66 Mass. App. Ct. 68, 845 N.E.2d 418 (App. Ct. 2006) ...................................7

*In re Dube's Case*, 70 Mass. App. Ct. 121, 872 N.E.2d 1171 (App. Ct. 2007)...........................14

*Eck v. Parke, Davis & Co.*, 256 F.3d 1013 (10th Cir. 2001).......................................................10

*Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365 (N.D. Ill. 1998).......................................11

*Ford Motor Co. v. General Accident Insurance Co.*, 779 A.2d 362 (Md. 2001) .......................17

*Freyermuth v. Lutfy*, 376 Mass. 612, 382 N.E.2d 1059 (1978) ..................................................14

*Garside v. Osco Drug, Inc.*, 895 F.2d 46 (1st Cir. 1990) .............................................................6

*Garside v. Osco Drug, Inc.*, 976 F.2d 77 (1st Cir. 1992) ..............................................9, 12, 18

*Hann v. Micron Separations, Inc.*, 107 F.3d 1 (1st Cir. 1997) ....................................6

*Haughton v. Hill Laboratories, Inc.*, No. 06-11217,
    2007 WL 2484889 (D. Mass. Aug. 30, 2007) ....................................................10

*Hershenow v. Enterprise Rent-a-Car Co. of Boston, Inc.*, 445 Mass. 790,
    840 N.E.2d 526 (2006)........................................................................................7

*Hoffman v. Houghton Chemical Corp.*, 434 Mass. 624, 751 N.E.2d 848 (2001).......................16

*Jones v. Walter Kidde Portable Equipment, Inc.*, 16 F. Supp. 2d 123 (D. Mass. 1998),
    *aff'd*, 183 F.3d 67 (1st Cir. 1999)....................................................................10

*Kelley v. Eli Lilly & Co.*, 517 F. Supp. 2d 99 (D.D.C. 2007) ....................................17

*Kelly v. Wyeth*, No. 20033314F, 2007 WL 1302589 (Mass. Super. Ct. Apr. 12, 2007)....... 18-19

*Kent v. Commonwealth*, 437 Mass. 312, 771 N.E.2d 770 (2002)................................14

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459,
    781 N.E.2d 787 (2003)........................................................................................7

*Lingis v. Waisbren*, 75 Mass. App. Ct. 464, 914 N.E.2d 976 (App. Ct. 2009)...........................20

*Lynch v. Merrell-National Laboratories Division of Richardson-Merrell, Inc.*,
    646 F. Supp. 856 (D. Mass. 1986), *aff'd*, 830 F.2d 1190 (1st Cir. 1987) ..............................6

*MacDermid v. Discover Finance Services*, 488 F.3d 721 (6th Cir. 2007),
    *cert. denied*, 2010 WL 155020 (Jan. 19, 2010) ..................................................15

*MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 475 N.E.2d 65 (1985)................17

*Matsuyama v. Birnbaum*, 452 Mass. 1, 890 N.E.2d 819 (2008)................................7

*McCarthy v. City of Newburyport*, 252 F. App'x 328 (1st Cir. 2007)..........................................6

*Morrisey v. Lieberman*, No. 002561, 2005 WL 2009433 (Mass. Super. Ct. July 13, 2005)......18

*Mullins v. Pine Manor College*, 389 Mass. 47, 449 N.E.2d 331 (1983) ......................................8

*NEC Electrical, Inc. v. New England Circuit Sales, Inc.*, 722 F. Supp. 861 (D. Mass. 1989) .....5

*Nelson v. Massachusetts Port Authority*, 55 Mass. App. Ct. 433,
    771 N.E.2d 209 (App. Ct. 2002) ...................................................................13, 14

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
   257 F.R.D. 315 (D. Mass. 2009) ...................................................................................13, 20

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
   618 F. Supp. 2d 96 (D. Mass. 2009) .............................................................1, 12, 17, 18, 20

*Nix v. SmithKline Beecham Corp.*, No. CV-06-43-PHX-SMM,
   2007 WL 2526402 (D. Ariz. Sept. 5, 2007)............................................................................11

*In re Norplant Contraceptive Products Liability Litigation*, 955 F. Supp. 700
   (E.D. Tex. 1997), *aff'd*, 165 F.3d 374 (5th Cir. 1999) ..........................................................11

*O'Connor v. SmithKline Bio-Science Laboratories, Inc.*, 36 Mass. App. Ct. 360,
   631 N.E.2d 1018 (App. Ct. 1994)............................................................................................8

*Odom v. G.D. Searle & Co.*, 979 F.2d 1001 (4th Cir. 1992)........................................................10

*Or v. Edwards*, 62 Mass. App. Ct. 475, 818 N.E.2d 163 (App. Ct. 2004) ...................................7

*Plummer v. Lederle Laboratories*, 819 F.2d 349 (2d Cir. 1987)................................................10

*Poskus v. Lombardos of Randolph, Inc.*, 423 Mass. 637, 670 N.E.2d 383 (1996)....................14

*Reinhardt v. Gulf Insurance Co.*, 489 F.3d 405 (1st Cir. 2007) ....................................................7

*Rodi v. Southern New England School of Law*, 389 F.3d 5 (1st Cir. 2004)...............................21

*Roth v. Ray-Stel's Hair Stylists, Inc.*, 18 Mass. App. Ct. 975,
   470 N.E.2d 137 (App. Ct. 1984) .......................................................................................7, 19

*Slaven v. City of Salem*. 386 Mass. 885, 438 N.E.2d 348 (1982) .........................................13, 14

*Spilios v. Cohen*, 38 Mass. App. Ct. 338, 647 N.E.2d 1218 (Mass. App. Ct. 1995) .................20

*Sprague v. Upjohn Co.*, No. 91-40035-NMG, 1995 WL 376934
   (D. Mass. May 10, 1994) .................................................................................................16, 19

*Staelens v. Dobert*, 318 F.3d 77 (1st Cir. 2003) ........................................................................14

*Stuto v. Corning Glass Work*s, No. 88-1150-W 1990 WL 105615 (D. Mass. 1990) .................19

*Sutera v. Perrier Group of America Inc.*, 986 F. Supp. 655 (D. Mass. 1997)..............................8

*Swartz v. General Motors Corp.*, 375 Mass. 628, 378 N.E.2d 61 (1978)..................................17

*Tate v. Canonica*, 5 Cal. Rptr. 28 (Ct. App. 1960) .....................................................................14

*Tayag v. Lahey Clinic Hospital, Inc.*, No. 08-10727-PBS,
    2010 WL 26217 (D. Mass. Jan. 6, 2010) ...................................................................6

*Thomas v. Digital Equipment Corp.*, 880 F.2d 1486 (1st Cir. 1989) ..............................6

*Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806 (5th Cir. 1992) ...........................9, 10

*Thornton v. UPS, Inc.*, 587 F.3d 27 (1st Cir. 2009) ......................................................5

*Vanderwerf v. SmithKlineBeecham Corp.*, 529 F. Supp. 2d 1294, 1313-14 & n.23 (D. Kan.
    2008) .......................................................................................................................12

*Vaughn v. G.D. Searle & Co.*, 536 P.2d 1247 (Or. 1975) ............................................11

*Wheat v. Pfizer, Inc.*, 31 F.3d 340 (5th Cir. 1994) .....................................................10

*Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099 (5th Cir. 1991) ..............................10

*Windham v. Wyeth Laboratories, Inc.*, 786 F. Supp. 607 (S.D. Miss. 1992) ...............11

## STATUTES & OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ...................................................................................................5

Mass. Gen. Laws Ann. ch. 93A, § 9(3) (West 2006)...................................................20

Mass. Gen. Laws Ann. ch. 106, § 2-313(1) (West 1999) ............................................18

*Restatement (Second) of Torts* § 433B 1965) ..............................................................8

*Restatement (Second) of Torts* § 455 (1965)..............................................................14

*Restatement (Second) of Torts* § 525 (1977) ..............................................................12

*Restatement (Third) of Torts* § 2 cmt. n (1998) ........................................................16

## PRELIMINARY STATEMENT

Plaintiff Linda Shearer seeks to recover for the suicide of her husband, Hartley Shearer, in 2002, which she claims was caused by his Neurontin use.  Mr. Shearer was a 57-year-old video artist diagnosed with a variety of psychiatric disorders, including depression, obsessive compulsive disorder, anxiety, attention deficit disorder, and narcissistic personality disorder.  Mr. Shearer also suffered profound health problems, including a stroke in 1999 that left him significantly paralyzed on the left side of his body.  Mr. Shearer never fully recovered from his stroke and required assistance with day-to-day living.  He also sought psychiatric treatment for a variety of issues relating to his stroke.  This difficult change in Mr. Shearer's physical ability created understandable strain and conflict between Mr. and Mrs. Shearer.  In 2000, Mr. Shearer was hospitalized for severe lower back pain, endocarditis and an emergency splenectomy.  His severe pain was initially treated with narcotic medications but he suffered serious side-effects. In October 2000 he was prescribed Neurontin to alleviate his severe pain.  On February 7, 2002, shortly after a telephone argument with Mrs. Shearer, Mr. Shearer committed suicide by gunshot. He left a signed note stating:  "Linda has left me powerless by hanging up on me for the last time. I love you both Ivor and Linda.  But this is it – Hartley Shearer."

Summary judgment is required because Plaintiff has no admissible evidence supporting causation, an essential element of each of her claims.  Plaintiff's remaining causes of action[1] center on her allegations that Neurontin presents a risk of suicide that was not, and should have been, indicated on its warning label, and that Mr. Shearer's use of Neurontin caused him to commit suicide.  Although Pfizer denies that Neurontin is associated with suicide, the Court need not reach this issue to decide this motion.  Plaintiff's claims fail regardless of whether Plaintiff is able to prove *general* causation because there is no competent evidence sufficient to raise any material fact questions regarding *specific* causation – *i.e.*, that Neurontin or any alleged failure to

---

[1] This Court has dismissed Plaintiff's claims of affirmative fraud, finding that there were insufficient allegations and no evidence of specific misrepresentations by Pfizer to Mr. Shearer's prescribing physicians. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 618 F. Supp. 2d 96, 114 (D. Mass. 2009).

warn was a but-for or proximate cause of *Mr. Shearer's* suicide. This failure of proof requires that all of Plaintiff's claims against Pfizer be dismissed.

*First*, Plaintiff's claims fail as a matter of law because she cannot present competent evidence that Neurontin use caused Mr. Shearer's suicide. Plaintiff's experts' opinions on this issue are inadmissible for the reasons discussed in Pfizer's Motion to Exclude the Specific Causation Testimony of Drs. Glenmullen and Kruszewski. Because expert testimony is required to prove specific medical causation, Plaintiff's claims fail as a matter of law.

*Second*, Plaintiff's claims fail for lack of evidence that Pfizer's alleged failure to warn caused Mr. Shearer's suicide. The learned intermediary rule requires Plaintiff to show that an additional warning to Plaintiff's prescribers would have changed the outcome. Plaintiff has no such evidence because none of Mr. Shearer's prescribers testified that they would not have prescribed Neurontin to Mr. Shearer if they had been warned of the alleged suicide risk.

*Third*, Plaintiff cannot prove proximate causation because well-settled Massachusetts law presumes that Mr. Shearer's decision to commit suicide is an intervening and superseding cause of his death. Plaintiff can overcome this presumption only by showing that Neurontin caused delirium or frenzy, or an uncontrollable impulse, that led to Mr. Shearer's suicide. Plaintiff's experts have offered no such opinion, and the undisputed facts preclude any such showing.

*Finally*, Plaintiff's implied warranty, strict liability, and fraudulent concealment claims must be dismissed as duplicative of her negligent failure-to-warn claim, and Plaintiff's express warranty and consumer protection claims fail for additional reasons discussed below.

## FACTUAL BACKGROUND

Prior to his stroke, Hartley Shearer was a video artist and a part-time lecturer at Williams College. (Deposition of Linda Shearer ("L. Shearer Dep.") at 67:14-18, 107:11-20, 110:24-111:21.)[2] His wife Linda, Plaintiff in this action, then worked as Director of the College's

---

[2] The medical records and deposition testimony cited herein are attached to the accompanying Declaration of Mark S. Cheffo, which Defendants refer to and incorporate herein, along with their Rule 56.1 Statement of Material Facts.

museum of art. (*Id.* at 99:15-18.) An avid hockey player and volunteer assistant coach prior to 1999, Mr. Shearer lived an active life, exercising daily and volunteering at a boys home on a consistent basis (*id.* at 74:7-77:3, 107:21-108:8, 120:24-122:7, 123:6-10), all while pursuing a masters degree in social work from the State University of New York at Albany. (*Id.* at 123:11-17, 217:22-218:17.) However, in 1999, during an operation for elective heart surgery, he suffered a severe right hemisphere stroke, which left him with significant and permanent paralysis on the left side of his body. (*Id.* at 152:1-22; Spaulding Rehab. Hosp. Records ("Spaulding") at 17SRH-9-12.) The stroke forced him to abandon both teaching as well as his pursuit of his degree, along with many of his favorite activities, including exercise, and his volunteer work. (North Adams Regional Hosp. Records ("NARH") at 22-NARH-313, 317; Williamstown Med. Assocs. Records ("WMA") at 30-WMA-191-192; Dr. Catapano-Friedman Records ("C-F") at 17DCR-1-2, Dep. of Dr. Lisa Catapano-Friedman ("C-F Dep.") at 20:20-21:6; L. Shearer Dep. at 126:4-127:9, 163:20-165:3, 218:8-17.) His work as a part-time teacher also became limited. (Spaulding at 17SRH-72-74.) His physical limitations and needs also created marital strain. (C-F Dep. at 31:19-32:13). Because Mr. Shearer was incapable of taking care of such daily needs as grooming and dressing himself, the Shearers had to hire a caretaker, incurring $20,000 to $35,000 of credit card debt in the process. (L. Shearer Dep. at 328:19-329:9.)

Even very early in his life, Mr. Shearer struggled with mental health issues. (Westminster School Records ("Westminster") at 16WSC-53, 82.) He was raised by his grandfather and sent away to boarding school at a young age. (*Id.* at 16WSC-53.) At various times throughout his life, Mr. Shearer was diagnosed by mental health professionals with depression, obsessive compulsive disorder, anxiety, and attention deficit disorder.[3] In the late 1980s, Mr. Shearer was diagnosed with attention deficit disorder, for which he was prescribed and continued to take Ritalin for the rest of his life. (L. Shearer Dep. at 77:19-79:2.) Mr.

---

[3] (*See* Pl.'s Resp. To Interrog. No. 11; Dr. William Chambers Records ("Chambers") at 38CWI-2-7; WMA at 30-WMA-51, 56, 59; Westminster at 16-WSC-00053, 85.)

Shearer also had a "controlling" personality, as described by himself and his family. (*E.g.*, Spaulding at 17SRH-78-79; C-F at 17DCR-1-2.) In 1996, even prior to his stroke, Mr. Shearer was diagnosed with depression, for which he was prescribed 20 mg Prozac. (WMA at 30WMA-59.) That dose was later increased to 40 mg to treat his feelings of anxiety. (*Id.* at 30WMA-56.) Mr. Shearer refilled his Prozac prescription 12 days prior to his death. (Hart's Pharmacy Records ("Hart's") at 26HPH-16.) Mr. Shearer saw several mental health professionals over the course of his lifetime. (*E.g.*, Pl.'s Resp. To Interrog. No. 10.) In February 2000, following his stroke, Mr. Shearer began to see a psychiatrist, Dr. Catapano-Friedman, because he was "concerned about his anger and venting it on Linda," (C-F at 17DCR-1-2), a problem that continued throughout his treatment with Dr. Catapano-Friedman. (C-F Dep. at 51:15-23.) Dr. Catapano-Friedman diagnosed Mr. Shearer with narcissistic personality disorder. (C-F Dep. at 144:25-145:2, 153:14-154:11.)

On September 28, 2000, Mr. Shearer was hospitalized for severe low back pain; he then developed endocarditis, and later required an emergency splenectomy. (*See* WMA at 30WMA-164; Berkshire Medical Center Records ("Berkshire") at 35BMC-79-81.) A nursing assessment of Mr. Shearer stated that Mr. Shearer felt "on [the] edge of breakdown." (Brigham & Women's Hospital Records ("BWH") at 37BWH-00395.) Mr. Shearer became disoriented and had paranoid delusions on certain narcotics. (*Id.* at 37BWH-00371-83.) The Brigham & Women's Hospital pain service prescribed Neurontin on October 14, 2000, to treat Mr. Shearer's pain. (*Id.* at 37BWH-00410-11, 37BWH-00371-83.) Mr. Shearer later told Dr. Catapano-Friedman that he was "very traumatized" by this hospitalization. (C-F Dep. at 45:6-47:4.)

On February 28, 2001, the Shearers got into an argument. (*Id.* at 50:9-22; L. Shearer Dep. at 171:20-172:17, 180:11-183:25.) After Mr. Shearer "ended up in her face" Mrs. Shearer slapped Mr. Shearer. (*See id.*) Mr. Shearer called the police, who arrested Mrs. Shearer. (*See id.*) Charges of assault and battery against Mrs. Shearer were later dismissed. (*See id.*) Dr. Catapano-Friedman later explained that because of this incident, Mr. Shearer had "[r]ealize[d] he need[ed] to 'ratchet down' his constant anger" and began taking Zyprexa. (C-F at 17DCR-5.)

On February 5, 2002, Mrs. Shearer left for Hawaii on a business trip. (Glenmullen Report at 26; L. Shearer Dep. at 214:22-215:12.) On February 7, 2002, Mr. and Mrs. Shearer got into an argument over the telephone. (Glenmullen Report at 26; Mass. State Police Records ("State Police") at 9; Wheeler Dep. at 31:9-33:22.) Mr. Shearer's caretaker observed that Mr. Shearer appeared agitated when he got off the phone. (Wheeler Dep. at 39:19-40:6.) Mr. Shearer told his caretaker that he planned on attending a scheduled medical appointment, but that he needed to collect a few things upstairs first. (Glenmullen Report at 26-27; State Police at 9; Wheeler Dep. at 40:23-41:15.) Mr. Shearer then locked his bedroom door and shot himself in the head with his gun.[4] He left a note that read: "Linda has left me powerless by hanging up on me for the last time. I love you both Ivor and Linda. But this is it —Hartley Shearer" (H. Shearer Suicide Note.)

Mr. Shearer was on a number of psychotropic drugs prior to his suicide – including Trazodone, Prozac, Ativan, Provigil, Zyprexa, and Ritalin – many of which have been associated with the risks of depression and suicide. The only drug found in Mr. Shearer's system was a benzodiazepine (*see* Mass. Medical Examiner Records at 420CM-3-9), which Plaintiff's expert claims increases the risk of depression and suicide. (Trimble Dep. at 98:8-17; Trimble Report at 18.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is properly granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Thornton v. UPS, Inc.*, 587 F.3d 27, 31 (1st Cir. 2009); *see also* Fed. R. Civ. P. 56(c). Where, as here, the non-moving party has the burden of proof to establish her claim, the movant "need not produce evidence negating the claim that there is a material issue in genuine dispute." *NEC Elecs., Inc. v. New Eng. Circuit Sales, Inc.*, 722 F. Supp. 861, 863 (D. Mass. 1989) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, the "moving party's burden is to point out to the district court 'that there is

---

[4] (*See* Glenmullen Report at 27; Wheeler Dep. at 38:15-39:2, Mass. State Police Records at 9, Williamstown Police Dept. Records at 35WPD-4-5, Death Certificate at 12PPR-470.)

an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325). Accordingly, Pfizer is entitled to summary judgment if Plaintiff fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Thomas v. Digital Equip. Corp.*, 880 F.2d 1486, 1489 (1st Cir. 1989) (citing *Celotex Corp.*, 477 U.S. at 323). Thus, the First Circuit has affirmed summary judgment in favor of a drug manufacturer based on the plaintiffs' failure to produce any evidence on the issue of causation. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49, 51 (1st Cir. 1990) (holding that "plaintiffs defaulted on [their] obligation" to produce "some evidence, admissible at trial, supporting their allegation that [defendant's medication] caused [their] adverse reaction"); *accord Lynch v. Merrell-National Labs. Div. of Richardson-Merrell, Inc.*, 646 F. Supp. 856, 867 (D. Mass. 1986), *aff'd*, 830 F.2d 1190 (1st Cir. 1987).

Rule 56(c) requires the nonmovant to "'go beyond the pleadings'" and, by admissible evidence, "'designate specific facts showing that there is a genuine issue for trial.'" *Bratton v. CSX Transp., Inc.*, 586 F. Supp. 2d 12, 16 (D. Mass. 2008) (quoting *Celotex Corp.*, 477 U.S. at 324). If Plaintiff's evidence on any element is "'merely colorable or is not significantly probative, summary judgment may be granted.'" *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted)). Additionally, Plaintiff cannot satisfy her burden through "unsupported allegations, unreasonable inferences, and conclusory speculation," *Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision), or by pointing to "'some metaphysical doubt as to the material facts.'" *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see also McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) ("If the nonmovant's argument 'rests merely upon conclusory allegations, improbable inferences, and unsupported speculation,' summary judgment is appropriate." (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990))).

6

## ARGUMENT

## I.  All Of Plaintiff's Claims Fail Because Plaintiff Cannot Establish Cause In Fact

Causation is an essential element of each of Plaintiff's claims in this action.  *See Doe v. Senechal*, 66 Mass. App. Ct. 68, 75-76, 845 N.E.2d 418, 425 (App. Ct. 2006) (causation is an element of a negligence claim); *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 469-70, 781 N.E.2d 787, 796 (2003) (holding that misrepresentation claim was defective where plaintiff "offered no evidence that any losses it incurred were caused by its reliance on a misrepresentation attributable to [defendant]"); *Roth v. Ray-Stel's Hair Stylists, Inc.*, 18 Mass. App. Ct. 975, 976, 470 N.E.2d 137, 138 (App. Ct. 1984) (holding that evidence of damages caused by the plaintiff's reliance is a "required element[] for a claim of breach of express warranty"); *Hershenow v. Enterprise Rent-a-Car Co. of Boston, Inc.*, 445 Mass. 790, 791-92, 840 N.E.2d 526, 528 (2006) ("[P]roving a causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery under our consumer protection statute.").

Because Plaintiff has no admissible evidence that Neurontin use or the purported lack of an adequate warning caused Mr. Shearer's suicide, Pfizer is entitled to summary judgment.

## A.  There Is No Competent Evidence That Neurontin Use Caused Mr. Shearer To Commit Suicide

To prove medical causation, Plaintiff must show that Neurontin was a "but-for" cause – not merely a contributing factor – of Mr. Shearer's suicide.  *See, e.g., Reinhardt v. Gulf Ins. Co.*, 489 F.3d 405, 412 (1st Cir. 2007) ("Under Massachusetts law, a plaintiff seeking to establish causation must show that the 'defendant's conduct was a but-for cause of [its] injury, and that [the] defendant's conduct was a 'substantial legal factor' in bringing about the alleged harm to [the] plaintiff.'" (quoting *Jorgensen v. Mass. Port Auth.*, 905 F.2d 515, 524 (1st Cir. 1990) (alterations in original))).  As Massachusetts' highest court recently recognized, where, as here, the conduct of only one defendant or set of related defendants is at issue, "[t]he proper test" for causation is "whether that conduct was the but-for cause." *Matsuyama v. Birnbaum*, 452 Mass. 1, 31, 890 N.E.2d 819, 842 (2008); *see also Or v. Edwards*, 62 Mass. App. Ct. 475, 485 & n.16,

818 N.E.2d 163, 171 & n.16 (App. Ct. 2004) (applying "but-for," rather than "substantial causative factor," formulation of factual cause to negligence claim involving single set of defendants); *Baghdady v. Lubin & Meyer, P.C.*, 55 Mass. App. Ct. 316, 321, 770 N.E.2d 513, 517 (App. Ct. 2002) (affirming "but-for" causation instruction in negligence action).

A causal connection between Neurontin and Mr. Shearer's suicide "'cannot be left to the jury's conjecture or speculation'"; that is, "'it is not enough to show the mere possibility of a causal connection; the probability of such a connection must be shown.'" *Reinhardt*, 489 F.3d at 412 (quoting *Jorgensen*, 905 F.2d at 524); *accord O'Connor v. SmithKline Bio-Science Labs., Inc.*, 36 Mass. App. Ct. 360, 363-64, 631 N.E.2d 1018, 1020 (App. Ct. 1994). Thus, Plaintiff must "'introduce evidence from which reasonable men may conclude that it is more probable that [the suicide] was caused by [Neurontin] than that it was not.'" *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 58, 449 N.E.2d 331, 339 (1983) (quoting *Carey v. GM Corp.*, 377 Mass. 736, 738-42, 387 N.E.2d 583, 585-86 (1979) (citing *Restatement (Second) of Torts* § 433B cmt. b (1965))).

Moreover, to prove medical causation, a plaintiff must present admissible expert testimony. *See Canavan's Case*, 432 Mass. 304, 315-16, 733 N.E.2d 1042, 1051 (2000); *see also Bardige v. Performance Specialists*, No. 0602586, 2007 WL 3012673, at *1 (Mass. Super. Ct. Sept. 26, 2007) (noting that expert causation testimony is ordinarily required in products liability actions), *aff'd*, 74 Mass. App. Ct. 99, 904 N.E.2d 464 (App. Ct. 2009).

Plaintiff's exerts' Drs. Glenmullen and Kruszewski claim to have determined, through "differential diagnosis," that Mr. Shearer's Neurontin use was a "substantial factor" that led to his suicide. But as set forth in detail in Pfizer's motion to exclude their specific causation testimony, both experts' opinions on specific causation are unreliable and inadmissible under *Daubert* and Rule 702 of the Federal Rules of Evidence. Neither expert performed anything resembling a proper differential diagnosis and, despite their "substantial factor" rubric, neither expert can reliably opine that Mr. Shearer would have committed suicide had he not taken Neurontin. Thus, because Plaintiff has no competent expert evidence of specific causation, there is no genuine issue of material fact, and her claims fail as a matter of law. *See, e.g., Sutera v.*

*Perrier Group of Am. Inc.*, 986 F. Supp. 655, 668 (D. Mass. 1997) (Saris, J.) (granting summary judgment to defendants where plaintiffs failed to offer admissible expert evidence of causation).

### B.    There Is No Competent Evidence That Mr. Shearer Would Not Have Been Prescribed Neurontin Had a Suicide Warning Been Included on the Label

Because all of Plaintiff's claims are based on the purported failure to warn of risks associated with a prescription drug, they are governed by the learned intermediary rule, which provides that "'a prescription drug manufacturer's duty to warn of dangers associated with its product runs only to the physician; it is the physician's duty to warn the ultimate consumer.'" *Cottam v. CVS Pharmacy*, 436 Mass. 316, 321, 764 N.E.2d 814, 820 (2002) (extending learned intermediary rule to pharmacies) (citation omitted).   The rationale for the rule is that "the prescribing physician, as the 'learned intermediary' standing between the manufacturer and the consumer/patient, is generally in the best position to evaluate the potential risks and benefits of ingesting a certain drug and to advise the patient accordingly." *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992) ("*Garside II*").   Thus, to prove causation, Plaintiff must adduce "evidence that if an additional warning had been given, *it would have been heeded and a different result would have obtained.*"   *Chamian v. Sharplan Lasers, Inc.*, No. 200000171, 2004 WL 2341569, at *7 (Mass. Super. Ct. Sept. 24, 2004) (granting summary judgment to defendant under learned intermediary rule for lack of such evidence) (emphasis added).   Otherwise, "the physician's conduct acts as an intervening-superseding cause of the plaintiff's injury which vitiates any liability on the part of the manufacturer." *Garside II*, 976 F.2d at 80.

Massachusetts courts apply a heeding presumption to the learned intermediary rule, that is, a presumption that a physician would have heeded an adequate warning if it had been given. *See id.* at 81.   However, "'heed' in this context means only that the learned intermediary would have incorporated the 'additional' risk into his decisional calculus." *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992) (footnotes omitted).   The Tenth Circuit has explained that a prescribing physician only "heed[s]" warnings in the sense of considering them while deciding how to prescribe the product and whether or not to tell the patient about the risk,

and it is unrealistic to presume physicians would "heed" any warning in the sense of never using the product or that they would automatically tell every patient about every risk. *See Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1021 (10th Cir. 2001).

The heeding presumption adds nothing to this case because Mr. Shearer's prescribers testified that they would have taken an additional warning into account. (Angevine Dep. at 111:8-112:12; Sullivan Dep. at 101:16-102:2, 103:7-16.)  Neither this testimony nor the heeding presumption satisfy Plaintiff's burden to demonstrate material fact questions regarding causation, because "[t]he burden remains on the plaintiff to demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff." *Thomas*, 949 F.2d at 814.  Accordingly, even under the heeding presumption, a plaintiff must "offer evidence that would . . . justif[y] the jury in concluding that if the warnings had been given and heeded, the outcome would have been different." *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999).  In *Jones*, a failure-to-warn case involving a medical device, the court applied the heeding presumption and inferred that the plaintiff's physicians would have considered additional warnings, but nevertheless granted judgment as a matter of law because the plaintiff had offered no evidence that merely considering the additional warning would have changed the outcome. *Id.*; *see also Haughton v. Hill Labs., Inc.*, No. 06-11217, 2007 WL 2484889, at *2 (D. Mass. Aug. 30, 2007) (Stearns, J.) (granting summary judgment where there was "no evidence that [plaintiff's] doctors were unaware of the risks or that their decision to prescribe [the medication] for [plaintiff] would have been influenced by any additional instructions or warnings"); *accord Chamian*, 2004 WL 2341569, at *7.[5]

---

[5] *See also, e.g., Thomas v. Hoffmann-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992) ("[T]he plaintiff must establish that an adequate warning would have convinced the treating physician not to prescribe the product for the plaintiff."); *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (holding that plaintiff must show "that 'a proper warning would have changed the decision of the treating physician, *i.e.*, that but for the inadequate warning, the treating physician would not have used or prescribed the product'" (quoting *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099 (5th Cir. 1991))); *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003-04 (4th Cir. 1992) (affirming summary judgment where prescribing physician testified that a different warning would not have changed his decision to prescribe an intrauterine device); *Plummer v. Lederle Labs.*, 819 F.2d 349, 358-59 (2d Cir. 1987) (finding no proximate cause in the absence of evidence that different warning would have caused the physician to

Likewise, none of Mr. Shearer's doctors testified that an additional warning would have changed their prescription decision.  Dr. Angevine, who prescribed Neurontin to Mr. Shearer in 2000, testified that even if the Neurontin label had instructed her to discuss a risk of suicide with families and caregivers, she did not "know if [she] would have recommended that or advised the patient of that based on that information or not at the time," because "it may depend upon whether or not [she] felt that that particular side effect was potentially relevant to the individual patient."  (Angevine Dep. at 111:8-112:12.)   Neither did  Dr.  Angevine  know  whether hypothetical knowledge that Neurontin was a psychotropic drug would have impacted her decision to prescribe Neurontin to Mr. Shearer.  (*Id.* at 119:8-16 ("Again, I think that is impacted by the patient's individual circumstances as to whether or not a side effect is potentially relevant to them.").)  Nor could she say whether knowledge of Neurontin's mechanism of action would "have played any role in [her] prescribing practice to Mr. Shearer."  (*Id.* at 120:17-23.)

Similarly, Dr. Sullivan, who prescribed Neurontin to Mr. Shearer from October 2000 to the time of his death, could only testify that if he had received information reflected in the FDA alert, it "would be factored into a decision process."  (Sullivan Dep. at 103:7-16.)   Despite repeated questioning by Plaintiff's counsel, Dr. Sullivan testified only that he did not "know what [he] would have done in 2001."  (*See id.* at 102:14-20; *see generally id.* 100:9-16.)  Nor would Dr. Sullivan credit Plaintiff's counsel's suggestion that the FDA warning should be dispositive, observing instead that "each situation needs to be evaluated individually," and "each FDA bulletin needs to be looked at carefully because the FDA unfortunately is not always in . . . the best of studies providing information that is accurate."  (*Id.* at 103:17-104:15; *see also id.* at

act differently); *Nix v. SmithKline Beecham Corp.*, No. CV-06-43-PHX-SMM, 2007 WL 2526402, at *3 (D. Ariz. Sept. 5, 2007) (same); *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 370 (N.D. Ill. 1998) (to prove causation, there must be evidence "to show that [the] physician would not have prescribed [the medication] if the defendants had provided adequate warnings"); *In re Norplant Contraceptive Prods. Liab. Litig.*, 955 F. Supp. 700, 711 (E.D. Tex. 1997) (noting that to prove causation, there must be evidence "that a different warning would have changed the decision of the treating physicians"), *aff'd*, 165 F.3d 374 (5th Cir. 1999); *Windham v. Wyeth Labs., Inc.*, 786 F. Supp. 607, 612 (S.D. Miss. 1992) (same); *Vaughn v. G.D. Searle & Co.*, 536 P.2d 1247, 1250-51 (Or. 1975) (same).

120:7-15 ("[T]he FDA has made decisions with groups of people who have special interests and as a result, perhaps, their recommendations are not always fair and balanced.").)

Plaintiff may attempt to create an issue of material fact with respect to causation by raising questions about Dr. Hynes's authorization of a Neurontin prescription for Mr. Shearer.[6] But Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin, and believes he may have simply approved a resident's prescription decision. (Hynes Dep. at 75:10-77:14.) Moreover, based on what he knows today, Dr. Hynes still believes Neurontin "was appropriate" for Mr. Shearer. (*Id.* at 177:5-18). And even if Plaintiff could show that Dr. Hynes would not have approved a Neurontin prescription to Mr. Shearer in 2000, this would not be evidence of a different outcome, given Dr. Angevine's independent decision to prescribe Neurontin (*see* Angevine Dep. at 109:15-20), as well as Dr. Sullivan's continued prescription of Neurontin up to the time of Mr. Shearer's death.

### C.     Plaintiff's Fraud Allegations Cannot Save Her Failure-To-Warn Claims

Plaintiff's remaining fraud claims are subject to the same causation requirements as her failure-to-warn claims. This Court has already dismissed Plaintiff's affirmative fraud claims, leaving only her fraudulent concealment claim. *See Neurontin*, 618 F. Supp. 2d at 114. To prevail on that claim, Plaintiff must prove a "pecuniary loss caused . . . by . . . justifiable reliance upon" Pfizer's failure to disclose. *Id.* at 108 (quoting *Restatement (Second) of Torts* § 525 (1977)). Thus, because Pfizer's duty to disclose ran only to Mr. Shearer's prescribers, *Garside II*,

---

[6] Dr. Hynes, who approved a Neurontin prescription issued by the pain service during Mr. Shearer's hospitalization (Hynes Dep. at 75:10-77:14; BWH at 37BWH-410-11), testified that if he knew of an increased risk of suicide associated with Neurontin in 2000, he would have shared that information with Mr. Shearer, but he was unsure whether he would have had any opportunity to inform Mr. Shearer's caregiver or family of the risk. (Hynes Dep. at 140:13-141:23.) Even if Dr. Hynes' testimony on this point is credited, Plaintiff would still have to show that Mr. Shearer, if he had received a warning, would have declined to take the Neurontin and that he would not have received or accepted any further Neurontin prescriptions from Drs. Angevine and Sullivan. *See Vanderwerf v. SmithKlineBeecham Corp.*, 529 F. Supp. 2d 1294, 1313-14 & n.23 (D. Kan. 2008) (holding that testimony that physician would have monitored the patient more closely and warned the patient of risks did not bar summary judgment where plaintiff had no evidence that, given the additional monitoring and warning, the injury would have been avoided). Any testimony on such matters would be inadmissible speculation.

976 F.2d at 80, Plaintiff must prove that these prescribers relied upon Pfizer's alleged statements or omissions to them, and that such reliance caused Mr. Shearer's suicide. She cannot do so.

None of Mr. Shearer's prescribing doctors testified that an additional warning on the product label would have affected their decision to prescribe Neurontin. Neither Dr. Angevine nor Dr. Sullivan recalled receiving *any* promotional statements by Pfizer before they prescribed Neurontin to Mr. Shearer. (Sullivan Dep. at 111:5-114:9; Angevine Dep. at 15:1-5.) And Dr. Hynes still believes that prescribing Neurontin to Mr. Shearer "was appropriate." (Hynes Dep. at 177:5-18.) Nor can Plaintiff survive summary judgment by claiming that Mr. Shearer's prescribing doctors were indirectly influenced by statements or omissions to the medical community at large, because this Court has consistently rejected such impermissible fraud-on-the-market theories of reliance. *See Neurontin*, 618 F. Supp. 2d at 111-12; *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315 (D. Mass. 2009).

## II.    All Plaintiff's Claims Fail Because Plaintiff Cannot Establish Proximate Causation

Under long-settled Massachusetts law, "[a]n act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues." *Daniels v. N.Y., New Haven & Hartford. R.R.*, 183 Mass. 393, 400, 67 N.E. 424, 426 (1903). Thus, a defendant may not be held liable unless

> the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the [defendant], and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act.

*Id.* at 399-400, 67 N.E. at 426. Massachusetts courts have repeatedly reaffirmed *Daniels* in cases like this one, where a plaintiff claims that the defendant's conduct caused someone to commit suicide. *See, e.g., Slaven v. City of Salem*, 386 Mass. 885, 887-89, 438 N.E.2d 348, 349-50 (1982) (affirming summary judgment where decedent committed suicide while in police custody); *Nelson v. Mass. Port Auth.*, 55 Mass. App. Ct. 433, 434-36, 771 N.E.2d 209, 211-212 (App. Ct. 2002) (affirming summary judgment where decedent committed suicide by jumping

from Tobin Bridge, owned and operated by defendant).[7] Indeed, *Daniels* is the landmark case among "[t]he overwhelming weight of authority" that treats suicide as an independent, intervening cause, *Tate v. Canonica*, 5 Cal. Rptr. 28, 39 (Ct. App. 1960), and its holding has been codified in the relevant Restatement provision. *See Restatement (Second) of Torts* § 455 & reporter's notes (1965) (citing *Daniels*). The rare Massachusetts cases allowing recovery for suicide are factually distinguishable, and their legal analysis supports summary judgment here.[8]

Moreover, proximate cause often depends upon legal and policy questions properly resolved as a matter of law by courts, rather than upon strictly fact-based foreseeability questions. As the Supreme Judicial Court has recognized, "[t]here must be limits to the scope or definition of reasonable foreseeability based on considerations of policy and pragmatic judgment." *Poskus v. Lombardos of Randolph, Inc.*, 423 Mass. 637, 640, 670 N.E.2d 383, 386 (1996). Thus, where "a series of events occur between the negligent conduct and the ultimate harm," the question is not just "whether those intervening events have broken the chain of factual causation," but also whether they have "otherwise extinguished the element of proximate cause and become a superseding cause of the harm." *Kent v. Commonwealth*, 437 Mass. 312, 320-21, 771 N.E.2d 770, 777 (2002); *accord Staelens v. Dobert*, 318 F.3d 77, 79 (1st Cir. 2003). The presumptive rule that suicide constitutes an independent intervening act is based on such legal and policy determinations, *see Daniels*, 183 Mass. at 397-98, 67 N.E. at 425, with the issue in particular

---

[7] The *Nelson* and *Slaven* courts suggested that an exception to the presumptive rule of suicide as intervening cause might apply if "the decedent was in the defendant's custody and the defendant had knowledge of the decedent's suicidal ideation." *Nelson*, 55 Mass. App. Ct. at 435-36, 771 N.E.2d at 212; *see also Slaven*, 386 Mass. at 888-89, 438 N.E.2d at 350. Neither court actually applied this narrow exception. The exception could not even conceivably apply here, since Pfizer never had "custody" or any "knowledge" of Mr. Shearer.

[8] *See Freyermuth v. Lutfy*, 376 Mass. 612, 619, 620 n.6, 382 N.E.2d 1059, 1064, 1065 n.6 (1978) (citing *Daniels* as "applicable rule," but upholding plaintiff's verdict based on expert testimony that decedent had "involutional psychosis"); *Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 242-43, 825 N.E.2d 554, 557-58 (App. Ct. 2005) (citing *Daniels* as "historical view," but holding summary judgment improper due to fact questions regarding whether plaintiff shot herself accidentally based on "belief that the gun was unloaded"); *In re Dube's Case*, 70 Mass. App. Ct. 121, 127-28, 872 N.E.2d 1171, 1175-76 (App. Ct. 2007) (*Daniels* standard did not apply because workers compensation case was "governed by a simple causation test, and not by an independent intervening cause analysis").

cases simply being whether suicide occurred "without conscious volition . . . or knowledge of the physical nature and consequences of the act," *id.* at 399, 67 N.E.2d at 426.

Courts in other jurisdictions have applied these same principles to prescription drug failure-to-warn cases. For example, in *Beer v. Upjohn Co.*, 943 S.W.2d 691 (Mo. Ct. App. 1997), the plaintiffs claimed that the decedent shot himself after taking Halcion, a sleeping drug allegedly associated with depression and suicidal thoughts. *See id.* at 692-93. The plaintiffs presented expert psychiatric testimony that "Halcion could cause loss of impulse control and [the expert] could see no other reason for [the decedent's] suicide." *Id.* at 694. Affirming a directed verdict for the defendant, the court held that this testimony was legally insufficient to support a finding that the decedent "could not understand the consequences of his act or [that] he could not resist taking insane actions." *Id.* at 695. The jury could not have made any such finding "without resorting to conjecture and speculation." *Id.*

Moreover, the *Daniels* exception for delirium or frenzy is "extremely limited in application." *MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 736-37 (6th Cir. 2007), *cert. denied*, 2010 WL 155020 (Jan. 19, 2010). To illustrate, the Sixth Circuit cited a state supreme court decision holding that suicide was an intervening cause even though the defendant had inflicted sadistic punishment on the decedent, including breaking her leg, burning her with a cigarette, and beating her repeatedly. *See id.* at 737 (citing *Lancaster v. Montesi*, 390 S.W.2d 217 (Tenn. 1965)). As the Sixth Circuit put it, "[i]f the facts of [*Lancaster*] … do not fit the delirium/insanity exception … then neither do the facts in the instant case." *Id.* at 738. Nor can the exception be triggered by Pfizer's alleged conduct: marketing an FDA-approved medication claimed to cause suicidal ideation – a claim as to which there is considerable, legitimate dispute.

Plaintiff's experts have not opined that Mr. Shearer's suicide was driven by any "uncontrollable impulse, . . . delirium or frenzy" caused by Neurontin. *Daniels*, 183 Mass. at 399, 67 N.E. at 426. Dr. Kruszewski specifically denies making any "determination one way or the other" as to whether Mr. Shearer was "compelled to commit suicide." (*See* Kruszewski Dep. at 40:18-25.) Nor can Plaintiff present any evidence that Mr. Shearer acted without "conscious

volition" or "knowledge of the physical nature and consequences of his act." *Daniels*, 183 Mass. at 399-400, 67 N.E. at 426. It is undisputed that, before committing suicide, Mr. Shearer told his caretaker that he planned on attending a scheduled medical appointment, but that he needed to collect a few things upstairs first. (Glenmullen Report at 26-27; State Police at 9; Wheeler Dep. at 40:23-41:15.) Mr. Shearer then locked his door and wrote a cogent suicide note. (Glenmullen Report at 27; Wheeler Dep. at 38:15-39:2; H. Shearer Suicide Note.) He shot himself as much as an hour or more after his telephone conversation with Plaintiff. (*See* Williamstown Police Dept. Records at 25WPD-9.) Thus, as in *Daniels*,

> [a]ll the evidence tended to show that the deceased, with deliberate purpose, planned to take his own life; that he closed the door and locked it, with a view to exclude others to prevent interruption . . . . All this points to an understanding of the physical nature and effect of his act, and to a willful and intelligent purpose to accomplish it.

183 Mass. at 400, 67 N.E. at 426.

### III. Plaintiff's Implied Warranty, Strict Liability, And Fraudulent Concealment Claims Should Be Dismissed As Duplicative Of Her Negligent Failure-To-Warn Claim

Even if Plaintiff could present evidence of causation in support her failure-to-warn theory (which she cannot), Plaintiff's duplicative claims should still be dismissed. *See Restatement (Third) of Torts* § 2 cmt. n (1998) ("[T]wo or more factually identical failure-to-warn claims should not be submitted to the trier of fact in the same case under different doctrinal labels."). Here, well-settled Massachusetts authority recognizes that Plaintiff's claims under theories of implied warranty, strict liability, and fraudulent concealment are subsumed by her claim of negligent failure to warn, and they should therefore be dismissed.

Plaintiff's implied warranty claims are duplicative of her negligent failure-to-warn claims. Indeed, the Supreme Judicial Court has "expressly recognize[d] that convergence." *Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 637, 751 N.E.2d 848, 859 (2001). In product liability actions, courts regularly treat claims for breach of implied warranty and negligence under Massachusetts law as a single claim for negligent failure to warn. *See Sprague v. Upjohn Co.*, No. 91-40035-NMG, 1995 WL 376934, at *3-4 (D. Mass. May 10, 1994) (finding that

Massachusetts and First Circuit authority in drug product liability actions directed the court to treat breach of implied warranty and negligence claims "as a consolidated, single claim of negligent failure to warn"); *Kelley v. Eli Lilly & Co.*, 517 F. Supp. 2d 99, 110 (D.D.C. 2007) (same, applying Massachusetts law); *see also Hoffman*, 434 Mass. at 637, 751 N.E.2d at 859 (holding that theories of negligent failure to warn and failure to warn as a breach of warranty "are to be judged by the same standard: the reasonableness of the Defendant's actions in the circumstances"). Likewise, "there is no 'strict liability in tort' apart from liability for breach of warranty under the Uniform Commercial Code." *Swartz v. GM Corp.*, 375 Mass. 628, 629, 378 N.E.2d 61, 62 (1978). Accordingly, this Court should grant summary judgment on both Plaintiff's implied warranty and strict liability claims. *See Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 362, 369-70 (Md. 2001) (observing that although the themes of negligence, breach of warranty, and strict liability are distinct, they converge for "'they all require proof that the product was defective when it left the hands of the manufacturer, and that the defective condition was the proximate cause of the injuries or damages of which the plaintiff complains.'")

Plaintiff's fraudulent concealment claim is also subsumed by her negligent failure-to-warn claim, because the duty to disclose on which it is predicated is identical to the duty to warn physicians in prescription medication products liability cases. As this Court has recognized, other courts have repeatedly found fraudulent concealment claims duplicative of failure-to-warn claims in actions just like this. *See In re Neurontin*, 618 F. Supp. 2d at 113 (citing cases). The Court nevertheless concluded that the fraudulent concealment claims of products liability plaintiffs were independently actionable because Pfizer also had a duty to disclose Neurontin's material risks to *patients* in connection with Pfizer's alleged off-label promotion. *See id.* at 110, 112.[9] However, discovery in this action has now revealed that there is no causal nexus between

---

[9] Although this Court has suggested that Pfizer may also have a duty to disclose Neurontin's risks to patients where it is engaged in off-label promotion and "it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts," the Court was addressing the claims of products liability plaintiffs from several different states. *Id.* at 110. No such duty to warn *patients* exists under Massachusetts law, which only recognizes a duty to warn prescribing *physicians*. *See Garside II*, 976 F.2d at 80. The Supreme Judicial Court has recognized just one exception to the learned intermediary rule, in the inapposite context of oral contraceptives. *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 135, 475 N.E.2d 65, 68 (1985).

Pfizer's alleged off-label promotion and Plaintiff's injury, because there is no evidence connecting any marketing by Pfizer to the Neurontin prescriptions that Plaintiff claims caused Mr. Shearer's death. (*See* Section I.B, *supra*.) Nor can Plaintiff argue for a duty to disclose by virtue of Pfizer's alleged off-label promotion in other Neurontin cases or on a national scale, because this Court specifically dismissed Plaintiff's fraudulent concealment claims "to the extent they are premised on the claim of fraudulent omissions in the national advertising and marketing campaign." *In re Neurontin*, 618 F. Supp. 2d at 114. Thus, the Court's postulated legal duty to disclose risks to patients in the context of off-label promotion has not been triggered, and Plaintiff's fraudulent concealment claim may only be predicated on Pfizer's alleged "fail[ure] to disclose the risks of its drugs in the product labeling itself." *Id.* at 112. That duty to disclose risks on the product label is identical to and coextensive with the duty to warn that underpins Plaintiff's negligent failure-to-warn claim. *See Garside II*, 976 F.2d at 80 (manufacturers of prescription medications have a duty to warn prescribing physicians of medication's risk). Because Pfizer's duty is the same under either theory, Plaintiff's fraudulent concealment claim is duplicative of her negligence claim and should be dismissed as such.

## IV.    Plaintiff Cannot Prove Essential Elements of Her Express Warranty Claims

To prove her claim for express warranty under Massachusetts law, Plaintiff must show an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Mass. Gen. Laws Ann. ch. 106, § 2-313(1) (West 1999). A claim for breach of express warranty thus "requires proof that the defendant promised the plaintiff a specific result that was not achieved." *Kelly v. Wyeth*, No. 20033314F, 2007 WL 1302589, at *7 (Mass. Super. Ct. Apr. 12, 2007) (citing *Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc.*, 396 Mass. 818, 823, 489 N.E.2d 172, 175 (1986)). Indeed, "[a] claim for breach of express warranty differs from a negligence claim 'because the plaintiff must demonstrate that the defendant promised a specific result.'" *Morrisey v. Lieberman*, No. 002561, 2005 WL 2009433, at *4 (Mass. Super. Ct. July 13, 2005) (citation omitted). Yet in this case, there is no evidence that Pfizer ever communicated directly with Mr. Shearer. (Pl.'s Resp. To

Interrog. No. 17.)  Nor is there any evidence of any affirmative representations about Neurontin to Dr. Sullivan or Dr. Angevine.  (Sullivan Dep. at 111:5-114:9; Angevine Dep. at 15:1-5.)[10] And even assuming *arguendo* that Dr. Hynes received any warranties, there is no evidence that he relied on them, given that he still believes Neurontin "was appropriate" for Mr. Shearer. (Hynes Dep. at 177:5-18.)   As a result, Plaintiff's express warranty claim fails as a matter of law. *See Sprague*, 1995 WL 376934, at *3 (dismissing plaintiff's express warranty claim in a prescription drug case because she established "neither the existence of an express warranty nor any reliance thereon"); *Kelly*, 2007 WL 1302589, at *7 (granting summary judgment on express warranty claim where label did not guarantee that the drug would produce a specific result).

Additionally, Plaintiff cannot prove that any reliance on an express warranty given by Pfizer caused Mr. Shearer's suicide.  *See Sprague*, 1995 WL 376934, at *3  (to prevail on an express warranty claim, a plaintiff "must show reliance on such warranty" (citing *Roth v. Ray-Stel's Hair Stylists Inc.*, 18 Mass. App. Ct. 975, 976, 470 N.E.2d 137, 138 (App. Ct. 1984))); *see also Stuto v. Corning Glass Work*s, No. 88-1150-WF, 1990 WL 105615, at *5 (D. Mass. 1990) ("[S]ome minimum of reliance is a required element of a breach of express warranty claim in this state.").   There is absolutely no evidence that Mr. Shearer took Neurontin in reliance on any affirmation of fact by Pfizer that later proved false.  Nor is there any such evidence with respect to Mr. Shearer's prescribing physicians.  Further, even if Plaintiff could show some reliance by Mr. Shearer's physicians on an affirmation of Pfizer, she would be unable to show a causal connection between that reliance and Mr. Shearer's injury, for the reasons discussed in Section I.B, *supra*.  Finally, Plaintiff cannot evade the reliance requirement through her allegations that Pfizer made express warranties "by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of paralysis and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of paralysis," and that Plaintiff

---

[10] Any argument that the Neurontin label served as an express warranty must be rejected.  *See Kelly*, 2007 WL 1302589, at *7 ("While [plaintiff] asserts that these warnings [on the label] do not adequately represent the true dangers, the label does not explicitly or implicitly promise that her symptoms would not occur.").

relied on those warranties.  (Am. Compl. [1208] ¶¶ 148, 150.)  This again is a quintessential fraud-on-the-market theory of reliance, which has been consistently rejected by this Court.  *See Neurontin*, 618 F. Supp. 2d at 111-12; *Neurontin*, 257 F.R.D. at 315.

## V.     Plaintiff's Chapter 93A Claim Fails Because She Did Not Give Prior Notice to Pfizer

Plaintiff's consumer protection claim fails not only for lack of causation, but also because Plaintiff did not provide Pfizer with any pre-suit notice of her claim.  At least 30 days before filing suit under Chapter 93A, a plaintiff must send a "'written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive practice relied upon.'" *Rodi v. S. New Eng. School of Law*, 389 F.3d 5, 19 (1st Cir. 2004) (quoting Mass. Gen. Laws Ann. ch. 93A, § 9(3)).  The demand requirement "is not merely a procedural nicety, but rather 'a prerequisite to suit,'" such that failure to give notice is "sufficient ground to justify dismissal of the Chapter 93A claim." *Id.* at 19 (quoting *Entrialgo v. Twin City Dodge, Inc.*, 368 Mass. 812, 812, 333 N.E.2d 202, 204 (1975)); *Lingis v. Waisbren*, 75 Mass. App. Ct. 464, 468, 914 N.E.2d 976, 979 (App. Ct. 2009) (holding that demand requirement is "'condition precedent to commencing an action'" and that the plaintiff has the burden to prove "'the timely sending of a letter complying with the statutory specifications'" (citation omitted)).  Here, it is undisputed that Plaintiff failed to satisfy this "prerequisite to suit" and provide Pfizer with notice of her claim.  Indeed, Plaintiff's Amended Complaint does not even allege that she provided the requisite statutory notice. (*See* Am. Compl. [1208] ¶¶ 293-96.)  Accordingly, Pfizer is entitled to summary judgment on this claim. *See, e.g.*, *Spilios v. Cohen*, 38 Mass. App. Ct. 338, 342-43, 647 N.E.2d 1218, 1221 (Mass. App. Ct. 1995) (affirming summary judgment entered in defendant's favor where the plaintiff failed to satisfy her burden of proving the timely sending of a demand); *Brooks v. Manzaro*, No. 062501A, 2008 WL 5146863, at *3 (Mass. Super. Ct. Dec. 1, 2008) (granting summary judgment because plaintiff's failure to send the required demand letter was "fatal").

## CONCLUSION

For the foregoing reasons, Pfizer's summary judgment motion should be granted.

Dated: February 2, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP

By: /s/ Mark S. Cheffo
    Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

     -and-

BOIES, SCHILLER & FLEXNER LLP

By: /s/ William S. Ohlemeyer
    William S. Ohlemeyer

333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200

     -and-

WHITE AND WILLIAMS LLP

By: /s/ David B. Chaffin
    David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

21

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 2, 2010.

/s/ David B. Chaffin
David B. Chaffin