UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br>*Shearer v. Pfizer Inc., et al.*<br>Case No. 1:07-cv-11428-PBS | Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin<br>**UNREDACTED VERSION FILED UNDER SEAL** |

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") submit this Statement of Material Facts in support of their Motion for Summary Judgment, pursuant to Local Rule 56.1.[1]

1. Prior to his stroke in 1999, Hartley Shearer was a video artist and a part-time lecturer at Williams College. (Pl.'s Resp. To Interrog. No. 3, Ex. A; Dep. of Linda B. Shearer ("L. Shearer Dep.") at 67:14-18, 107:11-20, 110:24-111:21, Ex. B.)[2]

2. Plaintiff Linda Shearer, during the relevant time period, worked as Director of the Williams College Museum of Art. (L. Shearer Dep. at 99:15-18, Ex. B.)

3. An avid hockey player and volunteer assistant coach prior to 1999, Mr. Shearer lived an active life, exercising daily and volunteering at a boys home on a consistent basis (Pl.'s Resp. To Interrog. No. 5, Ex. A; L. Shearer Dep. at 74:7-77:3, 107:21-108:8, 120:24-122:7, 123:6-10, Ex. B), while pursuing a masters degree in social work from the State University of New York at Albany. (L. Shearer Dep. at 123:11-17, 217:22-218:17, Ex. B.)

---

[1] The facts asserted herein are admitted for purposes of Defendants' Motion for Summary Judgment only.

[2] All documents cited herein as "Ex. __" are attached as exhibits to the accompanying Declaration of Mark S. Cheffo.

4. In 1999, during an operation for elective heart surgery, Mr. Shearer suffered a severe right hemisphere stroke, which left him with significant paralysis on the left side of his body. (L. Shearer Dep. at 152:11-22, Ex. B; Spaulding Rehab. Hosp. Records ("Spaulding") at 17SRH-9-12, Ex. C.)

5. The stroke forced him to abandon, or significantly alter, both teaching as well as his pursuit of his degree, along with many of his favorite activities, including exercise, and his volunteer work. (North Adams Regional Hosp. Records ("NARH") at 22NARH-313, 317, Ex. D; Williamstown Med. Assocs. Records ("WMA") at 30WMA-191-192, Ex. E; Dr. Catapano-Friedman Records ("C-F") at 17DCR-1-2, Ex. F; Dep. of Dr. Lisa Catapano-Friedman ("C-F Dep.") at 20:20-21:6, Ex. G; L. Shearer Dep. at 126:4-127:9, 163:20-165:3, 218:8-17, Ex. B.)

6. His work as a part-time teacher also became limited. (Spaulding at 17SRH-72-74, Ex. C.)

7. His physical limitations and needs also created marital strain. (C-F Dep. at 31:19-32:13, Ex. G.)

8. Because Mr. Shearer was incapable of taking care of his daily needs on his own, such as grooming and dressing himself, the Shearers were forced to hire a caretaker, incurring $20,000 to $35,000 of credit card debt in the process. (L. Shearer Dep. at 328:19-329:9, Ex. B.)

9. Even very early in his life, Mr. Shearer struggled with mental health issues. (Westminster School Records ("Westminster") at 16WSC-53, 82, Ex. H.)

10. He was raised by his grandfather and sent away to boarding school at a young age. (Westminster at 16WSC-53, Ex. H.)

11. At various times throughout his life, Mr. Shearer was diagnosed by mental health professionals with depression, obsessive compulsive disorder, anxiety, and attention deficit disorder. (Pl.'s Resp. To Interrog. No. 11, Ex. A; Dr. William Chambers Records ("Chambers") at 38CWI-2-7, Ex. I; WMA at 30WMA-51, 56, 59, Ex. E; Westminster at 16-WSC-53, 85, Ex. H.)

12. In the late 1980s, Mr. Shearer was diagnosed with attention deficit disorder, for

which he was prescribed Ritalin and continued to take the rest of his life. (L. Shearer Dep. at 77:19-79:2, Ex. B.)

13. Mr. Shearer also had a "controlling" personality, as described by himself and his family. (Spaulding at 17SRH-78-79, Ex. C; C-F at 17DCR-1-2, Ex. F.)

14. In 1996, even prior to his stroke, Mr. Shearer was diagnosed with depression, for which he was prescribed 20 mg Prozac. (WMA at 30WMA-59, Ex. E.)

15. That dose was later increased to 40 mg to treat increased anxiety. (WMA at 30WMA-56, Ex. E.)

16. Mr. Shearer refilled his Prozac prescription 12 days prior to his death. (Hart's Pharmacy Records ("Hart's") at 26HPH-16, Ex. J.)

17. Mr. Shearer saw several mental health professionals over the course of his lifetime. (Pl.'s Resp. To Interrog. No. 10, Ex. A.)

18. On February 18, 2000, following his stroke, Mr. Shearer began to see a psychiatrist, Dr. Catapano-Friedman, because he was "concerned about his anger and venting it on Linda," a problem that continued throughout his treatment with Dr. Catapano-Friedman. (C-F at 17DCR-1-2, Ex. F; C-F Dep. at 51:15-23, Ex. G.)

19. Dr. Catapano-Friedman diagnosed Mr. Shearer with narcissistic personality disorder. (C-F Dep. at 144:25-145:2, 153:14-154:11, Ex. G.)



21. On September 28, 2000, Mr. Shearer was hospitalized for severe low back pain; he then developed endocarditis, and later required an emergency splenectomy. (NARH at 30WMA-164, Ex. D; Berkshire Medical Center Records ("Berkshire") at 35BMC-79-81, Ex. L.)

22. A nursing assessment of Mr. Shearer on October 14, 2000, reported that Mr. Shearer felt "on [the] edge of breakdown." (Brigham & Women's Hosp. Records ("BWH") at

37BWH-394-97, Ex. M.)

23. Mr. Shearer became disoriented and had paranoid delusions on certain narcotics. (BWH at 37BWH-371-83, Ex. M.)

24. The Brigham & Women's Hospital pain service prescribed Neurontin on October 14, 2000, to treat Mr. Shearer's pain. (BWH at 37BWH-371-83, 410-11, Ex. M.)

25. Mr. Shearer later told Dr. Catapano-Friedman that he was "very traumatized" by this hospitalization. (C-F Dep. at 45:6-47:4, Ex. G.)

26. On February 28, 2001, the Shearers got into an argument. According Mrs. Shearer, after Mr. Shearer "ended up in her face" Mrs. Shearer slapped Mr. Shearer. Mr. Shearer called the police, who came and arrested Mrs. Shearer and took her into custody. The charges of assault and battery against Mrs. Shearer were later dismissed. (C-F Dep. at 50:9-22, Ex. G; L. Shearer Dep. at 171:20-172:17, 180:11-183:25, Ex. B.)

27. Dr. Catapano-Friedman later explained that because of this incident, Mr. Shearer "[r]ealize[d] he need[ed] to 'ratchet down' his constant anger" and began taking Zyprexa. (C-F at 17DCR-5, Ex. F; C-F Dep. at 51:15-23, Ex. G.)

28. On February 5, 2002, Mrs. Shearer left Massachusetts for a conference in Hawaii for the Association of Art Museum Directors. (Expert Report of Dr. Joseph Glenmullen ("Glenmullen Report") at 26, Ex. N; L. Shearer Dep. at 214:22-215:12, Ex. B.)

29. On February 7, 2002, Mr. and Mrs. Shearer got into an argument over the telephone. (Glenmullen Report at 26, Ex. N; Mass. State Police Records ("State Police") at 9, Ex. O; Dep. of Sean Wheeler ("Wheeler Dep.") at 31:16-33:22, Ex. P.)

30. Mr. Shearer's caretaker, Sean Wheeler, observed that Mr. Shearer appeared agitated when he got off the phone. (Wheeler Dep. at 39:19-40:6, Ex. P.)

31. Mr. Shearer told his caretaker that he planned on attending a scheduled medical appointment, but that he needed to collect a few things upstairs first. (Glenmullen Report at 26-27, Ex. N; State Police at 9, Ex. O; Wheeler Dep. at 40:23-41:15, Ex. P.)

32. Mr. Shearer locked his bedroom door and shot himself in the head with his gun.

(Glenmullen Report at 27, Ex. N; Wheeler Dep. at 38:15-39:2, Ex. P; State Police at 9, Ex. O; Williamstown Police Dept. Records at 25WPD-4-5, Ex. Q; Death Certificate at 12PPR-470, Ex. R.)

33. Mr. Shearer shot himself as much as an hour or more after his telephone conversation with Plaintiff. (Williamstown Police Dept. Records at 25WPD-9, Ex. Q.)

34. Mr. Shearer died within hours of shooting himself. (Death Certificate at 12PPR-470, Ex. R.)

35. Mr. Shearer left a suicide note that read: "Linda has left me powerless by hanging up on me for the last time. I love you both Ivor and Linda. But this is it —Hartley Shearer" (H. Shearer Suicide Note, Ex. S.)

36. Mr. Shearer was on a number of psychotropic drugs prior to his suicide – including Trazodone, Prozac, Ativan, Provigil, Zyprexa, and Ritalin. (Hart's at 26HPH-15-17, Ex. J.)

37. The only drug found in Mr. Shearer's system was a benzodiazepine. (Mass. Medical Examiner Records at 420CM-3-9, Ex. T.)

38. Plaintiff's expert Dr. Trimble claims that benzodiazepines increase the risk of depression and suicide. (2/27/08 Deposition of Dr. Michael Trimble ("Trimble Dep.) at 98:8-17, Ex. U; Expert Report of Dr. Michael Trimble ("Trimble Report") at 18, Ex. V.)

39. Dr. Anne Hudson Angevine prescribed Neurontin to Mr. Shearer in October 2000. (BWH at 37BWH-363, Ex. M.)

40. Dr. Daniel Sullivan renewed Mr. Shearer's prescription for Neurontin on May 4, 2001. (WMA at 30WMA-8, Ex. E.)

41. Dr. Angevine testified that "it would be customary" for her to consider the risks and benefits of Neurontin before prescribing it to Mr. Shearer. (Deposition of Dr. Anne Hudson Angevine ("Angevine Dep.") at 109:15-20, Ex. W.)

42. When asked whether she would have informed Mr. Shearer had she been aware in 2000 "that Neurontin was associated with suicidality," Dr. Angevine testified: "[m]aybe. . . . I

don't know . . . I don't know if I would have recommended that or advised the patient of that based on that information or not at the time. . . . It may depend upon a particular patient and whether or not I felt that that particular side effect was potentially relevant to the individual patient." (Angevine Dep. at 109:21-112:12, Ex. W.)

43. Dr. Angevine testified that she did not know whether hypothetical knowledge in 2000 that Neurontin was a psychotropic drug would have impacted her decision to prescribe Neurontin to Mr. Shearer. (Angevine Dep. at 119:8-16 ("I don't know. Again, I think that is impacted by the patient's individual circumstances as to whether or not a side effect is potentially relevant to them."), Ex. W.)

44. Dr. Angevine testified that she did not know whether knowledge of Neurontin's mechanism of action would "have played any role in [her] prescribing practice to Mr. Shearer." (Angevine Dep. at 120:17-23, Ex. W.)

45. Dr. Sullivan testified that information regarding a statistically significant increased risk of suicide in placebo controlled randomized trials "would be factored into a decision process." (Deposition of Dr. Daniel Sullivan ("Sullivan Dep.") at 103:7-16, Ex. X.)

46. When asked had he seen "an analysis such as [the FDA alert] in 2001" whether he would have "spoken to Mr. Shearer about the increased risk of suicidality" when refilling his prescription, Dr. Sullivan testified: "I don't know. Because it didn't happen, so I don't know what I would have done." (Sullivan Dep. at 100:9-16, Ex. X; *see also id.* at 102:14-20 (testifying that he "[didn't] know what [he] would have done in 2001" had an analysis of placebo-controlled clinical studies similar to the FDA alert been available in 2001).)

47. As to significance of the FDA alert, Dr. Sullivan testified that "each situation needs to be evaluated individually. . . . each FDA bulletin needs to be looked at carefully because the FDA unfortunately is not always in — in the best of studies providing information that is accurate." (Sullivan Dep. at 103:17-104:15, Ex. X; *see also id.* at 120:7-15 ("[T]he FDA has made decisions with groups of people who have special interests and as a result, perhaps, their recommendations are not always fair and balanced.").)

48. Dr. Hynes approved a Neurontin prescription issued by a resident of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization. (Deposition of Dr. Wilfred Hynes ("Hynes Dep.") at 75:10-77:14, Ex. Y; BWH at 37BWH-410-411, Ex. M).

49. Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin. (Hynes Dep. at 75:10-77:14, Ex. Y.)

50. Dr. Hynes testified that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he was not sure whether he would have had an opportunity to inform Mr. Shearer's caregiver or family of the risk. (Hynes Dep. at 141:15-23, Ex. Y.)

51. Dr. Hynes still believes that prescribing Neurontin to Mr. Shearer "was appropriate." (Hynes Dep. at 177:5-18, Ex. Y.)

52. None of Mr. Shearer's prescribing doctors testified that an additional disclosure in the label would have changed their decision to prescribe Neurontin to Mr. Shearer.

53. Neither Dr. Angevine nor Dr. Sullivan recalled receiving any promotional efforts by Pfizer before they prescribed Neurontin to Mr. Shearer. (Sullivan Dep. at 111:5-114:9, Ex. X; Angevine Dep. at 15:1-5, Ex. W.)

54. Dr. Sullivan testified that he did not recall: any discussions with sales representatives regarding Neurontin, (Sullivan Dep. at 111:5-8, 114:3-6, Ex. X), receiving any Neurontin samples, (*id.* at 114:7-9), participating in any teleconferences regarding Neurontin, (*id.* at 111:25-112:2), or meeting with any medical liaisons regarding Neurontin. (*Id.* at 113:4-7)

55. Aside from speaking about Alzheimer's "a couple of times," Dr. Sullivan did not recall speaking for, receiving money from, or sitting on any advisory boards for, a pharmaceutical company while practicing in Williamstown. (Sullivan Dep. at 112:3-113:3, 113:24-114:2, Ex. X.)

56. Dr. Sullivan testified that he gained familiarity with prescription medications through medical school, "continuing into internship and residency, and then continued use of new therapies as a licensed physician, continuing medical education, talking to colleagues . . . many different ways." (Sullivan Dep. at 13:11-20, Ex. X.)

57. Dr. Angevine testified that prior to October 2000, she had had no contact with Pfizer sales representatives. (Angevine Dep. at 15:1-5, Ex. W.)

58. Dr. Angevine testified that what she knew about Neurontin she learned in pharmacology class, in the course of her training as a physician, from the attending staff at Brigham & Women's Hospital, and through her own prescription of Neurontin. (Angevine Dep. at 15:6-25, Ex. W.)

59. Dr. Angevine testified that she continues to prescribe Neurontin. (Angevine Dep. at 22:10-13, 23:4-16, Ex. W.)

60. Dr. Sullivan testified that he has prescribed Neurontin since treating Mr. Shearer. (Sullivan Dep. at 28:4-21, Ex. X.)

61. Plaintiff's experts have not opined that Mr. Shearer's suicidal act was driven by any uncontrollable impulse or delirium or frenzy caused by Neurontin. (*Cf.* Glenmullen Report at 31, Ex. N; Expert Report of Dr. Stefan P. Kruszewski ("Kruszewski Report") at 16, Ex. Z; Deposition of Dr. Joseph Glenmullen Dep. ("Glenmullen Dep.") at 81:21-82:11, Ex. AA.)

62. Dr. Kruszewski specifically denies making any "determination one way or the other" as to whether Mr. Shearer was "compelled to commit suicide." (1/14/10 Deposition of Dr. Stefan P. Kruszewski ("Kruszewski Dep.") at 40:18-25, Ex. BB.)

63. There is no evidence that Pfizer ever communicated directly with Mr. Shearer. (Pl.'s Resp. To Interrog. No. 17, Ex. A.)

64. There is no evidence of any affirmative representations about Neurontin by Pfizer concerning Neurontin's alleged risk of suicidality to Dr. Sullivan or Dr. Angevine. (Sullivan Dep. at 111:5-114:9, Ex. X; Angevine Dep. at 15:1-5, Ex. W.)

65. There is no evidence that, even if Dr. Hynes received any warranties from Pfizer, he relied on them in prescribing Neurontin to Mr. Shearer.

66. There is no evidence that Mr. Shearer took Neurontin in reliance on any affirmation of fact by Pfizer that later proved false.

67. There is no evidence that Mr. Shearer's prescribing physicians prescribed

Neurontin based on an affirmation of fact by Pfizer that later proved false. (*Cf.* Angevine Dep. at 15:6-25, Ex. W; Hynes Dep. at 38:21-39:13, Ex. Y; Sullivan Dep. at 111:5-8, 111:25-113:3, 113:4-114:9, Ex. X.)

68. Plaintiff did not provide Pfizer with any pre-suit notice of her claim.

69. Plaintiff's Amended Complaint does not allege that she provided the requisite statutory notice. (Am. Compl. ¶¶ 293-96, [1208].)

Dated: February 2, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Mark S. Cheffo
    Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000

-and-

BOIES, SCHILLER & FLEXNER LLP

By: /s/ William S. Ohlemeyer
    William S. Ohlemeyer

333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200

-and-

WHITE AND WILLIAMS LLP

By: /s/ David B. Chaffin
David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 2, 2010.

/s/ David B. Chaffin
David B. Chaffin