# EXHIBIT P

Page 1

```
 1
 2           UNITED STATES DISTRICT COURT
 3              DISTRICT OF CONNECTICUT
 4
 5   CIVIL ACTION NO. 07 CA 11428 (PBS)
 6   OCTOBER 29, 2009
 7   ----------------------------------------
 8   LINDA B. SHEARER,
 9                              Plaintiff
10              -vs-
11   PFIZER, INC. &  WARNER-LAMBERT, COMPANY,
     LLC
12
13                              Defendant
14   ----------------------------------------
15        Deposition of SEAN WHEELER, a Witness, in the
16   hereinbefore-entitled action, taken by the
17   Defendant, pursuant to Notice before Victorine
18   Kaliszewski, a duly qualified Notary Public in and
19   for the State of Connecticut, held at the Law
20   Offices of Lynch, Traub, Keefe & Errante, 52
21   Trumbull Street, New Haven, Connecticut on October
22   29, 2009.
23
24   REPORTED BY:  VICTORINE KALISZEWSKI
     LICENSE NUMBER: 00208
25      Job No: 220682
```

Page 2

```
1    APPEARANCES:
2        ON BEHALF OF THE PLAINTIFF:
3        KENNETH B. FROMSON, ESQUIRE
         FINKELSTEIN & PARTNERS
4        785 Broadway, 3rd Floor
         Kingston, New York 12401
5        (800) 634-1212 Ext. 2755
         kfromson@lawampm.com
6
7        ON BEHALF OF THE DEFENDANT PFIZER:
8        WILLIAM S. OHLEMEYER, ESQUIRE
         BOIES, SCHILLER & FLEXNER, LLP
9        333 Main Street
         Armonk, New York 10504
10       (914) 749-8440
         wohlemeyer@bsfllp.com
11
12
         CATHERINE B. STEVENS, ESQUIRE
13       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
         Four Times Square
14       New York, New York 10036
         (212) 735-3353
15       catherine.stevens@skadden.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            STIPULATIONS
2        IT IS HEREBY STIPULATED AND AGREED by and
3    between counsel for the respective parties that all
4    formalities in connection with taking of this
5    deposition, including time, place, sufficiency of
6    and the authority of the officer before whom it is
7    being taken may be and are hereby waived.
8        IT IS FURTHER STIPULATED AND AGREED by and
9    between counsel for the respective parties hereto
10   that all objections, except as to form, are reserved
11   to the time of trial.
12       IT IS FURTHER STIPULATED AND AGREED by and
13   between counsel for the respective parties hereto
14   that the signing of the deposition may be performed
15   before a Notary Public.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2        VIDEOGRAPHER:  My name is Adam Lee of
3    Veritext Corporate Services.
4        The date today is October 29th, 2009 and
5    the time is approximately 9:08 a.m.  This
6    deposition is being held in the office of
7    Lynch, Traub, Keefe and Errante located at 52
8    Trumbull Street, New Haven, Connecticut.
9        The caption of this case is Linda B.
10   Shearer versus Pfizer, Inc. and Warner-Lambert
11   Company, LLC in the United States District
12   Court for the District of Connecticut, Civil
13   Action Number 07 CA 11428 PBS.
14       The name of the witness is Sean Wheeler.
15       At this time the attorneys will identify
16   themselves and the parties they represent after
17   which our Court Reporter, Vicki Kaliszewski, of
18   Veritext will swear in the witness.
19       MR. OHLEMEYER:  My name is Bill Ohlemeyer
20   and I represent the Pfizer defendants.
21       MS. STEVENS:  Catherine Stevens from
22   Skadden, Arps for the Pfizer defendants.
23       MR. FROMSON:  Kenneth Fromson for the
24   Shearers.
25
```

Page 5

```
1    SEAN WHEELER, of 1331 East Street, Southington,
2    Connecticut, called as a witness, having been first
3    duly sworn by Victorine Kaliszewski, a Notary Public
4    in and for the State of Connecticut, was examined
5    and testified as follows:
6        COURT REPORTER:  Usual stips?
7        MR. FROMSON:  Federal rules, usual
8    stipulations.
9    DIRECT EXAMINATION
10   BY MR. OHLEMEYER:
11       Q    Good morning, Mr. Wheeler.
12       A    Good morning.
13       Q    Thanks for coming in this morning, and
14   we'll try to make this as efficient as we can and
15   get you right out.
16       Have you ever had a deposition taken before?
17       A    No.
18       Q    One of the most important things to
19   remember this morning is if you don't understand a
20   question that I ask you, will you let me know?
21       A    Sure.
22       Q    And if you want to take a break at any
23   time, let me know and we'll take a break.
24       A    Sure.  That's fine.
25       Q    Where do you live?
```

Page 30

1  couldn't do the things that he used to do anymore.
2  I think that's pretty natural, though.
3      Q   Did there come a point where you knew
4  Mr. Shearer where his attitude or his expectations
5  about the physical limitations or his prospects for
6  improvement ever changed?
7          MR. FROMSON: Objection; form.
8          THE WITNESS: No, he really never let on
9      any of that stuff to me. Like we were just
10     business. Like, you know, when I go over, I
11     mean, we would talk about personal things, you
12     know, just as far as he'd always ask me how I
13     was doing, how was school, how's this, how's
14     that? You know, we had conversations, but they
15     were more like casual conversations like you
16     just have with, you know, I wouldn't say like a
17     close friend or anything like that, but just,
18     you know, someone that you're an acquaintance
19     with.
20 BY MR. OHLEMEYER:
21     Q   Did Mrs. Shearer ever talk with you about
22 Mr. Shearer's state of mind or attitude about his
23 limitations?
24     A   No.
25     Q   Did she ever talk with you or express any

Page 31

1  concerns about Mr. Shearer being depressed?
2      A   No.
3      Q   Did she ever talk with you or suggest that
4  she had observed or heard Mr. Shearer think about or
5  talk about suicide?
6      A   No.
7      Q   Do you know if Mr. and Mrs. Shearer ever
8  had arguments -- strike that.
9          Did you ever observe Mr. and Mrs. Shearer to
10 have arguments about his state of mind or about his
11 attitude?
12     A   Never --
13         MR. FROMSON: Hold on.
14         Objection to form.
15         Thank you.
16         THE WITNESS: Never in my presence. They
17     just kept things pretty professional when I was
18     around, you know, other than, you know, in the
19     morning when Hartley, you know, took his life,
20     you know, the two of them were arguing on the
21     phone that morning and that was really like the
22     first time I ever heard them argue about
23     anything, and I really wasn't, you know -- it
24     was one of those things when he was on the
25     phone when I showed up, you know, in his

Page 32

1      office, which was on the first floor of their
2      house, and, you know, I had, you know, I would
3      never really knock or anything like that, I was
4      always just to let myself in, because I knew
5      they were expecting me, so he was on the phone,
6      you know, kind of going back and forth with
7      Linda a little bit, which is like the first
8      time I had ever heard them argue about
9      anything, but, obviously, if he's on the phone,
10     I'm not hearing what's coming out of her end,
11     I'm just hearing his end, and I just kind of
12     went about my business as usual and, you know,
13     started cleaning up their kitchen, doing their
14     dishes, you know, cleaning up the house. I had
15     come there that day to take Hartley to a
16     doctor's appointment. I can't remember whether
17     it was a doctor's appointment to get braces
18     fitted or it was a doctor's appointment to get
19     blood work done, I can't remember.
20 BY MR. OHLEMEYER:
21     Q   Why do you believe that they were having
22 an argument?
23     A   Well, I mean, Hartley's tone of voice, you
24 know. I could hear him kind of yelling and, you
25 know, going on. That was -- Linda was gone that

Page 33

1  week, she was in Hawaii, so I just -- he was
2  frustrated, for whatever reason, that, you know, he
3  was -- that she was not there that week, you know,
4  and Ivor was staying in the house, too, that week,
5  but he had left that morning to go back to school to
6  do something, so, you know.
7      Q   You knew Mr. Shearer well enough and had
8  been around him long enough that you could observe
9  frustration in his voice?
10         MR. FROMSON: Objection; form.
11         THE WITNESS: Yeah. I mean, like I said,
12     he always kept things pretty business with me.
13     He never -- if he was mad at me about anything,
14     he never showed it, you know, he would always
15     just keep his cool, you know. I think he
16     appreciated having me there doing the things
17     that I was doing for him, so, you know, he
18     never once when I was working for him even
19     raised his voice to me or anything like that.
20     So, I mean, when he was on the phone like
21     raising his voice, you know, you know,
22     obviously, I knew he was upset about something.
23 BY MR. OHLEMEYER:
24     Q   Let's back up a little bit and talk about
25 that day.

Page 38

1   Q   Yes.
2       But my question is -- bearing in mind this was
3   almost eight years ago, or seven years ago --
4   A   Uh huh. (Affirmative) --
5   Q   -- do you believe this was an accurate
6   description of what you remember at that time?
7   A   I probably tried to recall that, as best
8   as I possibly could and gave them every detail that
9   I could, so there was no room for questions or
10  anything like that.
11  Q   Did they ask you for a handwriting sample?
12  A   A handwriting sample?
13  Q   Yeah.
14  A   I'm not sure if they did.
15  Q   So, do you recall them -- well, I guess if
16  you don't remember, you don't remember.
17      Do you know if Mr. Shearer left a suicide note?
18  A   I did see a suicide note because he had
19  locked his bedroom door. If you walked up their
20  stairs and walked down the hallway, their bedroom
21  was to the right, the first door to the right, and
22  that door was locked when I had gone upstairs, so
23  when I had ran around the corner, you know, and
24  tried to call for him, there was a bathroom between
25  where his study was and where their room was, you

Page 39

1   know, and, obviously, when I had -- I didn't see it
2   until I was leaving that room, you know.
3   Q   So, were you the person that actually
4   found it or did the police find it?
5   A   I mean, I like looked at it and as I was
6   on my way, you know, to -- actually, I think I ran
7   downstairs and called 911. I don't really remember.
8   To be honest with you, I don't really, you know, I
9   do remember seeing a suicide note, but I don't
10  remember at what point in time I saw that. I don't
11  remember whether it was leaving the room or if I had
12  called 911 first. I'm pretty sure I ran downstairs
13  and called 911 first.
14  Q   Fair enough.
15      What I'm interested in is where it was in
16  relationship to Mr. Shearer, was it outside the room
17  or inside the room?
18  A   It was in his study on the desk.
19  Q   And -- how did you -- how did you -- what
20  alerted you to the fact that something might have
21  happened that day in the home?
22  A   What alerted me?
23  Q   Yes.
24  A   Well, I was downstairs, you know, when he
25  asked me for time, you know. I had kind of been,

Page 40

1   you know, saying to him all day, like we got to get
2   going, you got an appointment, we got to get going,
3   you got an appointment, we're going to be late for
4   this appointment, and, like I said, he was upset all
5   that morning, you know, he was noticeably, you know,
6   agitated.
7   Q   And is it your -- does Exhibit 1 refresh
8   your recollection that he was on and off the phone
9   with Mrs. Shearer?
10  A   I don't remember him being on and off the
11  phone, I just remember him, you know, while I was
12  cleaning -- as I'm sitting here today, I just
13  remember him being on the phone and yelling back and
14  forth with Linda on the phone as I was cleaning up
15  their kitchen and, you know, had the dishwasher
16  running and the T.V. was also going, too. They had
17  just a little small T.V. in the kitchen.
18  Q   Do you remember what he was saying?
19  A   I was just more or less paying attention
20  to the tone of his voice. Like I could hear him
21  yelling and I was not actually listening to him, you
22  know, what he was saying.
23  Q   Then when he got off the phone, did you
24  speak with him?
25  A   Um, not anything related to that, just

Page 41

1   along the lines of, like, all right, we got to get
2   going, we have an appointment, you know, and I
3   remember -- he used to have a little chair in his
4   bathroom that he'd sit down in so he could see
5   himself and brush his teeth and do his hair and I'm
6   pretty sure I propped him in that chair, got him
7   ready, you know, and did all that stuff and he, you
8   know, got ready to leave and, you know, he had said,
9   you know, I said, look, okay, let's go, let's get
10  dressed, and he said he was -- either I think he
11  said he was tired and he was going to go upstairs
12  and to give him a couple of minutes, you know, he
13  had gone upstairs to his room, you know, and I said,
14  all right, I'm just going to keep doing things down
15  here and then we're going to be on our way.
16  Q   And then what happened?
17  A   I was downstairs, you know, dishwasher
18  going, T.V. on, you know, I think I was actually in
19  the sink, you know, just washing some things that,
20  obviously, you just couldn't put into the
21  dishwasher, so -- I used to be kind of meticulous in
22  the house, just making sure if I was there, that it
23  was not a mess, because there was, you know, down
24  time -- and I just heard like a crack from upstairs
25  and at first -- the first thought in my head was

11 (Pages 38 to 41)