# EXHIBIT X

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~

IN RE: NEURONTIN MARKETING, SALES

PRACTICES AND PRODUCTS LIABILITY      MDL Docket No. 1629

LITIGATION                            Master File

                                      No.04-10981

THIS DOCUMENT RELATES TO:

PRODUCTS LIABILITY ACTIONS

Shearer v. Pfizer, Inc., et al.,

Case No. 1:07-CV-11428-PBS

        CONTAINS CONFIDENTIAL INFORMATION
        ~~~~~~~~~~~~~~~~~~~~~~~~~~~

            Videotaped deposition of

            DANIEL M. SULLIVAN, M.D.

            March 27, 2008
            9:00 a.m.

            Taken at:
            Cleveland Clinic

        29800 Bainbridge Road

            Solon, Ohio

        CONFIDENTIAL

        Donnalee Cotone, RPR, CLR

2

```
1  APPEARANCES:
2
3       On behalf of the Shearer Family:
4       The Lanier Law Firm, by
5       KENNETH S. SOH, ESQ.
6       6810 FM 1960 West
7       Houston, Texas  77069
8       (713) 659-5200
9       kss@lanierlawfirm.com
10
11      On behalf of the Defendants:
12      Shook, Hardy & Bacon, LLP, by
13      LORI R. SCHULTZ, ESQ.
14      2555 Grand Boulevard
15      Kansas City, Missouri  64108-2613
16      (816) 474-6550
17      lschultz@shb.com
18
19
20
21
22
23
24
25
```

4

```
1                  I N D E X
2
3  EXAMINATION OF          9      14
4  DANIEL M. SULLIVAN, M.D.
5  BY MS. SCHULTZ
6  EXAMINATION OF         73       5
7  DANIEL M. SULLIVAN, M.D.
8  BY MR. SOH
9  EXAMINATION OF        119      11
10 DANIEL M. SULLIVAN, M.D.
11 BY MS. SCHULTZ
12 EXAMINATION OF        126      10
13 DANIEL M. SULLIVAN, M.D.
14 BY MR. SOH
15
16
17 Exhibits 1 and 2 were      8      3
18 marked
19 Exhibit 3 was marked      74     12
20 Exhibit 4 was marked      94     25
21 Exhibit 5 was marked     110     17
22 Exhibit 6 were marked    114     18
23 Exhibit 7 was marked     124      3
24
25
```

3

```
1  Appearances (Continued):
2
3       On behalf of the Cleveland Clinic and the
4       Witness:
5       MATTHEW J. DONNELLY, ESQ.
6       Office of General Counsel
7       3050 Science Park Drive/AC321
8       Beachwood, Ohio  44122
9       (216) 448-0140
10      donnem1@ccf.org
11      ~ ~ ~ ~ ~
12
13 ALSO PRESENT:
14      Kim DiMuzio, The Videographer
15
16      ~ ~ ~ ~ ~
17
18
19
20
21
22
23
24
25
```

5

```
1  objection          21      1
2  objection          65     16
3  object             80     19
4  object             81     24
5  object             84     11
6  object             85     10
7  object             86     23
8  object             87      4
9  object             87     10
10 object             87     15
11 object             88      9
12 object             88     17
13 object             90     20
14 object             90     24
15 objection          93     17
16 object             98     19
17 object            100     14
18 object            100     25
19 object            101     10
20 object            101     21
21 object            102      6
22 object            102     12
23 object            102     18
24 object            103      3
25 object            103     12
```

2 (Pages 2 to 5)

10

1    A.   Since October of 2006.
2    Q.   You provided me with a copy of a CV
3  prior to the start of this deposition, and I've
4  marked it as Deposition Exhibit 1.
5        Is that a current copy of your CV?   09:13:50
6    A.   It is.
7    Q.   Because it sets forth the
8  information pertaining where you went to
9  medical school, whether you're board-certified,
10  I'm going to try to skip through some of that   09:14:02
11  for now given that we have some time
12  constraints in today's deposition, all right?
13    A.   Mm-hmm.
14    Q.   In what states are you currently
15  licensed, Doctor?   09:14:15
16    A.   Currently licensed in the state of
17  Ohio.
18    Q.   And your specialty?
19    A.   Internal medicine.
20    Q.   Does the state of Ohio require a   09:14:31
21  continuing medical education?
22    A.   They do.
23    Q.   And what is the requirement?
24    A.   It's 50 hours yearly of continuing
25  lectures and updates.   09:14:46

11

1    Q.   Have you ever taken any courses
2  outside of medical school through any
3  continuing medical education requirements or
4  otherwise that relate to suicide?
5    A.   No.   09:15:01
6    Q.   Okay.  What about anticonvulsants?
7    A.   No.
8    Q.   Neuropathic pain?
9    A.   No.
10    Q.   Chronic pain?   09:15:09
11    A.   Yes.
12    Q.   Tell me about those courses.
13    A.   Just last week I went to a course
14  on palliative medicine, which is the treatment
15  of predominantly cancer patients, but also   09:15:21
16  people with other chronic and potentially
17  life-ending illnesses and ways to mitigate
18  their suffering.
19    Q.   Were any specific prescription
20  drugs discussed at that course -- during that   09:15:36
21  course?
22    A.   Many.
23    Q.   Was Neurontin discussed?
24    A.   No.
25    Q.   Do you prescribe [sic] regularly to   09:15:50

12

1  any medical journals?
2    A.   Yes.
3    Q.   Which ones?
4    A.   The Journal of the American Medical
5  Association, the New England Journal of   09:15:58
6  Medicine, the Annals of Internal Medicine, and
7  the Archives of Internal Medicine.
8    Q.   Do you subscribe to any psychiatry
9  journals that you regularly review?
10    A.   No.   09:16:16
11    Q.   Do you subscribe to the PDR?
12    A.   No.
13    Q.   Excuse me.  Do you use some other
14  source to review information concerning the
15  drugs that you prescribe?   09:16:33
16    A.   I do.
17    Q.   Okay.  What source do you use?
18    A.   Epocrates.
19    Q.   And what is the reason that you use
20  the Epocrates instead of the PDR?   09:16:43
21    A.   It's -- the information is more
22  readily accessible being on a handheld device.
23    Q.   Does it essentially contain the
24  same information as the PDR?
25    A.   I don't know that.   09:17:02

13

1    Q.   Do you review the information on
2  the Epocrates when new drugs come out that
3  you're going to prescribe?
4    A.   Sometimes.
5    Q.   Under what circumstances would you   09:17:15
6  review that information and what circumstances
7  would you not?
8    A.   I use Epocrates when I need
9  information about a medication that I'm not
10  familiar with.   09:17:27
11    Q.   And how do you become familiar with
12  the medications you prescribe, Doctor?
13    A.   A variety of methods, starting from
14  the first day of medical school, being educated
15  on a medication.  That education continuing   09:17:43
16  into internship and residency, and then
17  continued use of potential new therapies as a
18  licensed physician, continuing medical
19  education, talking to colleagues, so it's many
20  different ways.   09:18:02
21    Q.   Have you published any
22  peer-reviewed literature or made presentations
23  at any medical meetings?
24    A.   I have.
25    Q.   Okay.  Tell me about that.   09:18:14

4 (Pages 10 to 13)

26

1    Q.   And did -- at the time you refilled
2  that prescription, did you know for what
3  purpose you were refilling the prescription?
4    A.   Mr. Shearer was being treated for
5  pain after his stroke, and it was my            09:33:10
6  understanding that this medication was being
7  used for that.
8    Q.   For neuropathic pain or just some
9  type of pain?
10   A.   I don't know.              09:33:27
11   Q.   Now, did you talk with the doctor
12  that had originally prescribed the Neurontin
13  prior to refilling it for Mr. Shearer?
14   A.   Did not.
15   Q.   Okay.  Is that -- is it your       09:33:37
16  general practice if a patient comes to you and
17  says, I've been on this medication from another
18  doctor, can you prescribe it for me now, that
19  you go ahead and do that or what type of
20  information do you want before you refill a     09:33:51
21  prescription?
22   A.   It's not -- there's no general
23  practice, but if -- if a patient in our
24  community is receiving care from a specialist
25  elsewhere, and he's under their active therapy  09:34:09

27

1  and certainly our preference would be for them
2  to get refills from that physician for
3  treatments they're administering, but in the
4  interest of -- helping patients get their
5  care met in a fashion that won't be            09:34:31
6  interrupted, on occasion they will not be able
7  to contact their doctor in Boston or New York
8  promptly or their doctor in Boston or New York
9  won't know which pharmacy to contact in our
10  little town and how to communicate with them    09:34:49
11  accurately.
12       This little town doesn't have
13  access to electronic communication, so it would
14  be an occasional situation where a patient
15  would call us and ask us to assist them in not  09:35:00
16  having their care interrupted in refilling a
17  medication that they would like to have
18  refilled for their care.
19   Q.   Did you have any concern about
20  refilling the Neurontin prescription for        09:35:13
21  Mr. Shearer in May 4 of 2001, under the
22  circumstances that you've just described where
23  he called you to ask you to have it refilled?
24   A.   I don't remember what my thoughts
25  were on that day.              09:35:29

28

1    Q.   Prior to that time, had you
2  prescribed Neurontin to other patients?
3    A.   Possibly.
4    Q.   Since that time, have you
5  prescribed Neurontin for other patients?        09:35:43
6    A.   I have.
7    Q.   Okay.  For what type of conditions?
8    A.   The ones I can recall are for
9  postherpetic neuralgia.
10   Q.   Any others that you can recall?      09:35:58
11   A.   No.
12   Q.   When you prescribed the Neurontin
13  for Mr. Shearer, were you prescribing it on
14  label or off label in May of 2001?
15   A.   I don't know.             09:36:12
16   Q.   When was the last time that you
17  prescribed Neurontin for a patient?
18   A.   I don't remember.
19   Q.   Okay.  Within the last year?
20   A.   Probably, but I can't recall        09:36:26
21  specifically.
22   Q.   That's fine.  Approximately how
23  many patients have you prescribed Neurontin to?
24  And I'm just looking for an estimate.
25   A.   I -- I don't know.  I -- it would   09:36:41

29

1  be a guess, and I don't want to guess.
2    Q.   Have you found that Neurontin has
3  been helpful to treat patients with
4  postherpetic neuralgia?
5    A.   I don't know the answer to that     09:37:00
6  question because postherpetic neuralgia will
7  get better on its own.  So whether or not the
8  medication or time is making a patient better,
9  there's no way for me to prove that.
10   Q.   If you felt like a drug was not     09:37:16
11  helping a patient's condition, would you
12  continue to prescribe it for that patient?
13   A.   That's sort of a general question.
14  Possibly, but I don't know.
15   Q.   What type of medications do you     09:37:48
16  prescribe for neuropathic pain?
17   A.   Currently, for postherpetic
18  neuropathic pain, I've used Neurontin, and/or
19  Lyrica.
20   Q.   Is postherpetic neuralgia one form  09:38:11
21  of neuropathic pain?
22   A.   It is.
23   Q.   And can you explain what
24  postherpetic neuralgia is?
25   A.   It's a nerve injury from an         09:38:21

8 (Pages 26 to 29)

98

```
 1   says, "All patients who are currently taking or
 2   starting on any antiepileptic drug should be
 3   closely monitored for notable changes in
 4   behavior that could indicate the emergence or
 5   worsening of suicidal thoughts or behavior or      11:06:55
 6   depression."
 7           Do you see that?
 8       A.  I do.
 9       Q.  All right.  Go to page 2 for a
10   second, first full paragraph.  They talk,          11:07:06
11   "There was a statistically significant
12   increased risk of suicidal behavior and
13   suicidal ideation in the patients randomized to
14   receive an antiepileptic drug compared to
15   patients who received a placebo."                  11:07:21
16           Do you see that?
17       A.  I do.
18       Q.  What does that mean to you?
19           MS. SCHULTZ:  Object to the form.
20       A.  If I can just read the sentence.           11:07:28
21   It's a statement that there's an increased risk
22   of suicidal behavior and suicidal ideation in
23   patients that received an antiepileptic drug
24   compared to patients who received a placebo.
25       Q.  Okay.  "All patients treated with          11:07:43
```

99

```
 1   antiepileptic drugs should be monitored for
 2   suicidality and other unusual changes in
 3   behavior."
 4           MS. SCHULTZ:  Where are you
 5   reading?                                           11:07:52
 6           MR. SOH:  Oh, I'm sorry.
 7       Q.  I'm going down three paragraphs,
 8   sir.  Okay?
 9       A.  Mm-hmm.
10       Q.  It says, "All patients treated with        11:07:56
11   antiepileptic drugs should be monitored for
12   suicidality and other unusual changes in
13   behavior.  Symptoms such as anxiety, agitation,
14   hostility, mania and hypomania may be
15   precursors to emerging suicidality."               11:08:13
16           And it says, "Healthcare
17   professionals who prescribe antiepileptic drugs
18   should:"
19           First bullet point:  "Balance the
20   risk for suicidality with the clinical need of     11:08:24
21   the drug.
22           "Be aware of the possibility of the
23   emergence or worsening of depression,
24   suicidality or any unusual changes in
25   behavior."                                         11:08:35
```

100

```
 1           And then last bullet point is:
 2   "Inform patients, their families and caregivers
 3   of the potential for an increase in the risk of
 4   suicidality so they are aware and able to
 5   notify their healthcare providers of any           11:08:43
 6   unusual behavioral changes."
 7           Do you see that?
 8       A.  I do.
 9       Q.  All right.  If you had seen an
10   analysis such as this in 2001, when you            11:09:08
11   refilled Mr. Shearer's prescription, would you
12   have spoken to Mr. Shearer about the increased
13   risk of suicidality?
14           MS. SCHULTZ:  Object to the form.
15       A.  I don't know.  Because it didn't            11:09:28
16   happen, so I don't know what I would have done.
17       Q.  Well I mean, fair to say that
18   you -- suicide is a -- I mean, let's back up.
19           Would you have wanted to know this
20   information that is statistically significant      11:09:46
21   increased risk of suicidality was seen in
22   antiepileptic drugs such as Neurontin while you
23   were making the decision to prescribe
24   Neurontin?
25           MS. SCHULTZ:  Object to the form.          11:09:57
```

101

```
 1       A.  Every medication I always review in
 2   my mind risks and benefits --
 3       Q.  Sure.  And this is -- I'm sorry.
 4       A.  -- and there are medications
 5   that -- while possibly would not have a patient   11:10:21
 6   take under my direction and others that would
 7   be okay.
 8       Q.  This demonstrates a risk, though,
 9   doesn't it?
10           MS. SCHULTZ:  Object to the form.          11:10:33
11       Q.  Per the FDA?
12       A.  This form -- this piece of paper
13   you've provided me that has the FDA logo on the
14   top has sentences that show that there's a
15   risk.                                              11:10:43
16       Q.  Okay.  And you would factor that
17   into, if you're aware of this alert, you would
18   factor that into your decision with regard to
19   the risks and benefits of prescribing Neurontin
20   to patients?                                       11:10:51
21           MS. SCHULTZ:  Object to the form.
22       A.  As of today, looking at this piece
23   of paper, if I was to prescribe Neurontin
24   myself, initiate the therapy of Neurontin for
25   someone in the condition where I occasionally      11:11:04
```

26 (Pages 98 to 101)

102

1 use it which is postherpetic neuralgia, I would
2 certainly take this into account.
3     Q.   Okay. What about similarly if you
4 were prescribing Neurontin off label, you would
5 also take that into account, wouldn't you?   11:11:17
6         MS. SCHULTZ: Object to the form.
7     A.   I'm not aware where I've ever
8 initiated the therapy for Neurontin off label.
9     Q.   If you're refilling a prescription
10 for off-label use of Neurontin, would you   11:11:27
11 consider this?
12         MS. SCHULTZ: Object to the form.
13     A.   Today I would.
14     Q.   Okay. If an analysis -- if a
15 similar analysis of placebo controlled clinical   11:11:32
16 studies was available in 2001, you would have
17 considered it for Mr. Shearer?
18         MS. SCHULTZ: Object to the form.
19     A.   I don't know what I would have done
20 in 2001.   11:11:45
21     Q.   I mean, you're saying -- I
22 understand that. But I'm saying if you were
23 aware of a statistically significant increased
24 risk of suicidal behavior and suicidal ideation
25 in placebo controlled randomized trials in   11:11:56

103

1 2001, you would have considered that in your
2 decision to prescribe Neurontin to Mr. Shearer?
3         MS. SCHULTZ: Object to the form.
4     A.   With all due respect, I can only
5 testify to my cognitive abilities today and not   11:12:10
6 to what I would think or do in 2001.
7     Q.   Would you have ignored a
8 statistically significant increased risk of
9 suicide in placebo controlled randomized trials
10 in your decision to prescribe Neurontin in   11:12:30
11 2001?
12         MS. SCHULTZ: Object to the form.
13     A.   I -- I don't ignore information,
14 but data that is presented to me, on a given
15 day in a given situation, would be factored   11:12:42
16 into a decision process.
17     Q.   I mean, out of curiosity, can you
18 think of any more important data than an FDA
19 analysis of randomized clinical trials, placebo
20 controlled trials to show a statistically   11:12:58
21 significant risk of any harm?
22         MS. SCHULTZ: Object to the form.
23     A.   Unfortunately the FDA is, provides
24 good information and poor information and as a
25 result, you have to -- each situation needs to   11:13:11

104

1 be evaluated individually.
2     Q.   Right. But can you -- can you -- I
3 guess my question was, can you think of any
4 more -- any more crucial evidence in making a
5 prescribing decision than an FDA analysis of   11:13:24
6 randomized placebo controlled clinical trials
7 that show a statistically significant increased
8 risk of harm?
9         MS. SCHULTZ: Object to the form.
10 Asked and answered.   11:13:37
11     A.   Again, unfortunately, I can only
12 say that each FDA bulletin needs to be looked
13 at carefully because the FDA unfortunately is
14 not always in -- in the best of studies
15 providing information that is accurate.   11:13:52
16     Q.   Is there anything about this alert
17 that makes you question its accuracy?
18         MS. SCHULTZ: Object to the form.
19     A.   I don't have enough information to
20 answer that question.   11:14:01
21     Q.   You read it. I mean -- and that's
22 what I'm -- you know, this is all that's on the
23 website, sir, this isn't a press release.
24     A.   With all due respect, it's only as
25 accurate as the words that are on the page and   11:14:13

105

1 those words are created by a human being.
2     Q.   Right.
3     A.   And people in all situations
4 misspeak, to quote Hilary Clinton, and so
5 that's all I can say.   11:14:25
6     Q.   Okay. Let me ask you, were you
7 aware that the manufacturers of Neurontin pled
8 guilty to two felonies and paid a $240 million
9 fine for illegal off label marketing?
10         MS. SCHULTZ: Object to the form.   11:14:45
11         MR. DONNELLY: I'm going to object
12 again. This has nothing to do with the care
13 and treatment.
14         MR. SOH: Let me make my -- I'll
15 make my showing.   11:14:50
16     Q.   Were you aware of that, sir?
17         MS. SCHULTZ: Object to the form.
18     A.   I'm aware of an article in The New
19 York Times at some point in the past vaguely
20 about that, but the details, I don't recall.   11:14:59
21     Q.   Okay. Would criminal conduct by a
22 pharmaceutical company be something that you
23 would want to consider to make -- criminal
24 conduct relating to off-label marketing, would
25 that be information you'd want to consider in   11:15:20

27 (Pages 102 to 105)

110

1    MR. SOH: Will you let me ask the
2  questions and then you can instruct him not to
3  answer?
4    MR. DONNELLY: Well --
5    MR. SOH: Let me just ask the
6  questions.
7    MR. DONNELLY: -- we can save a lot
8  of time and energy here if you ask him relevant
9  questions.
10    MR. SOH: I'm just going to ask him   11:21:04
11  questions, and you can tell him if they're
12  relevant and instruct him not to answer, okay?
13    Let me mark that as Exhibit 5. Are
14  we at Exhibit 5?
15    - - - - -
16    (Thereupon, Sullivan Deposition
17    Exhibit 5 was marked for purposes of
18    identification.)
19    - - - - -
20    Q.  Dr. Sullivan, I just showed you   11:21:17
21  some call notes that were produced in this case
22  with respect to sales reps who contacted you,
23  and to be fair to the other side and your
24  attorney, they're dated 2002 to 2004. Do you
25  see that in front of you?   11:21:32

111

1    A.  I do.
2    MS. SCHULTZ: Just so it's clear,
3  I'm not stating that that's what these are
4  because I've never seen these documents.
5    Q.  Let me ask Dr. Sullivan. Do you   11:21:40
6  recall any discussions with any sales reps
7  regarding Neurontin?
8    A.  I don't.
9    Q.  Let me ask you a quick question
10  here on one of the call notes, and I want to   11:21:55
11  know if it has anything to do with Neurontin.
12  That's what I'm trying to clear up here, is
13  that -- in the call note dated March 10 of
14  2004; correct?
15    A.  I see it.   11:22:20
16    Q.  "I discussed with him speaking
17  locally for Alzheimer's. He has done it before
18  and says he would be very willing to do it
19  again. Others that are nearby seem to really
20  like him and respect him in this area. He was   11:22:31
21  excited about the teleconference and he said he
22  would participate. Neurontin three-step
23  messaging was full deal. He talked about all
24  the ways he uses Neurontin. We discussed MGs."
25    Did you ever participate in a   11:22:46

112

1  teleconference regarding Neurontin?
2    A.  None that I recall.
3    Q.  Okay. Was it your practice as a
4  physician to ever participate in any
5  teleconferences about any pharmaceutical drugs?   11:22:54
6    MS. SCHULTZ: Object to the form.
7    A.  I think once I was -- I wasn't
8  leading the discussion, but I listened to a
9  discussion on one of the treatments, maybe
10  Aricept for Alzheimer's.   11:23:08
11    Q.  Did you ever eventually speak for
12  Pfizer or any other pharmaceutical company?
13    MS. SCHULTZ: Object to the form.
14    A.  I did -- on Alzheimer's treatments
15  I spoke a couple of times but for which   11:23:25
16  company, I can't remember.
17    Q.  Okay. Let me ask you this: I just
18  want to get a feel. Have you ever -- you said
19  you spoke on Alzheimer's treatments for a
20  pharmaceutical company. Are there any other   11:23:39
21  times you remember receiving any remuneration
22  or any money from any pharmaceutical company in
23  your practice in Williamstown?
24    MS. SCHULTZ: Object to the form.
25    MR. DONNELLY: Object.   11:23:50

113

1    Doctor, you don't have to answer
2  that.
3    A.  I can't remember.
4    Q.  Okay. Did you ever remember
5  speaking to any medical liaison officers for   11:23:54
6  any pharmaceutical company about Neurontin?
7    A.  Can't remember that.
8    Q.  Okay. Did you ever attend any
9  consultant meetings with any pharmaceutical
10  companies?   11:24:10
11    A.  Once.
12    Q.  Do you remember when?
13    A.  The date, I can't recall, but it
14  was a meeting about Cymbalta, if I -- I think
15  was the drug.   11:24:21
16    Q.  What is Cymbalta?
17    A.  It's a medication -- no, it wasn't.
18  It was a meeting for Provigil. I take that
19  back.
20    Q.  What is Provigil?   11:24:27
21    A.  Provigil is a medication that
22  people use for sleep apnea to assist with being
23  more awake.
24    Q.  Did you ever sit on any advisory
25  boards of any -- any medical advisory boards   11:24:39

29 (Pages 110 to 113)

114

1  for any pharmaceutical companies?
2     A.  No.
3     Q.  All right.  How many times -- I
4  think you testified earlier you don't recall
5  any specific sales rep meeting about Neurontin?   11:24:51
6     A.  Never.  No, I don't recall any.
7     Q.  Do you recall receiving Neurontin
8  samples at any point in time?
9     A.  I don't.
10       MR. SOH:  Tell you what, let's go   11:25:23
11  off the record for a few seconds.  I might be
12  done.
13       MS. SCHULTZ:  Okay.
14       THE VIDEOGRAPHER:  Going off the
15  record at 11:24.              11:25:32
16        - - - - -
17       (Thereupon, Sullivan Deposition
18       Exhibit 6 was marked for purposes of
19       identification.)
20        - - - - -          11:28:25
21       THE VIDEOGRAPHER:  Going back on
22  the record at 11:27.
23  BY MR. SOH:
24     Q.  One last line of questions for you,
25  Dr. Sullivan.  I've marked -- given to you   11:28:32

115

1  something marked as Exhibit 6, which is a
2  peer-reviewed study called -- well, why don't
3  you read the title because I can't -- I don't
4  think I read the first word.
5     A.  "Divalproex Lithium and Suicide   11:28:48
6  Among Medicaid Patients With Bipolar Disorder."
7     Q.  I'll tell you what, let me
8  switch.  Oh, all right.  I labeled both copies.
9  All right.
10       In making prescribing decisions, do   11:29:00
11  you review -- do you rely upon peer-reviewed
12  medical literature?
13     A.  Sometimes.
14     Q.  All right.  In this peer-reviewed
15  article, if you could read the -- I want to   11:29:12
16  direct your attention to the result section in
17  the abstract on the first page.
18     A.  Mm-hmm.
19     Q.  Do you see that?  Can you read the
20  last sentence in the result sections?   11:29:24
21       MS. SCHULTZ:  I'm going to object
22  to the form and I'm going to object to him just
23  reading the last sentence when I don't have a
24  copy of the document and I can't deal with what
25  the rest says.              11:29:34

116

1       MR. SOH:  Sure.  I'll hand it over
2  to you.
3     A.  In front of me is a document where
4  someone has highlighted in orange the sentence,
5  "For suicide deaths, the adjusted hazard ratios   11:29:38
6  were 1.5 for divalproex users (not
7  significant), 2.6 for gabapentin users,
8  significance value, less than 0.001, and not
9  available for carbamazepine users."
10     Q.  And let me -- I goofed here.  Let   11:29:59
11  me -- if you could go to the method section,
12  all right, in the abstract, in the abstract.
13  The method section in the abstract.  Okay?
14       Can you tell me what this study
15  purported to do in the method section of the   11:30:18
16  abstract in the methods section of the paper?
17       MS. SCHULTZ:  Object to the form.
18     A.  The only thing I can do that would
19  be accurate would be to literally read every
20  word there.              11:30:30
21     Q.  In the abstract.  There's a method
22  section in the abstract.
23     A.  Okay.  I'll read it for you.
24       "Methods.  Subjects were 12,662
25  Oregon Medicaid patients diagnosed with bipolar   11:30:40

117

1  disorder and treated with medication between
2  1998 and 2003.  Outcome measures were completed
3  suicide and emergency department visits for
4  suicide attempts (including nonfatal
5  poisoning).  Cox proportional hazards models   11:31:00
6  were used to adjust for demographics,
7  comorbidity, and concurrent psychotropic
8  medication use."
9     Q.  All right.  Had you previously
10  looked at the result section, all right, with   11:31:22
11  regards to suicide deaths, what is -- what does
12  this study say about gabapentin users
13  in -- what does the study say to you about
14  suicide deaths and gabapentin users?
15       MS. SCHULTZ:  Object to the form.   11:31:37
16     A.  What this study says to me is that
17  the sentence -- what it says to me is what it
18  reads:  Most studies I read, I think about, I
19  review, and I don't form an opinion --
20     Q.  Okay.              11:31:51
21     A.  -- for days or weeks later.
22     Q.  And with regards to suicide deaths
23  in this study, it says that two point -- it
24  says that adjusted hazard ratio for gabapentin
25  users, Neurontin, was 2.6; is that correct?   11:32:05

30 (Pages 114 to 117)

VERITEXT CORPORATE SERVICES (800) 567-8658

## 118

1    MS. SCHULTZ: Object to the form.
2    A.   The words --
3    Q.   I'm paraphrasing the results
4    section.
5    A.   So what's correct is what it says    11:32:11
6    on this page. I'm --
7    Q.   Okay.
8    A.   We're just reading a document.
9    Your questioning for me to -- my reading skills
10    is somewhat insulting and ridiculous.    11:32:20
11    Q.   I don't mean it to be insulting or
12    ridiculous, sir. I just need to get this in
13    the record and either you read it or I read it.
14    So I just want to get this in the record very
15    briefly.    11:32:32
16    But a 2.6 adjusted hazard ratio
17    means that there's an increased risk of suicide
18    deaths of 260 percent?
19    MS. SCHULTZ: Object to the form.
20    A.   I don't know.    11:32:41
21    MR. DONNELLY: I want to object.
22    He's not here to analyze this. It is what it
23    is, if you want to read it. The jury can read
24    it.
25    MR. SOH: No. I just want to know    11:32:47

## 119

1    if that's his understanding of what a 2.6
2    hazard ratio is, adjusted hazard ratio is.
3    MR. DONNELLY: Object to form.
4    A.   I cannot provide any opinion about
5    what this states without reading the entire    11:32:57
6    paper, reviewing it, possibly looking at the
7    references and then forming an opinion and I
8    cannot provide that opinion today.
9    MR. SOH: All right. Pass the
10    witness.    11:33:07
11    EXAMINATION OF DANIEL M. SULLIVAN, M.D.
12    BY MS. SCHULTZ:
13    Q.   Dr. Sullivan, you were asked some
14    questions by Mr. Shearer's counsel concerning a
15    recent FDA alert, and that alert was    11:33:22
16    marked -- do you have it -- Exhibit 4.
17    I'm going to go ahead and place
18    that in front of you again. During that
19    discussion you made the comment that the FDA
20    does some things well, some things not so well,    11:33:39
21    and that some recommendations are accurate and
22    some recommendations are tainted.
23    Do you recall that?
24    A.   I do.
25    Q.   What things do you think that the    11:33:51

## 120

1    FDA does not do so well?
2    MR. DONNELLY: I'm just going to
3    object, again, because he's not here to testify
4    about the credibility of the FDA.
5    A.   I can only state what's in the    11:34:04
6    public media, is that the FDA makes mistakes.
7    Q.   When you say that some
8    recommendations are tainted, are there specific
9    recommendations to which you were referring?
10    A.   Again, I can only refer to what's    11:34:16
11    in the public media, which was on occasion the
12    FDA has made decisions with groups of people
13    who have special interests and as a result,
14    perhaps, their recommendations are not always
15    fair and balanced.    11:34:34
16    Q.   And when you refer to groups of
17    people who have special interests, are you
18    referring to a specific group?
19    A.   No.
20    Q.   Do you recall any of the    11:34:46
21    recommendations that you think or that the
22    media thinks may have been tainted with respect
23    to any particular medication?
24    A.   No.
25    Q.   If you'll look with me at the FDA    11:34:58

## 121

1    alert, portions of that were read to you by
2    plaintiff's counsel, and if you look on that
3    first page, I think plaintiff's counsel stopped
4    reading after the second paragraph where it
5    ends: "Suicidal thoughts or behavior or    11:35:14
6    depression."
7    Do you see that?
8    A.   Yes.
9    Q.   And I'd like to continue reading
10    into the record the next paragraph. "This    11:35:21
11    information reflects FDA's current analysis of
12    available data concerning these drugs. Posting
13    this information does not mean that FDA has
14    concluded there's a causal relationship between
15    the drug products and the emerging safety    11:35:34
16    issue, nor does it mean that FDA is advising
17    healthcare professionals to discontinue
18    prescribing these products. FDA intends to
19    update this document when additional
20    information or analysis becomes available."    11:35:46
21    Do you see that?
22    A.   I do.
23    Q.   Would you be interested to see the
24    FDA's update of this document once it has
25    additional information and has performed    11:36:00

31 (Pages 118 to 121)