# EXHIBIT Y

```
                                                              Page 1
 1                              VOLUME:       I
                                PAGES:        1-199
 2                              EXHIBITS:     1-10
 3
              UNITED STATES DISTRICT COURT
 4              DISTRICT OF MASSACHUSETTS
 5
     IN RE:  NEURONTIN              ) MDL DOCKET
 6   MARKETING, SALES PRACTICES     ) NO. 1629
     AND PRODUCTS LIABILITY         ) MASTER FILE
 7   LITIGATION                     ) NO.  04-10981
                                    )
 8   _____ )
                                    )
     THIS DOCUMENT RELATES TO:      ) JUDGE PATTI
 9                                  ) B. SARIS
     SHEARER VS. PFIZER, ET AL;     ) MAGISTRATE
10   1:07-CV-11428-PBS              ) JUDGE LEO T.
                                    ) SOROKIN
11                                  )
12
13
14            VIDEOTAPED DEPOSITION OF
15   WILFRED HYNES, M.D., a witness called on
16   behalf of the Plaintiff, pursuant to the
17   provisions of the Federal Rules of Civil
18   Procedure, before Jill Shepherd, Registered
19   Professional Reporter, CSR, CLR and Notary
20   Public, in and for the Commonwealth of
21   Massachusetts, at the Tufts Medical Center,
22   800 Washington Street, Boston,
23   Massachusetts, on Tuesday, November 13,
24   2009, commencing at 12:08 p.m.
25   Job No: 226411
```

Page 2

1
2  APPEARANCES:
3
4
5  FINKELSTEIN & PARTNERS
6  By: Kenneth B. Fromson, Esquire
7  1279 Route 300
8  P.O. Box 1111
9  Newburgh, New York 12551
10 Tel: 845.562.3492
11 E-mail: kfromson@lawampmmt.com
12 Attorney for the Plaintiff.
13
14
15
16
17 GOODELL, DeVRIES, LEECH, DANN, LLP
18 By: Richard M. Barnes, Esquire
19 One South Street, 20th Floor
20 Baltimore, Maryland 21202
21 Tel: 410.783.4004
22 E-mail: rmb@gdldlaw.com
23
24      -- and --
25

Page 3

1
2  APPEARANCES, CONTINUED
3
4
5  BOIES, SCHILLER & FLEXNER, LLP
6  By: Harlan A. Levy, Esquire
7  575 Lexington Avenue
8  7th Floor
9  New York, NY 10022
10 Tel: 212.446.2300
11 E-mail: hlevy@bsfllp.com
12 Attorneys for the Defendant, Pfizer.
13
14
15 ALSO PRESENT: Sam Krumholz
16      David Egilman, M.D.
17      Marissa Demonte, Videographer
18
19
20
21
22
23
24
25

Page 4

```
                I N D E X
WITNESS                              PAGE
WILFRED HYNES, M.D.
Examination by Mr. Barnes             7
Examination by Mr. Fromson           91
Examination by Mr. Barnes           149
Examination by Mr. Fromson          186
Examination by Mr. Barnes           189




            E X H I B I T S
NO.   DESCRIPTION                    PAGE
1     Notice                          6
2     000374-37BWH-00205 -            6
      000374-37BWH-00426

3     CV                             13

4     Demand for Jury Trial          91

5     Answer                         91

6     US Package Insert of 2009     100

7     Settlement Agreement          133
```

Page 5

```
8     Letter 9/9/09                 142
9     FDA Article                   168
10    Update                        194
```

Page 38

1  appropriate once you've evaluated the
2  patient, how do you select between a
3  tricyclic antidepressant versus narcotic
4  verse antiepileptic drug such as Neurontin?
5  A. In the chronic setting, we're probably more
6  likely to try non-narcotics first.
7  Q. Why is that?
8  A. Because of the risk of addiction, the
9  side-effect profile of narcotics.
10 Q. What are your concerns about the side-effect
11 profile for narcotics?
12 A. Nausea, constipation. Certainly, it's a
13 step up in terms of potency. Narcotics are
14 much stronger agents. They are closely
15 regulated. Clearly, if you are going to
16 treat a patient without narcotics, that
17 would be the preference.
18 Q. They are a heavier drug than the
19 antiepileptics?
20 A. That's correct.
21 Q. In terms of selecting a drug such as
22 Neurontin, an antiepileptic drug such as
23 Neurontin, for the treatment of a pain
24 condition in the year 2000, what information
25 would you rely upon in choosing that drug?

Page 39

1  What sort of information --
2  A. My prior experience.
3  Q. Was that the predominant --
4  A. Yes.
5  Q. Why is that?
6  A. I found it to be effective for neuropathic
7  pain.
8  Q. Did you begin using Neurontin during your
9  fellowship?
10 A. Yes.
11 Q. And you just carried it forward in your
12 private practice?
13 A. That's correct.
14 Q. In your training, did you have any -- I
15 think you already answered, but in your
16 training, your decision to use Neurontin was
17 basically based upon the information you
18 received from your colleagues here in
19 Boston?
20 A. The attending physicians, yes.
21 Q. And they were generally satisfied with
22 Neurontin to treat neuropathic pain?
23     MR. FROMSON: Objection. Hold on.
24 Objection. Form.
25     You can answer.

Page 40

1  A. Yes.
2  Q. What was their experience with Neurontin for
3  the treatment of neuropathic pain during
4  your fellowship?
5     MR. FROMSON: Objection. Form.
6  Q. You may answer.
7  A. Predominant feeling was that it was
8  effective for neuropathic pain.
9  Q. And that was your experience as well?
10 A. Yes.
11 Q. I have marked as an example -- you have it
12 in front of you -- Exhibit 2. I've given it
13 to counsel.
14     Exhibit 2, for the record, is the
15 records from Brigham and Women's from
16 October 2000 for Mr. Shearer.
17 A. Okay.
18 Q. You've had a brief moment prior to the
19 deposition.
20     Let me ask you this again: Other than
21 spending a moment prior to the deposition,
22 have you had a chance to familiarize
23 yourself with the records for Mr. Shearer
24 from his hospitalization at Brigham and
25 Women's Hospital in 2000?

Page 41

1  A. No.
2  Q. We'll take our time and go through them.
3  First of all, would you turn to Exhibit 2,
4  and it's the -- it's at Bates number 410 and
5  411, and it's a consult note.
6     Do you know Dr. Britton,
7  B-R-I-T-T-O-N? He requested a consult.
8  A. No.
9  Q. Okay.
10     Looking at the top of page 410, it's a
11 request to APS.
12     What is "APS"?
13 A. Acute Pain Service.
14 Q. And that would be you?
15 A. Yes.
16 Q. In fact, that was the name of the service,
17 correct?
18 A. Yeah.
19 Q. But also treated chronic pain forms,
20 correct?
21 A. That's correct.
22 Q. Okay. And there was a diagnosis number one.
23     What was the diagnosis number one?
24 A. Status post-mitral valve repair, status
25 post-stroke.

Page 74

1  Q. Okay.
2     Can you just briefly read the note as
3     it pertains to the pain evaluation -- what
4     was conducted -- on the 16th of October?
5  A. Sure. "Pain recommendations much
6     appreciated. Will convert to shorter-acting
7     narcotics PRN. D/C PCA. Psyche symptoms
8     likely medication's side effects. Continue
9     Flexeril, Neurontin."
10 Q. And then would you go down to the psyche
11    assessment, please?
12 A. "Patient reports feeling disoriented and
13    confused. Likely combination of
14    overmedication, new environment. Will cut
15    back on psychotropic meds. Follow mental
16    status. Haldol PRN for agitation. Psyche
17    consult if symptoms persist off heavy
18    narcotics."
19 Q. So at that time, was a staff at Brigham and
20    Women's concerned about the use of opioids
21    as they were psychotropic medications that
22    were affecting Mr. Shearer's mental status?
23        MR. FROMSON: Objection. Form.
24 A. That appears to be the case.
25 Q. And on the 16th of October, what medicines

Page 75

1     did the staff continue Mr. Shearer on for
2     the treatment of his pain?
3  A. Flexeril and Neurontin.
4  Q. Okay.
5     What is Flexeril?
6  A. Muscle relaxant.
7  Q. And Neurontin is an antiepileptic drug that
8     we've discussed previously?
9  A. Correct.
10 Q. Now, would you go back briefly -- I was
11    reviewing my notes -- to your original
12    consult at page 411.
13 A. Okay.
14 Q. I went back and checked my notes.
15    Did you -- what does the last sentence
16    in your notes say after you prescribe
17    Neurontin in the morphine sulfate?
18 A. "Await MRI."
19 Q. And then below that, what is that sentence
20    below?
21 A. "Patient seen and agree with above."
22 Q. Does that indicate you actually saw the
23    patient prior to administering him the
24    medicine, do you think?
25 A. No.

Page 76

1  Q. Was he seen by somebody?
2  A. Right.
3  Q. Okay.
4     And how did you know that he agreed
5     with the above plan? When you say "agreed
6     with above," what does that mean?
7  A. I agree with the resident's note.
8  Q. You agree with the resident's note?
9  A. Right.
10 Q. Okay.
11    So that's you agreeing with what had
12    been written above?
13 A. Right.
14 Q. Okay.
15    When did the resident prescribe
16    Neurontin, or did you prescribe Neurontin?
17 A. The resident.
18 Q. Where does it say that she prescribed the
19    Neurontin?
20 A. It doesn't. The resident inputs the orders
21    into the computer.
22 Q. I understand.
23    But when you say "start Neurontin," is
24    that something you told her to do or
25    something you just ratified by signing the

Page 77

1     note?
2  A. I don't know.
3  Q. Well, when you say "start Neurontin," you
4     were just saying that you noted Neurontin
5     had been prescribed, or you just don't know?
6  A. I think that was probably discussed and it
7     was decided to start it. I don't know
8     100 percent.
9  Q. So just so I understand, at this consult,
10    the pain service prescribed the Neurontin
11    for Mr. Shearer?
12 A. Yes.
13 Q. And you agreed with that?
14 A. Yes.
15 Q. Okay.
16    If you hadn't agreed with it, would
17    you have changed the order?
18 A. Yes.
19 Q. Do you believe that it was appropriate to
20    continue Mr. Shearer on Neurontin and
21    Flexeril after the physicians at Brigham and
22    Women's determined that Mr. Shearer was
23    suffering from paranoid delusions?
24        MR. FROMSON: Objection. Form.
25 A. I was no longer covering, but that appears

20 (Pages 74 to 77)

Page 138

```
1        You were directly supervising her?
2   A. Yes.
3   Q. Where would she -- this person -- I'm sorry.
4        Where would this person have gained
5     knowledge about the use of Neurontin, if not
6     from you?
7        MR. BARNES: Objection.
8   A. From rotating in the pain management center.
9   Q. Under the same house you were practicing?
10  A. Correct.
11  Q. Under the same roof basically?
12  A. Right.
13  Q. You had mentioned a satellite office at that
14    time.
15  A. Yes.
16  Q. Where was the satellite office?
17  A. Worcester Medical Center.
18  Q. Was that an inpatient facility or outpatient
19    facility?
20  A. It was an outpatient office.
21  Q. Okay.
22       And is that the type of office where
23    patients could come make appointments and
24    come in and get a visit, get treatment,
25    prescriptions, and leave?
```

Page 139

```
1   A. Yes.
2   Q. Did sales representatives come to you at
3     that office before 2000 from Parke-Davis
4     Warner-Lambert?
5        MR. BARNES: Objection.
6   A. I believe so.
7   Q. When I asked you earlier about visits from
8     sales representatives, I apologize, I didn't
9     make a distinction whether they came to the
10    hospital, Brigham and Women's, or your
11    satellite office.
12       Can you tell us whether they came to
13    either the hospital, the satellite office,
14    or both?
15  A. When you say hospital, both settings were
16    hospital-based settings and outpatient
17    practices that they came to, and they would
18    come to both outpatient practices.
19  Q. And would they -- and in both circumstances,
20    did they actually visit with you?
21  A. Yes.
22  Q. All right.
23       In terms of your prescription of
24    Neurontin to Mr. Shearer, is it fair to say
25    you did not discuss with Mr. Shearer the
```

Page 140

```
1     capacity for Neurontin to contribute to
2     suicidal behavior?
3        MR. BARNES: Objection. Assumes
4     facts not in evidence.
5   A. I guess I'm not sure that it was common
6     knowledge at that time.
7   Q. My question, however, is: Did you speak to
8     Mr. Shearer about whether Neurontin had the
9     capacity to increase suicidal behavior when
10    Neurontin was prescribed to him?
11       MR. BARNES: Objection.
12  A. Probably unlikely.
13  Q. In hindsight, this is a hypothetical
14    question, Doctor, if you did have knowledge
15    that Neurontin increased the risk of
16    suicidal behavior in patients taking
17    Neurontin, would you have shared that
18    information with Mr. Shearer?
19       MR. BARNES: Objection.
20  A. Yes.
21  Q. If you had known -- again, in hindsight,
22    that is hypothetical -- if at the time the
23    Neurontin was being prescribed to
24    Mr. Shearer, if you knew Neurontin had the
25    capacity to increase the risk of suicidal
```

Page 141

```
1     behavior, would you have considered
2     alternatives to Neurontin?
3        MR. BARNES: Objection.
4   A. Considered? Sure.
5   Q. Okay. Mr. Barnes asked you about a number
6     of different types of regimens that could
7     have considered, or maybe even were
8     considered.
9        Can you tell us what alternatives were
10    available to you back in October of 2000 if
11    you would have considered them in light of a
12    then known suicide risk with Neurontin?
13       MR. BARNES: Objection.
14  A. Certainly other anticonvulsants.
15  Q. If, at the time Neurontin was being
16    prescribed to Mr. Shearer, you had knowledge
17    that Neurontin had the capacity to
18    contribute or cause suicidal behavior, would
19    you have informed Mr. Shearer's caregiver or
20    family about that fact?
21       MR. BARNES: Objection.
22  A. I'm not sure if I would have the opportunity
23    to do that or not.
24  Q. To the extent that the package insert --
25    withdrawn.
```

Page 174

```
 1    the oral narcotics much at all.
 2  Q. Was a PRN prescription, correct?
 3  A. Correct.
 4  Q. And that's as needed?
 5  A. Correct. The PCA is also as needed.
 6  Q. As to tricyclic antidepressants, it was the
 7    judgment of the medical doctors treating
 8    Mr. Shearer's pain in 2000 that they would
 9    not be appropriate for Mr. Shearer because
10    he was a heart patient, correct?
11        MR. FROMSON: Objection. Form, and
12    it's been asked and answered on direct.
13  A. In general, the tricyclics we -- with a
14    patent with atrial fibrillation, the
15    preference would be to avoid tricyclics.
16  Q. Is that what the pain staff did at the
17    Brigham and Women's Hospital with respect to
18    Mr. Shearer?
19  A. That appears to be the case.
20  Q. Okay.
21        Now, we talked about antiepileptic
22    medicines, correct?
23        From reading the Exhibit 9, you now
24    understand that all antiepileptic drugs
25    carry a class labeling for suicidal behavior
```

Page 175

```
 1    and ideation, correct?
 2  A. Correct.
 3        MR. FROMSON: Objection.
 4  Q. Doctor, do you now understand that all
 5    antiepileptic drugs carry a class label for
 6    suicidal behavior and ideation?
 7        MR. FROMSON: Objection.
 8  A. Yes.
 9  Q. Okay.
10        Now, as to Neurontin, Neurontin was
11    a -- it was ultimately the prescription that
12    you approved for Mr. Shearer in 2000,
13    correct?
14  A. Correct.
15  Q. You would agree that Mr. Shearer's pain
16    needed to be treated in October of 2000,
17    correct?
18        MR. FROMSON: Objection. Leading,
19    asked and answered.
20        You covered it very well on direct.
21        MR. BARNES: I understand.
22        MR. FROMSON: I know time is
23    precious, but...
24        MR. BARNES: "Objection" would be
25    fine.
```

Page 176

```
 1        MR. FROMSON: Thanks.
 2  Q. Okay. Now I've lost where I was. Don't
 3    worry about it. I'll get back to it.
 4        In follow-up to Mr. Fromson's
 5    question, it is still your belief that
 6    Mr. Shearer's pain needed to be treated with
 7    medicines in October of 2000, correct?
 8  A. Correct.
 9  Q. And do you still believe, based upon the
10    information you've reviewed today and your
11    knowledge of the class-wide label that
12    Mr. Fromson has discussed, that Neurontin
13    was an appropriate choice for Mr. Shearer
14    and the treatment of his pain conditions in
15    2000?
16        MR. FROMSON: Objection.
17  A. I mean, are we talking about now?
18  Q. Looking back.
19        Given what you had available in 2000,
20    the choices you had, do you still believe
21    that Neurontin was an appropriate choice for
22    the treatment of Mr. Shearer's neuropathic
23    pain?
24        MR. FROMSON: Objection. Form.
25  A. Again, I -- my understanding is we are
```

Page 177

```
 1    talking about now, right now -- or then as
 2    opposed to now.
 3  Q. Looking at what you did -- let me strike
 4    that.
 5        Do you believe that the use of
 6    Neurontin was appropriate for Mr. Shearer
 7    back in 2000 to treat his pain condition?
 8        MR. FROMSON: Objection. Asked and
 9    answered.
10  A. From what I see of basically what's in front
11    of me, it appears at the time that that was
12    appropriate.
13  Q. Okay.
14        And you still feel it was appropriate
15    based upon what you know today?
16        MR. FROMSON: Object. Form.
17  A. That's what I see in front of me is at that
18    time it appears it was appropriate.
19  Q. Okay.
20        Now, is it your practice to advise --
21    you still prescribe Neurontin today,
22    correct?
23  A. Yes.
24  Q. And you are comfortable prescribing
25    Neurontin today for pain?
```