UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | : MDL Docket No. 1629<br>:<br>: Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | :<br>: Judge Patti B. Saris |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | :<br>: Magistrate Judge Leo T. Sorokin<br>: |

**DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE'S ORDER
DENYING MOTION FOR CONTINUED DEPOSITION OF NICHOLAS WIEDER
AND ADDITIONAL RELIEF AND REQUEST FOR EXPEDITED RELIEF**

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a), Defendants Pfizer Inc

and Warner-Lambert Company LLC (together, "Pfizer") hereby object to Magistrate Judge

Sorokin's January 29, 2010 Order denying Pfizer's emergency motion [2372] to compel

Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively,

"Kaiser") to produce Dr. Nicolas Wieder for the continuation of his deposition and for other

relief.

Trial of this action is set for February 22, 2010. It is, therefore, important that the

continuation of Dr. Wieder's deposition be scheduled as soon as possible and Pfizer requests

expedited consideration of this objection.

**ARGUMENT**

**MAGISTRATE JUDGE SOROKIN'S ORDER DENYING PFIZER'S MOTION
TO COMPEL IS CLEARLY ERRONEOUS AND CONTRARY TO LAW**

A district court may reconsider a non-dispositive ruling of a magistrate judge "'where it

has been shown that the . . . order is clearly erroneous or contrary to law.'" *United States v.*

*Bruck*, 152 F.3d 40, 43 (1st Cir. 1998) (quoting 28 U.S.C. § 636(b)(1)(A)); *accord United States*

*v. Garcia*, 983 F.2d 1160, 1166 (1st Cir. 1993). "The 'clearly erroneous' standard" applies to

factual findings, whereas "the more lenient 'contrary to law' standard" applies to legal

conclusions. *Jochims v. Isuzu Motors, Ltd.*, 151 F.R.D. 338, 340 (S.D. Iowa 1993) (citation

omitted); *accord Williamson v. Horizon Lines LLC*, 248 F.R.D. 79, 82 (D. Me. 2008).

The Court "should not be hamstrung by the clearly erroneous standard." 12 Charles Alan Wright et al., *Federal Practice and Procedure* § 3069, at 355 (2d ed. 1997). "[I]t would turn the jurisprudential system on its head to ascribe irrevocable finality (akin to that of a final judgment) to any unreviewed discovery or evidentiary rulings by a Magistrate Judge." *Phillips v. Raymond Corp.*, 213 F.R.D. 521, 525 (N.D. Ill. 2003). Here, the Magistrate Judge did not issue a written order, made no fact findings, and simply denied Pfizer's motion without explanation. Courts grant less deference to magistrate judges' rulings in these circumstances. *See, e.g., VLT, Inc. v. Lucent Techs., Inc.*, No. Civ. A. 00-11049-PBS, 2003 WL 151399 (D. Mass. Jan. 21, 2003) (Saris, J.).

For the reasons discussed below, by instructing deponent Nicolas Wieder, M.D. not to respond to certain questions, Kaiser's counsel committed a clear and unjustified violation of the Federal Rules of Civil Procedure governing the conduct of depositions. Their interjection of improper objections prevented Pfizer's counsel from fully exploring a subject matter with great importance to Pfizer's defense of this litigation: the clear and irreconcilable positions taken by Kaiser in this litigation regarding the efficacy of Neurontin for treatment of off-label conditions and its numerous public recommendations of Neurontin for treatment of the same and additional off-label conditions on its website. Given the clear rules violation and demonstrated prejudice to Pfizer, denial of Pfizer's motion was both clearly erroneous and contrary to law and should be overruled.

Second, Dr. Wieder's testimony regarding the "recommendations" made by him regarding Neurontin's formulary placement and guidelines contradicts his sworn declaration, which should be stricken.

## I.   Plaintiffs Should Be Ordered To Produce Dr. Wieder For A Continued Deposition To Respond To Questions That He Was Improperly Instructed Not To Answer

### A.   Kaiser's Counsel Impermissibly Obstructed Pfizer's Questioning Of Dr. Wieder

In opposition to Pfizer's motion for summary judgment, Kaiser offered a declaration

from Dr. Nicholas Wieder in which he stated that "[i]n or around September 1999, I recommended removal of all formulary restrictions and guidelines for Neurontin," a recommendation he indicates was accepted by the P&T Committee. (Exh. A, Wieder Decl. ¶ 8.) He further stated: "Had I known at that time that Neurontin was no more effective and did not have a better safety profile than existing, less expensive treatments for reflex sympathetic dystrophy and neuropathic pain, I would not have recommended that the [sic] expansion of the formulary status of Neurontin in 1997 or again in 1999." (*Id.* ¶ 9.)   This Court specifically relied upon Dr. Wieder's declaration in denying Pfizer's motion for summary judgment as to Kaiser. (Mem. & Order [2309] at 8.)

Although Dr. Wieder had never been identified by Kaiser as a potential witness prior to his summary judgment declaration and was, therefore, clearly within the scope of this Court's November 12, 2009 Procedural Order regarding permissible depositions, Pfizer was forced to move to compel to obtain Dr. Wieder's deposition. Pfizer's motion was granted on December 17, 2009, and, after further delay by Kaiser, Dr. Wieder was finally deposed on January 12, 2010.

Pfizer's counsel sought to question Dr. Wieder about numerous statements made on Kaiser's website that are flatly inconsistent with positions being taken by Kaiser in this lawsuit. In order to lay the foundation for his questions, Pfizer's counsel accessed the internet during Dr. Wieder's deposition, and asked him to look at Kaiser's website reached by typing in the URL "www.kp.org." At the first attempt by Pfizer's attorney, Kaiser's counsel objected: "[U]nless there is going to be a be a foundation that you're actually on the internet right now, Mark." (Exh. B, Wieder Dep. at 330:20-21.) The following exchange then took place:

> Q.   Doctor, you could find this [kp.org] on the Internet; right?
>
> MR. SOBOL:  No, he's not going to be doing any demonstrations either.  No, he's not.  The whole thing is a little bit silly.
>
> Q.   Maybe for you.  But Doctor, do you have any reason to believe I'm not on the internet here?
>
> MR. SOBOL:  There's no – Don't answer the question.  Don't answer the question.

Q.  Doctor, do you have any reason –

MR. SOBOL:  Do not answer the question, this line of questioning.

Q.  Under what basis?

 MR. SOBOL:  On the basis that you're wasting everybody's time at this point.

Q.  Is that an appropriate objection?

 MR. SOBOL:  Yes, it is.  At times, there is.  Yes.

Q.  I'm trying to lay a foundation for your – the website, the Kaiser Permanente website and you're stopping me from doing that after you just said there's no foundation?

MR. SOBOL:  I said the whole thing is a little bit silly and ridiculous.  Something is either on the web or it's not.  And there's no reason –

(*Id.* at 331:4-332:12.)

Given counsel's refusal to allow the witness to even look at Kaiser's website, Pfizer's counsel asked if Kaiser would stipulate that certain print-outs were authentic pages from Kaiser's website.  Kaiser's counsel refused to stipulate and he refused to allow the witness to answer any foundation questions.  (*Id.* at 332:13-333:25.)  Counsel for Pfizer again tried to question the witness regarding Kaiser's website, by directing him to the results of a Google search for the words "Kaiser Permanente formulary."  Once again, Kaiser's counsel refused to allow him to answer any questions.  (*Id.* at 333:22-336:10.)  Counsel for Pfizer then asked the witness how he would access Kaiser's website, was told by Dr. Wieder to type in kp.org, which Pfizer's counsel did.  (*Id.* at 336:12-337:9.)  When the witness was asked simply whether the screen that appeared from this search was "the screen that you usually see when you type that [kp.org] in?" Dr. Wieder was again instructed not to answer.  (*Id.* at 337:10-12.)  Pfizer's counsel also asked the witness to log in using his ID and password and to find the articles on the website regarding the use of anticonvulsants for cancer pain and lower back pain.  He was instructed not to do so. (*Id.* at 339:22-340:1.)

Kaiser attempts to justify its blatant violations of the rules by characterizing this dispute as one about authenticity.  (Pl. Opp. [2402] at 3-5.)  However, as any attorney who has ever

taken a deposition knows, authenticity and foundation are just the preamble to more substantive questions. Here, Pfizer's counsel was prevented from asking his follow-up questions due to Kaiser's obstructionist tactics.[1]

The significance of this interrupted line of questioning was made patent by the testimony that Pfizer's counsel was finally able to obtain. In blatant contradiction to the positions that it has taken in this litigation, Kaiser's website, which purports to provide its members with interactive tools and other resources so that its members can live healthier lives (Exh. D), contains numerous articles where it recommends the use of anticonvulsants, including Neurontin and gabapentin, for treatment of chronic pain, cancer pain, cluster headaches and other conditions. (Exhs. C & D.)

For example, if a Kaiser member clicked on the "Drugs and natural medicines" link of the Health and Wellness tab on Kaiser's site, he or she would be taken to a Kaiser Permanente page that reads: "Look up prescription and nonprescription drugs, vitamins, herbs, and other dietary supplements, including how to use them, side effects, interactions, and more." (Exh. D) A click on this page takes a Kaiser patient-subscriber to Kaiser's "drug encyclopedia," where patients can find information on medications. (*Id.*) Someone who clicked on "Pain Originating From a Nerve" under "Conditions: P" in the Drug Encyclopedia would be taken to a page that reads as follows:

**Drugs for managing Pain Originating From a Nerve**
Please click on a drug name to see more information

- Gabapentin Oral
- Neurontin Oral

(*Id.*) These are the ***only*** two drugs listed in Kaiser's Drug Encyclopedia under "Pain Originating

---

[1] While authenticity was only the first of many questions that Pfizer's counsel sought to ask, Kaiser should, nonetheless, be directed to stipulate to the authenticity of the website pages at issues, as well as any other website pages pertaining to Neurontin or the conditions at issue in this litigation. The parties are attempting to work out a stipulation on authenticity governing several categories of documents, including website pages; however, it is not yet final. In addition, the stipulation only establishes a good faith process and does not prohibit authenticity objections to specific documents.

from a Nerve."

Kaiser's website also has a Health Encyclopedia, where members can "[r]esearch health conditions for information on prevention, treatment options, and more." (*Id.*)  An article on "Anticonvulsants for chronic pain" advises Kaiser patient-subscribers that anticonvulsant drugs (including Neurontin) may "be used to treat other painful conditions, such as postherpetic neuralgia and fibromyalgia." (*Id.*)  The article explains: "Experts do not know exactly how anticonvulsants work to reduce chronic pain.  They may block the flow of pain signals from the central nervous system."  Significantly, the article notes that "gabapentin and pregabalin *are the only drugs that have proved to help some types of chronic pain.*" (*Id.* (emphasis added).) Another article indicates that anticonvulsants (including Neurontin) are used to control cancer pain and explains that "[a]nticonvulsants help reduce pain related to the nervous system (neuropathic pain).  Some have fewer side effects than tricyclic antidepressants." (*Id.*)  Another article states:  "The anticonvulsant gabapentin may be *your best bet for safely treating chronic pain* because it is not used by the body in the same way as many other medicines." (*Id.,* emphasis added).

The contradiction between Kaiser's allegations and the information it provides its members is profound, irreconcilable and devastating.[2]  So much so that the only way that

---

[2] Kaiser cannot rationalize the contradiction away by attributing the articles on its website to Healthwise.  Initially, these are not links to a wholly separate website.  Instead, Kaiser's members are directed to articles on Kaiser's website with the Kaiser Permanente logo prominently displayed at the top of each page.  As Dr. Wieder testified: "[N]o one would be reasonably – would  reasonably think that it wasn't a Kaiser document." (Exh. B, Wieder Dep. at 351:20-21)

Second, Kaiser actively contracted with Healthwise to provide it with content for its website and openly touted its collaboration with Healthwise. (Exh. E.)  Likewise, according to a 2004 Kaiser press release, Kaiser "showcase[d] [its] online health programs" in order to encourage enrollment. (Exh. F.) Promoting its website, Kaiser states that it features "online drug and medical encyclopedias *reviewed and approved by Kaiser Permanente physicians*." (*Id.,* emphasis added.)  Another Kaiser press release tells people to "[c]lick to kaiserpermanente.org for physician approved health information." (Exh. G.)  "Kaiser invite[d] everyone – members and nonmembers alike – to access *trustworthy, up-to-date, physician-approved health information* by visiting [its] redesigned Web site . . . ." (*Id.,* emphasis added)  And Kaiser represents on its website that the material provided by Healthwise is both accurate and current. (Exh. G.)

Dr. Wieder was able to respond to the blatant inconsistency was to characterize the statements on Kaiser's website – ***statements made by Kaiser to its patient-subscribers to help them make decisions about their healthcare*** – as misleading.  For example, when asked about Kaiser's website article recommending the use of anticonvulsants (including Neurontin) for cancer pain, Dr. Wieder gave the following testimony:

> Q.  Let's take them one at a time.  Read the one for cancer pain and tell me if there's anything wrong or inaccurate in it.
>
> A.  There's something misleading about it.
>
>         . . . .
>
> It's this – it suggests that anticonvulsants are sometimes used generally for cancer pain.  It's like saying using your heels stop a car.
>
>         . . . .
>
> Q.  So that's misleading statement on the Kaiser Permanente website?
>
> A.  Well, it's misleading statement by Healthwise, if this is by Healthwise.   I'm assuming it is.  But it's misleading to suggest that anticonvulsants are generally used for cancer pain.
>
>         . . . .
>
> Q.  Okay.  In exhibit 17, what if anything else is misleading?
>
> A.  It's misleading to have a list of medications that appear to have equal prominence as if all of them are equal to the other.  It's misleading to suggest that there is something specific about the way anticonvulsants work in regard specifically to cancer pain.  It's misleading to suggest that it is commonly used in the section, "Why It is Used."  It's misleading to use the word "well" in "How Well it Works."  The side effect profile seems relatively accurate.  And the USDA – FDA warning seems accurate.  It's misleading to use the word "drug encyclopedia" when we don't really – we don't – it's a language that's not usually our website language, so it looks like it's something from somewhere else.  I don't know if we have a drug encyclopedia but it's not a term I've used with ours.  It's misleading to put the Tegretol at the top of the list in the beginning examples and at the end say, it's not generally used in cancer pain. It seems contradictory, and it seems to reflect a lack of care that's taken with this overall.  It's misleading to – well that's enough.  That's enough misleading stuff.

(Exh. B, Wieder Dep. at 345:4-348:17.)

Similarly, when questioned about the Kaiser website article on the use of anticonvulsants

(including Neurontin) to treat lower back pain, Dr. Wieder testified:

> Q.   What, if anything is misleading on that exhibit, talking about anticonvulsants and chronic low back pain?

> A.   It's – some of them are similar.   It's misleading to suggest that anticonvulsants for chronic low back pain is a standard and common treatment.   It's misleading, again, to order the examples in the way they are as if they have equal emphasis.   It's misleading to describe a sentence "How It Works" when the topic is titled "Chronic Low Back Pain," but then the description of how it works talks about brain electrical activity.   It's just another example of how poorly conceived and lacking they are in any real expectation that this would be used in any kind of significant way.   It's misleading that – the comment about persistent low back pain with fewer side effects is – suggests that all anticonvulsants can reduce some persistent low back pain to the advantage of all tricyclics antidepressants with fewer side effects than all anti- – tricyclic antidepressant.   Its misleading to use the phrase "How Well It Works" when it doesn't work very well.   It may work, but it gives a false sense that it works very well  especially when it – the title of the paragraph is "How Well It Works" and the third sentence says, "This type of medicine is not well-studied as a chronic pain treatment."   So that's contradictory.   In addition –

> . . . .

> Okay.   The pregabalin can cause swelling in some people including swelling of the face or lips.   Really, the thing that bothers most people is the leg swelling, which can be really devastating.   And the other thing is that the – what's misleading is that the citations are from the American Geriatric Society, which presumably is something that discusses chronic low back pain for geriatric patients and it's misleading to put this without identifying that – at least in the title, that this is primarily based on geriatric patients, and it's misleading that there is no geriatrician in the credits for the reviews when the citation is from the American Geriatric Society.   And it's also misleading that there is no pain doctor or physiatrist or anybody who actually predominantly sees low back pain as a primary part of their practice.   And it's also misleading to not identify – well it's okay.   The Healthwise issue is another one – no one would be reasonably – would  reasonably think that it wasn't a Kaiser document. It's a little misleading to me.   I know when I look at things, I see Healthwise, it seems like a strange name to me.   So I know, but a patient wouldn't think that.   They would think somehow if – it's an imprimatur of some type, which it's not.   So those are the misleading things.   And you asked me if there are any half truths, and I would say if there are there are, that means there's half lies, in which case it's as we say, [garnished] anyway.   It's nothing.

(*Id.* at 349:10-352:6.)

Regarding the physician-authored article on Kaiser's website regarding burning mouth, Dr. Wieder provided the following testimony:

What's misleading is that the title is – under Healthwise is "National Organization for Rare Disorders, Inc." It sounds as if it's some kind of benevolent society for rare disorders, maybe even NIH related. It has a similar ring to some of the more official government, and my impression is – I don't know who they are. I don't know if they're a patient support organization or not. It doesn't sound like the ones that I know. So that's a little bit misleading. The other things that are misleading about it. . . . The standard therapies are informative until you get to the medications, because even with Elavil and Klonopin, including Neurontin, those are -- really there is no good study for any of them. And there's no – it's hard to say any of them would help except for helping people sleep. So it's deceiving in the sense that, you know, it might help do more things than is suggested, although they seem to be clear about that they're designed to reduce pain or the perception of pain. But mostly, really, they're more sedation, and the – one of the proofs of that is that they all have to be taken at bedtime. And many patients with this disorder have problems at bedtime, and so it's really mostly for sleep and for anxiety.

    . . . .

It's interesting to me also that the – it's – combined with the misleading National Organization for Rare Disorders, Inc., is that when they look in their resources, the National Organization for Rare Disorders is not one of the resources that they use, which means that it's not really a resource, even though it appears to be.

(*Id.* at 355:6-357:9.)

When shown the article on Kaiser's website about the use of anticonvulsants for hot flashes, an article that tells Kaiser members that "gabapentin is also commonly used to treat chronic pain, migraine headache, panic disorder, and social phobia" (Exh. C), Dr. Wieder testified:

… But what's misleading about it is that the only name there is Neurontin, and yet how it works is clearly something different. And how it works to improve hot flashes is not fully understood. It's misleading because you could put almost anything in there, you know, how clouds work to improve hot flashes not fully understood. I mean, how anything – so it's a little misleading. And then, after it tells you it's not understood and its misleading, then it tells you it may be used to treat it. Well, again, holy water may be used to treat it. Good conversation may be used to – so it's a little misleading. Anything is treat – baldness is treatable, you know, it's not curable. . . .

(Exh. B, Wieder Dep. at 357:18-358:12.)

Dr. Wieder continued to accuse Kaiser of misleading its member when questioned about a physician-authored article on Kaiser's website regarding the use of anticonvulsants for chronic pain was misleading:

9

... It's misleading – the part that's misleading is that chronic pain encompasses any single type of pain that may last for longer than a certain period of time. ... It's misleading because the title suggests that anticonvulsants can be used for any type of pain of any dura – of any long duration of any type. So from – who knows what it means. It could mean from my shoulder that's been hurting for three months to my headache, to my cancer around my pancreas, to my prostate. I have no idea what "Anticonvulsants For Chronic Pain" means. So it's very misleading. It suggests hey, if you have pain . . . we welcome all comers. . . .

. . . .

I'm sorry. It's misleading – no, I take that back. Oh, and Anne Poinier is here again. She must be quite an expert in many, many areas. I'm saying that sarcastically. But I, again – she's the primary reviewer, and now it makes me – she may very well have a full pain practice of patients with chronic pain, tremors and hot flashes. I don't know. But I just – all of a sudden, I'm seeing her name everywhere. Unless she's very ambitious and wants to be on everything, I would start to think about it. You know, I honestly don't know her at all. I don't even know who she is.

(*Id.* 359:4-361:17; *see also id.* at 362:1-363:5 (describing Kaiser's website article recommending gabapentin to treat primary orthostatic tremor as misleading).[3]

Counsel's wholly improper instructions to the witness precluded Pfizer's counsel from thoroughly questioning Dr. Wieder on inconsistencies between the public statements on Kaiser's websites and its allegations in this litigation. Pfizer's opportunity to depose the witness was further impaired when the witness left immediately after Kaiser's counsel concluded his questions (which consumed almost 90 minutes of deposition time) and Pfizer's counsel was not permitted to ask even ten minutes of follow-up questions. (Exh. B, Wieder Dep. at 523:18-524:24.) It is no answer for Kaiser to invoke the seven-hour limitation on depositions when Kaiser's counsel impeded Pfizer's attorney from asking questions and obtaining direct

---

[3] That Dr. Wieder was intent on adhering to the lawsuit party line is evident from other aspects of his testimony. For example, instead of reviewing any documents in his possession regarding Neurontin or any information on Kaiser's website about Neurontin, Dr. Wieder reviewed the report of Plaintiffs' expert John Abramson while on vacation. (Exh. B, Wieder Dep. at 43:6-44:10, 46:7-15, 52:18-53:14, 54:3-55:9.) Engaging in Orwellian doublespeak, he testified that the words "effective" and "efficacy" mean different things, but he couldn't explain what they mean. (*Id.* at 397:22-398:8.) Not wanting to concede Neurontin's effectiveness for *anything*, he testified that he would prescribe a tricyclic antidepressant for post-herpetic neuralgia (an off-label use) before prescribing Neurontin. Dr. Wieder did not even know that Neurontin has an FDA approved indication for post-herpetic neuralgia. (*Id.* at 246:18-248:20.)

answers from the witness, deposition time was taken up discussing wholly improper objections by counsel, Kaiser's attorneys made numerous speaking objections,[4] and the witness provided rambling and non-responsive testimony (*e.g.*, *id.* at 405:13-408:16).  Rule 30 provides that "[t]he court *must* allow additional time consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination."  Fed. R. Civ. P. 30(d)(1)(emphasis added).

### B.     The Conduct Of Kaiser's Counsel Was A Blatant And Inexcusable Violation Of The Federal Rules

It was clearly improper for Kaiser's counsel to instruct Dr. Wieder not to respond to questions.  Federal Rule of Civil Procedure 30 provides:

> An objection at the time of the examination – whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition – must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection.  An objection must be stated concisely in a nonargumentative and nonsuggestive manner.  A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

Fed. R. Civ. P. 30(c)(2).  The rules do not permit an attorney to instruct a witness not to answer on the ground that the attorney thinks his opponent's questions are "silly," as Kaiser's counsel did here.[5]  "None of the reasons given by counsel . . . for instructing the witness not to answer fall within the category where an answer would cause some serious harm, i.e. the answer would reveal trade secrets, privileged material, or other confidential material."  *Paparelli v. Prudential Ins. Co. of Am.*, 108 F.R.D. 727, 731 (D. Mass. 1985); *see also Calzaturficio S.C.A.R.P.A. S.P.A., v. Fabiano Shoe Co.*, 201 F.R.D. 33, 40 (D. Mass. 2001) (noting that counsel was not entitled to instruct a witness not to answer questions).  Kaiser's counsel did not interpose a privilege

---

[4] Excerpts from Dr. Wieder's deposition, highlighted to show where improper speaking objections were made and the deposition was interrupted by counsel, were attached to the previously filed Supplemental Declaration of Mark S. Cheffo [2447].

[5] Research has found no cases where a court held that it was proper to instruct a witness not to look at an internet site or to answer questions about an internet site.

11

objection to any of the questions, nor did they raise any issues regarding trade secrets or confidentiality.

Kaiser's counsel offered no legitimate justification for their clear rule violation. And the excuses that they made – far from mitigating their fault – demonstrated only that they have engaged in such improper behavior before. For example, in opposing Pfizer's motion for a continued deposition of Dr. Wieder, Kaiser noted that in 2007, Dr. Albert Carver, Kaiser's Vice President of Pharmacy Strategy and Operations in California, was asked: "Would you personally feel compelled to take some action if you learned that Permanente Group's public website was advising visitors that 'People who took Gapapentin for chronic pain said they felt one-third less pain while they were taking Gabapentin?" (Exh. H Carver Dep. at 447:16-21; Pl. Opp. [2402] at 3.)

It is, frankly, incredible that Kaiser would select this particular piece of testimony to support its arguments, in light of the fact that Dr. Carver was instructed not to answer by a two-page speaking objection. What followed the question above was not an answer, but the following:

> MS. NUSSBAUM: Objection. I'm going to ask the witness not to answer that.
>
> MR. JAMES: You can answer.
>
> MS. NUSSBAUM: No, first of all, it's an unintelligible question. Second of all, it's a question that calls for the witness' personal opinion, which is totally irrelevant in the action. Third, we have not been able to identify whose website this is. Fourth, we have not been able to identify this is a small piece of something, what this is, who it's available to, what its purpose is. I think that your question is highly misleading and I will not have the witness answer it. I don't think it's capable of being answered and it would simply be speculation and hypothetical.
>
> MR. JAMES: Are you directing the witness not to answer the question?
>
> MS. NUSSBAUM: I think that there's not a question that's capable of being answered without speculation, a hypothetical question and having to do with his personal feelings about something which is totally irrelevant in this action.
>
> MR. JAMES: Do you understand that questions relating to the witness' personal feelings are a basis for counsel directing the witness not to answer?

MS. NUSSBAUM: I didn't say that.  You want to ask a question that's capable of being answered, we will see if that's possible.  You want to identify this document and not give a misleading few pages of something that there's no testimony as to where it comes from or who a contained the content or anything else, then I'm happy to address appropriate questions.  The witness has been answering questions now for two full days.

MR. JAMES:  To be clear, you're not asserting the attorney-client privilege over the response?  . . . Attorney-client privilege is not in any way implicated by my question, is that correct?

MS. NUSSBAUM:  I don't even understand your question, so how can I know whether or not it implicates attorney-client privilege?  I have no idea if it's written by attorneys or supervised by attorneys or anything else.  The present question is not capable of being answered.

(*Id.* at 447:22-450:2.)  In fact, Pfizer contemplated filing a motion in 2007 seeking an order directing Kaiser's counsel to refrain from making improper objections, but did not do so, based upon the agreement by Kaiser's attorneys that they would conduct themselves in accordance with *Calzaturficio* (cited *supra* at 11.) (1/25/2010 Cheffo Decl [2448] ¶¶ 2-4; Exh. I.)[6]

Even if Dr. Carver had been permitted to answer, there would be no duplication.  Pfizer's questions were directed at what is on Kaiser's website today, in 2010, not in 2005 or in 2007.  That Kaiser's website continues to endorse Neurontin for off-label uses over two years after Mr. Carver was asked the question above is even more powerful evidence that Kaiser's allegations in this lawsuit cannot be reconciled with the actions taken by Kaiser in the ordinary course of its business.

Where, as here, there has been a clear rules violations that resulted in demonstrated prejudice to Pfizer, the Magistrate Judge's denial of Pfizer's motion was clearly erroneous or

---

[6] Compounding the surreal nature of their arguments, Kaiser's counsel, having violated a prior agreement to refrain from improper objections, attempted to deflect attention from their own behavior by accusing Pfizer's counsel of failing to meet and confer in good faith.  (Pl. Opp. [2402] at 2-3.)  In fact, Pfizer's counsel conferred at the deposition when he asked that the objections be withdrawn.  He continued his attempt to reach agreement in a detailed conference with Kaiser's counsel the Friday after the deposition before filing this motion and gave Kaiser until 5:00 p.m. the following Monday (the deadline originally requested by Kaiser's counsel) to respond.  (Cheffo Decl. [2447] ¶ 8.)  The purpose of the "meet and confer" requirement is to avoid the Court having to hear motions that could be resolved by negotiation.  It is not meant to enable one side to delay its opponent from timely seeking relief.

contrary to law.   Fairness requires that Pfizer be allowed additional time to complete its examination of Dr. Wieder, at a time and place convenient to Pfizer's counsel.

**II.     The Declaration Of Dr. Wieder Submitted By Kaiser In Opposition To Summary Judgment Should Be Stricken**

In his declaration, offered by Kaiser in opposition to Pfizer's motion for summary judgment, Dr. Wieder declared under penalty of perjury as follows:

> I am informed and believed that in or around September 1994, the Southern California Regional P&T Committee ("P&T Committee") voted to accept Neurontin to the formulary for use by or in consultation with a neurologist. In or around September 1997, as a practicing pain specialist, I recommended expansion of the formulary restrictions to include prescribing by pain clinic physicians for the treatment of reflex sympathetic dystrophy. I am informed and believe that the P&T Committee adopted this recommendation. In or around September 1999, I recommended removal of all formulary restrictions and guidelines for Neurontin. I am informed and believed that in or around September 1999, the P&T Committee adopted this recommendation.

(Exh. A, Wieder Decl. ¶ 8.)   Initially, Dr. Wieder's declaration gives the decidedly misleading impression that he played an important role in advising the P&T committee.  But, although he testified regarding decisions made by the P&T Committee in 1994, he was not even with Kaiser Southern California medical group at the time.  (Exh. B, Wieder Dep. at 268:22-24, 270:13-15.) When he signed his declaration, he had no independent recollection of documents that might have informed him about the activities of the 1994 P&T Committee, nor was he shown any.  He was simply "reminded" by someone of what happened. (*Id.* at 271:12-16.)

Moreover, Dr. Wieder has never presented to the P&T Committee and has no more than a vague understanding about how its makes decisions regarding formulary placement.  (*Id.* at 221:22-222:4.)  His only role in "advising" the P&T Committee was to respond to an email inquiry sent out by the P&T Committee to all specialists within a certain area.  (*Id.* at 269:18-270:8.)  Regarding the 1997 formulary decision, Dr. Wieder described his role as follows:

> Q.  In or around September 1997, there was an action by the P&T committee with respect to Neurontin and reflex sympathetic dystrophy; is that fair?
>
> A.  Yes.
>
> Q.  Did you present at the P&T committee in 1997?

A.   No.

Q.   Did you initiate the suggestion that reflex sympathetic dystrophy should be something that's included on the formulary?

A.   No.

Q.   Did someone else raise that and ask you to  comment on it?

A.   Yes

Q.   Who?

A.   I don't recall who.  In general, a request  is made, and then Drug Information Systems gives us all the literature and gives us what the nature of the discussion is, and then we review it.

Q.   How did you make the recommendation in 1997?

A.   By email. . . . [Y]es, by email, but more than just me giving it.  There's a discussion that goes on.

     . . . .

Q.   Okay.  But there are a lot of other people who were involved in this decision; is that fair?

A.   I don't know how many, but there – certainly more than me and –

Q.   It doesn't discuss any of them in your declaration, does it?

A.   No, it doesn't.

     . . . .

Q.   So, in fact, what – do you know the history about reflex sympathetic dystrophy with – before it got to the P&T committee and before it got to you?

A.   In what – what do you mean the history?  In what way?

Q.   Well, in other words, do you know whose idea it initially was, who . . . suggested it?

A.   No.  I don't know.

Q.   Do you know who was supporting it, who was against it?

A.   I don't recall that at all.

Q.   Your – the basis of your involvement was that you received some material in an email saying that the P&T committee was going to consider this,  do you have a view on it?

15

A. Do I have a view on it, and I also talked with other people who took care of pain patients and talked with my department, and so it was through conversation and through my own personal view.

(*Id.* at 273:10-274:12, 275:1-7, 276:12-277:8.) Dr. Wieder learned of the P&T Committee's decision through a "download." He has no knowledge regarding what they discussed or how they came to their decision. (*Id.* at 283:20-284:16.)

The "recommendation" and P&T action described in Dr. Wieder's declaration for September 1999 resulted from the same process. (*Id.* at 285:13-24.) Dr. Wieder did not make an independent recommendation to remove formulary restrictions and guidelines. He could not even say that it would have been his role to do so. (*Id.* at 286:13-19.) And, once again, Dr. Wieder did not know about the specifics of the P&T Committee's decision making process. He does not know what information they reviewed or relied upon or what factors influenced their decision. (*Id.* at 288:6-13; 290:4-18.) Clearly, Dr. Wieder's "recommendation" did not play the pivotal role in the decision of the P&T Committee that his declaration would leave one to believe. In fact, Drug Information Services had recommended removing restrictions at least three months prior to September 1999, something Dr. Wieder could not even recall if he was aware of. (*Id.* at 386:19-388:19.)[7]

Even more disturbing, Dr. Wieder directly contradicted his sworn declaration. Dr. Wieder's declaration states, unequivocally, that he "recommended removal *of all formulary restrictions and guidelines* for Neurontin" and that his recommendation was adopted by the P&T Committee. (Exh. A, Wieder Decl. ¶ 8 (emphasis added).) When shown the actual minutes of the P&T Committee, which make clear that it did not recommend removal of guidelines, but only restrictions, and that it adopted guidelines that are still in place today, Dr. Wieder tried to fix the false statement in his declaration by inserting a comma after the fact:

---

[7] In fact, one wonders why the P&T Committee was soliciting the "personal opinions" of treating physicians when Kaiser has taken the position in this lawsuit that these types of decisions can only be based upon the existence of double-blind, randomized clinical trials and that no consideration should be given to clinician experience.

Q.  So when you wrote here – when you wrote here in your sworn declaration that you recommend removal of all formulary guidelines and restrictions for Neurontin under oath – Do you remember that?

A.  I think I've said yes.

Q.  That's wrong, isn't it?

A.  Why was – why is it wrong?

Q.  Well, doesn't this say that they're going to be recommending the removal of formulary restrictions but adding guidelines?

. . . .

A.  The formulary restrictions, like I said, when I looked – when I read that, my reading of it was in relationship to the restrictions.  And my – I knew there were guidelines because I was, you know – I was involved in DUAT, working with the guidelines.  So I knew that there had been guidelines there.

Q.  Well, Doctor, you went through a whole litany of things that are misleading. I mean, isn't it misleading, don't you think, to say, in or about September 1999, I recommended removal of all formulary restrictions and guidelines, no caveats for Neurontin – hold on – and you also said, I am informed and believe that in or about September 1990, the P&T committee accepted this recommendation?

. . . .

Q.  Is that accurate?

. . . .

A.  I recommend removal of all formulary restrictions, *comma*, and guidelines for Neurontin.  That's one way to read it.

Q.  Where's the comma?

A.  There isn't.  But I'm just saying that in reading it, that's what – I – again, what I told you before about the grammar element.

(Exh. B, Wieder Dep.  at 409:21-411:15 (emphasis added).)

Kaiser's attempt to reconcile Dr. Wieder's deposition testimony with his prior declaration is as incoherent as Dr. Wieder's explanations.  First, the clear implication of Dr. Wieder's declaration was that he played a pivotal role in formulary decisions made by the P&T Committee. He stated that he recommended formulary expansion in 1997 and that the P&T Committee adopted his recommendation.  Similarly, he stated that he recommended removal of restrictions

17

in 1997 and that the P&T Committee adopted his recommendation. (Exh. A, Wieder Decl. ¶ 8.) His deposition testimony, quoted at length above, makes clear that Dr. Wieder's role was tangential at best. He never presented to the P&T Committee and had no knowledge of their decision-making process. All he did was respond to e-mail inquiries directed to several physicians. (Def. Mem. [2445] at 17-19.)

Second, Dr. Wieder stated unequivocally in his deposition that "[i]n or a around September 1999, I recommended removal of all formulary restrictions and guidelines for Neurontin." (Exh. A, Wieder Decl. ¶ 8.) During his deposition, confronted with conflicting documents showing that the P&T Committee did not remove guidelines, but added them, Dr. Wieder sought to rationalize this sworn statement, as Kaiser did in its response to Pfizer's motion. Kaiser stated: "Dr. Wieder clearly indicated that when he stated in his declaration that he recommended removal of formulary restrictions and guidelines, he was referring to the removal of guidelines on which doctors may prescribe Neurontin, not of general guidelines for how to use medications." (Pl. Opp. [2402] at 14-15.) In other words, Kaiser argued that Dr. Wieder intended the word "guidelines" to mean the exact same thing as "restrictions." This explanation makes no sense. It would not only render the word "guidelines" redundant, it is inconsistent with the way Kaiser uses the word "guidelines," which refers to its recommendations for how to use medication. (*See* Exh. J, Chiefs of Neurology Meeting, June 17, 1999.)

Moreover, this explanation contradicts the first explanation that Dr. Wieder offered, where he attempted to insert an imaginary comma in his declaration, in order to suggest that he recommended *adding* guidelines. (Exh. B, Wieder Dep. at 409:21-411:16.)

This Court specifically relied upon Dr. Wieder's declaration in denying Pfizer's motion for summary judgment as to Kaiser. (Mem. & Order [2309] at 8.) Dr. Wieder's deposition testimony is irreconcilable with his declaration, which should be stricken.

## CONCLUSION

For all the foregoing reasons, the Court should set aside Magistrate Judge Sorokin's

Order denying Pfizer's motion and issue an Order (1) compelling Kaiser to make Dr. Wieder available for a two-hour continuation of his deposition in either New York or Boston, (2) directing Kaiser to reimburse Pfizer for expenses and attorneys' fees incurred in connection with the continued deposition of Dr. Wieder, (3) directing Kaiser to stipulate to the authenticity of the website pages at issues, as well as any other website pages pertaining to Neurontin or the conditions at issue in this litigation, and (4) striking the Declaration of Dr. Wieder submitted in opposition to Pfizer's motion for summary judgment.

Dated: February 5, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:   /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:   /s/ Raoul D. Kennedy
       Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400

-and-

WHEELER TRIGG O'DONNELL LLP

By:   /s/ James E. Hooper
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800

-and-

19

WHITE AND WILLIAMS LLP

By:     /s/ David B. Chaffin
        David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and*
*Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 5, 2010.

/s/ David B. Chaffin
David B. Chaffin

20