# EXHIBIT B

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3

 4     ------------------------------)

 5   In re: NEURONTIN MARKETING,    )MDL Docket No. 1629

 6   SALES PRACTICES AND PRODUCTS   )

 7   LIABILITY LITIGATION           )Master File No.

 8   ------------------------------)04-10981

 9   THIS DOCUMENT RELATES TO:      )

10   THE GUARDIAN LIFE INSURANCE    )Judge Patti B. Saris

11   COMPANY OF AMERICA v. PFIZER   )

12   INC., 04 CV 10739 (PBS)        )Magistrate Judge Leo

13   ------------------------------)T. Sorokin

14

15

16          Videotaped Deposition of

17      NICOLAS WIEDER, D.O., at 300 S. Grand Avenue,

18      Los Angeles, California, commencing at

19      9:22 p.m., Tuesday, January 12, 2010, before

20      Janice Schutzman, CSR No. 9509.

21

22

23

24   Job No: 234602

25   PAGES 1 - 536
```

Page 2

```
 1   APPEARANCES OF COUNSEL:
 2
 3      FOR KAISER:
 4
 5        HAGENS BERMAN SOBOL SHAPIRO LLP
 6        BY: THOMAS M. SOBOL, ESQ.
 7        55 Cambridge Parkway
 8        Cambridge, Massachusetts  02142
 9        617.482.3700
10        tom@hbsslaw.com
11
12
13      FOR PFIZER:
14
15        SKADDEN, ARPS, SLATE, MEAGHER &
16        FLOM LLP
17        BY: MARK S. CHEFFO, ESQ.
18        Four Times Square
19        New York, New York  10036-6522
20        212-735.3000
21        mcheffo@skadden.com
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL (CONTINUED):
 2
 3      FOR PFIZER:
 4
 5        WHEELER TRIGG O'DONNELL LLP
 6        BY: JAMES E. HOOPER, ESQ.
 7        1801 California St.
 8        Suite 3600
 9        Denver, Colorado  80202
10        303.244.1800
11
12
13      FOR THE WITNESS:
14
15        KAPLAN FOX & KILSHEIMER LLP
16        BY: LINDA P. NUSSBAUM, ESQ.
17        850 Third Avenue
18        New York, New York  10022
19        212.687.1980
20        lnussbaum@kaplanfox.com
21
22
23      ALSO PRESENT:
24
25        DAVID WEST, Videographer
```

Page 4

```
 1   Tuesday, January 12, 2010; Los Angeles, California
 2             9:22 a.m.
 3          -- oOo --
 4      (Deposition Exhibits 1 through 7 were
 5   marked for identification.)
 6
 7      THE VIDEOGRAPHER:  Good morning.  My name
 8   is David West of Veritext.  The date today is
 9   January 12th, 2010, and the time is approximately
10   9:22 a.m.  The deposition is being held in the      09:21AM
11   office of Skadden Arps, located at 300 South Grand
12   Avenue, Suite 3200, Los Angeles, California.
13      The caption of this case is In re:
14   Neurontin Marketing and Sales Practices Litigation.
15   It is in the United States District Court for the   09:21AM
16   District of Massachusetts.  The name of the witness
17   is Nicolas A. Wieder, D.O.
18      At this time, the attorneys will identify
19   themselves and the parties they represent, after
20   which our court reporter, Janice Schutzman of       09:21AM
21   Veritext, will swear in the witness and we can
22   proceed.
23      MS. NUSSBAUM:  Linda Nussbaum for the
24   witness.
25      MR. SOBOL:  Thomas Sobol, Hagins, Berman,   09:21AM
```

Page 5

```
 1   Sobol, Shapiro, of counsel for Kaiser.
 2      MR. CHEFFO:  My name is Mark Cheffo from
 3   Skadden, Arps, Slate, Meagher & Flom, for Pfizer.
 4      MR. HOOPER:  Jim Hooper, Wheeler, Trigg,
 5   O'Donnell, Pfizer.                   09:22AM
 6
 7      NICOLAS WIEDER, D.O.,
 8   the witness, having been administered an oath by the
 9   Court Reporter, testified as follows:
10
11            EXAMINATION
12   BY MR. CHEFFO:
13      Q.  Good morning, Dr. Wieder.  My name is Mark
14   Cheffo as you just heard.  But for the record, I
15   represent Pfizer.  I'm here with my colleague, Jim   09:22AM
16   Hooper.  We also represent Pfizer.
17      Have you ever had your deposition taken
18   before?
19      A.  Yes.
20      Q.  Okay.  So I take it you're generally      09:22AM
21   familiar with some of the ground rules?
22      A.  Yes.
23      Q.  Okay.  I'm just going to cover a few of
24   them just so we're on the same page.
25      You understand that you're under oath here   09:22AM
```

Veritext Corporate Services

800-567-8658

973-410-4040

Page 42

1  ICD-9 purposes if the main purpose of their
2  complaint was low back pain but they mentioned
3  ancillary or you treated ancillary pain?
4      MR. SOBOL: Objection.
5      MS. NUSSBAUM: And I'll ask you not to          10:03AM
6  speculate, so only if you know the answer. If you
7  know --
8      THE WITNESS: I -- I --
9      MS. NUSSBAUM: -- with certainty.
10     THE WITNESS: It depends on the             10:03AM
11 examination, and it -- that's -- it can't be
12 answered the way that you're asking the question.
13 It just can't be.
14 BY MR. CHEFFO:
15     Q. Patients who have -- who you've treated     10:03AM
16 with low back pain, do they typically also have
17 other problems, other pain problems?
18     A. Sometimes they do, sometimes they don't.
19     Q. Okay. And for those that do, do you
20 attempt to treat them?                          10:03AM
21     A. It depends what -- if it's within my scope
22 of practice.
23     Q. And if it's within your scope of practice
24 and you treat them, how is it coded?
25     MR. SOBOL: Objection.                      10:03AM

Page 43

1      THE WITNESS: Whatever my judgment was
2  about the examination, what I thought the diagnosis
3  was. It has to be accurate, so whatever is
4  accurate, that's what we do.
5  BY MR. CHEFFO:                                 10:03AM
6      Q. Okay. With respect to preparing for this
7  deposition, we talked a little bit about that,
8  what -- you had a conversation with the lawyers that
9  you told us about for -- a few weeks ago for about
10 two hours.                                      10:04AM
11     What else did you do to prepare, if
12 anything?
13     A. There were some documents that I reviewed.
14     Q. Who -- where did you get the documents
15 from?                                           10:04AM
16     A. They were emailed to me.
17     Q. By who?
18     A. By Mitch Cohen.
19     Q. Did you ask for any documents?
20     A. No.                                      10:04AM
21     Q. Do you know who selected the documents?
22     A. Not entirely, no.
23     Q. Do you have any idea who selected them?
24     A. Not -- I assume Mitch sent them to me, that
25 he knew about them, but I don't know who selected   10:04AM

Page 44

1  them.
2      Q. When did you receive those documents?
3      A. I think the -- I received them just before
4  New Year's, sometime before New Year's.
5      Q. Did you ask for any additional documents?   10:04AM
6      A. No.
7      Q. Did you review any documents other than the
8  documents that were given to you by the Kaiser
9  lawyer?
10     A. No.                                      10:05AM
11     Q. Did you review any of your own personal
12 records or anything on your computer?
13     A. No.
14     Q. Do you have any materials or documents
15 about Neurontin or gabapentin in your office or on   10:05AM
16 your personal effects?
17     A. I have tons of material, yeah.
18     Q. Okay. Has anyone ever told you to save any
19 of that material, not destroy it or throw it out?
20     A. No, I -- no, not at all.                 10:05AM
21     Q. And I take it in the normal course of your
22 business, like you do with other documents, you
23 throw those out when you don't have a need for them?
24     MR. SOBOL: Objection.
25     THE WITNESS: Most of the times it comes     10:05AM

Page 45

1  down to forgetting to throw things out that I
2  should. I just -- I'm a little bit of a pack rat
3  when it comes to articles. I haven't fully
4  converted to the computer age, and the tactile
5  element of the paper is still -- confers a certain   10:06AM
6  type of security to me. I don't know what, but I
7  like the paper.
8  BY MR. CHEFFO:
9      Q. So if we were to go back to your home
10 office or your office, what types of documents about  10:06AM
11 Neurontin or antiepileptics would we find?
12     A. Books, articles, monographs. I suppose. I
13 haven't looked in a long time through that stuff,
14 but I'm -- I think it's a good assumption.
15     Q. Certainly if someone had asked you to      10:06AM
16 collect those, you could have done that; right?
17     A. I wouldn't have wanted to, but I probably
18 could have.
19     Q. Are you aware of whether you ever were
20 asked to provide documents to the lawyers in this    10:06AM
21 litigation at any point?
22     A. I was never asked to provide documents.
23     Q. So I guess --
24     A. My CV was the only thing I was asked
25 specifically to provide.                         10:06AM

12 (Pages 42 to 45)

Page 46

1    Q.  And that was just within the last few
2  weeks?
3    A.  Yes.
4    Q.  And I take it the next question of --
5  either you or no one under your control or at your       10:07AM
6  direction provided any documents to the lawyers?
7    A.  No.  I've been deposed before, so the
8  minute that I knew this might happen, I just
9  don't -- I just -- I don't want to have any extra
10  work in that way.  I just didn't review anything,       10:07AM
11  look at anything, doing anything.
12    Q.  So you made a conscious effort not to?
13    A.  Yeah, absolutely.  It was my vacation.  It
14  was Christmas, New Year's vacation.  I was not
15  interested in pouring over stuff, and so I didn't.      10:07AM
16    Q.  Do you have an understanding why you were
17  being deposed?
18    A.  Yeah.
19    Q.  What was your understanding?
20       MR. SOBOL:  Objection.  Is this important     10:07AM
21  because then I've got to confer with him as to the
22  source of the information.
23       MR. CHEFFO:  Well, I can ask him a
24  question, you know, that will limit it, I think, as
25  I've done before.                    10:08AM

Page 47

1  BY MR. CHEFFO:
2    Q.  Doctor, here's what -- I'm not looking to
3  try and understand what your lawyers may have told
4  you about what the deposition was about, but, you
5  know, did you have a general understanding about     10:08AM
6  why -- what I would be talking to you about today?
7    A.  Yeah.
8       MR. SOBOL:  Apart from what the lawyers
9  told you.
10       THE WITNESS:  Yes.            10:08AM
11  BY MR. CHEFFO:
12    Q.  And what is that?
13    A.  What was in that -- the thing that I
14  signed.  That was my understanding.  It was pretty
15  specific, actually.                 10:08AM
16    Q.  "That thing" meaning your sworn
17  declaration?
18    A.  Yeah.
19    Q.  And we'll talk a little bit more about
20  that, but let me just ask you a few questions about   10:08AM
21  that.
22       You understood that you signed a
23  declaration in this litigation under the penalties
24  of perjury?
25    A.  Yes.                     10:08AM

Page 48

1    Q.  And you had a chance to review it before
2  you signed it?
3    A.  Yes.
4    Q.  Is it something that you prepared, or was
5  it prepared for you?                  10:08AM
6    A.  It was something that I spoke aloud, but I
7  didn't type up.  So I didn't actually do the
8  physical preparation, but I spoke the words, you
9  know, and they were fashioned in a better way.
10    Q.  Did you receive a draft before you signed    10:09AM
11  it?
12    A.  No.  I received a copy of it, asking if I
13  would sign it, if I felt comfortable signing it.
14    Q.  And did you sign it?
15    A.  Yes.                     10:09AM
16    Q.  So basically, the copy and the draft you
17  received was the copy that you ultimately signed?
18    A.  Yes.
19    Q.  In reviewing it and evaluating the
20  affidavit, did you look for -- did you look at any    10:09AM
21  documents, either to refresh your recollection or to
22  confirm your understanding?
23    A.  I'm not clear.  You mean --
24    Q.  In other words, what -- did you need to
25  look at any documents other than the affidavit or    10:09AM

Page 49

1  the declaration in order to confirm that what you
2  were signing was a hundred percent accurate?
3    A.  No, I don't --
4    Q.  Okay.  And you understood it was very
5  important to be as accurate as possible; correct?    10:10AM
6    A.  Of course.
7    Q.  Because you knew the judge and others may
8  rely on this?
9    A.  Perhaps even another lawyer.
10    Q.  Have you -- when was the last time you     10:10AM
11  looked back at that declaration?
12    A.  Looked at it yesterday.
13    Q.  And was it accurate?
14    A.  I think so.
15    Q.  Is there anything that you'd change?       10:10AM
16    A.  That I changed?
17    Q.  That you -- no, I'm sorry.
18       Is there anything that you would change?
19    A.  I don't think so, no.
20    Q.  The documents that were sent to you by the   10:10AM
21  lawyers, did you review all of them?
22    A.  Not all of them.
23    Q.  We have a copy here that have been -- do
24  you remember which ones you reviewed and which ones
25  you didn't review?                  10:11AM

13 (Pages 46 to 49)

Page 50

1    A.  Those are the ones I reviewed.
2        I saw the documents, and some of them I saw
3    the titles, but I didn't go through the -- I didn't
4    review them in any -- with any intent to review
5    anything.  But these right here.          10:11AM
6    Q.  Okay.  So we -- I've been given some
7    documents.
8        These are the documents that were sent to
9    you and that you reviewed?
10   A.  Yes.                                   10:11AM
11   Q.  There were other documents sent to you in
12   addition to these?
13   A.  That's right.
14   Q.  And it's your testimony that you didn't
15   look at them at all, or you didn't read them?    10:11AM
16   A.  No.  I saw the titles, but I didn't -- you
17   know, some of the titles, I saw where they came
18   from, but I didn't review them.
19   Q.  And why is it that those weren't produced?
20   A.  Because I didn't review them.           10:11AM
21   Q.  Well, you read the title.
22   A.  I read the title, yeah, but I didn't, I
23   don't -- what do you mean by "review"?
24       MS. NUSSBAUM:  Well --
25       MR. SOBOL:  Your subpoena says produce    10:11AM

Page 51

1    documents he reviewed.
2        MS. NUSSBAUM:  Right, so --
3    BY MR. CHEFFO:
4    Q.  There are certain documents that you read
5    the titles to and you chose not to read any more?    10:12AM
6        Is that fair?
7    A.  Yes.
8    Q.  And there are certain titles that --
9    certain documents that you read the title of
10   something about and you decided to read either fully    10:12AM
11   or in substantial completion?
12   A.  Yes.
13   Q.  And the ones that you reviewed the title or
14   some other heading and read, you produced those?
15   A.  Yes.                                    10:12AM
16   Q.  And the ones that you reviewed the title
17   and decided not to read any further, you didn't
18   produce those?
19   A.  Right.  Some of them, I didn't even review
20   the title.  So -- some I didn't even look at at all.    10:12AM
21   Q.  Are those documents still in your control?
22   A.  Yeah.  They're in my computer.
23   Q.  Could you -- if we took a break, could your
24   secretary find out what documents those were?
25   A.  I think we know what the documents -- those    10:12AM

Page 52

1    were.  Those are the -- all the -- we know what
2    those documents were.  And I don't have access to my
3    computer right now.  And I don't have a secretary.
4    Q.  That's easier.  If you know what they are,
5    you can just tell me.                       10:13AM
6    A.  Well, I don't know offhand because I didn't
7    really take note of them in any serious way.
8        MS. NUSSBAUM:  Mr. Cheffo, I think that the
9    notice that you served here requested copies of
10   documents that were reviewed by the witness.  The    10:13AM
11   witness has testified that he's produced to you
12   copies of documents that were reviewed by him.
13       I think that any other documents that were
14   not reviewed by this witness would be attorney work
15   product and not subject to production.      10:13AM
16       MR. CHEFFO:  You can make that objection.
17   BY MR. CHEFFO:
18   Q.  What other documents did you receive but
19   not read completely?
20       MS. NUSSBAUM:  That misstates his         10:13AM
21   testimony.  His testimony was anything that he read
22   at all, that he reviewed at all, he's produced.
23   BY MR. CHEFFO:
24   Q.  You read the headings of some documents --
25   A.  Yes.

Page 53

1    Q.  -- that were --
2    A.  Yes.
3    Q.  -- not produced; right?
4    A.  Yes.
5    Q.  Okay.  What were those?               10:13AM
6    A.  The ones that had -- some of them that had
7    DUAT on them.  Drug Utilization Action Team is what
8    it stands for.
9    Q.  And why did you decide not to read those?
10   A.  Because I had been to those meetings years    10:14AM
11   before.  I didn't feel like rereading all the stuff
12   that -- you know, it was just charts and tables.  I
13   was on vacation, not interested in spending time
14   looking over those things again.
15   Q.  Are there any other documents that you at    10:14AM
16   least identified and did not review?
17   A.  Most of the lawyer -- most of the lawyer
18   stuff of expert witness stuff, most of it I didn't
19   review.
20   Q.  Did you get expert reports other than the    10:14AM
21   ones that were produced?
22   A.  Yes.
23   Q.  Do you remember any of them?
24   A.  Not really.  If I saw the names, I would
25   remember them, but I didn't -- wasn't interested in    10:14AM

14 (Pages 50 to 53)

Page 54

```
1    reading them. I -- it was -- I wasn't interested in
2    reading them.
3        Q.  Well, there are -- there is one expert
4    report here that's pretty fat; right?
5        A.  Right.                    10:15AM
6        Q.  That's John Abramson's report?
7        A.  Uh-huh.
8        Q.  You read that one?
9        A.  I went through that one, yeah.
10       Q.  Why did you read that one and not the    10:15AM
11   others?
12       A.  Because it was kind of a -- I thought it
13   was kind of a short and dirty way of getting a
14   review of all of them.  It was -- looked like it was
15   kind of a review of all the expert stuff rather than  10:15AM
16   having to read every individual expert.
17       Q.  Well, it's 122 pages.
18       A.  Yeah.  So I --
19       Q.  That's not short and dirty, is it?
20       A.  It is.  It is in the sense that I didn't --  10:15AM
21   you know, I didn't review it as if I was an expert
22   witness reviewing it.  I was reviewing it to
23   familiarize myself with it.
24           And so I thought, well, I was -- it was --
25   I was in Tyler on my vacation.  I had about three    10:15AM
```

Page 55

```
1    hours before my tee time, and I thought, you know,
2    okay, let me just -- if I had -- if I have to look
3    at one of them, which one do I look at?  Let me look
4    at the one that, you know, maybe has -- could review
5    all of them for me.                10:16AM
6           So I just went page by page.  I didn't -- I
7    don't think that -- I didn't see my role as an
8    expert witness, and so I saw my role mostly to
9    familiarize myself with some of the information.
10       Q.  Did, after reading the Abramson report, did  10:16AM
11   you take any action?
12       A.  No.
13       Q.  Well, I mean, have you taken any action at
14   Kaiser or professionally as a result of the Abramson
15   report?                        10:16AM
16       A.  Oh.  It's been just a short time since I
17   read it, and I wouldn't say -- based solely on the
18   Abramson report?  No.
19       Q.  Or any of the documents you read.
20       A.  Well, yeah.  Yeah.                10:16AM
21       Q.  What did you do?
22       A.  First, I felt a little embarrassed.  And
23   then I just started to rethink the role I had as a
24   leader that recommended, you know, algorithms for
25   treatments.                    10:17AM
```

Page 56

```
1        Q.  What do you mean by that?
2           MR. SOBOL:  Has he finished his answer?  I
3    wasn't looking up.
4    BY MR. CHEFFO:
5        Q.  I didn't interrupt you, did I?        10:17AM
6        A.  No.
7           MR. SOBOL:  Sorry.
8    BY MR. CHEFFO:
9        Q.  What do you mean by that, as a leader who
10   recommended algorithms for treatment?        10:17AM
11       A.  I was -- I have two roles.  One is as a
12   regular doctor who sees patients and tries the best
13   they can to treat them.  And then the other role is
14   to analyze and help advise on what types of
15   treatments have the best evidence for an entire    10:18AM
16   group of doctors.
17       Q.  Could you be a little more specific?
18       A.  In regards to?
19       Q.  Well, let's break it down, I guess.
20           You have your role as treating physician?    10:18AM
21       A.  Uh-huh.
22       Q.  For that -- that you're just like every
23   other doc that --
24       A.  That's right.
25       Q.  -- that we would expect.  Right?  And then    10:18AM
```

Page 57

```
1    you have some type of an administrative oversight
2    role within Kaiser?
3        A.  That's right.
4        Q.  And I want to talk about the administrative
5    role for just --                    10:18AM
6        A.  Okay.
7        Q.  -- a few minutes.
8           Within that role, you said something about
9    using algorithms to help you and your colleagues
10   treat patients; right?                10:18AM
11       A.  Yes.
12       Q.  And I understand that you may understand
13   that, but I'm going to ask you some specifics
14   because the judge or jury --
15       A.  Okay.                        10:18AM
16       Q.  -- who's looking at this doesn't understand
17   what --
18       A.  Sure.
19       Q.  -- that means.
20       A.  Sure.                    10:18AM
21       Q.  So can you break it down so an average
22   person would understand what that means?
23       A.  There -- what is the -- it all boils down
24   to the right treatment for the right patient.  And
25   the right treatment is based on many factors, but    10:18AM
```

15 (Pages 54 to 57)

1  chairman decides where it goes.  It could go to any
2  committee.  It depends on what the recommendation
3  is.  It could go to safety.  It could go to quality.
4  It could go to P&T.  I don't know.  But it's a very
5  complicated, kind of intricate web.  And so          01:53PM
6  depending on what the necessity is, then the -- that
7  decision is made, not by me.
8       Q.  Well, but I mean, you know, you -- you
9  submitted an affidavit in this case, a
10  declaration --                                        01:54PM
11      A.  Yes.
12      Q.  -- right, under oath?  Right?
13      A.  Okay.
14      Q.  And it talked about formulary placement;
15  right?                                                01:54PM
16      A.  Yeah.
17      Q.  And I'll --
18      A.  What section are you talking about in the
19  affidavit?
20      Q.  I'll show you in a minute.                    01:54PM
21       But I mean, do you have an understanding
22  about how decisions are made from a nuts and bolts
23  perspective about formulary placement?
24      A.  You know, if you're going to -- I wish you
25  would --                                              01:54PM

1       MR. SOBOL:  Object to form.
2       THE WITNESS:  -- show me what you're
3  talking about.
4  BY MR. CHEFFO:
5       Q.  I want to ask you first generally.  Forget   01:54PM
6  about your affidavit.
7       A.  I don't feel comfortable answering it
8  generally.
9       Q.  Well, I'm asking a question.
10      A.  Okay.                                         01:54PM
11      Q.  Do you have an understanding, as you sit
12  here today, about how formulary decisions are made
13  by Kaiser or the P&T committee, whoever makes those
14  decisions?
15      A.  I have --                                     01:54PM
16      MR. SOBOL:  Objection to the form.
17      THE WITNESS:  I have a general
18  understanding.  I don't have a strict nuts and
19  bolts -- I'm not -- I don't have the expert nuts and
20  bolts bird's eye view of it.                          01:55PM
21  BY MR. CHEFFO:
22      Q.  Do you know how they would view a
23  recommendation from you or from DUAT?
24      MS. NUSSBAUM:  Who's the "they" that you're
25  referring to?                                         01:55PM

1       MR. CHEFFO:  The P&T committee.
2       THE WITNESS:  I don't know how they would
3  view it.  I know they would take it in and discuss
4  it, but they have a certain autonomy.
5  BY MR. CHEFFO:                                         01:55PM
6       Q.  How do you know that?
7       A.  Because we've -- because I've --
8  remember -- not specifically, but in general I
9  remember making -- you know, we have discussions and
10  making recommendations before, and it doesn't always  01:55PM
11  happen the way that we recommended it.  So I know
12  that they have their own decision-making process.
13      Q.  So based on your experience, you've been
14  aware of recommendations DUAT has made because
15  you're a member of DUAT; right?                       01:55PM
16      A.  Yes.
17      Q.  And you know that sometimes those
18  recommendations are not ultimately followed by the
19  P&T committee?  Is that your testimony?
20      MR. SOBOL:  Objection.                            01:56PM
21      THE WITNESS:  I don't remember any specific
22  time.  I don't remember any specific one.  It would
23  make sense to me because I -- there's so much input
24  that goes into those committees that has to be
25  weighed by so many people that it's completely        01:56PM

1  possible that a recommendation might not be followed
2  in the same strict way.
3  BY MR. CHEFFO:
4       Q.  You just told me -- two minutes ago, I
5  thought you said you remember a specific situation     01:56PM
6  where DUAT made a recommendation.  It wasn't
7  implemented.  Right?
8       A.  No.
9       MR. SOBOL:  Objection.  Misstates the
10  testimony.                                             01:56PM
11      THE WITNESS:  I don't think I said that.
12  BY MR. CHEFFO:
13      Q.  Okay.  Are you aware of any --
14      THE REPORTER:  I'm sorry.  Misstates the
15  testimony?                                             01:56PM
16      MR. SOBOL:  Yes.
17  BY MR. CHEFFO:
18      Q.  Are you aware of any situation where DUAT
19  made a recommendation and it was not followed by the
20  P&T committee?                                         01:56PM
21      A.  No.
22      Q.  And am I correct that you don't know what
23  the steps are -- once the recommendation is made by
24  DUAT, you don't know how it ultimately gets to the
25  P&T committee?                                         01:57PM

56 (Pages 218 to 221)

Page 222

1      MR. SOBOL: Objection.
2      MS. NUSSBAUM: I --
3      MR. CHEFFO: Just object. We don't need a
4  whole speech.
5  BY MR. CHEFFO:
6      Q. Go ahead.
7      A. I don't know the specific steps. If I -- I
8  know it gets there, but I don't know how -- you're
9  asking me how it gets there. I don't know
10 specifically how it gets transported there, who does   01:57PM
11 it, under what -- you know, how it gets done.
12     Q. And in the areas of pain, your specialty,
13 do you ever present to the P&T committee?
14     A. I've never presented to the P&T committee.
15     Q. However the information gets there, is that   01:57PM
16 done through the chair, Dr. Hyatt, from the DUAT
17 committee?
18     A. I don't know the -- I don't know.
19     Q. Fair enough. I mean, I don't mean to
20 interrupt you, but if you don't know, I just want to   01:57PM
21 kind of keep --
22     A. Drug Information Systems is really a key
23 player. They have all the -- you know, the
24 doctorate experts, and they are a presence
25 throughout these committees. I don't know exactly   01:57PM

Page 223

1  if they do it, but I know a lot of information
2  sharing is done by them. But the bottom line, to
3  answer your question is, I don't know exactly how
4  it's done.
5      Q. It's not through you?   01:58PM
6      A. It's not through me personally, absolutely
7  not, no.
8      Q. And Drug Information, that's an entity -- a
9  Kaiser function; right?
10     A. I think so, yeah. They -- they're -- as   01:58PM
11 far as I know.
12     Q. And as you said, they're integrated in all
13 of these processes?
14     A. The ones that I'm involved with, they have
15 been integrated.   01:58PM
16     MS. NUSSBAUM: Can you define what you're
17 saying is integrated?
18 BY MR. CHEFFO:
19     Q. And who's the main person that you dealt
20 with at DIS?   01:58PM
21     A. The main people that I deal with are the
22 ones who either come into the meeting and present
23 the information or give us the -- if there are
24 articles that we need to review, we ask them for
25 them, and it could be -- it could be an assortment   01:58PM

Page 224

1  of people, whoever -- they have multiple doctors who
2  work -- who do the presentation, and so it could be
3  any of them, but they all have the same kind of
4  research doctor level person. They come in and
5  present to the committee.   01:59PM
6      Q. And they -- at the DUAT committee?
7      A. Yes.
8      Q. Because that's the only committee that
9  you're a part of; right?
10     A. I'm part of the -- just the regular   01:59PM
11 regional pain committee as well, but that's more of
12 a clinical -- having to deal with our own
13 administrative stuff and our -- you know, how many
14 nurses we have and things like -- more from the
15 administrative pain process.   01:59PM
16     Q. Does DIS participate in that administrative
17 function?
18     A. They sometimes will -- yeah, they sometimes
19 will present at that meeting as well. They present
20 at many meetings. They present at all the   01:59PM
21 department meetings, the regional department
22 meetings. They have to because of the -- there are
23 medications that affect -- that may affect different
24 departments, and so they let us know what's new,
25 what's coming down the pike, things like that.   01:59PM

Page 225

1      Q. Did -- at any of your DUAT meetings, did
2  anyone ever discuss the Abramson report?
3      A. I don't recall.
4      Q. Did anyone ever discuss any of the expert
5  reports in this case?   02:00PM
6      A. I don't recall.
7      Q. You know that some of the expert reports in
8  this case deal with efficacy of Neurontin?
9      A. I haven't read -- remember, I haven't read
10 all the expert reports --   02:00PM
11     Q. Well, I meant --
12     A. -- so I don't know if they would have
13 presented those or not.
14     Q. Okay. But you did read the headings at
15 least of some of them; right?   02:00PM
16     A. The headings -- by "headings," I meant the
17 name of the person.
18     Q. Well, so you -- is it your testimony that
19 you all of a sudden saw this 122-page document, and
20 you just saw "Expert Report of John Abramson," and   02:00PM
21 you decided to pick that one?
22     A. The -- that -- there was -- some reports
23 were longer than others. And my -- when I looked at
24 it -- I didn't look -- I looked at the titles of
25 some, looked at the name of some, so it wasn't all   02:01PM

Page 246

1    A.  Including Neurontin.
2    Q.  -- including Neurontin.
3        Not just Neurontin alone?
4    A.  You asked me typically what I do.  No.  Has
5  it happened?  Probably.  But if you're asking for a   02:19PM
6  general approach, when they first come in, I might
7  do that.
8    Q.  What other medicines would you prescribe as
9  this cocktail?
10   A.  A tricyclic.                         02:20PM
11   Q.  So you would give them both a TCA and
12  Neurontin?
13   A.  I might.
14   Q.  Well, I'm asking you about your practice.
15   A.  Yeah, I might do -- as a general practice,   02:20PM
16  I might do that, plus a narcotic.  Yeah.  These
17  patients are just in excruciating pain.
18   Q.  Is the main differentiation about how much
19  pain?  So in other words, is it fair to say if
20  someone comes in and they're not in excruciating   02:20PM
21  pain, you might say, let me try Neurontin?
22   A.  A tricyclic.
23   Q.  A tricyclic for --
24   A.  Yeah, I might -- yeah, I might -- yeah,
25  exactly.  I usually would.            02:20PM

Page 247

1    Q.  TCA first?
2    A.  I usually would.
3    Q.  Is the -- are the TCAs approved by the FDA
4  for postherpetic neuralgia?
5    A.  It --                               02:20PM
6        MR. SOBOL:  Objection.
7        THE WITNESS:  To me, it has the --
8  approximately the same evidence base.  The evidence
9  base for the --
10  BY MR. CHEFFO:                           02:20PM
11   Q.  That's not what I asked you.  Are TCA --
12   A.  Then the answer is I don't know.
13   Q.  You don't know if there's an FDA approval
14  for TCA for postherpetic neuralgia?
15   A.  Can you repeat the original question you   02:21PM
16  asked me.
17   Q.  That was the question.
18       Do you know if TCAs are approved or any TCA
19  are approved by the FDA --
20   A.  I don't think so.               02:21PM
21   Q.  Well, you need to let me finish.
22   A.  Sure.
23   Q.  -- for postherpetic neuralgia?
24   A.  No, I don't think they are.  They might be,
25  but I don't know.                   02:21PM

Page 248

1    Q.  But you still use them as part of a
2  cocktail to treat --
3    A.  Yes.
4    Q.  -- right?
5        And you've done that off label?   02:21PM
6        MR. SOBOL:  Objection.
7  BY MR. CHEFFO:
8    Q.  Well, strike that.
9        If, in fact, they're not approved, would
10  you have done it off label; right?        02:21PM
11   A.  They would have been considered off label,
12  yeah.
13       It's a different set of circumstances with
14  tricyclics.
15   Q.  And do you know whether Neurontin or   02:21PM
16  gabapentin is approved for postherpetic neuralgia?
17   A.  I believe that was one of the -- I don't
18  know -- I know that -- oh, you know, I couldn't be
19  sure offhand.  In terms of indicated for it, the
20  answer would be I don't know.          02:22PM
21   Q.  Well, if you wanted to find out, what would
22  you do?
23   A.  I would ask Drug Information Systems and
24  ask them.  I don't know to the PDR for it.  I go to
25  our Drug Information System people.     02:22PM

Page 249

1    Q.  Okay.  You told me earlier that you would
2  do some literature reading and that's how you get
3  your information --
4    A.  Yeah, that's right.  That's one of the
5  ways.                                02:22PM
6    Q.  If you need to know right now, like --
7    A.  I'd call Drug Information Systems.
8    Q.  And what would you say to them?
9    A.  If I needed to know, which I wouldn't -- I
10  don't see a situation in which I would absolutely   02:22PM
11  need to know, unless, you know, in the rare
12  circumstances that I was being --
13       MS. NUSSBAUM:  Just answer the question.
14       MR. CHEFFO:  No, no, don't interrupt his
15  conversation.
16       THE WITNESS:  In the rare circumstance that
17  I was being deposed, I would need to know --
18       THE REPORTER:  I'm sorry.  Everybody's
19  speaking at the same time.
20       MR. CHEFFO:  I don't stop him in the middle   02:22PM
21  of the --
22  BY MR. CHEFFO:
23   Q.  Go ahead.
24   A.  Except for the rare circumstance in which I
25  was being deposed, I actually don't really need to   02:22PM

Page 266

1   identification.)
2   BY MR. CHEFFO:
3       Q.   Doctor, we've marked your declaration.
4   It's two pages, with the third page has your
5   signature on it.                          02:50PM
6           Have you seen that before?
7       A.   Yes.
8       Q.   It says executed on June 15th, 2009.
9           Is that consistent with your recollection?
10      A.   Yes.                             02:50PM
11      Q.   It also says that it was declared "under
12  penalty of perjury under the laws of the United
13  States of America," on the first page?
14      A.   Yes.
15      Q.   And you read this carefully and believed it   02:50PM
16  to be accurate?
17      A.   Yes.
18      Q.   Is there anything inaccurate or misleading
19  or in error about it?
20      A.   Not that I see.                  02:50PM
21      Q.   You told me earlier lawyers drafted this
22  for you and you signed it and sent it back?
23      A.   Yes.  What I told you was that we had a
24  discussion and that they codified my words in this
25  way and -- you know, as a result of the things we   02:51PM

Page 267

1   discussed, and then I -- and they sent it out, and
2   then I signed it.
3       Q.   There were no drafts or revisions to --
4       A.   Not that I recall.
5       Q.   Do you know why this was filed under seal?   02:51PM
6       A.   I don't know what that means.
7       Q.   Is there anything particularly confidential
8   about this document?
9       A.   Not personally.  There's nothing that I
10  wouldn't mind divulging about it personally.  But I   02:51PM
11  don't know if -- what organizations or, you know,
12  what the -- what lawyers think is something that
13  should be protected or not.
14      Q.   From your administrative role at Kaiser, is
15  there anything in here that's sensitive to Kaiser?   02:52PM
16      A.   I don't -- I don't know.  I mean, I'd have
17  to speculate about it, but I don't know specifically
18  if --
19      Q.   Okay.  You -- it says here that currently
20  you are a member of the Kaiser Permanente Southern   02:52PM
21  California region's Drug Utilization Action Team;
22  right?
23          I'm in paragraph 3, Doctor.  Paragraph 3,
24  second sentence.
25      A.   Yes.                             02:52PM

Page 268

1       Q.   When did you become a member of the
2   Southern California DUAT?
3       A.   I don't remember exactly.  I think it
4   was -- I don't remember.  Maybe -- you know, I don't
5   remember the exact year.  Probably for the last   02:52PM
6   least six years, something like that, at least.
7       Q.   Does each region have its own DUAT?
8       A.   If it's not called DUAT, it's some
9   organization has the same function.
10      Q.   Okay.  Are the Southern California's -- is   02:53PM
11  the Southern California DUATs' responsibilities
12  limited to the Southern California region?
13      A.   I don't know.  I think so -- but I imagine
14  so.  It doesn't mean they don't have influence, but
15  it would only be influenced based on best practices   02:53PM
16  or what we've done -- sharing what we've done.
17      Q.   The Northern California DUAT doesn't make
18  decisions for the Southern California DUAT, does it?
19      A.   I don't think so, no.  We all share
20  information, but they don't -- no, I don't think   02:53PM
21  they make decisions for us.
22      Q.   And you started at Southern California
23  Permanente Medical Group in 1997?
24      A.   Yes.
25      Q.   There are a number of partnerships or   02:53PM

Page 269

1   medical groups that have contracts with Kaiser; is
2   that right?
3       A.   I don't know.  I only know of my own.
4       Q.   Okay.  Fair enough.
5           The Southern California Permanente Medical   02:54PM
6   Group is comprised of doctors who practice in
7   Southern California?
8       A.   Yes.
9       Q.   And doctors who provide services in
10  Northern California would be part of some other   02:54PM
11  group?
12      A.   They're a corporation.  They're -- I don't
13  think they're a partnership.
14      Q.   But your partnership is limited to
15  providing services in Southern California, however   02:54PM
16  that region is defined?
17      A.   That's my understanding, yeah.
18      Q.   Now, it says in paragraph 8 that:
19          I am informed and believe that in
20  or around September 1994, the Southern   02:54PM
21  California P&T committee voted to
22  accept Neurontin to the formulary.
23          Do you see that?
24      A.   Yes.
25      Q.   How do you know that?   02:55PM

68 (Pages 266 to 269)

Page 270

1    A.  Because the P&T committee sends out
2  every -- I think it's every week or -- there's a P&T
3  representative with each facility, and they send out
4  information about what's happening.
5       In addition to that, we were all -- when a    02:55PM
6  question comes up with P&T, it goes out to all the
7  specialists in that group by email, and then we're
8  asked to give our opinions.
9    Q.  Okay.  But I'm talking back in 1994.
10      Were you at Kaiser in 1994?           02:55PM
11   A.  Oh, no.  I'm sorry.  I thought you said
12  the -- I was looking for 1997.
13   Q.  Yeah, we're going to cover that, but let's
14  talk 1994.
15   A.  No, I wasn't there.                 02:55PM
16   Q.  So how are you able to make this statement?
17   A.  That I -- I knew from the events afterwards
18  that that had happened.  In other words, I knew that
19  in 1997 the information about whether we were going
20  to expand it or not also included the information of  02:56PM
21  what happened in '94.
22   Q.  Was it documents?  Was it a person?
23   A.  I think it was -- I don't recall exactly,
24  but I'm -- I think it was both just in discussion,
25  but I think also there was some, you know, kind of    02:56PM

Page 271

1  history of what happened.  Usually we're given that.
2  I would assume it -- usually we're given something
3  in there.  We -- it was started this year, this is
4  what we're deciding now.
5    Q.  When you were -- when you signed this and   02:56PM
6  prepared it --
7    A.  Yeah.
8    Q.  -- do you have an indep--- did you have --
9  did you have an independent relec-- -- strike that.
10      MS. NUSSBAUM:  Recollection.
11  BY MR. CHEFFO:
12   Q.  When you signed this declaration, did you
13  have an independent recollection about the 1994
14  events?
15   A.  Not de novo.  I think I was reminded of it    02:56PM
16  and it -- I remembered.  But I was reminded of it.
17   Q.  And did you see any documents to --
18   A.  Not at that time.  I remembered the -- kind
19  of the process of what was going on.
20   Q.  Okay.  Now, in or -- then the next sentence   02:57PM
21  says:
22      "In or around September 1997, as a
23  practicing pain specialist, I
24  recommended expansion of the formulary
25  restrictions to include prescribing by    02:57PM

Page 272

1  pain clinic physicians for the
2  treatment of reflex sympathetic
3  dystrophy."
4    Do you see that?
5    A.  Yes.                             02:57PM
6    Q.  Were you the first person to make that
7  recommendation?
8    A.  I don't know.
9    Q.  How did it come about that you made that
10  recommendation?                         02:57PM
11   A.  In the same way that any individual pain
12  specialist would make that recommendation.  But at
13  the time, I was probably one of the only
14  fellowship-trained pain specialists in the region.
15   Q.  But I want to talk specifically in this     02:57PM
16  case.  It says that -- well, let me take a step
17  back.
18      In 1994, according to this declaration,
19  there was a vote by the P&T committee to accept
20  Neurontin on the formulary to be used by or in      02:57PM
21  consultation with a neurologist; right?
22   A.  Yes.
23   Q.  So is that called a restriction?
24   A.  I guess so, yeah.
25   Q.  So it was accepted to the formulary with a    02:58PM

Page 273

1  restriction?
2    A.  Okay.
3    Q.  Is that right?
4    A.  Yeah, that's -- I think that's the
5  language.                               02:58PM
6    Q.  And then in or around --
7       MR. SOBOL:  Objection.  Motion to strike
8  then.
9  BY MR. CHEFFO:
10   Q.  In or around September 1997, there was an    02:58PM
11  action by the P&T committee with respect to
12  Neurontin and reflex sympathetic dystrophy; is that
13  fair?
14   A.  Yes.
15   Q.  Did you present at the P&T committee in     02:58PM
16  1997?
17   A.  No.
18   Q.  Did you initiate the suggestion that reflex
19  sympathetic dystrophy should be something that's
20  included on the formulary?                02:58PM
21   A.  No.
22      (Discussion off the record.)
23  BY MR. CHEFFO:
24   Q.  Did someone else raise that and ask you to
25  comment on it?                          02:59PM

69 (Pages 270 to 273)

Page 274

1    A.  Yes.
2    Q.  Who?
3    A.  I don't recall who.  In general, a request
4  is made, and then Drug Information Systems gives us
5  all the literature and gives us what the nature of    02:59PM
6  the discussion is, and then we review it.
7    Q.  How did you make the recommendation in
8  1997?
9    A.  By email.
10    Q.  So --                                   02:59PM
11    A.  And also, yes, by email, but more than just
12  me giving it.  There's a discussion that goes on.
13    Q.  Are there also chiefs of neurology and
14  chiefs of anesthesiology who meet?
15    A.  Yes.                                     02:59PM
16    Q.  Were you a member of those committees?
17    A.  No.
18    Q.  Do you know if anybody else recommended
19  reflex sympathetic dystrophy?
20    A.  Well, clearly, because they adopted it.  I   03:00PM
21  don't think they would -- that it would be adopted
22  solely on my recommendation.  Although I -- like I
23  said, I was -- I don't think there was anybody else
24  who was fellowship trained at the time, so I think
25  my recommendation would have had some weight.       03:00PM

Page 275

1    Q.  Okay.  But there are a lot of other people
2  who were involved in this decision; is that fair?
3    A.  I don't know how many, but there --
4  certainly more than me and --
5    Q.  It doesn't discuss any of them in your    03:00PM
6  declaration, does it?
7    A.  No, it doesn't.
8    Q.  It just says that you made the
9  recommendation.
10    A.  Well, it's -- it can -- I have English as a   03:00PM
11  second language, but I read that as meaning that
12  that's an act that I took.  It doesn't describe any
13  other acts anyone else may have taken, but maybe I
14  don't understand the language as well as I should.
15    Q.  Okay.  And I don't think we need to be      03:00PM
16  sarcastic.
17    A.  I'm not being sarcastic.  I'm being honest.
18  I have a gap sometimes in learning -- in -- because
19  I have English as a second language, so I take
20  sometimes things very concretely grammarwise, and    03:01PM
21  I'm -- often have poor grammar.
22    Q.  Well, somebody else -- a lawyer wrote this
23  for you; right?
24    A.  Yes, and I -- when I read that, that's what
25  I assumed, is that, yes, I did make the              03:01PM

Page 276

1  recommendation.  I didn't think at the time that
2  that meant that I was the only one who ever made the
3  recommendation.
4    Q.  You could see that someone could say this
5  looks like you made a recommendation to the P&T    03:01PM
6  committee and then all of a sudden they adopted it;
7  right?
8    MS. NUSSBAUM:  Objection.
9    THE WITNESS:  I don't think a reasonable
10  person would, but I guess somebody could.         03:01PM
11  BY MR. CHEFFO:
12    Q.  So, in fact, what -- do you know the
13  history about reflex sympathetic dystrophy with --
14  before it got to the P&T committee and before it got
15  to you?                                          03:01PM
16    A.  In what -- what do you mean the history?
17  In what way?
18    Q.  Well, in other words, do you know whose
19  idea it initially was, who --
20    A.  Oh, no.
21    Q.  -- suggested it?
22    A.  No.  I don't know.
23    Q.  Do you know who was supporting it, who was
24  against it?
25    A.  I don't recall that at all.               03:02PM

Page 277

1    Q.  Your -- the basis of your involvement was
2  that you received some material in an email saying
3  that the P&T committee was going to consider this,
4  do you have a view on it?
5    A.  Do I have a view on it, and I also talked    03:02PM
6  with other people who took care of pain patients and
7  talked with my department, and so it was through
8  conversation and through my own personal view.
9    Q.  And at the time you had had positive
10  experience with using Neurontin for reflex          03:02PM
11  sympathetic dystrophy?
12    MR. SOBOL:  Objection.
13    MS. NUSSBAUM:  Objection.
14    THE WITNESS:  At the time I felt like there
15  was some evidence that suggested it might help.     03:02PM
16  It's a terribly difficult condition to treat.  And I
17  thought, well, it looks like there's some evidence
18  in certain cases.  Based on the judgment of the
19  treating doctor, they should have the -- they should
20  be able to use their own judgment about it.         03:03PM
21  BY MR. CHEFFO:
22    Q.  And if you believe that there was no
23  evidence whatsoever, you wouldn't have recommended
24  it; isn't that right?
25    A.  I think that's true.                       03:03PM

Page 282

1  restriction limiting to neurologists. In 1997, you
2  were asked through an email whether you would agree
3  with or suggest that the -- as it says here, the
4  formulary restrictions be expanded to include
5  treatment of RSD with gabapentin; correct?        03:06PM
6     A.  Again, yes.
7     Q.  Okay.  Now -- and it says here:
8        "I'm informed and believe that the
9  P&T committee adopted certain" --
10    A.  I'm sorry.  What did you say?  I thought I   03:06PM
11 heard you say something else.  Go ahead.
12    Q.  It says here:
13       "I'm informed and believe that the
14 P&T committee adopted this recommendation."
15    A.  Okay.  Yes.                      03:07PM
16    Q.  You weren't at the commit- -- the P&T
17 committee meeting; right?
18    A.  I was not a member.
19    Q.  You didn't provide any information directly
20 to them?                               03:07PM
21       MR. SOBOL:  Objection.
22       THE WITNESS:  In the form -- if you
23 consider email as a direct -- that's the extent,
24 email and discussions.  The same -- just what I said
25 before.                                03:07PM

Page 283

1  BY MR. CHEFFO:
2     Q.  Was it a yes-or-no email, or was it a
3  dialogue?
4     A.  I don't recall what the exact email was,
5  but the options were absolutely for dialogue.    03:07PM
6  There's no -- it was not a yes or no type of
7  question.
8     Q.  Do you remember what you did?
9     A.  I said I supported it.  I know that.  And I
10 don't remember if I included reasons for it, but I  03:07PM
11 did say I supported it.
12    Q.  So -- and then -- and you don't know who
13 else, if anyone else, supported that recommendation;
14 right?
15       MR. SOBOL:  Objection.          03:07PM
16       THE WITNESS:  Not -- no, I don't remember.
17 BY MR. CHEFFO:
18    Q.  You don't know if anyone dissented from it?
19    A.  I don't remember.  No, I don't know.
20    Q.  Do you remember how you found out that the  03:08PM
21 committee adopted it?
22    A.  The P&T committee has a regular information
23 download that they give, and that's how I found out
24 about it.
25    Q.  And do you have any information about what  03:08PM

Page 284

1  went on at that P&T committee, the discussion about
2  it?
3     A.  No.
4     Q.  Do you have any idea about what information
5  they reviewed or talked about?                   03:08PM
6        MR. SOBOL:  Objection.
7        THE WITNESS:  I don't recall any -- being
8  told or I -- it was a long time ago.  I don't really
9  remember.
10 BY MR. CHEFFO:                            03:08PM
11    Q.  Did you ever ask after the fact?
12    A.  I don't remember asking, no.  I already
13 supported it, so if it happened, then I wouldn't
14 be -- I'm busy enough.  I wouldn't be running
15 afterwards to figure out why did they support     03:08PM
16 something I supported.
17    Q.  And in -- it says here:
18       "In or around 1999, I recommended
19 removal of all formulary restrictions
20 and guidelines for Neurontin."              03:08PM
21       Do you see that?
22    A.  Yes.
23    Q.  Was that the same process that you went
24 through in 1997.  In other words, you were asked to
25 comment on a recommendation?                03:09PM

Page 285

1        MR. SOBOL:  Objection.
2        THE WITNESS:  By that time, I think I was
3  already -- you know, I don't recall exactly,
4  although I remember that I was being asked more and
5  more, not by them, but just in general about pain.   03:09PM
6  By that time, it was known that I was a pain doctor,
7  and so I was being asked more about it.
8  BY MR. CHEFFO:
9     Q.  But I want to talk specifically about the
10 declaration --                          03:09PM
11    A.  Uh-huh.
12    Q.  -- okay?
13       This says in or around September 1999, you
14 made a recommendation; right?
15       Are you with me?                 03:09PM
16    A.  Yes.
17    Q.  And then it also says in the next sentence,
18 that in the same month, "in or around
19 September 1999, the P&T committee adopted this
20 recommendation."                        03:09PM
21    A.  Yes.
22    Q.  Okay.
23    A.  It was the same process of -- you're asking
24 about the process.  Yes.
25    Q.  I'm going to show you them in a few      03:09PM

Page 286

1  minutes, but --
2    A.  Okay.
3    Q.  -- I've seen some documents where the
4  process tends to start or in this case started
5  months before.                              03:10PM
6    A.  Okay.
7    Q.  Is that consistent with the way things work
8  at Kaiser?
9    MR. SOBOL:  Objection.
10    THE WITNESS:  It's -- who can -- it's a   03:10PM
11  process.  So processes can last longer or shorter.
12  BY MR. CHEFFO:
13    Q.  So you did not independently make a
14  recommendation to remove formulary restrictions and
15  guidelines; is that fair?                   03:10PM
16    MR. SOBOL:  Objection.
17    THE WITNESS:  I don't recall doing that.  I
18  don't recall that it would have been my role to do
19  that.
20  BY MR. CHEFFO:                              03:10PM
21    Q.  What happened was someone from DIS asked
22  you whether you had a view about the removal of
23  formulary restrictions and guidelines for Neurontin?
24    A.  Well, what I recall is, is that -- I don't
25  know if it was someone directly from DIS, but I know  03:10PM

Page 287

1  the information that was used came from DIS and that
2  whoever specifically sent it to me, I don't
3  remember, but that they are -- we rely on them for
4  information.  And as well as ourselves, but we rely
5  a lot on them as well.                      03:11PM
6    Q.  You don't know if any of the chiefs of any
7  of the departments had already discussed this issue?
8    A.  I assume that they had, but I don't know
9  directly.
10    Q.  You don't know what their decision-making  03:11PM
11  process was?
12    A.  I'm familiar with parts of it.
13    Q.  In this case?
14    A.  In all -- it's similar to most cases.
15    Q.  Well, I want to talk specifically with the  03:11PM
16  1999 recommendation.
17    A.  In that case, I don't remember specifically
18  that one.  I assume that it's like all the others,
19  but I don't specifically remember that one.
20    Q.  Do you know which chiefs and which         03:11PM
21  departments met regarding the 1999 recommendation?
22    A.  I know some of them.  I don't know -- that
23  information gets disseminated to each individual
24  department, so P&T could be disseminating to whoever
25  they think is appropriate to know about this.   03:11PM

Page 288

1    I know that at least neurology was and that
2  at least pain or anesthesia was, and I would assume
3  probably physical medicine was.  But it could have
4  been other departments as well.  I don't control
5  that.  I don't know who they sent it to.    03:12PM
6    Q.  And other than your responding in an email,
7  you don't know what other people said, did or
8  thought; is that right?
9    A.  I just assumed that because it was approved
10  that other people must have thought the same thing.  03:12PM
11    Q.  But as you sit here, from personal
12  knowledge, you don't know --
13    A.  That's right.
14    Q.  -- what anyone else's view is?
15    A.  That's right.                         03:12PM
16    Q.  You don't know what other information they
17  reviewed or talked about?
18    MR. SOBOL:  Objection.
19    MS. NUSSBAUM:  Well, as he sits here today
20  doesn't mean he didn't know that in 1999.   03:12PM
21  BY MR. CHEFFO:
22    Q.  Okay.  Did you know it then?
23    That's a great objection.
24    Did you know it -- what other people were
25  talking about or what they had seen back in --  03:12PM

Page 289

1    A.  I had discussed it with them.
2    THE REPORTER:  Excuse me.
3  BY MR. CHEFFO:
4    Q.  Who -- who --
5    THE REPORTER:  Did you finish --
6    MR. CHEFFO:  No.
7    THE REPORTER:  -- the question, please?
8  BY MR. CHEFFO:
9    Q.  Back in --
10    MR. SOBOL:  Is there some race that the two  03:12PM
11  of you have to -- between question and answer?
12  BY MR. CHEFFO:
13    Q.  Back in --
14    MR. SOBOL:  It's been unfair to the
15  stenographer and me.                        03:12PM
16    MR. CHEFFO:  I'm going to try and --
17  BY MR. CHEFFO:
18    Q.  Back in 1999 -- back in 1999, did you
19  discuss with anyone the removal of formulary
20  restrictions and guidelines for Neurontin.  03:13PM
21    A.  I discussed it with the people in my
22  department, the doctors in my department, my chief.
23  I discussed it I think with -- there were a couple
24  of other doctors.  I'm trying to remember who they
25  were, but they were people who were not neurology   03:13PM

73 (Pages 286 to 289)

Page 290

1  but in other departments, and I discussed it with
2  them. And so yes, those are the -- I think people
3  at another facility, actually.
4      Q. Did you attend the chiefs of neurology
5  meeting?                                03:13PM
6      A. I didn't.
7      Q. Did you receive the chiefs of
8  anesthesiology meeting?
9      A. No.
10     Q. Did you attend the P&T committee?      03:13PM
11     A. No.
12     Q. Do you know what was discussed or reviewed
13  at any of those committee meetings?
14     A. No.
15     Q. Do you know what was discussed or reviewed  03:13PM
16  at any other committee meeting that may have
17  commented on removal of these restrictions?
18     A. No.
19     Q. Okay. Now, it says here that you
20  recommended removal of all formulary restrictions  03:14PM
21  and guidelines for Neurontin.
22     A. Uh-huh.
23     Q. Is that right?
24     A. Yeah. Yes.
25     Q. Okay. Are there -- well, go ahead.     03:14PM

Page 291

1      A. No, it's -- but "guidelines" is a kind of a
2  nebulous word, but the guidelines that determine the
3  formulary restrictions -- yeah, it doesn't mean that
4  other guidelines still don't exist because
5  guidelines are -- mean like -- a low back guideline  03:14PM
6  is -- can be considered a guideline. But in terms
7  of specific with Neurontin, yes, that's right.
8      Q. So it's your testimony here that you
9  recommended in or about September 1999 removal of
10  all restrictions and guidelines for Neurontin?    03:15PM
11     A. My understanding of what guidelines were in
12  relationship to Neurontin, yes.
13     Q. What guidelines existed and what
14  restrictions existed that you were recommending
15  removal of them?                           03:15PM
16     A. Hard to remember exactly what it was, but
17  my recollection is, was it the guidelines around the
18  restrictions, the guidelines that suggested only
19  certain consultants could use it. That's a kind of
20  a guideline, and that's -- to me, it was the same --  03:15PM
21  has a similar meaning, so the guidelines that
22  suggest only a specialist can do it, that's -- I was
23  okay with removing that.
24     Q. And you believe that's what the P&T
25  committee did?                             03:15PM

Page 292

1      A. Yes.
2      Q. Did you see any documents, any minutes from
3  those meetings?
4      A. Then. I haven't seen any since then.
5      Q. You actually saw the minutes from the P&T   03:15PM
6  committee?
7      A. Oh, no. I'm sorry. Not the minutes, but
8  the -- the decision -- the document that they send
9  out that says this has been approved, this has been
10  taken off, this has -- you know, those kinds of    03:16PM
11  things. Just a bullet point about it.
12     Q. And it's your testimony that as of
13  September 1999, the P&T committee said that there
14  should be no restrictions and no guidelines --
15     MR. SOBOL: Objection.                   03:16PM
16  BY MR. CHEFFO:
17     Q. -- for Neurontin.
18     A. Well, I -- hopefully I was clear before
19  what I meant by that. It would be the same thing.
20     Q. Well, I just want to make sure what this    03:16PM
21  means. It says I am informed and believe that, in
22  or around September 1999, the P&T committee adopted
23  this recommendation.
24     A. Right. Take off -- primarily, the most
25  important one really is the removal of the formulary  03:16PM

Page 293

1  restriction.
2      Q. Did they add any or leave any guidelines in
3  place?
4      A. I don't remember.
5      Q. As you sit here today, are you aware of any  03:17PM
6  restrictions or guidelines on gabapentin or
7  Neurontin?
8      A. Sure.
9      MR. SOBOL: Objection.
10     THE WITNESS: Yes.                       03:17PM
11  BY MR. CHEFFO:
12     Q. Neurontin? Well --
13     A. Yes.
14     Q. -- formulary.
15     A. Well, there's two questions so what --     03:17PM
16     Q. Okay. Fair enough. I thought we were
17  talking about the formula but --
18     A. You're talking about as I sit here today.
19  That was the question.
20     Q. Sure.                               03:17PM
21     A. Okay.
22     Q. Today, are there any formulary restrictions
23  or guidelines in place with respect to Neurontin or
24  gabapentin?
25     A. There are guidelines in place. I don't    03:17PM

74 (Pages 290 to 293)

Page 330

1    yes.
2        Q.  And it's either discussed or recommended in
3    the body of the document?
4        MR. SOBOL:  Objection.
5        THE WITNESS:  It's not recommended, it's        04:02PM
6    discussed, and information is given about it.
7    BY MR. CHEFFO:
8        Q.  Okay.  Now, I'd like you to take a look --
9    I have on the screen here the Kaiser Permanente -- I
10   typed in through Google KaiserPermanente.org.        04:02PM
11       Do you see that?
12       A.  Yes.
13       Q.  Does this top portion look like the top of
14   the documents I've given you?
15       A.  Yes.                                          04:03PM
16       MR. CHEFFO:  Can I ask the videographer for
17   a minute to just -- Jim, move your head -- turn
18   and --
19       MR. SOBOL:  Well, I'm going to object
20   unless there's going to be a foundation that you're  04:03PM
21   actually on the Internet right now, Mark.
22       MR. CHEFFO:  I assume you're joking.
23       MR. SOBOL:  Well, I mean, I don't
24   understand what the point is actually of having the
25   video on the screen right now that you've been       04:03PM

Page 331

1    typing in.
2        MR. CHEFFO:  Do you want to -- would you --
3    BY MR. CHEFFO:
4        Q.  Doctor, you could find this on the
5    Internet; right?                                     04:03PM
6        MR. SOBOL:  No, he's not going to be doing
7    any demonstrations either.  No, he's not.  The whole
8    thing is a little bit silly.
9        MR. CHEFFO:  Maybe for you.
10   BY MR. CHEFFO:
11       Q.  But Doctor, do you have any reason to
12   believe I'm not on the Internet here?
13       MR. SOBOL:  There's no --
14       Don't answer the question.  Don't answer
15   the question.                                        04:03PM
16   BY MR. CHEFFO:
17       Q.  Doctor, do you have any reason --
18       MR. SOBOL:  Do not answer the question,
19   this line of questioning.
20       MR. CHEFFO:  Under what basis?               04:03PM
21       MR. SOBOL:  On the basis that you're
22   wasting everybody's time at this point.
23       MR. CHEFFO:  Is that an appropriate
24   objection?
25       MR. SOBOL:  Yes, it is.  At times, there    04:04PM

Page 332

1    is.  Yes.
2        MR. CHEFFO:  I'm trying to lay a foundation
3    for your -- the website, the Kaiser Permanente
4    website and you're stopping me from doing that after
5    you just said there's no foundation.                 04:04PM
6        MS. NUSSBAUM:  He just said he's an
7    employee --
8        MR. CHEFFO:  You can't talk.
9        MS. NUSSBAUM:  -- not a --
10       MR. SOBOL:  I said the whole thing is a      04:04PM
11   little bit silly and ridiculous.  Something's either
12   on the web or it's not.  And there's no reason --
13       MR. CHEFFO:  Are you going to stipulate
14   that those are appropriate documents?
15       MR. SOBOL:  What do you mean by            04:04PM
16   "appropriate"?
17       MR. CHEFFO:  They are authentic documents?
18       MS. NUSSBAUM:  He's not an employee of
19   Kaiser Permanente.
20       MR. CHEFFO:  Are you going to stipulate or  04:04PM
21   not?
22       MR. SOBOL:  To what?  What's the request?
23       MR. CHEFFO:  That those are authentic
24   documents off the website?
25       MR. SOBOL:  No.                             04:04PM

Page 333

1        MR. CHEFFO:  Okay.
2        MR. SOBOL:  And we're not going to have
3    this witness take his time --
4        MR. CHEFFO:  Well, it's my time.
5        MR. SOBOL:  -- doing that.
6        MR. CHEFFO:  Yeah, like you did to --
7    BY MR. CHEFFO:
8        Q.  Would you do this if I ask you to?
9        MR. SOBOL:  No.  He won't.  He's been
10   instructed by his counsel not to be wasting our time  04:04PM
11   this way.
12       There are many different ways to deal with
13   something that's very simple between lawyers in
14   terms of figuring out whether something's on the web
15   or not.  We don't have to be wasting --           04:05PM
16       MR. CHEFFO:  You just wasted --
17       MR. SOBOL:  -- this doctor's time with it.
18   That's all --
19       MR. CHEFFO:  Okay.
20       MR. SOBOL:  -- Mark.                        04:05PM
21   BY MR. CHEFFO:
22       Q.  Doctor, do you have -- I've typed in
23   here -- I've typed in here Kaiser Permanente
24   formulary in Google and typed search.
25       What comes up?                              04:05PM

84 (Pages 330 to 333)

Page 334

1     MR. SOBOL: I instruct you not to answer.
2  BY MR. CHEFFO:
3     Q.  Do you recognize this page?
4     MR. SOBOL: I instruct you not to answer.
5  BY MR. CHEFFO:                              04:05PM
6     Q.  Have you ever seen this page before?
7     MR. SOBOL: I instruct you not to answer.
8     And I don't know what you mean when you're
9  saying "this page." Are you pointing at some
10 screen, or are you pointing --               04:05PM
11    MR. CHEFFO: Yes.
12    MR. SOBOL: -- at an exhibit?
13    MR. CHEFFO: Let's look at it with the
14 video. The screen.
15 BY MR. CHEFFO:
16    Q.  Doctor, there's a screen that says
17 Https//memberskaiserpermanente, and it goes on.
18    Have you ever seen that screen before?
19    MR. SOBOL: I instruct him not to answer.
20    MR. CHEFFO: I really think what you're    04:05PM
21 doing is sanctionable, Tom, but you can continue
22 doing it.
23    MR. SOBOL: I think it's a waste of time.
24    MR. CHEFFO: You know what, that's not a
25 basis to instruct not to answer, but you're really   04:06PM

Page 335

1  at your peril here. But if you're going to do it --
2  I'm trying to authenticate the website and the
3  document. Instructing the witness to ask -- to
4  ans- -- not to answer whether he's ever seen a page?
5  I've never in my entire career had a lawyer do that.   04:06PM
6     So I respect you. You're a good lawyer.
7  But again, I'm putting you on notice that we're
8  going to have him come back if you won't let him
9  answer these questions about what this website says.
10    So is this the final time you're going    04:06PM
11 to -- you're not going to let him talk about
12 anything on the website or authenticate it?
13    MR. SOBOL: Is there a question before the
14 witness?
15    MR. CHEFFO: I'm asking you.              04:06PM
16    MR. SOBOL: Is there a question before the
17 witness?
18 BY MR. CHEFFO:
19    Q.  Okay. Doctor, what does that web -- what
20 does that website say?                       04:06PM
21    MR. SOBOL: What are you pointing at right
22 now?
23    MS. NUSSBAUM: Well, let's just see if he
24 can read English.
25    What does it say? Go ahead. Can you read   04:06PM

Page 336

1  English? What does it say?
2     MR. CHEFFO: Which one of you is
3  representing the witness?
4     MR. SOBOL: I want to know what the "that"
5  is in the question. You're talking about --    04:06PM
6     MR. CHEFFO: The video is pretty clear.
7     MR. SOBOL: -- the screen or the exhibit?
8     MR. CHEFFO: No, it's the screen. I'm
9  pointing to the screen.
10    MR. SOBOL: I instruct him not to answer.    04:06PM
11 BY MR. CHEFFO:
12    Q.  Okay. If you wanted to go online, Doctor,
13 to find the Kaiser Permanente web --
14    You can put it back on the doctor, please.
15    If you wanted to go online to find the     04:07PM
16 Kaiser Permanente website, how would you do it?
17    A.  I would type in KP.org.
18    Q.  KP.org?
19    A.  In the -- in --
20    Q.  Where?                                 04:07PM
21    A.  In the address.
22    Q.  So it would be a --
23    A.  Just KP.org. You can erase all -- you can
24 delete all that. No -- okay.
25    Q.  Is it www?                             04:07PM

Page 337

1     A.  You're asking me the way I would do it. I
2  would have a whole blank section. I would type in
3  KP.org. That's how I would do it. It's not maybe
4  the best way, but that's the way I'd do it.
5     Q.  Let's try that.                        04:07PM
6     A.  Release -- no.
7     Q.  KP dot --
8     A.  You -- okay.
9     Q.  -- org.
10    Okay. Is that the screen that you usually   04:08PM
11 see when you type that in?
12    MR. SOBOL: I instruct him not to answer.
13 BY MR. CHEFFO:
14    Q.  Doctor, you understand that if we move to
15 compel this and Mr. Sobol is wrong, that you're    04:08PM
16 going to have to come back and answer these
17 questions; right?
18    MR. SOBOL: No, he's not going to have to
19 come back because if there's something on the record
20 that you want to do --                        04:08PM
21    MR. CHEFFO: I am on the record.
22    MR. SOBOL: -- with him --
23    I haven't finished what I'm saying.
24    If there's something you want to do with
25 him on the record with a document in front of him    04:08PM

85 (Pages 334 to 337)

Page 338

1    that he can read, you can do that, which you already
2    have. If you're concerned about a foundational
3    issue about what appears in the website today, you
4    can speak to the lawyers. You don't need him to do
5    it.                                      04:08PM
6         MR. CHEFFO: That's not the way it works,
7    but that's fine.
8         MR. SOBOL: Well, it is the way it works --
9    BY MR. CHEFFO:
10    Q.   Doctor, you have on the screen --
11        MR. SOBOL: -- in Boston because you don't
12   have to waste this doctor's time making a foundation
13   for what exists in the website. Judge Saris and
14   every other judge in Boston would say don't waste
15   people's time with that --                04:09PM
16        MR. CHEFFO: Okay.
17        MR. SOBOL: -- Counsel. Make a --
18        MR. CHEFFO: I'm asking you then right now
19   to stipulate. We have the witness here. We're in
20   California. If you stipulate that these are    04:09PM
21   authentic, I won't need to do it.
22        MR. CHEFFO: And you don't have to waste his
23   time today doing that, is my point.
24        MR. CHEFFO: Okay. But I'm asking you
25   then. Will you stipulate?                 04:09PM

Page 339

1         MR. SOBOL: If it's on the web, I'll
2    stipulate with you, but I don't know whether it is,
3    and I'm not doing stipulations today. We're doing a
4    deposition of this Doctor.
5         MR. CHEFFO: Okay. But I want to find out  04:09PM
6    if it's on the web, and he can help us find that
7    out.
8         MR. SOBOL: No, he doesn't have to take his
9    time, is my point.
10        MR. CHEFFO: I don't know why you're so     04:09PM
11   scared of your own client's website. It's stunning.
12        MR. SOBOL: It's not a matter of being
13   scared. It's a matter of not wasting his time.
14        MR. CHEFFO: Do you care -- well, he's
15   still going to be here. Okay, Tom? I can use my    04:09PM
16   time. Okay? I'm using my time.
17   BY MR. CHEFFO:
18    Q.   I'd like you to go and log in --
19        MR. SOBOL: You're using his time and our
20   time also.                               04:09PM
21   BY MR. CHEFFO:
22    Q.   I'd like to log in, use your user ID and
23   log in and find out if you can find how you'd find
24   anticonvulsants for cancer pain and low back pain.
25        MR. SOBOL: I instruct you not to be       04:09PM

Page 340

1    engaging in this, Doctor.
2         He's following his counsel's advice.
3         THE WITNESS: I'm following my counsel's --
4         MR. CHEFFO: Okay.
5         THE WITNESS: -- advice.              04:10PM
6    BY MR. CHEFFO:
7     Q.   If he had allowed you to do it, you could
8    log in to the website, couldn't you?
9         MR. SOBOL: What website?
10   BY MR. CHEFFO:                            04:10PM
11    Q.   The Kaiser Permanente website?
12    A.   I imagine I could have. I don't remember
13   my user name and password, but I could have
14   probably, you know, gotten on somehow on some parts
15   of it.                                   04:10PM
16    Q.   Right. And you could have accessed it, and
17   we could have been able to look and find out if
18   those things are on the website or not; right?
19    A.   We could -- I imagine so, yeah.
20    Q.   Okay. Have you ever been to the part of   04:10PM
21   the -- in case you reconsider, we'll leave that
22   there for a few minutes.
23        Have you ever been to the part of the
24   website that has those listings?
25    A.   I've never seen these listings.         04:10PM

Page 341

1     Q.   Your lawyer's never showed you those?
2     A.   No.
3         MR. SOBOL: Objection and instruct him not
4    to answer. Actually, I move to strike.
5         What you discuss with your --
6    BY MR. CHEFFO:
7     Q.   This is the first time --
8         MR. SOBOL: Wait a second.
9         What you discussed with the lawyers one way
10   or the other is privileged, Doctor.       04:11PM
11        THE WITNESS: Thank you.
12   BY MR. CHEFFO:
13    Q.   That's the first time you've ever seen
14   those documents; right?
15    A.   Yes.                               04:11PM
16    Q.   Are you surprised to see them?
17        MR. SOBOL: Objection.
18        THE WITNESS: What does it matter? I'm
19   seeing them. That's fine with me.
20   BY MR. CHEFFO:                            04:11PM
21    Q.   Based on your testimony earlier today, are
22   you surprised to see those documents?
23        MR. SOBOL: Objection.
24        THE WITNESS: I don't -- I don't have any
25   kind of emotional reaction about them at all. I'm  04:11PM

86 (Pages 338 to 341)

Page 342

1  just waiting to find out what you want me to tell
2  you about them.
3  BY MR. CHEFFO:
4      Q.  Are they consistent with your testimony?
5      MR. SOBOL:  Objection.          04:11PM
6      THE WITNESS:  What part of my testimony?
7  BY MR. CHEFFO:
8      Q.  Are the documents that say that
9  anticonvulsants and Neurontin can be used for
10 chronic pain, neuropathic pain and other syndromes,   04:11PM
11 are they consistent with your testimony earlier
12 today?
13     MR. SOBOL:  Objection.
14     THE WITNESS:  This is not data.  This is
15 not true data.  It -- so it has no bearing on any of  04:11PM
16 the testimony I gave you.
17 BY MR. CHEFFO:
18     Q.  What's the -- what -- does it have any use
19 or meaning whatsoever?
20     A.  Not -- no.  Not to me.          04:12PM
21     Q.  What about to patients?
22     A.  It may.  I think the only use it would
23 have -- it would generate questions.  And then I
24 could -- you know, just like it says here.  In fact,
25 what does it say?

Page 343

1      It says somewhere here -- where does it say
2  it?
3      "This information is not intended to
4  replace the advice of a doctor."
5      So this usually is just to generate      04:12PM
6  questions.  This is not accurate information.  It's
7  not -- it's just -- it's generic basically to
8  stimulate -- and, in fact, I don't even know who
9  Healthwise is.  But like I told you before,
10 Healthwise, it's not Kaiser.          04:12PM
11     Q.  But Kaiser -- you know who Kaiser is;
12 right?  That's on the top left of the document,
13 isn't it?
14     MR. SOBOL:  Which document?
15 BY MR. CHEFFO:          04:12PM
16     Q.  Kaiser -- on every one of them.  Kaiser
17 Permanente --
18     A.  Are you asking me if I know what Kaiser is?
19     Q.  Well, no.
20     A.  Are you actually asking me that?      04:12PM
21     Q.  You said it says Healthwise, but it's
22 printed out on the Kaiser Permanente document;
23 right?
24     A.  It appears to be.
25     Q.  Okay.

Page 344

1      A.  Sure.
2      Q.  And is there any information that you
3  disagree with in any of the five or six exhibits
4  that I put before you and gave you a chance to read?
5      MR. SOBOL:  Objection.          04:13PM
6      Do you want him to read each one and go
7  through it that way?
8      MR. CHEFFO:  Well, I thought he did read
9  them.
10     THE WITNESS:  I reviewed them.  I mean, I      04:13PM
11 didn't -- you know --
12     MR. SOBOL:  Are you withdrawing the last
13 question?  Yes or no.  Because then he would have to
14 go through each exhibit line-by-line and make a
15 decision about whether or not he agrees or disagrees  04:13PM
16 with it.
17     MR. CHEFFO:  Okay.  Let's go off the
18 record.
19     THE VIDEOGRAPHER:  Off the record, 4:14.
20     (Discussion off the record.)          04:14PM
21     THE VIDEOGRAPHER:  Back on the record 4:16.
22     THE WITNESS:  I don't want to read these
23 all over again.  I -- if there's a -- the question
24 is so general about all of them.  If there's
25 something specific --          04:14PM

Page 345

1      MR. CHEFFO:  Okay.
2      THE WITNESS:  -- I'm happy to look at it.
3  BY MR. CHEFFO:
4      Q.  Let's take them one at a time.
5      Read the one for cancer pain and tell me if  04:14PM
6  there's anything wrong or inaccurate in it.
7      A.  There's something misleading about it.
8      Q.  Misleading?
9      MS. NUSSBAUM:  Do you have another copy of
10 that one for counsel?          04:15PM
11     MR. CHEFFO:  I think he has them all.
12     MS. NUSSBAUM:  No.
13     MR. SOBOL:  Hold on a second.  Before he
14 answers the question, can we have a copy of the
15 cancer one, please.          04:15PM
16     MS. NUSSBAUM:  We only have chronic low
17 back and restless leg.
18     MR. CHEFFO:  I think I gave you all of
19 them.
20     THE WITNESS:  I don't have a second copy of  04:15PM
21 it.
22     MS. NUSSBAUM:  Doctor, you have the
23 exhibits.
24     MR. CHEFFO:  You can look at mine.
25     THE WITNESS:  Here's another one here,      04:15PM

Page 346

1      MR. CHEFFO:  Oh, I thought I didn't give it
2 to you?
3      THE WITNESS:  Here's one for --
4 BY MR. CHEFFO:
5   Q.  Okay.  So what's misleading in the cancer   04:16PM
6 pain?
7   A.  It's this -- it suggests that
8 anticonvulsants are sometimes used generally for
9 cancer pain.  It's like saying using your heels stop
10 a car.      04:16PM
11      MR. CHEFFO:  I'm sorry.  Could you read
12 that back?
13     (Record read as follows:
14     "ANSWER:  It suggests that
15     anticonvulsants are sometimes used   04:16PM
16     generally for cancer pain.  It's like
17     saying using your heels stop a car.")
18 BY MR. CHEFFO:
19   Q.  So that's a misleading statement on the
20 Kaiser Permanente website?   04:16PM
21   A.  Well, it's a misleading statement by
22 Healthwise, if this is by Healthwise.  I'm assuming
23 it is.  But it's misleading to suggest that
24 anticonvulsants are generally used for cancer pain.
25   Q.  Okay.  What else is misleading on the   04:16PM

Page 347

1 Kaiser Permanente website regarding anticonvulsants
2 for cancer pain, if anything?
3      MS. NUSSBAUM:  Objection.
4      THE WITNESS:  You keep saying that -- the
5 Kaiser Permanente website, and I'm only speaking   04:17PM
6 about this particular document.  I can't possibly
7 speak to the entire website.
8 BY MR. CHEFFO:
9   Q.  Well, we're talking about that -- okay?
10   A.  Okay.  I just -- whenever you say -- you   04:17PM
11 keep mentioning --
12   Q.  What's the exhibit number there?
13   A.  I don't have it.  Oh, 17.
14   Q.  Okay.  In Exhibit 17, what, if anything,
15 else is misleading?   04:17PM
16   A.  It's misleading to have a list of
17 medications that appear to have equal prominence as
18 if all of them are equal to the other.
19     It's misleading to suggest that there's
20 something specific about the way anticonvulsants   04:17PM
21 work in regard specifically to cancer pain.
22     It's misleading to suggest that it is
23 commonly used in the section, "Why It is Used."
24     It's misleading to use the word "well" in
25 "How Well It Works."   04:18PM

Page 348

1     The side effect profile seems relatively
2 accurate.  And the USDA -- FDA warning seems
3 accurate.
4     It's misleading to use the word "drug
5 encyclopedia" when we don't really -- we don't --   04:18PM
6 it's a language that's not usually our website
7 language, so it looks like it's something from
8 somewhere else.  I don't know if we have a drug
9 encyclopedia, but it's not a term I've used with
10 ours.      04:18PM
11     It's misleading to put the Tegretol at the
12 top of the list in the beginning examples and at the
13 end say, it's not generally used in cancer pain.  It
14 seems contradictory, and it seems to reflect a lack
15 of care that's taken with this overall.   04:19PM
16     It's misleading to -- well, that's enough.
17 That's enough misleading stuff.
18   Q.  Do you know who any of the people listed
19 are?
20   A.  Only one, the citation.   04:19PM
21   Q.  Who's that?
22   A.  Kathleen Foley.  She's a well-respected
23 cancer pain doctor.
24   Q.  Anybody else listed on the credits or the
25 medical review?   04:19PM

Page 349

1   A.  I don't know them.
2   Q.  Do you know who Anne Poinier is?
3   A.  No.
4   Q.  Do you know who Shannon Erstad is?
5   A.  No.   04:19PM
6   Q.  Okay.  What's the next exhibit that you
7 have?  Why don't you look at the low -- chronic low
8 back pain.
9   A.  Okay.
10   Q.  What, if anything, is misleading on that   04:19PM
11 exhibit, talking about anticonvulsants and chronic
12 low back pain?
13   A.  It's -- some of them are similar.
14     It's misleading to suggest that
15 anticonvulsants for chronic low back pain is a   04:20PM
16 standard and common treatment.
17     It's misleading, again, to order the
18 examples in the way they are, as if they have equal
19 emphasis.
20     It's misleading to describe a sentence "How   04:20PM
21 It Works" when the topic is titled "Chronic Low Back
22 Pain," but then the description of how it works
23 talks about brain electrical activity.
24     It's just another example of how poorly
25 conceived and lacking they are in any real   04:20PM

88 (Pages 346 to 349)

Page 350

1  expectation that this would be used in any kind of
2  significant way.
3      It's misleading that -- the comment about
4  persistent low back pain with fewer side effects
5  is -- suggests that all anticonvulsants can reduce    04:21PM
6  some persistent low back pain to the advantage of
7  all tricyclic antidepressants with fewer side
8  effects than all anti- -- tricyclic antidepressants.
9      It's misleading to use the phrase "How Well
10 It Works" when it doesn't work very well. It may     04:21PM
11 work, but it gives a false sense that it works very
12 well, especially when it -- the title of the
13 paragraph is "How Well It Works" and the third
14 sentence says, "This type of medicine is not
15 well-studied as a chronic pain treatment." So        04:21PM
16 that's contradictory. In addition --
17 Q.   Are there any half truths in there, Doctor?
18     MR. SOBOL: Objection. Had he finished his
19 answer?
20     THE WITNESS: I -- no, I -- there's many          04:21PM
21 other things that were --
22 BY MR. CHEFFO:
23 Q.   No, you can keep going.
24 A.   Okay. The pregabalin can cause swelling in
25 some people, including swelling of the face or lips.  04:22PM

Page 351

1      Really, the thing that bothers most people
2  is the leg swelling, which can be really
3  devastating.
4      And the other thing is that the -- what's
5  misleading is that the citations are from the        04:22PM
6  American Geriatric Society, which presumably is
7  something that discusses chronic low back pain for
8  geriatric patients, and it's misleading to put this
9  without identifying that -- at least in the title,
10 that this is primarily based on geriatric patients,  04:22PM
11 and it's misleading that there's no geriatrician in
12 the credits for the reviews when the citation is
13 from the American Geriatric Society.
14     And it's also misleading that there is no
15 pain doctor or physiatrist or anybody who actually   04:22PM
16 prominently sees low back pain as a primary part of
17 their practice.
18     And it's also misleading to not identify --
19 well, it's okay. The Healthwise issue is another
20 one -- no one would be reasonably -- would           04:23PM
21 reasonably think that it wasn't a Kaiser document.
22 It's a little misleading to me. I know when I look
23 at things, I see Healthwise, it seems like a strange
24 name to me. So I know, but a patient wouldn't think
25 that. They would think somehow if -- it's an         04:23PM

Page 352

1  imprimatur of some type, which it's not.
2      So those are the misleading things.
3      And you asked me if there were any half
4  truths, and I would say if there are, that means
5  there's half lies, in which case it's, as we say,    04:23PM
6  gornisht anyway. It's nothing.
7  Q.   Are there any half truths or half lies?
8     MR. SOBOL: Objection.
9     THE WITNESS: I don't know how to measure a
10 truth.                                               04:23PM
11 BY MR. CHEFFO:
12 Q.   Can you look at the next exhibit that you
13 haven't reviewed and --
14 A.   Headache cluster.
15 Q.   Yes, sir.                                       04:23PM
16 A.   Okay.
17 Q.   Doctor. Excuse me.
18 A.   That's okay.
19 Q.   And just so we're clear, the question I'm
20 asking you is, are there any misleading or           04:24PM
21 misrepresentations in that exhibit?
22     MR. SOBOL: Which exhibit are we on now?
23     THE WITNESS: Headache cluster.
24 BY MR. CHEFFO:
25 Q.   Which is the number there, Doctor?             04:24PM

Page 353

1  A.   15.
2  Q.   What's the heading -- what's the title of
3  it, just for the record?
4  A.   "Headache, cluster."
5  Q.   Okay.                                           04:24PM
6     MS. NUSSBAUM: I don't have it.
7     THE WITNESS: What's misleading -- I won't
8  go over the things that are similarly misleading as
9  in the other one, but the new misleading things --
10    MR. SOBOL: Hold on. Before you answer the         04:24PM
11 question, may we have a copy of the exhibit.
12    MR. CHEFFO: You did this to me last time.
13 I threw two for everyone. She told me that you
14 don't have it and then it's in there. So before you
15 tell me again it's not there, let's look.            04:24PM
16    THE WITNESS: You're being punished.
17    MR. SOBOL: I don't see it.
18    THE WITNESS: I have Headache, Cluster
19 here.
20    MS. NUSSBAUM: Yeah, these are all original        04:24PM
21 exhibits.
22    THE WITNESS: Yeah, I know, but I have only
23 one Headache, Cluster here because last time I had
24 the second one.
25 BY MR. CHEFFO:

89 (Pages 350 to 353)

Page 354

1   Q.  Put Headache, Cluster aside for a minute.
2   A.  Okay.
3   Q.  I want to see if we have another one.  See
4   if you can --
5   A.  Burning Mouth --                        04:25PM
6   Q.  -- use the next one.
7   A.  Burning Mouth Syndrome.
8   Q.  Yeah.
9       MR. SOBOL:  I don't have that one either.
10      THE WITNESS:  Maybe it's over here.        04:25PM
11      MS. NUSSBAUM:  No.  You only have exhibits.
12  There are no more -- you don't have anymore.
13      THE WITNESS:  Primary Orthostatic Tremor,
14  do you have that one?
15  BY MR. CHEFFO:                               04:25PM
16  Q.  Do Burning Mouth.  I have Burning Mouth.
17  A.  Okay.  Burning -- we have a second Burning
18  Mouth there, please.
19      MR. SOBOL:  I do not have a Burning Mouth.
20      MR. CHEFFO:  He's going to give it to you.
21      THE WITNESS:  Thank God.
22  BY MR. CHEFFO:
23  Q.  Okay.  What's the number there, what
24  exhibit number?
25  A.  18.                                      04:25PM

Page 355

1   Q.  Okay.  What's -- what, if anything, is
2   misleading about the Exhibit 18?
3   A.  What's misleading is --
4       MR. SOBOL:  Objection.
5       Go ahead.                               04:25PM
6       THE WITNESS:  What's misleading is that the
7   title is -- under Healthwise is "National
8   Organization for Rare Disorders, Inc."  It sounds as
9   if it's some kind of benevolent society for rare
10  disorders, maybe even NIH related.  It has a similar  04:25PM
11  ring to some of the more official government, and my
12  impression is -- I don't know who they are.  I don't
13  know if they're a patient support organization or
14  not.  It doesn't sound like the ones that I know.
15  So that's a little bit misleading.             04:26PM
16      The other things that are misleading about
17  it.
18      The symptom -- the general discussion and
19  the symptoms section are actually -- I think they're
20  quite clear, and that -- those actually are          04:26PM
21  informative to a general person.  I think that
22  the -- I think that the causes are informative.  I
23  think that the affected population section is
24  informative.  I don't know if it's accurate.
25  Whenever I say informative -- most of it is, up      04:26PM

Page 356

1   until now, I would say is probably pretty accurate
2   just on a quick read.
3       Related disorders seems informative.
4       The standard therapies are informative
5   until you get to the medications, because even with  04:27PM
6   Elavil and Klonopin, including Neurontin, those
7   are -- really there is no good study for any of
8   them.  And there's no -- it's hard to say any of
9   them would help except for helping people sleep.
10      So it's deceiving in the sense that, you    04:27PM
11  know, it might help do more things than is
12  suggested, although they seem to be clear about that
13  they're designed to reduce pain or the perception of
14  pain.  But mostly, really, they're more sedation,
15  and the -- one of the proofs of that is that they    04:27PM
16  all have to be taken at bedtime.  And many patients
17  with this disorder have problems at bedtime, and so
18  it's really mostly for sleep and for anxiety.
19  BY MR. CHEFFO:
20  Q.  I think you're doing this, Doctor, but for  04:28PM
21  the purpose of time, I would just ask you to focus
22  on either half truths or misstatements or things
23  like that.
24      I think that's what you've been doing;
25  right?                                        04:28PM

Page 357

1   A.  Uh-huh.
2   Q.  Okay.
3   A.  It's interesting to me also that the --
4   it's -- combined with the misleading National
5   Organization for Rare Disorders, Inc., is that when  04:28PM
6   they look in their resources, the National
7   Organization for Rare Disorders is not one of the
8   resources that they use, which means that it's not
9   really a resource, even though it appears to be.
10      What's next?                            04:28PM
11  Q.  Do you have the headaches?
12  A.  No.  I have Anticonvulsants For Chronic
13  Pain, for Hot Flashes.
14  Q.  Yeah, why don't we do the Hot Flashes?
15  A.  Hot Flashes.                            04:28PM
16      MR. SOBOL:  May I have a hot flash, please.
17      MR. CHEFFO:  Gladly.
18      THE WITNESS:  I can't comment on this in
19  any way other than as just as a patient because I
20  don't treat hot flashes.                      04:29PM
21      MR. SOBOL:  What number is this?
22      THE WITNESS:  That is number 14.
23      But what's misleading about it is that the
24  only name there is Neurontin, and yet how it works
25  is clearly something different.  And how it works to  04:29PM

90 (Pages 354 to 357)

Page 358

1  improve hot flashes is not fully understood.  It's
2  misleading because you could put almost anything in
3  there, you know, how clouds work to improve hot
4  flashes is not fully understood.  I mean, how
5  anything -- so it's a little misleading.      04:29PM
6        And then, after it tells you it's not
7  understood and it's misleading, then it tells you it
8  may be used to treat it.  Well, again, holy water
9  may be used to treat it.  Good conversation may be
10  used to -- so it's a little misleading.  Anything   04:29PM
11  can be -- you know, anything is treat-- -- baldness
12  is treatable, you know, it's not curable.
13        So -- but otherwise, I don't have much to
14  say.  I just do notice that Anne Poinier is -- again
15  seems to be active here.  I wonder if -- I mean is   04:30PM
16  Anne Poinier on the Pfizer speaker -- speakers
17  bureau?
18  BY MR. CHEFFO:
19    Q.  Why don't you continue answering --
20    A.  I mean, I was on the speakers bureau for   04:30PM
21  Pfizer.
22    Q.  Why don't you just continue answering my
23  question.
24    A.  Oh, okay.  Because, I mean, that's the
25  first -- I start looking at this all over the place,   04:30PM

Page 359

1  and I think, oh, maybe she's -- but I don't know
2  her, so I would never suggest that that was true,
3  but it's just what's on my mind.
4        Next is Anticonvulsants For Chronic Pain.
5  I have all the same misleading statements.      04:30PM
6    Q.  I'm sorry, Doctor.  Which one are you on?
7    A.  16.
8    Q.  Which one is that, the heading?
9    A.  "Anticonvulsants For Chronic Pain."
10    Q.  That's in your area of expertise; right?   04:31PM
11    A.  Uh-huh.
12    Q.  Okay.
13        THE REPORTER:  Is that yes?
14        THE WITNESS:  Yes.
15  BY MR. CHEFFO:                     04:31PM
16    Q.  What, if anything, is false, misleading or
17  untruthful in this document?
18        MR. SOBOL:  I'm sorry.  Which one are we
19  on?
20        THE WITNESS:  16, Anticonvulsants For   04:31PM
21  Chronic Pain.
22        It's misleading -- the part that's
23  misleading is that chronic pain encompasses any
24  single type of pain that may last for longer than a
25  certain period of time.      04:31PM

Page 360

1        It's misleading to think that anyone --
2        (Discussion off the record.)
3        THE WITNESS:  It's misleading because the
4  title suggests that anticonvulsants can be used for
5  any type of pain of any dura-- -- of any long   04:31PM
6  duration of any type.  So from -- who knows what it
7  means.  It could mean from my shoulder that's been
8  hurting for three months to my headache, to my
9  cancer around my pancreas, to my prostate.  I have
10  no idea what "Anticonvulsants For Chronic Pain"   04:31PM
11  means.  So it's very misleading.  It suggests that,
12  hey, if you have pain, you know, we welcome all
13  comers.
14        And why it is used -- very sketchy.  It's
15  not very -- it's not very -- it's misleading in the   04:32PM
16  sense that it's suggested it's commonly being used
17  and appropriate for essentially any pain.
18        And more specifically, what's wrong about
19  it is that, you know, is the pregabalin -- the
20  pregabalin stuff.  That's just misleading because   04:32PM
21  pregabalin has been shown to not be as effective as
22  tricyclics in some studies.  So -- and has had
23  negative studies that weren't published.  So that I
24  know from Robert Dworkin, who's one of the big
25  Pfizer guys who told me that personally.  So that's   04:32PM

Page 361

1  something that's -- is misleading.
2        It's misleading that the F-- -- it says FDA
3  has issued an warning anticonvulsants --
4        THE REPORTER:  You'll have to read slower.
5        THE WITNESS:  I'm sorry.  It's      04:33PM
6  misleading -- no, I take that back.  Oh, and Anne
7  Poinier is here again.  She must be quite an expert
8  in many, many areas.  I'm saying that sarcastically.
9  But I, again -- she's the primary reviewer, and now
10  it makes me -- she may very well have a full pain   04:33PM
11  practice of patients with chronic pain, tremors and
12  hot flashes.  I don't know.  But I just -- all of a
13  sudden, I'm seeing her name everywhere.  Unless
14  she's very ambitious and wants to be on everything,
15  I would start to think about it.  You know, I   04:33PM
16  honestly don't know her at all.  I don't even know
17  who she is.
18        And then Primary Orthostatic Tremor.  The
19  same kinds of problems.  National Organization for
20  Rare Disorders, Inc., that's Exhibit 13.  The   04:34PM
21  general discussion is more or less -- well, it's not
22  necessarily rare.  It's uncommon.  And the inf-- --
23  some of the information is, I think, on mark.  Some
24  of the related disorders, I think, that's
25  informative.      04:34PM

91 (Pages 358 to 361)

Page 362

```
1      Standard therapies, it's misleading because
2   the way that it's worded suggests that people who
3   haven't responded to anything suddenly respond
4   favorably to gabapentin. I think it would have been
5   more accurate if they had simply included it in        04:35PM
6   additional drug therapies, which I think, you know,
7   maybe would have not been accurate or been kind of
8   borderline accurate, but it would have been
9   borderline accurate equally about primidone and
10  about valproic acid and other things. In fact, it       04:35PM
11  helps some people. It doesn't help some.
12      It's odd to me that it was singled out for
13  a separate sentence on its own, describing how
14  affected individuals responded favorably after being
15  treated with an anti-seizure drug called gabapentin,    04:35PM
16  as if it's this thing we didn't know anything about
17  it and now -- it's just -- it differentiates in a
18  way that's misleading.
19      And then otherwise, I think that, you know,
20  it's information that's available elsewhere. And so     04:35PM
21  that part is not misleading.
22      And again, the other misleading part is
23  this -- this corporation that has -- National
24  Organization for Rare Disorders, Inc., and yet is
25  not one of the resources. That's very suspicious.      04:36PM
```

Page 363

```
1   Why aren't they one of the resources? What -- why
2   do they call themselves that and what do they do?
3   Why are they in this? And they do have a email
4   there, and I don't know anything more about them.
5       And that would be it.              04:36PM
6   BY MR. CHEFFO:
7       Q. Okay. You mentioned holy water a few
8   times.
9       A. Yes.
10      Q. Who do you mean by that, just so the     04:36PM
11  record's clear?
12      A. I meant a treatment that has no evidence.
13      Q. Something that's ineffective or a
14  superstition, something like that?
15      A. No. A treatment that has no evidence and   04:36PM
16  yet there's strong belief about it.
17      Q. You said you were on the -- Pfizer's
18  speakers bureau?
19      A. I was.
20      Q. In what capacity?              04:36PM
21      A. As a -- I spoke for -- as a speaker.
22      Q. What product?
23      A. Neurontin.
24      Q. When was that?
25      A. 1996, I think. It was '96. Just before I   04:37PM
```

Page 364

```
1   joined Kaiser.
2       Q. What were your responsibilities?
3       A. My responsibilities were to give a talk on
4   pain.
5       Q. You gave one talk?              04:37PM
6       A. I gave one talk.
7       Q. Who did you give it to?
8       A. To a group in San Jose on a boat. I don't
9   remember exac- -- I think they were family
10  practitioners. I don't remember exactly. My      04:37PM
11  contact person there was -- it was a woman, but I
12  don't -- also don't remember her name.
13      Q. Do you remember -- do you have the
14  materials that you used?
15      A. No.                     04:37PM
16      Q. Did you use any materials?
17      A. Yes.
18      Q. Who gave them to you?
19      A. Some of them I did myself, and others, they
20  were given to me by the -- it was part of a slide   04:37PM
21  set from the company.
22      Q. And do you remember the sum and substance
23  of what you talked about?
24      A. Yes. It was a general pain talk, and in it
25  I talked about the different -- some different     04:38PM
```

Page 365

```
1   disorders. It was the typical talk I gave at that
2   time, which was introduction to disorders and some
3   of the treatments.
4       Q. And how did Neurontin come up, or what did
5   you talk about with respect to Neurontin?         04:38PM
6       A. Neurontin came up because I had -- well,
7   first of all, I had been detailed for -- you know,
8   for a long time about it, so I had gotten a lot of
9   information. And then I was -- I had come out of my
10  fellowship and so the -- I forgot who asked --      04:38PM
11  somebody asked me if I wanted to be on the speakers
12  bureau. It wasn't the person in San Jose, but
13  somebody asked me, and somehow I got to be on it,
14  and I don't remember how.
15      And then I was asked to talk about it, and    04:38PM
16  one of the things that I always did -- I'd given
17  other lectures. You know, obviously in fellowship
18  you give a lot of lectures and afterwards, newly
19  started, you market yourself. You give lectures.
20  And I'd always -- my first statement was always,   04:39PM
21  well, you know, I just -- I need to be honest about
22  the -- I want to be even-handed, so I don't want to
23  emphasize one thing or another in the lecture. So
24  that was always the thing that I started out with.
25      So the idea of a lecture was to -- well,     04:39PM
```

Page 386

1  seven hours. The plaintiff's position is that that
2  time should be split in half, three and a half hours
3  each.
4         As in the accommodation to counsel for
5  Pfizer, the plaintiffs have been permitting the      05:07PM
6  questioning to go after three and a half hours.
7  We're now somewhat over six hours, and our position
8  is that the deposition -- the questioning of -- by
9  Pfizer has slightly less than an hour left.
10        I would suggest to counsel that some of      05:07PM
11  that time be reserved if they want any opportunity
12  to undertake a redirect after we have questioned the
13  witness, which we intend to do when you're at the
14  end of the next hour.
15        MR. CHEFFO: We'll take that under      05:07PM
16  advisement. I want to use our time appropriately on
17  the record, so let's just go.
18  BY MR. CHEFFO:
19     Q. You had a chance to look at what we've
20  marked as Exhibit 21, Doctor?      05:08PM
21     A. Yes.
22     Q. It's also got a 24 sticker, but you --
23  we'll ignore that. That's from a prior deposition.
24        Have you ever seen this document before?
25     A. No.      05:08PM

Page 387

1     Q. It's from a chief of neurology meeting
2  June 17th, 1999; right?
3     A. Yes.
4     Q. And it's a Kaiser document?
5     A. It doesn't -- there's a stamp that says KIS   05:08PM
6  confidential, which I think means it is a Kaiser
7  document.
8     Q. And Debbie Kubota, she's a drug information
9  services person?
10     A. Yes, she is.      05:08PM
11     Q. The -- we know from your declaration that
12  the P&T committee took up the issue of guidelines
13  and restrictions of gabapentin in or about
14  September of 1999; is that correct?
15     A. Yes.      05:08PM
16     Q. So this is approximately three or four
17  months before.
18     A. It was in June 1999.
19     Q. Okay. And under gabapentin, there is a --
20  information here from this chief of neurology      05:09PM
21  meeting regarding removal of restrictions; right?
22     A. Yes.
23     Q. And it says that:
24        "Family Practice and Internal
25  Medicine people have asked to expand      05:09PM

Page 388

1  the restriction to include prescribing
2  for neuropathies and/or with guidelines
3  or consultation with neurology."
4        Right?
5     A. That's the first sentence, yes.      05:09PM
6     Q. And then in the next paragraph, it says:
7        DI/SPS, which is the Kaiser DIS
8  service, "is recommending to remove
9  prescription restrictions and add
10  guidelines for the use of gabapentin to      05:09PM
11  discourage overprescribing with
12  resultant significant cost impact."
13        Did I read that correctly?
14     A. More or less.
15     Q. Okay. Were you aware this was going on on   05:09PM
16  or about the time of June 17th, 1999?
17     A. I don't recall if I was aware right then.
18  I mean, I was aware at some point in 1999. I don't
19  know about that moment.
20     Q. Were you aware that there was -- that the   05:10PM
21  family practice and internal medicine folks had
22  asked to remove the guidelines or restrictions or
23  alter them?
24     A. I'm not surprised, but I don't remember.
25  It makes sense to me that they would.      05:10PM

Page 389

1     Q. And is it a fair reading that this was then
2  being presented to the chief of -- chiefs of
3  neurology to consider that request so they could
4  weigh in?
5     A. Weighing is in the important point. Yes,   05:10PM
6  they were asked for their opinion.
7     Q. And they would be one of a group that would
8  then ultimately give a recommendation to the P&T
9  committee?
10     A. That's usually the -- my understanding is   05:10PM
11  that's the way it happens. That's the way it works.
12     Q. Okay. And back here in 1999, there was a
13  concern about overprescriptions and possible
14  significant cost impact of gabapentin?
15     A. That's what's stated.      05:10PM
16     Q. And, in fact, they had tracked unrestricted
17  use in Northern California and determined that, in
18  the past year, there were 30,384 prescriptions for
19  gabapentin?
20     A. Right. You're reading the document. I --   05:11PM
21  that's exactly what it says.
22     Q. Right. Well, remember I asked you earlier
23  if there were ways of figuring out how many
24  prescriptions were written.
25        Is it fair to say that someone went back   05:11PM

98 (Pages 386 to 389)

Page 394

```
 1      Q.  Just so we're clear here.  If you look on
 2   the third page.  I wasn't making this up, Doctor.
 3   It says here the chiefs of neurology recommend to
 4   remove prescribing restrictions and add guidelines
 5   for use.                              05:16PM
 6        Isn't that what it says?
 7        MR. SOBOL:  Objection.
 8        THE WITNESS:  Where?
 9   BY MR. CHEFFO:
10      Q.  Right in the very middle of the third page.  05:16PM
11   Right here, topic gabapentin, restriction.
12      A.  That's what it says, but you're asking me
13   about the prior statement, which is the preamble to
14   that.
15      Q.  Let's go to the third page and just let me   05:16PM
16   ask you --
17      A.  Okay.
18      Q.  -- questions about that.
19        Does it say on the third page that "the
20   chiefs of neurology recommended to remove           05:16PM
21   prescribing physicians and add guidelines"?
22      A.  That's what I'm reading.
23      Q.  And were you aware of that at the time?
24      A.  I recall that.  I don't know if I was aware
25   at that particular time at that meeting because I   05:17PM
```

Page 395

```
 1   wasn't privy to what happened, but I was certainly
 2   aware during that period of time that there were
 3   guidelines, yes.
 4      Q.  They were voting to remove restrictions and
 5   add guidelines.  That's what the recommendation was.  05:17PM
 6      A.  Okay.
 7      Q.  And they basically talk about what
 8   Neurontin is indicated for; right?
 9        MR. SOBOL:  Objection.
10        THE WITNESS:  Specifically -- they --      05:17PM
11   there's a statement about indication of Neurontin in
12   there.  Is that what you're asking about?
13   BY MR. CHEFFO:
14      Q.  It says:
15        "Neurontin is indicated as           05:17PM
16   adjunctive therapy in the treatment of
17   partial seizures."
18      A.  That's right.  Yes, that's what it says,
19   yes.
20      Q.  And then it talks about RSD; right?        05:17PM
21      A.  But not as an indication.  It doesn't use
22   the word "indication."
23      Q.  I understand that.
24      A.  Well, that's why I was confused because --
25      Q.  The first bullet talks about indications.   05:18PM
```

Page 396

```
 1      A.  You --
 2      Q.  We've established that it's not indicated
 3   for RSD; right?
 4      A.  That it doesn't discuss indications for RSD
 5   that's right.                          05:18PM
 6      Q.  Right.  And Neurontin's not indicated for
 7   that, is it?
 8      A.  It is not reflected in this document, no.
 9      Q.  Well, you prescribe it.  Do you know
10   whether it is or not?                   05:18PM
11        MR. SOBOL:  Objection.
12        THE WITNESS:  It's not reflected in this
13   document so let -- I'm -- I -- you kind of move back
14   and forth.  Sometimes you want me to be general and
15   specific.  I'm --                     05:18PM
16   BY MR. CHEFFO:
17      Q.  Okay.
18      A.  -- just trying to answer your question.
19      Q.  It's not reflected here?
20      A.  No, it's not.                    05:18PM
21      Q.  And it says -- under bipolar affective
22   disorder, it says that:
23        "A review of several studies and
24   case reports found that gabapentin may
25   be effective as monotherapy or         05:18PM
```

Page 397

```
 1   adjunctive therapy in some
 2   treatment-resistant cases of bipolar
 3   affective disorders."
 4        Right?
 5      A.  Yes.                            05:18PM
 6      Q.  That's information that the neurology
 7   chiefs and others had back in June of 1999?
 8      A.  That's --
 9        MR. SOBOL:  Objection.
10        THE WITNESS:  That's precisely what's      05:18PM
11   written on the page.
12   BY MR. CHEFFO:
13      Q.  Okay.  And it also says that:
14        "Studies have shown gabapentin to
15   be effective in the treatment of        05:19PM
16   diabetic and postherpetic
17   neuropathies."
18        Right?
19        MR. SOBOL:  Objection.
20        THE WITNESS:  That's what is written.      05:19PM
21   BY MR. CHEFFO:
22      Q.  And effective talks -- that means efficacy,
23   right, when a doctor talks about it?
24      A.  No, it -- there's -- no.
25      Q.  So what do you think -- read -- take a     05:19PM
```

100 (Pages 394 to 397)

Page 398

1  second and read that bullet and tell me what you
2  think it means.
3      A.  Just what it says.  Effective and efficacy,
4  one of them is a statistical term, and one of them
5  is different.  I don't --                    05:19PM
6      Q.  What does this one mean?
7      A.  Well, I don't know what it means now, quite
8  honestly.
9      Q.  What did it mean back in 1999?
10     A.  It -- back in 1999, it meant that the      05:19PM
11 evidence that was used to show this, that we now
12 know to be tainted, is -- suggested that it was
13 effective.  Now we know something different.  So
14 it's --
15     Q.  Is that what this says?                05:19PM
16         MR. SOBOL:  Obje- --
17 BY MR. CHEFFO:
18     Q.  I'm just asking you what -- what --
19     A.  That -- then I'll read it:
20         "Studies have shown gabapentin to       05:20PM
21 be effective in the treatment of
22 diabetic and postherpetic
23 neuropathies."
24         That's what it says.
25     Q.  Okay.  And then it also has in bold that:  05:20PM

Page 399

1          The use of gabapentin for the
2  treatment of neuropathy should be
3  reserved for patients unresponsive to
4  or intolerant of other available
5  treatment modalities including          05:20PM
6  tricyclic antidepressants.
7          And it has others; right?
8      A.  Yes.
9      Q.  So that's saying it should be used as a
10 second- or third-line treatment?          05:20PM
11     A.  At that time with that evidence, yes.
12     Q.  And that's part of the guidelines that were
13 being recommended by the chiefs of neurology?
14     A.  With the false evidence they had, yes.
15     Q.  It was recommended by the chiefs of      05:20PM
16 neurology at that time; right?
17         MR. SOBOL:  Objection, asked and answered.
18         THE WITNESS:  With the false evidence they
19 had, yes.
20 BY MR. CHEFFO:                            05:20PM
21     Q.  What was false?
22     A.  That the groups -- the groups were -- were
23 biased in terms of selection in regards to pulling
24 out cases in which -- had not responded to
25 Neurontin, that sedation -- the factor of sedation  05:21PM

Page 400

1  wasn't taken into it, that the wording of the
2  study -- of some of the studies was polished by the
3  Pfizer pharmaceutical people, that some of the
4  studies were suppressed, waiting for the English
5  studies, hoping that they would get better, and then  05:21PM
6  even when the doctor wanted to publish the negative
7  study, they -- that they -- it was the decision not
8  to publish a negative study.
9          I think all those things, if those things
10 had been known, this would never have happened.     05:21PM
11     Q.  Where did you get all that information
12 from?  From the Abramson report?
13     A.  I did read it in the Abramson report.
14     Q.  You weren't at -- you weren't a chief of
15 neurology, were you?                      05:22PM
16     A.  I was not.
17     Q.  You weren't at this meeting, were you?
18     A.  I was not.
19     Q.  And you said that if they had known then
20 what they know now, things would have been        05:22PM
21 different; right?
22     A.  If I had known.
23     Q.  If they had known?
24     A.  No, I said if I had known.
25     Q.  Okay.  What if they had known all the stuff  05:22PM

Page 401

1  that you just said right now, would things have been
2  different?
3      A.  I don't --
4          MR. SOBOL:  Objection.
5          THE WITNESS:  -- know.  I can't speculate  05:22PM
6  about that.
7  BY MR. CHEFFO:
8      Q.  Are they any different right now today than
9  then were back in 1999?
10         MR. SOBOL:  Objection.                05:22PM
11 BY MR. CHEFFO:
12     Q.  Yes or no?
13     A.  They will be.
14     Q.  Are they today?
15     A.  I don't know.                      05:22PM
16     Q.  You know they are not, Doctor.
17         MR. SOBOL:  Hold on a second.
18         MS. NUSSBAUM:  Wait a minute.  We've had
19 all his testimony --
20         MR. CHEFFO:  Okay.
21         MS. NUSSBAUM:  -- about DUAT and
22 everything --
23         MR. CHEFFO:  You know, I don't think
24 you're -- you're not here to talk.
25         MS. NUSSBAUM:  Well, but you're not --   05:22PM

101 (Pages 398 to 401)

Page 402

1  BY MR. CHEFFO:
2    Q.  Doctor –
3       MS. NUSSBAUM:  -- going to mislead the
4  witness.
5  BY MR. CHEFFO:                          05:22PM
6    Q.  Doctor, today, aren't there the same
7  guidelines in effect as are indicated here back
8  in -- as in 2- -- 1999?
9       MR. SOBOL:  Objection, asked and answered.
10      THE WITNESS:  As far as I know, yes, but   05:23PM
11 that's in flux.  That's in flux.
12 BY MR. CHEFFO:
13   Q.  So your point -- let's just see if we
14 understand this, is if these people knew what we
15 know now, things would have been different, but   05:23PM
16 nothing's different.  Right?
17      MR. SOBOL:  Objection.
18      Do you understand the question?  Answer.
19      THE WITNESS:  I do understand the question.
20 BY MR. CHEFFO:                          05:23PM
21   Q.  Can you answer it?
22   A.  It's impossible to answer that question.
23   Q.  Okay.  Fair enough.  Then let's go to the
24 next question.
25      MR. SOBOL:  Have you finished answer to his   05:23PM

Page 403

1  question?
2       THE WITNESS:  I haven't finished.
3       MS. NUSSBAUM:  Doctor --
4  BY MR. CHEFFO:
5    Q.  Well, you told me it was impossible.   05:23PM
6       MR. SOBOL:  Well, you know --
7       THE WITNESS:  I haven't finished answering
8  the question.
9       MR. SOBOL:  I don't think.  If he has,
10 fine.  If he hasn't --
11 BY MR. CHEFFO:
12   Q.  Okay.  You can answer an impossible
13 question.
14   A.  That people make their best decisions based
15 on the trust they have in the organizations, our   05:23PM
16 own -- the information drug services, where they get
17 the information from, which is the literature.  And
18 they make the decision based on that moment in time.
19      But mistakes can be corrected.  And right
20 now, it -- you have to consider that Kaiser is like   05:24PM
21 a big ship.  It takes a long time to turn.  So
22 there's no expectation that now that we just -- that
23 I just read this in the last couple of weeks, that I
24 would have any kind of question or suspicion until
25 then.  Now, that I do, then, yeah, I'm going to make   05:24PM

Page 404

1  every effort to look into it.
2       I think it's very reasonable, when you have
3  doubts about the scientific evidence, to clarify it.
4  But until then, you don't continue making that
5  mistake.  You put it on hold.  You bring it back.   05:24PM
6  You reel it back in.  That's what I'm saying.
7    Q.  Doctor --
8    A.  So while today, this moment, no, I have
9  every intention of correcting what I think is
10 something we should look further into, and I'm going   05:24PM
11 to make it my business, but I need the permission to
12 do that.  The only reason that I haven't done it so
13 far because, as far as I know, this is privileged
14 information.  I will find out what is privileged,
15 what isn't, and then I'll do what the right thing   05:24PM
16 is.
17   Q.  Who told you that it was privileged?
18   A.  It's an assumption that I made.  I didn't
19 ask specifically about it.
20   Q.  So you're not on the P&T committee, are   05:25PM
21 you?
22   A.  No.
23   Q.  You have no ability to unilaterally make
24 any changes, do you?
25      MR. SOBOL:  Objection, asked and answered   05:25PM

Page 405

1  many times.
2       THE WITNESS:  I have influence as a senior
3  member of the Regional Pain Committee.  I have
4  influence as a senior pain physician.
5  BY MR. CHEFFO:                          05:25PM
6    Q.  You can unilaterally --
7    A.  I have influence as a longtime committee
8  member of DUAT.  I think that I'm a reasonable
9  person, and I think that people listen to a
10 reasonable person.  I have good training, and I --   05:25PM
11 so I'll -- I'm going to go with that.  I'm going to
12 rely on that.
13   Q.  Do you have any idea why this information's
14 been out there for a year and a half and no one told
15 you about it?                            05:25PM
16   A.  I don't know.
17      MR. SOBOL:  Objection.
18      THE WITNESS:  I don't know why.  But again,
19 I think I answered that earlier, which is that I
20 assume that there is some due diligence that needs   05:25PM
21 to take place to verify whether something is
22 accurate or not.
23      And I trust -- like I said, I -- there's a
24 track record I have with Kaiser that I've seen
25 Kaiser do well by patients.  Vioxx is a good   05:26PM

102 (Pages 402 to 405)

Page 406

1   example. We saved many lives precisely with the
2   DUAT organization, doing what we do best, which is
3   quality utilization. So I have reason to trust
4   that.
5       I don't necessarily have every reason to       05:26PM
6   trust the -- Pfizer, who had been detailing me for
7   years, telling me all this stuff, and then giving me
8   a lecture somewhere and then insinuating that I
9   hadn't talked enough about Neurontin and feeling,
10  you know -- you know, all those things and then     05:26PM
11  being dropped from it, thinking to myself, well,
12  gee, I must -- I guess I must be a bad speaker, but
13  then realizing that wasn't the case. That's the
14  track record I have with Pfizer.
15      The track record I have with Pfizer is a        05:26PM
16  well-publicized, well-known marketing snafu where
17  they got sued, has been in the papers all over the
18  place. I didn't -- that's a track record.
19      You know, as far as I'm concerned, you
20  know, what's the difference between -- I mean, why   05:26PM
21  do we need a Pfizer? We could have just one guy in
22  a room creating medical papers and, you know, why --
23  as long as -- it's a slippery slope. As long as you
24  are, you know, being a little bit -- you know, you
25  can kind of do what you want, then why not just      05:27PM

Page 407

1   write what you want. I don't understand why Pfizer
2   needs to have buildings all over the place. Just
3   have one guy in a room. That -- you know, it's
4   really irritating as a physician, as someone who
5   other people depend on for opinions, to be -- it     05:27PM
6   feels like --
7   BY MR. CHEFFO:
8       Q.  This is our use of time?
9       A.  It feels like it's being mocked. Well, you
10  know, I -- you know, it's been --                    05:27PM
11      Q.  I'm not going to interrupt you, Doctor.
12  You go on --
13      A.  You just did.
14      Q.  Well --
15      A.  You just did.
16      Q.  -- I think you've gone on for -- I let you
17  go for -- you know, rambling on.
18      A.  Right. And you know what, I feel like I've
19  been here --
20      Q.  Okay. I'm going to move to strike. Do you   05:27PM
21  want to keep talking? I'll let you.
22      A.  I can't unless you let me. Will you?
23      Q.  You know what, I'm not going to interrupt
24  you.
25      A.  I feel that that kind of evidence cooking    05:27PM

Page 408

1   and that kind of marketing is mocking of a whole
2   medical organization. I think it destroys the trust
3   that people have. I think when a patient comes to
4   me, if anything like this comes out or when
5   gabapentin came out and there was a big problem, I   05:28PM
6   look like an idiot. I don't like to look like an
7   idiot with my patients. I don't like to look like
8   an idiot with my colleagues.
9       Q.  Are you --
10      A.  So that's why it has an effect on me.        05:28PM
11      Q.  Are you done?
12      MR. SOBOL:  Yeah, he's done.
13      THE WITNESS:  I'm done. I'm done, and I'm
14  done politely.
15      MR. CHEFFO:  I'm going to move to strike       05:28PM
16  that entire response.
17      THE WITNESS:  You look like you might have
18  a little tremor. Do you maybe -- do you need a
19  little gabapentin there?
20      MR. SOBOL:  Let's go, guys.                    05:28PM
21  BY MR. CHEFFO:
22      Q.  Now, do you -- just -- I'm not going to ask
23  you specifics about the Abramson report or any of
24  the other reports, but do you know whether you were
25  the only doctor at Kaiser who received that          05:29PM

Page 409

1   information?
2       A.  I don't know.
3       Q.  You don't know if it was widely
4   disseminated or to anybody else in Kaiser, do you?
5       A.  I don't know. I know Mitch Cohen, who's at  05:29PM
6   Kaiser Health Plan, had it. So -- but I don't know.
7   I assume that it was, but I don't know.
8       Q.  You assumed it was?
9       A.  I assumed it was, yes.
10      MR. SOBOL:  Motion to strike.                  05:29PM
11  BY MR. CHEFFO:
12      Q.  And if you assumed it was, that would mean
13  it's -- people other than you know about it; right?
14      MR. SOBOL:  Objection.
15      THE WITNESS:  I don't know.
16      MR. SOBOL:  Motion to strike the last
17  answer about the last assumption.
18      THE WITNESS:  I don't know specifically. I
19  don't have specific knowledge of it.
20  BY MR. CHEFFO:                                      05:29PM
21      Q.  So when you wrote here -- when you wrote
22  here in your sworn declaration that you recommend
23  removal of all formulary guidelines and restrictions
24  for Neurontin under oath --
25      Do you remember that?

103 (Pages 406 to 409)

Page 406

1  example. We saved many lives precisely with the
2  DUAT organization, doing what we do best, which is
3  quality utilization. So I have reason to trust
4  that.
5        I don't necessarily have every reason to     05:26PM
6  trust the -- Pfizer, who had been detailing me for
7  years, telling me all this stuff, and then giving me
8  a lecture somewhere and then insinuating that I
9  hadn't talked enough about Neurontin and feeling,
10 you know -- you know, all those things and then     05:26PM
11 being dropped from it, thinking to myself, well,
12 gee, I must -- I guess I must be a bad speaker, but
13 then realizing that wasn't the case. That's the
14 track record I have with Pfizer.
15       The track record I have with Pfizer is a      05:26PM
16 well-publicized, well-known marketing snafu where
17 they got sued, has been in the papers all over the
18 place. I didn't -- that's a track record.
19       You know, as far as I'm concerned, you
20 know, what's the difference between -- I mean, why   05:26PM
21 do we need a Pfizer? We could have just one guy in
22 a room creating medical papers and, you know, why --
23 as long as -- it's a slippery slope. As long as you
24 are, you know, being a little bit -- you know, you
25 can kind of do what you want, then why not just      05:27PM

Page 407

1  write what you want. I don't understand why Pfizer
2  needs to have buildings all over the place. Just
3  have one guy in a room. That -- you know, it's
4  really irritating as a physician, as someone who
5  other people depend on for opinions, to be -- it     05:27PM
6  feels like --
7  BY MR. CHEFFO:
8     Q. This is our use of time?
9     A. It feels like it's being mocked. Well, you
10 know, I -- you know, it's been --                     05:27PM
11    Q. I'm not going to interrupt you, Doctor.
12 You go on --
13    A. You just did.
14    Q. Well --
15    A. You just did.
16    Q. -- I think you've gone on for -- I let you
17 go for -- you know, rambling on.
18    A. Right. And you know what, I feel like I've
19 been here --
20    Q. Okay. I'm going to move to strike. Do you  05:27PM
21 want to keep talking? I'll let you.
22    A. I can't unless you let me. Will you?
23    Q. You know what, I'm not going to interrupt
24 you.
25    A. I feel that that kind of evidence cooking    05:27PM

Page 408

1  and that kind of marketing is mocking of a whole
2  medical organization. I think it destroys the trust
3  that people have. I think when a patient comes to
4  me, if anything like this comes out or when
5  gabapentin came out and there was a big problem, I   05:28PM
6  look like an idiot. I don't like to look like an
7  idiot with my patients. I don't like to look like
8  an idiot with my colleagues.
9     Q. Are you --
10    A. So that's why it has an effect on me.       05:28PM
11    Q. Are you done?
12       MR. SOBOL: Yeah, he's done.
13       THE WITNESS: I'm done. I'm done, and I'm
14 done politely.
15       MR. CHEFFO: I'm going to move to strike      05:28PM
16 that entire response.
17       THE WITNESS: You look like you might have
18 a little tremor. Do you maybe -- do you need a
19 little gabapentin there?
20       MR. SOBOL: Let's go, guys.               05:28PM
21 BY MR. CHEFFO:
22    Q. Now, do you -- just -- I'm not going to ask
23 you specifics about the Abramson report or any of
24 the other reports, but do you know whether you were
25 the only doctor at Kaiser who received that          05:29PM

Page 409

1  information?
2     A. I don't know.
3     Q. You don't know if it was widely
4  disseminated or to anybody else in Kaiser, do you?
5     A. I don't know. I know Mitch Cohen, who's at  05:29PM
6  Kaiser Health Plan, had it. So -- but I don't know.
7  I assume that it was, but I don't know.
8     Q. You assumed it was?
9     A. I assumed it was, yes.
10       MR. SOBOL: Motion to strike.              05:29PM
11 BY MR. CHEFFO:
12    Q. And if you assumed it was, that would mean
13 it's -- people other than you know about it; right?
14       MR. SOBOL: Objection.
15       THE WITNESS: I don't know.
16       MR. SOBOL: Motion to strike the last
17 answer about the last assumption.
18       THE WITNESS: I don't know specifically. I
19 don't have specific knowledge of it.
20 BY MR. CHEFFO:                                  05:29PM
21    Q. So when you wrote here -- when you wrote
22 here in your sworn declaration that you recommend
23 removal of all formulary guidelines and restrictions
24 for Neurontin under oath --
25       Do you remember that?

103 (Pages 406 to 409)

Page 410

1    A.  I think I've said yes.
2    Q.  That's wrong, isn't it?
3    A.  Why was -- why is it wrong?
4    Q.  Well, doesn't this say that they're going
5    to be recommending the removal of formulary          05:30PM
6    restrictions but adding guidelines?
7        MR. SOBOL:  Objection, asked and answered.
8  BY MR. CHEFFO:
9    Q.  Go ahead.
10   A.  The formulary restrictions, like I said,      05:30PM
11   when I looked -- when I read that, my reading of it
12   was in relationship to the restrictions.  And my --
13   I knew there were guidelines because I was, you
14   know -- I was involved in DUAT, working with the
15   guidelines.  So I knew that there had been          05:30PM
16   guidelines there.
17   Q.  Well, Doctor, you went through a whole
18   litany of things that are misleading.  I mean, isn't
19   it misleading, don't you think, to say, in or about
20   September 1999, I recommended removal of all          05:30PM
21   formulary restrictions and guidelines, no caveats
22   for Neurontin -- hold on -- and you also said, I am
23   informed and believe that in or about
24   September 1990, the P&T committee accepted this
25   recommendation?                                      05:31PM

Page 411

1        MR. SOBOL:  Objection.  There's no question
2    before you yet.
3  BY MR. CHEFFO:
4    Q.  Is that accurate?
5        MR. SOBOL:  Objection.                  05:31PM
6        You may answer.
7  BY MR. CHEFFO:
8    Q.  You can answer.
9    A.  I recommend removal of all formulary
10   restrictions, comma, and guidelines for Neurontin.   05:31PM
11   That's one way to read it.
12   Q.  Where's the comma?
13   A.  There isn't.  But I'm just saying that in
14   reading it, that's what -- I -- again, what I told
15   you before about the grammar element.              05:31PM
16       Another way to read it is --
17       THE REPORTER:  I'm sorry.  About the?
18       THE WITNESS:  Another way to read it --
19       THE REPORTER:  What I told you before about
20   the?
21       MR. SOBOL:  Grammar element.
22       THE WITNESS:  Element.
23       Another way to read it is I recommend
24   removal of all formulary restrictions and
25   guidelines, guidelines related to how the formulary   05:31PM

Page 412

1    restrictions are -- what's the word?
2        MS. NUSSBAUM:  Enforced?
3        THE WITNESS:  No.  I'll find it.
4        How the guidelines are implemented.  And
5    that's the way I read it -- as I told you before,   05:32PM
6    that's the way I read it before, was that it related
7    to the guidelines for formulary restrictions.  So
8    when I read it the first time, that's what I was
9    looking at.
10       So in other words, we're not going to          05:32PM
11   restrict it any -- we're not going to have
12   guidelines anymore that a neurologist has to do it
13   or guidelines anymore that -- because, as I told you
14   when you first asked me, guidelines is a very
15   nebulous word.  It applies to many, many things.     05:32PM
16   And that's the way I originally read it.
17  BY MR. CHEFFO:
18   Q.  Doctor, it's not nebulous in terms of
19   Kaiser; right?  I mean, they use "guidelines" very
20   specifically, don't they?
21       MR. SOBOL:  Objection.
22       THE WITNESS:  They use it in a different
23   way, in a specific way.
24  BY MR. CHEFFO:
25   Q.  So you're telling me that you -- when you     05:32PM

Page 413

1    use "guidelines" in your sworn declaration, you're
2    using it differently than the way Kaiser does?
3        MR. SOBOL:  Objection.
4        THE WITNESS:  I said at the beginning,
5    earlier today, many hours ago, that when I read it,   05:32PM
6    my reading of it -- my understanding when I signed
7    it was that there are certain guidelines for
8    formulary restrictions.  It was the guidelines
9    related to formulary restrictions, not clinical
10   guidelines about how to use medications.  That was   05:32PM
11   my -- when I had talked about it, that was my
12   reading.
13       I can absolutely see where you could add a
14   different interpretation to it, but that -- I don't
15   recall that that was my interpretation at the time.   05:33PM
16   My interpretation was strictly, in this case, about
17   the guidelines related to formulary --
18  BY MR. CHEFFO:
19   Q.  What -- what guidelines --
20   A.  -- formulary restrictions.                  05:33PM
21   Q.  What guidelines --
22       THE REPORTER:  Wait a minute.
23  BY MR. CHEFFO:
24   Q.  -- relate --
25       MR. SOBOL:  You can't talk over him.          05:33PM

104 (Pages 410 to 413)

Page 522

1 with this, but I can tell you that it made sense to
2 me, when I read this, when I heard that Pfizer had
3 done this with another drug that's -- Lyrica is
4 similar to Neurontin. And so when I heard that the
5 same thing was being done, I said, oh, that sounds     07:49PM
6 familiar. That was, you know, made me more sure
7 that, you know, this is something I really need to
8 worry about. So --
9     MR. CHEFFO: I move to strike the comments
10 about Lyrica.     07:49PM
11 BY MR. SOBOL:
12     Q. You testified in your declaration about
13 whether or not you would have made the same
14 recommendations back in 1997 and 1999 that you did.
15     A. Right. I would absolutely not have had I     07:49PM
16 known what I know now.
17     Q. Why not?
18     MR. CHEFFO: Objection.
19     THE WITNESS: The reason why is because it
20 would lead to -- I don't need to be definitive about     07:49PM
21 it, about -- and to look at every detail of the
22 evidence with a fine-tooth comb to know that it
23 poses serious questions about the evidence. That
24 alone is a reason to hold back.
25 BY MR. SOBOL:     07:49PM

Page 523

1     Q. Is that the -- particularly the case when
2 the drug has not been approved by the FDA for the
3 particular indication?
4     MR. CHEFFO: Objection.
5     THE WITNESS: If a drug isn't approved but     07:50PM
6 has a lot of evidence -- people were using aspirin
7 for a long time before really good evidence came
8 about. That evidence was good. And so the FDA
9 alone isn't the key to allowing us to use it,
10 obviously, because we do. It's the strength of the     07:50PM
11 evidence and how much you trust the evidence.
12 That's really what it comes down to.
13     And you know, there has to be a certain
14 level of trust in where the evidence is -- where the
15 evidence is coming from. And if there's a question     07:50PM
16 about it, then you have to hold off.
17     MR. SOBOL: Nothing further.
18     MR. CHEFFO: I have a few questions,
19 Doctor.
20     MR. SOBOL: No. We're done.     07:50PM
21     THE WITNESS: No, I can't. I'm exhausted,
22 actually.
23     MR. CHEFFO: I have about five minutes.
24     MR. SOBOL: No. We're done.
25     THE WITNESS: You -- I -- I honestly --     07:50PM

Page 524

1     MR. CHEFFO: I have an opportunity to ask
2 five minutes of redirect questions.
3     THE WITNESS: I'm leaving. I have a kid
4 who's waiting for me. I don't know what to tell
5 you. I mean, I --     07:51PM
6     MR. CHEFFO: You just sat through these
7 entire questions. You're not dismissed. I can't
8 stop you physically from doing it, but I'm entitled
9 to ask -- you asked categories --
10     MR. SOBOL: He's instructed not to answer     07:51PM
11 anything further.
12     THE WITNESS: I'm exhausted, and you
13 know --
14     MR. CHEFFO: You weren't exhausted five
15 minutes ago.     07:51PM
16     THE WITNESS: You know it's --
17     MR. CHEFFO: Doctor, I don't want to --
18 we're not going to engage with you. You're going to
19 leave. You can leave. I'm stating my position for
20 the record.     07:51PM
21     My position is the deposition is not done.
22 I have five to ten minutes' worth of questions.
23 You're not going to allow them or you're not going
24 to stay for them. I'll make a motion.
25     THE VIDEOGRAPHER: This will conclude the     07:51PM

Page 525

1 deposition for today. We've had five DVD media
2 used. We're off the record at 7:53.
3
4     (TIME NOTED: 7:53 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

132 (Pages 522 to 525)