# EXHIBIT A

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL SALES & MARKETING ACTIONS | Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin |

**CLASS PLAINTIFFS' MEMORANDUM REGARDING *GUARDIAN* RULING IN CONNECTION WITH CLASS PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER DENYING RENEWED MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ........................................................................................................... 1

II.   PROCEDURAL HISTORY ............................................................................................ 2

III.  CASE LAW DOES NOT SUPPORT THE *GUARDIAN* RULE ............................................ 3

   A.   The First Circuit Endorses the Use of Aggregate Evidence ................................ 3

   B.   The Pharmaceutical Cases This Court Cites Do Not Support the *Guardian* Rule ............ 4

   C.   The General Circuit Court Cases This Court Cites Support the Use of Aggregate Evidence ........................................................................................................... 10

   D.   The Mississippi Zyprexa Decision Supports the Use of Aggregate Evidence ................. 12

IV.  THE PERCEIVED LACK OF INDIVIDUAL PHYSICIAN EVIDENCE DOES NOT REQUIRE REJECTION OF AGGREGATE EVIDENCE ........................................................ 15

V.   CONCLUSION ............................................................................................................ 17

## I.   INTRODUCTION

Several weeks ago, this Court may have adopted a sweeping new rule of law which devastates private litigants' ability to protect affordable healthcare from many types of marketing frauds perpetuated by pharmaceutical companies.  In *Guardian Life Ins. Co. of America v. Pfizer (In re Neurontin Mktg. & Sales Practices Litig.)*, 2010 U.S. Dist. LEXIS 1756, *84 (D. Mass. Jan. 8, 2010) ("*Guardian*"), this Court wrote:

> While Plaintiffs' position [that aggregate statistical evidence supports a jury finding quantifying the harm to health benefit providers from fraudulent drug marketing] has strong intuitive appeal, trial courts have almost uniformly held that in a misrepresentation action involving fraudulent marketing of direct claims to doctors, a plaintiff TPP or class must prove through individualized evidence that the misrepresentation caused specific physicians, TPP's, or consumers to rely on the fraud, and cannot rely on aggregate or statistical proof.

*Guardian*, 2010 U.S. Dist. LEXIS 1756, at *75-76.  *See also generally In re Neurontin Mktg. & Sale Practices Litig.*, 257 F.R.D. 315 (D. Mass. 2009) ("*Neurontin 2009*") (refusing to certify a class of payors on the grounds that common issues do not predominate and requiring individualized proof of causation and damages).  The Court rejects well-established principles of healthcare economics, and follows a poorly reasoned line of cases to eviscerate one of the few tools the public wields in fighting healthcare fraud and abuse.

If the *Guardian* rule of law sticks, private litigants are foreclosed from seeking redress even where they "have presented substantial evidence that [the pharmaceutical company] engaged in a widespread fraudulent off-label marketing campaign to promote [a drug] which increased off-label sales of [the drug]."  *Guardian* at *77-78.  And the *Guardian* rule appears to be invoked regardless of how well-developed, or persuasive, the overall aggregate evidence might be in terms of reasonably calculating the extent to which abusive pharmaceutical marketing practices caused unnecessary healthcare expenses, thereby taxing the overall ability of healthcare systems to provide affordable care.

The Court should revisit the *Guardian* rule.  It is inconsistent with binding First Circuit precedent.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, *Blue Cross Blue Shield of Massachusetts v. AstraZeneca Pharmaceuticals LP*, 08-cv-1056, 582 F.3d 156 (1st Cir. 2009) ("*In re AWP*").  The case law cited by *Guardian* does not support such a sweeping proposition of law.  The rule (if it exists) would require civil enforcement efforts to utilize the least reliable and most impractical form of evidence: physician self-reporting.

## II.    PROCEDURAL HISTORY

On May 28, 2009, Class Plaintiffs filed a Motion for Reconsideration of Order Denying Renewed Motion for Class Certification.  Docket No. 1796, dated May 28, 2009.  *See also* Docket No. 1827, dated June 11, 2009 (Errata Re Class Plainitffs' Motion for Reconsideration of Order Denying Renewed Motion for Class Certification).

On June 18, 2009, Defendants filed their Opposition to Class Plaintiffs' Motion for Reconsideration.  Docket No. 1856, dated June 18, 2009.  On August 31, 2009, Class Plaintiffs replied.  Docket No. 2071.

On September 18, 2009, this Court conducted a hearing on Defendants' motion for summary judgment on the Class Plaintiffs' and Coordinated Plaintiffs' claims.  The Court did not entertain argument on Class Plaintiffs' reconsideration motion at that time, but indicated that it is "something [the Court] will have argument on but not today."  Motion Hearing Transcript, dated September 18, 2009, at p. 3-4 ("SJ Transcript"). Since then there have been developments.

On October 8, 2009, Defendants filed a Notice of Supplemental Authority in Support of Summary Judgment and in Opposition to Class Plaintiffs' Motion for Reconsideration of Class Certification Denial, citing, and arguing, one of the decisions this Court ultimately relied upon in its *Guardian* ruling.  Docket No. 2120, dated October 8, 2009.

On October 15, 2009, a hearing on Plaintiffs' Motion for Reconsideration was held.  The Court left open the possibility of additional hearings.

On January 8, 2010, this Court entered a Memorandum and Order in the *Guardian* matter, granting in part and denying in part Defendants' Motion for Summary Judgment against Consolidated Plaintiffs.  2010 U.S. Dist. LEXIS 1756.

This brief replies to Defendants' October submission and this Court's January 2010 *Guardian* order.

### III.     CASE LAW DOES NOT SUPPORT THE *GUARDIAN* RULE

In what may be a bold move, this Court aligns itself with several recent cases that it perceives establish a new rule of law for lawsuits against pharmaceutical companies: that "in a misrepresentation action involving fraudulent marketing of direct claims to doctors, a plaintiff TPP or class must prove through individualized evidence that the misrepresentation caused specific physicians, TPPs, or consumers to rely on the fraud, and cannot rely on aggregate or statistical proof."   *Guardian*, 2010 U.S. Dist. LEXIS 1756, at *75-77.  Respectfully, no such sweeping rule of law exists.

#### A.     The First Circuit Endorses the Use of Aggregate Evidence

The *Guardian* rule, ironically, is inconsistent with recent First Circuit precedent generated by the Court's groundbreaking *AWP* decision.  On September 23, 2009, the First Circuit upheld this Court's $12.9 million judgment against AstraZeneca for violating the Massachusetts Consumer Protection Act.  *See In re AWP*, 582 F.3d at 160.  In so doing, the First Circuit rejected the defendants' contention that this Court erred by relying on aggregate proof – that is, a statistical damages model.  The First Circuit also distinguished the Second Circuit's decision in *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), and recognized

3

that "it is … obvious that class-action litigation often *requires* the district court to extrapolate

from the class representatives to the entire class," explaining,

> The district court in this case determined that the class was adequately represented
> when it certified the class, and it carefully examined the representatives'
> knowledge…. As a general matter, this is precisely the kind of analysis that Rule
> 23 was designed to permit, and it would quickly undermine the class-action
> mechanism were we to find that a district court presiding over a class action
> lawsuit errs ever time it allows proof in the aggregate.

*Id.* at 195. Noting "[t]he use of aggregate damages calculations is well established in federal

court and implied by the very existence of the class action mechanism itself", the First Circuit

continued:

> "Aggregate computation of class monetary relief is lawful and proper. Courts
> have not required absolute precision as to damages . . . . Challenges that such
> aggregate proof affects substantive law and otherwise violates the defendant's due
> process or jury trial rights to contest each member's claim individually, will not
> withstand analysis. . . . Just as an adverse decision against the class in the
> defendant's favor will be binding against the entire class in the aggregate without
> any rights of individual class members to litigate the common issues individually,
> so, too, an aggregate monetary liability award for the class will be binding on the
> defendant without offending due process."

*Id.* at 197-198 (*quoting* 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10.5,

at 483-86 (4th ed. 2002)).

**B.      The Pharmaceutical Cases This Court Cites Do Not Support the *Guardian* Rule**

This Court turns to four district court decisions by trial courts outside the First Circuit in

support of the *Guardian* rule. But none of the cases justify the proposition this Court appears to

be adopting in *Guardian*.

*Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP*, 585 F. Supp. 2d 1339

(M.D. Fla. 2008) ("*Seroquel*") dismissed on Rule 12(b)(6) grounds RICO claims regarding

misrepresentations of the comparative safety, efficacy and superiority of the atypical

antipsychotic Seroquel. Basing its ruling on the sole ground that the plaintiffs failed to

4

adequately allege the first of the three *Holmes* factors for RICO proximate cause, the court,

without citing any authority, *simply assumed* that the only way to prove the impact of

pharmaceutical marketing on a discernable level of drug sales is by asking each doctor, one

doctor at a time:

> This case raises serious concerns regarding the ascertainment of damages caused
> by Defendants' alleged fraudulent conduct, as opposed to damages caused by
> other, independent, factors.  The key independent factor in this case stems from
> the fact that consumers may only obtain Seroquel through a prescription from a
> physician.  Presumably, these physicians use their independent medical judgment
> to decide whether Seroquel is the best treatment for a given patient.  This
> independent judgment can be influenced by a number of things, only one of which
> may be representations by a manufacturer as to a particular drug's relative safety
> and efficacy.  Thus, in the context of this case, establishing that Plaintiffs' injuries
> were caused by Defendants' misconduct would require an inquiry into the
> specifics of each doctor-patient relationship implicated by the lawsuit.  In other
> words, each physician who prescribed Seroquel to an individual consumer or
> health and welfare fund member would have to be questioned as to whether his or
> her independent medical judgment was influenced by Defendants'
> misrepresentations, and to what extent.  Furthermore, as Defendant AstraZeneca
> points out in its motion, this individualized inquiry would likely have to be
> conducted with regard to each consumer purchase transaction or third-party
> reimbursement payment made over the last approximately ten years.  This is
> precisely the type of 'intricate, uncertain inquir[y]' the *Holmes* Court sought to
> prevent.

585 F. Supp. 2d at 1344.

*Seroquel* contains no discussion, let alone ruling, regarding the appropriate use of

statistical, econometric or other forms of aggregate proof.  It contains no discussion of -- and it

appears the plaintiff lawyers did not present information about -- any changes in Seroquel sales

over time, or any other historical view as to the potential impact of the wrongdoing on sales.  The

record reflects no effort by the plaintiffs' lawyers to educate the court regarding either (i) the

specific facts of how Astrazeneca's wrongful conduct affected, in the aggregate, Seroquel sales

over time, or (ii) methods and manners of statistical, econometric and aggregate proof used

successfully in other pharmaceutical matters.  The *Seroquel* ruling is simply *an assumption* about

what might happen, unaided by legal citation, description of appropriate methods of proof, or any solution regarding widespread use of healthcare economics to discern the impacts of pharmaceutical marketing.[1]

In the second case cited, *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009) ("*Actimmune*"), drug marketing firm InterMune purchased the rights to market and distribute Actimmune, a bio-engineered form of interferon gamma, after its developer Genentech had failed to successfully commercialize the product for its two proven uses for very rare diseases.  The complaint alleged that InterMune misrepresented Actimmune as effective in treating idiopathic pulmonary fibrosis, a generally incurable and deadly disease for which Actimmune's use was unproven, and "that this fraud directly caused economic loss to the individual plaintiffs as purchasers and to the TPPs as co-payors or reimbursers . . . [and that plaintiffs] would not have made payments for a drug that was not effective for the treatment of IPF and damages would not have been incurred had defendants' advertisements not been deceptive and fraudulent."  614 F. Supp. 2d at 1050.

In dismissing the RICO and state law claims under Rule 12(b)(6) for failure to allege causation, the *Actimmune* court relied on the *Seroquel* decision and the new Rule 12(b)(6) standard outlined in the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  The *Actimmune* decision does not elucidate why doctor-by-doctor proof is necessary if, as the plaintiffs argued, they can allege, prove, and quantify a significant and measurable impact on Actimmune sales in the aggregate.  It may be because both consumers and third party

---

[1] Although this Court did not cite it for this proposition, the District of New Jersey issued a similarly perplexing and groundless decision in *District 1199P Health & Plan v. Janssen, L.P.*, 2008 U.S. Dist. LEXIS 103526 (D.N.J. Dec. 23, 2008) ("*Risperdal*").  There, the lawyers pursuing the *Seroquel* case, involving one atypical antipsychotic, brought similar claims against Janssen for another atypical antipsychotic: Risperdal.  The court ruled that the allegations failed to plead injury with the result that the court recognized it "need not address causation more fully," cited *Seroquel* and made the observation that it "has a substantial question" as to whether *Holmes* proximate causation could be satisfied or that "individualized decision-making of physicians prescribing Risperdal breaks any chain of causation…"  *Risperdal*, 2008 U.S. Dist. LEXIS 103526 at * at 34-36.

payors made claims that the *Actimmune* court was concerned of the need to prove doctor-by-

doctor damage (since each consumer might arguably need to prove that his or her doctor was

influenced by the unlawful marketing).  But for third party payors, the *Actimmune* court gave no

citation to any examples of why such specific doctor-by-doctor proof was necessary and relied

on no cases in holding doctor-by-doctor proof necessary save *Seroquel*.

In any event, the *Actimmune* ruling cannot be said to be a rejection of proof by statistical,

econometric or other aggregate means since there is no discussion of such proof in this decision.

It is also inconsistent with the rulings of this Court in prior *Neurontin* decisions.  *See*, *e.g.*,

*Neurontin 2009*, 257 F.R.D. at 331 (noting the evidence and aggregate model "could support a

conclusion that a fraud had been perpetrated on the entire prescription market"); *In re Neurontin

Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 111 (D. Mass. 2007) ("*Neurontin 2007*") (*holding*

"Professor Rosenthal's proposed methodology is a plausible way of determining aggregate class-

wide liability, and defendants have identified no fundamental flaws now appearing in her

proposal to calculate aggregate damages."); *id*. at 114 (*writing* "This case is troublesome because

defendants allegedly used a national marketing scheme to promote a fraud.  If true, they should

not get off scot-free if there is a practical statistical way to address the difficult causation issues.

Plaintiffs claim that Dr. Rosenthal's model can prove what the effect of any fraudulent

promotional campaign for an off-label indication was.  If only a *de minimis* number of doctors

prescribed Neurontin for an off-label condition, and then off-label prescriptions skyrocketed after

a fraudulent campaign for that indication (*i.e.*, migraines or bipolar), the Court will consider

statistical proof as sufficient to demonstrate that most purchasers in that period were injured.");

*id*. (*quoting* District Judge Jack Weinstein in *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d

571, 579 (E.D.N.Y. 2007) ("*Zyprexa 2007*"), where he writes "[s]tatistical proof of reliance is

appropriate in the RICO context where a 'sophisticated, broad-based [scheme,] by [its] very

nature . . . likely to be designed to distort the entire body of public knowledge rather than to

individually mislead millions of people[,]' is alleged" (internal citations omitted)) .

This Court next turned in *Guardian* to *Southern Illinois Laborers' & Emplrs. Health &

*Welfare Fund v. Pfizer Inc.*, 2009 U.S. Dist. LEXIS 91414 (S.D.N.Y. Sept. 30, 2009) ("*Lipitor*")

for support.  There, plaintiffs posited several theories of causation, including one of flawed

physician decisions.  The full presentation of the court's rejection of this theory follows:

> The first theory of causation is that the alleged overpayment for patients'
> cholesterol treatment was caused by Defendant's fraudulent misrepresentations to
> physicians regarding the efficacy and safety of Lipitor as compared to alternative
> cholesterol therapies.  Plaintiffs contend that Defendant made these
> misrepresentations to physicians in general, and as a result of these
> misrepresentations, Plaintiffs had to pay for Lipitor rather than cheaper statins or
> non-drug therapies for treating high cholesterol.
>
> Implicit in Plaintiffs' theory of causation is the claim that physicians relied upon
> Defendant's misrepresentations when they decided to prescribe Lipitor instead of
> other cholesterol-lowering treatments.  However, Plaintiffs do not explicitly
> allege that physicians in fact relied on Defendant's misrepresentations.
>
> Plaintiffs do not cite a single instance in which a physician received the fraudulent
> information and decided to prescribe Lipitor based on the information she
> received.  Plaintiffs do not even explicitly allege the more general claim that
> physicians in general relied on Defendant's misrepresentations.  Accordingly, this
> causation argument fails as currently pled.

2009 U.S. Dist. LEXIS 91414 at *19-20.  Like the *Actimmune* court, the *Lipitor* court engaged in

no discussion of aggregate evidence at all, simply dismissing the case for a failure to plead an

required element of the claim correctly.

Finally, this Court looked to *In re Schering-Plough Corp. Intron*, 2009 U.S. Dist. LEXIS

58900 (D.N.J. July 10, 2009) ("*Intron/Temodar*"), in which the District of New Jersey dismissed

a complaint for failure to allege both injury and causation.  In *Intron/Temodar*, as to injury, the

court ruled plaintiffs "failed to plead that the Subject Drugs were ineffective."  2009 U.S. Dist.

LEXIS 58900 at *45.  In so ruling, the court specifically noted that the case before it differed substantially from that faced by this Court in the *Neurontin* litigation, and it approved of this Court's *Neurontin* approach to requiring proof of inefficacy.  *Id.*

Of the four cases cited by this Court in *Guardian* regarding causation, only *Intron/Temodar* addresses the issue of the use of statistical modeling.  In concluding on a 12(b)(6) ruling that plaintiffs "may not prove causation by way of generalized proof . . . ", *id.* at *89, the court cited *Seroquel* and *Risperdal*.  *See supra* n.1 for discussion of *Risperdal*.  But, as we have seen, neither *Seroquel* nor *Risperdal* presented any legal authority or analysis of the use of statistical or other aggregate evidence by which plaintiffs might compellingly demonstrate with accuracy the extent of pharmaceutical marketing on drug sales.

The *Intron/Temodar* decision fails to explain, why the use of statistical and econometric modeling may not work in the factual circumstances presented, let alone why such modeling should be rejected for all drug cases regardless of the facts.  Curiously, the *Intron/Temodar* court did not even attempt to distinguish this Court's prior *Neurontin* rulings relating to use of statistical and aggregate evidence.  *See supra*; *infra* at Section IV.B.  Things are a bit backward.  The *Intron/Temodar* court appears to have rejected *(subsilentio)* this Court's approval of the use of statistical and aggregate evidence in *Neurontin*; yet, this Court now cites *Intron/Temodar* as a basis by which to reject its own prior *Neurontin* approval of aggregate evidence.[2]

---

[2] Notably, the only presentation of statistical, econometric or other evidence apparently made by counsel in *Intron/Temodar* was to reference to what other plaintiffs, and other counsel, had done in this litigation and the summary judgment decision issued in the Zyprexa third party payor litigation.  *Id.* at *84-86, *citing Neurontin 2007*, 244 F.R.D. 89, and *Zyprexa 2007*, 493 F. Supp. 2d 571.

Of course, all cases should be decided by their individual facts, and the individual circumstances under which the complaints were pled.  Thus, cases such as *Seroquel*, *Actimmune*, *Risperdal* or *Intron/Temodar* should be decided on the general or specific allegations regarding the impact of described unlawful pharmaceutical marketing on drug sales.  There may be reasons why allegations in one case may have been scant and insufficient while in the others the aggregate evidence, with appropriate medical and statistical allegations, shows real world impact, at least by broad and significant changes in sales, which make the overall claim far more compelling.  But these differences in pleadings, and the deficiencies, ought not be whipped up into some new broad rule that prevents, for all cases, the use of general allegations coupled with well-crafted statistical, econometric and other aggregate evidence to show an overall fraud and its impact in a measurable way.

None of the cases cited by this Court in support of the *Guardian* rule explain why the use

statistical and econometric modeling or aggregate evidence is insufficient to prove the impact of

drug marketing on drug sales.  Neither RICO nor any rule of civil procedure or evidence bars the

use of such evidence.  Should such a bar exist, one would expect to find it in the language of

Rule 23, or in the Federal Rules of Evidence, or in some substantive law.  It is not there.[3]

Rather, as the First Circuit affirmed only months ago, "[aggregate evidence] is precisely the kind

of analysis that Rule 23 was designed to permit, and it would quickly undermine the class-action

mechanism were we to find that a district court presiding over a class action lawsuit errs ever

time it allows proof in the aggregate."  *In re AWP*, 582 F.3d at 195.

**C.     The General Circuit Court Cases This Court Cites Support the Use of Aggregate Evidence**

This Court cites a trio of circuit court cases for the proposition that Plaintiffs must be able

to "segregate[] damages caused by unlawful conduct from damages caused by lawful conduct."

*Guardian*, 2010 U.S. Dist. LEXIS 1756 at *78 (*citing U.S. Football League v. Nat'l Football

League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988), *Farley Transp. Co., Inc. v. Santa Fe Trail

Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985), and *MCI Commc'ns Corp. v. Am. Tel. & Tel.

Co.*, 708 F.2d 1081, 1162-63 (7th Cir. 1982).  No one contests this simple proposition of law.

But interestingly, a reading of these cases supports, plaintiffs' contention that aggregate evidence

may be used to segregate lawful, from unlawful, consequences.

In *Farley*, the court commented upon the plaintiff's "utter failure to make any segregation

between damages attributable to lawful competition and that attributable to the unlawful

scheme."  786 F.2d at 1352.  There is nothing to suggest that, in so noting, the Ninth Circuit

---

[3] What seems to have transpired in these cases is that on 12(b)(6) motion the district judges pondered how causation may ultimately be proven, and without much analysis or information from proceedings in the actions, simply assumed that doctor-by-doctor self-reporting is the only method.  Since the class complaints did not plead allegations doctor-by-doctor, the courts dismissed the cases.  *Seroquel* is on appeal to the Third Circuit.  *Actimmune* and *Intron/Temodar permitted re-pleading.*  The *Lipitor* plaintiffs gave up.

required Farley to trudge every shipping customer into court in order to explain why it was attracted to the Santa Fe Trail Transportation Company rather than Farley.  Instead, the court described generally that the plaintiff would need "an initial showing that material [aggregate] savings were in fact provided to those customers," and that "the next step, then, would be presentation of evidence that those savings, attributable to the unlawful scheme, were the impetus for the diversion of customer business…" *Id*.  In *Farley*, the plaintiff simply failed to produce any form of aggregate evidence.  The Ninth Circuit did not opine that aggregate evidence is inappropriate in order to discern damages attributable to defendant's conduct and that which was not.  *Id*.

Similarly, in *MCI*, the plaintiff's damages preparation had assumed that all twenty-two alleged claims against AT&T were proven to be illegal.  In fact, only seven of the twenty-two were proven, 708 F.2d at 1092, and so MCI's lost profits blended lost profits proof was unacceptable.  *Id*. at 1162-63.  But nothing in the Seventh Circuit's opinion suggests the court was requiring MCI to prove its lost profits through customer-by-customer inquiries into the impact of the pricing policies of AT&T.  Rather, the Seventh Circuit noted that because the damages calculation that assumed all twenty-two acts were illegal, "the jury was left with no way to adjust the amount of damages to reflect lawful competition from AT&T."  *Id*. at 1163.  Again, the driving assumption behind the court's analysis is that aggregate evidence of lost profits, so long as it is reasonably attributable to the particular illegal pricing policies, would be appropriate to prove lost profits or other form of damages reasonably attributed to the defendants conduct as opposed to other activities.  There is simply nothing in *MCI* to support the notion that aggregate evidence is to be tossed aside in sweeping manner for drug cases, telephone cases, or any other kind of case.

*U.S. Football* leads to the same result.  842 F.2d 1335, 1378-79.  There, the Second Circuit upheld a jury charge that permitted the jury to award no damages or $1 if they found that they could not "separate out the amount of losses caused by [NFL misconduct] from the amount caused by other factors…" 842 F.2d at 1378.  The United States Football League, which alleged unlawful monopolization through a variety of activities by the NFL, presented damages evidence based upon all of the alleged misconduct, but failed to disaggregate its evidence within the different buckets of alleged wrongdoing by the NFL.  *Id.*  Again, nothing in the Second Circuit's opinion suggests it required United States Football League to prove its damages one football fan at a time.

**D.      The Mississippi Zyprexa Decision Supports the Use of Aggregate Evidence**

Finally, this Court cites *Mississippi v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 2009 U.S. Dist. LEXIS 113289 (E.D.N.Y. Dec. 1, 2009) ("*Zyprexa Mississippi*") as supporting the *Guardian* rule.  But Judge Weinstein's writings support aggregate evidence as sufficient to prove causation as reliance in appropriate circumstances.

In *Zyprexa Mississippi*, Judge Weinstein reiterated his long held view that in class actions and other structural mass matters, *there can and should be* an appropriate role of statistical and other aggregate evidence to address issues of reliance, loss-causation, and injury.  Although the court described a series of cases purportedly adopting an "Individualized Proof Rule", Judge Weinstein acknowledged that "this view is far from universal" citing, notably, his own ruling in *UFCW Local 1776 & Participating Emplrs. Health & Welfare Fund v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 253 F.R.D. 69 (E.D.N.Y. 2008) ("*Zyprexa 2008*") and the First Circuit Court of Appeals ruling in *In re AWP*.  *See Zyprexa Mississippi*, 2009 U.S. Dist. LEXIS 113289 at *99.

Lamenting and reluctantly chronicling the possible evolution of an "Individualized Proof Rule," Judge Weinstein cites a number of circuit court cases.  But at least two critical limitations surround the circuit court cases he cites, and those limitations demonstrate the narrowness of such a rule, if indeed such a rule really does exist.

First, the circuit cases cited in *Zyprexa Mississippi* involve only claims of groups of *consumers or individuals* who needed to prove reliance or injury from specific, *affirmative* misrepresentations; none involve aggregate claims by third party payors or other health benefit providers.  *See In re St. Jude Med., Inc.*, 522 F.3d 836, 837-38 (8th Cir. 2008) (individual issues predominate class of patients seeking medical monitoring where members relied on affirmative representations on increased risk of paravalvular leakage); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223-30 (2d Cir. 2008) (question of reliance was too individualized in proposed class of cigarette smokers who allegedly relied on affirmative representations regarding how light cigarettes are safer than regular cigarettes); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-514 (7th Cir. 2006) (class of soda drinkers could not be certified where individual questions existed as to whether members relied on and were deceived by misrepresentations about Diet Coke); *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1343-44 (11th Cir. 2006) (proposed class of insured members must prove individual reliance on the no deductible term of his or her plan's summary plan description); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 658, 666-67 (9th Cir. 2004) (proposed class of gamblers alleging that defendants had affirmatively misrepresented the operation of the poker machines and the odds of winning on any particular play must prove individualized reliance to show causation); *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 549-50 (5th Cir. 2003) (class could not be certified where individual issues of reliance exist as to misrepresentations on a vehicle's towing capacity); *Fotta v. Trustees of*

*United Mine Workers of Am.*, 319 F.3d 612, 619 (3d Cir. 2003) (proposed class of miners entitled only to interest on benefits if the delays on such benefits could be shown to have been wrongful as to each individual member); *Doe v. Chao*, 306 F.3d 170, 183-84 (4th Cir. 2002) (individual class members alleging improper disclosure of social security numbers each must demonstrate an actual adverse effect).

Second, none of these circuit cases reference statistical, econometric, or other aggregate forms of evidence suggesting that such generalized evidence might be used to prove the fact or scope of reliance or causation with regard to the affirmative misrepresentations allegedly made by the defendants.  *See In re St. Jude Med., Inc.*, 522 F.3d 836, *passim*; *McLaughlin*, 522 F.3d 215, *passim*; *Oshana*, 472 F.3d 506, *passim*; *Heffner*, 443 F.3d 1330, *passim*; *Poulos*, 379 F.3d 654, *passim*; *McManus*, 320 F.3d 545, *passim*; *Fotta*, 319 F.3d 612, *passim*; *Doe* 306 F.3d 170, *passim*.  Because the cases neither discuss nor reject the use of statistical, econometric, or other aggregate forms of evidence, they cannot now be cited as being hostile to such evidence.

Ultimately, Judge Weinstein suggested the First Circuit's decision in *In re Pharmaceutical Industry Average Wholesale Price Litigation* merits following, noting

> The reasoning of the Court of Appeals for the First Circuit in *In re Pharmaceutical Industry Average Wholesale Price Litigation* is significant in that it highlights the tensions between the Individualized Proof Rule and the underlying rationale for Rule 23, and for aggregate litigation in general, of seeking justice for the many….
>
> … the power of its analysis and the continuing need to find a procedurally convenient and fair way to try these kinds of mass product liability cases-- deterring the guilty and compensating the many injured--warrants further consideration rather than unthinking rejection based solely on precedent.

*Zyprexa Mississippi*, 2009 U.S. Dist. LEXIS 113289, at *143-45.

14

**IV.    THE PERCEIVED LACK OF INDIVIDUAL PHYSICIAN EVIDENCE DOES NOT REQUIRE REJECTION OF AGGREGATE EVIDENCE**

In *Guardian* this Court observed that "despite over a decade of Neurontin-related litigation… no evidence has been presented of any doctor who states that she relied on a misrepresentation or omission in prescribing Neurontin for an off-label indication." *Guardian*, 2010 U.S. Dist. LEXIS 1756, at *78. From this, the *Guardian* court reasoned that the apparent lack of such doctor-specific evidence was so compelling that it required the Court to eschew aggregate evidence as a sufficient means by which to disaggregate unlawfully induced, as opposed lawfully induced, Neurontin bipolar sales. However, a closer look at the Neurontin-related proceedings, and the actual physiatrists' evidence, discards this reasoning.

First, throughout the Neurontin-related litigation, the litigants and this Court have *assiduously avoided* doctor-specific discovery or evidence. The *qui tam* matter involved regulatory violations, not impact on specific doctors. *U.S. ex rel. David Franklin v. Pfizer, Inc., et al,* C.A. 96-11651 (D. Mass.) ("*Franklin*"). *Franklin* required no doctor-specific discovery. In the class actions, plaintiffs never intended to prove the case physician-by-physician and, in fact, explicitly disavowed any desire to litigate questions of Defendants' fraud in this manner. *See*, *e.g.*, Motion Hearing Transcript, dated September 27, 2006, at p. 9 (stating "No, your Honor, we don't intend to prove the case that way. That would be, I think, a fairly hopeless endeavor, given the number of physicians who have written these prescriptions."). The Court supported this approach, rebuffing Defendants' attempts to drag patient after patient, and physician after physician, to the deposition chair, ruling instead that the case should be proven in the aggregate. *See*, *e.g.*, *id*. at p. 68 (stating "what you're arguing is, you have to go doctor by doctor, and I don't think you do.") As a result, in Neurontin-related litigation, neither plaintiffs

nor defendants have deposed multiple physicians.  No inference can be made from the lack of physician testimony.

Second, to the best of the class plaintiffs' knowledge, *only four psychiatrists* were deposed in the MDL as a treating physician or about their Neurontin prescribing habits.  See Declaration of Kristen Johnson Parker, attached to *Motion* as Exhibit B.  The testimony of all four supports the exposure of the psychiatrists to Pfizer's marketing:

- **Dr. John Arness:**  Although Dr. Arness testified that he was never detailed about Neurontin, detailing records proves that he was in fact detailed about Neurontin, and his prescriptions of Neurontin subsequently skyrocketed.  *See* Plaintiffs Motion for Reconsideration.  Dr. Arness was deposed in the class case.

- **Dr. David Chandler:**  Dr. Chandler testified that he was detailed by Pfizer sales representatives over the past ten years, regularly attended continuing medical education presentations, and relies on scientific literature to make prescription decisions.  Deposition Transcript of Dr. David Chandler, October 30, 2007, at p. 35-36, 207.  Dr. Chandler was deposed in the Kaiser case.

- **Dr. Robin Dea:**  Dr. Dea testified that he was detailed by sales representatives. He relies on sales representatives to inform him about the risks and benefits of medicines, and also keeps abreast of the scientific literature.  Deposition of Dr. Robin Dea, September 28, 2007, at p. 22-24.   Dr. Dea was deposed in the Kaiser case.

- **Dr. Jerrold Gray:**  Dr. Gray testified that he has seen thousands of sales representatives, that it is possible one provided him information about Neurontin, but he didn't remember.  The Plaintiff in the PI matter testified that Dr. Gray told her that sales representatives told Dr. Gray that they had seen remarkable improvement in symptoms of those with bipolar disorder after taking Neurontin, and that Dr. Gray should increase the dose of Neurontin he was giving the Plaintiff.  Deposition of Jerrold Gray, February 6, 2008, at p. 106-125: 1-25.  Dr. Gray was deposed in a personal injury case.

In summary, although there is little psychiatrist-specific testimony there is from the Neurontin-litigation, what it tells us is that *no psychiatrist* escaped the potential influence of Defendants' Neurontin marketing.  Rather than serving as a basis to discard aggregate evidence

as a sufficient means to prove the impact of unlawful marketing, the psychiatrist-specific evidence supports it.

## V.      CONCLUSION

In its denial of Plaintiffs' renewed motion for class certification, this Court, "troubled by defendants' blatantly illegal off-label promotion activities for which they have been criminally sanctioned," opined that

> Defendants have fought this suit tooth-and-nail, and a small TPP would be wary of taking on the drug Goliath.  Still, much of the work has been done.  This denial of class certification does not preclude individual TPPs from bringing suit on their own behalf, as many well-heeled TPPs have already done.

*Neurontin 2009*, 257 F.R.D. at 333.

This Court should revisit the rationale for its *Guardian* rule.

Dated: February 8, 2010                          Respectfully Submitted,

                                      By:      **/s/ Thomas M. Sobol**
                                              Thomas M. Sobol
                                              Edward Notargiacomo
                                              Hagens Berman Sobol Shapiro LLP
                                              55 Cambridge Parkway, Suite 301
                                              Cambridge, MA 02142

                                      ***Plaintiffs' Liaison Counsel and Member of the
                                      Class Plaintiffs' Steering Committee***

                                      By:      **/s/Thomas Greene**
                                              Thomas Greene, Esquire
                                              Greene LLP
                                              33 Broad Street, 5th Floor
                                              Boston, MA 02110

                                      By:      **/s/Barry Himmelstein**
                                              Barry Himmelstein, Esquire
                                              Lieff Cabraser Heimann & Bernstein
                                              Embarcadero Center West
                                              275 Battery Street, 30th Floor
                                              San Francisco, CA 94111-3339

By: **/s/Don Barrett**
   Don Barrett, Esquire
   Barrett Law Office
   404 Court Square North
   P.O. Box 987
   Lexington, MS 39095

By: **/s/Daniel Becnel, Jr.**
   Daniel Becnel, Jr., Esquire
   Law Offices of Daniel Becnel, Jr.
   106 W. Seventh Street
   P.O. Drawer H
   Reserve, LA 70084

By: **/s/James Dugan**
   James R. Dugan, Esquire
   Dugan & Browne, PLC
   650 Poydras Street, Suite 2150
   New Orleans, LA 70130

*Members of the Class Plaintiffs'*
*Steering Committee*

## CERTIFICATE OF SERVICE

  I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on February 8, 2010.

       /s/ Thomas M. Sobol