EXHIBIT 1

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert (Defense Expert)**
2/3/2009

--------------------------

37

1    assuming that they own it. I don't know how they
2    get the data and I don't know what the their
3    business model is or any of the legalities of how
4    those data are obtained except through my
5    interaction with them and this contract.
6    BY MR. LONDON:
7        Q. Well, I assume that as far as you're
8    concerned, requesting the data, signing the license
9    and paying for the data was the extent of your
10   contact with PHARMetrics before actually receiving
11   the data?
12       A. That's correct.
13       Q. Okay. And so as far as you're concerned,
14   this license says whatever it says, but that sets
15   out the terms of who owns it and what you can do
16   with it?
17           MS. McGRODER: Object to form. If you
18   know.
19           THE WITNESS: That's my understanding.
20   BY MR. LONDON:
21       Q. All right. How much did the data cost?
22       A. $15,000.
23       Q. And who paid for the data?
24       A. I paid for it.

38

1        Q. How do you -- let me start over. Both on
2    the front page it says 1(a), 20th day of May and
3    then as I recall on the second page, that was the
4    signature date. How was it that on May 20th or
5    May 21st, 2008 you came to request the PHARMetrics
6    database that contained the two cohort databases?
7           MS. McGRODER: Object to form.
8    BY MR. LONDON:
9        Q. What was your reason in doing that?
10          MS. McGRODER: Same objection.
11          THE WITNESS: Can you be more specific?
12   BY MR. LONDON:
13       Q. Probably not. Why did you purchase the
14   PHARMetrics databases?
15       A. I purchased them so that I could do these
16   analyses.
17       Q. Both the pharmacoepidemiology analysis
18   relating to the gabapentin database and is it also
19   called a pharmacoepidemiologic analysis that you
20   did using the bipolar index database?
21       A. They're both pharmacoepidemiologic
22   analyses.
23       Q. You did it so that you could do both of
24   those epidemiological analyses with the two

39

1    separate cohort databases?
2        A. That's correct.
3        Q. Why did you want to do that?
4        A. It actually has to do in part with the
5    last time we were all together. I believe it was
6    Dr. Bloom who was testifying at the Daubert hearing
7    and I think Mr. Barnes had asked her could you have
8    done an epidemiologic study and she said yes. And
9    he asked her did you do a pharmacoepidemiologic
10   study or an epidemiologic study. She said no.
11          And I think at that moment I thought,
12   yeah, that would be a really good idea to do that
13   study. And so I proposed the idea to counsel for
14   Pfizer and they agreed that it was a good idea and
15   we went about thinking about what would be the
16   appropriate database, the best database to get and
17   I felt PHARMetrics was the best database for this
18   purpose and we acquired the data and did the
19   analysis.
20       Q. May I ask just a couple of more questions
21   before we go on past that? Who were Pfizer's
22   counsel to whom you proposed the idea? I assume
23   Mr. Barnes was one?
24          MS. McGRODER: Object to form.

40

1           THE WITNESS: I don't know if it was him.
2    Most of my conversations have been with Laurie.
3    BY MR. LONDON:
4        Q. All right. And so is it fair to say that
5    your memory of the general flow of events was that
6    you and Miss McGroder discussed the idea of
7    obtaining that database to do the
8    pharmacoepidemiological study after hearing
9    Dr. Bloom's testimony in the hearing in Boston?
10          MS. McGRODER: Object to form.
11          THE WITNESS: I believe the conversation
12   was around -- you know, around that time. It may
13   have been that day. It may have been, you know,
14   shortly thereafter.
15   BY MR. LONDON:
16       Q. I'm not trying to precisely pin you down
17   to 2:00 in the afternoon, but I mean it was after
18   you heard Dr. Bloom testify and it was after you
19   thought about it that you went and spoke with
20   Miss McGroder about doing the pharmaco study?
21          MS. McGRODER: Object to form.
22          THE WITNESS: I'm not sure -- I'm not
23   sure I remember the exact sequence of the events.
24   I think that, you know, the idea of doing this kind

41

1  of a study was -- I mean, I'm not sure that, if you
2  will, the light bulb went off after listening to
3  Dr. Bloom. I may have, you know, thought about
4  doing this kind of thing earlier on. I'm not sure
5  -- I don't remember the exact sequence of events.
6  BY MR. LONDON:
7      Q.  Let me ask it a different way. Did you
8  not buy the PHARMetrics database in question until
9  after speaking with Pfizer counsel about it?
10      MS. McGRODER: Object to form.
11      THE WITNESS: Yes, that's correct.
12  BY MR. LONDON:
13      Q.  And it was primarily Miss McGroder that
14  you recall being the counsel with whom you spoke?
15      A.  Yes.
16      Q.  And that leads to the next question and
17  that is, even though you paid for the database by
18  writing a check I assume for $15,000, were you
19  reimbursed for that payment?
20      A.  Yes, I was.
21      Q.  And let me just ask, who reimbursed you?
22      A.  I sent an invoice to Miss McGroder.
23      Q.  Okay.  I'm not trying to pick, but here's
24  the reason I am not clear on it. I can envision

42

1  sending an invoice for services or expenses to
2  Miss McGroder and receiving a check from their law
3  firm, but I can also envision sending that same
4  invoice and receiving a check via their law firm
5  but written on a Pfizer account. Do you understand
6  the question?
7      A.  Yes.
8      Q.  Do you recall which it was?
9      A.  All of the payments that I've received
10  have been through their law firm.
11      Q.  On a law firm checking account?
12      A.  That's my understanding, yes.
13      Q.  May I ask this question, when did you
14  physically receive the database on the disk from I
15  assume from PHARMetrics?
16      A.  I don't recall.
17      Q.  And I ask that because of the date. I
18  mean the date says May 21. Is that something that
19  you can just send them over the signed request and
20  it comes in the mail within a few days or is it
21  months?
22      A.  I don't think it was months certainly,
23  but it wasn't -- I don't think I got it the next
24  day, but I don't recall the exact sequence of when

43

1  we actually received it.
2      Q.  I don't want to push too hard on this,
3  but I would like to know the date you received it.
4  And I appreciate you don't have that information
5  here in front of you, but among your bills and
6  communications with Miss McGroder, is there a
7  record somewhere that you can look at this
8  afternoon after the recess and come up with the
9  date that would be within a few days of the date
10  you received the PHARMetrics database?
11      A.  I can't think of any way to triangulate
12  on that date.
13      Q.  I like that phrase. Are you sure you
14  weren't in the military?
15      A.  I'm very sure.
16      Q.  Are you a pilot?
17      A.  No.
18      Q.  Sailor?
19      A.  No.
20      Q.  Just triangulate's in that universe of
21  your vocabulary?
22      A.  Yeah.
23      Q.  What did you do upon receiving the
24  PHARMetrics database insofar as working with that

44

1  database is concerned?
2      A.  I met with Dr. Hur and there were I
3  believe SAS transport files.
4      Q.  What does that mean? I'm sorry.
5      A.  It's the way that you transmit a SAS
6  file. It's sort of a protected and condensed mode
7  that allows it to be locked and unlocked and
8  extract the SAS files which contain the data. And
9  I asked him to, you know, begin going over it and
10  verifying that what was there was what we had asked
11  for.
12      Q.  Is that something that you would have the
13  particular skill set to have done without Dr. Hur
14  yourself?
15      A.  I could have done it, but he's much
16  better at it than I am.
17      Q.  And I accept that. I'm just curious
18  whether if you looked up one day and you found only
19  yourself and a big computer and a desert island and
20  a PHARMetrics database and a SAS file, you could
21  have done the work that involved the SAS transport
22  files and the database and begin to do the work?
23      MS. McGRODER: Object to form.
24      THE WITNESS: I have done SAS work in the

217

1    minutes of vapor here so let's take this moment to
2    change.
3          VIDEOGRAPHER:  The time is 3:15 p.m.
4    This is the end of tape Number 5.  We are going off
5    the record.
6          (Short recess.)
7          VIDEOGRAPHER:  This is the beginning of
8    tape Number 6.  The time is 3:38 p.m.  We are back
9    on the record.
10   BY MR. LONDON:
11        Q.  We're talking about what I believe is
12   Exhibit 20, the paper of September 2008.
13        A.  Yes.
14        Q.  Okay.  As I understood your testimony
15   this morning, the idea of doing this study that is
16   reflected in the paper arose in some connection
17   with your hearing Dr. Bloom's testimony at the
18   Daubert hearing.  True?
19        A.  No.
20        Q.  Correct me then.
21        A.  This paper was really largely --
22        Q.  I said that badly and I self-correct.
23   The idea of doing a pharmacoepidemiology study of
24   gabapentin and bipolar subjects in the 11 AEDs came

218

1    to you as a consequence of hearing Dr. Bloom say
2    she had not done that.  Is that what you did?
3          MS. McGRODER:  Well, objection.  And you
4    interrupted his last answer in which he was going
5    to answer that very same question.  So go ahead,
6    Dr. Gibbons.
7          THE WITNESS:  You also kind of didn't get
8    it quite right the second time.  The gabapentin
9    pharmacoepidemiologic study that was done where
10   gabapentin was the index date or episode or event
11   in question was not just done in bipolar patients.
12   It was done in patients with lots of different
13   indications and you know, the motivation for doing
14   that was in part I think really done from reading
15   Dr. Bloom's expert report and you know, what I was
16   learning in the process of getting involved in this
17   case.  And it was clear that that kind of
18   epidemiologic study had not been done.  So that was
19   part of the motivation for that work.  And of
20   course, part of the motivation and really the large
21   motivation for writing the paper was FDA's alert
22   that I had been made aware of before I ever really
23   got involved in this case.
24

219

1    BY MR. LONDON:
2        Q.  When I'm talking about the
3    pharmacoepidemiology studies, is it all right if I
4    include within that both the gabapentin index and
5    the bipolar index because they're both
6    pharmacoepidemiology studies that you did from the
7    PHARMetrics database?
8          MS. McGRODER:  Well, I object to that
9    because the answers might be different based on the
10   two different analyses.  So I think that would make
11   a --
12        MR. LONDON:  I haven't asked a question
13   about those.
14        MS. McGRODER:  Well, you're asking him if
15   he'll assume that those are the same thing.
16        MR. LONDON:  Lori, please.
17        MS. McGRODER:  No, Jack, I'm serious.  If
18   you're asking him if he'll assume when you refer to
19   pharmacoepidemiology that applies to both, I object
20   to that because that's compound.  They are
21   different.
22        MR. LONDON:  He is sufficiently bright to
23   tease out whether in the context of any different
24   question I'm asking it in such a way that it makes

220

1    the answer come out wrong.
2          MS. McGRODER:  Well, my objection is what
3    as I stated.
4          MR. LONDON:  We've heard your objection.
5          MS. McGRODER:  And I don't want him to
6    answer questions.
7          MR. LONDON:  It doesn't matter what you
8    want.  I will ask him what I'm going to ask him.
9          MS. McGRODER:  Can you let me finish?
10         MR.. LONDON:  No, you've said it three
11   times.  You've had enough.
12         MS. McGRODER:  I don't want him to answer
13   questions based on your assumption that they're the
14   same when they're not.
15         MR.. LONDON:  We've heard that.
16        Q.  Do you understand the problem?
17        A.  I'd prefer to keep them distinct and
18   maybe for simplicity, if you could just refer to
19   one as the gabapentin being the gabapentin cohort
20   that is outlined in detail exclusively in my expert
21   report from November 2nd and then the bipolar
22   cohort that's the subject of this paper, it would
23   be easier for me.
24        Q.  I'll do my best.  I may not succeed.  In

125

1   controls or other therapies.
2       Q.  All right.  Do you find Table 3 in the
3   document?  And to help you, it appears to me to be
4   on page 27 in the upper right-hand corner, 27,
5   under the category psychiatry studies.
6       A.  I see that.
7       Q.  All right.  And among others, does
8   Table 3 provide the demographic characteristics and
9   treatment exposure in three psychiatry studies,
10  bipolar, panic and social phobia?
11      A.  Yes.
12      Q.  And does it provide a number called N?
13      A.  Yes.
14      Q.  What does N mean, if you can tell me, in
15  those three table studies?
16      A.  It appears to be the number of subjects
17  that were, I'm assuming, randomized to either
18  gabapentin or placebo.
19      Q.  If we look under bipolar study 945-209,
20  we have 58 gabapentin patients and 59 placebo
21  patients.  Is that how you interpret N?
22      A.  Yes.
23      Q.  And then in total patient years, we have
24  8.3 gabapentin patient years and 9.7 placebo years

126

1   on the bipolar patients.  Am I reading that
2   correct?
3       A.  Yes.
4       Q.  And what does a patient year mean as it's
5   described there as you understand it?
6       A.  As footnoted at the bottom of the table,
7   total patient years is the sum of days of exposures
8   for all subjects divided by 365.25.
9       Q.  All right, sir.  And then we could
10  replicate those same questions and answers for
11  panic disorder and social phobia just by reading
12  those two tables?
13      A.  Yes.
14      Q.  Then following that we have a table of
15  risk rate and cumulative risk.  Do you see that?
16  It just says there were no reports of suicide or
17  attempt in the three studies conducted in the
18  psychiatry studies?
19      A.  Yes.
20      Q.  Then beyond that, you have Table 4
21  appearing on page 29.  Do you see that?
22      A.  Yes.
23      Q.  That has the neuropathic pain treatment
24  exposure, correct?

127

1       A.  Correct..
2       Q.  Is there a section, if you recall or find
3   it, that tells whether there were any risks -- any
4   events in the neuropathic pain studies?  And I'll
5   direct your attention to the bottom of page 30.
6           MS. McGRODER:  Are you asking him if
7   there were ever events in the neuropathic pain
8   studies?
9           MR. LONDON:  We can ask that.
10          MS. McGRODER:  Well, objection.  The
11  document speaks for itself.  I mean --
12  BY MR. LONDON:
13      Q.  You had this document available to you,
14  didn't you?
15      A.  According to --
16          MS. McGRODER:  Well, actually the list is
17  a considered list.  I mean, Dr. Gibbons has not
18  testified he relied on everything on that list.
19          MR. LONDON:  Right.
20          MS. McGRODER:  And I don't think you've
21  asked him.
22  BY MR. LONDON:
23      Q.  Is it your testimony you did not rely on
24  Pfizer documents in doing your autopsy?

128

1       A.  I don't recall much about this document.
2   Did I look at this document?  I mean, I may have.
3   Looking at it right now, does it look familiar?  I
4   can't really tell you one way or the other.  I
5   mean, one of the things that I'm noticing in this
6   document is it's combining studies that had -- were
7   placebo controlled and also includes, you know,
8   nonrandomized studies.  So if I did see this
9   document, it wouldn't have meant a huge amount to
10  me.
11      Q.  Well, could you have taken the
12  information in this document -- strike that.
13          Did you take the information in this
14  document in an attempt to do a statistical autopsy
15  in the manner you predicted the FDA would have done
16  so that as, I recall your testimony, by excluding
17  zero event trials?
18      A.  No, I wouldn't have had -- I mean, this
19  document doesn't give me a breakdown of the number
20  of events by individual trials.  And I didn't have
21  that information from the FDA.
22      Q.  Or from Pfizer?
23      A.  Or from Pfizer to my knowledge.  At that
24  time, all I was working with was an overview of the

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

177

1   was available and is presented in Table 8, page 18.
2   So it does allow some general comparisons of the
3   percentage of patients who had at least three
4   indications, epilepsy, psychiatric or other.
5        Q.  Let's just look at Table 8 on page 18 of
6   Exhibit 14, the statistical review.  What is the
7   number of psychiatric patients who were, as I
8   understand it on drug, on gabapentin?
9        A.  It indicates that there were 331
10   psychiatric patients on gabapentin.
11        Q.  And what is the parentheses seven to the
12   side of that number?
13        A.  That indicates that 331 represents
14   7 percent of the overall 4,932.
15        Q.  And then how many Lamotrigine patients?
16        A.  For Lamotrigine it's 2,313 for a total of
17   47 percent.
18        Q.  And then Topiramate patients?
19        A.  Topiramate 1,933 for a total of
20   17 percent.
21        MS. McGRODER:  I want to ask you if you
22   want to withdraw your objection as nonresponsive
23   before he even answered the question.
24        MR. LONDON:  No.  But we're now three

178

1   questions past that, so it's too late for me to
2   withdraw my objection but thanks for the advice.
3        Q.  Now, my next question is as to patient
4   years.  Is there a difference between the number of
5   patients and the concept of patient years?
6        A.  There can be, yes.
7        Q.  Give me what you mean when you use the
8   term patient years so that we'll use the same
9   definition.
10        A.  It's the total number of years of
11   exposure aggregated over the number of patients.
12        Q.  As I recall, earlier you read to me from
13   a page I was looking at but not able to read that
14   the number of patient years was the number of days
15   a patient was on a drug divided by 365?
16        MS. McGRODER:  I'll object to form.
17        THE WITNESS:  The number of patient years
18   is a summation of that ratio over all of the
19   subjects within a particular condition.
20   BY MR. LONDON:
21        Q.  All right.  Do we know the number of
22   patient years that the FDA studied in the
23   psychiatric group who were on gabapentin?
24        A.  I'd have to look through the report to

179

1   see if that was provided.  I don't remember
2   offhand.  Maybe you could direct me to it if you
3   know.
4        Q.  And if I knew I would direct you to it,
5   but I want to leave that an open question as to all
6   three of these drugs.  We have -- Table 8 has the
7   number of patients and so my question now is as to
8   all three drugs on the psychiatric indication, do
9   we know the number of patient years?
10        A.  At this moment I don't.
11        Q.  Okay.
12        A.  And leafing through this I'm not finding
13   it.
14        Q.  Can we leave that question open?  I'll
15   try to come back to it at some point in time, but
16   I'm not going to ask you to stop what you're doing
17   and answer it now, nor am I going to ask you to
18   dwell on that question in the back of your mind
19   while in the front of your mind you're answering
20   other questions.
21        A.  Fair enough.
22        Q.  So I'm going to try to write a come back
23   to question.  And when we have a chance, we'll come
24   back to it..  And I told you just before we broke

180

1   that the next thing we were going to do is talk
2   briefly about your Exhibit 11 which I believe is
3   your report of July 11.  Are you there?
4        A.  I am.
5        Q.  The first question that I want to ask is
6   was this the only report you wrote after receiving
7   the FDA statistical review before the November 5th
8   report?
9        A.  I believe so, yes.
10        Q.  And I think you're going to find these
11   questions to be fairly easy and familiar, but over
12   in paragraph 5 you reflected that the FDA reached
13   an odds ratio of 1.57 with a confidence interval of
14   .12 to .47.56.  Do you recall that?
15        A.  Yes, I do.
16        Q.  Were you able to replicate that number by
17   your own work?
18        A.  I don't believe so because I think that
19   number came from the Mantel-Hansel test which would
20   have required the individual study level data which
21   while I had individual study level data from what I
22   received from counsel, I didn't know -- I didn't
23   have the exact same and I couldn't figure out
24   exactly which studies were included in FDA's

229

1      Q.  Were preparatory acts the types -- were
2 they the subjects of claims that were included in
3 the PHARMetrics database?
4      A.  I don't know.
5      Q.  Was there any control that you could
6 exercise to be sure that what one claims facility,
7 such as hospitals in Illinois, for example, called
8 an attempt was the same thing that another
9 facility, say a hospital in Texas, called an
10 attempt were in fact the same clinical things?
11      A.  I had no way of having control over that.
12      Q.  Okay.  I know that Pfizer -- I suppose
13 reimbursed you is the better way to say it -- for
14 the expense of the PHARMetrics database.  Did
15 Pfizer or Pfizer's counsel pay for any of the work
16 that went into Exhibit 20, the paper, "The
17 Relationship Between Antiepileptics and Suicide
18 Attempts"?
19      A.  I believe all of the payment was for the
20 work that went into my expert report on the
21 gabapentin cohort.
22      Q.  And that's close to what I'm asking you
23 but not quite.  I'm asking you if Pfizer paid you
24 for the work that went into the paper?

230

1      A.  Not to my knowledge, no.
2      Q.  And you probably -- well, let me just ask
3 it.  Do you have any reason to believe that Pfizer
4 paid Dr. Mann, Dr. Hur or Dr. Brown for any of the
5 work --
6      A.  I have no reason --
7      Q.  -- related to the paper?
8      A.  I have no reason to believe they received
9 anything.
10      Q.  Well, I'm getting tired and my voice is
11 trailing off.
12      MS. McGRODER:  His voice is trailing off.
13      MR. LONDON:  He's probably getting tired
14 too.  We're both small town professionals or
15 country professionals.
16      THE WITNESS:  Country.  I once visited
17 the suburbs.
18      MR. LONDON:  And they sent you back?
19      THE WITNESS:  I was dressed wrong.
20      MR. ALTMAN:  They thought he was the
21 cosmetician.
22      MR. LONDON:  That was good.  You've been
23 hanging around for two days and you finally got
24 one.

231

1      Q.  On page -- I believe it's page 35, again
2 working from those pages that are up at the top, it
3 begins with "there are several limitations of our
4 study" and there are five of those listed.  True?
5      A.  True.
6      Q.  Do those same limitations in that study
7 apply to the gabapentin study that is contained in
8 your report of November the 5th?
9      A.  Yes, they do.
10      Q.  As to the report of November 5th, that
11 report also is based on medical claims data and
12 likely is underreporting of suicide attempts?
13      A.  As I indicated, all of these same
14 limitations would apply equally.
15      MR. LONDON:  I'm sure that's my wife.  I
16 can only say I'm blessed to have a wife who know to
17 calls me even though I'm busy.  This happens on
18 airplanes too.
19      Q.  The PHARMetrics claim data did not
20 contain information on completed suicides.  I take
21 it you did not -- do you not have in mind some
22 other source other than the sources you've used in
23 papers in the past for data on completed suicides?
24      A.  It's very complicated to get data from --

232

1 for completed suicide.  Even, for example, the
2 Veterans Administration database isn't linked to
3 the national death index data where you could get
4 cause of death.  So you know, that's a project that
5 we're interested in trying to undertake as part of
6 our grant, but we're still probably a few years
7 down the road from that.
8      Q..  This says that your analyses do not
9 incorporate intensity of treatment.  Can you
10 explain that sentence to me?
11      A.  We have prescription data.  We know how
12 many pills were prescribed, but we don't really
13 have the intensity with which patients were
14 treated, you know, those sorts of things.
15      Q.  Well, earlier we had some questions back
16 and forth about patient years.  And you gave me
17 some testimony concerning what appears to be the
18 phenomena that suicides or suicide attempts, I
19 don't recall which, seem to be more likely to
20 appear closer in time to the onset of drug
21 treatment.  Do you recall that?
22      A.  Yes.
23      Q.  Is that different than what you mean in
24 this sentence when you say, "Our analyses do not

233

1    incorporate intensity of treatment"?
2        A..  Yes.  It's different.
3        Q.  How is it different?
4        A.  What I'm talking about here is we don't
5    know specifically what the dosage of medication
6    was.  We don't know whether or not a person
7    prescribed a 90-day supply of medication, actually
8    took the medication that they were supposed to
9    take.  Unlike the other studies, here we do know
10   the risk period and, in fact, by definition, by
11   design, we've set the risk period to be equal for
12   all people.  At least the period of observation is
13   equal for all people in both cohorts.
14       Q.  Okay.  Did the information in the
15   PHARMetrics database include nonprescription
16   treatment?
17       A.  Such as?
18       Q.  Psychotherapy?
19       A.  We did not have data on psychotherapy.
20       Q.  Did it include information on
21   environmental factors that contribute to either
22   suicide attempts or reduced suicide attempts such
23   as the emotional stressors that may or may not be
24   associated with an immediate decision to attempt

234

1    suicide?
2        A.  No, those kinds of data are not
3    available.
4        Q.  Fourth, patients were not randomized.
5    Would you explain that limitation to me, patients
6    were not randomized to treatment and there may be
7    other factors that play a significant role in the
8    process by which specific treatments are selected
9    for patients?
10       A.  One of the key findings in the paper is
11   that patients who ultimately are treated with an
12   antiepileptic drug have a much higher suicide
13   attempt rate prior to the initiation of treatment
14   than those patients who don't seek treatment.  So
15   there is a selection effect in which probably the
16   more severely ill patients seek treatment or are
17   treated by their physician relative to those that
18   don't seek treatment.
19       So in a randomized study, we would assume
20   that that kind of baseline difference, if you will,
21   wouldn't exist because each subject would be
22   equally likely to receive treatment or a relative
23   control.
24       Q.  And then of course last, you do say

235

1    straight up that this is statistical data, not
2    psychiatric interviews or other structured requests
3    and that's a limitation?
4        A.  With respect to the diagnoses.
5        Q.  Yes, sorry, with respect to the
6    diagnoses?.
7        A.  Right..  We don't know that, you know, a
8    trained psychiatric interviewer did a detailed
9    psychiatric evaluation to give the diagnosis of
10   bipolar.
11       Q.  And each of these limitations apply to
12   the bipolar -- I'm sorry -- to the gabapentin study
13   that was done for the November 5th expert report?
14       A.  Yes.
15       Q.  I'm not sure if this is a limitation or
16   simply a question.  But did you have any
17   information such as the PHARMetrics database
18   information for the period before the year 2000?
19       A.  No.
20       Q.  All right.  Are there any other
21   limitations that apply that now occur to you or
22   have occurred to you since the time you released
23   the paper into the wild that you didn't know of at
24   that time?

236

1        MS. McGRODER:  Object to form.
2        THE WITNESS:  Not that I -- not that I
3    can think of right now.
4    BY MR. LONDON:
5        Q.  All right.  To whom have you submitted
6    the paper, publications or editors for
7    consideration?
8        MS. McGRODER:  Well, I object on the
9    basis of confidentiality if there is one and I
10   leave that to you.
11       THE WITNESS:  I don't -- I don't know
12   what the appropriate thing of how to deal with that
13   kind of information is.  I'm not uncomfortable
14   telling you that if you're not uncomfortable.
15       MS. McGRODER:  Fine with it if you are.
16       THE WITNESS:  I submitted the paper -- we
17   submitted the paper to the Journal of the American
18   Medical Association who felt that the paper was
19   best suited to their -- their journal the Archives
20   of General Psychiatry and they passed that paper
21   onto the Archives of General Psychiatry due to its
22   content.
23   BY MR. LONDON:
24       Q.  Is the -- what is the relationship

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
2/4/2009

456

1      I certainly wouldn't conclude that from
2   those data, but from the available data, it doesn't
3   look like, you know, the drug is inducing suicide.
4      Q.   Well, that's not quite what you said
5   here.
6        You said "these data indicate." You
7   don't say suggest. You don't say it may be. You
8   say "indicate." That's pretty definitive, isn't it?
9      A.   Well, I'm not sure that I would interpret
10  that as -- as being definitive.
11     Q.   And you say "these indicate that
12  gabapentin is reducing suicide risk." That's a
13  pretty definitive statement?
14     MS. McGRODER: Objection, asked and answered.
15  BY THE WITNESS:
16     A.   Again, I don't -- I don't view it as a
17  definitive statement, and in the context of my
18  testimony here, I think I have made that clear.
19  BY MR. ALTMAN:
20     Q.   Do you understand that a lot of people
21  are going to read your written submissions in this
22  case, your expert reports, your declarations, and
23  things like that, correct?
24     A.   I'm not sure who is going to be reading

457

1   this. I understand people will be reading it, yes.
2      Q.   Plaintiffs obviously, as we are here,
3   right?
4      A.   I'm sure you have read it carefully.
5      Q.   The Court, correct?
6      A.   Correct.
7      Q.   Okay. Other experts, correct?
8      A.   Yes.
9      MS. McGRODER: Well, to the extent you know.
10  BY MR. ALTMAN:
11     Q.   Do you know if any of the other experts
12  in this case have read any of your papers,
13  submissions?
14     A.   Well, I think I know that Dr. Greenland
15  has commented on it, and he is an expert in this
16  case. So I am assuming he read it.
17     Q.   Are you aware that Dr. Weiss Smith read
18  your expert report?
19     A.   It wouldn't surprise me.
20     Q.   And that Dr. Ruggieri read your expert
21  report?
22     A.   I believe so.
23     Q.   And Dr. Arrowsmith-Lowe read your expert
24  report?

458

1      A.   Again, it wouldn't surprise me if all of
2   the other Pfizer experts had read my report, but I
3   don't know that personally.
4      Q.   But you would expect them to be able to
5   rely upon what you write here, correct?
6      MS. McGRODER: Well, I object on foundation
7   grounds. He doesn't know what the other experts
8   rely upon.
9      A.   I don't know what they relied upon or
10  not. I have tried to provide the most factual and
11  evidence-based discussion of the data and of the
12  literature. I have tried to do the best I can in
13  doing that.
14  BY THE WITNESS:
15  BY MR. ALTMAN:
16     Q.   And you would -- would you intentional
17  try to mislead a reader?
18     A.   No, I wouldn't.
19     Q.   Okay. And if something in here was
20  misleading, whether intentional or otherwise, it
21  could cause somebody else, whether an expert or the
22  Court, to reach a conclusion that would not be
23  correct; is that right?
24     MS. McGRODER: Objection, improper

459

1   hypothetical, assumes facts not in evidence.
2   BY THE WITNESS:
3      A.   I don't -- I don't know what the Court is
4   going to do or how it would be misled, and I'm sure
5   that if there was a comment in here that, for
6   example, this comment, and you felt that it was not
7   consistent with -- with my opinion, I'm sure that
8   you would bring it up at court, and I would give you
9   a factual and honest answer to it as I have done
10  here.
11  BY MR. ALTMAN:
12     Q.   But that also assumes that the reader is
13  able to understand some of the things you write and
14  whether there is something that is not quite clear,
15  correct?
16     MS. McGRODER: Object to form and foundation.
17  How does he know what readers understand?
18  BY THE WITNESS:
19     A.   Yeah, I think that, you know, if you have
20  a particular question, it should be a little more
21  precise.
22     MR. ALTMAN: Okay. We will come back to that.
23  I think we need to change tapes. So why don't we do
24  so right now.

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

468

1  the diagnostic code which is in a code, and then
2  there's another file mapped on to that that tells
3  you the name of the drug.
4      Q.  Okay.  And I think there's another file
5  for procedure codes which was not used in this
6  dataset, correct?
7      A.  Yeah, I think so, and I mean, there --
8  there were definitely more than four input files,
9  and those are all documented in the SAS files --
10     Q.  We are going to -- we are going to look
11  at that in a second.
12         Now, I'm curious why -- for the File 3,
13  the drug files, how come you didn't get all of the
14  drugs that those people were taking?
15     A.  For one, I think they would have, you
16  know, probably charged more; and, two, these were --
17  we wanted to define a priori which drugs we were
18  looking at.
19         We wanted to make sure that we could look
20  at the primary antiepileptic drugs, but at the same
21  time adjust for concomitant medication with other
22  anticonvulsants that were not a part of the 11 AEDs
23  or lithium, other antidepressants, and other
24  antipsychotic medications.

469

1      Q.  Are there other drugs that you can think
2  of that are used in treating psychiatric conditions
3  that are not an antidepressant, an antipsychotic, or
4  an anticonvulsant?
5          And by the way, you didn't get all
6  antipsychotics.  You only got atypical
7  antipsychotics, correct?
8      A.  I believe so.  These lists were compiled,
9  you know, in part based on our work with the VA
10  sample and consulting with the VA pharmacy people,
11  and then during that time, we also -- there were,
12  you know, lists were reviewed by Dr. Mann and lists
13  were reviewed -- we got with Rob Valuck's group, a
14  pharmacoepidemiologist, a couple of
15  pharmacoepidemiologists at the university.
16         These were lists that were compiled prior
17  to this work, and we used those lists here.
18     Q.  I'm curious.  Xanax is often used in
19  treating manic people or bipolar people, correct?
20     A.  I don't -- I'm not an expect on that.  I
21  know that Xanax is an anxiolytic with also, you
22  know, antidepressant qualities and properties, and
23  it -- I think it's used as an antidepressant.  I'm
24  not sure, you know, to the extent that it's used in

470

1  treating bipolar illness.
2      Q.  Do you know if Xanax was --
3      MS. McGRODER:  Bless you.
4  BY MR. ALTMAN:
5      Q.  Do you know if Xanax or other similar
6  drugs were included in your extract here?
7      A.  I would have to take a look and see if it
8  was.  I don't know the answer to that off the top of
9  my head.
10     Q.  If Xanax was not included, and I will
11  represent to you it's not.  I have looked.
12     A.  Okay.
13     Q.  Could that potentially bias the results
14  because there's a drug that's -- you know, that may
15  be used as an antidepressant that you are not able
16  to -- strike that.
17         How would you know that Xanax wasn't
18  prescribed to people in -- concomitantly with an
19  antiepileptic, and that the Xanax had the majority
20  or some influence over any potential efficacy of the
21  drug?
22     MS. McGRODER:  Object to form and foundation.
23  BY THE WITNESS:
24     A.  Obviously if Xanax is not a part of --

471

1  of, you know, the database and isn't used as a
2  covariate or as an exclusion in our -- in our
3  monotherapy or no drug conditions, then, you know,
4  potentially it could be used by somebody, and it
5  wouldn't be a part of our analysis.
6          In these kinds of analyses, you try to do
7  the very best you can with the available data.  You
8  don't always get every single different drug that
9  could be taken, and -- and there may be drugs that
10 are used concomitantly that -- that, you know, just
11 at that point in time, you just didn't know about.
12         We tried to cast a pretty wide net, and I
13 think we did a very good job in terms of looking at
14 a wide variety of different drugs that could be
15 taken as a concomitant therapy.
16         I will note that the results of both of
17 the studies are very, very similar whether you
18 adjust for concomitant therapy or not.
19     Q.  Understood.  But that would be a
20 limitation of your study that you don't know all the
21 drugs that these people were taking, correct?
22     MS. McGRODER:  Object to form.  Are you talking
23 now about the bipolar study or the gabapentin study?
24     MR. ALTMAN:  Either one.  He didn't buy the

472

1    data for either one.
2        MS. McGRODER:  Well, I object to your
3    argumentative colloquy.
4        Do you want to restate the question?
5    BY MR. ALTMAN:
6        Q.    Would it be a limitation of your study
7    that you don't know all the drugs that these people
8    were taking?
9        MS. McGRODER:  Object to form and foundation.
10   BY THE WITNESS:
11       A.   It really depends.  It depends, No. 1,
12   you know, if -- if those were drugs that people were
13   taking with frequency; and, secondly, if the
14   presence of those drugs would explain suicidal
15   behavior above and beyond the drugs that were
16   included in the study.
17   BY MR. ALTMAN:
18       Q.    But when you say "suicidal behavior," it
19   could also be the -- the reduction of suicidal
20   behavior, correct?
21       A.   It could have something to do with the
22   reduction of suicidal behavior.  Remember the -- the
23   primary focus of both of these analyses is to
24   determine whether or not these drugs increase the

473

1    risk of suicide attempts.
2        Now, our findings in these studies
3    indicate that in many cohorts, for example, in the
4    gabapentin study in the psychiatric cohorts, they
5    appear to have protective effects.  Now, that
6    doesn't mean that we can draw a causal inference
7    that these drugs are, in fact, protective.
8        What it allows us to determine is that
9    there is no evidence that these drugs are increasing
10   the suicide rates.  They may well be causally
11   protective, but there are a host of different kinds
12   of analyses that can be done to -- to further
13   explore that.
14       Q.    Now, it's possible that every person who
15   took gabapentin was taking Xanax at the same time,
16   correct?
17       MS. McGRODER:  Object to form.
18   BY THE WITNESS:
19       A.   I think that's extremely unlikely, and
20   if, as you purport, Xanax was not included in our
21   analysis as a concomitant therapy, then I wouldn't
22   know one way or the other, and I couldn't answer
23   your question, you know, affirmatively.
24       I would say that it's extremely unlikely

474

1    that everyone who was taking gabapentin was also
2    taking Xanax.
3    BY MR. ALTMAN:
4        Q.    But a substantial number could have been
5    taking some other concomitant drug, Xanax or
6    otherwise, you just wouldn't know, correct?
7        MS. McGRODER:  Object to form.
8    BY THE WITNESS:
9        A.   My, you know, analysis is restricted to
10   the drugs that have been a part of the study which
11   include the 11 AEDs, lithium, a fairly extensive
12   list of antidepressants, antipsychotics, and other
13   anticonvulsants.  To the extent that there are other
14   drugs that are not included, they may have an
15   effect.  They may not have an effect.
16   BY MR. ALTMAN:
17       Q.    Okay.  Under "Permitted Use" it says:
18   "The Deliverables are being provided by PharMetrics
19   to Dr. Gibbons for the purpose of performing
20   analyses solely for Pfizer Inc."
21       Did I read that correctly?
22       A.   Yes, you did.
23       Q.    "For a project entitled 'BP suicide.'"
24       Did I read the rest of it correctly?

475

1        A.   Yes.
2        Q.    Okay.  Is there anything in there that
3    says that you can use this for writing a paper
4    for -- you know, for scientific publication?
5        A.   In my speaking with the -- with the folks
6    at PharMetrics, I explored this.  I saw this in the
7    contract, and they said that the reason this was in
8    the contract is because they were providing the data
9    at a dramatically reduced cost because of their
10   association with Pfizer, and that we would be
11   permitted to write, you know, manuscripts.
12       Q.    Did you get -- and it says after that:
13   "Any other use of the Deliverables is strictly
14   prohibited and requires PharMetric's prior written
15   approval."
16       Did I read that correctly?
17       A.   Yes, you did.
18       Q.    Did you get PharMetric's prior written
19   approval before you published -- you published a
20   manuscript?
21       A.   I haven't published a manuscript.
22       Q.    Before you submitted a manuscript for
23   publication?
24       A.   No, I did not.

476

1     MR. ALTMAN: Okay. Let's mark the next Exhibit
2 27.
3         (WHEREUPON, a certain document was
4     marked Gibbons Deposition Exhibit
5     No. 27, for identification, as of
6     2/4/09.)
7 BY MR. ALTMAN:
8     Q.  Bear with me one second, please.
9     Dr. Gibbons, I have handed you what's
10 been marked as Exhibit No. 27, and it is a document
11 entitled "Read_Me_SHC.txt."
12     Do you -- do you see that at the top?
13     A.  I do.
14     Q.  Have you ever seen this document before?
15     A.  I believe this is just a printout of the
16 Read_Me file that was, you know, provided with the
17 CD or on the CD.
18     Q.  Okay. Would you please read -- would you
19 please read the letter portion of the document at
20 the top starting with "To whom it may concern."
21     A.  "On this CD we are providing analytic
22 files in accordance with the agreement between
23 Pfizer and PharMetrics, Inc. Datasets are in SAS
24 format. If you have any questions about the data,

477

1 please do not hesitate to contact us."
2     Q.  And the rest of it, the name and the
3 date.
4     A.  "PharMetrics, Inc. May 22, 2008."
5     Q.  Is there any reason to expect that you
6 would not have received this data very shortly after
7 the 22nd of May?
8     A.  I can't think of any reason.
9     Q.  Okay. Does that help refresh your
10 recollection when you first got this data?
11     MS. McGRODER: Well, object to the form to the
12 extent this tells us when he got the data.
13     MR. ALTMAN: I asked if it helped reflect --
14 refresh his recollection. I didn't ask him --
15     MS. McGRODER: You said for when he got the
16 data. I don't know that it does.
17     MR. ALTMAN: Does this help you --
18     MS. McGRODER: I don't know if this reflects
19 when he got the data.
20     MR. ALTMAN: I didn't say it did. I asked does
21 it help him remember when he got it, Lori.
22 BY THE WITNESS:
23     A.  Beyond saying that this -- you know, the
24 Read_Me file was written on May 22nd, I still don't

478

1 remember when, but, you know, it seems logical that
2 I got it not long thereafter.
3 BY MR. ALTMAN:
4     Q.  Would you expect to have had it by June
5 1st?
6     MS. McGRODER: Objection, calls for
7 speculation.
8 BY THE WITNESS:
9     A.  Again, I don't -- I don't really know. I
10 mean, it's -- it's logical that I received it, but,
11 you know, maybe I didn't receive it then. I just --
12 I can't answer it in an affirmative way because I
13 just don't remember the date.
14 BY MR. ALTMAN:
15     Q.  Do you know if you had it before the
16 Daubert hearing, the first Daubert hearing?
17     MS. McGRODER: Do you know when the first
18 Daubert hearing was?
19     THE WITNESS: I don't.
20 BY MR. ALTMAN:
21     Q.  You were there. It was June 22nd or
22 23rd.
23     Did you have it before then?
24     A.  I may have. I don't remember right now.

479

1     Q.  Okay. That's fine.
2     The first file on this bipolar disorder
3 patients, it says: "47,918 observations."
4     Did I read that correctly?
5     A.  Yes.
6     Q.  Does that seem to be the right number of
7 people in your bipolar cohort?
8     A.  Yes, it does.
9     Q.  I think yesterday you said 49,000, but
10 you were going off the top of your head.
11     Would you take this number as being the
12 more accurate number?
13     A.  Probably, I would have to take a look at
14 what's in the paper, but it sounds about right.
15     Q.  It's not that important. It is just
16 yesterday you said 49,000, and I just wanted to be
17 clear that -- see -- would it seem to be reasonable
18 to go by what's on the Read_Me file from
19 PharMetrics?
20     A.  I think it would be. I mean, there were
21 a couple of other inconsistencies. So, you know, if
22 you really want me to check, I'm happy to.
23     Q.  It's not -- it's not that important.
24     A.  Okay.

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

504

1    Q.  Yeah, we have a person being treated with
2  lithium before their bipolar diagnosis date,
3  correct?
4    A.  That appears to be the case, yes.
5    Q.  Is lithium used for other purposes
6  besides bipolar disorder to the best of your
7  knowledge?
8    MS. McGRODER:  Objection, no foundation.
9  BY THE WITNESS:
10    A.  I'm not an expert in that.
11  BY MR. ALTMAN:
12    Q.  Okay.  That's fine.  Let's go to Exhibit
13  No. 20 which is the manuscript, and let's go to
14  Table 1.
15    We talked about this briefly yesterday,
16  but -- I'm sure Lori is going to object -- there's
17  no complex statistical calculations that go into the
18  making of Table 1, correct?
19    MS. McGRODER:  Object.
20  BY MR. ALTMAN:
21    Q.  I mean, is this anything more than simply
22  the counts of the number of patients and how many
23  suicide attempts there are?
24    There's no -- there's no Poisson

505

1  calculations.  There's no normalizations.  I mean,
2  this is really just counts and things like that,
3  correct?
4    MS. McGRODER:  Well, object to the form of that
5  question.
6  BY THE WITNESS:
7    A.  If your question is are these -- are the
8  entries here the product of some more sophisticated
9  statistical computation or comparison, the answer is
10  no.
11  BY MR. ALTMAN:
12    Q.  Okay.  Let's start with gabapentin.  We
13  are going to work down this chart, and I think we
14  will be at the time to break for lunch.
15    And just -- first of all just so I
16  understand, for the purposes of Table 1, you
17  excluded data from before the bipolar diagnosis,
18  correct?
19    MS. McGRODER:  Object to form.
20  BY THE WITNESS:
21    A.  Could you --
22  BY MR. ALTMAN:
23    Q.  Sure.
24    A.  -- restate that or.

506

1    Q.  On -- go to what's labeled page 26.  It's
2  it actually the page before.
3    Would you please read the first sentence
4  into the record.
5    A.  "Table 1 presents number of patients at
6  risk, number of suicide attempts, person years of
7  exposure and rate of suicide attempts per 1,000
8  person years of exposure before and after initiation
9  of treatment during the one year observation period
10  following the index date of bipolar disorder
11  diagnosis."
12    Q.  Okay.  Let's go back to the table.
13    So what I had asked you before is you got
14  two years of data centered on the date of index
15  date, correct?
16    A.  Correct.
17    Q.  But for the purposes of Table 1, you did
18  not use the years worth of data before the index
19  date, correct?
20    A.  That is correct.
21    Q.  Okay.  That's what I want to make sure.
22  Let's -- we are going to work down the chart, but
23  for gabapentin, would you please read the number
24  of -- strike that.

507

1    You effectively break this up into two
2  chunks of time in that one-year period:  Before the
3  date of treatment -- first treatment, and after the
4  date of first treatment, correct --
5    A.  That's correct.
6    Q.  -- for the rest of the year?
7    Now, I think you said to be clean is when
8  we have gabapentin here in Table 1, that means
9  gabapentin and not one of the other anti -- the
10  other ten anticonvulsants or lithium, correct?
11    A.  That's correct.
12    Q.  Okay.  But it could have an unnamed
13  antiepileptic or an antipsychotic or an
14  antidepressant, correct?
15    A.  Correct.
16    Q.  Okay.  For gabapentin, you indicate
17  there's 1229 individuals at risk, correct?
18    A.  That's correct.
19    Q.  Okay.  And you say that there's 213
20  person years in the period of time before the first
21  diagnosis of gabapentin, correct?
22    A.  No.  You said diagnosis --
23    Q.  I'm sorry.  Before the first treatment
24  with gabapentin, between the time of the bipolar

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)        Page  504 - 507

Gibbons, Robert D PhD (Defense Expert) 2/4/2009 9:16:00 AM

508

1  diagnosis and the first treatment of gabapentin,
2  there are 213 patient years for the 1229 people,
3  correct?
4      A.   That's correct.
5      Q.   And there are 1,016 patient years of
6  exposure to gabapentin, correct, after that?
7      MS. McGRODER:  Object to form.
8  BY THE WITNESS:
9      A.   There's 1,016 person years of
10  gabapentin -- person years following the initiation
11  of gabapentin monotherapy with respect to the other
12  ten AEDs and lithium through the end of the what
13  turns out to be I believe 359-day follow up.
14  BY MR. ALTMAN:
15      Q.   And we talked about yesterday where you
16  used 359 and 360.
17          Within the precision of these kinds of
18  studies, that's not going to change results,
19  correct?
20      A.   I would agree with that.
21      Q.   Okay.  I'm a little confused.
22          Are you saying there's a thousand six --
23  there's 1,016 patient years leftover or there's
24  1,016 patient years of gabapentin exposure in

509

1  these -- we are only talking about these 1229
2  people, not any other people.  So we don't have to
3  qualify everything.
4          The 1,016 person years, is that the
5  person years of exposure on gabapentin?
6      A.   That's the person years of exposure after
7  the first initiation of gabapentin.  So it's not the
8  amount of exposure to gabapentin in terms of, you
9  know, number of pills prescribed or anything.  It's
10  the number of person years following the initiation
11  of gabapentin monotherapy.
12          That person could have been on gabapentin
13  or could have been prescribed gabapentin for one day
14  or 30 days or continuously throughout that same
15  period, and in this analysis that would be treated
16  all equally.
17      Q.   Why would you treat that all equally?
18      A.   Because the -- and, again, we have done
19  sensitivity analyses that look at it in different
20  ways, but the primary analysis here was comparing
21  the risk of suicide attempt before and after the
22  initial exposure to a particular antiepileptic drug
23  knowing that there may be a very short period of
24  time after the initiation of treatment and some kind

510

1  of suicidal behavior.
2          So requiring, for example, 30 days of
3  exposure.  If there was a suicide attempt prior to
4  30 days, that wouldn't be counted.  So we wanted to
5  cast the widest net and indicate any exposure to the
6  drug followed up by a suicide attempt irrespective
7  of the length of that exposure.
8          Sensitivity analyses we have also looked
9  at the density of the exposure, whether or not you
10  have been on gabapentin, you know, from month to
11  month, and how does that relate to the likelihood of
12  a suicide attempt using the number of pills data,
13  but for this analysis, it's before and after the
14  initial exposure.
15      Q.   You say you did that sensitivity
16  analysis?
17      A.   Yes.
18      Q.   Where is it?
19      A.   I, you know, have it around someplace.
20      MR. ALTMAN:  Okay.  I asked that that be
21  produced.
22      MR. LONDON:  To be -- to be clear -- I'm
23  sorry -- the sensitivity analysis is not in the
24  manuscript?

511

1      THE WITNESS:  No, it's not at this point.
2  I've -- I mean, I have continued to -- for academic
3  purposes and for the purpose of preparing -- you
4  know, anticipating requested revisions to this
5  manuscript for publication, that there will be a
6  series of other issues raised, and some of those
7  issues have been raised to questions when I
8  presented this.
9          I had some really good questions when I
10  presented this at Harvard, and so I have been
11  interested in pursuing this, not so much in the
12  context of this litigation, but in the context of
13  this paper and in the context of proposing these --
14  this methodology for other applications.
15      MR. LONDON:  I apologize for the interjection
16  and clarification.  Thank you.  Thank you, Lori, for
17  letting me do that.
18  BY MR. ALTMAN:
19      Q.   So on this line over here, you have 13
20  attempts before -- you have 13 attempts before -- in
21  the period between the date of bipolar diagnosis and
22  the initiation of therapy, and then 13 attempts
23  after that, correct?
24      A.   That's correct.

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

---

512

1    Q.   Now, some of those 13 attempts may have
2  been when the person wasn't actually on gabapentin,
3  correct?
4    A.   That's correct.
5    Q.   Okay. Could you tell me where in this
6  paper somebody would know that this did not
7  represent 1,016 years of exposure to gabapentin?
8    MS. McGRODER:  Object to form.
9  BY THE WITNESS:
10   A.   I'd have to read the paper and make sure
11  that that was clear. You know, I -- it's always
12  been clear to me, but, you know, I did the analysis.
13  Maybe it isn't completely clear.
14  BY MR. ALTMAN:
15   Q.   Well, let's go back to the page before,
16  and you say: "Person years of exposure and rate of
17  suicide attempts per thousand" --
18   THE COURT REPORTER:  I'm sorry.
19   MR. ALTMAN:  Sorry.
20   THE COURT REPORTER:  Person you say?
21  BY MR. ALTMAN:
22   Q.   "Person years of exposure and rate of
23  suicide attempts per thousand years of exposure
24  before and after initiation of treatment during the

---

513

1  one year period observation -- the one year
2  observation period following the index date of
3  bipolar disorder diagnosis."
4    Did I read that correctly?
5    A.   Yes, you did.
6    Q.   Okay. That's not real clear that that
7  second time interval is not all gabapentin -- you
8  know -- all exposure to the drug, is it?
9    MS. McGRODER:  Well, object to form.
10  BY THE WITNESS:
11   A.   I'm sorry. To me --
12   MS. McGRODER:  That's argumentative.
13  BY THE WITNESS:
14   A.   To me, that's -- that's very clear
15  because it -- you know, the -- it says the number of
16  patients at risk, the number of suicide attempts,
17  and person years of exposure and rate of suicide
18  attempts per thousand years of exposure before and
19  after the initiation of treatment.
20  BY MR. ALTMAN:
21   Q.   Okay.
22   A.   So I am using the term "exposure" to
23  indicate length of follow-up after a particular
24  event, and in this case, the event is initiation of

---

514

1  treatment.
2    So I think given the -- you know, the
3  phrase "initiation of treatment," to me that's
4  clear. It may be that reviewers of this paper will
5  share your, you know, opinion that it's not clear
6  and ask for further clarification.
7    Q.   Now, you said you -- you ran the
8  sensitivity analysis where you looked at considering
9  whether the person was actually on or off gabapentin
10  at the time of the suicide attempt?
11   A.   Yes, that's one of the -- one of the
12  sensitivity analyses that I've done since this paper
13  was submitted was to look at in the bipolar cohort
14  whether or not -- to use exposure at the monthly
15  level as a time varying covariate.
16   So is there a relationship between
17  gabapentin and suicide relative to not gabapentin on
18  a month-by-month basis whether or not you are
19  currently prescribed. You have days of dose that
20  cover that -- that interval.
21   Q.   So would one reasonable way to do a
22  sensitivity analysis is to take a look at every
23  suicide attempt -- suicide event, distinct suicide
24  event, and we are not going to deal with whether --

---

515

1  how you counted them or not -- and determine whether
2  they were on or off the drug at that particular
3  point in time?
4    MS. McGRODER:  Object to form. When you say
5  "the drug" --
6  BY MR. ALTMAN:
7    Q.   On whatever drug you are looking at. I
8  mean, in the gabapentin group, would one way to do a
9  sensitivity analysis would be take a look at all 26
10  of these events and see whether the person was on or
11  off the drug at the time of the event and compute
12  your rates based upon that?
13   A.   Not necessarily. I think if you wanted
14  to do that kind of analysis, you would do the kind
15  of sensitivity analysis that I described where you
16  deal -- where you treat exposure or gabapentin as a
17  time varying covariate, and you say on this month
18  was the person on gabapentin, yes, no, and that
19  becomes the gabapentin covariate in the analysis,
20  and -- and how does the presence or absence of
21  covariate -- of gabapentin at each month change the
22  odds of suicide attempt during that month.
23   So that would be, you know, the way that
24  I think that would be done. Now that's a different

---

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)                Page  512 - 515

516

1  kind of analysis. That's a time-to-event analysis.
2  So in that analysis we would be looking at not
3  multiple suicide attempts, but the time to the first
4  suicide attempt. So that's another part of that --
5  that sensitivity analysis.
6      Just as a note, I mean, there are --
7  there are lots of ways of doing this, and I think
8  it's important to try to consider as many competing
9  hypotheses and provide a variety of different
10  analyses that -- that try to show whether or not the
11  findings are consistent across those different
12  assumptions.
13      That would be quite different than doing
14  an NDA for the efficacy of a drug and trying lots of
15  analyses to see, you know, and reporting the one
16  that -- that makes you happy.
17      MR. ALTMAN: Why don't we go ahead and -- why
18  don't we go ahead and break for lunch at this point.
19      THE VIDEOGRAPHER: This is the end of tape No.
20  3, day 2. The time is 12:31 p.m. We are off the
21  record.
22      (WHEREUPON, a recess was had at
23      12:31 p.m. until 1:21 p.m.)
24      THE VIDEOGRAPHER: This is the beginning of

517

1  tape No. 4 of day 2. The time is 1:21 p.m. We are
2  back on the record.
3  BY MR. ALTMAN:
4      Q. Dr. Gibbons, before lunch, we were
5  talking about your paper.
6      Are you aware whether there are any
7  patients within the bipolar cohort that had suicide
8  events on the same day as the index date?
9      A. Yes, there were.
10      Q. What did you do with those patients?
11      Did they get included in the post period
12  or were they excluded?
13      A. They were handled in two different ways:
14  One, in the primary analysis, they were a part of
15  the preperiod since they didn't -- I mean, if a --
16  if a patient had a suicide attempt on the index date
17  and had been prescribed say gabapentin, it was
18  monotherapy on that day, that would have been a pre
19  because they didn't actually get the drug. The
20  suicide attempt was the same as the index date.
21      Then in a sensitivity analysis the --
22  those patients -- the analysis was repeated without
23  those patients at all in the analysis, and it was
24  very little difference in the -- in the results.

518

1  There -- I'm sorry. Go ahead.
2      Q. Let me ask you a slightly different
3  question.
4      I'm talking about regardless of the
5  gabapentin initiation date. I'm talking about if it
6  was the same as the -- we are not talking about the
7  gabapentin study. We are talking about the bipolar
8  cohort.
9      A. Correct.
10      Q. For Table 1, you did not look at the data
11  in the one year to the diag -- bipolar
12  diagnosis?
13      A. That's right.
14      Q. If a person had a suicide event on the
15  same date as the bipolar diagnosis, were they
16  included in Table 1 or excluded from Table 1?
17      A. Included in Table 1.
18      Q. Then that would mean that on the same day
19  they had -- were diagnosed as bipolar, and then
20  immediately went out and tried to -- attempted some
21  suicidal act, correct?
22      MS. McGRODER: Object to form.
23  BY THE WITNESS:
24      A. It probably means that they attempted

519

1  suicide, and then were brought into the clinic and
2  got the diagnosis.
3  BY MR. ALTMAN:
4      Q. Why would you then -- if the suicide
5  probably occurred before the bipolar diagnosis, why
6  would you have included that in the dataset with
7  bipolar as the index?
8      A. I thought it was a reasonable thing to
9  do.
10      Q. Did you look to see how much of the
11  suicides -- how many of the suicides actually --
12  strike that.
13      Did you check to see how many times that
14  occurred where you had a suicide event on the same
15  day as the bipolar diagnosis?
16      A. In the bipolar cohort, there was a fair
17  number. In the gabapentin cohort, it was very rare.
18      Q. I think there were three in the
19  gabapentin.
20      A. Yeah, I think you're right.
21      Q. Did you run a sensitivity analysis to see
22  what difference that would make?
23      A. I did.
24      Q. Okay. Is that part of the sensitivity

524

1   you know, just saying, oh, I found something kind of
2   cool, but that work is -- you know, it's -- I
3   haven't really envisioned that work as really, you
4   know, that's been designed for this paper.  That's
5   been more academic work.
6       Q.   But if there was -- but there could be a
7   sensitivity analysis that could show -- throw
8   question at the -- the validity of the results here,
9   correct?
10      A.   There could be.  I mean, that's the whole
11  idea.  The important thing to note in all of this
12  stuff, and I think that, you know, in some way
13  Pfizer should be credited for it.  These analyses
14  there's no predetermination of how they would come
15  out.  These analyses could have come out in a way
16  that Pfizer probably would not have wanted to use me
17  as an expert witness in these cases.
18      Q.   By the way, there was no indication for
19  the drug that this -- any particular drug was given
20  for any particular condition, correct?
21      MS. McGRODER:  Object.  In the bipolar?
22      BY MR. ALTMAN:
23      Q.   In either one of the cohorts.  I mean,
24  there was no -- you didn't know why that person got

525

1   that particular prescription, correct?
2       A.   That's correct, and it's a good point.
3   In -- in the -- in my expert report one of the
4   things -- I think it's in Table 1 -- shows the
5   co-morbidities of people who might have had bipolar
6   illness with did they also have a pain disorder, did
7   they also have epilepsy, and it shows those
8   co-morbidities.
9            It's unclear to me whether or not a
10  patient receiving gabapentin who had bipolar maybe
11  70 percent of those people also had pain.  The
12  gabapentin may have been prescribed for the pain and
13  not for the bipolar, and you are correct.  I don't
14  have a way of knowing which indication it was
15  prescribed for.
16      Q.   And when we look at Table 1 in your
17  paper, which you might want to flip to, you show
18  a -- you show a reduction in the rate before and
19  after treatment, correct?  For -- just looking at
20  the gabapentin, the top line, correct?
21      MS. McGRODER:  I'm sorry.  Did you say weight?
22      MR. ALTMAN:  Rate.
23      MS. McGRODER:  Oh, rate.  Okay.  Thank you.
24

526

1   BY MR. ALTMAN:
2       Q.   Is that correct?
3       A.   That's correct.
4       Q.   You don't know that those people did not
5   get -- first of all, you don't know that those
6   people got the gabapentin for bipolar disorder,
7   correct?
8       A.   I have just testified to that.
9       Q.   You also don't know whether they were
10  taking gabapentin before they were diagnosed with
11  bipolar disorder, correct?
12      A.   There are patients that may have been
13  taking -- may have been prescribed gabapentin prior
14  to the index date.
15      Q.   You also don't know that they might not
16  have received a prescription specifically for
17  treating the bipolar disorder.  That is not one of
18  the ones that represented your three classes of
19  drugs you purchased, correct?
20      MS. McGRODER:  Object to form.
21      BY THE WITNESS:
22      A.   I didn't follow the question.
23      BY MR. ALTMAN:
24      Q.   You didn't buy all the drugs -- you

527

1   didn't get all the drugs that a person was taking.
2   You got a subset for which you selected upfront,
3   correct?
4       A.   That's correct.  I got the drugs that
5   were of interest, you know, for this.  They may have
6   received other medications.
7       Q.   So you don't know, for example, that some
8   of these people may have gotten Xanax -- I think we
9   talked about this earlier -- may have gotten Xanax
10  for the bipolar disorder, and that's why they were
11  prescribed Xanax, and that led to the decrease in
12  the rate, correct?
13      MS. McGRODER:  Objection, asked and answered.
14      BY THE WITNESS:
15      A.   As we discussed before, if there's a drug
16  that's relevant to this and I don't have it in the
17  database, then I can't say, you know, that it was
18  not relevant or that was the reason the person was
19  prescribed the medication.
20      BY MR. ALTMAN:
21      Q.   And you are not qualified to decide what
22  drugs would be relevant in the treatment of bipolar
23  disorder, correct?
24      MS. McGRODER:  Object to form.

576

1 are also withdrawal effects from going off of a drug
2 that there may be associations with withdrawing from
3 a medication in terms of the likelihood of a suicide
4 attempt.
5 And I also know that these are medical
6 claims data, and the information I have is the time
7 of the prescription, and just because the drug was
8 prescribed on a particular date doesn't necessarily
9 mean that the person took it on that date. They may
10 have actually started taking it two weeks later or
11 something like that.
12 The data are coarse in that -- in that
13 respect. So the most conservative approach to these
14 kinds of analyses is to identify the time of the
15 exposure and compare rates before and after that
16 exposure.
17 BY MR. ALTMAN:
18 Q. You do -- the data provided to you by
19 PharMetrics did include how many days of
20 prescription a patient was given, correct?
21 A. That's correct.
22 Q. Do you think it would have been difficult
23 for you to have assessed each suicide event and
24 determined whether the person was on or off the drug

577

1 at that point in time?
2 A. I did an analysis like that as a
3 sensitivity analysis, as I described before, of
4 looking at the exposure as a time varying monthly
5 covariate. Was the person on gabapentin in this
6 particular month, this month, or this month and was
7 the taking of gabapentin on that particular month or
8 any of these months when treated as a time varying
9 covariate associated with suicide attempts, and I
10 found very similar results.
11 Q. How similar is similar?
12 A. Statistically significant protective
13 effects.
14 Q. And we will have to see -- take a look at
15 your sensitivity analysis to -- to really understand
16 that, correct?
17 A. Of course.
18 Q. Now, why is it that you wouldn't -- you
19 couldn't simply add up -- aside from doing it the
20 way you just described, simply adding up how much
21 time the person was exposed to the drug and how much
22 time they were not exposed to the drug and how many
23 events they had while exposed to the drug and how
24 many events they had while not exposed to the drug

578

1 and compared those?
2 A. Well, first you would have to adjust for
3 the amount of the exposure. You would have to be
4 able to adjust for concomitant medications. You
5 would want to adjust for suicide attempts in the
6 year prior to the index episode and -- you know, so
7 there are a lot of different factors that you would
8 want to include in that model.
9 Simply adding that up or tallying those
10 results wouldn't be sensitive to those kind of
11 features that are preserved in all the analysis that
12 we -- we have done.
13 Q. But they are not -- but those -- all
14 those aspects that you just described are not taken
15 into account in Table -- your Table 1 either, are
16 they?
17 A. They are in Table 2.
18 Q. In Table 2 but not in Table 1, correct?
19 A. Well, Table 1 is just a description of
20 the data that went in to the actually statistical
21 analysis. All of the inferences in the paper are
22 based on statistical results, not the simple
23 tallying of the -- of the results.
24 These -- the entries in Table 1 are as

579

1 close to the basic data, if you will, or summary
2 statistics that are -- are preserved in the
3 statistical analyses. So I wouldn't, you know, do
4 the kind of thing that you did and then do a
5 statistical analysis that was more like the
6 treatment in Table 1.
7 Q. And am I correct that in Table 2 you
8 never took exposure into account, correct?
9 A. If by exposure you mean how long they
10 were on the drug or how many pills they were
11 prescribed, that's correct. Table 2 does not have
12 that.
13 The sensitivity analysis does have that,
14 and I'll prepare, you know, some discussion of that
15 for the final version of this paper.
16 Q. Now, you could also include in that
17 sensitivity analysis what happens if you -- do you
18 think it would be unreasonable to run a sensitivity
19 analysis where you consider events on the same
20 day -- on consecutive days to be part of one event?
21 MS. McGRODER: Objection, asked and answered.
22 BY THE WITNESS:
23 A. Well, I have already stated that one of
24 the sensitivity analyses that I did looked at the --

620

1  BY MR. ALTMAN:

2      Q.  And then a pretty sharp reduction after

3  the bipolar diagnosis, right?

4      MS. McGRODER:  Object to form.

5  BY THE WITNESS:

6      A.  That's consistent with the column of your

7  table that you have in here.

8  BY MR. ALTMAN:

9      Q.  But those people aren't taking any drug?

10     A.  That's true.

11     Q.  So why should they have this -- so if

12 people who are not taking any drug can exhibit the

13 same reduction, how do you know that whatever caused

14 those people suicide attempts to go down is not the

15 same thing that happened for the gabapentin people?

16     A.  That -- that may be the case.  There may

17 be other factors that are going on with these

18 patients.  These patients may be receiving

19 psychotherapy.  I don't know the answer to that.

20     Q.  So you don't -- and that's my point.  You

21 have -- there's something -- I mean, clearly there

22 can be a non-pharmacologic reason for the reduction

23 in the suicide risk, right?

24     MS. McGRODER:  Object to form --

621

1  BY THE WITNESS:

2      A.  It could be --

3      MS. McGRODER:  -- calls for speculation.  Go

4  ahead.

5  BY THE WITNESS:

6      A.  I'm sorry.  Could be, and again the --

7  the key here is that this paper provides a

8  comparison between subjects in terms of the rate in

9  these subjects who are taking medication versus

10 those that are not, and then within subjects, to

11 determine whether or not once they start taking

12 medication is there an increase.

13     The finding of the paper, as articulated

14 in the final paragraph of the discussion, is that

15 there is no evidence that these drugs are leading to

16 increases in suicide attempt rates, and if anything,

17 what we are seeing are decreases following the

18 initiation of treatment and --

19     MS. McGRODER:  Wait.  Are you finished with

20 your answer because --

21     THE WITNESS:  Yes.

22     MS. McGRODER:  Let's go off the record for a

23 minute.

24     THE VIDEOGRAPHER:  Okay.  The time is 3:27 p.m.

622

1  We are going off the record.

2      (WHEREUPON, a recess was had at

3      3:27 p.m. until 3:35 p.m.)

4      THE VIDEOGRAPHER:  This is beginning of tape

5  No. 6, day 2.  The time is 3:35 p.m.

6  BY MR. ALTMAN:

7      Q.  Dr. Gibbons, before we went on the break,

8  we were looking at Exhibit 31, and we were looking

9  at the no medication group and how we saw similar

10 picture, for lack of a better term, in terms of what

11 happened around the date of the bipolar diagnosis as

12 we did with the gabapentin group.

13     You also see a reasonably similar picture

14 with the -- with the lamotrigine group, correct,

15 which is column E?

16     MS. McGRODER:  Object to form, not that part

17 but your preceding little summary.

18 BY THE WITNESS:

19     A.  Somewhat similar and that's -- that's

20 shown as well in my Table 2.

21 BY MR. ALTMAN:

22     Q.  Let's put this aside for right now.  I'd

23 like to go back to Exhibit 9 which is your actual

24 expert report.

623

1      MS. McGRODER:  Well, there are multiple --

2      MR. ALTMAN:  Well, that's his expert report --

3  expert report.  Everything is either the declaration

4  or the supplement.

5      MS. McGRODER:  May 19, 2008 expert report?

6      MR. ALTMAN:  Yes.

7  BY THE WITNESS:

8      A.  I have it.

9  BY MR. ALTMAN:

10     Q.  All right.  One of the things I forgot to

11 ask about.  On page 3 when you calculated the

12 confidence interval at the bottom, the odds ratio

13 you say is 1.033 and the confidence interval is

14 0.135 to 7.884, correct?

15     A.  Correct.

16     Q.  Did you use exact methods for that or

17 approximate methods?

18     A.  I used approximate methods.

19     Q.  Is that appropriate in that context?

20     A.  Well, it could be argued that an exact

21 method giving the rarity of the event would have

22 given you a more precise estimate.

23     Q.  I think Dr. -- Dr. Greenland ran the

24 numbers with the exact method and came up with a

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
3/5/2009

847

1   and it's not statistically significant.
2         Further analysis -- so that comes out
3   of column one. Further analysis in column two
4   indicates that those patients who ultimately get
5   an antiepileptic drug are almost at five times
6   the increased risk of a suicide attempt before
7   they ever get the drug. So it indicates that
8   there is a selection effect, and that that
9   selection effect is that the more severely ill
10  patients or at least those patients who have
11  increased risk of suicide -- suicide attempts
12  prior to the initiation of pharmacotherapy that
13  those -- that risk, that increased risk prior to
14  taking the drug is either significantly reduced
15  or completely eradicated following taking the
16  drug.
17        And then finally, and I don't know if
18  it's in here -- oh, yeah, yeah. The bottom
19  column of table -- I'm sorry -- bottom row of
20  Table 2 where it says "AED only," this is the
21  group of people who only took an AED. They
22  didn't take -- so it was AED monotherapy, no
23  concomitant antidepressant, antipsychotic, or
24  other antiepileptic drug as compared to those

849

1   the paper that lead one to the conclusion that
2   there may be, in fact, a protective effect of
3   these drugs.
4         Now, the sensitivity analyses are
5   designed to try to understand whether or not that
6   kind of an effect can be -- we can derive any
7   kind of causal inference for.
8   BY MR. ALTMAN:
9      Q. Now, you say on page 35 and 36 the
10  next to last page, you make the statement:  "If
11  anything, the effects of most" -- I'm sorry.
12  It's on the next to last page. There you go.
13  Right there.
14        You say in the second sentence in the
15  last paragraph: "If anything, the effects of
16  most AEDs and lithium are to reduce suicide
17  attempt rates relevant to pretreatment levels in
18  those patients who are ultimately prescribed
19  those drugs."
20        Did I read that correctly?
21     A. Yes, you did.
22     Q. That's the pre versus post comparison,
23  correct?
24     A. Yes, it is.

848

1   people who took absolutely nothing, none of those
2   categories.
3         And in that group -- bless you --
4   there is a significantly lower rate relative to
5   the -- to the no drug group, and the effect is
6   highlighted in terms of rate per person per
7   thousand person years back in Table 1 where we
8   have a rate -- a rate for the 11 AED only, the
9   fourth row from the bottom of Table 1 of three
10  per thousand patient years relative to a no
11  medication rate of 15 per thousand patient years.
12        So that is the primary between subject
13  analysis that supports the idea that there is a
14  statistically significant -- significantly lower
15  rate among those people who are treated with an
16  antiepileptic drug relative to those people who
17  receive no treatment despite the fact that in
18  those same individuals, the rate was much higher
19  than the rate of no treatment: 44 per 1,000
20  patient years versus 15 per 1,000 patient years
21  prior to their initiation, and it went from 44
22  per 1,000 down to three per 1,000 following the
23  initiation of treatment.
24        So those are the various findings in

850

1      Q. Okay. Why didn't you run any
2   sensitivity analyses to see whether that
3   proposition was affected by the sensitivity
4   analyses?
5      A. Well, the sensitivity analyses that
6   were included in the -- that were included or
7   will ultimately be included in this paper and
8   that I -- you know, that I shared with you
9   actually do some of that. The analyses using the
10  person-time analyses which treat each month as an
11  observation period of exposure to the drug and
12  suicide attempt that preserve the multiple
13  suicide attempts in the analysis go at long
14  lengths to provide more information on the post
15  versus predrug kind of analysis.
16        The post versus predrug analysis
17  requires that you keep the multiple suicide
18  attempts in the analysis. The primary suicide --
19  the primary analyses or at least the first three
20  major sensitivity analyses use a logistic
21  regression. They only consider a single suicide
22  attempt for each individual because they invoke
23  this new monotherapy distinction where in the
24  event of a suicide attempt, monotherapy is

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

851

1   defined prior to the suicide attempt.
2        You can't do that if you have multiple
3   suicide attempts, and you can't do the pre versus
4   post if you get rid of the multiple suicide
5   attempts. So the different sensitivity analyses
6   provide information about different pieces of the
7   analysis. The first three -- I think the first
8   three there's the new monotherapy which also adds
9   in looking at a single suicide attempt for each
10  individual, gets around the question about
11  multiple suicide attempts like on the same, you
12  know, consecutive days, and those sorts of
13  things.
14       The second one being duration of 30
15  days or more cumulatively over the first year,
16  and the third sensitivity analyses of throwing
17  out all suicide attempts that occurred on the
18  index date to get a sense of how big -- how do
19  things change when you -- when you exclude those
20  people. Those analyses really pertain largely to
21  the post-drug versus no drug.
22       MR. ALTMAN: Objection, non-responsive.
23  BY MR. ALTMAN:
24       Q.  My question to you is why didn't you

852

1   run sensitivity analyses for the pre versus post?
2        MS. McGRODER: Objection, asked and
3   answered.
4   BY THE WITNESS:
5        A.  And I answered your question that I
6   did. The SuperMix analyses that are included
7   have a component of that analysis which is
8   exactly predrug versus post-drug, and, secondly,
9   the sensitivity analyses that I ran specifically
10  on the post-drug versus no drug could not be run
11  on the post-drug versus predrug because they did
12  not permit multiple suicide attempts.
13  BY MR. ALTMAN:
14       Q.  Okay. When you say you answered my
15  question, nowhere in that answer before did you
16  mention the word SuperMix.
17       So I'm trying to understand here
18  your -- for lack of a better term mish-mashing
19  some of the sensitivity analyses that you did
20  using the SAS programs with the SuperMix
21  programs. So why don't we take a step back.
22       What did you do in the SuperMix
23  program?
24       MS. McGRODER: Object to form.

853

1   BY THE WITNESS:
2        A.  The SuperMix program was a person-time
3   logistic regression, and it was performed using
4   SuperMix. So in my first answer to your
5   question, I talked about the person-time logistic
6   regressions, and then in the second answer to
7   your question, I expanded on that and referred to
8   it as the SuperMix analysis because SuperMix was
9   the computer program that I used to perform the
10  person-time logistic regression analyses.
11  BY MR. ALTMAN:
12       Q.  Now, I looked at your SuperMix
13  analyses. Nowhere did you actually determine --
14  well, strike that.
15       For any of the sensitivity analyses
16  that you ran, did you check to see whether the
17  person was actually on the drug on the date of
18  the suicide attempt?
19       A.  The person-time analyses broke down
20  the year following the index episode of bipolar
21  disorder into monthly intervals and determined
22  whether or not a prescription included that month
23  in terms of the number of pills that were
24  available, and then within that month, whether or

854

1   not the suicide attempt occurred before or after
2   the prescription date.
3        So we had was there a prescription of
4   say gabapentin during month one, was there a
5   suicide attempt during month one, and if there
6   was a suicide attempt during month one, did it occur
7   before the prescription date for gabapentin or
8   after the prescription date.
9        Q.  Where did you do that, which analysis?
10       A.  That's all -- the analysis of those
11  data are reported in the -- in the SuperMix
12  files.
13       Q.  Okay. I am looking at your SuperMix.
14  Which of the SuperMix files?
15       A.  Well, I believe there are three
16  SuperMix files. The first one is the overall
17  cohort. The second one, I believe, and I might
18  be mistaken, the second one with the third one is
19  looking at the definition of exposure to
20  gabapentin only, and then the third one is
21  looking at only those people -- I believe there
22  were 662 people who had made a suicide attempt
23  prior to the index episode.
24       So looking at those people that were

863

1    regression.  I don't actually use that in the
2    analysis, but historically our programs didn't
3    put in an intercept automatically.  So we used to
4    do it that way.
5    BY MR. ALTMAN:
6        Q.   Now, if a person had more than one
7    attempt in a month, would there be more than one
8    record -- would the number of suicide attempts be
9    greater than one or --
10       A.   No, this is a person-time logistic
11   regression which is, as the sampling interval
12   gets smaller, it becomes a proportional hazard
13   general in your model.  So it takes on the
14   interpretation of a survival-type analysis.
15       So the idea is that you have -- for
16   each individual, you either have all of the
17   records for which they were available where the
18   event code would be zero if they never made a
19   suicide attempt for all 12 of those records, or a
20   person who had made a suicide attempt say at
21   month six, you would have five zeros, and then
22   the final record would be month six with a one
23   for the event, and we would take the first
24   suicide attempt in that analysis.

864

1        Q.   If a person -- we discussed the issue
2    of suicide attempts on multiple days?
3        A.   Correct.
4        Q.   On multiple consecutive days whether
5    that was really distinct suicide attempts?
6        A.   Correct.
7        Q.   Normalizing our time, let's call it
8    days since the index date.  If a person in month
9    one had an event on the 30th day of the month and
10   then the first, second, third, fourth, and fifth
11   days of the next month, you would count that
12   person as having suicide attempts in two separate
13   months, correct?
14       A.   No, this analysis is a person-time
15   logistic regression analysis which provides an
16   interpretation of a hazard rate which is, you
17   know, focused on the time to the first suicide
18   attempt.  So in this analysis, we don't count
19   multiple suicide attempts.
20       This analysis purely counts time to
21   the first suicide attempt and the association of
22   exposure to a given drug yes or no on each one of
23   those months.  So drug is a time varying
24   covariate here, and the analysis focuses on the

865

1    first suicide attempt.
2        Q.   So your assumption is is that if a
3    person takes a drug on one day of the month, they
4    took the drug for the entire month, correct?
5        A.   No.  We use the -- there had to be
6    a -- let me -- repeat your question.
7        Q.   If a person took a drug on one day in
8    the month -- and when I say months, we are always
9    talking about not calendar months, but we are
10   talking months since the index date.
11       A.   Right.
12       Q.   If a person takes a drug on one day
13   during the month, you flag that.  That's just
14   binary.  They either took the drug in that month
15   or they didn't, correct?
16       A.   Well, not exactly the way you said it.
17   We know whether or not there was a prescription
18   for that drug on that month.  We know whether or
19   not the prescription was either before or after
20   the suicide attempt.
21       So if there was a suicide attempt made
22   on the 15th day of month and the prescription was
23   on the 20th day of the month and it included a
24   year's long prescription, that suicide attempt

866

1    would not be attributed to the presence of that
2    drug on that month.
3        Now, if the prescription occurred on
4    the month before but it was a 60-day
5    prescription, then it would cover the first
6    month, and it would cover the second month as
7    well.  So there could have been a prescription on
8    the -- on month minus one for 60 days, and it
9    would cover two months.  So that person would
10   have exposure in that month.
11       Now, the final thing which I think is
12   what you are asking about is let's say somebody
13   had a prescription for one day, which is a little
14   rare, but let's say they did for one day and it
15   was the first day of the month and they made a
16   suicide attempt on the 15th day of the month,
17   they would be considered to have been exposed in
18   that month to the drug, which is similar to the
19   other analyses that we did.  And then in the
20   sense -- the other sensitivity analysis we did we
21   required that they have a 30-day exposure, but in
22   this, this is a month-by-month analysis.
23       Q.   Why didn't you simply find out whether
24   they were on or off the drug at the time of the

867

1  suicide attempt, and do it that way?
2      A.  Because --
3      MS. McGRODER:  Asked and answered in the
4  last deposition, but go ahead.
5  BY THE WITNESS:
6      A.  Yeah, the -- you know, imagine
7  somebody who has been on drug for you, know,
8  three weeks, and then they make -- and then their
9  prescription was just for those three weeks and
10  the next day they make a suicide attempt.
11  That would indicate that that person hadn't been
12  exposed to the drug.  Well, in fact, they had
13  been exposed to the drug.
14      Also, we don't know from medical
15  claims data that these people are necessarily
16  taking the drug or when they actually took the
17  drug.  They could have taken it -- you know, you
18  have 30 pills of the drug.  You don't necessarily
19  start it on the day of the -- that the
20  prescription was filled.
21      So to be conservative, we, you know,
22  indicate -- I mean in the primary analyses that
23  are described in the paper, we are basically
24  saying once you were exposed to the drug, you

868

1  know, that's the post period.  You might have
2  been -- only had one day of a prescription but
3  it's post.  This analysis is a little more
4  molecular in the sense that it breaks things down
5  on a month-by-month exposure basis.
6      So it really allows you to say
7  somebody was taking the drug for two months, then
8  they stopped taking it for a month, then they
9  started taking it again.  What was the
10  association with suicide in terms of that pattern
11  of response.
12  BY MR. ALTMAN:
13      Q.  So going back to your first -- going
14  back to the paper Table 2, for gabapentin the
15  post versus predrug value of .15, does that
16  number -- what does that number mean?
17      How should somebody interpret that
18  number?
19      A.  That number means that the ratio
20  between the rate of preinitiation of the drug
21  suicide attempts was .15 following initiation of
22  drug then before.  So it's about one -- 1/6th of
23  the rate, and the previous column indicates an
24  event rate ratio of 6.11 in the comparison of

869

1  predrug versus no drug.
2      So what you are basically -- the
3  interpretation is that prior to initiating
4  therapy in those people who ultimately did take
5  the drug, in this case gabapentin, their suicide
6  attempt rate was six times higher than people who
7  didn't take any of those antiepileptic drugs.
8      However, following the rate --
9  following the initiation of drug, the rate went
10  down six-fold.  So it essentially eradicated that
11  increased elevated risk associated with people
12  taking a drug before they ever took the drug, and
13  that's kind of articulated in figure 1 where you
14  see the open squares.  This is on page 30 of 36.
15      The open squares are the predrug,
16  pretreatment suicide attempt rates, and you can
17  see that they are all uniformly much higher than
18  the post-drug, and that after the filled in
19  squares, which are the post treatment suicide
20  attempt rates, are all basically kind of at the
21  level that you observe for those people who
22  didn't take any medication.
23      So -- so, you know, really in terms of
24  interpretation, what I get out of all of this is

870

1  that there's no evidence at all that these drugs
2  are increasing the rate of suicide attempts, and
3  that the people who ultimately get on these drugs
4  are at much higher risk of a suicide attempt
5  before they ever take them, and the drugs
6  decrease that risk to the level seen in people
7  who don't take these drugs.
8      Q.  If -- for gabapentin on Table 2, if
9  the post-drug versus predrug, whatever the ERR is
10  and the confidence interval includes one, that
11  allow you -- would that allow you to conclude
12  that gabapentin is protective of suicide
13  attempts?
14      If instead of .15 with a confidence
15  interval of .05 to .47, whatever the ERR is, the
16  confidence intervals included one, would that
17  allow you to conclude that gabapentin is
18  protective of suicide attempt?
19      A.  No. 1, if the -- if the confidence
20  interval included one and, of course, the -- if
21  the probability value -- now, this probability
22  value is related to the confidence interval, but
23  if the confidence -- if the probability value is
24  greater than .05, then we could not reject the

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

871

1  null hypothesis that the true confidence -- that
2  the true event rate ratio was different from one.
3  So you could not conclude on the basis of that
4  that there was a significant reduction in the
5  rate.
6         I'm not sure that the -- showing that
7  high rates go to lower rates in and of itself,
8  this column here (indicating), allows one to
9  conclude that the effect of these drugs is
10  protective.  So, you know, I mean, the direction
11  is to one of decreased -- significant decreased
12  risk.  If the confidence interval included one
13  and this P value is greater than .05, then you
14  couldn't conclude that there was a significant
15  reduction pre versus post.
16         So, for example, for carbamazepine,
17  the event rate ratio is .076, and it's definitely
18  less than one, but the confidence interval
19  clearly includes one.  The probability value is
20  .8, and on the basis of that we cannot say that
21  the true event rate ratio is different than one.
22         So we can't conclude that the rates
23  are decreasing.  Even though we know overall from
24  the figure and from the other table that the

872

1  rates are decreasing, that amount of decrease is
2  consistent with chance expectations.
3     Q.   So when you said on the last paragraph
4  I guess on page 35 or 36:  "If anything, the
5  effects of most AEDs and lithium are to reduce
6  suicide attempts rates relevant to pretreatment
7  levels in those patients who are ultimately
8  prescribed those drugs," that sentence would not
9  apply to carbamazepine, correct?
10    A.   Well, I mean, by "if anything,"
11  carbamazepine is an example of one where there's
12  nothing, but the answer is, yes, that would not
13  apply.  The -- the statistical evaluation of the
14  results for carbamazepine which has a
15  pretreatment rate of 40 suicide attempt per
16  thousand person years and decreases to 29 suicide
17  attempts per thousand years, the statistical
18  result, the significance of that result in terms
19  of testing to see whether or not there is a
20  statistically significant reduction in that rate
21  does not permit that conclusion.
22    Q.   And that would also be true of
23  topiramate, correct?
24    A.   That's correct.  So even though the

873

1  event rate ratio for topiramate is .52, which is
2  saying that it is cut in half, the result is not
3  statistically significant.  So we can't ascribe
4  to that that, you know, is being -- that the
5  reduction is beyond what we would expect by
6  chance.
7         This is saying, you know, there's a 22
8  percent probability that 50 percent
9  reduction in that particular sample given those
10  particular base rates are -- are consistent with
11  chance alone.
12    Q.   Now, what is -- if we were to
13  calculate the odds for the rate ratio from Table
14  1, we would obviously not get the same numbers as
15  you got in Table 2, correct, because you ran this
16  through the regression in order to -- the Poisson
17  regression in order to generate the ERs, correct?
18    A.   Well, it's correct.  The -- as long
19  as -- so this was a question you raised in your
20  last deposition where you were looking at some of
21  the numbers and -- in one of my tables, and you
22  were saying, you know, I can get exactly the same
23  numbers that look like they are coming out of
24  your GEE model and just by simple taking the

874

1  ratio of the rates and, you know, how can that
2  be.  You are doing this kind of fancy statistical
3  model.  How can you -- how can I get the same
4  point estimate by just doing the division.
5         And I said, you know, I'm not sure how
6  to answer that.  I went back, and I looked into
7  it, and so the answer to that, and I think it is
8  the answer to the question you just asked me is
9  that if there are no time varying covariates;
10  that is, if the covariates don't change from the
11  pre to the post, they are all the same, all they
12  are going to do is move things up and down, but
13  it will preserve the ratio.
14         Now, of course, that has nothing to do
15  with the standard error or the statistical
16  significance test, but, you know, you will be
17  able to see in the marginal; that is, in the
18  real -- in the observed data if you take the rate
19  ratios, you will get the maximum likelihood.
20  Well, these are GEE.  They are not really maximum
21  likelihood, but you will get the point estimate.
22    Q.   Well, the confidence -- the
23  confidence -- if you were to calculate the --
24  using basic statistics, the standard error and

879

1  quick, there's an exhibit. I don't remember what
2  the number is, but can you just take a look at
3  where -- under the drug?
4      A.  Yeah, I would probably just want to
5  double-check in the list of drugs, you know,
6  to -- to verify exactly was it all antipsychotics
7  or atypical. I know it says atypical here. So
8  that's probably what it is, but we would have to
9  double-check, and I'm assuming that's something
10  you may have done.
11      Q.  What other -- aside from the
12  antiepileptic, what other factors might have led
13  to the decrease in the suicide risk -- suicide
14  attempt risk that your analysis demonstrates or
15  shows?
16      MS. McGRODER:  In the manuscript?
17  BY MR. ALTMAN:
18      Q.  In either -- in either one.
19      A.  You say in -- oh, besides for the
20  antiepileptic drug?
21      Q.  Besides the drug, what other factors
22  might have led to the decrease?
23      MS. McGRODER:  Object to form, calls for
24  speculation.

880

1  BY THE WITNESS:
2      A.  Well, the analyses suggests that the
3  antidepressant -- concomitant antidepressant
4  medications led to decreases. Those were
5  adjusted for the analysis. The analysis also
6  suggests decreases associated with antipsychotic
7  medications.
8      The very significant month effect in
9  the -- in the person-time logistic models
10  suggests that there is a decrease overall as you
11  got further out in time from the index episode
12  of, you know, decreasing in all patients overall.
13  I think we talked about that and saw some of that
14  in the patients who were in the no drug condition
15  where the highest rates appear to be in the
16  months just before the index and then start to
17  decrease as you get further away from the index.
18  BY MR. ALTMAN:
19      Q.  I didn't ask a very good question.
20  What other factors that the data -- strike that.
21      What other factors that are not
22  related to the data -- the PharMetrics dataset
23  could have led to the decrease?
24      MS. McGRODER:  Object to form, calls for

881

1  speculation.
2  BY THE WITNESS:
3      A.  I'm not sure --
4  BY MR. ALTMAN:
5      Q.  Let me give you an example. We talked
6  you didn't purchase all drugs. So one of the
7  things that you don't know about is the influence
8  of drugs that are not in the set that you
9  purchased.
10      For example, we talked about Xanax
11  or -- with the assumption that you only got
12  atypical antipsychotics, typical antipsychotics.
13  For example, those might have been an influence.
14      Are there any other influence -- any
15  other factors that you could think of that you
16  would not have been able to determine with the
17  PharMetrics data that could have contributed to
18  the decrease?
19      A.  I understand your question.
20      MS. McGRODER:  Object to form.
21  BY THE WITNESS:
22      A.  One other variable that wasn't
23  available in the PharMetrics that I would have
24  liked to have had was, for example,

882

1  psychotherapy.
2  BY MR. ALTMAN:
3      Q.  So is it possible that psychotherapy
4  is responsible for most of the decreased risk in
5  this -- in this dataset?
6      MS. McGRODER:  Object to form, calls for
7  speculation.
8  BY THE WITNESS:
9      A.  I don't think that's possible. I
10  think it -- you know, there may be some role of
11  psychotherapy, but I don't think psychotherapy is
12  sufficiently prevalent to, you know, explain the
13  magnitudes of the effects that we are seeing
14  here.
15      Again, I -- the decreases are
16  interesting. There are alternative explanations
17  which include the natural course of the disorder
18  and its relationship to suicide attempt rates
19  that make rates go down as you go further out in
20  time. Remember the pretreatment rate is probably
21  closest to the index episode. The post treatment
22  rate is further away.
23      So there's going to be a natural
24  decrease to some extent. The statistical models

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

883

1  adjust for that, particularly the person-time
2  logistic model.  That's one of the primary
3  reasons for doing that model.  It allows one to
4  model the sort of exponential decay, if you will,
5  in the rate of the suicide attempts over time in
6  the total population including those people who
7  don't receive treatment and then determine the
8  extent to which the treatment changes that hazard
9  function over time.
10      That's an important part of why, you
11 know, I did those.  I did those person-time
12 logistic models to try and tease that part of the
13 puzzle apart.
14 BY MR. ALTMAN:
15     Q.  Let me give you two other exhibits,
16 and then we are going to put those aside for now
17 just because they have already been marked, and
18 then we are going to come -- I am going to talk
19 to you about a different exhibit.
20     What I'm handing are you Exhibits 53
21 and 54 -- I'm sorry 54 -- 55 and 56.  These are
22 the gabapentin cohort sensitivity analyses.
23
24

884

1          (WHEREUPON, certain documents
2          were marked Gibbons Deposition
3          Exhibit Nos. 55, 56, for
4          identification, as of 3/5/09.)
5      MS. McGRODER:  Thank you.
6  BY MR. ALTMAN:
7      Q.  And I'll just ask you very quickly for
8  now.  Do those appear to be the analyses that you
9  provided?
10     A.  Yes, they do.
11     Q.  Okay.  Let's put those aside for right
12 now.  We are going to come back to those.  I will
13 hand you the next exhibit.
14          (WHEREUPON, a certain document
15          was marked Gibbons Deposition
16          Exhibit No. 57, for
17          identification, as of 3/5/09.)
18 BY MR. ALTMAN:
19     Q.  Dr. Gibbons, I have handed to you what
20 has been marked as Exhibit 57 as a text file
21 entitled "AE2OUT."  It was dot txt which I
22 believe is the output file from the second of
23 your SuperMix analyses; is that correct?
24     A.  Right.  It says AED2OUT.

885

1      Q.  I thought that's what I said, but if I
2  was wrong, you corrected me.
3      A.  Sorry.  I didn't hear the D.
4      Q.  You are right.  I didn't.  Okay.
5      Does this appear to be the output file
6  from the SuperMix computation?
7      A.  Yes, it does.
8      Q.  And this is the gabapentin only
9  collection, correct?
10     A.  This is treating gabapentin as the
11 time varying drug effect.  So gabapentin only.
12     Q.  And if we go to the -- page 2 and on
13 to page 3, that's where you get the results of
14 your analysis, correct?
15     A.  That's correct.
16     Q.  And I assume the one that we are
17 interested in here is the GAB analysis, correct?
18     MS. McGRODER:  I will object to form.
19 BY THE WITNESS:
20     A.  You are referring to the parameter GAB
21 listed under results for the model without any
22 random effects?
23 BY MR. ALTMAN:
24     Q.  Well, all the way down at the bottom

886

1  where it says:  "Odds Ratio 95 Percent, Odds
2  Ratio Confidence Intervals."
3      A.  Okay.  So just before that are the
4  estimated regression weights, and then those
5  regression weights, the estimates are reiterated
6  on the second and third page and include odds
7  ratios and the confidence intervals for the odds
8  ratio.
9      Q.  And the reiterated -- the reiterated
10 results are frankly the ones that count.  That's
11 the end result of the analysis, correct?
12     A.  Well, no.  I mean, the probability
13 value, for example, for gabapentin -- the overall
14 probability value is -- is provided under the --
15 on the far column of the estimated regression
16 weights.
17     Q.  Right.  If we go to the odds ratio,
18 though, starting at the bottom of page 2 where we
19 get to gabapentin, the odds ratio as provided
20 here for gabapentin is .6269, correct?
21     A.  That's correct.
22     Q.  Which would be rounded to .63,
23 correct?
24     A.  Okay.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

887

1    Q.   Is that correct?
2    A.   Yes.
3    Q.   And the confidence intervals as shown
4    as .3278 which would round to .33, correct?
5    A.   That's correct.
6    Q.   And the upper would be 1.1990,
7    correct?
8    A.   Correct.
9    Q.   That would round to 1.20, correct?
10   A.   Correct.
11   Q.   So according to this analysis of just
12   the gabapentin data, this does not show
13   that gaba -- these are not statistically
14   significant results for gabapentin, correct?
15   A.   That's true, and that's reiterated
16   under the P values where the probability value
17   testing whether or not the regression weight is
18   one or the odds ratio -- the -- the regression
19   weight is -- the logarithm of the odds ratio is
20   equal to -- is equal to zero is .1581.  So that's
21   not statistically significant.
22        So we can't conclude that, you know,
23   gabapentin in this analysis -- the presence of
24   gabapentin is significantly decreasing the risk

888

1    of suicide attempts.  The purpose of the analysis
2    is to show if we were to -- you know, obviously
3    we are reducing the sample size by quite a bit by
4    just looking at gabapentin as opposed to looking
5    at all of the AEDs, and what we are seeing is, I
6    believe, that the risk ratio -- the estimated
7    odds ratio for the overall AED was .59, and
8    that's looking at all of the AEDs simultaneously,
9    and that was statistically significant.  And this
10   effect is quite similar to it, but it's not
11   statistically significant because of the lower
12   sample size.
13        MR. ALTMAN:  Let me take a break for a
14   minute.  Can we go off the record?
15        THE VIDEOGRAPHER:  Off the record at 1:26.
16            (WHEREUPON, a recess was had at
17            1:26 p.m. until 1:29 p.m.)
18        THE VIDEOGRAPHER:  We are back on the record
19   at 1:29.
20        BY MR. ALTMAN:
21   Q.   Dr. Gibbons, I forgot to ask you one
22   thing.
23        Before the lunch break, we were
24   talking about trying to locate the SAS programs

889

1    that extracted the data.  Did you have any luck?
2    A.   I put in a request to get them.  I'm
3    not sure that, you know, we will be able to get
4    them, but I'm waiting for a return phone call.  I
5    put my phone on -- on mute.  So as soon as I hear
6    back, I am expecting a call one way or the other.
7    Q.   Who did you call to ask them?
8    A.   Dr. Hur.
9    Q.   Okay.  Do you think he might not have
10   them at all or --
11   A.   Today he is at the VA, and the VA with
12   recent issues related to data security doesn't
13   necessarily allow you to plug an external data
14   storage device into their network.  So he would
15   have to be able to do it elsewhere.  So he is
16   investigating (No. 1) does he even have it around
17   with him, and (No. 2) can he plug it into a
18   computer where he can have access to send it to
19   me.  So if he doesn't have it, you know, or isn't
20   able to do that, surely, I'll be able to get it
21   tonight and forward it on.
22   Q.   Is all the work that was done with
23   these data analyses on an external drive or a
24   discrete external drive?

890

1        MS. McGRODER:  Object to form.  "These
2    analyses" you mean, the sensitivity analysis?
3        BY MR. ALTMAN:
4    Q.   All the work that's been done in this
5    case by Dr. Hur, does he keep that on a separate
6    external drive?
7    A.   Not to my knowledge.
8    Q.   Does he keep -- he keeps it on his
9    laptop, on the hard drive on the laptop?
10   A.   Some of it is at the computer at the
11   university.  Some of it is on an external drive
12   that he keeps, you know, those sort of things.
13   Some of it obviously is on my computer or on my
14   external drives.
15   Q.   So there may be some data on his
16   drives or his computer that is not on your
17   computer?
18   A.   There shouldn't be at this point.  I
19   don't think I have on my computer the SAS program
20   that you are looking for that generated the
21   monthly data file that I used in my analysis, and
22   I also want to double-check.  There may be -- I
23   may have taken that file and then modified that
24   file for the purpose of putting it into the

923

1  suicide attempt occurred before the person took
2  the drug.
3       However, if the suicide attempt
4  occurred on day one of the observation period,
5  I'm counting it in the background because it
6  occurred within my window of the observation
7  period, and it occurred before the person started
8  drug.
9       Now, I certainly believe that a person
10  who made a suicide attempt at 3:00 in the
11  afternoon, got rushed to the emergency room, got
12  a diagnosis of bipolar disorder, had bipolar
13  disorder all day long.  I do not believe that a
14  person who made a suicide attempt at 2:00, got
15  rushed to the emergency room, got a diagnosis of
16  bipolar disorder, and then was given a
17  prescription to fill of gabapentin I don't
18  believe in any way that the gabapentin was
19  responsible for the suicide attempt, and I think
20  that that is perfectly justifiable, and I cannot
21  think of any other way to do it, and I also did
22  a -- I did a sensitivity analysis to explore the
23  effect of including those folks in the analysis.
24       Q.  And that had a big effect, didn't it?

924

1       MS. McGRODER:  Object to form.    .
2  BY THE WITNESS:
3       A.  Yes, it did, and that big effect is --
4  speaks to the question of whether or not
5  gabapentin or antiepileptic drugs are protective
6  for suicide attempt.  It does not speak to the
7  effect of whether or not they are causing suicide
8  attempts.
9  BY MR. ALTMAN:
10      Q.  We are not even discussing that.  You
11  made a conclusion in your paper that said:  "If
12  anything, the effects of most AEDs and lithium
13  are to reduce suicide attempt rates relevant to
14  pretreatment levels in those patients who are
15  ultimately prescribed those drugs."
16      So that's -- that's what I am talking
17  right there.
18      A.  And I --
19      MS. McGRODER:  Well, wait.  Is that a
20  question?  I mean, what is your question?
21  BY MR. ALTMAN:
22      Q.  Well, we are not talking about -- we
23  are not talking about cause and effects.  We are
24  talking about protective effects, and the

925

1  question whether that statement is justified.
2       MS. McGRODER:  Is your question is that
3  statement justified?
4       MR. ALTMAN:  Well, I know what he is going
5  to say.  So I don't have to ask him that but --
6       MS. McGRODER:  Well, you have to ask a
7  question so he can answer something.  It can't
8  just be a debate you want to engage in.  Ask a
9  question.
10  BY MR. ALTMAN:
11      Q.  Would it be reasonable -- would it
12  have been reasonable for a person to decide that
13  suicide attempts on the index date are not to be
14  included?
15      A.  I don't believe so.  I think that
16  would have been unreasonable.  I think with the
17  question now you've just drawn a distinction
18  between causal inference and protective effects,
19  and I will -- I will tell you that there are many
20  people who will say that as soon as you start
21  using the word "protective," you are drawing a
22  causal inference.
23      So this whole line of research is
24  really about trying to determine whether or not

926

1  there's justification for using the word
2  "protective effects" or drawing a causal
3  inference and whether or not the effect is
4  protective because there are other alternative
5  explanations like regression effects, like the
6  natural course of the disease, and what -- what
7  really makes all this really interesting is
8  trying to tease apart which parts of these are
9  artifacts of regression effects, are artifacts of
10  the natural course of the disease, and which ones
11  are real effects.
12      Q.  Dr. Gibbons, does your paper stand for
13  the proposition that gabapentin -- the use of
14  gabapentin is protective for suicide attempt?
15      MS. McGRODER:  Wait.  His --
16  BY MR. ALTMAN:
17      Q.  All right.  Strike that.  I will ask
18  it -- I'll ask it differently.
19      Your manuscript, does your manuscript
20  allow you to conclude that gabapentin is
21  protective for suicide attempts?
22      A.  The conclusions in my manuscript are
23  related to antiepileptic drugs in general, and
24  the conclusions are that the antiepileptic drugs

927

1    do not increase the risk of suicide attempts
2    whatsoever, and, if anything, they decrease. As
3    we've seen for the overall analysis, they
4    significantly decrease the risk of suicide
5    attempts following the initiation of drug.
6        There can be other explanations beyond
7    the fact that the drug is itself responsible for
8    decreasing the suicide attempt rate, and the
9    sensitivity analyses that I have performed
10   specifically look at those questions.
11      MR. ALTMAN: Objection, non-responsive.
12   BY MR. ALTMAN:
13      Q.  Does your manuscript allow you to
14   conclude that gabapentin is protective for
15   suicide attempts?
16      MS. McGRODER: Objection, asked and
17   answered. You can answer it the same way, if you
18   want.
19   BY THE WITNESS:
20      A.  Just keeping answering it in the same
21   way. Where we -- the manuscript shows that there
22   are statistically significant decreases
23   associated with the use of antiepileptic drugs in
24   general and gabapentin in particular from the

928

1    period prior to the initiation of drug to
2    following the initiation of drug.
3        What my manuscript does not say is
4    that one can draw a causal inference that this
5    protective effect, this significant decrease is,
6    in fact, a protective effect of the drug, and --
7    and the goal of all of this work, what makes this
8    scientifically interesting is to try to figure
9    out which combination of sensitivity analyses
10   would allow you to draw that kind of inference
11   from these kind of observational data.
12   BY MR. ALTMAN:
13      Q.  If another expert were to say
14   Dr. Gibbons' paper proves that gabapentin is
15   protective of suicide, would that expert be
16   wrong?
17      MS. McGRODER: Object to form and
18   foundation.
19   BY THE WITNESS:
20      A.  The expert -- it depends on how the --
21   how this expert was using the word protective.
22   If they were using the word protective the way I
23   would use the word protective, then I think that
24   might be a misinterpretation. If you were using

929

1    the word protective to show that there was a
2    statistically significant reduction associated
3    with the use of gabapentin in these data, the
4    answer would be they would be correct. There is
5    a statistically significant reduction in the
6    rate.
7        Is it a causal effect? Is it really
8    because they took the drug, or is it because in
9    part the time period after taking gabapentin is
10   further away from the index episode then -- then
11   the time point before and there's a natural
12   decline. That's another alternative explanation.
13   That's why I did the person-time logistic
14   regression models to try and control for that.
15       The results of that analysis are
16   consistent showing a very similar odds ratio,
17   very similar protective effect. So it's kind of
18   the best I can answer your question.
19      MS. McGRODER: I need to take a break. I
20   apologize.
21      MR. ALTMAN: Yes. Let's -- let's go off the
22   record.
23      THE VIDEOGRAPHER: This is the end of tape
24   No. 4. Off the record at 2:12.

930

1        (WHEREUPON, a recess was had at
2        2:12 p.m. until 2:30 p.m.)
3      THE VIDEOGRAPHER: This is the beginning of
4    tape No. 5. We are back on the record at 2:30.
5   BY MR. ALTMAN:
6      Q.  Dr. Gibbons, we just talked about --
7    spent quite a bit of time talking about the
8    bipolar analysis -- the bipolar manuscript. The
9    discussions we had, would they essentially apply
10   to the gabapentin -- the gabapentin analysis as
11   well?
12      A.  I think that statement is probably,
13   you know, a little too broad for me to answer --
14      Q.  Okay. That's fine.
15       Just like with the bipolar analysis
16   where you said you could not conclude that the
17   AEDs cause a protective effect, is that -- is
18   that the same -- can you say the same thing in
19   terms of the gabapentin study that you did in
20   your expert report?
21      MS. McGRODER: Object to form, misstates --
22   that misstates his testimony.
23   BY THE WITNESS:
24      A.  I think that -- I mean, if what you

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

931

1    are asking me is would I on the basis of either
2    the bipolar analysis or the gabapentin analysis
3    indicate that there is an unequivocal causal
4    protective effect of gabapentin, the answer is,
5    no, I couldn't draw that from -- you know, these
6    are observational data.  There are some other
7    alternative explanations.
8         I think that it may be possible to do
9    so through sensitivity analyses through
10   additional analyses, but I don't believe anything
11   that -- I would not state that I believe that the
12   significant decreases that we are seeing in off
13   drug, on drug, predrug, post-drug are necessarily
14   a causal effect of the drug.
15        There are other potential
16   explanations, and until those potential
17   explanations are adjusted for, I wouldn't state
18   that there is a causal protective effect.
19   BY MR. ALTMAN:
20        Q.   And one of those influences would be
21   the effect of other drugs which is something you
22   could not remedy with the dataset from
23   PharMetrics as purchased, correct?
24        A.   I would say that that one would be

932

1    probably the least of my concerns, but that is
2    certainly a limitation of the study.  If there
3    are other drugs out there that might exert a
4    protective or a harmful effect on suicide attempt
5    rates that we may or may not even know about at
6    this stage, you know, that's certainly a
7    limitation since not every drug is included,
8    but -- but to me, that's really one of the more
9    minor points.
10        A larger point is the question of
11   teasing apart the natural history, the natural
12   course of the disease from the potential effects
13   of the -- of the drugs.
14        Q.   Do you think you will be able to do
15   that with the PharMetrics data?
16        A.   I think that some of the sensitivity
17   analyses start to speak to that.  I think the
18   person-time logistic model speaks to that to some
19   extent.  I don't know.
20        I mean, I'm going to continue to work
21   on this obviously in one way or another, not just
22   for these drugs, but, you know, in general for
23   all drug safety kinds of problems.  How do you
24   derive causal inferences for either protective or

933

1    harmful effects of drugs for a variety of adverse
2    events.
3         Q.   I have to check something for a
4    second.
5         You stated that you saw no evidence
6    that gabapentin was causing suicide attempts
7    correct?
8         A.   Correct.
9         MS. McGRODER:  Object to form.
10   BY MR. ALTMAN:
11        Q.   How do you know that gabapentin is not
12   leading to an increased risk and that risk is
13   being counterbalanced by some other factor?
14        MS. McGRODER:  Object to form.
15   BY THE WITNESS:
16        A.   I think that the sensitivity analyses
17   go a long way to show that that's not the case,
18   particularly the person-time logistic models that
19   are really looking at the coincidence between
20   exposure to the drug and suicide attempts,
21   adjusted for previous suicide attempts, age, sex,
22   year, concomitant medications, and the natural
23   decreases in the overall suicide attempt rates
24   that occur over time in that -- in that bipolar

934

1    cohort.
2    BY MR. ALTMAN:
3         Q.   But once again, you are not adjusting
4    for another drugs that are not in the set you
5    purchased, correct?
6         MS. McGRODER:  Object to form.
7    BY THE WITNESS:
8         A.   I can only adjust for the drugs that,
9    you know, are part of the analysis and a part of
10   the PharMetrics database.  I suspect that there
11   may -- you know, if there are other drugs out
12   there, they are probably correlated with the use
13   of some of the drugs that are in the analysis,
14   but to the extent that, you know, they are not in
15   there, I can't tell you exactly that their
16   affects would be, of course.
17   BY MR. ALTMAN:
18        Q.   So when you said before that this
19   would be a minor effect, you don't really know
20   that that's a minor effect.  You don't know what
21   the effect would be?
22        MS. McGRODER:  Object to form.
23   BY THE WITNESS:
24        A.   I believe that, you know, through

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert (Defense Expert)**
4/27/2009

1103

1 Exhibit 1 so we do need to call the Magistrate.
2 Yes, we convened and went for, I don't know,
3 whatever -- how many minutes have we gone?
4         VIDEOGRAPHER:  23.
5         MS. McGRODER:  We convened for 23
6 minutes.  We convened for 23 minutes.  Well, there
7 appears to not be any kind of phone in here so I
8 guess you have to call my cell phone.
9         MR. ALTMAN:  There is a phone in here.
10 Jack, can you follow-up on that?
11        MS. McGRODER:  This is why I thought it
12 would be appropriate to go off the record, but
13 apparently they want the logistics of the phone
14 call on the record.
15        MR. LONDON:  We are at 708-458 --
16        MS. McGRODER:  Do you think they can call
17 straight through?
18        MR. LONDON:  I'm going to find out.
19 458-7790.  I'm going to find out what the extension
20 is.
21        MS. McGRODER:  It's 913 -- I don't really
22 want my cell phone number on the record.  Let's go
23 off the record, please.
24        MR. ALTMAN:  For the cell phone number

1104

1 you can go off the record.
2         VIDEOGRAPHER:  The time is 11:15 a.m.  We
3 are going off the record.
4         (Discussion off the record.)
5         VIDEOGRAPHER:  The time is 12:04 p.m.  We
6 are back on the record.
7         MS. McGRODER:  So since we are still
8 waiting for the Magistrate to call back, I think
9 we've agreed to continue with questions that are
10 pursuant to the agreement that pertained to the
11 certain paragraphs in Dr. Gibbons' report.
12        MR. ALTMAN:  That's correct.
13 BY MR. ALTMAN:
14     Q.  Dr. Gibbons, if you could turn in your
15 new report to page 15, which are the start of the
16 tables.  Could you please explain the difference
17 between 2A and 2?
18     A.  Two uses the concomitant medications
19 based on the definition of concomitant to taking
20 gabapentin.  So it's restricted to the post period.
21 As you'll recall, there's a one year following
22 initiation of gabapentin and one year prior to
23 gabapentin whereas in 2A, we treat concomitant
24 medication as a time varying co-variant so if

1105

1 somebody was taking say an antidepressant in the
2 previous time period prior to taking gabapentin, so
3 it wasn't really contaminant, it was there by
4 itself, it's actually -- that value the change in
5 value between the pre-period and the post period is
6 preserved in the analysis.
7     Q.  I'm not exactly sure I understand.
8     A.  It's kind of a subtle point.  So when
9 you're adjusting -- one of the reasons for
10 adjusting for concomitant medications is that more
11 severely ill patients will tend to be treated with
12 the drug that you're interested in but also other
13 drugs.  So they'll be polypharmacy.  Those are the
14 sicker patients and you want to adjust for the fact
15 that you have sicker patients.
16         Another reason for adjusting for other
17 medications is that those other medications may
18 have an effect in and of themselves for the
19 treatment of whatever it is you're looking at.  So
20 the concomitant medication view that just sort of
21 says that this is a selection effect leading to
22 some patients getting treated with multiple drugs
23 would be the original analysis that just says I'm
24 going to look at whether or not there was

1106

1 concomitant antidepressants or concomitant
2 antipsychotics in addition to gabapentin.  And so
3 the status of concomitant medication would be only
4 based on the post initiation of gabapentin data.
5         Another view is well, antidepressants or
6 antipsychotics may exert an effect in the
7 pre-gabapentin period before they started taking
8 gabapentin, so it's important to include those
9 effects in the model as well, hence the sensitivity
10 analysis.  That's the only difference between 2 and
11 2A.
12        So if somebody was taking -- was taking
13 an antidepressant say in the pre-gabapentin period,
14 but not during the post period, in the original
15 analysis there would not be concomitant medication,
16 that is the gabapentin wasn't being accompanied by
17 the antidepressant.
18        In the second, in the sensitivity
19 analysis, the time varying nature of the
20 concomitant medication was included.  So the fact
21 that the person was taking the antidepressant in
22 the pre-period was built into the model as well as
23 the fact that they weren't taking it in the post
24 period was built into the model.  So in one case

Gibbons, Robert (Defense Expert)  4/27/2009  10:49:00 AM

1107

1   it's a time invariant co-variant and in the other
2   case it's a time varying co-variant.
3       Q.  Now, it says at the bottom Note 1,
4   subjects with any CNS drugs after index date were
5   excluded.
6           MS. McGRODER:  Are you on --
7           MR. ALTMAN:  I'm on page 16, footnote 1.
8           MS. McGRODER:  Of Table 2A?
9           MR. ALTMAN:  Actually it's in 2 and 2A.
10      Q.  You make the statement, subjects with any
11  CNS drugs after index date were excluded.  What do
12  you mean by that?
13      A.  The footnote is for gabapentin
14  monotherapy.
15      Q.  So that only applies to monotherapy?
16      A.  Right.
17      Q.  So if they took a CNS drug before they
18  took gabapentin but not afterwards, they're
19  included there?
20      A.  That's correct, because it says subjects
21  with any CNS drugs after the index date were
22  excluded.  So the index date here is the date of
23  gabapentin.
24      Q.  So Table 2B -- and by the way, one

1108

1   difference is you've now included -- with Table 2,
2   you've included a column that wasn't there before,
3   correct, which is the P value column?  If you can
4   compare that to Exhibit 92 or 93.
5       A.  Yes, that's correct.
6       Q.  And what is the difference between 2B
7   and 2?
8       A.  So 2B now adds the requirement that in
9   order for a person to be in this analysis, they had
10  to have a prescription with a minimum of 30 days in
11  length.  So if a person had received a prescription
12  of only one day of gabapentin, they would be in 2
13  because that was the initial exposure.  In 2B, the
14  definition of gabapentin exposure now requires at
15  least a prescription for 30 days or more.  And
16  that's the difference between 2 and 2B.
17      Q.  Did you do the inverse sensitivity
18  analysis, which is people who only took it for less
19  than 30 days?
20      A.  No.
21      Q.  Could it be that somebody who had taken
22  gabapentin for a short period of time had an
23  adverse effect was taken off the drug?
24      A.  Remember that these are medical claims

1109

1   data, so the duration of exposure is based on the
2   prescription.  So a patient filled the prescription
3   for however many days.  If the doctor decided to
4   take them off because they had an adverse effect,
5   that wouldn't change the analysis because they
6   can't undue the prescription.  Our estimate was
7   based on the prescription.
8       Q.  But there are some people that clearly
9   are identified with less than 30 days of
10  prescription, correct?
11          MS. McGRODER:  Object to form.
12          THE WITNESS:  The differences between
13  Table 2 and Table 2B would be the difference in
14  those people who had prescriptions less than 30
15  days.
16  BY MR. ALTMAN:
17      Q.  And you could have done an analysis of
18  those that had taken the drug -- had less than a
19  30-day prescription, correct?
20      A.  Well, again your original point was --
21  and what you just -- you said it both ways.  So
22  just to be clear, if somebody had a prescription
23  for 30 days but their doctor took them off the
24  drug, we have no way of knowing that.  We don't

1110

1   know whether or not anybody here took the drug.  We
2   know they had a prescription for the drug of a
3   particular length of time.
4           The sensitivity analysis is looking at
5   the difference between those people who had any
6   length of prescription versus those people who had
7   a minimum of 30 days.
8           Now, to your other question of could we
9   have done the analysis in only those people who had
10  less than a 30-day prescription, the answer is no
11  because there weren't enough of them.  If you
12  compare the number at risk between Tables 2B and 2,
13  you'll see that, you know, it's really the minority
14  that had prescriptions of less than 30 days.  And
15  that -- those numbers, for example, for by bipolar
16  it went from 3,783 down to 3,479, that difference
17  of just a few hundred subjects would be too small
18  to do this kind of analysis.
19      Q.  You certainly could have done it on all
20  of them where it appears you go from 131,000 to
21  115,000, correct?
22      A.  Still with this kind of an analysis, you
23  really need large numbers when you're looking at
24  something that's a rare event.

Gibbons, Robert (Defense Expert) 4/27/2009 10:49:00 AM

1111

1    Q.   But you didn't look, correct?
2    A.   I did not do that analysis.
3    Q.   Was there any technical reason you
4    couldn't have done that analysis other than the
5    statistics may not have been adequate?
6    A.   The technical reason is that, you know,
7    there wouldn't have been power to detect an effect
8    if it was there, the base rate is too low for
9    suicide attempts to make that a meaningful
10   analysis. So that is the technical reason.
11        If you're asking by technical reason
12   could I have programmed the computer and pushed the
13   button and said let's do the analysis, yes, I
14   could. I don't know if it even would have
15   converged. So there may, in fact, be technical
16   reasons that, you know, in a sample of that size
17   you couldn't even do the analysis or at least you
18   could attempt to do it, but it wouldn't converge,
19   but again I have not done that analysis.
20   Q.   Just looking at the bipolar, 3,783,
21   looking to the difference between 2A and 2B, 3,783
22   minus 3,469 is about 314, correct?
23   A.   That's correct.
24   Q.   And we went from 181 attempts to 169

1112

1    which would suggest those people had 12 attempts,
2    correct?
3    A.   That's correct.
4    Q.   And we go from 119 to 106 which suggests
5    that there are 13 attempts, correct?
6    A.   I'm not sure I know where you're reading.
7    Q.   If you look at 2A, there are 119 attempts
8    after for the bipolar and 2B there's 106. That
9    would suggest that those group of people had 13
10   attempts after, correct?
11   A.   That's correct.
12   Q.   And can you, as you sit here today, say
13   that that would not have been statistically
14   significant?
15   A.   I would have to do the analysis to
16   determine that.
17   Q.   And if we look at -- just looking at all,
18   the all category, we had 456 attempts before in
19   Table 2A and we drop down to 426 in Table 2B,
20   correct?
21   A.   That's correct.
22   Q.   And that suggests that there were 30
23   attempts in that other population of less than 30
24   days, correct?

1113

1    A.   That's correct.
2    Q.   And then there are -- we go from 453 to
3    390 which is 63, correct?
4    A.   That's correct.
5    Q.   So actually there's double the number of
6    attempts if you look at all of the people who did
7    not have 30-day supply, correct, approximately
8    double?
9    A.   Approximately.
10   Q.   And as you sit here today, can you say
11   that that number wouldn't have been statistically
12   significant?
13   A.   I can't say that it would be, but I would
14   certainly interpret that as a beneficial effect of
15   the drug. That is if you have adequate treatment
16   with the drug, the suicide attempt rates are going
17   down. If you have inadequate treatment, the
18   suicide attempt rates if anything look like they're
19   going in the other direction.
20   Q.   It could also be that the drug was
21   actually causing harm in the short-term period,
22   correct?
23   A.   I don't see how the drug could be causing
24   harm in the short-term period if somebody who has a

1114

1    prescription for only say one day is going to be
2    taking the drug for one day and somebody who has a
3    prescription for 30 days is also taking the drug on
4    that first day, so I wouldn't, you know, agree with
5    that conclusion.
6    Q.   Do drugs affect people the same -- all
7    people the same way?
8    A.   I'm not an expert on that.
9    Q.   Are there some drugs that have acute
10   effects of one individual that may not have acute
11   effects on a different individual?
12   A.   I'm not an expert on that.
13   Q.   If somebody's allergic to a particular
14   drug, they could be affected by the drug after a
15   single dose where somebody who is not allergic may
16   be able to take it for months and not have an
17   effect, correct?
18   A.   Again, I think you misunderstand. If
19   somebody has a prescription for 30 days, they are
20   taking the drug for one day and then another day
21   and then another day. If somebody has a
22   prescription for one day, they're taking that drug
23   for one day. They're not having a prescription for
24   30 days and then taking it for one day and then

1115

1 having an allergic reaction and quitting. That's
2 not the difference between Table 2 and Table 2B.
3     So if your interpretation of that
4 difference is that somehow Table 2B is excluding
5 those people who may have had a 30-day prescription
6 but only took the drug for one day because they had
7 an adverse event, that's the incorrect --
8     Q.  I wasn't making that interpretation.
9 What I'm saying is that as you sit here today, in
10 the population of people who took the drug for less
11 than 30 days you cannot say that the drug was not
12 actually causing harm, correct?
13     A.  Again, I think you're misstating this.
14 My analysis compares between 2 and 2B those people
15 who had prescriptions for 30 days or more versus
16 those people in the total population which includes
17 a subset who had prescriptions of less than 30
18 days. I don't know how long any of those people
19 were taking the drug. The people who had
20 prescriptions of 30 days, some of those people may
21 have only taken the drug for one day and stopped
22 taking it for a wide variety of reasons. I don't
23 know why the doctor prescribed a drug for one day
24 or two days or any, you know, less than 30 days. I

1116

1 don't have that information.
2     Q.  I understand that. And I understand that
3 some of the people who have prescriptions for more
4 than 30 days may not have taken the drug for 30
5 days, but what I'm asking you is of that population
6 who only had prescriptions of less than 30 days, as
7 you sit here today, can you say that the data
8 demonstrates that the drug did not cause harm?
9     MS. McGRODER:  Object to form.
10     THE WITNESS:  The analysis with all of
11 the people in it shows that there's no evidence
12 that the drug is causing harm. And the analysis
13 with only those people who had 30 days or more
14 suggests that there is no evidence of the drug
15 causing harm. I have not done a separate analysis
16 on those people who received a prescription of less
17 than 30 days. So I haven't done that analysis so I
18 can't really answer your question.
19 BY MR. ALTMAN:
20     Q.  But one possibility is -- you said one
21 possibility is that the fact that there are more
22 suicide attempts in that population may be
23 indicative that you need to take the drug for a
24 sufficient period of time to derive its beneficial

1117

1 effects. I think that's what you said earlier,
2 correct?
3     MS. McGRODER:  Object to form.
4     THE WITNESS:  What I said earlier is that
5 if there is a -- if you will a dose response
6 relation where if it were true that there was
7 evidence that if you only took the drug say one day
8 you had a higher rate than if you took the drug for
9 30 days, and of course we don't know that here
10 because we don't know how long these people were
11 taking the drug and of course, these summary
12 statistics don't also tell us about the concomitant
13 medications these patients were taking, but the
14 statistical model knows about that, that what we
15 may be seeing is that the drug is having a
16 beneficial effect maybe on the pain that it was
17 prescribed for because in most cases these drugs
18 were -- appear to be prescribed in people who were
19 suffering from pain and that there wasn't adequate
20 time and so the effect of pain on suicide attempt
21 rates was not decreased as it may have been in
22 those patients who had taken it for a longer period
23 of time. And if the -- if the mechanism by which
24 the reductions in suicide attempt rates that we're

1118

1 observing here is through the treatment of pain,
2 then that would be consistent with that hypothesis.
3 BY MR. ALTMAN:
4     Q.  But is one possibility that the drug
5 could actually be harming that particular
6 population?
7     A.  It's --
8     MS. McGRODER:  Objection, asked and
9 answered. Go ahead, answer it again if you like.
10     THE WITNESS:  I don't see any -- I don't
11 see in my opinion any evidence that would suggest
12 that the drug is being harmful in that population
13 since there's nothing -- you know, there's nothing
14 to indicate that the people in that population were
15 necessarily taking, you know -- were taking it or
16 weren't or why they were prescribed. I don't have
17 any evidence that would suggest that.
18 BY MR. ALTMAN:
19     Q.  But you do have that there's twice as
20 many suicide attempts after the initiation of
21 gabapentin as before, correct?
22     A.  I mean in the overall population it looks
23 like there are more suicide attempts after in those
24 patients but, you know, we'd have to go through and

Gibbons, Robert (Defense Expert)  4/27/2009  10:49:00 AM

1119

1 break that down at the very least and go through
2 and break it down for each one of the diagnoses and
3 we'd have to look at the concomitant medications
4 that those patients were taking.  We'd have to look
5 at is there other confounds with age or with sex.
6 I mean, you know, simply trying to base that view
7 on these tabulations that have -- you know, there's
8 a lot more that goes into these statistical models
9 I think would be inappropriate.
10     Q.  Isn't the opposite also true to suggest
11 that there is a protective effect of the drugs in
12 any population without having done the same kind of
13 analysis that you just said?
14     A.  But I in fact did the same analysis.
15 Everything that's in Table 2, those probability
16 values, those relative risks are all based on the
17 statistical model that adjusted for concomitant
18 diagnoses, age and sex and previous suicide
19 attempts in the prior year.
20        So to just sort of kind of look at this
21 summary statistical tabulation just looking at the
22 data and to use that as the basis to arrive a test
23 of a statistical hypothesis would be inappropriate.
24     Q.  Table 2C excludes medications -- excludes

1120

1 people -- excuse me -- who had suicide attempt on
2 the same date as the index date, correct?
3     A.  Correct.
4     Q.  I think we've discussed earlier as far as
5 the gabapentin population that really has made very
6 little difference because there were only a few for
7 the gabapentin population, correct?
8     A.  That's correct.
9     Q.  So we wouldn't expect really to see much
10 of a difference in this particular chart?
11     A.  No.
12     Q.  Table 3, could you please explain
13 Table 3?
14     A.  Table 3 mirrors Table 2 except in this
15 case rather than including multiple suicide
16 attempts, we included only the first suicide
17 attempt.  So this is a -- instead of a Poisson
18 regression which is modeling the count for each
19 individual, this is a logistic regression which
20 models the binary event of whether or not there was
21 a suicide attempt.
22     Q.  Now, did you do an analysis -- I think we
23 talked earlier in the last depositions about events
24 on multiple days and whether that represented

1121

1 distinct events or that represented one event and
2 multiple days of treatment.  Did you do an analysis
3 to see whether you could attempt to resolve those
4 multiple day events into a number of discrete
5 suicide attempts and then run a sensitivity
6 analysis?
7        MS. McGRODER:  Object to form.
8        THE WITNESS:  This is that sensitivity
9 analysis.  This sensitivity analysis basically says
10 that once you have the first suicide attempt, none
11 of the other ones are being counted or included in
12 that analysis.  So this is saying, you know, if we
13 assume that there is, you know, overcounting or
14 that the same suicide attempt is counted multiple
15 times, this analysis is robust to that because it
16 does not count the -- any more than one.  Once you
17 have one, that's it.
18 BY MR. ALTMAN:
19     Q.  But another analysis would be to try to
20 resolve how many discrete suicide attempts there
21 were, correct?
22     A.  I'm not sure how such an analysis could
23 be conducted.  The data are simply the way the data
24 are.  We don't know whether or not those are

1122

1 multiple suicide attempts that were made on a daily
2 basis or whether or not they're, you know, just
3 people getting -- receiving treatment and all being
4 indicated for the same suicide attempt or an error
5 on the part of the -- how it was recorded.  I mean,
6 those are the data.
7        MS. McGRODER:  Go off the record for a
8 second.
9        MR. ALTMAN:  Sure.
10        VIDEOGRAPHER:  The time is 12:28 p.m.  We
11 are going off the record.
12        (Whereupon, the deposition in the
13        above-entitled cause was recessed to
14        1:19 p.m. this date.)
15
16
17
18
19
20
21
22
23
24

1123

1       AFTERNOON SESSION
2           VIDEOGRAPHER: This is the beginning of
3    tape Number 2. The time is 1:19 p.m. We are back
4    on the record.
5           EXAMINATION (continued)
6    BY MR. ALTMAN:
7       Q. Dr. Gibbons, going back to Table 2B for a
8    second, and I suppose in an ode to Shakespeare, I'm
9    going to ask you about not 2B. If you were to have
10   done the analysis that we suggested earlier running
11   the all or the -- running that all group and when
12   you did all your analyses and all your co-variants
13   and everything like that and had come out with a
14   result that was let's day where the odds ratio was
15   2.0, for example, how would you have interpreted
16   that result?
17          MS. McGRODER: Object to form, improper
18   hypothetical. Go ahead.
19          THE WITNESS: You're talking about in
20   Table 2?
21   BY MR. ALTMAN:
22      Q. If you took the differential between 2 --
23   2B excluded some of the people that are part of
24   Table 2. We talked about that earlier, the people

1124

1    who had prescriptions of less than 30 days?
2       A. Uh-huh.
3       Q. And if you were to do the same full
4    analysis with all the co-variants and all the
5    adjustments and everything like that and let's say
6    just for the all group had come up with an odds
7    ratio of 2.0 just as an example, how would you have
8    interpreted that result?
9           MS. McGRODER: Objection, improper
10   hypothetical.
11          THE WITNESS: So if I'm understanding the
12   question correctly, if I had taken the difference
13   between 131,000 people and 115,000 people, roughly
14   those 15,000 people who had a prescription but no
15   more than -- but less than 30 days, and I had done
16   an analysis and I had adjusted for all of the
17   co-variants, the same kind of analysis that was
18   done here and I got an odds ratio of 2.0, how would
19   I interpret that and the answer is it depends
20   totally on whether or not that was statistically
21   significant?
22   BY MR. ALTMAN:
23      Q. Assuming it was statistically
24   significant?

1125

1           MS. McGRODER: Same objection, improper
2    hypothetical, assumes facts not in evidence.
3           THE WITNESS: You know, if that were
4    statistically significant, I mean, my -- I would
5    have concluded that there was a statistically
6    significant increase following initiation of
7    treatment in that subpopulation and then I would
8    have gone and tried to better understand who were
9    those people, did they have -- what were the
10   composition in terms of the different diagnoses
11   they had, you know, were the concomitant
12   medications similar to the rest of the group, what
13   was going on with them. But based solely -- if the
14   odds ratio was 2.0 in that population irrespective
15   of co-variant adjustment I think it would be very
16   unlikely that it would be statistically significant
17   in a sample of 15,000 people.
18   BY MR. ALTMAN:
19      Q. Did you do that kind of review of --
20   strike that.
21          If the results had been statistically
22   significant, you said you would have done a review
23   or tried to understand why that result was
24   statistically significant, a statistically

1126

1    significant increase, correct?
2           MS. McGRODER: Object to form, improper
3    hypothetical.
4           THE WITNESS: I said that because you had
5    restricted your question to the all category. So I
6    would have definitely wanted to get a better
7    understanding, like I did in all of these tables
8    about well, we looked at the all, we looked at
9    gabapentin monotherapy, we looked at pain disorder
10   and epilepsy and other psychiatric disorders and
11   schizophrenia and major depressive disorder and
12   bipolar disorder, so we stratified -- in addition
13   to doing the overall analysis, stratified on
14   diagnostic groups and tried to better understand,
15   you know, is this something that is restricted to a
16   particular diagnosis or does it go across the
17   diagnoses.
18   BY MR. ALTMAN:
19      Q. Can you show me in your paper where you
20   explained to the court and the jury reasons why you
21   might have seen a reduction according to your
22   analyses that might not have had to do anything
23   with the drug?
24          MS. McGRODER: Object to form. When you

Gibbons, Robert (Defense Expert) 4/27/2009 10:49:00 AM

1127

1 say paper, are you talking about his expert report?
2 BY MR. ALTMAN:
3     Q. Your expert report.
4     A. So you're not talking about a paper.
5 You're talking about the expert report.
6     Q. Well, let me ask a side question now that
7 you bring that up. I mean, did you use any less
8 scientific vigor in doing this expert report than
9 you would for doing a paper you would try to have
10 published?
11    A. No.
12    Q. So for all intents and purposes, while
13 this may be part of an expert report and the
14 bipolar study is a manuscript you submitted, you
15 treated these the same, correct?
16    A. Correct.
17       MS. McGRODER: Object to form.
18 BY MR. ALTMAN:
19    Q. So I just wanted to make sure that you
20 did something less than you would have done if you
21 were trying to get this published.
22       MS. McGRODER: Same objection. Is that a
23 question?
24

1128

1 BY MR. ALTMAN:
2     Q. Is that correct, you treated this just
3 like you were going to get this published, correct?
4       MS. McGRODER: Object to form.
5       THE WITNESS: Well, I didn't -- you know,
6 no one's going to publish an expert report, but did
7 I use the same high quality of science to do the
8 expert report as I did the paper, and the answer is
9 yes.
10 BY MR. ALTMAN:
11    Q. That's what I was asking. Okay. Could
12 you show me where in your expert report you have a
13 discussion section, shall we say, where you talk
14 about the reasons why you may have seen a reduction
15 in the suicide attempt rate after initiation of
16 gabapentin therapy that may have nothing to do with
17 the drug?
18       MS. McGRODER: Hold on one second.
19       THE WITNESS: Are you waiting for me? I
20 was waiting for you. You said --
21       MS. McGRODER: I'm sorry. I wondered if
22 you were waiting for me. No, go ahead.
23       THE WITNESS: So in answer to your
24 question, there are places in the paper -- in the

1129

1 paper -- in the expert report where I talk about
2 the fact that, for example, none of the analyses in
3 the largest cohort ever studied in this area
4 revealed any evidence whatsoever that gabapentin
5 increases risk of suicide. So I've largely been
6 focusing on the increased risk of suicide. I make
7 comments like whether this protective effect is
8 based on reducing the symptoms of psychiatric
9 disorder or by treating the concomitant pain
10 disorder that is present in many of these patients
11 remains an open question.
12 BY MR. ALTMAN:
13    Q. Where are you reading from? I'm sorry.
14    A. I'm reading from page 11.
15    Q. The sentence -- okay. That's the
16 paragraph above.
17    A. So I think I made an attempt to provide a
18 balanced view of what's going on. I do not have
19 like I would have in a scientific paper that would
20 be published in a journal a section on limitations
21 or something like that. But I've certainly shared
22 that with you and I have no doubt that you will
23 raise those questions in the context of this case
24 and you know, my opinions about the limitations of

1130

1 these kinds of studies are well-known in the
2 literature. There's nothing secretive there.
3     Q. Okay. I think before lunch we were
4 asking -- excuse me one second. I believe we were
5 talking about Table 3. Now, if I understand the
6 way you did things, if somebody had let's say six
7 suicide attempt treatment codes, three on
8 consecutive days, two months later shall we say two
9 on two consecutive days and two months after that,
10 just a stray suicide attempt event, in the original
11 analysis you would have considered that six
12 attempts, correct?
13    A. Correct.
14    Q. In your Table 3, you would have only
15 flagged that person one time because they in fact
16 attempted suicide?
17    A. That's correct.
18    Q. Would another way to look at it to have
19 considered that person to have attempted three
20 times on three time separated occasions?
21    A. There are hundreds of ways that you could
22 look at it. There are lots of different things
23 that you could do. The argument against doing it
24 that way is that in some people, maybe those two

1131

1  attempts were -- you know, on consecutive days were
2  two legitimate attempts. So you're imposing
3  something on the data that may or may not be true.
4       I think the most conservative sensitivity
5  analysis is to compare the model that looks at the
6  overall count of suicide attempts, be that correct
7  or incorrect, versus treating someone who made one
8  or more attempts in the same way and compare the
9  results of those analyses and determine whether or
10  not they're similar. I did those analyses and, in
11  fact, the results are very similar.
12       Q.  But you didn't do the one where you would
13  try to discretely separate out distinct suicide
14  attempt groupings, correct?
15       A.  That's correct. I didn't do that and I
16  think, you know, that would be kind of the -- I
17  wouldn't do that because I don't have any auxiliary
18  information that would support that every single
19  one of those was, in fact, a unique and valid
20  suicide attempt. I don't know the answer to that.
21  I don't think anyone does.
22       Q.  Well, I don't think we're talking about
23  that. But if somebody showed the same suicide
24  attempt code on four consecutive days, why would it

1132

1  be invalid to see as a sensitivity analysis what
2  would happen if you considered that collection of
3  four events to be one attempt?
4       A.  I mean, I think that analysis could be
5  done. I think it would be hard to know when you've
6  done that analysis what the results are really
7  meaning. I think that the sensitivity analysis
8  that I did was the appropriate one to test that
9  hypothesis as to whether or not there was
10  overcounting going on.
11       Q.  And the difference between 3 and 3A is
12  the same as the difference between 2 and 2A,
13  correct?
14       A.  Correct.
15       Q.  And the same thing with 3B and 2B?
16       A.  Correct.
17       Q.  And if we were to look at it the same way
18  with the people who had not taken -- got a 30-day
19  prescription, the difference between 3 and 3B I
20  guess in terms of the number of people for the all
21  would be about -- well, it would be -- well, it's
22  the same. It's the same 16 -- same 15,000 some odd
23  people, but the number of attempts before goes from
24  273 to 251, correct, which is 22 and goes from 289

1133

1  to 251 which is 38, correct?
2       A.  That's correct.
3       Q.  And once again, you didn't look at to see
4  whether there was anything -- whether those results
5  could be statistically significant, correct?
6            MS. McGRODER: Object to form.
7            THE WITNESS: I didn't do that analysis.
8  BY MR. ALTMAN:
9       Q.  And once again, as with -- as with
10  Exhibit -- with Table 2C, Table 3C we wouldn't
11  expect to have much of an effect since there were
12  very few events?
13       A.  That's correct.
14       Q.  Did you run any analyses for the
15  gabapentin studies to look at whether a person was
16  on or off the drug at the time of the attempt?
17       A.  No.
18       Q.  Why not?
19       A.  Didn't get round to it.
20       Q.  So I think it's safe to say you don't
21  know what effect that has on these numbers if you
22  would have looked at it that way, correct?
23       A.  That's correct.
24       Q.  Do you know of the -- we had 131,000

1134

1  people in the cohort. Do you know how much
2  gabapentin usage those people represent in terms of
3  patient years?
4       A.  If your question is do I know how long
5  the prescriptions for gabapentin -- I guess I don't
6  understand.
7       Q.  If you took all the prescriptions for
8  those 131,000 people and added it up, do you know
9  how many patient years you come to?
10       A.  No, I didn't do that analysis.
11       Q.  Would that be difficult to do?
12            MS. McGRODER: Object to form.
13            THE WITNESS: Not particularly.
14  BY MR. ALTMAN:
15       Q.  Do you have any -- knowing what you know
16  of the data sets, do you have any feeling of what
17  generally would happen if you were to consider
18  whether the person was on or off the drug at the
19  time of the attempt?
20            MS. McGRODER: Object to form, calls for
21  speculation.
22            THE WITNESS: These analyses would
23  represent a lower bound on what would be ultimately
24  the protective effect because this analysis assumes

1135

1 that as soon as you take gabapentin, you are
2 exposed from that moment on. So everybody post
3 gabapentin who made a suicide attempt is attributed
4 to gabapentin.
5        Now, if I only looked at the post
6 gabapentin initiation months where they actually
7 were taking gabapentin, then fewer suicide attempts
8 would be attributed to gabapentin. So the effect
9 would be even smaller.
10 BY MR. ALTMAN:
11    Q.  That's not necessarily true though
12 because you could, let's say, lose half the suicide
13 attempts but only have a third of the exposure,
14 correct?
15    A.  If you included the person -- if you
16 included the time of the exposure in the analysis
17 that could happen. So if there was smaller amount,
18 that could be.
19    Q.  So generally you would move -- some of
20 the attempts that you currently are attributing to
21 gabapentin would move over to the unexposed group,
22 correct?
23        MS. McGRODER: Object to form, improper
24 hypothetical.

1136

1        THE WITNESS: Could happen, yes.
2 BY MR. ALTMAN:
3    Q.  Well, it would happen. I mean not every
4 attempt occurred while somebody was on gabapentin
5 in the post index period, correct?
6        MS. McGRODER: Object to form, improper
7 hypothetical. Go ahead.
8        THE WITNESS: I've already told you I
9 haven't looked at those data. One possibility is
10 that everybody was on gabapentin continuously. I
11 mean that is a possibility. I haven't looked at
12 it, don't think it's true, but I'm not going to
13 answer the question affirmative without having
14 looked at it.
15 BY MR. ALTMAN:
16    Q.  I apologize. Now, with the -- all these
17 various tables have P values, correct?
18    A.  Correct.
19    Q.  Explain the intersection between P values
20 and confidence intervals.
21    A.  The P value is a test statistic. It's
22 the probability associated with a test statistic to
23 determine whether or not a particular coefficient
24 in the model is statistically significant or not.

1137

1 So in this case, this is the P value for post
2 exposure versus pre-exposure. It's testing the
3 null hypothesis that that coefficient is equal to
4 zero. Not important in the model.
5    Q.  And how does that interplay with the
6 confidence interval?
7    A.  The confidence interval is a by-product
8 of the analysis. So the point estimate for the
9 odds ratio is the exponential of the regression
10 coefficient in the model and the corresponding
11 confidence interval is in this case an
12 asymptotically -- bad word -- normal confidence
13 interval for the odds ratio. So it's an interval
14 estimate that is based on a by-product of the
15 analysis.
16        In general, there's reasonable
17 correspondence between the two, but not always.
18 There's more rounding that goes on in terms of the
19 confidence intervals because you're taking an
20 estimated coefficient and taking its exponential
21 and then doing things with that.
22        MR. ALTMAN: Go off the record for a
23 minute.
24        VIDEOGRAPHER: The time is 1:41 p.m. We

1138

1 are going off the record.
2        (Short recess.)
3        VIDEOGRAPHER: The time is 1:53 p.m. We
4 are back on the record.
5 BY MR. ALTMAN:
6    Q.  Dr. Gibbons, would it have been
7 reasonable to assume -- strike that.
8        We discussed earlier how you don't know
9 whether -- just because somebody got a prescription
10 doesn't mean they took the entire prescription,
11 correct?
12    A.  That's correct.
13    Q.  Would it be reasonable to assume that if
14 somebody got a 30-day prescription and then in 30
15 days got another 30-day prescription, they probably
16 took the drug for the 30 days at least?
17        MS. McGRODER: Object to form.
18        THE WITNESS: Probably more than if they
19 had gotten it for 30 days, but we have no way of
20 really knowing. I mean they could have gotten the
21 prescription for 30 days, lost it and then asked
22 for another prescription. This kind -- these kind
23 of data, you know, do not support that level of
24 inference.

1139

1    MR. LONDON:  That level of what?
2    THE WITNESS:  Inference.
3  BY MR. ALTMAN:
4    Q.  Did you do any kind of a sensitivity
5  analysis to see how much the data might change if
6  you were to assume that a person never took the
7  last prescription or took only part of the last
8  prescription?
9    MS. McGRODER:  Object to form.
10   THE WITNESS:  No.
11  BY MR. ALTMAN:
12   Q.  Why not?
13   A.  Didn't think it was meaningful.
14   Q.  Wouldn't it be useful to see how much of
15  an effect that might have on the drug if you assume
16  that somebody only took it for 15 days out of the
17  30?
18   A.  You could do hundreds of sensitivity
19  analyses.  I didn't find that one to be, you know,
20  anything that even occurred to me to do.  The ones
21  -- the sensitivity analyses we did were, I believe,
22  the important ones.
23   Q.  Paragraph 21 of your report, you did make
24  a change from the last version of your report which

1140

1  was -- it originally had said -- if you want to
2  take either one of the earlier versions, the first
3  sentence there said, "More broadly, in connection
4  with FDA's public health alert on the entire class
5  of AEDs, Gibbons, et al. (2008 examined)" then for
6  this version of the report you changed that.
7  Instead of Gibbons, et al. 2008, you changed that
8  to under review.  Correct?
9    A.  Correct.
10   MS. McGRODER:  Wait, wait.  I'm going to
11  give you a little leeway here based on the
12  conversation I had with Jack at lunch, but this
13  kind of question and this scope of questioning is
14  outside of our agreement.  So I'm giving you a
15  little leeway, Mr. Altman, and hope you don't abuse
16  it.
17   MR. ALTMAN:  I just want why he changed
18  from what it was to what it says now.
19   MS. McGRODER:  Is that your question?
20  I'll allow that and nothing further on paragraph 21
21  because it's outside the scope of the agreement.
22   THE WITNESS:  The revised -- the
23  supplement was done in 2009 and the paper was not
24  accepted for publication or in press, so the

1141

1  original one was done in 2008.  So 2008
2  corresponded to the expert -- the time of the
3  expert report.  And in this one, it would have been
4  wrong to list 2008 because that would have implied
5  that it had been published in 2008 and it still
6  wasn't published.  It was still under review.  So I
7  changed the 2008 to under review to update the
8  status of the paper.
9  BY MR. ALTMAN:
10   Q.  In the data, that data set that you had
11  from PHARMetrics, it included the -- for the
12  prescription information it included the dosage,
13  the number of pills and the -- the dosage and the
14  number of pills, correct, for each prescription?
15   A.  It included the number of pills of the
16  prescription.  I don't remember if it included the
17  dosage or not.
18   Q.  That would have come from the NDC code,
19  correct?
20   A.  Could have, sure.
21   Q.  So for example, somebody could have had a
22  30-day supply of 120 pills of 300 milligrams that
23  would tell you that they were taking -- prescribed
24  4 pills of 300 milligrams per day, correct?

1142

1    A.  Could you repeat the question?
2    Q.  If the prescription data said the person
3  received a 30-day prescription, got 120 pills of
4  300 milligrams of gabapentin, would it be a
5  reasonable inference that that person was
6  prescribed 1200 milligrams per day?
7    A.  Yes.
8    Q.  Did you do any sensitivity analysis to
9  see the effect on -- the effect of dosage on any of
10  the results?
11   A.  No.
12   Q.  Could you have done so?
13   A.  If that information was available.  At
14  this point I just don't remember at this point from
15  the data what was available, but if there was
16  dosage information, certainly could include dosage
17  information.  Generally it's not done where we
18  don't really know who took what.  And generally in
19  the pharmacoepidemiologic literature really what's
20  done is kind of what I did here, look at exposure
21  of the time when someone initiated treatment and
22  then as a sensitivity analysis look at some form of
23  duration.  Particularly true when studying suicide
24  since, you know, it's been argued that one of the

1143

1  reasons why people commit suicide is an adverse
2  effect that occurs very early on in the exposure
3  period.
4       Q.  Has anybody made that -- drawn that
5  conclusion with respect to anticonvulsants?
6       MS. McGRODER:  Object to form.  Was your
7  question has anybody?
8  BY MR. ALTMAN:
9       Q.  Is there any published literature on
10  anticonvulsants that draws that conclusion that you
11  just stated?
12      A.  I don't know of any offhand.  That's
13  largely the literature on antidepressants and
14  antipsychotics.  But you know, there isn't a lot of
15  literature and anticonvulsants of suicide.  So I
16  think, you know, certainly borrows strength from
17  the literature on antidepressants.
18      Q.  What is your basis for concluding that
19  that -- the antidepressant information is relevant
20  to the anticonvulsants?
21      A.  Only the volume of the literature.  I
22  mean, I'm not an expert on the comparisons of the
23  pharmacologic properties of anticonvulsants and
24  antidepressants, but you know, there's a tradition

1144

1  of looking at short-term exposures in suicide
·2  research related to drugs, looking for short-term
3  effects.  So I think it's reasonable to preserve
4  short-term effects.
5       Q.  But most of the people who are studied
6  for antidepressants were actually depressed at the
7  time they were getting the drug, correct?
8       MS. McGRODER:  Object to form.
9       THE WITNESS:  I don't know the answer
10  necessarily is true for that.  There are -- even in
11  FDA's med analyses of randomized clinical trials,
12  many of the antidepressant trials were for
13  conditions other than depression.
14  BY MR. ALTMAN:
15      Q.  Such as?
16      A.  Obsessive compulsive disorders is one
17  that comes to mind.  I'd have to go back and look
18  at it.
19      Q.  But there's psychiatric conditions
20  though, correct?
21      MS. McGRODER:  Object to form.
22      THE WITNESS:  In general, yes, they're
23  psychiatric conditions.  There may be other uses of
24  antidepressants, but I'm not an expert on that.

1145

1  But many of the patients who are a part of these
2  data have co-morbid psychiatric conditions and many
3  of the patients who are part of the, you know, the
4  FDA's med analyses were in trials or that involved
5  psychiatric conditions.
6  BY MR. ALTMAN:
7       Q.  That's not true for gabapentin though,
8  correct, in terms of the FDA's med analysis?
9       A.  It was --
10      MS. McGRODER:  Objection.
11      THE WITNESS:  It was certainly -- I don't
12  know if there were any, but it was certainly lower
13  than for many of the -- than for, for example,
14  Lamotrigine.
15  BY MR. ALTMAN:
16      Q.  There was only a few hundred gabapentin
17  patients in psychiatric clinical trials, correct?
18      A.  I don't remember exactly, but that sounds
19  about right.
20      Q.  So aside from the volume of literature on
21  antidepressants, what -- are there any other bases
22  for why you conclude that anticonvulsants would
23  show a similar property to having suicidal issues
24  shortly after initiation of therapy?

1146

1       A.  The statistical issue is one of looking
2  at the time of exposure as the relevant variable
3  and not necessarily the density of exposure.  And
4  the purpose of that is to ensure that if there is
5  an adverse effect, that it will be captured by not
6  excluding anyone who was exposed because they
7  weren't exposed long enough.  So it's an attempt to
8  be conservative.
9       Q.  In the FDA's analysis -- one other issue
10  with the FDA's analysis, they did exclude anybody
11  who attempted more than one day after, correct?
12      MS. McGRODER:  Okay.  I just have to
13  object.  I don't understand, Keith.  I understood
14  when you were asking questions about 30-day supply
15  and short-term use because that relates to
16  Dr. Gibbons' sensitivity analyses, but the
17  questions you're asking now have nothing to do with
18  the sensitivity analyses in paragraphs 19 and 20 of
19  this report.
20      MR. ALTMAN:  Well, we're talking about
21  the absence of a sensitivity analysis that maybe
22  should have been done.
23      MS. McGRODER:  Okay.  Maybe I'm just not
24  following you.  What sensitivity analysis are you

1147

1   talking about because you're not referring to
2   anything in this report which seems to me to be
3   outside the scope of the agreement.
4        MR. ALTMAN:  We talked about an analysis
5   of -- bear with me a second.  I asked him whether
6   he could have done a sensitivity analysis to see
7   the effect of dosage on any of the results.  He
8   said no.  I said could you have done so.  And as
9   part of his answer there he said, particularly true
10  when studying suicide since, you know, it's been
11  argued that one of the reasons why people commit
12  suicide is an adverse effect that occurs very early
13  on in the exposure period.  So I'm simply following
14  up on the basis for him making that statement in
15  issues about short and the exposure period.
16       MS. McGRODER:  Can you read back the last
17  question?
18       (Record read as requested.)
19       MR. ALTMAN:  So we're talking about
20  short-term -- we're talking about short-term
21  exposure issues.
22       MS. McGRODER:  All right.  I think it's
23  getting far afield, but go ahead for the moment.
24

1148

1   BY MR. ALTMAN:
2       Q.  That was one of the considerations that
3   the FDA decided to use, correct?
4       A.  One day after that?
5       Q.  That they would exclude attempts -- in
6   the FDA's study in the med analysis?
7       A.  Which FDA study in med analysis?
8       Q.  For anticonvulsants?
9       A.  Okay.
10      Q.  They did not include suicidal events that
11  occurred more than one day after the last dosage of
12  the anticonvulsant, correct?
13      A.  One day after the last dosage or one day
14  after the end of the study?
15      Q.  No, one day after the last dosage?
16      A.  Okay.  I'd have to go back to that and
17  see that.  I don't remember that offhand.
18      Q.  Do you have an understanding that it's at
19  least more than one day after the end of the study?
20      A.  Well, you know, there are patients who
21  stopped taking medication in these studies, but
22  it's my understanding that they were -- whether you
23  stop taking the medication or not, you were still
24  at risk in their analyses till the end of the study

1149

1   if you had valid data through that period.  And
2   what I don't remember is whether or not they used
3   that or the -- what they didn't use were data that
4   were after the end of the trial where somebody
5   might have gone on a different kind of medication.
6   And sitting here today, I can't remember which of
7   those two, but they're very different things.
8       Q.  I'll represent to you that it was they
9   excluded events that occurred more than one day
10  after the last time they took the drug.  So given
11  that, could you have done a sensitivity analysis to
12  see the effects of suicide attempts after the end
13  of any prescription that a person may have been
14  written?
15       MS. McGRODER:  Object to form and
16  foundation.
17       THE WITNESS:  I'm sorry.  I'm not
18  following you.
19  BY MR. ALTMAN:
20      Q.  For your studies other than the -- for
21  your gabapentin studies, pretty much once the
22  person had taken gabapentin, you considered them to
23  be at risk for the entire rest of the period,
24  correct?

1150

1       A.  Correct.
2       Q.  Did you do any sensitivity analyses to
3   see what the effect of limiting how long after the
4   last prescription of gabapentin could be before a
5   suicide attempt?
6       A.  As I've indicated, the only sensitivity
7   analysis that I did for the gabapentin cohort with
8   respect to duration was the 30 days, requiring that
9   they had at least a prescription of 30 days.  I did
10  not do any other form of sensitivity analyses
11  related to the duration or the frequency, you know,
12  or the dosage of the exposure.
13      I did in the bipolar cohort do a
14  person/time analysis which looked at each month and
15  determined whether or not a suicide attempt was
16  made either prior to the initiation in that month
17  or after the initiation in that month and whether
18  or not there was any drug during that month.  That
19  analysis was done in the bipolar cohort.  But I
20  didn't do that kind of analysis as I told you
21  before for the gabapentin cohort.
22      Q.  Why didn't you do that analysis for the
23  gabapentin?
24      A.  One of the primary reasons I wanted to do

1151

1  that analysis in the bipolar cohort is that we had
2  an index diagnosis and so we know that the
3  likelihood of suicide attempts is highest actually
4  right before the index diagnosis or right before
5  people initiate treatment and then it goes down
6  after that.
7      The person/time analysis, one of the big
8  benefits of that is it allows you to model the
9  independent effects of time since the diagnosis of
10 the index disorder along with the effects of drugs
11 and how those effects change over time.  We don't
12 really have that in the gabapentin cohort.  We have
13 the start of medication and we can see in the
14 gabapentin cohort because there were very few
15 patients who, you know, made a suicide attempt on
16 the same day they started gabapentin, so suicide
17 attempt was not leading to treatment in the
18 gabapentin cohort.  So there wasn't the same
19 motivation for including the -- this sort of time
20 effect, the exponential decay that we see in a
21 cohort in which the index thing is a diagnosis.
22     Q.  Well, I'm a little confused about
23 something.  But you said that when you did the time
24 to event analysis for the bipolar, wasn't -- if I

1152

1  remember right, weren't you just figuring out how
2  much time was it before the first suicide attempt
3  and that was it and once it fired, it was done?
4      A.  Are you referring now to the
5  person/time --
6      Q.  Person/time analysis?
7      A.  -- analysis in the bipolar cohort?
8      Q.  Right.
9      A.  So in that analysis, the data were broken
10 up into monthly intervals, 12 months of time, up
11 until the point of the first suicide attempt.  And
12 the drug status was determined separately on each
13 one of the months.  So you know, people who never
14 made a suicide attempt had 12 months of
15 observation.  People who made a suicide attempt say
16 at month six would have had six months of
17 observation in that analysis.  So it's a time to
18 that event.
19     Q.  And somebody who had an attempt in month
20 six and may have been on the drug, went off the
21 drug, went back on the drug and had another
22 attempt, you wouldn't be -- all the data past the
23 first attempt was just not used in that particular
24 study, correct?

1153

1      A.  That's correct, in that particular
2  analysis.
3      Q.  If and when your bipolar paper is
4  accepted for publication, do you intend to modify
5  any of the analyses that you did in your expert
6  report?
7      A.  No.
8      Q.  If the paper is ultimately not published,
9  do you expect to amend your expert report to
10 reflect the fact that it has not been published?
11     MS. McGRODER:  Well, I object to form.
12 If you know.  I think it's an improper hypothetical
13 that assumes facts not in evidence.  I mean if you
14 have an intention, you can state it.  If you don't
15 have one, that's fine.
16     THE WITNESS:  I would leave it the way it
17 is because it indicates that it's under review.  If
18 the paper's not accepted in the Archives of General
19 Psychiatry, I'll resubmit it someplace else.  It's
20 a pretty high profile issue.  Paper's pretty -- I
21 mean, I wrote it, but I think it's a pretty good
22 paper.  I think somebody's going to publish it.  I
23 don't know.  It's hard to predict what reviewers
24 will do.  But if it's not published, you know, I

1154

1  indicate that it's under review because it will be
2  under review.  It will either be published or under
3  review.  I'll keep submitting it for the rest of my
4  life.
5      MR. ALTMAN:  Persistence.  Let's go off
6  the record.
7      VIDEOGRAPHER:  The time is 2:15 p.m.  We
8  are going off the record.
9      (Short recess.)
10     VIDEOGRAPHER:  The time is 2:27 p.m.  We
11 are back on the record.
12     (Document marked as Gibbons Exhibit
13         Number 94 for identification.)
14     MR. ALTMAN:  I'm going to mark what is
15 Exhibit 94 is a copy of three checks to Dr. Hur.  I
16 guess, Lori, you'll authenticate that those are the
17 three checks?
18     MS. McGRODER:  Those are the checks that
19 Dr. Gibbons wrote to Dr. Hur that comport with his
20 testimony given about those checks.
21     MR. ALTMAN:  I want to put a few things
22 on the record and I think we may be done.
23 According to the agreement entered into April 13th
24 that we discussed earlier between counsel, we have