EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                  )
                                        ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,)    Pages 1 - 124
AND PRODUCTS LIABILITY LITIGATION       )


FINAL PRETRIAL CONFERENCE - DAY TWO
AND
DAUBERT HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 21, 2009, 9:15 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

Page 30

1   THE COURT: All right, thank you.
2   So did you want to do an opening statement?
3   MR. BARNES: I think I should, your Honor, if you
4   don't mind. There are many things I need to correct here.
5   I guess, first of all, we spent a lot of time on
6   Dr. Gibbons' conclusions. Daubert concerns --
7   THE COURT: Well, we're only doing the reverse
8   order because your guy couldn't make it.
9   MR. BARNES: No, I understand that. Just in terms
10  of Daubert considerations, it's the methodology that is it
11  reliable, and was it properly applied? So that the
12  conclusions -- just because an expert comes in and says
13  something's incorrect, that's not where the Daubert inquiry
14  is. It's on the methods. Dr. Gibbons is the only expert in
15  this entire litigation who has been subjected to peer
16  review, intense peer review by four objective peer-review
17  experts. That is unusual in litigation. So what he has
18  done is put himself out not only to four days of depositions
19  and massive productions of documents --
20  THE COURT: You're talking about the paper for
21  the --
22  MR. BARNES: Yes, so I want to go back to first
23  principles.
24  THE COURT: So why don't we just limit him to the
25  paper.

Page 31

1   MR. BARNES: If that's where you end up after
2   Thursday, but I think every one of his concerns can be
3   addressed. First of all --
4   THE COURT: Well, what's of huge concern to me
5   personally is that I allowed him to do this in November, and
6   then he did it in March, and then he did it in May, and then
7   there's a paper. So suddenly this one what I thought was
8   fair to Pfizer to allow him to respond to the FDA has turned
9   into this huge new pharmaepidemiologic study that I'm now
10  dealing with three days before trial. That's what's of huge
11  concern to me. So the safe course for me is to just allow
12  the peer-reviewed study to go in.
13  MR. BARNES: With the November report which was
14  agreed to and subject to cross-examination. The November
15  report was subject to the scheduling order. Everything was
16  absolutely done according to time. There were four
17  depositions, so --
18  THE COURT: That's what my concern is that it just
19  kept coming.
20  MR. BARNES: I understand.
21  THE COURT: And so I read the peer-reviewed paper
22  which was softer and gentler, and seemed to be inconsistent
23  with some of the strong language in the report; and it
24  strikes me that that would be the appropriate set of
25  conclusions to introduce.

Page 32

1   MR. BARNES: Well, that may be where we end up,
2   but I want to go through it because, number one, they have
3   set up so many straw men which they have set up and they're
4   knocking down. It's not what Dr. Gibbons is saying. So the
5   first slide in the Daubert. Okay, can we switch over to
6   ours, please? I want to walk you through it briefly so you
7   can see some of this, your Honor, because there's really not
8   that much difference, and they're going into the, as you
9   described yesterday, the nitpicks.
10  THE COURT: One thing I didn't think was a nitpick
11  was that you assume, because you get one prescription of
12  Neurontin, that you're on it for a year.
13  MR. BARNES: Well, okay, I can address that, okay.
14  THE COURT: That did seem -- what's it called
15  patient exposure years? -- to be a huge issue.
16  MR. BARNES: Allow me to do that, okay. Here's
17  how Dr. Gibbons' study was designed, okay? In the
18  gabapentin study -- no, let's do the Archive published paper
19  on eleven antiepileptic drugs. It's been called a bipolar
20  study, but it's really, it's the antiepileptic drug study in
21  bipolar patients. That's number one. And that's in direct
22  response to the FDA meta-analysis. It's absolutely
23  understood in that paper. This is in direct response.
24  So what does that paper do? Well, that paper does
25  two things. On the date of bipolar diagnosis, okay, that's

Page 33

1   called the index date, and what Dr. Gibbons does is compare
2   the rate of suicide before the date of diagnosis, suicide
3   attempt before the date of diagnosis to the rate of suicide
4   attempt --
5   THE COURT: We're talking about the paper now or
6   the report?
7   MR. BARNES: The paper, just the paper. For the
8   next five minutes, it's just going to be the paper. So you
9   have the index date. And if someone would set up the board
10  here, I could draw it for you. So you have the index date
11  and a rate before and a rate after. The index date is the
12  date of diagnosis for bipolar disorder.
13  So what Dr. Gibbons does is, he has a primary
14  conclusion based upon that comparison. Then he does a
15  sensitivity analysis which compares months in which a
16  prescription is filled against months in which a
17  prescription is not filled. And he does a sensitivity
18  analysis, and it confirms the analysis that was done on the
19  primary analysis. So that has been covered on a
20  month-by-month basis.
21  THE COURT: So he only included in patient years
22  the time periods in which somebody filled a prescription?
23  MR. BARNES: Compared to the months they did not
24  on a patient-by-patient basis. So that criticism has been
25  handled.

Page 50

1    understand whether it's a reliable methodology, not whether
2    other experts could criticize it, not whether there could be
3    a disagreement among experts in the field. I just want to
4    understand it. Is the methodology behind the article
5    reasonable, the conclusions in the article?
6        THE WITNESS: I would say that it passes -- it's
7    reasonable enough, the methodology. The problem I would
8    have, the primary problem I have with the final form was, I
9    think the conclusions were a bit overdrawn relative to the
10   methodology, but not as extreme as in the expert reports.
11       THE COURT: I understand you had problems with the
12   expert reports, but I just want to understand. So is there
13   anything -- what specifically do you feel about the final
14   conclusion that's overstated?
15       THE WITNESS: If you had -- if I could quote, if
16   there was a copy of the paper, the abstract or the final
17   conclusions of the paper, I could point to where --
18       MR. BARNES: Could I catch up to you, Doctor?
19       THE WITNESS: What's that?
20       MR. BARNES: Just so I know what he's referring
21   to, your Honor.
22       THE COURT: The paper, the published paper, the
23   one that's to be published.
24       MR. ALTMAN: May I approach?
25       THE COURT: Yes.

Page 51

1        MR. ALTMAN: Do you want it on the Elmo, or do you
2    want it in front of you? It's also in the binder, your
3    Honor.
4        (Witness examining document.)
5        MR. ALTMAN: I believe at Tab 9 within the binder
6    we submitted to you this morning.
7        THE COURT: Great. Thank you.
8        THE WITNESS: Yes, the conclusions, my opinion is
9    that the conclusions are overstated despite FDA reports.
10   This is under the abstract under "Conclusions" at the bottom
11   of the first page of the abstract where it begins, "Despite
12   FDA reports regarding increased risk of suicidality
13   associated with AED treatment, the current study reveals
14   that as a class, AEDs do not increase risk of suicide
15   attempts in patients with bipolar disorder relative to
16   patients not treated with an AED or lithium. AEDs reduce
17   suicide attempt rates, both relative to patients not
18   receiving any psychotropic medication and relative to their
19   own pretreatment levels."
20       I believe those conclusions do not follow from the
21   study, its methodology, and are overdrawn.
22       THE COURT: All right, so if you look at all the
23   limitations he puts in at the end, if you allow the
24   limitations in the study where he puts in a lot of the
25   things we've been talking about this morning, would that be

Page 52

1    a fair conclusion? In other words, it's just the way the
2    abstract captures it?
3        THE WITNESS: I don't believe that that's a good
4    conclusion, no. I don't believe that's sound. I don't
5    believe that that's --
6        THE COURT: What's sound, the abstract?
7        THE WITNESS: The conclusion in the abstract.
8        THE COURT: But if you took it in the more
9    holistic, how the article is written with, you know, by the
10   end he puts in all these limitations, would that be a fairer
11   way of discussing it? Would that be fair?
12       THE WITNESS: Well, if you properly account for
13   all those limitations, then those conclusions would not
14   follow.
15       THE COURT: All right. So you have no problems
16   with the methodology. You have a problem with the way the
17   conclusions are too strongly stated?
18       THE WITNESS: Yes.
19       THE COURT: Subject to limitations, all right.
20   Now, do you have a different feeling about the papers? Do
21   you think that the methodology -- excuse me, I said that
22   wrong -- the methodology in the expert reports is flawed?
23       THE WITNESS: The methodology is basically similar
24   between the two. So, again, that's not the issue. It's the
25   conclusions.

Page 53

1        THE COURT: All right, so why don't you -- there
2    are two separate reports, expert reports, so do you need to
3    parse between the two of them? Does it matter?
4        THE WITNESS: I don't think so.
5        THE COURT: All right, so the same criticism
6    against both of the studies?
7        THE WITNESS: Yes.
8    BY MR. ALTMAN:
9    Q. Dr. Greenland, not knowing whether people actually took
10   the drug --
11       THE COURT: Don't do it in a leading way, okay?
12   Have him teach me, okay?
13   Q. Did Dr. Gibbons' study consider whether people actually
14   took the drug Neurontin when he did his calculations?
15   A. No.
16       MR. BARNES: Say that? I'm sorry.
17   Q. What's the significance of that?
18   A. Well, we don't know what the people actually took. And
19   I give you an example from everyday experience. If you go
20   into most people's homes, and certainly mine and many
21   others, you'll often see a medicine chest full of
22   prescription bottles, some of which were hardly used at all,
23   old bottles.
24       THE COURT: Excuse me. I understand that you
25   can't know what they actually took.

Page 54

1    THE WITNESS: Yes.
2    THE COURT: But since you as well as other experts
3 actually use this database, that's always a limitation in
4 using this database, right?
5    THE WITNESS: Yes.
6    THE COURT: All right, so since everybody uses
7 this database, as I understand it, for some studies, when
8 you use the database, how do you account for that
9 limitation, which is, you can't know if someone actually
10 took their prescription?
11    THE WITNESS: First of all, you recognize that
12 limitation in the discussion and try to take account of it
13 as part of your uncertainty about what the actual effects of
14 the drug are. In a randomized trial, when you have a
15 placebo-controlled trial, you use what they were assigned to
16 take, and that's called a "intent-to-treat analysis." So
17 you say what you're analyzing is intention to treat because
18 even in a randomized trial, you can't be sure what they were
19 taking when they went home. But in an observational study
20 like this, you also can't be sure. And unlike in a
21 randomized trial, even the intention to treat has not been
22 randomly assigned. It's been given on the basis of --
23    THE COURT: I understand. The FDA did the gold
24 standard, right?
25    THE WITNESS: What's that?

Page 55

1    THE COURT: The FDA study is the gold standard,
2 right, because it has a placebo as the comparison, right?
3    THE WITNESS: Yes.
4    THE COURT: This isn't the gold standard?
5    THE WITNESS: Right.
6    THE COURT: Everyone in the field knows that,
7 right?
8    THE WITNESS: Yes.
9    THE COURT: But still people use it?
10    THE WITNESS: Yes.
11    THE COURT: So there are going to be certain
12 limitations every time someone uses this database?
13    THE WITNESS: Yes.
14    THE COURT: So you've used it, Gibbons uses it.
15 So is there ways in which he has not tested for those
16 limitations? In other words, when you use it, the same
17 problem arises for you.
18    THE WITNESS: Yes. I would -- well, in using
19 databases like this, a procedure that my colleagues and I
20 have used is to compare -- is to do a more -- it's a more
21 involved comparison, taking the comparisons of the
22 post-prescription rates of whatever it is, in this case
23 suicide attempts, to the pre-prescription rates, taking that
24 ratio for each drug, and then comparing the ratios across
25 the drugs. So it's taking a ratio of ratios instead of

Page 56

1 taking simply the ratios and using them directly as he did.
2 So you could say it's a more involved, we'd like to think a
3 more sophisticated way of trying to approach these data to
4 try and account for the fact that some of these limitations
5 are present.
6    Now, another important factor is to try and do an
7 analysis that's based on actual real exposure time or closer
8 to it, our best estimate of it, as opposed to simply calling
9 the time after a prescription "exposure time."
10    THE COURT: So that is a concern. As I
11 understand, one of your big criticisms is that once you
12 prescribe Neurontin, the presumption is that the patient
13 took it for a year, right?
14    THE WITNESS: Right.
15    THE COURT: But, now, the other side claims, well,
16 he did a sensitivity analysis to account for that. Did he
17 adequately do it?
18    THE WITNESS: He did a sensitivity analysis that
19 went as far as, I suppose, he thought he could with what he
20 had, but one could do more. And one of the things he just
21 didn't do apparently, according to the -- let me turn to my
22 report where I quote where he says he didn't get around to
23 it, "and I would have liked to have seen to it."
24    Q. I'm sorry, I believe that's Page 14 you're referring
25 to.

Page 57

1    THE COURT: Of what?
2    MR. ALTMAN: Oh, I'm sorry. It's his expert
3 report, which should be Tab No. 4, Dr. Greenland's May 31
4 report.
5    THE WITNESS: Yes, the part where in Page 14 of my
6 report of May 31 of 2009, Mr. Altman asks, "Did you run any
7 analyses for the gabapentin studies to look at whether a
8 person was on or off the drug at the time of the attempt?"
9 Dr. Gibbons replies "No." Mr. Altman asks, "Why not?"
10 Dr. Gibbons replies, "Didn't get around to it." Mr. Altman
11 replies, "So I think it's safe to say you don't know what
12 effect that has on these numbers if you would have looked at
13 it that way, correct?" And Dr. Gibbons says, "That's
14 correct."
15    So I would have liked to have seen him do that to
16 address my concerns in more depth.
17    THE COURT: So do you view that as creating such a
18 fundamental flaw that the conclusions are unreliable?
19    THE WITNESS: It's one of the contributors. There
20 are other things in my report I list, but there are many
21 things like this.
22    THE COURT: You list a gazillion things, so --
23    THE WITNESS: True.
24    THE COURT: Let me put it this way: My job isn't
25 to say whether there are some different ways different

Page 58

1  experts can look at these things. I want to know what you
2  think is so wrong about this that it fundamentally
3  undermines the reliability of the conclusion.
4       MR. ALTMAN: Your Honor, may I ask a couple
5  questions to maybe clarify that point?
6       THE COURT: Yes.
7  Q. Dr. Greenland, did the data as acquired by Dr. Gibbons
8  indicate the dates of suicide attempts?
9  A. I believe it did.
10 Q. Did the data as provided to Dr. Gibbons include data on
11 when prescriptions were issued?
12 A. I believe it did, yes.
13 Q. So could Dr. Gibbons have calculated for any given
14 suicide attempt whether that was in the time span of the
15 prescription as identified in the data?
16 A. Yes.
17 Q. You've looked at the data, correct?
18 A. Yes.
19 Q. Do you believe that would have been a particularly
20 difficult thing to look at?
21 A. No.
22 Q. Do you think it would have been important to do that?
23 A. Yes.
24      MR. BARNES: Objection. Counsel is testifying at
25 this point.

Page 59

1  Q. Why would it have been important to have looked at that
2  data?
3  A. For the reasons we just discussed, to properly assign
4  suicide attempts to times when a person was on or off
5  gabapentin.
6       MR. ALTMAN: Mr. Alba, can you flip to the Elmo
7  for a second.
8       THE COURT: Is failure to do that unreasonable?
9       THE WITNESS: What's that?
10      THE COURT: Is failure to make that correlation
11 unreasonable when you do an epidemiological study?
12      THE WITNESS: Let's say that it undermines, it
13 further undermines any conclusions that one might attempt to
14 draw about the effect of gabapentin.
15 Q. And, Dr. Greenland, this ties in with the whole patient
16 year exposure issue. Under his results for the primary
17 analyses -- and this is out of Dr. Greenland's paper -- it
18 says, "Table 1 presents number of patients at risk, numbers
19 of SAs, or suicide attempts, PY, patient years, of exposure
20 and rate of suicide attempts per 1,000 patient years of
21 exposure before and after initiation of treatment during the
22 year following the index diagnosis."
23      THE COURT: What am I looking at now?
24      MR. ALTMAN: I'm sorry. This is the published
25 paper, and unfortunately it doesn't have page numbers, your

Page 60

1  Honor, but I believe it is probably about --
2       THE COURT: What tab is this now?
3       MR. ALTMAN: I think it's Tab 9, and this is right
4  before the first tables that you see. It's the page before
5  the tables.
6  Q. Now, Dr. Greenland, when you read that sentence, what
7  does that tell you about what Dr. Gibbons is saying in terms
8  of exposure on the drug?
9  A. Well, that he's treating the entire year after a
10 prescription as if they were exposed.
11 Q. And is that a correct statement based upon how he did
12 his study?
13 A. It's not a correct.
14 Q. So it's not exposure. It's years of study, correct?
15 A. Right.
16      THE COURT: It's what?
17      MR. ALTMAN: The attempt -- I'm sorry.
18      THE WITNESS: It's how long the person was being
19 observed for suicide attempts. It's not how long they were
20 on gabapentin.
21      THE COURT: This is the issue that he was
22 criticized on for the first draft, right?
23      THE WITNESS: Yes.
24      THE COURT: And then he says he did sensitivity
25 analyses that then address that concern. So did it?

Page 61

1       THE WITNESS: And, no, not adequately and not in
2  my view.
3       THE COURT: Why?
4       THE WITNESS: For the reasons I was just
5  explaining, that he didn't finish his analysis basically.
6       MR. BARNES: Hold on. Objection. Are we talking
7  about the report? You're mixing -- this is the paper he's
8  on. Now, he showed you the paper, so let's stay on the
9  paper.
10      THE COURT: All right, on the paper. So did he
11 take into account your exposure issue through a sensitivity
12 analysis?
13      THE WITNESS: Not adequately.
14      THE COURT: And that's because he didn't correlate
15 in the paper the actual suicide attempts with when he was on
16 the drug? Is that the former point?
17      THE WITNESS: Right.
18      THE COURT: So that's what you're referring to?
19      THE WITNESS: Yes.
20 Q. Dr. Greenland, focusing on things that are not inherent
21 limitations of the pharmacoepidemiologic studies, did you
22 review any information about specific patients within the
23 data set that Dr. Gibbons used?
24 A. Yes.
25 Q. Did you observe whether there were any patients that

Page 62

1  had suicide attempt codes on multiple dates?
2  A. Yes.
3  Q. Okay. If that person did not actually attempt suicide
4  multiple times on consecutive dates, could that have
5  affected the data and the results that Dr. Gibbons has
6  provided?
7  A. Well, it would affect his analysis and conclusions.
8       THE COURT: So you found one -- did you look at
9  all the patients?
10      THE WITNESS: No.
11      THE COURT: So what happened with that one
12 patient?
13      THE WITNESS: Well, there are multiple suicide
14 attempts recorded, or multiple codes, I should say.
15      THE COURT: Afterwards?
16      THE WITNESS: Right, if I understand you.
17      THE COURT: So it's after the index date?
18      THE WITNESS: Right.
19      THE COURT: So if the person were on the drugs at
20 that time, how would it affect the study? Wouldn't it make
21 it seem as if it was -- it would cut the other way, wouldn't
22 it?
23      THE WITNESS: If they were on the drug. If they
24 were off the drug, it would cut. A lot of the objections
25 that I have, as I try and say in my report --

Page 63

1       THE COURT: Actually it would hurt, it would hurt.
2  It would make it less protective.
3       THE WITNESS: Right, but, I mean, for another
4  patient, that was not -- that was a comparison patient that
5  was not on the drug, okay. And if they were -- the point is
6  that --
7       THE COURT: So this particular patient you looked
8  at was not on the drug?
9       THE WITNESS: What's that?
10      THE COURT: This particular patient that you
11 looked at was not on any of these drugs?
12      THE WITNESS: No. Oh, no, no. They were --
13      THE COURT: They were all on the drug?
14      THE WITNESS: Right.
15      THE COURT: Just by definition, right?
16      THE WITNESS: At certain times.
17      THE COURT: So while this may have been a flaw,
18 it's a flaw that hurts Dr. Gibbons?
19      THE WITNESS: Well, I don't know if it hurt
20 Dr. Gibbons, but it might make gaba- --
21      THE COURT: In other words, if he had counted it
22 correctly, the AED would have been even more protective?
23      THE WITNESS: Yes, in some cases than this case.
24 It depends on how or what you're counting and when you're
25 counting it. My point is a general one, that when these

Page 64

1  events occur, if you're overcounting the events, this could
2  cut in general -- set aside -- just it's that example of
3  simply pointing out that these events do occur where you
4  can't tell how many attempts are actually there. And this,
5  of course, can occur at other points in time as well. So it
6  adds another element of uncertainty to what is going on
7  based on the data.
8       If I could make a general comment by way, I hope,
9  of clarifying things, my position? A lot of the points that
10 I make could cut both ways. My chief argument -- and I
11 published extensively on this and talk extensively about
12 this, and I'll be talking a lot about this at the FDA, or
13 they've asked me, they've been after me for a long time to
14 give a workshop on these methods that I advocate, and
15 they're trying to incorporate -- is that the standard
16 statistical methods such as those Dr. Gibbons is using here
17 do not adequately take account of the uncertainty that one
18 should have in light of the kind of data that we are using,
19 "we" meaning Dr. Gibbons, myself, my colleagues; that when
20 you take into account these sources of uncertainty, such as
21 this one or the one we were talking about before, or the
22 other ones listed in my report, it would in effect -- should
23 expand your interval estimate about what's going on. It
24 would remove the significance that's often asserted as in
25 his report, and it would --

Page 65

1       MR. BARNES: Remove the what? I'm sorry, the
2  significance?
3       THE WITNESS: The significance.
4       MR. BARNES: Thank you. Sorry, your Honor.
5       THE WITNESS: And it would lead you to caution
6  your conclusions tremendously, even to the point of saying,
7  we can't really draw a conclusion here based on these data.
8  We can simply say, here is what these data show, appear to
9  show. But taking into account all the uncertainty we have
10 about why they're showing it -- there are many different
11 reasons that could be showing this association -- we can't
12 really say whether there's an effect, whether the effect is
13 protective or it's causal. It could be causing problems,
14 and yet it appears protective because of some of these or
15 many of these problems accumulating.
16      So if you consider it in the course of -- I think
17 a good analogy would be an investment. If you're investing
18 in the market, nobody -- few people today could claim to be
19 so outstanding in playing the market. Even Berkshire
20 Hathaway, Warren Buffet's company, took big losses last
21 year. And that shows that there's a lot of uncertainty
22 involved, and you can't just point and say, oh, it's this
23 one thing. It's an accumulation of all kinds of things,
24 like, what's going to happen with oil, what's going to
25 happen with this --

Page 66

1  THE COURT: I know, but can we get back on this?
2  I would love investment advice, but going back on this, I'm
3  just trying to understand. So what you're saying, and I'm
4  trying to listen very closely, is that statisticians in
5  general are relying on methodologies which overdraw
6  conclusions based on the databases that you have,
7  particularly this PHARMetrics?
8  THE WITNESS: Yes.
9  THE COURT: So what you're saying is, there's
10 nothing that was wrong with what he did. It's how he's
11 stating the conclusions that he draws from it?
12 THE WITNESS: Yes.
13 THE COURT: So, for example, the one factor he
14 doesn't take into account is whether someone was seeing a
15 psychiatrist or maybe some of these other drugs. So that
16 really means he's got to hedge his statement more than that
17 he can't say anything?
18 THE WITNESS: Right, right. Well, I mean, there
19 are some things I wish -- I think he should have done, and
20 if I had been a referee, I would have said, "Please look at
21 this."
22 THE COURT: This is the correlation between
23 whether you were on -- that makes sense -- whether you were
24 on the drug at the time you were attempting to commit
25 suicide?

Page 67

1  THE WITNESS: Right.
2  THE COURT: Am I right that another big difference
3  is that he only looked at suicide attempts rather than
4  suicide ideation?
5  THE WITNESS: That's another issue.
6  THE COURT: So it's hard to compare apples and
7  apples with the FDA report?
8  THE WITNESS: Yes.
9  THE COURT: So the FDA report may show a lot
10 bigger correlation of problems with these drugs because it
11 includes an extra problem, which is thinking about suicide,
12 whereas his report only gives claims of attempts?
13 THE WITNESS: Right.
14 THE COURT: And not final suicides. So actually
15 the FDA is picking up more kinds of incidents, is that
16 right?
17 THE WITNESS: Right. And, of course, his report
18 also can't deal with completed suicides, the other extreme
19 of the spectrum.
20 THE COURT: Right, he doesn't need to deal with
21 the ideation or the completed suicide. He only deals with
22 attempts, whereas the FDA deals with all three?
23 THE WITNESS: Right.
24 THE COURT: All right, I just want to make sure I
25 understand it correctly.

Page 68

1  Q. Dr. Greenland, I just want to ask you a question.
2  Counsel did a chart --
3  MR. ALTMAN: May I approach the witness, your
4  Honor?
5  Q. Counsel did this chart before when he was talking about
6  Dr. Gibbons' paper, and he said that if we took the bipolar
7  diagnosis point here, Dr. Gibbons looked at the time period
8  before the bipolar diagnosis and compared it to the time
9  period after the bipolar diagnosis. Is that what
10 Dr. Gibbons did in his bipolar paper?
11 A. The before/after, yes, yes, I think.
12 Q. Did Dr. Gibbons compare the time period between the
13 time of diagnosis and first treatment, to treatment to the
14 end of the year, or before diagnosis and after diagnosis?
15 THE COURT: You just lost me in that question.
16 THE WITNESS: What?
17 THE COURT: Yes, you did too, see. Good, so --
18 THE WITNESS: Wait. I got lost there.
19 Q. Did Dr. Gibbons when he -- was the comparison that
20 Dr. Gibbons did the time period from the date of bipolar
21 diagnosis through first treatment compared to the rest of
22 the year, or before bipolar diagnosis to after bipolar
23 diagnosis?
24 A. It was before and after, if I recall correctly. Is
25 that right?

Page 69

1  THE COURT: I have no idea what you -- so help me
2  out on this.
3  MR. ALTMAN: If I can --
4  MR. BARNES: Well, no, you can't testify.
5  THE COURT: No. I'm going to let the expert to
6  say. So what did --
7  THE WITNESS: I'm not sure what the -- what's --
8  MR. ALTMAN: Okay.
9  Can we have the Elmo up.
10 Q. Dr. Greenland, can you see that first sentence there?
11 It says, "Table 1 presents number of patients at risk,
12 number of SAs, PY of exposure and rate of SAs per 1,000
13 patient years of exposure before and after initiation of
14 treatment during the year following the index diagnosis."
15 A. Right, okay, that's what it is.
16 Q. Okay, so did Dr. Gibbons compare the period before the
17 diagnosis to after the diagnosis, or was everything of
18 Dr. Gibbons after the diagnosis?
19 A. It was all after the diagnosis.
20 Q. Thank you. What is the significance of that?
21 A. Well, there are several things, issues that enter. For
22 one thing, the diagnosis as recorded in the database may not
23 reflect the actual beginning of the disease for one thing.
24 It may simply be the first diagnosis that appears in that
25 medical record. And that's indicated by some of these

18 (Pages 66 to 69)

Page 70

1  records where there's evidence based on prescriptions before
2  that diagnosis that the person already had the condition.
3  Sometimes diagnoses appear in the database not because it's
4  the first time the person has been diagnosed but because
5  they're entering the diagnosis for the purpose of the
6  record.
7      THE COURT: You need to finish.
8      MR. ALTMAN: Okay.
9  Q. Dr. Greenland, based upon Dr. Gibbons' paper and
10 studies, is it a valid conclusion that Neurontin is
11 protective of suicide?
12     MR. BARNES: Objection.
13     THE COURT: Overruled.
14 A. I don't think so, no.
15 Q. Based upon Dr. Gibbons' paper and expert report, is it
16 a valid conclusion that Neurontin does not cause suicidal
17 behavior in any way?
18     MR. BARNES: Objection.
19     THE WITNESS: Did you overrule it?
20     THE COURT: Sustained. He's not a doctor.
21     MR. ALTMAN: What? No, I only asked based upon
22 the studies.
23 Q. Okay, does Dr. Gibbons make the statement that his
24 study and his paper and his expert report do not demonstrate
25 an increased risk for suicidality?

Page 71

1      MR. BARNES: Objection.
2      THE COURT: Any what?
3  Q. Does Dr. Gibbons in his conclusions of his expert
4  report and his paper make the statement that the evidence
5  does not show that Neurontin is associated with an increased
6  risk of suicidality?
7      MR. BARNES: Objection.
8      THE COURT: Overruled.
9  A. Too many multiple negatives there for me to follow
10 exactly. Can I just answer what I think he's --
11     THE COURT: Yes.
12 A. Again, I don't think any causal, and by that, I mean to
13 include protective as well as causal conclusions follow from
14 the data and the methods that he used to analyze them. In
15 fact, I have no method that could draw those conclusions
16 from the data validly. I don't --
17     THE COURT: So when you use that data, what are
18 you using it for?
19     THE WITNESS: The data?
20     THE COURT: When experts in your field, including
21 yourself, use that PHARMetrics data, what is it, just one
22 piece of a puzzle?
23     THE WITNESS: Yes.
24     THE COURT: So it's one piece you want to look at,
25 but it's not definitive?

Page 72

1      THE WITNESS: Right.
2  A. Dr. Greenland, I just want to show you and I'm going to
3  end with Dr. Gibbons' conclusion at the end of his March 19
4  report. He says, "Based on all the evidence that I have
5  reviewed and the data that I have personally analyzed, it is
6  my opinion that there is no increased risk of suicidal
7  thinking and behavior for gabapentin overall."
8      Is that statement a natural consequence of
9  Dr. Gibbons' paper and expert report?
10     THE WITNESS: No.
11     MR. ALTMAN: Thank you, Dr. Greenland.
12     MR. BARNES: Thank you, your Honor.
13 CROSS-EXAMINATION BY MR. BARNES:
14 Q. Good morning, Dr. Greenland. We have to transition,
15 take a short break.
16     THE WITNESS: Are we having a break?
17     THE COURT: Do you need one?
18     THE WITNESS: No, no.
19     THE COURT: I think we'll finish within half an
20 hour, forty-five minutes, but if you want a break, you're
21 welcome to it.
22     THE WITNESS: No. I just thought when he said a
23 break --
24     MR. BARNES: It might be a good time to take a
25 break just to set up because I would like to organize based

Page 73

1  on your dialogue with him.
2      THE COURT: That's fine. Just know that once, as
3  Robert has learned from bitter experience, once you lose me
4  for five minutes, you lose me for fifteen.
5      MR. BARNES: I think it might make my examination
6  more helpful for your Honor.
7      THE COURT: All right, that's fine. We'll take a
8  fifteen-minute break.
9      (A recess was taken, 10:38 a.m.)
10     (Resumed, 11:03 a.m.)
11     MR. BARNES: Thank you, your Honor.
12 BY MR. BARNES:
13 Q. Dr. Greenland, thank you for bringing the rain over
14 from Los Angeles. We appreciate it.
15     First of all, I want to just go back to some
16 things you said on direct and just clarify a few points
17 before I get into my examination. Did you do any analyses
18 in the PHARMetrics database itself, the claims database?
19 A. No.
20 Q. Okay. So you would agree with me that the information
21 that -- that if the PHARMetrics database was produced and
22 other files from Dr. Gibbons was produced between November
23 and March, you did not go through it and actually test what
24 Dr. Gibbons did in the data itself, correct?
25 A. Correct.

Page 78

1  A. Yes.
2  Q. And it's routinely and commonly employed by researchers
3  like yourself to study drug effects, correct?
4  A. Yes.
5  Q. And study medical device effects, correct?
6  A. Yes.
7  Q. And you've done that yourself?
8  A. Yes.
9  Q. And there are limitations to it?
10 A. Yes.
11 Q. Which are disclosed in papers?
12 A. Yes.
13 Q. Which Dr. Gibbons did?
14 A. Yes.
15 Q. Okay. So, now, I want to talk to you about some of the
16 ideas that you've expressed in the report --
17     THE COURT: So in the field, once you have a claim
18 for a drug, how long do you assume the patient is exposed to
19 it?
20     THE WITNESS: Well, it depends on -- first of all,
21 of course, the time of the prescription would be the maximum
22 is usually assumed, but it depends on the drugs and what
23 they're being prescribed for. Some drugs are much more
24 likely to be neglected to be taken -- the patient may have a
25 side effect and just stop -- than other drugs where they may

Page 79

1  be essential. They may be a drug like an anti-immunity drug
2  that's given to a transplant patient. They tell them, "If
3  you stop taking this drug, you're going to die." Then the
4  person is much more likely to be taking that drug, although
5  even there, some people stop taking it and they die or their
6  organ gets rejected, but as opposed to an antidepressant
7  where they take it and they feel worse, so they say "heck
8  with this," and then they stop taking it.
9      THE COURT: But for purposes of studies, is it
10 standard in the field to assume that they, with some
11 limitations, that they're taking it for the amount of time
12 that it was prescribed for, 30 pills, 30 days, or whatever?
13     THE WITNESS: I would say that's common. I'm not
14 aware of it being a "standard" as such. People may attempt
15 to adjust for that, and that wouldn't be rejected out of
16 hand.
17     MR. BARNES: Okay, thank you, your Honor.
18 Q. Let's talk about that. There seems to be a concern
19 about the issue of whether or not a patient who has had a
20 prescription filled after the index date, as I've described
21 for Judge Saris, was on drug in a given month -- and when I
22 say "on drug," I mean had a prescription filled -- or did
23 not have a prescription filled in a given month, okay? Do
24 you understand what I'm talking about?
25 A. I think so.

Page 80

1  Q. Okay. You criticized Dr. Gibbons for misclassifying a
2  considerable amount of person time of unexposed to
3  gabapentin as person time exposed to gabapentin; is that
4  correct?
5  A. Well, I would say it's a criticism of some of his
6  analyses.
7  Q. But you understand that Dr. Gibbons did a sensitivity
8  analysis that actually tested the results of his primary
9  analysis to compare months where a patient had a
10 prescription filled versus months where patients did not
11 have a prescription filled, correct?
12 A. Yes, I understand.
13 Q. That is called a "person time analysis," correct?
14 A. Yes.
15 Q. So what Dr. Gibbons did to account for your concerns in
16 his published paper, and concerns raised to him at Harvard
17 when he gave a lecture, was to actually compare months where
18 the patient was on a drug versus the months where the
19 patient was off the drug, did the analyses to check the
20 robustness of the primary analysis, correct?
21 A. Well, he did what he referred to -- what you refer to
22 that way, but there are some issues that --
23 Q. I'm not talking about the history. I'm talking about
24 what he did.
25     MR. FROMSON: May the witness finish the answer?

Page 81

1      THE COURT: Were you done?
2      THE WITNESS: No.
3      THE COURT: Go ahead.
4  A. Yes, the issue is that whether the sensitivity analysis
5  as done took a proper, a full account of concerns that I had
6  and, as you said, were raised at Harvard by other people.
7  And this comes down to this issue about, which we were
8  discussing at one point on Page 14 about, "Did you look if
9  the person was on or off the drug at the time of the suicide
10 attempt?" And --
11 Q. Okay --
12 A. Can I finish?
13 Q. You may.
14     THE COURT: Let him.
15 A. And as he said, he did not do that. And as I said, if
16 I had been refereeing or editor in charge, I would have
17 said, "Please do that." And he just said he didn't get
18 around to it, so --
19 Q. Okay, that's the paper. Look at your report and tell
20 me if I misread your paper.
21 A. My paper?
22 Q. Your report is talking about Dr. Gibbons' paper and his
23 report. That quote is about Dr. Gibbons' report, correct?
24 A. Yes, but I think it applies to his paper as well.
25 Q. No, no.

Page 82

1  A.  It doesn't?
2  Q.  Well, you should read it more carefully.
3      THE COURT:  No, strike that.  Come on.
4      MR. BARNES:  Your Honor, that remark deals with
5  the gabapentin study.  I asked him about his paper.
6      THE COURT:  I am so lost between the different
7  studies and the different dates and the different articles
8  that you have to help me.  Okay, so what remark?
9      MR. BARNES:  Okay, I want to be very precise
10 because he went right to the study.  I asked him about the
11 paper.  I asked him about the paper on the AEDs, and he then
12 went --
13     THE COURT:  That was admitted in some
14 peer-reviewed journal?
15     MR. BARNES:  Yes.
16     THE COURT:  All right.
17     MR. BARNES:  That's what I was talking about, and
18 rather than answer my question, he went, to confuse me and
19 perhaps the Court, was to go to the gabapentin study which
20 is in the supplemental report.  I'm talking about the paper.
21     THE COURT:  All right, so now we're talking about
22 the paper.  What's the question again?
23     MR. BARNES:  Okay, and that's why I interrupted
24 him because he was going into the report.
25 Q.  Let's focus on the paper.  I only have 30 minutes.  The

Page 83

1  paper adjusts for the very criticism you made by a person
2  time analysis, which is some kind of regression analysis
3  which you and Dr. Gibbons explained for hours, correct?
4  Isn't that correct?
5      THE COURT:  Limit yourself at this point to the
6  article.
7  A.  Yes.  Yes, well, I'm looking at the article, and he
8  says -- I'm just reading from the article.  That's all I can
9  go by is what he says he did.  "For sensitivity analysis was
10 a person time logistic regression model that related to AED
11 treatment on a monthly basis to the first SA," suicide
12 attempt, "a significant decrease in SA rate associated with
13 AED treatment was found.  Figure 2 presents the estimated
14 hazard function."
15     So, okay, I'm turning the page:  "Overall the SA
16 rate decreases with time.  However, the rates are lower in
17 AED-treated patients throughout."
18     And then he -- okay, so it's not clear to me from
19 reading that exactly the protocol that he used to do that
20 analysis and that adjustment.  If it's not what he describes
21 in more detail elsewhere, then I'm not clear from that
22 passage -- and that's all I could find in the paper, that's
23 all I could find in the paper -- whether he was fully
24 accounting for my concern, okay.
25 Q.  Thank you.  But whether he fully accounted for your

Page 84

1  concern, he did in fact do a sensitivity analysis to at
2  least partially account for the concern that you raised,
3  correct?
4  A.  Yes.
5  Q.  Okay.  And whether or not he did it fully or not is
6  something that you and Dr. Gibbons can debate, but he did
7  adjust for it, correct, in his paper?
8  A.  Yes.  He made a partial adjustment.
9  Q.  Okay.  And, as a matter of fact, he cites references
10 for his person time analysis which are in the published
11 peer-reviewed literature, correct?
12 A.  Yes.
13 Q.  References 9 and 10.  So he's using published
14 peer-reviewed literature on regression analysis in his paper
15 in 2009, correct?
16 A.  Yes.
17     MR. BARNES:  Now, your Honor, I want to talk about
18 the study, okay?  I want to address those separately.
19 Q.  Okay, now we're going to talk about Dr. Gibbons'
20 supplemental report, okay, on the gabapentin cohort, okay?
21 I just want to focus you on that.
22 A.  Okay.
23 Q.  Now, you're criticizing Dr. Gibbons because he did not
24 fully account for this issue in the gabapentin paper,
25 correct?

Page 85

1  A.  And many other issues.
2  Q.  Yes.  Well, I spoke about the person time issue, so I
3  want to focus on that.
4  A.  But can I clarify for the Court?  The problem is,
5  there's an overarching problem here is that somebody who
6  works with these kind of databases, and I've also used
7  studies for my own work in meta-analysis that use the
8  PHARMetrics database, and there are some what I would call
9  very good studies that have been done with that database,
10 but they're good in part because they recognize that the
11 data themselves are fundamentally limited.  Then the methods
12 that we apply to these data are themselves going to be
13 fundamentally limited because of that and also because they
14 contain their own limitations.
15     So my points, the points I'm raising are by and
16 large quite general, not just something specific to what he
17 did or didn't do, although sometimes, as I said, on this one
18 issue I would have asked for something more or more
19 explanation, at least.  But there are more general problems
20 which he couldn't address, I couldn't address, nobody I know
21 could address.
22 Q.  They're baked into the pie?
23 A.  Yes.
24 Q.  Okay, we all understand that there are limitations, and
25 there are in fact limitations to randomized controlled

Page 86

1  clinical trials, which you describe at Page 2 of your May 31
2  report, correct?
3  A. Correct.
4  Q. There is all sorts of issues in taking a randomized
5  controlled trial, in your view, and applying it generally to
6  other populations, correct?
7  A. Correct.
8  Q. And there's all sorts of ascertainment biases, correct,
9  in clinical trials?
10 A. There can be.
11 Q. Sure. And in fact, if you take a meta-analysis of
12 these limited clinical trials, you compound the issues, in
13 your view, correct?
14 A. No.
15 Q. Well, you've written extensively about issues and the
16 abuses and uses of meta-analyses, correct?
17 A. Yes. I mean, you don't have to compound the problems.
18 You can do a meta-analysis carefully and not compound the
19 problems.
20 Q. But it's prone to that in your writings?
21 A. It has happened. People do that.
22 Q. Sure. Let me move on from that. Let me go back to
23 this issue here. So Dr. Gibbons has accounted for the
24 on-and-off issue on his paper. In his report, Dr. Gibbons
25 makes --

Page 87

1      THE COURT: Well, does he in his paper, in his
2  report?
3      MR. BARNES: No. We're going to go to the report
4  now, okay.
5      THE COURT: All right.
6  Q. Now, Dr. Greenland, we're on the report now.
7  Dr. Gibbons made a judgment that the issue of this person
8  time analysis he would not adjust for in the same manner in
9  which he did with the AED study, correct?
10 A. I don't recall.
11 Q. Okay. Well, I think I will help you. In your report
12 you talk about it being different, okay? And so I guess my
13 point to you, sir, is that your counsel had PHARMetrics data
14 since November, and whether or not this accounting for the
15 person time analysis made a material difference, you did not
16 yourself test this question, did you?
17 A. Correct.
18 Q. And you have the competence and technical expertise to
19 have taken the data from the PHARMetrics database --
20      THE COURT: You have to do baby steps now. So
21 Gibbons did not do the person time analysis, sensitivity
22 analysis for his report?
23      MR. BARNES: Not the one that he used in the
24 bipolar, yes. It's a different study. He did not do that.
25      THE COURT: The gabapentin one that goes across

Page 88

1  all indications?
2      MR. BARNES: Correct.
3      THE COURT: So there was not the sensitivity
4  analysis done?
5      MR. BARNES: Not the person time logistic
6  regression analysis. He made a choice not to do that, which
7  he'll explain to you on Thursday.
8      THE COURT: And this person time logistic
9  regression analysis is the one that was required by the
10 peer-review journal, is that right?
11     MR. BARNES: I don't know. I think it came from a
12 suggestion from a colleague at Harvard.
13     THE COURT: Do you know?
14     THE WITNESS: I don't recall.
15     THE COURT: In your view, is it critical to do
16 this person time logistic regression analysis?
17     THE WITNESS: I think it helps. I mean, the paper
18 looks better to me than the expert report. That's the way I
19 put it.
20     THE COURT: You know, it's not -- you know, you've
21 got to see where I'm coming from. It's not just a question
22 of "looks better." I have this gatekeeper role. I just
23 want to know, is it junk science if you don't do it?
24     THE WITNESS: Right. Well --
25     THE COURT: I mean, just putting it as bluntly as

Page 89

1  you can, is it unreliable if you don't do it?
2      THE WITNESS: It reduces -- see, for me, it's a
3  matter, and this is where I always get into trouble with the
4  court to say, look, I operate on matters of degrees. I
5  don't know the law, but I can only say there's matters of
6  degrees. It's less reliable if you don't do it, less
7  reliable.
8      THE COURT: I don't care about less reliable
9  because that you can all fight about in court. Is it
10 unreliable if you don't do it?
11     THE WITNESS: It's unreliable anyway. To draw a
12 causal conclusion, regardless of what he did -- I don't care
13 if he, you know, looked at chicken end trails or whatever he
14 did, it's unreliable to draw a causal conclusion from it,
15 causal or protective, in other words.
16     THE COURT: By which you mean, protective it's
17 unreliable?
18     THE WITNESS: Yes, that's unreliable no matter
19 what he did. There's nothing I could do that could make it
20 reliable.
21     MR. BARNES: I don't want to interrupt, your
22 Honor. I'm sorry.
23 Q. My point to you, Dr. Greenland, is that you've raised
24 an issue. Counsel has data on the PHARMetrics data that's
25 been given to him in November, and whether or not in the