EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                      )
                                            ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,)   Pages 1 - 72
AND PRODUCTS LIABILITY LITIGATION      )

DAUBERT HEARING - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 23, 2009, 9:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA   02210
(617)345-6787

Page 22

disorder, there was evidence again of statistically significant protective effects, significant decreases in the post period relative to the pre period.

So what we're starting to see is a coherence of findings across these different studies showing that in the psychiatric populations, where people are at increased risk of suicide attempt relative to the general population, that risk decreases with treatment with antiepileptic drugs in general, and gabapentin in particular.

And in those nonpsychiatric cohorts, there doesn't appear to be any kind of harmful effect. The rates before and after initiation of treatment are identical.

MR. BARNES: Slide 2 gives the figures, your Honor. I think we have it up.

Q. Would you just review with the Court the statistics on bipolar and major depressive disorder and other psych.

A. Okay, so overall there was no increased risk in the total population. When broken down by the psychiatric indications or the individual indications, we found that there were statistically significant decreases in the risk associated with bipolar disorder after initiation of gabapentin relative to before, similar to the effect that we found in the bipolar cohort.

THE COURT: Did you do all the same sensitivity analyses for the gabapentin study as the bipolar?

Page 23

THE WITNESS: I did six sensitivity analyses for the bipolar cohort and six sensitivity analyses for the gabapentin. Some were the same and a couple were different because these are different kinds of cohorts.

THE COURT: You were criticized apparently when you first submitted the paper for not doing some things, and then you did it, and then they accepted the paper. Whatever you were criticized for, did you do that with the gabapentin study?

THE WITNESS: No, I did not because you can't do it in the gabapentin study. So in this study --

THE COURT: Have you ever submitted the gabapentin study for peer review?

THE WITNESS: No, I haven't done that. The gabapentin study I did for the purpose of this litigation, so I have not submitted it for a publication. I'd like to down the road, but I didn't feel that it was appropriate to do so while this was the focus of an ongoing litigation.

Q. Explain to the Court and everyone the -- I think --

THE COURT: Yes, I want to understand.

MR. BARNES: Let me help you with that.

THE COURT: I want to understand. I was told yesterday that some of the sensitivity analyses that you did for bipolar were not done for gabapentin.

MR. BARNES: Can I focus this for you?

Page 24

THE COURT: Yes.

Q. We had a lot of discussion with Dr. Greenland about the person-time analysis, which is a sensitivity analysis which tests the robustness of the results you reached in November. You did three sensitivity analyses. The one that seemed to have the most interest was the person-time analysis which you did in the bipolar AED paper, did not do in the gabapentin paper. Can you explain to the Judge why you decided it was not necessary to do it in the gabapentin paper?

A. So let me explain the motivation for doing that analysis. First of all, in my analysis, when you define a cohort in terms of a diagnosis, the natural course of the disease is associated with decreases in suicide attempt rates over time.

Q. Is that the regression to the mean?

A. Some people describe that an regression towards the mean; some people describe it as the natural course of the disorder.

Q. Briefly define a sensitivity analysis to make sure we understand what it is.

A. Okay, a sensitivity analysis is an alternate change in the model specification or in the definition of the cohort to test the robustness of the findings of the overall analysis. So this sensitivity analysis addressed three

Page 25

issues: One, it addressed the issue of whether or not the same results would be obtained if we counted multiple suicide attempts within individuals, or just said we're going to create a binary variable: You either didn't make a suicide attempt or you made one or more suicide attempts.

Q. Is that multiple counting?

A. That would be multiple counting. So this analysis tests whether or not multiple counting is a factor.

Q. So that's the five suicide attempts on the same patient? You tested that?

A. That would be an example of that. Yes, I did.

The second piece of the person-time analysis adjusts for the natural decrease over time or the regression towards the mean effects because it builds in a person-time function. It builds in a monthly change in the overall rate and allows that rate to either increase or decrease in the population. And then once it's adjusted for that, it then compares what's left over in terms of whether or not it's related to taking an antiepileptic drug or not.

And then the final piece of this is that it addresses the question raised by Dr. Greenland of whether or not -- how I defined exposure. So in my overall analysis, I defined exposure by the initiation of taking an antiepileptic drug; and then, to be conservative, I attributed every suicide attempt that was made following the initiation of an

Page 26

1  antiepileptic drug to the drug, whether the person was
2  taking the drug at the time they made that suicide attempt
3  or not. This is a very conservative assumption. Assume
4  that a person took the drug on one day, and then 360 days
5  later they made a suicide attempt. I coded that suicide
6  attempt as it was related to taking the drug. It is the
7  most sensitive.
8      THE COURT: But the flip side of it is, if the
9  person only took the drug for two weeks or a month, but they
10 didn't like the side effects -- it made them feel dizzy or
11 tired or some of the side effects that it has -- and
12 stopped, and there were no suicide events on day 300, you're
13 asserting that's a protective aspect of the drug?
14      THE WITNESS: So that to deal with that issue --
15 yes, absolutely.
16      MR. BARNES: That's a valid concern.
17      THE WITNESS: And that's the concern that
18 Dr. Greenland raised. Dr. Greenland said, well, wait, you
19 know --
20      MR. BARNES: She understands that.
21      THE WITNESS: Okay, so this analysis adjusts for
22 that.
23      THE COURT: And that's what you did for the
24 bipolar study. You adjusted for that?
25      THE WITNESS: Oh, absolutely. So I did a monthly

Page 27

1  analysis.
2      THE COURT: That's right, but you didn't do that
3  for the gabapentin?
4      MR. BARNES: Explain why.
5      THE COURT: Am I right?
6      MR. BARNES: Yes.
7      THE WITNESS: Yes, you are right.
8      THE COURT: We have to do baby steps, okay.
9      THE WITNESS: I did not did the person-time
10 analysis --
11     THE COURT: Reviewers were concerned. They liked
12 the overall paper; they were concerned. You did that
13 analysis with the bipolar cohort?
14     THE WITNESS: Well, the primary reason that they
15 were concerned about that was because of the regression
16 towards the mean effect.
17     THE COURT: Fair enough. My only point is that
18 they didn't take it until you did it. Okay, so --
19     THE WITNESS: So a lot of the patients who got in
20 here, into the bipolar cohort, had a suicide attempt, had a
21 diagnosis, and had initiated treatment on the same day. So
22 in a sense, the suicide attempt actually led to their
23 diagnosis, and the suicide attempt led to their ultimate
24 treatment. So here we have an example where the outcome is
25 sort of influencing the treatment. And when you define a

Page 28

1  cohort in terms of the diagnosis, we know that close to the
2  time of that diagnosis the risk of a suicide attempt is
3  really high, and it trickles off down the road.
4      That's not true when you define a cohort in terms
5  of taking a drug. And to support that, of the 131,000
6  patients who took gabapentin, only three of them had a
7  suicide attempt on the same day that they were prescribed
8  gabapentin. So this concern about regression towards the
9  mean, when you define the cohort in terms of an index
10 diagnosis, does not apply in the same way when you define a
11 cohort in terms of the initiation of drug.
12     Now, the second important reason why I didn't do
13 this analysis is that on the first month of treatment,
14 everybody in this cohort is taking gabapentin. There is no
15 non-gabapentin control. Whereas in this cohort, there is a
16 mix of people who are taking gabapentin in the first month
17 and not taking an antiepileptic drug in the first month. So
18 every month in the analysis has an appropriate control.
19     The fact that there's no control initially here,
20 that every single one of these 131,000 patients is taking
21 gabapentin and there are zero people not taking gabapentin
22 tremendously reduces the interest in doing such an analysis.
23     THE COURT: I don't know if I'd agree with that.
24 I mean, I was rereading last night Maris and Kruszewski's
25 things, and a huge number of people -- put aside whether it

Page 29

1  creates depression -- just say they feel tired or dizzy or
2  moody. In fact, Bulger said that. In fact, I had a case, a
3  totally different case that had nothing to do with anything
4  here, and the woman was taking Neurontin, and she went off
5  of it because she said it made her feel dizzy or something.
6  It was just a completely different case. There was no
7  motive for it.
8      So I'm not saying that that makes it bad or good.
9  It just means that people go off drugs. It's not clear that
10 people are going to stay on the gabapentin for more than a
11 week or a month. So I don't understand how you can say it's
12 either -- you can study it without understanding how long
13 someone was exposed to the drug and how much.
14     THE WITNESS: But that's exactly the problem.
15 During this first month, everybody was on it at least for
16 some period.
17     THE COURT: Fine, so you could measure it for a
18 month. Maybe you could -- I think you can presume that if
19 someone is prescribed for a month, they're on it for a
20 month. But you haven't measured whether they were
21 prescribed for the second month, right? Or have you?
22     THE WITNESS: I have all of the data. I mean, all
23 of those data are in the --
24     THE COURT: Excuse me. You haven't correlated
25 with who stayed on it, right? You don't know -- you assumed

### Page 30

1  that once they took it for one -- the first prescription,
2  they were on it for a year, right?
3      THE WITNESS: Well, I did do a sensitivity
4  analysis that said that in order for me to say someone was
5  on gabapentin, they had to be on it at least 30 days. So
6  that is one of the sensitivity analyses that gets away from
7  the idea that you could be on it for one day and then not
8  take it. So during that period they had to be on it for at
9  least 30 days, and the results were virtually identical to
10 the analysis that didn't have that requirement. That was
11 one of the primary --
12     THE COURT: How would you know they were actually
13 on it? Just you assumed that if --
14     THE WITNESS: Well, all of these data are based on
15 filling a prescription, so my exposure to any of these drugs
16 in a medical claims database is based on whether or not they
17 filled a prescription in that month.
18     The point that I was making of methodological
19 concern is that if everybody in the first month is on the
20 drug, there is no statistical comparison to people who are
21 not on the drug in the first month. Later down the pike,
22 there may be people who are on the drug and off the drug,
23 and that can be looked at.
24     THE COURT: Were all these suicides or nonsuicides
25 within the first month? No.

### Page 31

1      THE WITNESS: There were suicides throughout that
2  whole period, that's correct.
3  Q. Doctor, do you have an opinion -- well, first of all,
4  have the methods you've described been published in the
5  peer-reviewed literature?
6  A. Yes, they have.
7  Q. That's the gabapentin study?
8  A. Yes, they have.
9  Q. Can you give us some examples of where these methods
10 have been employed in important public health issues?
11 A. The methodology that's laid out in both of these was
12 originally described in our VA study, which was published in
13 the American Journal of Psychiatry in 2007. This was a
14 study of 226,000 major depressed patients in the Veterans'
15 Administration.
16 Q. Claims database?
17 A. Claims database, very similar. It was the Veterans
18 Administration's database, and that's where this general
19 design came from. The person-time analyses that are
20 described here were originally described to the statistical
21 literature by Brad Efron at Stanford University in the
22 1980s, and we generalized those methods and used those in
23 the Institute of Medicine report on organ transplantation.
24 Q. Is this the book where this was published?
25 A. Yes, it is.

### Page 32

1  Q. Briefly, what is this book about?
2  A. It's about developing a new allocation system for solid
3  organ transplantations. We looked at another observational
4  database --
5      THE COURT: This isn't psychiatric.
6      MR. BARNES: It's a different application.
7      THE COURT: It's organs?
8      MR. BARNES: This is organ transplantation. It's
9  how to allocate organs from other people.
10     THE WITNESS: This is the report that led to the
11 change in the way that solid organs are shared across
12 regional areas, and it led to a very major change in public
13 health, and it's now the current system that we use for
14 organ allocation. The work there was then later published
15 in the statistical literature, peer reviewed in 2003 in
16 Biostatistics, and that's the methodology that was used as
17 this sensitivity analysis, the person-time logistic model.
18 Q. Briefly, I want to talk to you briefly, the Court
19 expressed concern about the FDA. I want to just go back to
20 some of those issues. Dr. Gibbons, can you explain to us
21 how your studies respond to the FDA meta-analyses. We had a
22 discussion with the Judge Tuesday afternoon. Can you
23 explain to us how your studies respond to the meta-analysis,
24 and how they differ, and the relative strengths and
25 weaknesses of those two designs.

### Page 33

1  A. Of course. The FDA meta-analysis is an observational
2  study. These are observational studies. The FDA
3  meta-analysis looked at approximately 40,000 people from 199
4  different studies. Those studies were not designed to look
5  at suicide. Suicide was retrospectively harvested from the
6  medical records and claims databases. This is very
7  different --
8      THE COURT: As against a placebo?
9      THE WITNESS: Correct, so patients were -- the
10 strength of randomized control trials -- so let's talk about
11 randomized controlled trials for a minute in the study of
12 suicide.
13     THE COURT: But in a sense, it's better in the
14 sense it's the closest to what you were talking about, those
15 who went on an AED and those who didn't; not the same
16 subject, but you're diagnosed with bipolar, the people who
17 went on and people who aren't. It's a better --
18     THE WITNESS: Let me clarify what's better. If
19 there is a prospective end point, if we really designed a
20 study with 40,000 people, and we randomized them to placebo
21 and Neurontin, and we use the Columbia classification scale
22 of suicidal ideation and behavior, and even with 40,000
23 people enrolled in a randomized clinical trial, we'd be
24 mostly looking at suicidal ideation. That would be one
25 large randomized controlled trial, and we could derive some

Page 34

1   THE COURT: So let's say, so it's not included in
2   patient year as part of a patient -- what if somebody gets
3   one prescription of Neurontin and no more? He is not
4   included in the study?
5   MR. BARNES: That person, in the bipolar paper, he
6   or she would be included in the study.
7   THE COURT: Would be?
8   MR. BARNES: Would be.
9   THE COURT: Why? It's only one month.
10  MR. BARNES: Then it's adjusted. In the
11  sensitivity analysis, he adjusts for that and confirms the
12  primary analysis. He will explain that ---
13  THE COURT: Didn't it reduce the number of patient
14  years?
15  MR. BARNES: No, it would not.
16  THE COURT: Why? Why wouldn't it?
17  MR. BARNES: In the primary analysis, as I said,
18  it's before and after. In the sensitivity analysis where
19  it's actual exposure versus months of nonexposure, then that
20  comparison is done explicitly to confirm the primary
21  analysis. So if I can just spend a moment just setting up
22  the tests for you, and then I can speak with the authority
23  of a Dr. Gibbons on the sensitivity analysis --
24  THE COURT: What you're saying, before we get into
25  it because it will take us all morning, that he basically

Page 35

1   did adjust the patient years?
2   MR. BARNES: Yes.
3   THE COURT: All right, and what's the next?
4   MR. BARNES: You correctly recognized this is a
5   pharmacoepidemiologic study where the prescription claim of
6   a drug is a surrogate for actual drug exposure. You said
7   that's entirely reasonable, and indeed that's how
8   pharmacoepidemiology is done. I think Dr. Gibbons --
9   THE COURT: But only for the length of time of the
10  prescription.
11  MR. BARNES: Well, it depends on the study design,
12  and Dr. Gibbons will talk to you about that, but --
13  THE COURT: So if you got one prescription for
14  30 days of pills, that's what it should cover.
15  MR. BARNES: Yes, it is, it's covered and
16  addressed in his study appropriately. That was raised and
17  addressed -- he'll talk to you about that 30-day. It's not
18  an issue. But what I want to focus on is the idea, just so
19  you understand, just generically, before, after, okay?
20      On the antiepileptic study of the eleven drugs in
21  response to the FDA meta-analysis, this date here is the
22  diagnosis of bipolar disorder, okay? He compares this time
23  period for suicide attempts, he compares this time period
24  for suicide attempts, and he is looking at the eleven
25  antiepileptic drugs and sees if there's a protective effect.

Page 36

1   He'll explain the idea, but this is the comparison he sets
2   up.
3   THE COURT: So he doesn't compare them to a
4   placebo ever?
5   MR. BARNES: He does not. This is an exposure.
6   This is a pharmacoepidemiologic study. Dr. Gibbons and
7   Dr. Greenland --
8   THE COURT: So he doesn't flat out refute the FDA
9   because the FDA looks at placebo clinical trials, right?
10  MR. BARNES: The FDA looks at a meta-analysis, a
11  combined pool analysis of eleven drugs. It's a different
12  way of --
13  THE COURT: Excuse me. But as against placebos.
14  MR. BARNES: They are placebo-controlled trials in
15  that study.
16  THE COURT: Right, so this is a complete -- it's
17  not a flat on flat contradiction. It's just a totally
18  different way of thinking about it?
19  MR. BARNES: Can I just restate that a bit?
20  THE COURT: All right.
21  MR. BARNES: It is a different study design to
22  test the same issue. This is a different study design than
23  the meta-analysis. A meta-analysis --
24  THE COURT: I know what a -- so but it's very
25  different --

Page 37

1   MR. BARNES: It is different.
2   THE COURT: -- because it isn't as against a
3   placebo?
4   MR. BARNES: Correct.
5   THE COURT: So you don't know, for example,
6   whether or not psychiatric treatment is the protective
7   effect?
8   MR. BARNES: I think what you'll see is -- and
9   I'll get to that in a moment -- what inferences you can draw
10  from an observational study like this is the subject of
11  many, many books. There are limitations to this study, for
12  sure, and there are advantages. This is a quicker, and it
13  involves hundreds of thousands of patients, okay, the
14  gabapentin cohort. This involved 47,000. So what you get
15  is large numbers, lots of data, and an ability to make
16  judgments based upon study designs.
17      Dr. Gibbons and Dr. Greenland would agree. They
18  may not agree on the same limitations to this study, but
19  what they would agree to is that there are limitations to
20  them, and there are advantages which are all well known.
21  And Dr. Gibbons on the subject of limitations -- and he
22  talks about limitations in his paper. You've pointed it
23  out; counsel has pointed that out.
24      In his deposition the question is asked: "Do the
25  same limitations stated in your paper apply to your

Page 38

1  that is generally accepted in the field of
2  pharmacoepidemiology and biostatistics?
3  A. Absolutely.
4     MR. BARNES: Thank you, your Honor.
5     THE COURT: Who's going to do the cross? Thank
6  you. Do you want him back up on the stand?
7     MR. ALTMAN: Yes, your Honor. Let's take them
8  down.
9  CROSS-EXAMINATION BY MR. ALTMAN:
10 Q. Good morning, Dr. Gibbons. How are you today?
11 A. Good morning. Fine, thank you.
12 Q. Before we move forward, I just want to clarify
13 something for the Court. Mr. Barnes asked you if there were
14 differences between your November expert report and your
15 March expert report, and I believe you said you did some
16 additional sensitivity analyses; is that correct?
17 A. Yes.
18 Q. Those were not the only changes between the two
19 reports, correct?
20 A. I believe there were a couple of typographical errors
21 in one of the tables, and those were corrected as well. I'm
22 not sure if that was done at that time.
23 Q. Would you agree there was also an error where you
24 miscalculated the number of patients in one of the groups?
25 A. That's correct. You had pointed out in one of my

Page 39

1  depositions that there was an error in one of the codings,
2  and that some of the major depressive patients were miscoded
3  as other psychiatric disorders, and I had corrected that,
4  and thank you for pointing that out.
5  Q. And I'd just like to show you -- that wasn't just a
6  change of a patient or two, correct?
7  A. It was a large number of patients. As I recall, it was
8  about 10,000 patients, and it produced no changes in the
9  results of the analyses of any substance. If anything, they
10 made the effects a little stronger.
11 Q. That's not the only change that you made as well. In
12 your original report you had put -- for the statistical
13 significance, in the bipolar disorder group, you had put it
14 was .66. It went from .43 to .99, correct?
15 A. Yes.
16 Q. In your second report, you changed that to 1.0,
17 correct?
18 A. Yes, I did.
19 Q. And that was because you made a rounding error,
20 correct?
21 A. That is correct, but the probability value associated
22 with that was unchanged. It was P less than .047, which was
23 less than the 5 percent critical value.
24 Q. But it still does include 1, correct?
25 A. The confidence interval includes 1, but our test of the

Page 40

1  hypothesis of whether or not the relative risk is less than
2  1 was statistically significant.
3  Q. So there were a lot more changes than just simply doing
4  sensitivity analyses, correct?
5  A. In my opinion, those other changes, with the exception
6  of the one I omitted, the point that you had highlighted in
7  our deposition, which, you know, was certainly an important
8  thing to correct, those were the only others. But none of
9  them were changes of any particular substance.
10 Q. Dr. Gibbons, you had shown earlier that it is -- would
11 you agree that it's not uncommon for a person to have a
12 code -- and we're talking only about your bipolar study --
13 it's not uncommon for a person to have a suicide attempt on
14 the same day as the bipolar diagnosis, correct?
15 A. That is correct. You know, by using the term
16 "uncommon," I don't know that you would say uncommon in the
17 same way that I would say uncommon, but there are a large
18 number of those. I don't remember at this time how many
19 there were.
20 Q. And you will agree that that inflates the rate of
21 suicide attempts before drug treatment, correct?
22 A. No. I believe that what it does is, it -- you know,
23 it's part of the background rate. These people were not a
24 part of -- they were not taking the antiepileptic drug.
25 It's part of the natural background rate. But it is a way

Page 41

1  in which you may be identifying people who ultimately get
2  into the study, and it makes it important to take into
3  consideration that kind of a regression effect that was done
4  in the person-time analyses.
5  Q. You did write, "It can inflate the rate of suicide
6  attempts observed prior to the initiation of treatment,"
7  correct?
8     MR. BARNES: Objection.
9     THE COURT: Overruled.
10 A. It depends on whether or not you use the term
11 "inflating" to reflect, you know, that this is a part of the
12 drug experience. Clearly it's not. It will increase, if
13 you're identifying more people, it will increase the number
14 of people who have suicide attempts in the period prior.
15 Q. I'd like you to read right here. It says, "It can
16 inflate the rate of suicide attempts prior to the initiation
17 of treatment." You did write that, correct?
18 A. Yes, I did.
19 Q. You would agree that when you eliminated in your
20 sensitivity analysis the suicide attempts on the same date
21 as the index date, the results were no longer significant,
22 correct?
23 A. The results of the analysis when we actually threw out
24 all of those suicide attempts on the same day in the bipolar
25 cohort showed no significant difference, indicating no

11 (Pages 38 to 41)

Page 42

1  elevated risk associated with taking an antiepileptic drug.
2  Q. And they were no longer significant, correct? The
3  results were no longer statistically significant, correct?
4  A. There was no longer a statistically significant
5  decrease in the rate when we've eliminated them. But that
6  is a sensitivity analysis that's extremely conservative.
7  You would never find reason to eliminate all of those. This
8  was just done to look at what happens in the extreme, would
9  it in fact change it to a potentially harmful effect?
10 Q. Dr. Gibbons, I have up on the screen --
11     MR. ALTMAN: Your Honor, is your monitor on?
12 Q. I just want to show you here, this is the contract,
13 part of the contract from PHARMetrics which set forth the
14 data which you acquired.
15     MR. BARNES: Can I have a copy of that, please?
16     MR. ALTMAN: Unfortunately, I do not have that,
17 but that's the one that I e-mailed you the other night,
18 Mr. Barnes.
19     MR. BARNES: Well, can I have a copy of it to look
20 at while you're examining the witness as a courtesy copy?
21     THE COURT: Hold on. What is this?
22     MR. ALTMAN: This is a copy of the contract for
23 the data that Dr. Gibbons acquired from PHARMetrics, and I
24 just want to ask him a question about it. Unfortunately, I
25 neglected to bring one this morning, but Mr. Barnes and I

Page 43

1  discussed this very document just two days ago at
2  Dr. Greenland's deposition, and I e-mailed it to him
3  yesterday.
4      THE COURT: He doesn't have one. Have you seen it
5  before?
6      MR. BARNES: It was a point of controversy. It
7  was mislabeled in Dr. Greenland's report. I couldn't find
8  it. He e-mailed it yesterday. He did not tell me he was
9  going to use it in his report today. I didn't bring it --
10     THE COURT: He forgot to bring a copy.
11     MR. BARNES: That's fine.
12     THE COURT: He sent it to you. Now, how do you
13 want to solve this?
14     MR. BARNES: Let's proceed.
15 Q. Dr. Gibbons, I just want to ask you, File No. 3 which
16 is the drug file, that's where it lists which drugs you
17 obtained as part of the data set from PHARMetrics, correct?
18 A. That's correct.
19 Q. And it says "Drugs of interest, AED," correct?
20 A. Yes.
21 Q. Antidepressants, correct?
22 A. Yes.
23 Q. Lithium, correct?
24 A. Yes.
25 Q. And atypical antipsychotics, correct?

Page 44

1  A. That's correct. That's what it says.
2  Q. Those are the drugs you obtained from PHARMetrics,
3  correct?
4      MR. BARNES: Objection.
5      THE COURT: Overruled.
6  A. Actually, that's incorrect. You raised this in our
7  deposition, and you pointed to this document, and it was
8  confusing to me. I since that time went back and took a
9  look at the list of drugs, and it does include typical
10 antipsychotics. There are drugs like Haldol in that list,
11 which is a typical antipsychotic.
12 Q. Okay, so with that exception, so potentially you did
13 get the typical antipsychotics?
14 A. That's correct.
15 Q. Okay. But you would agree, in your analyses, you did
16 not consider whether people were on stimulants, correct?
17 A. I would agree with that.
18 Q. Like drugs for attention deficit disorder, correct?
19 A. That's correct, I did not include those.
20 Q. Or weight-loss medications? Those are also stimulants
21 typically, correct?
22 A. I did not include those. I've included more drugs than
23 anyone has ever included in any study in this area by a
24 large number. I've included 79, the major classes that have
25 been thought to be implicated with suicide in these

Page 45

1  populations.
2  Q. You didn't include depressants, correct?
3  A. Could you explain what you mean by a depressant?
4  Q. Drugs that tend to make people depressed. For example,
5  ethanol is not a prescription drug, but there are other
6  kinds of depressants. You didn't include depressants,
7  correct?
8  A. I don't think people make medical claims for gin and
9  tonic.
10 Q. But there are other drugs that are depressants that can
11 be used to bring manic people down, correct?
12 A. Again, the analysis is described in detail. The drugs
13 that I've adjusted for are described in detail. They have
14 withstood the process of peer review. They have withstood
15 the process of scrutiny by my colleague, Dr. John Mann, one
16 of our nation's leading psychopharmacologists. I stand by
17 this list.
18 Q. You didn't include anxiolytics, correct, such as Xanax
19 or Valium?
20 A. There were several anxiolytics that were included in
21 this analysis. Valium was included in this analysis. It
22 was one of the other antiepileptic drugs that's included in
23 this, as in addition to other -- there's one other I'm
24 forgetting the name of right now which is a part of that
25 list that is also used as an anxiolytic.

Page 46

1  Q. But you didn't include Xanax, did you?
2  A. I didn't include Xanax, no.
3  Q. Okay. You didn't include pain medications, correct,
4  such as NSAIDs, Motrin, things like that, Tylenol, correct?
5  A. No. That was not the focus of this analysis.
6  Q. And you didn't include opiates, pain medication such as
7  OxyContin or codeine or things like that, correct?
8  A. That is correct.
9  Q. Now, these drugs that you didn't include, these drugs
10 are psychoactive or psychotropic, correct?
11 A. I'm not an expert on that.
12 Q. Okay. Since you're not an expert on whether these
13 drugs are psychoactive or psychotropic, then when you wrote
14 in your paper that -- you included these people had no other
15 psychotropic medications, what do you base that statement
16 on?
17 A. I base that on the expert opinion of Dr. John Mann,
18 who, you know, reviewed all of these. I base this on the
19 other psychopharmacologic literature in terms of other
20 studies that have been conducted in this area.
21 Q. Are there multiple Dr. John Manns, or is there only one
22 Dr. John Mann?
23 A. I don't know the answer to that.
24 Q. Do you know more than one Dr. John Mann?
25 A. I only know one Dr. John Mann.

Page 47

1  Q. Were you aware, Dr. Gibbons -- by the way, your
2  decision, the drugs that you got, it was also not just for
3  the bipolar cohort; that was for the gabapentin cohort as
4  well, correct?
5  A. That's correct.
6  Q. And so as you sit here, you relied upon Dr. Mann to
7  tell you what drugs that you should acquire, correct?
8      MR. BARNES: Objection.
9      THE COURT: You know, you know, I'm walking out
10 this door at 11:00 o'clock.
11 A. I relied on several people. I relied on the
12 pharmacists at the VA who helped us in the VA study to
13 acquire our list of antidepressants. I relied on
14 interactions I've had with Dr. Rob Valuck at the University
15 of Colorado, one of the leading pharmacoepidemiologists, to
16 review our lists. I relied on the peer-review process of
17 the paper of the American Journal of Psychiatry for the VA
18 cohort and the Archives of General Psychiatry for the
19 bipolar paper to review and tell me whether or not I had
20 left out important classes of drugs. In no cases did anyone
21 raise an issue that I had left out important classes of
22 drugs in this analysis.
23 Q. Do you know as you sit here whether any of the drugs
24 that we listed before that you didn't get are psychoactive?
25 A. You've listed a lot of drugs. Perhaps some of them

Page 48

1  are; perhaps some of them aren't. You know, I'm not sure
2  what your definition of "psychoactive" is. The important
3  thing in this analysis is to control for other classes of
4  drugs that have been thought to be implicated with
5  suicidality. So an obvious choice is to control for
6  antidepressant drugs that have been implicated in the
7  possible relationship to suicidality. To not control for
8  antidepressant drugs would be a big mistake. While you're
9  in the neighborhood, controlling for antipsychotic drugs is
10 a very good idea. And, of course, the eleven antiepileptic
11 drugs that FDA looked at is not the total list of
12 antiepileptic drugs. To include the additional ones is also
13 important. We felt that those were the important
14 concomitant therapies to look at.
15 Q. Dr. Gibbons, you did a declaration when we tried to
16 take the deposition of Dr. Mann in this case that Dr. Mann
17 had nothing to do whatsoever with your expert report,
18 correct?
19     MR. BARNES: Objection.
20 A. Dr. Mann didn't even know I was involved in this case.
21 Q. You wrote, "I do not believe that Drs. Hur, Brown, or
22 Mann possess any knowledge or have formed any opinions
23 concerning the specific expert issues that have been raised
24 in this litigation, or the contents of my expert reports."
25 When you wrote that, you knew that Dr. Mann had helped you

Page 49

1  figure out what drugs to put into your analysis, right?
2      THE COURT: You know what, can I just say this?
3  Don't do your impeachment here for what you plan on doing a
4  trial. I am only looking at whether or not two of his
5  opinions pass muster. And let me just say, my threshold
6  take on this is that "yes" to the bipolar, and I'm worried
7  about the gabapentin. I don't care if he said one thing one
8  place and one thing another. We're really going to whether
9  these studies are admissible. And I don't have all day.
10 Remember we were talking about half an hour apiece?
11     MR. ALTMAN: I understand. Your Honor, the only
12 reason that I raise this is, he doesn't know the effect that
13 all these other drugs could have had in his study. We tried
14 to get some information as part of the discovery process as
15 to how he selected --
16     THE COURT: You know, if you want to use this as a
17 deposition, you can use it as a deposition, but I'm walking
18 out at 11:00, and I'm telling you where I'm leaning.
19     (Discussion off the record.)
20 Q. Dr. Gibbons, we talked about the issue with multiple
21 suicide attempts on consecutive days. Do you know how many
22 times that happened within your studies?
23 A. No, I don't.
24 Q. And you said that you adjusted for the multiple
25 attempts. Did you ever use the actual number of suicide

Page 50

1  attempts for any of these patients in any of your
2  calculations?
3  A. I'm not sure I understand your question.
4  Q. Well, if we agree that a person didn't actually attempt
5  suicide on five consecutive days --
6  A. Sir, you and I do not agree on --
7  Q. Okay, but if the person didn't attempt suicide on five
8  consecutive days, you did another analysis where you only
9  counted one suicide attempt no matter how many they had,
10 correct?
11 A. I did one analysis that used the medical claim record
12 that stated the number of suicide attempts that that patient
13 had made, and another sensitivity analysis that said, well,
14 what would happen if we simply say a person had made either
15 no suicide attempt or one or more suicide attempts, to see
16 whether or not the effect of multiple counting had any
17 effect on the inferences that are drawn from that analysis.
18 Q. But you never used the actual number of suicide
19 attempts per person, correct?
20 A. Sir, I don't know what the actual number of suicide
21 attempts are. I don't know if every other day was a real
22 suicide attempt and the middle days were not real or that
23 every single one of them. It's not beyond the realm of
24 possibility that in a few obscure cases, somebody made a
25 suicide attempt every day.

Page 51

1  Q. And you would agree that your results are completely
2  dependent on numbers of suicide attempts, correct?
3  A. I disagree with that. My results and my sensitivity
4  analysis clearly show that looking at the numbers of suicide
5  attempts versus the binary decision of whether or not a
6  person made a suicide attempt or not give a virtually
7  identical result. So in fact my conclusions are invariant
8  to the question of whether or not those multiple suicide
9  attempts are real or not.
10 Q. I just have a couple more questions, Dr. Gibbons. You
11 said you did your sensitivity analysis when you adjusted for
12 the person-time issue, correct?
13 A. I'm not following your question.
14 Q. We talked about the person-time issue where somebody
15 was on or off the drug, and you said you did a sensitivity
16 analysis to calculate that, correct, to look at that issue,
17 correct?
18 A. I did a person-time analysis, yes.
19 Q. When you did that analysis, you stopped when a person
20 had their first suicide, correct?
21 A. That's correct. That's the way that analysis works.
22 Q. They could have had more suicides after that, correct?
23 A. That is true.
24 Q. And when you did that for gabapentin, those results
25 were no longer significant, correct, statistically

Page 52

1  significant, correct?
2  A. I'm not following -- when I did that for gabapentin? I
3  did that for the overall cohort.
4  Q. You also did it for the gabapentin group as well,
5  didn't you?
6  A. Not to my knowledge. I don't know what you're
7  referring to.
8  Q. Okay, Dr. Gibbons, I'm holding in my hand the output
9  that you provided to us of your analysis, SuperMix? That's
10 what I think you used to do this, correct?
11 A. That's correct.
12      THE COURT: What's SuperMix?
13      THE WITNESS: SuperMix is a statistical software
14 package that does this kind of analysis.
15 Q. Okay. And on the last page you provided the results of
16 your SuperMix calculation, correct?
17 A. I'm not really sure what you're referring to, and that
18 doesn't seem -- that analysis does not ring a bell. The
19 analyses are -- I'm not sure what that -- I'm not sure what
20 that actually is.
21      The gabapentin, there weren't really enough
22 patients in the bipolar cohort to do a meaningful
23 person-time analysis for gabapentin alone.
24 Q. Do you see here, this is your printout, it says --
25      THE COURT: Sometimes if you fold it over.

Page 53

1  Everyone has that problem. It's good to get in practice for
2  next week.
3  Q. Do you see right here, it says "PHARMetrics AED data,
4  gabapentin only"?
5      MR. BARNES: May I have a copy of it? Again, I've
6  never seen this one before.
7      MR. ALTMAN: This I do have a copy of.
8      THE COURT: This is what's not going to happen
9  next week because everyone's going to show up with a pile of
10 documents in the morning, and we're going to go through in
11 the order, and if it's not in that pile, you don't get to
12 use it.
13     MR. BARNES: Can the witness look at the entire
14 document?
15     THE COURT: Sure. You can stand and look over his
16 shoulder. This is really informal. This is a Daubert
17 hearing, it's fine.
18     (Witness examining document.)
19 A. This appears to be one of the analyses that looked
20 at -- appears to be an analysis of looking at gabapentin by
21 itself, adjusting for concomitant medications, prior suicide
22 attempts. It looks to be like a logistic regression
23 analysis. This isn't something that I've described in my
24 report or relied upon in my opinion.
25     THE COURT: What does it show?

14 (Pages 50 to 53)

Page 54

1   THE WITNESS: What it shows is that the odds ratio
2   for gabapentin is consistent with what we saw for
3   antiepileptic drugs in general. It has an odds ratio of
4   .62, which is a reduction in the rate of suicide attempts
5   for gabapentin alone. It also shows that that result is not
6   statistically significant. The probability value is .158,
7   indicating that we can't reject a null hypothesis of no
8   difference, but the direction of the effect is consistent
9   with what we see for the overall composite.
10  Q.  Just to make sure that I understand it, in your paper
11  you described the overall analysis. You did the same
12  analysis for all the antiepileptic drugs, correct?
13  A.  Right. To do this kind of analysis and to rely upon
14  this analysis to make sure there us sufficient power, we
15  really needed to have the full mass of the sample, to have
16  all of the antiepileptic drugs. This appears to be an
17  analysis that I did looking at gabapentin in particular,
18  which was consistent with the overall effect but is
19  underpowered to find an effect.
20  Q.  But you claim it's consistent with the effect of the
21  overall antiepileptics, correct?
22  A.  Yes, I do.
23  Q.  Dr. Gibbons, I just want to end with one thing here.
24  In the end, if we take all of the statistics and we put it
25  all aside, you say this finding suggests a possible

Page 55

1   protective effect of antiepileptic treatment on suicidality,
2   correct?
3   A.  I said that where?
4       THE COURT: The second line down.
5   Q.  The second line of your paper.
6       THE COURT: That is what I was referring to
7   before. Look on the screen, it's your article.
8       (Witness examining document.)
9   A.  Yes.
10      MR. ALTMAN: Thank you, Dr. Gibbons. Your Honor,
11  may we have two minutes to, if he does a redirect, two
12  minutes to just close after he's done?
13      MR. BARNES: I have no redirect. Just maybe five
14  minutes for each side for summary close? Dr. Gibbons, you
15  may step down. Thank you very much.
16      (Witness excused.)
17      MR. BARNES: Your Honor, we have one issue
18  Mr. Cheffo would like to raise briefly, either now or before
19  the close.
20      MR. CHEFFO: Yes, I don't want to interrupt your
21  Honor now, but I would just like to just reserve five
22  minutes, if I could, your Honor.
23      THE COURT: Maybe. I'm assuming we'll have time.
24      MR. CHEFFO: Thank you.
25      MR. ALTMAN: Your Honor, I'll be extremely brief.

Page 56

1   I think after examining --
2       MR. FROMSON: We went first, your Honor, for
3   opening. Wouldn't defense go first?
4       THE COURT: Yes.
5       MR. BARNES: Thank you, your Honor. I won't be
6   long.
7       THE COURT: He just loves the limelight there. He
8   can't sit down.
9       (Discussion off the record.)
10      MR. BARNES: Your Honor, you've raised earlier, I
11  think on Tuesday, why are we here? We're here because the
12  plaintiffs have challenged a preeminent scientist and
13  statistician in the field of suicide and suicide
14  measurements. I want to go through briefly two things in
15  the record that you need to consider as to the gabapentin
16  cohort and why it's clearly admissible under Rule 702 and
17  the Daubert standards.
18      First, Slide 1. Your Honor, you asked
19  Dr. Greenland here -- could we have Slide 1, please. 3, I'm
20  sorry. Thank you. This is in response to your Honor's
21  question: "All right --" this is the Court -- "so you have
22  no problems with the methodology. You have a problem with
23  the way the conclusions are too strongly stated."
24  Dr. Greenland said to you "Yes."
25      "The Court: Subject to limitations, all right.

Page 57

1   Now, do you have a different feeling about the papers?"
2   This is the gabapentin study. "Do you think that the
3   methodology -- excuse me I said that wrong -- the
4   methodology of the expert reports is flawed?"
5       THE COURT: So the first question was about the
6   bipolar?
7       MR. BARNES: Yes, ma'am.
8       THE COURT: All right, I'm just making sure.
9       MR. BARNES: Yes. And then the second one
10  (Inaudible) to the gabapentin study in the papers.
11  Dr. Greenland flies all across the country after having
12  filed his report and tells the Court and counsel that the
13  methodology is basically similar between the two, so, again,
14  that's not the issue --
15      THE COURT: Wasn't it referring to the using the
16  PHARMetrics database before and after? It wasn't referring
17  to whether or not sensitivity analyses were done because he
18  criticized that.
19      MR. BARNES: No, he admitted that the sensitivity
20  analyses and the bipolar paper was adjusted for, but he said
21  not completely. But I think what's clear here is,
22  Dr. Greenland on cross-examination and in response to your
23  Honor admitted on several occasions that Dr. Gibbons'
24  PHARMetrics methodology and the methodology he described
25  here this morning was valid and reasonable and acceptable.

1  he put sugar in it, and it's got pie crust. The other
2  problem, though, is, he went into his spice cabinet. He's
3  got a bunch of spices that don't have labels. He doesn't
4  know what's in the pie. That's the problem. He's making
5  the conclusion that this is going to taste like pie.
6      THE COURT: How could I possibly exclude the
7  bipolar study?
8      MR. ALTMAN: Because he says it merely suggests a
9  possibility.
10     THE COURT: He's going to have to say that on the
11 stand, but how could I -- that it's possible that it's
12 protective, but it is not showing an increased risk.
13     MR. ALTMAN: It's not reliable if it suggests a
14 possibility, but I think he should also have to -- if your
15 Honor is going to let it in, I think he should also have to
16 put some of these limitations in.
17     THE COURT: Well, sure, you can cross on that.
18 I'm allowing in the bipolar study.
19     Now, let's get to the one I'm more concerned
20 about, which is the gabapentin.
21     MR. ALTMAN: Well, the gabapentin --
22     THE COURT: Listen, I thought that -- I never met
23 Professor Greenland. He was totally credible. He's such an
24 academic. He could be Hollywood cast for an academic, okay?
25 He's totally believable. He's a lovely man, but he hedged

Page 63

1  everything he said. So, I mean, if I can say this, that
2  Professor Gibbons is a far more polished witness. Now, he's
3  certainly got a bias. He's been paid for by Pfizer, so I
4  have some greater level of concern about the gabapentin
5  paper than I do the bipolar paper because it is generated
6  for litigation. And I've got serious concerns about the
7  issue of not measuring -- of assuming patient exposure
8  years.
9      So that is what I am thinking about, okay, not --
10 it sort of hasn't panned out, the whole issue of which
11 medications he called in for. He says he did. You said he
12 didn't. Maybe he missed Xanax, but he got Haldol. You
13 know, that goes to the weight of it, not its admissibility.
14     My only concern, let me just say as I'm sitting
15 through it all, that using that database is standard in the
16 industry; using the methodology of before and after on the
17 database is standard in the industry. The issue is -- you
18 know, I'm being rushed to do this within a week by both
19 sides. They put stuff forward late. You raised a Daubert
20 motion two weeks ago. This is not the way it ideally should
21 happen, but I'm dealing with the deck of cards I've been
22 handed, all right?
23     So my big concern is, based on my knowledge of
24 case and my knowledge of Neurontin and the entire record, is
25 whether or not measuring that sensitivity analysis that was

Page 64

1  required for the paper in the gabapentin study undermines
2  its reliability. That is my concern, so I can just tee it
3  right up. I need you to bring this home, not apple pies. I
4  want to understand: Did Mr. Greenland really say, if you
5  looked at the doctrine of completeness, that he agreed with
6  the full methodology of the gabapentin study?
7      MR. ALTMAN: No, I don't believe --
8      THE COURT: I would like to see a transcript of
9  that deposition before I make a ruling because my
10 instinct -- this is where I'm leaning towards -- is, when
11 you do the opening statements on Monday, you can refer to
12 the bipolar study if you do so with the limitations that
13 Dr. Gibbons himself put on it. It's possible protective,
14 possible. It's got to refer to the fact that this is a
15 different study from the FDA, but why he -- you have expert
16 testimony that makes you think that the FDA study isn't
17 reliable. And I don't want you mentioning, not mentioning
18 the gabapentin study until I get to see a full deposition
19 transcript because I've got huge concerns about not doing
20 the same thing for the both studies. Maybe he didn't have
21 time. I have serious problems with assuming that if you
22 have a prescription for 30 days, you had it for a year.
23     MR. BARNES: Your Honor, we have a half an hour.
24 We could have Dr. --
25     THE COURT: No, we're not. This is over. I am

Page 65

1  out of here. Now, I want to see the deposition transcript,
2  and then I'll make my final ruling.
3      MR. BARNES: I probably did not cover this issue
4  because it was covered in the hearing on the methodology.
5      THE COURT: I'm not reopening this transcript.
6  This is what I've got. It's over. I want to read the
7  deposition transcript. Right now it's a direct order. In
8  opening statements, I am finding that the defendants have
9  met their burden of reliability with respect to the bipolar
10 study. It's been admitted in a peer review. Both experts
11 agree the methodology is sound. Both experts agree that the
12 database is sound, and both experts agree that there were
13 appropriate sensitivity analyses, with the exception that
14 Professor Greenland said it would have been better if he had
15 looked at a direct correlation between when the person
16 committed suicide and the amount of time on the drug. He
17 says he did it. I can't resolve that right here, and that's
18 a ground for cross-examination.
19     You cannot mention the bigger study, if you will,
20 on the entire gabapentin cohort at this point because I have
21 not made a final ruling. And at this point I am profoundly
22 worried about the core assumption here, which is that if you
23 were prescribed it once, you were on it for a year. And I
24 want to see because I am worried about that last quote from
25 Dr. Greenland which basically looked as if he said he had no

## Page 66

1  problems with the methodology. I don't know whether that
2  was similarly hedged as it was on the trial or whether it
3  was a broader statement. I don't know why there was a
4  deposition done about it afterwards. I mean, that's not
5  great from my point of view because I didn't get a chance to
6  ask my own questions, but that's the way it is.
7      Now, let's move on.
8      MR. BARNES: Your Honor, I'm sorry, one other
9  point. The data itself -- it's in the data. There's no
10 problem in the data with regard to this 30-day issue and
11 after. All you have to do is look at the data. It's not
12 even an issue. If you count the attempts pre- --
13     THE COURT: I've asked him. I asked him three
14 times. He assumed that if you took it on day one and you
15 had a 30-day prescription, you were on it for the year,
16 right?
17     MR. BARNES: Yes, in the (Inaudible) of the study,
18 that is true. But the data don't lie. The data account for
19 this --
20     THE COURT: Excuse me. I've done the Daubert
21 study. You -- let me say this to Pfizer, okay? I
22 allowed -- the FDA study arose late in this game. I can't
23 imagine what it was like to be the lawyer to wake up that
24 morning when the FDA study came out. The whole dynamic of
25 this case changed. When the Food and Drug Administration

## Page 67

1  says something is associated with suicide, I take it
2  seriously. There was no way on earth once that happened
3  that this case did not change dramatically.
4      So then you got the fancy-shmanciest expert you
5  can, he's got all these awards, to respond to the FDA study.
6  Fair game, okay? No one's perfect, not even the FDA. But
7  then you came up with this brand-new study out of the blue,
8  okay. And then I said I'll let you do it just to respond to
9  the FDA. And then it kept changing. It kept changing. And
10 there were criticisms and people -- and there were huge
11 criticisms, and no one teed it up for me until two weeks
12 ago. I am doing the best that I can. What will happen in
13 future litigation, I don't know. Right now I have a concern
14 about the core methodology with respect to assuming that if
15 you took it once, you took it for the entire year.
16     At the end of the day, this may help Pfizer or
17 hurt Pfizer. You just can't know whether that assumption,
18 if done in person-hours, actually ends up being the same as
19 with the bipolar or ends up being differently. This is what
20 I've got, and it's stopping here. And I want to see the
21 deposition transcript, and then I'll make a ruling, but in
22 no circumstances should this be raised in the opening
23 statement with respect to the overall gabapentin study. It
24 may come up in some ways on cross if you raise certain
25 things, but I can't predict that now.

## Page 68

1  I am not going to allow you to subpoena someone
2  who was not on the witness list. I understand this creates
3  an awkwardness, which is you have to put in your case
4  through videotape depositions. Put on Franklin first if you
5  need a little firepower in the beginning. I don't have to
6  worry about your strategy. That's the way it is. You have
7  some of the most experienced lawyer in the country. You
8  know this.
9      MR. CHEFFO: I do, Judge.
10     THE COURT: You've known it for a long time. No
11 new witnesses. It's not so much the apex witness issue.
12 It's the issue that he wasn't on the witness list. And I
13 have to stop this case from hemorrhaging out of control,
14 okay? So as far as I'm concerned, unless something
15 genuinely new comes up, like some new witness comes up out
16 of the blue, you know, we're not going to do this.
17     Now, who is going to be the first set of witnesses
18 on the first -- don't forget, we'll impanel Monday
19 afternoon.
20     MR. FROMSON: Judge, in light of your ruling just
21 now, we'll speak with our team. We'll make our disclosure
22 within the 24-hour time period as ordered by the Court's
23 protocol.
24     THE COURT: But what you don't want to do is start
25 crying wolf with me --

## Page 69

1      MR. FROMSON: Oh, I'm not crying wolf. I think we
2  may --
3      THE COURT: In terms of like these motions, you
4  don't want me to be an eye roller, like, oh, gosh, you know?
5      MR. FROMSON: I have no other motions planned,
6  Judge.
7      THE COURT: Okay, no more like this, unless
8  there's genuinely discovered evidence. That does happen.
9  Life isn't perfect. Something that couldn't have been
10 contemplated before. So as I said --
11     Have you checked yet? Did we do a 2:00 o'clock
12 call-in? What time should these folks be here?
13     (Discussion off the record between the Court and
14 Clerk.)
15     THE COURT: So maybe if you came at 1:00 o'clock
16 on Monday because as, unfortunately, I mentioned to you
17 before, I'm going to be sitting with the First Circuit in
18 the morning. That's not unfortunate; it's just that the
19 timing didn't work so well. So we're bringing the jurors in
20 for 2:00. I'm going to do -- I haven't heard from you, so
21 that's good. I'm not asking for -- I'm going to use
22 something like a question that we talked about and then go
23 from there, ten jurors.
24     MR. CHEFFO: Maybe I should -- my silence was that
25 we agreed that if you use the question that we talked about,