EXHIBIT 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
----------------------------------------------------------x
                                          :
In re:  NEURONTIN MARKETING,              :
        SALES PRACTICES AND               :
        PRODUCTS LIABILITY LITIGATION     :
                                          :
----------------------------------------------------------x
                                          :
THIS DOCUMENT RELATES TO:                 :
                                          :
Bulger v. Pfizer Inc., 1:07-11426-PBS     :
                                          :
----------------------------------------------------------x
```

MDL Docket No.: 1629

Master File No.: 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

## PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE THE
## TESTIMONY AND EXHIBITS OF DEFENSE EXPERT DR. GIBBONS

Plaintiff RONALD J. BULGER, SR., as Administrator of the Estate of Susan Bulger, deceased, by and through his attorneys, The Lanier Law Firm, P.L.L.C. and Finkelstein & Partners, LLP, hereby moves this Court for an order precluding Defendants PFIZER INC. and WARNER-LAMBERT COMPANY LLC from proffering testimony and exhibits of Defendants' expert Robert D. Gibbons, Ph.D.

This Motion is supported by Plaintiff's Memorandum in Support, and the Declaration of Andrew G. Finkelstein, Esq. and the exhibits annexed thereto, submitted herewith.

Dated:  June 22, 2009

Respectfully submitted,

By:    /s/ W. Mark Lanier
       W. Mark Lanier, Esquire
       THE LANIER LAW FIRM, P.L.L.C.
       126 East 56th Street, 6th Floor
       New York, NY  10022

By:   **/s/ Andrew G. Finkelstein**

Andrew G. Finkelstein, Esquire
FINKELSTEIN & PARTNERS, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY 12551

*Attorneys for Plaintiff Ronald J. Bulger, Sr.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on June 22, 2009.

**/s/ Andrew G. Finkelstein**

Andrew G. Finkelstein, Esquire

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-------------------------------------------------------------x
                                               :    MDL Docket No.: 1629
In re:  NEURONTIN MARKETING,                   :
        SALES PRACTICES AND                    :    Master File No.: 04-10981
        PRODUCTS LIABILITY LITIGATION          :
                                               :    Judge Patti B. Saris
-------------------------------------------------------------x
                                               :    Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                      :
                                               :
Bulger v. Pfizer Inc., 1:07-11426-PBS          :
                                               :
-------------------------------------------------------------x
```

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE THE TESTIMONY AND EXHIBITS OF DEFENDANTS' EXPERT DR. GIBBONS

W. Mark Lanier, Esquire
THE LANIER LAW FIRM, P.L.L.C.
126 East 56th Street, 6th Floor
New York, NY  10022

Andrew G. Finkelstein, Esquire
FINKELSTEIN & PARTNERS, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551

*Attorneys for Plaintiff Ronald J. Bulger, Sr.*

## PRELIMINARY STATEMENT

Robert D. Gibbons, Ph.D., is a bio-statistical witness who was hired by Pfizer as a general causation defense expert several months after the ending date set by the scheduling order for defense experts to be identified. Dr. Gibbons was granted permission to appear out-of-time by Judge Patti B. Saris for the limited purpose of providing expert testimony of the FDA Safety Alert of January 31, 2008, in which the FDA announced that Neurontin and ten other anti-epileptic drugs had been determined in a meta-analysis of random controlled trials to double the rate of suicides and suicide attempts over placebo. Dr. Gibbons criticized the FDA's methods and conclusions, largely on his premise that the odds ratio for Neurontin was out of line with the odds ratio for two other of the eleven subject anti-epileptic drugs, lamotrigine and topiramate.

Subsequently, Dr. Gibbons went beyond far the scope of work that Judge Saris had limited him to opine upon in this litigation by performing two so-called pharmacoepidemiology studies which Defendants disclosed, without seeking leave of this Court, in November 2008, almost a year after Defendants' expert disclosure deadline. The first study, the "bipolar study," which Gibbons relied upon in his November 2008 report, was submitted for publication and rejected. The second study, or "gabapentin study," was a second supplemental expert report Dr. Gibbons disclosed in this litigation; it relied on his "bipolar" study. (Most of the citations in this study were to Dr. Gibbons and to papers he had previously written.) Both were derived from a patient claims database purchased from PharMetrics covering 131,178 gabapentin and 47,918 that were bipolar patients. The bipolar study supposedly compared suicide attempts among bipolar patients during one year before and one year after they first took any of the eleven anti-epileptic drugs. The gabapentin study supposedly compared suicide attempts patients among patients with any of several psychiatric or pain conditions during one year before and one year

1

after first taking Neurontin. Dr. Gibbons changed these reports repeatedly after his depositions were conducted and right up until May 7, 2009.

Dr. Gibbons's methods, heavily criticized by his peers in the past, do not have scientific reliability and are not based on sound data or analyses of data. Dr. Gibbons's methods are junk science masquerading as complex mathematical analyses that are not accepted methods for analyzing meta-analyses or for ecological pharmacoepidemiology studies.

## ARGUMENT

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The U.S. Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, made clear that district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable, and identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony:  (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community.  509 U.S. 579, 593-94 (1993).  The First Circuit has detailed three factors that must be fulfilled in order to succeed against a Rule 702 challenge:  (1) the expert must be qualified; (2) the expert's scientific testimony must be reliable; and (3) the testimony in question must "assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995).

## POINT I

## <u>DR. GIBBONS'S CRITICISM OF THE FDA IS FLAWED AND UNRELIABLE</u>

Plaintiff incorporates the Declarations of Dr. Sander Greenland, dated May 2, 2008, and July 22, 2008. *See* Declaration of Andrew G. Finkelstein, Exhibits. A and B, respectively. Dr. Greenland is the co-author of *Modern Epidemiology*, 2d Ed., Rothman and Greenland (1998). His work is the primary authority relied on by the Federal Judicial Center, *Reference Manual on Scientific Evidence*, Reference Guide on Epidemiology. Dr. Greenland's review of Dr. Gibbons's criticism of the FDA suicidality study of Neurontin found many scientific flaws and deceptive biases in Dr. Gibbons's studies.

In his criticism of the FDA, Dr. Gibbons made a severe epidemiological error in comparing suicide rates from differing populations. Dr. Gibbons made an equally severe error in calculating odds ratios by mixing results from placebo-controlled random trials and from non-placebo controlled trials, even though he was provided the correct numbers by defense counsel in a spreadsheet and told how to read the numbers in an email. Dr. Gibbons excluded lamotrigine and topiramate trials after seeing the outcomes and with no physiologic evidence that they act differently from the other drugs in the FDA safety alert. He erroneously chose to exclude them based on odds ratios different from 1 rather than on whether their odds ratios were significantly different from the other drugs' odds ratios, overlooking or ignoring that the FDA heterogeneity study found that their results do not differ significantly. He erred in reading the FDA primary analysis and erred mathematically in claiming that excluding zero event trials led to wider confidence intervals. Dr. Gibbons conflated two separate analyses regarding the zero-event trials. He disregarded that the confidence intervals for both lamotrigine and topiramate include the gabapentin risk difference. He ignored that gabapentin most closely resembles eight of the

eleven AEDs in that it falls on the risk side of suicidality.  Dr. Gibbons made severe errors in the power calculations of the FDA study while never acknowledging the low power of the gabapentin trials.  Dr. Gibbons draws an erroneous opinion, that the FDA study has serious flaws with respect to consistency, despite the fact that the odds ratios he cites are remarkably consistent and that every confidence interval overlaps every point estimate of every group.

The FDA study was based exclusively on placebo-controlled studies.  The study data was provided to the FDA by Pfizer as well as by the other manufacturers.  The safety alert stated on its face that the study was based on placebo-controlled trials, Finkelstein Decl., Ex. C, as did a published FDA slide show.  Finkelstein Decl., Ex. D.  The FDA published a Statistical Analysis on May 23, 2008, detailing the placebo studies and five different analyses of them.  Finkelstein Decl., Ex. E.

Dr. Gibbons never performed an analysis of the data used by the FDA in the meta-analysis.  Pfizer sent its studies of random controlled placebo trials to the FDA in 2006 and supplemented it in 2007, and also provided a statistical analysis of the odds ratios to the FDA in April 2008.  Counsel never provided any of those documents to Dr. Gibbons.  However, defense counsel did send him a spreadsheet with the correct number of placebo trial patients on it, Finkelstein Decl., Ex. F, (Gibbons Ex. 85), as well as an email telling him which patients on the spreadsheet were in non-placebo trials.  Instead of independently reviewing and analyzing the data, Dr. Gibbons simply parroted the calculations performed by the company.  As a result, when the company erroneously calculated odds ratios including single dose and non-placebo controlled studies, Dr. Gibbons replicated the same mistakes.  Both Dr. Gibbons and the company analyzed the data inappropriately by combining placebo, non-placebo, low dose, and single dose studies.  Finkelstein Decl., Ex. G at 331:24-332:15; 398:18-399:3; 679:1-4.  As a result, the FDA study

involved 2,903 Pfizer patients on drug and 2,029 on placebo with an odds ratio of 1.40, final ratio of 1.57.  Even Pfizer calculated the ratio at 1.37 when it presented briefing materials to the FDA in advance of the advisory committee meeting on July 10, 2009.  However, because Dr. Gibbons mis-added the patients in the groups, Dr. Gibbons calculated his odds ratio to be 1.033 and expressed the opinion that it was so close to the "null hypothesis" that it was impossible to attribute a risk of increased suicidality to Neurontin.  Dr. Gibbons achieved his deflated number by improperly including more than 2000 low dose, single dose, and non-placebo patients.  When apprised of his mistake, Dr. Gibbons testified that doing placebo controlled studies "would not be the appropriate analysis."  Finkelstein Decl., Ex. G at 404:7-405:20.  His opinion is that not only did the FDA get it wrong, Pfizer got it wrong, but he got it right — even knowing the FDA and Pfizer studies included only placebo-controlled trials.  "It would have been no use to me whatsoever for the purpose of what I was doing…"  Finkelstein Decl., Ex. G at 407:12-408:17.

When publication of the FDA statistical analysis proved just how badly he had erred, Dr. Gibbons simply changed his focus, now contending that the FDA studies were driven by the numbers of suicides and attempted suicides reported by two drugs in particular, lamotrigine and topiramate, that he stated should have been excluded because their numbers "drove the FDA result."  Dr. Gibbons offered no scientific explanation for excluding topiramate and lamotrigine from the group of eleven AEDs, instead claiming that their odds ratios were significantly different from 1.  However, he did not recognize that the FDA heterogeneity tests do not show any significant difference between those two drugs and Neurontin or the other eight.  Finkelstein Decl., Ex. E at Figure 2.  Those two drugs did indeed report higher numbers of events than Neurontin, but Dr. Gibbons refused to acknowledge that those two drugs also were approved for

psychiatric indications, as Neurontin was not, and therefore had far higher numbers of patients in placebo-controlled trials than Neurontin. He instead erred in several ways.

First, Dr. Gibbons based his opinion that Neurontin was improperly included in the suicide Alert by selectively picking which odds ratios were different from 1 rather than which, if any, were significantly different from the other odds ratios. This violates the accepted scientific approach of comparisons within meta-analyses, which is to compare each group to the mean of the groups rather than to the odds ratio of 1. (Rothman and Greenland, Chapter 32, 1998.) Even then Neurontin was unexceptional, so Dr. Gibbons proceeded to exclude topiramate and lamotrigine from the other nine drugs and thereby drove down the mean. There is no scientific authority for such cherry-picking.

Second, Dr. Gibbons intentionally misrepresented the FDA's results as if they were incidence rates of events per patient-year. The FDA found that the odds ratio of drug versus placebo in the eleven antiepileptics was .43/.22, or very nearly 2. Dr. Gibbons extrapolated those numbers as if they were incidence rates in an attempt to show that there should be 22 events for Neurontin when there were only 2. This calculation is completely invalid because it fails to take into account patient exposure and also wrongly assumes that all of the drugs reviewed have the same incidence rate of suicidality. Dr. Gibbons's analysis is even more far-fetched because he disregards the low power of the gabapentin random controlled trials. Whether such trials would yield any given number of suicide events in either the drug or treatment arm would depend upon whether there were enough patient years in the study to uncover the background risk in either treatment or placebo; Pfizer/Warner-Lambert only tested 58 bipolar patients for a few months whereas the minimum number of patients to detect a doubling of the risk would exceed 600 patients on drug for a year. As Dr. Greenland stated concerning the low power of the Neurontin

6

placebo trials: "Thus the total power of the gabapentin trials is much lower that that of the lamotrigine and topiramate trials ... It means that there is over a 90% chance that a doubling of risk by gabapentin would go undetected...."  Finkelstein Decl., Ex. B at p. 8, Item 6.

**POINT II**

**DR. GIBBONS'S GABAPENTIN AND BIPOLAR
PHARMACOEPIDEMIOLOGY STUDIES ARE NOT BASED ON ACCEPTED
METHODOLOGY AND DO NOT HAVE RELIABLE FOUNDATIONS**

The Declaration of Dr. Sander Greenland dated May 31, 2009, Finkelstein Decl., Ex. H is incorporated by reference as if fully set forth herein.  Dr. Gibbons's two pharmacoepidemiology studies purport to evaluate statistical changes in attempted suicides in (a) bipolar patients who begin to take AEDs, and (b) patients of various diagnoses who begin to take Neurontin.  Dr. Greenland observes, and in most instances Dr. Gibbons admits, that the data on which the studies are based do not have the ability to produce the information from which Dr. Gibbons forms his opinions.

Dr. Gibbons did not follow the guides established by the FDA Guidance for Industry Finkelstein Decl., Ex. J, or by the International Society for Pharmacoepidemiology (I.S.P.E.), Finkelstein Decl., Ex. K, to conduct a pharmacoepidemiology study.  He particularly omitted the need for a statistical plan, Finkelstein Decl., Ex. G at 303-305, the elimination of confounding factors of concomitant medications and concomitant medical conditions that could explain the presence or absence of suicide attempts on either side of the index, and the need to consider drug exposure.  *See* Finkelstein Decl., Ex. K, at I.S.P.E. Guideline 3 and 4.

A. **Failure to Account for Biases and Errors:**

Pharmacoepidemiology studies are much lower on the scale of scientific evidence than random controlled placebo trials and controlled low dose versus dose trials.  *See* FDA *Guidance*

7

*for Industry*, 2005, "Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment." Finkelstein Decl., Ex. J.  Among the scientific biases of such studies are that, unlike controlled patient trials, such studies do not record how much, if any, of a medication a patient took.  The studies also do not report when events actually take place but instead report only when hospital and medical workers record the claims for the events.  Given that in the antiepileptic trials the FDA required that the drug manufacturers include only reports of suicide events that took place within 24 hours of last taking the medicine, time lapses of as little as one day between when a patient attempted suicide or received a prescription and the date when the event was recorded in the hospital or doctor claim record wrecks the index date of such studies. It leads to classifying patients who attempted suicide before taking a drug when it should have been after, or to mis-classifying index dates of diagnosis.  Exactly such errors are known to exist in Dr. Gibbons's study, such as with patient 6416AAAAAACAZJAF, Finkelstein Decl., Ex. L.

The studies performed by Dr. Gibbons in this litigation represent only the second time he has worked with a PharMetrics database and his first time as a lead investigator.  (Dr. Gibbons's previous effort was not published.)  He is not an expert in the SAS statistical programming language, and he relied upon a biostatistician, Kwan Hur, to correctly implement complex statistical computations.  In assisting Dr. Gibbons, Dr. Hur admitted that he made programming mistakes.  This is a partial list of Dr.Gibbons's admitted deficiencies in the PharMetrics data:

> 1.    He could not, and make no attempt to determine and if any of the patients actually took the drug at any time, or what dose if a drug was taken.  Finkelstein Decl., Ex. G at 867:14-20, 1133:14-23.    This is fatal to the pharmacoepidemiology studies since his conclusion from the study purports to be that there is no evidence that people who ingested Neurontin commit suicide more frequently than those who do not.    It is fundamental in making such a determination to know if the subjects actually ingested the drug and how much. His only control data was whether a drug was *prescribed*, not taken.    It is impossible to tell whether any patient who attempted suicide in the year after the patient's first prescribed Neurontin ingested the drug at all.

8

2.      While he knows the dosage that each patient was prescribed, Dr. Gibbons chose to ignore this information.  Finkelstein Decl., Ex. G at 233:4-9, 1142:8-11.  The dose-response effect of Neurontin on suicidality is well known.  It was observed in the New Drug Application to the FDA in 1991 in the Summary of Adverse Events that as the amount of the dose changed, the number of psycho-biologic adverse events (such as violence, loss of control, depression, etc.) changed.  Finkelstein Decl., Ex M.  Accordingly, it is not possible to tell from the PharMetrics database or Dr. Gibbons's study whether any, all, or none of the attempted suicides recorded after a patient began to ingest Neurontin were related to the dose or whether patients who ingested Neurontin would have been statistically more likely to attempt suicide at dose levels that are commonly prescribed than patients who ingest low doses.

3.      He made errors in mis-classification of patients.   One such error miscounted over 10,000 major depressive disorder patients.  Finkelstein Decl., Ex. G at 757-761, 794.  He made the error because Dr. Hur mis-programmed patient ISD-9 code 311 so that none of the major depressive disorder patients would be counted as such.

4.      Dr. Gibbons used some invalid ICD-9 codes.   ICD-9 codes are the numbers given to patient conditions and diagnoses.  Some of the codes he used in the pharmacoepidemiology studies don't actually exist.  Finkelstein Decl., Ex. G at 804:17-807:11.  He made no effort to check to see how many invalid codes were assigned to patients.  Finkelstein Decl., Ex. G at 822:6-17.  This would result in mis-classifying patients by drug or by diagnosis and, of course, would alter all the risk ratios and confidence intervals of every patient in any group that had even one patient mis-classified.  Finkelstein Decl., Ex. G at 823:6-13.

5.      It was not possible to account for confounding by other drugs that might have caused suicide attempts or have led to improvements in the patient.  Finkelstein Decl., Ex. G at 468:12-471:5, 527:7-19.  This is true both before and after the index because drugs such as Xanax, pain medicines, and  typical antipsychotics were not included in the PharMetrics database, even though they are heavily prescribed for the psychiatric, pain, and other diagnoses that Dr. Gibbons studied.  It is as possible that every suicide attempt on either side of the index date could have been related to such other drugs as the possibility that the effects or absence of effects of Neurontin could have been detected.

6.      It also was not possible to account for confounding diagnoses or treatment.  Finkelstein Decl., Ex. G at 620:11-19.  Dr. Gibbons simply did not take into account whether the presence or absence of diagnoses or treatment not included in the database would explain the presence of suicide attempts before an index date or the absence or reduction of suicide attempts afterward.  Failure to account for alternative explanations is not reliable methodology.

7.     Dr. Gibbons did not control for consistency between or among the hospitals, doctors, or insurance companies that provided claims data.  Finkelstein Decl., Ex. G at 229: 5-11.  Events and diagnoses that one facility might code by ISD-9 300 or 200 numbers are commonly coded differently by practitioners for treatment and by insurance companies for billing and underwriting and, further, are not coded the same way between different facilities.

8.     Dr. Gibbons made no effort to determine any of the suicidal risk factor clinical presentations for any patient.  Finkelstein Decl., Ex. G at 233, 499, 620. An apples-apples comparison would require that the conditions that preceded suicide attempts before and after the index be the same to determine whether the presence or absence of Neurontin affected the patient.  However, Dr. Gibbons has no idea whether a single patient who attempted suicide before an index date had suicidal risk factors such as divorce, drug / alcohol overdose, job loss, or a traumatic lifetime event and had any similar risk factor afterward.  This, of course, ignores the most basic premise of medical trials, the regression toward the mean.  Patients who are acutely impaired to the extent of medical intervention improve by treatment and passage of time in the direction toward health norms. This regression must be accounted for to estimate whether a drug introduced after the index date had any or no effect on the patient.  Finkelstein Decl., Ex. 9 at 8. Moreover, to compare a patient with high experience risk factors not on drug to a patient with low risk factors on drug is not a comparison.

**B.     Dr. Gibbons's Report Is False and Misleading Regarding "Protective Effects."**

Dr. Gibbons's expert report on the gabapentin patients who attempted suicide before and a after the index date, states that "statistically significant protective effects of gabapentin were clearly demonstrated."  Finkelstein Decl., Ex. B  However, both in his bipolar academic paper and in his deposition he admits that this is not true.  He testified that one could not conclude from the pharmacoepidemiology study that protective effects were demonstrated:

So we can't conclude that, you know, gabapentin in this analysis -- the presence of gabapentin is significantly decreasing the risk of suicide attempts.  [Finkelstein Decl., Ex. G at 886:22-887:1.]

Dr. Gibbons attempted to salvage his misleading claim by contending that he was performing sensitivity analyses to strip down some of the over-counting of patient years and

over-counting of time-to-drug data that he got from PharMetrics.  However, he finally admitted that he was intentionally mis-using the word "protective."

> Q.   If another expert were to say Dr. Gibbons's paper proves that gabapentin is protective of suicide, would that expert be wrong?
>
> MS. McGRODER:  Object to form and foundation.
>
> BY THE WITNESS:
>
> A.   The expert -- *it depends on how the -- how this expert was using the word protective.  If they were using the word protective the way I would use the word protective, then I think that might be a misinterpretation.*  [Finkelstein Decl., Ex. G at 928: 13-24.]

It is evident that Dr. Gibbons simply leads people to misinterpret what he wrote -that gabapentin is protective when it is not.

This is beyond junk science — it is a false advertising tract for Neurontin buried in statistical cloaks and masquerading behind words given their opposite, not ordinary meanings. Dr. Gibbons wrote the report for the Court and jury, not for experts who might really understand what he was talking about.  Compare his words on the same subject in his academic paper:

> The natural course of psychiatric illnesses exhibits a decrease in S.A.s (suicide attempts) over time from diagnosis.  This can make it appear that the SA rate is higher prior to treatment initiation than after, giving the false appearance of a protective effect. [Finkelstein Decl., Ex. Q at 19.]

Dr. Gibbons did not mention this well-known phenomenon in his expert report.  He mentioned it in his paper because the peer reviewers of an earlier draft called him out:  Reviewer 4:  "In observational studies such as the present, it is very difficult to separate an effect of the drug from the effect of confounding factors."  Finkelstein Decl., Ex. N at 14.

There is no general scientific acceptance that Dr. Gibbons's method or stated conclusion is reliable.  The peer-reviewed, scientific community, including the community that criticized his bipolar paper in this case is summarized by Sondergard, *Anti-depressants/Mood Stabilizing*

11

*Treatment and Risk of Suicide; A Pharmacoepidemiological Study*, pages 45-46: "Additionally, it should be emphasized that in observational studies, such as the present, it is not possible to discriminate the effect of treatment from the effect of time itself on the rate of suicide." As Dr. Greenland noted, Dr. Gibbons responded to this criticism by ignoring it in his expert report: "It is remarkable that although Gibbons, *et al.*, revised their manuscript to remove the term "effect" in reference to antiepileptics (including gabapentin), Dr. Gibbons did not do so when presenting his Supplemental Expert Report of March 19, 2009, and continued to refer to inverse associations of gabapentin with suicide attempts as "protective effects." Finkelstein Decl., Ex. I at 10. Thus, Dr. Gibbons not only disregards the scientific community, he disregards his own work.

### C.    Patient Years/Apples and Oranges.

Dr. Gibbons's report states that he studied 131,178 patients for one year before they ingested gabapentin and the same number for one year after. His most glaring scientific flaw is that he compares "before" and "after", not "on-drug"/"off- drug". The one year "after" includes vast swaths of time in which the patients were not ingesting the drug either, but he counts the period as if it were a full year on drug regardless whether during that one year the patient took one pill, no pill, a 30 day prescription, or anything else:

> (by Altman)
> … The 1,016 person years, is that the person years of exposure *on* gabapentin?
>
> A.    That's the person years of exposure *after* the first initiation of gabapentin. So it's not the amount of exposure to gabapentin in terms of, you know, number of pills prescribed or anything. It's the number of person years *following* the initiation of gabapentin monotherapy. That person could have been on gabapentin or could have been prescribed gabapentin for one day or 30 days or continuously throughout that same period, and in this analysis that would be treated all equally.  [Finkelstein Decl., Ex. G at 509:4-16.]

The obvious result is to grossly distort the risk percentages and to mislead the readers as to the true nature of the exposure. More correctly, Dr. Gibbons should have referred to the time period after the initiation of the drug to be patient years of observation as opposed to exposure. Patients who did not take the drug for 365 days and attempted suicide are compared to the same number of patients who might have taken the drug for as little as one day and did not attempt suicide. Not surprisingly, the percentages of attempted suicides between the two groups went down in the group that had vastly less than a full year of comparable exposure. As Dr. Greenland notes, Dr. Gibbons not only failed to account for the biases set out above, he "introduces bias in the statistics... and adds considerable uncertainty to the results." Finkelstein Decl., Ex. I at pp. 11-12. This "adds truly unexposed person-days to the 'gabapentin exposed-group.'" *Id.* at 12. It also inflates the number of so-called exposed person-days and is an outright error. This flaw applies to both his expert report and to his paper and is a flaw in methodology.

To summarize, Dr. Gibbons's reports violate precepts of scientific neutrality and are scientifically unreliable. Dr. Greenland refers to them as advocacy tracts for Neurontin. More bluntly, "no statistically or scientifically reliable inference or conclusion about the effects of gabapentin can be drawn from" Dr.Gibbons's pharmacoepidemiology studies. Finkelstein Decl., Ex. I at p. 19. In short, they are nothing more than a sham.

## POINT III

### DR. GIBBONS'S PROPOSED TESTIMONY AND EXHIBITS SHOULD BE PRECLUDED

The Federal Judicial Center Reference Manual on Scientific Evidence recognizes that:

[a] particular study may use a method that is entirely appropriate, but (is) so poorly executed that it should be inadmissible under Federal Rules of Evidence 403 and 702. Or, the method may be inappropriate for the problem at hand and

thus lacks the "fit" spoken of in *Daubert*. Or, the study may rest on data of the type not reasonably relied on by statisticians or substantive experts, and hence run afoul of Federal Rule of Evidence 703.  [Reference Manual on Scientific Evidence at 86.]

Dr. Gibbons's disregard for some confounding factors, his creation of others, his intentionally unequal patient years, and the failure to read any clinical patient data in his pharmacoepidemiology studies makes them inherently unreliable and inadmissable.  *See In re Zyprexa Prods. Liab. Litig.*, 254 F.R.D. 50, 52 (E.D.N.Y. 2008), quoting from Brian L. Strom, *Pharmacoepidemiology* (4th ed. 2005):  "[A]n approach to handling confounding by factors not recorded in encounter data is to perform medical record review within the cases to assess the relationship between the confounding factor and the exposure of interest."  His failure to rule out other explanations, including the presence or absence of other medical conditions and other medicines, or the passage of time, make his opinions pure speculation.

In *Santos v. Chrysler Corp.*, 430 Mass. 198, 206 715 N.E.2d 47 (Mass. 1999), the Supreme Court of Massachusetts excluded a statistical expert's opinion:

> From the FARS database, the expert could not tell whether the circumstances of the accidents reported matched the circumstances of the plaintiff's accident.  The FARS data did not contain any direct information on the use of brakes before or during the accidents, on any loss of control or skidding, or on the contribution of rear wheel lockup.  The expert tried to isolate a comparable subset of data by making her own inferences regarding which accidents involved braking, skidding or rear wheel lockup.

This, too, is Dr. Gibbons's problem with the PharMetrics database:  he cannot even tell if a patient was on or off the medicine, or for how long, or how much, much less whether other lifetime or medical conditions may have led to the suicide attempts.  As the Court went on to hold:  "The judge excluded the expert's testimony because it was based on speculation, was not relevant, and because the danger of the jurors being misled exceeded the probative value of the expert's opinion.  We conclude that there was no abuse of discretion."  *Id.* at 205.

Lack of similarity between his test comparators, such as the length of exposure on-drug compared to the length of exposure off-drug, and his admitted failure to account for unexplained alternative causes of suicides between the "before" group and the "after" group mean there is no reliable link between Dr. Gibbons's data and the facts in litigation. *See Phillips v American Honda Motor Co.*, 238 Fed. Appx. 537, 540 (11th Cir. 2007).

There must be sufficient facts or data for a witness to extrapolate the desired information from them. Dr. Gibbon's PharMetrics database is insufficient to support his conclusions. *See General Electric Co. v. Joiner*, 522 U.S. 136 (1997), in which the U.S. Supreme Court found that certain studies did not account for confounding factors such as exposure to other carcinogens and absence of exposure to the PCB's in question. Those are the same confounding failures in Dr. Gibbons's studies, *viz.*, ignoring the presence of other drugs that can cause suicidality, ignoring other medical conditions and clinical conditions that can cause suicidality, not having data on doses or even if the patients actually took Neurontin, and using vastly dissimilar and unreliable patient-time exposure comparisons. These are not "sufficient facts or data," within Fed. R. Evid. 702. *See Rudd v. General Motors Corp.*, 127 F. Supp. 2d 1330, 1339 (M.D. Ala 2001); *Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F. Supp. 2d 1283, 1285-86 (M.D. Ala. 2001).

Dr. Gibbons has been heavily criticized by his peers for cherry-picking data to support his client and for ignoring other data that undermined his thesis. *See, e.g.*, Jureidini, *Black Box Warnings: Decreased Prescriptions and Increased Youth Suicide*, in which Dr. Jureidini took Dr. Gibbons to task for publishing data tables to show suicides increasing in children as SSRI prescriptions declined, but ignoring that the current statistics were the opposite — suicides down, SSRI's up. Leckman and King, *A Developmental Perspective on the Controversy Surrounding the Use of SSRI's to Treat Pediatric Depression*, reach the same result with Dr. Gibbons. Their

15

criticisms arose after Wyeth hired Dr. Gibbons to write supposedly scholarly articles in support of his being an expert witness in *Giles v. Wyeth*, an SSRI suicide case. It is his *modus* to concoct statistical articles for publication that coincidentally contradict the FDA and medical journal articles to support his client's economic position, mimicking Pfizer/Warner-Lambert's own method of placing medical journal articles to multiply the Neurontin message in the marketplace. That was one of the practices that led to the criminal charges to which they pleaded guilty.

Dr. Gibbons's cherry-picking of selective data is not acceptable in the scientific community. *See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005):

> A factor that courts have considered in *Daubert* analyses is whether an expert has accounted adequately for obvious alternative explanations. This is appropriate because any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect. By the same token, if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable. Accordingly, courts have excluded expert testimony "where the expert selectively chose his support from the scientific landscape."[1]

Dr. Gibbons's gabapentin studies are solely litigation-driven and paid for by Pfizer. Pfizer even paid directly for work he and Dr. Hur did on the allegedly scientific bipolar publication in this case, without reporting to the journal or to the IOM that he had been paid almost a half-million dollars for the job. Finkelstein Decl., Ex. G at 979-979, 998:3-999:11; 1009: 21-1010: 23. As recognized by the Court in *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 597 (9th Cir. 1996):

> We have noted that the *Daubert* inquiry is flexible and have provided additional guidance. "One very significant fact" is whether the expert has "developed [his] opinions expressly for purposes of testifying," since "a scientist's normal

---

[1] Citing in footnote 164 to *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1039 (N.D. Cal. 1999); *accord Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594 (9th Cir. 1996) (affirming district's court's exclusion of evidence on grounds, among others, that the expert had " 'pick [ed] and chos[en]' from the scientific landscape"); *see also Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1086-87 (D. Kan. 2002) ( "selective reliance ... 'is not generally accepted practice'.... [O]btaining information from sources that support, refute or are neutral regarding the hypothesis is appropriate to minimize the likelihood of a false conclusion"), *aff'd*, 356 F.3d 1326 (10th Cir. 2004).

workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert,* 43 F.3d at 1317.  ....Although Done published the 1984 article prior to this litigation, he was at that time already a professional plaintiff's witness.  It is not unreasonable to presume that Done's opinion on Clomid was influenced by a litigation-driven financial incentive.

Done could have convinced the district court that his methodology was nevertheless scientific if he had explained how he went about reaching his conclusions and had pointed to an objective source demonstrating that his method and premises were generally accepted by or espoused by a recognized minority of teratologists.  But he failed to do so.

Dr. Gibbons's model for his studies were the articles he wrote criticizing the FDA for ordering black box suicide warnings on SSRI's when he served as an expert witness for Wyeth in *Giles v Wyeth*.  In the instant case, Dr. Gibbons not only cites himself as his authority, he also copies himself as his authority.  Large sections of his July 2008 supplemental expert report in this case were copied into his bipolar paper that he has submitted for publication, without informing the journal involved either that his source was himself or that Pfizer paid him for a substantial amount of the time he spent as an expert witness in working on the "scholarly" paper.

Similarly, in *Soldo v Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 527-528 (W.D. Pa. 2003), the Court noted:

When an expert's testimony "relies in part on his own *ipse dixit,* rather than on something more readily verifiable ... it is open to attack." *In re TMI Litig.,* 193 F.3d at 687. "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." *Id.* (*quoting Daubert II,* 43 F.3d at 1315-16).  Expert opinions generated as the result of litigation have less credibility than opinions generated as the result of academic research or other forms of "pure" research. *E.g., Daubert,* 509 U.S. at 593, 113 S. Ct. 2786 (one factor to consider is whether opinion was generated to further litigation or was subject to peer review); *Wade-Greaux,* 874 F. Supp. at 1465, 1476 (witness educated as a pediatrician, pharmacologist, and toxicologist unqualified to testify regarding the cause of birth defects because he had merely reviewed, for purposes of litigation, selected literature on that subject); *see also National Bank of Commerce v. Dow Chem. Co.,* 965 F. Supp. 1490, 1516 (E.D. Ark. 1996) ("[T]he expert's motivation for his/her study and research is important.... [W]e may not ignore the fact that a scientist's normal work place is the lab or field, not the courtroom or the lawyer's office.") ( *quoting Daubert* ) (internal quotations omitted).

17

Dr. Gibbons is never at a loss to offer some theory why his subsets validate his theory, but he never gets to the underlying deficiency of data. His opinions require a leap of faith that bridge a factual gap, borne by speculation. To say a jury would be confused is a cautious understatement.

Moreover, Dr. Gibbons's particular methods, as set out above, do not have general acceptance in the scientific community. Confusing incidence or background rates of diseases with risk ratios of drugs, disregarding certain drugs within groups to alter statistical risk ratios for others within the group — those are prohibited methods, not accepted methods. Among the gatekeeping tests under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 594-95, are those of the scientific acceptance and error rates. While Dr. Gibbons cites himself as the authority for his brand of ecological studies, he does not overcome the scientific requirement to use the same patient-time periods in his comparator groups or to reduce or eliminate confounding factors. For example, while writing that there are clear protective effects in the patients who (he thinks) took gabapentin, he has up to an 80% overlap in patient confounding conditions, such as pain patients who also are bipolar. It is impossible to tell whether any reduced suicidality was from one group, the other group, or only in a group with the overlapping diagnoses. His opinion assumes that there is a protective effect without accounting for other variables and then proceeds to concede that "whether this protective effect is based on reducing the symptoms of the psychiatric disorder or by treating the concomitant pain disorder... remains an open question." The error rate, then, is upward of 100 % — Dr. Gibbons does not know if there is a protective effect and, if there is, to whom it applies. This is only one example.

The court in *In Re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 644 (D.N.J. 2008) noted:

The second prong of admissibility under Rule 702 requires a determination of the reliability, or inquiry into the underlying substance, of the opinion. Expert testimony is "admissible so long as the process or technique used in formulating the opinion is reliable," and the principles and methods employed by the expert are applied reliably to the facts of the case. *Id.* at 247 (citing *Paoli*, 35 F.3d at 742); Fed. R. Evid. 702 advisory committee's note. An "expert's opinions must be based on the methods and procedures of science, rather than on subjective belief or unsupported speculation." *Paoli*, 35 F.3d at 742 (citations and internal quotations omitted). Thus, "the expert must have 'good grounds' for his or her belief." *Id.* (quoting *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786). These good grounds must support each step of the analysis and " *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* at 745." *Id.* at 656.

Dr. Gibbons skipped steps — confounding factors, using the same patient-time measurements for each side of his index date or event, and misrepresenting the word "protective" — that would be essential if his study was to produce reliable information.

## <u>CONCLUSION</u>

Plaintiff objects to Dr. Gibbons's testimony, report, tables, and exhibits. His underlying data is insufficient to produce reliable foundations to determine whether there is any increase, decrease or other change in suicide attempts among patients in his bipolar study who were prescribed antiepileptics or among patients in his gapapentin study who have the conditions he selected. His analysis of that data was litigation- and outcome-driven, not driven by the scientific methods acceptable to bio-statistical research. His criticisms of the FDA meta-analysis are not based on application of sound statistical methods. As a result, his opinions are not reliable, his methods are not reliable, and his conclusions are speculative. His testimony is not

relevant and will only serve to confuse the jury.  Dr. Gibbons's testimony should be precluded in its entirety.

Dated:  June 22, 2009                                        Respectfully submitted,


                                        By:    **/s/ W. Mark Lanier**
                                               W. Mark Lanier, Esquire
                                               THE LANIER LAW FIRM, P.L.L.C.
                                               126 East 56th Street, 6th Floor
                                               New York, NY  10022


                                        By:    **/s/ Andrew G. Finkelstein**
                                               Andrew G. Finkelstein, Esquire
                                               FINKELSTEIN & PARTNERS, LLP
                                               1279 Route 300, P.O. Box 1111
                                               Newburgh, NY  12551

                                               *Attorneys for Plaintiff Ronald J. Bulger, Sr.*


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on June 22, 2009.


                                               **/s/ Andrew G. Finkelstein**
                                               Andrew G. Finkelstein, Esquire