# EXHIBIT 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------x
                                                                :    MDL Docket No. 1629
In re:   NEURONTIN MARKETING,                                   :
         SALES PRACTICES AND                                    :    Master File No. 04-10981
         PRODUCTS LIABILITY LITIGATION                          :
                                                                :    Judge Patti B. Saris
----------------------------------------------------------------x
                                                                :    Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                                       :
                                                                :
*Bulger v. Pfizer Inc.*, 1:07-cv-11425-PBS                      :
                                                                :
----------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF PRODUCTS LIABILITY PLAINTIFFS'
EMERGENCY MOTION TO STRIKE THE NEW MARCH 2009
EXPERT REPORT AND BIPOLAR STUDY OF ROBERT GIBBONS, PH.D.,
AND FOR RECONSIDERATION OF JUDGE SARIS'S NOVEMBER 2008
DECISION TO ALLOW DR. GIBBONS'S STUDY AND ARTICLE AT TRIAL**

Product Liability Plaintiffs ("Plaintiffs") move this Court for an Order: (1) to reconsider Judge Saris's November 25, 2008 decision to permit Defendants to use the November 5, 2008 supplemental expert report of Robert Gibbons, Ph.D., due to Gibbons's extraordinary withholding of documents and evidence from discovery and obstruction of the discovery process; and (2) to strike Gibbons's untimely new March 19, 2009 supplemental expert report and new bipolar epidemiology study, which were not authorized by this Court, pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure. Movants will demonstrate that Defendants' rebuttal expert Gibbons has engaged in persistent and prejudicial misconduct by extraordinary withholding of documents and evidence from discovery and obstruction of discovery. The misconduct continues to this day and includes withholding of discovery in regard to Gibbons's new supplemental report which was first disclosed to Plaintiffs on March 19, 2009, and his new bipolar epidemiology study that was performed in March 2009 but not disclosed until May 7,

1

2009. Further, this motion is not in lieu of, but in addition to, a Motion in Limine to strike Gibbons as an expert which Plaintiffs intend to file at the appropriate time pursuant to Rule 702 et. seq., of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and its progeny.

This motion has been filed simultaneously with a motion to strike Dr. Gibbons entirely and should only be considered if this Court does not grant that motion.

## BACKGROUND

Plaintiffs are moving by emergency motion because a trial in this case is scheduled to begin on July 27, 2009, and the issues in contention will have a direct bearing on the parties preparation for trial. Defendants' rebuttal witness Dr. Gibbons submitted a supplemental expert report dated November 5, 2008, containing the results of two litigation driven pharmacoepidemiologic studies. The only reason that expert disclosure of Defendants' rebuttal expert Gibbons is still proceeding in this litigation at this late date is that on November 14, 2008, Plaintiffs sought to preclude Gibbons's opinions as being beyond the FDA Alert on Anticonvulsants. At that time, Plaintiffs sought from Pfizer Defendants, "production related to all data Dr. Gibbons reviewed and relied upon in reaching his opinions, as well as all underlying data to which Dr. Gibbons had access but may have ignored." *See* ECF Doc. # 1490, Pls.' Mem. in Supp. The Court had previously limited Gibbons's opinions to the FDA Alert on Anticonvulsants about which the Court is very well familiar. Thereafter, on November 25, 2008, this Court recognized the impropriety of Pfizer Defendants' disclosure of Gibbons's supplemental expert report, Declaration of Andrew G. Finkelstein, Ex. 1, and that it related to his Study and Article when the Court described the disclosure as "**untimely and beyond the scope of this Court's order**" (emphasis added) (Electronic Order, Nov. 25, 2008). Nevertheless, the

2

Court provided Pfizer Defendants with a means towards introducing the Study and Article at trial, and the Court also ordered that Plaintiffs be granted discovery on Gibbons's new rebuttal report without setting a scheduling order for its completion. *Id.* This Court did not permit Defendants' rebuttal expert Gibbons to submit any further rebuttal reports or studies.

Plaintiffs are requesting that Judge Saris reconsider her decision to allow Dr. Gibbons's November 2008 expert report and related article to be introduced by Defendants at trial because of Gibbons's egregious actions to withhold documents and evidence from disclosure and obstruct the discovery permitted by the orders of this Court. Moreover, Plaintiffs request that this Court also consider in its determination the fact that the article, in addition to Defendants' withholding of discovery in relation to the article, were rejected by a peer reviewed journal for substantive reasons. Finkelstein Decl., Ex. 2. Defendants procured an agreement under false pretenses from Plaintiffs' counsel that they would not to question Gibbons concerning the letter from the Archives regarding his submission of the manuscript. Once Plaintiffs learned that the letter was a rejection letter (not a revise and resubmit letter as characterized by defense counsel), Defendants obstructed Plaintiffs from questioning Gibbons regarding the letter and reasons provided by the peer-review panel for the rejection of Gibbons's letter.[1]

Defense counsel did not disclose Dr. Gibbons's first pharmacoepidemiology reports until November 2008, almost one year after the December 2007 deadline for expert disclosure under Discovery Order 13. ECF Doc. # 801. At the time of Defendants' disclosure, Plaintiffs immediately requested all missing data, computer programs, tests, and supporting records that had not been disclosed with the report. Finkelstein Decl., Ex. 3. On November 26, 2008,

---

[1] A subsequent manuscript was accepted by the Archives and produced to Plaintiffs on May 7, 2009. Plaintiffs have not had the opportunity to question Dr. Gibbons concerning the new manuscript.

3

defense counsel disclosed some of the underlying technical data, which led Plaintiffs to believe that all had been disclosed. Finkelstein Decl., Ex. 4.

During Dr. Gibbons's deposition in February 2009, he admitted to not disclosing: (1) all of the SAS computer program that he had written to do the pharmacoepidemiology studies, (Finkelstein Decl., Ex. 5 at 544:4-16); (2) any of the FORTRAN computer program he wrote to check his reports (Finkelstein Decl., Ex. 5 at 691:5-15, Ex. 6, and Ex. 7); (3) most of the statistical sensitivity tests he said that he had done (Finkelstein Decl., Ex. 5 at 509:17-510:21); and (4) other items such as his bills (Finkelstein Decl., Ex. 5 at 258-259; 440:7-13). Defense counsel abruptly terminated the deposition of February 4, 2009, when Plaintiffs' counsel asked Gibbons why he signed a judicial declaration to Magistrate Judge Sorokin that he had provided everything to Plaintiffs per the November 12 letter when in truth he had not provided his Fortran programs or missing CMED files, as well as other items:

> MS. McGRODER: Okay. The deposition is over. We are out. You want more time. We are not going to do this. We are not going to pull this game. We are not doing this.
>
> MR. LONDON: You are the one pulling the game.
>
> MR. ALTMAN: I'm asking him whether -- it says I have produced all materials requested by plaintiffs in their letter of November 12, 2008.
>
> MS. McGRODER: Do not answer any more questions. We are finished for today. [Finkelstein Decl., Ex. 5 at 692:1-10.]

That session ultimately continued, but as Dr. Gibbons admitted:

> A: …I know I have not given the raw data files and all of the SAS files, and I understand that there may be a SAS file or two that maybe didn't make it into it, and I apologize for that. [Finkelstein Decl., Ex. 5 at 699:4-7.]

After the February 2009 deposition, Dr. Gibbons proceeded to **alter the statistical tables of his November 2008 report**. On February 10, 2009, defense counsel wrote, five days *after* the

4

first deposition session, listing the data, programs, tests, measurements, and related items that had not been disclosed. Finkelstein Decl., Ex. 6. Among these items are the FORTRAN programs necessary to duplicate, or attempt to duplicate, Gibbons's numbers, some of the SAS program files that had been omitted, and ASCII output files containing the data read by the FORTRAN programs. *Id.* Six days later, on February 16, 2009, defense counsel transmitted via e-mail to Plaintiffs' counsel the two tables of data contained in his report. Finkelstein Decl., Ex. 7. Plaintiffs' wasted time and effort in attempts to duplicate his work, an impossible task as most of his sensitivity tests and all the FORTRAN programs that had been withheld. Finkelstein Decl., Ex. 5 at 531-532, 691-692.

Plaintiffs attempted to complete Dr. Gibbons's deposition on March 5, 2009, but learned that Gibbons had done other statistical work that, at that point, had not been disclosed. Gibbons had disclosed a "Supermix" statistical analysis related to his November 2008 report and bipolar study. Finkelstein Decl., Ex. 8. However, it was learned at the deposition that he failed to disclose along with it the SAS output files that were necessary to review it: spreadsheets of numbers and data, PowerPoint presentations, and related items. Finkelstein Decl., Ex. 5 at 857:4-16. Those items should have been disclosed at the time the November 5 report was disclosed. It was an expensive and time consuming ordeal to attempt to depose Gibbons in February:

> Q. ... There are - there's an AED 1, 2, and 3 dot dat, an AED 1 inp dot dat, and an AED 1 dot out for each one of these. There are no SAS programs. And so what I would like to know is how were these AED 1 dot dat files -- these three data files created? What created them?
>
> A. Those are created by a -- you know, those were created by some SAS file that apparently is not included in there.
>
> Q. Where would that SAS file be?

5

   A. I'm sure that we would have that around some place. [Finkelstein Decl., Ex. 5 at 857:4-16.]

On **March 19, 2009**, Dr. Gibbons submitted an **entirely new "supplemental report."** Finkelstein Decl., Ex. 8. The new report changed the two data tables of his first report, then added six entirely new data tables, none of which were captioned or explained in the report in such a way as to make reproduction or testing of them possible without questioning Gibbons. Finkelstein Decl., Ex. 9. An example of the obscurity of the new disclosures can be gleaned from looking at an example of the changes:

Old Table 2 (November 5) *Suicide Attempt Rate per 1,000 Person Years Before and After Treatment of Gabapentin by Diagnosis*

New Table 2 (March 19) *Suicide Attempt Rate per 1,000 Person Years Before and After Treatment of Gabapentin by Diagnosis **Poisson Regression Model with Time - Variant (post-treatment) Concomitant Medication***

New Table 2B (March 19) *Suicide Attempt Rate per 1,000 Person Years Before and After Treatment of Gabapentin by Diagnosis **Poisson Regression Model with Time - Variant Concomitant Medication and 30 or More Days Supply***

  The above is only one example of the radical changes in the new March 19 2009 report. Not only did the new tables change the data in the old tables, they also changed the entire focus of Dr. Gibbons's pharmacoepidemiology study. The Court should bear in mind that all of these disclosures came after both defense counsel, in a letter to Plaintiffs dated November 26, 2008, Finkelstein Decl., Ex. 4, and Gibbons himself, in the sworn declaration to Judge Sorokin signed January 21, 2009, ECF Doc. # 1624, represented to Plaintiffs that they had already disclosed everything. Indeed, Plaintiffs have been blind-sided.

  Yet, there is more. After the disclosure of the new March 19, 2009 report, Plaintiffs sought discovery of a letter that the *Archives of General Psychiatry* had sent to Dr. Gibbons which he had falsely represented was an invitation to revise and resubmit his paper. Finkelstein

6

Decl., Ex. 5 at 837. Plaintiffs also sought the correspondence between Gibbons and PharMetrics to learn what he had chosen to include (and not include) in the database. Defense counsel refused. The parties conferred.

Dr. Gibbons was unavailable to be deposed about his new March 19 report until April 27, 2009, by which time the Court had set this Track One case for trial. On April 23, 2009, one business day before that deposition session, defense counsel disclosed almost 1000 pages of material that Gibbons had led Plaintiffs to believe did not exist! Finkelstein Decl., Ex. 10. Defense counsel then ordered Gibbons not to answer questions about the documents at the deposition session of April 27, 2009. Finkelstein Decl., Ex. 5 at 1099:8-1102:7. The defense also refused to let Gibbons answer any questions about an undisclosed bipolar epidemiology manuscript that he had written to replace the flawed manuscript on which he relied for his November 2008 report. Finkelstein Decl., Ex. 5 at 1099:8-1102:7.

Next, on May 7, 2009, defense counsel submitted yet another new epidemiology report on bipolar patients. Finkelstein Decl., Ex. 11. The correspondence accompanying the disclosures, Finkelstein Decl., Ex. 12, proved that Dr. Gibbons had completed the study before the date of his March 19, 2009 supplemental report. Defense counsel had that document in their possession during Gibbons's April 27, 2009 deposition but, as stated above, did not disclose it and ordered Gibbons to not answer questions about it. Finkelstein Decl., Ex. 5 at 1099:8-1102:7. Below is a summary of Defendants' delinquent disclosures:

    **A.**    <u>**Items Withheld/Undisclosed: Until After disclosure of the November 5, 2008 Supplemental Expert Report:**</u>

1. PharMetrics database of gabapentin and bipolar patient cohorts; withheld since May, 2008
2. SAS program files used to analyze the Pharmetrics Database; withheld since August 2008
3. Dr. Gibbons's bipolar cohort manuscript; withheld since September 2008

B.  **Items Withheld Until after Deposition Session of February 3-4, 2009:**

1. FORTRAN programs Dr. Gibbons wrote to check Dr. Hur's SAS programs
2. ASCII files containing the data read by the FORTRAN programs
3. CMed program file, the absence of which prevented Plaintiffs from fully reviewing Dr. Gibbons's report
4. Original SAS output files for the gabapentin and bipolar cohorts
5. Data files, descriptions, and output files for changed analysis of primary analyses requiring minimum of 30 day supply of medication (gabapentin cohort)
6. Data files, descriptions, and output files for changed sensitivity analyses to one suicide attempt per person (gabapentin cohort)
7. Data files, descriptions, and output files for a new sensitivity analysis eliminating all suicide attempt events occurring on index date (gabapentin cohort)
8. Data files, descriptions, and output files for a changed analysis of the primary analyses requiring minimum of 30 day supply of medication (bipolar cohort)
9. Data files, descriptions, and output files of a new sensitivity analysis limiting analyses to one suicide attempt per person (bipolar cohort)
10. Data files, descriptions, and output files of a new sensitivity analysis eliminating all suicide attempt events occurring on index data (bipolar cohort)
11. Data files, descriptions, and output files of a new monotherapy definition (bipolar cohort)

It should also be noted that it was not until the second day of that same session that defense counsel disclosed two items that should have been disclosed before the deposition, the absence of which altered the deposition procedure:

12. Spreadsheets of study level data
13. Dr. Gibbons's bills

C.  **Items Withheld Until After Deposition Session of March 5, 2009:**

1. Data files, descriptions, and output files for underlying data files used to create the monthly datasets for the SuperMix sensitivity analyses
2. Data files, descriptions, and output files for person time logistic regression analysis using SuperMix program (bipolar cohort)
3. Revised November 5, 2008 report tables 1 and 2 after correcting the ICD-9 code 311 for MDD

D.  **Items Withheld Until after Disclosure of Dr. Gibbons's March 19, 2009 Supplemental Report:**

8

1. On April 23, 2009, counsel disclosed the February 2, 2009 letter to Dr. Gibbons rejecting publication of his bipolar epidemiology study
2. On April 23, 2009, counsel disclosed 1000 pages of emails, documents, and records, many of them substantive, that Dr. Gibbons had led Plaintiffs to believe he did not keep
3. On May 7, 2009, counsel disclosed a new bipolar epidemiology study of over 40,000 patients from the years 2000-2002. This study was completed in March 2009 and withheld during the April 27, 2009 deposition.

Dr. Gibbons's untimely March 19, 2009 supplemental report did not contain a list of the items he considered in developing his new pharmacoepidemiology study of Neurontin patients. The transmittal letter stated that the list of items considered by Gibbons had been disclosed at his March 5, 2009 deposition session, and overlooks the fact that neither Gibbons nor counsel advised Plaintiffs counsel at that session that, in violation and in total disregard of Rule 26(a)(1)(B)(2), Gibbons was going to draft yet another untimely new supplemental expert report after the deposition and that he did not actually produce the items considered in preparing the March 19 supplemental report.

On April 9, 2009, after disclosure of Dr. Gibbons's March 19 Supplemental Report, the parties reached an agreement that Defendants would produce Gibbons's communications with PharMetrics, any correspondence that might be found between Gibbons and counsel, and the letter that Gibbons had received from the *Archives* on the condition Plaintiffs would not question him about the letter at a resumed deposition covering his new report. Plaintiffs agreed, not knowing the letter was a rejection letter, Gibbons having testified that it was "review and resubmit" letter. On that same day, Judge Saris set the case for trial on July 27, some 110 days hence. ECF Doc. # 1739.

Dr. Gibbons, at that time in Bali, was no longer available for a deposition until April 27, some 90 days from the newly-set trial date. On April 13, defense counsel sent a letter limiting Gibbons's deposition to the new paragraphs of Gibbons's new March 19 supplemental report.

9

Finkelstein Decl., Ex. 13. Defense counsel still had not provided the documents they had agreed to disclose. Then, on the last work day before Gibbons's deposition, defense counsel sent a startling email to Plaintiffs' counsel, hinting for the first time that they had been lied to about Gibbons's files:

> *Subject: Gibbons docs:*
> *Are going out today for delivery tomorrow morning. Where do you want me to send them – to Jack or to Keith? There are too many pages to send to both of you – if I do that, it will take another day of copying (there are well over 1000 pages). Thanks. Angela* [Finkelstein Decl., Ex. 10.]

Dr. Gibbons had testified in February and again in March that he did not keep emails and had testified that there were no e-mails of substance. Finkelstein Decl., Ex. 5 at 361-362; 973-974. However, when the documents finally arrived in New York on the Friday before a Monday deposition in Chicago it was clear that Gibbons had violated Rule 26 (e) (1) and (2), requiring supplementation of information that is 'incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.' Moreover, Gibbons had been advised by email on February 3, 2009, during his first deposition session, that the *Archives* had rejected his bipolar epidemiology study manuscript. Finkelstein Decl., Ex. 2. However, in direct contradiction, during his February deposition Gibbons testified that he had not heard from the *Archives*, and in March 2009, Gibbons testified that in regard to his manuscript, the *Archives* had invited him to "revise and resubmit, basically." Finkelstein Decl., Ex. 5 at 837. *Rejected* is not *revise and resubmit, basically*.

Moreover, other 'incomplete and incorrect information' was known to Dr. Gibbons from the outset: there were literally dozens of emails in Gibbons's file between defense counsel and Gibbons, and they were material and substantial. A sample of those emails is that of February 2,

10

2009, in which defense counsel sent lengthy notes to Gibbons. Finkelstein Decl., Ex. 14. This was two days before Gibbons testified that there were no such emails. Finkelstein Decl., Ex. 5 at 361-362. Another is the email string dated June 9-11, 2008 enclosing to Gibbons various charts and spreadsheets that purport to contain the number of patients in various Neurontin studies. Finkelstein Decl., Ex. 15.

## ARGUMENT

### POINT I

### DEFENDANTS' EXPERT DR. GIBBONS SHOULD NOT BE ALLOWED TO INCLUDE ADDITIONAL STATISTICAL ANALYSIS AND BASICALLY REDO HIS NOVEMBER 2008 EXPERT REPORT AND ARTICLE AND/OR INTRODUCE A NEW MARCH 2009 BIPOLAR STUDY AT THIS LATE DATE

Rule 26 of the Federal Rules of Civil Procedure requires timely disclosure of the data or other information considered by expert witnesses as well as a complete statement of opinions, the bases, and reasons for them. Fed. R. Civ. P. 26(a)(2). The duty to supplement expert disclosures extends both to data and to information given in the expert's deposition. Rule 26 (e)(2). The failure to supplement requires exclusion of the evidence by the self-executing provisions of Rule 37( c)(1). The party that fails to supplement is not permitted to supplement in a late, untimely, or calculated manner that circumvents or violates the discovery schedule and prevents the requesting party from preparing for trial. *Payne v Exxon Corp.*, 121 F.3d 503 (9th Cir. 1997):

> The issue is not whether Exxon and VECO eventually obtained the information that they needed, or whether plaintiffs are now willing to provide it, but whether plaintiffs' repeated failure to provide documents and information in a timely fashion prejudiced the ability of Exxon and VECO to prepare their case for trial.

Rule 37 provides as follows:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required

11

by Rule 26(e)(2), is not, unless such failure is harmless permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

This Court has struck expert opinions and data that were not disclosed until so close to trial as to make preparation for trial difficult on the opposing party. In *Hipsaver Co. v J.T. Posey Co.*, 497 F. Supp. 2d 96, 103 (D. Mass. 2007), the Court wrote:

First, late production of the 2006 corporate charge data was not "substantially justified" because the Court did not permit HipSaver to produce new documents which should have been disclosed during discovery in recasting its theory of injury after the summary judgment ruling. The 2006 sales data, including corporate charges, has always been relevant to issues of causation, injury, and damages. Mr. Goodwin cited "flat" revenues in 2006 as an indication of the lasting effects of Posey's false advertisements. This statement was crucial to HipSaver's theory that it had been-and continued to be-shut out of big chain heath care facilities as a result of Posey's false ads.

In the case at bar, although this Court allowed Defendants to introduce at trial Dr. Gibbons's November 2008 report and article which were submitted as rebuttal reports on general causation, it did not allow Gibbons leave to perform additional statistical analysis or to create an entirely new report or article for this litigation. The circumstances of this case are similar to those in *Hipsaver* in that the revamping of Gibbons's November 2008 expert report and his new March 19, 2009 supplemental report and new article are not based upon any new information but instead on the PharMetrics data which Defendants previously had in their possession and not new data: all the records in it came from the years 2000-2003. If Pfizer wanted to submit an expert pharmacoepidemiology report as a defense, it could have and should have done so before December 2007 rather than springing one on the Court and Plaintiffs in November 2008, again in March 2009, and yet again in May 2009, after the Track One cases, including this case, were scheduled. There is no excuse for withholding from those studies the underlying and, ultimately, changed analyses of data that is the new cornerstone of a case that has been in litigation for over

12

four years.  Moreover, Defendants' expert Gibbons is not allowed **a second bite of the apple to "redo"** his November 2008 study and article in this litigation and to either substitute and/or supplement same with new March 2009 reports when inadequacies of his original report are discovered through Plaintiffs' counsel's deposing of him, or when a peer-reviewed journal rejects the underpinnings of his study.  There is no "rejected" — but you can revise and submit mandate in the litigation before this Court.

In *Hipsaver*, Judge Saris excluded the late-disclosed reports and data based on Rule 37.  Rule 37 was promulgated to be "self-executing" in order to produce a strong inducement for disclosure of documents and information.  Fed. R. Civ. P. 37 Advisory Comm. Note (1993).  Plaintiffs have attempted to obtain the necessary discovery from Defendants so that they may test Dr. Gibbons's theories; however, none of their efforts have succeeded in getting defense counsel or Gibbons to comply with Rule 26.  Plaintiffs submit that the striking Gibbons's untimely new expert reports, which were disclosed in March of 2009, and May 2009, and charging the costs of discovery to the Defendants is proper in this case.  Fed. R. Civ. P. 37(b)(2)(C).

## POINT II

### THIS COURT SHOULD RECONSIDER ALLOWING DEFENDANTS TO INTRODUCE DR. GIBBONS'S NOVEMBER 2008 EXPERT REPORT AND ARTICLE AND STRIKE HIS NEW MARCH 2009 REPORTS AND ARTICLE DUE TO DR. GIBBONS'S EFFORTS TO OBSTRUCT THE <u>DISCOVERY PROCESS AND FAILURE TO DISCLOSE REQUIRED DISCOVERY</u>

In *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 248 F.3d 29, 34 (1st Cir. 2001), *followed in Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001), the trial court excluded expert evidence as a sanction for failure to disclose the information required by Rule 26(a)(2).  In doing so, it rejected the argument that there had been no prior order compelling disclosure.  The First Circuit found that a court order

13

issued under Rule 37 need not be violated before a court may impose sanctions under (c). It went on to say:

> What the district court must find under Rule 37(c) is that the offending parties were not "substantially justified" in failing to disclose information required by Rule 26(a) or Rule 26(e) and that the failure to disclose was not harmless. This is a "self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion under subdivision [37](a)(2)(A). [*Ortiz-Lopez*, 248 F.3d at 33.]

The Court in the Ninth Circuit case *Yeti by Molly* ruled similarly: "Thus, even though [plaintiffs] never violated an explicit court order to produce the [expert] report and even absent a showing in the record of bad faith or willfulness, exclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)." 259 F.3d at 1106. Expert testimony was also excluded in *1st Source Bank v. First Resource Credit Union,* 167 F.R.D. 61 (N.D. Ind. 1996), a case similar to this case.

Late disclosure does not cure the damage caused by failing to comply with Rule 26. *See Payne v Exxon Corp*., 121 F.3d 503 (9th Cir. 1997):

> "Belated compliance with discovery orders does not preclude the imposition of sanctions. Last-minute tender of documents does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts." *North American Watch Corp. v. Princess Ermine Jewels,* 786 F.2d 1447 (9th Cir. 1986) (citations omitted). The issue is not whether Exxon and VECO eventually obtained the information that they needed, or whether plaintiffs are now willing to provide it, but whether plaintiffs' repeated failure to provide documents and information in a timely fashion prejudiced the ability of Exxon and VECO to prepare their case for trial. *See* Henry, 983 F.2d at 947; *Adriana,* 913 F.2d at 1412. *Many of the discovery responses eventually tendered by the plaintiffs came only as the discovery period was drawing to a close, or after it had already closed.*

In *CQ, Inc. v TXU. Mining Co.*, *L.P.*, ___ F.3d ___ (5th Cir., 2009), 2009 U.S. App. LEXIS 7451 (April 9, 2009), the party and expert had not disclosed statistical data that became a

14

part of the opinions offered. The Fifth Circuit held that the sanctions are addressed to the trial court's discretion, to be evaluated by these factors:

> Rule 26 provides that "a party must, without awaiting a discovery request, provide ... a *computation* of each *category* of damages ... [and] the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based."
>
> Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added). Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *cf. KW Plastics v. U.S. Can Co.,* 131 F. Supp. 2d 1289, 1296 (M.D. Ala. 2001) (noting that an expert may not testify on unjust-enrichment damages when his Rule 26 report disclosed only a calculation for lost-profit damages). After a review of the record, we agree that CQ failed to properly disclose the "computations" for the various "categor[ies]" of damages it now complains of. Thus, we turn to whether the district court abused its discretion in excluding the evidence pursuant to Rule 37.
>
> We consider four factors in determining whether the district court abused its discretion: (1) CQ's explanation for its failure to disclose the evidence, (2) the importance of the evidence, (3) the potential prejudice to TXU in allowing the evidence, and (4) the availability of a continuance. *See Betzel,* 480 F.3d at 707. Significantly, CQ has not offered any justification for its failure to disclose the damages calculations or their underlying evidence. While the evidence is clearly important to CQ, it is not essential to CQ's underlying recovery. Moreover, given the advanced stage of the litigation, permitting the new evidence would not have been harmless. *See Hoffman v. Constr. Protective Servs., Inc.,* 541 F.3d 1175, 1179-80 (9th Cir. 2008) ("Later disclosure of damages would have most likely required the court to create a new briefing schedule and perhaps re-open discovery, rather than simply set a trial date. Such modifications to the court's and the parties' schedules supports a finding that the failure to disclose was not harmless."); *NutraSweet Co. v. X-L Eng'g Co.,* 227 F.3d 776, 785-86 (7th Cir. 2000) (finding harm based on scheduling issues). Accordingly, the district court did not abuse its discretion in excluding the evidence pursuant to Rule 37(c).

Neither Dr. Gibbons nor Defendants have offered any reason why they waited from May 2008 to November 2008 to disclose the PharMetrics database to Plaintiffs or to disclose the SAS programs they created in August to do the study. In fact, Gibbons testified that when the data

15

was purchased he knew he was going to use it for an expert report, despite the Court's limitation only allowing him to testify as to the FDA Alert:

> Q. When you purchased the data in May, did you know you were going to provide -- do an analysis for the gabapentin cohort that would show up in your expert report?
>
> A. Yes. [Finkelstein Decl., Ex. 5 at 718:4-8.]

Defendants have not offered any justification for disclosing only what it contended Dr. Gibbons "relied on" rather than what he considered. Moreover, Defendants did not disclose Gibbons's FORTRAN program, his sensitivity analyses, the ASCII files, the SAS output files, or any of the other hundreds of pages of documents, calculations, spreadsheets, tables, bills, or other records when called for or until after the deposition sessions in which they were sought. This Court should reconsider its November 25, 2008 decision to allow Defendants to introduce the November 2008 study and article at trial due to Defendants late disclosure of the aforementioned discovery. Furthermore, Defendants do not have any justification for performing additional statistical analysis from data it had in its possession and prior to November 2008 and disclosing in May 2009 a new report that Gibbons completed in March 2009 and referred to in his new March 19, 2009 Supplemental Report.

The prejudice from such an affair is self-evident. Dr. Gibbons has used highly selective data to create a statistical picture (not a clinical or biological picture) of innocence for Neurontin. The gist of Gibbons's opinions is that in groups he selected, the rates of attempted suicide by bipolar patients and psychiatric patients was higher before treatment with Neurontin than after. Gibbons hid from Plaintiffs from February 3 to April 23, 2009, written criticisms from his colleagues of the statistical flaws in his studies, and even then disclosed the criticisms only after misleading Plaintiffs about the contents of the rejection letter from the *Archives of General*

16

*Psychiatry*. Not only have Plaintiffs been forced to take two extra depositions of Gibbons, and been deprived by counsel's trickery from completing them, but Plaintiffs are also frustrated in their attempts to obtain and submit rebuttal expert reports and testimony to an ever-changing set of Gibbons's expert opinions, long after the due dates of the scheduling orders.

The Court has made plain that the purpose of selecting the instant case is to get jury verdicts of model cases to establish a profile under which the parties may be able to resolve the entire Products Liability MDL. To present to the jury a one-sided presentation of pharmacoepidemiology studies by Dr. Gibbons when the circumstances of disclosing his work may prevent Plaintiffs from being able to present rebuttal expert evidence would defeat Judge Saris's purpose regardless of the verdict. Given the expense of this prolonged discovery, the need for a rebuttal, and the injustice of a delay caused by Gibbons's misconduct in obstructing discovery in the case, this Court should reconsider its decision to allow Defendants to introduce Gibbons's November 2008 expert report and article, and strike his March 19 2009 and March 2009 Bipolar Study and grant such other appropriate relief to correct the misconduct.

Dated: May 29, 2009

Respectfully submitted,

By: **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY 12551
*Attorneys for Plaintiff Ronald J. Bulger, Sr.*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on May 29, 2009.

Dated: May 29, 2009

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire

17