EXHIBIT 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------x
:   MDL Docket No.: 1629
In re:  NEURONTIN MARKETING,   :
        SALES PRACTICES AND    :   Master File No.: 04-10981
        PRODUCTS LIABILITY LITIGATION :
        :   Judge Patti B. Saris
----------------------------------------------------------x
:   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:    :
        :   **LEAVE TO FILE**
*Bulger v. Pfizer Inc.,* 1:07-11426-PBS   :   **GRANTED ON 6/23/2009**
        :
----------------------------------------------------------x

### PLAINTIFF'S REPLY MEMORANDUM TO DEFENDANTS' CORRECTED CONSOLIDATED OPPOSITION TO PLAINTIFF'S EMERGENCY MOTIONS TO STRIKE DEFENSE EXPERT ROBERT D. GIBBONS, PH.D. AND, ALTERNATIVELY, TO STRIKE DR. GIBBONS'S MARCH 2009 EXPERT REPORT AND BIPOLAR STUDY AND FOR RECONSIDERATION OF THE COURT'S NOVEMBER 2008 DECISION ALLOWING DR. GIBBONS'S STUDY AND ARTICLE AT TRIAL

Plaintiff has already provided the authority in support of these motions in the original memoranda, and will not burden the Court with citing them again since same remains good law. Plaintiff also will not re-attach all the exhibits submitted with the original memoranda; a very few exhibits are submitted with this Reply Memorandum for the Court's convenience.

The rules are pretty simple. Witnesses are expected to tell the truth. Witnesses and counsel are expected to make disclosures pursuant to Fed. R. Civ. P. 26. When they lie and withhold material from discovery, Fed. R. Civ. P. 37 excludes the evidence. It is a self-executing rule. It doesn't matter if it was defense counsel or the witness who is at fault — the witness doesn't get to testify.

From the inception of Dr. Gibbons's entry into the case as an expert for Defendants, he and defense counsel have persistently violated those two simple rules. Dr. Gibbons's and

defense counsel's tactics were so very evident in this case that at the *Daubert* hearing such tactics prompted Judge Patti B. Saris to say "that's unfair."  Defense counsel presented Dr. Gibbons at the *Daubert* hearing in June 2008, at which time he proceeded to testify about odds ratios, risk differentials, and exhibits that were entirely different than those disclosed in his expert report.  Judge Saris was forced to forestall the litigation for 30 days because of Dr. Gibbons and defense counsel's failure to disclose his opinions in advance of the hearing.

> MR. LONDON:  Not one thing he said today was in his report.
>
> MS. McGRODER:  Well, your Honor –
>
> MR. LONDON:  Excuse me.  May I finish?  I know you like to -- everything he has said today he has come in and told you for the first time after reading the statistical review.  Nothing that was in the report you authorized him to write has been said by him today.  ***He has come in and given his spin to the FDA's numbers, and we're hearing it for the     first time.***
>
> ***JUDGE SARIS: Is that correct?***
>
> ***MS. McGRODER:  Well, your Honor, yes, it is correct.***  They submitted the FDA statistical review to you as soon as it came out last week, and every single one of their experts who has been in here for the last day and a half has used that FDA statistical review, including these very odds ratio charts to support their opinions about causation in this case.  And so Dr. Gibbons got the review last week and conducted his analysis on it.  As I said, we'd be happy to submit a supplemental report, but we thought your Honors wanted to hear from the witness today what this meta-analysis is about.
>
> **JUDGE SARIS:**  ***It's a little unfair.  I can't expect them to cross-examine him.  They can't do it.  That's unfair.***  [Declaration of Andrew G. Finkelstein, Ex. A at 315:2-25 (emphasis added).]

This Court provided Defendants with a second chance; instead of striking his testimony which was not disclosed, it allowed Plaintiff to conduct additional discovery of Dr. Gibbons.  To no avail, defense counsel and Dr. Gibbons failed to abide by the rules once again, inappropriately and intentionally shielding information and documents from Plaintiff which were rightly discoverable.  When he returned to Court, Dr. Gibbons proceeded to do that which defense

2

counsel claims is "scurrilous" — he attacked the statisticians who were employed by the FDA and the statisticians who served on the FDA committee that found Neurontin to be associated with an increased risk of suicide. *See, e.g.*, Finkelstein Decl., Ex. A at 397.

It is against this background that the Court should take with a very large grain of salt Defendants' aggressive Opposition to Plaintiff's Motions to strike Dr. Gibbons for cause. ECF Doc. # 1840.

## POINT I

## PFIZER DOTH PROTEST DR. GIBBONS'S REPUTATION TOO MUCH

The defense argues that the attack on Dr. Gibbons is "scurrilous" because he is a world-renowned statistician. The truth is Dr. Gibbons's standing in the community of statisticians is no higher than that of the experts who served on the FDA panel he criticized behind their backs by claiming that their work on the FDA analysis of antiepileptic drugs, including Neurontin, and suicidality was "a sad day for statisticians." Finkelstein Decl., Ex. A at 397:20-24.

A truer measure of Dr. Gibbons's standing is the blunt criticism of his peers, noted below, when he published (with the same group of authors who he listed for his bipolar report in this case) a paper saying that the FDA decision to require a black box for select serotonin reuptake inhibitors (SSRI's) caused and would cause an increase in suicides.

Dr. John Jureidini, in the *American Journal of Psychiatry*, 164:1907, December 2007, stated:

> Dr. Gibbons et al. indicated that there is a correspondence between a 22% decrease in prescriptions after warnings were issued by the Food and Drug Administration (FDA) and the 14% increase in youth suicide rates between 2003 and 2004. They concluded that decreases in prescriptions "were associated with increases in suicide rates in children and adolescents" (1, p. 1357). Unless carefully examined, Figure 1 and Figure 2 in their article create the same impression. ***However, the data show no such association.*** In the year in which suicide rates rose sharply, there was no significant drop in SSRI prescribing. This

3

fact is only acknowledged in the Discussion section, where an attempt is made to explain away the inconvenient truth: "While only a small decrease in the SSRI prescription rate for U.S. children and adolescents occurred from 2003 to 2004, the public health warnings may have left some of the most vulnerable youths untreated" (1, p. 1359). The discussion then continues at length as though a clear association (if not causal relationship) has been established, with alarmist predictions regarding the consequences of decreased prescribing. ***As it turns out, preliminary figures are now available from the Centers for Disease Control (CDC), which show that fewer people under age 25 committed suicide in 2005 (when prescribing did decrease) than in 2004 (2).***

Leckman and King, in *A Developmental Perspective on the Controversy Surrounding the Use of SSRI's to Treat Pediatric Depression*, American Journal of Psychiatry, 164: 1304-1306, September 2007, also noted:

> Gibbons *et al.* raise concerns about the potential for harm that may arise out of the decreased use of SSRIs in the pediatric population by pointing out an increase in suicide rates in both the United States and the Netherlands. Indeed, they offer specific predictions concerning the actual number of completed suicides should the number of prescriptions continue to decline. ***Unfortunately, they did not include an analysis of similar ecological data for both countries over the preceding decade, which presumably would have shown the reciprocal relationship—falling rates of suicide directly associated with the rising number of SSRIs prescriptions (3). Nor did they address the conflicting results from a recent case-control study that found in children and adolescents the risk of suicide attempts was 1.52 times higher after antidepressant drug treatment compared with no antidepressant treatment*** (4). Although the data presented by Gibbons et al. are largely compelling, we prefer to take a more nuanced, developmental viewpoint. [Emphasis added.]

To be perfectly blunt, Dr. Gibbons's peers observed in his tracts for SSRI's what is observed here: Dr. Gibbons makes up supportive facts and withholds problem facts. It does not improve his status in this case or in the community of his peers for defense counsel to attempt to cover his conduct by referring to him as world-renowned. To be sure, he has published many, many papers. Volume, like money, however, does not equal excellence. It should not buy evidence.

What are the facts he made up and what did he withhold?

4

## POINT II

## <u>WITHHOLDING DISCOVERY AND FILING REPORTS UNTIMELY</u>

The scheduling order ended the disclosure period for new general causation expert reports in December 2007. Judge Saris ordered in April 2008 that Dr. Gibbons was limited to testifying about the FDA Alert. Nevertheless, defense counsel and Dr. Gibbons did not seek leave of the Court to extend the scheduling order or to exceed the limitation that Judge Saris posed upon Dr. Gibbons's opinion and testimony (that it relate to the FDA Alert) but, instead, went about conducting two pharmacoepidemiology analyses in the Autumn of 2008. These are the bipolar analysis and the gabapentin analysis. When Defendants disclosed the two pharmacoepidemiology analyses in this case in November 2008, Defendants weren't even sufficiently forthright to call them new reports — they tried to couch them as "supplements to the *Daubert* record." Finkelstein Decl., Ex. B, ECF Doc. # 1489.

The pharmacoepidemiology analyses are two reports. Defense counsel take issue with Plaintiff's characterization of them as such, but the bipolar report is not published as of the date of this reply, is not available at this time from anyone except Dr. Gibbons, and is relied on by Dr. Gibbons as a part of his second study, the gabapentin report. Moreover, when on May 7, 2009, Defendants did finally produce the bipolar report in its last version, they also provided a new CV with it and said it was done so in contemplation of a Fed. R. Civ. P. 26 supplementation.

When Dr. Gibbons's bipolar and gabapentin reports were produced, Plaintiff sought discovery of the technical data on which they were based by sending to the Defendants a letter dated November 12, 2008, requesting such discovery. Finkelstein Decl., Ex. C.

Defendants' very first reply to the request for discovery was false and deceptive. Ms. McGroder's letter of November 26, 2008, literally says: "In response to your letter request of

5

November 12, 2008, please find....." The letter then goes on to enclose a disk of data and analysis of the gabapentin report, a copy of the PharMetrics license, a copy of Dr. Gibbons's retainer agreement, and a copy of the bipolar report, but none of the underlying data, statistics, or analysis to the bipolar report. The letter then concludes "With the production of these materials, plaintiffs 'document demand' is satisfied." Finkelstein Decl., Ex. D.

Plaintiff believed McGroder's letter, word for word. Plaintiff accepted that she and Dr. Gibbons had disclosed all that had been requested and all that there was to disclose pursuant to Fed. R. Civ. P. 26.

At that moment in time, however, there was sitting in Dr. Gibbons's files and computer, undisclosed, virtually all of his underlying work on both the gabapentin report and the bipolar report. This was not uncovered until Plaintiff attempted to depose him on February 3-4, 2009. The misrepresentations in Ms. McGroder's letter of November 26, 2008, are proved by letters and e-mails she sent *after* the deposition on February 10 and February 16, 2009. Finkelstein Decl., Exs. E, F. In them, she lists many (but still not all) of Gibbons's work that was withheld from Plaintiff, and promises to disclose the withheld data, programs, and related items. Here are some of the items they had not disclosed in his so-called Herculean effort:

– SAS files not included on the disk disclosed in November

– The FORTRAN programs necessary to review Dr. Gibbons's analyses

– The ASCII files necessary to read Dr. Gibbons's work product

– SAS output files necessary to execute the programs

– Supermix analyses (but not the output files for Supermix; those were not disclosed)

– New sensitivity analyses. As to these, Dr. Gibbons testified on March 5, 2009, that he had conducted them before the February 3-4 deposition, which meant that they had not

6

been disclosed in a timely manner that would have enabled Plaintiff's counsel to use them in the deposition.

That is a lot of very technical material that Dr. Gibbons withheld. It constitutes the vast majority of the statistical basis of all of Dr. Gibbons's work — to that point in time.

It is not possible for defense counsel to spin those facts as if they or Dr. Gibbons did disclose his work in time for the deposition of February 3-4. In fact, it took the deposition of February 3-4 just to discover that this material had been withheld, hence Ms. McGroder's letters of February 10 and e-mail of February 18. Instead, defense contends that there was no harm since Dr. Gibbons sat for a follow-up deposition on March 5. If there was a case or rule that withholding an expert's underlying data, tests, records, studies, and statistics until after a deposition complies with Fed. R. Civ. P. 26, Defendants have not cited it. Indeed, their position seems to be that no matter how much they withhold or for how long, even when disclosure is made only because the Plaintiff catches them at hiding discovery, there is no foul.

However, the March 5 deposition was much like this Court's first encounter with Dr. Gibbons. When Plaintiff pointed out that it was impossible to replicate the Supermix analysis, Dr. Gibbons admitted that he had not disclosed the output files necessary to do so. He did give testimony on his corrected Tables 1 and 2 to the gabapentin report. However, the corrected tables came about because he had tilted the playing field in favor of Neurontin in his gabapentin report by the manner in which he accounted for suicide attempts on the index date and by portraying patient *years* after the index date to be the same as patient years before when in fact the "after" period was at best patient *days* or *weeks*.[1]

---

[1] Defense counsel argues that Plaintiff's counsel didn't ask Dr. Gibbons about his studies in his deposition. Defense counsel overlooks that those questions brought to light that Dr. Gibbons rounded numbers up when it supported his position, and down when it impaired his opinion, that he misclassified over 10,000 patients, that he used non-existent ICD-9 codes, that he used utterly different patient year definitions for the before and after index-dates, and

7

However, the March 5 deposition was just another sham because, after it was completed, Dr. Gibbons did what he did the first time he testified in this case: he abandoned his previous opinions and came up with new opinions for trial. Defendants, again, simply sprung it on Plaintiff, exactly as they did with Dr. Gibbons in the *Daubert* hearing, by filing a report dated March 19, 2009, when Plaintiff was ready to go to trial on his reports of November 2008. They did not seek leave of court to file a new report. They did not meet and confer with Plaintiff's counsel about Dr. Gibbons changing his report. They simply filed a new report — on the gabapentin study.

Worse, to compound the injury, Defendants also had a new report on Gibbons's bipolar study, which they had not previously disclosed.

The supplemental supplemental supplemental new gabapentin report became the subject of Gibbons's April 27, 2009 deposition. It was completely different from the report filed in November 2008, with all new opinions about all new tables of time varying studies, changes to his study of multiple suicide attempts by the same patient, and the like. However, by one well-hidden change in the reference to the bipolar study, it surfaced that he also had changed his bipolar report. However, at the deposition he refused to turn over a copy of the report, and counsel refused to allow him to be questioned concerning the report. The disingenuous and, frankly, unprofessional manner in which counsel concealed Dr. Gibbons's communications until after obtaining an agreement to not question Dr. Gibbons about the communication from the *Archives* in exchange for his e-mails has already been detailed. If defense counsel is proud of that conduct they have bigger problems than a simple hearing to strike a witness can resolve.

---

that he counted multiple suicide attempts by the same patient and multiple claims in hospital records for the same patient as multiple attempts, thereby skewing the statistics in favor of gabapentin. Who knows what would have been uncovered if the defense had disclosed what they withheld?

8

But, when Plaintiff did get copies of the communications that had been withheld, the copies showed that Dr. Gibbons's original bipolar report had been rejected by the *Archives of General Psychiatry*. The rejection, along with criticisms of his bipolar report that were almost identical to the hard questions Plaintiff's counsel had asked him in the deposition of February 3-4, was in an e-mail received by Dr. Gibbons during his February deposition, a time when Dr. Gibbons testified that he had not heard from the *Archives*. Did he merely fail to read his e-mail until after the deposition as defense counsel suggests (without supporting evidence)? Perhaps. But, if so, why was it not disclosed until after he had re-written the report and re-submitted it to the *Archives* six weeks later? And why did he and defense counsel refuse to permit him to testify about it?

To this day, Dr. Gibbons has not disclosed all of the underlying data, statistics, analyses, and programs that he must have used to do the revised bipolar study.

Among the real world consequences of Dr. Gibbons constantly — shifting reports and opinions, of his withholding disclosure of his underlying work, and of his filing new reports without leave of court and without notice, is that it prevented Plaintiff from obtaining and submitting a rebuttal report until after Dr. Gibbons finally disclosed his bipolar report on May 7, 2009. Plaintiff anticipated filing a rebuttal report after the February 3-4 deposition; it had to be delayed first because of the new disclosures discussed above in defense counsel's letter of February 10 and e-mail of February 16, listing and disclosing some of the missing technical data. Plaintiff then anticipated filing a rebuttal report after the March 5 deposition, but it, too, was delayed for the same reason — the non-disclosure of the files necessary to read the Supermix analysis. Then, when these files were received, Defendants thwarted the process again by filing in the last week of March the changed gabapentin report. Dr. Gibbons could not be deposed on it

9

until April 27; Plaintiff anticipated filing a rebuttal after that deposition, but was thwarted again because of Defendants' disclosure on May 7, 2009, of the new bipolar report. In sum, every report Dr. Gibbons submitted up to that time changed both in form and in substance; rebuttal was not possible until he was through.

## POINT III

### OF TRUTH AND PARSING OF WORDS

Dr. Gibbons declared unequivocally in his Declaration of January 21, 2009, "I do not believe that Dr. Hur, Brown, and Mann ***possess any knowledge*** or have formed any opinions concerning the specific expert issues that have been raised in this litigation, ***or the content of my expert reports***." No reasonable person could interpret that to mean that Dr. Hur actually did possess some knowledge about the content of Dr. Gibbons's gabapentin report. Plaintiff took the statement at face value, as did Magistrate Judge Leo T. Sorokin, who believed it such that he quashed Dr. Hur's deposition. (Parenthetically, defense counsel also represented, incorrectly, to Magistrate Judge Sorokin in May 2009, that there should be no duces tecum of Dr. Hur because they had already turned over all of Dr. Hur's and Gibbons's work. Dr. Hur admitted at his deposition that he had not provided all his technical programs. But this motion is about Dr. Gibbons.)

That the declaration was utterly false was not uncovered until Dr. Gibbons admitted at his February 3-4 deposition that Dr. Hur actually did all the computer programming and some of the data analysis on the gabapentin report. It was not revealed until the March 5 deposition that Dr. Hur had performed approximately 80 hours of work for Dr. Gibbons on the gabapentin report and that Dr. Gibbons had paid him for it, with Pfizer money, in 2008, all *before* Dr. Gibbons had signed that declaration. By the defense getting Magistrate Judge Sorokin to quash Dr. Hur's

10

deposition by use of this false declaration, in combination with not disclosing Dr. Hur's programs and Dr. Gibbons's Fortran programs, Plaintiff was foreclosed from discovering and deposing Dr. Gibbons and Dr. Hur about (among other things) a programming error that mis-allocated some 10,000 patients in the gabapentin report alone. Plaintiff can not ask questions about that which has been concealed by false statements. Plaintiff can not depose a technical witness on the substance of his technical work when he withholds his technical data.

Some very good proof of this is that on February 3, 2009, Dr. Gibbons testified that he doesn't keep e-mails and that he and defense counsel did not send anything of significance to each other by e-mail. Defense counsel McGroder, sitting next to him, didn't flinch.

As a consequence of this utterly false testimony, Plaintiff did not know, could not inquire into, and to this day have been deprived of asking Dr. Gibbons about the contents of communications that were in his e-mails, the existence of which first came to light in April 2009. (On April 23, 2009, Defendants sent approximately 1,000 pages of Dr. Gibbons's e-mails and communications, the very thing he said didn't exist.) Accordingly, neither in the February nor March depositions could Plaintiff ask Dr. Gibbons about:

> – Ms. McGroder having to explain to Dr. Gibbons in e-mails how to read the columns of patients in the Excel spreadsheet she provided to him listing the numbers of patients in trials that Pfizer had sent to the FDA;
>
> – Notes sent to Dr. Gibbons the night before his deposition by Ms. McGroder, who was sitting next to him when he said there were no e-mails;
>
> – the criticisms of Dr. Gibbons by other statisticians about his methods of calculating patient years, accounting for (or failing to account for) confounding factors, and procedural omissions in his reports.

In fact, the very night before the deposition, Ms. McGroder sent Dr. Gibbons an e-mail attaching pages of notes for Dr. Gibbons to review. However, Plaintiff took his testimony at its

11

face value, believed that there were no communications of substance in the e-mails, and did not press him for the contents of something that he had stated did not exist.

The multiple credibility issues with Dr. Gibbons reached a zenith on March 5 when, in trying to learn from Dr. Gibbons what he did and when he did it, he testified that he had been coached to not keep such records:

> A. Please understand, you know, I'm a university professor. I'm not too good at providing really good descriptions of what I do on these bills, and -- and in the past, not by any of the lawyers sitting at this table, ***I have been counseled in prior litigations in different areas that having exquisitely detailed bills may not be the best plan for litigation-related work. So I haven't been very, very detailed in what I have described in the work and haven't had too many objections.***
> [Finkelstein Decl., Ex. H at 971:4-14 (emphasis added).

So, here is an expert witness who says not only that he does not keep e-mails but also that he was coached to not keep detailed records of any kind in order to prevent lawyers from discovering from them what he did and when he did it.

It takes a special suspension of belief for defense counsel to write as if they were offended by Plaintiffs being offended. (Amended Opposition, ECF Doc. # 1840 at 13.) Defendants argue that since Dr. Gibbons was under no obligation to disclose his e-mails before February of 2009, the date he testified that there were no e-mails, Plaintiff's accusation that Dr. Gibbons had improperly withheld them from April 2008 until April 2009 was a "falsehood."[2] Apart from not providing any authority for why Dr. Gibbons was under no obligation to produce his e-mails, he didn't testify that he was withholding them — he testified that there weren't any, thereby stopping the inquiry into what was in them.

---

[2] Defense counsel originally wrote, page 13, that this was some kind of tit for tat problem because Plaintiffs had not disclosed their expert's e-mails. When this error was brought to defense counsel's attention, see Mr. Altman's e-mail, Finkelstein Decl., Ex. G, Defendants withdrew that statement.

12

Because of his testifying falsely about these subjects, Plaintiff was not able to depose Dr. Gibbons about them. The only way Plaintiff obtained the e-mails at all was by agreeing to not depose Dr. Gibbons about the e-mail letter sent to him by the *Archives of General Psychiatry*, an agreement Plaintiff entered because neither Dr. Gibbons nor defense counsel at that time had disclosed that he had completely changed his bipolar report and submitted it to the *Archives* to replace the flawed one he had given to the Court and Plaintiff.

Defense counsel is critical in their opposition to Plaintiff making these matters known in the public record. However, Plaintiff's counsel tried to sort this out first in the deposition, a proceeding that under the standing order in this case could have been sealed. To repeat an excerpt from the original motion, counsel tried to ask Dr. Gibbons how he could file a declaration with Magistrate Judge Sorokin and testify that he had disclosed everything sought in the November 12 2008 discovery letter when in fact he had not disclosed his Fortran program, his sensitivity analyses, and most of the work on his bipolar paper. Ms. McGroder stopped the inquiry.

> MS. McGRODER: Okay. The deposition is over. We are out. You want more time. We are not going to do this. We are not going to pull this game. We are not doing this.
>
> MR. LONDON: You are the one pulling the game.
>
> MR. ALTMAN: I'm asking him whether -- it says I have produced all materials requested by plaintiffs in their letter of November 12, 2008.
>
> MS. McGRODER: Do not answer any more questions. We are finished for today. [Finkelstein Decl., Ex. H at 341:6-10.]

That session ultimately continued, but as Dr. Gibbons admitted:

> A: …I know I have not given the raw data files and all of the SAS files, and I understand that there may be a SAS file or two that maybe didn't make it into it, and I apologize for that.... [Finkelstein Decl., Ex. H at 699:4-7.]

13

Defense counsel defends the misconduct by parsing words that find no support in the Rules, that Dr. Gibbons had disclosed what he *relied* on instead of disclosing what had been *sought* in discovery or what he had *considered*. To begin with, that is not what Ms. McGroder represented in her letter of November 26, 2008, when she unequivocally declared that the Plaintiff's "document demand is satisfied." Finkelstein Decl., Ex. D. Moreover, it is no defense to the charge of misrepresenting a fact to say that instead of making a false representation one merely broke a rule of procedure by disclosing what was relied on rather than what was obligated to be disclosed, i.e., all tests, data, analyses, etc. Fed. R. Civ. P. 37(a)(4) regards these evasive replies to be the same as a complete failure to disclose.

But, to make it worse for the defense, it wasn't even true that they disclosed all that he relied on — as Dr. Gibbons testified, he did not disclose until two weeks after the deposition the Fortran program, SAS output files and the very sensitivity analyses that he conducted before the deposition. This is an instance of lying when the truth would have done some good.

## POINT V

## <u>HERCULES VERSUS PROMETHEUS</u>

Defense counsel's representation that Dr. Gibbons has engaged in a Herculean effort to produce his work product does not turn coal into holiday presents. First, under both Fed. R. Civ. P. 26 and the pending discovery requests, Dr. Gibbons was obligated to produce what he did finally produce. Second, he was obligated to supplement it when he got it, not withhold it until after his deposition. And third, Dr. Gibbons's disclosure is no more Herculean than Plaintiff's efforts. Mr. Altman has disclosed six gigabytes of data, some twenty times more than the 320 megabytes of Gibbons material that Defendants eventually turned over. Defendants continue to allege that they do not have all of Mr. Altman's support work for Dr. Blume, even though not

14

one defense expert has even opened the disks of data that Mr. Altman gave Dr. Blume and that Mr. Altman gave the defense. They have not identified a single item or category of item that Mr. Altman gave Dr. Blume in her expert work in this case that has not been disclosed. Finally, Dr. Trimble and Dr. Blume have produced their extensive files for multiple depositions. Dr. King, Dr. Blume, Dr. Brock, and Dr. McFarland brought e-mails to their depositions and they were made exhibits. Defendant has no complaint on this score.

## CONCLUSION

Defendants in no position to claim any gold stars for an effort that Dr. Gibbons was obliged to perform. The gamesmanship by which it was performed violates Fed. R. Civ. P. 37 and has made it extremely expensive and difficult for Plaintiff to prepare for trial. Dr. Gibbons's false testimony and declarations, whether originating from him, from counsel, or from both, do not pass muster under Rule 37. Plaintiff prays that his motions to strike Dr. Gibbons for cause be sustained.

Dated: June 22, 2009

Respectfully submitted,

By: **/s/ W. Mark Lanier**
W. Mark Lanier, Esquire
THE LANIER LAW FIRM, P.L.L.C.
126 East 56th Street, 6th Floor
New York, NY 10022

By: **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
FINKELSTEIN & PARTNERS, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY 12551

*Attorneys for Plaintiff Ronald J. Bulger, Sr.*

15

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on June 22, 2009.

                                                **/s/ Andrew G. Finkelstein**
                                                Andrew G. Finkelstein, Esquire