EXHIBIT 1A

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
# Gibbons, Robert (Defense Expert)
**2/3/2009**

**Printed : 2/17/2009**

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2
    IN RE: NEURONTIN        )
 3  MARKETING SALES PRACTICES )
    & PRODUCTS LIABILITY     )
 4  LITIGATION              )
                            ) MDL DOCKET
 5  BULGER VS. PFIZER, et al. )  No. 1629
    07-11426-PBS            )
 6                          ) MASTER FILE
    SMITH VS. PFIZER, et al.  )  No. 04-10981
 7  05-CV-11515-PBS         )
 8
         SUPERIOR COURT OF THE STATE OF CALIFORNI
 9              CITY OF LAKE
10  NICOLETTE CRONE,  et. al,  )
                              )
11       Plaintiffs,      )
                          )
12       versus          ) CV 400432
                         )
13  PFIZER, INC., et al.,    )
                           )
14       Defendants.      )
15  Job No.: 183059
              VOLUME I
16       The videotaped deposition of ROBERT D.
17  GIBBONS, Ph.D.., called by the Plaintiffs, for
18  examination, pursuant to Notice, and pursuant to
19  the Rules of Civil Procedure for the United States
20  District Courts, taken before Sandra L. Rocca, CSR,
21  CRR and Notary Public in and for the County of
22  DuPage, and State of Illinois, at 506 West
23  Harrison, Chicago, Illinois, on the 3rd day of
24  February, 2009, at the hour of 9:09 a.m..
```

**2**

```
 1  APPEARANCES:
 2
    MR. JACK LONDON
 3  3701 Bee Cave, Suite 200
    Austin, TX 78746
 4  (512) 478-5858
    jlondon@texas.net
 5
 6       -and-

 7  FINKELSTEIN & PARTNERS
    By:  MR. KEITH L. ALTMAN
 8  463 Robinson Avenue
    Newburgh, NY  12550
 9  (516) 456-5885/Fax: (951) 303-1222
    kaltman@lawampmmt.com
10       -and-
11  THE LANIER LAW FIRM
    By: MR. KENNETH S. SOH
12  6810 FM 1960 West
    Houston, TX  77069
13  (713) 659-5200/Fax: (713) 659-2204
    Kss@lanierlawfirm.com
14
         appeared on behalf of
15       the Plaintiffs;
16
    SHOOK, HARDY & BACON, L.L.P.
17  By: MS. LORI CONNORS McGRODER
    2555 Grand Blvd.
18  Kansas City, MO  64108-2613
    (816) 474-6550/Fax: (816) 421-5547
19  lmcgroder@shb.com
20       appeared on behalf of the
         Defendants;
21
    (continued)
22
23
24
```

**3**

```
 1  APPEARANCES: (Continued)
 2
 3  LAW OFFICES OF STEVEN D. HILLYARD, P.C.
    By: MR. GERHARD WINKLER
 4  345 California Street, Suite 1770
    San Francisco, CA  94104
 5  (415) 334-6880
 6       appeared on behalf of Defendant
         Dr. Jennings.
 7
 8
    Also Present:
 9
         James Pierdzioch, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1       VIDEOGRAPHER:  My name is James
 2  Pierdzioch of Veritext.  The date today is
 3  February 3rd, 2009 and the time is 9:09 a.m.  This
 4  deposition is being held at the Holiday Inn located
 5  at 506 West Harrison Street in Chicago, Illinois.
 6  The captions for this case are In Re:  Neurontin
 7  Marketing Sales Properties and Products Liability
 8  Litigation in the United States District Court,
 9  District of Massachusetts and Nicolette Crone,
10  et al. versus Pfizer Incorporated, et al. in the
11  Superior Court of the State of California for the
12  County of Lake.
13       The name of the witness is Robert
14  Gibbons, Ph.D.  At this time the attorneys will
15  please identifies themselves for the record.
16       MR. LONDON:  I'm Jack London.  I
17  represent the multi-district litigation Plaintiffs,
18  product liability steering committee Plaintiffs.
19       MR. ALTMAN:  Keith Altman.  I'm here
20  representing Nicolette Crone and the Crone
21  Plaintiffs and I'll be asking questions on behalf
22  of Crone.
23       MR. SOH:  Ken Soh for the Plaintiffs.
24       MR. WINKLER:  Gerhard Winkler on behalf
```

5

1    for Defendant Dr. Jenning in the Crone case.
2         MS. McGRODER:  Laurie McGroder on behalf
3    of Pfizer.
4         VIDEOGRAPHER:  The witness may now be
5    administer the oath by Sandi Rocca.
6         ROBERT D. GIBBONS, Ph.D.
7    having been first duly sworn, was examined and
8    testified as follows:
9              EXAMINATION
10   BY MR. LONDON:
11        Q.  Good morning, Dr. Gibbons.
12        A.  Good morning.
13        Q.  I'm Jack London.  I think we may have
14   said hello to one another in Boston, but apart from
15   that we've not met, have we?
16        A.  That's correct.
17        Q.  One of my suggestions is that I have a
18   soft voice and I'm just not as quick as a lot of
19   people and so I pause and stop and think about what
20   I'm saying and that sometimes causes witnesses to
21   not understand me.  If you don't, please tell me
22   and I'll try to give another go at the question so
23   that the question you answer is the question I got
24   out.  Fair enough?

6

1         A.  Yes.
2         Q.  All right, sir.  And my memory is that
3    you're very good at waiting for the question to
4    finish.  I'll do my best to be as good at waiting
5    for the answer to finish before I resume, mostly so
6    we don't talk over each other.  Can we try that?
7         A.  Yes.
8         Q.  If you need to stop for any reason, let
9    me know, we'll stop.  This is not -- this is
10   subject to the 14th Amendment we're all free here.
11   Fair enough?
12        A.  Fair enough.
13        Q.  Do you understand I'm going to be asking
14   questions about the Neurontin litigation that is
15   pending in the District Court in Massachusetts?
16        A.  Yes, I do.
17        Q.  And it's only about the products
18   liability case.  I know there are other things,
19   some individual Teamsters cases or insurance
20   company cases or class cases.  I have nothing to do
21   with those.  Do you understand that?
22        A.  I do.
23        Q.  And I won't be asking you questions
24   intentionally that have anything to do with those

7

1    cases, only with the individual Plaintiffs'
2    products cases.  Do you understand that?
3         A.  I do.
4         (Document marked as Gibbons Exhibit
5          Number 1 for identification.)
6    BY MR. LONDON:
7         Q.  You were -- were you provided Exhibit 1,
8    the Notice of this deposition?
9         A.  Yes, I was.
10        Q.  And I'd like to simply take a moment and
11   go through the list that has the documents the
12   deponent is required to produce.  It's over on
13   about the third or fourth page.  Do you see that?
14        A.  Yes.
15        Q.  Can we go through that list and ask you
16   what you brought to the deposition, please?
17        A.  I haven't brought anything.
18        Q.  Why not?
19        A.  Because all of the things that were here
20   I believe I already provided.
21        Q.  You've not provided any to us.  When you
22   say provided, do you mean you provided to Pfizer
23   counsel?
24        A.  That's correct.

8

1         Q.  Can we go through this just real quickly
2    and make sure -- let me short circuit that
3    question.
4         Are you telling me that you have read
5    this list and that you have satisfied yourself in
6    reading this list that you've given everything on
7    it that you have or have reasonable access to to
8    Pfizer counsel?
9         A.  Yes, I believe so.
10        Q.  And we can read this list ourselves and
11   take faith in the knowledge that the items that are
12   on this list you've given to Pfizer counsel?
13        A.  To the best of my knowledge, yes.
14        Q.  Yes?
15        A.  I looked this over quickly, but I think
16   I've seen it before.
17        Q.  One more question before we move away
18   from this list.  Is there anything that we've
19   requested on this list that simply does not exist?
20   Do you recall making that note to yourself as you
21   went over it?
22        A.  I don't recall.  I'd be happy to look it
23   over.
24        Q.  Let's do that for a moment.  You have

9

1    correspondence, I'm sure?
2        A.  Yes.
3        Q.  And I'm sure you've given that to
4    counsel?
5        A.  Yes..
6        Q.  Documents relating to money to be paid
7    and fee agreements, copies of your billings?
8        A.  All my billings have gone to them.
9        Q.  Your documents, notes, records and so
10   forth relating to the Plaintiffs including photos,
11   audio tapes, videos.  You've given -- do those all
12   exist?
13       A.  I don't have photographs or audio tapes
14   or videotapes.
15       Q.  With that caveat, have these items been
16   given, Items 3 been given to counsel?
17       A.  Yes, I believe so.
18       Q.  Can I take a hiatus here in the middle of
19   this question?  I recall that we were in the court
20   in Boston and you used slides.  Do you recall that?
21       A.  I do.
22       Q.  Did you create those slides?
23       A.  I think a lot of them were either -- I
24   either created or provided the data by which they

10

1    were created.
2        Q.  Have those that you created been given to
3    counsel?
4        A.  Everything that I've had with connection
5    to my appearance in the court in Boston was given
6    to counsel.
7        Q.  Is there some way that when we look at
8    the same slides that counsel gave us or will give
9    us in the future we can tell which ones were
10   created by you and which ones were collaborative
11   between you and counsel?
12       MS. McGRODER:  Well, just before you
13   answer that, all of those slides were given to you
14   and the court so you have them all.
15   BY MR. LONDON:
16       Q.  Okay.  Is there some way we can look at
17   those?
18       A.  I'm happy to look at them with you and I
19   can, you know, explain slide by slide where the
20   data came from.
21       Q.  Is there a set of them here in the room
22   today?
23       MS. McGRODER:  No, I didn't bring them.
24       MR. LONDON:  Why?

11

1        MS. McGRODER:  Well, I mean you have
2    them.
3        MR. LONDON:  Okay.
4        MS. McGRODER:  You could have brought
5    them.
6        MR. LONDON:  I understand that, but we
7    won't know what to bring since it's a duces tecum
8    and we're requesting the witness to provide us what
9    there is.
10       MS. McGRODER:  Mr. London, if you wanted
11   to ask questions about those slides to Dr. Gibbons,
12   you could have brought the slides and ask him the
13   questions.  You have all of them.
14   BY MR. LONDON:
15       Q.  I suppose this next one is all documents
16   provided to you by counsel for Defendants.  Do you
17   believe that all documents that were provided to
18   you by counsel they have?
19       A.  I believe so.
20       MS. McGRODER:  Wait, wait.  Objection.
21   That says all correspondence between you and
22   Defendants.
23       MR. LONDON:  And it goes on and says all
24   documents.

12

1        MS. McGRODER:  Oh, I see.
2    BY MR. LONDON:
3        Q.  Do you see that?  Correspondence with any
4    other person concerning the Plaintiffs or this
5    litigation, did you give all of that correspondence
6    to counsel?
7        A.  Yes.
8        Q.  All right.  Number 6, notes, records,
9    reports, medical scientific literature, have you
10   given all such items as are in Number 6 to defense
11   counsel?
12       A.  Yes, everything I relied upon I shared
13   with counsel.
14       Q.  I'm going to come back shortly to ask you
15   about this, but I know one of the items that's been
16   kind of a parallel to this proceeding has been that
17   there are several coauthors of certain articles or
18   an article that has come up in this litigation as a
19   result of an article you submitted as I recall in
20   September 2008.  Do you recall that?
21       A.  Yes.
22       Q.  And I don't recall off the top of my head
23   the precise name of it, but if we say the
24   September 2008 article, will we know what we're

13

1  talking about?
2      A.  Yes, we will.
3      Q.  And have all of those studies, reports,
4  records, opinions, notes and calculations relating
5  to the September 8th article also been provided to
6  defense counsel?
7      A.  Yes, they have.
8      Q.  And that includes those between you and
9  your coauthors?
10     MS. McGRODER:  Well --
11     MR. LONDON:  That's the question.
12     MS. McGRODER:  Objection to that
13  question.
14  BY MR. LONDON:
15     Q.  That's the question.
16     A.  I provided all of the data upon which
17  that paper is based, all of the statistical
18  analysis, files, so that every -- every data point
19  and every analytic method and every result is
20  easily reproducible by you.
21     Q.  Have you -- well, were there any emails
22  or correspondence between you and the other
23  coauthors regarding that paper?
24     A.  There may have been, sure.

14

1      Q.  Have you produced those to defense
2  counsel?
3      A.  Not to my knowledge.  I'm not sure I even
4  have them.
5      Q.  Are those retrievable?
6      A.  In general, no, I don't keep a long list
7  of emails.
8      Q.  And what about other correspondence?
9      A.  No other correspondence.
10     Q.  Okay.  Well, I'm going to ask if you will
11  do a reasonable search to see whether you have
12  emails between yourself and your coauthors of the
13  September article?
14     A.  Happy to.
15     Q.  And if you do, would you produce copies
16  of those for us, please?
17     MS. McGRODER:  Well, I object to that
18  question.  I mean you can direct that inquiry to me
19  and Dr. Gibbons and I will talk about it and
20  respond.  As you know, the Plaintiffs' counsel sent
21  a correspondence to us requesting specific items in
22  conjunction with that article and we produced
23  everything that was on that list.
24

15

1  BY MR. LONDON:
2      Q.  We're going to get there.  But I'm only
3  asking about things that were not produced or we
4  don't have any correspondence or emails with
5  coauthors.  So I'm asking for you to make a
6  reasonable search for that and produce those.  Do
7  you understand my request?
8      A.  I do understand your request.
9      Q.  And if you don't comply with it, it will
10  be because of conversations with yourself and
11  defense counsel, is that my understanding?
12     A.  Correct.
13     MS. McGRODER:  You know, Jack, I just
14  have to interpose on that one.  There are -- there
15  are cases that address the confidentiality of
16  communications between coauthors on a manuscript
17  submitted for publication.  So to the extent we
18  didn't produce something to you, it would be
19  pursuant to those cases.
20  BY MR. LONDON:
21     Q.  And if there are such things, I'm going
22  to ask you to submit them under seal to the court
23  so the court can determine whether confidentiality
24  applies.  Do you understand that?

16

1      MS. McGRODER:  I object to that question.
2  You don't have to answer that.
3      MR. LONDON:  Yes, you do.  You can't tell
4  him not to answer questions.
5      Q.  Do you understand that I'm requesting you
6  to submit under seal anything that you or your
7  defense counsel contends to be confidential?  Do
8  you understand that?
9      MS. McGRODER:  I object to the question.
10  You're asking him to understand your legal
11  arguments and --
12     MR. LONDON:  I'm not making an argument.
13  I'm asking a question.
14     MS. McGRODER:  It's inappropriate.
15     MR. LONDON:  Do you understand the
16  question.
17     MS. McGRODER:  Objection.  You don't have
18  to answer it.
19  BY MR. LONDON:
20     Q.  You do have to answer it, Doctor.  Do you
21  understand that I'm asking you to submit under seal
22  to the court anything that you contend or that
23  Miss McGroder contends to be confidential because
24  of its relationship to a pending publication

17

1　article.
2　　　MS. McGRODER:  Objection, you don't have
3　to answer that.  You're asking him to follow your
4　legal argument about what should be submitted under
5　seal.
6　　　MR. LONDON:  The question stands.  The
7　question stands.  Don't argue with me.  You may
8　instruct him --
9　　　MS. McGRODER:  I am instructing him.
10　　　MR. LONDON:  You may make an instruction.
11　We'll let the court rule on it.  You may say
12　objection.
13　　　MS. McGRODER:  Which I have stated, Jack.
14　　　MR. LONDON:  But that's it.  You don't
15　get to make a jury argument in the middle of my
16　question, Ms. McGroder.
17　　　MS. McGRODER:  I have objected to your
18　question on the basis that it calls for a legal
19　conclusion by this witness.
20　　　MR. LONDON:  Rule 34 does not require
21　that you state the basis.  I'm sorry.  I cut you
22　off.  I apologize.  Say that again.
23　　　MS. McGRODER:  I'm finished.
24　　　MR. LONDON:  Rule 34 not only does not

18

1　require that you state the basis of an objection,
2　it limits what you may say to objection, objection
3　nonresponsive or privilege.  Please stop going
4　further.  Okay.  That's on the record and we're not
5　going to conduct this deposition as an argument
6　between you and me and if we have to get help from
7　the court, we will.
8　　　MS. McGRODER:  I agree with that
9　completely.  If we need help from the court, we can
10　do that.
11　BY MR. LONDON:
12　　Q.  Do you understand my question, Doctor?
13　It's still on the table.
14　　　MS. McGRODER:  Well, I object to that
15　question.  I instruct you not to answer it.  It's a
16　legal argument.
17　　　MR. LONDON:  It's a question.
18　BY MR. LONDON:
19　　Q.  Number 8, have you -- are you reading
20　Number 8?
21　　A.  No.
22　　Q.  Would you please?
23　　A.  Yes.  I've read it.
24　　Q.  Are there such items?

19

1　　A.  No.
2　　Q.  I'm only going to do the same with
3　Number 9 and ask if you'll read it and tell me
4　whether to the extent you have such documents
5　they've been provided to defense counsel?
6　　A.  They have been.
7　　Q.  All right.  Number 10 is sort of a
8　nonspecific to this litigation subpoena issue that
9　has to do with advertisements regarding your
10　availability as a consultant.  Are there any such
11　items?
12　　A.  No.
13　　Q.  When I use the term advertisement in
14　reading this, I'm thinking of something you might
15　post on online or post in a publication or that
16　sort of thing.  Is that what you understood it to
17　mean?
18　　A.  Yes.
19　　Q.  And I can accept that publications
20　themselves might well be the best advertising
21　because they represent who you are and what you do.
22　I didn't have that in mind.  I meant paid for print
23　media advertisements.  You understood that?
24　　A.  That's correct.  I've never advertised

20

1　for anything.
2　　Q.  Number 11, documents reflecting your
3　relationship with experts, consultants or referral
4　services.  Are there any such things?
5　　A.  No.
6　　Q.  Number 12 has to do with relationships
7　between yourself and any regulatory body relating
8　to -- and I'm going to say Pfizer, Warner-Lambert
9　or Neurontin.  Are there any such items?
10　　A.  Not to my knowledge.
11　　Q.  And I'm going to ask the question in a
12　slightly finer way.  When I think of regulatory
13　body in this case, I think of the Food and Drug
14　Administration.  There may be others.  I'm not
15　sure.  Is the IOM a regulatory body?
16　　A.  No.
17　　Q.  It's a subacademy of the Academy of
18　Sciences as I recall, is that correct?
19　　A.  That's correct.
20　　Q.  And so is there any correspondence in
21　your possession regarding contacts between yourself
22　and the FDA concerning Neurontin?
23　　A.  No.
24　　Q.  Okay.  Coincidentally, as I understand

21

1    it, the generic term for Neurontin is gabapentin,
2    is that your understanding?
3        A.  Yes.
4        Q.  If we refer to those interchangeably,
5    will that be all right with you?
6        A.  Of course.
7        Q.  Because I never know when to call it one
8    or the other frankly.  Fair enough?
9        A.  Fair enough.
10       Q.  Is there a better time to use one term
11   more than the other?
12       A.  I would not be an expert on that.
13       Q.  You would not be an expert on that.  We
14   share the same level of inexpertise on that matter?
15       A.  Yes, sir.
16       Q.  I asked you previously about notes,
17   slides, overheads, presentation materials.  The
18   same question, to the extent that there are any,
19   have you provided those to defense counsel?  I
20   apologize I abbreviated that for time's sake and I
21   didn't do it well.
22           Have you taught any classes, courses,
23   seminars or other nonlitigation presentations
24   regarding Neurontin, adverse events, suicidal

22

1    ideation or behavior related to Neurontin?
2        A.  I'm asked to give lectures on my work on
3    the statistics of suicide and I'm just trying to
4    remember if ever used any of the antiepileptic data
5    that formed the basis of our paper.  I certainly
6    haven't used any of the data directly related to
7    Neurontin that formed the basis of the analysis
8    that I'm sure we'll be discussing here today.
9            But with respect to the paper, I may have
10   presented, you know, a slide, maybe one of the
11   tables from the paper at one of the lectures that
12   I've given.
13       Q.  Would the presentation that you made, if
14   you did to a class or group, have simply been using
15   the same documents, for example, tables that were
16   in the paper?
17       A.  That's correct.
18       Q.  The September '08 paper?
19       A.  That's correct.
20       Q.  Nothing different than that?
21       A.  Not to my knowledge, no.
22       Q.  And then the last is as I read this,
23   essentially is all of the underpinning work
24   relating to analyses, calculations, regarding

23

1    adverse event data or databases conducted by you
2    and in essence in this litigation.  Have you
3    provided all that?
4        A.  Yes, I think I've done the best job of
5    any one of these I've ever done in terms of giving
6    you a complete record of the data.
7        Q.  All right.
8        A.  And analyses.
9            (Document marked as Gibbons Exhibit
10           Number 2 for identification.)
11   BY MR. LONDON:
12       Q.  Dr. Gibbons, I'm giving you Exhibit 2, a
13   letter dated November 12, 2008.  Are you familiar
14   with this letter?
15       A.  It doesn't seem familiar.
16       Q.  All right.  In short reference -- and
17   I'll give you a moment to read but in short
18   reference, this is a letter in which generally
19   Mr. Fromson requested of Miss McGroder items
20   regarding the pharmacoepidemiologic study.  When I
21   say pharmacoepidemiologic study, I think of the
22   report that you wrote that was dated I believe
23   November 5th, 2008.  It contains tables regarding
24   pharmacoepidemiologic analyses.  Is that your

24

1    understanding --
2        A.  Yes.
3        Q.  -- of pharmacoepidemiologic study?
4        A.  Yes.
5        Q.  And then the other one has to do with
6    references to Gibbons, et al., 2008.  Again, I
7    believe that to be the September 2008 paper
8    referred to inside the November study.  Do you see
9    that over on the second page, sir?
10           MS. McGRODER:  Object to form.  I guess I
11   just don't know what you mean by inside the
12   November study.
13           THE WITNESS:  This is a reference to the
14   paper on antiepileptic drugs that we spoke of
15   before.  And I referred to this paper in my
16   supplemental report of November the 5th where I
17   describe the analyses that I did for the purpose of
18   that report on the gabapentin data.
19   BY MR. LONDON:
20       Q.  Now, since we understand that the letter
21   concerns requests regarding the paper and the
22   November report, will you take a moment at your
23   convenience now and see whether the numbered items
24   in -- first on page 1, Items 1 through 9,

25

1    continuing to page 2, whether to the extent that
2    those exist you've provided those to defense
3    counsel?
4        A.  Yes, I will.  Yes, I believe I've
5    complied with everything that's been requested
6    here.
7        Q.  All right.  And then can you identify for
8    me, again back on that list 1 through 9, regarding
9    the pharmacoepidemiologic study, whether any of
10   those Items 1 through 9 do not exist so that we can
11   stop asking for them?
12       A.  I'm not sure I have in any of -- any copy
13   of Number 3 of the retention.  I don't really know
14   if I have that.  They may have that.
15       Q.  All right.
16       A.  Number 4 is sort of redundant with
17   Numbers 1 and 2 in terms of the materials that I
18   have.
19       Q..  Your understanding of 4 is to the extent
20   it exists, it would have already been addressed in
21   1 and 2?
22       A.  That's correct.  Similarly with 5, the
23   License Agreement and the original proposal that
24   made up the License Agreement lists all of that

26

1    information.
2        Q.  It lists the inclusion --
3        A.  And exclusion criteria.
4        Q.  -- and exclusion criteria for the study?
5        A.  That's correct.  In terms of Item
6    Number 7 -- Item Number 6 I've provided the entire
7    universe of data.  In fact, exactly the data that I
8    received from PHARMetrics.  And I don't have any
9    documentation in Item 7 related to searches and
10   reviews and I don't -- I don't think there are any
11   documents that I considered in that regard beyond
12   those documents that I reviewed in this case in
13   general.
14       Q.  All right.
15       A.  Number 8's been provided completely to my
16   knowledge.  And Number 9 it just is sort of
17   redundant with Number 6.
18       Q.  Have you learned that in the course of
19   working in lawsuits that lawyers ask the same thing
20   three or four different ways in an effort to be
21   sure they've covered everything?
22       A.  I've become accustomed to that, yes, sir.
23       Q.  If that happens, will you just accept
24   that that's the nature of the beast as it were?

27

1        A.  Yes, I will.
2        Q.  And then let's turn to Items 1 through 4
3    on page 2, documents within the references in the
4    report to the paper.
5        A.  Item 1 I've complied with.  I don't have
6    drafts of manuscripts.
7        Q.  You're never asked to provide anything
8    you don't have, but do you know whether anywhere
9    there are drafts or manuscripts that preceded the
10   final publication?
11       A.  First of all, there hasn't been a final
12   publication yet.  It's still under the review
13   process and there were some edits, I believe, and I
14   just, you know, they're fairly minor edits in
15   preparation of submitting the paper and I just save
16   them over so that there was one copy.
17       Q.  All right.
18       A.  And Item 4 I've completely complied with.
19       Q.  All right.
20           (Document marked as Gibbons Exhibit
21           Number 3 for identification.)
22   BY MR. LONDON:
23       Q.  What is Exhibit 3?
24       A.  This looks like the License Agreement

28

1    between myself and PHARMetrics regarding the
2    purchase of the PHARMetrics data for the purpose of
3    the analysis of the gabapentin data and also the
4    data that led to the publication which is under
5    review.
6        Q.  All right, sir.
7        A.  The manuscript that's under review.  It's
8    not a publication yet because it's still under
9    review.
10       Q.  I understand what you're saying.  I don't
11   want us to get tripped up over the phrase final
12   manuscript because I understand that it's in the
13   review process and it may be accepted for
14   publication, it may be accepted with suggestions or
15   edits or modifications.  So when we talk about the
16   final manuscript, I'm really only asking you about
17   as it exists in its present form.  Fair enough?
18       A.  Yes.
19       Q.  And is there a different form more recent
20   than the September 2008 manuscript form that was
21   submitted to defense counsel and in turn to us?
22       A.  Not to my knowledge.
23       Q.  All right.  This License Agreement -- let
24   me just look at one or two things.  First, it's

29

1    dated May 21, 2008.  See where it says that on
2    page 2 of 9?
3        A.  Yes, I do.
4        Q.  What is it that you obtained physically
5    as a consequence of the License Agreement?
6        A.  I believe I obtained a disk, a CD disk
7    with the two general cohort databases and within
8    those there were, you know, subdatabases.
9        Q.  All right, sir.  When we talk about the
10   cohort databases, for the record, would you give a
11   brief description of what you mean by that term?
12       A.  Sure.  There are two cohorts, there's one
13   cohort of approximately 130,000 patients who were
14   treated with gabapentin and had one year prior to
15   the index drug date and one year following it.
16       And the second cohort is a cohort of
17   approximately 49,000 bipolar patients who had one
18   year prior to the index diagnosis of bipolar and
19   one year following it.  And those would be the two
20   cohorts and maybe for simplicity we can call them
21   the gabapentin cohort and the bipolar cohort which
22   is the way that I refer to them.
23       Q.  The gabapentin cohort is the database
24   that contains patient claim files as I understand

30

1    it in which the index date is the date when a
2    patient began to receive gabapentin by
3    prescription?
4        A.  That's correct.
5        Q.  And the bipolar cohort is the index date
6    on which the patient was within your available data
7    set first diagnosed to be a bipolar patient?
8        A.  That's correct.
9        Q.  Help me just because I'm caught up in the
10   forest and losing site of the trees, which was the
11   study in the paper and which was the study in the
12   pharmacoepidemiological study?
13       A.  The --
14       MS. McGRODER:  Object to form.
15   BY MR. LONDON:
16       Q.  If you understand my --
17       MS. McGRODER:  If you understand that
18   question.
19       THE WITNESS:  I do.  The cohort that led
20   to the paper that's been submitted to publication
21   was the bipolar cohort and the cohort that was --
22   that formed the basis of my supplemental opinion,
23   expert report was the gabapentin cohort.
24

31

1    BY MR. LONDON:
2        Q.  This question may be an anathema to you
3    because it uses numbers, but is it the epidemiology
4    study that was approximately 130,000 patients?
5        A.  The gabapentin cohort was approximately
6    130,000 patients.
7        Q.  And the bipolar cohort was approximately
8    40 --
9        A.  49,000.
10       Q.  All right.  If I ask you a question in
11   this deposition that calls for a specific number,
12   will you call time out and just not laugh on the
13   camera?
14       A.  I promise not to laugh.
15       Q.  Will you accept that I wasn't really very
16   good at arithmetic and it got worse as the numbers
17   got bigger?
18       A.  I'll accept your --
19       Q.  Will you not try to run over me during
20   the deposition with your superior knowledge of such
21   things?
22       A.  I promise to be gentle.
23       Q.  Thank you.  Do you appreciate -- have you
24   testified before a jury before?

32

1        A.  Yes, I have.
2        Q.  Were you ever in the military?
3        A.  No.
4        Q.  I recall in reading a resume that you
5    were awarded some recognition, I don't recall
6    which, I apologize, as I recall to do with the
7    Navy.  What was that?
8        A.  I had a Young Scientist Award from the
9    Office of Naval Research.
10       Q.  Was that not because you were in the
11   Navy, but because you participated in some work
12   that eventually was received by the Office of Naval
13   Research?
14       A.  That's correct.  And I was young.
15       Q.  And you were young?
16       A.  Yes.
17       Q.  By what epidemiological standard?
18       A.  All of them.
19       Q.  What was the index date?
20       A.  I was about 25.
21       Q.  Well, I don't know.  Did you have any
22   children yet?
23       A.  No.
24       Q.  Well, you were young.  You received a

33

1  disk and I'm going to try not to say CD-Rom because
2  that may not be what it was, but you received a
3  computer disk containing the two cohort databases?
4      A.  That's correct.  I don't believe they
5  were transmitted via email.  I'm pretty sure I
6  received a hard copy.
7      Q.  Did the disks or the databases did they
8  require manipulation by a computer program --
9      MS. McGRODER:  Object to form.
10  BY MR. LONDON:
11     Q.  -- in order for you to be able to work
12  with them?
13     A.  The disks I believe contained SAS files
14  that we were able to, you know, take directly off
15  of the disks and work with them directly and those
16  same SAS files are the ones that have been
17  transmitted to you.
18     Q.  Others may know, I do not, what is a SAS
19  file?
20     A.  It's a computer program, Statistical
21  Analysis System, that's what it's called.  And it
22  has a lot of well-documented and validated
23  procedures for the manipulation of data, the
24  sharing of data and the analysis of data.

34

1      Q.  Had you worked before on other projects
2  which required the use of a SAS program?
3      A.  Yes.
4      Q.  And in doing your work either on the
5  September paper or in other reports and
6  declarations in this case, did you use other people
7  to help you run SAS programs with information as a
8  part of your overall work product?
9      A.  Yes.
10     Q.  Who did you get to help you do those SAS
11  program operations?
12     MS. McGRODER:  Object to form.  Are we --
13  which cohort are you talking about?
14     MR. LONDON:  Either.
15     THE WITNESS:  Dr. Kwan Hur.
16  BY MR.. LONDON:
17     Q.  All right.  As I recall the paper, this
18  may be the wrong term, but you were considered to
19  be the lead author, Dr. Hur, Dr. Brown and Dr. Mann
20  were coauthors.  Are those fair terms to use?
21     A.  Yes.
22     Q.  Apart from those three gentlemen, we'll
23  come back and ask some questions about them later,
24  I was looking at whether you used graduate

35

1  students, college associates, that sort of thing in
2  your work to assist you in just the manual tasks of
3  doing the work with the SAS program with the two
4  cohort databases?
5      A.  No, I did not.
6      Q.  And just for an index purpose, is
7  Dr. Hur -- what is his specialty?
8      A.  Statistics.
9      Q.  Where is Dr. Hur?
10     A.  He works -- he's -- works for the
11  Veterans Administration.  He's one of the senior
12  statisticians at the Hines VA here in Chicago and
13  he also is a visiting professor in my Center For
14  Health Statistics.
15     Q.  The other question that I have just in a
16  moment is in looking at Exhibit 3, on the back page
17  it says page 6 of 9.  Do you see that in the lower
18  right-hand corner?
19     A.  Yes.
20     Q.  Are there supposed to be nine pages?
21     A.  I don't recall this document having any
22  more than the pages that it has here.
23     Q.  What would be the page 7, 8 and 9 if you
24  can tell me?

36

1      A.  I can't.
2      Q.  All right.  Just a couple of questions
3  about the License Agreement.  I assume that the
4  material that is in the PHARMetrics database -- and
5  when I talk about the farm metric database I'm
6  really talking about the two cohort programs you
7  bought, not the entire universe of the PHARMetrics
8  database.  I assume that's in some way proprietary
9  to PHARMetrics, is that correct?  Is that your
10  understanding?
11     MS. McGRODER:  Object to form, if you
12  know.
13     THE WITNESS:  I don't -- I didn't fully
14  understand the question.
15  BY MR. LONDON:
16     Q.  They own data?  Is it your understanding
17  that PHARMetrics owns the information and people
18  such as yourself buy the information but have to
19  have a license from them in order to use it?
20     MS. McGRODER:  Object to form, if you
21  know.
22     THE WITNESS:  You know, you have to
23  purchase the data from PHARMetrics, so to the
24  extent that you have to buy it from them, I'm

37

1   assuming that they own it. I don't know how they
2   get the data and I don't know what their
3   business model is or any of the legalities of how
4   those data are obtained except through my
5   interaction with them and this contract.
6   BY MR. LONDON:
7       Q. Well, I assume that as far as you're
8   concerned, requesting the data, signing the license
9   and paying for the data was the extent of your
10  contact with PHARMetrics before actually receiving
11  the data?
12      A. That's correct.
13      Q. Okay. And so as far as you're concerned,
14  this license says whatever it says, but that sets
15  out the terms of who owns it and what you can do
16  with it?
17      MS. McGRODER: Object to form. If you
18  know.
19      THE WITNESS: That's my understanding.
20  BY MR. LONDON:
21      Q. All right. How much did the data cost?
22      A. $15,000.
23      Q. And who paid for the data?
24      A. I paid for it.

38

1       Q. How do you -- let me start over. Both on
2   the front page it says 1(a), 20th day of May and
3   then as I recall on the second page, that was the
4   signature date. How was it that on May 20th or
5   May 21st, 2008 you came to request the PHARMetrics
6   database that contained the two cohort databases?
7       MS. McGRODER: Object to form.
8   BY MR. LONDON:
9       Q. What was your reason in doing that?
10      MS. McGRODER: Same objection.
11      THE WITNESS: Can you be more specific?
12  BY MR. LONDON:
13      Q. Probably not. Why did you purchase the
14  PHARMetrics databases?
15      A. I purchased them so that I could do these
16  analyses.
17      Q. Both the pharmacoepidemiology analysis
18  relating to the gabapentin database and is it also
19  called a pharmacoepidemiologic analysis that you
20  did using the bipolar index database?
21      A. They're both pharmacoepidemiologic
22  analyses.
23      Q. You did it so that you could do both of
24  those epidemiological analyses with the two

39

1   separate cohort databases?
2       A. That's correct.
3       Q. Why did you want to do that?
4       A. It actually has to do in part with the
5   last time we were all together. I believe it was
6   Dr. Bloom who was testifying at the Daubert hearing
7   and I think Mr. Barnes had asked her could you have
8   done an epidemiologic study and she said yes. And
9   he asked her did you do a pharmacoepidemiologic
10  study or an epidemiologic study. She said no.
11      And I think at that moment I thought,
12  yeah, that would be a really good idea to do that
13  study. And so I proposed the idea to counsel for
14  Pfizer and they agreed that it was a good idea and
15  we went about thinking about what would be the
16  appropriate database, the best database to get and
17  I felt PHARMetrics was the best database for this
18  purpose and we acquired the data and did the
19  analysis.
20      Q. May I ask just a couple of more questions
21  before we go on past that? Who were Pfizer's
22  counsel to whom you proposed the idea? I assume
23  Mr. Barnes was one?
24      MS. McGRODER: Object to form.

40

1       THE WITNESS: I don't know if it was him.
2   Most of my conversations have been with Laurie.
3   BY MR. LONDON:
4       Q. All right. And so is it fair to say that
5   your memory of the general flow of events was that
6   you and Miss McGroder discussed the idea of
7   obtaining that database to do the
8   pharmacoepidemiological study after hearing
9   Dr. Bloom's testimony in the hearing in Boston?
10      MS. McGRODER: Object to form.
11      THE WITNESS: I believe the conversation
12  was around -- you know, around that time. It may
13  have been that day. It may have been, you know,
14  shortly thereafter.
15  BY MR. LONDON:
16      Q. I'm not trying to precisely pin you down
17  to 2:00 in the afternoon, but I mean it was after
18  you heard Dr. Bloom testify and it was after you
19  thought about it that you went and spoke with
20  Miss McGroder about doing the pharmaco study?
21      MS. McGRODER: Object to form.
22      THE WITNESS: I'm not sure -- I'm not
23  sure I remember the exact sequence of the events.
24  I think that, you know, the idea of doing this kind

41

1      of a study was -- I mean, I'm not sure that, if you
2      will, the light bulb went off after listening to
3      Dr. Bloom. I may have, you know, thought about
4      doing this kind of thing earlier on. I'm not sure
5      -- I don't remember the exact sequence of events.
6      BY MR. LONDON:
7          Q.   Let me ask it a different way. Did you
8      not buy the PHARMetrics database in question until
9      after speaking with Pfizer counsel about it?
10         MS. McGRODER:  Object to form.
11         THE WITNESS:  Yes, that's correct.
12     BY MR. LONDON:
13         Q.   And it was primarily Miss McGroder that
14     you recall being the counsel with whom you spoke?
15         A.   Yes.
16         Q.   And that leads to the next question and
17     that is, even though you paid for the database by
18     writing a check I assume for $15,000, were you
19     reimbursed for that payment?
20         A.   Yes, I was.
21         Q.   And let me just ask, who reimbursed you?
22         A.   I sent an invoice to Miss McGroder.
23         Q.   Okay. I'm not trying to pick, but here's
24     the reason I am not clear on it. I can envision

42

1      sending an invoice for services or expenses to
2      Miss McGroder and receiving a check from their law
3      firm, but I can also envision sending that same
4      invoice and receiving a check via their law firm
5      but written on a Pfizer account. Do you understand
6      the question?
7          A.   Yes.
8          Q.   Do you recall which it was?
9          A.   All of the payments that I've received
10     have been through their law firm.
11         Q.   On a law firm checking account?
12         A.   That's my understanding, yes.
13         Q.   May I ask this question, when did you
14     physically receive the database on the disk from I
15     assume from PHARMetrics?
16         A.   I don't recall.
17         Q.   And I ask that because of the date. I
18     mean the date says May 21. Is that something that
19     you can just send them over the signed request and
20     it comes in the mail within a few days or is it
21     months?
22         A.   I don't think it was months certainly,
23     but it wasn't -- I don't think I got it the next
24     day, but I don't recall the exact sequence of when

43

1      we actually received it.
2          Q.   I don't want to push too hard on this,
3      but I would like to know the date you received it.
4      And I appreciate you don't have that information
5      here in front of you, but among your bills and
6      communications with Miss McGroder, is there a
7      record somewhere that you can look at this
8      afternoon after the recess and come up with the
9      date that would be within a few days of the date
10     you received the PHARMetrics database?
11         A.   I can't think of any way to triangulate
12     on that date.
13         Q.   I like that phrase. Are you sure you
14     weren't in the military?
15         A.   I'm very sure.
16         Q.   Are you a pilot?
17         A.   No.
18         Q.   Sailor?
19         A.   No.
20         Q.   Just triangulate's in that universe of
21     your vocabulary?
22         A.   Yeah.
23         Q.   What did you do upon receiving the
24     PHARMetrics database insofar as working with that

44

1      database is concerned?
2          A.   I met with Dr. Hur and there were I
3      believe SAS transport files.
4          Q.   What does that mean? I'm sorry.
5          A.   It's the way that you transmit a SAS
6      file. It's sort of a protected and condensed mode
7      that allows it to be locked and unlocked and
8      extract the SAS files which contain the data. And
9      I asked him to, you know, begin going over it and
10     verifying that what was there was what we had asked
11     for.
12         Q.   Is that something that you would have the
13     particular skill set to have done without Dr. Hur
14     yourself?
15         A.   I could have done it, but he's much
16     better at it than I am.
17         Q.   And I accept that. I'm just curious
18     whether if you looked up one day and you found only
19     yourself and a big computer and a desert island and
20     a PHARMetrics database and a SAS file, you could
21     have done the work that involved the SAS transport
22     files and the database and begin to do the work?
23         MS. McGRODER:  Object to form.
24         THE WITNESS:  I have done SAS work in the

45

1  past.  I have worked with SAS transport files in
2  the past.  I wouldn't have done it in SAS.  I did
3  this in SAS because I -- for work that's going to
4  be under scrutiny of say the FDA or involved in a
5  litigation, I want to make sure that that work has
6  been done in an easily reproducible format that's
7  generally accepted and using validated routines.
8  If you were to give me a SAS transport file, I
9  would dump the contents of that file and I would do
10  it all in fortran.
11  BY MR. LONDON:
12      Q.  You asked and answered my next question.
13  Did you come to eventually provide a copy of the
14  database, the PHARMetrics database to counsel?
15      A.  Yes, I did.
16      Q.  When was that?
17      A.  I don't recall at the time, you know,
18  when -- I'm assuming when this was all, you know,
19  we had finished the reports and providing all of
20  the relied upon information in response to I
21  imagine your letter of request.
22      Q.  Well, again, in short terms, the paper is
23  dated September the -- the pharmacoepidemiology
24  study in the report is in a report dated in

46

1  November.  Would it have been sometime between
2  September and November that you gave it to counsel?
3      MS. McGRODER:  Object to form.  If you
4  know.
5      THE WITNESS:  I don't know the specific
6  date.
7  BY MR. LONDON:
8      Q.  All right.  I'd like to ask that you
9  triangulate that date for me to the extent of your
10  ability to do and tell me when you provided it to
11  defense counsel after a reasonable search.  Do you
12  understand that?
13      A.  I do understand it.
14      Q.  Thank you.  A couple of more questions
15  about the PHARMetrics database.  Is this the first
16  time you had worked with the PHARMetrics database?
17      A.  I worked in collaboration with Rob Valek
18  at the University of Colorado on an analysis of
19  PHARMetrics database.
20      Q.  To what end?
21      A.  It led to a paper that I believe was -- I
22  don't know if it was ever published, but it was
23  presented at the American College of
24  Neuropsychopharmacology, ACNP.  I apologize for

47

1  that.
2      Q.  When would this have been, generally?
3      A.  I'm thinking 2005, 2006.
4      Q.  What would have been the cohort databases
5  in that PHARMetrics database that you used?
6      A.  This would have been a study of the
7  relationship between antidepressants, particularly
8  SSRIs, and suicide attempts I believe in an adult
9  cohort.
10      Q.  At some point we have been given to see
11  that you have been an author or a co-author, I'm
12  not sure I recall which, on a number of published
13  papers that have to do with suicidology and
14  antidepressants.  Fair enough, just in the general
15  universe of those concepts?
16      A.  Yes.
17      Q.  As I recall, some of them even were with
18  some or all of the same coauthors as the
19  September 2008 paper.  Still with me?
20      A.  Yes.
21      Q.  Was the PHARMetrics database that you
22  worked with around 2005 with the gentleman from the
23  University of Colorado whose name I don't recall,
24  was it also used to do any of the

48

1  pharmacoepidemiology studies that you, Dr. Brown,
2  Dr. Hur and Dr. Mann did on those same subjects,
3  antidepressants and suicide issues?
4      MS. McGRODER:  Object to form.
5      THE WITNESS:  No.
6  BY MR. LONDON:
7      Q.  All right.  And again, this is probably
8  something we'll ask a little bit more about as we
9  go along, but as I recall one of those papers that
10  had to do with SSRIs or SNRIs and suicidology had
11  to do with a large cohort of VA patients.  Is that
12  -- when I talk about the VA paper, will that be
13  enough that you'll know what I'm talking about?
14      A.  Yes.
15      Q.  Did the VA paper not come from a
16  PHARMetrics database?
17      A.  That's correct.
18      Q.  What database did it come from?
19      A.  The VA database.
20      Q.  And was access to that something that you
21  were able to envision because of your association
22  with Dr. Hur working for the VA?
23      A.  It was in part due to the association
24  with Dr. Hur and in part due to the fact that the

49

1    University of Illinois and the VA enjoy a close
2    working relationship and I had a federal funded
3    grant to pursue work in this area.  So they gave us
4    access to those data.
5         Q.   Going back to a question that we just
6    touched on previously, Miss McGroder's law firm
7    reimbursed you for the expense of the PHARMetrics
8    database in the Neurontin cohort studies.  Had you
9    ever been reimbursed for payment of a database by a
10   law firm in any other pharmacoepidemiology study
11   you performed?
12        MS. McGRODER:  Object to form and your
13   preamble to that question.
14        THE WITNESS:  Not to my knowledge.
15   BY MR. LONDON:
16        Q.   I'll ask you more about this in a moment
17   if I'm smart enough to remember to do it.  But as I
18   recall, you were retained as an expert witness in a
19   case approximately named Giles versus Wyeth.  Do
20   you recall that?
21        A..  Yes.
22        Q.   Did you have a database that you used in
23   the Wyeth versus Giles case to do a
24   pharmacoepidemiology study?

50

1         A.   I know that part of my testimony relied
2    on the VA study, but the VA study had been done
3    prior to that and so there wasn't a particular
4    reason to obtain a new pharmacoepidemiologic
5    database.  You know, my opinions were based on the
6    VA -- in that regard were based on the VA study
7    that was already in place.
8         Q.   As I recall, some one or more of your
9    SSRI papers had to do with adolescents?
10        A.   Yes.
11        Q.   Did you have a database for use in your
12   study of adolescents that led to the work you did
13   on some one or more of those papers, SSRIs and
14   adolescents?
15        A.   Yes.
16        Q.   And who funded those databases?
17        A.   The database that we used for the
18   adolescents was an ecological study.
19        Q..  E-c-o, ecological?
20        A.   Yes.  It involved the relationship
21   between county level suicide rates which we
22   obtained in working with the Center For Disease
23   Control and I believe those data were obtained
24   through the Institute of Medicine during the IOM

51

1    committee on suicide prevention.  And shortly after
2    the IOM study was completed, Dr. Mann, John Mann
3    from Columbia University, who also was a member of
4    the IOM study on suicide prevention, asked me if I
5    could augment the model that we had already used as
6    an illustration in the IOM report that looked at
7    the relationship between age and sex and race and
8    suicide rates at the county level using this new
9    statistical methodology that allowed us to
10   simultaneously analyze all 3300 or so counties in
11   the United States, if we could add in
12   antidepressant prescriptions of three different
13   classes, SSRI, SNRIs and tricyclic antidepressants
14   into that analysis and see whether or not there was
15   any association between those drugs and suicide
16   rates throughout the United States adjusted for
17   age, sex and race.  And I said that would be
18   possible.  He said he had data on that and could
19   share those data with me.
20        Q.   He was Dr. Mann?
21        A.   Yes.
22        Q.   And Dr. Mann had the data?
23        A.   That's correct.
24        Q.   Do you know what form the data came in,

52

1    was it PHARMetrics or other?
2         A.   It was IMS data.
3         Q.   And can you for my help tell me what IMS
4    data is?
5         A.   IMS data are data on prescription rates
6    for various -- various drugs and they're available
7    -- actually, I believe IMS health owns PHARMetrics
8    and they can provide prescription rates broken down
9    in various ways by age and sex and county.
10   Actually, I believe they break them down by zip
11   code and we had to go from zip codes to county in
12   order to link that with the CDC data which are
13   provided at county level.
14        Q.   All right.  Do you know who funded the
15   database acquired by Dr. Mann in that instance?
16        A.   My understanding is that he had obtained
17   those data prior to that from a grant that was
18   funded actually by Pfizer.  I think he received
19   $30,000 to purchase those data and then he gave
20   those data to me.  I was not involved in, you know,
21   any of those interactions.
22        MR. LONDON:  All right.  We have five
23   minutes until the tape changes.  Should we just go
24   ahead and do it now?

53

1    MS. McGRODER:  Fine with me.  You want to
2  take a little break?
3    MR. LONDON:  Let's take five and change
4  tapes if anyone needs a recess.
5    VIDEOGRAPHER:  This is the end of tape
6  Number 1.  The time is 10:05 a.m.  We are going off
7  the record.
8    (Short recess.)
9    VIDEOGRAPHER:  The time is 10:14 a.m.  We
10  are back on record.
11  BY MR. LONDON:
12    Q.  To the extent that you can tell me, has
13  Pfizer directly or indirectly funded any of the
14  other databases that you have used in your work in
15  doing pharmacoepidemiology studies over the past
16  few years?
17    A.  No, not to my knowledge.
18    Q.  And I'm going to say that there are two
19  of them and to index those, it is the PHARMetrics
20  study database in this case and the IMS database
21  that it appears Pfizer grant money used to fund
22  Dr. Mann's acquisition of that database in one of
23  your previous collaborations?
24    MS. McGRODER:  Object to form.  Is that a

54

1  question?
2    MR. LONDON:  It was, but you objected too
3  quickly.
4    Q.  Do you understand those are the two that
5  I have in mind that Pfizer funded directly or
6  indirectly?
7    MS. McGRODER:  I object to the form of
8  that question.
9    THE WITNESS:  Those are the only two
10  databases that I'm aware of that had any
11  involvement with Pfizer.
12  BY MR. LONDON:
13    Q.  Have any of the databases that you have
14  used in pharmacoepidemiology studies in the past,
15  whether for litigation or for scholarly research
16  which may or may not have resulted in papers, been
17  funded by a pharmaceuticals companies?
18    MS. McGRODER:  Object to form.
19    THE WITNESS:  Not to my knowledge.
20    (Documents marked as Gibbons Deposition
21    Exhibit Nos. 4 and 5 for identification.)
22  BY MR. LONDON:
23    Q.  I want to show you Exhibits 4 and 5.  I
24  don't have more copies than one of 4 and 5 we all

55

1  have copies of.  Can you identify those for me,
2  please?
3    A.  This appears to be the materials that we
4  shared with counsel to produce to you.
5    Q.  Do those appear to be in the form in
6  which you shared them with counsel?
7    A.  I believe so, yes.
8    Q.  I appreciate you can't actually tell
9  what's in the disk without inserting it in a drive
10  and opening it, but does that look like the disk
11  and the format you provided it to counsel?
12    MS. McGRODER:  Are we talking about
13  Exhibit 4 now?
14    MR. LONDON:  I'm sorry.  We are.
15    THE WITNESS:  Well, Exhibit 4 is simply a
16  disk.  It could have absolutely anything on it.
17  Exhibit 5 has contents that, you know, are
18  reminiscent of what was provided to counsel.
19  BY MR. LONDON:
20    Q.  Can we look at Exhibit 5 for just a
21  moment?  Each of these appears to have wholly or
22  partially a SAS suffix.  For example, Number 1 is
23  all diags for bipolar.SAS7BDAT.  Do you see that?
24    A.  Yes, I do.

56

1    Q.  The first number of those have a SAS BDAT
2  until you get down to a read me file.  Do you see
3  that?
4    A.  Yes.
5    Q.  And then I believe the remainder of these
6  all have SAS suffixes.  Do they?  Do you agree?
7    A.  Yes.
8    Q.  What -- are these suffixes such that it
9  would require a SAS program to open and read these
10  files on a disk that contains these contents?
11    A.  The first series of files that end with
12  BDAT prior to the read me text file are databases
13  which would require a SAS program to read them and
14  those files that end in the suffix S-A-S are the
15  SAS files instruction files that actually open
16  those databases, manipulate those databases and
17  perform analyses.
18    Q.  All right.  If one had only a computer
19  disk that contained these contents as shown in
20  Exhibit 5 and inserted that disk into the computer,
21  would it still require an additional SAS program to
22  run them?
23    A.  You'd need to have a license for the
24  Statistical Analysis System and, you know, in order

57

1  to run the SAS files that read the data.
2     Q.   And is it a commercially available
3  program?
4     A.   Yes, it is.
5     Q.   And as long as we're on this, to avoid
6  coming back more frequently than necessary, I'm
7  going to assume that Exhibit 5 is the list of the
8  contents of the PHARMetrics database that is the
9  basis of your two studies, the bipolar study and
10  the gabapentin study?  You know, we can open it and
11  compare it, but I'm going to accept it as it is,
12  all right?
13     A.   That's fine.
14     Q.   I understood that earlier you first
15  consulted with Dr. -- was it Dr. Hur, H-u-r?
16     A.   Yes.
17     Q.   -- upon receipt of the PHARMetrics data
18  because he was, in your view, better equipped to
19  work with this SAS database?
20        MS. McGRODER:  Object to form.
21  BY MR. LONDON:
22     Q.   He could do it faster, more efficiently
23  and not resort to fortran?
24        MS. McGRODER:  Object to form.

58

1        THE WITNESS:  It was a good division of
2  labor.
3  BY MR. LONDON:
4     Q.   The question I now have is apart from
5  working -- letting Dr. Hur do what he did, whatever
6  that was, did you yourself open and manipulate any
7  of the data on the files that are inside the list
8  on Exhibit 5?
9        MS. McGRODER:  Object to form.
10        THE WITNESS:  I had Dr. Hur write out the
11  contents of the SAS data files, the original data
12  sets and I verified the computations that he made.
13  BY MR. LONDON:
14     Q.   Tell me what it means when you say you
15  had him write out -- what did you say, write out
16  the contents?
17     A.   Yes, these files are in a SAS format.
18     Q.   Yes.  The BDAT files?
19     A.   The BDAT files, which these files with
20  the extension SAS read.  I had him write out the
21  contents, the actual data in the original format as
22  an ASCII file so that I could access those data and
23  verify values and tables and so forth to ensure
24  that both he and I would come up with the same

59

1  answer.
2     Q.   Well, there was more to the epidemiology
3  studies that you did than just opening the files
4  and reprinting the data.  I mean there had to be
5  some data analysis in order to generate the tables
6  in your paper and the tables in your expert report?
7        MS. McGRODER:  Object to form.
8  BY MR. LONDON:
9     Q.   True?
10     A.   Yes.
11     Q.   And are you the gentleman who did that
12  analysis of the data?
13     A.   The analyses of the data and the data
14  manipulation are all described in these files that
15  have the extension SAS.
16     Q.   Did the files that had the extension SAS
17  not appear in the contents of the PHARMetrics file?
18  In other words, let me ask that question a
19  different way if I can.  I don't know that it was
20  clear what I was trying to get to.
21        When you first received the PHARMetrics
22  database, were all of the files that are listed on
23  Exhibit 5 on the disk?
24     A..  No.

60

1     Q.   All right.  And so what was added to the
2  disk were all of the files on the contents
3  Exhibit 5 that are below the read me file, is that
4  correct?
5     A.   Yes.
6     Q.   And so the .SAS files are the files that
7  you and perhaps your colleagues created in doing
8  the pharmacoepidemiology studies?
9     A.   Yes.
10     Q.   And did so by -- this may not be the
11  right word, correct me -- manipulating or
12  extracting information from the BDAT files?
13        MS. McGRODER:  I'm going to object to
14  form.  I mean I think you keep using the word
15  manipulating.
16        MR. LONDON:  Those are words that I read
17  in his reports.
18        MS. McGRODER:  I object to it.
19        THE WITNESS:  The -- could you repeat the
20  question?
21  BY MR. LONDON:
22     Q.   I'll do my best.  Are those files listed
23  in the contents of Exhibit 5 the .SAS files, files
24  that you and perhaps one or more of your colleagues

61

1  created by virtue of having extracted and
2  manipulated data from the BDAT files in the course
3  of your pharmacoepidemiology work?
4         MS. McGRODER:  Object to form.
5         THE WITNESS:  Not in the way that you've
6  said it.
7  BY MR. LONDON:
8     Q.   Can you correct that so that it would be
9  understood how it was done?
10    A.   If I'm understanding your question
11 correctly as the SAS files that are listed below
12 the read me file were created by my colleague Kwan
13 Hur, and I, to open and read the original data that
14 were contained in the SAS BDAT files and to perform
15 analyses on those data, then the answer is yes.
16    Q.   Do the analyses that were performed on
17 the data appear in any of the files on the contents
18 page of Exhibit 5?
19    A.   The instruction files for performing the
20 analyses are all of the files that list the SAS
21 extension.
22    Q.   I don't -- I just simply don't understand
23 what you're telling me.  The instruction files are
24 contained within the .SAS files?

62

1     A.   Yes.
2     Q.   And what is an instruction file as you're
3  using that term?
4     A.   The SAS code that performs the analysis
5  of the data that is contained in the BDAT files.
6  That's what I'm referring to as an instruction
7  file.  So the files that have an SAS extension are
8  the files that are used to perform the analyses and
9  generate the output.
10    Q.   Is there on this contents page, and
11 presumably if it's the same, is there on that
12 CD-Rom, Exhibit 4, the actual work product that you
13 did yourself in extracting the data from the BDAT
14 files and/or the SAS files to produce the tables
15 that appear in the pharmaco reports?
16    A.   The files -- everything that is in the
17 reports is generated by these SAS files.
18    Q.   That I understood you to say.  What I'm
19 trying to ask is a slightly different question.  In
20 opening any of these files, would we see either the
21 tables that appear in your November 5 report or any
22 of the tables that appear in your September paper?
23    A.   None of the output files that are
24 generated from running these SAS files are

63

1  contained on this disk, but all of them can be
2  reproduced simply by running these SAS files.
3     Q.   I agree with probably everything you said
4  minus the word simply.  But having said that, where
5  are the output files?
6     A.   I'm not sure they even exist.  We would
7  reproduce them simply by rerunning these.
8     Q.   And earlier you said that Dr. -- I
9  believe it was Dr. Hur that had provided
10 information to you on an ASCII disk in order that
11 you might verify what he had extracted from these
12 contents disks?
13        MS. McGRODER:  Objection.
14 BY MR. LONDON:
15    Q.   And the key I'm asking about is the ASCII
16 part?
17        MS. McGRODER:  Well, object to form.  Do
18 you understand the question?
19        THE WITNESS:  If I understand what you
20 mean by an ASCII disk to be an ASCII file, I do
21 understand your question.
22 BY MR. LONDON:
23    Q.   Where is the ASCII file?
24    A.   I have that on a computer.

64

1     Q.   All right.  Is that a file that you could
2  convert into either a disk or a CD and provide a
3  copy to me, please?
4     A.   Yes.
5     Q.   All right.  Is that a hard project?
6     A.   No.  I'm sorry.  What do you mean?
7     Q.   By hard project I mean are we talking
8  about 48 hours or are we talking about 5 minutes or
9  more than a click and copy?
10    A.   If I'm understanding your question to be
11 is it hard for me to provide the ASCII file to you
12 in a disk, the answer is no.
13    Q.   Yes.
14    A.   If you're asking is it hard to do the
15 analyses, the answer is yes.
16    Q.   Well, if I were to do that work, the
17 answer to both would be yes, but since you're going
18 to do the work, may I ask that you do the former,
19 that is please provide for me a CD, if that's the
20 better format, of the ASCII file that you have
21 available that you used to verify Dr. Hur's
22 information from the contents of Exhibit 5?  If
23 you'd provide me a CD of that, I won't ask you to
24 explain to me how you did the verification, but

65

1   just provide the data, would you do that for me,
2   please?
3       A.   I'll consult with counsel.  But --
4       Q.   And assuming that we're not talking about
5   an extraordinarily time intensive product, is that
6   something you would bring back to us -- we'll
7   probably still be here tomorrow, so if I could ask
8   you to anticipate that I will request that tomorrow
9   morning when you come back.
10      A.   I'll do my best.  I had a technical
11  problem on my computer last night.  I had a hard
12  disk crash, but I should have it available and
13  should have another computer where I can create the
14  CD.
15      Q.   It's available in a backup or a server
16  somewhere you believe?
17      A.   Yes.
18      Q.   And so I do make that request and thank
19  you.
20           MS. McGRODER:  We'll do our best.
21           MR. LONDON:  Thank you.
22           (Document marked as Gibbons Exhibit
23           Number 6 for identification.)
24

66

1   BY MR. LONDON:
2       Q.   Dr. Gibbons, can you identify what I
3   believe is marked Exhibit 6 for me, please?
4       A.   Yes.
5       Q.   Please do.
6       A.   It looks like it's a retention letter
7   related to this case.
8       Q.   May I ask it in this way, does this
9   appear to set out the terms by which you were
10  retained by counsel for Pfizer to serve as a
11  consultant or to serve as an expert witness in the
12  Neurontin litigation?
13      A.   I believe it is, yes.
14      Q.   Are there any other agreements between
15  you and counsel that as far as you're concerned are
16  not -- are in addition to or more recent than this
17  Exhibit 6 dated March 25, 2008?
18      A.   Not to my knowledge.
19      Q.   Had you worked with the law firm of
20  Shook, Hardy & Bacon before?
21      A.   No.
22      Q.   With whom did you have first contact from
23  the firm of Shook, Hardy & Bacon regarding your
24  consultation in this case?

67

1       A.   With Miss McGroder.
2       Q.   And how did that communication take
3   place?  Was this a telephone call?  Did she come to
4   your office, that sort of thing?
5       A.   I believe it was a telephone call.
6       Q.   Did you know her before this time?
7       A.   No.
8       Q.   Were you anticipating this call for some
9   reason?
10      A.   I believe I had spoken with Mr. Hooper
11  who had contacted me first and said that -- asked
12  if I would be available to look into this matter
13  and then I spoke with Lori.
14      Q.   Had you worked with Mr. Hooper before?
15      A.   I might have talked with him before, but
16  I don't think I had worked with him.  I might have
17  met him once before, but I don't think I had done
18  any work with him.
19      Q.   How were you acquainted with Mr. Hooper
20  before you were contacted by Miss McGroder?
21      A.   I believe Mr. Hooper had -- was involved
22  in a case related to antidepressants and suicide
23  and I believe that he contacted the law firm of
24  Jones, Day who I provided expert testimony for in

68

1   the Giles case asking if I would -- if they would
2   mind if they approached me regarding other cases.
3       Q.   All right.  Let me reconstruct, if I can.
4   You once served as an expert witness for the Jones,
5   Day law firm representing Wyeth in the Giles case,
6   correct?
7           MS. McGRODER:  Object to form.
8           THE WITNESS:  Yes.
9   BY MR. LONDON:
10      Q.   And then your understanding is that from
11  that relationship, Mr. Hooper spoke with someone at
12  Jones, Day who brought up your name as a potential
13  witness or a potential consultant?
14      A.   I believe that was the -- what happened,
15  yes.
16      Q.   And Mr. Hooper spoke with you and after
17  that conversation, you thought you might hear from
18  someone who turned out to be Miss McGroder?
19      A.   Something along those lines.  That's as
20  much as I remember.
21      Q.   To the extent that you can correct it,
22  what's -- is there any correction to that that you
23  recall that better sets out how it came to be that
24  you were retained?

69

1        MS. McGRODER:  Well, object to form.  If
2  you know.
3        THE WITNESS:  I mean, I don't -- I don't
4  know, you know, the details of all of that.  I know
5  that I spoke with Mr. Hooper at one point about
6  antidepressants and a suicide litigation.  And
7  then, you know, he brought up this issue of
8  antiepileptic drugs and said that I'd be -- you
9  know, if I was interested, I would be contacted by
10  Miss McGroder.
11  BY MR. LONDON:
12        Q.  All right.  And do you recall what you
13  said to Mr. Hooper about your interest level?
14        A.  I think I -- I don't really remember.  I
15  said, you know, I had read something about this and
16  you know, I usually tell people I'm happy to look
17  at things.  I rarely say that I'm, you know,
18  willing to take something on, but usually happy to
19  talk to people.
20        Q.  Have you turned down other requests to
21  serve as an expert witness in pharmaceutical
22  products liability litigation?
23        A.  In a particular one or --
24        Q.  Yes, apart from this case and apart from

70

1  the Giles case, we know you've been accepted as an
2  expert witness in that case and in this case, but
3  have you in other cases -- have other cases been
4  brought to you with a request that you consider
5  being an expert witness for one side or the other
6  in a pharmaceutical drug products liability case
7  and you either accepted or turned it down?
8        A.  Well, I have been part of a case for the
9  U.S. Department of Justice and it's a little scary
10  getting a call from the U.S. Department of Justice
11  and you don't want to turn them down.
12        Q.  What is the nature of that case?  Let me
13  back up.  Is that a case that's currently pending?
14        A.  Yes.
15        Q.  And is it a civil case or is it a
16  criminal case?
17        A.  You're beyond my legal knowledge.
18        Q.  All right.  Does it involve a
19  pharmaceutical product?
20        A.  Yes.
21        Q.  And what product is it?
22        A.  I don't remember.
23        Q.  Have you done just a whole lot of work on
24  that case yet?

71

1        A.  I did quite a bit of work on that case
2  about a year ago.
3        Q.  And was that work done on behalf of the
4  United States Department of Justice or on behalf of
5  the party or person they're opposing?
6        A.  The -- on behalf of the U.S. Department
7  of Justice.
8        Q.  Have you given testimony in that case
9  whether by deposition or in court?
10        A.  No.
11        Q.  Have you written expert reports in that
12  case?
13        A.  Yes.
14        Q.  Where is the case pending?
15        A.  I believe it's in Wyoming.
16        Q.  I don't know of a better way than to
17  simply ask to leave a blank at this spot and if you
18  would get a chance to either remind me or to fill
19  it in when you read this, tell me what drug product
20  is involved in that case.  I appreciate you haven't
21  looked at it in a year and you've been focused on
22  other things, but tell me what drug that is.  And I
23  don't know of a better way to ask you to do it or
24  to tell me tomorrow when you come back or to fill

72

1  in a blank when you read the deposition.
2        MS. McGRODER:  Object to form.
3  BY MR. LONDON:
4        Q.  Is that all right?
5        A.  I'll try to do that.
6        Q.  Apart from the case involving the unknown
7  drug and the Department of Justice and the Giles
8  case, have you either accepted or turned down
9  requests to serve as an expert in other
10  pharmaceutical litigation?
11        A.  I've turned down a great many.
12        Q.  Can you recall -- let me ask it a
13  different way.
14        Do you have a general policy that leads
15  you to turn down most requests?
16        MS. McGRODER:  Object to form.
17        THE WITNESS:  I don't have a general
18  policy.  I have limitations on my time and the
19  amount of time that I want to spend on working on
20  non-academically related activities.  And I get
21  many calls from lawyers who are involved in either
22  defending or prosecuting doctors for prescribing
23  antidepressants for suicide or related kinds of
24  cases and I always turn those down.

73

BY MR. LONDON:

Q.  Why do you always turn those down?

A.  Well, first, I don't like working -- you know, it's a little too close.  I mean, it's a person.  You know, I don't find that really that interesting.  And you know, I don't want to -- I don't want to do too much of this stuff.  I don't want to be in a position where I'm labeled with conflicts of interest for my academic work.  I know I've received attention for that already which I just don't fully understand, but I don't want to do too much of it.

Q.  All right.  Have you ever turned down a request to serve as an expert witness in a case in which the request was brought to you by Pfizer or a law firm representing Pfizer?

A.  The only contacts I've had with law firms representing Pfizer are related to this case and the original contact by Mr. Hooper and I haven't done my -- I don't believe I've done any of the work related to the antidepressant cases that Mr. Hooper had involved..

Q.  All right.  And have you turned down a request by a pharmaceutical company or an attorney

74

representing a pharmaceutical company to serve as an expert witness in an SSRI case other than Wyeth and Giles?

MS. McGRODER:  Object to form.

THE WITNESS:  I believe so, yes.

BY MR. LONDON:

Q.  Who have you turned down as you recall?

A.  Most of them don't even really get to the point of telling me who their client is.  They'll just say I have a client in a case like this, I understand you testified in the Giles case.  Would you be available to do this.  And I say no, I'm not available.

Q.  And do you know whether those are attorneys from pharmaceutical companies or otherwise?

MS. McGRODER:  Object to form.  Go ahead.

THE WITNESS:  I believe those are attorneys who are representing pharmaceutical companies, but I don't know which.

BY MR. LONDON:

Q.  Can you tell me -- I think I'll go into the money questions for a few minutes and we'll kind of get those out of the way.

75

Can you tell me what sum of money you have been paid to this point by Pfizer, which may be through counsel's payments, for your services in the Neurontin litigation?

A.  I don't know the answer to that.

Q.  In the Exhibit 6 retainer agreement, that's what I call it, it indicates that your fee for services will be $500 per hour.  Do you see that?

A.  Yes.

Q.  Is that still the fee you charge?

A.  Yes.

Q.  Okay.  Do you have a record that would indicate how much time you have spent on behalf of Pfizer's work in this litigation?

A.  The only record would be the invoices that I've submitted.

Q.  Do you have copies of your invoices?

A.  Not with me.

Q.  Do you have a 1099?

A.  It's not broken down by -- you mean a 1099 from --

Q.  As I understand it, a 1099 is a form that is used to reflect the amount of compensation that

76

was paid by a taxpayer to a nonemployee individual in the course of a year.  They may be issued by law firms.  They may be issued by Pfizer.  They may be issued by others.  Have you received a 1099 reflecting the amount you have been paid for your services in the Neurontin litigation in the year 2008?

A.  Not to my knowledge.

Q.  Okay.  That was my first question.  Now we'll go into my second question.  I want to ask just a few questions about your background.  To do that, I think it's probably most efficient to use a CV.  What exhibit number is that?

MR. ALTMAN:  Seven.

(Document marked as Gibbons Exhibit Number 7 for identification.)

BY MR. LONDON:

Q.  Doctor, I believe this is a correct statement, but I cannot actually look at this document and validate it.  I believe this is a copy of the curriculum vitae you submitted in connection with the November 2008 report and I rather intentionally didn't use earlier CVs on the hypothesis that the November would have been the

77

1  most complete.  Can you look at Exhibit 7 and tell
2  me what it is, please?
3       A.  This is a relatively up-to-date version
4  of my CV.
5       Q.  All right.  Going at the moment only to
6  the education section on page 1, do you have any
7  other degrees or certificates from any other
8  academic institutions beyond those two listed?
9       A.  No.
10      Q.  You are not a medical doctor, are you?
11      A.  I'm not a medical doctor.
12      Q..  And have you at any time taken an
13  examination by any licensing authority by which
14  passage of the examination would give you
15  privileges to practice any particular profession in
16  any particular state of the United States?
17      A.  No.
18      Q.  Okay.  To be sure that -- and I'm sure
19  you did, but to be sure you understood my question,
20  you understand that doctors typically have to take
21  a license exam to be allowed to practice medicine.
22  I understand you're not a doctor and haven't taken
23  the doctor's exam, fair enough?
24      MS. McGRODER:  Object to form, asked and

78

1  answered.
2       THE WITNESS:  That's correct.
3  BY MR. LONDON:
4       Q.  All right.  Are there license exams to
5  practice pharmacoepidemiology as far as you know?
6       A.  Not to my knowledge.
7       Q.  Are there licensing exams to practice
8  statistical analyses of the type that you perform
9  as far as you know?
10      A.  No.
11      Q.  I know that you are a member of the
12  Institute of Medicine.  Was there an examination
13  that was required that you submit in order to be
14  listed as a member of the IOM?
15      A.  No.
16      Q.  All right.  That's an appointive or
17  elective honor, is it not?
18      A.  It's elected.
19      Q.  And you're elected on nomination of
20  existing or sitting members, is that correct?
21      A.  That's correct.
22      Q.  Three quick ones.  You're not a
23  psychiatrist, psychologist, pharmacist or
24  pharmacologist, are you?  I guess that's four quick

79

1  ones.
2       A.  I'm not any of those things.
3       Q.  Do you hold yourself out as an expert in
4  any of those things?
5       A.  No.
6       Q.  And I know that it's true, but for the
7  record, you are not in a position to prescribe
8  drugs for anyone, is that true?
9       A.  That's true.
10      Q.  Are you a person who has expertise in
11  clinically interpreting patient events or patient
12  symptoms to render a diagnosis?
13      A.  No.
14      Q..  A different way to ask this might be do
15  you consider yourself to be a medical clinician?
16      A.  No.
17      MS. McGRODER:  Objection, asked and
18  answered.
19  BY MR. LONDON:
20      Q.  Do you consider yourself to be an expert
21  in the science of suicidology?
22      MS. McGRODER:  Well, object to form.
23      THE WITNESS:  I have expertise in the
24  methodological and statistical aspects of the

80

1  reports of suicide research.
2  BY MR. LONDON:
3       Q.  In terms of performing a psychological
4  autopsy on a person who has committed suicide, is
5  that something you believe yourself to be able to
6  do?
7       A.  If what you mean by that question is do I
8  -- am I an expert in looking through the
9  psychological record and determining associations
10  in terms of clinical events in a person's life and
11  suicidal thinking or behavior, no, I'm not an
12  expert in that.
13      Q.  All right.  Are you a person who could
14  read a medical record of a patient, examine that
15  patient's signs or symptoms and consistently
16  allocate that person's conduct to suicidal
17  ideation, suicidal preparation, suicidal attempts?
18      MS. McGRODER:  Object to form.
19      THE WITNESS:  Well, I might be able to
20  consistently do it, but I would not hold myself out
21  as an expert to do such work.
22  BY MR. LONDON:
23      Q.  Then you've answered two questions and
24  saved one.  Thank you.  I'm not sure I know how to

81

1    ask this question because I'm just not very good
2    with some of the terms, but in looking at the two
3    PHARMetrics cohort databases, as I understand some
4    of what you did, you read claims files for patients
5    whose patient events had happened in the past.
6    Does that make sense?  In other words, all of the
7    data in those PHARMetrics databases concerned
8    patients whose events had already taken place?
9       A.   That's correct.
10      Q.   Is that called retrospective or looking
11    backward studies?
12       MS. McGRODER:  Object to form.
13       THE WITNESS:  I wouldn't call it that.
14    BY MR. LONDON:
15      Q.   What would you call it?
16       A.   I would call it an analysis of a medical
17    claims database of different kinds of events.
18      Q.   All right.  But events that have already
19    taken place?
20       A.   That's correct.
21      Q.   All right.  What I want to find out about
22    is whether you have been involved in the design of
23    a study for events that have not yet taken place,
24    events that will take place in the future, for

82

1    example, a random controlled trial.  Have you been
2    involved in the design of a study of a random
3    controlled trial of patients who will be collected
4    in the future and become enrolled in the trial?
5       MS. McGRODER:  Object to form.
6       THE WITNESS:  Yes.
7    BY MR. LONDON:
8      Q.   Tell me about your involvement in that
9    kind of study, please.
10       A.   Well, I've been consulted over the past
11    27 years regarding the design and analysis of a
12    wide variety of medical studies and those include
13    randomized clinical trials in many different areas
14    including psychiatric, cardiovascular, oncology,
15    you know, many different areas both in terms of
16    setting up the design of those studies, in terms of
17    selecting sample sizes for those studies, in
18    designing the statistical analytic methods that
19    will be used in the analysis of the data that
20    result from the studies.  I've been on data safety
21    monitoring boards that have reviewed the ongoing
22    conduct of such studies.  You know, I've had a lot
23    of experience with randomized controlled trials.
24      Q.   Can you identify for me a pharmaceutical

83

1    product that has been the subject of designing a
2    prospective random controlled trial to which you
3    have contributed?
4       A.   You mean a project that was done for
5    industry?  I think --
6       MS. McGRODER:  Well, object to form.  Do
7    you understand the question?
8    BY MR. LONDON:
9      Q.   Let's go with the bigger field first,
10    just at all.  Is there a drug out there that you
11    recall participating in the design of a random
12    controlled trial, the outcome of which was to in
13    some way assess that drug whether for efficacy, for
14    safety, for dosage, for anything?
15      A.   Yes.
16      Q.   Can you recall that drug for me or those
17    drugs for me?
18       A.   One that I remember working on a long
19    time ago was the drug Xanax.
20      Q.   Is that X-a-n-a-x?
21       A.   Correct.
22      Q.   And did you do more than one project for
23    the Xanax trial design?
24       A.   I believe that I analyzed data and helped

84

1    as a consultant to the Upjohn Company and this is a
2    long time ago because the Upjohn Company hasn't
3    existed for a long time, in the -- in the design
4    and analysis of maybe between 10 and 20 Xanax
5    trials.
6      Q.   Were these trials that were conducted
7    before the submission to the FDA of a request to
8    approve an indication for Xanax?
9      A.   Yes.
10      Q.   I've seen the term NDA for New Drug
11    Application.  Do you know that term?
12      A.   Yes.
13      Q.   Were these Xanax NDA trials?
14       A.   I believe they were -- are.
15      Q.   And what do you recall your role in that
16    to have been?
17       A.   It was the development of I believe the
18    statistical analysis plan and the implementation of
19    those analysis plans and the analysis of those
20    data.
21      Q.   In other words, the design involved the
22    proposal of a statistical analysis plan to be used
23    in the trials and then after the trials got
24    underway, the actual analysis of the data that was

85

1 coming back from the trials?
2     A.  That's correct.
3     Q.  You did both prospective and current and
4 retrospective work on those trials?
5     MS. McGRODER:  Well, object to form.
6     THE WITNESS:  My memory if -- of those
7 were that I helped both in the specification of the
8 statistical analysis plan and actually performing
9 those analyses once the data were collected.
10 BY MR. LONDON:
11     Q.  Do you recall what specifically you
12 contributed to the design of the plan?
13     A.  I believe the recommendation of the
14 statistical methods.  I might have helped with
15 statistical power analyses.  It was a long time
16 ago.  Don't remember all the details.
17     Q.  Did it involve in any way the
18 interpretation of clinical data of patients in the
19 plan?
20     A.  I wouldn't be an expert on that.
21     Q.  So it would be no?
22     A.  No.
23     Q.  Were there other products in addition to
24 Xanax for which you've performed design services on

86

1 prospective random controlled trials?
2     MS. McGRODER:  Object to form.
3     THE WITNESS:  My experience in the design
4 and analysis of randomized control trials, you
5 know, goes on for such a long time.  There are many
6 drugs that started out as academic research
7 projects of which colleagues from either my
8 university in the department of psychiatry or other
9 departments or other universities have consulted
10 with me about how many subjects do we need to power
11 this kind of study, what would be the appropriate
12 statistical methodology for analyzing the data that
13 result from that study.
14     And many of those were done early on in a
15 lot of newer antidepressants and I probably worked
16 on those studies when they were in their sort of
17 academic infancy.
18     I have not provided a lot of consultation
19 to pharmaceutical companies in doing this kind of
20 work.  The Xanax study is one example.  Other
21 pharmaceutical related -- I did some work for a
22 company called Cellegy Pharmaceuticals that were
23 trying to get an NDA for an anal fissure cream.
24 Something you probably don't want to get.  And I

87

1 helped them design and power these studies and I
2 met with FDA to talk about the design and analysis
3 and the results of those trials.
4     Q.  Did you do any work for Warner-Lambert
5 trials?
6     A.  Not to my knowledge.
7     Q.  Have you done any such work for Pfizer
8 trials?
9     A.  Not to my knowledge.
10     Q.  Is it fair to say you were not involved
11 in the design of any trials that had to do with
12 gabapentin or Neurontin?
13     A.  I have not had any interactions with
14 Pfizer designing any kind of trials that were in
15 support of New Drug Applications.
16     Q.  Are you aware that there was one single
17 random controlled trial conducted by a Dr. Atul
18 Pande, P-a-n-d-e, on bipolar patients and blinded
19 placebo patients taking gabapentin?
20     A.  I've heard that name in connection with a
21 bipolar trial that was conducted by Pfizer.  I
22 haven't seen the data or the protocol or I don't
23 believe I had any exposure to that.
24     Q.  To the extent that you were involved in

88

1 designing or recommending designs for the protocol
2 of such trials, did you design or recommend the
3 design of any patient parameters, not numbers
4 parameters, but condition parameters such as
5 inclusionary or exclusionary medical conditions of
6 patients to be included in trials?
7     A.  No.
8     MS. McGRODER:  Wait, object to form.
9 You're talking again about randomized controlled
10 trials dealing with pharmaceutical products?
11     MR. LONDON:  Yes, ma'am.
12     MS. McGRODER:  Go ahead and answer,
13 Dr. Gibbons.
14     THE WITNESS:  No, I have not.  I wouldn't
15 be an expert in that.
16 BY MR. LONDON:
17     Q.  All right.  Does your expertise extend to
18 the ability to render an expert opinion on the
19 presence or absence of a safety signal in a
20 pharmaceutical product, a drug, by any means other
21 than by your performing statistical analyses on
22 cohort groups?
23     MS. McGRODER:  Object to form.
24     THE WITNESS:  If by your question you

89

1  mean does my expertise in relationship to
2  identifying safety signals extend beyond the design
3  and analysis of data and identifying what is a
4  statistically significant association between a
5  drug and a particular adverse event, then the
6  answer is no.  That is why I, you know, have
7  colleagues like Dr. John Mann who help in
8  determining the clinical relevance of those kinds
9  of associations.
10  BY MR. LONDON:
11      Q.  And specifically to that point, you do
12  not hold yourself out as being a gentleman who
13  could perform such an analysis or render such an
14  opinion based solely on clinical data as opposed to
15  solely on statistical data, is that true?
16      MS. McGRODER:  Object to form.  Object to
17  form.  If you understand that question you can
18  answer it.
19      THE WITNESS:  If by that question you
20  mean can my determinations about a potential safety
21  signal be made by me on the basis of my clinical
22  knowledge, the answer is no.  I'm not an expert in
23  that.
24

90

1  BY MR. LONDON:
2      Q.  Do you hold yourself out to be an expert
3  on the knowledge of the mechanism of actions of any
4  particular drug?
5      A.  No.
6      Q.  And is it fair to say that you do not
7  hold yourself out to be an expert on the mechanism
8  of actions of any GABAergic drug including
9  Neurontin?
10      MS. McGRODER:  Object to form, assumes
11  facts not in evidence.
12      MR. LONDON:  Say that again.  I'm sorry.
13      MS. McGRODER:  Assumes facts not in
14  evidence.
15      THE WITNESS:  Could you repeat the
16  question?
17  BY MR. LONDON:
18      Q.  I'll do my best.  Do you accept that you
19  are not an expert witness on the mechanism of
20  action of GABAergic drugs?
21      A.  I wouldn't be an expert on mechanism of
22  action of any drug, so I guess GABAergic drugs
23  would fall in that.
24      Q.  Are you -- okay, let's go back to your

91

1  preamble.
2      You are not an expert witness on whether
3  a particular drug's action is caused by whether it
4  is a calcium channel active drug, a sodium channel
5  active drug, a GABAergic drug or an HT5AA receptor
6  drug, is that true?
7      MS. McGRODER:  Objection to form, asked
8  and answered.  Go ahead.
9      THE WITNESS:  I don't have that kind of
10  expertise.
11  BY MR. LONDON:
12      Q.  All right.  And you would not try to on
13  your own allocate whether a drug belongs in a class
14  with other drugs based on its scientific mechanism
15  of action, would you?
16      A.  I would have to rely on the expertise of
17  other people to make that determination.
18      Q.  All right.  Insofar as your studies in
19  this case have involved questions of comparing
20  statistical analyses among and between 11
21  antiepileptic drugs such as those studied by the
22  FDA in the statistical review of 2008, you would
23  not yourself make a determination as to whether any
24  of those 11 antiepileptic drugs belonged in one or

92

1  more classes with any of the other 11 of those
2  drugs, would you?
3      MS. McGRODER:  Object to form.  Do you
4  mean a mechanistic class?
5      MR. LONDON:  Yes.
6      THE WITNESS:  I wouldn't have the
7  expertise to make that categorization on my own.  I
8  would have to rely on an expert in that area.
9  BY MR. LONDON:
10      Q.  All right.  To the extent that
11  gabapentin, Lamotrigine and Topiramate have
12  comparable or differing mechanisms of actions on
13  patients who take them, that is information that
14  you would get from others rather than making that
15  determination yourself, is that true?
16      MS. McGRODER:  Objection, asked and
17  answered.
18      THE WITNESS:  Yes.
19  BY MR. LONDON:
20      Q.  And is it fair to say that you believe
21  that one of the difficulties that the statistical
22  review generated by the FDA in its analysis of the
23  11 antiepileptic drugs is that Topiramate and
24  Lamotrigine drove the numbers in the studies in

93

1   which those drugs were pooled with gabapentin?
2       MS. McGRODER:  Object to form.
3       THE WITNESS:  That is one -- one of the
4   concerns I have about their analysis.
5   BY MR. LONDON:
6       Q.  All right.  And the extent that pooling
7   those drugs with gabapentin was scientifically
8   correct or scientifically incorrect based on
9   whether their mechanisms of action are identical,
10  shared, overlap or distinct, that's also not a
11  distinction that you would call upon yourself to
12  decide, is that true?
13      MS. McGRODER:  Object to form.
14      THE WITNESS:  As I've said before, you
15  know, understanding the mechanisms of actions of
16  these drugs are issues that I would have to rely on
17  the expertise of others.  It's not any expertise
18  that I would have personally.
19  BY MR.. LONDON:
20      Q.  Do you know whether Neurontin has been
21  approved by the FDA for prescription -- for the
22  indication of bipolar disease?
23      A.  I'm certainly not an expert on the, you
24  know, regulatory approvals of Neurontin.  I don't

94

1   really know one way or the other.  I don't think it
2   has, but you know only from my exposure to this
3   case and the issues and listening to the experts.
4       Q.  Do you know whether either Lamotrigine or
5   Topiramate were approved by FDA for any
6   psychiatric indication?
7       A.  I think Lamotrigine has been approved,
8   but again I can't really site the source of where I
9   know that from, but again I'm not really sure and
10  I'm not an expert.
11      Q.  All right.  Then to take it down one
12  further level, do you know whether Lamotrigine
13  having been approved for some psychiatric
14  indication as you think it may have done whether
15  that include bipolar psychiatric indications?
16      MS. McGRODER:  Object to form.
17      THE WITNESS:  I think I heard that
18  Lamotrigine had been approved for bipolar, but I
19  can't even tell you the source for that information
20  and I may well have misunderstood.
21  BY MR. LONDON:
22      Q.  Okay.  Has Pfizer contributed to -- you
23  are at the University of Chicago, correct?
24      A.  University of Illinois at Chicago.

95

1       Q.  I apologize.  I get off on one thing and
2   I get so focused and I come back.
3       A.  I was trained at the University of
4   Chicago and didn't go very far away.
5       Q.  Didn't go very far in distance?
6       A.  Correct.
7       Q.  Has Pfizer contributed either chairs,
8   funding, research or even a building, for example,
9   to the University of Illinois?
10      MS. McGRODER:  Object to form.  If you
11  know.
12      THE WITNESS:  I don't know.
13  BY MR. LONDON:
14      Q.  Do you know a Dr. Weiss-Smith?
15      A.  I read the -- I believe the expert report
16  of a Dr. Sheila Weiss-Smith.
17      Q.  Do you know her personally?
18      A.  No.
19      Q.  Did you read her deposition in this case?
20      A.  Yes.
21      Q.  And as I understand it, I may be
22  mistaken, I believe she's given two depositions.
23  One before you were retained and one after you were
24  retained.  Do you know which you have read?

96

1       A.  The only one that I remember reading was
2   the more recent one.
3       Q.  Do you recall whether she testified that
4   she believed that she had the ability to perform an
5   analysis on the FDA statistical review to form an
6   opinion whether Neurontin should have been included
7   or excluded from the FDA safety alert?
8       MS. McGRODER:  Can you read that question
9   back?
10      (Record read as requested.)
11      MS. McGRODER:  Well, I object to the
12  extent it misstates her testimony.  Are you asking
13  if he remembers whether she testified to that or
14  are you asking him if that's what she believes?
15  What are you asking him?
16      MR. LONDON:  Go ahead.
17      MS. McGRODER:  Well, objection.
18      THE WITNESS:  Could you repeat your
19  question and make it more specific?
20  BY MR. LONDON:
21      Q.  Probably not.
22      A.  Okay.
23      Q.  What recollection, if any, do you have
24  about what Dr. Weiss-Smith testified to concerning

97

1    her ability to analyze the FDA statistical review?
2        A.  I don't have any memory of that from my
3    reading of it.
4        Q.  Did you read her curriculum vitae?
5        A.  Not that I recall.
6        Q.  Do you have any reason to testify that
7    Dr. Weiss-Smith is not capable of performing the
8    same type of pharmaco-- I'm sorry.  Strike that.
9    Let me start over.
10       Do you have any reason to testify that
11   Dr. Weiss-Smith does not have the ability to
12   perform the same type of analysis that you
13   performed on the FDA statistical analysis to form
14   an opinion whether Neurontin should have been
15   included or excluded from the FDA safety study?
16       MS. McGRODER:  Well, object to form.  I
17   mean, you can answer that if you have an opinion
18   about it.
19       THE WITNESS:  That question was harder
20   than fortran.
21   BY MR. LONDON:
22       Q.  But you mastered fortran.
23       A.  If by that question you mean do I have an
24   opinion as to whether or not Dr. Weiss-Smith is

98

1    competent to do the kind of pharmacoepidemiologic
2    analysis that I did or that the FDA did, I'm not
3    sure which one you're talking about.
4        Q.  First let's restrict the scope of the
5    question.  I'm only asking about the FDA safety
6    alert of 2008 including the safety -- including the
7    statistical analysis that the FDA released on the
8    safety alert.  Are you with me so far?
9        A.  Yes.
10       Q.  I'm not asking about the
11   pharmacoepidemiological studies that you did later
12   on the PHARMetrics database, only the FDA level
13   studies.  Are you with me so far?
14       A.  Yes.
15       Q.  And as I recollect, you did an analysis
16   of the FDA's study and statistical database in
17   which you analyzed gabapentin, as well as other
18   products, to form an opinion whether the
19   statistical analyses revealed a signal or
20   statistical significance for gabapentin regarding
21   whether it could be seen statistically to
22   contribute or cause increases in suicides.  So far
23   so good?
24       MS. McGRODER:  Object to form.  What's

99

1    your question?
2        THE WITNESS:  So far I'm with you.
3    BY MR.. LONDON:
4        Q.  You did that study, did you not?
5        A.  I did perform a pharmacoepidemiologic --
6    I did perform a review of FDA's analysis.
7        Q.  And you reviewed both its primary method
8    of assessment and its heterogeneity assessment,
9    true?
10       A.  I reviewed everything in that report,
11   yes.
12       Q.  But including -- certainly including
13   those two aspects of its report?
14       A.  Yes.
15       Q.  And including a review that involved
16   pooling gabapentin with both Lamotrigine and
17   Topiramate among other drugs and yielding common
18   odds ratios and risk ratios for those pooled drugs,
19   true?
20       MS. McGRODER:  Object to form.
21       THE WITNESS:  I read their complete
22   description of the statistical methodology that
23   they performed including the methodology they used
24   for performing their meta-analyses.

100

1    BY MR. LONDON:
2        Q.  And you yourself performed analyses on
3    risk differentials and odds ratios by both
4    including and excluding Topiramate and
5    carbamazepine from gabapentin, true?
6        MS. McGRODER:  Object to form.
7        THE WITNESS:  I believe the analyses I
8    did excluded Topiramate and Lamotrigine, not
9    carbamate.
10   BY MR. LONDON:
11       Q.  I apologize.  I misspoke.  You're
12   correct.  By restating that with Topiramate and
13   Lamotrigine, is that true?
14       A.  Yes.
15       Q.  And my question then comes back to this,
16   do you have any reason to believe that
17   Dr. Weiss-Smith could not have done that same type
18   of study --
19       MS. McGRODER:  Object to form and
20   foundation.
21   BY MR. LONDON:
22       Q.  -- that you performed?
23       A.  As I stated before, I've never met
24   Dr.. Weiss and I don't recall reviewing her CV.  I

101

1   don't have an opinion on it one way or another.
2       Q.   May I ask the same question about
3   Dr. Sheila Arrowsmith-Lowe?
4       MS. McGRODER:  Object to form.  Her name
5   is Janet.
6   BY MR. LONDON:
7       Q.   Did you read Dr. Arrowsmith-Lowe's
8   deposition or depositions and/or reports?
9       A.   Not to my knowledge.
10      Q.   All right.  Not having read them, is it
11  fair to say you really don't have a way to assess
12  on any level whether she would be able to do the
13  type of work analyzing the FDA statistical review
14  that you did?
15      A.   I don't know one way or the other.
16      Q.   And then finally, let me ask the same
17  question about a Dr. Ruggieri, did you read
18  Dr. Ruggieri's depositions and/or reports?
19      A.   What is his first name?
20      Q.   Alex.  Is it Alex?
21      A.   I believe I read -- I know I read one
22  additional deposition in addition to Dr. Sheila
23  Weiss-Smith and it might have been his deposition.
24      Q.   Assuming it was his deposition, do you

102

1   recall forming an opinion whether Dr. Ruggieri was
2   or was not capable of performing the same type of
3   analysis on the FDA statistical review performed?
4       MS. McGRODER:  Object to form and
5   foundation.
6       THE WITNESS:  I don't -- I didn't form an
7   opinion one way or the other.
8   BY MR. LONDON:
9       Q.   And have no opinion, is that true?
10      A.   Not at this moment, no.
11      MR. LONDON:  We need to probably take our
12  second break.  The videographer has told me that
13  he's going to take a break whether we do or not so
14  let's take one now.
15      VIDEOGRAPHER:  The time is 11:14 a.m.
16  This is the end of tape Number 2.  We are going off
17  the record.
18      (Short recess.)
19      VIDEOGRAPHER:  This is the beginning of
20  tape Number 3.  The time is 11:33 a.m.  We are back
21  on the record.
22      (Documents marked as Gibbons Deposition
23      Exhibit Nos. 8 through 14 for
24      identification.)

103

1   BY MR. LONDON:
2       Q.   Dr. Gibbons, while we were off the record
3   I marked and handed to you a number of exhibits.
4   Can we just quickly identify them and then we'll
5   try to work with them either by date or by number.
6   Is Exhibit Number 8 the first report called the
7   declaration that you provided in regard to the FDA
8   analysis?
9       MS. McGRODER:  Well, object to form only
10  in that it's not a report.  It is a declaration.
11      THE WITNESS:  I believe it is, yes.
12  BY MR. LONDON:
13      Q.   Dated April --
14      A.   I don't have a date on here.  That's --
15  I'm just looking at Exhibits 8 and 9 and I'm just
16  trying to sort of --
17      Q.   As I look at Exhibit 8, the last page
18  contains a graph and at the bottom it has your
19  signature and above your signature it says
20  April 23, 2008.
21      A.   I see that now.  Thank you.
22      Q.   Is that the first report that you wrote
23  or in this case a declaration in which you
24  submitted an analysis of the FDA safety alert?

104

1       A.   Yes, it is.
2       Q.   And when I say safety alert, we
3   understand we're talking about the January 2008
4   safety alert regarding 11 antiepileptic drugs and
5   suicidality.  Fair enough?
6       A.   Yes.
7       MR. LONDON:  We've been asked to go off
8   for a second.
9       VIDEOGRAPHER:  The time is 11:35 a.m.  We
10  are going off the record.
11      (Short recess.)
12      VIDEOGRAPHER:  The time is 11:36 a.m.  We
13  are back on the record.
14  BY MR. LONDON:
15      Q.   I believe we had just identified
16  Exhibit 8, is that correct?
17      A.   Yes.
18      Q.   Can you identify Exhibit 9 for me,
19  please?
20      A.   Exhibit 9 is my first expert report that
21  was executed on May 19th of 2008..
22      Q.   And just by brief reference, can we
23  simply say that that expert report also was
24  addressed to the FDA safety analysis or safety

105

1   alert?
2       A.  Yes.
3       Q.  All right.
4           MS. McGRODER:  Objection, just to the
5   extent it does go beyond that.  It does address
6   additional things.
7   BY MR. LONDON:
8       Q.  You understand what I'm including and
9   excluding.  Your reports earlier than autumn of '08
10  only addressed the FDA, they did not address the
11  gabapentin or the bipolar epidemiology studies that
12  you did after July of 2008, true?
13      A.  That's correct.
14      Q.  And so when I say they address the FDA,
15  it's not only they address the FDA, they did not
16  address the two pharmacoepidemiology studies,
17  understood?
18      A.  I do understand that.
19          MS. McGRODER:  Just for the record, Jack,
20  my clarification was that they address additional
21  subjects other than the FDA alert, for example,
22  Dr. Bloom's methodology and the Collins McFarland
23  study.
24

106

1   BY MR. LONDON:
2       Q.  No problem.  Can you identify Exhibit 10
3   for me, please?  We did 8 and 9, correct?
4       A.  Correct.
5       Q.  Exhibit 10, please?
6       A.  Exhibit 10 lists the materials that I
7   considered in deriving my opinions.
8       Q.  And I may need some help with you on
9   this.  But can you tell me the date of this
10  materials list?
11      A.  I don't know.
12      Q.  All right.  When we're on Exhibit 10, if
13  you'll turn to the second page and go to Item 22,
14  for quick reference I notice that there's a
15  material considered dated April 8, '08, Dr. Glen
16  Mullins disclosure, do you see that?
17      A.  Yes.
18      Q.  I don't see anything more recent on this
19  list than that.
20          MS. McGRODER:  I can help you out.
21  BY MR. LONDON:
22      Q.  I'm separating this document from a
23  materials list that you submitted in November
24  because clearly the material list in November had

107

1   the opportunity to include later documents.  What
2   I'm trying to do is identify a materials list that
3   I believe you considered through your first two FDA
4   writings, Exhibits 8 and 9.  Do you understand what
5   I'm trying to do?
6       A.  I understand.
7       Q.  Do you think Exhibit 10 is that list
8   before the FDA statistical review?
9           MS. McGRODER:  Object to form.
10          THE WITNESS:  To the best of my knowledge
11  sitting here right now, I believe that to be true.
12          MR. LONDON:  And counsel has tried to
13  help explain something and I don't mind if you want
14  to explain it now.  I wasn't trying to cut you off.
15          MS. McGRODER:  Sure.  Exhibit 10 is the
16  Rule 26 materials considered list that was provided
17  with his report on May 19, 2008 pursuant to
18  Rule 26.
19          MR. LONDON:  And that was what I thought
20  it was, it was the Rule 26 disclosure for
21  Exhibit 9?
22          MS. McGRODER:  Exactly.
23          MR. LONDON:  Okay.  For some reason when
24  it got sorted up into these exhibit files, that

108

1   part of it went off into Xerox space as opposed to
2   cyberspace.
3       Q.  And then can you tell me what is
4   Exhibit 11, please?
5       A.  Exhibit 11 is my supplemental expert
6   report that includes my opinions formed after
7   reviewing the statistical review and evaluation
8   published by the U.S. FDA and following the
9   July 10th FDA meeting of two of their scientific
10  advisory boards.
11      Q.  Can you identify what is Exhibit 13,
12  please?
13      A..  This appears to be the slides by
14  Dr. Evelyn Mentari from the FDA on suicidality and
15  antiepileptic drugs and I don't know whether or not
16  this is the presentation that she provided to the
17  Scientific Advisory Board or some other
18  presentation.
19      Q.  All right.  And then finally, Exhibit --
20  I believe it's going to be 14?
21      A.  Exhibit 14 is the statistical review and
22  evaluation published by the U.S. FDA.
23      Q.  And the date on this is dated May 23.  Do
24  you see that?

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

109

1    A.  I do.
2    Q.  Do you recall that that was the day the
3 FDA published it, but that it wasn't actually put
4 up on the FDA website until sometime shortly after
5 that?
6        MS. McGRODER:  Object to form.  If you
7 know.
8 BY MR. LONDON:
9    Q.  Do you recall that?
10    A.  I don't recall.
11    Q.  Well, we see that the date of this is
12 May 23, correct?
13    A.  Correct.
14    Q.  And the date of your exhibit Number 9 is
15 May 19th.  Do you see that?
16    A.  Yes.
17    Q.  And so you did not have, as of the time
18 of your first two papers on the FDA statistical --
19 pardon me, the FDA safety alert, you did not have
20 the FDA statistical review, did you?
21    A.  That's correct.
22    Q.  All right.  Then by the time that you
23 wrote the document Exhibit 11 dated July 11, you
24 did have the FDA statistical review, correct?

110

1    A.  Correct.
2    Q.  All right.  Now, in Exhibit 8 I want to
3 -- and it certainly won't trouble me to share this
4 with you.  I've marked it in my own paper just for
5 quick reference.  On page 3 in the middle of that
6 paragraph on page 3, opinion 1, I've gone to a
7 sentence that says, "However, for gabapentin the
8 odds ratio is 1.033 (0.1337.884) P less than 0.999
9 indicating that for the 7,876 patients treated with
10 gabapentin (5194 treated and 2682 controlled) there
11 is no evidence of an association."  Are you with me
12 on that sentence?
13    A.  Yes, I see that.
14    Q.  What does that mean that the odds ratio
15 that you wrote in this report was 1.033?
16    A.  It just means that the point estimate of
17 the odds ratio is 1.033 and that it's not
18 differentiable from the null hypothesis of 1 for
19 the odds ratio.
20    Q.  Does the null hypothesis inherently mean
21 that if -- that null means there is no effect?
22    A.  That's correct.
23    Q.  You also said that there were 5,194
24 treated and 2,682 controls, correct?

111

1    A.  Correct.
2    Q.  Okay.  What was the source of your
3 information that produced the statistical
4 information in that sentence?
5    A.  These were data that were shared with me
6 from counsel who obtained them from Wyeth, original
7 reports that were submitted to the FDA.
8    Q.  You said Wyeth.  Did you mean Pfizer?
9    A.  I meant Pfizer.  Of course these days I
10 think I mean both.
11    Q.  They do seem to have a monopoly on the
12 big news these days, don't they?
13        What did you understand the 5,194 treated
14 and 2,682 controls to be?
15    A.  All of the subjects that participated in
16 placebo controlled, randomized clinical trials that
17 were submitted to FDA for their review.
18    Q.  Did you understand at the time that you
19 drafted this paper whether the patients treated
20 with gabapentin that were analyzed in the FDA's
21 meta-analysis included patients with zero event
22 trials?
23    A.  Repeat the question.
24    Q.  Yes, sir.  Some random controlled studies

112

1 yield results in which there are no events and
2 those are called zero event trials, true?
3    A.  True.
4    Q.  And did you understand that the
5 number 7,876 patients of whom 5,194 were treated
6 and 2,682 were controls included patients who were
7 in zero event trials?
8    A.  I either knew that or I assumed that.
9    Q.  All right.  And did you include patients
10 who were in zero event trials in calculating your
11 odds ratio?
12    A.  I included all of the subjects that were
13 in -- in these trials.  I did not perform a
14 meta-analysis.  This is just the overall odds
15 ratio, pooling all of the available data together.
16    Q.  Yes.  Now the meta-analysis would be
17 across different drug groups.  I'm only asking
18 about the gabapentin patients?
19        MS. McGRODER:  I'll object to form.
20        THE WITNESS:  I think your statement's
21 incorrect.  The meta-analysis could have -- would
22 have been across multiple studies for a given drug.
23 BY MR. LONDON:
24    Q.  All right.  I'll accept that.  I'm only

113

1  asking whether you assumed that the odds ratio
2  calculated, which you have disclosed in this
3  report, would have properly included both zero
4  event trials and single dose trials?
5      A.  When you say properly -- you said
6  properly.
7      Q.  I did say properly.
8      A.  I don't understand your question.
9      Q.  All right.  Then let's try it a different
10  way.  You said that you included all patients who
11  were in the gabapentin trials, true?
12      A.  True.
13      Q.  And that number was 7,876?
14      A.  Those were the data that were provided to
15  me or at least the summary of those data that were
16  provided to me.
17      Q.  By counsel?
18      A.  Correct.
19      Q.  And did that include -- did you read the
20  trial data yourself?
21      MS. McGRODER:  Object to form.
22  BY MR. LONDON:
23      Q.  So as to determine whether patients were
24  event patients, no event patients or single dose

114

1  patients, for example?
2      A.  I do not believe that I received patient
3  level data.  I received summary information.  I
4  think I asked how many subjects were, you know,
5  on drug and how many subjects were on placebo and
6  provide me a summary of what was submitted to the
7  FDA, but I don't believe I had the individual data
8  either broken down by study or even broken down --
9  or broken down by individual.  I can't exactly
10  recall right now.
11      Q.  Is it fair to say that this number, the
12  odds ratio of 1.033 with a confidence interval of
13  .135 through 7.884 is the number you generated by
14  studying the 7,876 patients in all Neurontin trials
15  submitted to the FDA as you understood that number
16  to be?
17      A.  It's true with one exception to the way
18  that you stated it.  It's from all placebo
19  controlled, randomized controlled Neurontin trials.
20      Q.  And did you understand that to be what it
21  was that the FDA had requested of Pfizer and the
22  other companies to submit placebo, random
23  controlled trials?
24      A.  Yes, that was my understanding.

115

1      Q.  Did you at that time have an
2  understanding one way or the other whether the
3  analysis would include no event trials?
4      A.  At that stage and before I saw the
5  statistical report, it was unclear to me how FDA
6  had done the analysis in any way because those
7  details were omitted.
8      Q.  Did you include trials that were not
9  placebo controlled?
10      A.  To my knowledge, I did not.
11      (Discussion off the record.)
12  BY MR. LONDON:
13      Q.  Can I ask you to turn to your report of
14  -- that's Exhibit 9, I believe it's May the 19th.
15  Did you essentially reach the same numbers in that
16  report, that is the odds ratio of 1.033 with 7,876
17  patients treated with gabapentin, 5,194 treated and
18  2,682 controls as you -- I'm sorry.  I don't mind
19  sharing.  I just highlighted it for my quick
20  reference.
21      A.  Yes, that looks to be the same statement
22  that's made in the earlier report.
23      Q.  Did you do any reanalysis of the data
24  between the time you wrote Exhibit 8 and the time

116

1  you wrote Exhibit 9 that would be between April and
2  May 19th?
3      A.  Which data are you referring to?
4      Q.  That generated the odds ratio of 1.033
5  over 7,876 patients?
6      A.  Not that I can recall about that
7  particular statement, no.
8      Q.  All right.  Do you recall doing any other
9  reanalysis of data or data?
10      A.  I'd have to compare, you know, what I
11  said in the first report versus the other, but I
12  don't recall one way or the other at this point off
13  the top of my head.
14      Q.  All right.  Were you simply predicting at
15  that time what it would have been that the FDA did
16  in its meta-analysis to generate odds ratios and
17  the number of patients it included in the
18  gabapentin studies?
19      A.  I was trying to do, if you will, a
20  statistical autopsy to try to determine from the
21  summary figures that were put in the FDA alert what
22  proportion of the data were from the data that were
23  submitted by Pfizer regarding gabapentin and was
24  that the difference that they had observed between

117

1    placebo and active treatment arms consistent for
2    the gabapentin data with the overall result that
3    they had.
4         Q.  Did you make an attempt to perform the
5    same statistical autopsy excluding zero event
6    trials?
7         A.  I didn't have the raw data.  In fact, to
8    this day, I still don't have the raw data that
9    would be necessary to do that from FDA.  They don't
10   -- they're not making those data available.  I wish
11   they were.  They'd be useful for academic purposes.
12        Q.  Did you try to perform a comparable
13   analysis excluding single dose, random controlled
14   study trials?
15        A.  To my knowledge, I didn't have single
16   dose.  To my knowledge, I had only the data that
17   were submitted to FDA which were placebo controlled
18   RCTs.
19        Q.  Did you know one way or the other whether
20   at that time that Pfizer had on its own performed a
21   comparable odds ratio analysis of the patients who
22   were in the random controlled trials taking
23   gabapentin that were submitted to the FDA?
24             MS. McGRODER:  Object to form.

118

1             THE WITNESS:  I don't recall now whether
2    or not I had that information.
3    BY MR. LONDON:
4         Q.  I will represent to you -- and if it
5    becomes critical we can go back and read the trial
6    testimony, but I will represent to you that at the
7    end of your direct testimony in the Daubert
8    hearing, not the cross-examination by Mr. Lanier,
9    but the direct presentation as I recall by
10   Mr. Barnes or Miss McGroder, you were asked and did
11   not know that Pfizer had submitted to the FDA a
12   separate package of materials in which it had
13   calculated the odds ratio without providing that
14   package to you.  Do you recall that?
15            MS. McGRODER:  Well, object to form.  For
16   the record, that testimony was elicited by
17   Mr. Finkelstein on his cross-examination of
18   Dr. Gibbons.  That might help your memory, but if
19   it doesn't --
20            THE WITNESS:  I'm afraid none of that
21   helps my memory.
22   BY MR. LONDON:
23        Q.  Do you recall now that Pfizer had
24   submitted a separate second study of its gabapentin

119

1    odds ratios in confidence intervals to the FDA that
2    had different numbers than your odds ratios and
3    confidence intervals expressed in these two
4    reports?
5         A.  I don't have any memory of that right
6    now, but you know, it wouldn't necessarily surprise
7    me.
8         Q.  Okay.  Did you ask Miss McGroder or
9    anyone else to provide to you everything that
10   Pfizer had given to the FDA?
11        A.  I simply asked for a summary of the
12   placebo controlled, randomized clinical trials that
13   had been submitted to the FDA, summary by drug
14   versus placebo in terms of number of events and
15   number of patients so that I could try to better
16   understand the overall results that were listed in
17   the alert.
18        Q.  I appreciate that's what you did ask for.
19   My question was trying to get at the issue of
20   whether you asked for everything that Pfizer had
21   submitted directly to the FDA?
22            MS. McGRODER:  Well, object to form.
23   When?
24

120

1    BY MR. LONDON:
2         Q.  As of any time before he testified in the
3    Daubert hearing.
4         A.  I do not recall ever saying please send
5    me everything that they had submitted to FDA
6    because that would have included, you know,
7    materials in support of their New Drug Application.
8    It would have included, you know, single Phase I
9    studies with, you know, non-randomized studies and
10   I had no interest in looking at those.
11        Q.  Did you have any interest in learning
12   whether Pfizer had submitted to the FDA an analysis
13   of the odds ratios and confidence intervals of
14   gabapentin random control trials apart from
15   anything that you might calculate yourself as a --
16   what did you call it, a statistical autopsy?  I
17   hope that's the right phrase.
18            MS. McGRODER:  Object to form.
19            THE WITNESS:  No.  My answer was no.
20   BY MR. LONDON:
21        Q.  Okay.  In Exhibit 14, the statistical
22   review -- you've read the statistical review?
23        A.  Yes.
24        Q.  Did the FDA exclude no event trials in

121

1  its primary method meta-analysis?
2      A.  Yes, they did.
3      Q.  Is that different than what you did in
4  the first two autopsies that you performed before
5  you rendered a statistical review?
6      A.  The overall results presented in the FDA
7  alert did not allow me to look at the individual
8  studies.  So I couldn't do that.  All it allowed me
9  to do was look at the aggregate which included all
10  subjects and all of the events.  So my analysis
11  included everybody, whether or not they were a part
12  of a zero event study or not.
13      Q.  Did -- I understand your answer to be
14  that you learned on reading the statistical review
15  that the FDA had excluded the zero event trials
16  from its primary signals whereas you had included
17  the zero event trials in your odds ratio analysis?
18      A.  Let me help you restating in your
19  question.
20      Q.  Please do.
21      A.  It was unclear to me what the FDA had
22  done in terms of their meta-analysis.
23      Q.  And in fairness to me, tell me when
24  you're referring to, before statistical or after

122

1  statistical?
2      A.  Before statistical.  So there was no
3  methodology described in the alert or not
4  sufficient to really understand what they had done.
5  I anticipated that they would have excluded zero
6  event studies because that's what they did in their
7  meta-analyses of the antidepressant drug data.  So
8  but the data that I had to work with and still have
9  to work with are not at the study level.  So to
10  reanalyze the data at the study level, that was not
11  something that was possible for me to do.  All I
12  could do was provide an overall summary at least at
13  that time.
14      Q.  Can you help me to understand your
15  answer?  When you say the data that you had were
16  not at the study level, tell me what that means,
17  please.
18      A.  Okay.  So in order to do a meta-analysis
19  of any kind in the context of this problem, you
20  would need to have the number of people and the
21  number of events for each one of the individual
22  studies for each one of the individual
23  antiepileptic drugs.  Those data are still
24  unavailable to anybody I know that -- you know,

123

1  people have been trying to get those data and FDA
2  has not released those data.  So in order to really
3  replicate FDA's meta-analyses at the current time,
4  that's impossible for anyone to really do.
5      Q.  Did you have available to you the actual
6  submissions by Pfizer to the FDA that were made in
7  2004 and -- as I recall 2004 and 2006 transmitting
8  Pfizer's summary of information to the FDA about
9  the gabapentin and Lyrica RCTs?
10      A.  I remember that there was some materials
11  that I looked at that provided an overview of what
12  was being submitted to the FDA.  I don't remember
13  if I had both of them.  I know -- I think I looked
14  at one of them.
15      Q.  As I look at Exhibit -- I believe it's
16  10, I see Items 10, 11 and 12 on Exhibit 10.  Can
17  you tell me what those three items are?
18      A.  Those would appear to be various
19  overviews of Pfizer's data on gabapentin that were
20  submitted to the FDA.  I'm not sure that 10 and 11
21  were submissions to the FDA, but clearly it says 12
22  is..
23      Q.  All right.  Item 1 on Exhibit 10 says
24  Pfizer's September 2004 gabapentin suicidality

124

1  analysis?
2      A.  Yes.
3          (Document marked as Gibbons Exhibit
4          Number 15 for identification.)
5  BY MR. LONDON:
6      Q.  I'm going to give you what's been marked
7  as Exhibit 15 and ask if you can identify that?
8      A.  This looks to be the document that is
9  identified as Item Number 10 on my materials
10  considered list.
11      Q.  And does this document, Exhibit 15 -- did
12  I give you a copy?
13          MS. McGRODER:  Yes, I have one.  Thank
14  you.
15  BY MR. LONDON:
16      Q.  Does it contain tables that show the
17  sample size and the sample duration?  And to help
18  you, what I'm looking at appears to be on page --
19  down in the lower right-hand corner -- 1635 and
20  following.
21      A.  Table 2 of this document lists length of
22  the studies and number of patients who are -- were
23  randomized to either placebo or control, placebo or
24  gabapentin conditions or in some cases active

125

1 controls or other therapies.
2      Q.  All right.  Do you find Table 3 in the
3 document?  And to help you, it appears to me to be
4 on page 27 in the upper right-hand corner, 27,
5 under the category psychiatry studies.
6      A.  I see that.
7      Q.  All right.  And among others, does
8 Table 3 provide the demographic characteristics and
9 treatment exposure in three psychiatry studies,
10 bipolar, panic and social phobia?
11      A.  Yes.
12      Q.  And does it provide a number called N?
13      A.  Yes.
14      Q.  What does N mean, if you can tell me, in
15 those three table studies?
16      A.  It appears to be the number of subjects
17 that were, I'm assuming, randomized to either
18 gabapentin or placebo.
19      Q.  If we look under bipolar study 945-209,
20 we have 58 gabapentin patients and 59 placebo
21 patients.  Is that how you interpret N?
22      A.  Yes.
23      Q.  And then in total patient years, we have
24 8.3 gabapentin patient years and 9.7 placebo years

126

1 on the bipolar patients.  Am I reading that
2 correct?
3      A.  Yes.
4      Q.  And what does a patient year mean as it's
5 described there as you understand it?
6      A.  As footnoted at the bottom of the table,
7 total patient years is the sum of days of exposures
8 for all subjects divided by 365.25.
9      Q.  All right, sir.  And then we could
10 replicate those same questions and answers for
11 panic disorder and social phobia just by reading
12 those two tables?
13      A.  Yes.
14      Q.  Then following that we have a table of
15 risk rate and cumulative risk.  Do you see that?
16 It just says there were no reports of suicide or
17 attempt in the three studies conducted in the
18 psychiatry studies?
19      A.  Yes.
20      Q.  Then beyond that, you have Table 4
21 appearing on page 29.  Do you see that?
22      A.  Yes.
23      Q.  That has the neuropathic pain treatment
24 exposure, correct?

127

1      A.  Correct..
2      Q.  Is there a section, if you recall or find
3 it, that tells whether there were any risks -- any
4 events in the neuropathic pain studies?  And I'll
5 direct your attention to the bottom of page 30.
6      MS. McGRODER:  Are you asking him if
7 there were ever events in the neuropathic pain
8 studies?
9      MR. LONDON:  We can ask that.
10      MS. McGRODER:  Well, objection.  The
11 document speaks for itself.  I mean --
12 BY MR. LONDON:
13      Q.  You had this document available to you,
14 didn't you?
15      A.  According to --
16      MS. McGRODER:  Well, actually the list is
17 a considered list.  I mean, Dr. Gibbons has not
18 testified he relied on everything on that list.
19      MR. LONDON:  Right.
20      MS. McGRODER:  And I don't think you've
21 asked him.
22 BY MR. LONDON:
23      Q.  Is it your testimony you did not rely on
24 Pfizer documents in doing your autopsy?

128

1      A.  I don't recall much about this document.
2 Did I look at this document?  I mean, I may have.
3 Looking at it right now, does it look familiar?  I
4 can't really tell you one way or the other.  I
5 mean, one of the things that I'm noticing in this
6 document is it's combining studies that had -- were
7 placebo controlled and also includes, you know,
8 nonrandomized studies.  So if I did see this
9 document, it wouldn't have meant a huge amount to
10 me.
11      Q.  Well, could you have taken the
12 information in this document -- strike that.
13      Did you take the information in this
14 document in an attempt to do a statistical autopsy
15 in the manner you predicted the FDA would have done
16 so that as, I recall your testimony, by excluding
17 zero event trials?
18      A.  No, I wouldn't have had -- I mean, this
19 document doesn't give me a breakdown of the number
20 of events by individual trials.  And I didn't have
21 that information from the FDA.
22      Q.  Or from Pfizer?
23      A.  Or from Pfizer to my knowledge.  At that
24 time, all I was working with was an overview of the

129

1   total incidents reported in the FDA alert and I was
2   trying to understand what contribution the data
3   from the placebo controlled, randomized clinical
4   trials contributed to that.
5        Q.   All right.  What, if anything, did you do
6   to determine the number of zero event trials in the
7   random controlled clinical trials before receiving
8   the FDA statistical review?
9        A.   Well, there was nothing I could do from
10  the FDA data because they didn't provide that kind
11  of information.  It -- you know, looking at the
12  very low incidence of suicidality events, it was
13  clear that there would be quite a few of the
14  studies that they looked at.  They claimed to look
15  at 199 studies, that there would be quite a few
16  that had zero event studies and I'm not sure what
17  kind of information I did or did not get from
18  Pfizer regarding the number of studies that had
19  zero events at that time.  So I was just trying to
20  figure out how much of the data looked at by FDA
21  could be accounted for in the gabapentin data.
22       Q.   I think I was trying to find out whether
23  you went through the documents in hand to try to
24  piece out the number of no event or zero event

130

1   trials.  That's what I'm trying to learn.
2        A.   Okay.
3        MS. McGRODER:  Objection.  Asked and
4   answered.
5   BY MR. LONDON:
6        Q.   Well, okay.  Do you understand my
7   question?  What it is I'm trying to learn and I'm
8   not trying to parse words with you --
9        MS. McGRODER:  Are you asking whether he
10  looked at these documents to do his analysis?
11       MR. LONDON:  Well, we've tried it that
12  way, but I didn't quite hear the answer to the
13  question I was asking, so I'm trying different ways
14  until I hear the answer I'm asking.
15       Q.   I'm not asking for you to agree with me.
16  I'm just trying to find out whether you went
17  through the documents you had before you received
18  the FDA statistical analysis in an attempt to piece
19  out from the 7,000 some odd patients how many of
20  them were zero event trials?
21       MS. McGRODER:  Well, objection, asked and
22  answered three times.  He told you he didn't do a
23  zero event analysis.
24

131

1   BY MR. LONDON:
2        Q.   I'm asking if he went through the
3   documents to try to find out what that number was,
4   please?
5        A.   If I understand your question correctly
6   of whether or not at this stage of my analysis I
7   was focusing on looking at these documents to
8   determine the number of studies that had zero
9   events, the answer is no.
10       Q.   Okay.
11       A.   Because I didn't have that kind of
12  information for the rest of the drugs that would
13  have been available.  And I couldn't intuit that
14  from the gabapentin data because it was immediately
15  clear that the gabapentin data had far fewer events
16  than the rate that was described in the FDA alert.
17  So even if I were to get the breakdown necessary to
18  get the number of zero event studies for
19  gabapentin, it wouldn't necessarily be useful in
20  trying to understand the other drugs because
21  someplace in those other drugs were studies that
22  had much higher rates of events.
23       Q.   Respectfully, objection, nonresponsive.
24  I'm only trying to find out as to gabapentin only

132

1   as to what you did, if anything, before you had the
2   FDA statistical analysis to parse out from the data
3   the number of zero event patients in the gabapentin
4   trials and your answer involved other things about
5   whether it would be useful in light of not having
6   the same information about the other 10 EDs and so
7   I'm really only asking at this moment about
8   gabapentin.
9        MS. McGRODER:  Well, object to form.
10  Asked and answered.
11       THE WITNESS:  Again, no, that was not an
12  analysis.
13       MR. LONDON:  Okay.  And that's -- see how
14  easy that was.
15       VIDEOGRAPHER:  The time is 12:16 p.m.  We
16  are going off the record.
17       (Whereupon, the deposition in the
18       above-entitled cause was recessed to
19       1:15 p.m. this date.)
20
21
22
23
24

133

```
 1          A F T E R N O O N   S E S S I O N
 2          VIDEOGRAPHER:  The time is 1:05 p.m.
 3   This is the beginning of tape Number 4.  We are
 4   back on the record.
 5          EXAMINATION (Resumed)
 6   BY MR. LONDON:
 7      Q.  I need to be reminded of one or two
 8   things I saw that I had not because you didn't read
 9   -- because I need to be reminded.
10          I'm asking you about the report that you
11   wrote which is Exhibit 9, it's called the expert
12   report and the declaration you wrote which is
13   Exhibit 8 and just for reference, those are the two
14   autopsies you did on the FDA numbers before you had
15   the FDA statistical review.
16      A.  These two reports were written prior to
17   the statistical review.
18      Q.  And what it is -- I'm trying to remember
19   what you said.  Forgive me, please.  Did you say
20   that in doing your statistical autopsies, you
21   included patients who were in only placebo
22   controlled, random control trials or did you say
23   that you also included patients who were in open
24   label or non-placebo trials?
```

134

```
 1      A.  I requested the data for only the placebo
 2   controlled trials, those trials that would have
 3   been given to the FDA I believe as a part of the
 4   2006 submission.
 5      Q.  Okay.  And did you say -- and forgive me
 6   again, that you included or did not include data
 7   that had single dose and low dose trials or did I
 8   even ask you?
 9      A.  I don't believe you asked me that.
10      Q.  Let me ask you that.  In those two
11   studies, the Exhibit 8 and Exhibit 9 studies that
12   you performed before you had the FDA statistical
13   review, did your 7,876 patients in those studies
14   include patients who had single dose trials?
15      MS. McGRODER:  Object to form and
16   foundation.  If you know.
17      THE WITNESS:  What do you mean by single
18   dose?
19   BY MR. LONDON:
20      Q.  A patient who is in a random controlled
21   trial and the trial consists of giving the patient
22   one dose only of the drug?
23      MS. McGRODER:  Object to form and
24   foundation.
```

135

```
 1      THE WITNESS:  If these were placebo
 2   controlled randomized studies that had been
 3   submitted to FDA by Pfizer, they were included in
 4   my analysis whether they were single dose or
 5   multiple dose studies.
 6   BY MR. LONDON:
 7      Q.  Thank you.  And I want to hone in on the
 8   submitted to FDA by Pfizer part of your answer.
 9   Submitted to the FDA by Pfizer when?
10      A.  I believe this was a part of their 2006
11   submission.  My request was for the summary data
12   for all of the placebo controlled, randomized
13   control trials that were submitted to FDA and I
14   think if I remember my -- remember correctly, it
15   was the 2006 submission.
16          (Documents marked as Gibbons Deposition
17          Exhibit Nos. 17 and 18 for
18          identification.)
19   BY MR. LONDON:
20      Q.  Well, I think that's where it became a
21   time for a lunch break because I don't think we had
22   identified and you had not been given a chance to
23   look at in this deposition those submissions.  I
24   think I've pushed across to you Exhibit 17 and 18.
```

136

```
 1      A.  I have them here.
 2      Q.  All right.  Are those the 2006
 3   submissions that you're talking about and in
 4   particular, Exhibit 17 that specifies that it's
 5   from Neurontin?
 6      A.  The data that I received was not in a
 7   report like this.  I believe it was in a -- in an
 8   Excel file perhaps or something like that that had
 9   the summary or maybe it was just the summary data.
10   So I didn't extract those data from a report like
11   one of these.  Those data were provided to me.
12      Q.  I don't have data from discovery that is
13   in a format you're describing that I recall.  Do
14   you still have the Excel spreadsheet or the summary
15   data in the form you received it when you had that
16   data before you wrote Exhibits 8 and 9, the pre-FDA
17   statistical review forms?
18      A.  I can take a look for that.
19      Q.  I do request that and this is not picking
20   on you, but have you produced those to us, Lori, do
21   you know?
22      MS. McGRODER:  I don't know.
23      MR. LONDON:  I ask that you produce
24   those.
```

137

1      MS. McGRODER:  I mean I think the answer
2  is yes.  You can ask and I'll consider it.
3      MR. LONDON:  And may I have those while
4  we're here in Chicago if they're accessible?
5      MS. McGRODER:  I don't know the answer.
6      MR. LONDON:  Because I would like to have
7  those.
8      MS. McGRODER:  Well, I mean I think --
9  just for the record, Dr. Gibbons did have these,
10  the 2006 submissions.
11      MR. LONDON:  I understand that because he
12  lists those.
13      MS. McGRODER:  I actually don't know as I
14  sit here whether what he's talking about in terms
15  of a spreadsheet is this or something else.  I
16  don't know the answer.
17      MR. ALTMAN:  Lori, I'll represent to you
18  that in the submission that you made in response to
19  the Lyrica materials he reviewed, you provided
20  Table 1, Table 2 and that table for the Lyrica
21  stuff which we had asked for separately because we
22  didn't have it which is what's been printed out
23  over here.  So I suspect that we are all talking
24  about one in the same thing even if he saw it as an

138

1  Excel spreadsheet.
2      MS. McGRODER:  I'm not trying to take --
3  are you saying for Lyrica we produced it to you and
4  you believe Dr. Gibbons had something more than
5  this?
6      MR. ALTMAN:  No.  What I'm saying is I
7  believe that you had produced the contents of
8  Exhibit 18 in response to our request of what
9  Dr. Gibbons had reviewed specifically.
10      MS. McGRODER:  Okay.
11      MR. ALTMAN:  Which appears to be the
12  exact same kind of material as Exhibit 17 is for
13  Neurontin which you presumably already had.  So I
14  think that the mystery is likely that 17 and 18 is
15  what he saw even if he got it in an Excel
16  spreadsheet format.
17      MS. McGRODER:  I think that's probably
18  right and we will check to see if there was also an
19  Excel that put in some data in some different
20  format.
21      MR. LONDON:  I would just like to see the
22  data set and the form that you, Dr. Gibbons,
23  received it and if it is just this form, perhaps
24  digitally rather than on paper.  That's all right.

139

1  I just want to see what it is.
2      MS. McGRODER:  We will try to figure that
3  out tonight.
4      MR. LONDON:  Thanks very much.
5      (Document marked as Gibbons Exhibit
6      Number 16 for identification.)
7  BY MR. LONDON:
8      Q.   Now, that takes me back to 16 which I
9  think I didn't get to talk to you about before we
10  recessed at noon.  Do you have 16?
11      A.   I do.
12      Q.   16 is not listed in the list of materials
13  considered by you in your May 19th Rule 26 list
14  which is Exhibit 10.
15      MS. McGRODER:  Are you going to identify
16  16 for the record?
17      MR. LONDON:  Uh-huh, and I don't mind
18  doing that right now.
19      Q.   Would you rather look at Exhibit 10 or
20  would you rather look at Exhibit 16?
21      A.   I'm looking at --
22      Q.   I want to stay task efficient.  If it
23  helps the record and helps you, what is Exhibit 16?
24      A.   It indicates the title of the document is

140

1  "Pfizer's Assessment of suicide and related
2  behaviors in patients treated with alpha-2 Ligands,
3  gabapentin and pregabealin," April 29th, 2008.
4      Q.   And then as I look at your May 19th,
5  Rule 26 report, Exhibit 10, that document does not
6  appear on that list as best I can tell.  And would
7  you like to verify that's correct?
8      A.   I'm not seeing that here either.
9      Q.   Would it be your testimony that in all
10  probability you did not have that document, that is
11  Exhibit 16, the April 29, 2008 assessment at the
12  time you wrote your two pre-FDA statistical
13  analysis studies?
14      A.   That would be correct.
15      Q.   And I'm sorry, if we look at your
16  Exhibit 8 or 9 -- I believe this is probably in
17  both of them, but I'm looking at 9.  Are you with
18  me?  I'm looking at 9.  Do you have page 4?
19      A.   Yes, I do.
20      Q.   Earlier I asked you a few questions about
21  your numbers of patients in your study and your
22  odds ratio.  Now I want to ask you about this
23  sentence.  You say, "It is methodologically
24  appropriate and reliable to look at gabapentin and

141

1  pregabealin as a group since unlike the other nine
2  drugs in the FDA's pool data set, these two drugs
3  are both alpha-2 Delta, Ligands and share a similar
4  mechanism of action." Do you see that?
5      A.  Yes, I do.
6      Q.  That is not an attributed statement as
7  best I can tell.  What is the source that you
8  relied on in writing that statement that gabapentin
9  and pregabealin were alpha-2 delta ligands other
10  than in the FDA pool data set?
11      A.  Not the best that I can recall.  I had a
12  conversation about expanding the data set whether
13  other placebo controlled studies with counsel and
14  the pregabealin data arose as another possibility
15  and I think I asked whether or not, you know, these
16  are similar drugs and this was the information that
17  I was provided.
18      Q.  In plain words, counsel is the one that
19  told you that gabapentin and pregabealin are
20  alpha-2 ligands that share a similar mechanism of
21  action unlike the other nine drugs in the FDA's
22  pool data set?
23      A.  I believe so.
24      Q.  Which counsel?

142

1      A.  I don't -- I don't really remember.  I
2  think it may have been Lori.  I'm not sure.
3      Q.  Did you have a document to support that
4  statement provided by counsel or just the
5  declaration, that's what you were told?
6      A.  There may have been.  I just don't
7  remember it at this time.
8      Q.  Earlier --
9      A.  There may have been a search or something
10  like that to make sure that that was consistent.
11      Q.  Earlier this morning you told me that you
12  were not a scientist who had expertise that would
13  have on your own known that type of fact.  That's
14  true, isn't it?
15      A.  That's correct.
16      Q.  And I ask you to bear with me for just a
17  moment.  To the extent that Exhibit 16, the
18  assessment of suicide and related behaviors with
19  gabapentin and pregabealin discusses that those are
20  alpha-2 Delta ligands, you did not have that
21  information in the form of Exhibit 16 at that time,
22  did you?
23      A.  To my knowledge, I didn't have that.
24      Q.  It's hard enough not being a scientist

143

1  without even being able to read what's in front of
2  me.  I apologize.  Still within Exhibit 16, may I
3  ask you to turn to Table 12?
4      A.  I've done so.
5      Q.  In Table 12, the bottom entry says,
6  "Relative risk drug placebo 1.39." Do you see
7  that?
8      A.  Yes.
9      Q.  As best you know, is that trying to
10  express the same information that you were trying
11  to express in your reports when you said the odds
12  ratio was 1.033?
13      MS. McGRODER:  I'll object to form and
14  foundation and you've never even established that
15  Dr. Gibbons has seen this document.
16      THE WITNESS:  I mean, I'd have to go
17  through this document in some detail to understand
18  which data were a part of these.  Clearly the
19  number of subjects that are being considered here
20  is different than the number --
21  BY MR. LONDON:
22      Q.  Let me understand that.  Where do you
23  read that?  Is it under the N number?
24      MS. McGRODER:  Again object to form and

144

1  foundation.
2      THE WITNESS:  As I look at Table 12, I
3  can see that the number of subjects, N, was 2,638
4  for gabapentin and 1,836 for placebo.  Those
5  numbers are different than the numbers that were in
6  my reports, Exhibits --
7  BY MR. LONDON:
8      Q.  Eight and 9?
9      A.  -- 8 and 9.
10      Q.  And looking at one of these, your numbers
11  were, as I understood it, 5,194 treated and 2,682
12  in control.  I have that highlighted if it helps.
13      A.  That's correct.
14      Q.  Is that what you meant a moment ago when
15  you testified that you thought the numbers in
16  Exhibit 16, Table 12, were different than the
17  numbers you had in doing the autopsy that is
18  reflected in the odds ratio in Exhibits 8 and 9?
19      MS. McGRODER:  Well, object to form,
20  misstates his testimony and foundation to the use
21  of this Pfizer document.
22      THE WITNESS:  As I understand your
23  question, the difference -- the first difference --
24  the immediate difference that I noticed with

145

1   respect to Table 12 entries relative to what's
2   listed on page 3, end of the paragraph of Exhibit 9
3   is that there are different numbers of subjects in
4   treated and control conditions between the two
5   sources.
6   BY MR. LONDON:
7       Q.   And that's the question I was trying to
8   ask, perhaps not so artfully.  The different
9   numbers that you were referring to in your study
10  you had the number of patients at 5,194 treated and
11  2,682 control for placebo, correct?
12      A.   That's correct.
13      Q.   And in Table 12, it is stated that
14  whatever it means, N is 2,638 treated and 1,836
15  controlled, true?
16      MS. McGRODER:  Object to foundation for
17  the use of the Pfizer document.  Go ahead.
18      THE WITNESS:  True.  Could you repeat the
19  question?
20  BY MR. LONDON:
21      Q.   Yes, sir.  When you said there were
22  different numbers between the two exhibits, your
23  Exhibit 8 or 9 and Exhibit 16, the assessment of
24  April 29th, when you said there were different

146

1   numbers, you told me a moment ago that your numbers
2   that you had in mind were those -- I believe it's
3   5,194, is that correct, and 2,682 on placebo?
4       A.   Again, this is --
5       Q.   I'm just trying to make the question
6   clear because every time I ask it, she objects to
7   it.
8       MS. McGRODER:  Well, I object overall to
9   the use of this document because you've never
10  established that Dr. Gibbons has ever seen it.
11      THE WITNESS:  So let me just step back
12  and simply say that, you know, this is not a
13  document that I have -- remember reviewing.  I
14  don't know, you know, anything about this document.
15  If you'd like me to, you know, go through and read
16  the document I'd be happy to do so.
17  BY MR. LONDON:
18      Q.   I probably don't want you to do that
19  because I want to find out precisely what you know
20  about this document without you going back and
21  reading it.  Tell me, did you receive this document
22  after the date on which Exhibits 8 and 9 were
23  submitted, which as I recall was May 19th?
24      A.   This document is not ringing a bell to

147

1   me.  I don't recall seeing it.  I may have seen it.
2   It's just not -- you know, it's not triggering any
3   memory.  But after 50 years of age, that happens a
4   lot.
5       Q.   Well, and I appreciate that.  If you had
6   received this document in the course of your work,
7   would it have been your ordinary practice to have
8   listed this document on a list of materials
9   considered or a list of materials received?
10      MS. McGRODER:  Well, object to the form
11  of that question.
12      MR. LONDON:  I'm just asking about his
13  practice.
14      MS. McGRODER:  Well, I'm not sure that
15  practice would exist but for the Rule 26 obligation
16  for us to produce that to you.  So I object to the
17  question.
18      THE WITNESS:  In general, if I had
19  received a document, I would have listed that
20  document or, you know, would have had it as a list
21  of documents that I had received from counsel.  And
22  you know, I tried to be as comprehensive as
23  possible with it.  That doesn't mean that something
24  might not have slipped through.  But if I had seen

148

1   this -- if upon seeing this document right now it
2   rang a bell, I would tell you, yes, it looks like
3   I've seen it and maybe I overlooked listing it.
4   But that's not the case.
5       (Document marked as Gibbons Exhibit
6       Number 19 for identification.)
7   BY MR. LONDON:
8       Q.   I'm going to mark as Exhibit 19 the list
9   of additional materials considered which was
10  appended to your November -- either your July -- I
11  guess it was appended to your July report or your
12  November report, either one.  Is this a list you
13  composed?
14      A.   It looks familiar.
15      Q.   On there one, two, three, four down is an
16  entry that says Pfizer FDA briefing document
17  regarding Lyrica and Neurontin.  Do you see that?
18      A.   I do.
19      Q.   What is that document?
20      A.   At this moment, I don't recall.  It might
21  be this document, might be another document.
22      Q.   Do you recall the existence of another
23  document called the FDA briefing document -- pardon
24  me -- called the Pfizer FDA briefing document

149

1  regarding Lyrica and Neurontin?
2      A.  At this moment, I don't.
3      Q.  Okay.  And what I don't see on
4  Exhibit 19, the new additional materials list, what
5  I do not see on that list is a document that seems
6  to have precisely the same title as Exhibit 16,
7  assessment of suicide and related behaviors.
8      A.  I don't see that either.
9      Q.  Okay.  What is your testimony based upon
10  your -- let me start again.
11          Searching your memory as best you can
12  reasonably do at this time, what is your testimony
13  as to whether before today you have seen
14  Exhibit 16, the assessment of suicide and related
15  behaviors dated April 29, 2008?
16      A.  It's simply not ringing a bell.  I don't
17  have any memory of reading this document at this
18  time.
19      Q.  Okay.  And that helps.  That's really the
20  information I was trying to get to.
21          I want to ask you to look quickly at
22  Exhibit 14.  That's the statistical analysis.
23      A.  I have it.
24      Q.  And --

151

1  correct?
2      A.  Correct.
3      Q.  And a total of 4,932 patients in the
4  gabapentin controlled random control trials?
5      A.  Randomized control trials.
6      Q.  Correct?
7      A.  Correct.
8      Q.  How does -- how did their numbers come up
9  to be different than the numbers that you had,
10  again referring to Exhibit 8 or 9 before you had
11  the statistical review?
12      A.  The document indicates that they had
13  eliminated a series of studies from this analysis,
14  this pooled analysis and one of the -- and I don't
15  remember exactly where it was indicated, but
16  someplace in here it was indicated that they had
17  removed single dose studies.  I went back to try to
18  recreate their numbers by eliminating --
19  identifying and then eliminating the single dose
20  studies and after multiple attempts at trying to
21  reproduce 4,932 I never was able to.  So it's a
22  little bit of a mystery to me of exactly how they
23  came up with these sample sizes that are listed
24  here.

150

1          (Discussion off the record.)
2          MR. LONDON:  And it's fairly well known
3  in the legal business that providing cookies in a
4  deposition shortens the deposition.  So even though
5  we're prolonging it by the break, we might
6  accelerate it.
7      Q.  May I ask you to look at page 17 of the
8  statistical review?  Do you see that?
9      A.  I do.
10      Q.  And you have read the statistical review,
11  haven't you?
12      A.  Yes, I have.
13      Q.  All right.  And you've told me, as I
14  understand it before that in this type of study the
15  number N reflects the number of patients who are
16  the subject of a piece of information, correct?
17      A.  Correct.
18      Q.  And so when we look at gabapentin drug N,
19  it means that we have 2,903 gabapentin patients in
20  the random control trials that were considered by
21  the FDA in this part of the study, correct?
22      A.  Correct.
23      Q.  And we have 2,029 gabapentin patients in
24  random controlled trials who were given placebos,

152

1      Q.  4,932 being the combined placebo and on
2  drug patients in the gabapentin RCTs?
3      A.  Yes.
4      Q.  It brings up a question I thought I
5  should ask at some point in time.  Now's as good a
6  time as any.  Have you spoken with anyone at the
7  FDA about the statistical review?
8      A.  No.
9      Q.  Have you corresponded with anyone at the
10  FDA about the statistical review?
11      A.  No.
12      Q.  And as to this question in particular, I
13  know that Pfizer representatives were present,
14  Mr. Finkelstein was present, all sorts of people
15  were present during the June 10th -- July 10th
16  hearing.  But did you speak with anyone from
17  Pfizer, including counsel, who in turn had
18  specifically spoken with the FDA about where the
19  FDA extracted its numbers?
20          MS. McGRODER:  Object to form.
21  BY MR. LONDON:
22      Q.  In order to find out indirectly how they
23  got to -- for example, how they got to 4,932?
24          MS. McGRODER:  Object to form.

153

1      THE WITNESS:  If you're asking me did I
2  speak with anyone from FDA to try and find out how
3  they got to 4,932, no, I didn't speak to anyone
4  with -- from FDA.  And I tried to reconcile the
5  differences and I spoke with counsel about that,
6  but never obtained an answer.
7  BY MR. LONDON:
8      Q.  Between yourself and counsel and whatever
9  efforts you did and whatever efforts counsel might
10  have done, that is still not something that has
11  been reconciled in your mind?
12      A.  That's correct.
13      Q.  Okay.  You may remember this without me
14  having to piece it out, but as I recollect an odds
15  ratio that was achieved by the FDA to accrued odds
16  ratio of 1.39 and an ultimate odds ratio of 1.57
17  for gabapentin.  Do those -- if you say yes, that's
18  all right, fine.  If not, let's take a moment and
19  check because I may -- I may well be wrong.
20      A.  If your question --
21      Q.  In the statistical review?
22      A.  If your question is is that in the
23  ballpark, those numbers sound like they're in the
24  ballpark.  Whether they're the exact numbers or

154

1  not, I don't know.
2      Q.  For the purposes of my question the
3  ballpark is close enough.  They were, as I recall,
4  approximately 1.39 or so accrued and 1.57 or so
5  final.  Can you explain for me what the difference
6  is or how one would get a different number between
7  accrued and a final?  What steps would be taken?
8      MS. McGRODER:  Object to form and
9  foundation.  Are you asking him now in the abstract
10  or are you asking him --
11      MR. LONDON:  In the abstract.
12      MS. McGRODER:  Okay.
13      THE WITNESS:  My reading of the FDA
14  report is that the differences would be -- I think
15  this is correct from my memory -- that the accrued
16  odds ratio didn't adjust -- didn't -- wasn't based
17  on the meta-analysis, didn't adjust for
18  study-to-study variability and the -- so it was
19  just looking at gabapentin by itself.  And then the
20  other estimates are based on an overall combined
21  analysis that adjusts for study-to-study
22  variability, probably a Mantel-Hansel based test.
23      (Discussion off the record.)
24      MR. LONDON:  We identified the 2008

155

1  assessment of suicide that Pfizer submitted to the
2  FDA.  We identified the 2006 submissions of
3  gabapentin and Lyrica that Pfizer submitted to the
4  FDA.  And we asked the witness several questions
5  about whether he had or had not studied those
6  documents and about whether he had or had not
7  accounted for any possible differences in patient
8  numbers from those documents and that's about it.
9      MR. WINKLER:  In case this happens again
10  later or tomorrow because I called the hotel and
11  they had --
12      MR. ALTMAN:  We're in 533.
13      MR. WINKLER:  Room 533 and you'll be
14  there tomorrow, you think?
15      MR. ALTMAN:  We hope so.
16      MR. WINKLER:  Unless you don't pay your
17  bill I guess so I'll know where to send somebody.
18  Okay, thanks.
19      MR. ALTMAN:  Let me also give you since
20  I'm starting off tomorrow, let me give you my
21  number.  This is Keith Altman -- (516) 456-5885.
22      MR. WINKLER:  5885.  Okay, Keith.  Thank
23  you.
24      MS. McGRODER:  Tell us when we're back on

156

1  the record because we really don't want Dr. Gibbons
2  eating cookies on the record.
3      MR. ALTMAN:  We're having a cookie break
4  here.  Sorry.
5  BY MR. LONDON:
6      Q.  We're back on the record for a moment.
7  I'm going to ask one or two more follow-ups about
8  this odds ratio and confidence interval.
9      When we turn to the statistical review on
10  page 24, we locate some -- these odds ratios, it
11  says Figure 2, suicidal behavior or ideation, odds
12  ratio estimates, placebo controlled trials?
13      A.  Yes.
14      Q.  And when we turn to gabapentin, it says
15  as I understand it, that its odds ratio is 1.57,
16  its confidence interval is .12 to 47.66.  I hope I
17  said that correctly.  And that the number of
18  patients were 2,903 on drug and 2,029 on placebo,
19  is that correct?
20      A.  Yes.
21      Q.  And in addition, there is the Number 2
22  adjacent to the 2,903 on drug.  Do you know what
23  that refers to?
24      A.  That's the number of events of

157

1   suicidality on drug.
2       Q.   And then the Number 1 adjacent to placebo
3   would be one event of suicidality on placebo?
4       A.   That's correct.
5       Q.   Now, I want to ask you the question about
6   the odds ratio that is comparable to the question I
7   asked you about the patient size.  What did the FDA
8   do differently, if you can tell me, to get the odds
9   ratio and confidence intervals that are in Figure 2
10  that came up with a different number than you came
11  up with in your reports of April and May before you
12  had the statistical review?  What did the FDA do
13  differently if you can tell me?
14      A.   Well, first of all, the estimates in
15  Figure 2 are based on the Mantel-Hansel test so
16  it's based on an analysis that looked at study
17  level data which I did not have overall for their
18  analyses.
19           Secondly, they had a very different
20  sample size.  They had, you know, eliminated
21  studies and/or subjects from their analysis that
22  were present in mine.  So I had more -- more
23  studies and more data.  And third, in order to do
24  the Mantel-Hansel test, they eliminated all of

158

1   those studies that had zero events in both arms
2   which in this case eliminated all but three of the
3   studies because those three events, the two in drug
4   and the one on placebo occurred in three different
5   studies as I -- if I recall correctly.
6       Q.   What is the Mansel --
7       A.   Mantel-Hansel.
8       Q.   Mantel-Hansel, sorry.  What is the
9   Mantel-Hansel factor that you're attributing to the
10  FDA study?  What does that do to a study?
11      A.   The Mantel-Hansel is a test statistic and
12  it's one way of combining information from multiple
13  four-fold tables.  So in the present case we have a
14  two-by-two table that lists placebo versus drug and
15  suicidality event, yes or no, and we have one of
16  those for each one of the studies and the
17  Mantel-Hansel test is a way of combining those
18  different study level results into an overall
19  combined analysis.
20      Q.   Is that the only thing that would be
21  performed that would separate the accrued odds
22  ratio from this final odds ratio?
23           MS. McGRODER:  Object to foundation.  If
24  you know.

159

1   BY MR. LONDON:
2       Q.   As I recall, we had accrued odds ratio in
3   the vicinity of 1.39.  What I call the final odds
4   ratio may have been the wrong label, but it's the
5   1.57 that I'm looking at.
6       A.   My understanding from looking at this
7   right now is that the 1.57 is the result of what
8   FDA has termed a fixed effect model which is the
9   Mantel-Hansel statistic and that the accrued odds
10  ratio, if I'm understanding it correctly, and again
11  we haven't sort of verified exactly what that
12  number is, but it's in the ballpark, would simply
13  be a simple analysis pooling all of the data from
14  all of the different studies into one pot, if you
15  will, and analyzing that and that four-fold table
16  would be the four-fold table that's described under
17  the sample sizes, the two in 2,903 and the one in
18  2,029.
19      Q.   I may not have understood, don't be
20  surprised if that turns out to be the case, but as
21  I understood a description of Mantel-Hansel, it was
22  to exclude studies that had zero events so that the
23  studies that were eventually combined were event
24  driven studies.  Is that correct?

160

1       A.   The purpose of doing a Mantel-Hansel test
2   is to combine information from multiple studies
3   where that information happens to be in the form of
4   four-fold tables.  A consequence or limitation of
5   the Mantel-Hansel statistic is that it requires
6   that it can only be applied to studies that have
7   events in -- you know, it can only be applied to
8   studies that have events.  If there are no events
9   in both arms, the study gets discarded.  If there's
10  events in one of the two arms, then a correction
11  factor is added, sometimes called a continuity
12  correction of averaging the value 0.5 to all of the
13  cells.
14      Q.   As I recall, one of your points of
15  disagreement with the FDA had to do with the role
16  of Lamotrigine and Topiramate among the group of 11
17  AEDs that were combined in the meta-analyses that
18  included gabapentin affecting the odds ratio and a
19  risk differential for gabapentin.  Do I understand
20  that correctly?
21           MS. McGRODER:  Object to form.
22           THE WITNESS:  If I understand your
23  question correctly, you're saying that the presence
24  of Lamotrigine and Topiramate had an effect on the

161

1  gabapentin odds ratio, that was not an issue that
2  I --
3  BY MR. LONDON:
4      Q.  I probably said that, but that's not what
5  I was trying to say so let's give it another go.
6          The overall consequence of the FDA's
7  analysis was that the study revealed that there was
8  about a .43 risk in all 11 AEDs as opposed to a .22
9  on placebo.  Does that sound right?
10     A.  I don't know if those numbers are exactly
11 correct, but those are ballpark kinds of numbers.
12     Q.  And that your opinion is that the .43 was
13 driven upward by the presence of Topiramate and
14 Lamotrigine?
15     A.  My opinion is that the significant risk
16 difference as expressed by the odds ratio for the
17 pooled analysis of all of the studies for all of
18 the drugs was driven by Lamotrigine and Topiramate
19 and if those two drugs had not been a part of that
20 pooled analysis, there would not have been a
21 significant overall result for the remaining drugs.
22     Q.  Do you know why the FDA included
23 Topiramate and Lamotrigine in its meta-analysis?
24     A.  My understanding is that the FDA

162

1  identified the 11 primary antiepileptic drugs that
2  were currently in use and that was the population
3  of drugs, if you will, that they were trying to
4  derive an inference to.
5      Q.  Is it your understanding that the same
6  criteria that were applied to Neurontin as to the
7  random controlled trials that were to be submitted
8  to the FDA were applied to the other ten drugs,
9  that is the number of patients, the duration of the
10 trials, that sort of thing?
11     A.  My understanding is that FDA sent out a
12 letter requesting data that was the same letter
13 sent to everybody.  I'm not an expert on that.  I
14 haven't really -- I don't think I've ever seen the
15 letter, but I have no reason to believe that they
16 sent a different request to, you know, different
17 drug manufacturers.
18     Q.  You've operated under the assumption that
19 all 11 drug manufacturers were asked to produce the
20 same types of random control trials?
21     A.  That would be my assumption, yes.
22     Q.  And you've been on FDA panels yourself.
23 That would not only be your assumption, but it
24 would be your knowledge of how the FDA has operated

163

1  on other occasions?
2      A.  It would certainly be a big problem if
3  they had sent out different kinds of letters and
4  committees would take some exception to that.
5      Q.  And my other sort of recollection is that
6  among your concerns were that Lamotrigine had 27 of
7  the events, Topiramate had 40 of the events and
8  that between the two of them, they had something
9  approaching 60 percent of the events of the on-drug
10 events in the meta-analysis.  Does that sound
11 approximately correct?
12     A.  That was certainly one of my concerns.
13     Q.  Well, it's not only that it's one of the
14 concerns, but that it's 40 and 27 approached almost
15 maybe more than 60 percent of all of the events?
16     MS. McGRODER:  Well, object to form.  You
17 can look it up in your report, if you like.
18     THE WITNESS:  One of the concerns I
19 stated in my report was that these two drugs
20 accounted for, I believe, over 60 percent of all of
21 the events from all of the studies, all of the
22 different drugs, and that led me to, you know,
23 question the homogeneity of the results.  That was
24 just one of the things.

164

1  BY MR. LONDON:
2      Q.  And I recollect that.  And better said
3  than I could have done even though I was trying to
4  get it out in that way.
5          Do you have any scientific knowledge as
6  to how it could have been, apart from the
7  statistics, that Lamotrigine and Topiramate came to
8  account for some 60 percent plus or minus of all of
9  the events?
10     A.  There are lots of possible explanations,
11 but I don't have any firm idea and that's not
12 really my area of expertise.
13     Q.  You told me earlier that if the
14 explanation was clinical, that certainly would not
15 be something that you would be in a position to
16 analyze, as opposed to statistical?
17     MS. McGRODER:  Object to form.
18     THE WITNESS:  If there was a clinical
19 reason and it was, you know, one that I was unaware
20 of, there would be no reason I would necessarily be
21 aware of all the clinical determinants that could
22 have produced that kind of difference so I wouldn't
23 opine to the reason for it.  I can document that it
24 exists and I can show its effect on statistical

165

1  analyses, but in terms of coming up with a clinical
2  reason, I wouldn't be an expert in that.
3  BY MR. LONDON:
4      Q.  Did you -- do you know whether -- I
5  believe I've asked you, but let's index this
6  question.
7      You believe that the FDA has not approved
8  Neurontin for bipolar patients, correct?
9      MS. McGRODER:  Objection, asked and
10  answered.
11      THE WITNESS:  That's my lay
12  understanding, but again I'm not an expert on that
13  and I haven't reviewed that in any serious way.
14  BY MR. LONDON:
15      Q.  And that your recollection was that one
16  or both of Topiramate and Lamotrigine had been
17  approved by the FDA for bipolar?
18      MS. McGRODER:  Objection, asked and
19  answered.
20      THE WITNESS:  Again from a lay
21  perspective I think I've heard, and I can't tell
22  you exactly where, that Lamotrigine was approved
23  for bipolar.  I may be right or wrong or on that.
24

166

1  BY MR. LONDON:
2      Q.  Did you make an attempt to study, perhaps
3  do a statistical autopsy on the actual numbers of
4  bipolar patients in the three drugs random control
5  trials, that is the number of patients in
6  gabapentin bipolar trials, the number of patients
7  in Lamotrigine bipolar trials and the number of
8  patients in Topiramate bipolar trials?
9      MS. McGRODER:  Object to form.
10      THE WITNESS:  Are you referring to the
11  data that were analyzed by the FDA?
12  BY MR. LONDON:
13      Q.  Yes, sir.
14      A.  Those data were not made available to me.
15  I would have loved to have had those data, but FDA
16  has been very reluctant to release these kinds of
17  data and they were not made available based on my
18  recollection of the statistical report in that
19  report.
20      Q.  Earlier you identified that you at least
21  had, if you didn't particularly bathe in the data,
22  that were in the 2006 Pfizer submissions to the
23  FDA.  Did you ask counsel to find out from the
24  companies that manufacture Topiramate and

167

1  Lamotrigine to provide their similar submissions to
2  the FDA so that you could see whether the
3  populations studied by those three drugs were
4  similar?
5      A.  I really didn't want to put myself in a
6  position to be laughed at like that.
7      Q.  Does that mean no?
8      A.  It means no.
9      Q.  All right.  When the laughing all dies
10  down, is it at the end of the day true that you
11  just don't know how many bipolar patients were in
12  the Lamotrigine random control trials that the FDA
13  studied?
14      MS. McGRODER:  Object to form.
15      THE WITNESS:  That information wasn't
16  provided by FDA so I have no way of knowing it.
17  BY MR. LONDON:
18      Q.  And the same as to Topiramate?
19      MS. McGRODER:  Object to form.
20      THE WITNESS:  That's correct.
21  BY MR. LONDON:
22      Q.  And I believe that earlier we looked and
23  saw that there were something on the order of
24  between 50 and 60 bipolar patients in the

168

1  gabapentin random control trials.  Do you remember
2  looking at those numbers a little earlier?
3      A.  Yes, I do.
4      Q.  And again those are ballpark.  I don't
5  recall the precise numbers.  What proportion of the
6  total number of Pfizer random control trial
7  patients that were studied by the FDA would the
8  bipolar patients represent?
9      A.  It's hard to answer that question because
10  we don't really know which of the studies made it
11  into the FDA analysis.  I haven't been able to and
12  I don't know anybody who's been able to document
13  which study.  So it could be that the bipolar study
14  of gabapentin made it into their analysis or maybe
15  it didn't make it in.  But it's very hard to know
16  for any particular drug which studies for which
17  indications actually made it into the FDA analysis.
18  We know overall because FDA did a sensitivity
19  analysis or a secondary analysis where they looked
20  at different kinds of indications.  I don't think
21  they looked at bipolar per se.  They looked at
22  psychiatric indications which as we know could be
23  several different ones.. Did some overall analysis.
24      Q.  Have you on your own tried to perform a

169

1   study like that, a study of the total number of
2   bipolar patients in the Pfizer randomized trials
3   compared to the total number of patients in the
4   Pfizer randomized trials to determine what number
5   of patients could have been studied if the FDA had
6   done so?
7       A.  Again, I wouldn't have the information
8   necessary to do that and certainly not the
9   comparative information to the other drugs.
10      Q.  All right.  I don't know what the precise
11  term is because I've heard three or four different
12  words and every time I try to use one, they all go
13  that's not the right word.
14          Do you accept that some patients, and
15  let's just use bipolar patients as a model for this
16  question, some patients will commit suicide or
17  perform acts of suicidality regardless of the
18  presence or absence of a drug prescribed for their
19  problem?
20      A.  If I --
21          MS. McGRODER:  Object to form.
22          THE WITNESS:  -- understand your
23  question, do I believe that there can be
24  suicidality as defined as suicidal ideation,

170

1   suicide behavior or suicide completion in the
2   absence of pharmaceutical agents, the answer is
3   yes.
4   BY MR. LONDON:
5       Q.  Is that -- see, I've used the word
6   background rate and I've used the word incidence
7   rate and I don't know what the right word is.  Is
8   there such a word that defines what that rate of
9   affected patients is?
10      A.  If you're asking is there -- is there an
11  incidence for suicidality in untreated patients,
12  that would be complicated by untreated for what.
13  So if it's untreated for psychiatric illnesses,
14  it's going to be higher than untreated for
15  epilepsy.  If it's untreated for pain disorder, it
16  might be different than another indication.  So
17  it's a complicated question to answer and it
18  depends on what characteristics of the
19  patients and their severity and so forth.
20      Q.  I think you're worrying more about what
21  I'm asking than what I'm actually asking.
22      A.  I worry about everything you ask.
23      Q.  I'm just a simple country lawyer.
24      A.  I'm a simple country statistician.

171

1       Q.  What term do simple country statisticians
2   apply to that phenomenon?  Is it incidence rate,
3   background rate or is there another term?
4       A.  I think that when you're talking about
5   the incidence of some event in an unexposed
6   population, using a term background rate or
7   background incidence is reasonable.  You'll get
8   into trouble when you don't have a proper
9   denominator.  So you know, if you count up a
10  certain number of events without knowing the
11  population at risk and talk about that as a rate or
12  as an incidence, then you might be committing some
13  statistical atrocity, but otherwise, I think you're
14  probably okay talking about background rates or
15  background incidents.
16      Q.  Well, conceptually do the background
17  rates for -- and let's just use completed suicide
18  so that we have a common -- would that be a common
19  denominator?  Would the background rates for
20  completed suicides among bipolar patients be the
21  same as for epileptic patients, for example?
22      A.  Probably not.
23      Q.  And the same question among the other
24  different conditions neuropathic pain patients,

172

1   psychiatric -- perhaps schizophrenic patients, that
2   sort of thing, would each of those be likely to
3   have different background incidence rates from the
4   other conditions?
5       A.  All of those conditions -- all of those
6   indications would probably have different
7   background rates and as you shift from medical --
8   routine medical to more psychiatric, you'd expect
9   higher background rates.
10      Q.  And then if a patient had actually a
11  couple of those conditions, for example, both
12  epileptic and psychiatric, that would be yet a
13  different background rate than only epileptic or
14  only psychiatric in all likelihood, would it not?
15      A.  I couldn't answer that question.  There
16  might be additive effects.  There might be
17  multiplicative effects.  There are lots of
18  different things that could change those rates..  So
19  I don't think it would be fair to say that in
20  general that, you know, adding two together gives
21  four or gives eight.
22      Q.  Well, it's not a question of fairness or
23  unfairness.  The answer is you can't say?
24      A.  That's correct.  It's an empirical

173

1   question and I haven't studied it.
2       Q.  That's fine.  And that's the information
3   I was looking for is whether you had studied it or
4   not.
5           Now, would it also likely be that as for
6   each level of suicidality, those rates would be
7   different?  For example, by way of explanation, the
8   background rate among bipolar patients who have
9   suicidal ideation would likely be different than
10  the background rate of patients who commit
11  completed suicides?
12          MS. McGRODER:  Object to form.
13          THE WITNESS:  Yes.
14  BY MR. LONDON:
15      Q.  And would you expect that to be the same
16  among each of the different disease indications,
17  bipolar, epileptic, neuropathic pain and so on?
18      A..  I would imagine that the rates of
19  suicidality ideation and suicide completion will be
20  different in any population you look at.
21      Q.  Now, what I'm trying to get to in the
22  universal Excel spreadsheet of this series of
23  questions is whether you studied the FDA's
24  statistical information in such a way as to

174

1   determine whether the numbers of patients, for
2   example, among all 11 drugs -- that's a hard
3   question to ask so the answer's going to be just
4   unbelievable.  Strike it.  Let's give it another
5   go.  I'm going to have to come back and write the
6   question out for myself in order to ask it in a
7   cogent way.  My apologies.  And we might as well do
8   that during a break.  We've got a five-minute
9   warning.
10          MS. McGRODER:  Do you want to take it
11  now?
12          MR. LONDON:  I'll spend most of that five
13  minutes thinking of my next question so we might as
14  well take it now.
15          MS. McGRODER:  Okay, let's take it now.
16  Thanks.
17          VIDEOGRAPHER:  The time is 2:02 p.m.
18  This is the end of tape Number 4.  We are going off
19  the record.
20          (Short recess..)
21          VIDEOGRAPHER:  This is the beginning of
22  tape Number 5.  The time is 2:17 p.m.  We are back
23  on the record.
24

175

1   BY MR. LONDON:
2       Q.  Were the number of patients in the FDA
3   random control trials who had bipolar conditions
4   the same among Lamotrigine, Topiramate and
5   gabapentin?
6           MS. McGRODER:  Objection, no foundation.
7           THE WITNESS:  That information was not
8   provided in the FDA provided report so I don't have
9   any way of knowing that answer.
10  BY MR. LONDON:
11      Q.  It could be that there were roughly the
12  same numbers or completely dissimilar number of
13  patients among the three drugs?
14      A..  Again --
15      Q.  You just don't know?
16      A.  I don't know the answer to the question
17  because that information wasn't provided.
18      Q.  Were there the same number of off-label
19  patients among the three drugs, Lamotrigine,
20  Topiramate and gabapentin in the random control
21  trials studied by the FDA?  Do you know what I mean
22  by the term off-label?
23      A.  Yes, I believe I do.
24      Q.  All right.

176

1           MS. McGRODER:  Object to the form of that
2   question, the one preceding it.
3           MR. ALTMAN:  Do over.
4           THE WITNESS:  Could you repeat your
5   question?
6   BY MR. LONDON:
7       Q.  Do you know whether the numbers of
8   off-label patients in the random control trials
9   studied by the FDA were the same or dissimilar for
10  Lamotrigine, Topiramate and gabapentin?
11          MS. McGRODER:  Object to form.  Go ahead.
12          THE WITNESS:  FDA doesn't provide that
13  information directly.  What FDA did provide,
14  however, on page 18 of Exhibit 14 --
15  BY MR. LONDON:
16      Q.  I'm going to let you answer but from this
17  point forward, objection, nonresponsive, but please
18  go ahead and answer.
19      A.  They do provide a breakdown, and this is
20  further explication of my previous answer where you
21  were asking me about bipolar and I indicated that
22  there was no breakdown by bipolar.  They do have a
23  breakdown by psychiatric indication, other
24  indication or epilepsy by drug and that information

177

1  was available and is presented in Table 8, page 18.
2  So it does allow some general comparisons of the
3  percentage of patients who had at least three
4  indications, epilepsy, psychiatric or other.
5      Q.  Let's just look at Table 8 on page 18 of
6  Exhibit 14, the statistical review.  What is the
7  number of psychiatric patients who were, as I
8  understand it on drug, on gabapentin?
9      A.  It indicates that there were 331
10  psychiatric patients on gabapentin.
11     Q.  And what is the parentheses seven to the
12  side of that number?
13     A.  That indicates that 331 represents
14  7 percent of the overall 4,932.
15     Q.  And then how many Lamotrigine patients?
16     A.  For Lamotrigine it's 2,313 for a total of
17  47 percent.
18     Q.  And then Topiramate patients?
19     A.  Topiramate 1,933 for a total of
20  17 percent.
21     MS. McGRODER:  I want to ask you if you
22  want to withdraw your objection as nonresponsive
23  before he even answered the question.
24     MR. LONDON:  No.  But we're now three

178

1  questions past that, so it's too late for me to
2  withdraw my objection but thanks for the advice.
3      Q.  Now, my next question is as to patient
4  years.  Is there a difference between the number of
5  patients and the concept of patient years?
6      A.  There can be, yes.
7      Q.  Give me what you mean when you use the
8  term patient years so that we'll use the same
9  definition.
10     A.  It's the total number of years of
11  exposure aggregated over the number of patients.
12     Q.  As I recall, earlier you read to me from
13  a page I was looking at but not able to read that
14  the number of patient years was the number of days
15  a patient was on a drug divided by 365?
16     MS. McGRODER:  I'll object to form.
17     THE WITNESS:  The number of patient years
18  is a summation of that ratio over all of the
19  subjects within a particular condition.
20  BY MR. LONDON:
21     Q.  All right.  Do we know the number of
22  patient years that the FDA studied in the
23  psychiatric group who were on gabapentin?
24     A.  I'd have to look through the report to

179

1  see if that was provided.  I don't remember
2  offhand.  Maybe you could direct me to it if you
3  know.
4      Q.  And if I knew I would direct you to it,
5  but I want to leave that an open question as to all
6  three of these drugs.  We have -- Table 8 has the
7  number of patients and so my question now is as to
8  all three drugs on the psychiatric indication, do
9  we know the number of patient years?
10     A.  At this moment I don't.
11     Q.  Okay.
12     A.  And leafing through this I'm not finding
13  it.
14     Q.  Can we leave that question open?  I'll
15  try to come back to it at some point in time, but
16  I'm not going to ask you to stop what you're doing
17  and answer it now, nor am I going to ask you to
18  dwell on that question in the back of your mind
19  while in the front of your mind you're answering
20  other questions.
21     A.  Fair enough.
22     Q.  So I'm going to try to write a come back
23  to question.  And when we have a chance, we'll come
24  back to it..  And I told you just before we broke

180

1  that the next thing we were going to do is talk
2  briefly about your Exhibit 11 which I believe is
3  your report of July 11.  Are you there?
4      A.  I am.
5      Q.  The first question that I want to ask is
6  was this the only report you wrote after receiving
7  the FDA statistical review before the November 5th
8  report?
9      A.  I believe so, yes.
10     Q.  And I think you're going to find these
11  questions to be fairly easy and familiar, but over
12  in paragraph 5 you reflected that the FDA reached
13  an odds ratio of 1.57 with a confidence interval of
14  .12 to .47.56.  Do you recall that?
15     A.  Yes, I do.
16     Q.  Were you able to replicate that number by
17  your own work?
18     A.  I don't believe so because I think that
19  number came from the Mantel-Hansel test which would
20  have required the individual study level data which
21  while I had individual study level data from what I
22  received from counsel, I didn't know -- I didn't
23  have the exact same and I couldn't figure out
24  exactly which studies were included in FDA's

181

1    analysis so I guess the answer is no.
2        Q.   Earlier we talked about the fact that the
3    numbers -- the FDA reported of numbers of patients
4    differed from the number of patients that you had
5    used in your first two reports.  The number changed
6    from around 7,000 plus to around 5,000 plus.  Do
7    you understand what I'm talking about?
8        A.   I do.
9        MS. McGRODER:  Object to form.
10   BY MR. LONDON:
11       Q.   Did you try to calculate an odds ratio
12   using the FDA's numbers of patients as opposed to
13   using your numbers of patients?
14       A.   I couldn't compute the odds ratio that
15   came out of FDA's meta-analysis because FDA did not
16   provide the individual study level date.  I could
17   compute an overall odds ratio pooling those data as
18   if they came from a single study.  That's the
19   extent of what I could reproduce from the materials
20   that were made available in FDA's report.
21       Q.   In doing so, did you reach the same
22   number the FDA reached?
23       A.   I don't recall, but I'm assuming it was
24   similar or I don't remember if they actually did

182

1    that overall pooled analysis.  That might have been
2    their accrued odds ratio.  Can't quite remember
3    right now.
4        Q.   Well, I recall we asked earlier about two
5    odds ratios, one was the accrued odds ratio that
6    was in the vicinity of 1.37, 1.39 and the other one
7    was the post-Mantel-Hansel analysis that was 1.57.
8    As I understand, you were unable to replicate the
9    finished analysis because you simply didn't have
10   all of the data points.  Did you try to replicate
11   the accrued odds ratio using the FDA's patients
12   numbers for gabapentin?
13       A..  I think I did.  And it's probably in one
14   of my reports.  I just don't remember right now.
15       Q.   I thought I was waiting on an answer?
16       A.   I'm sorry.  I thought I was waiting on a
17   question.
18       Q.   May we have the last question?
19       (Record read as requested.)
20   BY MR. LONDON:
21       Q.   And then somewhere in there you said I'm
22   going to go back there and look for --
23       MS. McGRODER:  No.
24       THE WITNESS:  Well, I've been looking

183

1    for --
2        MS. McGRODER:  What does the record say?
3    He says -- that was the end of his answer, was it
4    not?
5        (Record read as requested.)
6    BY MR. LONDON:
7        Q.   I guess I need to ask the hard question.
8    Did you -- I'm trying to work with you here.
9        A.   I mean, it's a very simple computation.
10   I'm sure that I looked at that.  I don't remember
11   if I got the exact same answer as what FDA did or
12   didn't.  I know that it wasn't a statistically
13   significant result.  I don't know if I matched
14   their confidence interval and their point estimate
15   of the odds ratio exactly, but I can only assume
16   from an underlying knowledge of the statistics that
17   it was probably pretty close, if not exact.
18       Q.   You posed this hypothesis in paragraph 8
19   of that report.  It's on -- well, it's not
20   paginated.  It's just paragraph 8.  The question is
21   do we have enough subjects in gabapentin to
22   conclude that there is no increased risk of
23   suicidality relative to placebo based on the data
24   used in the FDA analysis and then I assume that the

184

1    balance of that paragraph is an explication of your
2    opinion on this question, correct?
3        A.   Correct.
4        Q.   Okay.  Now, this question is -- that you
5    have by the entry to paragraph 8 raises these
6    questions.  My question is do you have enough
7    patient years, not enough patients, but do you have
8    enough patient years tested with gabapentin to
9    assess an increased risk of suicidality relative to
10   placebo for any particular indication?
11       A.   Given that the data that I have available
12   from these studies were just the numbers of
13   patients who are enrolled in these randomized
14   clinical trials, those were the -- that was the
15   sample size that I was looking at.  My analysis did
16   not look at number of patient years.
17       Q.   And I believe you told me earlier that --
18   it's a come back to question, but you don't
19   recollect actually having the numbers of patient
20   years apart from that one study that we looked at
21   for gabapentin, the bipolar patients that were
22   somewhere between 50 and 60 patients on drug and
23   placebo and somewhere between seven and eight
24   patient years for each?

185

1       MS. McGRODER:  Object to form.
2   BY MR. LONDON:
3       Q.  Is that your recollection?
4       A.  My recollection is that I did not have
5   the patient year data.  I certainly didn't have it
6   for the different drugs and studies that were used
7   in the FDA report.  And since I couldn't replicate
8   exactly which gabapentin data the FDA had used, I
9   didn't have it for the gabapentin data either,
10  although I might have been able to have access to
11  that through Pfizer.
12      Q.  And you didn't have access to not merely
13  the gabapentin data, but you didn't have access to
14  the indication data that is bipolar or
15  schizophrenia or epileptic or neuropathic pain, the
16  various indications by patient year, is that true?
17      MS. McGRODER:  Are you asking that
18  question with respect to gabapentin?
19      MR. LONDON:  Yes.
20      MS. McGRODER:  I object to the form.
21      THE WITNESS:  I didn't have the
22  information for the other drugs or any more finely
23  grained than the data that we saw in table --
24  Table 8.  I certainly didn't have it broken down

186

1   by --
2   BY MR. LONDON:
3       Q.  Table 8, just for the record, meant
4   Table 8 on page 18 of the statistical review?
5       A.  That's correct.  So it wasn't a high
6   priority for me to get that for the gabapentin data
7   particularly since I couldn't even link up the
8   gabapentin data that Pfizer had supplied me with
9   the data that were used by the FDA.
10      Q.  Would merely having the number of
11  patients in a random controlled trial be sufficient
12  to know whether the trial was adequately powered to
13  answer the question whether there was an increased
14  or decreased risk of suicidality relative to
15  placebo or would you also need patient years to
16  answer that question?
17      A.  Well, I can imagine examples where you
18  would need both.  So for example, if the FDA had
19  restricted their analysis to studies that were of
20  only one day in duration, then -- and the risk
21  period for suicide attempts was a year, then one
22  could argue that just using the number of patients
23  would not be a good indicator of, you know, the
24  power of that study to detect an effect that had a

187

1   much longer risk period than the length of the
2   study.  In general, and particularly since the FDA
3   had excluded single dose studies, the issue of the
4   duration of those studies is probably not a huge
5   factor.
6       Q.  What do you mean by not a huge factor?
7       MS. McGRODER:  Wait, were you finished
8   with your answer?  Go ahead and finish your answer
9   then you can ask the next question.
10      THE WITNESS:  The risk period, the high
11  risk period for suicide attempts is usually early
12  on in treatment and these studies seem to have -- I
13  think one of -- there's a slide that gives the
14  average duration -- not a slide, I'm sorry.
15  BY MR. LONDON:
16      Q.  A table?
17      A.  Table.
18      Q.  And if you would point me to that, I'd
19  appreciate it.
20      A.  If you take a look at page 21 of the FDA
21  report, you'll see that the average duration --
22  also Table 11, the average duration for active
23  treatment drug was 90 days and 87 days for placebo
24  and the distribution of those numbers of days were,

188

1   you know, fairly tightly clustered in the lower
2   portion of that graph.  So it looks like there's
3   probably pretty similar exposures for drug and
4   placebo and relatively homogeneous lengths of
5   exposures across these different trials.
6       Q.  All right.  Would the -- as I'm looking
7   at this, you pointed me to the duration as
8   approximately 90 days, the average or mean standard
9   duration across the 11 trials.  Would 90 days equal
10  one-fourth of a patient year?
11      A.  Approximately.
12      Q.  Approximately?
13      A.  Yes..
14      Q.  And if an event only occurred in -- once
15  in every 250 patient years, what is the likelihood
16  that you would tease that event out in only taking
17  a drug for eight patient years?
18      A.  Could you repeat the question?
19      Q.  Yes, sir.  If an event occurs in only one
20  in 250 patient years, what is the likelihood of
21  uncovering that event during a trial that only
22  lasts eight or nine patient years?
23      A.  Well, it's hard to answer that question
24  given the way that you've set up the hypothetical.

189

1    If the risk of suicide or suicide attempt or
2    suicidal ideation is higher early on in the course
3    of a trial, then the number of patients exposed for
4    a short duration is going to give you more
5    information than say one person exposed for 250
6    years.  So it's really a function of what is the
7    period of risk, do the studies represent that
8    period of risk adequately and do you have enough
9    subjects to observe the event in question with
10   sufficient frequency to reliably reject the null
11   hypothesis when it's not true.
12          Q.   Using only the random control trials,
13   were there sufficient studies of sufficient numbers
14   of patients with sufficient intensity to tease out
15   whether it was likely to uncover suicidality in
16   gabapentin with the number of patient years for
17   which gabapentin patients were exposed in the
18   bipolar population?
19          MS. McGRODER:   Object to form.
20   BY MR. LONDON:
21          Q.   My question was limited to randomized
22   control trials?
23          MS. McGRODER:   Same objection.
24          THE WITNESS:   Well, one of the things

190

1    that you put in your question is whether or not
2    there were sufficient number of patient years.  And
3    besides these overall descriptors, I don't know
4    exactly the number of patient years so I can't
5    really answer your question as phrased..
6          Q.   Have you made an attempt to answer that
7    question using only randomized control trials?
8          A.   I've made an attempt to answer that
9    question in my report and it's stated in my report
10   in Exhibit 11.
11          Q.   The report of July 11?
12          A.   Yes, I believe so.
13          Q.   Which serendipitously is Exhibit 11?
14          A.   Never believe in probability.
15          Q.   No, I believe in serendipity.
16          MR. ALTMAN:   God doesn't play dice.
17          MS. McGRODER:   I think you answered the
18   question.
19   BY MR. LONDON:
20          Q.   Where in Exhibit 11 did you reflect that
21   attempt?
22          A.   I speak about this in Item Number 8.
23          Q.   All right.  I'm at paragraph 8.
24          A.   So I do a number of things in this

191

1    paragraph both to look at just the patients that
2    were included in the gabapentin RCTs that FDA
3    looked at.  It's the 4,932, and I compute power for
4    looking at the effect size so you understand that
5    when you're computing power, which tells you
6    whether or not you have enough subjects, you have
7    to postulate a particular magnitude of the effect
8    or you identify what magnitude of an effect you
9    could detect.  So not here, but in the next
10   paragraph --
11          Q.   In the paragraph that says in Dr. Sander
12   Greenland's report?
13          A.   Correct.
14          Q.   Go ahead.
15          A.   So I compute what is the magnitude of the
16   effect in terms of an odds ratio that you would
17   have to see in order to be able to detect it with
18   reasonable certainty with 4,932 subjects, 2,903 on
19   drug and 2,029 on placebo.  And there I see that
20   the relative risk would be 3.18.  So the number of
21   gabapentin treated subjects in FDA meta-analysis
22   would have been able to detect essentially a
23   tripling of the rate between active treatment and
24   placebo.

192

1          I then go back in the previous paragraph
2    and say well, could we have detected the effect
3    that we saw for Lamotrigine and Topiramate using
4    the observed incidence of .63 percent versus .32
5    percent on placebo and what I find there is that in
6    order to detect that effect, if you were to have
7    included the GABAergic drugs excluding Topiramate,
8    you would have had a sufficient sample to detect
9    that magnitude.
10         So by subtraction, the answer is for the
11   4,932 that were available in FDA's meta-analysis
12   for gabapentin alone, you would have needed a
13   larger effect than was seen for the combination of
14   Lamotrigine and Topiramate.  But if you restricted
15   it to FDA's classification of GABAergic drugs
16   excluding Topiramate, you would have had an
17   85 percent power.
18         What 85 percent power means is that in
19   order to detect an effect of that particular size
20   with this sample size, 85 percent of the time you
21   would have found it to be statistically significant
22   at the 5 percent level.
23         Q.   But would these denominators have been
24   the same if the -- strike that.  Let me ask it a

193

1  different way.
2      Would these results have been the same
3  regardless of the duration of the numbers of the
4  patients who are in each trial?
5      MS. McGRODER:  Object to form.  Do you
6  mean patient years?  You said duration of patients.
7  BY MR. LONDON:
8      Q.  Well, I don't want to use patient years
9  per se, but I do want to use duration because you
10  pointed out that you believe there is some science
11  to indicate that occurrences may occur more closely
12  in time to the taking of the drug than merely a
13  year.  So I want to use duration in whatever format
14  you want to express it, whether it's in patient
15  years, patient months, what have you.
16      MS.. McGRODER:  I just want to make sure
17  you guys are using the same terms in the same way
18  so if you understand the question, please answer
19  it.
20      THE WITNESS:  My understanding of the
21  question is would you get the same answers if you
22  did the power computations in patient years as a
23  denominator as opposed to patients?
24

194

1  BY MR. LONDON:
2      Q.  That's correct.
3      A.  And the answer is you'd probably get
4  slightly different answers depending.
5      Q.  And as I understood your earlier
6  testimony, you didn't have the ability to do those
7  calculations, those power calculations using
8  patient duration or patient years because there
9  just wasn't enough information from the FDA's
10  statistical review to enable you to do those
11  studies?
12      A.  That's correct.
13      Q.  And the only one left hanging is the one
14  that I said we would come back to and have you had
15  a chance to flip through that to see whether there
16  was, in fact, a patient year answer to Table 8?
17      A.  And so far I haven't seen it.
18      Q.  No, and I've given you a free throw on
19  that one so far because you haven't had whatever
20  time it would take for you to think about it while
21  battling off such tough questions as the one I'm
22  posing.  Okay.
23      A question that I asked earlier was is
24  this the only report that you had written between

195

1  the time you received this statistical review and
2  the November report that was submitted that was
3  both the FDA study that you did and the
4  pharmacoepidemiology report on one of the two
5  cohort groups?
6      A.  That's my understanding.
7      Q.  Did any of your coauthors play any role
8  in the July 11th report?  When I say coauthors I'm
9  talking about Dr. Hur, Dr. Brown and Dr. Mann?
10      MS. McGRODER:  And for the record, those
11  are the coauthors on the bipolar cohort manuscript,
12  not the coauthors of any of his litigation reports.
13      MR. LONDON:  Well, that's what I'm
14  asking.
15      MS. McGRODER:  Okay.
16      THE WITNESS:  None of those three
17  individuals had anything to do with my report of
18  July 11th.
19  BY MR. LONDON:
20      Q.  I apologize.  Did any of their work have
21  anything to do with the report of July 11th?
22      A.  Only to the extent that I may have
23  referenced work that we did together in the
24  literature.

196

1      Q.  In other words, if we looked at the
2  footnotes at the end of the paper, I believe you
3  gave five footnotes, one of which -- footnote 4
4  references yourself, Brown, Hur and Mann in
5  addition to Marcus and Balming on the VA study.  Is
6  that what you meant by your answer?
7      A.  Yes, that is.
8      Q.  But in terms of them actually doing any
9  work on the study you were doing for Neurontin and
10  for Miss McGroder or Pfizer, no, they did not
11  contribute?
12      MS. McGRODER:  Object to form.
13      THE WITNESS:  That's correct, they did
14  not contribute in any way.
15  BY MR. LONDON:
16      Q.  Okay.  I told you earlier that we were
17  going to come back and talk a little bit about the
18  paper, but I'm actually doing this in sort of a
19  logical sequence or an illogical sequence.  We just
20  hadn't gotten to their roles yet.
21      I now want to return to the role of you
22  and your coauthors and the work that you did
23  together.  Fair enough?
24      A.  Sure.

197

1   Q.   Earlier, probably before lunch even, you
2   told me a little bit about as I recall it was
3   Dr. H-u-r, Dr. Hur, and that Dr. Hur is, is it
4   correct, a statistician who works in some degree
5   with the VA and in some degree with your
6   universities and that you've known him and he
7   assisted you in some way on the SAS program work to
8   do the studies on the two cohort groups for the
9   epidemiology report and paper?  Did I say that
10  correctly?
11       MS. McGRODER:  Well, object just to the
12  extent it misstates his prior testimony.  Go ahead.
13       THE WITNESS:  If your question is did
14  Dr. Hur -- does he work for the VA, does he work
15  part-time in my lab and did he assist me on the
16  analysis of the two PHARMetric cohorts, the answer
17  is yes.
18  BY MR. LONDON:
19       Q.   And I wasn't trying to trick you with the
20  question.  I was trying to index the brief
21  conversation we had this morning in which my
22  recollection was you received the PHARMetrics
23  database and fairly promptly shared them with
24  Dr. Hur.  Fair enough?

198

1   A.   Yes, that is.
2   Q.   When was that?
3   A.   Again, I don't recall the exact date.
4   Q.   I'm going to ask you sort of these same
5   questions about each of the coauthors, but I want
6   to stay with Dr. Hur since we began there.  How did
7   you become acquainted with Dr. Hur?
8   A.   He was referred to me by a former student
9   of mine who was a teacher of his asking whether or
10  not I had any positions available in my Center For
11  Health Statistics for a part-time statistician who
12  was very good at working with large-scale
13  databases.
14       Q.   Who was the former student?
15       A.   Don Hedeker.
16       Q.   And you coauthored papers with him as
17  well, have you not?
18       A.   Quite a few, yes.
19       Q.   What was it that you thought Dr. Hur
20  would bring to this project that you could not
21  yourself bring to the pharmacoepidemiology study of
22  the PHARMetrics database?
23       MS. McGRODER:  Object to form.
24       THE WITNESS:  I don't think he could

199

1   bring anything in particular that I couldn't
2   besides having the time to devote to helping me
3   work on it.  I think that he is more proficient
4   than I am in the analysis of large-scale databases.
5   He's really quite exceptional in that regard and
6   most of our work together in these areas has been
7   in this type of collaboration where he starts out
8   at least as the hands-on person in terms of
9   insuring the integrity of the databases,
10  characterizing the various frequency distributions
11  of the measures and making sure that the databases
12  make sense and then typically I instruct him as to
13  what analyses to perform.
14  BY MR. LONDON:
15       Q.   Can you tell me what his educational
16  credentials are?
17       A.   He has a Ph.D. in biostatistics from the
18  University of Illinois at Chicago.  And I think he
19  has a Masters in statistics from Northern Illinois
20  University and I believe also a Bachelor's in
21  mathematics from Northern Illinois University.
22       Q.   How old a gentleman is he?
23       A.   Kwan is -- I think he's 50 years old.
24       Q.   What is his standing job in your

200

1   university?
2   A.   He's a research Assistant Professor.
3   Q.   Does he have classroom responsibilities?
4   A.   No.
5   Q.   What does he assist in researching apart
6   from this project with the PHARMetrics database?
7   A.   A great many things.  All of the
8   different kinds of databased projects that we're
9   doing.
10       Q.   Do you think you can tell me
11  approximately how many papers that you have jointly
12  worked upon?
13       A.   I have to look at my CV, but it's
14  probably in the neighborhood of five to ten.
15  Probably more than five and maybe 10 to 15.
16       Q.   Does he have medical skills, that is is
17  he a medical doctor, is he a psychiatrist, a
18  psychologist, a pharmacist?
19       A.   No.
20       Q.   Did he have as a part of his work on the
21  pharmacoepidemiology study, the FDA statistical
22  information that is Exhibit 14?
23       A.   Not to my knowledge.
24       Q.   I think just for convenience sake this is

201

1     a good time to identify as exhibits both the report
2     and the paper.
3           (Document marked as Gibbons Exhibit
4     Number 20 for identification.)
5     BY MR. LONDON:
6     Q.   And what is Exhibit 20, please?
7     A.   This is our paper, the relationship
8     between antiepileptics and suicide attempts.
9     Q.   At the middle of the page it refers to
10    the date September 2008.  True?
11    A.   True.
12    Q.   And when we've been talking about the
13    September paper, is Exhibit 20 that paper?
14    A.   Yes.
15    Q.   Is that paper along with perhaps the
16    November 5, 2008 report, are those the only
17    pharmacoepidemiology studies that you have
18    performed as to gabapentin from the PHARMetrics
19    database?
20    A.   Yes.
21    MS. McGRODER:  We will object to form
22    just to the extent the manuscript is not limited to
23    gabapentin.
24    MR. LONDON:  That is the problem with us

202

1     -- I was having this morning.  When you give these
2     speaking objections, they derail me.
3     MS. McGRODER:  Your question assumed that
4     both of the studies dealt with gabapentin.  That
5     was your question and in fact, the study in
6     Exhibit 20 does not deal only with gabapentin.
7     MR. LONDON:  In fairness, that's why you
8     need to use the word objection and just let it go
9     because that --
10    MS. McGRODER:  I actually didn't get to
11    get my objection in before Dr. Gibbons answered so
12    I wanted to be clear.
13    MR. LONDON:  But you don't need to give
14    what the objection is.  You only need to say
15    objection.
16    MS. McGRODER:  I'll say it however I feel
17    the need to say it.
18    MR. LONDON:  Please don't do it in such a
19    way that violates Rule 34 because the purpose of
20    that rule is to prevent derailing of depositions by
21    contentious explanatory objections when all that's
22    needed is the word objection, objection
23    nonresponsive or form objection.  It derails me and
24    that's what you're --

203

1     MS. McGRODER:  I don't intend to derail
2     you.  I object as I see fit and I haven't violated
3     rule 34 so go ahead and ask a question.
4     MR. LONDON:  If you haven't, don't do it
5     again.
6     Q.   Now, as to Exhibit 20, the paper, could
7     Dr. Hur have written this paper without your input?
8     A.   I don't believe so.
9     Q.   Okay.  What did he bring to this paper?
10    If I were to look at this paper, what could I read
11    and say this is what Dr. Hur did?
12    MS. McGRODER:  Object to form.
13    THE WITNESS:  Dr. Hur's contribution to
14    this paper is probably twofold.
15    BY MR. LONDON:
16    Q.   All right.
17    A.   One, the underlying methodological
18    strategy employed in this paper was borrowed from
19    in large part our VA paper in which we developed
20    this general methodologic strategy; and two, in
21    performing the computations that led to the
22    development of Figure 1, which I prepared, and
23    Tables 1 and 2.
24    Q.   I don't really understand your answer and

204

1     I'm not criticizing you, but when you said he
2     contributed something to Table 1, you then said
3     Table 1 that I prepared and Table 2.  So --
4     A.   I'm sorry.  I said Figure 1.
5     Q.   It's just not clear to me what it was you
6     were trying to say that Dr. Hur did?
7     MS. McGRODER:  Object to form.  Asked and
8     answered.  And what he said was he contributed the
9     computations for the table that he prepared.
10    BY MR. LONDON:
11    Q.   It's not clear to me what Dr. Hur did.
12    MS. McGRODER:  Well, do you have a
13    question?
14    MR. LONDON:  Yes.
15    MS. McGRODER:  Then ask it.
16    BY MR. LONDON:
17    Q.   What did Dr. Hur do?
18    MS. McGRODER:  Objection, asked and
19    answered.
20    MR. LONDON:  It's not asked and answered?
21    MS. McGRODER:  It is.  Dr. Gibbons just
22    answered that exact same question.
23    BY MR. LONDON:
24    Q.   What did Dr. Hur do in Table 1?

205

1        MS. McGRODER:  Same objection.  Go ahead
2   and answer it, Dr. Gibbons.
3        THE WITNESS:  Dr. Hur provided the
4   numbers that are in Table 1 based on analyzing the
5   PHARMetrics data in the way that I had instructed
6   him to.
7   BY MR. LONDON:
8        Q.   What did Dr. Hur do in Table 2?
9        A.   Table 2 provides output that was a part
10  of the analyses that Dr. Hur performed.  This came
11  out of SAS outputs.
12       Q.   Are the numbers in Table 2, are those
13  simply SAS outputs?
14       A.   They are abstracted from the SAS outputs,
15  but all of these numbers can be found in the SAS
16  output files.
17       Q.   When you go back to Table 1, you said as
18  I understood it, that Dr. Hur provided the numbers
19  in Table 1 pursuant to the instructions you gave
20  him and then I lost your answer.  The methodology
21  or the categories of information, what was it you
22  instructed Dr. Hur to look for to get these
23  numbers?
24       A.   To look at the number of attempts before

206

1   initiation of treatment, to look at the number of
2   person years to compute the rates per person year
3   for each one of the drug groups in terms of suicide
4   attempts, to do this using monotherapy conditions,
5   to then look at a pooled analysis of all 11 of the
6   AEDs or any of the 11 AEDs to restrict that
7   analysis then to those people who took one of the
8   11 AEDs only without any other concomitant
9   medication, to look at lithium monotherapy and to
10  look at the two no medication conditions, no
11  medication with respect to the 11 AEDs and/or
12  lithium and no medication with respect to any
13  central nervous system medication.
14       Q.   Do I understand you to mean that while he
15  extracted the numbers, it was you who came up with
16  the definitions for the categories that are the
17  caption of each of the columns?
18       A.   That's correct.
19       Q.   You came up with the definition that
20  would be used by Dr. Hur to come up with the number
21  at risk?
22       A.   That's correct.
23       Q.   And the same as numbers before, person
24  years and so on, each of those column captions?

207

1        A.   That's correct.
2        Q.   And he would take the instructions you
3   gave him and do whatever SAS computing was required
4   for him to extract that information?
5        MS.. McGRODER:  Object to form.
6        THE WITNESS:  He would perform those
7   analyses.
8   BY MR. LONDON:
9        Q.   Did you on your own perform any of the
10  analyses yourself either as a check on Dr. Hur or
11  as a two people working in parallel to see if he
12  replicated the results?
13       A.   Both of those seem to me to be the same
14  thing, yes.
15       Q.   All right.  And you did?
16       A.   Yes.
17       Q.   And did you do all of those or just
18  selective ones?
19       A.   I did everything in Table 1.
20       Q.   To replicate what Dr. Hur had already
21  done in Table 1?
22       A.   To replicate that the summary statistics
23  that led to the statistical analyses were done
24  correctly.

208

1        Q.   Okay.  Can I ask you the same question
2   about Table 2?  Did he extract the data from the
3   SAS information based on the definitions or the
4   parameters that you gave him that are the captions
5   for each of those columns, the post drug versus no
6   drug, the pre-drug versus no drug and the post drug
7   versus pre-drug?
8        A.   That's correct.
9        Q.   In other words, you would define what
10  those parameters were, he would use those defined
11  parameters to do the SAS calculations?
12       A.   I'm not sure I understand what you mean
13  parameters.
14       Q.   Well, I assume post drug versus no drug,
15  no drug means no drug, but post drug means that you
16  would give him the date that he was to work with
17  and look for whatever drug administration's or
18  prescriptions occurred after that drug and he would
19  follow that instruction to get the data in the
20  first column?
21       A.   No, that's not correct.
22       Q.   That's all right.  Just please describe
23  for me what happened.
24       A.   Well, what's not correct about that is I

209

1    didn't give him a date.  The date of drug
2    initiation of drug therapy will vary for each
3    subject who actually took one of these drugs and
4    took only one of these drugs.  And so the
5    instruction I gave him was to do a statistical
6    comparison between the period following the
7    initiation of say, for example, in the first row
8    gabapentin monotherapy, monotherapy with respect to
9    the other 10 AEDs and lithium and compare that to
10   those people who didn't take any of the 11 AEDs or
11   lithium.
12       Q.   Okay.  And he would take those directions
13   and extract the data from the SAS computer and
14   produce the numbers that are in Table 2?
15       A.   He wasn't extracting the data.  He would
16   just -- he would develop and run the SAS code to
17   perform that analysis.
18       Q.   I want to go back and start asking the
19   same questions about Dr. Brown if I may.  Who is
20   Dr. Brown?
21       A.   Hendricks Brown, he's a professor of
22   biostatistics at the University of South Florida
23   and also a visiting member of our Center For Health
24   Statistics.

210

1        Q.   Does he have a faculty position at your
2    institute?
3        A.   No.  We have a grant which we're
4    co-principal investigators on and the grant is
5    administered through the University of Illinois and
6    the primary subcontract is to the University of
7    South Florida under the direction of Dr. Brown.
8        Q.   Is he a medical doctor?
9        A.   No.
10       Q.   What was his role in the project of the
11   paper?
12       A.   He helped in both the original design of
13   the methodological strategy for the analysis of the
14   data from the original VA study, helped in thinking
15   about the -- adopting that strategy to the
16   PHARMetrics data that as we've discussed had a
17   somewhat different form than the VA study, helped
18   in reviewing the results and writing up the paper.
19       Q.   Did he compose some of the text of the
20   paper as opposed to the tables?
21       A.   As I recall, I wrote the first draft of
22   the paper and then distributed it to all of my
23   coauthors who either verbally or, you know, with
24   edits sent back their comments and rewrites to the

211

1    text.
2        Q.   Did Dr. Brown write any of the paragraphs
3    or the pages -- I appreciate that he edited and
4    suggested, but in reading any of the paper, is
5    there something that we could identify with a pen
6    or a magic marker or page number and say Dr. Brown
7    wrote this?
8        A.   I don't remember offhand who, you know,
9    would be responsible for each particular sentence,
10   but I know that Hendricks did quite a bit of
11   writing and overview.
12       Q.   And what?
13       A.   Overview.
14       Q.   Overview?
15       A.   Of the paper.  I mean, he contributed
16   significantly to the work.
17       Q.   Did his contributions have to do with the
18   statistical subjects or did they have anything to
19   do with pharmacy or did they have anything to do
20   with medicine?
21       A.   No.
22            MS. McGRODER:  Object to form.
23            THE WITNESS:  His contributions are
24   methodological contributions.  And again, you know,

212

1    he was responsible in large part as one of the
2    original contributors to the general idea of how to
3    do this kind of work from the VA paper which, of
4    course, predated all of this.
5    BY MR. LONDON:
6        Q.   Okay.  Could he have written this paper
7    without you?
8        A.   I think he probably could have.
9        Q.   And then I want to ask the same question
10   about -- is it Dr. Mann, what was Dr. Mann's
11   contribution?
12       A.   John Mann is a psychiatrist at Columbia
13   University who is head of the department of
14   neuroscience at Columbia University and one of the
15   leading experts in the field of suicide in the
16   world and he is our resident or non-resident
17   clinical expert.
18       Q.   What did he contribute to the paper?
19       A.   He helped with the review of the relevant
20   literature and the discussion of the results and
21   how they fit in with the rest of the literature.  I
22   think he also suggested a couple of the comparisons
23   that ultimately ended up in the paper.
24       Q.   Can you recall what those were of the

213

1   comparisons he suggested?
2       A.   I think John was -- was the person who
3   suggested the comparison to the -- if you look in
4   Table 1, the no medication condition.  I think
5   originally we had looked at those people who didn't
6   take any of the 11 AEDs or lithium, but may have
7   taken another central nervous system drug, another
8   -- some alternative anticonvulsant, not a member of
9   the 11 identified by the FDA, or an antidepressant
10  or an antipsychotic medication.  In our analyses we
11  treated those as co-variants.  We adjusted for
12  their use and John suggested that an additional
13  analysis should be performed where we look at those
14  people who took absolutely nothing, no central
15  nervous system drug.
16      Q.   On the bottom of Table 1 it says no
17  medication and there's a row of no medication
18  numbers?
19      A.   Correct.
20      Q.   Was it that concept, that row that
21  Dr. Mann recommended you consider?
22      A.   Only the final one.
23      Q.   The no medication?
24      A.   The no medication which is no medication

214

1   whatsoever, none of the AEDs or lithium or
2   alternative anticonvulsant or antipsychotic or
3   antidepressant medications.
4       Q.   Above that there is a row for no
5   antiepileptic drug and is that no lithium?
6       A.   Correct.
7       Q.   Were those his recommendations or yours
8   or do you remember that that would be read and
9   analyzed?
10      A.   That row was the primary -- between
11  subject comparison condition that I had instructed
12  Kwan to do and was part of the design of the
13  statistical comparisons, allowing the presence of
14  concomitant medications that were not a member of
15  the 11 AEDs or lithium to be treated as co-variants
16  as they were with these other drugs.
17      Q.   Okay.  Do you recall what else Dr. Mann
18  recommended be studied or included?
19      A.   I think that was the only, you know, more
20  methodological recommendation that he made.  And I
21  thought it was a good recommendation.
22      Q.   Did he write any of the text?
23      A.   Yes.  He again, you know, contributed to
24  the discussion section.

215

1       Q.   Can you identify that for me, where in
2   the discussion section you can identify something
3   that Dr. Mann wrote?
4       A.   I don't -- I mean, again I don't really
5   remember sentence by sentence who contributed what.
6   But I remember that he -- he's a good editor.
7       Q.   Well, do you remember what he good
8   edited?
9       A.   No, I don't.
10      Q.   Could Dr. Mann have written this paper
11  without the contributions made by you or Dr. Hur or
12  Dr. Brown?
13      A.   I think he could have written the paper
14  if we had already done the analysis and simply
15  passed him the results, but I don't think he could
16  have done it himself.
17      Q.   As to the calculations of numbers or the
18  allocation of the definitions for the category
19  headings that you gave to Dr. Hur, are those the
20  sort of things you don't think Dr. Mann could have
21  done?
22      MS. McGRODER:  Object to form.
23      THE WITNESS:  I don't think Dr. Mann
24  could have done the Poisson regression models that

216

1   we did.  I don't think he could have worked with
2   the PHARMetrics database himself.  He might have
3   found other statistical help and spearheaded such a
4   paper on his own and he would be quite competent.
5   BY MR. LONDON:
6       Q.   But as to spearheaded, that's a different
7   problem.  I'm just asking about could he have
8   written this paper if he'd gotten the PHARMetrics
9   database and the SAS computer program and launched
10  off on his own?  Do you think he could have done it
11  without you or Dr. Kwan to help?
12      MS. McGRODER:  Well, objection, asked and
13  answered and it's an improper hypothetical.
14      THE WITNESS:  No, I don't think he could
15  have.
16  BY MR. LONDON:
17      Q.   Okay.  Who besides you and Dr. H-u-r,
18  Dr. Hur, had the PHARMetrics database?
19      A.   Nobody except for you guys.
20      Q.   I guess I asked that in a way that
21  deserved that answer.  Did Dr. Brown or Dr. Mann
22  receive a copy of the PHARMetrics database?
23      A.   No.
24      MR. LONDON:  Okay.  We've gotten the five

217

1  minutes of vapor here so let's take this moment to
2  change.
3          VIDEOGRAPHER:  The time is 3:15 p.m.
4  This is the end of tape Number 5.  We are going off
5  the record.
6          (Short recess.)
7          VIDEOGRAPHER:  This is the beginning of
8  tape Number 6.  The time is 3:38 p.m.  We are back
9  on the record.
10  BY MR. LONDON:
11      Q.  We're talking about what I believe is
12  Exhibit 20, the paper of September 2008.
13      A.  Yes.
14      Q.  Okay.  As I understood your testimony
15  this morning, the idea of doing this study as
16  reflected in the paper arose in some connection
17  with your hearing Dr. Bloom's testimony at the
18  Daubert hearing.  True?
19      A.  No.
20      Q.  Correct me then.
21      A.  This paper was really largely --
22      Q.  I said that badly and I self-correct.
23  The idea of doing a pharmacoepidemiology study of
24  gabapentin and bipolar subjects in the 11 AEDs came

218

1  to you as a consequence of hearing Dr. Bloom say
2  she had not done that.  Is that what you did?
3          MS. McGRODER:  Well, objection.  And you
4  interrupted his last answer in which he was going
5  to answer that very same question.  So go ahead,
6  Dr. Gibbons.
7          THE WITNESS:  You also kind of didn't get
8  it quite right the second time.  The gabapentin
9  pharmacoepidemiologic study that was done where
10  gabapentin was the index date or episode or event
11  in question was not just done in bipolar patients.
12  It was done in patients with lots of different
13  indications and you know, the motivation for doing
14  that was in part I think really done from reading
15  Dr. Bloom's expert report and you know, what I was
16  learning in the process of getting involved in this
17  case.  And it was clear that that kind of
18  epidemiologic study had not been done.  So that was
19  part of the motivation for that work.  And of
20  course, part of the motivation and really the large
21  motivation for writing the paper was FDA's alert
22  that I had been made aware of before I ever really
23  got involved in this case.
24

219

1  BY MR. LONDON:
2      Q.  When I'm talking about the
3  pharmacoepidemiology studies, is it all right if I
4  include within that both the gabapentin index and
5  the bipolar index because they're both
6  pharmacoepidemiology studies that you did from the
7  PHARMetrics database?
8          MS. McGRODER:  Well, I object to that
9  because the answers might be different based on the
10  two different analyses.  So I think that would make
11  a --
12          MR. LONDON:  I haven't asked a question
13  about those.
14          MS. McGRODER:  Well, you're asking him if
15  he'll assume that those are the same thing.
16          MR. LONDON:  Lori, please.
17          MS. McGRODER:  No, Jack, I'm serious.  If
18  you're asking him if he'll assume when you refer to
19  pharmacoepidemiology that applies to both, I object
20  to that because that's compound.  They are
21  different.
22          MR. LONDON:  He is sufficiently bright to
23  tease out whether in the context of any different
24  question I'm asking it in such a way that it makes

220

1  the answer come out wrong.
2          MS. McGRODER:  Well, my objection is what
3  as I stated.
4          MR. LONDON:  We've heard your objection.
5          MS. McGRODER:  And I don't want him to
6  answer questions.
7          MR. LONDON:  It doesn't matter what you
8  want.  I will ask him what I'm going to ask him.
9          MS. McGRODER:  Can you let me finish?
10          MR.. LONDON:  No, you've said it three
11  times.  You've had enough.
12          MS. McGRODER:  I don't want him to answer
13  questions based on your assumption that they're the
14  same when they're not.
15          MR.. LONDON:  We've heard that.
16      Q.  Do you understand the problem?
17      A.  I'd prefer to keep them distinct and
18  maybe for simplicity, if you could just refer to
19  one as the gabapentin being the gabapentin cohort
20  that is outlined in detail exclusively in my expert
21  report from November 2nd and then the bipolar
22  cohort that's the subject of this paper, it would
23  be easier for me.
24      Q.  I'll do my best.  I may not succeed.  In

221

1    reading -- and we haven't made an exhibit of it
2    yet, but in reading the November 5th report,
3    paragraph 11 seems to propose that the notion for
4    doing both the gabapentin and the bipolar
5    pharmacoepidemiology studies came as a consequence
6    of Dr. Bloom's role in this case, do you agree with
7    that?
8        MS. McGRODER:  Well, object to form.  If
9    you're looking at his report, you need to give it
10   to him so he can see it.
11   BY MR. LONDON:
12       Q.   Do you agree with that?
13       A.   So I'm looking at what's listed as
14   Exhibit 11?
15       Q.   No, you don't have it yet.  It's
16   Exhibit 21..  You don't have that yet either.
17           (Document marked as Gibbons Exhibit
18   Number 21 for identification.)
19   BY MR. LONDON:
20       Q.   Is Exhibit 21 your November 5th report?
21       A.   Yes, it appears to be.
22       Q.   And as I've tried to make this easy and
23   it's just been made harder by the frightened
24   concerns that I'm trying to trick you with vague

222

1    terms.  Going to paragraph 11 on page 8.
2        MS. McGRODER:  Well, I object to that.
3    That's ridiculous.  Just ask him a question, Jack.
4    BY MR. LONDON:
5        Q.   It starts out, "I have reviewed the
6    declarations of Dr. Bloom and Mr. Altman."  Do you
7    see that?
8        A.   Yes, I do.
9        Q.   Does that paragraph set out what it was
10   that was your incipience for deciding to do the
11   pharmacoepidemiology reports, both gabapentin and
12   bipolar?
13       A.   I think that it lays out pretty clearly
14   the motivation for doing the gabapentin, but you
15   know, a big part of my own personal motivation for
16   doing the paper is to continue my work that was
17   started with antidepressants and suicidality and
18   extend that to work on antiepileptic drugs.  And
19   this has been a project that my coauthors and I
20   have been interested in for quite some time.  And
21   that was really motivated by my participation in
22   the Scientific Advisory Board that put the black
23   box warning on antidepressants for childhood
24   suicidality.

223

1        Q.   Would you have done the bipolar study
2    when you did the bipolar study but for having been
3    engaged to become involved in the Neurontin
4    litigation?
5        A.   I guess the most -- the clearest and most
6    heartfelt honest answer I can give you is I saw the
7    opportunity to get these important data on all 11
8    of the antiepileptic drugs as a side benefit, if
9    you will, from this -- from this case..
10       Q.   From being hired as an expert witness by
11   Pfizer in this case?
12       MS. McGRODER:  Object to form.
13       THE WITNESS:  That's correct.
14   BY MR. LONDON:
15       Q.   Are you able to testify that you would
16   have done the study had you not been hired as an
17   expert witness by Pfizer in this case?
18       MS. McGRODER:  Object to form and now
19   you're talking about the bipolar study.
20       THE WITNESS:  So if I'm understanding you
21   correctly, you're asking me whether or not I would
22   have done the bipolar study if I had never had a
23   role in this case and the answer is yes, I would
24   have.

224

1    BY MR. LONDON:
2        Q.   And when would you have done that?
3        A.   I would have done that probably sometime
4    next year using funds that we obtained in our new
5    grant.
6        Q.   Tell me what you mean when you say funds
7    we obtained in our new grant..
8        A.   I received a grant from the National
9    Institute of Health to study and develop
10   statistical approaches to the analysis of suicide
11   and other rare event data.  I think -- I don't
12   remember the start date of the grant, but sometime
13   late last year.
14       Q.   Late in 2008?
15       A.   In 2008.  It's a -- now I believe it's a
16   four-year grant.  It's about a $2.5 million grant
17   and we wrote the grant before the advisory came out
18   on antiepileptic drugs and so primarily the data
19   sets that we were looking at were related to
20   antidepressants and so I would have been interested
21   in studying this as well.
22       Q.   All right.  The we part of that, is that
23   the same team who wrote the paper that is
24   Exhibit 20?

225

1     A.   They're members of the -- of that grant.
2   They're participants in that grant.
3     Q.   And who got the grant?  Was it you,
4   Dr. Mann, all of you?  I don't quite understand how
5   grants work.
6     A.   I'm the principal investigator.
7     Q.   In the paper -- I'm sorry.  In the expert
8   report, Exhibit 21, on page 13 there are two
9   tables, Table 1 and Table 2.  Is that more than one
10  copy?  It feels thicker than these other.
11        MR. ALTMAN:  There should be three.
12        MS. McGRODER:  No, it's all one.
13  BY MR. LONDON:
14    Q.   Do you see Table 1 and Table 2?
15    A.   I do.
16    Q.   The report's dated November.  The paper's
17  dated September..  When were Table 1 and Table 2
18  composed?
19    A.   I don't remember the exact date.
20    Q..  Were they composed before the paper dated
21  September was finished in the form in which we see
22  it?
23    A.   I think that we completed the work on the
24  paper before the -- I think we started in looking

226

1   at the bipolar cohort.
2     Q.   I think you're probably getting as tired
3   as I am.  Your answers are beginning to trail a
4   little built.  Who is the we in Table 1 and
5   Table 2, page 13?
6     A.   Myself and Dr. Hur.
7     Q.   Okay.  Did Dr. Mann or Dr. Brown play any
8   role in Table 1 and Table 2 of the November 5th
9   report, Exhibit 21?
10    A.   No.
11    Q.   I can draw a big international X across
12  them.  They're not involved in the report, Table 1
13  and Table 2, November 5th, is that --
14    A.   That's correct.
15    Q.   Okay.
16    A.   And if by who you mean is their John
17  Mann or Hendricks Brown.
18    Q.   Dr. Mann and Dr. Brown?
19    A.   Correct.
20    Q.   Okay.  Then let's go back to the paper a
21  minute and help me finish a couple of things about
22  that.  When was the start date and when was the
23  finish date for the project that did all of the
24  work that resulted in the paper?

227

1     A.   The start date would have been the date
2   that -- I don't remember exactly when we actually
3   got the PHARMetrics data, but probably that very
4   day when we received the data.  And the end date
5   would have been sometime in September when the
6   paper was completed and submitted.
7     Q.   Give me your best estimate of your recall
8   of how much of a lag there was between May 20th and
9   when the PHARMetrics data showed up?
10    A.   I don't have the slightest memory.
11    Q.   You can't say it's a day, a week, a month
12  or two months?
13    A.   I'm sorry.  I just don't know.
14    Q.   That's okay.  If you don't know, you
15  don't know.  In the paper -- make sure I'm with the
16  paper -- you have Table 1 and we have this rather
17  odd -- my form of the paper has these captions
18  across the top that are the way it was filed in
19  court.  So I'm going to call it page 27 because
20  that's what's on the top.  Do you see that?
21    A.   Yes, I do.
22    Q.   On page 27, Table 1, the second column is
23  called number of attempts before treatment?
24    A.   Yes.

228

1     Q.   What did you define as an attempt so that
2   an event would be included or not included in that
3   column?
4     A.   ICD 9 codes 950 through 959 which include
5   -- and I'm reading from page 24 as enumerated at
6   the top of the Exhibit 20, self-inflicted
7   poisoning, self-conflicted injury by hanging,
8   drowning, self-conflicted injury by firearms,
9   self-inflicted injury by cutting, self-inflicted
10  injury by jumping from high places, other
11  unspecified self-inflicted injury and late effects
12  of self-inflicted injury.
13    Q.   All right.  As I understand the paper, it
14  is attempts as opposed to any study of whatsoever
15  of completed suicides, is that correct?
16    A.   Yes.
17    Q.   And it is not a study of ideations or
18  preparatory acts to a suicide, is that correct?
19    A.   That's correct.
20    Q.   Do you know whether there are different I
21  -- is it ICDN 9 codes for preparatory acts?
22    A.   ICD 9.
23    Q.   ICD 9 codes?
24    A.   I don't know if there are.

229

1    Q.   Were preparatory acts the types -- were
2  they the subjects of claims that were included in
3  the PHARMetrics database?
4    A.   I don't know.
5    Q.   Was there any control that you could
6  exercise to be sure that what one claims facility,
7  such as hospitals in Illinois, for example, called
8  an attempt was the same thing that another
9  facility, say a hospital in Texas, called an
10  attempt were in fact the same clinical things?
11    A.   I had no way of having control over that.
12    Q.   Okay.  I know that Pfizer -- I suppose
13  reimbursed you is the better way to say it -- for
14  the expense of the PHARMetrics database.  Did
15  Pfizer or Pfizer's counsel pay for any of the work
16  that went into Exhibit 20, the paper, "The
17  Relationship Between Antiepileptics and Suicide
18  Attempts"?
19    A.   I believe all of the payment was for the
20  work that went into my expert report on the
21  gabapentin cohort.
22    Q.   And that's close to what I'm asking you
23  but not quite.  I'm asking you if Pfizer paid you
24  for the work that went into the paper?

230

1    A.   Not to my knowledge, no.
2    Q.   And you probably -- well, let me just ask
3  it.  Do you have any reason to believe that Pfizer
4  paid Dr. Mann, Dr. Hur or Dr. Brown for any of the
5  work --
6    A.   I have no reason --
7    Q.   -- related to the paper?
8    A.   I have no reason to believe they received
9  anything.
10    Q.   Well, I'm getting tired and my voice is
11  trailing off.
12    MS. McGRODER:  His voice is trailing off.
13    MR. LONDON:  He's probably getting tired
14  too.  We're both small town professionals or
15  country professionals.
16    THE WITNESS:  Country.  I once visited
17  the suburbs.
18    MR. LONDON:  And they sent you back?
19    THE WITNESS:  I was dressed wrong.
20    MR. ALTMAN:  They thought he was the
21  cosmetician.
22    MR. LONDON:  That was good.  You've been
23  hanging around for two days and you finally got
24  one.

231

1    Q.   On page -- I believe it's page 35, again
2  working from those pages that are up at the top, it
3  begins with "there are several limitations of our
4  study" and there are five of those listed.  True?
5    A.   True.
6    Q.   Do those same limitations in that study
7  apply to the gabapentin study that is contained in
8  your report of November the 5th?
9    A.   Yes, they do.
10    Q.   As to the report of November 5th, that
11  report also is based on medical claims data and
12  likely is underreporting of suicide attempts?
13    A.   As I indicated, all of these same
14  limitations would apply equally.
15    MR. LONDON:  I'm sure that's my wife.  I
16  can only say I'm blessed to have a wife who know to
17  calls me even though I'm busy.  This happens on
18  airplanes too.
19    Q.   The PHARMetrics claim data did not
20  contain information on completed suicides.  I take
21  it you did not -- do you not have in mind some
22  other source other than the sources you've used in
23  papers in the past for data on completed suicides?
24    A.   It's very complicated to get data from --

232

1  for completed suicide.  Even, for example, the
2  Veterans Administration database isn't linked to
3  the national death index data where you could get
4  cause of death.  So you know, that's a project that
5  we're interested in trying to undertake as part of
6  our grant, but we're still probably a few years
7  down the road from that.
8    Q..  This says that your analyses do not
9  incorporate intensity of treatment.  Can you
10  explain that sentence to me?
11    A.   We have prescription data.  We know how
12  many pills were prescribed, but we don't really
13  have the intensity with which patients were
14  treated, you know, those sorts of things.
15    Q.   Well, earlier we had some questions back
16  and forth about patient years.  And you gave me
17  some testimony concerning what appears to be the
18  phenomena that suicides or suicide attempts, I
19  don't recall which, seem to be more likely to
20  appear closer in time to the onset of drug
21  treatment.  Do you recall that?
22    A.   Yes.
23    Q.   Is that different than what you mean in
24  this sentence when you say, "Our analyses do not

233

1    incorporate intensity of treatment"?
2        A.. Yes.  It's different.
3        Q.  How is it different?
4        A.  What I'm talking about here is we don't
5    know specifically what the dosage of medication
6    was.  We don't know whether or not a person
7    prescribed a 90-day supply of medication, actually
8    took the medication that they were supposed to
9    take.  Unlike the other studies, here we do know
10   the risk period and, in fact, by definition, by
11   design, we've set the risk period to be equal for
12   all people.  At least the period of observation is
13   equal for all people in both cohorts.
14       Q.  Okay.  Did the information in the
15   PHARMetrics database include nonprescription
16   treatment?
17       A.  Such as?
18       Q.  Psychotherapy?
19       A.  We did not have data on psychotherapy.
20       Q.  Did it include information on
21   environmental factors that contribute to either
22   suicide attempts or reduced suicide attempts such
23   as the emotional stressors that may or may not be
24   associated with an immediate decision to attempt

234

1    suicide?
2        A.  No, those kinds of data are not
3    available.
4        Q.  Fourth, patients were not randomized.
5    Would you explain that limitation to me, patients
6    were not randomized to treatment and there may be
7    other factors that play a significant role in the
8    process by which specific treatments are selected
9    for patients?
10       A.  One of the key findings in the paper is
11   that patients who ultimately are treated with an
12   antiepileptic drug have a much higher suicide
13   attempt rate prior to the initiation of treatment
14   than those patients who don't seek treatment.  So
15   there is a selection effect in which probably the
16   more severely ill patients seek treatment or are
17   treated by their physician relative to those that
18   don't seek treatment.
19       So in a randomized study, we would assume
20   that that kind of baseline difference, if you will,
21   wouldn't exist because each subject would be
22   equally likely to receive treatment or a relative
23   control.
24       Q.  And then of course last, you do say

235

1    straight up that this is statistical data, not
2    psychiatric interviews or other structured requests
3    and that's a limitation?
4        A.  With respect to the diagnoses.
5        Q.  Yes, sorry, with respect to the
6    diagnoses?
7        A.  Right..  We don't know that, you know, a
8    trained psychiatric interviewer did a detailed
9    psychiatric evaluation to give the diagnosis of
10   bipolar.
11       Q.  And each of these limitations apply to
12   the bipolar -- I'm sorry -- to the gabapentin study
13   that was done for the November 5th expert report?
14       A.  Yes.
15       Q.  I'm not sure if this is a limitation or
16   simply a question.  But did you have any
17   information such as the PHARMetrics database
18   information for the period before the year 2000?
19       A.  No.
20       Q.  All right.  Are there any other
21   limitations that apply that now occur to you or
22   have occurred to you since the time you released
23   the paper into the wild that you didn't know of at
24   that time?

236

1        MS. McGRODER:  Object to form.
2        THE WITNESS:  Not that I -- not that I
3    can think of right now.
4    BY MR. LONDON:
5        Q.  All right.  To whom have you submitted
6    the paper, publications or editors for
7    consideration?
8        MS. McGRODER:  Well, I object on the
9    basis of confidentiality if there is one and I
10   leave that to you.
11       THE WITNESS:  I don't -- I don't know
12   what the appropriate thing of how to deal with that
13   kind of information is.  I'm not uncomfortable
14   telling you that if you're not uncomfortable.
15       MS. McGRODER:  Fine with it if you are.
16       THE WITNESS:  I submitted the paper -- we
17   submitted the paper to the Journal of the American
18   Medical Association who felt that the paper was
19   best suited to their -- their journal the Archives
20   of General Psychiatry and they passed that paper
21   onto the Archives of General Psychiatry due to its
22   content.
23   BY MR. LONDON:
24       Q.  Is the -- what is the relationship

237

1  between the Journal of the American Medical
2  Association and the Archives of General Psychiatry?
3      A.  It's kind of like a parent/child
4  relationship.  JAMA is kind the overreaching, more
5  newsy kind of journal and then they have the
6  Archives of Neurology and the Archives of Internal
7  Medicine and the Archives of Psychiatry, which are
8  their more focused subspecialty journals.  And
9  sometimes you'll submit a paper to JAMA and they'll
10  say, you know, this is really a paper that's better
11  suited to the Archives of Internal Medicine and so
12  we like the paper, but we're going to pass it on to
13  one of these other journals.
14      Q.  Is the archives -- or are the Archives of
15  General Psychiatry, is that considered to be a
16  scholarly publication?
17      A.  I believe it's considered to be the
18  premiere journal in psychiatry, the Archives of
19  General Psychiatry and the American Journal of
20  Psychiatry.  I think if you were to look they'd
21  probably have the Archives of General Psychiatry as
22  the Number 1.
23      Q.  Have you received any reply from that?
24      A.  No, I'm still waiting.

238

1      Q.  I have not written in the last couple of
2  months a peer reviewed medical paper.
3      A.  It comes as a surprise me to me.
4      Q.  Be patient.  It's coming.  But what I
5  don't remember from the last time I did that was
6  when it would be that I would be notified that
7  peers had selected the paper for evaluation.  Has
8  that happened in this case, have you been notified
9  whether peers have selected this paper for
10  distribution --
11      MS. McGRODER:  I'm going to object.
12  BY MR. LONDON:
13      Q.  -- and evaluation?
14      MS. McGRODER:  I'm going to object on the
15  basis of confidentiality.
16      MR. LONDON:  It's just the fact of
17  whether -- I'm not --
18      MS. McGRODER:  I mean I still don't want
19  to open the door to information that I do know is
20  confidential and the peer review process is, in
21  fact, confidential.  So go ahead and answer that
22  question.
23      THE WITNESS:  I guess I'm not even sure I
24  understand your question.  Are you asking me the

239

1  question, just to save time, that have peer
2  reviewers been selected for the purpose of
3  reviewing this paper?
4  BY MR. LONDON:
5      Q.  That's a little earlier question, but it
6  certainly would answer both questions.
7      A.  Okay, the answer is it's my understanding
8  that the process has begun and is probably nearing
9  its conclusion.
10      Q.  I assume, without knowing, that you don't
11  really know who the peers are, is that correct?
12      A.  That's correct.
13      Q.  I assume that you were paid by Pfizer for
14  the report that you wrote on July 11th?
15      A.  Yes.
16      MS. McGRODER:  Well, sorry.  I need to
17  interpose my late objection to that question.
18      MR. LONDON:  What is the objection?
19  Because if you didn't pay him, this is the time to
20  tell me.
21      MS. McGRODER:  Well, we didn't pay him to
22  write a report the way that you said it.  We paid
23  him for his time in formulating and providing his
24  opinions in the Neurontin litigation, so I just

240

1  object to the form of your question.  I think it's
2  misleading.
3      MR. LONDON:  I don't think it's any more
4  misleading than the idea that you didn't pay him to
5  write a report.
6      MS. McGRODER:  Well, that's my objection.
7  You asked me to provide it and so I did.
8      MR. LONDON:  That's actually why we do
9  that.  That's what the rule provides is that when
10  you want to hear what the basis of an objection is
11  you ask and the person --
12      MS. McGRODER:  Thank you for teaching me
13  the Rules of Civil Procedure, Jack.
14      MR. LONDON:  I do my best.  Sometimes it
15  doesn't hurt for you to hear a recap.  You get a
16  CLE.  If you want to launch those bombs, I'll
17  launch them back at you.
18      MR. ALTMAN:  Dr. Gibbons probably wants
19  to shoot everybody.  He's had enough of this.
20  BY MR. LONDON:
21      Q.  Here's why I'm asking.  I find identical
22  quotes in the paper that came straight out of your
23  July 11th expert report that are not attributed in
24  the paper to your expert report.  Were you aware of

241

1   that?
2      A.  It wouldn't surprise me if my thinking
3   that's reflected in the paper is reiterated in the
4   expert report.
5      Q.  Well, this seems to go beyond thinking
6   and I'm going to labor for a few minutes to read
7   these into the record.  If you will take both
8   Exhibit 11 and Exhibit 20.
9      A.  I have those two exhibits.
10     Q.  If on Exhibit 11 you'll just keep the
11  face page up that's titled "Supplemental Expert
12  Report."  Do you have that?
13     A.  Yes.
14     Q.  But on Exhibit 20 if you'll go to page
15  20, read into the record, please, the very first
16  two sentences of the paper that begin under the
17  word introduction.
18     MS. McGRODER:  I object to the form of
19  that question.
20  BY MR. LONDON:
21     Q.  Would you please read into the record --
22     MS. McGRODER:  No, no, I'm sorry.  To the
23  statement you made earlier leading up to the
24  question.

242

1   BY MR. LONDON:
2      Q.  Would you please read into the record
3   first two sentences of the paper beginning after
4   the word introduction on page 20?
5      A.  "Anticonvulsant medications are
6   lifesaving in the treatment of seizure disorders
7   and are also extensively used for other indications
8   such as mood disorders and trigeminal neuralgia.
9   In March of 2005, the Food and Drug Administration
10  and the United States FDA sent letters to sponsors
11  of 11 antiepileptic drugs, AEDs, requesting the
12  submission of suicidality data from placebo
13  controlled, randomized clinical trials, RCTs."
14     Q.  Okay.  And then if you'll look on the
15  very first page of the supplemental report,
16  July 11, numbered paragraph 1, do you see that?
17     A.  I do.
18     Q.  Did you simply block copy on your word
19  processor that first two sentences and copy that
20  into the paper that is Exhibit 20, the scholarly
21  paper?
22     A.  Actually, I block copied both what's in
23  the expert report and this -- what's in the first
24  -- first two lines of the paper from something else

243

1   I had written.
2      Q.  All right.  So what was that item that
3   you had written?
4      A.  John Mann and I wrote an editorial that
5   we submitted to the American Journal of Psychiatry
6   on the FDA advisory.
7      Q.  Can you give me an attribution of that?
8      A.  What do you mean?
9      Q.  The date, the journal number, anything
10  that would identify where that is so that we could
11  read it?
12     A.  It hasn't been published.  The editors of
13  the journal felt that it was too controversial and
14  too condemning of the FDA to publish it.  And we
15  kind of left it on the back burners and now that,
16  you know, we might do something with it.
17     Q.  Does that communication exist in some
18  word processing file somewhere that you could
19  retrieve it and provide it to us?
20     A.  Sure.
21     Q.  Would you do that, please?
22     A.  I'll ask counsel, but I'd be happy to.
23     Q.  All right.  When was it that you and
24  Dr. Mann composed those two sentences that were

244

1   block copied into the Pfizer expert report of
2   July 11 and then again into the scholarly paper of
3   September 2008?
4      A.  I don't remember, but sometime before I
5   composed that.
6      Q.  Sometime before July 11?
7      A.  Yeah.  Now, I may not have exactly those
8   -- you know, that may have been edited and I'm not
9   sure I have the original version of that, but I
10  went through a couple times with it.
11     Q.  Do you use word Microsoft Word?
12     A.  I use Word and also Tech, but these were
13  done in Word.
14     Q.  If these were done in Word, would you
15  mind reproducing this in a format so that showing
16  markups is available, please?
17     A.  Well, I would but I don't have -- you
18  know, I don't keep copies with markups.
19     Q.  Well, the word processing program will
20  keep the copies of the markups.
21     MS. McGRODER:  We'll take your request
22  under advisement.
23  BY MR. LONDON:
24     Q.  Now, if you would go back to the

245

1  scholarly paper of September 2008, buried down
2  two-thirds of the way down it says, "based on the
3  FDA's analyses." Do you see that?
4       MS. McGRODER:  Are you on the same page?
5       MR. LONDON:  It's on page 20 of the
6  scholarly paper, but it continues to be on page 1
7  of the July 11 report.
8       MS. McGRODER:  I'm sorry.  I see based on
9  these findings.
10  BY MR. LONDON:
11      Q.  No, it says based on the FDA's analysis
12  of these data.
13      A.  That says based on these findings.
14      Q.  I've given you the wrong thing..  It's not
15  a point that's worth belaboring and I won't.
16          If you would turn to page 32 of the
17  scholarly paper, 1, 2, 3, 4 lines from the bottom
18  it begins the word, "Third, the majority."  Do you
19  see that?
20      A.  I do.
21      Q.  And would you read into the record,
22  please, for me the text that is in the scholarly
23  paper down through 1, 2, 3, 4 and a half lines
24  ending with a confidence interval up to 5.11 on the

246

1  following page?
2       A.  "Third, the majority of the suicidality
3  events in the FDA analyses were observed for only
4  two of the eleven AEDs, Lamotrigine and Topiramate.
5  61 percent of all of the events were observed for
6  these two drugs despite the fact that these two
7  drugs account for only 38 percent of the suicide
8  related adverse event reports.  These two drugs
9  were the only drugs that individually had
10  statistically significant effects on suicidality."
11  And then it goes through and talks about some
12  confidence intervals for individual drugs.  Do you
13  want me to read that as well?
14      Q.  Yes, please go ahead and read those into
15  the record.
16      A.  "Lamotrigine odds ratio 2.08 confidence
17  interval of 1.03 through 4.40.  Topiramate odds
18  ratio equal 2.53, confidence interval equal 1.21
19  to 5.85 and in the risk difference (RD) analysis
20  that included data from all studies Lamotrigine
21  risk difference equal 5.4 per 1,000, confidence
22  interval .24 through 10.57, Topiramate risk
23  difference equal to 3.05, confidence interval 0.98
24  through 5.11."

247

1       Q.  All right.  Then if we turn back to
2  Exhibit 11, the scholarly -- pardon me, Exhibit 11,
3  the expert report that you wrote for Pfizer dated
4  July 11, if you'll go to the second page, on
5  paragraph 3, do you see that?
6       A.  Yes.
7       Q.  And then if you'll go down to the second
8  line on paragraph 3, do you see where it begins
9  with the word "the majority"?  The third line, I
10  apologize.
11      A.  I do see it.
12      Q.  It says, "The majority of the suicidality
13  events were observed for only two of the eleven
14  AEDs"?
15      A.  Yes, I see that.
16      Q.  And does that continue verbatim word for
17  word as printed in your scholarly paper of
18  September 2008 right on down to the Topiramate 3.05
19  confidence interval .98 to 5.11?
20      A.  I'll take your word for it.
21      Q.  Please don't.  I mean read it for
22  yourself if there's any question in your mind.
23      A.  Okay.  It is not word for word.
24      Q.  All right.  Tell me the difference.

248

1       A.  Well, the first difference -- and I've
2  only gotten to the second line, where it says that
3  these two drugs account for only 38 percent of the
4  data used by FDA in their meta-analysis and here it
5  says that these two drugs account for only 38
6  percent of the suicide related adverse event
7  reports.
8       Q.  All right.  Any other differences?
9       A.  In the next line, these two drugs were
10  the only drugs that individually had statistically
11  significant effects on suicidality whereas in this
12  report it says these drugs -- these two drugs were
13  the only drugs that had a statistically significant
14  difference relative to placebo.
15      Q.  All right.
16      A.  Both in the analysis discarding --
17      Q.  Zero events?
18      A.  Zero events.  So none of that material is
19  in the paper.
20      Q.  All right.  And then the balance of it
21  quotes exactly the same numbers that you used in
22  the expert report, doesn't it?
23      A.  I hope so.  Yes, the rest of it checks
24  out.

249

1    Q.  May I ask that same question, did you
2    simply block copy on your word processing program
3    the text from the expert report of July 11th and
4    transplant that into the scholarly paper of
5    September 2008 with the two editorial changes or
6    word changes that you just pointed out to me?
7         MS. McGRODER:  Well, object to form.
8         THE WITNESS:  I don't -- I don't recall
9    exactly how that was done.  Maybe I did and then I
10   edited it.  These are my opinions and certainly in
11   the discussion section of this paper, I want to
12   reiterate my opinions about why I found something
13   different than the FDA did in their report.
14   BY MR. LONDON:
15        Q.  Well, in the scholarly paper these
16   opinions are not given attribution to the fact that
17   they originated in your expert report paid for by
18   Pfizer on July 11th, 2008, isn't that true?
19        MS. McGRODER:  Objection, argumentative.
20        THE WITNESS:  Again, and I think this
21   relates back to the previous objection.  My
22   opinions weren't paid for by Pfizer.  My opinions
23   are my opinions.  My time was paid for by
24   Ms. McGroder's law firm to express my opinions.  My

250

1    opinions are the same whether they're written in an
2    expert report or they're written in a scholarly
3    article.
4    BY MR. LONDON:
5         Q.  However, you missed the point of the
6    question.  The question was there's no attribution
7    in the scholarly paper to the fact that the origin
8    of this information came in work that you were paid
9    to do by Pfizer in connection with your service as
10   an expert witness, albeit which came up in an
11   expert report, isn't that true?
12        MS. McGRODER:  Objection, asked and
13   answered and argumentative and you don't have to
14   answer it.
15   BY MR. LONDON:
16        Q.  You do have to answer it because it has
17   not been answered.
18        MS. McGRODER:  No, you don't.
19   BY MR. LONDON:
20        Q.  Answer the question, Doctor.  Is there an
21   attribution in the scholarly paper to your expert
22   report of July 11th?
23        MS. McGRODER:  Objection, asked and
24   answered and argumentative.

251

1         THE WITNESS:  There is.
2    BY MR. LONDON:
3         Q.  Where?
4         A.  Under acknowledgements it says,
5    "Dr. Gibbons has served as an expert witness for
6    the U.S. Department of Justice and Wyeth and Pfizer
7    Pharmaceuticals, the latter involving gabapentin,
8    one of the drugs considered in this paper."  And in
9    my professional opinion, having published over 180
10   papers, I believe that that is sufficient
11   disclosure to indicate that I have participated in
12   a study related to this particular -- one of the
13   drugs that's described in this paper and I would
14   never reference directly a report like this.  I
15   would reference as I have referenced extensively,
16   you know, in the paper the literature that the
17   report has cited.
18   BY MR. LONDON:
19        Q.  Do you think the editor of the Journal of
20   the American Medical Association understood that
21   this particular text came from an expert report?
22        MS. McGRODER:  Objection, argumentative
23   and improper hypothetical.
24        THE WITNESS:  I don't know.

252

1         MS. McGRODER:  Calls for speculation.
2    BY MR. LONDON:
3         Q.  All right.  I want you to go back to the
4    expert -- I'm sorry, to the scholarly paper.  The
5    very next passage begins immediately after the
6    Topiramate risk differential.  It begins with the
7    phrase "By contrast."  Do you see that?
8         A.  Could you remind me the page?
9         Q.  I'm sorry.  I don't mind just showing
10   you.  Page 20 -- I'm sorry, on page 33 of
11   Exhibit 20.
12        A.  I see that.
13        Q.  It begins with "by contrast."  Would you
14   read into the record the passages that go down to
15   the phrase "between antiepileptic drugs and
16   suicidality or AEDs and suicidality," six lines
17   below?
18        A.  "By contrast, the other nine drugs showed
19   no significant association with suicidality either
20   individually or in combination, odds ratio equal
21   1.127, confidence interval equal 0.652 through
22   1.948, probability equal to 0.78.  These results
23   reveal that FDA's meta-analysis was driven by
24   Lamotrigine and Topiramate and had these two drugs

253

1  that already had suicidality warnings in their
2  labels been excluded from the analysis, there would
3  have been no remaining signal of an association
4  between AEDs and suicidality."
5      Q.  There's no footnote or attribution in
6  that statement to your expert report either, is
7  there?
8      A.  Not --
9          MS. McGRODER:  Object to form.
10  BY MR. LONDON:
11      Q.  And then in the expert report to you find
12  in paragraph 3 in the bottom of page 2 and
13  continuing to the second line of page 3 almost
14  essentially that verbatim language?
15          MS. McGRODER:  Well, object to form.
16  Almost essentially that verbatim language.
17  BY MR. LONDON:
18      Q.  Do you find that?
19      A.  I'll have to take a look at it.
20      Q.  Sure.  And feel free to use mine if it's
21  easier just because of the fact that I've blocked
22  it off already.
23      A..  Well, there are already differences in
24  the first line.  I mean, the report says by

254

1  contrast the suicidality event incidence for the
2  combination and the paper says by contrast, the
3  other nine drugs showed no significant association.
4  So I mean, it's not a block copy as you referred to
5  it.
6      Q.  Well, let's see.  Does it go on to say --
7  if we're in the same place..  I may have given you
8  the wrong thing.
9          Does it give the same data regarding the
10  odds ratio in -- pardon me -- the odds ratio in
11  placebo of 1.127 both in the paper and in the
12  expert report?
13      A.  I certainly hope that it does, sir.
14      Q.  All right.  And the confidence interval
15  of .652 to 1.948, the P equals .78?
16      A.  Certainly a testimonial to the fact that
17  it's correct.
18      Q.  Well, is it testimonial to the fact that
19  it was copied from one word processing program to
20  the other?
21      A.  Clearly it wasn't copied from one word
22  processing program to the other if the words are
23  not the same, sir.
24      Q.  Well, are you not aware of editing as

255

1  Dr. Mann appears to have done for you?
2          MS. McGRODER:  Object to form and
3  foundation and it's argumentative.  You don't have
4  to answer that.
5          MR. LONDON:  I'm responding to his
6  argumentative nature.
7          MS. McGRODER:  That is objectionable,
8  Jack, and no, Dr. Gibbons, you don't have to answer
9  that.
10          MR. LONDON:  If he wants to argue, I'll
11  argue back.
12          MS. McGRODER:  I object to your
13  argumentativeness.
14          MR. LONDON:  I understand that.  And I
15  object it his argumentativeness.
16          MS. McGRODER:  Ask a question, Jack.  Ask
17  a non-argumentative non-objectionable question.
18          MR. LONDON:  Thank you for the CLE.  When
19  was the last time you gave CLE on Rule 34.  Oh, I
20  guess never, is that right?
21          MS. McGRODER:  Do you have a question?
22  Let's continue.
23  BY MR. LONDON:
24      Q.  Well, let me ask this question.  I do

256

1  think it's one that is worth pursuing.
2          Did you tell Dr. Hur that the text that
3  we've read out of your July 11th report as it
4  appears in the scholarly paper came from the
5  scholarly paper?
6          MS. McGRODER:  Object to form and
7  foundation and assumes facts not in evidence.
8          THE WITNESS:  I'm not sure I even
9  understand what you just asked me.
10  BY MR. LONDON:
11      Q.  What part of it do you not understand?
12  Did you tell Dr. Hur the text that is in the
13  scholarly paper came out of the expert report?
14          MS. McGRODER:  Objection.
15          THE WITNESS:  No, the question you
16  asked --
17          MS. McGRODER:  Let me insert an
18  objection.  Object to the form of that question,
19  it's argumentative and it also assumes facts not in
20  evidence.  Now you can answer.
21          THE WITNESS:  The question you asked me
22  was did I tell Dr. Hur that the quotation out of
23  the scholarly paper came out of the scholarly
24  paper.

257

1  BY MR. LONDON:
2     Q.  I said out of the July 11 report?
3     A.  No, that's actually not what you said.
4        MS. McGRODER:  That's okay.  Ask a
5  question.
6  BY MR. LONDON:
7     Q.  Time out.  Just let me get the question
8  on the table.  Did you tell Dr. Hur that the
9  quotations that we have read out of the scholarly
10  paper that are the same or very similar to the
11  quotations that are in the scholarly -- the July
12  11th report first appeared in the July 11th report?
13        MS. McGRODER:  Object, argumentative and
14  assumes facts not in evidence.
15        THE WITNESS:  I don't recall if I told
16  him that or not, but we didn't discuss the -- my
17  expert report so I don't assume that I mentioned
18  that.
19  BY MR. LONDON:
20     Q.  Did you mention it to Dr. Brown?
21        MS. McGRODER:  Same objections,
22  argumentative and assumes facts not in evidence.
23        THE WITNESS:  No.
24

258

1  BY MR. LONDON:
2     Q.  Did you mention it to Dr. Mann?
3        MS. McGRODER:  Same objections.
4        THE WITNESS:  I don't believe so.
5  BY MR. LONDON:
6     Q.  The report is -- I'm sorry.  The paper is
7  dated September 2008 and can you tell me when it
8  was that you first sent it to JAMA?
9        MS. McGRODER:  Objection, asked and
10  answered.
11        THE WITNESS:  I don't remember.
12  BY MR. LONDON:
13     Q.  Did you send it to Miss McGroder before
14  you sent it to JAMA?
15     A.  No.
16     Q.  When did you send it to Miss McGroder?
17     A.  After it had been submitted for
18  publication.
19     Q.  Can you give me a date on that?
20     A.  I don't remember.
21        MR. LONDON:  Okay.  Lori, I need to know
22  if you have Dr. Gibbons's bills here so we can look
23  at them and see whether or not those help us
24  triangulate some of these missing dates.  Do you

259

1  have his bills here?
2        MS. McGRODER:  I don't.  I don't have
3  them.
4        MR. LONDON:  I request them for that very
5  purpose.
6        MS. McGRODER:  Okay.
7        MR. LONDON:  I'd like to know the amounts
8  of the bills, but more specifically, I want to see
9  the bills or billing information to see if they'll
10  help us understand some of these dates that we've
11  been asking about.  Will you do that for me?
12        MS. McGRODER:  I'll do my best.
13        MR. ALTMAN:  Can they be faxed from your
14  office?  I assume they're in your office.
15        MS. McGRODER:  I don't know.
16  BY MR. LONDON:
17     Q.  Let's lift hands for a minute and just
18  pause, okay.
19     A.  Okay.
20     Q.  Let's lift hands and pause for a minute.
21        VIDEOGRAPHER:  The time is 4:29 p.m.
22  We're going off the record.
23        (Short recess.)
24        VIDEOGRAPHER:  The time is 4:32 p.m.

260

1  This is the beginning of tape Number 7.  We are
2  back on record.
3  BY MR. LONDON:
4     Q.  Dr. Gibbons, did you send any financial
5  disclosures to the JAMA or the Archives of General
6  Psychiatry in connection with submission of the
7  scholarly paper of September 2008?
8     A.  I submitted the paper with the
9  acknowledgments that are listed in the front.
10     Q.  To that extent, the financial disclosure
11  that I saw that is germane to my question is this
12  one on page 17.  Do you see where I'm referring to?
13     A.  Yes.
14     Q.  And does it say that the data were
15  obtained from PHARMetrics with the assistance of a
16  grant in aid from Pfizer?
17     A.  Yes, it does.
18     Q.  Did you consider the reimbursement of the
19  PHARMetrics expense you incurred by the Pfizer
20  defense firm to be a grant in aid?
21     A.  At the time that's how I referred to it.
22  I guess that was just sort of standard way of
23  referring to that.
24     Q.  Well, it's true, isn't it, that you

261

1 actually submitted that bill to Pfizer on one of
2 your bills for work that you did as an expert
3 witness?
4     A.   Separately as a reimbursement for a
5 personal expense.
6     Q.   But if we were to look at that bill, the
7 odds are pretty slender that it will say grant in
8 aid, wouldn't they?
9         MS. McGRODER:  Object to form.
10        THE WITNESS:  I don't remember what it
11 says.
12 BY MR. LONDON:
13    Q.   Do you believe that the editor of either
14 of those two publications would read that this
15 PHARMetrics grant in aid was actually payment in
16 connection with expert witness services?
17        MS. McGRODER:  I'll object to form.
18        THE WITNESS:  I think that the disclosure
19 is more than adequate given that I indicated that I
20 was an expert witness that also -- for Pfizer
21 related to one of these drugs.  I mean, I don't
22 think I could have been more clear.
23 BY MR. LONDON:
24    Q.   You could not have been more clear?

262

1     A.   In my opinion, I could not have been more
2 clear.
3     Q.   What is R56 MH078580 RDG and CHB?
4     A.   It's a form of a merit award grant given
5 by the National Institute of Health for promising
6 pilot research projects.
7     Q.   Okay.  Before this afternoon, had you
8 discussed with Miss McGroder or anyone else in her
9 law firm that these passages that you just went
10 over in the scholarly paper are identical to or
11 similar to the pages in your July 11 expert report?
12    A.   It's first time --
13        MS. McGRODER:  Wait, object to the form
14 of that question.  It assumes faction not in
15 evidence.  Go ahead.
16        THE WITNESS:  It's the first time it's
17 been discussed.
18 BY MR. LONDON:
19    Q..  Had you discussed the scholarly paper
20 with Mrs. McGroder before?
21    A.   Not prior to its completion.
22    Q.   But since its completion?
23    A.   I sent it to her and she shared it with
24 you.  I don't think we -- I told her about it and I

263

1 think I talked with her about it on the phone after
2 I'd sent it to her and I was excited about the work
3 and shared that with her.
4     Q.   No one at her law firm called back and
5 said Dr. Gibbons, some of the passages in this
6 paper sure look they came from the July 11th expert
7 report?
8     A.   I received no such call.
9     Q.   You did four other papers with Dr. Brown,
10 Dr. Mann and Dr. Hur among others, did you not,
11 that had to do with SSRI or SNRIs and suicidality,
12 some relating to VA studies, some relating to, as I
13 recall, adolescents, is that correct?
14    A.   There were two ecological studies dealing
15 with suicide rates at the county level, one of
16 which was done in the general population, one of
17 which was done in the adolescent, child and --
18 actually child and adolescent population I think it
19 was the 5- to 14-year old population, the VA study
20 and then a study on trends in antidepressant
21 prescriptions and suicide rates both in the United
22 States and in the Netherlands.  And then another
23 study in -- that was published in Statistics in
24 Medicine on a new approach to the analysis of

264

1 spontaneous reporting data.
2     Q.   Were any of the drugs that were the
3 subject of any of those papers manufactured by
4 Wyeth?
5     A.   I believe one of them -- their
6 antidepressant was.
7     Q.   Would that have been Effexor?
8     A.   Yes.
9     Q.   Would that have been the subject of the
10 litigation in which you were an expert witness in
11 the case of Giles against Wyeth?
12    A.   It would have been, but those papers all
13 predated my involvement in that case..
14    Q.   I understand that.  Did any of your
15 scholarly paperwork in the Giles versus -- sorry --
16 let me back up and try again.
17        Did any of the text of the papers that
18 you and Drs. Brown, Mann and Hur wrote that you
19 just described a moment ago find their way into the
20 text of your expert reports in Giles versus Wyeth?
21    A.   They may -- they may well have, you know.
22 It's -- in describing the results of the VA study
23 in my reports, perhaps even here, but certainly in
24 the Wyeth case, I would have certainly included

265

1   descriptions of that -- of that paper that may have
2   been best phrased in one of our published papers
3   and I would have included odds ratios or risk
4   ratios that I certainly hope would have been
5   redundant with the published reports.
6       Q.   All right.   As I recall, one of the
7   conclusions that you reached in the September 2008
8   paper addressed the question of whether there was a
9   protective effect as opposed to an effect that
10  would increase the risk of adverse events or
11  suicidality in the drugs under study in the
12  September 8th paper, is that fair to say?
13      A.   September 2008 paper?
14      Q.   Yes, sir.
15      A.   Yes.
16      Q.   It was a protective, not causative effect
17  as regards suicide?
18          MS. McGRODER:   Well, object to form.
19          THE WITNESS:   I'm not sure I understand
20  what you mean by causative effect.
21  BY MR. LONDON:
22      Q.   The title of the paper in September is
23  "The Relationship Between Antiepileptics and
24  Suicide Attempts."   True?

266

1       A.   Yes.
2       Q.   And was it in the discussion that the
3   statistics as you studied them suggested that
4   antiepileptics were protective against suicide
5   rather than increasing the risk of suicide
6   attempts?
7           MS. McGRODER:   Object to form.
8   BY MR. LONDON:
9       Q.   Is that correct?
10      A.   I concluded that -- excuse me.   These
11  results reveal that AED monotherapy with one of the
12  11 AEDs results in a statistically and clinically
13  significant reduction in suicide attempt rates
14  relative to both pretreatment rates i.e., within
15  patients and no treatment rates i.e., between
16  patients in patients with bipolar disorder.
17      Q.   Do you mind giving me the page you are
18  reading from?
19      A.   I'm sorry.   I was reading from page 31 in
20  the end of the first paragraph.
21      Q.   Does the bottom of that page, the very
22  last two sentences -- pardon me, the last two lines
23  say, "This finding suggests a protective effect of
24  AED or lithium treatment on suicidality in contrast

267

1   to FDA's report of an increase in suicidality
2   associated with AED treatment"?
3       A.   Yes, it does.
4       Q.   And did the papers that you and Dr. Hur
5   and Dr. Brown and Dr. Mann submitted for
6   publication regarding SSRIs, SNRIs and VA patients
7   and adolescents also conclude that those products
8   had a protective effect rather than increasing the
9   risk of suicidality in those populations?
10      A.   That's correct.
11      Q.   Have the four of you collaborated on any
12  papers in which you concluded that a drug had --
13  pardon me.
14          Have the four of you collaborated on a
15  paper in which one of the conclusions was that a
16  drug showed a statistical increase in the risk of
17  some suicide related event?
18      A.   Yes.
19      Q.   And what was that, please?
20      A.   Tricyclic antidepressants.
21      Q.   I don't have that paper in front of me or
22  those papers, if you will.   Do you recall whether
23  that was for ideations, preparatory acts, attempts
24  or completed suicides or some one or more of those?

268

1       A.   Completed suicides.
2       Q.   And as to attempts, do you recall whether
3   you concluded that tricyclic antidepressants had an
4   effect one way or the other on attempts as opposed
5   to completed suicides?
6       A.   The only place where we looked at
7   tricyclic antidepressants and suicide attempts was
8   in the VA paper and there didn't appear to be any
9   increases given the patient level of data.
10          MS. McGRODER:   I'm sorry.   What was the
11  end of your sentence?
12          THE WITNESS:   Given the patient level of
13  date.   I'm sorry.   I'll try to speak a little
14  louder..   I'm getting tired.
15  BY MR. LONDON:
16      Q.   I appreciate you're getting tired.   And
17  did that have the same limitation on the quality of
18  the data on completed suicides that you described
19  earlier, that is that there was no good linkage
20  between the VA database and other national
21  databases reflecting deaths and suicides?
22          MS. McGRODER:   Object to form.
23          THE WITNESS:   If your question is did I
24  have completed suicide data for the VA data, the

269

1   answer is no.  The completed suicide data came from
2   the CDC county level data that we published in the
3   first two papers.
4            MR. LONDON:  I'd like to propose that we
5   go off the record for a second.
6            VIDEOGRAPHER:  The time is 4:43 p.m.  We
7   are going off the record.
8            (Short recess.)
9            VIDEOGRAPHER:  The time is 4:57 p.m.  We
10  are back on record.
11           (Documents marked as Gibbons Deposition
12               Exhibit Nos. 22 and 23 for
13               identification.)
14               EXAMINATION
15  BY MR. ALTMAN:
16      Q.   Dr. Gibbons, how are you.  My name is
17  Keith Altman.  I'm representing Nicolette Crone and
18  the Crones.  I know you've been here a long day so
19  we've got a little bit longer today and then we'll
20  pick up tomorrow.
21           First I'd like to hand to you a couple of
22  exhibits.  One is marked Exhibit 22, which really
23  isn't anything for you to look at and I don't only
24  have one copy and that's the -- just the cross

270

1   Notice in the case of Nicolette Crone and it
2   attaches the same deposition Notice as in the MDL
3   case.  So I just wanted to get that in the record.
4   I don't think you'll ever look at that again.
5       A.   Good.
6       Q.   The second document I'm going to hand to
7   you has been marked as Exhibit Gibbons 23.  Have
8   you ever seen this document before?
9       A.   Not at the front of it.  I don't know.
10      Q.   Why don't you take a quick look through
11  that?
12      A.   Yes, I have seen this.
13      Q.   Okay.  Dr. Gibbons, does this represent
14  your opinions that you intend to present in the
15  case of Crone, in the Crone case?
16           MS. McGRODER:  Object to form and
17  foundation..
18           THE WITNESS:  These are the opinions that
19  I've formulated to date relative to this area in
20  this case.
21  BY MR. ALTMAN:
22      Q.   I don't understand what you mean by in
23  this area in this case?
24      A.   I mean the case -- the Crone case and the

271

1   area of antiepileptic drugs and suicide.
2       Q.   Are there any other opinions you have to
3   date concerning Neurontin and antiepileptics that
4   are not expressed within this document I've just
5   handed to you?
6            MS. McGRODER:  Well, object to form and
7   foundation.  I mean do you want him to sit here and
8   study this word for word and tell you whether he
9   has any other opinions in Crone?
10           MR. ALTMAN:  I need to know what he
11  intends -- I need to know what opinions he intends
12  to express in Crone.
13           MS. McGRODER:  He intends to express the
14  opinions that are contained in all of his MDL
15  reports in Crone.  This is a declaration to support
16  the summary judgment motion.  This is not an expert
17  report in Crone.  So there may be opinions in his
18  other expert reports that are not contained in this
19  because this was merely to support our arguments on
20  summary judgment.
21  BY MR. ALTMAN:
22      Q.   Okay.  Taking that into consideration,
23  are there any opinions that you intend to express
24  in Crone that are not contained either within this

272

1   document or within your expert report submitted in
2   the MDL?
3       A.   Not at this time.
4       Q.   Okay.  That's fine.  I'm going to move
5   around a little bit.  I want to follow-up on a few
6   questions and then we'll dive into some new stuff.
7            I'd like you to pull your paper, Exhibit
8   -- I believe it's Exhibit 20 for a second.  And I'd
9   like you to go to the front page right at the
10  bottom.
11      A.   I'm sorry.  I'm doing the chronological
12  thing.
13      Q.   And would you please read for me the
14  sentence right on the first -- I'm sorry, literally
15  the front of the document, the title page.  And
16  would you read the sentence in for the record
17  starting with Dr. Gibbons at the bottom?
18      A.   "Dr. Gibbons had full access to all of
19  the data in the study and takes responsibility for
20  the integrity of the data and the accuracy of the
21  data analysis."
22      Q.   Okay.  Dr. Gibbons, I'm going to read you
23  a passage and unfortunately, I don't have it
24  printed out, but given the late nature of us

273

1  finding out the information I can't do anything
2  else.  And then I'm going to ask you a couple
3  questions about it to the extent that I can.
4       "For industry sponsored studies, an
5  analysis of the data based on the entire raw data
6  set and evaluation of study protocol and
7  prespecified plan for data analysis must be
8  conducted by an independent statistician at an
9  academic institution rather than by statisticians
10  employed by the sponsor or by a commercial contract
11  research organization.  The independent
12  biostatistician must be a faculty member at a
13  medical school or academic medical center or an
14  employee of a government research institute that
15  has oversight over the person conducting the
16  analysis and that is independent of the commercial
17  sponsor."
18       What I just read to you is the guidelines
19  -- guidelines that are provided on the website for
20  JAMA on data access and responsibility.  Now, first
21  of all, Pfizer did pay for the data in this study,
22  objection?
23       MS.. McGRODER:  Object to the form of that
24  question, just the whole preamble leading up to it

274

1  it.  Go ahead.
2  BY MR. ALTMAN:
3       Q.  That's fine.
4       A.  That's correct, they paid for the data.
5       Q.  That makes this study at least in part
6  funded by industry?
7       A.  That's correct, so are my previous
8  studies where Pfizer paid for the data from John
9  Mann that were published as a part of my first two
10  papers long before any of these litigations came
11  into being.  Or at least my involvement.
12       Q.  The -- you are working for Pfizer in
13  terms of you are working for them as an expert
14  witness in this case, correct?
15       MS. McGRODER:  Well, object to form.
16       THE WITNESS:  My understanding is I'm
17  working for the law firm that is representing
18  Pfizer.  I haven't had any real direct
19  communication with Pfizer.
20  BY MR. ALTMAN:
21       Q.  Okay.  Is there any other person who has
22  oversight over this data other than you?
23       MS. McGRODER:  Object to form.
24       THE WITNESS:  I'm not sure I understand

275

1  your question.
2  BY MR. ALTMAN:
3       Q.  Was there anybody that had oversight over
4  the data analysis and the accuracy of the data
5  other than you?
6       MS. McGRODER:  Object to form.
7       THE WITNESS:  Well, I took the primary
8  role as the principal author of this study, but as
9  I testified earlier, Kwan Hur had access to the
10  data and performed analyses under my direction.
11  BY MR. ALTMAN:
12       Q.  I'd also like to point out -- if you flip
13  back to the first page, I'm a little bit confused
14  because you say Dr. Gibbons has served as an expert
15  witness for the U.S. Department of Justice and
16  Wyeth and Pfizer Pharmaceuticals.  So you do say
17  here that you're working for Pfizer, correct?
18       MS. McGRODER:  Object to form.
19       THE WITNESS:  Again, I don't see myself
20  as working for Pfizer.  I mean, I don't have a
21  consulting relationship with Pfizer where I'm
22  designing their studies or analyzing their data.
23  I'm being paid for my time to express my own
24  opinions about the relationship between

276

1  antiepileptic drugs and suicide.  Just as in the
2  Wyeth case I was paid for my time to express my
3  opinions about the relationship between
4  antidepressants and suicide, I was hired to do this
5  based on my work published in the peer reviewed
6  literature and sponsored by federally funded
7  studies and the work that was initiated by me in
8  connection with this case was, in fact, initiated
9  by me.  I was the one who suggested that they do
10  this work and, you know, now I've lost my train of
11  thought.
12  BY MR. ALTMAN:
13       Q.  Objection, nonresponsive.  You say you're
14  being paid for your time but these are your
15  opinions, correct?  Is that -- I think that's what
16  you said?
17       MS. McGRODER:  Well, object to form.  It
18  misstates his testimony completely.
19  BY MR. ALTMAN:
20       Q.  Did I hear you say that you're being paid
21  for the time -- that these are your opinions and
22  you're just being paid for your time, correct?
23       MS. McGRODER:  Object to form.
24       THE WITNESS:  That's correct.

277

1  BY MR. ALTMAN:
2  Q.  Did you have these opinions that you
3  expressed today before you started working in the
4  Neurontin litigation?
5  MS. McGRODER:  Well, which opinions,
6  Keith?  He's testified for six hours.
7  MR. ALTMAN:  Lori, just object.  Please,
8  Lori.
9  MS. McGRODER:  It's overbroad and vague
10  and misleading.
11  MR. ALTMAN:  That's fine, then limit your
12  objections to that.
13  THE WITNESS:  So the opinions that I had
14  prior to working in the Neurontin litigation were
15  that the methodologies employed by the FDA were --
16  had serious -- serious problems with them and those
17  I expressed as a member of FDA's Scientific
18  Advisory Board prior to having any involvement
19  whatsoever with being an expert witness or being
20  involved with Wyeth or Pfizer and I believe that
21  those same kinds of errors were made with the
22  antiepileptic work.
23  Now, I initiated studies to help
24  understand what's going on with antiepileptics and

278

1  suicide and those studies could have come out
2  showing that antiepileptic drugs increased the
3  likelihood of suicide and that would have been the
4  way the results just simply came out.
5  BY MR. ALTMAN:
6  Q.  In your expert report you express
7  opinions to having reviewed the data that Pfizer
8  presented to the FDA, correct?
9  A.  That's correct.
10  MS. McGRODER:  Well, object to form.
11  BY MR. ALTMAN:
12  Q.  You didn't have that opinion before you
13  were retained by Pfizer, correct?  Any of those
14  opinions, right?
15  MS. McGRODER:  Well, object to form.
16  Which opinions?
17  MR. ALTMAN:  The opinions we just
18  discussed, Lori.
19  MS. McGRODER:  I object.
20  BY MR. ALTMAN:
21  Q.  Why don't we take a step back?  You
22  expressed opinions based upon submissions that
23  Pfizer made to the FDA, correct?
24  A.  Could you --

279

1  Q.  In your expert reports, you reviewed the
2  submissions that Pfizer made to the FDA, correct?
3  A.  I'm assuming that Pfizer has made many
4  submissions to the FDA.  I'd like to know what
5  you're asking me.
6  Q.  How many submissions to the FDA did --
7  Pfizer submissions to the FDA did you review as
8  part of your expert reports?
9  A.  I don't remember the answer to that.  I
10  remember I reviewed the -- at my request I asked
11  for the data that had been submitted as a part of
12  the placebo controlled, randomized clinical trials
13  that were submitted to the FDA that were used to --
14  by the FDA in reaching their conclusion that there
15  was an association between antiepileptic drugs and
16  suicide and one of the first things I wanted to
17  know was whether or not that relationship existed
18  for gabapentin which was the focus of this
19  litigation.
20  Q.  And so -- and Pfizer provided you that
21  information, correct?
22  A.  That's correct.
23  Q.  And you rendered opinions based upon that
24  information, correct?

280

1  A.  Yes.
2  MS. McGRODER:  Amongst others.
3  MR. ALTMAN:  Lori, please.
4  MS. McGRODER:  I mean I guess, Keith,
5  your question --
6  MR. LONDON:  You just start talking.
7  MR. ALTMAN:  Just object.
8  MS. McGRODER:  Well, I object.  You're
9  trying to limit what his opinions are in this case
10  and it's misleading.
11  MR. ALTMAN:  Lori, you're being
12  disruptive.
13  Q.  You expressed opinions based upon those
14  submissions, correct, the ones are we just talked
15  about on suicidality?
16  MS. McGRODER:  Object to form.
17  THE WITNESS:  I have expressed opinions
18  base on a wide variety of things including my
19  review of the data that were provided to me at my
20  request by Pfizer.
21  BY MR. ALTMAN:
22  Q..  Those opinions you did not have -- the
23  opinions that you expressed based upon the data
24  that Pfizer submitted to the FDA on suicidality,

281

1   you did not have those opinions before you were
2   retained by Pfizer, correct?
3        MS. McGRODER:  Objection.
4        THE WITNESS:  That is correct.
5   BY MR. ALTMAN:
6    Q.   Okay.  So you actually -- so you
7   developed some of your opinions after you were
8   retained as an expert by Pfizer, correct?
9        MS. McGRODER:  Objection, it's
10   misleading.
11        THE WITNESS:  My opinions have evolved
12   through my interactions working with Pfizer,
13   exploring the data that Pfizer submitted to the
14   FDA.  My opinions have continued to evolve from my
15   analysis of the PHARMetrics data that is described
16   both in the paper in Exhibit 20 and in my report.
17   BY MR. ALTMAN:
18    Q.   Objection, nonresponsive.  Could you have
19   written your November 2008 expert report on
20   March 27, 2008 before you had been retained by
21   Pfizer?
22        MS. McGRODER:  Objection, improper
23   hypothetical.
24        THE WITNESS:  Could you run those dates

282

1   by me again?
2   BY MR. ALTMAN:
3    Q.   Your last expert report, the supplemental
4   report from November of 2008, could you have
5   written that report based upon your opinions and
6   the knowledge you had on the day before you were
7   retained by Pfizer?
8        MS. McGRODER:  Same objection.
9        THE WITNESS:  No.
10   BY MR. ALTMAN:
11    Q.   Okay.  So and you were paid by Pfizer
12   starting from when you were retained by Pfizer for
13   the work -- for time that you spent, correct?
14    A.   That's correct.
15    Q.   And you got paid for doing the -- for
16   reviewing the submission that Pfizer made to the
17   FDA, correct?
18        MS. McGRODER:  Object to form.
19        THE WITNESS:  If you're referring to the
20   data that they submitted to the FDA, the answer is
21   yes.
22   BY MR. ALTMAN:
23    Q.   Okay.  So when you say you weren't paid
24   for your opinions, you were paid to develop your

283

1   opinions, correct?
2        MS. McGRODER:  Well, object to form.
3        THE WITNESS:  I was paid for my time in
4   this case.  My opinions in this case are based on
5   the opinions that I had related to the methodology
6   used by the FDA prior to this case and also to the
7   data that I reviewed as a part of being an expert
8   in this case.
9   BY MR. ALTMAN:
10    Q.   That's what I wanted to get at.  Okay.
11   Did you tell JAMA -- strike that.
12        When did you hear back from JAMA that
13   they thought this would be better placed in the
14   Archives of General Psychiatry?
15    A.   I don't recall.
16    Q.   Could you tell me approximately?
17    A.   Probably within a month of submitting it
18   initially.
19    Q.   Okay.  So that was prior to your November
20   expert report?
21    A.   I believe so.
22    Q.   Did you have to resubmit it or they just
23   transferred it over to the other journal?
24    A.   It was transferred.

284

1    Q.   Did you tell -- have you had any
2   correspondence with that journal since?
3    A.   No.
4    Q.   Did you tell that journal that you had
5   included the manuscript as part of an expert report
6   in a litigation?
7        MS. McGRODER:  Object to form just to the
8   extent that impinges on confidentiality issues and
9   I'm not -- I don't know the answer.
10        THE WITNESS:  Well, I certainly didn't
11   include the report in my expert report.  I referred
12   to this -- this paper that was submitted in my
13   expert report, but there's a lot in this -- in this
14   paper that is not in my expert report.  And you
15   know, beyond the acknowledgments that are listed in
16   the front of the paper, that's the only
17   communication I had with the journal in terms of
18   potential conflicts of interest.
19   BY MR. ALTMAN:
20    Q.   Did you tell the journal you were going
21   to refer to some of the findings of this expert
22   report -- of this paper in an expert report for
23   litigation?
24    A.   No, and that would not be my practice or

285

1   the practice of any of my colleagues doing this
2   kind of work.
3       Q.   Did you tell Dr. Hur you were going to
4   include references and data from this report in
5   your expert report?
6       A.   No, I did not..
7       Q.   Did you tell Dr. Brown?
8       A.   No.
9       Q.   Did you tell Dr. Mann?
10      A.   No, but I would have no reason to do so
11  and I wouldn't expect them to do so the same for
12  me..
13      Q.   Were you aware that Shook Hardy in this
14  case submitted the paper as part of the discovery
15  process in this case?
16      A.   I shared the paper with them after I had
17  submitted it for publication to ensure that there
18  would be no confusion of them having any role in
19  the writing and/or editing of that paper, just in
20  the same way as Pfizer was never provided a copy of
21  our paper in 2005 that was published in the
22  Archives of General Psychiatry despite the fact
23  that they had donated $30,000 to John Mann to
24  obtain part of the data that were used in that

286

1   paper.
2       Q.   Do you have any opinions in any case
3   involving -- in the Neurontin litigation specific
4   to a particular plaintiff?  Let me strike that.
5           All the opinions you expressed today and
6   your expert reports and everything, is any of that
7   specific to Mr. Crone?
8       A.   Only to the extent that there's a
9   question about the relationship between the drug
10  that he took and the behavior that he exhibited.
11      Q.   But that's not specific to Mr. Crone,
12  that's to anybody who took that drug and that
13  behavior, correct?
14      A.   Conditional on that age, but yes.
15      Q.   Same thing for, you know, the Smith case,
16  there's nothing that you said here that's specific
17  to the Smith case, correct?
18      A.   My opinions in this case are about the
19  general science and about the data and the
20  literature related to the statistics, methodology
21  and science underlying this putative relationship.
22      Q.   Did you -- are there any materials that
23  you reviewed for any purposes associated with this
24  litigation that are not listed on your materials

287

1   considered that you provided which I believe is our
2   Exhibit -- I believe it's Exhibit 10 and
3   Exhibit 19?
4       A.   I've reviewed --
5           MS. McGRODER:  Well, I'm sorry.  I object
6   just to the extent that I mean, for example, I
7   don't think the PHARMetrics data is listed there.
8   But --
9   BY MR. ALTMAN:
10      Q.   That's one thing, fine.  Is there
11  anything else that's not listed?
12      A.   Not to my knowledge.
13      Q.   Okay.  How did you communicate with --
14  strike that.
15          You said you had communications with
16  Dr. Hur concerning both the gabapentin study and
17  the bipolar study, correct?
18      A.   Correct.
19      Q.   How did those communications take place?
20      A.   Verbally.
21      Q.   Were there any emails?
22      A.   Not to my knowledge.
23      Q.   When he did a data run, how did he send
24  you the results of the data run?

288

1       A.   He is at the university every Wednesday
2   and so we would review everything typically on his
3   computer or he would print something out and, you
4   know, show it to me.
5       Q.   Did you save those printouts or papers or
6   anything that he shared with you?
7       A.   No.
8       Q.   Did you specifically discard them?
9       A.   No.  It's not my practice to save papers.
10          MS. McGRODER:  Object to form.
11  BY MR. ALTMAN:
12      Q.   Do you have any -- did you at any time
13  have any emails with Dr. Hur concerning this paper?
14      A.   I may have.  I don't recall specifically.
15      Q.   When you said you submitted drafts of the
16  paper to the authors for their input, correct?
17      A.   Correct.
18      Q.   How did you submit the paper to them?
19      A.   Sent it via email.
20      Q.   And did you get responses from them?
21      A.   Yes.
22      Q.   Was that also via email?
23      A.   Yes.
24      Q.   Do you have any of those emails?

289

1      A.   Not that I'm aware of.

2      Q.   What did you do with the emails?

3      A.   Usually just simply discard them after I

4    would take a look at the -- what they had attached

5    with their edits and then I would, you know, create

6    the next version of the paper.

7      Q.   Did you save any of the versions of the

8    papers as you modified them over time?

9          MS. McGRODER:  Well, I'm just going to

10   object to this whole line of questioning on the

11   basis that drafts of manuscripts submitted for

12   publication are confidential.  So you can ask..

13         MR. ALTMAN:  I'm just curious, what's the

14   basis of that?

15         MS. McGRODER:  Case law.

16         MR. ALTMAN:  What case law?

17         MS. McGRODER:  I can't cite it to you,

18   but I looked it up.

19         MR. ALTMAN:  I'm sorry.  I don't agree

20   with you.

21         MS. McGRODER:  You can disagree if you

22   want, but it is confidential.

23         MR. ALTMAN:  Are you instructing him not

24   to --

290

1          MS.. McGRODER:  No, I didn't tell him he

2    couldn't answer.  I'm just telling you I'm putting

3    my objection on the record on the basis that drafts

4    -- information about drafts of a manuscript or

5    production of drafts submitted for publication is

6    confidential.

7          MR. ALTMAN:  I'd like you to send me a

8    copy of the case law.  That would be very useful.

9          MS. McGRODER:  I'll do it.

10         MR. ALTMAN:  But there is also a

11   confidentiality agreement in this case I might add.

12         MS. McGRODER:  I don't think that impacts

13   my objection.

14         MR. ALTMAN:  That's fine.

15    Q.   Do you know if Dr. Hur sent -- had any

16   communications with Dr. Mann directly?

17    A.   Not to my knowledge.

18    Q.   Well, do you know they didn't or you just

19   don't know one way or the other?

20    A.   I just answered your question.

21    Q.   I'm confused.  Do you know one way or the

22   other whether Dr. Mann had any communications with

23   Dr. --

24    A.   I don't remember.

291

1          MS. McGRODER:  Wait.  Objection asked and

2    answered.

3          MR. ALTMAN:  No, I don't think it was, I

4    think we were unclear or I was unclear.  Let's take

5    it again.

6      Q.   Do you know one way or the other whether

7    Dr. Hur had any direct communications with

8    Dr. Brown?

9          MS. McGRODER:  Objection, asked and

10   answered.

11         THE WITNESS:  Now you're asking me about

12   Dr. Brown?

13   BY MR. ALTMAN:

14    Q.   I'm starting over.  Do you know one way

15   or the other whether they had communications?

16    A.   I don't -- I think that they had

17   communications when Dr. Brown was visiting with us

18   in Chicago and we talked about a great number of

19   things and there were times where the three of us

20   would be in my office talking about the manuscript

21   and the analyses and Kwan would be, you know,

22   reviewing some of the findings with us and we'd be

23   discussing them.

24    Q.   But do you know whether he ever had

292

1    communications with Dr. Brown that you were not a

2    party to?

3      A.   I don't -- with respect to this paper or

4    in general?

5      Q.   With respect to either one of these

6    analyses, this paper, Neurontin?

7      A.   Well, I know he had no communications

8    with Dr. Brown or Dr. Mann with respect to the

9    gabapentin analyses that were the subject of my

10   expert report.  With respect to this paper, I

11   believe the only communications that Dr. Hur had

12   were with Dr. Brown when Dr. Brown was visiting

13   with us in the summer.

14    Q.   What's your basis of saying there were no

15   communications for the gabapentin studies?

16         MS. McGRODER:  Well, object to form.

17   That's not what he said.  It misstates his

18   testimony.

19   BY MR. ALTMAN:

20    Q.   You said I know he had no communications

21   with Dr. Brown or Dr. Mann with respect to the

22   gabapentin analyses that were the subject of my

23   expert report.  What is your basis for making that

24   statement?

293

1    A.  Because I never -- I never spoke with
2  Dr.. Brown about the gabapentin analyses.  I never
3  -- any discussions that Dr. Hur and I had about the
4  gabapentin analyses were not with Dr. Brown.  So I
5  don't believe there was any communication between
6  the two of them.  It would be very surprising to me
7  if there was.
8    Q.  Well, that's not the same as I know he
9  had no communications, is it?
10       MS. McGRODER:  He said to his knowledge.
11       MR. ALTMAN:  No, he didn't.
12       MR. McGRODER:  Initially he said to his
13  knowledge and you wouldn't accept that answer.
14       MR. ALTMAN:  I'm sorry, he said I know he
15  had no communications with Dr. Brown or Dr. Mann.
16  I don't think I misread that.  I have your
17  testimony right here.
18    Q.  So I'm just trying to find out.  Do you
19  know for a fact or are you assuming it would be
20  unlikely -- I just want to know whether you know
21  definitively there were no communications?
22       MS. McGRODER:  Object to form.  It's
23  argumentative and it's asked and answered.
24       THE WITNESS:  To the best of my

294

1  knowledge, there were no communications about the
2  gabapentin paper between Dr. Hur and anybody but
3  myself.
4  BY MR. ALTMAN:
5    Q.  Did you ask her whether he had
6  communications with anybody else?
7    A.  No, I did not..
8    Q.  Do you know if with respect to the
9  bipolar paper -- well, you said -- but do you know
10  that Dr. Hur never had communications with
11  Dr. Brown with respect to the bipolar paper outside
12  of your presence?
13    A.  To the best of my knowledge, he did not
14  except relative to perhaps discussion via email
15  that he would have been cc'd on, so if I would have
16  sent out a draft of the paper I would have included
17  all of the coauthors and they would have sent back
18  their edits.
19    Q.  Did you ask Dr. Hur whether he had
20  communications with the other two authors with
21  respect to the bipolar study?
22    A.  No, I did not.
23    Q.  Do you know if Dr. Brown had any
24  communications with Dr. Mann directly independent

295

1  of you?
2    A.  Independent of me, I wouldn't imagine so.
3  I don't -- I know of no such communications.  It
4  would be unlikely that Hendricks would have
5  communicated with John without cc'ing me on that
6  kind of communication if it were by email or having
7  a conference call with all of us.  To my knowledge,
8  Dr. Brown and Dr. Mann have not worked
9  independently on any project beyond their work with
10  me.
11    Q.  Did you ask Dr. Brown whether he had any
12  communications with Dr. Mann?
13    A.  No, I don't believe I have.
14    Q.  Okay.  Do you know whether Dr. Hur had
15  any communications with Dr. Mann with respect to
16  the bipolar study?
17    A..  I don't believe, again outside of the
18  auspices of communications or discussions that we
19  had as a group, that Dr. Hur would have contacted
20  Dr. Mann or Dr. Mann would have contacted Dr. Hur
21  for any reason.
22    Q.  Do you know if Dr. Hur, Dr. Mann or
23  Dr. Brown have any copies of any of the drafts of
24  the manuscript?

296

1    A.  I don't know that.
2    Q.  Did you ask them?
3    A.  No, I have not.
4    Q.  Were you aware that they represented in
5  sum and substance that there is nothing with
6  respect to the bipolar study that they would have
7  that you do not have?
8       MS. McGRODER:  Object to the form of that
9  question.  It's argumentative.
10       THE WITNESS:  Could you repeat the
11  question?
12       MR. ALTMAN:  We'll come back to that.
13       MS. McGRODER:  So you're withdrawing the
14  question?
15  BY MR. ALTMAN:
16    Q.  I withdraw the question for now.  Do you
17  have a ballpark idea of how many hours you've spent
18  on behalf of Pfizer drafting the expert reports,
19  testifying at the Daubert hearing, preparing for
20  this deposition?
21    A.  No.
22    Q.  Not any idea?  Was it 1,000 hours?
23    A.  I would assume it was less than 1,000
24  hours.

297

1   Q.  Is it more than 100 hours?

2   A.  It's probably more than 100 hours.

3   Q.  Is it less than 500?

4   A.  I don't really know.

5   Q.  So somewhere between 100 and 1,000?

6   A.  That's a guess.

7   Q.  I'm just trying to get a ballpark idea

8   since we don't have the bills, we just don't

9   understand what the issues are.  We're going to

10  discuss it in more detail later, but the SAS

11  programs that were created to do both analyses

12  associated with the cohorts, did you write those

13  SAS programs?

14  A.  They were written primarily by Dr. Hur.

15  Q.  Did you have any part in writing those

16  SAS programs?

17  A.  I worked with him from time to time on

18  constructing the logic of the code.

19  Q.  Did you ever do the editing of the

20  program yourself or did you just have discussions

21  with him and he did the editing?

22  A.  We might work together in front of the

23  same computer and going through that and making

24  sure that the logic of the programs were doing what

298

1   was intended and then he would do the editing of

2   the programs.

3   Q.  Did you ever work on the programs

4   independently of Dr. Hur?

5   A.  No, I did not.  Not on the SAS programs

6   if that's what you're referring to.

7   Q.  That's what I was referring to, the SAS

8   programs.  You said that Dr. Hur extracted the data

9   out of the SAS data sets and gave them to you for

10  you to perform some independent analyses, is that

11  correct?

12  A.  Yes, it is.

13  Q.  And I think you said he provided it to

14  you as an ASCII format?

15  A.  Correct.

16  Q.  Which is A-S-C-I-I, by the way, all

17  capitals.  Didn't know if you knew it.

18  What tool did you use to analyze that

19  data?

20  A.  Fortran.

21  Q.  Did those -- do you have those fortran

22  programs?

23  A.  I do.

24  Q.  Did you turn those over to your counsel

299

1   as part of the materials asked for in this case?

2   A.  No, I didn't.  I only used those to

3   verify the analyses that were done in the SAS

4   programs which were what we relied upon.

5   Q.  Were you able to do all of the analyses

6   including the Poisson modeling and everything like

7   that within the fortran programs?

8   A.  No, I did everything up until the

9   preparation of the summary statistics that would go

10  into the Poisson regression.  I could do that.

11  I've written those kinds of programs before, but I

12  figured relying on SAS to do those appropriately

13  was okay.

14  Q.  A lot more than three lines of code in

15  SAS?

16  A.  Even in APL.

17  Q.  Did those fortran analyses produce any

18  output -- I want to say output.  I mean did you

19  output the information to a data file or did it

20  just literally come up on the screen?

21  A.  Both.

22  Q.  Do you have the output data files that

23  you created?

24  A.  I do.

300

1   MR. ALTMAN:  Lori, as part of the stuff

2   that we'll ask for, we'll ask for those working

3   files.

4   Q.  In your conduct of running your

5   independent verification analyses, did you ever

6   find a time that you had a difference between what

7   you saw and what Dr. Hur saw?

8   MS. McGRODER:  Wait.  Object just because

9   I don't know, are we talking about the gabapentin

10  cohort or the bipolar cohort?

11  MR. ALTMAN:  All of it.

12  MS. McGRODER:  Does your question relate

13  to both?

14  BY MR. ALTMAN:

15  Q.  Relates to both.  Wait, time out, strike

16  it.  You got me confused.

17  But with respect to either cohort, yeah,

18  with respect to either cohort, did you ever find a

19  difference in your analysis from what Dr. Hur had

20  which caused you to call Dr. Hur and say hey,

21  something's not right, either I got something wrong

22  or you got something wrong?

23  A.  Yes.

24  Q.  Do you remember any of those

301

1 circumstances?
2     A.  It was in relationship to the bipolar
3 cohort and getting the number of person years which
4 is the number of person days aggregated over all of
5 the 49,000 people and I was off by a couple of days
6 and we were trying to figure out why that was and
7 we resolved that.
8     Q.  And I noticed that you used 360 days I
9 believe for your year, is that correct?
10     A.  That's correct.  That comes from the
11 PHARMetrics contract and draw.  They said that they
12 were going to define the year as 30 monthly days
13 for, you know, the -- the 30 days a month for 12
14 months.
15     Q.  Okay.
16     A.  I should tell you I think it may actually
17 be 359.  I'm not sure I know the answer to why it's
18 359, but that's the number that comes out.
19     Q.  Realistically would you expect that if
20 you used 359 or 360 that would substantially alter
21 any results or analyses that you came out such
22 that, you know, you would see an effect with one
23 and not with the other?
24     A.  Not at all.

302

1     Q.  You said that you got the check for
2 $15,000, was written to you from Shook Hardy to pay
3 for the PHARMetrics data, correct?
4     A.  Yes.
5     Q.  Why didn't you report in the paper here
6 that you received the funding from Shook Hardy?
7     A.  I felt that it was probably more
8 appropriate in terms of looking at potential
9 conflicts of interest to name the party that was
10 potentially benefitting from my testimony in the
11 case.
12     Q.  And I also notice that you say
13 Dr. Gibbons has served as an expert witness..  But
14 you didn't say that you're still serving as an
15 expert witness, correct?
16     A.  That's correct.
17     Q.  Think that might have been a little
18 clearer that you were still involved in this
19 litigation?
20         MS. McGRODER:  Object to form.
21         THE WITNESS:  It didn't occur to me at
22 the time.  I can see your point.  It didn't -- it
23 wasn't something that I was trying to be -- trying
24 to obscure anything.

303

1 BY MR. ALTMAN:
2     Q.  The consulting fees that you get, were
3 they written on checks to you?
4     A.  Yes, to me.
5     Q.  And did you get to keep that money or did
6 you have to reimburse the university for any of
7 that money?
8     A.  No, the university has a -- has a policy
9 that allows us to keep consulting fees.
10     Q.  Are you familiar with the International
11 Society of Pharmacoepidemiology?
12     A.  I've heard of it, yes.
13     Q.  Are you a member?
14     A.  No.
15     Q.  Any particular reason why not?
16     A.  I'm not a pharmacoepidemiologist.
17     Q.  But you do pharmacoepidemiological
18 studies?
19     A.  Well, my work is on the development of
20 the methodology and tools -- statistical tools that
21 pharmacoepidemiologists can and should use and to
22 see whether or not they're any good, I like to test
23 them out in the real world.
24     Q.  Did you do a statistical analysis plan

304

1 for either one of the studies?
2     A.  No.  Well, sort of yes in terms of the
3 proposal that I wrote to PHARMetrics in describing
4 what, you know, what I was requesting.
5     Q.  Do you have a copy of that proposal?
6     A.  I think it actually ended up being what
7 was described in the contract.
8     Q.  Well, why don't we pull that contract
9 out?  I believe that is Exhibit -- Exhibit
10 Number 3.
11     A.  Now that's a good reason.
12     Q.  Now, I'm assuming that you're probably
13 referring to pages 5 and 6, correct?
14     A.  That's correct.
15     Q.  Okay.  Page 5 I believe describes a scope
16 of work and a patient selection criteria, correct?
17     A.  Yes.
18     Q.  And then it talks about the deliverables
19 and timeline, correct?
20     A.  Correct.
21     Q.  And then on the next page it defines the
22 data files that will be provided, correct?
23     A.  Correct.
24     Q.  And then there's a timeline that says the

305

1  cohort data sets will be delivered 10 to 15 days
2  upon licensee's approval of the final drug list,
3  correct?
4      A.  Correct.
5      Q.  So one would think that certainly within
6  10 or 15 days after you signed this contract, you
7  probably had the data in your possession?
8      A.  Could well be the case.
9      Q.  Okay.  I don't see anywhere in here that
10  talks about how you're going to analyze the data.
11      A.  I'm not sure that I included that
12  information as a part of the original kind of
13  proposal that I had submitted to the folks at
14  PHARMetrics.  This is their -- their sort of spin
15  on that.
16      Q.  So putting that aside for a second, I'd
17  asked you if there was a statistical analysis plan.
18  Just to make sure we're talking the same language,
19  that would be the plan where you talk about how
20  you're going to analyze the data, correct?
21      A.  That would be correct.
22      Q.  Is there a statistical analysis plan for
23  either the gabapentin study or the bipolar study?
24      A.  It would not be my habit to prepare such

306

1  a plan unless this was a project that I was helping
2  prepare a statistical analysis plan to aid some
3  pharmaceutical company in obtaining an NDA for a
4  particular drug.  But certainly when I collaborate
5  on projects with substantive folks, we don't
6  develop a statistical analysis plan unless there's
7  some general description of the statistical
8  methodology that's related to a grant that's
9  funding the research and then we would -- then we
10  would write that for the grant.
11      Q.  Is there any written documentation
12  anywhere of how the data was going to be analyzed?
13      A.  Well, the model for the approach of the
14  analysis of these data and the method that I
15  described at least in conversations with counsel
16  was to apply the methodology that was described in
17  our VA paper to the question of antiepileptics and
18  suicide and gabapentin in particular and then I
19  defined these two cohorts.
20      Q.  Was there a statistical analysis planned
21  for the VA study?
22      A.  No.  No, there wasn't.
23      Q.  So does a document exist anywhere that
24  says this is the analyses that we're going to do

307

1  and how we're going to do the analyses?
2      A.  Again, there may be some description of
3  that in what I wrote up as the initial proposal
4  that was submitted to PHARMetrics which they
5  modified in terms of the final contract to indicate
6  what they were capable of providing.
7      Q.  Other than the programs, is there any log
8  of the analyses or the steps that were taken to
9  prepare either the gabapentin study or the bipolar
10  study?
11      MS. McGRODER:  Object to form.  Log, did
12  you say?
13      MR. ALTMAN:  A log?
14      MS. McGRODER:  Well, I don't know what
15  you mean by a log but you can go ahead and answer.
16  BY MR. ALTMAN:
17      Q.  Did you write down -- did you write down
18  we did this, then we did this, then we did this so
19  that when you sat down to write your paper you
20  could replicate and say exactly what you did?
21      A.  Well, everything that we did is
22  documented completely in the SAS files and, you
23  know, the paper was easy to write from the
24  experience of performing those analyses.  Didn't

308

1  need to write down anything to tell me or remind me
2  of the methodology that we used.
3      Q.  Did you write all the SAS programs in one
4  shot or did they -- did you write, for example, one
5  of them first, got your results from that, then
6  move on to the next step and write the paper, you
7  know, or did you write all the SAS programs up
8  front and then run the data through the SAS
9  programs?
10      A.  Well, each of the programs as it was
11  being written, you know, was run -- as you know
12  since we've submitted them, there are quite a few
13  SAS programs that build intermediate files and
14  define what no medication conditions are and define
15  what monotherapy really is.  And then only at the
16  end do we run the series of comparisons.  So in the
17  gabapentin cohort we do comparisons before and
18  after within different indication groups and within
19  the bipolar cohort we do comparisons both between
20  subjects and within subjects, those subjects who
21  didn't take a medication versus those that did
22  prior to taking the medication and then following
23  the medication, and then finally a comparison among
24  those patients who took a medication before and

309

1  after the initiation of that medication.  So those
2  were the primary analyses.
3      Q.  So if I understand what you're saying, at
4  no point before you started writing the SAS
5  programs, before you started crunching the data did
6  you guys ever sit down together and develop a plan
7  this is how we're going to go do this analysis, is
8  that correct?
9      A.  We talked about it and you know, as you
10  can see from the analyses, they're not particularly
11  complicated.  We have some between group analyses
12  that are fairly trivial and then some GEE analyses.
13  And we talked about whether or not we wanted to
14  look at just a suicide attempt or not versus
15  allowing for multiple suicide attempts which led to
16  the decision to go to a Poisson versus a logistic
17  regression model.
18      And of course, in the within subject
19  analyses we had to absorb the correlation induced
20  by looking at the same people both before and after
21  the initiation of treatment.  So those analyses
22  were performed using GEE which is appropriate for
23  that kind of analysis, particularly in the case
24  that we have no missing data and questions about

310

1  the mechanism of missing data are not an issue.
2      Q.  Have you ever designed a prospective
3  study to see whether individuals would commit
4  suicide on some agent or through some exposure?
5      A.  I helped in the -- in the design of the
6  National Institute of Mental Health -- thank you --
7  mental health collaborative study on the
8  psychobiology of depression.  This was work I did
9  with Jan Fawcett probably in the early to mid
10  1980's of looking at the determinants of suicide in
11  a large cohort of highly at-risk patients and those
12  papers were published over the years.
13      Q.  So this was looking going forward whether
14  they would commit suicide and not looking back?
15      A.  Prospectively.
16      Q.  Okay.  I just want to kind of understand
17  one thing.  Is it your opinion just looking at the
18  gabapentin data by itself as submitted to the FDA
19  and the FDA's finding that that data demonstrates
20  that there is no increased risk associated with
21  Neurontin and suicidality?
22      A.  I think that the randomized control trial
23  data, like any data set, have limitations and there
24  are ascertainment biases associated with looking

311

1  retrospectively at spontaneous adverse event
2  reports even in the context of randomized clinical
3  trials.
4      I think that the data suggests that there
5  is no evidence of an association of a signal of
6  suicidality and the treatment of gabapentin.  I
7  think that the data are probably a little
8  underpowered to make that statement definitively
9  given that the number of observations is less than
10  would yield 80 percent power for detecting a
11  twofold change, an odds ratio of two or relative
12  risk of two.
13      On the other hand, I think that in a
14  sample of close to 5,000 people to see only two
15  events on drug and one event on placebo suggests
16  that you'd need a real earthquake in the next 5,000
17  people to change that opinion.
18      Q.  I believe that the adjusted odds ratio in
19  the FDA analysis is 1.57 with a confidence interval
20  of .12 to 47.66.  Does that sound about right?
21      A.  Sounds about right.
22      Q.  What I'm going to ask is not important on
23  the precise numbers and that's a 95 percent
24  confidence interval, correct?

312

1      A.  Correct.
2      Q.  Can you exclude any value within that
3  95 percent confidence interval as the true odds --
4  true odds ratio?
5      A.  The interpretation of a confidence
6  interval is that if we were to repeat that
7  experiment 100 times say, 95 out of 100 times the
8  true value would be within the confidence interval
9  for that particular repetition of the study.
10      Q.  That's not what I asked.  Can you exclude
11  any -- can you exclude the odds ratio of being two
12  based on that odds ratio and confidence interval?
13      MS. McGRODER:  Object to form.  It's
14  argumentative.
15      THE WITNESS:  Different values of that
16  odds ratio have different probabilities within that
17  interval.  If the -- if the -- if the drug had no
18  events and placebo had no events and there were one
19  million patients studies, the confidence interval
20  would go from minus infinity to plus infinity.
21      So what's driving the width of that
22  confidence interval is the rarity of the events.
23  So to indicate that something that has very rare
24  events could potentially have an odds ratio of 47

313

1 would to me be misleading.
2 MR. ALTMAN: Objection nonresponsive.
3 Q. Could the -- can you exclude an odds
4 ratio of two?
5 MS. McGRODER: Objection, asked and
6 answered.
7 BY MR. ALTMAN:
8 Q. No, he didn't. Can you exclude an odds
9 ratio two given that point estimate and confidence
10 interval?
11 MS. McGRODER: Objection, asked and
12 answered.
13 THE WITNESS: Assuming that that
14 confidence interval was the same over and over and
15 over again, 95 percent of the time the true odds
16 ratio would be contained within it. And so if that
17 odds ratio didn't -- if that confidence interval
18 was -- included two, then 95 percent of the time
19 the true odds ratio could be two.
20 BY MR. ALTMAN:
21 Q. Okay. Can you exclude ..5 within that
22 confidence interval?
23 A. Just in the same way that you can't
24 exclude two, you wouldn't exclude .5.

314

1 Q. Now, I think you said there's --
2 different odds ratios have different probabilities
3 of being the actual true odds ratio, correct?
4 A. Different values within the interval, of
5 within the confidence interval.
6 Q.. And so if you were to graph that
7 probability, you'd kind of see some kind of a
8 curve, that would be small, that would be bigger,
9 and then it would get small again, is that correct?
10 A. It would get largest it at the point
11 estimate.
12 Q. At the point estimate. So the
13 probability that the true odds ratio is -- would be
14 1.57 would be higher than the probability that
15 it's 1, correct?
16 A. Well, again I think you're
17 overinterpreting what that confidence interval is
18 telling you. What that confidence -- what you're
19 seeing there is that there's no -- there's very
20 little probability associated with any rejection of
21 the null hypothesis that the true odds ratio is 1.
22 The point estimate says that it's 1.5, but you can
23 imagine that one additional suicidal -- suicidality
24 event in the placebo group would make the point

315

1 estimate 1.0. So you know, the -- it's a very flat
2 kind of function.
3 Q. Objection, nonresponsive..
4 Is the point -- is the probability that
5 the odds ratio is equal to the point estimate
6 higher than the probability that it is 1?
7 MS. McGRODER: Objection, asked and
8 answered.
9 THE WITNESS: To really know that you
10 would have to do repeated sampling of that.
11 BY MR. ALTMAN:
12 Q. Just based on if you graph based on that
13 point estimate and that confidence interval, is the
14 probability higher that it is 1.57 than it is 1?
15 A. If you were to simply plot out the
16 probability on the basis of those data, the highest
17 probability would be associated with the point
18 estimate of 1.57 and that would be higher than it
19 would be at 1.
20 MR. ALTMAN: Why don't we change the tape
21 and take a -- well, you determined to --
22 MS. McGRODER: Yeah, he has to go. He
23 has a --
24 MR. ALTMAN: Let's go off the record for

316

1 a --
2 VIDEOGRAPHER: This is the end of tape
3 Number 7. The time is 5:46 p.m. We are going off
4 the record.
5 (Discussion off the record.)
6 VIDEOGRAPHER: This is the beginning of
7 tape Number 8. The time is 5:48 p.m. We are back
8 on the record.
9 BY MR. ALTMAN:
10 Q. I think you said on many times that you
11 really wish you knew all the data the FDA
12 looked at and how they had done their review, is
13 that correct?
14 MS. McGRODER: Object to form.
15 THE WITNESS: I would have liked to have
16 had all of the FDA data, yes.
17 BY MR. ALTMAN:
18 Q. Did you ask the FDA whether they would
19 make that date available to you?
20 A. I've been asking the FDA about getting
21 data since my -- my participation on the FDA
22 Advisory Board, actually from before. I was
23 contacted by the FDA shortly before the Scientific
24 Advisory Board for kids and suicide and

317

1  antidepressants to review their findings with me
2  and to make some recommendations about how -- if
3  they had done the analyses correctly.  And I had
4  suggested an alternative approach to their analyses
5  and they told me that they would provide me with
6  the data, but they didn't have time to do it
7  before.  So I've been still waiting for those data
8  since 2004.
9      Q.  With respect to Neurontin, did you ask
10  the FDA for data with respect to -- I'm sorry, with
11  respect to the anticonvulsants, antiepileptics, did
12  you ask the FDA for the data that they analyzed for
13  the anticonvulsants?
14      A.  I've had no opportunity to spend any time
15  with FDA people asking them for anything since --
16  on Neurontin.
17      Q.  Are you familiar with FOIA, F-O-I-A?
18      A.  Yes, I am.
19      Q.  Have you ever made a FOIA request in all
20  of your career?
21      A.  I have colleagues who have made those
22  requests on my behalf.
23      Q.  Did you make a FOIA request here?
24      A.  Yes.

318

1      Q.  You did?
2      A.  Not personally.
3      Q.  Did you ask somebody to make a FOIA
4  request for the data?
5      A.  I did.
6      Q.  Who did you ask?
7      A.  I asked counsel.
8      Q.  Do you know if they did that?
9      A.  I believe they did.
10      Q.  Do you know when they did that?
11      A.  I don't know.
12      Q.  Is there some reason that you didn't do
13  that yourself?
14      A.  I just figured it would be easier for
15  them to do it.  I'm also working with another group
16  interested in the development of new methods for
17  meta-analysis who have made similar requests for
18  the adult suicide data and have not had any
19  response to those requests for the last year or so.
20      Q.  I'd like to turn you very quickly to your
21  original declaration which I believe is Exhibit
22  Number 8.  Do you have that in front of you?
23      A.  I do.
24      Q.  To do some introductory stuff on the

319

1  first few pages.  Going to page 3, you make an
2  introductory paragraph there talking about
3  information that came out of the FDA alert itself,
4  correct?
5      A.  That's correct.
6      Q.  At the time that you wrote this, which I
7  believe is in late April of 2008, you had not seen
8  the FDA statistical review, correct?
9      A..  That's correct.
10      Q.  You had no idea how the FDA had reviewed
11  the data, correct?
12      MS. McGRODER:  Objection, asked and
13  answered.  Jack just went over all that with him.
14      MR. ALTMAN:  That's fine.
15      MS. McGRODER:  50 questions this morning.
16  We're not going to replow the same ground.  The
17  depositions --
18      MR. ALTMAN:  Lori, stop.
19      MS. McGRODER:  You know what, I'll give
20  you a little leeway because it's your leading up
21  question, but we're not going to go over the same
22  stuff that we went over all morning.
23      MR. ALTMAN:  That's fine, Lori.
24      (Discussion off the record.)

320

1  BY MR. ALTMAN:
2      Q.  You were -- you had not had an
3  opportunity to review the FDA -- the FDA
4  statistical analysis at that time, correct?
5      A.  That's correct.
6      Q.  You tried to more or less back out from
7  the FDA alert what you thought the FDA had done
8  with the submission from Pfizer, correct?
9      A.  That's correct.
10      Q.  That was pure speculation, correct?
11      MS. McGRODER:  Object to form and
12  foundation.
13      THE WITNESS:  Well, I wouldn't call it
14  pure speculation, but you know, I asked for the
15  data that were submitted to FDA from Pfizer and on
16  the assumption that those were the data that FDA
17  had used in their analysis, did some computations
18  that are reported here.
19  BY MR. ALTMAN:
20      Q.  But that was a pure assumption, pure
21  speculation, correct?
22      MS. McGRODER:  No.  Objection, asked and
23  answered.
24      THE WITNESS:  Again, I don't like your

321

1  term pure speculation.  It seemed like a pretty
2  reasonable thing to do at the time.
3  BY MR. ALTMAN:
4       Q.  Okay.  And that's -- and I just want to
5  be clear.  Did you review -- we're going to talk
6  more about -- I don't think we'll get to it
7  tonight.  We're going to talk more about what you
8  were provided from Pfizer, but did you review --
9  strike that.
10      The primary basis of the information that
11  forms the basis what you wrote here in terms of
12  Pfizer's submission is the June 22nd, 2006
13  Neurontin submission from Pfizer to the FDA,
14  correct?
15      A.  It's the data that I received through
16  counsel after asking for those data and if those
17  data are the same data that were in that report,
18  that may be the case.
19      Q.  Did you get the actual letter that Pfizer
20  sent to the FDA?  I mean I think we looked at --
21  I'm not sure what exhibit number it is, I believe
22  we talked about this a little bit earlier, but I
23  believe it's Exhibit -- I believe it's Exhibit 16.
24  Can you find Exhibit 16?

322

1           MS. McGRODER:  No, 16 is not it.  17.
2           MR. ALTMAN:  17 is not the Lyrica
3  submission?
4           MS. McGRODER:  18 is the Lyrica
5  submission.  17 is the Neurontin submission from
6  June of 2006.
7  BY MR. ALTMAN:
8       Q.  I must have wrote this down wrong.
9  Sorry.  Now, just to be clear, just if you could
10  flip to -- I threw my page away now.  If you could
11  flip to page 4 of that letter, does this seem like
12  this is the source -- that table is the source of
13  the two versus one under suicidal ideation code 5
14  where it says .39 percent and .37 percent?
15          MS. McGRODER:  The source for what?
16  BY MR. ALTMAN:
17      Q.  The source for the information in your
18  declaration?
19          MS. McGRODER:  Objection.
20          THE WITNESS:  I don't recall.  I mean, it
21  could be or I may have also gotten some other form
22  of this.  And like I said before, I thought I had
23  received something like an Excel spreadsheet that
24  listed the studies, but maybe it was just this.  I

323

1  don't remember at this moment sitting here.
2  BY MR. ALTMAN:
3       Q.  I don't see anything -- I didn't see
4  anything listed.  I'd ask you to take a look
5  tonight when you go back and see if you remember
6  something else that you may have looked at that
7  contains this information that is not on your list?
8           MS. McGRODER:  Keith, Jack already us to
9  do that.  We spent an hour on this this morning and
10  we told you we're happy to look.
11          THE WITNESS:  I'll try to do that, but
12  remember I said before I had this unfortunate event
13  of my hard disk so it will be a little difficult.
14  I hope to recover that..
15          MS. McGRODER:  I can fill in a little bit
16  here on this.  This wasn't all he got, this letter.
17          MR. ALTMAN:  What else did he get?
18          MS. McGRODER:  He did get the complete
19  letter and he got -- he got something and I don't
20  know what it is, that gave the patient -- that gave
21  the studies with events by study.  We got to figure
22  it out.
23          MR. ALTMAN:  That's kind of important.
24          MS. McGRODER:  I mean, it's the

324

1  controlled clinical study data that comprised the
2  47 studies that went from Pfizer to FDA.  You have
3  the same thing.
4           MR. ALTMAN:  I understand, but it's not a
5  question of whether I have the data or not.  It's a
6  question of what did he look at.
7           MS. McGRODER:  He looked at the same
8  thing you've got.
9           MR. ALTMAN:  Which is this letter.
10          MS. McGRODER:  It's the studies that were
11  submitted in response to the FDA's criteria for the
12  June 2006 submission.  He got the exact same thing
13  you guys have, but we'll look further.
14  BY MR. ALTMAN:
15      Q.  Okay.  That's fine.  Now, is it -- I
16  think you testified that to the best of your
17  knowledge -- well, first of all, if we look at
18  Table 4 it says gabapentin 5194 for the N, correct?
19      A.  Correct.
20      Q.  Does that comport with what's in your
21  declaration?
22      A.  I'm just looking at that now.  Yes, it
23  does.
24      Q..  Does the 2,682 for placebo comport with

325

1   your numbers in your declaration?
2       A.  Yes, it does.
3       Q.  Does the two events on gabapentin comport
4   with what's your declaration?
5       A.  Yes.
6       Q.  Does the one event for placebo comport
7   with what's in your declaration?
8       A.  Yes.
9       Q.  Does the .39 percent on line 5 comport?
10      A.  On line 5 of what?
11      Q.  I'm sorry.  Code 5?
12          MS. McGRODER:  They're not listed as
13  codes here.  He wouldn't know that.
14          MR. ALTMAN:  It says code 5?
15          MS. McGRODER:  It sure does, you're
16  right.  .039, is that what you said?
17  BY MR. ALTMAN:
18      Q.  That's .39 percent?
19      A.  That's consistent with what -- well,
20  let's see.  Yes, that's consistent with what I have
21  in my report.
22          MS. McGRODER:  It's .039 it's not .39
23  percent.  It's .039 percent.
24

326

1   BY MR. ALTMAN:
2       Q.  Correct.
3       A.  Those two numbers are reiterated in my
4   report.
5       Q.  And those are probably a little bit of
6   approximations because to really get to the 1.033,
7   we would just simply take 2 over 5,194 divided by 1
8   over 2,682, correct?
9       A.  That would give you the relative risk.
10      Q.  Right.  Which you list there as 1.033?
11      A.  I list the odds ratio.  It's not the
12  same.
13      Q.  It's not the same.  Okay.  So how would I
14  calculate the odds ratio here?
15      A.  You take P over 1 minus P.
16      Q.  You speak reverse Polish or regular?
17      A.  Regular.
18      Q.  Here you go.  Why don't we do that?
19          MS. McGRODER:  Do you want him to say it
20  for the record?
21          MR. ALTMAN:  You could say it for the
22  record.
23          MS. McGRODER:  It's calculated in his
24  report.

327

1           MR. ALTMAN:  That's all right.  We've --
2           MS. McGRODER:  Do you want him to
3   describe it on the record?  Is that what you want?
4           MR. ALTMAN:  No, it's not that important.
5   I'm not that concerned about the number right now.
6       Q.  Now, it was your belief that these
7   numbers represented randomized clinical trials --
8   randomized placebo controlled clinical trials,
9   correct?
10      A.  Yes.
11      Q.  Would you please go -- it's Table 1 if
12  you go a couple pages down?
13          MS. McGRODER:  We're still in Exhibit 17?
14  BY MR. ALTMAN:
15      Q.  We're still in Exhibit 17.  Table 1 right
16  there.  This I represent to you is the studies that
17  were included as part of the submission to the FDA.
18  And I'd like you to look at --
19          MS. McGRODER:  What do you mean part of?
20  I'm sorry.
21          MR. ALTMAN:  Well, there was the letter
22  and there was Table 1 and Table 2?
23          MS. McGRODER:  Part of the full
24  submission.

328

1   BY MR. ALTMAN:
2       Q.  Part of the full submission for
3   Neurontin.  Table 1, I'd like you to go down 1, 2,
4   3, 4, 5, 6, 7 lines down where it says gabapentin
5   and vigabatrin?
6       A.  I do.
7       Q.  And in patients does it say number of
8   patients dosed placebo?
9       A.  It says zero.
10      Q.  The next line gabapentin and
11  carbamazepine, how many patients does it say for
12  number of patients dosed placebo?
13      A.  It says zero.
14      Q.  The next line for gabapentin, how many
15  patients does it say dosed for placebo?
16      A.  Zero.
17      Q.  And the next line, gabapentin, how many
18  patients does it say for number of patients dosed
19  placebo?
20      A.  Zero.
21      Q.  Next line, gabapentin number of patients
22  dosed placebo, how many there?
23      A.  Zero.
24      Q.  That looks like at least on this first

329

1    page four or five studies that say that there were
2    no placebo controls, correct?
3        A.   That's correct.
4        Q.   So in fact, there were non-placebo
5    controlled studies included in that number,
6    correct?
7            MS. McGRODER:  No, object to form and
8    foundation.  You know, I think you're asking him
9    questions outside of his expertise and so you may
10   answer if you can.  But I think if you're --
11           MR. ALTMAN:  No, no.  Let's --
12           MS. McGRODER:  -- very reasonable
13   document to understand what those tables are.
14           MR. ALTMAN:  Lori, your objection --
15   let's take a step back.
16           MS. McGRODER:  I mean there's methodology
17   in this that he may not know.
18           MR. ALTMAN:  Lori, please.
19       Q.   You represented that this is the document
20   -- this submission is what you reviewed in writing
21   your original declaration and expert report,
22   correct?
23           MS. McGRODER:  Objection.
24           THE WITNESS:  No.

330

1            MS. McGRODER:  Misstates his testimony.
2            THE WITNESS:  This is not -- this is not
3    the source of the data that I reviewed.  As I told
4    you before, I received something else.  I had asked
5    for all of the placebo controlled studies that were
6    submitted to FDA and I received a spreadsheet, an
7    Excel file that had all of those.  Now, the total
8    numbers that are in my report that I got from that
9    are consistent with the 5,194 and the 2,682 that
10   are listed in this table in this report.  I don't
11   know whether or not those numbers are consistent
12   with all of the numbers here and maybe perhaps this
13   was misrepresented to me.  But my understanding of
14   the data that I received were that these were all
15   of the placebo controlled studies.
16   BY MR. ALTMAN:
17       Q.   Well, I'd like to point you to page 4
18   where it says contents of submission.  I'm sorry,
19   page 4 of the letter.  If you look at the bottom it
20   says contents of submission.  Do you see that?
21       A.   I do.
22       Q.   As requested, we are herein forwarding
23   the following table and basic study design.  Did I
24   read that correctly?

331

1        A.   I believe so.
2        Q.   Table 2, screening and key exclusionary
3    criteria.  Did I read that correctly?
4        A.   Yes.
5        Q.   And a false positive table.  Did I read
6    that correctly?
7        A.   Correct.
8        Q.   What I just had you read is labeled page
9    -- Table 1, basic study design, correct?
10       A.   That's correct..
11       Q.   Okay.  So is there any question in your
12   mind that this is the table that Pfizer submitted
13   with the FDA when they did their submission on
14   June 22 of 2006?
15           MS. McGRODER:  Object to form and
16   foundation.  I don't think he knows that.
17           THE WITNESS:  I don't know what Pfizer
18   submitted and I don't know that this table reflects
19   the total sample size that are listed here.  We
20   could certainly go through it and add them up and
21   see whether that's the case and again, the
22   information that I requested were from double-blind
23   studies.
24           Now, if we assume as a hypothetical that

332

1    in fact, a small subset of these studies were low
2    dose studies and were not placebo controlled,
3    although they were randomized studies, then in the
4    analysis that FDA conducted, I would assume that
5    those studies would have been removed as they had
6    removed those studies that were in here that might
7    have been single dose studies since FDA's analysis
8    has smaller numbers of total subjects in both the
9    gabapentin and the placebo arms, but the same
10   number of suicidality events, namely two and one,
11   then I don't believe that these studies that while
12   randomized, appear not to have a placebo arm,
13   contributed any events to that analysis.  So I
14   don't think that the presence of these studies
15   would have changed my conclusions.
16   BY MR. ALTMAN:
17       Q.   That's not -- all right.  Let me ask a
18   different question..  Would it have been correct --
19   hypothetically assume that those numbers, the 5,194
20   includes the studies listed in the attachment
21   that's part of the submission to the FDA.  Would it
22   have been correct to include the non-placebo
23   controlled studies?
24           MS.. McGRODER:  Objection to form and

333

1 foundation.  He's not a regulatory expert.  He
2 hasn't studied this Pfizer submission to the FDA to
3 know whether it's correct or not..
4        MR. ALTMAN:  Lori, you can object.  Stop
5 the speaking objections.
6        MS. McGRODER:  I can make speak
7 objections in California all day long.
8        MR. ALTMAN:  No, you can't.
9        MS. McGRODER:  Oh, yes I can.  Look at
10 the California rules.  This depo's in Crone, I make
11 speaking objections.
12        MR. ALTMAN:  No, you can't.
13        MS. McGRODER:  Look it up.  Anyway, okay..
14 BY MR. ALTMAN:
15     Q.  From a biostatistical perspective -- I
16 don't care what your objections is.
17        From biostatistical perspective, would it
18 have been correct to include non-placebo controlled
19 studies?
20        MS. McGRODER:  Objection to form and
21 foundation and it's an improper hypothetical,
22 assumes facts not in evidence.
23        THE WITNESS:  I don't know what was
24 requested of Pfizer by FDA.  I'm assuming that this

334

1 is in response to their request and this is what
2 FDA had requested.  I assumed that FDA had used
3 everything that they had requested in preparing
4 their advisory.  And my purpose in this analysis
5 was to remove the gabapentin portion of those
6 studies, whatever they were, from the overall
7 analysis.
8 BY MR. ALTMAN:
9     Q.  Objection, nonresponsive.  If the goal
10 was to do a calculation based on placebo controlled
11 studies, would it have been correct to include
12 non-placebo controlled studies?
13        MS. McGRODER:  Objection, asked and
14 answered, assumes facts not in evidence, improper
15 hypothetical and there's no foundation for him to
16 answer that question.
17        THE WITNESS:  I can only assume that the
18 type of studies that were included here which start
19 out on the --
20 BY MR. ALTMAN:
21     Q.  I'm asking you a question that has
22 nothing to do with that document, Dr. Gibbons.
23     A.  Well, I think it has a lot to do with
24 this document.

335

1     Q.  I asked you as a general proposition,
2 from a biostatistical perspective if you were going
3 to do a computation based on placebo controlled
4 trials, would it be correct to include non-placebo
5 controlled trials in such a computation?
6        MS. McGRODER:  Well, same objections to
7 foundation.  It's an improper hypothetical and
8 assumes facts not in evidence and you aren't asking
9 in the abstract.  You're asking on the basis of
10 a --
11        MR. ALTMAN:  Lori, I'm asking it in the
12 abstract.
13        THE WITNESS:  If there was a requirement
14 that all of the studies be placebo controlled and
15 some of the studies that were included were not
16 placebo controlled or were not even randomized,
17 then that would not be correct.
18 BY MR. ALTMAN:
19     Q.  That's all I wanted to know.  We'll deal
20 with whether that was -- whether this is something
21 else, but I do want to point out if you pull
22 Exhibit 10 of your materials reviewed, Item
23 Number 7 you list the Pfizer's June 2006 Neurontin
24 suicide analysis submitted to FDA.  Is that what

336

1 Number 7 says?
2     A.  Yes, it does.
3     Q.  Is that what Exhibit 17 says -- is?
4     A.  Could be..
5     Q.  So you don't know --
6     A.  I'm not positive.
7     Q.  So you don't know whether that's the
8 submission to the FDA?
9     A.  It looks like it is.
10     Q.  But yet you say you've never seen that
11 document before?
12        MS. McGRODER:  No.  Objection.  That
13 misstates his testimony.  He did not say he'd never
14 seen the document before.
15        THE WITNESS:  I didn't say that.
16 BY MR. ALTMAN:
17     Q.  Have you seen this document before?
18     A.  What I told you was the material that I
19 relied upon for forming my expert opinion was a
20 spreadsheet that listed what I had asked for as the
21 placebo controlled, randomized clinical trials.  I
22 believe I received this, but I did not rely upon
23 this in forming my opinion.
24     Q.  So you didn't check to see if the 5,194

337

1   you get to by adding up the number of patients in
2   Table 1, did you?
3       A.   No, I did not.
4       Q.   So it's possible that Pfizer might have
5   included the non-randomized -- the non-placebo
6   controlled trials in that 5,194 correct?
7       MS. McGRODER:   Object to form and
8   foundation.  You're asking him a regulatory
9   question about whether Pfizer with --
10      MR. ALTMAN:   Lori, it's not a
11  regulatory --
12      MS. McGRODER:   Let me finish.
13      MR. ALTMAN:   No, I won't.  No, I will
14  not.
15      MS. McGRODER:   You are asking him a
16  regulatory question whether Pfizer complied with
17  the FDA's request.
18      MR. ALTMAN:   We're going to call the
19  judge in a minute.
20      MS. McGRODER:   Go ahead.  He doesn't know
21  anything about these tables and whether they comply
22  with the --
23      MR. ALTMAN:   Lori, that's not what I
24  asked him.  Lori, if you don't stop we're calling

338

1   the judge.
2       MS. McGRODER:   Go ahead, call the judge.
3   I invite you to call the judge.
4       MR. ALTMAN:   In fact, I suggest we call
5   the judge after this.  We don't need to waste
6   Dr. Gibbons' time on it.
7       MS. McGRODER:   You can call the judge
8   whenever you want.  I object to form and
9   foundation.
10      MR. ALTMAN:   That's totally fine.  We'll
11  do that.
12      Q.   This is not a regulatory question.
13  Should you have checked to see whether the 5,194
14  included the non-placebo controlled trials?
15      A.   I asked for the placebo controlled
16  trials.  I received a document that gave me the
17  placebo controlled trials.  I assume they were the
18  placebo controlled trials.  Once the FDA
19  statistical review was published, I immediately saw
20  that, in fact, FDA did not use all of these data in
21  their analysis.  I saw that they had used a smaller
22  set of data.  I read that they had excluded some of
23  the studies on the basis of being single dose
24  studies.

339

1       If you are correct that these studies
2   were a part of the data that were submitted, I
3   assume that they also excluded these studies for
4   not having a placebo arm.  And my analyses
5   thereafter were restricted to the 4,000 plus
6   subjects that were used by FDA in their analysis.
7   I didn't have that information before.
8       Q.   Objection, nonresponsive.  Should you
9   have checked?  You got a document that lists the
10  placebo controlled trials and you simply -- you did
11  not calculate and come to the number 5,194 on your
12  own, correct?
13      A.   I did come to 5,194 by looking I believe
14  at that spreadsheet and adding up all of the
15  values.
16      Q.   So you added all the numbers up and you
17  got 5,194 and the 2,682?
18      A.   I believe so.  I'm not really sure, you
19  know, exactly where that came from.
20      Q.   Let's put aside whether you did or
21  didn't.  From a methodological perspective, if you
22  were going to write a report and you were going to
23  talk about the odds ratio or the relative risks or
24  these numbers, from a scientific perspective, do

340

1   you think that you should have checked to make sure
2   that the 5,194 was correct?
3       A.   Well, I think it's -- well, I think you
4   know, from a scientific perspective, you know,
5   there are several -- several answers to your
6   question.  First of all, if the studies that were
7   included here were Phase I non-randomized studies
8   and they were combined with the randomized studies,
9   then I think that would be a pretty bad error.
10      If these are randomized studies, if
11  there's a handful of randomized studies and it
12  wasn't placebo but it was a low dose comparator
13  that's less of an egregious error.  I would have
14  preferred, as I had requested, purely the placebo
15  controlled studies.  That's what I assumed that I
16  had obtained.
17      I don't know when I received this
18  document.  I might have received this document
19  after I had prepared my report.  I don't really
20  know.  And I don't know -- I know that I did not
21  rely upon this report in the formulation of my
22  expert opinion Number 1 that's listed in Exhibit 8.
23      Q.   We'll come back to what you did rely upon
24  because that's obviously of importance here.  How

341

1  much time do we have left?
2       VIDEOGRAPHER:  Approximately eight
3  minutes.
4  BY MR. ALTMAN:
5       Q.  A couple little miscellaneous questions
6  and then we'll wrap up.  No point in starting a new
7  topic right now.
8       In terms of the FDA's calculations and
9  frankly, for your -- these calculations here, if
10  the exposure -- patient years of exposure between
11  the active and the placebo groups were identical,
12  then the exposure would essentially drop out in
13  computations that you did when you were calculating
14  relative risks or odds ratios or things like that,
15  correct?
16       A.  That's correct.
17       Q.  And the FDA checked to see what the
18  impact -- the FDA observed there was a
19  statistically significant difference in exposure
20  between the active and the placebo groups, correct?
21       A.  You'd have to point me to that.
22       Q.  Well, they did a sensitivity analysis to
23  see what the effect is, didn't they?
24       MS. McGRODER:  Objection.

342

1       THE WITNESS:  Again I'm not following
2  what you're --
3  BY MR. ALTMAN:
4       Q.  Pull Exhibit 14 for a second which is the
5  FDA's analysis.  At Table 11 we talked about this a
6  little bit earlier about the duration issues,
7  correct?
8       MS. McGRODER:  What page is that, Keith?
9  BY MR. ALTMAN:
10       Q.  I believe it's on page 21 of the
11  analysis.  And I believe they came up with a value
12  -- a mean duration of 77 days for placebo and 73
13  days for active, is that correct?
14       A.  That's based on the least squares
15  estimated means.  The observed means in terms of
16  duration are 90 and 87, so they're just kind of the
17  opposite difference.  So I'm not really sure what
18  the -- what the difference is and where these least
19  square means come in.  That's not clear to me from
20  this.
21       Q..  But my real question is if you go to
22  page 28, the FDA as one of their secondary analyses
23  looked at person time to see whether that was an
24  issue between treatment on arms, correct?

343

1       MS. McGRODER:  Are you saying that is
2  represented on page 28?
3  BY MR. ALTMAN:
4       Q.  28 of the analysis, 6.33.  6.33 person
5  time analysis, do you see where that is?
6       MS. McGRODER:  Yes, thank you.  I'm
7  sorry, and your question is?
8  BY MR. ALTMAN:
9       Q.  My question is the FDA did look to see if
10  there was different -- you know, if the duration
11  differences between active and placebo arms of the
12  studies had any effect on the analysis, correct?
13       A.  They say they did that, but when you look
14  at the figure on page 28, it still lists the sample
15  sizes, not the person years, so I was always a
16  little confused by that.
17       Q.  My whole point is they looked it and
18  concluded that the person time analysis did not
19  substantially change?
20       A.  They show that the overall rate ratio was
21  pretty similar.
22       Q.  Okay.  That's all I wanted to know.  You
23  talked earlier about risk due to the drug and
24  whether it was an acute risk, you know, from

344

1  shortly after you take the drug.  I think that's
2  what you said, correct?
3       MS. McGRODER:  Object to form, misstates
4  his testimony.
5       THE WITNESS:  I made some comments about
6  the time interval from the index episode to a
7  suicide event and suggested that that is a
8  decreasing function of time from the -- from the
9  initiation of the drug.
10  BY MR. ALTMAN:
11       Q.  If I understand what you're saying is
12  that the risk -- any risk associated with the use
13  of the drug would be soon after you start taking
14  the drug and would decrease over time?
15       A.  From the data that I've looked at, it
16  seems like the risk decreases over time.
17       Q.  What's the basis of -- what's the basis
18  of that statement?  Where do you -- what data shows
19  that?
20       A.  I've done some -- some modeling of the
21  antiepileptic data in terms of time to the first
22  event and you can find that there's a significant
23  effect of month -- of, you know, time to the event.
24       Q.  Where are those analyses?

345

1    A.   These are just analyses that I've done in
2  the context of my own research.
3    Q.   Have you provided those to counsel?
4    A.   No, I haven't opined on them or used them
5  in any consultation in this case.
6    Q.   Well, you did today when you said that
7  there was a decreasing function over time?
8    MS. McGRODER:  Objection.  Is that a
9  question or are you just arguing with him?
10    MR. ALTMAN:  I'm not arguing with him.
11    MS. McGRODER:  Ask him a question.
12    MR. ALTMAN:  I asked him a question.
13    MS. McGRODER:  And he answered it.
14    MR. ALTMAN:  I'd like the production of
15  the data that forms the basis of what he answered
16  in this deposition.
17    MS. McGRODER:  You can ask us for that
18  and we'll take it under advisement.  You don't have
19  to argue with him.
20    THE WITNESS:  I also haven't finished my
21  statement.
22  BY MR. ALTMAN:
23    Q.   I'm sorry.  Please do.
24    A.   I've also seen this with the VA data..

347

1    THE WITNESS:  That's what they say.
2    MR. ALTMAN:  Okay.  Why don't we stop for
3  tonight.  We'll pick up in the morning.
4    MS. McGRODER:  You can ask it tomorrow.
5    MR.. LONDON:  Stand by one second.
6    MS. McGRODER:  It's not like we won't be
7  here.
8    MR. WINKLER:  9:00 a.m. tomorrow?
9    MS. McGRODER:  Yes, 9:00 a.m. tomorrow.
10    MR. LONDON:  We're off.
11    VIDEOGRAPHER:  This is the end of tape
12  Number 8.  The time is 6:23 p.m.  We are going off
13  the record.
14    (Whereupon, the deposition adjourned at
15    6:23 p.m.)
16
17
18
19
20
21
22
23
24

346

1  I've also for antidepressant medications.  I've
2  also seen this with the studies published by Simon
3  showing the risk of suicide attempts from the time
4  of initiation of treatment.  They all indicate that
5  the highest risk of suicide attempt is the month
6  prior to the initiation of treatment and then it
7  goes down in sort of an exponential way from the
8  time of the initiation of treatment.
9    Q.   On page 29 though the FDA did an
10  exploratory analysis of time to event analysis,
11  correct?
12    A.   Yes.
13    Q.   And their conclusion was that the higher
14  hazard was observed as early as one week from
15  initiating treatment until at least 24 weeks,
16  correct?
17    A.   They're talking about the drug versus
18  placebo difference and they indicate that it's hard
19  to tell because there wasn't a lot of data after 24
20  weeks.
21    Q.   But they do say that there's a risk as
22  early as one week and for at least 24 weeks,
23  correct?
24    MS. McGRODER:  Object to form.

348

I N D E X

1                   WITNESS                    PAGE
2  ROBERT D. GIBBONS, Ph.D.
3  EXAMINED BY
4    Mr. London                          5
5    Mr. Altman                        269
                   EXHIBITS
6  NUMBER                      MARKED FOR ID
   Gibbons Deposition Exhibit
7  No. 1    Notice                        7
8  No. 2    11/12/08 Fromson letter to
9            McGroder                    23
   No. 3    License Agreement           27
10 No. 4    disk                        54
   No. 5    list of contents of disk    54
11 No. 6    3/25/08 McGroder letter to
            Gibbons                     65
12 No. 7    Curriculum vitae            76
   No. 8    Gibbons declaration        102
13 No. 9    Gibbons expert report      102
   No. 10   list of materials considered  102
14
   No. 11   Supplemental Gibbons report   102
15 No. 12   FDA online alert           102
   No. 13   PowerPoint "Suicidality and
16          Antiepileptic Drugs"       102
   No. 14   US Dept of Health & Human Svs.
17          statistical review         102
   No. 15   Pfizer response to NDA on
18          Neurontin                  124
   No. 16   Pfizer Assessment of Suicide and
19          Related Behaviors in Patients
            Treated with the alpha-2 ligands,
20          gabapentin and pregabealin   139
   No. 17   6/22/06 Evertsz letter to Katz  135
21 No. 18   6/22/06 Powers letter to Katz   135
   No. 19   additional materials considered  148
22 No. 20   2008 submitted paper        201
   No. 21   Supplemental Gibbons report  221
23 No. 22   Notice (Crone)             269
   No. 23   Gibbons declaration (Crone)  269
24

349

```
1            IN THE UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2
   IN RE: NEURONTIN              )
3  MARKETING SALES PRACTICES )
   & PRODUCTS LIABILITY    )
4  LITIGATION              )
                           )  MDL DOCKET
5  BULGER VS. PFIZER, et al. )  No. 1629
   07-11426-PBS           )
6                         )  MASTER FILE
   SMITH VS. PFIZER, et al.  )  No. 04-10981
7  05-CV-11515-PBS        )
8     SUPERIOR COURT OF THE STATE OF CALIFORN
             CITY OF LAKE
9
   NICOLETTE CRONE,  et. al,   )
10                             )
        Plaintiffs,     )
11                      )
      versus            )  CV 400432
12                      )
   PFIZER, INC., et al.,  )
13                        )
        Defendants.   )
14
15     I, ROBERT D. GIBBONS, Ph.D., being first
   duly sworn, on oath say that I am the deponent in
16 the aforesaid deposition taken on February 3, 2009;
   that I have read the foregoing transcript of my
17 deposition, consisting of pages 1 through 351
18 inclusive, and affix my signature to same.
19
   _____ as it now appears
20 _____ as it now appears with corrections
21
           ROBERT D. GIBBONS, Ph.D..
22
   SUBSCRIBED and sworn to
23 before me this _____ day of
   _____, 2009.
24 _____
           Notary Public
```

350

```
1    STATE OF ILLINOIS    )
                          )  SS:
2    COUNTY OF DuPAGE      )
3        I, Sandra L. Rocca, a State of Illinois
4    licensed Certified Shorthand Reporter, License No.
5    084-003435, do hereby certify that on the 3rd day
6    of February, 2009, at 9:09 a.m., 506 West Harrison,
7    Chicago, Illinois, the deponent ROBERT D. GIBBONS,
8    Ph.D. personally appeared before me.
9        I further certify that the said ROBERT D.
10   GIBBONS, Ph.D. was by me first duly sworn to
11   testify and that the foregoing is a true record of
12   the testimony given by the witness.
13       I further certify that the deposition
14   adjourned at 6:23 p.m..
15       I further certify that the reading and
16   signing of the deposition was not waived, and the
17   deposition was submitted for signature.  Pursuant
18   to Rule 30(e) of the Rules of Civil Procedure, if
19   deponent does not appear or read and sign the
20   deposition within 30 days, or make other
21   arrangements for reading and signing, the
22   deposition may be used as fully as though signed,
23   and this certificate will then evidence such
24   failure to appear as the reason for signature not
```

351

```
1    being obtained.
2        I further certify that I am not counsel
3    for nor related to any of the parties herein, nor
4    am I interested in the outcome hereof.
5        In witness whereof, I have hereunto set
6    my hand and seal of office this       day of
7          , 2009.
8
9
10       Notary Public, DuPage County, Illinois
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

**$**

**$15,000** 37:22 41:18
302:2
**$2.5** 224:16
**$30,000** 52:19 285:23
**$500** 75:8

**-**

**-and-** 2:-,10

**0**

**0.1337.884** 110:8
**0.5** 160:12
**0.652** 252:21
**0.78** 252:22
**0.98** 246:23
**0.999** 110:8
**039** 325:16,22,23
**04-10981** 1:- 349:-
**05-cv-11515-pbs** 1:7
349:7
**07-11426-pbs** 1:- 349:-
**08** 22:18 105:9 106:15
**084-003435** 350:5

**1**

**1** 7:5,7 24:24,24 25:8,10
,17,21 27:2,5 53:6 55:22
77:6 110:6,18 123:23
137:20 157:2 203:22,23
204:2,3,4,24 205:4,17
,19 207:19,21 213:4,16
225:9,14,17 226:4,8,12
227:16,22 237:22
242:16 245:6,17,23
314:15,21 315:6,14,19
326:7,15 327:11,15,22
328:3,3 331:9 337:2
340:22 348:8 349:18
**1(a)** 38:2
**1,000** 246:21 296:22,23
297:5
**1,836** 144:4 145:14
**1,933** 177:19
**1.0** 315:1
**1.03** 246:17
**1.033** 110:8,15,17
114:12 115:16 116:4
143:12 326:6,10
**1.127** 252:21 254:11
**1.21** 246:18
**1.37** 182:6
**1.39** 143:6 153:16 154:4
159:3 182:6
**1.5** 314:22
**1.57** 153:16 154:4
156:15 159:5,7 180:13
182:7 311:19 314:14

315:14,18
**1.948** 252:22 254:15
**10** 19:7 84:4 106:2,5,6
,12 107:7,15 123:16,16
,16,20,23 124:9 132:6
139:14,19 140:5 200:15
209:9 287:2 305:1,6
335:22 348:-
**10.57** 246:22
**100** 297:1,2,5 312:7,7
**102** 348:-,13,-,-,15,16,17
**1099** 75:20,22,23 76:4
**10:05** 53:6
**10:14** 53:9
**10th** 108:9 152:15,15
**11** 20:2 91:20,24 92:1,23
104:4 108:4,5 109:23,23
123:16,20 160:16 161:8
162:1,19 174:2 180:2,3
187:22 188:9 190:10,11
,13,20 206:5,6,8,11
209:10 213:6,9 214:15
217:24 221:3,14 222:1
223:7 241:8,10 242:11
,16 244:2,6 245:7 247:2
,2,4 257:2 262:11
266:12 342:5 348:-
**11/12/08** 348:-
**11:14** 102:15
**11:33** 102:20
**11:35** 104:9
**11:36** 104:12
**11th** 195:8,18,21 239:14
240:23 249:3,18 250:22
256:3 257:12,12 263:6
**12** 20:6 23:13 123:16,21
143:3,5 144:2,16 145:1
,13 156:16 180:14
301:13 311:20 348:15
**124** 348:18
**12550** 2:8
**12:16** 132:15
**13** 108:11 225:8 226:5
348:-
**130,000** 29:13 31:4,6
**135** 114:13 348:-,21
**139** 348:20
**14** 102:23 108:20,21
120:21 149:22 176:14
177:6 200:22 342:4
348:-
**14-year** 263:19
**148** 348:-
**14th** 6:10
**15** 124:4,7,11 200:15
305:1,6 348:-
**16** 139:6,8,10,12,16,20
,23 140:11 142:17,21
143:2 144:16 145:23

149:6,14 321:23,24
322:1 348:-
**1629** 1:5 349:5
**1635** 124:19
**17** 135:17,24 136:4
138:12,14 150:7 177:20
260:12 322:1,2,5 327:13
,15 336:3 348:-
**1770** 3:4
**18** 135:17,24 138:8,14
176:14 177:1,5 186:4
322:4 348:21
**180** 251:9
**183059** 1:15
**19** 107:17 148:6,8 149:4
287:3 348:-
**1960** 2:12
**1980's** 310:10
**199** 129:15
**19th** 104:21 109:15
115:14 116:2 139:13
140:4 146:23
**1:05** 133:2
**1:15** 132:19

**2**

**2** 23:10,12 25:1,17,21
27:3 29:2 102:16 124:21
137:20 156:11,21 157:9
,15 203:23 204:3 205:8
,9,12 208:2 209:14
225:9,14,17 226:5,8,13
245:17,23 253:12 326:7
327:22 328:3 331:2
348:-
**2,029** 150:23 156:18
159:18 191:19
**2,313** 177:16
**2,638** 144:3 145:14
**2,682** 110:24 111:14
112:6 115:18 144:11
145:11 146:3 324:24
326:8 330:9 339:17
**2,903** 150:19 156:18,22
159:17 191:18
**2.08** 246:16
**2.53** 246:18
**20** 84:4 201:4,6,13 202:6
203:6 217:12 224:24
228:6 229:16 241:8,14
,15 242:4,20 245:5
252:10,11 272:8 281:16
348:22
**200** 2:3
**2000** 235:18
**2004** 123:7,7,24 317:8
**2005** 47:3,22 242:9
285:21
**2006** 47:3 123:7 134:4

135:10,15 136:2 137:10
155:2 166:22 321:12
322:6 324:12 331:14
335:23
**2008** 12:20,24 23:13,23
24:6,7 28:20 29:1 38:5
47:19 66:17 76:7,22
91:22 98:6 103:20 104:3
,21 105:12 107:17 140:3
,11 149:15 154:24
201:10,16 217:12
224:14,15 244:3 245:1
247:18 249:5,18 258:7
260:7 265:7,13 281:19
,20 282:4 319:7 348:22
**2009** 1:24 4:3 349:16,-
350:6 351:7
**201** 348:22
**20th** 38:2,4 227:8
**21** 29:1 42:18 187:20
221:16,18,20 225:8
226:9 342:10 348:-
**21st** 38:5
**22** 106:13 161:8 269:12
,22 331:14 348:23
**221** 348:-
**22nd** 321:12
**23** 103:20 108:23 109:12
269:12 270:7 348:9,-
**24** 156:10 228:5 246:22
346:15,19,22
**25** 32:20 66:17
**250** 188:15,20 189:5
**2555** 2:-
**26** 107:16,18,20 139:13
140:5 147:15
**2682** 110:10
**269** 348:5,23,-
**27** 82:11 125:4,4 163:6
,14 227:19,22 281:20
348:-
**28** 342:22 343:2,4,14
**29** 126:21 140:11 149:15
346:9
**29th** 140:3 145:24
**2:00** 40:17
**2:02** 174:17
**2:17** 174:22
**2nd** 220:21

**3**

**3** 9:16 25:13 27:21,23
35:16 102:20 110:5,6
125:2,8 145:2 245:17,23
247:5,8 253:12,13
304:10 319:1 328:4
348:- 349:16
**3.05** 246:23 247:18
**3.18** 191:20

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

**3/25/08** 348:11
**30** 127:5 301:12,13 350:20
**30(e)** 350:18
**303-1222** 2:-
**31** 266:19
**32** 192:4 245:16
**33** 252:10
**3300** 51:10
**331** 177:9,13
**334-6880** 3:5
**34** 17:20,24 202:19 203:3 255:19
**345** 3:4
**35** 231:1
**351** 349:18
**359** 301:17,18,20
**360** 301:8,20
**365** 178:15
**365.25** 126:8
**37** 322:14
**3701** 2:3
**38** 246:7 248:3,5
**39** 322:14 325:9,18,22
**3:15** 217:3
**3:38** 217:8
**3rd** 1:23 4:3 350:5

---

**4**

**4** 25:16,19 27:2,18 54:21 ,23,24 55:13,15 62:12 126:20 133:3 140:18 174:18 196:3 245:17,23 322:11 324:18 328:4 330:17,19 348:10
**4,000** 339:5
**4,932** 151:3,21 152:1,23 153:3 177:14 191:3,18 192:11
**4.40** 246:17
**40** 31:8 163:7,14
**400432** 1:12 349:-
**415** 3:5
**421-5547** 2:-
**43** 161:8,12
**456-5885** 155:21
**456-5885/fax** 2:-
**463** 2:-
**47** 177:17 312:24 324:2
**47.56** 180:14
**47.66** 156:16 311:20
**474-6550/fax** 2:-
**478-5858** 2:4
**48** 64:8
**49,000** 29:17 31:9 301:5
**4:29** 259:21
**4:32** 259:24
**4:43** 269:6
**4:57** 269:9

---

**5**

**5** 25:22 54:21,23,24 55:17,20 56:20 57:7 58:8 59:23 60:3,23 61:18 62:21 64:8,22 174:22 180:12 192:22 201:16 217:4 304:13,15 313:21,24 322:13 325:9 ,10,11,14 328:4 348:-,-
**5,000** 181:6 311:14,16
**5,194** 110:23 111:13 112:5 115:17 144:11 145:10 146:3 326:7 330:9 332:19 336:24 337:6 338:13 339:11,13 ,17 340:2
**5-** 263:19
**5.11** 245:24 246:24 247:19
**5.4** 246:21
**5.85** 246:19
**50** 147:3 167:24 184:22 199:23 319:15
**500** 297:3
**506** 1:22 4:5 350:6
**512** 2:4
**5194** 110:10 324:18
**533** 155:12,13
**54** 348:10,-
**58** 125:20
**5885** 155:22
**59** 125:20
**5:46** 316:3
**5:48** 316:7
**5th** 23:23 24:16 180:7 221:2,20 226:8,13 231:8 ,10 235:13

---

**6**

**6** 12:8,10 26:6,17 35:17 65:23 66:3,17 75:6 217:8 304:13 328:4 348:11
**6.33** 343:4,4
**6/22/06** 348:-,21
**60** 163:9,15,20 164:8 167:24 184:22
**61** 246:5
**63** 192:4
**64108-2613** 2:18
**65** 348:-
**652** 254:15
**659-2204** 2:13
**659-5200/fax** 2:13
**6810** 2:12
**6:23** 347:12,15 350:14

---

**7**

**7** 26:6,9 35:23 76:16 77:1 177:14 260:1 316:3 328:4 335:23 336:1 348:8,12
**7,000** 130:19 181:6
**7,876** 110:9 112:5 113:13 114:14 115:16 116:5 134:13
**7.884** 114:13
**713** 2:13,13
**73** 342:12
**76** 348:12
**77** 342:12
**77069** 2:-
**78** 254:15
**78746** 2:-

---

**8**

**8** 18:19,20 35:23 102:23 103:6,15,17 104:16 106:3,15 107:4 110:2 115:24 133:13 134:11 136:16 140:16 144:9,18 145:23 146:22 151:10 177:1,5 179:6 183:18,20 184:5 185:24 186:3,4 190:22,23 194:16 222:1 316:7 318:22 340:22 347:12 348:-
**8's** 26:15
**8.3** 125:24
**80** 311:10
**816** 2:-,-
**85** 192:17,18,20
**87** 187:23 342:16
**8th** 13:5 265:12

---

**9**

**9** 19:3 24:24 25:8,10 26:16 29:2 35:17,23 103:15 104:18,20 106:3 107:4,21 109:14 115:14 116:1 133:11 134:11 136:16 140:16,17,18 144:8,9,18 145:2,23 146:22 151:10 228:4,21 ,22,23 348:13
**9.7** 125:24
**90** 187:23 188:8,9 342:16
**90-day** 233:7
**94104** 3:-
**945-209** 125:19
**95** 311:23 312:3,7 313:15,18
**950** 228:4

---

**951** 2:-
**959** 228:4
**98** 247:19
**9:00** 347:8,9
**9:09** 1:24 4:3 350:6

---

**A**

**a-s-c-i-i** 298:16
**a.m** 1:24 4:3 53:6,9 102:15,20 104:9,12 347:8,9 350:6
**abbreviated** 21:20
**ability** 46:10 88:18 96:4 97:1,11 194:6
**able** 33:11,14 48:21 80:5 ,19 101:12 143:1 151:21 168:11,12 178:13 180:16 185:10 191:17 ,22 223:15 299:5
**above** 103:19 214:4
**above-entitled** 132:18
**absence** 88:19 169:18 170:2
**absolutely** 55:16 213:14
**absorb** 309:19
**abstract** 154:9,11 335:9 ,12
**abstracted** 205:14
**academic** 73:9 77:8 86:6 ,17 117:11 273:9,13
**academy** 20:17
**accelerate** 150:6
**accept** 19:19 26:23 31:15,18 44:17 57:11 90:18 112:24 169:14 293:13
**accepted** 28:13,14 45:7 70:1,7 72:8
**access** 8:7 48:20 49:4 58:22 185:10,12,13 272:18 273:20 275:9
**accessible** 137:4
**according** 127:15
**account** 42:5,11 164:8 246:7 248:3,5
**accounted** 129:21 155:7 163:20
**accrued** 153:15 154:4,7 ,15 158:21 159:2,9 182:2,5,11
**accuracy** 272:20 275:4
**accustomed** 26:22
**achieved** 153:15
**acknowledgements** 251:4
**acknowledgments** 260:9 284:15
**acnp** 46:24
**acquainted** 67:19 198:7

**acquired** 39:18 52:15
**acquisition** 53:22
**across** 112:17,22 135:24
188:5,9 226:11 227:18
**action** 90:20,22 91:3,15
93:9 141:4,21
**actions** 90:3,8 92:12
93:15
**active** 91:4,5 117:1
124:24 187:22 191:23
341:11,20 342:13
343:11
**activities** 72:20
**acts** 169:17 228:18,21
229:1 267:23
**actual** 58:21 62:12 84:24
123:5 166:3 314:3
321:19
**actually** 37:10 39:4 43:1
52:7,10,18 55:8 56:15
76:19 85:8 109:3 127:16
137:13 168:17 170:21
172:10 181:24 184:19
196:8,18 202:10 209:3
227:2 233:7 240:8
242:22 257:3 261:1,15
263:18 281:6 301:16
304:6 316:22
**acute** 343:24
**add** 51:11 290:11 331:20
**added** 60:1 160:11
339:16
**adding** 172:20 337:1
339:14
**addition** 66:16 85:23
101:22 156:21 196:5
**additional** 56:21 101:22
105:6,20 148:9 149:4
213:12 314:23 348:-
**additive** 172:16
**address** 15:15 105:5,10
,14,15,16,20
**addressed** 25:20 104:24
105:10 265:8
**adequate** 261:19
**adequately** 186:12
189:8
**adjacent** 156:22 157:2
**adjourned** 347:14
350:14
**adjust** 154:16,17
**adjusted** 51:16 213:11
311:18
**adjusts** 154:21
**administer** 5:5
**administered** 210:5
**administration** 20:14
35:11 232:2 242:9
**administration's** 208:17

**adolescent** 263:17,18
**adolescents** 50:9,12,14
,18 263:13 267:7
**adopting** 210:15
**adult** 47:8 318:18
**adverse** 21:24 23:1 89:5
246:8 248:6 265:10
311:1
**advertised** 19:24
**advertisement** 19:13
**advertisements** 19:9,23
**advertising** 19:20
**advice** 178:2
**advisement** 244:22
345:18
**advisory** 108:10,17
222:22 224:17 243:6
277:18 316:22,24 334:4
**aed** 266:11,24 267:2
**aeds** 160:17 161:8 206:6
,6,8,11 209:9,10 213:6
214:1,15 217:24 242:11
246:4 247:14 252:16
253:4 266:12
**affected** 170:9
**affecting** 160:18
**affix** 349:19
**aforesaid** 349:16
**afraid** 118:20
**afternoon** 40:17 43:8
262:7
**again** 17:22 24:6 25:8
45:22 48:7 88:9 90:12
94:8,9 132:11 134:6
143:24 146:4 149:10
151:10 155:9 159:10
165:12,20 168:4 169:7
175:14 198:3 203:5
211:24 214:23 215:4
231:1 244:2 249:20
264:16 270:4 275:19
282:1 291:5 295:17
307:2 313:15 314:9,16
320:24 331:21 342:1
**against** 264:11 266:4
**age** 51:7,17 52:9 147:3
286:14
**agent** 310:4
**agents** 170:2
**aggregate** 121:9
**aggregated** 178:11
301:4
**ago** 71:2 83:19 84:2
85:16 144:14 146:1
264:19
**agree** 18:8 56:6 63:3
130:15 221:6,12 289:19
**agreed** 39:14
**agreement** 25:23,24

27:24 28:23 29:5 36:3
75:6 290:11 348:-
**agreements** 9:7 66:14
**ahead** 52:24 74:17 88:12
91:8 96:16 145:17
176:11,18 187:8 191:14
197:12 203:3 205:1
218:5 238:21 246:14
262:15 274:1 307:15
337:20 338:2
**aid** 260:16,20 261:8,15
306:2
**airplanes** 231:18
**al** 1:5,-,10,13 4:10,10
24:6 349:5,-,-,-
**albeit** 250:10
**alert** 96:7 98:6,8 103:24
104:2,4 105:1,21 109:19
116:21 119:17 121:7
122:3 129:1 131:16
218:21 319:3 320:7
348:15
**alex** 101:20,20
**allocate** 80:16 91:13
**allocation** 215:18
**allow** 121:7 177:2
**allowed** 51:9 77:21
121:8
**allowing** 214:13 309:15
**allows** 44:7 303:9
**almost** 163:14 253:13,16
**alone** 192:12
**along** 48:9 68:19 201:15
**alpha-2** 140:2 141:3,9,20
142:20 348:-
**already** 72:19 25:20 50:7
51:5 73:10 81:8,18
138:13 207:20 215:14
253:1,22,23 323:8
**alter** 301:20
**alternative** 213:8 214:2
317:4
**although** 185:10 332:3
**altman** 2:7 4:19,19 76:14
137:17 138:6,11 155:12
,15,19,21 156:3 176:3
190:16 222:6 225:11
230:20 240:18 259:13
269:15,17 270:21
271:10,21 274:2,20
275:2,11 276:12,19
277:1,7,11 278:5,11,17
,20 280:3,7,11,21 281:5
,17 282:2,10,22 283:9
284:19 287:9 288:11
289:13,16,19,23 290:7
,10,14 291:3,13 292:19
,15 300:1,11,14 303:1

307:13,16 313:2,7,20
315:11,20,24 316:9,17
319:14,18,23 320:1,19
321:3 322:2,7,16 323:2
,17,23 324:4,9,14
325:14,17 326:1,21
327:1,4,14,21 328:1
329:11,14,18 330:16
332:16 333:4,8,12,14
334:8,20 335:11,18
336:16 337:10,13,18,23
338:4,10 341:4 342:3,9
343:3,8 344:10 345:10
,12,14,22 347:2 348:5
**always** 72:24 73:2
343:15
**am** 17:9 41:24 44:16
80:8 126:1 179:17 180:4
199:4 226:3 317:18
349:15 351:2,4
**amendment** 6:10
**american** 46:23 236:17
237:1,19 243:5 251:20
**among** 43:5 91:20 99:17
125:7 160:16 163:6
171:20,23 173:8,16
174:2 175:4,13,19
263:10 308:23
**amongst** 280:2
**amount** 72:19 75:24
76:5 128:9
**amounts** 259:7
**anal** 86:23
**analyses** 22:24 23:8,24
24:17 38:16,22,24 56:17
59:13 61:15,16,20 62:8
64:15 78:8 85:9,15
88:21 91:20 98:19 100:2
,7 157:18 165:1 199:13
205:10 207:7,10,23
213:10 219:10 232:8,24
245:3 246:3 275:10
291:21 292:6,9,22 293:2
,4 297:11 298:10 299:3
,5,17 300:5 301:21
306:24 307:1,8,24 309:2
,10,11,12,19,21 317:3,4
339:4 342:22 344:24
345:1
**analysis** 13:18 22:7 28:3
33:21,24 38:17,19 39:19
46:18 51:14 56:24 59:5
,12 62:4 81:16 82:11,19
84:4,18,19,19,22,24
85:8 86:4 87:2 89:3,13
92:22 93:4 96:5 97:12
,13 98:2,7,15 99:6 102:3
103:8,24 104:24 115:3,6
117:13,21 120:12

121:10,17 124:1 130:10
,18,23 131:6 132:2,12
135:4 140:13 149:22
151:13,14 154:21
157:16,21 158:19
159:13 161:7,17,20
168:11,14,17,19,19,23
181:1 182:1,7,9 183:24
184:15 186:19 197:16
199:4 206:5,7 209:17
210:13 213:13 215:14
224:10 245:11 246:19
248:16 253:2 263:24
272:21 273:5,7,16 275:4
281:15 300:19 303:24
305:17,22 306:2,6,14,20
309:7,23 311:19 320:4
,17 332:4,7,13 334:4,7
335:24 338:21 339:6
341:22 342:5,11 343:4,5
,12,18 346:10,10
**analytic** 13:19 82:18
**analyze** 51:10 97:1
164:16 298:18 305:10
,20
**analyzed** 83:24 98:17
111:20 166:11 214:9
306:12 317:12
**analyzing** 86:12 101:13
159:15 205:4 275:22
**anathema** 31:2
**and/or** 62:14 101:8,18
157:21 206:11 285:19
**answer** 5:23 6:5 10:13
16:2,4,18,20 17:3 18:15
59:1 61:15 64:12,15,17
75:5 88:12 89:6,18,22
97:17 120:19 121:13
122:15 130:12,14 131:9
132:4 135:8 137:1,5,16
153:6 168:9 170:2,17
172:15,23 175:9,16
176:16,18,20 179:17
181:1 182:15 183:3,11
186:13,16 187:8,8
188:23 190:5,6,8 192:10
193:18 194:3,16 196:6
197:16 203:24 205:2,20
216:21 218:4,5 220:1,6
,12 223:6,23 238:21
239:6,7 250:14,16,20
255:4,8 256:20 269:1
279:9 282:20 284:9
290:2 293:13 301:17
307:15 329:10 334:16
**answer's** 174:3
**answered** 45:12 78:1
79:18 80:23 91:8 92:17
130:4,22 132:10 165:10

,19 177:23 190:17
202:11 204:8,19,20,22
216:13 250:13,17,24
258:10 290:20 291:2,10
293:23 313:6,12 315:8
319:13 320:23 334:14
345:13,15
**answering** 179:19
**answers** 126:10 193:21
194:4 219:9 226:3 340:5
**anticipate** 65:8
**anticipated** 122:5
**anticipating** 67:8
**anticonvulsant** 213:8
214:2 242:5
**anticonvulsants** 317:11
,13
**antidepressant** 51:12
73:21 122:7 213:9 214:3
263:20 264:6 346:1
**antidepressants** 47:7,14
48:3 51:13 67:22 69:6
72:23 86:15 222:17,23
224:20 267:20 268:3,7
276:4 317:1
**antiepileptic** 22:4 24:14
69:8 91:21,24 92:23
104:4 108:15 122:23
162:1 214:5 222:18
223:8 224:18 234:12
242:11 252:15 271:1
276:1 277:22 278:2
279:15 344:21 348:16
**antiepileptics** 201:8
229:17 265:23 266:4
271:3 277:24 306:17
317:11
**antipsychotic** 213:10
214:2
**anybody** 122:24 168:12
275:3 286:12 294:2,6
**anyone** 53:4 79:8 119:9
123:4 152:6,9,16 153:2
,3 262:8
**anything** 6:24 7:17 8:18
16:6,22 20:1 27:7 55:16
83:14 106:18 120:15
129:5 132:1 146:14
195:17,21 199:1 211:18
,19 230:9 243:9 269:23
273:1 287:11 288:6
302:24 308:1 317:15
323:3,4 337:21
**anyway** 333:13
**anywhere** 27:8 305:9
306:12,23
**apart** 5:14 34:22 58:4
69:24,24 72:6 120:14
164:6 184:20 200:5

**apl** 299:16
**apologies** 174:7
**apologize** 17:22 21:20
32:6 46:24 95:1 100:11
143:2 195:20 247:10
**appear** 55:5 59:17 61:17
62:15,21,22 66:9 123:18
140:6 232:20 268:8
332:12 350:19,24
**appearance** 10:5
**appearances** 2:1 3:-
**appeared** 2:-,20 3:6
257:12 350:8
**appearing** 126:21
**appears** 53:21 55:3,21
108:13 124:18 125:3,16
138:11 221:21 232:17
255:1 256:4 349:-,20
**appended** 148:10,11
**application** 84:11 120:7
**applications** 87:15
**applied** 160:6,7 162:6,8
**applies** 15:24 219:19
**apply** 171:2 231:7,14
235:11,21 306:16
**appointive** 78:16
**appreciate** 31:23 43:4
55:8 71:20 119:18 147:5
187:19 211:3 268:16
**approach** 263:24 306:13
317:4
**approached** 68:2 163:14
**approaches** 224:10
**approaching** 163:9
**appropriate** 39:16 86:11
140:24 236:12 302:8
309:22
**appropriately** 299:12
**approval** 305:2
**approvals** 93:24
**approve** 84:8
**approved** 93:21 94:5,7
,13,18 165:7,17,22
**approximately** 29:13,17
31:4,5,7 49:19 154:4
163:11 188:8,11,12
200:11 283:16 341:2
**approximations** 326:6
**april** 103:13,20 106:15
116:1 140:3,11 145:24
149:15 157:11 319:7
**archives** 236:19,21
237:2,6,6,7,11,14,14,18
,21 260:5 283:14 285:22
**area** 49:3 92:8 164:12
270:19,23 271:1
**areas** 82:13,15 199:6
**aren't** 335:8
**argue** 17:7 186:22

255:10,11 345:19
**arguing** 345:9,10
**argument** 16:12 17:4,15
18:5,16
**argumentative** 249:19
250:13,24 251:22 255:3
,6 256:19 257:13,22
293:23 296:9 312:14
**argumentativeness**
255:13,15
**arguments** 16:11 271:19
**arithmetic** 31:16
**arm** 332:12 339:4
**arms** 117:1 158:1 160:9
,10 332:9 342:24 343:11
**arose** 141:14 217:16
**around** 40:12,12 47:22
181:6,6 230:23 272:5
**arrangements** 350:21
**arrowsmith-lowe** 101:3
**arrowsmith-lowe's**
101:7
**artfully** 145:8
**article** 12:18,19,24 13:5
14:13,22 17:1 250:3
**articles** 12:17
**ascertainment** 310:24
**ascii** 58:22 63:10,15,20
,20,23 64:11,20 298:14
**aside** 305:16 339:20
**ask** 7:15 11:11,12 12:14
14:10 15:22 19:3 20:11
26:19 31:10 34:23 39:20
41:7,21 42:13,17 46:8
48:8 49:16 59:18 62:19
64:18,23 65:7 66:8
71:17,23 72:12 76:10
79:14 81:1 101:2,16
115:13 119:8,18 124:7
127:9 134:8,10 136:23
137:2 140:22 142:16
143:3 145:8 146:6
149:21 150:7 152:5
156:7 157:5 166:23
170:22 174:3,6 177:21
179:16,17 180:5 183:7
187:9 192:24 198:4
203:3 204:15 208:1
212:9 220:8,8 222:3
230:2 240:11 243:22
249:1 255:16,16,24
257:4 273:2 289:12
294:5,19 295:11 296:2
300:2,2 311:22 316:18
317:9,12 318:3,6 323:4
332:17 345:11,17 347:4
**asked** 21:16 22:2 27:7
39:7,9 44:9,10 45:12
51:4 67:11 77:24 79:17

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

91:7 92:16 104:7 114:4
118:10 119:11,20
127:21 130:3,21 132:10
134:9 137:21 140:20
141:15 155:4 157:7
162:19 165:5,9,18 182:4
194:23 204:7,18,20
216:12,20 219:12 240:7
250:12,23 256:9,16,21
258:9 279:10 291:1,9
293:23 299:1 305:17
312:10 313:5,11 315:7
318:7 319:12 320:14,22
330:4 334:13 335:1
336:20 337:24 338:15
345:12
**asking** 4:21 6:13,23 15:3
,5 16:10,13,21 17:3
25:11 28:16 63:15 64:14
68:1 96:12,14,15 98:5
,10 112:17 113:1 127:6
130:9,13,14,15 131:2
132:7 133:10 147:12
153:1 154:9,10 170:10
,21,21 176:21 185:17
195:14 198:9 209:18
216:7 219:14,18,24
223:21 229:22,23
238:24 240:21 259:11
279:5 291:11 316:20
317:15 321:16 329:8
334:21 335:8,9,11 337:8
,15
**aspects** 79:24 99:13
**assess** 83:13 101:11
184:9
**assessment** 99:8,8
140:1,11 142:18 145:23
149:7,14 155:1 348:-
**assist** 35:2 197:15 200:5
**assistance** 260:15
**assistant** 200:2
**assisted** 197:7
**associated** 233:24 267:2
286:23 297:12 310:20
,24 314:20 315:17
344:12
**associates** 35:1
**association** 48:21,23
51:15 89:4 110:11
236:18 237:2 251:20
252:19 253:3 254:3
279:15 311:5
**associations** 80:9 89:9
**assume** 36:3,8 37:7
39:22 41:18 42:15 57:7
183:15,24 208:14
219:15,18 234:19
239:10,13 257:17

259:14 296:23 331:24
332:4,19 334:17 338:17
339:3
**assumed** 112:8 113:1
202:3 334:2 340:15
**assumes** 90:10,13 256:7
,19 257:14,22 262:14
333:22 334:14 335:8
**assuming** 37:1 45:18
65:4 101:24 125:17
181:23 279:3 293:19
304:12 313:13 333:24
**assumption** 162:18,21
,23 220:13 320:16,20
**at-risk** 310:11
**atrocity** 171:13
**attached** 289:4
**attaches** 270:2
**attachment** 332:20
**attempt** 117:4 126:17
128:14 130:18 166:2
189:1 190:6,8,21 228:1
229:8,10 233:24 234:13
266:13 309:14 346:5
**attempts** 47:8 80:17
151:20 186:21 187:11
201:8 205:24 206:4
227:23 228:14 229:18
231:12 232:18 233:22
,22 265:24 266:6 267:23
268:2,4,7 309:15 346:3
**attention** 73:10 127:5
**attorney** 73:24
**attorneys** 4:14 74:15,19
**attributed** 141:6 240:23
**attributing** 158:9
**attribution** 243:7 249:16
250:6,21 253:5
**atul** 87:17
**audio** 9:11,13
**augment** 51:5
**auspices** 295:18
**austin** 2:-
**author** 34:19 47:11
275:8
**authority** 77:13
**authors** 288:16 294:20
**autopsies** 121:4 133:14
,20
**autopsy** 80:4 116:20
117:5 120:16 127:24
128:14 144:17 166:3
**autumn** 105:9
**availability** 19:10
**available** 30:6 52:6 57:2
64:21 65:12,15 67:12
74:12,13 112:15 117:10
123:5 127:13 131:13
166:14,17 177:1 181:20

184:11 192:11 198:10
234:3 244:16 316:19
**avenue** 2:-
**average** 187:14,21,22
188:8
**averaging** 160:12
**avoid** 57:5
**award** 32:8 262:4
**awarded** 32:5
**aware** 54:10 87:16
164:21 218:22 240:24
254:24 285:13 289:1
296:4
**away** 8:17 95:4 322:10

---

B

**bachelor's** 199:20
**back** 12:14 25:8 34:23
35:16 49:5 53:10 57:6
65:6,9 70:13 71:24 85:1
90:24 95:2 96:9 100:15
102:20 104:13 118:5
133:4 139:8 146:11,20
151:17 155:24 156:6
174:5,22 179:15,18,22
,24 182:22 184:18 192:1
194:14 196:17 205:17
209:18 210:24 217:8
226:20 230:18 232:15
240:17 243:15 244:24
247:1 249:21 252:3
255:11 260:2 263:4
264:16 269:10 275:13
278:21 283:12 294:17
296:12 310:14 316:7
320:6 323:5 329:15
340:23
**background** 76:11 170:6
171:3,6,7,14,15,16,19
172:3,7,9,13 173:8,10
**backup** 65:15
**backward** 81:11
**bacon** 2:- 66:20,23
**bad** 340:9
**badly** 217:22
**balance** 184:1 248:20
**ballpark** 153:23,24
154:3 159:12 161:11
168:4 296:17 297:7
**balming** 196:5
**barnes** 39:7,23 118:10
**base** 280:18
**based** 13:17 50:5,6
89:14 91:14 93:8 149:9
154:16,20,22 157:15,16
166:17 183:23 205:4
208:3 219:9 220:13
231:11 245:2,8,11,13
273:5 276:5 278:22

279:23 280:13,23 282:5
283:4 312:12 315:12,12
334:10 335:3 342:14
**baseline** 234:20
**basic** 330:23 331:9
**basis** 17:18,21 18:1 22:5
,7 30:22 57:9 89:21
236:9 238:15 240:10
289:11,14 290:3 292:14
,23 315:16 321:10,11
335:9 338:23 344:17,17
345:15
**bathe** 166:21
**battling** 194:21
**bdat** 56:1,12 58:18,19
60:12 61:2,14 62:5,13
**bear** 142:16
**beast** 26:24
**became** 135:20
**become** 26:22 82:4
198:7 223:3
**becomes** 118:5
**bee** 2:3
**began** 30:2 198:6
**begin** 44:9,22 241:16
**beginning** 102:19 133:3
174:21 217:7 226:3
242:3 260:1 316:6
**begins** 231:3 245:18
247:8 252:5,6,13
**begun** 239:8
**behalf** 2:-,20 3:6 4:21,24
5:2 71:3,4,6 75:14
296:18 317:22
**behavior** 22:1 80:11
156:11 170:1 286:10,13
**behaviors** 140:2 142:18
149:7,15 348:19
**belaboring** 245:15
**belief** 327:6
**believe** 7:20 8:9 9:17
11:17,19 23:22 24:7
25:4 27:13 29:6 33:4,13
39:5 40:11 44:3 46:21
47:8 50:23 52:7,10 55:7
56:5 63:9 65:16 66:3,13
67:5,10,21,23 68:14
71:15 73:20 74:5,18
76:18,20 80:5 83:24
84:14,17 85:13 87:23
92:20 95:15,22 100:7,16
101:21 103:11 104:15
107:3,11 108:20 114:2,7
115:14 123:15 134:3,9
135:10 136:7 138:4,7
140:16 141:23 146:2
162:15 163:20 165:5,7
167:22 169:23 175:23
180:2,9,18 184:17

Gibbons, Robert (Defense Expert) 2/3/2009 9:09:00 AM

190:12,14,15 193:10
196:2 199:20 203:8
217:11 224:15 229:19
230:3,8 231:1 237:17
251:10 258:4 261:13
264:5 272:8 277:20
283:21 287:1,2 292:11
293:5 295:13,17 301:9
304:9,15 311:18 318:9
,21 319:7 321:21,23,23
331:1 332:11 336:22
339:13,18 342:10,11
**believed** 96:4
**believes** 96:14
**bell** 146:24 148:2 149:16
**belonged** 91:24
**belongs** 91:13
**below** 60:3 61:11 252:17
**benefit** 223:8
**benefitting** 302:10
**besides** 190:3 199:2
216:17
**best** 6:4 8:13 19:20 23:4
39:16,17 60:22 65:10,20
90:18 107:10 140:6
141:7,11 143:9 149:11
220:24 227:7 236:19
240:14 259:12 265:2
293:24 294:13 324:16
**better** 21:10 44:16 57:18
64:20 68:23 71:16,23
119:15 164:2 229:13
237:10 283:13
**beyond** 26:11 70:17
77:8 89:2 105:5 126:20
241:5 284:15 295:9
**biases** 310:24
**big** 44:19 111:12 163:2
222:15 226:11
**bigger** 31:17 83:9 314:8
**bill** 155:17 261:1,6
**billing** 259:9
**billings** 9:7,8
**bills** 43:5 258:22 259:1,8
,9 261:2 297:8
**biostatistical** 333:15,17
335:2
**biostatistician** 273:12
**biostatistics** 199:17
209:22
**bipolar** 29:17,18,21 30:5
,7,21 31:7 38:20 57:9
87:18,21 93:22 94:15,18
105:11 125:10,19 126:1
165:8,17,23 166:4,6,7,8
167:11,24 168:8,13,21
169:2,15 171:20 173:8
,17 175:3 176:21,22
184:21 185:14 189:18

195:11 217:24 218:11
219:5 220:21 221:4
222:12 223:1,2,19,22
226:1 235:10,12 266:16
287:17 294:9,11,21
295:16 296:6 300:10
301:2 305:23 307:9
308:19
**bipolar.sas7bdat** 55:23
**bit** 48:8 71:1 151:22
196:17 197:2 211:10
269:19 272:5 275:13
321:22 323:15 326:5
342:6
**black** 222:22
**blank** 71:17 72:1
**blessed** 231:16
**blinded** 87:18
**block** 242:18,22 244:1
249:2 254:4
**blocked** 253:21
**bloom** 39:6 40:18 41:3
218:1 222:6
**bloom's** 40:9 105:22
217:17 218:15 221:6
**blvd** 2:-
**board** 108:17 222:22
277:18 316:22,24
**boards** 82:21 108:10
**body** 20:7,13,15
**bombs** 240:16
**borrowed** 203:18
**boston** 5:14 9:20 10:5
40:9
**bottom** 103:18 126:6
127:5 143:5 213:16
245:17 253:12 266:21
272:10,17 330:19
**bought** 36:7
**box** 222:23
**break** 52:10 53:2 102:12
,13 135:21 150:5 156:3
174:8
**breakdown** 128:19
131:17 176:19,22,23
**brief** 29:11 104:22
197:20
**briefing** 148:16,23,24
**briefly** 180:2
**bright** 219:22
**bring** 10:23 11:7 65:6
198:20,21 199:1 203:9
**brings** 152:4
**broke** 179:24
**broken** 52:8 75:21 114:8
,8,9 185:24
**brought** 7:16,17 11:4,12
68:12 69:7 70:4 73:15
**brown** 34:19 48:1 195:9

196:4 209:19,20,21
210:7 211:2,6 215:12
216:21 226:7,17,18
230:4 257:20 263:9
264:18 267:5 285:7
291:8,12,17 292:1,8,12
,12,21 293:2,4,15
294:11,23 295:8,11,23
**build** 308:13
**building** 95:8
**built** 226:4
**bulb** 41:2
**bulger** 1:5 349:5
**buried** 245:1
**burners** 243:15
**business** 37:3 150:3
**busy** 231:17
**buy** 36:18,24 41:8

**C**

**ca** 3:-
**calcium** 91:4
**calculate** 120:15 181:11
326:14 339:11
**calculated** 113:2 118:13
326:23
**calculating** 112:10
341:13
**calculation** 334:10
**calculations** 13:4 22:24
194:7,7 208:11 215:17
341:8,9
**california** 1:- 3:4 4:11
333:7,10 349:8
**call** 21:7 29:20 31:12
67:3,5,8 70:10 75:7
81:13,15,16 93:11
120:16 159:3 227:19
263:8 295:7 300:20
320:13 337:18 338:2,3,4
,7
**called** 1:17 33:21 38:19
81:10 86:22 103:6 112:2
125:12 133:11 148:23
,24 155:10 160:11
227:23 229:7,9 263:4
**calling** 337:24
**calls** 17:18 31:11 72:21
231:17 252:1
**camera** 31:13
**can't** 16:3 36:1 43:11
55:8 94:8,19 114:9
128:4 165:21 172:23
182:2 190:4 227:11
273:1 289:17 313:23
333:8,12
**cannot** 76:19
**capable** 97:7 102:2
307:6

**capitals** 298:17
**caption** 206:17
**captions** 4:6 206:24
208:4 227:17
**carbamate** 100:9
**carbamazepine** 100:5
328:11
**cardiovascular** 82:14
**care** 333:16
**career** 317:20
**case** 4:6 5:1 6:18 20:13
26:12 34:6 49:19,23
53:20 66:7,24 67:22
68:1,5 69:24 70:1,2,2,6
,8,12,13,15,16,24 71:1,8
,12,14,20 72:6,8 73:14
,18 74:2,10,11 91:19
94:3 95:19 103:23 148:4
155:9 158:2,13 159:20
,11,17,23 238:8 264:11
,13,24 270:1,3,15,15,20
,23,24,24 274:14 276:2
,8 280:9 283:4,4,6,8
285:14,15 286:2,15,17
,18 289:15,16 290:8,11
299:1 302:11 305:8
309:23 321:18 331:21
345:5
**cases** 6:19,20,20 7:1,2
15:15,19 68:2 70:3,3
72:24 73:21 124:24
**categories** 205:21
206:16
**categorization** 92:7
**category** 125:5 215:18
**caught** 30:9
**causative** 265:16,20
**cause** 98:22 132:18
232:4
**caused** 91:3 300:20
**causes** 5:20
**cave** 2:3
**caveat** 9:15
**cc'd** 294:15
**cc'ing** 295:5
**cd** 29:6 64:2,19,23 65:14
**cd-rom** 33:1 62:12
**cdc** 52:12 269:2
**cellegy** 86:22
**cells** 160:13
**center** 35:13 50:22
198:10 209:23 273:13
**central** 206:13 213:7,14
**certain** 12:17 171:10
**certainly** 22:5 42:22
93:23 99:12 110:3 163:2
,12 164:14 169:8 185:5
,24 239:6 249:10 254:13

,16 264:23,24 265:4
284:10 305:5 306:4
331:20
**certainty** 191:18
**certificate** 350:23
**certificates** 77:7
**certified** 350:4
**certify** 350:5,9,13,15
351:2
**chairs** 95:7
**chance** 71:18 135:22
179:23 194:15
**change** 53:3 172:18
217:2 311:11,17 315:20
343:19
**changed** 181:5 332:15
**changes** 52:23 249:5,6
**channel** 91:4,4
**characteristics** 125:8
170:18
**characterizing** 199:10
**charge** 75:11
**chb** 262:3
**check** 41:18 42:2,4
138:18 153:19 207:10
302:1 336:24
**checked** 338:13 339:9
340:1 341:17
**checking** 42:11
**checks** 248:23 303:3
**chicago** 1:23 4:5 35:12
94:23,24 95:4 137:4
199:18 291:18 350:7
**child** 263:17,18
**childhood** 222:23
**children** 32:22
**chronological** 272:11
**circuit** 8:2
**circumstances** 301:1
**cite** 289:17
**cited** 251:17
**city** 1:9 2:18 349:-
**civil** 1:19 70:15 240:13
350:18
**claim** 29:24 231:19
**claimed** 129:14
**claims** 81:4,17 229:2,6
231:11
**clarification** 105:20
**class** 6:20 22:14 91:13
92:4
**classes** 21:22 51:13
92:1
**classification** 192:15
**classroom** 200:3
**cle** 240:16 255:18,19
**clear** 41:24 59:20 129:13
131:15 146:6 202:12
204:5,11 218:17 261:22

,24 262:2 321:5 322:9
342:19
**clearer** 302:18
**clearest** 223:5
**clearly** 106:24 123:21
143:18 222:13 254:21
**click** 64:9
**client** 74:9,10
**clinical** 80:10 82:13
85:18 89:8,14,21 111:16
119:12 129:3,7 164:14
,18,21 165:1 184:14
212:17 229:10 242:13
279:12 311:2 324:1
327:7,8 336:21
**clinically** 79:11 266:12
**clinician** 79:15
**close** 49:1 73:4 154:3
183:17 229:22 311:14
**closely** 193:11
**closer** 232:20
**clustered** 188:1
**co-author** 47:11
**co-principal** 210:4
**co-variants** 213:11
214:15
**coauthored** 198:16
**coauthors** 12:17 13:9,23
14:12 15:5,16 34:20
47:18 195:7,8,11,12
196:22 198:5 210:23
222:19 294:17
**code** 52:11 62:4 209:16
297:18 299:14 322:13
325:11,14
**codes** 52:11 228:4,21,23
325:13
**cogent** 174:7
**cohort** 29:7,10,13,16,16
,21,21,23 30:5,19,21,21
,23 31:5,7 33:3 34:13
35:4 36:6 38:6 39:1 47:4
,9 48:11 49:8 81:3 88:22
195:5,11 197:8 220:19
,22 226:1 229:21 300:10
,10,17,18 301:3 305:1
308:17,19 310:11
**cohorts** 29:12,20 197:16
233:13 297:12 306:19
**coincidentally** 20:24
**collaborate** 306:4
**collaborated** 267:11,14
**collaboration** 46:17
199:7
**collaborations** 53:23
**collaborative** 10:10
310:7
**colleague** 61:12
**colleagues** 60:7,24 86:7

89:7 285:1 317:21
**collected** 82:3 85:9
**college** 35:1 46:23
**collins** 105:22
**colorado** 46:18 47:23
**columbia** 51:3 212:12
,14
**column** 206:24 208:20
227:22 228:3
**columns** 206:17 208:5
**combination** 192:13
252:20 254:2
**combine** 160:2
**combined** 152:1 154:20
158:19 159:23 160:17
340:8
**combining** 128:6 158:12
,17
**coming** 57:6 85:1 165:1
238:4
**comments** 210:24 344:5
**commercial** 273:10,16
**commercially** 57:2
**commit** 169:16 173:10
310:3,14
**committed** 80:4
**committee** 4:18 51:1
**committees** 163:4
**committing** 171:12
**common** 99:17 171:18
,18
**communicate** 287:13
**communicated** 295:5
**communication** 67:2
243:17 274:19 284:17
293:5 295:6
**communications** 15:16
43:6 287:15,19 290:16
,22 291:7,15,17 292:1,7
,11,15,20 293:9,15,21
294:1,6,10,20,24 295:3
,12,15,18
**companies** 54:17 74:15
,20 86:19 114:22 166:24
**company** 6:20 73:24
74:1 84:1,2 86:22 306:3
**comparable** 92:12
117:12,21 157:6
**comparative** 169:9
**comparator** 340:12
**compare** 57:11 116:10
209:9
**compared** 169:3
**comparing** 91:19
**comparison** 209:6 213:3
214:11 308:23
**comparisons** 177:2
212:22 213:1 214:13
308:16,17,19

**compensation** 75:24
**competent** 98:1 216:4
**complete** 23:6 77:1
99:21 323:18
**completed** 51:2 171:17
,20 173:11 225:23 227:6
228:15 231:20,23 232:1
267:24 268:1,5,18,24
269:1
**completely** 18:9 26:15
27:18 175:12 276:18
307:22
**completion** 170:1
173:19 262:21,22
**complicated** 170:12,17
231:24 309:11
**complied** 25:5 27:5,18
337:16
**comply** 15:9 337:21
**comport** 324:20,24
325:3,6,9
**compose** 210:19
**composed** 148:13
225:18,20 243:24 244:5
**compound** 219:20
**comprehensive** 147:22
**comprised** 324:1
**computation** 183:9
335:3,5
**computations** 58:12
193:22 203:21 204:9
320:17 341:13
**compute** 181:14,17
191:3,15 206:2
**computer** 33:3,8,20
44:19 56:18,20 63:24
65:11,13 209:13 216:9
288:3 297:23
**computing** 191:5 207:3
**concept** 178:5 213:20
**concepts** 47:15
**conceptually** 171:16
**concerned** 37:8,13 44:1
66:15 81:7 327:5
**concerning** 12:4 20:22
96:24 232:17 271:3
287:16 288:13
**concerns** 24:21 93:4
163:6,12,14,18 221:24
**conclude** 183:22 267:7
**concluded** 266:10
267:12 268:3 343:18
**conclusion** 17:19 239:9
279:14 346:13
**conclusions** 265:7
267:15 332:15
**concomitant** 206:8
214:14
**condemning** 243:14

condensed 44:6
condition 88:4 178:19
213:4 214:11
conditional 286:14
conditions 88:5 124:24
145:4 171:24 172:4,5,11
175:3 206:4,10 308:14
conduct 18:5 80:16
82:22 300:4
conducted 23:1 84:6
87:17,21 126:17 273:8
332:4
conducting 273:15
conference 295:7
confidence 114:12
119:1,3 120:13 156:8,16
157:9 180:13 183:14
245:24 246:12,16,18,21
,23 247:19 252:21
254:14 311:19,24 312:3
,5,8,12,19,22 313:9,14
,17,22 314:5,17,18
315:13
confidential 16:7,23
238:20,21 289:12,22
290:6
confidentiality 15:15,23
236:9 238:15 284:8
290:11
conflicts 73:9 284:18
302:9
confused 275:13 290:21
300:16 343:16
confusion 285:18
conjunction 14:22
connection 10:4 76:21
87:20 217:16 250:9
260:6 261:16 276:8
345:5
connors 2:17
consequence 29:5
160:4 161:6 218:1 221:5
consider 70:4 79:15,20
137:2 213:21 260:18
consideration 236:7
271:22
considered 26:11 34:18
106:7,15 107:3,16
124:10 127:17 139:13
143:19 147:9 148:9
150:20 237:15,17 251:8
287:1 348:-,-
consistent 117:1 142:10
325:19,20 330:9,11
consistently 80:15,20
consisting 349:18
consists 134:21
constructing 297:18
consult 65:3

consultant 19:10 66:11
68:13 84:1
consultants 20:3
consultation 66:24
86:18
consulted 57:15 82:10
86:9
consulting 275:21 303:2
,9
contact 37:10 66:22
73:19
contacted 67:11,20,23
69:9 295:19,20 316:23
contacts 20:21 73:17
contain 44:8 124:16
231:20
contained 33:13 38:6
56:19 61:14,24 62:5
63:1 231:7 271:14,18,24
313:16
containing 33:3
contains 23:23 29:24
56:10 103:18 323:7
contend 16:22
contends 16:7,23
content 236:22
contentious 202:21
contents 45:9 55:17
56:10,19 57:8 58:11,16
,21 59:17 60:2,23 61:17
62:10 63:12 64:22 138:7
330:18,20 348:-
context 122:19 219:23
311:2 345:2
continue 222:16 247:16
255:22
continued 2:- 3:- 281:14
continues 245:6
continuing 25:1 253:13
continuity 160:11
contract 37:5 273:10
301:11 304:7,8 305:6
307:5
contrast 252:7,13,18
254:1,2 266:24
contribute 98:22 196:11
,14 212:18 233:21
contributed 83:3 85:12
94:22 95:7 129:4 204:2
,8 211:15 214:23 215:5
332:13
contribution 129:2
203:13 212:11
contributions 211:17,23
,24 215:11
contributors 212:2
control 50:23 86:4
120:14 124:23 133:22
135:13 144:12 145:4,11

150:20 151:4,5 162:20
166:4 167:12 168:1,6
175:3,20 176:8 189:12
,22 190:7 229:5,11
234:23 310:22
controlled 82:1,3,23
83:2,12 86:1 87:17 88:9
110:10 111:16,24
114:19,19,23 115:9
117:13,17,22 119:12
128:7 129:3,7 133:22
134:2,20 135:2,12
141:13 145:15 150:24
151:4 156:12 162:7
186:11 242:13 279:12
324:1 327:8 329:5 330:5
,15 332:2,23 333:18
334:10,12 335:3,5,14,16
336:21 337:6 338:14,15
,17,18 339:10 340:15
controls 110:24 111:14
112:6 115:18 125:1
329:2
controversial 243:13
convenience 24:23
200:24
conversation 40:11
68:17 141:12 197:21
conversations 15:10
40:2 306:15
convert 64:2
cookie 156:3
cookies 150:3 156:2
copied 242:22 244:1
254:19,21
copies 9:7 14:15 54:24
55:1 75:18 244:18,20
295:23
copy 25:12 27:16 33:6
45:13 64:3,9 76:20
124:12 216:22 225:10
242:18,19 249:2 254:4
269:24 285:20 290:8
304:5
corner 35:18 124:19
125:4
correct 5:16 7:24 15:12
19:24 20:18,19 22:17,19
25:22 26:5 30:4,8 32:14
33:4 36:9 37:12 39:2
41:11 48:17 51:23 60:4
,11 61:8 68:6,21 76:18
78:2,20,21 81:9,20
83:21 85:2 93:8 94:23
95:6 100:12 104:16
105:13 106:3,4 109:12
,13,21,24 110:1,22,24
111:1 113:18 126:2,24
127:1 140:7,14 142:15

144:13 145:11,12 146:3
150:16,17,21,22 151:1,2
,6,7 153:12 154:15
156:19 157:4 159:24
161:11 163:11 165:8
167:20 172:24 184:2,3
186:5 191:13 194:2,12
196:13 197:4 206:18,22
207:1 208:8,21,24
213:19 214:6 217:20
223:13 226:14,19
228:15,18,19 239:11,12
254:17 263:13 266:9
267:10 274:4,7,14
275:17 276:15,22,24
278:8,9,13,23 279:2,21
,22,24 280:14 281:2,4,8
282:13,14,17 283:1
286:13,17 287:17,18
288:16,17 298:11,15
301:9,10 302:3,15,16
304:13,14,16,19,20,22
,23 305:3,4,20,21 309:8
311:24 312:1 314:3,9,15
316:13 319:4,5,8,9,11
320:4,5,8,9,10,21
321:14 324:18,19 326:2
,8 327:9 329:2,3,6,22
331:7,9,10 332:18,22
333:3,18 334:11 335:4
,17 337:6 339:1,12
340:2 341:15,16,20
342:7,13,24 343:12
344:2 346:11,16,23
correction 68:22 160:10
,12
corrections 349:20
correctly 61:11 131:5
135:14 156:17 158:5
159:10 160:20,23
197:10 207:24 223:21
317:3 330:24 331:3,6
correlation 309:19
corresponded 152:9
correspondence 9:1
11:21 12:3,5 13:22 14:8
,9,21 15:4 20:20 284:2
cosmetician 230:21
cost 37:21
couldn't 121:8 131:13
172:15 180:23 181:14
185:7 186:7 199:1 290:2
counsel 7:23 8:8,12 9:4
,16 10:3,6,8,11 11:16,18
12:6,11,13 13:6 14:2,20
15:11 16:7 19:5 21:19
25:3 28:21 39:13,22
41:9,14 45:14 46:2,11
55:4,6,11,18 65:3 66:10

,15 107:12 111:6 113:17
141:13,18,24 142:4
147:21 152:17 153:5,8,9
166:23 180:22 229:15
243:22 298:24 306:15
318:7 321:16 345:3
351:2
**counsel's** 75:3
**count** 171:9
**counties** 51:10
**country** 170:23,24 171:1
230:15,16
**county** 1:21 4:12 50:21
51:8 52:9,11,13 263:15
269:2 350:2 351:10
**couple** 36:2 39:20 46:14
172:11 212:22 226:21
238:1 244:10 269:21
273:2 301:5 327:12
341:5
**course** 21:6 26:18 61:2
76:2 111:9 147:6 189:2
212:4 218:20 234:24
309:18
**courses** 21:22
**court** 1:1,- 4:8,11 6:15
9:19 10:5,14 15:22,23
16:22 17:11 18:7,9 71:9
227:19 349:1,8
**courts** 1:20
**covered** 26:21
**crash** 65:12
**cream** 86:23
**create** 9:22 65:13 289:5
**created** 9:24 10:1,2,10
60:7 61:1,12 297:11
299:23
**credentials** 199:16
**criminal** 70:16
**criteria** 26:3,4 162:6
304:16 324:11 331:3
**critical** 118:5
**criticizing** 204:1
**crone** 1:10 4:9,20,20,22
5:1 269:17 270:1,15,15
,24 271:9,12,15,17,24
286:7,11 333:10 348:23
,- 349:-
**crones** 269:18
**cross** 269:24
**cross-examination**
118:8,17
**crr** 1:21
**crunching** 309:5
**csr** 1:20
**cumulative** 126:15
**curious** 44:17 289:13
**current** 85:3 123:3
**currently** 70:13 162:2

**curriculum** 76:21 97:4
348:12
**curve** 314:8
**cut** 17:21 107:14
**cutting** 228:9
**cv** 1:12 76:13 77:4
100:24 200:13 349:-
**cvs** 76:23
**cyberspace** 108:2

D

**data** 9:24 10:20 13:16,18
22:4,6 23:1,6 24:18 26:7
,7 28:2,3,4 30:6 33:23
,24,24 36:16,23 37:2,4,8
,9,11,21,23 39:18 44:8
49:4 50:23 51:18,19,22
,24 52:2,4,5,5,12,17,19
,20 57:1,17 58:7,11,11
,21,22 59:4,5,12,13,13
61:2,13,15,17 62:5,13
65:1 81:7 82:19,20
83:24 84:20,24 85:9,18
86:12 87:22 89:3,14,15
111:5 112:15 113:14,15
,20 114:3,7 115:23
116:3,9,9,22,22 117:2,7
,8,10,16 122:7,8,10,15
,23 123:1,2,19 129:2,10
,20,21 131:14,15 132:2
134:1,6 135:11 136:6,9
,10,11,12,15,16 138:19
,22 141:2,10,12,14,22
143:18 157:17,23
159:13 162:12 166:11
,14,15,17,21 180:20,21
181:17 182:10 183:23
184:11 185:5,8,9,13,14
,23 186:6,8,9 205:5
208:2,19 209:13,15
210:14,16 223:7 224:11
,18 227:3,4,9 231:11,19
,23,24 232:3,11 233:19
234:2 235:1 242:12
245:12 246:20 248:4
254:9 260:14 264:1
268:9,18,24,24 269:1,2
272:19,20,21 273:5,5,7
,20,21 274:4,8,22 275:4
,4,10,22 278:7 279:11
280:19,23 281:13,15
282:20 283:7 285:4,24
286:19 287:7,23,24
298:8,9,19 299:19,22
302:3 304:22 305:1,7,10
,20 306:12,14 308:8
309:5,24 310:1,18,19,23
,23 311:4,7 315:16
316:11,16,21 317:6,7,10

,12 318:4,18 319:11
320:15,16 321:15,16,17
,17 324:1,5 330:3,14
338:20,22 339:2 344:15
,18,21 345:15,24 346:19
**database** 29:23 36:4,5,8
38:6,18,20 39:16,16,17
40:7 41:8,17 42:14
43:10,24 44:1,20,22
45:14,14 46:15,16,19
47:5,21 48:16,18,19
49:8,9,22 50:5,11,17
52:15 53:20,20,22 57:8
,19 59:22 81:17 98:12
,16 197:23 198:22 200:6
201:19 216:2,9,18,22
219:7 229:3,14 232:2
233:15 235:17 268:20
**databased** 200:8
**databases** 23:1 29:7,10
33:3,7 35:4 38:6,14 39:1
47:4 50:16 53:14 54:10
,13 56:12,16,16 81:3,7
198:13 199:4,9,11
268:21
**date** 4:2 29:15 30:1,1,5
32:19 38:4 42:17,18
43:3,9,9,12 46:6,9 103:5
,14 106:9 108:23 109:11
,14 132:19 146:22
181:16 198:3 201:10
208:16,18 209:1,1
218:10 224:12 225:19
226:22,23 227:1,1,4
243:9 258:19 268:13
270:19 271:3 316:19
**dated** 23:13,22 29:1
45:23,24 66:17 103:13
106:15 108:23 109:23
149:15 225:16,17,20
247:3 258:7
**dates** 258:24 259:10
281:24
**daubert** 39:6 118:7
120:3 217:18 296:19
**day** 1:23 38:2 40:13
42:24 44:18 67:24 68:5
,12 109:2 117:8 167:10
186:20 227:4,11 269:18
282:6 333:7 349:23
350:5 351:6
**days** 42:20 43:9 111:9
,12 126:7 178:14 187:23
,23,24 188:8,9 230:23
301:4,5,8,13 305:1,6
342:12,13 350:20
**deal** 202:6 236:12
335:19
**dealing** 88:10 263:14

**dealt** 202:4
**death** 232:3,4
**deaths** 268:21
**decide** 93:12
**deciding** 222:10
**decision** 233:24 309:16
**declaration** 103:7,10,23
133:12 142:5 271:15
318:21 322:18 324:21
325:1,4,7 329:21 348:-,-
**declarations** 34:6 222:6
**decrease** 344:14
**decreased** 186:14
**decreases** 344:16
**decreasing** 344:8 345:7
**defendant** 3:6 5:1
**defendants** 1:14 2:-
11:16,22 349:-
**defending** 72:22
**defense** 12:10 13:6 14:1
15:11 16:7 19:5 21:19
25:2 28:21 46:11 260:20
**define** 208:9 228:1
301:12 308:14,14
**defined** 169:24 208:10
306:19
**defines** 170:8 304:21
**definition** 178:9 206:19
233:10
**definitions** 206:16 208:3
215:18
**definitively** 293:21 311:8
**degree** 197:4,5
**degrees** 77:7
**deliverables** 304:18
**delivered** 305:1
**delta** 141:3,9 142:20
**demographic** 125:8
**demonstrates** 310:19
**denominator** 171:9,19
193:23
**denominators** 192:23
**department** 70:9,10 71:4
,6 72:7 86:8 212:13
251:6 275:15
**departments** 86:9
**depending** 194:4
**depends** 170:18
**depo's** 333:10
**deponent** 7:12 349:15
350:7,19
**deposition** 1:16 4:4 7:8
,16 18:5 31:11,20 54:20
71:9 72:1 95:19 101:8
,22,23,24 102:22 132:17
135:16,23 150:4,4
269:11 270:2 296:20
345:16 347:14 348:7
349:16,18 350:13,16,17

,20,22
**depositions** 95:22 101:8 ,18 202:20 319:17
**depression** 310:8
**dept** 348:-
**derail** 202:2 203:1
**derailing** 202:20
**derails** 202:23
**derive** 162:4
**deriving** 106:7
**describe** 24:17 208:22 327:3
**described** 59:14 122:3 126:5 131:16 159:16 251:13 264:19 268:18 281:15 304:7 306:15,16
**describes** 304:15
**describing** 136:13 264:22 304:3
**description** 29:11 99:22 159:21 306:7 307:2
**descriptions** 265:1
**descriptors** 190:3
**desert** 44:19
**deserved** 216:21
**design** 81:22 82:2,11,16 83:11,23 84:3,21 85:12 ,24 86:3 87:1,2,11 88:2 ,3 89:2 210:12 214:12 233:11 310:5 330:23 331:9
**designed** 310:2
**designing** 82:18 83:1 87:14 88:1 275:22
**designs** 88:1
**despite** 246:6 285:22
**detail** 143:17 220:20 297:10
**detailed** 235:8
**details** 69:4 85:16 115:7
**detect** 186:24 191:9,17 ,22 192:6,8,19
**detected** 192:2
**detecting** 311:10
**determinants** 164:21 310:10
**determination** 91:17,23 92:15
**determinations** 89:20
**determine** 15:23 113:23 116:20 129:6 131:8 169:4 174:1
**determined** 315:21
**determining** 80:9 89:8
**develop** 209:16 224:9 282:24 306:6 309:6
**developed** 203:19 281:7
**development** 84:17 203:22 303:19 318:16

**devote** 199:2
**diagnosed** 30:7
**diagnoses** 235:4,6
**diagnosis** 29:18 79:12 235:9
**diags** 55:23
**dice** 190:16
**didn't** 10:23 15:18 19:22 21:21 36:13 76:23 95:4 ,5 102:6 117:7,15 127:14 128:20 129:10 130:12,22 131:11 133:8 136:10 137:22 139:9 142:23 153:3 154:16,16 ,17 166:21 167:5 168:15 180:22,22 182:9 183:12 185:5,9,12,13,21,24 194:6 202:10 209:1,10 213:5 218:7 235:23 239:19,21 240:4 257:16 268:8 278:12 284:10 290:1,18 293:11 298:17 299:2 302:5,14,21,22 307:24 308:21 313:8,17 317:6 318:12 323:3 336:15,24 339:7,21 341:23
**dies** 167:9
**differed** 181:4
**difference** 116:24 144:23,23,24 154:5 161:16 164:22 178:4 234:20 246:19,21,23 247:24 248:1,14 300:6 ,19 341:19 342:17,18 346:18
**differences** 153:5 154:14 155:7 248:8 253:23 343:11
**different** 22:20 26:20 28:19 41:7 51:12 59:19 62:19 72:13 79:14 81:17 82:13,15 112:17 113:9 119:2 121:3 130:13 138:19 143:20 144:5,16 145:3,8,22,24 151:9 154:6 157:10,19 158:4 ,18 159:14 162:16,16 163:3,22 168:20,23 169:11 170:16 171:24 172:3,6,13,18 173:7,9 ,16,20 185:6 188:5 193:1 194:4 200:8 210:17 216:6 218:12 219:9,10,21,23 228:20 232:23 233:2,3 249:13 308:18 312:15,16 314:2 ,2,4 332:18 343:10
**differentiable** 110:18

**differential** 160:19 252:6
**differentials** 100:3
**differently** 157:8,13
**differing** 92:12
**difficult** 323:13
**difficulties** 92:21
**digitally** 138:24
**direct** 14:18 118:7,9 127:5 179:2,4 274:18 291:7
**direction** 210:7 275:10
**directions** 209:12
**directly** 22:6 33:14,15 53:13 54:5 119:21 176:13 251:14 290:16 294:24
**disagree** 289:21
**disagreement** 160:15
**discard** 288:8 289:3
**discarded** 160:9
**discarding** 248:16
**disclosed** 113:2
**disclosure** 106:16 107:20 251:11 260:10 261:18
**disclosures** 260:5
**discovery** 136:12 285:14
**discuss** 257:16 297:10
**discussed** 40:6 210:16 262:8,17,19 278:18
**discusses** 142:19
**discussing** 22:8 291:23
**discussion** 115:11 150:1 154:23 212:20 214:24 215:2 249:11 266:2 294:14 316:5 319:24
**discussions** 293:3 295:18 297:20
**disease** 50:22 93:22 173:16
**disk** 29:6,6 33:1,3 42:14 55:9,10,16 56:10,19,20 59:23 60:2 63:1,10,20 64:2,12 65:12 323:13 348:10,-
**disks** 33:7,13,15 63:12
**disorder** 126:11 170:15 266:16
**disorders** 242:6,8
**disruptive** 280:12
**dissimilar** 175:12 176:9
**distance** 95:5
**distinct** 93:10 220:17
**distinction** 93:11
**distributed** 210:22
**distribution** 187:24 238:10
**distributions** 199:10

**district** 1:1,-,20 4:8,9 6:15 349:1,-
**dive** 272:6
**divided** 126:8 178:15 326:7
**division** 58:1
**docket** 1:- 349:-
**doctor** 16:20 18:12 76:18 77:10,11,22 200:17 210:8 250:20
**doctor's** 77:23
**doctors** 72:22 77:20
**document** 7:4 23:9 27:20 35:21 65:22 76:15 ,20 106:22 109:23 124:3 ,8,11,21 125:3 127:11 ,13 128:1,2,6,9,12,14,19 139:5,24 140:5,10 142:3 143:15,17 144:21 145:17 146:9,13,14,16 ,20,21,24 147:6,8,19,20 148:1,5,16,19,21,21,23 ,23,24 149:5,17 151:12 164:23 168:12 201:3 221:17 270:6,8 271:4 272:1,15 306:23 329:13 ,19 334:22,24 336:11,14 ,17 338:16 339:9 340:18 ,18
**documentation** 26:9 306:11
**documented** 307:22
**documents** 7:11 9:6,9 11:15,17,24 19:4 20:2 22:15 26:11,12 27:3 54:20 102:22 107:1 127:24 129:23 130:10 ,17 131:3,7 135:16 147:21 155:6,8 269:11
**doesn't** 23:15 118:19 128:19 147:23 176:12 190:16 220:7 240:15 248:22 337:20
**doing** 34:4 35:3 38:9 40:20,24 41:4 53:15 60:7 86:19 116:8 127:24 133:20 139:18 144:17 160:1 179:16 181:21 196:8,9,18 200:9 217:15 ,23 218:13 221:4 222:14 ,16 272:11 282:15 285:1 297:24
**don** 198:15
**don't** 5:21 6:6 8:22 9:13 12:22 14:6 15:4,9 16:2 ,17 17:2,7,14 24:11 25:13 26:8,10,10 27:5,8 28:10 32:5,21 33:4 35:21 36:13 37:1,2 40:1

41:5 42:16,22,23,24
43:2,4 45:17 46:5,22
47:23 54:24 59:19 61:22
,22 67:16,17 69:3,3,14
70:11,22 71:16,23 72:17
73:3,5,6,7,7,11,11,20
74:8,20 75:5 85:16
86:24 87:22 91:9 93:24
94:1 95:12 97:2 100:24
101:1,11,15 102:6
103:14 106:11,18
107:13 108:15 109:10
111:12 113:8 114:7
115:18 116:12 117:8,9
118:1 119:5 123:12
127:20 128:1 134:9
135:21 136:12,22 137:5
,13,16 139:17 142:1,1,6
146:14,18 147:1 148:20
149:2,3,8,16 151:14
154:1 155:16 156:1
159:19 161:10 162:14
164:11 167:11 168:4,10
,12,20 169:10 170:7
171:8 172:19 175:8,15
,16 179:1,10 180:18
181:23,24 182:14
183:10,13 184:18 190:3
193:8 198:3,24 202:13
,18 203:1,4,8,24 211:8
215:4,4,9,15,20,23
216:1,14 220:5,12
221:15,16 224:11 225:4
,19 227:2,10,13,14,15
228:24 229:4 232:12,19
233:4,6 234:14,18 235:7
236:11,11 238:5,18
239:10 240:3 244:4,17
,18 247:21 249:8,8
250:13,18 251:24 252:9
255:3,8 257:15,17 258:4
,11,20 259:2,2,15
261:10,21 262:24
267:21 269:23 270:4,9
,10,22 272:23 275:19,20
278:21 279:9 283:15
284:9 287:7 288:14
289:19 290:12,19,24
291:3,16 292:3 293:5,16
295:3,13,17 296:1 297:4
,8,8 300:9 304:8 305:9
306:5 307:14 315:20
318:11 320:24 321:6
322:20 323:1,3,19
326:18 330:10 331:16
,17,18 332:11,14 333:16
,23 336:5,7 337:24
338:5 340:17,19,20
345:18 347:2

**donated** 285:23
**done** 23:4,5 39:8 44:13
,15,21,24 45:2,6 50:2
61:9 67:17 70:23 71:3
73:20,20 83:4 86:14
87:7 94:14 100:17 115:6
121:22 122:4 128:15
143:4 153:10 164:3
169:6 207:21,23 215:14
,16,21,24 216:10 218:2
,9,11,12,14,18 223:1,16
,22 224:2,3 235:13
244:13,14 249:9 255:1
263:16,17 299:3 316:12
317:3 320:7 344:20
345:1
**door** 238:19
**dosage** 83:14 233:5
**dose** 113:4,24 117:13,16
134:7,7,14,18,22 135:4
,5 151:17,19 187:3
332:2,7 338:23 340:12
**dosed** 328:8,12,15,18,22
**double-blind** 331:22
**down** 40:16 52:8,10 56:2
69:20 70:7,11 72:8,11
,15,24 73:2,13,23 74:7
75:21 94:11 103:18
114:8,8,9 124:19 148:15
167:10 185:24 232:7
245:1,2,23 247:7,18
252:14 307:17,17,19
308:1 309:6 322:8
327:12 328:3,4 346:7
**dr** 3:- 5:1,11 11:11 14:19
23:12 34:15,19,19,19
35:7,9 39:6 40:9,18 41:3
44:2,13 48:1,2,2,22,24
51:2,20,22 52:15 53:22
57:15,15 58:5,10 63:8,9
64:21 66:2 87:17 88:13
89:7 95:14,16 96:24
97:7,11,24 100:17,24
101:3,7,17,18,22 102:1
103:2 105:22 106:15
108:14 118:18 127:17
137:9 138:4,9,22 143:15
146:10 156:1 191:11
195:9,9,9 197:3,3,3,14
,24 198:6,7,19 202:11
203:7,11,13 204:6,11,17
,21,24 205:2,3,8,10,18
,22 206:20 207:10,20
209:19,20 210:7 211:2,6
212:10,10 213:21
214:17 215:3,10,11,12
,19,20,23 216:11,17,18
,21,21 217:17 218:1,6
,15 221:6 222:6 225:4

226:6,7,7,18,18 230:4,4
,4 240:18 243:24 251:5
255:1,8 256:2,12,22
257:8,20 258:2,22 260:4
263:5,9,10,10 267:4,5,5
269:16 270:13 272:17
,18,22 275:14 285:3,7,9
287:16 288:13 290:15
,16,22,23 291:7,8,12,17
292:1,8,8,11,12,12,21
,21 293:2,3,4,15,15
294:2,10,11,19,23,24
295:8,8,11,12,14,15,19
,20,20,20,22,22,23
297:14 298:4,8 300:7,19
,20 302:13 334:22 338:6
**draft** 210:21 294:16
**drafted** 111:19
**drafting** 296:18
**drafts** 27:6,9 288:15
289:11 290:3,4,5 295:23
**draw** 226:11 301:11
**dressed** 230:19
**drive** 55:9
**driven** 159:24 161:13,18
252:23
**driving** 312:21
**drop** 341:12
**drove** 92:24
**drowning** 228:8
**drs** 264:18
**drug** 20:13 29:15 70:6
71:19,22 72:7 83:10,13
,16,19 84:10 87:15
88:20 89:5 90:4,8,22
91:4,5,5,6,13 112:17,22
114:5 119:13 120:7
122:7 134:22 143:6
150:18 152:2 156:18,22
157:1 158:3,14 162:17
,19 168:16 169:18
176:24 177:8 178:15
184:22 187:23 188:3,17
191:19 193:12 206:3
208:5,6,6,6,14,14,15,15
,15,17 209:1,2 213:7,15
214:5 232:20 234:12
242:9 267:12,16 286:9
,12 305:2 306:4 311:15
312:17 343:23 344:1,9
,13,14 346:17
**drug's** 91:3
**drugs** 24:14 51:15 52:6
69:8 79:8 83:17 86:6
90:20,22 91:14,21,24
92:2,23 93:1,7,16 99:17
,18 104:4 108:15 122:23
131:12,20,21 141:2,2,16
,21 161:18,19,21 162:1

,3,8 163:19,22 166:4
167:3 169:9 174:2
175:13,19 179:6,8 185:6
,22 192:7,15 209:3,4
214:16 222:18 223:8
224:18 242:11 246:6,7,8
,9,12 248:3,5,9,10,12,12
,13 251:8,13 252:15,18
,24 254:3 261:21 264:2
265:11 271:1 276:1
278:2 279:15 348:16
**duces** 11:7
**due** 48:23,24 236:21
343:23
**duly** 5:7 349:15 350:10
**dump** 45:9
**dupage** 1:22 350:2
351:10
**duration** 124:17 162:9
186:20 187:4,14,21,22
188:7,9 189:4 193:3,6
,13 194:8 342:6,12,16
343:10
**during** 31:19 50:24
152:15 174:8 188:21
**dwell** 179:18

E

**e-c-o** 50:19
**earlier** 41:4 57:14 63:8
76:23 105:9 115:22
140:20 142:8,11 164:13
166:20 167:22 168:2
178:12 181:2 182:4
184:17 194:5,23 196:16
197:1 232:15 239:5
241:23 268:19 275:9
321:22 342:6 343:23
**early** 86:14 187:11 189:2
310:9 346:14,22
**earthquake** 311:16
**easier** 220:23 253:21
318:14
**easily** 13:20 45:6
**easy** 132:14 180:11
221:22 307:23
**eating** 156:2
**ecological** 50:18,19
263:14
**edited** 211:3 215:8 244:8
249:10
**editing** 254:24 285:19
297:19,21 298:1
**editor** 215:6 251:19
261:13
**editorial** 243:4 249:5
**editors** 236:6 243:12
**edits** 27:13,14 28:15
210:24 289:5 294:18

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

eds 132:6
education 77:6
educational 199:15
effect 110:21 159:8
160:24 164:24 186:24
191:4,7,8,16 192:2,6,13
,19 234:15 265:9,9,16
,20 266:23 267:8 268:4
301:22 341:23 343:12
344:23
effects 172:16,17 228:11
246:10 248:11
effexor 264:7
efficacy 83:13
efficient 76:12 139:22
efficiently 57:22
effort 26:20
efforts 153:9,9
egregious 340:13
eight 144:3 172:21
184:23 188:17,22 341:2
either 9:23,24 34:4,14
62:20 64:2 70:7 71:18
72:8,21 86:7 94:4 95:7
103:5 112:8 114:8
124:23 125:17 140:8
148:10,12 149:8 185:9
207:10 210:23 221:16
233:21 252:19 253:6
261:13 271:24 292:5
300:17,18,21 304:1
305:23 307:9
elected 78:18,19
elective 78:17
eleven 246:4 247:15
elicited 118:16
eliminated 151:13
157:20,24 158:2
eliminating 151:18,19
else 119:9 137:15
214:17 242:24 262:8
273:2 287:11 294:6
323:6,17 330:4 335:21
email 33:5 288:19,22
294:14 295:6
emails 13:21 14:7,12
15:4 287:21 288:13,24
289:2
emotional 233:23
empirical 172:24
employed 203:18
273:10 277:15
employee 273:14
enable 194:10
end 46:20 53:5 56:11,14
102:16 118:7 145:2
167:10 174:18 183:3
196:2 217:4 227:4
266:20 268:11 308:16

316:2 347:11
ended 212:23 304:6
ending 245:24
engaged 223:3
enjoy 49:1
enough 5:24 6:11,12
21:8,9 28:17 47:14
48:13 49:17 77:23 104:5
142:24 154:3 179:21
183:21 184:6,7,8 189:8
191:6 194:9 196:23
197:24 220:11 240:19
enrolled 82:4 184:13
ensure 58:23 285:17
entire 26:6 36:7 273:5
entries 145:1
entry 143:5 148:16
184:5
enumerated 228:5
environmental 233:21
envision 41:24 42:3
48:21
epidemiologic 39:8,10
218:18
epidemiological 32:17
38:24
epidemiology 31:3 59:2
105:11 197:9
epilepsy 170:15 176:24
177:4
epileptic 171:21 172:12
,13 173:17 185:15
episode 218:10 344:6
equal 188:9 233:11,13
246:18,18,21,23 252:20
,21,22 315:5
equally 231:14 234:22
equals 254:15
equipped 57:18
error 340:9,13
errors 277:21
essence 23:2
essentially 22:23 115:15
191:22 253:14,16
341:12
established 143:14
146:10
estimate 110:16 183:14
227:7 313:9 314:11,12
,22 315:1,5,13,18
estimated 342:15
estimates 154:20 156:12
157:14
et 1:5,-,10,13 4:10,10
24:6 349:5,-,-,-
evaluation 108:7,22
235:9 238:7,13 273:6
evelyn 108:14
even 14:3 41:17 47:17

63:6 74:8 94:19 95:8
114:8 131:17 134:8
137:24 138:15 143:1,14
150:4 164:3 177:23
186:7 197:1 231:17
232:1 238:23 256:8
264:23 299:16 311:2
335:16
event 23:1 89:5 111:21
112:2,7,10 113:4,24,24
115:3 117:5 120:24
121:12,15,17 122:6
128:17 129:6,16,24,24
130:20,23 131:18 132:3
157:3 158:15 159:23
171:5 188:14,16,19,21
189:9 218:10 224:11
228:2 246:8 248:6 254:1
267:17 311:1,15 314:24
323:12 325:6 344:7,22
,23 346:10
events 21:24 40:5,23
41:5 79:11 80:10 81:5,8
,17,18,23,24 112:1
119:14 121:10 122:21
127:4,7 128:20 129:12
,19 131:9,15,22 156:24
158:1,3 159:22 160:7,8
,8,10 163:7,7,9,10,15,21
164:9 171:10 246:3,5
247:13 248:17,18
265:10 311:15 312:18
,18,22,24 323:21 325:3
332:10,13
eventually 32:12 45:13
159:23
ever 22:4 23:5 32:2
46:22 49:9 73:13 120:4
127:7 146:10 162:14
218:22 270:4,8 291:24
297:19 298:3 300:5,18
309:6 310:2 317:19
evertsz 348:-
every 13:18,18,19,19
146:6 169:12 188:15
288:1
everybody 121:11
162:13 240:19
everything 8:6 10:4
12:12 14:23 25:5 26:21
62:16 63:3 99:10 119:9
,20 120:5 127:18 170:22
207:19 286:6 288:2
299:6,8 307:21 334:3
evidence 90:11,14
110:11 256:7,20 257:14
,22 262:15 311:5 333:22
334:14 335:8 350:23
evolve 281:14

evolved 281:11
exact 40:23 41:5 42:24
138:12 153:24 180:23
183:11,17 198:3 204:22
225:19 324:12
exactly 26:7 107:22
114:9 151:15,22 159:11
161:10 165:22 180:24
183:15 185:8 190:4
227:2 244:7 248:21
249:9 307:20 339:19
exam 77:21,23
examination 1:18 5:9
77:13,14 78:12 133:5
269:14
examine 80:14
examined 5:7 348:-
example 22:15 55:22
82:1 86:20 95:8 105:21
114:1 152:23 171:21
172:11 173:7 174:2
186:18 209:7 229:7
232:1 287:6 308:4
examples 186:17
exams 78:4,7
excel 136:8,14 138:1,15
,19 173:22 322:23 330:7
except 37:4 216:19
294:14
exception 114:17 163:4
exceptional 199:5
excited 263:2
exclude 120:24 159:22
312:2,10,11 313:3,8,21
,24,24
excluded 96:7 97:15
100:8 121:15 122:5
187:3 253:2 338:22
339:3
excluding 100:4 105:9
117:5,13 128:16 192:7
,16
exclusion 26:3,4
exclusionary 88:5 331:2
exclusively 220:20
excuse 266:10
executed 104:21
exercise 229:6
exhibit 7:4,7 23:9,12
27:20,23 35:16 54:21
55:13,15,17,20 56:20
57:7 58:8 59:23 60:3,23
61:18 62:12 64:22 65:22
66:3,17 75:6 76:13,15
77:1 102:23 103:6,17
104:16,18,20 106:2,5,6
,12 107:7,15,21,24
108:4,5,11,19,21 109:14
,23 110:2 115:14,24

116:1 120:21 123:15,16
,23 124:3,7,11 133:11
,13 134:11,11 135:17,24
136:4 138:8,12 139:5,14
,19,20,23 140:5,11,16
142:17,21 143:2 144:16
145:2,23,23 148:5,8
149:4,6,14,22 151:10
176:14 177:6 180:2
190:10,13,20 200:22
201:3,6,13 202:6 203:6
217:12 221:1,14,16,17
,20 224:24 225:8 226:9
228:6 229:16 241:8,8,10
,14 242:20 247:2,2
252:11 269:12,22 270:7
272:7,8 281:16 287:2,2
,3 304:9,9 318:21
321:21,23,23,24 327:13
,15 335:22 336:3 340:22
342:4 348:7
exhibited 286:10
exhibits 54:23 103:3,15
107:4 136:16 144:6,18
145:22 146:22 201:1
241:9 269:22 348:-
exist 8:19 9:12 25:2,10
63:6 147:15 234:21
243:17 306:23
existed 84:3 279:17
existence 148:22
existing 78:20
exists 25:20 28:17
164:24
expanding 141:12
expect 172:8 173:15
285:11 301:19
expense 49:7 229:14
260:19 261:5
expenses 42:1
experience 82:23 86:3
307:24
experiment 312:7
expert 21:12,13 30:23
49:18 59:6 66:11 67:24
68:4 69:21 70:2,5 71:11
72:9 73:14 74:2 79:3,20
80:8,12,21 85:20 88:15
,18 89:22 90:2,7,19,21
91:2 92:8 93:23 94:10
95:15 104:20,23 108:5
133:11 162:13 165:2,12
212:17 218:15 220:20
223:10,17 225:7 229:20
235:13 240:23,24 241:4
,11 242:23 244:1 247:3
248:22 249:3,17 250:2
,10,11,21 251:5,21
252:4 253:6,11 254:12

256:13 257:17 261:2,16
,20 262:11 263:6 264:10
,20 271:16,18 272:1
274:13 275:14 277:19
278:6 279:1,8 281:8,19
282:3 283:7,20 284:5,11
,13,14,21,22 285:5
286:6 292:10,23 296:18
302:13,15 329:21 333:1
336:19 340:22 348:13
expertise 79:10,23
88:17 89:1 91:10,16
92:7 93:17,17 142:12
164:12 329:9
experts 20:3 94:3
212:15
explain 10:19 64:24
107:13,14 154:5 232:10
234:5
explanation 164:14
173:7
explanations 164:10
explanatory 202:21
explication 176:20
184:1
exploratory 346:10
exploring 281:13
exponential 346:7
exposed 189:3,5,17
exposure 87:23 94:2
125:9 126:24 178:11
310:4 341:10,10,12,19
exposures 126:7 188:3
,5
express 143:10,11
193:14 249:24 271:12
,13,23 275:23 276:2
278:6
expressed 119:3 161:16
271:4 277:3,17 278:22
280:13,17,23 286:5
extend 88:17 89:2
222:18
extension 58:20 59:15
,16 61:21 62:7
extensively 242:7
251:15
extent 15:17 19:4 21:18
25:1,19 36:24 37:9 46:9
53:12 68:21 87:24 92:10
93:6 96:12 105:5 142:17
181:19 195:22 197:12
201:22 260:10 273:3
284:8 286:8 287:6
extract 44:8 136:10
207:4 208:2 209:13
extracted 61:1 63:11
152:19 206:15 298:8
extracting 60:12 62:13

209:15
extraordinarily 65:5

F

f-o-i-a 317:17
face 241:11
facility 229:6,9
fact 26:7 48:24 117:7
142:13 181:2 194:16
202:5 229:10 233:10
238:16,21 246:6 249:16
250:7 253:21 254:16,18
276:8 285:22 293:19
329:4 332:1 338:4,20
faction 262:14
factor 158:9 160:11
187:5,6
factors 233:21 234:7
facts 90:11,13 256:7,19
257:14,22 333:22
334:14 335:8
faculty 210:1 273:12
failure 350:24
fair 5:24 6:11,12 21:8,9
28:17 34:20 40:4 47:14
77:23 87:10 90:6 92:20
101:11 104:5 114:11
172:19 179:21 196:23
197:24 265:12
fairly 27:14 150:2 180:11
188:1 197:23 309:12
fairness 121:23 172:22
202:7
faith 8:11
fall 90:23
false 331:5
familiar 23:13,15 128:3
148:14 180:11 303:10
317:17
far 37:7,13 66:15 78:5,9
95:4,5 98:8,13,22 99:2
131:15 194:17,19
farm 36:5
faster 57:22
fawcett 310:9
faxed 259:13
fda 20:22 45:4 84:7 87:2
91:22 92:22 93:21 94:5
96:5,7 97:1,13,15 98:2,5
,7,12 101:13 102:3
103:7,24 104:24 105:10
,14,15,21 107:3,8 108:8
,9,14,22 109:3,4,18,19
,20,24 111:7,17 114:7
,15,21 115:5 116:15,21
117:9,17,23 118:11
119:1,10,13,21 120:5,12
,24 121:6,15,21 123:1,6
,8,12,20,21 128:15,21

129:1,8,10,20 130:18
131:16 132:2 133:14,15
134:3,12 135:3,8,9,13
141:10 148:16,23,24
150:21 152:7,10,18,19
153:2,4,15 154:13 155:2
,4 157:7,12 158:10
159:8 160:15 161:22,24
162:8,11,22,24 165:7,17
166:11,15,23 167:2,12
,16 168:7,11,17,18
169:5 175:2,8,21 176:9
,12,13 178:22 180:7,12
181:3,15,22 183:11,24
185:7,8 186:9,18 187:2
,20 191:2,21 195:3
200:21 213:9 242:10
243:6,14 246:3 248:4
249:13 277:15 278:8,23
279:2,4,6,7,13,14
280:24 281:14 282:17
,20 283:6 310:18 311:19
316:11,16,18,20,21,23
317:10,12,15 319:3,8,10
320:3,3,7,7,15,16
321:13,20 324:2 327:17
330:6 331:13 332:4,21
333:2,24 334:2,2 335:24
336:8 338:18,20 339:6
341:17,18 342:22 343:9
346:9 348:15
fda's 98:16 99:6 111:20
123:3 141:2,21 161:6
173:23 180:24 181:12
,15,20 182:11 192:11,15
194:9 218:21 245:3,11
252:23 267:1 277:17
310:19 324:11 332:7
337:17 341:8 342:5
february 1:24 4:3 349:16
350:6
federal 49:2
federally 276:6
fee 9:7 75:7,11
feel 202:16 253:20
feels 225:10
fees 303:2,9
felt 39:17 236:18 243:13
302:7
few 42:20 43:9 53:16
74:23 76:11 129:13,15
140:20 198:18 232:6
241:6 272:5 308:12
319:1
fewer 131:15
field 83:9 212:15
figure 129:20 139:2
156:11 157:9,15 180:23
203:22 204:4 301:6

323:21 343:14
**figured** 299:12 318:14
**figures** 116:21
**file** 1:6 33:19 44:6,20
45:8,9 56:2,12 58:22
59:17 60:3 61:12 62:2,7
63:20,23 64:1,11,20
136:8 243:18 299:19
330:7 349:6
**filed** 227:18
**files** 13:18 29:24 33:13
,16 44:3,8,22 45:1 56:10
,11,14,15,15 57:1 58:7
,11,17,18,19,19 59:3,14
,16,22 60:2,6,6,12,22,23
,23 61:2,11,14,17,19,20
,23,24 62:5,7,8,14,14,16
,17,20,23,24 63:2,5 81:4
107:24 205:16 299:22
300:3 304:22 307:22
308:13
**fill** 71:18,24 323:15
**final** 27:10,11 28:11,16
154:5,7 158:22 159:3
213:22 305:2 307:5
**finally** 101:16 108:19
230:23 308:23
**financial** 260:4,10
**find** 73:5 81:21 125:2
127:2 129:22 130:16
131:3,24 146:19 152:22
153:2 166:23 180:10
192:5 240:21 253:11,18
264:19 293:18 300:6,18
321:24 344:22
**finding** 179:12 266:23
273:1 310:19
**findings** 234:10 245:9
,13 284:21 291:22 317:1
**fine** 53:1 57:13 153:18
173:2 236:15 272:4
274:3 277:11 287:10
290:14 319:14,23
324:15 338:10
**finely** 185:22
**finer** 20:12
**finish** 6:4,5 187:8 220:9
226:21,23 337:12
**finished** 17:23 45:19
182:9 187:7 225:21
345:20
**finkelstein** 2:- 118:17
152:14
**firearms** 228:8
**firm** 2:11 42:3,4,10,11
49:6,10 66:19,23 67:23
68:5 73:16 164:11
249:24 260:20 262:9
263:4 274:17

**firms** 73:17 76:3
**first** 5:7 24:24 27:11
28:24 30:7 46:15 56:1
,11 57:14 59:21 66:22
67:11 73:3 76:9 83:9
98:4 101:19 103:6,22
104:20 107:3 109:18
116:11 121:4 144:23
157:14 180:5 181:5
208:20 209:7 210:21
241:15 242:3,15,19,23
,24 248:1 253:24 257:12
258:8 262:12,16 266:20
269:3,21 272:14 273:20
274:9 275:13 279:16
308:5 319:1 324:17
328:24 340:6 344:21
349:- 350:10
**fissure** 86:23
**fit** 203:2 212:21
**five** 52:22 53:3 174:12
196:3 200:14,15 216:24
231:4 329:1
**five-minute** 174:8
**fixed** 159:8
**flat** 315:1
**flip** 194:15 275:12
322:10,11
**florida** 209:22 210:7
**flow** 40:5
**fm** 2:12
**focus** 279:18
**focused** 71:21 95:2
237:8
**focusing** 131:7
**foia** 317:17,19,23 318:3
**folks** 305:13 306:5
**follow** 17:3 208:19
**follow-up** 272:5
**follow-ups** 156:7
**following** 29:15,19
108:8 124:20 126:14
209:6 246:1 308:22
330:23 342:1
**follows** 5:8
**food** 20:13 242:9
**footnote** 196:3 253:5
**footnoted** 126:6
**footnotes** 196:2,3
**foregoing** 349:17 350:11
**forest** 30:10
**forgive** 133:19 134:5
**form** 24:10 28:17,19,20
30:14 33:9 34:12 36:11
,20 37:17 38:7 39:24
40:10,21 41:10 44:23
46:3 48:4 49:12 51:24
53:24 54:7,18 55:5
57:20,24 58:9 59:7

60:14 61:4 63:17 68:7
69:1 72:2,16 74:4,17
75:23 77:24 79:22 80:18
81:12 82:5 83:6 85:5
86:2 88:8,23 89:16,17
90:10 91:7 92:3 93:2,13
94:16 95:10 96:5 97:13
,16 98:18,24 99:20
100:6,19 101:4 102:4,6
103:9 107:9 109:6
112:19 113:21 117:24
118:15 119:22 120:18
132:9 134:15,23 136:15
138:22,23 142:21
143:13,24 144:19
147:10 152:20,24 154:8
160:3,21 163:16 164:17
166:9 167:14,19 169:21
173:12 176:1,11 178:16
181:9 185:1,20 189:19
193:5 196:12 198:23
201:21 202:23 203:12
204:7 207:5 210:17
211:22 215:22 221:8
223:12,18 225:21
227:17 236:1 240:1
241:18 249:7 253:9,15
255:2 256:6,18 261:9,17
262:4,13 265:18 266:7
268:22 270:16 271:6
273:23 274:15,23 275:6
,18 276:17,23 278:10,15
280:16 282:18 283:2
284:7 288:10 292:16
293:22 296:8 302:20
307:11 312:13 316:14
320:11 322:21 329:7
331:15 332:24 333:20
337:7 338:8 344:3
346:24
**format** 45:6 55:11 58:17
,21 64:20 136:13 138:16
,20 193:13 244:15
298:14
**formed** 22:5,7 30:22
108:6
**former** 64:18 198:8,14
**forming** 102:1 336:19,23
**forms** 136:17 321:11
**formulated** 270:19
**formulating** 239:23
**formulation** 340:21
**forth** 9:10 58:23 170:19
232:16
**fortran** 45:10 57:23
97:20,22 298:20,21
299:7,17
**forward** 176:17 310:13

**forwarding** 330:22
**found** 44:18 192:21
205:15 216:3 249:12
**foundation** 100:20 102:5
134:16,24 143:14 144:1
,20 145:16 154:9 158:23
175:6 255:3 256:7
270:17 271:7 320:12
329:8 331:16 333:1,21
334:15 335:7 337:8
338:9
**four** 26:20 78:24 148:15
169:11 172:21 263:9
267:11,14 329:1
**four-fold** 158:13 159:15
,16 160:4
**four-year** 224:16
**fourth** 7:13 234:4
**francisco** 3:-
**frankly** 21:8 341:9
**free** 6:10 194:18 253:20
**frequency** 189:10
199:10
**frequently** 57:6
**frightened** 221:23
**fromson** 23:19 348:-
**front** 38:2 43:9 143:1
179:19 260:9 267:21
270:9 272:9,15 284:16
297:22 308:8 318:22
**full** 272:18 327:23 328:2
**fully** 36:13 73:11 350:22
**function** 189:6 315:2
344:8 345:7
**fund** 53:21
**funded** 49:2 50:16 52:14
,18 53:13 54:5,17 274:6
276:6
**funding** 95:8 302:6
306:9
**funds** 224:4,6
**further** 18:4 94:12
176:20 324:13 350:9,13
,15 351:2
**future** 10:9 81:24 82:4

| G |
| --- |

**gabaergic** 90:8,20,22
91:5 192:7,15
**gabapentin** 21:1 24:18
28:3 29:14,21,23 30:2
,23 31:5 38:18 57:10
87:12,19 92:11 93:1,7
98:17,20 99:16 100:5
105:11 110:7,10 111:20
112:18 113:11 115:17
116:18,23 117:2,23
118:24 120:14 123:9,19
,24 124:24 125:18,20,24

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

129:21 131:14,15,19,24
132:3,8 140:3,24 141:8
,19 142:19 144:4 150:18
,19,23 151:4 152:2
153:17 154:19 155:3
156:14 160:18,19 161:1
166:6 168:1,14 175:5,20
176:10 177:8,10 178:23
182:12 183:21 184:8,21
185:8,9,13,18 186:6,8
189:16,17 191:2,21
192:12 201:18,23 202:4
,6 209:8 217:24 218:8
,10 219:4 220:19,19
221:4 222:11,14 229:21
231:7 235:12 251:7
279:18 287:16 292:9,15
,22 293:2,4 294:2 300:9
305:23 306:18 307:9
308:17 310:18 311:6
324:18 325:3 328:4,10
,14,17,21 332:9 334:5
348:20
**gave** 10:8 46:2 49:3
52:19 196:3 205:19
207:3 208:4 209:5
215:19 232:16 255:19
298:9 323:20,20 338:16
**gee** 309:12,22
**general** 14:6 26:13 29:7
40:5 47:14 72:14,17
147:18 172:20 177:2
187:2 203:20 212:2
236:20,21 237:2,15,19
,21 260:5 263:16 283:14
285:22 286:19 292:4
306:7 335:1
**generally** 23:18 45:7
47:2
**generate** 59:5 62:9
116:16
**generated** 62:17,24
92:22 114:13 116:4
**generic** 21:1
**gentle** 31:22
**gentleman** 47:22 59:11
89:12 199:22
**gentlemen** 34:22
**gerhard** 3:- 4:24
**germane** 260:11
**gets** 160:9
**getting** 70:10 218:16
226:2 230:10,13 268:14
,16 301:3 316:20
**gibbons** 1:17 4:14 5:6
,11 7:4 11:11 14:19 23:9
,12 24:6 27:20 54:20
65:22 66:2 76:15 88:13
102:22 103:2 118:18

124:3 127:17 135:16
137:9 138:4,9,22 139:5
143:15 146:10 148:5
156:1 201:3 202:11
204:21 205:2 218:6
221:17 240:18 251:5
255:8 260:4 263:5
269:11,16 270:7,13
272:17,18,22 275:14
302:13 334:22 338:6
348:-,7,-,-,13,-,-,- 349:-,-
350:7,10
**gibbons's** 258:22
**giles** 49:19,23 68:1,5
70:1 72:7 74:3,11
264:11,15,20
**give** 5:22 10:8 12:5 22:2
23:17 29:10 45:8 77:14
124:6,12 128:19 155:19
,20 161:5 174:4 178:7
189:4 202:1,13 208:16
209:1 221:9 223:6 227:7
235:9 243:7 254:9
258:19 319:19 326:9
**given** 8:6,12 9:3,11,16
,16 10:2,5,13 12:10
22:12 47:10 71:8 95:22
112:22 119:10 134:3
135:22 150:24 184:11
188:24 194:18 245:14
249:16 254:7 261:19
262:4 268:9,12 272:24
311:9 313:9 350:12
**gives** 172:20,21 187:13
**giving** 23:5,12 134:21
266:17
**glen** 106:15
**go** 5:22 7:11,15 8:1
39:21 48:9 52:11,23
74:17,22 76:10 83:9
88:12 90:24 91:8 95:4,5
96:16 104:7 105:5
106:13 118:5 143:16
145:17 146:15 161:5
169:12 174:5 176:11,18
182:22 187:8 191:14
192:1 197:12 202:8
203:3 205:1,17 209:18
218:5 226:20 238:21
241:5,14 244:24 246:14
247:4,7 252:3,14 254:6
262:15 269:5 272:9
274:1 299:9 307:15
309:7,16 312:20 315:22
,24 319:21 323:5 326:18
327:11,12 328:3 331:20
337:20 338:2 342:21
**goal** 334:9
**god** 190:16

**goes** 11:23 86:5 246:11
346:7
**going** 6:13 12:14 14:10
15:2,21 18:3,5 19:2 20:8
,11 33:1 44:9 45:3 49:5
53:6,18 57:7,11 60:13
64:17 77:5 102:13,16
104:10 108:20 124:6
132:16 139:15 146:20
148:8 156:7 170:14
174:3,5,18 176:16
179:16,17,22 180:1,10
182:22 189:4 196:17
198:4 217:4 218:4 220:8
222:1 227:19 237:12
238:11,14 241:6 259:22
269:7 270:6 272:4,22
273:2 277:24 284:20
285:3 289:9 297:9,23
301:12 305:10,20
306:12,24 307:1 309:7
310:13 311:22 316:3
319:1,16,21 321:5,7
335:2 337:18 339:22,22
347:12
**gone** 9:8 110:6
**good** 5:11,12 6:3,4
31:16 39:12,14 58:1
81:1 98:23 152:5 186:23
198:12 201:1 214:21
215:6,7 230:22 268:19
270:5 303:22 304:11
**gotten** 196:20 216:8,24
248:2 322:21
**government** 273:14
**graduate** 34:24
**grained** 185:23
**grand** 2:-
**grant** 49:3 52:17 53:21
210:3,4 224:5,7,8,12,16
,16,17 225:1,2,3 232:6
260:16,20 261:7,15
262:4 306:8,10
**grants** 225:5
**graph** 103:18 188:2
314:6 315:12
**great** 72:11 200:7
291:18
**greenland's** 191:12
**ground** 319:16
**group** 22:14 141:1
160:16 178:23 295:19
309:11 314:24 318:15
**groups** 88:22 112:17
195:5 197:8 206:3
308:18 341:11,20
**guess** 24:10 78:24 90:22
148:11 155:17 181:1
183:7 216:20 223:5

238:23 255:20 260:22
280:4 297:6
**guidelines** 273:18,19
**guys** 193:17 216:19
309:6 324:13

---

## H

**h-u-r** 57:15 197:3 216:17
**habit** 305:24
**hadn't** 196:20
**half** 245:23
**hand** 129:23 269:21
270:6 311:13 351:6
**handed** 103:3 271:5
**handful** 340:11
**hands** 259:17,20
**hands-on** 199:8
**hanging** 194:13 228:7
230:23
**happened** 68:14 81:5
208:23 238:8
**happens** 26:23 147:3
155:9 160:3 231:17
**happy** 8:22 10:18 14:14
69:16,18 146:16 243:22
323:10
**hard** 33:6 43:2 64:5,7,11
,14 65:11 142:24 168:9
,15 174:2 183:7 188:23
323:13 346:18
**harder** 97:19 221:23
**hardy** 2:- 66:20,23
285:13 302:2,6
**harrison** 1:23 4:5 350:6
**hasn't** 27:11 84:2 243:12
333:2
**haven't** 7:17 22:6 71:20
73:19 77:22 87:22
150:11 159:11 162:14
165:13 168:11 173:1
194:17,19 203:2,4
219:12 221:1 274:18
345:4,20
**having** 5:7 35:21 61:1
63:4 94:13 101:10 132:5
153:14 156:3 184:19
186:10 199:2 202:1
223:2 229:11 251:9
277:18 278:7 285:18
295:6 339:4
**hazard** 346:14
**he'd** 216:8 336:13
**he'll** 219:15,18
**he's** 35:10,11 44:15
102:13 137:14 199:5,23
200:2 209:21 215:6
230:13 240:19 277:6
333:1
**head** 12:22 116:13

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

212:13
**headings** 215:19
**health** 35:14 52:7 198:11
209:23 224:9 262:5
310:6,7 348:-
**hear** 68:17 130:12,14
240:10,15 276:20
283:12
**heard** 40:18 87:20 94:17
165:21 169:11 220:4,15
303:12
**hearing** 39:6 40:8,9
118:8 120:3 152:16
217:17,18 218:1 296:19
**heartfelt** 223:6
**hedeker** 198:15
**held** 4:4
**hello** 5:14
**help** 18:6,9 30:9 34:7,10
52:3 89:7 106:8,20
107:13 118:18 121:18
122:14 124:17 125:3
216:3,11 226:21 258:23
259:10 277:23
**helped** 83:24 85:7,14
87:1 210:12,14,17
212:19 310:5
**helping** 199:2 306:1
**helps** 118:21 139:23,23
144:12 149:19
**hendricks** 209:21
211:10 226:17 295:4
**here's** 41:23 240:21
**hereby** 350:5
**herein** 330:22 351:3
**hereof** 351:4
**hereunto** 351:5
**heterogeneity** 99:8
**hey** 300:20
**hiatus** 9:18
**high** 186:5 187:10
228:10
**higher** 131:22 170:14
172:9 189:2 234:12
314:14 315:6,14,18
346:13
**highest** 315:16 346:5
**highlighted** 115:19
144:12
**highly** 310:11
**hillyard** 3:3
**hines** 35:12
**hired** 223:10,16 276:4
**hold** 79:3 80:20 89:12
90:2,7
**holiday** 4:4
**homogeneity** 163:23
**homogeneous** 188:4
**hone** 135:7

**honest** 223:6
**honor** 78:17
**hooper** 67:10,14,19,21
68:11,16 69:5,13 73:19
,22
**hope** 120:17 155:15
156:16 248:23 254:13
265:4 323:14
**hospital** 229:9
**hospitals** 229:7
**hotel** 155:10
**hour** 1:24 75:8 323:9
**hours** 64:8 277:6 296:17
,22,24 297:1,2
**houston** 2:-
**however** 110:7 176:14
202:16 250:5
**ht5aa** 91:5
**huge** 128:9 187:4,6
**human** 348:-
**hur** 34:15,19 35:7,9 44:2
,13 48:2,22,24 57:15
58:5,10 61:13 63:9
195:9 196:4 197:3,3,14
,24 198:6,7,19 203:7,11
204:6,11,17,24 205:3,8
,10,18,22 206:20 207:10
,20 215:11,19 216:18
226:6 230:4 256:2,12,22
257:8 263:10 264:18
267:4 275:9 285:3
287:16 288:13 290:15
291:7 292:11 293:3
294:2,10,19 295:14,19
,20,22 297:14 298:4,8
300:7,19,20
**hur's** 64:21 203:13
**hurt** 240:15
**hypothesis** 76:24
110:18,20 183:18
189:11 314:21
**hypothetical** 188:24
216:13 251:23 281:23
331:24 333:21 334:15
335:7
**hypothetically** 332:19

---

I

**i'd** 7:10 8:22 46:8 69:8
116:10 143:16 146:16
178:24 187:18 220:17
243:22 259:7 263:2
269:4,21 272:7,8 275:12
279:4 290:7 305:16
318:20 323:4 327:18
328:3 330:17 345:14
**i'll** 4:21 5:22 6:4 23:17
31:18 49:16 60:22 65:3
,10 72:5 74:22 90:18

112:19,24 127:4 137:2
,17 143:13 155:17
174:12 178:16 179:14
202:16 220:24 240:16
243:22 247:20 253:19
255:10 259:12 261:17
268:13 290:9 319:19
323:11
**i'm** 4:16,19 5:13,18,20
6:13 9:1,3 10:18 12:14
14:3,10 15:2,5,21 16:5
,12,13,21 17:21,23 19:2
,14 20:8,11,14 22:2,3,8
23:12 25:12 28:16 30:9
33:1,5 36:5,24 40:16,22
,22 41:1,4,23 43:15 44:4
,17 45:18 47:3,11 48:13
49:17 53:18 54:10 55:14
57:6,11 60:13 61:10
62:6,18 63:6,15 64:6,10
69:16,17 73:8 74:12
77:11,18 79:2 80:11,24
81:1 89:22 90:12 93:23
94:9,10 97:8 98:2,5,10
99:2 103:15,15 105:8
106:22 107:2,5 112:17
,24 115:18 118:20
123:20 124:6,18 125:17
128:5 129:16 130:1,7,7
,13,14,15,16 131:2,24
132:7 133:10,18 138:2,6
139:21 140:8,15,17,18
142:2 146:5 147:12,14
148:8 155:20 156:7
159:5,10 162:13 165:12
170:21,21,23,24 173:21
174:5 176:16 179:12,16
,22 181:7,23 182:16,21
183:8,10 187:14 188:6
190:23 194:21 195:8,13
196:18 198:4 204:1,4
208:12 216:7 219:2,17
,24 220:8 221:13,24
223:20 225:6,7 227:13
,15,19 228:5 229:22,23
230:10 231:15,16,17
233:4 235:12,15 236:13
237:24 238:11,14,17,23
240:21 241:6,22 244:8
245:8 252:4,9,10 255:5
256:8 258:6 260:12
265:19 266:19 268:10
,13,14 269:17 270:6
272:4,11,11,14,22 273:2
274:16,24 275:13,21,23
279:3 284:9 287:5 289:1
,9,13,19 290:2,2,21
291:14 293:14,18 297:7
301:17 303:16 304:12

305:11 311:22 317:10
318:15 321:21 324:22
325:11 327:5,20 330:18
333:24 334:21 335:11
336:6 339:18 342:1,17
343:6 345:10,23
**i've** 8:16 10:4 18:23
19:24 22:12 23:4,5 25:4
26:6,22 27:5,18 42:9
72:11 73:10,17,20 75:17
82:10,20,22 84:10 87:20
93:14 100:23 110:4,6
135:24 143:4 148:3
162:14 165:5,21 169:11
170:5,6 182:24 190:8
194:18 221:22 245:14
248:1 253:21 270:19
271:4 276:10 287:4
299:11 303:12 316:20
317:7,14 344:15,20
345:1,24 346:1,1
**i.e** 266:14,15
**icd** 228:4,22,23
**icdn** 228:21
**id** 348:6
**idea** 39:12,13,14,22 40:6
,24 164:11 212:2 217:15
,23 240:4 296:17,22
297:7 319:10
**ideation** 22:1 80:17
156:11 169:24 173:9,19
189:2 322:13
**ideations** 228:17 267:23
**identical** 93:9 240:21
262:10 341:11
**identification** 7:5 23:10
27:21 54:21 65:23 76:16
102:24 124:4 135:18
139:6 148:6 201:4
221:18 269:13
**identified** 104:15 124:9
135:22 154:24 155:2
162:1 166:20 213:9
**identifies** 4:15
**identify** 25:7 55:1 66:2
82:24 103:4 104:18
106:2 107:2 108:11
124:7 139:15 191:8
201:1 211:5 215:1,2
243:10
**identifying** 89:2,3
151:19
**ill** 234:16
**illinois** 1:22,23 4:5 49:1
94:24 95:9 199:18,19,21
210:5 229:7 350:1,3,7
351:10
**illnesses** 170:13
**illogical** 196:19

**illustration** 51:6
**imagine** 45:21 173:18
186:17 295:2 314:23
**immediate** 144:24
233:24
**immediately** 131:14
252:5 338:19
**impact** 341:18
**impacts** 290:12
**impinges** 284:8
**implementation** 84:18
**importance** 340:24
**important** 223:7 311:22
323:23 327:4
**impossible** 123:4
**improper** 216:13 251:23
281:22 333:21 334:14
335:7
**ims** 52:2,3,5,7 53:20
**inappropriate** 16:14
**inc** 1:13 349:-
**incidence** 129:12 170:6
,11 171:2,5,7,12 172:3
192:4 254:1
**incidents** 129:1 171:15
**incipience** 222:10
**include** 82:12 94:15
107:1 112:9 113:19
115:3,8 134:6,14 219:4
228:4 233:15,20 284:11
285:4 332:22 333:18
334:11 335:4
**included** 88:6 96:6
97:15 111:21 112:6,12
113:3,10 116:17 120:6,8
121:9,11,16 133:21,23
134:6 135:3 160:18
161:22 180:24 191:2
192:7 214:18 228:2,2
229:2 246:20 264:24
265:3 284:5 294:16
305:11 313:18 327:17
329:5 334:18 335:15
337:5 338:14 340:7
**includes** 13:8 108:6
128:7 332:20
**including** 9:10 82:14
90:8 98:6,6 99:12,15,15
,23 100:4 105:8 152:17
280:18 299:6
**inclusion** 26:2
**inclusionary** 88:5
**inclusive** 349:19
**incorporate** 232:9 233:1
**incorporated** 4:10
**incorrect** 93:8 112:21
**increase** 265:10 267:1
,16
**increased** 183:22 184:9

**increases** 98:22 268:9
**increasing** 266:5 267:8
**incurred** 260:19
**independent** 273:8,11
,16 294:24 295:2 298:10
300:5
**independently** 295:9
298:4
**index** 29:15,18 30:1,5
32:19 35:6 38:20 53:19
165:5 197:20 218:10
219:4,5 232:3 344:6
**indicate** 75:14 193:11
251:11 307:5 312:23
346:4,18
**indicated** 151:15,16
176:21 231:13 261:19
**indicates** 75:7 139:24
151:12 177:9,13
**indicating** 110:9
**indication** 84:8 93:22
94:6,14 170:16 176:23
,24 179:8 184:10 185:14
308:18
**indications** 94:15
168:17,20,22 172:6
173:16 177:4 185:16
218:13 242:7
**indicator** 186:23
**indirectly** 53:13 54:6
152:22
**individual** 6:19 7:1 76:1
114:7,9 121:7 122:21,22
128:20 180:20,21
181:16 246:12
**individually** 246:9
248:10 252:20
**individuals** 195:17
310:3
**induced** 309:19
**industry** 83:5 273:4
274:6
**inexpertise** 21:14
**infancy** 86:17
**inference** 162:4
**infinity** 312:20,20
**information** 26:1 34:7
36:17,18 43:4 45:20
60:12 63:10 64:22 92:13
94:19 111:3,4 114:3
118:2 123:8 128:12,13
,21 129:11,17 131:12
132:6 141:16 142:21
143:10 149:20 150:16
158:12 160:2,3 167:15
169:7,9 173:2,24 175:7
,17 176:13,24 185:22
189:5 194:9 200:22

205:21 207:4 208:3
231:20 233:14,20
235:17,18 236:13
238:19 250:8 259:9
273:1 279:21,24 290:4
299:19 305:12 319:3
321:10 322:17 323:7
331:22 339:7
**inherently** 110:20
**initial** 307:3
**initially** 283:18 293:12
**initiated** 276:7,8 277:23
**initiating** 346:15
**initiation** 206:1 209:2,7
234:13 309:1,21 344:9
346:4,6,8
**injury** 228:7,8,9,10,11,12
**inn** 4:4
**input** 203:7 288:16
**inquiry** 14:18
**insert** 256:17
**inserted** 56:20
**inserting** 55:9
**inside** 24:8,11 58:7
**insofar** 43:24 91:18
**instance** 52:15
**institute** 50:24 78:12
210:2 224:9 262:5
273:14 310:6
**institution** 273:9
**institutions** 77:8
**instruct** 17:8 18:15
199:12
**instructed** 205:5,22
214:11
**instructing** 17:9 289:23
**instruction** 17:10 56:15
61:19,23 62:2,6 208:19
209:5
**instructions** 205:19
207:2
**insurance** 6:19
**insuring** 199:9
**integrity** 199:9 272:20
**intend** 203:1 270:14
271:23
**intended** 298:1
**intends** 271:11,11,13
**intensity** 189:14 232:9
,13 233:1
**intensive** 65:5
**intentionally** 6:24 76:23
**interaction** 37:5
**interactions** 52:21 87:13
281:12
**interchangeably** 21:4
**interest** 69:13 73:9
120:10,11 284:18 302:9
**interested** 69:9 222:20

224:20 232:5 318:16
351:4
**interesting** 73:6
**intermediate** 308:13
**internal** 237:6,11
**international** 226:11
303:10
**interpose** 15:14 239:17
**interpret** 125:21
**interpretation** 85:18
312:5
**interpreting** 79:11
**interrupted** 218:4
**interval** 114:12 156:8,16
180:13 183:14 245:24
246:17,18,22,23 247:19
252:21 254:14 311:19
,24 312:3,6,8,12,17,19
,22 313:10,14,17,22
314:4,5,17 315:13 344:6
**intervals** 119:1,3 120:13
157:9 246:12
**interviewer** 235:8
**interviews** 235:2
**introduction** 241:17
242:4
**introductory** 318:24
319:2
**intuit** 131:13
**investigator** 225:6
**investigators** 210:4
**invite** 338:3
**invoice** 41:22 42:1,4
**invoices** 75:16,18
**involve** 70:18 85:17
**involved** 44:21 45:4
50:20 52:20 67:21 71:20
72:21 73:22 81:22 82:2
84:21 87:10,24 91:19
99:15 132:4 218:16,23
223:3 226:12 277:20
302:18
**involvement** 54:11 82:8
264:13 274:11 277:18
**involving** 72:6 251:7
286:3
**iom** 20:15 50:24 51:2,4,6
78:14
**island** 44:19
**isn't** 142:14 232:2
249:18 250:11 260:24
269:23
**issue** 19:8 69:7 119:19
161:1 187:3 310:1
342:24
**issued** 76:2,3,4
**issues** 48:3 93:16 94:3
284:8 297:9 342:6
**it's** 6:17 7:12 11:7 16:14

18:13,15,17 20:17 27:12
28:7,8,12,24 33:20,21
44:5,6 62:11 65:15 66:6
70:9 71:15 73:4,4 75:21
76:12 78:18 79:6 93:17
103:10 105:15 108:20
110:17 114:17,18
115:14 123:15 126:4
128:6 133:11 136:4
142:24 146:2 147:2,2
149:16 150:2 151:21
157:16 158:12 159:4,12
163:13,13,14 168:9,15
170:13,14,15,17 172:22
,24 177:16 178:1,10
182:13 183:9,19,19,20
184:18 188:23 189:6,11
190:9 191:3 193:14
200:13 204:5,11,20
216:13 221:15,23
224:15,15,16 225:12
227:11 231:1,24 233:2
237:3,17 238:4,16 239:7
240:1,3 245:5,14 253:20
254:4,17 255:3 256:1,19
260:24 262:4,12,16,16
264:22 272:8 277:9
280:10 281:9 287:2
288:9 293:22,23 296:9
297:2 301:17 312:13
314:15,22 315:1 319:20
321:15,23,23 323:24
324:4,5,10 325:22,22,23
326:11,13,23 327:4,11
333:3,21 335:7 337:4,10
340:3 342:10 346:18
347:6
**item** 26:5,6,9 27:5,18
106:13 123:23 124:9
190:22 243:2 335:22
**items** 8:11 9:15,16 12:10
,15 14:21 18:24 19:11
20:9 23:19 24:23,24
25:10 27:2 123:16,17
**itself** 127:11 154:19
310:18 319:3

---

**J**

**jack** 2:- 4:16 5:13 15:13
17:13 105:19 219:17
222:3 240:13 255:8,16
319:13 323:8
**jama** 237:4,9 258:8,14
260:5 273:20 283:11,12
**james** 3:- 4:1
**jan** 310:9
**janet** 101:5
**january** 104:3
**jenning** 5:1

**jennings** 3:-
**jlondon@texas.net** 2:-
**job** 1:15 23:4 199:24
**john** 51:2 89:7 212:12
213:2,12 226:16 243:4
274:8 285:23 295:5
**jointly** 200:11
**jones** 67:24 68:4,12
**journal** 236:17,19 237:1
,5,18,19 243:5,9,13
251:19 283:23 284:2,4
,17,20
**journals** 237:8,13
**judge** 337:19 338:1,2,3,5
,7
**judgment** 271:16,20
**july** 105:12 108:9 109:23
148:10,11 152:15 180:3
190:11 195:8,18,21
239:14 240:23 242:16
244:2,6 245:7 247:4
249:3,18 250:22 256:3
257:2,11,12 262:11
263:6
**jumping** 228:10
**june** 152:15 321:12
322:6 324:12 331:14
335:23
**jury** 17:15 31:24
**justice** 70:9,10 71:4,7
72:7 251:6 275:15

---

**K**

**ka** 2:9an@lawampmmt.co
**kansas** 2:18
**katz** 348:-,21
**keep** 14:6 60:14 220:17
241:10 244:18,20 303:5
,9
**keith** 2:7 4:19 155:21,22
269:17 277:6 280:4
323:8 342:8
**ken** 4:23
**kenneth** 2:-
**key** 63:15 234:10 331:2
**kids** 316:24
**kind** 12:16 40:24 41:4
74:24 82:9 86:11,19
87:14 91:9 98:1 122:19
129:10,17 131:11
138:12 164:22 212:3
218:7,17 234:20 236:13
237:3,4,5 243:15 285:2
295:6 305:12 309:23
310:16 314:7,7 315:2
323:23 342:16
**kinds** 72:23 81:17 89:8
161:11 163:3 166:16
168:20 200:8 234:2

277:21 299:11
**knew** 112:8 179:4
298:17 316:11
**know** 6:9,18 10:19 11:7
12:15,24 14:20 15:13
21:7 22:10 24:11 25:13
27:8,14 29:8 32:21
33:14,18 36:12,21,22
37:1,2,18 40:1,12,13,24
41:3 43:3 44:9 45:17,18
46:4,5,22 48:13 50:1,5
51:24 52:14,20 55:17
56:24 57:10 59:19 67:6
69:2,4,4,4,7,9,15,16,17
70:1 71:16,23 73:4,5,6,9
74:14,20 75:5 78:5,9,11
79:6 80:24 82:15,22
84:11 86:5 89:6 93:15
,20,24 94:1,2,4,9,12
95:11,12,14,17,24
101:15,21 106:11
108:15 109:7 114:4
116:10 117:19 118:11
119:6 120:6,8,9 122:24
,24 123:13 128:7 129:11
134:16 136:21,22 137:5
,13,16 141:15 143:9
146:12,14,14,15,19
147:2,20,22 152:13
154:1 155:17 156:22
157:20 158:24 160:7
161:10,22 162:16
163:22 164:19 165:4
167:11 168:10,12,15,18
,22 169:10 170:7 171:9
172:20 175:15,16,21
176:7 178:21 179:3,9
180:22 183:12,13
186:12,23 188:1 190:3
210:23 211:8,10,24
214:19,23 218:13,15
222:15 227:13,14,15
228:20,24 229:4,12
231:16 232:4,11,14
233:5,6,9 235:7,7,23
236:11 237:10 238:19
239:11 243:16 244:8,18
251:16,24 258:21 259:7
,15 264:21 269:18 270:9
271:10,11 276:10 279:4
,17 284:9,15 286:15
288:4 289:5 290:15,18
,19,21 291:6,14,21,24
292:7,20 293:8,14,19,20
,20 294:8,9,23 295:3,14
,22 296:1 297:4 298:17
300:9 301:13,17,22
304:4 307:14,23 308:7
,11,11 309:9 315:1,9

318:8,10,11 319:19
320:14 323:20 325:13
329:8,17 330:11 331:17
,18 333:3,23 335:19
336:5,7 337:20 339:19
340:4,4,17,20,20,20
343:10,22,24 344:23
**knowing** 167:16 171:10
175:9 239:10
**knowledge** 8:11,13 14:3
20:10 22:21 26:16 28:22
31:20 49:14 53:17 54:19
66:18 70:17 76:8 78:6
87:6,9 89:22 90:3 101:9
107:10 115:10 117:15
,16 128:23 142:23
162:24 164:5 183:16
200:23 230:1 282:6
287:12,22 290:17
293:10,13 294:1,13
295:7 324:17
**known** 142:13 150:2
197:6
**knows** 331:16
**kss@lanierlawfirm.com**
2:-
**kwan** 34:15 61:12
199:23 214:12 216:11
275:9 291:21

---

**L**

**l.l.p** 2:-
**lab** 197:15
**label** 133:24 159:4
**labeled** 73:8 331:8
**labels** 253:2
**labor** 58:2 241:6
**lag** 227:8
**lake** 1:9 4:12 349:-
**lamotrigine** 92:11,24
94:4,7,12,18 99:16
100:8,13 160:16,24
161:14,18,23 163:6
164:7 165:16,22 166:7
167:1,12 175:4,19
176:10 177:15,16 192:3
,14 246:4,16,20 252:24
**language** 253:14,16
305:18
**lanier** 2:11 118:8
**large** 48:11 203:19 212:1
218:20 310:11
**large-scale** 198:12
199:4
**largely** 217:21
**larger** 192:13
**largest** 314:10
**last** 22:22 39:5 65:11
103:17 182:18 218:4

224:13 234:24 238:1,5
255:19 266:22,22 282:3
318:19
**lasts** 188:22
**late** 178:1 224:13,14
228:11 239:17 272:24
319:7
**later** 34:23 98:11 107:1
155:10 297:10
**latter** 251:7
**laugh** 31:12,14
**laughed** 167:6
**laughing** 167:9
**launch** 240:16,17
**launched** 216:9
**laurie** 5:2 40:2
**law** 2:11 3:3 42:2,4,10
,11 49:6,10 66:19 67:23
68:5 73:16,17 76:2
249:24 262:9 263:4
274:17 289:15,16 290:8
**lawsuits** 26:19
**lawyer** 170:23
**lawyers** 26:19 72:21
**lay** 165:11,20
**lays** 222:13
**lead** 34:19
**leading** 212:15 241:23
273:24 319:20
**leads** 41:16 72:14
**leafing** 179:12
**learn** 130:1,7
**learned** 26:18 121:14
**learning** 120:11 218:16
**least** 113:15 122:12
166:20 177:3 199:8
233:12 274:5,11 306:15
328:24 342:14,18
346:15,22
**leave** 71:17 179:5,14
236:10
**lectures** 22:2,11
**led** 28:4 30:19 46:21
50:12 163:22 203:21
207:23 309:15
**leeway** 319:20
**left** 194:13 243:15 341:1
**legal** 16:10 17:4,18
18:16 70:17 150:3
**legalities** 37:3
**length** 124:21 187:1
**lengths** 188:4
**less** 110:8 296:23 297:3
311:9 320:6 340:13
**let** 6:8 8:2 17:11 28:23
38:1 41:7,21 59:18 68:3
70:12 72:12 97:9 101:16
121:18 134:10 143:22
146:11 149:10 155:19

,20 176:16 192:24 202:8
220:9 230:2 255:24
256:17 257:7 264:16
286:4 332:17 337:12
**let's** 8:24 27:2 53:3 83:9
90:24 98:4 102:14 113:9
153:18 161:5 165:5
169:15 171:17 174:4,15
177:5 217:1 226:20
254:6 255:22 259:17,20
291:4 315:24 325:20
329:11,15 339:20
**letter** 23:13,14,18 24:20
45:21 66:6 162:12,12,15
321:19 322:11 323:16
,19 324:9 327:21 330:19
348:-,11,-,21
**letters** 163:3 242:10
**letting** 58:5
**level** 21:14 50:21 51:8
52:13 69:13 94:12 98:12
101:12 114:3 122:9,10
,16 157:17 158:18 173:6
180:20,21 181:16
192:22 263:15 268:9,12
269:2
**liability** 1:- 4:7,18 6:18
69:22 70:6 349:-
**license** 25:23,24 27:24
28:23 29:5 36:3,19 37:8
,14 56:23 77:21 78:4
348:- 350:4
**licensed** 350:4
**licensee's** 305:2
**licensing** 77:13 78:7
**life** 80:10
**lifesaving** 242:6
**lift** 259:17,20
**ligands** 140:2 141:3,9,20
142:20 348:-
**light** 41:2 132:5
**liked** 316:15
**likelihood** 172:14
188:15,20 278:3
**likely** 138:14 172:2
173:5,9 189:15 231:12
232:19 234:22
**limit** 277:11 280:9
**limitation** 160:4 234:5
235:3,15 268:17
**limitations** 72:18 231:3
,6,14 235:11,21 310:23
**limited** 189:21 201:22
**limits** 18:2
**line** 247:8,9 248:2,9
253:13,24 289:10 325:9
,10 328:10,14,17,21
**lines** 68:19 242:24
245:17,23 252:16

266:22 299:14 328:4
**link** 52:12 186:7
**linkage** 268:19
**linked** 232:2
**list** 7:11,15 8:5,6,10,12
,18,19 14:6,23 25:8 57:7
58:7 61:20 106:10,19,23
,24 107:2,7,16 124:10
127:16,17,18 139:12,13
140:6 147:8,9,20 148:8
,12 149:4,5 305:2 323:7
326:10,11 335:23 348:-,-
**listed** 59:22 60:22 61:11
77:8 78:14 119:16
139:12 145:2 147:8,19
151:23 221:13 231:4
260:9 284:15 286:24
287:7,11 322:24 323:4
325:12 330:10 331:19
332:20 336:20 340:22
**listening** 41:2 94:3
**listing** 148:3
**lists** 25:24 26:2 106:6
124:21 137:12 158:14
339:9 343:14
**literally** 272:14 299:20
**literature** 12:9 195:24
212:20,21 251:16 276:6
286:20
**lithium** 206:9,12 209:9
,11 213:6 214:1,5,15
266:24
**litigation** 1:4 4:8,17 6:14
12:5,18 19:8 23:2 45:5
54:15 66:12 69:6,22
72:10 75:4,15 76:6
195:12 223:4 239:24
264:10 277:4,14 279:19
284:6,23 286:3,24
302:19 349:4
**litigations** 274:10
**little** 48:8 53:2 70:9 73:4
151:22 168:2 196:17
197:2 226:4 239:5
268:13 269:19 272:5
275:13 302:17 311:7
314:20 319:20 321:22
323:13,15 326:5 341:5
342:6 343:16
**lmcgroder@shb.com**
2:19
**locate** 156:10
**located** 4:4
**locked** 44:7
**log** 307:7,11,13,15
**logic** 297:18,24
**logical** 196:19
**logistic** 309:16
**london** 2:- 4:16,16 5:10

,13 7:6 10:15,24 11:3,6
,10,14,23 12:2 13:11,14
15:1,20 16:3,12,15,19
17:6,10,14,20,24 18:11
,17,18 23:11 24:19
27:22 30:15 31:1 33:10
34:14,16 36:15 37:6,20
38:8,12 40:3,15 41:6,12
45:11 46:7 48:6 49:15
52:22 53:3,11 54:2,12
,22 55:14,19 57:21 58:3
,13 59:8 60:16,21 61:7
63:14,22 65:21 66:1
68:9 69:11 72:3 73:1
74:6,21 76:17 78:3
79:19 80:2,22 81:14
82:7 83:8 85:10 88:11
,16 89:10 90:1,12,17
91:11 92:5,9,19 93:5,19
94:21 95:13 96:16,20
97:21 99:3 100:1,10,21
101:6 102:8,11 103:1,12
104:7,14 105:7 106:1,21
107:12,19,23 109:8
112:23 113:22 115:12
118:3,22 120:1,20 124:5
,15 127:9,12,19,22
130:5,11 131:1 132:13
133:6 134:19 135:6,19
136:23 137:3,6,11
138:21 139:4,7,17
143:21 144:7 145:6,20
146:17 147:12 148:7
150:2 152:21 153:7
154:11,24 156:5 159:1
161:3 164:1 165:3,14
166:1,12 167:17,21
170:4 173:14 174:12
175:1,10 176:6,15
177:24 178:20 181:10
182:20 183:6 185:2,19
186:2 187:15 189:20
190:19 193:7 194:1
195:13,19 196:15
197:18 199:14 201:5,24
202:7,13,18 203:4,15
204:10,14,16,20,23
205:7 207:8 212:5 216:5
,16,24 217:10 219:1,12
,16,22 220:4,7,10,15
221:11,19 222:4 223:14
224:1 225:13 230:13,18
,22 231:15 236:4,23
238:12,16 239:4,18
240:3,8,14,20 241:20
242:1 244:23 245:5,10
249:14 250:4,15,19
251:2,18 252:2 253:10
,17 255:5,10,14,18,23

256:10 257:1,6,19 258:1 ,5,12,21 259:4,7,16 260:3 261:12,23 262:18 265:21 266:8 268:15 269:4 280:6 347:5,10 348:-

**long** 14:6 57:5 83:18 84:2,3 85:15 86:5 269:18 274:10 333:7

**longer** 187:1 269:19

**look** 8:22 10:7,16,18 28:24 43:7 55:10,20 67:12 69:16 76:19 77:1 103:17 121:7,9 123:15 125:19 128:2,3 129:14 135:23 136:18 139:19 ,20 140:4,15,24 144:2 149:21 150:7,18 163:17 173:20 177:5 178:24 182:22 184:16 187:20 191:1 200:13 203:10 205:22,24 206:1,5,9,10 208:17 213:3,13 237:20 242:14 253:19 258:22 261:6 263:6 269:23 270:4,10 289:4 309:14 323:4,10 324:6,13,17 327:18 330:19 333:9,13 343:9,13

**looked** 8:15 44:18 51:6 71:21 123:11,13 129:14 ,20 130:10 157:16 167:22 168:19,21,21 183:10 184:20 191:3 196:1 213:5 268:6 289:18 316:12 321:20 323:6 324:7 342:23 343:17 344:15

**looking** 34:24 35:16 80:8 81:2,10 103:15 120:10 124:18 128:3 129:11 131:7 139:21 140:17,18 144:10 154:19 159:5,6 168:2 173:3 178:13 182:24 184:15 188:6 191:4 221:9,13 224:19 225:24 302:8 309:20 310:10,13 ,14,17,24 324:22 339:13

**looks** 27:24 66:6 115:21 124:8 148:2,14 188:2 328:24 336:9

**lori** 2:17 67:13 136:20 137:17 142:2 219:16 258:21 277:7,8 278:18 280:3,11 300:1 319:18 ,23 329:14,18 333:4 335:11 337:10,23,24

**losing** 30:10

**lost** 205:20 276:10

**lot** 5:18 9:23 33:22 70:23 82:22 86:15,18 147:4 284:13 299:14 334:23 346:19

**lots** 164:10 172:17 218:12

**louder** 268:14

**loved** 166:15

**low** 129:12 134:7 332:1 340:12

**lower** 35:17 124:19 188:1

**lunch** 135:21 197:1

**lyrica** 123:9 137:19,20 138:3 148:17 149:1 155:3 322:2,4

---

### M

**ma'am** 88:11

**magic** 211:6

**magnitude** 191:7,8,15 192:9

**mail** 42:20

**majority** 245:18 246:2 247:9,12

**making** 8:20 16:12 92:14 117:10 199:11 292:23 297:23

**manipulate** 56:16 58:6

**manipulated** 61:2

**manipulating** 60:11,15

**manipulation** 33:8,23 59:14

**mann** 34:19 48:2 51:2,2 ,20,22 52:15 89:7 195:9 196:4 212:10,12 213:21 214:17 215:3,10,20,23 216:21 225:4 226:7,17 ,18 230:4 243:4,24 255:1 258:2 263:10 264:18 267:5 274:9 285:9,23 290:16,22 292:8,21 293:15 294:24 295:8,12,15,20,20,22

**mann's** 53:22 212:10

**manner** 128:15

**mansel** 158:6

**mantel-hansel** 154:22 157:15,24 158:7,8,9,11 ,17 159:9,21 160:1,5 180:19

**manual** 35:2

**manufacture** 166:24

**manufactured** 264:3

**manufacturers** 162:17 ,19

**manuscript** 15:16 28:7 ,12,16,20 195:11 201:22

**284:5** 290:4 291:20 295:24

**manuscripts** 27:6,9 289:11

**march** 66:17 242:9 281:20

**marcus** 196:5

**mark** 148:8

**marked** 7:4 23:9 27:20 54:20 65:22 66:3 76:15 102:22 103:3 110:4 124:3,6 135:16 139:5 148:5 201:3 221:17 269:11,22 270:7 348:6

**marker** 211:6

**marketing** 1:3 4:7 349:3

**markups** 244:16,18,20

**massachusetts** 1:- 4:9 6:15 349:-

**master** 1:6 349:6

**mastered** 97:22

**masters** 199:19

**matched** 183:13

**material** 36:4 106:15,24 138:12 248:18 336:18

**materials** 21:17 25:17 55:3 106:6,10,23 107:2 ,16 118:12 120:7 123:10 124:9 137:19 139:12 147:8,9 148:9 149:4 181:19 286:22,24 299:1 335:22 348:-,-

**mathematics** 199:21

**matter** 21:14 67:12 220:7

**may** 5:4,13 13:24 17:7 ,10,11 18:2 20:14 22:9 25:14 28:13,14 29:1 31:2 33:2,18 34:18 38:2 ,4,5 39:20 40:12,13 41:3 42:13,18 54:16,16 60:10 64:18 66:8 75:2 76:2,3,3 94:14,20 95:21 101:2 104:21 106:8 107:17 108:23 109:12,15 115:14 116:2 128:2 137:3 139:13 140:4 142:2,6,9 143:2 146:23 147:1 150:7 153:13,19 ,19 157:11 159:4,19 165:23 182:18 193:11 195:22 209:19 213:6 220:24 227:8 233:23,23 234:6 244:7,8 249:1 254:7 264:21,21 265:1 271:17 288:14 301:16 307:2 321:18 322:21 323:6 329:9,17 350:22

**maybe** 22:10 29:20 84:4

**136:9** 148:3 163:15 168:14 179:2 200:15 220:18 249:9 322:24 330:12

**mcfarland** 105:22

**mcgroder** 2:17 5:2,2 10:12,23 11:1,4,10,20 12:1 13:10,12 14:17 15:13 16:1,9,14,17,23 17:2,9,13,16,17,23 18:8 ,14 23:19 24:10 30:14 ,17 33:9 34:12 36:11,20 37:17 38:7,10 39:24 40:6,10,20,21 41:10,13 ,22 42:2 43:6 44:23 46:3 48:4 49:12 53:1,24 54:7 ,18 55:12 57:20,24 58:9 59:7 60:13,18 61:4 63:13,17 65:20 67:1,20 68:7,18 69:1,10 72:2,16 74:4,17 77:24 79:17,22 80:18 81:12 82:5 83:6 85:5 86:2 88:8,12,23 89:16 90:10,13 91:7 92:3,16 93:2,13 94:16 95:10 96:8,11,17 97:16 98:24 99:20 100:6,19 101:4 102:4 103:9 105:4 ,19 106:20 107:9,15,22 109:6 112:19 113:21 117:24 118:10,15 119:8 ,22 120:18 124:13 127:6 ,10,16,20 130:3,9,21 132:9 134:15,23 136:22 137:1,5,8,13 138:2,10 ,17 139:2,15 143:13,24 144:19 145:16 146:8 147:10,14 152:20,24 154:8,12 155:24 158:23 160:21 163:16 164:17 165:9,18 166:9 167:14 ,19 169:21 173:12 174:10,15 175:6 176:1 ,11 177:21 178:16 181:9 182:23 183:2 185:1,17 ,20 187:7 189:19,23 190:17 193:5,16 195:10 ,15 196:10,12 197:11 198:23 201:21 202:3,10 ,16 203:1,12 204:7,12 ,15,18,21 205:1 207:5 211:22 215:22 216:12 218:3 219:8,14,17 220:2 ,5,9,12 221:8 222:2 223:12,18 225:12 230:12 236:1,8,15 238:11,14,18 239:16,21 240:6,12 241:18,22 244:21 245:4,8 249:7,19

---

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

250:12,18,23 251:22
252:1 253:9,15 255:2,7
,12,16,21 256:6,14,17
257:4,13,21 258:3,9,13
,16 259:2,6,12,15 261:9
,17 262:8,13,20 265:18
266:7 268:10,22 270:16
271:6,13 273:23 274:15
,23 275:6,18 276:17,23
277:5,9 278:10,15,19
280:2,4,8,16 281:3,9,22
282:8,18 283:2 284:7
287:5 288:10 289:9,15
,17,21 290:1,9,12 291:1
,9 292:16 293:10,12,22
296:8,13 300:8,12
302:20 307:11,14
312:13 313:5,11 315:7
,22 316:14 319:12,15,19
320:11,22 322:1,4,15,19
323:8,15,18,24 324:7,10
325:12,15,22 326:19,23
327:2,13,19,23 329:7,12
,16,23 330:1 331:15
332:24 333:6,9,13,20
334:13 335:6 336:12
337:7,12,15,20 338:2,7
341:24 342:8 343:1,6
344:3 345:8,11,13,17
346:24 347:4,6,9 348:9
,11
**mcgroder's** 49:6 249:24
**mdl** 1:- 270:2 271:14
272:2 349:-
**mean** 7:22 11:1 14:18
19:17 24:11 29:11 40:17
41:1 42:18 44:4 59:4
60:14 63:20 64:6,7 69:3
73:4 75:21 80:7 83:4
89:1,20 92:4 97:17,23
110:14,20 111:8,10
125:14 126:4 127:11,17
128:2,5,18 134:17 137:1
,8 143:16 147:23 167:7
175:21 178:7 183:9
187:6 188:8 193:6
206:14 208:12 211:15
215:4 224:6 226:16
232:23 238:18 243:8
247:21 253:24 254:4
261:21 265:20 270:22
,24 271:7 275:20 280:4
287:6 299:18 307:15
321:20 322:20 323:24
327:19 329:16 342:12
**means** 58:14 88:20
110:16,21 122:16
145:14 150:19 167:8
192:18 208:15,15

342:15,15,19
**meant** 19:22 111:9 128:9
144:14 186:3 196:6
**measures** 199:11
**mechanism** 90:3,7,19
,21 91:14 141:4,20
310:1
**mechanisms** 92:12 93:9
,15
**mechanistic** 92:4
**media** 19:23
**medical** 12:9 77:10,11
79:15 80:14 81:16 82:12
88:5 172:7,8 200:16,17
210:8 231:11 236:18
237:1 238:2 251:20
273:13,13
**medication** 206:9,10,11
,12,13 213:4,10,17,17
,23,24,24 233:5,7,8
308:14,21,22,23,24
309:1
**medications** 214:3,14
242:5 346:1
**medicine** 50:24 77:21
78:12 211:20 237:7,11
263:24
**meeting** 108:9
**member** 51:3 78:11,14
209:23 213:8 214:14
273:12 277:17 303:13
**members** 78:20 225:1
**memory** 6:2 40:5 85:6
97:2 118:18,21 119:5
147:3 149:11,17 154:15
227:10
**mental** 310:6,7
**mentari** 108:14
**mention** 257:20 258:2
**mentioned** 257:17
**merely** 185:12 186:10
193:12 271:19
**merit** 262:4
**met** 5:15 44:2 67:17 87:2
100:23
**meta-analyses** 99:24
122:7 123:3 160:17
**meta-analysis** 111:21
112:14,16,21 116:16
121:1,22 122:18 154:17
161:23 163:10 181:15
191:21 192:11 248:4
252:23 318:17
**method** 13:19 99:7
121:1 306:14
**methodologic** 203:20
**methodological** 79:24
203:17 210:13 211:24
214:20 339:21

**methodologically**
140:23
**methodologies** 277:15
**methodology** 51:9 86:12
99:22,23 105:22 122:3
205:20 283:5 286:20
303:20 306:8,16 308:2
329:16
**methods** 82:18 85:14
318:16
**metric** 36:5
**mh078580** 262:3
**microsoft** 244:11
**mid** 310:9
**middle** 9:18 17:15 110:5
201:9
**military** 32:2 43:14
**million** 224:16 312:19
**mind** 19:22 54:5 68:2
107:13 115:18 139:17
146:2 153:11 179:18,19
231:21 244:15 247:22
252:9 266:17 331:12
**mine** 157:22 198:9
253:20
**minor** 27:14
**minus** 63:4 164:8 312:20
326:15
**minute** 226:21 259:17
,20 337:19
**minutes** 52:23 64:8
74:23 174:13 217:1
241:6 341:3
**miscellaneous** 341:5
**misleading** 240:2,4
277:10 280:10 281:10
313:1
**misread** 293:16
**misrepresented** 330:13
**miss** 16:23 23:19 40:6
,20 41:13,22 42:2 43:6
49:6 67:1,20 68:18
69:10 118:10 119:8
196:10 258:13,16 262:8
**missed** 250:5
**missing** 258:24 309:24
310:1
**misspoke** 100:11
**misstates** 96:12 144:20
197:12 276:18 292:17
330:1 336:13 344:3
**mistaken** 95:22
**misunderstood** 94:20
**mo** 2:18
**mode** 44:6
**model** 37:3 51:5 159:8
169:15 306:13 309:17
**modeling** 299:6 344:20
**models** 215:24

**modifications** 28:15
**modified** 289:8 307:5
**moment** 7:10 8:24 23:17
24:22 35:16 39:11 49:16
55:21 77:5 102:10 132:7
142:17 144:14 146:1
148:20 149:2 153:18
156:6 179:10 217:1
264:19 323:1
**money** 9:6 53:21 74:23
75:1 303:5,7
**monitoring** 82:21
**monopoly** 171:10
**monotherapy** 206:4,9
209:8,8 266:11 308:15
**month** 227:11 283:17
301:13 344:23 346:5
**monthly** 301:12
**months** 42:21,22 193:15
227:12 238:2 301:14
**mood** 242:8
**morning** 5:11,12 65:9
142:11 197:21 202:1
217:15 319:15,22 323:9
347:3
**mostly** 6:5
**motion** 271:16
**motivated** 222:21
**motivation** 218:13,19,20
,21 222:14,15
**move** 8:17 272:4 308:6
**mr** 2:-,7,- 3:- 4:16,19,23
,24 5:10 7:6 10:15,24
11:3,6,10,14,23 12:2
13:11,14 15:1,20 16:3
,12,15,19 17:6,10,14,20
,24 18:11,17,18 23:1
,19 24:19 27:22 30:15
31:1 33:10 34:14,16
36:15 37:6,20 38:8,12
39:7,23 40:3,15 41:6,12
45:11 46:7 48:6 49:15
52:22 53:3,11 54:2,12
,22 55:14,19 57:21 58:3
,13 59:8 60:16,21 61:7
63:14,22 65:21 66:1
67:10,14,19,21 68:9,11
,16 69:5,11,13 72:3 73:1
,19,22 74:6,21 76:14,17
78:3 79:19 80:2,22
81:14 82:7 83:8 85:10
88:11,16 89:10 90:1,12
,17 91:11 92:5,9,19 93:5
,19 94:21 95:13 96:16
,20 97:21 99:3 100:1,10
,21 101:6 102:8,11
103:1,12 104:7,14 105:7
106:1,21 107:12,19,23
109:8 112:23 113:22

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

115:12 118:3,8,10,17,22 120:1,20 124:5,15 127:9 ,12,19,22 130:5,11 131:1 132:13 133:6 134:19 135:6,19 136:23 137:3,6,11,17 138:6,11 ,21 139:4,7,17 143:21 144:7 145:6,20 146:17 147:12 148:7 150:2 152:14,21 153:7 154:11 ,24 155:9,12,13,15,16 ,19,22 156:3,5 159:1 161:3 164:1 165:3,14 166:1,12 167:17,21 170:4 173:14 174:12 175:1,10 176:3,6,15 177:24 178:20 181:10 182:20 183:6 185:2,19 186:2 187:15 189:20 190:16,19 193:7 194:1 195:13,19 196:15 197:18 199:14 201:5,24 202:7,13,18 203:4,15 204:10,14,16,20,23 205:7 207:8 212:5 216:5 ,16,24 217:10 219:1,12 ,16,22 220:4,7,10,15 221:11,19 222:4,6 223:14 224:1 225:11,13 230:13,18,20,22 231:15 236:4,23 238:12,16 239:4,18 240:3,8,14,18 ,20 241:20 242:1 244:23 245:5,10 249:14 250:4 ,15,19 251:2,18 252:2 253:10,17 255:5,10,14 ,18,23 256:10 257:1,6 ,19 258:1,5,12,21 259:4 ,7,13,16 260:3 261:12 ,23 262:18 265:21 266:8 268:15 269:4,15 270:21 271:10,21 274:2,20 275:2,11 276:12,19 277:1,7,11 278:5,11,17 ,20 280:3,6,7,11,21 281:5,17 282:2,10,22 283:9 284:19 286:7,11 287:9 288:11 289:13,16 ,19,23 290:7,10,14 291:3,13 292:19 293:11 ,12,14 294:4 296:12,15 300:1,11,14 303:1 307:13,16 313:2,7,20 315:11,20,24 316:9,17 319:14,18,23 320:1,19 321:3 322:2,7,16 323:2 ,17,23 324:4,9,14 325:14,17 326:1,21 327:1,4,14,21 328:1

329:11,14,18 330:16 332:16 333:4,8,12,14 334:8,20 335:11,18 336:16 337:10,13,18,23 338:4,10 341:4 342:3,9 343:3,8 344:10 345:10 ,12,14,22 347:2,5,8,10 348:-,5

**mrs** 262:20
**ms** 2:17 5:2 10:12,23 11:1,4,10,20 12:1 13:10 ,12 14:17 15:13 16:1,9 ,14,17 17:2,9,13,16,17 ,23 18:8,14 24:10 30:14 ,17 33:9 34:12 36:11,20 37:17 38:7,10 39:24 40:10,21 41:10 44:23 46:3 48:4 49:12 53:1,24 54:7,18 55:12 57:20,24 58:9 59:7 60:13,18 61:4 63:13,17 65:20 68:7 69:1 72:2,16 74:4,17 77:24 79:17,22 80:18 81:12 82:5 83:6 85:5 86:2 88:8,12,23 89:16 90:10,13 91:7 92:3,16 93:2,13 94:16 95:10 96:8,11,17 97:16 98:24 99:20 100:6,19 101:4 102:4 103:9 105:4,19 106:20 107:9,15,22 109:6 112:19 113:21 117:24 118:15 119:22 120:18 124:13 127:6,10 ,16,20 130:3,9,21 132:9 134:15,23 136:22 137:1 ,5,8,13 138:2,10,17 139:2,15 143:13,24 144:19 145:16 146:8 147:10,14 152:20,24 154:8,12 155:24 158:23 160:21 163:16 164:17 165:9,18 166:9 167:14 ,19 169:21 173:12 174:10,15 175:6 176:1 ,11 177:21 178:16 181:9 182:23 183:2 185:1,17 ,20 187:7 189:19,23 190:17 193:5,16 195:10 ,15 196:12 197:11 198:23 201:21 202:3,10 ,16 203:1,12 204:7,12 ,15,18,21 205:1 207:5 211:22 215:22 216:12 218:3 219:8,14,17 220:2 ,5,9,12 221:8 222:2 223:12,18 225:12 230:12 236:1,8,15 238:11,14,18 239:16,21

240:6,12 241:18,22 244:21 245:4,8 249:7,19 ,24 250:12,18,23 251:22 252:1 253:9,15 255:2,7 ,12,16,21 256:6,14,17 257:4,13,21 258:3,9 259:2,6,12,15 261:9,17 262:13 265:18 266:7 268:10,22 270:16 271:6 ,13 273:23 274:15,23 275:6,18 276:17,23 277:5,9 278:10,15,19 280:2,4,8,16 281:3,9,22 282:8,18 283:2 284:7 287:5 288:10 289:9,15 ,17,21 290:1,9,12 291:1 ,9 292:16 293:10,22 296:8,13 300:8,12 302:20 307:11,14 312:13 313:5,11 315:7 ,22 316:14 319:12,15,19 320:11,22 322:1,4,15,19 323:8,15,18,24 324:7,10 325:12,15,22 326:19,23 327:2,13,19,23 329:7,12 ,16,23 330:1 331:15 332:24 333:6,9,13,20 334:13 335:6 336:12 337:7,12,15,20 338:2,7 341:24 342:8 343:1,6 344:3 345:8,11,13,17 346:24 347:4,6,9
**mullins** 106:16
**multi-district** 4:17
**multiple** 112:22 135:5 151:20 158:12 160:2 309:15
**multiplicative** 172:17
**myself** 28:1 80:20 167:5 174:6 226:6 275:19 294:3
**mystery** 138:14 151:22

## N

**name** 4:1,13 12:23 47:23 68:12 87:20 101:4,19 269:16 302:9
**named** 49:19
**namely** 332:10
**national** 224:8 232:3 262:5 268:20 310:6
**nature** 26:24 70:12 255:6 272:24
**naval** 32:9,12
**navy** 32:7,11
**nda** 84:10,13 86:23 306:3 348:-
**nearing** 239:8
**necessarily** 119:6

131:19 164:20
**necessary** 57:6 117:9 131:17 169:8
**need** 6:8 18:9 56:23 86:10 102:11 106:8 122:20 133:7,9 183:7 186:15,18 202:8,13,14 ,17 221:9 239:16 258:21 271:10,11 308:1 311:16 338:5
**needed** 192:12 202:22
**needs** 53:4
**neighborhood** 200:14
**nervous** 206:13 213:7 ,15
**netherlands** 263:22
**neuralgia** 242:8
**neurology** 237:6
**neurontin** 1:- 4:6 6:14 20:9,22 21:1,24 22:1,7 49:8 66:12 75:4 76:6 87:12 90:9 93:20,24 96:6 97:14 114:14,19 136:5 138:13 148:17 149:1 162:6 165:8 196:9 223:3 239:24 271:3 277:4,14 286:3 292:6 310:21 317:9,16 321:13 322:5 328:3 335:23 348:18 349:-
**neuropathic** 126:23 127:4,7 171:24 173:17 185:15
ne 46:24ychcopharmacology
**neuroscience** 212:14
**new** 50:4 51:8 84:10 87:15 120:7 149:4 224:4 ,7 263:24 272:6 318:16 341:6
**newburgh** 2:8
**newer** 86:15
**news** 111:12
**newsy** 237:5
**next** 11:15 41:16 42:23 45:12 174:13 178:3 180:1 187:9 191:9 224:4 248:9 252:5 289:6 304:21 308:6 311:16 328:10,14,17,21
**nicolette** 1:10 4:9,20 269:17 270:1 349:-
**night** 65:11
**nine** 35:20 141:1,21 188:22 252:18 254:3
**no** 1:5,-,15 10:23 14:6,9 18:21 19:1,12 20:5,16 ,23 22:21 32:3,23 35:5 39:10 43:17,19 48:5 53:17 59:24 64:6,12

66:21 67:7 71:10 74:12
77:9,17 78:10,15 79:5
,13,16 80:11 85:21,22
88:7,14 89:6,22 90:5
95:18 102:9,10 106:2
110:11,21 112:1 113:24
115:3 116:7 120:10,19
,19,24 122:2 126:16
128:18 129:24 131:9
132:11 138:6 152:8,11
153:3 158:15 160:8
162:15 164:20 167:7,8
,16 175:6 176:22 177:24
181:1 182:23 183:22
190:15 194:18 196:10
200:4,19 206:10,10,12
208:5,6,14,15,15,21
210:3,9 211:21 213:4,14
,16,17,23,24,24 214:4,5
215:9 216:14,23 217:19
219:17 220:10 221:15
225:12 226:10 229:11
230:1,6,8 234:2 235:19
237:24 241:22,22
245:11 250:6,18 252:19
253:3,5 254:3 255:8
256:15 257:3,23 258:15
263:4,8 266:15 268:19
269:1 282:9 284:3,24
285:6,8,10,10,18 288:7
,9 290:1 291:3 292:7,14
,20 293:9,11,15,21
294:1,7,22 295:3,13
296:3,21 298:5 299:2,8
303:8,14 304:2 306:22
,22 308:14 309:4,24
310:20 311:5 312:17,18
313:8 314:19 317:14
319:10 320:22 322:1
327:4 329:2,7,11,11,24
333:8,12 334:15 336:12
337:3,13,13 341:6 345:4
348:8,-,-,10,-,11,12,-,13
,-,-,15,-,-,-,-,21,-,22,-
,23,- 349:5,- 350:4
**nobody** 216:19
**nomination** 78:19
**non-academically** 72:20
**non-argumentative**
255:17
**non-objectionable**
255:17
**non-placebo** 133:24
329:4 332:22 333:18
334:12 335:4 337:5
338:14
**non-randomized** 120:9
337:5 340:7
**non-resident** 212:16

**none** 62:23 118:20
195:16 214:1 248:18
**nonemployee** 76:1
**nonlitigation** 21:23
**nonprescription** 233:15
**nonrandomized** 128:8
**nonresponsive** 18:3
131:23 176:17 177:22
202:23 276:13 281:18
313:2 315:3 334:9 339:8
**nonspecific** 19:8
**noon** 139:10
**nor** 179:17 351:3,3
**northern** 199:19,21
**nos** 54:21 102:23 135:17
269:12
**notary** 1:21 349:- 351:10
**note** 8:20
**notes** 9:9 12:8 13:4
21:16
**nothing** 6:20 22:20
129:9 213:14 286:16
296:5 334:22
**notice** 1:18 7:8 106:14
270:1,2 302:12 348:8,23
**noticed** 144:24 301:8
**noticing** 128:5
**notified** 238:6,8
**notion** 221:3
**november** 23:13,23 24:8
,12,16,22 46:1,2 62:21
76:22,24 106:23,24
148:10,12 180:7 195:2
201:16 220:21 221:2,20
225:16 226:8,13 231:8
,10 235:13 281:19 282:4
283:19
**now's** 152:5
**null** 10:18,20,21 189:10
314:21
**number** 7:5 12:8,10
18:19,20 19:3,7 20:2,6
23:10 25:13,16 26:6,6
,15,16,17 27:21 31:11
47:12 53:6 55:22 56:1
65:23 76:13,16 102:16
,20 103:3,5,6 109:14
112:5 113:13 114:11,13
,15 116:17 119:14,15
122:20,21 124:4,9,22
125:12,16 128:19 129:6
,18,24 131:3,8,18 132:3
133:3 139:6 143:19,20
,23 144:3 145:10 148:6
150:15,15 154:6 155:21
156:17,21,24 157:2,10
159:12 162:9 166:5,6,7
168:6 169:1,3,4 171:10
174:18,22 175:2,12,18

177:7,12 178:4,10,11,14
,14,17,21 179:7,9
180:16,19 181:4,5,22
184:16 186:10,22 189:3
,16 190:2,4,22,24
191:20 201:4 205:24
206:1,20 211:6 217:4,8
221:18 227:23 237:22
243:9 260:1 291:18
301:3,4,18 304:10 311:9
316:3,7 318:22 321:21
327:5 328:7,12,18,21
329:5 332:10 335:23
336:1 337:1 339:11
340:22 347:12 348:6
**numbered** 24:23 242:16
**numbers** 25:17 31:3,16
88:3 92:24 115:15 119:2
133:14 140:21 144:5,5
,10,15,17 145:3,9,22
146:1,1 151:8,9,18
152:19 153:23,24 155:8
161:10,11 166:3 168:2,5
174:1 175:12 176:7
181:3,3,12,13 182:12
184:12,19 187:24
189:13 193:3 205:4,12
,15,18,23 206:15,23
209:14 213:18 215:17
248:21 311:23 325:1
326:3 327:7 330:8,11,12
332:8,19 339:16,24
**ny** 2:8

---

O

**oath** 5:5 349:15
**object** 14:17 16:1,9
18:14 24:10 30:14 33:9
34:12 36:11,20 37:17
38:7 39:24 40:10,21
41:10 44:23 46:3 48:4
49:12 53:24 54:7,18
57:20,24 58:9 59:7
60:13,18 61:4 63:17
68:7 69:1 72:2,16 74:4
,17 77:24 79:22 80:18
81:12 82:5 83:6 85:5
86:2 88:8,23 89:16,16
90:10 92:3 93:2,13
94:16 95:10 96:11 97:16
98:24 99:20 100:6,19
101:4 102:4 103:9 107:9
109:6 112:19 113:21
117:24 118:15 119:22
120:18 132:9 134:15,23
143:13,24 144:19
145:16 146:8 147:10,16
152:20,24 154:8 158:23
160:21 163:16 164:17

166:9 167:14,19 169:21
173:12 176:1,11 178:16
181:9 185:1,20 189:19
193:5 196:12 197:11
198:23 201:21 203:2,12
204:7 207:5 211:22
215:22 219:8,19 221:8
222:2 223:12,18 236:1,8
238:11,14 240:1 241:18
249:7 253:9,15 255:2,12
,15 256:6,18 257:13
261:9,17 262:13 265:18
266:7 268:22 270:16
271:6 273:23 274:15,23
275:6,18 276:17,23
277:7 278:10,15,19
280:7,8,16 282:18 283:2
284:7 287:5 288:10
289:10 292:16 293:22
296:8 300:8 302:20
307:11 312:13 316:14
320:11 329:7 331:15
333:4 337:7 338:8 344:3
346:24
**objected** 17:17 54:2
**objection** 11:20 13:12
16:17 17:2,12 18:1,2,2
38:10 63:13 79:17 91:7
92:16 96:17 105:4
127:10 130:3,21 131:23
165:9,18 175:6 176:17
177:22 178:2 189:19
202:8,11,14,15,22,22,23
204:18 205:1 216:12
218:3 220:2,4 239:17,18
240:6,10 249:19,21
250:12,23 251:22
256:14,18 258:9 273:22
276:13 281:3,9,18,22
282:8 290:3,13 291:1,9
313:2,5,11 315:3,7
319:12 320:22 322:19
329:14,23 332:24
333:20 334:9,13 336:12
339:8 341:24 345:8
**objectionable** 255:7
**objections** 202:2,21
257:21 258:3 277:12
333:5,7,11,16 335:6
**objects** 146:6
**obligation** 147:15
**obscure** 302:24
**observation** 233:12
**observations** 311:9
**observe** 189:9
**observed** 116:24 192:4
246:3,5 247:13 341:18
342:15 346:14
**obtain** 50:4 285:24

**obtained** 29:4,6 37:4 50:22,23 52:16 111:6 153:6 224:4,7 260:15 340:16 351:1
**obtaining** 40:7 306:3
**obviously** 340:24
**occasions** 163:1
**occur** 193:11 235:21 302:21
**occurred** 158:4 188:14 208:18 235:22
**occurrences** 193:11
**occurs** 188:19
**odd** 130:19 227:17
**odds** 99:18 100:3 110:8 ,14,17,19 112:11,14 113:1 114:12 115:16 116:4,16 117:21 118:13 119:1,2 120:13 121:17 140:22 143:11 144:18 153:14,15,16 154:16 156:8,10,11,15 157:6,8 158:21,22 159:2,3,9 160:18 161:1,16 180:13 181:11,14,17 182:2,5,5 ,11 183:15 191:16 246:16,17 252:20 254:10,10 261:7 265:3 311:11,18 312:3,4,11,12 ,16,24 313:3,8,15,17,19 314:2,3,13,21 315:5 326:11,14 339:23 341:14
**off** 12:22 17:22 33:14 41:2 53:6 95:1 102:16 103:2 104:7,10 107:14 108:1 115:11 116:12 132:16 150:1 154:23 155:20 174:18 194:21 216:10 217:4 230:11,12 253:22 259:22 269:5,7 301:5 315:24 316:3,5 319:24 347:10,12
**off-label** 175:18,22 176:8
**offhand** 179:2 211:8
**office** 32:9,12 67:4 259:14,14 291:20 351:6
**offices** 3:3
**oh** 12:1 255:19 333:9
**okay** 10:16 11:3 14:10 18:4 20:24 37:13 41:23 75:13 76:9 77:18 90:24 94:22 96:22 107:23 111:2 119:8 120:21 122:18 130:2,6 131:10 132:13 134:5 138:10 149:3,9,19 153:13 154:12 155:18,22

171:14 174:15 179:11 184:4 194:22 195:15 196:16 203:9 208:1 209:12 212:6 214:17 216:17,24 217:14 226:7 ,15,20 227:14 229:12 233:14 239:7 242:14 247:23 257:4 258:21 259:6,18,19 262:7 270:13 271:22 272:4,22 274:21 281:6 282:11,23 283:10,19 287:13 295:14 299:13 301:15 304:15 305:9 310:16 313:21 321:4 324:15 326:13 331:11 333:13 343:22 347:2
**old** 199:22,23 263:19
**omitted** 115:7
**on-drug** 163:9
**once** 67:17 68:4 85:9 188:14 230:16 338:18
**oncology** 82:14
**one** 5:14,17 8:17 11:15 12:15 15:14 21:7,10 22:10,11 23:5 24:5 27:16 28:24 29:12,14,15 ,17,19 35:11 39:23 44:18 48:9 50:8,13 53:22 54:24 56:18 60:24 69:5,23 70:5 80:24 83:18,22 86:20 87:16 91:24 92:21 93:3,3 94:1 ,11 95:1,23,23 96:1,2 98:3 101:1,15,21 102:7 ,14 114:17 115:2 116:12 117:19 122:21,22 123:14 124:13 128:4,5 133:7 134:22 136:11 137:24 141:18 144:10 148:12,15 151:14 154:6 156:7 157:3 158:4,12,15 ,16 159:14,17 160:10,14 163:12,13,18,24 164:19 165:15 169:12 176:2 182:5,6,13 184:20 186:20,21 187:13 188:19 189:5,24 194:13 ,13,19,21 195:4 196:3 203:17 206:3,7 209:3,4 212:1,14 213:22 220:19 225:9,12 229:6 230:24 234:10 236:9 237:13 251:8,12 254:19,21 256:1 260:12 261:1,21 263:4,15,16 264:5 265:2 ,6 266:11 267:15,24 268:4 269:22,24 276:9 279:16 287:10 290:19

,21 291:6,14 292:5 301:22 304:1 305:5 308:3,4 310:17 311:15 312:18 314:23 322:13 325:6 332:10 342:22 346:14,22 347:5
**one-fourth** 188:10
**ones** 10:9,10 33:16 78:22 79:1 168:23 207:18 280:14
**ongoing** 82:21
**online** 19:15 348:15
**onset** 232:20
**onto** 236:21
**open** 56:9,15 57:10 58:6 61:13 133:23 179:5,14 238:19
**opening** 55:10 59:3 62:20
**operated** 162:18,24
**operations** 34:11
**opine** 164:23
**opined** 345:4
**opinion** 30:22 88:18 89:14 96:6 97:14,17,24 98:18 101:1 102:1,7,9 110:6 161:12,15 184:2 251:9 262:1 278:12 310:17 311:17 336:19 ,23 340:22
**opinions** 13:4 50:5 106:7 108:6 239:24 249:10,12,16,22,22,23 ,24 250:1 270:14,18 271:2,9,11,14,17,23 275:24 276:3,15,21 277:2,5,13 278:7,14,16 ,17,22,23 279:23 280:9,13 ,17,22,23 281:1,7,11,14 282:5,24 283:1,4,5 286:2,5,18
**opportunity** 107:1 223:7 317:14 320:3
**opposed** 89:14 108:1 161:8 164:16 181:12 193:23 210:20 228:14 265:9 268:4
**opposing** 71:5
**opposite** 342:17
**order** 31:3 14:39 52:12 56:24 59:5 63:10 78:13 122:18 123:2 152:22 157:23 167:23 174:6 191:17 192:6,19
**ordinary** 147:7
**organization** 273:11
**origin** 250:7
**original** 25:23 58:11,21 61:13 73:19 111:6

210:12,14 212:2 244:9 305:12 318:21 329:21
**originally** 213:5
**originated** 249:17
**otherwise** 74:16 171:13
**ourselves** 8:10
**outcome** 83:12 351:4
**outlined** 220:20
**output** 62:9,23 63:5 205:9,16 299:18,18,19 ,22
**outputs** 205:11,13,14
**outside** 294:11 295:17 329:9
**overall** 34:8 112:14 117:2 119:16 121:6 122:12 146:8 154:20 157:17 158:18 161:6,21 168:18,23 177:14 181:17 182:1 190:3 334:6 343:20
**overbroad** 277:9
**overheads** 21:17
**overinterpreting** 314:17
**overlap** 93:10
**overlooked** 148:3
**overreaching** 237:4
**oversight** 273:15 274:22 275:3
**overview** 123:11 128:24 211:11,13,14
**overviews** 123:19
**own** 36:16 37:1 91:13 92:7 110:4 117:20 142:13 168:24 180:17 207:9 216:4,10 222:15 275:23 339:12 345:2
**owns** 36:17 37:15 52:7

| P |
| --- |

**p-a-n-d-e** 87:18
**p.c** 3:3
**p.m** 132:15,19 133:2 174:17,22 217:3,8 259:21,24 269:6,9 316:3 ,7 347:12,15 350:14
**package** 118:12,14
**page** 7:13 24:9,24 25:1 27:3 29:2 35:16,17,23 38:2,3 61:18 62:10 77:6 103:17 106:13 110:5,6 124:18 125:4 126:21 127:5 140:18 145:2 150:7 156:10 176:14 177:1,5 178:13 186:4 187:20 201:9 211:6 222:1 225:8 226:5 227:19,22 228:5 231:1,1 241:11,14 242:4,15

245:4,5,6,16 246:1
247:4 252:8,10,10
253:12,13 260:12
266:17,19,21 272:9,15
275:13 304:15,21 319:1
322:10,11 329:1 330:17
,19 331:8 342:8,10,22
343:2,14 346:9 348:-
**pages** 35:20,22 211:3
231:2 262:11 304:13
319:1 327:12 349:18
**paginated** 183:20
**paid** 9:6 19:22 37:23,24
41:17 75:2 76:1,5
229:23 230:4 239:13,22
249:17,22,23 250:8
274:4,8 275:23 276:2,14
,20,22 282:11,15,23,24
283:3
**pain** 126:23 127:4,7
170:15 171:24 173:17
185:15
**pande** 87:18
**panels** 162:22
**panic** 125:10 126:11
**paper** 13:17,23 22:5,9
,11,16,18 24:7,14,15,21
27:4,15 30:11,20 34:5
,17 45:22 46:21 47:19
48:12,15 59:6 62:22
110:4 111:19 138:24
196:2,18 197:9 201:2,7
,13,13,15 203:6,7,9,10
,14,18,19 210:11,18,20
,22 211:4,15 212:3,6,18
,23 215:10,13 216:4,8
217:12,16,21 218:21
220:22 222:16 224:23
225:7,20,24 226:20,24
227:6,15,16,17 228:13
229:16,24 230:7 234:10
235:23 236:6,16,17,18
,20 237:9,10,12 238:2,7
,9 239:3 240:22,24
241:3,16 242:3,20,21,24
244:2 245:1,6,17,23
247:17 248:19 249:4,11
,15 250:7,21 251:8,13
,16 252:4 254:2,11
256:4,5,13,23,24 257:10
258:6 260:7,8 262:10,19
263:6 265:1,8,12,13,22
267:15,21 268:8 272:7
281:16 284:12,14,16,22
285:14,16,19,21 286:1
288:13,16,18 289:6
292:3,6,10 294:2,9,11
,16 302:5 306:17 307:19
,23 308:6 348:22

**paper's** 225:16
**papers** 47:13 48:9 50:9
,13 54:16 109:18 198:16
200:11 231:23 251:10
263:9 264:3,12,17 265:2
267:4,12,22 269:3
274:10 288:5,9 289:8
310:12
**paperwork** 264:15
**paragraph** 110:6 145:2
180:12 183:18,20 184:1
,5 190:23 191:1,10,11
192:1 221:3 222:1,9
242:16 247:5,8 253:12
266:20 319:2
**paragraphs** 211:2
**parallel** 12:16 207:11
**parameters** 88:3,4,4
208:4,10,11,13
**pardon** 109:19 148:23
247:2 254:10 266:22
267:13
**parent/child** 237:3
**parentheses** 177:11
**parse** 130:8 132:2
**part** 34:8 39:4 48:23,24
50:1 63:16 70:8 108:1
121:11 134:3 135:8,10
143:18 150:21 161:19
200:20 203:19 205:9
212:1 214:12 218:14,19
,20 222:15 224:22 232:5
256:11 274:5,9 279:8,11
283:7 284:5 285:14,24
297:15 299:1 300:1
305:12 327:17,19,23
328:2 332:21 339:2
**part-time** 197:15 198:11
**partially** 55:22
**participants** 225:2
**participated** 32:11
111:15 251:11
**participating** 83:11
**participation** 222:21
316:21
**particular** 44:13 50:3
69:23 77:15,16 89:5
90:4 91:3 116:7 136:4
152:12 168:16 178:19
184:10 191:7 192:19
199:1 211:9 251:12,21
286:4 303:15 306:4,18
312:9
**particularly** 47:7 166:21
186:7 187:2 309:10,23
**parties** 351:3
**partners** 2:-
**party** 71:5 292:2 302:9
**pass** 237:12

**passage** 77:14 252:5
272:23
**passages** 252:14 262:9
263:5
**passed** 215:15 236:20
**past** 39:21 45:1,2 53:15
54:14 81:5 82:10 178:1
231:23
**patient** 29:24 30:2,6,7
79:11,11 80:14 81:5
88:3 114:2 125:23,24
126:4,7 134:20,21 155:7
157:7 172:10 178:3,5,8
,14,15,17,22 179:9
184:7,8,16,19,24 185:5
,16 186:15 188:10,15,17
,20,22 189:16 190:2,4
193:6,8,14,15,22 194:8
,8,16 232:16 238:4
268:9,12 304:16 323:20
341:10
**patient's** 80:15
**patients** 29:13,17 31:4,6
48:11 81:4,8 82:3 85:18
87:18,19 88:6 92:13
110:9 111:19,21 112:5,6
,9,18 113:10,23,24,24
114:1,14 115:17 116:5
,17 117:21 119:15
124:22 125:20,21 126:1
130:19 132:3 133:21,23
134:13,14 140:2,21
145:10 150:15,19,23
151:3 152:2 156:18
162:9 165:8 166:4,5,6,8
167:11,24 168:7,8 169:2
,3,5,14,15,16 170:9,11
,19 171:20,21,24 172:1
173:8,10 174:1 175:2,13
,19 176:8 177:3,7,10,15
,18 178:5,11 179:7
181:3,4,12,13 182:11
184:7,13,21,22 186:11
,22 189:3,14,17 191:1
193:4,6,23 218:11,12
232:13 234:4,5,9,11,14
,16 266:15,16,16 267:6
308:24 310:11 312:19
328:7,8,11,12,15,18,18
,21 337:1 348:19
**pause** 5:19 259:18,20
**pay** 155:16 229:15
239:19,21 240:4 273:21
302:2
**paying** 37:9
**payment** 41:19 49:9
229:19 261:15
**payments** 42:9 75:3
**peer** 238:2,20 239:1

276:5
**peers** 238:7,9 239:11
**pen** 211:5
**pending** 6:15 16:24
70:13 71:14
**people** 5:19 34:6 36:17
69:16,19 91:17 122:20
123:1 152:14 206:7
207:11 209:10 213:5,14
233:12,13 301:5 309:20
311:14,17 317:15
**per** 75:8 168:21 193:9
206:2 246:21
**percent** 163:9,15,20
164:8 177:14,17,20
192:4,5,17,18,20,22
246:5,7 248:3,6 311:10
,23 312:3 313:15,18
322:14,14 325:9,18,23
,23
**percentage** 177:3
**perform** 56:17 61:14
62:8 78:8 89:13 96:4
97:12 99:5,6 112:13
117:4,12 168:24 169:17
199:13 207:6,9 209:17
298:10
**performed** 49:11 61:16
85:24 97:13 99:23 100:2
,22 102:3 117:20 121:4
134:12 158:21 201:18
205:10 213:13 275:10
309:22
**performing** 61:19 80:3
85:8 88:21 97:7 99:24
102:2 203:21 307:24
**performs** 62:4
**perhaps** 60:7,24 136:8
138:23 145:8 166:2
172:1 201:15 264:23
294:14 330:12
**period** 186:21 187:1,10
,11 189:7,8 209:6
233:10,11,12 235:18
**person** 12:4 71:5 73:5
79:10 80:4,13 189:5
199:8 206:2,2,23 213:2
233:6 240:11 273:15
274:21 301:3,4 342:23
343:4,15,18
**person's** 80:10,16
**personal** 222:15 261:5
**personally** 93:18 95:17
318:2 350:8
**perspective** 165:21
333:15,17 335:2 339:21
,24 340:4
**pfizer** 1:5,-,13 4:10 5:3
7:22 8:8,12 20:8 39:14

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

41:9 42:5 52:18 53:13
,21 54:5,11 66:10 73:15
,16,18 75:2 76:3 87:7,14
,21 94:22 95:7 111:8,9
114:21 116:23 117:20
118:11,23 119:10,20
120:12 123:6 127:24
128:22,23 129:18 135:3
,8,9 144:21 145:17
148:16,24 152:13,17
155:1,3 166:22 168:6
169:2,4 185:11 186:8
196:10 223:11,17
229:12,15,23 230:3
239:13 244:1 247:3
249:18,22 250:9 251:6
260:16,19 261:1,20
273:21 274:8,12,18,19
275:16,17,20,21 277:20
278:7,13,23 279:2,3,7
,20 280:20,24 281:2,8
,12,13,21 282:7,11,12
,16 285:20 296:18 320:8
,15 321:8,13,19 324:2
331:12,17 333:2,24
337:4,9,16 348:-,- 349:5
,-,-
**pfizer's** 39:21 75:15
123:8,19,24 140:1
229:15 321:12 335:23
**ph.d** 1:17 4:14 5:6
199:17 348:- 349:-,-
350:8,10
**pharmaceutical** 69:21
70:6,19 72:10 73:24
74:1,15,19 82:24 86:19
,21 88:10,20 170:2
306:3
**pharmaceuticals** 54:17
86:22 251:7 275:16
**pharmacist** 78:23
200:18
**pharmaco** 40:20 62:15
**pharmaco--** 97:8
**pharmacoepidemiologic**
23:20,21,24 24:3 25:9
38:19,21 39:9 50:4 98:1
99:5 218:9
**ph** 30:12 40:8 98:11 **logica**
303:17
**ph** 303:16 **epidemiologis**
**ph** 303:21 **epidemiologis**
**pharmacoepidemiology**
38:17 45:23 48:1 49:10
,24 53:15 54:14 60:8
61:3 78:5 105:16 195:4
198:21 200:21 201:17
217:23 219:3,6,19 221:5
222:11 303:11

**pharmacologist** 78:24
**pharmacy** 211:19
**pharmetric** 197:16
**pharmetrics** 26:8 28:1,2
36:4,7,9,17,23 37:10
38:5,14 39:17 41:8
42:15 43:10,24 44:20
45:14 46:15,16,19 47:5
,21 48:16 49:7 52:1,7
53:19 57:8,17 75:21
81:3,7 98:12 197:22
198:22 200:6 201:18
205:5 210:16 216:2,8,18
,22 219:7 227:3,9 229:3
,14 231:19 233:15
235:17 260:15,19
261:15 281:15 287:7
301:11 302:3 304:3
305:14 307:4
**phase** 120:8 340:7
**phenomena** 232:18
**phenomenon** 171:2
**phobia** 125:10 126:11
**phone** 263:1
**photographs** 9:13
**photos** 9:10
**phrase** 28:11 43:13
120:17 252:7,15
**phrased** 190:5 265:2
**physically** 29:4 42:14
**physician** 234:17
**pick** 41:23 269:20 347:3
**picking** 136:19
**piece** 129:24 130:18
150:16 153:14
**pierdzioch** 3:- 4:2
**pills** 232:12
**pilot** 43:16 262:6
**pin** 40:16
**place** 50:7 67:3 81:8,19
,23,24 254:7 268:6
287:19
**placebo** 87:19 111:16
114:5,18,22 115:9 117:1
,17 119:12,14 124:23,23
125:18,20,24 128:7
129:3 133:21 134:1
135:1,12 141:13 143:6
144:4 145:11 146:3
152:1 156:12,18 157:2,3
158:4,14 161:9 183:23
184:10,23 186:15
187:23 188:4 191:19,24
192:5 242:12 248:14
254:11 279:12 311:15
312:18 314:24 324:24
325:6 327:8 328:8,12,15
,19,22 329:2 330:5,15
332:2,9,12 334:10 335:3

,14,16 336:21 338:15,17
,18 339:4,10 340:12,14
341:11,20 342:12
343:11 346:18
**placebos** 150:24
**placed** 283:13
**places** 228:10
**plain** 141:18
**plaintiff** 286:4
**plaintiffs** 1:11,17 2:15
4:17,18,21,23 7:1 9:10
12:4 14:20 349:-
**plan** 84:18,22 85:8,12,19
273:7 303:24 305:17,19
,22 306:1,2,6 309:6
**planned** 306:20
**plans** 84:19
**play** 190:16 195:7 226:7
234:7
**please** 4:15 5:21 7:16
14:16 18:3,22 55:2 64:3
,19 65:2 66:3,5 77:2
82:9 104:19 106:3,5
108:4,12 120:4 121:20
122:17 131:4 133:19
176:17 193:18 201:6
202:18 208:22 219:16
241:15,21 242:2 243:21
244:16 245:22 246:14
247:21 267:19 272:13
277:7 280:3 327:11
329:18 345:23
**plot** 315:15
**plus** 164:8 181:6,6
312:20 339:5
**point** 13:18 47:10 69:5
74:9 75:2 89:11 110:16
116:12 152:5 176:17
179:15 183:14 187:18
245:15 250:5 275:12
302:22 309:4 313:9
314:10,12,22,24 315:4,5
,13,17 330:17 335:21
341:6,21 343:17
**pointed** 188:7 193:10
249:6
**points** 160:14 182:10
**poisoning** 228:7
**poisson** 215:24 299:6
,10 309:16
**policy** 72:14,18 303:8
**polish** 326:16
**pool** 141:2,10,22
**pooled** 93:1 99:18
151:14 161:17,20 182:1
206:5
**pooling** 93:6 99:16
112:15 159:13 181:17
**population** 162:2 171:6

,11 173:20 189:18
263:16,18,19
**populations** 167:3 267:9
**portion** 188:2 334:5
**posed** 183:18
**posing** 194:22
**position** 73:8 79:7
164:15 167:6 210:1
**positions** 198:10
**positive** 331:5 336:6
**possession** 20:21 305:7
**possibility** 141:14
**possible** 51:18 122:11
147:23 155:7 164:10
337:4
**post** 19:15,15 208:5,6,14
,15
**post-mantel-hansel**
182:7
**postulate** 191:7
**pot** 159:14
**potential** 68:12,13 89:20
284:18 302:8
**potentially** 302:10
312:24
**power** 85:15 86:10 87:1
186:24 191:3,5 192:17
,18 193:22 194:7 311:10
**powered** 186:12
**powerpoint** 348:-
**powers** 348:21
**practice** 77:15,21 78:5,7
147:7,13,15 284:24
285:1 288:9
**practices** 1:3 349:3
**pre-drug** 208:6,7
**pre-fda** 136:16 140:12
**preamble** 49:13 91:1
273:24
**preceded** 27:9
**preceding** 176:2
**precise** 12:23 168:5
169:10 311:23
**precisely** 40:16 146:19
149:6
**predated** 212:4 264:13
**predicted** 128:15
**predicting** 116:14
**prefer** 220:17
**preferred** 340:14
**pregabealin** 140:3 141:1
,9,14,19 142:19 348:20
**premiere** 237:18
**preparation** 27:15 80:17
299:9
**preparatory** 228:18,21
229:1 267:23
**prepare** 305:24 306:2
307:9

**prepared** 203:22 204:3,9 340:19
**preparing** 296:19 334:3
**prescribe** 79:7
**prescribed** 169:18 232:12 233:7
**prescribing** 72:22
**prescription** 30:3 52:5,8 93:21 232:11
**prescriptions** 51:12 208:18 263:21
**presence** 88:19 160:23 161:13 169:18 214:13 294:12 332:14
**present** 3:- 28:17 152:13 ,14,15 157:22 158:13 270:14
**presentation** 21:17 22:13 108:16,18 118:9
**presentations** 21:23
**presented** 22:10 46:23 121:6 177:1 278:8
**prespecified** 273:7
**presumably** 62:11 138:13
**pretreatment** 266:14
**pretty** 33:5 183:17 188:3 222:13 261:7 321:1 340:9 343:21
**prevent** 202:20
**prevention** 51:1,4
**previous** 53:23 176:20 192:1 249:21 274:7
**previously** 21:16 49:6
**primarily** 41:13 224:18 297:14
**primary** 99:7 121:1,16 162:1 210:6 214:10 275:7 309:2 321:10
**principal** 225:6 275:8
**print** 19:22 288:3
**printed** 137:22 247:17 272:24
**printouts** 288:5
**prior** 29:14,18 50:3 52:17 56:12 133:16 197:12 234:13 262:21 277:14,18 283:6,19 308:22 346:6
**priority** 186:6
**privilege** 18:3
**privileges** 77:15
**probabilities** 312:16 314:2
**probability** 140:10 190:14 252:22 314:7,13 ,14,20 315:4,6,14,16,17
**probably** 38:13 48:7 63:3 65:7 76:12 86:15

,24 96:21 102:11 138:17 140:16 146:18 154:22 161:4 171:14,22 172:6 182:13 183:17 187:4 188:3 194:3 197:1 200:14,15 203:14 212:8 224:3 226:2 227:3 230:2 ,13 232:6 234:15 237:21 239:8 240:18 283:17 297:2 302:7 304:12 305:7 310:9 311:7 326:5
**problem** 65:11 106:2 122:19 163:2 169:19 201:24 216:7 220:16
**problems** 277:16
**procedure** 1:19 240:13 350:18
**procedures** 33:23
**proceeding** 12:16
**process** 27:13 28:13 218:16 234:8 238:20 239:8 285:15
**processing** 243:18 244:19 249:2 254:19,22
**processor** 242:19
**produce** 7:12 14:15 15:6 ,18 55:4 62:14 136:23 147:16 162:19 209:14 299:17
**produced** 14:1,22 15:3 111:3 136:20 138:3,7 164:22
**product** 4:18 34:8 62:12 65:5 70:19,21 71:19 83:1 88:20
**production** 290:5 345:14
**products** 1:- 4:7 6:17 7:2 69:22 70:6 85:23 88:10 98:18 267:7 349:-
**profession** 77:15
**professional** 251:9
**professionals** 230:14,15
**professor** 35:13 200:2 209:21
**proficient** 199:3
**program** 33:8,20 34:2,11 35:3 56:9,13,21 57:3 197:7 216:9 244:19 249:2 254:19,22 297:20
**programs** 34:7 36:6 297:11,13,16,24 298:2,3 ,5,8,22 299:4,7,11 307:7 308:3,7,9,10,13 309:5
**project** 64:5,7 83:4,22 198:20 200:6 210:10 222:19 226:23 232:4 295:9 306:1
**projects** 34:1 86:7 200:8

262:6 306:5
**prolonging** 150:5
**promise** 31:14,22
**promising** 262:5
**promptly** 197:23
**proper** 171:8
**properly** 113:3,5,6,7
**properties** 4:7
**proportion** 116:22 168:5
**proposal** 25:23 84:22 304:3,5 305:13 307:3
**propose** 221:3 269:4
**proposed** 39:13,22
**proposition** 335:1
**proprietary** 36:8
**prosecuting** 72:22
**prospective** 83:2 85:3 86:1 310:2
**prospectively** 310:15
**protected** 44:6
**protective** 265:9,16 266:4,23 267:8
**protocol** 87:22 88:1 273:6
**provide** 11:8 27:7 45:13 52:8 64:2,11,19,23 65:1 114:6 119:9 122:12 125:8,12 129:10 167:1 176:12,13,19 181:16 240:7 243:19 317:5
**provided** 7:7,20,21,22 ,22 9:24 11:16,17 13:5 ,16 19:5 21:19 23:3 25:2 26:6,15 46:10 52:13 55:11,18 63:9 67:24 86:18 103:7 107:16 108:16 113:14,16 123:11 136:11 137:19 141:17 142:4 167:16 175:8,8,17 179:1 205:3 ,18 273:19 279:20 280:19 285:20 287:1 298:13 304:22 321:8 345:3
**provides** 205:9 240:9
**providing** 45:19 118:13 150:3 239:23 307:6
**psychiatric** 82:14 94:6 ,13,15 168:22 170:13 172:1,8,14 176:23 177:4,7,10 178:23 179:8 235:2,8,9
**psychiatrist** 78:23 200:17 212:12
**psychiatry** 86:8 125:5,9 126:18 236:20,21 237:2 ,7,15,18,19,20,21 243:5 260:6 283:14 285:22
**psychobiology** 310:8

**psychological** 80:3,9
**psychologist** 78:23 200:18
**psychotherapy** 233:18 ,19
**public** 1:21 349:- 351:10
**publication** 15:17 16:24 19:15 27:10,12 28:4,8 ,14 30:20 237:16 258:18 267:6 285:17 289:12 290:5
**publications** 19:19 236:6 261:14
**publish** 243:14
**published** 46:22 47:12 108:8,22 109:3 243:12 251:9 263:23 265:2,5 269:2 274:9 276:5 285:21 310:12 338:19 346:2
**pull** 272:7 304:8 335:21 342:4
**purchase** 28:2 36:23 38:13 52:19
**purchased** 38:15
**pure** 320:10,14,20,20 321:1
**purely** 340:14
**purpose** 24:17 28:2 35:6 39:18 160:1 202:19 239:2 259:5 334:4
**purposes** 117:11 154:2 286:23
**pursuant** 1:18,18 15:19 107:17 205:19 350:17
**pursue** 49:3
**pursuing** 256:1
**push** 43:2
**pushed** 135:24
**put** 109:3 116:21 138:19 167:5 190:1 222:22 339:20
**putative** 286:21
**putting** 290:2 305:16

---

**Q**

---

**quality** 268:17
**question** 5:22,23,23 6:3 8:3,17 9:19 13:11,13,15 14:18 16:1,9,13,16 17:6 ,7,16,18 18:12,15,17 20:11 21:18 30:18 31:2 ,10 35:15 36:14 41:8,16 42:6,13 45:12 49:5,13 54:1,8 58:4 59:18 60:20 61:10 62:19 63:18,21 64:10 76:9,10 77:19 80:7 81:1 83:7 88:24 89:17,19 90:16 96:8,19

97:19,23 98:5 99:1
100:15 101:2,17 111:23
113:8 119:19 121:19
130:7,13 131:5 144:23
145:7,19 146:5 147:11
,17 152:4,12 153:20,22
154:2 157:5,6 160:23
163:23 165:6 168:9
169:16,23 170:17
171:23 172:15,22 173:1
174:3,6,13 175:16 176:2
,5 177:23 178:3 179:5,7
,14,18,23 180:5 182:17
,18 183:7,20 184:2,4,6
,18 185:18 186:13,16
187:9 188:18,23 189:9
,21 190:1,5,7,9,18
193:18,21 194:23
197:13,20 202:3,5 203:3
204:13,22 208:1 212:9
218:5,11 219:12,24
222:3 235:16 238:22,24
239:1,5,17 240:1 241:19
,24 247:22 249:1 250:6
,6,20 255:16,17,21,24
256:15,18,21 257:5,7
260:11 262:14 265:8
268:23 273:24 275:1
280:5 286:9 290:20
296:9,11,14,16 300:12
306:17 319:21 324:5,6
331:11 332:18 334:16
,21 337:9,16 338:12
340:6 342:21 343:7,9
345:9,11,12
**questioning** 289:10
**questions** 4:21 6:14,23
11:11,13 16:4 34:23
36:2 39:20 46:14 74:23
76:11 80:23 91:19
126:10 140:20 155:4
173:23 178:1 179:20
180:11 184:6 194:21
198:5 209:19 220:6,13
232:15 239:6 272:6
273:3 309:24 319:15
329:9 341:5
**quick** 5:18 78:22,24
106:14 110:5 115:19
270:10
**quickly** 8:1,15 54:3
103:4 149:21 318:20
**quite** 71:1 129:13,15
130:12 182:2 198:18
199:5 211:10 216:4
218:8 222:20 225:4
229:23 308:12
**quotation** 256:22
**quotations** 257:9,11

**quotes** 240:22 248:21

**R**

**r56** 262:3
**race** 51:7,17
**raises** 184:5
**random** 82:1,2 83:2,11
86:1 87:17 111:24
114:22 117:13,22
120:14 129:7 133:22
134:20 150:20,24 151:4
162:7,20 166:4 167:12
168:1,6 175:3,20 176:8
186:11 189:12
**randomized** 82:13,23
86:4 88:9 111:16 114:19
119:12 124:23 125:17
129:3 135:2,12 151:5
169:2,4 184:13 189:21
190:7 234:4,6,19 242:13
279:12 310:22 311:2
327:7,8 332:3,12 335:16
336:21 340:8,10,11
**rang** 148:2
**rare** 224:11 312:23
**rarely** 69:17
**rarity** 312:22
**rate** 126:15 131:16 170:6
,7,8 171:2,3,6,11 172:13
173:8,10 191:23 234:13
343:20
**rates** 50:21 51:8,16 52:5
,8 131:22 171:14,17,19
172:3,7,9,18 173:6,18
206:2 263:15,21 266:13
,14,15
**rather** 76:22 92:14
138:24 139:19,20
227:16 266:5 267:8
273:9
**ratio** 110:8,14,17,19
112:11,15 113:1 114:12
115:16 116:4 117:21
118:13 121:17 140:22
143:12 144:18 153:15
,16,16 154:16 156:8,12
,15 157:6,9 158:22,22
159:2,4,10 160:18 161:1
,16 178:18 180:13
181:11,14,17 182:2,5,11
183:15 191:16 246:16
,18 252:20 254:10,10
311:11,18 312:4,11,12
,16,24 313:4,9,16,17,19
314:3,13,21 315:5
326:11,14 339:23
343:20
**ratios** 99:18,18 100:3
116:16 119:1,2 120:13

156:10 182:5 265:3,4
314:2 341:14
**raw** 117:7,8 273:5
**rcts** 117:18 123:9 152:2
191:2 242:13
**rd** 246:19
**rdg** 262:3
**re** 1:- 4:6 349:-
**reach** 115:15 181:21
**reached** 180:12 181:22
265:7
**reaching** 279:14
**read** 8:4,10 18:23 19:3
22:22 23:17 56:2,9,12
,13 57:1 58:20 60:3,16
61:12,13 69:15 71:19
72:1 80:14 81:4 95:15
,19,24 96:8,10 97:4
99:21 101:7,10,17,21,21
113:19 118:5 120:22
133:8 143:1,23 146:15
150:10 178:12,13
182:19 183:5 203:10
214:8 241:6,15,21 242:2
243:11 245:21 246:13
,14 247:21 252:14 256:3
257:9 261:14 272:13,16
,22 273:18 330:24 331:3
,5,8 338:22 349:17
350:19
**reading** 8:6 18:19 19:14
32:4 96:1 97:3 121:14
126:1,11 146:21 149:17
154:13 211:4 218:14
221:1,2 228:5 266:18,19
350:15,21
**real** 8:1 274:18 303:23
311:16 342:21
**realistically** 301:19
**really** 25:13 28:16 31:15
36:6 39:12 69:14 73:5
74:8 94:1,8,9 101:11
122:4 123:2,4 128:4
132:7 142:1 149:19
156:1 162:14 164:12
167:5 168:10 189:6
190:5 199:5 203:24
215:4 217:21 218:14,20
,22 222:21 232:12
237:10 239:11 269:22
297:4 308:15 315:9
316:11 326:6 339:18
340:19 342:17
**reanalysis** 115:23 116:9
**reanalyze** 122:10
**reason** 6:8 38:9 41:24
50:4 67:9 97:6,10
100:16 107:23 162:15
164:19,20,23 165:2

230:3,6,8 285:10 295:21
303:15 304:11 318:12
350:24
**reasonable** 8:7 14:11
15:6 46:11 171:7 191:18
321:2 329:12
**reasonably** 149:12
**recall** 8:20,22 9:19,20
12:19,20,22 20:18 32:4
,5,6 34:17 35:21 38:3
41:14 42:8,16,24 45:17
47:12,17,23 48:9 49:18
,20 50:8 68:23 69:12
72:12 74:7 83:11,16
84:15 85:11 96:3 97:5
100:24 102:1 109:2,9,10
114:10 116:6,8,12 118:1
,9,14,23 120:4 123:7
127:2 128:1,16 136:13
141:11 146:23 147:1
148:20,22 154:3 158:5
159:2 160:14 168:5
178:12 180:14 181:23
182:4 197:2 198:3
210:21 212:24 214:17
227:7 232:19,21 249:8
257:15 263:13 265:6
267:22 268:2 283:15
288:14 322:20
**recap** 240:15
**receipt** 57:17
**receive** 30:2 42:14
146:21 216:22 234:22
**received** 26:8 32:12,24
33:2,6 42:9 43:1,3,10
52:18 59:21 73:10 76:4
114:2,3 130:17 136:6,15
138:23 147:6,9,19,21
180:22 195:1 197:22
224:8 227:4 230:8
237:23 263:8 302:6
321:15 322:23 330:4,6
,14 336:22 338:16
340:17,18
**receiving** 37:10 42:2,4
43:23 129:7 180:6
**recent** 28:19 66:16 96:2
106:18
**receptor** 91:5
**recess** 43:8 53:4,8
102:18 104:11 174:20
217:6 259:23 269:8
**recessed** 132:18 139:10
**recognition** 32:5
**recollect** 98:15 153:14
164:2 184:19
**recollection** 96:23 163:5
165:15 166:18 185:3,4
197:22

**recommend** 88:2
**recommendation** 85:13
214:20,21
**recommendations**
214:7 317:2
**recommended** 213:21
214:18
**recommending** 88:1
**reconcile** 153:4
**reconciled** 153:11
**reconstruct** 68:3
**record** 4:15 18:4 23:6
29:10 43:7 53:7,10
75:13,16 79:7 80:9,14
96:10 102:17,21 103:2
104:10,13 105:19
115:11 118:16 132:16
133:4 137:9 139:16,23
150:1 154:23 156:1,2,6
174:19,23 182:19 183:2
,5 186:3 195:10 217:5,9
241:7,15,21 242:2
245:21 246:15 252:14
259:22 260:2 269:5,7,10
270:3 272:16 290:3
315:24 316:4,5,8 319:24
326:20,22 327:3 347:13
350:11
**records** 9:9 12:8 13:4
**recover** 323:14
**recreate** 151:18
**reduced** 233:22
**reduction** 266:13
**redundant** 25:16 26:17
265:5
**refer** 21:4 29:22 219:18
220:18 284:21
**reference** 23:16,18
24:13 104:22 106:14
110:5 115:20 133:13
251:14,15
**referenced** 195:23
251:15
**references** 24:6 27:3
196:4 285:4
**referral** 20:3
**referred** 24:8,15 198:8
254:4 260:21 284:11
**referring** 62:6 116:3
121:24 145:9 151:10
166:10 260:12,23
282:19 298:6,7 304:13
**refers** 156:23 201:9
**reflect** 75:24 190:20
**reflected** 144:18 180:12
217:16 241:3
**reflecting** 20:2 76:5
268:21
**reflects** 150:15 331:18

**regard** 26:11 50:6 103:7
199:5
**regarding** 13:23 19:9
20:21 21:24 22:24 23:20
,23 24:21 25:8 28:1
66:23 68:2 82:11 98:20
104:4 116:23 129:18
148:17 149:1 254:9
267:6
**regardless** 169:17 193:3
**regards** 265:17
**regression** 215:24
299:10 309:17
**regular** 326:16,17
**regulatory** 27:7,12,15
93:24 333:1 337:8,11,16
338:12
**reimburse** 303:6
**reimbursed** 41:19,21
49:7,9 229:13
**reimbursement** 260:18
261:4
**reiterate** 249:12
**reiterated** 241:3 326:3
**reject** 189:10
**rejection** 314:20
**relate** 300:12
**related** 22:1,6 26:9 66:7
67:22 72:20,23 73:18,21
86:21 140:1 142:18
149:7,14 224:19 230:7
246:8 248:6 251:12
261:21 267:17 283:5
286:20 306:8 348:19
351:3
**relates** 249:21 300:15
**relating** 9:6,10 13:4 20:7
22:24 38:18 263:12,12
**relationship** 16:24 20:3
47:7 49:2 50:20 51:7
68:11 89:1 201:7 229:17
236:24 237:4 265:23
275:21,24 276:3 279:17
286:9,21 301:2
**relationships** 20:6
**relative** 143:6 145:1
183:23 184:9 186:14
191:20 234:17,22
248:14 266:14 270:19
294:14 311:11 326:9
339:23 341:14
**relatively** 77:3 188:4
**release** 166:16
**released** 98:7 123:2
235:22
**relevance** 89:8
**relevant** 212:19
**reliable** 140:24
**reliably** 189:10

**relied** 12:12 45:20 50:1
127:18 141:8 299:4
336:19
**reluctant** 166:16
**rely** 91:16 92:8 93:16
127:23 336:22 340:21
,23
**relying** 299:12
**remainder** 56:5
**remaining** 161:21 253:3
**remember** 22:4 40:23
41:5 49:17 68:20 69:14
70:22 83:18 85:16 96:1
123:10,12 133:18
135:14,14 142:1,7
146:13 151:15 153:13
168:1 179:1 181:24
182:2,14 183:10 211:8
214:8 215:5,6,7 224:12
225:19 227:2 238:5
244:4 258:11,20 261:10
279:9,10 290:24 300:24
323:1,5,12
**remembers** 96:13
**remind** 71:18 252:8
308:1
**reminded** 133:7,9
**reminiscent** 55:18
**remove** 334:5
**removed** 151:17 332:5,6
**render** 79:12 88:18
89:13
**rendered** 121:5 279:23
**repeat** 60:19 90:15
96:18 111:23 145:18
176:4 188:18 296:10
312:6
**repeated** 315:10
**repetition** 312:9
**replicate** 123:3 126:10
180:16 182:8,10 185:7
207:20,22 307:20
**replicated** 207:12
**replow** 319:16
**reply** 237:23
**report** 23:22 24:16,18,22
27:4 30:23 45:24,24
51:6 59:6 62:21 76:22
95:15 99:10,13 103:6,10
,22 104:20,23 107:17
108:6 110:15 113:3
115:5,13,16,22 116:11
133:10,12 136:7,10
140:5 148:11,12 154:14
163:17,19 166:18,19
175:8 178:24 180:3,6,8
181:20 183:19 185:7
187:21 190:9,9,11
191:12 194:24 195:2,4,8

,17,21 197:9 201:1,16
218:15 220:21 221:2,9
,20 225:8 226:9,12
229:20 231:8,10,11
235:13 239:14,22 240:5
,23,24 241:4,12 242:15
,23 244:1 245:7 247:3
248:12,22 249:3,13,17
250:2,11,22 251:14,17
,21 253:6,11,24 254:12
256:3,13 257:2,12,12,17
258:6 262:11 263:7
267:1 271:17 272:1
278:6 281:16,19 282:3,4
,5 283:20 284:5,11,11
,13,14,22,22 285:4,5
292:10,23 302:5 321:17
325:21 326:4,24 329:21
330:8,10 339:22 340:19
,21 348:10,-,-
**report's** 225:16
**reported** 129:1 181:3
320:18
**reporter** 350:4
**reporting** 264:1
**reports** 12:9 13:3 34:5
45:19 60:17 62:15,17
71:11 80:1 101:8,18
105:9 111:7 119:4
126:16 133:16 143:11
144:6 157:11 181:5
182:14 195:12 222:11
246:8 248:7 264:20,23
265:5 271:15,18 279:1,8
286:6 296:18 311:2
**represent** 4:17 19:21
118:4,6 137:17 168:8
189:7 270:13 327:16
**representatives** 152:13
**represented** 296:4 327:7
329:19 343:2
**representing** 4:20 68:5
73:16,18 74:1,19 269:17
274:17
**represents** 177:13
**reprinting** 59:4
**reproduce** 63:7 151:21
181:19
**reproduced** 63:2
**reproducible** 13:20 45:6
**reproducing** 244:15
**request** 15:7,8 38:5
42:19 45:21 65:8,18
70:4 73:14,15,24 84:7
135:11 136:19 138:8
162:16 244:21 259:4
279:10 280:20 317:19
,23 318:4 334:1 337:17
**requested** 8:19 23:19

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

25:5 96:10 114:21 134:1
182:19 183:5 330:22
331:22 333:24 334:2,3
340:14
**requesting** 11:8 14:21
16:5 37:8 162:12 242:11
304:4
**requests** 24:21 69:20
72:9,15 235:2 317:22
318:17,19
**require** 17:20 18:1 33:8
56:9,13,21
**required** 7:12 34:2 78:13
180:20 207:3
**requirement** 335:13
**requires** 160:5
**rerunning** 63:7
**research** 32:9,13 54:15
80:1 86:6 95:8 200:2
262:6 273:11,14 306:9
345:2
**researching** 200:5
**resident** 212:16
**resolved** 301:7
**resort** 57:23
**respect** 22:9 145:1
185:18 206:11,12 209:8
235:4,5 292:3,5,8,10,21
294:8,11,21 295:15
296:6 300:17,18 317:9
,10,11
**respectfully** 131:23
**respond** 14:20
**responding** 255:5
**response** 45:20 137:18
138:8 318:19 324:11
334:1 348:-
**responses** 288:20
**responsibilities** 200:3
**responsibility** 272:19
273:20
**responsible** 211:9 212:1
**rest** 131:12 212:21
248:23
**restating** 100:12 121:18
**restrict** 98:4 206:6
**restricted** 186:19 192:14
339:5
**resubmit** 283:22
**result** 12:19 13:19 82:20
86:13 117:2 159:7
161:21 183:13
**resulted** 54:16 226:24
**results** 87:3 112:1
119:16 121:6 158:18
163:23 193:2 207:12
210:18 212:20 215:15
252:22 264:22 266:11
,12 278:4 287:24 301:21

308:5
**resume** 6:5 32:4
**resumed** 133:5
**retained** 49:18 66:10
68:24 95:23,24 278:13
281:2,8,20 282:7,12
**retainer** 75:6
**retention** 25:13 66:6
**retrievable** 14:5
**retrieve** 243:19
**retrospective** 81:10 85:4
**retrospectively** 311:1
**return** 196:21
**reveal** 252:23 266:11
**revealed** 98:19 161:7
**reverse** 326:16
**review** 27:12 28:5,7,9,13
91:22 92:22 96:5 97:1
99:6,15 101:13 102:3
107:8 108:7,21 109:20
,24 111:17 120:22,22
121:5,14 129:8 133:15
,17 134:13 136:17 150:8
,10 151:11 152:7,10
153:21 156:9 157:12
177:6 180:7 186:4
194:10 195:1 212:19
238:20 279:7 280:19
288:2 316:12 317:1
319:8 320:3 321:5,8
338:19 348:17
**reviewed** 26:12 82:21
99:7,10 137:19 138:9
165:13 222:5 238:2
276:5 278:7 279:1,10
283:7 286:23 287:4
319:10 329:20 330:3
335:22
**reviewers** 239:2
**reviewing** 100:24 108:7
146:13 210:18 239:3
282:16 291:22
**reviews** 26:10
**rewrites** 210:24
**ridiculous** 222:3
**right** 6:2 12:8 19:7 21:5
23:7,16 25:7,15 26:14
27:17,19 28:6,23 29:9
31:10 34:17 36:2 37:21
40:4 48:7 52:14,22
56:18 57:12 60:1,11
64:1,5 68:3 69:12 70:18
72:4 73:13,23 77:5 78:4
,16 80:13 81:18,21
88:17 91:12,18 92:10
93:6 94:11 101:10 105:3
106:12 107:11 108:19
109:22 110:2 112:9,24
113:9 114:10 116:8,14

119:5 120:17 123:23
125:2,7 126:9 127:19
128:3 129:5 136:2
138:18,24 139:18 148:1
150:13 153:18 159:7
161:9 165:23 167:9
169:10,13 170:7 175:24
178:21 182:3,14 188:6
190:23 203:16 207:15
208:22 218:8 219:3
224:22 228:13 235:7,20
236:3,5 243:2,23 247:1
,18,24 248:8,15,20
252:3 254:14 255:20
265:6 272:9,14 278:14
293:17 300:21 311:20
,21 325:16 326:10 327:1
,5,15 332:17 341:7
**right-hand** 35:18 124:19
125:4
**ringing** 146:24 149:16
**risk** 99:18 100:3 126:15
,15 143:6 160:19 161:8
,15 171:11 183:22 184:9
186:14,20 187:1,10,11
189:1,7,8 191:20 206:21
233:10,11 246:19,21,22
252:6 265:3,10 266:5
267:9,16 310:20 311:12
326:9 343:23,24 344:12
,12,16 346:3,5,21
**risks** 127:3 339:23
341:14
**road** 232:7
**rob** 46:17
**robert** 1:16 4:13 5:6
348:- 349:-,- 350:7,9
**robinson** 2:-
**rocca** 1:20 5:5 350:3
**role** 84:15 160:15 195:7
196:21 210:10 221:6
223:23 226:8 234:7
275:8 285:18
**roles** 196:20
**room** 10:21 155:13
**roughly** 175:11
**routine** 172:8
**routines** 45:7
**row** 209:7 213:17,20
214:4,10
**ruggieri** 101:17 102:1
**ruggieri's** 101:18
**rule** 17:11,20,24 107:16
,18,20 139:13 140:5
147:15 202:19,20 203:3
240:9 255:19 350:18
**rules** 1:19 240:13 333:10
350:18
**run** 31:19 34:7 56:22

57:1 209:16 281:24
287:23,24 308:8,11,16
**running** 62:24 63:2
300:4

S

**s-a-s** 56:14
**safety** 82:20 83:14 88:19
89:2,20 96:7 97:15 98:5
,6,8 103:24 104:2,4,24
,24 109:19
**sailor** 43:18
**sake** 21:20 200:24
**sales** 1:3 4:7 349:3
**sample** 82:17 124:17,17
151:23 157:20 159:17
184:15 192:8,20 311:14
331:19 343:14
**sampling** 315:10
**san** 3:-
**sander** 191:11
**sandi** 5:5
**sandra** 1:20 350:3
**sas** 33:13,16,18 34:2,7
,10 35:3 44:3,5,8,20,21
,24 45:1,2,3,8 55:22
56:1,6,9,13,15,21 57:1
,19 58:11,17,20 59:15
,16 60:6,23 61:11,14,20
,24 62:4,7,14,17,24 63:2
197:7 205:11,13,14,15
207:3 208:3,11 209:13
,16 216:9 297:10,13,16
298:5,7,9 299:3,12,15
307:22 308:3,7,8,13
309:4
**sat** 307:19
**satisfied** 8:5
**save** 27:15 239:1 288:5
,9 289:7
**saved** 80:24
**saw** 115:4 133:8 137:24
138:15 167:23 185:23
192:3 223:6 260:11
300:7,7 338:19,21
**say** 7:22 12:23 17:11,22
18:2 20:8 23:21 33:1
40:4 45:4 53:18 58:14
,15 62:18 69:17 74:10
,12 87:10 90:6,12 92:20
101:11 104:2,23 105:14
113:5,7 114:11 122:15
133:19,22 134:5 140:23
146:12 153:17 161:5
172:19,23 183:2 189:5
192:2 195:8 197:9
202:14,16,17 203:11
204:6 209:7 211:6 218:1
224:6 227:11 229:9,13

231:16 232:24 234:24
237:10 254:6 260:14
261:7 265:12 266:23
275:14,16 276:13,20
282:23 299:18 300:20
302:12,14 307:12,20
312:7 326:19,21 328:7
,11,15,18 329:1 336:10
,13,15 343:13 346:21
347:1 349:15
**saying** 5:20 28:10 120:4
138:3,6 160:23 292:14
309:3 343:1 344:11
**says** 11:21,23 29:1
35:17 37:14,14 38:2
42:18 103:19 110:7
123:21,23 126:16 143:5
148:16 156:11,14 183:3
191:11 213:16 232:8
245:2,11,13 247:12
248:2,5,12 251:4 253:24
254:2 261:11 304:24
306:24 314:22 322:14
324:18 325:14 328:4,9
,13 330:18,20 336:1,3
**scary** 70:9
**schizophrenia** 185:15
**schizophrenic** 172:1
**scholarly** 54:15 237:16
242:20 244:2 245:1,6,17
,22 247:2,17 249:4,15
250:2,7,21 252:4 256:4
,5,13,23,23 257:9,11
260:7 262:10,19 264:15
**school** 273:13
**science** 79:21 193:10
286:19,21
**sciences** 20:18
**scientific** 12:9 91:14
108:9,17 164:5 222:22
277:17 316:23 339:24
340:4
**scientifically** 93:7,8
**scientist** 32:8 142:12,24
**scope** 98:4 304:15
**screen** 299:20
**screening** 331:2
**scrutiny** 45:4
**se** 168:21 193:9
**seal** 15:22 16:6,21 17:5
351:6
**search** 14:11 15:6 46:11
142:9
**searches** 26:9
**searching** 149:11
**second** 24:9 29:16 38:3
76:10 102:12 104:8
106:13 118:24 218:8
227:22 247:4,7 248:2

253:13 269:5 270:6
272:8 305:16 342:4
347:5
**secondary** 168:19
342:22
**secondly** 157:19
**section** 77:6 127:2
214:24 215:2 249:11
**seeing** 140:8 147:1
148:1 314:19
**seek** 234:14,16,18
**seem** 23:15 111:11
187:12 207:13 232:19
322:11
**seemed** 321:1
**seems** 149:5 221:3
241:5 344:16
**seen** 8:16 84:10 87:22
98:21 143:15 146:10
147:1,24 148:3 149:13
162:14 192:13 194:17
270:8,12 319:7 336:10
,14,17 345:24 346:2
**seizure** 242:6
**selected** 234:8 238:7,9
239:2
**selecting** 82:17
**selection** 234:15 304:16
**selective** 207:18
**self-conflicted** 228:7,8
**self-correct** 217:22
**self-inflicted** 228:6,9,9
,11,12
**seminars** 21:23
**send** 42:19 120:4 155:17
258:13,16 260:4 287:23
290:7
**sending** 42:1,3
**senior** 35:11
**sense** 81:6 199:12
**sensitivity** 168:18
341:22
**sent** 14:20 41:22 162:11
,13,16 163:3 210:24
230:18 242:10 258:8,14
262:23 263:2 288:19
290:15 294:16,17
321:20
**sentence** 110:7,12 111:4
140:23 211:9 215:5,5
232:10,24 268:11
272:14,16
**sentences** 241:16 242:3
,19 243:24 266:22
**separate** 39:1 118:12,24
158:21
**separately** 137:21 261:4
**separating** 106:22
**september** 12:20,24

13:5 14:13 22:18 24:7
28:20 34:5 45:23 46:2
47:19 62:22 123:24
201:10,13 217:12
225:17,21 227:5 244:3
245:1 247:18 249:5
258:7 260:7 265:7,12,13
,22
**sequence** 40:23 41:5
42:24 196:19,19
**serendipitously** 190:13
**serendipity** 190:15
**series** 56:11 151:13
173:22 308:16
**serious** 165:13 219:17
277:16,16
**serve** 66:10,11 69:21
72:9 73:14 74:1
**served** 68:4 251:5
275:14 302:13
**server** 65:15
**service** 250:9
**services** 20:4 42:1 75:3
,8 76:6 85:24 261:16
**serving** 302:14
**set** 10:21 30:7 44:13
66:9 138:22 141:2,10,12
,22 188:24 222:9 233:11
273:6 310:23 338:22
351:5
**sets** 37:14 58:12 68:23
224:19 298:9 305:1
**setting** 82:16
**seven** 76:14 177:11
184:23
**several** 12:17 155:4
168:23 231:3 340:5,5
**severely** 234:16
**severity** 170:19
**sex** 51:7,17 52:9
**share** 21:14 51:19 110:3
141:3,20
**shared** 12:12 55:4,6
93:10 111:5 197:23
262:23 263:3 285:16
288:6
**sharing** 33:24 115:19
**she's** 95:22
**sheila** 95:16 101:3,22
**shift** 172:7
**shook** 2:- 66:20,23
285:13 302:2,6
**shoot** 240:19
**short** 8:2 23:16,17 45:22
53:8 102:18 104:11
174:20 189:4 217:6
259:23 269:8
**shortens** 150:4
**shorthand** 350:4

**shortly** 12:14 40:14 51:1
109:4 316:23 344:1
**shot** 308:4
**show** 54:23 124:16
164:24 288:4 343:20
**showed** 227:9 252:18
254:3 267:16
**showing** 244:15 252:9
278:2 346:3
**shown** 56:19
**shows** 344:18
**side** 70:5 177:12 223:8
**sign** 350:19
**signal** 88:19 89:21 98:19
253:3 311:5
**signals** 89:2 121:16
**signature** 38:4 103:19
,19 349:19 350:17,24
**signed** 42:19 305:6
350:22
**significance** 98:20
**significant** 89:4 161:15
,21 183:13 192:21 234:7
246:10 248:11,13
252:19 254:3 266:13
341:19 344:22
**significantly** 211:16
**signing** 37:8 350:16,21
**signs** 80:15
**similar** 141:3,16,20
167:1,4 181:24 188:3
257:10 262:11 318:17
343:21
**similarly** 25:22
**simon** 346:2
**simple** 159:13 170:23,24
171:1 183:9
**simplicity** 29:20 220:18
**simply** 7:10 8:19 22:14
55:15 61:22 63:2,4,7
71:17 104:23 116:14
119:11 146:12 149:16
159:12 182:9 205:13
215:14 235:16 242:18
249:2 278:4 289:3
315:15 326:7 339:10
**simultaneously** 51:10
**single** 87:16 113:4,24
117:13,15 120:8 134:7
,14,17 135:4 151:17,19
181:18 187:3 332:7
338:23
**sir** 6:2 21:15 24:9 26:22
28:6 29:9 111:24 126:9
145:21 166:13 188:19
254:13,23 265:14
**sit** 137:14 271:7 309:6
**site** 30:10 94:8
**sitting** 78:20 107:11

323:1
**six** 252:16 277:6
**size** 124:17 157:7,20
 184:15 191:4 192:19,20
 331:19
**sizes** 82:17 151:23
 159:17 343:15
**skill** 44:13
**skills** 200:16
**slender** 261:7
**slide** 10:19,19 22:10
 187:13,14
**slides** 9:20,22 10:8,13
 11:11,12 21:17 108:13
**slightest** 227:10
**slightly** 20:12 62:19
 194:4
**slipped** 147:24
**small** 230:14 314:8,9
 332:1
**smaller** 332:8 338:21
**smart** 49:17
**smith** 1:- 286:15,17
 349:-
**snris** 48:10 51:13 263:11
 267:6
**social** 125:10 126:11
**society** 303:11
**sodium** 91:4
**soft** 5:18
**soh** 2:- 4:23,23
**solely** 89:14,15
**somebody** 155:17 318:3
**someone** 68:11,18
**someplace** 131:21
 151:16
**something** 15:18 19:14
 42:18 44:12 48:8,20
 65:6 68:19 69:15,18
 80:5 86:24 107:13
 122:11 136:8 137:15
 138:4 142:9 147:23
 153:10 163:8 164:15
 167:23 204:2 211:5
 215:2 242:24 243:16
 249:12 288:3 300:21,22
 302:23 312:23 322:23
 323:6,19 330:4 335:20
**something's** 300:21
**sometime** 46:1 109:4
 224:3,12 227:5 244:4,6
**sometimes** 5:20 160:11
 237:9 240:14
**somewhat** 210:17
**somewhere** 43:7 65:16
 182:21 184:22,23
 243:18 297:5
**soon** 344:13
**sorry** 17:21 44:4 55:14

64:6 90:12 97:8 115:18
 140:15 156:4 158:8
 182:16 187:14 204:4
 225:7 227:13 235:5,12
 239:16 241:22 245:8
 252:4,9,10 258:6 264:15
 266:19 268:10,13
 272:11,14 287:5 289:19
 293:14 317:10 322:9
 325:11 327:20 330:18
 343:7 345:23
**sort** 19:7,16 25:16 26:16
 35:1 44:6 67:4 86:16
 103:16 159:11 162:10
 163:5 172:2 196:18
 198:4 215:20 260:22
 304:2 305:14 346:7
**sorted** 107:24
**sorts** 152:14 232:14
**sound** 153:23 161:9
 163:10 311:20
**sounds** 311:21
**source** 94:8,19 111:2
 141:7 231:22 322:12,12
 ,15,17 330:3
**sources** 145:5 231:22
**south** 209:22 210:7
**space** 108:1
**speak** 152:16 153:2,3
 190:22 268:13 326:16
 333:6
**speaking** 41:9 202:2
 333:5,11
**speaks** 127:11
**spearheaded** 216:3,6
**specialty** 35:7
**specific** 14:21 31:11
 38:11 46:5 96:19 234:8
 286:3,7,11,16
**specifically** 85:11 89:11
 138:9 152:18 233:5
 259:8 288:8,14
**specification** 85:7
**specifies** 136:4
**speculation** 252:1
 320:10,14,21 321:1
**spend** 72:19 174:12
 317:14
**spent** 75:14 282:13
 296:17 323:9
**spin** 305:14
**spoke** 24:14 40:19 41:14
 67:13 68:11,16 69:5
 153:5 293:1
**spoken** 67:10 152:6,18
**sponsor** 273:10,17
**sponsored** 273:4 276:6
**sponsors** 242:10
**spontaneous** 264:1

311:1
**spot** 71:17
**spreadsheet** 136:14
 137:15 138:1,16 173:22
 322:23 330:6 336:20
 339:14
**square** 342:19
**squares** 342:14
**ss** 350:-
**ssri** 50:9 51:13 74:2
 263:11
**ssris** 47:8 48:10 50:13
 267:6
**stage** 115:4 131:6
**stand** 347:5
**standard** 32:17 188:8
 260:22
**standing** 199:24
**stands** 17:6,7
**start** 38:1 97:9 149:10
 209:18 224:12 226:22
 227:1 280:6 334:18
 344:13
**started** 86:6 222:17
 225:24 277:3 309:4,5
**starting** 155:20 272:17
 282:12 291:14 341:6
**starts** 199:7 222:5
**state** 1:-,22 4:11 17:21
 18:1 77:16 349:8 350:1
 ,3
**stated** 17:13 100:23
 114:18 145:13 163:19
 190:9 220:3
**statement** 76:19 115:21
 116:7 141:6,8 142:4
 241:23 253:6 292:24
 311:8 344:18 345:21
**statement's** 112:20
**states** 1:1,19 4:8 51:11
 ,16 71:4 77:16 242:10
 263:22 349:1
**statistic** 158:11 159:9
 160:5
**statistical** 13:17 33:20
 51:9 56:24 78:8 79:24
 82:18 84:18,22 85:8,14
 ,15 86:12 88:21 89:15
 91:20,22 92:21 96:5
 97:1,13 98:7,16,19,20
 99:22 101:13 102:3
 107:8 108:7,21 109:18
 ,20,24 111:3 115:5
 116:20 117:5 120:16,21
 ,22 121:5,14,24 122:1,2
 128:14 129:8 130:18
 132:2 133:15,17,20
 134:12 136:17 140:12
 149:22 150:8,10 151:11

152:7,10 153:21 156:9
 157:12 164:16,24 166:3
 ,18 171:13 173:24 177:6
 180:7 186:4 194:10
 195:1 200:21 207:23
 209:5 211:18 214:13
 216:3 224:10 235:1
 267:16 303:20,24
 305:17,22 306:2,6,7,20
 319:8 320:4 338:19
 348:17
**statistically** 89:4 98:21
 183:12 192:21 246:10
 248:10,13 266:12
 341:19
**statistician** 170:24
 197:4 198:11 273:8
**statisticians** 35:12
 171:1 273:9
**statistics** 22:3 35:8,14
 164:7 183:16 198:11
 199:19 207:22 209:24
 263:23 266:3 286:20
 299:9
**stay** 139:22 198:6
**steering** 4:18
**step** 146:11 278:21
 308:6 329:15
**steps** 154:7 307:8
**steven** 3:3
**stop** 5:19 6:8,9 18:3
 25:11 179:16 319:18
 333:4 337:24 347:2
**straight** 235:1 240:22
**strategy** 203:18,20
 210:13,15
**street** 3:4 4:5
**stressors** 233:23
**strike** 97:8 128:12 174:4
 192:24 283:11 286:4
 287:14 300:15 321:9
**structured** 235:2
**student** 198:8,14
**students** 35:1
**studied** 91:21 155:5
 167:3,13 168:7 169:5
 173:1,3,23 175:21 176:9
 178:22 214:18 266:3
 333:2
**studies** 13:3 48:1 49:8
 53:15 54:14 57:9 59:3
 60:8 81:11 82:12,16,17
 ,20,22 86:16 87:1 91:18
 92:24 98:11,13 105:11
 ,16 111:24 112:22
 116:18 120:9,9 121:8
 122:6,22 124:22 125:5,9
 ,15 126:17,18 127:4,8
 128:6,8 129:14,15,16,18

131:8,18,21 134:11,11
,13 135:2,5 140:13
141:13 151:13,17,20
157:21,23 158:1,3,5,16
159:14,22,23,24 160:2,6
,8 161:17 163:21 168:10
,16 180:24 184:12 185:6
186:19 187:3,4,12 189:7
,13 194:11 197:8 201:17
202:4 219:3,6 221:5
233:9 246:20 263:12,14
273:4 274:8 275:22
276:7 277:23 278:1
292:15 303:18 304:1
312:19 322:24 323:21
324:2,10 327:16 329:1,5
330:5,15 331:23 332:1,2
,3,5,6,7,11,14,20,23
333:19 334:6,11,12,18
335:14,15 338:23,24
339:1,3 340:6,7,8,10,11
,15 343:12 346:2
**study** 23:20,21 24:3,8,12
25:9 26:4 30:11,11,12
31:4 39:8,10,10,13 40:8
,20 41:1 45:24 47:6
49:10,24 50:2,2,6,12,18
51:2,4 53:20 57:9,10
81:23 82:2,9 86:11,13
,20 97:15 98:16 99:4
100:18 105:23 114:8
117:14 118:24 121:12
122:9,10,16 125:19
140:21 145:9 150:14,21
157:16 158:10,10,18
160:9 161:7 166:2
168:13,13 169:1,1
180:20,21 181:16,18
184:20 186:24 187:2
195:3 196:5,9 198:21
200:21 202:5 210:14,17
217:15,23 218:9,18
223:1,2,16,19,22 224:9
228:14,17 231:4,6,7
234:19 235:12 251:12
263:19,20,23 264:22
265:11 271:8 272:19
273:6,21 274:5 275:8
287:16,17 294:21
295:16 296:6 305:23,23
306:21 307:9,10 310:3,7
312:9 323:21 324:1
330:23 331:9
**study-to-study** 154:18
,21
**studying** 114:14 224:21
**stuff** 73:7 137:21 272:6
300:1 318:24 319:22
**subacademy** 20:17

**subcontract** 210:6
**subdatabases** 29:8
**subject** 6:10 83:1 150:16
209:3 214:11 220:22
234:21 264:3,9 292:9,22
309:18
**subjects** 48:2 86:10
105:21 111:15 112:12
114:4,5 121:10 125:16
126:8 143:19 144:3
145:3 157:21 178:19
183:21 189:9 191:6,18
,21 211:18 217:24 229:2
308:20,20,20 332:8
339:6
**submission** 84:7 134:4
135:11,15 137:18
242:12 260:6 282:16
320:8 321:12,13 322:3,5
,5 324:12 327:17,24
328:2 329:20 330:18,20
331:13 332:21 333:2
336:8
**submissions** 123:6,21
135:23 136:3 137:10
155:2 166:22 167:1
278:22 279:2,4,6,7
280:14
**submit** 15:22 16:6,21
78:13 114:22 237:9
288:18
**submitted** 12:19 15:17
17:4 28:21 30:20 75:17
76:21 103:24 106:23
111:7,17 114:6,15
116:23 117:17,23
118:11,24 119:13,21
120:5,12 123:12,20
135:3,8,9,13 146:23
155:1,3 162:7 195:2
227:6 236:5,16,17 243:5
258:17 260:8 261:1
267:5 272:1 279:11,13
280:24 281:13 282:20
284:12 285:14,17
288:15 289:11 290:5
305:13 307:4 308:12
310:18 320:15 324:11
330:6 331:12,18 335:24
339:2 348:22 350:17
**submitting** 27:15 283:17
**subpoena** 19:8
**subscribed** 349:-
**subset** 332:1
**subspecialty** 237:8
**substance** 296:5
**substantially** 301:20
343:19
**substantive** 306:5

**subtraction** 192:10
**suburbs** 230:17
**succeed** 220:24
**sufficient** 122:4 186:11
189:10,13,13,14 190:2
192:8 251:10
**sufficiently** 219:22
**suffix** 55:22 56:14
**suffixes** 56:6,8
**suggest** 338:4
**suggested** 211:4 212:22
213:1,3,12 266:3 276:9
317:4 344:7
**suggestions** 5:17 28:14
**suggests** 266:23 311:4
,15
**suicidal** 21:24 80:11,16
,17,17 156:11 169:24
173:9 189:2 314:23
322:13
**suicidality** 104:5 108:14
123:24 129:12 157:1,3
158:15 169:17,24
170:11 173:6,19 183:23
184:9 186:14 189:15
222:17,24 242:12 246:2
,10 247:12 248:11
252:16,16,19 253:1,4
254:1 263:11 265:11
266:24 267:1,9 280:15
,24 310:21 311:6 314:23
332:10 348:-
**suicide** 22:3 47:8 48:3
50:21 51:1,4,8,15 67:22
69:6 72:23 80:1,4
126:16 140:1 142:18
149:7,14 155:1 169:16
170:1,1 171:17 173:19
186:21 187:11 189:1,1
201:8 206:3 212:15
224:10 228:18 229:17
231:12 232:1,18 233:22
,22 234:1,12 246:7
248:6 263:15,21 265:17
,24 266:4,5,13 267:17
268:7,24 269:1 271:1
276:1,4 278:1,3 279:16
306:18 309:14,15 310:4
,10,14 316:24 318:18
335:24 344:7 346:3,5
348:-
**suicides** 98:22 171:20
173:11 228:15 231:20
,23 232:18 267:24 268:1
,5,18,21
**suicidology** 47:13 48:10
79:21
**suite** 2:3 3:4
**suited** 236:19 237:11

**sum** 75:1 126:7 296:5
**summary** 113:15 114:3
,6 116:21 119:11,13
122:12 123:8 135:11
136:9,9,14 207:22
271:16,20 299:9
**summation** 178:18
**summer** 292:13
**superior** 1:- 4:11 31:20
349:8
**supplemental** 24:16
30:22 108:5 241:11
242:15 282:3 348:-,-
**supplied** 186:8
**supply** 233:7
**support** 87:15 120:7
142:3 271:15,19
**suppose** 11:15 229:12
**supposed** 35:20 233:8
**sure** 8:2 9:1,3 13:24 14:3
20:15 22:8 25:12 26:21
29:12 33:5 40:22,23
41:1,4 43:13,15 45:5
47:12 63:6 77:18,18,19
80:24 94:9 98:3 107:15
123:20 129:16 142:2,10
147:14 183:10 193:16
196:24 199:11 208:12
227:15 229:6 231:15
235:15 238:23 243:20
244:9 253:20 256:8
263:6 265:19 274:24
297:24 301:17 305:11
,18 321:21 325:15
339:18 340:1 342:17
**surprise** 119:6 238:3
241:2
**surprised** 159:20
**surprising** 293:6
**suspect** 137:23
**svs** 348:-
**sworn** 5:7 349:15,-
350:10
**symptoms** 79:12 80:15
**system** 33:21 56:21
206:13 213:7,15

T

**table** 18:13 124:21 125:2
,8,15 126:6,14,20
137:20,20,20 143:3,5
144:2,16 145:1,13
158:14 159:15,16 177:1
,5 179:6 185:23,24
186:3,4 187:16,17,22
194:16 204:2,3,3,9,24
205:4,8,9,12,17,19
207:19,21 208:2 209:14
213:4,16 225:9,9,14,14

,17,17 226:4,5,8,8,12,13
227:16,22 257:8 322:12
324:18 327:11,15,22,22
328:3 330:10,23 331:2,5
,9,12,18 337:2 342:5
**tables** 22:11,15 23:23
58:23 59:5,6 62:14,21
,22 124:16 126:12
158:13 160:4 203:23
210:20 225:9 329:13
337:21
**taken** 1:20 77:12,22 81:8
,19,23 128:11 154:7
213:7 307:8 349:16
**taking** 87:19 117:22
188:16 193:12 271:22
308:22 344:13
**talk** 6:6 14:19 28:15 29:9
36:5 48:12 69:19 87:2
139:9 171:11 180:1
196:17 305:19 321:5,7
339:23
**talked** 67:15 181:2 263:1
280:14 291:18 309:9,13
321:22 342:5 343:23
**talking** 13:1 34:13 36:6
48:13 55:12 64:7,8 65:4
88:9 98:3 104:3 136:3
137:14,23 171:4,14
181:7 195:9 201:12
217:11 219:2 223:19
233:4 280:6 291:20
300:9 305:18 319:2
346:17
**talks** 246:11 304:18
305:10
**tape** 52:23 53:5 102:16
,20 133:3 174:18,22
217:4,8 260:1 315:20
316:2,7 347:11
**tapes** 9:11,13 53:4
**task** 139:22
**tasks** 35:2
**taught** 21:22
**taxpayer** 76:1
**teacher** 198:9
**teaching** 240:12
**team** 224:23
**teamsters** 6:19
**tease** 188:16 189:14
219:23
**tech** 244:12
**technical** 65:10
**tecum** 11:7
**telephone** 67:3,5
**tell** 5:21 10:9 16:3 19:3
35:24 46:10 52:3 53:12
55:8 58:14 69:16 71:19
,22,24 74:22 75:1 77:1

82:8 94:19 106:9 108:3
121:23 122:16 123:17
125:14 128:4 140:6
141:7 146:21 148:2
155:24 157:8,13 165:21
199:15 200:10 224:6
239:20 247:24 256:2,12
,22 257:8 258:7 271:8
283:11,16 284:1,4,20
285:3,7,9 290:1 301:16
308:1 346:19
**telling** 8:4 61:23 74:9
236:14 290:2 314:18
**tells** 127:3 191:5
**ten** 162:8 200:14
**term** 19:13 21:1,10
29:11 34:18 62:3 84:10
,11 169:11 171:1,3,6
175:22 178:8 321:1
**termed** 159:8
**terms** 23:5 25:17 26:5
34:20 37:15 45:22 66:9
80:3,10 81:2 82:15,16
119:14 121:22 137:14
165:1 191:16 193:17
196:8 199:8 206:3 222:1
274:13 284:17 302:8
304:2 307:5 321:11
341:8 342:15 344:21
**test** 154:22 157:15,24
158:11,17 160:1 180:19
303:22
**tested** 184:8
**testified** 5:8 31:24 74:11
96:3,13,24 120:2 127:18
144:15 275:9 277:6
324:16
**testify** 40:18 97:6,10
223:15 350:11
**testifying** 39:6 296:19
**testimonial** 254:16,18
**testimony** 40:9 50:1
67:24 71:8 96:12 118:6
,7,16 127:23 128:16
140:9 144:20 149:9,12
194:6 197:12 217:14,17
232:17 276:18 292:18
293:17 302:10 330:1
336:13 344:4 350:12
**texas** 229:9
**text** 56:12 210:19 211:1
214:22 245:22 249:3
251:21 256:2,12 264:17
,20
**thank** 31:23 46:14 65:18
,21 80:24 103:21 124:13
135:7 155:22 240:12
255:18 310:6 343:6
**thanks** 139:4 155:18

174:16 178:2
**that's** 5:16 7:24 12:15
13:11,15 17:14 18:4
19:24 20:19 22:17,19
25:5,22 26:5,24 28:7
30:4,8,20 32:14 33:4,21
36:8 37:12,19 39:2
41:11 42:12 45:3,6
48:17 51:23 57:13 62:6
64:19 68:19 70:13 75:7
78:2,16,21,24 79:9 81:9
,20 85:2 93:10 96:14
103:14 105:13 109:21
110:22 115:14,22
119:18 120:17 122:6
123:4 130:1 132:13
135:20 138:17,24 140:7
142:5,13,15 144:13
145:7,12 148:4 149:19
,22 153:12,17 155:8
156:24 157:4 159:16
161:4 164:11 165:11
167:20 169:13 172:24
173:2,2 174:2 181:18
186:5 194:2,12 195:6,13
196:13 202:7,21,24
206:18,22 207:1 208:8
,21,22 216:6 219:20
220:22 222:3 223:13
226:14 227:14,20
228:19 229:22 231:15
232:4 235:3 237:10
239:5,12 240:6,8,9
241:3,11 245:15 251:13
257:3,4 260:21 267:10
269:24 272:4 274:3,4,7
276:15,24 277:11 278:9
279:22 282:14 283:10
284:16 286:11,12,16
287:10,11 290:14
292:17 293:8 297:6
298:6,7 301:10,18
302:16 304:11,14 306:8
,8 311:23 312:10 319:5
,9,14,23 320:5,9 321:4
323:23 324:15 325:18
,19,20 327:1 329:3
331:10,21 332:17,21
335:19 336:7 337:23
338:10 340:13,15,22,24
341:16 342:14,19
343:22 344:1 347:1
**themselves** 4:15 19:20
**therapies** 125:1
**therapy** 209:2
**there's** 29:12 106:14
160:9 187:13 188:2
213:17 247:22 250:6
253:5 284:13 286:8,16

304:24 306:6 314:1,19
,19 329:16 334:15
340:11 344:22 346:21
**thereafter** 40:14 339:5
**they'd** 117:11 237:20
**they'll** 74:9 237:9 259:9
**they're** 27:14 38:21 52:6
71:5 117:10 137:4
153:23,24 219:5 220:13
,14 225:1,2 226:12
250:1,2 259:14 303:22
309:10 325:12 342:16
346:17
**they've** 19:5 26:21
**thicker** 225:10
**thing** 19:16 26:19 35:1
41:4 67:4 95:1 137:24
158:20 162:10 172:2
180:1 207:14 219:15
229:8 236:12 245:14
254:8 272:12 286:15
287:10 310:17 321:2
324:3,8,12
**things** 6:18 7:19 15:3,21
20:4 28:24 31:21 69:17
71:22 79:2,4 105:6
128:5 132:4 133:8
163:24 172:18 189:24
190:24 200:7 215:20
226:21 229:10 232:14
279:16 280:18 291:19
341:14
**think** 5:13,19 8:15 9:23
20:12,13 23:4,21 26:10
39:7,11 40:24 42:22,23
43:11 52:18 60:14 67:16
,17 69:14 74:22 76:12
83:5 94:1,7,14,17 107:7
111:10 112:20 114:4
123:13 127:20 129:22
135:14,20,21,24 137:1,8
138:14,17 139:9 141:15
142:2 154:14 155:14
162:14 165:21 168:20
170:20 171:4,13 172:19
180:10,18 182:13
187:13 190:17 194:20
198:24 199:3,18,23
200:10,24 212:8,22
213:2,4 214:19 215:13
,15,20,23 216:1,10,14
218:14 219:10 222:13
224:11 225:23,24 226:2
236:3 237:20 240:1,3
249:20 251:19 256:1
261:18,22 262:24 263:1
,18 270:4 276:15 287:7
290:12 291:3,4,16
293:16 298:13 301:16

302:17 304:6 305:5
310:22 311:4,7,13 314:1
,16 316:10 321:6,20
324:16 329:8,10 331:16
332:14 334:23 340:1,3,3
,9 344:1
**thinking** 19:14 39:15
47:3 80:11 174:13
210:14 241:2,5
**third** 7:13 157:23 245:18
246:2 247:9
**though** 41:17 150:4
164:3 231:17 346:9
350:22
**thought** 39:11 40:19
41:3 68:17 107:19
144:15 152:4 182:15,16
198:19 214:21 230:20
276:11 283:13 320:7
322:22
**three** 26:20 34:22 51:12
78:22 123:17 125:9,15
126:17 130:22 148:15
158:2,3,4 166:4 167:3
169:11 175:13,19 177:3
,24 179:6,8 195:16
220:10 225:11 291:19
299:14
**threw** 322:10
**throughout** 51:16
**throw** 194:18
**tightly** 188:1
**time** 4:3,14 21:10 31:12
39:5 40:12 45:17 46:16
53:6,9 65:5 67:6 72:18
,19 75:14 77:12 83:19
84:2,3 85:15 86:5
102:15,20 104:9,12
109:17,22 111:18 115:1
,24,24 116:15 117:20
120:2 122:13 123:3
128:24 129:19 132:15
133:2 135:21 140:12
142:7,21 146:6 149:12
,18 152:5,6 169:12
174:17,22 179:15
192:20 193:12 194:20
195:1 199:2 201:1 217:3
,8 218:8 222:20 232:20
235:22,24 238:5 239:1
,19,23 249:23 255:19
257:7 259:21,24 260:21
262:12,16 269:6,9 272:3
275:23 276:2,14,21,22
282:13 283:3 288:12
289:8 297:17,17 300:6
,15 302:22 313:15,18
316:3,7 317:6,14 319:6
320:4 321:2 338:6 341:1

342:23 343:5,18 344:6,8
,14,16,21,23 345:7
346:3,8,10 347:12
**time's** 21:20
**timeline** 304:19,24
**times** 130:22 220:11
244:10 291:19 312:7,7
316:10
**tired** 226:2 230:10,13
268:14,16
**title** 139:24 149:6 265:22
272:15
**titled** 241:11
**today** 4:2 10:22 22:8
149:13 269:19 277:3
286:5 345:6
**together** 39:5 112:15
172:20 195:23 196:23
199:6 297:22 309:6
**told** 102:12 130:22
141:19 142:5,11 146:1
150:13 164:13 179:24
184:17 196:16 197:2
257:15 262:24 317:5
323:10 330:3 336:18
**tomorrow** 65:7,8 71:24
155:10,14,20 269:20
347:4,8,9
**tonight** 139:3 321:7
323:5 347:3
**took** 206:7 209:3,4
213:14 233:8 275:7
286:10,12 308:24
**tool** 298:18
**tools** 303:20,20
**top** 12:22 116:13 227:18
,20 228:6 231:2
**topic** 341:7
**topiramate** 92:11,23
94:5 99:17 100:4,8,12
160:16,24 161:13,18,23
163:7 164:7 165:16
166:8,24 167:18 175:4
,20 176:10 177:18,19
192:3,7,14,16 246:4,17
,22 247:18 252:6,24
**total** 125:23 126:7 129:1
151:3 168:6 169:1,3
177:16,19 178:10 330:7
331:19 332:8
**totally** 338:10
**touched** 49:6
**tough** 194:21
**town** 230:14
**trail** 226:3
**trailing** 230:11,12
**train** 276:10
**trained** 95:3 235:8
**transcript** 349:17

**transferred** 283:23,24
**transmit** 44:5
**transmitted** 33:5,17
**transmitting** 123:7
**transplant** 249:4
**transport** 44:3,21 45:1,8
**treated** 29:14 110:9,10
,24 111:13,19 112:5
115:17,17 140:2 144:11
145:4,10,14 191:21
213:11 214:15 232:14
234:11,17 348:-
**treatment** 117:1 125:9
126:23 187:12,23
191:23 206:1 227:23
232:9,21 233:1,16 234:6
,13,14,16,18,22 242:6
266:15,24 267:2 309:21
311:6 342:24 346:4,6,8
,15
**treatments** 234:8
**trees** 30:10
**trends** 263:20
**trial** 82:1,3,4 83:2,12,23
87:17,21 113:20 118:5
134:21,21 168:6 186:11
,12 188:21 189:3 193:4
310:22
**trials** 82:13,23 84:5,6,13
,23,23 85:1,4 86:1,4
87:3,5,8,11,14 88:2,6,10
111:16,22 112:2,7,10,13
113:4,4,11 114:14,19,23
115:3,8 117:6,14,22
119:12 120:14,24
121:15,17 128:17,20
129:4,6,7 130:1,20
132:4 133:22,24 134:2,2
,7,14 135:13 150:20,24
151:4,5 156:12 162:7,10
,20 166:5,6,7,8 167:12
168:1 169:2,4 175:3,21
176:8 184:14 188:5,9
189:12,22 190:7 242:13
279:12 311:3 327:7,8
335:4,5 336:21 337:6
338:14,16,17,18 339:10
**triangulate** 43:11 46:9
258:24
**triangulate's** 43:20
**trick** 197:19 221:24
**tricyclic** 51:13 267:20
268:3,7
**tried** 107:12 130:11
147:22 153:4 168:24
221:22 320:6
**trigeminal** 242:8
**triggering** 147:2
**tripling** 191:23

**tripped** 28:11
**trivial** 309:12
**trouble** 110:3 171:8
**true** 59:9 79:6,8,9 89:15
91:6 92:15 93:12 99:9
,19 100:5,13 102:9
105:12 107:11 112:2,3
113:11,12 114:17
142:14 145:15,18
167:10 185:16 189:11
201:10,11 217:18 231:4
,5 249:18 250:11 260:24
265:24 312:3,4,8 313:15
,19 314:3,13,21 350:11
**try** 5:22 6:6 31:19 33:1
72:5 91:12 103:5 113:9
116:20 117:12 119:15
129:23 131:3 139:2
151:17 153:2 169:12
179:15,22 181:11
182:10 264:16 268:13
323:11
**trying** 22:3 40:16 41:23
59:20 62:19 86:23
103:16 107:2,5,14
116:19 119:19 123:1
129:2,19,22 130:1,7,8
,13,16 131:20,24 133:18
138:2 143:9,10 145:7
146:5 149:20 151:20
161:5 162:3 164:3
173:21 183:8 197:19,20
204:6 221:24 232:5
280:9 293:18 297:7
301:6 302:23,23
**turn** 27:2 28:21 70:11
72:15,24 73:2 106:13
115:13 143:3 152:17
156:9,14 245:16 247:1
298:24 318:20
**turned** 68:18 69:20 70:7
72:8,11 73:13,23 74:7
**turns** 159:20
**two-by-two** 158:14
**two-thirds** 245:2
**twofold** 203:14 311:11
**tx** 2:-,-
**type** 78:8 97:8,12 100:17
101:13 102:2 142:13
150:14 199:7 334:18
**types** 162:20 229:1
**typically** 77:20 199:12
288:2

---

U

---

**u.s** 70:9,10 71:6 108:8
,22 251:6 275:15
**uh-huh** 139:17
**ultimate** 153:16

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

**ultimately** 212:23 234:11
**unable** 182:8
**unavailable** 122:24
**unaware** 164:19
**unbelievable** 174:4
**unclear** 115:5 121:21 291:4,4
**uncomfortable** 236:13 ,14
**uncover** 189:15
**uncovering** 188:21
**underlying** 183:16 203:17 286:21
**underpinning** 22:23
**underpowered** 311:8
**underreporting** 231:12
**understand** 5:21 6:13,21 7:2 11:6 15:7,8,24 16:5 ,8,10,15,21 18:12 20:24 24:20 28:10,12 29:24 30:16,17 36:14 42:5 46:12,13 54:4 61:22 63:18,19,21 73:11 74:11 75:23 77:20,22 81:3 83:7 89:17 95:21 104:3 105:8,18 107:4,6 111:13 ,18 112:4 113:8 114:20 119:16 121:13 122:4,14 126:5 129:2 130:6 131:5 ,20 137:11 143:17,22 144:22 150:14 156:15 160:19,22 169:22 177:8 181:7 182:8 191:4 193:18 203:24 206:14 208:12 220:16 225:4 228:13 238:24 255:14 256:9,11 259:10 264:14 265:19 270:22 274:24 277:24 297:9 309:3 310:16 324:4 329:13 344:11
**understanding** 15:11 21:2 24:1 25:19 36:10 ,16 37:19 42:12 52:16 61:10 64:10 68:10 93:15 114:24 115:2 159:6,10 161:24 162:5,11 165:12 193:20 195:6 223:20 239:7 274:16 330:13
**understood** 19:16,23 57:14 61:9 62:18 77:19 105:17 114:15 144:11 159:19,21 194:5 205:18 217:14 251:20
**undertake** 232:5
**underway** 84:24
**unexposed** 171:5
**unfairness** 172:23

**unfortunate** 323:12
**unfortunately** 272:23
**united** 1:1,19 4:8 51:11 ,16 71:4 77:16 242:10 263:21 349:1
**universal** 173:22
**universe** 26:7 36:7 43:20 47:15
**universities** 86:9 197:6
**university** 46:18 47:23 49:1 51:3 86:8 94:23,24 95:3,9 199:18,20,21 200:1 209:22 210:5,6 212:13,14 288:1 303:6,8
**unknown** 72:6
**unless** 155:16 306:1,6
**unlike** 141:1,21 233:9
**unlikely** 293:20 295:4
**unlocked** 44:7
**unspecified** 228:11
**until** 41:8 52:23 56:2 109:4 130:14 299:8 346:15
**untreated** 170:11,12,13 ,14,15
**up-to-date** 77:3
**upjohn** 84:1,2
**upon** 12:12 13:16 43:23 45:20 57:17 93:11 148:1 149:9 200:12 278:22 279:23 280:13,23 282:5 299:4 305:2 336:19,22 340:21,23
**upper** 125:4
**upward** 161:13
**us** 7:21 10:8,9 11:8 14:16,21 28:11,21 49:3 51:9 65:6 136:20 147:16 155:24 201:24 243:19 258:23 259:10 272:24 291:17,19,22 292:13 295:7 303:9 323:8 345:17 348:-
**use** 19:13 21:10 34:2,6 ,20 36:19 50:11 76:12 ,23 144:20 145:17 146:9 162:2 169:12,15 171:17 178:7,8 193:8,9,13 202:8 208:10 213:12 244:11,12 253:20 298:18 303:21 338:20 344:12
**used** 9:20 22:4,6 34:24 47:5,24 49:22 50:17 51:5 53:14,21 54:14 62:8 64:21 75:24 82:19 84:22 99:23 170:5,6 181:5 183:24 185:6,8 186:9 206:20 231:22

242:7 248:4,21 279:13 283:6 285:24 299:2 301:8,20 308:2 320:17 334:2 338:21 339:6 345:4 350:22
**useful** 117:11 131:19 132:5 290:8
**uses** 31:3
**using** 22:14 38:20 45:7 51:8 60:14 62:3 171:6 181:12,13 182:11 186:22 189:12 190:7 192:3 193:17 194:7 206:4 224:4 309:22
**usually** 69:16,18 187:11 289:3

---

**V**

---

**va** 35:12 48:11,12,15,19 ,22 49:1 50:2,2,6,6 196:5 197:5,14 203:19 210:14,17 212:3 263:12 ,19 264:22 267:6 268:8 ,20,24 306:17,21 345:24
**vague** 221:24 277:9
**valek** 46:17
**validate** 76:20
**validated** 33:22 45:7
**value** 160:12 312:2,8 342:11
**values** 58:23 312:15 314:4 339:15
**vapor** 217:1
**variability** 154:18,22
**variety** 82:12 280:18
**various** 52:6,6,9 123:18 185:16 199:10
**vary** 209:2
**verbally** 210:23 287:20
**verbatim** 247:16 253:14 ,16
**verification** 64:24 300:5
**verified** 58:12 159:11
**verify** 58:23 63:11 64:21 140:7 299:3
**verifying** 44:10
**veritext** 4:2
**version** 77:3 244:9 289:6
**versions** 289:7
**versus** 1:12 4:10 49:19 ,23 116:11 119:14 158:14 192:4 208:5,6,7 ,14 264:15,20 308:21 309:14,16 322:13 346:17 349:-
**veterans** 35:11 232:2
**via** 33:5 42:4 288:19,22 294:14

**vicinity** 159:3 182:6
**videographer** 3:- 4:1 5:4 53:5,9 102:12,15,19 104:9,12 132:15 133:2 174:17,21 217:3,7 259:21,24 269:6,9 316:2 ,6 341:2 347:11
**videos** 9:11
**videotaped** 1:16
**videotapes** 9:14
**view** 57:18
**vigabatrin** 328:5
**violated** 203:2
**violates** 202:19
**virtue** 61:1
**visited** 230:16
**visiting** 35:13 209:23 291:17 292:12
**vitae** 76:21 97:4 348:12
**vocabulary** 43:21
**voice** 5:18 230:10,12
**volume** 1:-
**vs** 1:5,- 349:5,-

---

**W**

---

**wait** 11:20,20 88:8 187:7 262:13 291:1 300:8,15
**waiting** 6:3,4 182:15,16 237:24 317:7
**waived** 350:16
**want** 28:11 39:3 43:2 45:5 53:1 54:23 70:11 72:19 73:6,7,8,11 76:10 81:21 86:24 107:13 110:2 135:7 139:1,22 140:22 146:18,19 149:21 156:1 157:5 167:5 174:10 177:21,22 179:5 180:5 193:8,9,13 ,14,16 196:21 198:5 209:18 212:9 220:5,8,12 238:18 240:10,16 246:13 249:11 252:3 259:8 271:7 272:5 289:22 293:20 299:18 310:16 321:4 326:19 327:2,3 335:21 338:8
**wanted** 11:10 202:12 270:3 279:16 283:10 309:13 335:19 343:22
**wants** 240:18 255:10
**warner-lambert** 20:8 87:4
**warning** 174:9 222:23
**warnings** 253:1
**wasn't** 31:15 42:23 50:3 107:14 109:3 154:16 167:15 175:17 183:12 186:5 194:9 197:19

Gibbons, Robert (Defense Expert)  2/3/2009  9:09:00 AM

209:15 254:21 302:23
306:22 323:16 340:12
346:19
**waste** 338:5
**ways** 26:20 52:9 130:13
**we'd** 291:22
**we'll** 6:9 17:11 22:8
34:22 48:8 65:6,20
74:23 76:10 103:4 178:8
179:23 244:21 269:19
272:6 296:12 300:2,2
321:6 324:13 335:19
338:10 340:23 341:6
345:18 347:3
**we're** 6:10 11:8 12:24
15:2 18:4 57:5 65:4
104:3 106:12 137:4
150:5 155:12,24 156:3,6
177:24 200:8 210:3
217:11 230:14 232:5,6
237:12 254:7 259:22
297:9 305:18 306:24
307:1 309:7 319:16,21
321:5,7 323:10 327:13
,15 337:18,24 347:10
**we've** 5:15 8:18 104:7
130:11 174:8 201:12
210:16 216:24 220:4,15
233:11 256:3 259:10
269:19 308:12 327:1
**website** 109:4 273:19
**wednesday** 288:1
**week** 227:11 346:14,22
**weeks** 346:15,20,22
**weiss** 100:24
**weiss-smith** 95:14,16
96:24 97:7,11,24 100:17
101:23
**well** 10:12 11:1 13:10,21
14:10,17 18:14 19:20
21:21 32:21,24 37:7
45:22 55:15 59:2 63:17
64:16 69:1 70:8 73:3
79:22 80:19 82:10 83:6
85:5 94:20 96:11,17
97:16 98:17 103:9
109:11 118:15 119:22
127:10,16 128:11 129:9
130:6,11,21 132:9
135:20 137:8 144:19
146:8 147:5,10,14 150:2
153:19 157:14 163:13
,16 171:16 172:22 174:7
,14 182:4,24 183:19
186:17 188:23 189:24
192:2 193:8 195:13
197:11 198:17 204:12
208:14,24 215:7 216:12
218:3 219:8,14 220:2

221:8 222:2 224:21
230:2,10 232:15 236:8
239:16,21 240:6 241:5
244:17,19 246:13 248:1
249:7,15 253:15,23
254:6,18,24 255:24
260:24 264:21 265:18
271:6 274:15 275:7
276:17 277:5 278:10,15
280:8 283:2 284:10
287:5 289:9 290:18
292:7,16 293:8 294:9
303:19 304:2,8 305:8
306:13 307:14,21
308:10 314:16 315:21
320:13 324:17 325:19
327:21 330:17 334:23
335:6 340:3,3 341:22
345:6
**well-documented** 33:22
**went** 8:21 39:15 40:19
41:2 108:1 129:23
130:16 131:2 151:17
229:16,20,24 244:10
262:9 319:13,22 324:2
**weren't** 43:14 249:22
282:23
**west** 1:22 2:12 4:5 350:6
**what's** 55:9 68:22 98:24
124:6 137:22 143:1
145:1 208:24 221:13
227:20 242:22,23
277:24 289:13 292:14
312:21 324:20 325:4,7
344:17,17
**whatever** 37:14 58:5
145:14 153:8,9 193:13
194:19 207:3 208:17
334:6
**whatsoever** 214:1
228:14 277:19
**whenever** 338:8
**whereas** 121:16 248:11
**whereof** 351:5
**whereupon** 132:17
347:14
**whether** 14:11 15:23
19:4 24:23 25:1,9 27:8
34:24 44:18 51:14 54:15
71:9 74:14 81:22 83:13
91:2,3,13,23 93:9,20
94:4,12,14 96:3,6,13
97:14,24 98:18,21
101:12 102:1,13 108:15
111:19 113:1,23 115:2
117:19 118:1 119:20
120:12 121:11 127:3
129:22 130:9,16 131:6
132:5 135:4 137:14

141:12,15 149:13
153:24 155:5,6 165:4
167:2 173:3,23 174:1
176:7 186:12,13 189:15
190:1 191:6 193:14
194:15 198:9 219:23
223:21 228:20 233:6
238:9,17 250:1 258:23
265:8 267:22 268:2
271:8 279:17 290:22
291:6,15,24 293:20
294:5,19 295:11,14
303:22 309:13 310:3,13
316:18 324:5 330:11
331:21 333:3 335:20,20
336:7 337:9,16,21
338:13 339:20 342:23
343:24
**who's** 168:12
**whole** 70:23 273:24
289:10 343:17
**wholly** 55:21
**whom** 39:22 41:14 66:22
112:5 236:5
**whose** 47:23 81:5,8
**why** 7:18 10:24 38:13
39:3 73:2 89:6 161:22
202:7 240:8,21 249:12
270:10 278:21 301:6,17
302:5 303:15 304:8
315:20 326:18 347:2
**wide** 82:12 280:18
**width** 312:21
**wife** 231:15,16
**wild** 235:23
**will** 4:14 10:8 12:24 13:2
14:10,19 15:9 18:7 21:5
24:22 25:4 26:23 27:1
31:12,15,19 41:2 48:12
65:8 75:8 81:24 82:3,19
116:19 118:4,6 138:18
139:2 159:15 162:3
169:16 173:19 201:21
209:2 220:8 223:9
234:20 241:7 244:19
259:11 261:7 267:22
304:22 305:1 323:13
337:13 350:23
**willing** 69:18
**winkler** 3:- 4:24,24 155:9
,13,16,22 347:8
**wish** 117:10 316:11
**withdraw** 177:22 178:2
296:16
**withdrawing** 296:13
**within** 27:3 29:7 30:6
42:20 43:9 61:24 143:2
178:19 219:4 266:14
271:4,24 272:1 283:17

299:7 305:5 308:18,18
,20 309:18 312:2,8,16
313:16,21 314:4,5
350:20
**without** 44:13 55:9
118:13 143:1 146:20
153:13 171:10 203:7
206:8 212:7 215:11
216:11 239:10 295:5
**witness** 4:13 5:4 11:8
17:19 24:13 30:19 34:15
36:13,22 37:19 38:11
40:1,11,22 41:11 44:24
46:5 48:5 49:14,18 54:9
,19 55:15 58:1,10 60:19
61:5 63:19 66:11 68:4,8
,13 69:3,21 70:2,5 72:17
73:14 74:2,5,18 78:2
79:23 80:19 81:13 82:6
85:6 86:3 88:14,24
89:19 90:15,19 91:2,9
92:6,18 93:3,14 94:17
95:12 96:18 97:19 99:2
,21 100:7 102:6 103:11
107:10 112:20 118:1,20
120:19 132:11 134:17
135:1 143:16 144:2,22
145:18 146:11 147:18
153:1 154:13 155:4
160:22 163:18 164:18
165:11,20 166:10
167:15,20 169:22
173:13 175:7 176:4,12
178:17 182:24 185:21
187:10 189:24 193:20
195:16 196:13 197:13
198:24 203:13 205:3
207:6 211:23 215:23
216:14 218:7 223:10,13
,17,20 230:16,19 236:2
,11,16 238:23 249:8,20
250:10 251:1,5,24 256:8
,15,21 257:15,23 258:4
,11 261:3,10,16,18,20
262:16 264:10 265:19
268:12,23 270:18
274:14,16,24 275:7,15
,19 276:24 277:13,19
280:17 281:4,11,24
282:9,19 283:3 284:10
291:11 293:24 296:10
302:13,15,21 312:15
313:13 315:9 316:15
320:13,24 322:20
323:11 329:24 330:2
331:17 333:23 334:17
335:13 336:15 342:1
344:5 345:20 347:1
348:- 350:12 351:5

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)

**witnesses** 5:20
**won't** 6:23 11:7 64:23
110:3 245:15 337:13
347:6
**word** 60:11,14 63:4
169:13 170:5,6,7,8
202:8,22 241:17 242:4
,18 243:18 244:11,11,12
,13,14,19 245:18 247:9
,16,17,20,23,23 249:2,6
254:19,21 271:8,8
**words** 59:18 60:16 81:6
84:21 130:8 141:18
169:12 196:1 208:9
254:22
**work** 22:2,23 32:11
33:11,15 34:4,8 35:2,3
44:21,22,24 45:3,5 49:3
50:12 53:14 57:19 61:3
62:12 64:16,18 67:18
70:23 71:1,3 73:9,21
75:15 80:21 85:4 86:20
,21 87:4,7 101:13 103:5
122:8,9 147:6 180:17
183:8 195:20,23 196:9
,22 197:7,14,14 199:3,6
200:20 208:16 211:16
212:3 218:19 222:16,18
225:5,23 226:24 229:15
,20,24 230:5 250:8
261:2 263:2 276:5,7,10
277:22 282:13 285:2
295:9 297:22 298:3
303:19 304:16 310:8
**worked** 34:1 45:1 46:16
,17 47:22 66:19 67:14
,16 86:15 200:12 216:1
295:8 297:17
**working** 26:19 43:24
48:22 49:2 50:22 58:5
72:19 73:3 83:18 128:24
198:12 207:11 231:2
274:12,13,17 275:17,20
277:3,14 281:12 300:2
318:15
**works** 35:10,10 197:4
**world** 212:16 303:23
**worry** 170:22
**worrying** 170:20
**worse** 31:16
**worth** 245:15 256:1
**wouldn't** 45:2 81:13
85:20 88:14 90:21 92:6
119:6 128:9,18 131:19
164:22 165:2 169:7
234:21 241:2 261:8
285:11 293:13 295:2
313:24 320:13 325:13
**wrap** 341:6

**write** 58:10,15,15,20
174:5 179:22 211:2
214:22 239:22 240:5
297:12 306:10 307:17
,17,19,23 308:1,3,4,6,7
339:22
**writing** 41:18 141:8
210:18 211:11 218:21
285:19 297:15 309:4
329:20
**writings** 107:4
**written** 42:5 71:11
133:16 194:24 203:7
212:6 215:10,13 216:8
238:1 243:1,3 250:1,2
281:19 282:5 297:14
299:11 302:2 303:3
306:11 308:11
**wrong** 34:18 153:19
159:4 165:23 220:1
230:19 245:14 254:8
300:21,22 322:8
**wrote** 23:22 103:22
109:23 110:15 115:24
116:1 133:11,12 136:16
140:12 180:6 210:21
211:7 215:3 224:17,23
239:14 243:4 247:3
264:18 304:3 307:3
319:6 321:11 322:3
**wyeth** 49:19,23 68:5
74:2 111:6,8 251:6
264:4,11,20,24 275:16
276:2 277:20
**wyoming** 71:15

X

**x-a-n-a-x** 83:20
**xanax** 83:19,23 84:4,8
,13 85:24 86:20
**xerox** 108:1

Y

**yeah** 39:12 43:22 244:7
300:17 315:22
**year** 29:14,15,18,19 71:2
,21 76:2,6 126:4 185:5
,16 186:21 188:10
193:13 194:16 206:2
224:4,13 235:18 301:9
,12 318:19
**years** 53:16 82:11
125:23,24,24 126:7
147:3 178:4,5,8,10,14
,17,22 179:9 184:7,8,16
,20,24 186:15 188:15,17
,20,22 189:6,16 190:2,4
193:6,8,15,22 194:8
199:23 206:2,24 232:6

,16 301:3 310:12 341:10
343:15
**yes** 6:1,7,16 7:9,14 8:9
,13,14 9:2,5,17 12:7,12
,21 13:2,7 16:3 18:23
19:18 21:3,15 23:4 24:2
,4 25:4,4 26:22 27:1
28:18 29:3 32:1,16 34:3
,9,21 35:19 39:8 41:11
,15,20 42:7,12 45:15
47:16,20 48:14 49:21
50:10,15,20 51:21 55:7
,24 56:4,7 57:4,16 58:17
,18 59:10 60:5,9 61:15
62:1 64:4,13,15,17
65:17 66:4,13 68:8,15
69:24 70:14,20 71:13
74:5 75:10,12 82:6
83:15 84:9,12 88:11
92:5,18 95:20 98:9,14
99:11,14 100:14 103:11
104:1,6,17 105:2 106:17
109:16 110:13 111:24
112:16 114:24 115:21
120:23 121:2 124:2,13
125:11,13,22 126:3,13
,19,22 137:2 140:19
141:5 143:8 145:21
148:2 150:12 152:3
153:17 156:13,20
158:15 162:21 166:13
168:3 170:3 173:13
175:23 178:6 180:9,15
185:19 188:13,19
190:12 196:7 197:17
198:1,18 201:14,20
204:14 207:14,16
214:23 217:13 221:21
222:8 223:23 227:21,24
228:16 231:9 232:22
233:2 235:5,14 239:15
241:13 246:14 247:6,15
248:23 260:13,17 264:8
265:14,15 266:1 267:3
,18 270:12 280:1 282:21
286:14 288:21,23
298:12 300:23 302:4
303:4,12 304:2,17
316:16 317:18,24
324:22 325:2,5,8,20
327:10 331:4 333:9
336:2 343:6 346:12
347:9
**yet** 27:12 28:8 32:22
70:24 81:23 172:12
196:20 221:2,15,16
336:10
**yield** 112:1 311:10
**yielding** 99:17

**you'd** 56:23 64:23
146:15 172:8 194:3
311:16 314:7 341:21
**you'll** 19:3 48:13 106:13
155:13 171:7 187:21
237:9 241:10,14 242:14
247:4,7 270:4
**you're** 6:3 16:10 17:3
27:7 28:10 37:7,13
61:23 62:2 64:14,17
66:15 70:17 77:22 78:19
,22 88:9 98:3 100:11
121:24 136:3,13 153:1
158:9 160:23 170:10,20
171:4,13 179:16,19
180:10 191:5 202:24
219:14,18 221:9 223:19
,21 226:2 236:14 268:16
275:17 276:13,20,22
279:5 280:8,11 282:19
291:11 296:13 298:6
302:14 304:12 305:10
,20 309:3 314:16,18
325:15 329:8,10 335:9
337:8 342:2 344:11
**you've** 7:21 8:6,12 9:3
,11 25:2 61:5 70:1 71:21
80:23 85:24 120:22
127:20 143:14 146:9
150:13 162:18,22
188:24 197:6 220:10,11
230:22 231:22 269:18
296:17 324:8 336:10
**young** 32:8,14,15,24
**yourself** 8:5,20 14:12
15:10 20:7,21 36:18
44:14,19 58:6 62:13
79:3,15,20 80:5 89:12
90:2,7 91:23 92:15
93:11 100:2 113:20
120:15 153:8 162:22
196:4 198:21 207:10
247:22 297:20 318:13

Z

**zero** 111:21 112:2,7,10
113:3 117:5 121:12,15
,17 122:5 128:17 129:6
,16,19,24 130:20,23
131:8,18 132:3 158:1
159:22 248:17,18 328:9
,13,16,20,23
**zip** 52:10,11