EXHIBIT 1B

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
**2/4/2009**

352

1      IN THE UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS
3   IN RE; NEURONTIN            )
4   MARKETING SALES PRACTICES     )
5   & PRODUCT LIABILITY          )
6   LITIGATION,                 )
7                        ) MDL DOCKET
8   BULGER vs. PFIZER, et al.,    ) No. 1629
9                        ) MASTER FILE
10  SMITH vs. PFIZER, et al.,     ) No. 04-10981
11  05-CV-11515-PBS             )
12      SUPERIOR COURT OF THE STATE OF CALIFORNIA
13              CITY OF LAKE
14  NICOLETTE CRONE, et al.,     )
15          Plaintiffs,    )
16          vs.          ) CV 400432
17  PFIZER, INC., et al.,        )
18          Defendants.   )
19          2/4/09  Job No.: 183060
20          9:16 a.m.
21      The videotaped deposition of ROBERT D.
22  GIBBONS, Ph.D., resumed pursuant to adjournment at
23  Suite 533, 506 West Harrison Street, Chicago,
24  Illinois.

353

1   PRESENT:
2   LAW OFFICES OF JACK LONDON,
3       (3701 Bee Cave, Suite 200,
4       Austin, Texas 78746,
5       512-478-5858), by:
6   MR. JACK LONDON,
7       jlondon@texas.net,
8       -and-
9   FINKELSTEIN & PARTNERS, LLP,
10      (463 Robinson Avenue,
11      Newburgh, New York 12550,
12      800-634-1212), by:
13  MR. KEITH L. ALTMAN,
14      kaltman@lawampmmt.com,
15      -and-
16  THE LANIER LAW FIRM,
17      (6810 FM 1960 West,
18      Houston, Texas 77069,
19      713-659-5200), by:
20  MR. KENNETH S. SOH,
21      kss@lanierlawfirm.com,
22      appeared on behalf of the Plaintiffs;
23
24

354

1   PRESENT:  (Continued)
2   SHOOK, HARDY & BACON, L.L.P.,
3       (2555 Grand Boulevard,
4       Kansas City, Missouri 6108-2613,
5       816-474-6550), by:
6   MS. LORI CONNORS McGRODER,
7       lmcgroder@shb.com,
8       appeared on behalf of the Defendants;
9
10  LAW OFFICES OF STEVEN D. HILLYARD, PC,
11      (345 California Street, Suite 1770,
12      San Francisco, California 94104,
13      415-334-6880), by:
14  MR. GERHARD O. WINKLER,
15      appeared telephonically on behalf of
16      Defendant Raymond D. Jennings, M.D.
17
18  VIDEOTAPED BY:
19  MR. JAMES PIERDZICH, Veritext Chicago
20      Reporting Company.
21
22
23  REPORTED BY:  ANDREA L. CARTER,
24      Illinois CSR No. 84-3722.

355

1       THE VIDEOGRAPHER:  My name is James Pierdzioch
2   of Veritext.  The date today is February 4th, 2009,
3   and the time is 9:16 a.m.  This deposition is being
4   held at the Holiday Inn located at 506 West Harrison
5   Street in Chicago, Illinois.
6       The captions for this case are Neurontin
7   Marketing Sales Practices and Products Liability
8   Litigation in the United States District Court,
9   District of Massachusetts, and Nicolette Crone, et
10  al. versus Pfizer Incorporated, et al. in the
11  Superior Court of the State of California for the
12  County of Lake.
13      This is the day two deposition of Robert
14  Gibbons, Ph.D.  At this time the attorneys will
15  please identify themselves for the record.
16      MR. ALTMAN:  Keith Altman on behalf of
17  Nicolette Crone and the Crone plaintiffs.
18      MR. LONDON:  Jack London on behalf of the MDL
19  product liability plaintiffs.  Also here but out of
20  the room for a moment is Ken Soh also with the
21  plaintiffs' product liability MDL group.
22      MS. McGRODER:  Lori McGroder on behalf of
23  Pfizer.
24      MR. WINKLER:  Gary Winkler on behalf of

356

1    defendant Dr. Jennings in the Crone case.
2        THE VIDEOGRAPHER:  Dr. Gibbons, you are still
3    under oath.  Counsel, you may proceed.
4        ROBERT D. GIBBONS, Ph.D.,
5    called as a witness herein, having been previously
6    duly sworn and having testified, was examined and
7    testified further as follows:
8        EXAMINATION (Resumed)
9    BY MR. ALTMAN:
10       Q.   Dr. Gibbons, how are you this morning?
11       A.   Good thank you.  How are you?
12       Q.   Not too bad, not too bad.  No snow.
13   That's always a good sign, right?
14       A.   Yes.
15       Q.   Dr. Gibbons, you have handed to me what I
16   am going to mark as Exhibit 24.
17           (WHEREUPON, a certain document was
18           marked Gibbons Deposition Exhibit
19           No. 24, for identification, as of
20           2/4/09.)
21   BY MR. ALTMAN:
22       Q.   Dr. Gibbons, could you please identify
23   Exhibit 24 for the record?
24       A.   This is a printout of the Excel

357

1    spreadsheet that I had requested from counsel
2    listing the study level data for events and sample
3    sizes in the various treatment arms that were
4    submitted to the FDA by Pfizer.
5        Q.   Did they give you any kind of a legend at
6    all that went with that spreadsheet?
7        A.   They may have.  I don't remember at this
8    time.  I think there was to identify what these
9    various treatment arms were.
10       Q.   Okay.  Do you still have that legend
11   somewhere?
12       A.   I may.  As I told you, I have had some
13   computer problems.  So it's been hard to get -- get
14   information.  I might have a descriptor of it.
15       Q.   Okay.  Particularly, I believe there is a
16   column on this exhibit labeled TXARM.
17           Did I read that correctly upside down?
18       A.   That's correct.
19       Q.   Okay.  And there are various numbers in
20   there that go along -- for each study listed under
21   the trial column, there are multiple records,
22   correct?
23       A.   Correct.
24       Q.   And sometimes the TXARM, which I assume

358

1    is treatment arm; is that correct?
2        A.   That's correct.
3        Q.   You see ones, twos, sometimes you see
4    threes and fours.
5            As you sit here today, can you tell me
6    what one, two, three, and four mean?
7        A.   One is gabapentin, two is placebo, and
8    three and four are some form of low-dose comparator
9    drugs.
10       Q.   Okay.  I want to make a little pile for a
11   second.  Can you put that on the side for one
12   second.
13           Could you please pull the PharMetrics
14   contract which is I believe --
15       MS. McGRODER:  Three, I think.
16   BY MR. ALTMAN:
17       Q.   -- Exhibit 3.  Could you pull the CD.  It
18   should be somewhere over there.  It's right over
19   there to your left.  Could you pull Exhibit 6.
20       MS. McGRODER:  What is Exhibit 6?
21       MR. ALTMAN:  That is the retainer agreement
22   with Dr. Gibbons.
23           Although we haven't marked it yet, we
24   have been just provided copies of your invoices.  So

359

1    it's -- well, why -- do we have the copies of that
2    contract -- why don't we mark one of them as Exhibit
3    25 so it can be complete.
4            (WHEREUPON, a certain document was
5            marked Gibbons Deposition Exhibit
6            No. 25, for identification, as of
7            2/4/09.)
8    BY MR. ALTMAN:
9        Q.   Put that on the pile over there, if you
10   could.
11       MS. McGRODER:  Were we lucky enough to have a
12   stapler today?
13       MR. ALTMAN:  We are not unfortunately, but I do
14   have some binder clips.  Jack, do you see if you can
15   could dig out -- there are some just in the bottom
16   of the box.
17   BY MR. ALTMAN:
18       Q.   Do you recall yesterday, Dr. Gibbons,
19   that Mr. London asked you about various materials
20   that were requested for you to produce as part of
21   this deposition?
22       A.   I believe so.
23       Q.   And you went through a list of a number
24   of items, and you had represented that you had

360

1    submitted some items to counsel and some items
2    didn't exist, correct?
3        A.   I believe so.
4        Q.   Dr. Gibbons, the pile you see in front of
5    you represents the sum total of the materials unique
6    to you that plaintiffs have received in this case.
7        MS. McGRODER:  Well, I -- I object to that
8    representation.
9        MR. ALTMAN:  Well, are there --
10       MS. McGRODER:  He has no idea to know whether
11   that's correct.
12       MR. ALTMAN:  I'm representing to him that
13   that's what's been produced.
14   BY MR. ALTMAN:
15       Q.   Are there other materials that you gave
16   to counsel that are not in the pile that you see in
17   front of you?
18       MS. McGRODER:  Well, I object to that, Keith,
19   because there are documents that we have given --
20   that Dr. Gibbons has received that we have given you
21   separately.  If you are asking him --
22       MR. ALTMAN:  I'm talking about in terms of -- I
23   am not talking about documents that were produced to
24   Dr. Gibbons.  I'm talking about correspondence

361

1    between Shook Hardy and Dr. Gibbons, anything along
2    those lines.
3    BY MR. ALTMAN:
4        Q.   Any other materials that you created
5    relevant to this case that you gave to counsel in
6    response to that document request.  Are there any
7    other materials?
8             For example, I think you were asked if
9    there were correspondence between you and Shook
10   Hardy.
11            Do you remember that?
12       A.   Yes.
13       Q.   I think you said there was some?
14       A.   Yes.
15       Q.   Do you see that -- any of that
16   correspondence in the pile over here?
17       A.   The majority of the correspondence that I
18   recall was via telephone.
19       Q.   Okay.  Was there any written
20   correspondence between you and counsel?
21       A.   Not to my knowledge beyond what's here.
22       Q.   So you sent no e-mails back and forth at
23   any time?
24       A.   There were occasional e-mails.  I haven't

362

1    saved those.  They weren't of a substantive nature.
2    Any substantive nature conversations were held on
3    the telephone.
4        Q.   So it's your representation there is
5    nothing substantive ever discussed in an e-mail
6    between you or counsel or counsel and you?
7        A.   That's correct.
8        Q.   Do you have the -- when you -- how did
9    you send the draft -- the submitted version of your
10   paper to counsel?
11       A.   I sent that as an e-mail.
12       Q.   Okay.  Do you have that e-mail?
13       A.   I don't retain e-mails that I have sent.
14       Q.   So you don't think that -- okay.  All
15   right.  We will come back to that.
16            Dr. Gibbons, Exhibit 25 has just been
17   produced to us is your invoices associated with the
18   Neurontin case, and I believe the first invoice here
19   is dated November 1st of 2008; is that correct?
20       MS. McGRODER:  Are you going in reverse
21   chronological order or --
22       MR. ALTMAN:  Well, the first invoice that I see
23   is dated April 1st of 2008.
24       MS. McGRODER:  You said November.

363

1        MR. ALTMAN:  Did I say November?  I apologize.
2    I meant April.
3    BY THE WITNESS:
4        A.   These are all of my invoices.  These all
5    include invoices on the sales and marketing case of
6    which you guys -- of which this deposition is not
7    about.
8    BY MR. ALTMAN:
9        Q.   Understood.  I'd just like to sum up the
10   total of these numbers.
11            The first invoice is for $13,500,
12   correct?
13       A.   Correct.
14       Q.   The next invoice dated April 23, 2008 is
15   for $26,000, correct?
16       A.   That's correct.
17       Q.   By the way, before we get to that, the
18   first invoice was that work for work in this case?
19       MS. McGRODER:  You mean the -- you mean the --
20       MR. ALTMAN:  In the products liability case.
21   BY THE WITNESS:
22       A.   Yes.
23   BY MR. ALTMAN:
24       Q.   Okay.  The next invoice for $26,000 dated

364

```
 1    April 23rd, is that also for work in the products
 2    liability case?
 3        A.   That's correct.
 4        Q.   The next invoice dated May 20, 2008 is 54
 5    hours for $27,000.
 6            Is that in this case?
 7        A.   That's correct.
 8            May I ask a point of clarification?
 9        Q.   Sure.
10        A.   When you say "this case," many of these
11    were related to the Daubert motions.  I just --
12        Q.   That's this -- I mean, anything having to
13    do with the safety of Neurontin and the products
14    liability actions, whether it's in the Crone case
15    or -- but excluding the sales and marketing --
16    excluding work for the sales and marketing.
17        MS. McGRODER:  He doesn't really get those
18    finer distinctions, but you understand the
19    difference between the products case and the sales
20    and marketing case, right?
21    BY THE WITNESS:
22        A.   I do, and that was the point of
23    clarification --
24
```

365

```
 1    BY MR. ALTMAN:
 2        Q.   That's fine.
 3        A.   -- I was seeking.
 4        Q.   The next invoice dated June 13, 2008 is
 5    for 60 hours, and it has got some expenses.  We will
 6    put those aside, and is a total of $30,000 excluding
 7    the expenses; is that correct?
 8        A.   That's correct.
 9        Q.   Okay.  And that's all in this case,
10    right?
11        A.   Yes, it is.
12        Q.   The next invoice is dated June 22, 2008
13    and has 40 hours on it and some expenses which we
14    will exclude and $20,000, correct?
15        A.   That's correct.
16        Q.   And that's in this case, right?
17        A.   Yes, it is.
18        Q.   The next invoice is July 13, 2008 which
19    appears to be for 62 hours and a total of $31,000.
20            Did I read that correct?
21        A.   Yes, you did.
22        Q.   Is that in this case?
23        A.   Yes, it is.
24        Q.   The next invoice I see is dated July 29,
```

366

```
 1    2008.  It says:  "Preparation -- preparation and
 2    participation in trial 32 hours."
 3            Now, I suspect does that mean the Daubert
 4    hearing?
 5        A.   Yes, it does.
 6        Q.   Okay.  That was 32 hours.  It has got
 7    some expenses.
 8            So we will say it's $16,000 not counting
 9    the expenses, correct?
10        A.   Correct.
11        Q.   And that's in this case, right?
12        A.   Yes, it is.
13        Q.   July 29th there's an invoice for $15,000
14    "Expense for data from IMS/PHARMetrics."
15            Did I read that correct?
16        A.   Yes, you did.
17        Q.   Okay.  We are not going to include that
18    because that's expenses.
19            The next invoice is dated August 6th.  It
20    appears to be 58 hours, a total of $29,000.
21            Did I read that correct?
22        A.   Yes, you did.
23        Q.   And that's in this case?
24        A.   Yes, it is.
```

367

```
 1        Q.   September 2nd, 2008 is another 40 hours
 2    for $20,000.
 3            Did I read that correct?
 4        A.   That's correct.
 5        Q.   Is that in this case?
 6        A.   Yes, it is.
 7        Q.   The next invoice is 44 hours for $22,000
 8    dated September 2, 2008.
 9            Is that in this case, or is that in the
10    sales and marketing case?
11        A.   Sales and marketing.
12        Q.   Okay.  We will put that -- let's keep
13    that on the side.
14            The next invoice dated October 5, 2008 is
15    analytic worked on PharMetrics data, 40 hours.  Is
16    that $20,000.
17            Did I read that correct?
18        A.   Yes, you did.
19        Q.   Is that in this case?
20        A.   Yes.
21        Q.   The next invoice dated October 18, 2008
22    is 32 hours, $16,000.
23            Did I read that correct?
24        A.   Yes, you did.
```

368

1   Q.   And that's in this case, correct?

2   A.   Yes, it is.

3   Q.   The next invoice is for -- dated October

4   5th, 2008 for 16 hours and $8,000.  I suspect that's

5   not in this case, correct?

6        That's the sales and marketing?

7   A.   It's the sales and marketing.

8   Q.   Okay.  The next invoice dated October

9   26th, 2008, is 40 hours, $20,000.

10       Did I read that correct?

11  A.   Yes, you did.

12  Q.   And I suspect that's also in the sales

13  and marketing case, correct?

14  A.   Yes, it is.

15  Q.   Okay.  The next invoice is dated November

16  15th, 2008.  It's 40 hours $20,000.

17       Is that in the sales and marketing case

18  or the products liability case?

19  A.   Sales and marketing.

20  Q.   Okay.  The next invoice dated November

21  30th, 2008 says:  "Prepare CD with materials relied

22  upon for PharMetrics analysis, 8 hours, $4,000."

23       Did I read that correct?

24  A.   Yes, you did.

369

1   Q.   And that's in this case, correct?

2   A.   Yes, it is.

3   Q.   Okay.  The next invoice date -- wait, I

4   forgot to put that in the right place.

5   MS. McGRODER:  You know, Mr. Altman, I just

6   noticed, for example, on this November 30, 2008

7   there are some handwritten notes, and they have

8   been -- I suppose that's a check number.  Maybe we

9   ought to --

10  MR. ALTMAN:  That's what it appears to be --

11  MS. McGRODER:  Maybe we ought to -- I mean, I

12  don't know whether that's pertinent to the issues.

13  To the extent that's part of a public record, maybe

14  we ought to redact it.

15  MR. ALTMAN:  I don't know.  Why don't we not --

16  we don't need to waste any time with it.  Personally

17  I am not opposed to the redactions, but I will

18  confer with co-counsel --

19  MS. McGRODER:  We can talk about it later.

20  MR. ALTMAN:  We can talk about it later.

21  BY MR. ALTMAN:

22  Q.   November 30th, 2008 there's an invoice it

23  looks for 56 hours.  I suspect that is for the sales

24  and marketing case; is that correct?

370

1   A.   Yes, it is.

2   Q.   Okay.  December 15, 2008 is another 24

3   hours.  I suspect that's also for sales and

4   marketing; is that correct?

5   A.   Yes, it is.

6   Q.   Okay.  January 22, 2008 is another

7   invoice for 19 hours, $9500.

8        Did I read that correct?

9   A.   Yes, you did.

10  Q.   I suspect that's also for the sales and

11  marketing case?

12  A.   Yes, it is.

13  Q.   Okay.  Then there's another invoice, and

14  the last one that we have here is dated January

15  22nd, 2008, eight hours, reviewed depositions and

16  other materials $4,000.

17       Which case is that in?

18  A.   That's in this case.

19  Q.   Okay.  According to my --

20  A.   I think the date on that invoice is

21  incorrect.  I think it's 2009 and not 2008.

22  Q.   That's correct.  I don't think we dispute

23  that.  I think that's what we all do in the first

24  month.

371

1        According to my calculations, what we

2   just went through, I come up with $256,500 that you

3   have been paid in this case.

4        Does that seem to be reasonable based on

5   what I have just reviewed with you?

6   A.   Yes, it does.

7   Q.   Okay.  And in the sales and marketing

8   case --

9   MS. McGRODER:  I'm trusting your math since you

10  have a calculator and I don't.

11  BY MR. ALTMAN:

12  Q.   It appears to be -- I come up with

13  $119,500.

14       Does that seem reasonable based on what

15  we just went through?

16  A.   Yes, it does.

17  Q.   And the total of those is -- comes out to

18  be $376,000.

19       Does that seem to be the simple math of

20  adding these up?

21  MS. McGRODER:  And, again, I just am trusting

22  your math, and so to the extent that works out to be

23  accurate, but I have no objection to your question.

24  Go ahead, Dr. Gibbons.

372

1  BY THE WITNESS:
2      A.  Yes, again conditional on the accuracy of
3  the numbers you put into your calculator.
4  BY MR. ALTMAN:
5      Q.  Okay.  Dr. Gibbons, did you have any
6  other income from outside of the university in the
7  last -- the vast bulk of that is from 2008, correct?
8      A.  That's correct.
9      Q.  So we will say -- you know, we will say
10 it's probably about 350,000 from 2008.
11         Does that sound about right?
12     A.  It sounds about right.
13     Q.  Okay.  Did you do any other outside
14 consulting in 2008 for which you were paid outside
15 of the -- outside of the university?
16     A.  That was the bulk of the work that I did.
17 There may have been some others.
18     Q.  Do you know approximately how much you
19 did for the other?
20     A.  Not at this moment.
21     Q.  Is it a large percentage of that, or this
22 really heavily dominants the figure?
23     A.  This heavily dominates the figure.
24     MS. McGRODER:  Dr. Gibbons, keep your voice up,

373

1  okay?  I can barely hear you.
2  BY MR. ALTMAN:
3      Q.  What percentage of your total income did
4  this consulting revenue represent?
5      A.  That's about half of my -- that's about
6  similar to my university salary.
7      Q.  So you basically doubled your university
8  salary?
9      A.  Yes.
10     Q.  Okay.  Put this aside for now.
11         Dr. Gibbons, I want to come back to
12 Exhibit 24.  You can put 25 aside.  I don't think we
13 are going to look at that again.  25 is just the
14 invoices.
15     MS. McGRODER:  What was 24?
16     MR. ALTMAN:  Did we find clips, Jack?
17         24 is the spreadsheet that Dr. Gibbons
18 just produced.  We only have the one copy of it.
19 Just clip that.
20     THE WITNESS:  Thank you.
21     MR. ALTMAN:  And we can put that aside.
22 BY MR. ALTMAN:
23     Q.  All right.  You might just want to throw
24 that on the bottom of the stack.  Great.

374

1      MR. ALTMAN:  Okay.  I'd like to mark Exhibit
2  26.
3         (WHEREUPON, a certain document was
4         marked Gibbons Deposition Exhibit
5         No. 26, for identification, as of
6         2/4/09.)
7  BY MR. ALTMAN:
8      Q.  Have you seen this document before,
9  Dr. Gibbons?
10     A.  It looks a lot like one of the other
11 documents that you showed me -- well, one that
12 Pfizer report.
13     Q.  Okay.  I'd like you to pull Exhibit 19,
14 which was your list of supplemental materials
15 considered so.  It is just a one-page document.
16 Easy to miss.
17         The fourth item is entitled -- on your
18 list is "Pfizer FDA Briefing Document regarding
19 Lyrica and Neurontin."
20         Did I read that correctly?
21     A.  Yes, you did.
22     Q.  Does that appear to be the document I
23 just handed to you as Exhibit 26?
24     A.  It does.

375

1      Q.  Okay.  Now, I would like you to pull out
2  Exhibit 16 which was the other -- keep Exhibit 26
3  handy, and then pull Exhibit 16.
4         Okay.  Do you have those in front of you?
5      A.  I do.
6      Q.  Okay.  I'd like you to go to page 17 --
7      MS. McGRODER:  Of?
8  BY MR. ALTMAN:
9      Q.  -- of Exhibit -- of Exhibit 16.  And I'd
10 also like you to go to page 17 of Exhibit 26.
11         You are on page 16.  Page 17 of that.
12     MS. McGRODER:  There's two pages.
13     MR. ALTMAN:  Oh, I'm sorry.  It's that page 17.
14     MS. McGRODER:  Page 17 at the bottom.
15     MR. ALTMAN:  Okay.
16     MS. McGRODER:  Why are there two pages on
17 your --
18     MR. ALTMAN:  Because one is as you submitted --
19 was as it was submitted to the FDA made available by
20 the FDA, and the other one is -- this came down --
21     MS. McGRODER:  Oh, the pagination from the
22 Pfizer -- from Pfizer.  Okay.
23     MR. ALTMAN:  Right, Pfizer submitted this
24 document to the FDA, and then I think the FDA

376

1   just -- it might have had a cover sheet or something
2   like that.
3   BY MR. ALTMAN:
4       Q.   Dr. Gibbons, I would like you to take a
5   look at the last paragraph on both page 17s --
6   actually, would you read -- first, I would like you
7   to read them to yourself to see if paragraphs -- the
8   last paragraph is the same in both documents.  I
9   will let you do that first.
10      A.   They seem to be the same.
11      Q.   Okay.  Would you please read from either
12  one that paragraph into the record, your choice.
13      A.   "Analyses were conducted using all data
14  from placebo controlled trials and the dataset
15  created in response to the FDA query for information
16  and by excluding the trials that the FDA would
17  presumably have excluded based either on durations
18  of trials shorter than requested or small sample
19  size, see Table 3.  For both sets of analyses
20  trialed were excluded in the 2006 datasets if they
21  have no placebo arm, see Table 4, or had a single
22  dose/single day treatment duration."
23      Q.   Okay.  Does that seem to indicate that
24  Pfizer believed the FDA would have excluded studies

377

1   with zero -- with no placebo arm?
2       MS. McGRODER:  We will object on the basis of
3   foundation.  He has no idea what Pfizer would have
4   believed.
5   BY MR. ALTMAN:
6       Q.   Is that what Pfizer wrote there?
7       A.   That's what Pfizer wrote.  I don't know,
8   you know, what their motivation was.  I didn't
9   assist them in writing this.
10      Q.   That's fine, but Pfizer did write that,
11  correct?
12      A.   It's stated here in their documents.
13      Q.   Okay.  What I find pretty interesting,
14  Dr. Gibbons, is that the earlier version of this
15  report from April 29th -- your original expert
16  report was dated, I believe, April the 22nd,
17  correct?
18      MS. McGRODER:  Do you need to look?
19  BY THE WITNESS:
20      A.   I'd have to -- I would need to look.
21  BY MR. ALTMAN:
22      Q.   I believe that might have been Exhibit 8.
23      A.   I think so.  April 23rd.
24      Q.   April 23rd.  That's six days before this

378

1   Pfizer document was dated, correct?
2       It's dated April 29th.  The one in your
3   right hand.
4       A.   That's correct.
5       Q.   Okay.
6       MS. McGRODER:  So Exhibit -- you are talking
7   about Exhibit No --
8   BY MR. ALTMAN:
9       Q.   16 is dated April 29th, correct?
10      A.   Correct.
11      Q.   Your expert report, not your declaration
12  is dated May the 20th or thereabouts.
13      You want to check that.  I think that's
14  Exhibit 9.
15      A.   May the 19th.
16      Q.   May the 19th, and that's after the April
17  29th document, correct?
18      A.   That's correct.
19      Q.   Did you in any way participate with
20  Pfizer in drafting the April 29th document?
21      A.   You are referring to Document 16?
22      Q.   Exhibit 16, the April 29th Pfizer
23  analysis of the clinical trial data.
24      A.   I had no participation in this at all.

379

1       Q.   I think you testified in the Daubert, you
2   had not ever seen that document even up to the
3   Daubert hearing which was June -- June 23rd or so in
4   2008, correct?
5       MS. McGRODER:  Well, objection to the extent
6   that misstates his testimony.  We would have to look
7   at the transcript to know precisely what he
8   testified.
9   BY THE WITNESS:
10      A.   I don't recall exactly what I testified,
11  but, you know, if that's corroborated by the record,
12  that would seem, you know, reasonable.
13  BY MR. ALTMAN:
14      Q.   This document was not on your list of --
15  your list of documents that you reviewed attached to
16  your expert report dated May the 19th, correct?
17      A.   Again, I would have to take a look at
18  that, but I -- I remember when you first showed this
19  to me yesterday or Mr. London showed it to me
20  yesterday, I remember questioning whether or not I
21  had ever seen it.
22      Q.   Okay.  That's fine.  I would like you to
23  go to the next page of the document which is page
24  18, and please do that in both versions.

380

1    I'd like you to just, you know, glance to
2    satisfy yourself that page 18 for both documents
3    appears to be identical in terms of the tables.
4    There may be some other notations.
5        A.   The sample sizes seem to be dissimilar
6    between Document 26 and Document 16.
7        Q.   Okay.  Any other differences?
8        A.   Well, there are quite a -- quite a few
9    differences in terms of the overall sizes of the
10   datasets that are being used in these two documents.
11   So I would say they are quite -- quite a bit
12   different.
13       Q.   Okay.  Well, let's go with the one from
14   April 29th.
15       MS. McGRODER:  So Exhibit 16.
16   BY MR. ALTMAN:
17       Q.   Exhibit 16.  By the way, are they
18   substantially different?
19       MS. McGRODER:  Well, I object.  He is going to
20   need to sit there and study them to quantify the
21   difference.
22   BY MR. ALTMAN:
23       Q.   All right.  Let's say, the total -- let's
24   take on Exhibit 16 about right before the end of the

381

1    first table, it says "Total GAB" which means
2    gabapentin, right?
3        A.   Where are you looking?
4        Q.   I'm looking at Table 3.  Just about the
5    last line it says "Total GAB."
6            It's maybe one line up from the end of
7    the table.  Do you see that?
8        A.   Yes, I do.
9        Q.   And that says for Gabapentin N 2132,
10   correct?
11       A.   That's correct.
12       Q.   In Exhibit 26 that says 2117, correct?
13       A.   Correct.
14       Q.   For the Placebo N, it says 942 in Exhibit
15   16, correct?
16       A.   Correct.
17       Q.   And it says 927 in Exhibit 26, correct?
18       A.   Correct.
19       Q.   Okay.  In Table 4 if you look at the
20   Gabapentin N for Exhibit 16, are those numbers
21   identical to the Gabapentin Ns in Exhibit 26?
22       MS. McGRODER:  Can you -- I'm sorry.  I didn't
23   hear that question.
24

382

1    BY MR. ALTMAN:
2        Q.   In Table 4 are the Gabapentin Ns the same
3    in Exhibit 16 as they are in Exhibit 26?
4        A.   Yes, they are.
5        Q.   And the only difference is the pregabalin
6    number, correct?
7        A.   That's correct.  One is listed as 42 in
8    Exhibit 26, and for the same study, it's listed as
9    51 in Exhibit 16.
10       Q.   Okay.  So there are slight differences.
11   As a percentage basis, there's a few percent
12   difference between Exhibit 16 and Exhibit 26.
13           Would you agree?
14       A.   I'd say the differences are pretty
15   significant in terms of it's unclear to me which --
16   you know, which subjects were excluded and which
17   weren't.  I mean, these would certainly be
18   differences that would cause me to have some
19   question about how these datasets are -- you know,
20   whether they are really comparable or not, which
21   studies were included and which subjects.
22           I would be -- you know, I would question
23   why the same study has a different number of
24   subjects for the pregabalin.  You know, I guess my

383

1    answer to your question as to a statistician seeing
2    those kinds of differences or inconsistencies would
3    be something that, you know, would be worth
4    following up.
5        Q.   Okay.  The difference between Exhibit --
6    the difference between Exhibit 16 and Exhibit 26,
7    Exhibit 16 has 2132 as we said, and Exhibit 26 has
8    2117, right?
9        MS. McGRODER:  Object to form.
10   BY MR. ALTMAN:
11       Q.   The total GAB, G-A-B.
12       MS. McGRODER:  Same objection.
13   BY THE WITNESS:
14       A.   In Table 3.
15   BY MR. ALTMAN:
16       Q.   In Table 3.  I'm sorry.
17       A.   Yes, that's correct.
18       Q.   Okay.  And Exhibit 16, I'd like you to go
19   through the Ns in Exhibit 16 and compare them to the
20   GAB -- and I am only asking about the Gabapentin Ns,
21   and compare them to the Gabapentin Ns in Exhibit 26.
22       A.   I've done that.
23       Q.   Okay.  Does it appear that the numbers
24   are identical except that there is one study in the

384

1  Exhibit 16, 945439 that has been removed from
2  Exhibit 26?
3      A.  That's correct.
4      Q.  And other than that, the numbers are
5  identical, correct?
6      A.  Yes, they are.
7      Q.  Okay.
8      MS. McGRODER:  For the Gabapentin N?
9      MR. ALTMAN:  For the Gabapentin N.  That's all
10 I was asking.
11     MS. McGRODER:  The placebo numbers are not.
12     MR. ALTMAN:  That's all I was asking about for
13 the Gabapentin N.
14 BY MR. ALTMAN:
15     Q.  And the Placebo N is 942 in Exhibit 16
16 and 927 in Exhibit 26, correct, the total N?
17     A.  That's correct.
18     Q.  And if you look at that same study 95439,
19 there were 15 in the Placebo N, correct?
20     A.  That's correct.
21     Q.  So it appears the only difference
22 between the two is that one study that was in
23 Exhibit 26 was removed from Exhibit -- in Exhibit --
24 I'm sorry -- was in Exhibit 16 and was removed from

385

1  Exhibit 26, correct?
2      A.  That's correct.
3      Q.  And if you take that study out, you get
4  exactly the same numbers for everything else,
5  correct?
6      A.  That's correct.
7      Q.  Okay.  April -- April 29th does this
8  chart, Exhibit 16 -- we are going to really focus on
9  Exhibit 16 -- does this demonstrate that Pfizer
10 removed certain studies from its attempt to analyze
11 the data that the FDA would have looked at?
12     MS. McGRODER:  Object to form and foundation.
13 He -- he wasn't involved in that document.  He has
14 no basis on which to testify what Pfizer did or
15 didn't do.
16 BY MR. ALTMAN:
17     Q.  I'm sorry.  You read the paragraph before
18 on Exhibit -- on page 17.
19     A.  Yes, I did.
20     Q.  Is that anything unclear about that
21 paragraph that Pfizer intended to remove studies
22 that had no placebos?
23     MS. McGRODER:  Object to form and foundation.
24 He has no basis on which to testify about Pfizer's

386

1  intent.
2  BY MR. ALTMAN:
3      Q.  Does the document say they removed
4  placebo controlled -- non-placebo controlled
5  studies?
6      A.  As I understand your question, you asked
7  whether or not Pfizer removed these studies in an
8  attempt to replicate what the FDA had done.
9      I have no idea whether or not the
10 intention of this document was to replicate what the
11 FDA was done -- had done or to perform an additional
12 analysis for some other purpose by Pfizer.
13     Q.  That's fine.
14     Let's go to page -- let's go to page 23
15 of the document.
16     MS. McGRODER:  Again, we are still on Exhibit
17 16, right?
18     MR. ALTMAN:  We are in Exhibit 16.  We are not
19 going to touch Exhibit 26.  The documents are
20 substantially the same.
21     MS. McGRODER:  Well, I object to your colloquy.
22 I don't think they are.
23     MR. ALTMAN:  Okay.  That's fine.
24

387

1  BY MR. ALTMAN:
2      Q.  You see Table 10 there -- this section is
3  titled "Summary of Gabapentin Placebo Controlled
4  Data," correct?
5      A.  That's correct.
6      Q.  It says:  "Gabapentin Exposure Data From
7  2006 FDA Response," correct?
8      A.  Yes.
9      Q.  Okay.  That's Table 10.  And it lists the
10 Gabapentin Ns for various different indications,
11 correct?
12     A.  Yes, it does.
13     Q.  And I am going to add those up.  It's
14 1,081 for neuropathic pain, correct?
15     A.  Correct.
16     Q.  778 for epilepsy, correct?
17     A.  Correct.
18     Q.  144 for other psychiatric, correct?
19     A.  Correct.
20     Q.  157 for chronic pain, correct?
21     A.  Correct.
22     Q.  And 478 for other studies, correct?
23     A.  That's correct.
24     Q.  You get a total of 2638, correct?

388

1  MS. McGRODER:  Well, object.  He doesn't have a
2  calculator.
3  BY MR. ALTMAN:
4     Q.   Would you prefer to do the calculations
5  yourself?
6          I mean, I'll do whatever --
7     A.   I mean, I'm -- I'm -- you know,
8  conditional on that you have done it correctly --
9     Q.   That's fine.
10    A.   -- I'll accept your number.
11    Q.   Let's take the placebos.  We have 785 in
12  neuropathic pain, correct?
13    A.   That's correct.
14    Q.   Six hundred and --
15         MS. McGRODER:  So you are asking what the
16  document says, right?
17         MR. ALTMAN:  I'm asking him what the document
18  says.
19         MS. McGRODER:  Because otherwise he wouldn't
20  know.  Okay.  Go ahead.
21  BY MR. ALTMAN:
22    Q.   617 in epilepsy, correct?
23    A.   That's what it says.
24    Q.   145 in other psych, correct?

389

1     A.   That's what it says.
2         THE COURT REPORTER:  Other?
3         MR. ALTMAN:  Psych, I'm sorry.
4  BY MR. ALTMAN:
5     Q.   53 for chronic pain, correct?
6     A.   That's what it says.
7     Q.   And 236 for -- 236 for other studies,
8  correct?
9     A.   That's what it says.
10    Q.   Which comes to a total of 1,836.
11         Did I get that right?
12    A.   I can't verify that in my head, but I
13  will accept that you did that correctly.
14    Q.   I would like you to go over to page -- to
15  Table 12 on the next page.
16         Now, I don't think there's any dispute
17  that I think every analysis shows that there were
18  two events in the gabapentin active group, correct,
19  no matter whose analysis, FDA, the company, yours.
20         Nobody disputes the two, correct?
21    A.   I believe so.
22    Q.   And nobody disputes that there was one in
23  the placebo groups, correct?
24    A.   That appears to be consistent in all the

390

1  analyses.
2     Q.   And by the way, the FDA was not the one
3  who decided how to categorize the patients into
4  which -- into which group whether it was a suicide
5  or suicide attempt.
6         That was all done by the company,
7  correct?
8         MS. McGRODER:  Well, object on foundation
9  grounds.  He has no idea how the -- how the FDA did
10 that or how Pfizer did it.  He's not a regulatory
11 expert.
12         MR. ALTMAN:  This is not a regulatory issue,
13 Lori.  Do you --
14         MS. McGRODER:  Yeah, it is, Keith.
15         MR. ALTMAN:  Lori, please stop coaching the
16 witness.
17         MS. McGRODER:  I'm not coaching the witness --
18 BY MR. ALTMAN:
19    Q.   Did you in any way review --
20         MS. McGRODER:  That's an objectionable
21 question.
22 BY MR. ALTMAN:
23    Q.   Did you in any way review how Pfizer came
24 about classifying events into whether it was

391

1  suicide, suicide attempt, suicide ideation, or any
2  of the categories specified by the FDA?
3     A.   My understanding is is that FDA laid out
4  guidelines -- categories that they were going to
5  include as suicidal ideation or behavior, and that
6  Pfizer complied with those guidelines, but I have no
7  way of knowing to the extent of the level of an
8  individual patient as to whether or not they
9  actually did comply with those guidelines or
10 knowledge about the details of what the guidelines
11 were that were presented to them.
12    Q.   But the categorizations were all
13 performed by Pfizer, correct?
14         MS. McGRODER:  Object to foundation.
15 BY THE WITNESS:
16    A.   You know, again, I don't know -- I wasn't
17 participating with that.  I don't know who did those
18 categorizations.
19 BY MR. ALTMAN:
20    Q.   Did the FDA do those categorizations or
21 was that submitted to the FDA by Pfizer?
22         MS. McGRODER:  Object on foundation.
23 BY THE WITNESS:
24    A.   Again, I -- you know, I don't have the

392

1  details.
2  BY MR. ALTMAN:
3      Q.  All right.  Let's pull Exhibit -- let's
4  go to Exhibit 17.  On your list you said you
5  reviewed Exhibit 17.  I know we are not quite sure
6  of that, but that's what's on your list.
7          Would you please go to page 3.  Would you
8  read the -- would you read the bottom paragraph of
9  Exhibit 3.
10     A.  "Using the search strategies stipulated
11  by FDA for 'Possibly Suicide-Related' adverse events
12  that occurred during the double-blind phase of
13  treatment or within one day of beginning of taper,
14  switching or stopping treatment, 336 possible cases
15  out of 8,829 patients were identified.  A complete
16  set of narrative summaries were prepared for each
17  identified case.  The narrative summaries were all
18  subsequently blinded with information blocked out as
19  requested by the agency prior to any review.
20  Appropriately trained and qualified Pfizer
21  psychiatrists then reviewed and classified the
22  blinded narratives using the approach from the
23  Columbia group for the pediatric suicidality
24  narratives.  The results of their blinded reviews

393

1  and classifications are summarized in the following
2  table."
3      Q.  Does that satisfy you that Pfizer is the
4  one who actually reviewed the narratives?
5      A.  Yes, it does.
6      Q.  Okay.  And hypothetically if there was
7  some error in how Pfizer had analyzed those
8  narratives, that could alter the numbers here,
9  correct?
10     MS. McGRODER:  Object to form and foundation,
11  improper hypothetical, and assumes facts not in
12  evidence.
13  BY THE WITNESS:
14     A.  If you are asking do errors in data lead
15  to differences in the -- in data and tabulations,
16  the answer is, of course, they do.
17  BY MR. ALTMAN:
18     Q.  And that's wasn't a complicated question.
19         And so my point is these numbers that
20  show up in the table that follow this are all
21  dependent upon Pfizer's internal sub -- we would
22  consider that to be a subjective review, correct?
23     MS. McGRODER:  Well, object on foundation
24  grounds.

394

1  BY THE WITNESS:
2      A.  I think in psychiatric research this --
3  using these kinds of criteria, using the Columbia
4  group's classification, using trained psychiatrists
5  to make those determinations would be considered to
6  be objective similarly to the -- to the
7  classifications that were performed by the Columbia
8  group on behalf of the FDA in the child and adult
9  suicidality studies performed by FDA.
10  BY MR. ALTMAN:
11     Q.  But there's still clinical judgment
12  involved, correct?
13     MS. McGRODER:  Objection to form and
14  foundation.
15  BY THE WITNESS:
16     A.  The foundation of most of psychiatric
17  research is based on clinical judgments and --
18  BY MR. ALTMAN:
19     Q.  That's fine.  Okay.
20         When we go to Table 12 back in Exhibit
21  16 -- keep that out because we are going to come
22  back to that document.  If you see in Table 12 which
23  is titled "Summary Statistics for Events by
24  Indication Using the 2006 FDA Response Gabapentin

395

1  Data."
2          Did I read that correct?
3      A.  Yes, you did.
4      Q.  And that is -- the Exhibit 17 that we
5  just discussed that is the company's FDA -- 2006 FDA
6  response, correct --
7      MS. McGRODER:  Object --
8  BY MR. ALTMAN:
9      Q.  -- for Neurontin?
10     MS. McGRODER:  Objection, form and foundation.
11  BY MR. ALTMAN:
12     Q.  What we just looked at Exhibit 17, that
13  is the company's response to the FDA from 2006 on
14  suicidality, correct?
15     A.  It certainly appears to be a response.  I
16  don't know.  There may be other responses, but this
17  seems to be a response to the FDA dated June 22,
18  2006.
19         Whether that's the same 2006 FDA response
20  gabapentin data as listed in Table 12, I can't -- I
21  can't answer that question for you.
22     Q.  Okay.  Bear with me a second here.
23         Would you please go to page 16 of Exhibit
24  16 for a second.

396

1    Section 4 at the top "Percentage of
2  Gabapentin and Pregabalin Data Contributing to the
3  FDA Meta-analysis."
4    Did I read that --
5    THE COURT REPORTER: I'm sorry. The Pre?
6    MR. ALTMAN:  Gabalin. I don't know if you have
7  it. P-r-e-g-a-b-a-l-i-n.
8    THE COURT REPORTER:  Finish.
9  BY MR. ALTMAN:
10    Q.   -- "Pregabalin Data Contributing to the
11  FDA Meta-analysis."
12    Did I read that correctly?
13    A.  Could you read that again.
14    Q.  "Percentage of Gabapentin and Pregabalin
15  Data Contributing to the FDA Meta-analysis."
16    Did I read that correctly?
17    A.  Yes, you did.
18    Q.  The next sentence says:  "The number of
19  patients included in the June 22, 2006 submission to
20  the FDA are compared with the total number of
21  patients analyzed by the FDA in Table 2 below."
22    Did I read that correctly?
23    A.  Yes, you did.
24    Q.  Exhibit 17 is that data June 22, 2006?

397

1    A.  It is.
2    Q.  So that appears to be the document they
3  are talking about here, correct?
4    A.  Unless they submitted another document on
5  that same day.
6    Q.  Do you know of any other document for
7  Neurontin on that day?
8    A.  I haven't seen any.
9    Q.  Okay.  If you take Exhibit 17 and flip to
10  I think it's the third page maybe.  It's the -- it's
11  the table -- maybe -- no, it might be on this --
12  yeah, that's the page. I'm sorry, page 4.  Okay.
13    Do you see that in Table 2 under the --
14  on Exhibit 16 right over here (indicating), do you
15  see that for the line titled "Gabapentin" it says
16  "Drug-Treated 5194"; is that correct?
17    A.  That's correct.
18    Q.  And that's the same number you used in
19  your report, correct?
20    A.  That's correct.
21    Q.  And it says "Placebo-Treated 2682."
22    Did I read that correct?
23    A.  Yes.
24    Q.  And that's the same as what you wrote in

398

1  your report, correct?
2    A.  Yes.
3    Q.  And it says "Total 7876," correct?
4    A.  Correct.
5    Q.  And that's the same number you used in
6  your report, correct?
7    A.  Yes, it is.
8    Q.  Now, you are pretty definitive in your
9  report when you tried to calculate the percentages
10  of the other drugs by backing out the Neurontin and
11  the pregabalin data.
12    You didn't put in your report that that
13  was not -- you didn't really know how much of the
14  pregabalin or Neurontin data the FDA used, correct?
15    MS. McGRODER:  Object to form and foundation.
16  It's argumentative.
17  BY THE WITNESS:
18    A.  My report was designed to look at the
19  available data that I had at that time.  I had the
20  information that Pfizer had submitted data for 7,876
21  subjects who participated in randomized clinical
22  trials with either placebo or -- and/or a low-dose
23  comparator drug, and those were the data that were
24  submitted to the FDA, and I did my analysis assuming

399

1  that those data were used by FDA given that I had no
2  reason to assume that they had excluded any data or
3  not.
4    Subsequent to that, I learned that they,
5  in fact, excluded some of these data, and I used the
6  figures that the FDA had used in their analyses and
7  subsequent expert and will supplemental reports.
8  BY MR. ALTMAN:
9    Q.  Would you go back to page 18 of Exhibit
10  16.  I am going to hand you back Exhibit 24, and I
11  have got it open at page 2 of Exhibit 4.  We only
12  have one -- this is the only copy we have.
13    MS. McGRODER:  Okay.  Thank you.  Exhibit 24?
14  BY MR. ALTMAN:
15    Q.  24, I'm sorry.  And you see there's the
16  study 945077?
17    A.  Yes.
18    Q.  Do you see any -- we talked before about
19  the line items one meant active, two meant placebo,
20  three, and four.
21    Do you see a two there in your chart?
22    A.  No, there isn't a two for that study.
23    Q.  Okay.  And if you see on to page 18 of
24  Exhibits 16, you see that's one of the studies that

400

1  Pfizer excluded when they did this analysis,
2  correct?
3       It's in Table 4, first item for
4  gabapentin, correct?
5       A.  That's correct.
6       Q.  Okay.  You didn't exclude that, though,
7  when you wrote your report, did you?
8       MS. McGRODER:  Which report -- we are talking
9  original report?
10      MR. ALTMAN:  Correct.
11  BY MR. ALTMAN:
12      Q.  When you wrote your original report --
13      A.  Exhibit 8.
14      Q.  -- Exhibit 8 or Exhibit 9, you didn't
15  exclude 94 -- that study, correct?
16      A.  Absolutely not.
17      Q.  Okay.  But even though it didn't have a
18  placebo control there?
19      A.  I did not want to exclude any study that
20  was submitted to FDA and potentially could have been
21  used by FDA in their analysis.
22      Q.  You don't think it would have been
23  important since the FDA asked for placebo-controlled
24  studies to check to see whether the company had

401

1  accidentally, inadvertently included non-placebo
2  controlled studies in their submission to the FDA?
3       MS. McGRODER:  Object to form and foundation
4  and assumes facts not in evidence that the -- that
5  Pfizer accidentally excluded or included certain
6  studies.
7  BY MR. ALTMAN:
8       Q.  Let's take Exhibit 17 which is the June
9  22nd submission.  I think it might be under Exhibit
10  24.  I think that might be it.  Would you please go
11  to Table 1.
12      We went through this yesterday, but on
13  Table 1 there are several studies on the first page
14  of Table 1 that don't have any placebo control,
15  correct -- don't have any placebo, correct?
16      A.  That's correct.
17      Q.  Those should not have been included in an
18  analysis of placebo-controlled studies, correct?
19      MS. McGRODER:  Well, object to form and
20  foundation.  That assumes facts not in evidence.
21      MR. ALTMAN:  Wait, could you clarify.  What
22  fact is not in evidence?
23      MS. McGRODER:  Well, Table 1 -- Table 1 is a
24  representation as you well know of what the FDA

402

1  requested.  Table 1 just identifies the studies
2  requested by the FDA.  So -- so whether they were
3  included or excluded from analyses by the FDA is a
4  separate question, and you are merging two concepts.
5       MR. ALTMAN:  No, I am not.  I'm asking
6  Dr. Gibbons whether he should have excluded a
7  non-placebo controlled study.
8       MS. McGRODER:  Well, again I object.  I think
9  it's misleading.
10  BY MR. ALTMAN:
11      Q.  Did you calculate the -- okay.  You know
12  what, strike that.
13      The 5194, did you calculate that number?
14      A.  Yes, I did.
15      Q.  How did you calculate it?
16      A.  By summing the values in the -- in the
17  spreadsheet that is --
18      Q.  Exhibit 24?
19      A.  -- Exhibit 24.
20      Q.  But some of those were not placebo
21  controlled, correct?
22      A.  That's correct.
23      Q.  Don't you think you should have excluded
24  the ones that were not placebo controlled?

403

1       A.  Absolutely not.
2       Q.  Why is that?
3       A.  Because these were the data that were
4  submitted by Pfizer to the FDA.  It was my
5  understanding that Pfizer had been requested by FDA
6  to provide all randomized studies either placebo
7  controlled or with a low-dose comparator.
8       I did not review or have the information
9  of exactly what FDA had requested from Pfizer.  This
10  was my understanding of what they were asked to do,
11  and these were the data that were submitted to FDA,
12  and it would have been improper for me to remove any
13  of the data that had been submitted to FDA by Pfizer
14  in doing my analysis.
15      Now, your question to me was would it
16  have been -- why would you include studies that
17  didn't have placebo for an analysis of
18  placebo-controlled studies, and the disconnect
19  between your question and my experience with this is
20  that I did not have the information that FDA had
21  requested only placebo-controlled studies, and as I
22  stand here today -- or sit here today -- I do not
23  know that FDA had required exclusively
24  placebo-controlled studies and not all randomized

404

1    studies which included studies in which there was a
2    low-dose comparator and not a control.
3        If Pfizer had submitted to the FDA the
4    wrong data, I simply wanted to know which data had
5    been submitted. These were all randomized studies,
6    and that was the analysis that I performed.
7        Q.   Pfizer seemed to know that certain
8    studies should have been removed, correct, in their
9    April 29th analysis because that's what they did,
10   isn't it?
11       MS. McGRODER:  Well, object on foundation
12   grounds. He doesn't know what Pfizer understood or
13   knew. He has no foundation to answer that.
14   BY THE WITNESS:
15       A.   Can I answer?
16   BY MR. ALTMAN:
17       Q.   Sure.
18       A.   I completely disagree with your point.
19   Pfizer provided these documents based on an analysis
20   that they wanted to do, and the purpose of that
21   analysis was not to reconstruct what FDA did.
22       I don't know what the purpose of these
23   analyses are, but certainly a valid analysis would
24   be to look at only those placebo-controlled studies.

405

1    That would not be the appropriate analysis if I was
2    trying to understand what portion of the FDA data,
3    the data that were submitted to FDA by the various
4    pharmaceutical companies came from Pfizer.
5        Q.   But you didn't -- simply didn't know,
6    though, how much of the Pfizer data the FDA had
7    used, correct?
8        A.   I didn't know that, and I only learned
9    what they had used once the statistical report from
10   FDA came out, and I made that clear in my expert
11   report that that kind of information was not
12   available to me, and what I was trying to do was to
13   determine what portion of the FDA data, the data
14   that were submitted to the FDA were based on data
15   submitted by Pfizer.
16       So the appropriate analytic set, the
17   appropriate dataset were the data that were
18   submitted to Pfizer -- submitted by Pfizer to the
19   FDA, and that's the 5,194 gabapentin subjects and
20   the 2,682 placebo subjects.
21       Q.   Dr. Gibbons, I would like you to pull
22   Exhibit 12 which is the FDA Alert. Please flip to
23   the first page of the Alert itself.
24       Would you read the first sentence into

406

1    the record?
2        A.   "The FDA has analyzed reports of
3    suicidality (suicidal behavior or ideation) from
4    placebo-controlled clinical studies of eleven drugs
5    used to treat epilepsy as well as psychiatric
6    disorders and other conditions."
7        Q.   Is it still your position that you didn't
8    know or couldn't have known that the FDA only used
9    placebo-controlled studies?
10       MS. McGRODER:  Well, I object to foundation.
11   BY THE WITNESS:
12       A.   This is an Alert that does not describe
13   the methodology that was used. Now, there may well
14   be -- once I got to what they had actually used, a
15   footnote that indicated that they considered all
16   active comparators. I don't know.
17       All I know is that the data that were
18   submitted by Pfizer to the FDA for the purpose of
19   their analysis were -- consisted of 5,194
20   gabapentin-treated subjects and whatever the number
21   I just told you before of the placebo subjects, and
22   those were the best data that I had available at
23   that time.
24       Once I had more information from what FDA

407

1    had actually used, I no longer included those active
2    comparators subjects.
3        Now, I have never been able to based on
4    the data that were provided to me by Pfizer, nor
5    have I seen in any of these reports a real
6    description of exactly how the FDA got to the number
7    of gabapentin-treated subjects and corresponding
8    placebo subjects based on any kind of analysis of
9    the data that were submitted to them. So that's
10   still a mystery to me.
11   BY MR. ALTMAN:
12       Q.   Would you like to have had Exhibit 16
13   that April 29th analysis by Pfizer before you had
14   written your May 20th report?
15       A.   It would have been of no use to me
16   whatsoever for the purpose of what I was doing in
17   that analysis. This is a totally different
18   document. It's not designed to try to decompose the
19   information that was provided in the Alert.
20       You know, in part the analysis that I
21   performed to try to decompose what portion of the
22   data that were described in the Alert was feeling
23   around in the dark. I didn't have the -- any of the
24   methodological descriptions of what the FDA had

408

1  done, and I was trying to provide the best possible
2  estimate I could given tremendous uncertainty in
3  what FDA had done.
4       Once, again, after I obtained the data or
5  the information of what FDA had done, I no longer
6  used those data that included studies that did not
7  have a placebo control.  I also no longer used those
8  data in which there was a single dose which were
9  also submitted to the FDA.
10       But I had no way of knowing at the time
11  of my report -- my initial expert report what FDA
12  had used and what FDA did not use from the
13  information that was submitted by Pfizer to the FDA.
14  So I could only assume that they used everything.
15       Q.  So in other words, you did no independent
16  analysis of the information that Pfizer provided to
17  the FDA, correct?
18       A.  I don't understand your question.
19       Q.  You didn't do anything to verify whether
20  all the studies that Pfizer included was appropriate
21  to include in the FDA -- well, strike that.
22       Did Pfizer ever provide to you the
23  request from the FDA as to what the FDA was looking
24  for?

409

1       MS. McGRODER:  Object.
2  BY THE WITNESS:
3       A.  I don't recall.
4  BY MR. ALTMAN:
5       Q.  Did Pfizer ever provide to you any of
6  their correspondence with the FDA over methodology
7  or things that they were going to do in complying
8  with the FDA request?
9       A.  Not to my knowledge.
10       Q.  Do you think it would have been important
11  to review that information in -- in deciding whether
12  to accept Pfizer's submission to the FDA at face
13  value?
14       A.  If I did not --
15       MS. McGRODER:  Wait.  Object to form.  When you
16  say "Pfizer's submission to the FDA at face value,"
17  you are talking about the June 22, 2006 submission?
18       MR. ALTMAN:  That's the -- that's the
19  submission I'm speaking to.  We need to -- we are at
20  a --
21  BY MR. ALTMAN:
22       Q.  Why don't you answer that question, and
23  then I think we need to go off for a minute.
24       A.  I'm sorry.  Could you repeat it?

410

1       Q.  Sure.  Do you think it would have been
2  important to review that information to decide
3  whether to accept Pfizer's -- Pfizer's submission to
4  the FDA at face value, and we are talking about the
5  June 22nd submission?
6       A.  No, I don't think that would be of value
7  because I -- my objective was to eliminate the data
8  that Pfizer had submitted to the FDA.  If I said,
9  boy, you know what, Pfizer, you really submitted all
10  the wrong data, and if I were you, I would have
11  submitted only those randomized placebo-controlled
12  studies so I'm going to assume that FDA thinks just
13  like me, and they discarded those data, and so I am
14  going to, you know, figure out what portion were
15  your data based on my assumption, that would have
16  been inappropriate.
17       I didn't know what FDA had used and
18  didn't use.  So I assumed that they had used
19  everything.  It was the best estimate I had at the
20  time, and so those were the data that I represented
21  were due to Pfizer.
22       MR. ALTMAN:  Why don't we go off for a second
23  and change tapes.
24       THE VIDEOGRAPHER:  This is the end of tape No.

411

1  1, day 2.  The time is 10:16 a.m.  We are going off
2  the record.
3       (WHEREUPON, a recess was had at
4       10:16 a.m. until 10:25 a.m.)
5       THE VIDEOGRAPHER:  This is the beginning of
6  tape No. 2 on day 2.  The time is 10:25.  We are
7  back on the record.
8  BY MR. ALTMAN:
9       Q.  Dr. Gibbons, would you please go to Table
10  12 in Exhibit 16.
11       MS. McGRODER:  And what page is that?
12       MR. ALTMAN:  I'm sorry.  That's page 24.
13       MS. McGRODER:  Thank you.
14  BY MR. ALTMAN:
15       Q.  And do you see in the bottom section for
16  all studies for gabapentin, it shows that for events
17  it's two out of 2638, correct?
18       A.  I see that.
19       Q.  And one out of 1836, correct?
20       A.  Correct.
21       Q.  Earlier before we had added up the
22  numbers from Table 10, and I came up with the same
23  2638 and 1836.
24       Does that seem to -- do those numbers

412

1  seem to match up with this stuff from Table 10?

2  A. I believe so.

3  Q. Okay. And they come out with a relative

4  risk of 1.39, correct?

5  A. Correct.

6  Q. That's quite a bit different than what

7  you came up with, if you used the 5194 and the 2682,

8  correct?

9  A. Yes, it is.

10  Q. And -- and using that, as we discussed --

11  as we discussed yesterday, the 1.39 would be the

12  point estimate there, correct?

13  A. It looks to be. I don't see a confidence

14  interval on that.

15  Q. But it would be the point estimate,

16  and -- and clearly that would be the highest point

17  on the probability curve as we discussed yesterday,

18  correct?

19  MS. McGRODER: Objection to form and asked and

20  answered.

21  MR. ALTMAN: As to with respect the 1.39 here

22  in Table 12?

23  MS. McGRODER: No -- well, yeah, you just asked

24  him if that was a point estimate, and he gave you an

413

1  answer and said there's no confidence interval. So

2  he can't say it's a point estimate. Then your next

3  question assumed it was the point estimate.

4  BY MR. ALTMAN:

5  Q. Well, that would be the point estimate.

6  You would just have to calculate the confidence

7  interval, correct?

8  THE COURT REPORTER: Wait, wait.

9  MR. ALTMAN: Sorry.

10  THE COURT REPORTER: Would be the point

11  estimate. You would have to --

12  BY MR. ALTMAN:

13  Q. Calculate the confidence interval,

14  correct?

15  A. That's correct.

16  Q. Okay. So you just -- we don't know what

17  the confidence interval here is, but there is -- is

18  there any question in your mind that 1.39 is the

19  point estimate?

20  A. No, if that was done correctly, and it

21  seems to be.

22  Q. Okay. And that would be the highest

23  point on the probability curve, correct?

24  A. For that particular dataset.

414

1  Q. Okay. I'd like you to pull Exhibit 14

2  which I believe is the FDA Statistical Review.

3  That's it, and I'd like you to go to page 23 of the

4  Alert.

5  If you look in the line for gabapentin,

6  it says two out of 2903, correct?

7  A. Correct.

8  Q. And one out of 2029, correct?

9  A. That's correct.

10  Q. And accrued odds ratio of 1.4, correct?

11  A. That's correct.

12  Q. Now, the 2903 if we compare that to

13  Exhibit 16, Exhibit 16 had 2638, correct?

14  A. Correct.

15  Q. While not -- that's a lot closer than

16  5194, correct?

17  MS. McGRODER: Well, object to form. What do

18  you mean by "a lot closer"?

19  BY MR. ALTMAN:

20  Q. Mathematically is the difference between

21  2638 and 2903 a lot less than the difference between

22  the 5194 and 2903?

23  A. The difference between those numbers is

24  smaller than the difference to the numbers that are

415

1  outlined in my report.

2  Q. Okay. Now, the -- in Exhibit 16 Pfizer

3  had calculated a relative risk, and that's not the

4  same as an odds ratio, correct?

5  A. That's correct.

6  Q. How would you calculate the odds ratio

7  for those numbers there?

8  A. You would have to compute the quantity P

9  over one minus P for the drug divided by P over one

10  minus P for the placebo.

11  Q. Okay. So give me what those numbers

12  should be, and let's do that calculation here so we

13  can compare what Pfizer had to what the FDA had.

14  A. It would be --

15  MS. McGRODER: Are you -- are you using the

16  numbers in Exhibit 16?

17  MR. ALTMAN: Yes, Exhibit 16.

18  BY MR. ALTMAN:

19  Q. We have two over 2638 and one over 1836.

20  So let's compute the odds ratio for that.

21  A. Okay. So you would have two over 2638

22  and that would be divided by one minus two over 2638

23  and then you divide that whole thing by one over

24  1836 divided by one minus the quantity one over

416

1    1836, and when you are dealing with a rare event
2    like this, the relative risk and the odds ratio will
3    be very close.
4         Q.   Okay.  So do have any belief that it
5    would be any different than 1.39 --
6         A.   It would be in the neighborhood of 1.39.
7         Q.   So if we calculated the odds -- I'm still
8    not quite sure.  You said two over 2638 --
9         It's P one over one minus P one.
10        Q.   Why don't I let you do -- I'd like you to
11   do that calculation for us.  I wasn't quite sure I
12   understood what you were saying.  Unless you -- you
13   know, as I said, I have your choice.  Which would
14   you rather use?  This is reverse Polish, and that is
15   regular.
16        A.   I will use this one.
17        Q.   Okay.
18        A.   Can I write on these?
19        Q.   Absolutely.  In fact, I would prefer that
20   you did.  If you could put it at the bottom -- put
21   it somewhere near where the 1.39 is on Exhibit 16 if
22   you could write your numbers in the -- in the -- to
23   the --
24        MS. McGRODER:  Do it on a scrap paper.  I don't

417

1    want him writing on the exhibit.  If he is doing it
2    during the deposition --
3         MR. ALTMAN:  That's fine.
4         MS. McGRODER:  -- it may not be accurate.
5         MR. ALTMAN:  Why don't we mark -- then we will
6    mark this after, that's fine.
7    BY THE WITNESS:
8         A.   I am going to use these values that they
9    have here in the table for the incident -- the
10   percentages, the .0008.
11   BY MR. ALTMAN:
12        Q.   Dr. Gibbons, the only reason I prefer you
13   don't do that is because I don't know how much of a
14   round-off there is to that, and they may have lost
15   several decimals.  And if it was point -- the
16   round-off error could be a significant portion.
17        A.   That's fine.  I don't know how to do all
18   the storage stuff and things like that on this
19   calculator.  So I am just going to make some
20   intermediate notes, but I will put in extra decimal
21   places.
22        And, of course, you see why the odds
23   ratio and the relative risk when the event is rare
24   are close because I'm going to be dividing this by a

418

1    number that is essentially one.  Of course, the
2    relative risk is just P one divided by P two.  I get
3    1.39.
4         Q.   Okay.  So that's pretty close to what the
5    FDA got for their odds ratio, correct?
6         MS. McGRODER:  Well, object -- object to form.
7    For their crudes odds ratio?
8    BY MR. ALTMAN:
9         Q.   For the crude odds ratio.  That's what we
10   are talking about.
11        A.   Very close to what they got for their
12   crude odds ratio.
13        Q.   Okay.  Now, Dr. Gibbons, putting aside
14   whether you should or should not have taken out
15   placebo-controlled studies --
16        A.   Do you want this?
17        Q.   You know, I don't think we -- I don't
18   think we really need to.  You get the same number.
19   We can probably keep that for notes, if you want.
20   If Lori wants to mark it, that's fine.  I'm not
21   particularly concerned.
22        Putting aside the -- whether you should
23   have removed placebo-controlled studies or
24   single-dose studies or anything like that, did you

419

1    look at converting the studies that were part of
2    your review into patient years and comparing patient
3    years?
4         MS. McGRODER:  Well, object to form.  You said
5    removing placebo-controlled studies which I don't
6    think --
7         MR. ALTMAN:  I'm sorry.  Removing
8    non-placebo-controlled studies.
9         MS. McGRODER:  Also are you -- which analysis
10   of his are you talking about?  There are about ten
11   here.
12   BY MR. ALTMAN:
13        Q.   We're talking about -- we're talking
14   about -- all right.  Strike that.  Let's start over.
15   You are right.  Fine.
16        Your analysis in your original
17   declaration and paper comparing the .37 and .39 and
18   coming up with the 1.033 and the confidence
19   intervals and all that, did you look at doing that
20   calculation in terms of patient years to see if
21   there was a difference?
22        A.   I didn't have the data to be able to --
23   to do that in patient years at the time.
24        Q.   Could you please hand me Exhibit 24, the

420

1 table you produced. There it is (indicating).
2     MS. McGRODER: And when you say "you produced,"
3 you mean --
4     MR. ALTMAN: That he produced today.
5     MS. McGRODER: -- he produced to you.
6     MR. ALTMAN: Yeah, produced today.
7     MS. McGRODER: Because he didn't produce that
8 table.
9     MR. ALTMAN: That's correct.
10 BY MR. ALTMAN:
11     Q. Do you see that there's a column called
12 "Exposure Days"?
13     A. My -- my comment was I didn't have the --
14 my point was I didn't have the data for Exposure
15 Days from the FDA.
16     Q. I understand that --
17     A. I had them here.
18     Q. And you could have compared the
19 percentage -- the relative risk by converting to
20 patient days in comparing and using exposure,
21 correct?
22     A. Yes, I could have done that.
23     Q. Did you do that?
24     A. No.

421

1     Q. Do you know if that would have a
2 substantially different number than the 1.033?
3     A. I haven't done the analysis. So I don't
4 know the answer.
5     Q. Why would you not have looked at exposure
6 if you wanted to calculate a relative risk?
7     A. Again, my purpose at that early stage in
8 this where all I had to go by was the FDA Alert was
9 to simply say are the data for gabapentin consistent
10 with the primary analysis that was performed by the
11 FDA.
12     The FDA primary analysis as described in
13 the Alert was not adjusted for patient days. So I
14 wanted an apples-to-apples comparison.
15     Q. And that would -- and we talked about it
16 yesterday. It would be okay to not use patient days
17 if the exposures between the treatment arms were
18 comparable, correct?
19     A. That's certainly one case where going to
20 patient days would not make a big difference.
21     Q. Did you check to see if that was the case
22 here?
23     A. Again, the purpose of my analysis, and as
24 described in my expert report at that point, was to

422

1 look at the question of whether or not the effects
2 were consistent as suggested by FDA, and this came
3 about because when I got involved in this case, I
4 was told, you know, we submitted about 7,000
5 subjects, and for those 7,000 subjects, there were
6 three events: Two in active treatment and one in
7 placebo.
8     And I said, "Well, that's, you know, very
9 inconsistent with what's in the FDA Alert." So I
10 tried to decompose the FDA Alert data into those
11 data that were for gabapentin, and those data that
12 were for the other ten antiepileptic drugs, and that
13 was my purpose there.
14     My purpose was not to identify the best
15 unbiased estimate of the odds ratio for gabapentin.
16 It was to show that the effect for gabapentin was
17 quite dissimilar to the overall effect cited by FDA.
18     Q. Okay. Do you recall in your report
19 criticizing the FDA for using the Mantel-Haenszel
20 calculations using the .5 correction?
21     A. I believe so, yes.
22     Q. Do you have any opinion as to how using
23 the .5 correction would bias the results?
24     I think you said there would be a bias,

423

1 correct?
2     A. Oh, yes.
3     Q. Do you have any opinion of how it would
4 bias the results?
5     A. It would tend to inflate the overall rate
6 of the -- of the event and would have a bias that
7 would lead in the direction of rejecting the null
8 hypothesis more frequently than the test statistic
9 would -- would anticipate under the null hypothesis.
10     Q. Did you actually look at that?
11     MS. McGRODER: Can -- can you hear him? Okay.
12 Good.
13 BY MR. ALTMAN:
14     Q. Did you actually look at that for the
15 Neurontin data?
16     A. The -- I'm not sure I understand your
17 question.
18     Q. Did you actually -- you said that it
19 would bias the -- bias it towards showing that
20 there was an effect when there was not an effect,
21 correct?
22     A. That's -- that's correct.
23     Q. Okay. Did you actually look for the
24 Neurontin at what the effect of the Mantel-Haenszel

424

1    calculation would do?

2        A.   Well, I could never do that analysis

3    until we would be able to get the data for all of

4    the different drugs that were used in FDA's

5    analysis, you know, at the study level.  Those data

6    have not been made available by the FDA so I can't

7    do that.

8            I'd love to.  It's a topic of

9    considerable statistical interest and research on my

10   part and the part of several of my colleagues on how

11   do you do this properly.  I can -- I can tell you

12   that the Mantel-Haenszel test or the DerSimonian and

13   Laird meta-analytic methods perform extremely poorly

14   for non-linear models particularly for rare event

15   binary data, and if you would like, I can describe

16   to you why that is to a level of detail that I find

17   exquisite.

18       Q.   I don't think we will --

19       MS. McGRODER:  Did you say exquisite?

20       THE WITNESS:  Yes.

21   BY MR. ALTMAN:

22       Q.   I'm sorry, but I don't think I have ever

23   heard that kind of thing called exquisite, but maybe

24   one time in another environment we can say that we

425

1    can have that discussion.  I don't think this is --

2        A.   I thought you might like that actually.

3        Q.   I probably would, but I'd like you -- but

4    you never -- you could have done that, though, with

5    respect to the gabapentin-only data, correct?

6        A.   Yes, I could have done a wide variety of

7    analyses on the gabapentin-only data because I did

8    have study-level information.

9        Q.   And you didn't do that for the gabapentin

10   data, correct?

11       A.   No, and --

12       MS. McGRODER:  Object to form.  You didn't do

13   that meaning what?

14   BY MR. ALTMAN:

15       Q.   You didn't calculate the -- do the

16   Mantel-Haenszel or do any other analyses, correct?

17       A.   Again, the -- the purpose of my -- my

18   analyses in my initial report were to try to

19   decompose the FDA Alert data into those attributable

20   to gabapentin and those for the other drugs, and

21   given that I didn't have that information, the study

22   level information for the other drugs, I didn't

23   think that it was a worthwhile exercise.

24       Q.   Would you please go to page 27 and 28 of

426

1    the Exhibit 16.

2            Do you see Table 16?

3        A.   Yes, I do.

4        Q.   This is the suicidality data for

5    pregabalin trials Exhibit 16, and do you see they

6    have various different methods that they used in

7    calculating the odds ratio?

8        MS. McGRODER:  And when you say "they," you

9    mean Pfizer?

10   BY MR. ALTMAN:

11       Q.   Pfizer.  This was a Pfizer document,

12   correct?

13       A.   That's correct.

14       Q.   Do you see the odds ratio there?

15       A.   Yes, I do.

16       Q.   Okay.  The second line is the

17   Mantel-Haenszel calculation of the odds ratio.  They

18   come up with 1.781, correct?

19       A.   Correct.

20       Q.   The line above that is the

21   Mantel-Haenszel with .5 correction, correct?

22       A.   That's correct.

23       Q.   And that odds ratio is 0.868?

24       A.   That's correct.

427

1        Q.   So it went down, didn't it?

2        A.   It went down.  It went to -- remember the

3    odds ratio under the null hypothesis is -- is the --

4    is one.  So it's now flipped over, and it's now

5    showing a protective effect.  So it's still, you

6    know, quite a ways away from one.

7        Q.   I understand that, but you said that --

8    so you are saying it would bias -- so when you said

9    before that it would bias it towards rejecting the

10   null hypothesis, you were just saying that it would

11   make it more different than one.  It could go either

12   way?

13       A.   That's correct.

14       Q.   It could cause it to flip --

15       A.   Sure.

16       Q.   -- either way?

17       A.   Sure.

18       Q.   Okay.  Now, are you aware that on the 2nd

19   of June, 2008 Pfizer made a presentation.  I believe

20   it was at Columbia, and there were individuals from

21   the FDA present at which time Pfizer showed -- made

22   a presentation?

23       A.   I'm not aware of that.

24       Q.   Okay.  And you weren't there at that --

428

1   A.   At Columbia University.

2   Q.   I think at Columbia University.  You

3   weren't there at that particular meeting, correct?

4   A.   No, I wasn't.

5   Q.   Okay.  And you didn't participate in

6   developing the slides for that meeting?

7   A.   No.  I have had no interaction with

8   people at Pfizer except through their legal counsel.

9   Q.   Okay.  I want to go back to -- move on to

10  a new topic.  I want to finish up and talk a little

11  more about the -- some of the financial issues.

12       In 2008 aside --

13  MS. McGRODER:  When you say "finish up," my

14  mouth starts watering.  You mean you are close to

15  being finished?

16  MR. ALTMAN:  No, no, I said on the financial

17  issue.  I want to finish up that particular topic.

18  No, I'm sorry.

19  MS. McGRODER:  I'm kidding you, Keith.

20  BY MR. ALTMAN:

21  Q.   How do you earn income with your -- using

22  your Ph.D. and your experience?

23  MS. McGRODER:  I'll object to form.

24

429

1   BY THE WITNESS:

2   A.   Could you make the question a little more

3   clear?

4   BY MR. ALTMAN:

5   Q.   Sure.  Do you have an income from

6   activities that have nothing to do with your

7   expertise as a statistician?

8   A.   No.

9   Q.   Okay.  So you don't own a separate

10  business or corporation or something like that has

11  nothing to do with statistics or anything you do?

12  A.   That's correct.  I don't have any other

13  skills that people would pay money for.

14  Q.   Now, do you have a corporation for your

15  consulting services?

16  A.   I do.  I have an S -- Chapter S --

17  Subchapter S Corporation.

18  Q.   Okay.  That's fine.

19  A.   A professional services kind of thing.

20  Q.   Do you happen to know your tax ID number

21  off the top of your head?

22  A.   No, I don't.

23  Q.   Is that on the -- on the invoices?  I

24  don't have them in front of me.

430

1       Can you hand me Exhibit 24, I believe, it

2   is which is your invoices.

3            WHEREUPON, a certain question and

4            answer were requested by attorneys

5            to be stricken from the record.)

6   BY MR. ALTMAN:

7   Q.   Okay.  Does that corporation have any

8   activities other than your consulting services?

9   A.   No.

10  Q.   Okay.  When did you form that

11  corporation?

12  MS. McGRODER:  Well, you know, I don't think we

13  should have his tax ID number on the record, do you?

14  MR. LONDON:  Because it's a public record.  Is

15  that what you are saying?

16  MS. McGRODER:  Well, right, because that's a

17  confidential --

18  MR. LONDON:  I don't mind sealing that within

19  the record, if that's what you are asking --

20  MS. McGRODER:  Yes.

21  MR. LONDON:  It's already in the record but --

22  MS. McGRODER:  Right.

23  MR. LONDON:  -- I don't mind that part of the

24  record being sealed.

431

1   MS. McGRODER:  And you will take the steps to

2   make sure that that part of the record is sealed?

3   MR. ALTMAN:  You can ask -- you can ask the

4   court --

5   MR. LONDON:  I'm going to object to your -- I

6   am not going to take any active steps on that.

7   MR. ALTMAN:  And that's a corporate ID number.

8   That's not his personal Social Security number.

9   MS. McGRODER:  But a tax ID number would

10  violate Judge Saris's order I think about personal

11  identifiers.

12  MR. ALTMAN:  That's not a personal identifier.

13  That's his corporation.

14  MS. McGRODER:  So it's his personal

15  corporation.

16  MR. ALTMAN:  That's not the same.

17  MR. LONDON:  I think that's within the --

18  MR. ALTMAN:  That's not the same thing.

19  MS. McGRODER:  You don't --

20  MR. LONDON:  I don't mind looking at --

21  MS. McGRODER:  Well, let's talk about it

22  because I don't -- I don't like that as part of the

23  record.

24  MR. LONDON:  I don't mind it being sealed as

432

1  part of the record.  We don't need to have this --
2      MS. McGRODER:  Okay.  Well, we will figure out
3  how to do it.
4      MR. ALTMAN:  It's not --
5      MS. McGRODER:  Right, can't we do that?  Can we
6  strike that question and answer?  Do you really need
7  it in the record?
8      MR. ALTMAN:  No, I don't really need it in the
9  record.
10     MR. LONDON:  Can you go back --
11     THE COURT REPORTER:  I can't -- it's on video.
12     MR. LONDON:  Can you go back on the typed
13  record to the first question which asks what is your
14  tax ID number followed by a number, and from that
15  point to the point where we have agreed to strike
16  that question and answer, please do so on the typed
17  record.
18     MR. ALTMAN:  Okay.
19     THE WITNESS:  Thank you.
20  BY MR. ALTMAN:
21     Q.  Do you sit on any boards of any
22  corporations or any advisory boards or panels?
23     A.  No, I was on the Health Science Policy
24  Board of the Institute of Medicine, but there's not

433

1  a financial kind of thing.
2      Q.  Are you still on that --
3      A.  I was on it for six years, and then you
4  rotate off.
5      Q.  Do you sit on the boards of any
6  corporations?
7      A.  No.
8      Q.  Okay.  Are you doing any expert
9  consulting outside of the context of litigation?
10     A.  I have done from time to time
11  environmental statistical consulting.  I developed
12  the methods that are used to see whether or not
13  landfills are leaking including the highest point in
14  the State of Florida, and I've done some Superfund
15  litigation work, and some times I help typically
16  small companies who are running into statistical
17  trouble with the FDA.  I'm brought in as a kind of
18  an intermediary to say who is doing what right and
19  wrong, that kind of thing.
20     Q.  When did you form your corporation?
21     A.  I think it was in the -- in the early
22  1980s.
23     Q.  Okay.  And you have been operating as
24  a -- all this time under that?

434

1      A.  Yes, I think it was originally like a
2  regular corporation, and then it shifted to an S
3  Corporation.
4      Q.  Okay.  And what's the actual name of the
5  corporation?
6      A.  It's called Robert D. Gibbons, Limited,
7  not a real catchy name.
8      Q.  And it's not a -- it's not a LLC,
9  correct?
10     Do you know what an LLC is?
11     A.  No.  That's a limited liability
12  corporation?
13     Q.  Right.
14     A.  I don't -- I don't -- it may have started
15  out that way, but I -- it's currently and has been
16  for at least the last decade or so a Subchapter S
17  Corporation.
18     Q.  Have you ever been on the speakers bureau
19  of any -- for any company, gone out and give talks
20  on their behalf or anything like that?
21     A.  No.
22     Q.  Have you ever given any lectures outside
23  of the context of academia and your academia --
24  academic activities?

435

1      A.  I gave -- I gave a series of lectures
2  across the U.S. on statistical methods groundwater
3  monitoring and surface water monitoring to a variety
4  of states and municipalities, and I did a series of
5  I think six lectures for the ASTM on environmental
6  statistics.
7      Q.  Have you ever gotten -- have you received
8  any payments from Pfizer other than -- or Pfizer's
9  lawyers other than in the Neurontin litigation?
10     A.  No.
11     Q.  Have you ever participated in the writing
12  of any portion of a new drug application?
13     A.  I think I testified yesterday that I've
14  helped in the preparation of statistical analyses
15  plans in the past for various -- various companies,
16  typically small pharmaceutical companies.  I --
17  yeah, I -- but, you know, not an NDA in particular.
18     Q.  Okay.  Are there any other -- what other
19  cases have you served as an expert witness in?
20     We talked about -- we talked about
21  obviously this case, and we talked about Effexor.
22     Are there any other cases in which you
23  provide expert -- services as an expert witness?
24     A.  Did we talk about Effexor?

436

1  Q.  I think we talked about it briefly about
2  the Wyeth case.  I mean, we discussed it at least --
3  A.  Oh, as identify --
4  Q.  Right, we didn't talk in detail.
5  A.  Right, the Giles case.  I have
6  historically done two large Superfund cases:  City
7  and County of Denver versus the Fortune Ten
8  companies, and the City and County of Los Angeles
9  versus the Fortune Ten companies.  On both cases I
10  was hired to represent the city and counties.
11  These were Superfund cost allocation
12  cases where there were extensive cleanup costs
13  associated with these Superfund sites, and the
14  industry said, well, there's hazardous constituents
15  in municipal solid waste and you put 95 percent of
16  the garage in there so you should be responsible for
17  95 percent of the cleanup costs.  And the
18  municipalities said, yeah, but if it wasn't for
19  your, you know, pure toxic fluids, we wouldn't be a
20  Superfund site in the first place.
21  So I did some -- some kind of
22  classification contaminant source analyses to
23  determine whether or not the hazardous liquids and
24  the leachate from the municipal landfill which ones

437

1  were responsible for the impacts to groundwater
2  monitoring using sort of non-parametric discriminate
3  function analyses to classify the impact to
4  groundwater, and in both cases the -- you know,
5  municipalities did real well in those cases.
6  I have also done a couple of cases,
7  patent cases of generic companies suing major
8  brands.  One was the Olanzapine case --
9  Q.  I know a bit about that stuff.
10  A.  -- a generic company which hired me to --
11  to review those data, and I provided some expert
12  testimony about the validity of the Olanzapine
13  patent which was based on slightly elevated
14  cholesterol levels of four female Beagle dogs.
15  Q.  And who were you working on behalf of in
16  that case?
17  A.  A generic company.  I can't remember the
18  name, but they all get bought up by the Israeli
19  company Teva Pharmaceuticals.  So at some point they
20  were all Teva Pharmaceuticals, I think.
21  And then the other one was, again,
22  generics versus Forest Pharmaceuticals in a case --
23  these are typically isomer cases.  So, you know, the
24  isomer for citalopram is escitalopram, and the

438

1  patent issue is to show that there's this
2  unexpected, wonderful result for the isomer that was
3  never anticipated by anybody.  In this case that it
4  was more efficacious than citalopram.  So I
5  reanalyzed all of the head-to-head comparisons of
6  citalopram and escitalopram and showed that they are
7  undifferentiate -- undifferentiable.
8  I have also -- was involved in the 160
9  Liberty litigation in New York City.  One of the
10  Twin Towers fell into one of the neighboring
11  buildings and caused rampant contamination, and the
12  building was owned by Deutsch Bank, and they sued
13  their insurance company because the insurance
14  company just wanted to come in and clean it up for a
15  couple hundred million dollars, and Deutsch Bank
16  wanted a new building for a couple of billion
17  dollars.
18  And the issue was whether or not you
19  could determine what the background concentrations
20  were to see whether or not the giant fireball that
21  went through this building actually did produce any
22  contamination.  Of course, you could only go into
23  the building with a space suit.
24  And so that analysis was performed to

439

1  identify an upper bound on background by looking at
2  the simultaneously lowest concentrations that
3  remained in the building and showed that it was
4  essentially impossible to clean it up, and I believe
5  Deutsch Bank got their new building or they are
6  building it or something like that.
7  Those are the ones that I can remember
8  off the top of my head.
9  Q.  Have you spoken with any of the other
10  Pfizer experts directly?
11  A.  Only saying hi when we were, you know,
12  hanging around at the Daubert trial.
13  Q.  Who?
14  A.  I said "saying hi."
15  Q.  Or saying hi.  I thought there might be
16  some new expert I didn't know.  I'm like, oh, wait,
17  let me think.
18  A.  Sorry about that.
19  Q.  That's okay.
20  Do you have any intention of doing any
21  more analyses or articles related to gabapentin or
22  that would touch upon gabapentin between now and the
23  end of the year?
24  A.  Nothing --

440

1    MS. McGRODER:  As he sits here right at this
2    moment?
3        MR. ALTMAN:  As he sits here right now.
4    BY THE WITNESS:
5        A.   I have nothing planned at this moment.
6    BY MR. ALTMAN:
7        Q.   By the way, I just want to -- you said
8    Dr. Hur helped you with the programs for both the
9    bipolar study and the gabapentin study, correct?
10       A.   That's correct.
11       Q.   Did you pay Dr. Hur for his help -- for
12   his assistance with you on the gabapentin study?
13       A.   For the gabapentin study, yes, I did.
14       Q.   Okay.  How much did you pay Dr. Hur for
15   that?
16       A.   I don't remember how much.
17       Q.   Do you have records for that?
18       A.   I might.
19       Q.   Okay.  We request that -- did you pay him
20   personally, or did you pay him out of your
21   corporation?
22       A.   Out of my corporation.
23       MR. ALTMAN:  Okay.  We request that we get
24   information associated with how much Dr. Hur had

441

1    been paid for his work in the gabapentin study.
2        MS. McGRODER:  Your request is noted.
3    BY MR. ALTMAN:
4        Q.   How does it work with -- for the bipolar
5    study and the grants and everything like that, is
6    there an actual -- does the grant go to the
7    university, and you just kind of just do work and
8    the grant funds part of your work, or is there an
9    actual transfer of funds from some -- you know, bank
10   account -- does the grant send you some money, you
11   put it in a bank account, and then as you expend
12   work under the grant, you just withdraw funds out of
13   that and give it to the university?
14       How does that work?
15       A.   The grant is to the university, and the
16   university pays my salary, and there are, you know,
17   objectives and pays the salary of Dr. Hur and my
18   co-investigators, but the money goes directly to the
19   university.
20       Q.   Do you have to account for how much time
21   you spend working on, you know, something that falls
22   under the umbrella of a particular grant?
23       A.   There's no like time sheet kind of thing
24   or anything like that.  There's a proposal and the

442

1    proposal, you know, lists various percent efforts
2    for members of the grant, and they are usually gross
3    underestimates, and, you know, we do the work.  And,
4    you know, the National Institute of Health is either
5    happy based on our productivity or not happy.
6    Generally for our work, they are pretty happy.
7        Q.   Now, if you wanted to use an outside
8    individual to assist in a grant, would you -- would
9    they wind up getting some money from your university
10   going to that other person's university?
11       A.   An example of that would be we have a
12   subcontract with the University of South Florida to
13   pay for time and travel and support for Dr. Brown on
14   our suicide grant, both on the current suicide grant
15   and the original R-56 grant.
16       Q.   Okay.  I'd like you to pull out your
17   original declaration which is I believe Exhibit 8.
18   I believe it's Exhibit 8.
19       At the bottom of page 3 -- we are not
20   going to look at page 1 and 2 -- would you please
21   read in the first sentence of the paragraph at the
22   bottom?
23       A.   "Our best estimate of the ratio of the
24   probability of suicidality for patients treated with

443

1    gabapentin to those treated with placebo is a ratio
2    of 1.033 indicating no increased risk of suicidality
3    with gabapentin at a confidence level" --
4        MS. McGRODER:  Just for the court reporter,
5    slow down.
6    BY THE WITNESS:
7        A.   Oh, I'm sorry.  -- "in excess of 99.9
8    percent."
9    BY MR. ALTMAN:
10       Q.   Now, you didn't qualify when you said
11   "our best estimate."  That is just taking the
12   submission to the FDA by Pfizer at face value?
13       I mean, you didn't actually look to see
14   whether that -- whether they should have included
15   all those studies, whether that was the right way to
16   do it, whether you have should included -- gone to
17   patient years or any of that when you said that,
18   correct?
19       MS. McGRODER:  Object to form.
20   BY THE WITNESS:
21       A.   That was my estimate based on the data
22   that were submitted to the FDA by Pfizer.
23   BY MR. ALTMAN:
24       Q.   Is that the best estimate that you could

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

444

1    do based on what you had?
2        A.   At that moment it was the best estimate
3    representing those data that were submitted to -- to
4    the FDA.
5        Q.   Okay.  Now, at the bottom of page 3, you
6    say:  "When we examine the 10 other drugs, excluding
7    the gabapentin data, the odds ratio increases to
8    1.787 with a confidence interval of 1.215 to 2.629 P
9    less than 0.003."
10       Did I read that correctly?
11       A.   Yes, you did.
12       Q.   That assumes that -- that assumed that
13   the FDA had used all of the gabapentin data,
14   correct?
15       A.   That is correct.
16       Q.   And then when you say:  "For the other 10
17   drugs, the incidence of suicidality is .45 percent
18   for treated versus 0.26 for control patients,"
19   correct?
20       A.   That's correct.
21       Q.   At any point in the FDA Alert, to your
22   knowledge, did the FDA ever compare incidence rates
23   between the different drugs?
24       A.   In the FDA Alert?

445

1        Q.   In the FDA Alert or the FDA statistical
2    analysis, did they ever come up with the -- you
3    know, with true incidence rates?
4        MS. McGRODER:  Well, object on foundation
5    grounds.  To the extent you know.
6    BY THE WITNESS:
7        A.   I would have to look --
8    BY MR. ALTMAN:
9        Q.   We can just go with the Alert, that's
10   fine.
11       A.   Well, in the Alert the only comparison
12   per se is simply their statement that the effect was
13   consistent across the different drugs.  So that's a
14   type of comparison.
15       Q.   Now, consistent can mean the magnitude,
16   correct, of the effect, correct?
17       MS. McGRODER:  Are you asking him with respect
18   to this document, or are you asking him --
19   BY MR. ALTMAN:
20       Q.   Okay.  Let me -- strike that.
21       How did you interpret consistent when you
22   read this?
23       A.   I interpreted the statement made by FDA
24   that the treatment effect; namely, the difference

446

1    between treatment and -- and control placebo were
2    generally consistent across the 11 drugs.  That was
3    my interpretation of their statement.
4        Q.   Would another reasonable interpretation
5    mean that while the magnitudes of the effect may be
6    different between the drugs, they are all in the
7    same direction?
8        MS. McGRODER:  Object to form.
9    BY THE WITNESS:
10       A.   That wouldn't be my -- my interpretation
11   of that.  They could be -- they could be many orders
12   of magnitude different.  That wouldn't be an
13   example -- even if they were all in the same
14   direction, that would -- that would not be a use of
15   the term consistent.
16   BY MR. ALTMAN:
17       Q.   How would you describe it then -- if that
18   were the case, if the magnitudes were different but
19   they were all in the same direction, how would you
20   describe that if not using the term consistent?
21       A.   I would say they were inconsistent.  They
22   were heterogeneous.  There was a substantial
23   variability in the treatment effect from study to
24   study.

447

1        Q.   Okay.  And so no -- you think no
2    reasonable person can interpret consistent to mean
3    all in the same direction, not in the same
4    magnitude?
5        MS. McGRODER:  Object to form and foundation.
6    He doesn't know what all reasonable people think.
7    BY THE WITNESS:
8        A.   I can only speak for a statistician, and
9    I certainly wouldn't interpret that as a case in
10   point.  If one of the odds ratio was say 1.4 and the
11   other was 5, I certainly wouldn't view that to be
12   consistent.
13       I certainly wouldn't view a mixture of
14   results, some of which were statistically
15   significant and others were not statistically
16   significant as an indication of consistency.  I
17   certainly wouldn't view a -- the results of an
18   analysis that showed effects all in the same
19   direction but had a significant heterogeneity effect
20   as an indication that it was consistent.
21       So I can think of lots of examples where
22   the results are all in the same direction, but I
23   wouldn't view them as consistent.
24

448

1    BY MR. ALTMAN:
2       Q.   In opinion 2 which is on page 5 --
3       A.   Of which document?
4       Q.   Of -- I'm sorry -- of Exhibit 8.  You --
5    you say -- it's about two-thirds of the way down the
6    paragraph -- strike that.
7          The next paragraph we discuss adding the
8    0.5 to all the cells, that Mantel-Haenszel
9    correction that we talked about before, correct?
10      A.   That's one of the effects.  It also will
11   talk about eliminating those studies have no events
12   in either arm.
13      Q.   That's fine.  You say, though, about the
14   middle of the paragraph, I'd like you to start
15   reading with the word "both."
16      A.   "Both of these practices can lead to
17   bias, and the practice of discarding studies with no
18   events will lead to bias in the direction of
19   increased risk in active treated patients because it
20   discards studies in which there were no difference
21   between treated and control arms (i.e., 0 in both
22   arms)."
23      Q.   Okay.  Page 7, Opinion 4 and point 2.
24   When you say your analyses, when you came up with

449

1    the 5194 and the 2682 and the .37 and the .39, that
2    was effectively the company's analysis, wasn't it?
3       MS. McGRODER:  Object to form.
4       BY THE WITNESS:
5       A.   I performed an analysis on the company's
6    data.  Those were my analyses.
7       BY MR. ALTMAN:
8       Q.   But you didn't come up -- you didn't do
9    anything differently than what the company had
10   already done, correct?
11      MS. McGRODER:  Well, object to form and
12   foundation.  He doesn't know what the company had
13   already done.
14      BY THE WITNESS:
15      A.   I think the company may have done a lot
16   of different things.  I did an analysis of the data
17   that they provided to me and represented to me were
18   the data that they submitted to the FDA.
19      BY MR. ALTMAN:
20      Q.   They had already done that same analysis,
21   correct?
22      MS. McGRODER:  Objection, no foundation.
23      BY THE WITNESS:
24      A.   I don't know what analysis they did or

450

1    they didn't do at that time.  I had asked them for
2    the data that are represented in Exhibit 24, and I
3    performed an analysis of those data.
4       BY MR. ALTMAN:
5       Q.   And got the same exact results as what
6    the company had already calculated, correct, as we
7    see in Exhibit 17, I believe, the June 22, 2006
8    submission?
9       A.   I'd have to look --
10      MS. McGRODER:  Well, there's no analysis by the
11   company in the June 17 --
12      MR. ALTMAN:  Yes, there is.
13      MS. McGRODER:  -- June 22 submission.
14      MR. ALTMAN:  There certainly is.  Could you --
15      MS. McGRODER:  They don't do an odds ratio.
16   They don't do a relative risk.  They just set out
17   the numbers.
18      BY MR. ALTMAN:
19      Q.   Okay.  So is it -- so is it your position
20   that -- is the only difference between what you did
21   and what the company did with respect to the
22   analysis -- the initial analysis is that you
23   calculated the odds ratio, and they had not?
24      MS. McGRODER:  Objection, no foundation.  He

451

1    does not know what the company did.
2       BY THE WITNESS:
3       A.   As represented by Exhibit 17, page 4,
4    there is no analysis whatsoever on page 4.  This is
5    just simply a tabulation of the data, and there's a
6    very important distinction between tabulating data
7    and performing statistical analyses, as I'm sure you
8    know.
9       BY MR. ALTMAN:
10      Q.   So you just took this here and calculated
11   the relative risk on a confidence interval, and that
12   represented your analysis with respect to these
13   data, correct?
14      MS. McGRODER:  Well, object to form.  You've
15   just spent the last two hours going over with him
16   what he did for his analysis, and that summary of it
17   in your question is misleading.
18      BY THE WITNESS:
19      A.   Your summary is incorrect.  I didn't just
20   take what is represented here, and by "here," I'm
21   assuming you are meaning page 4 of Exhibit 17.
22          What I did was I took the data that were
23   provided to me in the spreadsheet, the summary of
24   which is contained here in page 4, and I did an

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

452

1    analysis of those data.
2    BY MR. ALTMAN:
3        Q.   Okay.  Back to your report, page 7, point
4    3 you say:  "Meta-analysis of RCT's for multiple
5    clinical -- for multiple different drugs with
6    differences in chemical structure, mechanism of
7    action, pharmacologic properties, does not provide
8    causal evidence of a link to suicide for either the
9    individual drugs contained in this analysis or the
10   drugs as a heterogeneous group."
11       Did I read that correctly?
12       A.   Yes, you did.
13       Q.   I think you testified yesterday you are
14   not qualified to have decided what the specific case
15   of the anticonvulsants, whether there were
16   differences in chemical structure or mechanism of
17   action or pharmacologic properties, correct?
18       MS. McGRODER:  Well, object to form and
19   foundation and misstates his testimony.
20   BY THE WITNESS:
21       A.   My testimony is of a statistical nature,
22   and my testimony is that meta-analysis of randomized
23   clinical trials be it of a single drug or of
24   multiple drugs, it does not provide causal

453

1    inferences, and I think that's a well-accepted
2    position by statisticians.
3        Adding heterogeneity of multiple drugs
4    can only further limit the inferences that can be
5    drawn from such a meta-analysis because they -- they
6    do add to the heterogeneity of the effect.
7    BY MR. ALTMAN:
8        Q.   When a company gets a drug approved, does
9    the company have to demonstrate that the drug is
10   effective, do you know?
11       MS. McGRODER:  Object to form and foundation.
12   He is not a regulatory expert.
13   BY MR. ALTMAN:
14       Q.   That's fine.  Do you know?
15       A.   I do.  They have to demonstrate efficacy
16   of the drug.
17       Q.   And you do that using multiple studies,
18   correct?
19       A.   They do it using individual analyses of
20   prospectively defined end points and prospectively
21   collected end-point data, and they do not do it on
22   the basis of a meta-analysis.
23       Q.   Well, when they combine -- when they do
24   combine data from several different trials together,

454

1    that would be a meta-analysis, isn't it?
2        A.   No, it would not.  They are not combining
3    the data from multiple trials into a submission for
4    an NDA.  They have two pivotal trials, and that's
5    the requirement by FDA to show efficacy.
6        And there is no requirement to pool the
7    information in any way statistically from those
8    trials.  In fact, it's discouraged.
9        Q.   Okay.  Opinion 5 on page 8, you are
10   commenting -- the last paragraph you are commenting
11   on the Collins McFarland study, correct?
12       A.   The last paragraph I believe --
13       Q.   Well, the whole opinion -- I'm sorry --
14       A.   Yes.
15       Q.   -- it's talking about the Collins
16   McFarland paper, correct?
17       A.   That's correct, and it is augmented by
18   some additional results from a paper from
19   Baldessarini in 2006.
20       Q.   The last sentence of the second paragraph
21   says:  "These data indicate that gabapentin is
22   reducing suicide risk, not increasing it."
23       Do you see that?
24       A.   I do.

455

1        Q.   Is it your opinion that you can actually
2    take that result out of the Collins McFarland paper?
3        A.   Well, as I start out, you know, the --
4    the Collins and McFarland paper never provides a
5    comparison of people who did or did not -- who
6    didn't take these drugs.  It's a drug-to-drug kind
7    of comparison, and I don't believe, you know, it
8    will provide a -- any kind of causal evidence in
9    this regard.
10       And the comparison that I made to the
11   Baldessarini data with respect to people who had
12   received no treatment were epidemiologic incidence
13   data that suggests that the incidence and background
14   is higher than for any of the drugs considered in
15   the Collins and McFarland study.  So based on those
16   available data suggests that the drug is not
17   increasing the rate of suicide or suicide attempt.
18       I think -- yeah, both suicide completion
19   and suicide attempt rates.  These are not
20   head-to-head comparisons.  These are from different
21   populations.  I don't view that to be a strong
22   inference saying, you know, because Baldessarini
23   background rates are higher, you know, gabapentin is
24   definitely protective.

456

1     I certainly wouldn't conclude that from
2  those data, but from the available data, it doesn't
3  look like, you know, the drug is inducing suicide.
4     Q.  Well, that's not quite what you said
5  here.
6        You said "these data indicate."  You
7  don't say suggest.  You don't say it may be.  You
8  say "indicate."  That's pretty definitive, isn't it?
9     A.  Well, I'm not sure that I would interpret
10  that as -- as being definitive.
11     Q.  And you say "these indicate that
12  gabapentin is reducing suicide risk."  That's a
13  pretty definitive statement?
14     MS. McGRODER:  Objection, asked and answered.
15  BY THE WITNESS:
16     A.  Again, I don't -- I don't view it as a
17  definitive statement, and in the context of my
18  testimony here, I think I have made that clear.
19  BY MR. ALTMAN:
20     Q.  Do you understand that a lot of people
21  are going to read your written submissions in this
22  case, your expert reports, your declarations, and
23  things like that, correct?
24     A.  I'm not sure who is going to be reading

457

1  this.  I understand people will be reading it, yes.
2     Q.  Plaintiffs obviously, as we are here,
3  right?
4     A.  I'm sure you have read it carefully.
5     Q.  The Court, correct?
6     A.  Correct.
7     Q.  Okay.  Other experts, correct?
8     A.  Yes.
9     MS. McGRODER:  Well, to the extent you know.
10  BY MR. ALTMAN:
11     Q.  Do you know if any of the other experts
12  in this case have read any of your papers,
13  submissions?
14     A.  Well, I think I know that Dr. Greenland
15  has commented on it, and he is an expert in this
16  case.  So I am assuming he read it.
17     Q.  Are you aware that Dr. Weiss Smith read
18  your expert report?
19     A.  It wouldn't surprise me.
20     Q.  And that Dr. Ruggieri read your expert
21  report?
22     A.  I believe so.
23     Q.  And Dr. Arrowsmith-Lowe read your expert
24  report?

458

1     A.  Again, it wouldn't surprise me if all of
2  the other Pfizer experts had read my report, but I
3  don't know that personally.
4     Q.  But you would expect them to be able to
5  rely upon what you write here, correct?
6     MS. McGRODER:  Well, I object on foundation
7  grounds.  He doesn't know what the other experts
8  rely upon.
9  BY THE WITNESS:
10     A.  I don't know what they relied upon or
11  not.  I have tried to provide the most factual and
12  evidence-based discussion of the data and of the
13  literature.  I have tried to do the best I can in
14  doing that.
15  BY MR. ALTMAN:
16     Q.  And you would -- would you intentional
17  try to mislead a reader?
18     A.  No, I wouldn't.
19     Q.  Okay.  And if something in here was
20  misleading, whether intentional or otherwise, it
21  could cause somebody else, whether an expert or the
22  Court, to reach a conclusion that would not be
23  correct; is that right?
24     MS. McGRODER:  Objection, improper

459

1  hypothetical, assumes facts not in evidence.
2  BY THE WITNESS:
3     A.  I don't -- I don't know what the Court is
4  going to do or how it would be misled, and I'm sure
5  that if there was a comment in here that, for
6  example, this comment, and you felt that it was not
7  consistent with -- with my opinion, I'm sure that
8  you would bring it up at court, and I would give you
9  a factual and honest answer to it as I have done
10  here.
11  BY MR. ALTMAN:
12     Q.  But that also assumes that the reader is
13  able to understand some of the things you write and
14  whether there is something that is not quite clear,
15  correct?
16     MS. McGRODER:  Object to form and foundation.
17  How does he know what readers understand?
18  BY THE WITNESS:
19     A.  Yeah, I think that, you know, if you have
20  a particular question, it should be a little more
21  precise.
22     MR. ALTMAN:  Okay.  We will come back to that.
23  I think we need to change tapes.  So why don't we do
24  so right now.

460

1    THE VIDEOGRAPHER: This is the end of tape No.
2  2, day 2. The time is 11:22 a.m. We are going off
3  the record.
4    (WHEREUPON, a recess was had at
5    11:22 a.m. until 11:31 a.m.)
6    THE VIDEOGRAPHER: This is the beginning of
7  tape 3 of day 2. The time is 11:31 a.m. We are
8  back on the record.
9  BY MR. ALTMAN:
10    Q. Dr. Gibbons, I would like you to pull --
11  we are going to shift gears substantially at this
12  point.
13    I would like you to pull Exhibit 3.
14    MS. McGRODER: What is Exhibit 3?
15    MR. ALTMAN: Exhibit 3 is the contract with
16  PharMetrics.
17    MS. McGRODER: The licensing agreement?
18    MR. ALTMAN: Yes.
19  BY MR. ALTMAN:
20    Q. And I would like you to go to the Exhibit
21  A which is labeled at the bottom page 5 of 9.
22    Do you see that?
23    A. Yes, I do.
24    Q. Okay. And this page and the next page,

461

1  if I'm correct, represents the -- the data that
2  PharMetrics was going to deliver to you; is that
3  correct?
4    A. Yes, it does.
5    Q. Okay. And as I read this here, there
6  were two cohorts that you were getting from
7  PharMetrics on this agreement, correct?
8    A. Correct.
9    Q. One of them we used -- we've
10  conventionally defined as the bipolar cohort,
11  correct?
12    A. Yes.
13    Q. And the other one is the gabapentin
14  cohort, correct?
15    A. Yes.
16    Q. And so we can use just to keep things
17  clean, the bipolar study and the gabapentin study,
18  and those would use the bipolar cohort and
19  gabapentin cohort respectfully, correct?
20    A. That's a good mnemonic.
21    Q. Okay. So there we go.
22    Now, if you go down to the paragraph
23  about five down, it says "Furthermore."
24    Do you see that?

462

1    A. Yes.
2    Q. Okay. Before we get to that, for each
3  one of those cohorts, they had an index date,
4  correct?
5    A. Yes.
6    Q. For the bipolar study, it was the date of
7  first bipolar diagnosis, correct?
8    A. Yes.
9    Q. And for the gabapentin cohort, it's the
10  date of the first gabapentin usage, correct?
11    A. That's correct.
12    Q. And you looked at one year on -- you
13  got -- you needed patients who had data from one
14  year on either side of those index points, correct?
15    A. That's correct.
16    Q. A patient who had been diagnosed as
17  bipolar more than one year before could possibly
18  have been picked up in this cohort, correct?
19    A. That would be correct, but not if they
20  had filed any kind of claim for medication or
21  anything like that that listed a bipolar diagnosis.
22    Q. Unless it had been before they came into
23  PharMetrics' pool of -- strike that.
24    PharMetrics collects data from several

463

1  different insurance companies and HMOs, correct?
2    A. That's correct.
3    Q. Not every insurance company in the United
4  States provides their data to PharMetrics, correct?
5    A. That's correct.
6    Q. Somebody who had, let's say, been with an
7  insurance company outside of the PharMetrics'
8  umbrella and had been diagnosed as bipolar and was
9  not necessarily being actively treated and then came
10  into the PharMetrics' umbrella, could have been
11  picked up in here even though it was not the first
12  time they were diagnosed as bipolar, correct?
13    A. That's correct. As long as they hadn't
14  filed any kind of claim, say, for treatment with
15  gabapentin or lithium or that indicated that they
16  had a diagnosis of bipolar.
17    So if they had filled a prescription
18  during that one-year period and they -- and the
19  diagnosis was bipolar, then they have would been
20  excluded.
21    Q. I understand.
22    A. If they hadn't, then your point is
23  correct.
24    Q. And my point is it's possible that there

464

1      were people who would be mixed up in here who really
2      shouldn't have been in the cohort if you'd had
3      infinite data on either side and had every claim
4      these people had ever made, correct?
5          A.   Well --
6          MS. McGRODER:  Objection --
7      BY THE WITNESS:
8          A.   -- I am not sure that I --
9          MS. McGRODER:  Go ahead.
10     BY THE WITNESS:
11         A.   I'm not sure that I would say that they
12     shouldn't be in the cohort.  The cohort is defined
13     as a period of time where these people are not being
14     treated for the index diagnosis or with the index
15     drug depending on cohort, and that period is one
16     year, and the choice of one year was -- was based on
17     the availability of a large population of
18     continuously enrolled people.
19              So, as I'm sure you have read our VA
20     study, in the VA study because people stay around in
21     the VA for a very long period of time, we had a
22     longer background window of time that they weren't
23     treated.
24

465

1      BY MR. ALTMAN:
2          Q.   Okay.  And the paragraph that says:
3      "Furthermore, only newly diagnosed -- newly
4      treated/diagnosed patients are of interest.
5      Therefore, cohort 1 patients will be excluded if
6      they have any bi-polar diagnosis during the
7      pre-index period, and cohort 2 patients will be
8      excluded if they have any gabapentin claims during
9      the pre-index period."
10              Did I read that correctly?
11         A.   Yes.
12         Q.   That's what we were just talking about.
13              The intention was to exclude people, but
14     it's always possible that some number of those got
15     included?
16         A.   Right.  When it says "newly diagnosed" or
17     "newly treated," it indicates in a one-year period
18     prior to the index date.  They could have received
19     treatment two years before or a year and -- and, you
20     know, a half or whatever.
21         Q.   Right.  Then it says:  "Only plans with
22     enrollment days -- with enrollment, days supplied
23     and no mental health carve-out will be included."
24              What does "no mental health carve-out"

466

1      mean?
2          A.   I'm not an expert in that.  I'm not
3      exactly sure what it means, but I think what it
4      means is these are plans where -- they are -- they
5      are in a plan, but there's no coverage of the mental
6      health or the mental health portion of the coverage
7      is covered by another company that might not be a
8      part of the PharMetrics database.
9               So you can imagine a person who is in the
10     PharMetrics database and shows, you know, no mental
11     health treatment but really is getting mental health
12     treatment because that plan is designed to provide
13     it from another carrier.
14         Q.   Okay.
15         A.   It's not a part of their database.
16     That's my best understanding of what that means.
17         Q.   That seems to be pretty reasonable.
18              Okay.  And then it talks about
19     deliverables and timelines, correct?
20         A.   Correct.
21         Q.   And it talks about four primary files,
22     correct?
23         A.   Yes.
24         Q.   Starting to the next page:  File 1, File

467

1      2, File 3, and File 4.
2               File 1 being the patient file, correct?
3          A.   That's correct.
4          Q.   File 2 being the diagnosis file, correct?
5          A.   I believe so.  Let me take a look.
6               Yes.
7          Q.   File 3 being the drug file?
8          A.   Yes.
9          Q.   And it says:  "One record for every drug
10     of interest (AED, anti-depressants, lithium, and
11     atypical anti-psychotics within the pre- and
12     post-index periods)."
13              Did I read that correctly?
14         A.   Yes, you did.
15         Q.   Okay.  And then File 4 is the suicide and
16     self-inflicted injury data, correct?
17         A.   That's correct.
18         Q.   Okay.  And then I think, even though it's
19     not listed here, there are some other subsidiary
20     files because some of these have like a diagnostic
21     code, and there's a table that gives you the
22     diagnostic code and what that actually means,
23     correct?
24         A.   Right.  There's a -- there's a file for

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

468

1   the diagnostic code which is in a code, and then
2   there's another file mapped on to that that tells
3   you the name of the drug.
4       Q.   Okay.  And I think there's another file
5   for procedure codes which was not used in this
6   dataset, correct?
7       A.   Yeah, I think so, and I mean, there --
8   there were definitely more than four input files,
9   and those are all documented in the SAS files --
10      Q.   We are going to -- we are going to look
11  at that in a second.
12           Now, I'm curious why -- for the File 3,
13  the drug files, how come you didn't get all of the
14  drugs that those people were taking?
15      A.   For one, I think they would have, you
16  know, probably charged more; and, two, these were --
17  we wanted to define a priori which drugs we were
18  looking at.
19           We wanted to make sure that we could look
20  at the primary antiepileptic drugs, but at the same
21  time adjust for concomitant medication with other
22  anticonvulsants that were not a part of the 11 AEDs
23  or lithium, other antidepressants, and other
24  antipsychotic medications.

469

1       Q.   Are there other drugs that you can think
2   of that are used in treating psychiatric conditions
3   that are not an antidepressant, an antipsychotic, or
4   an anticonvulsant?
5            And by the way, you didn't get all
6   antipsychotics.  You only got atypical
7   antipsychotics, correct?
8       A.   I believe so.  These lists were compiled,
9   you know, in part based on our work with the VA
10  sample and consulting with the VA pharmacy people,
11  and then during that time, we also -- there were,
12  you know, lists were reviewed by Dr. Mann and lists
13  were reviewed -- we got with Rob Valuck's group, a
14  pharmacoepidemiologist, a couple of
15  pharmacoepidemiologists at the university.
16           These were lists that were compiled prior
17  to this work, and we used those lists here.
18      Q.   I'm curious.  Xanax is often used in
19  treating manic people or bipolar people, correct?
20      A.   I don't -- I'm not an expert on that.  I
21  know that Xanax is an anxiolytic with also, you
22  know, antidepressant qualities and properties, and
23  it -- I think it's used as an antidepressant.  I'm
24  not sure, you know, to the extent that it's used in

470

1   treating bipolar illness.
2       Q.   Do you know if Xanax was --
3       MS. McGRODER:  Bless you.
4   BY MR. ALTMAN:
5       Q.   Do you know if Xanax or other similar
6   drugs were included in your extract here?
7       A.   I would have to take a look and see if it
8   was.  I don't know the answer to that off the top of
9   my head.
10      Q.   If Xanax was not included, and I will
11  represent to you it's not.  I have looked.
12      A.   Okay.
13      Q.   Could that potentially bias the results
14  because there's a drug that's -- you know, that may
15  be used as an antidepressant that you are not able
16  to -- strike that.
17           How would you know that Xanax wasn't
18  prescribed to people in -- concomitantly with an
19  antiepileptic, and that the Xanax had the majority
20  or some influence over any potential efficacy of the
21  drug?
22      MS. McGRODER:  Object to form and foundation.
23  BY THE WITNESS:
24      A.   Obviously if Xanax is not a part of --

471

1   of, you know, the database and isn't used as a
2   covariate or as an exclusion in our -- in our
3   monotherapy or no drug conditions, then, you know,
4   potentially it could be used by somebody, and it
5   wouldn't be a part of our analysis.
6            In these kinds of analyses, you try to do
7   the very best you can with the available data.  You
8   don't always get every single different drug that
9   could be taken, and -- and there may be drugs that
10  are used concomitantly that -- that, you know, just
11  at that point in time, you just didn't know about.
12           We tried to cast a pretty wide net, and I
13  think we did a very good job in terms of looking at
14  a wide variety of different drugs that could be
15  taken as a concomitant therapy.
16           I will note that the results of both of
17  the studies are very, very similar whether you
18  adjust for concomitant therapy or not.
19      Q.   Understood.  But that would be a
20  limitation of your study that you don't know all the
21  drugs that these people were taking, correct?
22      MS. McGRODER:  Object to form.  Are you talking
23  now about the bipolar study or the gabapentin study?
24      MR. ALTMAN:  Either one.  He didn't buy the

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)                     Page  468 - 471

472

1    data for either one.
2        MS. McGRODER:  Well, I object to your
3    argumentative colloquy.
4        Do you want to restate the question?
5    BY MR. ALTMAN:
6        Q.   Would it be a limitation of your study
7    that you don't know all the drugs that these people
8    were taking?
9        MS. McGRODER:  Object to form and foundation.
10   BY THE WITNESS:
11       A.   It really depends.  It depends, No. 1,
12   you know, if -- if those were drugs that people were
13   taking with frequency; and, secondly, if the
14   presence of those drugs would explain suicidal
15   behavior above and beyond the drugs that were
16   included in the study.
17   BY MR. ALTMAN:
18       Q.   But when you say "suicidal behavior," it
19   could also be the -- reduction of suicidal
20   behavior, correct?
21       A.   It could have something to do with the
22   reduction of suicidal behavior.  Remember the -- the
23   primary focus of both of these analyses is to
24   determine whether or not these drugs increase the

473

1    risk of suicide attempts.
2        Now, our findings in these studies
3    indicate that in many cohorts, for example, in the
4    gabapentin study in the psychiatric cohorts, they
5    appear to have protective effects.  Now, that
6    doesn't mean that we can draw a causal inference
7    that these drugs are, in fact, protective.
8        What it allows us to determine is that
9    there is no evidence that these drugs are increasing
10   the suicide rates.  They may well be causally
11   protective, but there are a host of different kinds
12   of analyses that can be done to -- further
13   explore that.
14       Q.   Now, it's possible that every person who
15   took gabapentin was taking Xanax at the same time,
16   correct?
17       MS. McGRODER:  Object to form.
18   BY THE WITNESS:
19       A.   I think that's extremely unlikely, and
20   if, as you purport, Xanax was not included in our
21   analysis as a concomitant therapy, then I wouldn't
22   know one way or the other, and I couldn't answer
23   your question, you know, affirmatively.
24       I would say that it's extremely unlikely

474

1    that everyone who was taking gabapentin was also
2    taking Xanax.
3    BY MR. ALTMAN:
4        Q.   But a substantial number could have been
5    taking some other concomitant drug, Xanax or
6    otherwise, you just wouldn't know, correct?
7        MS. McGRODER:  Object to form.
8    BY THE WITNESS:
9        A.   My, you know, analysis is restricted to
10   the drugs that have been a part of the study which
11   include the 11 AEDs, lithium, a fairly extensive
12   list of antidepressants, antipsychotics, and other
13   anticonvulsants.  To the extent that there are other
14   drugs that are not included, they may have an
15   effect.  They may not have an effect.
16   BY MR. ALTMAN:
17       Q.   Okay.  Under "Permitted Use" it says:
18   "The Deliverables are being provided by PharMetrics
19   to Dr. Gibbons for the purpose of performing
20   analyses solely for Pfizer Inc."
21       Did I read that correctly?
22       A.   Yes, you did.
23       Q.   "For a project entitled 'BP suicide.'"
24       Did I read the rest of it correctly?

475

1        A.   Yes.
2        Q.   Okay.  Is there anything in there that
3    says that you can use this for writing a paper
4    for -- you know, for scientific publication?
5        A.   In my speaking with the -- with the folks
6    at PharMetrics, I explored this.  I saw this in the
7    contract, and they said the reason this was in
8    the contract is because they were providing the data
9    at a dramatically reduced cost because of their
10   association with Pfizer, and that we would be
11   permitted to write, you know, manuscripts.
12       Q.   Did you get -- and it says after that:
13   "Any other use of the Deliverables is strictly
14   prohibited and requires PharMetric's prior written
15   approval."
16       Did I read that correctly?
17       A.   Yes, you did.
18       Q.   Did you get PharMetric's prior written
19   approval before you published -- you published a
20   manuscript?
21       A.   I haven't published a manuscript.
22       Q.   Before you submitted a manuscript for
23   publication?
24       A.   No, I did not.

476

1     MR. ALTMAN:  Okay.  Let's mark the next Exhibit
2     27.
3           (WHEREUPON, a certain document was
4           marked Gibbons Deposition Exhibit
5           No. 27, for identification, as of
6           2/4/09.)
7     BY MR. ALTMAN:
8     Q.   Bear with me one second, please.
9          Dr. Gibbons, I have handed you what's
10    been marked as Exhibit No. 27, and it is a document
11    entitled "Read_Me_SHC.txt."
12         Do you -- do you see that at the top?
13    A.   I do.
14    Q.   Have you ever seen this document before?
15    A.   I believe this is just a printout of the
16    Read_Me file that was, you know, provided with the
17    CD or on the CD.
18    Q.   Okay.  Would you please read -- would you
19    please read the letter portion of the document at
20    the top starting with "To whom it may concern."
21    A.   "On this CD we are providing analytic
22    files in accordance with the agreement between
23    Pfizer and PharMetrics, Inc.  Datasets are in SAS
24    format.  If you have any questions about the data,

477

1     please do not hesitate to contact us."
2     Q.   And the rest of it, the name and the
3     date.
4     A.   "PharMetrics, Inc. May 22, 2008."
5     Q.   Is there any reason to expect that you
6     would not have received this data very shortly after
7     the 22nd of May?
8     A.   I can't think of any reason.
9     Q.   Okay.  Does that help refresh your
10    recollection when you first got this data?
11         MS. McGRODER:  Well, object to the form to the
12    extent this tells us when he got the data.
13         MR. ALTMAN:  I asked if it helped reflect --
14    refresh his recollection.  I didn't ask him --
15         MS. McGRODER:  You said for when he got the
16    data.  I don't know that it does.
17         MR. ALTMAN:  Does this help you --
18         MS. McGRODER:  I don't know if this reflects
19    when he got the data.
20         MR. ALTMAN:  I didn't say it did.  I asked does
21    it help him remember when he got it, Lori.
22    BY THE WITNESS:
23    A.   Beyond saying that this -- you know, the
24    Read_Me file was written on May 22nd, I still don't

478

1     remember when, but, you know, it seems logical that
2     I got it not long thereafter.
3     BY MR. ALTMAN:
4     Q.   Would you expect to have had it by June
5     1st?
6          MS. McGRODER:  Objection, calls for
7     speculation.
8     BY THE WITNESS:
9     A.   Again, I don't -- I don't really know.  I
10    mean, it's -- it's logical that I received it, but,
11    you know, maybe I didn't receive it then.  I just --
12    I can't answer it in an affirmative way because I
13    just don't remember the date.
14    BY MR. ALTMAN:
15    Q.   Do you know if you had it before the
16    Daubert hearing, the first Daubert hearing?
17         MS. McGRODER:  Do you know when the first
18    Daubert hearing was?
19         THE WITNESS:  I don't.
20    BY MR. ALTMAN:
21    Q.   You were there.  It was June 22nd or
22    23rd.
23         Did you have it before then?
24    A.   I may have.  I don't remember right now.

479

1     Q.   Okay.  That's fine.
2          The first file on this bipolar disorder
3     patients, it says: "47,918 observations."
4          Did I read that correctly?
5     A.   Yes.
6     Q.   Does that seem to be the right number of
7     people in your bipolar cohort?
8     A.   Yes, it does.
9     Q.   I think yesterday you said 49,000, but
10    you were going off the top of your head.
11         Would you take this number as being the
12    more accurate number?
13    A.   Probably, I would have to take a look at
14    what's in the paper, but it sounds about right.
15    Q.   It's not that important.  It is just
16    yesterday you said 49,000, and I just wanted to be
17    clear that -- see -- would it seem to be reasonable
18    to go by what's on the Read_Me file from
19    PharMetrics?
20    A.   I think it would be.  I mean, there were
21    a couple of other inconsistencies.  So, you know, if
22    you really want me to check, I'm happy to.
23    Q.   It's not -- it's not that important.
24    A.   Okay.

480

1     Q.   And it says here for the gabapentin
2  users, Cohort 2, 131,178 people.
3         Did I get that correct?
4     A.   I'm sorry?
5     Q.   Under the patient on --
6     A.   Did you say 231,000?
7     Q.   I said 131,178.
8     A.   That's what it says here.
9     Q.   Okay.  And then I think at the end we
10 talk about the PF48 underscore DX and the PF48
11 underscore RX and the PF48 underscore PR.  Those
12 were those look-up tables that we talked about a
13 little bit earlier, correct?
14    A.   Correct.
15    Q.   Okay.  Dr. Gibbons, I'm going to hand you
16 the next exhibit which we will mark.
17         (WHEREUPON, a certain document was
18         marked Gibbons Deposition Exhibit
19         No. 28, for identification, as of
20         2/4/09.)
21 BY MR. ALTMAN:
22    Q.   Dr. Gibbons, I have handed you what has
23 been marked as Exhibit 28.  Exhibit 28 I will
24 represent to you is a printout of the four data

481

1  files for one particular patient listed at the top
2  just so that we can kind of make sure that we
3  understand the data.
4         The only modification is that for the
5  diagnosis table and the drug table, we did actually
6  combine the two tables together to give you the
7  diagnosis and the drug names so that we could sit
8  and review it here for our convenience.
9     MS. McGRODER:  Well, then I object to the
10 authenticity of this document because he has no way
11 of verifying that you did that accurately, but you
12 can ask all the questions you want.
13    MR. ALTMAN:  That's fine.  He can verify it
14 all -- he can verify it all he wants.  Well, first
15 of all, with respect to -- with respect to --
16    MS. McGRODER:  My point is he is not capable of
17 verifying it right here.
18    MR. ALTMAN:  That's fine.
19 BY MR. ALTMAN:
20    Q.   I will represent to you that that is what
21 has been done.  If you can show that there's some
22 inaccuracy to suggest that that's not true, then we
23 can address that at a later time.
24         But at least with respect to the

482

1  diagnoses, do you see that for the diagnoses and for
2  every diagnosis description that those code numbers
3  appear to match?
4     MS. McGRODER:  Can I just have a running
5  objection on the authenticity of this document --
6     MR. ALTMAN:  That's fine.
7     MS. McGRODER:  -- and foundation for its use?
8     MR. ALTMAN:  That's fine.
9     MS. McGRODER:  Thank you.
10 BY THE WITNESS:
11    A.   That appears to be the case.
12 BY MR. ALTMAN:
13    Q.   Okay.  By the way, do you think it would
14 a particular difficult query to have joined the
15 diagnosis table with the -- the decoded table that
16 tells you what each diagnosis code is?
17    A.   No, I don't.
18    Q.   Okay.  Same thing with the drug names.
19 Do you think there would be any particular
20 difficulty in doing the same thing for the drug
21 names?
22    A.   It should be fairly straightforward.
23    Q.   Okay.  Let's just take a look at the data
24 at the top which is out of -- straight out of the

483

1  patient ID file, and by the way, Dr. Gibbons, if you
2  have -- so feel the desire, I do have all the data
3  here, and, you know, on a break if you feel you
4  really need to, we can look at -- you know, we can
5  look at the data if that becomes a necessity.
6         There are four fields there that appear
7  to be pat underscore id, correct?
8     A.   Yes.
9     Q.   And that's the patient ID, correct?
10    A.   That's correct.
11    Q.   And that's some number that is anonymized
12 so that we don't know the actual person's name,
13 correct?
14    A.   That's correct.
15    Q.   But it's designed so that you can use
16 that particular field to join all the information
17 from the different tables together, correct?
18    A.   Yes.
19    Q.   Okay.  The next column is called D-E-R
20 underscore sex, correct?
21    A.   Yes.
22    Q.   In that particular case -- I'm not going
23 to read the patient ID because it's some big long
24 string, but here it says F, and it is reasonable to

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

484

1    assume that F means female?

2    A.  Yes.

3    Q.  And you made that assumption when you

4    used the data, correct?

5    A.  That's correct.

6    Q.  Okay.  The next field there is called

7    index underscore dt, correct?

8    A.  Yes.

9    Q.  And it says here 2006-05-11 -- 18.  Did I

10   read that correctly?

11   A.  The second time.

12   Q.  And that is in -- that is in year, month,

13   day format, correct?

14   A.  That's correct.

15   Q.  And so that date would be May the -- May

16   the 18th, 2006, correct?

17   A.  Correct.

18   Q.  And under age it says 44, correct?

19   A.  Yes.

20   Q.  We would assume that that means years --

21   A.  Yes.

22   Q.  -- is that correct?  Okay.

23       The next table we have here is all

24   underscore diags underscore for underscore bipolar.

485

1    The first column there is pat underscore id.

2        Did I read that correctly?

3    A.  Yes.

4    Q.  Does that number there appear to be the

5    same as the pat underscore id in the bi -- patient

6    bipolar field?

7    A.  Yes, it does.

8    Q.  Okay.  Does it appear that this is

9    diagnosis data that goes along with that particular

10   patient?

11   A.  That's correct.

12   Q.  Okay.  The next column is from underscore

13   dt, correct?

14   A.  Yes.

15   Q.  There are various different dates there,

16   correct, in the same format as the table above?

17   A.  That's correct.

18   Q.  Okay.  And they are in year, month, day

19   format as above, correct?

20   A.  Correct.

21   Q.  And the first one, for example, is

22   2005-06-04, correct?

23   A.  Yes.

24   Q.  You would interpret that to be June the

486

1    4th of 2005, correct?

2    A.  Yes.

3    Q.  After that is a field called diag,

4    d-i-a-g, correct?

5    A.  Yes.

6    Q.  And that would appear to be the diagnosis

7    code, right?

8    A.  Yes, it does.

9    Q.  And those are ICD codes, correct?

10   A.  I believe so, yes.

11   Q.  Okay.  And the first one here is V as in

12   Victor 1041, correct?

13   A.  Yes.

14   Q.  The next column which I'll represent was

15   done by a simple query between the tables is called

16   diag underscore description.

17       Did I read that correctly?

18   A.  Yes.

19   Q.  And it says under there for the same

20   record -- that would be the description of the ICD

21   code, correct?

22   A.  Correct.

23   Q.  And it says V1041 - HX space of space

24   cervical space malignancy, correct?

487

1    A.  Yes.

2    Q.  Okay.  And that would appear to be what

3    the 1041 is, correct?

4    A.  Correct.

5    Q.  Okay.  I'd like you to go to the second

6    page, and you will notice at the bottom -- and there

7    are several pages it looks like, you know, almost

8    five pages of diagnoses for this particular patient,

9    but on the second page, I have highlighted one of

10   them for our convenience at the bottom.  It's in

11   bold.

12       Do you see that?

13   A.  Yes, I do.

14   Q.  Okay.  And the date there is listed as

15   May 18th, 2006, correct?

16   A.  That's correct.

17   Q.  And the diagnostic code is 29651,

18   correct?

19   A.  Correct.

20   Q.  And under the description it says

21   29651-bipolar -- BPLR dash AFCTV -- not dash --

22   space, space DSORD space DPRSD space Mild.

23       Did I read that correctly?

24   A.  Yes.

488

1     Q.   It would seem that's bipolar effective
2   disorder, and what does the DPRSD mean, do you know?
3     A.   Probably in the depressed phase.
4     Q.   Depressed mild.  Okay.
5          Dr. Gibbons, if you go back to the first
6   page under the index date -- for the patient
7   information under the index date, it lists May the
8   18th of 2006.
9          Did I read that correctly?
10    A.   Yes.
11    Q.   Okay.  That appears to be in sync with
12  the diagnosis data that May 15 -- May 18, 2006 we
13  have a diagnosis of bipolar disorder, correct?
14    A.   Correct.
15    Q.   Okay.  So that appears to be -- so if we
16  mark that there, that's the index date, correct?
17    A.   Yes.
18    Q.   The diagnoses -- if these are in date
19  order, and I will represent they are -- those were
20  before the diagnose -- index date, and these are
21  after the index date, correct?
22    A.   Correct.
23    Q.   Okay.  Would you go to the page 6 of the
24  document, and here we have all underscore drugs

489

1   underscore for underscore bipolar.
2          Did I read that correctly?
3     A.   Yes.
4     Q.   This appears to be the listing of drugs
5   that this particular person took, correct?
6     A.   Correct.
7          MS. McGRODER:  Well, for bipolar, right?
8          MR. ALTMAN:  No.  This is all the drugs in the
9   database that was provided.
10         MS. McGRODER:  Well, the title is all drugs for
11  bipolar.
12         MR. ALTMAN:  That's the name of the table as
13  provided by PharMetrics.  I didn't name it.
14         MS. McGRODER:  I just don't know the answer.
15         MR. ALTMAN:  I'm just representing this is the
16  contents of the all drugs for bipolar table provided
17  by PharMetrics for this patient.
18  BY THE WITNESS:
19    A.   Right.  These are -- these are the drugs
20  of the list of drugs that we -- we looked for which
21  would be the CNS drugs that were taken by this
22  patient.
23  BY MR. ALTMAN:
24    Q.   But there are no other drugs in the data

490

1   that you have other than -- strike that.
2          I'll represent to you this is all of the
3   records in the bi -- in the drugs for bipolar table
4   for this particular patient.  That's all that's
5   there regardless of -- there are no other drugs.
6          Do you have any reason to dispute that?
7     A.   I don't have any reason to dispute that
8   these are all of the drugs and their corresponding
9   dates that are available in that table.
10    Q.   Okay.  And we have here -- aside from the
11  pat underscore id we have talked about once again
12  links to that particular patient, correct, that we
13  have been looking -- talking about?
14    A.   Correct.
15    Q.   And so it would seem that these are the
16  records that go along with that patient, correct,
17  that we have been talking about from the first page
18  of this exhibit?
19    A.   That would be -- appear to be correct.
20    Q.   Okay.  The next column is from underscore
21  dt, correct?
22    A.   Yes.
23    Q.   And there's various dates there, correct?
24    A.   Correct.

491

1     Q.   The next column is ndc, correct?
2     A.   Yes.
3     Q.   Ndc would be the -- the numeric code that
4   is assigned to each particular drug and dosage and
5   quantity for identifying.  It's kind of a unique
6   number, correct?
7     A.   Correct.
8     Q.   And you can match that up with a table
9   that has a list of this ndc code has this particular
10  drug, correct?
11    A.   That is correct.
12    Q.   Okay.  The next column says DAY --
13  DAYSSUP, DAYSSUP, and has various numbers.
14         Does that appear to be the number of days
15  of -- whoops.
16         THE COURT REPORTER:  You're going to have to
17  slow down, or I'm just going to stop.
18         MR. ALTMAN:  Well, then ask me to slow down,
19  but I need -- I need that connection back.  If I'm
20  going too fast, feel free to let me know.
21         THE COURT REPORTER:  Okay.
22  BY MR. ALTMAN:
23    Q.   Does that appear to be the number of days
24  supply for that particular prescription for that

492

1    particular date that was provided?

2       A.  Yes.

3       Q.  Okay.  There's another column there

4    called QUAN, Q-U-A-N, correct?

5       A.  Yes.

6       Q.  And that would appear -- should be the

7    quantity of -- some kind of quantity indication,

8    correct?

9       A.  I'm not sure what that is.

10      Q.  In this particular case, though, it's all

11   zeros for this patient, correct?

12      A.  Yes, but I'm not -- again, I'm not sure

13   what that refers to.

14      Q.  Okay.  The last column is gen underscore

15   nm, correct?

16      A.  Yes.

17      Q.  That appears to be the generic name for

18   that particular NDC code, correct?

19      A.  Correct.

20      Q.  Okay.  Let's go to page 7.

21      Page 7 is a table called All underscore

22   Suicide underscore For underscore Bipolar.

23      Did I read that correct?

24      A.  Yes.

493

1       Q.  And we have the pat underscore id column

2    again, correct?

3       A.  Yes.

4       Q.  And that is the same patient ID we have

5    been talking about for the last several minutes,

6    correct?

7       A.  It appears to be, yes.

8       Q.  Okay.  And we have a from date, correct?

9       A.  Yes.

10      Q.  And that would be the date of the event,

11   correct?

12      A.  Yes.

13      Q.  And then we have a diag -- diagnosis

14   column, diag, correct?

15      A.  Correct.

16      Q.  And that would have codes there also

17   starting with an E, correct?

18      A.  Correct.

19      Q.  And then we would have a diag underscore

20   description column, correct?

21      A.  Correct.

22      Q.  And that would have the diagnostic code

23   and the actual text of what that is, correct?

24      A.  Yes.

494

1       Q.  These all appear to be suicide-type

2    issues, correct?

3       A.  Correct.

4       Q.  Okay.  We have looked at data from one

5    particular patient.

6       Is there anything -- does this appear to

7    be in sum and substance the data as provided to you

8    by -- for PharMetrics for one particular patient?

9       MS. McGRODER:  Well, object to form.

10    BY THE WITNESS:

11      A.  We are looking at one patient.  I

12   don't -- I can't -- you know, I could certainly

13   verify that I have no reason to believe that you

14   have fabricated this in any way, and this is

15   certainly a very troubled individual, but I'm sure

16   you have selected this person for -- for that

17   reason.

18      But it's -- you know, I have no reason to

19   believe that these are inconsistent with the kinds

20   of data that I received from PharMetrics.

21    BY MR. ALTMAN:

22      Q.  I mean, this appears to be the general

23   format, structure, everything like that from the

24   PharMetrics' data.  That's really what I am asking.

495

1       A.  Yes.

2       Q.  Okay.  That's fine.

3      Let's go look at the suicide stuff for

4    one second.  I'd like you to look at the last one,

5    two, three, four, five records for this particular

6    table.  It appears that there was an event on

7    January the 5th of 2007, correct?

8       A.  Correct.

9       Q.  And it's a suicide by firearm, air gun,

10   explosive?

11      A.  Yes.

12      Q.  Okay.  There appears to be another event

13   on January the 6th with the same description,

14   correct?

15      A.  Correct.

16      MS. McGRODER:  Well, object to form.

17    BY MR. ALTMAN:

18      Q.  And another event on January the 7th with

19   the same description, correct?

20      MS. McGRODER:  Object to form.

21    BY THE WITNESS:

22      A.  The data -- the from date shows January

23   7th, and it has the same diagnostic code.

24

496

1    BY MR. ALTMAN:

2        Q.   And on January 8th you show the same --

3    you show an event with the same code, correct?

4        MS. McGRODER:  Object to form.

5    BY THE WITNESS:

6        A.   That's correct.

7    BY MR. ALTMAN:

8        Q.   And January 9th you see the same event,

9    correct?

10       A.   Yes.

11       Q.   Do you have -- does this appear to be an

12   individual who attempted suicide five times on five

13   consecutive days and received treatment on each

14   one -- each day, was then released, and tried it

15   again?

16       A.   I don't know from what's given here

17   whether that's the case or not.

18       Q.   Okay.  But do you have any feeling, any

19   opinion, any idea?

20       MS. McGRODER:  You are asking him for his

21   feelings.  I object to that part.  If you ask him

22   for his opinions.

23   BY MR. ALTMAN:

24       Q.   I'm asking for your opinion.  Do you have

497

1    an opinion?

2        A.   I think this is a very unusual case, and

3    I don't know if these represent five separate

4    suicide attempts or one suicide attempt that's coded

5    five times in a row.  This is a person who has made,

6    you know, several different suicide attempts at

7    different points in time.

8        Q.   And we see it's not the only -- it's not

9    the only instance where there are events on multiple

10   consecutive days, correct?

11       A.   That's correct.

12       Q.   Okay.  How did you deal with this

13   individual in your studies?  Would you have counted

14   each one of these as a separate attempt?

15       A.   I would have to go back and double-check.

16   In analyses that looked at -- that allowed patients

17   to have multiple attempts, they may have been.  I

18   would have to double-check.

19       Q.   Okay.  We're -- we will do that -- we

20   will do that probably after lunch.

21       A.   Okay.

22       Q.   Now, there also appears to be on the

23   second -- the first and second and the third and

24   fourth lines, they appear to be not only consecutive

498

1    days, but they appear to be consecutive -- they

2    appear to be multiple events on the same day,

3    correct?

4        If you see the first two items, the dates

5    are May the 2nd of 2006.  One of them is suicide by

6    medicinals, and the other one is suicide by

7    tranquilizers, correct?

8        A.   That's correct.

9        Q.   Okay.  Would you have considered that to

10   be two separate attempts when you did your analysis?

11       A.   Well, I think it's important to realize

12   that the -- you know, these analyses were done in a

13   variety of ways.  There were sensitivity analyses as

14   well that have been performed to look at including

15   time to the events.

16       So where the analysis looked at just the

17   first of any suicide event and didn't do multiple

18   events in that analysis, the results of which were

19   quite similar.  So, you know, I don't think we would

20   have used those two events on the same day as two

21   separate events.

22       Q.   Okay.  That's fine.  But we are not sure

23   whether you would have counted events on consecutive

24   days as distinct events or whether they would have

499

1    been one event?

2        A.   It is certainly possible in analyses that

3    looked at, you know, the total number of events that

4    a person made that they could have been counted as

5    five different events.  I don't know.  I would have

6    to go back and double-check.  Certainly, a valid

7    question.

8        Q.   And you did not review any medical

9    records for these individuals, correct?

10       A.   I had no access to that kind of

11   information.

12       Q.   There are pharmaco -- are there

13   pharmacoepidemiological studies that are conducted

14   that also involve chart review?

15       A.   There may be some.  Certainly, that's not

16   the kind of information you can get from PharMetrics

17   or medical claims databases.

18       Q.   Have you ever done such a study?

19       A.   No.

20       Q.   Okay.

21       MS. McGRODER:  Keith, are you at a good

22   stopping point?

23       MR. ALTMAN:  Let's go off the record for one

24   second.

500

1    THE VIDEOGRAPHER:  Okay.  The time is 12:10
2    p.m.  We are going off the record.
3         (WHEREUPON, a recess was had at
4         12:10 p.m. until 12:12 p.m.)
5    THE VIDEOGRAPHER:  The time is 12:12 p.m.  We
6    are back on the record.
7    BY MR. ALTMAN:
8    Q.  All right.  Dr. Gibbons, I would like you
9    to go to the page before which is page 6 of 7, and
10   this is the -- we talked about before all the drugs.
11        Now, first of all, our index date is May
12   the 18th, 2006, correct?
13   MS. McGRODER:  Object to form.
14   BY THE WITNESS:
15   A.  That's correct.
16   BY MR. ALTMAN:
17   Q.  Okay.  If we go down the chart, and I did
18   not mark on this one.  If we go it looks like about
19   12 lines or so up from the bottom, we have a
20   prescription from May the 25th, 2006.
21        Do you see that?  And if you would like a
22   highlighter, if that would be of assistance to you,
23   feel free to mark that.
24   A.  That would be great.

501

1    Q.  It looks like the one on May the 25th,
2    2006 appears to be the first prescription after the
3    diagnosis date.
4    I'm sorry -- yeah, the diagnosis date.
5    MS. McGRODER:  The index date, right?
6    MR. ALTMAN:  The index date -- well, that's the
7    diagnosis date for bipolar.
8    BY MR. ALTMAN:
9    Q.  By the way, just one slight diversion.
10   We looked at the data for one particular bipolar
11   patient, but the gabapentin cohort data is exactly
12   the same as this, correct?  In term -- in terms of
13   the same table structure, we would have seen the
14   same --
15   A.  Same file structure.
16   Q.  -- same file structure, same fields and
17   everything --
18   A.  Right, different data, but the same file
19   structure.
20   Q.  Correct.  Okay.
21        First of all, are there prescriptions of
22   lithium before the date of diagnosis?
23   A.  Yes.
24   Q.  Okay.  Now, I'd like to make sure I get

502

1    this right here.  We have got a lithium prescription
2    on June the 15th, correct, 2006?  I'm only looking
3    post -- post-index date, correct?
4    A.  Correct.
5    Q.  Okay.  And then we have got another one
6    and that's -- we have got another one on July the
7    23rd, correct?
8    A.  Correct.
9    Q.  And we have got another one on January
10   the 1st of -- January the 9th of 2007, correct?
11   A.  Correct.
12   Q.  We have got another one on February the
13   6th of 2007, correct?
14   A.  Yes.
15   Q.  We have got another one on March the 6th
16   of 2007, correct?
17   A.  Correct.
18   Q.  We have got another one on April the 3rd
19   of 2007, correct?
20   A.  Yes.
21   Q.  We have got another one on May the 7th of
22   2007, correct?
23   A.  Correct.
24   Q.  Now, I am going to add up the exposure.

503

1    The first one we have 30 days, correct?
2    A.  Correct.
3    Q.  The next one we have 15 days, correct?
4    MS. McGRODER:  Object to the form.  When you
5    say "exposure," are you saying days supply --
6    MR. ALTMAN:  Days supply, let's go with days
7    supply.
8    BY MR. ALTMAN:
9    Q.  We have 30 days.  Then we have 15 days
10   for the second prescription, right?
11   A.  Correct.
12   Q.  And then we have 30 days for the third --
13   we have 30 days for all the others, correct?
14   A.  Correct.
15   Q.  All right.  So that gives us one, two,
16   three, four, five, six that's 195 days according to
17   the day supplied, correct?
18   A.  That's correct.
19   Q.  Okay.  Now, according to the definitions
20   of the cohort, this person should not have been
21   diagnosed with bipolar disorder prior to the index
22   date.  So I mean, it is our first date of bipolar
23   diagnosis, correct?
24   A.  That's correct.

504

1      Q.   Yeah, we have a person being treated with
2  lithium before their bipolar diagnosis date,
3  correct?
4      A.   That appears to be the case, yes.
5      Q.   Is lithium used for other purposes
6  besides bipolar disorder to the best of your
7  knowledge?
8      MS. McGRODER:  Objection, no foundation.
9  BY THE WITNESS:
10     A.   I'm not an expert in that.
11 BY MR. ALTMAN:
12     Q.   Okay.  That's fine.  Let's go to Exhibit
13 No. 20 which is the manuscript, and let's go to
14 Table 1.
15         We talked about this briefly yesterday,
16 but -- I'm sure Lori is going to object -- there's
17 no complex statistical calculations that go into the
18 making of Table 1, correct?
19     MS. McGRODER:  Object.
20 BY MR. ALTMAN:
21     Q.   I mean, is this anything more than simply
22 the counts of the number of patients and how many
23 suicide attempts there are?
24         There's no -- there's no Poisson

505

1  calculations.  There's no normalizations.  I mean,
2  this is really just counts and things like that,
3  correct?
4      MS. McGRODER:  Well, object to the form of that
5  question.
6  BY THE WITNESS:
7      A.   If your question is are these -- are the
8  entries here the product of some more sophisticated
9  statistical computation or comparison, the answer is
10 no.
11 BY MR. ALTMAN:
12     Q.   Okay.  Let's start with gabapentin.  We
13 are going to work down this chart, and I think we
14 will be at the time to break for lunch.
15         And just -- first of all just so I
16 understand, for the purposes of Table 1, you
17 excluded data from before the bipolar diagnosis,
18 correct?
19     MS. McGRODER:  Object to form.
20 BY THE WITNESS:
21     A.   Could you --
22 BY MR. ALTMAN:
23     Q.   Sure.
24     A.   -- restate that or.

506

1      Q.   On -- go to what's labeled page 26.  It's
2  actually the page before.
3         Would you please read the first sentence
4  into the record.
5      A.   "Table 1 presents number of patients at
6  risk, number of suicide attempts, person years of
7  exposure and rate of suicide attempts per 1,000
8  person years of exposure before and after initiation
9  of treatment during the one year observation period
10 following the index date of bipolar disorder
11 diagnosis."
12     Q.   Okay.  Let's go back to the table.
13         So what I had asked you before is you got
14 two years of data centered on the date of index
15 date, correct?
16     A.   Correct.
17     Q.   But for the purposes of Table 1, you did
18 not use the years worth of data before the index
19 date, correct?
20     A.   That is correct.
21     Q.   Okay.  That's what I want to make sure.
22 Let's -- we are going to work down the chart, but
23 for gabapentin, would you please read the number
24 of -- strike that.

507

1         You effectively break this up into two
2  chunks of time in that one-year period:  Before the
3  date of treatment -- first treatment, and after the
4  date of first treatment, correct --
5      A.   That's correct.
6      Q.   -- for the rest of the year?
7         Now, I think you said to be clean is when
8  we have gabapentin here in Table 1, that means
9  gabapentin and not one of the other anti -- the
10 other ten anticonvulsants or lithium, correct?
11     A.   That's correct.
12     Q.   Okay.  But it could have an unnamed
13 antiepileptic or an antipsychotic or an
14 antidepressant, correct?
15     A.   Correct.
16     Q.   Okay.  For gabapentin, you indicate
17 there's 1229 individuals at risk, correct?
18     A.   That's correct.
19     Q.   Okay.  And you say that there's 213
20 person years in the period of time before the first
21 diagnosis of gabapentin, correct?
22     A.   No.  You said diagnosis --
23     Q.   I'm sorry.  Before the first treatment
24 with gabapentin, between the time of the bipolar

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

508

1  diagnosis and the first treatment of gabapentin,
2  there are 213 patient years for the 1229 people,
3  correct?
4      A.  That's correct.
5      Q.  And there are 1,016 patient years of
6  exposure to gabapentin, correct, after that?
7      MS. McGRODER:  Object to form.
8  BY THE WITNESS:
9      A.  There's 1,016 person years of
10  gabapentin -- person years following the initiation
11  of gabapentin monotherapy with respect to the other
12  ten AEDs and lithium through the end of the what
13  turns out to be I believe 359-day follow up.
14  BY MR. ALTMAN:
15      Q.  And we talked about yesterday where you
16  used 359 and 360.
17      Within the precision of these kinds of
18  studies, that's not going to change results,
19  correct?
20      A.  I would agree with that.
21      Q.  Okay.  I'm a little confused.
22      Are you saying there's a thousand six --
23  there's 1,016 patient years leftover or there's
24  1,016 patient years of gabapentin exposure in

509

1  these -- we are only talking about these 1229
2  people, not any other people.  So we don't have to
3  qualify everything.
4      The 1,016 person years, is that the
5  person years of exposure on gabapentin?
6      A.  That's the person years of exposure after
7  the first initiation of gabapentin.  So it's not the
8  amount of exposure to gabapentin in terms of, you
9  know, number of pills prescribed or anything.  It's
10  the number of person years following the initiation
11  of gabapentin monotherapy.
12      That person could have been on gabapentin
13  or could have been prescribed gabapentin for one day
14  or 30 days or continuously throughout that same
15  period, and in this analysis that would be treated
16  all equally.
17      Q.  Why would you treat that all equally?
18      A.  Because the -- and, again, we have done
19  sensitivity analyses that look at it in different
20  ways, but the primary analysis here was comparing
21  the risk of suicide attempt before and after the
22  initial exposure to a particular antiepileptic drug
23  knowing that there may be a very short period of
24  time after the initiation of treatment and some kind

510

1  of suicidal behavior.
2      So requiring, for example, 30 days of
3  exposure.  If there was a suicide attempt prior to
4  30 days, that wouldn't be counted.  So we wanted to
5  cast the widest net and indicate any exposure to the
6  drug followed up by a suicide attempt irrespective
7  of the length of that exposure.
8      Sensitivity analyses we have also looked
9  at the density of the exposure, whether or not you
10  have been on gabapentin, you know, from month to
11  month, and how does that relate to the likelihood of
12  a suicide attempt using the number of pills data,
13  but for this analysis, it's before and after the
14  initial exposure.
15      Q.  You say you did that sensitivity
16  analysis?
17      A.  Yes.
18      Q.  Where is it?
19      A.  I, you know, have it around someplace.
20      MR. ALTMAN:  Okay.  I asked that that be
21  produced.
22      MR. LONDON:  To be -- to be clear -- I'm
23  sorry -- the sensitivity analysis is not in the
24  manuscript?

511

1      THE WITNESS:  No, it's not at this point.
2  I've -- I mean, I have continued to -- for academic
3  purposes and for the purpose of preparing -- you
4  know, anticipating requested revisions to this
5  manuscript for publication, that there will be a
6  series of other issues raised, and some of those
7  issues have been raised to questions when I
8  presented this.
9      I had some really good questions when I
10  presented this at Harvard, and so I have been
11  interested in pursuing this, not so much in the
12  context of this litigation, but in the context of
13  this paper and in the context of proposing these --
14  this methodology for other applications.
15      MR. LONDON:  I apologize for the interjection
16  and clarification.  Thank you.  Thank you, Lori, for
17  letting me do that.
18  BY MR. ALTMAN:
19      Q.  So on this line over here, you have 13
20  attempts before -- you have 13 attempts before -- in
21  the period between the date of bipolar diagnosis and
22  the initiation of therapy, and then 13 attempts
23  after that, correct?
24      A.  That's correct.

512

1    Q.   Now, some of those 13 attempts may have
2  been when the person wasn't actually on gabapentin,
3  correct?
4    A.   That's correct.
5    Q.   Okay.  Could you tell me where in this
6  paper somebody would know that this did not
7  represent 1,016 years of exposure to gabapentin?
8    MS. McGRODER:   Object to form.
9  BY THE WITNESS:
10   A.   I'd have to read the paper and make sure
11  that that was clear.  You know, I -- it's always
12  been clear to me, but, you know, I did the analysis.
13  Maybe it isn't completely clear.
14  BY MR. ALTMAN:
15   Q.   Well, let's go back to the page before,
16  and you say:  "Person years of exposure and rate of
17  suicide attempts per thousand" --
18   THE COURT REPORTER:   I'm sorry.
19   MR. ALTMAN:   Sorry.
20   THE COURT REPORTER:   Person you say?
21  BY MR. ALTMAN:
22   Q.   "Person years of exposure and rate of
23  suicide attempts per thousand years of exposure
24  before and after initiation of treatment during the

513

1  one year period observation -- the one year
2  observation period following the index date of
3  bipolar disorder diagnosis."
4    Did I read that correctly?
5    A.   Yes, you did.
6    Q.   Okay.  That's not real clear that that
7  second time interval is not all gabapentin -- you
8  know -- all exposure to the drug, is it?
9    MS. McGRODER:   Well, object to form.
10  BY THE WITNESS:
11   A.   I'm sorry.  To me --
12   MS. McGRODER:   That's argumentative.
13  BY THE WITNESS:
14   A.   To me, that's -- that's very clear
15  because it -- you know, the -- it says the number of
16  patients at risk, the number of suicide attempts,
17  and person years of exposure and rate of suicide
18  attempts per thousand years of exposure before and
19  after the initiation of treatment.
20  BY MR. ALTMAN:
21   Q.   Okay.
22   A.   So I am using the term "exposure" to
23  indicate length of follow-up after a particular
24  event, and in this case, the event is initiation of

514

1  treatment.
2    So I think given the -- you know, the
3  phrase "initiation of treatment," to me that's
4  clear.  It may be that reviewers of this paper will
5  share your, you know, opinion that it's not clear
6  and ask for further clarification.
7    Q.   Now, you said you -- you ran the
8  sensitivity analysis where you looked at considering
9  whether the person was actually on or off gabapentin
10  at the time of the suicide attempt?
11   A.   Yes, that's one of the -- one of the
12  sensitivity analyses that I've done since this paper
13  was submitted was to look at in the bipolar cohort
14  whether or not -- to use exposure at the monthly
15  level as a time varying covariate.
16    So is there a relationship between
17  gabapentin and suicide relative to not gabapentin on
18  a month-by-month basis whether or not you are
19  currently prescribed.  You have days of dose that
20  cover that -- that interval.
21   Q.   So would one reasonable way to do a
22  sensitivity analysis is to take a look at every
23  suicide attempt -- suicide event, distinct suicide
24  event, and we are not going to deal with whether --

515

1  how you counted them or not -- and determine whether
2  they were on or off the drug at that particular
3  point in time?
4    MS. McGRODER:   Object to form.  When you say
5  "the drug" --
6  BY MR. ALTMAN:
7    Q.   On whatever drug you are looking at.  I
8  mean, in the gabapentin group, would one way to do a
9  sensitivity analysis would be take a look at all 26
10  of these events and see whether the person was on or
11  off the drug at the time of the event and compute
12  your rates based upon that?
13   A.   Not necessarily.  I think if you wanted
14  to do that kind of analysis, you would do the kind
15  of sensitivity analysis that I described where you
16  deal -- where you treat exposure or gabapentin as a
17  time varying covariate, and you say on this month
18  was the person on gabapentin, yes, no, and that
19  becomes the gabapentin covariate in the analysis,
20  and -- and how does the presence or absence of
21  covariate -- of gabapentin at each month change the
22  odds of suicide attempt during that month.
23    So that would be, you know, the way that
24  I think that would be done.  Now that's a different

516

1  kind of analysis.  That's a time-to-event analysis.

2  So in that analysis we would be looking at not

3  multiple suicide attempts, but the time to the first

4  suicide attempt.  So that's another part of that --

5  that sensitivity analysis.

6         Just as a note, I mean, there are --

7  there are lots of ways of doing this, and I think

8  it's important to try to consider as many competing

9  hypotheses and provide a variety of different

10  analyses that -- that try to show whether or not the

11  findings are consistent across those different

12  assumptions.

13         That would be quite different than doing

14  an NDA for the efficacy of a drug and trying lots of

15  analyses to see, you know, and reporting the one

16  that -- that makes you happy.

17     MR. ALTMAN:  Why don't we go ahead and -- why

18  don't we go ahead and break for lunch at this point.

19     THE VIDEOGRAPHER:  This is the end of tape No.

20  3, day 2.  The time is 12:31 p.m.  We are off the

21  record.

22         (WHEREUPON, a recess was had at

23         12:31 p.m. until 1:21 p.m.)

24     THE VIDEOGRAPHER:  This is the beginning of

517

1  tape No. 4 of day 2.  The time is 1:21 p.m.  We are

2  back on the record.

3  BY MR. ALTMAN:

4     Q.   Dr. Gibbons, before lunch, we were

5  talking about your paper.

6         Are you aware whether there are any

7  patients within the bipolar cohort that had suicide

8  events on the same day as the index date?

9     A.   Yes, there were.

10     Q.   What did you do with those patients?

11         Did they get included in the post period

12  or were they excluded?

13     A.   They were handled in two different ways:

14  One, in the primary analysis, they were a part of

15  the preperiod since they didn't -- I mean, if a --

16  if a patient had a suicide attempt on the index date

17  and had been prescribed say gabapentin, it was

18  monotherapy on that day, that would have been a pre

19  because they didn't actually get the drug.  The

20  suicide attempt was the same as the index date.

21         Then in a sensitivity analysis the --

22  those patients -- the analysis was repeated without

23  those patients at all in the analysis, and it was

24  very little difference in the -- in the results.

518

1  There -- I'm sorry.  Go ahead.

2     Q.   Let me ask you a slightly different

3  question.

4         I'm talking about regardless of the

5  gabapentin initiation date.  I'm talking about if it

6  was the same as the -- we are not talking about the

7  gabapentin study.  We are talking about the bipolar

8  cohort.

9     A.   Correct.

10     Q.   For Table 1, you did not look at the data

11  in the one year to the diag -- the bipolar

12  diagnosis?

13     A.   That's right.

14     Q.   If a person had a suicide event on the

15  same date as the bipolar diagnosis, were they

16  included in Table 1 or excluded from Table 1?

17     A.   Included in Table 1.

18     Q.   Then that would mean that on the same day

19  they had -- were diagnosed as bipolar, and then

20  immediately went out and tried to -- attempted some

21  suicidal act, correct?

22     MS. McGRODER:  Object to form.

23  BY THE WITNESS:

24     A.   It probably means that they attempted

519

1  suicide, and then were brought into the clinic and

2  got the diagnosis.

3  BY MR. ALTMAN:

4     Q.   Why would you then -- if the suicide

5  probably occurred before the bipolar diagnosis, why

6  would you have included that in the dataset with

7  bipolar as the index?

8     A.   I thought it was a reasonable thing to

9  do.

10     Q.   Did you look to see how much of the

11  suicides -- how many of the suicides actually --

12  strike that.

13         Did you check to see how many times that

14  occurred where you had a suicide event on the same

15  day as the bipolar diagnosis?

16     A.   In the bipolar cohort, there was a fair

17  number.  In the gabapentin cohort, it was very rare.

18     Q.   I think there were three in the

19  gabapentin.

20     A.   Yeah, I think you're right.

21     Q.   Did you run a sensitivity analysis to see

22  what difference that would make?

23     A.   I did.

24     Q.   Okay.  Is that part of the sensitivity

520

1  analyses that -- that you have that have not been
2  produced as of yet?
3      A.  That's correct.
4      MS. McGRODER:  Well, object to form.
5  BY MR. ALTMAN:
6      Q.  Are there any other sensitivity analyses
7  that you did that have not been produced?
8      MS. McGRODER:  Object to form.  Only in that he
9  doesn't know what has been produced and what's not
10  produced.
11     MR. ALTMAN:  I have represented everything
12  that's been produced.
13     MS. McGRODER:  Well, that's your
14  representation, and we don't necessarily accept
15  that.  So I mean, he --
16     MR. ALTMAN:  Okay.
17     MS. McGRODER:  -- is not involved -- Keith,
18  it's a minor objection.  It is just that he doesn't
19  know everything that's been given to you guys
20  because that's the legal part of it.  So I mean just
21  ask him about the sensitivity analysis, and then you
22  can ask me if you can have them, and I will say yes.
23  BY MR. ALTMAN:
24     Q.  Are there other sensitivity analyses?

521

1      A.  Yes.
2      Q.  And what -- what sensitivity analyses are
3  there?
4      A.  The ones that I can remember right now I
5  did a sensitivity analysis looking at the -- only
6  those people who had made a suicide attempt prior.
7  In the bipolar cohort, I believe there are about 660
8  suicide attempts prior -- or patients who had made a
9  suicide attempt prior -- in the year prior, and
10  defined those as a high-risk sample.
11     Of those, I think about 110 made a
12  suicide attempt in the post-index, and repeatedly --
13  I repeated the analysis on just that high-risk
14  sample, found very similar results.
15     There was another sensitivity analysis
16  that was performed in the -- in the bipolar cohort
17  where the -- in the way that we define monotherapy,
18  it was monotherapy during the entire year.  So if
19  somebody made -- if somebody had been on gabapentin
20  and then shifted to another antiepileptic drug after
21  they had made a suicide attempt, that person would
22  not have fit the monotherapy criteria as defined in
23  the paper.
24     I felt that that was -- potentially, you

522

1  know, could be biased because up until the point of
2  the suicide attempt, they were on monotherapy.  So
3  there wasn't a good reason to exclude them from the
4  analysis if they were on monotherapy up to the point
5  of the suicide attempt.
6      Similarly, someone might have been on no
7  drug up until the point of the suicide attempt and
8  then took gabapentin after the suicide attempt.
9  That person would have been described as being on
10  gabapentin monotherapy.  The suicide attempt would
11  have been before, but, in fact, up until the point
12  of the suicide attempt, that person was on no
13  therapy whatsoever.
14     So a sensitivity analysis was done in
15  those cases where there was a suicide attempt of
16  defining -- redefining monotherapy with reference to
17  time to the suicide attempt, and, of course, that
18  can change depending on people -- you know, people
19  who made multiple suicide attempts.
20     And then, of course, there were -- there
21  were some other sensitivity analyses looking at
22  these comparisons between those people -- using all
23  of the attempts and the example that you -- you
24  identified of the person who made four attempts.  So

523

1  do you count that as four, and I don't remember if
2  that patient was counted as four, but in the
3  sensitivity analysis just sort of looking at that
4  patient as a single suicide attempt and counting
5  that person once as opposed to multiple suicide
6  attempts, again, to try to understand were there
7  other factors that may have changed the results.
8  There may be one or two others that I am not
9  thinking of right now.
10     Q.  And you have all of that work, shall we
11  say?
12     A.  I do, yes, and much of that was done in
13  preparation for and in anticipation of, you know,
14  comments that the reviewers might make to this paper
15  or comments that I have received in presenting this
16  work, the work on the bipolar cohort, you know, in
17  scientific settings.
18     Q.  These analyses we are discussing now, did
19  you tell Ms. McGroder or anybody from Shook Hardy
20  about them prior to this day, or is this the first
21  time this has ever come up?
22     A.  I know that some of these I probably
23  haven't even discussed them.  I may have, you know,
24  talked with -- with her about one or two of them,

524

1 you know, just saying, oh, I found something kind of
2 cool, but that work is -- you know, it's -- I
3 haven't really envisioned that work as really, you
4 know, that's been designed for this paper.  That's
5 been more academic work.
6     Q.   But if there was -- but there could be a
7 sensitivity analysis that could show -- throw
8 question at the -- the validity of the results here,
9 correct?
10    A.   There could be.  I mean, that's the whole
11 idea.  The important thing to note in all of this
12 stuff, and I think that, you know, in some way
13 Pfizer should be credited for it.  These analyses
14 there's no predetermination of how they would come
15 out.  These analyses could have come out in a way
16 that Pfizer probably would not have wanted to use me
17 as an expert witness in these cases.
18    Q.   By the way, there was no indication for
19 the drug that this -- any particular drug was given
20 for any particular condition, correct?
21    MS. McGRODER:  Object.  In the bipolar?
22 BY MR. ALTMAN:
23    Q.   In either one of the cohorts.  I mean,
24 there was no -- you didn't know why that person got

525

1 that particular prescription, correct?
2     A.   That's correct, and it's a good point.
3 In -- in the -- in my expert report one of the
4 things -- I think it's in Table 1 -- shows the
5 co-morbidities of people who might have had bipolar
6 illness with did they also have a pain disorder, did
7 they also have epilepsy, and it shows those
8 co-morbidities.
9          It's unclear to me whether or not a
10 patient receiving gabapentin who had bipolar maybe
11 70 percent of those people also had pain.  The
12 gabapentin may have been prescribed for the pain and
13 not for the bipolar, and you are correct.  I don't
14 have a way of knowing which indication it was
15 prescribed for.
16    Q.   And when we look at Table 1 in your
17 paper, which you might want to flip to, you show
18 a -- you show a reduction in the rate before and
19 after treatment, correct?  For -- just looking at
20 the gabapentin, the top line, correct?
21    MS. McGRODER:  I'm sorry.  Did you say weight?
22    MR. ALTMAN:  Rate.
23    MS. McGRODER:  Oh, rate.  Okay.  Thank you.
24

526

1 BY MR. ALTMAN:
2     Q.   Is that correct?
3     A.   That's correct.
4     Q.   You don't know that those people did not
5 get -- first of all, you don't know that those
6 people got the gabapentin for bipolar disorder,
7 correct?
8     A.   I have just testified to that.
9     Q.   You also don't know whether they were
10 taking gabapentin before they were diagnosed with
11 bipolar disorder, correct?
12    A.   There are patients that may have been
13 taking -- may have been prescribed gabapentin prior
14 to the index date.
15    Q.   You also don't know that they might not
16 have received a prescription specifically for
17 treating the bipolar disorder.  That is not one of
18 the ones that represented your three classes of
19 drugs you purchased, correct?
20    MS. McGRODER:  Object to form.
21 BY THE WITNESS:
22    A.   I didn't follow the question.
23 BY MR. ALTMAN:
24    Q.   You didn't buy all the drugs -- you

527

1 didn't get all the drugs that a person was taking.
2 You got a subset for which you selected upfront,
3 correct?
4     A.   That's correct.  I got the drugs that
5 were of interest, you know, for this.  They may have
6 received other medications.
7     Q.   So you don't know, for example, that some
8 of these people may have gotten Xanax -- I think we
9 talked about this earlier -- may have gotten Xanax
10 for the bipolar disorder, and that's why they were
11 prescribed Xanax, and that led to the decrease in
12 the rate, correct?
13    MS. McGRODER:  Objection, asked and answered.
14 BY THE WITNESS:
15    A.   As we discussed before, if there's a drug
16 that's relevant to this and I don't have it in the
17 database, then I can't say, you know, that it was
18 not relevant or that was the reason the person was
19 prescribed the medication.
20 BY MR. ALTMAN:
21    Q.   And you are not qualified to decide what
22 drugs would be relevant in the treatment of bipolar
23 disorder, correct?
24    MS. McGRODER:  Object to form.

528

1  BY THE WITNESS:
2      A.   You know, I relied on the expertise of my
3  co-author Dr. Mann to review the drugs that were --
4  we defined as concomitant therapy, and in previous
5  work I have relied upon others like Rob Valuck who
6  is a pharmacist and pharmacoepidemiologist to make
7  sure that the list of drugs that we are using in our
8  analyses are the appropriate ones.
9  BY MR. ALTMAN:
10     Q.   Did you talk with Dr. Mann specific to
11  either the bipolar or the gabapentin study as to
12  what drugs you should purchase?
13     MS. McGRODER:   Object to form.
14  BY THE WITNESS:
15     A.   The --
16     MS. McGRODER:   What drug data you should
17  purchase?
18     MR. ALTMAN:   The drug data -- you know, what
19  drug data.   That's what we are talking --
20     MS. McGRODER:   It just sounded bad.
21  BY THE WITNESS:
22     A.   I spoke with him as we were developing
23  these lists for -- in connection with the bipolar
24  study.   I have had no discussion with Dr. Mann about

529

1  the gabapentin study.
2  BY MR. ALTMAN:
3      Q.   But since you used the same -- since you
4  have used the same set of criteria for the
5  gabapentin study, then in effect he's influenced
6  both, correct?
7      MS. McGRODER:   Object to form.   Well, calls
8  for -- no, go ahead.
9  BY THE WITNESS:
10     A.   Much of the discussions of the lists of
11  drugs evolved out of our work with the Veterans
12  Administration database.   So while I think I may
13  have, you know, run these lists by John Mann, and,
14  you know, I don't, you know, specifically remember,
15  you know, the drugs have been reviewed by him at one
16  phase or another.
17  BY MR. ALTMAN:
18     Q.   We are going to spend a little time in
19  the SAS programs in a bit, but in the gabapentin
20  study, you classified the use of the drug by
21  indication, correct?
22     MS. McGRODER:   Object to form.
23  BY MR. ALTMAN:
24     Q.   In your gabapentin analysis in your

530

1  expert report, you break up by indication,
2  correct -- your analysis by indication?
3      A.   If I'm understanding your -- your
4  question correctly, I show the -- the effects of
5  drug or break downs of drug further stratified by
6  different indications like bipolar disorder,
7  epilepsy, pain, so forth.
8      Q.   And you used an inquiry based on various
9  different ICD codes to bucket these -- to bin these
10  up into different buckets, correct?
11     MS. McGRODER:   Object to form.   ICD 9 codes?
12  BY THE WITNESS:
13     A.   If your question is about using ICD 9
14  codes to you, know, derive the diagnostic
15  information, the answer is yes.
16  BY MR. ALTMAN:
17     Q.   Who was the person who decided what codes
18  went with what bucket?
19     A.   I believe those grew out of our -- some
20  of the prior work for the VA sample, and I think
21  also Dr. Mann reviewed those codes.   I think I might
22  have also -- I think we probably developed a
23  preliminary list, and then ran that by John Mann.
24     Q.   And you only used a list like that in the

531

1  gabapentin study, correct -- strike that.   We will
2  come back to it a different -- when we look at the
3  programs.   Why don't we -- why don't we mark the
4  programs for right now.
5          Now, before I throw the SAS -- SAS
6  programs at you, do you believe that you are
7  qualified to sit and explain the exquisite, intimate
8  details of these SAS programs, or would Dr. Hur be
9  in a better position to do that?
10     MS. McGRODER:   Object to form.
11  BY THE WITNESS:
12     A.   You know, I -- I can make my way through
13  them.   I have replicated the results of those SAS
14  programs independently.   So I can testify to their
15  validity.   If you pull a line out of a -- you know,
16  the middle of one of them and ask me to explain
17  exactly what's going on, I can give it my best shot.
18          I don't pretend to be a world-class
19  expert in SAS, and these are fairly complicated
20  files.   I have gone through them completely to the
21  point at the time that I went through them, I
22  understood exactly what was going on.   That was one
23  of the things that Dr. Hur and I did together to
24  make sure that the logic of what I had asked for was

532

1   implemented, and we went through them to such a
2   degree so that we were able to find confidence that
3   that, in fact, was the case.
4          I then supplemented that by redoing these
5   in Fortran, and as I have said, I will share those
6   with counsel and the associated ASCII files which
7   they read.
8          So having said that, you know, I can -- I
9   can give it my best shot, but I can't tell you that
10  you will ask me a question and I will go -- it might
11  take a long time to try and figure it out, and I
12  might not be able to answer it for you.
13         MR. ALTMAN: Objection, non-responsive.
14  BY MR. ALTMAN:
15     Q.  My question to you was:  Would Dr. Hur be
16  in a better position to discuss these SAS programs
17  than you would?
18         MS. McGRODER: Well, objection to form and
19  foundation, and he already answered that question,
20  asked and answered.
21         MR. ALTMAN: He did not.
22  BY MR. ALTMAN:
23     Q.  Would you please answer that question.
24         MS. McGRODER: He can't know whether Dr. Hur is

533

1   it in a better position until you ask him the
2   questions, and he gives you the answers.  I mean,
3   how can he know that --
4          MR. ALTMAN: Would you answer -- Lori, you are
5   coaching the witness now.  You are not allowed to do
6   that --
7          MS. McGRODER: No, he answered your question.
8          MR. ALTMAN: No, he did not.  I asked him would
9   Dr. Hur be in a better position to discuss the SAS
10  programs.
11         MS. McGRODER: Well, my objection is --
12         MR. ALTMAN: He told me --
13         MS. McGRODER: -- there is no foundation for
14  him to answer that question until you ask the
15  questions.
16         MR. ALTMAN: That's fine.
17  BY MR. ALTMAN:
18     Q.  Would Dr. Hur be in a better position to
19  discuss these SAS programs than you?
20     A.  You know, it depends on what part of the
21  programs that you are describing.  As I have
22  testified, Dr. Hur had the primary role of writing
23  those programs.  Authors are always, you know,
24  closest to their code, but everything that's in the

534

1   code is based on -- on direction that Dr. Hur
2   received from me.
3          So I should be, you know, in reasonably
4   good stead to -- stead -- I am not sure that's even
5   a word.  I should be able to -- to review them with
6   you, if you would like.
7      Q.  Still not answering my question.  Would
8   Dr. Hur be in a better position to discuss these
9   programs?
10         MS. McGRODER: Object to form and foundation,
11  asked and answered.  He cannot answer that question.
12  He can't know until you ask --
13  BY MR. ALTMAN:
14     Q.  Did you rely on Dr. Hur to write these
15  programs as opposed to yourself?
16     A.  Dr. Hur wrote the programs, that's
17  correct.
18     Q.  Would it have been as easy for you to
19  write these programs as Dr. Hur?
20     A.  He has more expertise in using SAS than I
21  do.
22     Q.  Do you routinely rely upon Dr. Hur to
23  write your SAS programs in projects that you work on
24  together?

535

1      A.  Yes, I do.
2      Q.  Is there a time where you would write the
3   program as opposed to Dr. Hur?
4      A.  Well, which program are you talking
5   about?
6      Q.  Is there -- can you think of instances
7   where you and Dr. Hur have collaborated on papers
8   where you wrote the SAS programs instead of Dr. Hur
9   writing the SAS programs?
10     A.  If you are just talking upon SAS
11  programs, then I would rely upon Dr. Hur to do that.
12         MR. ALTMAN: Okay.  Let's mark as the next two
13  exhibits -- well, let's mark as -- this exhibit
14  first whatever the next number is 29.
15         (WHEREUPON, a certain document was
16             marked Gibbons Deposition Exhibit
17             No. 29, for identification, as of
18             2/4/09.)
19  BY MR. ALTMAN:
20     Q.  Now, Dr. Gibbons, if you would please
21  pull -- it's probably Exhibit No. 5 which was the
22  listing of the contents of the CD.  It's the next
23  one right there.
24         You see that there are several files at

536

1  the top which are the data files.  We talked about
2  that yesterday, correct?
3      A.  Correct.
4      Q.  Then there were several files after that
5  that appear to be the SAS programs; is that correct?
6      A.  That's correct.
7      Q.  Okay.  Now, there is no real distinction
8  between which programs go with which study, correct?
9  As you see it -- as it sits right here; is that
10  correct?
11  MS. McGRODER:  Object to form.
12  BY THE WITNESS:
13      A.  Well, I mean, obviously the data files
14  are -- are delineated --
15  BY MR. ALTMAN:
16      Q.  I'm -- I'm sorry.  I am only talking
17  about the programs.
18      A.  Oh, for some of them, it would be hard to
19  determine.
20      Q.  Okay.  As best we can determine it,
21  GABAMODEL1, GABAMODEL2, and GABASUMM appear to all
22  go together and -- with the gabapentin study.
23          Would you agree with that?
24      A.  Yes.

537

1      Q.  Okay.  BPRX would appear to be the
2  bipolar -- go with the bipolar study, correct.
3      A.  That's correct.
4      Q.  Same thing with MONO1 and MONO2, correct?
5      A.  I believe that's correct.
6      Q.  Okay.  It appears that you have one AEDs
7  pre versus post, and there are several different
8  flavors in that.  That would appear to be all the
9  different iterations you did on your Poisson
10  modeling, correct?
11      A.  Those would be the -- probably the -- I
12  don't know if those are the -- I think those are the
13  pooled -- pooling over all of the 11 AEDs, and then
14  you have the different flavors of those where you
15  have previous versus post -- I'm sorry -- you have
16  previous versus post.  You have previous versus no
17  medication, and then you have post versus no
18  medication.  And then those are reiterated for --
19  without that AED prefix to indicate that those would
20  be the compound specific or drug specific analyses.
21      Q.  And all the ones we just talked about
22  would be going with the bipolar study, correct?
23      A.  That's correct.
24      Q.  Okay.  The only one that's left then

538

1  appears to be the SARATE program.  It appears from
2  our review that goes along with the bipolar study?
3      A.  I'd have to look at it.
4      Q.  Okay.  And we will -- and we will do so.
5          Given that understanding, I have provided
6  to you Exhibit 29 which are GABAMODEL1, GABAMODEL2,
7  and GABASUMM.  You will notice at the bottom I have
8  labeled them "Gabapentin Study," and it's pages 1
9  through 18, and then each of the individual programs
10  is identified on the -- on the left-hand side at the
11  bottom as to which are programs and a page number.
12          Does that appear to be correct?
13      A.  It seems to be.
14      Q.  Okay.  Those three SAS programs I have
15  handed you, does that appear to accurately reflect
16  the three SAS programs that we used to conduct the
17  gabapentin study?
18      A.  We used?
19      Q.  That you used to conduct the gabapentin
20  study?
21      A.  I mean, I haven't gone through them, but
22  they look like the programs.
23      Q.  Do you have any reason to suspect those
24  are not the programs that you provided to us?

539

1      A.  I'm assuming that you simply printed
2  those programs off from the materials that I
3  provided on the CD, and if that is true, then they
4  would be the programs that were used.
5      Q.  And there's nothing there to suggest that
6  that's not what happened, correct?
7  MS. McGRODER:  Well, I mean, he would need to
8  sit there and read it to answer that question.
9  BY THE WITNESS:
10      A.  If you really wanted me to answer that
11  question with authority, I would have to go through
12  and compare them line by line.  I, you know --
13  BY MR. ALTMAN:
14      Q.  I understand what you are saying.  I am
15  just saying there's nothing there obviously that
16  says, oh, my God, this just doesn't look right,
17  correct?
18      A.  No, and when you are looking at 18 pages
19  of SAS code, what is obvious and not obvious is a
20  little hard to say.  I don't see any -- anything
21  that is, oh, my goodness this is not SAS code, and,
22  you know, this is for Fortran, but beyond that, I
23  can't really say too much.  If you tell me that you
24  printed these off and this is what I gave you, then

540

1  I'll accept that.

2      MR. ALTMAN:  I would like to mark the next

3  exhibit.

4          (WHEREUPON, a certain document was

5          marked Gibbons Deposition Exhibit

6          No. 30, for identification, as of

7          2/4/09.)

8      MS. McGRODER:  This is 30, right?

9      THE COURT REPORTER:  Yes.

10  BY MR. ALTMAN:

11     Q.   Dr. Gibbons, you have been handed what's

12  been marked as Exhibit 30 which appears to be 67

13  pages of exquisite SAS code that appears based on

14  our description to represent the programs used in

15  the bipolar study.

16          Now, the one program we had a question

17  about, if you go to --

18     MS. McGRODER:  Keith, I'm sorry.  Are you

19  representing that you did print these off --

20     MR. ALTMAN:  Yes.

21     MS. McGRODER:  -- from the same PharMetrics

22  disks?

23     MR. ALTMAN:  Yes.

24     MS. McGRODER:  Okay.  Thank you.

541

1  BY MR. ALTMAN:

2      Q.   Yes.  If you go to page I believe it is

3  15 of 67 is the SARATE program which appears to be

4  the one that we were unsure whether it goes with the

5  gabapentin.

6          It says at the top under the description

7  "suicide attempts per 1,000 person use for each

8  drug."

9          Since in the gabapentin study we were

10  only looking at one drug, that would seem to

11  indicate that this is associated with the bipolar

12  study, correct?

13     A.   Yes, and that would be consistent of --

14  with the use of the data file later on that page of

15  all underscore suicide underscore for as in f-o-r

16  underscore bipolar.

17     Q.   Okay.  Good.  So we solved that mystery.

18  All right.

19          Let's go to the -- Exhibit 29 for a

20  moment, and I will point your attention to page 3 of

21  18, and this is the program GABASUMM1, correct?

22     A.   GABASUMM1.

23     Q.   Okay.  I'd like you to look two lines up

24  from the bottom, and there's a line there that says

542

1  merge, gabasumm gabad, and in parenthesis keep

2  equals pat underscore id space psycd space epilp

3  space bipld space mdd space schiz space paind close

4  parenthesis space in dot cmed.

5          Did I read that correctly?

6      A.   I believe so, yes.

7      Q.   Okay.  Now, as I understand that, that is

8  to attempt to do a join between two data files,

9  correct?

10     A.   Yes.

11     Q.   And the in dot cmed implies that's a data

12  file that would have been already on the disk in the

13  library, correct?

14     A.   It could be a -- it looks likes it's a --

15  it's a fixed dataset.

16     Q.   Okay.  Could you please go to Exhibit --

17  whatever the list of -- Exhibit 5 is, and could you

18  please tell me where on the list the cmed SAS

19  dataset is listed?

20     A.   The cmed dataset I believe is a

21  concomitant medication data set that's created by

22  some of these SAS programs.  That was not a dataset

23  that was supplied to us by PharMetrics.

24     Q.   Which SAS data program created it?

543

1      A.   At one time I knew that.  I don't

2  remember right now.

3      Q.   Would it have been one of the bipolar --

4  well, it couldn't have been one of the bipolar

5  programs, correct, because this is the gabapentin

6  study?

7      A.   That's correct.

8      Q.   So it would be one of these three

9  programs here?

10     A.   Presumably.

11     Q.   Okay.  I hate to do this to you, but I

12  need to find out where that's created because I

13  couldn't find out where it was created.

14     A.   Okay.  One of the things that I can do is

15  I can determine whether or not -- I mean, I can look

16  through here.  I'm assuming if you couldn't find it

17  in here, maybe it's not.  I can double-check to see

18  whether or not there are any other programs that

19  might have created some of these secondary files

20  that for one reason or another were not included on

21  the disk for you, and that's a possibility --

22     Q.   Okay.

23     A.   -- and if that's the case, I can provide

24  that to you.  It was not my intention, as you can

544

1    see this, to -- to leave out any important pieces of
2    information, but if I did inadvertently, I can
3    certainly correct that.
4        Q.   And -- and you do realize that not having
5    that file would essentially keep these programs from
6    executing, correct?
7        A.   I'm assuming the programs will execute by
8    themselves, but if you are missing one of the
9    intermediate files, you know, it's going to -- it's
10   going to crash. So, you know, you would need that
11   file, and, again, it was not -- if I have excluded
12   something.
13       I do know that cmed was one of the
14   programs that gets created by one of the SAS
15   programs. If I've left that out, I apologize. It
16   wasn't my intention to do so.
17       Q.   And -- and I believe you didn't do it
18   intentionally, but, Dr. Gibbons, do you understand
19   that a lot of time and effort goes into reviewing
20   the information that you have provided?
21       MS. McGRODER:  Objection, you don't have to
22   answer that. What is this going to be a lecture on
23   why --
24       MR. ALTMAN:  No, it's not going to be -- it's

545

1    not going to be a lecture, Lori.
2    BY MR. ALTMAN:
3        Q.   Do you understand that a lot of time and
4    effort is spent reviewing the information you
5    provided?
6        MS. McGRODER:  Objection, he has no idea how
7    much time you spend. You don't have to answer that.
8    There's no foundation --
9    BY MR. ALTMAN:
10       Q.   Are you going to answer --
11       MR. ALTMAN:  Are you instructing him --
12       MS. McGRODER:  No, I'm instructing him not to
13   answer.
14       MR. ALTMAN:  I don't know that you can.
15       MS. McGRODER:  I am.
16       MR. ALTMAN:  Okay. Well, you can't.
17   BY MR. ALTMAN:
18       Q.   Are you going to follow your lawyer's
19   advice?
20       MS. McGRODER:  Well, I'm not his lawyer --
21       MR. ALTMAN:  Okay. That's right. You are not
22   his lawyer.
23       MS. McGRODER:  -- and I am instructing him as a
24   witness that I am representing in this -- on behalf

546

1    of a client that I represent in this deposition not
2    to answer that question. So you can move on.
3    BY MR. ALTMAN:
4        Q.   Are you going to abide by her
5    instruction?
6        A.   I like her more.
7        Q.   What I'm getting at, Dr. Gibbons, is that
8    on at least two or three times today we have
9    discovered that there is information concerning your
10   analyses with Neurontin that have not been provided.
11       MS. McGRODER:  Well, I object to that. I don't
12   even think that's accurate.
13       MR. ALTMAN:  Well, all the sensitivity -- were
14   the sensitivity analyses provided?
15       MS. McGRODER:  Keith, I didn't even know about
16   the sensitivity analysis until yesterday.
17       MR. ALTMAN:  Lori, I'm not -- no, Lori --
18       MS. McGRODER:  At the end of this deposition,
19   you can list all the things you want, and we'll try
20   to get them --
21       MR. ALTMAN:  Lori, I'm going to ask my
22   question. Stop coaching the witness.
23       MS. McGRODER:  No, I am not going to let him
24   answer --

547

1        MR. ALTMAN:  Lori -- Lori --
2        MS. McGRODER:  -- about your litigation
3    document production issues.
4        MR. ALTMAN:  -- Lori, that's enough now. Do we
5    need to call the Court?
6        MS. McGRODER:  Yeah, go ahead and call the
7    Court.
8        MR. ALTMAN:  That's fine.
9    BY MR. ALTMAN:
10       Q.   Dr. Gibbons, what I'm asking you is on at
11   least several times today you have identified
12   materials that have -- I'm not suggesting that was
13   done intentionally but was not identified to
14   counsel, was not identified to us.
15       And so what I am asking you is to take
16   some time and think is there any other materials on
17   anything having to do with Neurontin and these
18   calculations and these studies and your expert
19   reports that you may have forgotten in the past that
20   may be existing on a hard drive. And I'm asking if
21   you can't remember it, that when you go back today,
22   you make a diligent search through your materials to
23   see if there are other stuff.
24       MS. McGRODER:  I object to the form of that

548

1    question.  I think it's argumentative, and you don't
2    have to respond to it.
3          We will go through the items that you've
4    identified that you think you want, and we will look
5    for them and provide them, if possible, as I've told
6    you all along.  You don't need to instruct my
7    witness.
8          MR. ALTMAN:  Lori, the problem is is that I
9    can't identify what I don't know about.
10         MS. McGRODER:  Well, if you want to ask him
11   that exact same question without that argumentative
12   colloquy, that's fine.  Ask it.  Ask him if there's
13   anything else he remembers, but he doesn't have to
14   answer that question.  It's inappropriate.
15   BY MR. ALTMAN:
16   Q.   Is there anything else you can remember?
17   A.   There's one thing I remember right now.
18   There are two typos in my report dated -- I think
19   it's the November 5th report.
20   Q.   Yes, the November 5th.
21   A.   That's Exhibit 21, and I believe the
22   first one is on Table 1, and if you look at the
23   final column, you will see two numbers that are
24   81.6.

549

1    Q.   Okay.
2    A.   And the first of those two numbers I
3    believe is 16.2.  I can verify that but --
4    Q.   Well, I would rather that you wrote -- we
5    will mark it, and I would rather that you get us
6    whatever the corrected -- whatever the corrected --
7          MS. McGRODER:  Do you want him to write on the
8    exhibit?  Dr. Marris would.  Go ahead.  Write the
9    correct number on the exhibit --
10   BY MR. ALTMAN:
11   Q.   What's the basis of that -- how do you
12   know that that's the correct number?
13   A.   I have gone through all of these, and as
14   I have said, you know, I have done the -- duplicated
15   all of the values, and Kwan also went through and
16   verified everything and realized that that was a
17   typo, and the only reason I'm -- I'm almost certain
18   it's 16.2, but I didn't bring any paper with me here
19   to verify that.
20         But I do know that that top 81.6 is
21   incorrect which -- which is also consistent with
22   what you would imagine.  People with other
23   psychiatric disorders, you know, 81.6 percent of
24   them would not be taking antipsychotic medications.

550

1    Q.   That's fine.  I only ask that you -- you
2    know, I will accept your representation, but if you
3    can actually pull the document or at some point that
4    has the correct thing, and just -- I just want to be
5    sure that it's -- it's real easy with all these
6    numbers to get -- it could be 12.6 or 16.2, and when
7    you are being asked lots of questions, very easy to
8    make a mistake like that.
9    A.   I will -- I will put something formal
10   together and share it with counsel who --
11   Q.   I don't even know that it needs to be
12   formal.  It's just if you can go back and check and
13   be sure.  I will accept Lori's -- if Lori just sends
14   me an e-mail that says Dr. Gibbons went back and
15   checked and number is this, I will accept that.  I
16   don't think you need to do anything more --
17   A.   Okay.  There's one other number also,
18   and, again, I'll just highlight it for you so that
19   you will know to expect it.  In table -- in Table 2
20   I believe it's the -- again, the far right column,
21   second row from the bottom all, the 1.22 should be
22   1.23.  Those are the only two that I found.
23         There may be other inaccuracies in here,
24   but those are the two that I found, and I wanted to

551

1    share that with you today.
2    Q.   I appreciate that.  While we're on --
3    since we have gone to that column; let's -- I have
4    got a couple of questions about that column since
5    you already went there.
6          What formula did you use for calculating
7    your confidence intervals there?
8    A.   These were calculated out of the
9    generalized estimating equation regression model.
10   So this is a full GEE model with -- with all the
11   covariates that are described in the paper --
12   Q.   Now, would the GE --
13   A.   -- I'm sorry -- in the -- in this expert
14   report.
15   Q.   Would the GEE model -- did you calculate
16   the rate ratio there is the -- also from the GEE
17   model?
18   A.   That's correct.
19   Q.   Would the rate ratio from the GEE model
20   be equal to the rate ratio -- simple rate ratio by
21   just dividing the simple rates?
22   A.   No.
23   Q.   Dr. Gibbons, since we are dealing with
24   the same number of patient years before and

552

1    afterwards, we can just go to the simple -- the
2    rate -- the -- the attempts before and the attempts
3    after or the rates.  Either one is going to yield
4    the same thing, correct?
5        A.   Yes.
6        Q.   Okay.  So I'm going to take the
7    gabapentin lines 119 attempts after, correct?
8        A.   Where are you --
9        Q.   I'm on the -- I'm sorry -- for bipolar --
10   I'm sorry -- for bipolar disorder.
11       A.   Okay.
12       Q.   119, right?  119 attempts after, correct?
13   Did I read that correctly?
14       A.   Correct.
15       Q.   And there are 181 before, correct?
16       A.   Correct.
17       Q.   So I'm just going to divide those two,
18   and that should give me the simple -- the simple
19   relative risk, correct?
20       A.   Correct.
21       Q.   And that comes out to be .66?
22       A.   Okay.
23       Q.   I'm going to take the next one.  We have
24   10 after.  We have 12 before.  I'm going to do the

553

1    simple -- and divide those two, and I get .83.
2        By the way, the .66 is the same as you
3    had for the rate ratio from the GEE calculations,
4    right?
5        A.   That's correct.  Maybe the analysis -- I
6    would expect that the GEE would give me a different
7    number.  So it may be that the values that are in
8    Table 2 are not from the GEE, and maybe they are the
9    simple rate ratios.  I would have to double-check.
10       Q.   Well, I would like you to go to page
11   16 -- I'm sorry -- page 10, point 16 of your expert
12   report, and you say: "Significance decreases in
13   suicide attempt rates were observed for bipolar
14   patients," and it says, "ERR 0.66," correct?
15       A.   That's correct.
16       Q.   That's supposed to be the GEE
17   calculation, correct?
18       A.   That's correct.
19       Q.   Okay.  Is that not the same as the rate
20   ratio in Table 2?
21       A.   It is.
22       Q.   And it says for MDD patients ERR equals
23   0.63, correct?
24       A.   That's correct.

554

1        Q.   Is that not the same as the rate ratio in
2    Table 2?
3        A.   That is.
4        Q.   And it says for psychiatric disorders,
5    ERR equals 0.8, correct?
6        THE COURT REPORTER:  I'm sorry.  Psychiatric?
7    BY MR. ALTMAN:
8        Q.   Psychiatric disorders, it says ERR equals
9    0.8, correct?
10       A.   Yes, it does.
11       Q.   And if you go to Table 2 psychiatric
12   disorders, it says 0.8, doesn't it?
13       A.   That's correct.
14       Q.   And for schizophrenia, I believe it says
15   ERR 0.74, correct, in the -- in the text?
16       A.   That's correct.
17       Q.   And on Table 2, it says 0.74, correct?
18       A.   That's correct.
19       Q.   Something is not right here, is it?
20       A.   Not necessarily.  I would have to go back
21   and take a look.  The GEE may be providing the
22   margin, and it will adjust the standard error.
23   Remember what GEE attempts to do is model the
24   marginal rates.

555

1        So I can't say at this moment that
2    because these numbers are the same as the crude
3    rates -- rate ratios that that would be -- that they
4    are not the exponential of the maximum likelihood
5    estimate coming out of GEE.  I would have to
6    double-check and see.
7        Certainly, the standard errors wouldn't
8    be the same, and that may account for a different
9    confidence interval, but, again, the objective of
10   GEE is to obtain estimates of the marginal
11   distribution, and if it's hitting the marginal
12   distribution exactly, it wouldn't necessarily
13   surprise me.
14       I would think that maybe in the inclusion
15   of the covariates and so forth, it would have
16   changed them.  That's why I answered in the way that
17   I did, but, you know, you raise an interesting
18   point, and I should go back and take a look at that.
19       Q.   And I think all the numbers are the same
20   so, and this these appear to be the simple ratios.
21       Doesn't it strike you kind of a little
22   strange that maybe it would happen once, maybe it
23   would happen twice, but one, two, three, four, five,
24   six, seven, eight times you get exactly the same as

556

1 the simple ratio?

2    MS. McGRODER:  Objection to form.

3 BY THE WITNESS:

4    A.  Not necessarily.

5 BY MR. ALTMAN:

6    Q.  Have you ever seen that happen before?

7    A.  I have never done that kind of comparison

8 before.  Again, you know, I think it's -- you raise

9 a -- you raise a good question, and I'm happy to go

10 back to it and take a look at it, and if something

11 was done -- you know, if I'm portraying the rate

12 ratios not out of the GEE, the more appropriate ones

13 to include in this report would be the ones out of

14 the GEE, and I will go back and make that

15 correction.

16    Are these for me?  Can I make notes on

17 these to myself to look at something like this?

18    MR. LONDON:  The ones that have the yellow

19 exhibit tags are for the court.

20    THE WITNESS:  Okay.

21    MR. LONDON:  So we need to let you use

22 Ms. McGroder's copy to make personal notes on.

23    MR. ALTMAN:  Well, except for the fact that if

24 he is going to mark this up, then technically I

557

1 think that should be part of the exhibit.  We could

2 mark up whatever he wants.  We will make a copy of

3 it, and you can take -- and you can make your notes

4 and take it back.  So I want you to have your notes,

5 but I think it should be part of the exhibit.

6    MS. McGRODER:  Well, then why doesn't he just

7 write on the exhibit.

8    MR. ALTMAN:  That's what I'm saying.  Let him

9 do that, and then we will make a -- we can make a

10 photocopy of that and get that to him so that he can

11 check.

12    MS. McGRODER:  I'm fine either way.

13    MR. LONDON:  Then that way we don't have to go

14 back and get --

15    MS. McGRODER:  The less that goes on the

16 better.

17    MR. LONDON:  Sorry?

18    MS. McGRODER:  The less that goes on the

19 better.

20 BY THE WITNESS:

21    A.  And I am also going to mark as a note to

22 check that this 1.22 is 1.23 and to check that the

23 first 81.6 is 16.2, and similarly I'll check the

24 confidence intervals.

558

1 BY MR. ALTMAN:

2    Q.  Dr. Gibbons, did you happen to look at

3 the -- going back to your paper now.

4    A.  Sorry.  You have quite a -- quite a

5 mountain in front of me.

6    MR. ALTMAN:  There you go.  Cookie time.

7    MR. LONDON:  Let the record reflect that while

8 you are working diligently, counsel is eating ice

9 cream.

10    THE WITNESS:  But I would much -- I'd much

11 rather be doing this.

12 BY MR. ALTMAN:

13    Q.  Please go back to Table 1 for a second.

14    A.  This is in Exhibit 20 in my paper?

15    Q.  Yes.

16    MR. LONDON:  Page 27.

17    THE WITNESS:  Yes.

18 BY MR. ALTMAN:

19    Q.  Did you happen to -- just taking let's

20 say the 1229 gabapentin model therapy patients, did

21 you happen to look at the time distribution of the

22 suicide events?

23    A.  Not in this paper.  I did in the

24 sensitivity analysis look at time to the first

559

1 suicide attempt.

2    Q.  I'm not talking time to the first suicide

3 attempt.  I'm talking how many suicide attempts

4 there were at in discrete time intervals centered

5 around the date -- the index date.

6    Did you happen to look at that?

7    A.  I'm not following you.

8    Q.  If we took -- if we took by week, by

9 month if we wanted to look at using the index date

10 for that cohort, how many suicide attempts there

11 were 12 months before the index date, how many

12 suicide attempts there were 11 months before, ten

13 months before, nine months before, eight months

14 before, etc. all the way --

15    A.  Oh, you are talking about in the -- in

16 the year prior to --

17    Q.  Or -- or -- and the year after.

18    Did you look at any kind of analysis like

19 that to see the time distribution of, not the time

20 to event, but how many attempts you were actually

21 seeing?

22    A.  You mean in the aggregate?

23    Q.  For those 1229 people.

24    A.  The only analysis that included timing of

560

1  the event that I looked at was the analysis that
2  looked at time to the first event and how the
3  likelihood of a suicide attempt changed over time,
4  and that would be for the one-year equal to or
5  greater than the index episode.
6      Q.  I am not sure I understand what you just
7  said.
8      A.  I said that I looked at whether or not
9  the distribution of suicide attempts was monotone
10  over the 12 months of following index bipolar
11  episode and, you know, in a sensitivity analysis,
12  but I did not say create a frequency distribution
13  that showed how many of the suicide attempts were
14  minus one month, one month after, you know, that
15  sort of thing.
16      Q.  That wouldn't be particularly difficult
17  to do, correct?
18      A.  No, it wouldn't.
19      Q.  One of the things we would -- if we were
20  to do that, what you would expect to see is like,
21  for example, after the index date for gabapentin,
22  you would expect to see a total of 26 suicide
23  events, correct?  Since you saw 13 before the first
24  date of treatment and 13 after, correct?

561

1      A.  That would be correct.
2      Q.  And you would expect to see 78 for
3  divalproex, correct?
4      THE COURT REPORTER:  For what?
5      MR. ALTMAN:  Divalproex, d-i-v-a-l-p-r-o-e-x.
6  BY MR. ALTMAN:
7      Q.  Correct?
8      A.  That's correct.
9      Q.  And you would expect to see 74 for
10  lamotrigine, correct?
11      A.  Correct.
12      Q.  And you would expect to see 50
13  oxcarbazepine, o-x-c-a-r-b-a-z-e-p-i-n-e, correct?
14      A.  Correct.
15      Q.  And you would expect to see 35 for
16  topiramate, correct?
17      A.  Correct.
18      Q.  And we would get two for zonisamide,
19  correct?
20      A.  Correct.
21      Q.  And two for carbamazepine -- I'm sorry.
22  11 for carbamazepine, correct?
23      A.  11, yes.
24      MR. ALTMAN:  Okay.  Let's mark the next

562

1  exhibit.
2          (WHEREUPON, a certain document was
3          marked Gibbons Deposition Exhibit
4          No. 31, for identification, as of
5          2/4/09.)
6  BY MR. ALTMAN:
7      Q.  Now, we talked about a minute ago looking
8  at that kind of data by month, correct?
9      A.  Correct.
10      Q.  But you could look at it by week,
11  correct?
12      A.  You could look at in a lot of different
13  ways, sure.
14      Q.  Okay.  What I'll hand -- what I have just
15  handed to you as Exhibit 31 is a chart from the data
16  you provided for each one of the categories that you
17  selected, and if you look -- go all the way to the
18  bottom of the second page, you'll see which drug
19  group it is.
20          Is that how many suicide attempts --
21  well, suicide events is in each week interval
22  where zero represents -- day one of week zero
23  represents the index date, and what I direct you to
24  first is at the bottom, I will represent to you is

563

1  the sum starting at week zero through the rest of
2  the data, and you can verify for yourself that each
3  one of those numbers matches your table and the
4  numbers that we just discussed.
5          If you just want to satisfy yourself that
6  that's true.
7      MS. McGRODER:  While he is doing that, I will
8  put my objection on the record, and you can accept
9  as a continuing objection to the use of this
10  document with Dr. Gibbons since he has never laid
11  eyes on it and doesn't know how you did your
12  analysis.  There's just no foundation for the use it
13  of with this witness.
14      MR. ALTMAN:  That's fine.
15  BY THE WITNESS:
16      A.  Could you remind me again how you
17  computed the -- these sums?  This is a sum from what
18  to what?
19  BY MR. ALTMAN:
20      Q.  From point zero -- from week zero through
21  week 51.
22      A.  Got you.  Okay.  These numbers appear to
23  be consistent with the values that I have in
24  Table 1.

564

1    Q.   The only thing that you haven't seen that
2    we haven't really talked about is going backwards
3    before with this, correct?
4    A.   Those -- the -- the suicide attempts
5    prior to the index episode were used as a covariate
6    in the -- in the analysis.
7    Q.   No, I understand that.  I'm just
8    saying -- but just in terms of what we've talked
9    about here your table here doesn't reflect how many
10   suicides there were before the index date, correct?
11   A.   That's correct.
12   Q.   So we can't sum up the whole thing and be
13   sure that we have got the right numbers, correct?
14   A.   Correct.
15   Q.   Okay.  And I understand you didn't create
16   this chart, but is there anything on this chart that
17   you look at that says, oh, my God that just can't
18   possibly be right.  That's got to be wrong?
19   MS. McGRODER:  I will object to form and
20   foundation.
21   BY MR. ALTMAN:
22   Q.   All right.  Strike that.
23       Dr. Gibbons, have you ever looked at a
24   set of data, and when you look at it, right away

565

1    something doesn't seem to be right?
2        Has that ever happened to you in all the
3    time you have looked at data?
4    A.   Yes.
5    Q.   Okay.  Do you see anything like that here
6    that says, oh, my God this just can't possibly be
7    right of that same kind of thing you have done in
8    the past?
9    A.   Well, I wouldn't conclude something can't
10   possibly be right, but there -- you know, I might
11   look at, for example, column N of this table for
12   DrugL which is the no AED group and see that there
13   seem like a lot of suicide events that occurred
14   prior to the -- the index -- in the few weeks prior
15   to the index episode.  Although, that's not
16   inconsistent with what you see in say the work of
17   Simon or my own work in the VA where the highest
18   risk period is in the month prior to the index
19   episode.
20       So that's -- you know, just looking at
21   this table, that's the first thing that looks like
22   something that deserves attention.
23   Q.   But you do notice that if you go all to
24   the way to the bottom for column N for the no AED,

566

1    it says 334 events, correct?
2    A.   Correct.
3    Q.   And that's the same as your Table 1,
4    correct?
5    A.   Correct.
6    Q.   And the 170 in the no drug group, that's
7    also the same as your Table 1, correct?
8    A.   That's correct.
9    Q.   Is there any reason to believe that if
10   the same methodology that was used to create the
11   data after the index period was used beforehand, but
12   these numbers should not be correct?
13   A.   Could you repeat that?
14   Q.   Is there any reason to believe that if
15   the same methodology that generated the data
16   starting in the year after the index date was used
17   to generate the data before that, that this whole
18   chart would not be correct?
19   MS. McGRODER:  Well, object to form and
20   foundation because he doesn't know what methodology
21   you used.  You can answer.
22   BY THE WITNESS:
23   A.   I don't -- I don't know if the -- if the
24   chart is correct or incorrect, but I would agree

567

1    that if the data following the index episode matches
2    the numbers in my report, I have no reason to
3    believe that the data prior to it would have been
4    done incorrectly.
5    BY MR. ALTMAN:
6    Q.   That's fair enough.  That's all I was
7    looking for you to do, and I understand that you
8    haven't done this and certainly it's something you
9    may want to look at afterwards to verify for
10   yourself.
11       What I'm interesting in, though, is that
12   the first column which is gabapentin DrugS at the
13   top.
14   A.   That's the second column.
15   Q.   I'm sorry.  The second column.
16   A.   It is probably really the third column.
17   Q.   But the first drug.
18   A.   Correct.
19   Q.   You have 26 suicidal events in the post
20   period, correct?
21   A.   Correct.
22   Q.   Okay.  And I'm not quite sure I
23   understand, but did you look at the impact of -- for
24   those events that where you had the suicide event on

568

1  the same date as the index date of including or
2  excluding those in your numbers here?
3      A.  Yes, I did.
4      Q.  Okay.  Do you know what the effect was
5  for gabapentin?
6      A.  It was still -- the rate following the
7  initiation of treatment was still higher -- I'm
8  sorry -- was still lower than the rate prior to the
9  initiation of treatment.
10         Now, I'm not sure that I at this stage
11  went back and did reanalyze the data statistically,
12  but I do know that when I went through and prepared
13  the -- the reenactment of Table 1 with my Fortran
14  program, I did, as a sensitivity analysis, remove
15  those patients to see what the effect would be on
16  these rates, and my intention is in the final
17  version of this paper to include such a sensitivity
18  analysis along with these other sensitivity analyses
19  we have talked about.
20      Q.  I will represent to you, and you can
21  check it, and we are going look at something a
22  little later that there are -- for gabapentin there
23  are six events on that date.
24      A.  It looks here that there are 12.

569

1      Q.  Six of those -- no, there were 12 in that
2  week, but six of those are on the same date as the
3  index date.
4      A.  It doesn't seem inconsistent with my
5  knowledge of the data.
6      Q.  Well, just taking your simple numbers
7  here, if you were to exclude six events from the --
8  from the attempts before treatment, that goes from
9  13 to 7, that basically changes your -- your
10  relative risk by almost a factor by two, doesn't it,
11  or half?
12      A.  That's probably true.
13      Q.  That's a pretty big difference, isn't it?
14      MS. McGRODER:  Object to form.
15  BY THE WITNESS:
16      A.  Again, the key comparison here is the
17  comparison of the risk before treatment to the risk
18  after treatment, and you -- instead of having a risk
19  ratio that's on the order of five times, it may now
20  be three times or something like that.
21         So, again, the risk following treatment
22  was substantially lower than the risk before
23  treatment.  Also, again, this is a sensitivity
24  analysis.  There my primary analysis includes those

570

1  patients.  Those patients are at risk who are
2  bipolar patients.  These patients have not taken
3  gabapentin yet they have suicide attempts, and
4  that's an important baseline condition.
5         It's still prior.  It happens to be the
6  date of their index, and it may be that the suicide
7  attempt brought them in to -- in to treatment.  It
8  may be that the suicide attempt identified them
9  which led to their diagnosis, but, nevertheless,
10  that is a risk associated with having bipolar
11  disorder and not having treatment with gabapentin.
12  I don't think that that is a biased result.  I think
13  that is -- is an important result to consider when
14  you are comparing treated and untreated conditions.
15         Now, in the sensitivity analysis to see
16  can we differentiate those suicide events that may
17  have led to treatment from those that once people
18  had the diagnosis before and after, I think that's a
19  valid sensitivity analysis, and certainly the
20  inclusion of those people could be raised as a
21  question, and is this really a protective effect or
22  is this in part an identification effect.
23  BY MR. ALTMAN:
24      Q.  So that could have dramatic -- that could

571

1  have an influence on the conclusions of this paper,
2  couldn't it?
3      MS. McGRODER:  Object to form.
4  BY THE WITNESS:
5      A.  No, it definitely will not have a
6  conclusion because I have done that analysis, and it
7  does not change the fact that in none of these cases
8  do you see that the rate of -- of suicide attempts
9  is increasing following the initiation of treatment.
10  What it will change is the magnitude of the
11  decrease.
12         So in this case, as an example, if you
13  your six is correct, that risk ratio is going to go
14  from maybe one-fifth the risk to maybe one-third the
15  risk but still a substantial decrease in the risk
16  following the initiation of treatment if you exclude
17  those suicide attempts that happened on the date of
18  the index, the same date.
19  BY MR. ALTMAN:
20      Q.  Is that -- is that the only effect it
21  might have?  Couldn't it also affect the confidence
22  intervals?
23      A.  It could be.  It may be that something
24  that was statistically significant in terms of

572

1  before and after is no longer statistically
2  significant.  What it will not do is produce a
3  statistically significant increase in the rate
4  following treatment.
5      Q.  Maybe.  I mean, you could have so many
6  events on that day.
7      A.  I have already -- the only reason I can
8  tell you that is I have already conducted that
9  sensitivity analysis in terms of reproducing Table 1
10  without those events.
11      MR. ALTMAN:  We need to change tapes.
12      THE VIDEOGRAPHER:  This is the end of tape 4,
13  day 2.  The time is 2:22 p.m.  We are off the
14  record.
15          (WHEREUPON, a recess was had at
16          2:22 p.m. until 2:31 p.m.)
17      THE VIDEOGRAPHER:  This is the beginning of
18  tape No. 5, day 2.  The time is 2:31 p.m.  We are
19  back on the record.
20  BY MR. ALTMAN:
21      Q.  Dr. Gibbons, your no drug group, you
22  don't know if that's really no drug, correct?
23      A.  Could you be more specific?
24      Q.  That just means no anticonvulsive, no

573

1  antidepressant, no antipsychotic, correct?
2      A.  So if you -- are you referring to Table 1
3  in my -- in Exhibit 20?
4      Q.  Yes, when you say no medication.
5      A.  Okay.  So the no medication group means
6  that there was no treatment, and this is for the
7  full two-year period.  No medication for -- I think
8  that's correct -- or maybe that's for the gabapentin
9  cohort.
10          This is -- well, by no medication, I mean
11  none of the 11 AEDs or lithium or the additional
12  anticonvulsants or antidepressants or
13  antipsychotics, and if I have left Xanax off of that
14  list, that would not apply to any drugs that are not
15  a part of the database.
16      Q.  That's what I mean.  There's no -- there
17  were no records in the drug table for those people,
18  correct?
19      A.  That's correct, and the point that I'm
20  not remembering yes or no now is whether or not
21  those people might have taken medication prior to
22  the index data.  I would have to go back and take a
23  look at that.
24      Q.  I think it is that there were no --

574

1  literally no records for those people.
2          I would like you to go to page 35 of your
3  paper, and in your summary you say:  "In summary,
4  the present analysis provides no evidence that AEDs
5  increase the risk of suicide attempts among patients
6  with bipolar disorder," correct?  That's one
7  conclusion, right?
8      A.  Yes, that's the primary conclusion.
9      Q.  Then you say:  "If anything, the effects
10  of most AEDs and lithium are to reduce suicide
11  attempts relative to pretreatment levels in those
12  patients who are ultimately prescribed those drugs."
13          Did I read that correctly?
14      A.  Except that it's "these drugs" instead of
15  "those drugs" but close enough for government work.
16      Q.  Okay.  "In these drugs."  I stand
17  corrected.
18          You are making the statement there that
19  these do in fact -- these drugs do, in fact, reduce
20  the risk of suicide attempt, correct?
21      A.  The observation, you know, based on the
22  data is that in this dataset, they lead to decreases
23  or they are associated with decreases, but by
24  starting the sentence with, "if anything," we are

575

1  seeing that the effects of these AEDs or at least
2  most of them is to reduce the suicide attempts.
3          So that's consistent with the data.
4  That's certainly consistent with Table 1 and
5  consistent with the statistically significant pre
6  versus post analyses.
7      Q.  We talked earlier about the issue with
8  Table 1 that taking the gabapentin, for example, you
9  really don't have a thousand and 16 patient years of
10  exposure on gabapentin.
11          You simply have 1,016 patient years of
12  observation, correct?
13      A.  I have 1,016 years of observation
14  following the initial exposure to gabapentin.
15      Q.  Do you have any basis to believe that any
16  protective or harmful effects of gabapentin last for
17  any particular period of time after you stop taking
18  gabapentin?
19      MS. McGRODER:  Object to form.
20  BY THE WITNESS:
21      A.  I'm not a clinical expert in this, but I
22  think that -- no, I don't know.  I know that there
23  can be carryover effects.  In the literature they
24  have discussed carryover effects.  I know that there

576

1    are also withdrawal effects from going off of a drug
2    that there may be associations with withdrawing from
3    a medication in terms of the likelihood of a suicide
4    attempt.
5          And I also know that these are medical
6    claims data, and the information I have is the time
7    of the prescription, and just because the drug was
8    prescribed on a particular date doesn't necessarily
9    mean that the person took it on that date.  They may
10   have actually started taking it two weeks later or
11   something like that.
12         The data are coarse in that -- in that
13   respect.  So the most conservative approach to these
14   kinds of analyses is to identify the time of the
15   exposure and compare rates before and after that
16   exposure.
17   BY MR. ALTMAN:
18       Q.   You do -- the data provided to you by
19   PharMetrics did include how many days of
20   prescription a patient was given, correct?
21       A.   That's correct.
22       Q.   Do you think it would have been difficult
23   for you to have assessed each suicide event and
24   determined whether the person was on or off the drug

577

1    at that point in time?
2        A.   I did an analysis like that as a
3    sensitivity analysis, as I described before, of
4    looking at the exposure as a time varying monthly
5    covariate.  Was the person on gabapentin in this
6    particular month, this month, or this month and was
7    the taking of gabapentin on that particular month or
8    any of these months when treated as a time varying
9    covariate associated with suicide attempts, and I
10   found very similar results.
11       Q.   How similar is similar?
12       A.   Statistically significant protective
13   effects.
14       Q.   And we will have to see -- take a look at
15   your sensitivity analysis to -- to really understand
16   that, correct?
17       A.   Of course.
18       Q.   Now, why is it that you wouldn't -- you
19   couldn't simply add up -- aside from doing it the
20   way you just described, simply adding up how much
21   time the person was exposed to the drug and how much
22   time they were not exposed to the drug and how many
23   events they had while exposed to the drug and how
24   many events they had while not exposed to the drug

578

1    and compared those?
2        A.   Well, first you would have to adjust for
3    the amount of the exposure.  You would have to be
4    able to adjust for concomitant medications.  You
5    would want to adjust for suicide attempts in the
6    year prior to the index episode and -- you know, so
7    there are a lot of different factors that you would
8    want to include in that model.
9          Simply adding that up or tallying those
10   results wouldn't be sensitive to those kind of
11   features that are preserved in all the analysis that
12   we -- we have done.
13       Q.   But they are not -- but those -- all
14   those aspects that you just described are not taken
15   into account in Table -- your Table 1 either, are
16   they?
17       A.   They are in Table 2.
18       Q.   In Table 2 but not in Table 1, correct?
19       A.   Well, Table 1 is just a description of
20   the data that went in to the actually statistical
21   analysis.  All of the inferences in the paper are
22   based on statistical results, not the simple
23   tallying of the -- of the results.
24         These -- the entries in Table 1 are as

579

1    close to the basic data, if you will, or summary
2    statistics that are -- are preserved in the
3    statistical analyses.  So I wouldn't, you know, do
4    the kind of thing that you did and then do a
5    statistical analysis that was more like the
6    treatment in Table 1.
7        Q.   And am I correct that in Table 2 you
8    never took exposure into account, correct?
9        A.   If by exposure you mean how long they
10   were on the drug or how many pills they were
11   prescribed, that's correct.  Table 2 does not have
12   that.
13         The sensitivity analysis does have that,
14   and I'll prepare, you know, some discussion of that
15   for the final version of this paper.
16       Q.   Now, you could also include in that
17   sensitivity analysis what happens if you -- do you
18   think it would be unreasonable to run a sensitivity
19   analysis where you consider events on the same
20   day -- on consecutive days to be part of one event?
21       MS. McGRODER:  Objection, asked and answered.
22   BY THE WITNESS:
23       A.   Well, I have already stated that one of
24   the sensitivity analyses that I did looked at the --

580

1    only counted a person once if they made one or more
2    suicide attempts.  There were a few people like the
3    person that you identified in your Exhibit --
4        MS. McGRODER:  26 -- no, 28.
5    BY THE WITNESS:
6        A.    -- in Exhibit -- in Exhibit 28 that made
7    lots of suicide attempts, and we looked at that
8    distribution early on, and there are a handful of
9    patients who were multiple attempters, and so a
10   sensitivity analysis was done to ensure that the
11   results were not biased by a few outliers --
12   outliers like the person that you described in
13   Exhibit 28.
14   BY MR. ALTMAN:
15       Q.    Do you know how many people there were
16   that had -- and I'm not talking about multiple
17   events that are clearly separated by time, let's
18   say, at least seven days, at least five days.  I'm
19   talking about how many people there were who had
20   events on consecutive days?
21       A.    I don't know the answer to that.  I know
22   there weren't too many people who had made multiple
23   attempts.  So, you know, it's -- it's a small number
24   and probably a smaller number in terms of the people

581

1    who made them on consecutive days, but I can look
2    into that, sure.
3        Q.    Leave that for now.  We will come back to
4    it.
5             Let's go to Exhibit 15 which is the
6    Parsons report.  That's response to FDA, not the --
7    from September of 2004.
8        MS. McGRODER:  What exhibit number?
9        MR. ALTMAN:  It's Exhibit 15.
10   BY THE WITNESS:
11       A.    Sorry, I'm getting a little messy here.
12   BY MR. ALTMAN:
13       Q.    That's it.  I'd like you to go to page
14   27, and I was a little unclear with some of the
15   stuff you said yesterday.
16            Do you see that under the
17   placebo-controlled studies for bipolar disorder
18   patient years just says 8.3 patient years.
19            Did I read that correctly?
20       A.    Yes.
21       Q.    The company had discussed a number of one
22   and 250 patient years for suicide for untreated
23   bipolar patients.
24            Does that number sound familiar to you?

582

1        MS. McGRODER:  Objection to form and
2    foundation.
3    BY THE WITNESS:
4        A.    Not at this moment.
5    BY MR. ALTMAN:
6        Q.    Okay.  Do you have an understanding of
7    what -- do you have a number you like to use of what
8    the suicide rate is for bipolar patients --
9    untreated bipolar patients?
10       A.    The only number that I know of is the one
11   that I cited from the Baldessarini article.
12       Q.    I think that was one in 100, does that
13   sound right?  Ten in -- I think they said ten in
14   1,000 patients.
15       MS. McGRODER:  It's in your report.
16   BY THE WITNESS:
17       A.    I think it's like seven point something.
18   It's probably pretty close.
19       MS. McGRODER:  Well, it's discussed in part in
20   Exhibit 9.
21       MR. ALTMAN:  Yeah, what page?
22       MS. McGRODER:  Page 9.
23       MR. ALTMAN:  That's what I thought.
24       MS. McGRODER:  To page 10.  It's discussed in

583

1    multiple reports, but there's one --
2    BY MR. ALTMAN:
3        Q.    There you go.  Yeah, top of page 10 of
4    your report.
5        A.    Yes, one per 100.
6        Q.    It's one in 100 patient years, correct?
7        A.    Correct.
8        Q.    I have seen other numbers the company had
9    used one in 250 patient years, but we will go with
10   one in 100.  I don't think that will make an
11   enormous difference here.  On to page 27.
12            In a population of 8.3 patient years of
13   exposure, would you expect to see -- how many
14   suicide events would you have expected to see in
15   that population if the rate of suicide in bipolar is
16   one in 100 patient years?
17       A.    Well, remember these events included
18   suicidal ideation and behavior and completion, and
19   the rates that had led to the one in 100, that's --
20   that's suicide completed.
21       Q.    I just said -- and that's what I'm asking
22   you.
23            How many completed suicides would you
24   have expected to see in a study that has a

584

1    population of 8.3 patient years of exposure?

2        A.   I wouldn't have expected to see any.

3        Q.   If it -- I think it says four in 100 for

4    attempts; is that right?

5        MS. McGRODER:  Weren't these the very same

6    questions asked by Mr. London yesterday --

7        MR. ALTMAN:  No, they are not -- it was not

8    clearly addressed.  I'm sorry, Lori.

9        MS. McGRODER:  It totally was.

10       MR. ALTMAN:  It was not.

11       MS. McGRODER:  He answered these question --

12       MR. ALTMAN:  Lori --

13       MS. McGRODER:  -- about the bipolar paper, the

14   number of patient years, and whether you would

15   expect to see a suicide event in that number of

16   patient years.

17       MR. ALTMAN:  No, that's -- Lori, that's not

18   exactly what was asked.  I'm sorry.

19       MS. McGRODER:  It is.

20       MR. ALTMAN:  Okay.

21       MS. McGRODER:  Asked and answered.

22       MR. ALTMAN:  That's nice.

23       MS. McGRODER:  The cases are cross-noticed.

24   That means you can use all -- all testimony for all

585

1    purposes.  We are not going to replow old ground.

2        MR. ALTMAN:  That's fine.  I'm going to get

3    clarification of what I want so.

4        MS. McGRODER:  Well, he answered these

5    questions yesterday.

6        MR. ALTMAN:  You know, what, Lori, he didn't

7    ask the same questions.  I will go to the

8    transcript.  It was unclear.  I'm going to ask my

9    questions.

10       MS. McGRODER:  Go to the transcript.

11   BY MR. ALTMAN:

12       Q.   It's four in 100 -- it's four in 1,000,

13   correct -- four in 100, correct?

14       A.   Yes, that's what it says here.

15       Q.   Okay.  That's one in 25 patient years,

16   correct?

17       A.   Correct.

18       Q.   How many suicide attempts would you

19   expect to see in a population of 8.3 patient years

20   of exposure?

21       MS. McGRODER:  Objection, asked and answered.

22   BY THE WITNESS:

23       A.   Probably none.

24

586

1    BY MR. ALTMAN:

2        Q.   So if you didn't see any suicide attempts

3    or suicide -- completed suicides in that population,

4    would that allow you to conclude anything about

5    whether the drug is associated with a risk of

6    suicide or suicide attempt?

7        MS. McGRODER:  Objection, asked and answered

8    yesterday by Mr. London.

9    BY THE WITNESS:

10       A.   Well, if your question is should they

11   have seen a suicide event in a -- in a study of

12   this -- this size, this population, you know, the

13   answer is, first of all, the suicide events they

14   were looking at occur at rates that are, you know,

15   maybe one or two or three orders of magnitude higher

16   than the rates that you are citing based on my

17   report because they also included suicidal ideation.

18       So, you know, I -- I think that there is

19   a probability associated with seeing one of the

20   suicide events that they were looking for in these

21   studies.  I think there is a huge probability of

22   seeing suicide events as characterized by suicidal

23   ideation or worse in the pooled data that were

24   considered from all of the studies.

587

1        MR. ALTMAN:  Objection, non-responsive.

2    BY MR. ALTMAN:

3        Q.   I asked you about suicide or suicide

4    attempt.

5        Would that -- would the absence of any

6    suicide or suicide attempt reports in that

7    population allow you to conclude anything about the

8    risk of suicide or suicide attempt in a bipolar

9    population using gabapentin?

10       MS. McGRODER:  Objection, asked and answered.

11   That same question was asked yesterday and he

12   answered it, and not only that, but he just answered

13   it again right now.

14       MR. ALTMAN:  No, he didn't.  No, he didn't.  I

15   will read back his answer.  He said --

16       MS. McGRODER:  We are not going to do this --

17       MR. ALTMAN:  Lori --

18       MS. McGRODER:  You just didn't like the answer

19   he gave you yesterday --

20       MR. ALTMAN:  Lori --

21       MS. McGRODER:  -- and you want to do it --

22       MR. ALTMAN:  Lori --

23       MR. LONDON:  That was not asked yesterday.  It

24   was not asked yesterday.  Show us your notes.  Show

588

1  us your notes because it's not in the transcript.  I
2  did not ask that question.
3       MS. McGRODER:  You asked -- you asked whether
4  we could expect to see any suicide events on this
5  number of patient years in the Pande study.  That's
6  exactly what you asked.
7       MR. ALTMAN:  Lori, I just asked him does that
8  allow you to conclude anything about the --
9       MS. McGRODER:  That was also also.
10      MR. ALTMAN:  No, that was not asked.
11      MS. McGRODER:  All right.  Do you know what, I
12  think it was --
13      MR. ALTMAN:  Okay.  Lori --
14      MS. McGRODER:  -- go ahead and ask it, and you
15  can answer it the same way you answered it
16  yesterday.
17      MR. LONDON:  He can answer truthfully.
18      MS. McGRODER:  Which is the same way he
19  answered it yesterday.
20      MR. ALTMAN:  Dr. Gibbons wants to give an
21  answer --
22      THE COURT REPORTER:  Wait, wait, wait, wait.
23      MR. ALTMAN:  Dr. Gibbons is trying to answer
24  the question, and all you are doing is interfering

589

1  so.
2       MS. McGRODER:  I'm telling you --
3       MR. ALTMAN:  Dr. Gibbons --
4       MS. McGRODER:  -- you are not going to get to
5  fish around for new answers to questions that were
6  asked yesterday.
7       MR. ALTMAN:  That's nice, Lori.
8  BY MR. ALTMAN:
9       Q.  Dr. Gibbons, I will ask the question
10  again.
11      If you did not observe any suicides or
12  suicide attempts in a population of 8.3 patient
13  years of gabapentin individuals who are bipolar,
14  does that allow you to conclude anything about
15  whether gabapentin is associated with suicide or
16  suicide attempt?
17      MS. McGRODER:  Objection, asked and answered.
18  BY THE WITNESS:
19      A.  It allows you to conclude something that
20  in that period of time you didn't see a suicide
21  attempt or a suicide completion.  It doesn't
22  necessarily mean that if you studied more patients,
23  you wouldn't see a suicide attempt or a suicide
24  completion, but, you know, this is a very small

590

1  number of patients to be looking for an event that's
2  as rare as a suicide attempt or suicide completion.
3       It is -- it's still small even for a
4  suicidal ideation, but the likelihood of seeing a
5  suicidal ideation would be much -- would be much
6  higher.
7  BY MR. ALTMAN:
8       Q.  Now, those numbers that you quoted, the
9  one out of 100 patient years for suicide and the
10  four out of 100 patient years, those were untreated
11  bipolar patients, correct?
12      A.  Based on the Baldessarini article, that's
13  correct.
14      Q.  Okay.  Were you aware that none of these
15  patients were untreated, Dr. Gibbons?
16      MS. McGRODER:  Object to form and foundation.
17  He hasn't studied the Pande studies.  That had
18  nothing to do with his analysis --
19  BY MR. ALTMAN:
20      Q.  Were you aware that every one of these
21  patients was on lithium, and gabapentin was used as
22  an add-on?
23      MS. McGRODER:  Objection, no foundation.
24

591

1  BY THE WITNESS:
2       A.  Would you tell me which patients you are
3  referring to?  I'm sorry.
4  BY MR. ALTMAN:
5       Q.  The -- the 945209 study, okay, everybody
6  in the study was on lithium.  The active group also
7  had gabapentin added in.
8       MS. McGRODER:  Are you testifying, or do you
9  have a question in there somewhere?
10      MR. ALTMAN:  I asked if he was aware of that.
11      MS. McGRODER:  Well, objection, no foundation.
12  BY THE WITNESS:
13      A.  This was not a study that I relied upon
14  or reanalyzed the data from in my expect report.
15  This doesn't appear in my expert report.
16  BY MR. ALTMAN:
17      Q.  Dr. Gibbons, didn't you express opinions
18  that the studies were adequately powered overall to
19  show an effect if there was one?
20      A.  Overall, yes.
21      Q.  Okay.  You would have to take a look
22  at --
23      A.  Excuse me.  I'm sorry.  Can I -- I need
24  to complete that answer.

592

1    Q.   That's fine.  I'm sorry.

2    A.   I think my -- my testimony was that

3  looking at the -- and I don't remember the number --

4  4900 or so patients that FDA analyzed from the

5  larger set of data, that that in and of itself was

6  adequately powered to detect a threefold increase or

7  3.18 fold increase, but not adequately powered to

8  detect a twofold increase or the magnitude of the

9  increase that were seen associated with lamotrigine

10  at least 80 percent of the time.

11    So that's my testimony.  I did not say

12  that -- you know, make a blanket statement that

13  there were adequate subjects to, you know, have 80

14  percent statistical power to detect any effect.

15  Obviously power is dependent on the magnitude of the

16  effect, and I think I was careful to point out what

17  the magnitude of the effect was.

18    I think I did say that in order to detect

19  the kind of effect that was observed for lamotrigine

20  and topiramate, there were adequate data for the

21  pooled GABAergic, either pregabalin plus gabapentin

22  or the other GABAergic drugs as classified by FDA

23  excluding topiramate.  So that was my testimony.

24    Q.   How many patient years of exposure would

593

1  you need to detect a doubling of the risk if the

2  active and placebo size are the same and the event

3  occurs in the background of one in 250 patient

4  years?

5    A.   I wouldn't -- well, first of all --

6    Q.   Strike that.  Let's do this a different

7  way.

8    MR. ALTMAN:  You will have to bear with me for

9  a second.  I'm not finding -- let's mark the next

10  exhibit.

11    (WHEREUPON, a certain document was

12    marked Gibbons Deposition Exhibit

13    No. 32, for identification, as of

14    2/4/09.)

15  BY MR. ALTMAN:

16    Q.   Dr. Gibbons, I have handed to you a

17  document that essentially provides the formula for

18  calculating power to detect an effect in different

19  populations.

20    As a biostatistician, do the formulas on

21  this page look familiar?

22    MS. McGRODER:  Well, object to form and

23  foundation.  There's no even attribution for where

24  this comes form.  It looks like something you've

594

1  typed, and it's not authenticated, and I object to

2  the use of this document with this witness, but go

3  ahead and ask what you want.

4    MR. ALTMAN:  That's fine.

5    MS. McGRODER:  And I will have a standing

6  objection --

7    MR. ALTMAN:  I'm asking him is that the formula

8  that's used for calculating power?

9    MS. McGRODER:  But do I have a -- is there an

10  agreement that I have a standing objection?

11    MR. ALTMAN:  That's fine.  You can have a

12  standing objection on that.

13  BY THE WITNESS:

14    A.   I don't know it is or it isn't.  I

15  mean, you know, I don't have committed to memory

16  this particular, you know, power formula.  I mean,

17  I'm assuming that this is taken out of

18  Dr. Greenland's book or something like that.  I have

19  no reason to believe that it's incorrect.

20    It -- you know, certainly it has as

21  its -- at face value it has the sort of observed

22  minus expected squared over the variance which is of

23  the kind of form of -- that you would -- that would

24  be asymptotically normal --

595

1    THE COURT REPORTER:  That would be, I'm sorry?

2  BY THE WITNESS:

3    A.   I'm sorry.  Asymptotically,

4  a-s-y-m-p-t-o-t-i-c-a-l-l-y, close enough.

5    So it could be, and if you tell me that

6  you've copied it out of his book directly or he

7  prepared this for you and it came out of his book

8  and I look at his book, I have no reason to believe

9  it would be the wrong formula.

10  BY MR. ALTMAN:

11    Q.   Okay.  At the bottom he puts in for an

12  event of one in 2500 patient years to detect a

13  doubling of the risk, he comes up with 15,800

14  patient years in each group.

15    MS. McGRODER:  Is he Dr. Greenland?

16    MR. ALTMAN:  This formula.

17    MS. McGRODER:  Well, who is he?

18    MR. ALTMAN:  Doesn't matter.  This formula.

19  BY THE WITNESS:

20    A.   The formula has a gender?

21  BY MR. ALTMAN:

22    Q.   The formula yields 58,800 patient years

23  of exposure.

24    MS. McGRODER:  Objection to form and

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

596

1    foundation.
2    BY MR. ALTMAN:
3        Q.   Does that look right to you?
4        A.   So you are looking at the case here where
5    in the control group -- is this a placebo-controlled
6    group?
7        Q.   They are equal exposures, yes.
8        A.   I'm not sure you answered my question.
9    What do you mean equal exposure?
10       Q.   The control group is placebo --
11       A.   Okay.
12       Q.   -- and it assumes that the exposure in
13   the active group is these same -- going to be the
14   same as the exposure in the placebo group.
15       A.   One in 2500.  Well, this is one approach
16   to computing power for this kind of comparison, and
17   as you can see from this, it is assuming normality
18   for a lot of the effects.  So it's an approximation,
19   but basically what it's saying is if you have got
20   something -- an event, a rare event that occurs
21   something on the order of 40 per 100,000, in order
22   to see a doubling of that which would be 80 per
23   100,000, you would need to have on the order of
24   50,000 people to see that, and that's not -- that

597

1    doesn't, you know, surprise me tremendously.
2        Q.   Is 50,000 people or 50 --
3        A.   50,000 person years.
4        Q.   Person years, and it actually says 58,000
5    but --
6        A.   Well, you know, this is -- this is --
7    this is an approximation.
8        Q.   Okay.  That's fair enough.
9        A.   We are putting it in the ballpark, and
10   it's -- again, remember I don't know that, you know,
11   whoever put this together didn't make a mistake in
12   the arithmetic.  I haven't checked it, and maybe
13   it's only 5800, but I'm -- I'm assuming that for the
14   purpose of our discussion, that this -- you know,
15   the arithmetic was done correctly, and that the
16   equation was taken out of a reputable source, and
17   that, you know, it was copied down correctly and
18   implemented correctly, and has come out of -- came out
19   of Dr. Greenland's book, then, you know, I would
20   consider that to be a reputable source.
21       Q.   Do you have another formula that you
22   would use?  I mean, if I said to you right now -- I
23   handed you a calculator, could you do the same
24   calculation or would you need some reference?

598

1        A.   I'd -- I'd need -- I'd need some
2    horsepower to do that.  The other alternative would
3    be to do it based on a Poisson distribution and, you
4    know, you could do it via simulation, but it's
5    not -- you know, there -- in order to get a closed
6    form solution like this, you have to make some
7    pretty strong assumptions of asymptotic normality.
8        Q.   Would those other approximations yield
9    substantially different results?
10            Might they -- I mean, is one of them
11   going to come up with 5,000 patient years instead of
12   50,000, or might one come up with 40,000 instead of
13   50,000?  I mean, is that the kind of difference we
14   are talking about?
15       MS. McGRODER:  Object to form and foundation
16   and calls for speculation.
17   BY THE WITNESS:
18       A.   In general this result does not surprise
19   me.  I mean, I think we are -- we are probably in
20   the ballpark.  It's why we go to large scale
21   pharmacoepidemiologic databases.  It's why, you
22   know, I wanted to look at a minimum of 40,000 or
23   50,000 bipolar patients in my analysis of the -- of
24   the antiepileptic data and have a minimum of a year

599

1    of observation period.  So I have -- I don't know if
2    it's 49,000 or 47,000, but it's pretty much in the
3    ballpark of his.
4    BY MR. ALTMAN:
5        Q.   This formula is inversely proportional to
6    the -- to the rate, correct?
7        MS. McGRODER:  Object to form and foundation.
8    BY MR. ALTMAN:
9        Q.   If the rarity of the event goes up by an
10   order of magnitude, let's say, one in 25,000 patient
11   years, you are going to multiple this by ten.
12            You are going to need ten times as many
13   patients, correct?
14       MS. McGRODER:  Object to form and foundation.
15   BY THE WITNESS:
16       A.   I don't know if it's directly
17   proportional.  I would have to look at that.  I
18   would think that you would -- you know, as the --
19   but it is related to the rate.  As the rate goes
20   down, you need more patients to detect it.
21   BY MR. ALTMAN:
22       Q.   Well, if you look at the formula kind of
23   in the middle of page, it says T0 equals Z subalpha
24   divided by two plus Z subbeta in parenthesis

600

1  squared, right?

2        That's a constant, correct?

3    A.  They are both constants based on the type

4  one and type two error rates being considered.

5    Q.  Okay.  And then that's multiplied by in

6  parentheses IR plus K close parenthesis, correct,

7  that's what it says here?

8    A.  That's what it says.

9    Q.  And the IR is the -- the -- the relative

10  risk that you are looking for, correct?

11    A.  Correct.

12    Q.  Okay.  Plus K, and K is the ratio of the

13  exposure to two groups, right?

14    A.  It's the relative sizes.

15    Q.  And if that's -- you are going to have

16  same size group.  That's a one, correct?

17    A.  Correct.

18    Q.  So that would all be multiplied by IR

19  plus one, correct?

20    A.  That's correct.

21    Q.  And the next term is IR minus -- it's

22  divided by IR minus one, correct?

23    A.  That's correct.

24    Q.  Squared, correct?

601

1    A.  Uh-huh.

2    Q.  And then it's multiplied by IO which is

3  what your -- which is the rate of the event you are

4  interested in detecting, correct?

5    A.  That's correct.

6    Q.  So that's pretty much -- that's just

7  multiplied.  There's no squareds or anything like

8  that.  That's going to be directly proportional one

9  way or the other, correct, at least according to

10  this formula?

11    A.  According to the --

12    MS. McGRODER:  Object to form and foundation.

13  BY THE WITNESS:

14    A.  According to this formula, that will

15  probably be one of the major determinants that

16  drives this, that and the rate ratio.

17  BY MR. ALTMAN:

18    Q.  But if the rate ratio was left constant,

19  then, you know, that would be the only factor, and

20  it should be directly proportional, correct?

21    MS. McGRODER:  Objection to form and

22  foundation.  Go ahead.

23  BY THE WITNESS:

24    A.  Yeah, that's correct unless you start,

602

1  you know, changing type one and type two areas.

2  BY MR. ALTMAN:

3    Q.  Okay.  Left alone?

4    A.  Yeah.

5    Q.  Okay.  So if we have got that 58,800 was

6  based on one in 2500 patient years, right?

7    MS. McGRODER:  Well, object to form and

8  foundation.  He hasn't done that calculation.  I

9  don't know how he would know that.

10  BY MR. ALTMAN:

11    Q.  That's -- you can read that's how that

12  was done, correct?

13    A.  Again, assuming that that calculation was

14  done correctly and that is the appropriate formula

15  and 58,800 people is the right answer, then -- and,

16  you know, one out of 2500 was what was put into it

17  for I NOT (phonetic), then -- then what was your

18  question?

19    Q.  I just wanted to make sure.  The bottom

20  line is if we are interested in one -- if we are

21  interested in one out of 100 patient years, wouldn't

22  you just take the 58,800 and divide it by 25,

23  correct?

24    MS. McGRODER:  Same objections.

603

1  BY THE WITNESS:

2    A.  I don't think it's quite as simple as

3  that or it shouldn't be quite as simple as that --

4  BY MR. ALTMAN:

5    Q.  Well, if there's --

6    A.  -- there's other -- there's other factors

7  that go into it but --

8    Q.  Well, if every other -- all the other

9  factors are left equal and all you are changing is

10  the rate of the event and it goes from one in 2500

11  patient years to one in 100 patient years, you

12  should simply need 1/25th the number of people,

13  correct?

14    MS. McGRODER:  Object to form and foundation.

15  BY THE WITNESS:

16    A.  I believe that would be correct.

17  BY MR. ALTMAN:

18    Q.  Okay.  I just did that calculation, and

19  that's 2,352 patient years.

20        Does that seem about, right, 1/25th of

21  58,800?

22    MS. McGRODER:  Object to form and foundation,

23  calls for speculation.

24

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

604

1   BY THE WITNESS:
2       A.  Say that again.
3   BY MR. ALTMAN:
4       Q.  About 2352, 5880 -- 58,800 divided by 25.
5       A.  And remind me why you divided that by 25.
6       Q.  Because the risk we are interested in
7   looking at instead of one in 2500 is one in 100.
8       A.  So you are saying the -- the -- a much
9   smaller --
10      Q.  A much more frequent event.
11      A.  A much more frequent event.  Yeah, that
12  sounds about right.
13      Q.  So about 2352 patient years, and we'll
14  just round it off to 2,000.  You said 50,000 before.
15  Sticking with your number, about 2,000 patient
16  years.
17      MS. McGRODER:  Same objections.
18  BY MR. ALTMAN:
19      Q.  Okay.  And in the bipolar studies, there
20  was 8.3 patient years of exposure, correct?
21      MS. McGRODER:  Did you say studies plural?
22  BY MR. ALTMAN:
23      Q.  Bipolar study -- excuse me, that's right.
24  There was only one.

605

1           There was 8.3 patient years of exposure,
2   correct?
3       A.  Correct.
4       Q.  And we said the rate of suicide is one in
5   100 patient years for untreated bipolars, correct,
6   according to Baldessarini, right?
7       A.  Correct.
8       MS. McGRODER:  Objection, asked and answered.
9   BY MR. ALTMAN:
10      Q.  So you would have needed to see a
11  doubling somewhere on the order of 2,000 patient
12  years of exposure to detect a doubling of the risk,
13  correct?
14      MS. McGRODER:  Objection, asked and answered.
15  BY THE WITNESS:
16      A.  Based on everything that's led up to this
17  discussion, that would be correct.
18  BY MR. ALTMAN:
19      Q.  Does that number -- I mean, you have done
20  power calculations before.
21          Does that number consistent with what
22  your general experience would tell you?
23      MS. McGRODER:  Well, object to form and
24  foundation and calls for speculation.

606

1           (WHEREUPON, there was a short
2           interruption.)
3       MR. ALTMAN:  He killed himself, sorry.  That
4   was referring to defense counsel for the Jennings.
5           Well, is anybody on the call?
6       MR. WINKLER:  Yep, I have gotten knocked off
7   somehow, but the computer put me back on I guess.
8       MR. ALTMAN:  Okay.  We were just about -- we
9   thought maybe you had killed yourself.
10      MR. WINKLER:  Well, the word scintillating does
11  not arise on my horizon when describing this
12  experience but not -- not suicidal yet.
13      MR. ALTMAN:  Okay.  That's good.
14  BY MR. ALTMAN:
15      Q.  Dr. Gibbons, what I'm trying to get at is
16  if the risk is one in 100 patient years, does it
17  seem unreasonable that you would need 2,000 patient
18  years of exposure to detect a doubling of the risk?
19      MS. McGRODER:  Object to form.
20  BY MR. ALTMAN:
21      Q.  Is that of the order of magnitude you
22  would expect?
23      MS. McGRODER:  Object to form and foundation,
24  calls for speculation.

607

1   BY THE WITNESS:
2       A.  In general, it wouldn't surprise me.  I
3   mean, if you are looking for, you know, a risk of
4   completed suicide to need at a minimum of a couple
5   thousand patients to have say 80 percent power,
6   which I'm assuming was the power -- well, actually
7   it looks like here for whatever reason -- yeah, it
8   was 80 percent power that you would need a couple
9   thousands patients.
10  BY MR. ALTMAN:
11      Q.  Now, if we were looking at suicide
12  attempt which was four times the suicide --
13  completed suicide rate, correct, according to
14  Baldessarini?
15      A.  Correct.
16      Q.  You would need about one-fourth that or
17  about 500 patient years, correct?
18      A.  That sounds like it would be in the right
19  ballpark.
20      Q.  Now, of all the people that were studied
21  on gabapentin, there were some people were for
22  bipolar, correct?
23      MS. McGRODER:  What study are you talking
24  about?

608

1    MR. ALTMAN:  All the studies on gabapentin.

2    MS. McGRODER:  Are you talking about the

3  randomized-controlled studies?

4    MR. ALTMAN:  All the randomized -- sorry,

5  that's correct.  Thank you.

6  BY MR. ALTMAN:

7    Q.    All the randomized controlled

8  placebo-controlled studies, there were some people

9  who were -- for psychiatric conditions, correct?

10   A.    Correct.

11   Q.    And those included the three that we see

12  on the Parsons report, Exhibit 15.  I think there's

13  a bipolar, a social phobia, and what's the other

14  one?

15   A.    Panic disorder.

16   Q.    Panic disorder.  And there were some

17  people who obviously took it for epilepsy, correct?

18   A.    Correct.

19   Q.    And some people who got it for

20  neuropathic pain, correct?

21   A.    Correct.

22   Q.    There's a few people who got it for

23  other pain conditions, correct?

24   A.    Correct.

609

1    Q.    Okay.  Of all those different groups of

2  people, which group of people has the highest risk

3  of suicide, as you understand it?

4    A.    In general that would be the patients

5  with a psychiatric disorder.

6    MS. McGRODER:  You mean -- wait, you are

7  talking apart from what the study shows or in

8  background?

9    MR. ALTMAN:  In background rate in general.

10  BY MR. ALTMAN:

11   Q.    The psychiatrics.  And of the psychiatric

12  studies, the three that are there, which of those

13  people have the highest?

14   MS. McGRODER:  If you know.

15  BY THE WITNESS:

16   A.    I don't know the answer to that.

17  BY MR. ALTMAN:

18   Q.    Do you think any of them would have a

19  higher rate than bipolar?

20   MS. McGRODER:  Well, objection, calls for

21  speculation.

22  BY THE WITNESS:

23   A.    I don't know what the rates are in panic

24  disorder or social phobia.  It could be that panic

610

1  disorder has the highest one.  I don't know.

2  BY MR. ALTMAN:

3    Q.    Okay.  Were you aware that if you took

4  all of the exposure of all of the gabapentin

5  studies, there are something on the order of 500

6  patient years of exposure.  Of all the randomized

7  placebo-controlled studies, you have on the -- about

8  500 patient years of exposure?

9    MS. McGRODER:  Object to form and foundation.

10  BY THE WITNESS:

11   A.    No, I wasn't aware of that.

12  BY MR. ALTMAN:

13   Q.    If we just said you would need 500

14  patient years of exposure or 2,000 patient years of

15  exposure to be able to detect a doubling of the risk

16  for the bipolar people, which have probably, if not

17  the highest, very close to the highest rate, why

18  would you think 500 patient years of exposure for a

19  lot of people with much lower risks associated

20  with -- for completed suicide would be adequate?

21   MS. McGRODER:  Well, object to the form of that

22  question.  It's an improper hypothetical, it assumes

23  facts not in evidence, and calls for speculation.

24

611

1  BY MR. ALTMAN:

2    Q.    That's fine.  That's fine.  Let's do

3  that.  Let's go back to --

4    A.    Can I answer the question?

5    Q.    Sure.

6    MS. McGRODER:  Do you have an answer?

7  BY THE WITNESS:

8    A.    I would love to.  Well, first of all, you

9  are -- you are talking about the wrong comparison.

10  The purpose of these analyses were to look at

11  suicidality, and you are doing power computations on

12  the basis of completed suicide.

13        There are plenty of patients available

14  on -- the frequencies are much, much higher.  The

15  difference between bipolar and people with pain in

16  terms of their risk of suicide completion is far

17  smaller than the difference between suicidality

18  which includes suicidal ideation.  You are talking

19  about events that occur orders of magnitude more

20  frequently than is the basic -- basis of your

21  argument.

22        So I think that you have got a very --

23  you know, 500 patient years is probably a very

24  reasonable amount to look at suicidal ideation or

612

1    worse.
2        Furthermore, you know, I think that the
3    argument about patient years of exposure is not
4    necessarily something that everyone would agree on.
5    If the risk of suicidal ideation or behavior occurs
6    close in time to the index -- to the onset of the
7    index episode, then all days within the patient year
8    are not created equal, and an argument can be made
9    that it's -- it's really the number of patients, as
10   long as they are observed for more than a day or
11   more than a week, that is the important determinant
12   and not the number of patients years.
13   BY MR. ALTMAN:
14       Q.   Do you have any evidence that that's true
15   for gabapentin?
16       A.   Yes, the sensitivity analysis that I
17   performed showed that there was a very significant
18   effect of time in the time to suicide attempt
19   analyses, and that the protective effects of
20   gabapentin were even stronger early on; namely, that
21   overall the risk of suicide attempt decreased as you
22   got away from the index episode, and the largest
23   protective effects were early on, most temporally
24   proximal to that index episode.

613

1        Q.   But you didn't have that when you wrote
2    your -- your declaration, your initial report, or
3    your first supplemental report, did you?
4        MS. McGRODER:  Well, object to form.  He didn't
5    have the data when he wrote his declaration and
6    first report.
7    BY MR. ALTMAN:
8        Q.   That's correct.  So when you say that you
9    didn't know that -- you could not have known that to
10   be true at the time you wrote your initial report,
11   correct?
12       A.   I'm sorry.  You said I didn't have that.
13   I'm not sure what that means.
14       Q.   You had not done your analysis of the
15   gabapentin data.
16       A.   But I had done analyses of
17   antidepressants and suicide, and the same kind of
18   effect is -- is clearly there.  The same sort of
19   effect that is -- that you have done in your own
20   analysis in Exhibit No. 31 is very characteristic of
21   the kind of data that you see in my VA study and in
22   the work by Simon and others that show that the
23   greatest risk of suicide attempt is actually before
24   you initiate treatment, remains high in the first

614

1    month following the initiation of treatment, and
2    then trails off thereafter.
3        So adding an additional say 11-month
4    requirement to people being observed may not add
5    anything in terms of statistical power if the
6    greatest risk is within the first month, and an
7    argument can be made that it's the number of
8    patients who are -- as long as they are observed for
9    an adequate period of time, say a month or two
10   months, that's really the determinant that drives
11   statistical power.
12       Q.   How do you know that -- with what you
13   just said, that it wasn't psychotherapy or
14   alternative, you know, non-pharmacologic treatment
15   that is leading to the reduction of suicide in the
16   short-term after the diagnosis?
17       A.   Well, again, the -- the papers by Simon
18   look at the effects of pharmacotherapy and
19   psychotherapy and break them apart individually and
20   show very, very similar temporal patterns in terms
21   of the risk of suicide attempts.
22       Q.   But you didn't do that here for
23   Neurontin, correct?
24       A.   I didn't have data on psychotherapy.

615

1        Q.   What I find interesting is when you go
2    back to the paper and you go back to Table 1 --
3    thank you -- just looking at the gabapentin, it says
4    there are 213 patient years of observation prior to
5    the initiation of therapy, correct?
6        A.   That's correct.
7        Q.   Which is an average of, what, about two
8    months to 129 people?
9        A.   Something on that order.
10       Q.   When we look at the gabapentin data here,
11   the week before the diagnosis of bipolar -- well,
12   two weeks before, there is one suicide -- I think
13   you have a copy of this over there so you can follow
14   along.
15       MS. McGRODER:  You are looking at Exhibit --
16       MR. ALTMAN:  31.
17       MS. McGRODER:  -- 31.  Thank you.
18   BY MR. ALTMAN:
19       Q.   Two weeks before bipolar diagnosis
20   there's one event, correct, or at least that's what
21   the chart says?
22       A.   That's correct.  That's what it says.
23       Q.   And in the week before, it says there
24   were 11 events, correct?

616

1    A.   Correct.

2    Q.   And on the day it says that there were

3    12, correct?

4    A.   If that's what zero means.

5    Q.   I mean, that's what zero -- starting at

6    index date in that week there were 12?

7    A.   Correct.

8    Q.   And then after one week, there's zero,

9    correct?

10   A.   That's correct.

11   Q.   And after -- you know, in week two

12   there's three, correct?

13   A.   Correct.

14   Q.   And in week three there's two, correct?

15   A.   Correct.

16   Q.   So by the time you roll around in the

17   first month --

18   MS. McGRODER:  Ask him the next -- ask him the

19   next weeks.

20   MR. ALTMAN:  What?

21   MS. McGRODER:  Ask him the next weeks.

22   MR. ALTMAN:  It's not relevant.

23   MS. McGRODER:  They are all zeros.

24   MR. ALTMAN:  Exactly, and this is before they

617

1    have started taking gabapentin.

2    BY THE WITNESS:

3    A.   How do you know that?

4    BY MR. ALTMAN:

5    Q.   Well, you say there's an average of two

6    months.

7    A.   Well, there are -- you can't say that.  I

8    mean, that -- there's an average of two months, but

9    there are -- there are patients in here who start

10   taking gabapentin on the day of the index episode,

11   and you can't attribute the average amount of time

12   to -- you know, when people take it to this kind of

13   analysis that's breaking things down by individual

14   weeks.  That doesn't make any sense.

15   Q.   And people could have been taking

16   gabapentin even before the date of the bipolar

17   diagnosis, correct?

18   A.   In the bipolar cohort that's --

19   Q.   That's all we are talking about.

20   A.   -- that's true, they could be -- they

21   could have been taking it prior to.  Although, if

22   they were taking it 30 days prior -- I mean, if they

23   had a -- if they were taking it before and they had

24   say a 30-day prescription, we would have brought

618

1    that forward.

2    So in other words, if somebody had 30

3    days of pills within the month prior to the index

4    episode, that would have shown that they were taking

5    gabapentin at the time of the index episode.

6    Q.   Right, but they could have been taking it

7    long before is what I'm saying.  They -- these

8    people could have been on gabapentin when they

9    became -- started having suicidal events, correct,

10   before they were diagnosed with bipolar disorder?

11   A.   In the year prior to the index episode,

12   they may have been taking gabapentin in the bipolar

13   cohort.  That wouldn't be true in the gabapentin

14   cohort.

15   Q.   We are only talking about the bipolar

16   cohort now.

17   A.   I understand.

18   Q.   And so do you know how much exposure

19   there was -- do you know how much exposure there was

20   to gabapentin leading up to the bipolar diagnosis?

21   A.   That's available in the database.  I

22   think we have looked at it at some point, but I

23   don't know off the top of my head, but this is

24   exactly what I have been talking about.

619

1    I mean, what you see here is that the

2    highest risk of suicide attempt is either on or in

3    the immediate period, and I think it's -- the data

4    are probably not of sufficient magnitude to be

5    breaking this down by week.  I mean, you have done

6    it, but I'd say by month is more reasonable based on

7    our VA study and based on the Simon study, but the

8    highest risk of suicide attempt occurs before the

9    initiation of treatment, and then it trails off

10   dramatically after the initiation of treatment.

11   That's the same observation we made with

12   the VA study.  It is the point of this paper, and it

13   is the same observation made by Simon and others who

14   have studied the temporal patterns of suicide and

15   its relationship to -- to psychiatric treatments.

16   Q.   It's also the same thing you see for the

17   people who didn't have any drug, correct?

18   A.   You see some of that, but you also see

19   higher rates further out in time.

20   Q.   You see some oscillations, but you see a

21   pretty good spike very -- you know, you see a pretty

22   big increase right before the bipolar diagnosis

23   date, correct?

24   MS. McGRODER:  Object to form.

620

1    BY MR. ALTMAN:
2       Q.   And then a pretty sharp reduction after
3    the bipolar diagnosis, right?
4       MS. McGRODER:  Object to form.
5    BY THE WITNESS:
6       A.   That's consistent with the column of your
7    table that you have in here.
8    BY MR. ALTMAN:
9       Q.   But those people aren't taking any drug?
10      A.   That's true.
11      Q.   So why should they have this -- so if
12   people who are not taking any drug can exhibit the
13   same reduction, how do you know that whatever caused
14   those people suicide attempts to go down is not the
15   same thing that happened for the gabapentin people?
16      A.   That -- that may be the case.  There may
17   be other factors that are going on with these
18   patients.  These patients may be receiving
19   psychotherapy.  I don't know the answer to that.
20      Q.   So you don't -- and that's my point.  You
21   have -- there's something -- I mean, clearly there
22   can be a non-pharmacologic reason for the reduction
23   in the suicide risk, right?
24      MS. McGRODER:  Object to form --

621

1    BY THE WITNESS:
2       A.   It could be --
3       MS. McGRODER:  -- calls for speculation.  Go
4    ahead.
5    BY THE WITNESS:
6       A.   I'm sorry.  Could be, and again the --
7    the key here is that this paper provides a
8    comparison between subjects in terms of the rate in
9    these subjects who are taking medication versus
10   those that are not, and then within subjects, to
11   determine whether or not once they start taking
12   medication is there an increase.
13         The finding of the paper, as articulated
14   in the final paragraph of the discussion, is that
15   there is no evidence that these drugs are leading to
16   increases in suicide attempt rates, and if anything,
17   what we are seeing are decreases following the
18   initiation of treatment and --
19      MS. McGRODER:  Wait.  Are you finished with
20   your answer because --
21      THE WITNESS:  Yes.
22      MS. McGRODER:  Let's go off the record for a
23   minute.
24      THE VIDEOGRAPHER:  Okay.  The time is 3:27 p.m.

622

1    We are going off the record.
2          (WHEREUPON, a recess was had at
3          3:27 p.m. until 3:35 p.m.)
4       THE VIDEOGRAPHER:  This is beginning of tape
5    No. 6, day 2.  The time is 3:35 p.m.
6    BY MR. ALTMAN:
7       Q.   Dr. Gibbons, before we went on the break,
8    we were looking at Exhibit 31, and we were looking
9    at the no medication group and how we saw similar
10   picture, for lack of a better term, in terms of what
11   happened around the date of the bipolar diagnosis as
12   we did with the gabapentin group.
13         You also see a reasonably similar picture
14   with the -- with the lamotrigine group, correct,
15   which is column E?
16      MS. McGRODER:  Object to form, not that part
17   but your preceding little summary.
18   BY THE WITNESS:
19      A.   Somewhat similar and that's -- that's
20   shown as well in my Table 2.
21   BY MR. ALTMAN:
22      Q.   Let's put this aside for right now.  I'd
23   like to go back to Exhibit 9 which is your actual
24   expert report.

623

1       MS. McGRODER:  Well, there are multiple --
2       MR. ALTMAN:  Well, that's his expert report --
3    expert report.  Everything is either the declaration
4    or the supplement.
5       MS. McGRODER:  May 19, 2008 expert report?
6       MR. ALTMAN:  Yes.
7    BY THE WITNESS:
8       A.   I have it.
9    BY MR. ALTMAN:
10      Q.   All right.  One of the things I forgot to
11   ask about.  On page 3 when you calculated the
12   confidence interval at the bottom, the odds ratio
13   you say is 1.033 and the confidence interval is
14   0.135 to 7.884, correct?
15      A.   Correct.
16      Q.   Did you use exact methods for that or
17   approximate methods?
18      A.   I used approximate methods.
19      Q.   Is that appropriate in that context?
20      A.   Well, it could be argued that an exact
21   method giving the rarity of the event would have
22   given you a more precise estimate.
23      Q.   I think Dr. -- Dr. Greenland ran the
24   numbers with the exact method and came up with a

624

1  somewhat higher range on the top end; is that
2  correct?
3       MS. McGRODER:  Well, object to form, calls for
4  speculation, and what do you mean by "somewhat
5  higher"?
6  BY MR. ALTMAN:
7       Q.   Well, I think he came up with a 30 which
8  you even discuss there.
9       A.   I don't have the -- I don't know.  Do I
10  have in here the one the -- I mean, my only point is
11  I think it was a wider interval.  I don't think it
12  was -- you know, it's just not bigger on the -- on
13  the top end although --
14       Q.   It couldn't get much narrower on the
15  bottom end.
16       A.   Well, yeah, actually it could.  I mean,
17  remember this is -- you know, the bottom end is
18  whatever that number is one divided -- it's one
19  divided by whatever that number is.
20       So, you know, when you look at confidence
21  intervals for odds ratios, it makes it look like,
22  you know, you can't get too far away from one on the
23  bottom end, but you can get up to infinity.  You
24  know, you're -- as you get to zero, you are at

625

1  infinity so.
2       Q.   Is that kind of like a zero over zero
3  type thing?
4       A.   Something -- something like that.  So,
5  you know, it's a wider -- a wider interval, and
6  it -- you know, it -- the exact method is not
7  relying on the asymptotic normality similar to what
8  Dr. Greenland relies on in computing power.  I mean,
9  it's -- you know, there are two different ways.  I
10  am not arguing the point.
11       Q.   Okay.  I just wanted to make sure of
12  that, but I would like you to go to page 14, point
13  2.
14       Now, there you took -- just to make sure
15  we are correct, the FDA Alert came up was it .43
16  percent versus .22 percent, correct?
17       A.   Correct.  There were a couple of
18  different numbers for the active treatment.  One was
19  .43 percent.  One was .38 percent depending on whose
20  document you read, but .43 was I believe the one
21  that was published in the Alert.
22       Q.   And you used the point four -- and what
23  you do here is you say -- you say Pfizer should have
24  observed -- if it was the same as the other drugs,

626

1  Pfizer should have observed .43 percent of their
2  patients having a suicidal event, correct?
3       A.   That's correct.
4       Q.   And if there were 5194, you should see
5  approximately 22 cases of suicidal events -- 22
6  suicidal events, correct?
7       A.   Correct.
8       Q.   And you only saw two, and you found that
9  to be a problem, correct?
10       A.   Found it to be inconsistent with the
11  expected number based on the FDA Alert.
12       Q.   What was the expected number of events in
13  the placebo group which you didn't calculate here?
14       A.   The expected number I don't remember, but
15  it would also be larger than what we saw.
16       Q.   So doesn't the fact that you don't see
17  what you expect in the placebo call into question
18  whether it was appropriate to use the .43 percent
19  and the .22 percent against the Neurontin numbers?
20       A.   Not at all.  It shows that the data -- it
21  shows (No. 1) that the data for gabapentin in
22  general are inconsistent with the rest of the data,
23  and, secondly, it calls into question the assumption
24  made by the FDA that this is a common effect across

627

1  all of these different drugs for these different
2  indications based on their use of the
3  Mantel-Haenszel statistic.
4       Q.   And you take the FDA when they said
5  consistent, you think the FDA was saying consistent
6  in terms of magnitude?
7       MS. McGRODER:  Objection, asked and answered.
8  BY THE WITNESS:
9       A.   I think that the FDA was saying it was
10  consistent in terms of a treatment effect, and I
11  think that, you know, we are seeing here an example
12  where both the magnitude or the incidence, if you
13  will, and the treatment effect are very different
14  than the remainder of the data.
15       So it calls into question the idea that
16  this is -- you know, gabapentin is just exchangeable
17  with these other drugs, and it's -- you know,
18  there's really no difference between any of them,
19  and this Alert should apply equally to all of them.
20  BY MR. ALTMAN:
21       Q.   What did the FDA say that all these drugs
22  are exchangeable, and that the magnitude of the
23  effects are the same?
24       A.   They said --

628

1    MS. McGRODER:  Object -- objection to form.  Go
2  ahead.
3    BY THE WITNESS:
4    A.   They said that the -- you know, by their
5  characterization of the effect being consistent
6  across all of the drugs and indicating that they
7  found no evidence of heterogeneity, they are
8  basically saying they are exchangeable.
9    Furthermore, by basing their primary
10  analysis on the Mantel-Haenszel statistic that
11  assumes a common effect for all of the drugs, that's
12  a pretty clear statement of their assumption.
13    BY MR. ALTMAN:
14    Q.   And to be clear, they did look at
15  heterogeneity, correct?
16    A.   They looked at it by testing for it in
17  the usual sort of way.  I don't believe that's a
18  proper test of heterogeneity, and as Dr. Greenland
19  says in his book, the -- you know, to -- I don't
20  want to misquote him, but it's something along the
21  lines of, you know, you never want to assume
22  homogeneity, and the absence of the statistically
23  significant heterogeneity test does not mean that
24  the data really aren't heterogenous, and this

629

1  gets -- you know, the typical meta-analysis, of
2  course, is looking at one treatment relative to one
3  control condition and pooling information for
4  multiple studies of that.
5    What FDA is doing here by contrast is
6  doing that for individual drugs and then pooling
7  those different drugs.  So we have lots of different
8  treatments that are being treated as if they are
9  exchangeable in their analysis, and I certainly take
10  exception with -- with that.
11    Q.   So if gabapentin did increase the risk
12  but at a magnitude different than some of the other
13  drugs in the FDA's analysis, what you discuss here
14  at point 2 doesn't really apply, correct?
15    MS. McGRODER:  Object to form.
16    BY THE WITNESS:
17    A.   I'm not following your question.
18    BY MR. ALTMAN:
19    Q.   All that point 2 suggests is that
20  gabapentin does not have the same magnitude of
21  effect as some of the other drugs in the analysis,
22  correct?
23    MS. McGRODER:  Objection, asked and answered.
24  He just answered that.

630

1    A.   I actually believe I did answer that.
2    BY MR. ALTMAN:
3    Q.   Well, I'm still not clear, and, you know,
4  you gave quite a long answer.  I just want to make
5  sure --
6    MS. McGRODER:  He said it was not just
7  magnitude.  He said it was treatment effect.
8    BY MR. ALTMAN:
9    Q.   Well, how does the -- how does that
10  analysis -- how can you say from that analysis shows
11  that gabapentin doesn't have an increased risk?
12    A.   Well, first of all, if I had put in the
13  estimate for placebo, you would see that it would
14  have been substantially lower than the 22 cases, and
15  now in part that's because there were fewer placebo
16  patients.  So once we adjusted for that, but the
17  overall magnitude is different for gabapentin
18  relative to the other drugs or the -- what's left
19  over once you remove gabapentin which was the focus
20  here and as well as the magnitude of the treatment
21  effect.
22    There is no magnitude to the treatment
23  effect.  I mean, basically you have two in active

631

1  treatment and one on placebo and a similar sort of
2  ratio in terms of sample sizes, and you have a --
3  probably close to a doubling when you look at the
4  other drugs, and as you hone in on lamotrigine and
5  topiramate, which I think are the drugs that are
6  driving this and if those two hadn't been
7  considered, we wouldn't be having this conversation
8  now.  You see an even larger effect.
9    Q.   I'm still not sure I'm getting the
10  answer.  I know you are answering a question.  I
11  don't know.  I think we are missing each other.
12    A.   Okay.
13    Q.   This analysis over here I think I
14  understand you saying stands for the proposition
15  clearly that Neurontin does not have the same
16  magnitude of effect as the FDA Alert overall,
17  correct?
18    MS. McGRODER:  Objection to the extent it
19  misstates his testimony over the last hour half.  Go
20  ahead.
21    BY THE WITNESS:
22    A.   The point that I'm making in 2 here is
23  (No. 1) that for gabapentin by itself -- let's
24  forget about placebo for the moment -- we would have

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

632

1    if the -- if the rate was the same for gabapentin,
2    we would have observed 22 cases of suicidal thoughts
3    or behaviors.
4        BY MR. ALTMAN:
5        Q.  Right.
6        A.  Instead we only observed two people with
7    suicidal thoughts.
8        Q.  Okay.  I follow you there.
9        A.  Period.
10       Q.  Okay.  But that doesn't say anything
11   about whether there was an increased risk, correct?
12       A.  Well, I say a lot about whether or not --
13       Q.  In point No. 2 --
14       A.  In --
15       MS. McGRODER:  Wait, let him finish his answer,
16   Keith.
17       BY THE WITNESS:
18       A.  In the first sentence of point No. 2, I'm
19   not talking about the differential risk.  I talking
20   about the differential incidence of suicidal
21   ideation between gabapentin and the other treatment
22   arms for the other drugs.
23       BY MR. ALTMAN:
24       Q.  Okay.  And the rest of this we have

633

1    talked about ad nauseum that the 1.033 was based
2    upon your understanding at that time, but we know it
3    is different than the 1.033 based on FDA -- the way
4    the FDA looked at it, correct?
5        A.  That's correct, but both of them are not
6    anywhere near being statistically significant, and I
7    don't believe that there is an either clinically or
8    statistically significant distinction between the
9    1.033 that I computed using all of the data that
10   were submitted to FDA versus the other estimates of
11   1.39 or 1.40.
12       None of those are indicative of a
13   significant risk of gabapentin, and none of those
14   are indicative of a -- even a signal, if you will,
15   that looks anything like what you see for
16   lamotrigine and topiramate in FDA's analysis.
17       Q.  But that doesn't mean that there's not an
18   effect.  It is just that it's not statistically
19   significant, correct?
20       A.  Well, I believe there -- you know, if
21   you -- if you have a reasonable number of subjects,
22   and I believe this is a reasonable number of
23   subjects, and you do not find a statistically
24   significant effect, I don't believe that it is an

634

1    effect.
2        Q.  What's the rate of suicidal ideation in a
3    epileptic population, background rate?
4        A.  I don't know.
5        Q.  What is the background rate of suicidal
6    ideation in a bipolar population?
7        A.  I don't know the answer to that offhand.
8    We could use placebo-treated people as an -- as an
9    index of that, but I am not sure that
10   placebo-treated people in randomized clinical trials
11   for a variety of indications are necessarily
12   representative of the background rate in the general
13   population.
14       Q.  Well, you said earlier that the -- the
15   rate of ideation is I believe you said orders of
16   magnitude greater than that of attempt.  Orders of
17   magnitude would imply at least ten times greater.
18       That would be one order of magnitude,
19   right?
20       A.  That's correct.
21       Q.  And two orders of magnitude would be 100
22   times greater, correct?
23       A.  That's correct.
24       Q.  What do you base that upon?

635

1        A.  Based on the data for antidepressants in
2    suicide.
3        Q.  Could you -- I'd like, if you can, a
4    better citation to that figure.
5        MS. McGRODER:  Well, object to form.  He just
6    answered it.
7        MR. ALTMAN:  I need to know what he based it
8    on.
9        BY MR. ALTMAN:
10       Q.  You say based on -- what is the data?
11   What data do you base that upon?
12       A.  I have the data.  I -- there's a --
13   there's a -- I did a thing for -- for WebMD where we
14   reviewed the data on suicide risk in children and
15   adolescents and compared the rates of ideation and
16   attempts and completed suicide.  I don't have all
17   those numbers at my fingertips, but they were orders
18   of magnitude difference -- differences, and it's a
19   useful tutorial.
20       Q.  That was -- that was in a depressed
21   population, correct?
22       A.  I did it both in the general population
23   and in the depressed population.
24       Q.  But you didn't do it -- did you do it in

636

1    an epileptic population?
2        A.   No, I don't have those data.
3        Q.   Did you do it in a neuropathic pain
4    population?
5        A.   No, I don't have those data.
6        Q.   So you don't really know in those
7    populations what the rate of suicidal ideation is,
8    do you?
9        A.   I have no reason to believe that the
10   relative risk of suicidal ideation to suicide
11   attempt to suicide completion would necessarily be
12   different based on different populations.  The
13   overall magnitudes might change.  They might go up
14   or they might go down, but I would imagine that they
15   would shift in equal proportions, but I don't have
16   the data to necessarily back that up.  I don't know
17   of any data to back that up except the data that are
18   in the Baldessarini paper relative to bipolar
19   disorder.
20       Q.   I don't think he lists suicidal ideation,
21   does he?
22       A.   I don't believe so.
23       Q.   So we really don't -- so when you say
24   that the studies were adequately powered based upon

637

1    suicidal thinking or worse, you don't really know
2    that, do you?
3        MS. McGRODER:  Objection, argumentative.
4    BY THE WITNESS:
5        A.   I'm -- I'm using the -- the data, the
6    rates, and the magnitudes of the effects that are
7    seen in the studies that FDA pooled in their -- in
8    their meta-analyses.  I'm using the fact that
9    statistically significant effects of lamotrigine and
10   topiramate in and of themselves in FDA's database
11   were found.
12       So I am assuming that samples of that
13   size are somewhat adequately powered to detect such
14   an effect given that they did detect such an effect,
15   and based on power computations, I know that I'm
16   fairly close to the ballpark based on gabapentin
17   alone and certainly when you add gabapentin and
18   pregabalin or other GABAergic drugs that are put
19   into the same class by FDA at least excluding
20   topiramate, you have more than enough subjects to
21   detect a doubling in the -- in the rate of suicidal
22   ideation or worse.
23   BY MR. ALTMAN:
24       Q.   The -- there was a big difference,

638

1    though, in the -- in how many people in the
2    psychiatric population were included in the
3    lamotrigine trials versus gabapentin, wasn't there?
4        MS. McGRODER:  Objection.
5    BY THE WITNESS:
6        A.   There was a fairly large difference, but
7    there were probably close to double the number of
8    psychiatric population patients in pregabalin
9    relative to topiramate, and topiramate and
10   gabapentin were relatively similar.
11       MR. ALTMAN:  Let's mark the next exhibit.
12       (WHEREUPON, a certain document was
13            marked Gibbons Deposition Exhibit
14            No. 33, for identification, as of
15            2/4/09.)
16   BY MR. ALTMAN:
17       Q.   Dr. Gibbons, I have given you what's been
18   marked as Exhibit 33 which is a -- let's call it a
19   generic letter from the FDA.
20       Have you ever seen this document before?
21       A.   I believe so.  I think this is the recent
22   letter that was sent out by the FDA regarding --
23   following the scientific advisory board meetings.
24       Q.   That's correct.  I believe you testified

639

1    in your expert report that you agree, and actually I
2    think this is in your Crone report but not in your
3    November 5th report which would be expected since
4    this document came out in December.  You wouldn't
5    have had it.  That you agreed with the FDA in not
6    putting a black box, correct?
7        MS. McGRODER:  Object to form.
8    BY THE WITNESS:
9        A.   I don't know if I agreed with the FDA.  I
10   think I agreed with the scientific advisory board
11   which voted against the black box warning.
12   BY MR. ALTMAN:
13       Q.   What is your -- have you ever written a
14   label before?
15       A.   No.
16       Q.   Have you ever been asked to write a label
17   before?
18       A.   No.
19       Q.   Have you ever reviewed a label before to
20   see if it is -- if it adequately represents the
21   risks and benefits of a drug?
22       A.   I'm -- I'm not an expert in label
23   writing.
24       Q.   And how is it that you are qualified to

640

1  opine that F -- the advisory panel is correct in not
2  including a black box -- not recommending a black
3  box?
4     A.  I have served on scientific advisory
5  boards that have opined on whether or not black box
6  warnings should be placed on drugs, particularly
7  psychiatric drugs.
8     Q.  How many times have you done that?
9     A.  One time.
10    Q.  One time.
11    A.  The one time that they did put a black
12  box warning.  It was a good one time.
13    Q.  Did you vote in favor of that black box?
14    A.  No, I voted against it.
15    Q.  What was your basis for voting against it
16  then?
17    A.  I was concerned (No. 1) that the
18  prospective data from the Hamilton depression scale
19  item 3 that were prospectively and a priori defined
20  showed no evidence of any increase in suicidality
21  associated with antidepressant medications.
22        I was concerned that the effect seen
23  in -- for the spontaneous adverse event reports were
24  due to ascertainment biases, in particular two

641

1  ascertainment biases.  The first being the bias
2  associated with patients who are randomized to drug
3  having more side effects in general and, therefore,
4  having more contact with their doctor than patients
5  assigned randomly to placebo.
6        And the second ascertainment bias that if
7  you attempt suicide by taking an overdose of your
8  study medication and you happen to be randomly
9  assigned to an SSRI, you will wake up in the
10  emergency room not a very happy camper, and if you
11  take an overdose of placebo, nothing will happen to
12  you, and there will be an underreporting of your
13  suicidal behavior.  Both of which I felt were of
14  sufficient magnitude to account for a 2 percent
15  versus 4 percent difference.
16        I was concerned that the presence of the
17  black box warning would -- rather than leading to
18  better quality care for children and adolescents,
19  having more follow up would lead to particularly
20  pediatricians and general practitioners stopping to
21  treat patients, and might have an unexpected
22  consequence of increase in completed suicide rates
23  relative to the expected or desired decrease in
24  suicide rates among children and adolescents in this

642

1  country.  Those are the primary reasons.  There
2  might have been a couple of others.
3     Q.  There was also a vote about whether --
4  there was also a vote about whether the Alert -- the
5  black box or whatever warning they were going to
6  go -- use should apply to all antidepressants, all
7  SSRIs, etc.
8        Are you familiar with what I am talking
9  about?
10    A.  Are you now talking about the scientific
11  advisory board for --
12    Q.  Yes.
13    A.  -- children, adolescents, and --
14    Q.  Yes.
15    A.  Yes, I am.
16    Q.  And you had expressed concerns about
17  that, correct?
18    A.  Concerns about what?
19    Q.  I think in the -- I have read the
20  transcript, and I believe you raised an issue that
21  you were concerned about including these other drugs
22  in the Alert?
23    A.  Which other drugs?
24    Q.  Other drugs that didn't show events.

643

1        MS. McGRODER:  Are you talking about the
2  antidepressant --
3        MR. ALTMAN:  Yes, we are talking about -- yeah,
4  we are talking about the antidepressant.
5        MS. McGRODER:  Well, your question is way
6  unclear.  Object to form.
7        MR. ALTMAN:  I mean, that's what we have been
8  talking about.
9        MS. McGRODER:  But you can't tell from your
10  question.
11  BY THE WITNESS:
12    A.  Yeah, I'm sorry.  Actually, this one I --
13  your question was a little vague.
14  BY MR. ALTMAN:
15    Q.  Okay.  We are talking about the
16  antidepressants now, the scientific advisory
17  committees that you sat on.
18    A.  Correct.
19    Q.  I believe there was a discussion about
20  whether the -- the warnings, whatever was done,
21  should apply to drugs that showed no events, etc.,
22  correct, there was that discussion?
23    A.  Yes, there was a discussion.
24    Q.  And I believe you participated in that

644

1  particular discussion, correct?

2      A.   As I -- I may have.  I certainly have

3  opinions about that.

4      Q.   How did you vote when it came time to

5  decide -- deciding whether the warnings should be

6  applied against all of the drugs?

7      A.   I don't remember that there was a

8  separate vote to that.  There might have been, but I

9  don't remember.

10         Part of the issue related to the vote

11  of -- you know, it's a -- it's a kind of a

12  double-edged sword, and it appeared as well here in

13  the antiepileptic hearings, and that is if you have

14  a selective warning on say just the SSRIs, as an

15  example, but you don't leave in the tricyclic

16  antidepressants that were not the focus of this

17  Alert or these -- these studies that were pooled in

18  the meta-analysis to -- to lead to -- to the -- to

19  the warning, that you will selectively increase the

20  use of these other drugs which may actually, in

21  fact, be inferior in terms of both safety and

22  efficacy to the drugs that the studies were based

23  on.

24         So that's one of the concerns about

645

1  selective, you know, labeling changes.  The other,

2  of course, is that you are penalizing some drugs

3  that may actually have no effect or may have

4  protective effects, and I think that's really from a

5  statistical perspective one of the great concerns

6  about the limitations of the kinds of meta-analyses

7  that FDA does, and the limitations in these tests of

8  heterogeneity.

9         These tests of heterogeneity are really,

10  really important because if those tests are

11  insensitive and there really is heterogeneity, the

12  whole idea of extending a warning label to large

13  classes of drugs, some of the drugs not even studied

14  as a part of -- by FDA is a real questionable

15  activity.

16         So I think it's important that if we are

17  going to use be using randomized-control trials,

18  meta-analyses of these randomized-control trial,

19  that we have better tools to do those kinds of

20  analyses and better methods to assess heterogeneity.

21      Q.   The antidepressants, you sat on the

22  advisory committee, they were -- you didn't have a

23  lot of off-label usage of antidepressants.  And when

24  I mean off-label usage, I don't mean using it in

646

1  kids versus adults.  I mean using an antidepressant

2  like an SSRI for headache or stuff like that.

3         Basically, antidepressants, the SSRIs

4  were used as antidepressants, correct?

5      MS. McGRODER:  Object to form and foundation.

6  BY THE WITNESS:

7      A.   I don't know -- I don't know if that's

8  true.  I know there are off-labeled uses of

9  antidepressants.  People take antidepressants for a

10  wide variety of reasons, but I wouldn't, you know,

11  indicate that I'm an expert on the medical uses of

12  antidepressants.

13  BY MR. ALTMAN:

14      Q.   I wasn't asking that, but was there a

15  discussion of the off-label use of the

16  antidepressants at the advisory committee?

17      A.   I don't remember.

18      Q.   Okay.  Are you aware that the majority of

19  the use of Neurontin is for off-label purposes?

20      A.   I think the data would -- that I have

21  reviewed indicates that the majority are for other

22  uses beyond epilepsy, but I'm not sure I even know

23  exactly what the labeled uses are and what it's

24  approved or not approved for.  I wouldn't be an

647

1  expert on that.

2      Q.   Do you know whether you have to prove a

3  statistical association in order to make a labeling

4  change?

5      A.   I don't know the answer to that.

6      Q.   Okay.  We talked before about -- give you

7  a second.

8         We talked before about when you have a

9  point estimate and a confidence interval that there

10  would be some kind of a probability function that

11  you could graph, correct?

12      A.   Yes.

13      Q.   We talked about it earlier.

14         That would not be -- if you graph it on

15  like a conventional zero, one, two, three, it

16  wouldn't look very symmetric based upon the point

17  estimate, correct, it would --

18      A.   Correct.

19      Q.   Okay.  What scale could you apply to that

20  so that it would look symmetric around the point

21  estimate?

22      A.   Taking the logarithm of that would help,

23  you know, make it a little more symmetric.  Wouldn't

24  necessarily make it symmetric.

648

1      Q.   All right.  The point estimate of 1.57,
2   is it more likely than not that the true relative
3   risk is greater than one?
4      A.   I just as a statistician can't condone
5   talking about non-statistically significant risk
6   ratios or odds ratio and -- and attributing some
7   risk to them.  They are either significant or they
8   are not significant.  If they are significant, it's
9   appropriate to talk about the magnitudes of those
10  effects.
11       If you can't differentiate them from the
12  null; namely, for an odds ratio of one, then I don't
13  think you can really interpret any deviation from
14  one in one direction or the other.
15     Q.   Well, we know it's more likely than not
16  that it is not one, correct?
17    MS. McGRODER:  Objection, asked and answered.
18    BY THE WITNESS:
19     A.   No, I don't believe you know that.
20    BY MR. ALTMAN:
21     Q.   Well, if 1. -- if 1.57 would be more
22  probable than one, then it's certainly you can't say
23  that it's more likely that it be one then some other
24  value other than one, right?

649

1      A.   I think --
2    MS. McGRODER:  Object to form, improper
3   hypothetical, calls for speculation.  Go ahead.
4    BY THE WITNESS:
5      A.   I would think that would -- my opinion
6   that just flies in the face of all statistical
7   theory on hypothesis testing.
8    BY MR. ALTMAN:
9      Q.   Well, we -- we went through this earlier,
10  and you said that if we graph the probability curve,
11  1.57 would be higher than one, correct?
12     A.   I did say that --
13     Q.   Okay.
14     A.   -- and that does not mean that I would
15  add that the -- and in the case where you have not
16  rejected the null hypothesis, that you can interpret
17  the magnitude of that odds ratio as indicating that
18  the most likely effect is that there really is an
19  effect of the drug of some magnitude.
20       Prior to rejecting the null hypothesis,
21  you cannot make any statement that the true value of
22  the odds ratio is -- is anything different than the
23  null value of one, and my comments to you before is
24  based on that experiment and based on that point

650

1   estimate if you plot out the probability curve, you
2   are going to see the largest mass of probability at
3   the point estimate.  That does not mean that you
4   have the right to interpret that value in any way
5   for any practical purpose.
6    MR. ALTMAN:  Objection, non-responsive.
7    BY MR. ALTMAN:
8      Q.   What I asked you is is it more likely
9   than -- is it more likely that the odds ratio is not
10  one then that it is one with a point estimate of
11  1.57?
12     A.   Just --
13    MS. McGRODER:  Objection, asked and answered.
14    BY THE WITNESS:
15     A.   Just as I -- if you had a non-significant
16  effect with an odds ratio less than one indicating a
17  protective effect of say .8 or .85, I would not
18  interpret that result to indicate that there's
19  greater likelihood that it is a protective effect
20  than a non-protective effect.  It's either
21  significantly differentiable from one or not.  Once
22  it is, then you can interpret it.
23    BY MR. ALTMAN:
24     Q.   That is not -- was not my question,

651

1   Dr. Gibbons.
2    MR. ALTMAN:  Objection, non-responsive.
3    BY MR. ALTMAN:
4      Q.   What I asked is is it more likely than
5   not that the true odds ratio is not one?
6      A.   And as a --
7    MS. McGRODER:  Objection, asked and answered.
8    BY THE WITNESS:
9      A.   As a statistician, I can only tell you
10  that I would not even answer that question unless
11  you have evidence to reject the null hypothesis.  If
12  I can't reject the null hypothesis, any alternative
13  value I will consider to be equally likely to be
14  one.
15    BY MR. ALTMAN:
16     Q.   So even though you say the probability
17  that it is the point estimate -- so even though you
18  say it's the probability that the point estimate has
19  a greater probability than the null, right, you did
20  say that, correct?
21     A.   I didn't say that it has a greater
22  probability than the null.  I think what -- I think
23  the confusion and the trouble that we are having
24  communicating about this is that I am talking about

652

1  the true value, and you are talking about the
2  observed value for a particular dataset.
3      Now, if I can't reject the null
4  hypothesis, I can't conclude that the true odds
5  ratio is different than one.  So I can't tell you
6  that that particular observed odds ratio is
7  associated with a true odds ratio that is greater
8  than one, and that's probably the disconnect.
9      Q.   Well, that's not what I'm asking.
10     What I am asking is is that there is a
11  probability curve.  There are points -- there are
12  values on the probability curve.  We have talked
13  about that the point estimate would be at the
14  highest point of curve, correct?
15     MS. McGRODER:  Objection, asked and answered.
16  BY THE WITNESS:
17     A.   The point estimate for the observed data
18  for that particular experiment if you would just
19  simply compute out the probability, will be highest
20  at the point estimate.
21  BY MR. ALTMAN:
22     Q.   And that would be greater than one if the
23  point estimate was 1.57, correct?
24     MS. McGRODER:  Objection, asked and answered.

653

1  BY THE WITNESS:
2      A.   The probability for that observed value
3  would be greater -- if the -- if the point estimate
4  is greater, the probability for that observed value
5  will be greater than the probability for 1.0, but
6  that has nothing to do with testing the hypothesis
7  of whether or not the true value is any different
8  from the null value of 1.0 or the probability
9  associated with that.
10  BY MR. ALTMAN:
11     Q.   Do you spend much of your time working
12  with Bayesian statistics?
13     A.   I do a lot of work with empirical Bayes
14  statistics which full Bayesians like even less than
15  Fisherian statistics.
16     Q.   Let's go --
17     MS. McGRODER:  Can you spell that for her.
18     MR. ALTMAN:  He can spell the second one.
19     THE WITNESS:  Fisherian is Fisher with an i-a-n
20  where Fisher is F-i-s-h-e-r-i-a-n, and Bayesian is
21  B-a-y-e-s-i-a-n.
22     MR. LONDON:  You probably didn't have to spell
23  that.
24     THE WITNESS:  Just like -- just like the

654

1  English muffin.
2  BY MR. ALTMAN:
3      Q.   Unlike the statistics we have been
4  talking about, you could say some different things
5  if you do a Bayesian calculation.
6      The interpretation of those results is
7  somewhat different than the kind of statistics we
8  have just been dealing with, correct?
9      A.   To some extent.
10     Q.   All right.  Would you please go to page
11  29 of Exhibit 16.  That is the April 29th.  That's
12  it.
13     A.   I'm there 29.  Well, he wants to go to
14  29.  I was at 28.
15     Q.   But you can -- you know, if you want to
16  see, that's where they start discussing Bayesian
17  statistics.
18     Now, on -- they say in Table 19 for the
19  pregabalin and gabapentin -- for the pregabalin
20  studies, it shows a -- ratio of event rates
21  0.95, correct?
22     A.   Yes.
23     Q.   And for pregabalin and gabapentin
24  studies, it says 1.14, correct?

655

1      A.   Correct.
2      Q.   It doesn't give you the gabapentin only,
3  correct?
4      A.   I'm not seeing that here.
5      Q.   Do you have any feeling for whether the
6  gabapentin would be higher or lower than the 1.14 by
7  itself?
8      MS. McGRODER:  Object to form and foundation.
9  BY THE WITNESS:
10     A.   I think the credible interval would be
11  wider in a Bayesian framework for gabapentin by
12  itself.  I'm not really sure without doing that
13  analysis.
14  BY MR. ALTMAN:
15     Q.   But in terms of Bayesian calculation, the
16  1.14 there, are you able to make the statement that
17  given this calculation, that it is more likely than
18  not that the relative risk is greater than one?
19     A.   Clearly since the -- well, first of all,
20  these are -- are these Bayes estimates for relative
21  risk for or odds ratios?  These are ratios of event
22  rates.  I guess the Bayes -- I don't know the answer
23  to that.
24     Could you repeat your question?

656

1    Q.   Yeah, given a ratio of 1.14 -- I think
2  kind of in a long-winded way when we were talking
3  about the 1.57, the standard -- standard
4  calculation, you can't say that because it's greater
5  than one, it's more likely than not it's greater
6  than one.
7     You can't do that in that context,
8  correct?
9    A.   That's correct.
10    Q.   But you can do that in a Bayesian
11  context, can't you?
12    A.   No, I don't think so.  You still have a
13  credible interval, and that credible interval
14  contains one.  So that's essentially the same
15  idea -- you know, the hypothesis testing exists in
16  Bayesian statistics as well.  It is just done
17  through confidence regions or what Bayesians would
18  call credible intervals.
19     So in the same way that, you know, we'd
20  normally use a confidence interval for a risk ratio
21  or a hazard rate or an odds ratio or relative risk,
22  the same kind of idea applies to Bayesian statistics
23  where you have a credible interval, and if that
24  credible interval contains the null hypothesis, then

657

1  we, you know, can't interpret a different between
2  say 1.14 and 1.0 much in the same way as we can't
3  interpret a difference between .95 and 1.0.
4    Q.   But if you were to graph the probability
5  function for the Bayesian calculation, bigger area
6  under the curve would be on the side greater than
7  1.0, correct?
8    MS. McGRODER:  Objection, are you talking with
9  respect to this calculation in this document --
10    MR. ALTMAN:  Yes, this is the --
11    MS. McGRODER:  Then I object on the basis of
12  form and foundation.  He already testified he didn't
13  have anything to do with those analysis, and he
14  hasn't done the calculation you are talking about
15  so.
16    MR. ALTMAN:  That's fine.
17    MS. McGRODER:  Answer if you can.
18  BY THE WITNESS:
19    A.   Well, again, I haven't done these
20  calculations.  I didn't participate this -- at this
21  at all.  I don't exactly know how these were done.
22  BY MR. ALTMAN:
23    Q.   In spite of your -- Lori's coaching, as a
24  general proposition, if you have the ratio of 1.14

658

1  regardless of how it's calculated, when you do it
2  using Bayesian methods, there's still just like with
3  the other methods, there's a probability function,
4  correct?
5    MS. McGRODER:  Again, I object on the basis of
6  form and foundation.
7  BY THE WITNESS:
8    A.   There is absolutely nothing that you can
9  say in your lifetime that will get me to let you
10  know that 1.14 is differentiable in any possible way
11  from the null hypothesis when you have confidence --
12  credible intervals in the Bayesian case that include
13  the null value or tests of hypotheses in the
14  Fisherian case that are not statistically
15  significant.
16    I will not go on any form of record
17  allowing anyone to interpret non-statistically
18  significant odds ratios.  Now, we can -- I mean, I'm
19  just trying to save your time.
20    MR. ALTMAN:  Objection, non-responsive.
21  BY MR. ALTMAN:
22    Q.   That was not the question that I asked
23  you.
24    I asked you just like with the other

659

1  kinds of statistics, there is a probability curve
2  that you could graph of -- of what the probability
3  of any particular odds ratios is, correct, with
4  Bayesian statistics?
5    A.   With Bayesian statistics, I don't think a
6  Bayesian would call that a probability curve.  I
7  think they would call that a posterior
8  distribution --
9    Q.   Okay.
10    A.   -- and they might plot out that posterior
11  distribution, and on the basis of this analysis, I
12  can't tell you what that posterior distribution
13  would really look like.
14    Q.   But if the -- if the ratio is 1.14, the
15  majority of that distribution would be greater than
16  one, correct?
17    MS. McGRODER:  Objection, asked and answered.
18  BY MR. ALTMAN:
19    Q.   If you graph that, the majority of the
20  area of that distribution would be greater than one,
21  correct?
22    MS. McGRODER:  Objection, asked and answered,
23  and object on the basis of form and foundation.
24

660

BY THE WITNESS:

1    A.   I think that your -- your use of the term

2    "majority" is misleading.  First of all, there are

3    many things that go into this Bayesian analysis.

4    There are prior distributions on all the parameters.

5    These individuals who I guess work for Pfizer have

6    selected particular prior distributions.

7         A small change in that prior distribution

8    might well lead to the result for the combination

9    being .95 instead of 1.14, and I would not sit here

10   and tell you that there's greater likelihood of a

11   protective effect for the .95 relative to the null

12   hypothesis on the basis of a non-statistically

13   significant result.

14        And I'm not going to sit here and tell

15   you that there is more likelihood associated -- you

16   know, that the true value is really greater than one

17   in this case.  I don't know the details of this

18   analysis.  I don't see any sensitivity analysis.

19        I wouldn't believe a Bayesian analysis

20   without a sensitivity analysis exploring the effect

21   of the prior distributions on both the point

22   estimates and on the credible intervals.  Those are

23   routine kinds of Bayesian analyses which I don't see

661

1    here.

2         So asking me to opine on these particular

3    results that I didn't have anything to do with, and

4    I don't see the sort of standard requisite

5    sensitivity analyses doesn't, you know -- doesn't

6    work for me.

7    BY MR. ALTMAN:

8         Q.   I'd like you to go to the page before.

9    Last paragraph it says:  "Based on discussions with

10   external statistical experts, David Madigan, Ph.D."

11        Do you know him?

12        A.   I know of him.  I think I have talked

13   with him once or twice on the phone.

14        Q.   Javier Cabrera, do you know him?

15        A.   I don't think so.

16        Q.   And Sharon-Lise Normand, do you know her?

17        A.   I know her.

18        Q.   Okay.  Those are -- it says right here

19   that those three biostatisticians were consulted to

20   assist with doing that calculation.  So these were

21   not -- these were not internal Pfizer people.

22        Are those people you would believe would

23   be competent at performing Bayesian calculations?

24        A.   Well, the one here who is truly an expert

662

1    in Bayesian statistics is Sharon-Lise Normand, and I

2    believe that Sharon-Lise, based on conversations I

3    had with her, spoke with the people at Pfizer about

4    doing this.  She did not perform these analysis

5    herself.  She told me she didn't, and, you know, if

6    she had, I would have expected to see a lot more

7    information including those kinds of sensitivity

8    analyses, but these results, you know, are not at

9    all surprising to me.

10        These results are very consistent with

11   the kinds of Fisherian results that, you know, I

12   obtained looking at the odds ratio and, again, show

13   very clearly the absence of a signal or any

14   statistically significant association between these

15   two drugs and -- and suicidality.  I don't know of

16   any other way to interpret these results.

17        Q.   But once, again, you cannot exclude based

18   on these data that there is an effect, correct?

19        A.   Well, I'm now looking at event counts out

20   of what appear to be now over 500,000 exposure

21   units.  I'm not really sure I know what those

22   500,000 exposure units are.

23        Q.   Those are days.  Those are days.

24        A.   It looks like days.  You know, so I'm not

663

1    sure that's the right metric that I would use in

2    terms of days, and, you know, I guess we can divide

3    that by 365 to get years and, you know --

4         Q.   About 1400 or so years seem about right?

5         A.   Yeah, that sounds like in the right

6    ballpark, and I would have to do some kind of power

7    computation, and I'm not sure I would want to use an

8    asymptotic normal power computation to figure out

9    what these Bayesian methods would be doing.

10        So I might do it via simulation to see,

11   you know, what was the power they would have in

12   terms of their credible intervals to detect an

13   effect in this size sample.

14        Q.   That's not quite what I asked you.

15        You cannot exclude that there is an

16   effect based on these data, correct?

17        MS. McGRODER:  Objection, asked and answered.

18   BY THE WITNESS:

19        A.   If -- if -- if there is adequate

20   statistical power to detect an effect size that you

21   and I agree on is a reasonable effect size, then

22   these data would allow one to exclude the

23   possibility that there is a significant association.

24        We would not have the evidence to reject

664

1   the null hypothesis if we don't have sufficient data
2   to agree that this is an adequately powered
3   comparison.  Then we can only say that to this point
4   we have not seen any evidence of a significant
5   association, but, you know, there is such and such a
6   probability that we have missed the target.
7   BY MR. ALTMAN:
8       Q.   With the median ratio of 1.14 and a 95
9   percent credible interval of 0.14 to 9.99, I did
10  read those numbers correct, right?
11      A.   Yes.
12      Q.   Did you exclude that there is an effect
13  of pregabalin and gabapentin?
14      MS. McGRODER:  Object to form, foundation, and
15  asked and answered for the fourth time.  You know,
16  you can answer it one more time, and then we are
17  moving on.  I mean, you've asked him that same
18  question --
19      MR. ALTMAN:  Did I ask him using those numbers?
20      MS. McGRODER:  It's not any different.  The
21  question is the same.
22      MR. ALTMAN:  Lori, I don't care.  Stop coaching
23  the witness.
24      MS. McGRODER:  I'm not coaching.  It's obvious

665

1   to him that you have asked him the same question
2   four times in a row.
3       MR. ALTMAN:  Thank you, Lori.
4   BY MR. ALTMAN:
5       Q.   Can you exclude that there is an effect?
6       A.   Based on these data, again, assuming that
7   there is a sufficient number of observations here to
8   detect an effect and we have to decide on what that
9   effect is, let's call it a doubling, and I don't
10  know the answer to that, but I will assume for the
11  moment that there is.  There's a lot of data here.
12      It's pretty similar to the kinds of
13  numbers of patient years we have been talking about
14  for suicide attempts.  Then I would conclude that
15  there is no association between these drugs and
16  suicidality which includes suicidal ideation.
17      Q.   If there was adequate power, though, then
18  the confidence interval would be tighter, wouldn't
19  it?
20      A.   Not necessarily.  Let's assume that we
21  are studying a drug that's been -- we have now data
22  in 100 million people, and we have never once seen a
23  suicidal attempt, a suicide completion, or a
24  suicidal ideation, the confidence interval is going

666

1   to be between minus infinity and plus infinity.
2       It's completely dictated by the rarity of
3   the event.  So for you to say that the width of the
4   confidence interval says we really don't know where
5   the effect is completely misleading.  The reason
6   why the confidence interval is large is that there
7   are very few events associated with these drugs and
8   any kind of suicidal thinking or behavior or
9   completion.
10      If there were zero events, which would be
11  further evidence that this drug has nothing to do
12  with suicidality, the interval would be even larger.
13  It would range from minus infinity to plus infinity.
14      Q.   Going back to the FDA letter, which is
15  Exhibit --
16      MS. McGRODER:  33.
17  BY MR. ALTMAN:
18      Q.   -- 33.  Would you please go to I guess
19  it's page 8 at the top, and at point 2 I would like
20  you to read for the record point 2 and the bullet
21  points that follow along after that.
22      A.   "Call a healthcare provider right away if
23  you have any of these symptoms, especially if they
24  are new, worse, or a worry to you:  Thoughts about

667

1   suicide or dying, attempts to commit suicide, new or
2   worse depression, new or worse anxiety, feeling
3   agitated or restless, panic attacks, trouble
4   sleeping (insomnia), new or worse irritability,
5   acting aggressive, being angry or violent, acting on
6   dangerous impulses, an extreme increase in activity
7   and talking in parenthesis mania" or -- I'm sorry,
8   not or strike or -- "other unusual changes in
9   behavior or mood."
10      Q.   According to this medication guide put
11  out by the FDA, there are other -- strike that --
12  there are various symptoms that are in the FDA's
13  medication guide that they have required all
14  antiepileptic manager -- manufacturers to use that
15  there are various symptoms that could be associated
16  with suicidal behavior, correct?
17      MS. McGRODER:  Object to form and foundation.
18  BY THE WITNESS:
19      A.   I don't know if -- what the reason the
20  FDA listed these various symptoms and their
21  motivation for doing so.  I'm certainly not an
22  expert in that area or an expect in the psychiatry
23  that underlies these issues.
24      I know that from my own work with Jan

668

1  Fawcett in the early 1980s when we attempted to
2  predict suicidal behavior and completion in the NIMH
3  biological collaborative study on depression, we
4  looked at all of these symptoms as predictors, and
5  found that none of them were predictive of suicide
6  attempts or completions.
7       The only one that was, and to my
8  knowledge the only one besides prior suicide
9  attempts which is predictive of future suicide
10 attempts was hopelessness which isn't even on this
11 list.
12 BY MR. ALTMAN:
13      Q.  So is it your opinion that based on what
14 you just said that somebody who commits suicide just
15 one second they are fine, and the next second they
16 commit suicide and exhibit none of these symptoms?
17      MS. McGRODER:  Object to form and foundation.
18 BY THE WITNESS:
19      A.  Again, as I preface this, I am not an
20 expert in the clinical predictors of suicide.  My
21 experience is with respect to working with experts,
22 and I can only tell you what we found when we
23 prospectively looked to determine what were the
24 determinants of suicide attempts and completions,

669

1  and, you know, I imagine there are some people who
2  show no signs and commit suicide or have suicidal
3  thoughts, and there are others who have long
4  histories of psychiatric disorders, and I imagine
5  that varies in different cultures and in different
6  parts of the world.
7       I know the determinants of suicide in
8  China are very different than they are in the United
9  States.  You know, I participated in the Institute
10 of Medicine study on suicide prevention, and there
11 were many experts on both clinical and -- and
12 cultural aspects of suicide.  There are a great many
13 possibilities.
14      MR. ALTMAN:  I think we need to go off the
15 record and change the tape.
16      THE VIDEOGRAPHER:  This is the end of tape No.
17 6, day 2.  The time is 4:35 p.m.  We are going off
18 the record.
19      (WHEREUPON, a recess was had at
20      4:35 p.m. until 4:49 p.m.)
21      THE VIDEOGRAPHER:  This is the beginning of
22 tape No. 7.  The time is 4:49 p.m.  We are back on
23 the record.
24

670

1  BY MR. ALTMAN:
2       Q.  You say on -- if you go to Exhibit 11
3  which is your July supplemental report.
4       MS. McGRODER:  What page?
5       MR. ALTMAN:  Point 10 which the page is not
6  numbered unfortunately.
7       MS. McGRODER:  Paragraph 10.
8       THE VIDEOGRAPHER:  We have got to stop for a
9  second.  There's an issue here.  The time is 4:51.
10 We are going off the record.
11      (WHEREUPON, a recess was had at
12      4:51 p.m. until 4:52 p.m.)
13      THE VIDEOGRAPHER:  Okay.  The time is 4:52 p.m.
14 We are back on the record.
15 BY MR. ALTMAN:
16      Q.  Okay.  Point 10, in the middle of the
17 paragraph you write:  "I do not believe there is any
18 statistical justification for such a labeling
19 change," correct?
20      A.  Correct.
21      Q.  And your only experience -- just to make
22 sure I understand, your only experience in having
23 dealt with any kind of a labeling change is the one
24 time you were on the one other advisory committee,

671

1  correct?
2       MS. McGRODER:  Object to form.
3  BY THE WITNESS:
4       A.  That's correct.
5  BY MR. ALTMAN:
6       Q.  And you are not qualified to render an
7  opinion whether from a clinical perspective such a
8  labeling change should be made, correct?
9       MS. McGRODER:  Well, object to form.  Whether
10 he is qualified will depend on what the Court says.
11 BY MR. ALTMAN:
12      Q.  You are not a clinician, correct?
13      A.  I am not a clinician.
14      Q.  You are not an expert in how to interpret
15 a label and read a label, correct?
16      A.  That's correct.
17      Q.  Okay.  So your basis is absolutely
18 limited to on a statistical basis, correct?
19      MS. McGRODER:  Object to form.
20 BY THE WITNESS:
21      A.  Statistical basis and my previous
22 experience serving on a scientific advisory board
23 considering a similar issue.
24

672

1  BY MR. ALTMAN:
2      Q.  And you also testified that you didn't
3  know whether you needed to have a statistical
4  justification to change a label, correct?
5      A.  That's correct.  I don't know the -- the
6  requirements to change a label --
7      Q.  Okay.
8      A.  -- or at least not all of them.
9      Q.  And the FDA Alert was Exhibit 12.
10         Overall, the FDA's analysis included --
11  the FDA's meta-analysis included many different
12  drugs, correct?
13     A.  Correct.
14     Q.  For each drug, many different
15  indications, correct?
16     A.  Correct.
17     Q.  And for those different indications, they
18  have many different background rates of suicidal
19  risks whether it's attempt or completed suicide or
20  ideation, correct?
21     A.  Well, I don't know that they have proven,
22  you know, that all of those are -- the true
23  underlying background rates are significantly
24  different than each other, but, you know, there are

673

1  certain observed differences in the rates across the
2  different indications.
3      Q.  And people with bipolar have a higher
4  risk than people who are epileptic, correct?
5      THE COURT REPORTER:  I'm sorry.  Than people
6  who?
7  BY MR. ALTMAN:
8      Q.  Who are epileptic, correct?
9      MS. McGRODER:  Object to the form and
10  foundation.
11  BY MR. ALTMAN:
12     Q.  And --
13     A.  I'm haven't -- I'm still considering the
14  question.
15     Q.  Oh, okay.  I'm sorry.
16     A.  I think it's true from the FDA Alert that
17  the -- the incidence between psychiatric indications
18  an epilepsy are pretty different.  There's a
19  five-fold difference, but the difference between
20  epilepsy and the pooling of all the others do not
21  seem to be very different.  Although, I don't know
22  if there are -- if anybody has actually done any
23  statistical test to compare them.
24     Q.  Well, just based on this here, placebo

674

1  patients it says one per 1,000 patients, correct?
2      A.  That's correct.
3      Q.  And for psychiatric, it says 5.2,
4  correct?
5      A.  Correct.
6      Q.  As for other, it says 0.8, correct?
7      A.  Correct.
8      Q.  Okay.  It appears at least from this
9  chart that there are differences between the
10  different populations?
11     A.  It appears that there's a difference
12  between the psychiatric populations and epilepsy and
13  other.  It's unclear to me whether or not there's
14  differences between other and epilepsy.  So I --
15  your state -- you stated the question in a very --
16  in the broadest possible way, and I'm just kind of
17  making it a little more evidence based.
18     Q.  That's fine.
19         Wouldn't it have been more appropriate if
20  you wanted to -- given what we just said:  Different
21  drugs, different indications, different risks for
22  those different indications, wouldn't it have been
23  more appropriate if you wanted to try to -- to work
24  in terms of patient years if you are going to try to

675

1  do comparisons with different drugs?
2      MS. McGRODER:  Is "you" in this question the
3  FDA?
4  BY MR. ALTMAN:
5      Q.  You or the FDA or --
6      MS. McGRODER:  Well, object to form.
7  BY THE WITNESS:
8      A.  Well, first of all, when I did the -- the
9  PharMetrics analysis, I worked with patient years
10  because that was essential because the risk periods
11  before and after initiating treatment for the
12  bipolar cohort were dissimilar, and that was really
13  important.  It wasn't important --
14  BY MR. ALTMAN:
15     Q.  I don't mean to interrupt you, but I was
16  only referring to your calculation.  I'm not talking
17  about your studies, and I wasn't clear.
18         I'm only talking about in terms of your
19  computations and analysis based on the FDA Alert --
20     A.  Oh.
21     Q.  -- and I didn't mean to interrupt you,
22  but I think you were --
23     A.  I appreciate that.
24     Q.  But clearly I know that you did patient

676

1  years with those studies.  I'm talking about your
2  computations that you did with respect to the FDA
3  especially where you compared -- you know, let me
4  ask it a different way.
5       The .43 percent is that really an
6  incidence?  The overall 4.3 percent finding, is that
7  really an incidence that you should be able to just
8  apply to any one of the groups?
9       A.  It's not an incidence with respect to a
10  period of exposure.  The period of exposure for the
11  .43 is not taken into consideration in -- in that
12  computation.  It is an incidence in terms of
13  patients who participated in randomized controlled
14  trials of a particular average length.  I suppose
15  you could say it's that.
16       And, you know, as I do in my own work, I
17  think it's important to show effects in terms of
18  rates in patients, and I think it is also important
19  to look at it in terms of rates in terms of patient
20  exposure times and see whether or not the findings
21  are consistent or is the methodology by which you
22  reach the answer change the answer and, you know,
23  that's consistent with the way that we did the VA
24  study as an example.  We did it both ways.

677

1       Q.  Do you happen to know -- taking your
2  original analysis, do you happen to know how many
3  patient years of exposure there were in the active
4  group that makes up the 5194 patients?
5       A.  Not off the top of my head.
6       Q.  Was that information available for you to
7  calculate if you wanted it?
8       A.  I believe it was available in Exhibit 24.
9       Q.  And the same thing for placebo.  You
10  could have calculated that as well?
11       A.  Yes.
12       Q.  Is there some reason why you didn't think
13  to do the same calculation using patient years once
14  again to see if there was a difference between what
15  Pfizer had sent to the FDA?
16       MS. McGRODER:  Object to form, asked and
17  answered.
18  BY THE WITNESS:
19       A.  As we spoke about yesterday, I believe it
20  was, I, you know, didn't explore the analyses with
21  exposure days or patient years because I didn't have
22  those same data from the FDA Alert, and I also
23  really didn't have those data even after the FDA
24  statistical report came out.

678

1  So it wasn't going to help me in an
2  apples-to-apples comparison, and it really wasn't
3  going to help me at all really with the gabapentin
4  data because no matter what you put in the
5  denominator, the bottom line is we have three events
6  out of a lot of patients and a lot of patient years,
7  and whether I used patient years or number of
8  patients or, you know, the square root of their
9  mother's maiden name, it wasn't going to really
10  change the result at all.
11  BY MR. ALTMAN:
12       Q.  But your -- in your report where you talk
13  about that 1.033 is so close to one, that argument
14  really doesn't make sense anymore in light of the
15  real numbers, correct -- that the FDA used, correct?
16       MS. McGRODER:  Object to form.
17  BY THE WITNESS:
18       A.  Well, I mean, I wouldn't necessarily say
19  that what the FDA used in their meta-analysis is
20  necessarily the gold standard.  In fact, I can't
21  even replicate which patients they actually used.
22  They might have even made a mistake.
23       I think there -- I think it would be
24  invalid to include non-randomized studies and

679

1  randomized study in a pooled analysis.  I don't
2  think it's invalid to -- to include randomized
3  studies that are placebo-controlled versus low-dose
4  comparator studies in a meta-analysis.
5       I think it's reasonable to do it both
6  ways, but I don't think there's anything inherently
7  wrong about the 5194 or whatever it is sample.
8  There are lots of other patients who agreed to be
9  randomized to gabapentin and take their chances that
10  they wouldn't get gabapentin in these studies and
11  did not have suicide attempts, did not have suicidal
12  ideation, did not have completed suicide.
13       So I don't think that's an invalid
14  comparison.  It happens not to be the comparison
15  that FDA did, and so by my simple subtraction from
16  the -- from the Alert, you know, certainly I
17  overrepresented the number of gabapentin-treated
18  patients in my original expert report.
19  BY MR. ALTMAN:
20       Q.  Do you have any belief that Neurontin is,
21  for lack of a better term, toxic after a single
22  dose?
23       A.  I wouldn't be an expert on that.  I don't
24  know.  I have never taken Neurontin, and I'm not a

680

1 clinician --
2     MS. McGRODER:  We vehemently object to that
3 question.  I do object to that question.
4 BY MR. ALTMAN:
5     Q.  I'm talking about with respect to
6 suicidality.
7         Do you have any -- you have dealt with a
8 lot of drugs and a lot of suicide data.  Have you
9 ever seen a drug that makes people commit suicide
10 after one dose?
11     A.  I know it was argued in the Giles case
12 that that happened that people would take one dose,
13 and they would get akathisia, and they would commit
14 suicide.  You know, that was argued in those cases.
15         So, you know, I mean, I don't know it
16 personally.  That's not what I do, but I know that
17 argument has been made by people who are involved in
18 these kinds of litigations.
19     Q.  And those were people who were depressed,
20 though, correct?
21         And what I mean is depressed in the --
22 you know, when we were talking about Effexor which
23 was the Giles case.  Here in the single dose studies
24 were for people with neuropathic pain?

681

1     MS. McGRODER:  Object to form.  Are you
2 finished with your question?
3 BY MR. ALTMAN:
4     Q.  Is there any belief that people were
5 taking Neurontin in a neuropathic pain clinical
6 trial would likely try to take some suicide act
7 after a single dose of Neurontin?
8     MS. McGRODER:  Objection to form and
9 foundation.
10 BY THE WITNESS:
11     A.  I don't know.  It wouldn't surprise me if
12 someone made the same argument that, you know, you
13 take -- you take a drug and you have this
14 antithetical reaction where you become extremely
15 agitated and you have akathisia and you jump out of
16 your skin and you kill yourself.
17         I don't know why that argument would be
18 unique to -- to SSRIs or antidepressants, but,
19 again, I am not expert on this.  I don't have a
20 strong feeling about it one way or the other.
21 BY MR. ALTMAN:
22     Q.  Bottom line is nothing stops you from
23 calculated patient years and doing that comparison,
24 correct, just with respect to the Neurontin data

682

1 from which you were given, correct?
2     MS. McGRODER:  Object to form, asked and
3 answered 15 times.  He told you why he didn't think
4 that.
5 BY THE WITNESS:
6     A.  This one I have asked -- I have answered
7 many ways -- many times.  I'm sorry.  I have given
8 you the same answer.
9 BY MR. ALTMAN:
10     Q.  Well, I asked you if -- I asked it a
11 little differently.  There was nothing that stopped
12 you from doing so, correct?
13     A.  As I --
14     MS. McGRODER:  Objection, asked and answered.
15 BY THE WITNESS:
16     A.  As I answered before, it wasn't relevant
17 to what I was attempting to opine on in my expert
18 report.  I was trying to do an apples-to-apples
19 comparison to determine whether or not the data for
20 gabapentin were consistent with the other ten AEDs
21 that were considered by the FDA.
22         I was not in and of those data trying to,
23 you know, say, well, I think this is significant or
24 I don't think it's significant, and I should do this

683

1 analysis or another analysis.  I didn't really know
2 exactly what FDA did, and I took the data in total
3 that were submitted to FDA, and I performed this
4 analysis.
5         And as a part of that analysis, I looked
6 at whether or not there was a significant odds
7 ratio, and had I done it with only the
8 placebo-controlled trials, I would have come to the
9 same conclusion, and if I had done it only with
10 exposure days or exposure patient years, I would
11 have come to the same conclusion.
12     MR. ALTMAN:  I would like to hand you the next
13 exhibit.
14         (WHEREUPON, a certain document was
15         marked Gibbons Deposition Exhibit
16         No. 34, for identification, as of
17         2/4/09.)
18 BY MR. ALTMAN:
19     Q.  Dr. Gibbons, would you pull Exhibit 2,
20 please.
21     A.  Could you tell me what it is?
22     Q.  It's a -- it's a letter at the top that
23 says Finkelstein & Partners to Lori.  That's it.
24         Now, we discussed this document

684

1   yesterday, correct?
2       A.   Correct.
3       Q.   And, you know, I don't where my copy of
4   the letter -- just hand me the one I just gave you.
5   Okay.
6           And if you take a look at Exhibit 34 is a
7   letter from Lori in response to plaintiffs' request,
8   correct?
9       A.   Correct.  I mean, I think.  It's a letter
10  from Lori.  It looks like it's --
11      Q.   Okay.
12      A.   -- in response to your letter request of
13  November 12th, and this is your letter request of
14  November 12th.  So, yes, it appears to be.
15      Q.   It says -- the last sentence in the
16  second paragraph says:  "With the production of
17  these materials, plaintiffs' document demand is
18  satisfied."
19          Is that what it says?
20      A.   Yes.
21      MS. McGRODER:  I object to any questions on the
22  basis of correspondence between counsel in this case
23  that Dr. Gibbons couldn't know anything about this.
24  There's no foundation for asking him questions about

685

1   this correspondence.
2       MR. ALTMAN:  That's fine.
3   BY MR. ALTMAN:
4       Q.   I just want to make sure we definitively
5   established that all our requests have not been
6   satisfied, correct?  That there are --
7       MS. McGRODER:  Object to form and foundation.
8       MR. ALTMAN:  Can I finish asking my question?
9       MS. McGRODER:  Well, I'm sorry --
10      MR. ALTMAN:  I wasn't.
11      MS. McGRODER:  It's because your questions are
12  too long and unwieldy but go ahead.
13      MR. ALTMAN:  Thank you.
14      MR. LONDON:  You would argue with anybody about
15  anything, anytime, wouldn't you?
16      MS. McGRODER:  Pretty much.
17      MR. ALTMAN:  I know I just got out of law
18  school.  So I appreciate the instruction.
19          You made me forget my question.
20      MS. McGRODER:  Your question is an argument but
21  go ahead.
22  BY MR. ALTMAN:
23      Q.   This morning I showed you the materials
24  that plaintiffs had been -- produced, correct?

686

1       MS. McGRODER:  Well, and I object to that
2   because that's not the extent of the materials that
3   have been produced to plaintiffs.
4       MR. ALTMAN:  You didn't even let me finish my
5   question, Lori.
6       MS. McGRODER:  You said, correct, and you were
7   waiting for him to answer.  So that's my objection.
8       MR. ALTMAN:  Okay.  That's fine.
9   BY MR. ALTMAN:
10      Q.   You saw the list of materials that
11  plaintiffs represented were provided in response to
12  our request, correct?
13      MS. McGRODER:  Well, I object to foundation of
14  that question.
15  BY THE WITNESS:
16      A.   I believe -- I believe so, but could you
17  just point to the exhibit just so that I know that
18  we are talking about the same thing.
19  BY MR. ALTMAN:
20      Q.   Remember this morning we stacked up a
21  couple of things up here, and we took the -- we
22  took the PharMetrics disk and the contract and your
23  retainer agreement?
24      A.   But she also -- you know, there's also a

687

1   list of things that I relied upon that I'm assuming
2   they shared with you as well or at least that list.
3       Q.   That's not what -- that's not what I'm
4   referring to.  I'm referring to in request -- in
5   response to our request --
6       A.   Okay.
7       Q.   -- here associated with your studies.
8       A.   Okay.
9       Q.   And that's all I'm referring to right
10  now, only with respect to your studies.
11          We have discussed several different kinds
12  of material throughout the course of the last two
13  days that -- and once, again, I'm not trying to
14  place blame or whatever, but the simple reality is
15  there are several sets of materials that would have
16  fallen under one of the items in Exhibit 2, correct?
17      MS. McGRODER:  Well, I don't think that is
18  correct, and I object.  I object to you doing this
19  legal argument with Dr. Gibbons.  Keith, I have told
20  you 20 times.  We've -- you have identified things
21  on the record that you need.  Dr. Gibbons has
22  advised us of new things that he has.
23          We will go over all of them with you
24  after the deposition, and we will provide you what

688

1   is responsive to your requests, and I have not
2   disputed that one time.
3        So I think that is a waste of your
4   deposition time to be asking Dr. Gibbons to respond
5   to your legal argument about whether your document
6   production request has been satisfied.
7        MR. ALTMAN:  That's fine.
8        Let's mark the next exhibit.
9             (WHEREUPON, a certain document was
10            marked Gibbons Deposition Exhibit
11            No. 35, for identification, as of
12            2/4/09.)
13  BY MR. ALTMAN:
14       Q.   Dr. Gibbons, you have just been handed
15  what I believe is Exhibit 35 which is titled
16  "Declaration of Dr. Robert D. Gibbons."
17            Did I read that correct?
18       A.   Yes.
19       Q.   Have you seen this document before?
20       A.   Right now I have seen so many documents I
21  can't remember what I have seen and what I haven't
22  seen.  I believe so.  I signed it.
23       Q.   And this is dated I believe the 21st day
24  of January; is that correct, right above your

689

1   signature?
2        A.   Yes.
3        Q.   Okay.  Did you write this declaration or
4   was it written for you and given to you to sign?
5        MS. McGRODER:  Object to form and foundation.
6   BY THE WITNESS:
7        A.   I know I have seen it, and I've gone over
8   it in some detail.
9   BY MR. ALTMAN:
10       Q.   Not my question.  Did you write this
11  document?
12       A.   I wrote portions of it.
13       Q.   Okay.  Did you then e-mail it to counsel?
14       A.   I believe so.
15       Q.   Do you have copies of those e-mails?
16       A.   No, I don't keep copies of my outgoing
17  e-mails.
18       Q.   Did counsel in this case ever suggest to
19  you that maybe you should send e-mails that are
20  correspondence between you and outgoing counsel and
21  that one day might be asked to produce those?
22       A.   No.
23       Q.   Counsel never suggested to you that you
24  save all of your e-mails between counsel and you,

690

1   either in or out?
2        A.   I don't recall having that conversation.
3   I mean, the majority of our communication has been
4   via the telephone.
5        Q.   But there have been e-mails sent back and
6   forth, correct?
7        A.   There have been, yes.
8        Q.   Okay.  I'd like you to go to item No. 6.
9   I'd like you to read item No. 6 into the record.
10       A.   "I have provided to counsel for
11  defendants all materials requested by plaintiffs on
12  which I relied in conducting the
13  pharmacoepidemiologic study of whether there is an
14  association between Neurontin and suicide attempt.
15  I have also produced all materials requested by the
16  plaintiffs in their letter of November 12, 2008, on
17  which my co-authors and I relied in preparing the
18  Manuscript.  It is my understanding that defense
19  counsel has provided all of these materials to the
20  attorneys for the plaintiffs."
21       Q.   In light of what we have discussed today,
22  that's not a true statement, correct?
23       MS. McGRODER:  I object.  That -- that is
24  misleading and improper cross-examination, and you

691

1   don't have to answer that question.
2        MR. LONDON:  Yes, he does.  I mean --
3        MS. McGRODER:  No, no, he doesn't.
4        MR. ALTMAN:  Yes, he does.
5        MR. LONDON:  He issued an affidavit under
6   oath --
7        MS. McGRODER:  Because he found out today that
8   there was a piece of data missing off of that disk
9   which he didn't know about --
10       MR. ALTMAN:  Excuse me.  A piece of data?  The
11  Fortran analyses --
12       MS. McGRODER:  Wait.  Let's do this on the
13  record.  If you want to do this on the record, the
14  Fortran were not relied upon by Dr. Gibbons in
15  preparing his manuscript but --
16       MR. ALTMAN:  Okay.
17       MS. McGRODER:  Wait, wait.  No, no, let me
18  finish, but there are not identified.
19       MR. ALTMAN:  Don't you ever raise your voice at
20  me.
21       MR. LONDON:  Stop it.
22       MS. McGRODER:  But they are not -- but they are
23  not --
24       MR. ALTMAN:  Lori.

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

692

1    MS. McGRODER:  Okay.  The deposition is over.
2  We are out.  You want more time.  We are not going
3  to do this.  We are not going to pull this game.  We
4  are not doing this.
5    MR. LONDON:  You are the one pulling the game.
6    MR. ALTMAN:  I'm asking him whether -- it says
7  I have produced all materials requested by
8  plaintiffs in their letter of November 12, 2008.
9    MS. McGRODER:  Do not answer any more
10  questions.  We are finished for today.
11  BY MR. ALTMAN:
12    Q.  Are you abiding by her --
13    MR. ALTMAN:  Let's call the judge.
14    MS. McGRODER:  Call the judge.
15    MR. ALTMAN:  You are going to be here -- you
16  are going to miss your flight.
17    MS. McGRODER:  You said you are not done
18  anyway.  We are going to come back.
19    MR. ALTMAN:  Are you going to stipulate that we
20  come back?
21    MS. McGRODER:  Not right now.
22    MR. ALTMAN:  Then let's call the judge.
23    MS. McGRODER:  Go ahead.
24    Let me explain my --

693

1    MR. ALTMAN:  No, I don't want to hear your
2  position.  We are calling --
3    MS. McGRODER:  Well, I'm going to explain my
4  position for the record.
5    MR. ALTMAN:  We are calling the judge.  You
6  have already terminated --
7    MS. McGRODER:  For the record --
8    MR. ALTMAN:  I'm sorry.  You terminated the
9  deposition.
10    MS. McGRODER:  For the record --
11    MR. ALTMAN:  Lori, did you -- Lori, did you
12  terminate the deposition?
13    MS. McGRODER:  -- his declaration says:  "I
14  have also produced all materials requested by
15  plaintiffs in their letter of November 12, 2008 on
16  which my co-authors and I relied in preparing the
17  manuscript."
18    The bulk of materials with one exception
19  today are not items on which Dr. Gibbons and his
20  co-authors relied in preparing the manuscript.  So
21  for you to insinuate that Mr. Gibbons has been
22  misleading or has been untruthful is improper and
23  inappropriate, and I won't allow it.
24    MR. ALTMAN:  It is not a true statement.

694

1    MS. McGRODER:  It is -- your -- you are -- you
2  are assuming and insinuating, and it's misleading
3  and improper, and I won't allow it.
4    MR. LONDON:  Well, we know we don't have the
5  sensitivity analyses.  We know we don't have --
6    MS. McGRODER:  The sensitivity analyses were
7  not used in preparing the manuscript.  They were
8  done after the fact.
9    MR. ALTMAN:  Are you kidding?  Lori, are you
10  serious?  He says he used -- he prepared it in
11  preparing a defense for peer-reviewed publication.
12  You can't seriously stand there and say that the
13  sensitivity analysis have nothing to do with his
14  manuscript.
15    MS. McGRODER:  Well, look, did we say we are
16  going to give you the sensitivity analysis?  Yes, we
17  did --
18    MR. ALTMAN:  No, but you have not --
19    MS. McGRODER:  -- he did not -- he did not --
20  he did not prepare the sensitivity analysis and
21  relied on them in preparing his manuscript.  His
22  manuscript was submitted on September -- in
23  September of 2008.  Those sensitivity analyses were
24  not done before the manuscript was prepared.  So a

695

1  fortiori his statement is not untrue.
2    MR. LONDON:  A fortiori.
3    MS. McGRODER:  His statement is not untrue.
4    MR. LONDON:  No, his statement --
5    MR. ALTMAN:  Lori, I am sure the judge will
6  truly appreciate --
7    MS. McGRODER:  You know what, I think this
8  is -- this is a legal argument, and I will not allow
9  him to answer questions where you are telling him
10  that he is lying.  It's not --
11    MR. ALTMAN:  I didn't suggest that he was
12  lying.  What I suggest is it's not a true statement.
13  That does not mean he lied.  I never suggested that
14  he lied.
15    MS. McGRODER:  There is no difference.
16    MR. ALTMAN:  There is a difference.
17    MS. McGRODER:  No, there's not.
18    MR. ALTMAN:  Yes, there is a difference.  There
19  are statements that could be made that are not
20  truthful --
21    MS. McGRODER:  Keith, you can ask him a
22  legitimate question --
23    MR. ALTMAN:  Lori --
24    MS. McGRODER:  -- in this deposition, and we

696

1  will conclude it for today.  He is not answering
2  that question.  That question is improper, and I
3  won't allow him to answer it.  If you want to ask a
4  legitimate question, we can continue.
5       MR. LONDON:  Well, you are not the judge of a
6  legitimate question.  You don't get to call that
7  shot.  The rules for that, Lori --
8       MS. McGRODER:  You can -- you can criticize my
9  characterization, but he is not answering that
10  question.
11  BY MR. ALTMAN:
12      Q.  Fine.  Dr. Gibbons, would you please go
13  in Exhibit 2 to point 3.
14           Would you please read that for the
15  record.
16      MS. McGRODER:  Objection, asked and answered.
17  We did this yesterday.
18      MR. ALTMAN:  Good, we are going to do it again.
19  BY THE WITNESS:
20      A.  "Plaintiffs demand all documents
21  associated" --
22      Q.  I'm sorry?
23      A.  -- "with retention of Dr. Gibbons by the
24  defendants."

697

1      Q.  I'm sorry.  On the second page.  We are
2  talking about the study now, the bipolar study.
3      A.  "Plaintiffs demand all documents and
4  underlying data that pertain to the aforementioned
5  study, Gibbons, et al. (2008)."
6      Q.  Was there anything in that sentence that
7  says the word relied upon?
8      MS. McGRODER:  I object to this question.  He's
9  never even seen -- he has never even seen this
10  letter --
11      MR. ALTMAN:  Lori --
12      MS. McGRODER:  -- this is legal --
13      MR. ALTMAN:  Lori, stop coaching the witness.
14      MS. McGRODER:  It's not about --
15      MR. ALTMAN:  Lori, you are coaching the
16  witness.  I have asked him a simple question.
17  BY MR. ALTMAN:
18      Q.  Does the word relied upon exist anywhere
19  in point 3?
20      MR. ALTMAN:  The man can read --
21      MS. McGRODER:  And I --
22      MR. ALTMAN:  -- he is a biostatistician.
23      MS. McGRODER:  And I object to you --
24      MR. ALTMAN:  That's nice.

698

1      MS. McGRODER:  -- asking him questions about
2  legal communications --
3      MR. ALTMAN:  Lori --
4      MS. McGRODER:  -- between you and me.
5      MR. ALTMAN:  -- that's fine.  He put in his
6  declaration that he complied --
7      MS. McGRODER:  I didn't say he couldn't answer
8  the question.  Stop your argument and let him answer
9  it.  I'm putting my objection on the record.
10      MR. ALTMAN:  That's fine.  Your objection is
11  noted.
12      MS. McGRODER:  If you can answer the
13  question --
14      MR. ALTMAN:  Now stop.
15      MS. McGRODER:  -- I can make the objection, and
16  he can answer that question.
17  BY MR. ALTMAN:
18      Q.  Dr. Gibbons, does the word relied upon
19  exist anywhere in there?
20      THE COURT REPORTER:  Wait one second.
21      MR. LONDON:  Are you worn out?
22      THE COURT REPORTER:  Okay.  Go ahead.
23  BY THE WITNESS:
24      A.  The word relied upon does not exist in

699

1  sentence -- in bullet No. 3 on page 2 of Exhibit 2.
2           However, in answering your question, I
3  believe I did a very reasonable job of giving you
4  materials.  I know I have not given the raw data
5  files and all of the SAS files, and I understand
6  that there may be a SAS file or two that maybe
7  didn't make it into it, and I apologize for that.
8           It wasn't my intention to do that.  I
9  didn't try to trip you up in any way.  If you had
10  asked for it prior to this, I would have, you know,
11  made sure that it was there.  You could have said to
12  opposing counsel, you know, we are trying to
13  recreate the cmed dataset, and I can't find it in
14  here.  Could Dr. Gibbons go back and see if that's
15  being created in another file, and I certainly would
16  have done that, and I would have given it to you.
17           I relied upon the -- and I know that word
18  isn't in here, but I'm just trying to be as honest
19  with you as I can -- the SAS output to build the
20  paper.  The paper was submitted.  The reference to
21  that paper is the paper that was submitted for
22  publication.  It's a part of my academic work.  I
23  have been doing further sensitivity analyses, and I
24  will use those -- those antiepileptic data hopefully

700

1     for the next ten years as an example of how to do
2     the pharmacoepidemiologic work, and I hope that I
3     will continue to evolve and revise the methodology
4     to a point where we can use it in a wide variety of
5     applications.
6            And I really -- I mean, I feel like I did
7     a yeoman's job of giving you all of the data in the
8     files.  I could have made it far more obscure, and
9     I -- you know, this is a complicated project.  It's
10    big dataset, and the SAS files are pretty
11    complicated, but, you know, I tried hard not to --
12    to make it difficult for you.
13           And the Fortran code and associated work
14    was done for my own edification to make sure that
15    the SAS files which formed the basis of the results
16    that went into the paper and went into my expert
17    report were simply done for my own reassurance that
18    what was done by myself and my colleague was -- was
19    accurate.
20    BY MR. ALTMAN:
21       Q.  Dr. Gibbons, I'm not suggesting that you
22    intentionally withheld anything.
23       MS. McGRODER:  No, you are suggesting that he
24    lied.

701

1        MR. ALTMAN:  No, I didn't suggest that he lied.
2     I am pointing -- I'm pointing out a simple fact that
3     a motion was filed, and we are going to talk more
4     about this in a minute.
5     BY MR. ALTMAN:
6        Q.  We wanted to take the deposition of your
7     co-authors.
8            Are you aware of that?
9        A.  Yes, I am.
10       Q.  When they got their subpoenas -- you are
11    aware that they were subpoenaed to testify, correct?
12       A.  I am.
13       Q.  Did they call you?
14       A.  I got a terrified call by Dr. Hur who
15    hates confrontation of any kind, not knowing what
16    this was about, and he was very frightened about it.
17    I later learned that Dr. Mann and Dr. Brown were
18    also contacted.
19           And, frankly, I don't think they cared
20    one way or the other, but, you know, I am very
21    protective of Dr. Hur, and I don't want to put him
22    in a position that would make him uncomfortable.
23       Q.  Did you refer Dr. Hur to Shook Hardy?
24       A.  I don't believe so.  I believe they had

702

1     contact directly.
2        MR. LONDON:  What's the basis of that?
3     BY MR. ALTMAN:
4        Q.  How do you know that -- that's a good
5     question.
6            What is the basis of that belief?
7        A.  Because Kwan told me that he had talked
8     with Lori, and you, know, I don't -- I don't recall
9     saying, Kwan, you need to call Lori or giving him
10    her number or anything like that.  I think she was
11    in contact with him directly when she knew that the
12    subpoena had been served.
13       Q.  Okay.  You understand that an -- do you
14    understand that an objection was filed by Pfizer to
15    the depositions being taken of Dr. Hur, Mann, and
16    Brown?
17       A.  I do.
18       Q.  Okay.  And you are aware that your
19    affidavit you wrote here was used in support of
20    their objection to those depositions, correct?
21       MS. McGRODER:  If you know.
22    BY THE WITNESS:
23       A.  That I don't know.
24

703

1     BY MR. ALTMAN:
2        Q.  Do you know why you wrote this
3     declaration?
4        A.  Yes, this was used to indicate that the
5     buck stops with me and that I take responsibility
6     for this work and this is my work and I directed
7     this work and am the primary author of this paper
8     and there's no information that can or will be
9     obtained from my co-authors that I cannot provide.
10       Q.  But you don't know -- I think I asked you
11    this.  You don't know whether Dr. Hur has any work
12    files that he worked on that you don't have,
13    correct?
14       MS. McGRODER:  Objection, argumentative and
15    asked and answered.
16    BY THE WITNESS:
17       A.  Everything that Dr. Hur worked on with
18    the possible exception of the SAS file that was not
19    included here assuming there was such a file was
20    provided to you.
21    BY MR. ALTMAN:
22       Q.  You are aware that in SAS you can create
23    a project, correct?
24       A.  That's correct.

704

1    Q.   And that project can contain all the
2  various outputs that are generated, correct?
3    A.   That's correct.
4    Q.   Was that SAS project provided to us?
5    A.   My understanding of what was required was
6  the underlying data and programs that were used to
7  produce the results that were described in my paper,
8  and that's exactly what I provided to you.
9    Q.   I will direct you back to the request
10  point 3 on the second page.
11    MS. McGRODER:  This is exactly what we gave
12  him.
13  BY MR. ALTMAN:
14    Q.   That says "all documents and underlying
15  data."
16       HTML documents are created as part of the
17  SAS run, correct?
18    A.   They are not necessarily saved as a part
19  of that run.  You have to rerun it, and what I gave
20  you was the -- was the SAS code and the underlying
21  SAS data files that all you had to do was stick in
22  SAS and run, and you would get the exact same output
23  that we got.  If you had contacted, Lori, and -- I'm
24  sorry?

705

1       MR. LONDON:  Dr. Hur.
2  BY THE WITNESS:
3    A.   If you had contacted Lori, and she had
4  asked me you know what, you know, they don't have
5  SAS, and they don't want to go out and pay the money
6  to buy SAS, can you give me the outputs, I would
7  have gladly given you the outputs.  I wasn't holding
8  them back for any particular reason.
9  BY MR. ALTMAN:
10    Q.   I'm not suggesting that you were, but the
11  fact is those outputs may exist.  He may have saved
12  them when he ran them and saved the project which
13  you can do which will save your HTML outputs,
14  correct?  You can do that.
15    MS. McGRODER:  Are you asking him whether he
16  knows that is a fact or not?
17  BY MR. ALTMAN:
18    Q.   Yeah, I'm asking him do you know?
19    A.   I do know that it's not a fact because
20  every time that, you know, we have gone back to a
21  particular analysis, he pulls up the SAS code and
22  reruns it, and I will go back to the same thing ten
23  minutes later, and he will rerun it again.  So he
24  doesn't keep those.

706

1    Q.   You don't know that for sure?
2    MS. McGRODER:  Well, objection, argumentative.
3  BY THE WITNESS:
4    A.   You know, I've just -- I've just
5  testified to that effect.
6  BY MR. ALTMAN:
7    Q.   Okay.  That's fine.
8       When did you begin doing the sensitivity
9  analyses?
10    A.   I started on several of those after the
11  paper had been submitted.
12    Q.   So that was after September 2008?
13    A.   Yes, I don't remember the exact date of
14  my lecture at Harvard, but, you know, I was invited
15  to give the -- once a year the departments of
16  statistics and biostatistics at Harvard have an
17  invited lecture.  They don't like each other very
18  much, and so they only get together once a year, and
19  I was the -- the invited lecturer for this year, and
20  they asked me to talk about some of my work and the
21  statistical issues underlying pharmacoepidemiology
22  and drug safety.
23       And, you know, I presented the work on --
24  you know, starting from the early work on

707

1  antidepressant and suicide in children and then
2  adults and the analysis of spontaneous reports and
3  ecological data and meta-analysis issues related to
4  randomized clinical trials, and then I also included
5  some of the more recent work on antiepileptic drugs
6  that, you know, were -- were reported in this -- in
7  this draft paper that's been submitted.
8       And, you know, I got some wonderful
9  comments back from some of the great statisticians
10  that, you know, have been my heroes for a long, long
11  time, and, you know, really good comments, and I
12  have been thinking more and more about those, and
13  those sensitivity analysis at least in part are
14  motivated by those conversations.
15    Q.   Do you have any idea when you went to
16  Harvard?
17    A.   I think it was sometime in October.
18    MR. LONDON:  Did you say October?
19    THE WITNESS:  October, yeah.
20  BY MR. ALTMAN:
21    Q.   And you -- when you came back, you
22  started doing some of those things?
23    A.   That's correct.
24    Q.   So as of the letter of November 12th, you

708

1    had some of these sensitivity analysis, correct?
2        A.   Probably -- you know, I don't know the
3    exact dates.  I don't know if a letter of November
4    12 or when they were actually finished, but, you
5    know, this is -- this is in an area that's, you
6    know, close to the center of my current research,
7    and it's not motivated by this -- by this
8    litigation.
9            It's motivated by trying to develop
10   better tools for drug surveillance and safety, and I
11   will continue to think about it after this case is
12   over, and in some ways I'm thankful to this case
13   because it has given me some practical experience
14   with this and an opportunity to look at other kinds
15   of datasets.
16       Q.   Had you ever seen Exhibit 2 before?  And
17   when I say "before," before this deposition started
18   yesterday.
19       A.   I can't answer that yes or no.  It
20   doesn't ring a bell.  You know, I may have seen it,
21   but it doesn't ring a bell.
22       Q.   Do you see at the bottom in your
23   declaration on page 2:  "I have also produced all
24   materials requested by plaintiffs in their letter of

709

1    November 12, 2008."
2            If you hadn't seen the letter, how could
3    you make that statement?
4        A.   Well, I just said --
5        MS. McGRODER:  Objection.
6    BY THE WITNESS:
7        A.   I just said that I don't know that -- I
8    don't remember did I see this letter or not.  You
9    know, I know what was asked of me by counsel to
10   produce for you, and I tried to do that in the best
11   faith possible.  And these issues -- I may have had
12   the letter, and we went over it point by point or
13   maybe Lori read the letter to me over the telephone
14   and said, you know, these are the things that they
15   are looking for.  Can you provide these.  And I
16   said, yeah, the easiest way for me to provide it is
17   why don't I just give them the entire PharMetrics
18   database as I received it and give them all the
19   programs that I used to analyze it and, you know,
20   what could be better.
21           And she said, yeah, that should work, and
22   I remember her telling me, you know, I'm -- I'm very
23   big on -- I don't know if you call it -- what the
24   right term is discovery, whatever.  You know,

710

1    whatever it is you did, just give it to them.
2        Q.   Did you -- then I think -- did you review
3    this letter in writing -- when you wrote your
4    declaration here on January 22, 2009 just about 12
5    days ago?
6        A.   I have already told you I don't remember
7    writing -- reading this letter, you know, in
8    particular or -- and I also told you that I, you
9    know, edited this.  I didn't write the whole thing.
10       Q.   You understand that the judge, in fact,
11   granted the defendants' motion to quash the
12   depositions of your three co-authors, correct?  Are
13   you aware of that?
14       MS. McGRODER:  Objection, asked and answered.
15   And you know what, I'm not going to allow him to
16   ask -- to ask --
17       MR. ALTMAN:  I'm asking did he know.
18       MS. McGRODER:  But you just asked him that, and
19   he said, yes, he did know.
20       MR. ALTMAN:  Did he know that the judge granted
21   the motion?
22       MS. McGRODER:  I don't know about that, but
23   this is all legal argument, Keith.
24       MR. ALTMAN:  No, it's not legal argument, Lori.

711

1        MS. McGRODER:  If you want to -- you know what
2    discovery you want.  You've asked him all the
3    questions about the discovery.  Asking him about the
4    Court's ruling on a motion is irrelevant.  It's
5    improper.
6        MR. ALTMAN:  Lori, thank you.
7    BY MR. ALTMAN:
8        Q.   Were you aware that the judge granted the
9    motion quashing the depositions?
10       A.   Yes, I was told that.
11       Q.   Okay.  And were you aware that that was
12   done in part based upon your declaration?
13       A.   I hope so.
14       MR. ALTMAN:  Let's mark the next exhibit.
15           (WHEREUPON, a certain document was
16           marked Gibbons Deposition Exhibit
17           No. 36, for identification, as of
18           2/4/09.)
19   BY MR. ALTMAN:
20       Q.   Dr. Gibbons, I have handed you what's
21   been marked as Exhibit 36.  At the top it's titled
22   "Computer Retrieval of Information on Scientific
23   Projects," CRISP.
24           Have you ever heard of this system

712

1  before?

2      A.  Actually, CRISP I thought was Center For

3  Research and Securities Prices.

4      Q.  Apparently there's another CRISP.

5      A.  Apparently.  Yeah, I think I have heard

6  that there's another CRISP that is not Center For

7  Research and Security Prices, and it's a way of

8  getting scientific projects that are funded by -- I

9  think from the National Institute of Health or other

10  federal agencies.  It's kind of cool that you could

11  get all this.

12      Q.  Yeah, it really is.

13          I would like to take -- just would you

14  grab your paper which is Exhibit -- God -- No. 20.

15      A.  I have it here.

16      Q.  And before we go to that, I just want to

17  make sure of one thing.

18          You testified yesterday that you were not

19  paid by Pfizer for the drafting of this paper,

20  correct?

21      MS. McGRODER:  Objection to the extent it

22  misstates his testimony from yesterday.

23  BY MR. ALTMAN:

24      Q.  Were you paid by Pfizer for writing this

713

1  paper in any part other than them acquiring the data

2  for you?

3      MS. McGRODER:  Objection, asked and answered

4  yesterday.

5  BY THE WITNESS:

6      A.  I was -- I was -- they acquired the data.

7  They paid -- they reimbursed me for the data.  I did

8  some review of all of the data, the gabapentin

9  cohort and the -- and the bipolar cohort in terms of

10  the integrity of the data and looking through the

11  data.  I think they may have paid for some of that

12  time.

13          They didn't pay for any of the analyses.

14  They didn't pay for the writing of the paper.  They

15  didn't pay for sensitivity analyses that I performed

16  after the paper has been submitted.

17  BY MR. ALTMAN:

18      Q.  Okay.  That's fine.

19          At the bottom of Exhibit 20, you list the

20  grants which were used to fund this work, correct?

21      A.  Correct.

22      Q.  I would just like to take Exhibit 36 and

23  make sure I have the right grants here.

24          The first grant you listed is NIMH grant

714

1  MH062185 in the parenthesis JJM, which I assume

2  means that belongs to Dr. Mann, correct?

3      A.  Correct.

4      Q.  Does that appear to be the first grant --

5      A.  Yes, it does.

6      Q.  -- on Exhibit 36.  Okay.  Good.  Did that

7  right.

8          Let's go the second grant which is listed

9  R56 MH078580 and says RDG and CHB.  I believe that

10  would be you and Dr. Brown, correct?

11      A.  That's correct.

12      Q.  And is that the grant that you see -- the

13  second grant in Exhibit 36?

14      A.  Yes.

15      Q.  Okay.  And then the next grant that's

16  listed is MH40859 with a CHB in parenthesis.  I

17  believe that would be Dr. Brown's grant?

18      A.  Yes.

19      Q.  And is that the next grant that is listed

20  in Exhibit 36?

21      A.  Yes.

22      Q.  And then the last grant is said -- it's

23  an AHRQ grant, and it's entitled 1 uniform

24  U18HS016973.

715

1          Did I read that correctly?

2      A.  Yes, you did.

3      Q.  And is that the last grant on this list

4  here?

5      A.  Yes, it is.

6      Q.  Okay.  The first grant for Dr. Mann is

7  entitled:  "The Neurobiology of Suicidal Behavior,"

8  correct?

9      A.  Correct.

10      Q.  Can you identify for me what part -- what

11  in this abstract covers the topic of your paper on

12  the relationship between antiepileptics and suicide

13  attempts?

14      A.  This grant covers a portion of Dr. Mann's

15  research time related to his work on suicide, and

16  he's cited this grant because this paper is a

17  derivative of that work.

18      Q.  Where does this paper discuss the

19  neurobiology of suicidal behavior?

20      A.  Well, it has -- it has drugs that have

21  neurobiological effects, and it has suicide in it,

22  and the time that he spent working on this was paid

23  for in part by the support of this grant, and that's

24  how we do things in academics.

716

1          If we have a grant on suicide and we
2    write a paper that has suicide on it, whether the
3    grant is -- whether the paper is completely in line
4    with the specific aims of the grant or not, we
5    acknowledge support of that grant in our work.
6          And many times in our scientific work we
7    start out proposing to do one thing, and we end up
8    doing something different.  When I wrote this R56
9    grant, it was about antidepressants, but it was
10    really about the statistics of suicide, and the work
11    on antiepileptics is a derivative of that work, and
12    I didn't know anything about it when I wrote this
13    grant, but I think that it's completely in line with
14    the spirit of that grant and the objectives of that
15    grant.  So I acknowledge that grant in terms of it
16    funding my time to work on this.
17    Q.    Did you inform any of these granting --
18    organizations providing the grants that you were
19    going to use some of the work product for which
20    those grant funded in litigation?
21    MS. McGRODER:  Object to form, assumes facts
22    not in evidence, improper hypothetical.
23    BY MR. ALTMAN:
24    Q.    Okay.  Take a step back.

717

1          Did you include references and some of
2    the discussion of the findings from your -- your
3    relationship between antiepileptics and suicide
4    attempts paper in your expert report in this case?
5    A.    Yes.
6    Q.    Did you do that before it was even
7    accepted for publication?
8    A.    Probably.
9    Q.    It hasn't been accepted --
10    A.    I mean, it hasn't been accepted for
11    publication.  So, you know.
12    Q.    So you did that prior to it being
13    accepted for publication?
14    A.    Yes, I -- because it's the basis of work
15    that I have done and that work has been submitted
16    for publication.
17    Q.    And Pfizer -- Pfizer bought you the
18    data back in -- back in May, correct?
19    MS. McGRODER:  Object to form.
20    BY THE WITNESS:
21    A.    The -- the data were purchased some time
22    back in May, yes.
23    BY MR. ALTMAN:
24    Q.    By the way, when you purchased the data

718

1    in May, did you know you were going to write a paper
2    on bipolar?
3    A.    No.
4    Q.    When you purchased the data in May, did
5    you know you were going to provide -- do an analysis
6    for the gabapentin cohort that would show up in your
7    expert report?
8    A.    Yes.
9    MS. McGRODER:  Well, object to form.
10    BY MR. ALTMAN:
11    Q.    Would you have included that in your
12    expert report if it showed that there was an
13    increased risk?
14    A.    I would have reported that and given that
15    to counsel, and they would have done whatever you
16    guys do when things don't work out the way you want.
17    Q.    When did you decide to write the paper on
18    bipolar disorder?
19    A.    I asked for the bipolar cohort largely in
20    trying to better understand the FDA Alert and -- and
21    thought about responding to it and thought this
22    would be a good opportunity to get those data.  Of
23    course, in the back of my mind, I felt that this
24    would be a good paper to write.

719

1          I mean, everything I do I think is a good
2    paper to write.  I think -- I think even the
3    gabapentin cohort would be a very interesting paper.
4    Although, given that it's so tightly aligned with
5    this court case, I doubt it will ever see the
6    publication light of day.
7    Q.    Why didn't you acquire data on other
8    indications besides bipolar?
9    A.    I thought that the -- strong tie-in
10    to the antidepressants and suicide in depressed
11    populations, and the group that would be in the
12    highest risk bipolar patients having extremely high
13    risk of suicide made it a perfect population to work
14    in.  I didn't know at the time when we requested it
15    whether or not there would be enough bipolar
16    patients in the PharMetrics data.
17          I was hopeful, and when I found out that
18    there were, you know, close to 50,000 bipolar
19    patients with a two-year window of continuous
20    enrollment, I was, you know, very pleased, and by
21    that time, I started to think, you know, this might
22    end up being a really good paper and communicated
23    with my -- my co-authors that this opportunity had
24    presented itself and would they be interested in

720

1 joining me in -- in this research, and I don't know
2 if I ever said that will ultimately result in a
3 paper we will publish, but, you know, that was
4 certainly assumed.
5     Q.   If I remember right, wasn't the relative
6 risk greatest for the epileptic populations in the
7 FDA Alert?
8     A.   I believe it was -- I don't remember
9 which cohort was -- the relevant risk was largest or
10 the odds ratio was largest for, but I know it was
11 not for the psychiatric.  I know in the psychiatric
12 population it wasn't statistically significant.
13    Q.   What's the FDA Alert -- the FDA Alert,
14 where is it?  Here it is.
15    A.   It's Exhibit 12, I believe.
16    Q.   Yes, that's correct.  The relative risk
17 on -- we are talking on page I guess 3 of the Alert.
18 I think you are looking at the right page was
19 highest for the epileptic populations, correct, at
20 3.6?
21    A.   That's correct.
22    Q.   Given that these were not -- well, given
23 that these populations while at an increased risk
24 for suicide -- strike that.

721

1         It's conventional to believe that
2 epileptic populations have an increased risk of
3 suicide over the normal background population,
4 correct?
5     A.   Correct.
6     Q.   It's not thought to be as high, though,
7 as those in the psychiatric population, correct?
8     A.   That would be correct.
9     Q.   Okay.  The highest relative risk there
10 was 3.6, correct?
11    A.   That's correct.
12    Q.   Why didn't you obtain the epileptic
13 population because these are people who potentially
14 are showing the biggest influence in these drugs,
15 and all of these drugs are used to treat epileptics
16 or at least had epileptic -- approved for epilepsy?
17    A.   That's an -- that's an interesting
18 question.  There are two reasons:  No. 1, I wanted
19 to look in the population that would ultimately be
20 the highest risk; No. 2, the psychiatric indications
21 were a mixture of different psychiatric indications
22 and not purely a bipolar sample, and probably among
23 psychiatric indications, it is my understanding that
24 bipolar is typically very, very high.

722

1         Now, I don't know -- we talked before
2 whether or not it's higher than panic disorder or
3 not.  I don't know the answer to that, but it seemed
4 like an appropriate group to study.
5         Furthermore, in -- in their defense FDA
6 indicated when their result was not statistically
7 significant based on the risk ratio for the
8 psychiatric population that, in fact, the risk
9 difference, which was an analysis that used all of
10 the available information from all subjects and
11 didn't discard any of the studies, was, in fact,
12 larger for the psychiatric population.
13        So that suggested to me that (No. 1) by
14 looking at a psychiatric disorder, (2) by looking at
15 probably one of the most serious psychiatric
16 disorders; namely, bipolar illness, and (3) given
17 that the one analysis conducted by FDA that included
18 data for all of the subjects showed the highest
19 difference in that subpopulation -- well, not the
20 bipolar subpopulation, but of the psychiatric
21 subpopulation of which bipolars are probably one of
22 the highest risk groups, that this would be a good
23 population to study.
24    Q.   Did anybody at -- did you discuss any of

723

1 this with Pfizer when you were deciding what cohorts
2 to get and whether they would pay for the cohorts or
3 not?
4     A.   I don't remember the extent of the
5 discussions.  I recall pretty much just proposing
6 this and saying if I were you guys, this is what I
7 would do.  I think it's important to understand that
8 I recommended this to them.  They didn't recommend
9 this to me, and I presented the ideas behind what I
10 wanted to do and said is this something that you
11 would like to pursue, and they decided that they
12 did.
13    Q.   Would doing a study of the epileptic --
14 doing an epileptic study just like the bipolar study
15 be substantially the same?
16    A.   I don't know.  I mean, I don't know how
17 that would come out.  I -- you know, that's an
18 empirical question.
19    Q.   Strike that, wrong question.
20        To conduct the study, to analyze the data
21 from PharMetrics, would it more or less be you would
22 just get the same exact cohort as you did for
23 bipolar but for epilepsy and all of your programs
24 should more or less work, correct?

724

1    A.   Sitting here right now, I would have to
2  say, you know, they -- they would be pretty similar
3  kinds of analysis.  Again, it's defining a cohort
4  based on an index episode of something, and in this
5  case it would be epilepsy, and we probably would
6  look for a plus or minus one-year window.
7       So, yeah, I think we could do something
8  for epilepsy in and of itself that would be similar
9  to this.
10    Q.   And the same thing for neuropathic,
11  correct?
12    A.   You could do -- you could do it for any
13  particular indication.  I think that by doing the
14  gabapentin analysis cohort where we were able to
15  condition on indication in the ways that you are
16  describing now and specifically look at gabapentin,
17  the drug in question in this particular case, it
18  allowed us to sort of have the best of both worlds.
19       In one cohort we condition on a
20  particular illness.  In the other we condition on a
21  particular and most relevant treatment to this case
22  and explore the effects of different indications.
23  So I felt that for the purpose of my looking as an
24  academic at antiepileptics in a high-risk

725

1  population, the bipolar cohort was pretty useful,
2  and for the purpose of this case, the gabapentin
3  cohort was essential, and that was about as much I
4  could tolerate of doing applied work.
5    Q.   Were you aware that the vast majority of
6  the cases against Pfizer involved individuals who
7  were not taking Neurontin for an on-label
8  indication?
9    MS. McGRODER:  Object to form and foundation.
10  BY THE WITNESS:
11    A.   I don't -- I'm not aware of what the vast
12  majority of cases are about for -- for Pfizer.  I'm
13  aware of the Daubert hearing that I participated in
14  and the -- and about this particular case, but
15  that's the -- kind of the only two that I kind of --
16  that I -- that I really know about in specific.  I
17  know there's the MDL which contains a lot of
18  different cases, but I don't know the specifics of
19  those cases.
20    MR. ALTMAN:  I am going to mark the next three
21  exhibits.  How much time do I have?
22    THE VIDEOGRAPHER:  Seven minutes.
23    MR. ALTMAN:  Seven minutes, what to do in seven
24  minutes.

726

1    MS. McGRODER:  Mark three exhibits.
2       (WHEREUPON, certain documents were
3       marked Gibbons Deposition Exhibit
4       Nos. 37-39, for identification, as
5       of 2/4/09.)
6  BY MR. ALTMAN:
7    Q.   Before we get to this, by the way, do you
8  think that you can actually separate your efforts on
9  the gabapentin study from your efforts on the
10  bipolar study as if they are completely separate and
11  distinct and don't have cross-over?
12    MS. McGRODER:  I will object to form.
13  BY THE WITNESS:
14    A.   I guess it depends on what you mean about
15  that.  I mean, with respect to what?
16  BY MR. ALTMAN:
17    Q.   The things you learned about the bipolar
18  cohort, ideas, ways of working with the data that
19  you then used in the gabapentin study.
20    A.   I think that the general analytic
21  strategies that were laid out in advance and that
22  were developed as a part of our work with the VA and
23  then adapted to this slightly different design for
24  the PharMetrics data were laid out in advance both

727

1  for the gabapentin and for the bipolar.  They
2  haven't really changed a great deal.
3       Certainly, our knowledge of working with
4  PharMetrics' data benefited from being able to look
5  at both databases and -- but otherwise I think they
6  are, you know, fairly independent.  I don't cite the
7  gabapentin dataset or, you know, the results of
8  these analyses in -- in my -- in the paper on the
9  bipolar cohort, nor do I see any particular reason
10  to do so.
11    Q.   Okay.  I have handed you Exhibits 37, 38,
12  and 39.  These are the three declarations from your
13  co-authors.
14       Have you ever seen these documents
15  before?
16    A.   No.
17    Q.   Okay.  I want to ask you a question about
18  Dr. Hur's declaration, and if you go to page 4,
19  point 14, it says:  "I do not have any information
20  or possess any knowledge concerning either the
21  manuscript or any of the records supporting the
22  manuscript that is not equally (if not more)
23  available to and within Dr. Gibbons' knowledge"; is
24  that correct?

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

728

1    A.  Yes.
2    MS. McGRODER:  Objection.  I object on grounds
3    of foundation to any questions for these documents
4    that he has never seen.  You can still answer.
5    BY MR. ALTMAN:
6    Q.  Do you know whether that is a true
7    statement other than what Dr. Hur has written here?
8    MS. McGRODER:  Object on form and foundation.
9    BY THE WITNESS:
10   A.  I don't understand your question.
11   BY MR. ALTMAN:
12   Q.  Do you have any independent basis for
13   knowing the truth of point 14 other than what
14   Dr. Hur wrote here?
15   MS. McGRODER:  Object to form and foundation.
16   BY THE WITNESS:
17   A.  I mean, I have worked with Dr. Hur, and I
18   know that all of the analyses that were conducted
19   in -- relating to either the gabapentin cohort or
20   the bipolar cohort were all done under my direction.
21   He didn't initiate these analyses.  He
22   didn't design those analyses.  He helped in the
23   writing of the SAS code to implement the analyses
24   that I envisioned and oversaw, and to make sure that

729

1    they were accurate, I went through the painstaking
2    task of writing the Fortran programs to reproduce
3    the results.  So I don't think that he has anything
4    to add above and beyond what I have told you and
5    what questions I can answer for you.
6    MS. McGRODER:  How much time is left?
7    BY MR. ALTMAN:
8    Q.  Point 15 it says:  "I do not possess any
9    knowledge concerning Dr. Gibbons' supplemental
10   expert report submitted in this litigation."
11   Did I read that correctly?
12   MS. McGRODER:  Objection to form and
13   foundation.
14   BY THE WITNESS:
15   A.  It looks like you read it correctly.
16   BY MR. ALTMAN:
17   Q.  Okay.  He did, though, in fact, work on
18   the gabapentin analysis, correct?
19   A.  He helped me with the gabapentin
20   analysis, but he never saw any of my expert reports
21   or supplemental reports and was not involved in
22   writing those reports or reviewing those reports and
23   never had any knowledge of those reports.
24   MS. McGRODER:  Okay.  The deposition is over.

730

1    MR. ALTMAN:  That's fine.
2    THE VIDEOGRAPHER:  Okay.  This concludes day 2.
3    The time is 5:59 p.m.  We are off the record.
4    (WHEREUPON, the deposition was
5    concluded at 5:59 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

731

1    IN THE UNITED STATES DISTRICT COURT
2    DISTRICT OF MASSACHUSETTS
3    IN RE; NEURONTIN et al.,      )
4    ) MDL DOCKET
5    BULGER vs. PFIZER, et al.,    ) No. 1629
6    ) MASTER FILE
7    SMITH vs. PFIZER, et al.,     ) No. 04-10981
8    05-CV-11515-PBS    )
9    I hereby certify that I have read the
10   foregoing transcript of my deposition given at the
11   time and place aforesaid, consisting of Pages 352 to
12   730, inclusive, and I do again subscribe and make
13   oath that the same is a true, correct and complete
14   transcript of my deposition so given as aforesaid,
15   and includes changes, if any, so made by me.
16
17
18   ROBERT D. GIBBONS, Ph.D.
19
20
21   SUBSCRIBED AND SWORN TO before me
22   this      day of           , A.D. 200 .
23
24   Notary Public

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)          Page  728 - 731

732

```
 1     STATE OF ILLINOIS )
 2                       ) SS:
 3     COUNTY OF COOK    )
 4
 5         I, ANDREA L. CARTER, a State of Illinois
 6     Licensed Certified Shorthand Reporter, License
 7     number 84-3722, do hereby certify:
 8         That previous to the commencement of the
 9     examination of the aforesaid witness, the witness
10     was duly sworn to testify the whole truth concerning
11     the matters herein;
12         That the foregoing deposition transcript
13     was reported stenographically by me, was thereafter
14     reduced to typewriting under my personal direction
15     and constitutes a true record of the testimony given
16     and the proceedings had;
17         That the said deposition was taken before
18     me at the time and place specified;
19         That I am not a relative or employee or
20     attorney or counsel, nor a relative or employee of
21     such attorney or counsel for any of the parties
22     hereto, nor interested directly or indirectly in the
23     outcome of this action.
24
```

734

```
 1                 I N D E X
 2
 3     WITNESS:                   PAGE:
 4     ROBERT D. GIBBONS, Ph.D.
 5       EXAM by MR. ALTMAN................  356
 6
 7                   *****
 8                 I N D E X
 9     EXHIBIT NUMBER             RECEIVED
10     No. 24.......................356
11     No. 25.......................359
12     No. 26.......................374
13     No. 27.......................476
14     No. 28.......................480
15     No. 29.......................535
16     No. 30.......................540
17     No. 31.......................562
18     No. 32.......................593
19     No. 33.......................638
20     No. 34.......................683
21     No. 35.......................688
22     No. 36.......................711
23     Nos. 37-39...................726
24
```

733

```
 1         IN WITNESS WHEREOF, I do hereunto set my
 2     hand and affix my seal of office at Chicago,
 3     Illinois, this 11th day of February, 2009.
 4
 5
 6             Certified Shorthand Reporter
 7             License No. 84-3722.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**$**

**$119,500** 371:13
**$13,500** 363:11
**$15,000** 366:13
**$16,000** 366:8 367:22
**$20,000** 365:14 367:2,16
368:9,16
**$22,000** 367:7
**$256,500** 371:2
**$26,000** 363:15,24
**$27,000** 364:5
**$29,000** 366:20
**$30,000** 365:6
**$31,000** 365:19
**$376,000** 371:18
**$4,000** 368:22 370:16
**$8,000** 368:4
**$9500** 370:7

**-**

**-and-** 353:8,15

**0**

**0** 448:21
**0.003** 444:9
**0.135** 623:14
**0.14** 664:9
**0.26** 444:18
**0.5** 448:8
**0.63** 553:23
**0.66** 553:14
**0.74** 554:15,17
**0.8** 554:5,9,12 674:6
**0.868** 426:23
**0.95** 654:21
**0008** 417:10
**04-10981** 352:10 731:7
**05-cv-11515-pbs** 352:11
731:8

**1**

**1** 401:11,13,14,23,23
402:1 411:1 442:20
465:5 466:24 467:2
472:11 504:14,18
505:16 506:5,17 507:8
518:10,16,16,17 525:4
,16 538:8 548:22 558:13
563:24 566:3,7 568:13
572:9 573:2 575:4,8
578:15,18,19,24 579:6
615:2 626:21 631:23
640:17 648:21 714:23
721:18 722:13
**1,000** 506:7 541:7
582:14 585:12 674:1
**1,016** 508:5,9,23,24
509:4 512:7 575:11,13

**1,081** 387:14
**1,836** 389:10
**1.0** 653:5,8 657:2,3,7
**1.033** 419:18 421:2
443:2 623:13 633:1,3,9
678:13
**1.14** 654:24 655:6,16
656:1 657:2,24 658:10
659:14 660:10 664:8
**1.215** 444:8
**1.22** 550:21 557:22
**1.23** 550:22 557:22
**1.39** 412:4,11,21 413:18
416:5,6,21 418:3 633:11
**1.4** 414:10 447:10
**1.40** 633:11
**1.57** 648:1,21 649:11
650:11 652:23 656:3
**1.781** 426:18
**1.787** 444:8
**1/25th** 603:12,20
**10** 387:2,9 411:22 412:1
444:6,16 552:24 553:11
582:24 583:3 670:5,7,16
**100** 582:12 583:5,6,10
,16,19 584:3 585:12,13
590:9,10 602:21 603:11
604:7 605:5 606:16
634:21 665:22
**100,000** 596:21,23
**1041** 486:12 487:3
**10:16** 411:1,4
**10:25** 411:4,6
**11** 446:2 468:22 474:11
537:13 559:12 561:22
,23 573:11 615:24 670:2
**11-month** 614:3
**110** 521:11
**119** 552:7,12,12
**11:22** 460:2,5
**11:31** 460:5,7
**11th** 733:3
**12** 389:15 394:20,22
395:20 405:22 411:10
412:22 500:19 552:24
559:11 560:10 568:24
569:1 616:3,6 672:9
690:16 692:8 693:15
708:4 709:1 710:4
720:15
**12.6** 550:6
**1229** 507:17 508:2 509:1
558:20 559:23
**12550** 353:11
**129** 615:8
**12:10** 500:1,4
**12:12** 500:4,5
**12:31** 516:20,23
**12th** 684:13,14 707:24

**13** 365:4,18 511:19,20
,22 512:1 560:23,24
569:9
**131,178** 480:2,7
**14** 414:1 625:12 727:19
728:13
**1400** 663:4
**144** 387:18
**145** 388:24
**15** 370:2 384:19 488:12
503:3,9 541:3 581:5,9
608:12 682:3 729:8
**15,800** 595:13
**157** 387:20
**15th** 368:16 502:2
**16** 368:4 375:2,3,9,11
378:9,21,22 380:6,15,17
,24 381:15,20 382:3,9
,12 383:6,7,18,19 384:1
,15,24 385:8,9 386:17
,18 394:21 395:23,24
397:14 399:10,24
407:12 411:10 414:13
,13 415:2,16,17 416:21
426:1,2,5 553:11,11
575:9 654:11
**16.2** 549:3,18 550:6
557:23
**160** 438:8
**1629** 352:8 731:5
**17** 375:6,10,11,13,14
385:18 392:4,5 395:4,12
396:24 397:9 401:8
450:7,11 451:3,21
**170** 566:6
**1770** 354:11
**17s** 376:5
**18** 367:21 379:24 380:2
399:9,23 484:9 488:12
538:9 539:18 541:21
**181** 552:15
**183060** 352:19
**1836** 411:19,23 415:19
,24 416:1
**18th** 484:16 487:15
488:8 500:12
**19** 370:7 374:13 623:5
654:18
**195** 503:16
**1960** 353:17
**1980s** 433:22 668:1
**19th** 378:15,16 379:16
**1:21** 516:23 517:1
**1st** 362:19,23 478:5
502:10

**2**

**2** 367:8 396:21 397:13
399:11 411:1,6,6 442:20

448:2,23 460:2,2,7
465:7 467:1,4 480:2
516:20 517:1 550:19
553:8,20 554:2,11,17
572:13,18 578:17,18
579:7,11 622:5,20
625:13 629:14,19
631:22 632:13,18
641:14 666:19,20
669:17 683:19 687:16
696:13 699:1,1 708:16
,23 721:20 722:14 730:2
**2,000** 604:14,15 605:11
606:17 610:14
**2,352** 603:19
**2,682** 405:20
**2.629** 444:8
**2/4/09** 352:19 356:20
359:7 374:6 476:6
480:20 535:18 540:7
562:5 593:14 638:15
683:17 688:12 711:18
726:5
**20** 364:4 504:13 558:14
573:3 687:20 712:14
713:19
**200** 353:3 731:22
**2004** 581:7
**2005** 486:1
**2005-06-04** 485:22
**2006** 376:20 387:7
394:24 395:5,13,18,19
396:19,24 409:17 450:7
454:19 484:16 487:15
488:8,12 498:5 500:12
,20 501:2 502:2
**2006-05-11** 484:9
**2007** 495:7 502:10,13,16
,19,22
**2008** 362:19,23 363:14
364:4 365:4,12,18 366:1
367:1,8,14,21 368:4,9
,16,21 369:6,22 370:2,6
,15,21 372:7,10,14
379:4 427:19 428:12
477:4 623:5 690:16
692:8 693:15 694:23
697:5 706:12 709:1
**2009** 355:2 370:21 710:4
733:3
**2029** 414:8
**20th** 378:12 407:14
**21** 548:21
**2117** 381:12 383:8
**213** 507:19 508:2 615:4
**2132** 381:9 383:7
**21st** 688:23
**22** 365:12 370:6 395:17
396:19,24 409:17 450:7

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

,13 477:4 625:16 626:5
,5,19 630:15 632:2
710:4
**22nd** 370:15 377:16
401:9 410:5 477:7,24
478:21
**23** 363:14 386:14 414:3
**231,000** 480:6
**2352** 604:4,13
**236** 389:7,7
**23rd** 364:1 377:23,24
379:3 478:22 502:7
**24** 356:16,19,23 370:2
373:12,15,17 399:10,13
,15 401:10 402:18,19
411:12 419:24 430:1
450:2 677:8
**24** 734:10.......................
**25** 359:3,6 362:16
373:12,13 585:15
602:22 604:4,5
**25,000** 599:10
**25** 734:11.......................
**250** 581:22 583:9 593:3
**2500** 595:12 596:15
602:6,16 603:10 604:7
**2555** 354:3
**25th** 500:20 501:1
**26** 374:2,5,23 375:2,10
380:6 381:12,17,21
382:3,8,12 383:6,7,21
384:2,16,23 385:1
386:19 506:1 515:9
560:22 567:19 580:4
**26** 734:12.......................
**2638** 387:24 411:17,23
414:13,21 415:19,21,22
416:8
**2682** 397:21 412:7 449:1
**26th** 368:9
**27** 425:24 476:2,5,10
558:16 581:14 583:11
**27** 734:13.......................
**28** 425:24 480:19,23,23
580:4,6,13 654:14
**28** 734:14.......................
**29** 365:24 535:14,17
538:6 541:19 654:11,13
,14
**29** 734:15.......................
**2903** 414:6,12,21,22
**29651** 487:17
**29651-bipolar** 487:21
**29th** 366:13 377:15
378:2,9,17,20,22 380:14
385:7 404:9 407:13
654:11
**2:22** 572:13,16
**2:31** 572:16,18

**2nd** 367:1 427:18 498:5

### 3

**3** 358:17 376:19 381:4
383:14,16 392:7,9
442:19 444:5 452:4
460:7,13,14,15 467:1,7
468:12 516:20 541:20
623:11 640:19 696:13
697:19 699:1 704:10
720:17 722:16
**3.18** 592:7
**3.6** 720:20 721:10
**30** 369:6 503:1,9,12,13
509:14 510:2,4 540:6,8
,12 617:22 618:2 624:7
**30-day** 617:24
**30** 734:16.......................
**30th** 368:21 369:22
**31** 562:4,15 613:20
615:16,17 622:8
**31** 734:17.......................
**32** 366:2,6 367:22
593:13
**32** 734:18.......................
**33** 638:14,18 666:16,18
**33** 734:19.......................
**334** 566:1
**336** 392:14
**34** 683:16 684:6
**34** 734:20.......................
**345** 354:11
**35** 561:15 574:2 688:11
,15,
**35** 734:21.......................
**350,000** 372:10
**352** 731:11
**356** 734:5
**359** 508:16
**359-day** 508:13
**36** 711:17,21 713:22
714:6,13,20
**36** 734:22.......................
**360** 508:16
**365** 663:3
**37** 419:17 449:1 727:11
**37-39** 726:4
**37** 734:23.......................
**3701** 353:3
**38** 625:19 727:11
**39** 419:17 449:1 727:12
**3:27** 621:24 622:3
**3:35** 622:3,5
**3rd** 502:18

### 4

**4** 376:21 381:19 382:2
396:1 397:12 399:11
400:3 448:23 451:3,4,21

,24 467:1,15 517:1
572:12 641:15 727:18
**4.3** 676:6
**40** 365:13 367:1,15
368:9,16 596:21
**40,000** 598:12,22
**400432** 352:16
**415-334-6880** 354:13
**42** 382:7
**43** 625:15,19,20 626:1
,18 676:5,11
**44** 367:7 484:18
**45** 444:17
**463** 353:10
**47,000** 599:2
**47,918** 479:3
**478** 387:22
**49,000** 479:9,16 599:2
**4900** 592:4
**4:35** 669:17,20
**4:49** 669:20,22
**4:51** 670:9,12
**4:52** 670:12,13
**4th** 355:2 486:1

### 5

**.593**

**5** 367:14 422:20,23
426:21 447:11 448:2
454:9 460:21 535:21
542:17 572:18
**5,000** 598:11
**5,194** 405:19 406:19
**5.2** 674:3
**50** 561:12 597:2
**50,000** 596:24 597:2,3
598:12,13,23 604:14
719:18
**500** 607:17 610:5,8,13
,18 611:23
**500,000** 662:20,22
**506** 352:23 355:4
**51** 382:9 563:21
**512-478-5858** 353:5
**5194** 397:16 402:13
412:7 414:16,22 449:1
626:4 677:4 679:7
**53** 389:5
**533** 352:23
**54** 364:4
**56** 369:23
**58** 366:20
**58,000** 597:4
**58,800** 595:22 602:5,15
,22 603:21 604:4
**5800** 597:13
**5880** 604:4
**5:59** 730:3,5
**5th** 368:4 495:7 548:19
,20 639:3

### 6

**6** 358:19,20 488:23
500:9 622:5 669:17
690:8,9
**60** 365:5
**6108-2613** 354:4
**617** 388:22
**62** 365:19
**66** 552:21 553:2
**660** 521:7
**67** 540:12 541:3
**6810** 353:17
**6th** 366:19 495:13
502:13,15

### 7

**7** 448:23 452:3 492:20
,21 500:9 569:9 669:22
**7,000** 422:4,5
**7,876** 398:20
**7,884** 623:14
**70** 525:11
**713-659-5200** 353:19
**730** 731:12
**74** 561:9
**77069** 353:18
**778** 387:16
**78** 561:2
**785** 388:11
**78746** 353:4
**7876** 398:3
**7th** 495:18,23 502:21

### 8

**8** 368:22 377:22 400:13
,14 442:17,18 448:4
454:9 650:17 666:19
**8,829** 392:15
**8.3** 581:18 583:12 584:1
585:19 589:12 604:20
605:1
**80** 592:10,13 596:22
607:5,8
**800-634-1212** 353:12
**81.6** 548:24 549:20,23
557:23
**816-474-6550** 354:5
**83** 553:1
**84-3722** 354:24 732:7
733:7
**85** 650:17
**8th** 496:2

### 9

**9** 378:14 400:14 460:21
530:11,13 582:20,22
622:23

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)                                      Page  2

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**9.99** 664:9
**927** 381:17 384:16
**94** 400:15
**94104** 354:12
**942** 381:14 384:15
**945077** 399:16
**945209** 591:5
**945439** 384:1
**95** 436:15,17 657:3
660:10,12 664:8
**95439** 384:18
**99.9** 443:7
**9:16** 352:20 355:3
**9th** 496:8 502:10

---

A

**a-s-y-m-p-t-o-t-i-c-a-l-l-y**
595:4
**a.d** 731:22
**a.m** 352:20 355:3 411:1
,4,4 460:2,5,5,7
**abide** 546:4
**abiding** 692:12
**able** 407:3 419:22 424:3
458:4 459:13 470:15
532:2,12 534:5 578:4
610:15 655:16 676:7
724:14 727:4
**above** 426:20 472:15
485:16,19 688:24 729:4
**absence** 515:20 587:5
628:22 662:13
**absolutely** 400:16 403:1
416:19 658:8 671:17
**abstract** 715:11
**academia** 434:23,23
**academic** 434:24 511:2
524:5 699:22 724:24
**academics** 715:24
**accept** 388:10 389:13
409:12 410:3 520:14
540:1 550:2,13,15 563:8
**accepted** 717:7,9,10,13
**access** 499:10
**accidentally** 401:1,5
**accordance** 476:22
**according** 370:19 371:1
503:16,19 601:9,11,14
605:6 607:13 667:10
**account** 441:10,11,20
555:8 578:15 579:8
641:14
**accrued** 414:10
**accuracy** 372:2
**accurate** 371:23 417:4
479:12 546:12 700:19
729:1
**accurately** 481:11
538:15

**acknowledge** 716:5,15
**acquire** 719:7
**acquired** 713:6
**acquiring** 713:1
**across** 435:2 445:13
446:2 516:11 626:24
628:6 673:1
**act** 518:21 681:6
**acting** 667:5,5
**action** 452:7,17 732:23
**actions** 364:14
**active** 389:18 399:19
406:16 407:1 422:6
431:6 448:19 591:6
593:2 596:13 625:18
630:24 677:3
**actively** 463:9
**activities** 429:6 430:8
434:24
**activity** 645:15 667:6
**actual** 434:4 441:6,9
483:12 493:23 622:23
**actually** 376:6 391:9
393:4 406:14 407:1
423:10,14,18,23 425:2
438:21 443:13 455:1
467:22 481:5 506:2
512:2 514:9 517:19
519:11 550:3 559:20
576:10 578:20 597:4
607:6 613:23 624:16
630:2 639:1 643:12
644:20 645:3 673:22
678:21 708:4 712:2
726:8
**ad** 633:1
**adapted** 726:23
**add** 387:13 453:6 502:24
577:19 614:4 637:17
649:15 729:4
**add-on** 590:22
**added** 411:21 591:7
**adding** 371:20 448:7
453:3 577:20 578:9
614:3
**additional** 386:11
454:18 573:11 614:3
**address** 481:23
**addressed** 584:8
**adequate** 592:13,20
610:20 614:9 663:19
665:17
**adequately** 591:18
592:6,7 636:24 637:13
639:20 664:2
**adjournment** 352:22
**adjust** 468:21 471:18
554:22 578:2,4,5
**adjusted** 421:13 630:17

**administration** 529:12
**adolescents** 635:15
641:18,24 642:13
**adult** 394:8
**adults** 646:1 707:2
**advance** 726:21,24
**adverse** 392:11 640:23
**advice** 545:19
**advised** 687:22
**advisory** 432:22 638:23
639:10 640:1,4 642:11
643:16 645:22 646:16
670:24 671:22
**aed** 467:10 537:19
565:12,24
**aeds** 468:22 474:11
508:12 537:6,13 573:11
574:4,10 575:1 682:20
**afctv** 487:21
**affect** 571:21
**affidavit** 691:5 702:19
**affirmative** 478:12
**affirmatively** 473:23
**affix** 733:2
**aforementioned** 697:4
**aforesaid** 731:11,14
732:9
**afterwards** 552:1 567:9
**again** 371:21 372:2
373:13 379:17 386:16
391:16,24 396:13 402:8
408:4 421:7,23 425:17
437:21 456:16 458:1
478:9 490:11 492:12
493:2 496:15 509:18
523:6 544:11 550:18,20
555:9 556:8 563:16
569:16,21,23 587:13
589:10 597:10 602:13
604:2 614:17 621:6
657:19 658:5 662:12,17
665:6 668:19 677:14
681:19 687:13 696:18
705:23 724:3 731:12
**against** 626:19 639:11
640:14,15 644:6 725:6
**age** 484:18
**agencies** 712:10
**agency** 392:19
**aggregate** 559:22
**aggressive** 667:5
**agitated** 667:3 681:15
**ago** 562:7 710:5
**agree** 382:13 508:20
536:23 566:24 612:4
639:1 663:21 664:2
**agreed** 432:15 639:5,9
,10 679:8
**agreement** 358:21

460:17 461:7 476:22
594:10 686:23
**ahead** 371:24 388:20
464:9 516:17,18 518:1
529:8 547:6 549:8
588:14 594:3 601:22
621:4 628:2 631:20
649:3 685:12,21 692:23
698:22
**ahrq** 714:23
**aims** 716:4
**air** 495:9
**akathisia** 680:13 681:15
**al** 352:8,10,14,17 355:10
,10 697:5 731:3,5,7
**alert** 405:22,23 406:12
407:19,22 414:4 421:8
,13 422:9,10 425:19
444:21,24 445:1,9,11
625:15,21 626:11
627:19 631:16 642:4,22
644:17 672:9 673:16
675:19 677:22 679:16
718:20 720:7,13,13,17
**aligned** 719:4
**allocation** 436:11
**allow** 586:4 587:7 588:8
589:14 663:22 693:23
694:3 695:8 696:3
710:15
**allowed** 497:16 533:5
724:18
**allowing** 658:17
**allows** 473:8 589:19
**almost** 487:7 549:17
569:10
**alone** 602:3 637:17
**along** 357:20 361:1
485:9 490:16 538:2
548:6 568:18 615:14
628:20 666:21
**already** 430:21 449:10
,13,20 450:6 532:19
542:12 551:5 572:7,8
579:23 657:12 693:6
710:6
**alter** 393:8
**alternative** 598:2 614:14
651:12
**although** 358:23 565:15
617:21 624:13 673:21
719:4
**altman** 353:13 355:16,16
356:9,21 358:16,21
359:8,13,17 360:9,12,14
,22 361:3 362:22 363:1
,8,20,23 365:1 369:5,10
,15,20,21 371:11 372:4
373:2,16,21,22 374:1,7

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

375:8,13,15,18,23 376:3
377:5,21 378:8 379:13
380:16,22 382:1 383:10
,15 384:9,12,14 385:16
386:2,18,23 387:1 388:3
,17,21 389:3,4 390:12
,15,18,22 391:19 392:2
393:17 394:10,18 395:8
,11 396:6,9 399:8,14
400:10,11 401:7,21
402:5,10 404:16 407:11
409:4,18,21 410:22
411:8,12,14 412:21
413:4,9,12 414:19
415:17,18 417:3,5,11
418:8 419:7,12 420:4,6
,9,10 423:13 424:21
425:14 426:10 428:16
,20 429:4 430:6 431:3,7
,12,16,18 432:4,8,18,20
440:3,6,23 441:3 443:9
,23 445:8,19 446:16
448:1 449:7,19 450:4,12
,14,18 451:9 452:2
453:7,13 456:19 457:10
458:15 459:11,22 460:9
,15,18,19 465:1 470:4
471:24 472:5,17 474:3
,16 476:1,7 477:13,17
,20 478:3,14,20 480:21
481:13,18,19 482:6,8,12
489:8,12,15,23 491:18
,22 494:21 495:17 496:1
,7,23 499:23 500:7,16
501:6,8 503:6,8 504:11
,20 505:11,22 508:14
510:20 511:18 512:14
,19,21 513:20 515:6
516:17 517:3 519:3
520:5,11,16,23 524:22
525:22 526:1,23 527:20
528:9,18 529:2,17,23
530:16 532:13,14,21,22
533:4,8,12,16,17 534:13
535:12,19 536:15
539:13 540:2,10,20,23
541:1 544:24 545:2,9,11
,14,16,17,21 546:3,13
,17,21 547:1,4,8,9 548:8
,15 549:10 554:7 556:5
,23 557:8 558:1,6,12,18
561:5,6,24 562:6 563:14
,19 564:21 567:5 570:23
571:19 572:11,20
576:17 580:14 581:9,12
582:5,21,23 583:2 584:7
,10,12,17,20,22 585:2,6
,11 586:1 587:1,2,14,17
,20,22 588:7,10,13,20

,23 589:3,7,8 590:7,19
591:4,10,16 593:8,15
594:4,7,11 595:10,16,18
,21 596:2 599:4,8,21
601:17 602:2,10 603:4
,17 604:3,18,22 605:9
,18 606:3,8,13,14,20
607:10 608:1,4,6 609:9
,10,17 610:2,12 611:1
612:13 613:7 615:16,18
616:20,22,24 617:4
620:1,8 622:6,21 623:2
,6,9 624:6 627:20
628:13 629:18 630:3,9
632:4,23 635:7,9 637:23
638:11,16 639:12 643:3
,7,14 646:13 648:20
649:8 650:6,7,23 651:2
,3,15 652:21 653:10,18
654:2 655:14 657:10,16
,22 658:20,21 659:18
661:7 664:7,19,22 665:3
,4 666:17 668:12 669:14
670:1,5,15 671:5,11
672:1 673:7,11 675:4,14
678:11 679:19 680:4
681:3,21 682:9 683:12
,18 685:2,3,8,10,13,17
,22 686:4,8,9,19 688:7
,13 689:9 691:4,10,16
,19,24 692:6,11,13,15
,19,22 693:1,5,8,11,24
694:9,18 695:5,11,16,18
,23 696:11,18 697:11,13
,15,17,20,22,24 698:3,5
,10,14,17 700:20 701:1
,5 702:3 703:1,21
704:13 705:9,17 706:6
707:20 710:17,20,24
711:6,7,14,19 712:23
713:17 716:23 717:23
718:10 725:20,23 726:6
,16 728:5,11 729:7,16
730:1 734:5
always 356:13 465:14
471:8 512:11 533:23
am 356:16 360:23
369:17 371:21 383:20
387:13 399:10 402:5
410:13 417:8,19 431:6
457:16 464:8 494:24
502:24 513:22 523:8
534:4 536:16 539:14
545:15,23,24 546:23
547:15 557:21 560:6
579:7 625:10 634:9
637:12 642:8,15 651:24
652:10 668:19 671:13
681:19 695:5 701:2,9,12

,20 703:7 725:20 732:19
among 574:5 641:24
721:22
amount 509:8 578:3
611:24 617:11
analyses 376:13,19
390:1 399:6 402:3
404:23 425:7,16,18
435:14 436:22 437:3
439:21 448:24 449:6
451:7 453:19 471:6
472:23 473:12 474:20
497:16 498:12,13 499:2
509:19 510:8 514:12
516:10,15 520:1,6,24
521:2 522:21 523:18
524:13,15 528:8 537:20
546:10,14 568:18 575:6
576:14 579:3,24 611:10
612:19 613:16 645:20
660:24 661:5 662:8
677:20 691:11 694:5,6
,23 699:23 706:9 713:13
,15 727:8 728:18,21,22
,23
analysis 368:22 378:23
386:12 389:17,19
398:24 400:1,21 401:18
403:14,17 404:6,9,19,21
,23 405:1 406:19 407:8
,13,17,20 408:16 419:9
,16 421:3,10,12,23
424:2,5 438:24 445:2
447:18 449:2,5,16,20,24
450:3,10,22,22 451:4,12
,16 452:1,9 471:5
473:21 474:9 498:10,16
,18 509:15,20 510:13,16
,23 512:12 514:8,22
515:9,14,15,19 516:1,1
,2,5 517:14,21,22,23
519:21 520:21 521:5,13
,15 522:4,14 523:3
524:7 529:24 530:2
546:16 553:5 558:24
559:18,24 560:1,11
563:12 564:6 568:14,18
569:24,24 570:15,19
571:6 572:9 574:4 577:2
,3,15 578:11,21 579:5
,13,17,19 580:10 590:18
598:23 612:16 613:14
,20 617:13 628:10 629:9
,13,21 630:11,11 631:13
633:16 655:13 657:13
659:11 660:4,19,19,20
,21 662:4 672:10 675:9
,19 677:2 679:1 683:1,1
,4,5 694:13,16,20

705:21 707:2,13 708:1
718:5 722:9,17 724:3,14
729:18,20
analytic 367:15 405:16
476:21 726:20
analyze 385:10 709:19
723:20
analyzed 393:7 396:21
406:2 592:4
and/or 398:22
andrea 354:23 732:5
angeles 436:8
angry 667:5
anonymized 483:11
answer 383:1 393:16
395:21 404:13,15
409:22 413:1 421:4
430:4 432:6,16 459:9
470:8 473:22 478:12
489:14 505:9 530:15
532:12,23 533:4,14
534:11 539:8,10 544:22
545:7,10,13 546:2,24
548:14 566:21 580:21
586:13 587:15,18
588:15,17,21,23 591:24
602:15 609:16 611:4,6
620:19 621:20 630:2,5
631:10 632:15 634:7
647:5 651:10 655:22
657:17 664:16 665:10
676:22,22 682:8 686:7
691:1 692:9 695:9 696:3
698:7,8,12,16 708:19
722:3 728:4 729:5
answered 412:20
456:14 527:13 532:19
,20 533:7 534:11 555:16
579:21 584:11,21 585:4
,21 586:7 587:10,12,12
588:15,19 589:17 596:8
605:8,14 627:7 629:23
,24 635:6 648:17 650:13
651:7 652:15,24 659:17
,22 663:17 664:15
677:17 682:3,6,14,16
696:16 703:15 710:14
713:3
answering 534:7 631:10
696:1,9 699:2
answers 533:2 589:5
anti 507:9
anti-depressants
467:10
anti-psychotics 467:11
anticipate 423:9
anticipated 438:3
anticipating 511:4
anticipation 523:13

**anticonvulsant** 469:4
**anticonvulsants** 452:15 468:22 474:13 507:10 573:12
**anticonvulsive** 572:24
**antidepressant** 469:3,22 ,23 470:15 507:14 573:1 640:21 643:2,4 646:1 707:1
**antidepressants** 468:23 474:12 573:12 613:17 635:1 642:6 643:16 644:16 645:21,23 646:3 ,4,9,9,12,16 681:18 716:9 719:10
**antiepileptic** 422:12 468:20 470:19 507:13 509:22 521:20 598:24 644:13 667:14 699:24 707:5
**antiepileptics** 715:12 716:11 717:3 724:24
**antipsychotic** 468:24 469:3 507:13 549:24 573:1
**antipsychotics** 469:6,7 474:12 573:13
**antithetical** 681:14
**anxiety** 667:2
**anxiolytic** 469:21
**anybody** 438:3 523:19 606:5 673:22 685:14 722:24
**anymore** 678:14
**anyone** 658:17
**anything** 361:1 364:12 385:20 408:19 418:24 429:11 434:20 441:24 449:9 462:21 475:2 494:6 504:21 509:9 539:20 547:17 548:13 ,16 550:16 564:16 565:5 574:9,24 586:4 587:7 588:8 589:14 601:7 614:5 621:16 632:10 633:15 649:22 657:13 661:3 679:6 684:23 685:15 697:6 700:22 702:10 716:12 729:3
**anytime** 685:15
**anyway** 692:18
**anywhere** 633:6 697:18 698:19
**apart** 609:7 614:19
**apologize** 363:1 511:15 544:15 699:7
**apparently** 712:4,5
**appear** 374:22 383:23 473:5 482:3 483:6 485:4

,8 486:6 487:2 490:19 491:14,23 492:6 494:1,6 496:11 497:24 498:1,2 536:5,21 537:1,8 538:12 ,15 555:20 563:22 591:15 662:20 714:4
**appeared** 353:22 354:8 ,15 644:12
**appears** 365:19 366:20 369:10 371:12 380:3 384:21 389:24 395:15 397:2 482:11 488:11,15 489:4 492:17 493:7 494:22 495:6,12 497:22 501:2 504:4 537:6 538:1 ,1 540:12,13 541:3 674:8,11 684:14
**apples-to-apples** 421:14 678:2 682:18
**application** 435:12
**applications** 511:14 700:5
**applied** 644:6 725:4
**applies** 656:22
**apply** 573:14 627:19 629:14 642:6 643:21 647:19 676:8
**appreciate** 551:2 675:23 685:18 695:6
**approach** 392:22 576:13 596:15
**appropriate** 405:1,16,17 408:20 528:8 556:12 602:14 623:19 626:18 648:9 674:19,23 722:4
**appropriately** 392:12
**approval** 475:15,19
**approved** 453:8 646:24 ,24 721:16
**approximate** 623:17,18
**approximately** 372:18 626:5
**approximation** 596:18 597:7
**approximations** 598:8
**april** 362:23 363:2,14 364:1 377:15,16,23,24 378:2,9,16,20,22 380:14 385:7,7 404:9 407:13 502:18 654:11
**area** 657:5 659:20 667:22 708:5
**areas** 602:1
**aren't** 620:9 628:24
**argue** 685:14
**argued** 623:20 680:11 ,14
**arguing** 625:10
**argument** 611:21 612:3

,8 614:7 678:13 680:17 681:12,17 685:20 687:19 688:5 695:8 698:8 710:23,24
**argumentative** 398:16 472:3 513:12 548:1,11 637:3 703:14 706:2
**arise** 606:11
**arithmetic** 597:12,15
**arm** 358:1 376:21 377:1 448:12
**arms** 357:3,9 421:17 448:21,22 632:22
**around** 407:23 439:12 464:20 510:19 559:5 589:5 616:16 622:11 647:20
**arrowsmith-lowe** 457:23
**article** 582:11 590:12
**articles** 439:21
**articulated** 621:13
**ascertainment** 640:24 641:1,6
**ascii** 532:6
**aside** 365:6 373:10,12 ,21 418:13,22 428:12 490:10 577:19 622:22
**ask** 364:8 431:3,3 477:14 481:12 491:18 496:21 514:6 518:2 520:21,22 531:16 532:10 533:1,14 534:12 546:21 548:10,12,12 550:1 585:7,8 588:2,14 589:9 594:3 616:18,18 ,21 623:11 664:19 676:4 695:21 696:3 710:16,16 727:17
**asked** 359:19 361:8 386:6 400:23 403:10 412:19,23 450:1 456:14 477:13,20 506:13 510:20 527:13 531:24 532:20 533:8 534:11 550:7 579:21 584:6,18 ,21 585:21 586:7 587:3 ,10,11,23,24 588:3,3,6,7 ,9,10 589:6,17 591:10 605:8,14 627:7 629:23 639:16 648:17 650:8,13 651:4,7 652:15,24 658:22,24 659:17,22 663:14,17 664:15,17 665:1 677:16 682:2,6,10 ,10,14 689:21 696:16 697:16 699:10 703:10 ,15 705:4 706:20 709:9 710:14,18 711:2 713:3

718:19
**asking** 360:21 383:20 384:10,12 388:15,17 393:14 402:5 430:19 445:17,18 494:24 496:20,24 547:10,15,20 583:21 594:7 646:14 652:9,10 661:2 684:24 685:8 688:4 692:6 698:1 705:15,18 710:17 711:3
**asks** 432:13
**aspects** 578:14 669:12
**assess** 645:20
**assessed** 576:23
**assigned** 491:4 641:5,9
**assist** 377:9 442:8 661:20
**assistance** 440:12 500:22
**associated** 362:17 436:13 440:24 532:6 541:11 570:10 574:23 577:9 586:5,19 589:15 592:9 610:19 640:21 641:2 652:7 653:9 660:16 666:7 667:15 687:7 696:21 700:13
**association** 475:10 647:3 662:14 663:23 664:5 665:15 690:14
**associations** 576:2
**assume** 357:24 399:2 408:14 410:12 484:1,20 628:21 665:10,20 714:1
**assumed** 410:18 413:3 444:12 720:4
**assumes** 393:11 401:4 ,20 444:12 459:1,12 596:12 610:22 628:11 716:21
**assuming** 398:24 451:21 457:16 539:1 543:16 544:7 594:17 596:17 597:13 602:13 607:6 637:12 665:6 687:1 694:2 703:19
**assumption** 410:15 484:3 626:23 628:12
**assumptions** 516:12 598:7
**astm** 435:5
**asymptotic** 598:7 625:7 663:8
**asymptotically** 594:24 595:3
**attached** 379:15
**attacks** 667:3
**attempt** 385:10 386:8 390:5 391:1 455:17,19

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

497:4,14 509:21 510:3,6
,12 514:10,23 515:22
516:4 517:16,20 521:6,9
,12,21 522:2,5,7,8,10,12
,15,17 523:4 542:8
553:13 559:1,3 560:3
570:7,8 574:20 576:4
586:6 587:4,6,8 589:16
,21,23 590:2 607:12
612:18,21 613:23 619:2
,8 621:16 634:16 636:11
641:7 665:23 672:19
690:14
**attempted** 496:12
518:20,24 668:1
**attempters** 580:9
**attempting** 682:17
**attempts** 473:1 497:4,6
,17 498:10 504:23 506:6
,7 511:20,22 512:1
,17,23 513:16,18 516:3
521:8 522:19,23,24
523:6 541:7 552:2,2,7
,12 554:23 559:3,10,12
,20 560:9,13 562:20
564:4 569:8 570:3 571:8
,17 574:5,11 575:2
577:9 578:5 580:2,7,23
584:4 585:18 586:2
589:12 614:21 620:14
635:16 665:14 667:1
668:6,9,10,24 679:11
715:13 717:4
**attention** 541:20 565:22
**attorney** 732:20,21
**attorneys** 355:14 430:4
690:20
**attributable** 425:19
**attribute** 617:11
**attributing** 648:6
**attribution** 593:23
**atypical** 467:11 469:6
**augmented** 454:17
**august** 366:19
**austin** 353:4
**authenticated** 594:1
**authenticity** 481:10
482:5
**author** 703:7
**authority** 539:11
**authors** 533:23
**availability** 464:17
**available** 375:19 398:19
405:12 406:22 424:6
455:16 456:2 471:7
490:9 611:13 618:21
677:6,8 722:10 727:23
**avenue** 353:10
**average** 615:7 617:5,8

,11 676:14
**aware** 427:18,23 457:17
517:6 590:14,20 591:10
610:3,11 646:18 701:8
,11 702:18 703:22
710:13 711:8,11 725:5
,11,13
**away** 427:6 564:24
612:22 624:22 666:22

B

**b-a-y-e-s-i-a-n** 653:21
**back** 361:22 362:15
373:11 394:20,22 399:9
,10 411:7 428:9 432:10
,12 452:3 459:22 460:8
488:5 491:19 497:15
499:6 500:6 506:12
512:15 517:2 531:2
547:21 550:12,14
554:20 555:18 556:10
,14 557:4,14 558:3,13
568:11 572:19 573:22
581:3 587:15 606:7
611:3 615:2,2 622:23
636:16,17 666:14
669:22 670:14 690:5
692:18,20 699:14 704:9
705:8,20,22 707:9,21
716:24 717:18,18,22
718:23
**background** 438:19
439:1 455:13,23 464:22
593:3 609:8,9 634:3,5
,12 672:18,23 721:3
**backing** 398:10
**backwards** 564:2
**bacon** 354:2
**bad** 356:12,12 528:20
**baldessarini** 454:19
455:11,22 582:11
590:12 605:6 607:14
636:18
**ballpark** 597:9 598:20
599:3 607:19 637:16
663:6
**bank** 438:12,15 439:5
441:9,11
**barely** 373:1
**base** 634:24 635:11
**based** 371:4,14 376:17
394:17 404:19 405:14
407:3,8 410:15 437:13
442:5 443:21 444:1
455:15 464:16 469:9
515:12 530:8 534:1
540:13 574:21 578:22
586:16 590:12 598:3
600:3 602:6 605:16

619:6,7 626:11 627:2
633:1,3 635:1,7,10
636:12,24 637:15,16
644:22 647:16 649:24
,24 661:9 662:2,17
663:16 665:6 668:13
673:24 674:17 675:19
711:12 722:7 724:4
**baseline** 570:4
**basic** 579:1 611:20
**basically** 373:7 569:9
596:19 628:8 630:24
646:3
**basing** 628:9
**basis** 377:2 382:11
385:14,24 453:22
514:18 549:11 575:15
611:12,20 640:15
657:11 658:5 659:11,23
660:13 671:17,18,21
684:22 700:15 702:2,6
717:14 728:12
**bayes** 653:13 655:20,22
**bayesian** 653:12,20
654:5,16 655:11,15
656:10,16,22 657:5
658:2,12 659:4,5,6
660:4,20,24 661:23
662:1 663:9
**bayesians** 653:14
656:17
**beagle** 437:14
**bear** 395:22 476:8 593:8
**became** 618:9
**become** 681:14
**becomes** 483:5 515:19
**bee** 353:3
**beforehand** 566:11
**begin** 706:8
**beginning** 392:13 411:5
460:6 516:24 572:17
622:4 669:21
**behalf** 353:22 354:8,15
355:16,18,22,24 394:8
434:20 437:15 545:24
**behavior** 391:5 406:3
472:15,18,20,22 510:1
583:18 612:5 641:13
666:8 667:9,16 668:2
715:7,19
**behaviors** 632:3
**behind** 723:9
**belief** 416:4 679:20
681:4 702:6
**believe** 357:15 358:14
359:22 360:3 362:18
377:16,22 389:21 412:2
414:2 422:21 427:19
430:1 439:4 442:17,18

450:7 454:12 455:7
457:22 467:5 469:8
476:15 486:10 494:13
,19 508:13 521:7 530:19
531:6 537:5 541:2 542:6
,20 544:17 548:21 549:3
550:20 554:14 566:9,14
567:3 575:15 594:19
595:8 603:16 625:20
628:17 630:2 633:7,20
,22,24 634:15 636:9,22
638:21,24 642:20
643:19,24 648:19
660:20 661:22 662:2
670:17 677:8,19 686:16
,16 688:15,22,23 689:14
699:3 701:24,24 714:9
,17 720:8,15 721:1
**believed** 376:24 377:4
**bell** 708:20,21
**belongs** 714:2
**below** 396:21
**benefited** 727:4
**benefits** 639:21
**besides** 504:6 668:8
719:8
**best** 406:22 408:1
410:19 422:14 442:23
443:11,24 444:2 458:13
466:16 471:7 504:6
531:17 532:9 536:20
709:10 724:18
**better** 531:9 532:16
533:1,9,18 534:8 557:16
,19 622:10 635:4 641:18
645:19,20 679:21
708:10 709:20 718:20
**beyond** 361:21 472:15
477:23 539:22 646:22
729:4
**bi** 485:5 490:3
**bi-polar** 465:6
**bias** 422:23,24 423:4,6
,19,19 427:8,9 448:17
,18 470:13 641:1,6
**biased** 522:1 570:12
580:11
**biases** 640:24 641:1
**big** 421:20 483:23
569:13 619:22 637:24
700:10 709:23
**bigger** 624:12 657:5
**biggest** 721:14
**billion** 438:16
**bin** 530:9
**binary** 424:15
**binder** 359:14
**biological** 668:3
**biostatistician** 593:20

697:22
**biostatisticians** 661:19
**biostatistics** 706:16
**bipld** 542:3
**bipolar** 440:9 441:4
461:10,17,18 462:6,7,17
,21 463:8,12,16,19
469:19 470:1 471:23
479:2,7 484:24 485:6
488:1,13 489:1,7,11,16
490:3 492:22 501:7,10
503:21,22 504:2,6
505:17 506:10 507:24
511:21 513:3 514:13
517:7 518:7,11,15,19
519:5,7,15,16 521:7,16
523:16 524:21 525:5,10
,13 526:6,11,17 527:10
,22 528:11,23 530:6
537:2,2,22 538:2 540:15
541:11,16 543:3,4 552:9
,10 553:13 560:10 570:2
,10 574:6 581:17,23
582:8,9 583:15 584:13
587:8 589:13 590:11
598:23 604:19,23
607:22 608:13 609:19
610:16 611:15 615:11
,19 617:16,18 618:10,12
,15,20 619:22 620:3
622:11 634:6 636:18
673:3 675:12 697:2
713:9 718:2,18,19 719:8
,12,15,18 721:22,24
722:16,20 723:14,23
725:1 726:10,17 727:1,9
728:20
**bipolars** 605:5 722:21
**bit** 380:11 412:6 437:9
480:13 529:19
**black** 639:6,11 640:2,2,5
,11,13 641:17 642:5
**blame** 687:14
**blanket** 592:12
**bless** 470:3
**blinded** 392:18,22,24
**blocked** 392:18
**board** 432:24 638:23
639:10 642:11 671:22
**boards** 432:21,22 433:5
640:5
**bold** 487:11
**book** 594:18 595:6,7,8
597:19 628:19
**bottom** 359:15 373:24
375:14 392:8 411:15
416:20 442:19,22 444:5
460:21 487:6,10 500:19
538:7,11 541:24 550:21

562:18,24 565:24
595:11 602:19 623:12
624:15,17,23 678:5
681:22 708:22 713:19
**bought** 437:18 717:17
**boulevard** 354:3
**bound** 439:1
**box** 359:16 639:6,11
640:2,3,5,12,13 641:17
642:5
**boy** 410:9
**bp** 474:23
**bplr** 487:21
**bprx** 537:1
**brands** 437:8
**break** 483:3 505:14
507:1 516:18 530:1,5
614:19 622:7
**breaking** 617:13 619:5
**briefing** 374:18
**briefly** 436:1 504:15
**bring** 459:8 549:18
**broadest** 674:16
**brought** 433:17 519:1
570:7 617:24
**brown** 442:13 701:17
702:16 714:10
**brown's** 714:17
**buck** 703:5
**bucket** 530:9,18
**buckets** 530:10
**build** 699:19
**building** 438:12,16,21
,23 439:3,5,6
**buildings** 438:11
**bulger** 352:8 731:5
**bulk** 372:7,16 693:18
**bullet** 666:20 699:1
**bureau** 434:18
**business** 429:10
**buy** 471:24 526:24 705:6

### C

**cabrera** 661:14
**calculate** 398:9 402:11
,13,15 413:6,13 415:6
421:6 425:15 551:15
626:13 677:7
**calculated** 415:3 416:7
450:6,23 451:10 551:8
623:11 658:1 677:10
681:23
**calculating** 426:7 551:6
593:18 594:8
**calculation** 415:12
416:11 419:20 424:1
426:17 553:17 597:24
602:8,13 603:18 654:5
655:15,17 656:4 657:5,9

,14 661:20 675:16
677:13
**calculations** 371:1
388:4 422:20 504:17
505:1 547:18 553:3
605:20 657:20 661:23
**calculator** 371:10 372:3
388:2 417:19 597:23
**california** 352:12 354:11
,12 355:11
**call** 547:5,6 606:5
626:17 638:18 656:18
659:6,7 665:9 666:22
692:13,14,22 696:6
701:13,14 702:9 709:23
**called** 356:5 420:11
424:23 434:6 483:19
484:6 486:3,15 492:4,21
**calling** 693:2,5
**calls** 478:6 529:7 598:16
603:23 605:24 606:24
609:20 610:23 621:3
624:3 626:23 627:15
649:3
**camper** 641:10
**can't** 389:12 395:20,21
413:2 424:6 432:5,11
437:17 477:8 478:12
494:12 527:17 532:9,24
534:12 539:23 545:16
547:21 548:9 555:1
564:12,17 565:6,9 617:7
,11 624:22 643:9 648:4
,11,22 651:12 652:3,4,5
656:4,7,11 657:1,2
659:12 678:20 688:21
694:12 699:13 708:19
**cannot** 534:11 649:21
662:17 663:15 703:9
**capable** 481:16
**captions** 355:6
**carbamazepine** 561:21
,22
**care** 641:18 664:22
**cared** 701:19
**careful** 592:16
**carefully** 457:4
**carrier** 466:13
**carryover** 575:23,24
**carter** 354:23 732:5
**carve-out** 465:23,24
**case** 355:6 356:1 360:6
361:5 362:18 363:5,18
,20 364:2,6,10,14,19,20
365:9,16,22 366:11,23
367:5,9,10,19 368:1,5
,13,17,18 369:1,24
370:11,17,18 371:3,8
392:17 421:19,21 422:3

435:21 436:2,5 437:8,16
,22 438:3 446:18 447:9
452:14 456:22 457:12
,16 482:11 483:22
492:10 496:17 497:2
504:4 513:24 532:3
543:23 571:12 596:4
620:16 649:15 658:12
,14 660:18 680:11,23
684:22 689:18 708:11
,12 717:4 719:5 724:5
,17,21 725:2,14
**cases** 392:14 435:19,22
436:6,9,12 437:4,5,6,7
,23 522:15 524:17 571:7
584:23 626:5 630:15
632:2 680:14 725:6,12
,18,19
**cast** 471:12 510:5
**catchy** 434:7
**categories** 391:2,4
562:16
**categorizations** 391:12
,18,20
**categorize** 390:3
**causal** 452:8,24 455:8
473:6
**causally** 473:10
**cause** 382:18 427:14
458:21
**caused** 438:11 620:13
**cave** 353:3
**cd** 358:17 368:21 476:17
,17,21 535:22 539:3
**cells** 448:8
**center** 708:6 712:2,6
**centered** 506:14 559:4
**certain** 356:17 359:4
374:3 385:10 401:5
404:7 430:3 476:3
480:17 535:15 540:4
549:17 562:2 593:11
638:12 673:1 683:14
688:9 711:15 726:2
**certainly** 382:17 395:15
404:23 421:19 447:9,11
,13,17 450:14 456:1
494:12,15 499:2,6,15
544:3 555:7 567:8
570:19 575:4 594:20
629:9 637:17 644:2
648:22 667:21 679:16
699:15 720:4 727:3
**certified** 732:6 733:6
**certify** 731:9 732:7
**cervical** 486:24
**chances** 679:9
**change** 410:23 459:23
508:18 515:21 522:18

571:7,10 572:11 636:13
647:4 660:8 669:15
670:19,23 671:8 672:4,6
676:22 678:10
**changed** 523:7 555:16
560:3 727:2
**changes** 569:9 645:1
667:8 731:15
**changing** 602:1 603:9
**chapter** 429:16
**characteristic** 613:20
**characterization** 628:5
696:9
**characterized** 586:22
**charged** 468:16
**chart** 385:8 399:21
499:14 500:17 505:13
506:22 562:15 564:16
,16 566:18,24 615:21
674:9
**chb** 714:9,16
**check** 369:8 378:13
400:24 421:21 479:22
519:13 550:12 557:11
,22,22,23 568:21
**checked** 550:15 597:12
**chemical** 452:6,16
**chicago** 352:23 354:19
355:5 733:2
**child** 394:8
**children** 635:14 641:18
,24 642:13 707:1
**china** 669:8
**choice** 376:12 416:13
464:16
**cholesterol** 437:14
**chronic** 387:20 389:5
**chronological** 362:21
**chunks** 507:2
**citalopram** 437:24 438:4
,6
**citation** 635:4
**cite** 727:6
**cited** 422:17 582:11
715:16
**citing** 586:16
**city** 352:13 354:4 436:6
,8,10 438:9
**claim** 462:20 463:14
464:3
**claims** 465:8 499:17
576:6
**clarification** 364:8,23
511:16 514:6 585:3
**clarify** 401:21
**class** 637:19
**classes** 526:18 645:13
**classification** 394:4
436:22

**classifications** 393:1
394:7
**classified** 392:21 529:20
592:22
**classify** 437:3
**classifying** 390:24
**clean** 438:14 439:4
461:17 507:7
**cleanup** 436:12,17
**clear** 405:10 429:3
456:18 459:14 479:17
510:22 512:11,12,13
513:6,14 514:4,5 628:12
,14 630:4 675:17
**clearly** 412:16 580:17
584:8 613:18 620:21
631:15 655:19 662:13
675:24
**client** 546:1
**clinic** 519:1
**clinical** 378:23 394:11
,17 398:21 406:4 452:5
,23 575:21 634:10
668:20 669:11 671:7
681:5 707:4
**clinically** 633:7
**clinician** 671:12,13
680:1
**clip** 373:19
**clips** 359:14 373:16
**close** 416:3 417:24
418:4,11 428:14 542:3
574:15 579:1 582:18
595:4 600:6 610:17
612:6 631:3 637:16
638:7 678:13 708:6
719:18
**closed** 598:5
**closer** 414:15,18
**closest** 533:24
**cmed** 542:4,11,18,20
544:13 699:13
**cns** 489:21
**co-author** 528:3
**co-authors** 690:17
693:16,20 701:7 703:9
710:12 719:23 727:13
**co-counsel** 369:18
**co-investigators** 441:18
**co-morbidities** 525:5,8
**coaching** 390:15,17
533:5 546:22 657:23
664:22,24 697:13,15
**coarse** 576:12
**code** 467:21,22 468:1,1
482:2,16 486:7,21
487:17 491:3,9 492:18
493:22 495:23 496:3
533:24 534:1 539:19,21

540:13 700:13 704:20
705:21 728:23
**coded** 497:4
**codes** 468:5 486:9
493:16 530:9,11,14,17
,21
**cohort** 461:10,14,18,19
462:9,18 464:2,12,12,15
465:5,7 479:7 480:2
501:11 503:20 514:13
517:7 518:8 519:16,17
521:7,16 523:16 559:10
573:9 617:18 618:13,14
,16 675:12 713:9,9
718:6,19 719:3 720:9
723:22 724:3,14,19
725:1,3 726:18 727:9
728:19,20
**cohorts** 461:6 462:3
473:3,4 524:23 723:1,2
**collaborated** 535:7
**collaborative** 668:3
**colleague** 700:18
**colleagues** 424:10
**collected** 453:21
**collects** 462:24
**collins** 454:11,15 455:2
,4,15
**colloquy** 386:21 472:3
548:12
**columbia** 392:23 394:3
,7 427:20 428:1,2
**column** 357:16,21
420:11 483:19 485:1,12
486:14 490:20 491:1,12
492:3,14 493:1,14,20
548:23 550:20 551:3,4
565:11,24 567:12,14,15
,16 620:6 622:15
**combination** 660:9
**combine** 453:23,24
481:6
**combining** 454:2
**coming** 419:18 555:5
**commencement** 732:8
**comment** 420:13 459:5
,6
**commented** 457:15
**commenting** 454:10,10
**comments** 523:14,15
649:23 707:9,11
**commit** 667:1 668:16
669:2 680:9,13
**commits** 668:14
**committed** 594:15
**committee** 645:22
646:16 670:24
**committees** 643:17
**common** 626:24 628:11

**communicated** 719:22
**communicating** 651:24
**communication** 690:3
**communications** 698:2
**companies** 405:4
433:16 435:15,16 436:8
,9 437:7 463:1
**company** 354:20 389:19
390:6 400:24 434:19
437:10,17,19 438:13,14
449:9,12,15 450:6,11,21
451:1 453:8,9 463:3,7
466:7 581:21 583:8
**company's** 395:5,13
449:2,5
**comparable** 382:20
421:18
**comparator** 358:8
398:23 403:7 404:2
679:4
**comparators** 406:16
407:2
**compare** 383:19,21
414:12 415:13 444:22
539:12 576:15 673:23
**compared** 396:20
420:18 578:1 635:15
676:3
**comparing** 419:2,17
420:20 509:20 570:14
**comparison** 421:14
445:11,14 455:5,7,10
505:9 556:7 569:16,17
596:16 611:9 621:8
664:3 678:2 679:14,14
681:23 682:19
**comparisons** 438:5
455:20 522:22 675:1
**competent** 661:23
**competing** 516:8
**compiled** 469:8,16
**complete** 359:3 392:15
591:24 731:13
**completed** 583:20,23
586:3 607:4,13 610:20
611:12 635:16 641:22
672:19 679:12
**completely** 404:18
512:13 531:20 666:2,5
716:3,13 726:10
**completion** 455:18
583:18 589:21,24 590:2
611:16 636:11 665:23
666:9 668:2
**completions** 668:6,24
**complex** 504:17
**complicated** 393:18
531:19 700:9,11
**complied** 391:6 698:6

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**comply** 391:9
**complying** 409:7
**compound** 537:20
**computation** 505:9
663:7,8 676:12
**computations** 611:11
637:15 675:19 676:2
**compute** 415:8,20
515:11 652:19
**computed** 563:17 633:9
**computer** 357:13 606:7
711:22
**computing** 596:16 625:8
**concentrations** 438:19
439:2
**concepts** 402:4
**concern** 476:20
**concerned** 418:21
640:17,22 641:16
642:21
**concerning** 546:9
727:20 729:9 732:10
**concerns** 642:16,18
644:24 645:5
**conclude** 456:1 565:9
586:4 587:7 588:8
589:14,19 652:4 665:14
696:1
**concluded** 730:5
**concludes** 730:2
**conclusion** 458:22
571:6 574:7,8 683:9,11
**conclusions** 571:1
**concomitant** 468:21
471:15,18 473:21 474:5
528:4 542:21 578:4
**concomitantly** 470:18
471:10
**condition** 524:20 570:4
629:3 724:15,19,20
**conditional** 372:2 388:8
**conditions** 406:6 469:2
471:3 570:14 608:9,23
**condone** 648:4
**conduct** 538:16,19
723:20
**conducted** 376:13
499:13 572:8 722:17
728:18
**conducting** 690:12
**confer** 369:18
**confidence** 412:13
413:1,6,13,17 419:18
443:3 444:8 451:11
532:2 551:7 555:9
557:24 571:21 623:12
,13 624:20 647:9 656:17
,20 658:11 665:18,24
666:4,6

**confidential** 430:17
**confrontation** 701:15
**confused** 508:21
**confusion** 651:23
**connection** 491:19
528:23
**connors** 354:6
**consecutive** 496:13
497:10,24 498:1,23
579:20 580:20 581:1
**consequence** 641:22
**conservative** 576:13
**consider** 393:22 516:8
570:13 579:19 597:20
651:13
**considerable** 424:9
**consideration** 676:11
**considered** 374:15
394:5 406:15 455:14
498:9 586:24 600:4
631:7 682:21
**considering** 514:8
671:23 673:13
**consisted** 406:19
**consistency** 447:16
**consistent** 389:24 421:9
422:2 445:13,15,21
446:2,15,20 447:2,12,20
,23 459:7 516:11 541:13
549:21 563:23 575:3,4,5
605:21 620:6 627:5,5,10
628:5 662:10 676:21,23
682:20
**consisting** 731:11
**constant** 600:2 601:18
**constants** 600:3
**constituents** 436:14
**constitutes** 732:15
**consulted** 661:19
**consulting** 372:14 373:4
429:15 430:8 433:9,11
469:10
**contact** 477:1 641:4
702:1,11
**contacted** 701:18
704:23 705:3
**contain** 704:1
**contained** 451:24 452:9
**contains** 656:14,24
725:17
**contaminant** 436:22
**contamination** 438:11
,22
**contents** 489:16 535:22
**context** 433:9 434:23
456:17 511:12,12,13
623:19 656:7,11
**continue** 696:4 700:3
708:11

**continued** 354:1 511:2
**continuing** 563:9
**continuous** 719:19
**continuously** 464:18
509:14
**contract** 358:14 359:2
460:15 475:7,8 686:22
**contrast** 629:5
**contributing** 396:2,10
,15
**control** 400:18 401:14
404:2 408:7 444:18
446:1 448:21 596:5,10
629:3
**controlled** 376:14 386:4
,4 387:3 401:2 402:7,21
,24 403:7 608:7 676:13
**convenience** 481:8
487:10
**conventional** 647:15
721:1
**conventionally** 461:10
**conversation** 631:7
690:2
**conversations** 362:2
662:2 707:14
**converting** 419:1 420:19
**cook** 732:3
**cookie** 558:6
**cool** 524:2 712:10
**copied** 595:6 597:17
**copies** 358:24 359:1
689:15,16
**copy** 373:18 399:12
556:22 557:2 615:13
684:3
**corporate** 431:7
**corporation** 429:10,14
,15 433:15 434:2,3,5,12,17
440:21,22
**corporations** 432:22
433:6
**correct** 357:18,22,23
358:1,2 360:2,11 362:7
,19 363:12,13,15,16
364:3,7 365:7,8,14,15
,20 366:9,10,15,21
367:3,4,17,23 368:1,5
,10,13,23 369:1,24
370:4,8,22 372:7,8
377:11,17 378:1,4,9,10
,17,18 379:4,16 381:10
,11,12,13,15,16,17,18
382:6,7 383:17 384:3,5
,16,17,19,20 385:1,2,5,6
387:4,5,7,11,14,15,16
,17,18,19,20,21,22,23
,24 388:12,13,22,24

389:5,8,18,20,23 390:7
391:13 393:9,22 394:12
395:2,6,14 397:3,16,17
,19,20,22 398:1,3,4,6,14
400:2,4,5,10,15 401:15
,15,16,18 402:21,22
404:8 405:7 408:17
411:17,19,20 412:4,5,8
,12,18 413:7,14,15,23
414:6,7,8,9,10,11,13,14
,16 415:4,5 418:5 420:9
,21 421:18 423:1,21,22
425:5,10,16 426:12,13
,18,19,21,22,24 427:13
428:3 429:12 434:9
440:9,10 443:18 444:14
,15,19,20 445:16,16
448:9 449:10,21 450:6
451:13 452:17 453:18
454:11,16,17 456:23
457:5,6,7 458:5,23
459:15 461:1,3,7,8,11
,14,19 462:4,7,10,11,14
,15,18,19 463:1,2,4,5,12
,13,23 464:4 466:19,20
,22 467:2,3,4,16,17,23
468:6 469:7,19 471:21
472:20 473:16 474:6
480:3,13,14 483:7,9,10
,13,14,17,20 484:4,5,7
,13,14,16,17,18,22
485:11,13,16,17,19,20
,22 486:1,4,9,12,21,22
,24 487:3,4,15,16,18,19
488:13,14,16,21,22
489:5,6 490:12,14,16,19
,21,23,24 491:1,6,7,10
,11 492:4,8,11,15,18,19
,23 493:2,6,8,11,14,15
,17,18,20,21,23 494:2,3
495:7,8,14,15,19 496:3
,6,9 497:10,11 498:3,7,8
499:9 500:12,15 501:12
,20 502:2,3,4,7,8,10,11
,13,16,17,19,22,23
503:1,2,3,11,13,14,17
,18,23,24 504:3,18
505:3,18 506:15,16,19
,20 507:4,5,10,11,14,15
,17,18,21 508:3,4,6,19
511:23,24 512:3,4 518:9
,21 520:3 524:9,20
525:1,2,13,19,20 526:2
,3,7,11,19 527:3,4,12,23
529:6,21 530:2,10 531:1
534:17 536:2,3,5,6,8,10
537:2,3,4,5,10,22,23
538:12 539:6,17 541:12
,21 542:9,13 543:5,7

544:3,6 549:9,12 550:4
551:18 552:4,7,12,14,15
,16,19,20 553:5,14,15
,17,18,23,24 554:5,9,13
,15,16,17,18 560:17,23
,24 561:1,3,7,8,10,11,13
,14,16,17,19,20,22
562:8,9,11 564:3,10,11
,13,14 566:1,2,4,5,7,8
,12,18,24 567:18,20,21
571:13 572:22 573:1,8
,18,19 574:6,20 575:12
576:20,21 577:16
578:18 579:7,8,11 583:6
,7 585:13,13,16,17
590:11,13 599:6,13
600:2,6,10,11,16,17,19
,20,22,23,24 601:4,5,9
,20,24 602:12,23 603:13
,16 604:20 605:2,3,5,7
,13,17 607:13,15,17,22
608:5,9,10,17,18,20,21
,23,24 613:8,11 614:23
615:5,6,20,22,24 616:1
,3,7,9,10,12,13,14,15
617:17 618:9 619:17,23
622:14 623:14,15 624:2
625:15,16,17 626:2,3,6
,7,9 628:15 629:14,22
631:17 632:11 633:4,5
,19 634:20,22,23 635:21
638:24 639:6 640:1
642:17 643:18,22 644:1
646:4 647:11,17,18
648:16 649:11 651:20
652:14,23 654:8,21,24
655:1,3 656:8,9 657:7
658:4 659:3,16,21
662:18 663:16 664:10
667:16 670:19,20 671:1
,4,8,12,15,16,18 672:4,5
,12,13,15,16,20 673:4,8
674:1,2,4,5,6,7 678:15
,15 680:20 681:24 682:1
,12 684:1,2,8,9 685:6,24
686:6,12 687:16,18
688:17,24 690:6,22
701:11 702:20 703:13
,23,24 704:2,3,17
705:14 707:23 708:1
710:12 712:20 713:20
,21 714:2,3,10,11 715:8
,9 717:18 720:16,19,21
721:4,5,7,8,10,11
723:24 724:11 727:24
729:18 731:13
**corrected** 549:6,6
574:17
**correction** 422:20,23

426:21 448:9 556:15
**correctly** 357:17 374:20
388:8 389:13 396:12,16
,22 413:20 444:10
452:11 465:10 467:13
474:21,24 475:16 479:4
484:10 485:2 486:17
487:23 488:9 489:2
513:4 530:4 542:5
552:13 574:13 581:19
597:15,17,18 602:14
715:1 729:11,15
**correspondence** 360:24
361:9,16,17,20 409:6
684:22 685:1 689:20
**corresponding** 407:7
490:8
**corroborated** 379:11
**cost** 436:11 475:9
**costs** 436:12,17
**couldn't** 406:8 473:22
543:4,13,16 571:2,21
577:19 624:14 684:23
698:7
**counsel** 356:3 357:1
360:1,16 361:5,20 362:6
,6,10 428:8 532:6
547:14 550:10 558:8
606:4 684:22 689:13,18
,20,23,24 690:10,19
699:12 709:9 718:15
732:20,21
**count** 523:1
**counted** 497:13 498:23
499:4 510:4 515:1 523:2
580:1
**counties** 436:10
**counting** 366:8 523:4
**country** 642:1
**counts** 504:22 505:2
662:19
**county** 355:12 436:7,8
732:3
**couple** 437:6 438:15,16
469:14 479:21 551:4
607:4,8 625:17 642:2
686:21
**course** 393:16 417:22
418:1 438:22 522:17,20
577:17 629:2 645:2
687:12 718:23
**court** 352:1,12 355:8,11
389:2 396:5,8 413:8,10
431:4 432:11 443:4
457:5 458:22 459:3,8
491:16,21 512:18,20
540:9 547:5,7 554:6
556:19 561:4 588:22
595:1 671:10 673:5

698:20,22 719:5 731:1
**court's** 711:4
**covariate** 471:2 514:15
515:17,19,21 564:5
577:5,9
**covariates** 551:11
555:15
**cover** 376:1 514:20
**coverage** 466:5,6
**covered** 466:7
**covers** 715:11,14
**crash** 544:10
**cream** 558:9
**create** 560:12 564:15
566:10 703:22
**created** 361:4 376:15
542:21,24 543:12,13,19
544:14 612:8 699:15
704:16
**credible** 655:10 656:13
,13,18,23,24 658:12
660:23 663:12 664:9
**credited** 524:13
**crisp** 711:23 712:2,4,6
**criteria** 394:3 521:22
529:4
**criticize** 696:8
**criticizing** 422:19
**crone** 352:14 355:9,17
,17 356:1 364:14 639:2
**cross-examination**
690:24
**cross-noticed** 584:23
**cross-over** 726:11
**crude** 418:9,12 555:2
**crudes** 418:7
**csr** 354:24
**cultural** 669:12
**cultures** 669:5
**curious** 468:12 469:18
**current** 442:14 708:6
**currently** 434:15 514:19
**curve** 412:17 413:23
649:10 650:1 652:11,12
,14 657:6 659:1,6
**cv** 352:16

### D

**d-e-r** 483:19
**d-i-a-g** 486:4
**d-i-v-a-l-p-r-o-e-x** 561:5
**dangerous** 667:6
**dark** 407:23
**dash** 487:21,21
**data** 357:2 366:14
367:15 376:13 378:23
385:11 387:4,6 393:14
,15 395:1,20 396:2,10
,15,24 398:11,14,19,20

,23 399:1,2,5 403:3,11
,13 404:4,4 405:2,3,6,13
,13,14,17 406:17,22
407:4,9,22 408:4,6,8
410:7,10,13,15,20
419:22 420:14 421:9
422:10,11,11 423:15
424:3,5,15 425:5,7,10
,19 426:4 437:11 443:21
444:3,7,13 449:6,16,18
450:2,3 451:5,6,13,22
452:1 453:21,24 454:3
,21 455:11,13,16 456:2
,2,6 458:12 461:1
462:13,24 463:4 464:3
467:16 471:7 472:1
475:8 476:24 477:6,10
,12,16,19 480:24 481:3
482:23 483:2,5 484:4
485:9 488:12 489:24
494:4,7,20,24 495:22
501:10,11,18 505:17
506:14,18 510:12
518:10 528:16,18,19
536:1,13 541:14 542:8
,11,21,24 562:8,15
563:2 564:24 565:3
566:11,15,17 567:1,3
568:11 569:5 573:22
574:22 575:3 576:6,12
,18 578:20 579:1 586:23
591:14 592:5,20 598:24
613:5,15,21 614:24
615:10 619:3 626:20,21
,22 627:14 628:24 633:9
635:1,10,11,12,14 636:2
,5,16,17,17 637:5
640:18 646:20 652:17
662:18 663:16,22 664:1
665:6,11,21 677:22,23
678:4 680:8 681:24
682:19,22 683:2 691:8
,10 697:4 699:4,24
700:7 704:6,15,21 707:3
713:1,6,7,8,10,11
717:18,21,24 718:4,22
719:7,16 722:18 723:20
726:18,24 727:4
**database** 466:8,10,15
471:1 489:9 527:17
529:12 573:15 618:21
637:10 709:18
**databases** 499:17
598:21 727:5
**dataset** 376:14 405:17
413:24 468:6 519:6
542:15,19,20,22 574:22
652:2 699:13 700:10
727:7

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**datasets** 376:20 380:10 382:19 476:23 708:15
**date** 355:2 369:3 370:20 462:3,6,10 465:18 477:3 478:13 484:15 487:14 488:6,7,16,18,20,21 492:1 493:8,10 495:22 500:11 501:3,4,5,6,7,22 502:3 503:22,22 504:2 506:10,14,15,19 507:3,4 511:21 513:2 517:8,16 ,20 518:5,15 526:14 559:5,5,9,11 560:21,24 562:23 564:10 566:16 568:1,1,23 569:2,3 570:6 571:17,18 576:8,9 616:6 617:16 619:23 622:11 706:13
**dated** 362:19,23 363:14 ,24 364:4 365:4,12,24 366:19 367:8,14,21 368:3,8,15,20 370:14 377:16 378:1,2,9,12 379:16 395:17 548:18 688:23
**dates** 485:15 490:9,23 498:4 708:3
**daubert** 364:11 366:3 379:1,3 439:12 478:16 ,16,18 725:13
**david** 661:10
**day** 355:13 376:22 392:13 397:5,7 411:1,6 460:2,7 484:13 485:18 491:12 496:14 498:2,20 503:17 509:13 516:20 517:1,8,18 518:18 519:15 523:20 562:22 572:6,13,18 579:20 612:10 616:2 617:10 622:5 669:17 688:23 689:21 719:6 730:2 731:22 733:3
**dayssup** 491:13,13
**deal** 497:12 514:24 515:16 727:2
**dealing** 416:1 551:23 654:8

**dealt** 670:23 680:7
**decade** 434:16
**december** 370:2 639:4
**decide** 410:2 527:21 644:5 665:8 718:17
**decided** 390:3 452:14 530:17 723:11
**deciding** 409:11 644:5 723:1
**decimal** 417:20
**decimals** 417:15
**declaration** 378:11 419:17 442:17 613:2,5 623:3 688:16 689:3 693:13 698:6 703:3 708:23 710:4 711:12 727:18
**declarations** 456:22 727:12
**decoded** 482:15
**decompose** 407:18,21 422:10 425:19
**decrease** 527:11 571:11 ,15 641:23
**decreased** 612:21
**decreases** 553:12 574:22,23 621:17
**defendant** 354:16 356:1
**defendants** 352:18 354:8 690:11 696:24 710:11
**defense** 606:4 690:18 694:11 722:5
**define** 468:17 521:17
**defined** 453:20 461:10 464:12 521:10,22 528:4 640:19
**defining** 522:16 724:3
**definitely** 455:24 468:8 571:5
**definitions** 503:19
**definitive** 398:8 456:8 ,10,13,17
**definitively** 685:4
**degree** 532:2
**delineated** 536:14
**deliver** 461:2
**deliverables** 466:19 474:18 475:13
**demand** 684:17 696:20 697:3
**demonstrate** 385:9 453:9,15
**denominator** 678:5
**density** 510:9
**denver** 436:7
**departments** 706:15
**depend** 671:10
**dependent** 393:21

592:15
**depending** 464:15 522:18 625:19
**depends** 472:11,11 533:20 726:14
**deposition** 352:21 355:3 ,13 356:18 359:5,21 363:6 374:4 417:2 476:4 480:18 535:16 540:5 546:1,18 562:3 593:12 638:13 683:15 687:24 688:4,10 692:1 693:9,12 695:24 701:6 708:17 711:16 726:3 729:24 730:4 731:10,14 732:12 ,17
**depositions** 370:15 702:15,20 710:12 711:9
**depressed** 488:3,4 635:20,23 680:19,21 719:10
**depression** 640:18 667:2 668:3
**derivative** 715:17 716:11
**derive** 530:14
**dersimonian** 424:12
**describe** 406:12 424:15 446:17,20
**described** 407:22 421:12,24 515:15 522:9 551:11 577:3,20 578:14 580:12 704:7
**describing** 533:21 606:11 724:16
**description** 407:6 482:2 486:16,20 487:20 493:20 495:13,19 540:14 541:6 578:19
**descriptions** 407:24
**descriptor** 357:14
**deserves** 565:22
**design** 726:23 728:22
**designed** 398:18 407:18 466:12 483:15 524:4
**desire** 483:2
**desired** 421:20
**detail** 424:16 436:4 689:8
**details** 391:10 392:1 531:8 660:18
**detect** 592:6,8,14,18 593:1,18 595:12 599:20 605:12 606:18 610:15 637:13,14,21 663:12,20 665:8
**detecting** 601:4
**determinant** 612:11 614:10

**determinants** 601:15 668:24 669:7
**determinations** 394:5
**determine** 405:13 436:23 438:19 472:24 473:8 515:1 536:19,20 543:15 621:11 668:23 682:19
**determined** 576:24
**deutsch** 438:12,15 439:5
**develop** 708:9
**developed** 433:11 530:22 726:22
**developing** 428:6 528:22
**deviation** 648:13
**diag** 486:3,16 493:13,14 ,19 518:11
**diagnose** 488:20
**diagnosed** 462:16 463:8 ,12 465:3,16 503:21 518:19 526:10 618:10
**diagnoses** 482:1,1 487:8 488:18
**diagnosis** 462:7,21 463:16,19 464:14 465:6 467:4 481:5,7 482:2,15 ,16 485:9 486:6 488:12 ,13 493:13 501:3,4,7,22 503:23 504:2 505:17 506:11 507:21,22 508:1 511:21 513:3 518:12,15 519:2,5,15 570:9,18 614:16 615:11,19 617:17 618:20 619:22 620:3 622:11
**diagnostic** 467:20,22 468:1 487:17 493:22 495:23 530:14
**diags** 484:24
**dictated** 666:2
**didn't** 360:2 377:8 381:22 385:15 398:12 ,13 400:6,14,17 403:17 405:5,5,8 406:7 407:23 408:19 410:17,18 419:22 420:7,13,14 425:9,12,15,21,22 427:1 428:5 436:4 439:16 443:10,13 449:8,8 450:1 451:19 455:6 468:13 469:5 471:11,24 477:14 ,20 478:11 489:13 498:17 517:15,19 524:24 526:22,24 527:1 544:17 546:15 549:18 564:15 585:6 586:2 587:14,14,18 589:20

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

591:17 597:11 613:1,4,9
,12 614:22,24 619:17
626:13 635:24 642:24
645:22 651:21 653:22
657:12,20 661:3 662:5
672:2 675:21 677:12,20
,21,23 682:3 683:1
686:4 691:9 695:11
698:7 699:7,9 701:1
710:9 713:13,14,15
716:12 719:7,14 721:12
722:11 723:8 728:21,22
**difference** 364:19
380:21 382:5,12 383:5,6
384:21 414:20,21,23,24
419:21 421:20 445:24
448:20 450:20 517:24
519:22 569:13 583:11
598:13 611:15,17
627:18 635:18 637:24
638:6 641:15 657:3
673:19,19 674:11
677:14 695:15,16,18
722:9,19
**differences** 380:7,9
382:10,14,18 383:2
393:15 452:6,16 635:18
673:1 674:9,14
**different** 380:12,18
382:23 387:10 407:17
412:6 416:5 421:2 424:4
426:6 427:11 444:23
445:13 446:6,12,18
449:16 452:5 453:24
455:20 463:1 471:8,14
473:11 483:17 485:15
497:6,7 499:5 501:18
509:19 515:24 516:9,11
,13 517:13 518:2 530:6
,9,10 531:2 537:7,9,14
553:6 555:8 562:12
578:7 593:6,18 598:9
609:1 625:9,18 627:1,1
,13 629:7,7,12 630:18
633:3 636:12,12 649:22
652:5 653:7 654:4,7
657:1 664:20 669:5,5,8
672:11,14,17,18,24
673:2,18,21 674:10,20
,21,21,22 675:1 676:4
687:11 716:8 721:21
724:22 725:18 726:23
**differentiable** 650:21
658:10
**differential** 632:19,20
**differentiate** 570:16
648:11
**differently** 449:9 682:11
**difficult** 482:14 560:16

576:22 700:12
**difficulty** 482:20
**dig** 359:15
**diligent** 547:22
**diligently** 558:8
**direct** 562:23 704:9
**directed** 703:6
**direction** 423:7 446:7,14
,19 447:3,19,22 448:18
534:1 648:14 728:20
732:14
**directly** 439:10 441:18
595:6 599:16 601:8,20
702:1,11 732:22
**disagree** 404:18
**discard** 722:11
**discarded** 410:13
**discarding** 448:17
**discards** 448:20
**disconnect** 403:18
652:8
**discouraged** 454:8
**discovered** 546:9
**discovery** 709:24 711:2
,3
**discrete** 559:4
**discriminate** 437:2
**discuss** 448:7 532:16
533:9,19 534:8 624:8
629:13 715:18 722:24
**discussed** 362:5 395:5
412:10,11,17 436:2
523:23 527:15 563:4
575:24 581:21 582:19
,24 683:24 687:11
690:21
**discussing** 523:18
654:16
**discussion** 425:1
458:12 528:24 579:14
597:14 605:17 621:14
643:19,22,23 644:1
646:15 717:2
**discussions** 529:10
661:9 723:5
**disk** 542:12 543:21
686:22 691:8
**disks** 540:22
**disorder** 479:2 488:2,13
503:21 504:6 506:10
513:3 525:6 526:6,11,17
527:10,23 530:6 552:10
570:11 574:6 581:17
608:15,16 609:5,24
610:1 618:10 636:19
718:18 722:2,14
**disorders** 406:6 549:23
554:4,8,12 669:4 722:16
**dispute** 370:22 389:16

490:6,7
**disputed** 688:2
**disputes** 389:20,22
**dissimilar** 380:5 422:17
675:12
**distinct** 498:24 514:23
726:11
**distinction** 451:6 536:7
633:8
**distinctions** 364:18
**distribution** 555:11,12
558:21 559:19 560:9,12
580:8 598:3 659:8,11,12
,15,20 660:8
**distributions** 660:5,7,22
**district** 352:1,2 355:8,9
731:1,2
**divalproex** 561:3,5
**diversion** 501:9
**divide** 415:23 552:17
553:1 602:22 663:2
**divided** 415:9,22,24
418:2 599:24 600:22
604:4,5 624:18,19
**dividing** 417:24 551:21
**docket** 352:7 731:4
**doctor** 641:4
**document** 356:17 359:4
361:6 374:3,8,15,18,22
375:24 378:1,17,20,21
379:2,14,23 380:6,6
385:13 386:3,10,15
388:16,17 394:22 397:2
,4,6 407:18 426:11
445:18 448:3 476:3,10
,14,19 480:17 481:10
482:5 488:24 535:15
540:4 547:3 550:3 562:2
563:10 593:11,17 594:2
625:20 638:12,20 639:4
657:9 683:14,24 684:17
688:5,9,19 689:11
711:15
**documented** 468:9
**documents** 360:19,23
374:11 376:8 377:12
379:15 380:2,10 386:19
404:19 688:20 696:20
697:3 704:14,16 726:2
727:14 728:5
**doesn't** 364:17 388:1
404:12 447:6 449:12
456:2 458:7 473:6 520:9
,18 539:16 548:13
554:12 555:21 557:6
563:11 564:9 565:1
566:20 569:4,10 576:8
589:21 591:15 595:18
597:1 617:14 626:16

629:14 630:12 632:10
633:17 655:2 661:5,5
678:14 691:3 705:24
708:20,21
**dogs** 437:14
**doing** 403:14 407:16
417:1 419:19 433:8,18
439:20 458:14 482:20
516:7,13 558:11 563:7
577:19 588:24 611:11
629:5,6 655:12 661:20
662:4 663:9 667:21
681:23 682:12 687:18
692:4 699:23 706:8
707:22 716:8 723:13,14
724:13 725:4
**dollars** 438:15,17
**dominants** 372:22
**dominates** 372:23
**don't** 357:7 359:2 362:13
,14 369:12,15,15,16
370:22 371:10 373:12
377:7 379:10 386:22
389:16 391:16,17,24
395:16 396:6 400:22
401:14,15 402:23
404:22 406:16 408:18
409:3,22 410:6,22
412:13 413:16 416:10
,24 417:5,13,13,17
418:17,17 419:5 421:3
424:18,22 425:1 429:9
,12,22,24 430:12,18,23
431:19,20,22,22,24
432:1,8 434:14,14
440:16 449:24 450:15
,16 455:7,21 456:7,7,16
,16 458:3,10 459:3,3,23
469:20 470:8 471:8,20
472:7 477:16,18,24
478:9,9,13,19,24 482:17
483:12 489:14 490:7
494:12 496:16 497:3
498:19 499:5 509:2
516:17,18 520:14 523:1
525:13 526:4,5,9,15
527:7,16 529:14 531:3,3
,18 537:12 539:20 543:1
544:21 545:7,14 546:11
548:1,6,9 550:11,16
557:13 566:23,23
570:12 572:22 575:9,22
580:21 583:10 592:3
594:14,15 597:10 599:1
,16 602:9 603:2 609:16
,23 610:1 618:23 620:19
,20 624:9,9,11 626:14
,16 628:17,19 631:11
633:7,24 634:4,7 635:16

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

636:2,5,6,15,16,20,22
,23 637:1 639:9 644:7,9
,15 645:24 646:7,7,17
647:5 648:12,19 655:22
656:12 657:21 659:5
660:18,19,24 661:4,15
662:15 664:1,22 665:9
666:4 667:19 672:5,21
673:21 675:15 679:1,6
,13,23 680:15 681:11,17
,19 682:24 684:3 687:17
689:16 690:2 691:1,19
693:1 694:4,5 696:6
701:19,21,24 702:8,8,23
703:10,11,12 705:4,5
706:1,13,17 708:2,3
709:7,8,17,23 710:6,22
718:16 720:1,8 722:1,3
723:4,16,16 725:11,18
726:11 727:6 728:10
729:3
**done** 383:22 386:8,11,11
388:8 390:6 408:1,3,5
413:20 420:22 421:3
425:4,6 433:10,14 436:6
437:6 449:10,13,15,20
459:9 473:12 481:21
486:15 498:12 499:18
509:18 514:12 515:24
522:14 523:12 547:13
549:14 556:7,11 565:7
567:4,8 571:6 578:12
580:10 597:15 602:8,12
,14 605:19 613:14,16,19
619:5 640:8 643:20
656:16 657:14,19,21
673:22 683:7,9 692:17
694:8,24 699:16 700:14
,17,18 711:12 717:15
718:15 728:20
**dosage** 491:4
**dose** 408:8 514:19
679:22 680:10,12,23
681:7
**dose/single** 376:22
**dot** 542:4,11
**double** 638:7
**double-blind** 392:12
**double-check** 497:15,18
499:6 543:17 553:9
555:6
**double-edged** 644:12
**doubled** 373:7
**doubling** 593:1 595:13
596:22 605:11,12
606:18 610:15 631:3
637:21 665:9
**doubt** 719:5
**down** 357:17 375:20

427:1,2 443:5 448:5
461:22,23 491:17,18
500:17 505:13 506:22
597:17 599:20 617:13
619:5 620:14 636:14
**downs** 530:5
**dprsd** 487:22 488:2
**dr** 356:1,2,10,15,22
358:22 359:18 360:4,20
,24 361:1 362:16 371:24
372:5,24 373:11,17
374:9 376:4 377:14
402:6 405:21 411:9
417:12 418:13 440:8,11
,14,24 441:17 442:13
457:14,17,20,23 460:10
469:12 474:19 476:9
480:15,22 483:1 488:5
500:8 517:4 528:3,10,24
530:21 531:8,23 532:15
,24 533:9,18,22 534:1,8
,14,16,19,22 535:3,7,8
,11,20 540:11 544:18
546:7 547:10 549:8
550:14 551:23 558:2
563:10 564:23 572:21
588:20,23 589:3,9
590:15 591:17 593:16
594:18 595:15 597:19
606:15 622:7 623:23,23
625:8 628:18 638:17
651:1 683:19 684:23
687:19,21 688:4,14,16
691:14 693:19 696:12
,23 698:18 699:14
700:21 701:14,17,17,21
,23 702:15 703:11,17
705:1 711:20 714:2,10
,17 715:6,14 727:18,23
728:7,14,17 729:9
**draft** 362:9 707:7
**drafting** 378:20 712:19
**dramatic** 570:24
**dramatically** 475:9
619:10
**draw** 473:6
**drawn** 453:5
**drive** 547:20
**drives** 601:16 614:10
**driving** 631:6
**drug** 398:23 415:9
435:12 452:23 453:8,9
,16 455:16 456:3 464:15
467:7,9 468:3,13 470:14
,21 471:3,8 474:5 481:5
,7 482:18,20 491:4,10
509:22 510:6 513:8
515:2,5,7,11 516:14
517:19 521:20 522:7

524:19,19 527:15
528:16,18,19 529:20
530:5,5 537:20 541:8,10
562:18 566:6 567:17
572:21,22 573:17 576:1
,7,24 577:21,22,23,24
579:10 586:5 619:17
620:9,12 639:21 641:2
649:19 665:21 666:11
672:14 680:9 681:13
706:22 708:10 724:17
**drug-to-drug** 455:6
**drug-treated** 397:16
**drugl** 565:12
**drugs** 358:9 398:10
406:4 422:12 424:4
425:20,22 444:6,17,23
445:13 446:2,6 452:5,9
,10,24 453:3 455:6,14
468:14,17,20 469:1
470:6 471:9,14,21 472:7
,12,14,15,24 473:7,9
474:10,14 488:24 489:4
,8,10,16,19,20,21,24
490:3,5,8 500:10 526:19
,24 527:1,4,22 528:3,7
,12 529:11,15 567:12
573:14 574:12,14,15,16
,19 592:22 621:15
625:24 627:1,17,21
628:6,11 629:6,7,13,21
630:19 631:4,5 632:22
637:18 640:6,7 642:21
,23,24 643:21 644:6,20
,22 645:2,13,13 662:15
665:15 666:7 672:12
674:21 675:1 680:8
707:5 715:20 721:14,15
**dsord** 487:22
**dt** 484:7 485:13 490:21
**due** 410:21 640:24
**duly** 356:6 732:10
**duplicated** 549:14
**duration** 376:22
**durations** 376:17
**during** 392:12 417:2
463:18 465:6,8 469:11
506:9 512:24 515:22
521:18
**dx** 480:10
**dying** 667:1

| E |
| --- |

**e-mail** 362:5,11,12
550:14 689:13
**e-mails** 361:22,24
362:13 689:15,17,19,24
690:5
**earlier** 377:14 411:21

480:13 527:9 575:7
634:14 647:13 649:9
**early** 421:7 433:21 580:8
612:20,23 668:1 706:24
**earn** 428:21
**easiest** 709:16
**easy** 374:16 534:18
550:5,7
**eating** 558:8
**ecological** 707:3
**edification** 700:14
**edited** 710:9
**effect** 422:16,17 423:20
,20,24 427:5 445:12,16
,24 446:5,23 447:19
453:6 474:15,15 529:5
568:4,15 570:21,22
571:20 591:19 592:14
,16,17,19 593:18 612:18
613:18,19 626:24
627:10,13 628:5,11
629:21 630:8,22,24
631:8,16 633:18,24
634:1 637:14,14 640:22
645:3 649:18,19 650:16
,17,19,20 660:12,21
662:18 663:13,16,20,21
664:12 665:5,8,9 666:5
706:5
**effective** 453:10 488:1
**effectively** 449:2 507:1
**effects** 422:1 447:18
448:10 473:5 530:4
574:9 575:1,16,23,24
576:1 577:13 596:18
612:19,23 614:18
627:23 637:6,9 641:3
645:4 648:10 676:17
715:21 724:22
**effexor** 435:21,24
680:22
**efficacious** 438:4
**efficacy** 453:15 454:5
470:20 516:14 644:22
**effort** 544:19 545:4
**efforts** 442:1 726:8,9
**eight** 370:15 555:24
559:13
**either** 376:11,17 398:22
403:6 427:11,16 442:4
448:12 452:8 462:14
464:3 471:24 472:1
524:23 528:11 552:3
557:12 578:15 592:21
619:2 623:3 633:7 648:7
650:20 690:1 727:20
728:19
**elevated** 437:13
**eleven** 406:4

**eliminate** 410:7
**eliminating** 448:11
 else 385:4 458:21
 548:13,16
**emergency** 641:10
**empirical** 653:13 723:18
**employee** 732:19,20
 end 380:24 381:6 410:24
 439:23 453:20 460:1
 480:9 508:12 516:19
 546:18 572:12 624:1,13
 ,15,17,23 669:16 716:7
 719:22
**end-point** 453:21
**english** 654:1
**enormous** 583:11
 enough 359:11 547:4
 567:6 574:15 595:4
 597:8 637:20 719:15
**enrolled** 464:18
**enrollment** 465:22,22
 719:20
**ensure** 580:10
**entire** 521:18 709:17
**entitled** 374:17 474:23
 476:11 714:23 715:7
**entries** 505:8 578:24
**environment** 424:24
**environmental** 433:11
 435:5
**envisioned** 524:3
 728:24
**epidemiologic** 455:12
**epilepsy** 387:16 388:22
 406:5 525:7 530:7
 608:17 646:22 673:18
 ,20 674:12,14 721:16
 723:23 724:5,8
**epileptic** 634:3 636:1
 673:4,8 720:6,19 721:2
 ,12,16 723:13,14
**epileptics** 721:15
**epilp** 542:2
**episode** 560:5,11 564:5
 565:15,19 567:1 578:6
 612:7,22,24 617:10
 618:4,5,11 724:4
 equal 551:20 560:4
 596:7,9 603:9 612:8
 636:15
 equally 509:16,17
 627:19 651:13 727:22
**equals** 542:2 553:22
 554:5,8 599:23
**equation** 551:9 597:16
 err 553:14,22 554:5,8,15
**error** 393:7 417:16
 554:22 600:4
**errors** 393:14 555:7

**escitalopram** 437:24
 438:6
**especially** 666:23 676:3
**essential** 675:10 725:3
**essentially** 411:1 439:4
 544:5 593:17 656:14
**established** 685:5
**estimate** 408:2 410:19
 412:12,15,24 413:2,3,5
 ,11,19 422:15 442:23
 443:11,21,24 444:2
 555:5 623:22 630:14
 647:9,17,21 648:1 650:1
 ,3,10 651:17,18 652:13
 ,17,20,23 653:3
**estimates** 555:10 633:10
 655:20 660:23
**estimating** 551:9
 et 352:8,10,14,17 355:9
 ,10 697:5 731:3,5,7
 etc 559:14 642:7 643:21
 even 379:2 400:17
 446:13 463:11 467:18
 523:23 534:4 546:12,15
 550:11 590:3 593:23
 612:20 617:16 624:8
 631:8 633:14 645:13
 646:22 651:10,16,17
 653:14 666:12 668:10
 677:23 678:21,22 686:4
 697:9,9 717:6 719:2
**event** 416:1 417:23
 423:6 424:14 493:10
 495:6,12,18 496:3,8
 498:17 499:1 513:24,24
 514:23,24 515:11
 518:14 519:14 559:20
 560:1,2 567:24 576:23
 579:20 584:15 586:11
 590:1 593:2 595:12
 596:20,20 599:9 601:3
 603:10 604:10,11
 615:20 623:21 626:2
 640:23 654:20 655:21
 662:19 666:3
**events** 357:2 389:18
 390:24 392:11 394:23
 411:16 422:6 448:11,18
 497:9 498:2,15,18,20,21
 ,23,24 499:3,5 515:10
 517:8 558:22 560:23
 562:21 565:13 566:1
 567:19,24 568:23 569:7
 570:16 572:6,10 577:23
 ,24 579:19 580:17,20
 583:14,17 586:13,20,22
 588:4 611:19 615:24
 618:9 626:5,6,12 642:24
 643:21 666:7,10 678:5

**ever** 362:5 379:2,21
 408:22 409:5 424:22
 434:18,22 435:7,11
 444:22 445:2 464:4
 476:14 499:18 523:21
 556:6 564:23 565:2
 638:20 639:13,16,19
 680:9 689:18 691:19
 708:16 711:24 719:5
 720:2 727:14
 every 389:17 463:3
 464:3 467:9 471:8
 473:14 482:2 514:22
 590:20 603:8 705:20
**everybody** 591:5
**everyone** 474:1 612:4
**everything** 385:4 408:14
 410:19 441:5 494:23
 501:17 509:3 520:11,19
 533:24 549:16 605:16
 623:3 703:17 719:1
**evidence** 393:12 401:4
 ,20,22 452:8 455:8
 459:1 473:9 574:4
 610:23 612:14 621:15
 628:7 640:20 651:11
 663:24 664:4 666:11
 674:17 716:22
**evidence-based** 458:12
**evolve** 700:3
**evolved** 529:11
**exact** 450:5 548:11
 623:16,20,24 625:6
 704:22 706:13 708:3
 723:22
**exactly** 379:10 385:4
 403:9 407:6 466:3
 501:11 531:17,22
 555:12,24 584:18 588:6
 616:24 618:24 646:23
 657:21 683:2 704:8,11
**exam** 734:5
**examination** 356:8
 732:9
**examine** 444:6
**examined** 356:6
**example** 361:8 369:6
 442:11 446:13 459:6
 473:3 485:21 510:2
 522:23 527:7 560:21
 565:11 571:12 575:8
 627:11 644:15 676:24
 700:1
**examples** 447:21
**excel** 536:24
**except** 383:24 428:8
 556:23 574:14 636:17
**exception** 629:10
 693:18 703:18

**excess** 443:7
**exchangeable** 627:16
 ,22 628:8 629:9
**exclude** 365:14 400:6,15
 ,19 465:13 522:3 569:7
 571:16 662:17 663:15
 ,22 664:12 665:5
**excluded** 376:17,20,24
 382:16 399:2,5 400:1
 401:5 402:3,6,23 463:20
 465:5,8 505:17 517:12
 518:16 544:11
**excluding** 364:15,16
 365:6 376:16 444:6
 568:2 592:23 637:19
**exclusion** 471:2
**exclusively** 403:23
**excuse** 591:23 604:23
 691:10
**execute** 544:7
**executing** 544:6
**exercise** 425:23
**exhibit** 356:16,18,23
 357:16 358:17,19,20
 359:2,5 362:16 373:12
 374:1,4,13,23 375:2,2,3
 ,9,9,10 377:22 378:6,7
 ,14,22 380:15,17,24
 381:12,14,17,20,21
 382:3,3,8,9,12,12 383:5
 ,6,6,7,7,18,19,21 384:1
 ,2,15,16,23,23,23,24
 385:1,8,9,18 386:16,18
 ,19 392:3,4,5,9 394:20
 395:4,12,23 396:24
 397:9,14 399:9,10,11,13
 400:13,14,14 401:8,9
 402:18,19 405:22
 407:12 411:10 414:1,13
 ,13 415:2,16,17 416:21
 417:1 419:24 426:1,5
 430:1 442:17,18 448:4
 450:2,7 451:3,21 460:13
 ,14,15,20 476:1,4,10
 480:16,18,23,23 490:18
 504:12 535:13,16,21
 538:6 540:3,5,12 541:19
 542:16,17 548:21 549:8
 ,9 556:19 557:1,5,7
 558:14 562:1,3,15 573:3
 580:3,6,6,13 581:5,8,9
 582:20 593:10,12
 608:12 613:20 615:15
 620:12 622:8,23 638:11
 ,13,18 654:11 666:15
 668:16 670:2 672:9
 677:8 683:13,15,19
 684:6 686:17 687:16
 688:8,10,15 696:13

699:1 708:16 711:14,16
,21 712:14 713:19,22
714:6,13,20 720:15
726:3 734:9
**exhibits** 399:24 535:13
725:21 726:1 727:11
**exist** 360:2 697:18
698:19,24 705:11
**existing** 547:20
**exists** 656:15
**expect** 458:4 469:20
477:5 478:4 550:19
553:6 560:20,22 561:2,9
,12,15 583:13 584:15
585:19 588:4 591:14
606:22 626:17 667:22
**expected** 583:14,24
584:2 594:22 626:11,12
,14 639:3 641:23 662:6
**expend** 441:11
**expense** 366:14
**expenses** 365:5,7,13
366:7,9,18
**experience** 403:19
428:22 605:22 606:12
668:21 670:21,22
671:22 708:13
**experiment** 649:24
652:18
**expert** 377:15 378:11
379:16 390:11 399:7
405:10 408:11 421:24
433:8 435:19,23,23
437:11 439:16 453:12
456:22 457:15,18,20,23
458:21 466:2 504:10
524:17 525:3 530:1
531:19 547:18 551:13
553:11 575:21 591:15
622:24 623:2,3,5 639:1
,22 646:11 647:1 661:24
667:22 668:20 671:14
679:18,23 681:19
682:17 700:16 717:4
718:7,12 729:10,20
**expertise** 429:7 528:2
534:20
**experts** 439:10 457:7,11
458:2,7 661:10 668:21
669:11
**explain** 472:14 531:7,16
692:24 693:3
**explore** 473:13 677:20
724:22
**explored** 475:6
**exploring** 660:21
**explosive** 495:10
**exponential** 555:4
**exposed** 577:21,22,23

,24
**exposure** 387:6 420:12
,14,20 421:5 502:24
503:5 506:7,8 508:6,24
509:5,6,8,22 510:3,5,7,9
,14 512:7,16,22,23
513:8,17,18,22 514:14
515:16 575:10,14
576:15,16 577:4 578:3
579:8,9 583:13 584:1
585:20 592:24 595:23
596:9,12,14 600:13
604:20 605:1,12 606:18
610:4,6,8,14,15,18
612:3 618:18,19 662:20
,22 676:10,10,20 677:3
,21 683:10,10
**exposures** 421:17 596:7
**express** 591:17
**expressed** 642:16
**exquisite** 424:17,19,23
531:7 540:13
**extending** 645:12
**extensive** 436:12 474:11
**extent** 369:13 371:22
379:5 391:7 445:5 457:9
469:24 474:13 477:12
631:18 654:9 686:2
712:21 723:4
**external** 661:10
**extra** 417:20
**extract** 470:6
**extreme** 667:6
**extremely** 424:13
473:19,24 681:14
719:12
**eyes** 563:11

### F

**f-i-s-h-e-r-i-a-n** 653:20
**f-o-r** 541:15
**fabricated** 494:14
**face** 409:12,16 410:4
443:12 594:21 649:6
**fact** 399:5 401:22 416:19
454:8 473:7 522:11
532:3 556:23 571:7
574:19,19 626:16 637:8
644:21 678:20 694:8
701:2 705:11,16,19
710:10 722:8,11 729:17
**factor** 569:10 601:19
**factors** 523:7 578:7
603:6,9 620:17
**facts** 393:11 401:4,20
459:1 610:23 716:21
**factual** 458:11 459:9
**fair** 519:16 567:6 597:8
**fairly** 474:11 482:22

531:19 637:16 638:6
727:6
**faith** 709:11
**fallen** 687:16
**falls** 441:21
**familiar** 581:24 593:21
642:8
**far** 550:20 611:16 624:22
700:8
**fast** 491:20
**favor** 640:13
**fawcett** 668:1
**fda** 357:4 374:18 375:19
,20,24,24 376:15,16,24
385:11 386:8,11 387:7
389:19 390:2,9 391:2,3
,20,21 392:11 394:8,9
,24 395:5,5,13,17,19
396:3,11,15,20,21
398:14,24 399:1,6
400:20,21,23 401:2,24
402:2,3 403:4,5,9,11,13
,20,23 404:3,21 405:2,3
,6,10,13,14,19,22 406:2
,8,18,24 407:6,24 408:3
,5,9,11,12,13,17,21,23
,23 409:6,8,12,16 410:4
,8,12,17 414:2 415:13
418:5 420:15 421:8,11
,12 422:2,9,10,17,19
424:6 425:19 427:21
433:17 443:12,22 444:4
,13,21,22,24 445:1,1,23
449:18 454:5 581:6
592:4,22 625:15 626:11
,24 627:4,5,9,21 629:5
631:16 633:3,4,10 637:7
,19 638:19,22 639:5,9
645:7,14 666:14 667:11
,20 672:9 673:16 675:3
,5,19 676:2 677:15,22
,23 678:15,19 679:15
682:21 683:2,3 718:20
720:7,13,13 722:5,17
**fda's** 424:4 629:13
633:16 637:10 667:12
672:10,11
**features** 578:11
**february** 355:2 502:12
733:3
**federal** 712:10
**feel** 483:2,3 491:20
500:23 700:6
**feeling** 407:22 496:18
655:5 667:2 681:20
**feelings** 496:21
**fell** 438:10
**felt** 459:6 521:24 641:13
718:23 724:23

**female** 437:14 484:1
**few** 380:8 382:11 565:14
580:2,11 608:22 666:7
**fewer** 630:16
**field** 483:16 484:6 485:6
486:3
**fields** 483:6 501:16
**figure** 372:22,23 410:14
432:2 532:11 635:4
663:8
**figures** 399:6
**file** 352:9 466:24,24
467:1,1,2,2,4,4,7,7,15
,24 468:2,4,12 476:16
477:24 479:2,18 483:1
501:15,16,18 541:14
542:12 544:5,11 699:6
,15 703:18,19 731:6
**filed** 462:20 463:14
701:3 702:14
**files** 466:21 467:20
468:8,9,13 476:22 481:1
531:20 532:6 535:24
536:1,4,13 542:8 543:19
544:9 699:5,5 700:8,10
,15 703:12 704:21
**filled** 463:17
**final** 548:23 568:16
579:15 621:14
**financial** 428:11,16
433:1
**find** 373:16 377:13
424:16 532:2 543:12,13
,16 615:1 633:23 699:13
**finding** 593:9 621:13
676:6
**findings** 473:2 516:11
676:20 717:2
**fine** 365:2 377:10 379:22
386:13,23 388:9 394:19
417:3,6,17 418:20
419:15 429:18 445:10
448:13 453:14 479:1
481:13,18 482:6,8 495:2
498:22 504:12 533:16
547:8 548:12 550:1
557:12 563:14 585:2
592:1 594:4,11 611:2,2
657:16 668:15 674:18
685:2 686:8 688:7
696:12 698:5,10 706:7
713:18 730:1
**finer** 364:18
**fingertips** 635:17
**finish** 396:8 428:10,13
,17 632:15 685:8 686:4
691:18
**finished** 428:15 621:19
681:2 692:10 708:4

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**finkelstein** 353:9
**finklestein** 683:23
**firearm** 495:9
**fireball** 438:20
**firm** 353:16
**first** 362:18,22 363:11
,18 370:23 376:6,9
379:18 381:1 400:3
401:13 405:23,24
432:13 436:20 442:21
462:7,10 463:11 477:10
478:16,17 479:2 481:14
485:1,21 486:11 488:5
490:17 497:23 498:4,17
500:11 501:2,21 503:1
,22 505:15 506:3 507:3
,4,20,23 508:1 509:7
516:3 523:20 526:5
535:14 548:22 549:2
557:23 558:24 559:2
560:2,23 562:24 565:21
567:12,17 578:2 586:13
593:5 611:8 613:3,6,24
614:6 616:17 630:13
632:18 641:1 655:19
660:3 675:8 713:24
714:4 715:6
**fish** 589:5
**fisher** 653:19,20
**fisherian** 653:15,19
658:14 662:11
**fit** 521:22
**five** 461:23 487:8 495:5
496:12,12 497:3,5 499:5
503:16 555:23 569:19
580:18
**five-fold** 673:19
**fixed** 542:15
**flavors** 537:8,14
**flies** 649:6
**flight** 692:16
**flip** 397:9 405:22 427:14
525:17
**flipped** 427:4
**florida** 433:14 442:12
**fluids** 436:19
**fm** 353:17
**focus** 385:8 472:23
630:20 644:16
**fold** 592:7
**folks** 475:5
**follow** 393:20 508:13
526:22 545:18 615:13
632:8 641:19 666:21
**follow-up** 513:23
**followed** 432:14 510:6
**following** 383:4 393:1
506:10 508:10 509:10
513:2 559:7 560:10

**fortiori** 695:1,2
**fortran** 532:5 539:22
568:13 691:11,14
700:13 729:2
**fortune** 436:7,9
**forward** 618:1
**found** 521:14 524:1
550:22,24 577:10 626:8
,10 628:7 637:11 668:5
,22 691:7 719:17
**foundation** 377:3 385:12
,23 390:8 391:14,22
393:10,23 394:14,16
395:10 398:15 401:3,20
404:11,13 406:10 445:4
447:5 449:12,22 450:24
452:19 453:11 458:6
459:16 470:22 472:9
482:7 504:8 532:19
533:13 534:10 545:8
563:12 564:20 566:20
582:2 590:16,23 591:11
593:23 596:1 598:15
599:7,14 601:12,22
602:8 603:14,22 605:24
606:23 610:9 646:5
653:8 657:12 658:6
659:23 664:14 667:17
668:17 673:10 681:9
684:24 685:7 686:13
689:5 725:9 728:3,8,15
729:13
**four** 358:6,8 399:20
437:14 466:21 468:8
480:24 483:6 495:5
503:16 522:24 523:1,2
555:23 584:3 585:12,12
,13 590:10 607:12
625:22 665:2
**fours** 358:4
**fourth** 374:17 497:24
664:15
**framework** 655:11
**francisco** 354:12
**frankly** 701:19
**free** 491:20 500:23
**frequencies** 611:14
**frequency** 472:13
560:12
**frequent** 604:10,11
**frequently** 423:8 611:20
**frightened** 701:16
**front** 360:4,17 375:4
429:24 558:5
**full** 551:10 573:7 653:14
**function** 437:3 647:10
657:5 658:3
**fund** 713:20
**funded** 712:8 716:20

**567:1** 568:6 569:21
571:9,16 572:4 575:14
614:1 621:17 629:17
638:23
**follows** 356:7
**footnote** 406:15
**foregoing** 731:10 732:12
**forest** 437:22
**forget** 631:24 685:19
**forgot** 369:4 623:10
**forgotten** 547:19
**form** 358:8 383:9 385:12
,23 393:10 394:13
395:10 398:15 401:3,19
409:15 412:19 414:17
418:6 419:4 425:12
428:23 430:10 433:20
443:19 446:8 447:5
449:3,11 451:14 452:18
453:11 459:16 470:22
471:22 472:9 473:17
474:7 477:11 494:9
495:16,20 496:4 500:13
503:4 505:4,19 508:7
512:8 513:9 515:4
518:22 520:4,8 526:20
527:24 528:13 529:7,22
530:11 531:10 532:18
534:10 536:11 547:24
556:2 564:19 566:19
569:14 571:3 575:19
582:1 590:16 593:22,24
594:23 595:24 598:6,15
599:7,14 601:12,21
602:7 603:14,22 605:23
606:19,23 610:9,21
613:4 619:24 620:4,24
622:16 624:3 628:1
629:15 635:5 639:7
643:6 646:5 649:2 655:8
657:12 658:6,16 659:23
664:14 667:17 668:17
671:2,9,19 673:9 675:6
677:16 678:16 681:1,8
682:2 685:7 689:5
716:21 717:19 718:9
725:9 726:12 728:8,15
729:12
**formal** 550:9,12
**format** 476:24 484:13
485:16,19 494:23
**formed** 700:15
**formula** 551:6 593:17
594:7,16 595:9,16,18,20
,22 597:21 599:5,22
601:10,14 602:14
**formulas** 593:20
**forth** 361:22 530:7
555:15 690:6

**funding** 716:16
**funds** 441:8,9,12
**further** 356:7 453:4
473:12 514:6 530:5
619:19 666:11 699:23
**furthermore** 461:23
465:3 612:2 628:9 722:5
**future** 668:9

G

**g-a-b** 383:11
**gab** 381:1,5 383:11,20
**gabad** 542:1
**gabaergic** 592:21,22
637:18
**gabalin** 396:6
**gabamodel1** 536:21
538:6
**gabamodel2** 536:21
538:6
**gabapentin** 358:7 381:2
,9,20,21 382:2 383:20
,21 384:8,9,13 387:3,6
,10 389:18 394:24
395:20 396:2,14 397:15
400:4 405:19 411:16
414:5 421:9 422:11,15
,16 425:9,20 439:21,22
440:9,12,13 441:1 443:1
,3 444:7,13 454:21
455:23 456:12 461:13
,17,19 462:9,10 463:15
465:8 471:23 473:4,15
474:1 480:1 501:11
505:12 506:23 507:8,9
,16,21,24 508:1,6,10,11
,24 509:5,7,8,11,12,13
510:10 512:2,7 513:7
514:9,17,17 515:8,16,18
,19,21 517:17 518:5,7
519:17,19 521:19 522:8
,10 525:10,12,20 526:6
,10,13 528:11 529:1,5
,19,24 531:1 536:22
538:8,17,19 541:5,9
543:5 552:7 558:20
560:21 567:12 568:5,22
570:3,11 573:8 575:8,10
,14,16,18 577:5,7 587:9
589:13,15 590:21 591:7
592:21 607:21 608:1
610:4 612:15,20 613:15
615:3,10 617:1,10,16
618:5,8,12,13,20 620:15
622:12 626:21 627:16
629:11,20 630:12,18,20
631:23 632:1,21 633:13
637:16,17 638:3,10
654:19,23 655:2,6,11

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

664:13 678:3 679:9,10
682:20 713:8 718:6
719:3 724:14,16 725:2
726:9,19 727:1,7 728:19
729:18,19
**gabapentin-only** 425:5
,7
**gabapentin-treated**
406:20 407:7 679:17
**gabasumm** 536:21
538:7 542:1
**gabasumm1** 541:21,22
**game** 692:3,5
**garage** 436:16
**gary** 355:24
**gave** 360:15 361:5
412:24 435:1,1 539:24
587:19 630:5 684:4
704:11,19
**ge** 551:12
**gears** 460:11
**gee** 551:10,15,16,19
553:3,6,8,16 554:21,23
555:5,10 556:12,14
**gen** 492:14
**gender** 595:20
**general** 494:22 598:18
605:22 607:2 609:4,9
626:22 634:12 635:22
641:3,20 657:24 726:20
**generalized** 551:9
**generally** 442:6 446:2
**generate** 566:17
**generated** 566:15 704:2
**generic** 437:7,10,17
492:17 638:19
**generics** 437:22
**gerhard** 354:14
**gets** 453:8 544:14 629:1
**getting** 442:9 461:6
466:11 546:7 581:11
631:9 712:8
**giant** 438:20
**gibbons** 352:22 355:14
356:2,4,10,15,18,22
358:22 359:5,18 360:4
,20,24 361:1 362:16
371:24 372:5,24 373:11
,17 374:4,9 376:4
377:14 402:6 405:21
411:9 417:12 418:13
434:6 460:10 474:19
476:4,9 480:15,18,22
483:1 488:5 500:8 517:4
535:16,20 540:5,11
544:18 546:7 547:10
550:14 551:23 558:2
562:3 563:10 564:23
572:21 588:20,23 589:3

,9 590:15 591:17 593:12
,16 606:15 622:7 638:13
,17 651:1 683:15,19
684:23 687:19,21 688:4
,10,14,16 691:14 693:19
,21 696:12,23 697:5
698:18 699:14 700:21
711:16,20 726:3 727:23
729:9 731:18 734:4
**giles** 436:5 680:11,23
**give** 357:5 415:11
434:19 441:13 459:8
481:6 531:17 532:9
552:18 553:6 588:20
647:6 655:2 694:16
705:6 706:15 709:17,18
710:1
**given** 360:19,20 399:1
408:2 425:21 434:22
496:16 514:2 520:19
524:19 538:5 576:20
623:22 637:14 638:17
655:17 656:1 674:20
682:1,7 689:4 699:4,16
705:7 708:13 718:14
719:4 720:22,22 722:16
731:10,14 732:15
**gives** 467:21 503:15
533:2
**giving** 623:21 699:3
700:7 702:9
**gladly** 705:7
**glance** 380:1
**go** 357:20 371:24 375:6
,10 379:23 380:13
383:18 386:14,14
388:20 389:14 392:4,7
394:20 395:23 399:9
401:10 409:23 410:22
411:9 414:3 421:8
425:24 427:11 428:9
432:10,12 438:22 441:6
445:9 460:20 461:21,22
464:9 479:18 487:5
488:5,23 490:16 492:20
495:3 497:15 499:6,23
500:9,17,18 503:6
504:12,13,17 506:1,12
512:15 516:17,18 518:1
529:8 532:10 536:8,22
537:2 539:11 540:17
541:2,19 542:16 547:6
,21 548:3 549:8 550:12
552:1 553:10 554:11,20
555:18 556:9,14 557:13
558:6,13 562:17 565:23
571:13 573:22 574:2
581:5,13 583:3,9 585:7
,10 588:14 594:2 598:20

601:22 603:7 611:3
615:1,2 620:14 621:3,22
622:23 625:12 628:1
631:19 636:13,14 642:6
649:3 653:16 654:10,13
658:16 660:4 661:8
666:18 669:14 670:2
685:12,21 687:23 690:8
692:23 696:12 698:22
699:14 705:5,22 712:16
714:8 727:18
**god** 539:16 564:17 565:6
712:14
**goes** 441:18 485:9 538:2
541:4 544:19 557:15,18
569:8 599:9,19 603:10
**going** 356:16 362:20
366:17 373:13 380:19
385:8 386:19 387:13
391:4 394:21 399:10
409:7 410:12,14 411:1
417:8,19,24 421:19
431:5,6 442:10,20
451:15 456:21,24 459:4
460:2,11 461:2 468:10
,10 479:10 480:15
483:22 491:16,17,20
500:2 502:24 504:16
505:13 506:22 508:18
514:24 529:18 531:17
,22 537:22 544:9,10,22
,24 545:1,10,18 546:4
,21,23 552:3,6,17,23,24
556:24 557:21 558:3
564:2 568:21 571:13
576:1 585:1,2,8 587:16
589:4 596:13 598:11
599:11,12 600:15 601:8
620:17 622:1 642:5
645:17 650:2 660:15
665:24 666:14 669:17
670:10 674:24 678:1,3,9
692:2,3,15,16,18,19
693:3 694:16 696:18
701:3 710:15 716:19
718:1,5 725:20
**gold** 678:20
**gone** 434:19 443:16
531:20 538:21 549:13
551:3 689:7 705:20
**good** 356:11,13 423:12
461:20 471:13 499:21
511:9 522:3 525:2 534:4
541:17 556:9 606:13
619:21 640:12 696:18
702:4 707:11 714:6
718:22,24 719:1,22
722:22
**goodness** 539:21

**gotten** 435:7 527:8,9
606:6
**government** 574:15
**grab** 712:14
**grand** 354:3
**grant** 441:6,8,10,12,15
,22 442:2,8,14,14,15
713:24,24 714:4,8,12,13
,15,17,19,22,23 715:3,6
,14,16,23 716:1,3,4,5,9
,13,14,15,15,20
**granted** 710:11,20 711:8
**granting** 716:17
**grants** 441:5 713:20,23
716:18
**graph** 647:11,14 649:10
657:4 659:2,19
**great** 373:24 500:24
645:5 669:12 707:9
727:2
**greater** 560:5 634:16,17
,22 648:3 650:19 651:19
,21 652:7,22 653:3,4,5
655:18 656:4,5 657:6
659:15,20 660:11,17
**greatest** 613:23 614:6
720:6
**greenland** 457:14
595:15 623:23 625:8
628:18
**greenland's** 594:18
597:19
**grew** 530:19
**gross** 442:2
**ground** 585:1
**grounds** 390:9 393:24
404:12 445:5 458:7
728:2
**groundwater** 435:2
437:1,4
**group** 355:21 389:18
390:4 392:23 394:8
452:10 469:13 515:8
562:19 565:12 566:6
572:21 573:5 591:6
595:14 596:5,6,10,13,14
600:16 609:2 622:9,12
,14 626:13 677:4 719:11
722:4
**group's** 394:4
**groups** 389:23 600:13
609:1 676:8 722:22
**guess** 382:24 606:7
655:22 660:6 663:2
666:18 720:17 726:14
**guide** 667:10,13
**guidelines** 391:4,6,9,10
**gun** 495:9
**guys** 363:6 520:19

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

718:16 723:6

**H**

**hadn't** 463:13,22 631:6 709:2
**half** 373:5 465:20 569:11 631:19
**hamilton** 640:18
**hand** 378:3 399:10 419:24 430:1 480:15 562:14 683:12 684:4 733:2
**handed** 356:15 374:23 476:9 480:22 538:15 540:11 562:15 593:16 597:23 688:14 711:20 727:11
**handful** 580:8
**handled** 517:13
**handwritten** 369:7
**handy** 375:3
**hanging** 439:12
**happen** 429:20 555:22 ,23 556:6 558:2,19,21 559:6 641:8,11 677:1,2
**happened** 539:6 565:2 571:17 620:15 622:11 680:12
**happens** 570:5 579:17 679:14
**happy** 442:5,5,6 479:22 516:16 556:9 641:10
**hard** 357:13 536:18 539:20 547:20 700:11
**hardy** 354:2 361:1,10 523:19 701:23
**harmful** 575:16
**harrison** 352:23 355:4
**harvard** 511:10 706:14 ,16 707:16
**hasn't** 590:17 602:8 657:14 717:9,10
**hate** 543:11
**hates** 701:15
**haven't** 358:23 361:24 397:8 421:3 475:21 523:23 524:3 538:21 564:1,2 567:8 597:12 657:19 673:13 688:21 727:2
**having** 356:5,6 364:12 532:8 544:4 547:17 569:18 570:10,11 618:9 626:2 631:7 641:3,4,19 651:23 670:22 690:2 719:12
**hazard** 656:21
**hazardous** 436:14,23
**he's** 390:10 529:5 697:8

715:16
**head** 389:12 429:21 439:8 470:9 479:10 618:23 677:5
**head-to-head** 438:5 455:20
**headache** 646:2
**health** 432:23 442:4 465:23,24 466:6,6,11,11 712:9
**healthcare** 666:22
**hear** 373:1 381:23 423:11 693:1
**heard** 424:23 711:24 712:5
**hearing** 366:4 379:3 478:16,18,18 725:13
**hearings** 644:13
**heavily** 372:22,23
**held** 355:4 362:2
**help** 433:15 440:11 477:9,17,21 647:22 678:1,3
**helped** 435:14 440:8 477:13 728:22 729:19
**hereby** 731:9 732:7
**herein** 356:5 732:11
**hereto** 732:22
**hereunto** 733:1
**heroes** 707:10
**herself** 662:5
**hesitate** 477:1
**heterogeneity** 447:19 453:3,6 628:7,15,18,23 645:8,9,11,20
**heterogeneous** 452:10
**heterogeneity** 446:22 628:24
**hi** 439:11,14,15
**high** 613:24 719:12 721:6,24
**high-risk** 521:10,13 724:24
**higher** 455:14,23 568:7 586:15 590:6 609:19 611:14 619:19 624:1,5 649:11 655:6 673:3 722:2
**highest** 412:16 413:22 433:13 565:17 609:2,13 610:1,17,17 619:2,8 652:14,19 719:12 720:19 721:9,20 722:18 ,22
**highlight** 550:18
**highlighted** 487:9
**highlighter** 500:22
**hillyard** 354:10
**hired** 436:10 437:10

**historically** 436:6
**histories** 669:4
**hitting** 555:11
**hmos** 463:1
**holding** 705:7
**holiday** 355:4
**homogeneity** 628:22
**hone** 631:4
**honest** 459:9 699:18
**hope** 700:2 711:13
**hopeful** 719:17
**hopefully** 699:24
**hopelessness** 668:10
**horizon** 606:11
**horsepower** 598:2
**host** 473:11
**hour** 631:19
**hours** 364:5 365:5,13,19 366:2,6,20 367:1,7,15 ,22 368:4,9,16,22 369:23 370:3,7,15 451:15
**houston** 353:18
**however** 699:2
**html** 704:16 705:13
**huge** 586:21
**hundred** 388:14 438:15
**hur** 440:8,11,14,24 441:17 531:8,23 532:15 ,24 533:9,18,22 534:1,8 ,14,16,19,22 535:3,7,8 ,11 701:14,21,23 702:15 703:11,17 705:1 728:7 ,14,17
**hur's** 727:18
**hx** 486:23
**hypotheses** 516:9 658:13
**hypothesis** 423:8,9 427:3,10 649:7,16,20 651:11,12 652:4 653:6 656:15,24 658:11 660:13 664:1
**hypothetical** 393:11 459:1 610:22 649:3 716:22
**hypothetically** 393:6

**I**

**i'd** 363:9 374:1,13 375:6 ,9 377:20 380:1 382:14 383:18 414:1,3 416:10 424:8 425:3 442:16 448:14 450:9 487:5 495:4 501:24 512:10 538:3 541:23 558:10 581:13 598:1,1,1 619:6 622:22 635:3 661:2 690:8,9

**i'll** 388:6,10 428:23 486:14 490:2 540:1 550:18 557:23 562:14 579:14
**i'm** 360:12,22,24 371:9 375:13 381:4,22 383:16 384:24 385:17 388:7,7 ,17 389:3 390:17 396:5 397:12 399:15 402:5 409:19,24 410:12 411:12 416:7 417:24 418:20 419:7 423:16 424:22 427:23 428:18 ,19 431:5 433:17 439:16 443:7 448:4 451:7,20 454:13 456:9,24 457:4 459:4,7 461:1 464:11,19 466:2,2 468:12 469:18 ,20,23 479:22 480:4,15 483:22 489:15 491:17 ,19 492:9,12,12 494:15 496:24 501:4 502:2 504:10,16 507:23 508:21 510:22 512:18 513:11 518:1,4,5 525:21 530:3 536:16,16 537:15 539:1 540:18 543:16 544:7 545:12,20 546:7 ,17,21 547:10,12,20 549:17,17 551:13 552:6 ,9,9,10,17,23,24 553:11 554:6 556:9,11 557:8,12 559:2,3,7 561:21 564:7 567:11,15,22 568:7,10 573:19 575:21 580:16 ,18 581:11 583:21 584:8 ,18 585:2,8 589:2 591:3 ,23 592:1 593:9 594:7 ,17 595:1,3 596:8 597:13,13 606:15 607:6 613:12,13 618:7 621:6 629:17 630:4 631:9,9,22 632:18 637:5,5,8,15 639:22,22 643:12 646:11,22 652:9 654:13 655:4,12 658:18 660:15 662:19,21,24 663:7 664:24 667:7,21 673:5 ,13,15,15 674:16 675:16 ,18 676:1 679:24 680:5 682:7 685:9 687:1,3,4,9 ,13 692:6 693:3,8 696:22 697:1 698:9 699:18 700:21 701:2 704:23 705:10,18 708:12 709:22,22 710:15,17 725:11,12
**i've** 383:22 433:14 435:13 511:2 514:12

544:15 548:5 689:7
706:4,4
**i-a-n** 653:19
**i.e** 448:21
**icd** 486:9,20 530:9,11,13
**ice** 558:8
**id** 429:20 430:13 431:7,9
432:14 483:1,7,9,23
485:1,5 490:11 493:1,4
542:2
**idea** 360:10 377:3 386:9
390:9 496:19 524:11
545:6 627:15 645:12
656:15,22 707:15
**ideas** 723:9 726:18
**ideation** 391:1,5 406:3
583:18 586:17,23 590:4
,5 611:18,24 612:5
632:21 634:2,6,15
635:15 636:7,10,20
637:22 665:16,24
672:20 679:12
**identical** 380:3 381:21
383:24 384:5
**identification** 356:19
359:6 374:5 476:5
480:19 535:17 540:6
562:4 570:22 593:13
638:14 683:16 688:11
711:17 726:4
**identified** 392:15,17
522:24 538:10 547:11
,13,14 548:4 570:8
580:3 687:20 691:18
**identifier** 431:12
**identifiers** 431:11
**identifies** 402:1
**identify** 355:15 356:22
357:8 422:14 436:3
439:1 548:9 576:14
715:10
**identifying** 491:5
**illinois** 352:24 354:24
355:3 732:1,5 733:3
**illness** 470:1 525:6
722:16 724:20
**imagine** 466:9 549:22
636:14 669:1,4
**immediate** 619:3
**immediately** 518:20
**impact** 437:3 567:23
**impacts** 437:1
**implement** 728:23
**implemented** 532:1
597:18
**implies** 542:11
**imply** 634:17
**important** 400:23 409:10
410:2 451:6 479:15,23

498:11 516:8 524:11
544:1 570:4,13 612:11
645:10,16 675:13,13
676:17,18 723:7
**impossible** 439:4
**improper** 393:11 403:12
458:24 610:22 649:2
690:24 693:22 694:3
696:2 711:5 716:22
**impulses** 667:6
**ims/pharmetrics** 366:14
**inaccuracies** 550:23
**inaccuracy** 481:22
**inadvertently** 401:1
544:2
**inappropriate** 410:16
548:14 693:23
**inc** 352:17 474:20
476:23 477:4
**incidence** 444:17,22
445:3 455:12,13 627:12
632:20 673:17 676:6,7,9
,12
**incident** 417:9
**include** 363:5 366:17
391:5 403:16 408:21
474:11 556:13 568:17
576:19 578:8 579:16
658:12 678:24 679:2
717:1
**included** 382:21 396:19
401:1,5,17 402:3 404:1
407:1 408:6,20 443:14
,16 465:15,23 470:6,10
472:16 473:20 474:14
517:11 518:16,17 519:6
543:20 559:24 583:17
586:17 608:11 638:2
672:10,11 703:19 707:4
718:11 722:17
**includes** 569:24 611:18
665:16 731:15
**including** 433:13 498:14
568:1 640:2 642:21
662:7
**inclusion** 555:14 570:20
**inclusive** 731:12
**income** 372:6 373:3
428:21 429:5
**inconsistencies** 383:2
479:21
**inconsistent** 422:9
446:21 494:19 565:16
569:4 626:10,22
**incorporated** 355:10
**incorrect** 370:21 451:19
549:21 566:24 594:19
**incorrectly** 567:4
**increase** 472:24 572:3

574:5 592:6,7,8,9
619:22 621:12 629:11
640:20 641:22 644:19
667:6
**increased** 443:2 448:19
630:12 632:11 718:13
720:23 721:2
**increases** 444:7 621:16
**increasing** 454:22
455:17 473:9 571:9
**independent** 408:15
727:6 728:12
**independently** 531:14
**index** 462:3,14 464:14
,14 465:18 484:7 488:6
,7,16,20,21 500:11
501:5,6 503:21 506:10
,14,18 513:2 517:8,16
,20 519:7 526:14 559:5
,9,11 560:5,10,21
562:23 564:5,10 565:14
,15,18 566:11,16 567:1
568:1 569:3 570:6
571:18 573:22 578:6
612:6,7,22,24 616:6
617:10 618:3,5,11 634:9
724:4
**indicate** 376:23 454:21
456:6,8,11 473:3 507:16
510:5 513:23 537:19
541:11 646:11 650:18
703:4
**indicated** 406:15 463:15
722:6
**indicates** 465:17 646:21
**indicating** 397:14 420:1
443:2 628:6 649:17
650:16
**indication** 394:24
447:16,20 492:7 524:18
525:14 529:21 530:1,2
724:13,15 725:8
**indications** 387:10
530:6 627:2 634:11
672:15,17 673:2,17
674:21,22 719:8 721:20
,21,23 724:22
**indicative** 633:12,14
**indirectly** 732:22
**individual** 391:8 442:8
452:9 453:19 494:15
496:12 497:13 538:9
617:13 629:6
**individually** 614:19
**individuals** 427:20
499:9 507:17 589:13
660:6 725:6
**inducing** 456:3
**industry** 436:14

**inference** 455:22 473:6
**inferences** 453:1,4
578:21
**inferior** 644:21
**infinite** 464:3
**infinity** 624:23 625:1
666:1,1,13,13
**inflate** 423:5
**influence** 470:20 571:1
721:14
**influenced** 529:5
**inform** 716:17
**information** 357:14
376:15 392:18 398:20
403:8,20 405:11 406:24
407:19 408:5,13,16
409:11 410:2 425:8,21
,22 440:24 454:7 483:16
488:7 499:11,16 530:15
544:2,20 545:4 546:9
576:6 629:3 662:7 677:6
703:8 711:22 722:10
727:19
**inherently** 679:6
**initial** 408:11 425:18
450:22 509:22 510:14
575:14 613:2,10
**initiate** 613:24 728:21
**initiating** 675:11
**initiation** 506:8 508:10
509:7,10,24 511:22
512:24 513:19,24 514:3
518:5 568:7,9 571:9,16
614:1 615:5 619:9,10
621:18
**injury** 467:16
**inn** 355:4
**input** 468:8
**inquiry** 530:8
**insensitive** 645:11
**insinuate** 693:21
**insinuating** 694:2
**insomnia** 667:4
**instance** 497:9
**instances** 535:6
**instead** 535:8 569:18
574:14 598:11,12 604:7
632:6 660:10
**institute** 432:24 442:4
669:9 712:9
**instruct** 548:6
**instructing** 545:11,12,23
**instruction** 546:5 685:18
**insurance** 438:13,13
463:1,3,7
**integrity** 713:10
**intended** 385:21
**intent** 386:1
**intention** 386:10 439:20

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

465:13 543:24 544:16
568:16 699:8
**intentional** 458:16,20
**intentionally** 544:18
547:13 700:22
**interaction** 428:7
**interest** 424:9 465:4
467:10 527:5
**interested** 511:11 601:4
602:20,21 604:6 719:24
732:22
**interesting** 377:13
555:17 567:11 615:1
719:3 721:17
**interfering** 588:24
**interjection** 511:15
**intermediary** 433:18
**intermediate** 417:20
544:9
**internal** 393:21 661:21
**interpret** 445:21 447:2,9
456:9 485:24 648:13
649:16 650:4,18,22
657:1,3 658:17 662:16
671:14
**interpretation** 446:3,4
,10 654:6
**interpreted** 445:23
**interrupt** 675:15,21
**interruption** 606:2
**interval** 412:14 413:1,7
,13,17 444:8 451:11
513:7 514:20 555:9
562:21 623:12,13
624:11 625:5 647:9
655:10 656:13,13,20,23
,24 664:9 665:18,24
666:4,6,12
**intervals** 419:19 551:7
557:24 559:4 571:22
624:21 656:18 658:12
660:23 663:12
**intimate** 531:7
**invalid** 678:24 679:2,13
**inversely** 599:5
**invited** 706:14,17,19
**invoice** 362:18,22
363:11,14,18,24 364:4
365:4,12,18,24 366:13
,19 367:7,14,21 368:3,8
,15,20 369:3,22 370:7
,13,20
**invoices** 358:24 362:17
363:4,5 373:14 429:23
430:2
**involve** 499:14
**involved** 385:13 394:12
422:3 438:12 520:17
680:17 725:6 729:21

**io** 601:2
**ir** 600:6,9,18,21,22
**irrelevant** 711:4
**irrespective** 510:6
**irritability** 667:4
**isn't** 399:22 404:10
454:1 456:8 471:1
512:13 569:13 594:14
668:10 699:18
**isomer** 437:23,24 438:2
**israeli** 437:18
**issue** 390:12 428:17
438:1,18 575:7 642:20
644:10 670:9 671:23
**issued** 691:5
**issues** 369:12 428:11
494:2 511:6,7 547:3
667:23 706:21 707:3
709:11
**it's** 357:13 358:18 359:1
362:4 364:14 366:8
368:7,16 370:21 372:10
375:13 377:12 378:2
381:6 382:8,15 387:13
397:10,10,10 398:16
400:3 402:9 407:18
411:17 413:2 416:9
424:8 427:4,4,5 430:14
,21 431:14 432:4,11
434:6,8,8,15 442:18
448:5 454:8,15 455:6
462:9 463:24 465:14
466:15 467:18 469:23
,24 470:11 473:14,24
478:10,10 479:15,23,23
483:15,23 487:10 491:5
492:10 494:18 495:9
497:8,8 498:11 506:1
509:7,9 510:13 511:1
512:11 514:5 516:8
520:18 524:2 525:2,4,9
535:21,22 538:8 542:14
,15 543:17 544:9,9,24
,24 548:1,14,19 549:18
550:5,5,12,20 555:11
556:8 567:8 570:5
574:14 580:23,23 581:9
582:15,17,18,19,24
583:6 585:12,12 588:1
590:3 594:1,19 596:18
,19 597:10,13 598:4,20
,21 599:2,2,16 600:14
,21 601:2 603:2 610:22
612:9,9 614:7 616:22
619:3,16 624:12,18
625:5,9 627:17 628:20
633:18 635:18 644:11
,11 645:16 646:23 648:8
,15,22,23 650:20 651:18

656:4,5,5 658:1 664:20
,24 665:12 666:2,19
672:19 673:16 674:13
676:9,15,17 679:2,5
682:24 683:22,22 684:9
,10 685:11 694:2 695:10
,12 697:14 699:22 700:9
705:19 708:7,9 710:24
711:4,21 712:7,10
714:22,23 716:13
717:14 719:4 720:15
721:1,6 722:2 723:7
724:3
**item** 374:17 400:3
640:19 690:8,9
**items** 359:24 360:1,1
399:19 498:4 548:3
687:16 693:19
**iterations** 537:9
**itself** 405:23 592:5
631:23 655:7,12 719:24
724:8

### J

**jack** 353:2,6 355:18
359:14 373:16
**james** 354:19 355:1
**jan** 667:24
**january** 370:6,14 495:7
,13,18,22 496:2,8 502:9
,10 688:24 710:4
**javier** 661:14
**jennings** 354:16 356:1
606:4
**jjm** 714:1
**jlondon@texas.net**
353:7
**job** 352:19 471:13 699:3
700:7
**john** 529:13 530:23
**join** 483:16 542:8
**joined** 482:14
**joining** 720:1
**judge** 431:10 692:13,14
,22 693:5 695:5 696:5
710:10,20 711:8
**judgment** 394:11
**judgments** 394:17
**july** 365:18,24 366:13
502:6 670:3
**jump** 681:15
**june** 365:4,12 379:3,3
395:17 396:19,24 401:8
409:17 410:5 427:19
450:7,11,13 478:4,21
485:24 502:2
**justification** 670:18
672:4

### K

**ka** 353:14)a**lawampmmt.com**
**kansas** 354:4
**keep** 367:12 372:24
375:2 394:21 418:19
461:16 542:1 544:5
689:16 705:24
**keith** 353:13 355:16
360:18 390:14 428:19
499:21 520:17 540:18
546:15 632:16 687:19
695:21 710:23
**ken** 355:20
**kenneth** 353:20
**key** 569:16 621:7
**kidding** 428:19 694:9
**kids** 646:1
**kill** 681:16
**killed** 606:3,9
**kind** 357:5 405:11 407:8
424:23 429:19 433:1,17
,19 436:21 441:7,23
455:6,8 462:20 463:14
481:2 491:5 492:7
499:10,16 509:24
515:14,14 516:1 524:1
555:21 556:7 559:18
562:8 565:7 578:10
579:4 592:19 594:23
613:17,21 617:12 625:2
644:11 647:10 654:7
656:2,22 663:6 666:8
670:23 674:16 701:15
712:10 725:15,15
**kinds** 383:2 394:3 471:6
473:11 494:19 508:17
576:14 645:6,19 659:1
660:24 662:7,11 665:12
680:18 687:11 708:14
724:3
**knew** 404:13 543:1
702:11
**knocked** 606:6
**know** 360:10 369:5,12
,15 372:9,18 377:7,8
379:7,11,12 380:1
382:16,19,22,24 383:3
388:7,20 391:16,16,17
,24 392:5 395:16 396:6
397:6 398:13 401:24
402:11 403:23 404:4,7
,12,22 405:5,8 406:8,16
,17 407:20 410:9,14,17
413:16 416:13 417:13
,17 418:17 421:1,4
422:4,8 424:5 427:6
429:20 430:12 434:10

435:17 436:19 437:4,9
,23 439:11,16 441:9,16
,21 442:1,3,4 445:3,5
447:6 449:12,24 451:1,8
453:10,14 455:3,7,22,23
456:3 457:9,11,14 458:3
,7,10 459:3,17,19
465:20 466:10 468:16
469:9,12,21,22,24 470:2
,5,8,14,17 471:1,3,10,11
,20 472:7,12 473:22,23
474:6,9 475:4,11 476:16
477:16,18,23 478:1,9,11
,15,17 479:21 483:3,4
,12 487:7 488:2 489:14
491:20 494:12,18
496:16 497:3,6 498:12
,19 499:3,5 509:9
510:10,19 511:4 512:6
,11,12 513:8,15 514:2,5
515:23 516:15 520:9,19
522:1,18 523:13,16,22
,23 524:1,2,4,12,24
526:4,5,9,15 527:5,7,17
528:2,18 529:13,14,14
,15 530:14 531:12,15
532:8,24 533:3,20,23
534:3,12 537:12 539:12
,22 544:9,10,13 545:14
546:15 548:9 549:12,14
,20,23 550:2,11,19
555:17 556:8,11 560:11
,14 563:11 565:10,20
566:20,23 568:4,12
572:22 574:21 575:22
,22,24 576:5 578:6
579:3,14 580:15,21,21
,23 582:10 585:6 586:12
,14,18 588:11 589:24
592:12,13 594:14,15,16
,20 597:1,6,10,10,14,17
,18,19 598:4,5,22 599:1
,16,18 601:19 602:1,9,9
,16 607:3 609:14,16,23
610:1 611:23 612:2
613:9 614:12,14 616:11
617:3,12 618:18,19,23
619:21 620:13,19 624:9
,12,17,20,22,24 625:5,6
,9 627:11,16,17 628:4
,19,21 629:1 630:4
631:10,11 633:2,20
634:4,7 635:7 636:6,16
637:1,15 639:9 644:11
645:1 646:7,7,8,10,22
647:2,5,23 648:15,19
654:15 655:22 656:15
,19 657:1,21 658:10
660:17,18 661:5,11,12

,14,16,17 662:5,8,11,15
,21,24 663:2,3,11 664:5
,15 665:10 666:4 667:19
,24 669:1,7,9 672:3,5,21
,22,24 673:21 675:24
676:3,16,22 677:1,2,20
678:8 679:16,24 680:11
,14,15,15,16,22 681:11
,12,17 682:23 683:1
684:3,23 685:17 686:17
,24 689:7 691:9 694:4,5
695:7 699:4,10,12,17
700:9,11 701:20 702:4,8
,21,23 703:2,10,11
705:4,4,18,19,20 706:1
,4,14,23,24 707:6,8,10
,11 708:2,2,3,5,6,20
709:7,9,9,14,19,22,23
,24 710:7,9,15,17,19,20
,22 711:1 716:12 717:11
718:1,5 719:14,18,20,21
720:1,3,10,11 722:1,3
723:16,16,17 724:2
725:16,17,18 727:6,7
728:6,18
**knowing** 391:7 408:10
509:23 525:14 701:15
728:13
**knowledge** 361:21
391:10 409:9 444:22
504:7 569:5 668:8 727:3
,20,23 729:9,23
**known** 406:8 613:9
**knows** 705:16
**kss@lanierlawfirm.com**
353:21
**kwan** 549:15 702:7,9

L

**l.l.p** 354:2
**label** 639:14,16,19,22
645:12 671:15,15 672:4
,6
**labeled** 357:16 460:21
506:1 538:8 646:23
**labeling** 645:1 647:3
670:18,23 671:8
**lack** 622:10 679:21
**laid** 391:3 563:10 726:21
,24
**laird** 424:13
**lake** 352:13 355:12
**lamotrigine** 561:10
592:9,19 622:14 631:4
633:16 637:9 638:3
**landfill** 436:24
**landfills** 433:13
**lanier** 353:16
**large** 372:21 436:6

464:17 598:20 638:6
645:12 666:6
**largely** 718:19
**larger** 592:5 626:15
631:8 666:12 722:12
**largest** 612:22 650:2
720:9,10
**last** 370:14 372:7 376:5
,8 381:5 434:16 451:15
454:10,12,20 492:14
493:5 495:4 575:16
631:19 661:9 684:15
687:12 714:22 715:3
**later** 369:19,20 481:23
541:14 568:22 576:10
701:17 705:23
**law** 353:2,16 354:10
685:17
**lawyer** 545:20,22
**lawyer's** 545:18
**lawyers** 435:9
**leachate** 436:24
**lead** 393:14 423:7
448:16,18 574:22
641:19 644:18 660:9
**leading** 614:15 618:20
621:15 641:17
**leaking** 433:13
**learned** 399:4 405:8
701:17 726:17
**least** 434:16 436:2
481:24 546:8 547:11
575:1 580:18,18 592:10
601:9 615:20 634:17
637:19 672:8 674:8
687:2 707:13 721:16
**leave** 544:1 581:3
644:15
**lecture** 544:22 545:1
706:14,17
**lecturer** 706:19
**lectures** 434:22 435:1,5
**led** 527:11 570:9,17
583:19 605:16
**left** 358:19 537:24
544:15 573:13 601:18
602:3 603:9 630:19
729:6
**left-hand** 538:10
**leftover** 508:23
**legal** 428:8 520:20
687:19 688:5 695:8
697:12 698:2 710:23,24
**legend** 357:5,10
**legitimate** 695:22 696:4
,6
**length** 510:7 513:23
676:14
**less** 414:21 444:9

557:15,18 650:16
653:14 723:21,24
**let** 376:9 416:10 439:17
445:20 467:5 491:20
518:2 546:23 556:21
557:8 558:7 632:15
658:9 676:3 686:4
691:17 692:24 698:8
**let's** 367:12 380:13,23
,23 386:14,14 388:11
392:3,3 401:8 415:12,20
419:14 431:21 463:6
476:1 482:23 492:20
495:3 499:23 503:6
504:12,13 505:12
506:12,22 512:15
535:12,13 541:19 551:3
558:19 561:24 580:17
581:5 593:6,9 599:10
611:2,3 621:22 622:22
631:23 638:11,18
653:16 665:9,20 688:8
691:12 692:13,22
711:14 714:8
**letter** 476:19 638:19,22
666:14 683:22 684:4,7,9
,12,13 690:16 692:8
693:15 697:10 707:24
708:3,24 709:2,8,12,13
710:3,7
**letting** 511:17
**level** 357:2 391:7 424:5
,16 425:22 443:3 514:15
**levels** 437:14 574:11
**liability** 352:5 355:7,19
,21 363:20 364:2,14
368:18 434:11
**liberty** 438:9
**library** 542:13
**license** 732:6 733:7
**licensed** 732:6
**licensing** 460:17
**lied** 695:13,14 700:24
701:1
**lifetime** 658:9
**light** 678:14 690:21
719:6
**likelihood** 510:11 555:4
560:3 576:3 590:4
650:19 660:11,16
**likely** 648:2,15,23
649:18 650:8,9 651:4,13
655:17 656:5 681:6
**limit** 453:4
**limitation** 471:20 472:6
**limitations** 645:6,7
**limited** 434:6,11 671:18
**line** 381:5,6 397:15
399:19 414:5 426:16,20

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

511:19 525:20 531:15
539:12,12 541:24
602:20 678:5 681:22
716:3,13
**lines** 361:2 497:24
500:19 541:23 552:7
628:21
**link** 452:8
**links** 490:12
**liquids** 436:23
**list** 359:23 374:14,18
379:14,15 392:4,6
474:12 489:20 491:9
528:7 530:23,24 542:17
,18 546:19 573:14
668:11 686:10 687:1,2
713:19 715:3
**listed** 357:20 382:7,8
395:20 462:21 467:19
481:1 487:14 542:19
667:20 713:24 714:8,16
,19
**listing** 357:2 489:4
535:22
**lists** 387:9 442:1 469:8
,12,12,16,17 488:7
528:23 529:10,13
636:20
**literally** 574:1
**literature** 458:13 575:23
**lithium** 463:15 467:10
468:23 474:11 501:22
502:1 504:2,5 507:10
508:12 573:11 574:10
590:21 591:6
**litigation** 352:6 355:8
433:9,15 435:9 438:9
511:12 547:2 708:8
716:20 729:10
**litigations** 680:18
**little** 358:10 428:10
429:2 459:20 480:13
508:21 517:24 529:18
539:20 555:21 568:22
581:11,14 622:17
643:13 647:23 674:17
682:11
**llc** 434:8,10
**llp** 353:9
**lmcgroder@shb.com**
354:7
**located** 355:4
**logarithm** 647:22
**logic** 531:24
**logical** 478:1,10
**london** 353:2,6 355:18
,18 359:19 379:19
430:14,18,21,23 431:5
,17,20,24 432:10,12

510:22 511:15 556:18
,21 557:13,17 558:7,16
584:6 586:8 587:23
588:17 653:22 685:14
691:2,5,21 692:5 694:4
695:2,4 696:5 698:21
702:2 705:1 707:18
**long** 463:13 464:21
478:2 483:23 532:11
579:9 612:10 614:8
618:7 630:5 669:3
685:12 707:10,10
**long-winded** 656:2
**longer** 407:1 408:5,7
464:22 572:1
**look** 373:13 376:5
377:18,20 379:6,17
381:19 384:18 398:18
404:24 414:5 419:1,19
422:1 423:10,14,23
442:20 443:13 445:7
450:9 456:3 467:5
468:10,19 470:7 479:13
482:23 483:4,5 495:3,4
498:14 509:19 514:13
,22 515:9 518:10 519:10
525:16 531:2 538:3,22
539:16 541:23 543:15
548:4,22 554:21 555:18
556:10,17 558:2,21,24
559:6,9,18 562:10,12,17
564:17,24 565:11 567:9
,23 568:21 573:23
577:14 581:1 591:21
593:21 595:8 596:3
598:22 599:17,22
611:10,24 614:18
615:10 624:20,21
628:14 631:3 647:16,20
659:13 676:19 684:6
694:15 708:14 721:19
724:6,16 727:4
**look-up** 480:12
**looked** 385:11 395:12
421:5 462:12 470:11
489:20 494:4 497:16
498:16 499:3 501:10
510:8 514:8 560:1,2,8
564:23 565:3 579:24
580:7 618:22 628:16
633:4 668:4,23 683:5
**looking** 381:3,4 408:23
431:20 439:1 468:18
471:13 490:13 494:11
502:2 515:7 516:2 521:5
522:21 523:3 525:19
539:18 541:10 562:7
565:20 567:7 577:4
586:14,20 590:1 592:3

596:4 600:10 604:7
607:3,11 615:3,15 622:8
,8 629:2 662:12,19
709:15 713:10 720:18
722:14,14 724:23
**looks** 369:23 374:10
412:13 487:7 500:18
501:1 542:14 565:21
568:24 593:24 607:7
633:15 662:24 684:10
729:15
**lori** 354:6 355:22 390:13
,15 418:20 477:21
504:16 511:16 533:4
545:1 546:17,17,21
547:1,1,4 548:8 550:13
584:8,12,17 585:6
587:17,20,22 588:7,13
589:7 664:22 665:3
683:23 684:7,10 686:5
691:24 693:11,11 694:9
695:5,23 696:7 697:11
,13,15 698:3 702:8,9
704:23 705:3 709:13
710:24 711:6
**lori's** 550:13 657:23
**los** 436:8
**lost** 417:14
**lot** 374:10 414:15,18,21
449:15 456:20 544:19
545:3 562:12 565:13
578:7 596:18 610:19
632:12 645:23 653:13
662:6 665:11 678:6,6
680:8,8 725:17
**lots** 447:21 516:7,14
550:7 580:7 629:7 679:8
**love** 424:8 611:8
**low-dose** 358:8 398:22
403:7 404:2 679:3
**lower** 568:8 569:22
610:19 630:15 655:6
**lowest** 439:2
**lucky** 359:11
**lunch** 497:20 505:14
516:18 517:4
**lying** 695:10,12
**lyrica** 374:19

| M |
| --- |

**m.d** 354:16
**madigan** 661:10
**magnitude** 445:15
446:12 447:4 571:10
586:15 592:8,15,17
599:10 606:21 611:19
619:4 627:6,12,22
629:12,20 630:8,18,21
,23 631:16 634:16,17,18

,21 635:18 641:14
649:17,19
**magnitudes** 446:5,18
636:13 637:6 648:9
**maiden** 678:9
**major** 437:7 601:15
**majority** 361:17 470:19
646:18,21 659:15,19
660:3 690:3 725:5,12
**making** 504:18 574:18
631:22 674:17
**malignancy** 486:24
**man** 697:20
**manager** 667:14
**mania** 667:7
**manic** 469:19
**mann** 469:12 528:3,10
,24 529:13 530:21,23
701:17 702:15 714:2
715:6
**mann's** 715:14
**mantel-haenszel** 422:19
423:24 424:12 425:16
426:17,21 448:8 627:3
628:10
**manufacturers** 667:14
**manuscript** 475:20,21
,22 504:13 510:24 511:5
690:18 691:15 693:17
,20 694:7,14,21,22,24
727:21,22
**manuscripts** 475:11
**mapped** 468:2
**march** 502:15
**margin** 554:22
**marginal** 554:24 555:10
,11
**mark** 356:16 359:2 374:1
417:5,6 418:20 476:1
480:16 488:16 500:18
,23 531:3 535:12,13
540:2 549:5 556:24
557:2,21 561:24 593:9
638:11 688:8 711:14
725:20 726:1
**marked** 356:18 358:23
359:5 374:4 476:4,10
480:18,23 535:16 540:5
,12 562:3 593:12 638:13
,18 683:15 688:10
711:16,21 726:3
**marketing** 352:4 355:7
363:5 364:15,16,20
367:10,11 368:6,7,13,17
,19 369:24 370:4,11
371:7
**marris** 549:8
**mass** 650:2
**massachusetts** 352:2

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

355:9 731:2
**master** 352:9 731:6
**match** 412:1 482:3 491:8
**matches** 563:3 567:1
**material** 687:12
**materials** 359:19 360:5
,15 361:4,7 368:21
370:16 374:14 539:2
547:12,16,22 684:17
685:23 686:2,10 687:15
690:11,15,19 692:7
693:14,18 699:4 708:24
**math** 371:9,19,22
**mathematically** 414:20
**matter** 389:19 595:18
678:4
**matters** 732:11
**maximum** 555:4
**may** 356:3 357:7,12
364:4,8 372:17 378:12
,15,16 379:16 380:4
395:16 406:13 407:14
417:4,14 434:14 446:5
449:15 456:7 470:14
471:9 473:10 474:14,15
476:20 477:4,7,24
478:24 484:15,15
487:15 488:7,12,12
497:17 498:5 499:15
500:11,20 501:1 502:21
509:23 512:1 514:4
523:7,8,23 525:12
526:12,13 527:5,8,9
529:12 547:19,20
550:23 553:7 554:21
555:8 567:9 569:19
570:6,8,16 571:23 576:2
,9 614:4 618:12 620:16
,16,18 623:5 644:2,20
645:3,3 699:6 705:11,11
708:20 709:11 713:11
717:18,22 718:1,4
**maybe** 369:8,11,13
381:6 397:10,11 424:23
478:11 512:13 525:10
543:17 553:5,8 555:14
,22,22 571:14,14 572:5
573:8 586:15 597:12
606:9 689:19 699:6
709:13
**mcfarland** 454:11,16
455:2,4,15
**mcgroder** 354:6 355:22
,22 358:15,20 359:11
360:7,10,18 362:20,24
363:19 364:17 369:5,11
,19 371:9,21 372:24
373:15 375:7,12,14,16
,21 377:2,18 378:6

379:5 380:15,19 381:22
383:9,12 384:8,11
385:12,23 386:16,21
388:1,15,19 390:8,14,17
,20 391:14,22 393:10,23
394:13 395:7,10 398:15
399:13 400:8 401:3,19
,23 402:8 404:11 406:10
409:1,15 411:11,13
412:19,23 414:17
415:15 416:24 417:4
418:6 419:4,9 420:2,5,7
423:11 424:19 425:12
426:8 428:13,19,23
430:12,16,20,22 431:1,9
,14,19,21 432:2,5 440:1
441:2 443:4,19 445:4,17
446:8 447:5 449:3,11,22
450:10,13,15,24 451:14
452:18 453:11 456:14
457:9 458:6,24 459:16
460:14,17 464:6,9 470:3
,22 471:22 472:2,9
473:17 474:7 477:11,15
,18 478:6,17 481:9,16
482:4,7,9 489:7,10,14
494:9 495:16,20 496:4
,20 499:21 500:13 501:5
503:4 504:8,19 505:4,19
508:7 512:8 513:9,12
515:4 518:22 520:4,8,13
,17 523:19 524:21
525:21,23 526:20
527:13,24 528:13,16,20
529:7,22 530:11 531:10
532:18,24 533:7,11,13
534:10 536:11 539:7
540:8,18,21,24 544:21
545:6,12,15,20,23
546:11,15,18,23 547:2,6
,24 548:10 549:7 556:2
557:6,12,15,18 563:7
564:19 566:19 569:14
571:3 575:19 579:21
580:4 581:8 582:1,15,19
,22,24 584:5,9,11,13,19
,21,23 585:4,10,21
586:7 587:10,16,18,21
588:3,9,11,14,18 589:2
,4,17 590:16,23 591:8
,11 593:22 594:5,9
595:15,17,24 598:15
599:7,14 601:12,21
602:7,24 603:14,22
604:17,21 605:8,14,23
606:19,23 607:23 608:2
609:6,14,20 610:9,21
611:6 613:4 615:15,17
616:18,21,23 619:24

620:4,24 621:3,19,22
622:16 623:1,5 624:3
627:7 628:1 629:15,23
630:7 631:18 632:15
635:5 637:3 638:4 639:7
643:1,5,9 646:5 648:17
649:2 650:13 651:7
652:15,24 653:17 655:8
657:8,11,17 658:5
659:17,22 663:17
664:14,20,24 666:16
667:17 668:17 670:4,7
671:2,9,19 673:9 675:2
,6 677:16 678:16 680:2
681:1,8 682:2,14 684:21
685:7,9,11,16,20 686:1
,6,13 687:17 689:5
690:23 691:3,7,12,17,22
692:1,9,14,17,21,23
693:3,7,10,13 694:1,6
,15,19 695:3,7,15,17,21
,24 696:8,16 697:8,12
,14,21,23 698:1,4,7,12
,15 700:23 702:21
703:14 704:11 705:15
706:2 709:5 710:14,18
,22 711:1 712:21 713:3
716:21 717:19 718:9
725:9 726:1,12 728:2,8
,15 729:6,12,24
**mcgroder's** 556:22
**mdd** 542:3 553:22
**mdl** 352:7 355:18,21
725:17 731:4
**mean** 358:6 363:19,19
364:12 366:3 369:11
382:17 388:6,7 414:18
420:3 426:9 428:14
436:2 443:13 445:15
446:5 447:2 466:1 468:7
473:6 478:10 479:20
488:2 494:22 503:22
504:21 505:1 511:2
515:8 516:6 517:15
518:18 520:15,20
524:10,23 533:2 536:13
538:21 539:7 543:15
559:22 572:5 573:10,16
576:9 579:9 589:22
594:15,16 596:9 597:22
598:10,13,19 605:19
607:3 609:6 616:5 617:8
,22 619:1,5 620:21
624:4,10,16 625:8
628:23 630:24 633:17
643:7 645:24,24 646:1
649:14 650:3 658:18
664:17 675:15,21
678:18 680:15,21 684:9

690:3 691:2 695:13
700:6 717:10 719:1
723:16 726:14,15
728:17
**meaning** 425:13 451:21
**means** 381:1 466:3,4,16
467:22 484:1,20 507:8
518:24 572:24 573:5
584:24 613:13 616:4
714:2
**meant** 363:2 399:19,19
**mechanism** 452:6,16
**median** 664:8
**medical** 499:8,17 576:5
646:11
**medication** 462:20
468:21 527:19 537:17
,18 542:21 573:4,5,7,10
,21 576:3 621:9,12
622:9 641:8 667:10,13
**medications** 468:24
527:6 549:24 578:4
640:21
**medicinals** 498:6
**medicine** 432:24 669:10
**meeting** 428:3,6
**meetings** 638:23
**members** 442:2
**memory** 594:15
**mental** 465:23,24 466:5
,6,10,11
**merge** 542:1
**merging** 402:4
**messy** 581:11
**meta-analyses** 637:8
645:6,18
**meta-analysis** 396:3,11
,15 452:4,22 453:5,22
454:1 629:1 644:18
672:11 678:19 679:4
707:3
**meta-analytic** 424:13
**method** 623:21,24 625:6
**methodological** 407:24
**methodology** 406:13
409:6 511:14 566:10,15
,20 676:21 700:3
**methods** 424:13 426:6
433:12 435:2 623:16,17
,18 645:20 658:2,3
663:9
**metric** 663:1
**mh062185** 714:1
**mh078580** 714:9
**mh40859** 714:16
**middle** 448:14 531:16
599:23 670:16
**mild** 487:22 488:4
**million** 438:15 665:22

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**mind** 413:18 430:18,23
431:20,24 718:23
**minimum** 598:22,24
607:4
**minor** 520:18
**minus** 415:9,10,22,24
416:9 560:14 594:22
600:21,22 666:1,13
724:6
**minute** 409:23 562:7
621:23 701:4
**minutes** 493:5 705:23
725:22,23,24
**mislead** 458:17
**misleading** 402:9
451:17 458:20 660:3
666:5 690:24 693:22
694:2
**misled** 459:4
**misquote** 628:20
**miss** 374:16 692:16
**missed** 664:6
**missing** 544:8 631:11
691:8
**missouri** 354:4
**misstates** 379:6 452:19
631:19 712:22
**mistake** 550:8 597:11
678:22
**mixed** 464:1
**mixture** 447:13 721:21
**mnemonic** 461:20
**model** 551:9,10,15,17,19
554:23 558:20 578:8
**modeling** 537:10
**models** 424:14
**modification** 481:4
**moment** 355:20 372:20
440:2,5 444:2 541:20
555:1 582:4 631:24
665:11
**money** 429:13 441:10,18
442:9 705:5
**monitoring** 435:3,3
437:2
**mono1** 537:4
**mono2** 537:4
**monotherapy** 471:3
508:11 509:11 517:18
521:17,18,22 522:2,4,10
,16
**monotone** 560:9
**month** 370:24 484:12
485:18 510:10,11
515:17,21,22 559:9
560:14,14 562:8 565:18
577:6,6,6,7 614:1,6,9
616:17 618:3 619:6
**month-by-month** 514:18

**monthly** 514:14 577:4
**months** 559:11,12,13,13
,13 560:10 577:8 614:10
615:8 617:6,8
**mood** 667:9
**morning** 356:10 685:23
686:20
**mother's** 678:9
**motion** 701:3 710:11,21
711:4,9
**motions** 364:11
**motivated** 707:14 708:7
,9
**motivation** 377:8 667:21
**mountain** 558:5
**mouth** 428:14
**move** 428:9 546:2
**moving** 664:17
**mr** 353:6,13,20 354:14
,19 355:16,18,24 356:9
,21 358:16,21 359:3,14
,17,19 360:9,12,14,22
361:3 362:22 363:1,8,20
,23 365:1 369:5,10,15
,20,21 371:11 372:4
373:2,16,21,22 374:1,7
375:8,13,15,18,23 376:3
377:5,21 378:8 379:13
,19 380:16,22 382:1
383:10,15 384:9,12,14
385:16 386:2,18,23
387:1 388:3,17,21 389:3
,4 390:12,15,18,22
391:19 392:2 393:17
394:10,18 395:8,11
396:6,9 399:8,14 400:10
,11 401:7,21 402:5,10
404:16 407:11 409:4,18
,21 410:22 411:8,12,14
412:21 413:4,9,12
414:19 415:17,18 417:3
,5,11 418:8 419:7,12
420:4,6,9,10 423:13
424:21 425:14 426:10
428:16,20 429:4 430:6
,14,18,21,23 431:3,5,7
,12,16,17,18,20,24
432:4,8,10,12,18,20
440:3,6,23 441:3 443:9
,23 445:8,19 446:16
448:1 449:7,19 450:4,12
,14,18 451:9 452:2
453:7,13 456:19 457:10
458:15 459:11,22 460:9
,15,18,19 465:1 470:4
471:24 472:5,17 474:3
,16 476:1,7 477:13,17
,20 478:3,14,20 480:21
481:13,18,19 482:6,8,12

489:8,12,15,23 491:18
,22 494:21 495:17 496:1
,7,23 499:23 500:7,16
501:6,8 503:6,8 504:11
,20 505:11,22 508:14
510:20,22 511:15,18
512:14,19,21 513:20
515:6 516:17 517:3
519:3 520:5,11,16,23
524:22 525:22 526:1,23
527:20 528:9,18 529:2
,17,23 530:16 532:13,14
,21,22 533:4,8,12,16,17
534:13 535:12,19
536:15 539:13 540:2,10
,20,23 541:1 544:24
545:2,9,11,14,16,17,21
546:3,13,17,21 547:1,4
,8,9 548:8,15 549:10
554:7 556:5,18,21,23
557:8,13,17 558:1,6,7
,12,16,18 561:5,6,24
562:6 563:14,19 564:21
567:5 570:23 571:19
572:11,20 576:17
580:14 581:9,12 582:5
,21,23 583:2 584:6,7,10
,12,17,20,22 585:2,6,11
586:1,8 587:1,2,14,17
,20,22,23 588:7,10,13
,17,20,23 589:7,8,17
590:7,19 591:4,10,16
593:8,15 594:4,7,11
595:10,16,18,21 596:2
599:4,8,21 601:17 602:2
,10 603:4,17 604:3,18
,22 605:9,18 606:3,6,8
,10,13,14,20 607:10
608:1,4,6 609:9,10,17
610:2,12 611:1 612:13
613:7 615:16,18 616:20
,22,24 617:4 620:1,8
622:6,21 623:2,6,9
624:6 627:20 628:13
629:18 630:3,9 632:4,23
635:7,9 637:23 638:11
,16 639:12 643:3,7,14
646:13 648:20 649:8
650:6,7,23 651:2,3,15
652:21 653:10,18,22
654:2 655:14 657:10,16
,22 658:20,21 659:18
661:7 664:7,19,22 665:3
,4 666:17 668:12 669:14
670:1,5,15 671:5,11
672:1 673:7,11 675:4,14
678:11 679:19 680:4
681:3,21 682:9 683:12
,18 685:2,3,8,10,13,14

,17,22 686:4,8,9,19
688:7,13 689:9 691:2,4
,5,10,16,19,21,24 692:5
,6,11,13,15,19,22 693:1
,5,8,11,21,24 694:4,9,18
695:2,4,5,11,16,18,23
696:5,11,18 697:11,13
,15,17,20,22,24 698:3,5
,10,14,17,21 700:20
701:1,5 702:2,3 703:1
,21 704:13 705:1,9,17
706:6 707:18,20 710:17
,20,24 711:6,7,14,19
712:23 713:17 716:23
717:23 718:10 725:20
,23 726:6,16 728:5,11
729:7,16 730:1 734:5
**ms** 354:6 355:22 358:15
,20 359:11 360:7,10,18
362:20,24 363:19
364:17 369:5,11,19
371:9,21 372:24 373:15
375:7,12,14,16,21 377:2
,18 378:6 379:5 380:15
,19 381:22 383:9,12
384:8,11 385:12,23
386:16,21 388:1,15,19
390:8,14,17,20 391:14
,22 393:10,23 394:13
395:7,10 398:15 399:13
400:8 401:3,19,23 402:8
404:11 406:10 409:1,15
411:11,13 412:19,23
414:17 415:15 416:24
417:4 418:6 419:4,9
420:2,5,7 423:11 424:19
425:12 426:8 428:13,19
,23 430:12,16,20,22
431:1,9,14,19,21 432:2
,5 440:1 441:2 443:4,19
445:4,17 446:8 447:5
449:3,11,22 450:10,13
,15,24 451:14 452:18
453:11 456:14 457:9
458:6,24 459:16 460:14
,17 464:6,9 470:3,22
471:22 472:2,9 473:17
474:7 477:11,15,18
478:6,17 481:9,16 482:4
,7,9 489:7,10,14 494:9
495:16,20 496:4,20
499:21 500:13 501:5
503:4 504:8,19 505:4,19
508:7 512:8 513:9,12
515:4 518:22 520:4,8,13
,17 523:19 524:21
525:21,23 526:20
527:13,24 528:13,16,20
529:7,22 530:11 531:10

532:18,24 533:7,11,13
534:10 536:11 539:7
540:8,18,21,24 544:21
545:6,12,15,20,23
546:11,15,18,23 547:2,6
,24 548:10 549:7 556:2
,22 557:6,12,15,18
563:7 564:19 566:19
569:14 571:3 575:19
579:21 580:4 581:8
582:1,15,19,22,24 584:5
,9,11,13,19,21,23 585:4
,10,21 586:7 587:10,16
,18,21 588:3,9,11,14,18
589:2,4,17 590:16,23
591:8,11 593:22 594:5,9
595:15,17,24 598:15
599:7,14 601:12,21
602:7,24 603:14,22
604:17,21 605:8,14,23
606:19,23 607:23 608:2
609:6,14,20 610:9,21
611:6 613:4 615:15,17
616:18,21,23 619:24
620:4,24 621:3,19,22
622:16 623:1,5 624:3
627:7 628:1 629:15,23
630:7 631:18 632:15
635:5 637:3 638:4 639:7
643:1,5,9 646:5 648:17
649:2 650:13 651:7
652:15,24 653:17 655:8
657:8,11,17 658:5
659:17,22 663:17
664:14,20,24 666:16
667:17 668:17 670:4,7
671:2,9,19 673:9 675:2
,6 677:16 678:16 680:2
681:1,8 682:2,14 684:21
685:7,9,11,16,20 686:1
,6,13 687:17 689:5
690:23 691:3,7,12,17,22
692:1,9,14,17,21,23
693:3,7,10,13 694:1,6
,15,19 695:3,7,15,17,21
,24 696:8,16 697:8,12
,14,21,23 698:1,4,7,12
,15 700:23 702:21
703:14 704:11 705:15
706:2 709:5 710:14,18
,22 711:1 712:21 713:3
716:21 717:19 718:9
725:9 726:1,12 728:2,8
,15 729:6,12,24
**muffin** 654:1
**multiple** 357:21 452:4,5
,24 453:3,17 454:3
497:9,17 498:2,17 516:3
522:19 523:5 580:9,16

,22 583:1 599:11 623:1
629:4
**multiplied** 600:5,18
601:2,7
**municipal** 436:15,24
**municipalities** 435:4
436:18 437:5
**myself** 556:17 700:18
**mystery** 407:10 541:17

### N

**name** 355:1 434:4,7
437:18 468:3 477:2
483:12 489:12,13
492:17 678:9
**namely** 445:24 612:20
648:12 722:16
**names** 481:7 482:18,21
**narrative** 392:16,17
**narratives** 392:22,24
393:4,8
**narrower** 624:14
**national** 442:4 712:9
**nature** 362:1,2 452:21
**nauseam** 633:1
**nda** 345:17 454:4 516:14
**ndc** 491:1,3,9 492:18
**near** 416:21 633:6
**necessarily** 463:9
515:13 520:14 554:20
555:12 556:4 576:8
589:22 612:4 634:11
636:11,16 647:24
665:20 678:18,20
704:18
**necessity** 483:5
**need** 369:16 377:18,20
380:20 409:19,23
418:18 432:1,6,8 459:23
483:4 491:19,19 539:7
543:12 544:10 547:5
548:6 550:16 556:21
572:11 591:23 593:1
596:23 597:24 598:1,1
599:12,20 603:12
606:17 607:4,8,16
610:13 635:7 669:14
687:21 702:9
**needed** 462:13 605:10
672:3
**needs** 550:11
**neighborhood** 416:6
**neighboring** 438:10
**net** 471:12 510:5
**neurobiological** 715:21
**neurobiology** 715:7,19
**neurontin** 352:3 355:6
362:18 364:13 374:19
395:9 397:7 398:10,14

423:15,24 435:9 546:10
547:17 614:23 626:19
631:15 646:19 679:20
,24 681:5,7,24 690:14
725:7 731:3
**neuropathic** 387:14
388:12 608:20 636:3
680:24 681:5 724:10
**nevertheless** 570:9
**new** 353:11 428:10
435:12 438:9,16 439:5
,16 589:5 666:24 667:1
,2,4 687:22
**newburgh** 353:11
**newly** 465:3,3,16,17
**next** 363:14,24 364:4
365:4,12,18,24 366:19
367:7,14,21 368:3,8,15
,20 369:3 379:23 389:15
396:18 413:2 448:7
460:24 466:24 476:1
480:16 483:19 484:6,23
485:12 486:14 490:20
491:1,12 503:3 535:12
,14,22 540:2 552:23
561:24 593:9 600:21
616:18,19,21 638:11
668:15 683:12 688:8
700:1 711:14 714:15,19
725:20
**nice** 584:22 589:7
697:24
**nicolette** 352:14 355:9
,17
**nimh** 668:2 713:24
**nine** 559:13
**nm** 492:15
**no** 352:8,10,19 354:24
356:12,19 359:6 360:10
361:22 371:23 374:5
376:21 377:1,3 378:7,24
385:14,22,24 386:9
389:19 390:9 391:6
397:11 399:1,22 402:5
404:13 407:1,15 408:5,7
,10,15 410:6,24 411:6
412:23 413:1,20 420:24
425:11 428:4,7,7,16,16
,18 429:8,22 430:9
432:8,23 433:7 434:11
,21 435:10 441:23 443:2
447:1,1 448:11,17,20
449:22 450:10,24 451:4
454:2,6 455:12 458:18
460:1 465:23,24 466:5
,10 471:3 472:11 473:9
475:24 476:5,10 480:19
481:10 482:17 489:8,24
490:5 494:13,18 499:10

,19 504:8,13,17,24,24
505:1,10 507:22 511:1
515:18 516:19 517:1
522:6,12 524:14,18,24
528:24 529:8 533:7,8,13
535:17,21 536:7 537:16
,17 539:18 540:6 544:24
545:6,8,12 546:17,23
551:22 560:18 562:4
563:12 564:7 565:12,24
566:6 567:2 569:1 571:5
572:1,18,21,22,24,24
573:1,4,5,6,7,10,16,17
,20,24 574:1,4 575:22
580:4 584:7,17 587:14
,14 588:10 590:23
591:11 593:13,23
594:19 595:8 601:7
610:11 613:20 621:15
622:5,9 626:21 627:18
628:7 630:23 631:23
632:13,18 636:2,5,9
638:14 639:15,18
640:14,17,20 643:21
645:3 648:19 656:12
665:15 669:2,16,22
678:4 683:16 684:24
688:11 689:16,22 690:8
,9 691:3,3,17,17 693:1
694:18 695:4,15,17
699:1 700:23 701:1
703:8 708:19 710:24
711:17 712:14 718:3
721:18,20 722:13
727:16 731:5,7 733:7
734:10,11,12,13,14,15
,16,17,18,19,20,21,22
**nobody** 389:20,22
**non-linear** 442:4
**non-parametric** 437:2
**non-pharmacologic**
614:14 620:22
**non-placebo** 386:4
401:1 402:7
**non-placebo-controlled**
419:8
**non-protective** 650:20
**non-randomized** 678:24
**non-responsive** 532:13
587:1 650:6 651:2
658:20
**non-significant** 650:15
**non-statistically** 648:5
658:17 660:13
**none** 571:7 573:11
585:23 590:14 633:12
,13 668:5,16
**nor** 407:4 727:9 732:20
,22

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**normal** 594:24 663:8
721:3
**normality** 596:17 598:7
625:7
**normalizations** 505:1
**normally** 656:20
**normand** 661:16 662:1
**nos** 726:4 734:23
**notary** 731:24
**notations** 380:4
**note** 471:16 516:6
524:11 557:21
**noted** 441:2 698:11
**notes** 369:7 417:20
418:19 556:16,22 557:3
,4 587:24 588:1
**nothing** 362:5 429:6,11
439:24 440:5 539:5,15
590:18 641:11 653:6
658:3 666:11 681:22
682:11 694:13
**notice** 487:6 538:7
565:23
**noticed** 369:6
**november** 362:19,24
363:1 368:15,20 369:6
,22 548:19,20 639:3
684:13,14 690:16 692:8
693:15 707:24 708:3
709:1
**ns** 381:21 382:2 383:19
,20,21 387:10
**null** 423:7,9 427:3,10
648:12 649:16,20,23
651:11,12,19,22 652:3
653:8 656:24 658:11,13
660:12 664:1
**number** 359:23 369:8
382:6,23 388:10 396:18
,20 397:18 398:5 402:13
406:20 407:6 418:1,18
421:2 429:20 430:13
431:7,8,9 432:14,14
465:14 474:4 479:6,11
,12 483:11 485:4 491:6
,14,23 499:3 504:22
506:5,6,23 509:9,10
510:12 513:15,16
519:17 535:14 538:11
549:9,12 550:15,17
551:24 553:7 580:23,24
581:8,21,24 582:7,10
584:14,15 588:5 590:1
592:3 603:12 604:15
605:19,21 612:9,12
614:7 624:18,19 626:11
,12,14 633:21,22 638:7
665:7 678:7 679:17
702:10 732:7 734:9

**numbered** 670:6
**numbers** 357:19 363:10
372:3 381:20 383:23
384:4,11 385:4 393:8,19
411:22,24 414:23,24
415:7,11,16 416:22
450:17 482:2 491:13
548:23 549:2 550:6
555:2,19 563:3,4,22
564:13 566:12 567:2
568:2 569:6 583:8 590:8
623:24 625:18 626:19
635:17 664:10,19
665:13 678:15
**numeric** 491:3

**O**

**o-x-c-a-r-b-a-z-e-p-i-n-e**
561:13
**oath** 356:3 691:6 731:13
**object** 360:7,18 377:2
380:19 383:9 385:12,23
386:21 388:1 390:8
391:14,22 393:10,23
395:7 398:15 401:3,19
402:8 404:11 406:10
409:1,15 414:17 418:6,6
419:4 425:12 428:23
431:5 443:19 445:4
446:8 447:5 449:3,11
451:14 452:18 453:11
458:6 459:16 470:22
471:22 472:2,9 473:17
474:7 477:11 481:9
494:9 495:16,20 496:4
,21 500:13 503:4 504:16
,19 505:4,19 508:7
512:8 513:9 515:4
518:22 520:4,8 524:21
526:20 527:24 528:13
529:7,22 530:11 531:10
534:10 536:11 546:11
547:24 564:19 566:19
569:14 571:3 575:19
590:16 593:22 594:1
598:15 599:7,14 601:12
602:7 603:14,22 605:23
606:19,23 610:9,21
613:4 619:24 620:4,24
622:16 624:3 628:1
629:15 635:5 639:7
643:6 646:5 649:2 655:8
657:11 658:5 659:23
664:14 667:17 668:17
671:2,9,10 673:9 675:6
677:16 678:16 680:2,3
681:1 682:2 684:21
685:7 686:1,13 687:18
,18 689:5 690:23 697:8

,23 716:21 717:19 718:9
725:9 726:12 728:2,8,15
**objection** 371:23 379:5
383:12 394:13 395:10
412:19 449:22 450:24
456:14 458:24 464:6
478:6 482:5 504:8
520:18 527:13 532:13
,18 533:11 544:21 545:6
552:1 563:8,9 579:21
582:1 585:21 586:7
587:1,10 589:17 590:23
591:11 594:6,10,12
595:24 601:21 605:8,14
609:20 627:7 628:1
629:23 631:18 637:3
638:4 648:17 650:6,13
651:2,7 652:15,24 657:8
658:20 659:17,22
663:17 681:8 682:14
686:7 696:16 698:9,10
,15 702:14,20 703:14
706:2 709:5 710:14
712:21 713:3 728:2
729:12
**objectionable** 390:20
**objections** 602:24
604:17
**objective** 394:6 410:7
555:9
**objectives** 441:17
716:14
**obscure** 700:8
**observation** 506:9 513:1
,2 574:21 575:12,13
599:1 615:4 619:11,13
**observations** 479:3
665:7
**observe** 589:11
**observed** 553:13 592:19
594:21 612:10 614:4,8
625:24 626:1 632:2,6
652:2,6,17 653:2,4
673:1
**obtain** 555:10 721:12
**obtained** 408:4 662:12
703:9
**obvious** 539:19,19
664:24
**obviously** 435:21 457:2
470:24 536:13 539:15
592:15 608:17
**occasional** 361:24
**occur** 586:14 611:19
**occurred** 392:12 519:5
,14 565:13
**occurs** 593:3 596:20
612:5 619:8
**october** 367:14,21 368:3

,8 707:17,18,19
**odds** 414:10 415:4,6,20
416:2,7 417:22 418:5,7
,9,12 422:15 426:7,14
,17,23 427:3 444:7
447:10 450:15,23
515:22 623:12 624:21
648:6,12 649:17,22
650:9,16 651:5 652:4,6
,7 655:21 656:21 658:18
659:3 662:12 683:6
720:10
**off** 409:23 410:22 411:1
429:21 433:4 439:8
460:2 470:8 479:10
499:23 500:2 514:9
515:2,11 516:20 539:2
,24 540:19 572:13
573:13 576:1,24 604:14
606:6 614:2 618:23
619:9 621:22 622:1
669:14,17 670:10 677:5
691:8 730:3
**off-label** 645:23,24
646:15,19
**off-labeled** 646:8
**offhand** 634:7
**office** 733:2
**offices** 353:2 354:10
**often** 469:18
**oh** 375:13,21 423:2
436:3 439:16 443:7
524:1 525:23 536:18
539:16,21 559:15
564:17 565:6 673:15
675:20
**okay** 357:10,15,19
358:10 361:19 362:12
,14 363:24 365:9 366:6
,17 367:12 368:8,15,20
369:3 370:2,6,13,19
371:7 372:5,13 373:1,10
374:1,13 375:1,4,6,15
,22 376:11,23 377:13
378:5 379:22 380:7,13
,23 384:7 385:7 386:23
387:9 388:20 393:6
394:19 395:22 397:9,12
399:13,23 400:6,17
402:11 412:3 413:16,22
414:1 415:2,11,21 416:4
,17 418:4,13 421:16
422:18 423:11,23
426:16 427:18,24 428:5
,9 429:9,18 430:7,10
432:2,18 433:8,23 434:4
435:18 439:19 440:14
,19,23 442:16 444:5

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

445:20 447:1 448:23
450:19 452:3 454:9
457:7 458:19 459:22
460:24 461:5,21 462:2
465:2 466:14,18 467:15
,18 468:4 470:12 474:17
475:2 476:1,18 477:9
479:1,24 480:9,15
482:13,18,23 483:19
484:6,22 485:8,12,18
486:11 487:2,5,14 488:4
,11,15,23 490:10,20
491:12,21 492:3,14,20
493:8 494:4 495:2,12
496:18 497:12,19,21
498:9,22 499:20 500:1
,17 501:20,24 502:5
503:19 504:12 505:12
506:12,21 507:12,16,19
508:21 510:20 512:5
513:6,21 519:24 520:16
525:23 535:12 536:7,20
537:1,6,24 538:4,14
540:24 541:17,23 542:7
,16 543:11,14,22 545:16
,21 549:1 550:17 552:6
,11,22 553:19 556:20
561:24 562:14 563:22
564:15 565:5 567:22
568:4 573:5 574:16
582:6 584:20 585:15
588:13 590:14 591:5,21
595:11 596:11 597:8
600:5,12 602:3,5 603:18
604:19 606:8,13 609:1
610:3 621:24 625:11
631:12 632:8,10,24
643:15 646:18 647:6,19
649:13 659:9 661:18
670:13,16 671:17 672:7
673:15 674:8 684:5,11
686:8 687:6,8 689:3,13
690:8 691:16 692:1
698:22 702:13,18 706:7
711:11 713:18 714:6,15
715:6 716:24 721:9
727:11,17 729:17,24
730:2
**olanzapine** 437:8,12
**old** 585:1
**on-label** 725:7
**once** 405:9 406:14,24
408:4 490:11 523:5
555:22 570:17 580:1
621:11 630:17,20
650:21 661:13 662:17
665:22 677:13 687:13
706:15,18
**one** 358:6,7,11 359:2

370:14 373:18 374:10
,11 375:18,20 376:12
378:2 380:13 381:6
382:7 383:24 384:22
389:22 390:2 392:13
393:4 399:12,19,24
411:19 414:8 415:9,9,19
,22,23,24,24 416:9,9,9
,16 418:1,2 421:19
422:6 424:24 427:4,6,11
437:8,21 438:9,10
447:10 448:10 461:9,13
462:3,12,13,17 464:15
,16 467:9 468:15 471:24
472:1 473:22 476:8
481:1 485:21 486:11
487:9 494:4,8,11 495:4
,4 496:14 497:4,14
498:5,6 499:1,23 500:18
501:1,9,10 502:5,6,9,12
,15,18,21 503:1,3,15
506:9 507:9 509:13
513:1,1 514:11,11,21
515:8 516:15 517:14
518:11 523:8,24 524:23
525:3 526:17 529:15
531:16,22 535:23 537:6
,24 540:16 541:4,10
543:1,3,4,8,14,20 544:8
,13,14 548:17,22 550:17
552:3,23 555:23 560:14
,14,19 562:16,22 563:3
574:6 579:20,23 580:1
581:21 582:10,12 583:1
,5,6,9,10,16,19 585:15
586:15,19 590:9,20
591:19 593:3 595:12
596:15,15 598:10,12
599:10 600:4,16,19,21
,22 601:8,15 602:1,6,16
,20,21 603:10,11 604:7
,7,24 605:4 606:16
608:14 610:1 615:12,20
616:8 623:10 624:10,18
,18,22 625:18,19,20
629:2,2 631:1 634:18
640:9,10,11,12 643:12
644:24 645:5 647:15
648:3,12,14,14,16,22,23
,24 649:11,23 650:10,10
,16,21 651:5,14 652:5,8
,22 653:18 655:18 656:5
,6,14 659:16,20 660:17
661:24 663:22 664:16
668:7,8,15 670:23,24
674:1 676:8 678:13
680:10,12 681:20 682:6
684:4 687:16 688:2
689:21 692:5 693:18

698:20 701:20 712:17
716:7 722:15,17,21
724:19
**one-fifth** 571:14
**one-fourth** 607:16
**one-page** 374:15
**one-third** 571:14
**one-year** 463:18 465:17
507:2 560:4 724:6
**ones** 358:3 402:24
436:24 439:7 521:4
526:18 528:8 537:21
556:12,13,18
**onset** 612:6
**open** 399:11
**operating** 433:23
**opine** 640:1 661:2
682:17
**opined** 640:5
**opinion** 422:22 423:3
448:2,23 454:9,13 455:1
459:7 496:19,24 497:1
514:5 649:5 668:13
671:7
**opinions** 496:22 591:17
644:3
**opportunity** 708:14
718:22 719:23
**opposed** 369:17 523:5
534:15 535:3
**opposing** 699:12
**order** 362:21 431:10
488:19 569:19 592:18
596:21,21,23 598:5
599:10 605:11 606:21
610:5 615:9 634:18
647:3
**orders** 446:11 586:15
611:19 634:15,16,21
635:17
**organizations** 716:18
**original** 377:15 400:9,12
419:16 442:15,17 677:2
679:18
**originally** 434:1
**oscillations** 619:20
**otherwise** 388:19
458:20 474:6 727:5
**ought** 369:9,11,14
**outcome** 732:23
**outgoing** 689:16,20
**outliers** 580:11,12
**outlined** 415:1
**output** 699:19 704:22
**outputs** 704:2 705:6,7
,11,13
**outside** 372:6,13,14,15
433:9 434:22 442:7
463:7

**overall** 380:9 422:17
423:5 591:18,20 612:21
630:18 631:16 636:13
672:10 676:6
**overdose** 641:7,11
**overrepresented** 679:17
**oversaw** 728:24
**own** 429:9 565:17
613:19 667:24 676:16
700:14,17
**owned** 438:12
**oxcarbazepine** 561:13

---

P

---

**p-r-e-g-a-b-a-l-i-n** 396:7
**p.m** 500:2,4,4,5 516:20
,23,23 517:1 572:13,16
,16,18 621:24 622:3,3,5
669:17,20,20,22 670:12
,12,13 730:3,5
**page** 375:6,10,11,11,13
,14 376:5 379:23,23
380:2 385:18 386:14,14
389:14,15 392:7 395:23
397:10,12,12 399:9,11
,23 401:13 405:23
411:11,12 414:3 425:24
442:19,20 444:5 448:2
,23 451:3,4,21,24 452:3
454:9 460:21,24,24
466:24 487:6,9 488:6,23
490:17 492:20,21 500:9
,9 506:1,2 512:15
538:11 541:2,14,20
553:10,11 558:16
562:18 574:2 581:13
582:21,22,24 583:3,11
593:21 599:23 623:11
625:12 654:10 661:8
666:19 670:4,5 697:1
699:1 704:10 708:23
720:17,18 727:18 734:3
**pages** 375:12,16 487:7,8
538:8 539:18 540:13
731:11
**pagination** 375:21
**paid** 371:3 372:14 441:1
712:19,24 713:7,11
715:22
**pain** 387:14,20 388:12
389:5 525:6,11,12 530:7
608:20,23 611:15 636:3
680:24 681:5
**paind** 542:3
**painstaking** 729:1
**pande** 588:5 590:17
**panel** 640:1
**panels** 432:22
**panic** 608:15,16 609:23

---

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

,24 667:3 722:2
**paper** 362:10 416:24
419:17 454:16,18 455:2
,4 475:3 479:14 511:13
512:6,10 514:4,12 517:5
521:23 523:14 524:4
525:17 549:18 551:11
558:3,14,23 568:17
571:1 574:3 578:21
579:15 584:13 615:2
619:12 621:7,13 636:18
699:20,20,21,21 700:16
703:7 704:7 706:11
707:7 712:14,19 713:1
,14,16 715:11,16,18
716:2,3 717:4 718:1,17
,24 719:2,3,22 720:3
727:8
**papers** 457:12 535:7
614:17
**paragraph** 376:5,8,12
385:17,21 392:8 442:21
448:6,7,14 454:10,12,20
461:22 465:2 621:14
661:9 670:7,17 684:16
**paragraphs** 376:7
**parameters** 660:5
**parentheses** 600:6
**parenthesis** 542:1,4
599:24 600:6 667:7
714:1,16
**parsons** 581:6 608:12
**part** 359:20 369:13
407:20 419:1 424:10,10
430:23 431:2,22 432:1
441:8 466:8,15 468:22
469:9 470:24 471:5
474:10 496:21 516:4
517:14 519:24 520:20
533:20 557:1,5 570:22
573:15 579:20 582:19
622:16 630:16 644:10
645:14 683:5 699:22
704:16,18 707:13
711:12 713:1 715:10,23
726:22
**participate** 378:19 428:5
657:20
**participated** 398:21
435:11 643:24 669:9
676:13 725:13
**participating** 391:17
**participation** 366:2
378:24
**particular** 413:24 428:3
,17 435:17 441:22
459:20 481:1 482:14,19
483:16,22 485:9 487:8
489:5 490:4,12 491:4,9

,24 492:1,10,18 494:5,8
495:5 501:10 509:22
513:23 515:2 524:19,20
525:1 575:17 576:8
577:6,7 594:16 640:24
644:1 652:2,6,18 659:3
660:7 661:2 676:14
705:8,21 710:8 724:13
,17,20,21 725:14 727:9
**particularly** 357:15
418:21 424:14 560:16
640:6 641:19
**parties** 732:21
**partners** 353:9 683:23
**parts** 605:9
**past** 435:15 547:19
565:8
**pat** 483:7 485:1,5 490:11
493:1 542:2
**patent** 437:7,13 438:1
**patient** 391:8 419:2,2,20
,23 420:20 421:13,16,20
443:17 462:16 467:2
480:5 481:1 483:1,9,23
485:5,10 487:8 488:6
489:17,22 490:4,12,16
492:11 493:4 494:5,8,11
501:11 508:2,5,23,24
517:16 523:2,4 525:10
551:24 575:9,11 576:20
581:18,18,22 583:6,9,12
,16 584:1,14,16 585:15
,19 588:5 589:12 590:9
,10 592:24 593:3 595:12
,14,22 598:11 599:10
602:6,21 603:11,11,19
604:13,15,20 605:1,5,11
606:16,17 607:17 610:6
,8,14,14,18 611:23
612:3,7 615:4 665:13
674:24 675:9,24 676:19
677:3,13,21 678:6,7
681:23 683:10
**patients** 390:3 392:15
396:19,21 442:24
444:18 448:19 462:13
465:4,5,7 479:3 497:16
504:22 506:5 513:16
517:7,10,22,23 521:8
526:12 553:14,22
558:20 568:15 570:1,1,2
,2 574:5,12 580:9
581:23 582:8,9,14
589:22 590:1,11,15,21
591:2 592:4 598:23
599:13,20 607:5,9 609:4
611:13 612:9,12 614:8
617:9 620:18,18 626:2
630:17 638:8 641:2,4,21

674:1,1 676:13,18 677:4
678:6,8,21 679:8,18
719:12,16,19
**patterns** 614:20 619:14
**pay** 429:13 440:11,14,19
,20 442:13 705:5 713:13
,14,15 723:2
**payments** 435:8
**pays** 441:16,17
**pc** 354:10
**pediatric** 392:23
**pediatricians** 641:20
**peer-reviewed** 694:11
**penalizing** 645:2
**people** 428:8 429:13
447:6 455:5,11 456:20
457:1 464:1,4,13,18,20
465:13 468:14 469:10
,19,19 470:18 471:21
472:7,12 479:7 480:2
508:2 509:2,2 521:6
522:18,18,22 525:5,11
526:4,6 527:8 549:22
559:23 570:17,20
573:17,21 574:1 580:2
,15,19,22,24 596:24
597:2 602:15 603:12
607:20,21 608:8,17,19
,22 609:2,2,13 610:16
,19 611:15 614:4 615:8
617:12,15 618:8 619:17
620:9,12,14,15 632:6
634:8,10 638:1 646:9
661:21,22 662:3 665:22
669:1 673:3,4,5 680:9
,12,17,19,24 681:4
721:13
**per** 445:12 506:7 512:17
,23 513:18 541:7 583:5
596:21,22 674:1
**percent** 382:11 436:15
,17 442:1 443:8 444:17
525:11 549:23 592:10
,14 607:5,8 625:16,16
,19,19 626:1,18,19
641:14,15 664:9 676:5,6
**percentage** 372:21
373:3 382:11 396:1,14
420:19
**percentages** 398:9
417:10
**perfect** 719:13
**perform** 386:11 424:13
662:4
**performed** 391:13 394:7
,9 404:6 407:21 421:10
438:24 449:5 450:3
498:14 521:16 612:17
683:3 713:15

**performing** 451:7
474:19 661:23
**period** 463:18 464:13,15
,21 465:7,9,17 506:9
507:2,20 509:15,23
511:21 513:1,2 517:11
565:18 566:11 567:20
573:7 575:17 589:20
599:1 614:9 619:3 632:9
676:10,10
**periods** 467:12 675:10
**permitted** 474:17 475:11
**person** 447:2 466:9
473:14 489:5 494:16
497:5 499:4 503:20
504:1 506:6,8 507:20
508:9,10 509:4,5,6,10
,12 512:2,16,20,22
513:17 514:9 515:10,18
518:14 521:21 522:9,12
,24 523:5 524:24 527:1
,18 530:17 541:7 576:9
,24 577:5,21 580:1,3,12
597:3,4
**person's** 442:10 483:12
**personal** 431:8,10,12,14
556:22 732:14
**personally** 369:16
440:20 458:3 680:16
**perspective** 645:5 671:7
**pertain** 697:4
**pertinent** 369:12
**pf48** 480:10,10,11
**pfizer** 352:8,10,17
355:10,23 357:4 374:12
,18 375:22,22,23 376:24
377:3,6,7,10 378:1,20
,22 385:9,14,21 386:7
,12 390:10,23 391:6,13
,21 392:20 393:3,7
398:20 400:1 401:5
403:4,5,9,13 404:3,7,12
,19 405:4,6,15,18,18
406:18 407:4,13 408:13
,16,20,22 409:5 410:8,9
,21 415:2,13 426:9,11
,11 427:19,21 428:8
435:8 439:10 443:12,22
458:2 474:20 475:10
476:23 524:13,16
625:23 626:1 660:6
661:21 662:3 677:15
702:14 712:19,24
717:17,17 723:1 725:6
,12 731:5,7
**pfizer's** 385:24 393:21
409:12,16 410:3,3 435:8
**ph.d** 352:22 355:14
356:4 428:22 661:10

731:18 734:4
**pharmaceutical** 405:4
435:16
**pharmaceuticals** 437:19
,20,22
**pharmacist** 528:6
**pharmaco** 499:12
**pharmacoepidemiologic**
598:21 690:13 700:2
**ph** 499:13)epidemiologic:placed
**ph** 469:14 528:6)miologis:places
**ph** 469:15)epidemiologist:plaintiffs
**pharmacoepidemiology**
706:21
**pharmacologic** 452:7,17
**pharmacotherapy**
614:18
**pharmacy** 469:10
**pharmetric's** 475:14,18
**pharmetrics** 358:13
367:15 368:22 460:16
461:2,7 462:23,24 463:4
,7,10 466:8,10 474:18
475:6 476:23 477:4
479:19 489:13,17 494:8
,20,24 499:16 540:21
542:23 576:19 675:9
686:22 709:17 719:16
723:21 726:24 727:4
**phase** 392:12 488:3
529:16
**phobia** 608:13 609:24
**phone** 661:13
**phonetic** 602:17
**photocopy** 557:10
**phrase** 514:3
**picked** 462:18 463:11
**picture** 622:10,13
**piece** 691:8,10
**pieces** 544:1
**pierdzioch** 354:19 355:1
**pile** 358:10 359:9 360:4
,16 361:16
**pills** 509:9 510:12
579:10 618:3
**pivotal** 454:4
**place** 369:4 436:20
687:14 731:11 732:18
**placebo** 358:7 376:14,21
377:1 381:14 384:11,15
,19 386:4 387:3 389:23
398:22 399:19 400:18
401:14,15 402:20,24
403:6,17 405:20 406:21
407:8 408:7 415:10
422:7 443:1 446:1 593:2
596:10,14 626:13,17
630:14,16 631:1,24
641:5,11 673:24 677:9

**placebo-controlled**
400:23 401:18 403:18
,21,24 404:24 406:4,9
410:11 418:15,23 419:5
581:17 596:5 608:8
610:7 679:3 683:8
**placebo-treated** 397:21
634:8,10
**placebos** 385:22 388:11
placed 640:6
places 417:21
plaintiffs 352:15 353:22
355:17,19,21 360:6
457:2 684:7,17 685:24
686:3,11 690:11,16,20
692:8 693:15 696:20
697:3 708:24
**plan** 466:5,12
**planned** 440:5
**plans** 435:15 465:21
466:4
**please** 355:15 356:22
358:13 376:11 379:24
390:15 392:7 395:23
401:10 405:22 411:9
419:24 425:24 432:16
442:20 476:8,18,19
477:1 506:3,23 532:23
535:20 542:16,18
558:13 654:10 666:18
683:20 696:12,14
**pleased** 719:20
**plenty** 611:13
**plot** 650:1 659:10
**plural** 604:21
**plus** 592:21 599:24
600:6,12,19 666:1,13
724:6
**point** 364:8,22 393:19
404:18 412:12,15,16,24
413:2,3,5,10,19,23
417:15 420:14 421:24
432:15,15 433:13
437:19 444:21 447:10
448:23 452:3 460:12
463:22,24 471:11
481:16 499:22 511:1
515:3 516:18 522:1,4,7
,11 525:2 531:21 541:20
550:3 553:11 555:18
563:20 573:19 577:1
582:17 592:16 618:22
619:12 620:20 624:10
625:10,12,22 629:14,19
631:22 632:13,18 647:9
,16,20 648:1 649:24
650:3,10 651:17,18
652:13,14,17,20,23
653:3 660:22 664:3

666:19,20 670:5,16
686:17 696:13 697:19
700:4 704:10 709:12,12
727:19 728:13 729:8
**pointing** 701:2,2
**points** 453:20 462:14
497:7 652:11 666:21
**poisson** 504:24 537:9
598:3
**policy** 432:23
**polish** 416:14
**pool** 454:6 462:23
**pooled** 537:13 586:23
592:21 637:7 644:17
679:1
**pooling** 537:13 629:3,6
673:20
**poorly** 424:13
**population** 464:17
583:12,15 584:1 585:19
586:3,12 587:7,9 589:12
634:3,6,13 635:21,22,23
636:1,4 638:2,8 719:13
720:12 721:3,7,13,19
722:8,12,23 725:1
**populations** 455:21
593:19 636:7,12 674:10
,12 719:11 720:6,19,23
721:2
**portion** 405:2,13 407:21
410:14 417:16 435:12
466:6 476:19 715:14
**portions** 689:12
**portraying** 556:11
**position** 406:7 450:19
453:2 531:9 532:16
533:1,9,18 534:8 693:2
,4 701:22
**possess** 727:20 729:8
**possibilities** 669:13
**possibility** 543:21
663:23
**possible** 392:14 408:1
463:24 465:14 473:14
499:2 548:5 658:10
674:16 703:18 709:11
**possibly** 392:11 462:17
564:18 565:6,10
**post** 502:3 517:11 537:7
,15,16,17 567:19 575:6
**post-index** 467:12 502:3
521:12
**posterior** 659:7,10,12
**potential** 470:20
**potentially** 400:20
470:13 471:4 521:24
721:13
**power** 592:14,15 593:18
594:8,16 596:16 605:20

607:5,6,8 611:11 614:5
,11 625:8 637:15 663:6
,8,11,20 665:17
**powered** 591:18 592:6,7
636:24 637:13 664:2
**pr** 480:11
**practical** 650:5 708:13
**practice** 448:17
**practices** 352:4 355:7
448:16
**practitioners** 641:20
**pre** 396:5 517:18 537:7
575:5
**pre-** 467:11
**pre-index** 465:7,9
**preceding** 622:17
**precise** 459:21 623:22
**precisely** 379:7
**precision** 508:17
**predetermination**
524:14
**predict** 668:2
**predictive** 668:5,9
**predictors** 668:4,20
**preface** 668:19
**prefer** 388:4 416:19
417:12
**prefix** 537:19
**pregabalin** 382:5,24
396:2,10,14 398:11,14
426:5 592:21 637:18
638:8 654:19,19,23
664:13
**preliminary** 530:23
**preparation** 366:1,1
435:14 523:13
**prepare** 368:21 579:14
694:20
**prepared** 392:16 568:12
595:7 694:10,24
**preparing** 511:3 690:17
691:15 693:16,20 694:7
,11,21
**preperiod** 517:15
**prescribed** 470:18 509:9
,13 514:19 517:17
525:12,15 526:13
527:11,19 574:12 576:8
579:11
**prescription** 463:17
491:24 500:20 501:2
502:1 503:10 525:1
526:16 576:7,20 617:24
**prescriptions** 501:21
**presence** 472:14 515:20
641:16
**present** 353:1 354:1
427:21 574:4
**presentation** 427:19,22

**presented** 391:11 511:8
,10 706:23 719:24 723:9
**presenting** 523:15
**presents** 506:5
**preserved** 578:11 579:2
**presumably** 376:17
543:10
**pretend** 531:18
**pretreatment** 574:11
**pretty** 377:13 382:14
398:8 418:4 442:6 456:8
,13 466:17 471:12
569:13 582:18 598:7
599:2 601:6 619:21,21
620:2 628:12 665:12
673:18 685:16 700:10
723:5 724:2 725:1
**prevention** 669:10
**previous** 528:4 537:15
,16,16 671:21 732:8
**previously** 356:5
**prices** 712:3,7
**primary** 421:10,12
466:21 468:20 472:23
509:20 517:14 533:22
569:24 574:8 628:9
642:1 703:7
**print** 540:19
**printed** 539:1,24
**printout** 356:24 476:15
480:24
**prior** 392:19 465:18
469:16 475:14,18
503:21 510:3 521:6,8,9
,9 523:20 526:13 530:20
559:16 564:5 565:14,14
,18 567:3 568:8 570:5
573:21 578:6 615:4
617:21,22 618:3,11
649:20 660:5,7,8,22
668:8 699:10 717:12
**priori** 468:17 640:19
**probability** 412:17
413:23 442:24 586:19
,21 647:10 649:10 650:1
,2 651:16,18,19,22
652:11,12,19 653:2,4,5
,8 657:4 658:3 659:1,2,6
664:6
**probable** 648:22
**probably** 372:10 418:19
425:3 468:16 479:13
488:3 497:20 518:24
519:5 523:22 524:16
530:22 535:21 537:11
567:16 569:12 580:24
582:18 585:23 598:19
601:15 610:16 611:23
619:4 631:3 638:7 652:8

653:22 708:2 717:8
721:22 722:15,21 724:5
**problem** 548:8 626:9
**problems** 357:13
**procedure** 468:5
**proceed** 356:3
**proceedings** 732:16
**produce** 359:20 420:7
438:21 572:2 689:21
704:7 709:10
**produced** 360:13,23
362:17 373:18 420:1,2,4
,5,6 510:21 520:2,7,9,10
,12 685:24 686:3 690:15
692:7 693:14 708:23
**product** 352:5 355:19,21
505:8 716:19
**production** 547:3
684:16 688:6
**productivity** 442:5
**products** 355:7 363:20
364:1,13,19 368:18
**professional** 429:19
**program** 535:3,4 538:1
540:16 541:3,21 542:24
568:14
**programs** 440:8 529:19
531:3,4,6,8,14 532:16
533:10,19,21,23 534:9
,15,16,19,23 535:8,9,11
536:5,8,17 538:9,11,14
,16,22,24 539:2,4
540:14 542:22 543:5,9
,18 544:5,7,14,15 704:6
709:19 723:23 729:2
**prohibited** 475:14
**project** 474:23 700:9
703:23 704:1,4 705:12
**projects** 534:23 711:23
712:8
**proper** 628:18
**properly** 424:11
**properties** 452:7,17
469:22
**proportional** 599:5,17
601:8,20
**proportions** 636:15
**proposal** 441:24 442:1
**proposing** 511:13 716:7
723:5
**proposition** 631:14
657:24
**prospective** 640:18
**prospectively** 453:20,20
640:19 668:23
**protective** 427:5 455:24
473:5,7,11 570:21
575:16 577:12 612:19
,23 645:4 650:17,19

660:12 701:21
**prove** 647:2
**proven** 672:21
**provide** 403:6 408:1,22
409:5 435:23 452:7,24
455:8 458:11 466:12
516:9 543:23 548:5
687:24 703:9 709:15,16
718:5
**provided** 358:24 404:19
407:4,19 408:16 437:11
449:17 451:23 474:18
476:16 489:9,13,16
492:1 494:7 538:5,24
539:3 544:20 545:5
546:10,14 562:16
576:18 686:11 690:10
,19 703:20 704:4,8
**provider** 666:22
**provides** 455:4 463:4
574:4 593:17 621:7
**providing** 475:8 476:21
554:21 716:18
**proximal** 612:24
**psycd** 542:2
**psych** 388:24 389:3
**psychiatric** 387:18
394:2,16 406:5 469:2
473:4 549:23 554:4,6,8
,11 608:9 609:5,11
619:15 638:2,8 640:7
669:4 673:17 674:3,12
720:11,11 721:7,20,21
,23 722:8,12,14,15,20
**psychiatrics** 609:11
**psychiatrists** 392:21
394:4
**psychiatry** 667:22
**psychotherapy** 614:13
,19,24 620:19
**public** 369:13 430:14
731:24
**publication** 475:4,23
511:5 694:11 699:22
717:7,11,13,16 719:6
**publish** 720:3
**published** 475:19,19,21
625:21
**pull** 358:13,17,19 374:13
375:1,3 392:3 405:21
414:1 442:16 460:10,13
531:15 535:21 550:3
683:19 692:3
**pulling** 692:5
**pulls** 705:21
**purchase** 528:12,17
**purchased** 526:19
717:21,24 718:4
**pure** 436:19

**purely** 721:22
**purport** 473:20
**purpose** 386:12 404:20
,22 406:18 407:16 421:7
,23 422:13,14 425:17
474:19 511:3 597:14
611:10 650:5 724:23
725:2
**purposes** 504:5 505:16
506:17 511:3 585:1
646:19
**pursuant** 352:22
**pursue** 723:11
**pursuing** 511:11
**put** 358:11 359:9 365:6
367:12 369:4 372:3
373:10,12,21 398:12
416:20,20 417:20
436:15 441:11 550:9
563:8 597:11 602:16
606:7 622:22 630:13
637:18 640:11 667:10
678:4 698:5 701:21
**puts** 595:11
**putting** 418:13,22 597:9
639:6 698:9

Q

**q-u-a-n** 492:4
**qualified** 392:20 452:14
527:21 531:7 639:24
671:6,10
**qualify** 443:10 509:3
**qualities** 469:22
**quality** 641:18
**quan** 492:4
**quantify** 380:20
**quantity** 415:8,24 491:5
492:7,7
**quash** 710:11
**quashing** 711:9
**query** 376:15 482:14
486:15
**question** 371:23 381:23
382:19,22 383:1 386:6
390:21 393:18 395:21
402:4 403:15,19 408:18
409:22 413:3,18 422:1
423:17 429:2 430:3
432:6,13,16 451:17
459:20 472:4 473:23
499:7 505:5,7 518:3
524:8 526:22 530:4,13
532:10,15,19,23 533:7
,14 534:7,11 539:8,11
540:16 546:2,22 548:1
,11,14 556:9 570:21
584:11 586:10 587:11
588:2,24 589:9 591:9

596:8 602:18 610:22
611:4 626:17,23 627:15
629:17 631:10 643:5,10
,13 650:24 651:10
655:24 658:22 664:18
,21 665:1 673:14 674:15
675:2 680:3,3 681:2
685:8,19,20 686:5,14
689:10 691:1 695:22
696:2,2,4,6,10 697:8,16
698:8,13,16 699:2 702:5
721:18 723:18,19
724:17 727:17 728:10
**questionable** 645:14
**questioning** 379:20
**questions** 476:24
481:12 511:7,9 533:2,15
550:7 551:4 584:6 585:5
,7,9 589:5 684:21,24
685:11 692:10 695:9
698:1 711:3 728:3 729:5
**quite** 380:8,8,11,11
392:5 412:6 416:8,11
422:17 427:6 456:4
459:14 498:19 516:13
558:4,4 567:22 603:2,3
630:5 663:14
**quoted** 590:8

---

R

**r-56** 442:15
**r56** 714:9 716:8
**raise** 555:17 556:8,9
691:19
**raised** 511:6,7 570:20
642:20
**rampant** 438:11
**ran** 514:7 530:23 623:23
705:12
**randomized** 398:21
403:6,24 404:5 410:11
452:22 608:4,7 610:6
634:10 641:2 676:13
679:1,2,9 707:4
**randomized-control**
645:17,18
**randomized-controlled**
608:3
**randomly** 641:5,8
**range** 624:1 666:13
**rare** 416:1 417:23
424:14 519:17 590:2
596:20
**rarity** 599:9 623:21
666:2
**rate** 423:5 455:17 506:7
512:16,22 513:17
525:18,22,23 527:12
551:16,19,20,20 552:2

553:3,9,19 554:1 555:3
556:11 568:6,8 571:8
572:3 582:8 583:15
599:6,19,19 601:3,16,18
603:10 605:4 607:13
609:9,19 610:17 621:8
632:1 634:2,3,5,12,15
636:7 637:21 656:21
**rates** 444:22 445:3
455:19,23 473:10
515:12 551:21 552:3
553:13 554:24 555:3
568:16 576:15 583:19
586:14,16 600:4 609:23
619:19 621:16 635:15
637:6 641:22,24 654:20
655:22 672:18,23 673:1
676:18,19
**rather** 416:14 549:4,5
558:11 641:17
**ratio** 414:10 415:4,6,20
416:2 417:23 418:5,7,9
,12 422:15 426:7,14,17
,23 427:3 442:23 443:1
444:7 447:10 450:15,23
551:16,19,20,20 553:3
,20 554:1 556:1 569:19
571:13 600:12 601:16
,18 623:12 631:2 648:6
,12 649:17,22 650:9,16
651:5 652:5,6,7 654:20
656:1,20,21 657:24
659:14 662:12 664:8
683:7 720:10 722:7
**ratios** 553:9 555:3,20
556:12 624:21 648:6
655:21,21 658:18 659:3
**raw** 699:4
**raymond** 354:16
**rct's** 452:4
**rdg** 714:9
**re** 352:3 731:3
**reach** 458:22 676:22
**reaction** 681:14
**read** 357:17 365:20
366:15,21 367:3,17,23
368:10,23 370:8 374:20
376:6,7,11 385:17 392:8
,8 395:2 396:4,12,13,16
,22 397:22 405:24
442:21 444:10 445:22
452:11 456:21 457:4,12
,16,17,20,23 458:22
461:5 464:19 465:10
467:13 474:21,24
475:16 476:18,19 479:4
483:23 484:10 485:2
486:17 487:23 488:9
489:2 492:23 506:3,23

512:10 513:4 532:7
539:8 542:5 552:13
574:13 581:19 587:15
602:11 625:20 642:19
664:10 666:20 671:15
688:17 690:9 696:14
697:20 709:13 715:1
729:11,15 731:9
**read_me** 476:16 477:24
479:18
**read_me_shc.txt** 476:11
**reader** 458:17 459:12
**readers** 459:17
**reading** 448:15 456:24
457:1 710:7
**real** 407:5 434:7 437:5
513:6 536:7 550:5
645:14 678:15
**reality** 687:14
**realize** 498:11 544:4
**realized** 549:16
**really** 364:17 372:22
382:20 385:8 398:13
410:9 418:18 432:6,8
464:1 466:11 472:11
478:9 479:22 483:4
494:24 505:2 511:9
524:3,3 539:10,23 564:2
567:16 570:21 572:22
575:9 577:15 612:9
614:10 627:18 628:24
629:14 636:6,23 637:1
645:4,9,10,11 648:13
649:18 655:12 659:13
660:17 662:21 666:4
675:12 676:5,7 677:23
678:2,3,9,14 683:1
700:6 707:11 712:12
716:10 719:22 725:16
727:2
**reanalyze** 568:11
**reanalyzed** 438:5 591:14
**reason** 399:2 417:12
475:7 477:5,8 490:6,7
494:13,17,18 522:3
527:18 538:23 543:20
549:17 566:9,14 567:2
572:7 594:19 595:8
607:7 620:22 636:9
666:5 667:19 677:12
705:8 727:9
**reasonable** 371:4,14
379:12 446:4 447:2,6
466:17 479:17 483:24
514:21 519:8 611:24
619:6 633:21,22 663:21
679:5 699:3
**reasonably** 534:3
622:13

**reasons** 642:1 646:10
721:17
**reassurance** 700:17
**recall** 359:18 361:18
379:10 409:3 422:18
690:2 702:8 723:5
**receive** 478:11
**received** 360:6,20 435:7
455:12 465:18 477:6
478:10 494:20 496:13
523:15 526:16 527:6
534:2 709:18 734:9
**receiving** 525:10 620:18
**recent** 638:21 707:5
**recess** 411:3 460:4
500:3 516:22 572:15
622:2 669:19 670:11
**recollection** 477:10,14
**recommend** 723:8
**recommended** 723:8
**recommending** 640:2
**reconstruct** 404:21
**record** 355:15 356:23
369:13 376:12 379:11
406:1 411:2,7 430:5,13
,14,19,21,24 431:2,23
432:1,7,9,13,17 460:3,8
467:9 486:20 499:23
500:2,6 506:4 516:21
517:2 558:7 563:8
572:14,19 621:22 622:1
658:16 666:20 669:15
,18,23 670:10,14 687:21
690:9 691:13,13 693:4,7
,10 696:15 698:9 730:3
732:15
**records** 357:21 440:17
490:3,16 495:5 499:9
573:17 574:1 727:21
**recreate** 699:13
**redact** 369:14
**redactions** 369:17
**redefining** 522:16
**redoing** 532:4
**reduce** 574:10,19 575:2
**reduced** 475:9 732:14
**reducing** 454:22 456:12
**reduction** 472:19,22
525:18 614:15 620:2,13
,22
**reenactment** 568:13
**refer** 701:23
**reference** 522:16 597:24
699:20
**references** 717:1
**referring** 378:21 573:2
591:3 606:4 675:16
687:4,4,9
**refers** 492:13

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**reflect** 477:13 538:15 558:7 564:9
**reflects** 477:18
**refresh** 477:9,14
**regard** 455:9
**regarding** 374:18 638:22
**regardless** 490:5 518:4 658:1
**regions** 656:17
**regression** 551:9
**regular** 416:15 434:2
**regulatory** 390:10,12 453:12
**reimbursed** 713:7
**reiterated** 537:18
**reject** 651:11,12 652:3 663:24
**rejected** 649:16
**rejecting** 423:7 427:9 649:20
**relate** 510:11
**related** 364:11 439:21 599:19 644:10 707:3 715:15
**relating** 728:19
**relationship** 514:16 619:15 715:12 717:3
**relative** 412:3 415:3 416:2 417:23 418:2 420:19 421:6 450:16 451:11 514:17 552:19 569:10 574:11 600:9,14 629:2 630:19 636:10,18 638:9 641:23 648:2 655:18,20 656:21 660:12 720:5,16 721:9 732:19,20
**relatively** 638:10
**released** 496:14
**relevant** 361:5 527:16 ,18,22 616:22 682:16 720:9 724:21
**relied** 368:21 458:10 528:2,5 591:13 687:1 690:12,17 691:14 693:16,20 694:21 697:7 ,18 698:18,24 699:17
**relies** 625:8
**rely** 458:5,8 534:14,22 535:11
**relying** 625:7
**remainder** 627:14
**remained** 439:3
**remains** 613:24
**remember** 357:7 361:11 379:18,20 427:2 437:17 439:7 440:16 472:22 477:21 478:1,13,24 521:4 523:1 529:14

**543**:2 547:21 548:16,17 554:23 583:17 592:3 597:10 624:17 626:14 644:7,9 646:17 686:20 688:21 706:13 709:8,22 710:6 720:5,8 723:4
**remembering** 573:20
**remembers** 548:13
**remind** 563:16 604:5
**remove** 385:21 403:12 568:14 630:20
**removed** 384:1,23,24 385:10 386:3,7 404:8 418:23
**removing** 419:5,7
**render** 671:6
**repeat** 409:24 566:13 655:24
**repeated** 517:22 521:13
**repeatedly** 521:12
**replicate** 386:8,10 678:21
**replicated** 531:13
**replow** 585:1
**report** 374:12 377:15,16 378:11 379:16 397:19 398:1,6,9,12,18 400:7,8 ,9,12 405:9,11 407:14 408:11,11 415:1 421:24 422:18 425:18 452:3 457:18,21,24 458:2 525:3 530:1 548:18,19 551:14 553:12 556:13 567:2 581:6 582:15 583:4 586:17 591:14,15 608:12 613:2,3,6,10 622:24 623:2,3,5 639:1 ,2,3 670:3 677:24 678:12 679:18 682:18 700:17 717:4 718:7,12 729:10
**reported** 354:23 707:6 718:14 732:13
**reporter** 389:2 396:5,8 413:8,10 432:11 443:4 491:16,21 512:18,20 540:9 554:6 561:4 588:22 595:1 673:5 698:20,22 732:6 733:6
**reporting** 354:20 516:15
**reports** 399:7 406:2 407:5 456:22 547:19 583:1 587:6 640:23 707:2 729:20,21,22,22 ,23
**represent** 373:4 436:10 470:11 480:24 481:20 486:14 488:19 490:2 497:3 512:7 540:14

**546**:1 562:24 568:20
**representation** 360:8 362:4 401:24 520:14 550:2
**representative** 634:12
**represented** 359:24 410:20 449:17 450:2 451:3,12,20 520:11 526:18 686:11
**representing** 360:12 444:3 489:15 540:19 545:24
**represents** 360:5 461:1 562:22,23 639:20
**reproduce** 729:2
**reproducing** 572:9
**reputable** 597:16,20
**request** 361:6 408:23 409:8 440:19,23 441:2 684:7,12,13 686:12 687:4,5 688:6 704:9
**requested** 357:1 359:20 376:18 392:19 402:1,2 403:5,9,21 430:4 511:4 690:11,15 692:7 693:14 708:24 719:14
**requests** 685:5 688:1
**required** 403:23 667:13 704:5
**requirement** 454:5,6 614:4
**requirements** 672:6
**requires** 475:14
**requiring** 510:2
**requisite** 661:4
**rerun** 704:19 705:23
**reruns** 705:22
**research** 394:2,17 424:9 708:6 712:3,7 715:15 720:1
**respect** 412:21 425:5 445:17 450:21 451:12 455:11 481:15,15,24 508:11 576:13 657:9 668:21 676:2,9 680:5 681:24 687:10 726:15
**respectfully** 461:19
**respond** 548:2 688:4
**responding** 718:21
**response** 361:6 376:15 387:7 394:24 395:6,13 ,15,17,19 581:6 684:7 ,12 686:11 687:5
**responses** 395:16
**responsibility** 703:5
**responsible** 436:16 437:1
**responsive** 688:1
**rest** 474:24 477:2 507:6

**563**:1 626:22 632:24
**restate** 472:4 505:24
**restless** 667:3
**restricted** 474:9
**result** 438:2 455:2 570:12,13 598:18 650:18 660:9,14 678:10 720:2 722:6
**results** 392:24 422:23 423:4 447:14,17,22 450:5 454:18 470:13 471:16 498:18 508:18 517:24 521:14 523:7 524:8 531:13 577:10 578:10,22,23 580:11 598:9 654:6 661:3 662:8 ,10,11,16 700:15 704:7 727:7 729:3
**resumed** 352:22 356:8
**retain** 362:13
**retainer** 358:21 686:23
**retention** 696:23
**retrieval** 711:22
**revenue** 373:4
**reverse** 362:20 416:14
**review** 390:19,23 392:19 393:22 403:8 409:11 410:2 414:2 419:2 437:11 481:8 499:8,14 528:3 534:5 538:2 710:2 713:8
**reviewed** 370:15 371:5 379:15 392:5,21 393:4 469:12,13 529:15 530:21 635:14 639:19 646:21
**reviewers** 514:4 523:14
**reviewing** 544:19 545:4 729:22
**reviews** 392:24
**revise** 700:3
**revisions** 511:4
**right** 356:13 358:18 362:15 364:20 365:10 ,16 366:11 369:4 372:11 ,12 373:23 375:23 378:3 380:23,24 381:2 383:8 386:17 388:16 389:11 392:3 397:14 419:14,15 430:16,22 432:5 433:18 434:13 436:4,5 440:1,3 443:15 457:3 458:23 459:24 465:16,21 467:24 478:24 479:6,14 481:17 486:7 489:7,19 500:8 501:5,18 502:1 503:10,15 518:13 519:20 521:4 523:9 531:4 535:23 536:9

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

539:16 540:8 541:18
543:2 545:21 548:17
550:20 552:12 553:4
554:19 564:13,18,22,24
565:1,7,10 574:7 582:13
584:4 587:13 588:11
596:3 597:22 600:1,13
602:6,15 603:20 604:12
,23 605:6 607:18 618:6
619:22 620:3,23 622:22
623:10 632:5 634:19
648:1,24 650:4 651:19
654:10 661:18 663:1,4,5
664:10 666:22 687:9
688:20,24 692:21
709:24 713:23 714:7
720:5,18 724:1
**ring** 708:20,21
**risk** 412:4 415:3 416:2
417:23 418:2 420:19
421:6 443:2 448:19
450:16 451:11 454:22
456:12 473:1 506:6
507:17 509:21 513:16
552:19 565:18 569:10
,17,17,18,21,22 570:1
,10 571:13,14,15,15
574:5,20 586:5 587:8
593:1 595:13 600:10
604:6 605:12 606:16,18
607:3 609:2 610:15
611:16 612:5,21 613:23
614:6,21 619:2,8 620:23
629:11 630:12 632:11
,19 633:13 635:14
636:10 648:3,5,7 655:18
,21 656:20,21 673:4
675:10 718:13 719:12
,13 720:6,9,16,23 721:2
,9,20 722:7,8,22
**risks** 610:19 639:21
672:19 674:21
**rob** 469:13 528:5
**robert** 352:21 355:13
356:4 434:6 688:16
731:18 734:4
**robinson** 353:10
**role** 533:22
**roll** 616:16
**room** 355:20 641:10
**root** 678:8
**rotate** 433:4
**round** 604:14
**round-off** 417:14,16
**routine** 660:24
**routinely** 534:22
**row** 497:5 550:21 665:2
**ruggieri** 457:20
**rules** 696:7

**ruling** 711:4
**run** 519:21 529:13
579:18 704:17,19,22
**running** 433:16 482:4
**rx** 480:11

S

**safety** 364:13 644:21
706:22 708:10
**salary** 373:6,8 441:16,17
**sales** 352:4 355:7 363:5
364:15,16,19 367:10,11
368:6,7,12,17,19 369:23
370:3,10 371:7
**sample** 357:2 376:18
380:5 469:10 521:10,14
530:20 631:2 663:13
679:7 721:22
**samples** 637:12
**san** 354:12
**sarate** 538:1 541:3
**saris's** 431:10
**sas** 468:9 476:23 529:19
531:5,5,8,13,19 532:16
533:9,19 534:20,23
535:8,9,10 536:5 538:14
,16 539:19,21 540:13
542:18,22,24 544:14
699:5,6,19 700:10,15
703:18,22 704:4,17,20
,21,22 705:5,6,21
728:23
**sat** 643:17 645:21
**satisfied** 684:18 685:6
688:6
**satisfy** 380:2 393:3
563:5
**save** 658:19 689:24
705:13
**saved** 362:1 704:18
705:11,12
**saw** 475:6 560:23 622:9
626:8,15 686:10 729:20
**say** 363:1 364:10 366:8
372:9,9 380:11,23
382:14 386:3 409:16
413:2 420:2 421:9
424:19,24 426:8 428:13
433:18 444:6,16 446:21
447:10 448:5,13,24
452:4 456:7,7,8,11
463:6,14 464:11 472:18
473:24 477:20 480:6
503:5 507:19 510:15
512:16,20 515:4,17
517:17 520:22 523:11
525:21 527:17 539:20
,23 553:12 555:1 558:20
560:12 565:16 573:4

574:3,9 580:18 592:11
,18 599:10 604:2,21
607:5 613:8 614:3,9
617:5,7,24 619:6 623:13
625:23,23 627:21
630:11 632:10,12
635:10 636:23 644:14
648:22 649:12 650:17
651:16,18,20,21 654:4
,18 656:4 657:2 658:9
664:3 666:3 670:2
676:15 678:18 682:23
694:12,15 698:7 707:18
708:17 724:2
**saying** 416:12 427:8,10
430:15 439:11,14,15
455:22 477:23 503:5
508:22 524:1 539:14,15
557:8 564:8 596:19
604:8 618:7 627:5,9
628:8 631:14 702:9
723:6
**says** 366:1 368:21 381:1
,5,9,12,14,17 387:6
388:16,18,23 389:1,6,9
396:18 397:15,21 398:3
414:6 454:21 461:23
465:2,16,21 467:9
474:17 475:3,12 479:3
480:1,8 483:24 484:9,18
486:19,23 487:20
491:12 513:15 539:16
541:6,24 550:14 553:14
,22 554:4,8,12,14,17
564:17 565:6 566:1
581:18 584:3 585:14
597:4 599:23 600:7,8
615:3,21,22,23 616:2
628:19 654:24 661:9,18
666:4 671:10 674:1,3,6
683:23 684:15,16,19
692:6 693:13 694:10
697:7 704:14 714:9
727:19 729:8
**scale** 598:20 640:18
647:19
**schiz** 598:20 640:18
**schizophrenia** 554:14
**school** 685:18
**science** 432:23
**scientific** 475:4 523:17
638:23 639:10 640:4
642:10 643:16 671:22
711:22 712:8 716:6
**scintillating** 606:10
**scrap** 416:24
**se** 445:12
**seal** 733:2
**sealed** 430:24 431:2,24

**sealing** 430:18
**search** 392:10 547:22
**second** 358:11,12
395:22,24 410:22
426:16 454:20 468:11
476:8 484:11 487:5,9
495:4 497:23,23 499:24
503:10 513:7 550:21
558:13 562:18 567:14
,15 593:9 641:6 647:7
653:18 668:15,15 670:9
684:16 697:1 698:20
704:10 714:8,13
**secondary** 543:19
**secondly** 472:13 626:23
**section** 387:2 396:1
411:15
**securities** 712:3
**security** 431:8 712:7
**seeing** 383:1 559:21
575:1 586:19,22 590:4
621:17 627:11 655:4
**seeking** 365:3
**seem** 371:4,14,19
376:10,23 379:12 380:5
411:24 412:1 479:6,17
488:1 490:15 541:10
565:1,13 569:4 603:20
606:17 663:4 673:21
**seemed** 404:7 722:3
**seems** 395:17 413:21
466:17 478:1 538:13
**seen** 374:8 379:2,21
397:8 407:5 476:14
501:13 556:6 564:1
583:8 586:11 592:9
637:7 638:20 640:22
664:4 665:22 680:9
688:19,20,21,22 689:7
697:9,9 708:16,20 709:2
727:14 728:4
**selected** 494:16 527:2
562:17 660:7
**selective** 644:14 645:1
**selectively** 644:19
**self-inflicted** 467:16
**send** 362:9 441:10
689:19
**sends** 550:13
**sense** 617:14 678:14
**sensitive** 578:10
**sensitivity** 498:13
509:19 510:8,15,23
514:8,12,22 515:9,15
516:5 517:21 519:21,24
520:6,21,24 521:2,5,15
522:14,21 523:3 524:7
546:13,14,16 558:24
560:11 568:14,17,18

569:23 570:15,19 572:9
577:3,15 579:13,17,18
,24 580:10 612:16
660:19,21 661:5 662:7
694:5,6,13,16,20,23
699:23 706:8 707:13
708:1 713:15
**sent** 361:22 362:11,13
638:22 677:15 690:5
**sentence** 396:18 405:24
442:21 454:20 506:3
574:24 632:18 684:15
697:6 699:1
**separate** 402:4 429:9
497:3,14 498:10,21
644:8 726:8,10
**separated** 580:17
**separately** 360:21
**september** 367:1,8
581:7 694:22,23 706:12
**series** 435:1,4 511:6
**serious** 694:10 722:15
**seriously** 694:12
**served** 435:19 640:4
702:12
**services** 429:15,19
430:8 435:23
**serving** 671:22
**set** 392:16 405:16
450:16 529:4 542:21
564:24 592:5 733:1
**sets** 376:19 687:15
**settings** 523:17
**seven** 555:24 580:18
582:17 725:22,23,23
**several** 401:13 417:15
424:10 453:24 462:24
487:7 493:5 497:6
535:24 536:4 537:7
547:11 687:11,15
706:10
**sex** 483:20
**shall** 523:10
**share** 514:5 532:5
550:10 551:1
**shared** 687:2
**sharon-lise** 661:16
662:1,2
**sharp** 620:2
**sheet** 376:1 441:23
**shift** 460:11 636:15
**shifted** 434:2 521:20
**shook** 354:2 361:1,9
523:19 701:23
**short** 509:23 606:1
**short-term** 614:16
**shorter** 376:18
**shorthand** 732:6 733:6
**shortly** 477:6

**shot** 531:17 532:9 696:7
**shouldn't** 464:2,12
603:3
**show** 393:20 422:16
438:1 454:5 481:21
496:2,3 516:10 524:7
525:17,18 530:4 587:24
,24 591:19 613:22
614:20 642:24 662:12
669:2 676:17 718:6
**showed** 374:11 379:18
,19 427:21 438:6 439:3
447:18 560:13 612:17
640:20 643:21 685:23
718:12 722:18
**showing** 423:19 427:5
721:14
**shown** 618:4 622:20
**shows** 389:17 411:16
466:10 495:22 525:4,7
609:7 626:20,21 630:11
654:20
**side** 358:11 367:13
462:14 464:3 538:10
641:3 657:6
**sign** 356:13 689:4
**signal** 633:14 662:13
**signature** 689:1
**signed** 688:22
**significance** 553:12
**significant** 382:15
417:16 447:15,16,19
571:24 572:2,3 575:5
577:12 612:17 628:23
633:6,8,13,19,24 637:9
648:5,7,8,8 658:15,18
660:14 662:14 663:23
664:4 682:23,24 683:6
720:12 722:7
**significantly** 650:21
672:23
**signs** 669:2
**similar** 373:6 470:5
471:17 498:19 521:14
577:10,11,11 614:20
622:9,13,19 625:7 631:1
638:10 665:12 671:23
724:2,8
**similarly** 394:6 522:6
557:23
**simon** 565:17 613:22
614:17 619:7,13
**simple** 371:19 486:15
551:20,21 552:1,18,18
553:1,9 555:20 556:1
569:6 578:22 603:2,3
679:15 687:14 697:16
701:2
**simply** 404:4 405:5

421:9 445:12 451:5
504:21 539:1 575:11
577:19,20 578:9 603:12
652:19 700:17
**simulation** 598:4 663:10
**simultaneously** 439:2
**single** 376:21 408:8
452:23 471:8 523:4
679:21 680:23 681:7
**single-dose** 418:24
**sit** 358:5 380:20 403:22
432:21 433:5 481:7
531:7 539:8 660:10,15
**site** 436:20
**sites** 436:13
**sits** 440:1,3 536:9
**sitting** 724:1
**six** 377:24 388:14 433:3
435:5 503:16 508:22
555:24 568:23 569:1,2,7
571:13
**size** 376:19 586:12
593:2 600:16 637:13
663:13,20,21
**sizes** 357:3 380:5,9
600:14 631:2
**skills** 429:13
**skin** 681:16
**sleeping** 667:4
**slides** 428:6
**slight** 382:10 501:9
**slightly** 437:13 518:2
726:23
**slow** 443:5 491:17,18
**small** 376:18 433:16
435:16 580:23 589:24
590:3 660:8
**smaller** 414:24 580:24
604:9 611:17
**smith** 352:10 457:17
731:7
**snow** 356:12
**social** 431:8 608:13
609:24
**soh** 353:20 355:20
**solely** 474:20
**solid** 436:15
**solution** 598:6
**solved** 541:17
**somebody** 458:21 463:6
471:4 512:6 521:19,19
618:2 668:14
**somehow** 606:7
**someone** 522:6 681:12
**someplace** 510:19
**something** 376:1 383:3
429:10 439:6 441:21
458:19 459:14 472:21
524:1 544:12 550:9

554:19 556:10,17 565:1
,9,22 567:8 568:21
569:20 571:23 576:11
582:17 589:19 593:24
594:18 596:20,21 610:5
612:4 615:9 620:21
625:4,4 628:20 716:8
723:10 724:4,7
**sometime** 707:17
**sometimes** 357:24
358:3
**somewhat** 622:19 624:1
,4 637:13 654:7
**somewhere** 357:11
358:18 416:21 591:9
605:11
**sophisticated** 505:8
**sorry** 375:13 381:22
383:16 384:24 385:17
389:3 396:5 397:12
399:15 409:24 411:12
413:9 419:7 424:22
428:18 439:18 443:7
448:4 454:13 480:4
501:4 507:23 510:23
512:18,19 513:11 518:1
525:21 536:16 537:15
540:18 551:13 552:9,10
553:11 554:6 557:17
558:4 561:21 567:15
568:8 581:11 584:8,18
591:3,23 592:1 595:1,3
606:3 608:4 613:12
621:6 643:12 667:7
673:5,15 682:7 685:9
693:8 696:22 697:1
704:24
**sort** 437:2 523:3 560:15
594:21 613:18 628:17
631:1 661:4 724:18
**sound** 372:11 581:24
582:13
**sounded** 528:20
**sounds** 372:12 479:14
604:12 607:18 663:5
**source** 436:22 597:16
,20
**south** 442:12
**space** 438:23 486:23,23
,24 487:22,22,22,22
542:2,2,3,3,3,3,4
**speak** 447:8
**speakers** 434:18
**speaking** 409:19 475:5
**specific** 452:14 528:10
537:20,20 572:23 716:4
725:16
**specifically** 526:16
529:14 724:16

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

**specifics** 725:18
**specified** 391:2 732:18
**speculation** 478:17
 598:16 603:23 605:24
 606:24 609:21 610:23
 621:3 624:4 649:3
**spell** 653:17,18,22
**spend** 441:21 529:18
 545:7 653:11
**spent** 451:15 545:4
 715:22
**spike** 619:21
**spirit** 716:14
**spite** 657:23
**spoke** 528:22 662:3
 677:19
**spoken** 439:9
**spontaneous** 640:23
 707:2
**spreadsheet** 357:1,6
 373:17 402:17 451:23
**square** 678:8
**squared** 594:22 600:1
 ,24
**squareds** 601:7
**ss** 732:2
**ssri** 641:9 646:2
**ssris** 642:7 644:14 646:3
 681:18
**stack** 373:24
**stacked** 686:20
**stage** 421:7 568:10
**stand** 403:22 574:16
 694:12
**standard** 554:22 555:7
 656:3,3 661:4 678:20
**standing** 594:5,10,12
**stands** 631:14
**stapler** 359:12
**start** 419:14 448:14
 455:3 505:12 601:24
 617:9 621:11 654:16
 716:7
**started** 434:14 576:10
 617:1 618:9 706:10
 707:22 708:17 719:21
**starting** 466:24 476:20
 493:17 563:1 566:16
 574:24 616:5 706:24
**starts** 428:14
**state** 352:12 355:11
 433:14 674:15 732:1,5
**stated** 377:12 579:23
 674:15
**statement** 445:12,23
 446:3 456:13,17 574:18
 592:12 628:12 649:21
 655:16 690:22 693:24
 695:1,3,4,12 709:3

728:7
**statements** 695:19
**states** 352:1 355:8 435:4
 463:4 669:9 731:1
**statistic** 423:8 627:3
 628:10
**statistical** 405:9 414:2
 424:9 433:11,16 435:2
 ,14 445:1 451:7 452:21
 504:17 505:9 578:20,22
 579:3,5 592:14 614:5,11
 645:5 647:3 649:6
 661:10 663:20 670:18
 671:18,21 672:3 673:23
 677:24 706:21
**statistically** 447:14,15
 454:7 568:11 571:24
 572:1,3 575:5 577:12
 628:22 633:6,8,18,23
 637:9 658:14 662:14
 720:12 722:6
**statistician** 383:1 429:7
 447:8 648:4 651:9
**statisticians** 453:2
 707:9
**statistics** 394:23 429:11
 435:6 579:2 653:12,14
 ,15 654:3,7,17 656:16
 ,22 659:1,4,5 662:1
 706:16 716:10
**stay** 464:20
**stead** 534:4,4
**stenographically** 732:13
**step** 716:24
**steps** 431:1,6
**steven** 354:10
**stick** 704:21
**sticking** 604:15
**stipulate** 692:19
**stipulated** 392:10
**stop** 390:15 491:17
 546:22 575:17 664:22
 670:8 691:21 697:13
 698:8,14
**stopped** 682:11
**stopping** 392:14 499:22
 641:20
**stops** 681:22 703:5
**storage** 417:18
**straight** 482:24
**straightforward** 482:22
**strange** 555:22
**strategies** 392:10
 726:21
**stratified** 530:5
**street** 352:23 354:11
 355:5
**stricken** 430:5
**strictly** 475:13

**strike** 402:12 408:21
 419:14 432:6,15 445:20
 448:6 462:23 470:16
 490:1 506:24 519:12
 531:1 555:21 564:22
 593:6 667:8,11 720:24
 723:19
**string** 483:24
**strong** 455:21 598:7
 681:20 719:9
**stronger** 612:20
**structure** 452:6,16
 494:23 501:13,15,16,19
**studied** 589:22 590:17
 607:20 619:14 645:13
**studies** 376:24 382:21
 385:10,21 386:5,7
 387:22 389:7 394:9
 399:24 400:24 401:2,6
 ,13,18 402:1 403:6,16
 ,18,21,24 404:1,1,5,8,24
 406:4,9 408:6,20 410:12
 411:16 418:15,23,24
 419:1,5,8 443:15 448:11
 ,17,20 453:17 471:17
 473:2 497:13 499:13
 508:18 547:18 581:17
 586:21,24 590:17
 591:18 604:19,21 608:1
 ,3,8 609:12 610:5,7
 629:4 636:24 637:7
 644:17,22 654:20,24
 675:17 676:1 678:24
 679:3,4,10 680:23 687:7
 ,10 722:11
**study** 357:2,20 380:20
 382:8,23 383:24 384:18
 ,22 385:3 399:16,22
 400:15,19 402:7 424:5
 425:21 440:9,9,12,13
 441:1,5 446:23,24
 454:11 455:15 461:17
 ,17 462:6 464:20,20
 471:20,23,23 472:6,16
 473:4 474:10 499:18
 518:7 528:11,24 529:1,5
 ,20 531:1 536:8,22
 537:2,22 538:2,8,17,20
 540:15 541:9,12 543:6
 583:24 586:11 588:5
 591:5,6,13 604:23
 607:23 609:7 613:21
 619:7,7,12 641:8 668:3
 669:10 676:24 679:1
 690:13 697:2,2,5 722:4
 ,23 723:13,14,14,20
 726:9,10,19
**study-level** 425:8
**studying** 665:21

**stuff** 412:1 417:18 437:9
 495:3 524:12 547:23
 581:15 646:2
**sub** 393:21
**subalpha** 599:23
**subbeta** 599:24
**subchapter** 429:17
 434:16
**subcontract** 442:12
**subjective** 393:22
**subjects** 382:16,21,24
 398:21 405:19,20
 406:20,21 407:2,7,8
 422:5,5 592:13 621:8,9
 ,10 633:21,23 637:20
 722:10,18
**submission** 396:19
 401:2,9 409:12,16,17,19
 410:3,5 443:12 450:8,13
 454:3
**submissions** 456:21
 457:13
**submitted** 357:4 360:1
 362:9 375:18,19,23
 391:21 397:4 398:20,24
 400:20 403:4,11,13
 404:3,5 405:3,14,15,18
 ,18 406:18 407:9 408:9
 ,13 410:8,9,11 422:4
 443:22 444:3 449:18
 475:22 514:13 633:10
 683:3 694:22 699:20,21
 706:11 707:7 713:16
 717:15 729:10
**subpoena** 702:12
**subpoenaed** 701:11
**subpoenas** 701:10
**subpopulation** 722:19
 ,20,21
**subscribe** 731:12
**subscribed** 731:21
**subsequent** 399:4,7
**subsequently** 392:18
**subset** 527:2
**subsidiary** 467:19
**substance** 494:7
**substantial** 446:22
 474:4 571:15
**substantially** 380:18
 386:20 421:2 460:11
 569:22 598:9 630:15
 723:15
**substantive** 362:1,2,5
**subtraction** 679:15
**sued** 438:12
**sufficient** 619:4 641:14
 664:1 665:7
**suggest** 456:7 481:22
 539:5 689:18 695:11,12

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

701:1
**suggested** 422:2 689:23
695:13 722:13
**suggesting** 547:12
700:21,23 705:10
**suggests** 455:13,16
629:19
**suicidal** 391:5 406:3
472:14,18,19,22 510:1
518:21 567:19 583:18
586:17,22 590:4,5
606:12 611:18,24 612:5
618:9 626:2,5,6 632:7
,20 634:2,5 636:7,10,20
637:1,21 641:13 665:16
,23,24 666:8 667:16
668:2 669:2 672:18
679:11 715:7,19
**suicidality** 392:23 394:9
395:14 406:3 426:4
442:24 443:2 444:17
611:11,17 640:20
662:15 665:16 666:12
680:6
**suicide** 390:4,5 391:1,1
,1 442:14,14 452:8
454:22 455:17,17,18,19
456:3,12 467:15 473:1
,10 474:23 492:22 495:3
,9 496:12 497:4,4,6
498:5,6,17 504:23 506:6
,7 509:21 510:3,6,12
512:17,23 513:16,17
514:10,17,23,23,23
515:22 516:3,4 517:7,16
,20 518:14 519:1,4,14
521:6,8,9,12,21 522:2,5
,7,8,10,12,15,17,19
523:4,5 541:7,15 553:13
558:22 559:1,2,3,10,12
560:3,9,13,22 562:20,21
564:4 565:13 567:24
570:3,6,8,16 571:8,17
574:5,10,20 575:2 576:3
,23 577:9 578:5 580:2,7
581:22 582:8 583:14,15
,20 584:15 585:18 586:2
,3,6,6,11,13,20,22 587:3
,3,6,6,8,8 588:4 589:12
,15,16,20,21,23,23
590:2,2,9 605:4 607:4
,11,12,13 609:3 610:20
611:12,16 612:18,21
613:17,23 614:15,21
615:12 619:2,8,14
620:14,23 621:16 635:2
,14,16 636:10,11 641:7
,22,24 665:14,23 667:1
,1 668:5,8,9,14,16,20,24

669:2,7,10,12 672:19
679:11,12 680:8,9,14
681:6 690:14 707:1
715:12,15,21 716:1,2,10
717:3 719:10,13 720:24
721:3
**suicide-related** 392:11
**suicide-type** 494:1
**suicides** 519:11,11
564:10 583:23 586:3
589:11
**suing** 437:7
**suit** 438:23
**suite** 352:23 353:3
354:11
**sum** 360:5 363:9 494:7
563:1,17 564:12
**summaries** 392:16,17
**summarized** 393:1
**summary** 387:3 394:23
451:16,19,23 574:3,3
579:1 622:17
**summing** 402:16
**sums** 563:17
**superfund** 433:14 436:6
,11,13,20
**superior** 352:12 355:11
**supplement** 623:4
**supplemental** 374:14
399:7 613:3 670:3 729:9
,21
**supplemented** 532:4
**supplied** 465:22 503:17
542:23
**supply** 491:24 503:5,6,7
**support** 442:13 702:19
715:23 716:5
**supporting** 727:21
**suppose** 369:8 676:14
**supposed** 553:16
**sure** 364:9 392:5 404:17
410:1 416:8,11 423:16
427:15,17 429:5 431:2
451:7 456:9,24 457:4
459:4,7 464:8,11,19
466:3 468:19 469:24
481:2 492:9,12 494:15
498:22 501:24 504:16
505:23 506:21 512:10
528:7 531:24 534:4
550:5,13 560:6 562:13
564:13 567:22 568:10
581:2 596:8 602:19
611:5 613:13 625:11,14
630:6 631:9 634:9
646:22 655:12 662:21
663:1,7 670:22 685:4
695:5 699:11 700:14
706:1 712:17 713:23

728:24
**surface** 435:3
**surprise** 457:19 458:1
555:13 597:1 598:18
607:2 681:11
**surprising** 662:9
**surveillance** 708:10
**suspect** 366:3 368:4,12
369:23 370:3,10 538:23
**switching** 392:14
**sword** 644:12
**sworn** 356:6 731:21
732:10
**symmetric** 647:16,20,23
,24
**symptoms** 666:23
667:12,15,20 668:4,16
**sync** 488:11
**system** 711:24

---

T

---

**t0** 599:23
**table** 376:19,21 381:1,4
,7,19 382:2 383:14,16
387:2,9 389:15 393:2,20
394:20,22 395:20
396:21 397:11,13 400:3
401:11,13,14,23,23
402:1 411:9,22 412:1,22
417:9 420:1,8 426:2
467:21 481:5,5 482:15
,15 484:23 485:16
489:12,16 490:3,9 491:8
492:21 495:6 501:13
504:14,18 505:16 506:5
,12,17 507:8 518:10,16
,16,17 525:4,16 548:22
550:19,19 553:8,20
554:2,11,17 558:13
563:3,24 564:9 565:11
,21 566:3,7 568:13
572:9 573:2,17 575:4,8
578:15,15,17,18,18,19
,24 579:6,7,11 615:2
620:7 622:20 654:18
**tables** 380:3 480:12
481:6 483:17 486:15
**tabulating** 451:6
**tabulation** 451:5
**tabulations** 393:15
**tags** 556:19
**taken** 418:14 471:9,15
489:21 570:2 573:21
578:14 594:17 597:16
676:11 679:24 702:15
732:17
**taking** 443:11 468:14
471:21 472:8,13 473:15
474:1,2,5 526:10,13

527:1 549:24 558:19
569:6 575:8,17 576:10
577:7 617:1,10,15,21,22
,23 618:4,6,12 620:9,12
621:9,11 641:7 647:22
677:1 681:5 725:7
**talk** 369:19,20 428:10
431:21 435:24 436:4
448:11 480:10 528:10
648:9 678:12 701:3
706:20
**talked** 399:18 421:15
435:20,20,21 436:1
448:9 480:12 490:11
500:10 504:18 508:15
523:24 527:9 536:1
537:21 562:7 564:2,8
568:19 575:7 633:1
647:6,8,13 652:12
661:12 702:7 722:1
**talking** 360:22,23,24
378:6 397:3 400:8
409:17 410:4 418:10
419:10,13,13 454:15
465:12 471:22 490:13
,17 493:5 509:1 517:5
518:4,5,6,7 528:19
535:4,10 536:16 559:2,3
,15 580:16,19 598:14
607:23 608:2 609:7
611:9,18 617:19 618:15
,24 632:19,19 642:8,10
643:1,3,4,8,15 648:5
651:24 652:1 654:4
656:2 657:8,14 665:13
667:7 675:16,18 676:1
680:5,22 686:18 697:2
720:17
**talks** 434:19 466:18,21
**tallying** 578:9,23
**tape** 410:24 411:6 460:1
,7 516:19 517:1 572:12
,18 622:4 669:15,16,22
**taper** 392:13
**tapes** 410:23 459:23
572:11
**target** 664:6
**task** 729:2
**tax** 429:20 430:13 431:9
432:14
**technically** 556:24
**telephone** 361:18 362:3
690:4 709:13
**telephonically** 354:15
**tell** 358:5 424:11 512:5
523:19 532:9 539:23
542:18 572:8 591:2
595:5 605:22 643:9
651:9 652:5 659:12

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

660:11,15 668:22
683:21
**telling** 589:2 695:9
709:22
**tells** 468:2 477:12
482:16
**temporal** 614:20 619:14
**temporally** 612:23
**ten** 419:10 422:12 436:7
,9 507:10 508:12 559:12
582:13,13 599:11,12
634:17 682:20 700:1
705:22
**tend** 423:5
**term** 446:15,20 501:12
513:22 600:21 622:10
660:2 679:21 709:24
**terminate** 693:12
**terminated** 693:6,8
**terms** 360:22 380:3,9
382:15 419:20 471:13
501:12 509:8 564:8
571:24 572:9 576:3
580:24 611:16 614:5,20
621:8 622:10 627:6,10
631:2 644:21 655:15
663:2,12 674:24 675:18
676:12,17,19,19 713:9
716:15
**terrified** 701:14
**test** 423:8 424:12 628:18
,23 673:23
**testified** 356:6,7 379:1,8
,10 435:13 452:13 526:8
533:22 638:24 657:12
672:2 706:5 712:18
**testify** 385:14,24 531:14
701:11 732:10
**testifying** 591:8
**testimony** 379:6 437:12
452:19,21,22 456:18
584:24 592:2,11,23
631:19 712:22 732:15
**testing** 628:16 649:7
653:6 656:15
**tests** 645:7,9,10 658:13
**teva** 437:19,20
**texas** 353:4,18
**text** 493:23 554:15
**thank** 356:11 373:20
399:13 411:13 432:19
482:9 511:16,16 525:23
540:24 608:5 615:3,17
665:3 685:13 711:6
**thankful** 708:12
**that's** 356:13 357:18
358:2 360:11,13 362:7
363:16 364:3,7,12 365:2
,8,9,15,16 366:11,18,23

367:4 368:1,4,6,12
369:1,8,10,12,13 370:3
,10,18,22,23 372:8
373:5,5 377:7,10,24
378:4,13,16,18 379:11
,22 381:11 382:7 383:17
384:3,9,12,17,20 385:2
,6 386:13,23 387:5,9,23
388:9,13,23 389:1,6,9
390:20 392:6 393:18
394:19 395:19 397:12
,17,18,20,24 398:5
399:24 400:5 401:16
402:22 404:9 405:19
407:9 409:18,18 411:12
412:6 413:15 414:3,9,11
,15 415:3,5 417:3,6,17
418:4,9,20 420:9 421:19
422:8 423:22,22 426:13
430:16,19 431:7,8,12,13
,16,17,18 434:11 439:19
440:10 444:20 445:9,13
448:10,13 453:1,14
454:4,17 456:4,8,12
461:20 462:11,15 463:2
,5,13 465:12 466:16
467:3,17 470:14 473:19
479:1 480:8 481:13,18
,22 482:6,8 483:9,10,11
,14 484:5,14 485:11,17
487:16 488:1,16 489:12
490:4,4 494:24 495:2
496:6,17 497:4,11 498:8
,22 499:15 500:15 501:6
502:6 503:16,18,24
504:12 506:21 507:5,11
,18 508:4,18 509:6
511:24 512:4 513:6,12
,14,14 514:3,11 515:24
516:1,4 518:13 520:3,12
,13,19,20 524:4,4,10
525:2 526:3 527:4,10,16
528:19 533:16,24 534:4
,16 536:6 537:3,5,23,24
539:6 542:11,21 543:7
,12,21,23 545:21 546:12
547:4,8 548:12,21
549:12 550:1 551:18
553:5,15,16,18,24
554:13,16,18 555:16
557:8 561:8 563:6,14
564:11,18 565:15,20,21
566:3,6,8 567:6,6,14
569:12,13,19 570:4,18
572:22 573:8,8,16,19
574:6,8 575:3,4 576:21
579:11 581:6,13 582:23
583:19,20,21 584:17,17

,22 585:2,14,15 588:5
589:7 590:1,12 592:1,11
594:4,8,11 596:24 597:8
600:2,5,7,8,15,16,20,23
601:5,6,6,8,24 602:11
,11 603:19 604:23
605:16 606:13 608:5
611:2,2 612:14 613:8
614:10 615:6,20,22,22
616:4,5,10 617:13,18,19
,20 618:21 619:11 620:6
,10,20 622:19,19 623:2
626:3 628:11,17 630:16
633:5 634:20,23 638:24
643:7 644:24 645:4
646:7 652:8,9 654:11,16
656:9,14 657:16 663:1
,14 665:21 671:4,16
672:5 674:2,18 676:23
679:13 680:16 683:23
685:2 686:2,7,8 687:3,3
,9 688:7 690:22 697:24
698:5,10 699:14 702:4
703:24 704:3,8 706:7
707:7,23 708:5 713:18
714:11,15 715:23
720:16,21 721:11,17,17
723:17 725:15 730:1
**themselves** 355:15
544:8 637:10
**theory** 649:7
**therapy** 471:15,18
473:21 511:22 522:13
528:4 558:20 615:5
**there's** 366:13 369:22
370:13 375:12 382:11
389:16 394:11 399:15
413:1 420:11 432:24
436:14 438:1 441:23,24
450:10 451:5 466:5
467:21,24,24 468:2,4
470:14 481:21 490:23
492:3 504:16,24,24
505:1 507:17,19 508:9
,22,23,23 524:14 527:15
539:5,15 541:24 545:8
548:12,17 550:17
563:12 573:16 583:1
593:23 601:7 603:5,6,6
608:12,22 615:20 616:8
,12,14 617:5,8 620:21
627:18 633:17 635:12
,13 650:18 658:2,3
660:11 665:11 670:9
673:18 674:11,13 679:6
684:24 686:24 695:17
703:8 712:4,6 725:17
**thereabouts** 378:12
**thereafter** 478:2 614:2

732:13
**therefore** 465:5 641:3
**thing** 415:23 424:23
429:19 431:18 433:1,19
441:23 482:18,20 519:8
524:11 537:4 548:17
550:4 552:4 560:15
564:1,12 565:7,21 579:4
619:16 620:15 625:3
635:13 677:9 686:18
705:22 710:9 712:17
716:7 724:10
**things** 409:7 417:18
449:16 456:23 459:13
461:16 505:2 525:4
531:23 543:14 546:19
560:19 617:13 623:10
654:4 660:4 686:21
687:1,20,22 707:22
709:14 715:24 718:16
726:17
**think** 357:8 358:15 361:8
,13 362:14 370:20,21,22
,23 373:12 375:24
377:23 378:13 379:1
386:22 389:16,17 394:2
397:10 400:22 401:9,10
402:8,23 409:10,23
410:1,6 418:17,18 419:6
422:24 424:18,22 425:1
,23 428:2 430:12 431:10
,17 433:21 434:1 435:5
,13 436:1 437:20 439:17
447:1,6,21 449:15
452:13 453:1 455:18
456:18 457:14 459:19
,23 466:3 467:18 468:4
,7,15 469:1,23 471:13
473:19 477:8 479:9,20
480:9 482:13,19 497:2
498:11,19 505:13 507:7
514:2 515:13,24 516:7
519:18,20 521:11
524:12 525:4 527:8
529:12 530:20,21,22
535:6 537:12 546:12
547:16 548:1,4,18
550:16 555:14,19 556:8
557:1,5 570:12,12,18
573:7,24 575:22 576:22
579:18 582:12,13,17
583:10 584:3 586:18,21
588:12 592:2,16,18
598:19 599:18 603:2
608:12 609:18 610:18
611:22 612:2 615:12
618:22 619:3 623:23
624:7,11,11 627:5,9,11
631:5,11,13 636:20

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

638:21 639:2,10 642:19
645:4,16 646:20 648:13
649:1,5 651:22,22
655:10 656:1,12 659:5,7
660:2 661:12,15 669:14
673:16 675:22 676:17
,18 677:12 678:23,23
679:2,5,6,13 682:3,23
,24 684:9 687:17 688:3
695:7 701:19 702:10
703:10 707:17 708:11
710:2 712:5,9 713:11
716:13 719:1,2,2,21
720:18 723:7 724:7,13
726:8,20 727:5 729:3
**thinking** 523:9 637:1
666:8 707:12
**thinks** 410:12
**third** 397:10 497:23
503:12 567:16
**though** 400:6,17 405:6
425:4 448:13 463:11
467:18 492:10 567:11
638:1 651:16,17 665:17
680:20 721:6 729:17
**thought** 425:2 439:15
519:8 582:23 606:9
712:2 718:21,21 719:9
721:6
**thoughts** 632:2,7 666:24
669:3
**thousand** 508:22 512:17
,23 513:18 575:9 607:5
**thousands** 607:9
**three** 358:6,8,15 399:20
422:6 495:5 503:16
519:18 526:18 538:14
,16 543:8 546:8 555:23
569:20 586:15 608:11
609:12 616:12,14
647:15 661:19 678:5
710:12 725:20 726:1
727:12
**threefold** 592:6
**threes** 358:4
**throughout** 509:14
687:12
**throw** 373:23 524:7
531:5
**tie-in** 719:9
**tighter** 665:18
**tightly** 719:4
**time** 355:3,14 357:8
361:23 369:16 398:19
406:23 408:10 410:20
411:1,6 419:23 424:24
427:21 433:10,10,24
441:20,23 442:13 450:1
460:2,7 463:12 464:13

,21,22 468:21 469:11
471:11 473:15 481:23
484:11 497:7 498:15
500:1,5 505:14 507:2,20
,24 509:24 513:7 514:10
,15 515:3,11,17 516:3
,20 517:1 522:17 523:21
529:18 531:21 532:11
535:2 543:1 544:19
545:3,7 547:16 558:6,21
,24 559:2,4,19,19 560:2
,3 565:3 572:13,18
575:17 576:6,14 577:1,4
,8,21,22 580:17 589:20
592:10 612:6,18,18
613:10 614:9 616:16
617:11 618:5 619:19
621:24 622:5 633:2
640:9,10,11,12 644:4
653:11 658:19 664:15
,16 669:17,22 670:9,13
,24 688:2,4 692:2
705:20 707:11 713:12
715:15,22 716:16
717:21 719:14,21
725:21 729:6 730:3
731:11 732:18
**time-to-event** 516:1
**timelines** 466:19
**times** 433:15 496:12
497:5 519:13 546:8
547:11 555:24 569:19
,20 599:12 607:12
634:17,22 640:8 665:2
676:20 682:3,7 687:20
716:6
**timing** 559:24
**title** 489:10
**titled** 387:3 394:23
397:15 688:15 711:21
**today** 355:2 358:5
359:12 403:22,22 420:4
,6 546:8 547:11,21
551:1 690:21 691:7
692:10 693:19 696:1
**together** 453:24 481:6
483:17 531:23 534:24
536:22 550:10 597:11
706:18
**told** 357:12 406:21 422:4
533:12 548:5 662:5
682:3 687:19 702:7
710:6,8 711:10 729:4
**tolerate** 725:4
**took** 451:10,22 473:15
489:5 522:8 559:8,8
576:9 579:8 608:17
610:3 625:14 683:2
686:21,22

**tools** 645:19 708:10
**top** 396:1 429:21 439:8
470:8 476:12,20 479:10
481:1 482:24 525:20
536:1 541:6 549:20
567:13 583:3 618:23
624:1,13 666:19 677:5
683:22 711:21
**topic** 424:8 428:10,17
715:11
**topiramate** 561:16
592:20,23 631:5 633:16
637:10,20 638:9,9
**total** 360:5 363:10 365:6
,19 366:20 371:17 373:3
380:23 381:1,5 383:11
384:16 387:24 389:10
396:20 398:3 499:3
560:22 683:2
**totally** 407:17 584:9
**touch** 386:19 439:22
**towards** 423:19 427:9
**towers** 438:10
**toxic** 436:19 679:21
**trails** 614:2 619:9
**trained** 392:20 394:4
**tranquillizers** 498:7
**transcript** 379:7 585:8
,10 588:1 642:20 731:10
,14 732:12
**transfer** 441:9
**travel** 442:13
**treat** 406:5 509:17
515:16 641:21 721:15
**treated** 442:24 443:1
444:18 448:19,21 463:9
464:14,23 465:17 504:1
509:15 570:14 577:8
629:8
**treated/diagnosed**
465:4
**treating** 469:2,19 470:1
526:17
**treatment** 357:3,9 358:1
376:22 392:13,14
421:17 422:6 445:24
446:1,23 455:12 463:14
465:19 466:11,12
496:13 506:9 507:3,3,4
,23 508:1 509:24 512:24
513:19 514:1,3 525:19
527:22 560:24 568:7,9
569:8,17,18,21,23 570:7
,11,17 571:9,16 572:4
573:6 579:6 613:24
614:1,14 619:9,10
621:18 625:18 627:10
,13 629:2 630:8,21,23
631:1 632:21 675:11

724:21
**treatments** 619:15 629:8
**tremendous** 408:2
**tremendously** 597:1
**trial** 357:21 366:2 378:23
439:12 645:18 681:6
**trialed** 376:20
**trials** 376:14,16,18
398:22 426:5 452:23
453:24 454:3,4,8 634:10
638:3 645:17 676:14
683:8 707:4
**tricyclic** 644:15
**tried** 398:9 422:10
458:11,13 471:12
496:14 518:20 700:11
709:10
**trip** 699:9
**trouble** 433:17 651:23
667:3
**troubled** 494:15
**true** 445:3 481:22 539:3
563:6 569:12 612:14
613:10 617:20 618:13
620:10 646:8 648:2
649:21 651:5 652:1,4,7
653:7 660:17 672:22
673:16 690:22 693:24
695:12 728:6 731:13
732:15
**truly** 661:24 695:6
**trusting** 371:9,21
**truth** 728:13 732:10
**truthful** 695:20
**truthfully** 588:7
**try** 407:18 425:18 458:17
471:6 516:8,10 523:6
532:11 546:19 674:23
,24 681:6 699:9
**trying** 405:2,12 407:21
408:1 516:14 588:23
606:15 658:19 682:18
,22 687:13 699:12,18
708:9 718:20
**turns** 508:13
**tutorial** 635:19
**twice** 555:23 661:13
**twin** 438:10
**two-thirds** 448:5
**two-year** 573:7 719:19
**twofold** 592:8
**twos** 358:3
**txarm** 357:16,24
**type** 445:14 600:3,4
602:1,1 625:3
**typed** 432:12,16 594:1
**typewriting** 732:14
**typical** 629:1
**typically** 433:15 435:16

437:23 721:24
**typo** 549:17
**typos** 548:18

U

**u.s** 435:2
**u18hs016973** 714:24
**uh-huh** 601:1
**ultimately** 574:12 720:2
721:19
**umbrella** 441:22 463:8
,10
**unbiased** 422:15
**uncertainty** 408:2
**unclear** 382:15 385:20
525:9 581:14 585:8
643:6 674:13
**uncomfortable** 701:22
**underestimates** 442:3
**underlies** 667:23
**underlying** 672:23 697:4
704:6,14,20 706:21
**underreporting** 641:12
**underscore** 480:10,11
,11 483:7,20 484:7,24
,24,24 485:1,5,12
486:16 488:24 489:1,1
490:11,20 492:14,21,22
,22 493:1,19 541:15,15
,16 542:2
**understand** 364:18
386:6 405:2 408:18
420:16 423:16 427:7
456:20 457:1 459:13,17
463:21 481:3 505:16
523:6 539:14 542:7
544:18 545:3 560:6
564:7,15 567:7,23
577:15 609:3 618:17
631:14 670:22 699:5
702:13,14 710:10
718:20 723:7 728:10
**understanding** 391:3
403:5,10 466:16 530:3
538:5 582:6 633:2
690:18 704:5 721:23
**understood** 363:9
404:12 416:12 471:19
531:22
**undifferentiable** 438:7
**undifferentiate** 438:7
**unexpected** 438:2
641:21
**unfortunately** 359:13
670:6
**uniform** 714:23
**unique** 360:5 491:5
681:18
**united** 352:1 355:8

**units** 662:21,22
**university** 372:6,15
373:6,7 428:1,2 441:7
,13,15,16,19 442:9,10
,12 469:15
**unless** 397:4 416:12
462:22 601:24 651:10
**unlike** 654:3
**unlikely** 473:19,24
**unnamed** 507:12
**unreasonable** 579:18
606:17
**unsure** 541:4
**until** 411:4 424:3 460:5
500:4 516:23 522:1,7,11
533:1,14 534:12 546:16
572:16 622:3 669:20
670:12
**untreated** 570:14 581:22
582:9 590:10,15 605:5
**untrue** 695:1,3
**untruthful** 693:22
**unusual** 497:2 667:8
**unwieldy** 685:12
**upfront** 527:2
**upon** 368:22 393:21
439:22 458:5,8,10
515:12 528:5 534:22
535:10,11 591:13 633:2
634:24 635:11 636:24
647:16 687:1 691:14
697:7,18 698:18,24
699:17 711:12
**upper** 439:1
**upside** 357:17
**us** 362:17 416:11 473:8
477:1,12 503:15 538:24
542:23 547:14 549:5
587:24 588:1 687:22
704:4 724:18
**usage** 462:10 645:23,24
**use** 407:15 408:12
410:18 416:14,16 417:8
421:16 442:7 446:14
461:16,18 474:17 475:3
,13 482:7 483:15 506:18
514:14 524:16 529:20
541:7,14 551:6 556:21
563:9,12 582:7 584:24
594:2 597:22 623:16
626:18 627:2 634:8
642:6 644:20 645:17
646:15,19 656:20 660:2
663:1,7 667:14 699:24
700:4 716:19
**used** 380:10 397:18
398:5,14 399:1,5,6
400:21 405:7,9 406:5,8

,13,14 407:1 408:6,7,12
,14 410:17,18 412:7
424:4 426:6 433:12
444:13 461:9 468:5
469:2,17,18,23,24
470:15 471:1,4,10 484:4
498:20 504:5 508:16
529:3,4 530:8,24 538:16
,18,19 539:4 540:14
564:5 566:10,11,16,21
583:9 590:21 594:8
623:18 625:22 646:4
678:7,15,19,21 694:7,10
702:19 703:4 704:6
709:19 713:20 721:15
722:9 726:19
**useful** 635:19 725:1
**users** 480:2
**uses** 646:8,11,22,23
**using** 376:13 392:10,22
394:3,3,4,24 412:10
415:15 420:20 422:19
,20,22 428:21 437:2
446:20 453:17,19
510:12 513:22 522:22
528:7 530:13 534:20
559:9 587:9 633:9 637:5
,8 645:17,24 646:1
658:2 664:19 677:13
**usual** 628:17
**usually** 442:2

V

**v1041** 486:23
**va** 464:19,20,21 469:9
,10 530:20 565:17
613:21 619:7,12 676:23
726:22
**vague** 643:13
**valid** 404:23 499:6
570:19
**validity** 437:12 524:8
531:15
**valuck** 528:5
**valuck's** 469:13
**value** 409:13,16 410:4,6
443:12 594:21 648:24
649:21,23 650:4 651:13
652:1,2 653:2,4,7,8
658:13 660:17
**values** 402:16 417:8
549:15 553:7 563:23
652:12
**variability** 446:23
**variance** 594:22
**varies** 669:5
**variety** 425:6 435:3
471:14 498:13 516:9
634:11 646:10 700:4

**various** 357:3,9,19
359:19 387:10 405:3
426:6 435:15,15 442:1
485:15 490:23 491:13
530:8 667:12,15,20
704:2
**varying** 514:15 515:17
577:4,8
**vast** 372:7 725:5,11
**vehemently** 680:2
**verified** 549:16
**verify** 389:12 408:19
481:13,14 494:13 549:3
,19 563:2 567:9
**verifying** 481:11,17
**veritext** 354:19 355:2
**version** 362:9 377:14
568:17 579:15
**versions** 379:24
**versus** 355:10 436:7,9
437:22 444:18 537:7,15
,16,16,17 575:6 621:9
625:16 633:10 638:3
641:15 646:1 679:3
**veterans** 529:11
**via** 361:18 598:4 663:10
690:4
**victor** 486:12
**video** 432:11
**videographer** 355:1
356:2 410:24 411:5
460:1,6 500:1,5 516:19
,24 572:12,17 621:24
622:4 669:16,21 670:8
,13 725:22 730:2
**videotaped** 352:21
354:18
**view** 447:11,13,17,23
455:21 456:16
**violate** 431:10
**violent** 667:5
**voice** 372:24 691:19
**vote** 640:13 642:3,4
644:4,8,10
**voted** 639:11 640:14
**voting** 640:15
**vs** 352:8,10,16 731:5,7

W

**wait** 369:3 401:21
409:15 413:8,8 439:16
588:22,22,22,22 609:6
621:19 632:15 691:12
,17,17 698:20
**waiting** 686:7
**wake** 641:9
**want** 358:10 373:11,23
378:13 400:19 417:1
418:16,19 428:9,10,17

440:7 472:4 479:22
481:12 506:21 525:17
546:19 548:4,10 549:7
550:4 557:4 563:5 567:9
578:5,8 585:3 587:21
594:3 628:20,21 630:5
654:15 663:7 685:4
691:13 692:2 693:1
696:3 701:21 705:5
711:1,2 712:16 718:16
727:17
**wanted** 404:4,20 421:6
,14 438:14,16 442:7
468:17,19 479:16 510:4
515:13 524:16 539:10
550:24 559:9 598:22
602:19 625:11 674:20
,23 677:7 701:6 721:18
723:10
**wants** 418:20 481:14
557:2 588:20 654:13
**warning** 639:11 640:12
641:17 642:5 644:14,19
645:12
**warnings** 640:6 643:20
644:5
**wasn't** 385:13 391:16
393:18 416:11 428:4
436:18 449:2 470:17
512:2 522:3 544:16
610:11 614:13 638:3
646:14 675:13,17 678:1
,2,9 682:16 685:10
699:8 705:7 720:5,12
**waste** 369:16 436:15
688:3
**water** 435:3
**watering** 428:14
**ways** 427:6 498:13
509:20 516:7 517:13
562:13 625:9 676:24
679:6 682:7 708:12
724:15 726:18
**we'd** 656:19
**we'll** 546:19 604:13
**we're** 419:13,13 497:19
551:2
**we've** 461:9 564:8
687:20
**webmd** 635:13
**week** 559:8 562:10,21
,22 563:1,20,21 569:2
612:11 615:11,23 616:6
,8,11,14 619:5
**weeks** 565:14 576:10
615:12,19 616:19,21
617:14
**weight** 525:21
**weiss** 457:17

**well** 359:1 360:7,9,18
362:22 374:11 379:5
380:8,13,19 386:21
388:1 390:8 393:23
401:19,23,24 402:8
404:11 406:5,10,13
408:21 412:23 413:5
414:17 418:6 419:4
422:8 424:2 430:12,16
431:21 432:2 436:14
437:5 445:4,11 449:11
450:10 451:14 452:18
453:23 454:13 455:3
456:4,9 457:9,14 458:6
464:5 472:2 473:10
477:11 481:9,14 489:7
,10 491:18 494:9 495:16
498:11,14 501:6 505:4
512:15 513:9 520:4,13
529:7 532:18 533:11
535:4,13 536:13 539:7
543:4 545:16,20 546:11
,13 548:10 549:4 553:10
556:23 557:6 562:21
565:9 566:19 569:6
573:10 578:2,19 579:23
582:19 583:17 585:4
586:10 591:11 593:5,22
595:17 596:15 597:6
599:22 602:7 603:5,8
605:23 606:5,10 607:6
609:20 610:21 611:8
613:4 614:17 615:11
617:5,7 622:20 623:1,2
,20 624:3,7,16 630:4,10
,13,21 632:12 633:20
634:14 635:5 643:5
644:12 648:15,21 649:9
652:9 654:13 655:19
656:16 657:19 660:9
661:24 662:19 671:9
672:21 673:24 675:6,8
677:10 678:18 682:10
,23 685:9 686:1,13
687:2,17 693:3 694:4,15
696:5 706:2 709:4
715:20 718:9 720:22
722:19
**well-accepted** 453:1
**went** 357:6 359:23 371:2
,15 401:12 427:1,2,2
438:21 518:20 530:18
531:21 532:1 549:15
550:14 551:5 568:11,12
578:20 622:7 649:9
700:16,16 707:15
709:12 729:1
**weren't** 362:1 382:17
427:24 428:3 464:22

580:22 584:5
**west** 352:23 353:17
355:4
**what's** 360:13 361:21
392:6 422:9 434:4 476:9
479:14,18 496:16 506:1
520:9 531:17 540:11
549:11 608:13 630:19
634:2 638:17 702:2
711:20 720:13
**whatever** 388:6 406:20
465:20 515:7 535:14
542:17 549:6,6 557:2
607:7 620:13 624:18,19
642:5 643:20 679:7
687:14 709:24 710:1
718:15
**whatsoever** 407:16
451:4 522:13
**whereof** 733:1
**whereupon** 356:17
359:4 374:3 411:3 430:3
460:4 476:3 480:17
500:3 516:22 535:15
540:4 562:2 572:15
593:11 606:1 622:2
638:12 669:19 670:11
683:14 688:9 711:15
726:2 730:4
**whether** 360:10 364:14
369:12 379:20 382:20
386:7,9 390:4,24 391:8
395:19 400:24 402:2,6
408:9 409:11 410:3
418:14,22 422:1 433:12
436:23 438:18,20
443:14,14,15,16 452:15
458:20,21 459:14
471:17 472:24 496:17
498:23,24 510:9 514:9
,14,18,24 515:1,10
516:10 517:6 525:9
526:9 532:24 541:4
543:15,18 560:8 573:20
576:24 584:14 586:5
588:3 589:15 621:11
626:18 632:11,12 640:5
642:3,4 643:20 644:5
647:2 653:7 655:5 671:7
,9 672:3,19 674:13
676:20 678:7 682:19
683:6 688:5 690:13
692:6 703:11 705:15
716:2,3 719:15 722:2
723:2 728:6
**whoever** 597:11
**whole** 415:23 454:13
524:10 564:12 566:17
645:12 710:9 732:10

**whom** 476:20
**whoops** 491:15
**whose** 389:19 625:19
**why** 359:1,2 369:15
375:16 382:23 403:2,16
409:22 410:22 416:10
417:5,22 421:5 424:16
459:23 468:12 509:17
516:17,17 519:4,5
524:24 527:10 531:3,3
544:23 555:16 557:6
577:18 598:20,21 604:5
610:17 620:11 666:6
677:12 681:17 682:3
703:2 709:17 719:7
721:12
**wide** 425:6 471:12,14
646:10 700:4
**wider** 624:11 625:5,5
655:11
**widest** 510:5
**width** 666:3
**will** 355:14 362:15 365:5
,14 366:8 367:12 369:17
372:9,9 376:9 377:2
389:13 399:7 416:2,16
417:5,20 424:18 431:1
432:2 448:10,18 455:8
457:1 459:22 465:5,7,23
470:10 471:16 480:16
,23 481:20 487:6 488:19
497:19,20 505:14 511:5
514:4 520:22 531:1
532:5,10,10 538:4,4,7
541:20 544:7 548:3,4,23
549:5 550:2,9,9,13,15
,19 554:22 556:14 557:2
568:20 571:5,10 572:2
577:14 579:1 581:3
583:9,10 585:7 587:15
589:9 593:8 594:5
601:14 627:13 633:14
641:9,11,12 644:19
651:13 652:19 653:5
658:9,16 665:10 671:10
687:23,24 695:5,8 696:1
699:24 700:3 703:8
704:9 705:13,22,23
708:11 719:5 720:2,3
726:12
**wind** 442:9
**window** 464:22 719:19
724:6
**winkler** 354:14 355:24
,24 606:6,10
**withdraw** 441:12
**withdrawal** 576:1
**withdrawing** 576:2

**withheld** 700:22
**within** 392:13 430:18
431:17 467:11 508:17
517:7 612:7 614:6 618:3
621:10 727:23
**without** 517:22 537:19
548:11 572:10 655:12
660:21
**witness** 356:5 363:3,21
364:21 372:1 373:20
377:19 379:9 383:13
390:16,17 391:15,23
393:13 394:1,15 398:17
404:14 406:11 409:2
417:7 424:20 429:1
432:19 435:19,23 440:4
443:6,20 445:6 446:9
447:7 449:4,14,23 451:2
,18 452:20 456:15 458:9
459:2,18 464:7,10
470:23 472:10 473:18
474:8 477:22 478:8,19
482:10 489:18 494:10
495:21 496:5 500:14
504:9 505:6,20 508:8
511:1 512:9 513:10,13
518:23 524:17 526:21
527:14 528:1,14,21
529:9 530:12 531:11
533:5 536:12 539:9
545:24 546:22 548:7
556:3,20 557:20 558:10
,17 563:13,15 566:22
569:15 571:4 575:20
579:22 580:5 581:10
582:3,16 585:22 586:9
589:18 591:1,12 594:2
,13 595:2,19 598:17
599:15 601:13,23 603:1
,15 604:1 605:15 607:1
609:15,22 610:10 611:7
617:2 620:5 621:1,5,21
622:18 623:7 627:8
628:3 629:16 630:1
631:21 632:17 637:4
638:5 639:8 643:11
646:6 648:18 649:4
650:14 651:8 652:16
653:1,19,24 655:9
657:18 658:7 660:1
663:18 664:23 667:18
668:18 671:3,20 675:7
677:18 678:17 681:10
682:5,15 686:15 689:6
696:19 697:13,16
698:23 702:22 703:16
705:2 706:3 707:19
709:6 713:5 717:20
725:10 726:13 728:9,16

729:14 732:9,9 733:1
734:3
**won't** 693:23 694:3
696:3
**wonderful** 438:2 707:8
**word** 448:15 534:5
606:10 697:7,18 698:18
,24 699:17
**words** 408:15 618:2
**work** 363:18,18 364:1,16
372:16 433:15 441:1,4,7
,8,12,14 442:3,6 469:9
,17 505:13 506:22
523:10,16,16 524:2,3,5
528:5 529:11 530:20
534:23 565:16,17
574:15 613:22 653:13
660:6 661:6 667:24
674:23 676:16 699:22
700:2,13 703:6,6,7,11
706:20,23,24 707:5
709:21 713:20 715:15
,17 716:5,6,10,11,16,19
717:14,15 718:16
719:13 723:24 725:4
726:22 729:17
**worked** 367:15 675:9
703:12,17 728:17
**working** 437:15 441:21
558:8 653:11 668:21
715:22 726:18 727:3
**works** 371:22
**world** 669:6
**world-class** 531:18
**worlds** 724:18
**worn** 698:21
**worry** 666:24
**worse** 586:23 612:1
637:1,22 666:24 667:2,2
,4
**worth** 383:3 506:18
**worthwhile** 425:23
**wouldn't** 388:19 436:19
446:10,12 447:9,11,13
,17,23 456:1 457:19
458:1,18 471:5 473:21
474:6 510:4 555:7,12
560:16,18 565:9 577:18
578:10 579:3 584:2
589:23 593:5 602:21
607:2 618:13 631:7
639:4 646:10,24 647:16
,23 660:20 665:18
674:19,22 678:18
679:10,23 681:11
685:15
**write** 377:10 416:18,22
458:5 459:13 475:11
534:14,19,23 535:2

549:7,8 557:7 639:16
670:17 689:3,10 710:9
716:2 718:1,17,24 719:2
**writing** 377:9 417:1
435:11 475:3 533:22
535:9 639:23 710:3,7
712:24 713:14 728:23
729:2,22
**written** 361:19 407:14
456:21 475:14,18
477:24 639:13 689:4
728:7
**wrong** 404:4 410:10
433:19 564:18 595:9
611:9 679:7 723:19
**wrote** 377:6,7 397:24
400:7,12 534:16 535:8
549:4 613:1,5,10 689:12
702:19 703:2 710:3
716:8,12 728:14
**wyeth** 436:2

---

X

**xanax** 469:18,21 470:2,5
,10,17,19,24 473:15,20
474:2,5 527:8,9,11
573:13

---

Y

**yeah** 390:14 397:12
412:23 420:6 435:17
436:18 455:18 459:19
468:7 501:4 504:1
519:20 547:6 582:21
583:3 601:24 602:4
604:11 607:7 624:16
643:3,12 656:1 663:5
705:18 707:19 709:16
,21 712:5,12 724:7
**year** 439:23 462:12,14
,17 464:16,16 465:19
484:12 485:18 506:9
507:6 513:1,1 518:11
521:9,18 559:16,17
566:16 578:6 598:24
612:7 618:11 706:15,18
,19
**years** 419:2,3,20,23
433:3 443:17 465:19
484:20 506:6,8,14,18
507:20 508:2,5,9,10,23
,24 509:4,5,6,10 512:7
,16,22,23 513:17,18
551:24 575:9,11,13
581:18,18,22 583:6,9,12
,16 584:1,14,16 585:15
,19 588:5 589:13 590:9
,10 592:24 593:4 595:12
,14,22 597:3,4 598:11

599:11 602:6,21 603:11
,11,19 604:13,16,20
605:1,5,12 606:16,18
607:17 610:6,8,14,14,18
611:23 612:3,12 615:4
663:3,4 665:13 674:24
675:9 676:1 677:3,13,21
678:6,7 681:23 683:10
700:1
**yellow** 556:18
**yeoman's** 700:7
**yep** 606:6
**yes** 356:14 361:12,14
363:22 365:11,17,21,23
366:5,12,16,22,24 367:6
,18,20,24 368:2,11,14
,24 369:2 370:1,5,9,12
371:6,16 372:2 373:9
374:21 381:8 382:4
383:17 384:6 385:19
387:8,12 393:5 395:3
396:17,23 397:23 398:2
,7 399:17 402:14 412:9
415:17 420:22 422:21
423:2 424:20 425:6
426:3,15 430:20 434:1
440:13 444:11 450:12
452:12 454:14 457:1,8
460:18,23 461:4,12,15
462:1,5,8 465:11 466:23
467:6,8,14 474:22 475:1
,17 479:5,8 483:8,18,21
484:2,8,19,21 485:3,7
,14,23 486:2,5,8,10,13
,18 487:1,13,24 488:10
,17 489:3 490:22 491:2
492:2,5,12,16,24 493:3
,7,9,12,24 495:1,11
496:10 501:23 502:14
,20 504:4 510:17 513:5
514:11 515:18 517:9
520:22 521:1 523:12
530:15 535:1 536:24
540:9,20,23 541:2,13
542:6,10 548:20 552:5
554:10 558:15,17
561:23 565:4 568:3
573:4,20 574:8 581:20
583:5 585:14 591:20
596:7 612:16 621:21
623:6 642:12,14,15
643:3,23 647:12 654:22
657:10 664:11 677:11
684:14,20 688:18 689:2
690:7 691:2,4 694:16
695:18 701:9 703:4
706:13 708:19 710:19
711:10 714:5,14,18,21
715:2,5 717:5,14,22

718:8 720:16 728:1
**yesterday** 359:18 379:19
,20 401:12 412:11,17
421:16 435:13 452:13
479:9,16 504:15 508:15
536:2 546:16 581:15
584:6 585:5 586:8
587:11,19,23,24 588:16
,19 589:6 677:19 684:1
696:17 708:18 712:18
,22 713:4
**yet** 358:23 520:2 570:3
606:12
**yield** 552:3 598:8
**yields** 595:22
**york** 353:11 438:9
**you'd** 464:2
**you'll** 562:18
**you're** 491:16 519:20
624:24
**you've** 451:14 548:3
593:24 595:6 664:17
711:2
**yourself** 376:7 380:2
388:5 534:15 563:2,5
567:10 606:9 681:16

Z

**zero** 377:1 562:22,22
563:1,20,20 616:4,5,8
624:24 625:2,2 647:15
666:10
**zeros** 492:11 616:23
**zonisamide** 561:18