EXHIBIT 1C

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
**3/5/2009**

735

1        IN THE UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS
3    IN RE; NEURONTIN                )
4    MARKETING SALES PRACTICES     )
5    & PRODUCT LIABILITY            )
6    LITIGATION,                    )
7                                ) MDL DOCKET
8    BULGER vs. PFIZER, et al.,    ) No. 1629
9                                ) MASTER FILE
10   SMITH vs. PFIZER, et al.,     ) No. 04-10981
11   05-CV-11515-PBS               )
12      SUPERIOR COURT OF THE STATE OF CALIFORNIA
13             CITY OF LAKE
14   NICOLETTE CRONE, et al.,      )
15          Plaintiffs,            )
16          vs.                    ) CV 400432
17   PFIZER, INC., et al.,         )
18          Defendants.            )
19      3/5/09  Job No.: 191803
20          9:09 a.m.
21      The videotaped deposition of ROBERT D.
22   GIBBONS, Ph.D., Volume III resumed pursuant to
23   adjournment at Suite 2800, 333 West Wacker Drive,
24   Chicago, Illinois.

736

1    PRESENT:
2    LAW OFFICES OF JACK LONDON,
3        (3701 Bee Cave, Suite 200,
4        Austin, Texas 78746,
5        512-478-5858), by:
6        MR. JACK LONDON,
7        jlondon@texas.net,
8        -and-
9    FINKELSTEIN & PARTNERS, LLP,
10       (463 Robinson Avenue,
11       Newburgh, New York 12550,
12       800-634-1212), by:
13       MR. KEITH L. ALTMAN,
14       kaltman@lawampmmt.com,
15       -and-
16   THE LANIER LAW FIRM,
17       (6810 FM 1960 West,
18       Houston, Texas 77069,
19       713-659-5200), by:
20       MR. KENNETH S. SOH,
21       kss@lanierlawfirm.com,
22       appeared on behalf of the Plaintiffs;
23
24

737

1    PRESENT:  (Continued)
2    SHOOK, HARDY & BACON, L.L.P.,
3        (2555 Grand Boulevard,
4        Kansas City, Missouri 6108-2613,
5        816-474-6550), by:
6        MS. LORI CONNORS McGRODER,
7        lmcgroder@shb.com,
8        appeared on behalf of the Defendants;
9
10   LAW OFFICES OF STEVEN D. HILLYARD, PC,
11       (345 California Street, Suite 1770,
12       San Francisco, California 94104,
13       415-334-6880), by:
14       MS. ELANA GOLD,
15       appeared telephonically on behalf of
16       Defendant Raymond D. Jennings, M.D.
17
18   VIDEOTAPED BY:
19       MR. NICK PAGE, Veritext Chicago
20       Reporting Company.
21
22
23   REPORTED BY:  ANDREA L. CARTER,
24       Illinois CSR No. 84-3722.

738

1        THE VIDEOGRAPHER:  My name is Nick Page in
2    association with Veritext National Court
3    Reporting Services.  The date today is March 5,
4    2009, and the time is 9:09 a.m.
5        This deposition is being held in the
6    offices of Mandell Menkes, LLC, located at 333
7    West Wacker Drive, Chicago, Illinois.  The
8    caption of the case is In Re:  Neurontin
9    Marketing and Sales Practices and Product
10   Liability Litigation, Bulger versus Pfizer, et
11   al, Smith versus Pfizer, et al., O5-CV-11515-PBS,
12   MDL Docket No. 1629, Master File No. 04-10981,
13   and in the Superior Court of the State of
14   California, City of Lake, Nicolette Crone, et
15   al., plaintiffs versus Pfizer Incorporated, et
16   al, defendants, No. CV 400432.
17       The name of the witness is Robert
18   Gibbons.  This is Volume III.  At this time will
19   the attorneys please identify themselves and the
20   parties they represent.
21       MR. ALTMAN:  Keith Altman, Finklestein &
22   Partners.  I'll be asking questions on behalf of
23   the Crone plaintiffs.
24       MR. LONDON:  Jack London, I represent Bulger

739

1   and Smith and the plaintiffs' products liability

2   steering committee in the MDL.

3      MR. SOH:  Ken Soh for the plaintiffs.

4      MS. McGRODER:  Lori McGroder on behalf of

5   Pfizer.

6      MS. GOLD:  Elana Gold for Raymond Jennings

7   M.D. in the Crone matter.

8      (WHEREUPON, the witness was duly

9      sworn.)

10      ROBERT D. GIBBONS, Ph.D.,

11   called as a witness herein, having been first

12   duly sworn, was examined and testified as

13   follows:

14      EXAMINATION

15   BY MR. ALTMAN:

16     Q.  Dr. Gibbons, how are you this morning?

17     A.  Good, thank you.  How are you?

18     Q.  Okay.  We were here just about a month

19   ago, and we are going to be resuming your

20   deposition.  Before we get started, I just want

21   to you have identify something very quickly.

22      I am going to hand you to what's been

23   marked as Exhibit 40 which is the materials

24   considered by you, and I just would like you to

740

1   take a quick look at that and just confirm that

2   it is what it appears to be.

3      (WHEREUPON, a certain document

4      was marked Gibbons Deposition

5      Exhibit No. 40, for

6      identification, as of 3/5/09.)

7   BY THE WITNESS:

8     A.  Yes.

9   BY MR. ALTMAN:

10     Q.  Okay.  Now, just to -- I want to make

11   sure.  You have titled this "Materials

12   Considered."

13      Are there other materials that you

14   have looked at in conjunction with this

15   litigation that is not on this list?

16     A.  I think the list is -- casts a pretty

17   wide net, and so there are many things here that

18   I might have looked at very briefly but are

19   included.  Off the top of my head and without

20   studying this in tremendous detail, I can't think

21   of other things that, you know, I might have had

22   that I had looked at that were relevant to this

23   case, but, you know, detailed study of this we

24   might find something.  I don't know.

741

1     Q.  Okay.  Just put that aside for now.

2      MS. McGRODER:  Keith, for the record, that

3   Exhibit 40 attempts to combine two of your prior

4   exhibits and then adds a supplemental list dated

5   today.

6      MR. LONDON:  So is Exhibit 40 dated today

7   or --

8      MS. McGRODER:  It actually takes the first

9   two materials considered lists, combines them

10   into one document, and then tacks on at the end

11   dated today additional materials considered since

12   the last update.

13      MR. ALTMAN:  And so this should replace --

14   we could use this as being the one and only list.

15   Everything should be on this list?

16      MS. McGRODER:  Yes.

17   BY MR. ALTMAN:

18     Q.  We had asked you last time if you

19   would make an effort to search your files to see

20   if there were other materials that you may have

21   inadvertently omitted in providing to

22   Ms. McGroder.

23      Were you able to undertake such a

24   search?

742

1     A.  I looked through everything with

2   respect to the sensitivity analyses that we had

3   discussed, and then, you know, I supplied all of

4   that to her, and I believe she supplied that to

5   you.

6     Q.  Aside from the sensitivity analyses,

7   were there any other materials that you found

8   relating to Neurontin or your work in this case

9   or your work on the manuscript?

10     A.  No, nothing -- nothing beyond what's

11   been supplied that I could find.

12     Q.  Okay.  We had asked that you produce

13   the invoices and payments to Dr. Hur for the work

14   that he did on the programs that were used in

15   your expert report.

16      Were you able to locate those bills?

17     A.  There are no bills.  You know, when --

18   when I pay Dr. Hur, it's, you know, verbal

19   communication.  I ask him how many hours did you

20   spend.  Then I usually try to double it because

21   he always undercuts himself, and I went back to

22   the 1099 that I prepared for him last year for

23   the 2008 year, the total amount of that was

24   $10,100.

743

1    Q.   And is all of that 10,100 for work in
2  this?
3    A.   It's -- probably the majority of it is
4  for work in this.  There may have been some other
5  things.  Again, you know, I asked him how much
6  time he spent, and this was not the only project
7  that he worked on last year, but I think it is
8  safe to assume that the majority of that work was
9  related to this project.
10   Q.   What is his hourly rate that he bills
11  you at?
12   A.   It is $100 an hour.
13   Q.   Okay.  And did you pay him by check or
14  by cash?
15   A.   Check.
16   Q.   Okay.  And he never provided you any
17  invoices for the work that he did?
18   A.   No.
19   Q.   So I think with what you are saying --
20  do you have an estimate of what percentage of the
21  10,000 was for work on this case?
22   A.   My best guess would be, you know, 80
23  percent or more.
24   Q.   So with what you are saying, he

744

1  probably told you then if the rate is $100 an
2  hour, about 40 hours, and you doubled that to
3  about 80 -- about -- about 80 hours?
4    A.   He usually undercuts himself.  You
5  know, to the extent, I don't know if it was
6  doubled or whatever, you know.  That was the
7  amount that I paid him last year.
8    Q.   So is it reasonable to assume that he
9  did 40 to 50 -- he told you 40 to 50 hours worth
10  of work?
11   A.   I think it would probably be, you
12  know -- a lot of times he will just tell me I
13  don't know exactly, and I will try and get a
14  sense of it, and then write him a check
15  accordingly.  So I can't say that he told me 40
16  or 50 hours.
17       You know, I would just assume that,
18  you know, that a minimum of $8,000 of the money
19  that I paid him was related to his direct work on
20  the -- on either reviewing data or the gabapentin
21  cohort.  He spent a huge amount of time
22  working on the bipolar cohort in preparation for
23  the manuscript which I didn't pay him
24  additionally in any amount because that was

745

1  covered by the grants.
2    Q.   Why did you pay him for the work on
3  the gabapentin analysis?
4    A.   Because that was specifically for this
5  court case, and it would be inappropriate to pay
6  him out of federal grants for something that was
7  done as a -- as a consultant.  So I wanted to
8  make sure that any work that he did that was
9  related to a consulting project, which is
10  perfectly fine with the university, was paid for
11  separately.
12   Q.   So he knew that you were working on
13  this court case when he did that work for you,
14  correct?
15   A.   He knew that this was related to a
16  consulting project and, you know, he doesn't -- I
17  am not sure that he knew anything about this
18  court case, but he knew that this was a
19  consulting project just like he knew that, you
20  know, other projects that we have done have been
21  consulting projects and, you know, I will just
22  indicate to him this is a project for the
23  university.  This is a consulting project but
24  wouldn't necessarily go into the details of that.

746

1    Q.   Did he know that you were serving as
2  an expert witness in a litigation related to
3  Neurontin?
4    A.   I don't know.  I know he knows it now,
5  but I don't know at that time if he knew it.  In
6  fact, I don't think he did.
7    Q.   Okay.  Let's mark the next exhibit.
8        (WHEREUPON, a certain document
9        was marked Gibbons Deposition
10       Exhibit No. 41, for
11       identification, as of 3/5/09.)
12  BY MR. ALTMAN:
13   Q.   I am also going to hand to you,
14  Dr. Gibbons -- sorry -- what's been previously
15  marked as Exhibit 30.  I'm sorry.  It's the wrong
16  one.
17       What's been previously marked as
18  Exhibit 29.
19       (WHEREUPON, the document was
20       tendered to the witness.)
21  MS. McGRODER:  Can we go off the record for
22  one second?
23  MR. ALTMAN:  Sure.
24

747

1          (WHEREUPON, discussion was had
2          off the record.)
3      MS. McGRODER:  Back on.
4      BY MR. ALTMAN:
5      Q.   Dr. Gibbons, as we discussed last
6  time, Exhibit 29 were the original three programs
7  that you used for the gabapentin analysis,
8  correct?
9      A.   That's my memory of it.  Without going
10  through it in great detail.  You know, I don't
11  remember if it was Exhibit 29, but this looks
12  like what we are talking about.
13      Q.   Those are the gabapentin studies,
14  correct?  Okay.  I'd like you to --
15      MS. McGRODER:  Well, when you say "those are
16  the gabapentin studies," you mean --
17      BY MR. ALTMAN:
18      Q.   The three original -- for the three --
19  or for the gabapentin cohort, those are the three
20  original programs that were used in the
21  gabapentin cohort, correct?
22      A.   They appear to be.
23      Q.   Okay.  Okay.  What's been marked as
24  Exhibit 41 I will represent to you is a listing

748

1  from the PharMetrics database of the number of
2  records for particular diagnostic codes, and so
3  if you look at the chart that's there, you'll see
4  there's a column that says "diag."  That's the
5  diagnostic code from the ICD -- from the
6  PharMetrics data.
7          Next is what the description of that
8  particular ICD 9 code is.  Do you see that?
9      A.   Yes.
10      Q.   And then there's the count.  That's
11  the number of records in the database which I
12  will represent to you -- we'll discuss that in a
13  minute.  That's the number of each record in the
14  database, and the last column is "Group."
15          Now, Group when you did the gabapentin
16  studies, you broke the diagnosis into various
17  different groups, correct?
18      A.   We did an overall analysis.  We did a
19  gabapentin overall monotherapy analysis, and then
20  we also did diagnosis specific analyses based on
21  these group codes.
22      Q.   And if you go to Exhibit 29 --
23      MS. McGRODER:  Sorry to interrupt you,
24  Keith.

749

1      Are you representing that Exhibit 41
2  is something you printed off of something that
3  Dr. Gibbons gave you?
4      MR. ALTMAN:  It's from the PharMetrics data,
5  but let's just lay a little foundation on that.
6      MS. McGRODER:  That would be good.
7      BY MR. ALTMAN:
8      Q.   I will represent to you I did a simple
9  select diagnosis count star and got the number of
10  brackets.  That's a pretty standard SQL query,
11  correct?
12      A.   Yes, it would be.
13      Q.   And you are familiar with doing that
14  kind of query, correct?
15      A.   Yes.
16      Q.   That's not a very technically
17  sophisticated query, correct?
18      A.   No, it's not.
19      Q.   Okay.  I will represent to you that's
20  what was done to generate at least the first
21  three columns of this.
22          The last column is done based upon --
23  if you go to the second page of Exhibit 29,
24  there's some code in the program there where how

750

1  you assigned the particular groupings; is that
2  correct?
3      A.   That's correct.
4      Q.   Okay.  And I will represent to you
5  that we followed along with what you did here in
6  order to assign individual diagnostic codes into
7  the particular groupings, and feel free to at
8  your leisure sample any one of them.
9          Exhibit 41 I did not provide to you
10  every single diagnostic code that occurred.  I
11  only provided to you the ones that actually fit
12  into the groupings that you provided.  So there
13  are several others.  In fact, there is something
14  like 12,000 different codes that occurred.  This
15  is only the 800 or so according to your
16  specifications.
17          Does that all -- I know you haven't
18  sat and ran it yourself, but does at first glance
19  with what you see here, does there appear -- does
20  that appear to be -- make sense based upon what
21  you see here?
22      MS. McGRODER:  Well, I object to form and
23  foundation.
24

751

1    BY THE WITNESS:
2        A.   I'd have to go over the codes that you
3    used to produce this and the output that was
4    generated and depose you for seven hours to feel
5    comfortable that you have actually done this, but
6    nothing you are reporting here seems -- you know,
7    I mean, I don't know.  This is just something you
8    have handed to me.
9            It doesn't -- I mean, these seem --
10   these are the kinds of numbers and kinds of
11   descriptors and the kinds of groups that would be
12   found in that database.
13   BY MR. ALTMAN:
14       Q.   And -- and if you wanted to yourself,
15   it wouldn't be particularly difficult for you to
16   sit down and verify this yourself, if you choose
17   to do so, correct?
18       A.   I could do that, sure.
19       Q.   Okay.  It wouldn't take you very long
20   to do that either, would it?
21       A.   Not a huge amount of time.
22       Q.   Okay.  Now, I'd like you to -- before
23   you ran these analyses -- I know you didn't write
24   these programs, correct?

752

1        A.   That's correct.
2        Q.   Okay.  But you reviewed them with
3    Dr. Hur before you ran them?
4        A.   That's correct.
5        Q.   And you have accepted responsibility
6    for them, correct?
7        A.   I have, yes.
8        Q.   Okay.  Have you actually in detail
9    yourself reviewed them to see if there are any
10   bugs or any errors on the programs?
11       A.   I have gone over them.  I have -- as I
12   told you during your last deposition, went
13   through and regenerated the summary tables on the
14   basis of writing independent FORTRAN programs,
15   and so that -- that exercise showed that I could
16   reproduce all of the results that describe the
17   summary statistics of the -- of the samples.
18           So I was confident that there weren't
19   any egregious errors in the SAS code.  There may
20   be some, but I was able to reproduce everything
21   independently.  So I felt reasonably confident
22   that the -- what I had asked for was produced
23   accurately.
24       Q.   Okay.  And we are going to talk more

753

1    about the FORTRAN stuff in a minute.
2            I'd like you to take a look at the
3    code there that assigns the particular groupings.
4        MS. McGRODER:  Are you -- you are talking
5    about Exhibit 29?
6        MR. ALTMAN:  We're talking about Exhibit 29.
7    BY MR. ALTMAN:
8        Q.   Now, as I read this code over here,
9    you -- you took the diagnostic -- the ICD code,
10   and you are looked at either the first three
11   characters or the first four characters or the
12   first five characters and run various different
13   checks; is that correct?
14       A.   That I believe is correct.
15       Q.   Okay.  And if we follow along with the
16   code, do you see there's a line that says:  If
17   group3 in (345).  Then ind equals EPILP.
18           Is that correct?  Did I read that
19   correctly?
20       A.   Yes, that seems to be correct.
21       Q.   And so what that's saying is if the
22   diagnostic code -- the first three characters is
23   345, and it could have anything after that, that
24   would go into the EP -- the epilepsy bucket,

754

1    correct?
2            That's what EPILP means?
3        A.   That's correct.
4        Q.   Okay.  And then we go to the else if,
5    the next line, correct?
6        THE COURT REPORTER:  Then we go to the?
7    BY MR. ALTMAN:
8        Q.   The next line is else if, e-l-s-e
9    space if.
10           And it does another comparison,
11   correct?
12       A.   Correct.
13       Q.   Now, the way these programs work, that
14   line would only be evaluated if the first line
15   were not true, correct?
16       A.   That's correct.
17       Q.   Okay.  So if, for example, group3 is
18   311, that's not in 345.  So it would not do that.
19   It would go to the next line, correct?
20       A.   Correct.
21       Q.   And it would say else if group3 is
22   between 290 is equal -- greater than or equal to
23   290 or less than equal to 316, correct?
24       A.   That's correct.

755

1    Q.   And if group3 was equal to 311, that
2  would be true, right?
3    A.   That would be --
4    MS. McGRODER:  Object to form.  Go ahead.
5  BY THE WITNESS:
6    A.   That statement would be -- would be
7  satisfied.  That would be true, yes.
8  BY MR. ALTMAN:
9    Q.   Okay.  And so then we would execute
10  the code that's in there, correct?
11    A.   Yes.
12    Q.   Okay.  And the first line is ind
13  equals PSYCD, correct?
14    A.   That's correct.
15    Q.   So what you are doing is you're
16  setting everything equal to PSYCD within that
17  range of numbers 290 to 316, correct?
18    A.   Yes.
19    Q.   And the next line what it's actually
20  doing is changing some of them back to something
21  else, correct?
22    A.   That's correct.
23    Q.   And there are several different codes
24  that are being set to BIPLD which is bipolar

756

1  disorder, correct?
2    A.   Correct.
3    Q.   None of those -- none of those codes
4  there are 311, correct, on that line?
5    A.   That's correct.
6    Q.   Okay.  And the next line you see else
7  if group4 and some other numbers.  Then set it
8  equal to MDD which is major depressive disorder,
9  correct?
10    A.   That's correct.
11    Q.   And none of those are 311, correct?
12    A.   That's correct.
13    Q.   Okay.  And then it says else if it's
14  between a couple of numbers, 2950 and 2959, and
15  then set it equal to SCHIZ which I imagine is
16  schizophrenia, correct?
17    A.   That's correct.
18    Q.   Okay.  So at this point anything that
19  was 311 would have been set to PSYCD, correct?
20    A.   That's correct.
21    Q.   Okay.  And then we end, and then we go
22  to the next line that says else if group3 in 311,
23  then ind equals MDD, correct?
24    Did I read that line correct?

757

1    A.   That's correct.
2    Q.   Now, if group3 had been 311, then it's
3  between 290 and 316, and that would evaluate to
4  true, correct?
5    A.   That's correct.
6    Q.   Then when it gets to the else if
7  group3 equals 311, it's never going to evaluate
8  that code, is it, if it's 311?
9    MS. McGRODER:  Object to form.
10  BY THE WITNESS:
11    A.   I'm not sure whether that's correct.
12  I would have to go back and look at the syntax
13  for how SAS evaluates these things and run some
14  diagnostics to know whether that was true and
15  meet with Dr. Hur to go over that.
16  BY MR. ALTMAN:
17    Q.   Well, Dr. Gibbons you have accepted
18  responsibility for that.
19    Is that true?
20    A.   That's correct.
21    Q.   Okay.  This is basic if then elses.
22  That's basic programming logic, correct?
23    A.   That's correct, but we will have to
24  see how this is actually done.  Let me take a

758

1  look at this.
2    Q.   Well, I represent to you, Dr. Gibbons,
3  that that code never gets executed because since
4  the first part of that is true, between 290 and
5  316, then if it's 311, that else if never gets
6  run.
7    MS. McGRODER:  Well, object to form and
8  foundation --
9  BY THE WITNESS:
10    A.   Again, I'm not sure that --
11    MS. McGRODER:  Wait, let me object.  Assumes
12  facts not in evidence, improper hypothetical.  Go
13  ahead.
14  BY THE WITNESS:
15    A.   With the information that I have in
16  front of me, I cannot answer that question for
17  you.
18  BY MR. ALTMAN:
19    Q.   You can't look at this program code
20  there and tell that?
21    A.   I have answered that question.
22    Q.   Were any -- were any of the
23  diagnostic -- well, go back to Exhibit 41 for a
24  second, and I'd like you to go to 311, which is

759

1  probably on about the fourth page.
2          Could you read how many people -- how
3  many records there are with 311 as a diagnostic
4  code?
5          MS. McGRODER: Objection to foundation for
6  use of this document.
7  BY THE WITNESS:
8      A.  I have what you have listed here as
9  24,297.
10  BY MR. ALTMAN:
11     Q.  Okay.  And you could verify that once
12  again any time you wanted to, correct?
13     A.  Yes.
14         MS. McGRODER:  Well, object to form and
15  foundation.
16  BY MR. ALTMAN:
17     Q.  Dr. Gibbons, if you represented to --
18  that you accepted responsibility for the programs
19  and the data and you represented to the court
20  that you had all the knowledge necessary to
21  discuss anything about the programs and the data
22  and that we didn't need to talk to Dr. Hur or
23  anybody else, how is it that you can sit here and
24  say you can't tell whether the program is correct

760

1  or not?
2          MS. McGRODER:  Object to form.
3  BY THE WITNESS:
4      A.  I would need to go back to the
5  program, go back to the SAS manual, and determine
6  whether or not the else here -- this else if is
7  for the original if or for the entire clause.
8  BY MR. ALTMAN:
9      Q.  Was 311 -- if the code was 311, was
10  that set to MDD in this program?
11     A.  Again, I would have to go back to
12  this.  This is not how I would do this in
13  FORTRAN, and so I would have to go back and
14  verify that this was done appropriately, but this
15  syntax would be specific to SAS.
16         So I would have to verify that.  As I
17  have told you before, I'm not an expert in SAS.
18  This would not even -- this if then else
19  statement would not even execute in FORTRAN which
20  is the code that I use to verify this.  So I
21  would have to go back and verify that.
22     Q.  If that's true, then the number of
23  patients that you have assigned to the MDD group
24  and the other psychiatric indications group would

761

1  be different, wouldn't they?
2          MS. McGRODER:  Object to foundation.
3  BY THE WITNESS:
4      A.  If what's true?
5  BY MR. ALTMAN:
6      Q.  If you did not -- if it turns out that
7  for code 311 those people were not set to MDD
8  because this line didn't execute and were left as
9  other psychiatric disorder, then Table 1 in your
10  expert report would have an incorrect number of
11  patients for the MDD group and for the
12  psychiatric disorder group, correct?
13         MS. McGRODER:  Object to form and
14  foundation, assumes facts not in evidence.
15  BY THE WITNESS:
16     A.  If I'm understanding your question
17  correctly, if there was an error in the code that
18  confused major depressive disorder patients with
19  general psychiatric or other psychiatric disorder
20  patients, then that particular part of the
21  analysis of the gabapentin with respect to the
22  psychiatric indication or the MDD indication
23  would change if that error -- assuming such an
24  error has been committed, then those number would

762

1  change, of course.
2  BY MR. ALTMAN:
3      Q.  But in Table 1 in your expert report,
4  you also calculate percentages for concomitant
5  conditions.  So it would be a little more than
6  just simply changing the gab -- the MDD line and
7  the psychiatric disorder line since you
8  calculated how many percentages -- you know, what
9  percentage of the people had various different
10  conditions, correct?
11         MS. McGRODER:  Object to form and
12  foundation, assumes facts not in evidence,
13  improper hypothetical.
14  BY THE WITNESS:
15     A.  Again, if -- if what you are asking is
16  if there's an error here with respect to what is
17  designated as MDD versus what is designated as
18  other psychiatric disorders, then any entry
19  within Table 1 that referred to MDD or
20  psychiatric disorders would be incorrect to the
21  extent that this, you know, was actually an error
22  that was made.
23         It certainly wouldn't change the
24  conclusions of the study since, you know, the

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

763

1   conclusions of the study are clear for all people
2   considered, all people who received gabapentin
3   monotherapy, and basic conclusion from Table 1 is
4   that we see the protective effects or effects
5   that are in the direction of being protective for
6   the psychiatric disorders which include both MDD
7   and other psychiatric disorders.
8          And for the pain disorders, there
9   doesn't appear to be any -- any difference before
10  or after initiation of drugs.  So even if this
11  were true, it wouldn't change any of my
12  conclusions relative to the study.
13         I mean, obviously we want this to be
14  as accurate as possible and mistakes are made.  I
15  don't know if you are correct in assuming that
16  this is a mistake.  If it is, it certainly can be
17  corrected, but I can assure you that it's not
18  going to change the -- the conclusions of the
19  study if, in fact, what you have identified is
20  the error that you assume it to be.
21         MR. LONDON:  I object to everything after
22  the word incorrect as being non-responsive.  I
23  think you answered two questions, and only one
24  was asked.

764

1   BY MR. ALTMAN:
2       Q.  How -- how do you know what effect
3   this would have on Table 2 if it's, in fact,
4   true?
5           MS. McGRODER:  Well, object to form and
6   foundation, improper hypothetical, and assumes
7   facts not in evidence.
8   BY THE WITNESS:
9       A.  Everything you have said so far is
10  about Table 1.  Now you are talking about Table
11  2.  So could you give me a copy of my expert
12  report where Table 1 and Table 2 are?
13          MR. ALTMAN:  Sure.  Could you find that?
14          MR. LONDON:  I am going to give it from the
15  original exhibits.
16          MR. ALTMAN:  Yes, please do.
17  BY MR. ALTMAN:
18      Q.  I'm going to hand you, Dr. Gibbons,
19  what's been -- what was previously marked as
20  Exhibit 21.
21          (WHEREUPON, the document was
22              tendered to the witness.)
23  BY THE WITNESS:
24      A.  Thank you.

765

1   BY MR. ALTMAN:
2       Q.  Now, Table 1 is a -- calculates
3   various different percentages for various
4   different consequences of concomitant
5   indications, correct?
6           And I think we said if the number of
7   MDD and psychiatric disorder patients were
8   different than that report, then all of those
9   that rely upon any comparison with MDD or the
10  psychiatric conditions would be altered, correct?
11          MS. McGRODER:  Object to form and
12  foundation, improper hypothetical, assumes facts
13  not in evidence.
14  BY THE WITNESS:
15      A.  If I understand your question --
16  excuse me -- correctly, if there was an
17  interchange between what was designated as MDD
18  and what was designated as other psychiatric
19  disorders as broken out in this table, then there
20  would be changes in the summary statistics that
21  are presented in Table 1 for those two
22  categories, and those two categories alone --
23  BY MR. ALTMAN:
24      Q.  Well --

766

1           MS. McGRODER:  Wait.  Were you finished with
2   your answer?
3           MR. ALTMAN:  I'm sorry.
4   BY THE WITNESS:
5       A.  And then with respect to Table 2 --
6   BY MR. ALTMAN:
7       Q.  Well, I asked you about Table 1.  So
8   let's just focus on Table 2.
9       A.  You asked me about Table 2.  If you go
10  back to the record, you asked me about Table 2.
11  That's why I asked --
12      Q.  No, I only asked you about Table 1.
13  Now, Table 1 --
14          MS. McGRODER:  Before that.
15          MR. ALTMAN:  But I will get back to Table 2.
16  We are talking about Table 1.  When I handed him
17  the exhibit, I asked him a question about Table
18  1.  I would like to finish with Table 1.
19  BY MR. ALTMAN:
20      Q.  If you take your schizophrenia line,
21  though, and you go across, there's a column with
22  psychiatric disorder, correct?
23      A.  As I said, any -- if -- if your
24  hypothetical is correct, assuming that, that

767

1   there's been a misclassification of some patients
2   with major depressive disorder as other
3   psychiatric disorders, then any row of Table 1
4   for those two disorders and any column of Table 1
5   for those two disorders, the results of which
6   will change if that misclassification is -- that
7   hypothetical misclassification is corrected.
8       Q.   Well, isn't it even more complicated
9   than that because, for example, schizophrenia if
10  you take the psychiatric disorder, how many of
11  them it says I believe 71.2 percent, correct?
12         Did I read that correctly?
13      THE COURT REPORTER:  Was it 71.22?
14  BY MR. ALTMAN:
15      Q.   71.2 percent, correct --
16      MS. McGRODER:  Object to form and
17  foundation.
18  BY MR. ALTMAN:
19      Q.   -- did I read that correctly?
20      A.   Yes, you read it correctly.
21      Q.   Okay.  Well, if the number -- how many
22  of those also had concomitant psychiatric
23  disorder and that percentage is altered, all of
24  the ones for the schizophrenia line could be

768

1   altered, could they not?
2       MS. McGRODER:  Object to form, foundation,
3   improper hypothetical.
4       MR. ALTMAN:  We will move on from that.
5       MR. LONDON:  Get an answer?
6       MS. McGRODER:  So are you withdrawing that
7   question?
8       MR. ALTMAN:  No, I'm not withdrawing the
9   question.  Counsel has advised me.  Let's get an
10  answer.
11      MS. McGRODER:  Who is taking this
12  deposition, you or Jack?
13      MR. ALTMAN:  He whispered a comment to me,
14  and I'm --
15      MS. McGRODER:  Do you have the question in
16  mind, Dr. Gibbons?
17  BY THE WITNESS:
18      A.   Could you repeat the question?
19  BY MR. ALTMAN:
20      Q.   Sure.  For schizophrenia on the
21  psychiatric disorder, it says 71.2 percent,
22  correct?
23      A.   Yes.
24      Q.   If that 71.2 percent is something

769

1   different than that, then can't that influence
2   all of the numbers on the schizophrenia line?
3       MS. McGRODER:  Object to form and
4   foundation, improper hypothetical.
5   BY THE WITNESS:
6       A.   No.
7   BY MR. ALTMAN:
8       Q.   Okay.  Now, let's talk about Table 2.
9   Your conclusions are effectively based upon Table
10  2, correct?
11         When I say "conclusion," I mean your
12  general conclusions that gabapentin is protective
13  is based upon the findings in Table 2, correct?
14      A.   Well, let me answer both parts of that
15  question.  My general conclusion is that
16  gabapentin is not increasing the risk of suicide.
17  The data suggests that in some of these
18  disorders, the psychiatric disorders, the effects
19  are statistically significant in the direction of
20  being protective.  So but my general conclusion
21  from Table 1 is that gabapentin is not increasing
22  the risk of suicide.
23      Q.   Okay.  Now, if we altered the number
24  of people in the MDD group, you have no idea what

770

1   that's going to do to the rate ratio or the
2   confidence interval, correct?
3       MS. McGRODER:  Object to form and
4   foundation, improper hypothetical.
5   BY THE WITNESS:
6       A.   If you change the number -- let me
7   look at this for just a moment, please.
8       MS. McGRODER:  Could we go off the record
9   for one second, please?
10      MR. ALTMAN:  Sure.
11      THE VIDEOGRAPHER:  Off the record at 9:44.
12         (WHEREUPON, a recess was had at
13         9:44 a.m. until 9:48 a.m.)
14      THE VIDEOGRAPHER:  We are back on the report
15  at 9:48.
16  BY MR. ALTMAN:
17      Q.   Before the break, Dr. Gibbons, I had
18  asked you a question that if you had altered the
19  number of MDD people, you don't really know what
20  that's going to do to the rate ratio and the
21  confidence interval until you have run the
22  numbers, correct?
23      MS. McGRODER:  Objection, improper
24  hypothetical.

771

1    BY THE WITNESS:
2        A.   Well, on the basis of Table 2, if
3    there was an interchange between -- I mean, the
4    bottom line is that the rate ratio for major
5    depressive disorder is .63.  The rate ratio for
6    other psychiatric disorders is .8.
7        So you -- if such an error were to
8    have been made, you would basically be moving a
9    mixture of the people from the .8 rate ratio to
10   the .63 rate ratio.  Those two numbers are fairly
11   similar.  I don't know what the exact numbers
12   would be obviously.  I can't do that without
13   doing the computation, but I don't think that
14   they would change a great deal.
15   BY MR. ALTMAN:
16       Q.   But it could change the confidence
17   intervals substantially such that as of right
18   now, I believe the other psychiatric disorder
19   includes one and MDD does not include one.  That
20   could change, could it not?
21       MS. McGRODER:  Objection, improper
22   hypothetical.
23   BY THE WITNESS:
24       A.   My sense of this is that those

772

1    confidence intervals would change in a very small
2    way.  The addition of subjects to the major
3    depressive disorder would tighten the confidence
4    interval.  It would decrease the uncertainty.
5        The addition of those from a group
6    that had a slightly higher overall rate ratio
7    might increase it a little bit, might shift it up
8    a little bit, but it would be tighter.  You know,
9    it would be an analysis that would have to be
10   done, but, again, it's not going to change, you
11   know, anything with respect to the conclusions.
12       It might be that the other psychiatric
13   disorders might have a confidence interval that
14   now didn't include one.  That's a possibility.
15   It's also a possibility that for major depressive
16   disorder, it might -- the confidence interval
17   might include one.
18       I don't think so based on what you are
19   describing, but I would have to do the analysis,
20   and I would have to verify that, in fact, the
21   error had been made, but, again, it's not going
22   to change the conclusions.
23   BY MR. ALTMAN:
24       Q.   Okay.  Go back to -- put the paper

773

1    aside for a minute.  Go back to Exhibit 29 when
2    we were looking at the SAS code.
3        Many of the ICD codes are generally
4    five characters, right -- could be three, four,
5    or five characters, right?
6        A.   That's correct.
7        Q.   And a lot of the searches like, for
8    example, if we look at the line where things are
9    set for bipolar disorder the -- if group4 is in
10   2960, do you see that line?  It's right after the
11   else if 29 --
12       A.   I do see it.
13       Q.   Okay.  What that's basically saying is
14   if was 29601 or 29602 or 29603, all of those
15   would satisfy that search over there, correct?
16       A.   That's correct.
17       Q.   Now, would 29683 also be set to
18   bipolar?
19       A.   I believe it would.
20       Q.   Is 29683 a valid ICD 9 code?
21       MS. McGRODER:  Well, object to foundation
22   for the use of Exhibit 41.
23       MR. ALTMAN:  I am not asking based on
24   Exhibit 41.  I am asking it generally.

774

1    BY MR. ALTMAN:
2        Q.   Is that a valid ICD code?  Do you
3    know?
4        A.   I don't know sitting right here.
5        Q.   Okay.  Let me give you the next
6    exhibit.
7            (WHEREUPON, a certain document
8            was marked Gibbons Deposition
9            Exhibit No. 42, for
10           identification, as of 3/5/09.)
11   BY MR. ALTMAN:
12       Q.   I just want you to --
13       MS. McGRODER:  Is that a new exhibit?
14       MR. ALTMAN:  That's -- yes, Exhibit 42.
15       MS. McGRODER:  Do you have one for me?
16       MR. ALTMAN:  Yes, I'm sorry.
17       MS. McGRODER:  Thank you.
18   BY MR. ALTMAN:
19       Q.   This is Exhibit 42, and there's a
20   couple of different things here, and I only want
21   you to look at the first page for right now.
22       Dr. Gibbons, what I have printed out
23   for you is according to your definitions in
24   Exhibit 29 -- strike that.

775

1      With the PharMetrics database, there
2  was a table of ICD -- ICD 9 codes and the
3  descriptions, correct?
4      A.   Correct.
5      Q.   Okay.  What I have printed out for
6  you, the first page of Exhibit 42 is the listing
7  of the ICD 9 codes from the PharMetrics data that
8  match your criteria in Exhibit 29.  You can
9  verify that for yourself.
10      It's only the first page of this, but
11  you can see that Exhibit 29 says that bipolar is
12  2960 asterisk, 2961 asterisk, 2964 asterisk, 2965
13  asterisk, 2966 asterisk, and 2968 asterisk.
14      Did I read that correctly?
15      A.   I think you left out 2967 asterisk.
16      Q.   You are correct.  I left out 2967
17  asterisk.
18      With that correction, did I read
19  correctly what's in your program?
20      A.   Yes, I believe so.
21      Q.   Okay.  Does this appear to be the
22  list -- does that appear to be what's on this
23  list here?
24      A.   Well, this is a list.  I'm not sure

776

1  where it came from, but these are codes that
2  follow those prefixes, four digit prefixes.
3      Q.   Do you see 29683 listed here?
4      MS. McGRODER:  Well, I object to foundation
5  for the use of this document.
6  BY THE WITNESS:
7      A.   I don't see it listed here, but, you
8  know, again, I'm not sure exactly what all these
9  documents are.
10  BY MR. ALTMAN:
11      Q.   When you ran your code on Exhibit 29,
12  you don't actually check to see -- strike that.
13      Did you check to see whether there
14  were -- strike that, again.
15      There was a table within the
16  PharMetrics database that for each patient gave
17  the diagnoses for that patient, correct, in the
18  gabapentin cohort?
19      A.   Say that again.
20      Q.   In the PharMetrics data as produced,
21  one of the tables had all the diagnosis for each
22  patient, correct?
23      A.   That's correct.
24      Q.   Did you check to see whether there

777

1  were invalid codes in that list -- in those
2  patient diagnoses?
3      A.   I don't recall one way or the other at
4  this point.
5      Q.   And the program exhibit -- in Exhibit
6  29 does not make sure that the codes are valid,
7  correct?
8      It just uses ICD 9 codes, correct?
9      A.   The basis of the diagnosis-specific
10  analyses are the ICD 9 codes, yes.
11      Q.   And so, for example, if there was a
12  record within the actual patient diagnoses codes
13  for 29683, which is an invalid ICD 9 code, you
14  would have -- you didn't check to see if there
15  were invalid ICD codes, correct?
16      MS. McGRODER:  Object to form and
17  foundation, improper hypothetical, and assumes
18  facts not in evidence.
19  BY THE WITNESS:
20      A.   At this stage sitting here right now,
21  I cannot remember whether or not a search was
22  made for invalid ICD codes -- ICD 9 codes.  I
23  just can't remember at this point.  We did these
24  analyses some time ago.

778

1  BY MR. ALTMAN:
2      Q.   Well, the program does not search
3  against the -- does not search against the valid
4  ICD codes.  It only searches against the codes
5  that actual exist for particular patients,
6  correct?
7      MS. McGRODER:  Object to form.
8  BY THE WITNESS:
9      A.   My answer to you is I don't -- there's
10  nothing in this -- in this particular program
11  that will go through and say, you know, validate
12  the ICD codes and see whether or not, you know,
13  there's one that happens to be in the database
14  that may be an invalid one.
15      What I don't remember at this point is
16  whether or not additional searches of those data
17  were made.
18  BY MR. ALTMAN:
19      Q.   Okay.  We are going to make a little
20  side step, and then we are going to come back to
21  this.  Excuse me for one second.
22      Dr. Gibbons, when we were here the
23  last time, we talked about -- and I think you
24  even mentioned this morning that you -- parallel

779

1    to Dr. Hur's processing of the PharMetrics data,
2    you also processed the data and verified
3    Dr. Hur's results at least up until the point
4    that you ran any of the regression analysis,
5    correct?
6        A.   That's correct.
7        Q.   Did you start from the original
8    PharMetrics files and do all that, go step all
9    the way through the process and follow along with
10   the programs and do all of the steps that Dr. Hur
11   did?
12       A.   I used an export file from the
13   original files that Dr. Hur provided to me, and I
14   believe I provided those to you with the FORTRAN
15   programs.
16       Q.   And was that just -- was that just
17   simply a text version of the PharMetrics data
18   files, or were they in some format different than
19   the original PharMetrics data files?
20       A.   I don't recall right now, but I think
21   there was some -- some of the preprocessing of
22   the data had already been done.
23       Q.   So if there was a mistake in Dr. Hur's
24   programs prior to the extraction that he gave

780

1    you, you would have just -- you would have just
2    compounded his mistake, shall we say, for lack of
3    a better term, correct?
4        MS. McGRODER:  Object to form, foundation,
5    improper hypothetical, assumes facts not in
6    evidence, and calls for speculation.
7    BY MR. ALTMAN:
8        Q.   You can answer.
9        A.   Can I see the FORTRAN codes and have a
10   look at this so that I can answer your question?
11       Q.   Sure.  We are going to get there in
12   just a minute.
13       A.   Okay.
14       Q.   But what I was asking it's a different
15   thing.
16        You said Dr. Hur did some of the
17   processing of the data, correct, before he made
18   the extract to give to you; is that correct?
19       A.   I don't remember what exactly he did
20   at that point and, you know, how close the data
21   that I used from the extract was to the original
22   PharMetrics data.  That's why I asked to see the
23   FORTRAN code.
24       Q.   Okay.  And we are going to come to

781

1    that.
2        MR. ALTMAN:  Let's mark the next exhibit.
3          (WHEREUPON, a certain document
4          was marked Gibbons Deposition
5          Exhibit No. 43, for
6          identification, as of 3/5/09.)
7         MR. ALTMAN:  Let's mark this at the same
8    time too.
9          (WHEREUPON, a certain document
10         was marked Gibbons Deposition
11         Exhibit No. 44, for
12         identification, as of 3/5/09.)
13   BY MR. ALTMAN:
14       Q.   Dr. Gibbons, you have just been handed
15   what's been marked as Exhibit 43 and 44.  43 is a
16   CD, which obviously we cannot look at right now,
17   that was provided to us by counsel which
18   represents your FORTRAN programs and your
19   FORTRAN -- the data files that you used in a
20   couple of SAS programs.
21        Exhibit 44 is a listing of what was on
22   the disk along with the file names along with the
23   dates modified and sizes.
24       Do you see that?

782

1        A.   Yes.
2        Q.   Okay.  Does this look -- does the
3    contents, Exhibit 44 look to be what you placed
4    on that disk that you sent to counsel and
5    ultimately to us?
6        A.   I believe so.
7        Q.   Okay.
8        MS. McGRODER:  Well, just so I don't have
9    keep objecting to foundation.  Is this something
10   that was printed off the disk, or is this
11   something you prepared based on your review of
12   the disk?
13       MR. ALTMAN:  Is it just a directory of
14   what's on the disk.
15       MS. McGRODER:  Because -- so it appears on
16   the disk itself?
17       MR. ALTMAN:  No, this file does not
18   appear -- this is just a listing of what appears
19   on the disk.
20       MS. McGRODER:  Okay.  That you created?
21       MR. ALTMAN:  It's a listing of what's on the
22   disk.  I mean, if you want to object that it's a
23   listing of what's on the disk.  There's no file
24   on the disk that's a listing.  Anything I print

783

1  out would be -- this is a listing of what's on
2  the disk.
3  BY MR. ALTMAN:
4      Q.  Does this look to be the files that
5  are on the disk that you provided to counsel?
6      A.  From my memory, yes.
7      Q.  Okay.  When did you do the FORTRAN
8  analysis -- strike that.
9          When did you do the -- get the extract
10  from Dr. Hur so that you could perform your
11  FORTRAN analysis?
12      A.  I don't remember the date.
13      Q.  Approximately?
14  MS. McGRODER:  Object to form.
15  BY THE WITNESS:
16      A.  I don't remember.
17  BY MR. ALTMAN:
18      Q.  Was it before New Years or after New
19  Years?
20      A.  I don't remember.
21      Q.  Did you do it before you submitted the
22  manuscript -- strike that.
23          One of the FORTRAN analysis you did
24  was based upon the bipolar data, correct?

784

1      A.  That's correct.
2      Q.  And the bipolar data is the basis of
3  the manuscript, correct?
4      A.  That's correct.
5      Q.  Did you do that verification with
6  FORTRAN before you submitted the manuscript or
7  after the manuscript?
8      A.  I don't recall.  If I -- I mean, I
9  would just -- I would be guessing.
10      Q.  That's a six-month span.  You don't
11  have any date by which you could say you know you
12  definitely did it before that date?
13  MS. McGRODER:  Object to form,
14  argumentative.  He has answered that question
15  four times now.
16  BY THE WITNESS:
17      A.  I mean, I'm looking at the number --
18  the data on the text files which would have been
19  the data file that, you know, I had received from
20  Dr. Hur, and those dates are 1/25/2009 and
21  1/28/2009, and if those were the generation dates
22  of those files, then my FORTRAN code would have
23  been done after the receipt of those.
24          I just don't know sitting here right

785

1  now with you how I could verify that that, in
2  fact, was the generation date and not maybe, you
3  know, I had saved it to another media kind of
4  date.  So that's -- you know, so that's why -- I
5  don't -- I don't remember off the top of my head.
6  BY MR. ALTMAN:
7      Q.  The dates of your FORTRAN programs are
8  dated on February the 6th of 2009, correct?
9      A.  Well, they are dated that here, but
10  again, you know, in creating these -- in creating
11  the files to provide to you, I may have resaved
12  them in a way that gave it the date of when I,
13  you know, gave them to you.
14          All I am saying is -- and I'm not
15  trying to be difficult.  All I'm saying is is I
16  can't verify sitting here right now that the date
17  that I created my FORTRAN files was February 6,
18  2009, and that the date that Dr. Hur created the
19  text files was 1/25/2009 and 1/28/2009.  Are
20  these correct?  Maybe they are.  I don't know.  I
21  just can't answer that, you know, with certainty
22  sitting here right now.
23      Q.  Well, 2/6/2009 was after your
24  deposition in February, correct?

786

1      A.  You will have to remind me the date of
2  the deposition.
3      Q.  I believe it was the 3rd and the 4th
4  of February.
5      A.  Okay.  So I had done these analyses
6  prior to the deposition because I reported to you
7  at the deposition that I had done these analyses.
8  So it looks like the date -- these time stamps
9  reflect the time that I provided this disk to you
10  and not when I actually did the work, and I
11  cannot remember specifically when I went back and
12  did that work.
13      Q.  And you can't even give me a general
14  idea at all?
15  MS. McGRODER:  Well, object to form, asked
16  and answered.
17  BY THE WITNESS:
18      A.  Yeah, no.
19  BY MR. ALTMAN:
20      Q.  Was -- did you have the FORTRAN data
21  files prior to the 25th of January 2009?
22      A.  I've told you in two or three
23  different ways I just don't remember the date or
24  even close to the date when I did that work.  I

787

1   do a lot of different things.  I have done a lot
2   of different things on this case.  I did these
3   analyses.  I don't remember when I did these
4   analyses.
5       Q.   How do you keep track of your time to
6   bill counsel in this case?
7       A.   Just usually based on kind of an
8   overview of how much time I have been spending.
9   Usually how many days have I spent working on
10  this during the course of a week or a two-week
11  period.
12      Most of the time I bill them every
13  couple of weeks or every month.  It usually was
14  related to a particular series of tasks.  I don't
15  have -- you know, I don't have time sheet kinds
16  of things if that's what you are asking.
17      Q.   Well, do you keep a calendar at all?
18  I mean, how do you keep track of let's say that
19  on January the 15th of 2009 you did six hours of
20  work on this case?  How would you keep track of
21  that?
22      A.   Just from memory.
23      Q.   Okay.  Did you do any work on the
24  FORTRAN programs after the -- your last

788

1   deposition?
2       A.   No, I don't believe so.
3       Q.   Do you have any idea why the modified
4   date would have differed -- would be February 6th
5   for your FORTRAN programs?
6       MS. McGRODER:  Objection, asked and
7   answered.
8       BY MR. ALTMAN:
9       Q.   What?
10      A.   Sitting here no -- now I don't, unless
11  I had just included -- you know, had something to
12  do with the construction of the -- of the CD for
13  you or maybe I opened them up to make sure that
14  they were, you know, adequately documented.  I
15  don't really remember.
16      I do remember that I didn't change any
17  of the FORTRAN code.  I had done all of that
18  prior to our deposition.  I certainly didn't
19  change any of the language.
20      Q.   Is it your opinion that when you open
21  up a file, it changes the modified date?
22      MS. McGRODER:  Well, objection.  If you have
23  an opinion, go ahead.
24

789

1   BY THE WITNESS:
2       A.   My understanding is if you open
3   something up and resave it, it will change the
4   date, but there are also cases where when you
5   burn something to a CD, it can, you know, maybe
6   change the date.  I'm not sure.  I'm not an
7   expert in that.
8       BY MR. ALTMAN:
9       Q.   Well, it didn't change -- all these
10  files are not dated the 6th of February.  Some of
11  them maintain the date from January, correct?
12      MS. McGRODER:  Well, object to form and
13  foundation.
14      BY THE WITNESS:
15      A.   Well, there are lots of -- there are
16  lots of files here that had the date of 2/6/2009.
17  You know, I certainly didn't -- I don't think all
18  of these files were created on 2/6/2009.
19      So it had something to do with the
20  preparation of the files for you, you, why
21  they all had that time stamp.
22      BY MR. ALTMAN:
23      Q.   But why didn't the text files have a
24  date that changed?

790

1       A.   I don't know.
2       Q.   Okay.
3       MR. ALTMAN:  We have to change tapes.
4       THE VIDEOGRAPHER:  This is the end of tape
5   No. 1.  We are off the record at 10:11.
6           (WHEREUPON, a recess was had at
7           10:11 a.m. until 10:13 a.m.)
8           (WHEREUPON, certain documents
9           were marked Gibbons Deposition
10          Exhibit Nos. 45, 46, for
11          identification, as of 3/5/09.)
12      THE VIDEOGRAPHER:  This is the beginning of
13  tape No. 2.  We are back on the record at 10:13.
14      BY MR. ALTMAN:
15      Q.   Dr. Gibbons, before we continue, I
16  forgot to ask you earlier.
17      Have you already received the copies
18  of your transcript from the beginning part of
19  February?
20      A.   Yes.
21      Q.   Have you already completed your review
22  of those transcripts?
23      A.   I have.
24      Q.   Is there an errata sheet?

791

1    A.   There is.
2    Q.   You didn't happen to bring a copy of
3  that with you, did you?
4    A.   I sent it to counsel.
5    Q.   Were there any substantive changes
6  other than misspellings of words?
7    A.   There were some misspellings.  There
8  were some examples like accrued instead of two
9  words a crude.  That's what I remember offhand.
10      I mean, there weren't any major
11  changes that I think would substantively change
12  things, but I would have to go back over it.
13    Q.   Okay.  You have been handed Exhibits
14  45 and 46, correct?
15      Exhibit 45 is a couple of things that
16  that -- actually three things that went along
17  with your bipolar FORTRAN analysis, and I would
18  just like to make sure I have it right.
19      The first five or six pages or is it
20  nine pages is a FORTRAN program.  Does that
21  appear to be the FORTRAN program that you wrote
22  to process the bipolar data?
23    A.   You are referring to Exhibit 45?
24    Q.   45, yes, pages 1 through 9.

792

1    A.   Yes, it does.
2    Q.   Okay.  The next page after that is
3  just a single page.  It's an output file.
4      Does that appear to be the output file
5  that went along with the bipolar data at least in
6  form?  I understand without looking at the disk,
7  but is there anything that you see there that
8  says, God, that can't possibly be what I gave
9  you?
10    A.   This looks like the format of the file
11  that this program would have generated.
12    Q.   Okay.
13    MS. McGRODER:  Well, can I just ask you,
14  Keith, like with respect to the other exhibits,
15  is this something that you printed off the disk?
16    MR. ALTMAN:  Yes.
17    MS. McGRODER:  Okay.
18    MR. ALTMAN:  Yes.
19  BY MR. ALTMAN:
20    Q.   And then we have three pages because
21  obviously there would be thousands of pages if we
22  were to print them out.  This is just the first
23  three pages of the BP data file.
24      Does that look to generally be in the

793

1  format that the BP data file on the disk was?
2    A.   Yes, it does.
3    Q.   Okay.  Looking at the BP data file as
4  here -- as it is here, is that the same format as
5  the PharMetrics -- the original PharMetrics data
6  was?
7    A.   No, this is the abstracted data that
8  Dr. Hur provided for me to do this analysis.
9    Q.   And it appears that with respect to
10  the bipolar data here, he had already done the
11  classification of these records by the particular
12  drug involved; is that correct?
13    A.   That's correct.
14    Q.   Okay.  So this is not the original --
15  this is some number of steps away from the
16  PharMetrics database, correct?
17    A.   It's at least one step away from the
18  PharMetrics database because the -- the drug
19  names are provided here in these categorizations
20  that he would have had to have made from the
21  original files.
22    Q.   So if there was a mistake in Dr. Hur's
23  programs prior to the point that he made this
24  extraction, you wouldn't have any way to know

794

1  that, correct?
2    MS. McGRODER:  Object to form, foundation,
3  improper hypothetical.
4  BY MR. ALTMAN:
5    Q.   Simply based upon this data?
6    A.   Simply based upon this dataset.  You
7  know, if there were errors that he had made, you
8  know, I would have had a way of knowing it by
9  sitting side by side with him going over his SAS
10  programs if there was an error that had slipped
11  through that predated the generation of these
12  codes that are in this file, then I would not on
13  the basis of this file alone have a way of
14  knowing that.
15    Q.   And then I would like you to go to
16  Exhibit 46, and is Exhibit 46 essentially the
17  same information for the gabapentin cohort which
18  is your FORTRAN program and output file and then
19  a few pages out of the data file?
20    A.   Yes.
21    Q.   And the same point with the data file
22  over here.  If there was a problem with the
23  processing of the data prior to this point, this
24  data file does not allow you to check to see

795

1    whether there was an error just simply based upon
2    this data file, correct?
3        MS. McGRODER:  Object to form, foundation,
4    improper hypothetical.
5    BY THE WITNESS:
6        A.   If your question is did -- would I be
7    able to go back to the codes that generated say
8    the diagnosis of schizophrenia on the basis of
9    this dataset alone, the GABA.txt file, the answer
10   is no.
11   BY MR. ALTMAN:
12       Q.   Okay.  Now, one little problem that I
13   found in looking at your FORTRAN dataset is no
14   where in this dataset is the actual patient ID
15   from the PharMetrics data, is it?
16       MS. McGRODER:  Object to form.
17   BY THE WITNESS:
18       A.   I have used the sequential number of
19   the patient ID.
20   BY MR. ALTMAN:
21       Q.   Was that sequential number generated
22   by -- strike that.
23           If you would sort the patient IDs
24   alphanumerically and then assign a sequential

796

1    number to each one of those patient IDs, would
2    that match up with your patient IDs that's here?
3        A.   From what I am looking at right here,
4    I don't have any way of knowing that.
5        Q.   Do you know how Dr. Hur generated
6    those patient ID numbers?
7        A.   Not at this moment sitting here
8    looking at this.
9        Q.   Okay.  Let's go back to exhibit -- the
10   one that had the bipolar ICD codes.  I don't know
11   if that was 40.
12       MS. McGRODER:  42.
13   BY MR. ALTMAN:
14       Q.   42.  Okay.  Now, because the patient
15   ID was deleted -- deleted is not the right
16   term -- but it was changed to a sequential number
17   as opposed to the patient ID, it made it a little
18   bit difficult to match up the -- your FORTRAN
19   data that you used with the PharMetrics data, but
20   I will represent to you that that is how the
21   patient IDs were generated.  That it is
22   sequential and alphanumerical order, and we are
23   going to look at one particular patient, and to
24   satisfy yourself that that is, in fact, true that

797

1    I could match up the PharMetrics with your
2    FORTRAN data, I would like you to take a look
3    at -- go to the next page.
4            That is for a particular patient in
5    your FORTRAN dataset.  That is a particular
6    patient ID number 107869, and obviously we are
7    not going to sit and look at the disk right now.
8    I will represent to you that if you take your --
9    and this is out of the gabapentin set.  I will
10   represent to you if you go to the gabapentin set
11   and take a look at number 107869, this is the
12   records that will go along with that.
13           Does the format appear to match the
14   format of your dataset?
15       MS. McGRODER:  Object to form and
16   foundation.
17   BY THE WITNESS:
18       A.   So you are representing that this is
19   based on the GABA dot -- this is -- this is a
20   particular record from the GABA dot text?
21   BY MR. ALTMAN:
22       Q.   A particular patient.
23       A.   A particular patient.
24       Q.   Yes.  Does that -- does the format of

798

1    this particular patient appear to be the same as
2    the GABA dot text file that you have in front of
3    you --
4        MS. McGRODER:  Object to form.
5    BY MR. ALTMAN:
6        Q.   -- after it had been loaded in -- I
7    mean, you obviously assigned field names to each
8    one of these records.
9            Does this appear to match with what
10   you had done?
11       A.   It would be in the same format as the
12   GABA dot text file.
13       Q.   And if you wanted to verify that this
14   was, in fact, the data for that particular
15   patient, that wouldn't be particularly difficult
16   for you to do, correct?
17       A.   No.
18       Q.   Okay.
19       MS. McGRODER:  Well, if he has the disk, and
20   he does it or --
21       MR. ALTMAN:  He has got the FORTRAN data.
22   I'm saying if he wanted to sit and take this
23   data -- I mean, he can't do it right here right
24   this second.  Although, he could --

799

1    MS. McGRODER:  That's my only point.
2    MR. ALTMAN:  -- if he wanted to satisfy
3    himself on my computer, I could certainly make
4    that available.
5    BY MR. ALTMAN:
6        Q.   But if you went back to your office,
7    it wouldn't take you more than a few seconds to
8    sit and verify this is the data for that patient,
9    correct?
10       A.   That's correct.
11       Q.   Okay.  Now, this shows here that this
12   patient is 36 years old, correct?
13       A.   Yes.
14       Q.   And is a sex of one which is a male,
15   correct?
16       A.   I believe so.
17       Q.   All right.  And these are all
18   diagnostic codes.  That's what type D means,
19   correct?
20       A.   Correct.
21       Q.   And the index date for this person is
22   June 16th of 2001; is that correct?
23       A.   Yes.
24       Q.   Okay.  I'd like you to take the next

800

1    two pages.  You might want to -- it might be
2    easier for you to separate them out because this
3    is the PharMetrics database.  You might want to
4    just separate them so you can look at the two at
5    the same time.
6        Now, this is -- I will represent to
7    you that the diagnostic information and the
8    patient information for a particular patient out
9    of the PharMetrics database.  At the top, if you
10   look at the data, this person is, in fact, a
11   male, correct?
12       MS. McGRODER:  Well, object to foundation
13   for the use of this document.
14       MR. ALTMAN:  It's a printout from the
15   PharMetrics database that he provided.
16       MS. McGRODER:  You know, without belaboring
17   it, I don't think that's the way that you
18   described Exhibit 42 as a printout from the
19   PharMetrics database unless I am misremembering.
20       MR. ALTMAN:  I didn't say what it was.  I
21   said it was a number of different things.
22       MS. McGRODER:  Right.
23       MR. ALTMAN:  It was three different things.
24       MS. McGRODER:  So I object to the foundation

801

1    for use of this document.
2        MR. ALTMAN:  Okay.  That's fine.
3    BY MR. ALTMAN:
4        Q.   This is from -- this is from the
5    PharMetrics database.
6        Do you see at the top that for this
7    particular patient it's a male; is that correct?
8        A.   Yes.
9        Q.   And that matches up with your FORTRAN
10   person, correct?
11       A.   It matches with the file that you have
12   represented to me is a printout of GABA dot text
13   for this subject.
14       Q.   Understood.  And the index date here
15   is June 16, 2001; is that correct?
16       A.   That's correct.
17       Q.   And that's the same as the printout
18   from the FORTRAN data, correct?
19       A.   It's the same as the printout that you
20   have represented to me is the data FORTRAN --
21       Q.   I understand.
22       A.   -- is the data that I used in the
23   FORTRAN programs.
24       Q.   And the age is 36, and that also

802

1    matches, correct?
2        A.   Correct.
3        Q.   Okay.  Now, I'd like you to go down
4    and take your first -- your FORTRAN data, the
5    FORTRAN data first record is 8/24/2000.
6        You have identified as pain -- as
7    pain, correct?
8        MS. McGRODER:  Well, again, I'm just going
9    to -- can I just have a running objection to
10   foundation for the rest of these documents?
11       MR. ALTMAN:  That's fine.  There's no other
12   way to do this other than this way.  I
13   understand.
14   BY MR. ALTMAN:
15       Q.   On 8/24 in your FORTRAN data is pain,
16   correct?
17       A.   It would be easier if you would -- I
18   mean, since I can't tell -- first of all, there
19   isn't anything called FORTRAN data, and,
20   secondly, you have represented to me that you
21   have printed some records out of the file
22   that I have given to you called GABA dot text,
23   and I can't verify that.
24       I mean, you might have made up all of

803

1    these numbers.  I don't think you made up all
2    these numbers, but you might have.  So is there a
3    language you can use that implies that what you
4    are giving to me here as what you are referring
5    to as my FORTRAN data, which may or may not be
6    my -- the dataset that I used in -- in
7    constructing my FORTRAN program, you know, can
8    you just use the language so that I don't have
9    keep going back and saying --
10       Q.   That's fine.  What --
11       A.   -- what you are representing to me?
12       Q.   Why don't we just call it the first
13   page of -- the second page from Exhibit 42.  How
14   does that sound?
15       A.   It works for me.
16       Q.   Okay.  The second page of Exhibit 42.
17   The first record there is on 8/24/2000 is pain,
18   correct?
19       A.   Correct.
20       Q.   The -- on the third page from the
21   PharMetrics database, if we scroll down on to the
22   group, the first one that says pain it's also
23   8/24/2000, correct?
24       A.   Correct.

804

1        Q.   That matches between the two, correct?
2        A.   That's correct.
3        Q.   The next one is on 9/25/2000 is pain,
4    correct?
5        A.   Correct.
6        Q.   Do you see those records match up?
7        A.   I do.
8        Q.   Okay.  I will represent to you they
9    all match up.  You can satisfy yourself.
10           Do you have any reason to suspect that
11   they don't match up based on what you have seen
12   here?
13       A.   Not based on what I have seen here.
14       Q.   Okay.  So can we agree that these
15   appear to be the same person?
16       A.   They appear to be the same person.
17       Q.   Good.  So we don't have to go through
18   that.
19           Now, I would like you to scroll
20   down -- if you take the -- go to the fourth
21   page -- I'm sorry -- the last -- the second page
22   of the PharMetrics data.  You have got it in your
23   hand, the other one.
24           I would like you to scroll down to the

805

1    bottom where is it says 29683.  Do you see that?
2            It's the one that's got a blank for
3    the description.
4            Do you see that's 29683?
5        A.   I do.
6        Q.   The first page from this exhibit,
7    there was no code for 29683 for bipolar disorder,
8    correct?
9        A.   Correct.
10       Q.   Okay.  Now, I would like you to go in
11   your data to that same date -- your data -- I'm
12   sorry.  The second page of Exhibit 42 on
13   10/30/2001.  It's about eight up from the bottom,
14   do you see that in the second page of two
15   thousand -- of Exhibit 42 that code on that date
16   is called bipolar, BPLD.
17           Do you see that?
18       A.   I do.
19       Q.   Okay.  So this particular patient the
20   data, as you and Dr. Hur worked with it, you
21   consider that person to be bipolar based upon
22   this, correct?
23       MS. McGRODER:  Well, object to form and
24   foundation.

806

1    BY THE WITNESS:
2        A.   The SAS code that designated anything
3    with 2968 would have classified this patient who
4    had 29683 and a blank descriptor as bipolar,
5    that's correct.
6    BY MR. ALTMAN:
7        Q.   And that is not a valid ICD code for
8    bipolar disorder, correct, according to the
9    PharMetrics database?
10       MS. McGRODER:  Object to form and
11   foundation.
12   BY THE WITNESS:
13       A.   I would have to consult with the
14   people at PharMetrics to find out what the --
15   what the meaning of 29683 was.  They represented
16   to us that those would be the codes with any
17   extension would be bipolar disorder.  I don't
18   know why they did that.
19           Maybe it was purely a mistake.  Maybe
20   it was -- maybe it's a valid code.  I don't know.
21   I would have to go back and consult with them
22   about that.
23   BY MR. ALTMAN:
24       Q.   Do you have any idea how many codes

807

1    there are in the PharMetrics database which don't
2    match up -- how many diagnostic codes there are
3    actually assigned to patients that don't match up
4    to the ICD -- the list of ICD codes provided by
5    PharMetrics?
6        MS. McGRODER:  Well, object to form,
7    improper hypothetical, assumes facts not in
8    evidence, and calls for speculation.
9    BY THE WITNESS:
10       A.  I don't have any way of knowing that
11   sitting here right now.
12   BY MR. ALTMAN:
13       Q.  But you could have determined that,
14   correct?
15       MS. McGRODER:  Same objection.
16   BY THE WITNESS:
17       A.  It could be determined.  We would have
18   to go to a list of all ICD 9 codes and compare
19   that.  The data that we received from PharMetrics
20   did not have all ICD 9 codes.  So we would have
21   to go ahead and do that kind of verification.
22   BY MR. ALTMAN:
23       Q.  And I believe it's Exhibit -- is it
24   41?  Maybe it's not.

809

1    very simple join between that and the master list
2    of ICD codes that PharMetrics provided as one of
3    the subsidiary tables, correct?
4        MS. McGRODER:  Object to form.
5    BY THE WITNESS:
6        A.  That could be done.
7    BY MR. ALTMAN:
8        Q.  And if you do an outer join, you would
9    be able to see which records don't actually match
10   up to one of the PharMetrics ICD 9 codes,
11   correct?
12       MS. McGRODER:  Object to form.
13   BY THE WITNESS:
14       A.  What you are saying theoretically
15   sounds reasonable.
16   BY MR. ALTMAN:
17       Q.  Have you ever done that kind of
18   comparison between data tables?
19       A.  Not to my knowledge.
20       Q.  Do you have any idea how long it would
21   take to do it?
22       A.  No.
23       Q.  Do you think it would take a long
24   time?

808

1        A.  This is Exhibit 41 (indicating).
2        Q.  Yeah, Exhibit 41 that same listing
3    that only -- only provided counts for ICD codes
4    that fell into your grouping.  You could do the
5    same thing for all ICD codes whether it was in
6    your grouping or not, correct?
7        MS. McGRODER:  Object to form and
8    foundation.
9    BY THE WITNESS:
10       A.  I don't understand your question.
11   BY MR. ALTMAN:
12       Q.  Okay.  We talked about running a
13   select diag count star, you know, to count how
14   many times each diagnostic code showed up within
15   the patient data, correct?
16       A.  That's correct.
17       MS. McGRODER:  Well, object to form.
18   BY MR. ALTMAN:
19       Q.  And we could run that for all
20   diagnostic codes, not just limited to the ones
21   that happen to fall into the groups as you
22   assigned them, correct?
23       A.  Correct, that could be done.
24       Q.  And then you would just simply do a

810

1        MS. McGRODER:  Well, objection, calls for
2    speculation.  You just asked him if he knew and
3    he said no.
4        MR. ALTMAN:  I'm asking him if he has an
5    opinion of how long it might take.  That's not
6    the same thing.
7    BY THE WITNESS:
8        A.  I don't know specifically.
9    BY MR. ALTMAN:
10       Q.  Do you think that it's good practice
11   when you work with a dataset to check to make
12   sure that you have valid data?
13       A.  I think there are in a dataset of this
14   size so many different kinds of checks that can
15   and have been made, and at some point, you know,
16   there may be checks that in retrospect you might
17   want to have made that didn't make.  There are
18   lots and lots of possibilities.
19       You are dealing with medical claims
20   data that are subject to errors.  Some of these
21   we expect to be cleaned out and verified by
22   PharMetrics.  We spoke about in our last
23   deposition a patient who appeared to have made
24   suicide attempts on four consecutive days, and

811

1    that's a -- that's a question mark about those
2    data.
3           It's the nature of dealing with
4    medical claims data that there are going to be
5    uncertainties associated with them.  There are
6    going to be some inconsistencies.  One of the
7    advantages of having such large numbers is that
8    you -- most of those kinds of anomalies tend to
9    wash out.  They don't have an undue influence on
10   the overall results of the analysis.  So that's
11   one of the reasons we do sensitivity analysis.
12      Q.   What validity checks did you actually
13   run off of the PharMetrics data?
14      A.   Sitting here right now, I can't
15   remember.
16      Q.   Did you do the validity checks of the
17   data?
18      A.   I worked with Dr. Hur.  We went
19   through and screened the data, made sure that we
20   were getting consistent results.  I don't
21   remember all of those analyses.  Those were done
22   some time ago.
23      Q.   Was any records kept of those
24   analyses?

812

1      A.   Not to my knowledge.
2      Q.   Would Dr. Hur be in a better position
3   to talk about what kind of validity checks were
4   run upon the data?
5      A.   I don't think so.
6      Q.   Did Dr. Hur run any of these validity
7   checks on his own not sitting with you?
8      A.   I don't recall at this moment whether
9   everything was done together, whether or not we
10   sent out a list of things to -- to evaluate or
11   not.
12      Q.   If you had sent out a list, how would
13   you have done it by e-mail?
14      A.   No, no, just sitting and talking
15   together.  I promise you that, as you look
16   through these datasets, you will find anomalies.
17   I can go back, and I will find additional
18   anomalies.  There -- you know, these are -- we
19   are talking about millions and millions of
20   records.
21      Q.   Dr. Gibbons, I am going to hand you.
22
23
24

813

1           (WHEREUPON, a certain document
2           was marked Gibbons Deposition
3           Exhibit No. 47, for
4           identification, as of 3/5/09.)
5   BY MR. ALTMAN:
6      Q.   Dr. Gibbons, I am going to hand you
7   what's been marked as Exhibit 47 which is -- a
8   few weeks ago Lori McGroder sent us an e-mail
9   with an updated version of your November 5th,
10   2008 expert report at which you made two
11   corrections based upon our last deposition.
12         Does this appear to be that?  I think
13   one of them was you changed the other psychiatric
14   and antipsychotic number from to 81.6 to 16.2,
15   and you changed in Table 2 the all number from
16   1.22 to 1.23; is that correct?
17      A.   That's my memory, yes.
18      Q.   Okay.  Does this appear to be the
19   revised report?
20      A.   Yes, it does.
21      Q.   Okay.  Let's put that aside for a
22   second.
23      MS. McGRODER:  Oh, you did mark that?
24      MR. ALTMAN:  Yes.  It's 47.

814

1      MS. McGRODER:  Thank you.
2      MR. ALTMAN:  Mark the next exhibit.
3           (WHEREUPON, a certain document
4           was marked Gibbons Deposition
5           Exhibit No. 48, for
6           identification, as of 3/5/09.)
7   BY MR. ALTMAN:
8      Q.   Dr. Gibbons, the first two pages of
9   what I provided to you as Exhibit 48 --
10   Dr. Gibbons?
11      A.   Yes.
12      Q.   Do you have the --
13      A.   Oh, I am sorry.
14      Q.   That's okay.  The first page of
15   Exhibit 48 was provided on the FORTRAN disk was
16   listed as PGMS3 dot SAS which appeared to take
17   the bipolar -- take the bipolar data -- I'm
18   sorry -- take the gabapentin cohort data and kind
19   of generate the results for the last column of
20   Table 2 in your expert report that I just handed
21   to you; is that correct?
22         And what I have given you as the next
23   page is the output if you run that program.
24      A.   Okay.  I mean, I -- I have no reason

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

815

1   to disbelieve that.  I mean, this looks like the
2   kind of program that we use to take the parameter
3   estimates and convert them to risk ratios and
4   corresponding confidence intervals by
5   exponentiating the -- the model parameters.
6        Q.   Okay.  Go to the second page there,
7   please.
8        MS. McGRODER:  Okay.  I'm sorry.  I have the
9   same question.  Is this -- you ran the SAS
10  program and printed it out --
11       MR. ALTMAN:  I ran the -- I ran the SAS
12  program --
13       MS. McGRODER:  Okay.
14       MR. ALTMAN:  -- but you could do this with a
15  calculator, and, you know, I brought two with me
16  and you can --
17       MS. McGRODER:  I'm not questioning your
18  quality -- your qualifications to do it or your
19  ability.  I just wondered --
20       MR. ALTMAN:  No, just if Dr. Gibbons would
21  feel more comfortable, you know, going through
22  this program and taking like the formula and
23  punching the numbers himself on the calculator
24  here, I would oblige you.

816

1   BY MR. ALTMAN:
2        Q.   All I'm saying is that I ran the
3   SAS program and what you see there is the output,
4   and I notice that for the all group which is I
5   assume A-L here, it says 1.22618, and when you
6   had originally done the paper, you had put down
7   1.22, and then you corrected it to quote 1.23,
8   correct?
9        A.   Correct.
10       Q.   Okay.  Take a look at the bipolar
11  number there at the top.  It's .99535.  If you
12  were going to round that to two decimal places,
13  what does that round to?
14       A.   To one.
15       Q.   To one, correct?
16            Why did you put .99 on Table 1 -- on
17  Table 2 in your expert report?
18       A.   Sitting here right now, I don't -- I
19  can't tell you why.
20       Q.   That has a difference in meaning if
21  it's .9 or 1.0 at least in the hypothetical world
22  of statistics, doesn't it?
23       A.   I don't think -- I don't think a
24  statistician would make much of a difference

817

1   between 1.0 and .99.  Maybe -- maybe a lawyer
2   would.
3        Q.   Well, you have made -- you certainly
4   as a statistician have made a point that when it
5   includes 1.0, that you can't claim statistical
6   significance, correct?
7        A.   Well, you're -- you are right at --
8   when it overlaps 1.0, I mean, you were right
9   on -- right on the border essentially of the 5
10  percent level.
11       Q.   Was there any intentional reason why
12  you left it as .99 instead of 1.0?
13       A.   No.
14       Q.   And if you go to page 3 and 4 of
15  Exhibit 48 which is in your hand, I have actually
16  made a slight modification to your program where
17  it actually rounds it to two decimal places, and
18  you can see the output of that, and clearly those
19  generate 1.0, correct?
20       A.   If the number is .995, then that's the
21  number that it should generate.  I don't know --
22  again, I don't know if this was taken out and
23  there were less decimal places reported when I
24  looked at the -- when I looked at the parameter

818

1   estimates and just exponentiated them on my
2   calculator and didn't use this to prepare the
3   table.  I just don't remember.
4            That would be one way.  If I had
5   rounded something to less than four decimal
6   places or been given that and then just
7   exponentiated that, but there wasn't any
8   intentional reason.
9        Q.   Well, didn't the output files from SAS
10  where you got these numbers from give you
11  everything and calculate these for you to four
12  decimal places?
13       A.   Well, the -- you know, again, the
14  tables that, you know, were abstracted from that,
15  yes, the -- they would have.  I mean, they would
16  have probably had these beyond four decimal
17  places.  I'm assuming that there may have been
18  some rounding here as well just to put it into
19  this program.
20            I just don't remember if an output
21  like what you ran here was the basis for using --
22  for putting in the upper confidence limits or the
23  confidence intervals or whether it was, you know,
24  done by hand.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

819

1    Q.  Bear with me a second, please.

2    THE WITNESS:  I can write on these things,

3    can't I?

4    MR. ALTMAN:  Well, if you write on them,

5    they are going to be -- wind up being just part

6    of the exhibits.  I certainly don't mind that.

7    THE WITNESS:  Okay.

8    BY MR. ALTMAN:

9    Q.  Dr. Gibbons, and, you know, I know you

10   want to look through that data over there and

11   maybe, you know, we can come back to that in

12   another point in time --

13   A.  Sure.

14   Q.  -- but you provided -- as part of the

15   additional information that came after your last

16   deposition, you provided the outputs from running

17   the various different programs, correct?

18   MS. McGRODER:  Among other things.

19   BY THE WITNESS:

20   A.  Yes.

21   BY MR. ALTMAN:

22   Q.  You provided the outputs, correct?

23   A.  Yes.

24   Q.  I will represent to you that those

820

1    were provided to four decimal places.  So if

2    those are the outputs, these are just simple

3    copies of the outputs that came straight from

4    the -- straight from the data you provided.

5    Do you have any reason to dispute

6    that?

7    MS. McGRODER:  Object to form and

8    foundation.

9    BY THE WITNESS:

10   A.  If I -- if you show me the output and

11   it has the same numbers as what were put in here,

12   then, you know, I have no reason to dispute it.

13   BY MR. ALTMAN:

14   Q.  Let me see if I can zoom in there.

15   Are you able to read that,

16   Dr. Gibbons?

17   A.  Yes, I can see it.

18   Q.  Minus 0.4194.

19   THE COURT REPORTER:  I'm sorry?

20   BY MR. ALTMAN:

21   Q.  Minus 0.4194.

22   MS. McGRODER:  Object to form and

23   foundation.  Do you -- maybe it is just because

24   I'm not an insider on this, but I don't even know

821

1    what you are showing him.  Could you identify

2    that for the record?

3    BY MR. ALTMAN:

4    Q.  You provided a file called GABAMODEL1

5    dot doc as the output file from when you ran the

6    GABAMODEL1 program, and so what we looking at

7    here is the data, and you can see it's minus

8    0.4194, correct?

9    A.  Correct.

10   MS. McGRODER:  Object to foundation.

11   BY MR. ALTMAN:

12   Q.  And the standard error there is

13   provided as 0.2116, correct?

14   MS. McGRODER:  Same objection.

15   BY THE WITNESS:

16   A.  Correct.

17   BY MR. ALTMAN:

18   Q.  And that's the same as the two digits

19   that you have in your data over there, correct?

20   A.  That's correct, but I would also like

21   to point out that the probability value

22   associated with that effect from the model is

23   .0474 which is less than .05.

24   So my conclusion of an effect that is

822

1    significant in the direction of lower rates of

2    suicide attempts is consistent with the

3    probability value associated with that effect.

4    MR. ALTMAN:  Objection, non-responsive.

5    BY MR. ALTMAN:

6    Q.  When we talked about the one

7    individual before with that 29683 code, as you

8    sit here right now, you don't know how many times

9    you used invalid codes for given patients, do

10   you?

11   MS. McGRODER:  Object to form and

12   foundation.

13   BY THE WITNESS:

14   A.  No. 1, I don't know that 29 -- I'm

15   sorry -- 29683 is an invalid code, and if it --

16   and I do not know sitting here how many times

17   29683 appeared in the database.

18   BY MR. ALTMAN:

19   Q.  But that would potentially alter those

20   numbers, couldn't it?

21   A.  If the code 29683 is an invalid

22   code -- remind me what 29683 is for?

23   Q.  Well, you called it a bipolar, and if

24   there were somewhat less people there, that could

823

1 change your confidence interval, couldn't it?
2    MS. McGRODER:  Object to form, foundation,
3 improper hypothetical, calls for speculation, and
4 assumes facts not in evidence.
5 BY THE WITNESS:
6    A.  Again, if -- if, in fact, 29683 is not
7 an index of bipolar disorder and I called it an
8 index of bipolar disorder, then the data for that
9 subject would have been included in the data for
10 bipolar disorder, and to some extent, probably
11 proportional to the number of cases of 29683, it
12 would change the estimates associated with the
13 subanalysis that was done for bipolar disorder.
14 BY MR. ALTMAN:
15    Q.  And even -- and even changing one
16 patient potentially worse -- potentially could
17 change that confidence interval so that it is
18 over one and not .9953, correct?
19    MS. McGRODER:  Object to form, foundation,
20 improper hypothetical.
21 BY THE WITNESS:
22    A.  It could go either way.  It could make
23 it so that it's, you know, less.  It could make
24 it that it's more.  It's hard for me to imagine

824

1 in a sample of that size one patient's data
2 making much of a difference, but, again, as I
3 said before, it's proportional to the number of
4 those.
5 BY MR. ALTMAN:
6    Q.  But you don't know how many patients
7 there were with this problem, correct?
8    A.  I don't know that it is a problem, and
9 I don't know how many patients there were with a
10 code of 29683.  For me to determine if it was a
11 problem, I would have to go back to the folks at
12 PharMetrics and say why did you put that 29683 in
13 my nice database.
14    Q.  And once, again, you didn't look to
15 see how many invalid -- how many -- the number --
16 not necessarily how many of each, but the number
17 of different codes in the diagnosis data that
18 don't match up to an ICD code as provided by
19 PharMetrics, correct?
20    MS. McGRODER:  Well, object to form and
21 foundation and asked and answered four times.
22 BY MR. ALTMAN:
23    Q.  Do you have any intention of going
24 back and checking this issue out now that I have

825

1 brought it to your attention?
2    A.  Yes, I'd like to.
3    Q.  Okay.  Over the last several weeks, I
4 have been receiving a number of sensitivity
5 analyses from you which I assume -- well, from
6 Ms. McGroder which I'm assuming that you provided
7 to her; is that correct?
8    A.  I don't -- I don't brush my teeth in
9 the morning without sending you a file.
10    MS. McGRODER:  Pretty white.
11 BY MR. ALTMAN:
12    Q.  Did you work with Dr. Hur on any of
13 these sensitivity analyses?
14    A.  I did.
15    Q.  Did you work with Dr. Hur on both the
16 bipolar and the gabapentin sensitivity analyses?
17    A.  Yes.
18    Q.  Will you be paying Dr. Hur for his
19 work on the gabapentin sensitivity analyses?
20    A.  I plan to.
21    Q.  At your last deposition we discussed
22 bipolar sensitivity analyses, but we did not
23 discuss any gabapentin sensitivity analyses.
24       At the time of your last deposition,

826

1 had you done sensitivity analyses of the
2 gabapentin collection?
3    MS. McGRODER:  Well, object to form just to
4 the extent it misstates the record.
5    MR. ALTMAN:  Well, if I have misstated the
6 record, then please correct me.
7 BY THE WITNESS:
8    A.  I think --
9    MS. McGRODER:  Well, he would have to get
10 out the deposition and review it in total.  So I
11 objected just to the extent that it does.  You
12 can still ask the question, and he can still
13 answer it.
14    MR. ALTMAN:  No, that's fine.  Then let's
15 ask it a different way.
16 BY MR. ALTMAN:
17    Q.  You do recall that we discussed
18 sensitivity analyses you ran for the bipolar
19 cohort, correct?
20    A.  Yes.
21    Q.  Do you recall if we discussed any
22 sensitivity analyses you ran for the gabapentin
23 cohort?
24    A.  I think I in my deposition referred to

827

1  sensitivity analyses in general that applied --
2  some in general that applied to both gabapentin
3  and the bipolar cohort, but I don't remember
4  specifically right now.  I would have to go back
5  through my deposition.
6      Q.  Okay.  Maybe we will wind up doing
7  that after lunch.
8      Before your last deposition, had you
9  run gabapentin cohort sensitivity analyses?
10     A.  I don't recall.  I think so, but I
11  don't recall.  I mean, some of the sensitivity
12  analyses I have run, you know, were sent to you
13  within the last couple of days because, you know,
14  in going through and looking them over, I said I
15  want to do it this way as well.  I wanted to make
16  sure that you had the full benefit of those
17  analyses.
18     MS. McGRODER:  Can we take a break, Keith?
19  It's been about two hours.
20     MR. ALTMAN:  Well, that's true.  Okay.
21  Let's go off.
22     THE VIDEOGRAPHER:  Off the record at 10:51.
23     (WHEREUPON, a recess was had at
24         10:51 a.m. until 11:08 a.m.)

828

1  THE VIDEOGRAPHER:  We are back on the record
2  at 11:08.
3      (WHEREUPON, certain documents
4      were marked Gibbons Deposition
5      Exhibit Nos. 49, 50, for
6      identification, as of 3/5/09.)
7  BY MR. ALTMAN:
8      Q.  Dr. Gibbons, I am going to hand you
9  what's been marked as Exhibit 49.
10     MS. McGRODER:  Thank you.
11  BY MR. ALTMAN:
12     Q.  And we are not really going to spend
13  any time with this other than the fact that this
14  was just the transmittal e-mail that Lori
15  McGroder when she sent your original -- your
16  original sensitivity analyses to me.  Just so we
17  can kind of put some dates -- put those dates
18  into context.
19     I am going to hand you Exhibit -- I'm
20  going to hand you next Exhibit 51.  We are
21  skipping -- I have something marked as 50, and we
22  will come back to it, but right now this is 51.
23
24

829

1      (WHEREUPON, a certain document
2      was marked Gibbons Deposition
3      Exhibit No. 51, for
4      identification, as of 3/5/09.)
5  BY MR. ALTMAN:
6      Q.  And this is a document that was sent
7  to us that is supposed to be a description of
8  each of the sensitivity analysis data files as
9  well as the original data files; is that correct?
10     A.  Yes, it's correct.  It also proves I'm
11  a nice guy.
12     Q.  Okay.  Then I am going to hand you to
13  what has been marked as Exhibit 52.
14     (WHEREUPON, a certain document
15     was marked Gibbons Deposition
16     Exhibit No. 52, for
17     identification, as of 3/5/09.)
18     MS. McGRODER:  Thank you.
19  BY MR. ALTMAN:
20     Q.  Exhibit 52 -- one of the files that
21  you had provided that is mentioned in Exhibit 49
22  is a file called BP and GABA.zip.txt?
23     A.  Yes.
24     Q.  Which actually is a zip file, and was

830

1  just erroneously named with a dot txt extension
2  which we had to strip that out to be able to
3  unzip it but --
4      A.  The university does that
5  automatically.  It adds a text extension.  So
6  that it doesn't -- it will do that to executable
7  files and to zip files that could automatically
8  execute something.  So it -- it adds that.  So we
9  are always stripping that out as well.
10     Q.  Okay.  So I did the right thing, and
11  obviously that unzips, and what I have actually
12  provided to you as Exhibit 50 is the contents of
13  the zip file printed out from WinZip.
14     And does that Exhibit 50 appear to be
15  the things that were in that zip file?
16     A.  It seems to correspond with what you
17  have here in Exhibit 51.
18     Q.  Did I give you Exhibit 51?
19     A.  Yes.
20     Q.  Oh, you know, I had it out of order.
21  I'm sorry.  That's 51.
22     MS. McGRODER:  51 is this (indicating).
23     MR. ALTMAN:  Okay.  I screwed up my
24  numbering.  Hold on.  49, this is 52.  I put

831

1　things out of order.  That's 50 and that's 51.

2　Right.  Okay.  Sorry.  A lot of exhibits.

3　　　MS. McGRODER:  Okay.  I am sorry, but what

4　is Exhibit 50?

5　　　MR. ALTMAN:  I haven't given it to him yet.

6　　　MS. McGRODER:  Okay.  There you go.

7　　　MR. ALTMAN:  But it is an exhibit.  It will

8　come.

9　BY MR. ALTMAN:

10　　Q.  Dr. Gibbons, on Exhibit 52 this

11　contains the file dates of -- this contains the

12　file -- file names, file dates, file times, and

13　file sizes for the various files that were part

14　of that zip file, correct?

15　　A.  It has file dates.  Again, as we saw

16　in the other ones, I'm not sure that was the file

17　creation date or creating this -- this disk for

18　you.

19　　Q.  Well, do you -- of the SAS programs of

20　which there are some 20 of them, they are all

21　basically dated February 14th and February 15th.

22　　　Do you see that?

23　　A.  I do.

24　　Q.  And do you see that they are not in

832

1　really any one particular time, but they seem to

2　be, you know, most of the time several minutes

3　apart, not always but a lot of times several

4　minutes apart?

5　　A.  Yes.

6　　Q.  Were you working on these files on

7　February 14 and 15th?

8　　A.  Again, I don't recall what I was doing

9　on February 14th and 15th.  These were files that

10　were put together -- you know, many of these came

11　from the original analyses, and some of these

12　were in the sensitivity analyses, and we were

13　going through and verifying that they were

14　correct and making sure that you had all of them.

15　　　Some of them might not have been saved

16　originally were redone.  So I don't -- I don't

17　know what -- you know, if your question is do I

18　know that the file MONO1.SAS was originally

19　created on 2/14/2009 at 4:27 p.m., I don't know

20　the answer to that.

21　　Q.  Did you make -- strike that.

22　　　Did you work with Dr. Hur on February

23　14th and 15th in going through these SAS

24　programs?

833

1　　A.  I don't recall what I was doing on

2　February 14th and 15th or when these files or

3　these programs were originally worked on.

4　Dr. Hur and I went through and worked extensively

5　together to go over what the sensitivity analyses

6　would be, how to implement them, whether or not

7　they were being implemented correctly.

8　　Q.  How can we find out when these files

9　were originally created?

10　　A.  I don't know.

11　　Q.  And you have no actual records of when

12　you worked on the sensitivity analyses, correct?

13　　A.  Correct.

14　　Q.  Did you work with Dr. Hur on the

15　sensitivity analyses after your deposition in

16　last month?

17　　　MS. McGRODER:  Object to form.  Answer it if

18　you can.

19　BY THE WITNESS:

20　　A.  Yeah, there have been some sensitivity

21　analyses that I worked on over the last few days.

22　So some of these, you know -- I mean, we -- I

23　sent to Lori, you know, some of the materials and

24　then went back over some of those materials

834

1　and --

2　BY MR. ALTMAN:

3　　Q.  Is that -- is that Exhibit 50 with the

4　patient years?

5　　　MS. McGRODER:  Wait.  Were you finished with

6　your answer?

7　BY THE WITNESS:

8　　A.  Yeah --

9　BY MR. ALTMAN:

10　　Q.  Well, I just handed that to you

11　because that was the one that was just -- I

12　thought that would be helpful.  That was the one

13　that was just sent a couple of days ago.

14　　A.  There were three -- three iterations,

15　and -- and remember that I wanted to give you the

16　complete package including the other files that

17　you had -- had requested, and in going back over

18　the original package that was sent to you, I

19　noticed that one of the tables hadn't been

20　properly updated.

21　　　It had been copied over from the

22　original, but the sensitivity analysis that was

23　described in the heading actually those results

24　didn't correspond to it.  So another set was sent

835

1  to you, and then finally the last set, which I
2  think has to do with -- with this, is then, as I
3  was going through the bipolar sensitivity
4  analyses, I noticed that the results that were
5  reported to you were in people and not in person
6  years, and I wanted to see how they looked in
7  person years as well.
8        And so that was sent to you.  So those
9  are sort of the three waves as I recall them.
10     Q.  All right.  I'm going to hand you
11  what's been marked as Exhibit 53 and 54 which are
12  printouts from the files you sent called bipolar
13  analysis one -- Bipolar Analysis and Bipolar
14  Analysis 2.
15        (WHEREUPON, a certain document
16             was marked Gibbons Deposition
17             Exhibit No. 53, 54, for
18             identification, as of 3/5/09.)
19     MS. McGRODER:  Thank you.  So lithium
20  monotherapy is Exhibit 53?
21     MR. ALTMAN:  Well, they both -- they both
22  are.  These were the two separate files.  They
23  are labeled at the bottom.  If you look at the
24  bottom, it will tell you if it was Bipolar

836

1  Analysis or Bipolar Analysis 2.
2     MS. McGRODER:  Oh, I see.  I'm sorry.
3  Bipolar Analysis one is 53.  Okay.
4     THE WITNESS:  And the one that's listed as
5  Bipolar Analysis 2 is 54.
6     MS. McGRODER:  Thank you.  So I have two
7  Bipolar Analysis 2 is --
8     MR. ALTMAN:  Correct -- no.  You have two
9  twos?  Oh, did I give Jack two ones?
10     MS. McGRODER:  No, I have a one also.  Is
11  this just an extra?  This is not another exhibit,
12  right?  I have this (indicating).
13     MR. ALTMAN:  Oh, I didn't give one to Jack.
14  I'm sorry.
15     MS. McGRODER:  Okay.
16     MR. ALTMAN:  There we go.  Now we have got
17  it straightened out.
18  BY MR. ALTMAN:
19     Q.  Dr. Gibbons, you ran -- we are only
20  going to be talking about the bipolar sensitivity
21  analysis for a while.  So you don't have to worry
22  about the gabapentin cohort.
23        It appears that you ran this
24  sensitivity analysis for a drug versus no drug --

837

1  post-drug versus no drug, correct?
2     A.  Correct.
3     MR. ALTMAN:  Can you hand me the paper,
4  Jack.  It's about the middle of the stack.
5  BY MR. ALTMAN:
6     Q.  Dr. Gibbons, I am going to hand you
7  what has been marked as Exhibit 20 in your last
8  deposition which is the manuscript.
9        Before we get to talking about that,
10  have you received any news from any of the
11  journals concerning the manuscript?
12     A.  I did receive a letter from the
13  Archives of General Psychiatry regarding the
14  manuscript.
15     Q.  And what did they say?
16     A.  Revise and resubmit basically.
17     Q.  What did they ask you to revise?
18     A.  I --
19     MS. McGRODER:  Well, I object just to the
20  extent that those communications are
21  confidential.
22     MR. ALTMAN:  Lori, you cannot suggest that a
23  journal sending a request for Dr. Gibbons to
24  revise his report -- his manuscript is

838

1  confidential.
2     MS. McGRODER:  You just asked him what the
3  journal told him to revise, and that indeed is
4  confidential under the law that I sent you in my
5  letter of February approximately 10th.
6     MR. LONDON:  We will let the question
7  stand --
8     MR. ALTMAN:  Hold on.
9  BY MR. ALTMAN:
10     Q.  Dr. Gibbons, is Ms. McGroder
11  representing you in a legal capacity?
12     MS. McGRODER:  Well, object to form and
13  foundation.  Of course I'm not representing him.
14  I'm representing Pfizer, and he is an expert --
15     MR. ALTMAN:  Lori --
16     MS. McGRODER:  -- witness testifying on
17  behalf of Pfizer.
18     MR. ALTMAN:  Lori, let him -- Lori, let him
19  answer the question.
20     MS. McGRODER:  It's a legal conclusion --
21     MR. ALTMAN:  Lori --
22     MS. McGRODER:  -- and, no, he doesn't have
23  to answer.
24

839

1   BY MR. ALTMAN:

2       Q.  Did you retain Ms. McGroder or anybody

3   at Shook Hardy & Bacon to represent you?

4       A.  No.

5       Q.  Okay.  Are you aware that you are not

6   bound to comply with any instructions that

7   Ms. McGroder gives.  That you are free to answer

8   any questions that you choose to answer, correct?

9       MS. McGRODER:  Well, I object to that

10  lecture, and it calls for a legal conclusion --

11      MR. ALTMAN:  Lori --

12      MS. McGRODER:  -- and there's no foundation

13  for him to answer it, but you can answer it, if

14  you can.

15      BY THE WITNESS:

16      A.  I don't know the answer to that.  I

17  mean, I think that if counsel says we are

18  leaving, I am not going to sit here and stay.

19      BY MR. ALTMAN:

20      Q.  Okay.  I'm asking you now

21  notwithstanding anything counsel has said, will

22  you provide a copy of the letter from the journal

23  of -- The Archives of General Psychiatry as to

24  what they have asked you to revise?

840

1       A.  No.

2       Q.  Okay.  What is your basis for not

3   providing that?

4       A.  I view that as a confidential

5   communication just in the same way as if I'm a

6   reviewer on a -- on a paper, I would not want

7   my -- my scientific comments or review of an

8   article finding its way into -- into any other

9   forum than what it was intended for.

10      Q.  Well, you injected -- didn't you

11  inject your paper into the middle of this

12  litigation when you included -- when you included

13  findings from it in your expert report?

14      MS. McGRODER:  Object to form and

15  foundation, and if you can understand the

16  question, you can answer it.

17      BY THE WITNESS:

18      A.  I injected the overall results of the

19  paper as a corroboration of the gabapentin

20  analyses that were presented as the -- as one of

21  the primary tenets of my report, and I'll be

22  happy to provide the final version of the

23  manuscript, you know, once it's revised and

24  resubmitted to the journal or when it's published

841

1   or whatever counsel tells me is the appropriate

2   thing to do.

3       My personal view is, you know, that's

4   not something that I would be sharing, and I

5   wouldn't -- if I was in the other seat, I was one

6   of the reviewers or I was the editor of the

7   journal, I would feel uncomfortable sharing those

8   private comments to anybody else.

9   BY MR. ALTMAN:

10      Q.  You don't know --

11      A.  The reviews were actually very good.

12      Q.  You don't know who the peer reviewers

13  were, correct?

14      A.  I don't, but that could be -- you

15  know, we all know to some extent who we are, and

16  we all can tell who -- not everybody, but I

17  can -- I can probably tell you with close to

18  certainty who some of the reviewers are, sure.

19      Q.  And as you --

20      A.  And I know who the editor of the

21  journal is, and, you know, so it's a confidential

22  process.  I mean, if a judge tells me I order you

23  to give that material to you, then I will be

24  happy to do so.

842

1       MR. ALTMAN:  And I'm asking you to consider

2   doing that now because, Lori, you know, maybe on

3   a break you want to confer with Dr. Gibbons

4   because I can assure you that we will be filing a

5   motion seeking that production of that

6   information, and if we do get it, we will be back

7   here taking another deposition.

8       So I'm asking you to reconsider that

9   position.  Don't answer right now.  On a lunch

10  break, talk to Dr. Gibbons about it because I

11  cannot believe that Dr. Gibbons would sit here

12  and say that if a reviewer found that his paper

13  had flaws or some of the premises were wrong,

14  that that is not relevant to this litigation and

15  should be withheld from the jury, but you guys

16  considered that, and that's all I'm going to say

17  about it, and we will move on.

18      MS. McGRODER:  Well, you have made your

19  speech, and now I am going to respond to it.  I

20  don't need time to consider it.  I already told

21  you in the letter I sent you and cited the case

22  law that supports our position that the peer

23  review process is confidential.  It's considered

24  confidential by the courts.

843

1          There's no basis on which we have to
2      produce -- I, in fact, don't even have the
3      confidential comments from the peer reviewers,
4      and Dr. Gibbons feels that it's a scientifically
5      protected confidential process, and so it's up to
6      him whether he wants to give them to you or not.
7      He has said he does not, and I know that there is
8      legal support for our position.  So I don't need
9      to consider it.  If you need to file a motion, go
10     ahead.
11         BY MR. ALTMAN:
12         Q.   That's fine.  And so you won't even
13     tell us what they found was wrong with your
14     paper?
15         A.   I'm not even telling that to Lori.
16         Q.   Okay.  That's fine.  It's no problem.
17         A.   I will tell you that if they had found
18     critical flaws, I would not have been invited to
19     revise and resubmit.  I will tell you in
20     publishing well over 200 papers that I would --
21     you know, you always are asked to revise and
22     resubmit.  There's -- you will always find
23     something.
24         MR. ALTMAN:  Let's go off the record.  We

844

1      are going to call the Court because Dr. Gibbons
2      in making the statement he just made that if
3      there were any critical flaws, that they would
4      not have been invited to publish it, has now
5      injected their comments into the thing.  I think
6      we should call the Court --
7          MR. LONDON:  Let's confer.
8          MR. ALTMAN:  Let's confer.  We are going off
9      the record.
10         MS. McGRODER:  You are conferring or you
11     want to confer with me?
12         THE VIDEOGRAPHER:  This is the end of tape
13     No. 2.  We are off the record at 11:24.
14             (WHEREUPON, a recess was had at
15             11:24 a.m. until 11:28 a.m.)
16         THE VIDEOGRAPHER:  This is the beginning of
17     tape No. 3.  We are back on the record at 11:28.
18         BY MR. ALTMAN:
19         Q.   Dr. Gibbons, would you go to Table 2
20     on page 29 of 36 in your manuscript.  The
21     sensitivity analyses that you did for the bipolar
22     all revolve around the first column on this Table
23     2, correct?
24         A.   That's correct.

845

1          Q.   Why didn't you do any sensitivity
2      analyses for the last column of Table 2?
3          A.   These were the -- you know, it just
4      seemed like the -- well, for one, the manuscript
5      would be way too long if we kind of reproduced
6      this over and over and over again.  That seemed
7      to be one of the key analyses to look at; namely,
8      the between subject analysis in term of those
9      people who took a drug versus those people who
10     didn't take a drug.
11         For the purpose, of the paper, you
12     know, I wouldn't even put in the drug-specific
13     effects.  It will probably just be a discussion
14     of the NE AED comparison.  So it's not like we
15     are redoing everything.  We are just doing
16     sensitivity analyses to look at whether or not
17     some major findings of the paper are subject --
18     do they change when we -- we add additional
19     conditions.
20         The other part answer to that question
21     is the sensitivity analyses for the bipolar were
22     using the new monotherapy definition which limits
23     the analysis to a single suicide attempt for each
24     individual.  It would be invalid to do that with

846

1      the post-drug versus predrug since there's a
2      period before and after that you want to -- you
3      know, that has to be done with all of the
4      people -- I'm sorry -- with the multiple suicide
5      attempts.
6          Q.   Okay.  I'm a little bit confused right
7      now.
8          Which of the findings -- going to
9      Table 2, just take your paper as it is right now,
10     which are the items here that support your
11     opinion that gabapentin and some of the other
12     anticonvulsants are protective of suicide?
13         MS. McGRODER:  Object to form.
14         BY THE WITNESS:
15         A.   So first of all and let me reiterate,
16     the key conclusions I have about the effect of
17     antiepileptic drugs and suicide attempts is that
18     antiepileptic drugs do not increase the
19     likelihood of a suicide attempt.
20         The results of the analysis indicate
21     that overall as a group, there is no significant
22     difference between those people who are on any
23     antiepileptic drug versus those people who are
24     not.  And the event rate ratio for that is .88,

847

1     and it's not statistically significant.

2            Further analysis -- so that comes out

3     of column one.  Further analysis in column two

4     indicates that those patients who ultimately get

5     an antiepileptic drug are almost at five times

6     the increased risk of a suicide attempt before

7     they ever get the drug.  So it indicates that

8     there is a selection effect, and that that

9     selection effect is that the more severely ill

10    patients or at least those patients who have

11    increased risk of suicide -- suicide attempts

12    prior to the initiation of pharmacotherapy that

13    those -- that risk, that increased risk prior to

14    taking the drug is either significantly reduced

15    or completely eradicated following taking the

16    drug.

17           And then finally, and I don't know if

18    it's in here -- oh, yeah, yeah.  The bottom

19    column of table -- I'm sorry -- bottom row of

20    Table 2 where it says "AED only," this is the

21    group of people who only took an AED.  They

22    didn't take -- so it was AED monotherapy, no

23    concomitant antidepressant, antipsychotic, or

24    other antiepileptic drug as compared to those

848

1     people who took absolutely nothing, none of those

2     categories.

3            And in that group -- bless you --

4     there is a significantly lower rate relative to

5     the -- to the no drug group, and the effect is

6     highlighted in terms of rate per person per

7     thousand person years back in Table 1 where we

8     have a rate -- a rate for the 11 AED only, the

9     fourth row from the bottom of Table 1 of three

10    per thousand patient years relative to a no

11    medication rate of 15 per thousand patient years.

12           So that is the primary between subject

13    analysis that supports the idea that there is a

14    statistically significant -- significantly lower

15    rate among those people who are treated with an

16    antiepileptic drug relative to those people who

17    receive no treatment despite the fact that in

18    those same individuals, the rate was much higher

19    than the rate of no treatment:  44 per 1,000

20    patient years versus 15 per 1,000 patient years

21    prior to their initiation, and it went from 44

22    per 1,000 down to three per 1,000 following the

23    initiation of treatment.

24           So those are the various findings in

849

1     the paper that lead one to the conclusion that

2     there may be, in fact, a protective effect of

3     these drugs.

4            Now, the sensitivity analyses are

5     designed to try to understand whether or not that

6     kind of an effect can be -- we can derive any

7     kind of causal inference for.

8     BY MR. ALTMAN:

9      Q.   Now, you say on page 35 and 36 the

10    next to last page, you make the statement:  "If

11    anything, the effects of most" -- I'm sorry.

12    It's on the next to last page.  There you go.

13    Right there.

14           You say in the second sentence in the

15    last paragraph:  "If anything, the effects of

16    most AEDs and lithium are to reduce suicide

17    attempt rates relevant to pretreatment levels in

18    those patients who are ultimately prescribed

19    those drugs."

20           Did I read that correctly?

21     A.   Yes, you did.

22     Q.   That's the pre versus post comparison,

23    correct?

24     A.   Yes, it is.

850

1      Q.   Okay.  Why didn't you run any

2     sensitivity analyses to see whether that

3     proposition was affected by the sensitivity

4     analyses?

5      A.   Well, the sensitivity analyses that

6     were included in the -- that were included or

7     will ultimately be included in this paper and

8     that I -- you know, that I shared with you

9     actually do some of that.  The analyses using the

10    person-time analyses which treat each month as an

11    observation period of exposure to the drug and

12    suicide attempt that preserve the multiple

13    suicide attempts in the analysis go at long

14    lengths to provide more information on the post

15    versus predrug kind of analysis.

16           The post versus predrug analysis

17    requires that you keep the multiple suicide

18    attempts in the analysis.  The primary suicide --

19    the primary analyses or at least the first three

20    major sensitivity analyses use a logistic

21    regression.  They only consider a single suicide

22    attempt for each individual because they invoke

23    this new monotherapy distinction where in the

24    event of a suicide attempt, monotherapy is

851

1    defined prior to the suicide attempt.
2         You can't do that if you have multiple
3    suicide attempts, and you can't do the pre versus
4    post if you get rid of the multiple suicide
5    attempts.  So the different sensitivity analyses
6    provide information about different pieces of the
7    analysis.  The first three -- I think the first
8    three there's the new monotherapy which also adds
9    in looking at a single suicide attempt for each
10   individual, gets around the question about
11   multiple suicide attempts like on the same, you
12   know, consecutive days, and those sorts of
13   things.
14        The second one being duration of 30
15   days or more cumulatively over the first year,
16   and the third sensitivity analyses of throwing
17   out all suicide attempts that occurred on the
18   index date to get a sense of how big -- how do
19   things change when you -- when you exclude those
20   people.  Those analyses really pertain largely to
21   the post-drug versus no drug.
22        MR. ALTMAN:  Objection, non-responsive.
23        BY MR. ALTMAN:
24        Q.   My question to you is why didn't you

852

1    run sensitivity analyses for the pre versus post?
2         MS. McGRODER:  Objection, asked and
3    answered.
4         BY THE WITNESS:
5         A.   And I answered your question that I
6    did.  The SuperMix analyses that are included
7    have a component of that analysis which is
8    exactly predrug versus post-drug, and, secondly,
9    the sensitivity analyses that I ran specifically
10   on the post-drug versus no drug could not be run
11   on the post-drug versus predrug because they did
12   not permit multiple suicide attempts.
13        BY MR. ALTMAN:
14        Q.   Okay.  When you say you answered my
15   question, nowhere in that answer before did you
16   mention the word SuperMix.
17        So I'm trying to understand here
18   your -- for lack of a better term mish-mashing
19   some of the sensitivity analyses that you did
20   using the SAS programs with the SuperMix
21   programs.  So why don't we take a step back.
22        What did you do in the SuperMix
23   program?
24        MS. McGRODER:  Object to form.

853

1    BY THE WITNESS:
2         A.   The SuperMix program was a person-time
3    logistic regression, and it was performed using
4    SuperMix.  So in my first answer to your
5    question, I talked about the person-time logistic
6    regressions, and then in the second answer to
7    your question, I expended on that and referred to
8    it as the SuperMix analysis because SuperMix was
9    the computer program that I used to perform the
10   person-time logistic regression analyses.
11        BY MR. ALTMAN:
12        Q.   Now, I looked at your SuperMix
13   analyses.  Nowhere did you actually determine --
14   well, strike that.
15        For any of the sensitivity analyses
16   that you ran, did you check to see whether the
17   person was actually on the drug on the date of
18   the suicide attempt?
19        A.   The person-time analyses broke down
20   the year following the index episode of bipolar
21   disorder into monthly intervals and determined
22   whether or not a prescription included that month
23   in terms of the number of pills that were
24   available, and then within that month, whether or

854

1    not the suicide attempt occurred before or after
2    the prescription date.
3         So we had was there a prescription of
4    say gabapentin during month one, was there a
5    suicide attempt during month one, and if there
6    was a suicide attempt in month one, did it occur
7    before the prescription date for gabapentin or
8    after the prescription date.
9         Q.   Where did you do that, which analysis?
10        A.   That's all -- the analysis of those
11   data are reported in the -- in the SuperMix
12   files.
13        Q.   Okay.  I am looking at your SuperMix.
14   Which of the SuperMix files?
15        A.   Well, I believe there are three
16   SuperMix files.  The first one is the overall
17   cohort.  The second one, I believe, and I might
18   be mistaken, the second one the third one is
19   looking at the definition of exposure to
20   gabapentin only, and then the third one is
21   looking at only those people -- I believe there
22   were 662 people who had made a suicide attempt
23   prior to the index episode.
24        So looking at those people that were

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

855

1   at the greatest risk for suicide.  In fact, I
2   think the SuperMix analysis, the person-time
3   logistic regression analysis -- and I'm going to
4   be using those as synonyms -- shows that the
5   increased risk -- the people who made a suicide
6   attempt in the year prior to bipolar disorder
7   were 12 times more likely to make a suicide
8   attempt in the -- in the following year which is
9   kind of fascinating.
10       And so that final sensitivity analysis
11  is just looking at those 662 people and repeating
12  the same analysis on that very small but very
13  high risk sample of individuals to determine
14  whether or not the presence of an AED increased
15  or decreased the likelihood of a suicide, in this
16  case a repeat suicide attempt.
17      Q.   What did you use to generate the data
18  that you processed in SuperMix?
19      A.   Those data were created -- we created
20  a file that gave the monthly information for each
21  one of the -- you know, a monthly dataset that
22  allowed us to determine whether or not you had a
23  suicide attempt or drug prescription on each one
24  of the months.

856

1       Q.   Which of the programs did that?
2       A.   They weren't done in SuperMix.  Those
3   were done in SAS.
4       Q.   Which SAS program did that?
5       A.   I'm not sure.
6       Q.   Well, why don't you take a look at the
7   description of the sensitivity analyses you
8   provided there and tell me which one did that?
9       A.   Well, these are the programs that did
10  the analyses, and I believe there was a separate
11  description for these SuperMix analyses that
12  accompanied that.  I don't know if the dataset
13  included it, or can we see the transmittal for --
14      MS. McGRODER:  That may not be the
15  transmittal of the SuperMix analysis because I
16  think that was separate.
17  BY MR. ALTMAN:
18      Q.   Dr. -- Dr. Gibbons, I will represent
19  to you, and you can -- I mean, I can show you
20  that we have received a file called AED dot zip.
21      A.   Do you have the contents of that?
22      Q.   I'm going to show you that right now.
23       Anyway, I will represent to you,
24  Doctor -- I mean, you could certainly come and

857

1   look at it.  I just didn't know if you would be
2   able to see it.  There are nine files on the
3   disk.
4        There are -- there's an AED 1, 2, and
5   3 dot dat, an AED 1 inp dot dat, and an AED 1 dot
6   out for each one of these.  There are no SAS
7   programs.  And so what I would like to know is
8   how were these AED 1 dot dat files -- these three
9   data files created?
10       What created them?
11      A.   Those are created by a -- you know,
12  those were created by some SAS file that
13  apparently is not included in there.
14      Q.   Where would that SAS file be?
15      A.   I'm sure that we would have that
16  around some place.
17      Q.   Could you see if you can get that
18  e-mailed on a lunch break?
19      A.   I could try.
20      Q.   Because I don't want to have to come
21  back here again.
22      MS. McGRODER:  Let's go off the record for a
23  second.
24      MR. ALTMAN:  Let's go off the record.

858

1       THE VIDEOGRAPHER:  Off the record at 11:47.
2        (WHEREUPON, a recess was had at
3        11:47 a.m. until 11:53 a.m.)
4       THE VIDEOGRAPHER:  Back on record at 11:53.
5       MR. ALTMAN:  Just before we continue, I just
6   want to put something on the record.  I
7   appreciate that you are trying to get us all the
8   information.  I appreciate that there's a lot of
9   data, and it's very complex information, but
10  there clearly appear to be additional files that
11  we do not have that I request that be produced.
12       I do not know what impact that will
13  have on the rest of my examination and my desire
14  to have additional examination, but I just want
15  to point out that it is not the plaintiffs'
16  obligation to figure out what information should
17  be produced.  There is an affirmative obligation
18  on the part of an expert to provide the
19  information.  When information is omitted, we are
20  not the ones that have to figure -- we are not
21  the ones that have to figure it out, and that's
22  all I'm going to say about it.
23      MS. McGRODER:  Okay.  In response to that
24  I'm just going to say starting at -- on February

859

1  10th, if not before, I have sent you virtually
2  biweekly, if not triweekly, information and data
3  that Dr. Gibbons has provided, and which I
4  understand you know and the SuperMix analysis
5  that we are now talking about I sent to you I
6  believe on February 16th.
7      So while I appreciate that you don't
8  have some duty to figure out what's not there,
9  the fact of the matter is you know the data
10  better than I know the data. I can't tell what's
11  not there. So had you given me some notice that
12  this wasn't among the materials sent, I would
13  have given it to you earlier, and -- and what you
14  have said I totally accept and understand.
15      MR. ALTMAN: That's fine. Let's move on.
16      MR. LONDON: We are moving on with the
17  standing request that we take a brief lunch
18  break, and you make a run during the lunch break
19  to see if that can be e-mailed in. That's on the
20  table.
21      MS. McGRODER: Absolutely, we will do our
22  best.
23      MR. LONDON: Thank you.
24

860

1  BY MR. ALTMAN:
2      Q. Now, I'm looking at -- just looking at
3  one of the AED files. Unfortunately, I don't
4  have these printed out, and I am not going to
5  mark these as exhibits right now, but there are
6  variable -- there are various variable names.
7  One of them is called ID which I imagine is the
8  patient ID, correct?
9      A. Correct.
10      Q. One of them is called month, which
11  is -- as I imagine, is the patient's month,
12  correct?
13      A. Correct.
14      Q. The month for that particular patient.
15      Another one is age, correct?
16      A. I believe so. I don't have it in
17  front of me.
18      Q. Another one is sex which I'm just
19  going to ask you. It says "sex." That I imagine
20  that's the sex. There's one here that says year.
21  I think that's pretty obvious, and year I guess
22  is the year of the analysis stripped out --
23      THE COURT REPORTER: I'm sorry. What was
24  the --

861

1  BY THE WITNESS:
2      A. Years since the year 2000. So
3  numbered with I believe 2000 being year one and
4  2006 being year six.
5  BY MR. ALTMAN:
6      Q. Okay. There's another -- next field
7  is called SAP.
8      What is SAP?
9      A. Suicide attempt in the prior year. So
10  in the year before the index episode was there a
11  suicide attempt made.
12      Q. Okay. AED I assume means do they take
13  any one of the 11 AEDs?
14      A. That's correct.
15      Q. Okay. LI means did they take lithium?
16      A. Correct.
17      Q. AD means antidepressant, correct?
18      THE COURT REPORTER: I'm sorry?
19  BY MR. ALTMAN:
20      Q. Antidepressant, correct?
21      A. Correct.
22      Q. AP means antipsychotic, correct?
23      A. Correct.
24      Q. AC is anticonvulsant, correct?

862

1      A. That's an additional anti --
2  antiepileptic drug that was not a part of the 11
3  epileptic drugs highlighted in the FDA Alert.
4      Q. And SA is suicide attempt in that
5  period?
6      A. Correct, and this is -- these are
7  monthly records. So this is a vertical file that
8  has I believe 12 records per case indicating each
9  one of the months. The file for analysis
10  actually would -- would end on the month in which
11  there was a suicide attempt, or if there was no
12  suicide attempt, through month 12.
13      Q. Now, I'm looking at -- as far as I can
14  tell, looking at this data -- oh, inter -- and
15  what is intercept?
16      A. Intercept would just be a vector of
17  ones. That would be the term that would be --
18  are you looking at the output file now?
19      Q. No, there's another variable called
20  intercept which is one in every record.
21      MS. McGRODER: Do you need to see it?
22  BY THE WITNESS:
23      A. No. As long as it's one in every
24  record, it's the intercept of the -- of the

863

1  regression.  I don't actually use that in the
2  analysis, but historically our programs didn't
3  put in an intercept automatically.  So we used to
4  do it that way.
5  BY MR. ALTMAN:
6      Q.  Now, if a person had more than one
7  attempt in a month, would there be more than one
8  record -- would the number of suicide attempts be
9  greater than one or --
10     A.  No, this is a person-time logistic
11  regression which is, as the sampling interval
12  gets smaller, it becomes a proportional hazard
13  general in your model.  So it takes on the
14  interpretation of a survival-type analysis.
15         So the idea is that you have -- for
16  each individual, you either have all of the
17  records for which they were available where the
18  event code would be zero if they never made a
19  suicide attempt for all 12 of those records, or a
20  person who had made a suicide attempt say at
21  month six, you would have five zeros, and then
22  the final record would be month six with a one
23  for the event, and we would take the first
24  suicide attempt in that analysis.

864

1      Q.  If a person -- we discussed the issue
2  of suicide attempts on multiple days?
3      A.  Correct.
4      Q.  On multiple consecutive days whether
5  that was really distinct suicide attempts?
6      A.  Correct.
7      Q.  Normalizing our time, let's call it
8  days since the index date.  If a person in month
9  one had an event on the 30th day of the month and
10 then the first, second, third, fourth, and fifth
11 days of the next month, you would count that
12 person as having suicide attempts in two separate
13 months, correct?
14     A.  No, this analysis is a person-time
15 logistic regression analysis which provides an
16 interpretation of a hazard rate which is, you
17 know, focused on the time to the first suicide
18 attempt.  In this analysis, we don't count
19 multiple suicide attempts.
20        This analysis purely counts time to
21 the first suicide attempt and the association of
22 exposure to a given drug yes or no on each one of
23 those months.  So drug is a time varying
24 covariate here, and the analysis focuses on the

865

1  first suicide attempt.
2      Q.  So your assumption is that if a
3  person takes a drug on one day of the month, they
4  took the drug for the entire month, correct?
5      A.  No.  We use the -- there had to be
6  a -- let me -- repeat your question.
7      Q.  If a person took a drug on one day in
8  the month -- and when I say months, we are always
9  talking about not calendar months, but we are
10 talking months since the index date.
11     A.  Right.
12     Q.  If a person takes a drug on one day
13 during the month, you flag that.  That's just
14 binary.  They either took the drug in that month
15 or they didn't, correct?
16     A.  Well, not exactly the way you said it.
17 We know whether or not there was a prescription
18 for that drug on that month.  We know whether or
19 not the prescription was either before or after
20 the suicide attempt.
21        So if there was a suicide attempt made
22 on the 15th day of month and the prescription was
23 on the 20th day of the month and it included a
24 year's long prescription, that suicide attempt

866

1  would not be attributed to the presence of that
2  drug on that month.
3         Now, if the prescription occurred on
4  the month before but it included a 60-day
5  prescription, then it would cover the first
6  month, and it would cover the second month as
7  well.  So there could have been a prescription on
8  the -- on month minus one for 60 days, and it
9  would cover two months.  So that person would
10 have exposure in that month.
11        Now, the final thing which I think is
12 what you are asking about is let's say somebody
13 had a prescription for one day, which is a little
14 rare, but let's say they did for one day and it
15 was the first day of the month and they made a
16 suicide attempt on the 15th day of the month,
17 they would be considered to have been exposed in
18 that month to the drug, which is similar to the
19 other analyses that we did.  And then in the
20 sense -- the other sensitivity analysis we did we
21 required that they have a 30-day exposure, but in
22 this, this is a month-by-month analysis.
23     Q.  Why didn't you simply find out whether
24 they were on or off the drug at the time of the

867

1  suicide attempt, and do it that way?

2    A.   Because --

3    MS. McGRODER:  Asked and answered in the

4  last deposition, but go ahead.

5  BY THE WITNESS:

6    A.   Yeah, the -- you know, imagine

7  somebody who has been on drug for, you know,

8  three weeks, and then they make -- and then their

9  prescription was just for those three weeks and

10  then the next day they make a suicide attempt.

11  That would indicate that that person hadn't been

12  exposed to the drug.  Well, in fact, they had

13  been exposed to the drug.

14    Also, we don't know from medical

15  claims data that these people are necessarily

16  taking the drug or when they actually took the

17  drug.  They could have taken it -- you know, you

18  have 30 pills of the drug.  You don't necessarily

19  start it on the day of the -- that the

20  prescription was filled.

21    So to be conservative, we, you know,

22  indicate -- I mean in the primary analyses that

23  are described in the paper, we are basically

24  saying once you were exposed to the drug, you

868

1  know, that's the post period.  You might have

2  been -- only had one day of a prescription but

3  it's post.  This analysis is a little more

4  molecular in the sense that it breaks things down

5  on a month-by-month exposure basis.

6    So it really allows you to say

7  somebody was taking the drug for two months, then

8  they stopped taking it for a month, then they

9  started taking it again.  What was the

10  association with suicide in terms of that pattern

11  of response.

12  BY MR. ALTMAN:

13    Q.   So going back to your first -- going

14  back to the paper Table 2, for gabapentin the

15  post versus predrug value of .15, does that

16  number -- what does that number mean?

17    How should somebody interpret that

18  number?

19    A.   That number means that the ratio

20  between the rate of preinitiation of the drug

21  suicide attempts was .15 following initiation of

22  drug then before.  So it's about one -- 1/6th of

23  the rate, and the previous column indicates an

24  event rate ratio of 6.11 in the comparison of

869

1  predrug versus no drug.

2    So what you are basically -- the

3  interpretation is that prior to initiating

4  therapy in those people who ultimately did take

5  the drug, in this case gabapentin, their suicide

6  attempt rate was six times higher than people who

7  didn't take any of those antiepileptic drugs.

8    However, following the rate --

9  following the initiation of drug, the rate went

10  down six-fold.  So it essentially eradicated that

11  increased elevated risk associated with people

12  taking a drug before they ever took the drug, and

13  that's kind of articulated in figure 1 where you

14  see the open squares.  This is on page 30 of 36.

15    The open squares are the predrug,

16  pretreatment suicide attempt rates, and you can

17  see that they are all uniformly much higher than

18  the post-drug, and that after the filled in

19  squares, which are the post treatment suicide

20  attempt rates, are all basically kind of at the

21  level that you observe for those people who

22  didn't take any medication.

23    So -- so, you know, really in terms of

24  interpretation, what I get out of all of this is

870

1  that there's no evidence at all that these drugs

2  are increasing the rate of suicide attempts, and

3  that the people who ultimately get on these drugs

4  are at much higher risk of a suicide attempt

5  before they ever take them, and the drugs

6  decrease that risk to the level seen in people

7  who don't take these drugs.

8    Q.   If -- for gabapentin on Table 2, if

9  the post-drug versus predrug, whatever the ERR is

10  and the confidence interval includes one, that

11  allow you -- would that allow you to conclude

12  that gabapentin is protective of suicide

13  attempts?

14    If instead of .15 with a confidence

15  interval of .05 to .47, whatever the ERR is, the

16  confidence intervals included one, would that

17  allow you to conclude that gabapentin is

18  protective of suicide attempt?

19    A.   No. 1, if the -- if the confidence

20  interval included one and, of course, the -- if

21  the probability value -- now, this probability

22  value is related to the confidence interval, but

23  if the confidence -- if the probability value is

24  greater than .05, then we could not reject the

871

1    null hypothesis that the true confidence -- that
2    the true event rate ratio was different from one.
3    So you could not conclude on the basis of that
4    that there was a significant reduction in the
5    rate.
6            I'm not sure that the -- showing that
7    high rates go to lower rates in and of itself,
8    this column here (indicating), allows one to
9    conclude that the effect of these drugs is
10   protective.  So, you know, I mean, the direction
11   is to one of decreased -- significant event
12   risk.  If the confidence interval included one
13   and this P value is greater than .05, then you
14   couldn't conclude that there was a significant
15   reduction pre versus post.
16           So, for example, for carbamazepine,
17   the event rate ratio is .076, and it's definitely
18   less than one, but the confidence interval
19   clearly includes one.  The probability value is
20   .8, and on the basis of that we cannot say that
21   the true event rate ratio is different than one.
22           So we can't conclude that the rates
23   are decreasing.  Even though we know overall from
24   the figure and from the other table that the

872

1    rates are decreasing, that amount of decrease is
2    consistent with chance expectations.
3        Q.   So when you said on the last paragraph
4    I guess on page 35 or 36:  "If anything, the
5    effects of most AEDs and lithium are to reduce
6    suicide attempts rates relevant to pretreatment
7    levels in those patients who are ultimately
8    prescribed those drugs," that sentence would not
9    apply to carbamazepine, correct?
10       A.   Well, I mean, by "if anything,"
11   carbamazapine is an example of one where there's
12   nothing, but the answer is, yes, that would not
13   apply.  The -- the statistical evaluation of the
14   results for carbamazapine which has a
15   pretreatment rate of 40 suicide attempt per
16   thousand person years and decreases to 29 suicide
17   attempts per thousand years, the statistical
18   result, the significance of that result in terms
19   of testing to see whether or not there is a
20   statistically significant reduction in that rate
21   does not permit that conclusion.
22       Q.   And that would also be true of
23   topiramate, correct?
24       A.   That's correct.  So even though the

873

1    event rate ratio for topiramate is .52, which is
2    saying that it is cut in half, the result is not
3    statistically significant.  So we can't ascribe
4    to that that, you know, is being -- that the
5    reduction is beyond what we would expect by
6    chance.
7            This is saying, you know, there's a 22
8    percent probability that that 50 percent
9    reduction in that particular sample given those
10   particular base rates are -- are consistent with
11   chance alone.
12       Q.   Now, what is -- if we were to
13   calculate the odds or the rate ratio from Table
14   1, we would obviously not get the same numbers as
15   you got in Table 2, correct, because you ran this
16   through the regression in order to -- the Poisson
17   regression in order to generate the ERs, correct?
18       A.   Well, it's correct.  The -- as long
19   as -- so this was a question you raised in your
20   last deposition where you were looking at some of
21   the numbers and -- in one of my tables, and you
22   were saying, you know, I can get exactly the same
23   numbers that look like they are coming out of
24   your GEE model and just by simple taking the

874

1    ratio of the rates and, you know, how can that
2    be.  You are doing this kind of fancy statistical
3    model.  How can you -- how can I get the same
4    point estimate by just doing the division.
5            And I said, you know, I'm not sure how
6    to answer that.  I went back, and I looked into
7    it, and so the answer to that, and I think it is
8    the answer to the question you just asked me is
9    that if there are no time varying covariates;
10   that is, if the covariates don't change from the
11   pre to the post, they are all the same, all they
12   are going to do is move things up and down, but
13   it will preserve the ratio.
14           Now, of course, that has nothing to do
15   with the standard error or the statistical
16   significance test, but, you know, you will be
17   able to see in the marginal; that is, in the
18   real -- in the observed data if you take the rate
19   ratios, you will get the maximum likelihood.
20   Well, these are GEE.  They are not really maximum
21   likelihood, but you will get the point estimate.
22       Q.   Well, the confidence -- the
23   confidence -- if you were to calculate the --
24   using basic statistics, the standard error and

875

1   things like that, that's your initial estimate
2   into the GEE model, correct?
3       A.   Well, it's not even an initial
4   estimate for the confidence.  I mean, the
5   confidence interval for the GEE is derived by a
6   particular -- you know, it comes out of something
7   like an information matrix for the GEE.  So it's
8   a totally different way of getting the confidence
9   interval in the standard error than the simple
10  rate.
11      Q.   And my point is that if I go and I
12  calculate the confidence interval, I'm not going
13  to get the same thing as what the GEE model is
14  going to provide, correct?
15      A.   That's correct.
16      Q.   The confidence interval from the GEE
17  would tend to be larger than the one you would
18  get from just the standard calculating the --
19      A.   I don't think --
20      MS. McGRODER:  Can you finish the question
21  just so it is clear on the record?
22  BY MR. ALTMAN:
23      Q.   That you would get from the basic
24  statistical, you know, computation?

876

1       A.   Remember that the GEE is a model.  So,
2   you know, if -- if you have got lots of -- in the
3   GEE, I have got covariates in here.  So some of
4   these covariates may be minimizing the
5   variability.
6           So you could have a situation where
7   part of, you know, age, for example, is -- is
8   adding a lot of uncertainty and a lot of
9   variability.  The GEE, which is a regression
10  model, is adjusting for age.  So what's left over
11  is much tighter.
12          So I could imagine a situation where
13  the -- where the GEE estimate is -- is -- is the
14  smaller of the confidence interval than you would
15  get in the sort of usual approach.
16          You couldn't even really do it,
17  though, because remember at least in the -- where
18  we are using GEE in Table 2 is for the pre versus
19  post, and that's taking into consideration that
20  these are the same people before and after.  So,
21  you know, you would really have to use something
22  quite different in terms of this -- you know,
23  there isn't really even a good simple estimator
24  of that rate ratio for within subject kind

877

1   comparisons.
2       Q.   Okay.  But I think after this whole
3   thing here is that it turns out here when you
4   check with a calculator, that you don't get the
5   same as the simple ratios from Table 1 when you
6   like at your pre versus post here which is --
7   which is obviously a function of the regression
8   analysis and all the adjustments, correct?
9       A.   I would believe so, yes.
10      Q.   Is there some general relationship?  I
11  mean, would you expect that doing the regression
12  could change the simple ratio by a factor of two?
13      A.   That would totally depend on what you
14  have in the analysis.  I mean, think about the
15  effect that's associated with prior suicide
16  attempts.  You know, it's a 12-fold increase in
17  the likelihood of future suicide attempts.
18          So having that term in the model
19  versus not could have a really big effect.  You
20  know, an effect that is marginal like maybe some
21  of these age effects or something, you know,
22  might not change things too much.
23      MR. ALTMAN:  Why don't we break for lunch at
24  this point.  It's 20 after 1:00.  See if you

878

1   can -- I don't know how long you want to take.
2       MS. McGRODER:  Well, there's a place --
3   let's go off the record.
4       THE VIDEOGRAPHER:  This is the end of tape
5   No. 3.  We are off the record at 12:17.
6           (WHEREUPON, a recess was had at
7           12:17 p.m. until 1:14 p.m.)
8       THE VIDEOGRAPHER:  This is the beginning of
9   tape No. 4.  We are back on the record at 1:14.
10  BY MR. ALTMAN:
11      Q.   Dr. Gibbons, I just want to clarify
12  something.  We were talking earlier about what
13  the AP field meant.  That was antipsychotic, but
14  just to be clear, when you got the PharMetrics
15  dataset, you only got atypical antipsychotics and
16  not all antipsychotics, correct?
17      A.   I don't remember the answer to that
18  right now.  I would have to go back and check.
19      Q.   Why don't we do that just to be sure
20  we are talking the same language.
21      MR. ALTMAN:  Jack, can you get the
22  PharMetrics contract.
23  BY MR. ALTMAN:
24      Q.   You know what, why don't just to be

879

1  quick, there's an exhibit.  I don't remember what
2  the number is, but can you just take a look at
3  where -- under the drug?
4      A.  Yeah, I would probably just want to
5  double-check in the list of drugs, you know,
6  to -- to verify exactly was it all antipsychotics
7  or atypical.  I know it says atypical here.  So
8  that's probably what it is, but we would have to
9  double-check, and I'm assuming that's something
10 you may have done.
11     Q.  What other -- aside from the
12 antiepileptic, what other factors might have led
13 to the decrease in the suicide risk -- suicide
14 attempt risk that your analysis demonstrates or
15 shows?
16     MS. McGRODER:  In the manuscript?
17 BY MR. ALTMAN:
18     Q.  In either -- in either one.
19     A.  You say in -- oh, besides for the
20 antiepileptic drug?
21     Q.  Besides the drug, what other factors
22 might have led to the decrease?
23     MS. McGRODER:  Object to form, calls for
24 speculation.

880

1  BY THE WITNESS:
2      A.  Well, the analyses suggests that the
3  antidepressant -- concomitant antidepressant
4  medications led to decreases.  Those were
5  adjusted for the analysis.  The analysis also
6  suggests decreases associated with antipsychotic
7  medications.
8          The very significant month effect in
9  the -- in the person-time logistic models
10 suggests that there is a decrease overall as you
11 got further out in time from the index episode
12 of, you know, decreasing in all patients overall.
13 I think we talked about that and saw some of that
14 in the patients who were in the no drug condition
15 where the highest rates appear to be in the
16 months just before the index and then start to
17 decrease as you get further away from the index.
18 BY MR. ALTMAN:
19     Q.  I didn't ask a very good question.
20 What other factors that the data -- strike that.
21         What other factors that are not
22 related to the data -- the PharMetrics dataset
23 could have led to the decrease?
24     MS. McGRODER:  Object to form, calls for

881

1  speculation.
2  BY THE WITNESS:
3      A.  I'm not sure --
4  BY MR. ALTMAN:
5      Q.  Let me give you an example.  We talked
6  you didn't purchase all drugs.  So one of the
7  things that you don't know about is the influence
8  of drugs that are not in the set that you
9  purchased.
10         For example, we talked about Xanax
11 or -- with the assumption that you only got
12 atypical antipsychotics, typical antipsychotics.
13 For example, those might have been an influence.
14         Are there any other influence -- any
15 other factors that you could think of that you
16 would not have been able to determine with the
17 PharMetrics data that could have contributed to
18 the decrease?
19     A.  I understand your question.
20     MS. McGRODER:  Object to form.
21 BY THE WITNESS:
22     A.  One other variable that wasn't
23 available in the PharMetrics that I would have
24 liked to have had was, for example,

882

1  psychotherapy.
2  BY MR. ALTMAN:
3      Q.  So is it possible that psychotherapy
4  is responsible for most of the decreased risk in
5  this -- in this dataset?
6      MS. McGRODER:  Object to form, calls for
7  speculation.
8  BY THE WITNESS:
9      A.  I don't think that's possible.  I
10 think it -- you know, there may be some role of
11 psychotherapy, but I don't think psychotherapy is
12 sufficiently prevalent to, you know, explain the
13 magnitudes of the effects that we are seeing
14 here.
15         Again, I -- the decreases are
16 interesting.  There are alternative explanations
17 which include the natural course of the disorder
18 and its relationship to suicide attempt rates
19 that make rates go down as you go further out in
20 time.  Remember the pretreatment rate is probably
21 closest to the index episode.  The post treatment
22 rate is further away.
23         So there's going to be a natural
24 decrease to some extent.  The statistical models

883

1    adjust for that, particularly the person-time
2    logistic model.  That's one of the primary
3    reasons for doing that model.  It allows one to
4    model the sort of exponential decay, if you will,
5    in the rate of the suicide attempts over time in
6    the total population including those people who
7    don't receive treatment and then determine the
8    extent to which the treatment changes that hazard
9    function over time.
10        That's an important part of why, you
11   know, I did those.  I did those person-time
12   logistic models to try and tease that part of the
13   puzzle apart.
14   BY MR. ALTMAN:
15       Q.   Let me give you two other exhibits,
16   and then we are going to put those aside for now
17   just because they have already been marked, and
18   then we are going to come -- I am going to talk
19   to you about a different exhibit.
20        What I'm handing are you Exhibits 53
21   and 54 -- I'm sorry 54 -- 55 and 56.  These are
22   the gabapentin cohort sensitivity analyses.
23
24

884

1            (WHEREUPON, certain documents
2            were marked Gibbons Deposition
3            Exhibit Nos. 55, 56, for
4            identification, as of 3/5/09.)
5    MS. McGRODER:  Thank you.
6    BY MR. ALTMAN:
7        Q.   And I'll just ask you very quickly for
8    now.  Do those appear to be the analyses that you
9    provided?
10       A.   Yes, they do.
11       Q.   Okay.  Let's put those aside for right
12   now.  We are going to come back to those.  I will
13   hand you the next exhibit.
14            (WHEREUPON, a certain document
15            was marked Gibbons Deposition
16            Exhibit No. 57, for
17            identification, as of 3/5/09.)
18   BY MR. ALTMAN:
19       Q.   Dr. Gibbons, I have handed to you what
20   has been marked as Exhibit 57 as a text file
21   entitled "AE2OUT."  It was dot txt which I
22   believe is the output file from the second of
23   your SuperMix analyses; is that correct?
24       A.   Right.  It says AE2OUT.

885

1        Q.   I thought that's what I said, but if I
2    was wrong, you corrected me.
3        A.   Sorry.  I didn't hear the D.
4        Q.   You are right.  I didn't.  Okay.
5             Does this appear to be the output file
6    from the SuperMix computation?
7        A.   Yes, it does.
8        Q.   And this is the gabapentin only
9    collection, correct?
10       A.   This is treating gabapentin as the
11   time varying drug effect.  So gabapentin only.
12       Q.   And if we go to the -- page 2 and on
13   to page 3, that's where you get the results of
14   your analysis, correct?
15       A.   That's correct.
16       Q.   And I assume the one that we are
17   interested in here is the GAB analysis, correct?
18   MS. McGRODER:  I will object to form.
19   BY THE WITNESS:
20       A.   You are referring to the parameter GAB
21   listed under results for the model without any
22   random effects?
23   BY MR. ALTMAN:
24       Q.   Well, all the way down at the bottom

886

1    where it says:  "Odds Ratio 95 Percent, Odds
2    Ratio Confidence Intervals."
3        A.   Okay.  So just before that are the
4    estimated regression weights, and then those
5    regression weights, the estimates are reiterated
6    on the second and third page and include odds
7    ratios and the confidence intervals for the odds
8    ratio.
9        Q.   And the reiterated -- the reiterated
10   results are frankly the ones that count.  That's
11   the end result of the analysis, correct?
12       A.   Well, no.  I mean, the probability
13   value, for example, for gabapentin -- the overall
14   probability value is -- is provided under the --
15   on the far column of the estimated regression
16   weights.
17       Q.   Right.  If we go to the odds ratio,
18   though, starting at the bottom of page 2 where we
19   get to gabapentin, the odds ratio as provided
20   here for gabapentin is .6269, correct?
21       A.   That's correct.
22       Q.   Which would be rounded to .63,
23   correct?
24       A.   Okay.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

887

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   And the confidence intervals as shown

4   as .3278 which would round to .33, correct?

5    A.   That's correct.

6    Q.   And the upper would be 1.1990,

7   correct?

8    A.   Correct.

9    Q.   That would round to 1.20, correct?

10   A.   Correct.

11   Q.   So according to this analysis of just

12  the gabapentin data, this does not show

13  that gaba -- these are not statistically

14  significant results for gabapentin, correct?

15   A.   That's true, and that's reiterated

16  under the P values where the probability value

17  testing whether or not the regression weight is

18  one or the odds ratio -- the -- the regression

19  weight is -- the logarithm of the odds ratio is

20  equal to -- is equal to zero is .1581.  So that's

21  not statistically significant.

22        So we can't conclude that, you know,

23  gabapentin in this analysis -- the presence of

24  gabapentin is significantly decreasing the risk

888

1   of suicide attempts.  The purpose of the analysis

2   is to show if we were to -- you know, obviously

3   we are reducing the sample size by quite a bit by

4   just looking at gabapentin as opposed to looking

5   at all of the AEDs, and what we are seeing is, I

6   believe, that the risk ratio -- the estimated

7   odds ratio for the overall AED was .59, and

8   that's looking at all of the AEDs simultaneously,

9   and that was statistically significant.  And this

10  effect is quite similar to it, but it's not

11  statistically significant because of the lower

12  sample size.

13   MR. ALTMAN:  Let me take a break for a

14  minute.  Can we go off the record?

15   THE VIDEOGRAPHER:  Off the record at 1:26.

16        (WHEREUPON, a recess was had at

17        1:26 p.m. until 1:29 p.m.)

18   THE VIDEOGRAPHER:  We are back on the record

19  at 1:29.

20  BY MR. ALTMAN:

21   Q.   Dr. Gibbons, I forgot to ask you one

22  thing.

23        Before the lunch break, we were

24  talking about trying to locate the SAS programs

889

1   that extracted the data.  Did you have any luck?

2    A.   I put in a request to get them.  I'm

3   not sure that, you know, we will be able to get

4   them, but I'm waiting for a return phone call.  I

5   put my phone on -- on mute.  So as soon as I hear

6   back, I am expecting a call one way or the other.

7    Q.   Who did you call to ask them?

8    A.   Dr. Hur.

9    Q.   Okay.  Do you think he might not have

10  them at all or --

11   A.   Today he is at the VA, and the VA with

12  recent issues related to data security doesn't

13  necessarily allow you to plug an external data

14  storage device into their network.  So he would

15  have to be able to do it elsewhere.  So he is

16  investigating (No. 1) does he even have it around

17  with him, and (No. 2) can he plug it into a

18  computer where he can have access to send it to

19  me.  So if he doesn't have it, you know, or isn't

20  able to do that, surely, I'll be able to get it

21  tonight and forward it on.

22   Q.   Is all the work that was done with

23  these data analyses on an external drive or a

24  discrete external drive?

890

1    MS. McGRODER:  Object to form.  "These

2   analyses" you mean, the sensitivity analysis?

3   BY MR. ALTMAN:

4    Q.   All the work that's been done in this

5   case by Dr. Hur, does he keep that on a separate

6   external drive?

7    A.   Not to my knowledge.

8    Q.   Does he keep -- he keeps it on his

9   laptop, on the hard drive on the laptop?

10   A.   Some of it is at the computer at the

11  university.  Some of it is on an external drive

12  that he keeps, you know, those sort of things.

13  Some of it obviously is on my computer or on my

14  external drives.

15   Q.   So there may be some data on his

16  drives or his computer that is not on your

17  computer?

18   A.   There shouldn't be at this point.  I

19  don't think I have on my computer the SAS program

20  that you are looking for that generated the

21  monthly data file that I used in my analysis, and

22  I also want to double-check.  There may be -- I

23  may have taken that file and then modified that

24  file for the purpose of putting it into the

891

1  format that I need in this analysis with a
2  FORTRAN file.  So I would have to take a look at
3  that.
4       My understanding at the time I
5  prepared this was my obligation to you was to
6  provide you with the raw data that went into the
7  analysis and then the files that are used to run
8  the analysis, and I'm understanding from you
9  that, you know, you also -- if there was a file
10 that I used that was created in some other way
11 from the original file, you needed that as well.
12      And so, you know, I will go back and
13 see if I can give you every intermediate step
14 between the PharMetrics data and the file that
15 ultimately went into the SuperMix analyses.  As
16 you can see, there are three data files there.
17 You know, Kwan gave me one.
18     Q.   Sure, but I -- it would seem to me to
19 be a -- hopefully a reasonable assumption that he
20 used the same -- more or less the same program
21 for all three sets, and it was just some
22 parameter that decided whether he did -- it was
23 just some difference in parameter whether he only
24 did the gabapentin ones or did he --

892

1      A.   No, he gave me one file, and then I
2  extracted the information for everybody for just
3  gabapentin or for the people who had made the
4  suicide attempts using a FORTRAN program that
5  read that file.
6       So, you know, I will want to get you
7  those FORTRAN programs as well so that you can
8  see the track between the original PharMetrics
9  data, the SAS program that extracted the
10 longitudinal file, and then my FORTRAN programs
11 that took that longitudinal file and turned it
12 into these three files, and that also means I am
13 going to have get you the original longitudinal
14 file that was used to produce these three
15 separate files:  AED1 dat, two dot dat, and three
16 dot dat.
17     Q.   So you're --
18     MS. McGRODER:  If you want that --
19 BY THE WITNESS:
20     A.   I mean, if that's what you want.
21     MS. McGRODER:  Tell us -- tell us what you
22 want.
23 BY MR. ALTMAN:
24     Q.   I mean, my goal is not to make you do

893

1  things just for the sake of making you do things.
2  I may -- we can talk.  I definitely want the
3  program.
4      MS. McGRODER:  For the SAS extraction?
5  BY THE WITNESS:
6      A.   Which program?
7  BY MR. ALTMAN:
8      Q.   I definitely want -- good question --
9  I definitely want the program that prepared the
10 dataset that ultimately went into the SuperMix
11 program.
12     A.   Okay.  So that's three -- that's four
13 programs.  That's the SAS program that created
14 this intermediate longitudinal or monthly data
15 file, and then the three programs that I wrote to
16 turn that into AED1 dot dat, AED2 dot dat, and
17 AED3 dot dat.
18     Q.   It's probably just easier to just get
19 the four programs and the data is probably
20 just -- just as easy.
21     A.   Would you like me to also give you the
22 data file that I got from Dr. Hur that I wrote
23 the FORTRAN programs to extract for here?  So I
24 can give you the SAS program that created that

894

1  data file.  I can also give you the data file.
2  It's really big, and then I can give you the
3  three FORTRAN programs that took those data and
4  got them ready for SuperMix.
5      Q.   Probably rather have the data file.
6  At this rate there's just no -- I get concerned
7  because there appear to be questions at time did
8  I run the SAS program, did your run the SAS
9  program.  Probably to make sure that there's no
10 questions, if I have the files that you actually
11 worked with, then we know this is the input file.
12     A.   I would be happy to get all that
13 information to you.
14     Q.   That would be great.
15     A.   But let me take an aside.  Kwan
16 doesn't have all that information.  I have most
17 of that information --
18     Q.   Okay.
19     A.   -- so I will have to get that to you.
20 So that's not something I can get to you during
21 the course of today's deposition --
22     Q.   I understand --
23     A.   -- but I could get that to you no
24 later than tonight or depending on how tired I am

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

895

1  after your -- your surgery.
2     Q.  Frankly, if I didn't get it during the
3  depo, and I don't even know if it would make a
4  difference then whether I get it tonight or I got
5  it tomorrow or over the weekend is not going to
6  make a substantial difference.  So there's no --
7  it's not necessary for you to kill yourself to
8  get me that data.  It would not --
9     A.  Great, thanks.
10    Q.  -- not change anything.
11    A.  I couldn't agree more.
12    Q.  Go back to Table 1 within the paper.
13       To find the rate ratio for gabapentin,
14 it says the number of attempts before and after
15 is the same.  We could just simply divide 213 by
16 1016, correct?
17    A.  1016 is the number of person years
18 after initiation.  Remember this is the bipolar
19 cohort.
20    Q.  Right, right.
21    A.  So the number of person years before
22 is 213.
23    Q.  Right, so if I want to find the rate
24 ratio here since it is 13 and 13, that's going to

896

1  drop out.  I could just take 213 divided by
2  1016 --
3     A.  Oh, I see what you are saying --
4     Q.  -- is that correct?
5     A.  -- yes, you could.
6     Q.  Which comes out to be .21, and you
7  could satisfy yourself with this calculator if
8  you would like.
9        That's a little different than the .15
10 that you get on Table 2, correct?
11    A.  That's correct, but this also includes
12 covariates.
13    Q.  Exactly, and that's not unexpected
14 that it would be somewhat different --
15    A.  Correct.
16    Q.  -- between the two?
17       Okay.  I'm going to hand you the next
18 exhibit.
19          (WHEREUPON, a certain document
20          was marked Gibbons Deposition
21          Exhibit No. 58, for
22          identification, as of 3/5/09.)
23 BY MR. ALTMAN:
24    Q.  Dr. Gibbons, I have handed to you data

897

1  that comes from the PharMetrics database, and
2  this is from the bipolar cohort, and what this is
3  is this is a listing of the 26 suicides that are
4  the subject of Table 1 in your manuscript.
5     MS. McGRODER:  Suicide attempts?
6  BY MR. ALTMAN:
7     Q.  Suicide attempts, sorry.  We are only
8  talking about suicide attempts.
9     MS. McGRODER:  And, again, is this -- this
10 is something you generated, or it is printed off
11 a disk?
12    MR. ALTMAN:  It's from the -- it's from --
13 it's not directly printed out off the disk.  It's
14 from the PharMetrics data.  It has got some data
15 combined from some tables.  I understand your
16 objections, but clearly you can go and verify
17 this.  I will represent to you these are the 26
18 people.  You can go and verify that any time you
19 want.
20    MS. McGRODER:  And I will just have a
21 running objection to foundation for the use of
22 this document.
23    MR. ALTMAN:  That's totally fine.
24

898

1  BY MR. ALTMAN:
2     Q.  If you wanted to based on these
3  patient IDs, you could easily go back to the
4  PharMetrics data and see if these 26 people
5  actually have suicide attempt events, correct?
6     A.  Correct.
7     Q.  You would be able to tell what the
8  date of those attempts were, correct?
9     A.  Yes.
10    Q.  You would be able to tell what the
11 index date was for those events, correct?
12    A.  Yes.
13    Q.  Based upon your own data and matching
14 up, you could tell what drug group these people
15 were assigned to, correct?
16    A.  Yes.
17    Q.  It wouldn't be particularly difficult
18 for you to verify the data in this chart, would
19 it?
20    A.  No.
21    MS. McGRODER:  Object to form.
22 BY MR. ALTMAN:
23    Q.  Okay.  The only one that's not --
24 that's not actually there is the Rx status column

899

1  which is an expression of whether the suicide
2  attempt happens to occur between the time of --
3  the time of the prescription and the number of
4  days -- and the number of days for that
5  prescription, but we are not going to talk about
6  that column right now so.
7      Now, I am going to ask you to do
8  something, if you could, with this marker here
9  (indicating).  One of the sets -- we talked about
10  it the last time that if a person had a suicide
11  event on the date of the index date, it's much
12  more likely the person attempted suicide and then
13  were diagnosed as bipolar then the other way
14  around, correct?
15      MS. McGRODER:  Object to form.
16  BY THE WITNESS:
17      A.  Could you say that again.
18  BY MR. ALTMAN:
19      Q.  We discussed the last time that if a
20  person had a suicide event on the same day as the
21  index date, that it is more likely the person
22  attempted suicide and were diagnosed as bipolar
23  as a result of attempting suicide, correct?
24      MS. McGRODER:  Object to form.

900

1  BY THE WITNESS:
2      A.  It could be that the suicide attempt
3  was the -- was the precipitant of the patient
4  being brought in for treatment and receiving
5  the diagnosis.  So there could be an
6  identification effect.
7  BY MR. ALTMAN:
8      Q.  And, in fact, that's the basis of some
9  your sensitivity analyses was excluding suicides
10  on the index date, correct?
11      A.  Right.  I believe I called that
12  Sensitivity Analysis No. 3.
13      Q.  Okay.  What I would like you to do is,
14  if you could follow along with me, is I would
15  like you to cross off the ones on this list where
16  the suicide event is on the same date as the
17  index date.
18      Now, I will go along.  I will tell you
19  I think No. 2, if you agree, just go ahead and
20  cross that one off.  Just draw a line through it.
21      MS. McGRODER:  Well, again, I object to the
22  foundation for the use of this document that you
23  created --
24      MR. ALTMAN:  Okay.

901

1      MS. McGRODER:  -- but go ahead.
2      MR. ALTMAN:  You have your running
3  objection.
4  BY MR. ALTMAN:
5      Q.  No. 2, the suicide -- the date of the
6  event is January 2005.  The index date is January
7  2005, right, for the second event?
8      A.  Oh, I see what you are saying.  Yes.
9      Q.  Okay.  So would you please cross out
10  that one.
11      A.  (Indicating).
12      Q.  And line No. 3 we have the same thing,
13  right?  Would you please cross out that one.
14      A.  (Indicating).
15      Q.  And I think we have to go to line No.
16  16.
17      A.  (Indicating).
18      Q.  And I am assuming by your crossing
19  them out, you are agreeing that the dates are the
20  same, correct?
21      MS. McGRODER:  Well, object to form.  How
22  can he verify their accuracy when --
23  BY MR. ALTMAN:
24      Q.  Assuming that -- that what the

902

1  document says is that the dates are the same,
2  correct?
3      A.  Assuming the accuracy of the document,
4  the dates in the third and fourth column are the
5  same --
6      Q.  Okay, and --
7      A.  -- and that's the basis of crossing
8  things off.
9      Q.  That's fine.  And then line 21.  They
10  are also the same, correct?
11      A.  Correct (indicating).
12      Q.  And line 23?
13      A.  (Indicating).
14      Q.  And line 26?
15      A.  (Indicating).
16      Q.  Now, I understand subject to the
17  accuracy of the chart, do you agree that for
18  these six items you have just crossed off, the --
19  the suicide date is the same as the index date as
20  what's on this chart?
21      MS. McGRODER:  Object to form and
22  foundation.
23  BY THE WITNESS:
24      A.  Yes, these two dates are the same, and

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

903

1  you have labeled them as the suicide date and the
2  index dates, and I'm assuming that you have
3  labeled them correctly, and that these data are a
4  fair representation of the PharMetrics database,
5  and under those assumptions, those two dates look
6  to be same, and that's the basis for my crossing
7  off these one, two, three, four, five, six.
8      BY MR. ALTMAN:
9          Q.  Okay.  And we'll -- and we can just
10  say as whatever Exhibit 58 shows.  We don't have
11  to keep qualifying it every time according to
12  what Exhibit 58 says.  I understand your
13  qualifications and counsel's objection.
14          Now, let's take a look at lines 3
15  through 8.
16      MS. McGRODER:  You answer it however you see
17  fit.  Go ahead.
18      BY MR. ALTMAN:
19          Q.  Lines 3 through 8 are the same
20  patient, correct?
21          A.  That's correct.
22          Q.  And that particular person, the date
23  is -- the date to the events are October 7, 2004,
24  right?  The date of the S date, the date of the

904

1  suicide?
2          A.  It's a little hard to see.  I have
3  just crossed it out with a black line.
4          Q.  Okay.  The one is October -- is
5  October 7th.  The next one is October 8th?
6          A.  Right.
7          Q.  And the next one is October 9th?
8          A.  Correct.
9          Q.  And the next one is the October 10th?
10          A.  Correct.
11          Q.  And the next one is October 11th?
12          A.  Yes.
13          Q.  And the next one is October 12th?
14          A.  Correct.
15          Q.  So that appears to be a person that
16  has a suicide attempt on the -- according to the
17  chart, on the date of the index date and then
18  five consecutive days of suicide codes -- I'm
19  sorry -- has a total of six consecutive days of
20  suicide codes, correct?
21      MS. McGRODER:  Including the index date.
22      MR. ALTMAN:  Including the one on the index
23  date.
24

905

1      BY THE WITNESS:
2          A.  That's correct.
3      BY MR. ALTMAN:
4          Q.  And if we cross out the one on the
5  index date, the initial one, this is probably --
6  two possible scenarios.  This is a person who
7  was -- attempted suicide on the third and was
8  released to attempt suicide again on the fourth
9  and was released to attempt suicide attempt on
10  the -- I'm sorry -- attempt suicide attempt on
11  October 7th.  Who was released and then tried it
12  again on October 8th, and then was released and
13  tried it again on October 9th, and then was
14  released and tried it on October 10th.
15          I mean, my point is this is a person
16  who attempted six suicide -- has six distinct
17  suicide attempts, or is this more likely a person
18  who attempted suicide once and received treatment
19  on six consecutive days?
20      MS. McGRODER:  Object to form.
21      BY THE WITNESS:
22          A.  Well, first, your characterization
23  that the person was released suggests that the
24  person was in some way in custody or custodial

906

1  care, was admitted to the hospital or something
2  like that, and these data do not provide any
3  evidence that that's the case.
4          There are two alternative
5  explanations.  One is that this person, in fact,
6  made at least one suicide attempt every day for a
7  period of six days in the row which is not beyond
8  the realm of possibility, or that this one
9  suicide attempt was miscoded as being repeated on
10  each time and that -- on each of these
11  consecutive days, and, you know, that's another
12  possibility, and we would have to really go back
13  to PharMetrics to try to get a sense, and I'm not
14  sure they would know the answer.
15      BY MR. ALTMAN:
16          Q.  Well, that's not exactly true because
17  aren't these the dates of treatment, not
18  necessarily the dates of the suicide attempts?
19      MS. McGRODER:  Object to form.
20      BY THE WITNESS:
21          A.  Well, again, you know, there are --
22  there are different files for, you know, distinct
23  events.  The -- the try -- you know, these are
24  event dates of -- of ICD 9 codes, and, you know,

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

907

1  it's a little unclear to me why this person would
2  be given gabapentin -- separate gabapentin
3  treatments, you know, six days in a row.
4      So, you know, without -- without going
5  back to PharMetrics and trying to understand
6  what -- you know, what -- what they did here, I
7  don't know how to answer that.
8  BY MR. ALTMAN:
9      Q.   Would it have been -- your initial
10 analysis of the data assumed that those were six
11 distinct events, correct?
12     Would have assumed that those six
13 distinct events, correct?
14     A.   That's correct.
15     Q.   Okay.
16     A.   The analysis that allowed for multiple
17 suicide attempts would have treated these as
18 distinct attempts.  The analyses -- the
19 sensitivity analyses that looked at just the
20 first suicide attempt would not have.
21     The person-time logistic regression
22 which looked at a more molecular view of the
23 association between antiepileptic treatment and
24 suicide attempts on a month-by-month basis would

908

1  not have used these as multiple attempts.
2      Q.   But for the purposes of Table 1 in
3  your paper, your manuscript, you considered these
4  to be distinct events, correct?
5      A.   If they occurred on separate days and
6  they were in the database, they would have been
7  distinct events, and I am assuming that's why the
8  26 people you have here match those two columns
9  of 13 and 13.
10     Q.   Okay.  What I -- what I would like you
11 to do now is that -- if we excluded that -- well,
12 what I would like you to do now is let's assume
13 that those are one suicide attempt with
14 consecutive days of treatment.
15     I would like you to cross out the
16 other five events for this particular person.
17     MS. McGRODER:  On the exhibit you want him
18 to?
19     MR. ALTMAN:  On the exhibit which I believe
20 would be lines 4 through 8.
21     MS. McGRODER:  So you want him to cross out
22 that whole patient basically?
23     MR. ALTMAN:  Well, since we excluded the
24 patient from the index date.

909

1  BY MR. ALTMAN:
2      Q.   Okay.  Now, Dr. Gibbons, the last
3  column is an indicator of whether the event took
4  place after the initiation of gabapentin therapy
5  in the post index date era.
6      How many events are there where the
7  box is not checked that are left after we have
8  crossed out these events?
9      MS. McGRODER:  Object to form and
10 foundation.
11 BY THE WITNESS:
12     A.   There are two.
13 BY MR. ALTMAN:
14     Q.   Okay.  And how many events --
15 that's the -- that's two events before the
16 initiation of gabapentin therapy.
17     How many events are there after the
18 initiation of gabapentin therapy?
19     MS. McGRODER:  Object to form and
20 foundation.
21 BY THE WITNESS:
22     A.   13.
23 BY MR. ALTMAN:
24     Q.   Is it any more unreasonable to have

910

1  concluded that this person attempted suicide once
2  and was treated for six days then it is to assume
3  that they were six distinct events?
4      MS. McGRODER:  Object to form and foundation
5  and asked and answered.
6  BY THE WITNESS:
7      A.   As I said before, I don't know which
8  of those is true, and I mean, one of the things
9  with this -- this exercise is you are excluding
10 people who made a suicide attempt on the index
11 episode.  Certainly, that's one of the
12 sensitivity analyses.  I do not think that's the
13 appropriate thing to be doing.
14     This is an example of somebody who
15 made a suicide attempt who was not exposed.  It's
16 an extreme case as you might do in assuming as a
17 sensitivity analysis that everybody who dropped
18 out of the study died.  So it's an extreme
19 sensitivity analysis so.
20 BY MR. ALTMAN:
21     Q.   I'm not sure I understand what you
22 just said.  You said in your last deposition that
23 it is more likely that a person who has a suicide
24 event on the same as the index date that they

911

1    attempted suicide and they were diagnosed as

2    bipolar as a result of the suicide?

3       MS. McGRODER:  Well, object to form and to

4    the extent it misstates his prior testimony.

5    BY THE WITNESS:

6       A.  My prior testimony or at least -- I

7    mean, my -- my view of this is that we are doing

8    comparisons during a period of time of the rate

9    of suicide attempts prior to initiating a drug

10   relative to after a drug, off of a drug, on a

11   drug.

12      Suicide attempt that occurs on the

13   date of the index episode occurred prior to the

14   administration of the drug.  So it's part of the

15   background rate.  To exclude it would be wrong.

16   Now, that doesn't mean that it did not

17   potentially lead to treatment, but it is clearly

18   not a consequence of treatment.

19      So, you know, it's certainly fair game

20   as a sensitivity analysis to say how big of an

21   effect, would we still see say protective effects

22   if we excluded all of those.  What would it do --

23   what would it do to the odds ratio, but that

24   doesn't necessarily mean, as you are portraying

912

1    it, that -- that somehow that was the right thing

2    to do.  We should have excluded them in the first

3    place because in some way they led to the

4    identification of the -- of the diagnosis and

5    ultimately potentially to treatment.

6    BY MR. ALTMAN:

7       Q.  Bear with me a second here.  Sorry,

8    you are going to have to bear with me a second.

9       Dr. Gibbons, last time you

10   testified -- I asked you:  "Then that would mean

11   that on the same day they had -- were diagnosed

12   as bipolar and then immediately went out and

13   tried to attempt some suicide act, correct?"  And

14   your answer was:  "It probably means that they

15   attempted suicide and then were brought into the

16   clinic and got the diagnosis."

17      And I asked you:  "Why would you

18   then -- if the suicide probably occurred before

19   the bipolar diagnosis, why would you have

20   included that in the dataset with bipolar as the

21   index?"  And your answer was:  "I thought it was

22   a reasonable thing to do."

23      Do you wish to change that testimony?

24      A.  Well, no --

913

1       MS. McGRODER:  Object to form and

2    foundation.

3    BY MR. ALTMAN:

4       Q.  You just said -- you just said the

5    opposite?

6       A.  No, I -- no, I didn't say the

7    opposite.

8       MS. McGRODER:  And I object to --

9    BY MR. ALTMAN:

10      Q.  Well, okay --

11      MS. McGRODER:  I mean, if you have a

12   question, Keith, ask it.  If you want to argue

13   with him, don't.

14   BY MR. ALTMAN:

15      Q.  Here is my question.  Your bipolar --

16   you did your analysis based upon one year of data

17   starting from the index -- starting from the

18   index date.

19      If a suicide happened before the

20   person was diagnosed with bipolar, why would you

21   have included it even if they were treated for it

22   on the date of the bipolar disorder?

23      MS. McGRODER:  Object to form, asked and

24   answered.

914

1    BY THE WITNESS:

2       A.  I think it is absolutely legitimate,

3    and I did exactly the same thing in other

4    analyses to use the date of the index episode to

5    define the risk period, and if a suicide attempt

6    occurred on that date, then it should be part of

7    the background risk.  Just as you would in a

8    study of myocardial infarction include the -- the

9    event if it occurred prior to the exposure during

10   the window of time.

11      Now, it may be that someone got the MI

12   on the day that the study started or the

13   observation period started, and then because they

14   got the MI, they were put on a drug, and there

15   may be regression effects.  I mean, the whole

16   point here is that this all is about whether or

17   not we can draw a causal inference of the

18   protective effects.

19      These are not the adverse effects of a

20   drug.  If the -- if a suicide attempt occurs

21   prior to taking the drug, it's a part of the

22   background rate.  It should be incorporated into

23   the background rate including if it occurred on

24   the same day as the index episode.

915

1     Now, the point that -- and the reason
2  I did the sensitivity analysis is that people
3  have raised a very good point, and the point is
4  is that if you are trying to determine whether or
5  not a drug is protective and somebody gets
6  brought in to the cohort because they have
7  exhibited the event, then by regression alone you
8  would expect the rate of the event to go down.
9     If you pick, you know, tall parents,
10  you were going to have shorter kids.  If you pick
11  someone on the basis of having an extreme event,
12  the only way you can go is down.  So there may be
13  a natural course of decreases over time.
14     One way of dealing with that is to do
15  a person-time logistic regression where you allow
16  the rate of the event to go down and then look at
17  the effect of exposure above and beyond that
18  natural decay in the rate.  Another way to do it
19  is to say, as a sensitivity analysis, well, what
20  if we take the extreme view and throw out
21  everybody in the sample who had a suicide attempt
22  on the same day.  Once we throw them out, clearly
23  we don't have anybody where the suicide attempt
24  led to the treatment.  We only have people where

916

1  the treatment could have led to the suicide
2  attempt.
3     And that's a valid sensitivity
4  analysis, but it's not an analysis, as you are
5  portraying, that -- that I did because in some
6  way I think it was a mistake to do the primary
7  analysis which included suicide attempts on the
8  date of the index diagnosis.  I think that's
9  totally legitimate, and I certainly don't change
10  my opinion from -- from our previous deposition.
11  BY MR. ALTMAN:
12     Q.  You excluded a suicide attempt that
13  took place on the day before the bipolar
14  diagnosis, right?
15     A.  That's correct.
16     Q.  Why?
17     A.  Because that's part of the background
18  period of time.  It didn't occur based on the
19  definition of -- you know, if the definition was
20  from the date of the bipolar -- the date of the
21  bipolar index was the follow-up period.
22     So if we have a suicide attempt -- you
23  know, the person didn't wake up in the morning
24  and say guess what, I don't have bipolar

917

1  disorder.  I made a suicide attempt, and then at
2  3:00 they went to the doctor, and the doctor said
3  right now you have bipolar disorder.
4     Q.  So you think it was the other way --
5  well -- strike that -- strike that.
6     But -- well, aren't you by including
7  these, did you look to see how many people took
8  gabapentin on the date that they were -- on the
9  index date?
10     MS. McGRODER:  Object to form.
11  BY MR. ALTMAN:
12     Q.  How -- did you look to see how many
13  people took gabapentin on the index date?
14     A.  At some point I believe I did.  There
15  were -- you know, there were -- because some of
16  these people had gabapentin on the first -- you
17  know, on the index date they got the diagnosis.
18  There were people who got -- made a suicide
19  attempt who got a bipolar diagnosis and then were
20  given treatment, you know, all on the same day.
21     I don't know if I have done that
22  analysis separately for gabapentin but certainly
23  for the overall antiepileptic drug.
24     MR. ALTMAN:  Do you know what, let's mark

918

1  just as Exhibit -- is that 58?
2     MS. McGRODER:  Yes.
3     MR. ALTMAN:  Let's call this 58A.  I'm going
4  to give you an unmarked up chart.
5     (WHEREUPON, a certain document
6        was marked Gibbons Deposition
7        Exhibit No. 58A, for
8        identification, as of 3/5/09.)
9  BY MR. ALTMAN:
10     Q.  Dr. Gibbons, of the ones you crossed
11  out on Exhibit 58, how many of those had
12  gabapentin on the same day as the index date?
13     MS. McGRODER:  Object to form and
14  foundation.
15  BY THE WITNESS:
16     A.  Doesn't look like any of them did.
17  BY MR. ALTMAN:
18     Q.  So that has a huge -- that has a huge
19  influence by whether you put those six attempts
20  in the period -- whether you exclude or include
21  those six attempts that makes a big difference
22  for GAB -- the gabapentin analysis, doesn't it?
23     MS. McGRODER:  Object to form.
24

919

1    BY THE WITNESS:
2        A.   Which six attempts are we talking
3    about?
4        BY MR. ALTMAN:
5        Q.   The six that were on the same day as
6    the index date.
7        MS. McGRODER:  Same objection.
8    BY THE WITNESS:
9        A.   The people who made a suicide attempt
10   on the day of the index date were not taking
11   gabapentin --
12   BY MR. ALTMAN:
13       Q.   Right.  So --
14       A.   -- so how in this analysis could I
15   attribute those suicide attempts to taking
16   gabapentin.  Those were in the background --
17       Q.   Agreed.
18       A.   -- before they took gabapentin.
19       Q.   And that's where I agree with you 100
20   percent.
21            So, therefore, by having those six
22   included in the background rate, you have
23   substantially raised the background rate and that
24   100 percent affects the background and not

920

1    gabapentin, correct?
2        MS. McGRODER:  Object to form and
3    foundation.
4    BY THE WITNESS:
5        A.   The background rate is what the
6    background rate is.  I haven't raised or lowered
7    the background rate of suicide attempts.  The
8    background rate of suicide attempts is measured
9    by the rate of suicide attempts from the date of
10   the index episode to the point at which they
11   initiated the drug.
12            That is the rate of suicide attempts
13   in this cohort prior to exposure to the drug.
14   Following the initiation of drug to the end of
15   the study in the primary analysis, that is the
16   rate of suicide attempts following the initiation
17   of drug.
18   BY MR. ALTMAN:
19       Q.   But you make this arbitrary
20   distinction as to the index date --
21       A.   There's nothing arbitrary about it.
22       Q.   Let me finish my question.
23       A.   I'm sorry.
24       Q.   You make a decision that a suicide

921

1    attempt on the index date -- if a suicide attempt
2    preceded the bipolar diagnosis, the person
3    attempted suicide in the morning, gets treated,
4    gets diagnosed as bipolar.  Okay.  That person
5    gets included in the analysis.  But a person who
6    the day before attempts suicide and on the index
7    date gets treated bipolar, that person gets
8    excluded?
9        MS. McGRODER:  Object, asked and answered.
10   BY MR. ALTMAN:
11       Q.   That makes a real -- that makes a very
12   big difference here.
13       MS. McGRODER:  Same objection.
14   BY THE WITNESS:
15       A.   First of all, that person does not get
16   excluded.  That suicide attempt goes into the
17   analysis, but it becomes a covariate of suicide
18   attempts in the prior year.  So to say that that
19   suicide attempt gets excluded is wrong.  That
20   suicide attempt is in every one of these analysis
21   as a covariate in the model.
22            If we define the -- the -- you know, I
23   mean, if you define in a randomized clinical
24   trial the first day of medication and somebody

922

1    makes a suicide attempt on that first day of
2    medication, it's going to be an adverse event
3    that's associated with the medication arm of that
4    study.
5            If the suicide attempt is in the
6    washout period on the last day or the baseline
7    day of that randomized control trial, it will not
8    go into the treatment arm of that study, and
9    there's nothing different here.  If anything, we
10   are making use of those -- those suicide attempts
11   that occur in an entire year prior to the
12   initiation of the index diagnosis.  So all of
13   those suicide attempts are in the analysis.
14   BY MR. ALTMAN:
15       Q.   All right, but they are not in --
16   Table 1 would not include all the ones in the
17   prior year, correct?
18       A.   Of course not because Table 1 talks
19   about from the date of the index diagnosis to the
20   end of the year.  Now, you are trying to make the
21   distinction that if the suicide attempt occurred
22   on the same day as the treatment, that I'm
23   treating that as it occurred before the
24   treatment.  Well, of course, I am because the

923

1  suicide attempt occurred before the person took
2  the drug.
3         However, if the suicide attempt
4  occurred on day one of the observation period,
5  I'm counting it in the background because it
6  occurred within my window of the observation
7  period, and it occurred before the person started
8  drug.
9         Now, I certainly believe that a person
10  who made a suicide attempt at 3:00 in the
11  afternoon, got rushed to the emergency room, got
12  a diagnosis of bipolar disorder, had bipolar
13  disorder all day long.  I do not believe that a
14  person who made a suicide attempt at 2:00, got
15  rushed to the emergency room, got a diagnosis of
16  bipolar disorder, and then was given a
17  prescription to fill of gabapentin I don't
18  believe in any way that the gabapentin was
19  responsible for the suicide attempt, and I think
20  that that is perfectly justifiable, and I cannot
21  think of any other way to do it, and I also did
22  a -- I did a sensitivity analysis to explore the
23  effect of including those folks in the analysis.
24         Q.   And that had a big effect, didn't it?

924

1         MS. McGRODER:  Object to form.
2  BY THE WITNESS:
3         A.   Yes, it did, and that big effect is --
4  speaks to the question of whether or not
5  gabapentin or antiepileptic drugs are protective
6  for suicide attempt.  It does not speak to the
7  effect of whether or not they are causing suicide
8  attempts.
9  BY MR. ALTMAN:
10         Q.   We are not even discussing that.  You
11  made a conclusion in your paper that said:  "If
12  anything, the effects of most AEDs and lithium
13  are to reduce suicide attempt rates relevant to
14  pretreatment levels in those patients who are
15  ultimately prescribed those drugs."
16         So that's -- that's what I am talking
17  right there.
18         A.   And I --
19         MS. McGRODER:  Well, wait.  Is that a
20  question?  I mean, what is your question?
21  BY MR. ALTMAN:
22         Q.   Well, we are not talking about -- we
23  are not talking about cause and effects.  We are
24  talking about protective effects, and the

925

1  question whether that statement is justified.
2         MS. McGRODER:  Is your question is that
3  statement justified?
4         MR. ALTMAN:  Well, I know what he is going
5  to say.  So I don't have to ask him that but --
6         MS. McGRODER:  Well, you have to ask a
7  question so he can answer something.  It can't
8  just be a debate you want to engage in.  Ask a
9  question.
10  BY MR. ALTMAN:
11         Q.   Would it be reasonable -- would it
12  have been reasonable for a person to decide that
13  suicide attempts on the index date are not to be
14  included?
15         A.   I don't believe so.  I think that
16  would have been unreasonable.  I think with the
17  question now you've just drawn a distinction
18  between causal inference and protective effects,
19  and I will -- I will tell you that there are many
20  people who will say that as soon as you start
21  using the word "protective," you are drawing a
22  causal inference.
23         So this whole line of research is
24  really about trying to determine whether or not

926

1  there's justification for using the word
2  "protective effects" or drawing a causal
3  inference and whether or not the effect is
4  protective because there are other alternative
5  explanations like regression effects, like the
6  natural course of the disease, and what -- what
7  really makes all this really interesting is
8  trying to tease apart which parts of these are
9  artifacts of regression effects, are artifacts of
10  the natural course of the disease, and which ones
11  are real effects.
12         Q.   Dr. Gibbons, does your paper stand for
13  the proposition that gabapentin -- the use of
14  gabapentin is protective for suicide attempt?
15         MS. McGRODER:  Wait.  His --
16  BY MR. ALTMAN:
17         Q.   All right.  Strike that.  I will ask
18  it -- I'll ask it differently.
19         Your manuscript, does your manuscript
20  allow you to conclude that gabapentin is
21  protective for suicide attempts?
22         A.   The conclusions in my manuscript are
23  related to antiepileptic drugs in general, and
24  the conclusions are that the antiepileptic drugs

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

927

1    do not increase the risk of suicide attempts
2    whatsoever, and, if anything, they decrease.  As
3    we've seen for the overall analysis, they
4    significantly decrease the risk of suicide
5    attempts following the initiation of drug.
6          There can be other explanations beyond
7    the fact that the drug is itself responsible for
8    decreasing the suicide attempt rate, and the
9    sensitivity analyses that I have performed
10   specifically look at those questions.
11         MR. ALTMAN:  Objection, non-responsive.
12   BY MR. ALTMAN:
13       Q.   Does your manuscript allow you to
14   conclude that gabapentin is protective for
15   suicide attempts?
16         MS. McGRODER:  Objection, asked and
17   answered.  You can answer it the same way, if you
18   want.
19   BY THE WITNESS:
20       A.   Just keeping answering it in the same
21   way.  Where we -- the manuscript shows that there
22   are statistically significant decreases
23   associated with the use of antiepileptic drugs in
24   general and gabapentin in particular from the

929

1    the word protective to show that there was a
2    statistically significant reduction associated
3    with the use of gabapentin in these data, the
4    answer would be they would be correct.  There is
5    a statistically significant reduction in the
6    rate.
7          Is it a causal effect?  Is it really
8    because they took the drug, or is it because in
9    part the time period after taking gabapentin is
10   further away from the index episode then -- then
11   the time point before and there's a natural
12   decline.  That's another alternative explanation.
13   That's why I did the person-time logistic
14   regression models to try and control for that.
15         The results of that analysis are
16   consistent showing a very similar odds ratio,
17   very similar protective effect.  So it's kind of
18   the best I can answer your question.
19         MS. McGRODER:  I need to take a break.  I
20   apologize.
21         MR. ALTMAN:  Yes.  Let's -- let's go off the
22   record.
23         THE VIDEOGRAPHER:  This is the end of tape
24   No. 4.  Off the record at 2:12.

928

1    period prior to the initiation of drug to
2    following the initiation of drug.
3          What my manuscript does not say is
4    that one can draw a causal inference that this
5    protective effect, this significant decrease is,
6    in fact, a protective effect of the drug, and --
7    and the goal of all of this work, what makes this
8    scientifically interesting is to try to figure
9    out which combination of sensitivity analyses
10   would allow you to draw that kind of inference
11   from these kind of observational data.
12   BY MR. ALTMAN:
13       Q.   If another expert were to say
14   Dr. Gibbons' paper proves that gabapentin is
15   protective of suicide, would that expert be
16   wrong?
17         MS. McGRODER:  Object to form and
18   foundation.
19   BY THE WITNESS:
20       A.   The expert -- it depends on how the --
21   how this expert was using the word protective.
22   If they were using the word protective the way I
23   would use the word protective, then I think that
24   might be a misinterpretation.  If you were using

930

1          (WHEREUPON, a recess was had at
2          2:12 p.m. until 2:30 p.m.)
3          THE VIDEOGRAPHER:  This is the beginning of
4    tape No. 5.  We are back on the record at 2:30.
5    BY MR. ALTMAN:
6        Q.   Dr. Gibbons, we just talked about --
7    spent quite a bit of time talking about the
8    bipolar analysis -- the bipolar manuscript.  The
9    discussions we had, would they essentially apply
10   to the gabapentin -- the gabapentin analysis as
11   well?
12       A.   I think that statement is probably,
13   you know, a little too broad for me to answer --
14       Q.   Okay.  That's fine.
15         Just like with the bipolar analysis
16   where you said you could not conclude that the
17   AEDs cause a protective effect, is that -- is
18   that the same -- can you say the same thing in
19   terms of the gabapentin study that you did in
20   your expert report?
21         MS. McGRODER:  Object to form, misstates --
22   that misstates his testimony.
23   BY THE WITNESS:
24       A.   I think that -- I mean, if what you

931

1    are asking me is would I on the basis of either
2    the bipolar analysis or the gabapentin analysis
3    indicate that there is an unequivocal causal
4    protective effect of gabapentin, the answer is,
5    no, I couldn't draw that from -- you know, these
6    are observational data.  There are some other
7    alternative explanations.
8         I think that it may be possible to do
9    so through sensitivity analyses through
10   additional analyses, but I don't think anything
11   that -- I would not state that I believe that the
12   significant decreases that we are seeing in off
13   drug, on drug, predrug, post-drug are necessarily
14   a causal effect of the drug.
15        There are other potential
16   explanations, and until those potential
17   explanations are adjusted for, I wouldn't state
18   that there is a causal protective effect.
19   BY MR. ALTMAN:
20        Q.   And one of those influences would be
21   the effect of other drugs which is something you
22   could not remedy with the dataset from
23   PharMetrics as purchased, correct?
24        A.   I would say that that one would be

932

1    probably the least of my concerns, but that is
2    certainly a limitation of the study.  If there
3    are other drugs out there that might exert a
4    protective or a harmful effect on suicide attempt
5    rates that we may or may not even know about at
6    this stage, you know, that's certainly a
7    limitation since not every drug is included,
8    but -- but to me, that's really one of the more
9    minor points.
10        A larger point is the question of
11   teasing apart the natural history, the natural
12   course of the disease from the potential effects
13   of the -- of the drugs.
14        Q.   Do you think you will be able to do
15   that with the PharMetrics data?
16        A.   I think that some of the sensitivity
17   analyses start to speak to that.  I think the
18   person-time logistic model speaks to that to some
19   extent.  I don't know.
20        I mean, I'm going to continue to work
21   on this obviously in one way or another, not just
22   for these drugs, but, you know, in general for
23   all drug safety kinds of problems.  How do you
24   derive causal inferences for either protective or

933

1    harmful effects of drugs for a variety of adverse
2    events.
3         Q.   I have to check something for a
4    second.
5         You stated that you saw no evidence
6    that gabapentin was causing suicide attempts
7    correct?
8         A.   Correct.
9         MS. McGRODER:  Object to form.
10   BY MR. ALTMAN:
11        Q.   How do you know that gabapentin is not
12   leading to an increased risk and that risk is
13   being counterbalanced by some other factor?
14        MS. McGRODER:  Object to form.
15   BY THE WITNESS:
16        A.   I think that the sensitivity analyses
17   go a long way to show that that's not the case,
18   particularly the person-time logistic models that
19   are really looking at the coincidence between
20   exposure to the drug and suicide attempts,
21   adjusted for previous suicide attempts, age, sex,
22   year, concomitant medications, and the natural
23   decreases in the overall suicide attempt rates
24   that occur over time in that -- in that bipolar

934

1    cohort.
2    BY MR. ALTMAN:
3         Q.   But once again, you are not adjusting
4    for another drugs that are not in the set you
5    purchased, correct?
6         MS. McGRODER:  Object to form.
7    BY THE WITNESS:
8         A.   I can only adjust for the drugs that,
9    you know, are part of the analysis and a part of
10   the PharMetrics database.  I suspect that there
11   may -- you know, if there are other drugs out
12   there, they are probably correlated with the use
13   of some of the drugs that are in the analysis,
14   but to the extent that, you know, they are not in
15   there, I can't tell you exactly that their
16   affects would be, of course.
17   BY MR. ALTMAN:
18        Q.   So when you said before that this
19   would be a minor effect, you don't really know
20   that that's a minor effect.  You don't know what
21   the effect would be?
22        MS. McGRODER:  Object to form.
23   BY THE WITNESS:
24        A.   I believe that, you know, through

935

1    the -- through consultation with folks like John
2    Mann and others that, you know, we are looking at
3    the major CNS-type drugs that are in use under
4    those categories: Antidepressants,
5    anticonvulsants, antipsychotics. There may be
6    others that are not included in that list.
7         I would think those are more, you
8    know, modest in terms of the numbers of
9    prescriptions, and, you know, may not be used
10   very frequently or may be used in conjunction
11   with a drug that -- that is in our analysis.
12        I don't think we have excluded any
13   drug that is known to increase or decrease
14   suicide attempt rates in general. There's no
15   smoking gun.
16   BY MR. ALTMAN:
17       Q.   But you are -- but we talked about
18   Xanax before. You are aware that Xanax is often
19   used with bipolar patients, correct?
20       A.   Well, I -- my -- my understanding
21   of --
22       MS. McGRODER: Wait, you have to let me
23   object to form and asked and answered. Go ahead.
24

936

1    BY THE WITNESS:
2        A.   Right. I don't -- I have no reason to
3    believe that bi -- that Xanax is used widely with
4    bipolar patients, and, in fact, my understanding
5    from talking to clinicians is that Xanax isn't
6    used very much at all anymore.
7    BY MR. ALTMAN:
8        Q.   For any condition?
9        A.   For the treatment of psychiatric
10   conditions.
11       Q.   And once again, you say a -- you say
12   antipsychotics, but at least according to the
13   PharMetrics data, it limited to atypical
14   antipsychotics, correct?
15       MS. McGRODER: Objection, asked and answered
16   15 times.
17       MR. ALTMAN: I just want to clarify when he
18   says the term "antipsychotics" that's what he
19   means.
20   BY THE WITNESS:
21       A.   I have to go back and take a look at
22   the specific list to see whether or not that's
23   consistent with what's in the PharMetrics
24   license.

937

1    BY MR. ALTMAN:
2        Q.   Can we agree that when you use the
3    term "antipsychotics," it's limited to whatever
4    antipsychotics were purchased from the
5    PharMetrics database so we don't have to go
6    through this every time?
7        A.   Yes.
8        Q.   Okay. That's fine. Then I can live
9    with that.
10        And can we agree that when you have
11   used the term "antipsychotics" in the past, you
12   have meant consistent with whatever was produced
13   in the PharMetrics data?
14       A.   I cannot draw inference beyond what
15   the data I have.
16       Q.   No, I just want to make sure
17   that just -- can I -- can we say that going
18   backwards from this point, every time you have
19   used the term "antipsychotics" within any of
20   these analysis, it's always been limited to that
21   for which you actually purchased from the
22   PharMetrics. You did not mean all antipsychotics
23   what you got it from PharMetrics or not?
24       A.   Yes, I don't believe I have ever used

938

1    the term "antipsychotics" beyond reference to the
2    antipsychotics that were contained in the
3    PharMetrics database.
4        Q.   Fine. Then we don't have to deal with
5    that anymore.
6         I think you have your November 5th
7    expert report there. I know we talked about it
8    earlier. It's Exhibit 21. Is it in that pile
9    there? Oh, there it is (indicating).
10       A.   Oh, okay.
11       Q.   Of course, it's the last one you look
12   at --
13       A.   Right.
14       Q.   -- as always.
15        Can you give me the May expert report
16   which was Exhibit 9. That's it.
17         (WHEREUPON, the document was
18         tendered to the witness.)
19   BY MR. ALTMAN:
20       Q.   Dr. Gibbons, I am going to hand to you
21   what was previously marked as Exhibit 9 in your
22   last deposition which was your May expert report,
23   and I'd like you to go to page 14, and under
24   Opinion 2 -- we talked about this a bit last time

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

939

1   about how many events you would expect to see.
2   If you just want to read through that quickly to
3   refresh your memory.
4       A.   Okay.
5       Q.   In your opinion does the work that you
6   did for point two there constitute an adequate
7   test of heterogeneity for the FDA dataset?
8       MS. McGRODER:  I object because this
9   deposition is limited to the new data and
10  information that we provided after the last time,
11  and you could have asked him this very question
12  at the last deposition for those 14 hours of
13  cross-examination, and -- and so we came here
14  with the condition that you would be asking about
15  the new data and analyses that were provided
16  after the fact.  So I hope we are not going to
17  replow old ground now.
18      MR. ALTMAN:  Well, we are going to ask some
19  questions, and I don't recall that condition or
20  any limitation.
21      MS. McGRODER:  Well, it's in my letter to
22  you stating that we would give you one more day
23  for the deposition of Dr. Gibbons limited to the
24  data provided after the date of his last --

940

1       MR. ALTMAN:  Lori, we don't -- we don't
2   agree with that.  I have some questions.  You can
3   object if you want.
4       MS. McGRODER:  Well, I do object.  I mean,
5   you had 14 hours of cross-examination.  Jack took
6   up part of that, but you could have asked all the
7   questions about his May 19th report at the last
8   deposition, and for you to go back and ask
9   questions on the same materials that you already
10  had, wasn't my understanding for today.
11      MR. ALTMAN:  Lori, we never agreed to that
12  No. 1.  No. 2, there's no time limitation in
13  California.  I'm not going to spend enormous
14  amounts of time, and I suggest you just let me
15  ask my questions, and let's get this over and
16  done with.
17      MS. McGRODER:  Okay.  Well, I object to it.
18      MR. ALTMAN:  Okay.
19      MS. McGRODER:  And if it goes on very long,
20  I'm not going to be happy about it.
21      MR. ALTMAN:  Your objection has been noted.
22      MR. LONDON:  I don't think it is going to
23  amount to much.
24      MS. McGRODER:  All right.

941

1       MR. LONDON:  I want to make sure you
2   understand.  You told me I could ask him about
3   the bills.  I am going to ask him a few questions
4   about those --
5       MS. McGRODER:  Well, that's okay.  That is
6   different, but this was a report that has been in
7   existence, and you could have asked --
8       MR. ALTMAN:  That's fine.
9   BY MR. ALTMAN:
10      Q.   In your opinion, does this constitute
11  an adequate test of heterogeneity?
12      A.   This is one piece, but, you know, this
13  is one piece of comparing the expectation based
14  on the FDA Alert to the data just for this one
15  drug.  So I wouldn't view this as a formal test
16  of heterogeneity.  I would view it as -- as a
17  piece of evidence that suggests that there was
18  substantial heterogeneity in the -- in the FDA
19  analysis, but is it a formal test of
20  heterogeneity across all of different drugs and
21  all of the, you know, multiple studies?  No, it's
22  just one piece of the puzzle.
23      Q.   And so this would not allow you to
24  conclude just based upon that analysis that these

942

1   data were hetero -- heterogeneous, correct?
2       MS. McGRODER:  Objection.
3   BY THE WITNESS:
4       A.   Well, you know, I mean, that's a --
5   that's actually a very tough question.  If you
6   have -- if you have an outlier in a dataset,
7   would you say that dataset is heterogeneous.
8   Well, yeah, I guess I would say it.
9            Would you say that the data is
10  homogeneous once you removed the outlier.  If it
11  were a single outlier and you had access to all
12  of the data, then you would say, yes, the data
13  were heterogeneous initially.  I removed the
14  outlier.  They are now homogeneous.
15           Here I would conclude from this that,
16  you know, there's clearly some heterogeneity at
17  least in term of the incidence across these
18  different studies.  If I removed this one study,
19  would what would be left over be homogeneous?  I
20  don't know.  I mean, I know now, but at the time
21  I wrote this report, I didn't know, and I
22  couldn't make that kind of claim because I didn't
23  have the data or any real information about what
24  data were available -- you know, what FDA had

943

1 really done.
2 BY MR. ALTMAN:
3    Q.   Did you ever actually do -- you have
4 been critical of the way the FDA did their
5 heterogeneity sensitivity analysis, correct?
6    A.   Yes.
7    Q.   Did you ever do one yourself?
8    A.   I wish I could.  FDA will not give me
9 those data that would allow me to do it, and I
10 can't abstract them from FDA's statistical
11 summary.  I have done this kind of analysis for
12 the for -- for the child psychiatric -- you know,
13 child antidepressant suicide analyses and one of
14 the cardiac medication analyses, an illustration
15 of some statistical work in this area, and I can
16 tell you that it makes a huge difference in FDA's
17 approach to meta-analysis and testing for
18 heterogeneity is a train wreck.
19    Q.   Did --
20    A.   Train wreck will be our word for the
21 day -- our word for the day instead of --
22    MS. McGRODER:  Exquisite.
23 BY MR. ALTMAN:
24    Q.   Are you aware that in this part of the

944

1 June 22, 2006 submission to the FDA, the company
2 also submitted -- you have seen -- you have seen
3 the letter.
4    We talked about it last time, correct?
5    A.   Yes.
6    Q.   You had received a spreadsheet I think
7 we talked about the last time?
8    MS. McGRODER:  The June 2006 submission?
9    MR. ALTMAN:  Yes.
10 BY MR. ALTMAN:
11    Q.   You received a spreadsheet, and that
12 you did some of your computations based on that,
13 correct?
14    A.   That's correct.
15    Q.   Did you get the actual SAS dataset
16 that the company had provided to the FDA in June
17 of 2006?
18    A.   No.
19    Q.   Were you aware that the company in --
20 sometime in March or April of 2007 also submitted
21 a SAS data set to the FDA?
22    MS. McGRODER:  Object to form and
23 foundation.
24

945

1 BY THE WITNESS:
2    A.   Not to my knowledge.
3 BY MR. ALTMAN:
4    Q.   Prior to that, were you aware the FDA
5 had come back to the company and said would you
6 please provide us some additional information
7 that you had not provided to us in the first
8 dataset?
9    A.   I believe I saw a series of letters,
10 and one of them from FDA that I saw recently
11 after our deposition and some of that discussion
12 say some letters that initially said this is what
13 we would like from you.  Thank you very much.  We
14 are happy with what you sent us, and then
15 another -- another letter that detailed some
16 additional information, yes.
17    Q.   All right.  Would you have liked to
18 have had the dataset -- strike that.
19    Would it have been useful to you in
20 your initial reports to have the dataset that the
21 company actually submitted to the FDA?
22    MS. McGRODER:  Well, object to form and
23 foundation.  It's an improper hypothetical and
24 assumes facts not in evidence.

946

1 BY THE WITNESS:
2    A.   Yeah, I mean, as I said many times
3 during our previous deposition, I asked to have
4 the data that were submitted to the FDA so that I
5 could decompose the effect contributed by
6 gabapentin and pregabalin from the -- from the
7 effect for the other drugs.  They gave me a
8 dataset in the format that I had requested.  I
9 assumed it was correct.
10    It was consistent with the number of
11 events at the very least that FDA had reported.
12 As we learned later, it wasn't consistent with
13 the total number of cases that FDA used in their
14 analysis.  In fact, nobody including myself that
15 I know of has been able to replicate exactly
16 which cases FDA ended up using in -- in their
17 analysis.
18    So for the purpose of what I was using
19 those data for, and as described in this report,
20 I was very happy with what I received from Pfizer
21 and made no further requests, and if I were doing
22 it over again, I would do the same thing.
23 BY MR. ALTMAN:
24    Q.   Do you think it might have been easier

947

1   to understand how the FDA had used the data if
2   you had the actual dataset the FDA received?
3       A.   No.
4       MS. McGRODER:  Object to form.
5   BY THE WITNESS:
6       A.   No.  I had the data that the FDA was
7   sent, and those were the data -- that was my best
8   information at the time of what FDA had used, and
9   the only way to determine what FDA had actually
10  used was to see their statistical report where I
11  saw that, you know, the number of events were the
12  same, but the number of cases were not, and I
13  think I know some of the reasons the FDA
14  decided -- although they asked for studies that
15  included both placebo-controlled and low-dose
16  comparators which were supplied to them and
17  supplied to me, they only ended up using the
18  placebo-controlled studies.
19      There were also studies in there that
20  had single dose that they excluded from their
21  analysis, but there was no evidence that they
22  were going to exclude such studies.  So, you
23  know, in -- at that time.
24

948

1   BY MR. ALTMAN:
2       Q.   But you did not have the data from the
3   early 2000 submission to the FDA, correct?
4       MS. McGRODER:  Early 2000 submission, what
5   are talking about?
6       MR. ALTMAN:  There was a submission of a SAS
7   dataset made to the FDA in March or April of 2007
8   and complies with a revised FDA request.
9       MS. McGRODER:  You said early 2000.
10      MR. ALTMAN:  Seven I said.
11      THE WITNESS:  No, you said early 2000.
12      MR. ALTMAN:  I'm sorry --
13      MS. McGRODER:  It's just you haven't shown
14  him one document.  So the questions are very
15  abstract.  So at least be correct on the date.
16      MR. ALTMAN:  Okay.  That's fine.
17  BY MR. ALTMAN:
18      Q.   The 2000 -- the 2007 submission.  You
19  don't know -- you never saw what the company
20  actually sent to the FDA, correct?
21      MS. McGRODER:  Object to form.
22  BY THE WITNESS:
23      A.   It wouldn't matter.  It wouldn't
24  change anything.  It wasn't until FDA came out

949

1   with their statistical report that I had any
2   information as to exactly which cases, and I
3   still don't have information as to exactly which
4   cases they ended up using, and the 2007
5   submission whatever it was would not have
6   explicated that.
7   BY MR. ALTMAN:
8       Q.   Okay.  Are there any -- are there any
9   studies of any data with respect to gabapentin or
10  anticonvulsants that you are currently
11  undertaking that you have not told us about yet
12  or we haven't talked about?
13      MS. McGRODER:  Object to form.
14  BY THE WITNESS:
15      A.   The only data that I have for
16  gabapentin or antiepileptic drugs are the data
17  that I have from the PharMetrics database, the
18  two cohorts.  The gabapentin cohort I have done
19  all the analyses.  They are in my expert report.
20      At least to date, that's my only
21  intention of using them, although, I think they
22  are interesting, and the bipolar cohort I will
23  continue -- I will continue to do analyses in
24  order to hopefully find a home in print for

950

1   the -- for the paper.
2       But there are no other analyses that
3   I'm -- I've done or, you know, no other projects
4   that I'm planning to do.  I will, you know, maybe
5   in the future start looking at antiepileptic
6   drugs along with antidepressant drugs and some of
7   these other data sources that we have that are a
8   part of the -- part of our NIH grant since I now
9   know that they are kind of relevant to this area.
10  BY MR. ALTMAN:
11      Q.   Are you planning to do additional
12  sensitivity analyses for the two datasets that we
13  have been talking about today, the bipolar and
14  the gabapentin?
15      A.   I have no plans to do any further
16  analyses at all of the gabapentin dataset, and
17  any further analyses of the bipolar cohort, you
18  know, are either going to be done based on, you
19  know, having new research-related ideas or in
20  response to reviewers comments and suggestions or
21  criticisms.
22      Q.   Why did you do sensitivity analyses on
23  the gabapentin cohort?
24      MS. McGRODER:  Asked and answered.

951

1    MR. ALTMAN:  I didn't ask him why.
2    MS. McGRODER:  I think you did, but you can
3  answer again.
4    BY THE WITNESS:
5    A.   Well, I wanted to have consistency
6  between the sensitivity analyses I did for the
7  gabapentin and that I also did -- I did for the
8  bipolar cohort for the purpose of the paper and
9  also for the gabapentin analysis for the
10  gabapentin cohort just so that -- you know, be
11  able to rule out some of these alternative
12  explanations.
13    MR. ALTMAN:  Let's go off the record for a
14  few minutes.
15    THE VIDEOGRAPHER:  Off the record at 2:53.
16       (WHEREUPON, a recess was had at
17       2:53 p.m. until 3:02 p.m.)
18       (WHEREUPON, certain documents
19       were marked Gibbons Deposition
20       Exhibit Nos. 59, 60, for
21       identification, as of 3/5/09.)
22    THE VIDEOGRAPHER:  And we are back on the
23  record at 3:02.
24

952

1  BY MR. ALTMAN:
2    Q.   Dr. Gibbons, I want to mark a couple
3  of exhibits.  I am going to hand you what's been
4  marked as Exhibit 59.
5    MR. ALTMAN:  I don't have multiple copies.
6  I'm sorry.
7    MS. McGRODER:  That's okay.
8    MR. ALTMAN:  Is it just a presentation.
9  Unfortunately, I couldn't print out multiple
10  copies.  It's not printing right.
11    MS. McGRODER:  But I sent you a printed --
12    MR. ALTMAN:  You did.  You did but every
13  time -- I don't know how you printed it, and I
14  couldn't.
15    MS. McGRODER:  Neither could I.
16    MR. LONDON:  When we printed it, it printed
17  international map symbols and --
18    MS. McGRODER:  No, but you didn't just copy
19  the printed copy I gave you.
20    MR. ALTMAN:  That what I did for this
21  because I couldn't just print it out so.
22    MS. McGRODER:  Yes, I don't know.  That
23  happened to me too.
24

953

1  BY MR. ALTMAN:
2    Q.   Does that appear to be the
3  presentation that you made at Harvard?
4    A.   Yes.
5    Q.   Okay.  I'm going to hand you what's
6  been marked as Exhibit 60.
7       Exhibit 60 are three sets of programs
8  which represent all the different programs you
9  had provided so far as -- for your sensitivity
10  analyses.
11       Does that appear at first glance to be
12  what you see there?
13    MS. McGRODER:  Well, object, foundation.
14  BY THE WITNESS:
15    A.   It appears to be.  I don't know.
16  There's a lot of pages here.
17    MS. McGRODER:  Can you -- can you tell us
18  did you print that from all the data I gave you?
19    MR. ALTMAN:  Yeah, this is -- this is the
20  programs that went along with the sensitivity
21  analyses.  It came in two waves.  There was the
22  first wave, and then there's the wave that just
23  came the other day.  The patient year stuff, and
24  that's why you will see at the bottom if you look

954

1  it says P year, BP and GABA are how you can tell
2  they are basically in three sets.
3  BY THE WITNESS:
4    A.   Kind of looks like what I sent.
5  BY MR. ALTMAN:
6    Q.   Okay.
7    MR. ALTMAN:  I think I will pass the
8  witness.
9       EXAMINATION
10  BY MR. LONDON:
11    Q.   I think it will be easier if I'm kind
12  of down where you are.
13       Dr. Gibbons, I think it would be
14  easier for you if you probably just move all of
15  that stuff because I don't really intend to ask
16  you any pharmacoepidemiologic questions.
17       When we talked the other day during
18  your deposition, Ms. McGroder and I said we were
19  going to ask you some questions about documents
20  that had not been produced when I was asking
21  questions, and that's my goal.  Can I move
22  Keith's stuff here real quickly?  You are welcome
23  to keep these things in front of you.  It is just
24  that I don't really intend to ask you about them.

955

1    MR. ALTMAN: I think he wants to keep them
2  in suit in here.
3  BY MR. LONDON:
4    Q.   Whatever you want to do with them. I
5  am just trying to make it easier. In fact, so
6  that you will understand, for the most part, I
7  intend to ask you questions about Exhibit 25, and
8  Exhibit 25 are the invoices that you and
9  Ms. McGroder brought -- pardon me -- brought back
10  to the deposition the other day after I had
11  finished asking you my questions. Okay.
12     Before we go into the questions about
13  the bills, I want to see if I can understand one
14  thing that somehow between you and Mr. Altman
15  wasn't clear to me.
16     After the first round of your
17  depositions, those two days, I was given to
18  understand that you had performed sensitivity
19  analyses on the bipolar paper -- on the bipolar
20  paper. That you had done so because you had gone
21  to Harvard and had made a presentation and, you
22  know, you had the back and forth scholastically
23  and people raised questions and you say I believe
24  I will go do that, and then I wasn't clear then.

956

1  I'm clear now that you have done sensitivity
2  analyses on the gabapentin cohort that was the
3  subject of your November report in part.
4     Are you with me where I am so far?
5  A.   Yes.
6    Q.   Here is what I'm not clear on.
7     Is it possible to simply look at your
8  computer or Dr. Hur's computer or in someone's
9  portable drive or in someone's notebook and print
10  a file page that will show on what day things
11  were done?
12    MS. McGRODER: Object to form.
13  BY THE WITNESS:
14  A.   I don't think so because I think that
15  these analyses were, you know, rerun when there
16  were these, you know, give us the SAS programs,
17  give us the outputs. So they were rerun at those
18  times and then resaved. So I don't think we will
19  ever get what was the actual index date, if you
20  will, of when the gabapentin program was
21  originally run or anything like that.
22  BY MR. LONDON:
23    Q.   And when you say "the gabapentin
24  program was originally run," did you mean the

957

1  sensitivity analyses on the gabapentin program?
2  A.   That's correct.
3    Q.   Because that's what I was trying to
4  find out about.
5  A.   Right.
6    Q.   So there's nothing that you can
7  reproduce now that will show what at one time
8  would have been the first day you did this
9  sensitivity analysis on bipolar and then the
10  second sensitivity analysis you did and what day
11  that happened and then any further work on it
12  beyond what we already have in the exhibits?
13  A.   I believe so.
14    Q.   Okay. And that's what I wasn't clear
15  about.
16     Is it -- is it clear, though, that you
17  had not done a sensitivity analysis on the
18  bipolar cohort until after you went to make the
19  presentation I believe it was at Harvard sometime
20  in the autumn of last year?
21  A.   I believe it was October.
22    Q.   All right. And so to clear that up
23  and put that question to rest, you submitted the
24  paper to the JAMA publication and its sister

958

1  publication as a proposed scholarly article
2  before doing any sensitivity analysis on the
3  bipolar cohort?
4  A.   That's correct.
5    Q.   Okay. And is the same true of
6  gabapentin: You submitted the November 5th
7  expert report that was filed in court sometime in
8  November before doing any sensitivity analyses on
9  the gabapentin cohort?
10  A.   That's correct.
11    MS. McGRODER: Object to form only to the
12  extent he doesn't know whether his report is
13  filed in court or not but --
14  BY MR. LONDON:
15    Q.   Well, the reason I think it was filed
16  in court is because when we look at the paper, it
17  was filed in court, and it has the court filing
18  dates on the top of it, and it talks about it
19  being filed as a supplement to the Daubert
20  record. And that's why I think of it as the
21  November 5th report filed in November as a part
22  of the November filings in the case.
23    MS. McGRODER: He just wouldn't know that.
24  That's my --

959

```
 1   BY MR. LONDON:
 2       Q.   And I appreciate that, and I wouldn't
 3   have expected you to know the transmittal date,
 4   but you submitted it to Ms. McGroder and defense
 5   counsel for whatever they were going to do with
 6   it before doing any sensitivity analysis on the
 7   gabapentin cohort?
 8       A.   That's correct.
 9       Q.   Okay.  I'm going to do what I said.  I
10   am going to give you Exhibit 25.
11           (WHEREUPON, the document was
12            tendered to the witness.)
13   BY MR. LONDON:
14       Q.   Those are the bills that Ms. McGroder
15   presented my memory is it was on February 4th.
16   The bills were faxed in after our first session.
17   If you look at the page, you will see that
18   there's a fax printer line that says they were
19   faxed in at 6:30 in the evening on February 3rd.
20           So does that kind of help your memory?
21       A.   Yes.
22       Q.   Question No. 1:  Have you submitted
23   any more bills since the date of these bills that
24   are in Exhibit 25?
```

960

```
 1       A.   Yes.
 2       Q.   Do you have those?
 3       A.   No, not with me.  I'm sorry.
 4       Q.   Do you -- would you please --
 5   MS. McGRODER:  What's the last date of that?
 6   MR. LONDON:  Sometime in January.
 7   BY THE WITNESS:
 8       A.   I mean, I obviously submitted an
 9   invoice for the time that we spent together, not
10   that I wouldn't have done it for free.
11   BY MR. LONDON:
12       Q.   Well, in fact, a lot of people -- a
13   lot of people with whom I spend afternoons and
14   visits like this actually thank me for helping
15   make them better capable to do their job on the
16   next case.  And you should have actually offered
17   to contribute some of the money back to
18   Ms. McGroder --
19   MS. McGRODER:  I accept.
20   BY MR. LONDON:
21       Q.   -- for the scholarship that I gave
22   you.  I assume that didn't happen.
23           Is that true?
24       A.   It's still under -- I am still
```

961

```
 1   thinking about it.
 2       Q.   How much did you bill Ms. McGroder
 3   after the depositions?
 4       A.   I don't remember, but, you know, I can
 5   get all of the -- or she has all of the invoices.
 6       Q.   Okay.  And I request that you submit
 7   copies to us of those.
 8           I would like to ask you to take a
 9   pen -- doesn't matter to me what kind.  What I
10   would like for you to do is go through there and
11   in some way mark the pages that have to do with
12   the products liability case from those case --
13   those that have to do with what I assume is the
14   Tom Green case.  The --
15   MS. McGRODER:  I don't object to him doing
16   that, but we did go through that page by page
17   with Mr. Altman on day two of the deposition.
18   MR. LONDON:  Well, I just want him to mark
19   those so we don't talk about them anymore.
20   MS. McGRODER:  All right.  Well, I mean --
21   MR. LONDON:  Put an X on those --
22   MS. McGRODER:  Actually, that exercise
23   has -- has been done in this deposition already.
24
```

962

```
 1   BY MR. LONDON:
 2       Q.   Just take a minute, and just -- I
 3   don't care which ones you mark which, but if you
 4   will mark the pages that either are this case or
 5   mark the pages that are the other case because I
 6   don't want to ask you about the pages that are
 7   the other case.
 8   MR. ALTMAN:  Jack, before we do that, then
 9   maybe we can make this a new exhibit because the
10   old exhibit was 25, and we probably need to mark
11   this as a new exhibit --
12   MR. LONDON:  I don't mind doing that.  Do
13   you have a --
14   MR. ALTMAN:  Well, no, she can just mark
15   this one as the next exhibit number.
16   MR. LONDON:  That is the -- that is the
17   court's exhibit.
18   MR. ALTMAN:  No, that's 25, but let her mark
19   this as -- what's the next exhibit number?
20   THE COURT REPORTER:  61.
21   MR. ALTMAN:  Let her mark this as 61 with
22   the marks.
23   MS. McGRODER:  Isn't he working off of the
24   original?
```

963

1     MR. ALTMAN:  I know, but if he make marks
2  off of --
3     MS. McGRODER:  Are you going to be able to
4  see it?
5     MR. LONDON:  No, I would rather -- I would
6  rather just --
7     MR. ALTMAN:  Okay.  That's fine.
8  BY MR. LONDON:
9     Q.  Maybe I have a different way to do
10  this.  If it goes to Mr. Hopper or Ms. McGroder,
11  is it this case, and if it goes to --
12     A.  I'm not positive.  I don't think
13  that -- I don't think that works.
14     Q.  All right.  That's fine.
15     A.  And I'm assuming when you say this
16  case, the work that I did right from the
17  beginning on the Daubert is part of this case?
18     Q.  That's correct, yes.
19     A.  So just an X through the ones that are
20  related to the other case or a star up here?
21     Q.  That would be fine.  Star means other
22  case, asterisk.
23     A.  (Indicating).
24     Q.  All right.  Now --

964

1     MR. ALTMAN:  One second, Jack.  Let me just
2  look at the exhibit for one second.
3     MR. LONDON:  Sure.
4  BY MR. LONDON:
5     Q.  This morning Mr. Altman asked you
6  about I believe it was the sum of approximately
7  $10,100 that you had paid to Dr. Hur, and you
8  estimated that, as I recall, at least $8,000 of
9  those dollars related to the work on the
10  gabapentin case.
11     Is that your memory of what you said?
12     A.  Yes.
13     Q.  80 percent at least.
14     A.  None of those amounts showed up in any
15  of the bills that I saw in Exhibit 25 -- 25 as
16  such?
17     A.  That's correct.
18     Q.  Were those amounts inside those bills?
19     A.  Yes.
20     Q.  Okay.  How could we look at the bills,
21  if we could, and tell on what dates and in what
22  amounts Dr. Hur did work on the gabapentin case?
23     A.  All I did was sort of when I, you
24  know, would pay him, I was paying him at 1/5th

965

1  the rate that I did.  So I would just take -- I
2  would just add into my own hourly rate 1/5th of
3  that amount what I did -- you know, what I paid
4  to Kwan to get essentially reimbursed for that,
5  but I didn't break it out as a separate line
6  item.
7     Q.  Do you believe that -- he was being
8  paid $100 an hour, and you were being paid $500
9  an hour?
10     A.  Correct.
11     Q.  Do you believe that all of his
12  inclusions in his bills were in five-hour
13  increments?
14     A.  Roughly.  I mean, you know, I don't --
15  I mean, I don't know if it worked out exactly
16  like that.
17     Q.  Well, I'm just looking for example --
18     A.  There won't be an example.  I mean,
19  there's nothing that says exactly.  I mean, I
20  just --
21     Q.  If you look at the bill for September
22  2 just as an example, it's a bill for 40 hours at
23  $500 an hour, $20,000.
24     If that were $20,100, we could

966

1  conclude that $100 of those dollars went to
2  Dr. Hur's time?
3     A.  Correct.
4     Q.  But without such an indication or a
5  breakout, is there just no way to know?
6     A.  No way to know.
7     Q.  Did Dr. Hur do anything more than just
8  tell you, oh, this many hours from time to time,
9  and then you would double that and include that
10  in the bill to Ms. McGroder?
11     A.  Well, I wouldn't double it in a bill
12  to Ms. McGroder.  He would -- I would write him
13  checks from time to time based on his level of
14  effort, and if I felt that he had put in more
15  effort than he was telling me, then I would write
16  the check accordingly, and as I would bill
17  Ms. McGroder, I would, you know, add in -- I
18  would increase my rate by an hour or two hours or
19  five hours or whatever it was to accommodate the
20  expenses.
21     Q.  Okay.  Okay.  Now, I want to start
22  with these bills and kind of work backwards, if
23  we can.
24     The last bill we have appears to be

967

1    January 22, 2008?
2        A.  Yes.
3        Q.  Would that have been work done on the
4    gabapentin cohort or in preparation for the
5    deposition?
6        MS. McGRODER:  Object to form.
7    BY THE WITNESS:
8        A.  I think this was reviewing other
9    people's depositions.
10   BY MR. LONDON:
11       Q.  All right.  In preparation for your
12   own deposition?
13       A.  For my own.
14       Q.  All right.  Fine.  Moving forward --
15       MS. McGRODER:  Backward.
16       MR. LONDON:  Forward in time.  It could be
17   backward in time, forward in the document.
18   BY MR. LONDON:
19       Q.  The next bill that I see that is not
20   starred is November 30, 2008.
21           Do you see that?
22       A.  Yes.
23       Q.  The description on that bill is:
24   "Prepare CD with materials relied upon for

968

1    PharMetrics analyses, eight hours at $500 an
2    hour," correct?
3        A.  That's correct.
4        Q.  What is the CD that you were referring
5    to in that invoice?
6        A.  One of the CDs that took all of the
7    different analyses and, you know, we just kind of
8    went back and got all of the -- all of the data
9    with the PharMetric -- the PharMetrics data, all
10   the intermediate SAS files, and one of -- one of
11   the CDs that was transmitted to you guys.
12       Q.  Well, that's the only bill I have seen
13   so far that has a CD on it.  How can we identify
14   whether that's a CD that was sent to us guys?
15       MS. McGRODER:  I can tell you if you want to
16   know.
17   BY THE WITNESS:
18       A.  I'm assuming Ms. McGroder can tell
19   you.
20   BY MR. LONDON:
21       Q.  Yeah, but she's not a witness in the
22   case and you are.  So I kind of have to ask you
23   if you can tell.
24       A.  Well, I sent it to Ms. McGroder with

969

1    the idea that she was going to forward it on to
2    you.
3        Q.  All right.  Then can you tell me what
4    was in that CD?
5        A.  These were all of the original -- the
6    PharMetrics database, the -- all of the SAS
7    programs, the intermediate files.  They didn't
8    include the outputs.  We later provided the
9    outputs, but all the SAS files and so forth.
10       Q.  And I can assume there were no
11   sensitivity analyses in those as well.  Is
12   that --
13       A.  That's correct.
14       Q.  Okay.  Moving toward the front of the
15   exhibit further backward in time, the next bill
16   is November 15, 2008.
17           Do you see that?
18       A.  That's an asterisk.
19       Q.  Is it?  I apologize.  You are correct.
20           The next bill that I see is October
21   the 18th.  Will you take a quick look and make
22   sure that I'm correct in that?
23       A.  Yes.
24       Q.  Are there any other bills between

970

1    October 18th and the November bill that we talked
2    about earlier?
3        A.  Which November bill?
4        Q.  You just talked to me a few moments
5    ago about a November bill in which you submitted
6    a CD.  It's dated November 30th.
7        A.  No, I don't believe so.
8        Q.  Okay.  Here is -- here is what's on my
9    mind.
10          In the bill of October 18th, it says:
11   "Complete analytic work on PharMetrics data and
12   prepared draft report."  The next bill is after
13   the report was filed in court sometime in
14   November, and it only talks about a CD.
15          Is there a bill or did you bill them
16   for your final report dated November 5?  And it's
17   okay with me if you send them another bill.  I
18   don't mind that.  I just want to know.
19       A.  You know, I can't -- sitting here
20   right now, I can't -- I can't really tell you.
21   It may be that, you know, it was pretty close to
22   final, and it might have been a couple of hours
23   or an hour to complete it, and I included that on
24   that November 30th bill.

971

1    Q.   Well, the November 30th bill -- I'm
2  not quibbling with you -- doesn't say anything
3  about reports, does it?
4    A.   Please understand, you know, I'm a
5  university professor.  I'm not too good at
6  providing really good descriptions of what I do
7  on these bills, and -- and in the past, not by
8  any of the lawyers sitting at this table, I have
9  been counseled in prior litigations in different
10  areas that having exquisitely detailed bills may
11  not be the best plan for litigation-related work.
12  So I haven't been very, very detailed in what I
13  have described in the work and haven't had too
14  many objections.
15    Q.   Well, did Ms. McGroder or someone call
16  you after the November bill and say does this
17  include your work on the final report?
18    A.   No, I've received no calls from
19  anybody regarding whether any -- any other
20  details about my bills.
21    Q.   All right.  Did Ms. McGroder call you
22  after the October 18th bill and ask whether that
23  would be enough to cover you through the filing
24  of the final report?

972

1    MS. McGRODER:  Object to form.
2  BY THE WITNESS:
3    A.   I never had a conversation with
4  Ms. McGroder regarding my -- the contents of my
5  bills or whether I would be billing on any -- any
6  area.
7  BY MR. LONDON:
8    Q.   These bills or any of the other bills
9  in that exhibit, is that what you are saying?
10    You have submitted them.  They have
11  been paid.  You have never discussed them with
12  Ms. McGroder?
13    A.   That's correct.
14    Q.   Okay.  Moving forward, the next bill
15  that I find that appears to not have an asterisk
16  is dated September 2, 2008.
17    Do you see that?
18    MS. McGRODER:  Did you already talk about
19  the October 5?
20    MR. LONDON:  I thought I did.
21    MS. McGRODER:  I might have just missed it.
22    MR. LONDON:  Okay.  We will talk about
23  October 5.
24    THE WITNESS:  You are trying to help him

973

1  out?
2    MS. McGRODER:  Sorry.  As soon as I said it,
3  I thought.
4    MR. LONDON:  She wants -- she want you to
5  come off looking good.
6  BY MR. LONDON:
7    Q.   What's the subject of your October 5
8  bill?
9    A.   Oh, no, not the October 5 bill.
10    Q.   I mean, you charged them $20,000 for
11  40 hours on October 5?
12    A.   How could you miss that, Mr. London?
13    Q.   It didn't seem like much money, and
14  then you charged them $16,000 13 days later.
15    Apart from that, what did I know about
16  those bills and what you did?
17    A.   This was in support of the work on the
18  analysis of the gabapentin cohort, thinking about
19  analyses, performing analyses, reviewing, redoing
20  analyses, a variety of different things.
21    Q.   But there's no way -- and you told me
22  earlier that you couldn't look at any of your
23  computer screens and reproduce these dates, and
24  now you are telling me there's no way we can look

974

1  at time records or e-mails or anything and
2  reproduce what was done on these dates.  Is that
3  true?
4    MS. McGRODER:  Well, object to form to the
5  extent it misstates his testimony.
6  BY THE WITNESS:
7    A.   I don't keep such records, and so, no,
8  I never had them.  So there's no way to reproduce
9  them.
10  BY MR. LONDON:
11    Q.   And even though you don't keep such
12  records, you are also saying as far as you know
13  there are no such records whether kept by you or
14  anyone else?
15    MS. McGRODER:  Object to form.
16  BY THE WITNESS:
17    A.   That's correct.
18  BY MR. LONDON:
19    Q.   The next bill -- unless Ms. McGroder
20  has others that I missed -- going further back in
21  time, further toward the front of the document is
22  dated September 2nd, 2008, 80901.
23    Do you see that?
24    A.   Which one?  I'm sorry.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

975

1    Q.   It's invoice 80901.  It's dated
2  September 2, 2008?
3    A.   That's the one we were just
4  discussing.
5    Q.   Well, that's the one I began to ask
6  you about before Ms. McGroder so helpfully
7  intervened.
8    A.   Oh, I'm sorry, yes.
9    Q.   Is that correct?
10   A.   Yeah.
11   Q.   Okay.  What did you do that is the
12 subject of the invoice September 2, 2008?
13   A.   It's, you know, more of the same work
14 on -- on the -- looking at and analyzing the
15 gabapentin data.
16   Q.   Was there any billing in this for the
17 bipolar cohort?
18   A.   No.
19   Q.   This was six days, as I recall, before
20 the bipolar paper was published in the sense of
21 being called final and submitted for publication,
22 not published by a publication, but published by
23 you in hopes of finding a publication, correct?
24   A.   Correct.

976

1    Q.   All right.  And is it your testimony
2  that this invoice 80901 September 2, 2008 has
3  nothing to do with the gabapentin -- pardon me --
4  the bipolar cohort?
5    MS. McGRODER:  Objection, asked and
6  answered.
7  BY THE WITNESS:
8    A.   Yes, I've also, you know, made it
9  clear that the -- there were screening efforts
10 that were done on the initial data and getting
11 familiar with working with the data, and that
12 included both cohorts, but the invoices do not
13 include any of the analytic work for the bipolar
14 cohort.
15 BY MR. LONDON:
16   Q.   Let's look at that.  Let's go forward
17 one more bill, bill 80801.
18       Do you have that in front of you?
19   A.   I do.
20   Q.   Is that the bill of August 6, 2008?
21   A.   That's correct.
22   Q.   All right.  In that bill it says:
23 "Create specifications for statistical data
24 bases," true?

977

1    A.   True.
2    Q.   And what are those?
3    A.   This was related to additional
4  materials that were sent to PharMetrics.
5    Q.   I'm sorry Keith was telling me what to
6  ask you next.  I didn't hear what you said.
7    MS. McGRODER:  Well, you can read the record
8  back.  I mean --
9  BY MR. LONDON:
10   Q.   What did you tell me, Doctor?
11   A.   I told you that these were -- this is
12 for communications of the specifics and going
13 back and forth with the folks at PharMetrics in
14 specifying the databases, and then the second
15 item which is labeled here as the bipolar cohort
16 but actually includes all of the data were for
17 some of the preliminary screening and getting up
18 to speed and working with the data --
19   Q.   Well, the bill says -- I'm sorry.  I
20 didn't mean to interrupt you.
21   A.   Yeah, I know what the bill says, and,
22 yes, these were for all of our initial work
23 getting up to speed with both the gabapentin and
24 for the bipolar cohort.

978

1    Q.   Well, did you bill for analyses for
2  the bipolar cohort?
3    MS. McGRODER:  Objection, asked and
4  answered.
5  BY THE WITNESS:
6    A.   No, I did not.
7  BY MR. LONDON:
8    Q.   So the bill does not reflect what you
9  did.  The bill says it's for something that it's
10 not actually for.
11      Is that your testimony?
12   MS. McGRODER:  Objection, argumentative.
13 BY THE WITNESS:
14   A.   The second item:  "Construct
15 statistical database, compute summary statistics,
16 and perform screening analyses for the bipolar
17 cohort," those were analyses of internal
18 consistency both for the bipolar cohort and for
19 the gabapentin.
20      The omission is for the gabapentin,
21 but none of the analyses that are reported in the
22 paper that was submitted originally to JAMA and
23 is now currently under review in -- in the
24 Archives of General Psychiatry were billed for to

979

1    Ms. McGroder.
2    BY MR. LONDON:
3        Q.   How can I have reliability in that?
4    How can I hear what you are saying, read what you
5    are writing, know what you are getting paid for,
6    and reconcile those?
7        MS. McGRODER: Objection. That's an
8    argumentative question --
9        MR. LONDON: It's all right.
10       MS. McGRODER: -- and it calls for
11   speculation and it's improper. He doesn't know
12   how you can have reliability, how you feel about
13   reliability, Jack. How would he know that?
14   BY MR. LONDON:
15       Q.   What can you tell the judge -- what
16   can you tell Judge Saris that says even though I
17   said in my deposition under oath I was not paid
18   for the analyses and even though my bills page
19   showed that I was paid for the bipolar analysis
20   that was the subject of the paper, you really
21   shouldn't believe the bill. You ought to believe
22   what I say.
23           What can you tell Judge Saris so she
24   will have comfort in that?

980

1        MS. McGRODER: Objection to form. It's
2    argumentative, and it misstates the testimony he
3    just gave you.
4    BY THE WITNESS:
5        A.   Well, first of all, I don't think that
6    item number two on this bill says that I billed
7    for the analyses that went into the -- into the
8    paper. What it does say is computing summary
9    statistics and screening analyses.
10           And screening analyses to me means
11   something very, very different than the analyses
12   that were the subject of the paper. So
13   my response to Judge Saris would be simply we
14   were looking at all of the data that we received
15   from PharMetrics. We were getting up to speed
16   with using those data. We were doing internal
17   consistency checks. We were exploring those
18   data. There's a huge amount of data. It took
19   some time to do so, and that's what that bill was
20   for.
21           And as I have testified in my previous
22   deposition last time, that there were screening
23   analyses, internal consistency checks, and so
24   forth that were performed on both the gabapentin

981

1    and the bipolar cohort, and the only thing that's
2    misleading in this invoice is that it says
3    bipolar cohort, and it should have said both
4    cohorts.
5    BY MR. LONDON:
6        Q.   Were you paid money by the defense
7    counsel for working with the bipolar cohort?
8        MS. McGRODER: Objection, asked and
9    answered.
10   BY THE WITNESS:
11       A.   I have testified both on this
12   deposition and the previous deposition that I was
13   paid money for working with the data, getting up
14   to speed with the data, reviewing the data, but I
15   was not paid by counsel for the analyses that I
16   performed that in all of the work that was done
17   and all of the sensitivity analyses that were
18   done in support of the paper in question.
19   BY MR. LONDON:
20       Q.   Well, we know you weren't paid before
21   the paper was published for the sensitivity
22   analyses because there weren't any before the
23   paper was submitted to JAMA.
24       A.   That's correct.

982

1        Q.   Okay. So I'm back to these bills --
2        MS. McGRODER: His answer included both.
3    His answer included both sensitivity analyses and
4    primary analyses. He just said that. You are
5    just being argumentative.
6    BY MR. LONDON:
7        Q.   I am back to the bills, and the bills
8    are all that I have, and the bills show, as you
9    have just testified, that at least in part some
10   of the bill you sent to Ms. McGroder and some of
11   the money Ms. McGroder sent to you was for
12   working on the bipolar cohort, true?
13       A.   True.
14       MS. McGRODER: Objection, asked and
15   answered.
16   BY MR. LONDON:
17       Q.   Okay. Okay.
18       MS. McGRODER: You need to clarify that.
19   BY THE WITNESS:
20       A.   I mean, I think that what's really --
21   the key is that those analyses and all of the
22   work that was done in production for that paper
23   were not billed for, and that's what I would tell
24   Judge Saris.

983

1    What I stated before and I stated in
2  this deposition is that our initial startup with
3  all of the data that we received from PharMetrics
4  which did include the bipolar data were supported
5  by this work.  It was a part of -- a part of the
6  acquisition of the data.  Just like the purchase
7  of the data was reimbursed by -- by counsel and
8  that included the bipolar data as well.
9  BY MR. LONDON:
10    Q.   Well, but that's an expense as opposed
11  to payment for time, isn't it, the reimbursement
12  for the PharMetrics database?
13    A.   Well, it's an expense, but there's a
14  very -- at least I draw a very strong distinction
15  between, you know, having to be brought up to
16  speed on the analysis of a new and very large
17  stream of data which included both the bipolar
18  data and the gabapentin data from doing a series
19  of research-related analyses of the bipolar
20  cohort data for the purpose of publishing a
21  report.
22    We spent a huge amount of time on
23  that, much more time on that than on the
24  gabapentin analyses, and I have not billed for

984

1  that, and that's what I will tell you, and that's
2  what I told you before, and that's what I will be
3  happy to tell Judge Saris.
4    Q.   And I'm sure you will, but the problem
5  that I am coping with is that I can hear you, but
6  I don't have any documents from you that many
7  people in the ordinary course of business would
8  maintain such as time slips, computer records to
9  show when work was done, that sort of thing.
10    MS. McGRODER:  Object.  You are asking
11  for the time slips --
12  BY MR. LONDON:
13    Q.   And so I'm trying to find out from
14  you --
15    MS. McGRODER:  -- and computer records that
16  you didn't give us.
17  BY MR. LONDON:
18    Q.   So I am trying to find out from you --
19  I'm trying to find out from you without
20  Ms. McGroder asking to testify whether there's
21  any objective data you have that I can look at
22  that can validate your answer?
23    MS. McGRODER:  Well, objection, asked and
24  answered.  It's argumentative.  It assumes that

985

1  he needs to validate his answer, and that he is
2  somehow not telling the truth.  So it's an
3  improper question.
4    MR. LONDON:  That's what you are hearing.
5  I'm just hearing what the witness is telling me.
6    MS. McGRODER:  Well, I'm telling you that's
7  an improper question, and if you ask it another
8  time --
9  BY MR. LONDON:
10    Q.   Please answer.
11    MS. McGRODER:  -- we will finish.
12  BY MR. LONDON:
13    Q.   Please answer.
14    MS. McGRODER:  Asked and answered.
15  BY THE WITNESS:
16    A.   As I have said before, I don't have
17  any of the records that you are looking for.  All
18  I have is -- is my experience in doing this and
19  to tell you that this is not inconsistent with
20  the way that I work with -- with people in the
21  real world from day-to-day.
22  BY MR. LONDON:
23    Q.   The next exhibit -- pardon me -- the
24  next invoice I found going forward is the July

986

1  29th invoice.
2    Do you see that?  That's the one that
3  I have next.  That may not be the actual next
4  one.
5    A.   There look to be two of them.  Yes, I
6  see that.
7    Q.   Are there two different ones, or are
8  they duplicate copies?
9    A.   Two with the same date.
10    Q.   Are these different items?
11    A.   Yes.
12    Q.   Let's look at the one that I have in
13  mind.  It's 80710.
14    Do you see that?
15    A.   Yes.
16    Q.   And it is for the expense for the data
17  from the PharMetrics database $15,000?
18    A.   That's correct.
19    Q.   Is that the date on which you received
20  the PharMetrics database?
21    MS. McGRODER:  Objection, asked and
22  answered.
23  BY THE WITNESS:
24    A.   I don't recall.  You know, as we have

987

1    gone through this before, the date that I
2    received the PharMetrics database that's the date
3    I invoiced them for it, but it's probably not the
4    date that I received it.
5        MR. LONDON:  Okay.  We need to switch tapes.
6        THE VIDEOGRAPHER:  This is the end of tape
7    No. 5.  We are off the record at 3:37.
8            (WHEREUPON, a recess was had at
9        3:37 p.m. until 3:39 p.m.)
10       THE VIDEOGRAPHER:  The beginning of tape No.
11   6.  We are back on the record at 3:39.
12   BY MR. LONDON:
13       Q.  Between August 6th and September 2nd,
14   your September 2nd bill reflects that you did 40
15   hours of work on the -- analytic work on the
16   PharMetrics data.
17           I assume that's after the August 6th
18   bill.  Fair enough?
19       A.  Yes.
20       Q.  So on the August 6th bill, we have at
21   least 50 hours of work on the two cohorts, and by
22   September 2nd, we have another 40 hours on the
23   PharMetrics data.  A total of 90 hours on the
24   PharMetrics data that comprises the two cohorts.

988

1           Are you with me so far?
2        MS. McGRODER:  Well, object to form.  That
3    is misleading and misstates his testimony.
4    BY MR. LONDON:
5        Q.  Are you with me so far?
6        A.  Well, except for the part that you are
7    talking about the two cohorts.  The first bill
8    reflects both cohorts, and the second bill is
9    purely the gabapentin cohort.
10       Q.  What evidence do we have of that, if
11   any?
12       A.  My statement under oath.
13       Q.  All right.  Now, of the 90 hours, what
14   proportion of that was allocated to the
15   gabapentin cohort, and what proportion of that
16   was used in the bipolar cohort?
17       MS. McGRODER:  Well, object to form and it
18   misstates his testimony about how those analyses
19   were done.  Answer if you can.
20   BY THE WITNESS:
21       A.  All the analyses with respect to the
22   September 2nd invoice were for the gabapentin
23   cohort, and I can't really provide like a full
24   breakdown between the bipolar and gabapentin

989

1    components under item two in the August 6, 2008.
2    BY MR. LONDON:
3        Q.  Well, in the August bill it said, as I
4    understand that bill, that there were
5    specifications for statistical databases.
6           Do those statistical databases exist
7    as they appeared after you created the
8    specifications on August the 6th?
9        A.  Those specifications were discussions
10   I was having back and forth with PharMetrics
11   answering some of their questions, and they are
12   asking -- answering some of my questions in
13   preparing the specifications for the data.
14       Q.  It says you computed summary
15   statistics and performed screening analyses for
16   the BP cohort.
17           Do those summary statistics exist now
18   in the form in which they existed when you
19   submitted the August 6th bill to Ms. McGroder?
20       A.  I'm not --
21       MS. McGRODER:  Object to form.
22   BY THE WITNESS:
23       A.  I'm not sure what form they -- they
24   exist in.  These were largely just -- this was --

990

1    this was a bill for time familiarizing ourselves
2    with that database with doing, you know, some
3    screening analyses to look at overall incidents,
4    suicide attempts, different -- did people take --
5    take -- what was the -- you know, were there
6    enough monotherapy subjects to support these kind
7    of analyses, what were the overlap between
8    different diagnoses, and things like that.
9           There were a whole host of things.  So
10   they were done in a variety of different ways.
11   None of this -- you know, some of this may
12   actually be reflected in my expert report in
13   summary tables, but, you know, I don't --
14   BY MR. LONDON:
15       Q.  When -- when did you disclose to
16   anybody in the defense counsel side that you were
17   working on the bipolar cohort paper?
18       A.  Not until it was submitted.
19       Q.  Not until sometime in September of
20   2008?
21       A.  I believe so.
22       Q.  All right.  And are you aware that
23   in -- within the Public Health Service, there's
24   at least the standard that principal

991

1   investigators ought to take steps to avoid any
2   chance that the design or the conduct or the
3   execution of a scholarly investigation should
4   avoid the appearance even of being under the
5   influence by conflicting interest by payments
6   from outside payers such as pharmaceutical
7   companies or their lawyers?
8         MS. McGRODER: Object to form.
9   BY THE WITNESS:
10        A.   No.  The -- the key is that -- I mean,
11   there are many people who have -- I mean, people
12   who work for pharmaceutical companies publish
13   papers in the peer-reviewed scientific
14   literature.  They are obviously paid for their
15   time.
16        The key for conflicts is to ensure
17   that the design and analysis of the study was not
18   dictated by an outside party, and at no point did
19   Pfizer or counsel have any role whatsoever in the
20   design or analysis of any of the data in the
21   bipolar cohort.  I was, in fact, the person who
22   recommended doing all of this in the first place,
23   and they did not see the paper prior to its
24   submission.  They didn't edit the paper prior to

992

1   its submission.  They didn't participate in any
2   way prior to its submission.
3   BY MR. LONDON:
4         Q.   Did counsel go over with you the code
5   of federal regulations which set out what the
6   obligations of an investigator are in regard to
7   conflicts of interest in regard to papers and
8   scientific investigations that are funded by the
9   Public Health Service?
10        MS. McGRODER: Well, object to form.  That
11   assumes that counsel would go over --
12        MR. LONDON: I'm just asking --
13        MS. McGRODER: -- conflict of interest,
14   federal regulations regarding a paper that we had
15   nothing to do with.  So it's misleading, and I
16   object.
17   BY MR. LONDON:
18        Q.   I'm just asking if you went over that
19   with counsel?
20        A.   No.
21        Q.   Okay.  Do you know those regulations?
22        A.   I only know, you know, what is
23   required of me at the university and what is
24   required of me in terms of -- of providing

993

1   disclosures on scientific, peer-reviewed
2   publications that I have, you know, quite a --
3   quite a few of.
4         Q.   Okay.  Well, we are going -- we are
5   going to visit about it briefly.
6         MS. McGRODER: Well, Jack --
7         MR. LONDON: May I have be marked the next
8   exhibit, please.
9         MS. McGRODER: -- our -- our so-called
10   agreement, which I think you probably overstated,
11   was that you go back -- back and ask about the
12   invoices.  This is far afield from the invoices,
13   and -- and you had your opportunity to depose
14   this witness.  You took seven hours to do it, and
15   when you passed the witness, I told you that's
16   it.
17        We are not going to have a revolving
18   door of plaintiffs' counsel representing the same
19   parties deposing Dr. Gibbons.  So I let you ask
20   your questions about the invoices, and now we are
21   finished.
22        MR. LONDON: We are not finished.  We are
23   going to ask these questions --
24        MS. McGRODER: Does it relate to the

994

1   invoice?
2         MR. LONDON: Yes.
3         MS. McGRODER: In what way?
4         MR. LONDON: We will find out when we ask
5   the question --
6         MS. McGRODER: Well, I object.
7         MR. LONDON: I'm not going to send you my
8   list of questions.
9         MS. McGRODER: Well, I object.  You had your
10   opportunity.  You could have asked every single
11   one of these questions on your
12   cross-examination --
13        MR. LONDON: No, actually -- actually, I
14   could not have done --
15        MS. McGRODER: The federal regulations on
16   conflict disclosure.  That's not something you
17   needed to wait to get an invoice to ask him.
18        MR. LONDON: Lori, we need to stop this
19   discussion --
20        MS. McGRODER: No, we don't need to stop it.
21        MR. LONDON: You have two choices here.
22   Okay --
23        MS. McGRODER: You don't need to give me my
24   choices because I won't listen to you hand me

995

1　choices.
2　　　MR. LONDON:  Lori, Lori, you can either --
3　time out.  Time out.
4　　　MS. McGRODER:  We have an agreement, and you
5　are -- and you are violating it and exceeding it.
6　　　MR. LONDON:  Well, you may have thought you
7　had some idea in your mind of what I was going to
8　do.  It's not my fault if you didn't understand.
9　　　MS. McGRODER:  I actually am being quite
10　gracious letting you ask anything because you
11　passed the witness and you were done, and I told
12　you at the end of that day once you pass the
13　witness, you are done.
14　　　MR. LONDON:  Ms. McGroder, after you
15　withhold the disclosures from me being able to
16　ask the questions --
17　　　MS. McGRODER:  I didn't withhold anything
18　from you.
19　　　MR. LONDON:  Other than all these bills that
20　you paid.
21　　　MS. McGRODER:  I gave you those bills at the
22　deposition.  What bills have you provided me?
23　Which of your experts have provided me a single
24　invoice, none, zero.

996

1　　　MR. ALTMAN:  Lori, I think we are wasting
2　time.  We are wasting Dr. Gibbons --
3　　　MR. LONDON:  I have about 15 minutes of
4　questions.  I am going to ask them.
5　　　MS. McGRODER:  Well, I object to all of
6　them.  Go ahead.
7　　　MR. LONDON:  I understand.  I understand.
8　Do you have the exhibit marked, please?  Would
9　you please mark the exhibit I handed you.
10　　　　(WHEREUPON, a certain document
11　　　　was marked Gibbons Deposition
12　　　　Exhibit No. 61, for
13　　　　identification, as of 3/5/09.)
14　　　MR. LONDON:  What number is this?
15　BY MR. LONDON:
16　　　Q.   Dr. Gibbons, if you would take a quick
17　look at Exhibit 61.  The part I'm going to ask
18　you about begins under the bold part of the
19　center that says "50.601 Purpose."
20　　　　Do you see that?  If you would just
21　take a moment and read that.
22　　　A.   I have read it.
23　　　Q.   Were you aware before just now that
24　that regulation existed?

997

1　　　A.   I don't think I was -- you know, would
2　have been able to cite it based on 40 CFR, but
3　certainly I know through the conflict of interest
4　training and IRB training and being on -- on, you
5　know, grant review, internal review groups that,
6　you know, this is certainly the spirit of -- I
7　don't know if I have called it a regulation, but
8　it's the -- it's the way we are supposed to work.
9　　　MR. LONDON:  All right.  I'm going to ask
10　the reporter to mark the next exhibit, and just
11　before you mark it, I am going to point out that
12　this is also a CFR.  It is all of them, but I
13　have only circled off, and you will see that
14　circled off 602.  Fair enough?
15　　　THE WITNESS:  Yes.
16　　　MR. LONDON:  Please mark it.
17　　　　(WHEREUPON, a certain document
18　　　　was marked Gibbons Deposition
19　　　　Exhibit No. 62, for
20　　　　identification, as of 3/5/09.)
21　BY MR. LONDON:
22　　　Q.   In the center section shows "50.602
23　Applicability."
24　　　　Will you take just a moment and read

998

1　that.
2　　　A.   I am reading it.  Yeah, I read it.
3　　　Q.   Does the University of Illinois or --
4　pardon me -- the University of Illinois at
5　Chicago where you are employed, is it an
6　institution that applies for Public Health
7　Service grants for scholarly papers by employees
8　such as yourself?
9　　　A.   Well, I guess I'm not sure -- I'm
10　reading this, and I'm not expert on the law
11　obviously.  It says:  "Provided, that this
12　subpart does not apply to an SBIR Program Phase I
13　application," which clearly it doesn't, and "in
14　those few cases where an individual, rather than
15　the institution, is an applicant for the PHS
16　grant, they will take a case-by-case
17　determination."
18　　　　I'm -- I guess I'm not -- neither of
19　those cases apply to me, and I guess I am not
20　sure I am fully understanding, you know, what you
21　are asking.
22　　　Q.   At the moment I'm only asking if you
23　know whether the University of Illinois or
24　yourself applies for Public Health Service grants

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

999

1    for the scholarly research that you did?
2       A.   As you can see from my -- from my CV,
3    I have numerous grants from the National
4    Institute of Health which is part of the Public
5    Health Service, and, you know, these grants have
6    supported my research for many, many years.
7       Q.   And is that true of the scholarly
8    paper in this case, the bipolar cohort paper, was
9    it funded by in part a Public Health Service
10   grant?
11      A.   That's correct.
12      Q.   Okay.  What I think I don't understand
13   is whether that grant went directly to you or
14   whether it was administered through the
15   university.
16      A.   It's to the university.
17      Q.   Okay.  And then my next question is
18   going to start 5063 -- or 50.603.
19      MR. LONDON:  Would you mark that as an
20   exhibit, please.
21          (WHEREUPON, a certain document
22          was marked Gibbons Deposition
23          Exhibit No. 63, for
24          identification, as of 3/5/09.)

1000

1    BY MR. LONDON:
2       Q.   May I ask you to take a moment and
3    read 50.603, these definitions.  They continue on
4    down through the end of the first column on the
5    second page.  Then for some reason they just
6    repeated the print job.
7       A.   Okay.  I have read the definitions.
8       Q.   All right.  Under "Significant
9    Financial Interest," do you see where a
10   significant financial interest does not include
11   an equity interest that does not exceed $10,000
12   or is not expected to exceed $10,000.
13          Do you see that?
14      MS. McGRODER:  Objection to form and
15   foundation.  There's no foundation for the use of
16   this document with this witness.
17      BY THE WITNESS:
18      A.   I see where it says $10,000.
19      BY MR. LONDON:
20      Q.   All right.  Were you aware before
21   reading this regulation that there was a
22   regulation which set a $10,000 number at the
23   amount by which it would be assessed whether or
24   not an investigator had a significant financial

1001

1    interest --
2       MS. McGRODER:  Objection --
3    BY MR. LONDON:
4       Q.   -- in regard to some outside source
5    that may be a potential conflict of interest with
6    any systematic investigation the investigator
7    undertook?
8       MS. McGRODER:  Objection to form and
9    foundation.
10   BY THE WITNESS:
11      A.   I don't see anything in here that is
12   saying anything about -- I mean, these are
13   definitions.
14   BY MR. LONDON:
15      Q.   That's right.
16      A.   And --
17      Q.   I'm only asking you --
18      A.   -- I mean, my understanding of all of
19   this is whether or not there is a conflict of
20   interest or whether or not that conflict of
21   interest -- there are lots of people who have
22   potential conflicts of interest.
23          I mean, there are people who get
24   grants who work in industry or there are

1002

1    consultants or there are people who, you know,
2    spend a lot of their time on speaker bureaus and
3    things like that.
4          The question is whether or not that
5    activity has provided a bias in the way that the
6    study has been conducted or designed or whether
7    or not they have shared that information with
8    people who are directly benefiting from the
9    result of that.  I don't see any of that as
10   being --
11      Q.   Did you share with the University of
12   Illinois that you had received an excess of
13   $10,000 from Pfizer as an expert witness in
14   relation to your work that involved the cohorts,
15   the bipolar and gabapentin cohorts?
16      MS. McGRODER:  Object to form and
17   foundation, to the extent it misstates his
18   testimony and assumes facts not in evidence.
19   BY MR. LONDON:
20      Q.   I'm just asking if you did.
21      MS. McGRODER:  Same objection.
22   BY THE WITNESS:
23      A.   The university requests a -- what are
24   the kinds of outside work that you are doing.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

1003

1 They do not ask for and do not in any way ask for
2 the dollar amounts of what you are doing, and I
3 have listed for the past several years that some
4 of the work that I do outside involves expert
5 witnesses for the U.S. Department of Justice or
6 pharmaceutical companies, and on the basis of
7 that, they make a decision as to whether or not I
8 have a conflict of interest.
9     MR. ALTMAN:  Objection, non-responsive.
10    MR. LONDON:  Mark the next exhibit, please.
11    MS. McGRODER:  How is that non-responsive?
12 It directly answers the question.
13    MR. ALTMAN:  He did not answer the question
14 at all.
15    MS. McGRODER:  He completely answered the
16 question.
17    MR. LONDON:  He is about to.
18    Please mark the next exhibit.
19    MS. McGRODER:  Is this Exhibit --
20    THE COURT REPORTER:  It would be 64.
21
22
23
24

1004

1         (WHEREUPON, a certain document
2          was marked Gibbons Deposition
3          Exhibit No. 64, for
4          identification, as of 3/5/09.)
5 BY MR. LONDON:
6    Q.  Would you take a moment and read
7 Exhibit 64, again, I think in pertinent part
8 starting at the 50.604 and going through the end
9 of that which runs down to the second page, that
10 whole left-hand column.
11    A.  I have read it.
12    Q.  All right.  Does your employer, the
13 university, maintain a written policy on conflict
14 of interests regarding the submission of conflict
15 of interest disclosures by investigators doing
16 research on Public Health Service grants?
17    MS. McGRODER:  Objection, form and
18 foundation.
19 BY THE WITNESS:
20    A.  There's training that we have to go
21 through, and then there's our annual report of
22 outside activities.
23 BY MR. LONDON:
24    Q.  But I'm just asking if you know if

1005

1 there's a written policy.  I know you have gone
2 through training but...
3    A.  I don't know what the policy of the
4 university is with the Public Health Service.
5    Q.  All right.  Do you know if the
6 university has designated an official to solicit
7 and review financial disclosures from
8 investigators such as you?
9    MS. McGRODER:  Objection to form and
10 foundation.
11 BY THE WITNESS:
12    A.  Again, I'm not an administrator at the
13 university.  I assume they have designated
14 someone because we get such forms, and we have to
15 return them to some person.  I don't know who
16 that person is.  I don't know their job
17 description, and I don't know whether or not that
18 person does their job.
19 BY MR. LONDON:
20    Q.  And then when we go to the paragraph
21 (c)(1) which is kind of the second paragraph in
22 the upper right-hand column, it says it requires
23 that by the time an application is submitted to
24 the Public Health Service, each investigator who

1006

1 is planning to participate in the Public Health
2 Service funded research has submitted to the
3 designated official a listing of his or her known
4 significant financial interests including your
5 spouse and child that would reasonably appear to
6 be affected by the research.
7    So had the university or some official
8 at the university had you submit to the
9 university a requirement that you tell them how
10 much money Pfizer has paid you in connection with
11 your expert witness work inasmuch as you are
12 doing the bipolar cohort study as a National
13 Institute of Health service paper?
14    MS. McGRODER:  Objection to form and
15 foundation, assumes facts not in evidence, and
16 misstates his testimony.
17 BY MR. LONDON:
18    Q.  I'm just asking if someone at the
19 university has asked if you have -- asked you to
20 submit your bills?
21    A.  You already asked me a question, and I
22 am trying to answer it.
23    Q.  I know, and I was responding to her
24 instead of to you.  You are right.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

1007

1    MS. McGRODER:  My objection stands.
2  BY MR. LONDON:
3    Q.  And it does.  I hear you.  Go forward.
4    A.  So (No. 1) there's a specific
5  requirement that we do not put the amounts or
6  specifically the instructions of our form say do
7  not tell us how much, tell us what you are doing,
8  and the university will determine whether or not
9  they believe that to be a conflict of interest.
10  I have always been compliant with that and will
11  continue to be so.
12    The grant that I have that started out
13  long before this project, my participation in
14  this project is about antidepressants and
15  suicide.  It has nothing to do with -- please,
16  let me finish.
17    Q.  I am.  I'm just trying -- I want to
18  make sure I understand which grant you're talking
19  about.
20    A.  Okay.  I have a grant that originated
21  its life as an R-56 award.  It's a merit award
22  that has now matriculated into an R-01, and it
23  goes for another four years.  So it's about
24  antidepressants in suicide, but more generally

1008

1  it's about drug adverse event interactions.
2    The bipolar cohort was never proposed
3  as a part of that grant.  It is not part of my
4  work product.  It is related to the general ideas
5  of that grant, and as we talked about on the last
6  deposition, when I do something that's related to
7  suicide in any way possible, I will acknowledge
8  the support of the grant, but this is not one of
9  the projects of the grant.
10    I could just as easily say it has, you
11  know, nothing to do with the grant, and it's --
12  I'm, you know -- it's just -- it is just an
13  academic pursuit.  It's an interest and so, but
14  I'm acknowledging the support of the grant
15  because it's part of that whole body of research.
16    Q.  All right.  And when I said time out,
17  I want to be sure -- I wanted to make sure you
18  were talking about the bipolar paper that you and
19  your co-authors completed in September.
20    That was the paper you were talking
21  about when you said that you acknowledged that it
22  was part of I believe it was the R-56 grant?
23    A.  R-56 which --
24    MS. McGRODER:  Object to form and foundation

1009

1  and to the extent it misstates his testimony --
2    MR. LONDON:  Please let him finish.
3  BY THE WITNESS:
4    A.  The R-56 grant which is now an R-01
5  grant, and, yes, I was referring to the
6  bipolar -- bipolar paper which acknowledges
7  support of those two grants and also other grants
8  to John Mann and to Hendricks Brown and also
9  acknowledges potential conflicts of interest with
10  being an expert witness for Pfizer, for Wyeth,
11  and for the U.S. Department of Justice.
12  BY MR. LONDON:
13    Q.  Well, you typed on the front page of
14  the paper what those grants were and listed what
15  you listed about your role as an expert witness,
16  true?
17    A.  True.
18    Q.  We can pull the exhibit and see that,
19  but there's no quarrel that you did that, true?
20    A.  True.
21    Q.  Okay.  The quarrel is did you tell the
22  university or the Public Health Service that you
23  had been paid more than $10,000 by Pfizer in
24  connection with this litigation which involves

1010

1  both the gabapentin and bipolar cohorts?
2    MS. McGRODER:  Object to form and to the
3  extent it misstates his testimony.
4    Go ahead.
5  BY THE WITNESS:
6    A.  No. 1, the university specifically
7  does not require that you report whether or not
8  you have made $1 or $10 million.  The university
9  requires that you provide a report of outside
10  work that you are doing, and I did report to the
11  university that this was one of the outside
12  projects that I was working on.
13  BY MR. LONDON:
14    Q.  And I'm not quarreling whether you
15  told them about this outside project of yours.
16  It's the -- it's the dollars that I am asking
17  about.
18    MS. McGRODER:  Objection --
19  BY THE WITNESS:
20    A.  We are not required to do that, and I
21  didn't -- I didn't report the dollars, and I'm
22  not asked to report the dollars and nobody -- you
23  know, we don't do that.
24

1011

1  BY MR. LONDON:
2      Q.   And when you say "I'm not required to
3  report the dollars," what are you telling me you
4  are not required by the university, as you
5  understand it, to report the dollars?
6      A.   That's correct.
7      Q.   Okay.  Did you advise anyone at the
8  university that you received any dollars from
9  Pfizer for doing any work on the bipolar cohort
10  that went into the paper?
11      MS. McGRODER:  Object to form and to the
12  extent it misstates his testimony.
13  BY THE WITNESS:
14      A.   Again, I -- I advised the university
15  that I am doing outside consulting work which
16  includes things from environmental consulting to
17  expert witness work for the U.S. Department of
18  Justice and for pharmaceutical companies, and
19  that was sufficient to provide -- to fulfill my
20  obligation.
21  BY MR. LONDON:
22      Q.   As you understand it with the
23  university?
24      MS. McGRODER:  Object to form.

1012

1  BY THE WITNESS:
2      A.   Well, as I understand it with the
3  university, and if I hadn't fulfilled my
4  obligation, I assure the university would have
5  come back to me and said "Robert, we need more
6  information."
7  BY MR. LONDON:
8      Q.   Well, I just want to talk with you for
9  a moment about this -- let's go to Exhibit 64,
10  this paragraph Each Institution B.
11          Do you see this where I'm referring
12  to?
13      A.   No, I don't.
14      Q.   It's the way lawyers talk, and I
15  apologize for having said that.
16          Exhibit 64 is Section 50.604.  So far
17  so good?
18      MS. McGRODER:  Well, I object to the --
19  BY MR. LONDON:
20      Q.   Are you with me?
21      MS. McGRODER:  Wait, let me put my objection
22  on the record.  I object to the use of this
23  document with this witness.  There's no
24  foundation for it.  He has never laid eyes on it.

1013

1  He doesn't understand the federal regs the way
2  you do, and so I think it's argumentative and
3  misleading but go ahead.
4  BY MR. LONDON:
5      Q.   Now, do you see where at the beginning
6  of it it says:  "Each institution must" --
7      A.   Yes, I see that.
8      Q.   And then if we go down to paragraph B,
9  it says:  "Must designate an institutional
10  official to solicit and review financial
11  disclosure statements."
12          Do you see that?
13      A.   I see that.
14      Q.   Okay.  And it's -- it's the part about
15  the financial disclosure statements that is your
16  testimony that the university has not requested
17  that you provide such statements?
18      MS. McGRODER:  Objection to form and to
19  foundation for the use of this document with this
20  witness.
21  BY THE WITNESS:
22      A.   That's correct.
23  BY MR. LONDON:
24      Q.   There's -- there's an official, but no

1014

1  official has told you give us your financial
2  disclosures?
3      MS. McGRODER:  Same objection.
4  BY THE WITNESS:
5      A.   They haven't now, and they haven't in
6  the past.
7  BY MR. LONDON:
8      Q.   And do you know who the official is?
9      A.   No, I don't.
10      Q.   Okay.  And then moving on down, we see
11  the paragraph C where it says C-1 or C(1).
12          Do you see where I am?
13      A.   Uh-huh.
14      Q.   And it says:  "Require that by the
15  time an application is submitted, the
16  investigator has submitted a listing of
17  significant financial interest."
18          Do you see that?
19      MS. McGRODER:  Object to form and
20  foundation.  The document speaks for itself.
21      MR. LONDON:  And it does, but I'm asking the
22  witness if he sees it.
23  BY THE WITNESS:
24      A.   I see it.

1015

1    MS. McGRODER:  Same objection.
2  BY MR. LONDON:
3    Q.  Same question.  No one at the
4  university has asked you to provide a listing of
5  significant financial interest in connection with
6  this paper at least, true?
7    MS. McGRODER:  Objection to foundation.
8  BY THE WITNESS:
9    A.  First of all, I mean, I don't
10  understand all this stuff, but my sense is
11  neither do you.  This is about an application.
12  It's not about a paper.  This is about an
13  application for federal health dollars.  It's for
14  a grant.
15    Now, there's nothing in my grant -- I
16  haven't -- I haven't like written this paper and
17  on the basis of this paper, I have applied for a
18  grant.  There's nothing in my grant that talks
19  about this paper.  I could have gone off and --
20  and become a consultant for Pfizer.
21    I could have taken a break from the
22  university, gone to work for Pfizer, had been the
23  president of Pfizer, gotten all of these data,
24  been paid zillions of dollars to do this

1016

1  analysis, and I could have submitted that paper
2  to the Archives of General Psychiatry or
3  wherever, and as long as I fulfilled my
4  obligation to indicate, hey, I have potential
5  conflicts of interest because I am the president
6  of Pfizer writing this paper and I make money or
7  my stock -- stockholders make money on the basis
8  of what happens to this drug, but I did this
9  study, it's unbiased, and you can evaluate it on
10  its scientific merits, and I'm telling you what
11  it is that I did, that would be totally fine.
12    This is all about submitting a grant.
13  So what this is -- this is really about is
14  somebody who is -- you know, has a drug company
15  and is applying for federal dollars to show that
16  their drug is better than some comparator drug,
17  and that's the kind of financial conflict that at
18  least the NIH as an example or the Public Health
19  Service in general would like to evaluate prior
20  to awarding that grant.
21  BY MR. LONDON:
22    Q.  Well, I know you are back on the prior
23  to awarding.  In fact, let me ask you about the
24  prior to awarding.

1017

1    Did you submit to the NIH or anyone
2  the amount you were paid by other drug companies
3  in connection with the work you did in the Giles
4  case?
5    MS. McGRODER:  Objection, assumes facts not
6  in evidence.
7  BY THE WITNESS:
8    A.  The grant that I received predated the
9  Giles case.  So there was no reason to submit,
10  you know, to them that -- something that was
11  going to happen in the future, and the work that
12  I did for the -- I mean, this is not at all
13  uncommon for university professors to be brought
14  into these cases.  I'm sure you have had a few
15  university professors who are experts in certain
16  areas that you have used.
17  BY MR. LONDON:
18    Q.  I can't remember.  I don't keep
19  records.
20    A.  Well, that's -- you know, we will just
21  guess, and, you know, that's I guess -- well --
22    Q.  But the question on the table is did
23  you update the NIH when you were paid fees in the
24  Giles case?

1018

1    MS. McGRODER:  Object to form.
2  BY THE WITNESS:
3    A.  No.  No, I did not.
4  BY MR. LONDON:
5    Q.  Okay.  And then as we go down to this
6  paragraph 2, do you see paragraph 2?
7    A.  Yes.
8    Q.  It says:  "All financial disclosures
9  must be updated during the period of the award."
10    Do you see that?
11    MS. McGRODER:  Object to form and
12  foundation.
13  BY THE WITNESS:
14    A.  Again, I don't see --
15  BY MR. LONDON:
16    Q.  The question is:  Do you see it?
17    A.  I see it.
18    Q.  Okay.  Now, I will let you get a
19  chance to say what you think about it, but is it
20  true that we are still during the period of the
21  R-56 award?
22    A.  The R-56 award is over.
23    Q.  All right.  And what award has it now
24  become?

1019

1    A.   An R-01.
2    Q.   And are we during the period of the
3  R-01 award?
4    A.   Yes.
5    Q.   All right.  And have you submitted an
6  updated financial disclosure with either the
7  Giles fees or the Pfizer fees during the period
8  of the R-01 award?
9    A.   Again, we do not submit these
10 financial disclosures to the NIH.  We submit them
11 to our university who shares them with the NIH,
12 and the university's policy is not to ask for the
13 amount.
14        So the university has the information
15 of what my outside work is.  I presume they are
16 sharing it with whoever is by law required to
17 have it, and they are making a decision as to
18 whether or not I have a conflict of interest.
19   Q.   Well, whatever it is they are sharing
20 about your outside work doesn't include a
21 financial disclosure from you, does it?
22        MS. McGRODER:  Object to form and foundation
23 and assumes facts not in evidence.
24

1020

1  BY THE WITNESS:
2    A.   That's correct.  I have not provided
3  financial disclosure.
4  BY MR. LONDON:
5    Q.   Okay.  Stand by.  I'm being pestered
6  over here on my left.  He came up with a great
7  question.
8        Do you own any stock in Pfizer?
9    A.   No.
10   Q.   Okay.  That was a good question.
11       Do you own any stock in any
12 pharmaceutical company?
13   A.   Fortunately, I don't own any stock at
14 all anymore I don't think.  I hope.
15   Q.   I think the answer to that is
16 fortunately.  I'm not sure as of when.  I mean,
17 if that goes back to last year, it may be
18 unfortunately.
19       But as far as you know, you have no
20 financial interest in something like a retirement
21 plan or your own stock holdings in Pfizer or some
22 other?
23   A.   My only relationship to Pfizer is
24 through -- through this case.

1021

1    Q.   I think -- I think you can answer this
2  in one easy question, and it's a -- it's an
3  almost -- and she's going to say asked and
4  answered, but you haven't submitted a financial
5  disclosure of actual dollars billed or received
6  to anyone whether it's the university, the Public
7  Health Service, or the publications to whom you
8  have submitted your scholarly papers.
9        Am I correct in that?
10       MS. McGRODER:  I object.  It's asked and
11 answered, and it assumes facts not in evidence
12 and it's misleading.
13 BY THE WITNESS:
14   A.   I have not -- I mean, I think that
15 ultimately we will -- I will probably indicate --
16 may or may not indicate the amount.  I will check
17 with the editor of the journal what -- I mean,
18 what the editor would like me to -- to disclose.
19 I will talk with the editor and say, you know, is
20 this disclosure sufficient.  This is the
21 activities that I've -- you know, I've
22 participated in.  Are you comfortable with this
23 disclosure.  Should we put in the amount for
24 the -- for the Pfizer database, should we put

1022

1  in -- for the PharMetrics database, should we put
2  in the amount that I was paid to, you know, get
3  up to the speed with that database, what do you
4  think is the appropriate disclosure including,
5  you know, gee, I think you're totally conflicted,
6  and we are not going to publish your paper.
7        So I will have that conversation with
8  the editor of the journal.  I have not had any
9  other kinds of financial disclosures to the
10 university above and beyond the acknowledgment
11 that I have served as expert witness in these
12 cases, nor have they asked for any explication of
13 that, and I have been giving them these things
14 for several years.
15 BY MR. LONDON:
16   Q.   I am not accusing you of hiding it
17 from the university.  I'm trying to find out, as
18 I have asked, whether you have disclosed it, and
19 as I understand your testimony, they haven't
20 asked for it and you haven't given it?
21       MS. McGRODER:  Well, object --
22 BY THE WITNESS:
23   A.   They specifically asked me not to do
24 it.

1023

1    THE COURT REPORTER: Wait, wait, wait, wait.
2    Could we just have one person talking at a time,
3    please.
4        MS. McGRODER: You have got to give me a
5    chance to put my objection on the record. Did
6    you get it?
7        THE COURT REPORTER: No, I didn't get his
8    answer at all.
9        MS. McGRODER: Okay. My objection was asked
10   and answered, and his answer was: "They
11   specifically asked me not to."
12   BY MR. LONDON:
13   Q.   Was that your answer?
14   A.   Yes.
15   Q.   Okay. Let's shift gears for one
16   moment, and let's go back to the gabapentin --
17   pardon me -- let's go back to the bipolar
18   sensitivity analysis.
19       MS. McGRODER: No, no, no, no, no. No, you
20   are -- you have now covered the entire issue of
21   invoices, conflict disclosure, financial
22   interest, payments, and you had your opportunity,
23   Jack, to ask questions about everything else in
24   your seven hours of deposition, or you could have

1024

1    fed questions to Keith for his 14 hours of
2    deposition, but this is not going to be a
3    revolving door of plaintiffs' lawyers. So are
4    you finished?
5        MR. LONDON: No.
6    BY MR. LONDON:
7    Q.   Did you tell the people at Harvard
8    that the slides you gave them in your
9    presentation of the paper in October included
10   slides that you had developed for the lawsuit
11   that you showed Judge Saris in July?
12   A.   I made some mention while I was
13   introducing the topic of how I got involved with
14   the antiepileptic work, and that this was in
15   connection with a lawsuit that was filed against
16   Pfizer which I was an expert witness.
17   Q.   Specifically asking about the slides
18   at Harvard, did you tell them that any of those
19   slides were developed for the lawsuit?
20   A.   No, I didn't, and I -- I would not be
21   doing that in the normal course. I didn't tell
22   them the reason I had developed slide four or
23   where -- you know, the sources of all of these.
24       MR. LONDON: Okay. Do we not have this as

1025

1    an exhibit yet? What exhibit is this?
2        MS. McGRODER: Keith marked it.
3        MR. LONDON: But it is an exhibit?
4        MS. McGRODER: Yes. Now, do you have
5    questions about it too?
6        MR. ALTMAN: He may.
7        MS. McGRODER: Well, that's ridiculous.
8        MR. ALTMAN: Why is that ridiculous?
9        MS. McGRODER: Because he -- no, Keith.
10       MR. ALTMAN: Lori, this document was not
11   produced before the last deposition.
12       MS. McGRODER: Yeah, but you deposed him all
13   day long.
14       MR. ALTMAN: So what.
15       MS. McGRODER: My issue is not -- my issued
16   is not with him asking questions. It was Jack
17   asking questions at all. Jack had his
18   opportunity. Jack's opportunity is over.
19       MR. ALTMAN: Lori, then terminate the
20   deposition if you think --
21       MS. McGRODER: Well, you know what I'm about
22   to.
23       MR. ALTMAN: Then by all means do --
24       MS. McGRODER: Well, I'm trying to be -- I'm

1026

1    trying to be generous here.
2        MR. ALTMAN: Okay.
3        MS. McGRODER: I'm trying to be as gracious
4    and generous as I can, and it's very difficult.
5        Why don't you just pass the witness
6    back to Keith, and we will just keep doing this
7    for days.
8        MR. LONDON: Is that an invitation?
9        MS. McGRODER: No.
10       MR. LONDON: It sounded like a good idea.
11   At $500 an hour, I'm sure that somebody would say
12   okay.
13       MS. McGRODER: Is this 65?
14       MR. LONDON: I don't know.
15            (WHEREUPON, a certain document
16            was marked Gibbons Deposition
17            Exhibit No. 65, for
18            identification, as of 3/5/09.)
19   BY MR. LONDON:
20   Q.   What number is that?
21   A.   65.
22   Q.   Dr. Gibbons, what is Exhibit 65?
23   A.   This looks like an announcement for
24   the lecture I gave at Harvard University.

1027

1    Q.   Would this be the lecture that you
2    mentioned previously when you said it generated
3    the questions that led you to the idea of doing
4    sensitivity analyses on the bipolar cohort?
5    A.   The lecture and the couple of days
6    that I spent at Harvard talking to -- to some of
7    the faculty there.
8    Q.   All right.  And who were the faculty,
9    if you remember?
10   A.   There are quite a few.
11   Q.   Okay.  And then can you identify the
12   three attachments to the paper -- to the cover of
13   the exhibit?
14   A.   The first one is -- looks to be the
15   first slide of the -- of the lecture, and the
16   second one is this slide that was a part of the
17   Daubert hearing work and that breaks out the
18   lamotrigine and topiramate effects from the other
19   antiepileptic drugs.
20   Q.   And -- and was that same slide also
21   part of the lecture?
22   A.   Yes, it was.
23   Q.   And then the third page, please?
24   A.   This is an empirical Bayes estimate of

1028

1    rate multipliers and confidence intervals from
2    the AERS data on completed suicide rates.
3    Q.   And was that also a slide from the
4    Daubert hearing?
5    A.   I don't remember.
6    Q.   Okay.  Fair enough.  Was it a slide at
7    the Harvard presentation?
8    A.   I believe it was in there.
9    Q.   It was my intention to include it as
10   such, and if I have made a mistake, I apologize
11   now but --
12   A.   No, I think it probably was.  I'm --
13   you should know I'm not sure that I actually got
14   to all of these slides in my lecture.
15   Q.   I wasn't there.
16   A.   Yeah, I am not sure, you know, I even
17   made it to the antiepileptic part of this -- this
18   whole lecture.
19   Q.   Were the slides reproduced and given
20   as handouts?
21   A.   No.
22   Q.   Okay.  Were you paid by anyone to
23   participate in this lecture?
24   A.   They paid my expenses to go to

1029

1    Harvard.
2    Q.   All right.
3    A.   I think they once said something about
4    giving me an honorarium, but I'm not ever sure I
5    got it.
6    Q.   And the slides that we identified
7    attached --
8    A.   They took me out to dinner though.  It
9    was a nice dinner.
10   Q.   Yeah, good places to eat in Cambridge
11   for a country lawyer.
12   A.   Yeah.
13   Q.   But the slides that were part of the
14   Daubert litigation that were also used at the
15   Harvard lecture, those were slides that were paid
16   for in one of yours bills that you sent to
17   Ms. McGroder for work in the Harvard -- in the
18   Daubert part of the case, true?
19   MS. McGRODER:  Object to form and
20   foundation.
21   BY THE WITNESS:
22   A.   They were -- those were -- I mean, my
23   time in working on that was paid for as a
24   consultant.

1030

1    BY MR. LONDON:
2    Q.   In the litigation?
3    A.   In the litigation.
4    MR. LONDON:  I think that's all I'm going to
5    ask.
6    MS. McGRODER:  Okay.  We are concluded then.
7    Thank you.
8    THE VIDEOGRAPHER:  We are off the record at
9    4:21.
10   (WHEREUPON, the deposition was
11   concluded at 4:21 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

1031

1   IN THE UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3   IN RE; NEURONTIN            )
4   MARKETING SALES PRACTICES      )
5   & PRODUCT LIABILITY           )
6   LITIGATION,              )
7        I hereby certify that I have read the
8   foregoing transcript of my deposition given at
9   the time and place aforesaid, consisting of Pages
10  735 to 1030, inclusive, and I do again subscribe
11  and make oath that the same is a true, correct
12  and complete transcript of my deposition so given
13  as aforesaid, and includes changes, if any, so
14  made by me.
15
16        ROBERT D. GIBBONS, Ph.D.
17
18
19
20  SUBSCRIBED AND SWORN TO before me
21  this    day of        , A.D. 200 .
22
23        Notary Public
24

1032

1   STATE OF ILLINOIS )
2          ) SS:
3   COUNTY OF COOK   )
4
5        I, ANDREA L. CARTER, a State of
6   Illinois Licensed Certified Shorthand Reporter,
7   License number 84-3722, do hereby certify:
8        That previous to the commencement of
9   the examination of the aforesaid witness, the
10  witness was duly sworn to testify the whole truth
11  concerning the matters herein;
12        That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction and constitutes a true record
16  of the testimony given and the proceedings had;
17        That the said deposition was taken
18  before me at the time and place specified;
19        That I am not a relative or employee
20  or attorney or counsel, nor a relative or
21  employee of such attorney or counsel for any of
22  the parties hereto, nor interested directly or
23  indirectly in the outcome of this action.
24

1033

1        IN WITNESS WHEREOF, I do hereunto set
2   my hand and affix my seal of office at Chicago,
3   Illinois, this 10th day of March, 2009.
4
5
6        Certified Shorthand Reporter
7        License No. 84-3722.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1034

1            I N D E X
2
3   WITNESS:            PAGE:
4   ROBERT D. GIBBONS, Ph.D.
5    EXAM by MR. ALTMAN................  739
6    EXAM by MR. LONDON................  954
7
8            *****
9            I N D E X
10  EXHIBIT NUMBER              MARKED
11  No. 40......................................740
12  No. 41......................................746
13  No. 42......................................774
14  No. 43......................................781
15  No. 44......................................781
16  Nos. 45, 46................................790
17  No. 47......................................813
18  No. 48......................................814
19  Nos. 49, 50................................828
20  No. 51......................................829
21  No. 52......................................829
22  Nos. 53, 54................................835
23  Nos. 55, 56................................884
24

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

1035

1          I N D E X

2     EXHIBIT NUMBER              MARKED

3     No. 57.........................................884

4     No. 58.........................................896

5     No. 58A......................................918

6     Nos. 59, 60.................................951

7     No. 61.........................................996

8     No. 62.........................................997

9     No. 63.........................................999

10    No. 64........................................1004

11    No. 65........................................1026

12

13

14

15

16

17

18

19

20

21

22

23

24

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

| $ |
|---|

**$1** 1010:8
**$10** 1010:8
**$10,000** 1000:11,12,18
,22 1002:13 1009:23
**$10,100** 742:24 964:7
**$100** 743:12 744:1 965:8
966:1
**$15,000** 986:17
**$16,000** 973:14
**$20,000** 965:23 973:10
**$20,100** 965:24
**$500** 965:8,23 968:1
1026:11
**$8,000** 744:18 964:8

| ( |
|---|

**(c)(1)** 1005:21

| - |
|---|

**-and-** 736:8,15

| 0 |
|---|

**0.2116** 821:13
**0.4194** 820:18,21 821:8
**04-10981** 735:10 738:12
**0474** 821:23
**05** 821:23 870:15,24
871:13
**05-cv-11515-pbs** 735:11
**076** 871:17

| 1 |
|---|

**1** 761:9 762:3,19 763:3
764:10,12 765:2,21
766:7,12,13,16,18,18
767:3,4 769:21 790:5
791:24 816:16 822:14
848:7,9 857:4,5,5,8
869:13 870:19 873:14
877:5 889:16 895:12
897:4 908:2 922:16,18
940:12 959:22 1007:4
1010:6
**1,000** 848:19,20,22,22
**1.0** 816:21 817:1,5,8,12
,19
**1.1990** 887:6
**1.20** 887:9
**1.22** 813:16 816:7
**1.22618** 816:5
**1.23** 813:16 816:7
**1/25/2009** 784:20 785:19
**1/28/2009** 784:21 785:19
**1/5th** 964:24 965:2
**1/6th** 868:22
**10,000** 743:21

**10,100** 743:1
**10/30/2001** 805:13
**100** 919:19,24
**1016** 895:16,17 896:2
**1030** 1031:10
**107869** 797:6
**1099** 742:22
**10:11** 790:5,7
**10:13** 790:7,13
**10:51** 827:22,24
**10th** 838:5 859:1 904:9
905:14 1033:3
**11** 848:8 861:13 862:2
**11:08** 827:24 828:2
**11:24** 844:13,15
**11:28** 844:15,17
**11:47** 858:1,3
**11:53** 858:3,4
**11th** 904:11
**12** 855:7 862:8,12
863:19
**12,000** 750:14
**12-fold** 877:16
**12550** 736:11
**12:17** 878:5,7
**12th** 904:13
**13** 895:24,24 908:9,9
909:22 973:14
**14** 832:7 938:23 939:12
940:5 1024:1
**14th** 831:21 832:9,23
833:2
**15** 848:11,20 868:15,21
870:14 896:9 936:16
969:16 996:3
**1581** 887:20
**15th** 787:19 831:21
832:7,9,23 833:2 865:22
866:16
**16** 801:15 901:16
**16.2** 813:14
**1629** 735:8 738:12
**16th** 799:22 859:6
**1770** 737:11
**18th** 969:21 970:1,10
971:22
**191803** 735:19
**1960** 736:17
**19th** 940:7
**1:00** 877:24
**1:14** 878:7,9
**1:26** 888:15,17
**1:29** 888:17,19

| 2 |
|---|

**2** 764:3,11,12 766:5,8,9
,10,15 769:8,10,13
771:2 790:13 813:15
814:20 816:17 835:14

**836**:1,5,7 844:13,19,23
845:2 846:9 847:20
857:4 868:14 870:8
873:15 876:18 885:12
886:18 889:17 896:10
900:19 901:5 938:24
940:12 965:22 972:16
975:2,12 976:2 1018:6,6
**2/14/2009** 832:19
**2/6/2009** 785:23 789:16
,18
**20** 831:20 837:7 877:24
**200** 736:3 843:20
1031:21
**2000** 861:2,3 948:3,4,9
,11,18
**2001** 799:22 801:15
**2004** 903:23
**2005** 901:6,7
**2006** 861:4 944:1,8,17
**2007** 944:20 948:7,18
949:4
**2008** 742:23 813:10
967:1,20 969:16 972:16
974:22 975:2,12 976:2
,20 989:1 990:20
**2009** 738:4 785:8,18
786:21 787:19 1033:3
**20th** 865:23
**21** 764:20 896:6 902:9
938:8
**213** 895:15,22 896:1
**22** 873:7 944:1 967:1
**23** 902:12
**24,297** 759:9
**25** 955:7,8 959:10,24
962:10,18 964:15,15
**2555** 737:3
**25th** 786:21
**26** 897:3,17 898:4
902:14 908:8
**2800** 735:23
**29** 746:18 747:6,11
748:22 749:23 753:5,6
773:1,11 774:24 775:8
,11 776:11 777:6 822:14
844:20 872:16
**290** 754:22,23 755:17
757:3 758:4
**2950** 756:14
**2959** 756:14
**2960** 773:10 775:12
**29601** 773:14
**29602** 773:14
**29603** 773:14
**2961** 775:12
**2964** 775:12
**2965** 775:12
**2966** 775:13

**2967** 775:15,16
**2968** 775:13 806:3
**29683** 773:17,20 776:3
777:13 805:1,4,7 806:4
,15 822:7,15,17,21,22
823:6,11 824:10,12
**29th** 986:1
**2:00** 923:14
**2:12** 929:24 930:2
**2:30** 930:2,4
**2:53** 951:15,17
**2nd** 974:22 987:13,14,22
988:22

| 3 |
|---|

**3** 817:14 844:17 857:5
878:5 885:13 900:12
901:12 903:14,19
**3/5/09** 735:19 740:6
746:11 774:10 781:6,12
790:11 813:4 814:6
828:6 829:4,17 835:18
884:4,17 896:22 918:8
951:21 996:13 997:20
999:24 1004:4 1026:18
**30** 746:15 851:14 867:18
869:14 967:20
**30-day** 866:21
**30th** 864:9 970:6,24
971:1
**311** 754:18 755:1 756:4
,11,19,22 757:2,7,8
758:5,24 759:3 760:9,9
761:7
**316** 754:23 755:17 757:3
758:5
**3278** 887:4
**33** 887:4
**333** 735:23 738:6
**345** 737:11 753:17,23
754:18
**35** 849:9 872:4
**36** 799:12 801:24 844:20
849:9 869:14 872:4
**3701** 736:3
**3:00** 917:2 923:10
**3:02** 951:17,23
**3:37** 987:7,9
**3:39** 987:9,11
**3rd** 786:3 959:19

| 4 |
|---|

**4** 817:14 878:9 908:20
929:24
**40** 739:23 740:5 741:3,6
744:2,9,9,15 796:11
872:15 965:22 973:11
987:14,22 997:2
**40** 1034:11.......................**740**

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**400432** 735:16 738:16
**41** 746:10 747:24 749:1
750:9 758:23 773:22,24
807:24 808:1,2
**41** 1034:12..............................
**415-334-6880** 737:13
**42** 774:9,14,19 775:6
796:12,14 800:18
803:13,16 805:12,15
**42** 1034:13.............................
**43** 781:5,15,15
**43** 1034:14.............................
**44** 781:11,15,21 782:3
848:19,21
**44** 1034:15.............................
**45** 790:10 791:14,15,23
,24 1034:16
**46** 790:10 791:14 794:16
,16
**46** 1034:16....................**79**
**463** 736:10
**47** 813:3,7,24 870:15
**47** 1034:17.............................
**48** 814:5,9,15 817:15
**48** 1034:18.............................
**49** 828:5,9 829:21
830:24 1034:19
**4:21** 1030:9,11
**4:27** 832:19
**4th** 786:3 959:15

**5**

**5** 738:3 817:9 930:4
970:16 972:19,23 973:7
,9,11 987:7
**50** 744:9,9,16 828:5,21
830:12,14 831:1,4 834:3
873:8 987:21
**50** 1034:19....................**828**
**50.601** 996:19
**50.602** 997:22
**50.603** 999:18 1000:3
**50.604** 1004:8 1012:16
**5063** 999:18
**51** 828:20,22 829:3
830:17,18,21,22 831:1
**51** 1034:20.............................
**512-478-5858** 736:5
**52** 829:13,16,20 830:24
831:10 873:1
**52** 1034:21.............................
**53** 835:11,17,20 836:3
883:20 1034:22
**54** 835:11,17 836:5
883:21,21
**54** 1034:22........................**8**
**55** 883:21 884:3 1034:23
**56** 883:21 884:3
**56** 1034:23...................**88**

**57** 884:16,20
**57** 1035:3..............................
**58** 896:21 903:10,12
918:1,11
**58** 1035:4..............................
**58a** 918:3,7
**58** 1035:5..............................
**59** 888:7 951:20 952:4
1035:6
.......................**5th** 813:9 938:6 958:6,21

**6**

**6** 785:17 976:20 987:11
989:1
**6.11** 868:24
**60** 866:8 951:20 953:6,7
**60-day** 866:4
**60** 1035:6.......................**95**
**602** 997:14
**61** 962:20,21 996:12,17
**61** 1035:7..............................
**6108-2613** 737:4
**62** 997:19
**62** 1035:8..............................
**6269** 886:20
**63** 771:5,10 886:22
999:23
**63** 1035:9..............................
**64** 1003:20 1004:3,7
1012:9,16
**64** 1035:10........................
**65** 1026:13,17,21,22
**65** 1035:11........................
**662** 854:22 855:11
**6810** 736:17
**6:30** 959:19
**6th** 785:8 788:4 789:10
987:13,17,20 989:8,19

**7**

**7** 903:23
**71.2** 767:11,15 768:21
,24
**71.22** 767:13
**713-659-5200** 736:19
**735** 1031:10
**739** 1034:5
**77069** 736:18
**78746** 736:4
**7th** 904:5 905:11
.......................**829**

**8**

**8** 771:6,9 871:20 903:15
,19 908:20
**8/24** 802:15
**8/24/2000** 802:5 803:17
,23
**80** 743:22 744:3,3

964:13
**800** 750:15
**800-634-1212** 736:12
**80710** 986:13
**80801** 976:17
**80901** 974:22 975:1
976:2
**81.6** 813:14
**816-474-6550** 737:5
**84-3722** 737:24 1032:7
1033:7
**88** 846:24
**8th** 904:5 905:12

**9**

**9** 748:8 773:20 775:2,7
777:8,10,13,22 791:24
807:18,20 809:10
816:21 906:24 938:16
,21
**9/25/2000** 804:3
**90** 987:23 988:13
**94104** 737:12
**95** 886:1
**954** 1034:6
**99** 816:16 817:1,12
**995** 817:20
**9953** 823:18
**99535** 816:11
**9:09** 735:20 738:4
**9:44** 770:11,13
**9:48** 770:13,15
**9th** 904:5 905:13

**A**

**a-l** 816:5
**a.d** 1031:21
**a.m** 735:20 738:4 770:13
,13 790:7,7 827:24,24
844:15,15 858:3,3
**ability** 815:19
**able** 741:23 742:16
752:20 795:7 809:9
820:15 830:2 857:2
874:17 881:16 889:3,15
,20,20 898:7,10 932:14
946:15 951:11 963:3
995:15 997:2
**above** 915:17 1022:10
**absolutely** 848:1 859:21
914:2
**abstract** 943:10 948:15
**abstracted** 793:7 818:14
**ac** 861:24
**academic** 1008:13
**accept** 859:14 960:19
**accepted** 752:5 757:17
759:18
**access** 889:18 942:11

**accommodate** 966:19
**accompanied** 856:12
**according** 750:15
774:23 806:8 887:11
903:11 904:16 936:12
**accordingly** 744:15
966:16
**accrued** 791:8
**accuracy** 901:22 902:3
,17
**accurate** 763:14
**accurately** 752:23
**accusing** 1022:16
**acknowledge** 1008:7
**acknowledged** 1008:21
**acknowledges** 1009:6,9
**acknowledging** 1008:14
**acknowledgment**
1022:10
**acquisition** 983:6
**across** 766:21 941:20
942:17
**act** 912:13
**action** 1032:23
**activities** 1004:22
1021:21
**activity** 1002:5
**actual** 777:12 778:5
795:14 833:11 944:15
947:2 956:19 986:3
1021:5
**actually** 741:8 750:11
751:5 752:8 755:19
757:24 762:21 776:12
786:10 791:16 807:3
809:9 811:12 817:15,17
829:24 830:11 834:23
841:11 850:9 853:13,17
862:10 863:1 867:16
894:10 898:5,24 937:21
942:5 943:3 945:21
947:9 948:20 960:14,16
961:22 977:16 978:10
990:12 994:13,13 995:9
1028:13
**ad** 861:17
**add** 845:18 965:2 966:17
**adding** 876:8
**addition** 772:2,5
**additional** 741:11
778:16 812:17 819:15
845:18 858:10,14 862:1
931:10 945:6,16 950:11
977:3
**additionally** 744:24
**adds** 741:4 830:5,8
851:8
**adequate** 939:6 941:11
**adequately** 788:14

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**adjournment** 735:23
**adjust** 883:1 934:8
**adjusted** 880:5 931:17
 933:21
**adjusting** 876:10 934:3
**adjustments** 877:8
**administered** 999:14
**administration** 911:14
**administrator** 1005:12
**admitted** 906:1
**advantages** 811:7
**adverse** 914:19 922:2
 933:1 1008:1
**advise** 1011:7
**advised** 768:9 1011:14
**ae2out** 884:21
**aed** 845:14 847:20,21,22
 848:8 855:14 856:20
 857:4,5,5,8 860:3
 861:12 888:7
**aed1** 892:15 893:16
**aed2** 893:16
**aed2out** 884:24
**aed3** 893:17
**aeds** 849:16 861:13
 872:5 888:5,8 924:12
 930:17
**aers** 1028:2
**affected** 850:3 1006:6
**affects** 919:24 934:16
**affirmative** 858:17
**affix** 1033:2
**afield** 993:12
**aforesaid** 1031:9,13
 1032:9
**afternoon** 923:11
**afternoons** 960:13
**again** 743:5 758:10
 759:12 760:11 762:15
 772:10,21 776:8,14,19
 785:10 802:8 817:22
 818:13 823:6 824:2,14
 831:15 832:8 845:6
 857:21 868:9 882:15
 897:9 899:17 900:21
 905:8,12,13 906:21
 934:3 936:11 946:22
 951:3 1004:7 1005:12
 1011:14 1018:14 1019:9
 1031:10
**against** 778:3,3,4
 1024:15
**age** 801:24 860:15 876:7
 ,10 877:21 933:21
**ago** 739:19 777:24
 811:22 813:8 834:13
 970:5
**agree** 804:14 895:11
 900:19 902:17 919:19

**agreed** 919:17 940:11
**agreeing** 901:19
**agreement** 993:10 995:4
**ahead** 755:4 758:13
 788:23 807:21 843:10
 867:4 900:19 901:1
 903:17 935:23 996:6
 1010:4 1013:3
**al** 735:8,10,14,17 738:11
 ,11,15,16
**alert** 862:3 941:14
**allocated** 988:14
**allow** 794:24 870:11,11
 ,17 889:13 915:15
 926:20 927:13 928:10
 941:23 943:9
**allowed** 855:22 907:16
**allows** 868:6 871:8
 883:3
**almost** 847:5 1021:3
**alone** 765:22 794:13
 795:9 873:11 915:7
**along** 750:5 753:15
 779:9 781:22,22 791:16
 792:5 797:12 900:14,18
 950:6 953:20
**alphanumerical** 796:22
**alphanumerically**
 795:24
**already** 779:22 790:17
 ,21 793:10 842:20
 883:17 940:9 957:12
 961:23 972:18 1006:21
**alter** 822:19
**altered** 765:10 767:23
 768:1 769:23 770:18
**alternative** 882:16 906:4
 926:4 929:12 931:7
 951:11
**although** 798:24 947:14
 949:21
**altman** 736:13 738:21,21
 739:15 740:9 741:13,17
 746:12,23 747:4,17
 749:4,7 751:13 753:6,7
 754:7 755:8 757:16
 758:18 759:10,16 760:8
 761:5 762:2 764:1,13,16
 ,17 765:1,23 766:3,6,15
 ,19 767:14,18 768:4,8
 ,13,19 769:7 770:10,16
 771:15 772:23 773:23
 774:1,11,14,16,18
 776:10 778:1,18 780:7
 781:2,7,13 782:13,17,21
 783:3,17 785:6 786:19
 788:8 789:8,22 790:3,14
 792:16,18,19 794:4

795:11,20 796:13
 797:21 798:5,21 799:2,5
 800:14,20,23 801:2,3
 802:11,14 806:6,23
 807:12,22 808:11,18
 809:7,16 810:4,9 813:5
 ,24 814:2,7 815:11,14
 ,20 816:1 819:4,8,21
 820:13,20 821:3,11,17
 822:4,5,18 823:14 824:5
 ,22 825:11 826:5,14,16
 827:20 828:7,11 829:5
 ,19 830:23 831:5,7,9
 834:2,9 835:21 836:8,13
 ,16,18 837:3,5,22 838:8
 ,9,15,18,21 839:1,11,19
 841:9 842:1 843:11,24
 844:8,18 849:8 851:22
 ,23 852:13 853:11
 856:17 857:24 858:5
 859:15 860:1 861:5,19
 863:5 868:12 875:22
 877:23 878:10,21,23
 879:17 880:18 881:4
 882:2 883:14 884:6,18
 885:23 888:13,20 890:3
 892:23 893:7 896:23
 897:6,12,23 898:1,22
 899:18 900:7,24 901:2,4
 ,23 903:8,18 904:22
 905:3 906:15 907:8
 908:19,23 909:1,13,23
 910:20 912:6 913:3,9,14
 916:11 917:11,24 918:3
 ,9,17 919:4,12 920:18
 921:10 922:14 924:9,21
 925:4,10 926:16 927:11
 ,12 928:12 929:21 930:5
 931:19 933:10 934:2,17
 935:16 936:7,17 937:1
 938:19 939:18 940:1,11
 ,18,21 941:8,9 943:2,23
 944:9,10 945:3 946:23
 948:1,6,10,12,16,17
 949:7 950:10 951:1,13
 952:1,5,8,12,20 953:1
 ,19 954:5,7 955:1,14
 961:17 962:8,14,18,21
 963:1,7 964:1,5 996:1
 1003:9,13 1025:6,8,10
 ,14,19,23 1026:2 1034:5
**always** 742:21 830:9
 832:3 843:21,22 865:8
 937:20 938:14 1007:10
**am** 739:22 745:17
 746:13 764:14 773:23
 ,24 785:14 796:3 800:19
 812:21 813:6 814:13
 828:8,19 829:12 831:3

837:6 839:18 842:19
 854:13 860:4 883:18
 889:6 892:12 894:24
 899:7 901:18 908:7
 922:24 924:16 938:20
 941:3 952:3 955:5 956:4
 959:10 960:24 982:7
 984:5,18 995:9 996:4
 997:11 998:2,19,20
 1006:22 1007:17
 1010:16 1011:15
 1014:12 1016:5 1021:9
 1022:16 1028:16
 1032:19
**among** 819:18 848:15
 859:12
**amount** 742:23 744:7,21
 ,24 751:21 872:1 940:23
 965:3 980:18 983:22
 1000:23 1017:2 1019:13
 1021:16,23 1022:2
**amounts** 940:14 964:14
 ,18,22 1003:2 1007:5
**analyses** 742:2,6 748:20
 751:23 777:10,24 786:5
 ,7 787:3,4 811:21,24
 825:5,13,16,19,22,23
 826:1,18,22 827:1,9,12
 ,17 828:16 832:11,12
 833:5,12,15,21 835:4
 840:20 844:21 845:2,7
 ,16,21 849:4 850:2,4,5,9
 ,10,19,20 851:5,16,20
 852:1,6,9,19 853:10,13
 ,15,19 856:7,10,11
 866:19 867:22 880:2
 883:22 884:8,23 889:23
 890:2 891:15 900:9
 907:18,19 910:12 914:4
 927:9 928:9 931:9,10
 932:17 933:16 939:15
 943:13,14 949:19,23
 950:2,12,16,17,22 951:6
 953:10,21 955:19 956:2
 ,15 957:1 958:8 968:1,7
 969:11 973:19,19,20
 978:1,16,17,21 979:18
 980:7,9,10,11,23 981:15
 ,17,22 982:3,4,21
 983:19,24 988:18,21
 989:15 990:3,7 1027:4
**analysis** 745:3 747:7
 748:18,19 761:21 772:9
 ,19 779:4 783:8,11,23
 791:17 793:8 811:10,11
 829:8 834:22 835:13,13
 ,14 836:1,1,3,5,7,21,24
 845:8,23 846:20 847:2,3
 848:13 850:13,15,16,18

851:7 852:7 853:8 854:9
,10 855:2,3,10,12
856:15 859:4 860:22
862:9 863:2,14,24
864:14,15,18,20,24
866:20,22 868:3 877:8
,14 879:14 880:5,5
885:14,17 886:11
887:11,23 888:1 890:2
,21 891:1,7,8 900:12
907:10,16 910:17,19
911:20 913:16 915:2,19
916:4,4,7 917:22 918:22
919:14 920:15 921:5,17
,20 922:13 923:22,23
927:3 929:15 930:8,10
,15 931:2,2 934:9,13
935:11 937:20 941:19
,24 943:5,11 946:14,17
947:21 951:9 957:9,10
,17 958:2 959:6 973:18
979:19 983:16 991:17
,20 1016:1 1023:18
**analytic** 970:11 976:13
987:15
**analyzing** 975:14
**andrea** 737:23 1032:5
**announcement** 1026:23
**annual** 1004:21
**anomalies** 811:8 812:16
,18
**answer** 758:16 766:2
768:5,10 769:14 778:9
780:8,10 785:21 795:9
826:13 832:20 833:17
834:6 838:19,23 839:7,8
,13,13,16 840:16 842:9
845:20 852:15 853:4,6
872:12 874:6,7,8 878:17
903:16 906:14 907:7
912:14,21 925:7 927:17
929:4,18 930:13 931:4
951:3 982:2,3 984:22
985:1,10,13 988:19
1003:13 1006:22
1020:15 1021:1 1023:8
,10,13
**answered** 758:21
763:23 784:14 786:16
788:7 824:21 852:3,5,14
867:3 910:5 913:24
921:9 927:17 935:23
936:15 950:24 976:6
978:4 981:9 982:15
984:24 985:14 986:22
1003:15 1021:4,11
1023:10
**answering** 927:20
989:11,12

**answers** 1003:12
**anti** 862:1
**anticonvulsant** 861:24
**anticonvulsants** 846:12
935:5 949:10
**antidepressant** 847:23
861:17,20 880:3,3
943:13 950:6
**antidepressants** 935:4
1007:14,24
**antiepileptic** 846:17,18
,23 847:5,24 848:16
862:2 869:7 879:12,20
907:23 917:23 924:5
926:23,24 927:23
949:16 950:5 1024:14
1027:19 1028:17
**antipsychotic** 813:14
847:23 861:22 878:13
880:6
**antipsychotics** 878:15
,16 879:6 881:12,12
935:5 936:12,14,18
937:3,4,11,19,22 938:1
,2
**anybody** 759:23 839:2
841:8 915:23 971:19
990:16
**anymore** 936:6 938:5
961:19 1020:14
**anyone** 974:14 1011:7
1017:1 1021:6 1028:22
**anything** 745:17 753:23
756:18 759:21 775:1
782:24 792:7 802:19
806:2 839:21 849:11,15
872:4,10 895:10 922:9
924:12 927:2 931:10
948:24 956:21 966:7
971:2 974:1 995:10,17
1001:11,12
**anyway** 856:23
**ap** 861:22 878:13
**apart** 832:3,4 883:13
926:8 932:11 973:15
**apologize** 929:20 969:19
1012:15 1028:10
**apparently** 857:13
**appear** 747:22 750:19
,20 763:9 775:21,22
782:18 791:21 792:4
797:13 798:1,9 804:15
,16 813:12,18 830:14
858:10 880:15 884:8
885:5 894:7 953:2,11
1006:5
**appearance** 991:4
**appeared** 736:22 737:8
,15 810:23 814:16

822:17 989:7
**appears** 740:2 782:15
,18 793:9 836:23 904:15
953:15 966:24 972:15
**applicability** 997:23
**applicant** 998:15
**application** 998:13
1005:23 1014:15
1015:11,13
**applied** 827:1,2 1015:17
**applies** 998:6,24
**apply** 872:9,13 930:9
998:12,19
**applying** 1016:15
**appreciate** 858:7,8
859:7 959:2
**approach** 876:15 943:17
**appropriate** 841:1
910:13 1022:4
**appropriately** 760:14
**approximately** 783:13
838:5 964:6
**april** 944:20 948:7
**arbitrary** 920:19,21
**archives** 837:13 839:23
978:24 1016:2
**area** 943:15 950:9 972:6
**areas** 971:10 1017:16
**aren't** 906:17 917:6
**argue** 913:12
**argumentative** 784:14
978:12 979:8 980:2
982:5 984:24 1013:2
**arm** 922:3,8
**around** 844:22 851:10
857:16 889:16 899:14
**article** 840:8 958:1
**articulated** 869:13
**artifacts** 926:9,9
**ascribe** 873:3
**aside** 741:1 742:6 773:1
813:21 879:11 883:16
884:11 894:15
**ask** 742:19 790:16
792:13 826:12,15
837:17 860:19 880:19
884:7 888:21 889:7
899:7 913:12 925:5,6,8
926:17,18 939:18 940:8
,15 941:2,3 951:1
954:15,19,24 955:7
961:8 962:6 968:22
971:22 975:5 977:6
985:7 993:11,19,23
994:4,17 995:10,16
996:4,17 997:9 1000:2
1003:1,1 1016:23
1019:12 1023:23 1030:5
**asked** 741:18 742:12

743:5 752:22 763:24
766:7,9,10,11,12,17
770:18 780:22 786:15
788:6 810:2 824:21
838:2 839:24 843:21
852:2 867:3 874:8 910:5
912:10,17 913:23 921:9
927:16 935:23 936:15
939:11 940:6 941:7
946:3 947:14 950:24
964:5 976:5 978:3 981:8
982:14 984:23 985:14
986:21 994:10 1006:19
,19,21 1010:22 1015:4
1021:3,10 1022:12,18
,20,23 1023:9,11
**asking** 738:22 762:15
773:23,24 780:14
787:16 810:4 839:20
842:1,8 866:12 931:1
939:14 954:20 955:11
984:10,20 989:12
992:12,18 998:21,22
1001:17 1002:20
1004:24 1006:18
1010:16 1014:21
1024:17 1025:16,17
**assessed** 1000:23
**assign** 750:6 795:24
**assigned** 750:1 760:23
798:7 807:3 808:22
898:15
**assigns** 753:3
**associated** 811:5 821:22
822:3 823:12 869:11
877:15 880:6 922:3
927:23 929:2
**association** 738:2
864:21 868:10 907:23
**assume** 743:8 744:8,17
763:20 816:5 825:5
861:12 885:16 908:12
910:2 960:22 961:13
969:10 987:17 1005:13
**assumed** 907:10,12
946:9
**assumes** 758:11 761:14
762:12 764:6 765:12
777:17 780:5 807:7
823:4 945:24 984:24
992:11 1002:18 1006:15
1017:5 1019:23 1021:11
**assuming** 761:23
763:15 766:24 818:17
825:6 879:9 901:18,24
902:3 903:2 908:7
910:16 963:15 968:18
**assumption** 865:2
881:11 891:19

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**assumptions** 903:5
**assure** 763:17 842:4
1012:4
**asterisk** 775:12,12,12,13
,13,13,15,17 963:22
969:18 972:15
**attached** 1029:7
**attachments** 1027:12
**attempt** 845:23 846:19
847:6 849:17 850:12,22
,24 851:1,9 853:18
854:1,5,6,22 855:6,8,16
,23 861:9,11 862:4,11
,12 863:7,19,20,24
864:18,21 865:1,20,21
,24 866:16 867:1,10
869:6,16,20 870:4,18
872:15 879:14 882:18
898:5 899:2 900:2
904:16 905:8,9,9,10,10
906:6,9 907:20 908:13
910:10,15 911:12
912:13 914:5,20 915:21
,23 916:2,12,22 917:1
,19 919:9 921:1,1,16,19
,20 922:1,5,21 923:1,3
,10,14,19 924:6,13
926:14 927:8 932:4
933:23 935:14
**attempted** 899:12,22
905:7,16,18 910:1 911:1
912:15 921:3
**attempting** 899:23
**attempts** 741:3 810:24
822:2 846:5,17 847:11
850:13,18 851:3,5,11,17
852:12 863:8 864:2,5,12
,19 868:21 870:2,13
872:6,17 877:16,17
883:5 888:1 892:4
895:14 897:5,7,8 898:8
905:17 906:18 907:17
,18,24 908:1 911:9
916:7 918:19,21 919:2
,15 920:7,8,9,12,16
921:6,18 922:10,13
924:8 925:13 926:21
927:1,5,15 933:6,20,21
990:4
**attention** 825:1
**attorney** 1032:20,21
**attorneys** 738:19
**attribute** 919:15
**attributed** 866:1
**atypical** 878:15 879:7,7
881:12 936:13
**august** 976:20 987:13
,17,20 989:1,3,8,19
**austin** 736:4

**automatically** 830:5,7
863:3
**autumn** 957:20
**available** 799:4 853:24
863:17 881:23 942:24
**avenue** 736:10
**avoid** 991:1,4
**award** 1007:21,21
1018:9,21,22,23 1019:3
,8
**awarding** 1016:20,23,24
**aware** 839:5 935:18
943:24 944:19 945:4
990:22 996:23 1000:20
**away** 793:15,17 880:17
882:22 929:10

## B

**back** 742:21 747:3
755:20 757:12 758:23
760:4,5,11,13,21 766:10
,15 770:14 772:24 773:1
778:20 786:11 790:13
791:12 795:7 796:9
799:6 803:9 806:21
812:17 819:11 824:11
,24 827:4 828:1,22
833:24 834:17 842:6
844:17 848:7 852:21
857:21 858:4 868:13,14
874:6 878:9,18 884:12
888:18 889:6 891:12
895:12 898:3 906:12
907:5 930:4 936:21
940:8 945:5 951:22
955:9,22 960:17 968:8
974:20 977:8,13 982:1,7
987:11 989:10 993:11
,11 1012:5 1016:22
1020:17 1023:16,17
1026:6
**background** 911:15
914:7,22,23 916:17
919:16,22,23,24 920:5,6
,7,8 923:5
**backward** 967:15,17
969:15
**backwards** 937:18
966:22
**bacon** 737:2 839:3
**base** 873:10
**based** 748:20 749:22
750:20 769:9,13 772:18
773:23 782:11 783:24
787:7 794:5,6 795:1
797:19 804:11,13
805:21 813:11 898:2,13
913:16 916:18 941:13
,24 944:12 950:18

966:13 997:2
**baseline** 922:6
**bases** 976:24
**basic** 757:21,22 763:3
874:24 875:23
**basically** 771:8 773:13
831:21 837:16 867:23
869:2,20 908:22 954:2
**basis** 752:14 771:2
777:9 784:2 794:13
795:8 818:21 840:2
843:1 868:5 871:3,20
900:8 902:7 903:6
907:24 915:11 931:1
1003:6 1015:17 1016:7
**bayes** 1027:24
**bear** 819:1 912:7,8
**become** 1015:20
1018:24
**becomes** 863:12 921:17
**bee** 736:3
**began** 975:5
**beginning** 790:12,18
844:16 878:8 930:3
963:17 987:10 1013:5
**begins** 996:11
**behalf** 736:22 737:8,15
738:22 739:4 838:17
**belaboring** 800:16
**believe** 742:4 753:14
767:11 771:18 773:19
775:20 779:14 782:6
786:3 788:2 799:16
807:23 842:11 854:15
,17,21 856:10 859:6
860:16 861:3 862:8
877:9 884:22 888:6
900:11 908:19 917:14
923:9,13,18 925:15
931:11 934:24 936:3
937:24 945:9 955:23
957:13,19,21 964:6
965:7,11 970:7 979:21
,21 990:21 1007:9
1008:22 1028:8
**benefit** 827:16
**benefiting** 1002:8
**besides** 879:19,21
**best** 743:22 859:22
929:18 947:7 971:11
**better** 780:3 812:2
852:18 859:10 960:15
1016:16
**beyond** 742:10 818:16
873:5 906:7 915:17
927:6 937:14 938:1
957:12 1022:10
**bi** 936:3
**bias** 1002:5

**big** 851:18 877:19 894:2
911:20 918:21 921:12
923:24 924:3
**bill** 787:6,12 961:2
965:21,22 966:10,11,16
,24 967:19,23 968:12
969:15,20 970:1,3,5,10
,12,15,15,17,24 971:1
,16,22 972:14 973:8,9
974:19 976:17,17,20,22
977:19,21 978:1,8,9
979:21 980:6,19 982:10
987:14,18,20 988:7,8
989:3,4,19 990:1
**billed** 978:24 980:6
982:23 983:24 1021:5
**billing** 972:5 975:16
**bills** 742:16,17 743:10
941:3 955:13 959:14,16
,23,23 964:15,18,20
965:12 966:22 969:24
971:7,10,20 972:5,8,8
973:16 979:18 982:1,7,7
,8 995:19,21,22 1006:20
1029:16
**binary** 865:14
**bipld** 755:24
**bipolar** 744:22 755:24
773:9,18 775:11 783:24
784:2 791:17,22 792:5
793:10 796:10 805:7,16
,21 806:4,8,17 814:17
,17 816:10 822:23 823:7
,8,10,13 825:16,22
826:18 827:3 835:3,12
,13,13,24 836:1,3,5,7,20
844:21 845:21 853:20
855:6 895:18 897:2
899:13,22 911:2 912:12
,19,20 913:15,20,22
916:13,20,21,24 917:3
,19 921:2,4,7 923:12,12
,16 930:8,8,15 931:2
933:24 935:19 936:4
949:22 950:13,17 951:8
955:19,19 957:9,18
958:3 975:17,20 976:4
,13 977:15,24 978:2,16
,18 979:19 981:1,3,7
982:12 983:4,8,17,19
988:16,24 990:17
991:21 999:8 1002:15
1006:12 1008:2,18
1009:6,6 1010:1 1011:9
1023:17 1027:4
**bit** 772:7,8 796:18 846:6
888:3 930:7 938:24
**biweekly** 859:2
**black** 904:3

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**blank** 805:2 806:4
**bless** 848:3
**body** 1008:15
**bold** 996:18
**border** 817:9
**bottom** 771:4 805:1,13 835:23,24 847:18,19 848:9 885:24 886:18 953:24
**boulevard** 737:3
**bound** 839:6
**box** 909:7
**bp** 792:23 793:1,3 829:22 954:1 989:16
**bpld** 805:16
**brackets** 749:10
**break** 770:17 827:18 842:3,10 857:18 859:18 ,18 877:23 888:13,21 929:19 965:5 1015:21
**breakdown** 988:24
**breakout** 966:5
**breaks** 868:4 1027:17
**brief** 859:17
**briefly** 740:18 993:5
**bring** 791:2
**broad** 930:13
**broke** 748:16 853:19
**broken** 765:19
**brought** 815:15 825:1 900:4 912:15 915:6 955:9,9 983:15 1017:13
**brown** 1009:8
**brush** 825:8
**bucket** 753:24
**bugs** 752:10
**bulger** 735:8 738:10,24
**bureaus** 1002:2
**burn** 789:5
**business** 984:7

C

**c(1)** 1014:11
**c-1** 1014:11
**calculate** 762:4 818:11 873:13 874:23 875:12
**calculated** 762:8
**calculates** 765:2
**calculating** 875:18
**calculator** 815:15,23 818:2 877:4 896:7
**calendar** 787:17 865:9
**california** 735:12 737:11 ,12 738:14 940:13
**call** 803:12 844:1,6 864:7 889:4,6,7 918:3 971:15,21
**called** 739:11 802:19,22 805:16 821:4 822:23

**823**:7 829:22 835:12 856:20 860:7,10 861:7 862:19 900:11 975:21 997:7
**calls** 780:6 807:8 810:1 823:3 839:10 879:23 880:24 882:6 971:18 979:10
**cambridge** 1029:10
**can't** 740:20 744:15 758:19 759:24 769:1 771:12 777:23 785:16 ,21 786:13 792:8 798:23 802:18,23 811:14 816:19 817:5 819:3 851:2,3 859:10 871:22 873:3 887:22 925:7 934:15 943:10 970:19 ,20,20 988:23 1017:18
**cannot** 758:16 777:21 781:16 786:11 837:22 842:11 871:20 923:20 937:14
**capable** 960:15
**capacity** 838:11
**caption** 738:8
**carbamazapine** 872:9 ,11,14
**carbamazepine** 871:16
**cardiac** 943:14
**care** 906:1 962:3
**carter** 737:23 1032:5
**case** 738:8 740:23 742:8 743:21 745:5,13,18 787:2,6,20 842:21 855:16 862:8 869:5 890:5 906:3 910:16 933:17 958:22 960:16 961:12,12,14 962:4,5,7 963:11,16,17,20,22 964:10,22 968:22 999:8 1017:4,9,24 1020:24 1029:18
**case-by-case** 998:16
**cases** 789:4 823:11 946:13,16 947:12 949:2 ,4 998:14,19 1017:14 1022:12
**cash** 743:14
**casts** 740:16
**categories** 765:22,22 848:2 935:4
**categorizations** 793:19
**causal** 849:7 914:17 925:18,22 926:2 928:4 929:7 931:3,14,18 932:24
**cause** 924:23 930:17
**causing** 924:7 933:6

**cave** 736:3
**cd** 781:16 788:12 789:5 967:24 968:4,13,14 969:4 970:6,14
**cds** 968:6,11
**center** 996:19 997:22
**certain** 740:3 746:8 774:7 781:3,9 790:8 813:1 814:3 828:3 829:1 ,14 835:15 884:1,14 896:19 918:5 951:18 996:10 997:17 999:21 1004:1 1017:15 1026:15
**certainly** 762:23 763:16 788:18 789:17 799:3 817:3 819:6 856:24 910:11 911:19 916:9 917:22 923:9 932:2,6 997:3,6
**certainty** 785:21 841:18
**certified** 1032:6 1033:6
**certify** 1031:7 1032:7
**cfr** 997:2,12
**chance** 872:2 873:6,11 991:2 1018:19 1023:5
**change** 761:23 762:1,23 763:11,18 767:6 770:6 771:14,16,20 772:1,10 ,22 788:16,19 789:3,6,9 790:3 791:11 823:1,12 ,17 845:18 851:19 874:10 877:12,22 895:10 912:23 916:9 948:24
**changed** 789:24 796:16 813:13,15
**changes** 765:20 788:21 791:5,11 883:8 1031:13
**changing** 755:20 762:6 823:15
**characterization** 905:22
**characters** 753:11,11,12 ,22 773:4,5
**charged** 973:10,14
**chart** 748:3 898:18 902:17,20 904:17 918:4
**check** 743:13,15 744:14 776:12,13,24 777:14 794:24 810:11 853:16 877:4 878:18 933:3 966:16 1021:16
**checked** 909:7
**checking** 824:24
**checks** 753:13 810:14 ,16 811:12,16 812:3,7 966:13 980:17,23
**chicago** 735:24 737:19 738:7 998:5 1033:2
**child** 943:12,13 1006:5

**choices** 994:21,24 995:1
**choose** 751:16 839:8
**circled** 997:13,14
**cite** 997:2
**cited** 842:21
**city** 735:13 737:4 738:14
**claim** 817:5 942:22
**claims** 810:19 811:4 867:15
**clarify** 878:11 936:17 982:18
**classification** 793:11
**classified** 806:3
**clause** 760:7
**cleaned** 810:21
**clear** 763:1 875:21 878:14 955:15,24 956:1 ,6 957:14,16,22 976:9
**clearly** 817:18 858:10 871:19 897:16 911:17 915:22 942:16 998:13
**clinic** 912:16
**clinical** 921:23
**clinicians** 936:5
**close** 780:20 786:24 841:17 970:21
**closest** 882:21
**cns-type** 935:3
**co-authors** 1008:19
**code** 748:5,8 749:24 750:10 752:19 753:3,8,9 ,16,22 755:10 757:8 758:3,19 759:4 760:9,20 761:7,17 773:2,20 774:2 776:11 777:13 780:23 784:22 788:17 805:7,15 806:2,7,20 808:14 822:7 ,15,21,22 824:10,18 863:18 992:4
**codes** 748:2,21 750:6,14 751:2 755:23 756:3 773:3 775:2,7 776:1 777:1,6,8,10,12,15,22 ,22 778:4,4,12 780:9 794:12 795:7 796:10 799:18 806:16,24 807:2 ,4,18,20 808:3,5,20 809:2,10 822:9 824:17 904:18,20 906:24
**cohort** 744:21,22 747:19 ,21 776:18 794:17 814:18 826:19,23 827:3 ,9 836:22 854:17 883:22 895:19 897:2 915:6 920:13 934:1 949:18,22 950:17,23 951:8,10 956:2 957:18 958:3,9 959:7 967:4 973:18 975:17 976:4,14 977:15

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

,24 978:2,17,18 981:1,3
,7 982:12 983:20 988:9
,15,16,23 989:16 990:17
991:21 999:8 1006:12
1008:2 1011:9 1027:4
**cohorts** 949:18 976:12
981:4 987:21,24 988:7,8
1002:14,15 1010:1
**coincidence** 933:19
**collection** 826:2 885:9
**column** 748:4,14 749:22
766:21 767:4 814:19
844:22 845:2 847:3,3,19
868:23 871:8 886:15
898:24 899:6 902:4
909:3 1000:4 1004:10
1005:22
**columns** 749:21 908:8
**combination** 928:9
**combine** 741:3
**combined** 897:15
**combines** 741:9
**comfort** 979:24
**comfortable** 751:5
815:21 1021:22
**coming** 873:23
**commencement** 1032:8
**comment** 768:13
**comments** 840:7 841:8
843:3 844:5 950:20
**committed** 761:24
**committee** 739:2
**communication** 742:19
840:5
**communications** 837:20
977:12
**companies** 991:7,12
1003:6 1011:18 1017:2
**company** 737:20 944:1
,16,19 945:5,21 948:19
1016:14 1020:12
**comparator** 1016:16
**comparators** 947:16
**compare** 807:18
**compared** 847:24
**comparing** 941:13
**comparison** 754:10
765:9 809:18 845:14
849:22 868:24
**comparisons** 877:1
911:8
**complete** 834:16 970:11
,23 1031:12
**completed** 790:21
1008:19 1028:2
**completely** 847:15
1003:15
**complex** 858:9
**compliant** 1007:10

**complicated** 767:8
**complies** 948:8
**comply** 839:6
**component** 852:7
**components** 989:1
**compounded** 780:2
**comprises** 987:24
**computation** 771:13
875:24 885:6
**computations** 944:12
**compute** 978:15
**computed** 989:14
**computer** 799:3 853:9
889:18 890:10,13,16,17
,19 956:8,8 973:23
984:8,15
**computing** 980:8
**concerned** 894:6
**concerning** 837:11
1032:11
**concerns** 932:1
**conclude** 870:11,17
871:3,9,14,22 887:22
926:20 927:14 930:16
941:24 942:15 966:1
**concluded** 910:1 1030:6
,11
**conclusion** 763:3
769:11,15,20 821:24
838:20 839:10 849:1
872:21 924:11
**conclusions** 762:24
763:1,12,18 769:9,12
772:11,22 846:16
926:22,24
**concomitant** 762:4
765:4 767:22 847:23
880:3 933:22
**condition** 880:14 936:8
939:14,19
**conditions** 762:5,10
765:10 845:19 936:10
**conduct** 991:2
**conducted** 1002:6
**confer** 842:3 844:7,8,11
**conferring** 844:10
**confidence** 770:2,21
771:16 772:1,3,13,16
815:4 818:22,23 823:1
,17 870:10,14,16,19,22
,23 871:1,12,18 874:22
,23 875:4,5,8,12,16
876:14 886:2,7 887:3
1028:1
**confident** 752:18,21
**confidential** 837:21
838:1,4 840:4 841:21
842:23,24 843:3,5
**confirm** 740:1

**conflict** 992:13 994:16
997:3 1001:5,19,20
1003:8 1004:13,14
1007:9 1016:17 1019:18
1023:21
**conflicted** 1022:5
**conflicting** 997:1
**conflicts** 991:16 992:7
1001:22 1009:9 1016:5
**confused** 761:18 846:6
**conjunction** 740:14
935:10
**connection** 1006:10
1009:24 1015:5 1017:3
1024:15
**connors** 737:6
**consecutive** 810:24
851:12 864:4 904:18,19
905:19 906:11 908:14
**consequence** 911:18
**consequences** 765:4
**conservative** 867:21
**consider** 825:21 842:1
,20 843:9 850:21
**consideration** 876:19
**considered** 739:24
740:12 741:9,11 763:2
842:16,23 866:17 908:3
**consistency** 951:5
978:18 980:17,23
**consistent** 811:20 822:2
872:2 873:10 929:16
936:23 937:12 946:10
,12
**consisting** 1031:9
**constitute** 939:6 941:10
**constitutes** 1032:15
**construct** 978:14
**constructing** 803:7
**construction** 788:12
**consult** 806:13,21
**consultant** 745:7
1015:20 1029:24
**consultants** 1002:1
**consultation** 935:1
**consulting** 745:9,16,19
,21,23 1011:15,16
**contained** 938:2
**contains** 831:11,11
**contents** 782:3 830:12
856:21 972:4
**context** 828:18
**continue** 790:15 858:5
932:20 949:23,23
1000:3 1007:11
**continued** 737:1
**contract** 878:22
**contribute** 960:17
**contributed** 881:17

946:5
**control** 922:7 929:14
**conversation** 972:3
1022:7
**convert** 815:3
**cook** 1032:3
**copied** 834:21
**copies** 790:17 820:3
952:5,10 961:7 986:8
**coping** 984:5
**copy** 764:11 791:2
839:22 952:18,19
**correct** 745:14 747:8,14
,21 748:17 749:11,14,17
750:2,3 751:17,24 752:1
,4,6 753:13,14,18,20
754:1,3,5,11,12,15,16
,19,20,23,24 755:10,13
,14,17,21,22 756:1,2,4,5
,9,10,11,12,16,17,19,20
,23,24 757:1,4,5,11,20
,22,23 759:12,24 761:12
762:10 763:15 765:5,10
766:22,24 767:11,15
768:22 769:10,13 770:2
,22 773:6,15,16 775:3,4
,16 776:17,22,23 777:7
,8,15 778:6 779:5,6
780:3,17,18 783:24
784:1,3,4 785:8,20,24
789:11 791:14 793:12
,13,16 794:1 795:2
798:16 799:9,10,12,15
,19,20,22 800:11 801:7
,10,15,16,18 802:1,2,7
,16 803:18,19,23,24
804:1,2,4,5 805:8,9,22
806:5,8 807:14 808:6,15
,16,22,23 809:3,11
813:16 814:21 816:8,9
,15 817:6,19 819:17,22
821:8,9,13,16,19,20
823:18 824:7,19 825:7
826:6,19 829:9,10
831:14 832:14 833:12
,13 836:8 837:1,2 839:8
841:13 844:23,24
849:23 860:8,9,12,13,15
861:14,16,17,20,21,22
,23,24 862:6 864:3,6,13
865:4,15 872:9,23,24
873:15,17,18 875:2,14
,15 877:8 878:16 884:23
885:9,14,15,17 886:11
,20,21,23 887:1,4,5,7,8
,9,10,14 895:16 896:4
,10,11,15 898:5,6,8,11
,15 899:14,23 900:10
901:20 902:2,10,11

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

903:20,21 904:8,10,14
,20 905:2 907:11,13,14
908:4 912:13 916:15
920:1 922:17 929:4
931:23 933:7,8 934:5
935:19 936:14 942:1
943:5 944:4,13,14 946:9
948:3,15,20 957:2 958:4
,10 959:8 963:18 964:17
965:10 966:3 968:2,3
969:13,19,22 972:13
974:17 975:9,23,24
976:21 981:24 986:18
999:11 1011:6 1013:22
1020:2 1021:9 1031:11
**corrected** 763:17 767:7
816:7 885:2
**correction** 775:18
**corrections** 813:11
**correctly** 753:19 761:17
765:16 767:12,19,20
775:14,19 833:7 849:20
903:3
**correlated** 934:12
**correspond** 830:16
834:24
**corresponding** 815:4
**corroboration** 840:19
**couldn't** 822:20 823:1
871:14 876:16 895:11
931:5 942:22 952:9,14
,21 973:22
**counsel** 768:9 781:17
782:4 783:5 787:6 791:4
839:17,21 841:1 959:5
981:7,15 983:7 990:16
991:19 992:4,11,19
993:18 1032:20,21
**counsel's** 903:13
**counseled** 971:9
**count** 748:10 749:9
808:13,13 864:11,18
886:10
**counterbalanced**
933:13
**counting** 923:5
**country** 1029:11
**counts** 808:3 864:20
**county** 1032:3
**couple** 756:14 774:20
781:20 787:13 791:15
827:13 834:13 952:2
970:22 1027:5
**course** 762:1 787:10
838:13 870:20 874:14
882:17 894:21 915:13
922:18,24 926:6,10
932:12 934:16 938:11
984:7 1024:21

**court** 735:1,12 738:2,13
745:5,13,18 754:6
759:19 767:13 820:19
844:1,6 860:23 861:18
958:7,13,16,17,17
962:20 970:13 1003:20
1023:1,7 1031:1
**court's** 962:17
**courts** 842:24
**covariate** 864:24 921:17
,21
**covariates** 874:9,10
876:3,4 896:12
**cover** 866:5,6,9 971:23
1027:12
**covered** 745:1 1023:20
**create** 976:23
**created** 782:20 785:17
,18 789:18 832:19 833:9
855:19,19 857:9,10,11
,12 891:10 893:13,24
900:23 989:7
**creating** 785:10,10
831:17
**creation** 831:17
**criteria** 775:8
**critical** 843:18 844:3
943:4
**criticisms** 950:21
**crone** 735:14 738:14,23
739:7
**cross** 900:15,20 901:9
,13 905:4 908:15,21
**cross-examination**
939:13 940:5 994:12
**crossed** 902:18 904:3
909:8 918:10
**crossing** 901:18 902:7
903:6
**crude** 791:9
**csr** 737:24
**cumulatively** 851:15
**currently** 949:10 978:23
**custodial** 905:24
**custody** 905:24
**cut** 873:2
**cv** 735:16 738:16 999:2

**D**

**dat** 857:5,5,8 892:15,15
,16 893:16,16,17
**data** 744:20 748:6 749:4
759:19,21 769:17 775:7
776:20 778:16 779:1,2
,17,19,22 780:17,20,22
781:19 783:24 784:2,18
,19 786:20 791:22 792:5
,23 793:1,3,5,7,10 794:5
,19,21,23,24 795:2,15

796:19,19 797:2 798:14
,21,23 799:8 800:10
801:18,20,22 802:4,5,15
,19 803:5 804:22 805:11
,11,20 807:19 808:15
809:18 810:12,20 811:2
,4,13,17,19 812:4
814:17,18 819:10 820:4
821:7,19 823:8,9 824:1
,17 829:8,9 854:11
855:17,19 857:9 858:9
859:2,9,10 862:14
867:15 874:18 880:20
,22 881:17 887:12 889:1
,12,13,23 890:15,21
891:6,14,16 892:9
893:14,19,22 894:1,1,3
,5 895:8 896:24 897:14
,14 898:4,13,18 903:3
906:2 907:10 913:16
928:11 929:3 931:6
932:15 936:13 937:13
,15 939:9,15,24 941:14
942:1,9,12,12,23,24
943:9 944:21 946:4,19
947:1,6,7 948:2 949:9
,15,16 950:7 953:18
968:8,9 970:11 975:15
976:10,11,23 977:16,18
980:14,16,18,18 981:13
,14,14 983:3,4,6,7,8,17
,18,18,20 984:21 986:16
987:16,23,24 989:13
991:20 1015:23 1028:2
**database** 748:1,11,14
751:12 775:1 776:16
778:13 793:16,18 800:3
,9,15,19 801:5 803:21
806:9 807:1 822:17
824:13 897:1 903:4
908:6 934:10 937:5
938:3 949:17 969:6
978:15 983:12 986:17
,20 987:2 990:2 1021:24
1022:1,3
**databases** 977:14 989:5
,6
**dataset** 794:6 795:9,13
,14 797:5,14 803:6
810:11,13 855:21
856:12 878:15 880:22
882:5 893:10 912:20
931:22 939:7 942:6,7
944:15 945:8,18,20
946:8 947:2 948:7
950:16
**datasets** 812:16 950:12
**date** 738:3 783:12
784:11,12 785:2,4,12,16

,18 786:1,8,23,24 788:4
,21 789:4,6,11,16,24
799:21 801:14 805:11
,15 831:17 851:18
853:17 854:2,7,8 864:8
865:10 898:8,11 899:11
,11,21 900:10,16,17
901:5,6 902:19,19 903:1
,22,23,24,24,24 904:17
,17,21,23 905:5 908:24
909:5 910:24 911:13
913:18,22 914:4,6 916:8
,20,20 917:8,9,13,17
918:12 919:6,10 920:9
,20 921:1,7 922:19
925:13 939:24 948:15
949:20 956:19 959:3,23
960:5 986:9,19 987:1,2
,4
**dated** 741:4,6,11 785:8,9
789:10 831:21 970:6,16
972:16 974:22 975:1
**dates** 781:23 784:20,21
785:7 828:17,17 831:11
,24 903:2,5 906:17,18
,24 958:18 964:21
973:23 974:2
**daubert** 958:19 963:17
1027:17 1028:4 1029:14
,18
**day** 864:9 865:3,7,12,22
,23 866:13,14,15,16
867:10,19 868:2 899:20
906:6 912:11 914:12,24
915:22 916:13 917:20
918:12 919:5,10 921:6
,24 922:1,6,7,22 923:4
,13 939:22 943:21,21
953:23 954:17 955:10
956:10 957:8,10 961:17
995:12 1025:13 1031:21
1033:3
**day-to-day** 985:21
**days** 787:9 810:24
827:13 833:21 834:13
851:12,15 864:2,4,8,11
866:8 899:4,4 904:18,19
905:19 906:7,11 907:3
908:5,14 910:2 955:17
973:14 975:19 1026:7
1027:5
**deal** 771:14 938:4
**dealing** 810:19 811:3
915:14
**debate** 925:8
**decay** 883:4 915:18
**decide** 925:12
**decided** 891:22 947:14

**decimal** 816:12 817:17
,23 818:5,12,16 820:1
**decision** 920:24 1003:7
1019:17
**decline** 929:12
**decompose** 946:5
**decrease** 772:4 870:6
872:1 879:13,22 880:10
,17,23 881:18 882:24
927:2,4 928:5 935:13
**decreased** 855:15
871:11,11 882:4
**decreases** 872:16 880:4
,6 882:15 915:13 927:22
931:12 933:23
**decreasing** 871:23
872:1 880:12 887:24
927:8
**defendant** 737:16
**defendants** 735:18
737:8 738:16
**defense** 959:4 981:6
990:16
**define** 914:5 921:22,23
**defined** 851:1
**definitely** 784:12 871:17
893:2,8,9
**definition** 845:22 854:19
916:19,19
**definitions** 774:23
1000:3,7 1001:13
**deleted** 796:15,15
**demonstrates** 879:14
**department** 1003:5
1009:11 1011:17
**depend** 877:13
**depending** 894:24
**depends** 928:20
**depo** 895:3
**depose** 751:4 993:13
**deposed** 1025:12
**deposing** 993:19
**deposition** 735:21 738:5
739:20 740:4 746:9
752:12 768:12 774:8
781:4,10 785:24 786:2,6
,7 788:1,18 790:9
810:23 813:2,11 814:4
819:16 825:21,24
826:10,24 827:5,8 828:4
829:2,15 833:15 835:16
837:8 842:7 867:4
873:20 884:2,15 894:21
896:20 910:22 916:10
918:6 938:22 939:9,12
,23 940:8 945:11 946:3
951:19 954:18 955:10
961:17,23 967:5,12
979:17 980:22 981:12

,12 983:2 995:22 996:11
997:18 999:22 1004:2
1008:6 1023:24 1024:2
1025:11,20 1026:16
1030:10 1031:8,12
1032:12,17
**depositions** 955:17
961:3 967:9
**depressive** 756:8
761:18 767:2 771:5
772:3,15
**derive** 849:6 932:24
**derived** 875:5
**describe** 752:16
**described** 800:18
834:23 867:23 946:19
971:13
**describing** 772:19
**description** 748:7 805:3
829:7 856:7,11 967:23
1005:17
**descriptions** 775:3
971:6
**descriptor** 806:4
**descriptors** 751:11
**design** 991:2,17,20
**designate** 1013:9
**designated** 762:17,17
765:17,18 806:2 1005:6
,13 1006:3
**designed** 849:5 1002:6
**desire** 858:13
**despite** 848:17
**detail** 740:20 747:10
752:8
**detailed** 740:23 945:15
971:10,12
**details** 745:24 971:20
**determination** 998:17
**determine** 760:5 824:10
853:13 855:13,22
881:16 883:7 915:4
925:24 947:9 1007:8
**determined** 807:13,17
853:21
**developed** 1024:10,19
,22
**device** 889:14
**diag** 748:4 808:13
**diagnosed** 899:13,22
911:1 912:11 913:20
921:4
**diagnoses** 776:17 777:2
,12 990:8
**diagnosis** 748:16,20
749:9 776:21 795:8
824:17 900:5 912:4,16
,19 916:8,14 917:17,19
921:2 922:12,19 923:12

,15
**diagnosis-specific**
777:9
**diagnostic** 748:2,5
750:6,10 753:9,22
758:23 759:3 799:18
800:7 807:2 808:14,20
**diagnostics** 757:14
**dictated** 991:18
**didn't** 744:23 751:23
759:22 761:8 772:14
777:14 788:16,18 789:9
,17,23 791:2 800:20
810:17 818:2,9 824:14
834:24 836:13 840:10
845:1,10 847:22 850:1
851:24 857:1 863:2
865:15 866:23 869:7,22
880:19 881:6 885:3,4
895:2 913:6 916:18,23
923:24 942:21,22 951:1
952:18 960:22 965:5
969:7 973:13 977:6,20
984:16 991:24 992:1
995:8,17 1010:21,21
1023:7 1024:20,21
**died** 910:18
**differed** 788:4
**difference** 763:9 816:20
,24 824:2 846:22 891:23
895:4,6 918:21 921:12
943:16
**different** 748:17 750:14
753:12 755:23 761:1
762:9 765:3,4,8 769:1
774:20 779:18 780:14
786:23 787:1,2 800:21
,23 810:14 819:17
824:17 826:15 851:5,6
871:2,21 875:8 876:22
883:19 896:9,14 906:22
922:9 941:6,20 942:18
953:8 963:9 968:7 971:9
973:20 980:11 986:7,10
990:4,8,10
**differently** 926:18
**difficult** 751:15 785:15
796:18 798:15 898:17
1026:4
**digit** 776:2
**digits** 821:18
**dinner** 1029:8,9
**direct** 744:19
**direction** 763:5 769:19
822:1 871:10 1032:15
**directly** 897:13 999:13
1002:8 1003:12 1032:22
**directory** 782:13
**disbelieve** 815:1

**disclose** 990:15 1021:18
**disclosed** 1022:18
**disclosure** 994:16
1013:11,15 1019:6,21
1020:3 1021:5,20,23
1022:4 1023:21
**disclosures** 993:1
995:15 1004:15 1005:7
1014:2 1018:8 1019:10
1022:9
**discrete** 889:24
**discuss** 748:12 759:21
825:23
**discussed** 742:3 747:5
825:21 826:17,21 864:1
899:19 972:11
**discussing** 924:10
975:4
**discussion** 747:1
845:13 945:11 994:19
**discussions** 930:9
989:9
**disease** 926:6,10 932:12
**disk** 781:22 782:4,10,12
,14,16,19,22,23,24
783:2,5 786:9 792:6,15
793:1 797:7 798:19
814:15 831:17 857:3
897:11,13
**disorder** 756:1,8 761:9
,12,18,19 762:7 765:7
766:22 767:2,10,23
768:21 771:5,18 772:3
,16 773:9 805:7 806:8
,17 823:7,8,10,13
853:21 855:6 882:17
913:22 917:1,3 923:12
,13,16
**disorders** 762:18,20
763:6,7,8 765:19 767:3
,4,5 769:18,18 771:6
772:13
**dispute** 820:5,12
**distinct** 864:5 905:16
906:22 907:11,13,18
908:4,7 910:3
**distinction** 850:23
920:20 922:21 925:17
983:14
**district** 735:1,2 1031:1,2
**divide** 895:15
**divided** 896:1
**division** 874:4
**doc** 821:5
**docket** 735:7 738:12
**doctor** 856:24 917:2,2
977:10
**document** 740:3 741:10
746:8,19 759:6 764:21

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

774:7 776:5 781:3,9
800:13 801:1 813:1
814:3 829:1,6,14 835:15
884:14 896:19 897:22
900:22 902:1,3 918:5
938:17 948:14 959:11
967:17 974:21 996:10
997:17 999:21 1000:16
1004:1 1012:23 1013:19
1014:20 1025:10
1026:15
**documented** 788:14
**documents** 776:9 790:8
802:10 828:3 884:1
951:18 954:19 984:6
**doesn't** 745:16 751:2
763:9 816:22 830:6
838:22 889:12,19
894:16 911:16,24
918:16,22 958:12 961:9
971:2 979:11 998:13
1013:1 1019:20
**doing** 749:13 755:15,20
771:13 827:6 832:8
833:1 842:2 845:15
874:2,4 877:11 883:3
910:13 911:7 946:21
958:2,8 959:6 961:15
962:12 980:16 983:18
985:18 990:2 991:22
1002:24 1003:2 1004:15
1006:12 1007:7 1010:10
1011:9,15 1024:21
1026:6 1027:3
**dollar** 1003:2
**dollars** 964:9 966:1
1010:16,21,22 1011:3,5
,8 1015:13,24 1016:15
1021:5
**don't** 740:24 744:5,13
746:4,5,6 747:10 751:7
763:15 770:19 771:11
,13 772:18 774:4 776:7
,12 777:3 778:9,15
779:20 780:19 782:8
783:12,16,20 784:8,10
,24 785:5,5,20 786:23
787:3,14,15 788:2,10,15
789:17 790:1 796:4,10
800:17 803:1,8,12
804:11,17 806:17,20
807:1,3,10 808:10 809:9
810:8 811:9,20 812:5,8
816:18,23,23 817:21,22
818:3,20 819:6 820:24
822:8,14 824:6,8,9,18
825:8,8 827:3,10,11
832:8,16,16,19 833:1,10
836:21 839:16 841:10

,12,14 842:9,20 843:2,8
847:17 852:21 856:6,12
857:20 859:7 860:3,16
863:1 864:18 867:14,18
870:7 874:10 875:19
877:4,23 878:1,17,19,24
879:1 881:7 882:9,11
883:7 890:19 895:3
903:10 907:7 910:7
913:13 915:23 916:9,24
917:21 923:17 925:5,15
931:10 932:19 934:19
,20 935:12 936:2 937:5
,24 938:4 939:19 940:1
,1,22 942:20 948:19
949:3 952:5,13,22
953:15 954:15,24
956:14,18 961:4,15,19
962:3,6,12 963:12,13
965:14,15 970:7,18
974:7,11 980:5 984:6
985:16 986:24 990:13
994:20,23 997:1,7
999:12 1001:11 1002:9
1005:3,15,16,17
1010:23 1012:13 1014:9
1015:9 1017:18 1018:14
1020:13,14 1026:5,14
1028:5
**done** 745:7,20 749:20,22
751:5 757:24 760:14
772:10 779:22 784:23
786:5,7 787:1 788:17
793:10 798:10 808:23
809:6,17 811:21 812:9
,13 816:6 818:24 823:13
826:1 846:3 856:2,3
879:10 889:22 890:4
917:21 940:16 943:1,11
949:18 950:3,18 955:20
956:1,11 957:17 960:10
961:23 967:3 974:2
976:10 981:16,18
982:22 984:9 988:19
990:10 994:14 995:11
,13
**door** 993:18 1024:3
**dose** 947:20
**dot** 797:19,20 798:2,12
801:12 802:22 814:16
821:5 830:1 856:20
857:5,5,5,8 884:21
892:15,16 893:16,16,17
**double** 742:20 966:9,11
**double-check** 879:5,9
890:22
**doubled** 744:2,6
**down** 751:16 802:3
803:21 804:20,24 816:6

848:22 853:19 868:4
869:10 874:12 882:19
885:24 915:8,12,16
954:12 1000:4 1004:9
1013:8 1014:10 1018:5
**dr** 739:16 742:13,18
746:14 747:5 749:3
752:3 757:15,17 758:2
759:17,22 764:18
768:16 770:17 774:22
778:22 779:1,3,10,13,23
780:16 781:14 783:10
784:20 785:18 790:15
793:8,22 796:5 805:20
811:18 812:2,6,21 813:6
814:8,10 815:20 819:9
820:16 825:12,15,18
828:8 831:10 832:22
833:4,14 836:19 837:6
,23 838:10 842:3,10,11
843:4 844:1,19 856:18
,18 859:3 878:11 884:19
888:21 889:8 890:5
893:22 896:24 909:2
912:9 918:10 926:12
928:14 930:6 938:20
939:23 952:2 954:13
956:8 964:7,22 966:2,7
993:19 996:2,16
1026:22
**draft** 970:12
**draw** 900:20 914:17
928:4,10 931:5 937:14
983:14
**drawing** 925:21 926:2
**drawn** 925:17
**drive** 735:23 738:7
889:23,24 890:6,9,11
956:9
**drives** 890:14,16
**drop** 896:1
**dropped** 910:17
**drug** 793:12,18 836:24
,24 837:1 845:9,10
846:23 847:5,7,14,16,24
848:5,16 850:11 851:21
852:10 853:17 855:23
862:2 864:22,23 865:3,4
,7,12,14,18 866:2,18,24
867:7,12,13,16,17,18,24
868:7,20,22 869:1,5,9
,12,12 879:3,20,21
880:14 885:11 898:14
911:9,10,10,11,14
914:14,20,21 915:5
917:23 920:11,13,14,17
923:2,8 927:5,7 928:1,2
,6 929:8 931:13,13,14
932:7,23 933:20 935:11

,13 941:15 1008:1
1016:8,14,16,16 1017:2
**drug-specific** 845:12
**drugs** 763:10 846:17,18
849:3,19 862:3 869:7
870:1,3,5,7 871:9 872:8
879:5 881:6,8 924:5,15
926:23,24 927:23
931:21 932:3,13,22
933:1 934:4,8,11,13
935:3 941:20 946:7
949:16 950:6,6 1027:19
**duly** 739:8,12 1032:10
**duplicate** 986:8
**duration** 851:14
**during** 752:12 787:10
854:4,5 859:18 865:13
894:20 895:2 911:8
914:9 946:3 954:17
1018:9,20 1019:2,7
**duty** 859:8

---

E

**e-l-s-e** 754:8
**e-mail** 812:13 813:8
828:14
**e-mailed** 857:18 859:19
**e-mails** 974:1
**earlier** 790:16 859:13
878:12 938:8 970:2
973:22
**early** 948:3,4,9,11
**easier** 800:2 802:17
893:18 946:24 954:11
,14 955:5
**easily** 898:3 1008:10
**easy** 893:20 1021:2
**eat** 1029:10
**edit** 991:24
**editor** 841:6,20 1021:17
,18,19 1022:8
**effect** 764:2 821:22,24
822:3 846:16 847:8,9
848:5 849:2,6 871:9
877:15,19,20 880:8
885:11 888:10 900:6
911:21 915:17 923:23
,24 924:3,7 926:3 928:5
,6 929:7,17 930:17
931:4,14,18,21 932:4
934:19,20,21 946:5,7
**effectively** 769:9
**effects** 763:4,4 769:18
845:13 849:11,15 872:5
877:21 882:13 885:22
911:21 914:15,18,19
924:12,23,24 925:18
926:2,5,9,11 932:12
933:1 1027:18

**effort** 741:19 966:14,15
**efforts** 976:9
**egregious** 752:19
**eight** 805:13 968:1
**either** 744:20 751:20
753:10 823:22 847:14
863:16 865:14,19
879:18,18 931:1 932:24
950:18 962:4 995:2
1019:6
**elana** 737:14 739:6
**elevated** 869:11
**else** 754:4,8,21 755:21
756:6,13,22 757:6 758:5
759:23 760:6,6,18
773:11 841:8 974:14
1023:23
**elses** 757:21
**elsewhere** 889:15
**emergency** 923:11,15
**empirical** 1027:24
**employed** 998:5
**employee** 1032:19,21
**employees** 998:7
**employer** 1004:12
**end** 741:10 756:21 790:4
844:12 862:10 878:4
886:11 920:14 922:20
929:23 987:6 995:12
1000:4 1004:8
**ended** 946:16 947:17
949:4
**engage** 925:8
**enormous** 940:13
**enough** 971:23 987:18
990:6 997:14 1028:6
**ensure** 991:16
**entire** 760:7 865:4
922:11 1023:20
**entitled** 884:21
**entry** 762:18
**environmental** 1011:16
**ep** 753:24
**epilepsy** 753:24
**epileptic** 862:3
**epilp** 753:17 754:2
**episode** 853:20 854:23
861:10 880:11 882:21
910:11 911:13 914:4,24
920:10 929:10
**equal** 754:22,22,23
755:1,16 756:8,15
887:20,20
**equals** 753:17 755:13
756:23 757:7
**equity** 1000:11
**era** 909:5
**eradicated** 847:15
869:10

**err** 870:9,15
**errata** 790:24
**erroneously** 830:1
**error** 761:17,23,24
762:16,21 763:20 771:7
772:21 794:10 795:1
821:12 874:15,24 875:9
**errors** 752:10,19 794:7
810:20
**ers** 873:17
**essentially** 794:16 817:9
869:10 930:9 965:4
**estimate** 743:20 874:4
,21 875:1,4 876:13
1027:24
**estimated** 886:4,15
888:6 964:8
**estimates** 815:3 818:1
823:12 886:5
**estimator** 876:23
**et** 735:8,10,14,17 738:10
,11,14,15
**evaluate** 757:3,7 812:10
1016:9,19
**evaluated** 754:14
**evaluates** 757:13
**evaluation** 872:13
**even** 760:18,19 763:10
767:8 778:24 786:13,24
820:24 823:15,15 843:2
,12,15 845:12 871:23
872:24 875:3 876:16,23
889:16 895:3 913:21
924:10 932:5 974:11
979:16,18 991:4
1028:16
**evening** 959:19
**event** 846:24 850:24
863:18,23 864:9 868:24
871:2,17,21 873:1
899:11,20 900:16 901:6
,7 906:24 909:3 910:24
914:9 915:7,8,11,16
922:2 1008:1
**events** 898:5,11 903:23
906:23 907:11,13 908:4
,7,16 909:6,8,14,15,17
910:3 933:2 939:1
946:11 947:11
**ever** 809:17 847:7
869:12 870:5 937:24
943:3,7 956:19 1029:4
**every** 750:10 787:12,13
862:20,23 891:13
903:11 906:6 921:20
932:7 937:6,18 952:12
994:10
**everybody** 841:16 892:2
910:17 915:21

**everything** 741:15 742:1
752:20 755:16 763:21
764:9 812:9 818:11
845:15 1023:23
**evidence** 758:12 761:14
762:12 764:7 765:13
777:18 780:6 807:8
823:4 870:1 906:3 933:5
941:17 945:24 947:21
988:10 1002:18 1006:15
1017:6 1019:23 1021:11
**exact** 771:11
**exactly** 744:13 776:8
780:19 852:8 865:16
873:22 879:6 896:13
906:16 914:3 934:15
946:15 949:2,3 965:15
,19
**exam** 1034:5,6
**examination** 739:14
858:13,14 954:9 1032:9
**examined** 739:12
**example** 754:17 767:9
773:8 777:11 871:16
872:11 876:7 881:5,10
,13,24 886:13 910:14
965:17,18,22 1016:18
**examples** 791:8
**exceed** 1000:11,12
**exceeding** 995:5
**except** 988:6
**excess** 1002:12
**exclude** 851:19 911:15
918:20 947:22
**excluded** 908:11,23
911:22 912:2 916:12
921:8,16,19 935:12
947:20
**excluding** 900:9 910:9
**excuse** 765:16 778:21
**executable** 830:6
**execute** 755:9 760:19
761:8 830:8
**executed** 758:3
**execution** 991:3
**exercise** 752:15 910:9
961:22
**exert** 932:3
**exhibit** 739:23 740:5
741:3,6 746:7,10,15,18
747:6,11,24 748:22
749:1,23 750:9 753:5,6
758:23 764:20 766:17
773:1,22,24 774:6,9,13
,14,19,24 775:6,8,11
776:11 777:5,5 781:2,5
,11,15,21 782:3 790:10
791:15,23 794:16,16
796:9 800:18 803:13,16

805:6,12,15 807:23
808:1,2 813:3,7 814:2,5
,9,15 817:15 828:5,9,19
,20 829:3,13,16,20,21
830:12,14,17,18 831:4,7
,10 834:3 835:11,17,20
836:11 837:7 879:1
883:19 884:3,13,16,20
896:18,21 903:10,12
908:17,19 918:1,7,11
938:8,16,21 951:20
952:4 953:6,7 955:7,8
959:10,24 962:9,10,11
,15,17,19 964:2,15
969:15 972:9 985:23
993:8 996:8,9,12,17
997:10,19 999:20,23
1003:10,18,19 1004:3,7
1009:18 1012:9,16
1025:1,1,3 1026:17,22
1027:13 1034:10 1035:2
**exhibited** 915:7
**exhibits** 741:4 764:15
791:13 792:14 819:6
831:2 860:5 883:15,20
952:3 957:12
**exist** 778:5 989:6,17,24
**existed** 989:18 996:24
**existence** 941:7
**expect** 810:21 873:5
877:11 915:8 939:1
**expectation** 941:13
**expectations** 872:2
**expected** 959:3 1000:12
**expecting** 889:6
**expended** 853:7
**expense** 983:10,13
986:16
**expenses** 966:20
1028:24
**experience** 985:18
**expert** 742:15 746:2
760:17 761:10 762:3
764:11 789:7 813:10
814:20 816:17 838:14
840:13 858:18 928:13
,15,20,21 930:20 938:7
,15,22 949:19 958:7
990:12 998:10 1002:13
1003:4 1006:11 1009:10
,15 1011:17 1022:11
1024:16
**experts** 995:23 1017:15
**explain** 882:12
**explanation** 929:12
**explanations** 882:16
906:5 926:5 927:6 931:7
,16,17 951:12
**explicated** 949:6

**explication** 1022:12
**explore** 923:22
**exploring** 980:17
**exponential** 883:4
**exponentiated** 818:1,7
**exponentiating** 815:5
**export** 779:12
**exposed** 866:17 867:12 ,13,24 910:15
**exposure** 850:11 854:19 864:22 866:10,21 868:5 914:9 915:17 920:13 933:20
**expression** 899:1
**exquisite** 943:22
**exquisitely** 971:10
**extension** 806:17 830:1 ,5
**extensively** 833:4
**extent** 744:5 762:21 823:10 826:4,11 837:20 841:15 882:24 883:8 911:4 932:19 934:14 958:12 974:5 1002:17 1009:1 1010:3 1011:12
**external** 889:13,23,24 890:6,11,14
**extra** 836:11
**extract** 780:18,21 783:9 893:23
**extracted** 889:1 892:2,9
**extraction** 779:24 793:24 893:4
**extreme** 910:16,18 915:11,20
**eyes** 1012:24

---

**F**

**fact** 746:6 750:13 763:19 764:3 772:20 785:2 796:24 798:14 800:10 823:6 828:13 843:2 848:17 849:2 855:1 859:9 867:12 900:8 906:5 927:7 928:6 936:4 939:16 946:14 955:5 960:12 991:21 1016:23
**factor** 877:12 933:13
**factors** 879:12,21 880:20,21 881:15
**facts** 758:12 761:14 762:12 764:7 765:12 777:18 780:5 807:7 823:4 945:24 1002:18 1006:15 1017:5 1019:23 1021:11
**faculty** 1027:7,8
**fair** 903:4 911:19 987:18 997:14 1028:6

**fairly** 771:10
**fall** 808:21
**familiar** 749:13 976:11
**familiarizing** 990:1
**fancy** 874:2
**far** 764:9 862:13 886:15 953:9 956:4 968:13 974:12 988:1,5 993:12 1012:16 1020:19
**fascinating** 855:9
**fault** 995:8
**fax** 959:18
**faxed** 959:16,19
**fda** 862:3 939:7 941:14 ,18 942:24 943:4,8 944:1,16,21 945:4,10,21 946:4,11,13,16 947:1,2 ,6,8,9,13 948:3,7,8,20 ,24
**fda's** 943:10,16
**february** 785:8,17,24 786:4 788:4 789:10 790:19 831:21,21 832:7 ,9,22 833:2 838:5 858:24 859:6 959:15,19
**fed** 1024:1
**federal** 745:6 992:5,14 994:15 1013:1 1015:13 1016:15
**feel** 750:7 751:4 815:21 841:7 979:12
**feels** 843:4
**fees** 1017:23 1019:7,7
**fell** 808:4
**felt** 752:21 966:14
**few** 794:19 799:7 813:8 833:21 941:3 951:14 970:4 993:3 998:14 1017:14 1027:10
**field** 798:7 861:6 878:13
**fifth** 864:10
**figure** 858:16,20,21 859:8 869:13 871:24 928:8
**file** 735:9 738:12 779:12 781:22 782:17,23 784:19 788:21 792:3,4 ,10,23 793:1,3 794:12 ,13,18,19,21,24 795:2,9 798:2,12 801:11 802:21 821:4,5 825:9 829:22,24 830:13,15 831:11,12,12 ,12,12,13,14,15,16 832:18 843:9 855:20 856:20 857:12,14 862:7 ,9,18 884:20,22 885:5 890:21,23,24 891:2,9,11 ,14 892:1,5,10,11,14 893:15,22 894:1,1,5,11

956:10
**filed** 958:7,13,15,17,19 ,21 970:13 1024:15
**files** 741:19 779:8,13,18 ,19 781:19 783:4 784:18 ,22 785:11,17,19 786:21 789:10,16,18,20,23 793:21 818:9 829:8,9,20 830:7,7 831:13 832:6,9 833:2,8 834:16 835:12 ,22 854:12,14,16 857:2 ,8,9 858:10 860:3 891:7 ,16 892:12,15 894:10 906:22 968:10 969:7,9
**filing** 842:4 958:17 971:23
**filings** 958:22
**fill** 923:17
**filled** 867:20 869:18
**final** 840:22 855:10 863:22 866:11 970:16 ,22 971:17,24 975:21
**finally** 835:1 847:17
**financial** 1000:9,10,24 1005:7 1006:4 1013:10 ,15 1014:1,17 1015:5 1016:17 1018:8 1019:6 ,10,21 1020:3,20 1021:4 1022:9 1023:21
**find** 740:24 742:11 764:13 806:14 812:16 ,17 833:8 843:22 866:23 895:13,23 949:24 957:4 972:15 984:13,18,19 994:4 1022:17
**finding** 840:8 975:23
**findings** 769:13 840:13 845:17 846:8 848:24
**fine** 745:10 801:2 802:11 803:10 826:14 843:12 ,16 859:15 897:23 902:9 930:14 937:8 938:4 941:8 948:16 963:7,14 ,21 967:14 1016:11
**finish** 766:18 875:20 920:22 985:11 1007:16 1009:2
**finished** 766:1 834:5 955:11 993:21,22 1024:4
**finkelstein** 736:9
**finklestein** 738:21
**firm** 736:16
**first** 739:11 741:8 749:20 750:18 753:10 ,11,12,22 754:14 755:12 758:4 774:21 775:6,10 791:19 792:22 802:4,5 ,18 803:12,17,22 805:6

814:8,14 844:22 846:15 850:19 851:7,7,15 853:4 854:16 863:23 864:10 ,17,21 865:1 866:5,15 868:13 905:22 907:20 912:2 917:16 921:15,24 922:1 945:7 953:11,22 955:16 957:8 959:16 980:5 988:7 991:22 1000:4 1015:9 1027:14 ,15
**fit** 750:11 903:17
**five** 753:12 773:4,5 791:19 847:5 863:21 903:7 904:18 908:16 966:19
**five-hour** 965:12
**flag** 865:13
**flaws** 842:13 843:18 844:3
**fm** 736:17
**focus** 766:8
**focused** 864:17
**focuses** 864:24
**folks** 824:11 923:23 935:1 977:13
**follow** 753:15 776:2 779:9 900:14
**follow-up** 916:21
**followed** 750:5
**following** 847:15 848:22 853:20 855:8 868:21 869:8,9 920:14,16 927:5 928:2
**follows** 739:13
**foregoing** 1031:8 1032:12
**forgot** 790:16 888:21
**form** 750:22 755:4 757:9 758:7 759:14 760:2 761:13 762:11 764:5 765:11 767:16 768:2 769:3 770:3 777:16 778:7 780:4 783:14 784:13 786:15 789:12 792:6 794:2 795:3,16 797:15 798:4 805:23 806:10 807:6 808:7,17 809:4,12 820:7,22 822:11 823:2,19 824:20 826:3 833:17 838:12 840:14 846:13 852:24 879:23 880:24 881:20 882:6 885:18 890:1 898:21 899:15,24 901:21 902:21 905:20 906:19 909:9,19 910:4 911:3 913:1,23 917:10 918:13,23 920:2 924:1

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

928:17 930:21 933:9,14
934:6,22 935:23 944:22
945:22 947:4 948:21
949:13 956:12 958:11
967:6 972:1 974:4,15
980:1 988:2,17 989:18
,21,23 991:8 992:10
1000:14 1001:8 1002:16
1004:17 1005:9 1006:14
1007:6 1008:24 1010:2
1011:11,24 1013:18
1014:19 1018:1,11
1019:22 1029:19
**formal** 941:15,19
**format** 779:18 792:10
793:1,4 797:13,14,24
798:11 891:1 946:8
**forms** 1005:14
**formula** 815:22
**forth** 955:22 969:9
977:13 980:24 989:10
**fortran** 752:14 753:1
760:13,19 779:14 780:9
,23 781:18,19 783:7,11
,23 784:6,22 785:7,17
786:20 787:24 788:5,17
791:17,20,21 794:18
795:13 796:18 797:2,5
798:21 801:9,18,20,23
802:4,5,15,19 803:5,7
814:15 891:2 892:4,7,10
893:23 894:3
**fortunately** 1020:13,16
**forum** 840:9
**forward** 889:21 967:14
,16,17 969:1 972:14
976:16 985:24 1007:3
**found** 742:7 751:12
795:13 842:12 843:13
,17 985:24
**foundation** 749:5 750:23
758:8 759:5,15 761:2,14
762:12 764:6 765:12
767:17 768:2 769:4
770:4 773:21 776:4
777:17 780:4 782:9
789:13 794:2 795:3
797:16 800:12,24
802:10 805:24 806:11
808:8 820:8,23 821:10
822:12 823:2,19 824:21
838:13 839:12 840:15
897:21 900:22 902:22
909:10,20 910:4 913:2
918:14 920:3 928:18
944:23 945:23 953:13
1000:15,15 1001:9
1002:17 1004:18
1005:10 1006:15

1008:24 1012:24
1013:19 1014:20 1015:7
1018:12 1019:22
1029:20
**four** 753:11 773:4 776:2
784:15 810:24 818:5,11
,16 820:1 824:21 893:12
,19 903:7 1007:23
1024:22
**fourth** 759:1 804:20
848:9 864:10 902:4
905:8
**francisco** 737:12
**frankly** 886:10 895:2
**free** 750:7 839:7 960:10
**frequently** 935:10
**front** 758:16 798:2
860:17 954:23 969:14
974:21 976:18 1009:13
**fulfill** 1011:19
**fulfilled** 1012:3 1016:3
**full** 827:16 988:23
**fully** 998:20
**function** 877:7 883:9
**funded** 992:8 999:9
1006:2
**further** 847:2,3 880:11
,17 882:19,22 929:10
946:21 950:15,17
957:11 969:15 974:20
,21
**future** 877:17 950:5
1017:11

G

**gab** 762:6 885:17,20
918:22
**gaba** 797:19,20 798:2,12
801:12 802:22 887:13
954:1
**gaba.txt** 795:9
**gaba.zip.txt** 829:22
**gabamodel1** 821:4,6
**gabapentin** 744:20
745:3 747:7,13,16,19,21
748:15,19 761:21 763:2
769:12,16,21 776:18
794:17 797:9,10 814:18
825:16,19,23 826:2,22
827:2,9 836:22 840:19
846:11 854:4,7,20
868:14 869:5 870:8,12
,17 883:22 885:8,10,11
886:13,19,20 887:12,14
,23,24 888:4 891:24
892:3 895:13 907:2,2
909:4,16,18 917:8,13,16
,22 918:12,22 919:11,16
,18 920:1 923:17,18

924:5 926:13,14,20
927:14,24 928:14 929:3
,9 930:10,10,19 931:2,4
933:6,11 946:6 949:9,16
,18 950:14,16,23 951:7
,9,10 956:2,20,23 957:1
958:6,9 959:7 964:10,22
967:4 973:18 975:15
976:3 977:23 978:19,20
980:24 983:18,24 988:9
,15,22,24 1002:15
1010:1 1023:16
**game** 911:19
**gave** 749:3 776:16
779:24 785:12,13 792:8
855:20 891:17 892:1
946:7 952:19 953:18
960:21 980:3 995:21
1024:8 1026:24
**gears** 1023:15
**gee** 873:24 874:20 875:2
,5,7,13,16 876:1,3,9,13
,18 1022:5
**general** 761:19 769:12
,15,20 786:13 827:1,2
837:13 839:23 863:13
877:10 926:23 927:24
932:22 935:14 978:24
1008:4 1016:2,19
**generally** 773:3,24
792:24 1007:24
**generate** 749:20 814:19
817:19,21 855:17
873:17
**generated** 751:4 792:11
795:7,21 796:5,21
890:20 897:10 1027:2
**generation** 784:21 785:2
794:11
**generous** 1026:1,4
**gets** 757:6 758:3,5
851:10 863:12 915:5
921:3,4,5,7,7,19
**getting** 811:20 875:8
976:10 977:17,23 979:5
980:15 981:13
**gibbons** 735:22 738:18
739:10,16 740:4 746:9
,14 747:5 749:3 757:17
758:2 759:17 764:18
768:16 770:17 774:8,22
778:22 781:4,10,14
790:9,15 812:21 813:2,6
814:4,8,10 815:20 819:9
820:16 828:4,8 829:2,15
831:10 835:16 836:19
837:6,23 838:10 842:3
,10,11 843:4 844:1,19
856:18 859:3 878:11

884:2,15,19 888:21
896:20,24 909:2 912:9
918:6,10 926:12 928:14
930:6 938:20 939:23
951:19 952:2 954:13
993:19 996:2,11,16
997:18 999:22 1004:2
1026:16,22 1031:16
1034:4
**giles** 1017:3,9,24 1019:7
**give** 764:11,14 774:5
780:18 786:13 818:10
830:18 834:15 836:9,13
841:23 843:6 881:5
883:15 891:13 893:21
,24 894:1,2 918:4
938:15 939:22 943:8
956:16,17 959:10
984:16 994:23 1014:1
1023:4
**given** 802:22 814:22
818:6 822:9 831:5
859:11,13 864:22 873:9
907:2 917:20 923:16
955:17 1022:20 1028:19
1031:8,12 1032:16
**gives** 839:7
**giving** 803:4 1022:13
1029:4
**glance** 750:18 953:11
**go** 745:24 746:21 748:22
749:23 751:2 753:24
754:4,6,19 755:4 756:21
757:12,15 758:12,23,24
760:4,5,11,13,21 766:9
,21 770:8 772:24 773:1
778:11 779:8 788:23
791:12 794:15 795:7
796:9 797:3,10,12 802:3
804:17,20 805:10
806:21 807:18,21
812:17 815:6 817:14
823:22 824:11 827:4,21
831:6 833:5 836:16
843:9,24 844:19 849:12
850:13 857:22,24 867:4
871:7 875:11 878:3,18
882:19,19 885:12
886:17 888:14 891:12
895:12 897:16,18 898:3
900:18,19 901:1,15
903:17 906:12 915:8,12
,16 922:8 929:21 933:17
935:23 936:21 937:5
938:23 940:8 951:13
955:12,24 961:10,16
976:16 992:4,11 993:11
996:6 1004:20 1005:20
1007:3 1010:4 1012:9

1013:3,8 1018:5
1023:16,17 1028:24
**goal** 892:24 928:7
954:21
**god** 792:8
**goes** 921:16 940:19
963:10,11 1007:23
1020:17
**going** 739:19,22 746:13
747:9 752:24 757:7
763:18 764:14,18 770:1
,20 772:10,21 778:19,20
780:11,24 794:9 796:23
797:7 802:8 803:9 811:4
,6 812:21 813:6 815:21
816:12 819:5 824:23
827:14 828:8,12,19,20
829:12 832:13,23
834:17 835:3,10 836:20
837:6 839:18 842:16,19
844:1,8 846:8 855:3
856:22 858:22,24 860:4
,19 868:13,13 874:12
875:12,14 882:23
883:16,18,18 884:12
892:13 895:5,24 896:17
899:5,7 907:4 912:8
915:10 918:3 922:2
925:4 932:20 937:17
938:20 939:16,18
940:13,20,22 941:3
947:22 950:18 952:3
953:5 954:19 959:5,9,10
963:3 969:1 974:20
977:12 985:24 993:4,5
,17,23 994:7 995:7
996:4,17 997:9,11
999:18 1004:8 1017:11
1021:3 1022:6 1024:2
1030:4
**gold** 737:14 739:6,6
**gone** 752:11 955:20
987:1 1005:1 1015:19
,22
**good** 739:17 749:6
804:17 810:10 841:11
876:23 880:19 893:8
915:3 971:5,6 973:5
1012:17 1020:10
1026:10 1029:10
**gotten** 1015:23
**gracious** 995:10 1026:3
**grand** 737:3
**grant** 950:8 997:5
998:16 999:10,13
1007:12,18,20 1008:3,5
,8,9,11,14,22 1009:4,5
1015:14,15,18,18
1016:12,20 1017:8

**grants** 745:1,6 998:7,24
999:3,5 1001:24
1004:16 1009:7,7,14
**great** 747:10 771:14
894:14 895:9 1020:6
**greater** 754:22 863:9
870:24 871:13
**greatest** 855:1
**green** 961:14
**ground** 939:17
**group** 748:14,15,21
760:23,24 761:11,12
769:24 772:5 803:22
816:4 846:21 847:21
848:3,5 898:14
**group3** 753:17 754:17
,21 755:1 756:22 757:2
,7
**group4** 756:7 773:9
**grouping** 808:4,6
**groupings** 750:1,7,12
753:3
**groups** 748:17 751:11
808:21 997:5
**guess** 743:22 860:21
872:4 916:24 942:8
998:9,18,19 1017:21,21
**guessing** 784:9
**gun** 935:15
**guy** 829:11
**guys** 842:15 968:11,14

**H**

**hadn't** 834:19 867:11
1012:3
**half** 873:2
**hand** 739:22 746:13
764:18 804:23 812:21
813:6 817:15 818:24
828:8,19,20 829:12
835:10 837:3,6 884:13
896:17 938:20 952:3
953:5 994:24 1033:2
**handed** 751:8 766:16
781:14 791:13 814:20
834:10 884:19 896:24
996:9
**handing** 883:20
**handouts** 1028:20
**happen** 791:2 808:21
960:22 1017:11
**happened** 913:19
952:23 957:11
**happens** 778:13 899:2
1016:8
**happy** 840:22 841:24
894:12 940:20 945:14
946:20 984:3
**hard** 823:24 890:9 904:2

**hardy** 737:2 839:3
**harmful** 932:4 933:1
**harvard** 953:3 955:21
957:19 1024:7,18
1026:24 1027:6 1028:7
1029:1,15,17
**haven't** 750:17 831:5
920:6 948:13 949:12
971:12,13 1014:5,5
1015:16,16 1021:4
1022:19,20
**having** 739:11 811:7
864:12 877:18 915:11
919:21 950:19 971:10
983:15 989:10 1012:15
**hazard** 863:12 864:16
883:8
**head** 740:19 785:5
**heading** 834:23
**health** 990:23 992:9
998:6,24 999:4,5,9
1004:16 1005:4,24
1006:1,13 1009:22
1015:13 1016:18 1021:7
**hear** 885:3 889:5 977:6
979:4 984:5 1007:3
**hearing** 985:4,5 1027:17
1028:4
**held** 738:5
**help** 959:20 972:24
**helpful** 834:12
**helpfully** 975:6
**helping** 960:14
**hendricks** 1009:8
**hereby** 1031:7 1032:7
**herein** 739:11 1032:11
**hereto** 1032:22
**hereunto** 1033:1
**hetero** 942:1
**heterogeneity** 939:7
941:11,16,18,20 942:16
943:5,18
**heterogeneous** 942:1,7
,13
**hey** 1016:4
**hiding** 1022:16
**high** 855:13 871:7
**higher** 772:6 848:18
869:6,17 870:4
**highest** 880:15
**highlighted** 848:6 862:3
**hillyard** 737:10
**historically** 863:2
**history** 932:11
**hold** 830:24 838:8
**holdings** 1020:21
**home** 949:24
**homogeneous** 942:10
,14,19

**honorarium** 1029:4
**hope** 939:16 1020:14
**hopefully** 891:19 949:24
**hopes** 975:23
**hopper** 963:10
**hospital** 906:1
**host** 990:9
**hour** 743:12 744:2 965:8
,9,23 966:18 968:2
970:23 1026:11
**hourly** 743:10 965:2
**hours** 742:19 744:2,3,9
,16 751:4 787:19 827:19
939:12 940:5 965:22
966:8,18,19 968:1
970:22 973:11 987:15
,21,22,23 988:13 993:14
1023:24 1024:1
**houston** 736:18
**however** 869:8 903:16
923:3
**huge** 744:21 751:21
918:18,18 943:16
980:18 983:22
**hur** 742:13,18 752:3
757:15 759:22 779:10
,13 780:16 783:10
784:20 785:18 793:8
796:5 805:20 811:18
812:2,6 825:12,15,18
832:22 833:4,14 889:8
890:5 893:22 964:7,22
966:7
**hur's** 779:1,3,23 793:22
956:8 966:2
**hypothesis** 871:1
**hypothetical** 758:12
762:13 764:6 765:12
766:24 767:7 768:3
769:4 770:4,24 771:22
777:17 780:5 794:3
795:4 807:7 816:21
823:3,20 945:23

**I**

**i'd** 747:14 751:2,22
753:2 758:24 799:24
802:3 825:2 938:23
**i'll** 738:22 840:21 884:7
889:20 926:18
**i'm** 746:15 757:11
758:10 760:17 761:16
764:18 766:3 768:8,14
774:16 775:24 776:8
784:17 785:14,15 789:6
,6 798:22 802:8 804:21
805:11 810:4 814:17
815:8,17 816:2 818:17
820:19,24 822:14 825:6

828:19 829:10 830:21
831:16 835:10 836:2,14
838:13,14 839:20 840:5
842:1,8,16 843:15 846:4
,6 847:19 849:11 852:17
855:3 856:5,22 857:15
858:22,24 860:2,18,23
861:18 862:13 871:6
874:5 875:12 879:9
881:3 883:20,21 889:2,4
891:8 896:17 903:2
904:18 905:10 906:13
910:21 918:3 920:23
922:22 923:5 932:20
940:13,20 948:12 950:3
,4 952:6 953:5 954:11
956:1,6 959:9 960:3
963:12,15 965:17
968:18 969:22 971:1,4,5
974:24 975:8 977:5,19
982:1 984:4,13,19 985:5
,6 989:20,23 992:12,18
994:7 996:17 997:9
998:9,9,10,18,18,22
1001:17 1002:20
1004:24 1005:12
1006:18 1007:17
1008:12,14 1010:14,21
1011:2 1012:11 1014:21
1016:10 1017:14 1020:5
,16 1022:17 1025:21,24
,24 1026:3,11 1028:12
,13 1029:4 1030:4
**i've** 786:22 950:3 971:18
976:8 1021:21,21
**icd** 748:5,8 753:9 773:3
,20 774:2 775:2,2,7
777:8,10,13,15,22,22
778:4,12 796:10 806:7
807:4,4,18,20 808:3,5
809:2,10 824:18 906:24
**id** 795:14,19 796:6,15,17
797:6 860:7,8
**idea** 769:24 786:14
788:3 806:24 809:20
848:13 863:15 969:1
995:7 1026:10 1027:3
**ideas** 950:19 1008:4
**identification** 740:6
746:11 774:10 781:6,12
790:11 813:4 814:6
828:6 829:4,17 835:18
884:4,17 896:22 900:6
912:4 918:8 951:21
996:13 997:20 999:24
1004:4 1026:18
**identified** 763:19 802:6
1029:6
**identify** 738:19 739:21

821:1 968:13 1027:11
**ids** 795:23 796:1,2,21
898:3
**iii** 735:22 738:18
**ill** 847:9
**illinois** 735:24 737:24
738:7 998:3,4,23
1002:12 1032:1,6
1033:3
**illustration** 943:14
**imagine** 756:15 823:24
860:7,11,19 867:6
876:12
**immediately** 912:12
**impact** 858:12
**implement** 833:6
**implemented** 833:7
**implies** 803:3
**important** 883:10
**improper** 758:12 762:13
764:6 765:12 768:3
769:4 770:4,23 771:21
777:17 780:5 794:3
795:4 807:7 823:3,20
945:23 979:11 985:3,7
**inadvertently** 741:21
**inappropriate** 745:5
**inasmuch** 1006:11
**inc** 735:17
**incidence** 942:17
**incidents** 990:3
**include** 763:6 771:19
772:14,17 882:17 886:6
914:8 918:20 922:16
966:9 969:8 971:17
976:13 983:4 1000:10
1019:20 1028:9
**included** 740:19 788:11
823:9 840:12,12 850:6,6
,7 852:6 853:22 856:13
857:13 865:23 870:16
,20 871:12 912:20
913:21 916:7 919:22
921:5 925:14 932:7
935:6 947:15 970:23
976:12 982:2,3 983:8,17
1024:9
**includes** 771:19 817:5
870:10 871:19 896:11
977:16 1011:16 1031:13
**including** 834:16 883:6
904:21,22 914:23 917:6
923:23 946:14 1006:4
1022:4
**inclusions** 965:12
**inclusive** 1031:10
**inconsistencies** 811:6
**inconsistent** 985:19
**incorporated** 738:15

914:22
**incorrect** 761:10 762:20
763:22
**increase** 772:7 846:18
877:16 927:1 935:13
966:18
**increased** 847:6,11,13
855:5,14 869:11 933:12
**increasing** 769:16,21
870:2
**increments** 965:13
**ind** 753:17 755:12
756:23
**indeed** 838:3
**independent** 752:14
**independently** 752:21
**index** 799:21 801:14
823:7,8 851:18 853:20
854:23 861:10 864:8
865:10 880:11,16,17
882:21 898:11 899:11
,21 900:10,17 901:6
902:19 903:2 904:17,21
,22 905:5 908:24 909:5
910:10,24 911:13
912:21 913:17,18 914:4
,24 916:8,21 917:9,13
,17 918:12 919:6,10
920:10,20 921:1,6
922:12,19 925:13
929:10 956:19
**indicate** 745:22 846:20
867:11,22 931:3 1016:4
1021:15,16
**indicates** 847:4,7 868:23
**indicating** 808:1 830:22
836:12 862:8 871:8
899:9 901:11,14,17
902:11,13,15 938:9
963:23
**indication** 761:22,22
966:4
**indications** 760:24
765:5
**indicator** 909:3
**indirectly** 1032:23
**individual** 750:6 822:7
845:24 850:22 851:10
863:16 998:14
**individuals** 848:18
855:13
**industry** 1001:24
**infarction** 914:8
**inference** 849:7 914:17
925:18,22 926:3 928:4
,10 937:14
**inferences** 932:24
**influence** 769:1 811:9
881:7,13,14 918:19

991:5
**influences** 931:20
**information** 758:15
794:17 800:7,8 819:15
842:6 850:14 851:6
855:20 858:8,9,16,19,19
859:2 875:7 892:2
894:13,16,17 939:10
942:23 945:6,16 947:8
949:2,3 1002:7 1012:6
1019:14
**initial** 875:1,3 905:5
907:9 945:20 976:10
977:22 983:2
**initially** 942:13 945:12
**initiated** 920:11
**initiating** 869:3 911:9
**initiation** 763:10 847:12
848:21,23 868:21 869:9
895:18 909:4,16,18
920:14,16 922:12 927:5
928:1,2
**inject** 840:11
**injected** 840:10,18 844:5
**inp** 857:5
**input** 894:11
**inside** 964:18
**insider** 820:24
**instead** 791:8 817:12
870:14 943:21 1006:24
**institute** 999:4 1006:13
**institution** 998:6,15
1012:10 1013:6
**institutional** 1013:9
**instructions** 839:6
1007:6
**intend** 954:15,24 955:7
**intended** 840:9
**intention** 824:23 949:21
1028:9
**intentional** 817:11 818:8
**inter** 862:14
**interactions** 1008:1
**intercept** 862:15,16,20
,24 863:3
**interchange** 765:17
771:3
**interest** 991:5 992:7,13
997:3 1000:9,10,11
1001:1,5,20,21,22
1003:8 1004:15 1007:9
1008:13 1009:9 1014:17
1015:5 1016:5 1019:18
1020:20 1023:22
**interested** 885:17
1032:22
**interesting** 882:16 926:7
928:8 949:22
**interests** 1004:14

1006:4
**intermediate** 891:13
893:14 968:10 969:7
**internal** 978:17 980:16
,23 997:5
**international** 952:17
**interpret** 868:17
**interpretation** 863:14
864:16 869:3,24
**interrupt** 748:23 977:20
**interval** 770:2,21 772:4
,13,16 823:1,17 863:11
870:10,15,20,22 871:12
,18 875:5,9,12,16
876:14
**intervals** 771:17 772:1
815:4 818:23 853:21
870:16 886:2,7 887:3
1028:1
**intervened** 975:7
**introducing** 1024:13
**invalid** 777:1,13,15,22
778:14 822:9,15,21
824:15 845:24
**investigating** 889:16
**investigation** 991:3
1001:6
**investigations** 992:8
**investigator** 992:6
1000:24 1001:6 1005:24
1014:16
**investigators** 991:1
1004:15 1005:8
**invitation** 1026:8
**invited** 843:18 844:4
**invoice** 960:9 968:5
975:1,12 976:2 981:2
985:24 986:1 988:22
994:1,17 995:24
**invoiced** 987:3
**invoices** 742:13 743:17
955:8 961:5 976:12
993:12,12,20 1023:21
**invoke** 850:22
**involved** 793:12 1002:14
1024:13
**involves** 1003:4 1009:24
**irb** 997:4
**isn't** 767:8 802:19
876:23 889:19 936:5
962:23 983:11
**issue** 824:24 864:1
1023:20 1025:15
**issued** 1025:15
**issues** 889:12
**it's** 742:18 743:3 746:15
749:4,18 755:19 756:13
757:2,7,8 758:5 763:17
764:3 772:10,15,21

773:10 775:10 780:14
782:21,22 792:3 793:17
800:14 801:7,19 803:22
805:2,13 806:20 807:23
,24 810:10 811:3 813:24
816:11,21 821:7 823:23
,24,24 824:3 827:19
829:10 837:4 838:20
840:23,24 841:21
842:23 843:4,5,16
845:14 847:1,18 849:12
858:9 862:23,24 868:3
,22 871:17 873:18 875:3
,7 877:16,24 888:10
893:18 894:2 895:7
897:12,12,13,13 899:11
904:2 907:1 910:15,18
911:14,19 914:21 916:4
922:2 929:17 937:3,20
938:8,11 939:21 941:21
945:23 948:13 952:10
960:24 965:22 970:6,16
975:1,1,13 978:9,9
979:9,11 980:1 983:13
984:24 985:2 986:13
987:3 992:15 995:8
997:8,8 999:16 1007:21
,23 1008:1,11,12,13,15
1010:16,16 1012:14
1013:2,14,14 1015:12
,13 1016:9 1021:2,2,6
,10,12 1026:4
**item** 965:6 977:15
978:14 980:6 986:12
**items** 846:10 902:18
986:10
**iterations** 834:14
**itself** 782:16 871:7 927:7
1014:20

---

J

**jack** 736:2,6 738:24
768:12 836:9,13 837:4
878:21 940:5 962:8
964:1 979:13 993:6
1023:23 1025:16,17
**jack's** 1025:18
**jama** 957:24 978:22
981:23
**january** 786:21 787:19
789:11 901:6,6 960:6
967:1
**jennings** 737:16 739:6
**jlondon@texas.net**
736:7
**job** 735:19 960:15
1000:6 1005:16,18
**john** 935:1 1009:8
**join** 809:1,8

**journal** 837:23 838:3
839:22 840:24 841:7,21
1021:17 1022:8
**journals** 837:11
**judge** 841:22 979:15,16
,23 980:13 982:24 984:3
1024:11
**july** 985:24 1024:11
**june** 799:22 801:15
944:1,8,16
**jury** 842:15
**justice** 1003:5 1009:11
1011:18
**justifiable** 923:20
**justification** 926:1
**justified** 925:1,3

---

K

**ka** 736:14]**lawampmmt.c**c
**kansas** 737:4
**keep** 782:9 787:5,17,18
,20 803:9 850:17 890:5
,8 903:11 954:23 955:1
974:7,11 1017:18
1026:6
**keeping** 927:20
**keeps** 890:8,12
**keith** 736:13 738:21
741:2 748:24 792:14
827:18 913:12 977:5
1024:1 1025:2,9 1026:6
**keith's** 954:22
**ken** 739:3
**kenneth** 736:20
**kept** 811:23 974:13
**key** 845:7 846:16 982:21
991:10,16
**kids** 915:10
**kill** 895:7
**kind** 749:14 785:3 787:7
807:21 809:17 812:3
814:18 815:2 828:17
845:5 849:6,7 850:15
855:9 869:13,20 874:2
876:24 928:10,11
929:17 942:22 943:11
950:9 954:4,11 959:20
961:9 966:22 968:7,22
990:6 1005:21 1016:17
**kinds** 751:10,10,11
787:15 810:14 811:8
932:23 1002:24 1022:9
**knew** 745:12,15,17,18
,19 746:5 810:2
**know** 740:21,23,24
742:3,17,18 743:5,22
744:5,5,6,12,13,17,18
745:16,20,21 746:1,4,4
,5 747:10 750:17 751:6

,7,23 757:14 762:8,21
,24 763:15 764:2 770:19
771:11 772:8,11 774:3,4
776:8 778:11,12 780:20
784:11,19,24 785:3,4,10
,13,20,21 787:15 788:11
,14 789:5,17,20 790:1
793:24 794:7,8 796:5,10
800:16 803:7 806:18,20
808:13 810:8,15 812:18
815:15,21 817:21,22
818:13,14,23 819:9,9,11
820:12,24 822:8,14,16
823:23 824:6,8,9 827:12
,13 830:20 832:2,10,17
,17,18,19 833:10,22,23
839:16 840:23 841:3,10
,12,15,15,20,21 842:2
843:7,21 845:3,12 846:3
847:17 850:8 851:12
855:21 856:12 857:1,7
,11 858:12 859:4,9,10
864:17 865:17,18 867:6
,7,14,17,21 868:1
869:23 871:10,23 873:4
,7,22 874:1,5,16 875:6
,24 876:2,7,21,22
877:16,20,21 878:1,24
879:5,7 880:12 881:7
882:10,12 883:11
887:22 888:2 889:3,19
890:12 891:9,12,17
892:6 894:11 895:3
906:11,14,21,22,23,24
907:3,4,6,7 910:7
911:19 915:9 916:19,23
917:15,17,20,21,24
921:22 925:4 930:13
931:5 932:5,6,19,22
933:11 934:9,11,14,19
,20,24 935:2,8,9 938:7
941:12,21 942:4,16,20
,20,21,24 943:12 946:15
947:11,13,23 948:19
950:3,4,9,18,19 951:10
952:13,22 953:15
955:22 956:15,16
958:12,23 959:3 961:4
963:1 964:24 965:3,14
,15 966:5,6,17 968:7,16
970:18,19,21 971:4
973:15 974:12 975:13
976:8 977:21 979:5,11
,13 981:20 983:15
986:24 990:2,5,11,13
992:21,22,22 993:2
997:1,3,5,6,7 998:20,23
999:5 1002:1 1004:24
1005:1,3,5,15,16,17

1006:23 1008:11,12
1010:23 1014:8 1016:14
,22 1017:10,20,21
1020:19 1021:19,21
1022:2,5 1024:23
1025:21 1026:14
1028:13,16
**knowing** 794:8,14 796:4
807:10
**knowledge** 759:20
809:19 812:1 890:7
945:2
**known** 935:13 1006:3
**knows** 746:4
**kss@lanierlawfirm.com**
736:21
**kwan** 891:17 894:15
965:4

---

L

**l.l.p** 737:2
**labeled** 835:23 903:1,3
977:15
**lack** 780:2 852:18
**laid** 1012:24
**lake** 735:13 738:14
**lamotrigine** 1027:18
**language** 788:19 803:3
,8 878:20
**lanier** 736:16
**laptop** 890:9,9
**large** 811:7 983:16
**largely** 851:20 989:24
**larger** 875:17 932:10
**last** 741:12,18 742:22
743:7 744:7 747:5
748:14 749:22 752:12
778:23 787:24 804:21
810:22 813:11 814:19
819:15 825:3,21,24
827:8,13 833:16,21
835:1 837:7 845:2
849:10,12,15 867:4
872:3 873:20 899:10,19
909:2 910:22 912:9
922:6 938:11,22,24
939:10,12,24 940:7
944:4,7 957:20 960:5
966:24 980:22 1008:5
1020:17 1025:11
**later** 894:24 946:12
969:8 973:14
**law** 736:2,16 737:10
838:4 842:22 998:10
1019:16
**lawsuit** 1024:10,15,19
**lawyer** 817:1 1029:11
**lawyers** 971:8 991:7
1012:14 1024:3

**lay** 749:5
**lead** 849:1 911:17
**leading** 933:12
**learned** 946:12
**least** 749:20 779:3 792:5
793:17 816:21 847:10
850:19 876:17 906:6
911:6 932:1 936:12
942:17 946:11 948:15
949:20 964:8,13 982:9
983:14 987:21 990:24
1015:6 1016:18
**leaving** 839:18
**lecture** 839:10 1026:24
1027:1,5,15,21 1028:14
,18,23 1029:15
**led** 879:12,22 880:4,23
912:3 915:24 916:1
1027:3
**left** 761:8 775:15,16
817:12 876:10 909:7
942:19 1020:6
**left-hand** 1004:10
**legal** 838:11,20 839:10
843:8
**legitimate** 914:2 916:9
**leisure** 750:8
**lengths** 850:14
**less** 754:23 817:23
818:5 821:23 822:24
823:23 871:18 891:20
**let** 757:24 758:11 769:14
770:6 774:5 820:14
838:6,18,18 846:15
865:6 881:5 883:15
888:13 894:15 920:22
935:22 940:14 962:18
,21 964:1 993:19
1007:16 1009:2 1012:21
1016:23 1018:18
**let's** 746:7 749:5 766:8
768:9 769:8 781:2,7
787:18 796:9 813:21
826:14 827:21 843:24
844:7,8 857:22,24
859:15 864:7 866:12,14
878:3 884:11 903:14
908:12 917:24 918:3
929:21,21 940:15
951:13 976:16,16
986:12 1012:9 1023:15
,16,17
**letter** 837:12 838:5
839:22 842:21 939:21
944:3 945:15
**letters** 945:9,12
**letting** 995:10
**level** 817:10 869:21
870:6 966:13

**levels** 849:17 872:7
924:14
**li** 861:15
**liability** 735:5 738:10
739:1 961:12 1031:5
**license** 936:24 1032:7
1033:7
**licensed** 1032:6
**life** 1007:21
**liked** 881:24 945:17
**likelihood** 846:19
855:15 874:19,21
877:17
**likely** 855:7 899:12,21
905:17 910:23
**limitation** 932:2,7
939:20 940:12
**limited** 808:20 936:13
937:3,20 939:9,23
**limits** 818:22 845:22
**line** 753:16 754:5,8,14
,14,19 755:12,19 756:4
,6,22,24 761:8 762:6,7
766:20 767:24 769:2
771:4 773:8,10 900:20
901:12,15 902:9,12,14
904:3 925:23 959:18
965:5
**lines** 903:14,19 908:20
**list** 740:15,16 741:4,14
,15 775:22,23,24 777:1
807:4,18 809:1 812:10
,12 879:5 900:15 935:6
936:22 994:8
**listed** 759:8 776:3,7
814:16 836:4 885:21
1003:3 1009:14,15
**listen** 994:24
**listing** 747:24 775:6
781:21 782:18,21,23,24
783:1 808:2 897:3
1006:3 1014:16 1015:4
**lists** 741:9
**literature** 991:14
**lithium** 835:19 849:16
861:15 872:5 924:12
**litigation** 735:6 738:10
740:15 746:2 840:12
842:14 1009:24 1029:14
1030:2,3 1031:6
**litigation-related** 971:11
**litigations** 971:9
**little** 749:5 762:5 772:7,8
778:19 795:12 796:17
846:6 866:13 868:3
896:9 904:2 907:1
930:13
**live** 937:8
**llc** 738:6

**llp** 736:9
**lmcgroder@shb.com**
737:7
**loaded** 798:6
**locate** 742:16 888:24
**located** 738:6
**logarithm** 887:19
**logic** 757:22
**logistic** 850:20 853:3,5
,10 855:3 863:10 864:15
880:9 883:2,12 907:21
915:15 929:13 932:18
933:18
**london** 736:2,6 738:24
,24 741:6 763:21 764:14
768:5 838:6 844:7
859:16,23 940:22 941:1
952:16 954:10 955:3
956:22 958:14 959:1,13
960:6,11,20 961:18,21
962:1,12,16 963:5,8
964:3,4 967:10,16,18
968:20 972:7,20,22
973:4,6,12 974:10,18
976:15 977:9 978:7
979:2,9,14 981:5,19
982:6,16 983:9 984:12
,17 985:4,9,12,22 987:5
,12 988:4 989:2 990:14
992:3,12,17 993:7,22
994:2,4,7,13,18,21
995:2,6,14,19 996:3,7
,15 997:9,16,21 999:19
1000:1,19 1001:3,14
1002:19 1003:10,17
1004:5,23 1005:19
1006:17 1007:2 1009:2
,12 1010:13 1011:1,21
1012:7,19 1013:4,23
1014:7,21 1015:2
1016:21 1017:17 1018:4
,15 1020:4 1022:15
1023:12 1024:5,6,24
1025:3 1026:8,10,14,19
1030:1,4 1034:6
**long** 751:19 809:20,23
810:5 845:5 850:13
862:23 865:24 873:18
878:1 923:13 933:17
940:19 1007:13 1016:3
1025:13
**longitudinal** 892:10,11
,13 893:14
**look** 740:1 748:3 753:2
757:12 758:1,19 770:7
773:8 774:21 780:10
781:16 782:2,3 783:4
792:24 796:23 797:2,7
,11 800:4,10 812:15

Gibbons, Robert D PhD (Defense Expert)   3/5/2009   9:09:00 AM

816:10 819:10 824:14
835:23 845:7,16 856:6
857:1 873:23 879:2
891:2 903:5,14 915:16
917:7,12 918:16 927:10
936:21 938:11 953:24
956:7 958:16 959:17
964:2,20 965:21 969:21
973:22,24 976:16
984:21 986:5,12 990:3
996:17
**looked** 740:14,18,22
742:1 753:10 817:24,24
835:6 853:12 874:6
907:19,22
**looking** 773:2 784:17
792:6 793:3 795:13
796:3,8 821:6 827:14
851:9 854:13,19,21,24
855:11 860:2,2 862:13
,14,18 873:20 888:4,4,8
890:20 933:19 935:2
950:5 965:17 973:5
975:14 980:14 985:17
**looks** 747:11 786:8
792:10 815:1 954:4
1026:23 1027:14
**lori** 737:6 739:4 813:8
828:14 833:23 837:22
838:15,18,18,21 839:11
842:2 843:15 940:1,11
994:18 995:2,2 996:1
1025:10,19
**lot** 744:12 773:7 787:1,1
831:2 832:3 858:8 876:8
,8 953:16 960:12,13
1002:2
**lots** 789:15,16 810:18,18
876:2 1001:21
**low-dose** 947:15
**lower** 822:1 848:4,14
871:7 888:11
**lowered** 920:6
**luck** 889:1
**lunch** 827:7 842:9
857:18 859:17,18
877:23 888:23

**M**

**m.d** 737:16 739:7
**magnitudes** 882:13
**maintain** 789:11 984:8
1004:13
**major** 756:8 761:18
767:2 771:4 772:2,15
791:10 845:17 850:20
935:3
**majority** 743:3,8
**making** 824:2 832:14

844:2 893:1 922:10
1019:17
**male** 799:14 800:11
801:7
**mandell** 738:6
**mann** 935:2 1009:8
**manual** 760:5
**manuscript** 742:9
744:23 783:22 784:3,6,7
837:8,11,14,24 840:23
844:20 845:4 879:16
897:4 908:3 926:19,19
,22 927:13,21 928:3
930:8
**map** 952:17
**march** 738:3 944:20
948:7 1033:3
**marginal** 874:17 877:20
**mark** 746:7 781:2,7
811:1 813:23 814:2
860:5 917:24 952:2
961:11,18 962:3,4,5,10
,14,18,21 996:9 997:10
,11,16 999:19 1003:10
,18
**marked** 739:23 740:4
746:9,15,17 747:23
764:19 774:8 781:4,10
,15 790:9 813:2,7 814:4
828:4,9,21 829:2,13,15
835:11,16 837:7 883:17
884:2,15,20 896:20
918:6 938:21 951:19
952:4 953:6 993:7 996:8
,11 997:18 999:22
1004:2 1025:2 1026:16
1034:10 1035:2
**marker** 899:8
**marketing** 735:4 738:9
1031:4
**marks** 962:22 963:1
**massachusetts** 735:2
1031:2
**master** 735:9 738:12
809:1
**match** 775:8 796:2,18
797:1,13 798:9 804:6,9
,11 807:2,3 809:9
824:18 908:8
**matches** 801:9,11 802:1
804:1
**matching** 898:13
**material** 841:23
**materials** 739:23 740:11
,13 741:9,11,20 742:7
833:23,24 859:12 940:9
967:24 977:4
**matriculated** 1007:22
**matrix** 875:7

**matter** 739:7 859:9
948:23 961:9
**matters** 1032:11
**maximum** 874:19,20
**may** 741:20 743:4
752:19 778:14 785:11
803:5,5 810:16 818:17
849:2 856:14 876:4
879:10 882:10 890:15
,22,23 893:2 914:11,15
915:12 931:8 932:5,5
934:11 935:5,9,10
938:15,22 940:7 970:21
971:10 986:3 990:11
993:7 995:6 1000:2
1001:5 1020:17 1021:16
,16 1025:6
**maybe** 785:2,20 788:13
789:5 806:19,19,20
807:24 817:1,1 819:11
820:23 827:6 842:2
877:20 950:4 962:9
963:9
**mcgroder** 737:6 739:4,4
741:2,8,16,22 746:21
747:3,15 748:23 749:6
750:22 753:4 755:4
757:9 758:7,11 759:5,14
760:2 761:2,13 762:11
764:5 765:11 766:1,14
767:16 768:2,6,11,15
769:3 770:3,8,23 771:21
773:21 774:13,15,17
776:4 777:16 778:7
780:4 782:8,15,20
783:14 784:13 786:15
788:6,22 789:12 792:13
,17 794:2 795:3,16
796:12 797:15 798:4,19
799:1 800:12,16,22,24
802:8 805:23 806:10
807:6,15 808:7,17 809:4
,12 810:1 813:8,23
814:1 815:8,13,17
819:18 820:7,22 821:10
,14 822:11 823:2,19
824:20 825:6,10 826:3,9
827:18 828:10,15
829:18 830:22 831:3,6
833:17 834:5 835:19
836:2,6,10,15 837:19
838:2,10,12,16,20,22
839:2,7,9,12 840:14
842:18 844:10 846:13
852:2,24 856:14 857:22
858:23 859:21 862:21
867:3 875:20 878:2
879:16,23 880:24
881:20 882:6 884:5

885:18 890:1 892:18,21
893:4 897:5,9,20 898:21
899:15,24 900:21 901:1
,21 902:21 903:16
904:21 905:20 906:19
908:17,21 909:9,19
910:4 911:3 913:1,8,11
,23 917:10 918:2,13,23
919:7 920:2 921:9,13
924:1,19 925:2,6 926:15
927:16 928:17 929:19
930:21 933:9,14 934:6
,22 935:22 936:15 939:8
,21 940:4,17,19,24
941:5 942:2 943:22
944:8,22 945:22 947:4
948:4,9,13,21 949:13
950:24 951:2 952:7,11
,15,18,22 953:13,17
954:18 955:9 956:12
958:11,23 959:4,14
960:5,18,19 961:2,15,20
,22 962:23 963:3,10
966:10,12,17 967:6,15
968:15,18,24 971:15,21
972:1,4,12,18,21 973:2
974:4,15,19 975:6 976:5
977:7 978:3,12 979:1,7
,10 980:1 981:8 982:2
,10,11,14,18 984:10,15
,20,23 985:6,11,14
986:21 988:2,17 989:19
,21 991:8 992:10,13
993:6,9,24 994:3,6,9,15
,20,23 995:4,9,14,17,21
996:5,14 1000:14
1001:2,8 1002:16,21
1003:11,15,19 1004:17
1005:9 1006:14 1007:1
1008:24 1010:2,18
1011:11,24 1012:18,21
1013:18 1014:3,19
1015:1,7 1017:5 1018:1
,11 1019:22 1021:10
1022:21 1023:4,9,19
1025:2,4,7,9,12,15,21
,24 1026:3,9,13 1029:17
,19 1030:6
**mdd** 756:8,23 760:10,23
761:7,11,22 762:6,17,19
763:6 765:7,9,17 769:24
770:19 771:19
**mdl** 735:7 738:12 739:2
**mean** 747:16 751:7,9
763:13 769:11 771:3
782:22 784:8,17 787:18
791:10 798:7,23 802:18
,24 814:24 815:1 817:8
818:15 827:11 833:22

839:17 841:22 856:19
,24 867:22 868:16
871:10 872:10 875:4
877:11,14 886:12 890:2
892:20,24 905:15 910:8
911:7,16,24 912:10
913:11 914:15 921:23
924:20 930:24 932:20
937:22 940:4 942:4,20
946:2 956:24 960:8
961:20 965:14,15,18,19
973:10 977:8,20 982:20
991:10,11 1001:12,18
,23 1015:9 1017:12
1020:16 1021:14,17
1029:22
**meaning** 806:15 816:20
**means** 754:2 799:18
861:12,15,17,22 868:19
892:12 912:14 936:19
963:21 980:10 1025:23
**meant** 878:13 937:12
**measured** 920:8
**media** 785:3
**medical** 810:19 811:4
867:14
**medication** 848:11
869:22 921:24 922:2,3
943:14
**medications** 880:4,7
933:22
**meet** 757:15
**memory** 747:9 783:6
787:22 813:17 939:3
959:15,20 964:11
**menkes** 738:6
**mention** 852:16 1024:12
**mentioned** 778:24
829:21 1027:2
**merit** 1007:21
**merits** 1016:10
**meta-analysis** 943:17
**mi** 914:11,14
**middle** 837:4 840:11
**million** 1010:8
**millions** 812:19,19
**mind** 768:16 819:6
962:12 970:9,18 986:13
995:7
**minimizing** 876:4
**minimum** 744:18
**minor** 932:9 934:19,20
**minus** 820:18,21 821:7
866:8
**minute** 748:13 753:1
773:1 780:12 888:14
962:2
**minutes** 832:2,4 951:14
996:3

**misclassification** 767:1
,6,7
**miscoded** 906:9
**mish-mashing** 852:18
**misinterpretation**
928:24
**misleading** 981:2 988:3
992:15 1013:3 1021:12
**misremembering**
800:19
**miss** 973:12
**missed** 972:21 974:20
**missouri** 737:4
**misspellings** 791:6,7
**misstated** 826:5
**misstates** 826:4 911:4
930:21,22 974:5 980:2
988:3,18 1002:17
1006:16 1009:1 1010:3
1011:12
**mistake** 763:16 779:23
780:2 793:22 806:19
916:6 1028:10
**mistaken** 854:18
**mistakes** 763:14
**mixture** 771:9
**model** 815:5 821:22
863:13 873:24 874:3
875:2,13 876:1,10
877:18 883:2,3,4 885:21
921:21 932:18
**models** 880:9 882:24
883:12 929:14 933:18
**modest** 935:8
**modification** 817:16
**modified** 781:23 788:3
,21 890:23
**molecular** 868:4 907:22
**moment** 770:7 796:7
812:8 996:21 997:24
998:22 1000:2 1004:6
1012:9 1023:16
**moments** 970:4
**money** 744:18 960:17
973:13 981:6,13 982:11
1006:10 1016:6,7
**mono1.sas** 832:18
**monotherapy** 748:19
763:3 835:20 845:22
847:22 850:23,24 851:8
990:6
**month** 739:18 787:13
833:16 850:10 853:22
,24 854:4,5,6 860:10,11
,14 862:10,12 863:7,21
,22 864:8,9,11 865:3,4,8
,13,14,18,22,23 866:2,4
,6,6,8,10,15,16,18 868:8
880:8

**month-by-month** 866:22
868:5 907:24
**monthly** 853:21 855:20
,21 862:7 890:21 893:14
**months** 855:24 862:9
864:13,23 865:8,9,10
866:9 868:7 880:16
**morning** 739:16 778:24
825:9 916:23 921:3
964:5
**motion** 842:5 843:9
**move** 768:4 842:17
859:15 874:12 954:14
,21
**moving** 771:8 859:16
967:14 969:14 972:14
1014:10
**mr** 736:6,13,20 737:19
738:21,24 739:3,15
740:9 741:6,13,17
746:12,23 747:4,17
749:4,7 751:13 753:6,7
754:7 755:8 757:16
758:18 759:10,16 760:8
761:5 762:2 763:21
764:1,13,14,16,17 765:1
,23 766:3,6,15,19
767:14,18 768:4,5,8,13
,19 769:7 770:10,16
771:15 772:23 773:23
774:1,11,14,16,18
776:10 778:1,18 780:7
781:2,7,13 782:13,17,21
783:3,17 785:6 786:19
788:8 789:8,22 790:3,14
792:16,18,19 794:4
795:11,20 796:13
797:21 798:5,21 799:2,5
800:14,20,23 801:2,3
802:11,14 806:6,23
807:12,22 808:11,18
809:7,16 810:4,9 813:5
,24 814:2,7 815:11,14
,20 816:1 819:4,8,21
820:13,20 821:3,11,17
822:4,5,18 823:14 824:5
,22 825:11 826:5,14,16
827:20 828:7,11 829:5
,19 830:23 831:5,7,9
834:2,9 835:21 836:8,13
,16,18 837:3,5,22 838:6
,8,9,15,18,21 839:1,11
,19 841:9 842:1 843:11
,24 844:7,8,18 849:8
851:22,23 852:13
853:11 856:17 857:24
858:5 859:15,16,23
860:1 861:5,19 863:5
868:12 875:22 877:23

878:10,21,23 879:17
880:18 881:4 882:2
883:14 884:6,18 885:23
888:13,20 890:3 892:23
893:7 896:23 897:6,12
,23 898:1,22 899:18
900:7,24 901:2,4,23
903:8,18 904:22 905:3
906:15 907:8 908:19,23
909:1,13,23 910:20
912:6 913:3,9,14 916:11
917:11,24 918:3,9,17
919:4,12 920:18 921:10
922:14 924:9,21 925:4
,10 926:16 927:11,12
928:12 929:21 930:5
931:19 933:10 934:2,17
935:16 936:7,17 937:1
938:19 939:18 940:1,11
,18,21,22 941:1,8,9
943:2,23 944:9,10 945:3
946:23 948:1,6,10,12,16
,17 949:7 950:10 951:1
,13 952:1,5,8,12,16,20
953:1,19 954:5,7,10
955:1,3,14 956:22
958:14 959:1,13 960:6
,11,20 961:17,18,21
962:1,8,12,14,16,18,21
963:1,5,7,8,10 964:1,3,4
,5 967:10,16,18 968:20
972:7,20,22 973:4,6,12
974:10,18 976:15 977:9
978:7 979:2,9,14 981:5
,19 982:6,16 983:9
984:12,17 985:4,9,12,22
987:5,12 988:4 989:2
990:14 992:3,12,17
993:7,22 994:2,4,7,13
,18,21 995:2,6,14,19
996:1,3,7,15 997:9,16
,21 999:19 1000:1,19
1001:3,14 1002:19
1003:9,10,13,17 1004:5
,23 1005:19 1006:17
1007:2 1009:2,12
1010:13 1011:1,21
1012:7,19 1013:4,23
1014:7,21 1015:2
1016:21 1017:17 1018:4
,15 1020:4 1022:15
1023:12 1024:5,6,24
1025:3,6,8,10,14,19,23
1026:2,8,10,14,19
1030:1,4 1034:5,6
**ms** 737:6,14 739:4,6
741:2,8,16,22 746:21
747:3,15 748:23 749:6
750:22 753:4 755:4

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

757:9 758:7,11 759:5,14
760:2 761:2,13 762:11
764:5 765:11 766:1,14
767:16 768:2,6,11,15
769:3 770:3,8,23 771:21
773:21 774:13,15,17
776:4 777:16 778:7
780:4 782:8,15,20
783:14 784:13 786:15
788:6,22 789:12 792:13
,17 794:2 795:3,16
796:12 797:15 798:4,19
799:1 800:12,16,22,24
802:8 805:23 806:10
807:6,15 808:7,17 809:4
,12 810:1 813:23 814:1
815:8,13,17 819:18
820:7,22 821:10,14
822:11 823:2,19 824:20
825:6,10 826:3,9 827:18
828:10 829:18 830:22
831:3,6 833:17 834:5
835:19 836:2,6,10,15
837:19 838:2,10,12,16
,20,22 839:2,7,9,12
840:14 842:18 844:10
846:13 852:2,24 856:14
857:22 858:23 859:21
862:21 867:3 875:20
878:2 879:16,23 880:24
881:20 882:6 884:5
885:18 890:1 892:18,21
893:4 897:5,9,20 898:21
899:15,24 900:21 901:1
,21 902:21 903:16
904:21 905:20 906:19
908:17,21 909:9,19
910:4 911:3 913:1,8,11
,23 917:10 918:2,13,23
919:7 920:2 921:9,13
924:1,19 925:2,6 926:15
927:16 928:17 929:19
930:21 933:9,14 934:6
,22 935:22 936:15 939:8
,21 940:4,17,19,24
941:5 942:2 943:22
944:8,22 945:22 947:4
948:4,9,13,21 949:13
950:24 951:2 952:7,11
,15,18,22 953:13,17
954:18 955:9 956:12
958:11,23 959:4,14
960:5,18,19 961:2,15,20
,22 962:23 963:3,10
966:10,12,17 967:6,15
968:15,18,24 971:15,21
972:1,4,12,18,21 973:2
974:4,15,19 975:6 976:5
977:7 978:3,12 979:1,7

,10 980:1 981:8 982:2
,10,11,14,18 984:10,15
,20,23 985:6,11,14
986:21 988:2,17 989:19
,21 991:8 992:10,13
993:6,9,24 994:3,6,9,15
,20,23 995:4,9,14,17,21
996:5,14 1000:14
1001:2,8 1002:16,21
1003:11,15,19 1004:17
1005:9 1006:14 1007:1
1008:24 1010:2,18
1011:11,24 1012:18,21
1013:18 1014:3,19
1015:1,7 1017:5 1018:1
,11 1019:22 1021:10
1022:21 1023:4,9,19
1025:2,4,7,9,12,15,21
,24 1026:3,9,13 1029:17
,19 1030:6
**multiple** 846:4 850:12
,17 851:2,4,11 852:12
864:2,4,19 907:16 908:1
941:21 952:5,9
**multipliers** 1028:1
**mute** 889:5
**myocardial** 914:8
**myself** 946:14

### N

**name** 738:1,17
**named** 830:1
**namely** 845:7
**names** 781:22 793:19
798:7 831:12 860:6
**national** 738:2 999:3
1006:12
**natural** 882:17,23
915:13,18 926:6,10
929:11 932:11,11
933:22
**nature** 811:3
**ne** 845:14
**necessarily** 745:24
824:16 867:15,18
889:13 906:18 911:24
931:13
**necessary** 759:20 895:7
**need** 759:22 760:4
842:20 843:8,9 862:21
891:1 929:19 962:10
982:18 987:5 994:18,20
,23 1012:5
**needed** 891:11 994:17
**needs** 985:1
**neither** 952:15 998:18
1015:11
**net** 740:17
**network** 889:14

**neurontin** 735:3 738:8
742:8 746:3 1031:3
**new** 736:11 774:13
783:18,18 845:22
850:23 851:8 939:9,15
950:19 962:9,11 983:16
**newburgh** 736:11
**news** 837:10
**next** 746:7 748:7 754:5,8
,19 755:19 756:6,22
774:5 781:2 792:2 797:3
799:24 804:3 814:2,22
828:20 849:10,12 861:6
864:11 867:10 884:13
896:17 904:5,7,9,11,13
960:16 962:15,19
967:19 969:15,20
970:12 972:14 974:19
977:6 985:23,24 986:3,3
993:7 997:10 999:17
1003:10,18
**nice** 824:13 829:11
1029:9
**nick** 737:19 738:1
**nicolette** 735:14 738:14
**nih** 950:8 1016:18
1017:1,23 1019:10,11
**nine** 791:20 857:2
**no** 735:8,10,19 737:24
738:12,12,16 740:5
742:10,17 743:18
746:10 749:18 766:12
768:8 769:6,24 774:9
781:5,11 782:17,23
786:18 788:2,10 790:5
,13 793:7 795:10,13
798:17 802:11 805:7
809:22 810:3 812:14,14
813:3 814:5,24 815:20
817:13 820:12 822:14
826:14 829:3,16 833:11
835:17 836:8,10,24
837:1 838:22 839:4,12
840:1 843:1,16 844:13
,17 846:21 847:22 848:5
,10,17,19 851:21 852:10
857:6 862:11,19,23
863:10 864:14,22 865:5
869:1 870:1,19 874:9
878:5,9 880:14 884:16
886:12 889:16,17 892:1
894:6,9,23 895:6 896:21
898:20 900:12,19 901:5
,12,15 912:24 913:6,6
918:7 929:24 930:4
931:5 933:5 935:14
936:2 937:16 940:12,12
,12 941:21 944:18
946:21 947:3,6,21

948:11 950:2,3,15
952:18 959:22 960:3
962:14,18 963:5 966:5,6
969:10 970:7 971:18,18
973:9,21,24 974:7,8,13
975:18 978:6 987:7,10
991:10,18 992:20
994:13,20 996:12
997:19 999:23 1000:15
1004:3 1007:4 1009:19
1010:6 1012:13,23
1013:24 1014:9 1015:3
1017:9 1018:3,3 1020:9
,19 1023:7,19,19,19,19
,19,19 1024:5,20 1025:9
1026:9,17 1028:12,21
1033:7 1034:11,12,13
,14,15,17,18,20,21,22
1035:3,4,5,7,8,9,10,11
**nobody** 946:14 1010:22
**non-responsive** 763:22
822:4 851:22 927:11
1003:9,11
**none** 756:3,3,11 848:1
964:14 978:21 990:11
995:24
**nor** 1022:12 1032:20,22
**normal** 1024:21
**normalizing** 864:7
**nos** 790:10 828:5 884:3
951:20 1034:16,19,23
1035:6
**notary** 1031:23
**notebook** 956:9
**noted** 940:21
**nothing** 742:10,10 751:6
778:10 848:1 872:12
874:14 920:21 922:9
957:6 965:19 976:3
992:15 1007:15 1008:11
1015:15,18
**notice** 816:4 859:11
**noticed** 834:19 835:4
**notwithstanding** 839:21
**november** 813:9 938:6
956:3 958:6,8,21,21,22
967:20 969:16 970:1,3,5
,6,14,16,24 971:1,16
**nowhere** 852:15 853:13
**null** 871:1
**number** 748:1,11,13
749:9 760:22 761:10,24
765:6 767:21 769:23
770:6,19 784:17 793:15
795:18,21 796:1,16
797:6 800:21 813:14,15
816:11 817:20,21
823:11 824:3,15,16
825:4 853:23 863:8

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

868:16,16,18,19 879:2
895:14,17,21 899:3,4
946:10,13 947:11,12
962:15,19 980:6 996:14
1000:22 1026:20 1032:7
1034:10 1035:2
**numbered** 861:3
**numbering** 830:24
**numbers** 751:10 755:17
756:7,14 769:2 770:22
771:10,11 796:6 803:1,2
811:7 815:23 818:10
820:11 822:20 873:14
,21,23 935:8
**numerous** 999:3

**O**

**o5-cv-11515-pbs** 738:11
**oath** 979:17 988:12
1031:11
**object** 750:22 755:4
757:9 758:7,11 759:14
760:2 761:2,13 762:11
763:21 764:5 765:11
767:16 768:2 769:3
770:3 773:21 776:4
777:16 778:7 780:4
782:22 783:14 784:13
786:15 789:12 794:2
795:3,16 797:15 798:4
800:12,24 805:23
806:10 807:6 808:7,17
809:4,12 820:7,22
821:10 822:11 823:2,19
824:20 826:3 833:17
837:19 838:12 839:9
840:14 846:13 852:24
879:23 880:24 881:20
882:6 885:18 890:1
898:21 899:15,24
900:21 901:21 902:21
905:20 906:19 909:9,19
910:4 911:3 913:1,8,23
917:10 918:13,23 920:2
921:9 924:1 928:17
930:21 933:9,14 934:6
,22 935:23 939:8 940:3
,4,17 944:22 945:22
947:4 948:21 949:13
953:13 956:12 958:11
961:15 967:6 972:1
974:4,15 984:10 988:2
,17 989:21 991:8 992:10
,16 994:6,9 996:5
1002:16 1008:24 1010:2
1011:11,24 1012:18,22
1014:19 1018:1,11
1019:22 1021:10
1022:21 1029:19

**objected** 826:11
**objecting** 782:9
**objection** 759:5 770:23
771:21 788:6,22 802:9
807:15 810:1 821:14
822:4 851:22 852:2
897:21 901:3 903:13
919:7 921:13 927:11,16
936:15 940:21 942:2
976:5 978:3,12 979:7
980:1 981:8 982:14
984:23 986:21 1000:14
1001:2,8 1002:21
1003:9 1004:17 1005:9
1006:14 1007:1 1010:18
1012:21 1013:18 1014:3
1015:1,7 1017:5 1023:5
,9
**objections** 897:16
971:14
**objective** 984:21
**obligation** 858:16,17
891:5 1011:20 1012:4
1016:4
**obligations** 992:6
**oblige** 815:24
**observation** 850:11
914:13 923:4,6
**observational** 928:11
931:6
**observe** 869:21
**observed** 874:18
**obvious** 860:21
**obviously** 763:13 771:12
781:16 792:21 797:6
798:7 830:11 873:14
877:7 888:2 890:13
932:21 960:8 991:14
998:11
**occur** 854:6 899:2
916:18 922:11 933:24
**occurred** 750:10,14
851:17 854:1 866:3
908:5 911:13 912:18
914:6,9,23 922:21,23
923:1,4,6,7
**occurs** 911:12 914:20
**october** 903:23 904:4,5
,5,7,9,11,13 905:11,12
,13,14 957:21 969:20
970:1,10 971:22 972:19
,23 973:7,9,11 1024:9
**odds** 873:13 886:1,1,6,7
,17,19 887:18,19 888:7
911:23 929:16
**off** 740:19 746:21 747:2
749:2 770:8,11 782:10
785:5 790:5 792:15
811:13 827:21,22

843:24 844:8,13 857:22
,24 858:1 866:24 878:3
,5 888:14,15 897:10,13
900:15,20 902:8,18
903:7 911:10 929:21,24
931:12 951:13,15
962:23 963:2 973:5
987:7 997:13,14
1015:19 1030:8
**offered** 960:16
**offhand** 791:9
**office** 799:6 1033:2
**offices** 736:2 737:10
738:6
**official** 1005:6 1006:3,7
1013:10,24 1014:1,8
**often** 935:18
**oh** 813:23 814:13 830:20
836:2,9,13 847:18
862:14 879:19 896:3
901:8 938:9,10 966:8
973:9 975:8
**okay** 739:18 740:10
741:1 742:12 743:13,16
746:7 747:14,23,23
749:19 750:4 751:19,22
752:2,8,24 753:15 754:4
,17 755:9,12 756:6,13
,18,21 757:21 759:11
767:21 769:8,23 772:24
773:13 774:5 775:5,21
778:19 780:13,24 782:2
,7,20 783:7 786:5
787:23 790:2 791:13
792:2,12,17 793:3,14
795:12 796:9,14 798:18
799:11,24 801:2 802:3
803:16 804:8,14 805:10
,19 808:12 813:18,21
814:14,24 815:6,8,13
816:10 819:7 825:3
827:6,20 829:12 830:10
,23 831:2,3,6 836:3,15
839:5,20 840:2 843:16
846:6 850:1 852:14
854:13 858:23 861:6,12
,15 877:2 884:11 885:4
886:3,24 889:9 893:12
894:18 896:17 898:23
900:13,24 901:9 902:6
903:9 904:4 907:15
908:10 909:2,14 913:10
921:4 930:14 937:8
938:10 939:4 940:17,18
941:5 948:16 949:8
952:7 953:5 954:6
955:11 957:14 958:5
959:9 961:6 963:7
964:20 966:21,21

969:14 970:8,17 972:14
,22 975:11 982:1,17,17
987:5 992:21 993:4
994:22 999:12,17
1000:7 1007:20 1009:21
1011:7 1013:14 1014:10
1018:5,18 1020:5,10
1023:9,15 1024:24
1026:2,12 1027:11
1028:6,22 1030:6
**old** 799:12 939:17
962:10
**omission** 978:20
**omitted** 741:21 858:19
**once** 759:11 824:14
840:23 867:24 905:18
910:1 915:22 934:3
936:11 942:10 995:12
1029:3
**one** 741:10,14 746:16,22
750:8 763:23 770:9
771:19,19 772:14,17
774:15 776:21 777:3
778:13,14,21 783:23
793:17 795:12 796:1,10
,23 798:8 799:14 803:22
804:3,23 805:2 809:2,10
811:6,11 813:13 816:14
,15 818:4 822:6 823:15
,18 824:1 829:20 832:1
834:11,12,19 835:13
836:3,4,10,13 840:20
841:5 845:4,7 847:3
849:1 851:14 854:4,5,6
,16,17,18,18,20 855:21
,23 856:8 857:6 860:3,7
,10,15,18,20 861:3,13
862:9,20,23 863:6,7,9
,22 864:9,22 865:3,7,12
866:8,13,14 868:2,22
870:10,16,20 871:2,8,11
,12,18,19,21 872:11
873:21 875:17 879:18
881:6,22 883:2,3 885:16
887:18 888:21 889:6
891:17 892:1 898:23
899:9 900:20 901:10,13
903:7 904:4,5,7,9,11,13
,22 905:4,5 906:5,6,8
908:13 910:8,11 913:16
915:14 921:20 923:4
928:4 931:20,24 932:8
,21 938:11 939:22
941:12,13,14,22 942:18
943:7,13 945:10 948:14
955:13 957:7 962:15
964:1,2 968:6,10,10
974:24 975:3,5 976:17
986:2,4,12 994:11

1008:8 1010:11 1015:3 1021:2 1023:2,15 1027:14,16 1029:16
**ones** 750:11 767:24 808:20 831:16 836:9 858:20,21 862:17 886:10 891:24 900:15 918:10 922:16 926:10 962:3 963:19 986:7
**open** 788:20 789:2 869:14,15
**opened** 788:13
**opinion** 788:20,23 810:5 846:11 916:10 938:24 939:5 941:10
**opportunity** 993:13 994:10 1023:22 1025:18 ,18
**opposed** 796:17 888:4 983:10
**opposite** 913:5,7
**order** 750:6 796:22 830:20 831:1 841:22 873:16,17 949:24
**ordinary** 984:7
**original** 747:6,18,20 760:7 764:15 779:7,13 ,19 780:21 793:5,14,21 828:15,16 829:9 832:11 834:18,22 891:11 892:8 ,13 962:24 969:5
**originally** 816:6 832:16 ,18 833:3,9 956:21,24 978:22
**originated** 1007:20
**ought** 979:21 991:1
**ourselves** 990:1
**outcome** 1032:23
**outer** 809:8
**outlier** 942:6,10,11,14
**output** 751:3 792:3,4 794:18 814:23 816:3 817:18 818:9,20 820:10 821:5 862:18 884:22 885:5
**outputs** 819:16,22 820:2 ,3 956:17 969:8,9
**outside** 991:6,18 1001:4 1002:24 1003:4 1004:22 1010:9,11,15 1011:15 1019:15,20
**overall** 748:18,19 772:6 811:10 840:18 846:21 854:16 871:23 880:10 ,12 886:13 888:7 917:23 927:3 933:23 990:3
**overlap** 990:7
**overlaps** 817:8
**overstated** 993:10

**overview** 787:8
**own** 812:7 898:13 965:2 967:12,13 1020:8,11,13 ,21

### P

**p.m** 832:19 878:7,7 888:17,17 930:2,2 951:17,17 987:9,9 1030:11
**package** 834:16,18
**page** 737:19 738:1 749:23 759:1 774:21 775:6,10 792:2,3 797:3 803:13,13,16,20 804:21 ,21 805:6,12,14 814:14 ,23 815:6 817:14 844:20 849:9,10,12 869:14 872:4 885:12,13 886:6 ,18 938:23 956:10 959:17 961:16,16 979:18 1000:5 1004:9 1009:13 1027:23 1034:3
**pages** 791:19,20,24 792:20,21,23 794:19 800:1 814:8 953:16 961:11 962:4,5,6 1031:9
**paid** 744:7,19 745:10 964:7 965:3,8,8 972:11 979:5,17,19 981:6,13,15 ,20 991:14 995:20 1006:10 1009:23 1015:24 1017:2,23 1022:2 1028:22,24 1029:15,23
**pain** 763:8 802:6,7,15 803:17,22 804:3
**paper** 772:24 816:6 837:3 840:6,11,19 842:12 843:14 845:11 ,17 846:9 849:1 850:7 867:23 868:14 895:12 908:3 924:11 926:12 928:14 950:1 951:8 955:19,20 957:24 958:16 975:20 978:22 979:20 980:8,12 981:18 ,21,23 982:22 990:17 991:23,24 992:14 999:8 ,8 1006:13 1008:18,20 1009:6,14 1011:10 1015:6,12,16,17,19 1016:1,6 1022:6 1024:9 1027:12
**papers** 843:20 991:13 992:7 998:7 1021:8
**paragraph** 849:15 872:3 1005:20,21 1012:10 1013:8 1014:11 1018:6

,6
**parallel** 778:24
**parameter** 815:2 817:24 885:20 891:22,23
**parameters** 815:5
**pardon** 955:9 976:3 985:23 998:4 1023:17
**parents** 915:9
**part** 758:4 761:20 790:18 819:5,14 831:13 845:20 858:18 862:2 876:7 883:10,12 911:14 914:6,21 916:17 929:9 934:9,9 940:6 943:24 950:8,8 955:6 956:3 958:21 963:17 982:9 983:5,5 988:6 996:17,18 999:4,9 1004:7 1008:3,3 ,15,22 1013:14 1027:16 ,21 1028:17 1029:13,18
**participate** 992:1 1006:1 1028:23
**participated** 1021:22
**participation** 1007:13
**particular** 748:2,8 750:1 ,7 753:3 761:20 778:5 ,10 787:14 793:11 796:23 797:4,5,20,22,23 798:1,14 800:8 801:7 805:19 832:1 860:14 873:9,10 875:6 903:22 908:16 927:24
**particularly** 751:15 798:15 883:1 898:17 933:18
**parties** 738:20 993:19 1032:22
**partners** 736:9 738:22
**parts** 769:14 926:8
**party** 991:18
**pass** 954:7 995:12 1026:5
**passed** 993:15 995:11
**past** 937:11 971:7 1003:3 1014:6
**patient** 776:16,17,22 777:2,12 795:14,19,23 796:1,2,6,14,17,21,23 797:4,6,11,22,23 798:1 ,15 799:8,12 800:8,8 801:7 805:19 806:3 808:15 810:23 823:16 834:4 848:10,11,20,20 860:8,14 898:3 900:3 903:20 908:22,24 953:23
**patient's** 824:1 860:11
**patients** 760:23 761:11 ,18,20 765:7 767:1

778:5 807:3 822:9 824:6 ,9 847:4,10,10 849:18 872:7 880:12,14 924:14 935:19 936:4
**pattern** 868:10
**pay** 742:18 743:13 744:23 745:2,5 964:24
**payers** 991:6
**paying** 825:18 964:24
**payment** 983:11
**payments** 742:13 991:5 1023:22
**pc** 737:10
**peer** 841:12 842:22 843:3
**peer-reviewed** 991:13 993:1
**pen** 961:9
**people** 759:2 761:7 762:9 763:1,2 769:24 770:19 771:9 806:14 822:24 835:5 845:9,9 846:4,22,23 847:21 848:1,15,16 851:20 854:21,22,24 855:5,11 867:15 869:4,6,11,21 870:3,6 876:20 883:6 892:3 897:18 898:4,14 908:8 910:10 915:2,24 917:7,13,16,18 919:9 925:20 955:23 960:12 ,13 984:7 985:20 990:4 991:11,11 1001:21,23 1002:1,8 1024:7
**people's** 967:9
**per** 848:6,6,10,11,19,20 ,22,22 862:8 872:15,17
**percent** 743:23 767:11 ,15 768:21,24 817:10 873:8,8 886:1 919:20,24 964:13
**percentage** 743:20 762:9 767:23
**percentages** 762:4,8 765:3
**perfectly** 745:10 923:20
**perform** 783:10 853:9 978:16
**performed** 853:3 927:9 955:18 980:24 981:16 989:15
**performing** 973:19
**period** 787:11 846:2 850:11 862:5 868:1 906:7 911:8 914:5,13 916:18,21 918:20 922:6 923:4,7 928:1 929:9 1018:9,20 1019:2,7
**permit** 852:12 872:21

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**person** 799:21 800:10
801:10 804:15,16
805:21 835:5,7 848:6,7
853:17 863:6,20 864:1,8
,12 865:3,7,12 866:9
867:11 872:16 895:17
,21 899:10,12,20,21
903:22 904:15 905:6,15
,17,23,24 906:5 907:1
908:16 910:1,23 913:20
916:23 921:2,4,5,7,15
923:1,7,9,14 925:12
991:21 1005:15,16,18
1023:2
**person-time** 850:10
853:2,5,10,19 855:2
863:10 864:14 880:9
883:1,11 907:21 915:15
929:13 932:18 933:18
**personal** 841:3 1032:15
**pertain** 851:20
**pertinent** 1004:7
**pestered** 1020:5
**pfizer** 735:8,10,17
738:10,11,15 739:5
838:14,17 946:20
991:19 1002:13 1006:10
1009:10,23 1011:9
1015:20,22,23 1016:6
1019:7 1020:8,21,23
1021:24 1024:16
**pgms3** 814:16
**ph.d** 735:22 739:10
1031:16 1034:4
**pharmaceutical** 991:6
,12 1003:6 1011:18
1020:12
**pharmacoepidemiologic**
954:16
**pharmacotherapy**
847:12
**pharmetric** 968:9
**pharmetrics** 748:1,6
749:4 775:1,7 776:16,20
779:1,8,17,19 780:22
793:5,5,16,18 795:15
796:19 797:1 800:3,9,15
,19 801:5 803:21 804:22
806:9,14 807:1,5,19
809:2,10 810:22 811:13
824:12,19 878:14,22
880:22 881:17,23
891:14 892:8 897:1,14
898:4 903:4 906:13
907:5 931:23 932:15
934:10 936:13,23 937:5
,13,22,23 938:3 949:17
968:1,9 969:6 970:11
977:4,13 980:15 983:3

,12 986:17,20 987:2,16
,23,24 989:10 1022:1
**phase** 998:12
**phone** 889:4,5
**phs** 998:15
**pick** 915:9,10
**piece** 941:12,13,17,22
**pieces** 851:6
**pile** 938:8
**pills** 853:23 867:18
**place** 857:16 878:2
909:4 912:3 916:13
991:22 1031:9 1032:18
**placebo-controlled**
947:15,18
**placed** 782:3
**places** 816:12 817:17,23
818:6,12,17 820:1
1029:10
**plaintiffs** 735:15 736:22
738:15,23 739:1,3
858:15 993:18 1024:3
**plan** 825:20 971:11
1020:21
**planning** 950:4,11
1006:1
**plans** 950:15
**please** 738:19 764:16
770:7,9 815:7 819:1
826:6 901:9,13 945:6
960:4 971:4 985:10,13
993:8 996:8,9 997:16
999:20 1003:10,18
1007:15 1009:2 1023:3
1027:23
**plug** 889:13,17
**point** 756:18 777:4,23
778:15 779:3 780:20
793:23 794:21,23 799:1
810:15 817:4 819:12
821:21 858:15 874:4,21
875:11 877:24 890:18
905:15 914:16 915:1,3,3
917:14 920:10 929:11
932:10 937:18 939:6
991:18 997:11
**points** 932:9
**poisson** 873:16
**policy** 1004:13 1005:1,3
1019:12
**population** 883:6
**portable** 956:9
**portraying** 911:24 916:5
**position** 812:2 842:9,22
843:8
**positive** 963:12
**possibilities** 810:18
**possibility** 772:14,15
906:8,12

**possible** 763:14 882:3,9
905:6 931:8 956:7
1008:7
**possibly** 792:8
**post** 849:22 850:14,16
851:4 852:1 868:1,3,15
869:19 871:15 874:11
876:19 877:6 882:21
909:5
**post-drug** 837:1 846:1
851:21 852:8,10,11
869:18 870:9 931:13
**potential** 931:15,16
932:12 1001:5,22
1009:9 1016:4
**potentially** 822:19
823:16,16 911:17 912:5
**practice** 810:10
**practices** 735:4 738:9
1031:4
**pre** 849:22 851:3 852:1
871:15 874:11 876:18
877:6
**preceded** 921:2
**precipitant** 900:3
**predated** 794:11 1017:8
**predrug** 846:1 850:15,16
852:8,11 868:15 869:1
,15 870:9 931:13
**prefixes** 776:2,2
**pregabalin** 946:6
**preinitiation** 868:20
**preliminary** 977:17
**premises** 842:13
**preparation** 744:22
789:20 967:4,11
**prepare** 818:2 967:24
**prepared** 742:22 782:11
891:5 893:9 970:12
**preparing** 989:13
**preprocessing** 779:21
**prescribed** 849:18 872:8
924:15
**prescription** 853:22
854:2,3,7,8 855:23
865:17,19,22,24 866:3,5
,7,13 867:9,20 868:2
899:3,5 923:17
**prescriptions** 935:9
**presence** 855:14 866:1
887:23
**present** 736:1 737:1
**presentation** 952:8
953:3 955:21 957:19
1024:9 1028:7
**presented** 765:21
840:20 959:15
**preserve** 850:12 874:13
**president** 1015:23

1016:5
**presume** 1019:15
**pretreatment** 849:17
869:16 872:6,15 882:20
924:14
**pretty** 740:16 749:10
825:10 860:21 970:21
**prevalent** 882:12
**previous** 868:23 916:10
933:21 946:3 980:21
981:12 1032:8
**previously** 746:14,17
764:19 938:21 1027:2
**primary** 840:21 848:12
850:18,19 867:22 883:2
916:6 920:15 982:4
**principal** 990:24
**print** 782:24 792:22
949:24 952:9,21 953:18
956:9 1000:6
**printed** 749:2 774:22
775:5 782:10 792:15
802:21 815:10 830:13
860:4 897:10,13 952:11
,13,16,16,19
**printer** 959:18
**printing** 952:10
**printout** 800:14,18
801:12,17,19
**printouts** 835:12
**prior** 741:3 779:24 786:6
,21 788:18 793:23
794:23 847:12,13
848:21 851:1 854:23
855:6 861:9 869:3
877:15 911:4,6,9,13
914:9,21 920:13 921:18
922:11,17 928:1 945:4
971:9 991:23,24 992:2
1016:19,22,24
**private** 841:8
**probability** 821:21 822:3
870:21,21,23 871:19
873:8 886:12,14 887:16
**probably** 743:3 744:1,11
759:1 818:16 823:10
841:17 845:13 879:4,8
882:20 893:18,19 894:5
,9 905:5 912:14,18
930:12 932:1 934:12
954:14 962:10 987:3
993:10 1021:15 1028:12
**problem** 794:22 795:12
824:7,8,11 843:16 984:4
**problems** 932:23
**proceedings** 1032:16
**process** 779:9 791:22
841:22 842:23 843:5
**processed** 779:2 855:18

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**processing** 779:1
780:17 794:23
**produce** 742:12 751:3
843:2 892:14
**produced** 752:22 776:20
858:11,17 937:12
954:20 1025:11
**product** 735:5 738:9
1008:4 1031:5
**production** 842:5
982:22
**products** 739:1 961:12
**professor** 971:5
**professors** 1017:13,15
**program** 749:24 758:19
759:24 760:5,10 775:19
777:5 778:2,10 791:20
,21 792:11 794:18 803:7
814:23 815:2,10,12,22
816:3 817:16 818:19
821:6 852:23 853:2,9
856:4 890:19 891:20
892:4,9 893:3,6,9,11,13
,24 894:8,9 956:20,24
957:1 998:12
**programming** 757:22
**programs** 742:14 747:6
,20 751:24 752:10,14
754:13 759:18,21
779:10,15,24 781:18,20
785:7 787:24 788:5
793:23 794:10 801:23
819:17 831:19 832:24
833:3 852:20,21 856:1,9
857:7 863:2 888:24
892:7,10 893:13,15,19
,23 894:3 953:7,8,20
956:16 969:7
**project** 743:6,9 745:9,16
,19,22,23 1007:13,14
1010:15
**projects** 745:20,21
950:3 1008:9 1010:12
**promise** 812:15
**properly** 834:20
**proportion** 988:14,15
**proportional** 823:11
824:3 863:12
**proposed** 958:1 1008:2
**proposition** 850:3
926:13
**protected** 843:5
**protective** 763:4,5
769:12,20 846:12 849:2
870:12,18 871:10
911:21 914:18 915:5
924:5,24 925:18,21
926:2,4,14,21 927:14
928:5,6,15,21,22,23

**proves** 829:10 928:14
**provide** 750:9 785:11
839:22 840:22 850:14
851:6 858:18 875:14
891:6 906:2 945:6
988:23 1010:9 1011:19
1013:17 1015:4
**provided** 743:16 750:11
,12 779:13,14 781:17
783:5 786:9 793:8,19
800:15 807:4 808:3
809:2 814:9,15 819:14
,16,22 820:1,4 821:4,13
824:18 825:6 829:21
830:12 856:8 859:3
884:9 886:14,19 939:10
,15,24 944:16 945:7
953:9 969:8 995:22,23
998:11 1002:5 1020:2
**provides** 864:15
**providing** 741:21 840:3
971:6 992:24
**psycd** 755:13,16 756:19
**psychiatric** 760:24
761:9,12,19,19,22 762:7
,18,20 763:6,7 765:7,10
,18 766:22 767:3,10,22
768:21 769:18 771:6,18
772:12 813:13 936:9
943:12
**psychiatry** 837:13
839:23 978:24 1016:2
**psychotherapy** 882:1,3
,11,11
**public** 990:23 992:9
998:6,24 999:4,9
1004:16 1005:4,24
1006:1 1009:22 1016:18
1021:6 1031:23
**publication** 957:24
958:1 975:21,22,23
**publications** 993:2
1021:7
**publish** 844:4 991:12
1022:6
**published** 840:24
975:20,22,22 981:21
**publishing** 843:20
983:20
**pull** 1009:18
**punching** 815:23
**purchase** 881:6 983:6
**purchased** 881:9 931:23
934:5 937:4,21
**purely** 806:19 864:20
988:9
**purpose** 845:11 888:1

890:24 946:18 951:8
983:20 996:19
**purposes** 908:2
**pursuant** 735:22
**pursuit** 1008:13
**put** 741:1 772:24 813:21
816:6,16 818:18 820:11
824:12 828:17,17
830:24 832:10 845:12
858:6 863:3 883:16
884:11 889:2,5 914:14
918:19 957:23 961:21
966:14 1007:5 1012:21
1021:23,24 1022:1
1023:5
**putting** 818:22 890:24
**puzzle** 883:13 941:22

**Q**

**qualifications** 815:18
903:13
**qualifying** 903:11
**quality** 815:18
**quarrel** 1009:19,21
**quarreling** 1010:14
**query** 749:10,14,17
**question** 758:16,21
761:16 765:15 766:17
770:18 780:10 784:14
795:6 808:10 811:1
815:9 826:12 832:17
838:6,19 840:16 845:20
851:10,24 852:5,15
853:5,7 865:6 873:19
874:8 875:20 880:19
881:19 893:8 913:12,15
920:22 924:4,20,20
925:1,2,7,9,17 929:18
932:10 939:11 942:5
957:23 959:22 979:8
981:18 985:3,7 994:5
999:17 1002:4 1003:12
,13,16 1006:21 1015:3
1017:22 1018:16 1020:7
,10 1021:2
**questioning** 815:17
**questions** 738:22
763:23 839:8 894:7,10
927:10 939:19 940:2,7,9
,15 941:3 948:14 954:16
,19,21 955:7,11,12,23
989:11,12 993:20,23
994:8,11 995:16 996:4
1023:23 1024:1 1025:5
,16,17 1027:3
**quibbling** 971:2
**quick** 740:1 879:1
969:21 996:16

**quickly** 739:21 884:7
939:2 954:22
**quite** 876:22 888:3,10
930:7 993:2,3 995:9
1027:10
**quote** 816:7

**R**

**r-01** 1007:22 1009:4
1019:1,3,8
**r-56** 1007:21 1008:22,23
1009:4 1018:21,22
**raised** 873:19 915:3
919:23 920:6 955:23
**ran** 750:18 751:23 752:3
776:11 779:4 815:9,11
,11 816:2 818:21 821:5
826:18,22 836:19,23
852:9 853:16 873:15
**random** 885:22
**randomized** 921:23
922:7
**range** 755:17
**rare** 866:14
**rate** 743:10 744:1 770:1
,20 771:4,5,9,10 772:6
846:24 848:4,6,8,8,11
,15,18,19 864:16 868:20
,23,24 869:6,8,9 870:2
871:2,5,17,21 872:15,20
873:1,13 874:18 875:10
876:24 882:20,22 883:5
894:6 895:13,23 911:8
,15 914:22,23 915:8,16
,18 919:22,23 920:5,6,7
,8,9,12,16 927:8 929:6
965:1,2 966:18 1028:1
**rates** 822:1 849:17
869:16,20 871:7,7,22
872:1,6 873:10 874:1
880:15 882:18,19
924:13 932:5 933:23
935:14 1028:2
**rather** 894:5 963:5,6
998:14
**ratio** 770:1,20 771:4,5,9
,10 772:6 846:24 868:19
,24 871:2,17,21 873:1
,13 874:1,13 876:24
877:12 886:1,2,8,17,19
887:18,19 888:6,7
895:13,24 911:23
929:16
**ratios** 815:3 874:19
877:5 886:7
**raw** 891:6
**raymond** 737:16 739:6
**re** 735:3 738:8 1031:3
**read** 753:8,18 756:24

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

759:2 767:12,19,20 775:14,18 820:15 849:20 892:5 939:2 977:7 979:4 996:21,22 997:24 998:2 1000:3,7 1004:6,11 1031:7
**reading** 998:2,10 1000:21
**ready** 894:4
**real** 874:18 921:11 926:11 942:23 954:22 985:21
**really** 770:19 788:15 828:12 832:1 851:20 864:5 868:6 869:23 874:20 876:16,21,23 877:19 894:2 906:12 925:24 926:7,7 929:7 932:8 933:19 934:19 943:1 954:15,24 970:20 971:6 979:20 982:20 988:23 1016:13
**realm** 906:8
**reason** 804:10 814:24 817:11 818:8 820:5,12 915:1 936:2 958:15 1000:5 1017:9 1024:22
**reasonable** 744:8 809:15 891:19 912:22 925:11,12
**reasonably** 752:21 1006:5
**reasons** 811:11 883:3 947:13
**recall** 777:3 779:20 784:8 812:8 826:17,21 827:10,11 832:8 833:1 835:9 939:19 964:8 975:19 986:24
**receipt** 784:23
**receive** 837:12 848:17 883:7
**received** 763:2 784:19 790:17 807:19 837:10 856:20 905:18 944:6,11 946:20 947:2 971:18 980:14 983:3 986:19 987:2,4 1002:12 1011:8 1017:8 1021:5
**receiving** 825:4 900:4
**recent** 889:12
**recently** 945:10
**recess** 770:12 790:6 827:23 844:14 858:2 878:6 888:16 930:1 951:16 987:8
**recommended** 991:22
**reconcile** 979:6
**reconsider** 842:8

**record** 741:2 746:21 747:2 748:13 766:10 770:8,11 777:12 790:5 ,13 797:20 802:5 803:17 821:2 826:4,6 827:22 828:1 843:24 844:9,13 ,17 857:22,24 858:1,4,6 862:20,24 863:8,22 875:21 878:3,5,9 888:14 ,15,18 929:22,24 930:4 951:13,15,23 958:20 977:7 987:7,11 1012:22 1023:5 1030:8 1032:15
**records** 748:2,11 759:3 793:11 797:12 798:8 802:21 804:6 809:9 811:23 812:20 833:11 862:7,8 863:17,19 974:1 ,7,12,13 984:8,15 985:17 1017:19
**redoing** 845:15 973:19
**redone** 832:16
**reduce** 849:16 872:5 924:13
**reduced** 847:14 1032:14
**reducing** 888:3
**reduction** 871:4,15 872:20 873:5,9 929:2,5
**reference** 938:1
**referred** 762:19 826:24 853:7
**referring** 791:23 803:4 885:20 968:4 1009:5 1012:11
**reflect** 786:9 978:8
**reflected** 990:12
**reflects** 987:14 988:8
**refresh** 939:3
**regard** 992:6,7 1001:4
**regarding** 837:13 971:19 972:4 992:14 1004:14
**regenerated** 752:13
**regression** 779:4 850:21 853:3,10 855:3 863:1,11 864:15 873:16,17 876:9 877:7,11 886:4,5,15 887:17,18 907:21 914:15 915:7,15 926:5,9 929:14
**regressions** 853:6
**regs** 1013:1
**regulation** 996:24 997:7 1000:21,22
**regulations** 992:5,14,21 994:15
**reimbursed** 965:4 983:7
**reimbursement** 983:11
**reiterate** 846:15
**reiterated** 886:5,9,9

887:15
**reject** 870:24
**relate** 993:24
**related** 743:9 744:19 745:9,15 746:2 787:14 870:22 880:22 889:12 926:23 963:20 964:9 997:3 1008:4,6
**relating** 742:8
**relation** 1002:14
**relationship** 877:10 882:18 1020:23
**relative** 763:12 848:4,10 ,16 911:10 1032:19,20
**released** 905:8,9,11,12 ,14,23
**relevant** 740:22 842:14 849:17 872:6 924:13 950:9
**reliability** 979:3,12,13
**relied** 967:24
**rely** 765:9
**remedy** 931:22
**remember** 747:11 777:21,23 778:15 780:19 783:12,16,20 785:5 786:11,23 787:3 788:15,16 791:9 811:15 ,21 818:3,20 827:3 834:15 876:1,17 878:17 879:1 882:20 895:18 961:4 1017:18 1027:9 1028:5
**remind** 786:1 822:22
**removed** 942:10,13,18
**repeat** 768:18 855:16 865:6
**repeated** 906:9 1000:6
**repeating** 855:11
**replace** 741:13
**replicate** 946:15
**replow** 937:17
**report** 742:15 761:10 762:3 764:12 765:8 770:14 813:10,19 814:20 816:17 837:24 840:13,21 930:20 938:7 ,15,22 940:7 941:6 942:21 946:19 947:10 949:1,19 956:3 958:7,12 ,21 970:12,13,16 971:17 ,24 983:21 990:12 1004:21 1010:7,9,10,21 ,22 1011:3,5
**reported** 737:23 786:6 817:23 835:5 854:11 946:11 978:21 1032:13
**reporter** 754:6 767:13 820:19 860:23 861:18

962:20 997:10 1003:20 1023:1,7 1032:6 1033:6
**reporting** 737:20 738:3 751:6
**reports** 945:20 971:3
**represent** 738:20,24 747:24 748:12 749:8,19 750:4 758:2 796:20 797:8,10 800:6 804:8 819:24 839:3 856:18,23 897:17 953:8
**representation** 903:4
**represented** 759:17,19 801:12,20 802:20 806:15
**representing** 749:1 797:18 803:11 838:11 ,13,14 993:18
**represents** 781:18
**reproduce** 752:16,20 957:7 973:23 974:2,8
**reproduced** 845:5 1028:19
**request** 837:23 858:11 859:17 889:2 948:8 961:6
**requested** 834:17 946:8 1013:16
**requests** 946:21 1002:23
**require** 1010:7 1014:14
**required** 866:21 992:23 ,24 1010:20 1011:2,4 1019:16
**requirement** 1006:9 1007:5
**requires** 850:17 1005:22 1010:9
**rerun** 956:15,17
**resave** 789:3
**resaved** 785:11 956:18
**research** 925:23 999:1,6 1004:16 1006:2,6 1008:15
**research-related** 950:19 983:19
**respect** 742:2 761:21 762:16 766:5 772:11 792:14 793:9 949:9 988:21
**respond** 842:19
**responding** 1006:23
**response** 858:23 868:11 950:20 980:13
**responsibility** 752:5 757:18 759:18
**responsible** 882:4 923:19 927:7
**rest** 802:10 858:13

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

957:23
**resubmit** 837:16 843:19 ,22
**resubmitted** 840:24
**result** 872:18,18 873:2 886:11 899:23 911:2 1002:9
**results** 752:16 767:5 779:3 811:10,20 814:19 834:23 835:4 840:18 846:20 872:14 885:13 ,21 886:10 887:14 929:15
**resumed** 735:22
**resuming** 739:19
**retain** 839:2
**retirement** 1020:20
**retrospect** 810:16
**return** 889:4 1005:15
**review** 782:11 790:21 826:10 840:7 842:23 978:23 997:5,5 1005:7 1013:10
**reviewed** 752:2,9
**reviewer** 840:6 842:12
**reviewers** 841:6,12,18 843:3 950:20
**reviewing** 744:20 967:8 973:19 981:14
**reviews** 841:11
**revise** 837:16,17,24 838:3 839:24 843:19,21
**revised** 813:19 840:23 948:8
**revolve** 844:22
**revolving** 993:17 1024:3
**rid** 851:4
**ridiculous** 1025:7,8
**right** 755:2 771:17 773:4 ,5,10 774:4,21 777:20 779:20 781:16 784:24 785:16,22 791:18 796:3 ,15 797:7 798:23,23 799:17 800:22 807:11 811:14 816:18 817:7,8,9 822:8 827:4 828:22 830:10 831:2 835:10 836:12 842:9 846:6,9 849:13 856:22 860:5 865:11 878:18 884:11 ,24 885:4 886:17 895:20 ,20,23 899:6 900:11 901:7,13 903:24 904:6 912:1 916:14 917:3 919:13 922:15 924:17 926:17 936:2 938:13 940:24 945:17 952:10 957:5,22 961:20 963:14 ,16,24 967:11,14 969:3

970:20 971:21 976:1,22 979:9 988:13 990:22 997:9 1000:8,20 1001:15 1004:12 1005:5 1006:24 1008:16 1018:23 1019:5 1027:8 1029:2
**right-hand** 1005:22
**risk** 769:16,22 815:3 847:6,11,13,13 855:1,5 ,13 869:11 870:4,6 871:12 879:13,14 882:4 887:24 888:6 914:5,7 927:1,4 933:12,12
**robert** 735:21 738:17 739:10 1012:5 1031:16 1034:4
**robinson** 736:10
**role** 882:10 991:19 1009:15
**room** 923:11,15
**roughly** 965:14
**round** 816:12,13 887:4,9 955:16
**rounded** 818:5 886:22
**rounding** 818:18
**rounds** 817:17
**row** 767:3 847:19 848:9 906:7 907:3
**rule** 951:11
**run** 753:12 757:13 758:6 770:21 808:19 811:13 812:4,6 814:23 827:9,12 850:1 852:1,10 859:18 891:7 894:8,8 956:21,24
**running** 902:9 808:12 819:16 897:21 901:2
**runs** 1004:9
**rushed** 923:11,15
**rx** 898:24

S

**sa** 862:4
**safe** 743:8
**safety** 932:23
**sake** 893:1
**sales** 735:4 738:9 1031:4
**sample** 750:8 824:1 855:13 873:9 888:3,12 915:21
**samples** 752:17
**sampling** 863:11
**san** 737:12
**sap** 861:7,8
**saris** 979:16,23 980:13 982:24 984:3 1024:11
**sas** 752:19 757:13 760:5 ,15,17 773:2 781:20

794:9 806:2 814:16 815:9,11 816:3 818:9 831:19 832:23 852:20 856:3,4 857:6,12,14 888:24 890:19 892:9 893:4,13,24 894:8,8 944:15,21 948:6 956:16 968:10 969:6,9
**sat** 750:18
**satisfied** 755:7
**satisfy** 773:15 796:24 799:2 804:9 896:7
**saved** 785:3 832:15
**saw** 831:15 880:13 933:5 945:9,10 947:11 948:19 964:15
**say** 744:15 747:15 754:21 759:24 769:11 776:19 778:11 780:2 784:11 787:18 795:7 800:20 824:12 837:15 842:12,16 849:9,14 852:14 854:4 858:22,24 863:20 865:8 866:12,14 868:6 871:20 879:19 899:17 903:10 911:20 ,21 913:6 915:19 916:24 921:18 925:5,20 928:3 ,13 930:18 931:24 936:11,11 937:17 942:7 ,8,9,12 945:12 955:23 956:23 963:15 971:2,16 979:22 980:8 1007:6 1008:10 1011:2 1018:19 1021:3,19 1026:11
**saying** 743:19,24 753:21 773:13 785:14,15 798:22 803:9 809:14 816:2 867:24 873:2,7,22 896:3 901:8 972:9 974:12 979:4 1001:12
**says** 748:4 753:16 756:13,22 767:11 768:21 775:11 792:8 803:22 805:1 816:5 839:17 847:20 860:19 ,20 879:7 884:24 886:1 895:14 902:1 903:12 936:18 954:1 959:18 965:19 970:10 976:22 977:19,21 978:9 979:16 980:6 981:2 989:14 996:19 998:11 1000:18 1005:22 1013:6,9 1014:11,14 1018:8
**sbir** 998:12
**scenarios** 905:6
**schiz** 756:15
**schizophrenia** 756:16

766:20 767:9,24 768:20 769:2 795:8
**scholarly** 958:1 991:3 998:7 999:1,7 1021:8
**scholarship** 960:21
**scholastically** 955:22
**scientific** 840:7 991:13 992:8 993:1 1016:10
**scientifically** 843:4 928:8
**screened** 811:19
**screening** 976:9 977:17 978:16 980:9,10,22 989:15 990:3
**screens** 973:23
**screwed** 830:23
**scroll** 803:21 804:19,24
**seal** 1033:2
**search** 741:19,24 773:15 777:21 778:2,3
**searches** 773:7 778:4,16
**seat** 841:5
**second** 746:22 749:23 758:24 770:9 778:21 798:24 803:13,16 804:21 805:12,14 813:22 815:6 819:1 849:14 851:14 853:6 854:17,18 857:23 864:10 866:6 884:22 886:6 901:7 912:7,8 933:4 957:10 964:1,2 977:14 978:14 988:8 1000:5 1004:9 1005:21 1027:16
**secondly** 802:20 852:8
**seconds** 799:7
**section** 997:22 1012:16
**security** 889:12
**seeing** 882:13 888:5 931:12
**seeking** 842:5
**seem** 751:9 832:1 891:18 973:13
**seemed** 845:4,6
**seems** 751:6 753:20 830:16
**seen** 804:11,13 870:6 927:3 944:2,2 968:12
**select** 749:9 808:13
**selection** 847:8,9
**send** 889:18 970:17 994:7
**sending** 825:9 837:23
**sense** 744:14 750:20 771:24 851:18 866:20 868:4 906:13 975:20 1015:10
**sensitivity** 742:2,6

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

811:11 825:4,13,16,19
,22,23 826:1,18,22
827:1,9,11 828:16 829:8
832:12 833:5,12,15,20
834:22 835:3 836:20,24
844:21 845:1,16,21
849:4 850:2,3,5,20
851:5,16 852:1,9,19
853:15 855:10 856:7
866:20 883:22 890:2
900:9,12 907:19 910:12
,17,19 911:20 915:2,19
916:3 923:22 927:9
928:9 931:9 932:16
933:16 943:5 950:12,22
951:6 953:9,20 955:18
956:1 957:1,9,10,17
958:2,8 959:6 969:11
981:17,21 982:3
1023:18 1027:4
**sent** 782:4 791:4 812:10
,12 813:8 827:12 828:15
829:6 833:23 834:13,18
,24 835:8,12 838:4
842:21 859:1,5,12
945:14 947:7 948:20
952:11 954:4 968:14,24
977:4 982:10,11
1029:16
**sentence** 849:14 872:8
**separate** 800:2,4 835:22
856:10,16 864:12 890:5
892:15 907:2 908:5
965:5
**separately** 745:11
917:22
**september** 965:21
972:16 974:22 975:2,12
976:2 987:13,14,22
988:22 990:19 1008:19
**sequential** 795:18,21,24
796:16,22
**series** 787:14 945:9
983:18
**served** 1022:11
**service** 990:23 992:9
998:7,24 999:5,9
1004:16 1005:4,24
1006:2,13 1009:22
1016:19 1021:7
**services** 738:3
**serving** 746:1
**session** 959:16
**set** 755:24 756:7,15,19
760:10 761:7 773:9,17
797:9,10 834:24 835:1
881:8 934:4 944:21
992:5 1000:22 1033:1
**sets** 891:21 899:9 953:7

954:2
**setting** 755:16
**seven** 751:4 948:10
993:14 1023:24
**several** 750:13 755:23
825:3 832:2,3 1003:3
1022:14
**severely** 847:9
**sex** 799:14 860:18,19,20
933:21
**shall** 780:2
**share** 1002:11
**shared** 850:8 1002:7
**shares** 1019:11
**sharing** 841:4,7 1019:16
,19
**she's** 968:21 1021:3
**sheet** 787:15 790:24
**shift** 772:7 1023:15
**shook** 737:2 839:3
**shorter** 915:10
**shorthand** 1032:6
1033:6
**shouldn't** 890:18 979:21
**show** 820:10 856:19,22
887:12 888:2 929:1
933:17 956:10 957:7
982:8 984:9 1016:15
**showed** 752:15 808:14
964:14 979:19 1024:11
**showing** 821:1 871:6
929:16
**shown** 887:3 948:13
**shows** 799:11 855:4
879:15 903:10 927:21
997:22
**side** 778:20 794:9,9
990:16
**significance** 817:6
872:18 874:16
**significant** 769:19 822:1
846:21 847:1 848:14
871:4,11,14 872:20
873:3 880:8 887:14,21
888:9,11 927:22 928:5
929:2,5 931:12 1000:8
,10,24 1006:4 1014:17
1015:5
**significantly** 847:14
848:4,14 887:24 927:4
**similar** 771:11 866:18
888:10 929:16,17
**simple** 749:8 809:1
820:2 873:24 875:9
876:23 877:5,12
**simply** 762:6 779:17
794:5,6 795:1 808:24
866:23 895:15 956:7
980:13

**simultaneously** 888:8
**single** 750:10 792:3
845:23 850:21 851:9
942:11 947:20 994:10
995:23
**sister** 957:24
**sit** 751:16 759:23 797:7
798:22 799:8 822:8
839:18 842:11
**sitting** 774:4 777:20
784:24 785:16,22
788:10 794:9 796:7
807:11 811:14 812:7,14
816:18 822:16 970:19
971:8
**situation** 876:6,12
**six** 787:19 791:19 861:4
863:21,22 869:6 902:18
903:7 904:19 905:16,16
,19 906:7 907:3,10,12
910:2,3 918:19,21 919:2
,5,21 975:19
**six-fold** 869:10
**six-month** 784:10
**size** 810:14 824:1 888:3
,12
**sizes** 781:23 831:13
**skipping** 828:21
**slide** 1024:22 1027:15
,16,20 1028:3,6
**slides** 1024:8,10,17,19
1028:14,19 1029:6,13
,15
**slight** 817:16
**slightly** 772:6
**slipped** 794:10
**slips** 984:8,11
**small** 772:1 855:12
**smaller** 863:12 876:14
**smith** 735:10 738:11
739:1
**smoking** 935:15
**so-called** 993:9
**soh** 736:20 739:3,3
**solicit** 1005:6 1013:10
**somebody** 866:12 867:7
868:7,17 910:14 915:5
921:24 1016:14 1026:11
**somehow** 912:1 955:14
985:2
**someone** 914:11 915:11
971:15 1005:14 1006:18
**someone's** 956:8,9
**something** 739:21
740:24 745:6 749:2,2
750:13 751:7 755:20
768:24 782:9,11 788:11
789:3,5,19 792:15 818:5
828:21 830:8 841:4

843:23 858:6 875:6
876:21 877:21 878:12
879:9 894:20 897:10
899:8 906:1 925:7
931:21 933:3 978:9
980:11 994:16 1008:6
1017:10 1020:20 1029:3
**sometime** 944:20
957:19 958:7 960:6
970:13 990:19
**somewhat** 822:24
896:14
**soon** 889:5 925:20 973:2
**sophisticated** 749:17
**sorry** 746:14,15 748:23
766:3 774:16 804:21
805:12 814:13,18 815:8
820:19 822:15 830:21
831:2,3 836:2,14 846:4
847:19 849:11 860:23
861:18 883:21 885:3
897:7 904:19 905:10
912:7 920:23 948:12
952:6 960:3 973:2
974:24 975:8 977:5,19
**sort** 795:23 835:9
876:15 883:4 890:12
964:23 984:9
**sorts** 851:12
**sound** 803:14
**sounded** 1026:10
**sounds** 809:15
**source** 1001:4
**sources** 950:7 1024:23
**space** 754:9
**span** 784:10
**speak** 924:6 932:17
**speaker** 1002:2
**speaks** 924:4 932:18
1014:20
**specific** 748:20 760:15
936:22 1007:4
**specifically** 745:4
786:11 810:8 827:4
852:9 927:10 1007:6
1010:6 1022:23 1023:11
1024:17
**specifications** 750:16
976:23 989:5,8,9,13
**specifics** 977:12
**specified** 1032:18
**specifying** 977:14
**speculation** 780:6 807:8
810:2 823:3 879:24
881:1 882:7 979:11
**speech** 842:19
**speed** 977:18,23 980:15
981:14 983:16 1022:3
**spend** 742:20 828:12

940:13 960:13 1002:2
**spending** 787:8
**spent** 743:6 744:21
787:9 930:7 960:9
983:22 1027:6
**spirit** 997:6
**spoke** 810:22
**spouse** 1006:5
**spreadsheet** 944:6,11
**sql** 749:10
**squares** 869:14,15,19
**ss** 1032:2
**stack** 837:4
**stage** 777:20 932:6
**stamp** 789:21
**stamps** 786:8
**stand** 838:7 926:12
1020:5
**standard** 749:10 821:12
874:15,24 875:9,18
990:24
**standing** 859:17
**stands** 1007:1
**star** 749:9 808:13 963:20
,21
**starred** 967:20
**start** 779:7 867:19
880:16 925:20 932:17
950:5 966:21 999:18
**started** 739:20 868:9
914:12,13 923:7
1007:12
**starting** 858:24 886:18
913:17,17 1004:8
**startup** 983:2
**state** 735:12 738:13
931:11,17 1032:1,5
**stated** 933:5 983:1,1
**statement** 755:6 760:19
844:2 849:10 925:1,3
930:12 988:12
**statements** 1013:11,15
,17
**states** 735:1 1031:1
**stating** 939:22
**statistical** 817:5 872:13
,17 874:2,15 875:24
882:24 943:10,15
947:10 949:1 976:23
978:15 989:5,6
**statistically** 769:19
847:1 848:14 872:20
873:3 887:13,21 888:9
,11 927:22 929:2,5
**statistician** 816:24
817:4
**statistics** 752:17 765:20
816:22 874:24 978:15
980:9 989:15,17

**status** 898:24
**stay** 839:18
**steering** 739:2
**stenographically**
1032:13
**step** 778:20 779:8
793:17 852:21 891:13
**steps** 779:10 793:15
991:1
**steven** 737:10
**stock** 1016:7 1020:8,11
,13,21
**stockholders** 1016:7
**stop** 994:18,20
**stopped** 868:8
**storage** 889:14
**straight** 820:3,4
**straightened** 836:17
**stream** 983:17
**street** 737:11
**strike** 774:24 776:12,14
783:8,22 795:22 832:21
853:14 880:20 917:5,5
926:17 945:18
**strip** 830:2
**stripped** 860:22
**stripping** 830:9
**strong** 983:14
**studies** 747:13,16
748:16 941:21 942:18
947:14,18,19,22 949:9
**study** 740:23 762:24
763:1,12,19 910:18
914:8,12 920:15 922:4,8
930:19 932:2 942:18
991:17 1002:6 1006:12
1016:9
**studying** 740:20
**stuff** 753:1 953:23
954:15,22 1015:10
**subanalysis** 823:13
**subject** 801:13 810:20
823:9 845:8,17 848:12
876:24 897:4 902:16
956:3 973:7 975:12
979:20 980:12
**subjects** 772:2 990:6
**submission** 944:1,8
948:3,4,6,18 949:5
991:24 992:1,2 1004:14
**submit** 961:6 1006:8,20
1017:1,9 1019:9,10
**submitted** 783:21 784:6
944:2,20 945:21 946:4
957:23 958:6 959:4,22
960:8 970:5 972:10
975:21 978:22 981:23
989:19 990:18 1005:23
1006:2 1014:15,16

1016:1 1019:5 1021:4,8
**submitting** 1016:12
**subpart** 998:12
**subscribe** 1031:10
**subscribed** 1031:20
**subsidiary** 809:3
**substantial** 895:6
941:18
**substantially** 771:17
919:23
**substantive** 791:5
**substantively** 791:11
**sufficient** 1011:19
1021:20
**sufficiently** 882:12
**suggest** 837:22 940:14
**suggestions** 950:20
**suggests** 769:17 880:2
,6,10 905:23 941:17
**suicide** 769:16,22
810:24 822:2 845:23
846:4,12,17,19 847:6,11
,11 849:16 850:12,13,17
,18,21,24 851:1,3,4,9,11
,17 852:12 853:18 854:1
,5,6,22 855:1,5,7,15,16
,23 861:9,11 862:4,11
,12 863:8,19,20,24
864:2,5,12,17,19,21
865:1,20,21,24 866:16
867:1,10 868:10,21
869:5,16,19 870:2,4,12
,18 872:6,15,16 877:15
,17 879:13,13 882:18
883:5 888:1 892:4 897:5
,7,8 898:5 899:1,10,12
,20,22,23 900:2,16
901:5 902:19 903:1
904:1,16,18,20 905:7,8
,9,10,16,17,18 906:6,9
,18 907:17,20,24 908:13
910:1,10,15,23 911:1,2
,9,12 912:13,15,18
913:19 914:5,20 915:21
,23 916:1,7,12,22 917:1
,18 919:9,15 920:7,8,9
,12,16,24 921:1,3,6,16
,17,19,20 922:1,5,10,13
,21 923:1,3,10,14,19
924:6,7,13 925:13
926:14,21 927:1,4,8,15
928:15 932:4 933:6,20
,21,23 935:14 943:13
990:4 1007:15,24
1008:7 1028:2
**suicides** 897:3 900:9
**suit** 955:2
**suite** 735:23 736:3
737:11

**sum** 964:6
**summary** 752:13,17
765:20 943:11 978:15
980:8 989:14,17 990:13
**superior** 735:12 738:13
**supermix** 852:6,16,20
,22 853:2,4,8,8,12
854:11,13,14,16 855:2
,18 856:2,11,15 859:4
884:23 885:6 891:15
893:10 894:4
**supplement** 958:19
**supplemental** 741:4
**supplied** 742:3,4,11
947:16,17
**support** 843:8 846:10
973:17 981:18 990:6
1008:8,14 1009:7
**supported** 983:4 999:6
**supports** 842:22 848:13
**supposed** 829:7 997:8
**sure** 740:11 745:8,17
746:23 751:18 757:11
758:10 764:13 768:20
770:10 775:24 776:8
777:6 780:11 788:13
789:6 791:18 810:12
811:19 819:13 827:16
831:16 832:14 841:18
856:5 857:15 871:6
874:5 878:19 881:3
889:3 891:18 894:9
906:14 910:21 937:16
941:1 964:3 969:22
984:4 989:23 998:9,20
1007:18 1008:17,17
1017:14 1020:16
1026:11 1028:13,16
1029:4
**surely** 889:20
**surgery** 895:1
**survival-type** 863:14
**suspect** 804:10 934:10
**switch** 987:5
**sworn** 739:9,12 1031:20
1032:10
**symbols** 952:17
**synonyms** 855:4
**syntax** 757:12 760:15
**systematic** 1001:6

**T**

**table** 761:9 762:3,19
763:3 764:3,10,10,12,12
765:2,19,21 766:5,7,8,9
,10,12,13,15,16,17,18
767:3,4 769:8,9,13,21
771:2 775:2 776:15
813:15 814:20 816:16

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

,17 818:3 844:19,22
845:2 846:9 847:19,20
848:7,9 859:20 868:14
870:8 871:24 873:13,15
876:18 877:5 895:12
896:10 897:4 908:2
922:16,18 971:8
1017:22
**tables** 752:13 776:21
809:3,18 818:14 834:19
873:21 897:15 990:13
**tacks** 741:10
**taken** 817:22 867:17
890:23 1015:21 1032:17
**taking** 768:11 815:22
842:7 847:14,15 867:16
868:7,8,9 869:12 873:24
876:19 914:21 919:10
,15 929:9
**talk** 752:24 759:22 769:8
812:3 842:10 883:18
893:2 899:5 961:19
972:18,22 1012:8,14
1021:19
**talked** 778:23 808:12
822:6 853:5 880:13
881:5,10 899:9 930:6
935:17 938:7,24 944:4,7
949:12 954:17 970:1,4
1008:5
**talking** 747:12 753:4,6
764:10 766:16 812:14
,19 836:20 837:9 859:5
865:9,10 878:12,20
888:24 897:8 919:2
924:16,22,23,24 930:7
936:5 948:5 950:13
988:7 1007:18 1008:18
,20 1023:2 1027:6
**talks** 922:18 958:18
970:14 1015:18
**tall** 915:9
**tape** 790:4,13 844:12,17
878:4,9 929:23 930:4
987:6,10
**tapes** 790:3 987:5
**tasks** 787:14
**tease** 883:12 926:8
**teasing** 932:11
**technically** 747:16
**teeth** 825:8
**telephonically** 737:15
**tell** 744:12 758:20
759:24 802:18 816:19
835:24 841:16,17
843:13,17,19 856:8
859:10 862:14 892:21
,21 898:7,10,14 900:18
925:19 934:15 943:16

953:17 954:1 964:21
966:8 968:15,18,23
969:3 970:20 977:10
979:15,16,23 982:23
984:1,3 985:19 1006:9
1007:7,7 1009:21
1024:7,18,21
**telling** 843:15 966:15
973:24 977:5 985:2,5,6
1011:3 1016:10
**tells** 841:1,22
**tend** 811:8 875:17
**tendered** 746:20 764:22
938:18 959:12
**tenets** 840:21
**term** 780:3 796:16 845:8
852:18 862:17 877:18
936:18 937:3,11,19
938:1 942:17
**terminate** 1025:19
**terms** 848:6 853:23
868:10 869:23 872:18
876:22 930:19 935:8
992:24
**test** 874:16 939:7 941:11
,15,19
**testified** 739:12 912:10
980:21 981:11 982:9
**testify** 984:20 1032:10
**testifying** 838:16
**testimony** 911:4,6
912:23 930:22 974:5
976:1 978:11 980:2
988:3,18 1002:18
1006:16 1009:1 1010:3
1011:12 1013:16
1022:19 1032:16
**testing** 872:19 887:17
943:17
**texas** 736:4,18
**text** 779:17 784:18
785:19 789:23 797:20
798:2,12 801:12 802:22
830:5 884:20
**thank** 739:17 764:24
774:17 814:1 828:10
829:18 835:19 836:6
859:23 884:5 945:13
960:14 1030:7
**thanks** 895:9
**that's** 747:9 748:3,4,10
,13 749:10,16,19 750:3
752:1,4 753:21 754:2,3
,16,18,24 755:10,14,22
756:5,10,12,17,20 757:1
,5,11,20,22,23 760:22
766:11 770:1,20 772:14
773:6,13,16 774:14
776:23 779:6 780:22

782:24 784:1,4,10 785:4
,4 787:16 791:9 793:13
796:2 799:1,10,18
800:17 801:2,16,17
802:11 803:10 804:2
805:2,4 806:5 808:16
810:5 811:1,1,10 813:17
814:14 817:20 821:18
,20 826:14 827:20
830:21 831:1,1 836:4
841:3 842:16 843:12,16
844:24 849:22 854:10
858:21 859:15,19
860:20,21 861:14 862:1
865:13 868:1 869:13
872:24 875:1,15 876:19
877:15 879:8,9 882:9
883:2,10 885:1,13,15
886:10,21 887:5,15,15
,20 888:8 890:4 892:20
893:12,12,13 894:20
895:24 896:9,11,13
897:23 898:23,24 900:8
902:7,9 903:6,21 905:2
906:3,11,16 907:14
908:7 909:15,15 910:11
,12 916:3,8,15,17
919:19 922:3 924:16,16
929:12,13 930:14 932:6
,8 933:17 934:20 936:18
,22 937:8 938:16 941:5
,8 942:4,5 944:14
948:16 949:20 952:7
953:24 954:21 957:2,3
,14 958:4,10,20,24
959:8 962:18 963:7,14
,18 964:17 968:3,12,14
969:13,18 972:13
974:17 975:3,5 976:21
979:7 980:19 981:1,24
982:23 983:10 984:1,1,2
985:4,6 986:2,18 987:2
,17 993:15 994:16
999:11 1001:15 1008:6
1011:6 1013:22 1016:17
1017:6,20,21 1020:2
1025:7 1030:4
**themselves** 738:19
**theoretically** 809:14
**therapy** 869:4 909:4,16
,18
**there's** 748:4,10 749:24
753:16 762:16 766:21
767:1 774:19 778:9,13
782:23 802:11 839:12
843:1,22 846:1 851:8
857:4 858:8 860:20
861:6 862:19 870:1
872:11 873:7 878:2

879:1 882:23 894:6,9
895:6 920:21 922:9
926:1 929:11 935:14
940:12 942:16 953:16
,22 957:6 959:18 965:19
973:21,24 974:8 980:18
983:13 984:20 990:23
1000:15 1004:20,21
1005:1 1007:4 1009:19
1012:23 1013:24,24
1015:15,18
**thereafter** 1032:14
**therefore** 919:21
**thing** 780:15 808:5
810:6 830:10 841:2
844:5 866:11 875:13
877:3 888:22 901:12
910:13 912:1,22 914:3
930:18 946:22 955:14
981:1 984:9
**things** 740:17,21 743:5
757:13 773:8 774:20
787:1,2,16 791:12,15,16
800:21,23 812:10 819:2
,18 830:15 831:1 851:13
,19 868:4 874:12 875:1
877:22 881:7 890:12
893:1,1 902:8 910:8
954:23 956:10 973:20
990:8,9 1002:3 1011:16
1022:13
**think** 740:16,20 743:7,19
744:11 746:6 763:23
765:6 771:13 772:18
775:15 778:23 779:20
789:17 791:11 800:17
803:1 809:23 810:10,13
812:5 813:12 816:23,23
826:8,24 827:10 835:2
839:17 844:5 851:7
855:2 856:16 860:21
866:11 874:7 875:19
877:2,14 880:13 881:15
882:9,10,11 889:9
890:19 900:19 901:15
910:12 914:2 916:6,8
917:4 923:19,21 925:15
,16 928:23 930:12,24
931:8,10 932:14,16,17
933:16 935:7,12 938:6
940:22 944:6 946:24
947:13 949:21 951:2
954:7,11,13 955:1
956:14,14,18 958:15,20
963:12,13 967:8 980:5
982:20 993:10 996:1
997:1 999:12 1004:7
1013:2 1018:19 1020:14
,15 1021:1,1,14 1022:4

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)                    Page 29

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

,5 1025:20 1028:12
1029:3 1030:4
**thinking** 961:1 973:18
**third** 803:20 851:16
854:18,20 864:10 886:6
902:4 905:7 1027:23
**though** 766:21 871:23
872:24 876:17 886:18
957:16 974:11 979:16
,18 1029:8
**thought** 834:12 885:1
912:21 972:20 973:3
995:6
**thousand** 805:15 848:7
,10,11 872:16,17
**thousands** 792:21
**three** 747:6,18,18,19
749:21 753:10,22 773:4
786:22 791:16 792:20
,23 800:23 834:14,14
835:9 848:9,22 850:19
851:7,8 854:15 857:8
867:8,9 891:16,21
892:12,14,15 893:12,15
894:3 903:7 953:7 954:2
1027:12
**throw** 915:20,22
**throwing** 851:16
**tighten** 772:3
**tighter** 772:8 876:11
**time** 738:4,18 741:18
743:6 744:21 746:5
747:6 751:21 759:12
777:24 778:23 781:8
786:8,9 787:5,8,12,15
789:21 800:5 809:24
811:22 819:12 825:24
828:13 832:1,2 842:20
864:7,17,20,23 866:24
874:9 880:11 882:20
883:5,9 885:11 891:4
894:7 897:18 899:2,3,10
,19 903:11 906:10 911:8
912:9 914:10 915:13
916:18 929:9,11 930:7
933:24 937:6,18 938:24
939:10 940:12,14
942:20 944:4,7 947:8,23
952:13 957:7 960:9
966:2,8,8,13,13 967:16
,17 969:15 974:1,21
980:19,22 983:11,22,23
984:8,11 985:8 990:1
991:15 995:3,3 996:2
1002:2 1005:23 1008:16
1014:15 1023:2 1029:23
1031:9 1032:18
**times** 744:12 784:15
808:14 822:8,16 824:21

831:12 832:3 847:5
855:7 869:6 936:16
946:2 956:18
**tired** 894:24
**titled** 740:11
**today** 738:3 741:5,6,11
889:11 940:10 950:13
**today's** 894:21
**together** 812:9,15
832:10 833:5 960:9
**told** 744:1,9,15 752:12
760:17 786:22 838:3
842:20 941:2 949:11
973:21 977:11 984:2
993:15 995:11 1010:15
1014:1
**tom** 961:14
**tomorrow** 895:5
**tonight** 889:21 894:24
895:4
**took** 753:9 845:9 847:21
848:1 865:4,7,14 867:16
869:12 892:11 894:3
909:3 916:13 917:7,13
919:18 923:1 929:8
940:5 968:6 980:18
993:14 1029:8
**top** 740:19 785:5 800:9
801:6 816:11 958:18
**topic** 1024:13
**topiramate** 872:23 873:1
1027:18
**total** 742:23 826:10
883:6 904:19 946:13
987:23
**totally** 859:14 875:8
877:13 897:23 916:9
1016:11 1022:5
**tough** 942:5
**toward** 969:14 974:21
**track** 787:5,18,20 892:8
**train** 943:18,20
**training** 997:4,4 1004:20
1005:2
**transcript** 790:18 1031:8
,12 1032:13
**transcripts** 790:22
**transmittal** 828:14
856:13,15 959:3
**transmitted** 968:11
**treat** 850:10
**treated** 848:15 907:17
910:2 913:21 921:3,7
**treating** 885:10 922:23
**treatment** 848:17,19,23
869:19 882:21 883:7,8
900:4 905:18 906:17
907:23 908:14 911:17
,18 912:5 915:24 916:1

917:20 922:8,22,24
936:9
**treatments** 907:3
**tremendous** 740:20
**trial** 921:24 922:7
**tried** 905:11,13,14
912:13
**triweekly** 859:2
**true** 754:15 755:2,7
757:4,14,19 758:4
760:22 761:4 763:11
764:4 796:24 827:20
871:1,2,21 872:22
887:15 906:16 910:8
958:5 960:23 974:3
976:24 977:1 982:12,13
999:7 1009:16,17,19,20
1015:6 1018:20 1029:18
1031:11 1032:15
**truth** 985:2 1032:10
**try** 742:20 744:13 849:5
857:19 883:12 906:13
,23 928:8 929:14
**trying** 785:15 852:17
858:7 888:24 907:5
915:4 922:20 925:24
926:8 955:5 957:3
972:24 984:13,18,19
1006:22 1007:17
1022:17 1025:24 1026:1
,3
**turn** 893:16
**turned** 892:11
**turns** 761:6 877:3
**two-week** 787:10
**twos** 836:9
**txt** 830:1 884:21
**type** 799:18
**typed** 1009:13
**typewriting** 1032:14
**typical** 881:12

U

**u.s** 1003:5 1009:11
1011:17
**uh-huh** 1014:13
**ultimately** 782:5 847:4
849:18 850:7 869:4
870:3 872:7 891:15
893:10 912:5 924:15
1021:15
**unbiased** 1016:9
**uncertainties** 811:5
**uncertainty** 772:4 876:8
**unclear** 907:1
**uncomfortable** 841:7
**uncommon** 1017:13
**undercuts** 742:21 744:4
**understand** 765:15

792:6 801:21 802:13
808:10 840:15 849:5
852:17 859:4,14 881:19
894:22 897:15 902:16
903:12 907:5 910:21
941:2 947:1 955:6,13,18
971:4 989:4 995:8 996:7
,7 999:12 1007:18
1011:5,22 1012:2
1013:1 1015:1 1022:19
**understanding** 761:16
789:2 891:4,8 935:20
936:4 940:10 998:20
1001:18
**understood** 801:14
**undertake** 741:23
**undertaking** 949:11
**undertook** 1001:7
**undue** 811:9
**unequivocal** 931:3
**unexpected** 896:13
**unfortunately** 860:3
952:9 1020:18
**uniformly** 869:17
**united** 735:1 1031:1
**university** 745:10,23
830:4 890:11 971:5
992:23 998:3,4,23
999:15,16 1002:11,23
1004:13 1005:4,6,13
1006:7,8,9,19 1007:8
1009:22 1010:6,8,11
1011:4,8,14,23 1012:3,4
1013:16 1015:4,22
1017:13,15 1019:11,14
1021:6 1022:10,17
1026:24
**university's** 1019:12
**unless** 788:10 800:19
974:19
**unmarked** 918:4
**unreasonable** 909:24
925:16
**until** 770:13,21 779:3
790:7 827:24 844:15
858:3 878:7 888:17
930:2 931:16 948:24
951:17 957:18 987:9
990:18,19
**unzip** 830:3
**unzips** 830:11
**update** 741:12 1017:23
**updated** 813:9 834:20
1018:9 1019:6
**upon** 749:22 750:20
765:9 769:9,13 783:24
794:5,6 795:1 805:21
812:4 813:11 898:13
913:16 941:24 967:24

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**upper** 818:22 887:6
1005:22
**us** 781:17 782:5 806:16
813:8 829:7 843:13
855:22 858:7 892:21,21
945:6,7,14 949:11
953:17 956:16,17 961:7
968:14 984:16 1007:7,7
1014:1
**use** 741:14 759:6 760:20
773:22 776:5 800:13
801:1 803:3,8 815:2
818:2 850:20 855:17
863:1 865:5 876:21
897:21 900:22 914:4
922:10 926:13 927:23
928:23 929:3 934:12
935:3 937:2 1000:15
1012:22 1013:19
**used** 742:14 747:7,20
751:3 779:12 780:21
781:19 795:18 796:19
801:22 803:6 822:9
853:9 863:3 890:21
891:7,10,20 892:14
908:1 935:9,10,19 936:3
,6 937:11,19,24 946:13
947:1,8,10 988:16
1017:16 1029:14
**useful** 945:19
**uses** 777:8
**using** 818:21 845:22
850:9 852:20 853:3
855:4 874:24 876:18
892:4 925:21 926:1
928:21,22,24 946:16,18
947:17 949:4,21 980:16
**usual** 876:15
**usually** 742:20 744:4
787:7,9,13

---

**V**

**va** 889:11,11
**valid** 773:20 774:2 777:6
778:3 806:7,20 810:12
916:3
**validate** 778:11 984:22
985:1
**validity** 811:12,16 812:3
,6
**value** 821:21 822:3
868:15 870:21,22,23
871:13,19 886:13,14
887:16
**values** 887:16
**variability** 876:5,9
**variable** 860:6,6 862:19
881:22
**variety** 933:1 973:20

990:10
**various** 748:16 753:12
762:9 765:3,3 819:17
831:13 848:24 860:6
**varying** 864:23 874:9
885:11
**vector** 862:16
**verbal** 742:18
**verification** 784:5
807:21
**verified** 779:2 810:21
**verify** 751:16 759:11
760:14,16,20,21 772:20
775:9 785:1,16 798:13
799:8 802:23 879:6
897:16,18 898:18
901:22
**verifying** 832:13
**veritext** 737:19 738:2
**version** 779:17 813:9
840:22
**versus** 738:10,11,15
762:17 836:24 837:1
845:9 846:1,23 848:20
849:22 850:15,16 851:3
,21 852:1,8,10,11
868:15 869:1 870:9
871:15 876:18 877:6,19
**vertical** 862:7
**videographer** 738:1
770:11,14 790:4,12
827:22 828:1 844:12,16
858:1,4 878:4,8 888:15
,18 929:23 930:3 951:15
,22 987:6,10 1030:8
**videotaped** 735:21
737:18
**view** 840:4 841:3 907:22
911:7 915:20 941:15,16
**violating** 995:5
**virtually** 859:1
**visit** 993:5
**visits** 960:14
**volume** 735:22 738:18
**vs** 735:8,10,16

---

**W**

**wacker** 735:23 738:7
**wait** 758:11 766:1 834:5
924:19 926:15 935:22
994:17 1012:21 1023:1
,1,1,1
**waiting** 889:4
**wake** 916:23
**want** 739:20 740:10
763:13 774:12,20
782:22 800:1,3 810:17
819:10 827:15 840:6
842:3 844:11 846:2

857:20 858:6,14 878:1
,11 879:4 890:22 892:6
,18,20,22 893:2,8,9
895:23 897:19 908:17
,21 913:12 925:8 927:18
936:17 937:16 939:2
940:3 941:1 952:2 955:4
,13 961:18 962:6 966:21
968:15 970:18 973:4
1007:17 1008:17 1012:8
**wanted** 745:7 751:14
759:12 798:13,22 799:2
827:15 834:15 835:6
898:2 951:5 1008:17
**wants** 843:6 955:1 973:4
**wash** 811:9
**washout** 922:6
**wasn't** 818:7 859:12
881:22 940:10 946:12
948:24 955:15,24
957:14 1028:15
**wasting** 996:1,2
**wave** 953:22,22
**waves** 835:9 953:21
**ways** 786:23 990:10
**we'll** 748:12 903:9
**we're** 753:6
**we've** 927:3
**week** 787:10
**weekend** 895:5
**weeks** 787:13 813:8
825:3 867:8,9
**weight** 887:17,19
**weights** 886:4,5,16
**welcome** 954:22
**well** 747:15 750:22
757:17 758:2,7,23
759:14 764:5 765:24
766:7 767:8,21 769:14
771:2 773:21 775:24
776:4 778:2 782:8 785:9
,23 786:15 787:17
788:22 789:9,12,15
792:13 798:19 800:12
802:8 805:23 807:6
808:17 810:1 817:3,7
818:9,13,18 819:4
822:23 824:20 825:5
826:3,5,9 827:15,20
829:9 830:9 831:19
834:10 835:7,21 837:19
838:12 839:9 840:10
842:18 843:20 845:4
850:5 853:14 854:15
856:6,9 865:16 866:7
867:12 872:10 873:18
874:20,22 875:3 878:2
880:2 885:24 886:12
891:11 892:7 900:21

901:21 905:22 906:16
,21 908:11,23 911:3
912:24 913:10 915:19
917:5,6 922:24 924:19
,22 925:4,6 930:11
935:20 939:18,21 940:4
,17 941:5 942:4,8
945:22 951:5 953:13
958:15 960:12 961:18
,20 962:14 965:17
966:11 968:12,24
969:11 971:1,15 974:4
975:5 977:7,19 978:1
980:5 981:20 983:8,10
,13 984:23 985:6 988:2
,6,17 989:3 992:10
993:4,6 994:6,9 995:6
996:5 998:9 1009:13
1012:2,8,18 1016:22
1017:20,21 1019:19
1022:21 1025:7,21,24
**went** 742:21 752:12
786:11 791:16 792:5
799:6 811:18 833:4,24
848:21 869:9 874:6
891:6,15 893:10 912:12
917:2 953:20 957:18
966:1 968:8 980:7
992:18 999:13 1011:10
**weren't** 752:18 791:10
856:2 981:20,22
**west** 735:23 736:17
738:7
**what's** 739:22 742:10
746:14,17 747:23 761:4
764:19 775:19,22
781:15 782:14,21,23
783:1 813:7 828:9
835:11 859:8,10 876:10
902:20 936:23 952:3
953:5 960:5 962:19
970:8 973:7 982:20
**whatever** 744:6 841:1
870:9,15 903:10 937:3
,12 949:5 955:4 959:5
966:19 1019:19
**whatsoever** 927:2
991:19
**whereof** 1033:1
**whereupon** 739:8 740:3
746:8,19 747:1 764:21
770:12 774:7 781:3,9
790:6,8 813:1 814:3
827:23 828:3 829:1,14
835:15 844:14 858:2
878:6 884:1,14 888:16
896:19 918:5 930:1
938:17 951:16,18
959:11 987:8 996:10

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

**997**:17 **999**:21 **1004**:1
**1026**:15 **1030**:10
**wherever** 1016:3
**whether** 757:11,14
759:24 760:6 776:13,24
777:21 778:12,16 795:1
808:5 812:8,9 818:23
833:6 843:6 845:16
849:5 850:2 853:16,22
,24 855:14,22 864:4
865:17,18 866:23
872:19 887:17 891:22
,23 895:4 899:1 909:3
914:16 915:4 918:19,20
924:4,7 925:1,24 926:3
936:22 958:12 968:14
971:19,22 972:5 974:13
984:20 998:23 999:13
,14 1000:23 1001:19,20
1002:4,6 1003:7
1005:17 1007:8 1010:7
,14 1019:18 1021:6
1022:18
**whispered** 768:13
**white** 825:10
**whoever** 1019:16
**whole** 877:2 908:22
914:15 925:23 990:9
1004:10 1008:15
1028:18 1032:10
**whom** 960:13 1021:7
**why** 745:2 766:11
780:22 785:4 788:3
789:20,23 803:12
806:18 816:16,19
817:11 824:12 845:1
850:1 851:24 852:21
856:6 866:23 877:23
878:19,24 883:10 907:1
908:7 912:17,19 913:20
916:16 929:13 950:22
951:1 953:24 958:20
1025:8 1026:5
**wide** 740:17
**widely** 936:3
**will** 738:18 744:12,13
745:21 747:24 748:12
749:8,19 750:4 757:23
766:15 767:6 768:4
778:11 786:1 789:3
796:20 797:8,9,12 800:6
804:8 812:16,17 819:24
825:18 827:6 828:22
830:6 831:7 835:24
838:6 839:21 841:23
842:4,6,17 843:17,19,22
845:13 850:7 856:18,23
858:12 859:21 874:13
,16,19,21 883:4 884:12

**885**:18 **889**:3 **891**:12
892:6 894:19 897:17,20
900:18,18 922:7 925:19
,19,20 926:17 932:14
943:8,20 949:22,23
950:4 953:24 954:7,11
955:6,24 956:10,18,20
957:7 959:17 962:4
969:21 972:22 979:24
984:1,2,4 985:11 994:4
997:13,24 998:16
1007:8,10 1008:7
1017:20 1018:18
1021:15,15,16,19
1022:7 1026:6
**wind** 819:5 827:6
**window** 914:10 923:6
**winzip** 830:13
**wish** 912:23 943:8
**withdrawing** 768:6,8
**withheld** 842:15
**withhold** 995:15,17
**within** 755:16 762:19
776:15 777:12 808:14
827:13 853:24 876:24
895:12 923:6 937:19
990:23
**without** 740:19 747:9
771:12 792:6 800:16
825:9 885:21 907:4,4
966:4 984:19
**witness** 738:17 739:8,11
740:7 746:2,20 751:1
755:5 757:10 758:9,14
759:7 760:3 761:3,15
762:14 764:8,22,23
765:14 766:4 768:17
769:5 770:5 771:1,23
776:6 777:19 778:8
783:15 784:16 786:17
789:1,14 795:5,17
797:17 806:1,12 807:9
,16 808:9 809:5,13
810:7 819:2,7,19 820:9
821:15 822:13 823:5,21
826:7 833:19 834:7
836:4 838:16 839:15
840:17 846:14 852:4
853:1 861:1 862:22
867:5 880:1 881:2,21
882:8 885:19 892:19
893:5 899:16 900:1
902:23 905:1,21 906:20
909:11,21 910:6 911:5
914:1 918:15 919:1,8
920:4 921:14 924:2
927:19 928:19 930:23
933:15 934:7,23 936:1
,20 938:18 942:3 945:1

**946**:1 **947**:5 **948**:11,22
949:14 951:4 953:14
954:3,8 956:13 959:12
960:7 967:7 968:17,21
972:2,24 974:6,16 976:7
978:5,13 980:4 981:10
982:19 985:5,15 986:23
988:20 989:22 991:9
993:14,15 995:11,13
997:15 1000:16,17
1001:10 1002:13,22
1004:19 1005:11
1006:11 1009:3,10,15
1010:5,19 1011:13,17
1012:1,23 1013:20,21
1014:4,22,23 1015:8
1017:7 1018:2,13
1020:1 1021:13 1022:11
,22 1024:16 1026:5
1029:21 1032:9,10
1033:1 1034:3
**witnesses** 1003:5
**won't** 843:12 965:18
994:24
**wondered** 815:19
**word** 763:22 852:16
925:21 926:1 928:21,22
,23 929:1 943:20,21
**words** 791:6,9
**work** 742:8,9,13 743:1,4
,8,17,21 744:10,19
745:2,8,13 754:13
786:10,12,24 787:20,23
810:11 825:12,15,19
832:22 833:14 889:22
890:4 928:7 932:20
939:5 943:15 957:11
963:16 964:9,22 966:22
967:3 970:11 971:11,13
,17 973:17 975:13
976:13 977:22 981:16
982:22 983:5 984:9
985:20 987:15,15,21
991:12 997:8 1001:24
1002:14,24 1003:4
1006:11 1008:4 1010:10
1011:9,15,17 1015:22
1017:3,11 1019:15,20
1024:14 1027:17
1029:17
**worked** 743:7 805:20
811:18 833:3,4,12,21
894:11 965:15
**working** 744:22 745:12
787:9 832:6 962:23
976:11 977:18 981:7,13
982:12 990:17 1010:12
1029:23
**works** 803:15 963:13

**world** 816:21 985:21
**worry** 836:21
**worse** 823:16
**worth** 744:9
**wouldn't** 745:24 751:15
,19 761:1 762:23 763:11
793:24 798:15 799:7
841:5 845:12 898:17
931:17 941:15 948:23
,23 958:23 959:2 960:10
966:11
**wreck** 943:18,20
**write** 744:14 751:23
819:2,4 966:12,15
**writing** 752:14 979:5
1016:6
**written** 1004:13 1005:1
1015:16
**wrong** 746:15 842:13
843:13 885:2 911:15
921:19 928:16
**wrote** 791:21 893:15,22
942:21
**wyeth** 1009:10

---

X

**xanax** 881:10 935:18,18
936:3,5

---

Y

**yeah** 786:18 808:2
833:20 834:8 847:18,18
867:6 879:4 942:8 946:2
953:19 968:21 975:10
977:21 998:2 1025:12
1028:16 1029:10,12
**year** 742:22,23 743:7
744:7 851:15 853:20
855:6,8 860:20,21,22
861:2,3,4,9,10 913:16
921:18 922:11,17,20
933:22 953:23 954:1
957:20 1020:17
**year's** 865:24
**years** 783:18,19 799:12
834:4 835:6,7 848:7,10
,11,20,20 861:2 872:16
,17 895:17,21 999:6
1003:3 1007:23 1022:14
**yes** 740:8 741:16 748:9
749:12,15 752:7 753:20
755:7,11,18 759:13
764:16 767:20 768:23
774:14,16 775:20
777:10 782:1 783:6
790:20 791:24 792:1,16
,18 793:2 794:20 797:24
799:13,23 801:8 813:17
,20,24 814:11 818:15

819:20,23 820:17 825:2
,17 826:20 829:10,23
830:19 832:5 849:21,24
864:22 872:12 877:9
884:10 885:7 887:2
896:5 898:9,12,16 901:8
902:24 904:12 918:2
924:3 929:21 937:7,24
942:12 943:6 944:5,9
945:16 952:22 953:4
956:5 959:21 960:1
963:18 964:12,19 967:2
,22 969:23 975:8 976:8
977:22 986:5,11,15
987:19 994:2 997:15
1009:5 1013:7 1018:7
1019:4 1023:14 1025:4
1027:22
**yet** 831:5 949:11 1025:1
**york** 736:11
**you'll** 748:3
**you're** 755:15 817:7
892:17 1007:18 1022:5
**you've** 925:17
**yourself** 750:18 751:14
,16 752:9 775:9 796:24
804:9 895:7 896:7 943:7
998:8,24

Z

**zero** 863:18 887:20
995:24
**zeros** 863:21
**zillions** 1015:24
**zip** 829:24 830:7,13,15
831:14 856:20
**zoom** 820:14