EXHIBIT 1D

1079

1    IN THE UNITED STATES DISTRICT COURT.    DISTRICT OF MASSA:

2

3    IN RE: NEURONTIN         ) MARKETING SALES PRACTICES  )

4    & PRODUCTS LIABILITY     ) LITIGATION             )

5                            ) MDL DOCKET BULGER vs. PFIZER, et al,  ) No. 1629

6    07-11426-PBS        )              )

7    SMITH vs. PFIZER, et al.,  ) MDL DOCKET 05-CV-11515-PBS       ) No. 04-1

8

9

10              VOLUME IV

11    The videotaped deposition of ROBERT D.

12    GIBBONS, Ph.D., called by the Plaintiffs for

13    examination, pursuant to stipulation, and pursuant

14    to the Rules of Civil Procedure for the United

15    States District Courts, taken before Sandra L.

16    Rocca, CSR, CRR and Notary Public in and for the

17    County of DuPage, and State of Illinois, at 6638

18    South Cicero Avenue, Chicago, Illinois, on the 27th

19    day of April, 2009, at the hour of 10:49 a.m.

20

21

22

23

24    Job No: 199412

1080

1    APPEARANCES:

2        FINKELSTEIN & PARTNERS

3        By:  MR. KEITH L. ALTMAN          463 Robinson Avenue

4        Newburgh, NY 12550      (516) 456-5885/Fax: (951) 303-1222

5        kaltman@lawampmmt.com

6        -and-

7    MR. JACK LONDON        3701 Bee Cave, Suite 200

8    Austin, TX 78746       (512) 478-5858

9    jlondon@texas.net

10        appeared on behalf of the        Plaintiffs;

11

12    SHOOK, HARDY & BACON, L.L.P.      By:  MS. LORI CONNORS McGROI

13    2555 Grand Boulevard     Kansas City, MO  64108-2613

14    (816) 474-6550/Fax: (816) 421-5547      lmcgroder@shb.com

15        -and-

16    SKADDEN ARPS SLATE MEAGHER & FLOM LLP

17    By: MR. STEVEN F. NAPOLITANO      Four Times Square

18    New York, NY 10036-6522        (212) 735-3000/Fax: (212) 735-2000

19    Snapolit@skadden.com

20        appeared on behalf of the        Defendants.

21    Also Present:

22    Mr. James Pierdzioch, Videographer

23

24

1081

1        (Document marked as Defendants' Exhibit

2        Number 1 for identification.)

3        VIDEOGRAPHER:  My name is James

4    Pierdzioch of Veritext.  The date today is

5    April 27th, 2009 and the time is approximately

6    10:49 a.m.  This deposition is being held at the

7    Renaissance Inn in Chicago, Illinois.  The caption

8    of this case is Neurontin Marketing and Sales

9    Practices v Pfizer Incorporated.  The name of the

10    witness is Dr. Robert Gibbons.  At this time the

11    attorneys will please identify themselves for the

12    record.

13        MR. ALTMAN:  Keith Altman on behalf of

14    the Plaintiffs products liability steering

15    committee.

16        MR. LONDON:  Jack London, Plaintiffs

17    products liability steering committee.

18        MS. McGRODER:  Lore McGroder on behalf of

19    the Pfizer Defendants.

20        MR. NAPOLITANO:  Steven Napolitano on

21    behalf the Pfizer Defendants.

22        VIDEOGRAPHER:  The witness may now be

23    administered the oath by Sandi Rocca.

24        (Witness sworn.)

1082

1        MS. McGRODER:  Before we start, I'd like

2    to make a statement on the record.  As you know,

3    gentlemen, we are here to produce Dr. Gibbons for

4    Plaintiffs' fourth opportunity to depose him based

5    on an agreement between the parties and we are here

6    only pursuant to that agreement which is summarized

7    in what is marked as Defendants Exhibit Number 1 to

8    Dr. Gibbons' deposition, a correspondence dated

9    April 13, 2009, which states specifically,

10    "Dr. Gibbons is available for deposition" -- let me

11    back up.

12        Among other parts of the agreement, this

13    statement refers specifically to this deposition

14    day.  "Dr. Gibbons is available for deposition on

15    Thursday, April 23 or Monday April 27 subject to

16    our agreement of April 16 specifically limiting the

17    areas of inquiry to the new language in his

18    supplemental expert report dated March 19, 2009,

19    appearing in paragraphs 18 through 20 and Tables

20    2A, 2B, 2C, Tables 3, 3A, 3B and 3C.  As per our

21    conversations, although we will not set an

22    arbitrary time limit, our expectation is that this

23    will not be a full day deposition."

24        Continuing with the respect to the

1083

1 relevant portions, "If this letter does not set
2 forth a correct and complete understanding of our
3 verbal agreement, please contact me as soon as
4 possible as our production of Dr. Gibbons for
5 deposition and production of the documents listed
6 in this letter is premised on the agreement as set
7 forth herein."
8         Defendants have not heard from
9 Plaintiffs' counsel at any time prior this morning
10 that this did not -- this correspondence did not
11 accurately and fairly summarize the parties'
12 agreement.  And so Defendants are happy to produce
13 Dr. Gibbons this morning with respect to that
14 substantive limitation.  And to the extent that
15 questions are asked outside the scope of that
16 limitation, please be advised that we will
17 terminate the deposition and call the Magistrate.
18         MR. ALTMAN:  I'll also add for the record
19 that certain materials which were promised to be
20 produced were not, in fact, produced.  As of this
21 point in time I believe that will be remedied, but
22 it has not been remedied as of this point and
23 specifically the checks to Dr. Hur.
24         MS. McGRODER:  I have those.

1084

1         MR. ALTMAN:  Well, we didn't talk -- we
2 didn't talk about that.
3         MS. McGRODER:  Would you like those now?
4         MR. ALTMAN:  No, we'll get them on a
5 break.
6         MS. McGRODER:  Okay.
7         ROBERT D. GIBBONS, Ph.D.,
8 having been first duly sworn, was examined and
9 testified as follows:
10         EXAMINATION
11 BY MR. ALTMAN:
12     Q.  Dr. Gibbons, how are you today?
13     A.  Fine, thank you.
14     Q.  I guess we were last together about six
15 weeks ago, correct?
16     A.  Something like that.
17     Q.  In the interim six weeks since we were
18 together last time, I believe it's March the 5th,
19 what additional work did you do in this litigation?
20         MS. McGRODER:  And does that question
21 relate to paragraphs 18 through 20 or the tables in
22 his expert report, Mr. Altman?
23         MR. ALTMAN:  Lori, I'm entitled to know
24 what he did in the last six weeks.

1085

1         MS. McGRODER:  Well, I'm trying to
2 proceed pursuant to the agreement of the parties
3 and so your questions must be limited to
4 paragraphs 18 through 20 and the tables as
5 referenced in the agreed upon letter.
6         MR. ALTMAN:  And I will --
7         MS. McGRODER:  I'd like you to proceed
8 with respect to this deposition based on the
9 parties agreement or not.
10         MR. ALTMAN:  I'm asking him about what
11 work he did since that point in time, Number 1.
12 Number 2, Angela Seaton and I had a discussion that
13 there would, of course, need to be some
14 foundational questions.
15         MS. McGRODER:  Then I'll allow that one.
16         MR. ALTMAN:  I'm not going to fight with
17 you over every question because then we can just
18 call the Magistrate right now and you can explain
19 to him your incredibly narrow interpretation of
20 things that I can't even ask the expert what he did
21 since the last deposition.
22         MS. McGRODER:  I don't know what he did
23 since the last deposition has to do with paragraphs
24 18 through 20 and the tables referenced in his

1086

1 March 19th report.  If you want to him what he did
2 leading up to the March 19 report as reflected in
3 those additional paragraphs in his report, that
4 would make sense to me.
5         MR. ALTMAN:  Lori, I'm just going to say
6 right now if we're going to get into this battle, I
7 won't ask those questions we'll simply notice him
8 for another deposition of what work he's done.  I'm
9 trying to avoid doing that.
10         MS. McGRODER:  I said I allow that one.
11         MR. ALTMAN:  I'm not going to fight with
12 you over every question.
13         MS. McGRODER:  We are producing him -- I
14 just want you to understand, Mr. Altman, we are
15 producing him pursuant to the agreement and nothing
16 more.
17         MR. ALTMAN:  That's fine.
18     Q.  Dr. Gibbons, what did you do working on
19 this litigation in the last six weeks?
20     A.  Can I have a copy of my supplemental
21 report that's listed there?
22     Q.  I will be happy -- that's fine, if you
23 want to look at it now.
24     A.  I just think I'm going to need it.

1087

1    Q.  We're going to mark it as an exhibit in a
2  few minutes.
3        MS. McGRODER:  Actually that's my
4  highlighted copy.  You shouldn't have that one.
5  BY MR. ALTMAN:
6    Q.  Let's side track.  Let's -- I want to
7  mark that, but I have other exhibits marked first.
8  Let's deal with the other exhibits that I have
9  first.  I want to get them marked and identified
10  and then we can just mark an official one for the
11  record.
12        I'm going to mark for the record a number
13  of documents -- I guess I have to put a statement
14  on the record.  A number of documents were produced
15  pursuant to the agreement on Friday of last week.
16  These are documents we had not ever seen before.
17  I'm going to mark several of those exhibits --
18  several of those documents as exhibits in this
19  deposition.  I believe that defense counsel will
20  make certain representations about those documents
21  once they've all been marked so why don't we do
22  that.
23
24

1088

1        (Documents marked as Gibbons Deposition
2        Exhibit Nos. 66 through 93 for
3        identification.)
4        MR. ALTMAN:  As Exhibit 66 I'm going to
5  mark a collection of a number of emails.  They're
6  not -- I only have one copy.
7        MS. McGRODER:  That's okay.  And Exhibit
8  -- is it 66, did you say?
9        MR. ALTMAN:  Yes.
10        MS. McGRODER:  Those are the emails that
11  Dr. Gibbons produced to you, correct?
12        MR. ALTMAN:  Well, I don't know who
13  produced them.  All I know is I got a box of
14  documents.  Why don't you let me get them all
15  marked and then you can put on the record what they
16  were and we have it all clean.  That's Exhibit 66.
17  I'm going to mark as Exhibit 67 through 88, I
18  believe --
19        MR. LONDON:  Should be 89.
20        MR. ALTMAN:  Oh, Exhibits 67 through 89
21  as a collection of what appear to be 23 discrete
22  documents.  And I will ask -- I'll hand these over.
23  That's a set for you.  The 23 through 89 is a set.
24        MS. McGRODER:  I don't know what you mean

1089

1  by 23 through 89.
2        MR. ALTMAN:  I'm sorry, 67 through 89,
3  that is a set of 67 through 89.
4        MS. McGRODER:  You just numbered that?
5        MR. ALTMAN:  Yes, those are discrete
6  emails.
7        MS. McGRODER:  And these are?
8        MR. ALTMAN:  Also documents that I
9  received last Friday from Shook Hardy.
10        MS. McGRODER:  Well, and you received
11  them pursuant to our agreement for us to produce
12  the files from Dr. Gibbons that you requested,
13  correct.
14        MR. ALTMAN:  Lori, let me just get them
15  all identified on the record and then you can make
16  your representation.
17        MS. McGRODER:  I guess the question I
18  have to you is I'm not sure how you're dividing
19  these up.  Like what is 66?
20        MR. ALTMAN:  66 is a collection of a
21  number of emails that I did not separate out.
22        MS. McGRODER:  So these are the ones you
23  separated out?
24        MR. ALTMAN:  That's correct, 67 through

1090

1  89 are each individually discrete documents.
2        MS. McGRODER:  Can we go off the record
3  for a minute?
4        VIDEOGRAPHER:  The time is 10:57 a.m.  We
5  are going off the record.
6        (Short recess.)
7        VIDEOGRAPHER:  The time is 10:59 a.m.  we
8  are back on record.
9        MR. ALTMAN:  I'll also mark as Exhibit 90
10  an email that was sent to both Jack London and
11  myself from Angela Seaton of Shook Hardy with the
12  subject Gibbons docs and a description that says
13  that the documents were going to be sent out
14  tomorrow.
15        MS. McGRODER:  Can I see that, please?
16        MR. ALTMAN:  Sure.
17        MR. LONDON:  I don't have another copy.
18        MS. McGRODER:  The email that says where
19  do you want me to send them, to Jack or to Keith?
20  There are too many pages to send to both of you.
21  If I do that, it will take another day of copying.
22  There are well over 1,000 pages.  Thanks, Angela.
23  Correct, that's Exhibit 90?
24        MR. ALTMAN:  That's Exhibit 90.

1091

1    MS. McGRODER: Do you have the email that
2    responds to that that contains your response to
3    that where it says to send them to Keith Altman.
4    MR. ALTMAN: I don't. On Friday I
5    received a box full of documents. They appear to
6    be in conformance with this document over here.
7    What I'd like defense counsel's representation of
8    is the following: That Number 1, these documents
9    were from Dr. Gibbons's file that Dr. Gibbons
10   printed them out and that the date that appears to
11   be at the bottom of the emails represents the date
12   that Dr. Gibbons printed these documents out and
13   that the header information at the top represents
14   the dates that the emails were received.
15   MS. McGRODER: That's my understanding
16   with this small correction. Dr. Gibbons printed
17   out the emails and the attachments as PDF files and
18   then he emailed those to me which I gave then to
19   you. Does that make sense?
20   MR. ALTMAN: That's fine. But my -- the
21   important point I'd like to understand is at the
22   bottom of many of the emails there is a banner at
23   the bottom that has a date that appears to be the
24   date that this was printed.

1092

1    MS. McGRODER: That's correct.
2    MR. ALTMAN: And so this is the date that
3    Dr. Gibbons printed that file, is that correct?
4    MS. McGRODER: That's correct.
5    MR. ALTMAN: Not every document in
6    Exhibit 67 through 89 is an email. There are a
7    couple of individual documents in there, one of
8    which is not completely legible. It appears to be
9    handwritten and so I would request that at some
10   point we can have a discussion so I can understand
11   the handwriting on that document.
12   MS. McGRODER: No problem.
13   MR. ALTMAN: It's certainly better than
14   mine, but not necessarily completely legible.
15   MS. McGRODER: I'd be happy to go over
16   any of these with you that you have questions
17   about.
18   MR. ALTMAN: So we have that
19   representation, that's our understanding that these
20   are Dr. Gibbons' documents.
21   MS. McGRODER: Yes, it is.
22   MR. ALTMAN: Now I will mark -- why don't
23   we just -- we're going to need three of them.
24   MS. McGRODER: Keith, I would only add I

1093

1    haven't gone through those so I'm -- my answer is
2    contingent on your representation being correct
3    that those are what you received in the box, okay.
4    MR. ALTMAN: You know --
5    MS. McGRODER: We're on the same page?
6    MR. ALTMAN: We're on the same page.
7    Q. I'm going to hand you -- Dr. Gibbons, I'm
8    going to hand you what's been marked as Exhibit 91
9    which I'll represent to you is a printout of the
10   March 19th version of your report. Just ask you to
11   take a look at that and see if that appears to be
12   the case?
13   A. It does.
14   Q. I'm going to hand you what's been marked
15   as Exhibit 92, which is an email cover page from
16   Lori McGroder dated February 23rd which was a
17   transmittal of a revised version of your
18   November 5th expert report but date was not changed
19   so to make things clear I have done two things. I
20   have provided the email attached -- the email that
21   this was sent and by my doing, I printed on the
22   bottom the file name of the documents so that we
23   could easily identify that this was the document
24   that was produced on February the 23rd and not the

1094

1    original expert report.
2    MS. McGRODER: And it's my memory that
3    the original November 5, 2008 expert report is
4    already an exhibit, but what you're doing is adding
5    the cover page?
6    MR. ALTMAN: Well, this is not -- this is
7    not an exhibit I believe because this is a revised
8    -- this is a revised version of the November 5th
9    report.
10   MS. McGRODER: I thought you marked that.
11   MR. ALTMAN: I may have, but for clarity
12   it's just easier to remark it so that will be
13   Exhibit 92.
14   MR. LONDON: 92 is the email with the
15   enclosed revised November 5 report.
16   MR. ALTMAN: Correct. I'll hand you
17   Exhibit 93 which is the original version of your
18   November 5th, 2008 expert report.
19   MS. McGRODER: Which I know for sure is
20   an exhibit.
21   MR. ALTMAN: I know it is too. It just
22   seems to be easier to keep the three of them
23   together so we have clarity.
24   Q. I would just like you to confirm that

1095

1 those three documents are what I have represented
2 that they are to the best that you can.
3   A. They look like as you represented.
4   Q. Now the question I had asked you when we
5 decided to digress into the documents is what have
6 you done with respect to the Neurontin litigation
7 since your March 5th deposition?
8   A. From memory, I updated this supplemental
9 report to include a discussion of the sensitivity
10 analyses and tables related to those sensitivity
11 analyses which I believe are Tables 2A, 2B, 2C and
12 then 3, 3A, 3B, 3C in these analyses, went back and
13 redid the analyses after the misclassification of I
14 think it was major depressive disorder that you had
15 highlighted in our previous deposition which
16 turned out to be correct, correct that it was an
17 error. So made that modification. Printed off my
18 emails as per your request and included the
19 attachments. That's all I can remember right now.
20 There might have been something else but off the
21 top of my head.
22   Q. What did you do prepare for today's
23 deposition?
24   A. I reread this supplemental report last

1096

1 night. I met with Lori on I think it was Thursday
2 again going over this report. I think that's about
3 it.
4   Q. Did you -- in trying to resolve the
5 misclassification issue, did you meet with Dr. Hur?
6   A. I did.
7   Q. When did you meet with Dr. Hur?
8   A. Shortly after our last deposition,
9 probably the following Wednesday because that's the
10 day I normally meet with him.
11   Q. How long did you meet with Dr. Hur for?
12   A. Well, he was there all day at the
13 university, so we went back and forth, you know,
14 talking about this and a variety of other issues.
15 So, you know, and then we looked at the results of
16 the reanalysis with that change and kind of went
17 through and went back and rechecked were there any
18 other examples of that kind of error that we could
19 find and we couldn't find any others. Doesn't mean
20 that there aren't any others, but we couldn't find
21 them.
22   Q. Did you also look into the issue we had
23 talked about where there were some invalid codes
24 for some of the -- that had been assigned to some

1097

1 of the patients, invalid diagnostic codes?
2     MS. McGRODER: Object to form and
3 foundation.
4     THE WITNESS: I remember there was --
5 there was -- we had some discussion about it and at
6 this moment, I don't remember the details of that
7 discussion. It didn't look like -- I mean, it
8 looked like it was sort of the nature of the data,
9 but I can't remember -- I know we got to the point
10 where we looked at it and just felt that there
11 really wasn't anything that could be done and
12 excluding those from the analysis wasn't the right
13 thing to do, but I'd have to go back and take a
14 look at that.
15 BY MR. ALTMAN:
16   Q. Why would you include diagnoses that had
17 invalid codes that don't exist, how do you know
18 that they were really whatever you had assigned
19 them to?
20     MS. McGRODER: Object to form and
21 foundation.
22     THE WITNESS: You know, at this moment I
23 can't remember the details of looking at the data
24 and, you know, how that was resolved. But I know

1098

1 there was some question that they may, in fact, not
2 have been -- not have been invalid, that there was
3 an extension that was left off or something. I
4 don't remember the details. I'd have to go back to
5 the data.
6 BY MR. ALTMAN:
7   Q. Is that stuff you discussed with Dr. Hur?
8   A. Yeah, we had talked about that as well on
9 that same day.
10   Q. As we sit here today, do you have any
11 plans to do any further work with respect to your
12 expert report?
13   A. Not as we sit here today.
14   Q. The letter that you received from the
15 journal, do any of the issues that were raised in
16 that letter apply to your expert report?
17   A. Well, the letter was about the bipolar
18 cohort, of course, and my expert report basically
19 says that the results for the bipolar cohort
20 support the analyses that were done on the
21 gabapentin cohort and indicates that the rates of
22 suicide attempts decreased significantly following
23 treatment and also the between subject comparisons.
24 And that's the extent of my reliance on that

1099

1 bipolar paper.

2     None of those in the revised manuscript,

3 you know, have changed in any way. And most of the

4 -- most of the responses to those reviewers with

5 respect to the questions that they raised had more

6 to do with some of the other sensitivity analyses

7 which are not a part of my expert report.

8     Q. That wasn't exactly what I was asking,

9 but there were some concerns that were raised about

10 various issues and my question to you was some of

11 the concerns that they had raised with respect to

12 your bipolar analysis, do those same concerns -- do

13 any of those concerns also apply to your gabapentin

14 analysis?

15     MS. McGRODER: Well, I object to form.

16     THE WITNESS: Not to my knowledge.

17 BY MR. ALTMAN:

18     Q. Have you resubmitted the bipolar paper

19 yet?

20     A. Yes.

21     Q. When did you resubmit it?

22     MS. McGRODER: Don't. That has nothing

23 to do with paragraphs 18 through --

24     MR. ALTMAN: Then instruct him.

1100

1     MS. McGRODER: No, I'm not going to do

2 that, Keith. We will stop the deposition now and

3 we'll call the Magistrate. Which do you want to

4 do? Do you want to proceed pursuant to the

5 agreement or do you want to stop the deposition

6 now?

7     MR. LONDON: Let me see if I can sort out

8 a middle ground problem.

9     MS. McGRODER: Then let's do that off the

10 record.

11     MR. LONDON: It seems to me --

12     MS. McGRODER: Let's go off the record.

13     MR. ALTMAN: No, we're doing this on the

14 record.

15     MR. LONDON: -- refers to the

16 epidemiology bipolar paper and to the extent that

17 the March 19th report incorporates the bipolar

18 paper, I think we need to learn what that means.

19     MS. McGRODER: Well, I don't disagree

20 that he relies on the manuscript as part of his

21 expert opinion in this case. But the agreement is

22 that your questions will be limited to changes he's

23 made in his supplemental expert report of March 19.

24 Those changes are made specifically in paragraphs

1101

1 18 through 20 and the tables that I already named

2 and are referenced in Defendants' Exhibit 1. So

3 that's what this deposition -- that's what we're

4 here for. We're here to produce him pursuant to

5 this agreement. And we can either do that or not,

6 but I'm not going to have this fight all day long.

7 Decide whether you want to comply with this or

8 don't.

9     MR. ALTMAN: Lori, I had made it very

10 clear to Angela than there would be the necessity

11 of asking some foundational questions, that you

12 could not that take such a narrow approach.

13     MS. McGRODER: That question was not

14 foundational. When did you make revisions to your

15 manuscript? That has nothing to do with paragraphs

16 18 through 20 and Tables 2 and 3 and their subparts

17 in his expert report.

18     MR. ALTMAN: Fine. I'll lay some

19 foundation.

20     Q. Dr. Gibbons, is the bipolar analysis --

21 the methodology that you used for the bipolar

22 analysis, does it have any relationship whatsoever

23 to the analyses you did that with respect to the

24 gabapentin cohorts?

1102

1     MS. McGRODER: Let's go off the record.

2 Let's call the Magistrate.

3     MR. ALTMAN: No, we're not going off the

4 record.

5     MS. McGRODER: Let's call the Magistrate.

6     MR. ALTMAN: Call the Magistrate on the

7 record. Go ahead.

8     MS. McGRODER: I will be calling the

9 Magistrate, but while I do that we are going off

10 the record.

11     MR. ALTMAN: No, let's do this on the

12 record.

13     MS. McGRODER: Can I make the phone call

14 without being on the record?

15     MR. ALTMAN: No, do it on the record.

16     MR. LONDON: Do we have a dial-in today?

17     MR. ALTMAN: We do not. Does that have

18 speaker phone?

19     MS. McGRODER: (On her cell phone) Can I

20 have David? Hi, David, it's Lori -- I'm good. The

21 Plaintiffs would not agree to go off the record so

22 even though this -- only this certain portion of

23 our conversation is on the record, the Plaintiffs

24 have violated the agreement summarizing Defendants'

1103

1 Exhibit 1 so we do need to call the Magistrate.
2 Yes, we convened and went for, I don't know,
3 whatever -- how many minutes have we gone?
4     VIDEOGRAPHER:  23.
5     MS. McGRODER:  We convened for 23
6 minutes.  We convened for 23 minutes.  Well, there
7 appears to not be any kind of phone in here so I
8 guess you have to call my cell phone.
9     MR. ALTMAN:  There is a phone in here.
10 Jack, can you follow-up on that?
11     MS. McGRODER:  This is why I thought it
12 would be appropriate to go off the record, but
13 apparently they want the logistics of the phone
14 call on the record.
15     MR. LONDON:  We are at 708-458 --
16     MS. McGRODER:  Do you think they can call
17 straight through?
18     MR. LONDON:  I'm going to find out.
19 458-7790.  I'm going to find out what the extension
20 is.
21     MS. McGRODER:  It's 913 -- I don't really
22 want my cell phone number on the record.  Let's go
23 off the record, please.
24     MR. ALTMAN:  For the cell phone number

1104

1 you can go off the record.
2     VIDEOGRAPHER:  The time is 11:15 a.m.  We
3 are going off the record.
4     (Discussion off the record.)
5     VIDEOGRAPHER:  The time is 12:04 p.m.  We
6 are back on the record.
7     MS. McGRODER:  So since we are still
8 waiting for the Magistrate to call back, I think
9 we've agreed to continue with questions that are
10 pursuant to the agreement that pertained to the
11 certain paragraphs in Dr. Gibbons' report.
12     MR. ALTMAN:  That's correct.
13 BY MR. ALTMAN:
14     Q.  Dr. Gibbons, if you could turn in your
15 new report to page 15, which are the start of the
16 tables.  Could you please explain the difference
17 between 2A and 2?
18     A.  Two uses the concomitant medications
19 based on the definition of concomitant to taking
20 gabapentin.  So it's restricted to the post period.
21 As you'll recall, there's a one year following
22 initiation of gabapentin and one year prior to
23 gabapentin whereas in 2A, we treat concomitant
24 medication as a time varying co-variant so if

1105

1 somebody was taking say an antidepressant in the
2 previous time period prior to taking gabapentin, so
3 it wasn't really contaminant, it was there by
4 itself, it's actually -- that value the change in
5 value between the pre-period and the post period is
6 preserved in the analysis.
7     Q.  I'm not exactly sure I understand.
8     A.  It's kind of a subtle point.  So when
9 you're adjusting -- one of the reasons for
10 adjusting for concomitant medications is that more
11 severely ill patients will tend to be treated with
12 the drug that you're interested in but also other
13 drugs.  So they'll be polypharmacy.  Those are the
14 sicker patients and you want to adjust for the fact
15 that you have sicker patients.
16     Another reason for adjusting for other
17 medications is that those other medications may
18 have an effect in and of themselves for the
19 treatment of whatever it is you're looking at.  So
20 the concomitant medication view that just sort of
21 says that this is a selection effect leading to
22 some patients getting treated with multiple drugs
23 would be the original analysis that just says I'm
24 going to look at whether or not there was

1106

1 concomitant antidepressants or concomitant
2 antipsychotics in addition to gabapentin.  And so
3 the status of concomitant medication would be only
4 based on the post initiation of gabapentin data.
5     Another view is well, antidepressants or
6 antipsychotics may exert an effect in the
7 pre-gabapentin period before they started taking
8 gabapentin, so it's important to include those
9 effects in the model as well, hence the sensitivity
10 analysis.  That's the only difference between 2 and
11 2A.
12     So if somebody was taking -- was taking
13 an antidepressant say in the pre-gabapentin period,
14 but not during the post period, in the original
15 analysis there would not be concomitant medication,
16 that is the gabapentin wasn't being accompanied by
17 the antidepressant.
18     In the second, in the sensitivity
19 analysis, the time varying nature of the
20 concomitant medication was included.  So the fact
21 that the person was taking the antidepressant in
22 the pre-period was built into the model as well as
23 the fact that they weren't taking it in the post
24 period was built into the model.  So in one case

1107

1 it's a time invariant co-variant and in the other
2 case it's a time varying co-variant.
3    Q.  Now, it says at the bottom Note 1,
4 subjects with any CNS drugs after index date were
5 excluded.
6       MS. McGRODER:  Are you on --
7       MR. ALTMAN:  I'm on page 16, footnote 1.
8       MS. McGRODER:  Of Table 2A?
9       MR. ALTMAN:  Actually it's in 2 and 2A.
10   Q.  You make the statement, subjects with any
11 CNS drugs after index date were excluded.  What do
12 you mean by that?
13   A.  The footnote is for gabapentin
14 monotherapy.
15   Q.  So that only applies to monotherapy?
16   A.  Right.
17   Q.  So if they took a CNS drug before they
18 took gabapentin but not afterwards, they're
19 included there?
20   A.  That's correct, because it says subjects
21 with any CNS drugs after the index date were
22 excluded.  So the index date here is the date of
23 gabapentin.
24   Q.  So Table 2B -- and by the way, one

1108

1 difference is you've now included -- with Table 2,
2 you've included a column that wasn't there before,
3 correct, which is the P value column?  If you can
4 compare that to Exhibit 92 or 93.
5    A.  Yes, that's correct.
6    Q.  And what is the difference between 2B
7 and 2?
8    A.  So 2B now adds the requirement that in
9 order for a person to be in this analysis, they had
10 to have a prescription with a minimum of 30 days in
11 length.  So if a person had received a prescription
12 of only one day of gabapentin, they would be in 2
13 because that was the initial exposure.  In 2B, the
14 definition of gabapentin exposure now requires at
15 least a prescription for 30 days or more.  And
16 that's the difference between 2 and 2B.
17   Q.  Did you do the inverse sensitivity
18 analysis, which is people who only took it for less
19 than 30 days?
20   A.  No.
21   Q.  Could it be that somebody who had taken
22 gabapentin for a short period of time had an
23 adverse effect was taken off the drug?
24   A.  Remember that these are medical claims

1109

1 data, so the duration of exposure is based on the
2 prescription.  So a patient filled the prescription
3 for however many days.  If the doctor decided to
4 take them off because they had an adverse effect,
5 that wouldn't change the analysis because they
6 can't undue the prescription.  Our estimate was
7 based on the prescription.
8    Q.  But there are some people that clearly
9 are identified with less than 30 days of
10 prescription, correct?
11      MS. McGRODER:  Object to form.
12      THE WITNESS:  The differences between
13 Table 2 and Table 2B would be the difference in
14 those people who had prescriptions less than 30
15 days.
16 BY MR. ALTMAN:
17   Q.  And you could have done an analysis of
18 those that had taken the drug -- had less than a
19 30-day prescription, correct?
20   A.  Well, again your original point was --
21 and what you just -- you said it both ways.  So
22 just to be clear, if somebody had a prescription
23 for 30 days but their doctor took them off the
24 drug, we have no way of knowing that.  We don't

1110

1 know whether or not anybody here took the drug.  We
2 know they had a prescription for the drug of a
3 particular length of time.
4       The sensitivity analysis is looking at
5 the difference between those people who had any
6 length of prescription versus those people who had
7 a minimum of 30 days.
8       Now, to your other question of could we
9 have done the analysis in only those people who had
10 less than a 30-day prescription, the answer is no
11 because there weren't enough of them.  If you
12 compare the number at risk between Tables 2B and 2,
13 you'll see that, you know, it's really the minority
14 that had prescriptions of less than 30 days.  And
15 that -- those numbers, for example, for by bipolar
16 it went from 3,783 down to 3,479, that difference
17 of just a few hundred subjects would be too small
18 to do this kind of analysis.
19   Q.  You certainly could have done it on all
20 of them where it appears you go from 131,000 to
21 115,000, correct?
22   A.  Still with this kind of an analysis, you
23 really need large numbers when you're looking at
24 something that's a rare event.

1111

1　Q. But you didn't look, correct?
2　A. I did not do that analysis.
3　Q. Was there any technical reason you
4　couldn't have done that analysis other than the
5　statistics may not have been adequate?
6　A. The technical reason is that, you know,
7　there wouldn't have been power to detect an effect
8　if it was there, the base rate is too low for
9　suicide attempts to make that a meaningful
10　analysis. So that is the technical reason.
11　　If you're asking by technical reason
12　could I have programmed the computer and pushed the
13　button and said let's do the analysis, yes, I
14　could. I don't know if it even would have
15　converged. So there may, in fact, be technical
16　reasons that, you know, in a sample of that size
17　you couldn't even do the analysis or at least you
18　could attempt to do it, but it wouldn't converge,
19　but again I have not done that analysis.
20　Q. Just looking at the bipolar, 3,783,
21　looking to the difference between 2A and 2B, 3,783
22　minus 3,469 is about 314, correct?
23　A. That's correct.
24　Q. And we went from 181 attempts to 169

1112

1　which would suggest those people had 12 attempts,
2　correct?
3　A. That's correct.
4　Q. And we go from 119 to 106 which suggests
5　that there are 13 attempts, correct?
6　A. I'm not sure I know where you're reading.
7　Q. If you look at 2A, there are 119 attempts
8　after for the bipolar and 2B there's 106. That
9　would suggest that those group of people had 13
10　attempts after, correct?
11　A. That's correct.
12　Q. And can you, as you sit here today, say
13　that that would not have been statistically
14　significant?
15　A. I would have to do the analysis to
16　determine that.
17　Q. And if we look at -- just looking at all,
18　the all category, we had 456 attempts before in
19　Table 2A and we drop down to 426 in Table 2B,
20　correct?
21　A. That's correct.
22　Q. And that suggests that there were 30
23　attempts in that other population of less than 30
24　days, correct?

1113

1　A. That's correct.
2　Q. And then there are -- we go from 453 to
3　390 which is 63, correct?
4　A. That's correct.
5　Q. So actually there's double the number of
6　attempts if you look at all the people who did
7　not have 30-day supply, correct, approximately
8　double?
9　A. Approximately.
10　Q. And as you sit here today, can you say
11　that that number wouldn't have been statistically
12　significant?
13　A. I can't say that it would be, but I would
14　certainly interpret that as a beneficial effect of
15　the drug. That is if you have adequate treatment
16　with the drug, the suicide attempt rates are going
17　down. If you have inadequate treatment, the
18　suicide attempt rates if anything look like they're
19　going in the other direction.
20　Q. It could also be that the drug was
21　actually causing harm in the short-term period,
22　correct?
23　A. I don't see how the drug could be causing
24　harm in the short-term period if somebody who has a

1114

1　prescription for only say one day is going to be
2　taking the drug for one day and somebody who has a
3　prescription for 30 days is also taking the drug on
4　that first day, so I wouldn't, you know, agree with
5　that conclusion.
6　Q. Do drugs affect people the same -- all
7　people the same way?
8　A. I'm not an expert on that.
9　Q. Are there some drugs that have acute
10　effects of one individual that may not have acute
11　effects on a different individual?
12　A. I'm not an expert on that.
13　Q. If somebody's allergic to a particular
14　drug, they could be affected by the drug after a
15　single dose where somebody who is not allergic may
16　be able to take it for months and not have an
17　effect, correct?
18　A. Again, I think you misunderstand. If
19　somebody has a prescription for 30 days, they are
20　taking the drug for one day and then another day
21　and then another day. If somebody has a
22　prescription for one day, they're taking that drug
23　for one day. They're not having a prescription for
24　30 days and then taking it for one day and then

1115

1 having an allergic reaction and quitting. That's
2 not the difference between Table 2 and Table 2B.
3     So if your interpretation of that
4 difference is that somehow Table 2B is excluding
5 those people who may have had a 30-day prescription
6 but only took the drug for one day because they had
7 an adverse event, that's the incorrect --
8     Q.  I wasn't making that interpretation.
9 What I'm saying is that as you sit here today, in
10 the population of people who took the drug for less
11 than 30 days you cannot say that the drug was not
12 actually causing harm, correct?
13     A.  Again, I think you're misstating this.
14 My analysis compares between 2 and 2B those people
15 who had prescriptions for 30 days or more versus
16 those people in the total population which includes
17 a subset who had prescriptions of less than 30
18 days.  I don't know how long any of those people
19 were taking the drug.  The people who had
20 prescriptions of 30 days, some of those people may
21 have only taken the drug for one day and stopped
22 taking it for a wide variety of reasons.  I don't
23 know why the doctor prescribed a drug for one day
24 or two days or any, you know, less than 30 days.  I

1116

1 don't have that information.
2     Q.  I understand that.  And I understand that
3 some of the people who have prescriptions for more
4 than 30 days may not have taken the drug for 30
5 days, but what I'm asking you is that population
6 who only had prescriptions of less than 30 days, as
7 you sit here today, can you say that the data
8 demonstrates that the drug did not cause harm?
9     MS. McGRODER:  Object to form.
10     THE WITNESS:  The analysis with all of
11 the people in it shows that there's no evidence
12 that the drug is causing harm.  And the analysis
13 with only those people who had 30 days or more
14 suggests that there is no evidence of the drug
15 causing harm.  I have not done a separate analysis
16 on those people who received a prescription of less
17 than 30 days.  So I haven't done that analysis so I
18 can't really answer your question.
19 BY MR. ALTMAN:
20     Q.  But one possibility is -- you said one
21 possibility is that the fact that there are more
22 suicide attempts in that population may be
23 indicative that you need to take the drug for a
24 sufficient period of time to derive its beneficial

1117

1 effects.  I think that's what you said earlier,
2 correct?
3     MS. McGRODER:  Object to form.
4     THE WITNESS:  What I said earlier is that
5 if there is a -- if you will a dose response
6 relation where if it were true that there was
7 evidence that if you took the drug say one day
8 you had a higher rate than if you took the drug for
9 30 days, and of course we don't know that here
10 because we don't know how long these people were
11 taking the drug and of course, these summary
12 statistics don't also tell us about the concomitant
13 medications these patients were taking, but the
14 statistical model knows about that, that what we
15 may be seeing is that the drug is having a
16 beneficial effect maybe on the pain that it was
17 prescribed for because in most cases these drugs
18 were -- appear to be prescribed in people who were
19 suffering from pain and that there wasn't adequate
20 time and so the effect of pain on suicide attempt
21 rates was not decreased as it may have been in
22 those patients who had taken it for a longer period
23 of time.  And if the -- if the mechanism by which
24 the reductions in suicide attempt rates that we're

1118

1 observing here is through the treatment of pain,
2 then that would be consistent with that hypothesis.
3 BY MR. ALTMAN:
4     Q.  But is one possibility that the drug
5 could actually be harming that particular
6 population?
7     A.  It's --
8     MS. McGRODER:  Objection, asked and
9 answered.  Go ahead, answer it again if you like.
10     THE WITNESS:  I don't see any -- I don't
11 see in my opinion any evidence that would suggest
12 that the drug is being harmful in that population
13 since there's nothing -- you know, there's nothing
14 to indicate that the people in that population were
15 necessarily taking, you know -- were taking it or
16 weren't or why they were prescribed.  I don't have
17 any evidence that would suggest that.
18 BY MR. ALTMAN:
19     Q.  But you do have that there's twice as
20 many suicide attempts after the initiation of
21 gabapentin as before, correct?
22     A.  I mean in the overall population it looks
23 like there are more suicide attempts after in those
24 patients but, you know, we'd have to go through and

1119

1 break that down at the very least and go through

2 and break it down for each one of the diagnoses and

3 we'd have to look at the concomitant medications

4 that those patients were taking. We'd have to look

5 at is there other confounds with age or with sex.

6 I mean, you know, simply trying to base that view

7 on these tabulations that have -- you know, there's

8 a lot more that goes into these statistical models

9 I think would be inappropriate.

10    Q. Isn't the opposite also true to suggest

11 that there is a protective effect of the drugs in

12 any population without having done the same kind of

13 analysis that you just said?

14    A. But I in fact did the same analysis.

15 Everything that's in Table 2, those probability

16 values, those relative risks are all based on the

17 statistical model that adjusted for concomitant

18 diagnoses, age and sex and previous suicide

19 attempts in the prior year.

20       So to just sort of kind of look at this

21 summary statistical tabulation just looking at the

22 data and to use that as the basis to arrive a test

23 of a statistical hypothesis would be inappropriate.

24    Q. Table 2C excludes medications -- excludes

1120

1 people -- excuse me -- who had suicide attempt on

2 the same date as the index date, correct?

3    A. Correct.

4    Q. I think we've discussed earlier as far as

5 the gabapentin population that really has made very

6 little difference because there were only a few for

7 the gabapentin population, correct?

8    A. That's correct.

9    Q. So we wouldn't expect really to see much

10 of a difference in this particular chart?

11    A. No.

12    Q. Table 3, could you please explain

13 Table 3?

14    A. Table 3 mirrors Table 2 except in this

15 case rather than including multiple suicide

16 attempts, we included only the first suicide

17 attempt. So this is a -- instead of a Poisson

18 regression which is modeling the count for each

19 individual, this is a logistic regression which

20 models the binary event of whether or not there was

21 a suicide attempt.

22    Q. Now, did you do an analysis -- I think we

23 talked earlier in the last depositions about events

24 on multiple days and whether that represented

1121

1 distinct events or that represented one event and

2 multiple days of treatment. Did you do an analysis

3 to see whether you could attempt to resolve those

4 multiple day events into a number of discrete

5 suicide attempts and then run a sensitivity

6 analysis?

7       MS. McGRODER: Object to form.

8       THE WITNESS: This is that sensitivity

9 analysis. This sensitivity analysis basically says

10 that once you have the first suicide attempt, none

11 of the other ones are being counted or included in

12 that analysis. So this is saying, you know, if we

13 assume that there is, you know, overcounting or

14 that the same suicide attempt is counted multiple

15 times, this analysis is robust to that because it

16 does not count the -- any more than once. Once you

17 have one, that's it.

18 BY MR. ALTMAN:

19    Q. But another analysis would be to try to

20 resolve how many discrete suicide attempts there

21 were, correct?

22    A. I'm not sure how such an analysis could

23 be conducted. The data are simply the way the data

24 are. We don't know whether or not those are

1122

1 multiple suicide attempts that were made on a daily

2 basis or whether or not they're, you know, just

3 people getting -- receiving treatment and all being

4 indicated for the same suicide attempt or an error

5 on the part of the -- how it was recorded. I mean,

6 those are the data.

7       MS. McGRODER: Go off the record for a

8 second.

9       MR. ALTMAN: Sure.

10       VIDEOGRAPHER: The time is 12:28 p.m. We

11 are going off the record.

12       (Whereupon, the deposition in the

13       above-entitled cause was recessed to

14       1:19 p.m. this date.)

15

16

17

18

19

20

21

22

23

24

1123

1    A F T E R N O O N   S E S S I O N
2        VIDEOGRAPHER: This is the beginning of
3    tape Number 2. The time is 1:19 p.m. We are back
4    on the record.
5        EXAMINATION (continued)
6    BY MR. ALTMAN:
7        Q. Dr. Gibbons, going back to Table 2B for a
8    second, and I suppose in an ode to Shakespeare, I'm
9    going to ask you about not 2B. If you were to have
10   done the analysis that we suggested earlier running
11   the all or the -- running that all group and when
12   you did all your analyses and all your co-variants
13   and everything like that and had come out with a
14   result that was let's day where the odds ratio was
15   2.0, for example, how would you have interpreted
16   that result?
17       MS. McGRODER: Object to form, improper
18   hypothetical. Go ahead.
19       THE WITNESS: You're talking about in
20   Table 2?
21   BY MR. ALTMAN:
22       Q. If you took the differential between 2 --
23   2B excluded some of the people that are part of
24   Table 2. We talked about that earlier, the people

1124

1    who had prescriptions of less than 30 days?
2        A. Uh-huh.
3        Q. And if you were to do the same full
4    analysis with all the co-variants and all the
5    adjustments and everything like that and let's say
6    just for the all group had come up with an odds
7    ratio of 2.0 just as an example, how would you have
8    interpreted that result?
9        MS. McGRODER: Objection, improper
10   hypothetical.
11       THE WITNESS: So if I'm understanding the
12   question correctly, if I had taken the difference
13   between 131,000 people and 115,000 people, roughly
14   those 15,000 people who had a prescription but no
15   more than -- but less than 30 days, and I had done
16   an analysis and I had adjusted for all of the
17   co-variants, the same kind of analysis that was
18   done here and I got an odds ratio of 2.0, how would
19   I interpret that and the answer is it depends
20   totally on whether or not that was statistically
21   significant.
22   BY MR. ALTMAN:
23       Q. Assuming it was statistically
24   significant?

1125

1        MS. McGRODER: Same objection, improper
2    hypothetical, assumes facts not in evidence.
3        THE WITNESS: You know, if that were
4    statistically significant, I mean, my -- I would
5    have concluded that there was a statistically
6    significant increase following initiation of
7    treatment in that subpopulation and then I would
8    have gone and tried to better understand who were
9    those people, did they have -- what were the
10   composition in terms of the different diagnoses
11   they had, you know, were the concomitant
12   medications similar to the rest of the group, what
13   was going on with them. But based solely -- if the
14   odds ratio was 2.0 in that population irrespective
15   of co-variant adjustment I think it would be very
16   unlikely that it would be statistically significant
17   in a sample of 15,000 people.
18   BY MR. ALTMAN:
19       Q. Did you do that kind of review of --
20   strike that.
21       If the results had been statistically
22   significant, you said you would have done a review
23   or tried to understand why that result was
24   statistically significant, a statistically

1126

1    significant increase, correct?
2        MS. McGRODER: Object to form, improper
3    hypothetical.
4        THE WITNESS: I said that because you had
5    restricted your question to the all category. So I
6    would have definitely wanted to get a better
7    understanding, like I did in all of these tables
8    about well, we looked at the all, we looked at
9    gabapentin monotherapy, we looked at pain disorder
10   and epilepsy and other psychiatric disorders and
11   schizophrenia and major depressive disorder and
12   bipolar disorder, so we stratified -- in addition
13   to doing the overall analysis, stratified on
14   diagnostic groups and tried to better understand,
15   you know, is this something that is restricted to a
16   particular diagnosis or does it go across the
17   diagnoses.
18   BY MR. ALTMAN:
19       Q. Can you show me in your paper where you
20   explained to the court and the jury reasons why you
21   might have seen a reduction according to your
22   analyses that might not have had to do anything
23   with the drug?
24       MS. McGRODER: Object to form. When you

1127

1 say paper, are you talking about his expert report?
2 BY MR. ALTMAN:
3    Q.   Your expert report.
4    A.   So you're not talking about a paper.
5 You're talking about the expert report.
6    Q.   Well, let me ask a side question now that
7 you bring that up.  I mean, did you use any less
8 scientific vigor in doing this expert report than
9 you would for doing a paper you would try to have
10 published?
11    A.   No.
12    Q.   So for all intents and purposes, while
13 this may be part of an expert report and the
14 bipolar study is a manuscript you submitted, you
15 treated these the same, correct?
16    A.   Correct.
17       MS. McGRODER:  Object to form.
18 BY MR. ALTMAN:
19    Q.   So I just wanted to make sure that you
20 did something less than you would have done if you
21 were trying to get this published.
22       MS. McGRODER:  Same objection.  Is that a
23 question?
24

1128

1 BY MR. ALTMAN:
2    Q.   Is that correct, you treated this just
3 like you were going to get this published, correct?
4       MS. McGRODER:  Object to form.
5       THE WITNESS:  Well, I didn't -- you know,
6 no one's going to publish an expert report, but did
7 I use the same high quality of science to do the
8 expert report as I did the paper, and the answer is
9 yes.
10 BY MR. ALTMAN:
11    Q.   That's what I was asking.  Okay.  Could
12 you show me where in your expert report you have a
13 discussion section, shall we say, where you talk
14 about the reasons why you may have seen a reduction
15 in the suicide attempt rate after initiation of
16 gabapentin therapy that may have nothing to do with
17 the drug?
18       MS. McGRODER:  Hold on one second.
19       THE WITNESS:  Are you waiting for me?  I
20 was waiting for you.  You said --
21       MS. McGRODER:  I'm sorry.  I wondered if
22 you were waiting for me.  No, go ahead.
23       THE WITNESS:  So in answer to your
24 question, there are places in the paper -- in the

1129

1 paper -- in the expert report where I talk about
2 the fact that, for example, none of the analyses in
3 the largest cohort ever studied in this area
4 revealed any evidence whatsoever that gabapentin
5 increases risk of suicide.  So I've largely been
6 focusing on the increased risk of suicide.  I make
7 comments like whether this protective effect is
8 based on reducing the symptoms of psychiatric
9 disorder or by treating the concomitant pain
10 disorder that is present in many of these patients
11 remains an open question.
12 BY MR. ALTMAN:
13    Q.   Where are you reading from?  I'm sorry.
14    A.   I'm reading from page 11.
15    Q.   The sentence -- okay.  That's the
16 paragraph above.
17    A.   So I think I made an attempt to provide a
18 balanced view of what's going on.  I do not have
19 like I would have in a scientific paper that would
20 be published in a journal a section on limitations
21 or something like that.  But I've certainly shared
22 that with you and I have no doubt that you will
23 raise those questions in the context of this case
24 and you know, my opinions about the limitations of

1130

1 these kinds of studies are well-known in the
2 literature.  There's nothing secretive there.
3    Q.   Okay.  I think before lunch we were
4 asking -- excuse me one second.  I believe we were
5 talking about Table 3.  Now, if I understand the
6 way you did things, if somebody had let's say six
7 suicide attempt treatment codes, three on
8 consecutive days, two months later shall we say two
9 on two consecutive days and two months after that,
10 just a stray suicide attempt event, in the original
11 analysis you would have considered that six
12 attempts, correct?
13    A.   Correct.
14    Q.   In your Table 3, you would have only
15 flagged that person one time because they in fact
16 attempted suicide?
17    A.   That's correct.
18    Q.   Would another way to look at it to have
19 considered that person to have attempted three
20 times on three time separated occasions?
21    A.   There are hundreds of ways that you could
22 look at it.  There are lots of different things
23 that you could do.  The argument against doing it
24 that way is that in some people, maybe those two

1131

1 attempts were -- you know, on consecutive days were
2 two legitimate attempts. So you're imposing
3 something on the data that may or may not be true.
4    I think the most conservative sensitivity
5 analysis is to compare the model that looks at the
6 overall count of suicide attempts, be that correct
7 or incorrect, versus treating someone who made one
8 or more attempts in the same way and compare the
9 results of those analyses and determine whether or
10 not they're similar. I did those analyses and, in
11 fact, the results are very similar.
12    Q. But you didn't do the one where you would
13 try to discretely separate out distinct suicide
14 attempt groupings, correct?
15    A. That's correct. I didn't do that and I
16 think, you know, that would be kind of the -- I
17 wouldn't do that because I don't have any auxiliary
18 information that would support that every single
19 one of those was, in fact, a unique and valid
20 suicide attempt. I don't know the answer to that.
21 I don't think anyone does.
22    Q. Well, I don't think we're talking about
23 that. But if somebody showed the same suicide
24 attempt code on four consecutive days, why would it

1132

1 be invalid to see as a sensitivity analysis what
2 would happen if you considered that collection of
3 four events to be one attempt?
4    A. I mean, I think that analysis could be
5 done. I think it would be hard to know when you've
6 done that analysis what the results are really
7 meaning. I think that the sensitivity analysis
8 that I did was the appropriate one to test that
9 hypothesis as to whether or not there was
10 overcounting going on.
11    Q. And the difference between 3 and 3A is
12 the same as the difference between 2 and 2A,
13 correct?
14    A. Correct.
15    Q. And the same thing with 3B and 2B?
16    A. Correct.
17    Q. And if we were to look at it the same way
18 with the people who had not taken -- got a 30-day
19 prescription, the difference between 3 and 3B I
20 guess in terms of the number of people for the all
21 would be about -- well, it would be -- well, it's
22 the same. It's the same 16 -- same 15,000 some odd
23 people, but the number of attempts before goes from
24 273 to 251, correct, which is 22 and goes from 289

1133

1 to 251 which is 38, correct?
2    A. That's correct.
3    Q. And once again, you didn't look at to see
4 whether there was anything -- whether those results
5 could be statistically significant, correct?
6       MS. McGRODER: Object to form.
7       THE WITNESS: I didn't do that analysis.
8 BY MR. ALTMAN:
9    Q. And once again, as with -- as with
10 Exhibit -- with Table 2C, Table 3C we wouldn't
11 expect to have much of an effect since there were
12 very few events?
13    A. That's correct.
14    Q. Did you run any analyses for the
15 gabapentin studies to look at whether a person was
16 on or off the drug at the time of the attempt?
17    A. No.
18    Q. Why not?
19    A. Didn't get round to it.
20    Q. So I think it's safe to say you don't
21 know what effect that has on these numbers if you
22 would have looked that way, correct?
23    A. That's correct.
24    Q. Do you know of the -- we had 131,000

1134

1 people in the cohort. Do you know how much
2 gabapentin usage those people represent in terms of
3 patient years?
4    A. If your question is do I know how long
5 the prescriptions for gabapentin -- I guess I don't
6 understand.
7    Q. If you took all the prescriptions for
8 those 131,000 people and added it up, do you know
9 how many patient years you come to?
10    A. No, I didn't do that analysis.
11    Q. Would that be difficult to do?
12       MS. McGRODER: Object to form.
13       THE WITNESS: Not particularly.
14 BY MR. ALTMAN:
15    Q. Do you have any -- knowing what you know
16 of the data sets, do you have any feeling of what
17 generally would happen if you were to consider
18 whether the person was on or off the drug at the
19 time of the attempt?
20       MS. McGRODER: Object to form, calls for
21 speculation.
22       THE WITNESS: These analyses would
23 represent a lower bound on what would be ultimately
24 the protective effect because this analysis assumes

1135

1 that as soon as you take gabapentin, you are
2 exposed from that moment on. So everybody post
3 gabapentin who made a suicide attempt is attributed
4 to gabapentin.
5      Now, if I only looked at the post
6 gabapentin initiation months where they actually
7 were taking gabapentin, then fewer suicide attempts
8 would be attributed to gabapentin. So the effect
9 would be even smaller.
10 BY MR. ALTMAN:
11      Q.  That's not necessarily true though
12 because you could, let's say, lose half the suicide
13 attempts but only have a third of the exposure,
14 correct?
15      A.  If you included the person -- if you
16 included the time of the exposure in the analysis
17 that could happen. So if there was smaller amount,
18 that could be.
19      Q.  So generally you would move -- some of
20 the attempts that you currently are attributing to
21 gabapentin would move over to the unexposed group,
22 correct?
23      MS. McGRODER: Object to form, improper
24 hypothetical.

1136

1      THE WITNESS: Could happen, yes.
2 BY MR. ALTMAN:
3      Q.  Well, it would happen. I mean not every
4 attempt occurred while somebody was on gabapentin
5 in the post index period, correct?
6      MS. McGRODER: Object to form, improper
7 hypothetical. Go ahead.
8      THE WITNESS: I've already told you I
9 haven't looked at those data. One possibility is
10 that everybody was on gabapentin continuously. I
11 mean that is a possibility. I haven't looked at
12 it, don't think it's true, but I'm not going to
13 answer the question affirmative without having
14 looked at it.
15 BY MR. ALTMAN:
16      Q.  I apologize. Now, with the -- all these
17 various tables have P values, correct?
18      A.  Correct.
19      Q.  Explain the intersection between P values
20 and confidence intervals.
21      A.  The P value is a test statistic. It's
22 the probability associated with a test statistic to
23 determine whether or not a particular coefficient
24 in the model is statistically significant or not.

1137

1 So in this case, this is the P value for post
2 exposure versus pre-exposure. It's testing the
3 null hypothesis that that coefficient is equal to
4 zero. Not important in the model.
5      Q.  And how does that interplay with the
6 confidence interval?
7      A.  The confidence interval is a by-product
8 of the analysis. So the point estimate for the
9 odds ratio is the exponential of the regression
10 coefficient in the model and the corresponding
11 confidence interval is in this case an
12 asymptotically -- bad word -- normal confidence
13 interval for the odds ratio. So it's an interval
14 estimate that is based on a by-product of the
15 analysis.
16      In general, there's reasonable
17 correspondence between the two, but not always.
18 There's more rounding that goes on in terms of the
19 confidence intervals because you're taking an
20 estimated coefficient and taking its exponential
21 and then doing things with that.
22      MR. ALTMAN: Go off the record for a
23 minute.
24      VIDEOGRAPHER: The time is 1:41 p.m. We

1138

1 are going off the record.
2      (Short recess.)
3      VIDEOGRAPHER: The time is 1:53 p.m. We
4 are back on the record.
5 BY MR. ALTMAN:
6      Q.  Dr. Gibbons, would it have been
7 reasonable to assume -- strike that.
8      We discussed earlier how you don't know
9 whether -- just because somebody got a prescription
10 doesn't mean they took the entire prescription,
11 correct?
12      A.  That's correct.
13      Q.  Would it be reasonable to assume that if
14 somebody got a 30-day prescription and then in 30
15 days got another 30-day prescription, they probably
16 took the drug for the 30 days at least?
17      MS. McGRODER: Object to form.
18      THE WITNESS: Probably more than if they
19 had gotten it for 30 days, but we have no way of
20 really knowing. I mean they could have gotten the
21 prescription for 30 days, lost it and then asked
22 for another prescription. This kind -- these kind
23 of data, you know, do not support that level of
24 inference.

1139

1    MR. LONDON:  That level of what?
2    THE WITNESS:  Inference.
3 BY MR. ALTMAN:
4    Q.  Did you do any kind of a sensitivity
5 analysis to see how much the data might change if
6 you were to assume that a person never took the
7 last prescription or took only part of the last
8 prescription?
9    MS. McGRODER:  Object to form.
10    THE WITNESS:  No.
11 BY MR. ALTMAN:
12    Q.  Why not?
13    A.  Didn't think it was meaningful.
14    Q.  Wouldn't it be useful to see how much of
15 an effect that might have on the drug if you assume
16 that somebody only took it for 15 days out of the
17 30?
18    A.  You could do hundreds of sensitivity
19 analyses. I didn't find that one to be, you know,
20 anything that even occurred to me to do. The ones
21 -- the sensitivity analyses we did were, I believe,
22 the important ones.
23    Q.  Paragraph 21 of your report, you did make
24 a change from the last version of your report which

1140

1 was -- it originally had said -- if you want to
2 take either one of the earlier versions, the first
3 sentence there said, "More broadly, in connection
4 with FDA's public health alert on the entire class
5 of AEDs, Gibbons, et al. (2008 examined)" then for
6 this version of the report you changed that.
7 Instead of Gibbons, et al. 2008, you changed that
8 to under review. Correct?
9    A.  Correct.
10    MS. McGRODER:  Wait, wait. I'm going to
11 give you a little leeway here based on the
12 conversation I had with Jack at lunch, but this
13 kind of question and this scope of questioning is
14 outside of our agreement. So I'm giving you a
15 little leeway, Mr. Altman, and hope you don't abuse
16 it.
17    MR. ALTMAN:  I just want why he changed
18 from what it was to what it says now.
19    MS. McGRODER:  Is that your question?
20 I'll allow that and nothing further on paragraph 21
21 because it's outside the scope of the agreement.
22    THE WITNESS:  The revised -- the
23 supplement was done in 2009 and the paper was not
24 accepted for publication or in press, so the

1141

1 original one was done in 2008. So 2008
2 corresponded to the expert -- the time of the
3 expert report. And in this one, it would have been
4 wrong to list 2008 because that would have implied
5 that it had been published in 2008 and it still
6 wasn't published. It was still under review. So I
7 changed the 2008 to under review to update the
8 status of the paper.
9 BY MR. ALTMAN:
10    Q.  In the data, that data set that you had
11 from PHARMetrics, it included the -- for the
12 prescription information it included the dosage,
13 the number of pills and the -- dosage and the
14 number of pills, correct, for each prescription?
15    A.  It included the number of pills of the
16 prescription. I don't remember if it included the
17 dosage or not.
18    Q.  That would have come from the NDC code,
19 correct?
20    A.  Could have, sure.
21    Q.  So for example, somebody could have had a
22 30-day supply of 120 pills of 300 milligrams that
23 would tell you that they were taking -- prescribed
24 4 pills of 300 milligrams per day, correct?

1142

1    A.  Could you repeat the question?
2    Q.  If the prescription data said the person
3 received a 30-day prescription, got 120 pills of
4 300 milligrams of gabapentin, would it be a
5 reasonable inference that if that person was
6 prescribed 1200 milligrams per day?
7    A.  Yes.
8    Q.  Did you do any sensitivity analysis to
9 see the effect on -- effect of dosage on any of
10 the results?
11    A.  No.
12    Q.  Could you have done so?
13    A.  If that information was available. At
14 this point I just don't remember at this point from
15 the data what was available, but if there was
16 dosage information, certainly could include dosage
17 information. Generally it's not done where we
18 don't really know who took what. And generally in
19 the pharmacoepidemiologic literature really what's
20 done is kind of what I did here, look at exposure
21 of the time when someone initiated treatment and
22 then as a sensitivity analysis look at some form of
23 duration. Particularly true when studying suicide
24 since, you know, it's been argued that one of the

1143

1  reasons why people commit suicide is an adverse
2  effect that occurs very early on in the exposure
3  period.
4      Q.  Has anybody made that -- drawn that
5  conclusion with respect to anticonvulsants?
6      MS. McGRODER:  Object to form.  Was your
7  question has anybody?
8  BY MR. ALTMAN:
9      Q.  Is there any published literature on
10  anticonvulsants that draws that conclusion that you
11  just stated?
12      A.  I don't know of any offhand.  That's
13  largely the literature on antidepressants and
14  antipsychotics.  But you know, there isn't a lot of
15  literature and anticonvulsants of suicide.  So I
16  think, you know, certainly borrows strength from
17  the literature on antidepressants.
18      Q.  What is your basis for concluding that
19  that -- the antidepressant information is relevant
20  to the anticonvulsants?
21      A.  Only the volume of the literature.  I
22  mean, I'm not an expert on the comparisons of the
23  pharmacologic properties of anticonvulsants and
24  antidepressants, but you know, there's a tradition

1144

1  of looking at short-term exposures in suicide
2  research related to drugs, looking for short-term
3  effects.  So I think it's reasonable to preserve
4  short-term effects.
5      Q.  But most of the people who are studied
6  for antidepressants were actually depressed at the
7  time they were getting the drug, correct?
8      MS. McGRODER:  Object to form.
9      THE WITNESS:  I don't know the answer
10  necessarily is true for that.  There are -- even in
11  FDA's med analyses of randomized clinical trials,
12  many of the antidepressant trials were for
13  conditions other than depression.
14  BY MR. ALTMAN:
15      Q.  Such as?
16      A.  Obsessive compulsive disorders is one
17  that comes to mind.  I'd have to go back and look
18  at it.
19      Q.  But there's psychiatric conditions
20  though, correct?
21      MS. McGRODER:  Object to form.
22      THE WITNESS:  In general, yes, they're
23  psychiatric conditions.  There may be other uses of
24  antidepressants, but I'm not an expert on that.

1145

1  But many of the patients who are a part of these
2  data have co-morbid psychiatric conditions and many
3  of the patients who are part of the, you know, the
4  FDA's med analyses were in trials or that involved
5  psychiatric conditions.
6  BY MR. ALTMAN:
7      Q.  That's not true for gabapentin though,
8  correct, in terms of the FDA's med analysis?
9      A.  It was --
10      MS. McGRODER:  Objection.
11      THE WITNESS:  It was certainly -- I don't
12  know if there were any, but it was certainly lower
13  than for many of the -- than for, for example,
14  Lamotrigine.
15  BY MR. ALTMAN:
16      Q.  There was only a few hundred gabapentin
17  patients in psychiatric clinical trials, correct?
18      A.  I don't remember exactly, but that sounds
19  about right.
20      Q.  So aside from the volume of literature on
21  antidepressants, what -- are there any other bases
22  for why you conclude that anticonvulsants would
23  show a similar property to having suicidal issues
24  shortly after initiation of therapy?

1146

1      A.  The statistical issue is one of looking
2  at the time of exposure as the relevant variable
3  and not necessarily the density of exposure.  And
4  the purpose of that is to ensure that if there is
5  an adverse effect, that it will be captured by not
6  excluding anyone who was exposed because they
7  weren't exposed long enough.  So it's an attempt to
8  be conservative.
9      Q.  In the FDA's analysis -- one other issue
10  with the FDA's analysis, they did exclude anybody
11  who attempted more than one day after, correct?
12      MS. McGRODER:  Okay.  I just have to
13  object.  I don't understand, Keith.  I understood
14  when you were asking questions about 30-day supply
15  and short-term use because that relates to
16  Dr. Gibbons' sensitivity analyses, but the
17  questions you're asking now have nothing to do with
18  the sensitivity analyses in paragraphs 19 and 20 of
19  this report.
20      MR. ALTMAN:  Well, we're talking about
21  the absence of a sensitivity analysis that maybe
22  should have been done.
23      MS. McGRODER:  Okay.  Maybe I'm just not
24  following you.  What sensitivity analysis are you

1147

1 talking about because you're not referring to
2 anything in this report which seems to me to be
3 outside the scope of the agreement.
4 MR. ALTMAN: We talked about an analysis
5 of -- bear with me a second. I asked him whether
6 he could have done a sensitivity analysis to see
7 the effect of dosage on any of the results. He
8 said no. I said could you have done so. And as
9 part of his answer there he said, particularly true
10 when studying suicide since, you know, it's been
11 argued that one of the reasons why people commit
12 suicide is an adverse effect that occurs very early
13 on in the exposure period. So I'm simply following
14 up on the basis for him making that statement in
15 issues about short and the exposure period.
16 MS. McGRODER: Can you read back the last
17 question?
18 (Record read as requested.)
19 MR. ALTMAN: So we're talking about
20 short-term -- we're talking about short-term
21 exposure issues.
22 MS. McGRODER: All right. I think it's
23 getting far afield, but go ahead for the moment.
24

1148

1 BY MR. ALTMAN:
2 Q. That was one of the considerations that
3 the FDA decided to use, correct?
4 A. One day after what?
5 Q. That they would exclude attempts -- in
6 the FDA's study in the med analysis?
7 A. Which FDA study in med analysis?
8 Q. For anticonvulsants?
9 A. Okay.
10 Q. They did not include suicidal events that
11 occurred more than one day after the last dosage of
12 the anticonvulsant, correct?
13 A. One day after the last dosage or one day
14 after the end of the study?
15 Q. No, one day after the last dosage?
16 A. Okay. I'd have to go back to that and
17 see that. I don't remember that offhand.
18 Q. Do you have an understanding that it's at
19 least more than one day after the end of the study?
20 A. Well, you know, there are patients who
21 stopped taking medication in these studies, but
22 it's my understanding that they were -- whether you
23 stop taking the medication or not, you were still
24 at risk in their analyses till the end of the study

1149

1 if you had valid data through that period. And
2 what I don't remember is whether or not they used
3 that or the -- what they didn't use were data that
4 were after the end of the trial where somebody
5 might have gone on a different kind of medication.
6 And sitting here today, I can't remember which of
7 those two, but they're very different things.
8 Q. I'll represent to you that it was they
9 excluded events that occurred more than one day
10 after the last time they took the drug. So given
11 that, could you have done a sensitivity analysis to
12 see the effects of suicide attempts after the end
13 of any prescription that a person may have been
14 written?
15 MS. McGRODER: Object to form and
16 foundation.
17 THE WITNESS: I'm sorry. I'm not
18 following you.
19 BY MR. ALTMAN:
20 Q. For your studies other than the -- for
21 your gabapentin studies, pretty much once the
22 person had taken gabapentin, you considered them to
23 be at risk for the entire rest of the period,
24 correct?

1150

1 A. Correct.
2 Q. Did you do any sensitivity analyses to
3 see what the effect of limiting how long after the
4 last prescription of gabapentin could be before a
5 suicide attempt?
6 A. As I've indicated, the only sensitivity
7 analysis that I did for the gabapentin cohort with
8 respect to duration was the 30 days, requiring that
9 they had at least a prescription of 30 days. I did
10 not do any other form of sensitivity analyses
11 related to the duration or the frequency, you know,
12 or the dosage of the exposure.
13 I did in the bipolar cohort do a
14 person/time analysis which looked at each month and
15 determined whether or not a suicide attempt was
16 made either prior to the initiation in that month
17 or after the initiation in that month and whether
18 or not there was any drug during that month. That
19 analysis was done in the bipolar cohort. But I
20 didn't do that kind of analysis as I told you
21 before for the gabapentin cohort.
22 Q. Why didn't you do that analysis for the
23 gabapentin?
24 A. One of the primary reasons I wanted to do

1151

1 that analysis in the bipolar cohort is that we had
2 an index diagnosis and so we know that the
3 likelihood of suicide attempts is highest actually
4 right before the index diagnosis or right before
5 people initiate treatment and then it goes down
6 after that.
7        The person/time analysis, one of the big
8 benefits of that is it allows you to model the
9 independent effects of time since the diagnosis of
10 the index disorder along with the effects of drugs
11 and how those effects change over time. We don't
12 really have that in the gabapentin cohort. We have
13 the start of medication and we can see in the
14 gabapentin cohort because there were very few
15 patients who, you know, made a suicide attempt on
16 the same day they started gabapentin, so suicide
17 attempt was not leading to treatment in the
18 gabapentin cohort. So there wasn't the same
19 motivation for including the -- this sort of time
20 effect, the exponential decay that we see in a
21 cohort in which the index thing is a diagnosis.
22   Q.  Well, I'm a little confused about
23 something. But you said that when you did the time
24 to event analysis for the bipolar, wasn't -- if I

1152

1 remember right, weren't you just figuring out how
2 much time was it before the first suicide attempt
3 and that was it and once it fired, it was done?
4   A.  Are you referring now to the
5 person/time --
6   Q.  Person/time analysis?
7   A.  -- analysis in the bipolar cohort?
8   Q.  Right.
9   A.  So in that analysis, the data were broken
10 up into monthly intervals, 12 months of time, up
11 until the point of the first suicide attempt. And
12 the drug status was determined separately on each
13 one of the months. So you know, people who never
14 made a suicide attempt had 12 months of
15 observation. People who made a suicide attempt say
16 at month six would have had six months of
17 observation in that analysis. So it's a time to
18 that event.
19   Q.  And somebody who had an attempt in month
20 six and may have been on the drug, went off the
21 drug, went back on the drug and had another
22 attempt, you wouldn't be -- all the data past the
23 first attempt was just not used in that particular
24 study, correct?

1153

1   A.  That's correct, in that particular
2 analysis.
3   Q.  If and when your bipolar paper is
4 accepted for publication, do you intend to modify
5 any of the analyses that you did in your expert
6 report?
7   A.  No.
8   Q.  If the paper is ultimately not published,
9 do you expect to amend your expert report to
10 reflect the fact that it has not been published?
11        MS. McGRODER: Well, I object to form.
12 If you know. I think it's an improper hypothetical
13 that assumes facts not in evidence. I mean if you
14 have an intention, you can state it. If you don't
15 have one, that's fine.
16        THE WITNESS: I would leave it the way it
17 is because it indicates that it's under review. If
18 the paper's not accepted in the Archives of General
19 Psychiatry, I'll resubmit it someplace else. It's
20 a pretty high profile issue. Paper's pretty -- I
21 mean, I wrote it, but I think it's a pretty good
22 paper. I think somebody's going to publish it. I
23 don't know. It's hard to predict what reviewers
24 will do. But if it's not published, you know, I

1154

1 indicate that it's under review because it will be
2 under review. It will either be published or under
3 review. I'll keep submitting it for the rest of my
4 life.
5        MR. ALTMAN: Persistence. Let's go off
6 the record.
7        VIDEOGRAPHER: The time is 2:15 p.m. We
8 are going off the record.
9        (Short recess.)
10        VIDEOGRAPHER: The time is 2:27 p.m. We
11 are back on the record.
12        (Document marked as Gibbons Exhibit
13        Number 94 for identification.)
14        MR. ALTMAN: I'm going to mark what is
15 Exhibit 94 is a copy of three checks to Dr. Hur. I
16 guess, Lori, you'll authenticate that those are the
17 three checks?
18        MS. McGRODER: Those are the checks that
19 Dr. Gibbons wrote to Dr. Hur that comport with his
20 testimony given about those checks.
21        MR. ALTMAN: I want to put a few things
22 on the record and I think we may be done.
23 According to the agreement entered into April 13th
24 that we discussed earlier between counsel, we have

1155

1 not been able to substantively ask questions about
2 the materials that were produced just last Friday,
3 Exhibits 66 to 90 and as such, while we agreed that
4 we would not file a motion to compel on those
5 materials does not mean we waive for all time our
6 ability to ask questions about those materials --
7 not about -- about the content of the materials
8 including the letter from the journal.
9       Furthermore, the letter discusses the
10 fact that Dr. Gibbons may supplement his expert
11 report.  It is our position that Dr. Gibbons
12 included his bipolar study as part of his expert
13 report, his originally filed expert report and
14 therefore as such, any changes to that manuscript
15 need to be produced in accordance with Rule 26 and
16 we have an understanding that Dr. Gibbons has
17 revised his manuscript and submitted it.
18       We have not had an opportunity to see it
19 nor have we had an opportunity to ask questions
20 about it and we believe that we have the right to
21 do so and that Defendants have an obligation to
22 supplement Dr. Gibbons' expert report with the
23 current version of the manuscript and any
24 additional letters that come from the Archives of

1156

1 General Psychiatry.  Therefore, we believe we have
2 the right to redepose Dr. Gibbons on those
3 materials at some point in the future and that is
4 pending the discussion between the parties.  Is
5 there anything you need to put on, Jack?
6       MS. McGRODER: May I see the agreement?
7       MR. ALTMAN: Sure.
8       MS. McGRODER: First, my response to your
9 statement on the record is that we will follow
10 Rule 26 as we always have.  And to the extent that
11 Dr. Gibbons is going to rely or consider a revised
12 manuscript as part of his opinions in this case we
13 will of course give it to you pursuant to the rule
14 because that's required.
15       And separately, on the issue of the
16 documents and materials that were produced to you,
17 as you know, they were produced as part of this
18 agreement of April 13, 2009 in exchange for not
19 filing a motion to compel and also as part of that
20 agreement that you would have a fourth deposition
21 opportunity with Dr. Gibbons limited to the new
22 paragraphs and new tables in his supplemental
23 expert report.
24       So that's the agreement and you can, you

1157

1 know, seek whatever motion you like with the court.
2 And are we concluded?
3       MR. ALTMAN: Before we're done, you say
4 fourth deposition?
5       MS. McGRODER: This is your fourth
6 deposition day with Dr. Gibbons.
7       MR. ALTMAN: It's not the fourth
8 deposition though.
9       MS. McGRODER: I meant fourth deposition
10 day.
11       MR. ALTMAN: You said fourth deposition.
12       MS. McGRODER: Duly noted.
13       MR. ALTMAN: Lori, is it your position
14 that Dr. Gibbons does not already have the
15 obligation to submit his revised manuscript as part
16 of Rule 26 considering that he included that
17 manuscript and findings from that manuscript in his
18 expert report?
19       MS. McGRODER: Well, I think what he
20 included in his expert report was the manuscript
21 that was authored last September and that has been
22 provided to you and there's nothing in his
23 supplemental expert report that suggests he's
24 considering and relying on the recently revised and

1158

1 resubmitted manuscript, but I will explore that
2 with Dr. Gibbons and happy to do so and happy to
3 follow the rule as always.
4       MR. ALTMAN: But could you show me where
5 in Rule 26 it says relied upon?
6       MS. McGRODER: Keith, the rest of my
7 sentence was and considered. So -- or considered.
8 You know what, we can have this discussion off the
9 record. We're going both to follow the rule. We
10 both know it.
11       MR. LONDON: I think the issue --
12       MR. ALTMAN: I would say that --
13       MR. LONDON: We're in recess.  We won't
14 be able to determine that we're concluded until we
15 resolve this issue about the manuscript and perhaps
16 the other issue about interpretation of the
17 agreement.
18       MS. McGRODER: And it's Defendants'
19 position that the deposition is concluded and any
20 further deposition time will have to be either
21 agreed on ordered by the court.
22       MR. LONDON: We understand.
23       MS. McGRODER: Thank you.
24       VIDEOGRAPHER: The time is 2:33 p.m.  We

1159

1 are going off the record.
2      (Whereupon, the deposition was concluded
3      at 2:33 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1161

1      IN THE UNITED STATES DISTRICT COURT        DISTRICT OF MASSAC
2 IN RE: NEURONTIN MARKETING     )
3 SALES PRACTICES & PRODUCTS    )LIABILITY LITIGATION      )
4               )MDL DOCKETBULGER vs. PFIZER, et al.,   )No. 1629
5 07-11426-PBS      )              )MDL DOCKET
6 SMITH vs. PFIZER, et al.,    )No. 04-1098105-CV-11515-PBS        )
7
8      I, ROBERT D. GIBBONS, Ph.D., being first
9 duly sworn, on oath say that I am the deponent in
10 the aforesaid deposition taken on April 27, 2009;
11 that I have read the foregoing transcript of my
12 deposition, consisting of pages REPLACE through
13 REPLACE inclusive, and affix my signature to same.
14      _____ as it now appears
15      _____ as it now appears with corrections
16
17          ROBERT D. GIBBONS, Ph.D.
18
19 SUBSCRIBED and sworn to
20 before me this _____ day of_____, 2009.
21 _____
22    Notary Public
23
24

1160

1          I N D E XWITNESS              PAGE
2 ROBERT D. GIBBONS, Ph.D.
3 EXAMINED BY
4    Mr. Altman        1084
5
6
7          EXHIBITSNUMBER          MARKED FOR ID
8 Gibbons Deposition Exhibit
9 No. 66  Gibbons emails      1088
10 Nos. 67 to 89
11      Gibbons discrete emails   1088
12 No. 90  Seaton email      1088No. 91  March 19 expert report    108
13 No. 92  McGroder 2/23/09 email   with 11/5/08 expert report   1088
14 No. 93  original expert report   1088No. 94  copies of checks to Dr. Hur
15
16 Defendants'
17 No. 1  4/13/09 Seaton letter    1081
18
19
20
21
22
23
24

1162

1 STATE OF ILLINOIS    )        ) SS:
2 COUNTY OF DuPAGE    )
3      I, Sandra L. Rocca, a State of Illinois
4 licensed Certified Shorthand Reporter, License No.
5 084-003435, do hereby certify that on the 27th day
6 of April, 2009, at 10:49 a.m., 6638 South Cicero
7 Avenue, Chicago, Illinois, the deponent ROBERT D.
8 GIBBONS, Ph.D. personally appeared before me.
9      I further certify that the said ROBERT D.
10 GIBBONS, Ph.D. was by me first duly sworn to
11 testify and that the foregoing is a true record of
12 the testimony given by the witness.
13      I further certify that the deposition
14 terminated at 2:33 p.m.
15      I further certify that the reading and
16 signing of the deposition was not waived, and the
17 deposition was submitted for signature.  Pursuant
18 to Rule 30(e) of the Rules of Civil Procedure, if
19 deponent does not appear or read and sign the
20 deposition within 30 days, or make other
21 arrangements for reading and signing, the
22 deposition may be used as fully as though signed,
23 and this certificate will then evidence such
24 failure to appear as the reason for signature not

1163

1   being obtained.

2        I further certify that I am not counsel

3   for nor related to any of the parties herein, nor

4   am I interested in the outcome hereof.

5        In witness whereof, I have hereunto set

6   my hand and seal of office this        day of

7        , 2009.

8

9

10        Notary Public, DuPage County, Illinois

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gibbons V4   4/27/2009   11:40:00 AM

---

**-**

**-and-** 1080:6,15

---

**0**

**04-10981** 1079:7
**04** 1161:6**05-cv-11515-pk** 1100:17
**05-cv-11515-pbs** 1079:7
**07-11426-pbs** 1079:6 1161:5
**084-003435** 1162:5

---

**1**

**1** 1081:2 1082:7 1085:11 1091:8 1101:2 1103:1 1107:3,7 1160:17
**1,000** 1090:22
**10036-6522** 1080:18
**106** 1112:4,8
**1081** 1160:17
**1084** 1160:4
**1088** 1160:9,11,12,13
**1088no** 1160:12,14
**10:49** 1079:19 1081:6 1162:6
**10:57** 1090:4
**10:59** 1090:7
**11** 1129:14
**11/5/08** 1160:13
**115,000** 1110:21 1124:13
**1154** 1160:14
**119** 1112:4,7
**11:15** 1104:2
**12** 1112:1 1152:10,14
**120** 1141:22 1142:3
**1200** 1142:6
**12550** 1080:4
**12:04** 1104:5
**12:28** 1122:10
**13** 1082:9 1112:5,9 1156:18
**131,000** 1110:20 1124:13 1133:24 1134:8
**13th** 1154:23
**15** 1104:15 1139:16
**15,000** 1124:14 1125:17 1132:22
**16** 1082:16 1107:7 1132:22
**1629** 1079:5 1161:4
**169** 1111:24
**18** 1082:19 1084:21 1085:4,24 1099:23 1101:1,16

---

**181** 1111:24
**19** 1082:18 1086:2 1100:23 1146:18 1160:12
**199412** 1079:24
**19th** 1086:1 1093:10
**1:19** 1122:14 1123:3
**1:41** 1137:24
**1:53** 1138:3

---

**2**

**2** 1085:12 1101:16 1104:17 1106:10 1107:9 1108:1,7,12,16 1109:13 1110:12 1115:2,14 1119:15 1120:14 1123:3,20,22 ,24 1132:12
**2.0** 1123:15 1124:7,18 1125:14
**2/23/09** 1160:13
**20** 1082:19 1084:21 1085:4,24 1101:1,16 1146:18
**200** 1080:7
**2008** 1094:3,18 1140:5 ,7 1141:1,1,4,5,7
**2009** 1079:19 1081:5 1082:9,18 1140:23 1156:18 1161:10,20 1162:6 1163:7
**21** 1139:23 1140:20
**212** 1080:18,18
**22** 1132:24
**23** 1082:15 1088:21,23 1089:1 1103:4,5,6
**23rd** 1093:16,24
**251** 1132:24 1133:1
**2555** 1080:13
**26** 1155:15 1156:10 1157:16 1158:5
**27** 1082:15 1161:10
**273** 1132:24
**27th** 1079:18 1081:5 1162:5
**289** 1132:24
**2:15** 1154:7
**2:27** 1154:10
**2:33** 1158:24 1159:3 1162:14
**2a** 1082:20 1095:11 1104:17,23 1106:11 1107:8,9 1111:21 1112:7,19 1132:12
**2b** 1082:20 1095:11 1107:24 1108:6,8,13,16 1109:13 1110:12

---

1111:21 1112:8,19 1115:2,4,14 1123:7,9 ,23 1132:15
**2c** 1082:20 1095:11 1119:24 1133:10

---

**3**

**3** 1082:20 1095:12 1101:16 1120:12,13,14 1130:5,14 1132:11,19
**3,469** 1111:22
**3,479** 1110:16
**3,783** 1110:16 1111:20 ,21
**30** 1108:10,15,19 1109:9,14,23 1110:7,14 1112:22,23 1114:3,19 ,24 1115:11,15,17,20 ,24 1116:4,4,6,13,17 1117:9 1124:1,15 1138:14,16,19,21 1139:17 1150:8,9 1162:20
**30(e)** 1162:18
**30-day** 1109:19 1110:10 1113:7 1115:5 1132:18 1138:14,15 1141:22 1142:3 1146:14
**300** 1141:22,24 1142:4
**303-1222** 1080:4
**314** 1111:22
**3701** 1080:7
**38** 1133:1
**390** 1113:3
**3a** 1082:20 1095:12 1132:11
**3b** 1082:20 1095:12 1132:15,19
**3c** 1082:20 1095:12 1133:10

---

**4**

**4** 1141:24
**4/13/09** 1160:17
**421-5547** 1080:14
**426** 1112:19
**453** 1113:2
**456** 1112:18
**456-5885/fax** 1080:4
**458-7790** 1103:19
**463** 1080:3
**474-6550/fax** 1080:14
**478-5858** 1080:8

---

**5**

**5** 1094:3,15
**512** 1080:8

---

**516** 1080:4
**5th** 1084:18 1093:18 1094:8,18 1095:7

---

**6**

**63** 1113:3
**64108-2613** 1080:13
**66** 1088:2,4,8,16 1089:19,20 1155:3 1160:9
**6638** 1079:17 1162:6
**67** 1088:17,20 1089:2,3 ,24 1092:6 1160:10

---

**7**

**708-458** 1103:15
**735-2000** 1080:18
**735-3000/fax** 1080:18
**78746** 1080:8

---

**8**

**816** 1080:14,14
**88** 1088:17
**89** 1088:19,20,23 1089:1,2,3 1090:1 1092:6 1160:10

---

**9**

**90** 1090:9,23,24 1155:3 1160:12
**91** 1093:8 1160:12
**913** 1103:21
**92** 1093:15 1094:13,14 1108:4 1160:13
**93** 1088:2 1094:17 1108:4 1160:14
**94** 1154:13,15 1160:14
**951** 1080:4

---

**A**

**a.m** 1079:19 1081:6 1090:4,7 1104:2 1162:6
**ability** 1155:6
**able** 1114:16 1155:1 1158:14
**above** 1129:16
**above-entitled** 1122:13
**absence** 1146:21
**abuse** 1140:15
**accepted** 1140:24 1153:4,18
**accompanied** 1106:16
**accordance** 1155:15
**according** 1126:21 1154:23
**accurately** 1083:11

---

**across** 1126:16
**actually** 1087:3 1105:4
  1107:9 1113:5,21
  1115:12 1118:5 1135:6
  1144:6 1151:3
**acute** 1114:9,10
**add** 1083:18 1092:24
**added** 1134:8
**adding** 1094:4
**addition** 1106:2
  1126:12
**additional** 1084:19
  1086:3 1155:24
**adds** 1108:8
**adequate** 1111:5
  1113:15 1117:19
**adjust** 1105:14
**adjusted** 1119:17
  1124:16
**adjusting** 1105:9,10,16
**adjustment** 1125:15
**adjustments** 1124:5
**administered** 1081:23
**adverse** 1108:23
  1109:4 1115:7 1143:1
  1146:5 1147:12
**advised** 1083:16
**aeds** 1140:5
**affect** 1114:6
**affected** 1114:14
**affirmative** 1136:13
**affix** 1161:13
**afield** 1147:23
**aforesaid** 1161:10
**afterwards** 1107:18
**again** 1096:2 1109:20
  1111:19 1114:18
  1115:13 1118:9 1133:3
  ,9
**against** 1130:23
**age** 1119:5,18
**ago** 1084:15
**agree** 1102:21 1114:4
**agreed** 1085:5 1104:9
  1155:3 1158:21
**agreement** 1082:5,6,12
  ,16 1083:3,6,12 1085:2
  ,9 1086:15 1087:15
  1089:11 1100:5,21
  1101:5 1102:24
  1104:10 1140:14,21
  1147:3 1154:23 1156:6
  ,18,20,24 1158:17
**ahead** 1102:7 1118:9
  1123:18 1128:22
  1136:7 1147:23
**al** 1079:5,7 1140:5,7
  1161:4,6

**alert** 1140:4
**allergic** 1114:13,15
  1115:1
**allow** 1085:15 1086:10
  1140:20
**allows** 1151:8
**along** 1151:10
**already** 1094:4 1101:1
  1136:8 1157:14
**although** 1082:21
**altman** 1080:3 1081:13
  ,13 1083:18 1084:1,4
  ,11,22,23 1085:6,10,16
  1086:5,11,14,17 1087:5
  1088:4,9,12,20 1089:2
  ,5,8,14,20,24 1090:9,16
  ,24 1091:3,4,20 1092:2
  ,5,13,18,22 1093:4,6
  1094:6,11,16,21
  1097:15 1098:6
  1099:17,24 1100:13
  1101:9,18 1102:3,6,11
  ,15,17 1103:9,24
  1104:12,13 1107:7,9
  1109:16 1116:19
  1118:3,18 1121:18
  1122:9 1123:6,21
  1124:22 1125:18
  1126:18 1127:2,18
  1128:1,10 1129:12
  1133:8 1134:14
  1135:10 1136:2,15
  1137:22 1138:5 1139:3
  ,11 1140:15,17 1141:9
  1143:8 1144:14 1145:6
  ,15 1146:20 1147:4,19
  1148:1 1149:19 1154:5
  ,14,21 1156:7 1157:3,7
  ,11,13 1158:4,12
  1160:4
**always** 1137:17 1156:10
  1158:3
**am** 1161:9 1163:2,4
**amend** 1153:9
**among** 1082:12
**amount** 1135:17
**analyses** 1095:10,11,12
  ,13 1098:20 1099:6
  1101:23 1123:12
  1126:22 1129:2 1131:9
  ,10 1133:14 1134:22
  1139:19,21 1144:11
  1145:4 1146:16,18
  1148:24 1150:2,10
  1153:5
**analysis** 1097:12
  1099:12,14 1101:20,22
  1105:6,23 1106:10,15

  ,19 1108:9,18 1109:5
  ,17 1110:4,9,18,22
  1111:2,4,10,13,17,19
  1112:15 1115:14
  1116:10,12,15,17
  1119:13,14 1120:22
  1121:2,6,9,9,12,15,19
  ,22 1123:10 1124:4,16
  ,17 1126:13 1130:11
  1131:5 1132:1,4,6,7
  1133:7 1134:10,24
  1135:16 1137:8,15
  1139:5 1142:8,22
  1145:8 1146:9,10,21,24
  1147:4,6 1148:6,7
  1149:11 1150:7,14,19
  ,20,22 1151:1,7,24
  1152:6,7,9,17 1153:2
**angela** 1085:12 1090:11
  ,22 1101:10
**answer** 1093:1 1110:10
  1116:18 1118:9
  1124:19 1128:8,23
  1131:20 1136:13
  1144:9 1147:9
**answered** 1118:9
**anticonvulsant** 1148:12
**anticonvulsants** 1143:5
  ,10,15,20,23 1145:22
  1148:8
**antidepressant** 1105:1
  1106:13,17,21 1143:19
  1144:12
**antidepressants** 1106:1
  ,5 1143:13,17,24
  1144:6,24 1145:21
**antipsychotics** 1106:2
  ,6 1143:14
**anybody** 1110:1 1143:4
  ,7 1146:10
**anyone** 1131:21 1146:6
**anything** 1097:11
  1113:18 1126:22
  1133:4 1139:20 1147:2
  1156:5
**apologize** 1136:16
**apparently** 1103:13
**appear** 1088:21 1091:5
  1117:18 1162:19,24
**appearances** 1080:1
**appeared** 1080:10,20
  1162:8
**appearing** 1082:19
**appears** 1091:10,23
  1092:8 1093:11 1103:7
  1110:20 1161:14,15
**applies** 1107:15
**apply** 1098:16 1099:13

**approach** 1101:12
**appropriate** 1103:12
  1132:8
**approximately** 1081:5
  1113:7,9
**april** 1079:19 1081:5
  1082:9,15,15,16
  1154:23 1156:18
  1161:10 1162:6
**arbitrary** 1082:22
**archives** 1153:18
  1155:24
**area** 1129:3
**areas** 1082:17
**aren't** 1096:20
**argued** 1142:24
  1147:11
**argument** 1130:23
**arps** 1080:16
**arrangements** 1162:21
**arrive** 1119:22
**aside** 1145:20
**ask** 1085:20 1086:7
  1088:22 1093:10
  1123:9 1127:6 1155:1,6
  ,19
**asked** 1083:15 1095:4
  1118:8 1138:21 1147:5
**asking** 1085:10 1099:8
  1101:11 1111:11
  1116:5 1128:11 1130:4
  1146:14,17
**assigned** 1096:24
  1097:18
**associated** 1136:22
**assume** 1121:13 1138:7
  ,13 1139:6,15
**assumes** 1125:2
**assuming** 1124:23
**asymptotically** 1137:12
**attached** 1093:20
**attachments** 1091:17
  1095:19
**attempt** 1111:18
  1113:16,18 1117:20,24
  1120:1,17,21 1121:3,10
  ,14 1122:4 1128:15
  1129:17 1130:7,10
  1131:14,20,24 1132:3
  1133:16 1134:19
  1135:3 1136:4 1146:7
  1150:5,15 1151:15,17
  1152:2,11,14,15,19,22
  ,23
**attempted** 1130:16,19
  1146:11
**attempts** 1098:22

Gibbons V4  4/27/2009  11:40:00 AM

1111:9,24 1112:1,5,7
,10,18,23 1113:6
1116:22 1118:20,23
1119:19 1120:16
1121:5,20 1122:1
1130:12 1131:1,2,6,8
1132:23 1135:7,13,20
1148:5 1149:12 1151:3
**attorneys** 1081:11
**attributed** 1135:3,8
**attributing** 1135:20
**austin** 1080:8
**authenticate** 1154:16
**authored** 1157:21
**auxiliary** 1131:17
**available** 1082:10,14
1142:13,15
**avenue** 1079:18 1080:3
1162:7
**avoid** 1086:9

**B**

**back** 1082:11 1090:8
1095:12 1096:13,17
1097:13 1098:4 1104:6
,8 1123:3,7 1138:4
1144:17 1147:16
1148:16 1152:21
1154:11
**bacon** 1080:12
**bad** 1137:12
**balanced** 1129:18
**banner** 1091:22
**base** 1111:8 1119:6
**based** 1082:4 1085:8
1104:19 1106:4 1109:1
,7 1119:16 1125:13
1129:8 1137:14
1140:11
**bases** 1145:21
**basically** 1098:18
1121:9
**basis** 1119:22 1122:2
1143:18 1147:14
**battle** 1086:6
**bear** 1147:5
**bee** 1080:7
**beginning** 1123:2
**behalf** 1080:10,20
1081:13,18,21
**believe** 1083:21
1084:18 1087:19
1088:18 1094:7
1095:11 1130:4
1139:21 1155:20
1156:1
**beneficial** 1113:14
1116:24 1117:16

**benefits** 1151:8
**best** 1095:2
**better** 1092:13 1125:8
1126:6,14
**big** 1151:7
**binary** 1120:20
**bipolar** 1098:17,19
1099:1,12,18 1100:16
,17 1101:20,21 1110:15
1111:20 1112:8
1126:12 1127:14
1150:13,19 1151:1,24
1152:7 1153:3 1155:12
**borrows** 1143:16
**bottom** 1091:11,22,23
1093:22 1107:3
**boulevard** 1080:13
**bound** 1134:23
**box** 1088:13 1091:5
1093:3
**break** 1084:5 1119:1,2
**bring** 1127:7
**broadly** 1140:3
**broken** 1152:9
**built** 1106:22,24
**bulger** 1079:5
**button** 1111:13
**by-product** 1137:7,14

**C**

**call** 1083:17 1085:18
1100:3 1102:2,5,6,13
1103:1,8,14,16 1104:8
**called** 1079:12
**calling** 1102:8
**calls** 1134:20
**can't** 1085:20 1097:9,23
1109:6 1113:13
1116:18 1149:6
**cannot** 1115:11
**caption** 1081:7
**captured** 1146:5
**case** 1081:8 1093:12
1100:21 1106:24
1107:2 1120:15
1129:23 1137:1,11
1156:12
**cases** 1117:17
**category** 1112:18
1126:5
**cause** 1116:8 1122:13
**causing** 1113:21,23
1115:12 1116:12,15
**cave** 1080:7
**cell** 1102:19 1103:8,22
,24
**certain** 1083:19
1087:20 1102:22

1104:11
**certainly** 1092:13
1110:19 1113:14
1129:21 1142:16
1143:16 1145:11,12
**certificate** 1162:23
**certified** 1162:4
**certify** 1162:5,9,13,15
1163:2
**change** 1096:16 1105:4
1109:5 1139:5,24
1151:11
**changed** 1093:18
1099:3 1140:6,7,17
1141:7
**changes** 1100:22,24
1155:14
**chart** 1120:10
**checks** 1083:23
1154:15,17,18,20
1160:14
**chicago** 1079:18 1081:7
1162:7
**cicero** 1079:18 1162:6
**city** 1080:13
**civil** 1079:14 1162:18
**claims** 1108:24
**clarity** 1094:11,23
**class** 1140:4
**clean** 1088:16
**clear** 1093:19 1101:10
1109:22
**clearly** 1109:8
**clinical** 1144:11
1145:17
**cns** 1107:4,11,17,21
**co-morbid** 1145:2
**co-variant** 1104:24
1107:1,2 1125:15
**co-variants** 1123:12
1124:4,17
**code** 1131:24 1141:18
**codes** 1096:23 1097:1
,17 1130:7
**coefficient** 1136:23
1137:3,10,20
**cohort** 1098:18,19,21
1129:3 1134:1 1150:7
,13,19,21 1151:1,12,14
,18,21 1152:7
**cohorts** 1101:24
**collection** 1088:5,21
1089:20 1132:2
**column** 1108:2,3
**comments** 1129:7
**commit** 1143:1 1147:11
**committee** 1081:15,17
**compare** 1108:4

1110:12 1131:5,8
**compares** 1115:14
**comparisons** 1098:23
1143:22
**compel** 1155:4 1156:19
**complete** 1083:2
**completely** 1092:8,14
**comply** 1101:7
**comport** 1154:19
**composition** 1125:10
**compulsive** 1144:16
**computer** 1111:12
**concerns** 1099:9,11,12
,13
**conclude** 1145:22
**concluded** 1125:5
1157:2 1158:14,19
1159:2
**concluding** 1143:18
**conclusion** 1114:5
1143:5,10
**concomitant** 1104:18
,19,23 1105:10,20
1106:1,3,15,20
1117:12 1119:3,17
1125:11 1129:9
**conditions** 1144:13,19
,23 1145:2,5
**conducted** 1121:23
**confidence** 1136:20
1137:6,7,11,12,19
**confirm** 1094:24
**conformance** 1091:6
**confounds** 1119:5
**confused** 1151:22
**connection** 1140:3
**connors** 1080:12
**consecutive** 1130:8,9
1131:1,24
**conservative** 1131:4
1146:8
**consider** 1134:17
1156:11
**considerations** 1148:2
**considered** 1130:11,19
1132:2 1149:22 1158:7
,7
**considering** 1157:16,24
**consistent** 1118:2
**consisting** 1161:12
**contact** 1083:3
**contains** 1091:2
**contaminant** 1105:3
**content** 1155:7
**context** 1129:23
**contingent** 1093:2
**continue** 1104:9
**continued** 1123:5

**continuing** 1082:24
**continuously** 1136:10
**convened** 1103:2,5,6
**converge** 1111:18
**converged** 1111:15
**conversation** 1102:23
  1140:12
**conversations** 1082:21
**copies** 1160:14
**copy** 1086:20 1087:4
  1088:6 1090:17
  1154:15
**copying** 1090:21
**correct** 1083:2 1084:15
  1088:11 1089:13,24
  1090:23 1092:1,3,4
  1093:2 1094:16
  1095:16,16 1104:12
  1107:20 1108:3,5
  1109:10,19 1110:21
  1111:1,22,23 1112:2,3
  ,5,10,11,20,21,24
  1113:1,3,4,7,22
  1114:17 1115:12
  1117:2 1118:21 1120:2
  ,3,7,8 1121:21 1126:1
  1127:15,16 1128:2,3
  1130:12,13,17 1131:6
  ,14,15 1132:13,14,16
  ,24 1133:1,2,5,13,22,23
  1135:14,22 1136:5,17
  ,18 1138:11,12 1140:8
  ,9 1141:14,19,24
  1144:7,20 1145:8,17
  1146:11 1148:3,12
  1149:24 1150:1
  1152:24 1153:1
**correction** 1091:16
**corrections** 1161:15
**correctly** 1124:12
**corresponded** 1141:2
**correspondence**
  1082:8 1083:10
  1137:17
**corresponding** 1137:10
**couldn't** 1096:19,20
  1111:4,17
**counsel** 1083:9 1087:19
  1154:24 1163:2
**counsel's** 1091:7
**count** 1120:18 1121:16
  1131:6
**counted** 1121:11,14
**county** 1079:17 1162:2
  1163:10
**couple** 1092:7
**course** 1085:13
  1098:18 1117:9,11

1156:13
**court** 1079:1 1126:20
  1157:1 1158:21 1161:1
**courts** 1079:15
**cover** 1093:15 1094:5
**crr** 1079:16
**csr** 1079:16
**current** 1155:23
**currently** 1135:20

———————————

**D**

**daily** 1122:1
**data** 1097:8,23 1098:5
  1106:4 1109:1 1116:7
  1119:22 1121:23,23
  1122:6 1131:3 1134:16
  1136:9 1138:23 1139:5
  1141:10,10 1142:2,15
  1145:2 1149:1,3 1152:9
  ,22
**date** 1081:4 1091:10,11
  ,23,24 1092:2 1093:18
  1107:4,11,21,22,22
  1120:2,2 1122:14
**dated** 1082:8,18
  1093:16
**dates** 1091:14
**david** 1102:20,20
**day** 1079:19 1082:14,23
  1090:21 1096:10,12
  1098:9 1101:6 1108:12
  1114:1,2,4,20,20,21,22
  ,23,24 1115:6,21,23
  1117:7 1121:4 1123:14
  1141:24 1142:6
  1146:11 1148:4,11,13
  ,13,15,19 1149:9
  1151:16 1157:6,10
  1161:20 1162:5 1163:6
**days** 1108:10,15,19
  1109:3,9,15,23 1110:7
  ,14 1112:24 1114:3,19
  ,24 1115:11,15,18,20
  ,24,24 1116:4,5,6,13,17
  1117:9 1120:24 1121:2
  1124:1,15 1130:8,9
  1131:1,24 1138:15,16
  ,19,21 1139:16 1150:8
  ,9 1162:20
**deal** 1087:8
**decay** 1151:20
**decide** 1101:7
**decided** 1095:5 1109:3
  1148:3
**decreased** 1098:22
  1117:21
**defendants** 1080:20
  1081:1,19,21 1082:7

1083:8,12 1101:2
  1102:24 1155:21
  1158:18 1160:16
**defense** 1087:19
  1091:7
**definitely** 1126:6
**definition** 1104:19
  1108:14
**demonstrates** 1116:8
**density** 1146:3
**depends** 1124:19
**deponent** 1161:9
  1162:7,19
**depose** 1082:4
**deposition** 1079:11
  1081:6 1082:8,10,13,14
  ,23 1083:5,17 1085:8
  ,21,23 1086:8 1087:19
  1088:1 1095:7,15,23
  1096:8 1100:2,5 1101:3
  1122:12 1156:20
  1157:4,6,8,9,11
  1158:19,20 1159:2
  1160:8 1161:10,12
  1162:13,16,17,20,22
**depositions** 1120:23
**depressed** 1144:6
**depression** 1144:13
**depressive** 1095:14
  1126:11
**derive** 1116:24
**description** 1090:12
**details** 1097:6,23
  1098:4
**detect** 1111:7
**determine** 1112:16
  1131:9 1136:23
  1158:14
**determined** 1150:15
  1152:12
**diagnoses** 1097:16
  1119:2,18 1125:10
  1126:17
**diagnosis** 1126:16
  1151:2,4,9,21
**diagnostic** 1097:1
  1126:14
**dial-in** 1102:16
**didn't** 1084:1,2 1097:7
  1111:1 1128:5 1131:12
  ,15 1133:3,7,19
  1134:10 1139:13,19
  1149:3 1150:20,22
**difference** 1104:16
  1106:10 1108:1,6,16
  1109:13 1110:5,16
  1111:21 1115:2,4
  1120:6,10 1124:12

1132:11,12,19
**differences** 1109:12
**different** 1114:11
  1125:10 1130:22
  1149:5,7
**differential** 1123:22
**difficult** 1134:11
**digress** 1095:5
**direction** 1113:19
**disagree** 1100:19
**discrete** 1088:21
  1089:5 1090:1 1121:4
  ,20 1160:11
**discretely** 1131:13
**discussed** 1098:7
  1120:4 1138:8 1154:24
**discusses** 1155:9
**discussion** 1085:12
  1092:10 1095:9 1097:5
  ,7 1104:4 1128:13
  1156:4 1158:8
**disorder** 1095:14
  1126:9,11,12 1129:9,10
  1151:10
**disorders** 1126:10
  1144:16
**distinct** 1121:1 1131:13
**district** 1079:1,1,15
  1161:1,1
**dividing** 1089:18
**docket** 1079:5,7 1161:5
**docketbulger** 1161:4
**docs** 1090:12
**doctor** 1109:3,23
  1115:23
**document** 1081:1
  1091:6 1092:5,11
  1093:23 1154:12
**documents** 1083:5
  1087:13,14,16,18,20
  1088:1,14,22 1089:8
  1090:1,13 1091:5,8,12
  1092:7,20 1093:22
  1095:1,5 1156:16
**doesn't** 1096:19
  1138:10
**doing** 1086:9 1093:21
  1094:4 1100:13
  1126:13 1127:8,9
  1130:23 1137:21
**don't** 1085:22 1087:21
  1088:12,14,24 1090:17
  1091:4 1092:22 1097:6
  ,17 1098:4 1099:22
  1100:19 1101:8 1103:2
  ,21 1109:24 1111:14
  1113:23 1115:18,22
  1116:1 1117:9,10,12

1118:10,10,16 1121:24
1131:17,20,21,22
1133:20 1134:5
1136:12 1138:8
1140:15 1141:16
1142:14,18 1143:12
1144:9 1145:11,18
1146:13 1148:17
1149:2 1151:11
1153:14,23
**done** 1086:8 1093:19
1095:6 1097:11
1098:20 1109:17
1110:9,19 1111:4,19
1116:15,17 1119:12
1123:10 1124:15,18
1125:22 1127:20
1132:5,6 1140:23
1141:1 1142:12,17,20
1146:22 1147:6,8
1149:11 1150:19
1152:3 1154:22 1157:3
**dosage** 1141:12,13,17
1142:9,16,16 1147:7
1148:11,13,15 1150:12
**dose** 1114:15 1117:5
**double** 1113:5,8
**doubt** 1129:22
**down** 1110:16 1112:19
1113:17 1119:1,2
1151:5
**dr** 1081:10 1082:3,8,10
,14 1083:4,13,23
1084:12 1086:18
1088:11 1089:12
1091:9,9,12,16 1092:3
,20 1093:7 1096:5,7,11
1098:7 1101:20
1104:11,14 1123:7
1138:6 1146:16
1154:15,19,19 1155:10
,11,16,22 1156:2,11,21
1157:6,14 1158:2
1160:14
**drawn** 1143:4
**draws** 1143:10
**drop** 1112:19
**drug** 1105:12 1107:17
1108:23 1109:18,24
1110:1,2 1113:15,16,20
,23 1114:2,3,14,14,20
,22 1115:6,10,11,19,21
,23 1116:4,8,12,14,23
1117:7,8,11,15 1118:4
,12 1126:23 1128:17
1133:16 1134:18
1138:16 1139:15
1144:7 1149:10

1150:18 1152:12,20,21
,21
**drugs** 1105:13,22
1107:4,11,21 1114:6,9
1117:17 1119:11
1144:2 1151:10
**duly** 1084:8 1157:12
1161:9 1162:10
**dupage** 1079:17 1162:2
1163:10
**duration** 1109:1
1142:23 1150:8,11
**during** 1106:14 1150:18

E

**earlier** 1117:1,4 1120:4
,23 1123:10,24 1138:8
1140:2 1154:24
**early** 1143:2 1147:12
**easier** 1094:12,22
**easily** 1093:23
**effect** 1105:18,21
1106:6 1108:23 1109:4
1111:7 1113:14
1114:17 1117:16,20
1119:11 1129:7
1133:11,21 1134:24
1135:8 1139:15 1142:9
,9 1143:2 1146:5
1147:7,12 1150:3
1151:20
**effects** 1106:9 1114:10
,11 1117:1 1144:3,4
1149:12 1151:9,10,11
**either** 1101:5 1140:2
1150:16 1154:2
1158:20
**else** 1095:20 1153:19
**email** 1090:10,18
1091:1 1092:6 1093:15
,20,20 1094:14 1160:12
,13
**emailed** 1091:18
**emails** 1088:5,10
1089:6,21 1091:11,14
,17,22 1095:18 1160:9
,11
**enclosed** 1094:15
**end** 1148:14,19,24
1149:4,12
**enough** 1110:11 1146:7
**ensure** 1146:4
**entered** 1154:23
**entire** 1138:10 1140:4
1149:23
**entitled** 1084:23
**epidemiology** 1100:16
**epilepsy** 1126:10

**equal** 1137:3
**error** 1095:17 1096:18
1122:4
**estimate** 1109:6 1137:8
,14
**estimated** 1137:20
**et** 1079:5,7 1140:5,7
1161:4,6
**even** 1085:20 1102:22
1111:14,17 1135:9
1139:20 1144:10
**event** 1110:24 1115:7
1120:20 1121:1
1130:10 1151:24
1152:18
**events** 1120:23 1121:1
,4 1132:3 1133:12
1148:10 1149:9
**ever** 1087:16 1129:3
**every** 1085:17 1086:12
1092:5 1131:18 1136:3
**everybody** 1135:2
1136:10
**everything** 1119:15
1123:13 1124:5
**evidence** 1116:11,14
1117:7 1118:11,17
1125:2 1129:4 1153:13
1162:23
**exactly** 1099:8 1105:7
1145:18
**examination** 1079:13
1084:10 1123:5
**examined** 1084:8
1140:5 1160:3
**example** 1110:15
1123:15 1124:7 1129:2
1141:21 1145:13
**examples** 1096:18
**except** 1120:14
**exchange** 1156:18
**exclude** 1146:10 1148:5
**excluded** 1107:5,11,22
1123:23 1149:9
**excludes** 1119:24,24
**excluding** 1097:12
1115:4 1146:6
**excuse** 1120:1 1130:4
**exert** 1106:6
**exhibit** 1081:1 1082:7
1087:1 1088:2,4,7,16
,17 1090:9,23,24
1092:6 1093:8,15
1094:4,7,13,17,20
1101:2 1103:1 1108:4
1133:10 1154:12,15
1160:8
**exhibits** 1087:7,8,17,18

1088:20 1155:3
**exhibitsnumber** 1160:7
**exist** 1097:17
**expect** 1120:9 1133:11
1153:9
**expectation** 1082:22
**expert** 1082:18 1084:22
1085:20 1093:18
1094:1,3,18 1098:12,16
,18 1099:7 1100:21,23
1101:17 1114:8,12
1127:1,3,5,8,13 1128:6
,8,12 1129:1 1141:2,3
1143:22 1144:24
1153:5,9 1155:10,12,13
,22 1156:23 1157:18,20
,23 1160:12,13,14
**explain** 1085:18
1104:16 1120:12
1136:19
**explained** 1126:20
**explore** 1158:1
**exponential** 1137:9,20
1151:20
**exposed** 1135:2 1146:6
,7
**exposure** 1108:13,14
1109:1 1135:13,16
1137:2 1142:20 1143:2
1146:2,3 1147:13,15,21
1150:12
**exposures** 1144:1
**extension** 1098:3
1103:19
**extent** 1083:14 1098:24
1100:16 1156:10

F

**fact** 1083:20 1098:1
1105:14 1106:20,23
1111:15 1116:21
1119:14 1129:2
1130:15 1131:11,19
1153:10 1155:10
**facts** 1125:2 1153:13
**failure** 1162:24
**fairly** 1083:11
**far** 1120:4 1147:23
**fda** 1148:3,7
**fda's** 1140:4 1144:11
1145:4,8 1146:9,10
1148:6
**february** 1093:16,24
**feeling** 1134:16
**felt** 1097:10
**few** 1087:2 1110:17
1120:6 1133:12
1145:16 1151:14

1154:21
fewer 1135:7
fight 1085:16 1086:11
1101:6
figuring 1152:1
file 1091:9 1092:3
1093:22 1155:4
filed 1155:13
files 1089:12 1091:17
filing 1156:19
filled 1109:2
find 1096:19,19,20
1103:18,19 1139:19
findings 1157:17
fine 1084:13 1086:17,22
1091:20 1101:18
1153:15
finkelstein 1080:2
fired 1152:3
first 1084:8 1087:7,9
1114:4 1120:16
1121:10 1140:2 1152:2
,11,23 1156:8 1161:8
1162:10
flagged 1130:15
flom 1080:16
focusing 1129:6
follow 1156:9 1158:3,9
follow-up 1103:10
following 1091:8 1096:9
1098:22 1104:21
1125:6 1146:24
1147:13 1149:18
follows 1084:9
footnote 1107:7,13
foregoing 1161:1
1162:11
form 1097:2,20 1099:15
1109:11 1116:9 1117:3
1121:7 1123:17 1126:2
,24 1127:17 1128:4
1133:6 1134:12,20
1135:23 1136:6
1138:17 1139:9
1142:22 1143:6 1144:8
,21 1149:15 1150:10
1153:11
forth 1083:2,7 1096:13
foundation 1097:3,21
1101:19 1149:16
foundational 1085:14
1101:11,14
four 1080:17 1131:24
1132:3
fourth 1082:4 1156:20
1157:4,5,7,9,11
frequency 1150:11
friday 1087:15 1089:9

1091:4 1155:2
full 1082:23 1091:5
1124:3
fully 1162:22
further 1098:11 1140:20
1158:20 1162:9,13,15
1163:2
furthermore 1155:9
future 1156:3

## G

gabapentin 1098:21
1099:13 1101:24
1104:20,22,23 1105:2
1106:2,4,8,16 1107:13
,18,23 1108:12,14,22
1118:21 1120:5,7
1126:9 1128:16 1129:4
1133:15 1134:2,5
1135:1,3,4,6,7,8,21
1136:4,10 1142:4
1145:7,16 1149:21,22
1150:4,7,21,23 1151:12
,14,16,18
gave 1091:18
general 1137:16
1144:22 1153:18
1156:1
generally 1134:17
1135:19 1142:17,18
gentlemen 1082:3
getting 1105:22 1122:3
1144:7 1147:23
gibbons 1079:12
1081:10 1082:3,8,10,14
1083:4,13 1084:7,12
1086:18 1088:1,11
1089:12 1090:12
1091:9,12,16 1092:3,20
1093:7 1101:20
1104:11,14 1123:7
1138:6 1140:5,7
1146:16 1154:12,19
1155:10,11,16,22
1156:2,11,21 1157:6,14
1158:2 1160:2,8,9,11
1161:8,17 1162:8,10
gibbons's 1091:9
give 1140:11 1156:13
given 1149:10 1154:20
1162:12
giving 1140:14
go 1090:2 1092:15
1097:13 1098:4
1100:12 1102:1,7,21
1103:12,22 1104:1
1110:20 1112:4 1113:2
1118:9,24 1119:1

1122:7 1123:18
1126:16 1128:22
1136:7 1137:22
1144:17 1147:23
1148:16 1154:5
goes 1119:8 1132:23,24
1137:18 1151:5
going 1085:16 1086:5,6
,11,24 1087:1,12,17
1088:4,17 1090:5,13
1092:23 1093:7,8,14
1096:2 1100:1 1101:6
1102:3,9 1103:18,19
1104:3 1105:24
1113:16,19 1114:1
1122:11 1123:7,9
1125:13 1128:3,6
1129:18 1132:10
1136:12 1138:1
1140:10 1153:22
1154:8,14 1156:11
1158:9 1159:1
gone 1093:1 1103:3
1125:8 1149:5
good 1102:20 1153:21
gotten 1138:19,20
grand 1080:13
ground 1100:8
group 1112:9 1123:11
1124:6 1125:12
1135:21
groupings 1131:14
groups 1126:14
guess 1084:14 1087:13
1089:17 1103:8
1132:20 1134:5
1154:16

## H

half 1135:12
hand 1088:22 1093:8
,14 1094:16 1163:6
handwriting 1092:11
handwritten 1092:9
happen 1132:2 1134:17
1135:17 1136:1,3
happy 1083:12 1086:22
1092:15 1158:2,2
hard 1132:5 1153:23
hardy 1080:12 1089:9
1090:11
harm 1113:21,24
1115:12 1116:8,12,15
harmful 1118:12
harming 1118:5
haven't 1093:1 1116:17
1136:9,11
having 1084:8 1114:23

1115:1 1117:15
1119:12 1136:13
1145:23
he's 1086:8 1100:22
1157:23
head 1095:21
header 1091:13
health 1140:4
heard 1083:8
held 1081:6
hence 1106:9
hereby 1162:5
herein 1083:7 1163:3
hereof 1163:4
hereunto 1163:5
hi 1102:20
high 1128:7 1153:20
higher 1117:8
highest 1151:3
highlighted 1087:4
1095:15
hold 1128:18
hope 1140:15
hour 1079:19
however 1109:3
hundred 1110:17
1145:16
hundreds 1130:21
1139:18
hur 1083:23 1096:5,7
,11 1098:7 1154:15,19
1160:14
hypothesis 1118:2
1119:23 1132:9 1137:3
hypothetical 1123:18
1124:10 1125:2 1126:3
1135:24 1136:7
1153:12

## I

i'd 1082:1 1085:7
1091:7,21 1092:15
1097:13 1098:4
1144:17 1148:16
i'll 1083:18 1085:15
1088:22 1090:9 1093:9
1094:16 1101:18
1140:20 1149:8
1153:19 1154:3
i'm 1084:23 1085:1,10
,16 1086:5,8,11,24
1087:12,17 1088:4,17
1089:2,18 1093:1,7,7
,14 1100:1 1101:6
1102:20 1103:18,19
1105:7,23 1107:7
1112:6 1114:8,12
1115:9 1116:5 1121:22

1123:8 1124:11
1128:21 1129:13,14
1136:12 1140:10,14
1143:22 1144:24
1146:23 1147:13
1149:17,17 1151:22
1154:14
i've 1129:5,21 1136:8
1150:6
id 1160:7
identification 1081:2
1088:3 1154:13
identified 1087:9
1089:15 1109:9
identify 1081:11
1093:23
ill 1105:11
illinois 1079:17,18
1081:7 1162:1,3,7
1163:10
implied 1141:4
important 1091:21
1106:8 1137:4 1139:22
imposing 1131:2
improper 1123:17
1124:9 1125:1 1126:2
1135:23 1136:6
1153:12
inadequate 1113:17
inappropriate 1119:9,23
include 1095:9 1097:16
1106:8 1142:16
1148:10
included 1095:18
1106:20 1107:19
1108:1,2 1120:16
1121:11 1135:15,16
1141:11,12,15,16
1155:12 1157:16,20
includes 1115:16
including 1120:15
1151:19 1155:8
inclusive 1161:13
incorporated 1081:9
incorporates 1100:17
incorrect 1115:7 1131:7
increase 1125:6 1126:1
increased 1129:6
increases 1129:5
incredibly 1085:19
independent 1151:9
index 1107:4,11,21,22
1120:2 1136:5 1151:2,4
,10,21
indicate 1118:14 1154:1
indicated 1122:4 1150:6
indicates 1098:21
1153:17

indicative 1116:23
individual 1092:7
1114:10,11 1120:19
individually 1090:1
inference 1138:24
1139:2 1142:5
information 1091:13
1116:1 1131:18
1141:12 1142:13,16,17
1143:19
initial 1108:13
initiate 1151:5
initiated 1142:21
initiation 1104:22
1106:4 1118:20 1125:6
1128:15 1135:6
1145:24 1150:16,17
inn 1081:7
inquiry 1082:17
instead 1120:17 1140:7
instruct 1099:24
intend 1153:4
intention 1153:14
intents 1127:12
interested 1105:12
1163:4
interim 1084:17
interplay 1137:5
interpret 1113:14
1124:19
interpretation 1085:19
1115:3,8 1158:16
interpreted 1123:15
1124:8
intersection 1136:19
interval 1137:6,7,11,13
,13
intervals 1136:20
1137:19 1152:10
invalid 1096:23 1097:1
,17 1098:2 1132:1
invariant 1107:1
inverse 1108:17
involved 1145:4
irrespective 1125:14
isn't 1119:10 1143:14
issue 1096:5,22 1146:1
,9 1153:20 1156:15
1158:11,15,16
issues 1096:14 1098:15
1099:10 1145:23
1147:15,21
it's 1084:18 1092:13
1094:2,12 1102:20
1103:21 1104:20
1105:4,8 1106:8 1107:1
,2,9 1110:13 1118:7
1132:21,22 1133:20

1136:12,21 1137:2,13
1140:21 1142:17,24
1144:3 1146:7 1147:10
,22 1148:18,22 1152:17
1153:12,17,19,21,23,24
1154:1 1157:7 1158:18
itself 1105:4
iv 1079:10

J

jack 1080:7 1081:16
1090:10,19 1103:10
1140:12 1156:5
james 1080:22 1081:3
jlondon@texas.net
1080:9
job 1079:24
journal 1098:15
1129:20 1155:8
jury 1126:20

K

ka 1080:5 lawampmmt.cu....
kansas 1080:13
keep 1094:22 1154:3
keith 1080:3 1081:13
1090:19 1091:3
1092:24 1100:2
1146:13 1158:6
kind 1096:16,18 1103:7
1105:8 1110:18,22
1119:12,20 1124:17
1125:19 1131:16
1138:22,22 1139:4
1140:13 1142:20
1149:5 1150:20
kinds 1130:1
know 1082:2 1084:23
1085:22 1088:12,13,24
1093:4 1094:19,21
1096:13,15 1097:9,17
,22,24,24 1099:3
1103:2 1110:1,2,13
1111:6,14,16 1112:6
1114:4 1115:18,23,24
1117:9,10 1118:13,15
,24 1119:6,7 1121:12
,13,24 1122:2 1125:3
,11 1126:15 1128:5
1129:24 1131:1,16,20
1132:5 1133:21,24
1134:1,4,8,15 1138:8
,23 1139:19 1142:18,24
1143:12,14,16,24
1144:9 1145:3,12
1147:10 1148:20
1150:11 1151:2,15

1152:13 1153:12,23,24
1156:17 1157:1 1158:8
,10
knowing 1109:24
1134:15 1138:20
knowledge 1099:16
knows 1117:14

L

l.l.p 1080:12
lamotrigine 1145:14
language 1082:17
large 1110:23
largely 1129:5 1143:13
largest 1129:3
last 1084:14,18,24
1085:21,23 1086:19
1087:15 1089:9
1095:24 1096:8
1120:23 1139:7,7,24
1147:16 1148:11,13,15
1149:10 1150:4 1155:2
1157:21
later 1130:8
lay 1101:18
leading 1086:2 1105:21
1151:17
learn 1100:18
least 1108:15 1111:17
1119:17 1138:16
1148:19 1150:9
leave 1153:16
leeway 1140:11,15
left 1098:3
legible 1092:8,14
legitimate 1131:2
length 1108:11 1110:3
,6
less 1108:18 1109:9,14
,18 1110:10,14 1112:23
1115:10,17,24 1116:6
,16 1124:1,15 1127:7
,20
let 1082:10 1088:14
1089:14 1100:7 1127:6
let's 1087:6,6,8 1100:9
,12 1102:1,2,5,11
1103:22 1111:13
1123:14 1124:5 1130:6
1135:12 1154:5
letter 1083:1,6 1085:5
1098:14,16,17 1155:8,9
1160:17
letters 1155:24
level 1138:23 1139:1
liability 1079:4 1081:14
,17 1161:3
license 1162:4

**licensed** 1162:4
**life** 1154:4
**likelihood** 1151:3
**limit** 1082:22
**limitation** 1083:14,16
**limitations** 1129:20,24
**limited** 1085:3 1100:22
1156:21
**limiting** 1082:16 1150:3
**list** 1141:4
**listed** 1083:5 1086:21
**literature** 1130:2
1142:19 1143:9,13,15
,17,21 1145:20
**litigation** 1079:4
1084:19 1086:19
1095:6 1161:3
**little** 1120:6 1140:11,15
1151:22
**llp** 1080:16
**lmcgroder@shb.com**
1080:14
**logistic** 1120:19
**logistics** 1103:13
**london** 1080:7 1081:16
,16 1088:19 1090:10,17
1094:14 1100:7,11,15
1102:16 1103:15,18
1139:1 1158:11,13,22
**long** 1096:11 1101:6
1115:18 1117:10
1134:4 1146:7 1150:3
**longer** 1117:22
**look** 1086:23 1093:11
1095:3 1096:22 1097:7
,14 1105:24 1111:1
1112:7,17 1113:6,18
1119:3,4,20 1130:18,22
1132:17 1133:3,15
1142:20,22 1144:17
**looked** 1096:15 1097:8
,10 1126:8,8,9 1133:22
1135:5 1136:9,11,14
1150:14
**looking** 1097:23
1105:19 1110:4,23
1111:20,21 1112:17
1119:21 1144:1,2
1146:1
**looks** 1118:22 1131:5
**lore** 1081:18
**lori** 1080:12 1084:23
1086:5 1089:14
1093:16 1096:1 1101:9
1102:20 1154:16
1157:13
**lose** 1135:12
**lost** 1138:21

**lot** 1119:8 1143:14
**lots** 1130:22
**low** 1111:8
**lower** 1134:23 1145:12
**lunch** 1130:3 1140:12

### M

**magistrate** 1083:17
1085:18 1100:3 1102:2
,5,6,9 1103:1 1104:8
**major** 1095:14 1126:11
**making** 1115:8 1147:14
**manuscript** 1099:2
1100:20 1101:15
1127:14 1155:14,17,23
1156:12 1157:15,17,17
,20 1158:1,15
**march** 1082:18 1084:18
1086:1,2 1093:10
1095:7 1100:17,23
1160:12
**mark** 1087:1,7,10,12,17
1088:5,17 1090:9
1092:22 1093:7
1154:14
**marked** 1081:1 1082:7
1087:7,9,21 1088:1,15
1093:8,14 1094:10
1154:12 1160:7
**marketing** 1079:3
1081:8 1161:2
**massachusetts** 1079:1
1161:1
**materials** 1083:19
1155:2,5,6,7 1156:3,16
**may** 1081:22 1094:11
1098:1 1105:17 1106:6
1111:5,15 1114:10,15
1115:5,20 1116:4,22
1117:15,21 1127:13
1128:14,16 1131:3,3
1144:23 1149:13
1152:20 1154:22
1155:10 1156:6
1162:22
**maybe** 1117:16 1130:24
1146:21,23
**mcgroder** 1080:12
1081:18,18 1082:1
1083:24 1084:3,6,20
1085:1,7,15,22 1086:10
,13 1087:3 1088:7,10
,24 1089:4,7,10,17,22
1090:2,15,18 1091:1,15
1092:1,4,12,15,21,24
1093:5,16 1094:2,10,19
1097:2,20 1099:15,22
1100:1,9,12,19 1101:13

1102:1,5,8,13,19
1103:5,11,16,21 1104:7
1107:6,8 1109:11
1116:9 1117:3 1118:8
1121:7 1122:7 1123:17
1124:9 1125:1 1126:2
,24 1127:17,22 1128:4
,18,21 1133:6 1134:12
,20 1135:23 1136:6
1138:17 1139:9
1140:10,19 1143:6
1144:8,21 1145:10
1146:12,23 1147:16,22
1149:15 1153:11
1154:18 1156:6,8
1157:5,9,12,19 1158:6
,18,23 1160:13
**mdl** 1079:5,7 1161:4,5
**meagher** 1080:16
**mean** 1088:24 1096:19
1097:7 1107:12
1118:22 1119:6 1122:5
1125:4 1127:7 1132:4
1136:3,11 1138:10,20
1143:22 1153:13,21
1155:5
**meaning** 1132:7
**meaningful** 1111:9
1139:13
**means** 1100:18
**meant** 1157:9
**mechanism** 1117:23
**med** 1144:11 1145:4,8
1148:6,7
**medical** 1108:24
**medication** 1104:24
1105:20 1106:3,15,20
1148:21,23 1149:5
1151:13
**medications** 1104:18
1105:10,17,17 1117:13
1119:3,24 1125:12
**meet** 1096:5,7,10,11
**memory** 1094:2 1095:8
**met** 1096:1
**methodology** 1101:21
**middle** 1100:8
**milligrams** 1141:22,24
1142:4,6
**mind** 1144:17
**mine** 1092:14
**minimum** 1108:10
1110:7
**minority** 1110:13
**minus** 1111:22
**minute** 1090:3 1137:23
**minutes** 1087:2 1103:3
,6,6

**mirrors** 1120:14
**misclassification**
1095:13 1096:5
**misstating** 1115:13
**misunderstand** 1114:18
**mo** 1080:13
**model** 1106:9,22,24
1117:14 1119:17
1131:5 1136:24 1137:4
,10 1151:8
**modeling** 1120:18
**models** 1119:8 1120:20
**modification** 1095:17
**modify** 1153:4
**moment** 1097:6,22
1135:2 1147:23
**monday** 1082:15
**monotherapy** 1107:14
,15 1126:9
**month** 1150:14,16,17
,18 1152:16,19
**monthly** 1152:10
**months** 1114:16 1130:8
,9 1135:6 1152:10,13
,14,16
**morning** 1083:9,13
**motion** 1155:4 1156:19
1157:1
**motivation** 1151:19
**move** 1135:19,21
**mr** 1080:3,7,17,22
1081:13,16,20 1083:18
1084:1,4,11,22,23
1085:6,10,16 1086:5,11
,14,17 1087:5 1088:4,9
,12,19,20 1089:2,5,8,14
,20,24 1090:9,16,17,24
1091:4,20 1092:2,5,13
,18,22 1093:4,6 1094:6
,11,14,16,21 1097:15
1098:6 1099:17,24
1100:7,11,13,15 1101:9
,18 1102:3,6,11,15,16
,17 1103:9,15,18,24
1104:12,13 1107:7,9
1109:16 1116:19
1118:3,18 1121:18
1122:9 1123:6,21
1124:22 1125:18
1126:18 1127:2,18
1128:1,10 1129:12
1133:8 1134:14
1135:10 1136:2,15
1137:22 1138:5 1139:1
,3,11 1140:15,17
1141:9 1143:8 1144:14
1145:6,15 1146:20
1147:4,19 1148:1

1149:19 1154:5,14,21
1156:7 1157:3,7,11,13
1158:4,11,12,13,22
1160:4
**ms** 1080:12 1081:18
1082:1 1083:24 1084:3
,6,20 1085:1,7,15,22
1086:10,13 1087:3
1088:7,10,24 1089:4,7
,10,17,22 1090:2,15,18
1091:1,15 1092:1,4,12
,15,21,24 1093:5
1094:2,10,19 1097:2,20
1099:15,22 1100:1,9,12
,19 1101:13 1102:1,5,8
,13,19 1103:5,11,16,21
1104:7 1107:6,8
1109:11 1116:9 1117:3
1118:8 1121:7 1122:7
1123:17 1124:9 1125:1
1126:2,24 1127:17,22
1128:4,18,21 1133:6
1134:12,20 1135:23
1136:6 1138:17 1139:9
1140:10,19 1143:6
1144:8,21 1145:10
1146:12,23 1147:16,22
1149:15 1153:11
1154:18 1156:6,8
1157:5,9,12,19 1158:6
,18,23
**multiple** 1105:22
1120:15,24 1121:2,4,14
1122:1
**myself** 1090:11

**N**

**name** 1081:3,9 1093:22
**named** 1101:1
**napolitano** 1080:17
1081:20,20
**narrow** 1085:19
1101:12
**nature** 1097:8 1106:19
**ndc** 1141:18
**necessarily** 1092:14
1118:15 1135:11
1144:10 1146:3
**necessity** 1101:10
**need** 1085:13 1086:24
1092:23 1100:18
1103:1 1110:23
1116:23 1155:15
1156:5
**neurontin** 1079:3
1081:8 1095:6 1161:2
**new** 1080:18 1082:17
1104:15 1156:21,22

**newburgh** 1080:4
**night** 1096:1
**no** 1079:5,7,24 1084:4
1092:12 1100:1,13
1102:3,11,15 1108:20
1109:24 1110:10
1116:11,14 1120:11
1124:14 1127:11
1128:6,22 1129:22
1133:17 1134:10
1138:19 1139:10
1142:11 1147:8
1148:15 1153:7 1160:9
,12,13,14,17 1161:4,6
1162:4
**none** 1099:2 1121:10
1129:2
**nor** 1155:19 1163:3,3
**normal** 1137:12
**normally** 1096:10
**nos** 1088:2 1160:10
**notary** 1079:16 1161:22
1163:10
**note** 1107:3
**noted** 1157:12
**nothing** 1086:15
1099:22 1101:15
1118:13,13 1128:16
1130:2 1140:20
1146:17 1157:22
**notice** 1086:7
**november** 1093:18
1094:3,8,15,18
**null** 1137:3
**number** 1081:2 1082:7
1085:11,12 1087:12,14
1088:5 1089:21 1091:8
1103:22,24 1110:12
1113:5,11 1121:4
1123:3 1132:20,23
1141:13,14,15 1154:13
**numbered** 1089:4
**numbers** 1110:15,23
1133:21
**ny** 1080:4,18

**O**

**oath** 1081:23 1161:9
**object** 1097:2,20
1099:15 1109:11
1116:9 1117:3 1121:7
1123:17 1126:2,24
1127:17 1128:4 1133:6
1134:12,20 1135:23
1136:6 1138:17 1139:9
1143:6 1144:8,21
1146:13 1149:15
1153:11

**objection** 1118:8
1124:9 1125:1 1127:22
1145:10
**obligation** 1155:21
1157:15
**observation** 1152:15,17
**observing** 1118:1
**obsessive** 1144:16
**obtained** 1163:1
**occasions** 1130:20
**occurred** 1136:4
1139:20 1148:11
1149:9
**occurs** 1143:2 1147:12
**odd** 1132:22
**odds** 1123:14 1124:6
,18 1125:14 1137:9,13
**ode** 1123:8
**of**_____
1161:20
**off** 1090:2,5 1095:17,20
1098:3 1100:9,12
1102:1,3,9,21 1103:12
,23 1104:1,3,4 1108:23
1109:4,23 1122:7,11
1133:16 1134:18
1137:22 1138:1
1152:20 1154:5,8
1158:8 1159:1
**offhand** 1143:12
1148:17
**office** 1163:6
**official** 1087:10
**oh** 1088:20
**okay** 1084:6 1088:7
1093:3 1128:11
1129:15 1130:3
1146:12,23 1148:9,16
**once** 1087:21 1121:10
,16 1133:3,9 1149:21
1152:3
**one** 1085:15 1086:10
1087:4,10 1088:6
1092:7 1104:21,22
1105:9 1106:24
1107:24 1108:12
1114:1,2,10,20,22,23
,24 1115:6,21,23
1116:20,20 1117:7
1118:4 1119:2 1121:1
,16,17 1128:18 1130:4
,15 1131:7,12,19
1132:3,8 1136:9
1139:19 1140:2 1141:1
,3 1142:24 1144:16
1146:1,9,11 1147:11
1148:2,4,11,13,13,15
,19 1149:9 1150:24

**objection** 1151:7 1152:13
1153:15
**one's** 1128:6
**ones** 1089:22 1121:11
1139:20,22
**open** 1129:11
**opinion** 1100:21
1118:11
**opinions** 1129:24
1156:12
**opportunity** 1082:4
1155:18,19 1156:21
**opposite** 1119:10
**order** 1108:9
**ordered** 1158:21
**original** 1094:1,3,17
1105:23 1106:14
1109:20 1130:10
1141:1 1160:14
**originally** 1140:1
1155:13
**outcome** 1163:4
**outside** 1083:15
1140:14,21 1147:3
**overall** 1118:22 1126:13
1131:6
**overcounting** 1121:13
1132:10

**P**

**p.m** 1104:5 1122:10,14
1123:3 1137:24 1138:3
1154:7,10 1158:24
1159:3 1162:14
**page** 1093:5,6,15
1094:5 1104:15 1107:7
1129:14 1160:1
**pages** 1090:20,22
1161:12
**pain** 1117:16,19,20
1118:1 1126:9 1129:9
**paper** 1099:1,18
1100:16,18 1126:19
1127:1,4,9 1128:8,24
1129:1,19 1140:23
1141:8 1153:3,8,22
**paper's** 1153:18,20
**paragraph** 1129:16
1139:23 1140:20
**paragraphs** 1082:19
1084:21 1085:4,23
1086:3 1099:23
1100:24 1101:15
1104:11 1146:18
1156:22
**part** 1099:7 1100:20
1122:5 1123:23
1127:13 1139:7 1145:1

,3 1147:9 1155:12
1156:12,17,19 1157:15
**particular** 1110:3
1114:13 1118:5
1120:10 1126:16
1136:23 1152:23
1153:1
**particularly** 1134:13
1142:23 1147:9
**parties** 1082:5 1083:11
1085:2,9 1156:4 1163:3
**partners** 1080:2
**parts** 1082:12
**past** 1152:22
**patient** 1109:2 1134:3,9
**patients** 1097:1
1105:11,14,15,22
1117:13,22 1118:24
1119:4 1129:10 1145:1
,3,17 1148:20 1151:15
**pdf** 1091:17
**pending** 1156:4
**people** 1108:18 1109:8
,14 1110:5,6,9 1112:1,9
1113:6 1114:6,7 1115:5
,10,14,16,18,19,20
1116:3,11,13,16
1117:10,18 1118:14
1120:1 1122:3 1123:23
,24 1124:13,13,14
1125:9,17 1130:24
1132:18,20,23 1134:1,2
,8 1143:1 1144:5
1147:11 1151:5
1152:13,15
**per** 1082:20 1095:18
1141:24 1142:6
**perhaps** 1158:15
**period** 1104:20 1105:2
,5 1106:7,13,14,24
1108:22 1113:21,24
1116:24 1117:22
1136:5 1143:3 1147:13
,15 1149:1,23
**persistence** 1154:5
**person** 1106:21 1108:9
,11 1130:15,19 1133:15
1134:18 1135:15
1139:6 1142:2,5
1149:13,22
**person/time** 1150:14
1151:7 1152:5,6
**personally** 1162:8
**pertained** 1104:10
**pfizer** 1079:5,7 1081:9
,19,21 1161:4,6
**ph.d** 1079:12 1084:7
1160:2 1161:8,17

1162:8,10
**ph** 1142:19;**pidemiologic**
**pharmacologic** 1143:23
**pharmetrics** 1141:11
**phone** 1102:13,18,19
1103:7,8,9,13,22,24
**pierdzioch** 1080:22
1081:4
**pills** 1141:13,14,15,22
,24 1142:3
**places** 1128:24
**plaintiffs** 1079:12
1080:10 1081:14,16
1082:4 1083:9 1102:21
,23
**plans** 1098:11
**please** 1081:11 1083:3
,16 1090:15 1103:23
1104:16 1120:12
**point** 1083:21,22
1085:11 1091:21
1092:10 1097:9 1105:8
1109:20 1137:8
1142:14,14 1152:11
1156:3
**poisson** 1120:17
**polypharmacy** 1105:13
**population** 1112:23
1115:10,16 1116:5,22
1118:6,12,14,22
1119:12 1120:5,7
1125:14
**portion** 1102:22
**portions** 1083:1
**position** 1155:11
1157:13 1158:19
**possibility** 1116:20,21
1118:4 1136:9,11
**possible** 1083:4
**post** 1104:20 1105:5
1106:4,14,23 1135:2,5
1136:5 1137:1
**power** 1111:7
**practices** 1079:3
1081:9 1161:3
**pre-exposure** 1137:2
**pre-gabapentin** 1106:7
,13
**pre-period** 1105:5
1106:22
**predict** 1153:23
**premised** 1083:6
**prepare** 1095:22
**prescribed** 1115:23
1117:17,18 1118:16
1141:23 1142:6
**prescription** 1108:10,11
,15 1109:2,2,6,7,10,19

,22 1110:2,6,10 1114:1
,3,19,22,23 1115:5
1116:16 1124:14
1132:19 1138:9,10,14
,15,21,22 1139:7,8
1141:12,14,16 1142:2,3
1149:13 1150:4,9
**prescriptions** 1109:14
1110:14 1115:15,17,20
1116:3,6 1124:1 1134:5
,7
**present** 1080:21
1129:10
**preserve** 1144:3
**preserved** 1105:6
**press** 1140:24
**pretty** 1149:21 1153:20
,20,21
**previous** 1095:15
1105:2 1119:18
**primary** 1150:24
**printed** 1091:10,12,16
,24 1092:3 1093:21
1095:17
**printout** 1093:9
**prior** 1083:9 1104:22
1105:2 1119:19
1150:16
**probability** 1119:15
1136:22
**probably** 1096:9
1138:15,18
**problem** 1092:12
1100:8
**procedure** 1079:14
1162:18
**proceed** 1085:2,7
1100:4
**produce** 1082:3
1083:12 1089:11
1101:4
**produced** 1083:20,20
1087:14 1088:11,13
1093:24 1155:2,15
1156:16,17
**producing** 1086:13,15
**production** 1083:4,5
**products** 1079:4
1081:14,17 1161:3
**profile** 1153:20
**programmed** 1111:12
**promised** 1083:19
**properties** 1143:23
**property** 1145:23
**protective** 1119:11
1129:7 1134:24
**provide** 1129:17
**provided** 1093:20

1157:22
**psychiatric** 1126:10
1129:8 1144:19,23
1145:2,5,17
**psychiatry** 1153:19
1156:1
**public** 1079:16 1140:4
1161:22 1163:10
**publication** 1140:24
1153:4
**publish** 1128:6 1153:22
**published** 1127:10,21
1128:3 1129:20 1141:5
,6 1143:9 1153:8,10,24
1154:2
**purpose** 1146:4
**purposes** 1127:12
**pursuant** 1079:13,13
1082:6 1085:2 1086:15
1087:15 1089:11
1100:4 1101:4 1104:10
1156:13 1162:17
**pushed** 1111:12
**put** 1087:13 1088:15
1154:21 1156:5

---

Q

**quality** 1128:7
**question** 1084:20
1085:17 1086:12
1089:17 1095:4 1098:1
1099:10 1101:13
1110:8 1116:18
1124:12 1126:5 1127:6
,23 1128:24 1129:11
1134:4 1136:13
1140:13,19 1142:1
1143:7 1147:17
**questioning** 1140:13
**questions** 1083:15
1085:3,14 1086:7
1092:16 1099:5
1100:22 1101:11
1104:9 1129:23
1146:14,17 1155:1,6,19
**quitting** 1115:1

---

R

**raise** 1129:23
**raised** 1098:15 1099:5,9
,11
**randomized** 1144:11
**rare** 1110:24
**rate** 1111:8 1117:8
1128:15
**rates** 1098:21 1113:16
,18 1117:21,24

rather 1120:15
ratio 1123:14 1124:7,18
 1125:14 1137:9,13
re 1079:3 1161:2
reaction 1115:1
read 1147:16,18
 1161:11 1162:19
reading 1112:6 1129:13
 ,14 1162:15,21
really 1097:11,18
 1103:21 1105:3
 1110:13,23 1116:18
 1120:5,9 1132:6
 1138:20 1142:18,19
 1151:12
reanalysis 1096:16
reason 1105:16 1111:3
 ,6,10,11 1162:24
reasonable 1137:16
 1138:7,13 1142:5
 1144:3
reasons 1105:9
 1111:16 1115:22
 1126:20 1128:14
 1143:1 1147:11
 1150:24
recall 1104:21
received 1089:9,10
 1091:5,14 1093:3
 1098:14 1108:11
 1116:16 1142:3
receiving 1122:3
recently 1157:24
recess 1090:6 1138:2
 1154:9 1158:13
recessed 1122:13
rechecked 1096:17
record 1081:12 1082:2
 1083:18 1087:11,12,14
 1088:15 1089:15
 1090:2,5,8 1100:10,12
 ,14 1102:1,4,7,10,12,14
 ,15,21,23 1103:12,14
 ,22,23 1104:1,3,4,6
 1122:7,11 1123:4
 1137:22 1138:1,4
 1147:18 1154:6,8,11,22
 1156:9 1158:9 1159:1
 1162:11
recorded 1122:5
redepose 1156:2
redid 1095:13
reducing 1129:8
reduction 1126:21
 1128:14
reductions 1117:24
referenced 1085:5,24
 1101:2

referring 1147:1 1152:4
refers 1082:13 1100:15
reflect 1153:10
reflected 1086:2
regression 1120:18,19
 1137:9
relate 1084:21
related 1095:10 1144:2
 1150:11 1163:3
relates 1146:15
relation 1117:6
relationship 1101:22
relative 1119:16
relevant 1083:1
 1143:19 1146:2
reliance 1098:24
relied 1158:5
relies 1100:20
rely 1156:11
relying 1157:24
remains 1129:11
remark 1094:12
remedied 1083:21,22
remember 1095:19
 1097:4,6,9,23 1098:4
 1108:24 1141:16
 1142:14 1145:18
 1148:17 1149:2,6
 1152:1
renaissance 1081:7
repeat 1142:1
replace 1161:12,13
report 1082:18 1084:22
 1086:1,2,3,21 1093:10
 ,18 1094:1,3,9,15,18
 1095:9,24 1096:2
 1098:12,16,18 1099:7
 1100:17,23 1101:17
 1104:11,15 1127:1,3,5
 ,8,13 1128:6,8,12
 1129:1 1139:23,24
 1140:6 1141:3 1146:19
 1147:2 1153:6,9
 1155:11,13,13,22
 1156:23 1157:18,20,23
 1160:12,13,14
reporter 1162:4
represent 1093:9
 1134:2,23 1149:8
representation 1089:16
 1091:7 1092:19 1093:2
representations
 1087:20
represented 1095:1,3
 1120:24 1121:1
represents 1091:11,13
request 1092:9 1095:18
requested 1089:12

1147:18
required 1156:14
requirement 1108:8
requires 1108:14
requiring 1150:8
reread 1095:24
research 1144:2
resolve 1096:4 1121:3
 ,20 1158:15
resolved 1097:24
respect 1082:24
 1083:13 1085:8 1095:6
 1098:11 1099:5,11
 1101:23 1143:5 1150:8
responds 1091:2
response 1091:2
 1117:5 1156:8
responses 1099:4
rest 1125:12 1149:23
 1154:3 1158:6
restricted 1104:20
 1126:5,15
resubmit 1099:21
 1153:19
resubmitted 1099:18
 1158:1
result 1123:14,16
 1124:8 1125:23
results 1096:15
 1098:19 1125:21
 1131:9,11 1132:6
 1133:4 1142:10 1147:7
revealed 1129:4
review 1125:19,22
 1140:8 1141:6,7
 1153:17 1154:1,2,3
reviewers 1099:4
 1153:23
revised 1093:17 1094:7
 ,8,15 1099:2 1140:22
 1155:17 1156:11
 1157:15,24
revisions 1101:14
right 1085:18 1086:6
 1095:19 1097:12
 1107:16 1145:19
 1147:22 1151:4,4
 1152:1,8 1155:20
 1156:2
risk 1110:12 1129:5,6
 1148:24 1149:23
risks 1119:16
robert 1079:11 1081:10
 1084:7 1160:2 1161:8
 ,17 1162:7,9
robinson 1080:3
robust 1121:15
rocca 1079:16 1081:23

1162:3
roughly 1124:13
round 1133:19
rounding 1137:18
rule 1155:15 1156:10,13
 1157:16 1158:3,5,9
 1162:18
rules 1079:14 1162:18
run 1121:5 1133:14
running 1123:10,11

---

S

safe 1133:20
sales 1079:3 1081:8
 1161:3
sample 1111:16
 1125:17
sandi 1081:23
sandra 1079:15 1162:3
say 1086:5 1088:8
 1105:1 1106:13
 1112:12 1113:10,13
 1114:1 1115:11 1116:7
 1117:7 1124:5 1127:1
 1128:13 1130:6,8
 1133:20 1135:12
 1152:15 1157:3
 1158:12 1161:9
saying 1115:9 1121:12
says 1090:12,18 1091:3
 1098:19 1105:21,23
 1107:3,20 1121:9
 1140:18 1158:5
schizophrenia 1126:11
science 1128:7
scientific 1127:8
 1129:19
scope 1083:15 1140:13
 ,21 1147:3
seal 1163:6
seaton 1085:12
 1090:11 1160:12,17
second 1106:18 1122:8
 1123:8 1128:18 1130:4
 1147:5
secretive 1130:2
section 1128:13
 1129:20
seeing 1117:15
seek 1157:1
seems 1094:22 1100:11
 1147:2
seen 1087:16 1126:21
 1128:14
selection 1105:21
send 1090:19,20 1091:3
sense 1086:4 1091:19
sensitivity 1095:9,10

1099:6 1106:9,18
1108:17 1110:4 1121:5
,8,9 1131:4 1132:1,7
1139:4,18,21 1142:8,22
1146:16,18,21,24
1147:6 1149:11 1150:2
,6,10
**sent** 1090:10,13
1093:21
**sentence** 1129:15
1140:3 1158:7
**separate** 1089:21
1116:15 1131:13
**separated** 1089:21
1130:20
**separately** 1152:12
1156:15
**september** 1157:21
**set** 1082:21 1083:1,6
1088:23,23 1089:3
1141:10 1163:5
**sets** 1134:16
**several** 1087:17,18
**severely** 1105:11
**sex** 1119:5,18
**shakespeare** 1123:8
**shall** 1128:13 1130:8
**shared** 1129:21
**shook** 1080:12 1089:9
1090:11
**short** 1090:6 1108:22
1138:2 1147:15 1154:9
**short-term** 1113:21,24
1144:1,2,4 1146:15
1147:20,20
**shorthand** 1162:4
**shortly** 1096:8 1145:24
**shouldn't** 1087:4
**show** 1126:19 1128:12
1145:23 1158:4
**showed** 1131:23
**shows** 1116:11
**sicker** 1105:14,15
**side** 1087:6 1127:6
**sign** 1162:19
**signature** 1161:13
1162:17,24
**signed** 1162:22
**significant** 1112:14
1113:12 1124:21,24
1125:4,6,16,22,24
1126:1 1133:5 1136:24
**significantly** 1098:22
**signing** 1162:16,21
**similar** 1125:12 1131:10
,11 1145:23
**simply** 1086:7 1119:6
1121:23 1147:13

**single** 1114:15 1131:18
**sit** 1098:10,13 1112:12
1113:10 1115:9 1116:7
**sitting** 1149:6
**six** 1084:14,17,24
1086:19 1130:6,11
1152:16,16,20
**size** 1111:16
**skadden** 1080:16
**slate** 1080:16
**small** 1091:16 1110:17
**smaller** 1135:9,17
**smith** 1079:7 1161:6
**snapolit@skadden.com**
1080:19
**solely** 1125:13
**somebody** 1105:1
1106:12 1108:21
1109:22 1113:24
1114:2,15,19,21 1130:6
1131:23 1136:4 1138:9
,14 1139:16 1141:21
1149:4 1152:19
**somebody's** 1114:13
1153:22
**somehow** 1115:4
**someone** 1131:7
1142:21
**someplace** 1153:19
**something** 1084:16
1095:20 1098:3
1110:24 1126:15
1127:20 1129:21
1131:3 1151:23
**soon** 1083:3 1135:1
**sorry** 1089:2 1128:21
1129:13 1149:17
**sort** 1097:8 1100:7
1105:20 1119:20
1151:19
**sounds** 1145:18
**south** 1079:18 1162:6
**speaker** 1102:18
**specifically** 1082:9,13
,16 1083:23 1100:24
**speculation** 1134:21
**square** 1080:17
**ss** 1162:1
**start** 1082:1 1104:15
1151:13
**started** 1106:7 1151:16
**state** 1079:17 1153:14
1162:1,3
**stated** 1143:11
**statement** 1082:2,13
1087:13 1107:10
1147:14 1156:9
**states** 1079:1,15 1082:9

1161:1
**statistic** 1136:21,22
**statistical** 1117:14
1119:8,17,21,23 1146:1
**statistically** 1112:13
1113:11 1124:20,23
1125:4,5,16,21,24,24
1133:5 1136:24
**statistics** 1111:5
1117:12
**status** 1106:3 1141:8
1152:12
**steering** 1081:14,17
**steven** 1080:17
1081:20
**stipulation** 1079:13
**stop** 1100:2,5 1148:23
**stopped** 1115:21
1148:21
**straight** 1103:17
**stratified** 1126:12,13
**stray** 1130:10
**strength** 1143:16
**strike** 1125:20 1138:7
**studied** 1129:3 1144:5
**studies** 1130:1 1133:15
1148:21 1149:20,21
**study** 1127:14 1148:6,7
,14,19,24 1152:24
1155:12
**studying** 1142:23
1147:10
**stuff** 1098:7
**subject** 1082:15
1090:12 1098:23
**subjects** 1107:4,10,20
1110:17
**submit** 1157:15
**submitted** 1127:14
1155:17 1162:17
**submitting** 1154:3
**subparts** 1101:16
**subpopulation** 1125:7
**subscribed** 1161:19
**subset** 1115:17
**substantive** 1083:14
**substantively** 1155:1
**subtle** 1105:8
**suffering** 1117:19
**sufficient** 1116:24
**suggest** 1112:1,9
1118:11,17 1119:10
**suggested** 1123:10
**suggests** 1112:4,22
1116:14 1157:23
**suicidal** 1145:23
1148:10
**suicide** 1098:22 1111:9

1113:16,18 1116:22
1117:20,24 1118:20,23
1119:18 1120:1,15,16
,21 1121:5,10,14,20
1122:1,4 1128:15
1129:5,6 1130:7,10,16
1131:6,13,20,23 1135:3
,7,12 1142:23 1143:1
,15 1144:1 1147:10,12
1149:12 1150:5,15
1151:3,15,16 1152:2,11
,14,15
**suite** 1080:7
**summarize** 1083:11
**summarized** 1082:6
**summarizing** 1102:24
**summary** 1117:11
1119:21
**supplement** 1140:23
1155:10,22
**supplemental** 1082:18
1086:20 1095:8,24
1100:23 1156:22
1157:23
**supply** 1113:7 1141:22
1146:14
**support** 1098:20
1131:18 1138:23
**suppose** 1123:8
**sure** 1089:18 1090:16
1094:19 1105:7 1112:6
1121:22 1122:9
1127:19 1141:20
1156:7
**sworn** 1081:24 1084:8
1161:9,19 1162:10
**symptoms** 1129:8

---

T

**table** 1107:8,24 1108:1
1109:13,13 1112:19,19
1115:2,2,4 1119:15,24
1120:12,13,14,14
1123:7,20,24 1130:5,14
1133:10,10
**tables** 1082:19,20
1084:21 1085:4,24
1095:10,11 1101:1,16
1104:16 1110:12
1126:7 1136:17
1156:22
**tabulation** 1119:21
**tabulations** 1119:7
**taken** 1079:15 1108:21
,23 1109:18 1115:21
1116:4 1117:22
1124:12 1132:18
1149:22 1161:10

**taking** 1104:19 1105:1,2 1106:7,12,12,21,23 1114:2,3,20,22,24 1115:19,22 1117:11,13 1118:15,15 1119:4 1135:7 1137:19,20 1141:23 1148:21,23

**talk** 1084:1,2 1128:13 1129:1

**talked** 1096:23 1098:8 1120:23 1123:24 1147:4

**talking** 1096:14 1123:19 1127:1,4,5 1130:5 1131:22 1146:20 1147:1,19,20

**tape** 1123:3

**technical** 1111:3,6,10 ,11,15

**tell** 1117:12 1141:23

**tend** 1105:11

**terminate** 1083:17

**terminated** 1162:14

**terms** 1125:10 1132:20 1134:2 1137:18 1145:8

**test** 1119:22 1132:8 1136:21,22

**testified** 1084:9

**testify** 1162:11

**testimony** 1154:20 1162:12

**testing** 1137:2

**thank** 1084:13 1158:23

**thanks** 1090:22

**that's** 1086:17,21,22 1087:3 1088:7,16,23 1089:24 1090:23,24 1091:15,20 1092:1,4,19 1095:19 1096:2,9 1098:24 1101:3,3 1104:12 1106:10 1107:20 1108:5,16 1110:24 1111:23 1112:3,11,21 1113:1,4 1115:1,7 1117:1 1119:15 1120:8 1121:17 1128:11 1129:15 1130:17 1131:15 1133:2,13,23 1135:11 1138:12 1143:12 1145:7 1153:1 ,15 1156:14,24

**themselves** 1081:11 1105:18

**therapy** 1128:16 1145:24

**there's** 1104:21 1112:8 1113:5 1116:11

**taking** 1118:13,13,19 1119:7 1130:2 1137:16,18 1143:24 1144:19 1157:22

**therefore** 1155:14 1156:1

**they'll** 1105:13

**they're** 1088:5 1107:18 1113:18 1114:22,23 1122:2 1131:10 1144:22 1149:7

**they've** 1087:21

**thing** 1097:13 1132:15 1151:21

**things** 1085:20 1093:19 ,19 1130:6,22 1137:21 1149:7 1154:21

**think** 1086:24 1095:14 1096:1,2 1100:18 1103:16 1104:8 1114:18 1115:13 1117:1 1119:9 1120:4 ,22 1125:15 1129:17 1130:3 1131:4,16,21,22 1132:4,5,7 1133:20 1136:12 1139:13 1143:16 1144:3 1147:22 1153:12,21,22 1154:22 1157:19 1158:11

**third** 1135:13

**though** 1102:22 1135:11 1144:20 1145:7 1157:8 1162:22

**thought** 1094:10 1103:11

**three** 1092:23 1094:22 1095:1 1130:7,19,20 1154:15,17

**thursday** 1082:15 1096:1

**till** 1148:24

**time** 1081:5,10 1082:22 1083:9,21 1084:18 1085:11 1090:4,7 1104:2,5,24 1105:2 1106:19 1107:1,2 1108:22 1110:3 1116:24 1117:20,23 1122:10 1123:3 1130:15,20 1133:16 1134:19 1135:16 1137:24 1138:3 1141:2 1142:21 1144:7 1146:2 1149:10 1151:9,11,19 ,23 1152:2,10,17 1154:7,10 1155:5 1158:20,24

**times** 1080:17 1121:15 1130:20

**today** 1081:4 1084:12 1098:10,13 1102:16 1112:12 1113:10 1115:9 1116:7 1149:6

**today's** 1095:22

**together** 1084:14,18 1094:23

**told** 1136:8 1150:20

**tomorrow** 1090:14

**took** 1107:17,18 1108:18 1109:23 1110:1 1115:6,10 1117:7,8 1123:22 1134:7 1138:10,16 1139:6,7,16 1142:18 1149:10

**top** 1091:13 1095:21

**total** 1115:16

**totally** 1124:20

**track** 1087:6

**tradition** 1143:24

**transcript** 1161:11

**transmittal** 1093:17

**treat** 1104:23

**treated** 1105:11,22 1127:15 1128:2

**treating** 1129:9 1131:7

**treatment** 1098:23 1105:19 1113:15,17 1118:1 1121:2 1122:3 1125:7 1130:7 1142:21 1151:5,17

**trial** 1149:4

**trials** 1144:11,12 1145:4 ,17

**tried** 1125:8,23 1126:14

**true** 1117:6 1119:10 1131:3 1135:11 1136:12 1142:23 1144:10 1145:7 1147:9 1162:11

**try** 1121:19 1127:9 1131:13

**trying** 1085:1 1086:9 1096:4 1119:6 1127:21

**turn** 1104:14

**turned** 1095:16

**twice** 1118:19

**tx** 1080:8

**U**

**uh-huh** 1124:2

**ultimately** 1134:23 1153:8

**understand** 1086:14 1091:21 1092:10

**taking** 1105:7 1116:2,2 1125:8 ,23 1126:14 1130:5 1134:6 1146:13 1158:22

**understanding** 1083:2 1091:15 1092:19 1124:11 1126:7 1148:18,22 1155:16

**understood** 1146:13

**undue** 1109:6

**unexposed** 1135:21

**unique** 1131:19

**united** 1079:1,14 1161:1

**university** 1096:13

**unlikely** 1125:16

**until** 1152:11 1158:14

**update** 1141:7

**updated** 1095:8

**upon** 1085:5 1158:5

**us** 1089:11 1117:12

**usage** 1134:2

**use** 1119:22 1127:7 1128:7 1146:15 1148:3 1149:3

**used** 1101:21 1149:2 1152:23 1162:22

**useful** 1139:14

**uses** 1104:18 1144:23

**V**

**valid** 1131:19 1149:1

**value** 1105:4,5 1108:3 1136:21 1137:1

**values** 1119:16 1136:17 ,19

**variable** 1146:2

**variety** 1096:14 1115:22

**various** 1099:10 1136:17

**varying** 1104:24 1106:19 1107:2

**verbal** 1083:3

**veritext** 1083:3

**version** 1093:10,17 1094:8,17 1139:24 1140:6 1155:23

**versions** 1140:2

**versus** 1110:6 1115:15 1131:7 1137:2

**videographer** 1080:22 1081:3,22 1090:4,7 1103:4 1104:2,5 1122:10 1123:2 1137:24 1138:3 1154:7 ,10 1158:24

**videotaped** 1079:11

**view** 1105:20 1106:5

Gibbons V4  4/27/2009  11:40:00 AM

1119:6 1129:18
**vigor** 1127:8
**violated** 1102:24
**volume** 1079:10
1143:21 1145:20
**vs** 1079:5,7 1161:4,6

---

W

**wait** 1140:10,10
**waiting** 1104:8 1128:19
,20,22
**waive** 1155:5
**waived** 1162:16
**want** 1086:1,14,23
1087:6,9 1090:19
1100:3,4,5 1101:7
1103:13,22 1105:14
1140:1,17 1154:21
**wanted** 1126:6 1127:19
1150:24
**wasn't** 1097:11,12
1099:8 1105:3 1106:16
1108:2 1115:8 1117:19
1141:6 1151:18,24
**ways** 1109:21 1130:21
**we'd** 1118:24 1119:3,4
**we'll** 1084:4 1086:7
1100:3
**we're** 1086:6 1087:1
1092:23 1093:5,6
1100:13 1101:3,4
1102:3 1117:24
1131:22 1146:20
1147:19,20 1157:3
1158:9,13,14
**we've** 1104:9 1120:4
**wednesday** 1096:9
**week** 1087:15
**weeks** 1084:15,17,24
1086:19
**well** 1084:1 1085:1
1088:12 1089:10
1090:22 1094:6
1096:12 1098:8,17
1099:15 1100:19
1103:6 1106:5,9,22
1109:20 1126:8 1127:6
1128:5 1131:22
1132:21,21 1136:3
1146:20 1148:20
1151:22 1153:11
1157:19
**well-known** 1130:1
**went** 1095:12 1096:13
,16,17 1103:2 1110:16
1111:24 1152:20,21
**weren't** 1106:23
1110:11 1118:16

1146:7 1152:1
**what's** 1093:8,14
1129:18 1142:19
**whatever** 1097:18
1103:3 1105:19 1157:1
**whatsoever** 1101:22
1129:4
**whereas** 1104:23
**whereof** 1163:5
**whereupon** 1122:12
1159:2
**whether** 1101:7 1105:24
1110:1 1120:20,24
1121:3,24 1122:2
1124:20 1129:7 1131:9
1132:9 1133:4,4,15
1134:18 1136:23
1138:9 1147:5 1148:22
1149:2 1150:15,17
**why** 1087:21 1088:14
1092:22 1097:16
1103:11 1115:23
1118:16 1125:23
1126:20 1128:14
1131:24 1133:18
1139:12 1140:17
1143:1 1145:22
1147:11 1150:22
**wide** 1115:22
**will** 1081:11 1082:21,23
1083:16,21 1085:6
1086:22 1087:19
1088:22 1090:21
1092:22 1094:12
1100:2,22 1102:8
1105:11 1117:5
1129:22 1146:5
1153:24 1154:1,2
1156:9,13 1158:1,20
1162:23
**within** 1162:20
**without** 1102:14
1119:12 1136:13
**witness** 1081:10,22,24
1097:4,22 1099:16
1109:12 1116:10
1117:4 1118:10 1121:8
1123:19 1124:11
1125:3 1126:4 1128:5
,19,23 1133:7 1134:13
,22 1136:1,8 1138:18
1139:2,10 1140:22
1144:9,22 1145:11
1149:17 1153:16
1162:12 1163:5
**won't** 1086:7 1158:13
**wondered** 1128:21
**word** 1137:12

**work** 1084:19 1085:11
1086:8 1098:11
**working** 1086:18
**wouldn't** 1109:5 1111:7
,18 1113:11 1114:4
1120:9 1131:17
1133:10 1139:14
1152:22
**written** 1149:14
**wrong** 1141:4
**wrote** 1153:21 1154:19

---

X

**xwitness** 1160:1

---

Y

**yeah** 1098:8
**year** 1104:21,22
1119:19
**years** 1134:3,9
**yes** 1088:9 1089:5
1092:21 1099:20
1103:2 1108:5 1111:13
1128:9 1136:1 1142:7
1144:22
**yet** 1099:19
**york** 1080:18
**you'll** 1104:21 1110:13
1154:16
**you're** 1089:18 1094:4
1105:9,12,19 1110:23
1111:11 1112:6
1115:13 1123:19
1127:4,5 1131:2
1137:19 1146:17
1147:1
**you've** 1108:1,2 1132:5

---

Z

**zero** 1137:4