EXHIBIT 2A

# Transcript of the Testimony of
## Sander Greenland, Dr.P.H.

Date Taken: July 21, 2009
Volume: I

Case:
In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti
v.
Neurontin Products Liability

Reported By: Maureen O'Connor Pollard, RPR, CLR, CSR

O'Connor Pollard Reporting, Inc.
Phone:508-528-2950
Fax:508-528-3927
www.opreporting.com

1             UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3                   MDL Docket No. 1629

4                   Master File No. 04-10981

5     ***********************************

6     IN RE:  NEURONTIN MARKETING, SALES

7             PRACTICES AND PRODUCTS

8             LIABILITY LITIGATION

9     ***********************************

10    THIS DOCUMENT RELATES TO:

11    RONALD J. BULGER, SR., as Administrator

12    of the Estate of Susan Bulger, Deceased

13    ***********************************

14

15             VIDEOTAPED DEPOSITION OF

16             SANDER GREENLAND, Dr.P.H.

17

18

19                     Held At:
                White and Williams, LLP
20                 100 Summer Street
              Boston, Massachusetts 02110
21

22              July 21st, 2009
                    3:30 P.M.
23

24    Reported By:  Maureen O'Connor Pollard, RPR, CLR

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 2

1    APPEARANCES:
2    FOR PLAINTIFFS:
3        BY:  KEITH L. ALTMAN, ESQ.
             FINKELSTEIN & PARTNERS, LLP
4            436 Robinson Avenue
             Newburgh, New York 12550
5            800-634-1212
             kaltman@lawampmmt.com
6
7    FOR THE DEFENDANT PFIZER:
8        BY:  RICHARD M. BARNES, ESQ.
             GOODELL, DeVRIES, LEECH & DANN, LLP
9            One South Street, 20th Floor
             Baltimore, Maryland 21202
10           410-783-4004
             rmb@gdldlaw.com
11           -and-
         BY:  STEVEN M. NAPOLITANO, ESQ.
12           SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
             Four Times Square
13           New York, New York 10036
             212-735-3000
14           snapolit@skadden.com
             -and-
15       BY:  LORI CONNORS McGRODER, ESQ.
             SHOOK, HARDY & BACON LLP
16           2555 Grand Blvd
             Kansas City, Missouri 64108-2613
17           816-474-6550
             lmcgroder@shb.com
18
19   Videographer: Bill Slater
20
21
22
23
24

Page 3

1                    INDEX
2    EXAMINATION                          PAGE
3    SANDER GREENLAND, Dr.P.H.
4    BY MR. BARNES                    5
5    BY MR. ALTMAN                  119
6    BY MR. BARNES                  120
7
8                  EXHIBITS
9    NO.         DESCRIPTION          PAGE
10   Exhibit 1    Dr. Greenland's CV............    6
11   Exhibit 2    Dr. Greenland's May 31, 2009
12                expert report................    8
13   Exhibit 3    Dr. Gibbons' March 19, 2009
14                report.....................   45
15   Exhibit 4    Statistical Review and
16                Evaluation...................   47
17
18
19
20
21
22
23
24

Page 4

1                 P R O C E E D I N G S
2
3            THE VIDEOGRAPHER:  This is video
4    operator speaking, Bill Slater of Budd Legal
5    Video.
6            Today's date is July 21st, 2009, the
7    time is 3:31 p.m..
8            We are here at the offices of White
9    and Williams located at 100 Summer Street,
10   Boston, Massachusetts to take the videotaped
11   deposition of Professor Sander Greenland in the
12   matter of In Re:  Neurontin Marketing, Sales
13   Practices and Products Liability Litigation as
14   it relates to Bulger versus Pfizer, Defendants,
15   in the United States District Court for the
16   District of Massachusetts, MDL Docket Number
17   1629, Master File Number 04-10981.
18           Will counsel please voice identify
19   yourselves for the record and state whom you
20   represent.
21           MR. BARNES:  Rick Barnes on behalf of
22   Pfizer.
23           MS. McGRODER:  Lori McGroder on behalf
24   of Pfizer.

Page 5

1            MR. NAPOLITANO:  Steven Napolitano on
2    behalf of Pfizer.
3            MR. ALTMAN:  Keith Altman on behalf of
4    Plaintiffs.
5            THE VIDEOGRAPHER:  Will the court
6    reporter, Maureen Pollard, please swear in the
7    witness.
8
9            SANDER GREENLAND, Dr.P.H.,
10   having been identified by photo identification,
11   being first duly sworn, was examined and
12   testified as follows:
13           DIRECT EXAMINATION
14           BY MR. BARNES:
15       Q.  Good afternoon, Dr. Greenland.
16       A.  Good afternoon.
17       Q.  Would you please state your name and
18   professional address, please?
19       A.  Sander Greenland, professor of
20   epidemiology and statistics at the University of
21   California, Los Angeles.
22       Q.  And we spoke this morning, did we not?
23       A.  Yes.
24       Q.  And I'd like to ask you a few

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 6

1  questions about your experience.
2        First of all, you are a
3  pharmacoepidemiologist?
4        A.  I'm an epidemiologist and
5  statistician.
6        Q.  Do you consider yourself a
7  pharmacoepidemiologist?
8        A.  Some would I suppose, but I don't.
9        Q.  Do you consider yourself one?
10        A.  I actually never thought of that.
11        Q.  Okay.  Now, I'd like to mark as an
12  exhibit, I only have one copy, your CV.
13        (Whereupon, Greenland Exhibit Number 1
14        was marked for identification.)
15        BY MR. BARNES:
16        Q.  Can you identify that for the record,
17  please?
18        A.  Yes.
19        MR. ALTMAN:  And just to be complete,
20  that's dated March 29th, 2007, so it's
21  something --
22        A.  It's quite out of date.
23        MR. BARNES:  It was produced with his
24  report in this case, so if there's an updated

Page 7

1  one I'd be delighted if you would update it for
2  me.  That would be great.  Thank you.
3        BY MR. BARNES:
4        Q.  You've been -- your hourly rate is
5  $500 an hour?
6        A.  Correct.
7        Q.  And how much have you been paid for
8  your services as an expert witness in this case?
9        A.  I don't know, but I would imagine it
10  must be somewhere, I'm guessing, somewhere in
11  the twenties at the moment.
12        Q.  And what is that guess based on?
13        A.  Just recollection.
14        Q.  When was your last invoice?
15        A.  What was it, a month ago perhaps, or a
16  month and a half.
17        Q.  So your best guess --
18        A.  I'm not sure.
19        Q.  Your best estimate as of a month and a
20  half ago was somewhere in the 20 to $30,000
21  range?
22        A.  I think.
23        Q.  Thank you.
24        And how much time have you put in to

Page 8

1  preparing for the Daubert hearing this morning
2  and for your deposition in terms of hours?
3        A.  I don't know, I would guess around
4  ten.
5        Q.  Ten hours.  So another five to six,
6  $7,000?
7        A.  Could be.
8        Q.  Now, I want to just follow up.
9        In your expert report, you indicate
10  that you have, you list as -- do you have a copy
11  of your expert report handy?
12        A.  No.
13        Q.  If counsel would provide you with the
14  expert report, which he has.
15        MR. ALTMAN:  I think you really do
16  need to mark one.
17        MR. BARNES:  I will.  Let's just mark
18  that one.  Thank you.
19        (Whereupon, Greenland Exhibit Number 2
20        was marked for identification.)
21        BY MR. BARNES:
22        Q.  This is your May 31st report.  If we
23  can get a binder clip.
24        MR. ALTMAN:  Do you have a small copy

Page 9

1  of it there?
2        MR. BARNES:  You tell me.  You handed
3  this to me this morning.
4        BY MR. BARNES:
5        Q.  Dr. Greenland, I'm going to hand you
6  what's been marked as Greenland Exhibit
7  Number 2.  Can you identify this for the record?
8        A.  My expert report of May 31st, 2009.
9        Q.  And you prepared that on behalf of
10  Plaintiff in this case?
11        A.  Correct.
12        Q.  And when were you asked to prepare
13  that?
14        A.  Sometime during May, I think.
15        Q.  Now, you said this morning that you
16  had reviewed the PharMetrics data.  Do you
17  remember that testimony?
18        A.  Yes.
19        Q.  Tell me precisely what it was you did
20  with the PharMetrics data.
21        A.  I was with Mr. Altman, we went through
22  the database on his computer.
23        Q.  And when was that done?
24        A.  It would have been March of this year,

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 10

1    I believe.
2        Q.   And did you keep any -- what was the
3    purpose of your review of the PharMetrics data,
4    sir?
5        A.   To familiarize me with the data
6    directly.
7        Q.   And what queries did you run?  How did
8    you address the PharMetrics database?
9        A.   We went through looking at the
10   structure of the data, the records on the
11   screen, and other details about documentation
12   about the structural file kind of information
13   was in it.
14       Q.   Were you given -- was Mr. Altman
15   leading the tour through the PharMetrics
16   database, or were you independently reviewing
17   the PharMetrics database yourself?
18       A.   Well, it was done on -- like I said, I
19   did not receive the data on my machine, it was
20   all done with me there and showing me the files,
21   where they were, how they were structured,
22   looking at the stuff that was submitted by
23   Dr. Gibbons, describing the data he'd received,
24   his data request, and what he had received and

Page 11

1    checking those things out and so forth, just a
2    routine examination.
3        Q.   Specifically what do you recall
4    examining in the PharMetrics database, sir?
5        A.   Well, specific things I mentioned, for
6    example, the particular records, and that
7    showed, I think, patterns of exposure that I
8    talked about in this report.
9        Q.   Did you document any of those
10   examinations?  How did you record your
11   observations, and how were they maintained?
12       A.   No particular form, just what I've
13   talked about here.
14       Q.   Did you take any notes, for example?
15       A.   I'm trying to remember if I had any.
16   There may have been some notes.  I think I might
17   have taken some notes, and then used them for
18   information in this report.
19       Q.   So when you were there in March, you
20   spent time looking at the PharMetrics database
21   with Mr. Altman and you took some notes?
22       A.   Then he sent me copies of items, which
23   I think they were exhibits, I think they might
24   have been produced as exhibits.

Page 12

1        Q.   Please look at your report, at Exhibit
2    2, and tell me what Mr. Altman sent you from
3    your report, please.
4        A.   Let's see.
5            (Witness reviewing document.)
6        A.   I guess not.  Okay.  Well, anyway,
7    that's what I recall.
8            BY MR. BARNES:
9        Q.   Describe what Mr. Altman sent you,
10   sir.
11       A.   Well, as I said, I thought that he --
12   I just remembered, it must be looking at the
13   screen, but these items.
14       Q.   What items were you referring to, sir?
15       A.   Those on Page 19 and 20.  Some of
16   these items were from the deposition, that's
17   right, the subsequent deposition of Robert
18   Gibbons, April 27th, e-mails, Coyle letter,
19   Robert Gibbons, April 29th, 2009.
20       Q.   Describe for me where your notes are
21   from your meeting with Mr. Altman where you
22   looked at the PharMetrics data.
23       A.   They're gone.
24       Q.   Where did they go to?

Page 13

1        A.   They were just denotations that I
2    tossed after I typed them into this report,
3    information into this report.
4        Q.   So you took notes with Mr. Altman as
5    you were looking at the PharMetrics database.
6    Those notes were then destroyed?
7        A.   Yeah, they were used in this -- for
8    this report, the examination of the record for
9    this patient.
10       Q.   Who found that record for patient,
11   sir, was it you or Mr. Altman?
12       A.   Mr. Altman.
13       Q.   So he pointed it out to you, sir?
14       A.   Yes.
15       Q.   Did you find any other patient
16   specifically that was relevant to your review of
17   this report?
18       A.   No.
19       Q.   So the one patient you have in your
20   report was identified with Mr. Altman, and he
21   walked you through the various aspects of that
22   one patient, and you took notes of what he told
23   you, correct?
24       A.   Well, I took notes of what was there

Page 14

1   in this record.
2       Q.   But the process was Mr. Altman --
3       A.   He pointed them out.
4       Q.   He pointed them out, correct?
5       A.   Yes.
6       Q.   And then he walked through the various
7   aspects of that patient?
8       A.   Yes.
9       Q.   And you verified that, and you took
10  notes, and you put that into your report?
11      A.   Right.
12      Q.   Okay.  Now, other than that patient --
13  strike that.
14           That was the only patient that you
15  identified in the entire 131,000 --
16      A.   I didn't identify it.
17      Q.   He did?
18           MR. ALTMAN:  Objection.  Hold on.
19  Objection.  Misstates his testimony.
20           BY MR. BARNES:
21      Q.   He identified the patient?
22      A.   Yes.
23      Q.   Was there any other patient that was
24  of interest to you that Mr. Altman identified?

Page 15

1       A.   Well, we looked at some others, I
2   believe, but I didn't actually take notes on
3   those.
4       Q.   Other than meet with Mr. Altman and
5   taking some notes, did you create any other
6   documentation leading up to your report?
7       A.   No.
8           MR. ALTMAN:  Objection.
9           Just pending agreement with counsel,
10  draft reports and --
11          MR. BARNES:  I didn't ask him about
12  draft reports.  I said notes, documentation.
13          Counsel, I would ask you to verify
14  that Dr. Greenland destroyed the notes of your
15  meeting where you showed him this patient who
16  ended up in his report, I want you to verify
17  that.  And if he has that, I want you to produce
18  all the notes pertaining to that patient and the
19  whole review he did with that.
20          MR. ALTMAN:  We'll take it under
21  advisement.
22          I will just point out to you, make it
23  a little bit easier for you, this was the same
24  patient that was discussed with Dr. Gibbons in

Page 16

1   his deposition.
2           MR. BARNES:  Thank you.
3           BY MR. BARNES:
4       Q.   Okay.  Can you be more precise; other
5   than going through the structure and the format
6   of the PharMetrics database with Mr. Altman on
7   his computer, did he actually give you the
8   PharMetrics database for you to use in your
9   office so you could look at it independently
10  sitting there with him?
11      A.   No.
12      Q.   So that was all done in New York with
13  Mr. Altman?
14      A.   Not New York, Chicago.
15      Q.   Chicago.  So he flew to Chicago with
16  the database, and he met you in Chicago?
17      A.   Correct.
18      Q.   Did you ask him for the database so
19  that you could look at it?
20      A.   No.
21      Q.   Sir, why didn't you ask him for the
22  database?
23      A.   Because I had no time, didn't have
24  enough time to do that sort of work.  I didn't

Page 17

1   commit to this case to spend that level of time.
2       Q.   Okay.  Now, historically, you can
3   correct me if I'm wrong, but your role in other
4   litigation has been to -- you're a
5   methodologist; is that fair to say?
6       A.   Correct.
7       Q.   So what you have generally done in the
8   course of your review of litigation of any kind
9   is generally comment on the methodologies
10  employed by others who are testifying in the
11  litigation, correct?
12      A.   Correct.
13      Q.   Okay.  I've seen that.
14           And hasn't most of -- hasn't all of
15  your work in this regard been on behalf of
16  Plaintiffs in personal injury cases?
17      A.   All the times I've been a named
18  expert.  I've consulted to defense, but I've
19  never become a named expert.
20      Q.   Thank you.  That's fair.
21           So in all the cases in which you have
22  performed the service of reviewing the
23  methodologies of defense expert witnesses, all
24  of your work where you've actually been named as

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

---

Page 18

1  an expert witness has been on behalf of
2  Plaintiffs' counsel in litigations?
3      A.  That's correct.
4      Q.  Okay.  So just to clarify it in this
5  case then, I think you said it this morning, but
6  in this case you did not undertake any
7  independent analysis of the PharMetrics data to
8  verify Dr. Gibbons' work, correct?
9      A.  That's correct.
10     Q.  You did not independently conduct any
11 analyses within the PharMetrics database of your
12 own to test the conclusions and the results of
13 Dr. Gibbons, correct?
14     A.  That is correct.
15     Q.  Okay.
16     A.  I took his word.
17     Q.  Okay.  And I want to spend a moment
18 with you -- I'm trying to organize my time here
19 since I know you're on a tight schedule.
20         I want to turn to the first page of
21 your report, if I might, sir.  And prior to
22 putting finger to keyboard rather than pen to
23 paper, how many times did you discuss your
24 May 31 report with Mr. Altman, sir?

Page 19

1         MR. ALTMAN:  Objection.  That goes to
2  the drafting of the expert report.
3         MR. BARNES:  Let me rephrase the
4  question, I want to withdraw the objection.
5         BY MR. BARNES:
6      Q.  How many times did you meet with
7  Mr. Altman before May 31st, 2009 and after your
8  last report?
9         You did a report in July of 2008?
10     A.  Mm-hmm.
11     Q.  Then you did a report in May of 2009.
12 Are there any other reports that you drafted?
13     A.  No other reports drafted.  Any reports
14 that were drafted are things that were filed.
15 So you're asking how many times I physically met
16 with him?
17     Q.  Yes, how many times have you
18 physically met with Mr. Altman concerning the
19 May 31, 2009 report?
20     A.  Well, let's see, we met in March.  And
21 we met again, didn't we?  You came out, right?
22     Q.  Give me your best recollection.
23     A.  I'm a little spacey because I didn't
24 get -- my flight was late last night.

Page 20

1      Q.  I understand.
2      A.  But I seem to recall we had -- anyway
3  we met, I think physically I may be mixing up,
4  but I think we met physically, might have
5  physically met again once, but I may be
6  misremembering.
7      Q.  In March, and then another time
8  between March and July?
9      A.  Yes.
10     Q.  Where was that meeting, sir?
11     A.  If I'm remembering correctly --
12     Q.  Give me your best recollection.
13     A.  I may be way off, it would have been
14 at my house in Malibu.
15     Q.  You have a house in Malibu?
16     A.  Yes.
17     Q.  And that's in California?
18     A.  Correct.
19     Q.  So you and Mr. Altman met at your
20 house in Malibu.
21         And for how long did you meet at your
22 house in Malibu?
23     A.  Oh, amount of time spent together
24 working on this, probably about a day's worth or

Page 21

1  something.
2      Q.  Okay.  And how many days did
3  Mr. Altman spend with you in Malibu?
4      A.  Well, I don't remember exactly.  But
5  I'd say a total of two, I mean consecutive days.
6      Q.  Two consecutive days.
7         And then did you meet with Mr. Altman
8  after you met with him at your house in Malibu
9  for two days or so?
10     A.  I don't think we physically -- did we
11 physically meet again?  I don't recall.  I don't
12 think so.
13     Q.  Okay.  It's now July, late July, July
14 21st, correct?
15     A.  Mm-hmm.
16     Q.  So between your meeting for a day --
17 your two-day meeting where you spent a day
18 working with Mr. Altman and a day doing
19 something else, how many times did you speak
20 with Mr. Altman between that day and the time of
21 the hearing?
22     A.  The actual number of phone calls?
23     Q.  Yes, sir.
24     A.  Oh, I don't recall that.  It would be

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 22

1    several.
2        Q.   Can you tell me what you talked about
3    in each of these phone calls?
4            MR. ALTMAN:  Objection.
5            He can answer to the extent that it
6    doesn't involve the drafting of the expert
7    report.
8        BY MR. BARNES:
9        Q.   Physically in terms of the subject
10   matter of your conversation with Mr. Altman,
11   what did you talk about?
12       A.   Well, we talked about this case, and
13   Gibbons' analysis, and what my opinions were
14   about his paper and his reports, and that sort
15   of stuff.  It was all matters related to this
16   case.
17       Q.   So other than saying you had several
18   telephone conversations, you can't give me a
19   number.
20           Can you give me a sense of how many
21   hours you spent with Mr. Altman on these
22   telephone conversations about the Gibbons
23   analysis?
24       A.   Well, there would be at least several

Page 23

1    hours.  I'm sorry, I can't --
2        Q.   Do you intend to bill for this time,
3    sir?
4        A.   I already have.
5        Q.   So is that reflected, is that time
6    reflected in your bill?
7        A.   Yes.
8        Q.   By the number of hours spent?
9        A.   Yes.
10           MR. BARNES:  I would ask you produce
11   his invoices, please.
12           BY MR. BARNES:
13       Q.   Now, in terms of your -- how many
14   hours did you spend reviewing Dr. Gibbons'
15   deposition?
16       A.   Which one?
17       Q.   There were several.
18       A.   There were several, so I couldn't
19   really split them up.  I mean I spent quite a
20   few hours going over his depositions, so looking
21   them over.
22       Q.   Now, I want you to turn to Page 9 of
23   your report.
24       A.   Yes.

Page 24

1        Q.   And you were in the courtroom this
2    morning when I spoke to the judge about the
3    question that Mr. Altman asked Dr. Gibbons,
4    Dr. Gibbons' paper -- "If another expert were to
5    say that Dr. Gibbons' paper proves that
6    gabapentin is protective of suicide, would that
7    expert be wrong?"
8            And you gave an answer that was four
9    and a half lines long, correct?  Your report
10   only reflects an answer from line 20 to line 24,
11   correct?
12           MR. ALTMAN:  Objection.  Misstates the
13   report.
14       A.   I don't -- I've read through the line
15   13 to 24 that's printed on this page.
16           BY MR. BARNES:
17       Q.   Did you read between line 25 over to
18   the next page to line 18?
19       A.   Yes.
20       Q.   Why didn't you -- why did you split
21   his answer in half, sir, when he -- his answer
22   was actually much longer than this.  What led
23   you to pick this spot or interpretation?  Why
24   did you stop there?

Page 25

1        A.   Because I thought that made my point,
2    that he agreed that we agreed on this issue.  It
3    indicates that he knows that the common usage of
4    the phrase -- "This passage indicates that
5    Dr. Gibbons knows that the common usage of the
6    phrase 'protective effects' would be interpreted
7    by both scientific and lay readers to mean
8    exactly what it sounds like."
9        Q.   But he went on, he went on much longer
10   than that in his answer to explain exactly what
11   he meant, isn't that true?
12       A.   Yes, he went on to explain other
13   things, but I don't think that's relevant to the
14   point I was making.
15       Q.   Do you think it's misleading, Doctor,
16   if you're accusing Dr. Gibbons of being
17   misleading, do you think it's misleading to only
18   include less than 25 percent of his answer that
19   was given in response to that question?
20       A.   I think that the judge or anybody
21   reading his report hand in hand with my comment
22   would be capable of reading further, and would
23   have and would see the rest of what he said.
24       Q.   But it's your obligation, according to

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 26

1   the standard you've set in your deposition that
2   it shouldn't be misleading, don't you think you
3   should have provided the Court the entire answer
4   in -- if you're going to accuse someone of
5   trying to be misleading, to give the entire
6   context and let the reader be the judge as to
7   whether or not his answer was misleading?
8        MR. ALTMAN:  Objection.  Misstates his
9   testimony.
10       A.  Yes, it certainly does.
11       No, I don't think so, I disagree.
12       BY MR. BARNES:
13       Q.  Here's what you say, sir.  It says it
14   appears -- you say that, on Page 9 of your
15   report, Exhibit 2, "In light of the fact that
16   Gibbons et al recognize several of the reasons
17   why the PharMetrics data cannot be claimed to
18   'demonstrate a protective effect of gabapentin,'
19   the use by Dr. Gibbons of this phrase in
20   Section 17 of his supplemental expert reports of
21   November 5, 2008 and March 19, 2009 appears to
22   me to be an attempt to mislead readers.
23   Furthermore, it appears from the Gibbons
24   deposition testimony of March 5, 2009 that

Page 27

1   Dr. Gibbons is well aware of the misleading
2   nature of his usage of 'protective' in his
3   supplemental expert reports.  Consider the
4   following exchange from Page 928 of that
5   deposition," and you added bolding.
6        My point is, don't you think that it
7   is important for an expert witness such as
8   yourself if you're going to quote from someone
9   in responding to an answer to give the entire
10  quote so the reader can understand the complete
11  answer as opposed to cherry picking less than
12  one quarter of the answer?
13       MR. ALTMAN:  Objection.
14   Argumentative, asked and answered.
15       MR. BARNES:  He used the word cherry
16  picking in this report, I'm using his words.
17       BY MR. BARNES:
18       Q.  Go ahead, Doctor.  You may answer.
19       A.  No, I don't.  No.  It makes my point.
20       Q.  Your point.  What's a fair point?
21       Isn't it fair to let the reader read
22  the entire answer as opposed to just a quarter
23  of it?
24       A.  Presumably the judge, who this was

Page 28

1   written for the Court, would have the entire
2   Gibbons report before them and would have read
3   it and would be able to compare it, and they
4   could judge whether I was being misleading or he
5   was.
6        Q.  Are you saying counsel provided the
7   entire quote elsewhere to the judge?
8        A.  That entire quote was provided to me
9   and I presume to the Court.  Wasn't the report
10  given to the Court?
11       Q.  I want you to assume that counsel did
12  not provide the entire answer to the Court in
13  the briefing in this case.  Wouldn't it be
14  appropriate for someone to have brought the
15  entire answer to the Court so she could see the
16  entire context?
17       A.  Didn't Gibbons bring the entire answer
18  to the Court?
19       Q.  This is your report, sir.
20       A.  And I'm quoting from Gibbons.
21       Q.  The question to you is; don't you
22  think in your report if you're accusing someone
23  of being misleading that your side should have
24  advised, you personally should have advised the

Page 29

1   Court of the entire answer so the Court could
2   have judged the entire answer as opposed to a
3   quarter of the answer?
4        MR. ALTMAN:  Hold on a second.
5        Objection.  Compound, vague and
6   ambiguous argumentative.
7        MR. BARNES:  That's fine.
8        MR. ALTMAN:  Go ahead.
9        A.  I disagree with you.
10       BY MR. BARNES:
11       Q.  So you believe providing the Court
12  with only less than 25 percent of an answer is
13  not misleading, is that correct?
14       MR. ALTMAN:  Objection.
15   Argumentative, asked and answered.  Now you're
16  starting to badger him.
17       MR. BARNES:  I'm not.  I'm asking that
18  question.
19       MR. ALTMAN:  You're badgering him.
20  You've asked him the same question three times.
21  Come on, move on.
22       BY MR. BARNES:
23       Q.  Answer that question.
24       A.  I'm going to answer the question with

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 30

1 an analogy.
2        If I pull out of context a single
3 sentence, and this ended at a sentence, at a
4 period, not at a semi-colon, not at a comma, not
5 at a dash or an ellipses, it ended at a period,
6 full sentence, would I be pulling it out of
7 context saying, if I pulled a quote from
8 somebody saying "I believe that somebody should
9 shoot President Obama," and you say -- would you
10 start arguing that that's out of context?
11   Q.  My question to you is; do you believe
12 that an answer that --
13   A.  That's my answer.
14   Q.  Let me ask my question.  I want an
15 answer to my question, sir, and I will pursue
16 this.
17        Do you believe as an expert that it is
18 not misleading to put in an expert report only
19 25 -- less than 25 percent of your colleague's
20 answer whom you're criticizing for being
21 misleading?
22        MR. ALTMAN:  Hold on.  Objection.
23 Asked and answered.
24        I'm not allowing him to answer at this

Page 31

1 point.  You're now badgering him, and if you
2 continue we're going to end this deposition.
3        MR. BARNES:  He gave me -- he answered
4 an analogy.
5        MR. ALTMAN:  You keep asking him the
6 same question.
7        MR. BARNES:  We're going to go off the
8 record.  We're going to call the magistrate.
9        MR. ALTMAN:  No, we're not going to.
10        MR. BARNES:  Yes, we are.
11        MR. ALTMAN:  No, we're not going to
12 until I put my statement on the record.
13        MR. BARNES:  That's fine.  Go ahead.
14        MR. ALTMAN:  You've asked him four
15 times or five times the same question, he's told
16 you he doesn't agree, you continue going at it
17 over and over again and badgering him.  You keep
18 throwing 25 percent.  I'm now instructing him
19 not to answer it.  If you want to --
20        MR. BARNES:  We're going to bring him
21 back.  We're going to bring him back.
22        MR. ALTMAN:  You can make your
23 argument to the magistrate.  You're very short
24 on time, I suggest you ask the questions that

Page 32

1 you want.
2        MR. BARNES:  I did.
3        MR. ALTMAN:  I'm instructing him not
4 to answer at this point.
5        MR. BARNES:  You're going to instruct
6 him not to answer.  He's not answered that
7 question, Keith.
8        MR. ALTMAN:  Yes, he has.  He says he
9 doesn't agree with you.  You're badgering him
10 now.
11        MR. BARNES:  I'm happy to have you pay
12 his way back.  Okay.  Next question.
13        He's the one that called Dr. Gibbons'
14 intent to mislead, and he provided the
15 misleading quote, and we're going to get to the
16 bottom of it.
17        MR. ALTMAN:  Rick, I object to your
18 statements on the record.  Please move on and
19 ask him the questions.
20        MR. BARNES:  We're going to move on.
21        BY MR. BARNES:
22   Q.  I direct your attention to Page 2 of
23 your report.
24   A.  Yes.

Page 33

1   Q.  Okay.  As a statistician with
2 expertise in the field of -- first of all, do
3 you claim expertise in the field of clinical
4 trial design?
5   A.  No.
6   Q.  So you're not a clinical trialist,
7 correct?
8   A.  Correct.
9   Q.  Okay.  You do agree that there were
10 serious limitations to even randomized
11 controlled clinical trials, correct?
12   A.  Yes.
13   Q.  And you would agree that randomized
14 controlled clinical trials, even though they're
15 treated as a gold standard, suffer from problems
16 which you list in your report at Page 2,
17 correct?
18   A.  Can suffer.
19   Q.  Can suffer.
20        Did you do any qualitative assessment
21 of any of the clinical trials that are in the
22 FDA meta-analysis?
23        MR. ALTMAN:  Objection.  Goes beyond
24 the scope of his expert report.

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 34

1        MR. BARNES:  It does not.
2        MR. ALTMAN:  He didn't say that he
3    reviewed the FDA meta-analysis.  You're asking
4    him about stuff he didn't do.
5        MR. BARNES:  This witness looked at
6    Dr. Gibbons' report, this report, and he looked
7    at it, it's one of the references he considered,
8    Dr. Gibbons' report of July of 2008.  So he has
9    looked at it, that's what Dr. Gibbons is
10   addressing in his report, so it's fair game for
11   me to talk about the meta-analysis.  It's in his
12   report.  That's all Dr. Gibbons talked about.
13       MR. ALTMAN:  You can ask him about
14   what he opined upon in section two with respect
15   to one section of Dr. Gibbons' July report.
16   Dr. Gibbons doesn't --
17       MR. BARNES:  Let me ask the question,
18   Keith.  We're going to get to the bottom of
19   this.  Okay.  He's reviewed it, it's in his
20   report, and we're going to ask questions about
21   the clinical trials.  You can object, and we'll
22   just see where we go.
23       BY MR. BARNES:
24   Q.  First of all, did you do any

Page 35

1    qualitative assessment of the randomized
2    controlled trials in the FDA meta-analysis?
3        MR. ALTMAN:  Objection.  It's not the
4    topic in his report here.
5        MS. McGRODER:  He can answer.
6        MR. ALTMAN:  He comments upon the
7    elements.  I'm instructing him not to answer
8    because it's pending an agreement.  You can ask
9    him questions about what's in his report here.
10       BY MR. BARNES:
11   Q.  Did you or did you not review
12   Dr. Gibbons' July, 2008 report as represented in
13   your report of May 31st, 2009?
14   A.  Yes.
15   Q.  Okay.  And that report concerns the
16   FDA meta-analysis, correct?
17   A.  Correct.
18   Q.  Okay.  You testified this morning that
19   you had reviewed the FDA meta-analysis, correct?
20   A.  Correct.
21   Q.  Okay.  Now, did you do -- in
22   connection of criticizing Dr. Gibbons' report,
23   considering Dr. Gibbons report in 2008, July,
24   2008 report, did you undertake any review of

Page 36

1    Dr. Gibbons' work analyzing the FDA
2    meta-analysis?
3        MR. ALTMAN:  Objection.  He hasn't --
4        MR. BARNES:  We have an agreement.
5        MR. ALTMAN:  We have an agreement.  If
6    you want to ask him about the one section of
7    Dr. Gibbons' November, 2008 report.
8        MR. BARNES:  I'm going to get to that.
9    I'm going to lay a foundation.
10       MR. ALTMAN:  Don't ask him about July
11   then.
12       MR. BARNES:  It's in July.
13       MS. McGRODER:  It's in every report.
14   His opinions about the FDA meta-analysis are in
15   his May report, July report, November report,
16   and March report.
17       MR. ALTMAN:  It doesn't matter.  He
18   only opined about one paragraph in Dr. Gibbons'
19   November, 2008 report.  If you want to ask him
20   about his opinions about the one paragraph --
21       MR. BARNES:  You instruct him not to
22   answer?
23       MR. ALTMAN:  I instruct him not to
24   answer to the extent that you exceed beyond

Page 37

1    paragraph number eight.  If you want to ask him
2    about what he says about paragraph number eight,
3    I will not object.
4        MR. BARNES:  Keith, I'm going to take
5    my deposition.  You've now obstructed me twice
6    on legitimate grounds of examination.  And so,
7    you know, I'm going to be in Boston, I can file
8    a motion with Judge Saris or Judge Sarokin.
9        MR. ALTMAN:  Okay.
10       MS. McGRODER:  Can I interject one
11   thing, Keith?  This report does not limit any of
12   Dr. Greenland's opinions to Paragraph 8 of
13   Dr. Gibbons' report.
14       MR. ALTMAN:  With respect to the FDA
15   alert, he only discusses what Dr. Gibbons says
16   in Paragraph 8.
17       MS. McGRODER:  That is not evident
18   from this report.
19       MR. ALTMAN:  Really?  Why don't you
20   read right over here, if you go to Page 3, I
21   believe, okay, is the first time he talks about
22   Dr. Gibbons, and he's talking about what
23   Dr. Gibbons said in Paragraph 8.
24       MR. BARNES:  So he's reviewed the

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 38

1    entire report from --
2         MS. McGRODER:  It doesn't say that.
3         MR. BARNES:  It doesn't say that.
4         MR. ALTMAN:  Yes, it does.
5         MS. McGRODER:  No, it doesn't.
6         MR. ALTMAN:  Dr. Gibbons in his
7    analysis in Paragraph 8.
8         MR. BARNES:  Instruct him not to
9    answer.
10        MR. ALTMAN:  If you want to ask him
11   about Paragraph 8 --
12        MR. BARNES:  I'm going to ask him
13   questions I want to ask him, sir.
14        MR. ALTMAN:  I'll just telling you
15   what I won't object to.
16        MS. McGRODER:  So you're going to
17   strike Pages 1 through middle of 3 since --
18        MR. ALTMAN:  What do those have to do
19   with the FDA alert?
20        MS. McGRODER:  Why are they in here
21   then?
22        MR. ALTMAN:  They don't discuss the
23   FDA alert.
24        MS. McGRODER:  They discuss the

Page 39

1    randomized controlled trials that underlie the
2    FDA alert.
3         MR. ALTMAN:  Really?  Where does it
4    say that?
5         MS. McGRODER:  Why else would he be
6    talking about randomized controlled trials?
7         MR. ALTMAN:  He's talking about
8    Dr. Gibbons' power calculations in section 8.
9         MR. BARNES:  Let me continue.
10        BY MR. BARNES:
11        Q.  You specifically cite on Page 2 the
12   comment for "randomized controlled trials
13   usually suffer from problems such as," correct?
14        A.  Correct.
15        Q.  Now, does "usually" mean most of them?
16        A.  Well, let me explain and say probably
17   most trials suffer from some problem, not all of
18   them at once listed there.
19        Q.  So let me ask that question.
20            You would agree from your perspective
21   that randomized controlled trials usually suffer
22   from one or more of the problems listed on
23   Page 2 of 20 of your report, is that a fair
24   question?

Page 40

1         A.  That's what I would guess.
2         Q.  Okay.  That's fine.  I just want to
3    make sure I understood that.
4         A.  Yes.
5         Q.  And in terms of that would apply to --
6    so as a general -- so when you talk about on
7    number four "Failure to enroll patients that are
8    representative of those who would receive the
9    treatment in practice, which results in lack of
10   generalizability of the results," what do you
11   mean by that?
12        A.  I'm not sure what you're asking.
13        Q.  Well, you wrote that.  Explain to me
14   what generalizability -- what "lack of
15   generalizability" means?
16        A.  Oh, it means that the patients who are
17   enrolled in trials sometimes, quite often, are
18   different from -- for example, if a drug is
19   being used, being evaluated in a trial, say,
20   conducted for or by the manufacturer to get
21   approval for a particular condition, then the
22   patients enrolled in that trial will be the
23   people who have the condition that they're
24   developing the drug to get approval for for that

Page 41

1    condition, and then that means it's not going to
2    have been tested, and the trial, the results in
3    the trial may not apply to those who -- for whom
4    it may be prescribed for off-label use.
5         MR. BARNES:  Would you read back that
6    last sentence, please?
7            (Whereupon, the reporter read back the
8    above answer.)
9         BY MR. BARNES:
10        Q.  As an example?
11        A.  Yes.
12        Q.  But even, you would agree that even
13   those who are enrolled in a randomized trial in
14   patients who are taking them for the indication,
15   the patients in the clinical trial may not be
16   reflective of the population in the real world
17   that is actually taking the drug for the
18   indication; agree?
19        A.  That can happen, too.
20        Q.  Absolutely.  Okay.
21        A.  Yes.
22        Q.  Now, you criticize Dr. Gibbons'
23   opinion that gabapentin had an adequate number
24   of subjects in clinical trials to calculate

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 42

1  relative risk of suicidal behavior and thinking,
2  correct?
3        I'm trying to understand what your
4  criticism is here on Page 2 and 3.  It says
5  here -- the third paragraph on Page 3, maybe you
6  can help me understand this.
7     A.  Okay.  "Power calculations"?
8     Q.  Yes.  Well, this is what you say,
9  let's go up to the power calculations, the
10 previous paragraph.
11    A.  Previous paragraph?
12    Q.  On Page 3.
13    A.  On Page 3.  The one that begins" Power
14 calculations"?
15    Q.  Let me go up a little farther.  You
16 say "Because the power calculations offered by
17 Dr. Gibbons take no account of biases (problems
18 2 to 4), these calculations do not establish his
19 claims that the available studies were of
20 adequate size to detect important effects of
21 gabapentin."
22       Do you see that?
23    A.  Yes.
24    Q.  Okay.  Now, help me with this, all

Page 43

1  right?
2        Where did Dr. Gibbons obtain the
3  information by which he conducted the power
4  calculations in his expert report?
5     MR. ALTMAN:  Objection.  Foundation.
6     You can answer.
7     BY MR. BARNES:
8     Q.  You can answer.
9     A.  Do you mean the numbers that he
10 plugged in?
11    Q.  He did his power calculations, so
12 where did he get the effect size by which he
13 performed his power calculation?
14    MR. ALTMAN:  Object to foundation.
15    A.  Well, depends on which calculation.
16 Some of the calculations he got his numbers from
17 what happened in the lamotrigine and topiramate
18 groups, and then there were other places there
19 he was using numbers from other sources in the
20 data from the -- used in the FDA meta-analysis.
21    BY MR. BARNES:
22    Q.  Okay.  So part of it is from the FDA
23 meta-analysis, and part of it is specific from
24 the lamotrigine and topiramate trials in the

Page 44

1  meta-analysis, correct?
2     A.  As I recall it.
3     Q.  Now, what was the -- what was wrong
4  with Dr. Gibbons -- let's take them one at a
5  time.
6        Do you have a criticism of Dr. Gibbons
7  using the data from the lamotrigine and
8  topiramate trials for purposes of calculating
9  the power calculation?
10    A.  Yes, as it pertains to gabapentin.
11    Q.  Okay.  Now, why don't you believe the
12 effect size that was calculated for topiramate
13 and lamotrigine, why it was inappropriate for
14 Dr. Gibbons to use those results from the FDA
15 meta-analysis in calculating his power
16 calculations in his expert report?
17    A.  Because the background risk in those
18 trials was different because the indications in
19 the particular population selected for
20 application of those drugs appeared to be
21 different in their background risk than those
22 for the gabapentin trials.
23    Q.  Did you go and determine the
24 background risk that was in the lamotrigine and

Page 45

1  topiramate trials?
2     A.  I took Dr. Gibbons' numbers at face
3  value.
4     MR. BARNES:  Mark this as an exhibit.
5  This is Dr. Gibbons' report from March 19th,
6  2009.  Mark that as the next exhibit.
7     (Whereupon, Greenland Exhibit Number 3
8     was marked for identification.)
9     BY MR. BARNES:
10    Q.  Explain to me where you claim
11 Dr. Gibbons obtained his information from the
12 FDA meta-analysis.
13    A.  I'll have to -- well, there it is.
14    Q.  What page, sir, and what paragraph?
15    A.  I believe I'll find it on seven, but
16 let me read through it, please.
17    Q.  Take your time.  Thank you, sir.
18    (Witness reviewing document.)
19    A.  Well, this is how I read it.
20    BY MR. BARNES:
21    Q.  You're on Paragraph 7 or Page 7?
22    A.  Page 7, Paragraph 8.
23    Q.  Thank you.
24    A.  And I'm not sure where to start

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 46

1    reading, but I'm going to read from the sentence
2    that begins about a third of the way down
3    Paragraph 8.  At the start of the line, it says
4    "Second, for the combination of lamotrigine and
5    topiramate, the incidence of suicidality events
6    on the drug was .63 percent and .32 percent on
7    placebo."
8        Q.  Is that a true statement, sir?
9        A.  I'm simply taking his word at this
10   point.
11       Q.  Did you -- you accept his word on it?
12       A.  I accept his word.
13       Q.  Continue.
14       A.  "By contrast, for the so-called
15   GABAergic drugs excluding topiramate, the
16   incidence of suicidality events on the drug was
17   .18 and .18 percent on placebo."
18       Q.  Okay.  Now, I want you to look at the
19   FDA meta-analysis.
20       MR. BARNES:  Keith, if you would give
21   Dr. Greenland, I'll mark that as an exhibit, the
22   Medical Statistical Review, please.
23       MR. ALTMAN:  I'm going to object to
24   the use of this document.  He says he based his

Page 47

1    opinion upon what was in Dr. Gibbons' --
2        MR. BARNES:  He's referencing the
3    doggone FDA meta-analysis.
4        MR. ALTMAN:  So?  But he says he
5    relied upon Dr. Gibbons' Paragraph 8.
6        MR. BARNES:  He has testified he has
7    reviewed the meta-analysis.
8        MR. ALTMAN:  There's not a question,
9    that's not a question whether he's ever looked
10   at the meta-analysis.  It's a question of what
11   did he talk about.
12       MR. BARNES:  I can't conduct a
13   deposition with you interrupting me, sir.
14       I'm going to mark my exhibit, you can
15   instruct him not to answer.
16       MR. ALTMAN:  That's fine.
17       MR. BARNES:  Or not.
18       (Whereupon, Greenland Exhibit Number 4
19       was marked for identification.)
20       BY MR. BARNES:
21       Q.  So as we go through this, you accept
22   Dr. Gibbons' calculation of a rate of
23   suicidality of .63 percent for the combination
24   of lamotrigine and topiramate and .23 percent,

Page 48

1    correct?
2        A.  For placebo.
3        Q.  "By contrast, the so-called
4    suicidality events for GABAergic drugs including
5    topiramate, the incidence of suicidality events
6    on the drug was .18 and 1.8 on placebo,"
7    correct?
8        A.  .18 percent on placebo.
9        Q.  Do you agree the that the exclusion of
10   topiramate from GABAergic drugs eliminated the
11   increased risk of suicidal thinking and behavior
12   in the FDA meta-analysis for GABAergic drugs?
13       MR. ALTMAN:  Hold on a sec.  I don't
14   think he's expressed that opinion in this expert
15   report, so I'm going to instruct him not to
16   answer.
17       MR. BARNES:  He has.  He's criticizing
18   a power analysis by a witness based upon his use
19   of these data.
20       MR. ALTMAN:  He did not render --
21       MR. BARNES:  Paragraph 8 is all about
22   that.  I'm entitled to inquire.  He's accused --
23       MR. ALTMAN:  Except that's in his
24   earlier report.  You guys had a full and fair

Page 49

1    opportunity to depose Dr. Gibbons on his earlier
2    report, you guys chose not to take his
3    deposition.
4        MR. BARNES:  You just told us I was
5    free to inquire anything about Paragraph 8.
6        MR. ALTMAN:  But his opinion on
7    Paragraph 8.  Read his opinion on --
8        MR. BARNES:  I'm allowed to test his
9    opinions, Keith.
10       MR. ALTMAN:  His opinion, he didn't
11   express any opinions about the --
12       MR. BARNES:  It's in his report.
13       MR. ALTMAN:  Where in his report is
14   the opinion that it was appropriate or not
15   appropriate to exclude topiramate or lamotrigine
16   in this report?
17       MS. McGRODER:  Are there certain
18   sentences in Paragraph 8 that you're limiting
19   his deposition to?
20       MR. ALTMAN:  I'm limiting his
21   deposition to his expert report.  If you could
22   point to me where he wrote about lamotrigine and
23   topiramate --
24       MR. BARNES:  This is unreal.

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 50

1       MS. McGRODER:  You pointed to us, you
2  said his opinions about Dr. Gibbons' report are
3  in Paragraph 8.
4       MR. ALTMAN:  Are from Paragraph 8.
5       MS. McGRODER:  Now we're talking about
6  Paragraph 8.
7       MR. ALTMAN:  Show me where in his
8  expert report where he discusses the
9  appropriateness of lamotrigine and topiramate,
10  and you may ask him about it.
11       MR. BARNES:  I'm talking about the
12  power analysis.  I'm allowed to set a predicate
13  and test his opinions, and you're just
14  completing undermining my ability to do that.
15  How am I going to cross this witness at trial if
16  you keep saying "oh, you're getting close to
17  something I don't want him to talk about."
18       MR. ALTMAN:  Rick, it's not my fault
19  that you guys didn't take his deposition.
20       MR. BARNES:  Okay.  Instruct him not
21  to answer the question.
22       MR. ALTMAN:  I'm instructing him not
23  to answer.
24       MR. BARNES:  That's fine.

Page 51

1       MR. ALTMAN:  Point to me in here where
2  he --
3       MR. BARNES:  I'm not going to point to
4  you.  I'm going to keep asking my questions.
5  You keep doing it, and we'll take it up.
6       MR. ALTMAN:  Okay.
7       BY MR. BARNES:
8       Q.  Okay.  So what is wrong about
9  Dr. Gibbons taking the effect size that was
10  measured for the combination of lamotrigine and
11  topiramate in his power calculation that you've
12  referenced?  What was your objection to that,
13  sir?
14       A.  That in a power calculation it depends
15  not only on the effect size, but also on the
16  background risk power.  That's one objection.
17  Not the only one that I had, but that's one.
18       Q.  What is the background risk of
19  lamotrigine and topiramate that you're saying
20  was not accounted for, do you know?
21       A.  It says -- I'm taking Dr. Gibbons'
22  writing at his face value.
23       Q.  Where is that?
24       A.  It says ".32 percent on placebo" in

Page 52

1  Paragraph 8.
2       Q.  Is it your testimony, sir, that the
3  .32 percent on placebo includes what population
4  of patients?  Can you describe what population
5  of patients make up that placebo group?
6       A.  The population of placebo controls
7  used in the lamotrigine and topiramate trials.
8       Q.  What indication, sir?
9       A.  Come again?
10       Q.  What indications were those patients
11  tested for?
12       A.  I believe at some point it was
13  discussed, might have been discussed in some
14  materials I saw, it might have been discussed by
15  Dr. Gibbons, but I don't see it discussed in
16  this passage and it would take a while to locate
17  it.
18       Q.  As you sit here today, do you know the
19  background rate of the patients for suicidal
20  thinking and behavior for lamotrigine and
21  topiramate?
22       MR. ALTMAN:  Objection.  Asked and
23  answered.
24       MR. BARNES:  I'd like an answer,

Page 53

1  Keith.  We're going to be here until
2  6:00 o'clock.  You're interrupting this
3  deposition.
4       MR. ALTMAN:  He just told you several
5  times he relied upon the numbers in Dr. Gibbons'
6  report, and you keep asking him.
7       MR. BARNES:  He says he cannot give
8  me -- he said and the background rate.  He does
9  not know what patient populations were tested in
10  the lamotrigine and topiramate clinicals trials.
11       BY MR. BARNES:
12       Q.  Correct?
13       MR. ALTMAN:  Objection.
14       MS. McGRODER:  Let him answer the
15  question.
16       MR. ALTMAN:  Objection.  Asked and
17  answered.
18       He's told you four times or five times
19  that he has relied upon the numbers in Dr.
20  Gibbons' report.
21       MR. BARNES:  You're coaching him now.
22  Now you're in the process of coaching this
23  witness.  I've got two hours.  You're telling
24  him exactly what to say.  I try to ask the

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 54

1  question, you block me, what's the point?
2  What's the point?
3          MR. ALTMAN: Rick, it's not my
4  fault --
5          MR. BARNES: From now on you object,
6  you do one thing, you object and instruct him
7  not to answer, and I'll try and get this
8  deposition done.
9          MR. ALTMAN: That's fine.
10         BY MR. BARNES:
11     Q.  Okay.  So it's your testimony, sir,
12  that the .32 percent on placebo is the
13  background rate?  Is that your answer?
14     A.  For whom?
15     Q.  For topiramate, topiramate and
16  lamotrigine.
17     A.  Lamotrigine and topiramate trials,
18  yes.
19     Q.  What do you base that on?
20     A.  The numbers that he presented.
21     Q.  Just .32 percent?
22     A.  Right.
23     Q.  Did Mr. Altman tell you before this
24  deposition that relate everything to

Page 55

1  Dr. Gibbons' paper, is that something you told
2  you to do in this dep?  I mean it seems like
3  every time I'm trying to ask a question he says
4  keep it to the report.
5          I mean are you telling me you didn't
6  do any background research on the background
7  rate for lamotrigine and topiramate in terms of
8  criticizing Dr. Gibbons' report?
9          MR. ALTMAN: Objection.  Asked and
10  answered.
11         MR. BARNES: Background research has
12  not been asked.
13         BY MR. BARNES:
14     Q.  You may answer.
15     A.  As I said, I've read through all these
16  materials.  And as I recall, it had been
17  discussed about how, I believe Dr. Gibbons
18  raised the issue, in fact, about how these
19  trials involved different patients with
20  different indications, so that differences in
21  background risks were to be expected.  And he
22  presented a difference in background risk which
23  matched the numbers that I recall from the FDA
24  report, so presumably he was reporting the same

Page 56

1  numbers or reporting on the FDA numbers
2  accurately, and then proceeded to report on the
3  GABAergic drugs without topiramate.
4     Q.  So the GABAergic drugs without
5  topiramate was something you reviewed in the
6  context of criticizing Dr. Gibbons' report,
7  correct?
8          MR. ALTMAN: Objection.
9          MR. BARNES: You better just object
10  now, Keith, because he's already --
11         MR. ALTMAN: Fine.  Objection.
12  Instruct him not to answer.
13         MR. BARNES: Fine.  So you're not
14  going to let him answer that question.
15         BY MR. BARNES:
16     Q.  All right.  Where in the FDA
17  meta-analysis does it talk about the background
18  rate for the drugs absent topiramate?
19         MR. ALTMAN: Objection.  Instruct him
20  not to answer.
21         BY MR. BARNES:
22     Q.  What are the indications tested for
23  topiramate and lamotrigine in these clinical
24  trials?

Page 57

1          MR. ALTMAN: Objection.  Instruct him
2  not to answer.
3          BY MR. BARNES:
4     Q.  You go on, the next sentence, "By
5  contrast, for the so-called GABAergic --" this
6  is Dr. Gibbons' report, "By contrast, for the
7  so-called GABAergic drugs excluding topiramate,
8  the incidence of suicidality events on the drug
9  .18 percent and .18 percent on placebo,"
10  correct?
11     A.  Yes.
12     Q.  You have no basis to challenge
13  Dr. Gibbons' calculation of the incidence of
14  suicidality events on GABAergic drugs excluding
15  topiramate, do you?
16     A.  I'm accepting his numbers.
17     Q.  You're accepting those numbers.  Okay.
18         So now if you go further, "The
19  sampling ratio of the GABAergic drugs (excluding
20  topiramate) to placebo is 1.8 to 1."
21         Do you see that?
22     A.  Yes.
23     Q.  So then Dr. Gibbons says "The
24  statistical power to detect the difference for

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 58

1    topiramate is .85, or 85 percent, which exceeds
2    the traditional scientific standard of
3    85 percent," correct?
4        A.   Right.
5        Q.   Do you disagree with his statement
6    there?
7        A.   Yes, for lamotrigine and topiramate.
8        Q.   That's accurate, isn't it?
9        A.   I did not check his numbers, but I
10   didn't -- I don't think I challenged them, that
11   particular statement, if I'm reading it
12   correctly.
13       Q.   Okay.  Then Dr. Gibbons says "This
14   number is also used by the FDA."
15            You agree with that, don't you?
16       A.   Wait.  Now he's saying the standard of
17   80 percent is also used by the FDA.
18       Q.   Yes, that's my question.
19       A.   Yes, I know that's used sometimes.
20       Q.   And you would agree that power
21   calculations are routinely included in
22   discussions with the FDA in terms of reviewing
23   clinical trial protocols to obtain approval of
24   new medicines in NDAs, correct?

Page 59

1        A.   Yes.
2        Q.   So power calculations are routinely
3    relied upon by companies and the FDA in
4    evaluating clinical trials, correct?
5        A.   Yes.
6        Q.   Okay.  So Dr. Gibbons then says "The
7    finding indicates that we would have more than
8    sufficient statistical power to detect and
9    effect equal to that found for the lamotrigine
10   or topiramate for the other so-called GABAergic
11   drugs that existed."
12            That's correct, too, isn't it?
13       A.   No.
14       Q.   Why not?
15       A.   That's what I object to.
16       Q.   Okay.  Now I got to it.
17            What's the problem?
18       A.   That when you go to the other
19   GABAergic drugs they have a lower background
20   risk and that would reduce their power.
21       Q.   So what you're saying, then, once you
22   exclude topiramate which has a much higher risk
23   of suicidal thinking and behavior, the other
24   GABAergic drugs do not have the same background

Page 60

1    risk, correct?
2        A.   Correct.
3        Q.   Topiramate is materially different in
4    terms of its risk of suicidal behavior and
5    thinking than the other GABAergic drugs --
6        A.   No.
7        Q.   Let me finish my question.
8            Has a higher risk of suicidal thinking
9    and behavior than the other GABAergic drugs in
10   the FDA meta-analysis, correct?
11           MR. ALTMAN:  Hold on.
12           Can you read back the question,
13   please?
14           (Whereupon, the reporter read back the
15   pending question.)
16           MR. ALTMAN:  Hold on.  I will object
17   unless he can answer the question based upon
18   what he reviewed in Dr. Gibbons -- if he can
19   answer it based on that, he can answer.
20           MR. BARNES:  You're asking him to
21   disaggregate information that's he's had in his
22   head which he specifically relied upon in
23   creating his report of May 31, 2009 of
24   criticizing Dr. Gibbons' report of March and

Page 61

1    November.  I don't see -- he gave me an answer,
2    I'm following up, I'm entitled to follow up.  He
3    can't disaggregate things.
4            You're trying to dance on the head of
5    a pin, Keith.  He's reviewed the stuff, he
6    criticized him, he didn't do it in a vacuum.  I
7    want an answer to that question.
8            MR. ALTMAN:  You also had an
9    opportunity to depose him.
10           MR. BARNES:  That's not the question.
11   I'm deposing him on his report as we've agreed
12   to, and I'm deposing him on his criticism of
13   Paragraph 8, which you told me to have it at it
14   so I'm having at it in my little two-hour window
15   that you've given me.
16           BY MR. BARNES:
17       Q.   So I want an answer to that question,
18   please, sir.
19           MR. ALTMAN:  I'll allow him to answer
20   it to the extent he can do it based on what is
21   in Dr. Gibbons' report.
22           BY MR. BARNES:
23       Q.   Answer the question, sir.
24           MR. BARNES:  You've now interrupted

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 62

1    the entire deposition yet again.
2         (Whereupon, the reporter read back the
3    pending question.)
4         BY MR. BARNES:
5         Q.  Answer that question, sir?
6         A.  And again, that's not what I was
7    talking about here.  This is that the background
8    risk is different.  It's not that topiramate has
9    the higher risk which would be in effect, it's
10   that the patients in the trials had a higher
11   risk, regardless of whether they had received
12   topiramate or not, it's showing in the placebo
13   group they had a higher risk.  So it's a higher
14   risk group, and this would make the relative
15   risk of a particular size easier to detect in
16   the higher risk -- it's easier to detect in the
17   higher risk group.
18        MR. BARNES:  You were just showing
19   Dr. --
20        MR. ALTMAN:  I wasn't showing him
21   anything.
22        MR. BARNES:  You opened this and you
23   just put this right in front of him and you
24   pointed at this page.

Page 63

1         MR. ALTMAN:  I didn't point at
2    anything.
3         MR. BARNES:  Why did you pick this up
4    and put this, lay it and do that?
5         MR. ALTMAN:  I thought that was the
6    page it was open to.
7         MR. BARNES:  Counsel, counsel, you
8    just --
9         MR. ALTMAN:  Rick, if you're going to
10   accuse me of some impropriety, this deposition
11   is going to end.  I picked it up frankly to look
12   to see whether he even relied upon the FDA
13   meta-analysis in writing this report which, in
14   fact, he did not.
15        MR. BARNES:  Keith, I am surprised.
16   You just picked up a report and you placed it in
17   front of the witness.  You could have asked me
18   permission, and I probably would have --
19        MR. ALTMAN:  Excuse me.  You didn't
20   bring a copy of this to refer to myself.
21        MR. BARNES:  We have one right here
22   for you.
23        MR. ALTMAN:  You asked me to share
24   with him.  You asked me --

Page 64

1         MR. BARNES:  Don't signal to the
2    witness.
3         MR. ALTMAN:  I didn't signal anything
4    to the witness.  If you're going to accuse me,
5    I'm terminating this deposition.
6         MR. BARNES:  You can do whatever you
7    want.
8         MR. ALTMAN:  That's fine.
9         This is ridiculous.
10        MR. BARNES:  You can do whatever you
11   want.
12        MR. ALTMAN:  That's fine.  You either
13   withdraw that off the record or this deposition
14   is over.
15        MR. BARNES:  I'm asking you --
16        MR. ALTMAN:  You're accusing me of
17   improprieties.  You either withdraw it --
18        MR. BARNES:  I asked you not to
19   place -- you could have asked me for permission.
20        MR. ALTMAN:  I'm sorry, I didn't need
21   to ask you.  When you provided this report and
22   said share this --
23        MR. BARNES:  I could have gotten you
24   one right here.

Page 65

1         MR. ALTMAN:  Did you not say to me to
2    share this?
3         MR. BARNES:  You weren't sharing it.
4         MR. ALTMAN:  I was checking to see
5    something.  Don't accuse me of things you're not
6    sure of, Rick.  Continue on.
7         MR. BARNES:  My golly.
8         I want to hear the last question,
9    please.
10        (Whereupon, the reporter read back the
11   above answer.)
12        BY MR. BARNES:
13        Q.  So is it your opinion, sir, that the
14   patients in the lamotrigine and topiramate
15   trials have a higher background rate than the
16   other GABAergic drugs?
17        A.  It does appear that way to me based on
18   the data that Dr. Gibbons discusses in that
19   paragraph.
20        Q.  And that's a comparison of the two
21   placebo populations only?
22        A.  Correct.
23        Q.  And you did no other background
24   research to see if that was an accurate

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 66

1  statement?
2      A.  Which was an accurate statement?
3      Q.  Forget that.
4          Are you critical of Dr. Gibbons'
5  decision to use the background rate of -- to use
6  the FDA meta-analysis data for purposes of
7  obtaining his effect size? In other words, he
8  obtains the effect size for his power
9  calculation he says from the FDA meta-analysis,
10 correct?
11     A.  Yes, from part of it anyway.
12     Q.  Yes.
13         And it is your belief that the effect
14 size that he utilizes is somehow unreliable for
15 purposes of power calculations, correct?
16     A.  May I refer back to --
17     Q.  You certainly may.
18     A.  -- exactly what you're referring to
19 and what I said?
20         MR. BARNES:  Please get Keith his own
21 copy of the report.
22     A.  So now we're on page of my report, it
23 would help me if you could point to exactly what
24 you're saying.  I'm saying -- there, okay.  So

Page 67

1  it's Page 2 and 3.  And now, Page 3.  Okay.  So
2  could you --
3          BY MR. BARNES:
4      Q.  What I'm understanding you to say, and
5  trying to get to the bottom of it just so I
6  understand your criticism, is that you're
7  criticizing Dr. Gibbons for taking information
8  from the FDA meta-analysis in the pursuit of
9  conducting a power calculation to determine the
10 adequacy of the number of patients in the
11 gabapentin clinical trials; is that a fair
12 understanding of where we are at this point?
13         MR. ALTMAN:  Objection.  Misstates his
14 testimony.
15     A.  I don't think I stated things that
16 way.
17         BY MR. BARNES:
18     Q.  You state for me what your criticism
19 is then.
20     A.  Well, if you could point to me in this
21 report what it is you're questioning me about,
22 it would help.  I'm finding or following --
23     Q.  State in your own words what your
24 criticism of Dr. Gibbons' use of the FDA

Page 68

1  meta-analysis in terms of his power analysis?
2      A.  Okay.  Again, he's taking and using a
3  background risk which does not apply to the
4  drugs in which gabapentin -- the drug group
5  which he created in which gabapentin falls.
6      Q.  Who created?
7      A.  Dr. Gibbons.
8      Q.  What's the drug group you're referring
9  to?
10     A.  This GABAergic excluding topiramate.
11     Q.  Well, there's a GABAergic drugs
12 excluding topiramate in the FDA meta-analysis?
13     A.  Yes, but I'm saying he's using this
14 here.  I'm talking about his report, not the FDA
15 meta-analysis, as I've been instructed this is
16 all we're concerned about here.  I can only go
17 by the instructions.
18     Q.  I'm not blaming you at all, Doctor.
19 You've been more than fair.
20         Did you consult the FDA meta-analysis
21 itself to see what the GABAergic drugs to
22 include topiramate, what the risk was?
23         MR. ALTMAN:  Objection.  Instruct him
24 not to answer.

Page 69

1          MR. BARNES:  He just referred to the
2  meta-analysis.  Dr. Gibbons didn't create that.
3  There is a group in the meta-analysis which
4  actually deals with that.
5          MR. ALTMAN:  You don't want me to say
6  any more.  I just instruct him not to answer.
7          MR. BARNES:  And that is fair.  That's
8  fine.
9          BY MR. BARNES:
10     Q.  What are your other criticisms of
11 Dr. Gibbons' efforts to conduct a power
12 analysis, other than using a background rate
13 which does not apply to the other drugs in the
14 GABAergic group?
15     A.  Okay.  Well, to go back to my Page 3.
16     Q.  Let me catch up to you.
17     A.  Okay.  This does not take account of
18 biases.
19     Q.  What's that now?
20     A.  To quote from my -- the sentence from
21 my report which is near the top of Page 3,
22 "Because the power calculations offered by
23 Dr. Gibbons take no account of biases," and then
24 "(problems 2-4), these calculations do not

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 70

1    establish his claims that the available studies
2    were of adequate size to detect important
3    effects of gabapentin."
4        Q.  Okay.
5        A.  That's one more.  Should I continue?
6        Q.  Let's keep track of that.  Let's talk
7    about that one and then we'll go to the next
8    one.  We'll go, as you said, seriatim.
9            So because the power calculations
10   offered by Dr. Gibbons take no account of biases
11   problem 2 through 4, biases, what are you
12   referring to?  What biases are you referring to
13   there?
14       A.  On the previous page, problems two to
15   four are as follows.  "Failure of enrolled
16   patients to comply with or adhere to their
17   assigned treatment (often described as
18   non-adherence)."
19           Number three, "Failure of patients to
20   remain in the study for the full period
21   requested (lost follow-up)."
22           Number four, "Failure to enroll
23   patients that are representative of those who
24   would receive the treatment in practice, which

Page 71

1    results in lack of generalizability of the
2    results."
3        Q.  How did these biases, two, three and
4    four, are these biases that you believe may or
5    may not have existed in the FDA meta-analysis
6    trials which he was working with in creating the
7    power calculations?
8            MR. ALTMAN:  Objection.
9            Instruct him not to answer.
10           BY MR. BARNES:
11       Q.  What biases are you referring to?  Are
12   these two through four, is this -- what biases
13   are you referring to?  What is the studies
14   you're referring to that are biased?
15       A.  Okay.  The studies that could be
16   suffering from these problems would include
17   randomized trials that Dr. Gibbons was referring
18   to from the original FDA report.
19       Q.  From the original FDA meta-analysis?
20       A.  Right.
21       Q.  Just so I understand this criticism,
22   you're criticizing Dr. Gibbons for using the
23   FDA -- the clinical trials and the FDA
24   meta-analysis in conducting his power

Page 72

1    calculations because those trials were probably
2    biased due to limitations two, three and four as
3    you set forth on Page 2 of your report, correct?
4            MR. ALTMAN:  Objection.  Misstates his
5    testimony.
6        A.  Yes, that does misstate what I said.
7            BY MR. BARNES:
8        Q.  May have?
9        A.  It's a possibility.
10       Q.  Okay.  Then let me restate it.  That's
11   fair.  I want to understand it.
12           Your criticism of Dr. Gibbons is that
13   in conducting his power calculations he did not
14   account for the potential biases in the
15   randomized controlled clinical trials in the FDA
16   meta-analysis that he relied upon in conducting
17   his power calculations, correct?
18       A.  That's fair.
19       Q.  That's fair enough.  And that's fine.
20           And so he did not account for it, nor
21   did you in your report either, correct, is that
22   what you're saying?  You didn't go back --
23   strike that.
24       A.  I say all of these problems can reduce

Page 73

1    the chance that the trial or a collection of
2    trials will detect treatment effects, whether
3    harmful or beneficial.
4        Q.  And where is that, sir?
5        A.  This is following item four on Page 2.
6        Q.  Okay.  So a collection of trials
7    refers to a pooled analysis such as the
8    meta-analysis, correct?
9        A.  Correct.
10       Q.  So at least you would concede then
11   that the collection of trials in the FDA
12   meta-analysis potentially are infected with
13   biases two, three and four in your report,
14   correct?
15       A.  Yes.
16       Q.  And that Dr. Gibbons should have not
17   relied upon these results of these trials in
18   creating his power analyses because they may be
19   infected with FDA -- the randomized trials and
20   the FDA meta-analysis may be infected with bias?
21           MR. ALTMAN:  Objection.  Misstates his
22   testimony.
23       A.  Yes, it misstates my testimony.
24           BY MR. BARNES:

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 74

1    Q.  Correct me, please.
2    A.  That he in making his assessment of
3  power should have taken into account the
4  possibilities that these biases existed and
5  therefore --
6    Q.  In the FDA meta-analysis?
7    A.  Yes.
8       -- therefore his power calculations
9  would be over-optimistic.
10    Q.  Okay.  Was there any way that you are
11  aware of that Dr. Gibbons could have accounted
12  for the potential biases in the randomized
13  trials that were collected in the FDA
14  meta-analysis when conducting his power
15  analysis?
16    A.  There are methods for doing so.
17    Q.  Do you believe that would have
18  adequately accounted for the biases in the
19  randomized controlled trials in the FDA
20  meta-analyses?
21       If he used these methods, would that
22  adequately in your view adjust for the potential
23  biases that were in the randomized clinical
24  trials used by the FDA in conducting its

Page 75

1  meta-analysis of anti-epileptic drugs?
2       MR. ALTMAN:  Objection.  Calls for
3  speculation.
4       BY MR. BARNES:
5    Q.  You may answer.
6    A.  Well, to -- I must explain that these
7  methods require a considerable amount of
8  judgment in their use, in decisions and care,
9  and that if those -- there could be a lot of
10  controversy about whether they were used with
11  that, with the appropriate amount of judgment
12  and care, and so whether they would succeed in
13  correcting the bias the way you've described
14  would depend entirely on how they were applied.
15  Since nobody has done that that I know of in
16  this matter, not me or Dr. Gibbons or anyone
17  else that I know of, there's no way I could give
18  you an evaluation.
19    Q.  Of its potential to correct for these
20  biases?
21    A.  It has a potential to, but how well it
22  would would depend on how it was applied.
23    Q.  Do you know if Dr. Gibbons -- let me
24  ask you.

Page 76

1       Do you know if FDA has been willing to
2  actually give researchers such as yourself or
3  Dr. Gibbons access to the underlying data in the
4  meta-analysis of these randomized trials so that
5  these sorts of adjustments could be considered
6  and applied to attempt to adjust for these
7  biases that you set forth in your report that
8  may infect the FDA meta-analysis?
9       MR. ALTMAN:  Objection.  Compound.
10       BY MR. BARNES:
11    Q.  Do you understand my question?  Let me
12  ask it simply.
13       If the FDA won't give the underlying
14  data to its meta-analysis, a researcher such as
15  yourself or Dr. Gibbons could not even attempt
16  the adjustments which you said might be able to
17  account for the biases in the randomized trials
18  that make up the FDA meta-analysis, correct?
19    A.  Not exactly correct, no.  They could
20  still use the methods, but they would have to be
21  performed much more crudely absent the actual
22  data being available, they would have to be
23  based on the numbers that were supplied and that
24  would be less, therefore less accurate.

Page 77

1    Q.  And maybe not meaningful?
2    A.  Well, or at least not as, I would say,
3  reliable.
4    Q.  Reliable might be a word.
5       But without having actually -- so
6  would you recommend -- if Dr. Gibbons had used
7  these cruder methods, I think that's what you
8  said, I don't want to put words in your mouth,
9  but if Dr. Gibbons had tried to adjust for these
10  biases without the actual underlying data, it
11  would not have the effect of reliably, as
12  reliably controlling for these biases, correct?
13    A.  As reliably.
14    Q.  Until you actually saw the analyses,
15  it might be that these matters may not even be
16  effective in controlling for these biases in the
17  FDA trial, correct?
18    A.  Correct.
19    Q.  Okay.  I understand that.
20    A.  It's part of -- all this was by way of
21  listing the reasons, my objections to his power
22  analysis.  If I could return to the next item.
23    Q.  Yes, I think we finished that.
24    A.  That's one item, one more item down.

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 78

1    And then another objection, and I'm
2  going to quote from Page 3, second paragraph of
3  my May 31st report.
4      Q.  Yes, sir.
5      A.  "Power calculations based on observed
6  data also provide no picture of the range of
7  effects compatible with the data.  In
8  particular, they are no substitute for examining
9  confidence intervals and other interval
10 estimates, and in fact are considered misleading
11 by many authors."  I won't read the authors
12 listed on the record.
13     Q.  I understand.
14     A.  "As explained in both peer reviewed
15 publications and in textbooks, random error must
16 be properly accounted for by examining the full
17 range of values included in the confidence
18 interval, as well as the width of the interval.
19 Furthermore, because confidence intervals
20 account only for random error and ignore bias,
21 (problems 2 to 4 above), confidence intervals at
22 best provide a bare minimum range of effects
23 compatible with the observations."
24     Q.  So now in English for a history major.

Page 79

1      A.  I love history.
2      Q.  You love this stuff.
3      A.  I love history.
4      Q.  Good.  Maybe next time we'll have a
5  drink and we'll talk about history, but I can --
6  you probably know a lot about that, too.
7          Can you kind of break that down into a
8  more lay explanation as to what your objection
9  is?
10     A.  The problem with power calculations is
11 that to assert as, for example, Dr. Gibbons
12 does, that a study had, say, an 85 percent
13 power, say I took his calculation face value --
14 I don't take that calculation face value, most
15 of his calculations I do but sometimes I hit
16 one, I say no, I don't.
17     Q.  Okay.  Fair.
18     A.  And that one, even if I accepted it,
19 that's like saying that the, after a horse race,
20 that the odds on this horse was 85 percent that
21 it would win, they were giving 85 to 15 odds at
22 the booth.
23     Q.  So you're complaint is he's doing a
24 post-hoc power assessment?

Page 80

1      A.  Correct.
2      Q.  I understand.
3      A.  And then going up to the booth -- but
4  if that horse lost and I went up to the booth
5  and started complaining saying "but I had
6  85 percent chance of winning so pay off," they
7  would usher me off the grounds, rightfully so,
8  because as many authors have argued, what
9  matters after the studies have been done is not
10 what power they had, but whether they actually
11 succeeded in detecting the effect.
12     Q.  Okay.
13     A.  And what their final result was in
14 terms of what could be said in terms of what
15 could be excluded based on what they saw and
16 what couldn't be excluded.  And what can be
17 included -- not excluded falls -- everything
18 that's within the confidence interval is what
19 can't be excluded based on that study.
20     Q.  Okay.  So is there any power
21 calculation that Dr. Gibbons could have
22 conducted that would have satisfied you based
23 upon the fact he was -- he chose the FDA
24 meta-analysis as the effect size for some of his

Page 81

1  power calculations?
2      A.  That final objection that we just
3  discussed about the need for an interval
4  estimate and discussing its full width and upper
5  limit and lower limit and also that it doesn't
6  take account of biases, all that could not be
7  addressed by any power calculation, that's
8  beyond the reach of a power calculation, and why
9  even though if one wants to present a power
10 calculation post-hoc as he does, okay, go ahead,
11 I could object to how he did it, and I did, but
12 even if I accepted it still wouldn't satisfy me
13 because it does not address this final issue and
14 no power calculation could.
15     Q.  You're not a fan of power calculations
16 at all, are you?
17     A.  Pre-trial they're meaningful, they're
18 helpful for planning a study.  But after the
19 study, it's like after the horse race, it's like
20 who won and who lost.
21     Q.  So your objection is that after the
22 FDA had finished its calculations on the various
23 effect sizes, picking one after those trials
24 were completed was something you would not do?

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 82

1      A.   It's something that I don't think is
2  very informative.  What's really important is
3  the intervals.
4      Q.   Okay.  Now, isn't it true that many
5  statisticians such as Dr. Gibbons actually do
6  post-hoc power calculations?
7      A.   Yes.
8      Q.   So it's common in the
9  pharmacoepidemiologic literature that
10 statisticians do go back and do post-hoc power
11 calculations to determine effect size for power
12 calculations, right?
13     A.   Well, we have to divide two classes of
14 calculations.  One would be a calculation done
15 to try and interpret the study, which is one
16 that the authors I cited are really objecting
17 to, and the other is doing the calculation to
18 say that in the future, this was clearly
19 underpowered, and in the future we we're going
20 to have to do better, do a larger study, for
21 example, that would be a use for planning
22 purposes which I don't know anybody with --
23     MR BARNES:  This is my family, one
24 second.

Page 83

1      THE VIDEOGRAPHER:  The time is 4:48
2  We're off the record.
3      (Pause.)
4      THE VIDEOGRAPHER:  This is the
5  beginning of tape number two.  We're back on the
6  record.  The time is 4:53.
7      BY MR. BARNES:
8      Q.   Okay.  Moving on to Page 4 of your
9  report, sir, you talk about the limitations of
10 non-randomized studies, correct?
11     A.   Yes.
12     Q.   And so what are non-randomized
13 studies?
14     A.   Studies in which the persons in the
15 study were not randomized to the treatment being
16 studied, medication or whatever device.
17     Q.   Is it generally true that all -- I
18 might overstate this, and help me; is it true to
19 say that all pharmacoepidemiologic studies are
20 non-randomized?
21     A.   That's a matter of semantics of how,
22 dialects, of how one would define
23 pharmacoepidemiology as to whether it would
24 include clinical trials or not.

Page 84

1      Q.   Let's exclude randomized controlled
2  clinical trials for pharmacoepidemiology for
3  purposes of my question.
4      A.   Okay.
5      Q.   So excluding randomized non-clinical
6  trials, randomized controlled clinical trials,
7  would you agree that pharmacoepidemiologic
8  studies, all of them do not have -- do not
9  employ randomization?
10     A.   If we exclude randomized studies
11 explicitly, then yes, I'd certainly agree
12 logically.
13     Q.   So there's a vast field of
14 epidemiologic literature that is non-randomized,
15 correct?
16     A.   Correct.
17     Q.   And people use those for various
18 studies, and you've done that yourself, correct?
19     A.   Yes.
20     Q.   Now, so would you apply these --
21 strike that.
22     Would you agree that there's a
23 hierarchy of reliability for randomized -- for
24 non-randomized studies in terms of their

Page 85

1  reliability?
2      A.   There are hierarchies.  I do not think
3  there's complete consistency or agreement on
4  exactly how the hierarchy should go.
5      Q.   I'll just -- I want your testimony as
6  to how you think it goes then.
7      If you were going to rank studies,
8  non-randomized studies in terms of their
9  reliability, it would be a cohort study?
10     A.   Well, I would put it this way.  There
11 are many, many dimensions that determine the
12 degree of reliability in the study, and that
13 usually, not 100 percent of the time, but
14 usually cohort studies will meet more -- satisfy
15 more of those dimensions in terms of being more
16 reliable than, for example, a case control
17 study.  This is not 100 percent, and this is one
18 of the reasons why there's some controversy or
19 ambiguity about these hierarchies, is that
20 they're more like if you imagine like galaxies
21 and inter-overlapping.
22     Q.   So there's going to be a diagram where
23 you've got an area where it may or may not be --
24 the hierarchy may not apply?

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 86

1    A.  Right, or shades of ambiguity.
2    Q.  In sources of data, you talk here
3  about claims data, and we talked about that this
4  morning.  Are there hierarchies of reliability
5  for various sources of data?
6    A.  Again in the same fashion, that
7  there's -- there are qualities that --
8  dimensions of reliability that we would expect
9  to be satisfied better, to a greater degree more
10 often with certain data sources than others.
11   Q.  Describe in your own words the design
12 Dr. Gibbons used.  Is that a -- it's a proper
13 epidemiological study of claims data; if you
14 were going to describe it, is it a cohort study,
15 a case controlled study, how would you describe
16 it?
17   A.  I would call it a claims database
18 cohort.
19   Q.  Study?
20   A.  Yes.
21   Q.  Okay.  And it's retrospective?
22   A.  Yes.
23   Q.  Okay.  How does that compare to a
24 study of just simply looking at other, let's

Page 87

1  say, spontaneous adverse event reports without
2  any comparison, what's more reliable?
3    A.  We would generally consider, again
4  this is -- when I say generally, I mean most of
5  the time aside from specific circumstances that
6  might diverge from this, but most of the time
7  it's considered a claims database study to be
8  more reliable, especially with regards to -- I'm
9  trying to think of the right way of describing
10 this.  The problem -- one of the issues is that
11 with spontaneous adverse events is reporting
12 system studies based on that they can suffer a
13 lot of false positives, whereas the claims can
14 suffer a lot of false negatives, so there would
15 be the question entered as to what do we think
16 is the greater danger or risk here, false
17 positive, false negative.  So, but most of the
18 time people are more concerned about false
19 positives, and so there's a natural preference
20 for a study that would be at greater risk of
21 false negative than false positive, and that
22 would make the claims database study superior in
23 a situation like this.  Plus there are many more
24 logical reasons to assume that it would give a

Page 88

1  less biased answer than something based on
2  spontaneous adverse events reports.
3    Q.  Have you ever done an analysis of
4  spontaneous adverse event reports yourself for
5  purposes of a health study?
6    A.  Not for publication.
7    Q.  Why not?
8    A.  Just hasn't happened that I was part
9  of a task that I recall.  Actually I've done --
10 I've been involved in hundreds of studies now
11 over three and a half decades, so I may have
12 forgotten one.  But not that I recall offhand,
13 so just hasn't happened.
14   Q.  Okay.  This morning you had a -- you
15 said you had worked with PharMetrics database in
16 the past for some work?
17   A.  Not PharMetrics.
18   Q.  I misunderstood you.
19   A.  I've taken studies -- I've worked with
20 other databases that are similar, and I've taken
21 studies that use PharMetrics and used them as
22 part of my material, for example in the
23 meta-analysis.
24   Q.  Okay.

Page 89

1    (Whereupon, the reporter read back the
2  above answer.)
3    BY MR. BARNES:
4    Q.  What meta-analysis was that?
5    A.  Well, for example, a meta-analysis of
6  paroxetine and paroxetine and cardiac
7  malformations that was done by the Engenics
8  group that used the PharMetrics database
9  extensively.  I think the first author in that
10 was Cole, and one of the authors was
11 GlaxoSmithKline, I think F. Ross might have been
12 on that, and Alexander Walker who is a
13 well-known pharmacoepidemiologist, so that's a
14 study that I considered a useful study in
15 examining this issue.
16   Q.  So to make sure, so basically you
17 conducted a meta-analysis, and one of those
18 studies had a PharMetrics database analysis?
19   A.  Yes.  I've also looked at other
20 studies in other contexts where again one of the
21 major studies was a PharMetrics based study.
22   Q.  It's a good healthcare database,
23 right?
24   A.  Well, it's a well-known healthcare

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 90

1  database that's been used extensively for these
2  sorts of studies, and its limitations and
3  advantages are well-known.
4      Q.  Okay.  I want to talk to you a little
5  bit about your concomitant medications.  We
6  spent some time speaking about that this morning
7  and I didn't really have much of a chance to
8  talk to you about it.
9          Would you look at Page 15 of 20 of
10  your report, please?
11      A.  Yes.
12      Q.  You state here that "Another deceptive
13  aspect of the analysis descriptions given in the
14  Gibbons supplemental expert reports as well as
15  the Gibbons paper is that they attempt to convey
16  the impression that all concomitant psychotropic
17  medications were accounted for in the analysis."
18          Do you see that?
19      A.  Yes.
20      Q.  Do you know what medications were
21  actually included in the adjustments for
22  concomitant treatments by Dr. Gibbons?
23      A.  According to this statement there's a
24  quote, it's "other AEDs, antidepressants,

Page 91

1  antipsychotics, and lithium."  However, the data
2  didn't actually include all psychotropic
3  medications, and they did not include
4  stimulants, if not ACE anti-anxiety drugs, and
5  various anti-psychotics weren't included, or
6  pain medications.
7      Q.  What do you base that on, sir?
8      A.  Based on both what -- both the
9  description of the database that was included by
10  -- I think submitted by Dr. Gibbons, and the way
11  it was described, various materials, there were
12  various points at various times, there was some
13  data, at some point I saw a data request that
14  was given to PharMetrics and what they were
15  going to be giving him, and it only included a
16  limited set of medications, and then the
17  deposition Dr. Gibbons confirmed that indeed
18  that was -- it was limited in that fashion.
19      Q.  Here's my question.
20          As far as you know, did you actually
21  see the list of medications that were, in fact,
22  adjusted for in the analysis?
23      A.  Yes, at one point.
24      Q.  And who gave that to you?

Page 92

1      A.  Well, I think it was an exhibit in one
2  of his depositions.  Actually that's where I
3  most prominently recall seeing it.
4      Q.  A list in the deposition?
5      A.  Yes.
6      Q.  And how many medications did he adjust
7  for?  What's that list?
8      A.  I think it was, I think it was eight
9  or something, that was the number.
10      Q.  Eight different prescription
11  medications?
12      A.  If I recall correctly.  I'm not sure.
13      Q.  So how far -- so is it your testimony
14  that Dr. Gibbons only adjusted for eight
15  different medications?
16          MR. ALTMAN:  Objection.  Misstates his
17  testimony.
18          MR. BARNES:  I'm asking him.  I want
19  to understand his testimony.
20      A.  No, I didn't make that testimony.
21          BY MR. BARNES:
22      Q.  Okay.  That's why I followed up.  It
23  was unclear to me.
24      A.  I'm saying that he adjusted for a

Page 93

1  limited list, whatever it was.
2      Q.  What is the list?
3      A.  Again, I don't have that in front of
4  me.  I don't have it memorized.  But in any
5  event, it was a relatively short list, and there
6  are thousands of medications out there
7  literally.
8          In fact, you can find some database
9  studies that come out of some
10  pharmacoepidemiology groups where they have
11  lists that exceed a thousand medications from
12  their databases, and they attempt to adjust for
13  all of them in some fashion.
14      Q.  How many -- let me ask you this.
15          You make a statement down here, you
16  say, going further down the page here on
17  Page 15, you may want to follow along.
18      A.  Yes.
19      Q.  You say "Close inspection of a
20  description of the PharMetrics data obtained by
21  Dr. Gibbons and colleagues reveal that these
22  statements are false," I need to know, what did
23  you inspect?
24      A.  According to the PharMetrics purchase

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 94

1  contract shown in Exhibit A of Gibbons
2  deposition of February 3rd, 2009, that's it.
3      Q.   So when you say "close inspection of
4  the description of PharMetrics data obtained by
5  Dr. Gibbons," your source for that statement is
6  Exhibit A of the purchase contract of the
7  Dr. Gibbons' deposition, correct?
8      A.   Correct.
9      Q.   Okay.  And that is what you base your
10 opinions on, correct?
11     A.   That and the other confirming
12 materials.
13     Q.   What other confirming materials?
14     A.   Again the comments, I believe there
15 was some discussion of it in the deposition,
16 which is why that was attached as an exhibit.
17         MR. ALTMAN:  For clarification, Rick,
18 he says Exhibit A here, it's exhibit -- it's
19 called Exhibit A, but I think he may not have
20 correctly notated the exhibit number from the
21 Gibbons deposition.
22         MR. BARNES:  I couldn't find it.
23         MR. ALTMAN:  It is one of the
24 exhibits.  I'll give you the exhibit number.

Page 95

1  It's one of the early exhibits in Gibbons.
2          MR. BARNES:  That helps.
3          BY MR. BARNES:
4      Q.   Just so, I'll move off this, just so I
5  understand it, you're basing your opinion on the
6  inadequacy of the list based upon what is
7  described in your report as Exhibit A of the
8  Gibbons deposition of February 3rd, plus
9  Dr. Gibbons' testimony, is that fair to say?
10     A.   Fair.
11     Q.   I'm sorry, I didn't hear you, is that
12 fair to say?
13     A.   Can we refer to his -- are we
14 talking -- by the way, I'm a little lost.  Are
15 we talking about, let me just --
16     Q.   We're talking about your criticism of
17 his adjustments of concomitant medication.
18     A.   I want to see what we're referring to,
19 the Gibbons supplemental expert report as well
20 as the Gibbons, Et Al 2009 paper.
21     Q.   That's right.
22     A.   So again in reading those materials,
23 too, that was again that it was -- it appeared
24 clear that they did not, in fact, obtain a full

Page 96

1  list of all medications in the database.
2      Q.   What do you believe is a full list;
3  every medication possible?
4      A.   Well, it would include just about.  It
5  would include certainly major groups, at least
6  the most common medications from major groups
7  like pain medication, for example.  And in a
8  study of psychotropic effects I would expect to
9  get all psychotropic drugs like tranquilizers
10 and so forth.
11     Q.   If Dr. Gibbons consulted with a
12 pharmacoepidemiologist and a psychiatrist in
13 selecting the list of concomitant medications to
14 be adjusted for in this database, would you be
15 critical of him for doing so?
16         MR. ALTMAN:  Objection.  Calls for
17 speculation.
18         BY MR. BARNES:
19     Q.   You may answer.
20         MR. ALTMAN:  Go ahead.  You can
21 answer.
22     A.   I wouldn't be critical of him for
23 consulting with them, not for consulting with
24 them.

Page 97

1          I would be critical -- could be
2  critical of him for simply excluding things
3  solely on the basis of dismissal of importance.
4          BY MR. BARNES:
5      Q.   Do you have any basis to say that the
6  list that he employed for concomitant
7  medications for his adjustments, do you have an
8  opinion that a more, a more complete list that
9  you were indicating should have been obtained
10 could have influenced his result one way or the
11 other?
12         MR. ALTMAN:  Objection.  Calls for
13 speculation.  Well, sorry, I'll withdraw that
14 objection.
15     A.   I mean it would be speculation.
16         But knowing how these adjustments
17 work, that the more things you adjust for, the
18 wider your confidence intervals will be at, and
19 so that's the usual rule of thumb.
20         BY MR. BARNES:
21     Q.   Okay.  You make the statement here, go
22 down to -- after you cite this illusive Exhibit
23 A which I spent last night trying to find --
24     A.   My apologies.

In Re: Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 98

1    **Q.** You are forgiven. Keith is not.
2    -- "Dr. Gibbons and colleagues did not
3    obtain data on non-pharmacologic treatment such
4    as psychotherapy and they did not obtain data on
5    all psychotropic medications," is it your
6    opinion that you have to have all psychotropic
7    medications adjusted for to have a reliable
8    study?
9    **A.** I wouldn't put it that way. I would
10   say that the claim that you adjust for both
11   relevant patients not receiving any psychotropic
12   medication relative to -- to be able to state
13   with assurance that they're not receiving any
14   psychotropic medication, you'd certainly have to
15   have a list of their prescriptions to get some
16   assurance of that.
17   **Q.** If Dr. Gibbons adjusted for
18   anti-epileptic medications, atypical
19   anti-psychotics, lithium, anti-depressants,
20   benzodiazapines, and had very, you know, large
21   numbers of medications in each of those
22   categories, would you be of the opinion that if
23   it didn't include all, every anti-psychotic,
24   that it would be a somehow unreliable report?

Page 99

1    **A.** No, because if some of those were
2    never prescribed or were known to be things that
3    were off the market or never used anymore or so
4    rare to discount, no, it would depend entirely
5    on --
6    **Q.** What was excluded?
7    **A.** -- what was excluded.
8    **Q.** Okay. Now, you then go down and say
9    that "what this means," very end of it, "what
10   this means is that adjustments for concomitant
11   treatments employed by Gibbons in his
12   supplemental expert reports and by Gibbon et al
13   in their paper (March, 2009) could not have come
14   close to complete adjustment or control for
15   confounding by concomitant treatments."
16   Did you do any calculations? Or you
17   make almost a quantitative statement here.
18   What did you do to justify your, or to support
19   your statement here that Dr. Gibbons could not
20   have come close to a complete adjustment? How
21   did you measure that?
22   **A.** Okay. That's based on noting that the
23   degree of compounding you have would be the
24   amount, determined by the amount of things you

Page 100

1    had not adjusted for that were important.
2    **Q.** Did you do any calculations or any
3    quantitative assessment to say would not come
4    close to a complete adjustment in making this
5    opinion?
6    **A.** Well, by taking the number of
7    medications that they adjusted for, which was a
8    relatively small number relative to the numbers
9    that I've seen adjusted for in other
10   pharmacoepidemiologic studies, I know that it
11   was a small proportion of medications that were
12   available.
13   **Q.** I need to know what the numbers you
14   should -- he should have and what he actually
15   did adjust for. You're making a statement he
16   didn't come close, I want to know quantitatively
17   how did you make that comparison? What is the
18   basis for that?
19   **A.** Well, that there are hundreds of
20   commonly used prescribed medications, including
21   if you just take all these categories of those
22   that have potential impact on psychological
23   states of a patient, and that I don't believe
24   that their adjustment included anything

Page 101

1    approaching hundreds of medications.
2    **Q.** What do you base that on?
3    **A.** The materials I was shown.
4    **Q.** Exhibit A of the --
5    **A.** Yes, that, for example.
6    **Q.** Anything else?
7    **A.** And again, those things that I read in
8    the course of going through all these materials,
9    there are papers.
10   **Q.** What other things? Supplemental
11   report. I want the list.
12   **A.** The supplemental report.
13   **Q.** The supplemental report of March 15th,
14   and Exhibit A which counsel will provide me.
15   What else did you read?
16   **A.** The paper that was accepted for
17   publication.
18   **Q.** The paper for publication.
19   What else did you read to make this
20   assessment?
21   **A.** Again what was discussed in
22   deposition, the exhibit it's attached to.
23   **Q.** This Exhibit A that's attached to?
24   **A.** Yes.

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 102

1    Q.   Anything else?
2    A.   I don't recall anything else.
3    Q.   Okay.  You said in court this morning
4  that many of your criticisms, the result could
5  swing one way or the other, either towards a
6  more protective effect or more harmful effect,
7  correct?
8    A.   That's correct.
9    Q.   And when I use the word "protective
10 effect," I'm saying that a statistically
11 significant decrease in suicide attempts as
12 opposed to -- and the harmful effect would be a
13 statistically significant increase in suicide
14 attempts, correct?
15   A.   If you left off the statistically
16 significant part, then I would be fine.
17   Q.   Okay.  I'm not quite sure --
18   A.   Because an effect can be there even if
19 it's not statistically significant.
20   Q.   Okay.  So even if a result does not
21 obtain a statistically significant beneficial
22 effect, it still may be there, you just didn't
23 measure it?
24   A.   Well, you just didn't reach the

Page 103

1  commonly used detection threshold.
2    Q.   Limits of detection?
3    A.   Declaring it so far off from the null
4  that you could no longer reasonably by current
5  standards say chance alone could have produced
6  this deviation from the null.  But it's a very
7  weak statement that's become used as a very
8  strong criterion.  It's very, very weak.
9    Q.   Statistical significance?
10   A.   Yes.
11   Q.   So let me go back.
12         If the result of a trial shows a --
13 you're measuring for suicide attempts, we'll
14 just talk about Dr. Gibbons paper, no reason to
15 beat around the bush.
16   A.   Okay.
17   Q.   If it measures a decrease in suicide
18 attempts, that would trend towards protective,
19 correct?
20   A.   If it found an inverse association.
21   Q.   You use the word inverse association
22 from harm?
23   A.   Right.
24   Q.   So, but I want to understand what that

Page 104

1  means.  So that if -- bear with me, I don't want
2  to interrupt you, but let me make sure I ask the
3  question I want to ask.
4         If a study shows a decrease in suicide
5  attempts, and you would describe it as an
6  inverse correlation?
7    A.   Inverse association.
8    Q.   Inverse association.  What does that
9  mean, sir?
10   A.   That means that, well, you'd see a
11 relative risk that's less than one or risk
12 difference less than zero that's negative.  So
13 the ratio of the risk in the treated group
14 versus the placebo group or the untreated group,
15 that ratio of risk, if that's less than one,
16 that's an inverse association.
17   Q.   And what does that mean to -- what
18 does inverse association mean; that it's less
19 than the null value?
20   A.   It's less than the null value.
21   Q.   Which means the 0, 1, 0 if it's risk
22 difference analysis, 1 if it's an odds ratio?
23   A.   Or risk ratio.
24   Q.   Or risk ratio.

Page 105

1         Okay.  Now, would an inverse
2  association be the equivalent of a protective
3  effect?
4    A.   No.
5    Q.   Why not?
6    A.   Well, because the inverse association
7  could come about from all these other factors.
8  It could even be that the medication is harmful,
9  but you see an inverse association because of
10 all these other forces, biases coming in, and
11 changing the size of the ratio.
12   Q.   Would you agree with the statement
13 that Dr. Gibbons' study, his PharMetrics paper
14 supports the hypothesis that there's no
15 increased risk for suicidal thinking behavior
16 associated with anti-epileptic drugs?
17   A.   I would say that, yes, I would say
18 that it supports the hypothesis that it
19 provides weaker scale than statistical
20 significance indicates, but it's not a
21 randomized trial.
22   Q.   Fair enough.
23         And with regard to the gabapentin
24 paper, would you agree with the statement that

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 106

1  Dr. Gibbons' findings in the gabapentin study in
2  his supplemental reports supports the hypothesis
3  that gabapentin does not increase the risk of
4  suicide attempts?
5      A.  Again, same comment.  Again, I would
6  say in the direction of supporting, but again
7  it's much weaker than the statistical
8  significance would suggest, because again it's
9  not a randomized trial, and it has all these
10  problems.
11      Q.  It has the limitations of a
12  pharmacoepidemiologic study?
13      A.  Correct.
14      Q.  As to the psychiatric subpopulation
15  where he found an odds ratio of less than the
16  null value for certain psychiatric populations,
17  would you -- do you know what I'm talking about,
18  this gabapentin paper?
19      A.  Yes.
20      Q.  Would you agree with the statement
21  that Dr. Gibbons' gabapentin study supports the
22  hypothesis that gabapentin does not increase the
23  risk of suicide attempt, suicide
24  behavior/thinking in psychiatric populations,

Page 107

1  support the hypothesis?
2          MR. ALTMAN:  Objection.  Foundation.
3      BY MR. BARNES:
4      Q.  You may answer.
5      A.  I think I may have gotten lost in some
6  of that.
7      Q.  Let me ask it again.  That's fair.
8      A.  Well, also again, the study you're
9  referring to, I just want to be sure.
10      Q.  The Judge was having trouble this
11  morning, I was having trouble.  It's late.  I
12  know you've been up late.
13          In the gabapentin study which is in
14  his supplemental report there was a finding by
15  Dr. Gibbons that in psychiatric populations
16  there was a statistically significant decrease
17  in the rate of suicide attempts --
18      A.  After the --
19      Q.  -- after initiation of gabapentin
20  therapy.  Do you understand?
21      A.  Yes.
22      Q.  You know where I am?
23      A.  Yes.
24      Q.  He found that, correct?

Page 108

1      A.  Yes.
2          MR. ALTMAN:  Objection.  Foundation.
3          BY MR. BARNES:
4      Q.  So the question then becomes; is it
5  fair to say also that this finding supports the
6  hypothesis that gabapentin does not increase the
7  risk of suicidal thinking and behavior in
8  psychiatric patients?
9      A.  Again, subject to all the very same,
10  it's weakly supported because of all these
11  problems that we've been discussing, it's not
12  randomized, and all the other issues that I've
13  raised here about with pharmacoepidemiologic
14  database studies.  Again I liked when -- I was
15  very pleased this morning when the judge seemed
16  to be getting a lot of these things saying it's
17  a piece of a puzzle, it goes in and must be
18  looked at with many other things and evaluated
19  in light of its flaws, its weaknesses,
20  especially given that this is not like some huge
21  randomized trial.
22      Q.  So you would agree it would support
23  the hypothesis with the limitations you
24  discussed?

Page 109

1      A.  With extensive limitations, yes, very
2  important.
3      Q.  Yes.
4      A.  You haven't mentioned those, but --
5  then given all that, I'd say okay, this is
6  weakly supported, has to be evaluated in this
7  context.
8      Q.  But it is supported?
9      A.  Well, again --
10      Q.  With the limitations?
11      A.  -- with the limitations attached.
12      Q.  Okay.  Now, as you've gone through the
13  concomitant medications issue, when you were
14  with Mr. Altman, did you actually look at the
15  issues of concomitant medications with him when
16  you were either at Malibu at your home or in
17  Chicago when you met with him?
18      A.  Well, we talked about that issue at
19  different points.  But when you say go through
20  it, you mean actually when we were looking at
21  the data?
22      Q.  Yes.
23      A.  We only did the data looking, as I
24  recall, when we were in Chicago, so I don't know

Page 110

1    if that's relevant.
2        Q.  So in Chicago, did you look at the
3    concomitant medications when you were in
4    Chicago?
5        A.  I don't recall if we actually looked
6    at -- what we looked at on the screen, looked at
7    on the screen versus descriptions on paper in
8    this exhibit and so forth, I really -- it's a
9    fog now for me.
10       Q.  Did you exchange e-mails with
11   Mr. Altman concerning your review of the
12   materials?
13       A.  No.
14       Q.  So there were no e-mails?
15       A.  No, I mean --
16           MR. ALTMAN:  Objection.  Misstates his
17   testimony.
18           MR. BARNES:  I want to find out.
19           BY MR. BARNES:
20       Q.  Were there any e-mails between you and
21   Mr. Altman?
22       A.  They were of the form "are you
23   available on this date" or "could we arrange a
24   call at this time," they're like, how would you

Page 111

1    call those, administrative?  I don't know what
2    you call those.
3            MR. BARNES:  I'd like to request that
4    you produce the e-mails between you and
5    Dr. Greenland as well.
6            MR. ALTMAN:  To the extent that
7    Dr. Greenland has them in his possession.
8            MR. BARNES:  You have them in your
9    possession as well.  If he's destroyed them, I
10   have to ask you to produce them.
11           MR. ALTMAN:  I don't know if we'll
12   agree to that.  Certainly Dr. Greenland will
13   produce e-mails concerning the drafts of his
14   report.
15           MR. BARNES:  My request is that to the
16   extent you have them in your possession,
17   Counsel, you produce them as well.
18           MR. ALTMAN:  We'll take it under
19   consideration.
20           MR. BARNES:  I'm sure you will.
21           How much more time do I have, Keith?
22   I've got a whole other section.
23           MR. ALTMAN:  I think you've got about
24   ten minutes.  Is it about ten minutes?  We're

Page 112

1    about 1.50 now.
2            THE VIDEOGRAPHER:  Yes.
3            BY MR. BARNES:
4        Q.  Doctor, I want to go back, I got
5    sidetracked on the generalizability.
6            You say -- go back to Paragraph 2 --
7    I'm sorry, Page 2.
8        A.  Page 2 of my report?
9        Q.  Yes.
10       A.  Okay.
11       Q.  Did you do any power calculations
12   yourself when you were looking at Dr. Gibbons'
13   report to criticize -- when you were criticizing
14   Dr. Gibbons with power calculations, did you
15   actually do any power calculations yourself?
16       A.  Yes, I recall doing some.
17       Q.  Are they in your report, sir?
18       A.  I thought I had put them in one of the
19   earlier reports.  Maybe we can go through and
20   check that.
21       Q.  Okay.
22           MR. ALTMAN:  If it's in his --
23           MR. BARNES:  I'm going to honor that.
24           BY MR. BARNES:

Page 113

1        Q.  In preparing this report, when you
2    were criticizing Dr. Gibbons' report with regard
3    to his power calculations, did you conduct any
4    power calculations yourself in the preparation
5    of this report?
6        A.  This report?  Oh, I'd done it earlier.
7    I didn't hear the "this report" part.
8        Q.  This report.
9        A.  Right.  Well, this report at that
10   point, I had done no further ones for this one.
11       Q.  Okay.  But any power calculations you
12   have done you would have done in connection with
13   the other reports, correct?
14       A.  Yes.
15       Q.  Okay.  Do you consider Dr. Brian Strom
16   an authority on pharmacoepidemiology?
17       A.  I understand that he's recognized as
18   an authority on pharmacoepidemiology.
19       Q.  When you criticized Dr. Gibbons on
20   Page 5 of 20 of your report, and this one
21   patient here you reviewed with Mr. Altman, would
22   you explain to me how this case actually
23   affected Dr. Gibbons' conclusions in either --
24   in the supplemental expert report?  I'm assuming

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

Page 114

1   this was in the gabapentin.
2       A.  You're talking about the patient at
3   the bottom of the page?
4       Q.  Yes.  I'm sorry, this is an AED study,
5   is it not?  Which cohort is this patient?
6       A.  PharMetrics is by Dr. Gibbons.
7       Q.  Is it the bipolar group, or the AED
8   group, or is it in the gabapentin group?
9       A.  Clearly there were bipolar patients.
10  It's not clear from my report which study
11  specifically they're -- which studies they're
12  in.
13      Q.  So you have no information as to how
14  this -- what study this patient actually
15  impacted, if at all, either the bipolar study or
16  the gabapentin study, correct?
17      MR. ALTMAN:  Objection.  Misstates his
18  testimony.
19          I have the report, I can help you if
20  you want.
21      MR. BARNES:  We'll talk later.  I have
22  two more minutes with the doctor.
23      A.  It must be in the bipolar study, the
24  question is whether they were in the gabapentin

Page 115

1   study.  For me the question, not your question.
2       BY MR. BARNES:
3       Q.  Do you know?
4       A.  I don't know.  Reading this, I don't
5   recall.
6       Q.  So as to how it affected either study,
7   you just wouldn't know, correct?
8       A.  No.
9       MR. ALTMAN:  Objection.  Misstates his
10  testimony.
11      A.  No.  For the bipolar study, published
12  study, I would presume they're in that cohort,
13  this is the bipolar person, and how it would
14  affect them.  Let me see.
15          The point of this patient, the point
16  of citing this patient was to show that there
17  are inaccuracies in the true index, the
18  diagnosis data of a patient, and showing that
19  the event times determined from the records in
20  the manner described by Dr. Gibbons is subject
21  to these inaccuracies, so that's one more source
22  of uncertainty that isn't accounted for in his
23  analysis.
24      Q.  We spoke about that this morning?

Page 116

1       A.  Yes.
2       Q.  Okay.  I've got to find one other
3   thing here, I've lost my note.
4       MR. ALTMAN:  Rick, I have about two
5   questions.  If you want to let me ask my
6   questions, I'll give you a few minutes to deal
7   with this in your questions while you find your
8   stuff.
9       MR. BARNES:  Just give me one second.
10      BY MR. BARNES:
11      Q.  Do you agree that the use of a bipolar
12  population for Dr. Gibbons' AED analysis was a
13  good population to study for suicide attempt?
14      A.  I have no opinion.
15      MR. ALTMAN:  Objection.  Foundation.
16      BY MR. BARNES:
17      Q.  No opinion on that?
18      A.  I have no opinion on that.
19      Q.  Would you agree that one of the
20  advantages of using a PharMetrics database is
21  that it measures and evaluates real world use of
22  medicines in studies; it studies drugs that are
23  actually used in real patients as opposed to a
24  clinical trial?

Page 117

1       A.  I'm sorry, would you repeat it?
2       Q.  Yes, I'm getting tired, and you've had
3   a long day, too.
4           I guess going back to the bipolar
5   population, do you believe using the PharMetrics
6   database is actually more generalizable than a
7   randomized controlled clinical trial to the real
8   world population?
9       MR. ALTMAN:  Objection.  Foundation.
10      A.  I would agree that issues of
11  generalizability would be possibly less severe
12  for PharMetrics than a typical trial population,
13  yes.
14      BY MR. BARNES:
15      Q.  Would you be critical of
16  Dr. Gibbons -- let me take a step back.
17          Let's focus on his published paper,
18  March, 2009 paper.  You would agree that
19  Dr. Gibbons set forth many limitations in his
20  published paper on the study, correct?
21      A.  Yes.
22      Q.  And you think that's good practice,
23  correct?
24      A.  Yes.

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 118

1    Q.  And you don't criticize Dr. Gibbons
2  for that, do you?
3    A.  No.
4    Q.  We agree on that?
5    A.  Yes.
6    Q.  And if Dr. Gibbons on deposition,
7  which you reviewed, advised counsel, Mr. Altman,
8  that the same limitations that were stated in
9  his published paper on the anti-epileptic drugs
10  applied to the gabapentin study of his
11  supplemental report, would you agree with his
12  statement?
13    A.  Yes.
14    Q.  You would not be critical of
15  Dr. Gibbons for accepting the limitations of his
16  paper to his gabapentin study, would you?
17    A.  I would not be.
18    Q.  And so did you see that in his
19  deposition where he actually accepted the
20  limitations?
21    A.  Yes.
22    Q.  And that's appropriate, isn't it?
23    A.  Yes.
24    MR. BARNES:  Okay.  Counsel, you may

Page 119

1  ask your two questions.
2    MR. ALTMAN:  If you need a couple
3  questions on redirect.
4    CROSS EXAMINATION
5    BY MR. ALTMAN:
6    Q.  A question that Mr. Barnes just asked
7  you about the limitations; there are limitations
8  in his published paper that are not listed in
9  the gabapentin expert report, correct?
10    A.  Correct.
11    Q.  Would the reader have any way to know
12  that those limitations apply by reading the
13  gabapentin expert report if they weren't there?
14    MR. BARNES:  Objection.
15    A.  Answer?
16    MR. BARNES:  You may answer.
17    A.  Not that I could see if they only had
18  that report.
19    BY MR. ALTMAN:
20    Q.  Okay.  If according to the data
21  purchased by Dr. Gibbons from PharMetrics he did
22  not purchase all of the drugs taken by each
23  individual in his cohort, is there any way that
24  Dr. Gibbons could have adjusted for the drugs

Page 120

1  that he didn't purchase?
2    A.  Not that I see.
3    Q.  And my last question is; if you had
4  taken the PharMetrics database yourself, is
5  there any analysis that you could have done with
6  the PharMetrics database that would allow you to
7  conclude that the data establishes that there's
8  no increased risk of suicidality?
9    MR. BARNES:  Objection.
10    A.  No.
11    BY MR. ALTMAN:
12    Q.  Is there anything you could have done
13  with the PharMetrics database that would allow
14  you to conclude that the data demonstrates that
15  there is a protective effect of gabapentin for
16  suicidality?
17    MR. BARNES:  Objection.
18    A.  No.
19    MR. ALTMAN:  That's all I have.
20    REDIRECT EXAMINATION
21    BY MR. BARNES:
22    Q.  Okay.  Doctor, you don't know whether
23  or not Dr. Gibbons purchased all of the drugs
24  each patient were on or not, do you?  You don't

Page 121

1  know if what he -- in other words, you have no
2  information whether or not Dr. Gibbons did or
3  did not purchase all the medications, the list
4  of all the medications that each patient was on,
5  do you?
6    MR. ALTMAN:  Objection.  Misstates his
7  testimony.
8    A.  I think what I said was that based on
9  the materials that I was given and I've seen,
10  the exhibit that we've referred to and all that,
11  it appeared that he got only a very small subset
12  of the drugs the patients would have been on,
13  could have been on, likely that they had.
14    BY MR. BARNES:
15    Q.  What do you say "likely" for?  What do
16  you base likely?
17    A.  For example, pain medications aren't
18  listed, and pain medications are very commonly
19  prescribed.  There are a hundred thousand
20  people, there must be a lot of them on pain
21  medication.
22    Q.  Are you saying that pain medications
23  are associated with suicidal behavior and
24  thinking?

Page 122

1    A.   That's a question that would only be
2    answerable in the PharMetrics database.  That's
3    the key thing, is whether they're associated
4    with, by getting those drugs in the PharMetrics
5    database and doing the adjustments and seeing if
6    they're associated.
7        Q.   If a psychiatrist that Dr. Gibbons was
8    working with did not believe pain medications
9    were appropriate to be included in this study of
10   anti-epileptic drugs to adjust for pain
11   medications, do you have a clinical basis to
12   disagree with that judgment?
13       MR. ALTMAN: Objection.  Foundation.
14   A.   Statistical basis.
15       BY MR. BARNES:
16       Q.   But not a clinical basis?
17       A.   Statistical, epidemiological
18   statistical.
19       Q.   But not a clinical basis?
20       A.   Not a clinical basis.
21       Q.   What is your epidemiologic statistical
22   basis for disagreeing with the judgment of a
23   psychiatrist as to what medicines should be
24   adjusted for?

Page 123

1    A.   The basis would be empirical.  If we
2    see some things indeed associated with the
3    outcome that is existing at the baseline,
4    whatever is taken at the baseline, Dr. Gibbons
5    used a baseline, then it is an indication, or
6    could either be itself be having an effect or
7    not having an effect, being picking up another
8    indication that does have an effect that was
9    also the basis for the prescription of, say,
10   gabapentin.
11       Q.   Then going to your statement about
12   pain medications, is it your belief as a
13   statistician and epidemiologist that pain
14   medicines are, in fact, associated with suicidal
15   thinking and behavior?
16       A.   Again, I couldn't answer that without
17   looking at the PharMetrics database, because
18   that's the relevant database for this study in
19   that question.
20       Q.   What would the PharMetrics database
21   tell you about whether or not pain medications
22   are associated with increased risk of suicidal
23   thinking and behavior?
24       A.   By looking at that directly.

Page 124

1        Q.   So you would want to test it in the
2    database as to whether pain medications are
3    associated with suicide attempts?
4        A.   Or the alternative.
5        Q.   Yes or no to that.  Would you want to
6    test -- my question was, you said or, you didn't
7    answer my question.
8        A.   I'm sorry.
9        Q.   I understand.
10       A.   The answer is yes.  Well, I should
11   actually, the way I would put it is yes, and.
12       Q.   Yes, and.  Okay, that's fine.
13       A.   It's really associated with
14   prescription for gabapentin, because it's become
15   more and more recognized over the last few
16   decades, and now very, very commonly recognized
17   in a lot of pharmacoepidemiology as well as in
18   other fields.  It's also important to look at
19   what's associated with the prescription for the
20   drug that you're studying.
21       Q.   Okay.  So you would accept, then, the
22   possibility that pain medications are associated
23   with increased risk of suicidal thinking and
24   behavior as an epidemiologist?  Yes?

Page 125

1        A.   Could be.  Or associated with
2    prescription for gabapentin, and its prescribing
3    patterns that are actually considered by some to
4    be the most important variables that you have to
5    adjust for.
6        Q.   And as to the effects of gabapentin --
7    strike that.
8        MR. BARNES: Okay.  That's all the
9    questions I have.  Thank you very much.
10       MR. ALTMAN:  Before we go off the
11   record, one thing I want to put on the record
12   that just came out that I think is very
13   important, it appears to me that, and this
14   doesn't have anything directly to do with
15   Dr. Greenland, but it appears to me that at some
16   point on Thursday with Dr. Gibbons you may argue
17   that a psychiatrist advised him on what drugs to
18   purchase or not purchase, and I believe that
19   psychiatrist will be Dr. Mann.
20       Earlier this year we noticed the
21   deposition of Dr. Mann, and Dr. Gibbons signed a
22   declaration to say Dr. Mann had absolutely
23   nothing to do with his expert report.
24       If at some point you intend to say

In Re: Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability

Sander Greenland, Dr.P.H. - July 21, 2009

Page 126

1  Dr. Gibbons picked the drugs that Dr. Mann told
2  him he should pick, or any psychiatrist told him
3  he should pick, we're going to raise with the
4  judge that we're going to need to take the
5  deposition of Dr. Mann which Dr. Gibbons filed a
6  declaration, and a motion was granted to quash
7  the subpoena.
8          MR. BARNES: I think that's your
9  right.
10         All right.  No further questions.
11         Dr. Greenland.  Thank you very much
12  for flying to the East Coast and spending the
13  day with us.  I hope you have a safe trip home
14  tonight.
15         THE WITNESS:  Thank you.
16         THE VIDEOGRAPHER:  This is the end of
17  tape two.  The deposition time is 5:41.  We're
18  off the record.
19         (Whereupon, the deposition was
20  concluded.)
21
22
23
24

Page 127

1  ATTACH: DEPOSITION OF SANDER GREENLAND, Dr.P.H..
2  CASE:  NEURONTIN MARKETING, SALES PRACTICES AND
3       PRODUCTS LIABILITY LITIGATION
4  DATE TAKEN: July 21st, 2009
5
6       ERRATA SHEET
7  PAGE  LINE  CHANGE  REASON
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14     I have read the foregoing transcript
15 of my deposition and except for any corrections
16 or changes noted above, I hereby subscribe to
17 the transcript as an accurate record of the
18 statements made by me.
19
20     Executed this____day of_____, 2009.
21
22     _____
23     SANDER GREENLAND, Dr.P.H.
24

Page 128

1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.              )
3
4          I, MAUREEN O'CONNOR POLLARD, RPR, CLR,
5  and Notary Public in and for the Commonwealth of
6  Massachusetts, do certify that on the 21st day
7  of July, 2009, at 3:30 o'clock, the person
8  above-named was duly sworn to testify to the
9  truth of their knowledge, and examined, and such
10 examination reduced to typewriting under my
11 direction, and is a true record of the testimony
12 given by the witness.  I further certify that I
13 am neither attorney, related or employed by any
14 of the parties to this action, and that I am not
15 a relative or employee of any attorney employed
16 by the parties hereto, or financially interested
17 in the action.
18         In witness whereof, I have hereunto
19 set my hand this 22nd day of July, 2009.
20
21     _____
22     REGISTERED PROFESSIONAL REPORTER
23
24

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

1

**A**

**ability** 50:14
**able** 28:3 76:16 98:12
**abovenamed** 128:8
**absent** 56:18 76:21
**absolutely** 41:20
  125:22
**accept** 46:11,12
  47:21 124:21
**accepted** 79:18 81:12
  101:16 118:19
**accepting** 57:16,17
  118:15
**access** 76:3
**account** 42:17 69:17
  69:23 70:10 72:14
  72:20 74:3 76:17
  78:20 81:6
**accounted** 51:20
  74:11,18 78:16
  90:17 115:22
**accurate** 58:8 65:24
  66:2 76:24 127:17
**accurately** 56:2
**accuse** 26:4 63:10
  64:4 65:5
**accused** 48:22
**accusing** 25:16 28:22
  64:16
**ace** 91:4
**action** 128:14,17
**actual** 21:22 76:21
  77:10
**added** 27:5
**address** 5:18 10:8
  81:13
**addressed** 81:7
**addressing** 34:10
**adequacy** 67:10
**adequate** 41:23
  42:20 70:2

**adequately** 74:18,22
**adhere** 70:16
**adjust** 74:22 76:6
  77:9 92:6 93:12
  97:17 98:10 100:15
  122:10 125:5
**adjusted** 91:22 92:14
  92:24 96:14 98:7,17
  100:1,7,9 119:24
  122:24
**adjustment** 99:14,20
  100:4,24
**adjustments** 76:5,16
  90:21 95:17 97:7,16
  99:10 122:5
**administrative**
  111:1
**administrator** 1:11
**advantages** 90:3
  116:20
**adverse** 87:1,11 88:2
  88:4
**advised** 28:24,24
  118:7 125:17
**advisement** 15:21
**aed** 114:4,7 116:12
**aeds** 90:24
**affect** 115:14
**afternoon** 5:15,16
**ago** 7:15,20
**agree** 31:16 32:9 33:9
  33:13 39:20 41:12
  41:18 48:9 58:15,20
  84:7,11,22 105:12
  105:24 106:20
  108:22 111:12
  116:11,19 117:10
  117:18 118:4,11
**agreed** 25:2,2 61:11
**agreement** 15:9 35:8
  36:4,5 85:3
**ahead** 27:18 29:8

31:13 81:10 96:20
**al** 26:16 95:20 99:12
**alert** 37:15 38:19,23
  39:2
**alexander** 89:12
**allow** 61:19 120:6,13
**allowed** 49:8 50:12
**allowing** 30:24
**alternative** 124:4
**altman** 2:3 3:5 5:3,3
  6:19 8:15,24 9:21
  10:14 11:21 12:2,9
  12:21 13:4,11,12,20
  14:2,18,24 15:4,8
  15:20 16:6,13 18:24
  19:1,7,18 20:19
  21:3,7,18,20 22:4
  22:10,21 24:3,12
  26:8 27:13 29:4,8
  29:14,19 30:22 31:5
  31:9,11,14,22 32:3
  32:8,17 33:23 34:2
  34:13 35:3,6 36:3,5
  36:10,17,23 37:9,14
  37:19 38:4,6,10,14
  38:18,22 39:3,7
  43:5,14 46:23 47:4
  47:8,16 48:13,20,23
  49:6,10,13,20 50:4
  50:7,18,22 51:1,6
  52:22 53:4,13,16
  54:3,9,23 55:9 56:8
  56:11,19 57:1 60:11
  60:16 61:8,19 62:20
  63:1,5,9,19,23 64:3
  64:8,12,16,20 65:1
  65:4 67:13 68:23
  69:5 71:8 72:4
  73:21 75:2 76:9
  92:16 94:17,23
  96:16,20 97:12
  107:2 108:2 109:14

110:11,16,21 111:6
  111:11,18,23
  112:22 113:21
  114:17 115:9 116:4
  116:15 117:9 118:7
  119:2,5,19 120:11
  120:19 121:6
  122:13 125:10
**ambiguity** 85:19
  86:1
**ambiguous** 29:6
**amount** 20:23 75:7
  75:11 99:24,24
**analogy** 30:1 31:4
**analyses** 18:11 73:18
  77:14
**analysis** 18:7 22:13
  22:23 38:7 48:18
  50:12 68:1 69:12
  72:17 73:7 74:15
  77:22 88:3 89:18
  90:13,17 91:22
  104:22 115:23
  116:12 120:5
**analyzing** 36:1
**angeles** 5:21
**answer** 22:5 24:8,10
  24:21,21 25:10,18
  26:3,7 27:9,11,12
  27:18,22 28:12,15
  28:17 29:1,2,3,12
  29:23,24 30:12,13
  30:15,20,24 31:19
  32:4,6 35:5,7 36:22
  36:24 38:9 41:8
  43:6,8 47:15 48:16
  50:21,23 52:24
  53:14 54:7,13 55:14
  56:12,14,20 57:2
  60:17,19,19 61:1,7
  61:17,19,23 62:5
  65:11 68:24 69:6

In Re: Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

2

71:9 75:5 88:1 89:2
96:19,21 107:4
119:15,16 123:16
124:7,10
**answerable** 122:2
**answered** 27:14
29:15 30:23 31:3
32:6 52:23 53:17
55:10
**antianxiety** 91:4
**antidepressants**
90:24 98:19
**antiepileptic** 75:1
98:18 105:16 118:9
122:10
**antipsychotic** 98:23
**antipsychotics** 91:1
91:5 98:19
**anybody** 25:20 82:22
**anymore** 99:3
**anyway** 12:6 20:2
66:11
**apologies** 97:24
**appear** 65:17
**appearances** 2:1
**appeared** 44:20
95:23 121:11
**appears** 26:14,21,23
125:13,15
**application** 44:20
**applied** 75:14,22
76:6 118:10
**apply** 40:5 41:3 68:3
69:13 84:20 85:24
119:12
**approaching** 101:1
**appropriate** 28:14
49:14,15 75:11
118:22 122:9
**appropriateness**
50:9
**approval** 40:21,24

58:23
**april** 12:18,19
**area** 85:23
**arent** 121:17
**argue** 125:16
**argued** 80:8
**arguing** 30:10
**argument** 31:23
**argumentative**
27:14 29:6,15
**arps** 2:12
**arrange** 110:23
**aside** 87:5
**asked** 9:12 24:3
27:14 29:15,20
30:23 31:14 52:22
53:16 55:9,12 63:17
63:23,24 64:18,19
119:6
**asking** 19:15 29:17
31:5 34:3 40:12
51:4 53:6 60:20
64:15 92:18
**aspect** 90:13
**aspects** 13:21 14:7
**assert** 79:11
**assessment** 33:20
35:1 74:2 79:24
100:3 101:20
**assigned** 70:17
**associated** 105:16
121:23 122:3,6
123:2,14,22 124:3
124:13,19,22 125:1
**association** 103:20
103:21 104:7,8,16
104:18 105:2,6,9
**assume** 28:11 87:24
**assuming** 113:24
**assurance** 98:13,16
**attach** 127:1
**attached** 94:16

101:22,23 109:11
**attempt** 26:22 76:6
76:15 90:15 93:12
106:23 116:13
**attempts** 102:11,14
103:13,18 104:5
106:4 107:17 124:3
**attention** 32:22
**attorney** 128:13,15
**atypical** 98:18
**author** 89:9
**authority** 113:16,18
**authors** 78:11,11
80:8 82:16 89:10
**available** 42:19 70:1
76:22 100:12
110:23
**avenue** 2:4
**aware** 27:1 74:11

**B**

**back** 31:21,21 32:12
41:5,7 60:12,14
62:2 65:10 66:16
69:15 72:22 82:10
83:5 89:1 103:11
112:4,6 117:4,16
**background** 44:17
44:21,24 51:16,18
52:19 53:8 54:13
55:6,6,11,21,22
56:17 59:19,24 62:7
65:15,23 66:5 68:3
69:12
**bacon** 2:15
**badger** 29:16
**badgering** 29:19
31:1,17 32:9
**baltimore** 2:9
**bare** 78:22
**barnes** 2:8 3:4,6 4:21
4:21 5:14 6:15,23

7:3 8:17,21 9:2,4
12:8 14:20 15:11
16:2,3 19:3,5 22:8
23:10,12 24:16
26:12 27:15,17 29:7
29:10,17,22 31:3,7
31:10,13,20 32:2,5
32:11,20,21 34:1,5
34:17,23 35:10 36:4
36:8,12,21 37:4,24
38:3,8,12 39:9,10
41:5,9 43:7,21 45:4
45:9,20 46:20 47:2
47:6,12,17,20 48:17
48:21 49:4,8,12,24
50:11,20,24 51:3,7
52:24 53:7,11,21
54:5,10 55:11,13
56:9,13,15,21 57:3
60:20 61:10,16,22
61:24 62:4,18,22
63:3,7,15,21 64:1,6
64:10,15,18,23 65:3
65:7,12 66:20 67:3
67:17 69:1,7,9
71:10 72:7 73:24
75:4 76:10 82:23
83:7 89:3 92:18,21
94:22 95:2,3 96:18
97:4,20 107:3 108:3
110:18,19 111:3,8
111:15,20 112:3,23
112:24 114:21
115:2 116:9,10,16
117:14 118:24
119:6,14,16 120:9
120:17,21 121:14
122:15 125:8 126:8
**base** 54:19 91:7 94:9
101:2 121:16
**based** 7:12 46:24
48:18 60:17,19

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

3

61:20 65:17 76:23
78:5 80:15,19,22
87:12 88:1 89:21
91:8 95:6 99:22
121:8
**baseline** 123:3,4,5
**basically** 89:16
**basing** 95:5
**basis** 57:12 97:3,5
100:18 122:11,14
122:16,19,20,22
123:1,9
**bear** 104:1
**beat** 103:15
**beginning** 83:5
**begins** 42:13 46:2
**behalf** 4:21,23 5:2,3
9:9 17:15 18:1
**behavior** 42:1 48:11
52:20 59:23 60:4,9
105:15 106:24
108:7 121:23
123:15,23 124:24
**belief** 66:13 123:12
**believe** 10:1 15:2
29:11 30:8,11,17
37:21 44:11 45:15
52:12 55:17 71:4
74:17 94:14 96:2
100:23 117:5 122:8
125:18
**beneficial** 73:3
102:21
**benzodiazapines**
98:20
**best** 7:17,19 19:22
20:12 78:22
**better** 56:9 82:20
86:9
**beyond** 33:23 36:24
81:8
**bias** 73:20 75:13

78:20
**biased** 71:14 72:2
88:1
**biases** 42:17 69:18
69:23 70:10,11,12
71:3,4,11,12 72:14
73:13 74:4,12,18,23
75:20 76:7,17 77:10
77:12,16 81:6
105:10
**bill** 2:19 4:4 23:2,6
**binder** 8:23
**bipolar** 114:7,9,15
114:23 115:11,13
116:11 117:4
**bit** 15:23 90:5
**blaming** 68:18
**block** 54:1
**blvd** 2:16
**bolding** 27:5
**booth** 79:22 80:3,4
**boston** 1:20 4:10
37:7
**bottom** 32:16 34:18
67:5 114:3
**break** 79:7
**brian** 113:15
**briefing** 28:13
**bring** 28:17 31:20,21
63:20
**brought** 28:14
**budd** 4:4
**bulger** 1:11,12 4:14
**bush** 103:15

_____

**C**

**calculate** 41:24
**calculated** 44:12
**calculating** 44:8,15
**calculation** 43:13,15
44:9 47:22 51:11,14
57:13 66:9 67:9

79:13,14 80:21 81:7
81:8,10,14 82:14,17
**calculations** 39:8
42:7,9,14,16,18
43:4,11,16 44:16
58:21 59:2 66:15
69:22,24 70:9 71:7
72:1,13 74:8 78:5
79:10,15 81:1,15,22
82:6,11,12,14 99:16
100:2 112:11,14,15
113:3,4,11
**california** 5:21 20:17
**call** 31:8 86:17
110:24 111:1,2
**called** 32:13 94:19
**calls** 21:22 22:3 75:2
96:16 97:12
**cant** 22:18 23:1 47:12
61:3 80:19
**capable** 25:22
**cardiac** 89:6
**care** 75:8,12
**case** 6:24 7:8 9:10
17:1 18:5,6 22:12
22:16 28:13 85:16
86:15 113:22 127:2
**cases** 17:16,21
**catch** 69:16
**categories** 98:22
100:21
**certain** 49:17 86:10
106:16
**certainly** 26:10 66:17
84:11 96:5 98:14
111:12
**certify** 128:6,12
**challenge** 57:12
**challenged** 58:10
**chance** 73:1 80:6
90:7 103:5
**change** 127:7

**changes** 127:16
**changing** 105:11
**check** 58:9 112:20
**checking** 11:1 65:4
**cherry** 27:11,15
**chicago** 16:14,15,15
16:16 109:17,24
110:2,4
**chose** 49:2 80:23
**circumstances** 87:5
**cite** 39:11 97:22
**cited** 82:16
**citing** 115:16
**city** 2:16
**claim** 33:3 45:10
98:10
**claimed** 26:17
**claims** 42:19 70:1
86:3,13,17 87:7,13
87:22
**clarification** 94:17
**clarify** 18:4
**classes** 82:13
**clear** 95:24 114:10
**clearly** 82:18 114:9
**clinical** 33:3,6,11,14
33:21 34:21 41:15
41:24 56:23 58:23
59:4 67:11 71:23
72:15 74:2 83:24
84:2,6 116:24 117:7
122:11,16,19,20
**clinicals** 53:10
**clip** 8:23
**close** 50:16 93:19
94:3 99:14,20 100:4
100:16
**clr** 1:24 128:4
**coaching** 53:21,22
**coast** 126:12
**cohort** 85:9,14 86:14
86:18 114:5 115:12

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

**4**

119:23
cole 89:10
colleagues 30:19
   93:21 98:2
collected 74:13
collection 73:1,6,11
com 2:5,10,14,17
combination 46:4
   47:23 51:10
come 29:21 52:9 93:9
   99:13,20 100:3,16
   105:7
coming 105:10
comma 30:4
comment 17:9 25:21
   39:12 106:5
comments 35:6
   94:14
commit 17:1
common 25:3,5 82:8
   96:6
commonly 100:20
   103:1 121:18
   124:16
commonwealth
   128:1,5
companies 59:3
compare 28:3 86:23
comparison 65:20
   87:2 100:17
compatible 78:7,23
complaining 80:5
complaint 79:23
complete 6:19 27:10
   85:3 97:8 99:14,20
   100:4
completed 81:24
completing 50:14
comply 70:16
compound 29:5 76:9
compounding 99:23
computer 9:22 16:7

concede 73:10
concerned 68:16
   87:18
concerning 19:18
   110:11 111:13
concerns 35:15
conclude 120:7,14
concluded 126:20
conclusions 18:12
   113:23
concomitant 90:5,16
   90:22 95:17 96:13
   97:6 99:10,15
   109:13,15 110:3
condition 40:21,23
   41:1
conduct 18:10 47:12
   69:11 113:3
conducted 40:20
   43:3 80:22 89:17
conducting 67:9
   71:24 72:13,16
   74:14,24
confidence 78:9,17
   78:19,21 80:18
   97:18
confirmed 91:17
confirming 94:11,13
confounding 99:15
connection 35:22
   113:12
connors 2:15
consecutive 21:5,6
consider 6:6,9 27:3
   87:3 113:15
considerable 75:7
consideration
   111:19
considered 34:7 76:5
   78:10 87:7 89:14
   125:3
considering 35:23

consistency 85:3
consult 68:20
consulted 17:18
   96:11
consulting 96:23,23
context 26:6 28:16
   30:2,7,10 56:6
   109:7
contexts 89:20
continue 31:2,16
   39:9 46:13 65:6
   70:5
contract 94:1,6
contrast 46:14 48:3
   57:5,6
control 85:16 99:14
controlled 33:11,14
   35:2 39:1,6,12,21
   72:15 74:19 84:1,6
   86:15 117:7
controlling 77:12,16
controls 52:6
controversy 75:10
   85:18
conversation 22:10
conversations 22:18
   22:22
convey 90:15
copies 11:22
copy 6:12 8:10,24
   63:20 66:21
correct 7:6 9:11
   13:23 14:4 16:17
   17:3,6,11,12 18:3,8
   18:9,13,14 20:18
   21:14 24:9,11 29:13
   33:7,8,11,17 35:16
   35:17,19,20 39:13
   39:14 42:2 44:1
   48:1,7 53:12 56:7
   57:10 58:3,24 59:4
   59:12 60:1,2,10

65:22 66:10,15 72:3
   72:17,21 73:8,9,14
   74:1 75:19 76:18,19
   77:12,17,18 80:1
   83:10 84:15,16,18
   94:7,8,10 102:7,8
   102:14 103:19
   106:13 107:24
   113:13 114:16
   115:7 117:20,23
   119:9,10
correcting 75:13
corrections 127:15
correctly 20:11 58:12
   92:12 94:20
correlation 104:6
couldnt 23:18 80:16
   94:22 123:16
counsel 4:18 8:13
   15:9,13 18:2 28:6
   28:11 63:7,7 101:14
   111:17 118:7,24
couple 119:2
course 17:8 101:8
court 1:1 4:15 5:5
   26:3 28:1,9,10,12
   28:15,18 29:1,1,11
   102:3
courtroom 24:1
coyle 12:18
create 15:5 69:2
created 68:5,6
creating 60:23 71:6
   73:18
criterion 103:8
critical 66:4 96:15,22
   97:1,2 117:15
   118:14
criticism 42:4 44:6
   61:12 67:6,18,24
   71:21 72:12 95:16
criticisms 69:10

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

5

102:4
**criticize** 41:22
  112:13 118:1
**criticized** 61:6
  113:19
**criticizing** 30:20
  35:22 48:17 55:8
  56:6 60:24 67:7
  71:22 112:13 113:2
**cross** 50:15 119:4
**crudely** 76:21
**cruder** 77:7
**current** 103:4
**cv** 3:10 6:12

———————————
**D**
**dance** 61:4
**danger** 87:16
**dann** 2:8
**dash** 30:5
**data** 9:16,20 10:3,5
  10:10,19,23,24
  12:22 18:7 26:17
  43:20 44:7 48:19
  65:18 66:6 76:3,14
  76:22 77:10 78:6,7
  86:2,3,5,10,13 91:1
  91:13,13 93:20 94:4
  98:3,4 109:21,23
  115:18 119:20
  120:7,14
**database** 9:22 10:8
  10:16,17 11:4,20
  13:5 16:6,8,16,18
  16:22 18:11 86:17
  87:7,22 88:15 89:8
  89:18,22 90:1 91:9
  93:8 96:1,14 108:14
  116:20 117:6 120:4
  120:6,13 122:2,5
  123:17,18,20 124:2
**databases** 88:20

93:12
**date** 4:6 6:22 110:23
  127:4
**dated** 6:20
**daubert** 8:1
**day** 21:16,17,18,20
  117:3 126:13
  127:20 128:6,19
**days** 20:24 21:2,5,6,9
**deal** 116:6
**deals** 69:4
**decades** 88:11
  124:16
**deceased** 1:12
**deceptive** 90:12
**decision** 66:5
**decisions** 75:8
**declaration** 125:22
  126:6
**declaring** 103:3
**decrease** 102:11
  103:17 104:4
  107:16
**defendant** 2:7
**defendants** 4:14
**defense** 17:18,23
**define** 83:22
**degree** 85:12 86:9
  99:23
**delighted** 7:1
**demonstrate** 26:18
**demonstrates**
  120:14
**denotations** 13:1
**dep** 55:2
**depend** 75:14,22
  99:4
**depends** 43:15 51:14
**depose** 49:1 61:9
**deposing** 61:11,12
**deposition** 1:15 4:11
  8:2 12:16,17 16:1

23:15 26:1,24 27:5
  31:2 37:5 47:13
  49:3,19,21 50:19
  53:3 54:8,24 62:1
  63:10 64:5,13 91:17
  92:4 94:2,7,15,21
  95:8 101:22 118:6
  118:19 125:21
  126:5,17,19 127:1
  127:15
**depositions** 23:20
  92:2
**describe** 12:9,20
  52:4 86:11,14,15
  104:5
**described** 70:17
  75:13 91:11 95:7
  115:20
**describing** 10:23
  87:9
**description** 3:9 91:9
  93:20 94:4
**descriptions** 90:13
  110:7
**design** 33:4 86:11
**destroyed** 13:6 15:14
  111:9
**details** 10:11
**detect** 42:20 57:24
  59:8 62:15,16 70:2
  73:2
**detecting** 80:11
**detection** 103:1,2
**determine** 44:23
  67:9 82:11 85:11
**determined** 99:24
  115:19
**developing** 40:24
**deviation** 103:6
**device** 83:16
**devries** 2:8
**diagnosis** 115:18

**diagram** 85:22
**dialects** 83:22
**didnt** 14:16 15:2,11
  16:21,23,24 19:21
  19:23 24:20 28:17
  34:2,4 49:10 50:19
  55:5 58:10 61:6
  63:1,19 64:3,20
  69:2 72:22 90:7
  91:2 92:20 95:11
  98:23 100:16
  102:22,24 113:7
  120:1 124:6
**difference** 55:22
  57:24 104:12,22
**differences** 55:20
**different** 40:18 44:18
  44:21 55:19,20 60:3
  62:8 92:10,15
  109:19
**dimensions** 85:11,15
  86:8
**direct** 5:13 32:22
**direction** 106:6
  128:11
**directly** 10:6 123:24
  125:14
**disaggregate** 60:21
  61:3
**disagree** 26:11 29:9
  58:5 122:12
**disagreeing** 122:22
**discount** 99:4
**discuss** 18:23 38:22
  38:24
**discussed** 15:24
  52:13,13,14,15
  55:17 81:3 101:21
  108:24
**discusses** 37:15 50:8
  65:18
**discussing** 81:4

In Re: Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

6

108:11
**discussion** 94:15
**discussions** 58:22
**dismissal** 97:3
**district** 1:1,2 4:15,16
**diverge** 87:6
**divide** 82:13
**docket** 1:3 4:16
**doctor** 25:15 27:18
    68:18 112:4 114:22
    120:22
**document** 1:10 11:9
    12:5 45:18 46:24
**documentation**
    10:11 15:6,12
**doesnt** 22:6 31:16
    32:9 34:16 36:17
    38:2,3,5 81:5
    125:14
**doggone** 47:3
**doing** 21:18 51:5
    74:16 79:23 82:17
    96:15 112:16 122:5
**dont** 6:8 7:9 8:3 21:4
    21:10,11,11,24
    24:14 25:13 26:2,11
    27:6,19 28:21 36:10
    37:19 38:22 44:11
    48:13 50:17 52:15
    58:10,15 61:1 64:1
    65:5 67:15 69:5
    77:8 79:14,16 82:1
    82:22 93:3,4 100:23
    102:2 104:1 109:24
    110:5 111:1,11
    115:4,4 118:1
    120:22,24
**dr** 1:16 3:3,10,11,13
    5:9,15 9:5 10:23
    15:14,24 18:8,13
    23:14 24:3,4,5 25:5
    25:16 26:19 27:1

32:13 34:6,8,9,12
34:15,16 35:12,22
35:23 36:1,7,18
37:12,13,15,22,23
38:6 39:8 41:22
42:17 43:2 44:4,6
44:14 45:2,5,11
46:21 47:1,5,22
49:1 50:2 51:9,21
52:15 53:5,19 55:1
55:8,17 56:6 57:6
57:13,23 58:13 59:6
60:18,24 61:21
62:19 65:18 66:4
67:7,24 68:7 69:2
69:11,23 70:10
71:17,22 72:12
73:16 74:11 75:16
75:23 76:3,15 77:6
77:9 79:11 80:21
82:5 86:12 90:22
91:10,17 92:14
93:21 94:5,7 95:9
96:11 98:2,17 99:19
103:14 105:13
106:1,21 107:15
111:5,7,12 112:12
112:14 113:2,15,19
113:23 114:6
115:20 116:12
117:16,19 118:1,6
118:15 119:21,24
120:23 121:2 122:7
123:4 125:15,16,19
125:21,21,22 126:1
126:1,5,5,11 127:1
127:23
**draft** 15:10,12
**drafted** 19:12,13,14
**drafting** 19:2 22:6
**drafts** 111:13
**drink** 79:5

**drug** 40:18,24 41:17
    46:6,16 48:6 57:8
    68:4,8 124:20
**drugs** 44:20 46:15
    48:4,10,12 56:3,4
    56:18 57:7,14,19
    59:11,19,24 60:5,9
    65:16 68:4,11,21
    69:13 75:1 91:4
    96:9 105:16 116:22
    118:9 119:22,24
    120:23 121:12
    122:4,10 125:17
    126:1
**due** 72:2
**duly** 5:11 128:8

———————
**E**
**earlier** 48:24 49:1
    112:19 113:6
    125:20
**early** 95:1
**easier** 15:23 62:15,16
**east** 126:12
**effect** 26:18 43:12
    44:12 51:9,15 59:9
    62:9 66:7,8,13
    77:11 80:11,24
    81:23 82:11 102:6,6
    102:10,12,18,22
    105:3 120:15 123:6
    123:7,8
**effective** 77:16
**effects** 25:6 42:20
    70:3 73:2 78:7,22
    96:8 125:6
**efforts** 69:11
**eight** 37:1,2 92:8,10
    92:14
**either** 64:12,17 72:21
    102:5 109:16
    113:23 114:15

115:6 123:6
**elements** 35:7
**eliminated** 48:10
**ellipses** 30:5
**emails** 12:18 110:10
    110:14,20 111:4,13
**empirical** 123:1
**employ** 84:9
**employed** 17:10 97:6
    99:11 128:13,15
**employee** 128:15
**ended** 15:16 30:3,5
**engenics** 89:7
**english** 78:24
**enroll** 40:7 70:22
**enrolled** 40:17,22
    41:13 70:15
**entered** 87:15
**entire** 14:15 26:3,5
    27:9,22 28:1,7,8,12
    28:15,16,17 29:1,2
    38:1 62:1
**entirely** 75:14 99:4
**entitled** 48:22 61:2
**epidemiologic** 84:14
    122:21
**epidemiological**
    86:13 122:17
**epidemiologist** 6:4
    123:13 124:24
**epidemiology** 5:20
**equal** 59:9
**equivalent** 105:2
**errata** 127:6
**error** 78:15,20
**especially** 87:8
    108:20
**esq** 2:3,8,11,15
**establish** 42:18 70:1
**establishes** 120:7
**estate** 1:12
**estimate** 7:19 81:4

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

7

estimates 78:10
et 26:16 95:20 99:12
evaluated 40:19
  108:18 109:6
evaluates 116:21
evaluating 59:4
evaluation 3:16
  75:18
event 87:1 88:4 93:5
  115:19
events 46:5,16 48:4,5
  57:8,14 87:11 88:2
evident 37:17
exactly 21:4 25:8,10
  53:24 66:18,23
  76:19 85:4
examination 3:2
  5:13 11:2 13:8 37:6
  119:4 120:20
  128:10
examinations 11:10
examined 5:11 128:9
examining 11:4 78:8
  78:16 89:15
example 11:6,14
  40:18 41:10 79:11
  82:21 85:16 88:22
  89:5 96:7 101:5
  121:17
exceed 36:24 93:11
exceeds 58:1
exchange 27:4
  110:10
exclude 49:15 59:22
  84:1,10
excluded 80:15,16
  80:17,19 99:6,7
excluding 46:15 57:7
  57:14,19 68:10,12
  84:5 97:2
exclusion 48:9
excuse 63:19

executed 127:20
exhibit 3:10,11,13,15
  6:12,13 8:19 9:6
  12:1 26:15 45:4,6,7
  46:21 47:14,18 92:1
  94:1,6,16,18,18,19
  94:20,24 95:7 97:22
  101:4,14,22,23
  110:8 121:10
exhibits 3:8 11:23,24
  94:24 95:1
existed 59:11 71:5
  74:4
existing 123:3
expect 86:8 96:8
expected 55:21
experience 6:1
expert 3:12 7:8 8:9
  8:11,14 9:8 17:18
  17:19,23 18:1 19:2
  22:6 24:4,7 26:20
  27:3,7 30:17,18
  33:24 43:4 44:16
  48:14 49:21 50:8
  90:14 95:19 99:12
  113:24 119:9,13
  125:23
expertise 33:2,3
explain 25:10,12
  39:16 40:13 45:10
  75:6 113:22
explained 78:14
explanation 79:8
explicitly 84:11
exposure 11:7
express 49:11
expressed 48:14
extensive 109:1
extensively 89:9 90:1
extent 22:5 36:24
  61:20 111:6,16

**F**

face 45:2 51:22 79:13
  79:14
fact 26:15 55:18
  63:14 78:10 80:23
  91:21 93:8 95:24
  123:14
factors 105:7
failure 40:7 70:15,19
  70:22
fair 17:5,20 27:20,21
  34:10 39:23 48:24
  67:11 68:19 69:7
  72:11,18,19 79:17
  95:9,10,12 105:22
  107:7 108:5
falls 68:5 80:17
false 87:13,14,16,17
  87:18,21,21 93:22
familiarize 10:5
family 82:23
fan 81:15
far 91:20 92:13 103:3
farther 42:15
fashion 86:6 91:18
  93:13
fault 50:18 54:4
fda 33:22 34:3 35:2
  35:16,19 36:1,14
  37:14 38:19,23 39:2
  43:20,22 44:14
  45:12 46:19 47:3
  48:12 55:23 56:1,16
  58:14,17,22 59:3
  60:10 63:12 66:6,9
  67:8,24 68:12,14,20
  71:5,18,19,23,23
  72:15 73:11,19,20
  74:6,13,19,24 76:1
  76:8,13,18 77:17
  80:23 81:22

february 94:2 95:8
field 33:2,3 84:13
fields 124:18
file 1:4 4:17 10:12
  37:7
filed 19:14 126:5
files 10:20
final 80:13 81:2,13
financially 128:16
find 13:15 45:15 93:8
  94:22 97:23 110:18
  116:2,7
finding 59:7 67:22
  107:14 108:5
findings 106:1
fine 29:7 31:13 40:2
  47:16 50:24 54:9
  56:11,13 64:8,12
  69:8 72:19 102:16
  124:12
finger 18:22
finish 60:7
finished 77:23 81:22
finkelstein 2:3
first 5:11 6:2 18:20
  33:2 34:24 37:21
  89:9
five 8:5 31:15 53:18
flaws 108:19
flew 16:15
flight 19:24
flom 2:12
floor 2:9
flying 126:12
focus 117:17
fog 110:9
follow 8:8 61:2 93:17
followed 92:22
following 27:4 61:2
  67:22 73:5
follows 5:12 70:15
followup 70:21

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

8

forces 105:10
foregoing 127:14
forget 66:3
forgiven 98:1
forgotten 88:12
form 11:12 110:22
format 16:5
forth 11:1 72:3 76:7
  96:10 110:8 117:19
found 13:10 59:9
  103:20 106:15
  107:24
foundation 36:9 43:5
  43:14 107:2 108:2
  116:15 117:9
  122:13
four 2:12 24:8 31:14
  40:7 53:18 70:15,22
  71:4,12 72:2 73:5
  73:13
frankly 63:11
free 49:5
front 62:23 63:17
  93:3
full 30:6 48:24 70:20
  78:16 81:4 95:24
  96:2
further 25:22 57:18
  93:16 113:10
  126:10 128:12
furthermore 26:23
  78:19
future 82:18,19

G
gabaergic 46:15 48:4
  48:10,12 56:3,4
  57:5,7,14,19 59:10
  59:19,24 60:5,9
  65:16 68:10,11,21
  69:14
gabapentin 24:6

26:18 41:23 42:21
  44:10,22 67:11 68:4
  68:5 70:3 105:23
  106:1,3,18,21,22
  107:13,19 108:6
  114:1,8,16,24
  118:10,16 119:9,13
  120:15 123:10
  124:14 125:2,6
galaxies 85:20
game 34:10
gdldlaw 2:10
general 40:6
generalizability
  40:10,14,15 71:1
  112:5 117:11
generalizable 117:6
generally 17:7,9
  83:17 87:3,4
getting 50:16 108:16
  117:2 122:4
gibbon 99:12
gibbons 3:13 10:23
  12:18,19 15:24 18:8
  18:13 22:13,22
  23:14 24:3,4,5 25:5
  25:16 26:16,19,23
  27:1 28:2,17,20
  32:13 34:6,8,9,12
  34:15,16 35:12,22
  35:23 36:1,7,18
  37:13,15,22,23 38:6
  39:8 41:22 42:17
  43:2 44:4,6,14 45:2
  45:5,11 47:1,5,22
  49:1 50:2 51:9,21
  52:15 53:5,20 55:1
  55:8,17 56:6 57:6
  57:13,23 58:13 59:6
  60:18,24 61:21
  65:18 66:4 67:7,24
  68:7 69:2,11,23

70:10 71:17,22
  72:12 73:16 74:11
  75:16,23 76:3,15
  77:6,9 79:11 80:21
  82:5 86:12 90:14,15
  90:22 91:10,17
  92:14 93:21 94:1,5
  94:7,21 95:1,8,9,19
  95:20 96:11 98:2,17
  99:11,19 103:14
  105:13 106:1,21
  107:15 112:12,14
  113:2,19,23 114:6
  115:20 116:12
  117:16,19 118:1,6
  118:15 119:21,24
  120:23 121:2 122:7
  123:4 125:16,21
  126:1,5
give 16:7 19:22 20:12
  22:18,20 26:5 27:9
  46:20 53:7 75:17
  76:2,13 87:24 94:24
  116:6,9
given 10:14 25:19
  28:10 61:15 90:13
  91:14 108:20 109:5
  121:9 128:12
giving 79:21 91:15
glaxosmithkline
  89:11
go 12:24 27:18 29:8
  31:7,13 34:22 37:20
  42:9,15 44:23 47:21
  57:4,18 59:18 68:16
  69:15 70:7,8 72:22
  81:10 82:10 85:4
  96:20 97:21 99:8
  103:11 109:19
  112:4,6,19 125:10
goes 19:1 33:23 85:6
  108:17

going 9:5 16:5 23:20
  26:4 27:8 29:24
  31:2,7,8,9,11,16,20
  31:21 32:5,15,20
  34:18,20 36:8,9
  37:4,7 38:12,16
  41:1 46:1,23 47:14
  48:15 50:15 51:3,4
  53:1 56:14 63:9,11
  64:4 78:2 80:3
  82:19 85:7,22 86:14
  91:15 93:16 101:8
  112:23 117:4
  123:11 126:3,4
gold 33:15
golly 65:7
good 5:15,16 79:4
  89:22 116:13
  117:22
goodell 2:8
gotten 64:23 107:5
grand 2:16
granted 126:6
great 7:2
greater 86:9 87:16
  87:20
greenland 1:16 3:3
  4:11 5:9,15,19 6:13
  8:19 9:5,6 15:14
  45:7 46:21 47:18
  111:5,7,12 125:15
  126:11 127:1,23
greenlands 3:10,11
  37:12
grounds 37:6 80:7
group 52:5 62:13,14
  62:17 68:4,8 69:3
  69:14 89:8 104:13
  104:14,14 114:7,8,8
groups 43:18 93:10
  96:5,6
guess 7:12,17 8:3

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

9

12:6 40:1 117:4
**guessing** 7:10
**guys** 48:24 49:2
50:19

---

**H**

**half** 7:16,20 24:9,21
88:11
**hand** 9:5 25:21,21
128:19
**handed** 9:2
**handy** 8:11
**happen** 41:19
**happened** 43:17 88:8
88:13
**happy** 32:11
**hardy** 2:15
**harm** 103:22
**harmful** 73:3 102:6
102:12 105:8
**hasnt** 17:14,14 36:3
88:8,13
**havent** 109:4
**head** 60:22 61:4
**health** 88:5
**healthcare** 89:22,24
**hear** 65:8 95:11
113:7
**hearing** 8:1 21:21
**hed** 10:23
**held** 1:19
**help** 42:6,24 66:23
67:22 83:18 114:19
**helpful** 81:18
**helps** 95:2
**heres** 26:13 91:19
**hereto** 128:16
**hereunto** 128:18
**hes** 31:15 32:6,13
34:19 37:22,24 39:7
47:2,9 48:14,17,22
53:18 56:10 58:16

60:21 61:5 68:2,13
79:23 111:9 113:17
**hierarchies** 85:2,19
86:4
**hierarchy** 84:23 85:4
85:24
**higher** 59:22 60:8
62:9,10,13,13,16,17
65:15
**historically** 17:2
**history** 78:24 79:1,3
79:5
**hit** 79:15
**hold** 14:18 29:4
30:22 48:13 60:11
60:16
**home** 109:16 126:13
**honor** 112:23
**hope** 126:13
**horse** 79:19,20 80:4
81:19
**hour** 7:5
**hourly** 7:4
**hours** 8:2,5 22:21
23:1,8,14,20 53:23
**house** 20:14,15,20,22
21:8
**huge** 108:20
**hundred** 121:19
**hundreds** 88:10
100:19 101:1
**hypothesis** 105:14
105:18 106:2,22
107:1 108:6,23

---

**I**

**id** 5:24 6:11 7:1 21:5
52:24 84:11 109:5
111:3 113:6
**identification** 5:10
6:14 8:20 45:8
47:19

**identified** 5:10 13:20
14:15,21,24
**identify** 4:18 6:16 9:7
14:16
**ignore** 78:20
**ill** 38:14 45:13,15
46:21 54:7 61:19
85:5 94:24 95:4
97:13 116:6
**illusive** 97:22
**im** 6:4 7:10,18 9:5
11:15 17:3 18:18
19:23 20:11 23:1
27:16 28:20 29:17
29:17,24 30:24
31:18 32:3,11 35:7
36:8,9 37:4,7 38:12
40:12 42:3 45:24
46:1,9,23 47:14
48:15,22 49:8,20
50:11,12,22 51:3,4
51:21 55:3 57:16
58:11 61:2,2,11,12
61:14 64:5,15,20
66:24 67:4,22 68:13
68:14,18 78:1 87:8
92:12,18,24 95:11
95:14 102:10,17
106:17 111:20
112:7,23 113:24
114:4 117:1,2 124:8
**imagine** 7:9 85:20
**impact** 100:22
**impacted** 114:15
**importance** 97:3
**important** 27:7
42:20 70:2 82:2
100:1 109:2 124:18
125:4,13
**impression** 90:16
**improprieties** 64:17
**impropriety** 63:10

**inaccuracies** 115:17
115:21
**inadequacy** 95:6
**inappropriate** 44:13
**incidence** 46:5,16
48:5 57:8,13
**include** 25:18 68:22
71:16 83:24 91:2,3
96:4,5 98:23
**included** 58:21 78:17
80:17 90:21 91:5,9
91:15 100:24 122:9
**includes** 52:3
**including** 48:4
100:20
**increase** 102:13
106:3,22 108:6
**increased** 48:11
105:15 120:8
123:22 124:23
**independent** 18:7
**independently** 10:16
16:9 18:10
**index** 3:1 115:17
**indicate** 8:9
**indicates** 25:3,4 59:7
105:20
**indicating** 97:9
**indication** 41:14,18
52:8 123:5,8
**indications** 44:18
52:10 55:20 56:22
**individual** 119:23
**infect** 76:8
**infected** 73:12,19,20
**influenced** 97:10
**information** 10:12
11:18 13:3 43:3
45:11 60:21 67:7
114:13 121:2
**informative** 82:2
**initiation** 107:19

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

10

**injury** 17:16
**inquire** 48:22 49:5
**inspect** 93:23
**inspection** 93:19
    94:3
**instruct** 32:5 36:21
    36:23 38:8 47:15
    48:15 50:20 54:6
    56:12,19 57:1 68:23
    69:6 71:9
**instructed** 68:15
**instructing** 31:18
    32:3 35:7 50:22
**instructions** 68:17
**intend** 23:2 125:24
**intent** 32:14
**interest** 14:24
**interested** 128:16
**interject** 37:10
**interoverlapping**
    85:21
**interpret** 82:15
**interpretation** 24:23
**interpreted** 25:6
**interrupt** 104:2
**interrupted** 61:24
**interrupting** 47:13
    53:2
**interval** 78:9,18,18
    80:18 81:3
**intervals** 78:9,19,21
    82:3 97:18
**inverse** 103:20,21
    104:6,7,8,16,18
    105:1,6,9
**invoice** 7:14
**invoices** 23:11
**involve** 22:6
**involved** 55:19 88:10
**isnt** 25:11 27:21 58:8
    59:12 82:4 115:22
    118:22

**issue** 25:2 55:18
    81:13 89:15 109:13
    109:18
**issues** 87:10 108:12
    109:15 117:10
**item** 73:5 77:22,24
    77:24
**items** 11:22 12:13,14
    12:16
**ive** 11:12 17:13,17,18
    17:18 24:14 53:23
    55:15 68:15 88:9,10
    88:19,19,20 89:19
    100:9 108:12
    111:22 116:2,3
    121:9

**J**

**judge** 24:2 25:20
    26:6 27:24 28:4,7
    37:8,8 107:10
    108:15 126:4
**judged** 29:2
**judgment** 75:8,11
    122:12,22
**july** 1:22 4:6 19:9
    20:8 21:13,13,13
    34:8,15 35:12,23
    36:10,12,15 127:4
    128:7,19
**justify** 99:18

**K**

**kaltman** 2:5
**kansas** 2:16
**keep** 10:2 31:5,17
    50:16 51:4,5 53:6
    55:4 70:6
**keith** 2:3 5:3 32:7
    34:18 37:4,11 46:20
    49:9 53:1 56:10
    61:5 63:15 66:20

98:1 111:21
**key** 122:3
**keyboard** 18:22
**kind** 10:12 17:8 79:7
**know** 7:9 8:3 18:19
    37:7 51:20 52:18
    53:9 58:19 75:15,17
    75:23 76:1 79:6
    82:22 90:20 91:20
    93:22 98:20 100:10
    100:13,16 106:17
    107:12,22 109:24
    111:1,11 115:3,4,7
    119:11 120:22
    121:1
**knowing** 97:16
**knowledge** 128:9
**known** 99:2
**knows** 25:3,5

**L**

**lack** 40:9,14 71:1
**lamotrigine** 43:17,24
    44:7,13,24 46:4
    47:24 49:15,22 50:9
    51:10,19 52:7,20
    53:10 54:16,17 55:7
    56:23 58:7 59:9
    65:14
**large** 98:20
**larger** 82:20
**late** 19:24 21:13
    107:11,12
**lawampmmt** 2:5
**lay** 25:7 36:9 63:4
    79:8
**leading** 10:15 15:6
**led** 24:22
**leech** 2:8
**left** 102:15
**legal** 4:4
**legitimate** 37:6

**letter** 12:18
**level** 17:1
**liability** 1:8 4:13
    127:3
**light** 26:15 108:19
**liked** 108:14
**limit** 37:11 81:5,5
**limitations** 33:10
    72:2 83:9 90:2
    106:11 108:23
    109:1,10,11 117:19
    118:8,15,20 119:7,7
    119:12
**limited** 91:16,18 93:1
**limiting** 49:18,20
**limits** 103:2
**line** 24:10,10,14,17
    24:18 46:3 127:7
**lines** 24:9
**list** 8:10 33:16 91:21
    92:4,7 93:1,2,5 95:6
    96:1,2,13 97:6,8
    98:15 101:11 121:3
**listed** 39:18,22 78:12
    119:8 121:18
**listing** 77:21
**lists** 93:11
**literally** 93:7
**literature** 82:9 84:14
**lithium** 91:1 98:19
**litigation** 1:8 4:13
    17:4,8,11 127:3
**litigations** 18:2
**little** 15:23 19:23
    42:15 61:14 90:4
    95:14
**llp** 1:19 2:3,8,12,15
**lmcgroder** 2:17
**locate** 52:16
**located** 4:9
**logical** 87:24
**logically** 84:12

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

11

**long** 20:21 24:9 117:3
**longer** 24:22 25:9
   103:4
**look** 12:1 16:9,19
   46:18 63:11 90:9
   109:14 110:2
   124:18
**looked** 12:22 15:1
   34:5,6,9 47:9 89:19
   108:18 110:5,6,6
**looking** 10:9,22
   11:20 12:12 13:5
   23:20 86:24 109:20
   109:23 112:12
   123:17,24
**lori** 2:15 4:23
**los** 5:21
**lost** 70:21 80:4 81:20
   95:14 107:5 116:3
**lot** 75:9 79:6 87:13,14
   108:16 121:20
   124:17
**love** 79:1,2,3
**lower** 59:19 81:5

**M**
**machine** 10:19
**magistrate** 31:8,23
**maintained** 11:11
**major** 78:24 89:21
   96:5,6
**making** 25:14 74:2
   100:4,15
**malformations** 89:7
**malibu** 20:14,15,20
   20:22 21:3,8 109:16
**mann** 125:19,21,22
   126:1,5
**manner** 115:20
**manufacturer** 40:20
**march** 3:13 6:20 9:24
   11:19 19:20 20:7,8

26:21,24 36:16 45:5
   60:24 99:13 101:13
   117:18
**mark** 6:11 8:16,17
   45:4,6 46:21 47:14
**marked** 6:14 8:20
   9:6 45:8 47:19
**market** 99:3
**marketing** 1:6 4:12
   127:2
**maryland** 2:9
**massachusetts** 1:2
   1:20 4:10,16 128:1
   128:6
**master** 1:4 4:17
**matched** 55:23
**material** 88:22
**materially** 60:3
**materials** 52:14
   55:16 91:11 94:12
   94:13 95:22 101:3,8
   110:12 121:9
**matter** 4:12 22:10
   36:17 75:16 83:21
**matters** 22:15 77:15
   80:9
**maureen** 1:24 5:6
   128:4
**mcgroder** 2:15 4:23
   4:23 35:5 36:13
   37:10,17 38:2,5,16
   38:20,24 39:5 49:17
   50:1,5 53:14
**mdl** 1:3 4:16
**meagher** 2:12
**mean** 21:5 23:19 25:7
   39:15 40:11 43:9
   55:2,5 87:4 97:15
   104:9,17,18 109:20
   110:15
**meaningful** 77:1
   81:17

**means** 40:15,16 41:1
   99:9,10 104:1,10,21
**meant** 25:11
**measure** 99:21
   102:23
**measured** 51:10
**measures** 103:17
   116:21
**measuring** 103:13
**medical** 46:22
**medication** 83:16
   95:17 96:3,7 98:12
   98:14 105:8 121:21
**medications** 90:5,17
   90:20 91:3,6,16,21
   92:6,11,15 93:6,11
   96:1,6,13 97:7 98:5
   98:7,18,21 100:7,11
   100:20 101:1
   109:13,15 110:3
   121:3,4,17,18,22
   122:8,11 123:12,21
   124:2,22
**medicines** 58:24
   116:22 122:23
   123:14
**meet** 15:4 19:6 20:21
   21:7,11 85:14
**meeting** 12:21 15:15
   20:10 21:16,17
**memorized** 93:4
**mentioned** 11:5
   109:4
**met** 16:16 19:15,18
   19:20,21 20:3,4,5
   20:19 21:8 109:17
**metaanalyses** 74:20
**metaanalysis** 33:22
   34:3,11 35:2,16,19
   36:2,14 43:20,23
   44:1,15 45:12 46:19
   47:3,7,10 48:12

56:17 60:10 63:13
   66:6,9 67:8 68:1,12
   68:15,20 69:2,3
   71:5,19,24 72:16
   73:8,12,20 74:6,14
   75:1 76:4,8,14,18
   80:24 88:23 89:4,5
   89:17
**methodologies** 17:9
   17:23
**methodologist** 17:5
**methods** 74:16,21
   75:7 76:20 77:7
**middle** 38:17
**minimum** 78:22
**minutes** 111:24,24
   114:22 116:6
**mislead** 26:22 32:14
**misleading** 25:15,17
   25:17 26:2,5,7 27:1
   28:4,23 29:13 30:18
   30:21 32:15 78:10
**misremembering**
   20:6
**missouri** 2:16
**misstate** 72:6
**misstates** 14:19
   24:12 26:8 67:13
   72:4 73:21,23 92:16
   110:16 114:17
   115:9 121:6
**misunderstood**
   88:18
**mixing** 20:3
**mmhmm** 19:10
   21:15
**moment** 7:11 18:17
**month** 7:15,16,19
**morning** 5:22 8:1 9:3
   9:15 18:5 24:2
   35:18 86:4 88:14
   90:6 102:3 107:11

12

108:15 115:24
**motion** 37:8 126:6
**mouth** 77:8
**move** 29:21 32:18,20
    95:4
**moving** 83:8

_____

**N**

**name** 5:17
**named** 17:17,19,24
**napolitano** 2:11 5:1,1
**natural** 87:19
**nature** 27:2
**ndas** 58:24
**near** 69:21
**need** 8:16 64:20 81:3
    93:22 100:13 119:2
    126:4
**negative** 87:17,21
    104:12
**negatives** 87:14
**neither** 128:13
**neurontin** 1:6 4:12
    127:2
**never** 6:10 17:19
    99:2,3
**new** 2:4,13,13 16:12
    16:14 58:24
**newburgh** 2:4
**night** 19:24 97:23
**nonadherence** 70:18
**nonclinical** 84:5
**nonpharmacologic**
    98:3
**nonrandomized**
    83:10,12,20 84:14
    84:24 85:8
**notary** 128:5
**notated** 94:20
**note** 116:3
**noted** 127:16
**notes** 11:14,16,17,21

12:20 13:4,6,22,24
    14:10 15:2,5,12,14
    15:18
**noticed** 125:20
**noting** 99:22
**november** 26:21
    36:7,15,19 61:1
**null** 103:3,6 104:19
    104:20 106:16
**number** 4:16,17 6:13
    8:19 9:7 21:22
    22:19 23:8 37:1,2
    40:7 41:23 45:7
    47:18 58:14 67:10
    70:19,22 83:5 92:9
    94:20,24 100:6,8
**numbers** 43:9,16,19
    45:2 53:5,19 54:20
    55:23 56:1,1 57:16
    57:17 58:9 76:23
    98:21 100:8,13

_____

**O**

**obama** 30:9
**object** 32:17 34:21
    37:3 38:15 43:14
    46:23 54:5,6 56:9
    59:15 60:16 81:11
**objecting** 82:16
**objection** 14:18,19
    15:8 19:1,4 22:4
    24:12 26:8 27:13
    29:5,14 30:22 33:23
    35:3 36:3 43:5
    51:12,16 52:22
    53:13,16 55:9 56:8
    56:11,19 57:1 67:13
    68:23 71:8 72:4
    73:21 75:2 76:9
    78:1 79:8 81:2,21
    92:16 96:16 97:12
    97:14 107:2 108:2

110:16 114:17
    115:9 116:15 117:9
    119:14 120:9,17
    121:6 122:13
**objections** 77:21
**obligation** 25:24
**observations** 11:11
    78:23
**observed** 78:5
**obstructed** 37:5
**obtain** 43:2 58:23
    95:24 98:3,4 102:21
**obtained** 45:11 93:20
    94:4 97:9
**obtaining** 66:7
**obtains** 66:8
**oclock** 53:2 128:7
**oconnor** 1:24 128:4
**odds** 79:20,21 104:22
    106:15
**offered** 42:16 69:22
    70:10
**offhand** 88:12
**office** 16:9
**offices** 4:8
**offlabel** 41:4
**oh** 20:23 21:24 40:16
    50:16 113:6
**okay** 6:11 12:6 14:12
    16:4 17:2,13 18:4
    18:15,17 21:2,13
    32:12 33:1,9 34:19
    35:15,18,21 37:9,21
    40:2 41:20 42:7,24
    43:22 44:11 46:18
    50:20 51:6,8 54:11
    57:17 58:13 59:6,16
    66:24 67:1 68:2
    69:15,17 70:4 71:15
    72:10 73:6 74:10
    77:19 79:17 80:12
    80:20 81:10 82:4

83:8 84:4 86:21,23
    88:14,24 90:4 92:22
    94:9 97:21 99:8,22
    102:3,17,20 103:16
    105:1 109:5,12
    112:10,21 113:11
    113:15 116:2
    118:24 119:20
    120:22 124:12,21
    125:8
**once** 20:5 39:18
    59:21
**ones** 113:10
**open** 63:6
**opened** 62:22
**operator** 4:4
**opined** 34:14 36:18
**opinion** 41:23 47:1
    48:14 49:6,7,10,14
    65:13 95:5 97:8
    98:6,22 100:5
    116:14,17,18
**opinions** 22:13 36:14
    36:20 37:12 49:9,11
    50:2,13 94:10
**opportunity** 49:1
    61:9
**opposed** 27:11,22
    29:2 102:12 116:23
**organize** 18:18
**original** 71:18,19
**outcome** 123:3
**overoptimistic** 74:9
**overstate** 83:18

_____

**P**

**page** 3:2,9 12:15
    18:20 23:22 24:15
    24:18 26:14 27:4
    32:22 33:16 37:20
    39:11,23 42:4,5,12
    42:13 45:14,21,22

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

13

62:24 63:6 66:22
67:1,1 69:15,21
70:14 72:3 73:5
78:2 83:8 90:9
93:16,17 112:7,8
113:20 114:3 127:7
pages 38:17
paid 7:7
pain 91:6 96:7
121:17,18,20,22
122:8,10 123:12,13
123:21 124:2,22
paper 18:23 22:14
24:4,5 55:1 90:15
95:20 99:13 101:16
101:18 103:14
105:13,24 106:18
110:7 117:17,18,20
118:9,16 119:8
papers 101:9
paragraph 36:18,20
37:1,2,12,16,23
38:7,11 42:5,10,11
45:14,21,22 46:3
47:5 48:21 49:5,7
49:18 50:3,4,6 52:1
61:13 65:19 78:2
112:6
paroxetine 89:6,6
part 43:22,23 66:11
77:20 88:8,22
102:16 113:7
particular 11:6,12
40:21 44:19 58:11
62:15 78:8
parties 128:14,16
partners 2:3
passage 25:4 52:16
patient 13:9,10,15,19
13:22 14:7,12,14,21
14:23 15:15,18,24
53:9 100:23 113:21

114:2,5,14 115:15
115:16,18 120:24
121:4
patients 40:7,16,22
41:14,15 52:4,5,10
52:19 55:19 62:10
65:14 67:10 70:16
70:19,23 98:11
108:8 114:9 116:23
121:12
patterns 11:7 125:3
pause 83:3
pay 32:11 80:6
peer 78:14
pen 18:22
pending 15:9 35:8
60:15 62:3
people 40:23 84:17
87:18 121:20
percent 25:18 29:12
30:19 31:18 46:6,6
46:17,17 47:23,24
48:8 51:24 52:3
54:12,21 57:9,9
58:1,3,17 79:12,20
80:6 85:13,17
performed 17:22
43:13 76:21
period 30:4,5 70:20
permission 63:18
64:19
person 115:13 128:7
personal 17:16
personally 28:24
persons 83:14
perspective 39:20
pertaining 15:18
pertains 44:10
pfizer 2:7 4:14,22,24
5:2
pharmacoepidemi...
82:9 83:19 84:7

100:10 106:12
108:13
pharmacoepidemi...
6:3,7 89:13 96:12
pharmacoepidemi...
83:23 84:2 93:10
113:16,18 124:17
pharmetrics 9:16,20
10:3,8,15,17 11:4
11:20 12:22 13:5
16:6,8 18:7,11
26:17 88:15,17,21
89:8,18,21 91:14
93:20,24 94:4
105:13 114:6
116:20 117:5,12
119:21 120:4,6,13
122:2,4 123:17,20
phone 21:22 22:3
photo 5:10
phrase 25:4,6 26:19
physically 19:15,18
20:3,4,5 21:10,11
22:9
pick 24:23 63:3 126:2
126:3
picked 63:11,16
126:1
picking 27:11,16
81:23 123:7
picture 78:6
piece 108:17
pin 61:5
place 64:19
placebo 46:7,17 48:2
48:6,8 51:24 52:3,5
52:6 54:12 57:9,20
62:12 65:21 104:14
placed 63:16
places 43:18
plaintiff 9:10
plaintiffs 2:2 5:4

17:16 18:2
planning 81:18
82:21
please 4:18 5:6,17,18
6:17 12:1,3 23:11
32:18 41:6 45:16
46:22 60:13 61:18
65:9 66:20 74:1
90:10
pleased 108:15
plugged 43:10
plus 87:23 95:8
point 15:22 25:1,14
27:6,19,20,20 31:1
32:4 46:10 49:22
51:1,3 52:12 54:1,2
63:1 66:23 67:12,20
91:13,23 113:10
115:15,15 125:16
125:24
pointed 13:13 14:3,4
50:1 62:24
points 91:12 109:19
pollard 1:24 5:6
128:4
pooled 73:7
population 41:16
44:19 52:3,4,6
116:12,13 117:5,8
117:12
populations 53:9
65:21 106:16,24
107:15
positive 87:17,21
positives 87:13,19
possession 111:7,9
111:16
possibilities 74:4
possibility 72:9
124:22
possible 96:3
possibly 117:11

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

14

**posthoc** 79:24 81:10
82:6,10
**potential** 72:14 74:12
74:22 75:19,21
100:22
**potentially** 73:12
**power** 39:8 42:7,9,13
42:16 43:3,11,13
44:9,15 48:18 50:12
51:11,14,16 57:24
58:20 59:2,8,20
66:8,15 67:9 68:1
69:11,22 70:9 71:7
71:24 72:13,17
73:18 74:3,8,14
77:21 78:5 79:10,13
79:24 80:10,20 81:1
81:7,8,9,14,15 82:6
82:10,11 112:11,14
112:15 113:3,4,11
**practice** 40:9 70:24
117:22
**practices** 1:7 4:13
127:2
**precise** 16:4
**precisely** 9:19
**predicate** 50:12
**preference** 87:19
**preparation** 113:4
**prepare** 9:12
**prepared** 9:9
**preparing** 8:1 113:1
**prescribed** 41:4 99:2
100:20 121:19
**prescribing** 125:2
**prescription** 92:10
123:9 124:14,19
125:2
**prescriptions** 98:15
**present** 81:9
**presented** 54:20
55:22

**president** 30:9
**presumably** 27:24
55:24
**presume** 28:9 115:12
**pretrial** 81:17
**previous** 42:10,11
70:14
**printed** 24:15
**prior** 18:21
**probably** 20:24
39:16 63:18 72:1
79:6
**problem** 39:17 59:17
70:11 79:10 87:10
**problems** 33:15
39:13,22 42:17
69:24 70:14 71:16
72:24 78:21 106:10
108:11
**proceeded** 56:2
**process** 14:2 53:22
**produce** 15:17 23:10
111:4,10,13,17
**produced** 6:23 11:24
103:5
**products** 1:7 4:13
127:3
**professional** 5:18
128:22
**professor** 4:11 5:19
**prominently** 92:3
**proper** 86:12
**properly** 78:16
**proportion** 100:11
**protective** 24:6 25:6
26:18 27:2 102:6,9
103:18 105:2
120:15
**protocols** 58:23
**proves** 24:5
**provide** 8:13 28:12
78:6,22 101:14

**provided** 26:3 28:6,8
32:14 64:21
**provides** 105:19
**providing** 29:11
**psychiatric** 106:14
106:16,24 107:15
108:8
**psychiatrist** 96:12
122:7,23 125:17,19
126:2
**psychological**
100:22
**psychotherapy** 98:4
**psychotropic** 90:16
91:2 96:8,9 98:5,6
98:11,14
**public** 128:5
**publication** 88:6
101:17,18
**publications** 78:15
**published** 115:11
117:17,20 118:9
119:8
**pull** 30:2
**pulled** 30:7
**pulling** 30:6
**purchase** 93:24 94:6
119:22 120:1 121:3
125:18,18
**purchased** 119:21
120:23
**purpose** 10:3
**purposes** 44:8 66:6
66:15 82:22 84:3
88:5
**pursue** 30:15
**pursuit** 67:8
**put** 7:24 14:10 30:18
31:12 62:23 63:4
77:8 85:10 98:9
112:18 124:11
125:11

**putting** 18:22
**puzzle** 108:17

---

**Q**

**qualitative** 33:20
35:1
**qualities** 86:7
**quantitative** 99:17
100:3
**quantitatively**
100:16
**quarter** 27:12,22
29:3
**quash** 126:6
**queries** 10:7
**question** 19:4 24:3
25:19 28:21 29:18
29:20,23,24 30:11
30:14,15 31:6,15
32:7,12 34:17 39:19
39:24 47:8,9,10
50:21 53:15 54:1
55:3 56:14 58:18
60:7,12,15,17 61:7
61:10,17,23 62:3,5
65:8 76:11 84:3
87:15 91:19 104:3
108:4 114:24 115:1
115:1 119:6 120:3
122:1 123:19 124:6
124:7
**questioning** 67:21
**questions** 6:1 31:24
32:19 34:20 35:9
38:13 51:4 116:5,6
116:7 119:1,3 125:9
126:10
**quite** 6:22 23:19
40:17 102:17
**quote** 27:8,10 28:7,8
30:7 32:15 69:20
78:2 90:24

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

15

quoting 28:20

**R**
race 79:19 81:19
raise 126:3
raised 55:18 108:13
random 78:15,20
randomization 84:9
randomized 33:10
  33:13 35:1 39:1,6
  39:12,21 41:13
  71:17 72:15 73:19
  74:12,19,23 76:4,17
  83:15 84:1,5,6,10
  84:23 105:21 106:9
  108:12,21 117:7
range 7:21 78:6,17
  78:22
rank 85:7
rare 99:4
rate 7:4 47:22 52:19
  53:8 54:13 55:7
  56:18 65:15 66:5
  69:12 107:17
ratio 57:19 104:13,15
  104:22,23,24
  105:11 106:15
reach 81:8 102:24
read 24:14,17 27:21
  28:2 37:20 41:5,7
  45:16,19 46:1 49:7
  55:15 60:12,14 62:2
  65:10 78:11 89:1
  101:7,15,19 127:14
reader 26:6 27:10,21
  119:11
readers 25:7 26:22
reading 25:21,22
  46:1 58:11 95:22
  115:4 119:12
real 41:16 116:21,23
  117:7

really 8:15 23:19
  37:19 39:3 82:2,16
  90:7 110:8 124:13
reason 103:14 127:7
reasonably 103:4
reasons 26:16 77:21
  85:18 87:24
recall 11:3 12:7 20:2
  21:11,24 44:2 55:16
  55:23 88:9,12 92:3
  92:12 102:2 109:24
  110:5 112:16 115:5
receive 10:19 40:8
  70:24
received 10:23,24
  62:11
receiving 98:11,13
recognize 26:16
recognized 113:17
  124:15,16
recollection 7:13
  19:22 20:12
recommend 77:6
record 4:19 6:16 9:7
  11:10 13:8,10 14:1
  31:8,12 32:18 64:13
  78:12 83:2,6 125:11
  125:11 126:18
  127:17 128:11
records 10:10 11:6
  115:19
redirect 119:3
  120:20
reduce 59:20 72:24
reduced 128:10
refer 63:20 66:16
  95:13
referenced 51:12
references 34:7
referencing 47:2
referred 69:1 121:10
referring 12:14

66:18 68:8 70:12,12
  71:11,13,14,17
  95:18 107:9
refers 73:7
reflected 23:5,6
reflective 41:16
reflects 24:10
regard 17:15 105:23
  113:2
regardless 62:11
regards 87:8
registered 128:22
relate 54:24
related 22:15 128:13
relates 1:10 4:14
relative 42:1 62:14
  98:12 100:8 104:11
  128:15
relatively 93:5 100:8
relevant 13:16 25:13
  98:11 110:1 123:18
reliability 84:23 85:1
  85:9,12 86:4,8
reliable 77:3,4 85:16
  87:2,8 98:7
reliably 77:11,12,13
relied 47:5 53:5,19
  59:3 60:22 63:12
  72:16 73:17
remain 70:20
remember 9:17
  11:15 21:4
remembered 12:12
remembering 20:11
render 48:20
repeat 117:1
rephrase 19:3
report 3:12,14 6:24
  8:9,11,14,22 9:8
  11:8,18 12:1,3 13:2
  13:3,8,17,20 14:10
  15:6,16 18:21,24

19:2,8,9,11,19 22:7
  23:23 24:9,13 25:21
  26:15 27:16 28:2,9
  28:19,22 30:18
  32:23 33:16,24 34:6
  34:6,8,10,12,15,20
  35:4,9,12,13,15,22
  35:23,24 36:7,13,15
  36:15,15,16,19
  37:11,13,18 38:1
  39:23 43:4 44:16
  45:5 48:15,24 49:2
  49:12,13,16,21 50:2
  50:8 53:6,20 55:4,8
  55:24 56:2,6 57:6
  60:23,24 61:11,21
  63:13,16 64:21
  66:21,22 67:21
  68:14 69:21 71:18
  72:3,21 73:13 76:7
  78:3 83:9 90:10
  95:7,19 98:24
  101:11,12,13
  107:14 111:14
  112:8,13,17 113:1,2
  113:5,6,7,8,9,20,24
  114:10,19 118:11
  119:9,13,18 125:23
reported 1:24
reporter 5:6 41:7
  60:14 62:2 65:10
  89:1 128:22
reporting 55:24 56:1
  87:11
reports 15:10,12
  19:12,13,13 22:14
  26:20 27:3 87:1
  88:2,4 90:14 99:12
  106:2 112:19
  113:13
represent 4:20
representative 40:8

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

16

70:23
**represented** 35:12
**request** 10:24 91:13
    111:3,15
**requested** 70:21
**require** 75:7
**research** 55:6,11
    65:24
**researcher** 76:14
**researchers** 76:2
**respect** 34:14 37:14
**responding** 27:9
**response** 25:19
**rest** 25:23
**restate** 72:10
**result** 80:13 97:10
    102:4,20 103:12
**results** 18:12 40:9,10
    41:2 44:14 71:1,2
    73:17
**retrospective** 86:21
**return** 77:22
**reveal** 93:21
**review** 3:15 10:3
    13:16 15:19 17:8
    35:11,24 46:22
    110:11
**reviewed** 9:16 34:3
    34:19 35:19 37:24
    47:7 56:5 60:18
    61:5 78:14 113:21
    118:7
**reviewing** 10:16 12:5
    17:22 23:14 45:18
    58:22
**richard** 2:8
**rick** 4:21 32:17 50:18
    54:3 63:9 65:6
    94:17 116:4
**ridiculous** 64:9
**right** 12:17 14:11
    19:21 37:20 43:1

54:22 56:16 58:4
    62:23 63:21 64:24
    71:20 82:12 86:1
    87:9 89:23 95:21
    103:23 113:9 126:9
    126:10
**rightfully** 80:7
**risk** 42:1 44:17,21,24
    48:11 51:16,18
    55:22 59:20,22 60:1
    60:4,8 62:8,9,11,13
    62:14,15,16,17 68:3
    68:22 87:16,20
    104:11,11,13,15,21
    104:23,24 105:15
    106:3,23 108:7
    120:8 123:22
    124:23
**risks** 55:21
**rmb** 2:10
**robert** 12:17,19
**robinson** 2:4
**role** 17:3
**ronald** 1:11
**ross** 89:11
**routine** 11:2
**routinely** 58:21 59:2
**rpr** 1:24 128:4
**rule** 97:19
**run** 10:7

---

**S**

**safe** 126:13
**sales** 1:6 4:12 127:2
**sampling** 57:19
**sander** 1:16 3:3 4:11
    5:9,19 127:1,23
**saris** 37:8
**sarokin** 37:8
**satisfied** 80:22 86:9
**satisfy** 81:12 85:14
**saw** 52:14 77:14

80:15 91:13
**saying** 22:17 28:6
    30:7,8 50:16 51:19
    58:16 59:21 66:24
    66:24 68:13 72:22
    79:19 80:5 92:24
    102:10 108:16
    121:22
**says** 26:13 32:8 37:2
    37:15 42:4 46:3,24
    47:4 51:21,24 53:7
    55:3 57:23 58:13
    59:6 66:9 94:18
**scale** 105:19
**schedule** 18:19
**scientific** 25:7 58:2
**scope** 33:24
**screen** 10:11 12:13
    110:6,7
**sec** 48:13
**second** 29:4 46:4
    78:2 82:24 116:9
**section** 26:20 34:14
    34:15 36:6 39:8
    111:22
**see** 12:4 19:20 25:23
    28:15 34:22 42:22
    52:15 57:21 61:1
    63:12 65:4,24 68:21
    90:18 91:21 95:18
    104:10 105:9
    115:14 118:18
    119:17 120:2 123:2
**seeing** 92:3 122:5
**seen** 17:13 100:9
    121:9
**selected** 44:19
**selecting** 96:13
**semantics** 83:21
**semicolon** 30:4
**sense** 22:20
**sent** 11:22 12:2,9

**sentence** 30:3,3,6
    41:6 46:1 57:4
    69:20
**sentences** 49:18
**seriatim** 70:8
**serious** 33:10
**service** 17:22
**services** 7:8
**set** 26:1 50:12 72:3
    76:7 91:16 117:19
    128:19
**seven** 45:15
**severe** 117:11
**shades** 86:1
**share** 63:23 64:22
    65:2
**sharing** 65:3
**shb** 2:17
**sheet** 127:6
**shook** 2:15
**shoot** 30:9
**short** 31:23 93:5
**shouldnt** 26:2
**show** 50:7 115:16
**showed** 11:7 15:15
**showing** 10:20 62:12
    62:18,20 115:18
**shown** 94:1 101:3
**shows** 103:12 104:4
**side** 28:23
**sidetracked** 112:5
**signal** 64:1,3
**signed** 125:21
**significance** 103:9
    105:20 106:8
**significant** 102:11,13
    102:16,19,21
    107:16
**similar** 88:20
**simply** 46:9 76:12
    86:24 97:2
**single** 30:2

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

17

**sir** 10:4 11:4 12:10
  12:14 13:11,13
  16:21 18:21,24
  20:10 21:23 23:3
  24:21 26:13 28:19
  30:15 38:13 45:14
  45:17 46:8 47:13
  51:13 52:2,8 54:11
  61:18,23 62:5 65:13
  73:4 78:4 83:9 91:7
  104:9 112:17
**sit** 52:18
**sitting** 16:10
**situation** 87:23
**six** 8:5
**size** 42:20 43:12
  44:12 51:9,15 62:15
  66:7,8,14 70:2
  80:24 82:11 105:11
**sizes** 81:23
**skadden** 2:12,14
**slate** 2:12
**slater** 2:19 4:4
**small** 8:24 100:8,11
  121:11
**snapolit** 2:14
**socalled** 46:14 48:3
  57:5,7 59:10
**solely** 97:3
**somebody** 30:8,8
**sorry** 23:1 64:20
  95:11 97:13 112:7
  114:4 117:1 124:8
**sort** 16:24 22:14
**sorts** 76:5 90:2
**sounds** 25:8
**source** 94:5 115:21
**sources** 43:19 86:2,5
  86:10
**south** 2:9
**spacey** 19:23
**speak** 21:19

**speaking** 4:4 90:6
**specific** 11:5 43:23
  87:5
**specifically** 11:3
  13:16 39:11 60:22
  114:11
**speculation** 75:3
  96:17 97:13,15
**spend** 17:1 18:17
  21:3 23:14
**spending** 126:12
**spent** 11:20 20:23
  21:17 22:21 23:8,19
  90:6 97:23
**split** 23:19 24:20
**spoke** 5:22 24:2
  115:24
**spontaneous** 87:1,11
  88:2,4
**spot** 24:23
**square** 2:12
**sr** 1:11
**ss** 128:2
**standard** 26:1 33:15
  58:2,16
**standards** 103:5
**start** 30:10 45:24
  46:3
**started** 80:5
**starting** 29:16
**state** 4:19 5:17 67:18
  67:23 90:12 98:12
**stated** 67:15 118:8
**statement** 31:12 46:8
  58:5,11 66:1,2
  90:23 93:15 94:5
  97:21 99:17,19
  100:15 103:7
  105:12,24 106:20
  118:12 123:11
**statements** 32:18
  93:22 127:18

**states** 1:1 4:15
  100:23
**statistical** 3:15 46:22
  57:24 59:8 103:9
  105:19 106:7
  122:14,17,18,21
**statistically** 102:10
  102:13,15,19,21
  107:16
**statistician** 6:5 33:1
  123:13
**statisticians** 82:5,10
**statistics** 5:20
**step** 117:16
**steven** 2:11 5:1
**stimulants** 91:4
**stop** 24:24
**street** 1:20 2:9 4:9
**strike** 14:13 38:17
  72:23 84:21 125:7
**strom** 113:15
**strong** 103:8
**structural** 10:12
**structure** 10:10 16:5
**structured** 10:21
**studied** 83:16
**studies** 42:19 70:1
  71:13,15 80:9 83:10
  83:13,14,19 84:8,10
  84:18,24 85:7,8,14
  87:12 88:10,19,21
  89:18,20,21 90:2
  93:9 100:10 108:14
  114:11 116:22,22
**study** 70:20 79:12
  80:19 81:18,19
  82:15,20 83:15 85:9
  85:12,17 86:13,14
  86:15,19,24 87:7,20
  87:22 88:5 89:14,14
  89:21 96:8 98:8
  104:4 105:13 106:1

  106:12,21 107:8,13
  114:4,10,14,15,16
  114:23 115:1,6,11
  115:12 116:13
  117:20 118:10,16
  122:9 123:18
**studying** 124:20
**stuff** 10:22 22:15
  34:4 61:5 79:2
  116:8
**subject** 22:9 108:9
  115:20
**subjects** 41:24
**submitted** 10:22
  91:10
**subpoena** 126:7
**subpopulation**
  106:14
**subscribe** 127:16
**subsequent** 12:17
**subset** 121:11
**substitute** 78:8
**succeed** 75:12
**succeeded** 80:11
**suffer** 33:15,18,19
  39:13,17,21 87:12
  87:14
**suffering** 71:16
**sufficient** 59:8
**suffolk** 128:2
**suggest** 31:24 106:8
**suicidal** 42:1 48:11
  52:19 59:23 60:4,8
  105:15 108:7
  121:23 123:14,22
  124:23
**suicidality** 46:5,16
  47:23 48:4,5 57:8
  57:14 120:8,16
**suicide** 24:6 102:11
  102:13 103:13,17
  104:4 106:4,23,23

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

18

107:17 116:13
124:3
summer 1:20 4:9
superior 87:22
supplemental 26:20
27:3 90:14 95:19
99:12 101:10,12,13
106:2 107:14
113:24 118:11
supplied 76:23
support 99:18 107:1
108:22
supported 108:10
109:6,8
supporting 106:6
supports 105:14,18
106:2,21 108:5
suppose 6:8
sure 7:18 40:3,12
45:24 65:6 89:16
92:12 102:17 104:2
107:9 111:20
surprised 63:15
susan 1:12
swear 5:6
swing 102:5
sworn 5:11 128:8
system 87:12

T
take 4:10 11:14 15:2
15:20 37:4 42:17
44:4 45:17 49:2
50:19 51:5 52:16
69:17,23 70:10
79:14 81:6 100:21
111:18 117:16
126:4
taken 11:17 74:3
88:19,20 119:22
120:4 123:4 127:4
talk 22:11 34:11 40:6

47:11 50:17 56:17
70:6 79:5 83:9 86:2
90:4,8 103:14
114:21
talked 11:8,13 22:2
22:12 34:12 86:3
109:18
talking 37:22 39:6,7
50:5,11 62:7 68:14
95:14,15,16 106:17
114:2
talks 37:21
tape 83:5 126:17
task 88:9
telephone 22:18,22
tell 9:2,19 12:2 22:2
54:23 123:21
telling 38:14 53:23
55:5
ten 8:4,5 111:24,24
terminating 64:5
terms 8:2 22:9 23:13
40:5 55:7 58:22
60:4 68:1 80:14,14
84:24 85:8,15
test 18:12 49:8 50:13
124:1,6
tested 41:2 52:11
53:9 56:22
testified 5:12 35:18
47:6
testify 128:8
testifying 17:10
testimony 9:17 14:19
26:9,24 52:2 54:11
67:14 72:5 73:22,23
85:5 92:13,17,19,20
95:9 110:17 114:18
115:10 121:7
128:11
textbooks 78:15
thank 7:2,23 8:18

16:2 17:20 45:17,23
125:9 126:11,15
thats 6:20 12:7,16
17:20 18:3,9 20:17
24:15 25:13 29:7
30:10,13 31:13 34:9
34:12 40:1,2 47:9
47:16 48:23 50:24
51:16,17 54:9 58:8
58:18,19 59:12,15
61:10 62:6 64:8,12
65:20 69:7 70:5
72:10,18,19,19 77:7
77:24 79:19 80:18
81:7 83:21 89:13
90:1 92:2,22 94:2
95:21 97:19 99:22
101:23 102:8 103:7
104:11,12,15,16
107:7 110:1 115:21
117:22 118:22
120:19 122:1,2
123:18 124:12
125:8 126:8
therapy 107:20
theres 6:24 47:8
68:11 75:17 84:13
84:22 85:3,18,22
86:7 87:19 90:23
105:14 120:7
theyre 12:23 33:14
40:23 81:17,17
85:20 98:13 110:24
114:11,11 115:12
122:3,6
thing 37:11 54:6
116:3 122:3 125:11
things 11:1,5 19:14
25:13 61:3 65:5
67:15 97:2,17 99:2
99:24 101:7,10
108:16,18 123:2

think 7:22 8:15 9:14
11:7,16,23,23 18:5
20:3,4 21:10,12
25:13,15,17,20 26:2
26:11 27:6 28:22
48:14 58:10 67:15
77:7,23 82:1 85:2,6
87:9,15 89:9,11
91:10 92:1,8,8
94:19 107:5 111:23
117:22 121:8
125:12 126:8
thinking 42:1 48:11
52:20 59:23 60:5,8
105:15 106:24
108:7 121:24
123:15,23 124:23
third 42:5 46:2
thought 6:10 12:11
25:1 63:5 112:18
thousand 93:11
121:19
thousands 93:6
three 29:20 70:19
71:3 72:2 73:13
88:11
threshold 103:1
throwing 31:18
thumb 97:19
thursday 125:16
tight 18:19
time 4:7 7:24 11:20
16:23,24 17:1 18:18
20:7,23 21:20 23:2
23:5 31:24 37:21
44:5 45:17 55:3
79:4 83:1,6 85:13
87:5,6,18 90:6
110:24 111:21
126:17
times 2:12 17:17
18:23 19:6,15,17

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

19

21:19 29:20 31:15
 31:15 53:5,18,18
 91:12 115:19
**tired** 117:2
**today** 52:18
**todays** 4:6
**told** 13:22 31:15 49:4
 53:4,18 55:1 61:13
 126:1,2
**tonight** 126:14
**top** 69:21
**topic** 35:4
**topiramate** 43:17,24
 44:8,12 45:1 46:5
 46:15 47:24 48:5,10
 49:15,23 50:9 51:11
 51:19 52:7,21 53:10
 54:15,15,17 55:7
 56:3,5,18,23 57:7
 57:15,20 58:1,7
 59:10,22 60:3 62:8
 62:12 65:14 68:10
 68:12,22
**tossed** 13:2
**total** 21:5
**tour** 10:15
**track** 70:6
**traditional** 58:2
**tranquilizers** 96:9
**transcript** 127:14,17
**treated** 33:15 104:13
**treatment** 40:9 70:17
 70:24 73:2 83:15
 98:3
**treatments** 90:22
 99:11,15
**trend** 103:18
**trial** 33:4 40:19,22
 41:2,3,13,15 50:15
 58:23 73:1 77:17
 103:12 105:21
 106:9 108:21

116:24 117:7,12
**trialist** 33:6
**trials** 33:11,14,21
 34:21 35:2 39:1,6
 39:12,17,21 40:17
 41:24 43:24 44:8,18
 44:22 45:1 52:7
 53:10 54:17 55:19
 56:24 59:4 62:10
 65:15 67:11 71:6,17
 71:23 72:1,15 73:2
 73:6,11,17,19 74:13
 74:19,24 76:4,17
 81:23 83:24 84:2,6
 84:6
**tried** 77:9
**trip** 126:13
**trouble** 107:10,11
**true** 25:11 46:8 82:4
 83:17,18 115:17
 128:11
**truth** 128:9
**try** 53:24 54:7 82:15
**trying** 11:15 18:18
 26:5 42:3 55:3 61:4
 67:5 87:9 97:23
**turn** 18:20 23:22
**twenties** 7:11
**twice** 37:5
**two** 21:5,6,9 34:14
 53:23 65:20 70:14
 71:3,12 72:2 73:13
 82:13 83:5 114:22
 116:4 119:1 126:17
**twoday** 21:17
**twohour** 61:14
**typed** 13:2
**typewriting** 128:10
**typical** 117:12

**U**
**uncertainty** 115:22

**unclear** 92:23
**underlie** 39:1
**underlying** 76:3,13
 77:10
**undermining** 50:14
**underpowered**
 82:19
**understand** 20:1
 27:10 42:3,6 67:6
 71:21 72:11 76:11
 77:19 78:13 80:2
 92:19 95:5 103:24
 107:20 113:17
 124:9
**understanding** 67:4
 67:12
**understood** 40:3
**undertake** 18:6
 35:24
**united** 1:1 4:15
**university** 5:20
**unreal** 49:24
**unreliable** 66:14
 98:24
**untreated** 104:14
**update** 7:1
**updated** 6:24
**upper** 81:4
**usage** 25:3,5 27:2
**use** 16:8 26:19 41:4
 44:14 46:24 48:18
 66:5,5 67:24 75:8
 76:20 82:21 84:17
 88:21 102:9 103:21
 116:11,21
**useful** 89:14
**usher** 80:7
**usual** 97:19
**usually** 39:13,15,21
 85:13,14
**utilizes** 66:14

**V**
**vacuum** 61:6
**vague** 29:5
**value** 45:3 51:22
 79:13,14 104:19,20
 106:16
**values** 78:17
**variables** 125:4
**various** 13:21 14:6
 81:22 84:17 86:5
 91:5,11,12,12
**vast** 84:13
**verified** 14:9
**verify** 15:13,16 18:8
**versus** 4:14 104:14
 110:7
**video** 4:3,5
**videographer** 2:19
 4:3 5:5 83:1,4 112:2
 126:16
**videotaped** 1:15 4:10
**view** 74:22
**voice** 4:18

**W**
**wait** 58:16
**walked** 13:21 14:6
**walker** 89:12
**want** 8:8 15:16,17
 18:17,20 19:4 23:22
 28:11 30:14 31:19
 32:1 36:6,19 37:1
 38:10,13 40:2 46:18
 50:17 61:7,17 64:7
 64:11 65:8 69:5
 72:11 77:8 85:5
 90:4 92:18 93:17
 95:18 100:16
 101:11 103:24
 104:1,3 107:9
 110:18 112:4
 114:20 116:5 124:1

In Re: Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

20

124:5 125:11
**wants** 81:9
**wasnt** 28:9 62:20
**way** 20:13 32:12 46:2
  65:17 67:16 74:10
  75:13,17 77:20
  85:10 87:9 91:10
  95:14 97:10 98:9
  102:5 119:11,23
  124:11
**weak** 103:7,8
**weaker** 105:19 106:7
**weakly** 108:10 109:6
**weaknesses** 108:19
**wellknown** 89:13,24
  90:3
**went** 9:21 10:9 25:9,9
  25:12 80:4
**weve** 61:11 108:11
  121:10
**whats** 9:6 27:20 35:9
  54:1,2 59:17 68:8
  69:19 82:2 87:2
  92:7 124:19
**whereof** 128:18
**white** 1:19 4:8
**wider** 97:18
**width** 78:18 81:4
**williams** 1:19 4:9
**willing** 76:1
**win** 79:21
**window** 61:14
**winning** 80:6
**withdraw** 19:4 64:13
  64:17 97:13
**witness** 5:7 7:8 12:5
  18:1 27:7 34:5
  45:18 48:18 50:15
  53:23 63:17 64:2,4
  126:15 128:12,18
**witnesses** 17:23
**won** 81:20

**wont** 38:15 76:13
  78:11
**word** 18:16 27:15
  46:9,11,12 77:4
  102:9 103:21
**words** 27:16 66:7
  67:23 77:8 86:11
  121:1
**work** 16:24 17:15,24
  18:8 36:1 88:16
  97:17
**worked** 88:15,19
**working** 20:24 21:18
  71:6 122:8
**world** 41:16 116:21
  117:8
**worth** 20:24
**wouldnt** 28:13 81:12
  96:22 98:9 115:7
**writing** 51:22 63:13
**written** 28:1
**wrong** 17:3 24:7 44:3
  51:8
**wrote** 40:13 49:22

_____
**X**
_____

_____
**Y**
_____

**yeah** 13:7
**year** 9:24 125:20
**york** 2:4,13,13 16:12
  16:14
**youd** 98:14 104:10
**youre** 17:4 18:19
  19:15 25:16 26:4
  27:8 28:22 29:15,19
  30:20 31:1,23 32:5
  32:9 33:6 34:3
  38:16 40:12 45:21
  49:18 50:13,16
  51:19 53:2,21,22,23
  56:13 57:17 59:21

60:20 61:4 63:9
  64:4,16 65:5 66:18
  66:24 67:6,21 68:8
  71:14,22 72:22
  79:23 81:15 95:5
  100:15 103:13
  107:8 114:2 124:20
**youve** 7:4 17:24 26:1
  29:20 31:14 37:5
  51:11 61:15,24
  68:19 75:13 84:18
  85:23 107:12
  109:12 111:23
  117:2

_____
**Z**
_____
**zero** 104:12

_____
**0**
_____
**0** 104:21,21
**00** 53:2
**000** 7:20 8:6 14:15
**02110** 1:20
**0410981** 1:4 4:17

_____
**1**
_____
**1** 3:10 6:13 38:17
  48:6 57:20,20
  104:21,22 112:1
**100** 1:20 4:9 85:13,17
**10036** 2:13
**119** 3:5
**120** 3:6
**12550** 2:4
**13** 24:15
**131** 14:15
**15** 79:21 90:9 93:17
**15th** 101:13
**1629** 1:3 4:17
**17** 26:20
**18** 24:18 46:17,17
  48:6,8 57:9,9

**19** 3:13 12:15 26:21
**19th** 45:5

_____
**2**
_____
**2** 3:11 8:19 9:7 12:2
  26:15 32:22 33:16
  39:11,23 42:4,18
  67:1 70:11 72:3
  73:5 78:21 112:6,7
  112:8
**20** 7:20 12:15 24:10
  39:23 90:9 113:20
**2007** 6:20
**2008** 19:9 26:21 34:8
  35:12,23,24 36:7,19
**2009** 1:22 3:11,13 4:6
  9:8 12:19 19:7,11
  19:19 26:21,24
  35:13 45:6 60:23
  94:2 95:20 99:13
  117:18 127:4,20
  128:7,19
**20th** 2:9
**21202** 2:9
**2127353000** 2:13
**21st** 1:22 4:6 21:14
  127:4 128:6
**22nd** 128:19
**23** 47:24
**24** 24:10,15 69:24
**25** 24:17 25:18 29:12
  30:19,19 31:18
**2555** 2:16
**27th** 12:18
**29th** 6:20 12:19

_____
**3**
_____
**3** 1:22 3:13 4:7 37:20
  38:17 42:4,5,12,13
  45:7 67:1,1 69:15
  69:21 78:2 128:7
**30** 1:22 7:20 128:7

In Re:  Neurontin Marketing, Sales Practices and Products Liability Liti v. Neurontin Products Liability
Sander Greenland, Dr.P.H. - July 21, 2009

**31** 3:11 4:7 18:24
   19:19 60:23
**31st** 8:22 9:8 19:7
   35:13 78:3
**32** 46:6 51:24 52:3
   54:12,21
**3rd** 94:2 95:8

---
**4**

**4** 3:15 42:18 47:18
   70:11 78:21 83:1,6
   83:8
**41** 126:17
**4107834004** 2:10
**436** 2:4
**45** 3:14
**47** 3:16
**48** 83:1

---
**5**

**5** 3:4 26:21,24 113:20
   126:17
**50** 112:1
**500** 7:5
**53** 83:6

---
**6**

**6** 3:10 53:2
**63** 46:6 47:23
**641082613** 2:16

---
**7**

**7** 8:6 45:21,21,22

---
**8**

**8** 3:12 37:12,16,23
   38:7,11 39:8 45:22
   46:3 47:5 48:6,21
   49:5,7,18 50:3,4,6
   52:1 57:20 61:13
**80** 58:17
**8006341212** 2:5
**8164746550** 2:17

**85** 58:1,1,3 79:12,20
   79:21 80:6

---
**9**

**9** 23:22 26:14
**928** 27:4