EXHIBIT 4A

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                          )
                                ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 72
AND PRODUCTS LIABILITY LITIGATION    )

DAUBERT HEARING - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE

United States District Court

1 Courthouse Way, Courtroom 19

Boston, Massachusetts

July 23, 2009, 9:10 a.m.

LEE A. MARZILLI

OFFICIAL COURT REPORTER

United States District Court

1 Courthouse Way, Room 7200

Boston, MA  02210

(617)345-6787

**2**

1  A P P E A R A N C E S :

2

FOR THE PLAINTIFFS:

3

ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4  and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5

6  FOR THE DEFENDANTS:
7  DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.

8

MARK S. CHEFFO, ESQ. and STEVE NAPOLITANO, ESQ.,
9  Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
Square, New York, New York, 10036.

10

RICHARD M. BARNES, ESQ., Goodell DeVries, Leech & Dann,
11  LLP, One South Street, 20th Floor, Baltimore, Maryland,
21202.

12

ALSO PRESENT:  Chuck Vaughn, Trial Graphix.

13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1                    I N D E X

2

WITNESS            DIRECT   CROSS   REDIRECT   RECROSS

3

4  Robert Gibbons
5    BY MR. BARNES:        5
     BY MR. ALTMAN:                38

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1                  P R O C E E D I N G S

2        THE CLERK:  In Re:  Neurontin Marketing, Sales

3  Practices, and Products Liability Litigation, Civil Action

4  No. 04-10981, will now be heard before this Court.  Will

5  counsel please identify themselves for the record.

6        MR. FINKELSTEIN:  Andrew Finkelstein, Finkelstein

7  & Partners.  Good morning.

8        MR. FROMSON:  Kenneth Fromson.  Good morning,

9  Judge.

10       MR. ALTMAN:  Keith Altman.  Good morning, your

11  Honor.

12       MR. CHEFFO:  Mark Cheffo from Skadden Arps, your

13  Honor.  Good morning.

14       MR. NAPOLITANO:  Steve Napolitano from Skadden

15  Arps for Pfizer.  Good morning.

16       MR. BARNES:  Rick Barnes from Goodell DeVries,

17  your Honor.

18       THE COURT:  There's a slight problem here.  How am

19  I going to see the witness?

20       MR. BARNES:  He's going to be up in front of

21  the -- I can put him anywhere you want, your Honor.

22       THE COURT:  Yes, he's got to be on the witness

23  stand.  It's just too awkward otherwise.

24       MR. BARNES:  Well, I want him to actually spend

25  time just drawing --

**5**

1        THE COURT:  I know, but then they can't see.  It's

2  a ridiculous location.

3        (Discussion off the record.)

4              ROBERT GIBBONS

5  having been first duly sworn, was examined and testified as

6  follows:

7        THE COURT:  I don't want to go through his

8  credentials.

9        MR. BARNES:  I understand that.

10       THE CLERK:  Would you please state your name and

11  spell it for the record.

12       THE WITNESS:  Robert Gibbons, G-i-b-b-o-n-s.

13  DIRECT EXAMINATION BY MR. BARNES:

14  Q.  Good morning.  Dr. Gibbons, you are here today in

15  response to a Daubert motion.  Do you understand that?

16  A.  I do.

17  Q.  First, I'd like to start, you have a small binder in

18  front of you that I've placed in front of you.  Exhibit A is

19  the November 2008 report in the Bulger case, correct?

20  A.  Correct.

21  Q.  And Exhibit B is a copy of your March 19, 2009

22  supplemental report?

23  A.  Correct.

24  Q.  Doctor, would you tell us what changed between your

25  March 2009 report and the report that was served back in

**6**

1  November.
2  A.  There were a series of additional sensitivity
3  analyses --
4  (Discussion off the record.)
5  Q.  Okay, Doctor, my question is, quite briefly, what
6  changed between your November report and the March report?
7  Just briefly advise the Judge.
8  A.  Briefly, there were a series of additional sensitivity
9  analyses that were conducted and reported on here.
10  Q.  Did your March 2009 supplemental report change in any
11  way the opinions you expressed in your November report?
12  A.  No, they did not.
13  Q.  Doctor, there has been some references in the trial
14  that there was a May report that you filed.  Did you file a
15  May report, supplemental report in this case?
16  A.  I believe there -- I believe there was a May report
17  that --
18  Q.  Did you file a report in May after your March report, a
19  litigation report?
20  A.  I don't recall.  I --
21  Q.  The record will reflect it.  That's fine.
22  THE COURT:  So let me understand.  There was a May
23  report, but as I understand it, it was the previous May.  Is
24  that right?
25  MR. BARNES:  Yes, it's the previous May.

**7**

1  THE COURT:  It was the previous May.  So when
2  people are referring to a May report, it wasn't subsequent
3  to this March 2009 report, is that right?
4  MR. BARNES:  That is correct.
5  THE COURT:  But there is a new article that was
6  disclosed in around the May 2009 time frame, right?
7  MR. BARNES:  After it was accepted for
8  publication, it was disclosed right after it was accepted
9  for publication.
10  THE COURT:  Right.  So what's in play today is a
11  November 2008 report, a March 2009 supplemental report, and
12  an article that was accepted for publication somewhere in
13  the vicinity of April and May of 2009?
14  MR. BARNES:  Correct, your Honor.  That's the
15  chronology.
16  THE COURT:  Right?
17  MR. BARNES:  Yes.
18  THE COURT:  And so whatever that May 2008 report
19  is is --
20  MR. BARNES:  History.
21  THE COURT:  History.
22  MR. BARNES:  Correct.
23  THE WITNESS:  I'm sorry.  I misunderstood the
24  question to be May of 2009, and that was what was confusing
25  to me.

**8**

1  THE COURT:  Well, it was confusing to me because
2  people were referring to multiple things and this kept
3  changing.  I thought this would just be November of 2008,
4  and the stuff kept coming when I saw it last.
5  MR. BARNES:  That I wanted to try and clear it up
6  this morning.  Thank you, your Honor.  That's what we wanted
7  to do.
8  Q.  Doctor, and Exhibit C is the report that was accepted
9  for publication in the Archives of General Psychiatry as
10  Exhibit C to your notebook?
11  A.  Yes, it is.
12  Q.  Okay.  Doctor, I want to talk to you briefly about the
13  conduct of the study of eleven antiepileptic drugs in a
14  bipolar population.  What hypothesis were you testing in
15  that study which ended up being published in the Archives of
16  General Psychiatry?
17  A.  I was testing the hypothesis that the eleven
18  antiepileptic drugs were associated with increases in the
19  risk of suicide attempts in patients with the highest risk
20  of those suicide attempts; namely, bipolar depressed
21  patients.
22  Q.  Did you also look at gabapentin separately in the
23  course of this work?
24  A.  Yes, I did.  There was an additional cohort of 131,000
25  patients that were treated with gabapentin that had one year

**9**

1  prior to and one year post-initiation of treatment, and I
2  looked at that as well.
3  Q.  Doctor, there's been some confusion as to the
4  differences between your published paper and the reports
5  that were submitted in March and November.  So I want you to
6  come forward briefly.  I want you to explain to the Court
7  the studies and the design of the studies, what you did.
8  And Mr. Napolitano will help you move the boards to a place
9  where everyone in the courtroom can have access to it, if
10  you would please step down.
11  THE WITNESS:  I conducted these two studies to
12  better understand the implications of the FDA alert and the
13  meta-analyses that were conducted by the FDA.  The first
14  cohort I looked at were defined in terms of an index episode
15  of bipolar depression.  There were 47,000 patients, a little
16  more, that had an episode of bipolar depression that had one
17  year prior to the episode and one year after the episode
18  where they had continuous enrollment in one of the managed
19  care plans that is contained in the PHARMetrics database.
20  So these patients were continuously enrolled.
21  Once they had their bipolar depression episode,
22  there was a period of time in which they may have not had
23  treatment.
24  THE COURT:  When you say treatment, you're just
25  referring to taking Neurontin?

10

1    THE WITNESS: Taking one of the eleven
2 antiepileptic drugs or lithium. This is an AED study, so
3 we're looking at all antiepileptic drugs. Neurontin is one
4 of those drugs.
5    Q. The eleven in the FDA meta-analysis?
6    A. That's correct.
7    THE COURT: All AEDs or lithium, but you're not
8 referring to someone who commits suicide and then gets
9 psychiatric assistance through a therapist or a
10 psychiatrist?
11    THE WITNESS: No. I'm looking at the primary
12 monotherapy with one of those eleven AEDs. There are
13 concomitant therapies that some of these patients have --
14    THE COURT: Okay, so when you say treatment, you
15 know, sort of in the generic sense, you're thinking of a
16 psychiatrist. You're only referring to taking one of the
17 AEDs drugs or lithium?
18    THE WITNESS: Right. This is purely about drugs.
19 And there is a post-period. So there's a pre-AED and a
20 post-AED. And depending on the patient, they may have more
21 of a period of observation before they take the drug and
22 more after.
23    The hypothesis that can be tested with this design
24 and the primary reason of looking at this design is that
25 bipolar patients -- you know, why did I use bipolar

11

1 patients? -- bipolar depressed patients among everybody who
2 is treated with an antiepileptic drug have the highest rate
3 of suicide. Their rate of suicide is a hundred times higher
4 than the general population. So if we're going to look for
5 a drug effect, we want to look in an area for an indication
6 where the risk of the event in question, suicide or suicide
7 attempts, is very high. So that was the purpose of
8 identifying this bipolar cohort of 47,000 people.
9    And an important thing to note as a part of this
10 is that the FDA meta-analysis had very few events. There
11 were only 38 suicide attempts in all of the FDA
12 meta-analyses of all 199 clinical trials. There were almost
13 700 suicide attempts made in this bipolar cohort.
14    The hypotheses that can be tested --
15    THE COURT: How many suicides did you say?
16    MR. BARNES: Suicide attempts.
17    THE WITNESS: Suicide attempts were -- I believe
18 it was about 670 in this cohort relative to 38 in the FDA
19 meta-analysis.
20    THE COURT: 670 both before and after?
21    THE WITNESS: Correct, but all in the post-index
22 episode, so --
23    Q. Why don't you write 670 after one year just on that
24 side of the line.
25    A. I'm going to use "SA" to be suicide attempts, okay?

12

1    THE COURT: And there was no way to measure
2 suicide ideation or actual suicides?
3    THE WITNESS: That's correct. This was purely
4 focusing on suicide attempts.
5    THE COURT: And that's because it's claim-based,
6 as I understand it?
7    THE WITNESS: That's correct. So if you make a
8 completed suicide and you aren't treated --
9    THE COURT: You don't make a claim.
10    THE WITNESS: -- you don't make a claim.
11    THE COURT: And if you have suicide ideation, it's
12 not necessarily a claim event.
13    THE WITNESS: That's correct. Now. In suicide
14 research, the best we can do, the hardest end point that we
15 can look at in patient-level data is typically suicide
16 attempts. They're the closest to the largest public health
17 concern, which of course is about completed suicide.
18    THE COURT: But it's not what the FDA looked at,
19 right?
20    THE WITNESS: What the FDA looked at was anything
21 that was registered during those randomized clinical trials.
22 So what the FDA exactly looked at, it was almost 100
23 suicidal thoughts, 38 suicide attempts, and four suicide
24 completions. So the analysis that the FDA performed was
25 really about suicidal thoughts. It had very little

13

1 information about suicidal behavior and very little
2 information about completed suicide. And this is very
3 consistent with previous analyses that the FDA has done in
4 antidepressants. They're really about suicidal thinking.
5 In fact, I just chaired a meeting?
6    THE COURT: All right, all right, so I understand
7 it. But you're looking at one subset of that, which is
8 suicide attempt, and you're looking at it through a
9 claims-based database that looks at managed care
10 populations?
11    THE WITNESS: That's correct.
12    THE COURT: All right.
13    THE WITNESS: So the first hypothesis is within
14 individuals. That is, is the post-AED greater than the
15 pre-AED? We can test that hypothesis. If antiepileptic
16 drugs are increasing the rate of suicide, we'd imagine that
17 after you start them, the rate of suicide attempts would go
18 up: it wouldn't go down.
19    THE COURT: Wait, wait. So post and pre is post
20 and pre-AED?
21    THE WITNESS: Pre and post-AED, correct.
22    THE COURT: So not suicide event. So you have it
23 sort of on the wrong side of the axis, is that it?
24    MR. BARNES: All of this work is being done over
25 here for the analysis. It's on the right side.

4 (Pages 10 to 13)

**14**

1    THE COURT:  You just ran out of space, is that it?
2    THE WITNESS:  Correct.  I'd be happy to get
3    another blackboard.
4        And the second hypothesis that we're testing is
5    between individuals.  So is the rate of suicide attempt
6    greater in those people who received an antiepileptic drug
7    relative to those that did not receive an antiepileptic
8    drug?  So a big strength of this study is that we can do
9    both comparisons between people, because some people took
10   the drug and some people didn't take the drug --
11   Q.  That's a group analysis, correct?
12   A.  That's a group analysis.  We can also do --
13       THE COURT:  So what was post and pre?  I thought
14   that was just -- that's post and pre-suicide event?
15       THE WITNESS:  That's the second thing.  No, this
16   is post and pre when you started taking the antiepileptic
17   drug.  So you walk into the study --
18   Q.  One second, Dr. Gibbons.
19       THE COURT:  They look like the same.
20   Q.  This line here is the index diagnosis of bipolar?  This
21   line here is before and after treatment with an AED?
22   A.  Well, let me explain --
23       THE COURT:  So the first one is before and after
24   you take an AED.  So what's the second one?
25       THE WITNESS:  The second one is comparing those

**16**

1    for prior suicide attempts is very important in these kinds
2    of analyses.
3    Q.  What controls did you conduct in adjusting for some of
4    the variables?
5    A.  In addition to looking at prior suicide attempts, we
6    adjusted for age sex, rate, and concomitant medications that
7    were taken along with the antiepileptic drug.
8    Q.  How many concomitant medications did you adjust for?
9    A.  There were 79 concomitant medication, which included
10   typical and atypical antipsychotics, antidepressants, and
11   other antiepileptic drugs.  Among those groups also included
12   drugs that are used in the treatment of anxiety disorders.
13       So this is the design that was used and was
14   published -- and will be published in the Archives of
15   General Psychiatry.  So this is the design and analysis that
16   was peer reviewed in the Archives of General Psychiatry.
17   Q.  Can you tell us the results?  Can we have Slide 1,
18   please.
19   A.  The first result is that there was a statistically
20   significant reduction in the rate of suicide attempts
21   following the initiation of antiepileptic drug therapy
22   relative to before in those patients with a diagnosis of
23   bipolar disorder.  The between subject analyses, there were
24   two.
25       THE COURT:  All right, so this is important.  So

**15**

1    people who took an AED versus those that didn't.  So there
2    are a large number of people in this cohort who never took
3    an AED.  So this talks about, if you took an AED, what
4    happened relative to before, what happened after.  This
5    says, among those people who took an AED, what is their
6    suicide attempt rate relative to those that never took an
7    AED?  So those are the two hypotheses we can test.
8        Now, why do we have this additional year of data
9    before they ever had a bipolar --
10       THE COURT:  So all of this is in your report
11   because I missed some of this?
12       THE WITNESS:  This is all in the report.
13       THE COURT:  The report as opposed to the article?
14       THE WITNESS:  Of course, the most detailed
15   description of this is in the article.  I refer to the
16   article in my report as supportive information.  So it is
17   described in there, but it's described, of course, most
18   detailed in the complete article, and that's why I'm going
19   through it right now.
20       This period of time, one year before they had the
21   diagnosis, is where we got information on whether or not
22   these people made a suicide attempt before they ever had a
23   bipolar disorder.  It turns out in this analysis that the
24   likelihood of making a suicide attempt here is twelve times
25   greater if you made a suicide attempt here.  So adjusting

**17**

1    that line down the middle is when you were diagnosed with
2    bipolar disorder, not when you tried to commit suicide?
3        THE WITNESS:  That's correct.  So you come in and
4    you get a diagnosis of bipolar disorder.  You have a period
5    that you may have had bipolar disorder before you started
6    the drug.  You have a period after you started one of these
7    antiepileptic drugs.  Some people never took an
8    antiepileptic drug.  Some people took an antiepileptic drug
9    on day one.  So at every point in here we can do comparisons
10   between people who took the drug and people who didn't take
11   the drug.  And we could also look before they took the drug
12   and after they took the drug using the person as their own
13   control.  So do antiepileptic drugs increase the risk of
14   suicide attempts in people who have a bipolar disorder?  We
15   have 47,000 of these people, and we have about 670 events of
16   interest.
17   Q.  Now, we have Slide 1 which talks about the comparison.
18   Could you tell her Honor about the precise statistic, the
19   significant decreased risk of suicide attempts that you
20   found?
21   A.  Prior to the initiation of antiepileptic drugs, the
22   rate was 72 per thousand.  After the taking of an
23   antiepileptic drug -- this antiepileptic drug
24   monotherapy -- the rate reduced to 13 per thousand.
25   Q.  Is that statistically significant, sir?

**18**

1   A.   Yes, it is.

2   Q.   Okay, please tell us about the between-subject analysis

3   that you conducted.

4   A.   There were two primary between-subject analyses, one

5   overall which showed that between those subjects who had

6   taken an AED versus not, the rates were identical.  So there

7   was no increased risk whatsoever associated with taking an

8   AED in those patients who took one and were initially much

9   higher risk relative to those that didn't take an AED.

10      The second comparison looked at what happens when

11  we look at the pure group, that group of people who took one

12  of the eleven AEDs only: they didn't take an antipsychotic,

13  they didn't take an antidepressant, they didn't take

14  lithium, and they didn't take any other antiepileptic drug.

15  Q.   One drug?

16  A.   One drug.  And we compared those people to people who

17  took no drug, no antiepileptic, no antidepressant, no

18  antipsychotic.  There we see, as on the slide, the rate off

19  drug was 15 per thousand, and the rate on drug was one-fifth

20  of that, 3 per thousand.  This is a huge effect.  This is

21  obviously statistically significant, far beyond what we

22  would expect by chance.  And it shows that in the purest

23  condition, the effect of this drug is in the direction of a

24  protective effect.  There's a decrease between in those

25  people who took one of these drugs relative to those people

**20**

1   A.   So that the gabapentin study defined the index as

2   gabapentin, and there was one year pre-initiation of

3   gabapentin and one year post-initiation of gabapentin.

4   Q.   So the index date is the prescription of the drug

5   gabapentin?

6   A.   Correct.  So whereas the index date here was a

7   diagnosis of bipolar disorder, the index here is when you

8   started taking the drug gabapentin.  And an overall analysis

9   was conducted, and then separate analyses were conducted in

10  people suffering from epilepsy, pain disorder, major

11  depressive disorder, bipolar disorder, schizophrenia, and

12  other psychiatric disorders.  And here everything is within

13  subject.  So we are testing the hypothesis within each of

14  those different kinds of diagnostic indications:  Is the

15  post now gabapentin rate of suicide attempts greater than

16  the pre-gabapentin?

17  Q.   One moment, Doctor.  How many patients were in the

18  gabapentin study?

19  A.   There were 131,000-plus patients in the gabapentin

20  study, and there were 909 suicide attempts.

21  Q.   In the entire study?

22  A.   In the entire study.  Now, this contrasts with the FDA

23  meta-analysis where there were approximately 4,700 patients

24  treated with gabapentin, and there were three suicidal

25  thoughts -- that is, three patients who had a suicidal

**19**

1   who took none of these drugs.

2   Q.   I want to stop you right there.  You used the word

3   "protective" effect.  Would you please explain to the Court

4   what you mean.  In your report and in your publication, when

5   you use the word "protective" effect, what are you

6   describing, sir?

7   A.   I'm describing a statistically significant decrease in

8   the rate of suicide attempt, either in a pre versus post, or

9   those who took it and those who didn't take it, that goes

10  beyond chance expectation, and in a particular study showing

11  this kind of decrease in the likelihood of a suicide

12  attempt.  That's what I mean by "protective."  If it went

13  the other way, I would describe it as a harmful effect.

14  Q.   Okay.  Now, let's move on to the gabapentin study,

15  briefly the design, and walk the Judge through the design

16  and the method and the conclusions of that as well, and

17  contrast where appropriate.

18  A.   The motivation for the gabapentin cohort was that --

19      THE COURT:  Which is not published or peer

20  reviewed?

21      THE WITNESS:  Which is not published or peer

22  reviewed.  That's described, and the only place where that's

23  described, is in my expert report.

24  Q.   What's the hypothesis you tested in the gabapentin

25  study?

**21**

1   thought -- and zero suicide attempts.  This is the largest

2   study of gabapentin that has ever been conducted in a

3   population for a variety of different indications where we

4   can look at the effects of taking gabapentin on what is an

5   enormous number of suicide attempts.

6   Q.   Did you control for the same factors that you did in

7   the bipolar AED study?

8   A.   We controlled for age, sex, race, concomitant

9   medications.  The analyses were, as I described, stratified

10  by different diagnostic indications and conducted overall.

11  And the only thing that wasn't also controlled for was prior

12  suicide attempts, since suicide attempts in the year before

13  define a pre-comparison in this cohort.

14  Q.   Now, is all of this information in the November -- what

15  you just described here in the gabapentin study, that was

16  all in your November report, correct?

17  A.   That's correct.

18  Q.   Why don't you explain Slide 2, please, explain the

19  results of the gabapentin study.

20  A.   So these results were very interesting.  In the

21  nonpsychiatric indications, like pain disorder, epilepsy,

22  there was no significant increase in those patients

23  following the initiation of gabapentin relative to the rate

24  of suicide attempts before they started gabapentin.

25      In the psychiatric indications, like bipolar

**22**

1  disorder, there was evidence again of statistically
2  significant protective effects, significant decreases in the
3  post period relative to the pre period.
4       So what we're starting to see is a coherence of
5  findings across these different studies showing that in the
6  psychiatric populations, where people are at increased risk
7  of suicide attempt relative to the general population, that
8  risk decreases with treatment with antiepileptic drugs in
9  general, and gabapentin in particular.
10      And in those nonpsychiatric cohorts, there doesn't
11  appear to be any kind of harmful effect. The rates before
12  and after initiation of treatment are identical.
13      MR. BARNES:  Slide 2 gives the figures, your
14  Honor.  I think we have it up.
15  Q.  Would you just review with the Court the statistics on
16  bipolar and major depressive disorder and other psych.
17  A.  Okay, so overall there was no increased risk in the
18  total population.  When broken down by the psychiatric
19  indications or the individual indications, we found that
20  there was statistically significant decreases in the risk
21  associated with bipolar disorder after initiation of
22  gabapentin relative to before, similar to the effect that we
23  found in the bipolar cohort.
24      THE COURT:  Did you do all the same sensitivity
25  analyses for the gabapentin study as the bipolar?

**23**

1       THE WITNESS:  I did six sensitivity analyses for
2  the bipolar cohort and six sensitivity analyses for the
3  gabapentin.  Some were the same and a couple were different
4  because these are different kinds of cohorts.
5       THE COURT:  You were criticized apparently when
6  you first submitted the paper for not doing some things, and
7  then you did it, and then they accepted the paper.  Whatever
8  you were criticized for, did you do that with the gabapentin
9  study?
10      THE WITNESS:  No, I did not because you can't do
11  it in the gabapentin study.  So in this study --
12      THE COURT:  Have you ever submitted the gabapentin
13  study for peer review?
14      THE WITNESS:  No, I haven't done that.  The
15  gabapentin study I did for the purpose of this litigation,
16  so I have not submitted it for a publication.  I'd like to
17  down the road, but I didn't feel that it was appropriate to
18  do so while this was the focus of an ongoing litigation.
19  Q.  Explain to the Court and everyone the -- I think --
20      THE COURT:  Yes, I want to understand.
21      MR. BARNES:  Let me help you with that.
22      THE COURT:  I want to understand.  I was told
23  yesterday that some of the sensitivity analyses that you did
24  for bipolar were not done for gabapentin.
25      MR. BARNES:  Can I focus this for you?

**24**

1       THE COURT:  Yes.
2  Q.  We had a lot of discussion with Dr. Greenland about the
3  person-time analysis, which is a sensitivity analysis which
4  tests the robustness of the results you reached in November.
5  You did three sensitivity analyses.  The one that seemed to
6  have the most interest was the person-time analysis which
7  you did in the bipolar AED paper, did not do in the
8  gabapentin paper.  Can you explain to the Judge why you
9  decided it was not necessary to do it in the gabapentin
10  paper?
11  A.  So let me explain the motivation for doing that
12  analysis.  First of all, in my analysis, when you define a
13  cohort in terms of a diagnosis, the natural course of the
14  disease is associated with decreases in suicide attempt
15  rates over time.
16  Q.  Is that the regression to the mean?
17  A.  Some people describe that an regression towards the
18  mean; some people describe it as the natural course of the
19  disorder.
20  Q.  Briefly define a sensitivity analysis to make sure we
21  understand what it is.
22  A.  Okay, a sensitivity analysis is an alternate change in
23  the model specification or in the definition of the cohort
24  to test the robustness of the findings of the overall
25  analysis.  So this sensitivity analysis addressed three

**25**

1  issues:  One, it addressed the issue of whether or not the
2  same results would be obtained if we counted multiple
3  suicide attempts within individuals, or just said we're
4  going to create a binary variable:  You either didn't make a
5  suicide attempt or you made one or more suicide attempts.
6  Q.  Is that multiple counting?
7  A.  That would be multiple counting.  So this analysis
8  tests whether or not multiple counting is a factor.
9  Q.  So that's the five suicide attempts on the same
10  patient?  You tested that?
11  A.  That would be an example of that.  Yes, I did.
12      The second piece of the person-time analysis
13  adjusts for the natural decrease over time or the regression
14  towards the mean effects because it builds in a person-time
15  function.  It builds in a monthly change in the overall rate
16  and allows that rate to either increase or decrease in the
17  population.  And then once it's adjusted for that, it then
18  compares what's left over in terms of whether or not it's
19  related to taking an antiepileptic drug or not.
20      And then the final piece of this is that it
21  addresses the question raised by Dr. Greenland of whether or
22  not -- how I defined exposure.  So in my overall analysis, I
23  defined exposure by the initiation of taking an antiepileptic
24  drug; and then, to be conservative, I attributed every
25  suicide attempt that was made following the initiation of an

**26**

1 antiepileptic drug to the drug, whether the person was
2 taking the drug at the time they made that suicide attempt
3 or not. This is a very conservative assumption. Assume
4 that a person took the drug on one day, and then 360 days
5 later they made a suicide attempt. I coded that suicide
6 attempt as it was related to taking the drug. It is the
7 most sensitive.
8 　　　THE COURT: But the flip side of it is, if the
9 person only took the drug for two weeks or a month, but they
10 didn't like the side effects -- it made them feel dizzy or
11 tired or some of the side effects that it has -- and
12 stopped, and there were no suicide events on day 300, you're
13 asserting that's a protective aspect of the drug?
14 　　　THE WITNESS: So that to deal with that issue --
15 yes, absolutely.
16 　　　MR. BARNES: That's a valid concern.
17 　　　THE WITNESS: And that's the concern that
18 Dr. Greenland raised. Dr. Greenland said, well, wait, you
19 know --
20 　　　MR. BARNES: She understands that.
21 　　　THE WITNESS: Okay, so this analysis adjusts for
22 that.
23 　　　THE COURT: And that's what you did for the
24 bipolar study. You adjusted for that?
25 　　　THE WITNESS: Oh, absolutely. So I did a monthly

**27**

1 analysis.
2 　　　THE COURT: That's right, but you didn't do that
3 for the gabapentin?
4 　　　MR. BARNES: Explain why.
5 　　　THE COURT: Am I right?
6 　　　MR. BARNES: Yes.
7 　　　THE WITNESS: Yes, you are right.
8 　　　THE COURT: We have to do baby steps, okay.
9 　　　THE WITNESS: I did not did the person-time
10 analysis --
11 　　　THE COURT: Reviewers were concerned. They liked
12 the overall paper: they were concerned. You did that
13 analysis with the bipolar cohort?
14 　　　THE WITNESS: Well, the primary reason that they
15 were concerned about that was because of the regression
16 towards the mean effect.
17 　　　THE COURT: Fair enough. My only point is that
18 they didn't take it until you did it. Okay, so --
19 　　　THE WITNESS: So a lot of the patients who got in
20 here, into the bipolar cohort, had a suicide attempt, had a
21 diagnosis, and had initiated treatment on the same day. So
22 in a sense, the suicide attempt actually led to their
23 diagnosis, and the suicide attempt led to their ultimate
24 treatment. So here we have an example where the outcome is
25 sort of influencing the treatment. And when you define a

**28**

1 cohort in terms of the diagnosis, we know that close to the
2 time of that diagnosis the risk of a suicide attempt is
3 really high, and it trickles off down the road.
4 　　　That's not true when you define a cohort in terms
5 of taking a drug. And to support that, of the 131,000
6 patients who took gabapentin, only three of them had a
7 suicide attempt on the same day that they were prescribed
8 gabapentin. So this concern about regression towards the
9 mean, when you define the cohort in terms of an index
10 diagnosis, does not apply in the same way when you define a
11 cohort in terms of the initiation of drug.
12 　　　Now, the second important reason why I didn't do
13 this analysis is that on the first month of treatment,
14 everybody in this cohort is taking gabapentin. There is no
15 non-gabapentin control. Whereas in this cohort, there is a
16 mix of people who are taking gabapentin in the first month
17 and not taking an antiepileptic drug in the first month. So
18 every month in the analysis has an appropriate control.
19 　　　The fact that there's no control initially here,
20 that every single one of these 131,000 patients is taking
21 gabapentin and there are zero people not taking gabapentin
22 tremendously reduces the interest in doing such an analysis.
23 　　　THE COURT: I don't know if I'd agree with that.
24 I mean, I was rereading last night Maris and Kruszewski's
25 things, and a huge number of people -- put aside whether it

**29**

1 creates depression -- just say they feel tired or dizzy or
2 moody. In fact, Bulger said that. In fact, I had a case, a
3 totally different case that had nothing to do with anything
4 here, and the woman was taking Neurontin, and she went off
5 of it because she said it made her feel dizzy or something.
6 It was just a completely different case. There was no
7 motive for it.
8 　　　So I'm not saying that that makes it bad or good.
9 It just means that people go off drugs. It's not clear that
10 people are going to stay on the gabapentin for more than a
11 week or a month. So I don't understand how you can say it's
12 either -- you can study it without understanding how long
13 someone was exposed to the drug and how much.
14 　　　THE WITNESS: But that's exactly the problem.
15 During this first month, everybody was on it at least for
16 some period.
17 　　　THE COURT: Fine, so you could measure it for a
18 month. Maybe you could -- I think you can presume that if
19 someone is prescribed for a month, they're on it for a
20 month. But you haven't measured whether they were
21 prescribed for the second month, right? Or have you?
22 　　　THE WITNESS: I have all of the data. I mean, all
23 of those data are in the --
24 　　　THE COURT: Excuse me. You haven't correlated
25 with who stayed on it, right? You don't know -- you assumed

**30**

1 that once they took it for one -- the first prescription,
2 they were on it for a year, right?
3 THE WITNESS: Well, I did do a sensitivity
4 analysis that said that in order for me to say someone was
5 on gabapentin, they had to be on it at least 30 days. So
6 that is one of the sensitivity analyses that gets away from
7 the idea that you could be on it for one day and then not
8 take it. So during that period they had to be on it for at
9 least 30 days, and the results were virtually identical to
10 the analysis that didn't have that requirement. That was
11 one of the primary --
12 THE COURT: How would you know they were actually
13 on it? Just you assumed that if --
14 THE WITNESS: Well, all of these data are based on
15 filling a prescription, so my exposure to any of these drugs
16 in a medical claims database is based on whether or not they
17 filled a prescription, the person-time factor.
18 The point that I was making of methodological
19 concern is that if everybody in the first month is on the
20 drug, there is no statistical comparison to people who are
21 not on the drug in the first month. Later down the pike,
22 there may be people who are on the drug and off the drug,
23 and that can be looked at.
24 THE COURT: Were all these suicides or nonsuicides
25 within the first month? No.

**31**

1 THE WITNESS: There were suicides throughout that
2 whole period, that's correct.
3 Q. Doctor, do you have an opinion -- well, first of all,
4 have the methods you've described been published in the
5 peer-reviewed literature?
6 A. Yes, they have.
7 Q. That's the gabapentin study?
8 A. Yes, they have.
9 Q. Can you give us some examples of where these methods
10 have been employed in important public health issues?
11 A. The methodology that's laid out in both of these was
12 originally described in our VA study, which was published in
13 the American Journal of Psychiatry in 2007. This was a
14 study of 226,000 major depressed patients in the Veterans'
15 Administration.
16 Q. Claims database?
17 A. Claims database, very similar. It was the Veterans
18 Administration's database, and that's where this general
19 design came from. The person-time analyses that are
20 described here were originally described to the statistical
21 literature by Brad Efron at Stanford University in the
22 1980s, and we generalized those methods and used those in
23 the Institute of Medicine report on organ transplantation.
24 Q. Is this the book where this was published?
25 A. Yes, it is.

**32**

1 Q. Briefly, what is this book about?
2 A. It's about developing a new allocation system for solid
3 organ transplantations. We looked at another observational
4 database --
5 THE COURT: This isn't psychiatric.
6 MR. BARNES: It's a different application.
7 THE COURT: It's organs?
8 MR. BARNES: This is organ transplantation. It's
9 how to allocate organs from other people.
10 THE WITNESS: This is the report that led to the
11 change in the way that solid organs are shared across
12 regional areas, and it led to a very major change in public
13 health, and it's now the current system that we use for
14 organ allocation. The work there was then later published
15 in the statistical literature, peer reviewed in 2003 in
16 Biostatistics, and that's the methodology that was used as
17 this sensitivity analysis, the person-time logistic model.
18 Q. Briefly, I want to talk to you briefly, the Court
19 expressed concern about the FDA. I want to just go back to
20 some of those issues. Dr. Gibbons, can you explain to us
21 how your studies respond to the FDA meta-analyses. We had a
22 discussion with the Judge Tuesday afternoon. Can you
23 explain to us how your studies respond to the meta-analysis,
24 and how they differ, and the relative strengths and
25 weaknesses of those two designs.

**33**

1 A. Of course. The FDA meta-analysis is an observational
2 study. These are observational studies. The FDA
3 meta-analysis looked at approximately 40,000 people from 199
4 different studies. Those studies were not designed to look
5 at suicide. Suicide was retrospectively harvested from the
6 medical records and claims databases. This is very
7 different --
8 THE COURT: As against a placebo?
9 THE WITNESS: Correct, so patients were -- the
10 strength of randomized control trials -- so let's talk about
11 randomized controlled trials for a minute in the study of
12 suicide.
13 THE COURT: But in a sense, it's better in the
14 sense it's the closest to what you were talking about, those
15 who went on an AED and those who didn't: not the same
16 subject, but you're diagnosed with bipolar, the people who
17 went on and people who aren't. It's a better --
18 THE WITNESS: Let me clarify what's better. If
19 there is a prospective end point, if we really designed a
20 study with 40,000 people, and we randomized them to placebo
21 and Neurontin, and we use the Columbia classification scale
22 of suicidal ideation and behavior, and even with 40,000
23 people enrolled in a randomized clinical trial, we'd be
24 mostly looking at suicidal ideation. That would be one
25 large randomized controlled trial, and we could derive some

**34**

1  really strong inferences about that.
2      That's a very different thing than creating a
3  patchwork quilt out of lots of much smaller randomized
4  controlled trials that were not designed to look at
5  suicidality and did not prospectively measure suicidality.
6  So that's one type of observational information.  Is it not
7  important?  Of course it's important.
8  Q.  Explain the difference between the meta-analysis and --
9      THE COURT:  But you can't say that the FDA is
10  wrong with this PHARMetrics study in the sense you're
11  comparing different apples and oranges as a sense of -- I
12  understand you have your separate lamotrigine/Topiramate
13  argument.  Fair game, all right.
14      THE WITNESS:  It's a whole different thing.
15      THE COURT:  All right, you know, we've been there
16  done that.  But this is just another piece of the puzzle.
17  It's looking at different things, different database,
18  different symptoms.  Right?
19      THE WITNESS:  That's both true and -- let me
20  expand on that.  I'm not saying that the FDA got this all
21  wrong.  The FDA identified a hint of a signal, which they
22  interpreted in terms of --
23  Q.  Based on eleven antiepileptic drugs?
24  A.  Based on eleven antiepileptic drugs as a whole, which
25  they said, you know, "We think there's a signal here."  The

**35**

1  signal is about suicidal thoughts.  It's dominated by
2  suicidal thoughts.  It really has very little to do with
3  suicidal attempts.  There were only 38 of them.  You can't
4  learn too much about that.  It has no information really
5  about suicide completions -- there were only four of
6  those -- and it has very little information about the
7  subject of this case, the drug Neurontin.  The drug
8  Neurontin, there were --
9      THE COURT:  No, I understand, you have your
10  separate criticism.
11      THE WITNESS:  And I'm not even criticizing.  So it
12  suggests an association.  Well, if there is this
13  association --
14  Q.  Between what?
15  A.  Between taking an antiepileptic drug and suicidality of
16  some form, if we move up the food chain and we look at a
17  harder suicidality event -- namely, a suicide attempt that
18  was of sufficient severity to be recorded in a medical
19  claims database, meaning that probably the person ended up
20  in an emergency room or had some contact with the medical
21  establishment -- and we look in an enriched population who
22  are at the highest risk of suicidality -- namely, bipolar
23  patients who are at a hundred times greater risk of the end
24  point that we really care about, which is completed
25  suicide -- and we see that there are 670 or more suicide

**36**

1  attempts in this database, if the FDA meta-analysis is
2  telling us that there really is a signal there, we should
3  see a lot more suicide attempts associated with the exposure
4  to these eleven antiepileptic drugs relative to those people
5  who did not get exposed to those eleven antiepileptic drugs.
6  And we should see that the rate after you start the drug
7  goes up relative to the rate before.  And when we then focus
8  on gabapentin, for which the FDA meta-analysis has very
9  little information, we should see that once you start taking
10  gabapentin, that the rate should increase significantly, and
11  in fact none of those things happened.
12      So these analyses help us understand the
13  relationship between antiepileptic drugs in general and
14  suicidality, and gabapentin in particular and suicidality,
15  that is hinted at by the FDA meta-analysis.
16      THE COURT:  Another criticism was that you didn't
17  correlate when someone tried to commit suicide with whether
18  they were actually on gabapentin at that moment or on an
19  AED.  Is that right?
20      THE WITNESS:  That was a criticism, but I
21  absolutely did that.
22      THE COURT:  I just want to understand.
23      THE WITNESS:  The person-time analysis is looking
24  at those months that a person was on an antiepileptic drug
25  and comparing them to those months where the person was not

**37**

1  on an antiepileptic drug.
2      THE COURT:  So it did correlate with, if you had
3  the suicide attempt, whether you were on or off the
4  gabapentin?
5      THE WITNESS:  That's correct.
6      THE COURT:  Excuse me, the AED.  But you did not
7  do that in the gabapentin?
8      THE WITNESS:  I did not do that analysis.
9      THE COURT:  I just want to understand the baby
10  steps.
11      THE WITNESS:  Absolutely.  And the important thing
12  is that when I did do that analysis, the protective effects
13  of antiepileptic drug therapy increased: they didn't
14  decrease.  And that's because I'm no longer attributing the
15  suicide attempts that occurred after a person was taking the
16  antiepileptic drug to the antiepileptic drug.  It
17  demonstrates the conservative nature of the analysis that I
18  performed.
19      THE COURT:  All right, you need to wrap up because
20  I need to give him a cross.  I need to be out at 11:00.
21      MR. BARNES:  Yes, your Honor.
22  Q.  One last question, Dr. Gibbons.  In your opinion, to a
23  reasonable degree of scientific certainty, do you have an
24  opinion that the methodology you employed in the gabapentin
25  study is valid and reliable and reflects the methodology

38

1  that is generally accepted in the field of
2  pharmacoepidemiology and biostatistics?
3  A.  Absolutely.
4       MR. BARNES:  Thank you, your Honor.
5       THE COURT:  Who's going to do the cross?  Thank
6  you.  Do you want him back up on the stand?
7       MR. ALTMAN:  Yes, your Honor.  Let's take them
8  down.
9  CROSS-EXAMINATION BY MR. ALTMAN:
10  Q.  Good morning, Dr. Gibbons.  How are you today?
11  A.  Good morning.  Fine, thank you.
12  Q.  Before we move forward, I just want to clarify
13  something for the Court.  Mr. Barnes asked you if there were
14  differences between your November expert report and your
15  March expert report, and I believe you said you did some
16  additional sensitivity analyses; is that correct?
17  A.  Yes.
18  Q.  Those were not the only changes between the two
19  reports, correct?
20  A.  I believe there were a couple of typographical errors
21  in one of the tables, and those were corrected as well.  I'm
22  not sure if that was done at that time.
23  Q.  Would you agree there was also an error where you
24  miscalculated the number of patients in one of the groups?
25  A.  That's correct.  You had pointed out in one of my

39

1  depositions that there was an error in one of the codings,
2  and that some of the major depressive patients were miscoded
3  as other psychiatric disorders, and I had corrected that,
4  and thank you for pointing that out.
5  Q.  And I'd just like to show you -- that wasn't just a
6  change of a patient or two, correct?
7  A.  It was a large number of patients.  As I recall, it was
8  about 10,000 patients, and it produced no changes in the
9  results of the analyses of any substance.  If anything, they
10  made the effects a little stronger.
11  Q.  That's not the only change that you made as well.  In
12  your original report you had put -- for the statistical
13  significance, in the bipolar disorder group, you had put it
14  was .66.  It went from .43 to .99, correct?
15  A.  Yes.
16  Q.  In your second report, you changed that to 1.0,
17  correct?
18  A.  Yes, I did.
19  Q.  And that was because you made a rounding error,
20  correct?
21  A.  That is correct, but the probability value associated
22  with that was unchanged.  It was P less than .047, which was
23  less than the 5 percent critical value.
24  Q.  But it still does include 1, correct?
25  A.  The confidence interval includes 1, but our test of the

40

1  hypothesis of whether or not the relative risk is less than
2  1 was statistically significant.
3  Q.  So there were a lot more changes than just simply doing
4  sensitivity analyses, correct?
5  A.  In my opinion, those other changes, with the exception
6  of the one I omitted, the point that you had highlighted in
7  our deposition, which, you know, was certainly an important
8  thing to correct, those were the only others.  But none of
9  them were changes of any particular substance.
10  Q.  Dr. Gibbons, you had shown earlier that it is -- would
11  you agree that it's not uncommon for a person to have a
12  code -- and we're talking only about your bipolar study --
13  it's not uncommon for a person to have a suicide attempt on
14  the same day as the bipolar diagnosis, correct?
15  A.  That is correct.  You know, by using the term
16  "uncommon," I don't know that you would say uncommon in the
17  same way that I would say uncommon, but there are a large
18  number of those.  I don't remember at this time how many
19  there were.
20  Q.  And you will agree that that inflates the rate of
21  suicide attempts before drug treatment, correct?
22  A.  No.  I believe that what it does is, it -- you know,
23  it's part of the background rate.  These people were not a
24  part of -- they were not taking the antiepileptic drug.
25  It's part of the natural background rate.  But it is a way

41

1  in which you may be identifying people who ultimately get
2  into the study, and it makes it important to take into
3  consideration that kind of a regression effect that was done
4  in the person-time analyses.
5  Q.  You did write, "It can inflate the rate of suicide
6  attempts observed prior to the initiation of treatment,"
7  correct?
8       MR. BARNES:  Objection.
9       THE COURT:  Overruled.
10  A.  It depends on whether or not you use the term
11  "inflating" to reflect, you know, that this is a part of the
12  drug experience.  Clearly it's not.  It will increase, if
13  you're identifying more people, it will increase the number
14  of people who have suicide attempts in the period prior.
15  Q.  I'd like you to read right here.  It says, "It can
16  inflate the rate of suicide attempts prior to the initiation
17  of treatment."  You did write that, correct?
18  A.  Yes, I did.
19  Q.  You would agree that when you eliminated in your
20  sensitivity analysis the suicide attempts on the same date
21  as the index date, the results were no longer significant,
22  correct?
23  A.  The results of the analysis when we actually threw out
24  all of those suicide attempts on the same day in the bipolar
25  cohort showed no significant difference, indicating no

**42**

1 elevated risk associated with taking an antiepileptic drug.

2 Q. And they were no longer significant, correct? The

3 results were no longer statistically significant, correct?

4 A. There was no longer a statistically significant

5 decrease in the rate when we've eliminated them. But that

6 is a sensitivity analysis that's extremely conservative.

7 You would never find reason to eliminate all of those. This

8 was just done to look at what happens in the extreme, would

9 it in fact change it to a potentially harmful effect?

10 Q. Dr. Gibbons, I have up on the screen --

11       MR. ALTMAN: Your Honor, is your monitor on?

12 I just want to show you here, this is the contract,

13 part of the contract from PHARMetrics which set forth the

14 data which you acquired.

15       MR. BARNES: Can I have a copy of that, please?

16       MR. ALTMAN: Unfortunately, I do not have that,

17 but that's the one that I e-mailed you the other night,

18 Mr. Barnes.

19       MR. BARNES: Well, can I have a copy of it to look

20 at while you're examining the witness as a courtesy copy?

21       THE COURT: Hold on. What is this?

22       MR. ALTMAN: This is a copy of the contract for

23 the data that Dr. Gibbons acquired from PHARMetrics, and I

24 just want to ask him a question about it. Unfortunately, I

25 neglected to bring one this morning, but Mr. Barnes and I

**43**

1 discussed this very document just two days ago at

2 Dr. Greenland's deposition, and I e-mailed it to him

3 yesterday.

4       THE COURT: He doesn't have one. Have you seen it

5 before?

6       MR. BARNES: It was a point of controversy. It

7 was mislabeled in Dr. Greenland's report. I couldn't find

8 it. He e-mailed it yesterday. He did not tell me he was

9 going to use it in his report today. I didn't bring it --

10       THE COURT: He forgot to bring a copy.

11       MR. BARNES: That's fine.

12       THE COURT: He sent it to you. Now, how do you

13 want to solve this?

14       MR. BARNES: Let's proceed.

15 Q. Dr. Gibbons, I just want to ask you, File No. 3 which

16 is the drug file, that's where it lists which drugs you

17 obtained as part of the data set from PHARMetrics, correct?

18 A. That's correct.

19 Q. And it says "Drugs of interest, AED," correct?

20 A. Yes.

21 Q. Antidepressants, correct?

22 A. Yes.

23 Q. Lithium, correct?

24 A. Yes.

25 Q. And atypical antipsychotics, correct?

**44**

1 A. That's correct. That's what it says.

2 Q. Those are the drugs you obtained from PHARMetrics,

3 correct?

4       MR. BARNES: Objection.

5       THE COURT: Overruled.

6 A. Actually, that's incorrect. You raised this in our

7 deposition, and you pointed to this document, and it was

8 confusing to me. I since that time went back and took a

9 look at the list of drugs, and it does include typical

10 antipsychotics. There are drugs like Haldol in that list,

11 which is a typical antipsychotic.

12 Q. Okay, so with that exception, so potentially you did

13 get the typical antipsychotics?

14 A. That's correct.

15 Q. Okay. But you would agree, in your analyses, you did

16 not consider whether people were on stimulants, correct?

17 A. I would agree with that.

18 Q. Like drugs for attention deficit disorder, correct?

19 A. That's correct, I did not include those.

20 Q. Or weight-loss medications? Those are also stimulants

21 typically, correct?

22 A. I did not include those. I've included more drugs than

23 anyone has ever included in any study in this area by a

24 large number. I've included 79, the major classes that have

25 been thought to be implicated with suicide in these

**45**

1 populations.

2 Q. You didn't include depressants, correct?

3 A. Could you explain what you mean by a depressant?

4 Q. Drugs that tend to make people depressed. For example,

5 ethanol is not a prescription drug, but there are other

6 kinds of depressants. You didn't include depressants,

7 correct?

8 A. I don't think people make medical claims for gin and

9 tonic.

10 Q. But there are other drugs that are depressants that can

11 be used to bring manic people down, correct?

12 A. Again, the analysis is described in detail. The drugs

13 that I've adjusted for are described in detail. They have

14 withstood the process of peer review. They have withstood

15 the process of scrutiny by my colleague, Dr. John Mann, one

16 of our nation's leading psychopharmacologists. I stand by

17 this list.

18 Q. You didn't include anxiolytics, correct, such as Xanax

19 or Valium?

20 A. There were several anxiolytics that were included in

21 this analysis. Valium was included in this analysis. It

22 was one of the other antiepileptic drugs that's included in

23 this, as in addition to other -- there's one other I'm

24 forgetting the name of right now which is a part of that

25 list that is also used as an anxiolytic.

**46**

1    Q.   But you didn't include Xanax, did you?
2    A.   I didn't include Xanax, no.
3    Q.   Okay.  You didn't include pain medications, correct,
4    such as NSAIDs, Motrin, things like that, Tylenol, correct?
5    A.   No.  That was not the focus of this analysis.
6    Q.   And you didn't include opiates, pain medication such as
7    OxyContin or codeine or things like that, correct?
8    A.   That is correct.
9    Q.   Now, these drugs that you didn't include, these drugs
10   are psychoactive or psychotropic, correct?
11   A.   I'm not an expert on that.
12   Q.   Okay.  Since you're not an expert on whether these
13   drugs are psychoactive or psychotropic, then when you wrote
14   in your paper that -- you included these people had no other
15   psychotropic medications, what do you base that statement
16   on?
17   A.   I base that on the expert opinion of Dr. John Mann,
18   who, you know, reviewed all of these.  I base this on the
19   other psychopharmacologic literature in terms of other
20   studies that have been conducted in this area.
21   Q.   Are there multiple Dr. John Manns, or is there only one
22   Dr. John Mann?
23   A.   I don't know the answer to that.
24   Q.   Do you know more than one Dr. John Mann?
25   A.   I only know one Dr. John Mann.

**47**

1    Q.   Were you aware, Dr. Gibbons -- by the way, your
2    decision, the drugs that you got, it was also not just for
3    the bipolar cohort: that was for the gabapentin cohort as
4    well, correct?
5    A.   That's correct.
6    Q.   And so as you sit here, you relied upon Dr. Mann to
7    tell you what drugs that you should acquire, correct?
8         MR. BARNES:  Objection.
9         THE COURT:  You know, you know, I'm walking out
10   this door at 11:00 o'clock.
11   A.   I relied on several people.  I relied on the
12   pharmacists at the VA who helped us in the VA study to
13   acquire our list of antidepressants.  I relied on
14   interactions I've had with Dr. Rob Valuck at the University
15   of Colorado, one of the leading pharmacoepidemiologists, to
16   review our lists.  I relied on the peer-review process of
17   the paper of the American Journal of Psychiatry for the VA
18   cohort and the Archives of General Psychiatry for the
19   bipolar paper to review and tell me whether or not I had
20   left out important classes of drugs.  In no cases did anyone
21   raise an issue that I had left out important classes of
22   drugs in this analysis.
23   Q.   Do you know as you sit here whether any of the drugs
24   that we listed before that you didn't get are psychoactive?
25   A.   You've listed a lot of drugs.  Perhaps some of them

**48**

1    are: perhaps some of them aren't.  You know, I'm not sure
2    what your definition of "psychoactive" is.  The important
3    thing in this analysis is to control for other classes of
4    drugs that have been thought to be implicated with
5    suicidality.  So an obvious choice is to control for
6    antidepressant drugs that have been implicated in the
7    possible relationship to suicidality.  To not control for
8    antidepressant drugs would be a big mistake.  While you're
9    in the neighborhood, controlling for antipsychotic drugs is
10   a very good idea.  And, of course, the eleven antiepileptic
11   drugs that FDA looked at is not the total list of
12   antiepileptic drugs.  To include the additional ones is also
13   important.  We felt that those were the important
14   concomitant therapies to look at.
15   Q.   Dr. Gibbons, you did a declaration when we tried to
16   take the deposition of Dr. Mann in this case that Dr. Mann
17   had nothing to do whatsoever with your expert report,
18   correct?
19        MR. BARNES:  Objection.
20   A.   Dr. Mann didn't even know I was involved in this case.
21   Q.   You wrote, "I do not believe that Drs. Hur, Brown, or
22   Mann possess any knowledge or have formed any opinions
23   concerning the specific expert issues that have been raised
24   in this litigation, or the contents of my expert reports."
25   When you wrote that, you knew that Dr. Mann had helped you

**49**

1    figure out what drugs to put into your analysis, right?
2         THE COURT:  You know what, can I just say this?
3    Don't do your impeachment here for what you plan on doing at
4    trial.  I am only looking at whether or not two of his
5    opinions pass muster.  And let me just say, my threshold
6    take on this is that "yes" to the bipolar, and I'm worried
7    about the gabapentin.  I don't care if he said one thing one
8    place and one thing another.  We're really going to whether
9    these studies are admissible.  And I don't have all day.
10   Remember we were talking about half an hour apiece?
11        MR. ALTMAN:  I understand.  Your Honor, the only
12   reason that I raise this is, he doesn't know the effect that
13   all these other drugs could have had in his study.  We tried
14   to get some information as part of the discovery process as
15   to how he selected --
16        THE COURT:  You know, if you want to use this as a
17   deposition, you can use it as a deposition, but I'm walking
18   out at 11:00, and I'm telling you where I'm leaning.
19        (Discussion off the record.)
20   Q.   Dr. Gibbons, we talked about the issue with multiple
21   suicide attempts on consecutive days.  Do you know how many
22   times that happened within your studies?
23   A.   No, I don't.
24   Q.   And you said that you adjusted for the multiple
25   attempts.  Did you ever use the actual number of suicide

50

1    attempts for any of these patients in any of your
2    calculations?
3        A.  I'm not sure I understand your question.
4        Q.  Well, if we agree that a person didn't actually attempt
5    suicide on five consecutive days --
6        A.  Sir, you and I do not agree on --
7        Q.  Okay, but if the person didn't attempt suicide on five
8    consecutive days, you did another analysis where you only
9    counted one suicide attempt no matter how many they had,
10   correct?
11       A.  I did one analysis that used the medical claim record
12   that stated the number of suicide attempts that that patient
13   had made, and another sensitivity analysis that said, well,
14   what would happen if we simply say a person had made either
15   no suicide attempt or one or more suicide attempts, to see
16   whether or not the effect of multiple counting had any
17   effect on the inferences that are drawn from that analysis.
18       Q.  But you never used the actual number of suicide
19   attempts per person, correct?
20       A.  Sir, I don't know what the actual number of suicide
21   attempts are.  I don't know if every other day was a real
22   suicide attempt and the middle days were not real or that
23   every single one of them.  It's not beyond the realm of
24   possibility that in a few obscure cases, somebody made a
25   suicide attempt every day.

51

1        Q.  And you would agree that your results are completely
2    dependent on numbers of suicide attempts, correct?
3        A.  I disagree with that.  My results and my sensitivity
4    analysis clearly show that looking at the numbers of suicide
5    attempts versus the binary decision of whether or not a
6    person made a suicide attempt or not give a virtually
7    identical result.  So in fact my conclusions are invariant
8    to the question of whether or not those multiple suicide
9    attempts are real or not.
10       Q.  I just have a couple more questions, Dr. Gibbons.  You
11   said you did your sensitivity analysis when you adjusted for
12   the person-time issue, correct?
13       A.  I'm not following your question.
14       Q.  We talked about the person-time issue where somebody
15   was on or off the drug, and you said you did a sensitivity
16   analysis to calculate that, correct, to look at that issue,
17   correct?
18       A.  I did a person-time analysis, yes.
19       Q.  When you did that analysis, you stopped when a person
20   had their first suicide, correct?
21       A.  That's correct.  That's the way that analysis works.
22       Q.  They could have had more suicides after that, correct?
23       A.  That is true.
24       Q.  And when you did that for gabapentin, those results
25   were no longer significant, correct, statistically

52

1    significant, correct?
2        A.  I'm not following -- when I did that for gabapentin?  I
3    did that for the overall cohort.
4        Q.  You also did it for the gabapentin group as well,
5    didn't you?
6        A.  Not to my knowledge.  I don't know what you're
7    referring to.
8        Q.  Okay, Dr. Gibbons, I'm holding in my hand the output
9    that you provided to us of your analysis, SuperMix?  That's
10   what I think you used to do this, correct?
11       A.  That's correct.
12           THE COURT:  What's SuperMix?
13           THE WITNESS:  SuperMix is a statistical software
14   package that does this kind of analysis.
15       Q.  Okay.  And on the last page you provided the results of
16   your SuperMix calculation, correct?
17       A.  I'm not really sure what you're referring to, and that
18   doesn't seem -- that analysis does not ring a bell.  The
19   analyses are -- I'm not sure what that -- I'm not sure what
20   that actually is.
21           The gabapentin, there weren't really enough
22   patients in the bipolar cohort to do a meaningful
23   person-time analysis for gabapentin alone.
24       Q.  Do you see here, this is your printout, it says --
25           THE COURT:  Sometimes if you fold it over.

53

1    Everyone has that problem.  It's good to get in practice for
2    next week.
3        Q.  Do you see right here, it says "PHARMetrics AED data,
4    gabapentin only"?
5            MR. BARNES:  May I have a copy of it?  Again, I've
6    never seen this one before.
7            MR. ALTMAN:  This I do have a copy of.
8            THE COURT:  This is what's not going to happen
9    next week because everyone's going to show up with a pile of
10   documents in the morning, and we're going to go through in
11   the order, and if it's not in that pile, you don't get to
12   use it.
13           MR. BARNES:  Can the witness look at the entire
14   document?
15           THE COURT:  Sure.  You can stand and look over his
16   shoulder.  This is really informal.  This is a Daubert
17   hearing, it's fine.
18           (Witness examining document.)
19       A.  This appears to be one of the analyses that looked
20   at -- appears to be an analysis of looking at gabapentin by
21   itself, adjusting for concomitant medications, prior suicide
22   attempts.  It looks to be like a logistic regression
23   analysis.  This isn't something that I've described in my
24   report or relied upon in my opinion.
25           THE COURT:  What does it show?

14 (Pages 50 to 53)

**54**

1        THE WITNESS:  What it shows is that the odds ratio
2   for gabapentin is consistent with what we saw for
3   antiepileptic drugs in general.  It has an odds ratio of
4   .62, which is a reduction in the rate of suicide attempts
5   for gabapentin alone.  It also shows that that result is not
6   statistically significant.  The probability value is .158,
7   indicating that we can't reject a null hypothesis of no
8   difference, but the direction of the effect is consistent
9   with what we see for the overall composite.
10  Q.   Just to make sure that I understand it, in your paper
11  you described the overall analysis.  You did the same
12  analysis for all the antiepileptic drugs, correct?
13  A.   Right.  To do this kind of analysis and to rely upon
14  this analysis to make sure there us sufficient power, we
15  really needed to have the full mass of the sample, to have
16  all of the antiepileptic drugs.  This appears to be an
17  analysis that I did looking at gabapentin in particular,
18  which was consistent with the overall effect but is
19  underpowered to find an effect.
20  Q.   But you claim it's consistent with the effect of the
21  overall antiepileptics, correct?
22  A.   Yes, I do.
23  Q.   Dr. Gibbons, I just want to end with one thing here.
24  In the end, if we take all of the statistics and we put it
25  all aside, you say this finding suggests a possible

**55**

1   protective effect of antiepileptic treatment on suicidality,
2   correct?
3   A.  I said that where?
4        THE COURT:  The second line down.
5   Q.  The second line of your paper.
6        THE COURT:  That is what I was referring to
7   before.  Look on the screen, it's your article.
8        (Witness examining document.)
9   A.  Yes.
10       MR. ALTMAN:  Thank you, Dr. Gibbons.  Your Honor,
11  may we have two minutes to, if he does a redirect, two
12  minutes to just close after he's done?
13       MR. BARNES:  I have no redirect.  Just maybe five
14  minutes for each side for summary close?  Dr. Gibbons, you
15  may step down.  Thank you very much.
16       (Witness excused.)
17       MR. BARNES:  Your Honor, we have one issue
18  Mr. Cheffo would like to raise briefly, either now or before
19  the close.
20       MR. CHEFFO:  Yes, I don't want to interrupt your
21  Honor now, but I would just like to just reserve five
22  minutes, if I could, your Honor.
23       THE COURT:  Maybe.  I'm assuming we'll have time.
24       MR. CHEFFO:  Thank you.
25       MR. ALTMAN:  Your Honor, I'll be extremely brief.

**56**

1   I think after examining --
2        MR. FROMSON:  We went first, your Honor, for
3   opening.  Wouldn't defense go first?
4        THE COURT:  Yes.
5        MR. BARNES:  Thank you, your Honor.  I won't be
6   long.
7        THE COURT:  He just loves the limelight there.  He
8   can't sit down.
9        (Discussion off the record.)
10       MR. BARNES:  Your Honor, you've raised earlier, I
11  think on Tuesday, why are we here?  We're here because the
12  plaintiffs have challenged a preeminent scientist and
13  statistician in the field of suicide and suicide
14  measurements.  I want to go through briefly two things in
15  the record that you need to consider as to the gabapentin
16  cohort and why it's clearly admissible under Rule 702 and
17  the Daubert standards.
18       First, Slide 1.  Your Honor, you asked
19  Dr. Greenland here -- could we have Slide 1, please.  3, I'm
20  sorry.  Thank you.  This is in response to your Honor's
21  question:  "All right --" this is the Court -- "so you have
22  no problems with the methodology.  You have a problem with
23  the way the conclusions are too strongly stated."
24  Dr. Greenland said to you "Yes."
25       "The Court:  Subject to limitations, all right.

**57**

1   Now, do you have a different feeling about the papers?"
2   This is the gabapentin study.  "Do you think that the
3   methodology -- excuse me I said that wrong -- the
4   methodology of the expert reports is flawed?"
5        THE COURT:  So the first question was about the
6   bipolar?
7        MR. BARNES:  Yes, ma'am.
8        THE COURT:  All right, I'm just making sure.
9        MR. BARNES:  Yes.  And then the second one
10  (Inaudible) to the gabapentin study in the papers.
11  Dr. Greenland flies all across the country after having
12  filed his report and tells the Court and counsel that the
13  methodology is basically similar between the two, so, again,
14  that's not the issue --
15       THE COURT:  Wasn't it referring to the using the
16  PHARMetrics database before and after?  It wasn't referring
17  to whether or not sensitivity analyses were done because he
18  criticized that.
19       MR. BARNES:  No, he admitted that the sensitivity
20  analyses and the bipolar paper was adjusted for, but he said
21  not completely.  But I think what's clear here is,
22  Dr. Greenland on cross-examination and in response to your
23  Honor admitted on several occasions that Dr. Gibbons'
24  PHARMetrics methodology and the methodology he described
25  here this morning was valid and reasonable and acceptable.

58

1 He did not criticize the method.  He did not criticize the
2 use of PHARMetrics' database.  His criticisms boiled down to
3 the conclusions, okay?
4         Now, I took Dr. Greenland's deposition right after
5 court on Tuesday on his supplemental expert report, and I
6 want to play about one minute of clip where I asked him
7 about the conclusions.  So if you turn to the screen, this
8 is Tuesday afternoon after court when I was deposing
9 Dr. Greenland.  This is as to the issue of the ipse dixit,
10 does his conclusions follow from the methodology, and let's
11 play those two:
12         DEPOSITION TESTIMONY PLAYED AS FOLLOWS:
13         "Q.  Would you agree with the statement that
14 Dr. Gibbons' study, his PHARMetrics paper, supports the
15 hypothesis that there's no increased risk for suicidal
16 thinking and behavior associated with antiepileptic drugs?
17         "A.  I would say that it -- yes, I would say that
18 it supports the hypothesis, that it provides -- that it's a
19 weaker scale than statistical significance indicates because
20 it's not an randomized trial.
21         "Q.  And with regard to the gabapentin paper,
22 would you agree with the statement that Dr. Gibbons'
23 findings in the gabapentin study and the supplemental
24 reports supports the hypothesis that gabapentin does not
25 increase the risk of suicide attempts?

59

1         "A.  Again the same comment.  Again, I would -- I
2 would personally say it's in the direction of supporting,
3 but, again, it's much weaker than that statistical
4 significance would suggest because, again, it's not a
5 randomized trial, and it has all these problems.
6         "Q.  It has limitations of a pharmacoepidemiologic
7 (Inaudible)?
8         "A.  Correct."
9         MR. BARNES:  Your Honor, that afternoon we talked
10 about the conclusions.  I didn't have a chance to ask him
11 that question because of time.  So not only does he admit in
12 court that the methodology is valid and reasonable in
13 response to the Court -- and there were other statements he
14 made -- I picked two because of time -- that afternoon I
15 went to the conclusions, and he said, yes, the hypothesis is
16 supported by Dr. Greenland's studies.
17         So what we have is the hypothesis of no increased
18 risk in suicidal thinking and behavior.  So what we have
19 here is an expert.  We have a Daubert motion that's filed.
20 Your Honor appropriately scheduled a hearing.  We have
21 vigorous cross-examination.  We have a deposition per
22 agreement.  And the witness who was sponsored as the primary
23 critic of Dr. Gibbons admits the methodology is fine and
24 that the conclusions follow from the methodology because
25 they support the hypothesis that was tested as Dr. Gibbons

60

1 explained this morning as to the hypothesis.
2         So we have met not only the threshold of Daubert
3 on the gatekeeping function you need to consider -- we're
4 way past that -- we now have joinder by two prominent
5 statisticians on methodology.  Yes, there are criticisms,
6 but the methodology was reasonable.  The conclusions are,
7 it's the strength of the conclusion, and I'd like to show
8 the last slide because First Circuit law focuses on not the
9 conclusions, even though we have -- we have pretty much
10 agreement on the conclusions.
11         THE COURT:  You do not have agreement on the
12 conclusions.
13         MR. BARNES:  Your Honor --
14         THE COURT:  You don't have agreement on the
15 conclusions.
16         MR. BARNES:  All I have is the witness's
17 testimony.  It's not total agreement, but it's quarreling
18 over the strength.
19         THE COURT:  He thinks he's overstating what it
20 shows.
21         MR. BARNES:  Okay, fair enough, absolutely.  But
22 the point is, the point is, we're not even looking at
23 conclusions; we're looking at the methodology.  So we've had
24 a hearing this week.  We have satisfied every possible
25 expectation under Daubert, and I appreciate the opportunity

61

1 you've given us to do so.
2         So just one last comment about the gabapentin
3 paper.  No expert witness in this case has been subject to
4 peer review except the defense experts, Dr. Taylor, who will
5 testify, and Dr. Gibbons.
6         THE COURT:  Trimble has been?
7         MR. BARNES:  Who?
8         THE COURT:  Trimble.
9         MR. BARNES:  Not on the issue of -- okay, well
10 he's a peer -- he's a -- but I'm talking about gabapentin in
11 particular.  So my point to your Honor is, we have Dr. Maris
12 testifying on a psychological autopsy, which is a very soft
13 end point, and you have Dr. Gibbons who has peer reviewed
14 the methodology in the bipolar cohort.  He explained the
15 differences.  I believe we've more than -- it's been
16 extremely rigorous.  They've tested it.  Dr. Greenland has
17 come in, he's kick the tires.
18         As to the gabapentin paper and the gabapentin
19 study, it clearly meets Daubert.  He's been deposed.
20         THE COURT:  All right, I got the point.
21         What's your opposition?
22         MR. ALTMAN:  Your Honor, if you'll indulge me for
23 a second on a brief analogy, I think we'll put it all into
24 perspective.  What we have here is, Dr. Gibbons is handing
25 you a box with an apple pie in it.  And he put apple in it,

**62**

1  he put sugar in it, and it's got pie crust. The other
2  problem, though, is, he went into his spice cabinet. He's
3  got a bunch of spices that don't have labels. He doesn't
4  know what's in the pie. That's the problem. He's making
5  the conclusion that this is going to taste like pie.
6      THE COURT: How could I possibly exclude the
7  bipolar study?
8      MR. ALTMAN: Because he says it merely suggests a
9  possibility.
10     THE COURT: He's going to have to say that on the
11  stand, but how could I -- that it's possible that it's
12  protective, but it is not showing an increased risk.
13     MR. ALTMAN: It's not reliable if it suggests a
14  possibility, but I think he should also have to -- if your
15  Honor is going to let it in, I think he should also have to
16  put some of these limitations in.
17     THE COURT: Well, sure, you can cross on that.
18  I'm allowing in the bipolar study.
19     Now, let's get to the one I'm more concerned
20  about, which is the gabapentin.
21     MR. ALTMAN: Well, the gabapentin --
22     THE COURT: Listen, I thought that -- I never met
23  Professor Greenland. He was totally credible. He's such an
24  academic. He could be Hollywood cast for an academic, okay?
25  He's totally believable. He's a lovely man, but he hedged

**63**

1  everything he said. So, I mean, if I can say this, that
2  Professor Gibbons is a far more polished witness. Now, he's
3  certainly got a bias. He's been paid for by Pfizer, so I
4  have some greater level of concern about the gabapentin
5  paper than I do the bipolar paper because it is generated
6  for litigation. And I've got serious concerns about the
7  issue of not measuring -- of assuming patient exposure
8  years.
9      So that is what I am thinking about, okay, not --
10  it sort of hasn't panned out, the whole issue of which
11  medications he called in for. He says he did. You said he
12  didn't. Maybe he missed Xanax, but he got Haldol. You
13  know, that goes to the weight of it, not its admissibility.
14     My only concern, let me just say as I'm sitting
15  through it all, that using that database is standard in the
16  industry: using the methodology of before and after on the
17  database is standard in the industry. The issue is -- you
18  know, I'm being rushed to do this within a week by both
19  sides. They put stuff forward late. You raised a Daubert
20  motion two weeks ago. This is not the way it ideally should
21  happen, but I'm dealing with the deck of cards I've been
22  handed, all right?
23     So my big concern is, based on my knowledge of
24  case and my knowledge of Neurontin and the entire record, is
25  whether or not measuring that sensitivity analysis that was

**64**

1  required for the paper in the gabapentin study undermines
2  its reliability. That is my concern, so I can just tee it
3  right up. I need you to bring this home, not apple pies. I
4  want to understand: Did Mr. Greenland really say, if you
5  looked at the doctrine of completeness, that he agreed with
6  the full methodology of the gabapentin study?
7      MR. ALTMAN: No, I don't believe --
8      THE COURT: I would like to see a transcript of
9  that deposition before I make a ruling because my
10  instinct -- this is where I'm leaning towards -- is, when
11  you do the opening statements on Monday, you can refer to
12  the bipolar study if you do so with the limitations that
13  Dr. Gibbons himself put on it. It's possible protective,
14  possible. It's got to refer to the fact that this is a
15  different study from the FDA, but why he -- you have expert
16  testimony that makes you think that the FDA study isn't
17  reliable. And I don't want you mentioning, not mentioning
18  the gabapentin study until I get to see a full deposition
19  transcript because I've got huge concerns about not doing
20  the same thing for the both studies. Maybe he didn't have
21  time. I have serious problems with assuming that if you
22  have a prescription for 30 days, you had it for a year.
23     MR. BARNES: Your Honor, we have a half an hour.
24  We could have Dr. --
25     THE COURT: No, we're not. This is over. I am

**65**

1  out of here. Now, I want to see the deposition transcript,
2  and then I'll make my final ruling.
3      MR. BARNES: I probably did not cover this issue
4  because it was covered in the hearing on the methodology.
5      THE COURT: I'm not reopening this transcript.
6  This is what I've got. It's over. I want to read the
7  deposition transcript. Right now it's a direct order. In
8  opening statements, I am finding that the defendants have
9  met their burden of reliability with respect to the bipolar
10  study. It's been admitted in a peer review. Both experts
11  agree the methodology is sound. Both experts agree that the
12  database is sound, and both experts agree that there were
13  appropriate sensitivity analyses, with the exception that
14  Professor Greenland said it would have been better if he had
15  looked at a direct correlation between when the person
16  committed suicide and the amount of time on the drug. He
17  says he did. I can't resolve that right here, and that's
18  a ground for cross-examination.
19     You cannot mention the bigger study, if you will,
20  on the entire gabapentin cohort at this point because I have
21  not made a final ruling. And at this point I am profoundly
22  worried about the core assumption here, which is that if you
23  were prescribed it once, you were on it for a year. And I
24  want to see because I am worried about that last quote from
25  Dr. Greenland which basically looked as if he said he had no

**66**

1   problems with the methodology. I don't know whether that
2   was similarly hedged as it was on the trial or whether it
3   was a broader statement. I don't know why there was a
4   deposition done about it afterwards. I mean, that's not
5   great from my point of view because I didn't get a chance to
6   ask my own questions, but that's the way it is.
7       Now, let's move on.
8       MR. BARNES: Your Honor, I'm sorry, one other
9   point. The data itself -- it's in the data. There's no
10  problem in the data with regard to this 30-day issue and
11  after. All you have to do is look at the data. It's not
12  even an issue. If you count the attempts pre- --
13      THE COURT: I've asked him. I asked him three
14  times. He assumed that if you took it on day one and you
15  had a 30-day prescription, you were on it for the year,
16  right?
17      MR. BARNES: Yes, in the (inaudible) of the study,
18  that is true. But the data don't lie. The data account for
19  this --
20      THE COURT: Excuse me. I've done the Daubert
21  study. You -- let me say this to Pfizer, okay? I
22  allowed -- the FDA study arose late in this game. I can't
23  imagine what it was like to be the lawyer to wake up that
24  morning when the FDA study came out. The whole dynamic of
25  this case changed. When the Food and Drug Administration

**67**

1   says something is associated with suicide, I take it
2   seriously. There was no way on earth once that happened
3   that this case did not change dramatically.
4       So then you got the fancy-shmancist expert you
5   can, he's got all these awards, to respond to the FDA study.
6   Fair game, okay? No one's perfect, not even the FDA. But
7   then you came up with this brand-new study out of the blue,
8   okay. And then I said I'll let you do it just to respond to
9   the FDA. And then it kept changing. It kept changing. And
10  there were criticisms and people -- and there were huge
11  criticisms, and no one teed it up for me until two weeks
12  ago. I am doing the best that I can. What will happen in
13  future litigation, I don't know. Right now I have a concern
14  about the core methodology with respect to assuming that if
15  you took it once, you took it for the entire year.
16      At the end of the day, this may help Pfizer or
17  hurt Pfizer. You just can't know whether that assumption,
18  if done in person-hours, actually ends up being the same as
19  with the bipolar or ends up being differently. This is what
20  I've got, and it's stopping here. And I want to see the
21  deposition transcript, and then I'll make a ruling, but in
22  no circumstances should this be raised in the opening
23  statement with respect to the overall gabapentin study. It
24  may come up in some ways on cross if you raise certain
25  things, but I can't predict that now.

**68**

1       I am not going to allow you to subpoena someone
2   who was not on the witness list. I understand that this creates
3   an awkwardness, which is you have to put in your case
4   through videotape depositions. Put on Franklin first if you
5   need a little firepower in the beginning. I don't have to
6   worry about your strategy. That's the way it is. You have
7   some of the most experienced lawyer in the country. You
8   know this.
9       MR. CHEFFO: I do, Judge.
10      THE COURT: You've known it for a long time. No
11  new witnesses. It's not so much the apex witness issue.
12  It's the issue that he wasn't on the witness list. And I
13  have to stop this case from hemorrhaging out of control,
14  okay? So as far as I'm concerned, unless something
15  genuinely new comes up, like some new witness comes up out
16  of the blue, you know, we're not going to do this.
17      Now, who is going to be the first set of witnesses
18  on the first -- don't forget, we'll impanel Monday
19  afternoon.
20      MR. FROMSON: Judge, in light of your ruling just
21  now, we'll speak with our team. We'll make our disclosure
22  within the 24-hour time period as ordered by the Court's
23  protocol.
24      THE COURT: But what you don't want to do is start
25  crying wolf with me --

**69**

1       MR. FROMSON: Oh, I'm not crying wolf. I think we
2   may --
3       THE COURT: In terms of like these motions, you
4   don't want me to be an eye roller, like, oh, gosh, you know?
5       MR. FROMSON: I have no other motions planned,
6   Judge.
7       THE COURT: Okay, no more like this, unless
8   there's genuinely discovered evidence. That does happen.
9   Life isn't perfect. Something that couldn't have been
10  contemplated before. So as I said --
11      Have you checked yet? Did we do a 2:00 o'clock
12  call-in? What time should these folks be here?
13      (Discussion off the record between the Court and
14  Clerk.)
15      THE COURT: So maybe if you came at 1:00 o'clock
16  on Monday because as, unfortunately, I mentioned to you
17  before, I'm going to be sitting with the First Circuit in
18  the morning. That's not unfortunate: it's just that the
19  timing didn't work so well. So we're bringing the jurors in
20  for 2:00. I'm going to do -- I haven't heard from you, so
21  that's good. I'm not asking for -- I'm going to use
22  something like a question that we talked about and then go
23  from there, ten jurors.
24      MR. CHEFFO: Maybe I should -- my silence was that
25  we agreed that if you use the question that we talked about,

70

1 that we would not make a position that you had to inquire of
2 them individually, so I think we were on the same page.
3 THE COURT: Yes, yes. So that's it. And no
4 opening statements I think would we have time for. An hour
5 apiece on Tuesday morning. And then you need to give them
6 on Monday exactly -- both sides need to exchange the chalks
7 that you're going to use, and both sides need to confer
8 about who the first -- your first witnesses are, let's say
9 first two, and the exhibits that you're going to use.
10 MR. FROMSON: Yes, Judge.
11 THE COURT: And the reality is, if you're only
12 going to realistically have one witness -- I don't know.
13 Who are you going to have?
14 MR. FROMSON: Well, if it's after the opening
15 statements and we're ending at 1:00, I don't imagine we'd be
16 able to have more than --
17 THE COURT: I think likely just one, right, unless
18 it's some little fact witness for the death.
19 MR. FINKELSTEIN: We're planning only one.
20 THE COURT: Okay, you've both given me memos which
21 I've not even had a chance to read yet on the hearsay rules.
22 MR. FROMSON: Judge, can I ask a question on a
23 totally different issue, involuntary selection? You gave us
24 a quick lesson on it on Monday, and I just don't know the
25 method by which the parties are going to use their

71

1 peremptories. My experience is that in a first round --
2 THE COURT: I tell you what, ask Mr. Alba.
3 MR. FROMSON: I did. Mr. Alba was very
4 informative. Basically he said, "You may want to inquire of
5 the Judge."
6 THE COURT: What's the issue?
7 MR. FROMSON: The issue is, when we have our first
8 round of peremptories, plaintiffs' position and experience
9 is, we pick one, and then we hand a board over to the
10 defense, they pick one, and it comes to us.
11 THE COURT: No, no. You'll pick all of yours, and
12 then they'll pick all of theirs, and the next time around
13 they pick all of theirs, and then you pick all of yours. I
14 used to do it that way, and it took forever.
15 MR. FROMSON: Okay, as long as the Court is aware,
16 we would prefer the former way as opposed to the latter.
17 Thank you, Judge.
18 THE COURT: I could do the strike method. That's
19 the one lawyers hate the most, right?
20 MR. FROMSON: Yes, your Honor.
21 THE COURT: My biggest concern is getting a jury
22 that's willing to sit for three of the prime vacation weeks.
23 MR. FROMSON: Thank you for the clarification.
24 THE COURT: Okay, thank you. You're all done?
25 MR. BARNES: Thank you, your Honor.

72

1 MR. FINKELSTEIN: Thank you, your Honor.
2 THE CLERK: Court is in recess.
3 (Adjourned, 10:40 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

73

1 C E R T I F I C A T E
2
3
UNITED STATES DISTRICT COURT )
4 DISTRICT OF MASSACHUSETTS   ) ss.
CITY OF BOSTON           )
5
6
7 I, Lee A. Marzilli, Official Federal Court
8 Reporter, do hereby certify that the foregoing transcript,
9 Pages 1 through 72 inclusive, was recorded by me
10 stenographically at the time and place aforesaid in Civil
11 Action No. 04-10981-PBS, In Re: Neurontin Marketing, Sales
12 Practices, and Product Liability Litigation, and thereafter
13 by me reduced to typewriting and is a true and accurate
14 record of the proceedings.
15 In witness whereof I have hereunto set my hand
16 this 23rd day of July, 2009.
17
18
19
20
21 /s/ Lee A. Marzilli
_____
22 LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER
23
24
25

**A**

**able** 70:16
**absolutely** 26:15,25
  36:21 37:11 38:3
  60:21
**academic** 62:24,24
**acceptable** 57:25
**accepted** 7:7,8,12 8:8
  23:7 38:1
**access** 9:9
**account** 66:18
**accurate** 73:13
**acquire** 47:7,13
**acquired** 42:14,23
**action** 4:3 73:11
**actual** 12:2 49:25
  50:18,20
**addition** 16:5 45:23
**additional** 6:2,8 8:24
  15:8 38:16 48:12
**addressed** 24:25
  25:1
**addresses** 25:21
**adjourned** 72:3
**adjust** 16:8
**adjusted** 16:6 25:17
  26:24 45:13 49:24
  51:11 57:20
**adjusting** 15:25 16:3
  53:21
**adjusts** 25:13 26:21
**administration**
  31:15 66:25
**administrations**
  31:18
**admissibility** 63:13
**admissible** 49:9
  56:16
**admit** 59:11
**admits** 59:23
**admitted** 57:19,23
  65:10
**advise** 6:7
**aed** 10:2 14:21,24
  15:1,3,5,7 18:6,8
  18:9 21:7 24:7

33:15 36:19 37:6
  43:19 53:3
**aeds** 10:7,12,17
  18:12
**aforesaid** 73:10
**afternoon** 32:22 58:8
  59:9,14 68:19
**age** 16:6 21:8
**ago** 43:1 63:20 67:12
**agree** 28:23 38:23
  40:11,20 41:19
  44:15,17 50:4,6
  51:1 58:13,22 65:11
  65:11,12
**agreed** 64:5 69:25
**agreement** 59:22
  60:10,11,14,17
**alba** 71:2,3
**alert** 9:12
**allocate** 32:9
**allocation** 32:2,14
**allow** 68:1
**allowed** 66:22
**allowing** 62:18
**allows** 25:16
**alternate** 24:22
**altman** 2:4 3:5 4:10
  4:10 38:7,9 42:11
  42:16,22 49:11 53:7
  55:10,25 61:22 62:8
  62:13,21 64:7
**american** 31:13
  47:17
**amount** 65:16
**analogy** 61:23
**analyses** 6:3,9 13:3
  16:2,23 18:4 20:9
  21:9 22:25 23:1,2
  23:23 24:5 30:6
  31:19 36:12 38:16
  39:9 40:4 41:4
  44:15 52:19 53:19
  57:17,20 65:13
**analysis** 12:24 13:25
  14:11,12 15:23
  16:15 18:2 20:8

24:3,3,6,12,12,20
  24:22,25,25 25:7,12
  25:22 26:21 27:1,10
  27:13 28:13,18,22
  30:4,10 32:17 36:23
  37:8,12,17 41:20,23
  42:6 45:12,21,21
  46:5 47:22 48:3
  49:1 50:8,11,13,17
  51:4,11,16,18,19,21
  52:9,14,18,23 53:20
  53:23 54:11,12,13
  54:14,17 63:25
**andrew** 2:3 4:6
**answer** 46:23
**antidepressant**
  18:13,17 48:6,8
**antidepressants**
  13:4 16:10 43:21
  47:13
**antiepileptic** 8:13,18
  10:2,3 11:2 13:15
  14:6,7,16 16:7,11
  16:21 17:7,8,8,13
  17:21,23,23 18:14
  18:17 22:8 25:19,23
  26:1 28:17 34:23,24
  35:15 36:4,5,13,24
  37:1,13,16,16 40:24
  42:1 45:22 48:10,12
  54:3,12,16 55:1
  58:16
**antiepileptics** 54:21
**antipsychotic** 18:12
  18:18 44:11 48:9
**antipsychotics** 16:10
  43:25 44:10,13
**anxiety** 16:12
**anxiolytic** 45:25
**anxiolytics** 45:18,20
**apex** 68:11
**apiece** 49:10 70:5
**apparently** 23:5
**appear** 22:11
**appears** 53:19,20
  54:16

**apple** 61:25,25 64:3
**apples** 34:11
**application** 32:6
**apply** 28:10
**appreciate** 60:25
**appropriate** 19:17
  23:17 28:18 65:13
**appropriately** 59:20
**approximately** 20:23
  33:3
**april** 7:13
**archives** 8:9,15
  16:14,16 47:18
**area** 11:5 44:23 46:20
**areas** 32:12
**arent** 12:8 33:17 48:1
**argument** 34:13
**arose** 66:22
**arps** 2:9 4:12,15
**article** 7:5,12 15:13
  15:15,16,18 55:7
**aside** 28:25 54:25
**asked** 38:13 56:18
  58:6 66:13,13
**asking** 69:21
**aspect** 26:13
**asserting** 26:13
**assistance** 10:9
**associated** 8:18 18:7
  22:21 24:14 36:3
  39:21 42:1 58:16
  67:1
**association** 35:12,13
**assume** 26:3
**assumed** 29:25 30:13
  66:14
**assuming** 55:23 63:7
  64:21 67:14
**assumption** 26:3
  65:22 67:17
**attempt** 13:8 14:5
  15:6,22,24,25 19:8
  19:12 22:7 24:14
  25:5,25 26:2,5,6
  27:20,22,23 28:2,7
  35:17 37:3 40:13

50:4,7,9,15,22,25
51:6
**attempts** 8:19,20
11:7,11,13,16,17,25
12:4,16,23 13:17
16:1,5,20 17:14,19
20:15,20 21:1,5,12
21:12,24 25:3,5,9
35:3 36:1,3 37:15
40:21 41:6,14,16,20
41:24 49:21,25 50:1
50:12,15,19,21 51:2
51:5,9 53:22 54:4
58:25 66:12
**attention** 44:18
**attributed** 25:24
**attributing** 37:14
**atypical** 16:10 43:25
**autopsy** 61:12
**awards** 67:5
**aware** 47:1 71:15
**awkward** 4:23
**awkwardness** 68:3
**axis** 13:23

**B**

**baby** 27:8 37:9
**back** 5:25 32:19 38:6
44:8
**background** 40:23
40:25
**bad** 29:8
**baltimore** 2:11
**barnes** 2:10 3:5 4:16
4:16,20,24 5:9,13
6:25 7:4,7,14,17,20
7:22 8:5 11:16
13:24 22:13 23:21
23:25 26:16,20 27:4
27:6 32:6,8 37:21
38:4,13 41:8 42:15
42:18,19,25 43:6,11
43:14 44:4 47:8
48:19 53:5,13 55:13
55:17 56:5,10 57:7
57:9,19 59:9 60:13

60:16,21 61:7,9
64:23 65:3 66:8,17
71:25
**base** 46:15,17,18
**based** 30:14,16 34:23
34:24 63:23
**basically** 57:13 65:25
71:4
**beginning** 68:5
**behavior** 13:1 33:22
58:16 59:18
**believable** 62:25
**believe** 6:16,16 11:17
38:15,20 40:22
48:21 61:15 64:7
**bell** 52:18
**best** 12:14 67:12
**better** 9:12 33:13,17
33:18 65:14
**betweensubject** 18:2
18:4
**beyond** 18:21 19:10
50:23
**bias** 63:3
**big** 14:8 48:8 63:23
**bigger** 65:19
**biggest** 71:21
**binary** 25:4 51:5
**binder** 5:17
**biostatistics** 32:16
38:2
**bipolar** 8:14,20 9:15
9:16,21 10:25,25
11:1,8,13 14:20
15:9,23 16:23 17:2
17:4,5,14 20:7,11
21:7,25 22:16,21,23
22:25 23:2,24 24:7
26:24 27:13,20
33:16 35:22 39:13
40:12,14 41:24 47:3
47:19 49:6 52:22
57:6,20 61:14 62:7
62:18 63:5 64:12
65:9 67:19
**blackboard** 14:3

**blue** 67:7 68:16
**board** 71:9
**boards** 9:8
**boiled** 58:2
**book** 31:24 32:1
**boston** 1:16,24 2:7
73:4
**box** 2:4 61:25
**brad** 31:21
**brandnew** 67:7
**brief** 55:25 61:23
**briefly** 6:5,7,8 8:12
9:6 19:15 24:20
32:1,18,18 55:18
56:14
**bring** 42:25 43:9,10
45:11 64:3
**bringing** 69:19
**broader** 66:3
**broken** 22:18
**brown** 48:21
**builds** 25:14,15
**bulger** 5:19 29:2
**bunch** 62:3
**burden** 65:9

**C**

**ca** 1:4
**cabinet** 62:2
**calculate** 51:16
**calculation** 52:16
**calculations** 50:2
**called** 63:11
**callin** 69:12
**cant** 5:1 23:10 34:9
35:3 54:7 56:8
65:17 66:22 67:17
67:25
**cards** 63:21
**care** 9:19 13:9 35:24
49:7
**case** 5:19 6:15 29:2,3
29:6 35:7 48:16,20
61:3 63:24 66:25
67:3 68:3,13
**cases** 47:20 50:24

**cast** 62:24
**certain** 67:24
**certainly** 40:7 63:3
**certainty** 37:23
**certify** 73:8
**chaffin** 2:7
**chain** 35:16
**chaired** 13:5
**chalks** 70:6
**challenged** 56:12
**chance** 18:22 19:10
59:10 66:5 70:21
**change** 6:10 24:22
25:15 32:11,12 39:6
39:11 42:9 67:3
**changed** 5:24 6:6
39:16 66:25
**changes** 38:18 39:8
40:3,5,9
**changing** 8:3 67:9,9
**checked** 69:11
**cheffo** 2:8 4:12,12
55:18,20,24 68:9
69:24
**choice** 48:5
**chronology** 7:15
**chuck** 2:12
**circuit** 60:8 69:17
**circumstances** 67:22
**city** 73:4
**civil** 4:3 73:10
**claim** 12:9,10,12
50:11 54:20
**claimbased** 12:5
**claims** 30:16 31:16
31:17 33:6 35:19
45:8
**claimsbased** 13:9
**clarification** 71:23
**clarify** 33:18 38:12
**classes** 44:24 47:20
47:21 48:3
**classification** 33:21
**clear** 8:5 29:9 57:21
**clearly** 41:12 51:4
56:16 61:19

**clerk** 4:2 5:10 69:14 72:2
**clinical** 11:12 12:21 33:23
**clip** 58:6
**close** 28:1 55:12,14 55:19
**closest** 12:16 33:14
**code** 40:12
**coded** 26:5
**codeine** 46:7
**codings** 39:1
**coherence** 22:4
**cohort** 8:24 9:14 11:8 11:13,18 15:2 19:18 21:13 22:23 23:2 24:13,23 27:13,20 28:1,4,9,11,14,15 41:25 47:3,3,18 52:3,22 56:16 61:14 65:20
**cohorts** 22:10 23:4
**colleague** 45:15
**colorado** 47:15
**columbia** 33:21
**come** 9:6 17:3 61:17 67:24
**comes** 68:15,15 71:10
**coming** 8:4
**comment** 59:1 61:2
**commit** 17:2 36:17
**commits** 10:8
**committed** 65:16
**compared** 18:16
**compares** 25:18
**comparing** 14:25 34:11 36:25
**comparison** 17:17 18:10 30:20
**comparisons** 14:9 17:9
**complete** 15:18
**completed** 12:8,17 13:2 35:24
**completely** 29:6 51:1

57:21
**completeness** 64:5
**completions** 12:24 35:5
**composite** 54:9
**concern** 12:17 26:16 26:17 28:8 30:19 32:19 63:4,14,23 64:2 67:13 71:21
**concerned** 27:11,12 27:15 62:19 68:14
**concerning** 48:23
**concerns** 63:6 64:19
**conclusion** 60:7 62:5
**conclusions** 19:16 51:7 56:23 58:3,7 58:10 59:10,15,24 60:6,9,10,12,15,23
**concomitant** 10:13 16:6,8,9 21:8 48:14 53:21
**condition** 18:23
**conduct** 8:13 16:3
**conducted** 6:9 9:11 9:13 18:3 20:9,9 21:2,10 46:20
**confer** 70:7
**confidence** 39:25
**confusing** 7:24 8:1 44:8
**confusion** 9:3
**consecutive** 49:21 50:5,8
**conservative** 25:24 26:3 37:17 42:6
**consider** 44:16 56:15 60:3
**consideration** 41:3
**consistent** 13:3 54:2 54:8,18,20
**contact** 35:20
**contained** 9:19
**contemplated** 69:10
**contents** 48:24
**continuous** 9:18
**continuously** 9:20

**contract** 42:12,13,22
**contrast** 19:17
**contrasts** 20:22
**control** 17:13 21:6 28:15,18,19 33:10 48:3,5,7 68:13
**controlled** 21:8,11 33:11,25 34:4
**controlling** 48:9
**controls** 16:3
**controversy** 43:6
**copy** 5:21 42:15,19 42:20,22 43:10 53:5 53:7
**core** 65:22 67:14
**correct** 5:19,20,23 7:4,14,22 10:6 11:21 12:3,7,13 13:11,21 14:2,11 17:3 20:6 21:16,17 31:2 33:9 37:5 38:16,19,25 39:6,14 39:17,20,21,24 40:4 40:8,14,15,21 41:7 41:17,22 42:2,3 43:17,18,19,21,23 43:25 44:1,3,14,16 44:18,19,21 45:2,7 45:11,18 46:3,4,7,8 46:10 47:4,5,7 48:18 50:10,19 51:2 51:12,16,17,20,21 51:22,25 52:1,10,11 52:16 54:12,21 55:2 59:8
**corrected** 38:21 39:3
**correlate** 36:17 37:2
**correlated** 29:24
**correlation** 65:15
**couldnt** 43:7 69:9
**counsel** 4:5 57:12
**count** 66:12
**counted** 25:2 50:9
**counting** 25:6,7,8 50:16
**country** 57:11 68:7

**couple** 23:3 38:20 51:10
**course** 8:23 12:17 15:14,17 24:13,18 33:1 34:7 48:10
**court** 1:1,15,22,23 4:4,18,22 5:1,7 6:22 7:1,5,10,16,18,21 8:1 9:6,24 10:7,14 11:15,20 12:1,5,9 12:11,18 13:6,12,19 13:22 14:1,13,19,23 15:10,13 16:25 19:3 19:19 22:15,24 23:5 23:12,19,20,22 24:1 26:8,23 27:2,5,8,11 27:17 28:23 29:17 29:24 30:12,24 32:5 32:7,18 33:8,13 34:9,15 35:9 36:16 36:22 37:2,6,9,19 38:5,13 41:9 42:21 43:4,10,12 44:5 47:9 49:2,16 52:12 52:25 53:8,15,25 55:4,6,23 56:4,7,21 56:25 57:5,8,12,15 58:5,8 59:12,13 60:11,14,19 61:6,8 61:20 62:6,10,17,22 64:8,25 65:5 66:13 66:20 68:10,24 69:3 69:7,13,15 70:3,11 70:17,20 71:2,6,11 71:15,18,21,24 72:2 73:3,7,22
**courtesy** 42:20
**courthouse** 1:15,23
**courtroom** 1:15 9:9
**courts** 68:22
**cover** 65:3
**covered** 65:4
**create** 25:4
**creates** 29:1 68:2
**creating** 34:2
**credentials** 5:8

**credible** 62:23
**critic** 59:23
**critical** 39:23
**criticism** 35:10 36:16
  36:20
**criticisms** 58:2 60:5
  67:10,11
**criticize** 58:1,1
**criticized** 23:5,8
  57:18
**criticizing** 35:11
**cross** 3:2 37:20 38:5
  62:17 67:24
**crossexamination**
  38:9 57:22 59:21
  65:18
**crr** 73:22
**crust** 62:1
**crying** 68:25 69:1
**current** 32:13

**D**

**dann** 2:10
**data** 12:15 15:8 29:22
  29:23 30:14 42:14
  42:23 43:17 53:3
  66:9,9,10,11,18,18
**database** 9:19 13:9
  30:16 31:16,17,18
  32:4 34:17 35:19
  36:1 57:16 58:2
  63:15,17 65:12
**databases** 33:6
**date** 20:4,6 41:20,21
**daubert** 1:9 5:15
  53:16 56:17 59:19
  60:2,25 61:19 63:19
  66:20
**david** 2:7
**day** 1:9 17:9 26:4,12
  27:21 28:7 30:7
  40:14 41:24 49:9
  50:21,25 66:14
  67:16 73:16
**days** 26:4 30:5,9 43:1
  49:21 50:5,8,22

64:22
**deal** 26:14
**dealing** 63:21
**death** 70:18
**decided** 24:9
**decision** 47:2 51:5
**deck** 63:21
**declaration** 48:15
**decrease** 18:24 19:7
  19:11 25:13,16
  37:14 42:5
**decreased** 17:19
**decreases** 22:2,8,20
  24:14
**defendants** 2:6 65:8
**defense** 56:3 61:4
  71:10
**deficit** 44:18
**define** 21:13 24:12
  24:20 27:25 28:4,9
  28:10
**defined** 9:14 20:1
  25:22,23
**definition** 24:23 48:2
**degree** 37:23
**demonstrates** 37:17
**dependent** 51:2
**depending** 10:20
**depends** 41:10
**deposed** 61:19
**deposing** 58:8
**deposition** 40:7 43:2
  44:7 48:16 49:17,17
  58:4,12 59:21 64:9
  64:18 65:1,7 66:4
  67:21
**depositions** 39:1
  68:4
**depressant** 45:3
**depressants** 45:2,6,6
  45:10
**depressed** 8:20 11:1
  31:14 45:4
**depression** 9:15,16
  9:21 29:1
**depressive** 20:11

22:16 39:2
**derive** 33:25
**describe** 19:13 24:17
  24:18
**described** 15:17,17
  19:22,23 21:9,15
  31:4,12,20,20 45:12
  45:13 53:23 54:11
  57:24
**describing** 19:6,7
**description** 15:15
**design** 9:7 10:23,24
  16:13,15 19:15,15
  31:19
**designed** 33:4,19
  34:4
**designs** 32:25
**detail** 45:12,13
**detailed** 15:14,18
**developing** 32:2
**devries** 2:10 4:16
**diagnosed** 17:1
  33:16
**diagnosis** 14:20
  15:21 16:22 17:4
  20:7 24:13 27:21,23
  28:1,2,10 40:14
**diagnostic** 20:14
  21:10
**didnt** 14:10 15:1
  17:10 18:9,12,13,13
  18:14 19:9 23:17
  25:4 26:10 27:2,18
  28:12 30:10 33:15
  36:16 37:13 43:9
  45:2,6,18 46:1,2,3,6
  46:9 47:24 48:20
  50:4,7 52:5 59:10
  63:12 64:20 66:5
  69:19
**differ** 32:24
**difference** 34:8 41:25
  54:8
**differences** 9:4 38:14
  61:15
**different** 20:14 21:3

21:10 22:5 23:3,4
  29:3,6 32:6 33:4,7
  34:2,11,14,17,17,18
  57:1 64:15 70:23
**differently** 67:19
**direct** 3:2 5:13 65:7
  65:15
**direction** 18:23 54:8
  59:2
**disagree** 51:3
**disclosed** 7:6,8
**disclosure** 68:21
**discovered** 69:8
**discovery** 49:14
**discussed** 43:1
**discussion** 5:3 6:4
  24:2 32:22 49:19
  56:9 69:13
**disease** 24:14
**disorder** 15:23 16:23
  17:2,4,5,14 20:7,10
  20:11,11 21:21 22:1
  22:16,21 24:19
  39:13 44:18
**disorders** 16:12
  20:12 39:3
**district** 1:1,1,11,15
  1:23 73:3,4
**dixit** 58:9
**dizzy** 26:10 29:1,5
**doctor** 5:24 6:5,13
  8:8,12 9:3 20:17
  31:3
**doctrine** 64:5
**document** 43:1 44:7
  53:14,18 55:8
**documents** 53:10
**doesnt** 22:10 43:4
  49:12 52:18 62:3
**doing** 23:6 24:11
  28:22 40:3 49:3
  64:19 67:12
**dominated** 35:1
**dont** 5:7 6:20 11:23
  12:9,10 21:18 28:23
  29:11,25 40:16,18

45:8 46:23 49:3,7,9
  49:23 50:20,21 52:6
  53:11 55:20 60:14
  62:3 64:7,17 66:1,3
  66:18 67:13 68:5,18
  68:24 69:4 70:12,15
  70:24
**door** 47:10
**dr** 5:14 14:18 24:2
  25:21 26:18,18
  32:20 37:22 38:10
  40:10 42:10,23 43:2
  43:7,15 45:15 46:17
  46:21,22,24,25 47:1
  47:6,14 48:15,16,16
  48:20,25 49:20
  51:10 52:8 54:23
  55:10,14 56:19,24
  57:11,22,23 58:4,9
  58:14,22 59:16,23
  59:25 61:4,5,11,13
  61:16,24 64:13,24
  65:25
**dramatically** 67:3
**drawing** 4:25
**drawn** 50:17
**drs** 48:21
**drug** 10:21 11:2,5
  14:6,8,10,10,17
  16:7,21 17:6,8,8,10
  17:11,11,12,23,23
  18:14,15,16,17,19
  18:19,23 20:4,8
  25:19,24 26:1,1,2,4
  26:6,9,13 28:5,11
  28:17 29:13 30:20
  30:21,22,22 35:7,7
  35:15 36:6,24 37:1
  37:13,16,16 40:21
  40:24 41:12 42:1
  43:16 45:5 51:15
  65:16 66:25
**drugs** 8:13,18 10:2,3
  10:4,17,18 13:16
  16:11,12 17:7,13,21
  18:25 19:1 22:8

29:9 30:15 34:23,24
  36:4,5,13 43:16,19
  44:2,9,10,18,22
  45:4,10,12,22 46:9
  46:9,13 47:2,7,20
  47:22,23,25 48:4,6
  48:8,9,11,12 49:1
  49:13 54:3,12,16
  58:16
**duly** 5:5
**dynamic** 66:24

---

### E

**earlier** 40:10 56:10
**earth** 67:2
**effect** 11:5 18:20,23
  18:24 19:3,5,13
  22:11,22 27:16 41:3
  42:9 49:12 50:16,17
  54:8,18,19,20 55:1
**effects** 21:4 22:2
  25:14 26:10,11
  37:12 39:10
**efron** 31:21
**either** 19:8 25:4,16
  29:12 50:14 55:18
**elevated** 42:1
**eleven** 8:13,17 10:1,5
  10:12 18:12 34:23
  34:24 36:4,5 48:10
**eliminate** 42:7
**eliminated** 41:19
  42:5
**emailed** 42:17 43:2,8
**emergency** 35:20
**employed** 31:10
  37:24
**ended** 8:15 35:19
**ends** 67:18,19
**enormous** 21:5
**enriched** 35:21
**enrolled** 9:20 33:23
**enrollment** 9:18
**entire** 20:21,22 53:13
  63:24 65:20 67:15
**epilepsy** 20:10 21:21

**episode** 9:14,16,17
  9:17,21 11:22
**error** 38:23 39:1,19
**errors** 38:20
**esq** 2:3,3,4,7,8,8,10
**establishment** 35:21
**ethanol** 45:5
**event** 11:6 12:12
  13:22 14:14 35:17
**events** 11:10 17:15
  26:12
**everybody** 11:1
  28:14 29:15 30:19
**everyones** 53:9
**evidence** 22:1 69:8
**exactly** 12:22 29:14
  70:6
**examination** 5:13
**examined** 5:5
**examining** 42:20
  53:18 55:8 56:1
**example** 25:11 27:24
  45:4
**examples** 31:9
**exception** 40:5 44:12
  65:13
**exchange** 70:6
**exclude** 62:6
**excuse** 29:24 37:6
  57:3 66:20
**excused** 55:16
**exhibit** 5:18,21 8:8
  8:10
**exhibits** 70:9
**expand** 34:20
**expect** 18:22
**expectation** 19:10
  60:25
**experience** 41:12
  71:1,8
**experienced** 68:7
**expert** 19:23 38:14
  38:15 46:11,12,17
  48:17,23,24 57:4
  58:5 59:19 61:3
  64:15 67:4

**experts** 61:4 65:10
  65:11,12
**explain** 9:6 14:22
  19:3 21:18,18 23:19
  24:8,11 27:4 32:20
  32:23 34:8 45:3
**explained** 60:1 61:14
**exposed** 29:13 36:5
**exposure** 25:22,23
  30:15 36:3 63:7
**expressed** 6:11
  32:19
**extreme** 42:8
**extremely** 42:6 55:25
  61:16
**eye** 69:4

---

### F

**fact** 13:5 28:19 29:2,2
  36:11 42:9 51:7
  64:14 70:18
**factor** 25:8
**factors** 21:6
**fair** 27:17 34:13
  60:21 67:6
**fancyshmanciest**
  67:4
**far** 18:21 63:2 68:14
**fda** 9:12,13 10:5
  11:10,11,18 12:18
  12:20,22,24 13:3
  20:22 32:19,21 33:1
  33:2 34:9,20,21
  36:1,8,15 48:11
  64:15,16 66:22,24
  67:5,6,9
**federal** 73:7,22
**feel** 23:17 26:10 29:1
  29:5
**feeling** 57:1
**felt** 48:13
**field** 38:1 56:13
**figure** 49:1
**figures** 22:13
**file** 6:14,18 43:15,16
**filed** 6:14 57:12

59:19
**filled** 30:17
**filling** 30:15
**final** 25:20 65:2,21
**find** 42:7 43:7 54:19
**finding** 54:25 65:8
**findings** 22:5 24:24
    58:23
**fine** 6:21 29:17 38:11
    43:11 53:17 59:23
**finkelstein** 2:3,4 4:6
    4:6,6 70:19 72:1
**firepower** 68:5
**first** 5:5,17 9:13
    13:13 14:23 16:19
    23:6 24:12 28:13,16
    28:17 29:15 30:1,19
    30:21,25 31:3 51:20
    56:2,3,18 57:5 60:8
    68:4,17,18 69:17
    70:8,8,9 71:1,7
**five** 25:9 50:5,7 55:13
    55:21
**flawed** 57:4
**flies** 57:11
**flip** 26:8
**flom** 2:9
**floor** 2:11
**focus** 23:18,25 36:7
    46:5
**focuses** 60:8
**focusing** 12:4
**fold** 52:25
**folks** 69:12
**follow** 58:10 59:24
**following** 16:21
    21:23 25:25 51:13
    52:2
**follows** 5:6 58:12
**food** 35:16 66:25
**foregoing** 73:8
**forever** 71:14
**forget** 68:18
**forgetting** 45:24
**forgot** 43:10
**form** 35:16

**formed** 48:22
**former** 71:16
**forth** 42:13
**forward** 9:6 38:12
    63:19
**found** 17:20 22:19,23
**four** 2:9 12:23 35:5
**frame** 7:6
**franklin** 68:4
**fromson** 2:3 4:8,8
    56:2 68:20 69:1,5
    70:10,14,22 71:3,7
    71:15,20,23
**front** 4:20 5:18,18
**full** 54:15 64:6,18
**function** 25:15 60:3
**future** 67:13

#### G
**gabapentin** 8:22,25
    19:14,18,24 20:1,2
    20:3,3,5,8,15,18,19
    20:24 21:2,4,15,19
    21:23,24 22:9,22,25
    23:3,8,11,12,15,24
    24:8,9 27:3 28:6,8
    28:14,16,21,21
    29:10 30:5 31:7
    36:8,10,14,18 37:4
    37:7,24 47:3 49:7
    51:24 52:2,4,21,23
    53:4,20 54:2,5,17
    56:15 57:2,10 58:21
    58:23,24 61:2,10,18
    61:18 62:20,21 63:4
    64:1,6,18 65:20
    67:23
**game** 34:13 66:22
    67:6
**gatekeeping** 60:3
**general** 8:9,16 11:4
    16:15,16 22:7,9
    31:18 36:13 47:18
    54:3
**generalized** 31:22
**generally** 38:1

**generated** 63:5
**generic** 10:15
**genuinely** 68:15 69:8
**getting** 71:21
**gibbons** 3:4 5:4,12
    5:12,14 14:18 32:20
    37:22 38:10 40:10
    42:10,23 43:15 47:1
    48:15 49:20 51:10
    52:8 54:23 55:10,14
    57:23 58:14,22
    59:23,25 61:5,13,24
    63:2 64:13
**gin** 45:8
**give** 31:9 37:20 51:6
    70:5
**given** 61:1 70:20
**gives** 22:13
**go** 5:7 13:17,18 29:9
    32:19 53:10 56:3,14
    69:22
**goes** 19:9 36:7 63:13
**going** 4:19,20 11:4
    11:25 15:18 25:4
    29:10 38:5 43:9
    49:8 53:8,9,10 62:5
    62:10,15 68:1,16,17
    69:17,20,21 70:7,9
    70:12,13,25
**good** 4:7,8,10,13,15
    5:14 29:8 38:10,11
    48:10 53:1 69:21
**goodell** 2:10 4:16
**gosh** 69:4
**graphix** 2:12
**great** 66:5
**greater** 13:14 14:6
    15:25 20:15 35:23
    63:4
**greenland** 24:2
    25:21 26:18,18
    56:19,24 57:11,22
    58:9 61:16 62:23
    64:4 65:14,25
**greenlands** 43:2,7
    58:4 59:16

**ground** 65:18
**group** 14:11,12 18:11
    18:11 39:13 52:4
**groups** 16:11 38:24

#### H
**haldol** 44:10 63:12
**half** 49:10 64:23
**hand** 52:8 71:9 73:15
**handed** 63:22
**handing** 61:24
**happen** 50:14 53:8
    63:21 67:12 69:8
**happened** 15:4,4
    36:11 49:22 67:2
**happens** 18:10 42:8
**happy** 14:2
**harder** 35:17
**hardest** 12:14
**harmful** 19:13 22:11
    42:9
**harvested** 33:5
**hasnt** 63:10
**hate** 71:19
**havent** 23:14 29:20
    29:24 69:20
**health** 12:16 31:10
    32:13
**heard** 4:4 69:20
**hearing** 1:9 53:17
    59:20 60:24 65:4
**hearsay** 70:21
**hedged** 62:25 66:2
**help** 9:8 23:21 36:12
    67:16
**helped** 47:12 48:25
**hemorrhaging** 68:13
**hereunto** 73:15
**hes** 4:20,22 55:12
    60:19 61:10,10,17
    61:19 62:2,4,10,23
    62:25,25 63:2,3
    67:5
**high** 11:7 28:3
**higher** 11:3 18:9
**highest** 8:19 11:2

35:22
**highlighted** 40:6
**hint** 34:21
**hinted** 36:15
**history** 7:20,21
**hold** 42:21
**holding** 52:8
**hollywood** 62:24
**home** 64:3
**honor** 4:11,13,17,21
7:14 8:6 17:18
22:14 37:21 38:4,7
42:11 49:11 55:10
55:17,21,22,25 56:2
56:5,10,18 57:23
59:9,20 60:13 61:11
61:22 62:15 64:23
66:8 71:20,25 72:1
**honorable** 1:10
**honors** 56:20
**hour** 49:10 64:23
70:4
**huge** 18:20 28:25
64:19 67:10
**hundred** 11:3 35:23
**hur** 48:21
**hurt** 67:17
**hypotheses** 11:14
15:7
**hypothesis** 8:14,17
10:23 13:13,15 14:4
19:24 20:13 40:1
54:7 58:15,18,24
59:15,17,25 60:1

### I

**id** 5:17 14:2 23:16
28:23 39:5 41:15
60:7
**idea** 30:7 48:10
**ideally** 63:20
**ideation** 12:2,11
33:22,24
**identical** 18:6 22:12
30:9 51:7
**identified** 34:21

**identify** 4:5
**identifying** 11:8 41:1
41:13
**ill** 55:25 65:2 67:8,21
**im** 7:23 10:11 11:25
15:18 19:7 29:8
34:20 35:11 37:14
38:21 45:23 46:11
47:9 48:1 49:6,17
49:18,18 50:3 51:13
52:2,8,17,19,19
55:23 56:19 57:8
61:10 62:18,19
63:14,18,21 64:10
65:5 66:8 68:14
69:1,17,20,21,21
**imagine** 13:16 66:23
70:15
**impanel** 68:18
**impeachment** 49:3
**implicated** 44:25
48:4,6
**implications** 9:12
**important** 11:9 16:1
16:25 28:12 31:10
34:7,7 37:11 40:7
41:2 47:20,21 48:2
48:13,13
**inaudible** 57:10 59:7
66:17
**include** 39:24 44:9
44:19,22 45:2,6,18
46:1,2,3,6,9 48:12
**included** 16:9,11
44:22,23,24 45:20
45:21,22 46:14
**includes** 39:25
**inclusive** 73:9
**incorrect** 44:6
**increase** 17:13 21:22
25:16 36:10 41:12
41:13 58:25
**increased** 18:7 22:6
22:17 37:13 58:15
59:17 62:12
**increases** 8:18

**increasing** 13:16
**index** 9:14 14:20
20:1,4,6,7 28:9
41:21
**indicates** 58:19
**indicating** 41:25
54:7
**indication** 11:5
**indications** 20:14
21:3,10,21,25 22:19
22:19
**individual** 22:19
**individually** 70:2
**individuals** 13:14
14:5 25:3
**indulge** 61:22
**industry** 63:16,17
**inferences** 34:1
50:17
**inflate** 41:5,16
**inflates** 40:20
**inflating** 41:11
**influencing** 27:25
**informal** 53:16
**information** 13:1,2
15:16,21 21:14 34:6
35:4,6 36:9 49:14
**informative** 71:4
**initially** 18:8 28:19
**initiated** 27:21
**initiation** 16:21
17:21 21:23 22:12
22:21 25:23,25
28:11 41:6,16
**inquire** 70:1 71:4
**instinct** 64:10
**institute** 31:23
**interactions** 47:14
**interest** 17:16 24:6
28:22 43:19
**interesting** 21:20
**interpreted** 34:22
**interrupt** 55:20
**interval** 39:25
**invariant** 51:7
**involuntary** 70:23

**involved** 48:20
**ipse** 58:9
**isnt** 32:5 53:23 64:16
69:9
**issue** 25:1 26:14
47:21 49:20 51:12
51:14,16 55:17
57:14 58:9 61:9
63:7,10,17 65:3
66:10,12 68:11,12
70:23 71:6,7
**issues** 25:1 31:10
32:20 48:23
**ive** 5:18 44:22,24
45:13 47:14 53:5,23
63:6,21 64:19 65:6
66:13,20 67:20
70:21

### J

**john** 45:15 46:17,21
46:22,24,25
**joinder** 60:4
**journal** 31:13 47:17
**judge** 1:11 4:9 6:7
19:15 24:8 32:22
68:9,20 69:6 70:10
70:22 71:5,17
**july** 1:16 73:16
**jurors** 69:19,23
**jury** 71:21

### K

**keith** 2:4 4:10
**kenneth** 2:3 4:8
**kept** 8:2,4 67:9,9
**kick** 61:17
**kind** 19:11 22:11
41:3 52:14 54:13
**kinds** 16:1 20:14
23:4 45:6
**knew** 48:25
**know** 5:1 10:15,25
26:19 28:1,23 29:25
30:12 34:15,25 40:7
40:15,16,22 41:11

46:18,23,24,25 47:9
47:9,23 48:1,20
49:2,12,16,21 50:20
50:21 52:6 62:4
63:13,18 66:1,3
67:13,17 68:8,16
69:4 70:12,24
**knowledge** 48:22
52:6 63:23,24
**known** 68:10
**kruszewskis** 28:24

_____
**L**

**labels** 62:3
**laid** 31:11
**lamotrigine** 34:12
**large** 15:2 33:25 39:7
40:17 44:24
**largest** 12:16 21:1
**late** 63:19 66:22
**law** 60:8
**lawyer** 66:23 68:7
**lawyers** 71:19
**leading** 45:16 47:15
**leaning** 49:18 64:10
**learn** 35:4
**led** 27:22,23 32:10,12
**lee** 1:22 73:7,21,22
**leech** 2:10
**left** 25:18 47:20,21
**lesson** 70:24
**level** 63:4
**liability** 1:5 4:3 73:12
**lie** 66:18
**life** 69:9
**light** 68:20
**liked** 27:11
**likelihood** 15:24
19:11
**limelight** 56:7
**limitations** 56:25
59:6 62:16 64:12
**line** 11:24 14:20,21
17:1 55:4,5
**list** 44:9,10 45:17,25
47:13 48:11 68:2,12

**listed** 47:24,25
**listen** 62:22
**lists** 43:16 47:16
**literature** 31:5,21
32:15 46:19
**lithium** 10:2,7,17
18:14 43:23
**litigation** 1:5 4:3
6:19 23:15,18 48:24
63:6 67:13 73:12
**little** 9:15 12:25 13:1
35:2,6 36:9 39:10
68:5 70:18
**llp** 2:4,7,9,11
**location** 5:2
**logistic** 32:17 53:22
**long** 29:12 56:6 68:10
71:15
**longer** 37:14 41:21
42:2,3,4 51:25
**look** 8:22 11:4,5
12:15 14:19 17:11
18:11 21:4 33:4
34:4 35:16,21 42:8
42:19 44:9 48:14
51:16 53:13,15 55:7
66:11
**looked** 9:2,14 12:18
12:20,22 18:10
30:23 32:3 33:3
48:11 53:19 64:5
65:15,25
**looking** 10:3,11,24
13:7,8 16:5 33:24
34:17 36:23 49:4
51:4 53:20 54:17
60:22,23
**looks** 13:9 53:22
**lot** 24:2 27:19 36:3
40:3 47:25
**lots** 34:3
**lovely** 62:25
**loves** 56:7

_____
**M**

**ma** 1:24

**maam** 57:7
**major** 20:10 22:16
31:14 32:12 39:2
44:24
**making** 15:24 30:18
57:8 62:4
**man** 62:25
**managed** 9:18 13:9
**manic** 45:11
**mann** 45:15 46:17,22
46:24,25 47:6 48:16
48:16,20,22,25
**manns** 46:21
**march** 5:21,25 6:6,10
6:18 7:3,11 9:5
38:15
**maris** 28:24 61:11
**mark** 2:8 4:12
**marketing** 1:5 4:2
73:11
**maryland** 2:11
**marzilli** 1:22 73:7,21
73:22
**mass** 54:15
**massachusetts** 1:1
1:16 2:7 73:4
**matter** 50:9
**meagher** 2:9
**mean** 19:4,12 24:16
24:18 25:14 27:16
28:9,24 29:22 45:3
63:1 66:4
**meaning** 35:19
**meaningful** 52:22
**means** 29:9
**measure** 12:1 29:17
34:5
**measured** 29:20
**measurements**
56:14
**measuring** 63:7,25
**medical** 30:16 33:6
35:18,20 45:8 50:11
**medication** 16:9 46:6
**medications** 16:6,8
21:9 44:20 46:3,15

53:21 63:11
**medicine** 31:23
**meeting** 13:5
**meets** 61:19
**memos** 70:20
**mention** 65:19
**mentioned** 69:16
**mentioning** 64:17,17
**merely** 62:8
**met** 60:2 62:22 65:9
**metaanalyses** 9:13
11:12 32:21
**metaanalysis** 10:5
11:10,19 20:23
32:23 33:1,3 34:8
36:1,8,15
**method** 19:16 58:1
70:25 71:18
**methodological**
30:18
**methodology** 31:11
32:16 37:24,25
56:22 57:3,4,13,24
57:24 58:10 59:12
59:23,24 60:5,6,23
61:14 63:16 64:6
65:4,11 66:1 67:14
**methods** 31:4,9,22
**middle** 17:1 50:22
**minute** 33:11 58:6
**minutes** 55:11,12,14
55:22
**miscalculated** 38:24
**miscoded** 39:2
**mislabeled** 43:7
**missed** 15:11 63:12
**mistake** 48:8
**misunderstood** 7:23
**mix** 28:16
**model** 24:23 32:17
**moment** 20:17 36:18
**monday** 64:11 68:18
69:16 70:6,24
**monitor** 42:11
**monotherapy** 10:12
17:24

**month** 26:9 28:13,16
  28:17,18 29:11,15
  29:18,19,20,21
  30:17,19,21,25
**monthly** 25:15 26:25
**months** 36:24,25
**moody** 29:2
**morning** 4:7,8,10,13
  4:15 5:14 8:6 38:10
  38:11 42:25 53:10
  57:25 60:1 66:24
  69:18 70:5
**motion** 5:15 59:19
  63:20
**motions** 69:3,5
**motivation** 19:18
  24:11
**motive** 29:7
**motrin** 46:4
**move** 9:8 19:14 35:16
  38:12 66:7
**multiple** 8:2 25:2,6,7
  25:8 46:21 49:20,24
  50:16 51:8
**muster** 49:5

— **N** —

**name** 5:10 45:24
**napolitano** 2:8 4:14
  4:14 9:8
**nations** 45:16
**natural** 24:13,18
  25:13 40:25
**nature** 37:17
**necessarily** 12:12
**necessary** 24:9
**need** 37:19,20,20
  56:15 60:3 64:3
  68:5 70:5,6,7
**needed** 54:15
**neglected** 42:25
**neighborhood** 48:9
**neurontin** 1:5 4:2
  9:25 10:3 29:4
  33:21 35:7,8 63:24
  73:11

**never** 15:2,6 17:7
  42:7 50:18 53:6
  62:22
**new** 2:4,9,9 7:5 32:2
  68:11,15,15
**newburgh** 2:4
**night** 28:24 42:17
**nongabapentin**
  28:15
**nonpsychiatric**
  21:21 22:10
**nonsuicides** 30:24
**note** 11:9
**notebook** 8:10
**november** 5:19 6:1,6
  6:11 7:11 8:3 9:5
  21:14,16 24:4 38:14
**nsaids** 46:4
**null** 54:7
**number** 15:2 21:5
  28:25 38:24 39:7
  40:18 41:13 44:24
  49:25 50:12,18,20
**numbers** 51:2,4

— **O** —

**objection** 41:8 44:4
  47:8 48:19
**obscure** 50:24
**observation** 10:21
**observational** 32:3
  33:1,2 34:6
**observed** 41:6
**obtained** 25:2 43:17
  44:2
**obvious** 48:5
**obviously** 18:21
**occasions** 57:23
**occurred** 37:15
**oclock** 47:10 69:11
  69:15
**odds** 54:1,3
**official** 1:22 73:7,22
**oh** 26:25 69:1,4
**okay** 6:5 8:12 10:14
  11:25 18:2 19:14

22:17 24:22 26:21
  27:8,18 44:12,15
  46:3,12 50:7 52:8
  52:15 58:3 60:21
  61:9 62:24 63:9
  66:21 67:6,8 68:14
  69:7 70:20 71:15,24
**omitted** 40:6
**once** 9:21 25:17 30:1
  36:9 65:23 67:2,15
**onefifth** 18:19
**ones** 48:12 67:6
**ongoing** 23:18
**opening** 56:3 64:11
  65:8 67:22 70:4,14
**opiates** 46:6
**opinion** 31:3 37:22
  37:24 40:5 46:17
  53:24
**opinions** 6:11 48:22
  49:5
**opportunity** 60:25
**opposed** 15:13 71:16
**opposition** 61:21
**oranges** 34:11
**order** 30:4 53:11
  65:7
**ordered** 68:22
**organ** 31:23 32:3,8
  32:14
**organs** 32:7,9,11
**original** 39:12
**originally** 31:12,20
**outcome** 27:24
**output** 52:8
**overall** 18:5 20:8
  21:10 22:17 24:24
  25:15,22 27:12 52:3
  54:9,11,18,21 67:23
**overruled** 41:9 44:5
**overstating** 60:19
**oxycontin** 46:7

— **P** —

**package** 52:14
**page** 52:15 70:2

**pages** 1:5 73:9
**paid** 63:3
**pain** 20:10 21:21
  46:3,6
**panned** 63:10
**paper** 9:4 23:6,7 24:7
  24:8,10 27:12 46:14
  47:17,19 54:10 55:5
  57:20 58:14,21 61:3
  61:18 63:5,5 64:1
**papers** 57:1,10
**part** 11:9 40:23,24,25
  41:11 42:13 43:17
  45:24 49:14
**particular** 19:10
  22:9 36:14 40:9
  54:17 61:11
**parties** 70:25
**partners** 2:4 4:7
**pass** 49:5
**patchwork** 34:3
**patient** 10:20 25:10
  39:6 50:12 63:7
**patientlevel** 12:15
**patients** 8:19,21,25
  9:15,20 10:13,25
  11:1,1 16:22 18:8
  20:17,19,23,25
  21:22 27:19 28:6,20
  31:14 33:9 35:23
  38:24 39:2,7,8 50:1
  52:22
**patti** 1:10
**peer** 16:16 19:19,21
  23:13 32:15 45:14
  61:4,10,13 65:10
**peerreview** 47:16
**peerreviewed** 31:5
**people** 7:2 8:2 11:8
  14:6,9,9,10 15:1,2,5
  15:22 17:7,8,10,10
  17:14,15 18:11,16
  18:16,25,25 20:10
  22:6 24:17,18 28:16
  28:21,25 29:9,10
  30:20,22 32:9 33:3

33:16,17,20,23 36:4
40:23 41:1,13,14
44:16 45:4,8,11
46:14 47:11 67:10
**percent** 39:23
**peremptories** 71:1,8
**perfect** 67:6 69:9
**performed** 12:24
37:18
**period** 9:22 10:21
15:20 17:4,6 22:3,3
29:16 30:8 31:2
41:14 68:22
**person** 17:12 26:1,4
26:9 35:19 36:24,25
37:15 40:11,13 50:4
50:7,14,19 51:6,19
65:15
**personally** 59:2
**personhours** 67:18
**persontime** 24:3,6
25:12,14 27:9 31:19
32:17 36:23 41:4
51:12,14,18 52:23
**perspective** 61:24
**pfizer** 4:15 63:3
66:21 67:16,17
**pharmacists** 47:12
**pharmacoepidemi...**
59:6
**pharmacoepidemi...**
47:15
**pharmacoepidemi...**
38:2
**pharmetrics** 9:19
34:10 42:13,23
43:17 44:2 53:3
57:16,24 58:2,14
**pick** 71:9,10,11,12,13
71:13
**picked** 59:14
**pie** 61:25 62:1,4,5
**piece** 25:12,20 34:16
**pies** 64:3
**pike** 30:21
**pile** 53:9,11

**place** 9:8 19:22 49:8
73:10
**placebo** 33:8,20
**placed** 5:18
**plaintiffs** 2:2 56:12
71:8
**plan** 49:3
**planned** 69:5
**planning** 70:19
**plans** 9:19
**play** 7:10 58:6,11
**played** 58:12
**please** 4:5 5:10 9:10
16:18 18:2 19:3
21:18 42:15 56:19
**point** 12:14 17:9
27:17 30:18 33:19
35:24 40:6 43:6
60:22,22 61:11,13
61:20 65:20,21 66:5
66:9
**pointed** 38:25 44:7
**pointing** 39:4
**polished** 63:2
**population** 8:14 11:4
21:3 22:7,18 25:17
35:21
**populations** 13:10
22:6 45:1
**position** 70:1 71:8
**possess** 48:22
**possibility** 50:24
62:9,14
**possible** 48:7 54:25
60:24 62:11 64:13
64:14
**possibly** 62:6
**post** 13:19,19 14:13
14:14,16 19:8 20:15
22:3
**postaed** 10:20 13:14
13:21
**postindex** 11:21
**postinitiation** 9:1
20:3
**postperiod** 10:19

**potentially** 42:9
44:12
**power** 54:14
**practice** 53:1
**practices** 1:5 4:3
73:12
**pre** 13:19,21 14:13
14:16 19:8 22:3
66:12
**preaed** 10:19 13:15
13:20
**precise** 17:18
**precomparison**
21:13
**predict** 67:25
**preeminent** 56:12
**prefer** 71:16
**pregabapentin**
20:16
**preinitiation** 20:2
**prescribed** 28:7
29:19,21 65:23
**prescription** 20:4
30:1,15,17 45:5
64:22 66:15
**present** 2:12
**presuicide** 14:14
**presume** 29:18
**pretty** 60:9
**previous** 6:23,25 7:1
13:3
**primary** 10:11,24
18:4 27:14 30:11
59:22
**prime** 71:22
**printout** 52:24
**prior** 9:1,17 16:1,5
17:21 21:11 41:6,14
41:16 53:21
**probability** 39:21
54:6
**probably** 35:19 65:3
**problem** 4:18 29:14
53:1 56:22 62:2,4
66:10
**problems** 56:22 59:5

64:21 66:1
**proceed** 43:14
**proceedings** 73:14
**process** 45:14,15
47:16 49:14
**produced** 39:8
**product** 73:12
**products** 1:5 4:3
**professor** 62:23 63:2
65:14
**profoundly** 65:21
**prominent** 60:4
**prospective** 33:19
**prospectively** 34:5
**protective** 18:24 19:3
19:5,12 22:2 26:13
37:12 55:1 62:12
64:13
**protocol** 68:23
**provided** 52:9,15
**provides** 58:18
**psych** 22:16
**psychiatric** 10:9
20:12 21:25 22:6,18
32:5 39:3
**psychiatrist** 10:10
10:16
**psychiatry** 8:9,16
16:15,16 31:13
47:17,18
**psychoactive** 46:10
46:13 47:24 48:2
**psychological** 61:12
**psychopharmacol...**
46:19
**psychopharmacol...**
45:16
**psychotropic** 46:10
46:13,15
**public** 12:16 31:10
32:12
**publication** 7:8,9,12
8:9 19:4 23:16
**published** 8:15 9:4
16:14,14 19:19,21
31:4,12,24 32:14

**pure** 18:11
**purely** 10:18 12:3
**purest** 18:22
**purpose** 11:7 23:15
**put** 4:21 28:25 39:12
  39:13 49:1 54:24
  61:23,25 62:1,16
  63:19 64:13 68:3,4
**puzzle** 34:16

**Q**

**quarreling** 60:17
**question** 6:5 7:24
  11:6 25:21 37:22
  42:24 50:3 51:8,13
  56:21 57:5 59:11
  69:22,25 70:22
**questions** 51:10 66:6
**quick** 70:24
**quilt** 34:3
**quite** 6:5
**quote** 65:24

**R**

**race** 21:8
**raise** 47:21 49:12
  55:18 67:24
**raised** 25:21 26:18
  44:6 48:23 56:10
  63:19 67:22
**ran** 14:1
**randomized** 12:21
  33:10,11,20,23,25
  34:3 58:20 59:5
**rate** 11:2,3 13:16,17
  14:5 15:6 16:6,20
  17:22,24 18:18,19
  19:8 20:15 21:23
  25:15,16 36:6,7,10
  40:20,23,25 41:5,16
  42:5 54:4
**rates** 18:6 22:11
  24:15
**ratio** 54:1,3
**reached** 24:4
**read** 41:15 65:6

70:21
**real** 50:21,22 51:9
**realistically** 70:12
**reality** 70:11
**really** 12:25 13:4
  28:3 33:19 34:1
  35:2,4,24 36:2 49:8
  52:17,21 53:16
  54:15 64:4
**realm** 50:23
**reason** 10:24 27:14
  28:12 42:7 49:12
**reasonable** 37:23
  57:25 59:12 60:6
**recall** 6:20 39:7
**receive** 14:7
**received** 14:6
**recess** 72:2
**record** 4:5 5:3,11 6:4
  6:21 49:19 50:11
  56:9,15 63:24 69:13
  73:14
**recorded** 35:18 73:9
**records** 33:6
**recross** 3:2
**redirect** 3:2 55:11,13
**reduced** 17:24 73:13
**reduces** 28:22
**reduction** 16:20 54:4
**refer** 15:15 64:11,14
**references** 6:13
**referring** 7:2 8:2
  9:25 10:8,16 52:7
  52:17 55:6 57:15,16
**reflect** 6:21 41:11
**reflects** 37:25
**regard** 58:21 66:10
**regional** 32:12
**registered** 12:21
**regression** 24:16,17
  25:13 27:15 28:8
  41:3 53:22
**reject** 54:7
**related** 25:19 26:6
**relationship** 36:13
  48:7

**relative** 11:18 14:7
  15:4,6 16:22 18:9
  18:25 21:23 22:3,7
  22:22 32:24 36:4,7
  40:1
**reliability** 64:2 65:9
**reliable** 37:25 62:13
  64:17
**relied** 47:6,11,11,13
  47:16 53:24
**rely** 54:13
**remember** 40:18
  49:10
**reopening** 65:5
**report** 5:19,22,25,25
  6:6,6,10,11,14,15
  6:15,16,18,18,19,23
  7:2,3,11,11,18 8:8
  15:10,12,13,16 19:4
  19:23 21:16 31:23
  32:10 38:14,15
  39:12,16 43:7,9
  48:17 53:24 57:12
  58:5
**reported** 6:9
**reporter** 1:22 73:8
  73:22
**reports** 9:4 38:19
  48:24 57:4 58:24
**required** 64:1
**requirement** 30:10
**rereading** 28:24
**research** 12:14
**reserve** 55:21
**resolve** 65:17
**respect** 65:9 67:14
  67:23
**respond** 32:21,23
  67:5,8
**response** 5:15 56:20
  57:22 59:13
**result** 16:19 51:7
  54:5
**results** 16:17 21:19
  21:20 24:4 25:2
  30:9 39:9 41:21,23

42:3 51:1,3,24
  52:15
**retrospectively** 33:5
**review** 22:15 23:13
  45:14 47:16,19 61:4
  65:10
**reviewed** 16:16
  19:20,22 32:15
  46:18 61:13
**reviewers** 27:11
**richard** 2:10
**rick** 4:16
**ridiculous** 5:2
**right** 6:24 7:3,6,8,10
  7:16 10:18 12:19
  13:6,6,12,25 15:19
  16:25 19:2 27:2,5,7
  29:21,25 30:2 34:13
  34:15,18 36:19
  37:19 41:15 45:24
  49:1 53:3 54:13
  56:21,25 57:8 58:4
  61:20 63:22 64:3
  65:7,17 66:16 67:13
  70:17 71:19
**rigorous** 61:16
**ring** 52:18
**risk** 8:19,19 11:6
  17:13,19 18:7,9
  22:6,8,17,20 28:2
  35:22,23 40:1 42:1
  58:15,25 59:18
  62:12
**road** 23:17 28:3
**rob** 47:14
**robert** 3:4 5:4,12
**robustness** 24:4,24
**roller** 69:4
**room** 1:23 35:20
**round** 71:1,8
**rounding** 39:19
**route** 2:4
**rule** 56:16
**rules** 70:21
**ruling** 64:9 65:2,21
  67:21 68:20

**rushed** 63:18

---

**S**

**sa** 11:25
**sales** 1:5 4:2 73:11
**sample** 54:15
**saris** 1:10
**satisfied** 60:24
**saw** 8:4 54:2
**saying** 29:8 34:20
**says** 15:5 41:15 43:19
  44:1 52:24 53:3
  62:8 63:11 65:17
  67:1
**scale** 33:21 58:19
**scheduled** 59:20
**schizophrenia** 20:11
**scientific** 37:23
**scientist** 56:12
**screen** 42:10 55:7
  58:7
**scrutiny** 45:15
**second** 14:4,15,18,24
  14:25 18:10 25:12
  28:12 29:21 39:16
  55:4,5 57:9 61:23
**see** 4:19 5:1 18:18
  22:4 35:25 36:3,6,9
  50:15 52:24 53:3
  54:9 64:8,18 65:1
  65:24 67:20
**seen** 43:4 53:6
**selected** 49:15
**selection** 70:23
**sense** 10:15 27:22
  33:13,14 34:10,11
**sensitive** 26:7
**sensitivity** 6:2,8
  22:24 23:1,2,23
  24:3,5,20,22,25
  30:3,6 32:17 38:16
  40:4 41:20 42:6
  50:13 51:3,11,15
  57:17,19 63:25
  65:13
**sent** 43:12

**separate** 20:9 34:12
  35:10
**separately** 8:22
**series** 6:2,8
**serious** 63:6 64:21
**seriously** 67:2
**served** 5:25
**set** 42:13 43:17 68:17
  73:15
**severity** 35:18
**sex** 16:6 21:8
**shared** 32:11
**shoulder** 53:16
**show** 39:5 42:12 51:4
  53:9,25 60:7
**showed** 18:5 41:25
**showing** 19:10 22:5
  62:12
**shown** 40:10
**shows** 18:22 54:1,5
  60:20
**side** 11:24 13:23,25
  26:8,10,11 55:14
**sides** 63:19 70:6,7
**signal** 34:21,25 35:1
  36:2
**significance** 39:13
  58:19 59:4
**significant** 16:20
  17:19,25 18:21 19:7
  21:22 22:2,2,20
  40:2 41:21,25 42:2
  42:3,4 51:25 52:1
  54:6
**significantly** 36:10
**silence** 69:24
**similar** 22:22 31:17
  57:13
**similarly** 66:2
**simply** 40:3 50:14
**single** 28:20 50:23
**sir** 17:25 19:6 50:6
  50:20
**sit** 47:6,23 56:8 71:22
**sitting** 63:14 69:17
**six** 23:1,2

**skadden** 2:9 4:12,14
**slate** 2:9
**slide** 16:17 17:17
  18:18 21:18 22:13
  56:18,19 60:8
**slight** 4:18
**small** 5:17
**smaller** 34:3
**soft** 61:12
**software** 52:13
**solid** 32:2,11
**solve** 43:13
**somebody** 50:24
  51:14
**sorry** 7:23 56:20 66:8
**sort** 10:15 13:23
  27:25 63:10
**sound** 65:11,12
**south** 2:11
**space** 14:1
**speak** 68:21
**specific** 48:23
**specification** 24:23
**spell** 5:11
**spend** 4:24
**spice** 62:2
**spices** 62:3
**sponsored** 59:22
**square** 2:9
**ss** 73:4
**stand** 4:23 38:6
  45:16 53:15 62:11
**standard** 63:15,17
**standards** 56:17
**stanford** 31:21
**start** 5:17 13:17 36:6
  36:9 68:24
**started** 14:16 17:5,6
  20:8 21:24
**starting** 22:4
**state** 5:10
**stated** 50:12 56:23
**statement** 46:15
  58:13,22 66:3 67:23
**statements** 59:13
  64:11 65:8 70:4,15

**states** 1:1,11,15,23
  73:3
**statistic** 17:18
**statistical** 30:20
  31:20 32:15 39:12
  52:13 58:19 59:3
**statistically** 16:19
  17:25 18:21 19:7
  22:1,20 40:2 42:3,4
  51:25 54:6
**statistician** 56:13
**statisticians** 60:5
**statistics** 22:15 54:24
**stay** 29:10
**stayed** 29:25
**stenographically**
  73:10
**step** 9:10 55:15
**steps** 27:8 37:10
**steve** 2:8 4:14
**stimulants** 44:16,20
**stop** 19:2 68:13
**stopped** 26:12 51:19
**stopping** 67:20
**strategy** 68:6
**stratified** 21:9
**street** 2:7,11
**strength** 14:8 33:10
  60:7,18
**strengths** 32:24
**strike** 71:18
**strong** 34:1
**stronger** 39:10
**strongly** 56:23
**studies** 9:7,7,11 22:5
  32:21,23 33:2,4,4
  46:20 49:9,22 59:16
  64:20
**study** 8:13,15 10:2
  14:8,17 19:10,14,25
  20:1,18,20,21,22
  21:2,7,15,19 22:25
  23:9,11,11,13,15
  26:24 29:12 31:7,12
  31:14 33:2,11,20
  34:10 37:25 40:12

41:2 44:23 47:12
49:13 57:2,10 58:14
58:23 61:19 62:7,18
64:1,6,12,15,16,18
65:10,19 66:17,21
66:22,24 67:5,7,23
**stuff** 8:4 63:19
**subject** 16:23 20:13
33:16 35:7 56:25
61:3
**subjects** 18:5
**submitted** 9:5 23:6
23:12,16
**subpoena** 68:1
**subsequent** 7:2
**subset** 13:7
**substance** 39:9 40:9
**suffering** 20:10
**sufficient** 35:18
54:14
**sugar** 62:1
**suggest** 59:4
**suggests** 35:12 54:25
62:8,13
**suicidal** 12:23,25
13:1,4 20:24,25
33:22,24 35:1,2,3
58:15 59:18
**suicidality** 34:5,5
35:15,17,22 36:14
36:14 48:5,7 55:1
**suicide** 8:19,20 10:8
11:3,3,6,6,11,13,16
11:17,25 12:2,4,8
12:11,13,15,17,23
12:23 13:2,8,16,17
13:22 14:5 15:6,22
15:24,25 16:1,5,20
17:2,14,19 19:8,11
20:15,20 21:1,5,12
21:12,24 22:7 24:14
25:3,5,5,9,25 26:2,5
26:5,12 27:20,22,23
28:2,7 33:5,5,12
35:5,17,25,25 36:3
36:17 37:3,15 40:13

40:21 41:5,14,16,20
41:24 44:25 49:21
49:25 50:5,7,9,12
50:15,15,18,20,22
50:25 51:2,4,6,8,20
53:21 54:4 56:13,13
58:25 65:16 67:1
**suicides** 11:15 12:2
30:24 31:1 51:22
**suite** 2:7
**summary** 55:14
**summer** 2:7
**supermix** 52:9,12,13
52:16
**supplemental** 5:22
6:10,15 7:11 58:5
58:23
**support** 28:5 59:25
**supported** 59:16
**supporting** 59:2
**supportive** 15:16
**supports** 58:14,18
58:24
**sure** 24:20 38:22
48:1 50:3 52:17,19
52:19 53:15 54:10
54:14 57:8 62:17
**sworn** 5:5
**symptoms** 34:18
**system** 32:2,13

**T**

**tables** 38:21
**take** 10:21 14:10,24
17:10 18:9,12,13,13
18:14 19:9 27:18
30:8 38:7 41:2
48:16 49:6 54:24
67:1
**taken** 16:7 18:6
**talk** 8:12 32:18 33:10
**talked** 49:20 51:14
59:9 69:22,25
**talking** 33:14 40:12
49:10 61:10
**talks** 15:3 17:17

**taste** 62:5
**taylor** 61:4
**team** 68:21
**tee** 64:2
**teed** 67:11
**tell** 5:24 16:17 17:18
18:2 43:8 47:7,19
71:2
**telling** 36:2 49:18
**tells** 57:12
**ten** 69:23
**tend** 45:4
**term** 40:15 41:10
**terms** 9:14 24:13
25:18 28:1,4,9,11
34:22 46:19 69:3
**test** 13:15 15:7 24:24
39:25
**tested** 10:23 11:14
19:24 25:10 59:25
61:16
**testified** 5:5
**testify** 61:5
**testifying** 61:12
**testimony** 58:12
60:17 64:16
**testing** 8:14,17 14:4
20:13
**tests** 24:4 25:8
**thank** 8:6 38:4,5,11
39:4 55:10,15,24
56:5,20 71:17,23,24
71:25 72:1
**thats** 6:21 7:14 8:6
10:6 12:3,5,7,13
13:11 14:11,12,14
14:15 15:18 17:3
19:12,22,22 21:17
25:9 26:13,16,17,23
27:2 28:4 29:14
31:2,7,11,18 32:16
34:2,6,19 37:5,14
38:25 39:11 42:6,17
43:11,16,18 44:1,1
44:6,14,19 45:22
47:5 51:21,21 52:9

52:11 57:14 59:19
62:4 65:17 66:4,6
68:6 69:18,21 70:3
71:18,22
**theirs** 71:12,13
**therapies** 10:13
48:14
**therapist** 10:9
**therapy** 16:21 37:13
**theres** 4:18 9:3 10:19
18:24 28:19 34:25
45:23 58:15 66:9
69:8
**theyll** 71:12
**theyre** 12:16 13:4
29:19
**theyve** 61:16
**thing** 11:9 14:15
21:11 34:2,14 37:11
40:8 48:3 49:7,8
54:23 64:20
**things** 8:2 23:6 28:25
34:17 36:11 46:4,7
56:14 67:25
**think** 22:14 23:19
29:18 34:25 45:8
52:10 56:1,11 57:2
57:21 61:23 62:14
62:15 64:16 69:1
70:2,4,17
**thinking** 10:15 13:4
58:16 59:18 63:9
**thinks** 60:19
**thought** 8:3 14:13
21:1 44:25 48:4
62:22
**thoughts** 12:23,25
20:25 35:1,2
**thousand** 17:22,24
18:19,20
**three** 20:24,25 24:5
24:25 28:6 66:13
71:22
**threshold** 49:5 60:2
**threw** 41:23
**time** 4:25 7:6 9:22

15:20 24:15 25:13
26:2 28:2 38:22
40:18 44:8 55:23
59:11,14 64:21
65:16 68:10,22
69:12 70:4,16 71:12
73:10
**times** 2:9 11:3 15:24
35:23 49:22 66:14
**timing** 69:19
**tired** 26:11 29:1
**tires** 61:17
**today** 5:14 7:10 38:10
43:9
**told** 23:22
**tonic** 45:9
**topiramate** 34:12
**total** 22:18 48:11
60:17
**totally** 29:3 62:23,25
70:23
**transcript** 64:8,19
65:1,5,7 67:21 73:8
**transplantation**
31:23 32:8
**transplantations**
32:3
**treated** 8:25 11:2
12:8 20:24
**treatment** 9:1,23,24
10:14 14:21 16:12
22:8,12 27:21,24,25
28:13 40:21 41:6,17
55:1
**tremendously** 28:22
**trial** 2:12 6:13 33:23
33:25 49:4 58:20
59:5 66:2
**trials** 11:12 12:21
33:10,11 34:4
**trickles** 28:3
**tried** 17:2 36:17
48:15 49:13
**trimble** 61:6,8
**true** 28:4 34:19 51:23
66:18 73:13

**try** 8:5
**tuesday** 32:22 56:11
58:5,8 70:5
**turn** 58:7
**turns** 15:23
**twelve** 15:24
**two** 1:9 9:11 15:7
16:24 18:4 26:9
32:25 38:18 39:6
43:1 49:4 55:11,11
56:14 57:13 58:11
59:14 60:4 63:20
67:11 70:9
**tylenol** 46:4
**type** 34:6
**typewriting** 73:13
**typical** 16:10 44:9,11
44:13
**typically** 12:15 44:21
**typographical** 38:20

───────────

**U**

**ultimate** 27:23
**ultimately** 41:1
**unchanged** 39:22
**uncommon** 40:11,13
40:16,16,17
**undermines** 64:1
**underpowered**
54:19
**understand** 5:9,15
6:22,23 9:12 12:6
13:6 23:20,22 24:21
29:11 34:12 35:9
36:12,22 37:9 49:11
50:3 54:10 64:4
68:2
**understanding**
29:12
**understands** 26:20
**unfortunate** 69:18
**unfortunately** 42:16
42:24 69:16
**united** 1:1,11,15,23
73:3
**university** 31:21

47:14
**use** 10:25 11:25 19:5
32:13 33:21 41:10
43:9 49:16,17,25
53:12 58:2 69:21,25
70:7,9,25

───────────

**V**

**va** 31:12 47:12,12,17
**vacation** 71:22
**valid** 26:16 37:25
57:25 59:12
**valium** 45:19,21
**valuck** 47:14
**value** 39:21,23 54:6
**variable** 25:4
**variables** 16:4
**variety** 21:3
**vaughn** 2:12
**versus** 15:1 18:6
19:8 51:5
**veterans** 31:14,17
**vicinity** 7:13
**videotape** 68:4
**view** 66:5
**vigorous** 59:21
**virtually** 30:9 51:6

───────────

**W**

**wait** 13:19,19 26:18
**wake** 66:23
**walk** 14:17 19:15
**walking** 47:9 49:17
**want** 4:21,24 5:7 8:12
9:5,6 11:5 19:2
23:20,22 32:18,19
36:22 37:9 38:6,12
42:12,24 43:13,15
49:16 54:23 55:20
56:14 58:6 64:4,17
65:1,6,24 67:20
68:24 69:4 71:4
**wanted** 8:5,6
**wasnt** 7:2 21:11 39:5
57:15,16 68:12
**way** 1:15,23 6:11

12:1 19:13 28:10
32:11 40:17,25 47:1
51:21 56:23 60:4
63:20 66:6 67:2
68:6 71:14,16
**ways** 67:24
**weaker** 58:19 59:3
**weaknesses** 32:25
**wed** 13:16 33:23
70:15
**week** 29:11 53:2,9
60:24 63:18
**weeks** 26:9 63:20
67:11 71:22
**weight** 63:13
**weightloss** 44:20
**went** 19:12 29:4
33:15,17 39:14 44:8
56:2 59:15 62:2
**weve** 34:15 42:5
60:23 61:15
**whats** 7:10 14:24
19:24 25:18 33:18
52:12 53:8 57:21
61:21 62:4 71:6
**whatsoever** 18:7
48:17
**whereof** 73:15
**white** 2:7
**whos** 38:5
**williams** 2:7
**willing** 71:22
**withstood** 45:14,14
**witness** 3:2 4:19,22
5:12 7:23 9:11 10:1
10:11,18 11:17,21
12:3,7,10,13,20
13:11,13,21 14:2,15
14:25 15:12,14 17:3
19:21 23:1,10,14
26:14,17,21,25 27:7
27:9,14,19 29:14,22
30:3,14 31:1 32:10
33:9,18 34:14,19
35:11 36:20,23 37:5
37:8,11 42:20 52:13

53:13,18 54:1 55:8
55:16 59:22 61:3
63:2 68:2,11,12,15
70:12,18 73:15
**witnesses** 68:11,17
70:8
**witnesss** 60:16
**wolf** 68:25 69:1
**woman** 29:4
**wont** 56:5
**word** 19:2,5
**work** 8:23 13:24
32:14 69:19
**works** 51:21
**worried** 49:6 65:22
65:24
**worry** 68:6
**wouldnt** 13:18 56:3
**wrap** 37:19
**write** 11:23 41:5,17
**wrong** 13:23 34:10
34:21 57:3
**wrote** 46:13 48:21,25

— **X** —
**xanax** 45:18 46:1,2
63:12

— **Y** —
**year** 8:25 9:1,17,17
11:23 15:8,20 20:2
20:3 21:12 30:2
64:22 65:23 66:15
67:15
**years** 63:8
**yesterday** 23:23 43:3
43:8
**york** 2:4,9,9
**youll** 61:22 71:11
**youre** 9:24 10:7,15
10:16 13:7,8 26:12
33:16 34:10 41:13
42:20 46:12 48:8
52:6,17 70:7,9,11
71:24
**youve** 31:4 47:25

56:10 61:1 68:10
70:20

— **Z** —
**zero** 21:1 28:21

— **0** —
**0** 39:16
**00** 37:20 47:10 49:18
69:11,15,20 70:15
**000** 8:24 9:15 11:8
17:15 28:5,20 31:14
33:3,20,22 39:8
**000plus** 20:19
**02110** 2:7
**02210** 1:24
**0410981** 4:4
**0410981pbs** 1:4
73:11
**047** 39:22

— **1** —
**1** 1:5,15,23 16:17
17:17 39:16,24,25
40:2 56:18,19 69:15
70:15 73:9
**10** 1:16 39:8 72:3
**100** 2:7 12:22
**10036** 2:9
**11** 37:20 47:10 49:18
**1111** 2:4
**12550** 2:4
**1279** 2:4
**13** 17:24
**131** 8:24 20:19 28:5
28:20
**15** 18:19
**158** 54:6
**19** 1:15 5:21
**1980s** 31:22
**199** 11:12 33:3

— **2** —
**2** 21:18 22:13 69:11
69:20
**2003** 32:15
**2007** 31:13

**2008** 5:19 7:11,18 8:3
**2009** 1:16 5:21,25
6:10 7:3,6,11,13,24
73:16
**20th** 2:11
**21202** 2:11
**226** 31:14
**23** 1:16
**23rd** 73:16
**24hour** 68:22
**2707** 2:7

— **3** —
**3** 18:20 43:15 56:19
**30** 30:5,9 64:22
**300** 2:4 26:12
**30day** 66:10,15
**3456787** 1:24
**360** 26:4
**38** 3:5 11:11,18 12:23
35:3

— **4** —
**4** 20:23
**40** 33:3,20,22 72:3
**43** 39:14
**47** 9:15 11:8 17:15

— **5** —
**5** 3:5 39:23

— **6** —
**617** 1:24
**62** 54:4
**66** 39:14
**670** 11:18,20,23
17:15 35:25

— **7** —
**700** 11:13 20:23
**702** 56:16
**72** 1:5 17:22 73:9
**7200** 1:23
**79** 16:9 44:24

— **8** —

— **9** —
**9** 1:16
**909** 20:20
**99** 39:14