UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | : MDL Docket No. 1629 |
| | : Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | : Judge Patti B. Saris |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | : Magistrate Judge Leo T. Sorokin |
| | : **UNREDACTED VERSION** |
| | : **FILED UNDER SEAL** |

## JOINT PRE-TRIAL MEMORANDUM

Pursuant to Federal Rule of Civil Procedure 16, Local Rule 16.5, and this Court's November 12, 2009 Procedural Order, Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser" or "Plaintiffs") and Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), submit this Joint Pre-Trial Memorandum.

I.    A concise summary of the evidence with respect to both liability and damages that will be offered by:

   A.    Kaiser is as follows:

Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser") will present evidence explaining Kaiser's structure, organization, and the function of its formulary, including the process of information-gathering that goes into a drug's placement on its formulary with or without certain restrictions. Kaiser will set forth the chronology of how and when Neurontin was added to Kaiser's formulary, and with what restrictions and at what time. This will include a presentation of what information Kaiser and its agents sought and received from Defendants concerning Neurontin, including information about Neurontin's use for indications other than its FDA-approved uses and dosages. Kaiser will show how its spending on Neurontin increased markedly during the relevant time period, until the truth about

Neurontin began to be revealed.   Kaiser will present the steps it took to reduce Neurontin utilization after reports of Defendants' campaign of misinformation about Neurontin emerged in 2002.

The evidence will show that Defendants specifically targeted health maintenance organizations such as Kaiser, which were important customers of Defendants, to increase sales of Neurontin by, among other things, influencing doctors to prescribe Neurontin off-label, and through misrepresentations specifically targeted at managed care organizations regarding Neurontin's efficacy and safety profile.

As to each of the off-label uses at issue (bipolar disorder, neuropathic pain, migraine, and dosages above the FDA-approved maximum of 1800 mg/day), Kaiser will introduce evidence, through documentary exhibits, fact witness testimony, and expert testimony, that Defendants were aware of studies showing that Neurontin was no better than a placebo in treating these conditions, but that Defendants suppressed negative information about Neurontin, communicated half-truths, or made affirmative misrepresentations as to each use.   Kaiser will show through expert testimony and documentary evidence the effects of Defendants' misleading promotional activities on prescriptions for Neurontin.

Kaiser's evidence will further show that Defendants worked with third parties to present misleading information about Neurontin in publications and medical education settings or to suppress negative information about Neurontin in publications and medical education settings.

The evidence will show that Defendants' omissions, half-truths, and misrepresentations directly injured Kaiser through their effect on Kaiser's formulary decisions and the prescribing decisions of Kaiser's physicians.   The evidence will further show that there were cheaper and more optimal alternatives to Neurontin in treating each of the off-label indications at issue.   The evidence will show that Kaiser paid for Neurontin at excessive doses and instead of cheaper alternatives.

The evidence that Kaiser will introduce will include, without limitation, the following:

1.  Warner-Lambert Company LLC (hereinafter "Warner-Lambert"), was a corporation operating and existing under the laws of the State of Delaware.[1] Its principal place of business was Morris Plains, New Jersey. Warner-Lambert's Parke-Davis Division was engaged in, among other things, the development, promotion, sale, and interstate distribution of prescription drugs intended for the human use in the United States. Warner-Lambert's pharmaceutical manufacturing facilities were located in Puerto Rico, from which it shipped products to all fifty states and the District of Columbia.

2.  The Federal Food, Drug and Cosmetic Act ("FDCA"), among other things governs the lawful interstate distribution of drugs for human. use. As codified at Title 21, United States Code, Sections 331 et seq., and specifically at § 355(b), the FDCA, and its implementing regulations, require that before a new drug may legally be distributed in interstate commerce, a sponsor of a new drug product must submit a New Drug Application ("NDA").

3.  The FDCA required, at 21 U.S.C. § 355, that the NDA sponsor submit to the United States Food and Drug Administration ("FDA"), as part of an NDA, proposed labeling for the proposed intended uses for the drug which included, among other things, the conditions for therapeutic use. The NDA must also provide, to the satisfaction of FDA, data generated in randomized and well-controlled clinical trials that demonstrates that the drug will be safe and effective when used in accordance with the proposed labeling.

---

[1] Paragraphs 1-38 are taken from the Information filed in *United States of America v. Warner-Lambert Co. LLC*, dated May 13, 2004. As set forth in the letter agreement of the same date, "Warner-Lambert expressly and unequivocally admits that it committed the crimes charged in the Information. Warner-Lambert agrees that the facts set forth in the Information are true." (*See* Dkt. No. 2302-2.

4.     The FDCA, at 21 U.S.C. § 355, prohibited the introduction into interstate commerce of any new drug, unless an approval of an NDA is effective.  Only after the NDA, including the proposed labeling, was reviewed and approved by FDA, was the sponsor permitted by law to promote and market the drug, and only for the medical conditions of use specified in the approved labeling, for which use FDA had found sufficient evidence of safety and effectiveness.  Uses unapproved by FDA, not included in the drug's approved labeling, are known as "unapproved uses" or "off-label uses."

5.     The FDCA, and the regulations promulgated thereunder, required that in order to label or promote a drug for a use different than the conditions for use specified in the approved labeling, the sponsor had to file a new NDA, or amend the existing NDA, by, among other requirements, submitting the newly proposed indications for use and evidence, in the form of randomized and well-controlled clinical studies, sufficient to demonstrate that the drug would be safe and effective for the newly proposed therapeutic use or uses.  Only upon approval of the new NDA could the sponsor promote the drug for the new intended use.

6.     The FDCA, at 21 U.S.C. § 352(f)(1), provided that a drug was misbranded if, among other things, the labeling did not contain adequate directions for use.  As the phrase is used in the FDCA, adequate directions for use cannot be written for medical indications or uses for which the drug had not been proven to be safe and effective through well-controlled clinical studies because that would be misleading under Section 352(a).

7.     The FDCA, 21, U.S.C. §§ 331(a)(d), 333(a), and 355, prohibits the distribution in interstate commerce of an unapproved new drug or of a misbranded drug.

8.     In or about 1993, Warner-Lambert submitted an NDA for approval of a drug called Neurontin (also known by the chemical name gabapentin), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3 (h)(4)

4

and (5).  In that application, Warner-Lambert sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.  On or about December 30,1993, FDA approved Neurontin for that specific use only.  This approved use for Neurontin will be referred to throughout this Information as the "Approved Use."  Because Warner-Lambert had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than the Approved Use.  Further, Neurontin was not, pursuant to 21 U.S.C. § 355(i), exempt from the prohibition of introducing into interstate commerce a new drug for medical indications beyond the conditions prescribed, recommended, or suggested in the approved labeling thereof.

9.      As described in this Information, from at least June of 1995 through at least August 20, 1996, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD); and migraine headaches, among other uses.  These and other approved uses for Neurontin will be collectively referred to in this Information as the "Unapproved Uses."

10.     Warner-Lambert did not file a new NDA seeking FDA approval for any of these Unapproved Uses during the time period addressed in this Information.  Of these Unapproved Uses, only post-herpetic neuralgia has ever received FDA approval, and that approval was applied for and received after the events described in this Information.

11.    Warner-Lambert conducted evaluations of the market potential for certain of the Unapproved Uses for Neurontin, including but not limited to: post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

12.    In or about the fall of 1995, Warner-Lambert's Southeast Customer Business Unit ("SECBU") treated a planning document regarding Neurontin which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including conference calls on pain and a pain consultant meeting.

13.    Certain of Warner-Lambert's annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies, and tactics for increasing sales of the Unapproved Uses of the drug. The marketing plans budgeted for and funded these tactics.

14.    From early 1995, on repeated occasions, Warner-Lambert determined not to seek FDA approval for certain Unapproved Uses.

15.    In or about April and May of 1995, Warner-Lambert performed a Marketing Assessment of proposed psychiatric indications for Neurontin. In that Marketing Assessment, Warner-Lambert forecast potential revenue from Neurontin for bipolar and anxiety treatment under two scenarios: with and without FDA approval. Warner-Lambert's Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that the company would not seek approval to promote and sell the drug for these Unapproved Uses.

16.    In or about July of 1995 Warner-Lambert's assessment of Neurontin's market potential for neuropathic pain was distributed to its Neurontin Development Team and to a Warner-Lambert Vice President for Marketing. That assessment stated

that "there is no intention to fully develop the indication at this point."   Full development would have required submission of an NDA to FDA for approval.

17.   One of the principal factors Warner-Lambert considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin.   Another factor was the negative impact such approval might generate on potential sales of another drug that Warner-Lambert had been developing.   The company expected this new drug would be approved by FDA not only for epilepsy but also for a variety of uses beyond Neurontin's Approved Use.

18.   Once Neurontin's patent expired, other companies could seek approval to distribute genetic equivalents of Neurontin.   Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in Warner-Lambert's original NDA approval for Neurontin.   If Warner-Lambert sought and obtained approval for any of the Unapproved Uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those Unapproved Uses.   Warner-Lambert was concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

19.   From in or about June of 1995 through in or about August 20, 1996, by certain of the conduct described in greater detail below, Warner-Lambert promoted the sale and use of Neurontin for certain conditions other than the Approved Use in Massachusetts and elsewhere:

20.   In October 1995, a member of Warner-Lambert's Epilepsy Disease Team circulated a memorandum to a group including other senior members of Warner-Lambert's Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 Warner-Lambert sales representatives for whom data was available in a two month period, was for off-

7

label use of Neurontin.  Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

21.  On or about July 10, 1996, a Warner-Lambert sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

22.  Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs far painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure.  This same document, entitled "Neurontin Can Do/Can't Do," stated that sales representatives could do lunch programs on Neurontin and pain.  The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

23.  Warner-Lambert employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department.  On the following occasion, a Warner-Lambert medical liaison promoted Neurontin for Unapproved Uses:

   (a)  In or about June of 1996, a Warner-Lambert sales representative requested that a Warner-Lambert medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

   (b)  The sales representative and the medical liaison selected the topic for the presentation to the local medical society.  After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

   (c)  Among the topics of the presentation was the use of Neurontin for Unapproved Uses.

(d)    During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of Unapproved Uses.

(e)    After the presentation, a Warner-Lambert Medical Director praised the event as "another great example of use of the medical liaisons" and an Area Business Manager called it an "outstanding utilization of … one of the medical affairs liaisons."

24.    In or about May 1996, a Warner-Lambert Medical Director based in the Northeast CBU sent a voice message to the Medical Liaisons in the Northeast CBU in which he stated:

> What we'd like you to do is, any time you're called out just make sure that your main focus out of what you're doing is on Neurontin … When we get out there, we want to kick some ass, we want to sell Neurontin on pain.  All right?  And monotherapy and everything that we can talk about, that's what we want to do.

One or more Medical Liaisons in the Northeast CBU interpreted this statement to mean that he or she should promote Neurontin for Unapproved Uses and thereafter, in or about May and June 1996, promoted Neurontin for neuropathic pain, an unapproved use.

25.    Warner-Lambert organized a consultant meeting at the Jupiter Bench Resort in Palm Beach, Florida on April 19-21, 1996.   Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to Unapproved Uses of Neurontin.

26.    Warner-Lambert invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs.  As part of this event, Warner-Lambert paid for accommodations and meals for the invited

doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.  Doctors who acted as faculty were paid between $1,500 and $2,000.

27.   Among the presentations made to the physicians in attendance was one relating to Unapproved Uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin."   In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances."  During this presentation, Neurontin was promoted for use in the treatment of pain.

28.   Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs."  During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol, and pain.

29.   On or about May 8, 1996, following the Jupiter Beach conference, Warner-Lambert circulated to employees in the Northeast region the agenda to the meeting specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations. Warner-Lambert told its employees that "[t]he meeting was a great success and the participants were delivered a hard-hitting message about Neurontin."  Warner-Lambert distributed to these employees a form entitled "Jupiter Beach Trending Worksheet" which was intended to be used to gauge the effect of the meeting on the prescribing by doctors who attended the Jupiter Beach meeting.

30.   From August 1-5,1996, Warner-Lambert organized an "advisory board meeting," in Atlanta, Georgia in conjunction with the 1996 Summer Olympics.   Warner-Lambert expressly instructed several of the physician speakers to address some of the Unapproved Uses.

31.   During that meeting, Warner-Lambert hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the

closing ceremonies. The company had already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on Warner-Lambert's behalf at prior meetings.

32.    Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

33.    In or about January, 1996, a Warner-Lambert Vice President of the Southeast Customer Business Unit sent a memorandum to Warner-Lambert sales representatives listing certain goals, including: "Utilize the Medical Liaison Group to target the Neurontin, Pain & Psychiatric market. Objective to conduct twice weekly Pain Teleconferences moderated by key Neuro Consultants. Goals 250 Physicians Participants quarterly."

34.    On or about March 1, 1996, Warner-Lambert sponsored such a teleconference moderated by a Warner-Lambert employee with a pain specialist as a speaker on Neurontin. The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

35.    On or about March 28, 1996, a Warner-Lambert Medical Director in the Northcentral Customer Business Unit sent a memorandum to Warner-Lambert Medical Liaisons in that unit instructing them to hold a series of teleconferences with doctors to provide clinical updates on Neurontin, including monotherapy epilepsy data and non-epilepsy use data entitled "Neurontin, A Clinical Update."

36.    In or about May, 1996, a Warner-Lambert Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

37.    Beginning as early as in or about April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts, and elsewhere, after previously having been convicted of violating the Federal Food, Drug and

Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses.  No approval, pursuant to 21 U.S.C. § 355, was in effect with respect too Neurontin for use in these conditions.  All in violation of 2l U.S.C. §§ 331(d), 333(a)(2), and 355(a).

38.     Beginning as early as April 1995, and continuing thereafter until at least in or about August 20, 1996, in the District of Massachusetts and elsewhere, Warner-Lambert, after previously having been convicted of violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331 and 333, did introduce and cause the introduction into interstate commerce from Puerto Rico and elsewhere, directly and indirectly, into Massachusetts and elsewhere, quantities of Neurontin, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p), which drug was intended for use for the treatment of neuropathic pain, bipolar disorder, as monotherapy for epilepsy, and other Unapproved Uses, and which was misbranded within the meaning of 21 U.S.C. § 352(a), in that Neurontin labeling lacked adequate directions for such uses.

39.     Warner-Lambert entered a plea of guilty the United States' prosecution of the company for off-label marketing described above.  Warner-Lambert agreed, as part of its Plea Agreement with the United States Attorney for the District of Massachusetts, to pay a criminal fine of $240,000,000 and to the United States and certain states, the amount of $190,000,000, and to enter into a Corporate Integrity Agreement with the Office of Inspector General for the United States Department of Health and Human Services.

40.    On January 31, 1992, Parke-Davis submitted New Drug Application (NDA) 20-235: Neurontin (gabapentin) for the treatment of partial seizures. (Defendants' Response to Class Plaintiffs' Statement of Disputed and Undisputed Facts In Opposition to Defendants' Motion for Summary Judgment ("Class Plaintiffs' SOF") ¶ 1 (undisputed).)

41.    In January 1992, as part of Neurontin's NDA, the FDA began a Combined Medical-Statistical Review ("FDA Review") of Neurontin.  Data from epilepsy, early migraine and spasticity trials were reviewed for safety.  The FDA Clinical Reviewer was Cynthia McCormick.  (Class Plaintiffs' SOF ¶ 2 (undisputed).)

42.    On December 30, 1993, the FDA approved Neurontin as an add-on or adjunctive therapy for epilepsy.  Specifically, Neurontin was approved for "adjunctive therapy in the treatment of partial seizures with or without secondary generalization in adults with epilepsy."  (Defendants' Reply to Coordinated Plaintiffs' Counterstatement of Disputed and Undisputed Facts ¶ 1 ("Coordinated Plaintiffs' Counterstatement") (undisputed).)

43.    The drug sponsor, Defendant Warner-Lambert, did not seek approval in 1993 for any medical condition other than epilepsy.  (Answer to Third Coordinated Amended Complaint ¶ 16.)

44.    Warner-Lambert Company marketed Neurontin in the United States until June 2000. (Answer to Third Coordinated Amended Complaint ¶ 11.)

45.    In 2000, the FDA approved a separate indication for Neurontin for use in pediatric patients.  As of October 12, 2000, Neurontin was "also indicated as adjunctive therapy for treatment of partial seizures in pediatric patients age 3-12 years." (Coordinated Plaintiffs' Counterstatement ¶ 4 (undisputed).)

46.    On June 6, 2001, Pfizer filed a supplemental new drug application (sNDA) seeking approval to market Neurontin as a treatment for neuropathic pain.  The FDA informed Pfizer that the application would be "refused to file," meaning that

it was obvious the application would not be approved. The FDA did, however, offer to have the application reviewed by an Advisory Committee of outside pain experts. (Class Plaintiffs' SOF ¶ 227 (excerpt) (disputed).)

47.     After approval of Neurontin for management of postherpetic neuralgia, the FDA has not approved Neurontin for other conditions. (Answer to Third Coordinated Amended Complaint ¶ 18.)

48.     Pfizer filed a supplemental New Drug Application with the FDA for broad neuropathic pain on August 6, 2001. This application included two post herpetic neuralgia (PHN) studies, two Diabetic peripheral neuropathy (DPN) studies, and one study in mixed neuropathic pain (MNP). (Coordinated Plaintiffs' Counterstatement ¶ 5 (undisputed).)

49.     On October 22, 2001, Defendants informed the FDA that it was "appropriate to amend the proposed indication in its pending New Drug Application" to "management of neuropathic pain associated with postherpetic neuralgia at this time," and that "narrowing the proposed indication may require some new analyses and presentations" to allow the FDA to complete its review. On November 6, 2001, Pfizer sent the FDA a proposed timeline for submission of documents and datasets to support its amended application. (Coordinated Plaintiffs' Counterstatement ¶ 7 (undisputed).)

50.     In 2001, the Cochrane Collaboration published the protocol for their review entitled: "Gabapentin in the treatment of acute affective episodes in bipolar disorder: efficacy and acceptability." (Class Plaintiffs' SOF ¶ 149 (undisputed).)

51.     On June 7, 2005, the Journal of Clinical Psychiatry received the written manuscript of Pfizer-sponsored protocol 945-421-291. The lead author was Dr. Eduard Vieta. (Class Plaintiffs' Statement of Facts ¶ 163 (undisputed).)

52.     On August 25, 2005, the Journal of Clinical Psychiatry accepted the written manuscript of Pfizer-sponsored protocol 945-421-291.   (Class Plaintiffs' SOF ¶ 163 (undisputed).)

53.     In March 2008, the Journal of Psychiatric Practice published an article authored by Dr. Timothy Carey entitled: "Gabapentin in the Treatment of Mental Illness: The Echo Chamber of the Case Series." (Class Plaintiffs' SOF (undisputed).)

54.     This article reports on 29 studies related to gabapentin and bipolar disorder "published between 1997 and 2007, with the greatest number of articles published in 1998 and 1999."  These 29 publications included 15 uncontrolled case series and 6 single case reports.  (Class Plaintiffs' SOF ¶ 189 (undisputed).)

55.     Carey et al. noted that "[d]espite the generally weak study design in the identified populations, the authors of the articles often commented on the promising nature of gabapentin therapy for bipolar disorder" and that "randomized trials in heterogeneous populations demonstrated little if any evidence of such efficacy." (Class Plaintiffs' SOF ¶ 190 (undisputed).)

56.     Carey et al. concluded that "[t]he number of reports and their distribution in many different journals created a type of 'echo chamber' effect, through which the sheer number of publications and citations may give legitimacy to the practice of using gabapentin for bipolar disorder." (Class Plaintiffs' SOF ¶ 191 (undisputed).)

57.     Carey et al. further concluded that a "cursory examination of the literature identified in this review reveals repeated references to a promising new treatment. Our more detailed examination demonstrates multiple poor quality observational studies which collectively represent an echo chamber encouraging utilization of the medication based on minimal evidence.   The literature on gabapentin represents a cautionary tale for industry, researchers, and journal editors." (Class Plaintiffs' SOF ¶ 192 (undisputed).)

58.   On March 31, 1995, Parke-Davis sent Dr. Mellick a check for $750.   (Class Plaintiffs' SOF ¶ 248 (undisputed).)

59.   On May 5, 1995, Larry Perlow congratulated Dr. Mellick on the acceptance of his manuscript concerning Reflex Sympathetic Dystrophy (RSD) and Neurontin. (Class Plaintiffs' SOF ¶ 249 (undisputed).)

60.   Kaiser Foundation Health Plan, Inc. is among the largest health maintenance organizations in the United States.   Kaiser Foundation Hospitals and Kaiser Foundation Health Plans ("Kaiser"), are non-profit, charitable organizations, which contract for medical services from Kaiser Permanente Medical Groups ("PMG").11   As of December 2004, Kaiser had 8.2 million members in nine states and the District of Columbia, with over 6 million members in California. The remaining members are in Colorado, Georgia, Maryland, Virginia, Oregon, Washington, Hawaii, Ohio and District of Columbia.   Kaiser offers its members pharmacy benefits that include prescriptions of Neurontin.   Kaiser owns and operates its own in-house pharmacies in the same nine states in which it has members and the District of Columbia. These pharmacies purchase prescription drugs, including Neurontin, and dispense these drugs directly to Kaiser members. A limited number of health plan members purchase their prescription drugs through a pharmacy benefit manager retained by Kaiser.   (Coordinated Plaintiffs' Counterstatement ¶ 143 (disputed).)

61.   Kaiser is an integrated healthcare provider organized into eight regions, each of which has its own Pharmacy & Therapeutics ("P&T") Committee that is responsible for deciding the formulary status of prescription drugs, including Neurontin. (Defendants' Reply to Coordinated TPP Plaintiffs' Response to Defendants' Statement of Material Facts ¶ 79 (undisputed).)

B.      Pfizer is as follows:

Asserting causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO")[2] and California's Unfair Competition Law,[3] Plaintiffs seek to recover amounts paid by them for Neurontin prescriptions written to treat neuropathic pain, nociceptive pain, migraine and bipolar disorder, as well as prescriptions written for doses greater than 1800 mg/day.  In order to recover in this action, Plaintiffs must prove (1) that Defendants' alleged *fraudulent* promotion of Neurontin (not merely off-label promotion), (2) caused *Kaiser* (not some hypothetical, average Third Party Payor ("TPP")) to pay (3) for prescriptions it otherwise would not have, or to pay more than it would have paid for alternative medicines (i.e., the prescriptions would not have been written in the "but for" world) and (4) that such "but for" alternative prescriptions would have been as effective as Neurontin, as well tolerated as Neurontin and with no greater side effects than Neurontin for each and every patient whose prescription forms the basis of Kaiser's damages claim.[4]  Because Kaiser has chosen to rely solely on aggregate evidence, Kaiser must be able to prove each of these facts for *every* prescription for which it seeks damages or restitution.  In addition, in order to recover on their RICO claims, Plaintiffs must show the number of prescriptions that were caused by a violation of RICO.

The following is a summary of the evidence Defendants will introduce at trial. Specific items of evidence are provided only as examples.

---

[2]   18 U.S.C. §§ 1961, *et seq.*

[3]   Cal. Bus. & Prof. Code §§ 17200, *et seq.*  Plaintiffs also seek to recover under various other state laws. Defendants deny that Plaintiffs has standing to assert claims on behalf of their subsidiaries in states other than California.  Regardless, the evidence at trial will show that Plaintiffs cannot recover damages or other relief regardless of the theory alleged.

[4]   These are necessary, but not sufficient, elements of Plaintiffs' claims.  For example, Pfizer does not agree that, where a patient received a benefit from Neurontin, Plaintiffs are entitled to recover for that prescription merely because the patient might also have benefited from a cheaper drug.  Nonetheless, as Plaintiffs have framed their claim, they must, at the least, offer evidence that supports their cheaper, alternative theory.

1.   The Evidence Will Show That Physicians Prescribed Neurontin Based Upon Their Own Independent Medical Judgment, Not Alleged Off-Label Promotion By Pfizer.

Not only can Kaiser not meet its burden of proof, the evidence will show that physicians prescribed Neurontin not as a result of alleged off-label promotion but based upon their own independent medical judgment.   The prescribing decisions of physicians are influenced by a wide range of factors – as acknowledged by Plaintiffs' experts – including their own clinical experience with Neurontin, the clinical experience of their colleagues with Neurontin, their clinical experience in prescribing other drugs in the same class (anti-epileptic drugs or "AEDs") for the same unlabeled conditions, the approval of a drug for additional conditions in other countries, consensus guidelines supporting unlabeled use of a drug, as well as publication in journals and at conferences of studies, case reports and other evidence supporting the effectiveness of a drug in treating unlabeled conditions.   In this case, all of these factors fully explain the growth of Neurontin and gabapentin prescriptions for the conditions at issue in this lawsuit. Significantly, the evidence will show that AEDs are routinely prescribed for the conditions at issue and that Neurontin prescriptions generally followed the same pattern over time as all AEDs.   In addition, the evidence will show that off-label prescriptions of gabapentin continued to grow even after generic entry, after which Plaintiffs concede that there was only minimal marketing and promotion, if any, of Neurontin.

The FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label because it advances an important public policy.   *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").   A medical doctor is permitted to prescribe a medication for any

indication if it is that doctor's medical judgment that doing so is in the best interests of the patient.

Physicians often properly make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition. Kaiser physician Dr. Bill McCarberg testified that his prior experience plays a primary role in his prescribing decisions. Another Kaiser physician, Morris Maizels, testified that his previous medical experience was "arguably the most important factor" in deciding whether to prescribe a medication. In fact, prescribing off-label is often the standard of care, especially for certain indications, such as neuropathic pain, for which there are few, if any, FDA approved medications. Kaiser acknowledges that certain drugs are prescribed so often for a specific unlabeled use that doctors consider it a common practice.[5] More than that, for five years after this lawsuit was filed, until February 9, 2010, Kaiser continued to recommend Neurontin to its members as an effective treatment for chronic pain, cancer pain, cluster headaches and other off-label conditions. For example, until February 9, 2010, Kaiser's Health Encyclopedia featured on its website contained the following articles:

- An article entitled "Anticonvulsants for chronic pain," in which Kaiser represented that "gabapentin and pregabalin are the *only* drugs that have proved to relieve some types of chronic pain." (Emphasis added.)

- An article entitled "Anticonvulsants for chronic low back pain," in which Kaiser represented that "[a]nticonvulsants [including Neurontin] can reduce some persistent low back pain with fewer side effects than tricyclic antidepressants" and that "[t]he anticonvulsant gabapentin may be your *best bet* for safely treating chronic pain because it is not used by the body in the same way as many other medicines." (Emphasis added.)

- An article entitled "Anticonvulsants for cancer pain," in which Kaiser represented that "[a]nticonvulsants [including Neurontin] control cancer pain by changing the way sodium and calcium travel across the surface of nerve cells in the brain. The

---

[5]         https://members.kaiserpermanente.org/kpweb/healthency.do?hwid=stu3083&sectionId=stu3083-sec&contextId=tn9511.

nerve cells send fewer signals, and the brain senses less pain"; and that "[a]nticonvulsants help reduce pain related to the nervous system (neuropathic pain)"; and that "[s]ome have fewer side effects than tricyclic antidepressants."

- An article entitled "Gabapentin for hot flashes," in which Kaiser represented that "[i]n addition to seizure control, gabapentin is also commonly used to treat chronic pain, migraine headache, panic disorder, and social phobia."

- An article on "Headache, Cluster," in which Kaiser represented that "[r]esearchers are studying the antiseizure (antiepileptic) drug gabapentin for the treatment of cluster headaches. . . .   Initial results have demonstrated gabapentin to be an effective treatment for individuals with cluster headaches."

- An article on "Anticonvulsants for restless legs syndrome," in which Kaiser stated that "Gabapentin can help people with restless legs syndrome.  It is sometimes used when symptoms are severe and can be used in combination with other drugs."

- An article on "Primary Orthostatic Tremor" in which Kaiser represented that "[s]ome affected individuals responded favorably after being treated with an anti-seizure (anticonvulsant) drug called gabapentin (Neurontin)."  )

- An article on "Burning Mouth Syndrome," in which Kaiser represented that "[m]edications designed to reduce pain, or the perception of pain, include . . . gabapentin (Neurontin) at bedtime."

Kaiser openly touted its on-line Health Encyclopedia to encourage enrollment and represented that it contained trustworthy, current and accurate information, reviewed by Kaiser physicians, intended to assist Kaiser members to make better decisions about their healthcare.   The articles identified above, or substantially similar articles, were on Kaiser's website during the five years this litigation has been pending.  In fact, the only significant change made by Kaiser to such articles was to make its "best bet . . . for chronic pain" comments *specific to gabapentin*, rather than AEDs as a group.  It was not until a little over ten days before trial – when Kaiser could no longer hide its blatant contradictions behind sealed court filings – that the website articles came down.

Significantly, while Kaiser intends to rely on statistical plot points on charts created by its expert witness – an expert who was told by Kaiser's attorneys to *assume* everything that Kaiser is required to *prove* in this case, Pfizer will introduce testimony from real physicians – including Kaiser Permanente physicians and expert witnesses –

who will tell the jury that they prescribed Neurontin in the past and continue to prescribe Neurontin or gabapentin today because it is effective for certain patients.  For example, Pfizer will introduce the following deposition testimony:

- Dr. David Chandler, a Kaiser Permanente psychiatrist, continues to prescribe Neurontin for anxiety disorder, including patients for whom anxiety is a co-morbid condition with bipolar disorder.

- Dr. Morris Maizels, a Kaiser Permanente physician who has served on Kaiser's P&T Committee, found Neurontin to be effective in the treatment of neuropathic pain and would continue to prescribe it today.

- Dr. Bill McCarberg, a Kaiser Permanent physician who has testified as an expert on pain management, has also found Neurontin effective and prescribes it for neuropathic pain based upon his clinical experience and word of mouth from other physicians.  He continues to use it as a first line treatment and considers it in every patient with a neuropathic phenomenon.

- Dr. Mitchell Danesh, Regional Chief of Neurology for the Southern California Permanente Medical Group in 1999, prescribed Neurontin to treat neuropathic pain (including diabetic neuropathy and idiopathic peripheral neuropathy) and epilepsy (including monotherapy) and believed that Neurontin has been efficacious for some of these patients.

- Dr. Robin Dea, Regional Director for Mental Health Services for Northern California Kaiser, prescribed Neurontin to treat patients with bipolar condition and stated that it could be effective for individual patients.

- Dr. Vithal Dhaduk, a practicing neurologist for 20 years, based on his clinical experience, continues to prescribe Neurontin off-label for migraine prophylaxis and neuropathic pain.

- Dr. John Arness, a psychiatrist who retired in 2003, prescribed Neurontin to treat patients with bi-polar disorder based upon its acceptance by the medical community for this use, as well as the recognized practice of prescribing anticonvulsants to treat bipolar disorder.

Likewise, in February 2005 – the same month that the amended complaint was filed in this action – Kaiser Permanente physicians Drs. Maizels and McCarberg published an article in American Family Physicians, where they explained that "[o]f the

second-generation antiepileptic drugs, gabapentin (Neurontin) has the best documented efficacy in the treatment of neuropathic pain."[6]

Pfizer's experts will explain the decision-making process that physicians undertake when prescribing medicines off-label to treat the chronic and difficult conditions in this litigation. For example, Dr. Shawn Bird, a board certified neurologist and Associate Professor of Neurology at the University of Pennsylvania, will explain that most of the available alternatives for the treatment of neuropathic pain immediately prior to and during the time period relevant to this litigation were not FDA approved, and instead found acceptance in clinical practice through clinical experience, through consideration of published literature, including consideration or both positive and negative randomized, double-blind, placebo controlled clinical trials, where any such trials existed, and through consideration of non-"Level 1" information and clinical investigations supporting their efficacy. Dr. Bird will explain that, while controlled clinical trials are entitled to great scientific weight on the specific scientific propositions that each such study is designed to test, physicians can, should, and do consider multiple sources, types, and levels of scientific evidence for purposes of clinical decision-making. He will testify that it is important for physicians to have numerous treatment options to alleviate the suffering that patients endure with chronic neuropathic pain, patients who cannot tolerate the side effects or risks of addiction of the alternative drugs identified by Kaiser, or for whom Kaiser's alternative drugs provided no relief.

Similarly, Dr. Andrew Slaby, a psychiatrist with more than thirty years of clinical experience, who has authored or edited some thirty books and literally hundreds of articles in the field of psychiatry, regularly treats patients with bipolar, anxiety, and substance-abuse disorders. Dr. Slaby will explain the algorithms that physician develop to guide selection of treatments. A physician tries interventions that may affect a greater

---

[6]   Maizels & McCarberg, *Antidepressants and Antiepileptic Drugs for Chronic Non-Cancer Pain*, 71 Am. Fam. Physician 483, 485-87 (Feb. 1, 2005).

number of patients early in his or her treatment of a particular patient.  For individual patients who do not benefit from such therapies, they will try other interventions after their initial selection failed.  Dr. Slaby, who also is an epidemiologist, will also testify why an inconclusive or "negative" clinical trial does not establish that a drug is not effective in all patients.  Pfizer's other experts will provide similar testimony regarding the conditions they treat.

Even Kaiser's proposed pain expert, Dr. Thomas L. Perry, concedes that it would be reasonable for doctors to prescribe Neurontin as a treatment for neuropathic pain in some circumstances.  And Kaiser's expert, Dr. Douglas McCrory, admits that he prescribes gabapentin off-label to treat neuropathic pain.  Similarly, Plaintiffs' expert Dr. Alldredge admits that doctors in clinical practice should titrate to effect, rather than simply titrating to the FDA-approved dosage limit.  Indeed, Dr. Alldredge admits that it is a "common error" in clinical practice for doctors to "stop titrating the dose when they get to the FDA approved dosage limit" if the patient has "had a partial response to that point" and is "continuing to tolerate the medicine."  According to Kaiser's expert Dr. Alldredge, some patients derive incremental benefit up to 3600 mg/day and even 4800 mg/day.

2.    The Evidence Will Show That Kaiser's Formulary Decisions Were Not Caused By The Alleged Conduct Attributed By Kaiser to Defendants

Kaiser survived summary judgment in this action based upon its proffer of evidence by which it purported to show a direct injury.  That is, Kaiser claims that it expanded formulary access to Neurontin based upon alleged misrepresentations by Pfizer and that it would have behaved otherwise in a hypothetical "but for" world.  First of all, Kaiser's allegations are belied by the fact that Neurontin and gabapentin are still on Kaiser's formulary and Kaiser's guidelines continue to recommend Neurontin and gabapentin as viable treatment options for the conditions at issue in this litigation.

Further, an examination of the minutes of the various Kaiser committees that made decisions regarding formulary access and prescribing guidelines shows that their

23

decisions had nothing to do with the conduct that Kaiser attributes to Pfizer.  For example, while Kaiser contends in this litigation that efficacy can only be proven through double blind, randomized control trials ("DBRCTs"), the evidence will show that the decision of Kaiser's Southern California region to expand formulary access to Neurontin in 1997 had nothing to do with whether there were DBRCTs to support off-label uses.  In 1997, "the Chiefs of Anesthesiology . . . requested that the restriction for gabapentin be expanded to include Anesthesiology for the treatment of Reflex Sympathetic Dystrophy (RSD)." (September 1997 Gabapentin (Neurontin® P&T Review.)  Drug Information Services ("DIS") agreed with the recommendation, and it did so even though "[r]andomized, clinical trials of gabapentin for the treatment of RSD could not be found in the literature." (*Id.*)  And they made this recommendation with full knowledge that Neurontin was more expensive than alternative drugs for the treatment.  (*Id.*)  The only evidence cited by DIS to support formulary expansion were two letters to the editor reporting on efficacy in 14 refractory RSD patients. (*Id.*)

Similarly, in June 1999, the Chiefs of Neurology of the Southern California Region recommended removing prescribing restrictions and adding guidelines for use. The guidelines included the following:

- Diabetic neuropathy and postherpetic neuropathy:  Studies have shown gabapentin to be effective in the treatment of diabetic and postherpetic neuropathies.

  **The use of gabapentin for the treatment of neuropathy should be reserved for those patients unresponsive to or intolerant of other available treatment modalities, including tricyclic antidepressants (alone or in combination with narcotic analgesic agents), carbamazepine and topical agents.**

- For all indications:

  Initial prescription quantities should be limited to amounts consistent with a one month trial.

(Chiefs of Neurology Meeting, June 17, 1999.)  In September 1999, Southern California DIS issued a Drug Monograph for Neurontin.  DIS noted that "[g]abapentin has been used in various pain syndromes including pain secondary to radiation

myelopathy, reflex sympathetic dystrophy (RSD), migraine prophylaxis, trigeminal neuralgia, AIDS-related sensory polyneuropathy, and post-surgical neuropathic pain." (*Id.* p.1.)  The report identified only three DBRCTs:  one for post-herpetic neuralgia (later, an approved indication for Neurontin), one for diabetic neuropathy (which the monograph indicates was inadvertently unblinded), and a third for diabetic neuropathy (which the monograph indicates "failed to demonstrate significant pain relief in three of the four efficacy measures").  (*Id.* p.2.)  The monograph makes clear that Kaiser was aware that Pfizer had "no plans to pursue an FDA approved indication for the treatment of pain, including neuropathies" (*id.*), and, therefore, Kaiser concluded it seemed "unlikely that further large randomized clinical drug trials to study the efficacy and safety of gabapentin for this indication would be forthcoming."  (*Id.*)  DIS further noted that "[t]here have not been studies directly comparing gabapentin with TCAs in the treatment of neuropathies.  Available studies of gabapentin in the treatment of neuropathies do not evaluate long term use."  (*Id.*)  Notwithstanding this lack of DBRCT evidence, and expectation that there would not be any DBRCT evidence forthcoming, DIS indicated that "[g]abapentin could be used in patients who have failed or are unable to tolerate other treatment modalities."  In other words, DIS recommended that gabapentin could be used as second-line treatment for neuropathic pain, the guideline that Kaiser adopted. DIS made this recommendation with full knowledge that the cost of Neurontin would significantly exceed certain other medicines.  (*Id.*)  The guidelines that Kaiser adopted in 1999 are essentially the same as the guidelines in effect today, which recommend gabapentin as "***the*** second-line agent in the management of [neuropathic pain]."  (May 2007 Kaiser Permanente Medical Care Program, Management of Neuropathic Pain in Adults.)  The guidelines are based, in part, on the clinical experience of the Kaiser Permanente Care Management Institute's Pain Management Advisory Group.  (*Id.*)

Similarly, in October 2005, the Regional Formulary and Therapeutics Committee of Kaiser Permanente Northwest met to review "pharmacy policies for [drug] utilization

management." (Oct. 13, 2005 Minutes of Kaiser Northwest Regional Formulary and Therapeutics Committee.) Regarding gabapentin titration, the committee wrote:

> Criteria-based prescribing was removed for gabapentin at the September 2005 meeting, at which time gabapentin was also added back to the formulary. Gabapentin is the most commonly used antiepileptic drug for the management of neuropathic pain, and gradual dosage titration to therapeutic effect is advised to lessen severity of side effects. The effective dose should be individualized according to patient response and tolerability, but clinical trial results indicate that most patients require at least 1600 mg/day in divided doses in order to achieve significant pain relief. Doses up to 3600 mg/day may be needed in some patients.

(*Id.*) In other words, in 2005, five years after Kaiser was aware of an investigation of the off-label promotion of Neurontin, three years after negative news reports about Neurontin began, after the Southern California Region's Drug Utilization Action Team ("DUAT") and Northern California Drug Utilization Group ("DRUG") embarked on their campaigns to reduce Neurontin use as a treatment for neuropathic pain, and over eight months after Kaiser joined the amended complaint in this action, a Kaiser P&T Committee was not only recommending use of gabapentin for treatment of neuropathic pain, it noted that doses in excess of 1,800 mg/day (and even up to 3,600 mg/day) might be required.

Similarly, addressing bipolar disorder, Kaiser has repeatedly removed restrictions from its formulary for medications, including Neurontin, in the absence of supporting DBRCT evidence. For example, in 2002, Kaiser's California Drug Information Services ("DIS") issued a class-wide drug monograph discussing the evidence for efficacy of various AEDs, including Neurontin, in treatment of bipolar disorder. (2002 DIS AED Drug Monograph.)

Kaiser's monograph noted that there were no DBRCTs establishing Neurontin's efficacy in bipolar disorder, and that two DBRCTs were negative. (*Id.* at 5, Table 1.) The monograph specifically cites and discusses the Frye and Pande bipolar studies, knowledge of which Kaiser has claimed in this lawsuit would have made a difference in the decisions made by its P&T Committees. (*Id.*) Despite knowledge of those studies, Kaiser's Ohio Region Drug Information Service recommended accepting the prescribing

of Neurontin for bipolar disorder in 2002.  (*Id.* at 3.)  The OPMG psychiatry group specifically recommended that formulary restrictions be expanded to permit use of Neurontin as a third-line agent in bipolar disorder. (*Id.*)

The same 2002 monograph also was utilized with the Southern California Permanente Medical Group ("SCPMG").   Neither the SCPMG nor DIS sought to re-impose restrictions on Neurontin among psychiatrists with the knowledge of the Frye and Pande studies, which Kaiser itself reported as being negative.  Furthermore, the drug monograph also addressed the evidence supporting use of another AED, topiramate, in treatment of bipolar disorder.  It noted that, for topiramate, there were no DBRCTs supporting efficacy in bipolar disorder, and that there was one negative, unpublished study. (*Id.* at 5, Table 1.)  The monograph even noted that – "as seen with gabapentin" – positive open label studies and case reports may not be confirmed with RCTs. (*Id.* at 2.)

Based on this non-DBRCT evidence,  Kaiser's Southern California Permanente Medical Group recommended formulary expansion to permit prescriptions of topiramate by psychiatrists with a guideline stating that the medication is a "[h]elpful adjunct for the treatment of bipolar disorder."  (*See* 2002 DIS Southern Calif. AED Drug Monograph.) Kaiser made this decision despite its knowledge of the higher cost of topiramate than gabapentin. (*Id.* at 2.)  In other words, Kaiser's doctors determined that topiramate could be an effective treatment for bipolar disorder despite the fact that there was not a shred of Level 1 evidence supporting its efficacy, despite the fact that the only available Level 1 evidence was negative, and despite its higher cost.  This is but one of several instances where Kaiser's real-world practices are in irreconcilable conflict with Kaiser's litigation claims.

The testimony of Kaiser representatives and physicians in this litigation likewise makes clear that Kaiser does not require DBRCTs when making formulary decisions, and that it considers the experience of treating physicians.  For example, Mirta Millares, Manager for Drug Information Services and Pharmacy Outcomes Research at Kaiser,

who testified as a 30(b)(6) witness for Kaiser, conceded that Kaiser does not require DBRCTs for its formulary decisions and that it seeks input from specialists.   Albert Carver, Kaiser's Vice President of Pharmacy Strategy and Operations in California, testified that physicians are in the best position to make a decision regarding the appropriate and the necessary treatment of the patients and that their decisions will not be second guessed by the health plan.   He further agreed "absolutely" that treating physicians are better equipped than anyone else, including the P&T committee to make prescription decisions for their patients. According to Dr. Carver, Kaiser's P&T committees consider the recommendations made by Kaiser Permanente physicians who specialize in treating specific conditions – recommendations based on their clinical experience.

Finally, even assuming that Kaiser could show that it would have made different formulary decisions (an assumption contradicted by the record), Kaiser cannot quantify the alleged impact of its formulary decisions on prescribing.   Kaiser 30(b)(6) representative Mirta Millares admitted that a drug's formulary status, guidelines, and restrictions make little difference to prescribing physicians.   Indeed, she testified that that Kaiser will pay for a prescription drug ordered by its physicians even if the drug is not on its formulary, and that Kaiser leaves the ultimate prescribing decision to the physician. And not a single expert that Kaiser intends to call at trial has attempted to measure in any way the impact of Kaiser's formulary decisions on the number or prescriptions written.

Kaiser facilely claims that 95 percent of prescriptions are on formulary; however this percentage is unremarkable if virtually every available drug is on formulary.   Kaiser has not produced any evidence that makes this anything more than a meaningless statistic. Indeed, that Neurontin is on the formulary is not a material fact.   It is each physician's decision to prescribe Neurontin over other drugs on or off the formulary that comprise the facts material to Kaiser's claim and on which they offer no evidence.   Kaiser also points to a 34 percent reduction in Neurontin prescriptions after it undertook an initiative (the

"DUAT Initiative") to encourage physicians to prescribe tricyclic antidepressants ("TCSa") as first line therapy for neuropathic pain. Again, this statistic was neither relied upon nor addressed by any of Kaiser's experts and, therefore, has not been subject to any admissible causation analysis. The evidence will show that the DUAT Initiative did not represent a change in either Kaiser's formulary restrictions or prescribing guidelines. As noted above, when formulary restrictions were removed for Neurontin, Kaiser's guidelines recommended Neurontin as a second line treatment for neuropathic pain. Moreover, Kaiser has no expert evidence who can render an causation opinion based upon this statistic because no expert has even considered it. Thus, Plaintiffs' experts cannot exclude alternative causes for this reduction, including whether it represents anything more than physicians bowing to pressure from Kaiser to cut costs. In addition, the DUAT Initiative was targeted only at neuropathic pain. Kaiser has not proffered comparable evidence for any of the other conditions at issue in this litigation.

3.    The Evidence Will Show That The Prescribing Decisions Of Individual Physicians Were Supported by Substantial Scientific Evidence Of The Efficacy Of Neurontin In Treating The Conditions At Issue

It is Plaintiffs' burden to prove that Neurontin was ineffective to treat all patients for all of the conditions at issue in this litigation. While Pfizer is not required to prove efficacy, it will introduce substantial evidence, including expert testimony, that scientific evidence supports the decisions of individual physicians to prescribe Neurontin to treat the conditions at issue in this case. In each case, the opinions of Pfizer's experts will be based on the totality of the evidence, giving appropriate weight to DBRCTs. The anticipated evidence described below is provided by way of example, only.

Dr. Bird, for instance, will provide a thorough review of the literature that supports his opinions that Neurontin is effective and safe for neuropathic pain. He specifically considers and gives appropriate weight to DBRCTs, but his opinions are based on the totality of the evidence, including case reports, case series, meta-analyses, peer-reviewed medical literature, medical textbooks and his clinical experience. Dr. Bird

will describe the extensive Level 1 evidence supporting gabapentin's efficacy in the treatment of neuropathic pain, as well as the additional evidence supporting gabapentin's efficacy in neuropathic pain.  In addition to extensive medical literature, Dr. Bird will also identify and discuss several leading medical texts supporting Neurontin's efficacy in neuropathic pain.  The authors of each of these medical treatises have, like Dr. Bird, considered the totality of available evidence of Neurontin's efficacy in neuropathic pain, and have concluded, like Dr. Bird, that Neurontin has demonstrated efficacy.

Likewise, Dr. Gary Brenner an attending physician at Massachusetts General Hospital and an assistant professor at Harvard Medical School who is board certified in anesthesiology and pain medicine, will testify that Neurontin is effective in treating neuropathic pain.  Dr. Brenner's opinions are based upon, among other evidence, a meta-analyses published by the Cochrane Collaboration, one of the most respected groups performing this type of analysis. The Cochrane Collaboration recently re-issued its report and conclusion that "[t]here is evidence to show that gabapentin is effective in neuropathic pain" and that two-thirds of patients can expect to achieve good pain relief. (The Cochrane Collaboration, *Gabapentin for acute and chronic pain* (Review) at 1 (2010).)[7]  In addition to the Cochrane review, Dr. Brenner's opinions are based upon other meta-analyses that have supported the efficacy of gabapentin for the control of neuropathic pain, as well as consensus statements from respected medical organizations or groups of individuals.

Dr. Slaby will testify regarding Neurontin's effectiveness in treating some patients with bipolar disorder, including treating their comorbid conditions and symptoms. Like all of Pfizer's experts, he considers and gives appropriate weight to DBRCTs, but does not ignore other relevant evidence.  Dr. Slaby additionally reviewed DBRCT studies of Neurontin's use in treating anxiety disorders, panic disorders, and social phobia, all

---

[7]   The authors re-issued their report even though the report makes clear that they "are aware of unpublished trial data for Gabapentin which could affect the results of this review." (*Id.*)

psychiatric disorders which commonly occur in patients with bipolar disorder, and which are characterized by symptoms that substantially overlap with the symptoms of bipolar disorder. Dr. Slaby will testify that Neurontin has been shown in a number of DBRCT studies to be efficacious in the treatment of such associated disorders. *See e.g.,* Pande, et al., *Treatment of Social Phobia With Gabapentin: A Placebo Controlled Study*, J. Clin. Psychopharmacol, 19:341-48 (1999); Pande, et al., *Placebo-controlled Study of Gabapentin Treatment of Panic Disorder*, J. Clin. Psychopharmacol. 20: 467-71 (2000).

Evidence of Neurontin's effective also includes a 2003 comprehensive "special review" of the medical evidence of Neurontin's effectiveness in treatment of bipolar disorders, including the Pande (2000), Frye (2000) and other RCTs cited by Kaiser as some sort of dispositive proof of inefficacy. The review concluded that:

> On the basis of the available literature, GBP [Neurontin] may have a role only as adjunctive treatment of bipolar patients showing components of depression, anxiety, and impulsiveness. Thus, it may be a valuable tool particularly in patients with comorbid psychiatric disorders. A further potential use may be in patients affected by concomitant substance abuse. Additional studies are needed to confirm these findings. Future studies should be carried out using appropriate methods and instruments capable of measuring the specific symptomatic components which may benefit from the use of GBP.

Carta, et al, *Special Review:  The Clinical Use of Gabapentin in Bipolar Spectrum Disorders*, 75 J. of Affective Disorders 83, 89 (2003). Further, at least one RCT study showed gabapentin's efficacy in a subset of bipolar patients. *See* Vieta, et al., *A Double Blind, Randomized, Placebo-Controlled, Prophylaxis Study of Adjunctive Gabapentin for Bipolar Disorder*, J. Clin. Psychiatry 67:3, 473-77 (March 2006).

In contrast to the totality of the evidence approach taken by Pfizer's experts, Plaintiffs' experts take a myopic view of the available evidence and give opinions that depend upon inappropriate extrapolations from negative studies to the entire patient population. As Pfizer's experts will explain, a study that concludes that a drug failed to effectively treat a given condition in a particular subpopulation when administered using a specified regimen does not by any stretch establish that the drug is ineffective for

treating the condition in all patients in all other circumstances. For example, a negative study conducted at one dose does not mean that the drug is ineffective at every dose. And the fact that the drug did not show a statistically significant effect where symptoms were severe does not mean it would not show such an effect in patients with mild or moderate symptoms. It is precisely because of these inherent limits in efficacy studies that off-label prescribing is a widely accepted practice, and a practice well-informed by clinical experience and recognized by the FDA.

For example, each negative study relied upon by Kaiser's expert psychiatrist carries explicit caveats limiting its findings. Each study cited by Kaiser examined specifically defined sub-categories of patients; none of them purported to study all, or even a representative cross-section or sample, of the general population of bipolar patients. And the authors of the studies explicitly warned against generalizing the results of their studies to other bipolar patients.

In addition, Kaiser's assertions regarding the scientific evidence is predicated on the validity of their experts' analysis interpretation of the available data from DBRCTs. Pfizer will also present testimony from Dr. Robert Gibbons who will explain the errors made by Plaintiffs' experts who purport to re-interpret the available data.

If Kaiser is permitted to introduce evidence concerning any alleged risk of increased suicidal thoughts or behavior, notwithstanding the lack of relevance of such allegations to the claims asserted by Kaiser, Pfizer will introduce expert testimony and other evidence demonstrating that Neurontin does not increase the risk of suicidal thoughts or behavior.

Pfizer's experts will also explain the flaw in Kaiser's "cheaper, alternative" theory. Significantly, Plaintiffs have not offered any expert testimony to support their claim that the list of alternative drugs that they provided to their economist to calculate damages would have been as effective for each patient, as well tolerated, with no greater side effects than Neurontin. For example, while Dr. Bird agrees that TCAs are effective in