treating neuropathic pain, they have a much more limiting side effect profile than Neurontin.  Plaintiffs' expert Dr. Perry concedes that they carry anti-cholinergic and alpha-blocking adverse effects and side effects including sedation, severe dry mouth, urinary retention, and orthostatic hypotension.  TCAs are also contra-indicated in people with ischemic cardiac disease or increased risk of sudden cardiac death.  Kaiser also proposes opiods as alternative medicines, whose use is limited by most physicians due to their addiction and abuse potential.  And Dr. Bird rejects Plaintiffs' contention that other drugs proposed by Kaiser, such as carbamazepine are as effective as Neurontin. Moreover, Pfizer's experts make clear that efficacy is very much a patient specific issue. While TCAs are generally effective in the treatment of neuropathic pain, they will have already been tried and failed in many of the patients for whom Neurontin was prescribed. Similar analysis will be provided of Kaiser's alternative drugs for other conditions at issue by Pfizer's other experts.  Significantly, Plaintiffs' list of "cheaper, alternative" drugs was not a list developed by its experts, but by Kaiser DIS Manager Millares, who backs up her selection with nothing more than her *ipse dixit*.

4.      Kaiser Cannot Prove Causation, Injury And Damages

Pfizer will also demonstrate at trial the fundamental flaws in Kaiser's proffered evidence of causation and damages.  To support its claims of causation, Kaiser will rely primarily upon the testimony of Prof. Meredith Rosenthal.  Plaintiffs' other economist, Dr. Raymond Hartman then takes Prof. Rosenthal's calculations and purports to monetize them to arrive at damages.

Pfizer will present testimony from Dr. Michael Keeley, who will set out the numerous flaws in Prof. Rosenthal's and Dr. Hartman's analysis.  However, the most fundamental problem with their opinions is apparent from their own reports and testimony:  Neither of their testimony has anything to do with Kaiser.

Prof. Rosenthal does not attempt to measure the impact of off-label promotion on prescriptions paid for by any particular third-party payor ("TPP"), and she certainly did

not construct a Kaiser specific model.  Significantly, throughout this litigation, Kaiser has maintained that it is different than other TPPs.  It was its ability to distinguish itself from other TPPs such as Guardian Life Insurance Company and Aetna, Inc. that allowed it to survive summary judgment.  This allegedly being the case, Kaiser can provide absolutely no basis for extrapolating industry data (which on its own has wide margins of error) to Kaiser.  To the contrary, Dr. Hartman testified that he would expect Kaiser's drug utilization to be different from other TPPs.

In fact, an internal survey of over 20,000 prescriptions conducted by Kaiser of its own drug utilization found that its Neurontin prescriptions for bipolar comprised only approximately 4 percent of Kaiser's total Neurontin prescriptions.  For the same time period, Dr. Hartman's estimates Kaiser's bipolar prescriptions at 13.6 percent of Kaiser's Neurontin prescriptions, overstating Kaiser's utilization by almost 3½ times.  Presumably, Kaiser will attempt to explain away this enormous discrepancy through the testimony of Ambrose Carrejo, the National Pharmaceutical Contracting Leader for Kaiser Permanente's Pharmaceutical Contracting and Strategic Purchasing Department.  None of the explanations offered by Dr. Carrejo are sufficient to justify the reliance by Plaintiffs' experts on industry data.  First, Dr. Carrejo stated in his declaration that estimate was derived from a subset of patients.  In other words, it was a sample.  But the data used by Prof. Rosenthal is also derived from a sample, one with large margins of error and which is not Kaiser specific.  Second, Dr. Carrejo states that the survey was conducted only in Northern California.  However, Kaiser's insistence that regional variability must be accounted for is a concession that Prof. Rosenthal's analysis should be excluded, because she made no attempt to address geographic differences.

Next, Dr. Carrejo essentially suggests that the bipolar statistic is unreliable as the result of selection bias.  However, this was Kaiser's survey and presumably it was designed to provide meaningful information to Kaiser.  Indeed, Kaiser publicized the findings internally as part of its DUAT initiative.  Kaiser now asks the court to assume

that it employs reasonable methods for analyzing drug utilization when it proffers its 34% figure, but any other internal drug utilization analysis should be ignored.   Further, if Kaiser corrected the selection bias identified by Dr. Carrejo for bipolar, it would have to correct it for all indications.   Kaiser has not shown that the percentages would be different.   Even more importantly, the evidence shows that Kaiser has the ability to conduct internal reviews to determine drug utilization, but it did not do so and did not provide that information to either Prof. Rosenthal or Dr. Hartman.

In addition, neither Prof. Rosenthal nor Dr. Hartman account for Kaiser's alternative "but for" world in which Kaiser alleges that, had it not been for Pfizer's alleged improper promotion, Kaiser would have paid for cheaper drugs.   As discussed above, Kaiser proffers no competent medical evidence to support its claim that the handful of drugs identified by it would have been as effective and as well tolerated by all patients.   Indeed, this cannot be shown on an aggregate basis.   Second, there is an economic component to Kaiser's "but for" world that is not addressed by either Prof. Rosenthal or Dr. Hartman.   The relevant question is not what theoretically *could* have been prescribed, but what physicians *would* have prescribed, because that is what Kaiser would have paid for in the "but for" world.   And there is no reason to assume that physicians would have selected from Kaiser's list of mostly generic drugs rather than a newer branded drug.   For example, while Kaiser relies upon a report from the University of North Carolina to support its choice of two AEDs to treat bipolar, that report identified a third, lamotrigine, that does not appear on Kaiser's alternative list.   Why?   Because lamotrigine was not available as a generic until 2005.   Neither medical nor economic testimony can justify Kaiser's selection of the *cheapest* alternative drugs it can identify without respect to what doctors would have actually prescribed in the "but for" world.

The evidence at trial will show that Prof. Rosenthal's analysis is afflicted with numerous other flaws.   Kaiser's counsel has instructed Prof. Rosenthal to make unrealistic and unproven assumptions and, as a result, her conclusions are contradicted by

the factual record in this case.   The evidence will show that Prof. Rosenthal has not measured anything relevant to any element of the Plaintiffs' claims in this action; that at the instruction of counsel, she assumed her conclusions and thereby engaged in circular reasoning; and that she employed a results-oriented methodology that does not conform with standard econometric practices.   Dr. Hartman's damages estimates are wholly dependent upon Prof. Rosenthal's analysis and, therefore, suffer from the same infirmities.

5.      The Evidence Will Show That Pfizer Appropriately Marketed Neurontin and Supported The Development Of The Scientific Literature

The evidence at trial will show that Pfizer did not engage in a national scheme to promote Neurontin for off-label uses and did not make fraudulent misrepresentations about Neurontin.   Kaiser will seek to introduce evidence of a criminal plea by Warner-Lambert Company LLC related to specific incidents of off-label promotion through certain representatives and events in discrete locations within the United States, and was concerned solely with conduct that occurred between April 1995 and August 1996.[8]   The Department of Justice did not charge Warner-Lambert with disseminating any false or misleading information about Neurontin.   While Warner-Lambert acknowledged that the facts set forth in an Information dated May 13, 2004 were factually accurate, the Information outlined and described *specific instances* in 1995 and 1996 in which Warner-Lambert's marketing activities violated the relevant provisions of the FDCA.   The Plea is not evidence of the existence of any intentional nationwide scheme to promote Neurontin for off-label use.   And the evidence at trial will not show any connection between the incidents described in the Information and Kaiser's claims in this litigation.

---

[8]   Pfizer continues to object to the introduction of this evidence for the reasons stated in its Motion in Limine to Exclude All Evidence of or References to Warner-Lambert Company LLC's Guilty Plea or Any Related Government Investigations or Agreements and supporting memorandum [2301, 2302].

In addition, the FDA recognizes the need among health care professionals for peer review and dissemination of the latest significant scientific data and information on drugs in scientific journals. As a result, information on unlabeled uses may be disseminated through the submission of original research to peer-reviewed publications. Pharmaceutical companies are also allowed to provide financial, logistical, and technical support for independent scientific or educational activity where off-labeled uses of a drug are discussed, so long as the content is controlled in content and format by the program provider and characterized by balance, objectivity, scientific rigor, and appropriate disclosure of financial support or conflicts of interests.

The FDA also allows companies to disseminate information on unlabeled uses in response to unsolicited requests for scientific information from health care professionals. As the FDA has observed, scientific departments within regulated companies generally maintain a large body of information on their products. When health care professionals request such information, companies are allowed to provide responsive, nonpromotional, balanced, scientific information, which may include information on unapproved uses. Companies may also disseminate independently prepared educational materials that contain product information.[9]

Through both fact and expert testimony, Pfizer will demonstrate at trial that it supported the development of scientific literature and responded to physician inquiries within the guidelines established by the FDA and that it did not suppress or manipulate publication of scientific literature.

Finally, the evidence at trial will show that Pfizer did not form an association-in-fact enterprise as alleged by Plaintiffs and did not conduct the affairs of any such enterprise through a pattern of racketeering activity.

---

[9] *Citizen Petition Regarding the Food and Drug Administration's Policy on Promotion of Unapproved Uses of Approved Drugs and Devices*; Notice; Request for Comments, 59 Fed. Reg. 59820-01, 1994 WL 645925 (Nov. 18, 1994).

II.     The facts established by pleadings or by stipulations or admissions of counsel are as follows:[10]

1.      Parke-Davis was an operating division of Warner-Lambert which was acquired by Pfizer in 2000.  Pfizer Inc is the sole owner of Warner-Lambert Company LLC, which is a Delaware limited liability company and the successor to Warner-Lambert Company.

2.      Defendants manufacture and distribute the prescription drug Neurontin, also known as gabapentin, its generic chemical name.

3.      On January 15, 1992, Parke-Davis submitted a New Drug Application ("NDA") to the U.S. Food & Drug Administration (FDA) seeking approval for Neurontin as an adjunctive therapy for epilepsy.  An adjunctive therapy is a secondary therapy intended to be used in conjunction with and as a supplement to a primary therapy.

4.      On or about December 15, 1992, the Peripheral and Central Nervous System Drugs Advisory Committee to the Department of Health and Human Services voted to recommend Neurontin for the adjunctive treatment for refractory epilepsy.

5.      Approximately one year later, on December 30, 1993, the company received FDA approval to market Neurontin only for the adjunctive treatment of epilepsy in adults, at the dose of 900 to 1800 milligrams per day.

6.      In August 2001, Pfizer filed a New Drug Application, which ultimately led to an FDA approval in May 2002 for the use of Neurontin in the management of postherpetic neuralgia ("PHN") in adults.

---

[10]   Kaiser believes other facts are established by pleadings or by stipulations or admissions of counsel, and reserves its right to later argue this or to submit a separate filing containing those facts.  Pfizer also reserves its right to later argue that additional facts are established by pleadings or by stipulations or admissions of counsel or to submit a separate filing containing such facts.

7. The FDA has not approved Neurontin to be marketed for any indications other than (1) adjunctive therapy in the treatment of partial seizures in adult and pediatric patients with epilepsy and (2) management of PHN.

III.  Contested Issues of Fact

The issues listed below are contested; however, the parties do not necessarily agree, with respect to each issue: (1) whether the issue is one of law or fact, (2) whether the issue has been correctly stated or (3) whether the issue is relevant.  The parties are, therefore, separately listing their contested issues of fact.

A. Kaiser's contested issues of facts are as follows:

1. Whether Neurontin is effective in treating bipolar and other mood disorders.

2. Whether Neurontin is effective in treating neuropathic pain.

3. Whether Neurontin is effective in treating nociceptive pain.

4. Whether Neurontin is effective in treating migraine and headache.

5. Whether Neurontin has greater efficacy at dosages over 1800 mg/day.

6. Whether Defendants misrepresented Neurontin's efficacy in treating bipolar and other mood disorders.

7. Whether Defendants misrepresented Neurontin's efficacy in treating neuropathic pain.

8. Whether Defendants misrepresented Neurontin's efficacy in treating nociceptive pain.

9. Whether Defendants misrepresented Neurontin's efficacy in treating migraine and headache.

10. Whether Defendants misrepresented Neurontin's efficacy at dosages over 1800 mg/day.

11. Whether Defendants' misrepresentations and omissions concerning Neurontin's efficacy in treating bipolar and other mood disorders caused Kaiser to suffer damages.

12.   Whether Defendants' misrepresentations and omissions concerning Neurontin's efficacy in treating neuropathic pain caused Kaiser to suffer damages.

13.   Whether Defendants' misrepresentations and omissions concerning Neurontin's efficacy in treating nociceptive pain caused Kaiser to suffer damages.

14.   Whether Defendants' misrepresentations and omissions concerning Neurontin's efficacy in treating migraine and headache caused Kaiser to suffer damages.

15.   Whether Defendants' misrepresentations and omissions concerning Neurontin's efficacy at dosages over 1800 mg/day caused Kaiser to suffer damages.

16.   Whether there were cheaper and more optimal alternative medications available during the relevant period to treat bipolar and other mood disorders.

17.   Whether there were cheaper and more optimal alternative medications available during the relevant period to treat neuropathic pain.

18.   Whether there were cheaper and more optimal alternative medications available during the relevant period to treat nociceptive pain.

19.   Whether there were cheaper and more optimal alternative medications available during the relevant period to migraine and headache.

20.   The amount of damages suffered by Kaiser as a result of Defendants' misrepresentations and omissions concerning  Neurontin's efficacy in treating bipolar and other mood disorders.

21.   The amount of damages suffered by Kaiser as a result of Defendants' misrepresentations and omissions concerning Neurontin's efficacy in treating neuropathic pain.

22.   The amount of damages suffered by Kaiser as a result of Defendants' misrepresentations and omissions concerning Neurontin's efficacy in treating nociceptive pain.

23.   The amount of damages suffered by Kaiser as a result of Defendants' misrepresentations and omissions concerning Neurontin's efficacy in treating migraine and headache.

24.   The amount of damages suffered by Kaiser as a result of Defendants' misrepresentations and omissions concerning Neurontin's efficacy at dosages over 1800 mg/day.

25.   Whether Defendants and Cline Davis Mann formed or constituted a RICO enterprise (the "Publication Marketing Enterprise").

26.   Whether Defendants and Medical Action Communications formed or constituted a RICO enterprise (the "Medical Education/Marketing Enterprise").

27.   Whether the activities of the Publication Marketing Enterprise affected interstate commerce.

28.   Whether the activities of the Medical Education/Marketing Enterprise affected interstate commerce.

29.   Whether Defendants were associated with the Publication Marketing Enterprise.

30.   Whether Defendants were associated with the Medical Education/Marketing Enterprise.

31.   Whether Defendants committed two or more acts of wire fraud within ten years of each other in connection with the operation of the Publication Marketing Enterprise.

32.   Whether Defendants committed two or more acts of wire fraud within ten years of each other in connection with the operation of the Medical Education/Marketing Enterprise.

33.   Whether Defendants conducted or participated in the conduct of the Publication Marketing Enterprise through a pattern of racketeering activity.

34.   Whether Defendants conducted or participated in the conduct of the Medical Education/Marketing Enterprise through a pattern of racketeering activity.

41

35.   Whether Kaiser has suffered damages as a result of the activities of the Publication Marketing Enterprise.

36.   Whether Kaiser has suffered damages as a result of the activities of the Medical Education/Marketing Enterprise.

37.   The amount of damages suffered by Kaiser as a result of the activities of the Publication Marketing Enterprise.

38.   The amount of damages suffered by Kaiser as a result of the activities of the Medical Education/Marketing Enterprise.

39.   Whether Defendants agreed or conspired to violate RICO.

40.   Whether the conspiracy to violate RICO caused Kaiser damages.

41.   The amount of damages suffered by Kaiser as a result of the RICO conspiracy.

42.   Whether Defendants have been unjustly enriched at Kaiser's expense.

43.   Whether Defendants engaged in unlawful business acts or practices in marketing Neurontin for the treatment of bipolar and other mood disorders, an off-label use.

44.   Whether Defendants engaged in unlawful business acts or practices in marketing Neurontin for the treatment of neuropathic pain, an off-label use.

45.   Whether Defendants engaged in unlawful business acts or practices in marketing Neurontin for the treatment of nociceptive pain, an off-label use.

46.   Whether Defendants engaged in unlawful business acts or practices in marketing Neurontin for the treatment of migraine and headache, an off-label use.

47.   Whether Defendants engaged in unlawful business acts or practices in promoting Neurontin at dosages in excess of the FDA-approved maximum.

48.   Whether Kaiser is entitled to restitution as a result of Defendants' unlawful business practice of marketing Neurontin for the treatment of bipolar and other mood disorders.

49.   Whether Kaiser is entitled to restitution as a result of Defendants' unlawful business practice of marketing Neurontin for the treatment of neuropathic pain.

42

50.     Whether Kaiser is entitled to restitution as a result of Defendants' unlawful business practice of marketing Neurontin for the treatment of nociceptive pain.

51.     Whether Kaiser is entitled to restitution as a result of Defendants' unlawful business practice of marketing Neurontin for the treatment of migraine and headache.

52.     Whether Kaiser is entitled to restitution as a result of Defendants' unlawful business practice of marketing Neurontin at dosages in excess of the FDA-approved maximum.

53.     Whether Defendants engaged in unfair business acts or practices in marketing Neurontin for the treatment of bipolar and other mood disorders, an off-label use.

54.     Whether Defendants engaged in unfair business acts or practices in marketing Neurontin for the treatment of neuropathic pain, an off-label use.

55.     Whether Defendants engaged in unfair business acts or practices in marketing Neurontin for the treatment of nociceptive pain, an off-label use.

56.     Whether Defendants engaged in unfair business acts or practices in marketing Neurontin for the treatment of migraine and headache, an off-label use.

57.     Whether Defendants engaged in unfair business acts or practices in promoting Neurontin at dosages in excess of the FDA-approved maximum.

58.     Whether Kaiser is entitled to restitution as a result of Defendants' unfair business practice of marketing Neurontin for the treatment of bipolar and other mood disorders.

59.     Whether Kaiser is entitled to restitution as a result of Defendants' unfair business practice of marketing Neurontin for the treatment of neuropathic pain.

60.     Whether Kaiser is entitled to restitution as a result of Defendants' unfair business practice of marketing Neurontin for the treatment of nociceptive pain.

61.     Whether Kaiser is entitled to restitution as a result of Defendants' unfair business practice of marketing Neurontin for the treatment of migraine and headache.

62.     Whether Kaiser is entitled to restitution as a result of Defendants' unfair business practice of marketing Neurontin at dosages in excess of the FDA-approved maximum.

63.     Whether Defendants engaged in fraudulent business acts or practices by materially misrepresenting Neurontin's efficacy in treating bipolar and other mood disorders.

64.     Whether Defendants engaged in fraudulent business acts or practices by materially misrepresenting Neurontin's efficacy in treating neuropathic pain.

65.     Whether Defendants engaged in fraudulent business acts or practices by materially misrepresenting Neurontin's efficacy in treating nociceptive pain.

66.     Whether Defendants engaged in fraudulent business acts or practices by materially misrepresenting Neurontin's efficacy in treating migraine and headache.

67.     Whether Defendants engaged in fraudulent business acts or practices by materially misrepresenting Neurontin's efficacy in treating bipolar and other mood disorders.

68.     Whether Defendants engaged in fraudulent business acts or practices by representing that Neurontin has increased efficacy at dosages over 1800 mg/day.

69.     Whether Kaiser is entitled to restitution as a result of Defendants' fraudulent business practice of materially misrepresenting Neurontin's efficacy in treating bipolar and other mood disorders.

70.     Whether Kaiser is entitled to restitution as a result of Defendants' fraudulent business practice of materially misrepresenting Neurontin's efficacy in treating neuropathic pain.

71.     Whether Kaiser is entitled to restitution as a result of Defendants' fraudulent business practice of materially misrepresenting Neurontin's efficacy in treating nociceptive pain.

72.     Whether Kaiser is entitled to restitution as a result of Defendants' fraudulent business practice of materially misrepresenting Neurontin's efficacy in treating migraine and headache.

73.     Whether Kaiser is entitled to restitution as a result of Defendants' fraudulent business practice of representing that Neurontin has increased efficacy at dosages over 1800 mg/day.

B.      Pfizer's contested issues of facts are as follows:

1.      That Neurontin is an effective treatment for neuropathic pain in some patients.

2.      That Neurontin is an effective treatment for nociceptive pain in some patients.

3.      That Neurontin is an effective treatment for migraine headaches in some patients.

4.      That Neurontin is an effective treatment for some patients diagnosed with bipolar disorder, including treatment of comorbid psychiatric and other conditions and symptoms.

5.      That Neurontin is effective at doses greater than 1800 mg/day for some patients.

6.      That Kaiser acknowledges the effectiveness of Neurontin for some patients in treating various off-label conditions, including neuropathic pain, nociceptive pain, migraine headaches, bipolar disorder (including comorbid psychiatric and other conditions and symptoms), and at doses greater than 1800 mg/day.

7.      That Kaiser acknowledges the effectiveness of Neurontin in treating neuropathic pain in some patients by including Neurontin on its formulary.

8.      That Kaiser acknowledges the effectiveness of Neurontin in treating nociceptive pain in some patients by including Neurontin on its formulary.

9.      That Kaiser acknowledges the effectiveness of Neurontin in treating migraine headaches in some patients by including Neurontin on its formulary.

10.     That Kaiser acknowledges the effectiveness of Neurontin in treating bipolar disorder (including comorbid psychiatric and other conditions and symptoms) in some patients by including Neurontin on its formulary.

11.    That Kaiser acknowledges the effectiveness of Neurontin at doses above 1800 mg/day in some patients by including Neurontin on its formulary.

12.    That Kaiser acknowledges the effectiveness of Neurontin in treating neuropathic pain in some patients by failing to restrict formulary access to Neurontin as a treatment for this condition.

13.    That Kaiser acknowledges the effectiveness of Neurontin in treating nociceptive pain in some patients by failing to restrict formulary access to Neurontin as a treatment for this condition.

14.    That Kaiser acknowledges the effectiveness of Neurontin in treating migraine headaches in some patients by failing to restrict formulary access to Neurontin as a treatment for this condition.

15.    That Kaiser acknowledges the effectiveness of Neurontin in treating bipolar disorder (including comorbid psychiatric and other conditions and symptoms) in some patients by failing to restrict formulary access to Neurontin as a treatment for this condition.

16.    That Kaiser acknowledges the effectiveness of Neurontin at doses above 1800 mg/day in some patients by failing to restrict formulary access to Neurontin as a treatment for this condition.

17.    That Kaiser acknowledges the effectiveness of Neurontin in treating neuropathic pain in some patients by issuing prescribing guidelines that include the use Neurontin as a treatment for this condition.

18.    That Kaiser acknowledges the effectiveness of Neurontin in treating nociceptive pain in some patients by issuing prescribing guidelines that include the use Neurontin as a treatment for this condition.

19.    That Kaiser acknowledges the effectiveness of Neurontin in treating migraine headaches in some patients by issuing prescribing guidelines that include the use Neurontin as a treatment for this condition.

20.  That Kaiser acknowledges the effectiveness of Neurontin in treating bipolar disorder (including comorbid psychiatric and other conditions and symptoms) in some patients by issuing prescribing guidelines that include the use Neurontin as a treatment for this condition.

21.  That Kaiser acknowledges the effectiveness of Neurontin at doses above 1800 mg/day in some patients by issuing prescribing guidelines that include the use Neurontin as a treatment for this condition.

22.  That Kaiser represents on its website the Neurontin is effective, appropriate and/or commonly prescribed for the treatment of various off-label conditions, including chronic pain, chronic lower back pain, pain originating from a nerve, cluster headaches, migraine headache, panic disorder and social phobia.

23.  That Kaiser represents on its website that anticonvulsants, including Neurontin, can reduce pain in some patients with fewer side effects than tricyclic antidepressants.

24.  That Defendants appropriately marketed Neurontin consistent with FDA regulations.

25.  That Defendants appropriately supported the development and publication and dissemination of scientific information, evidence and literature regarding the safety and efficacy of Neurontin.

26.  That physicians prescribed Neurontin for off-label conditions based upon factors other than alleged fraudulent promotion, including, without limitation, their own clinical experience, the clinical experience of their colleagues, experience in prescribing other anti-seizure medications for the conditions at issue, scientific evidence supporting the use of Neurontin for various conditions and the approval of Neurontin for various conditions in other countries.

27.  Even assuming that physicians would not have prescribed Neurontin absent the conduct alleged by Plaintiffs, whether they would have prescribed one of the

alternative drugs identified by Plaintiffs in opposition to Defendants' motion for summary judgment.

28. That the alternative drugs identified by Plaintiffs would not have been as effective as Neurontin, as well tolerated as Neurontin, and with no greater side effects than Neurontin in every patient to whom Plaintiffs contend the drugs should have been prescribed in lieu of Neurontin.

29. That Kaiser did not rely upon any representations made by Defendants in making formulary decisions or issuing prescribing guidelines.

30. That Neurontin does not increase the risk of suicidal thoughts or behavior.

31. Whether there existed an "enterprise" as defined by the Racketeer Influenced and Corrupt Organizations Act ("RICO").

32. Whether Defendants knowingly and willfully conducted or participated in the conduct of any RICO enterprise though a pattern of racketeering activity.

33. Whether Plaintiffs were injured in their business or property by reason of any alleged RICO violation and, if so, in what amount.

34. Whether Plaintiffs can disaggregate any claimed damages among off-label conditions at issue.

35. Whether Defendants violated California's Unfair Competition Law.

36. Whether Plaintiffs were injured in fact and lost money or property as a result of any alleged violation of California's Unfair Competition Law and, if so, in what amount?

37. Whether Plaintiffs have standing to recover under the consumer protection statute of any state other than California.

38. Whether Defendants violated the consumer protection statute of any other state that may be applicable to Plaintiffs' claims.

39.    Whether Plaintiffs suffered an injury as a result of any alleged violation of any consumer protection statute of any other state that may be applicable to Plaintiffs' claims and, if so, in what amount.

40.    To the extent Plaintiffs seek to recover punitive damages or discretionary treble damages under any consumer protection statute of any other state that may be applicable to Plaintiffs' claims (Defendants deny that they are entitled to do so), whether Defendants acted with the level of willfulness, culpability, or mental state required to permit any such award, whether any such damages should be awarded and, if so, in what amount.

41.    When did Plaintiffs know or should have known of their claims so as to trigger applicable statutes of limitations.

IV.    Any Jurisdictional Questions.

    A.    By Kaiser

    Not applicable. The parties agree that the Court has both subject matter jurisdiction over the action to be tried, and personal jurisdiction over the parties.

    B.    By Pfizer

    Jurisdiction in this case is based on federal question, 28 U.S.C. § 1331 and diversity of citizenship under 28 U.S.C. § 1332. While it is not disputed that Plaintiffs have alleged claims under a federal statute, that there is diversity of citizenship and that the amount-in controversy exceeds $75,000, Defendants contend that Plaintiffs have failed to allege a sufficiently direct injury to satisfy both Article III and RICO standing.

V.    Questions raised by pending motions are as follows:

    A.    By Kaiser

1.    Kaiser's motion to exclude the non-rebuttal testimony of Defendants' rebuttal expert Dr. Rothschild (Dkt. Nos. 2344-46) remains unresolved.

B.      By Pfizer

1.      Whether the testimony of Plaintiffs' expert Prof. Meredith Rosenthal should be excluded or limited [2316, 2317, 2439-2].[11]

2.      Whether the testimony of Plaintiffs' expert Dr. Raymond S. Hartman should be excluded or limited [2319, 2320, 2439-2].

3.      Whether the testimony of Plaintiffs' expert Dr. Kay Dickersin should be excluded or limited [2304, 2305, 2437-2].

4.      Whether the testimony of Plaintiffs' expert John Abramson, M.D. should be excluded or limited [2307, 2308].

5.      Whether the testimony of Plaintiffs' expert Dr. Rena Conti should be excluded or limited [2311, 2312].

6.      Whether the testimony of Plaintiffs' expert Dr. Curt Daniel Furberg should be excluded or limited [2311, 2312].

7.      Whether the court should exclude any reference to conduct unrelated to Neurontin, including (i) an August 31, 2009, settlement among Pfizer, the United States Department of Justice, and certain other government agencies (collectively, the "Government"), pursuant to which Pfizer and the Government agreed to settle certain qui tam actions against Pfizer involving drugs other than Neurontin (the "August 2009 Settlement") and (ii) a plea agreement between the Government and Pharmacia & Upjohn Company, Inc. (a company that is not a party to this litigation) involving the drug Bextra (the "Pharmacia Plea"), as well as any related government finding or investigation in connection with the August 2009 Settlement or Pharmacia Plea [2298, 2299, 2428-2].

---

[11]   Also pending before this Court are Pfizer's motions for leave to file a joint reply brief in support of their motion to exclude Prof. Rosenthal and Hartman [2439], motion to exclude Dr. Dickersin [2437] and motion to exclude conduct unrelated to Neurontin [2428].

8.    Whether evidence of or references to Warner-Lambert Company LLC's guilty plea or any related government investigations or agreements should be excluded [2301, 2302].

9.    Whether the testimony of David Franklin should be excluded or limited [2325, 2326].

10.   Whether Plaintiffs should be precluded from presenting the live testimony of Permanente physicians unless and until Plaintiffs make Permanente physicians available to Defendants for live testimony [2314, 2315].

11.   Whether this case should be transferred for trial to a federal district court in California [2206, 2194, 2257-2].

12.   Whether Plaintiffs should be compelled to (1) make Dr. Nicolas Wieder available for a two-hour continuation of his deposition in either New York or Boston, (2) reimburse Pfizer for expenses and attorneys' fees incurred in connection with the continued deposition of Dr. Wieder, and (3) stipulate to the authenticity of the website pages at issues [2471, 2472].

13.   Whether the Declaration of Dr. Nicolas Wieder submitted by Plaintiffs in opposition to Pfizer's motion for summary judgment should be stricken [2471, 2472].

VI.   Issues of law, including evidentiary questions, together with supporting authority:

A.    By Kaiser

1.    References to Treble Damages, Attorneys' Fees, and Injury to Pfizer's Share Price or Business Should Be Precluded

Evidence should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Rule 403 is "a tool that a trial judge can use to keep a jury's attention riveted on the

51

dispositive issues." *Williams v. Drake*, 146 F.3d 44, 47-48 (1st Cir. 1998).  The Rule requires preclusion of any reference to treble damages, attorneys' fees,[12] or potential harm to Pfizer's business or share prices[13] that may result from a jury award in this case.

2.



---

[12] *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 860 (1st Cir. 1985) (finding it "generally not advisable to inform a jury of the treble damages or attorneys' fees provisions of the antitrust laws because of the danger that a jury may reduce a plaintiff's award to account for trebling").  *See also HBE Leasing Corp. v. Frank*, 22 F.3d 41, 45 (2d Cir. 1994) ( "every authority brought to this court's attention upholds excluding references to trebling and attorneys fees in the RICO context"); *Fisher v. City of Memphis*, 234 F.3d 312, 319 (6th Cir. 2000) ( "it is clearly prejudicial to instruct a jury as to the potential for attorneys' fees when it is deciding the merits of the underlying § 1983 action").*Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1308 n.7 (7th Cir. 1987) (information pertaining to RICO's trebling provision is "irrelevant to a jury's deliberations and may confuse or prejudice the jury"); *Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 F.2d 1240, 1242-43 (1974) (jury should not be informed of the mandatory treble damages provision of Clayton Act); *Semke v. Enid Auto. Dealers Ass'n.*, 456 F.2d 1361, 1370 (10th Cir. 1972); *Vidosh v. Holsapple*, No. CIV. A. 84-2447, 1987 WL 273164, at *12-13 (E.D. Mich. Feb. 2, 1987) (excluding reference to RICO's treble damage and attorneys' fee provisions because "to inform the jury of a treble damage provision will cause it to adjust its award accordingly and thus distort its true function of finding damages . . .").

[13] Courts have consistently held that evidence that may induce a jury to alter a damages award based on irrelevant factors should be precluded under Rule 403. *See, e.g., St. Cyr v. Flying J. Inc.*, No. CIV. A. 06-13, 2007 WL 2696791, at *2 (M.D. Fla. Sept. 12, 2007) (precluding irrelevant evidence about defendants' wealth because "the jury may be tempted to render an award on the basis of that information alone"); *Murphy v. Ford Motor Co., Inc.*, No. CIV. A. 07-864, 2009 WL 2998960, at *5 (W.D. La. Sept. 14, 2009) (excluding evidence about defendants' financial condition or the relative wealth of the parties because irrelevant to the substantive merits of the case).  Similarly, any suggestion that a jury will adversely impact defendants' ability or incentive to develop new medications – thus harming the entire community – is an effort to artificially deflate the jury award based on the passions and sympathies of the jury.  Such argument is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial." *Westbrook v. Gen. Tire and Rubber Co.*, 754 F.2d 1233, 1238-9 (5th Cir. 1985) (holding that trial court should have excluded "all impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation").  *See also United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2006) (in a case alleging the fraudulent procurement of social security benefits, it was improper to appeal to the "individual pecuniary interests of jurors").



Kaiser also objects on the grounds that anecdotal evidence regarding Neurontin's efficacy is irrelevant because such evidence lacks statistical significance. *See, e.g., Haggerty v. Upjohn Co.*, 950 F.Supp. 1160, 1164 (S.D. Fla. 1996) (noting witness's concession "that scientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies."); *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387, 1411 (D. Or. 1996) (explaining that "case reports and case studies are universally regarded as an insufficient basis for a conclusion regarding causation because case reports lack controls.").

3.   Defendants Should Not Be Permitted to Make Any Arguments Regarding the Relative Lack of Documents from CBUs Other Than the Northeast

Kaiser seeks an order precluding Defendants from arguing that the relative lack of documents introduced from Customer Business Units ("CBU's") other than the Northeast CBU is evidence that Defendants' conduct did not reach Kaiser, or that Kaiser has not met its burden generally. This request is based on Pfizer's apparently having allowed documents outside the Northeast CBU and on Pfizer's having only been ordered to produce a limited number of marketing documents during this case.

During the Franklin litigation, Pfizer was required to preserve only documents from 1994-1998, and only documents related to the Northeast CBU or housed in Morris Plains, the corporate headquarters. Thus, until 2005, after this case was filed, there was no preservation order relating to documents relating to

the non-Northeast CBU's (including the West CBU, where the majority of Kaiser-affiliated physicians are found).  By the time that Magistrate Judge Sorokin ruled on July 18, 2006 (Dkt. No. 393) that marketing discovery would run through May 31, 2001, a date extended on December 12, 2006 to May 2004 by Judge Saris, few if any additional West CBU documents remained.  At a hearing in April 2007 on a separate discovery dispute, Pfizer's counsel implied that everything else has been deleted or destroyed.  (*See* 4/17/07 hearing transcript at 46:7-11 ("So it wasn't until November [2006] when for the first time that they put any complaint in this case, and they were asking for leave that had to be granted, asking for leave to allege conduct after May, 2001.  And since that time, there are no deletions of any information.").)  Thus, by the time that Pfizer purported to become aware of the discoverability of post-1998 documents, documents outside the Northeast CBU were likely gone.

Additionally, even after the date range for discoverable marketing events was extended to May 2004, Magistrate Judge Sorokin limited Defendants' production of documents reflecting communications among defendants' sales force and detailing personnel regarding Neurontin to those at the Vice President and regional manager level or higher (as well as a limited number of sales representatives who called on particular physicians).  (*See* Dkt. No. 632.)

Plaintiffs are not seeking a sanction in the form of an adverse inference for the destruction of the non-Northeast CBU documents, although the Court would have the inherent power to give such an instruction.  *See, e.g., Driggin v. American Sec. Alarm Co.*, 141 F. Supp. 2d 113, 120 (D. Me. 2000) (stating that "destructive acts occurring prior to the filing of a complaint where the potentiality of litigation is clear may also merit sanctions"); *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*, 593 F.Supp. 1443, 1455 (C.D. Cal. 1984) ("While a litigant is under no duty to keep or retain every document in its possession once a

complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request."). Instead, in the interest of fairness, Plaintiffs seek to preclude Defendants from taking advantage of their own deficient production at trial. Just as a party may not invoke a claim of privilege as both a shield from discovery and a sword in litigation, *see, e.g., U.S. v. Desir*, 273 F.3d 39, 45 (1st Cir. 2001), Defendants cannot use their claims of burden, which resulted in a limited production of marketing documents during discovery in this case, to argue that any purported gaps or differences between the CBU's have any bearing on Kaiser's having met its burden here.

B.    By Pfizer[14]

1.    Whether Plaintiffs have alleged a sufficiently direct injury to satisfy Article III standing.

2.    Whether Plaintiffs have alleged a sufficiently direct injury to satisfy RICO standing.

3.    Whether Plaintiffs have standing to recover damages on behalf of their subsidiary corporations.

4.    Whether Plaintiffs' expert testimony on the issue of causation and injury satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 703.

---

[14]   The legal authority for many of these issues has previously been provided to this Court. Defendants incorporate by reference their prior Defendants' Motion for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure [1689], Memorandum on Law in Support of Defendants' Motion for Summary Judgment [1691], Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment [1785], Defendants' Notice of Supplemental Authority in Support of Summary Judgment [2205] and all motions in limine and supporting memoranda listed in section V.B above. Additional legal authority is provided in Defendants' Trial Brief and Defendants' Special Requests for Jury Instructions, which are also being filed this date.

5.  Whether Plaintiffs' expert testimony on the issue of damages or restitution satisfies the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 703.

6.  Whether Plaintiffs' claims based upon prescriptions written for any condition other than neuropathic pain should be dismissed pursuant to this Court's order of January 8, 2010, based upon the fact that the only evidence of direct causation submitted by Plaintiffs is limited to neuropathic pain.[15]

7.  Whether Plaintiffs' RICO claims are barred by the statute of limitations.

8.  Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that a RICO enterprise existed.

9.  Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Defendants knowingly and willfully conducted or participated in the conduct of any RICO enterprise though a pattern of racketeering activity.

10.  Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Plaintiffs were injured in their business or property by reason of any alleged RICO violation.

11.  Whether there is a legally sufficient evidentiary basis for a reasonable jury to award damages under RICO.

12.  Whether Plaintiffs' claims under California's Unfair Competition Law are barred by the statute of limitations.

13.  Whether there is a legally sufficient evidentiary basis for the Court to find that Defendants violated California's Unfair Competition Law.

---

[15] The only evidence of causation beyond the opinions of Dr. Rosenthal (which this Court has found insufficient) is the fact that Neurontin usage decreased after Kaiser in 2003 instituted a specific counter-promotional initiative designed to reduce the number of new prescriptions for Neurontin written by Kaiser physicians. Defendants dispute the sufficiency of this evidence to meet Plaintiffs' burden with respect to causation. In any event, because the initiative was limited to neuropathic pain, it fails to meet Plaintiffs' burden with respect to any other condition; all such claims should be dismissed.

14.     Whether there is a legally sufficient evidentiary basis for the Court to find that Plaintiffs were injured in fact and lost money or property as a result of any alleged violation of California's Unfair Competition Law.

15.     Whether there is a legally sufficient evidentiary basis for the Court to award restitution pursuant to California's Unfair Competition Law.

16.     Whether Plaintiffs have standing to recover under the consumer protection statute of any state other than California.

17.     Which state's law governs Plaintiffs' state law claims.

18.     Whether any other state law claims asserted by Plaintiffs are barred by the statute of limitations.

19.     Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Defendants violated the consumer protection statute of any other state that may be applicable to Plaintiffs' claims.

20.     Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Plaintiffs suffered an injury as a result of any alleged violation of any consumer protection statute of any other state that may be applicable to Plaintiffs' claims.

21.     Whether there is a legally sufficient evidentiary basis for a reasonable jury to award damages under any consumer protection statute of any other state that may be applicable to Plaintiffs' claims.

22.     Whether Plaintiffs can recover unjust enrichment under the law of any state.

23.     To the extent Plaintiffs seek to recover punitive damages or discretionary treble damages under any consumer protection statute of any other state that may be applicable to Plaintiffs' claims (Defendants deny that they are entitled to do so), whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Defendants acted with the level of willfulness, culpability, or mental state

required to permit any such award, whether any such damages should be awarded and, if so, in what amount.

24.   To the extent Plaintiffs seek to recover punitive damages or discretionary treble damages under any consumer protection statute of any other state that may be applicable to Plaintiffs' claims (Defendants deny that they are entitled to do so), whether there is a legally sufficient evidentiary basis for a reasonable jury or the Court to determine the amount of any such award.

25.   To the extent Plaintiffs seek to recover punitive damages or discretionary treble damages under any consumer protection statute of any other state that may be applicable to Plaintiffs' claims (Defendants deny that they are entitled to do so), whether any such award is constitutionally permissible.

26.   All issues raised by Defendants' motions in limine, as set forth in section 5(b) above.

27.   The admissibility of any other evidence objected to by Defendants, as set forth in Defendants' objections to Plaintiffs' exhibit and deposition designations.

VII.   Any requested amendments to the pleadings.

A.   Kaiser's are as follows:

1.   Amendment formally adding a MAC Sub-Enterprise

Kaiser requests two technical amendments to its operative complaint, the Third Coordinated Amended Complaint (Dkt. No. 583).  As the Court may recall, Plaintiffs were granted leave to file third amended complaints, principally to add allegations concerning Medical Action Communications ("MAC"), a medical marketing firm that played a key role in the creation and publication of misleading journal articles concerning Neurontin's efficacy for off-label uses.. *See id.* ¶¶ 181-196.  While the complaint clearly alleges that Defendants and MAC conspired to commit the wrongs alleged, which constitute a pattern of racketeering activity under RICO, Kaiser inadvertently omitted to formally add

MAC to the list of RICO enterprises. *See id.* ¶¶ 244-334. Accordingly, pursuant to Fed. R. Civ. P. 15(a)(2), Kaiser respectfully requests leave to amend the complaint to formally add a MAC Sub-Enterprise.[16] Defendants will suffer no

---

[16] The complaint uses the term "Sub-Enterprise," as Kaiser originally pled a single, overarching RICO enterprise. The RICO allegations as to each Sub-Enterprise follow the same pattern. *See, e.g.*, Eighth Claim for Relief. Accordingly, Kaiser seeks leave to allege as follows:

Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) MAC (collectively, the "MAC Sub-Enterprise"). The MAC Sub-Enterprise is an ongoing organization that functions as a continuing unit. The MAC Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the MAC Sub-Enterprise.

The MAC Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

Defendants have conducted and participated in the affairs of the MAC Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

The AMM/Adelphi Sub-Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

Defendants exerted control over the MAC Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the MAC Sub-Enterprise, as described above.

As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Kaiser paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Kaiser relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Kaiser and others to pay for excessive amounts of Neurontin. Each such racketeering activity was related, had similar purposes, involved the

*(cont'd)*

prejudice from this amendment, in light of (1) Kaiser's extensive allegations about MAC's involvement in producing many of the misleading journal articles that are at the heart of this case; and (2) the depositions of three MAC employees—Dr. David Cooper, Stephen Valerio, and Michael Vinegra—taken in this case.

2.    Amendment Re-Alleging Inefficacy

The parties have repeatedly sparred over whether Kaiser has alleged that Neurontin is ineffective in treating the off-label conditions at issue. *See, e.g.*, Reply Memo. of Law in Support of Defendants' Motion for Summary Judgment (Dkt. No. 1785).   Kaiser has consistently taken the position that it has so alleged.[17]  To eliminate any unnecessary appellate issues regarding the sufficiency

---

*(cont'd from previous page)*

same or similar participants and methods of commission, and had similar results affecting similar victims, including Kaiser. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Kaiser's property.

The pattern of racketeering activity alleged herein and the MAC Sub-Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the MAC Sub-Enterprise.

Kaiser has been injured in its property by reason of these violations in that Kaiser has made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Kaiser for three times the damages Kaiser has sustained, plus the cost of this suit, including reasonable attorneys' fees.

[17]   For example, as discussed at the recent summary judgment hearing:

THE COURT:  I understand their damages model because theirs is quite straightforward: "It's snake oil. We shouldn't have to pay a penny for it," okay.  And so it's easy, it gets around some of the issues that you have."

MS. NUSSBAUM:  But we have both.  We have the snake oil, but we say, assuming, arguendo, the Court finds or a jury finds that it's not snake oil, then –

THE COURT:  I see, you have an alternative --

MS. NUSSBAUM:  Exactly.  And that's in Dr. Hartman's report.  In our complaint we have the alternative theory.

Transcript of Sept. 18, 2009 Motion Hearing, at 61:21-62:6.

of Kaiser's allegations, Kaiser requests leave to amend to allege that "Neurontin is ineffective in treating:  (1) bipolar and other mood disorders; (2) neuropathic pain; (3) nociceptive pain; (4) migraine and headache.", and that "Neurontin is no more effective at dosages in excess of 1800 mg/day."  As Kaiser has consistently asserted that it is alleging inefficacy—*as well as* the availability of cheaper and more optimal medications—Defendants can suffer no conceivable prejudice from these technical amendments.

    B.    Pfizer opposes Plaintiffs' requested amendments to the pleadings.

VIII.    Any additional matters to aid in the disposition of the action.

    A.    Pfizer requests that the jury sit as an advisory jury and answer special interrogatories as to Plaintiffs' UCL claim. *See* Fed. R. Civ. P. 39(c)(1); *see also Cambridge Plating Co. v. NAPCO, Inc.*, 890 F. Supp. 55, 60 (D. Mass. 1995) (using advisory jury on claim asserted under Massachusetts General Laws ch. 93A).

    B.    The parties propose the use of juror questionnaires to prospective jurors. Attached as Exhibit 14 is a sample questionnaire proposed by Plaintiff.  Attached as Exhibit 15 is a sample questionnaire proposed by Defendants.

IX.    The probable length of the trial is 4 weeks.  Per this Court's order of November 12, 2009, each side is limited to approximately 28 hours for direct, cross, re-direct and re cross.

X.    List of witnesses:

    A.    Kaiser's List of Trial Witnesses is attached as Exhibit 1 to this Pre-Trial Memorandum.

    B.    Pfizer's List of Trial Witnesses is attached as Exhibit 2 to this Pre-Trial Memorandum.

    C.    Kaiser's Deposition Designations are attached as Exhibit 3 to this Pre-Trial Memorandum.

    D.    Pfizer's Deposition Designations are attached as Exhibit 4 to this Pre-Trial Memorandum.

E.      Kaiser's Objections and Counter-designations are attached as Exhibit 5 to this Pre-Trial Memorandum

F.      Pfizer's Objections and Counter-designations are attached as Exhibit 6 to this Pre-Trial Memorandum

G.      Kaiser's Objections to Counter-designations are attached as Exhibit 7 to this Pre-Trial Memorandum

H.      Pfizer's Objections to Counter-designations are attached as Exhibit 8 to this Pre-rial Memorandum

XI.   List of proposed exhibits:

A.      Kaiser's List of Exhibits is attached as Exhibit 9 to this Pre-Trial Memorandum.

B.      Pfizer's List of Exhibits is attached as Exhibit 10 to this Pre-Trial Memorandum.

C.      The parties' joint list of medical and scientific literature is attached as Exhibit 11 to this Pre-Trial Memorandum.

D.      Kaiser's Objections to Defendants' Exhibits is attached as Exhibit 12 to this Pre-Trial Memorandum.

E.      Pfizer's Objections to Plaintiffs' Exhibits is attached as Exhibit 13 to this Pre-Trial Memorandum.

XII.  The parties respective positions on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3) is as follows:

A.      Kaiser respectfully refers the Court to its previously served objections to defendants' exhibit list and deposition designations, as well as its previously filed motions in limine. In addition, Kaiser reserves its right to supplement its objections as to (i) any exhibits or witness not yet reasonably identified by defendants, including but not limited to "placeholder" exhibits or witness list entries; (ii) any exhibit identified by defendants' exhibit list for which Kaiser has not yet had sufficient time to object, including but not limited exhibits that had not previously been served upon Kaiser by the time the defendants provided their

operative exhibit list; and (iii) objections to entries on the parties' combined literature list.  Kaiser incorporates any prior objection to evidence as which the Court has already ruled.

B.      Pfizer objects to Plaintiffs' attempt to assert in this Pre-trial Memorandum withdrawn motions in limine or to raise other matters that should have been raised by motion in limine and, as to which, Defendants have not had an opportunity to respond.

Pfizer further objects to Plaintiffs' supplementation of their deposition and exhibit lists (and witness list to the extent they have done so) beyond the deadlines agree to by the parties.  Even after Defendants allowed Plaintiffs to amend their exhibit list, Plaintiffs continued to designate additional exhibits beyond the extended deadline agreed to.  Plaintiffs also altered and added to their deposition designations after the agreed upon deadline and without Defendants' consent.  Defendants object to such designations as untimely and reserve their right to make additional objections and/or counterdesignations.

Defendants' position on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3) is set forth in their objections to Plaintiffs' witness lists, exhibits and designated deposition testimony (attached as Exhibit 6, 8, 13), as well as their previously filed motions in limine.  In addition, pursuant to Federal Rule of Evidence 103, Defendants incorporate and preserve any prior objections to evidence as to which the Court has already ruled.

Dated: February 15, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:   /s/ Mark S. Cheffo
       Mark S. Cheffo
       /s/ Katherine F. Arthur
       Katherine F. Arthur

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Email:  Mark.Cheffo@skadden.com
Email:  Katherine.Arthur@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:   /s/ Raoul D. Kennedy
       Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400
Email:Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:   /s/ James E. Hooper
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800
Email:  hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and*
*Warner-Lambert Company LLC*

KAPLAN FOX & KILSHEIMER LLP

By:  /s/ Linda P. Nussbaum
     Linda P. Nussbaum

850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals*

Of Counsel
Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 15, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo