UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                                    :        MDL Docket No. 1629

In re:  NEURONTIN MARKETING,         :

        SALES PRACTICES AND         :        Master File No. 04-10981

        PRODUCTS LIABILITY LITIGATION  :

                                      :        Judge Patti B. Saris

-------------------------------------------------------------x

                                      :        Magistrate Judge Leo T. Sorokin

THIS DOCUMENT RELATES TO:      :

                                      :

*Shearer v. Pfizer Inc.*, 1:07-cv-11428-PBS    :

                                      :

-------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S
EXPERTS, DR. GLENMULLEN AND DR. KRUSZEWSKI**

Andrew G. Finkelstein, Esquire
FINKELSTEIN & PARTNERS, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551
(800) 634-1212
(845) 562-3492 (fax)
email:  afinkelstein@lawampm.com

*Attorneys for Plaintiff Linda B. Shearer*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................ 1

FACTUAL BACKGROUND .............................................................. 1

LEGAL STANDARD ....................................................................... 2

I.  THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S
    EXPERT, DR. GLENMULLEN, IS RELIABLE AND ADMISSIBLE ...................... 2

    A.  Dr. Glenmullen Has the Requisite Knowledge, Skill, Education,
        Training and Experience to Provide the Opinion That Neurontin
        Was a Proximate Cause of Mr. Shearer's Suicide ............................. 2

    B.  Dr. Glenmullen's Opinions Are Based on His Use of Sound, Reliable
        Principles and Methods That He Applied to the Facts of This Case ................. 3

        1.   Dr. Glenmullen employed, in part, a "psychological autopsy",
             which is accepted as a reliable methodology to ascertain
             specific causation in the context of a suicide ............................. 4

        2.   Dr. Glenmullen's opinions and psychological autopsy ar
             adequately supported by the facts and circumstances of this case ........... 5

        3.   Dr. Glenmullen adequately considered other potential causes
             and did not have to rule out every potential cause of
             Mr. Shearer's suicide in order for his determination to be reliable ........ 7

        4.   Dr. Glenmullen's consideration of a temporal connection
             (*post hoc ergo hoc*) in combination with numerousother
             factors was appropriate and reliable ..................................... 10

II.  THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'
     EXPERT, DR. KRUSZEWSKI, IS RELIABLE AND ADMISSIBLE ...................... 12

    A.  Dr. Kruszewski Has the Requisite Knowledge, Skill, Education,
        Training and Experience to Provide the Opinion That Neurontin
        Was a Proximate Cause of Mr. Shearer's Suicide ............................ 12

    B.  Dr. Kruszewski's Opinions Are Based on His Use of Sound, Reliable
        Principles and Methods That He Applied to the Facts of This Case ............... 12

        1.   Dr. Kruszewski employed reliable methodology
             to ascertain whether Neurontin was a significant
             contributory factor in Mr. Shearer's suicide ......................... 13

        2.   Dr. Kruszewski considered appropriate risk factors in his
             differential diagnosis and did not have to rule out every potential
             cause of Mr.  Shearer's suicide for his determination to be reliable ..,,, 14

3.   Dr. Kruszewski had good grounds for forming his opinions
and his consideration of a temporal connection
(*post hoc ergo hoc*) in combination with numerous
other factors was appropriate and reliable ............................................ 17

III.   PLAINTIFF'S EXPERTS' OPINIONS AND TESTIMONY ARE NOT ONLY
HELPFUL TO THE JURY, BUT THIS EXPERT EVIDENCE IS PERTINENT
AND CRITICAL TO THE QUESTIONS OF CAUSATION IN THIS CASE ............   19

A.   Plaintiff's Response to Defendants' Assertions Regarding the Standard
for Proximate Cause and Superseding Cause Are Contained in Plaintiff's
Opposition to Defendants' Motion for Summary Judgment and
Incorporated by Reference as if Fully Set Forth Herein ...................................   19

CONCLUSION ...........................................................................................................   20

## PRELIMINARY STATEMENT

Plaintiff's designated specific causation experts, Joseph Glenmullen, M.D., and Stefan P. Kruszewski, M.D., are experienced, highly qualified expert witnesses with specialized training in their areas of expertise. The experts have taken into account all available scientific evidence which, when taken together, is a compelling basis for each expert's opinion. Each element of the scientific evidence that Plaintiff's experts rely upon is generally accepted, reliable, scientific evidence. Moreover, each expert reviewed and weighed the evidence with the same rigorous manner that he uses in his professional life. Ultimately, the *weight of the evidence* as analyzed by Plaintiff's experts leads to their opinions on specific causation in this case that the ingestion of Neurontin was a substantial factor in proximately causing the death by suicide of the decedent.

## FACTUAL BACKGROUND

On February 7, 2002, Hartley Shearer committed suicide by a self-inflicted gunshot wound to his head.[1] He left a suicide note for his wife, Plaintiff Linda B. Shearer, and their son, Ivor Shearer.[2] At the time, Mr. Shearer was 57 years old and a part-time art instructor at Williams College.[3] He had been married to his wife for 35 years, and their son was attending college.[4] Mr. Shearer had suffered a stroke and left hemiparesis in January 1999, but had demonstrated "tremendous strength of character" in making the adjustment to life with this condition.[5] Although his progress in recovering from the stroke had plateaued in the summer of 2000, he had adjusted and continued to improve his life and was working towards teaching again.[6] In October 2000, he suffered a series of medical events and during a hospitalization was first prescribed Neurontin.[7] Within a few days of ingesting Neurontin, he began experiencing mood and behavioral changes, "an alteration in self-concept" and became more depressed and developed a "new panicky anxiety," which are linked to Neurontin-induced suicidality.[8]

---

[1] Finkelstein Decl., Ex. A (Mass. State Police Report) at 2, 4, 6.
[2] Finkelstein Decl., Ex. B (Kruszewski Report) at 10.
[3] Finkelstein Decl., Ex. B (Kruszewski Report) at 10.
[4] Finkelstein Decl., Ex. B (Kruszewski Report) at 10
[5] Finkelstein Decl., Ex. C (Glenmullen Report) at 1.
[6] Finkelstein Decl., Ex. C (Glenmullen Report) at 1.
[7] Finkelstein Decl., Ex. C (Glenmullen Report) at 18.
[8] Finkelstein Decl., Ex. C (Glenmullen Report) at 1, 19.

## LEGAL STANDARD

The standards for admissibility of expert testimony are set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, the Federal Rules of Evidence, and the *Reference Manual for Scientific Evidence, Second*.  In applying the standards of admissibility to opinions involving psychiatry, a "soft" science, the courts have broad discretion to determine if the opinions are based upon sufficient facts and data and were derived from reliable principles and methods.  *See* Plaintiffs' Memorandum in opposition to Defendants' *Daubert* motion on general causation, ECF Doc. # 1191, pp. 5-9.  The same standards employed by this Court in determining general causation should also be applied in regard to specific causation.  Plaintiff incorporates by reference the legal standards detailed in the earlier Memorandum as if fully set forth herein.  Moreover, this Court has found that the methodologies utilized by Dr. Glenmullen and Dr. Kruszewski, a differential diagnosis and a psychological autopsy, "are generally accepted in the field".  *In re Neurontin Marketing, Sales Practices & Prods. Liab. Litig.*, No. 04-cv-10981-PBS, 2009 U.S. Dist. LEXIS 118006, at *50, *66-67. (D. Mass. Aug. 14, 2009).

## I.   THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT, DR. GLENMULLEN, IS RELIABLE AND ADMISSIBLE

### A.   Dr. Glenmullen Has the Requisite Knowledge, Skill, Education, Training and Experience to Provide the Opinion That Neurontin Was a Proximate Cause of Mr. Shearer's Suicide

Dr. Glenmullen is a graduate of Harvard Medical School, a Clinical Instructor in Psychiatry at Harvard Medical School, a staff psychiatrist at the Harvard Law School Health Services for twenty years and in private practice in Harvard Square.  He is Board Certified in Psychiatry by the American Board of Psychiatry and Neurology, and his academic and professional qualifications are impeccable and not challenged by Defendants.  He is a Member of the Board of Directors, New England Division of the American Foundation for Suicide Prevention and a Member of the American Association of Suicidology.  He has researched the medical literature on psychiatric medication-induced suicidality and violence and has drawn

upon his extensive knowledge of that side effect.[9]

### B. Dr. Glenmullen's Opinions Are Based on His Use of Sound, Reliable Principles and Methods That He Applied to the Facts of This Case

Dr. Glenmullen provides expert opinions based on the specific facts of this case by utilizing generally accepted scientific methodology and his more than 20 years of education, training and experience in the area of psychiatry.  In reaching his opinion on specific causation, Dr. Glenmullen reviewed, *inter alia,* the depositions of physicians, family and friends, incident reports and ambulance records, hospital and medical records, pharmacy records, sales representative sales call notes and information, literature on pharmaceuticals related to adverse and suicidogenic side effects, as well expert reports disclosed in this litigation.[10]  He personally interviewed Mr. Shearer's surviving spouse Linda Shearer and son Ivor Shearer by telephone.[11]

Dr. Glenmullen's methodology included the use of a "psychological autopsy" he conducted in an attempt to reconstruct Mr. Shearer's psychological life, which is essentially a retrospective evaluation to analyze Mr. Shearer's suicide.[12]  Moreover, Dr. Glenmullen performed a differential diagnosis, a standard methodology that is well accepted in the medical community, under which he considered the possible diagnoses that might account for Mr. Shearer's suicide and sought to "rule in" and "rule out" alternative causes.[13]  Dr. Glenmullen analyzed Mr. Shearer's risk factors for suicide against risk factors that have been determined to increase the likelihood of suicide and found that out of 17 known risk factors, Mr. Shearer had three known risk factors for suicide.  Dr. Glenmullen also opined that Mr. Shearer had six out of seven factors known to be protective from suicide.

After performing a retrospective evaluation of Mr.'s Shearer's life, a differential

---

[9] *See* Finkelstein Decl., Exhibit C (Glenmullen Report) at 1-2, 6, and Dr. Glenmullen's *curriculum vitae* annexed to his Report as Exhibit 1.

[10] Finkelstein Decl., Ex. C (Glenmullen Report) at 2-4.  Dr. Glenmullen has concurred with Plaintiff's general causation experts that the psychopharmacologic properties of gabapentin/Neurontin are suicidogenic.  Finkelstein Decl., Ex. C (Glenmullen Report) at 7.  His opinion is further based on numerous sources including, *inter alia*, familiarity with the FDA's meta-analysis, FDA's Alerts and warnings regarding Neurontin.  Finkelstein Decl., Ex. D (Glenmullen Dep.) at 61:11-63:23.

[11] Finkelstein Decl., Ex. D (Excerpts from Glenmullen Dep.) at 54:11-55:10; Ex. C (Glenmullen Report) at 2.

[12] Finkelstein Decl., Ex. D (Glenmullen Dep.) at 65:20-66:2; 110:24-111:16.

[13] Finkelstein Decl., Ex. C (Glenmullen Report) at 28-32.

diagnosis, described in detail above, and considering known risk factors and protective factors for suicide, Dr. Glenmullen ultimately concluded regarding Mr. Shearer's suicide:

> In the fall of 2000, Hartley Shearer was a 56-year-old man making a good recovery from a stroke and left-sided hemiparesis. Unfortunately, in October 2000, Hartley was prescribed Neurontin for back pain. On Neurontin, Hartley developed worsening depression and mood and behavioral changes, which the FDA has since warned may be precursors to Neurontin-induced suicidality. Hartley Shearer had a long history of mild to moderate depression and anxiety that had never before made him suicidal. Hartley was just the kind of patient who should not have been given a drug that could make him suicidal.

> But because of Pfizer's failure to warn, Hartley, his doctors, wife, and son did not know of Neurontin's risks. Since Hartley's death, the FDA has issued warning doctors and the public that Neurontin may make patients suicidal. Unfortunately, the warnings came too late for Hartley and his family.[14]

### 1. Dr. Glenmullen employed, in part, a "psychological autopsy", which is accepted as a reliable methodology to ascertain specific causation in the context of a suicide

Dr. Glenmullen based his specific causation opinion in this case on, *inter alia,* a "psychological autopsy", a methodology to determine causation for suicides focusing on risk factors in order to rule them in and rule them out.

This Court has held that a "psychological autopsy" is generally accepted as a scientific methodology for determining the cause of suicide. *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.,* No. 04-cv-10981-PBS, 1:05-cv-11515-PBS, 2009 U.S. Dist. LEXIS 118006, at \*50, \*66-67. (D. Mass. Aug. 14, 2009); *see also Routhier v. Keenan,* No. 04-1359, 2008 Mass. Super. LEXIS 372, at \*17, 18 (Super. Nov. 12, 2008).[15] In the *Smith* case, this Court denied Defendants' motion to exclude the testimony of Dr. Ronald Maris, who used a psychological autopsy, and whose report was based upon a review of depositions of family and friends; medical reports; review of the literature on the drug in question and its side effects, the analyses of 15 suicide risk factors and protective factors; and a review of the decedent's side effects consistent with the drug's use. *In re Neurontin,* 2009 U.S. Dist. LEXIS 118006. In arriving at his opinion,

---

[14] Finkelstein Decl., Ex. C (Glenmullen Report) at 33.
[15] *See Giles v. Wyeth Inc,* 500 F. Supp. 2d 1048, 1063 (S.D. Ill. 2007) (citing *Blanchard v. Eli Lilly & Co.,* 207 F. Supp. 2d 308, 313 & n.2 (D. Vt. 2002) (citing *Miller v. Pfizer, Inc.,* No. 99-2326, 1999 U.S. Dist. LEXIS 18345 (D. Kan. Nov. 10, 1999)); *Cloud v. Pfizer Inc.,* 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001); *see also Herrin v. Treon,* 459 F. Supp. 2d 525, 545 (N.D. Tex. 2006); *Yanco v. United States,* 45 Fed. Cl. 782, 787 (Fed. Cl. 2000)).

Dr. Glenmullen has employed the same methodology and detailed and rigorous retrospective psychological analysis that this Court found acceptable in the *Smith* case.  Plaintiff requests that this Court find that similarly, Dr. Glenmullen's methodology should be accepted as reliable here.

> **2.     Dr. Glenmullen's opinions and psychological autopsy are adequately supported by the facts and circumstances of this case**

Dr. Glenmullen reviewed and considered a myriad of evidence in this case to arrive at his opinions, including depositions, medical records, literature and expert reports.[16]  Contrary to Defendants' assertions that circular reasoning played a part in his opinion and differential diagnosis, Dr. Glenmullen performed a thorough retrospective analysis of Mr. Shearer's childhood life, childhood and adult relationships, marriage, medical and psychological conditions and treatment, momentous life events, mood and behavior changes, mental state and suicide.[17]  Dr. Glenmullen explored in detail Dr. William J. Chamber's diagnosis and treatment of Mr. Shearer for attention deficit disorder and found that although Mr. Shearer had reported some symptoms of depression, he was not diagnosed with either clinical depression or anxiety disorder.[18]  Dr. Glenmullen analyzed problems faced by Mr. Shearer during the family's transitional move from New York to Massachusetts and accompanying initial stress, depression and anxiety,[19] and the gradual adjustment Mr. Shearer made and the rich life he established in Williamstown.[20]  Dr. Glenmullen explored in great detail Mr. Shearer's stroke and his adjustment to life with a left hemiparesis, including that Mr. Shearer experienced frustration, but that his spirit and determination remained good.[21]  Dr. Glenmullen noted that Mr. Shearer tried treatment like Viagra and replacement testosterone to combat the challenge of erectile dysfunction that he suffered post-stroke, and that even after he plateaued in progress after the 1999 stroke, he did not become depressed or express suicidal ideation to anyone.[22]  Dr.

---

[16] A more detailed listing of the materials reviewed by Dr. Glenmullen is included in his Expert Report, Finkelstein Decl., Ex. C at 3-6.
[17] Finkelstein Decl., Ex. C (Glenmullen Report) at 7-28.
[18] Finkelstein Decl., Ex. C (Glenmullen Report) at 10-11.
[19] During the transitional period Mr. Shearer was prescribed Trazadone and Prozac and Dr. Chambers noted that Mr. Shearer responded to well to the Prozac.  Finkelstein Decl., Ex. C (Glenmullen Report) at 12.
[20] *Id.* (Glenmullen Report) at 11-13.
[21] *Id.* (Glenmullen Report) at 13-16.
[22] *Id.* (Glenmullen Report) at 16, 17.

Glenmullen explored in depth the Mr. Shearer's hospitalization in October 2000 for low back pain.  Dr. Glenmullen not only noted that on October 14, 2000, Mr. Shearer said he was "on edge of breakdown", but that on this same date in the medical records it was recognized that Mr. Shearer was becoming paranoid and disoriented on narcotics.  It was on October 14, 2000, that Mr. Shearer's pain medication was switched to a combination of Neurontin, Flexeril and Vioxx and morphine discontinue.[23]   October 14, 2000, was the first time that Mr. Shearer was prescribed Neurontin.[24]   Moreover, Dr. Glenmullen considered that after the change in medication and first ingestion of Neurontin, Mr. Shearer was making "complaints of anxiety" and that "he's had an alteration in self-concept."[25]  The records of Brigham & Woman's Hospital and a rehabilitation center indicate that during October 2000, after being prescribed Neurontin, Mr. Shearer began experiencing mood and behavioral changes including a "new panicky anxiety."[26]  Dr. Glenmullen found evidence of the new mood and behavioral changes and the deterioration of Mr. Shearer's mental state in the post-October 2000 incident notes of Dr. Lisa Catapano-Friedman, including the fact that she saw fit to prescribe Zyprexa for "emotional liability, his need mood and behavioral changes."[27]  Dr. Glenmullen considered Mr. Shearer's purchase of a gun and found it noteworthy that the purchase was after he first began ingesting Neurontin and experiencing mood and behavioral changes.[28]  Dr. Glenmullen also reviewed Mr. Shearer's suicide, the telephone conversation with his wife just prior to the suicide, and found that the suicide reflected "the mood and behavioral changes — particularly the worsening depression and panicky anxiety — that developed while he was on Neurontin."  *Id.* at 26, 27.

Based on his medical and psychiatric experience and education, the general causation reports of Dr. Trimble and Dr. Kruszewski regarding Neurontin, and the factual information

---

[23] *Id.* (Glenmullen Report) at 18.  Defendants point to the "edge of breakdown" statement to insinuate that Dr. Glenmullen did not consider that Mr. Shearer made this statement prior to his first prescription of Neurontin ( ECF Doc. # 2453 at pp. 8, 9), but Defendants conveniently fail to mention, which Dr. Glenmullen certainly considered, that at the time of the statement Mr. Shearer was paranoid and disoriented due to narcotics; precisely the reason for the  replacement by other drugs including Neurontin.

[24] Finkelstein Decl., Ex. C (Glenmullen Report) at 18.

[25] Finkelstein Decl., Ex. D (Glenmullen Dep.) at 37:16-38:14.

[26] Finkelstein Decl., Ex. C (Glenmullen Report) at 18, 19.

[27] Finkelstein Decl., Ex. C (Glenmullen Report) at 20, 23, Finkelstein Decl., Ex. D (Glenmullen Dep.) at 22:4-24:23.

[28] Finkelstein Decl., Ex. C (Glenmullen Report) at 24, 25.

from the medical, psychiatric, hospital, pharmacy records and other documents, deposition testimony and telephone interviews, Dr. Glenmullen considered all possible diagnoses that may have accounted for Mr. Shearer's symptoms and ultimate suicide and ruled in and ruled out each of the diagnoses to arrive at a final diagnosis. *Id.* at 28-32; *see* ¶¶ 1-16 in section IB *supra*.

### 3. Dr. Glenmullen adequately considered other potential causes and did not have to rule out every potential cause of Mr. Shearer's suicide in order for his determination to be reliable

This Court has previously held with regard to an expert analysis of potential causes for specific causation:

> Though an expert should consider and analyze alternative causes of a disease or side-effect, he or she is not required to rule out each and every other possible cause before offering a causation opinion. As explained in the Federal Judicial Center's Reference Manual on Scientific Evidence, "the common statement that 'alternative causes of disease must be ruled out' before causation is attributed can be more accurately refined to say that 'the role of other causes must be adequately considered.'" Reference Guide on Medical Testimony, *supra*, at 476; *see Goebel v. Denver and Rio Grande W. R.R. Co.*, 346 F.3d 987, 998-1000 (10th Cir. 2003) (upholding district court decision to admit testimony where expert did not explicitly rule out depression as an alternative cause and noting that "several circuits have held that the failure to rule out *all* possible causes of an illness does not automatically render an expert's testimony inadmissible").

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, Nos. 04-cv-10981-PBS, 1:05-cv-11515-PBS, 2009 U.S. Dist. LEXIS 118006, at *67-68 (D. Mass. Aug. 14, 2009).[29]

In *Anello v. Shaw Indus., Inc.,* which concerned allegations that a new-carpet installed in a home was "off-gassing toxic chemicals" and causing injury to the homes' inhabitants, the District Court found that the testimony of one of plaintiff's experts was admissible even though the expert "recognized that he could not rule out all other potential causes or conclude that the carpet definitively caused the plaintiffs' injuries." No. 95-30234-FHF, 2000 U.S. Dist. LEXIS 6835, *13 (D. Mass. Mar. 31, 2000) (citing to *Heller v. Shaw Indus.,* 167 F.3d 146, 156 (3d Cir. 1999), and *Baker v. Dalkon Shield Claimants' Trust,* 156 F.3d 248, 253 (1st Cir. 1998)). The court noted that the experts' causation testimony was based on "good grounds" and would be

---

[29] *See also Smith v. Pfizer Inc.*, No. 98-4156-CM, 2001 U.S. Dist. LEXIS 12983 at *1, 2, 28 (D. Kan. Aug. 14, 2001) (where plaintiff brought suit claiming that Pfizer's drug, Zoloft, resulted in suicide, District Court allowed testimony of plaintiff's specific causation expert, finding that "[d]efendants' claim that [the expert] has failed to account for other potential causal factors goes to the weight and credibility of the opinion, not its admissibility."

"helpful to the jury" and could be tested by the adversarial system.  2000 U.S. Dist. LEXIS at *14.[30]

Here, Dr. Glenmullen has acknowledged the various risk factors for suicide that were present in this case and fully explored same as potential causes of Mr. Shearer's suicide.[31] Defendants' assertions to the contrary simply manifests a displeasure with Dr. Glenmullen's conclusions and not the depth of his analysis or adequacy of methodology.  Dr. Glenmullen certainly did explore in detail, and consider all relevant alternative suicide risk factors such as the marital relationship of Mr. and Mrs. Shearer.  Dr. Glenmullen personally interviewed both Mrs. Shearer and the Shearers' son Ivor.[32]  Dr. Glenmullen also reviewed, *inter-alia,* the records and deposition testimony of Dr. Catapano-Friedman who treated Mr. Shearer prior to and subsequent to his first prescription of Neurontin.[33]  Defendants fault Dr. Glenmullen for opining that the Shearers had a "loving, decades-long marriage" and that there "marital issues were in normal limits."  ECF Doc. # 2453 at p. 10.  Dr. Catapano-Friedman expressed similar sentiments regarding the Shearers' marriage, she agreed that their being married 33 years was an accomplishment,[34] that they were at counseling because they wanted to make their marriage better and that Mr. Shearer was putting forth his best effort,[35] and that the Shearers were close to

---

[30] *See also In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 761 (3d Cir. 1994) ("so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion"); *Longoria v. State of Texas,* 2007 U.S. Dist. LEXIS 95853 at *11, 12, 13, 14 (E.D. Tex.  2007) (noting that cases where expert testimony concerns the social sciences, "other indicia of reliability are considered . . . including professional experience, education, training, and observations" and  "the test does not judge the conclusions themselves, but rather focuses on the principles and methodology," and that rejection of testimony under *Daubert* is "'the exception rather than the rule.'"); *Baker v. Dalkon Shield Claimants Trust,* 156 F.3d 248, 253 (1ˢᵗ Cir. 1998) (First Circuit reversed trial court's exclusion of defendants' expert's testimony and remanded case back for trial where a plausible theory of alternative causation was supported by a standard scientific technique, and Court noted that "little in diagnosis is certain" . . . *Daubert* "merely requires that evidence makes a contested fact more likely than it would be without the evidence (not 'more likely than not')").  In  *Goebel v. Denver & Rio Grand W. R.R. Co.,* 346 F.3d 987 (10ᵗʰ Cir. 2003), the plaintiff claimed he sustained injury while working and being exposed to high elevations and diesel fumes, and the case went to a jury, which reached a verdict for the plaintiff on the issues of causation and damages, and the defendant appealed on the grounds that the District Court abused its discretion in finding the plaintiff's expert's testimony on causation admissible.  *Id.* at 989.  The expert did not opine that the injury was developed "solely from the altitude exposure; rather, he opined that other factors contributed to the onset . . ."  *Id.* at 996.  On appeal, the Circuit Court found that the District Court was correct in finding that the expert had "followed a standard and accepted methodology in arriving at the diagnoses . . . that his failure to exclude explicitly one alternative (depression) did not affect the admissibility of the testimony, although it was an issue the fact finder could consider when assigning weight."  *Id.* at 999..
[31] Finkelstein Decl., Ex. C.(Glenmullen Report).
[32] Finkelstein Decl., Ex. D (Glenmullen Dep.) at 54:11-55:21.
[33] Finkelstein Decl., Ex. C (Glenmullen Report) at 4-5)
[34] Finkelstein Decl., Ex. E (Catapano-Friedman Dep.) at 147:19-25.
[35] Finkelstein Decl., Ex. E (Catapano-Friedman Dep.) at 148:1-7.

each other.[36]   Moreover, Mr. Shearer and his wife had planned to teach a course on contemporary art and film together and in fact taught their first class on February 4, 2002.[37]

Dr. Catapano-Friedman noted that although Mr. Shearer's anger was phrased as anger at Mrs. Shearer, it was in fact "railing at fate."[38]  Dr. Glenmullen points to the altercation between the Shearers which resulted in the police being summoned as an indication that Mr. Shearer's mood and behavior was deteriorating.[39]   Dr. Catapano-Friedman noted that Mr. Shearer's behavior was unusual, but she stated that she never had concerns regarding physical issues in their relationship prior to that time and that it was not a typical fight between the Shearers.[40]  Although Dr. Catapano-Friedman noted new concerns and issues, she did not have the benefit of a retrospective analysis or information that Neurontin causes adverse changes in mood and behavior and may increase the risk for suicide.[41]  She admitted that among the important things for a physician to know in treating a patient like Mr. Shearer is whether a drug affects the impulsivity of the brain, especially looking retrospectively in that she believed his suicide to be one of impulse, and it would be important to know if a drug might be a cause of increased suicide – either ideation or suicide actualization.[42]

Dr. Glenmullen, utilizing his education, medical and psychiatric clinical experience and judgment, performed an in depth analysis and carefully reviewed and considered all of the available evidence in this case to assess the pertinent risk factors prior to arriving at his opinion that Neurontin was a substantial cause of Mr. Shearer's suicide.[43]  Dr. Glenmullen did not rule out all other causes, he found that several other factors such as depression the medical events of October 2000 increased Mr. Shearer's risk for suicide, but were not substantial factors, and that

---

[36] Finkelstein Decl., Ex. E (Catapano-Friedman Dep.) at 76:17-25.
[37] Finkelstein Decl., Ex. C (Glenmullen Report) at 25, 26.
[38] Finkelstein Decl., Ex. E (Catapano-Friedman Dep.) at 85:2-5.
[39] Finkelstein Decl., Ex. C (Glenmullen Report) at 20.
[40] Finkelstein Decl., Ex. E, (Catapano Friedman Dep.) at 51:5-14.
[41] Finkelstein Decl., Ex. C, (Glenmullen Report) at 24, 29; Ex. D (Glenmullen Dep.) at 20:24-24:23.
[42] Finkelstein Decl., Ex .E (Catapano-Friedman Dep.) at 132:20-135:2; Ex. D (Glenmullen Dep.) at 33:7-34:2.
[43] Finkelstein Decl., Ex. C (Glenmullen Report) at 28-32; 10-11(Ritalin was helpful for his ADD and he was not diagnosed with clinical depression or anxiety disorder); at 13-17 (Mr. Shearer persevered had adjusted to life with hemiparesis after the stroke and had "excellent mood and affect" as noted in neurologist Edwards' records; and he had come to terms with the realization that his progress and had plateaued and was not depressed per his family); at 12 (financial debt – does not appear that Mr. Shearer was burdened or overly worried re finances).

other medications may have increased his risk for suicide and may have been substantial contributing factors.[44]  Dr. Glenmullen qualifies the other medications as "may" have increased the risk because for Mr. Shearer's age group, the other drugs do not reach the level of evidence required for proximate cause as Neurontin.[45]  Consequently, Defendants' argument that Dr. Glenmullen has not adequately considered other potential causes is misplaced.

### 4.   Dr. Glenmullen's consideration of a temporal connection (*post hoc ergo hoc*) in combination with numerous other factors was appropriate and reliable

The factual record in this case demonstrates that Mr. Shearer suffered mood and behavioral disturbances after ingesting Neurontin.  Dr. Glenmullen appropriately points to dramatic changes in Mr. Shearer's mood and behavior after he was first prescribed and began ingesting Neurontin from the time of his October 2000 hospitalization up until his suicide.

This Court has held that "[i]n both the general and specific causation contexts, the temporal relationship (order of exposure and illness) is a factor which experts are encouraged – and required – to consider".  *In re Neurontin Marketing, Sales Practices & Prods. Liab. Litig.*, No. 04-cv-10981-PBS, 2009 U.S. Dist. LEXIS 118006, at *75 (D. Mass. Aug. 14, 2009) (citing to Reference Guide on Medical Testimony at 469).  Further, this Court has held that the statements of case specific experts in regard to "dramatic changes" or "suddenly suicidal" are not made in a "vacuum":  "Rather, as extensively detailed in this Court's prior evaluation of Plaintiff's general causation testimony, there is scientific evidence that Neurontin puts some people at increased risk for depression and impulsive, aggressive, or suicidal behavior."  *Id.* at *75-76 (citing to *In re Neurontin,* 612 F. Supp. 2d at 152-53).[46]

---

[44] Finkelstein Decl., Ex. C (Glenmullen Report) at 28-33); Ex. D (Glenmullen Dep.) at 113:18-115:13).  *See* Exhibit F (Berkshire Surgical Associates 11/29/00 record indicating Mr. Shearer "is generally feeling well with increasing strength at home" and Exhibit G (VNA & Hospice of Northern Berkshire) that Mr. Shearer "has regained prior level of functional mobility that he had after the CVA".
[45] Finkelstein Decl., Ex. C (Glenmullen Report) at 31-32; Ex. D (Glenmullen Dep.) at 115:14-22.
[46] .*See also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 154 (3d Cir. 1999) ("The temporal relationship will often be (only) one factor, and how much weight it provides for the overall determination of whether an expert has "good grounds" for his or her conclusion will differ depending on the strength of that relationship; "Both a differential diagnosis and a temporal analysis, properly performed, would generally meet the requirements of *Daubert*.");  *Westbury v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999) (where expert relied on, *inter alia,* the "temporal proximity" of a claimant's exposure to talc and worsening health problems); *Zuchowicz v. United States,* 140 F.3d

Here, Dr. Glenmullen considered the medical records of Mr. Shearer's physicians, including Dr. Catapano-Friedman, whose notes demonstrate that there was a very distinct change in Mr. Shearer pre versus post his first being prescribed and ingesting Neurontin.  Before Mr. Shearer's ingestion of Neurontin there is an emphasis in the sessions on frustration and anger over the stroke, whereas, after his first ingestion of Neurontin there is a distinct shift to panicky anxiety and of being depressed.[47]  Moreover, Dr. Catapano-Friedman, as mentioned *supra,* noted in regard to the argument between the Shearers where the police were summoned, that Mr. Shearer's behavior was unusual, she stated that she never had concerns regarding physical issues in their relationship prior to that time and that it was not a typical fight between the Shearers and subsequently prescribed Zyprexa, an atypical antipsychotic to Mr. Shearer.[48]

As noted *supra,* Mr. Shearer's statement that he was on the "*edge of breakdown*" and "*expressed feeling of depression*" was taken from a nursing assessment on October 14, 2000, which is the same date that his pain medication was switched to a cocktail of Neurontin, Fexeril and Vioxx because **he was paranoid and disoriented on the narcotic medication morphine**.[49] There is no other indication in the record before this Court that such statements indicate his usual state of mind, absent morphine, prior to the ingestion of Neurontin, as Defendants suggest.

Dr. Glenmullen evaluated Mr. Shearer in regard to protective factors that reduce the likelihood of suicide and also identified risk factors that increase the likelihood of suicide.  Mr. Shearer had six out of seven factors protecting him from suicide and only had three out of seventeen risk factors for suicide.[50]  Dr. Glenmullen thus opined that Mr. Shearer "was strongly

---

381, 385, 390 (2d Cir. 1998) (where Court explained how the law regarding temporal connection has changed, and noted:  "Where such a strong causal link exists, it is up to the negligent party to bring in evidence denying but for cause and suggesting that in the actual case the wrongful conduct had not been a substantial factor."); *Tobin v. Smithkline Beecham Pharms.*, 164 F. Supp. 2d 1278, 1283, 1284 (D. Wyo. 2001) (where plaintiffs claimed that murder of family members and murderer's suicide was caused by his ingestion of Paxil, District Court found that where an expert's general causation testimony was not based on a temporal association alone but on numerous other factors including his education, training, experience and extensive research, his specific causation testimony based on medical records was "sufficient to support the jury's verdict.").

[47] Finkelstein Decl., Ex. D (Glenmullen Dep.) at 21:4-22:25.
[48] Finkelstein Decl., Ex. D (Glenmullen Dep.) at 23:1-24:23.
[49] Finkelstein Decl., Ex. C (Glenmullen Report) at 18, Ex. H (Brigham and Women's Hospital discharge report indicating that the night of admission that Shearer had paranoid delusions and was disoriented leading to discontinuation of the Dilaudid).
[50] Finkelstein Decl., Ex. C (Glenmullen Report) at 32, 33.

protected against suicide and at low risk before he was put on Neurontin."[51]  As explained in detail *supra*, Dr. Glenmullen clearly had "good grounds" and did not rely solely upon a temporal connection, but considered a host of other factors including ruling in and ruling out of suicide risk factors, which formed a solid and reliable foundation for his opinion that Neurontin was a substantial or major contributing factor (cause) of Mr. Shearer's suicide.

## II. THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT, DR. KRUSZEWSKI, IS RELIABLE AND ADMISSIBLE

### A. Dr. Kruszewski Has the Requisite Knowledge, Skill, Education, Training and Experience to Provide the Opinion That Neurontin Was a Proximate Cause of Mr. Shearer's Suicide

Dr. Kruszewski's qualifications as a board certified psychiatrist and addictionologist are impeccable and not challenged by Defendants.  *See* Kruszewski Report, Finkelstein Decl., Ex. B, at 1-5, and Pls.' Opp. to Defs.' General Causation Mot. to Exclude, ECF Doc. # 1191 at 52.

### B. Dr. Kruszewski's Opinions Are Based on His Use of Sound, Reliable Principles and Methods That He Applied to the Facts of This Case

Dr. Kruszewski provides expert opinions by utilizing generally accepted scientific methodology and his 31 years of clinical practice in which he has treated several thousand patients with a wide variety of psychiatric and neuropsychiatric conditions to whom he prescribed numerous drugs.  Dr. Kruszewski opines as follows:

> During the time that I spent reviewing Mr. Shearer's medical and pharmaceutical records and reading depositions in his case, I was confronted with factors that placed him at risk for suicide and factors that offered a protective effect against suicide.  I considered the information that was available to me about his life generally and focused, for obvious reasons, on those factors that specifically confronted him after his 1999 right-sided embolic cerebrovascular accident that resulted in left-sided hemiplegia.  I concentrated on what was happening— including medical, social, adaptational, pharmaceutical, circumstantial events--- proximate to the time that he decided to end his life.
>
> I examined the issues that increased Mr. Shearer's risk of suicide:  Those risks included, but were not limited to, his history of a CVA, his loss of function after his CVA; his change in emotional state witnessed by his caretaker, Sean and his wife, Linda after his 1999 CVA; his wife's trip to Hawaii that was co-occurring when he suicided; a history of previous and anger and domestic issues with his wife; his pharmaceutical prescriptions with special attention to pharmaceutical interventions or events that would increase the likelihood of an acute suicidal event(including gabapentin); his physical discomfort/pain, his non-

---

[51] Finkelstein Decl., Ex. C (Glenmullen Report) at 32.

12

life threatening medical issues requiring medicinal treatment (erectile dysfunction, history of atrial fibrillation, back pain, DVT, insomnia), and his history of depression. Separately, I examined the factors that protected him from suicide: positive adaptation to his disability after his 1999 CVA; his history of positive response to psychiatric intervention; a college and post baccalaureate education; a durable marriage; supportive environment from his son and wife; his occupation and part-time employment at Williams College; a son in college at Skidmore; a supportive caretaker with whom he had a positive relationship; absence of illicit drugs; his humor and disciplined personality lifestyle; and, the absence of suicidal statements prior to the immediate decision to commit suicide. After careful review and consideration, I am able to conclude that Mr. Shearer had both risks factors for, and protective factors against, suicide. From the above differential diagnosis applied to my analysis of factors in his suicide autopsy, I am able to conclude, within a reasonable degree of medical and psychiatric certainty, that Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide.

It is also my conclusion that Pfizer failed to adequately inform health professionals that Neurontin had the ability to precipitate significant deterioration in mood and increase the risk of suicide, including completed suicides, in susceptible individuals during the time frame that Mr. Shearer lived and died.[52]

### 1. Dr. Kruszewski employed reliable methodology to ascertain whether Neurontin was a significant contributory factor in Mr. Shearer's suicide

Dr. Kruszewski utilized various reliable methodologies including the following:

(a) A differential diagnosis in which he examined the risk factors and protective factors in relation to Mr. Shearer's suicide. The First Circuit has found that a differential diagnosis is a "standard scientific medical technique, widely used in medicine, of identifying a medical 'cause' by narrowing the more likely causes until the most likely culprit is isolated." *Baker v. Dalkon Shield Claimants' Trust*, 156 F.3d at 252; s*ee also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 755; *Goebel v. Denver & Rio Grand W. R.R. Co.*, 346 F.3d at 998-99. Dr. Kruszewski's employment of a differential analysis in forming his specific causation opinions comports with *Daubert* standards for the admission of expert evidence.

(b) Sir Bradford Hill's "Guideposts" to ascertain that Neurontin was a significant contributory factor in Mr. Shearer's suicidal behavior and completed suicide. Bradford Hill's Guideposts utilized nine factors for consideration in the question of causation.[53] Bradford Hill

---

[52] Finkelstein Decl., Ex. B (Kruszewski Report) at 15, 16.
[53] *See Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308, 318 n.4 (D. Vt. 2002) ("Bradford Hill's factors are: (1) temporality; (2) strength of association; (3) consistency of association; (4) specificity; (5) biological gradient, or dose-response relationship; (6) biological plausibility; (7) coherence, or consistency with known facts; (8) experimental evidence; and (9) analogy"); *see also* Austin Bradford Hill, The Environment and Disease: Association

has been accepted methodology in assisting scientists in determining causality. *Id.*[54] Dr. Kruszewski does not rely solely upon the Bradford Hill's Guideposts to form his opinions, but utilizes them as a "qualitative tool" during his specific causation analyses.[55]

Further, Dr. Kruszewski interviewed Linda Shearer on the telephone, and reviewed and/or relied on numerous documents and materials in arriving at his opinions on specific causation, including medical records, deposition transcripts, medical literature and expert reports in this litigation.[56] He utilized all of the available documents and materials that are routinely relied upon and generally accepted by experts in the performance of a differential diagnosis. He has sufficiently complied with the *Daubert* standards, and his testimony should not be excluded.

### 2.   Dr. Kruszewski considered appropriate risk factors in his differential diagnosis and did not have to rule out every potential cause of Mr. Shearer's suicide for his determination to be reliable

Dr. Kruszewski considered the appropriate and scientifically reliable and generally acceptable risk factors in his differential diagnosis, including Mr. Shearer's history of depression and his 35 year long marriage, and reported anger issues. Dr. Kruszewski considered that although Mr. Shearer had a history with depression, he was never diagnosed with psychotic depression, had not expressed prior suicidal intent and was successfully treated with antidepressant medication and psychotherapy.[57] Dr. Kruszewski states that Mr. Shearer's suicide

---

or Causation?, 58 Proc. Royal Soc'y Med. 295 (1965); Reference Manual on Scientific Evidence at 376-79; *In re Joint E. & S. Dist. Asbestos Litig.,* 52 F.3d 1124, 1128 (2d Cir. 1995)  Bradford Hill warned that the criteria could not prove or disprove causality, but were designed to assist the scientist in determining whether there was an explanation for an association equally or more likely than cause and effect. *See* Reference Manual on Scientific Evidence 376 n.113 (2d ed. 2000).

[54] Although Defendants suggest that Dr. Kruszewski's use of Bradford Hill is not appropriate methodology for specific causation, their own expert, Douglas G. Jacobs, employed Bradford Hill in reviewing the ten Track One cases to ascertain the plausibility of specific causation in relation to Neurontin. *See* Finkelstein Decl., Ex. I at 17-24.

[55] Finkelstein Decl., Ex. J (Kruszewski Dep. in *Bulger*) at 379:1-380:11, 358:11-15.

[56] A detailed listing of the materials reviewed are set forth in Dr. Kruszewski's report and include the following: death certificate of Mr. Shearer; pleadings and discovery responses; medical examiner's report; Mass. State and Williamstown Police reports; obituary, tax returns, SUNYA academic records; pharmacy records; records and depositions of Mr. Shearer's treating physicians and ambulance and hospital records; depositions of family and friends; suicide warning for Neurontin that was asserted by the US FDA on December 16th, 2008 [Yan, Jun. FDA Orders Suicide Risk Warning on Epilepsy Drug Labels. *Psychiatric News.* February 6, 2009. Vol. 44, (3) 7]; earlier, research from a number of sources, including the expert reports of Drs. Trimble, Blume and Kruszewski as well as the clinical work established through the analysis of 199 clinical trials by the US FDA and as reported in the UDA FDA 31 January 2008 Alert, concluded that there is a significant association between the risk of suicide and ingestion of Neurontin); and the expert report of Dr. Glenmullen (Ex. K (Kruszewski Dep.) at 78:10-80:8).

[57] Finkelstein Decl., Ex. B (Kruszewski Report) at 14, 15,16.

note was "an impulsive statement, the depressed statement and irritable statement"[58]   Dr. Kruszewski opined that there is evidence in the medical records of a change in Mr. Shearer's mood and behavior after his first prescription of Neurontin.  In reference to the consideration of anxiety and depression in his differential diagnosis, he notes that prior to receiving Neurontin:

> there are complaints in the medical records and treatment for his depression. There are treatments for some anxiety.  There are treatments for some other problems obviously related to his stroke and being post CVA with his left hemiparesis," but even though Neurontin was helpful for his pain, Mr. Shearer expressed "feeling more nervous and subsequently describes more panicky feelings.[59]

Dr. Kruszewski considered that there was mention of anger in reference to Mr. Shearer prior to his taking of Neurontin but that he is not "necessarily described as an angry fellow…he's determined and he's passionate."[60]   During the time Mr. Shearer began seeing Dr. Catapano-Friedman and before he was first prescribed Neurontin, there was evidence that he was functioning better and was expressing more humor.[61]  Dr. Kruszewski stated that evidence of post Neurontin behavioral changes include that Mr. Shearer's anger was "out of control" during the incident when is wife slapped him and that there is a behavioral change of "being more angry and then accepting some of the blame for the anger, I'm not sure why I'm so angry, but I'm angry, is a change."[62]  Dr. Kruszewski expressed that of utmost significance was the fact that Dr. Catapano-Friedman prescribed Zyprexa post-Mr. Shearer's ingestion of Neurontin in that it demonstrates her concern about his anger and the changes in mood and behavior that she is observing in her patient and "she needs something to get a control of it and decides to prescribe a potent atypical antipsychotic."[63]

Dr. Kruszewski stated that Mr. Shearer's purchase of a gun was noteworthy in that it was a new post Neurontin phenomenon, and there may have been unconscious and preconscious

---

[58] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 72:5-8.
[59] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 80:7-81:4.
[60] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 81:5-16.
[61] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 98:3-12, Ex. L (Dr. Catapano-Friedman med rec. shearer med00006-3).
[62] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 81:9-16.
[63] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 82:1-14.

reasons for the purchase.[64]   Dr. Kruszewski stated that the "depressive adgenic effects of Neurontin could have started and probably did…long before he came to the point where he was desperate and committed suicide. So even if it was not…absolutely known to him that he wanted to commit suicide, it still could have been there in his unconscious, preconscious level."[65]

Further, Dr. Kruszewski, as part of his retrospective and differential analysis, carefully considered the other medications that Mr. Shearer was ingesting at the time of the suicide, including the prescription for Ritalin for ADD, and whether any of the medications had warnings concerning suicidality.[66]   Dr. Kruszewski ruled out Prozac as a cause or contributing cause for Mr. Shearer's suicide, because Mr. Shearer had been on Prozac previously and there was no record of it having a specific adverse event other than impotence.[67]   Dr. Kruszewski considered that Mr. Shearer had been taking Ritalin for ADD over the course of his lifetime.[68]

Dr. Kruszewski considered the Shearers' financial situation in his differential analysis, that both Mr. and Mrs. Shearer had incomes, that they had indebtedness, "but they had enough money, whether they were paying for it from their savings or their credit cards to feed themselves and house themselves, paid for their son's education."[69]   Moreover, Dr. Kruszewski's analysis is confirmed by the notes of Dr. Catapano-Friedman's treatment of Mr. Shearer that do not indicate he expressed concern over his financial situation.[70]

Similar to Dr. Glenmullen, and as shown by the comments of Dr. Catapano-Friedman, *supra*, Dr. Kruszewski considered the Shearers' marital relationship in his analysis and found they had a stable marriage for 35 years, and that no acts of self-harm had occurred during any prior domestic dispute.   Dr. Kruszewski considered Mr. Shearer's medical conditions and that he was mobility challenged due to a right sided CVA with left hemiplegia since 1999, and that

> [s]ubsequent to his stroke, Mr. Shearer appears to have successfully maneuvered through a number of obstacles: physical limitations, anger, depression, pain,

---

[64] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 90:1-17.
[65] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 88:8-89:22.
[66] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 111:4-112:9.
[67] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 110:12-22.
[68] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 53:5-19.
[69] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 146:23-147:5.
[70] Finkelstein Decl., Ex. L (Records of Dr. Catapano-Friedman).

impotence.  He received psychiatric assistance from Dr. Catapano-Friedman from February of 2000 until late January of 2002, an intervention which showed his positive response to psychochemotherapeutic interventions.  Likewise, he had mechanical and interpersonal assists and support, via his caretaker, his son and his wife, which permitted him to continue to be mobile and to teach.

Dr. Kruszewski opined that Mr. Shearer was "disciplined, directed and showed strong methods of coping with prior adversity," "had a companion caretaker with whom he shared a good relationship", and a "positive adaptation to his disability after his 1999 CVA."  Dr. Kruszewski stated in his differential diagnosis that Mr. Shearer "had suffered pain and impaired mobility without having acted to hurt himself in the period from 1999 up until his suicide."[71]

In performing his differential diagnosis Dr. Kruszewski considered "multiple factors, pro and con…lay out the factors that I considered pro-suicide degenic factors that would increase the likelihood of Mr. Shearer's suicide as well as factors that would protect him from suicide."[72]  Dr. Kruszewski, based upon his analysis, included in his differential diagnosis 9 factors which he considered as Mr. Shearer's risk factors for suicide and 22 factors which he considered as Mr. Shearer's protective factors for suicide and ultimately concluded that Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide.[73]

As demonstrated by the caselaw and information cited in section I.B.3. above, it is not necessary for Dr. Kruszewski to rule out entirely all other potential causes for Mr. Shearer's suicide for his testimony to be sufficiently reliable to present to a jury.  Dr. Kruszewski considered the generally accepted risk factors for suicide as applied to Mr. Shearer in this case, and therefore his methodology and differential diagnosis should be deemed reliable.

### 3.    Dr. Kruszewski had good grounds for forming his opinions, and his consideration of a temporal connection (*post hoc ergo hoc*) in combination with numerous other factors was appropriate and reliable

Dr. Kruszewski considered numerous factors in determining that Neurontin was a substantial factor in Mr. Shearer's suicidal behavior and completed suicide in addition to temporality.  He performed a retrospective analysis of Mr. Shearer's life and a differential

---

[71] Finkelstein Decl., Ex. B (Kruszewski Report) at 14.
[72] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 29:3-17.
[73] Finkelstein Decl., Ex. B (Kruszewski Report) at 14-16.

diagnosis in which Kruszewski examined his risks for and protective features against suicide. Further, Dr. Kruszewski considered that Shearer was pharmaceutically challenged:

> before his death, he continued to take gabapentin. This was especially problematic from a risk-benefit standpoint, as the risks to him outweighed the benefits. That drug was medically ineffective for him (see footnotes 1, 2), may have been inappropriate because of his post-stroke condition (footnote 3) and was capable of severe downward mood change. Already stressed by situational factors, the continuation of Neurontin and its depressogenic effect resulted in hopelessness and an irrational desperation (inferred in his suicide note, below), powerlessness, and the impulsive act to kill himself.[74]

As noted in detail above, Dr. Kruszewski considered and weighed all of the relevant and material risk factors and protective factors in his differential analysis and did not solely resort to a temporal consideration in arriving at his conclusion. He made it clear that he performed an extensive analysis in arriving at his determination:

> During the time that I spent reviewing Mr. Shearer's medical and pharmaceutical records and reading depositions in his case, I was confronted with factors that placed him at risk for suicide and factors that offered a protective effect against suicide. I considered the information that was available to me about his life generally and focused, for obvious reasons, on those factors that specifically confronted him after his 1999 right-sided embolic cerebrovascular accident that resulted in left-sided hemiplegia. I concentrated on what was happening— including medical, social, adaptational, pharmaceutical, circumstantial events--- proximate to the time that he decided to end his life.[75]

As demonstrated in section I.B.4., above, temporal considerations together with a properly performed differential diagnosis would be sufficient under *Daubert* standards. Dr. Kruszewski's specific causation testimony was not based on a temporal association alone but on numerous other factors including his education, training, experience and extensive research and the medical records and other pertinent relevant materials and information that was considered in his differential diagnosis and formed a solid and reliable foundation for his opinion that Neurontin was a substantial contributing factor (cause) of Mr. Shearer's suicide.[76]

---

[74] Finkelstein Decl., Ex. B (Kruszewski Report) at 11.
[75] Finkelstein Decl., Ex. B (Kruszewski Report) at 16.
[76] Finkelstein Decl., Ex. B (Kruszewski Report) at 10, Dr. Kruszewski also considered the Sir Bradford Hill's Guideposts and that there was a strength of association; The suicide warning for Neurontin was asserted by the US FDA on December 16th, 2008[Yan, Jun. FDA Orders Suicide Risk Warning on Epilepsy Drug Labels. *Psychiatric News*. February 6, 2009. Vol. 44, (3) 7.] Earlier, research from a number of sources, including the expert reports of Drs. Trimble, Blume and me as well as the clinical work established through the analysis of 199 clinical trials by the US FDA and as reported in the UDA FDA 31 January 2008 Alert, concluded that there is a significant association between the risk of suicide and ingestion of Neurontin.

III. **PLAINTIFF'S EXPERTS' OPINIONS AND TESTIMONY ARE NOT ONLY HELPFUL TO THE JURY, BUT THIS EXPERT EVIDENCE IS PERTINENT AND CRITICAL TO THE QUESTIONS OF CAUSATION IN THIS CASE**

   A. **Plaintiff's Response to Defendants' Assertions Regarding the Standards for Proximate Cause and Superseding Cause Are Contained in Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Incorporated by Reference as if Fully Set Forth Herein**

Plaintiff's experts on specific causation, Dr. Glenmullen and Dr. Kruszewski have adequately articulated a thorough retrospective analysis, a differential diagnosis and psychological autopsy, which are sufficient under the standards of *Daubert* and its progeny, the experts have opined that Neurontin was a substantial factor in Mr. Shearer's death. The law in Massachusetts is clear that "plaintiffs are not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that they introduce evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. Restatement (Second) of Torts § 433B, Comment b (1965)." *Mullins v. Pine Manor College*, 389 Mass. 47, 58, 449 N.E.2d 331, 339 (1983). "The established rule is that an injured party is permitted to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident. [Citations omitted.]" *Delicata v. Bourlesses*, 9 Mass. App. Ct. 713, 720, 404 N.E.2d 667, 671 (App. Ct. 1980).

Dr. Glenmullen opined that "[g]iven how well Mr. Shearer coped with the stroke, to a reasonable degree of medical certainty, he would have coped as well with the events of October 2000, were it not for Neurontin. While the events of October 2000 may have increased the risk for his suicide, they were not a substantial factor in his death."[77] Dr. Glenmullen opined similarly that all other conditions in Mr. Shearer's life that he had said increased Mr. Shearer's risk for suicide were not a substantial factor in his death.[78] In reference to other medications, Dr. Glenmullen opined that some of Mr. Shearer's concurrent medications, particularly benzodiazepines, may have increased the risk of suicide and may have been a substantial

---

[77] Finkelstein Decl., Ex. C (Glenmullen Report) at 30.
[78] Finkelstein Decl., Ex. C (Glenmullen Report) at 28-31.

contributing factor in that it may have had an adverse reaction with the Neurontin.[79]  However, Dr. Glenmullen noted that Mr. Shearer had responded well to Prozac and the level of evidence in regard to the other drugs that had warnings did not rise to the level of evidence required for proximate cause, like Neurontin did.[80]  Dr. Glenmullen also opined that Mr. Shearer was strongly protected against suicide and at low risk before he was put on Neurontin, that he was "just the kind of patient who should not have been given a drug that could make him suicidal."[81]  Clearly, according to Dr. Glenmullen's analysis, but for Neurontin, Mr. Shearer would have been able to continue to cope and adjust to the adversity which faced him in life.

Similarly, Dr. Kruszewski opined that Neurontin was a "direct and significant" contributing cause of Mr. Shearer's death.[82]  Dr. Kruszewski opined that stressed by other factors, it was the "Neurontin and its depressogenic effect that resulted in hopelessness and an irrational desperation (inferred in his suicide note, below), powerlessness and the impulsive act to kill himself."[83]  Moreover, Dr. Kruszewski ruled out Prozac as a cause or contributing cause of Mr. Shearer's suicide because Mr. Shearer had been on Prozac previously and there was no record of it causing a specific adverse event other than impotence.[84]  Moreover, Dr. Kruszewski stated during his deposition that he agreed with Dr. Glenmullen's expert from page 18, *et seq*.[85]

In addition, Plaintiff refers this Court to other arguments in Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment that address Defendants' assertions concerning proximate cause, and incorporates those arguments as if fully set forth herein.

## CONCLUSION

In view of the above, it is respectfully requested that the Court deny in its entirety Defendants' motion to exclude Plaintiff's experts.

---

[79] Finkelstein Decl., Ex. C (Glenmullen Report) at 32.
[80] Finkelstein Decl., Ex. C (Glenmullen Report) at 12.
[81] Finkelstein Decl., Ex. C (Glenmullen Report) at 32, 33.
[82] Finkelstein Decl., Ex. B (Kruszewski Report) at 16.
[83] Finkelstein Decl., Ex. B (Kruszewski Report) at 11.
[84] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 110:12-22.
[85] Finkelstein Decl., Ex. K (Kruszewski Dep.) at 79:16-20.

Dated:  February 18, 2010

Respectfully submitted,

FINKELSTEIN & PARTNERS, LLP
*Attorneys for Plaintiff Linda B. Shearer*

By:  **/s/ Andrew G. Finkelstein**
      Andrew G. Finkelstein, Esquire
      1279 Route 300, P.O. Box 1111
      Newburgh, NY  12551
      (800) 634-1212
      (845) 562-3492 (fax)
      email:  afinkelstein@lawampm.com

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 18, 2010.

           **/s/ Andrew G. Finkelstein**
           Andrew G. Finkelstein, Esquire