EXHIBIT D

1

```
1                                    Volume: I
                                     Pages: 1-218
2                                    Exhibits: 1-8

3                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
4
                             MDL DOCKET NO. 1629
5                            MASTER FILE NO. 04-10981
   * * * * * * * * * * * * * * * * * * *
6  IN RE: NEURONTIN MARKETING, SALES      :
   PRACTICES AND PRODUCTS LIABILITY       :
7  LITIGATION,                            :
   ------------------------------------
8  THIS DOCUMENT RELATES TO:              :   JUDGE PATTI
                                          :   B. SARIS
9  SHEARER VS. PFIZER, ET AL;             :   MAGISTRATE
   1:07-CV-11428-PBS                      :   JUDGE LEO T.
10                                        :   SOROKIN
   * * * * * * * * * * * * * * * * * * *
11

12       AUDIO-VISUAL DEPOSITION OF JOSEPH GLENMULLEN,

13  M.D., a witness called on behalf of Pfizer, Inc.,

14  pursuant to the provisions of the Federal Rules of

15  Civil Procedure, before Lisa McDonald Valdario, (CSR

16  #130093), a Registered Professional Reporter and

17  Notary Public in and for the Commonwealth of

18  Massachusetts, held at the Hotel Tria, 220 Alewife

19  Brook Parkway, Cambridge, Massachusetts  02138, on

20  Monday, January 11, 2010, commencing at 9:02 a.m.

21

22

23

24

25  Job No.: CS234482
```

1     depositions that you thought was either incomplete

2     or inaccurate, or didn't make sense to you in the

3     context of everything else you had read?

4          MR. FROMSON:  Objection.  Form.  Go ahead.

5  A  I think the only thing that comes to mind, and

6     it's in my report, is that I have a commentary,

7     and in my experience this is not uncommon in cases

8     of medication-induced suicidality, that in my

9     estimation, some of Dr. Catapano-Friedman's

10    assessments of Hartley Shearer were misperceptions

11    so-to-speak because she couldn't have appreciated

12    the effect of Neurontin on his mood, and behavior,

13    and personality, and I think she misread some of

14    that as, in particular, a narcissistic personality

15    disorder.

16        I think if she'd had the benefit of the

17    warnings, that probably wouldn't have happened.

18    But other than that, I can't think of anything off

19    the top of my head that didn't seem to fit a

20    typical case, so-to-speak.

21  Q  Now, Dr. Catapano-Friedman actually saw

22    Mr. Shearer?

23  A  Correct.

24  Q  On how many occasions, do you recall?

25  A  I don't.  I probably added it up at the time.  I

1    think she was seeing him roughly once a month, but

2    there may have been an early period where it was

3    more frequent than that.

4  Q    And what was the purpose of her visits with

5       Mr. Shearer?

6  A    Well, she began seeing him after he'd had the

7       stroke in January of 1999.  In my report, I put in

8       that it was Dr. Edwards his neurologist in South

9       Bennington, Vermont who recommended that he see a

10      psychiatrist, and the initial, what's called chief

11      complaint per her report in the deposition was

12      anger; particularly venting with his wife Linda.

13          And then I believe she ends up seeing them

14      sometimes together.  I think she treated Linda

15      individually at times.  But one of the things

16      that's very interesting I think in the case is

17      that because she was a psychiatrist, she was one

18      of the people most talking to him and documenting

19      things about him.  And there is a very distinct

20      change in her notes pre and post the Neurontin.

21          The emphasis is on his frustration would be

22      one word with the stroke in the first half of the

23      meetings.  Her emphasis on that is a little more

24      anger than what some of his friends and family

25      describe, but I think they're all talking about

1    the same thing, frustration/anger over the stroke,

2    and then what you see, when he comes back after

3    the fall of 2000 events and being put on

4    Neurontin, is that there's a very distinct shift

5    to panicky anxiety and being depressed.  And

6    particularly in her notes, the panicky anxiety.

7    And part of my expert assessment of the case is

8    that that was a significant portion of the mood

9    and behavioral changes in Mr. Shearer on

10   Neurontin, and you don't see that in her notes

11   before that.

12        Her notes are one of the best.  I mean,

13   there's also other places in the medical records

14   that I cite, but her notes are in many ways one of

15   the best documentations of that change.

16        Again, as I said, she, and I have seen this

17   in many other antidepressant, antipsychotic, other

18   cases like this that I do, you see that the

19   treating doctors at the time without warnings may

20   misinterpret that as a personality disorder or

21   some other change, some other set of circumstances

22   in the person's life, because they're without the

23   benefit of warnings that these kinds of mood and

24   behavioral changes can occur with drugs that make

25   people suicidal as antecedents to the suicidality.

23

1   Q    Well, let's back up for a second.

2            Doctor Catapano-Friedman was providing

3        effective clinical care for Mr. Shearer's mental

4        disorders, wasn't she?

5            MR. FROMSON:  Objection.  Form.

6   A    I think yes, with the caveat that without the

7        Neurontin warnings, she wasn't able to factor in

8        the role of Neurontin, and I think certainly

9        looking back on it, things could have been done

10       very differently with a warning that Neurontin

11       could have the effects that it does now that we

12       have the FDA warning.

13           So I think she was, I presume she's a

14       competent psychiatrist.  I don't have any

15       questions with the treatment she was giving him

16       prior to the Neurontin.  I presume she would have,

17       you know, potentially done things differently, or

18       at least considered the Neurontin with the

19       warnings that we have now.

20           I know as myself, as an expert looking at

21       the case, that for example, one juncture in time

22       when things could have been done very, very

23       differently, had there been a Neurontin warning,

24       was the episode where Mr. Shearer kind of lost it

25       at night, and had an argument with his wife, and I

1    guess was kind of, said something kind of rude and

2    insensitive to her and she kind of, trying to

3    settle him down slapped him in the face.  He

4    called the police.  The police came.  The police

5    arrested her.  They charged her.

6        You know, at the next meeting with Dr.

7    Catapano, he describes this very out of character

8    behavior and this very dramatic situation.  And

9    she makes a change in his medications.  What does

10   she do, she adds another medication.  She adds

11   Zyprexa for his new, you know, emotion lability,

12   his new mood and behavioral changes.

13        In retrospect, looking at that, one would

14   say that was a really a marker of the mood and

15   behavioral changes.  Nothing like that had ever

16   happened before.  On Neurontin, and again, I've

17   seen this over and over with antidepressants,

18   antidepressants make people anxious.  What did the

19   doctors do before they had warnings, they add an

20   antianxiety agent.  What do we do now, we take

21   them off the antidepressant.  And in retrospect,

22   the better thing to do would have been to try

23   Mr. Shearer off the Neurontin.

24  Q  My question, doctor, I think was a little narrower

25     than that.  In your opinion, was Dr.

33

1      Mr. Shearer?

2           MR. FROMSON:  Can we have a time frame?

3  Q   While she treated him.

4  A   Well, for example, let's take this landmark --

5  Q   Let's not.

6           MR. FROMSON:  Let him answer the question.

7  Q   With respect, everybody, with respect, the

8      question is, and if you can't answer it, tell me

9      you can't answer it, was -- I don't even remember

10     the question.

11          The question was, Dr. Catapano-Friedman,

12     whether she had a warning or not, what was her

13     impression and what was her testimony about

14     whether Mr. Shearer was suicidal?

15          MR. FROMSON:  Objection as to form.

16 A   What I'm trying to say is that part of your

17     differential, if part of your differential is the

18     medication itself, you assess it, and you warn the

19     patient, and you assess it in an entirely

20     different way.

21 Q   Did she or did she not testify that Mr. Shearer

22     was not suicidal while she was treating him?

23 A   She testified that as far as she knew, he wasn't,

24     but, for example, she couldn't have known that

25     some of those signal events might have led to it,

34

1       whereas now, you could know because of the

2       warning.

3   Q   Well, with respect, doctor, I still think you

4       haven't answered the question.  I'm going to move

5       on.

6               Were there any other medically significant

7       events -- strike that.  What else happened in

8       Mr. Shearer's life at or about the time he was

9       first prescribed Neurontin?

10              MR. FROMSON:   Objection as to form.

11      Overbroad.

12  A   Well, there is a series of three medical events in

13      the fall of 2000.  He has severe low back pain.

14      He develops sepsis, and likely endocarditis, and

15      then he has an emergency spleenectomy, and the

16      Neurontin in particular was prescribed at the

17      Brigham and Women's Hospital for the low back

18      pain, but it's a part of a series of three medical

19      events in roughly October, 2000.

20  Q   How severe was the pain?

21  A   Very severe.

22  Q   Was he hospitalized for those events?

23  A   Yes.

24  Q   How long?

25  A   I don't recall specifically, but he was at North

1  never make any more progress, again, that's not

2  necessarily the case, but it's really leveled off.

3  And he goes through an adjustment to that, and by

4  all accounts, he was disappointed.

5  He would have, you know, he would prefer if

6  this never happened to him in the first place.  He

7  had a certain amount of frustration from the

8  consequences of the stroke but who wouldn't.  But

9  he came to terms with it.

10  There is no evidence that he became more

11  depressed at that point of time.  There's no

12  evidence that he became suicidal at that point of

13  time, and all of that is pre the three medical

14  events and being put on Neurontin in the fall of

15  2000.

16  Q  What can you show me in Mr. Shearer's medical

17  records after he was taking Neurontin that's new

18  or different than what you can find in those

19  records before he was taking Neurontin?  And I

20  guess implicit in that question is that you

21  attribute to his taking Neurontin.

22  A  Sure.

23  So I would turn to my report.  On page 18 of

24  the report, I quoted a medical record, it must be

25  at the Brigham, just a couple of days after he

1    started the Neurontin, where it says his pain is

2    gone.  So he's on a cocktail of three pain

3    medications, including the Neurontin, which appear

4    to have worked, and allowed them to wean him off

5    of the narcotic.  And the quote says, "but patient

6    complains of anxiety."  And as I say, I think

7    that's kind of prophetic, so-to-speak, that

8    Neurontin is one of three drugs that seems to have

9    worked with his pain, but there is, it's commented

10   that he's anxious.

11        I have a couple more quotes on the next

12   page, also from the Brigham, I presume.  Yeah, it

13   says here on the 18th, that's four days later,

14   that he's had an alteration in self-concept.

15        On October 23, feels panicky when he

16   can't -- oh, feels "dependent on Linda," and

17   "feels panicky when he can't reach her."  Now,

18   that is very new.  That's not being documented in

19   the medical records in the year and a half

20   following the stroke.  He's had a stroke.  He's

21   had a hemiparesis.  He's had catastrophic medical

22   set of situations, but there is no descriptions

23   that he feels panicky when he can't reach his

24   wife.

25        Here is an October 21 note; very depressed

1    A    Yup.

2    Q    And she knew that a man in his condition had to be

3         evaluated for suicidality, isn't that right?

4              MR. FROMSON:   Objection.   Lack of

5         foundation?

6    A    I think we've discussed this.   It's a whole

7         different ballgame if your treatment medications

8         could make someone suicidal and you are, you know,

9         you're really hamstrung as a treater if you don't

10        know that.

11   Q    Why did you talk with Mrs. Shearer about this

12        case?

13   A    Because she was one of the people who observed him

14        the most at the time.   I just always think it's

15        important to hear things directly from the spouse,

16        or another, one or two other people who are close

17        to the person.

18   Q    Who else did you talk to?

19   A    I talked to Ivor and I attempted to talk to Sean

20        Wheeler.   It was over the Thanksgiving weekend,

21        and he might have been away or something and I

22        didn't have the opportunity to talk with him.

23   Q    How long did you talk with Mrs. Shearer?

24   A    Probably two to three hours.

25   Q    And did you do it over the phone or in person?

1  A    Over the phone.

2  Q    Why didn't you do it in person?

3  A    I, if someone has survived a suicide attempt, I

4       really like to interview survivors in person, but

5       for something like Mrs. Shearer, who's not the

6       index patient so-to-speak, I feel that the

7       telephone interview is as good as seeing her in

8       person.  If she was still in Williamstown and

9       could have gotten to me easier, that would have

10      been nice, but she's in Houston.

11 Q    Not hard to get to Houston, is it?

12           MR. FROMSON:  Objection.  Argumentative.

13 A    I don't feel it's necessary.  That's my standard

14      of practice in these cases.

15 Q    So could you have reached the same conclusions you

16      reached about Mr. Shearer without talking with

17      Mrs. Shearer?

18 A    I don't really know how to answer that because

19      I've never done -- I would decline to do a case

20      like this without access to the people that I

21      thought I'd like to talk to.

22 Q    And as a source of information about Mrs., about

23      Mr. Shearer, what sort of biases might

24      Mrs. Shearer be encumbered with?

25 A    Well, I'm always looking, when I interview anyone,

61

1      not going to testify.  I'm not going to go any

2      further than having reviewed the records, or

3      sometimes -- sometimes I reject cases right after

4      reviewing the records.  Sometimes I reject them

5      after doing an interview or two.

6  Q  But just so I'm clear, this is the first Neurontin

7      case you've reviewed.

8  A  Yes.

9  Q  Is this the only Neurontin case you've reviewed?

10  A  I think that's probably accurate.

11  Q  And what did you do to inform yourself about the

12      issues relating to Neurontin and suicidality?

13  A  As I say in the report, I read the general

14      causation reports of the plaintiff's experts, the

15      defense experts, and the judge.  And then I have a

16      lot of experience evaluating psychiatric

17      medication-induced suicides or suicide attempts.

18      I did the same psychological autopsy and

19      differential diagnosis that I've been doing for

20      years in cases.

21  Q  But you had to assume that there is evidence that

22      demonstrates Neurontin has the potential to cause

23      suicidality?

24         MR. FROMSON:  Objection.  Form.  Only to the

25      use of the word assume.  Go ahead.

62

1   Q   We'll have a conversation here.  I mean, you said

2       you read the expert reports.  Is that because you

3       didn't, you didn't do the research yourself as to

4       whether Neurontin can cause suicidality in people

5       who take it?

6   A   I was already familiar with FDA's metanalysis.  I

7       was familiar with the FDA's alerts and warnings,

8       but I think the answer to your question is yes,

9       I'm not testifying as a general causation expert.

10      I have not read all of the medical literature and

11      internal Pfizer documents that the plaintiffs and

12      defense experts have read, but I read their

13      reports, and I read Judge Saris' rulings, and I

14      say in my own report that they informed, just in

15      the way I think you're saying, that assuming all

16      this is true, which it was very credible to me

17      reading it based on my background from the other

18      drugs.

19   Q   It's possible it might not be, right?

20   A   Again, there have been Dauber hearings, and the

21      experts are allowed, and I'm only testifying about

22      specific causation.

23   Q   Well, a Dauber hearing doesn't have a whole lot to

24      do with whether a drug actually does or doesn't

25      cause the condition alleged, does it?

1          MR. FROMSON:  Objection as to form of the

2     question.

3  A   It's a threshold for the quality of the scientific

4     evidence.

5  Q   In regard to its admissibility at trial, right?

6  A   Right.

7  Q   It's a different standard than you'd use at

8     Harvard to take a drug from a preclinical to a

9     clinical trial, isn't it?

10 A   Well, actually, I think that's a very important

11    point, and I think the answer is no, that the -- I

12    may not actually be clear on your question, but

13    the point I would make is that the reasonable

14    degree of certainty that's used in the legal

15    setting is actually the same that's used in a

16    medical setting.  And again, just for the record,

17    I read the plaintiff's general causation experts'

18    reports, with probably far more background than

19    most people in this country would have from

20    multiple other classes of drugs with similar

21    mechanisms or overlapping mechanisms of actions,

22    similar warnings, and it all was extremely

23    credible to me.

24 Q   What is the mechanism of action of Gabapentin?

25          MR. FROMSON:  Just note my objection to the

65

1      the report.   So that's pretty much it.

2   Q   If I were one of your students and you had laid

3      these, this report out as kind of a case study for

4      us --

5   A   Right.

6   Q   -- and I wanted to challenge your conclusions,

7      test your opinion, how would I do that?

8              MR. FROMSON:   Just note my objection.

9      Improper hypothetical.

10  A   How do you mean challenge it?

11  Q   Well, your opinion is a judgment, isn't it?

12  A   It's to a reasonable --

13             MR. FROMSON:   Objection as to form.

14     Leading, argumentative.

15  Q   It's not a trick question.   You didn't conduct a,

16     you didn't do any hysto-cytological tests on, you

17     know, a biopsy from Mr. Shearer and say this is a

18     Neurontin-induced suicide, right?

19  A   There is no histological studies.

20  Q   Right.   So your opinion about the cause or causes

21     of Mr. Shearer's suicide is a matter of judgment,

22     isn't it?

23  A   It's highly informed medical -- it's a

24     psychological autopsy and a differential

25     diagnosis.   It's a clinical judgment, in my

66

1    opinion, to a reasonable degree of medical

2    certainty.

3  Q   Now, if I were a colleague, or a student, or

4    superior, how would I test that judgment?  How

5    would I challenge it?  What would I have to do to

6    demonstrate to you that it was either incomplete

7    or incorrect?

8        MR. FROMSON:  Just note my objection as to

9    the form of the question.

10 A   I don't really know how you could.  My

11   differential diagnosis is extremely thorough, and

12   all of the report leading up to it kind of lays

13   out the issues that are then going to be parsed in

14   the differential.

15 Q   Your differential, with respect, is a list of all

16   the other risk factors and a judgment that it was

17   Neurontin, not anything else.  What would I have

18   to do to demonstrate to you that you might be

19   wrong?

20       MR. FROMSON:  Objection as to form.  Asked

21   and answered.

22       MR. OHLEMEYER:  Let me rephrase it.

23 Q   Is it possible that your judgment is wrong?

24       MR. FROMSON:  Objection as to form.

25   Overbroad and ambiguous.

110

1    Q    Okay.

2    A    Particularly, the tricyclics.

3    Q    Now, do tricyclic antidepressants increase

4         somebody's risk of committing suicide?

5    A    Well, they are so old that they were never studied

6         for this and were not part of the metanalysis done

7         by the FDA or the metanalyses done by the FDA.

8         But they do carry now the same warning just

9         because they're in the same class.

10            So I think to a reasonable degree of medical

11        certainty, the answer would be yes.

12   Q    If you had a patient, or if you had a case that

13        you were reviewing where you didn't have a history

14        of depression prior to an antidepressant

15        prescription, and you had a suicide, would you be

16        suspicious that the antidepressants had something

17        to do with the suicide?

18            MR. FROMSON:   Objection as to form.

19        Incomplete hypothetical.

20   A    It wouldn't necessarily be for that reason.   It

21        would be the fact pattern of the particular case.

22   Q    Bear with me just a second.

23                   (Off the record.)

24   Q    What's a psychological autopsy, doctor?

25   A    It's looking back retrospectively on someone who's

1      deceased.   It's, the term's usually used in

2      relation to retrospectively analyzing the suicide.

3  Q  And is there a, is there a book or a publication I

4      could go to to kind of find the protocol -- strike

5      that.   Do you use a protocol when you conduct a

6      psychological autopsy?

7  A  Sure.   It's essentially a retrospective

8      evaluation.   It's not much, it's not really any

9      different from an evaluation you would do of

10     someone who was alive.   It's just, it's called a

11     psychological autopsy because the person is dead.

12  Q  Well, are there any published books or manuscripts

13     that describe for me what I should be doing if I

14     were going to conduct a psychological autopsy?

15  A  There may well be articles.   There are certainly

16     people who lecture about it.

17  Q  Can you name any of those people?

18  A  Sure.   Dr. Terry Maltzberger here at Harvard.

19  Q  Anybody else?

20  A  No.

21  Q  Do you recall the authors of any of the books or

22     publications that describe how to do it?

23  A  Not off the top of my head.

24  Q  Are there experts or recognized authorities in the

25     field of psychological autopsy?

113

1   A   I think I may have at times.

2   Q   You ever heard him speak?

3   A   Have I ever heard him speak.  I don't think so.

4   Q   In a patient, doctor, who has pain and has a

5       history of some level of depression, no history of

6       suicide attempts, and he's taking a variety of

7       prescription medication that you or others

8       associate with increased risk of suicidality, how

9       do you figure out what the cause of that person's

10      suicide is?

11          MR. FROMSON:  Can I have that read back,

12      please?

13              (Question read back.)

14          MR. FROMSON:  Okay.  I'll object to it being

15      an incomplete hypothetical.

16  A   It would depend on the fact pattern in the

17      specific case.

18  Q   Very important in any case, where you're trying to

19      find the cause of a disease, to carefully look at

20      the fact pattern, isn't it?

21  A   Sure.  When you say the cause, there may be more

22      than one contributing factors, and in particular,

23      you're looking for the substantial contributing

24      factors in this case.

25  Q   Now, what is a substantial contributing factor?

114

1   A   It's a contributing -- I think, I don't know, it's

2       self-evident.  It's a significant contributing

3       factor, substantial.  It's not small.

4   Q   Is that a medical definition or a legal

5       definition?

6   A   I think it's legal.

7   Q   What besides, in your opinion, doctor, what

8       besides Neurontin caused or contributed to cause

9       Mr. Shearer's suicide?

10        MR. FROMSON:  Objection as to form.

11   A   Well, in my differential, I have a number of

12       things that I say increased his risk, like

13       depression and anxiety, but were not substantial

14       factors, and I explicate why I judged them that

15       way.

16        I have a couple of other things like his

17       underlying personality, and his attention deficit

18       disorder which I take a little bit different

19       position on, that they may have increased his

20       risk, but were not substantial contributing

21       factors.

22        I have a, I have some things like psychotic

23       disorders or his compulsive traits that I say

24       didn't contribute at all, either because he didn't

25       have them or they just weren't significant enough.

1          I have his stroke and his hemiparesis as

2     increasing his risk, but not being a substantial

3     factor.

4          I have the three medical events in October

5     2000 increasing his risk, or may have increased

6     his risk, but not substantial contributing

7     factors.  I rule out marital problems, financial

8     strain, alcoholism, substance abuse, and then I

9     say that Neurontin was a substantial contributing

10    factor, and that some of his other medications may

11    have increased his risk and may have been

12    substantial contributing factors, but are less

13    clear.

14  Q   Why are they less clear?

15  A   For the reasons that I articulate, that the, in

16    this particular case, the Neurontin, with the fact

17    pattern that we have, the metanalysis was

18    statistically significant finding, biological

19    plausibility, the signals, the adverse event

20    reports, ranks higher than, for example, the

21    Prozac, the trazodone, or whatever benzodiazepine

22    he was on at the particular time.

23  Q   In your opinion, it ranks higher, but in reality,

24    some of these other medications have stronger

25    warnings about depression and suicidality, don't

1   prescription, that your opinion or your claim is

2   aren't in the medical records before Neurontin.

3          MR. FROMSON:   Objection.

4  A   Again, I think we discussed this this morning.

5      I'm not saying that they never appeared.   For

6      example, he had anxiety before this.   But this

7      particular panicky anxiety around where his wife

8      was becomes much more prominent theme and he

9      becomes more depressed.   That's the mood and

10     behavioral changes right out of the FDA warning,

11     classic and exemplified in this case.

12 Q   And my question doctor is, none of that occurred

13     prior to Neurontin?

14         MR. FROMSON:   Objection as to form.   Asked

15     and answered.

16 A   You keep trying to use categorical terms which I

17     have not used.   I'm not saying that none of it was

18     present before.   What I'm saying is that there is

19     a distinct change.

20 Q   And I want to know, but for the temporal

21     relationship between Neurontin and those distinct

22     changes as you've described them, how do you

23     attribute them to Neurontin as opposed to the

24     underlying mood or behavioral disorders?

25 A   A large part of it, which we just discussed, is