# EXHIBIT I

# PROFESSIONAL PSYCHIATRIC ASSOCIATES

ONE WASHINGTON STREET, SUITE 304
WELLESLEY HILLS, MASSACHUSETTS 02481-1706
TEL (781) 239-0071
FAX (781) 235-6390

Douglas G. Jacobs, M.D.
E-mail: drj@djacobsmd.com

December 20, 2007

Ms. Lori McGroder

Shook, Hardy & Bacon

2555 Grand Boulevard

Kansas City, Missouri  64108-2613

*Re:*     *Neurontin Litigation-General Causation Report*

Dear Ms. McGroder,

## I.     INTRODUCTION

You have asked me to provide an opinion regarding the issue of general causation in terms of whether reliable scientific and medical evidence establishes Neurontin causes suicidality *(i.e.,* suicide or suicide attempt). My opinion is based upon my education, training, and experience, a review of the materials in Attachment A, a review of relevant literature, and my work in the field of suicidology, including my work as editor of The Harvard Medical School Guide to Suicide Assessment and Intervention (1999) and as chairperson of the Work Group For The American Psychiatric Association Practice Guidelines for the Assessment and Treatment of Patients With Suicidal Behavior. A copy of my Curriculum Vitae is attached and is incorporated herein by reference. I reserve the right to supplement my opinions based on review of additional materials including the reports and testimony and materials considered by other designated experts.

- 1 -

All opinions in my report are expressed to a reasonable degree of scientific and medical certainty.

## II.    SUMMARY OF OPINIONS

- It is not generally accepted in the scientific or medical community that Neurontin is associated with, or that it can cause or contribute to, suicidality.

- There are no peer reviewed published studies concluding that Neurontin is associated with or can cause or contribute to suicidality.

- Controlled, open label and epidemiology studies are generally accepted as scientifically reliable and necessary to determine whether a drug is associated with an event.   The data from controlled, open label and epidemiology studies for Neurontin does not establish that Neurontin is associated with, let alone causes, suicidality.   In fact, these data are consistently supportive of the conclusion that Neurontin is neither associated with nor causes suicidality.

- Analysis of spontaneous reports indicates that the number of observed cases of suicides are _below_ the expected number of cases in the populations taking Neurontin.   Although these data cannot be used to determine causation, nevertheless they do not support plaintiffs' claim that Neurontin causes suicide.

- The absence of an association between Neurontin and suicide is scientifically meaningful.   It indicates that there is no reliable scientific evidence to conclude that Neurontin is associated with, let alone causes, suicide.   Analysis of the criteria used to evaluate whether an association is "causal" also does not support a conclusion that Neurontin causes suicide.   I have examined ten representative cases[1] and the suicide behavior in each and every case can be fully explained by recognized suicide risk factors without regard to Neurontin.   In other words, alternative explanations and confounders account for the suicide or suicide attempt in each and every case.

---

[1]    The cases I reviewed were the original ten cases selected as Track One cases.   My understanding is that this group of ten cases was comprised of six random selections, two selected by plaintiffs and two selected by Pfizer.   I further understand that three of these cases (Strickland, Mendoza, and Moore) are no longer considered Track One cases.

- The available reliable scientific and medical evidence fails to establish that Neurontin is associated with, or causes or contributes to cause suicidality.

- The label for Neurontin adequately apprises physicians of the risks and benefits of Neurontin.

## III.   QUALIFICATIONS

I am an Associate Clinical Professor of Psychiatry at Harvard Medical School. I maintain an active clinical psychiatric practice in Wellesley and Newton, Massachusetts, suburbs of Boston. I have edited three books and numerous papers on suicide. I edited the textbook, the Harvard Medical School Guide to Suicide Assessment and Intervention, was published in 1999. I have organized and have led academic seminars, locally for Harvard faculty and nationally for other mental health professionals, on the subject of suicide and related psychiatric subjects (*e.g.*, depression). I currently teach Harvard medical students, who are pursing careers in nonpsychiatric disciplines. In addition, I established a unique non-profit organization, Screening for Mental Health, Inc. (SMH), which is devoted to screening for, and providing education about, a variety of mental health disorders, including depression. The programs of SMH are offered to a variety of healthcare clinicians, mental health professionals, and primary care clinicians.

I received my undergraduate degree from Trinity College in Hartford, Connecticut, in 1967. I received my medical degree from the University Of Pennsylvania School Of Medicine in 1971. Next, I completed a three-year residency (1972-75) in adult psychiatry at the Massachusetts Mental Health Center, a Harvard Medical School teaching program. I was board certified by the American Board of Psychiatry and Neurology in 1977. Between 1978 and 1992 I served by invitation as an examiner for the Board, participating in the examinations of physicians who were seeking board certification in psychiatry.

As part of my clinical practice, I am on the staff of several psychiatric hospitals in the greater Boston area, including McLean Hospital in Belmont, Massachusetts. I have been a member of the Harvard Medical School faculty since 1975. I am a member of several professional organizations, including the American Psychiatric Association, the

- 3 -

American Association of Suicidology, and the American Academy of Psychiatry and the Law.

I have more than 30 years experience evaluating, treating and consulting on suicidal patients. Between 1975 and 1983, I served as Director of Psychiatric Emergency Services at The Cambridge Hospital, where I was responsible for evaluating and supervising 3,000 psychiatric emergencies per year. In this patient group, there was approximately one suicide attempt per day. In my hospital experience and private practice since 1975, I have developed expertise in examining, understanding, and treating a diverse range of suicidal patients.

I was the founder of the Harvard Medical School Suicide Symposium in 1981, and directed that symposium for seven years. This symposium remains Harvard Medical School's Department of Continuing Education only postgraduate symposium specifically on the subject of suicide. In 2005, I was the keynote speaker on the subject of Adolescent Suicide.

I am the founder of National Depression Screening Day (NDSD) and its sister mental health screening programs, which are endorsed by the American Psychiatric Association. National Depression Screening Day is held each October during Mental Illness Awareness Week, which was established by the U.S. Congress. Since 1991, numerous hospitals, health centers, libraries, schools, primary care offices, and other practitioners have provided free depression screenings across the country on the designated day. As one of the programs of the non-profit Screening for Mental Health organization, this screening program is funded by federal and state government agencies, corporations, foundations, as well as by registration fees from our participating healthcare facilities and organizations. When I initiated the program fifteen years ago, it was the first time that the concept of large-scale mental health screening had been attempted. The program has been recognized by mental health professionals, the media, mental health advocacy groups and the federal government for its success in reaching people with depression and other disorders who can benefit from treatment, but who had not sought it in the past.

In terms of the primary care program, relevant professional organizations that serve as sponsors to this program are: the American Chronic Pain Association, the American College of Physicians, and the American Medical Association.

I was appointed by the American Psychiatric Association as Chairperson of the Workgroup to develop practice guidelines for the assessment and treatment of the patient with suicidal behaviors. The guidelines were published in 2003 and 2004.

In terms of awards, I received the Massachusetts Psychiatric Society Outstanding Psychiatrist Award in 2004 for advancement of the profession. In 2007, I received a commendation from the Massachusetts House of Representatives for my work on National Depression Screening Day.

I have been asked by clinicians, hospitals, and school systems to consult when there is a suicidal crisis or in the aftermath of a suicide. The American Psychiatric Association regularly refers media representatives who request information about suicide and other mental health topics to me for comment and analysis.

In the area of legal matters involving psychiatric disorders, suicide, or murder, I have been qualified by a number of courts as an expert in the specialty of psychiatry, specifically in the field of suicide and the medical treatment of psychiatric disorders and symptoms. I have testified in both civil and criminal court proceedings and have reviewed cases on behalf of both plaintiffs and defendants. I have also testified before Congress and the FDA on the subject of suicide, principles of causation, and the relationship to pharmaceuticals.

In terms of fees, I charge $500.00 per hour for record review, etc.

## IV.   BACKGROUND OF SUICIDE

"Suicide represents a major national and international public health problem with over 30,000 suicide deaths in the United States and 1 million deaths worldwide each year and every year. The estimated cost to this nation in lost income alone is 11.8 billion dollars per year." (Reference 1). Suicide is the 11th leading cause of death within the general population (Reference 2) and representing approximately 1.4% of all deaths on an annual

- 5 -

basis (Reference 3). Internationally, there are 1 million suicide deaths every year. (Reference 3).

Suicide is a multi-factorial event with a variety of conditions and stressors contributing to increased risk.[2]   The majority of persons who commit suicide have known risk factors for suicide. (Reference 4). Recognized risk factors for adult suicide include having psychiatric and medical conditions which make every day life more difficult (e.g. affective illness, alcohol / substance use, Cluster B personality disorders, functional impairment, chronic pain, epilepsy), being male (with the exception of people with bipolar disorder), and having a lack of social supports / resources (spouse / close family, valued friends, supportive community, rewarding work, financial security). (Reference 5). In general, the more risk factors an individual has, the higher their risk of suicide. Moreover, certain risk factors can act in a synergistic fashion that increases the risk beyond simply adding the factors.  "For example, the combined risk associated with comorbid depression and physical illness may be greater than the sum of the risk associated with each in isolation." (Reference 6). Risk factors include: psychiatric illness, substance abuse, physical illness-including pain and functional limitations, life stressors, prior suicidal behavior, and access to weapons. Certain psychiatric illnesses are associated with an increased risk for suicide, such as bipolar disorder which can have an increased risk of suicide ranging from 30 to 60 times the general population with an annual prevalence approximating 0.9%. (Reference 7). Certain physical illnesses, such as epilepsy, have an increased risk of suicide ranging from 3.5-7 times the general population. (References 8, 9, 10). Pain syndromes have been identified as having an increased risk for suicide varying from 2 to 5 times. Persons with functional limitations due to physical illness are known to increase the risk of suicide. (Reference 11).

Nearly 50% of psychiatrists will experience a suicide in their practice at some point in their career (Reference 6) and five percent of all suicides in the United States occur within hospital settings, accounting for nearly 1,500 suicides each. (Reference 12).

---

[2]   It is impossible to predict suicide as no specific risk factor has found to be predictive. For example, of the estimated 10 million people who experience suicidal ideation each year, only

Approximately 75% of persons that die by suicide have seen a physician within six months; while 60% have visited a physician within 30 days of their suicide. These findings suggest that suicidal individuals appreciate the issues troubling them and make an effort to see a clinician, but do not or cannot communicate their suicidal thoughts. (Reference 3). It is also believed that approximately 25-30% of persons who die by suicide are receiving psychiatric treatment at the time of their death. (Reference 6).

In fact, it is known that 50 – 75% of persons receive their mental health care through primary care physicians. Primary care physicians are thereby, in a unique position to learn about both a person's medical condition and psychosocial stressors.

### *Neurontin's Use in Persons at Risk for Suicide and Depression*

It is important to acknowledge that Neurontin is prescribed to several of the previously discussed populations with a background rate of suicide much higher than the incidence of suicide in the general population. The categories of patients for which Neurontin is used clinically ranges from patients with psychiatric disorders, (bipolar, anxiety disorders), pain syndromes (ranging from patients with musculoskeletal disorders, cancer, migraines), and epilepsy. As stated above, each of these populations has a risk of suicide that ranges from several times to many times the risk in the general population. Therefore, it would be expected that the rate of suicide behavior in patients being prescribed Neurontin would be greater than the rate in the general population. In terms of depression, it is known that persons with epilepsy and pain syndromes are at increased risk for developing depression. (References 13, 14). Specific risk factors for suicidality in chronic pain populations have been identified as the intensity and duration of the pain, insomnia, helplessness, and desire for escape from pain. Many of these factors apply to the cases reviewed. For example, in the Smith case, one of the ten index cases, Mr. Smith had a twenty-year history of chronic pain with multiple operations, joint replacement surgeries, and a progressive deterioration of his whole body. In fact, his suicide note stated, "Pain has taken over my mind and body. I need back surgery left and right rotator cuffs right bicep torn back surgery to correct pain in legs. Forgive me; I

---

30,000 (0.3%) commit suicide.

cannot go on like this!  I cannot have my body, the temple of the Holy Spirit cut on anymore.  I have talked to God and he understands."

Because individuals who are prescribed Neurontin are at a higher-than-average risk for suicide, if plaintiffs' theory had any validity, it would be expected that the rate of suicide in patients being prescribed Neurontin would exceed the rate expected in epilepsy, psychiatric, and chronic pain populations.  With an "at risk" population, however, the observed number of cases among Neurontin users, however, is far below the expected number of cases as described below.

While spontaneous adverse event reports (the post-marketing experience with the drug) cannot be used to prove causation, one would expect that if Neurontin caused suicide, there would be an increased number of suicides above what would be expected in the population of Neurontin users.  As discussed, the population of Neurontin users is comprised of epileptics, people in chronic pain and people with psychiatric illnesses. Accordingly, a certain number of suicides is to be expected in this population.  It turns out that the number of suicides reported as adverse events for Neurontin is far below what one would expect in the population of Neurontin users.  For example, in December 2005, Pfizer submitted to the European Union's EMEA a postmarketing report regarding spontaneous reports of suicide and suicide attempts.  The report, prepared by Jeffrey Mohan, Pharm D., consisted of a review of Gabapentin clinical study and solicited cases of completed suicide and suicide attempts, and a review of non-clinical study Gabapentin cases of completed suicide and suicide attempts reported to Pfizer as of July 31, 2005.  In terms of completed suicide, 111 cases were identified, 37 of which contained insufficient information for a proper assessment.  However, for purposes of this report, I will base all determinations on the 111 cases.  The Mohan report is based upon worldwide sales volume and an estimated daily regimen of three units daily.  Neurontin was first marketed in 1993, and there were over 13,788,613 patient years of exposure of Gabapentin through 2004.  The expected number of cases of completed suicide and suicide attempts in the population of people taking Neurontin can be estimated from the nearly 14 million patient-years of exposure.

- 8 -

What are the assumptions?  As previously stated, Gabapentin is prescribed to persons for a variety of indications: psychiatry disorders, seizure disorders and pain.  If one assumes, as plaintiffs' expert Sander Greenland did, the estimated rate in the Gabapentin exposed population to consist of a combination of the expected suicide rates for a mixture of psychiatry, pain and epilepsy patients, the suicide rate would be approximately 20-70 per 100,000.  The expected number of suicides is calculated from the following equations:

| x | = | 20-70 | = | 2757-9652 (estimate of *expected* number of suicides in Gabapentin users) |
|---|---|---|---|---|
| 13,788,633 | | 100,000 | | |

Even if one assumes dramatic underreporting of suicide cases,[3] the reported number of 111 cases over this 11 year period is far below the expected number of suicides (between 2757 and 9652) in this high risk population.  Even though adverse event reports are not utilized to demonstrate causation, it is significant that the analyses indicate that persons prescribed Gabapentin who have a known risk for suicide have a dramatically fewer observed number of suicide cases than would be expected. This analysis fails to support and, in fact, directly contradicts the theory that Neurontin causes suicide

## V.     THERE IS NO RELIABLE SCIENTIFIC EVIDENCE THAT NEURONTIN CAUSES SUICIDE.

It is not generally accepted in the field of psychiatry that Neurontin causes suicide.  No regulatory authority or recognized scientific or medical organization has ever concluded that Neurontin causes suicide.  To the contrary, since as early as 2004, the FDA has been aware of the allegations raised by lawyers representing plaintiffs in this litigation and has never concluded that Neurontin increases the risk of or is associated with or causes suicide.  In fact, in January 2006, the European regulatory authority (EMEA) issued a report concluding that "the available data show no clear evidence for a causal association between Gabapentin and suicide or suicide attempt and show no causal association for a risk of psychotic or mood disorders in patients with a positive history of psychotic

---

[3]     Underreporting of suicide cases is less likely in this instance because, among other things, (1) serious adverse events such as death are more likely to be reported, and (2) publicity in the form of

illness." EMEA, Joint Response Assessment Report at 28 (January 12, 2006). I agree with the EMEA's conclusions and find it persuasive that no regulatory, scientific, or medical body has disagreed.

Determination of causation is a judgment that has to be based on sound scientific principles. I am familiar with the reliable and accepted principles used to determine general causation. These principles function as methodological guidelines for determination of causation in a variety of disciplines, including epidemiology, pharmacology, and medicine. (References 15, 16). It is generally accepted that in order to determine whether a drug such as Neurontin is capable of causing suicide, controlled epidemiologic and clinical studies must be analyzed for an association between the drug and the event – that is, whether the risk of suicide or suicide attempts is increased in Neurontin users compared to an unexposed similar population. If there is a statistically significant increased risk of these events in subjects taking Neurontin, it can be said that there is an association between Neurontin and suicide. I have reviewed the data from controlled and open label studies, as well as the only epidemiology study cited by plaintiffs' experts, and these data do not show an increased risk of suicide or suicide attempts with Neurontin. It is my opinion to a reasonable degree of medical and scientific certainty that there is no scientifically reliable evidence of an association between Neurontin and suicidality.

### *The controlled-clinical trial data fail to show an association or increased risk of suicidal thinking or behavior.*

Controlled clinical-trial data provide the most reliable scientific evidence for evaluating whether a prescription medication is capable of causing suicide. (References 17, 18). As the FDA has noted, an analysis of the controlled trial data is "crucial to deciding the obviously important question" regarding whether a medication increases the risk of suicidality.[4] (Reference 17).

---

[4]    plaintiff advertisements and the filing of a Citizen's Petition increases the likelihood of reporting. It is significant that FDA's standard approach for evaluating drug-induced suicidality is to analyze placebo controlled clinical trial data. This was FDA's approach in its review of SSRIs, as well as AEDs. That FDA chose to evaluate suicide-related events reported in the placebo controlled

The placebo controlled trial data, summarized in Pfizer's June 2006 submission to the FDA, support my opinion that there is no reliable evidence that Neurontin is associated with an increased risk of completed suicides, suicide attempts, suicide gestures, or suicide ideation. Pfizer's June 2006 submission followed the FDA's protocol for assessing whether a medication increases the risk of suicidality. This protocol was developed by clinicians at Columbia University and is referred to as the Columbia Suicidality Classification Project. The protocol is FDA's standard approach for evaluating possible suicide-related events in clinical trials. (References 18, 19).

There were no cases of completed suicide or attempted suicide in any of the placebo-controlled studies, which involved 5,194 patients. There were no cases of "preparatory acts towards imminent suicidal behavior." And the incidence of suicidal ideation was nearly identical to that of placebo patients, specifically 0.039% of Gabapentin patients and 0.037% of placebo patients reported suicidal ideation. Only one of the 5,194 Gabapentin-treated patients exhibited self-injurious behavior, intent of which was unknown. In terms of the single most reliable scientific evidence – placebo controlled clinical trial data – Neurontin did not demonstrate any increased risk of suicide.

Any argument that these studies are meaningless because they are underpowered is flawed. The FDA has never concluded that the studies are meaningless because they are underpowered. This argument is also refuted by the fact that the postmarketing experience, which includes almost 14 million patient years, does not show an increase in suicide among Neurontin users. In fact, the number of suicide events in the postmarketing experience is <u>far below</u> what one would expect given the high risk population for whom Neurontin is prescribed (epileptics, chronic pain patients, and psychiatric patients).

---

studies is also significant. It is notable that one of plaintiffs' experts, Professor Michael Trimble, when asked if it was his opinion, "as a scientist, that the incident rates of completed suicide, suicide attempt and suicidal ideation from randomized double-blind placebo-controlled clinical trials are not relevant to a causal assessment of whether ... Gabapentin, has a causal association with either of those 3 outcomes," responded, "That is my opinion." Trimble Depo at 256. This statement is inconsistent with FDA's position and contrary to the generally accepted view of the scientific community for evaluating whether is associated with suicide.

### *The combined clinical-trial data fail to show an association between Neurontin and suicide or suicide attempt.*

The results of Pfizer's June 2006 submission are consistent with an earlier analyses that Pfizer submitted to the FDA in September 2004.  The September 2004 submission contained the results of a search for suicide-related events in 92 Phase 2-4 clinical studies included in Pfizer/Warner-Lambert's U.S. regulatory submissions.  The analysis revealed only two completed suicides and 12 suicide attempts out of a population of over 9,000 patients and 4,495 patient-years of exposure.  One of the suicides involved a patient who had stopped taking Neurontin six months before the suicide.  One or two suicides in 4,495 patient years of exposure is consistent with or below the background rates of suicide in the epilepsy, psychiatric, and chronic pain populations prescribed Neurontin. Given the accepted best estimate of 10 to 25 attempted suicides for every completed suicide, a total of 12 attempted suicides in 4,495 patient years is well below the rate expected in these populations.  Accordingly, these data do not support any association between Neurontin and suicide.

There were no suicide-related events reported by any patient in the studies of Neurontin in psychiatric populations.  In three well-controlled randomized trials studying Neurontin in patients with psychiatric disorders -- panic disorder, bipolar disorder, and social phobia --there was also no increased risk of anxiety or depression with Neurontin.  Using Hamilton Depression (or HAM-D) and Hamilton Anxiety (HAM-A) scales, these studies showed no significant differences from baseline reports of depression or anxiety at any time during the study period.  These results indicate that, in these psychiatric populations, there was no worsening of depression or anxiety.

### *There is no epidemiologic evidence to support the argument that Neurontin increases the risk of suicide in "susceptible" individuals*

Just as there is no evidence of an association between Neurontin and suicidality in the entire Neurontin population, there is no reliable clinical or epidemiologic evidence that Neurontin is associated with or increases the risk of suicidality in any "susceptible" sub-

- 12 -

group of Neurontin users.  While there is no doubt that certain subgroups of Neurontin users, such as those with bipolar disorder, are at heightened risk of suicidal behavior compared to the general population -- and even compared to the overall Neurontin population -- there is no clinical, epidemiological, or other human experiential data to support the conclusion that Neurontin increases the risk of suicide in any subgroup beyond background rates or in comparison to the same population not being treated.  The only epidemiological article cited by the plaintiffs' experts (Collins & McFarland) evaluates the risk of suicide specifically in a sub-group of bipolar patients.  This article supports the conclusion that, if anything, the risk of suicide and suicide attempt is reduced when untreated bipolar patients are given Neurontin.  There is nothing in this article that supports the proposition that Neurontin is associated with or causes suicidal behavior in a "susceptible minority" of individuals taking Neurontin.

## VI.   THE EPIDEMIOLOGIC EVIDENCE CITED BY PLAINTIFFS DOES NOT ESTABLISH AN ASSOCIATION BETWEEN NEURONTIN AND SUICIDE.

### *The Collins and McFarland study supports the proposition that Neurontin is protective for suicide*

Plaintiffs' experts have relied on the article by Collins & McFarland entitled "Divalproex, Lithium and Suicide among Medicaid patients with Bipolar Disorder," published in the Journal of Affective Disorders in 2007 for epidemiologic support that Gabapentin has the capacity to contribute to suicide.  In addition, Dr. McFarland has been proffered as an expert for the plaintiffs, basically submitting this article as his report. This article compared suicide deaths and attempts in 12,662 Medicaid patients diagnosed with Bipolar Disorder and treated with medication from 1998 to 2003.  The three primary medications were Divalproex, Gabapentin and Lithium.  In terms of frequency of use, Divalproex was the most common mood stabilizer (33%), followed by Gabapentin by 32% and Lithium 25%.

Dr. Kruszewski states in his report states that "my opinions are supported in the recent research report by Collins and McFarland who recognize an increase risk of completed

suicide in those patients exposed to Gabapentin as compared to those exposed to Lithium." It is my opinion that this article does not support the premise that there is epidemiologic support that Gabapentin has the capacity to contribute to suicide. In fact, this article supports the opposite conclusion -- that bipolar patients prescribed Gabapentin have a lower rate than would be expected in an untreated bipolar disorder population.

In the literature review section of the article by McFarland, he references several articles by Baldessarini which review suicidal behaviors in bipolar disorders. (Reference 7). Specifically, Dr. McFarland refers to the annual completed suicide rate in untreated bipolar disorder patients, which is 1% or 1 in 100, and the annual suicide attempt rate, which is 4% or 4 in 100. These risks are 100 times the risk for completed suicide, and 10 times the risk for suicide attempts, in the general population. Furthermore, McFarland acknowledges that Lithium reduces the risk of suicide in bipolar patients by 9-fold to 1 in 1,000 and for suicide attempts by 4-fold to 1 in 100. Baldessarini and others have demonstrated that among mood stabilizers, Lithium has been consistently shown to be the only mood stabilizer to have a protective effect against suicide. (Reference 20).

In the McFarland article, the suicide completion rate in the patients treated with Lithium was less than 1 per 1,000 patient-years of exposure (0.78). In the untreated bipolar patient population, the expected suicide rate would have been 10 per 1,000. Thus, an approximately nine-fold reduction in the suicide rate for the Lithium treated population occurred. In the Gabapentin group, there were 3.5 completed suicides per 1,000 patient-years of exposure with an expected suicide rate for bipolar patients of 10 per 1,000 patient-years of exposure. Thus, in this study, those treated with Gabapentin had an approximately three-fold reduction in suicide risk.

This article by McFarland demonstrates that Gabapentin also has an ability to reduce suicide risk. Although the reduction is different from Lithium, 3-fold to 9-fold, it would not be expected to be the same given that Lithium has been demonstrated to be the only mood stabilizer that consistently has a suicide protective effect, which has been replicated in multiple studies. (Reference 6). Furthermore, in terms of suicide attempts, the Lithium rate was approximately 6 per 1,000. The expected suicide attempt rate in bipolar disorder patients is 40 per 1,000; therefore, the McFarland study demonstrates that

- 14 -

Lithium had a 6.5 fold reduction of suicide attempt rate, whereas Gabapentin had a 4-fold reduction of suicide attempt rate, given that Gabapentin had a 9.5 suicide attempt rate per thousand patient-years of exposure.

The McFarland study demonstrates that Gabapentin is associated with a reduction in both risk for completed suicides (3-fold) and suicide attempts (4-fold). Moreover, as the McFarland article further discusses, this reduction may even be greater due to the acknowledgement by McFarland that the Gabapentin users may have also been people with chronic pain, which would only further increase the underlying risk of suicide. In essence, Dr. McFarland concurs with the hypothesis that Gabapentin has a protective effect against suicide and suicide attempt.[5] Nothing in the Collins & McFarland study supports the conclusion that Neurontin is associated with or causes suicide or suicide attempt.

### *Endpoints, such as non-suicide psychiatric adverse events, are not reliable to show causation.*

Plaintiffs' experts have focused on psychiatric events other than suicide, such as depression, anxiety, hostility, nervousness and psychosis, to support their opinions that Neurontin causes suicide. This is not an accepted and reliable approach to determine whether Neurontin causes suicide. The FDA has never asked for analysis of psychiatric events other than suicide or suicide attempt because this is not the generally accepted methodology. The use of other psychiatric adverse events is restricted to rare instances – when the event is relatively easily measured and predicts a rare or distant outcome, "but which is not itself a direct measure of either harm or clinical benefit." (Reference 21).

---

[5]   Dr. McFarland was asked in his deposition about whether the findings in his study support Gabapentin demonstrating a lower rate of suicide and suicide attempts in the Gabapentin users. On page 148 line 16, Dr. McFarland disagreed with this observation responding that the analysis by Dr. Baldessarini "involving over 30 studies going back many decades with numerous papers from Europe...comparing 12,662 Medicaid clients in 1998 to 2003 vs. people across the world 30 years ago is apples and oranges." However, when asked the hypothetical "if the populations were the same, he answers page 149 line 13 "if one were to accept this hypothesis, then I would concur." I would be prepared to offer additional references by Baldessarini which indicate that the purpose of a meta-analysis is to address the issue of publication and/or population bias. The issue here is not the homogeneity of a Medicaid population, but rather the homogeneity of a bipolar disorder population. Importantly, bipolar disorder is the only psychiatric illness in which the suicide rate is equal in men and women. Thus, his argument that the studies wouldn't apply to the

The presence of other psychiatric adverse events is not a good measure of the outcome unless it has "a good positive predictor value, and a good negative predictor value, i.e. it should be both sensitive and specific." The psychiatric events plaintiffs' experts rely on are neither sensitive nor specific to predicting suicide or suicide attempt. (Reference 6). For example, 14 million people experience depression in any given year, but only 20,000 actually commit suicide. Events like depression may be a clinical symptom that can occur in a suicide, but they are not factors that cause suicide. I am aware of no scientific basis or any peer-reviewed literature supporting the use of other psychiatric events which are clinical symptoms and not predictors of suicide, to analyze suicide causation. (Reference 22) ("In other words, one cannot assume, sic et simpliciter, that bipolar depression is a 'surrogate endpoint' for suicide risk.").

For many of these psychiatric adverse events, there is actually evidence in the controlled trials that the incidence was higher in placebo than with Neurontin. For example, the epilepsy and neuropathic pain studies show that more patients on placebo experienced depression than on Neurontin. (Reference 23). The controlled data on all "psychobiologic" adverse events show a higher percentage of these events in placebo (9.0%) than Neurontin (8.3%). (Reference 24). This is also true for hostility: 0.7% placebo compared to 0.0% Neurontin. (Reference 25). And anxiety: 1.3% placebos compared to 0.7% Neurontin. (Reference 26). Psychosis, paranoia, personality disorder, hallucination, and apathy, were more common in placebo than Gabapentin. (Reference 25). It is my opinion that the accepted methodology to determine whether Neurontin causes suicide is to follow the FDA's standard approach – to analyze the controlled clinical data on suicide events, not other psychiatric adverse events.

### *Even if the epidemiologic data did show an association, which it does not, the medical and scientific evidence fails to establish causation.*

If an association has been found, researchers consider whether the association reflects a true cause-effect relationship. (Reference 16). The reliable generally accepted method for determining whether an association is causal involves application of nine principles

Medicaid population is very thin

first introduced by Sir Austin Bradford Hill and generally known as the "Bradford Hill" criteria. (Reference 16). These criteria are:

1. temporal relationship;
2. strength of association;
3. dose-response relationship;
4. replication of the findings;
5. biological plausibility (coherence with existing knowledge);
6. consideration of alternative explanations;
7. cessation of exposure;
8. specificity of the association; and
9. consistency with other knowledge

Analysis of these factors demonstrates that there is no reliable evidence that Neurontin causes suicide.   Of the foregoing factors, "consideration of alternative explanations" is critical in assessing whether Neurontin can cause suicide.  This factor alone would be sufficient to rule out Neurontin on the list of possible causes for suicidal behavior.  I have reviewed the ten initial Track One cases for consideration in analyzing the Bradford Hill criteria, and in particular, I have focused on the critical component of alternative explanations.

**Temporal association**

If a factor such as exposure to a medication is hypothesized or believed to cause a disease or adverse event (for example, suicide or suicide attempt), exposure to that factor must occur before the disease develops to establish the necessary temporal relationship (i.e., timing) between the presence of the factor, exposure to it, and the development of the disease.  The before-and-after timing is not by itself proof of causation, but it must be present for causation ultimately to be established.  In terms of temporal relationship, I have evaluated the 10 indexed cases.  It is important to note that there is no consistent temporal relationship between the use of Neurontin and the suicide related event in any case.

- 17 -

**Temporal Relationship between Neurontin and Suicide Related Events in the 10 Representative Cases**

| Case (alphabetical listing) | Time on/off Neurontin prior to suicide related event |
|---|---|
| Bentley | *10 months* |
| Fenelon | *Approximately 3 years* |
| McGee | *2 months* |
| Mendoza | *2 years* |
| Owens | *8 months* |
| Pursey | *19 months* |
| Roberson | *Approximately 2 years* |
| Smith | *Intermittently for 1 year* |
| Strickland | *Intermittently for 2 years* |
| Vercillo | *Intermittently for 6 month* |

This is significant and it should be noted that plaintiffs' expert, Robert Trimble, in his deposition stated that "The relationship with the time of taking the drugs to the reporting the adverse events is very relevant." This lack of consistent relationship would put into question any implication of a specific pharmacologic mechanism related to the event, such as a side effect of Neurontin or its specific pharmacologic actions.

This absence of any consistent temporal relationship is also supported by Pfizer's September 2004 analysis of attempted and completed suicides in Neurontin clinical trials. In its analysis, which the FDA has never disagreed with, Pfizer explained that "Duration of treatment in each case varied and did not appear to be a factor involved in either the cases of suicide or suicide attempt." (Reference 16).

A principle that is sometimes discussed in reference to temporal association is dechallenge/rechallenge. This refers to the cessation of an event upon stopping the drug (dechallenge), and then a recurrence of the event upon reinstituting the medication (rechallenge). It is significant that among the ten cases that I reviewed, there were two in

- 18 -

which a person experienced a suicide attempt while on Neurontin, but then continued to take Neurontin subsequent to the suicide attempt, and did not have another attempt. This is known as a "negative rechallenge." There were no cases of positive rechallenge, that is, the person took Neurontin, experienced suicidality, stopped Neurontin and then the suicidality reoccurred upon rechallenge. In any event, had such "rechallenge" occurred in any one of these sample cases, it would not be considered reliable evidence of causation. In fact, rechallenge with events that are subjective or selective in nature – such as suicidality or reported psychiatric conditions – is suspect and not useful for establishing causation. (Reference 27).

**Strength of Association, Dose-response relationship, and Specificity of association**

The stronger the relationship between exposure to a putative causal agent and a hypothesized effect, the more likely that the connection is causal. This essentially means that, if it is true that a medication causes a particular adverse event, such as suicide or suicide attempt, then the use of the medication should lead to a greater incidence of suicide related events in persons exposed to the medication as compared with similar, unexposed persons. Larger increases in the incidence of the outcome of interest in exposed persons compared with unexposed persons (*e.g.,* higher relative risks) support a causal relationship more strongly than do smaller increases. No increase in risk is inconsistent with a causal relationship. "The relative risk is one of the cornerstones for causal inferences." (Reference 16).

As I have stated, it is my opinion that there is no scientifically reliable clinical or epidemiologic evidence of an increased risk of suicide with Neurontin. There were no cases of suicide identified in the placebo controlled studies, regardless of treatment. In the non-placebo controlled studies, there was one case of suicide that occurred during Gabapentin treatment, and another that occurred approximately six months after discontinuation. These results are consistent with the published literature for suicide and comparable patient populations in which Gabapentin has been studied or used, and they do not indicate any increased risk of suicide or suicide attempts with Gabapentin therapy.

- 19 -

Since there is no evidence of an association between Neurontin and suicide, there is obviously no "strength of association" to assess. The same is true for "specificity of association" and "dose response relationship," which suggests that intensity of exposure will increase the incidence of the event. Because there is no increased incidence of suicide with Neurontin, these factors cannot be used to suggest an association where one does not exist to begin with.

## Consistency (replication of findings)

Generally, this principle reflects the logic that like experiments should produce like results. In the case of studies of associations between exposure to medications and possible adverse events, a large number of consistent findings across multiple studies tend to support the existence of a true association that may be causal, whereas inconsistent results do not. In the Neurontin situation, it is important to emphasize that there is no clinical, epidemiologic, or human experimental data that demonstrates that Neurontin increases the risk of suicide. Importantly, not one of plaintiffs' experts has conducted any research demonstrating that Neurontin is associated with an increased risk of suicide. Not one of plaintiffs' experts has published in a peer reviewed journal their opinions in this litigation that Neurontin causes suicide. The clinical trials do not demonstrate any increased risk. The McFarland article does not demonstrate increased risk. The absence of studies showing an association between Neurontin and suicide, much less replication of any such finding, weighs heavily against any causal inference.

## Biological plausibility

The connection between the proposed factor and disease should be consistent with the present scientific knowledge, for example, knowledge of the pathophysiology of the disease or outcome (such as suicide) and the pharmacological properties of a medication. To the best of my knowledge, there is no scientific study in the published literature opining or stating that Neurontin has a mechanism of action that causes suicide. I am familiar with the opinions of Dr. Charles Taylor and Dr. Gerard Sanacora which state that Neurontin's known mechanism of action is inconsistent with the theory that Neurontin causes suicide or that there is any biologically plausible explanation for how Neurontin

- 20 -

might cause suicide. Given the opinions of these noted experts, and the absence of any scientific publications stating that Neurontin has a mechanism of action that causes suicide, it can hardly be said that this factor would support a conclusion that Neurontin causes suicide.

## Consideration of alternative explanations (confounding factors)

Where exposure to a hypothesized causal factor or agent appears to be associated with increased incidence of an outcome, investigators should consider other explanations for the relationship in question and determine whether one or more of those alternate explanations may account for the adverse event. In determining causation in the context of suicide, it is my opinion as a suicidologist who specializes in this precise area, that the consideration of alternative explanations, that is, the presence of multiple suicide risk factors and other confounding factors, is the critical element in considering causation.

While plaintiffs' experts acknowledge that people taking Neurontin have underlying conditions that increase the risk of suicide, none of them specifically address the underlying conditions or the suicide risk factors that generally accompany suicidal behavior. In clinical practice, this is absolutely necessary. My opinion is that no judgment about general causation can be made without "considering the possibility of bias and confounding" and ruling out underlying risk factors as the cause for suicide. (Reference 16).

The scientific community widely recognizes a variety of risk factors for suicide, including: prior suicidal behavior; evidence of hopelessness; advanced age; family history of suicide or mental illness; evidence of impulsiveness, panic attacks, or anxiety; presence of psychiatric illness, with particular attention to mood disorders, schizophrenia, substance use disorders, anxiety disorders, and personality disorders; medical conditions including nervous system disorders and chronic pain; and psychosocial stressors or "trigger events," such as real or perceived interpersonal losses, financial difficulties, changes in socioeconomic status, family discord, domestic violence, and past or current sexual or physical abuse or neglect.

- 21 -

I have reviewed in depth ten representative cases in the Neurontin litigation. There were seven suicides and three suicide attempts. The principle of alternative explanation explains the suicide events that have occurred in every case. In other words, in each of the ten representative cases, there are multiple risk factors for suicide and, in each case; it is my opinion that the suicide events can be entirely explained without regard to Neurontin. In other words, in every case, had the individual not been taking Neurontin, the suicide can be entirely explained by the presence of independent, established risk factors. For each case I reviewed, the suicide risk factors that, in my opinion, to a reasonable degree of medical certainty, explain these individuals' suicide behaviors are listed:

**Bentley:**     Prior to his suicide, Mr. Bentley had a long-standing history of alcoholism. He suffered from underlying depression and was diagnosed with chronic anxiety, characterized by "high anxiety attacks." Mr. Bentley exhibited suicidality on at least one occasion prior to using Neurontin. There is a history of molestation when Mr. Bentley was a child. Mr. Bentley's suicide was preceded by a series of financial, marital, and work-related stressors, culminating in him hanging himself at his work.

**Fenelon/Moore:**     According to the medical records, in 1995, prior to using Neurontin, Ms. Moore attempted suicide. Ms. Moore suffered from alcoholism and chronic depression and fatigue. There was a family history of mental illness (sister diagnosed with schizoaffective disorder, brother with history of alcoholism). In addition, she suffered from chronic pain (her medical records note that decedent suffered from "excruciating pain, cannot sleep, pain wakes her up") and chronic hepatitis.

**McGee:**     Ms. McGee suffered from a combination of joint pain and fibromyalgia. Her medical records prior to her suicide indicate that she suffered from persistent pain and discomfort. Prior to her suicide, Ms. McGee also suffered from a variety of psychosocial stressors, including financial problems. In her suicide note, Ms. McGee blamed the suicide on these financial stressors.

**Mendoza:**     To the extent that Mr. Mendoza actually attempted suicide (which is not clear from the records); his suicide attempt is explained by a long list of factors. Mr.

Mendoza attempted suicide several times (*e.g.,* at least two times) prior to using Neurontin. He suffered a severe head trauma prior to using Neurontin. Mr. Mendoza was diagnosed as bipolar and suffered from chronic depression. In addition, he is a poly-substance abuser (marijuana and crack cocaine). Mr. Mendoza had severe psychosocial stressors, including several domestic violence incidents, homelessness, and incarceration for assault. The "trigger event" for his alleged suicide attempt was his desire to find living arrangements (in-patient care at the hospital) after he was kicked out of his group home and found himself homeless.

**Owens:**     Mr. Owens had a complex medical history. He fell and slipped at work in 1994 and injured his hand and wrist. He developed chronic pain which limited his ability to work and/or enjoy life activities. Mr. Owens underwent two surgeries to help with his chronic pain. He also had long-standing depression and made suicidal statements to family members suggesting that if he could not find work, he would kill himself.

**Pursey:**     Mr. Pursey had a long psychiatric history dating back to 1976, when he was involved in an accident which resulted in a coma. Subsequently, he developed agoraphobia and panic. He was psychiatrically hospitalized in 1980 with symptoms of acute depression. Mr. Pursey was ultimately diagnosed as bipolar. Mr. Pursey had a long history of intermittent suicidal ideation prior to using Neurontin. Mr. Pursey's suicide was triggered more acutely by marital dysfunction and financial stressors.

**Roberson:**     Mr. Roberson had a long history of treatment-resistant depression and chronic pain. He also had a 40-year history of alcoholism and had gone through a detoxification program approximately 18 months before his suicide. Several weeks before his suicide, he resumed drinking, which led to a confrontation with his wife who threatened—for the first time in their long marriage—to leave him, as well as arguments with his son and daughter. Mr. Roberson left a suicide note in which he apologized for not being able to stop drinking and stated that he was no good to his wife. Roberson's suicide is explained by his decision to resume drinking and the marital and familial conflict this decision caused, coupled with his pre-existing depression and chronic pain.

**Smith**:  Mr. Smith's suicide is explained by his severe chronic pain.  In his suicide note, he himself attributed his suicide to his chronic, severe pain.  His pain led to and culminated in severe hopelessness, following his physicians telling him that he was not a candidate for any further surgery to relieve his pain.

**Strickland**:  To the extent Mr. Strickland actually attempted suicide, it is explained by his history of mental illness (paranoid schizophrenia), poly-substance abuse, and chronic pain.  Mr. Strickland also had a variety of psychosocial stressors which explain any suicidality, including an extensive criminal history and unresolved grief regarding the murder of his son.

**Vercillo**:     Mr. Vercillo is a 34-year-old single white male with a long history of substance abuse (LSD, ecstasy, and "mushrooms"), anxiety symptoms, and depressive symptoms.  He is characterized as impulsive, demanding, and oppositional.  Mr. Vercillo has a long history of legal difficulties, including assault and domestic violence charges. In addition, there were multiple psychosocial stressors preceding the suicide attempt, including the inability to hold steady employment, living at home with parents, social isolation and lack of self esteem.

To summarize, in the context of analyzing whether a drug such as Neurontin can cause suicide behavior, it is proper and necessary to consider "alternate explanations." There is compelling evidence of suicide risk factors in every case that fully explains the suicide behavior.  The suicide risk factors present include psychiatric illness, co-morbid depression, anxiety, panic, alcohol abuse, treatment resistant depression, polysubstance abuse, psychotic illness, and significant physical illness in the form of chronic pain and functional limitations, and compounded psychosocial stressors.  Based on these facts, any causal inference related to Neurontin is scientifically and medically implausible.

**Cessation of Exposure**

Like many of the others, this factor requires evidence of an association to assess whether cessation of the exposure decreases the risk.  Plaintiffs' experts do not cite to any clinical,

epidemiologic or human experimental data that suggests that once Neurontin ingestion is stopped, the risk of suicide decreases, this factor does not apply.

**Consistency with other knowledge**

Suicide rates have decreased from 1993 until 2004, at a time when Neurontin sales were generally rising. Spontaneous reports demonstrate that the number of observed cases is <u>lower than</u> expected in the patient population taking Neurontin. These facts do not support the proposition that Neurontin is causally associated with suicide.

## VII.   CONCLUSION

To summarize, suicide is a multi-factoral event. Individuals who commit suicide are known to have a combination of medical and psychiatric disorders. Neurontin is prescribed to persons who have a combination of these risk factors, including epilepsy, chronic pain, and/or psychiatric illness. It would not be unexpected or unusual therefore that patients who are prescribed Neurontin commit suicide. But when compared to the incidence of suicide in these populations, in both controlled studies and adverse event data, incidence and reported rate of suicide for Neurontin is <u>lower</u>. Importantly, there is overwhelming support from the human experimental evidence, published literature, and application of generally accepted principles of causation that Neurontin is not associated with an increased risk of suicide. It is my opinion, to a reasonable degree of medical and scientific certainty, that there is no reliable scientific evidence that Neurontin is associated with or causes suicide.

Sincerely,

Douglas G. Jacobs, M.D.

- 25 -

# References

1.  Goldsmith SK, Pellmar TC, Kleinman AM, Bunney WE (Eds). Reducing Suicide: A National Imperative (2002). Washington, DC:National Academies Press.

2.  Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS) [online] (2004 Data Analysis) Available from URL: www.cdc.gov/ncipc/wisqars.

3.  Jacobs DG. A 52-Year-Old Suicidal Man. JAMA 2000; 283(20):2693-2699.

4.  Harris EC, Barraclough B. Suicide as an Outcome for Mental Disorders. A Meta-Analysis. Br. J. Psychiatry 1997; 170:205-228.

5.  Jacobs DG (Ed.) The Harvard Medical School Guide to Suicide Assessment and Intervention (1999). Jossey-Bass:New York, New York.

6.  American Psychiatric Association. APA Practice Guidelines for the Assessment and Treatment of Patients with Suicidal Behaviors. American Journal of Psychiatry 2004; 160 (11).

7.  Baldessarini RJ, Pompili M, Tondo L. Suicide in Bipolar Disorder: Risks and Management. CNS Spectr 2006; 11(6):465-471.

8.  Kanemoto K, Kawaski J, Mori E. Violence and Epilepsy: A Close Relation Between Violence and Postictal Psychosis. Epilepsia 1999; 40(1):107-109.

9.  Kanner AM, Stagno S, Kotagal P, Morris HH. Postictal Psychiatric Events During Prolonged Video-Electroencephalographic Monitoring Studies. Arch Neurol 1996 Mar; 53(3):258-63.

10. Schmitz EB, Robertson MM, Trimble MR. Depression and Schizophrenia in Epilepsy: Social and Biological Risk Factors. Epilepsy Research 1999; 35:59-68.

11. Kaplan MS, McFarland BH, Huguet N, Newsom JT. Physical Illness, Functional Limitations and Suicide Risk: A Population-Based Study. American Journal of Orthopyshiatry 2007; 77(1):56-60.

12. Bush KA, Fawcett J, Jacobs DG. Clinical Correlates of Inpatient Suicide. J Clin Psychiatry 2003; 64:14-19.

13. Victoroff JI, Benson F, Grafton ST, Engel J Jr, Mazziotta JC. Depression in Complex Partial Seizures. Electroencephalography and Cerebral Metabolic Correlates. Arch Neurol 1994 Feb; 51(2):155-163.

14. Fisbain DA, Cutler R, Rosomoff HL, Rosomoff RS. Chronic Pain-Associated Depression: Antecedent or Consequence of Chronic Pain? A Review. Clinical Journal of Pain 1997; 13(2):116-137.

15. Jacobs DG, Deutsch NL, Brewer M. Suicide, Depression and Isotretinoin: Is There a Causal Link? J Am Acad Dermatol 2001; 45:S168-75.

16. Saks MJ, Faigman DL, Kaye DH, Sanders J (Eds). Annotated Reference Manual on Scientific Evidence (2005-2006). St. Paul, Minnesota: Thomson West;526-535.

17. Letter from Dr. Russell Katz, Director, FDA Division of Neuropharmacology, to Andrew Finkelstein (April 12, 2005).

18. Letter from Dr. Russell Katz, Director, FDA Division of Neuropharmacology, to Pfizer (March 16, 2005).

19. Posner K, Oquendo MA, Gould M, Stanley B, Davies M. Columbia Classification Algorithm of Suicide Assessment (C-CASA): Classification of Suicidal Events in the FDA's Pediatric Suicidal Risk Analysis of Antidepressants. Am J Psychiatry 2007; 164:1035-1043.

20. Baldessarini RJ, et al. Decreased Risk of Suicides and Attempts During Long-Term Lithium Treatment: A Meta-Analytic Review. Bipolar Disorder 2006; 8:625-639.

21. Fathalla MF. A Practical Guide for Health Researchers (2004). Nasr City, Cairo:WHO Regional Publications.

22. Ghaemi SN, HSU DJ, Soldani F, Goodwin FK. Antidepressants in Bipolar Disorder: The Case for Caution. Bipolar Disord 2003; 5(6):421-33.

23. Sharon Hertz, M.D., FDA Review at p. 77, Table 7.20 (May 24, 2002).

24. First Safety Update, 20-235, at Table 8 (May 29, 1992).

25. Integrated Summary of Safety, NDA 20-235, Appendix B.33 (November 18 (19) 1991).

26. First Safety Update, 20-235, Table 9 (May 29, 1992).

27. Girard M. Oral Provocation Limitations. Br J Clin Pharmac 1987;23:73-79; Girard M. Conclusiveness of Rechallenge in the Interpretation of Adverse Drug Reactions. Br J Clin Pharmacol 1987; 23(1):73-9.