# EXHIBIT K

1

1        U.S. DISTRICT COURT OF MASSACHUSETTS

2                * * * * * * * * *

3     IN RE: NEURONTIN MARKETING SALES, PRACTICES AND

4                 PRODUCTS LIABILITY

5                * * * * * * * * *

6                        *

7     SHEARER,            *   Docket No.

8        Plaintiff       *   1629

9        vs.             *   Master File No.

10    PFIZER, INC.,       *   04-10981

11       Defendant        *

12                        *

13                * * * * * * * *

14               DEPOSITION OF

15          STEFAN P. KRUSZEWSKI, M.D.

16               January 14, 2010

17

18

19

20

21

22

23

24

25    Job No. 234312

26

1   already have been, is that I don't think there's
2   anything new that can be done. Obviously, in any
3   case and in any scientific question, more analysis is
4   --- can be better than less analysis and more
5   quantitative analysis can be better than less, but in
6   terms of doing a psychological autopsy for the
7   precedents for --- or antecedents of death, I think
8   this was reasonably rigorously done.
9      Q. So I could go --- well, let's do it this way.
10   If I had similar background and education and
11   experience and did an equally rigorous analysis of
12   all of the information that you've described and I
13   came to a different conclusion, is there any kind of
14   test we could do to determine who was right and who
15   was wrong?
16            ATTORNEY FROMSON:
17            Objection as to form.
18      A. I think it's a good question. I don't think
19   necessarily so, because any kind of analysis can have
20   multiple experts rendering a difference of opinions
21   based upon the same kind of evidence, even the same
22   opinions based upon rigorously controlled clinical
23   trials, as you know.
24   BY ATTORNEY OHLEMEYER:
25      Q. And in fact, there are some areas of medicine

27

1   where the same person can review data on different
2   occasions and come to different results about it;
3   right?
4            ATTORNEY FROMSON:
5            Objection. Incomplete hypothetical.
6      A. Can the same person review different data and
7   come to different conclusions?
8   BY ATTORNEY OHLEMEYER:
9      Q. No, same data.
10      A. Same data and come to different ---.
11      Q. For example, a pathologist or a radiologist
12   could look at the same x-ray today that he or she
13   looked at last week and read it differently?
14            ATTORNEY FROMSON:
15            Objection. Incomplete hypothetical.
16      A. Well, it's certainly hypothetically plausible.
17   BY ATTORNEY OHLEMEYER:
18      Q. Well, you've heard of it; right?
19      A. Oh, absolutely.
20      Q. Yeah. It's called intra-observer variability?
21      A. Yes.
22      Q. Likewise, two different radiologists can look at
23   the same x-ray and come to different conclusions
24   about it?
25      A. Yes.

28

1      Q. And two different people with the requisite
2   background, education and experience could look at
3   everything you looked at and come to different
4   conclusions about it; correct?
5      A. Yes.
6      Q. And those conclusions, although different, could
7   be, you know, strongly held and sincerely held; isn't
8   that right?
9            ATTORNEY FROMSON:
10            Objection as to form.
11      A. Yes, I believe so.
12   BY ATTORNEY OHLEMEYER:
13      Q. In a case like this, it's a little harder than
14   it is in other areas of medicine to figure out
15   whether there's a right or wrong answer; isn't it?
16            ATTORNEY FROMSON:
17            Objection as to form.
18      A. It would depend upon how you're saying harder.
19   You can come across --- you can determine an answer
20   based upon all the evidence and information that is
21   available, and whether that's more right or more
22   wrong --- as we've already said, psychiatry and
23   psychiatry --- psychiatric analysis tends
24   fundamentally, excuse me, to be more subjective, so
25   it probably lends itself to more disparity in

29

1   responses.
2   BY ATTORNEY OHLEMEYER:
3      Q. What's the difference between a diagnosis and a
4   cause?
5            ATTORNEY FROMSON:
6            Objection as to form.
7      A. I don't think I specifically, you know, have a
8   direct response to that. Diagnosis --- however,
9   having said that, diagnosis implies a differential
10   consideration of multiple factors, pro and con, in
11   response to a question, and as you know, since you've
12   read my report, you know, I try to layout the factors
13   that I considered pro-suicide degenic factors that
14   would increase the likelihood of Mr. Shearer's
15   suicide as well as factors that would protect him
16   from suicide and that was part and parcel of the
17   differential diagnosis.
18   BY ATTORNEY OHLEMEYER:
19      Q. Is ---?
20      A. Cause ---.
21      Q. I'm sorry. Go ahead.
22      A. Cause to me is a more specific --- my response
23   here is specific to these questions at hand, is that,
24   as you already know, I believe that Neurontin is a
25   substantial cause to his suicide. There may be

8 (Pages 26 to 29)

50

1  time of his death; right?
2  A. That is correct.
3  Q. And there's really no eye witness testimony, is
4  there, that he actually took Neurontin on the day of
5  his death?
6          ATTORNEY FROMSON:
7              Objection to form.
8  A. Not on the day of his death. We have only the
9  testimony that he had been prescribed Neurontin. He
10  commented that it was helpful to his pain previously,
11  and that at one point it was ineffective and so
12  wanted to go off of it. We have the adjustment of
13  doses over a period from October 14th of 2000 until
14  his death, but we don't have any --- there is nothing
15  to specifically find that he was taking it the day he
16  died.
17  BY ATTORNEY OHLEMEYER:
18  Q. Now, he'd been prescribed Neurontin since about
19  the middle of October the year 2000; is that right?
20  A. I believe the first prescription under the
21  authorization of Dr. Haze and written for by Dr.
22  Angevine, who I'm assuming was Dr. Hudson and
23  probably got married, was the first person to write
24  for the prescription for Neurontin.
25  Q. And if we assume that was in October of 2000,

51

1  then about nine months later, you've identified a
2  reference to a telephone call that Mr. Shearer made
3  to Dr. Sullivan?
4  A. I think in August of 2001.
5  Q. It's actually July 10th,---
6  A. Or July ---.
7  Q. --- that your report says, ---
8  A. Yes.
9  Q. --- where they are discussing his free
10  testosterone level. Do you recall that?
11  A. Yes.
12  Q. Why would they be discussing his testosterone
13  levels?
14  A. One of his problems that I elaborated in my
15  report is that he complained of erectile dysfunction
16  repeatedly and he was taking Viagra, and I assume he
17  was taking testosterone for the same reason.
18  Q. Now, in the next sentence the doctor points out
19  that Mr. Shearer also plans a holiday from Neurontin.
20  Do you recall that?
21  A. Yes.
22  Q. And you also recall that's not the first
23  reference to a holiday from a prescription medicine
24  that Mr. Shearer makes in his medical history; is it?
25          ATTORNEY FROMSON:

52

1              Objection. Lack of foundation.
2  A. It is not the first one. That's correct.
3  BY ATTORNEY OHLEMEYER:
4  Q. He made another reference to taking a holiday
5  from Prozac at one point; didn't he?
6  A. I believe that he did.
7  Q. And that was because he thought or suspected it
8  might be exacerbating his erectile dysfunction; isn't
9  that right?
10          ATTORNEY FROMSON:
11              Objection. Lack of foundation.
12  A. I don't remembering --- well, I don't
13  remembering the specific wording, that he thought
14  Prozac was responsible for his --- or aggravated his
15  erectile dysfunction. I do remember that there was a
16  discussion between him and his PCP and/or neurologist
17  that antidepressants can cause problems with gaining
18  an erection, so let's take a holiday from that to
19  think about it. And I also believe that he at times
20  took holidays at least earlier on in his life for
21  Ritalin as well.
22  BY ATTORNEY OHLEMEYER:
23  Q. Why was he taking Ritalin?
24  A. He had a diagnosis of attention deficit, and he
25  had been taking, as had Ivor --- as you know, for a

53

1  long time, they'd been taking Ritalin.
2  Q. He was taking --- he was prescribed Ritalin at
3  the time of his death; isn't that right?
4  A. Yes.
5  Q. And in the months prior to his death, it appears
6  from the records he was taking large amounts of
7  Ritalin; doesn't it?
8          ATTORNEY FROMSON:
9              Objection to form.
10  A. I don't think we know that. The --- we have an
11  indication that he was probably taking five
12  milligrams four times a day. There's also my
13  supposition that since he had reported, I believe, to
14  his doctor that he --- 27 pills went down the sink or
15  something, that that leads me to suspect that he
16  might have been taking one more a day or something
17  like that. Over the course of his life, he had been
18  taking anywhere from, I believe this to be accurate,
19  5 milligrams a day up to 60 milligrams a day.
20  BY ATTORNEY OHLEMEYER:
21  Q. And you suspect that he didn't actually drop 27
22  pills down the sink?
23          ATTORNEY FROMSON:
24              Objection to form.
25  A. As --- I'm not sure if I said this when we met

14 (Pages 50 to 53)

70

1  Shearer's decision to commit suicide an abrupt
2  decision?
3      A. I believe it was --- let me ask you before I
4  answer that, your definition of abrupt is?
5      Q. Let me rephrase the question. When do you
6  believe that Mr. Shearer decided to commit suicide?
7      A. I believe that it was --- there's no way
8  specifically of knowing when the decision was made,
9  that it happened on the day in question ---- which
10  it's not meant as a rhetorical answer. It's that my
11  sense is that somewhere between when he woke up that
12  morning and whatever problems occurred that morning
13  and the telephone call, that his mood and behavior
14  was such and that the decision was made to commit
15  suicide, probably in combination with writing his
16  suicide note as well.
17      Q. What's that significance of a suicide note in
18  trying to determine when and why somebody's made a
19  decision to commit suicide? Let me withdraw that.
20      Let me just ask you simply, what's the
21  significance --- of what significance do you attach
22  to a suicide note, if any?
23      A. I think it gives us a reasonable understanding
24  that the decision was made to commit suicide as
25  opposed to not having one where it could have been a

71

1  homicide, obviously, and the investigation that
2  ensued, someone had to make a decision, was this a
3  suicide, a homicide or accidental. And it --- like
4  all of the other evidence in any case, it gives some
5  reflection of what was in the person's mind prior to
6  the actual act itself.
7      Q. We could --- I guess we could disagree about
8  whether it was the best evidence of what was in his
9  mind prior to the act, but it appears to be the only
10  evidence we have as to what was in this mind prior to
11  the act; isn't that right?
12      ATTORNEY FROMSON:
13      Objection. Form.
14      A. Just rephrase it for me. Are you asking was it
15  the only evidence?
16  BY ATTORNEY OHLEMEYER:
17      Q. Well, let me put it this way. You know, it goes
18  without saying, in a case without a note, I mean, we
19  have the benefit --- let's put it this way, with
20  respect to Mr. Shearer and what might have been going
21  on in this mind prior to the suicide, the note is of
22  some significance to try to make that determination?
23      A. It is. I mean, we still --- you know, I use my
24  clinical judgment and expertise to draw a conclusion
25  about the meaning as, would anybody, but I take from

72

1  it that he says that he loves Linda and Ivor and that
2  he's been --- that the decision is still somewhat
3  impulsive, and that's just a subjective opinion
4  because he feels like he's been hung up on, I think,
5  as he says for the last time. And so I think the
6  rest is probably my looking into what he might have
7  meant, but it strikes me as an impulsive statement,
8  the depressed statement and irritable statement.
9      Q. Is there a definition of an --- strike that.
10      In your profession, do you define impulsive
11  suicides as opposed to, you know, more --- again,
12  I'm not trying to be cute --- more thoughtful
13  suicides?
14      ATTORNEY FROMSON:
15      Objection. Form.
16      A. I don't know that there's a specific --- there
17  probably are specific definitions, let me put it that
18  way. I think carefully thought out suicides
19  occur --- you know, for people who live in Oregon,
20  and I'll use that as an example, and are critically
21  ill, they make a decision that they can't live that
22  way any longer and can be basically euthanized, which
23  is different process than the process of I'm so
24  uncomfortable and I'm so hurt and I'm so --- in such
25  a state of mind that I can't continue to live like

73

1  this, and that becomes relatively abrupt. So, you
2  know, it implies some quantitation of time, obviously
3  shorter if it's impulsive and longer if it's not.
4  BY ATTORNEY OHLEMEYER:
5      Q. Is the a range of time within which you would
6  character it as impulse outside of which you would
7  have your doubts?
8      ATTORNEY FROMSON:
9      Objection as to form.
10      A. There isn't one that I use.
11  BY ATTORNEY OHLEMEYER:
12      Q. Because if --- well, strike that.
13      There was a fair amount of time that passed
14  between the telephone call that we discussed and the
15  actual suicide; isn't that right?
16      ATTORNEY FROMSON:
17      Objection to form.
18      A. More than an hour ---.
19      ATTORNEY FROMSON:
20      Hold on a second. Objection to form,
21  reference to fair amount of time.
22  BY ATTORNEY OHLEMEYER:
23      Q. Go ahead.
24      A. Yeah, it's --- what you described is fair. It
25  was not instantaneously.

19 (Pages 70 to 73)

78

1  could become suicidal?
2       ATTORNEY FROMSON:
3       Are we still talking about before
4  Neurontin or after Neurontin?
5       ATTORNEY OHLEMEYER:
6       I'm talking about at any point --- at
7  any point prior to his death.
8       ATTORNEY FROMSON:
9       My objection is to form. Overbroad.
10  A. Yeah, I did not find good evidence that --- or
11  any evidence that he was suicidal for any protracted
12  period or any evidence of it prior to the time he
13  suicided. There's evidence of change of mood and
14  change in behavior, and Dr. Glenmullen did a good
15  job, in my opinion, of describing some of that. But
16  whether or not --- I believe those were suicidal
17  antecedents, but in terms of suicidal comments, no.
18  BY ATTORNEY OHLEMEYER:
19  Q. Aside from what you read in Dr. Glenmullen's
20  report, are there any changes in mood or behavior
21  that you've identified or can describe in Mr. Shearer
22  prior to the time he committed suicide, but after the
23  time he started taking Neurontin?
24       ATTORNEY FROMSON:
25       Objection. Form.

79

1  A. Read that back to me.
2  BY ATTORNEY OHLEMEYER:
3  Q. Let me just rephrase it. Can you describe for
4  me any changes in mood and behavior that were
5  observed in Mr. Shearer between the time he started
6  taking Neurontin and the day he committed suicide?
7  And if you want to --- you don't need to repeat Dr.
8  Glenmullen's report and it's not a memory test. If
9  you want to rely on that and adopt that, that's fine.
10  I just want to know what, if anything, the universe
11  of information is here with respect to your opinion?
12       ATTORNEY FROMSON:
13       Let me just object to the form to the
14  extent that the breadth of the question, I think it's
15  a little broad.
16  A. One, I think, everything I would say has
17  probably incorporated in Dr. Glenmullen's report
18  specifically starting on page 18. Two things stand
19  out to me. One is his --- actually a couple. I want
20  to take a moment just to write them down.
21  BY ATTORNEY OHLEMEYER:
22  Q. Sure.
23       ATTORNEY FROMSON:
24       I'll use this as an opportunity to
25  travel to the coffee pot.

80

1       ATTORNEY BARNES:
2       Thank you for supplying the coffee.
3  OFF RECORD DISCUSSION
4  A. Can you read the question back for me? Just
5  along a couple of points.
6  PREVIOUS QUESTION AND ANSWER READ BACK
7  A. Thank you. It's actually page 18, and moving
8  forward until Dr. Glenmullen describes his suicide.
9  Things --- without --- just I want to give a few
10  specifics that come to mind. Before Mr. Shearer ever
11  received Neurontin, there are complaints in the
12  medical records and treatment for his depression.
13  There are treatments for some anxiety. There are
14  treatments for some other problems obviously related
15  to his stroke and being post CVA with his left
16  hemiparesis.
17       The things that seem somewhat new to me is one
18  that is described by Dr. Glenmullen, which is that
19  he felt comfortable that Neurontin was helpful to
20  his pain. He was getting it as part of this
21  tri-part dose of, I believe, Flexeril and Vioxx and
22  Neurontin, but that was more helpful to his
23  neuropathic pain than previous problems that he had
24  with morphine and the hydrocodone, for example. And
25  yet, he said --- and this, again, is just repeating

81

1  what Dr. Glenmullen said. He said, you know, this
2  is helpful, but I'm feeling more nervous and then
3  subsequently describes more panicky feelings, so
4  that's one.
5       Two is his anger --- he's not necessarily
6  described as an angry fellow. The people who are
7  making the descriptions say that he's determined and
8  that he's passionate and a number of other things,
9  but his anger obviously got out of control when his
10  wife slapped him and then the police were called.
11  And of course, he describes some of the anger as
12  part of the reasons that he wanted to talk to his
13  psychiatrist, Dr. Lisa Catapano-Friedman. So that
14  behavioral change of being more angry and then
15  accepting some of the blame for the angry, I'm not
16  sure why I'm so angry, but I'm angry, is a change.
17       The next one is he purchased the gun. He goes
18  out with Sean and --- to, I guess, Pittsfield,
19  Massachusetts and buys a gun at some point. I know
20  there's --- I didn't --- I mentioned the gun in my
21  report. The reason I bring that up again is that
22  it's unclear whether he bought the gun for shooting
23  practice, which it appears from the recollections of
24  Sean and perhaps his wife, but in any case, he buys
25  a gun.

21 (Pages 78 to 81)

82

1      And I find that maybe the most significant one
2  for me is that Dr. Catapano-Friedman, hyphenated
3  last name, prescribes him to Zyprexa, and I believe
4  that the introduction of Zyprexa postdates the first
5  prescription of Neurontin. We can check in those
6  records or in her specific psychiatric records. But
7  at that point, she's obviously so concerned about
8  his --- in my opinion, about his anger and what
9  changes she's seeing is that she needs something to
10  get a control of it and decides to prescribe a
11  potent atypical antipsychotic. So as I sit here,
12  those are the four things that come to mind right
13  now. There's obviously --- I've said enough for
14  now.
15  BY ATTORNEY OHLEMEYER:
16  Q. Mr. Shearer had pain and impairment independent
17  of his stroke; didn't he?
18  A. Had ---?
19  Q. Pain and physical impairment independent of his
20  stroke.
21  A. Yes, he did.
22  Q. And there's no ---?
23      ATTORNEY FROMSON:
24      I didn't mean to cut you off. You mean
25  it's completely exclusive, he's independent ---?

83

1      ATTORNEY OHLEMEYER:
2      Oh, no, no. Independent.
3  BY ATTORNEY OHLEMEYER:
4  Q. What I'm --- just so we're all clear, his stroke
5  produced a fair amount of pain and impairment ---
6  A. Yes.
7  Q. --- no doubt? But separate and apart from that
8  he had other orthopedic or ---
9  A. Degenerative ---.
10  Q. --- degenerative issues?
11  A. Spinal disease, migraine headaches.
12  Q. That were creating pain and impairment?
13  A. Yes.
14  Q. Mr. Shearer never attributes nervousness or
15  anxiety or panic to his Neurontin prescription; does
16  he?
17  A. Not to my knowledge, no.
18  Q. And Mr. Shearer had some issues with anger and
19  anger management that predate his first Neurontin
20  prescription?
21  A. Well, as I said, I believe that he did.
22  Q. In fact --- and I don't mean to interrupt you,
23  but that's the reason Dr. Catapano-Friedman says she
24  was seeing him initially; wasn't it?
25      ATTORNEY FROMSON:

84

1      Just hold on. I want to make sure you
2  finish your previous answer, and second, I would
3  object to the next question. Lack of foundation.
4  A. Yes. Thank you. Yes, she started to see him in
5  --- I'm going to say February of 2000, which
6  obviously precedes the dose of Neurontin, and he's
7  already coming in because --- in part because he's
8  angry. Is that ---?
9  BY ATTORNEY OHLEMEYER:
10  Q. Very angry according to her; right?
11  A. Yeah, yeah.
12  Q. So there's no doubt that this anger manifests
13  itself prior to the Neurontin?
14      ATTORNEY FROMSON:
15      Objection, only to the extent you're
16  saying this anger.
17  A. I would concur with that, yes.
18  BY ATTORNEY OHLEMEYER:
19  Q. And there's no doubt that Dr. Catapano-Friedman
20  saw Mr. Shearer for a period of time before his first
21  Neurontin prescription and for a period of time
22  following his Neurontin prescriptions?
23  A. Yes.
24  Q. And there's nothing about her background, her
25  education, her experience or her deposition that

85

1  suggests to you she was incapable of observing and
2  recording any changes in his behavior during that
3  time period; is there?
4      ATTORNEY FROMSON:
5      Objection as to form.
6  A. Want me repeat that --- are you asking is there
7  anything --- would she be incapable of recording his
8  changes in mood and behavior?
9  BY ATTORNEY OHLEMEYER:
10  Q. Well, I guess what I'm asking is, are you --- do
11  you have any criticisms of her, or can you identify
12  any failure on her part to observe and report the
13  kinds of things somebody with her background,
14  education and experience should be observing and
15  reporting in a patient like Mr. Shearer?
16      ATTORNEY FROMSON:
17      Objection as to form.
18  A. A couple things. One, Dr. Catapano-Friedman is
19  known to me because we trained at the same
20  institution, and two is that I believe that her notes
21  are minimal. They --- if the --- right now I in part
22  supervise some pediatric residents who come through
23  --- I don't need to tell this story, but who come in
24  through Gaudenzia from Hershey Medical School, and I
25  believe that her note taking and her observations are

22 (Pages 82 to 85)

86

1 really quite limited. She basically has one or two
2 sentences often or a couple of phrases for a given
3 visit.
4 BY ATTORNEY OHLEMEYER:
5 Q. First visit she ever had, though, in her notes,
6 she describes him as seeing her and presenting with
7 anger issues?
8     ATTORNEY FROMSON:
9     Objection. Lack of foundation.
10 A. Yes.
11 BY ATTORNEY OHLEMEYER:
12 Q. And in her deposition describing her initial
13 impressions of Mr. Shearer --- we can all go back and
14 count it. I was looking at it this morning. She
15 uses the word angry seven times in that description;
16 doesn't she?
17     ATTORNEY FROMSON:
18     Objection. Lack of foundation.
19 A. Yeah, you'd have to show that to me, but I'm
20 going to take your word for it.
21 BY ATTORNEY OHLEMEYER:
22 Q. Yeah, we can count it.
23 A. I believe that she did, yeah.
24 Q. And she also pointed out --- and this is what I
25 want you to tell me whether you disagree with

87

1 this --- is that when somebody with her background,
2 her education and her training is presented with a
3 patient like Mr. Shearer, that she is alert to and
4 looking for signs of suicidality?
5     ATTORNEY FROMSON:
6     Objection as to form. Lack of
7 foundation.
8 A. She certainly should be.
9 BY ATTORNEY OHLEMEYER:
10 Q. She should be?
11 A. Yes.
12 Q. And in fact, she said she was; didn't she?
13     ATTORNEY FROMSON:
14     Objection. Lack of foundation. You
15 can answer.
16 A. Yes.
17 BY ATTORNEY OHLEMEYER:
18 Q. And during the entire time she saw Mr. Shearer,
19 she never observed or recorded any such observation?
20     ATTORNEY FROMSON:
21     Objection. Lack of foundation.
22 A. That is what she said, yes.
23 BY ATTORNEY OHLEMEYER:
24 Q. I'm curious about your reference --- it doesn't
25 matter whether I'm curious. I'm going to ask you

88

1 about your reference to the gun. Are you suggesting
2 that Mr. Shearer purchased the gun for a reason other
3 than that which has been described by Ms. Shearer,
4 Sean Wheeler and his son, Ivor?
5     ATTORNEY FROMSON:
6     Objection as to form and lack of
7 foundation.
8 A. What I'm speculating about the gun is that he
9 --- what facts do we know? We know that he purchased
10 the gun. He did it with Sean. He purchased a good
11 looking gun because it was consistent with his
12 personalty and demeanor, and the stated purpose and
13 what Sean went to was to shoot it at a shooting
14 range, I guess, as an another --- a hobby or
15 something that he could be doing that he was somewhat
16 compromised. Whether it was known to him or not, it
17 could have been in the back of his mind, and this is
18 obviously speculation, that there are multiple
19 purposes for the use of a gun. So the --- and that's
20 consistent for me with the whole --- my opinion
21 within a reasonable degree of medical certainty that
22 Neurontin was a contributing factor to his suicide,
23 because he was already taking Neurontin. The
24 depressive adgenic effects of Neurontin could have
25 started and probably did, 'cause I agree with Dr.

89

1 Glenmullen, long before he came to the point where he
2 was desperate and committed suicide. So even if it
3 was not --- I don't know what I want to say ---
4 absolutely known to him that he wanted to commit
5 suicide, it still could have been there in his
6 unconscious, preconscious level.
7 BY ATTORNEY OHLEMEYER:
8 Q. So if I understand your testimony, the Neurontin
9 he was taking unconsciously compelled him to purchase
10 a gun for a stated reason other than what his
11 subconscious was real telling him to do and that was
12 prepare to commit suicide?
13     ATTORNEY FROMSON:
14     Objection. Form.
15 A. No. No, that's not exactly my testimony. I
16 don't believe Neurontin compelled him to purchase a
17 gun. But we've already established in general
18 causality that --- and as we've already stated here
19 today, that Neurontin has the capacity and
20 capability, the biological plausibility to cause
21 serious mood changes and increase the risk of
22 suicide.
23 BY ATTORNEY OHLEMEYER:
24 Q. That's your opinion and I understand that, ---
25 A. Right.

23 (Pages 86 to 89)

90

1   Q. --- but what I'm looking for in this specific
2   case is some evidence of those mood changes. And
3   what I --- I just want to make sure, you're not
4   telling me that purchasing a gun to use for target
5   practice is evidence of one of those mood changes;
6   are you?
7   A. I think we'd have to go back to the question
8   before. I mean, we were talking about mood and
9   behavioral changes. There was a new phenomenon here.
10  He purchased the gun, so we believe as psychiatrists
11  that there are conscious reasons for doing things,
12  there are unconscious and there are preconscious
13  reasons. And what I'm saying is there may have been
14  more than one reason that he purchased the gun. We
15  have the evidence, as you've already articulated,
16  that his wife and Sean say that he did this for
17  purposes not intending to hurt himself.
18  Q. But with respect, I mean --- and this is kind of
19  an intellectual exercise. I mean, that's speculation
20  on your part; isn't it?
21      ATTORNEY FROMSON:
22          Objection.
23  A. It is speculation. I mean, it's --- yes.
24  BY ATTORNEY OHLEMEYER:
25  Q. What kind of medicine is Zyprexa?

91

1   A. Zyprexa is an atypical antipsychotic.
2   Q. What's it prescribed for?
3   A. Psychosis, particularly schizophrenia and for
4   bipolar mania and for actually multiple aspects of
5   bipolar disorder now.
6   Q. You've talked with Mrs. Shearer on the phone?
7   A. Yes.
8   Q. You've read her deposition?
9   A. Yes.
10  Q. You know a little bit about her background and
11  education?
12  A. Yes.
13  Q. She strike you as a --- as a bright, articulate
14  woman?
15  A. Yes.
16  Q. Do you think that a woman like Mrs. Shearer
17  whose husband had previously called the police and
18  had her taken out of the home in handcuffs would
19  allow her husband to keep a loaded gun in the house
20  if she thought he was suicidal or potentially
21  homicidal?
22      ATTORNEY FROMSON:
23          Objection. Form. Lack of foundation.
24  A. I think she actually answered that question in
25  her testimony, that had she known --- had been

92

1   forewarned --- I think the question was asked, if you
2   had been forewarned or knew about the suicide
3   potential associated with Neurontin and that your
4   husband could have suffered these serious side
5   effects including suicidality, would you have allowed
6   him to --- and I'm paraphrasing her --- or
7   paraphrasing the question, would you have allowed him
8   to have a gun in the house. I think her answer to
9   that was no.
10  BY ATTORNEY OHLEMEYER:
11  Q. Well, let's be --- let's be --- let's be blunt
12  about this. Mr. Shearer was take a variety of
13  medicines that you and others have suggested have the
14  potential to increase suicidality or suicidal
15  behavior in the people who take them; isn't that
16  right?
17      ATTORNEY FROMSON:
18          Objection.
19  A. You'd have to be more specific. I can't --- I
20  mean, I mentioned Prozac here. I've never opined
21  about the suicide degenic capacity of Prozac except,
22  I think, in this litigation.
23  BY ATTORNEY OHLEMEYER:
24  Q. Well, what's --- what is --- what kind of
25  medicine is Prozac?

93

1   A. It's a SSRI antidepressant.
2   Q. And you've testified before in other cases that
3   you believe SSRIs have the potential to increase mood
4   and behavior disorders in the people who take them;
5   isn't that right?
6   A. I have, yes.
7   Q. And in fact, you've stated that SSRIs, including
8   Prozac, may cause or be a major contributing factor
9   to manic episodes and acts of aggressive against self
10  and others; isn't that right?
11      ATTORNEY FROMSON:
12          Objection. Lack of foundation.
13  A. I don't specifically recall that, but that's
14  something I would have said and would likely have
15  said ---
16  BY ATTORNEY OHLEMEYER:
17  Q. And you ---.
18  A. --- because it's consistent with the black box
19  warning for all antidepressants.
20  Q. You've gone on to say that aggression against
21  self includes suicidal behavior and aggression
22  against others includes acting out under conditions
23  of stress and emotional challenge that would not
24  likely otherwise result in violence; isn't that
25  right?

24 (Pages 90 to 93)

98

1        Let me rephrase it.
2    BY ATTORNEY OHLEMEYER:
3    Q. Between the time Mr. Shearer started seeing Dr.
4    Catapano-Friedman and the day he was first prescribed
5    Neurontin, did Mr. Shearer's anger issues ever
6    resolve themselves?
7    A. My recollection is that in part they were
8    resolving at least at times, because she reflected in
9    her notes --- and I don't have them here, but we can
10   look at them --- that he was functioning somewhat
11   better on Zyprexa prescribed in part for his anger
12   and had become more humorous is what I recall.
13   Q. If you assume that Mr. Shearer had never taken
14   Neurontin but had committed suicide, what would the
15   most likely explanation for his suicide be?
16        ATTORNEY FROMSON:
17        Objection as to form. Lack of
18   foundation. Incomplete hypothetical.
19   A. The best way to answer that is I would have to
20   look at all of the records without Neurontin and
21   can't do that because presumably the records wouldn't
22   be exactly the same with or without Neurontin. So I
23   don't think I can give you an answer. I mean,
24   that --- my answer to a specific case like this one
25   is that we have all the records and we can --- I can

99

1    perform a suicide autopsy, but on a hypothetical, I
2    can't perform a suicide autopsy, so I wouldn't be
3    able to give a specific response.
4    BY ATTORNEY OHLEMEYER:
5    Q. Why didn't Mr. Shearer commit suicide the day
6    before he actually committed suicide?
7    A. I don't think I can answer that.
8    Q. Well, it's fair to say, isn't it, Doctor, that
9    Mr. Shearer had been prescribed the Neurontin for a
10   period of time well in advance of his suicide?
11   A. Yes.
12   Q. And in that period of time, he never attempted
13   suicide?
14   A. Correct.
15   Q. And he obviously didn't commit suicide?
16   A. Correct.
17   Q. Yet, he was still taking Neurontin?
18   A. Yes.
19   Q. And he still had all the other risk factors for
20   suicide that were present in his life?
21   A. Yes.
22   Q. So my question is, if Neurontin caused or
23   contributed to cause his suicide on February 7th
24   2002, why didn't it cause him to commit suicide
25   earlier than that?

100

1        ATTORNEY FROMSON:
2        Objection. Asked and answered.
3    A. I can't answer that. I can only deal with the
4    facts that we have in the case. We --- in
5    retrospective analysis based on the fact that he
6    committed suicide at such and such a time and we have
7    those circumstances, why wouldn't have committed
8    suicide or why he didn't on the day before is --- I
9    can't speculate.
10   BY ATTORNEY OHLEMEYER:
11   Q. Do you have any idea what the GABA levels would
12   have been in Mr. Shearer's brain at the time he
13   committed suicide?
14        ATTORNEY FROMSON:
15        Objection as to form.
16   A. There's no way to know the specific GABA levels.
17   As we've --- as I've discussed in previous cases and
18   also in general causality report, we know that
19   Neurontin can increase GABA levels, giving rise to
20   lower levels of serotonin. They can do if for
21   protracted period of time and then in part it's a
22   cumulative effect, but the specifics of --- the
23   quantity is --- no way of knowing.
24   BY ATTORNEY OHLEMEYER:
25   Q. And at the time of Mr. Shearer's death, you have

101

1    no way of knowing what the active serotonin level was
2    in his brain; do you?
3    A. You do know now.
4    Q. Do you know when in proximity to his suicide Mr.
5    Shearer last took Neurontin?
6    A. I do not. We only know that he refilled it at
7    the very end of January of 2002. We presume that he
8    was taking, I believe, 600 milligrams a day at the
9    point that he suicided.
10   Q. Is that a lot of Neurontin or a little of
11   Neurontin?
12        ATTORNEY FROMSON:
13        Objection as to form.
14   A. It depends what your definition is of a lot or a
15   little. I think it's --- having said that, it would
16   depend upon those definitions.
17   BY ATTORNEY OHLEMEYER:
18   Q. Well, let me rephrase that question. How much
19   Neurontin a day does somebody have to take for it to
20   increase their risk of committing suicide, in your
21   opinion?
22        ATTORNEY FROMSON:
23        Objection as to form. Incomplete
24   hypothetical.
25   A. I can't answer that. We only know that

26 (Pages 98 to 101)

110

1      Just note my objection as to form.  You
2  mean retrospectively, of course.
3          ATTORNEY OHLEMEYER:
4          Agreed.
5  A. Just repeat the question.
6          ATTORNEY OHLEMEYER:
7          Can you read that one back for me?
8  PREVIOUS QUESTION READ BACK
9  A. I think the prescription of Prozac was a
10 reasonable choice for someone like Mr. Shearer.
11 BY ATTORNEY OHLEMEYER:
12 Q. How do you rule out Prozac as a cause or
13 contributing cause of Mr. Shearer's suicide?
14         ATTORNEY FROMSON:
15         Objection as to form.  Lack of
16 foundation.
17 A. Mr. Shearer, as you had actually stated
18 previously, had been on and off Prozac previously,
19 and there is no reflection in the medical records
20 that I'm aware of that he was having specific adverse
21 events other than those related to impotence when he
22 was taking Prozac.
23 BY ATTORNEY OHLEMEYER:
24 Q. What's the evidence of adverse events Mr.
25 Shearer was having relating to Neurontin?

111

1          ATTORNEY FROMSON:
2          Objection.  Asked and answered.
3  BY ATTORNEY OHLEMEYER:
4  Q. Let me rephrase the question.  In a man who's
5  taking a variety of prescription medications, who
6  demonstrates adverse events, how do you determine
7  which ones, if any, you can ascribe them to?
8          ATTORNEY FROMSON:
9          Objection as to form.
10 A. I believe that is part of the, you know art, and
11 science as well as it is in this case, which is
12 examining the medicines that a person was likely
13 taking and which ones had a history or not of
14 associated suicidality, and where they affected mood
15 and behavior or not in other populations.  So
16 basically it's a --- when I did my retrospective
17 analysis and determined within a reasonable degree of
18 medical psychiatric certainty that Neurontin was a
19 contributing and a substantial factor in Mr.
20 Shearer's suicide, I obviously had to consider to the
21 best of my ability all of those medications that I
22 previously referred to.  The Digoxin doesn't have a
23 warning about suicidality.  Ritalin doesn't have a
24 warning about suicidality.  Provigil doesn't have a
25 warning about suicidality.  Prozac does have a

112

1  warning about suicidality, and obviously I had
2  mentioned that in my report because it appears that
3  he ran out of Prozac in approximately five or six
4  days before he suicided, and anyway the --- all the
5  other drugs that had been mentioned, Viagra and
6  testosterone don't have warnings associated with them
7  about suicidality, so in all of the factors that were
8  considered, that's part of the retrospective
9  analysis.
10 BY ATTORNEY OHLEMEYER:
11 Q. So as I understand, you ruled Prozac out because
12 you believe his prescription had run out five days
13 prior to his suicide?
14         ATTORNEY FROMSON:
15         Objection as to form.
16 A. Yeah, I don't think I ruled it out.  I mean,
17 Prozac withdrawal, for example, may have been a
18 contributing factor to Mr. Shearer's suicide.  It
19 would not change my opinion, however, that Neurontin
20 was a substantial and contributing factor to his
21 suicide.
22 BY ATTORNEY OHLEMEYER:
23 Q. Was Mr. Shearer in Prozac withdrawal that time
24 of his death?
25 A. All we know is that he would have run out of

113

1  medication based upon the quantitative analysis.
2  Q. That's a different question.  Was he in Prozac
3  withdrawal at it time of his death?
4  A. Again, I don't know.  I believe that he may have
5  run out of Prozac, and obviously if he ran out of
6  Prozac, the serotonin levels that would have been
7  increased due to his taking a serotonin retake
8  inhibitor would have fallen, and in my opinion would
9  have fallen even more because he was taking something
10 that decreased his serotonin levels.
11 Q. Well, aside from the fact that Mr. Shearer's
12 prescription may have run out prior to the suicide,
13 is there any other fact that you can point to me to
14 support your conclusion that Mr. Shearer was in
15 Prozac withdrawal at the time of his suicide?
16         ATTORNEY FROMSON:
17         Objection as to form.  Misstates the
18 testimony.
19 A. No.
20 BY ATTORNEY OHLEMEYER:
21 Q. Now, even if Mr. Shearer had run out of Prozac
22 five days before his suicide, are you --- are you ---
23 strike that.
24     If we assume Mr. Shearer had run out of Prozac
25 five days before his suicide ---?

29 (Pages 110 to 113)

146

1    How much Neurontin was Mr. Shearer supposed to
2    be taking on a daily basis?
3    A. His dose varied from --- starting dose of a
4    hundred milligrams twice a day. His maximum dose was
5    300 milligrams three times a day. I think when he
6    died he was taking 600 milligrams a day.
7    Q. What percent of people commit suicide on their
8    first attempt --- strike that.
9       What percent of people who commit suicide do it
10   on their first attempt?
11         ATTORNEY FROMSON:
12         Objection. Lack of foundation.
13   A. I don't know the answer to that. I believe it's
14   minority.
15   BY ATTORNEY OHLEMEYER:
16   Q. Would you be surprised to learn that it's
17   actually a majority of people?
18         ATTORNEY FROMSON:
19         Objection. Form.
20   A. Probably depends upon the reference, but it
21   would not surprise me either.
22   BY ATTORNEY OHLEMEYER:
23   Q. In your report you note that Mr. Shearer was not
24   socioeconomically impoverished. How do you define
25   that phrase?

147

1    A. Both he and his wife had incomes. They also had
2    indebtedness, but they had enough money, whether they
3    were paying for it from their savings or their credit
4    cards to feed themselves and house themselves, paid
5    for their son's education.
6    Q. They did experience some ongoing financial
7    issues, though; didn't they?
8    A. They did.
9    Q. Resulting from his stroke?
10   A. Mostly, yes. Let me just clarify that. It's
11   not from the stroke per se, but from the caretaking,
12   the medicines that were required in his care.
13         ATTORNEY OHLEMEYER:
14         Can we take a short break?
15         VIDEOGRAPHER:
16         The time is approximately 2:20 p.m.
17   We're off the record.
18   SHORT BREAK TAKEN
19         VIDEOGRAPHER:
20         The time is approximately 2:22 p.m.
21   We're back on the record.
22   BY ATTORNEY OHLEMEYER:
23   Q. Just a few more questions, Dr. Kruszewski. I'm
24   looking at what we've marked as Exhibit Three, which
25   is your brief resume, it's entitled; is that right?

148

1    A. Yes.
2    Q. And am I correct that you are by education and
3    experience a psychiatrist?
4    A. Yes.
5    Q. And that --- that --- as distinguished from
6    other specialties of people who go to medical school
7    and get medical degrees pursue --- correct?
8    A. Well, I have a medical degree --- an MD degree
9    from Harvard. My specialization was internal
10   medicine and then psychiatry after that.
11   Q. But for example, you wouldn't consider yourself
12   to be an radiologist?
13   A. No.
14   Q. You wouldn't consider yourself to be an
15   epidemiologist?
16   A. No.
17   Q. A toxicologist?
18   A. No.
19   Q. A neurologist?
20   A. No.
21   Q. I mean, when somebody says to you, who are you,
22   what do you do, you say I'm a psychiatrist?
23   A. That's correct.
24         ATTORNEY OHLEMEYER:
25         All right. Those are all the questions

149

1    I have.
2          ATTORNEY FROMSON:
3          Thanks. I have a few follow up. I
4    will be brief.
5    EXAMINATION
6    BY ATTORNEY FROMSON:
7    Q. Dr. Kruszewski, in terms of some of the records
8    that you have reviewed and utilized for your review
9    and consideration in drafting your report and coming
10   to an opinion in this case, is it fair to say you had
11   the records from Dr. William Sullivan?
12   A. Yes.
13   Q. And you had the records from Harts' Pharmacy?
14   A. Yes.
15   Q. Okay. And I would represent to you as a
16   hypothetical that the evidence in this case and in
17   the Harts' Pharmacy records that you reviewed from
18   the last fluoxetine prescription from Harts' Pharmacy
19   was January 26th of 2002. Would you agree with
20   statement?
21   A. I would.
22   Q. And I'd represent to you that the prescription
23   was for 20 milligrams. Would you agree with that
24   statement in terms of your review of the records?
25   A. Yes, 20 milligrams q.i.d.

38 (Pages 146 to 149)