UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------------x
                                                                 :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                                     :
        SALES PRACTICES AND                                      :   Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION                            :
                                                                 :   Judge Patti B. Saris
-----------------------------------------------------------------x
                                                                 :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                                        :
                                                                 :
*Shearer v. Pfizer Inc.*, 1:07-cv-11428-PBS                      :
                                                                 :
-----------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Andrew G. Finkelstein, Esquire
FINKELSTEIN & PARTNERS, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551
(800) 634-1212
(845) 562-3492 (fax)
email:  afinkelstein@lawampm.com

*Attorneys for Plaintiff Linda B. Shearer*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................................... 1

SUMMARY JUDGMENT STANDARD OF REVIEW ............................................................. 2

I.     PLAINTIFF CAN ESTABLISH CAUSE IN FACT ....................................................... 1

        A.    Plaintiff Is Entitled to Have a Jury Try and Determine, Based Upon the Evidence, Whether Neurontin Use Was a "But-For" Cause and a Substantial Factor in Causing Mr. Shearer to Commit Suicide, and Whether It Was Probable That Defendants' Conduct Caused Mr. Shearer's Suicide ......................................... 7

        B.    The Evidence Raises a Genuine Disputed Issue of Fact as to Whether a Suicide Warning Would Have Changed the Treating Physicians' Decisions to Prescribe Neurontin to Mr. Shearer ........................... 9

        C.    The Evidence Showing That Defendants Suppressed and Concealed Depression and Suicidality Information Raises Triable Issues of Fact .............. 10
              Regarding Defendants' Fraudulent Concealment

II.    IT WAS FORESEEABLE TO DEFENDANTS THAT A PATIENT SUCH AS MR. SHEARER WOULD BE PRESCRIBED NEURONTIN AND WOULD BECOME UNCONTROLLABLY IMPULSIVE AND SUICIDAL AS A RESULT OF CONSUMING NEURONTIN .................................... 12

III.   BECAUSE THERE IS SUFFICIENT EVIDENCE TO RAISE A GENUINE DISPUTED ISSUE OF FACT AS TO PLAINTIFF'S NEGLIGENT FAILURE-TO-WARN CLAIM, SUMMARY JUDGMENT SHOULD ALSO BE DENIED AS TO PLAINTIFF'S IMPLIED WARRANTY, FRAUDULENT CONCEALMENT AND SURVIVAL CLAIMS ..…………………......................... 16

CONCLUSION ............................................................................................................................ 17

## PRELIMINARY STATEMENT

On February 7, 2002, Hartley Shearer, the husband of plaintiff Linda Shearer, committed suicide by gunshot, allegedly as a result of ingesting the prescription drug Neurontin, which was sold by Defendants Pfizer Inc. and Warner-Lambert Company LLC.

The Amended Complaint in this action pleads six claims for relief: (1) Negligence; (2) Breach of Warranty (express and implied); (3) Strict Liability; (4) Fraud; (5) Violation of the Massachusetts Consumer Protection Act; and (6) Survival Action. Defendants have moved for summary judgment dismissing all of Plaintiff's claims. Plaintiff does not oppose those parts of Defendants' motion seeking to dismiss Plaintiff's claims for express warranty and violation of the Massachusetts Consumer Protection Act. However, as discussed below, Plaintiff seeks to continue to go to trial on her claims of negligent failure-to-warn, implied warranty, strict liability, fraudulent concealment and survival, which may not be dismissed as a matter of law.

## FACTUAL BACKGROUND

In 1999, Mr. Shearer suffered a severe stroke that left him with significant paralysis on the left side of his body. (L. Shearer Dep. at 152:11-22, Declaration of Mark S. Cheffo, ECF Doc. # 2459, Exhibit B; Spaulding Rehab. Hosp. Records at 17SRH-9-12, Defs.' Ex. C.) On February 18, 2000, Mr. Shearer began to see a psychiatrist, Dr. Lisa Catapano-Friedman, because he was "concerned about his anger and venting it on Linda. (Catapano-Friedman at 17DCR-1-2, Defs.' Ex. F; Catapano-Friedman Dep., at 51:15-23, Defs.' Ex. G.) On September 28, 2000, Mr. Shearer was hospitalized for severe low back pain; he then developed endocarditis, and later required an emergency splenectomy. (NARH at 30WMA-164, Defs.' Ex. D; Berkshire Medical Center Records at 35BMC-79-81, Defs.' Ex. L.)

After the stroke, Mr. Shearer could walk up and down stairs (L. Shearer Dep. at 152:1-6; 154:13-15, attached to the Declaration of Andrew G. Finkelstein, Esq., as Pl.'s Ex. A); he could ambulate; he could go downstairs and fix coffee (L. Shearer Dep. at 159:13-15, Pl.'s Ex. A); he could go to the bathroom by himself (L. Shearer Dep. at 163:7-11, Pl.'s Ex. A); he could give himself a sponge bath. (L. Shearer Dep. at 238:6-12, Pl.'s Ex. A.) Mr. Shearer's caregiver, Sean

Wheeler, testified that Mr. Shearer did not need help eating meals but that he would help get him situated. (Wheeler Dep. at 18: 24-25; 19: 1-8, Pl.'s Ex. C.)  Mr. Shearer exercised very diligently; very rigorously after the stroke. He continued to walk and swim.  He went target shooting twice a month. (L. Shearer Dep. at 163:20-25; 164:1; 268:3-8, Pl.'s Exs. A, B.)  He walked the hill next to his house for exercise. (Wheeler Dep. at 14: 5-6, Pl.'s Ex. C.)  He used a universal gym in his house. (Wheeler Dep. at 14: 9-10, Pl.'s Ex. C.)

In the Spring of 2002 Mr. Shearer began teaching a course at Williams College with Mrs. Shearer.  It was a three and a half hour, one day a week, seminar.  There were approximately 20 students enrolled.  The class was a big success.  Prior to that he was working on a CD-ROM and he wanted to complete that. (L. Shearer Dep. at 211:16-24; 212:6-10; 214:6-7, 17; 213:7, Pl.'s Ex. A.)  Mr. Shearer was working on an art college project.  There were often students in the house working on this DVD.  He also went to the computer center to work with a student there. (L. Shearer Dep. at 161:25; 162:1-3; 168:4-6, Pl.'s Ex. A.)  Mr. Shearer exercised very diligently; very rigorously after the stroke.  He continued to walk and swim. He went target shooting twice a month. (L. Shearer Dep. at 163:20-25; 164:1; 268:3-8, Pl.'s Exs. A, B.)

On February 5, 2002, Mrs. Shearer went to Hawaii for a conference. (Expert Report of Dr. Joseph Glenmullen at 26, Defs.' Ex. N; L. Shearer Dep. at 214:22-215:12, Defs.' Ex. B.) On February 7, 2002, while Mrs. Shearer was in Hawaii, Mr. and Mrs. Shearer got into an argument over the telephone. (Glenmullen Report at 26, Defs.' Ex. N; Mass. State Police Records at 9, Defs.' Ex. O; Sean Wheeler Dep. at 31:16-33:22, Defs.' Ex. P.)  Mr. Shearer locked his bedroom door and shot himself in the head with his gun. (Glenmullen Report at 27, Defs.' Ex. N; Wheeler Dep. at 38:15-39:2, Defs.' Ex. P; State Police at 9, Defs.' Ex. O; Williamstown Police Dept. Records at 25WPD-4-5, Defs.' Ex. Q; Death Certificate at 12PPR-470, Defs.' Ex. R.)  Mr. Shearer left a suicide note that read: "Linda has left me powerless by hanging up on me for the last time.  I love you both Ivor and Linda.  But this is it —Hartley Shearer." (H. Shearer Suicide Note, Defs.' Ex. S.)

The only drug found in the toxicology test performed on Mr. Shearer was benzodiazepine. (Mass. Medical Examiner Records at 420CM-3-9, Defs.' Ex. T.) Plaintiff's expert, Dr. Michael Trimble, has claimed that benzodiazepines increase the risk of depression and suicide. (2/27/08 Dr. Michael Trimble Dep. at 98:8-17, Defs.' Ex. U; Dr. Michael Trimble Expert Report at 18, Defs.' Ex V.) But another Plaintiff's expert, Dr. Glenmullen, states that "for Hartley's age group, the evidence of these other drugs [such as benzodiazepines] make patients suicidal is not yet as strong as the evidence implicating Neurontin (Glenmullen Report, p. 32, Pl.'s Ex. H), and "that with the fact pattern in this case, with neurontin 'metanalysis was statistically significant finding, biological plausibility, the signals, the adverse event reports, ranks higher thank for example the Prozac, the trazodone, or whatever benzodiazepine he was on at that particular time." (Glenmullen Dep. at 115:14-22, Pl.'s Ex. F.)

Dr. Anne Hudson Angevine prescribed Neurontin to Mr. Shearer in October 2000. (Brigham & Women's Hosp. Records at 37BWH-363, Defs.' Ex. M.) Dr. Angevine testified that "it would be customary" for her to consider the risks and benefits of Neurontin before prescribing it to Mr. Shearer. Dr. Anne Hudson Dep. at 109:15-20, Defs.' Ex. W.) In general, Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 109:21-112:12, 119:8-16, 120:17-23, Defs.' Ex. W.)

Dr. Daniel Sullivan renewed Mr. Shearer's prescription for Neurontin on May 4, 2001. (Williamstown Med. Assocs. Records at 30WMA-8, Defs.' Ex. E.) Dr. Sullivan testified that information regarding a statistically significant risk of suicide in placebo controlled randomized trials "would be factored into a decision process." (Dr. Daniel Sullivan Dep., at 103:7-16, Defs.' Ex. X.) Dr. Sullivan testified that as of today, looking at the FDA Alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so

they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.)  Dr. Sullivan always reviews the risks and benefits of every medication he prescribes.  If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

Dr. Hynes approved a Neurontin prescription issued by a resident at the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization. (Dr. Wilfred Hynes Dep. at 75:10-77:14, Defs.' Ex. Y; Brigham & Women's Hosp. Records at 37BWH-410-411, Defs.' Ex. M.)  If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.)  If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. (Hynes Dep. at 140:13-20; 141:1-4, Pl.'s Ex. J.)  Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.)  If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Pl.'s Ex. J.)  Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at  179: 3-7, Pl.'s Ex. J.)

Dr. Glenmullen testified that Mr. Shearer's suicidal act looks pretty impulsive. (Glenmullen Dep. 92:14, Pl.'s Ex. F.)  The note looks as though it was written that morning. It looks as though it's still part of a very impulsive event. (Glenmullen Dep. 149:24-25, 150:1, Pl.'s Ex. F.)  It appears to be part of an impulsive act. (Glenmullen Dep. 151:19-20, Pl.'s Ex. F.)

4

Mr. Shearer doesn't cite something that might be considered a reasonable explanation for his suicide; he says his wife hung up on him. This note doesn't indicate that the event was very premeditated, or that the note was premeditated. It looks like this particular note was part of an impulsive event. (Glenmullen Dep. at 154 9-24, Pl.'s Ex. F.) On Neurontin, Mr. Shearer developed worsening depression and mood and behavioral changes that led to his death. (Glenmullen Report, p. 31, ¶ 15, Pl.'s Ex. H.)

Dr. Kruszewski testified that Mr. Shearer's decision to commit suicide was "impulsive". (Kruszewski Dep. at 72:2-3, Pl.'s Ex. K.) Dr. Kruszewski describes the suicidal act as an "impulsive decision to shoot himself in the head." "Neurontin and its depressogenic effect resulted in hopelessness and an irrational desperation (inferred in his suicide note), powerlessness and the impulsive act to kill himself." (Kruszewski Report, p. 11, Pl.'s Ex. L.) "Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide." (Kruszewski Report, p. 16, Pl.'s Ex. L.) Dr. Kruszewski also was of the opinion that to a reasonable degree of medical and psychiatric certainty, Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide. (Kruszewski Report, p. 16.)

## SUMMARY JUDGMENT STANDARD OF REVIEW

This Court has recently reiterated its standard of review on a motion for summary judgment, which will not be repeated in full herein. *See McKenna v. First Horizon Home Loan Corp.,* 537 F. Supp. 2d 284, 287 (D. Mass. 2008); *Carter v. Symmes*, No. 06-10273-PBS, 2008 U.S. Dist. LEXIS 7680 at *5-6 (D. Mass. Feb. 4, 2008). Plaintiff, however, respectfully refers the Court to its following statements concerning the summary judgment standard of review:

> . . ."To succeed [on a motion for summary judgment], the moving party must show that there is an <u>absence of evidence</u> [emphasis added] to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).
>
> . . .The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." [*Barbour v. Dynamics Research Corp.*, 73 F.3d 32, 36 (1st Cir. 1995).]

*McKenna,* 537 F. Supp. 2d at 287; *Carter*, 2008 U.S. Dist. LEXIS 7680 at *5-6.

5

## I.   PLAINTIFF CAN ESTABLISH CAUSE IN FACT

"Because juries are uniquely qualified to apply the reasonable person standard and to decide questions of causation, a plaintiff usually is afforded the right to have his claim tried before a jury." *O'Connor v. Smithkline Bio-Science Labs., Inc.*, 36 Mass. App. Ct. 360, 363, 631 N.E.2d 1018, 1020 (App. Ct. 1994); *see also Mullins v. Pine Manor College*, 389 Mass. 47, 58, 449 N.E.2d 331, 338-39 (1983*)* ("The question of causation is generally one of fact for the jury. [Citation omitted.]  A plaintiff need only show 'that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause.  [Citation omitted.]"); *Augustine v. Cross*, No. 92-01417, 3 Mass. L. Rep. 273, 1995 Mass. Super. LEXIS 815, at *8 (Super. Ct. Jan. 4, 1995) ("the issue of causation is generally a question of fact to be determined by the jury"); *Limone v. United States*, 579 F.3d 79, 99 (1st Cir. 2009) ("Causation is a factbound issue and, as such, is normally left to the trier. [Citations omitted.]")

### A.   Plaintiff Is Entitled to Have a Jury Try and Determine, Based Upon the Evidence, Whether Neurontin Use Was a "But-For" Cause and a Substantial Factor in Causing Mr. Shearer to Commit Suicide, and Whether It Was Probable That Defendants' Conduct Caused Mr. Shearer's Suicide

This Court should deny Defendants' motion for summary judgment on the issue of specific-causation because Plaintiff has demonstrated, via admissible expert testimony, that Mr. Shearer's ingestion of Neurontin was a proximate cause of his injuries and death.  As set forth in detail in Plaintiff's Memorandum in opposition to Defendants' motion to exclude the specific-causation testimony of Joseph Glenmullen, M.D., and Stephen P. Kruszewski, M.D., Plaintiff's experts on specific causation opinions are relevant, reliable and pass Rule 702 and *Daubert's* requirements.  Although not exhaustive of the arguments and expert opinions discussed in the memorandum and exhibits submitted therewith, incorporated by reference as if fully set forth herein is the crux of Plaintiff's experts' opinions on specific causation:  Dr. Glenmullen and Dr. Kruszewski have opined that Mr. Shearer ingested Neurontin and that he experienced side effects consistent with Neurontin use, including mood and behavioral disturbances and worsened

6

depression.  Both Dr. Glenmullen and Dr. Kruszewski have opined that Mr. Shearer's ingestion of Neurontin was a proximate cause of his suicide.  They each base their opinion upon their clinical experience and education, their review of the depositions of physicians, family, incident reports, medical records, as well as literature on pharmaceuticals related to adverse and suicidogenic side effects, as well expert reports disclosed in this case.

Dr. Glenmullen analyzed suicide risk factors and protective factors his research has identified as statistically significant.  Dr. Glenmullen performed a different diagnosis and sought to "rule in" and "rule out" alternative causes, and he opined that Mr. Shearer had 6 out of 7 factors protecting him from suicide and only had 3 out of 17 risk factors for suicide.  Dr. Glenmullen further bases his opinion, in part, on the results of a "psychological autopsy" he conducted in an attempt to reconstruct Mr. Shearer's psychological life, thoughts, feelings and relevant environmental factors preceding his death.

Dr. Kruszewski also applied a differential diagnosis in which he examined the risk factors and protective factors in relation to Mr. Shearer's suicide, and utilized as guideposts the factors set forth by Sir Bradford Hill in evaluating causation.  Dr. Kruszewski, based upon his analysis, included in his differential diagnosis 9 factors that he considered as Mr. Shearer's risk factors for suicide and 22 factors that he considered as Mr. Shearer's protective factors for suicide and ultimately concluded that Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide.

Based on the opinions of Plaintiff's two specific causation expert, Plaintiff is entitled to have the jury to try and determine, based upon the evidence, whether Neurontin use was a "but-for" cause and a substantial factor in causing Mr. Shearer to commit suicide, *see Reinhardt v. Gulf Ins. Co.*, 489 F.3d 405, 412 (1st Cir. 2007); *Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 524 (1st Cir. 1990); and whether it was probable that Defendants' conduct caused Mr. Shearer's suicide.  *See O'Connor v. Smithkline Bio-Science Labs., Inc.*, 36 Mass. App. Ct. at 363, 631 N.E.2d at 1020; *Mullins v. Pine Manor College*, 389 Mass. at 58, 449 N.E.2d at 338-39.

### B. The Evidence Raises a Genuine Disputed Issue of Fact as to Whether a Suicide Warning Would Have Changed the Treating Physicians' Decisions to Prescribe Neurontin to Mr. Shearer

Massachusetts law follows a learned intermediary whereby a prescription drug manufacturer's duty to warn of dangers associated with its product runs only to the physician, and it is the physician's duty to warn the ultimate consumer. *See, e.g.*, *Cottam v. CVS Pharmacy*, 436 Mass. 316, 321, 764 N.E.2d 814, 820 (2002). Defendants admit that Massachusetts also applies a heading presumption to the learned intermediary rule whereby it is presumed that a physician would have heeded an adequate warning if it had been given. *See Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992). However, Defendants argue that ""[T]he plaintiff must establish that an adequate warning would have convinced the treating physician not to prescribe the product for the plaintiff." Defs.' Mem. at p. 10 n.5 (quoting from *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992). Defendants also cite to a number of non-Massachusetts cases to the same effect. *Id.* But Defendants notably cite to **NO** cases under Massachusetts law that the plaintiff must show that an adequate warning would have changed the treating physician's decision so as not to prescribe the product to the plaintiff.

Dr. Angevine, who prescribed Neurontin to Mr. Shearer, testified at her deposition that "it would be customary" for her to consider the risks and benefits of Neurontin before prescribing it to Mr. Shearer, but that in general, she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her.

Dr. Sullivan, who renewed Mr. Shearer's prescription for Neurontin in 2001, testified at his deposition that information regarding a statistically significant risk of suicide in placebo controlled randomized trials "would be factored into a decision process." As of today, looking at the FDA Alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that healthcare professionals who prescribed antiepileptic drugs should "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes," if Dr. Sullivan were to prescribe Neurontin, he would certainly take this

8

into account. Moreover, he always reviews the risks and benefits of every medication he prescribes, and if he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001.

Dr. Hynes, who approved a Neurontin prescription issued by a resident at the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization, testified at his deposition that if he had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer; and that if he had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. He would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000, and as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin.

The testimony of Mr. Shearer's prescribing physicians raise a genuine issue of material fact for determination by the jury, as to whether if Defendants had provided an adequate warning to Mr. Shearer's physicians, the physicians would have changed their decisions as to prescribing Neurontin to Mr. Shearer. Plaintiff need not demonstrate that the physicians would necessarily have decided to refrain from prescribing Neurontin to Mr. Shearer, but merely that the physicians would have advised Mr. Shearer of the warning, monitored Mr. Shearer more closely for depression and suicidality and/or prescribed Neurontin to Mr. Shearer in a lower dosage or for a more limited period of time.

      **C.**    **The Evidence Showing That Defendants Suppressed Depression/Suicidality Information Raises Triable Issues Of Fact Regarding Defendants' Failure-to-Warn Claims**

Defendants contend that Plaintiff must prove that Mr. Shearer's prescribers relied upon Defendants' alleged statements or omissions to them, and that such reliance caused Mr. Shearer's suicide. But in *In re Neurontin Marketing, Sales Practices and Products Liability Litigation*, 618 F. Supp. 2d 96, 110 (D. Mass. 2009), this Court noted that "a consumer injured by a fraudulent misrepresentation to his doctor has a claim based on third party reliance," and that "a manufacturer of a pharmaceutical has a duty to disclose to physicians and patients material facts about the risks of the drug, particularly when it is engaged in off-label marketing for uses not approved by the FDA, if it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts."

Here, as discussed by this Court, "As prescribed by his physician, [Mr.] Shearer purchased and consumed Neurontin to control the effects of paralysis." 618 F. Supp. 2d at 106. This was undeniably an off-label use. Defendants therefore had a duty to disclose to Mr. Shearer and his physicians materials facts about the risks of Neurontin. *See id.* at 110.

At her deposition, Dr. Angevine was asked hypotheticals such as whether, assuming she did review the Physician's Desk Reference for Neurontin before she prescribed Neurontin to Mr. Shearer, and if the PDR had said that patients, their families, and caregivers should be informed about an association with suicidality, would she have informed Mr. Shearer about Neurontin and suicidality? *See* Angevine Dep. at 111:8-19, Defs.' Ex. W. Dr. Angevine answered in general that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. Angevine Dep. at 111:1-2, 111:5-7, 111:9-12, Defs. Ex. W.

Similarly, Dr. Sullivan testified that he always reviews the risks and benefits of every medication he prescribes, and that if he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001.

Neither Dr. Angevine nor Dr. Sullivan testified that they would NOT have relied on the Physician's Desk Reference or any other source of information concerning the risks of ingesting

10

Neurontin prior to prescribing Neurontin to Mr. Shearer.  Thus, the evidence showing that Defendants suppressed depression/suicidality information raises triable issues of fact regarding Defendants' failure-to-warn claims.

## II. IT WAS FORESEEABLE TO DEFENDANTS THAT A PATIENT SUCH AS MR. SHEARER WOULD BE PRESCRIBED NEURONTIN AND WOULD BECOME UNCONTROLLABLY IMPULSIVE AND SUICIDAL AS A RESULT OF CONSUMING NEURONTIN

Under Massachusetts law, an act of suicide is generally deemed an independent intervening cause that relieves a defendant of liability unless "the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the [defendant], and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act."  *Daniels v. New York, New Haven & Hartford R.R.*, 183 Mass. 393, 399-400, 67 N.E. 424, 426 (1903); *see also Freyermuth v. Lutfy*, 376 Mass. 612, 382 N.E.2d 1059 (1978) (suicide was the result of an "uncontrollable impulse" or "irresistible impulse" produced by recurrence of plaintiff's preexisting mental illness, which in turn arose out of the trauma and mental distress brought on by automobile accident involving defendant's vehicle).  The Massachusetts courts have not limited their analysis of like cases to an ironclad rule, subject to the limited exceptions set out in *Daniels* and *Freyermuth*.  *Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 243, 825 N.E.2d 554, 558 (App. Ct. 2005).

Plaintiff does not contend that Mr. Shearer's suicide was accomplished in delirium or frenzy caused by Defendants.  However, as discussed above, there is medical testimony from both Plaintiff's specific causation experts that Mr. Shearer's suicide was not premeditated but was an uncontrollably impulsive act.  Defendants cite *Beer v. Upjohn Co.*, 943 S.W.2d 691 (Mo. Ct. App. 1997), where the plaintiff appealed from the action of the trial court in sustaining the defendant's motion for directed verdict at the close of the plaintiffs' case in a wrongful death action arising out of the decedent's suicide after consuming Halcion, a sleeping medication product of the defendant.  In *Beer*, the plaintiff's psychiatrist was permitted to testify *at trial* that Halcion had the capacity to seriously compromise the impulse control mechanisms of the brain.

11

"The psychiatrist concluded that Halcion was the cause of Beer's suicide because Halcion could cause loss of impulse control and *because he could see no other reason for Beer's suicide*." 943 S.W.2d at 694 (emphasis added).  In contrast, here, Dr. Glenmullen testified that Mr. Shearer's suicide note was part of a very impulsive event, and Dr. Kruszewski testified that Mr. Shearer's suicide was an impulsive decision.  Whether this impulsive act by Mr. Shearer fits the exception under Massachusetts law is a question of fact for the jury.

Defendants minimize the repeated emphasis by the courts on the significance of foreseeability in determining proximate cause.  *See, e.g.*, *Staelens v. Dobert*, 318 F.3d 77, 79 (1st Cir. 2003) ("the question of proximate cause —i.e., whether a risk of harm was reasonably foreseeable—is ordinarily for the jury"); *Kent v. Commonwealth*, 437 Mass. 312, 320, 771 N.E.2d 770, 777 (2002) ("Whether negligent conduct is the proximate cause of an injury depends not on factual causation, but rather on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct."); *Augustine v. Cross*, No. 92-01417, 3 Mass. L. Rep. 273, 1995 Mass. Super. LEXIS 815, at *8 ("The touchstone of proximate cause is forseeability."); *see also Tate v. Canonica*, 180 Cal. App. 2d 898, 918, 5 Cal. Rptr. 28, 42 (Cal. Ct. App. 1960) ("The usual rule is 'that the intervening act of a third person does not relieve the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing. [Citation omitted.]"); *MacDermid v. Discover Financial Servs.*, 488 F.3d 721, 736 (6th Cir. 2007) (foreseeability is the touchstone of the independent intervening cause inquiry"); *Lancaster v. Montesi*, 216 Tenn. 50, 55, 390 S.W.2d 217, 220 (1965) ("Foreseeability is the test for negligence, and the inquiry is whether defendant's conduct created an unreasonable risk of harm to plaintiff.").

This Court is well aware of the dispute in this multidistrict litigation as to whether and when it became foreseeable to Defendants that use of their prescription drug Neurontin could cause depression and suicidality.  Plaintiff previously submitted evidence by her general causation expert, Dr. Michael Trimble, who was formerly retained by Defendants, that he had warned of the risk of depression as a result of taking Neurontin, (*see* ECF Doc. # 1200, Exs. 77,

12

79, 92), as did Cynthia McCormick, a former FDA employee, in her Clinical Review. (*See* MDL ECF Doc. # 1200, Exs. 15, 35.) This question regarding foreseeability should be left to the jury.

In *Rimbert v. Eli Lilly & Co.*, 577 F. Supp. 2d 1174 (D.N.M. 2008), the plaintiff alleged that defendant Eli Lilly and Company wrongfully sold the prescription drug Prozac, which allegedly caused the plaintiff's decedent to commit suicide. Eli Lilly moved for summary judgment, asserting that under New Mexico law, the decedent's suicide was an independent intervening cause that interrupted the chain of causation and relieved Eli Lilly of liability. The district court held that Eli Lilly had not carried its burden to prove that the suicide was an independent intervening cause, and that there was a genuine issue of material fact regarding whether the suicide was an intervening cause. *Id.* at 1231, 1234.

Similarly, in *Stupak v. Hoffman-La Roche, Inc.*, 287 F. Supp. 2d 968 (E.D. Wis. 2003), the plaintiff alleged that defendant Hoffman-La Roche, Inc. wrongfully sold the prescription drug Accutane, which allegedly caused the plaintiff's decedent to commit suicide as a result of ingesting the drug. Hoffman-La Roche moved to dismiss the complaint, in part on the grounds that under Wisconsin law, suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render the defendant civilly liable. The district court held that the factual allegations raised by plaintiff were sufficient to raise a question of fact so as to preclude dismissal. *Id.* at 975.

In *White v. Lawrence*, 975 S.W.2d 525 (Tenn. Sup. Ct. 1998), the plaintiff's decedent committed suicide after taking Antabuse, a prescription medicine that produces a sensitivity to alcohol, which had been prescribed to him by the defendant physician. The Tennessee Supreme Court rejected the defendant's contention that the suicide was an independent intervening cause:

> As the expert testimony in this case demonstrates, the foreseeability or likelihood of a suicide does not necessarily depend upon the mental capacity of the deceased at the time the suicide was committed. The fact that the deceased was not insane or bereft of reason does not necessarily lead to the conclusion that the suicide, which is the purported intervening cause, is unforeseeable. As our cases dealing with proximate or legal causation have indicated, the crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide. If so, the suicide is not an

13

> independent intervening cause breaking the chain of legal causation. Those decisions holding to the contrary are overruled. . . .
>
> The record in this case shows that reasonable minds could conclude that the decedent's act of suicide was a foreseeable consequence of the defendant's negligence in surreptitiously prescribing and administering the Antabuse. The record shows that leading risk factors for suicide include physical illness and depression. The decedent suffered from both. The plaintiff presented medical proof that the decedent's suicide was reasonably foreseeable from a medical standpoint, and that the defendant's conduct was a substantial factor in bringing about the suicide. Both Dr. Pate and Dr. Smith testified that the defendant should have reasonably foreseen that secretly prescribing Antabuse to an alcoholic and depressed patient would cause severe physical problems and could cause the decedent to choose to end his life. The jury could thus find that the suicide was the foreseeable result of the defendant's negligence.

975 S.W.2d at 530.  Although the drug in *White* was prescribed by the defendant physician and was not sold by a pharmaceutical company, the circumstances are very similar to the case at bar.

Moreover, Defendants mischaracterize the debate and ignore the fact that Mr. Shearer's suicide was *dependent on* and *caused by* Defendants' own wrongful act.  As the California Court of Appeal noted sixty years ago in *Werkman v. Howard Zink Corp.*, 97 Cal. App. 2d 418, 424-25, 218 P.2d 43, 48 (Cal. Ct. App. 1950):

> She also confuses an "independent intervening cause" and a "dependent intervening cause," as applied to the facts.  "An independent intervening cause is one which operates without respect to defendant's cause.  It would have been operating when and where it did if defendant's cause was wholly out of the picture. In other words it is a cause which is not caused by defendant's act. . . . A dependent intervening cause is one which is caused by the tortfeasor act.  If the intervening act is stimulated or incited by defendant's act it will be dependent, but it need not be stimulated or incited, it is sufficient if it were merely caused by defendant's act." (Carpenter, *Rules For Determining Proximate Cause*, 20 Cal. L. Rev. 484; *see, also*, Rest., Torts, § 441, comment c.)

Likewise, here, Mr. Shearer's suicide was dependent on and caused by Defendants' act in selling their prescription drug without warning that Neurontin could cause suicidality, and was not and independent intervening cause that relieves Defendants of liability in this case.

In short, the evidence raises a genuine issue of material fact as to whether it was reasonably foreseeable to Defendants that the ingestion of their prescription drug Neurontin could cause a patient who consumed the drug to commit suicide.  Thus, Defendants' motion for summary judgment based upon their theory that Mr. Shearer's suicide was an independent intervening cause should be denied, and the issue should be left for decision by the jury.

**III**.   **THERE IS NO GOOD REASON TO DISMISS PLAINTIFF'S ALTERNATIVE CLAIMS OF IMPLIED WARRANTY, STRICT LIABILITY, FRAUDULENT CONCEALMENT AND SURVIVAL**

As discussed above, Plaintiff does not oppose those parts of Defendants' motion seeking to dismiss Plaintiff's claims for express warranty and violation of the Massachusetts Consumer Protection Act, but Plaintiff does seek to continue to go to trial on her claims of negligent failure-to-warn, implied warranty, strict liability, fraudulent concealment and survival.

The Court should reject Defendants' contention that Plaintiff's implied warranty, strict liability and fraudulent concealment claims should be dismissed as duplicative of her negligent failure-to-warn claim. Mass. R. Civ. P. 8(a) and 8(e)(2) permit the pleading of alternative theories of relief. *See Chambers v. Gold Medal Bakery, Inc.*, No. BRCV2009-00716, 2009 Mass. Super. LEXIS 344, at *35 (Super. Ct. 2009) (denying defendants' request that the court dismiss plaintiff's Count V claim for breach of the implied covenant, which was may be largely duplicative of plaintiff's Count VI breach of contract claim, although any recovery under Count V must not be duplicative of any recovery by plaintiffs under Count VI); *Christopher v. Glen-Mor Fuel Oil Co.*, 6 Mass. L. Rep. 178, 1996 Mass. Super. LEXIS 39, *6-7 (Super. Ct. Nov. 8, 1996) (rejecting defendants' argument that plaintiff's contract claim should be dismissed because it was duplicative of her negligence claim); *Frontier Ins. Co. v. A. Anthony Tappe & Assocs., Inc.*, No. 01-1344B, 15 Mass. L. Rep. 5, 2002 Mass. Super. LEXIS 234, at &17 (Super. Ct. July 10, 2002) (denying defendants' request to dismiss plaintiff's negligence counts because the causes were merely restatements of the G.L.c. 21E, §4A counts, where court had already rejected defendants' several challenges to plaintiff's G.L.c. 21E counts).

Similarly, here, this Court should deny Defendants' motion for summary judgment dismissing Plaintiff's implied warranty, strict liability and fraudulent concealment claims (and survival claim) as being duplicative of her negligent failure-to-warn claims, though any recovery under these allegedly duplicative claims should not be duplicative of any recovery by Plaintiff under her negligent failure-to-warn claim.

## CONCLUSION

In view of the above, it is respectfully requested that the Court deny in its entirety Defendants' motion for summary judgment.

Dated: February 18, 2010

Respectfully submitted,

FINKELSTEIN & PARTNERS, LLP
*Attorneys for Plaintiff Linda B. Shearer*

By: **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
1279 Route 300, P.O. Box 1111
Newburgh, NY 12551
(800) 634-1212
(845) 562-3492 (fax)
email: afinkelstein@lawampm.com

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 18, 2010.

Dated: February 18, 2010\

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire