UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-------------------------------------------------------------x
                                              :
In re:  NEURONTIN MARKETING,                  :
        SALES PRACTICES AND                   :
        PRODUCTS LIABILITY LITIGATION         :
                                              :
-------------------------------------------------------------x
                                              :
THIS DOCUMENT RELATES TO:                     :
                                              :
Shearer v. Pfizer Inc., 1:07-cv-11428-PBS     :
                                              :
-------------------------------------------------------------x
```

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS AND
PLAINTIFF'S FURTHER STATEMENT OF MATERIAL FACTS[1]**

**I.     PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL RULE 56.1
        STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Prior to his stroke in 1999, Hartley Shearer was a video artist and a part-time lecturer at Williams College.

Response:

        Admit.


2.      Plaintiff Linda Shearer, during the relevant time period, worked as Director of the Williams College Museum of Art.

Response:

        Admit.


3.      An avid hockey player and volunteer assistant coach prior to 1999, Mr. Shearer lived an active life, exercising daily and volunteering at a boys home on a consistent basis.

Response:

        Admit.

---

[1] The facts admitted herein are admitted for the purposes of opposing Defendants' Motion for Summary Judgment only.

4.      In 1999, during an operation for elective heart surgery, Mr. Shearer suffered a severe right hemisphere stroke, which left him with significant paralysis on the left side of his body.

Response:

    Admit.


5.      The stroke forced him to abandon, or significantly alter, both teaching as well as his pursuit of his degree, along with many of his favorite activities, including exercise, and his volunteer work.

Response:

    Disputed.   Plaintiff submits that paragraph 6 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  In the Spring of 2002, Mr. Shearer began teaching a course at Williams College with Mrs. Shearer.  It was a three and a half hour, one day a week, seminar. There were approximately 20 students enrolled.  The class was a big success.  Prior to that he was working on a CD-ROM and he wanted to complete that.  (L. Shearer Dep. Vol. I at 211:16-24; 212:6-10; 214:6-7, 17; 213:7, attached to the Declaration of Andrew G. Finkelstein, Esq., as Exhibit A.)  Mr. Shearer was working on an art college project.  There were often students in the house working on this DVD.  He also went to the computer center to work with a student there. (L. Shearer Dep. Vol. I at 161:25; 162:1-3; 168:4-6, Pl.'s Ex. A.)  Mr. Shearer exercised very diligently; very rigorously after the stroke.  He continued to walk and swim.  He went target shooting twice a month.  (L. Shearer Dep. Vol. I at 163:20-25; 164:1, Pl.'s Ex A; L. Shearer Dep. Vol. II at 268:3-8, Pl.'s Ex. B.)  He walked the hill next to his house for exercise.  (Wheeler Dep. at  14:5-6, Pl.'s Ex. C.)  He used a universal gym in his house.  (Wheeler Dep. at 14:9-10, Pl.'s Ex. C.)


6.      His work as a part-time teacher also became limited.

Response:

    Disputed.   Plaintiff submits that paragraph 6 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  In the Spring of 2002 Mr. Shearer began teaching a course at Williams College with Mrs. Shearer.  It was a three and a half hour, one day a week, seminar. (L. Shearer Dep., Vol. I at 211:16-24; 212:6-10, Pl.'s Ex. A.)


7.      His physical limitations and needs also created marital strain.

Response:

    Admit.

8.    Because Mr. Shearer was incapable of taking care of his daily needs on his own, such as grooming and dressing himself, the Shearers were forced to hire a caretaker, incurring $20,000 to $35,000 of credit care debt in the process.

Response:

Disputed. Plaintiff submits that paragraph 8 of Defendants' Statement of Facts is incorrect or otherwise incomplete. After the stroke, Mr. Shearer could walk up and down stairs (L. Shearer Dep. Vol. I at 152:1-6; 154:13-16, Pl.'s Ex. A); he could ambulate; he could go downstairs and fix coffee. (L. Shearer Dep. Vol. I at 159:13-15, Pl.'s Ex A); he could go to the bathroom by himself (L. Shearer Dep. Vol. I at 163:7-11, Pl.'s Ex. A); he could give himself a sponge bath. (L. Shearer Dep. Vol. I at 238:6-12, Pl.'s Ex. A.) Mr. Shearer's caregiver, Sean Wheeler, testified that Mr. Shearer did not need help eating meals, but that he would help get him situated. (Wheeler Dep. at 18:24-25; 19:1-8, Pl.'s Ex. C.) Mr. Shearer exercised very diligently; very rigorously after the stroke; he continued to walk and swim; and he went target shooting twice a month. (L. Shearer Dep. Vol. I at 163:20-25; 164:1; 268:3-8, Pl.'s Ex. A.) He walked the hill next to his house for exercise. (Wheeler Dep. at 14:5-6, Pl.'s Ex C.) He used a universal gym in his house. (Wheeler Dep. at 14:9-10 -- Ex. C.)

9.    Even very early in his life, Mr. Shearer struggled with mental health issues.

Response:

Admit.

10.    He was raised by his grandfather and sent away to boarding school at a young age.

Response:

Admit.

11.    At various times throughout his life, Mr. Shearer was diagnosed by mental health professionals with depression, obsessive compulsive disorder, anxiety, an attention deficit disorder.

Response:

Admit.

12.    In the late 1980s, Mr. Shearer was diagnosed with attention deficit disorder, for which he was prescribed Ritalin and continued to take the rest of his life.

Response:

Admit.

13.     Mr. Shearer also had a "controlling" personality as described by himself and his family.

Response:

Admit that on occasion the term "controlling" may have been used to describe Mr. Shearer, but the Spaulding records cited by Defendants actually say that Mr. Shearer 'has always been an in "control" person', which is distinguishable from "controlling".

14.     In 1996, even prior to his stroke, Mr. Shearer was diagnosed with depression, for which he was prescribe 20 mg Prozac.

Response:

Admit.

15.     That dose was later increased to 40 mg to treat increased anxiety.

Response:

Admit.

16.     Mr. Shearer refilled his Prozac prescription 12 days prior to his death.

Response:

Admit.

17.     Mr. Shearer saw several mental health professionals over the course of his lifetime.

Response:

Admit.

18.     On February 18, 2000, following his stroke, Mr. Shearer began to see a psychiatrist, Dr. Catapano-Friedman, because he was "concerned about his anger and venting it on Linda," a problem that continued throughout his treatment with Dr. Catapano-Friedman.

Response:

Admit.

19.     Dr. Catapano-Friedman diagnosed Mr. Shearer with narcissistic personality disorder.

Response:

Admit.



Response:

21.     On September 28, 2000, Mr. Shearer was hospitalized for severe low back pain; he then developed endocarditis, and later required an emergency splenectomy.

Response:

Admit.

22.     A nursing assessment of Mr. Shearer on October 14, 2000, reported that Mr. Shearer felt "on [the] edge of breakdown."

Response:

Admit.   However, Dr. Anne Hudson Angevine testified that when she wrote her admitting note on October 14, 2000, she did not get the sense that Mr. Shearer was on the edge of a breakdown. (Angevine Dep. at 48:21-25, Pl.'s Ex. D.)

23.     Mr. Shearer became disoriented and had paranoid delusions on certain narcotics.

Response:

Admit that Mr. Shearer experienced an episode of confusion and paranoia apparently attributable to heavy narcotics that had been prescribed to control pain during his admission to Brigham & Women's Hospital in October, 2000. (Angevine Dep. at 69:18-25; 70:1-10, Pl.'s Ex. D.)

24.     The Brigham & Women's Hospital pain service prescribed Neurontin on October 14, 2000, to treat Mr. Shearer's pain.

Response:

Admit.

25.     Mr. Shearer later told Dr. Catapano-Friedman that he was "very traumatized" by this hospitalization.

Response:

Admit the this is what Dr. Catapano-Friedman states Mr. Shearer told her.  (Catapano-Friedman Dep. at 46:10-15, Pl.'s Ex. E.)

26.     On February 28, 2001, the Shearers got into an argument.   According Mrs. Shearer after Mr. Shearer "ended up in her face" Mrs. Shearer slapped Mr. Shearer.  Mr. Shearer called the police, which came and arrested Mrs. Shearer and took her into custody.  The charges of assault and battery against Mrs. Shearer were later dismissed.

Response:

Admit.

27.     Dr. Catapano-Friedman later explained that because of this incident, Mr. Shearer "[r]ealize[d] he need[ed] to 'ratchet down' his constant anger" and began taking Zypreza.

Response:

Admit.

28.     On February 5, 2002, Mrs. Shearer left Massachusetts for a conference in Hawaii for the Association of Art Museum Directors.

Response:

Admit.

29.     On February 5, 2002, Mr. and Mrs. Shearer got into an argument over the telephone.

Response:

Admit.

30.     Mr. Shearer's caretaker, Sean Wheeler, observed Mr. Shearer appeared agitated when he got off the phone.

Response:

Admit.

31.   Mr. Shearer told his caretaker that he planned on attending a scheduled medical appointment, but that he needed to collect a few things upstairs first.

Response:

Admit.

32.   Mr. Shearer locked his bedroom door and shot himself in the head with his gun.

Response:

Admit.

33.   Mr. Shearer shot himself as much as an hour or more after his telephone conversation with Plaintiff.

Response:

Disputed.   Plaintiff submits that paragraph 33 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  After ending his phone call with Linda Shearer, Mr. Shearer "said he was tired and he was going to go upstairs and to give him a couple of minutes, you know, he had gone upstairs to his room, you know, and I said, all right, I'm just going to keep doing things down here and then we're going to be on our way." (Wheeler Dep. at 41:11-15, Pl.'s Ex. C.)  When asked "and then what happened?," Sean Wheeler testified "I was downstairs, you know, dishwasher going, T.V. on, you know, I think I was actually in the sink, you know, just washing some things that, obviously, you just couldn't put into the dishwasher, so -- I used to be kind of meticulous in the house, just making sure if I was there, that it was not a mess, because there was, you know, down time -- and I just heard like a crack from upstairs. . . ." (Wheeler Dep. at 41:16-24, Pl.'s Ex. C.)

34.   Mr. Shearer died within hours of shooting himself.

Response:

Admit.

35.   Mr. Shearer left a suicide note that read:  "Linda has left me powerless by hanging up on me for the last time.  I love you both Ivor and Linda.  But this is it – Hartley Shearer."

Response:

Admit.

36.   Mr. Shearer was on a number of psychotropic drugs prior to his suicide – including Trazodone, Prozac, Ativan, Provigil, Zyprexa and Ritalin.

Response:

Admit.

37.     The only drug found in Mr. Shearer's system was benzodiazepine.

Response:

Disputed.  Plaintiff submits that paragraph 37 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  The toxicology report is a screen of prescription and street drugs that people would abuse, such as cocaine, alcohol and benzodiazepine, and would not exhaustively include all of Mr. Shearer's prescription medications.  (Glenmullen Dep. at 200:22-25; 201:1-3, Pl.'s Ex. F)

38.     Plaintiff's expert Dr. Trimble claims that benzodiazepines increase the risk of depression and suicide.

Response:

Disputed.  Plaintiff submits that paragraph 38 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Trimble testified that the FDA did not say whether "marketed antiepileptic drugs" is going to include other drugs not on the list.  He did not have any evidence that the FDA analyzed any drugs other than the eleven on the list.  (Trimble 2/27/08 Dep. at 100:6-25; 102:12-15, Pl.'s Ex. G.)  Dr. Trimble's report as cited by Defendants states only that benzodiazepines "are known to precipitate depression in some people." Furthermore, Dr. Glenmullen notes that while "(b)enzodiazepines like Valium have precautions that they may disinhibit suicidal urges,... for Hartley's age group, the evidence that these other drugs make patients suicidal is not yet as strong as the evidence implicating Neurontin." (Glenmullen Report at p. 32, Pl.'s Ex. H.)  And if Mr. Shearer was ingesting Ativan, Valium and Ativan are both in the same category "benzodiazepines", so what he said regarding Valium would be applicable to Ativan.  (Glenmullen Dep. at 104:2-6; 105:7-8, Pl.'s Ex. F.)  Dr. Glenmullen testified that with the level of evidence in regard to the other drugs which had warnings did not rise to the level of evidence required for proximate cause, like Neurontin did. (Glenmullen Dep. at 115:14-22, Pl.'s Ex. F.)

39.     Dr. Anne Hudson Angevine prescribed Neurontin to Mr. Shearer in October 2000.

Response:

Admit.

40.     Dr. Daniel Sullivan renewed Mr. Shearer's prescription for Neurontin on May 4, 2001.

Response:

Admit.

41.     Dr. Angevine testified that "it would be customary" for her to consider the risks and benefits of Neurontin before prescribing it to Mr. Shearer.

Response:

Admit.

42.     When asked whether she would have informed Mr. Shearer had she been aware in 2000 "that Neurontin was associated with suicidality," Dr. Angevine testified "[m]aybe...I don't know if I would have recommended or advised the patient of that based on that information or not at the time....  It may depend upon a particular patient and whether or not I felt that that particular side effect was potentially relevant to the individual patient."

Response:

Admit that in general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 112:1-7, Pl.'s Ex. D.)

43.     Dr. Angevine testified that she did not know whether hypothetical knowledge in 2000 that Neurontin was a psychotropic drug would have impacted her decision to prescribe Neurontin to Mr. Shearer.

Response:

Admit that in general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 119:8-13, Pl.'s Ex. D.)

44.     Dr. Angevine testified that she did not know whether knowledge of Neurontin's mechanism of action would "have played any role in her prescribing practice to Mr. Shearer."

Response:

Admit that in general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 120:17-23, Pl.'s Ex. D.)

45.     Dr. Sullivan testified that information regarding a statistically significant risk of suicide in placebo controlled randomized trials "would be factored into a decision process."

Response:

Admit.

46.     When asked had he seen "an analysis such as [the FDA alert] in 2001" whether he would have "spoken to Mr. Shearer about the increased risk of suicidality" when refilling his prescription, Dr. Sullivan testified: "I don't know. Because it didn't happen, so I don't know what I would have done."

Response:

Disputed.   Plaintiff submits that paragraph 46 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes.  If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

47.     As to significance of the FDA alert, Dr. Sullivan testified that "each situation needs to be evaluated individually.... each FDA bulletin needs to be looked at carefully because the FDA unfortunately is not always in – in the best of studies providing information that is accurate."

Response:

Disputed.   Plaintiff submits that paragraph 47 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex I.)

48.     Dr. Hynes approved a Neurontin prescription issued by a resident at the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization.

Response:

Admit.

49.     Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.

<u>Response:</u>

Admit.


50.     Dr. Hynes testified that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he was not sure whether he would have had an opportunity to inform Mr. Shearer's caregiver or family of the risk.

<u>Response:</u>

Disputed.  If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.)  If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin.  (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.)  Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer.  (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.)  If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000.  (Hynes Dep. at 190:24-25; 191:1-14, Ex. J.)  Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.)


51.     Dr Hynes still believes that prescribing Neurontin "was appropriate."

<u>Response:</u>

Admit.

52.     None of Mr. Shearer's prescribing doctors testified that an additional disclosure in the label would have changed their decision to prescribe Neurontin to Mr. Shearer.

Response:

Disputed. Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25; 102:1-2, Ex I.)  Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001 . (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)  If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.) If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin.  (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.)  Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.)  If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000.  (Hynes Dep. at 190:24-25; 191:1-14, Pl.'s Ex. J.)  Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.)

53.     Neither Dr. Angevine nor Dr. Sullivan recalled receiving any promotional efforts by Pfizer before they prescribed Neurontin to Mr. Shearer.

Response:

Admit.

54.     Dr. Sullivan testified that he did not recall: any discussion with sales representatives regarding Neurontin participating in any teleconferences regarding Neurontin, or meeting with any medical liaisons regarding Neurontin.

Response:

Admit.

55. Aside from speaking about Alzheimer's "a couple of times," Dr. Sullivan did not recall speaking for, receiving money from, or sitting on any advisory boards for, a pharmaceutical company while practicing in Williamstown.

Response:

Admit.


56. Dr. Sullivan testified that he gained familiarity with prescription medications through medical school, "continuing into internship and residency, and then continued use of new therapies as a licensed physician, continuing medical education, talking to colleagues... many different ways."

Response:

Admit.


57. Dr. Angevine testified that prior to October 2000, she had had no contact with Pfizer sale representatives.

Response:

Admit.


58. Dr. Angevine testified that what she knew about Neurontin she learned in pharmacology class, in the course of her training as a physician, from the attending staff at Brigham & Women's Hospital, and through her own prescription of Neurontin.

Response:

Admit.


59. Dr. Angevine testified that she continues to prescribe Neurontin.

Response:

Admit.


60. Dr. Sullivan testified that he has prescribed Neurontin since treating Mr. Shearer.

Response:

Admit.

61.     Plaintiff's experts have not opined that Mr. Shearer's suicidal act was driven by any uncontrollable impulse or delirium or frenzy caused by Neurontin.

Response:

Disputed. Dr. Glenmullen testified that Mr. Shearer's suicidal act looks pretty impulsive. (Glenmullen Dep. at 92:14, Ex. F.) The note looks as though it was written that morning. It looks as though it's still part of a very impulsive event. (Glenmullen Dep. at 149:24-25; 150:1, Pl.'s Ex. F.) It appears to be part of an impulsive act. (Glenmullen Dep. at 151:19-20, Pl.'s Ex. F.) Mr. Shearer doesn't cite something that might be considered a reasonable explanation for his suicide; he says his wife hung up on him. This note doesn't indicate that the event was very premeditated, or that the note was premeditated. It looks like this particular note was part of an impulsive event. (Glenmullen Dep. at 154:9-24, Pl.'s Ex. F.)  On Neurontin, Mr. Shearer developed worsening depression and mood and behavioral changes that led to his death. (Glenmullen Report at p. 31, ¶ 15, Pl.'s Ex. H.) Dr. Kruszewski  testified that Mr. Shearer's decision to commit suicide was "impulsive". (Kruszewski Dep. at 151:19-20, Pl.'s Ex. K.) Dr. Kruszewski describes the suicidal act as an "impulsive decision to shoot himself in the head." "Neurontin and its depressogenic effect resulted in hopelessness and an irrational desperation (inferred in his suicide note), powerlessness and the impulsive act to kill himself." (Kruszewski Report, at p. 11, Pl.'s Ex. L.)  "Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide." (Kruszewski Report, at p. 16, Pl.'s Ex. L.)

62.     Dr. Kruszewski specifically denies making any "determination one way or the other" as to whether Mr. Shearer was "compelled to commit suicide."

Response:

Admit, however, Dr. Kruszewski was of the opinion that to a reasonable degree of medical and psychiatric certainty, Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide. ( Kruszewski Report, at p. 16, Pl.'s Ex. L.)

63.     There is no evidence that Pfizer ever communicated directly with Mr. Shearer.

Response:

Admit.

64.     There is no evidence of any affirmative representations about Neurontin by Pfizer concerning Neurontin's alleged risk of suicidality to Dr. Sullivan or Dr. Angevine.

Response:

Admit; however, Plaintiff disputes Defendants' use of the term "alleged" inasmuch as the Food and Drug Administration has determined that anticonvulsants, including Neurontin, increase the risk of suicidality (Pl.'s Ex. M), and Defendants' own United States Package Insert for Neurontin, since on or about April 2009, states that Antiepileptic drugs (AEDs), including Neurontin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication. (Pl.'s Ex. N.)

65.     There is no evidence that, even if Dr. Hynes received any warranties from Pfizer, he relied on them in prescribing Neurontin to Mr. Shearer.

Response:

Disputed. Dr. Hynes prescribed Neurontin to Mr. Shearer for neuropathic pain issues. (Hynes Dep. at 120:21-25; 121:1-2, Pl.'s Ex J.)  When Dr. Hynes was visited by Parke-Davis Warner-Lambert sales representatives in 1998-1999, they discussed the use of Neurontin for the treatment of neuropathic pain. (Hynes Dep. at 121:11-19, Pl.'s Ex. J.) The sales representatives did not ever disclose to Dr. Hynes any information whatsoever about whether Neurontin could increase the risk of suicidal behavior in people taking Neurontin. Dr. Ross, who was Dr. Hynes' attending when Dr. Hynes was a fellow, did not ever disclose to Dr. Hynes that Neurontin could cause suicidal behavior in people using it. (Hynes Dep. at 121:21-25; 122:1-4; 185:10-12, Pl.'s Ex. J.) Dr. Ross had a business relationship with Parke-Davis Warner-Lambert. Dr. Ross was a speaker; that is, he was paid by the company to give lectures on the use of Neurontin. (Hynes Dep. at 126:22-25; 127:6, 10-22, 23-25; 128:1-6, Pl.'s Ex. J.) Dr. Hynes attended approximately a half a dozen of such lectures before prescribing Neurontin to Mr. Shearer. (Hynes Dep. at 128:7-14, Pl.'s Ex. J.) Dr. Ross's lectures regarding Neurontin influenced Dr. Hynes with respect to his decision to prescribe Neurontin to Mr. Shearer. (Hynes Dep. at 130:3-17, Pl.'s Ex. J.) Dr. Hynes relied on the information provided by the sales representatives as part of his job as a prescribing physician. (Hynes Dep. at 185:3-9, Pl.'s Ex. J.)

66.     There is no evidence that Mr. Shearer took Neurontin in reliance on any affirmation of fact by Pfizer that later proved false.

Response:

Disputed.  If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.) If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.) Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.) If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Pl.'s Ex. J.) Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.) Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

67.     There is no evidence that Mr. Shearer's prescribing physicians prescribed Neurontin based on an affirmation of fact by Pfizer that later proved false.

Response:

Disputed. If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.) If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.) Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Ex. J.) If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Pl.'s Ex. J.) Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.) Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

68.     Plaintiff did not provide Pfizer with any pre-suit notice of her claim.

Response:

Admit.

69.     Plaintiff's Amended Complaint does not allege that she provided the requisite statutory notice.

Response:

Admit.

16

## II.    PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1.     In the Spring of 2002, Mr. Shearer began teaching a course at Williams College with Mrs. Shearer.  It was a three and a half hour, one day a week, seminar.  There were approximately 20 students enrolled.  The class was a big success.  Prior to that he was working on a CD-ROM and he wanted to complete that.  (L. Shearer Dep. Vol. I at 211:16-24; 212:6-10; 214:6-7, 17; 213:7, Pl.'s Ex. A.)

2.     Mr. Shearer was working on an art college project.  There were often students in the house working on this DVD.  He also went to the computer center to work with a student there.  (L. Shearer Dep. Vol. I at 161:25; 162:1-3; 168:4-6, Pl.'s Ex. A.)

3.     Mr. Shearer exercised very diligently; very rigorously after the stroke.  He continued to walk and swim.  He went target shooting twice a month.  (L. Shearer Dep. Vol. I at 163:20-25; 164:1, Pl.'s Ex. A; L. Shearer Dep. Vol. II at 268:3-8, Pl.'s Ex. B.)

4.     He walked the hill next to his house for exercise.  (Wheeler Dep. at 14:5-6, Pl.'s Ex. C.)

5.     He used a universal gym in his house.  (Wheeler Dep. at 14:9-10, Pl.'s Ex. C.)

6.     After the stroke, Mr. Shearer could walk up and down stairs.  (L. Shearer Dep. Vol. I at 152:1-6; 154:13-16, Pl.'s Ex. A.)

7.     He could ambulate; he could go downstairs and fix coffee.  (L. Shearer Dep. Vol. I at 159:13-15, Pl.'s Ex. A.)

8.     He could go to the bathroom by himself.  (L. Shearer Dep. Vol. I at 163:7-11, Pl.'s Ex. A.)

9.     He could give himself a sponge bath.  (L. Shearer Dep. Vol. I at 238:6-12, Pl.'s Ex. A.)

10.     Mr. Shearer's caregiver, Sean Wheeler, testified that Mr. Shearer did not need help eating meals, but that he would help get him situated.  (Wheeler Dep. at 18:24-25; 19:1-8, Pl.'s Ex. C.)

11.     Dr. Anne Hudson Angevine testified that when she wrote her admitting note on October 14, 2000, she did not get the sense that Mr. Shearer was on the edge of a breakdown.  (Angevine Dep. at 48:21-25, Pl.'s Ex. D.)

12.     Mr. Shearer experienced an episode of confusion and paranoia apparently attributable to heavy narcotics that had been prescribed to control pain during his admission to Brigham & Women's Hospital in October, 2000.  (Angevine Dep. at 69:18-25; 70:1-10, Pl.'s Ex. D.)

13.     After ending his phone call with Linda Shearer, Mr. Shearer "said he was tired and he was going to go upstairs and to give him a couple of minutes, you know, he had gone upstairs to his room, you know, and I said, all right, I'm just going to keep doing things down here and then we're going to be on our way."  (Wheeler Dep. at 41:11-15, Pl.'s Ex. C.)

14.     When asked "and then what happened?," Sean Wheeler testified "I was downstairs, you know, dishwasher going, T.V. on, you know, I think I was actually in the sink, you know, just washing some things that, obviously, you just couldn't put into the dishwasher, so -- I used to be kind of meticulous in the house, just making sure if I was there, that it was not a mess, because there was, you know, down time -- and I just heard like a crack from upstairs. . . ." (Wheeler Dep. at 41:16-24, Pl.'s Ex. C.)

15.     The toxicology report is a screen of prescription and street drugs that people would abuse, such as cocaine, alcohol and benzodiazepine, and would not exhaustively include all of Mr. Shearer's prescription medications. (Glenmullen Dep. at 200:22-25; 201:1-3, Pl.'s Ex. F.)

16.     Dr. Trimble testified that the FDA did not say whether "marketed antiepileptic drugs" is going to include other drugs not on the list. He did not have any evidence that the FDA analyzed any drugs other than the eleven on the list. (Trimble 2/27/08 Dep. at 100:6-25; 102:12-15, Pl.'s Ex. G.)

17.     Dr. Trimble's report states only that benzodiazepines "are known to precipitate depression in some people."   (Trimble Report annexed to Defendants' Summary Judgment motion as Exhibit V, at 18.)

18.     Dr. Glenmullen notes that while "(b)enzodiazepines like Valium have precautions that they may disinhibit suicidal urges,... for Hartley's age group, the evidence that these other drugs make patients suicidal is not yet as strong as the evidence implicating Neurontin." (Glenmullen Report at p. 32, Pl.'s Ex. H.)

19.     If Mr. Shearer was ingesting Ativan, Valium and Ativan are both in the same category "benzodiazepines", so what he said regarding Valium would be applicable to Ativan. (Glenmullen Dep. at 104:2-6; 105:7-8, Pl.'s Ex. F.)

20.     Dr. Glenmullen testified that with the level of evidence in regard to the other drugs which had warnings did not rise to the level of evidence required for proximate cause, like Neurontin did. (Glenmullen Dep. at 115:14-22, Pl.'s Ex. F.)

21.     In general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 112:1-7, Pl.'s Ex. D.)

22.     Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.)

23.     Dr. Sullivan always reviews the risks and benefits of every medication he prescribes.  If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

24.     If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.)

25.     If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin.  (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.)

26.     Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.)

27.     If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Ex. J.)

28.     Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.)

29.     Dr. Glenmullen testified that Mr. Shearer's suicidal act looks pretty impulsive. (Glenmullen Dep. at 92:14, Ex. F.)

30.     The note looks as though it was written that morning.  It looks as though it's still part of a very impulsive event. (Glenmullen Dep. at 149:24-25; 150:1, Pl.'s Ex. F.)

31.     It appears to be part of an impulsive act.  (Glenmullen Dep. at 151:19-20, Pl.'s Ex. F.)

32.     Mr. Shearer doesn't cite something that might be considered a reasonable explanation for his suicide; he says his wife hung up on him.  This note doesn't indicate that the event was very premeditated, or that the note was premeditated. It looks like this particular note was part of an impulsive event. (Glenmullen Dep. at 154:9-24, Pl.'s Ex. F.)

33.     On Neurontin, Mr. Shearer developed worsening depression and mood and behavioral changes that led to his death. (Glenmullen Report at p. 31, ¶ 15, Pl.'s Ex. H.) Dr. Kruszewski   testified that Mr. Shearer's decision to commit suicide was "impulsive". (Kruszewski Dep. at 72:2-3, Pl.'s Ex. K.)

34.     Dr. Kruszewski describes the suicidal act as an "impulsive decision to shoot himself in the head."  "Neurontin and its depressogenic effect resulted in hopelessness and an irrational desperation (inferred in his suicide note), powerlessness and the impulsive act to kill himself." (Kruszewski Report, at p. 11, Pl.'s Ex. L.)

35.     "Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide." (Kruszewski Report, at p. 16, Pl.'s Ex. L.)

36.     The Food and Drug Administration has determined that anticonvulsants, including Neurontin, increase the risk of suicidality (Pl.'s Ex. M.)

37.     Defendants' own United States Package Insert for Neurontin, since on or about April 2009, states that Antiepileptic drugs (AEDs), including Neurontin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication. (Pl.'s Ex. N.)

38.     Dr. Hynes prescribed Neurontin to Mr. Shearer for neuropathic pain issues. (Hynes Dep. at 120:21-25; 121:1-2, Pl.'s Ex J.)

39.     When Dr. Hynes was visited by Parke-Davis Warner-Lambert sales representatives in 1998-1999, they discussed the use of Neurontin for the treatment of neuropathic pain. (Hynes Dep. at 121:11-19, Pl.'s Ex. J.)

40.     The sales representatives did not ever disclose to Dr. Hynes any information whatsoever about whether Neurontin could increase the risk of suicidal behavior in people taking Neurontin. Dr. Ross, who was Dr. Hynes' attending when Dr. Hynes was a fellow, did not ever disclose to Dr. Hynes that Neurontin could cause suicidal behavior in people using it.  (Hynes Dep. at 121:21-25; 122:1-4; 185:10-12, Pl.'s Ex. J.)

41.     Dr. Ross had a business relationship with Parke-Davis Warner-Lambert. Dr. Ross was a speaker; that is, he was paid by the company to give lectures on the use of Neurontin. (Hynes Dep. at 126:22-25; 127:6, 10-22, 23-25; 128:1-6, Pl.'s Ex. J.)

42.     Dr. Hynes attended approximately a half a dozen of such lectures before prescribing Neurontin to Mr. Shearer.  (Hynes Dep. at 128:7-14, Pl.'s Ex. J.)

43.     Dr. Ross's lectures regarding Neurontin influenced Dr. Hynes with respect to his decision to prescribe Neurontin to Mr. Shearer.  (Hynes Dep. at 130:3-17, Pl.'s Ex. J.)

44.     Dr. Hynes relied on the information provided by the sales representatives as part of his job as a prescribing physician.  (Hynes Dep. at 185:3-9, Pl.'s Ex. J.)

Dated: February 18, 2010                    Respectfully submitted,

                                            FINKELSTEIN & PARTNERS, LLP
                                            *Attorneys for Plaintiff Linda B. Shearer*


                                                   /s/ **Andrew G. Finkelstein**
                                            Andrew G. Finkelstein, Esquire
                                            1279 Route 300, P.O. Box 1111
                                            Newburgh, NY  12551
                                            (800) 634-1212
                                            (845) 562-3492 (fax)
                                            email: afinkelstein@lawampm.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 18, 2010.

                                                   /s/ **Andrew G. Finkelstein**
                                            Andrew G. Finkelstein, Esquire