EXHIBIT D

```
 1  UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
 2  ----------------------------------x
    IN RE:    NEURONTIN MARKETING,      MDL DOCKET
 3            SALES PRACTICES AND       NO. 1629
              PRODUCTS LIABILITY        MASTER FILE
 4            LITIGATION,               NO. 04-10981

 5  _____x

 6  THIS DOCUMENT RELATES TO:          JUDGE PATTI B.
                                       SARIS, MAGISTRATE
 7  SHEARER VS. PFIZER, ET AL;         JUDGE LEO T.
       -CV-11428-PBS,                  SOROKIN
 8
                 Defendant.
 9  ----------------------------------x

10

11            DEPOSITION OF ANNE HUDSON ANGEVINE

12
         The deposition of Anne Hudson Angevine was
13
    taken on November 17, 2009, at Hyatt Regency
14
    Greenwich, 1800 East Putnam Avenue, Old Greenwich,
15
    Connecticut, before Susan Wandzilak, Registered
16
    Professional Reporter and Notary Public in the
17
    State of Connecticut.
18

19

20

21            Susan Wandzilak   License No. 377

22

23

24

25  Job No. 225429
```

1  Q.  Basically, this is in response to a question
2  that, Can you tell me why you were seeking help at
3  Brigham and Women's Hospital?  Include what the
4  patient states caused the situation to occur and what
5  will improve the situation.
6      What was the response to that question as
7  indicated by the patient health history?
8  A.  Here for pain control starting September 17.
9  Also needs mitral valve evaluated.
10  Q.  Going to the next page, would you read the
11  line under physical assessment.
12  A.  Skin warm and dry.  Color within patient's
13  norm.  Skin intact.  No rash, petechiae, or
14  ecchymosis.
15  Q.  Is there any indication there as to whether
16  or not that question was answered yes or no?
17  A.  If no, specify.  There is a written statement
18  that says unable to assess.  Patient unable to tear?
19  I am not sure exactly what that word says.  Patient
20  feels on edge of breakdown.
21  Q.  Now, in terms of your admitting note, which
22  was on October 14, 2000, did you get the sense that
23  from reading the note that you wrote that Mr. Shearer
24  was on the edge of breakdown?
25  A.  No, not based on my documentation.

1     Q.    According to your note?

2         MR. FROMSON:  Objection.

3         THE WITNESS:  It is not indicated in my note

4 which medication I felt was causing the side

5 effects.

6 BY MR. BARNES:

7     Q.    Why do you -- in terms of the continuation of

8 Flexeril and Neurontin, given the note, did you feel

9 that Flexeril or Neurontin were contributing to the

10 paranoia experienced by the patient?

11         MR. FROMSON:  Objection.  Lack of foundation.

12         THE WITNESS:  Should I answer?

13 BY MR. BARNES:

14     Q.    Yes.

15     A.    My note doesn't indicate whether or not I

16 felt either of those medications were specifically

17 causing the patient's paranoia.

18     Q.    Why don't you go down to the psyche note, the

19 next note.

20     A.    Number four, psyche.  Patient reports feeling

21 disoriented and confused.  Likely combination of

22 overmedication and new environment.  Will cut back on

23 psychotropic meds.  Follow mental status.  Haldol as

24 needed for agitation.  Psyche consult if symptoms

25 persist.  Off heavy narcotics.

1   Q.   And reading that note, did you come to the
2  determination as to which medicine was associated with
3  the patient's feelings of disorientation, confusion,
4  and paranoia?
5       MR. FROMSON:   Objection.  Form.
6       THE WITNESS:   It's hard to tell, but given
7   that I indicate that the patient -- that I will
8   re-evaluate after stopping heavy narcotics, it's
9   possible that I thought that the heavy narcotics
10  were causing the problem.
11 BY MR. BARNES:
12  Q.   Going down to the disposition, can you read
13 that into the record, please.
14  A.   Likely skilled nursing facility placement
15 once stable for -- likely skilled nursing facility
16 placement once stable for discharge in terms of pain
17 management.  Physical therapy evaluation.
18  Q.   Okay.  At this point, how was Mr. Shearer
19 responding to the pain regimen that you were
20 monitoring?
21  A.   According to my subjective assessment on
22 October 16, the patient was reporting that his pain
23 and mobility were improved compared to admission.
24  Q.   Would you go to page 420, please.  And I
25 don't know if that -- can you identify the author of

Case 1:04-cv-10981-PBS   Document 2525-5   Filed 02/18/10   Page 6 of 8

112

1      THE WITNESS:  I don't know.  Can I answer I
2   don't know?
3   BY MR. FROMSON:
4      Q.   You can answer whatever way is honest.
5      A.   I don't know if I would have recommended that
6   or advised the patient of that based on that
7   information or not at the time.
8      Q.   Is there a reason why you would not?
9      A.   It may depend upon a particular patient's --
10  it may depend upon whether or not I felt that that
11  particular side effect was potentially relevant to the
12  individual patient.
13     Q.   Do you have an independent recollection --
14  let me withdraw the question.  There were references
15  in the record to -- actually, let me withdraw that.
16          I want to know whether Mr. Shearer's
17  condition, the pain syndrome he was suffering from,
18  was non-susceptive or neuropathic, okay.  And I don't
19  know the distinction.  Can you first tell us what does
20  it mean to suffer from non-susceptive pain?
21          MR. BARNES:  Objection.
22          THE WITNESS:  That's not really my area of
23      expertise so I don't really feel comfortable
24      trying to define that.
25  BY MR. FROMSON:

Veritext Corporate Services
800-567-8658                                                      973-410-4040

```
 1  prescribing Neurontin to Mr. Shearer?
 2           MR. BARNES:  Objection.
 3           THE WITNESS:  Yes.
 4  BY MR. FROMSON:
 5      Q.   Why?
 6      A.   In general, it's important to know about any
 7  potential side effects of medications.
 8      Q.   Well, would -- assuming hypothetically that
 9  Neurontin was a psychotropic drug and assuming you
10  knew it back in 2000, would it have affected your
11  prescribing practice of Neurontin for Mr. Shearer?
12           MR. BARNES:  Objection.
13           THE WITNESS:  I don't know.
14           Again, I think that that is impacted by the
15  patient's individual circumstances as to whether or
16  not a side effect is potentially relevant to them.
17      Q.   Do you -- have you ever heard of the word
18  serotonin?
19      A.   Yes.
20      Q.   What is your understanding of what serotonin
21  is?
22      A.   It's a, it's a substance that circulates in
23  the body that has an impact on -- a neurohormone I
24  guess is how it would be defined.  And so it can be,
25  it can have an impact in the pathogenesis of
```

1  depression, for example.

2  Q. Did you have any knowledge as to whether --
3  well, withdrawn.

4  Do you prescribe antidepressants as a cancer
5  doctor, as an oncologist?

6  A. Not frequently.

7  Q. Are you generally familiar with whether --
8  let me withdraw the question.

9  Did you have any knowledge back in 2000 when
10  prescribing Neurontin to Mr. Shearer as to whether the
11  mechanism of action with respect to Neurontin resulted
12  in a decrease in the release of serotonin from the
13  brain?

14  MR. BARNES: Objection.

15  THE WITNESS: No.

16  BY MR. FROMSON:

17  Q. In terms of its pathogenesis to depression,
18  if you knew that Neurontin back in 2000 had a
19  mechanism of action that could decrease the release of
20  serotonin in the brain, would that have played any
21  role in your prescribing practice to Mr. Shearer?

22  MR. BARNES: Objection.

23  THE WITNESS: I don't know.

24  BY MR. FROMSON:

25  Q. You had indicated in your initial testimony