EXHIBIT F

```
                                    Volume: I
                                    Pages: 1-218
                                    Exhibits: 1-8

          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS

                            MDL DOCKET NO. 1629
                            MASTER FILE NO. 04-10981
* * * * * * * * * * * * * * * * *
IN RE: NEURONTIN MARKETING, SALES       :
PRACTICES AND PRODUCTS LIABILITY        :
LITIGATION,                             :
----------------------------------------
THIS DOCUMENT RELATES TO:               :  JUDGE PATTI
                                        :  B. SARIS
SHEARER VS. PFIZER, ET AL;              :  MAGISTRATE
1:07-CV-11428-PBS                       :  JUDGE LEO T.
                                        :  SOROKIN
* * * * * * * * * * * * * * * * *
```

AUDIO-VISUAL DEPOSITION OF JOSEPH GLENMULLEN, M.D., a witness called on behalf of Pfizer, Inc., pursuant to the provisions of the Federal Rules of Civil Procedure, before Lisa McDonald Valdario, (CSR #130093), a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, held at the Hotel Tria, 220 Alewife Brook Parkway, Cambridge, Massachusetts 02138, on Monday, January 11, 2010, commencing at 9:02 a.m.

Job No.: CS234482

1     prior to his suicide, is that right?
2         MR. FROMSON: Objection as to form. To the
3     extent it misstates his testimony.
4 Q  I'll rephrase that. Was Mr. Shearer suicidal
5     prior to his suicide?
6         MR. FROMSON: Are you talking about through
7     his whole life before Neurontin and during the
8     year that he's described a chain of events leading
9     to the actual event?
10        MR. OHLEMEYER: Sure.
11 Q  At any point in time was Mr. Shearer suicidal?
12 A  Well, obviously he was suicidal before he
13     committed suicide, but how long in advance, we
14     don't exactly know. It looks pretty impulsive,
15     but on the other hand, he wrote a note. So you
16     know, had he been having suicidal thoughts for two
17     hours, 24 hours, two days, two seconds, we don't
18     know.
19 Q  Two weeks, you don't know, do you?
20 A  We don't know.
21 Q  Okay.
22 A  But I think I did make a statement earlier that in
23     his, prior to the Neurontin, there's no evidence
24     he had ever been suicidal.
25 Q  And that conclusion's based on your review of his

1    but, and there are statistically significant
2    findings and metanalyses, but I did name the
3    Valium.  And if he was on Ativan at the time of
4    his death, it would fall in the same category.
5  Q  So Valium and Ativan are both benzodiazepines.
6  A  Correct.
7  Q  At the time of his death, Mr. Shearer didn't have
8    a prescription for Valium, did he?
9  A  I don't recall.  I thought he did because I
10   mention it in the differential.  If it was the
11   Ativan instead of the Valium, that's fine.
12 Q  Okay.  So he had a prescription for Ativan?
13        MR. FROMSON:  Just note my Objection to
14   form.  Lack of foundation.  Are you representing
15   that he did, because he's saying he doesn't
16   recall?
17 Q  I'm asking, do you know whether he did?
18 A  No.  At the time of the report I would have
19   checked.
20 Q  One thing we do know though is there was a
21   toxicology screen done postmortem that
22   demonstrated the presence of a benzodiazepine, is
23   that right?
24        MR. FROMSON:  Just note my objection.  Lack
25   of foundation.  If you have it, you want to show

1    it, but go ahead.
2  A  That I don't know.
3  Q  But you do agree with me that Ativan can increase
4     the possibility of suicide in patients with
5     depression.
6         MR. FROMSON: Objection as to form.
7  A  I would just stand by what I said about the
8     Valium, and the same would apply to Ativan.
9  Q  Was Mr. Shearer taking Zyprexa at the -- strike
10    that. Did Mr. Shearer have a prescription for
11    Zyprexa at the time of his death?
12 A  I believe so.
13 Q  Do you know whether he was taking it on a regular
14    basis?
15 A  Not off the top of my head.
16 Q  Do you assume he was?
17 A  I don't recall. I checked it at the time that I
18    wrote the report, but he was getting that from Dr.
19    Catapano-Friedman. Actually, he was no longer
20    seeing her, so he might well have been off that.
21    I just don't -- we could look at the pharmacy
22    records if you really want to nail that down.
23 Q  Is it fair to say, doctor, if you assume he was
24    taking Neurontin as prescribed at the time of his
25    death, you have to also assume he was taking any

1    I have his stroke and his hemiparesis as
2    increasing his risk, but not being a substantial
3    factor.
4         I have the three medical events in October
5    2000 increasing his risk, or may have increased
6    his risk, but not substantial contributing
7    factors.  I rule out marital problems, financial
8    strain, alcoholism, substance abuse, and then I
9    say that Neurontin was a substantial contributing
10   factor, and that some of his other medications may
11   have increased his risk and may have been
12   substantial contributing factors, but are less
13   clear.
14 Q  Why are they less clear?
15 A  For the reasons that I articulate, that the, in
16   this particular case, the Neurontin, with the fact
17   pattern that we have, the metanalysis was
18   statistically significant finding, biological
19   plausibility, the signals, the adverse event
20   reports, ranks higher than, for example, the
21   Prozac, the trazodone, or whatever benzodiazepine
22   he was on at the particular time.
23 Q  In your opinion, it ranks higher, but in reality,
24   some of these other medications have stronger
25   warnings about depression and suicidality, don't

1   MR. FROMSON: Objection as to form. Lack of
2   foundation, that they do it everyday, and it's
3   compound.
4 A Well, now I think you're -- I can't really respond
5   to an artificial hypothetical like that because we
6   don't know what else might have been going on in
7   the life of somebody who attempts or commits
8   suicide.
9 Q You really don't know what else might have been
10   going on in Mr. Shearer's mind on the day he
11   decided to commit suicide either, do you.
12 A I guess I don't really know what you're trying to
13   get at. We have voluminous records in this case.
14 Q Well, we also -- well, we have voluminous records.
15   One thing we have in this case that you don't have
16   in every case is a note, don't we.
17 A Yes.
18 Q What's the significance of a suicide note?
19 A The significance of a suicide note is just that he
20   took the time to write a note before he killed
21   himself.
22 Q That's all?
23 A Well, if you ask me to sit back and think about it
24   a little more, it looks as though it was written
25   that morning. It looks as though it's still part

1  litigation as a means of ascribing a cause to a
2  suicide other than something they might have
3  contributed to, isn't it?
4 A I don't think I would agree with that.
5 Q Do you know the, you do know that people who study
6  suicide have written that, don't you?
7 A That may be the case. I may have read it, but I'm
8  not familiar with it sitting here, and I certainly
9  wouldn't. That's not been my experience.
10 Q I want to make sure I understand something you
11  just said. Is a suicide note evidence of
12  impulsivity?
13 A It's more the other way around; the absence of a
14  suicide note I think I've sometimes cited as
15  evidence of impulsivity. In this case, it appears
16  he wrote the note almost, shortly before he did
17  it. There isn't a big span of time between the
18  phone calls and killing himself, and presumably he
19  wrote the note in the interim. It appears to be
20  part of an impulsive act.
21 Q Why do you say that?
22 A Because of the nature of the note. It says Linda
23  hung up -- actually, you know, if you want to
24  discuss the note in this much detail, can I look
25  at it?

1  Q    So the question is, what do you make of the note?
2          MR. FROMSON:  I'll object as to the form of
3       the question, What do you make of the note.  Go
4       ahead, doctor.
5  A    Well, if you ask it that way, it's very open
6       ended, and one of the most salient things to me
7       about it is that he does not say he hates his wife
8       or son.  He does not say that there are
9       longstanding issues between them.  He doesn't cite
10      something that might be considered a reasonable
11      explanation for his suicide, like you know, I
12      don't know, some catastrophic event that had
13      happened to the family.  He cites allegedly she
14      hung up on him.
15         So it's just kind of a sad commentary on
16      what's happening to him that day, and then the
17      other particularly salient thing I've already
18      mentioned is this appears to have been written
19      between the phone call and the suicide, which
20      means a very short period of time, which means
21      that it wasn't, this note doesn't indicate that
22      the event was very premeditated, or that the note
23      was premeditated.  It looks like this particular
24      note is part of an impulsive event.
25 Q    How much time passed between the phone call and

1  A   I think I have.  I'm not entirely sure.

2  Q   Well, I'll represent to you that in the material

3      that was provided to us today in response to our

4      notice, a variety of medical records including the

5      autopsy report was produced.

6  A   Okay.

7  Q   With the representation that it had been provided

8      to you.  Am I correct, and again, I don't mean to

9      belabor this, there was not a full toxicology

10     screen done in connection with the postmortem in

11     this case, was there?

12         MR. FROMSON:  Objection as to form.  Lack of

13     foundation, only to your description of the term

14     full.

15         MR. OHLEMEYER:  I'll rephrase it.

16 Q   The autopsy was not designed to, nor did it

17     demonstrate which particular medicines Mr. Shearer

18     might have been taking at the time of his death,

19     but for the benzodiazepine.

20         MR. FROMSON:  Objection as to form.

21 A   That may be true, but my description of it would

22     be from the toxicology report, that it's a fairly

23     typical screen of prescription and street drugs

24     that people would abuse.  So it's things like

25     cocaine, alcohol, and would include

1    benzodiazepines for that reason, and not
2    exhaustively include all of his prescription
3    medications.
4  Q  Right.  And we talked a little bit about
5    Mr. Shearer's effort to overcome and recover from
6    his stroke at various points today, isn't that
7    right?
8  A  Yes.
9  Q  And I think at one point you described his
10   recovery as remarkable.  Was that your word?
11 A  Yeah.
12 Q  Having said that though, he still required
13   constant attention at home, isn't that right?
14         MR. FROMSON:  Objection.  Form.
15 A  I think, I'm not sure how you mean it.  It sounds
16   to me like an overstatement.  He required
17   assistance with certain things, and I believe
18   remarkable is actually in the medical records, and
19   it's, what it's referring to is, given his
20   original deficits, how far he came, which most
21   people attributed to his persistence and
22   determination.
23 Q  Fair enough.  But having said that, he required a
24   caretaker, or the presence of somebody in the home
25   24 hours a day to help him with the activities of