EXHIBIT J

1

```
                              VOLUME:      I
                              PAGES:    1-199
                              EXHIBITS:  1-10


              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


IN RE:  NEURONTIN              ) MDL DOCKET
MARKETING, SALES PRACTICES     ) NO. 1629
AND PRODUCTS LIABILITY         ) MASTER FILE
LITIGATION                     ) NO.  04-10981
_____)
                               )
THIS DOCUMENT RELATES TO:      ) JUDGE PATTI
                               ) B. SARIS
SHEARER VS. PFIZER, ET AL;     ) MAGISTRATE
1:07-CV-11428-PBS              ) JUDGE LEO T.
                               ) SOROKIN
                               )
```

VIDEOTAPED DEPOSITION OF

WILFRED HYNES, M.D., a witness called on

behalf of the Plaintiff, pursuant to the

provisions of the Federal Rules of Civil

Procedure, before Jill Shepherd, Registered

Professional Reporter, CSR, CLR and Notary

Public, in and for the Commonwealth of

Massachusetts, at the Tufts Medical Center,

800 Washington Street, Boston,

Massachusetts, on Tuesday, November 13,

2009, commencing at 12:08 p.m.

Job No: 226411

Case 1:04-cv-10981-PBS   Document 2525-11   Filed 02/18/10   Page 3 of 16

120

```
 1            You may answer.
 2  A.   That appears to be the case from the
 3       documentation.
 4  Q.   Now, we discussed earlier some of the
 5       sources of information upon which you might
 6       rely to provide a prescription to a patient.
 7            The next one I want to ask you about
 8       is sales representatives from drug
 9       companies, so here's my line of questioning
10       on that.
11            Do you recall being visited by sales
12       representatives from the company Parke-Davis
13       Warner-Lambert back in 1998 and 1999?
14            MR. BARNES:  Objection.
15  A.   I believe so.
16  Q.   Now, and I'm sorry if I am stating the
17       obvious, but you were not and you are not
18       and you never have been an epileptologist;
19       is that correct?
20  A.   That's correct.
21  Q.   And when these sales representatives came to
22       visit you in '98 and '99, did they discuss
23       with you the use of Neurontin for
24       nociceptive pain?
25            MR. BARNES:  Objection.
```

Veritext Corporate Services
800-567-8658                                    973-410-4040

1           If you recall.
2  A.   I believe it was for neuropathic pain.
3  Q.   Okay.
4           Did these sales representatives
5  discuss with you broad neuropathic pain as a
6  use of Neurontin?
7           MR. BARNES:  Objection.
8           If you recall.
9  A.   I believe so.
10 Q.   Can you -- I know it's been quite some time.
11          Can you give us any sense of the
12 discussion that took place between yourself
13 and any sales representative from the
14 Parke-Davis Warner-Lambert era, '98 and '99,
15 and that discussion?
16          MR. BARNES:  Objection.
17 A.   I would be -- pretty much, as you said, that
18 it was mainly using Neurontin for the
19 treatment of neuropathic pain.
20 Q.   Did they -- withdrawn.
21          Did any sales representative who
22 visited you in '98 or '99 from Parke-Davis
23 Warner-Lambert ever disclose to you any
24 information whatsoever about whether
25 Neurontin could increase the risk of

1  suicidal behavior in people taking
2  Neurontin?
3           MR. BARNES:  Objection.
4  A.  I don't believe so.
5  Q.  Did the sales representatives who visited
6  with you in 1998 and '99 with respect to
7  Neurontin, did they come alone or did they
8  come with anyone else?
9           MR. BARNES:  Objection.
10 A.  I believe there were occasions where there
11 was more than one representative.
12 Q.  Did anyone identify themselves to you who
13 was accompanying what would be the sales
14 representative as a doctor?
15          MR. BARNES:  Objection.
16 A.  I don't believe so.
17 Q.  Did anyone identify themselves to you as
18 being what someone has called a medical
19 liaison?
20          MR. BARNES:  Objection.
21 A.  I've heard that term, and I don't know when
22 or what company that I have come across
23 medical liaisons.
24 Q.  That's a very good point.  I appreciate your
25 candor.  I just want to know if someone from

1  not Neurontin could cause suicidal behavior
2  in people using it?
3           MR. BARNES:  Objection.  Lack of
4  foundation, lack of evidence.
5           Go ahead.
6  A. I do not believe so.
7  Q. Did Dr. Ross -- well, did you consider
8  Dr. Ross to be someone upon whom you relied
9  for medical information?
10 A. Yes.
11 Q. Did you consider Dr. Ross to be a valuable
12  source of information regarding the drugs
13  you were considering prescribing to
14  patients?
15 A. Yes.
16 Q. Did Dr. Ross provide you information with
17  respect to Neurontin?
18          MR. BARNES:  Objection.
19 A. I'm sure in the time period that we would
20  have at some point discussed Neurontin.  He
21  was my attending when I was a fellow.
22 Q. Did he ever disclose to you any
23  relationships, business relationships, that
24  he had with Parke-Davis Warner-Lambert
25  regarding Neurontin?

1   MR. BARNES: Objection. Lack of
2   foundation, assumes facts not in evidence,
3   relevance.
4  A. I can answer?
5  Q. You can answer.
6  A. Yes, he was a speaker.
7  Q. In terms of time frame, being from the point
8   up to Mr. Shearer's death -- let me withdraw
9   the question. I'm so sorry.
10      Referencing your attention to the time
11   up to the point where you prescribed
12   Neurontin to Mr. Shearer in October of 2000,
13   and any time in that time frame, did
14   Dr. Ross disclose to you that he was a
15   speaker for Warner-Lambert or Parke-Davis?
16      MR. BARNES: Objection.
17 A. Yes.
18 Q. Okay.
19      What did he explain that that meant,
20   if anything?
21 A. He was paid by the company to give lectures
22   on the use of Neurontin.
23 Q. Now, did he ever give a lecture in your
24   presence on the use of Neurontin before you
25   prescribed Neurontin to Mr. Shearer?

1           MR. BARNES:  Objection.
2  A.  I'm sure he did when I was a fellow.
3  Q.  And did he discuss Neurontin's use for
4      neuropathic pain?
5           MR. BARNES:  Objection.
6  A.  Sure.
7  Q.  Any of the -- how many times did you attend
8      any lectures provided by Dr. Ross, Edgar
9      Ross, regarding Neurontin up to the point
10     that you had prescribed Neurontin to
11     Mr. Shearer?
12          MR. BARNES:  Objection.
13 A.  I don't know exactly, but maybe half a
14     dozen.
15 Q.  On any of those occasions, did -- did he
16     disclose any risk of suicidal behavior with
17     Neurontin?
18          MR. BARNES:  Objection.
19 A.  I don't believe so.
20 Q.  How many people attended these lectures in
21     general?
22 A.  It varied with the lectures for the
23     residents and fellows.  It would probably be
24     12, 12 people.  Other venues, maybe 15 to
25     20.  I can't speak to others that he gave

1       again then.
2  A.   Okay.
3  Q.   Did Dr. Ross' lectures regarding Neurontin,
4       which were given before you prescribed
5       Neurontin to Mr. Shearer, provide, at least
6       in part, a basis for your prescription of
7       Neurontin to Mr. Shearer?
8           MR. BARNES:  Objection.
9           In 2000?
10          MR. FROMSON:  Yes.
11 A.   I don't know how much -- again, how
12      ingrained my prescribing pattern was at that
13      point.  Granted, I was a young attending, so
14      it's clear that my director, you know, was
15      someone I looked up to and listened to.  So
16      I can't imagine that it would not have
17      influenced me.
18 Q.   After 2002, having nothing to do with your
19      prescription to Mr. Shearer, were you
20      contacted by sales representatives from
21      Pfizer regarding Neurontin?
22 A.   I believe so.
23 Q.   And did there come a point where you went to
24      a speaker training meeting in New York?
25 A.   Yes.

1     capacity for Neurontin to contribute to
2     suicidal behavior?
3             MR. BARNES: Objection. Assumes
4     facts not in evidence.
5 A. I guess I'm not sure that it was common
6     knowledge at that time.
7 Q. My question, however, is: Did you speak to
8     Mr. Shearer about whether Neurontin had the
9     capacity to increase suicidal behavior when
10    Neurontin was prescribed to him?
11           MR. BARNES: Objection.
12 A. Probably unlikely.
13 Q. In hindsight, this is a hypothetical
14    question, Doctor, if you did have knowledge
15    that Neurontin increased the risk of
16    suicidal behavior in patients taking
17    Neurontin, would you have shared that
18    information with Mr. Shearer?
19           MR. BARNES: Objection.
20 A. Yes.
21 Q. If you had known -- again, in hindsight,
22    that is hypothetical -- if at the time the
23    Neurontin was being prescribed to
24    Mr. Shearer, if you knew Neurontin had the
25    capacity to increase the risk of suicidal

Case 1:04-cv-10981-PBS   Document 2525-11   Filed 02/18/10   Page 11 of 16

141

1   behavior, would you have considered
2   alternatives to Neurontin?
3           MR. BARNES:  Objection.
4  A.  Considered?  Sure.
5  Q.  Okay.  Mr. Barnes asked you about a number
6   of different types of regimens that could
7   have considered, or maybe even were
8   considered.
9           Can you tell us what alternatives were
10  available to you back in October of 2000 if
11  you would have considered them in light of a
12  then known suicide risk with Neurontin?
13          MR. BARNES:  Objection.
14 A.  Certainly other anticonvulsants.
15 Q.  If, at the time Neurontin was being
16  prescribed to Mr. Shearer, you had knowledge
17  that Neurontin had the capacity to
18  contribute or cause suicidal behavior, would
19  you have informed Mr. Shearer's caregiver or
20  family about that fact?
21          MR. BARNES:  Objection.
22 A.  I'm not sure if I would have the opportunity
23  to do that or not.
24 Q.  To the extent that the package insert --
25  withdrawn.

Veritext Corporate Services
800-567-8658                                    973-410-4040

1           MR. FROMSON: Objection.
2  A.   Correct.
3  Q.   Today do you advise patients that -- of the
4       latest information concerning the class
5       labeling for suicidal behavior or ideation
6       when you prescribe Neurontin?
7  A.   Yes.
8  Q.   Do you -- okay.
9           And what do you tell them?
10 A.   I'm uncomfortable with this line of
11      questioning. I don't think what I do now is
12      relevant.
13 Q.   Okay.
14 A.   I mean, it's -- I don't have an attorney
15      with me. But, you know, this is if --
16           MR. BARNES: Off the record for a
17      minute.
18           THE VIDEOGRAPHER: The time is
19      3:39, and we're off the record.
20           (Short recess.)
21           THE VIDEOGRAPHER: The time is
22      3:56, and we're on the record.
23 Q.   Dr. Hynes, following up on some of
24      Mr. Fromson's questions, was it your --
25      based upon what you reviewed today of the

1      Mr. Barnes said, right?
2  A.  Yes, that was their job.
3  Q.  And with the expectation they would provide
4      you with accurate information, you would
5      rely upon it, at least in part, as part of
6      your job as a prescribing physician; is that
7      fair?
8           MR. BARNES:  Objection.
9  A.  That is a fair statement.
10 Q.  And they never discussed suicidality with
11     you; isn't that true?
12 A.  I don't believe so.
13 Q.  And when you were being trained as a speaker
14     in New York, the trainees -- the trainers
15     did not discuss suicidality with Neurontin
16     with you; is that true?
17          MR. BARNES:  Objection.
18 A.  I don't believe so.
19 Q.  And when you were in Arizona, the trainers
20     did not speak about suicidality there
21     either; isn't that true?
22          MR. BARNES:  Objection.
23 A.  I don't believe so.
24 Q.  And when you actually gave speeches as a
25     speaker, you were never told to discuss

1  When you were prescribing for
2  Mr. Shearer in 2000, is it your testimony
3  that the basis for your approving the
4  prescription by the resident was your own
5  clinical experience -- favorable clinical
6  experience with Neurontin for the treatment
7  of neuropathic pain conditions?
8      MR. FROMSON:  Objection.  Asked and
9  answered, form.
10 A. I can only assume that, again, looking at
11    the notes, that that's how I thought.
12     MR. BARNES:  No further questions.
13  Thank you.
14             * * * * *
15         EXAMINATION BY MR. FROMSON
16 Q. I'd like to assume the following:  That back
17    in 1992, when the drug was going through its
18    approval process for the epilepsy
19    indication, and the FDA did a review of the
20    clinical trials, safety, and the risks that
21    were -- about Neurontin, and that the FDA
22    clinical reviewer in '92 made the following
23    statement:  "Less common, but more serious,
24    events may limit the drugs widespread
25    usefulness, depression, while it may not be

1   an infrequent occurrence in the epileptic
2   population may become worse and require
3   intervention or lead to suicide and has
4   resulted in some suicidal attempts."
5       I'd ask you to assume that that is
6   evidence in this case at the time of trial.
7       Assuming that is true, did you know
8   that when you were prescribing the drug to
9   Mr. Shearer?
10      MR. BARNES: Objection.
11  A. That? No.
12  Q. Would you have wanted to know that
13     information about the FDA clinical review
14     and the FDA clinical reviewer's position on
15     the safety of Neurontin with respect to
16     depression and suicide when you were
17     prescribing the drug to Mr. Shearer?
18      MR. BARNES: Objection. Incomplete
19      evidence and beyond the scope of my
20      examination and irrelevant.
21      You may answer.
22  A. I certainly would want to know as much as I
23     could about any drug.
24  Q. And in particular, if you were using a drug
25     off label, and you knew that the drug had

1  not been approved for the indication you
2  were prescribing it, but there was a
3  potential risk of depression and suicide
4  attempt with that drug, is it fair to say
5  that you would have wanted to know that?
6         MR. BARNES: Objection. Assumes
7  facts not in evidence.
8         You may answer the question.
9  A. Yes.
10 Q. Because knowing it could have affected your
11 prescribing practice for Neurontin back in
12 2000? Would you agree with that?
13         MR. BARNES: Objection.
14 A. Hypothetically, yes.
15 Q. Thank you.
16         MR. BARNES: I have to ask some
17 more questions. Take a short break.
18         THE VIDEOGRAPHER: The time is
19 4:07, and we're off the record.
20         (Short recess.)
21         (Dr. Egilman not present.)
22         THE VIDEOGRAPHER: The time is
23 4:11, and this is the beginning of tape
24 three in the deposition of Wilfred Hynes,
25 M.D., and we're back on the record.