# EXHIBIT K

1

```
 1          U.S. DISTRICT COURT OF MASSACHUSETTS
 2                  * * * * * * * *
 3      IN RE: NEURONTIN MARKETING SALES, PRACTICES AND
 4                    PRODUCTS LIABILITY
 5                  * * * * * * * *
 6                          *
 7   SHEARER,                *   Docket No.
 8       Plaintiff           *   1629
 9       vs.                 *   Master File No.
10   PFIZER, INC.,           *   04-10981
11       Defendant           *
12                           *
13                  * * * * * * * *
14                     DEPOSITION OF
15              STEFAN P. KRUSZEWSKI, M.D.
16                   January 14, 2010
17
18
19
20
21
22
23
24
25   Job No. 234312
```

**Page 70**

1  Shearer's decision to commit suicide an abrupt
2  decision?
3  A. I believe it was --- let me ask you before I
4  answer that, your definition of abrupt is?
5  Q. Let me rephrase the question. When do you
6  believe that Mr. Shearer decided to commit suicide?
7  A. I believe that it was --- there's no way
8  specifically of knowing when the decision was made,
9  that it happened on the day in question ---- which
10 it's not meant as a rhetorical answer. It's that my
11 sense is that somewhere between when he woke up that
12 morning and whatever problems occurred that morning
13 and the telephone call, that his mood and behavior
14 was such and that the decision was made to commit
15 suicide, probably in combination with writing his
16 suicide note as well.
17 Q. What's that significance of a suicide note in
18 trying to determine when and why somebody's made a
19 decision to commit suicide? Let me withdraw that.
20    Let me just ask you simply, what's the
21 significance --- of what significance do you attach
22 to a suicide note, if any?
23 A. I think it gives us a reasonable understanding
24 that the decision was made to commit suicide as
25 opposed to not having one where it could have been a

**Page 71**

1  homicide, obviously, and the investigation that
2  ensued, someone had to make a decision, was this a
3  suicide, a homicide or accidental. And it --- like
4  all of the other evidence in any case, it gives some
5  reflection of what was in the person's mind prior to
6  the actual act itself.
7  Q. We could --- I guess we could disagree about
8  whether it was the best evidence of what was in his
9  mind prior to the act, but it appears to be the only
10 evidence we have as to what was in this mind prior to
11 the act; isn't that right?
12       ATTORNEY FROMSON:
13          Objection. Form.
14 A. Just rephrase it for me. Are you asking was it
15 the only evidence?
16 BY ATTORNEY OHLEMEYER:
17 Q. Well, let me put it this way. You know, it goes
18 without saying, in a case without a note, I mean, we
19 have the benefit --- let's put it this way, with
20 respect to Mr. Shearer and what might have been going
21 on in this mind prior to the suicide, the note is of
22 some significance to try to make that determination?
23 A. It is. I mean, we still --- you know, I use my
24 clinical judgment and expertise to draw a conclusion
25 about the meaning as, would anybody, but I take from

**Page 72**

1  it that he says that he loves Linda and Ivor and that
2  he's been --- that the decision is still somewhat
3  impulsive, and that's just a subjective opinion
4  because he feels like he's been hung up on, I think,
5  as he says for the last time. And so I think the
6  rest is probably my looking into what he might have
7  meant, but it strikes me as an impulsive statement,
8  the depressed statement and irritable statement.
9  Q. Is there a definition of an --- strike that.
10    In your profession, do you define impulsive
11 suicides as opposed to, you know, more --- again,
12 I'm not trying to be cute --- more thoughtful
13 suicides?
14       ATTORNEY FROMSON:
15          Objection. Form.
16 A. I don't know that there's a specific --- there
17 probably are specific definitions, let me put it that
18 way. I think carefully thought out suicides
19 occur --- you know, for people who live in Oregon,
20 and I'll use that as an example, and are critically
21 ill, they make a decision that they can't live that
22 way any longer and can be basically euthanized, which
23 is different process than the process of I'm so
24 uncomfortable and I'm so hurt and I'm so --- in such
25 a state of mind that I can't continue to live like

**Page 73**

1  this, and that becomes relatively abrupt. So, you
2  know, it implies some quantitation of time, obviously
3  shorter if it's impulsive and longer if it's not.
4  BY ATTORNEY OHLEMEYER:
5  Q. Is the a range of time within which you would
6  character it as impulse outside of which you would
7  have your doubts?
8        ATTORNEY FROMSON:
9           Objection as to form.
10 A. There isn't one that I use.
11 BY ATTORNEY OHLEMEYER:
12 Q. Because if --- well, strike that.
13    There was a fair amount of time that passed
14 between the telephone call that we discussed and the
15 actual suicide; isn't that right?
16       ATTORNEY FROMSON:
17          Objection to form.
18 A. More than an hour ---.
19       ATTORNEY FROMSON:
20          Hold on a second. Objection to form,
21 reference to fair amount of time.
22 BY ATTORNEY OHLEMEYER:
23 Q. Go ahead.
24 A. Yeah, it's --- what you described is fair. It
25 was not instantaneously.