# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

## KAISER'S OPPOSITION TO DEFENDANTS' MOTION FOR CONTINUED DEPOSITION OF DR. NICOLAS WIEDER AND ADDITIONAL RELIEF

## **TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................... 1

II.  FACTS ........................................................................................................... 3

III.  ARGUMENT ................................................................................................... 6

   A.  Continuing the Deposition of Dr. Wieder Would Give Defendants A Second Bite at the Discovery Apple ..................................................................................... 6

      1.  Defendants Already Exceeded the Time To Which They Were Entitled ....... 7

      2.  Defendants Fully Examined Dr. Wieder ........................................................ 8

      3.  Continuing the Deposition Would be Unduly Burdensome and Would Raise Issues That Defendants Have Had Ample Opportunity to Address ..................... 10

   B.  Defendants Should Not Receive Additional Discovery ..................................... 12

   C.  No Court Order is Necessary to Preserve Documents ...................................... 13

   D.  The Court Should Not Strike Dr. Wieder's Declaration ................................... 13

   E.  Healthwise Episode Demonstrates the Breadth of Pfizer's Fraud .................... 15

IV.  CONCLUSION ................................................................................................ 16

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Reigel v. Kaiser Foundation Health Plan of North Carolina, Inc.*, 859 F. Supp.
963 (E.D.N.C. 1994) ......................................................................................................8

### **FEDERAL STATUTES**

Fed. R. Civ. P. 26(b)(2)(C) ....................................................................................6, 10

Fed. R. Civ. P. 30(d)(1)...............................................................................................6

Fed. R. Civ. P. 30(d)(3)(A) ..........................................................................................9

## I.   INTRODUCTION

On January 18, 2010, Defendants Pfizer, Inc. and Warner-Lambert Company LLC

("Defendants" or "Pfizer") moved for a continued deposition of Dr. Nicolas Wieder and

"additional relief."[1]  Kaiser[2] opposes Defendants' transparent attempt to circumvent the Court's

rules and discovery guidelines.  More specifically, Plaintiffs oppose this motion for the following

reasons:

- ***Pfizer seeks "emergency" relief for an issue that first arose over two years ago in this***
  ***litigation.***  The information Pfizer seeks relates to the authenticity of materials on
  Kaiser's website, which was discussed on July 12-13, 2007 in the deposition of Albert
  Carver, Kaiser's 30(b)(6) representative.  The "emergency" is the byproduct of Pfizer's
  failure to seek discovery on these websites prior to the discovery deadline.

- ***Pfizer seeks more time to depose a witness who they have already questioned for longer***
  ***than the court-ordered seven hours.***  Defendants exceeded the seven-hour limit, but
  Plaintiffs twice allowed them to ask additional questions.  Pfizer failed to reserve a
  portion of its allotted time for re-direct examination, as has been the practice throughout
  this litigation.  Dr. Wieder should not be punished for Pfizer's inefficient use of time.

---

[1] On January 18, 2010, Defendants also filed a Motion "To Unseal Motion For Continued Deposition Of Nicholas Wieder And Additional Relief by Pfizer, Inc."  That motion was not styled as an "emergency" motion and Kaiser intends to file its reply within the standard 14-day response period.

[2] Plaintiffs are Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser").  Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries:  Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

- ***Pfizer seeks to reconvene the deposition of a witness located 3,000 miles away from the attorneys in this case to address a ministerial matter regarding the authenticity of website materials, when the attorneys could resolve the matter in short order.*** The only issue about which Pfizer was unable to question the witness involved the authenticity of materials that Pfizer claimed appeared on Kaiser's website. Dr. Wieder testified that he has never seen the materials that Pfizer sought to authenticate. Kaiser's counsel offered to authenticate those materials that actually appeared on the website, but Pfizer has nonetheless filed this motion.

- ***Pfizer seeks Kaiser to identify all of Kaiser's websites and to give it passwords to access the portions of the website where patients schedule appointments, although Pfizer knew about these materials over two and one half years ago, discovery closed over two years ago, and trial is one month away.*** Pfizer should have served discovery requests for this information while discovery was still pending. Plaintiffs should not suffer due to Defendants' delay.

- ***Pfizer seeks to have "stricken" a truthful declaration even though the declarant's extensive deposition testimony confirms the statements made in his declaration.*** Dr. Wieder provided a declaration in response to Pfizer's motion for summary judgment, stating that he previously recommended that the P&T Committee remove formulary restrictions and guidelines and would not have made the recommendation had he known about Pfizer's misconduct. Dr. Wieder's testimony repeated these statements and explained their meaning in more depth.

- ***Pfizer filed its motions prematurely.*** Defendants rushed the "meet and confer" process and ignored Plaintiffs' requests to confer after the holiday weekend. As a result,

2

Defendants filed this "emergency" motion and memorandum under seal and filed a
separate motion to unseal these documents.  A proper "meet and confer" process should
have been undertaken.

- ***Pfizer's rant about the Healthwise materials is the pinnacle of hypocrisy – Pfizer
  condones its own use of misleading statements but criticizes the Healthwise's repetition
  of those same statements.***   Pfizer quotes extensively from Dr. Wieder's testimony that
  the materials drafted by Healthwise and available on Kaiser's website contained
  misleading claims about Neurontin.  These claims resulted from Pfizer's misconduct.

The Court should not allow Defendants to take several more bites at the discovery apple, and
Defendants should be sanctioned for bringing the motion.

## II.    FACTS

This motion centers on Pfizer's desire to elicit more testimony regarding the authenticity
of materials from Kaiser's website.  Defendants have known about Kaiser's website at least since
July 12-13, 2007, when they deposed Albert Carver, Kaiser's 30(b)(6) witness.  Defendants
asked Carver numerous questions about Kaiser's websites, both about those sections available to
the public and internal sections requiring a password.  Ex. A, Carver Dep. 44:4-14; 441:15-20;
447:16-21.  Defendants also knew that the website posted materials on Neurontin, as they asked
Carver if he would "feel compelled to take some action if [he] learned that Permanente Group's
public website was advising visitors that, 'People who took Gabapentin for chronic pain said
they felt one-third less pain while they were taking Gabapentin?" Ex. A, Carver Dep. 447:16-21.
Despite knowing about Kaiser's public website and password-protected website, Defendants did
not pursue any discovery seeking their URLs or a username and password.

More than two years later, Defendants sought to depose Dr. Nicolas Wieder, a physician
specializing in pain medicine, presumably because Plaintiffs had attached a declaration of Dr.

Wieder as part of its response to Defendants' motion for summary judgment. The declaration simply stated (1) that Dr. Wieder had recommended removal of all formulary restrictions and guidelines for Neurontin, (2) that Dr. Wieder's belief was that the P&T Committee adopted his recommendation, and (3) that Dr. Wieder would not have recommended the expansion of Neurontin's formulary status had he known the truth about Neurontin's efficacy and safety. Wieder Decl. ¶¶ 8-9. On January 8, 2010, the Court denied Defendants' motion for summary judgment with respect to Kaiser, citing to the portion of Dr. Wieder's declaration that indicated he would not have recommended expansion of Neurontin's formulary status, but also citing to other authorities, including the declaration of Dr. Dale Daniel, the Chairperson of Kaiser's Southern California P&T Committee. *See* Mem. & Order [Dkt. # 2309] at 7-8. Although Plaintiffs did not include Dr. Wieder on their witness list, Defendants moved to compel his deposition, and the Court allowed a deposition of Dr. Wieder consistent with Rule 30(d)(1) of the Federal Rules of Civil Procedure. *See* December 17, 2009 docket entry.

On January 12, 2010, Defendants deposed Dr. Wieder. Because the Court ordered a seven-hour deposition, Plaintiffs believed that they should receive an equal amount of time as the Defendants, giving them three-and-one-half hours each to depose Dr. Wieder. Ex. B, Wieder Dep. 385:23-386:9. Instead, Defendants deposed Dr. Wieder, over Plaintiffs' objection, for the entire seven hours (not sharing any time with Plaintiffs), and even for several minutes beyond that limit.[3] Plaintiffs suggested that Defendants reserve a portion of their time for follow-up questions, but Defendants did not do so, even though such reservations have been the parties' practice throughout this litigation. *Id.* at 386:10-14.

---

[3] The witness began answering Pfizer's questions around 9:00 am. Pfizer's initial round of questioning was not complete until about 6:30 pm. The deposition did not conclude until just before 8:00 pm.

During the deposition, Defendants' counsel referred to materials regarding Neurontin he claimed were posted on Kaiser's website ("Healthwise materials"). Dr. Wieder testified that he has never seen them before. Ex. B, Wieder Dep. 340:23 – 341:2; 341:13-19. Dr. Wieder is not an employee of Kaiser, and therefore, would have no authority to speak about the website or the Healthwise materials. *Id.* at 20:4-14. Plaintiffs' counsel allowed Defendants' counsel to ask a lengthy series of questions about the Healthwise materials. *Id.* at 345:4 – 363:16.

Nonetheless, Plaintiffs' counsel took issue with (1) Defendants' attempt to use the internet for a demonstration as a form of authentication and (2) Defendants' attempt to authenticate materials that would easily be authenticated through counsel. Plaintiffs' counsel clearly stated his concerns by noting that "[i]f there's something you want to do with him on the record with a document in front of him that he can read, you can do that, which you already have. If you're concerned about a foundational issue about what appears in the website today, you can speak to the lawyers. You don't need him to do it." Ex. B, Wieder Dep. 337:24 – 338:5. In response to Defendants' counsel's request to stipulate to the document's authenticity, Plaintiff's counsel further said that "[i]f it's on the web, I'll stipulate with you, but I don't know whether it is, and I'm not doing stipulations today." *Id.* at 339:1-4. In other words, Plaintiffs' counsel was willing to stipulate to the authenticity of any materials actually on the website, but he did not want to engage in the demonstration of authenticating documents by navigating the website. After this exchange, Defendants had a full and fair opportunity to ask any questions they wanted about the Healthwise materials or other information printed out from Kaiser's website.

## III. ARGUMENT

### A. Continuing the Deposition of Dr. Wieder Would Give Defendants A Second Bite at the Discovery Apple

Pfizer seeks to reconvene the deposition of a witness who they have already questioned for longer than the court-ordered seven hours and who is located 3,000 miles away from the attorneys in this case – all to address a ministerial matter regarding the authenticity of website materials, which the attorneys could resolve in short order.

Rule 30(d)(1) of the Federal Rules of Civil Procedure limits depositions to 1 day of 7 hours, but states that the "court must allow additional time consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstances impedes or delays the examination." Fed. R. Civ. P. 30(d)(1). Courts may not provide additional time if to do so would violate Rule 26(b)(C), which requires courts to limit discovery that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," or that "the party seeking discovery has had ample opportunity to obtain . . . by discovery in the action." Fed. R. Civ. P. 26(b)(2)(C). Defendants' motion attempts to circumvent the "1 day, 7 hour" rule even though they had an opportunity to examine Dr. Wieder fully with respect to all information about which he is capable of testifying, the parties can agree upon the authenticity of these documents without the need to depose Dr. Wieder for two more hours, and the Defendants have had ample opportunity to seek discovery authenticating the materials on Kaiser's website.[4]

---

[4] Defendants appear to be relying on Rule 30(d)(1) to seek their proposed relief rather than Rule 37. *See* Def.'s Mem. of Law in Support of Defendants' Emergency Mot. for Continued Dep. of Nicholas (sic) Wieder and Additional Relief ("Mem.") at 14; Def.'s Emergency Mot. For Continued Dep. of Nicholas (sic) Wieder and Additional Relief ("Mot.") (silent on basis for relief). To the extent that Defendants claim that Rule 37 justifies their proposed relief, despite their opportunity to ask Dr. Wieder about any materials printed off the Kaiser website, Plaintiffs' actions were substantially justified and harmless to Defendants.

### 1. Defendants Already Exceeded the Time To Which They Were Entitled

Barring stipulation or court order, Rule 30(d)(1) generally limits the duration of depositions to "1 day of 7 hours." Fed. R. Civ. P. 30(d)(1). The court order granting Defendants' motion to depose Dr. Wieder did not alter this seven-hour limit. *See* December 17, 2009 docket entry. Given that both Plaintiffs and Defendants had questions for Dr. Wieder, Plaintiffs sought to split the seven hours evenly between the parties, with each side deposing Dr. Wieder for 3.5 hours, but Defendants insisted on using all seven hours. Ex. B, Wieder Dep. 385:23-386:9 ("The plaintiff's position is that [the seven hours] should be split in half, three and a half hours each. As [an] accommodation to counsel for Pfizer, the plaintiffs have been permitting the questioning to go after three and a half hours."). Moreover, Plaintiffs' counsel advised Defendants' counsel that he should reserve some of that time "if they want any opportunity to undertake a redirect after we have questioned the witness." *Id.* at 386:10-14. The practice throughout this litigation has been to reserve a portion of a party's time for re-direct examination. *See, e.g.*, Deposition of Robert Glanzman, August 2, 2007, at 487:14 – 488:10 (Plaintiff and Defendant agreeing as to the custom of reserving time in this litigation).[5] Defendants' counsel never reserved that time. Indeed, Defendants asked questions beyond the seven hour mark, but Plaintiffs agreed to allow Defendants to ask an additional five minutes of questions (and then an additional two questions after the five minutes had expired). *See* Ex. B, Wieder Dep. 446:17 – 447:14; 454:13 – 455:15 (allowing two more questions after noting that Defendants' counsel had exceeded the five minutes, exceeded the seven-hour limit, and exceeded

---

[5] [Counsel for Plaintiff]: As it has been the custom and practice in all of these depositions, the defendants have reserved the right to a portion, a small portion of the total of 14 hours for direct examination, and we have reserved that right here consistent with that practice, and allocated two hours for that. ...
 [Counsel for Defendant]: Join in [Counsel for Plaintiffs]'s statement with respect to the time allotment and the reservation of rights.

the 3.5 hours that would be half of the allotted time).  Largely due to Defendants' continuing past

these several benchmarks, Dr. Wieder's deposition lasted from just after 9:00 a.m. to almost 8:00

p.m.  In short, Defendants have already used more than their allotted time.

Defendants' argument that Kaiser made improper speaking objections and that the

witness impeded the examination lack merit.  Defendants claim that Pfizer could not use its time

because "Kaiser's attorneys made numerous speaking objections." Mem. at 14.  However, their

first three citations for this proposition comprise a total of 16 lines of a single page of deposition

testimony, and the fourth citation contains less than a page of discussions among counsel.  *See*

Mem. at 14 (citing Wieder Dep. at 39:5-13, 41:5-9, 51:20-22, and 99:18-100:12).  Plaintiffs'

objections, which were completely permissible, caused no delay in Defendants' deposition of Dr.

Wieder.  Defendants also claim that the witness rambled and provided non-responsive testimony.

Mem. at 14.  While Dr. Wieder was merely trying to answer Defendants' questions, Defendants'

counsel chose, rather than to narrow his questions or provide guidance to the witness, to make

comments like "I'm not going to interrupt you, Doctor." Ex. B, Wieder Dep. 407:11.  Counsel

thus encouraged Dr. Wieder to continue speaking rather than narrowing his questions.

Defendants got exactly the deposition they wanted and used more time than they were entitled to

use.  As a result, their motion should be denied.

### 2.     Defendants Fully Examined Dr. Wieder

Defendants claim that Plaintiffs' counsel "precluded Pfizer's counsel from thoroughly

questioning Dr. Wieder on inconsistencies between the public statements on Kaiser's websites

and its allegations in this litigation." Mem. at 14.  This assertion lacks merit. First, Dr. Wieder

lacks any knowledge about the Healthwise materials.  When asked at his deposition, Dr. Wieder

testified that he had never seen the Healthwise materials. Ex. B, Wieder Dep. 340:23 – 341:2;

341:13-19.  Further, Dr. Wieder could not even remember his username or password to enter the

8

system. *Id.* at 340:11-15. Although Dr. Wieder provides physician services to Kaiser members, he is not an employee of Kaiser. *Id.* at 20:4-14.[6] Thus, he has no authority to speak about the website or the Healthwise materials. Defendants have no special reason to seek his testimony on these materials.

Defendants nonetheless examined Dr. Wieder about the Healthwise materials. *See* Ex. B, Wieder Dep. at 345:4 – 363:16. Defendants' counsel spent over twenty minutes showing Dr. Wieder the Healthwise materials. *Id.* Dr. Wieder did not have specific knowledge of the issues addressed in the Healthwise materials, so Defendants' counsel chose to focus his questions on whether the materials were misleading. *Id.* Defendants' counsel then moved on to a different topic of his own volition rather than based on an objection by Plaintiffs' counsel. *Id.* at 363:17. Accordingly, Defendants' counsel had the opportunity to ask a full series of questions about the documents, which were limited largely because Dr. Wieder had not seen any of them.

Defendants nonetheless argue that Plaintiffs obstructed their deposition by raising issues with (1) Defendants' attempt to use the internet for a demonstration as a form of authentication and (2) Defendants' attempt to authenticate materials that would easily be authenticated through counsel. The Federal Rules of Civil Procedure clearly allow counsel to limit a deposition "on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A). Plaintiffs' counsel had concerns about whether Defendants' counsel's demonstration on a computer would accurately represent the materials posted on Kaiser's website and, rather than wasting the Court's time with a motion and suspended deposition, proposed a procedure that would enable

---

[6] The Permanente Medical Group for which Dr. Wieder's partnership provides contractual services is separate and distinct from the Plaintiffs in this action. *See Reigel v. Kaiser Foundation Health Plan of North Carolina, Inc.*, 859 F.Supp. 963, 964 (E.D.N.C. 1994); Pls.' Opp. to Defs.' Mot. To Preclude Plaintiffs from Presenting Live Testimony of Permanente Physicians (also filed today).

Defendants to ask any and all questions they wanted, the parties to agree as to authenticity, and

not waste the witness's time that could be used treating patients. *See* Ex. B, Wieder Dep. 337:24

– 339:4. Plaintiffs' counsel even agreed to stipulate to the authenticity of documents from

Kaiser's website, once those materials had been verified. *Id.* at 339:1-4. Defendants proceeded

to ask any and all questions they wanted regarding Healthwise materials printed from the

website. As a result, no additional testimony is necessary.[7]

### 3. Continuing the Deposition Would be Unduly Burdensome and Would Raise Issues That Defendants Have Had Ample Opportunity to Address

Continuing the deposition of Dr. Wieder would violate the precepts of Rule 26(b)(2)(C)

of the Federal Rules of Civil Procedure. Rule 26(b)(2)(C) provides that:

> On motion or its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> (i)        the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii)       the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii)      the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties, resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). Defendants' proposed continuation of Dr. Wieder's deposition

would violate all three prongs of this test. First, the discovery sought is both cumulative and far

more burdensome than the alternatives. The discovery sought – two additional hours of

deposing Dr. Wieder – would be cumulative and duplicative because Defendants already asked

---

[7] To the extent that the Court is inclined to grant Defendants additional time to depose Dr. Wieder because of this issue, Plaintiffs ask the Court to limit the deposition to questions regarding materials available on Kaiser's website. Defendants' motion does not limit how it would use its two hours of new testimony, yet again revealing their attempt to circumvent the discovery rules. Def.'s Mem. at 15.

Dr. Wieder extensive questions about the Healthwise materials. *See* Ex. B, Wieder Dep. 345:4 –
363:16. The only limitations on Defendants' testimony regarded the authenticity of the
materials, and Plaintiffs' counsel has already stated that "[i]f it's on the web, I'll stipulate with
you, but I don't know whether it is, and I'm not doing stipulations today." *Id.* at 339:1-4.
Stipulating as to the documents' authenticity would obviate the need to depose Dr. Wieder
further.

Second, the Defendants have had ample opportunity to raise questions about the
Healthwise materials. Defendants have known about the Healthwise materials since at least July
12-13, 2007, when they deposed Albert Carver, Kaiser's 30(b)(6) witness, and asked him if he
would "feel compelled to take some action if [he] learned that Permanente Group's public
website was advising visitors that, 'People who took Gabapentin for chronic pain said they felt
one-third less pain while they were taking Gabapentin?" Ex. A, Carver Dep. 447:16-21. This
question shows that Defendants were aware (1) that Kaiser's website makes materials available
to the public on its website and (2) that materials regarding Neurontin use were included on the
website. Fact discovery closed on October 15, 2007, and was extended for specific topics
through November 15, 2007. *See* Docket # 801, 890. Defendants had ample opportunity – while
discovery was still ongoing – to seek discovery on the process by which Healthwise materials
appear on Kaiser's website and who at Kaiser had responsibility for maintaining the website.
Instead, Defendants seek to re-depose a witness who has never before seen the Healthwise
materials less than one month before trial.

Third, the expense of the proposed continuation of the deposition would far outweigh the
likely benefit. The proposed continuation would yield no likely benefits, as Dr. Wieder has
never seen the Healthwise materials and he has no specific knowledge of the materials. Ex. B,

Wieder Dep. 340:23 – 341:2; 341:13-19. On the other hand, the expense of having attorneys in New York and Boston depose a witness from California, who has a vibrant medical practice that does not allow him to leave for extended periods of time, would impose a significant burden and expense on Dr. Wieder and the parties. As a result, a continued deposition would not be appropriate.

### B. Defendants Should Not Receive Additional Discovery

Pfizer seeks Kaiser to identify all of Kaiser's websites and to give it passwords to access the portions of the website where patients schedule appointments and communicate with their personal physician, although Pfizer knew about these materials over two and one half years ago, discovery closed over two years ago, and trial is one month away.

More specifically, Defendants seek (1) the identification of the URLs of all websites through which Kaiser provides information to its members, (2) a password to access additional portions of the websites, and (3) access to information made available to its physicians. Mem. at 15-16. Defendants knew about these websites at least as early as July 12, 2007, when it deposed Kaiser's 30(b)(6) witness, Albert Carver. Defendants' counsel asked in-depth questions about Kaiser's websites available to the public as well as its internal websites. Counsel's questions reflected knowledge that Kaiser maintains internal websites: "Q. In addition to the public website, does Kaiser maintain internal websites? A. Yes, we do." Ex. A, Carver Dep. 44:4-6. Counsel also asked "were documents that are either currently visible on Kaiser's website or otherwise were previously posted to that website during the relevant period searched in response for – to the defendant's requests for productions of documents?" and Carver responded "I believe they were." *Id.* at 44:7-14. Defense counsel also asked, in reference to materials printed from Kaiser's website, "[i]f I were to represent to you that my colleague seated here had printed this document from the worldwide web from this address in the upper right-hand corner, would you

12

have reason to doubt that?" and Carver responded "No, I wouldn't." *Id.* at 441:15-20. These questions show that Defendants knew that Kaiser posted materials on its website, both available to the public and internally before the close of discovery in this case. Rather than seek responses to interrogatories while discovery was open, Defendants seek to discover new information on the eve of trial. As such, their request for "additional relief" of new discovery should be denied.

### C.    No Court Order is Necessary to Preserve Documents

Pfizer also seeks a court order "to preserve the content on [Kaiser's] websites as it existed on January 11, 2010, before making any alterations." Mem. at 16. No Court order is necessary for Kaiser to preserve documents in accordance with its legal obligations. Kaiser raises two further points regarding the preservation of documents.

First, Healthwise has final editorial control over the Healthwise materials, so the process for altering the contents of the materials is more complicated than Defendants represent. *See* Ex. D, Decl. of Donald W. Kemper at ¶ 4 (stating that Healthwise has final editorial control over materials it generates).

Second, to the extent that the Court deems an order necessary to "preserve the content on its websites," it should be clear that Kaiser is only obligated to maintain a printed copy of any portions of the website that are altered. Requiring Plaintiffs not to alter the website at all would potentially expose viewers to misrepresentations about Neurontin that could harm the public and line Pfizer's pockets with further ill-gotten gains.

### D.    The Court Should Not Strike Dr. Wieder's Declaration

Pfizer seeks to have "stricken" a truthful declaration even though the declarant's extensive deposition testimony confirms the statements made in his declaration. Defendants argue that Dr. Wieder's declaration differs from his testimony in two ways: by suggesting that he played an "important role in the P&T committee" when he did not and by stating that the P&T

13

Committee removed all formulary restrictions and guidelines when they in fact maintained

guidelines on using the drug. Mem. at 16, 19. Both of these arguments drastically misstate the

facts.

First, Dr. Wieder accurately portrayed his level of input to the P&T Committee. Wieder

stated in his declaration that:

> In or around September 1997, as a practicing pain specialist, I
> recommended expansion of the formulary restrictions to include
> prescribing by pain clinic physicians for the treatment of reflex
> sympathetic dystrophy. I am informed and believe that the P&T
> Committee adopted this recommendation. In or around September 1999, I
> recommended removal of all formulary restrictions and guidelines for
> Neurontin. I am informed and believed that in or around September 1999,
> the P&T Committee adopted this recommendation."

Wieder Decl. at ¶ 8. Dr. Wieder's testimony reveals his declaration accurately portrayed his role

in recommending broader use of Neurontin. For example, in 1997, Dr. Wieder received a

general request for input and he provided a recommendation by e-mail. Dr. Wieder testified that

while the Committee would likely not expand the formulary based only on his recommendation,

he was the only specialist "who was fellowship trained at the time, so [he] thinks [his]

recommendation would have had some weight." Ex. B, Wieder Dep. 274:18-25. This language

is completely consistent with his statement that "as a practicing pain specialist," he

recommended broadening the availability of Neurontin on the formulary. The September 1999

expansion involved the same process. *Id.* at 285:13-24. Again, this language is completely

consistent with Dr. Wieder's declaration.

Second, Defendants are simply playing word games with Dr. Wieder's statement on

formulary guidelines. Dr. Wieder clearly indicated that when he stated in his declaration that he

recommended removal of formulary restrictions and guidelines, he was referring to the removal

of guidelines on which doctors may prescribe Neurontin, not of general guidelines for how to use

14

medications. *See* Ex. B, Wieder Dep. 412:25 – 413:17 ("[M]y understanding when I signed it was that there are certain guidelines for formulary restrictions. It was the guidelines related to formulary restrictions, not clinical guidelines about how to use medications . . . That was my reading."). Quite simply, Dr. Wieder's testimony is consistent with his declaration.

Moreover, Dr. Wieder's testimony on the portion of his declaration on which the Court relied in ruling on summary judgment is also consistent. The Court relied in part upon Dr. Wieder's statement that he would not have made the same recommendation had he known the truth about Neurontin. *See* Mem. & Order [Dkt. # 2309] at 7-8. Dr. Wieder repeated that testimony at his deposition. When asked whether he would have made the same recommendations, Dr. Wieder said "I would absolutely not have had I known what I know now." Ex. B, Wieder Dep. 522:12-25. This testimony further shows the consistency of Dr. Wieder's declaration and testimony.

### E. Healthwise Episode Demonstrates the Breadth of Pfizer's Fraud

Pfizer's rant about the Healthwise materials is the pinnacle of hypocrisy – Pfizer condones its own use of misleading statements but criticizes the Healthwise materials' repetition of those same statements.

Plaintiffs maintain a website that provides information to patients on a wide variety of health care related topics. The website contains articles from several sources, including Healthwise, HealthMedia, EatingWell, and First DataBank. *See* Ex. C, Decl. of David McWaters at ¶ 3. The majority of health care information provided on Kaiser's website is not written by Kaiser. *Id.* Kaiser posts these materials alongside disclaimers, which state that "[t]he information provided on this Web site is not a substitute for the advice of your personal physician or other qualified health care professional . . . Never disregard professional medical advice or delay in seeking it because of something you have read on this Web site." *Id.* at ¶ 6.

15

When pharmaceutical companies inappropriately report information, sometimes misleading information appears in the articles undetected. *Id.* at ¶ 8. Healthwise is one the leading medical information providers whose materials are posted on Kaiser's website. *Id.* at ¶ 3. Healthwise, a wholly independent entity from Kaiser, licenses certain materials to Kaiser, along with its other clients, including the top ten U.S. health plans, the major disease management companies, the most visited health portals, and hundreds of hospitals and physician groups. *See* Ex. D, Decl. of Donald W. Kemper at ¶¶ 2, 5. Healthwise maintains final editorial control over the materials it generates. *Id.* at ¶4. These materials included articles on the off-label use of Neurontin. *See* Ex. C, Decl. of David McWaters at ¶ 4.

Healthwise and Kaiser have both represented that they cannot always detect misinformation that was inappropriately reported by pharmaceutical companies. *See* Ex. C, Decl. of David McWaters at ¶ 8; Ex. D, Decl. of Donald W. Kemper at ¶ 9. Pfizer's spreading of misinformation about Neurontin appears to have resulted in the misstatements in the Healthwise materials. Pfizer, who has denied the misleading nature of these materials throughout this litigation, now seeks to gain further testimony regarding the misleading nature of the same statements. Pfizer's argument is hypocritical and the Court should see through their rhetoric.

## IV.   CONCLUSION

For the reasons stated herein, the Defendants' Emergency Motion for Continued Deposition of Nicolas Wieder and Additional Relief should be DENIED.

Dated: January 22, 2010                    Respectfully submitted,


By:    */s/ Linda P. Nussbaum*
       Linda P. Nussbaum

16

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served

pursuant to Case Management Order #3 on January 22, 2010.

/s/ *Elana Katcher*
Elana Katcher

# EXHIBIT A

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
MDL Docket No. 1629/Master File No. 04-10981

----------------------------X

IN RE: NEURONTIN MARKETING      MDL Docket No. 1629

SALES PRACTICES, AND PRODUCTS   Master File No.

LIABILITY LITIGATION            04-10981

----------------------------X


VIDEOTAPED DEPOSITION OF ALBERT CARVER

New York, New York

July 12, 2007


Reported by:
Amy A. Rivera, CSR, RPR

42

A. Carver

1
2    Q.   Does Kaiser have a website?
3    A.   Yes, we do.
4    Q.   And how long has Kaiser had this
5    website?
6    A.   For several years.  I'm sorry.  I
7    don't know the exact year in which the website was
8    launched.
9    Q.   Who creates or decides its content?
10   A.   The content of the website generally
11   is under the health plan leadership.
12   Q.   And how often is the content of the
13   website changed?
14   A.   Not frequently enough.  I don't know
15   the schedule of changing the website, but it's
16   been a fairly stable website in terms of the types
17   of content.  But I can't tell you the frequency of
18   updating or editing specific components of the
19   website.
20   Q.   Can Kaiser access its old web pages?
21   A.   I'm not sure that I understand that
22   question.
23   Q.   I guess to the extent there was
24   material posted on the website in the past which
25   is no longer visible on the website, does Kaiser

43

A. Carver

1
2    have access to an archive of that sort of
3    information?
4    A.   I believe we would have, yes.
5    Q.   Have responsive documents been
6    produced from the website?
7         MS. NUSSBAUM:  That is a legal
8    question and I don't think that, you know, the
9    witness is a lawyer.  If you want to ask him about
10   the document production here, you know, in general
11   he's a 30(b)(6) witness.  He is prepared to
12   respond to that.
13   Q.   In response to the defendant's request
14   for production of documents, was the website then
15   passed -- web pages searched?
16   A.   Could I ask a question of
17   clarification?  What do you mean by "website"?
18   Q.   You indicated that Kaiser has a
19   website; correct?
20   A.   I did.
21   Q.   And which website were you referring
22   to?
23   A.   I was referring to a website that's
24   public website, and from your line of questioning,
25   I'm not sure that that's what you were -- I'm now

44

A. Carver

1
2    confused as to what you are meaning by the
3    "website."
4    Q.   In addition to the public website,
5    does Kaiser maintain internal websites?
6    A.   Yes, we do.
7    Q.   So then I guess returning to the
8    question, I guess first were documents that are
9    either currently visible on Kaiser's website or
10   otherwise were previously posted to that website
11   during the relevant period searched in response
12   for -- to the defendant's requests for productions
13   of documents?
14   A.   I believe they were.
15   Q.   What's the basis for that belief?
16   A.   The basis for the belief is that your
17   request for documents and information came to our
18   legal counsel.  I believe that --
19        MS. NUSSBAUM:  I would ask you not to
20   give any specific advice or discussion that you
21   had with counsel with respect to their request.
22   Q.   Does anyone at Kaiser have knowledge
23   of whether the public website, including its
24   previously posted content, was searched except
25   information derived from Kaiser's legal counsel?

45

A. Carver

1
2    A.   I do not know whether or not previous
3    versions of publicly-available information on the
4    website were searched or not.
5    Q.   But the currently available website
6    was -- public website was searched?
7         MS. NUSSBAUM:  To the best of your
8    knowledge.
9    A.   To the best of my knowledge, all the
10   information has been provided from all of our
11   current public -- all of our current sources of
12   information.
13   Q.   And that's information you obtained
14   from legal counsel, is that right?
15        MS. NUSSBAUM:  I'm unclear now, when
16   you say that's information that you obtained from
17   your legal counsel, would you rephrase that
18   question?
19        MR. JAMES:  In stating that the public
20   website has been searched, does he have any basis
21   for that belief other than information from legal
22   counsel?
23   Q.   Is there anyone at Kaiser, other than
24   Kaiser's legal counsel, who would know whether
25   information relating to Kaiser's public website

12 (Pages 42 to 45)

210

1

2              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
3              MDL Docket No. 1629/Master File No. 04-10981

4

5  ---------------------------X

6  IN RE: NEURONTIN MARKETING      MDL Docket No. 1629

7  SALES PRACTICES, AND PRODUCTS  Master File No.

8  LIABILITY LITIGATION           04-10981

9  ---------------------------X

10

11     VIDEOTAPED DEPOSITION OF ALBERT L. CARVER

12                New York, New York

13                 July 13, 2007

14

15

16

17

18

19

20

21  Reported by:
    Amy A. Rivera, CSR, RPR
22

23

24

25

439

1          A. Carver
2          MS. NUSSBAUM:  If you know.
3      A.   I do not know.
4      Q.   Is this something that keeps you awake
5  at night?
6      A.   It is not.
7          (Kaiser-22 marked nor identification.)
8      Q.   Have you had a chance to review this
9  document?
10     A.   I have.
11     Q.   Is this -- whose website is this?  If
12  you look at the upper right-hand corner --
13         MS. NUSSBAUM:  If you know.
14     A.   I don't know.
15         MS. NUSSBAUM:  Does counsel want to
16  represent where this document came from?
17     A.   I've never seen the document, so I
18  really do not know.
19     Q.   Have you heard of the website
20  kaiserpermanente.org?
21     A.   Yes, I have.
22     Q.   And whose website is that?
23         MS. NUSSBAUM:  If you know.
24     A.   I don't know the legal owner of it.
25     Q.   Do you know who maintains this

440

1          A. Carver
2  website?
3      A.   I don't.
4      Q.   Does -- do the plaintiffs have a
5  separate public website you know which is not
6  kaiserpermanente.org?
7      A.   I do not believe so.  Are you talking
8  about a public website?
9      Q.   Yes.
10     A.   That's to the public, external?
11     Q.   Exactly.
12     A.   I believe there's just one website.
13     Q.   And it's kaiserper.org?
14     A.   Yes, kp.org.
15     Q.   Do you know if the two are equivalent?
16         MS. NUSSBAUM:  The witness testified
17  he doesn't know what website this is and he didn't
18  know where you got this document, what he's aware
19  is kp.org.
20     Q.   Are you aware of a site called kp.org,
21  but not a site called kaiserper.org?
22     A.   Yes, from a technical issue I don't
23  know what it's called.
24     Q.   The logo in the upper left-hand corner
25  of this document, is that the logo, the Permanente

441

1          A. Carver
2  Medical Group's logo, or is it a logo associated
3  with some other Kaiser entity, or you know,
4  something that you've never seen before?
5      A.   No, this a logo for Kaiser Permanente,
6  the umbrella organization.
7      Q.   So for both the plaintiffs and the
8  Permanente Medical Group, is that correct?
9      A.   That's correct.  I cannot tell from
10  this logo that's been used whether or not this is
11  part of the Permanente Medical Group context or
12  not.  But certainly the logo up there belongs to
13  the umbrella, I guess, branding of our
14  organization.
15     Q.   If I were to represent to you that my
16  colleague seated here had printed this document
17  from the worldwide web from this address in the
18  upper right-hand corner, would you have any reason
19  to doubt that?
20     A.   No, I wouldn't.  If you're asserting
21  that, I wouldn't doubt it.
22     Q.   If this were a publicly accessible
23  document at an address called
24  kaiserpermanente.org, would you be concerned about
25  the content of this document?

442

1          A. Carver
2          MS. NUSSBAUM:  Objection.  It calls
3  for his personal speculation.  As to whether or
4  not he'd be concerned about the document, I'm not
5  going to let him answer that.  I don't know what
6  that means.
7      Q.   You can answer the question, if you
8  understand it.
9          MS. NUSSBAUM:  What does "concern"
10  mean?
11     Q.   If you have a comment as to the
12  meaning of the word concern, you're free to answer
13  the question?
14         MS. NUSSBAUM:  Why don't you define it
15  using of the word concern.  I'm not going to have
16  him answer the question until you articulate a
17  question that can be answered.
18     Q.   Do you understand what the term
19  "concern" means?
20     A.   Could we reask the question, please?
21         MR. JAMES:  Could you read back the
22  question?
23         (Record read.)
24         MS. NUSSBAUM:  I ask you to define the
25  term concern as you're using it --

59 (Pages 439 to 442)

447

A. Carver

1
2  supervise the content of the remainder of the
3  website?
4      A.  I'm sorry, I do not know.
5      Q.  Do you know who does manage the
6  content of the plaintiff's public website?
7          MS. NUSSBAUM:  Are you referring to
8  the kp.org website, and you want to know who
9  manages the content of that website, if he knows?
10         MR. JAMES:  Yes.
11     A.  There is a manager that's responsible,
12  her name is not coming to my mind at this second,
13  but I'm be happy to provide it to you as soon as
14  it does, or through counsel.  There is a manager
15  of the -- of this particular website.
16     Q.  Would you personally feel compelled to
17  take some action if you learned that Permanente
18  Group's public website was advising visitors that,
19  "People who took Gabapentin for chronic pain said
20  they felt one-third less pain while they were
21  taking Gabapentin"?
22         MS. NUSSBAUM:  Objection.  I'm going
23  to ask the witness not to answer that.
24     Q.  You can answer.
25         MS. NUSSBAUM:  No, first of all, it's

448

A. Carver

1
2  an unintelligible question.
3          Second of all, it's a question that
4  calls for the witness' personal opinion, which is
5  totally irrelevant in the action.
6          Third, we have not been able to
7  identify whose website this is.
8          Fourth, we have not been able to
9  identify this is a small piece of something, what
10  this is, who it's available to, what its purpose
11  is.  I think that your question is highly
12  misleading and I will not have the witness answer
13  it.  I don't think it's capable of being answered
14  and it would simply be speculation and
15  hypothetical.
16         MR. JAMES:  Are you directing the
17  witness not to answer the question?
18         MS. NUSSBAUM:  I think that there's
19  not a question that's capable of being answered
20  without speculation, a hypothetical question and
21  having to do with his personal feelings about
22  something which is totally irrelevant in this
23  action.
24     Q.  Do you understand that questions
25  relating to the witness' personal feelings are a

449

A. Carver

1
2  basis for counsel directing the witness not to
3  answer?
4          MS. NUSSBAUM:  I didn't say that.  You
5  want to ask a question that's capable of being
6  answered, we will see if that's possible.  You
7  want to identify this document and not give a
8  misleading few pages of something that there's no
9  testimony as to where it comes from or who
10  contained the content or anything else, then I'm
11  happy to address appropriate questions.  The
12  witness has been answering questions now for two
13  full days.
14         MR. JAMES:  To be clear, you're not
15  asserting the attorney-client privilege over the
16  response?
17         MS. NUSSBAUM:  Excuse me?
18         MR. JAMES:  Attorney-client privilege
19  is not in any way implicated by my question, is
20  that correct?
21         MS. NUSSBAUM:  I don't even understand
22  your question, so how can I know whether or not it
23  implicates attorney-client privilege?  I have no
24  idea if it's written by attorneys or supervised by
25  attorneys or anything else.  The present question

450

A. Carver

1
2  is not capable of being answered.  Do you want to
3  ask a question that's capable of being answered,
4  you know, he'll attempt to answer it as he's been
5  doing for two full days here.
6      Q.  If you turn to the second page of the
7  document, do you have any familiarity with who
8  Shannon Erstadt is, at the bottom?
9      A.  I'm sorry, I do not.
10     Q.  Actually at this point, flipping over
11  to the third page, do you have any understanding
12  of what the company Healthwise, Incorporated is?
13     A.  I do from personal experience in that
14  Healthwise is in the business of producing general
15  health information.  I was a recipient of the
16  Healthwise -- a document called the Healthwise
17  Handbook at my home a few years ago, and it had
18  information regarding just a number of simple
19  little things regarding medical conditions and
20  their management, so, it was really intended --
21  the document that I received, which actually was a
22  booklet, was intended to be, to assist individual
23  patients or members -manage really minor
24  conditions such as if you have a cough or if you
25  have a sore throat or something of that -- that

61 (Pages 447 to 450)

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


------------------------------)

In re: NEURONTIN MARKETING,    )MDL Docket No. 1629

SALES PRACTICES AND PRODUCTS   )

LIABILITY LITIGATION           )Master File No.

------------------------------)04-10981

THIS DOCUMENT RELATES TO:      )

THE GUARDIAN LIFE INSURANCE    )Judge Patti B. Saris

COMPANY OF AMERICA v. PFIZER   )

INC., 04 CV 10739 (PBS)        )Magistrate Judge Leo

------------------------------)T. Sorokin



        Videotaped Deposition of

    NICOLAS WIEDER, D.O., at 300 S. Grand Avenue,

    Los Angeles, California, commencing at

    9:22 p.m., Tuesday, January 12, 2010, before

    Janice Schutzman, CSR No. 9509.



Job No: 234602

PAGES 1 - 536

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 18

1  then a -- worked as well in -- I was a prepartner in
2  another practice that included interventional pain
3  and some neurology.
4      Q.  So that was approximately from 1992 or 1993
5  to 1997?                              09:35AM
6      A.  That's right.
7      Q.  And during that period of time, you became
8  board certified in neurology?
9      A.  Yes.
10     Q.  And you were not at that point certified   09:35AM
11 in -- board certified in pain medicine; is that
12 right?
13     A.  No, I was actually.  I don't -- that's
14 actually -- thanks for pointing that out.  This is
15 actually a misprint.  I forgot -- I was -- I think   09:36AM
16 it was 1996, actually, that I was board certified in
17 pain medicine, but this is a recertification --
18     Q.  Okay.
19     A.  -- I believe.
20     Q.  And that's been -- so just so we're clear,   09:36AM
21 in 1995, approximately, you were board certified in
22 neurology?
23     A.  Yes.
24     Q.  In 1996, thereabouts, you were board
25 certified in pain management?              09:36AM

Page 19

1      A.  Yes.
2      Q.  You either were required or determined to
3  recertify both your neurological boards and your
4  pain medicine boards, and that happened on or about
5  2005?                                 09:36AM
6      A.  Right.  The neurology boards had to be
7  tested.  The pain boards did not.
8      Q.  When you came to Kaiser, were you a
9  partner?
10     A.  No.  It requires three years.        09:37AM
11     Q.  And were you made a partner after your
12 three-year tenure?
13     A.  Yes.
14     Q.  So approximately 2000 is when you became a
15 partner?                               09:37AM
16     A.  Yes.
17     Q.  In the structure of your partnership, are
18 there certain things or responsibilities that a
19 partner has that nonpartners don't have?  In other
20 words, what's the difference about being a Kaiser    09:37AM
21 partner than being a person who is not a partner who
22 practices for Kaiser?
23     A.  Mostly it's related to, but not precisely,
24 vesting.  It has more to do with your future -- your
25 financial future than it actually does with your    09:37AM

Page 20

1  practice future.
2      Q.  Is it more of an economic issue?
3      A.  I think so, yeah.  I think that's the way I
4  would characterize it.
5      Q.  You share in the profits as a partner would  09:37AM
6  as opposed to being an employee?
7      A.  We're nonprofit, so we don't share in
8  profits, but we're part of a -- what you could call
9  a retirement plan that we wouldn't be -- we're also
10 allowed to use -- invest in a Keogh, whereas prior   09:38AM
11 to that time, you contribute to a 401(k).  So those
12 kinds of differences.
13     Q.  Your partnership is nonprofit?
14     A.  The -- I don't know if the partnersh- -- I
15 don't know if -- yeah, I don't know.  The Kaiser     09:38AM
16 Permanente is nonprofit.  Our partnership is hired
17 by them --
18     Q.  Right.
19     A.  -- to provide services.  My understanding
20 is that it's a nonprofit, yes.              09:38AM
21     Q.  Okay.  What -- do you know one way or the
22 other whether your --
23     A.  Not clearly.
24     Q.  Okay.
25     A.  Not clearly.  Not with the partnership      09:38AM

Page 21

1  specifically because it's the -- the medical
2  services are divided up among different entities, so
3  I don't know precisely.
4      Q.  So what -- your understanding is Kaiser
5  itself is a nonprofit entity; right?        09:38AM
6      A.  Yes.
7      Q.  And it contracts with various other
8  entities to perform services right?
9      A.  It's contractual only with us.  We're -- we
10 have an exclusive service contract for physician    09:39AM
11 services, but yes, they have contracts with unions
12 and other people to provide services.  I think
13 that's actually health plan.  It's a little
14 confusing, actually.
15     Q.  Okay.  And what you're not sure of is       09:39AM
16 whether your actual partnership made up of doctors
17 is a nonprofit 501(c) --
18     A.  Yeah, yeah, exactly.
19         THE REPORTER:  Excuse me.  You need to wait
20 until the questions are completed before you answer.
21 BY MR. CHEFFO:
22     Q.  You're not sure whether your own medical
23 group is a profit entity or not?
24         MR. SOBOL:  Objection.
25         THE WITNESS:  Yes.                 09:39AM

6  (Pages 18 to 21)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 274

1    A.  Yes.
2    Q.  Who?
3    A.  I don't recall who.  In general, a request
4  is made, and then Drug Information Systems gives us
5  all the literature and gives us what the nature of    02:59PM
6  the discussion is, and then we review it.
7    Q.  How did you make the recommendation in
8  1997?
9    A.  By email.
10    Q.  So --                          02:59PM
11    A.  And also, yes, by email, but more than just
12  me giving it.  There's a discussion that goes on.
13    Q.  Are there also chiefs of neurology and
14  chiefs of anesthesiology who meet?
15    A.  Yes.                         02:59PM
16    Q.  Were you a member of those committees?
17    A.  No.
18    Q.  Do you know if anybody else recommended
19  reflex sympathetic dystrophy?
20    A.  Well, clearly, because they adopted it.  I    03:00PM
21  don't think they would -- that it would be adopted
22  solely on my recommendation.  Although I -- like I
23  said, I was -- I don't think there was anybody else
24  who was fellowship trained at the time, so I think
25  my recommendation would have had some weight.     03:00PM

Page 275

1    Q.  Okay.  But there are a lot of other people
2  who were involved in this decision; is that fair?
3    A.  I don't know how many, but there --
4  certainly more than me and --
5    Q.  It doesn't discuss any of them in your    03:00PM
6  declaration, does it?
7    A.  No, it doesn't.
8    Q.  It just says that you made the
9  recommendation.
10    A.  Well, it's -- it can -- I have English as a   03:00PM
11  second language, but I read that as meaning that
12  that's an act that I took.  It doesn't describe any
13  other acts anyone else may have taken, but maybe I
14  don't understand the language as well as I should.
15    Q.  Okay.  And I don't think we need to be    03:00PM
16  sarcastic.
17    A.  I'm not being sarcastic.  I'm being honest.
18  I have a gap sometimes in learning -- in -- because
19  I have English as a second language, so I take
20  sometimes things very concretely grammarwise, and    03:01PM
21  I'm -- often have poor grammar.
22    Q.  Well, somebody else -- a lawyer wrote this
23  for you; right?
24    A.  Yes, and I -- when I read that, that's what
25  I assumed, is that, yes, I did make the    03:01PM

Page 276

1  recommendation.  I didn't think at the time that
2  that meant that I was the only one who ever made the
3  recommendation.
4    Q.  You could see that someone could say this
5  looks like you made a recommendation to the P&T    03:01PM
6  committee and then all of a sudden they adopted it;
7  right?
8    MS. NUSSBAUM:  Objection.
9    THE WITNESS:  I don't think a reasonable
10  person would, but I guess somebody could.    03:01PM
11  BY MR. CHEFFO:
12    Q.  So, in fact, what -- do you know the
13  history about reflex sympathetic dystrophy with --
14  before it got to the P&T committee and before it got
15  to you?    03:01PM
16    A.  In what -- what do you mean the history?
17  In what way?
18    Q.  Well, in other words, do you know whose
19  idea it initially was, who --
20    A.  Oh, no.
21    Q.  -- suggested it?
22    A.  No.  I don't know.
23    Q.  Do you know who was supporting it, who was
24  against it?
25    A.  I don't recall that at all.    03:02PM

Page 277

1    Q.  Your -- the basis of your involvement was
2  that you received some material in an email saying
3  that the P&T committee was going to consider this,
4  do you have a view on it?
5    A.  Do I have a view on it, and I also talked    03:02PM
6  with other people who took care of pain patients and
7  talked with my department, and so it was through
8  conversation and through my own personal view.
9    Q.  And at the time you had had positive
10  experience with using Neurontin for reflex    03:02PM
11  sympathetic dystrophy?
12    MR. SOBOL:  Objection.
13    MS. NUSSBAUM:  Objection.
14    THE WITNESS:  At the time I felt like there
15  was some evidence that suggested it might help.    03:02PM
16  It's a terribly difficult condition to treat.  And I
17  thought, well, it looks like there's some evidence
18  in certain cases.  Based on the judgment of the
19  treating doctor, they should have the -- they should
20  be able to use their own judgment about it.    03:03PM
21  BY MR. CHEFFO:
22    Q.  And if you believe that there was no
23  evidence whatsoever, you wouldn't have recommended
24  it; isn't that right?
25    A.  I think that's true.    03:03PM

70 (Pages 274 to 277)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 282

1 restriction limiting to neurologists. In 1997, you
2 were asked through an email whether you would agree
3 with or suggest that the -- as it says here, the
4 formulary restrictions be expanded to include
5 treatment of RSD with gabapentin; correct?          03:06PM
6     A. Again, yes.
7     Q. Okay. Now -- and it says here:
8         "I'm informed and believe that the
9     P&T committee adopted certain" --
10    A. I'm sorry. What did you say? I thought I    03:06PM
11 heard you saying something else. Go ahead.
12    Q. It says here:
13        "I'm informed and believe that the
14    P&T committee adopted this recommendation."
15    A. Okay. Yes.                                  03:07PM
16    Q. You weren't at the commit- -- the P&T
17 committee meeting; right?
18    A. I was not a member.
19    Q. You didn't provide any information directly
20 to them?                                           03:07PM
21        MR. SOBOL: Objection.
22        THE WITNESS: In the form -- if you
23 consider email as a direct -- that's the extent,
24 email and discussions. The same -- just what I said
25 before.                                            03:07PM

Page 283

1 BY MR. CHEFFO:
2     Q. Was it a yes-or-no email, or was it a
3 dialogue?
4     A. I don't recall what the exact email was,
5 but the options were absolutely for dialogue.      03:07PM
6 There's no -- it was not a yes or no type of
7 question.
8     Q. Do you remember what you did?
9     A. I said I supported it. I know that. And I
10 don't remember if I included reasons for it, but I  03:07PM
11 did say I supported it.
12    Q. So -- and then -- and you don't know who
13 else, if anyone else, supported that recommendation;
14 right?
15        MR. SOBOL: Objection.                      03:07PM
16        THE WITNESS: Not -- no, I don't remember.
17 BY MR. CHEFFO:
18    Q. You don't know if anyone dissented from it?
19    A. I don't remember. No, I don't know.
20    Q. Do you remember how you found out that the  03:08PM
21 committee adopted it?
22    A. The P&T committee has a regular information
23 download that they give, and that's how I found out
24 about it.
25    Q. And do you have any information about what  03:08PM

Page 284

1 went on at that P&T committee, the discussion about
2 it?
3     A. No.
4     Q. Do you have any idea about what information
5 they reviewed or talked about?                      03:08PM
6         MR. SOBOL: Objection.
7         THE WITNESS: I don't recall any -- being
8 told or I -- it was a long time ago. I don't really
9 remember.
10 BY MR. CHEFFO:                                     03:08PM
11    Q. Did you ever ask after the fact?
12    A. I don't remember asking, no. I already
13 supported it, so if it happened, then I wouldn't
14 be -- I'm busy enough. I wouldn't be running
15 afterwards to figure out why did they support       03:08PM
16 something I supported.
17    Q. And in -- it says here:
18        "In or around 1999, I recommended
19     removal of all formulary restrictions
20     and guidelines for Neurontin."                03:08PM
21     Do you see that?
22    A. Yes.
23    Q. Was that the same process that you went
24 through in 1997. In other words, you were asked to
25 comment on a recommendation?                        03:09PM

Page 285

1         MR. SOBOL: Objection.
2         THE WITNESS: By that time, I think I was
3 already -- you know, I don't recall exactly,
4 although I remember that I was being asked more and
5 more, not by them, but just in general about pain.  03:09PM
6 By that time, it was known that I was a pain doctor,
7 and so I was being asked more about it.
8 BY MR. CHEFFO:
9     Q. But I want to talk specifically about the
10 declaration --                                      03:09PM
11    A. Uh-huh.
12    Q. -- okay?
13        This says in or around September 1999, you
14 made a recommendation; right?
15     Are you with me?                               03:09PM
16    A. Yes.
17    Q. And then it also says in the next sentence,
18 that in the same month, "in or around
19 September 1999, the P&T committee adopted this
20 recommendation."                                   03:09PM
21    A. Yes.
22    Q. Okay.
23    A. It was the same process of -- you're asking
24 about the process. Yes.
25    Q. I'm going to show you them in a few         03:09PM

72 (Pages 282 to 285)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 334

1    MR. SOBOL: I instruct you not to answer.
2 BY MR. CHEFFO:
3    Q.  Do you recognize this page?
4    MR. SOBOL: I instruct you not to answer.
5 BY MR. CHEFFO:                              04:05PM
6    Q.  Have you ever seen this page before?
7    MR. SOBOL: I instruct you not to answer.
8    And I don't know what you mean when you're
9 saying "this page."  Are you pointing at some
10 screen, or are you pointing --               04:05PM
11   MR. CHEFFO: Yes.
12   MR. SOBOL: -- at an exhibit?
13   MR. CHEFFO: Let's look at it with the
14 video.  The screen.
15 BY MR. CHEFFO:
16   Q.  Doctor, there's a screen that says
17 Https//memberskaiserpermanente, and it goes on.
18   Have you ever seen that screen before?
19   MR. SOBOL: I instruct him not to answer.
20   MR. CHEFFO: I really think what you're    04:05PM
21 doing is sanctionable, Tom, but you can continue
22 doing it.
23   MR. SOBOL: I think it's a waste of time.
24   MR. CHEFFO: You know what, that's not a
25 basis to instruct not to answer, but you're really  04:06PM

Page 335

1 at your peril here.  But if you're going to do it --
2 I'm trying to authenticate the website and the
3 document.  Instructing the witness to ask -- to
4 ans-- not to answer whether he's ever seen a page?
5 I've never in my entire career had a lawyer do that.  04:06PM
6    So I respect you.  You're a good lawyer.
7 But again, I'm putting you on notice that we're
8 going to have him come back if you won't let him
9 answer these questions about what this website says.
10   So is this the final time you're going    04:06PM
11 to -- you're not going to let him talk about
12 anything on the website or authenticate it?
13   MR. SOBOL: Is there a question before the
14 witness?
15   MR. CHEFFO: I'm asking you.              04:06PM
16   MR. SOBOL: Is there a question before the
17 witness?
18 BY MR. CHEFFO:
19   Q.  Okay.  Doctor, what does that web -- what
20 does that website say?                      04:06PM
21   MR. SOBOL: What are you pointing at right
22 now?
23   MS. NUSSBAUM: Well, let's just see if he
24 can read English.
25   What does it say?  Go ahead.  Can you read  04:06PM

Page 336

1 English?  What does it say?
2    MR. CHEFFO: Which one of you is
3 representing the witness?
4    MR. SOBOL:  I want to know what the "that"
5 is in the question.  You're talking about --      04:06PM
6    MR. CHEFFO:  The video is pretty clear.
7    MR. SOBOL: -- the screen or the exhibit?
8    MR. CHEFFO: No, it's the screen.  I'm
9 pointing to the screen.
10   MR. SOBOL: I instruct him not to answer.   04:06PM
11 BY MR. CHEFFO:
12   Q.  Okay.  If you wanted to go online, Doctor,
13 to find the Kaiser Permanente web --
14   You can put it back on the doctor, please.
15   If you wanted to go online to find the    04:07PM
16 Kaiser Permanente website, how would you do it?
17   A.  I would type in KP.org.
18   Q.  KP.org?
19   A.  In the -- in --
20   Q.  Where?                               04:07PM
21   A.  In the address.
22   Q.  So it would be a --
23   A.  Just KP.org.  You can erase all -- you can
24 delete all that.  No -- okay.
25   Q.  Is it www?                           04:07PM

Page 337

1    A.  You're asking me the way I would do it.  I
2 would have a whole blank section.  I would type in
3 KP.org.  That's how I would do it.  It's not maybe
4 the best way, but that's the way I'd do it.
5    Q.  Let's try that.                       04:07PM
6    A.  Release -- no.
7    Q.  KP dot --
8    A.  You -- okay.
9    Q.  -- org.
10   Okay.  Is that the screen that you usually  04:08PM
11 see when you type that in?
12   MR. SOBOL: I instruct him not to answer.
13 BY MR. CHEFFO:
14   Q.  Doctor, you understand that if we move to
15 compel this and Mr. Sobol is wrong, that you're     04:08PM
16 going to have to come back and answer these
17 questions; right?
18   MR. SOBOL: No, he's not going to have to
19 come back because if there's something on the record
20 that you want to do --                      04:08PM
21   MR. CHEFFO: I am on the record.
22   MR. SOBOL: -- with him --
23   I haven't finished what I'm saying.
24   If there's something you want to do with
25 him on the record with a document in front of him  04:08PM

85 (Pages 334 to 337)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 338

1  that he can read, you can do that, which you already
2  have. If you're concerned about a foundational
3  issue about what appears in the website today, you
4  can speak to the lawyers. You don't need him to do
5  it.                              04:08PM
6        MR. CHEFFO: That's not the way it works,
7  but that's fine.
8        MR. SOBOL: Well, it is the way it works --
9  BY MR. CHEFFO:
10   Q.  Doctor, you have on the screen --
11       MR. SOBOL: -- in Boston because you don't
12  have to waste this doctor's time making a foundation
13  for what exists in the website. Judge Saris and
14  every other judge in Boston would say don't waste
15  people's time with that --          04:09PM
16       MR. CHEFFO: Okay.
17       MR. SOBOL: -- Counsel. Make a --
18       MR. CHEFFO: I'm asking you then right now
19  to stipulate. We have the witness here. We're in
20  California. If you stipulate that these are   04:09PM
21  authentic, I won't need to do it.
22       MR. SOBOL: And you don't have to waste his
23  time today doing that, is my point.
24       MR. CHEFFO: Okay. But I'm asking you
25  then. Will you stipulate?          04:09PM

Page 339

1        MR. SOBOL: If it's on the web, I'll
2  stipulate with you, but I don't know whether it is,
3  and I'm not doing stipulations today. We're doing a
4  deposition of this Doctor.
5        MR. CHEFFO: Okay. But I want to find out   04:09PM
6  if it's on the web, and he can help us find that
7  out.
8        MR. SOBOL: No, he doesn't have to take his
9  time, is my point.
10       MR. CHEFFO: I don't know why you're so   04:09PM
11  scared of your own client's website. It's stunning.
12       MR. SOBOL: It's not a matter of being
13  scared. It's a matter of not wasting his time.
14       MR. CHEFFO: Do you care -- well, he's
15  still going to be here. Okay, Tom? I can use my   04:09PM
16  time. Okay? I'm using my time.
17  BY MR. CHEFFO:
18   Q.  I'd like you to go and log in --
19       MR. SOBOL: You're using his time and our
20  time also.                        04:09PM
21  BY MR. CHEFFO:
22   Q.  I'd like to log in, use your user ID and
23  log in and find out if you can find how you'd find
24  anticonvulsants for cancer pain and low back pain.
25       MR. SOBOL: I instruct you not to be   04:09PM

Page 340

1  engaging in this, Doctor.
2        He's following his counsel's advice.
3        THE WITNESS: I'm following my counsel's --
4        MR. CHEFFO: Okay.
5        THE WITNESS: -- advice.          04:10PM
6  BY MR. CHEFFO:
7    Q.  If he had allowed you to do it, you could
8  log in to the website, couldn't you?
9        MR. SOBOL: What website?
10  BY MR. CHEFFO:                     04:10PM
11   Q.  The Kaiser Permanente website?
12   A.  I imagine I could have. I don't remember
13  my user name and password, but I could have
14  probably, you know, gotten on somehow on some parts
15  of it.                           04:10PM
16   Q.  Right. And you could have accessed it, and
17  we could have been able to look and find out if
18  those things are on the website or not; right?
19   A.  We could -- I imagine so, yeah.
20   Q.  Okay. Have you ever been to the part of   04:10PM
21  the -- in case you reconsider, we'll leave that
22  there for a few minutes.
23       Have you ever been to the part of the
24  website that has those listings.
25   A.  I've never seen these listings.   04:10PM

Page 341

1    Q.  Your lawyer's never showed you those?
2    A.  No.
3        MR. SOBOL: Objection and instruct him not
4  to answer. Actually, I move to strike.
5        What you discuss with your --
6  BY MR. CHEFFO:
7    Q.  This is the first time --
8        MR. SOBOL: Wait a second.
9        What you discussed with the lawyers one way
10  or the other is privileged, Doctor.   04:11PM
11       THE WITNESS: Thank you.
12  BY MR. CHEFFO:
13   Q.  That's the first time you've ever seen
14  those documents; right?
15   A.  Yes.                       04:11PM
16   Q.  Are you surprised to see them?
17       MR. SOBOL: Objection.
18       THE WITNESS: What does it matter? I'm
19  seeing them. That's fine with me.
20  BY MR. CHEFFO:                    04:11PM
21   Q.  Based on your testimony earlier today, are
22  you surprised to see those documents?
23       MR. SOBOL: Objection.
24       THE WITNESS: I don't -- I don't have any
25  kind of emotional reaction about them at all. I'm   04:11PM

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 342

1 just waiting to find out what you want me to tell
2 you about them.
3 BY MR. CHEFFO:
4    Q. Are they consistent with your testimony?
5       MR. SOBOL: Objection.          04:11PM
6       THE WITNESS: What part of my testimony?
7 BY MR. CHEFFO:
8    Q. Are the documents that say that
9 anticonvulsants and Neurontin can be used for
10 chronic pain, neuropathic pain and other syndromes,   04:11PM
11 are they consistent with your testimony earlier
12 today?
13       MR. SOBOL: Objection.
14       THE WITNESS: This is not data. This is
15 not true data. It -- so it has no bearing on any of   04:11PM
16 the testimony I gave you.
17 BY MR. CHEFFO:
18    Q. What's the -- what -- does it have any use
19 or meaning whatsoever?
20    A. Not -- no. Not to me.          04:12PM
21    Q. What about to patients?
22    A. It may. I think the only use it would
23 have -- it would generate questions. And then I
24 could -- you know, just like it says here. In fact,
25 what does it say?

Page 343

1       It says somewhere here -- where does it say
2 it?
3       "This information is not intended to
4 replace the advice of a doctor."
5       So this usually is just to generate          04:12PM
6 questions. This is not accurate information. It's
7 not -- it's just -- it's generic basically to
8 stimulate -- and, in fact, I don't even know who
9 Healthwise is. But like I told you before,
10 Healthwise, it's not Kaiser.          04:12PM
11    Q. But Kaiser -- you know who Kaiser is;
12 right? That's on the top left of the document,
13 isn't it?
14       MR. SOBOL: Which document?
15 BY MR. CHEFFO:          04:12PM
16    Q. Kaiser -- on every one of them. Kaiser
17 Permanente --
18    A. Are you asking me if I know what Kaiser is?
19    Q. Well, no.
20    A. Are you actually asking me that?          04:12PM
21    Q. You said it says Healthwise, but it's
22 printed out on the Kaiser Permanente document;
23 right?
24    A. It appears to be.
25    Q. Okay.

Page 344

1    A. Sure.
2    Q. And is there any information that you
3 disagree with in any of the five or six exhibits
4 that I put before you and gave you a chance to read?
5       MR. SOBOL: Objection.          04:13PM
6       Do you want him to read each one and go
7 through it that way?
8       MR. CHEFFO: Well, I thought he did read
9 them.
10       THE WITNESS: I reviewed them. I mean, I   04:13PM
11 didn't -- you know --
12       MR. SOBOL: Are you withdrawing the last
13 question? Yes or no. Because then he would have to
14 go through each exhibit line-by-line and make a
15 decision about whether or not he agrees or disagrees   04:13PM
16 with it.
17       MR. CHEFFO: Okay. Let's go off the
18 record.
19       THE VIDEOGRAPHER: Off the record, 4:14.
20       (Discussion off the record.)          04:14PM
21       THE VIDEOGRAPHER: Back on the record 4:16.
22       THE WITNESS: I don't want to read these
23 all over again. I -- if there's a -- the question
24 is so general about all of them. If there's
25 something specific --          04:14PM

Page 345

1       MR. CHEFFO: Okay.
2       THE WITNESS: -- I'm happy to look at it.
3 BY MR. CHEFFO:
4    Q. Let's take them one at a time.
5       Read the one for cancer pain and tell me if   04:14PM
6 there's anything wrong or inaccurate in it.
7    A. There's something misleading about it.
8    Q. Misleading?
9       MS. NUSSBAUM: Do you have another copy of
10 that one for counsel?          04:15PM
11       MR. CHEFFO: I think he has them all.
12       MS. NUSSBAUM: No.
13       MR. SOBOL: Hold on a second. Before he
14 answers the question, can we have a copy of the
15 cancer one, please.          04:15PM
16       MS. NUSSBAUM: We only have chronic low
17 back and restless leg.
18       MR. CHEFFO: I think I gave you all of
19 them.
20       THE WITNESS: I don't have a second copy of   04:15PM
21 it.
22       MS. NUSSBAUM: Doctor, you have the
23 exhibits.
24       MR. CHEFFO: You can look at mine.
25       THE WITNESS: Here's another one here,          04:15PM

87 (Pages 342 to 345)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 346

1 MR. CHEFFO: Oh, I thought I didn't give it
2 to you?
3 THE WITNESS: Here's one for --
4 BY MR. CHEFFO:
5 Q. Okay. So what's misleading in the cancer     04:16PM
6 pain?
7 A. It's this -- it suggests that
8 anticonvulsants are sometimes used generally for
9 cancer pain. It's like saying using your heels stop
10 a car.                                            04:16PM
11 MR. CHEFFO: I'm sorry. Could you read
12 that back?
13 (Record read as follows:
14 "ANSWER: It suggests that
15 anticonvulsants are sometimes used          04:16PM
16 generally for cancer pain. It's like
17 saying using your heels stop a car.")
18 BY MR. CHEFFO:
19 Q. So that's a misleading statement on the
20 Kaiser Permanente website?                        04:16PM
21 A. Well, it's a misleading statement by
22 Healthwise, if this is by Healthwise. I'm assuming
23 it is. But it's misleading to suggest that
24 anticonvulsants are generally used for cancer pain.
25 Q. Okay. What else is misleading on the       04:16PM

Page 347

1 Kaiser Permanente website regarding anticonvulsants
2 for cancer pain, if anything?
3 MS. NUSSBAUM: Objection.
4 THE WITNESS: You keep saying that -- the
5 Kaiser Permanente website, and I'm only speaking     04:17PM
6 about this particular document. I can't possibly
7 speak to the entire website.
8 BY MR. CHEFFO:
9 Q. Well, we're talking about that -- okay?
10 A. Okay. I just -- whenever you say -- you     04:17PM
11 keep mentioning --
12 Q. What's the exhibit number there?
13 A. I don't have it. Oh, 17.
14 Q. Okay. In Exhibit 17, what, if anything,
15 else is misleading?                               04:17PM
16 A. It's misleading to have a list of
17 medications that appear to have equal prominence as
18 if all of them are equal to the other.
19 It's misleading to suggest that there's
20 something specific about the way anticonvulsants     04:17PM
21 work in regard specifically to cancer pain.
22 It's misleading to suggest that it is
23 commonly used in the section, "Why It is Used."
24 It's misleading to use the word "well" in
25 "How Well It Works."                              04:18PM

Page 348

1 The side effect profile seems relatively
2 accurate. And the USDA -- FDA warning seems
3 accurate.
4 It's misleading to use the word "drug
5 encyclopedia" when we don't really -- we don't --     04:18PM
6 it's a language that's not usually our website
7 language, so it looks like it's something from
8 somewhere else. I don't know if we have a drug
9 encyclopedia, but it's not a term I've used with
10 ours.                                             04:18PM
11 It's misleading to put the Tegretol at the
12 top of the list in the beginning examples and at the
13 end say, it's not generally used in cancer pain. It
14 seems contradictory, and it seems to reflect a lack
15 of care that's taken with this overall.            04:19PM
16 It's misleading to -- well, that's enough.
17 That's enough misleading stuff.
18 Q. Do you know who any of the people listed
19 are?
20 A. Only one, the citation.                   04:19PM
21 Q. Who's that?
22 A. Kathleen Foley. She's a well-respected
23 cancer pain doctor.
24 Q. Anybody else listed on the credits or the
25 medical review?                                   04:19PM

Page 349

1 A. I don't know them.
2 Q. Do you know who Anne Poinier is?
3 A. No.
4 Q. Do you know who Shannon Erstad is?
5 A. No.                                        04:19PM
6 Q. Okay. What's the next exhibit that you
7 have? Why don't you look at the low -- chronic low
8 back pain.
9 A. Okay.
10 Q. What, if anything, is misleading on that     04:19PM
11 exhibit, talking about anticonvulsants and chronic
12 low back pain?
13 A. It's -- some of them are similar.
14 It's misleading to suggest that
15 anticonvulsants for chronic low back pain is a      04:20PM
16 standard and common treatment.
17 It's misleading, again, to order the
18 examples in the way they are, as if they have equal
19 emphasis.
20 It's misleading to describe a sentence "How     04:20PM
21 It Works" when the topic is titled "Chronic Low Back
22 Pain," but then the description of how it works
23 talks about brain electrical activity.
24 It's just another example of how poorly
25 conceived and lacking they are in any real          04:20PM

88 (Pages 346 to 349)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 350

1  expectation that this would be used in any kind of
2  significant way.
3        It's misleading that -- the comment about
4  persistent low back pain with fewer side effects
5  is -- suggests that all anticonvulsants can reduce   04:21PM
6  some persistent low back pain to the advantage of
7  all tricyclic antidepressants with fewer side
8  effects than all anti- -- tricyclic antidepressants.
9        It's misleading to use the phrase "How Well
10 It Works" when it doesn't work very well.  It may   04:21PM
11 work, but it gives a false sense that it works very
12 well, especially when it -- the title of the
13 paragraph is "How Well It Works" and the third
14 sentence says, "This type of medicine is not
15 well-studied as a chronic pain treatment."  So   04:21PM
16 that's contradictory.  In addition --
17    Q.  Are there any half truths in there, Doctor?
18       MR. SOBOL:  Objection.  Had he finished his
19 answer?
20       THE WITNESS:  I -- no, I -- there's many   04:21PM
21 other things that were --
22 BY MR. CHEFFO:
23    Q.  No, you can keep going.
24    A.  Okay.  The pregabalin can cause swelling in
25 some people, including swelling of the face or lips.  04:22PM

Page 351

1        Really, the thing that bothers most people
2  is the leg swelling, which can be really
3  devastating.
4        And the other thing is that the -- what's
5  misleading is that the citations are from the   04:22PM
6  American Geriatric Society, which presumably is
7  something that discusses chronic low back pain for
8  geriatric patients, and it's misleading to put this
9  without identifying that -- at least in the title,
10 that this is primarily based on geriatric patients,   04:22PM
11 and it's misleading that there's no geriatrician in
12 the credits for the reviews when the citation is
13 from the American Geriatric Society.
14       And it's also misleading that there is no
15 pain doctor or physiatrist or anybody who actually   04:22PM
16 prominently sees low back pain as a primary part of
17 their practice.
18       And it's also misleading to not identify --
19 well, it's okay.  The Healthwise issue is another
20 one -- no one would be reasonably -- would   04:23PM
21 reasonably think that it wasn't a Kaiser document.
22 It's a little misleading to me.  I know when I look
23 at things, I see Healthwise, it seems like a strange
24 name to me.  So I know, but a patient wouldn't think
25 that.  They would think somehow if -- it's an   04:23PM

Page 352

1  imprimatur of some type, which it's not.
2        So those are the misleading things.
3        And you asked me if there were any half
4  truths, and I would say if there are, that means
5  there's half lies, in which case it's, as we say,   04:23PM
6  gornisht anyway.  It's nothing.
7    Q.  Are there any half truths or half lies?
8       MR. SOBOL:  Objection.
9       THE WITNESS:  I don't know how to measure a
10 truth.                                    04:23PM
11 BY MR. CHEFFO:
12    Q.  Can you look at the next exhibit that you
13 haven't reviewed and --
14    A.  Headache cluster.
15    Q.  Yes, sir.                          04:23PM
16    A.  Okay.
17    Q.  Doctor.  Excuse me.
18    A.  That's okay.
19    Q.  And just so we're clear, the question I'm
20 asking you is, are there any misleading or   04:24PM
21 misrepresentations in that exhibit?
22       MR. SOBOL:  Which exhibit are we on now?
23       THE WITNESS:  Headache cluster.
24 BY MR. CHEFFO:
25    Q.  Which is the number there, Doctor?   04:24PM

Page 353

1    A.  15.
2    Q.  What's the heading -- what's the title of
3  it, just for the record?
4    A.  "Headache, cluster."
5    Q.  Okay.                             04:24PM
6       MS. NUSSBAUM:  I don't have it.
7       THE WITNESS:  What's misleading -- I won't
8  go over the things that are similarly misleading as
9  in the other one, but the new misleading things --
10      MR. SOBOL:  Hold on.  Before you answer the   04:24PM
11 question, may we have a copy of the exhibit.
12      MR. CHEFFO:  You did this to me last time.
13 I threw two for everyone.  She told me that you
14 don't have it and then it's in there.  So before you
15 tell me again it's not there, let's look.   04:24PM
16      THE WITNESS:  You're being punished.
17      MR. SOBOL:  I don't see it.
18      THE WITNESS:  I have Headache, Cluster
19 here.
20      MS. NUSSBAUM:  Yeah, these are all original   04:24PM
21 exhibits.
22      THE WITNESS:  Yeah, I know, but I have only
23 one Headache, Cluster here because last time I had
24 the second one.
25 BY MR. CHEFFO:

Veritext Corporate Services

800-567-8658                                973-410-4040

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 354

1    Q.  Put Headache, Cluster aside for a minute.
2    A.  Okay.
3    Q.  I want to see if we have another one.  See
4  if you can --
5    A.  Burning Mouth --                    04:25PM
6    Q.  -- use the next one.
7    A.  Burning Mouth Syndrome.
8    Q.  Yeah.
9       MR. SOBOL:  I don't have that one either.
10      THE WITNESS:  Maybe it's over here.    04:25PM
11      MS. NUSSBAUM:  No.  You only have exhibits.
12  There are no more -- you don't have anymore.
13      THE WITNESS:  Primary Orthostatic Tremor,
14  do you have that one?
15  BY MR. CHEFFO:                          04:25PM
16   Q.  Do Burning Mouth.  I have Burning Mouth.
17   A.  Okay.  Burning -- we have a second Burning
18  Mouth there, please.
19      MR. SOBOL:  I do not have a Burning Mouth.
20      MR. CHEFFO:  He's going to give it to you.
21      THE WITNESS:  Thank God.
22  BY MR. CHEFFO:
23   Q.  Okay.  What's the number there, what
24  exhibit number?
25   A.  18.                                04:25PM

Page 355

1    Q.  Okay.  What's -- what, if anything, is
2  misleading about the Exhibit 18?
3    A.  What's misleading is --
4       MR. SOBOL:  Objection.
5       Go ahead.                          04:25PM
6       THE WITNESS:  What's misleading is that the
7  title is -- under Healthwise is "National
8  Organization for Rare Disorders, Inc."  It sounds as
9  if it's some kind of benevolent society for rare
10  disorders, maybe even NIH related.  It has a similar  04:25PM
11  ring to some of the more official government, and my
12  impression is -- I don't know who they are.  I don't
13  know if they're a patient support organization or
14  not.  It doesn't sound like the ones that I know.
15  So that's a little bit misleading.         04:26PM
16      The other things that are misleading about
17  it.
18      The symptom -- the general discussion and
19  the symptoms section are actually -- I think they're
20  quite clear, and that -- those actually are    04:26PM
21  informative to a general person.  I think that
22  the -- I think that the causes are informative.  I
23  think that the affected population section is
24  informative.  I don't know if it's accurate.
25  Whenever I say informative -- most of it is, up    04:26PM

Page 356

1  until now, I would say is probably pretty accurate
2  just on a quick read.
3       Related disorders seems informative.
4       The standard therapies are informative
5  until you get to the medications, because even with    04:27PM
6  Elavil and Klonopin, including Neurontin, those
7  are -- really there is no good study for any of
8  them.  And there's no -- it's hard to say any of
9  them would help except for helping people sleep.
10      So it's deceiving in the sense that, you    04:27PM
11  know, it might help do more things than is
12  suggested, although they seem to be clear about that
13  they're designed to reduce pain or the perception of
14  pain.  But mostly, really, they're more sedation,
15  and the -- one of the proofs of that is that they    04:27PM
16  all have to be taken at bedtime.  And many patients
17  with this disorder have problems at bedtime, and so
18  it's really mostly for sleep and for anxiety.
19  BY MR. CHEFFO:
20   Q.  I think you're doing this, Doctor, but for    04:28PM
21  the purpose of time, I would just ask you to focus
22  on either half truths or misstatements or things
23  like that.
24      I think that's what you've been doing;
25  right?                                  04:28PM

Page 357

1    A.  Uh-huh.
2    Q.  Okay.
3    A.  It's interesting to me also that the --
4  it's -- combined with the misleading National
5  Organization for Rare Disorders, Inc., is that when    04:28PM
6  they look in their resources, the National
7  Organization for Rare Disorders is not one of the
8  resources that they use, which means that it's not
9  really a resource, even though it appears to be.
10      What's next?                        04:28PM
11   Q.  Do you have the headaches?
12   A.  No.  I have Anticonvulsants For Chronic
13  Pain, for Hot Flashes.
14   Q.  Yeah, why don't we do the Hot Flashes?
15   A.  Hot Flashes.                        04:28PM
16      MR. SOBOL:  May I have a hot flash, please.
17      MR. CHEFFO:  Gladly.
18      THE WITNESS:  I can't comment on this in
19  any way other than as just as a patient because I
20  don't treat hot flashes.                    04:29PM
21      MR. SOBOL:  What number is this?
22      THE WITNESS:  That is number 14.
23      But what's misleading about it is that the
24  only name there is Neurontin, and yet how it works
25  is clearly something different.  And how it works to    04:29PM

Veritext Corporate Services

800-567-8658                                       973-410-4040

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 358

1  improve hot flashes is not fully understood.  It's
2  misleading because you could put almost anything in
3  there, you know, how clouds work to improve hot
4  flashes is not fully understood.  I mean, how
5  anything -- so it's a little misleading.      04:29PM
6       And then, after it tells you it's not
7  understood and it's misleading, then it tells you it
8  may be used to treat it.  Well, again, holy water
9  may be used to treat it.  Good conversation may be
10  used to -- so it's a little misleading.  Anything    04:29PM
11  can be -- you know, anything is treat- -- baldness
12  is treatable, you know, it's not curable.
13       So -- but otherwise, I don't have much to
14  say.  I just do notice that Anne Poinier is -- again
15  seems to be active here.  I wonder if -- I mean is   04:30PM
16  Anne Poinier on the Pfizer speaker -- speakers
17  bureau?
18  BY MR. CHEFFO:
19    Q.  Why don't you continue answering --
20    A.  I mean, I was on the speakers bureau for    04:30PM
21  Pfizer.
22    Q.  Why don't you just continue answering my
23  question.
24    A.  Oh, okay.  Because, I mean, that's the
25  first -- I start looking at this all over the place,   04:30PM

Page 359

1  and I think, oh, maybe she's -- but I don't know
2  her, so I would never suggest that that was true,
3  but it's just what's on my mind.
4       Next is Anticonvulsants For Chronic Pain.
5  I have all the same misleading statements.      04:30PM
6    Q.  I'm sorry, Doctor.  Which one are you on?
7    A.  16.
8    Q.  Which one is that, the heading?
9    A.  "Anticonvulsants For Chronic Pain."
10    Q.  That's in your area of expertise; right?    04:31PM
11    A.  Uh-huh.
12    Q.  Okay.
13       THE REPORTER:  Is that yes?
14       THE WITNESS:  Yes.
15  BY MR. CHEFFO:                    04:31PM
16    Q.  What, if anything, is false, misleading or
17  untruthful in this document?
18       MR. SOBOL:  I'm sorry.  Which one are we
19  on?
20       THE WITNESS:  16, Anticonvulsants For    04:31PM
21  Chronic Pain.
22       It's misleading -- the part that's
23  misleading is that chronic pain encompasses any
24  single type of pain that may last for longer than a
25  certain period of time.              04:31PM

Page 360

1       It's misleading to think that anyone --
2       (Discussion off the record.)
3       THE WITNESS:  It's misleading because the
4  title suggests that anticonvulsants can be used for
5  any type of pain of any dura- -- of any long    04:31PM
6  duration of any type.  So from -- who knows what it
7  means.  It could mean from my shoulder that's been
8  hurting for three months to my headache, to my
9  cancer around my pancreas, to my prostate.  I have
10  no idea what "Anticonvulsants For Chronic Pain"    04:31PM
11  means.  So it's misleading.  It suggests that,
12  hey, if you have pain, you know, we welcome all
13  comers.
14       And why it is used -- very sketchy.  It's
15  not very -- it's not very -- it's misleading in the   04:32PM
16  sense that it's suggested it's commonly being used
17  and appropriate for essentially any pain.
18       And more specifically, what's wrong about
19  it is that, you know, is the pregabalin -- the
20  pregabalin stuff.  That's just misleading because   04:32PM
21  pregabalin has been shown to not be as effective as
22  tricyclics in some studies.  So -- and has had
23  negative studies that weren't published.  So that I
24  know from Robert Dworkin, who's one of the big
25  Pfizer guys who told me that personally.  So that's   04:32PM

Page 361

1  something that's -- is misleading.
2       It's misleading that the F- -- it says FDA
3  has issued an warning anticonvulsants --
4       THE REPORTER:  You'll have to read slower.
5       THE WITNESS:  I'm sorry.  It's      04:33PM
6  misleading -- no, I take that back.  Oh, and Anne
7  Poinier is here again.  She must be quite an expert
8  in many, many areas.  I'm saying that sarcastically.
9  But I, again -- she's the primary reviewer, and now
10  it makes me -- she may very well have a full pain    04:33PM
11  practice of patients with chronic pain, tremors and
12  hot flashes.  I don't know.  But I just -- all of a
13  sudden, I'm seeing her name everywhere.  Unless
14  she's very ambitious and wants to be on everything,
15  I would start to think about it.  You know, I      04:33PM
16  honestly don't know her at all.  I don't even know
17  who she is.
18       And then Primary Orthostatic Tremor.  The
19  same kinds of problems.  National Organization for
20  Rare Disorders, Inc., that's Exhibit 13.  The      04:34PM
21  general discussion is more or less -- well, it's not
22  necessarily rare.  It's uncommon.  And the inf- --
23  some of the information is, I think, on mark.  Some
24  of the related disorders, I think, that's
25  informative.                    04:34PM

91 (Pages 358 to 361)

12a34797-d1b4-4842-88ce-84b30d0c9d39

1    Standard therapies, it's misleading because
2  the way that it's worded suggests that people who
3  haven't responded to anything suddenly respond
4  favorably to gabapentin.  I think it would have been
5  more accurate if they had simply included it in    04:35PM
6  additional drug therapies, which I think, you know,
7  maybe would have not been accurate or been kind of
8  borderline accurate, but it would have been
9  borderline accurate equally about primidone and
10  about valproic acid and other things.  In fact, it    04:35PM
11  helps some people.  It doesn't help some.
12    It's odd to me that it was singled out for
13  a separate sentence on its own, describing some
14  affected individuals responded favorably after being
15  treated with an anti-seizure drug called gabapentin,    04:35PM
16  as if it's this thing we didn't know anything about
17  it and now -- it's just -- it differentiates in a
18  way that's misleading.
19    And then otherwise, I think that, you know,
20  it's information that's available elsewhere.  And so    04:35PM
21  that part is not misleading.
22    And again, the other misleading part is
23  this -- this corporation that has -- National
24  Organization for Rare Disorders, Inc., and yet is
25  not one of the resources.  That's very suspicious.    04:36PM

1  Why aren't they one of the resources?  What -- why
2  do they call themselves that and what do they do?
3  Why are they in this?  And they do have a email
4  there, and I don't know anything more about them.
5    And that would be it.    04:36PM
6  BY MR. CHEFFO:
7    Q.  Okay.  You mentioned holy water a few
8  times.
9    A.  Yes.
10    Q.  Who do you mean by that, just so the    04:36PM
11  record's clear?
12    A.  I meant a treatment that has no evidence.
13    Q.  Something that's ineffective or a
14  superstition, something like that?
15    A.  No.  A treatment that has no evidence and    04:36PM
16  yet there's strong belief about it.
17    Q.  You said you were on the -- Pfizer's
18  speakers bureau?
19    A.  I was.
20    Q.  In what capacity?    04:36PM
21    A.  As a -- I spoke for -- as a speaker.
22    Q.  What product?
23    A.  Neurontin.
24    Q.  When was that?
25    A.  1996, I think.  It was '96.  Just before I    04:37PM

1  joined Kaiser.
2    Q.  What were your responsibilities?
3    A.  My responsibilities were to give a talk on
4  pain.
5    Q.  You gave one talk?    04:37PM
6    A.  I gave one talk.
7    Q.  Who did you give it to?
8    A.  To a group in San Jose on a boat.  I don't
9  remember exac- -- I think they were family
10  practitioners.  I don't remember exactly.  My    04:37PM
11  contact person there was -- it was a woman, but I
12  don't -- also don't remember her name.
13    Q.  Do you remember -- do you have the
14  materials that you used?
15    A.  No.    04:37PM
16    Q.  Did you use any materials?
17    A.  Yes.
18    Q.  Who gave them to you?
19    A.  Some of them I did myself, and others, they
20  were given to me by the -- it was part of a slide    04:37PM
21  set from the company.
22    Q.  And do you remember the sum and substance
23  of what you talked about?
24    A.  Yes.  It was a general pain talk, and in it
25  I talked about the different -- some different    04:38PM

1  disorders.  It was the typical talk I gave at that
2  time, which was introduction to disorders and some
3  of the treatments.
4    Q.  And how did Neurontin come up, or what did
5  you talk about with respect to Neurontin?    04:38PM
6    A.  Neurontin came up because I had -- well,
7  first of all, I had been detailed for -- you know,
8  for a long time about it, so I had gotten a lot of
9  information.  And then I was -- I had come out of my
10  fellowship and so the -- I forgot who asked --    04:38PM
11  somebody asked me if I wanted to be on the speakers
12  bureau.  It wasn't the person in San Jose, but
13  somebody asked me, and somehow I got to be on it,
14  and I don't remember how.
15    And then I was asked to talk about it, and    04:38PM
16  one of the things that I always did -- I'd given
17  other lectures.  You know, obviously in fellowship
18  you give a lot of lectures and afterwards, newly
19  started, you market yourself.  You give lectures.
20  And I'd always -- my first statement was always,    04:39PM
21  well, you know, I just -- I need to be honest about
22  the -- I want to be even-handed, so I don't want to
23  emphasize one thing or another in the lecture.  So
24  that was always the thing that I started out with.
25    So the idea of a lecture was to -- well,    04:39PM

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 382

1  people remove the restriction? It's not without
2  meaning, is it?
3      MR. SOBOL: Objection.
4      THE WITNESS: The reason that this happens
5  is if anesthesia doctors are treating pain are   04:54PM
6  seeing more of these kinds of patients than the
7  other department which had previously been given the
8  restriction, they simply want to be included so
9  that, should a patient come where they think they
10 might want to use it, they would like to use it   04:54PM
11 without having to waste the patient's time by having
12 an additional consult go to the neurologist who at
13 that time were the ones who had the restriction --
14 who had the formulary right, and not waste the
15 patient's time because the neurologists weren't   04:55PM
16 seeing those kind of pain patients.
17      So it -- really, the intent was to smooth
18 patient care, remove barriers to care, and to give
19 options to doctors. It doesn't in any way mean that
20 it was a -- there was -- in any way had -- it didn't  04:55PM
21 in any way have a permissive intent.
22 BY MR. CHEFFO:
23    Q. So you don't think it had -- you don't
24 think there was any indication -- you can't read any
25 stamp of approval regarding efficacy from the P&T   04:55PM

Page 383

1  committee?
2      A. No. You can only read that somehow that
3  there -- the people thought that they wanted to be
4  able to use it without having to send it to the
5  neurologist as --                    04:55PM
6      Q. And the P&T was blind --
7      MR. SOBOL: He hasn't finished answering
8  the question.
9      THE WITNESS: -- to send it to the
10 neurologist because they were the ones who were   04:55PM
11 seeing more of these patients. And if it was going
12 to start to be used in the patients they were
13 seeing, then they didn't have to have to waste the
14 time.
15 BY MR. CHEFFO:                       04:56PM
16    Q. Then why do they have a section here on
17 efficacy? Is that irrelevant?
18    A. It's a standard section.
19    Q. Well, it's not blank, is it?
20    A. It's a standard section in all    04:56PM
21 medication -- of monographs that we have -- the P&T
22 has.
23    Q. If there was no efficacy, do you think the
24 P&T would have approved it?
25    MR. SOBOL: Objection.          04:56PM

Page 384

1      THE WITNESS: If there was no efficacy,
2  they still would have this section, which is the
3  question you were asking.
4  BY MR. CHEFFO:
5      Q. Would they have approved it, do you   04:56PM
6  believe? Do you believe they would have -- if this
7  said, efficacy, absolutely none, do you think the
8  P&T would have approved the medicine --
9      A. No.
10     Q. -- that costs about 10 times --      04:56PM
11     MR. SOBOL: Objection.
12 BY MR. CHEFFO:
13     Q. -- more?
14     MR. SOBOL: Objection.
15     THE WITNESS: I don't think so.      04:56PM
16 BY MR. CHEFFO:
17     Q. Okay. So they considered efficacy?
18     A. They considered --
19     MR. SOBOL: Objection.
20     THE WITNESS: I think that they considered  04:56PM
21 all the factors including efficacy and perhaps even
22 that anesthesiologists, who were trying to keep up
23 with the literature, wanted to have a tool that they
24 thought was forward thinking.
25 BY MR. CHEFFO:                     04:56PM

Page 385

1      Q. Okay. Do you think the anesthesiologists
2  would ask for something they thought had no
3  efficacy?
4      MR. SOBOL: Objection.
5      THE WITNESS: I can't -- at the same time  04:57PM
6  that I can't presuppose to think for what
7  anesthesiologists wanted, at the same time I'm
8  surprised that there would be any other alternative
9  to that answer than why would anyone ask for
10 something that has no efficacy.            04:57PM
11 BY MR. CHEFFO:
12     Q. I agree, Doctor.
13       Can we mark that?
14     A. Are we taking that break soon?
15     Q. Oh, we can do it now if you need to. Let's  04:57PM
16 go off the record.
17     THE VIDEOGRAPHER: Off the record, 4:59.
18     (Recess taken.)
19     (Deposition Exhibit 21 was marked for
20 identification.)                   05:06PM
21     THE VIDEOGRAPHER: Back on the record. The
22 time is 5:08.
23     MR. SOBOL: Before we begin, I just wanted
24 to put on the record that it's my understanding that
25 the court has ordered that the deposition go for  05:07PM

97 (Pages 382 to 385)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 386

1    seven hours.  The plaintiff's position is that that
2    time should be split in half, three and a half hours
3    each.
4         As in the accommodation to counsel for
5    Pfizer, the plaintiffs have been permitting the          05:07PM
6    questioning to go after three and a half hours.
7    We're now somewhat over six hours, and our position
8    is that the deposition -- the questioning of -- by
9    Pfizer has slightly less than an hour left.
10        I would suggest to counsel that some of          05:07PM
11   that time be reserved if they want any opportunity
12   to undertake a redirect after we have questioned the
13   witness, which we intend to do when you're at the
14   end of the next hour.
15        MR. CHEFFO:  We'll take that under               05:07PM
16   advisement.  I want to use our time appropriately on
17   the record, so let's just go.
18   BY MR. CHEFFO:
19   Q.  You had a chance to look at what we've
20   marked as Exhibit 21, Doctor?                          05:08PM
21   A.  Yes.
22   Q.  It's also got a 24 sticker, but you --
23   we'll ignore that.  That's from a prior deposition.
24        Have you ever seen this document before?
25   A.  No.                                                05:08PM

Page 387

1    Q.  It's from a chief of neurology meeting
2    June 17th, 1999; right?
3    A.  Yes.
4    Q.  And it's a Kaiser document?
5    A.  It doesn't -- there's a stamp that says KIS   05:08PM
6    confidential, which I think means it is a Kaiser
7    document.
8    Q.  And Debbie Kubota, she's a drug information
9    services person?
10   A.  Yes, she is.                                      05:08PM
11   Q.  The -- we know from your declaration that
12   the P&T committee took up the issue of guidelines
13   and restrictions of gabapentin in or about
14   September of 1999; is that correct?
15   A.  Yes.                                              05:08PM
16   Q.  So this is approximately three or four
17   months before.
18   A.  It was in June 1999.
19   Q.  Okay.  And under gabapentin, there is a --
20   information here from this chief of neurology         05:09PM
21   meeting regarding removal of restrictions; right?
22   A.  Yes.
23   Q.  And it says that:
24        "Family Practice and Internal
25   Medicine people have asked to expand                  05:09PM

Page 388

1    the restriction to include prescribing
2    for neuropathies and/or with guidelines
3    or consultation with neurology."
4         Right?
5    A.  That's the first sentence, yes.               05:09PM
6    Q.  And then in the next paragraph, it says:
7         DI/SPS, which is the Kaiser DIS
8    service, "is recommending to remove
9    prescription restrictions and add
10   guidelines for the use of gabapentin to          05:09PM
11   discourage overprescribing with
12   resultant significant cost impact."
13        Did I read that correctly?
14   A.  More or less.
15   Q.  Okay.  Were you aware this was going on   05:09PM
16   or about the time of June 17th, 1999?
17   A.  I don't recall if I was aware right then.
18   I mean, I was aware at some point in 1999.  I don't
19   know about that moment.
20   Q.  Were you aware that there was -- that the     05:10PM
21   family practice and internal medicine folks had
22   asked to remove the guidelines or restrictions or
23   alter them?
24   A.  I'm not surprised, but I don't remember.
25   It makes sense to me that they would.           05:10PM

Page 389

1    Q.  And is it a fair reading that this was then
2    being presented to the chief of -- chiefs of
3    neurology to consider that request so they could
4    weigh in?
5    A.  Weighing is in the important point.  Yes,    05:10PM
6    they were asked for their opinion.
7    Q.  And they would be one of a group that would
8    then ultimately give a recommendation to the P&T
9    committee?
10   A.  That's usually the -- my understanding is   05:10PM
11   that's the way it happens.  That's the way it works.
12   Q.  Okay.  And back here in 1999, there was a
13   concern about overprescriptions and possible
14   significant cost impact of gabapentin?
15   A.  That's what's stated.                        05:10PM
16   Q.  And, in fact, they had tracked unrestricted
17   use in Northern California and determined that, in
18   the past year, there were 30,384 prescriptions for
19   gabapentin?
20   A.  Right.  You're reading the document.  I --   05:11PM
21   that's exactly what it says.
22   Q.  Right.  Well, remember I asked you earlier
23   if there were ways of figuring out how many
24   prescriptions were written.
25        Is it fair to say that someone went back    05:11PM

98 (Pages 386 to 389)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 406

1  example.  We saved many lives precisely with the
2  DUAT organization, doing what we do best, which is
3  quality utilization.  So I have reason to trust
4  that.
5      I don't necessarily have every reason to    05:26PM
6  trust the -- Pfizer, who had been detailing me for
7  years, telling me all this stuff, and then giving me
8  a lecture somewhere and then insinuating that I
9  hadn't talked enough about Neurontin and feeling,
10  you know -- you know, all those things and then    05:26PM
11  being dropped from it, thinking to myself, well,
12  gee, I must -- I guess I must be a bad speaker, but
13  then realizing that wasn't the case.  That's the
14  track record I have with Pfizer.
15      The track record I have with Pfizer is a    05:26PM
16  well-publicized, well-known marketing snafu where
17  they got sued, has been in the papers all over the
18  place.  I didn't -- that's a track record.
19      You know, as far as I'm concerned, you
20  know, what's the difference between -- I mean, why    05:26PM
21  do we need a Pfizer?  We could have just one guy in
22  a room creating medical papers and, you know, why --
23  as long as -- it's a slippery slope.  As long as you
24  are, you know, being a little bit -- you know, you
25  can kind of do what you want, then why not just    05:27PM

Page 407

1  write what you want.  I don't understand why Pfizer
2  needs to have buildings all over the place.  Just
3  have one guy in a room.  That -- you know, it's
4  really irritating as a physician, as someone who
5  other people depend on for opinions, to be -- it    05:27PM
6  feels like --
7  BY MR. CHEFFO:
8      Q.  This is our use of time?
9      A.  It feels like it's being mocked.  Well, you
10  know, I -- you know, it's been --    05:27PM
11      Q.  I'm not going to interrupt you, Doctor.
12  You go on --
13      A.  You just did.
14      Q.  Well --
15      A.  You just did.
16      Q.  -- I think you've gone on for -- I let you
17  go for -- you know, rambling on.
18      A.  Right.  And you know what, I feel like I've
19  been here --
20      Q.  Okay.  I'm going to move to strike.  Do you    05:27PM
21  want to keep talking?
22      A.  I can't unless you let me.  Will you?
23      Q.  You know what, I'm not going to interrupt
24  you.
25      A.  I feel that that kind of evidence cooking    05:27PM

Page 408

1  and that kind of marketing is mocking of a whole
2  medical organization.  I think it destroys the trust
3  that people have.  I think when a patient comes to
4  me, if anything like this comes out or when
5  gabapentin came out and there was a big problem, I    05:28PM
6  look like an idiot.  I don't like to look like an
7  idiot with my patients.  I don't like to look like
8  an idiot with my colleagues.
9      Q.  Are you --
10      A.  So that's why it has an effect on me.    05:28PM
11      Q.  Are you done?
12      MR. SOBOL:  Yeah, he's done.
13      THE WITNESS:  I'm done.  I'm done, and I'm
14  done politely.
15      MR. CHEFFO:  I'm going to move to strike    05:28PM
16  that entire response.
17      THE WITNESS:  You look like you might have
18  a little tremor.  Do you maybe -- do you need a
19  little gabapentin there?
20      MR. SOBOL:  Let's go, guys.    05:28PM
21  BY MR. CHEFFO:
22      Q.  Now, do you -- just -- I'm not going to ask
23  you specifics about the Abramson report or any of
24  the other reports, but do you know whether you were
25  the only doctor at Kaiser who received that    05:29PM

Page 409

1  information?
2      A.  I don't know.
3      Q.  You don't know if it was widely
4  disseminated or to anybody else in Kaiser, do you?
5      A.  I don't know.  I know Mitch Cohen, who's at    05:29PM
6  Kaiser Health Plan, had it.  So -- but I don't know.
7  I assume that it was, but I don't know.
8      Q.  You assumed it was?
9      A.  I assumed it was, yes.
10      MR. SOBOL:  Motion to strike.    05:29PM
11  BY MR. CHEFFO:
12      Q.  And if you assumed it was, that would mean
13  it's -- people other than you know about it; right?
14      MR. SOBOL:  Objection.
15      THE WITNESS:  I don't know.
16      MR. SOBOL:  Motion to strike the last
17  answer about the last assumption.
18      THE WITNESS:  I don't know specifically.  I
19  don't have specific knowledge of it.
20  BY MR. CHEFFO:    05:29PM
21      Q.  So when you wrote here -- when you wrote
22  here in your sworn declaration that you recommend
23  removal of all formulary guidelines and restrictions
24  for Neurontin under oath --
25      Do you remember that?

103  (Pages 406 to 409)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 410

1    A.  I think I've said yes.
2    Q.  That's wrong, isn't it?
3    A.  Why was -- why is it wrong?
4    Q.  Well, doesn't this say that they're going
5 to be recommending the removal of formulary      05:30PM
6 restrictions but adding guidelines?
7         MR. SOBOL:  Objection, asked and answered.
8 BY MR. CHEFFO:
9    Q.  Go ahead.
10   A.  The formulary restrictions, like I said,    05:30PM
11 when I looked -- when I read that, my reading of it
12 was in relationship to the restrictions.  And my --
13 I knew there were guidelines because I was, you
14 know -- I was involved in DUAT, working with the
15 guidelines.  So I knew that there had been         05:30PM
16 guidelines there.
17   Q.  Well, Doctor, you went through a whole
18 litany of things that are misleading.  I mean, isn't
19 it misleading, don't you think, to say, in or about
20 September 1999, I recommended removal of all        05:30PM
21 formulary restrictions and guidelines, no caveats
22 for Neurontin -- hold on -- and you also said, I am
23 informed and believe that in or about
24 September 1990, the P&T committee accepted this
25 recommendation?                                    05:31PM

Page 411

1         MR. SOBOL:  Objection.  There's no question
2 before you yet.
3 BY MR. CHEFFO:
4    Q.  Is that accurate?
5         MR. SOBOL:  Objection.             05:31PM
6         You may answer.
7 BY MR. CHEFFO:
8    Q.  You can answer.
9    A.  I recommend removal of all formulary
10 restrictions, comma, and guidelines for Neurontin.   05:31PM
11 That's one way to read it.
12   Q.  Where's the comma?
13   A.  There isn't.  But I'm just saying that in
14 reading it, that's what -- I -- again, what I told
15 you before about the grammar element.             05:31PM
16        Another way to read it is --
17        THE REPORTER:  I'm sorry.  About the?
18        THE WITNESS:  Another way to read it --
19        THE REPORTER:  What I told you before about
20 the?
21        MR. SOBOL:  Grammar element.
22        THE WITNESS:  Element.
23        Another way to read it is I recommend
24 removal of all formulary restrictions and
25 guidelines, guidelines related to how the formulary   05:31PM

Page 412

1 restrictions are -- what's the word?
2         MS. NUSSBAUM:  Enforced?
3         THE WITNESS:  No.  I'll find it.
4         How the guidelines are implemented.  And
5 that's the way I read it -- as I told you before,     05:32PM
6 that's the way I read it before, was that it related
7 to the guidelines for formulary restrictions.  So
8 when I read it the first time, that's what I was
9 looking at.
10        So in other words, we're not going to        05:32PM
11 restrict it any -- we're not going to have
12 guidelines anymore that a neurologist has to do it
13 or guidelines anymore that -- because, as I told you
14 when you first asked me, guidelines is a very
15 nebulous word.  It applies to many, many things.     05:32PM
16 And that's the way I originally read it.
17 BY MR. CHEFFO:
18   Q.  Doctor, it's not nebulous in terms of
19 Kaiser; right?  I mean, they use "guidelines" very
20 specifically, don't they?
21        MR. SOBOL:  Objection.
22        THE WITNESS:  They use it in a different
23 way, in a specific way.
24 BY MR. CHEFFO:
25   Q.  So you're telling me that you -- when you    05:32PM

Page 413

1 use "guidelines" in your sworn declaration, you're
2 using it differently than the way Kaiser does?
3         MR. SOBOL:  Objection.
4         THE WITNESS:  I said at the beginning,
5 earlier today, many hours ago, that when I read it,   05:32PM
6 my reading of it -- my understanding when I signed
7 it was that there are certain guidelines for
8 formulary restrictions.  It was the guidelines
9 related to formulary restrictions, not clinical
10 guidelines about how to use medications.  That was    05:32PM
11 my -- when I had talked about it, that was my
12 reading.
13        I can absolutely see where you could add a
14 different interpretation to it, but that -- I don't
15 recall that that was my interpretation at the time.   05:33PM
16 My interpretation was strictly, in this case, about
17 the guidelines related to formulary --
18 BY MR. CHEFFO:
19   Q.  What -- what guidelines --
20   A.  -- formulary restrictions.              05:33PM
21   Q.  What guidelines --
22        THE REPORTER:  Wait a minute.
23 BY MR. CHEFFO:
24   Q.  -- relate --
25        MR. SOBOL:  You can't talk over him.      05:33PM

104 (Pages 410 to 413)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 446

1   that you have that suggests that somehow Kaiser and
2   this are linked in a way that's more than just as
3   a -- the computer is a vehicle for this information.
4   That's my only concern.
5       Q.  Well, but you're saying it's misleading,    06:10PM
6   and I'm asking you is there a way to ameliorate
7   that?
8       A.  Yes.  If it was said that, you know, this
9   information was reviewed by the regional pain group,
10  something to that effect, and that it said that    06:10PM
11  there was a Kaiser imprimatur on it, the people who
12  actually work at Kaiser, not that it was simply
13  downloaded from the web for your -- you know, for
14  your availability.
15      Q.  Okay.  Can you look at the next exhibit,    06:10PM
16  please?
17         MR. SOBOL:  Make a note we're over the time
18  now --
19         THE WITNESS:  Can we stop now?
20         MR. SOBOL:  -- and we have been.    06:10PM
21         THE WITNESS:  Is it possible to stop?
22  BY MR. CHEFFO:
23      Q.  I don't think it's po-- I need about
24  another five or ten minutes, if we can just
25  continue, and then I'll actually be done.    06:10PM

Page 447

1       A.  Can we actually time it because I have
2   dinner.  I have a whole -- I mean, is it possible?
3       Q.  You need to just answer my questions,
4   Doctor, we'll be done.  So --
5          MR. SOBOL:  Well, he's been doing that all    06:10PM
6   day.
7          MR. CHEFFO:  I don't think so.
8          MR. SOBOL:  That's not fair.  We'll go for
9   another five minutes, and then that's it.
10         THE WITNESS:  Can we --
11  BY MR. CHEFFO:
12      Q.  Number 23.
13      A.  I'd like to time it, though.
14         MR. SOBOL:  I am timing it, Doctor.
15         THE WITNESS:  Thank you.    06:11PM
16  BY MR. CHEFFO:
17      Q.  This is a regional formulary, No. 23?
18      A.  I have 22 in front of me.
19      Q.  Didn't I give it to you?  This one.
20      A.  You held back -- oh, here it is.  Okay.  I    06:11PM
21  got it.
22      Q.  Regional Formulary and Therapeutics
23  Committee Meeting Minutes from --
24         THE REPORTER:  I'm sorry.  I didn't --
25         MR. CHEFFO:  I'm sorry.  That was too fast.    06:11PM

Page 448

1   BY MR. CHEFFO:
2       Q.  Regional Formulary and Therapeutics
3   Committee Meeting Minutes, October 13, 2005.
4          Do you see that?
5       A.  Yes.    06:11PM
6       Q.  Does this look like -- to be like a Kaiser
7   document?
8       A.  It does.
9       Q.  And it talks about the attendees at the
10  meeting; right?    06:11PM
11      A.  Yes.
12      Q.  Can you look at the --
13         Do you know when this lawsuit was filed?
14  Did I ask you that earlier?
15         MR. SOBOL:  Yes, you did.    06:11PM
16         THE WITNESS:  You did, and you told me, but
17  I didn't know exactly when.  But you told me, and I
18  forgot it.
19  BY MR. CHEFFO:
20      Q.  When did you start with the DUAT initiative    06:11PM
21  with respect to Neurontin?
22         MR. SOBOL:  Objection, asked and answered.
23         THE WITNESS:  I answered that earlier.  I
24  said I thought it was around 2003, 2004, but I don't
25  remember exactly how many years I've been doing it.    06:11PM

Page 449

1   Maybe later, maybe earlier.
2   BY MR. CHEFFO:
3       Q.  Okay.  And in part -- and part of the issue
4   was to stop new prescriptions of Neurontin?  That
5   was one of the initiative?    06:12PM
6       A.  That's part of the initiative, part of the
7   total initiative, yes.
8       Q.  Okay.  Look at the second page, which is
9   -045030 on Bates.
10         There's a gabapentin titration?    06:12PM
11      A.  Yes.
12      Q.  And it says here:
13         "Criteria-based prescribing was
14  removed for gabapentin at the
15  September 2005 meeting, at which time    06:12PM
16  gabapentin was also put back to the
17  formulary."
18      A.  Uh-huh.
19      Q.  Do you see that?
20      A.  I read that.    06:12PM
21      Q.  So that's after your initiative; right?
22      A.  Yes.
23      Q.  And then it says here:
24         "The effective dose should be
25  individualized" --    06:12PM

113  (Pages 446 to 449)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 454

1  people in Florida or people in Italy, and I would
2  have the same reaction. I don't know why people
3  elsewhere do the things they do.
4  BY MR. CHEFFO:
5      Q.  This isn't -- well, this isn't just        06:15PM
6  anybody. These are -- this was a Kaiser affiliated
7  entity; right?
8      A.  We're not connected with them. We're not
9  officially connected with them.
10     Q.  Is your -- is Kaiser Health connected with    06:16PM
11  them?
12     A.  I don't know.
13          MR. SOBOL:  Actually, I'm going to
14  interject now because we have gone over the five
15  minutes.                                          06:16PM
16          MR. CHEFFO:  I'm just -- I'm asking -- this
17  is my last document.
18  BY MR. CHEFFO:
19     Q.  Now --
20          MR. SOBOL:  Well, I understand it. It's    06:16PM
21  your last document. It's also your last question.
22  I made a commitment to the doctor that I would time
23  the five minutes. I've timed the five minutes.
24  We're way after seven hours. In fact, we're way
25  over three and a half hours. So you're pushing --   06:16PM

Page 455

1          MR. CHEFFO:  Let me just ask two more
2  questions.
3  BY MR. CHEFFO:
4      Q.  Doctor, do the P&T committees talk to each
5  other about best practices?                       06:16PM
6      A.  I don't know.
7      Q.  Do you have any explanation why the
8  Northwest Therapeutic Committee -- Therapeutics
9  Committee in October 2005 would put gabapentin back
10  on the formulary and indicate that doses of up to    06:16PM
11  3,600 milligrams may be needed in some patients?
12     A.  I don't know why.
13     Q.  Okay.
14          MR. SOBOL:  Those are two questions. All
15  right. Let's take a break.                         06:17PM
16          THE VIDEOGRAPHER:  We're off the record,
17  6:18.
18          (Recess taken.)
19          THE VIDEOGRAPHER:  We are back on the
20  record. The time is 6:27.                          06:26PM
21
22          EXAMINATION
23  BY MR. SOBOL:
24     Q.  Good evening, Doctor.
25     A.  Hello.                                       06:26PM

Page 456

1      Q.  Can you please sit up for the jury, please.
2      A.  Sure.
3      Q.  Thank you.
4          Good evening. My name's Tom Sobol. I'm a
5  lawyer in Boston. I work for the law firm called    06:26PM
6  Hagens Berman Sobol Shapiro. Now, that's based in
7  Cambridge. And I represent Kaiser, a plaintiff --
8  the plaintiff in this case.
9          You and I didn't meet until yesterday;
10  correct?                                          06:26PM
11     A.  That's right.
12     Q.  We had never met before in our life; right?
13     A.  Right.
14     Q.  We did meet yesterday for a few hours;
15  correct?                                          06:26PM
16     A.  Yes.
17     Q.  Along with Ms. Nussbaum and another
18  gentleman, Mr. Cohen; correct?
19     A.  Yes.
20     Q.  Okay. Now, I'd like to turn your attention  06:26PM
21  to the time of the early 1990s. This is almost 20
22  years ago.
23          Do you have in mind about 20 years ago?
24     A.  I do.
25          MR. CHEFFO:  Objection.                    06:26PM

Page 457

1  BY MR. SOBOL:
2      Q.  You had graduated from medical school;
3  correct?
4      A.  Yes.
5      Q.  In -- when?                                 06:26PM
6      A.  '87.
7      Q.  And so by early 1990s, you had been out of
8  medical school a couple years, a few years?
9      A.  I -- yes.
10     Q.  Okay. And you went into practice --         06:27PM
11  private practice in 1993; correct?
12     A.  Yes.
13     Q.  You had done something, though, before
14  that, a pain fellowship of some sort?
15     A.  Yes, I did.                                 06:27PM
16     Q.  Please tell the jury what a pain fellowship
17  was at the time.
18     A.  A pain fellowship at the time was the
19  advanced education related to treatment of pain
20  disorders. The -- there is no -- at the time and    06:27PM
21  even now, there is no specific education within
22  residency that identifies it as a -- as anything
23  more than an equal field of study with many other
24  things that a resident might have for use in his own
25  particular specialty. A pain fellowship is a        06:27PM

115 (Pages 454 to 457)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 522

1 with this, but I can tell you that it made sense to
2 me, when I read this, when I heard that Pfizer had
3 done this with another drug that's -- Lyrica is
4 similar to Neurontin. And so when I heard that the
5 same thing was being done, I said, oh, that sounds   07:49PM
6 familiar. That was, you know, made me more sure
7 that, you know, this is something I really need to
8 worry about. So --
9         MR. CHEFFO: I move to strike the comments
10 about Lyrica.                                        07:49PM
11 BY MR. SOBOL:
12     Q. You testified in your declaration about
13 whether or not you would have made the same
14 recommendations back in 1997 and 1999 that you did.
15     A. Right. I would absolutely not have had I    07:49PM
16 known what I know now.
17     Q. Why not?
18         MR. CHEFFO: Objection.
19         THE WITNESS: The reason why is because it
20 would lead to -- I don't need to be definitive about 07:49PM
21 it, about -- and to look at every detail of the
22 evidence with a fine-tooth comb to know that it
23 poses serious questions about the evidence. That
24 alone is a reason to hold back.
25 BY MR. SOBOL:                                        07:49PM

Page 523

1     Q. Is that the -- particularly the case when
2 the drug has not been approved by the FDA for the
3 particular indication?
4         MR. CHEFFO: Objection.
5         THE WITNESS: If a drug isn't approved but   07:50PM
6 has a lot of evidence -- people were using aspirin
7 for a long time before really good evidence came
8 about. That evidence was good. And so the FDA
9 alone isn't the key to allowing us to use it,
10 obviously, because we do. It's the strength of the  07:50PM
11 evidence and how much you trust the evidence.
12 That's really what it comes down to.
13         And you know, there has to be a certain
14 level of trust in where the evidence is -- where the
15 evidence is coming from. And if there's a question  07:50PM
16 about it, then you have to hold off.
17         MR. SOBOL: Nothing further.
18         MR. CHEFFO: I have a few questions,
19 Doctor.
20         MR. SOBOL: No. We're done.                  07:50PM
21         THE WITNESS: No, I can't. I'm exhausted,
22 actually.
23         MR. CHEFFO: I have about five minutes.
24         MR. SOBOL: No. We're done.
25         THE WITNESS: You -- I -- I honestly --      07:50PM

Page 524

1         MR. CHEFFO: I have an opportunity to ask
2 five minutes of redirect questions.
3         THE WITNESS: I'm leaving. I have a kid
4 who's waiting for me. I don't know what to tell
5 you. I mean, I --                                    07:51PM
6         MR. CHEFFO: You just sat through these
7 entire questions. You're not dismissed. I can't
8 stop you physically from doing it, but I'm entitled
9 to ask -- you asked categories --
10         MR. SOBOL: He's instructed not to answer   07:51PM
11 anything further.
12         THE WITNESS: I'm exhausted, and you
13 know --
14         MR. CHEFFO: You weren't exhausted five
15 minutes ago.                                         07:51PM
16         THE WITNESS: You know it's --
17         MR. CHEFFO: Doctor, I don't want to --
18 we're not going to engage with you. You're going to
19 leave. You can leave. I'm stating my position for
20 the record.                                          07:51PM
21         My position is the deposition is not done.
22 I have five to ten minutes' worth of questions.
23 You're not going to allow them or you're not going
24 to stay for them. I'll make a motion.
25         THE VIDEOGRAPHER: This will conclude the   07:51PM

Page 525

1 deposition for today. We've had five DVD media
2 used. We're off the record at 7:53.
3
4         (TIME NOTED: 7:53 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

132 (Pages 522 to 525)

12a34797-d1b4-4842-88ce-84b30d0c9d39

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

## DECLARATION OF DAVID S. MCWATERS

I, David S. McWaters, hereby declare that:

1.      I am employed by Kaiser Foundation Health Plan, Inc. as a Practice Leader for Quality & Compliance in Kaiser Permanente's Internet Service Group, and have held that position for three years.  I have personal knowledge of the matters that are the subject of this declaration.

2.      Kaiser's website, http://www.kaiserpermanente.org, contains health-related information for Kaiser members and the public.  The members-only section of Kaiser's website allows its members to receive test results, review their immunizations, view their allergies, refill prescriptions, schedule appointments, communicate directly with their doctors, and review aspects of their health plan.  The public section of Kaiser's website allows the public to view articles on a breadth of topics, including drugs, diseases, health and wellness, and nutrition.

1

3.      Kaiser's website contains articles from a number of sources for medical information, including Healthwise (its health encyclopedia), HealthMedia (its lifestyle programs), EatingWell (nutrition information), and First DataBank (its drug encyclopedia). The majority of health care information provided on Kaiser's website is not written by Kaiser.

4.      Kaiser licenses information from Healthwise for the purposes of posting it on the public portion of its website.  Some of the Healthwise materials discuss the off-label use of Neurontin.

5.      Healthwise is wholly independent from Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and other entities related to Kaiser Permanente. Kaiser does not exercise editorial control over the materials generated by Healthwise.

6       The health-related materials Kaiser posts on its website are intended for general information purposes.  Kaiser warns the public not to rely on the materials without seeking the judgment of a medical practitioner.  While the materials provide background information on certain drugs, they are not medical advice.

7       Kaiser posts relevant disclaimers on its website.  For example, Kaiser's Terms & Conditions states that, "The information provided on this Web site is not a substitute for the advice of your personal physician or other qualified health care professional. Always seek the advice of your physician or other qualified health care professional with any questions you may have regarding medical symptoms or a medical condition. Never disregard professional medical advice or delay in seeking it because of something you have read on this Web site." The website Terms & Conditions applies to

all website users, and must be explicitly accepted by members wishing to sign on to the

members-only section. The vendors' materials also contain disclaimers.

8.      On the drug encyclopedia page discussing the Neurontin 100 mg cap, the

webpage also contains a disclaimer in the initial paragraph:

> "This is a summary and does not contain all possible
> information about this product.  For complete information
> about this product or your specific health needs, ask your
> health care professional.  Always seek the advice of your
> health care professional if you have any questions about
> this product or your medical condition.  This information is
> not intended as individual medical advice and does not
> substitute for the knowledge and judgment of your health
> care professional.  This information does not contain any
> assurances that this product is safe, effective, or appropriate
> for you."

.       The same webpage also contains a disclaimer at the end of the section:

> "The above information is intended to supplement, not
> substitute for, the expertise and judgment of your health
> care professional.  You should consult your health care
> professional before taking any drug or changing your diet,
> or commencing or discontinuing any course of treatment."

9.      The information provided in the materials made accessible to patients is

derived from publicly available literature and studies.   Neither Kaiser nor its vendors

can detect all information that has been either inappropriately reported or withheld from

the public by pharmaceutical companies.

10.     Materials similar to those posted on Kaiser's website are available, often

verbatim, on the websites of numerous other entities, including WebMD, Blue Shield of

California, Palo Alto Medical Foundation, University of Michigan Health System, New

York University Medical Center, Tallahassee Memorial Healthcare, and HealthLink of

British Columbia, among many others.

11.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this Declaration was signed by me in the State of California on January 21, 2010.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
**David S. McWaters**

_____
Date and Place of Execution

4

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

## DECLARATION OF DONALD W. KEMPER

I, Donald W. Kemper, hereby declare under the penalty of perjury that the following is true and correct:

1.      I am the Chief Executive Officer of Healthwise, Incorporated ("Healthwise").  Healthwise is an Idaho nonprofit corporation with a single mission to help people make better health decisions.  To accomplish this goal, Healthwise provides health care information ("materials") to, among others, health plans, disease management companies, hospitals, employers, and clinics.  Healthwise is located at 2601 N. Bogus Basin Road, Boise, Idaho. The Healthwise Website is located at http://www.healthwise.org.

2      Healthwise is wholly independent from Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and other entities related to Kaiser Permanente ("Kaiser").

3.      Healthwise has an arms length business relationship with Kaiser.  Kaiser licenses certain Healthwise materials.  Upon information and belief, those materials are then posted on Kaiser's website.

4.      Healthwise has final editorial control over the materials generated by Healthwise.

5.      In addition to Kaiser, Healthwise provides similar or the same materials to its other clients which include the top ten U.S. health plans, all of the major disease management companies, the most visited health portals, and hundreds of hospitals and physician groups.

6.      The materials compiled by Healthwise are intended for general information purposes.  While our internal Medical Board reviews the materials, Healthwise makes it clear that these materials are not intended as a substitute for the judgment of a medical practitioner, and are not intended as medical advice.  The materials include medication information that is intended to provide some background information on certain drugs from a lay perspective.   We gather publically available information sometimes including information from pharmaceutical companies as the basis for our materials.

7.      Healthwise and its clients post relevant disclaimers on their websites.  For example, the Kaiser Permanente website indicates that "[t]he information provided on this Web site is not a substitute for the advice of your personal physician or other qualified health care professional . . . Never disregard professional medical advice or delay in seeking it because of something you have read on this Web site."  The standard

Healthwise disclaimer on materials is, "This information does not replace the advice of a doctor."

8.     Healthwise has no expectation that its customers such as Kaiser will review or edit the materials independently.

9.     The information provided in the materials provided to third parties such as Kaiser by Healthwise is derived from publicly available literature and studies. Healthwise chooses the highest quality literature to write its content; however, it is not always possible to detect information that has been inappropriately reported or otherwise not disclosed by pharmaceutical companies.

10.     Healthwise's materials on Neurontin are available to its clients, including 10 of the largest U.S. health plans and over 200 hospitals, among others.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Donald W. Kemper

January 20, 2010 ; Boise, Idaho.
Date and Place of Execution

3