```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS



   IN RE:                             )
                                      ) CA No. 04-10981-PBS
   NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 74
   AND PRODUCTS LIABILITY LITIGATION   )
```

FINAL PRETRIAL CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

```
                     United States District Court
                     1 Courthouse Way, Courtroom 19
                     Boston, Massachusetts
                     January 28, 2010, 2:10 p.m.
```

```
               LEE A. MARZILLI
            OFFICIAL COURT REPORTER
          United States District Court
          1 Courthouse Way, Room 7200
              Boston, MA  02210
               (617)345-6787
```

Page 2

1   A P P E A R A N C E S:

2

    FOR THE PLAINTIFFS:

3

        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ., Greene, LLP,
4   33 Broad Street, 5th Floor, Boston, Massachusetts, 02109.

5       THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6   Suite 301, Cambridge, Massachusetts, 02142.

7       LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
    850 Third Avenue, New York, New York, 10022.

8

9

    FOR THE DEFENDANTS:

10

        KATHERINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
11  Skadden Arps Slate Meagher & Flom, LLP, Four Times Square,
    New York, New York, 10036.

12

        RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
13  LLP, Four Embarcadero Center, San Francisco, California, 94111.

14      JAMES E. HOOPER, ESQ., Wheeler Trigg Kennedy, LLP,
    1801 California Street, Suite 3600, Denver, Colorado, 80202.

15

    ALSO PRESENT:  Corinne Reed, Paralegal, Hagens Berman Sobol
16                  Shapiro, LLP.

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2          THE CLERK:  In Re:  Neurontin Marketing, Sales

3   Practices, and Products Liability Litigation, Civil Action

4   No. 04-10981, will now be heard before this Court.  Will

5   counsel please identify themselves for the record.

6          MR. GREENE:  Good afternoon, your Honor.  Tom Greene

7   for Kaiser.

8          MS. NUSSBAUM:  Good afternoon, your Honor.  Linda

9   Nussbaum for Kaiser.

10          MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol, of

11   counsel for Kaiser.

12          MR. CHEFFO:  Good afternoon, your Honor.  Mark Cheffo

13   for Pfizer.

14          MS. ARMSTRONG:  Good afternoon, your Honor, Katherine

15   Armstrong for Pfizer.

16          MR. KENNEDY:  Good afternoon, your Honor.  Raoul

17   Kennedy, also for Pfizer.

18          THE COURT:  Gee, It's Kaiser and Pfizer.  I never

19   thought of it that way before.

20          (Laughter.)

21          MR. HOOPER:  Jim Hooper for Pfizer, your Honor.

22          MR. RONA:  Good afternoon, your Honor.  Ilyas Rona,

23   also of counsel.

24          MS. PARKER:  Kristin Johnson Parker, of counsel for

25   Pfizer.

1          THE COURT:  And you're Corinne?

2          MS. REED:  Corinne, yes.

3          THE COURT:  Corinne, welcome too.

4          So we're starting off with a really big problem.  You

5    all filed so much within the last week, I haven't even had a

6    chance to read most of it.  To the extent I've had a chance to

7    read it, I'm not sure it's physically possible to rule on it

8    all within three weeks, so I'm trying to figure out what to do

9    with that.  I will not be holding Daubert hearings.  It took a

10   law clerk, a fellow state court judge, and me six months to get

11   through a true Daubert hearing on this stuff; and my view is,

12   if you -- both sides did this -- move to exclude the opposing

13   expert with only two or three weeks to go -- maybe I have eight

14   of these Daubert hearings -- I don't know if you've counted

15   them, but it seemed like a lot -- I wouldn't physically have

16   time, if I did nothing else between now and then, to do eight

17   Daubert hearings.  So I'm not holding a hearing.  If I can't

18   figure it out on a record, you lose.  I don't know what else to

19   do on this.

20          So I haven't had the opportunity to sit and read all

21   the expert reports either.  They're too extensive, and I didn't

22   know if you all had a game plan as to how you even thought I

23   would do this.  There are some that are far more discrete

24   motions which maybe we can argue, and I'm hoping we do that

25   today.  But I don't know if you have a sense of a priority of

1    the things that you absolutely need to have, and we could start

2    those arguments today.

3            I will say this, that there's another case, which is

4    also very complex, which has also filed, one of the AWP cases,

5    a similar -- well, actually not quite as many, but, still, I'm

6    going to be seeing them tomorrow.  I'm hoping to make a

7    judgment after reading those what I can reasonably get to and

8    what I can't.  So that's the best that I have at this point.

9            Maybe what I can do is just alternate between sides in

10   terms of the motions you think have the highest priority, and

11   then I will be doing a lot of it, taking it under advisement,

12   and I don't promise you rulings before the day of the trial.

13           MR. CHEFFO:  Your Honor, I don't want to kind of

14   revisit history too much other than to just point out that when

15   we talked about a trial in February, it was defendants'

16   position that it was just simply very difficult to do.  And the

17   plaintiffs had said -- I think they put this in their papers --

18   "We don't intend to make," I think they said "many Daubert

19   motions."  And that's why -- and we didn't say that, but when

20   your Honor recalled that you set January 8 and then you set --

21   you know, and they filed an overlength brief.  So I just point

22   out that, you know, we're here --

23           THE COURT:  So this is "I told you so."  Well, you may

24   be right.

25           MR. CHEFFO:  Well, it's a polite "I told you so."

1          THE COURT:  It's a polite "I told you so," but it may

2    be right.  I don't know how -- let me just say this:  Even if I

3    put it in the summer, I couldn't get through this number of

4    Daubert hearings.  It literally took me, would you say six

5    months between the hearing and the opinion?  I couldn't do it

6    with the number that you've given me.  It's impossible.  I

7    don't have the resources; I don't have the time.  So as far as

8    I'm concerned, you both have given up the right to a hearing by

9    filing them so late.  If I can do it on the papers, I will, and

10   oral argument, but I'm not doing an evidentiary hearing where

11   two sides have experts and days and days of cross-examination.

12   We're not doing what we did for the initial set of Daubert

13   hearings.

14          MR. CHEFFO:  And, your Honor, certainly we'll be

15   guided by whatever your Honor wants to do with this, but I

16   would just say this, is that we certainly, I think on both

17   sides, can probably narrow the issues, but, I mean, this is

18   just a fundamental issue for us, at least.  You know, we think

19   for example, Dr. Rosenthal, I mean, we wouldn't have to perhaps

20   go through a four-week --

21          THE COURT:  She's the ones that's easy because at

22   least I know her report.  It's these other ones that the

23   reports are like this.  The Daubert hearings are these

24   broad-brush, "You can't do it without a placebo; oh, yes, we

25   can because of this," and I'm not going to hold two weeks of

 1  hearings per expert.  It's impossible.  I don't know why

 2  plaintiffs waited so long.  They've done a couple.  You've done

 3  five or six, right?

 4          MR. GREENE:  We've challenged their efficacy experts,

 5  yes.

 6          THE COURT:  Yes.

 7          MR. GREENE:  I have a suggestion on that, your Honor,

 8  that I think might help.  I agree with you that -- I mean, if I

 9  were a judge, I'd want to ask some good, very pointed questions

10  of these witnesses, and I have a suggestion that we could have

11  fifteen minutes of voir dire before a jury hears their

12  testimony, and I think in fifteen minutes of questions --

13          THE COURT:  I haven't even read enough to be able to

14  ask fifteen minutes.  I was so taken aback with how much has

15  been filed within the last week.  I've just been doing

16  catch-up.  You may not know this, but I've had two days of

17  hearings on my average wholesale pricing cases.  I had an

18  antitrust trial for a month.  I only have so much time.  I

19  can't give you more than falling asleep at 11:00 at night and

20  doing weekends.  I can't do more than that.  I have a trial

21  next week; I have a trial the following week.  You've got a

22  busy Federal District Court judge, and I couldn't possibly hold

23  evidentiary hearings on each one of those and try this case.

24          So one possibility is continuing it, but even if I

25  continued it, I couldn't give you what I gave you the last

1  time.  I mean, you got A-plus quality justice last time in

2  terms of length of time, quality of opinion writing.  I

3  couldn't even write an opinion.

4      MR. CHEFFO:  Certainly, your Honor, I think, from our

5  perspective, I don't think we need that level; but I do think,

6  again, just to harken back a few months ago, you know, we did

7  stand up, and obviously, you know, we said this is very

8  complicated.  You know, they basically said this case is ready

9  to go, it's in the box, let's go, and we can do it.  And now --

10  and what we said was, "Judge, you can't reasonably --"

11      THE COURT:  Well, I don't know.  We're going to start

12  today in doing some of the arguments.  I haven't read it even

13  in enough depth to know if there's a shortcut.  I just

14  started -- and some of these issues are quite simple, actually,

15  but most of them are narrow.  But most, you know, like should

16  we allow in the prior conviction, we can have an argument on

17  that, and I don't need an evidentiary hearing.  But the Daubert

18  ones are different.

19      MR. SOBOL:  Can I make a suggestion, your Honor?  My

20  suggestion would be that we start some oral argument today.

21  That might enable the Court to get a little better feel for the

22  issues.  And then at some point, at least from the plaintiffs'

23  perspective, if we could have ten minutes to break and talk and

24  come back after we've done that argument to respond to your

25  question about, you know, what's a practical way to proceed.

1   But first let me try to get a little bit of the arguments under

2   our belt, and then if we can do that, break.  We can give you

3   a --

4         THE COURT:  Right, and I'm going to be meeting with

5   the other folks tomorrow, and then I'll make a judgment as to

6   who goes first and who follows right on the heels.  So, I mean,

7   we're not talking about indefinite postponements, as a

8   practical matter.

9         How long do you think, on a 9:00-to-1:00 basis, do you

10  think your case will take to try?

11        MR. SOBOL:  Well, you've already ordered each side

12  limited to 28 hours, which is a challenge, I think, for both

13  sides, but --

14        THE COURT:  Well, but if I gave you that, would you be

15  able to fit in all the people, even if I gave you full reign on

16  what you want?

17        MR. SOBOL:  Well, I think what we've been doing is

18  trying to practice the order, what you've ordered, so --

19        THE COURT:  Twenty-eight hours is per side?

20        MR. SOBOL:  Per side.

21        MR. CHEFFO:  I mean, I think that's less of an issue.

22  That would still be, you know, a three- to four-week trial.

23  Again, I think the real issue here is that there are some

24  fundamental -- and, you know, we completely agree.  You know,

25  they filed their Daubert motions, five of them, a week ago.  We

1    only had a week to respond.  So, you know, it's not normally

2    the way we that we'd like to --

3         THE COURT:  And you popped all these people on them,

4    so this was sort of like sneak attack on both sides.  And as

5    far as I'm concerned, I'm the last one to know, and I just

6    started looking at the range of these.  These aren't the usual,

7    you know, motion to preclude prior conviction.  I can handle

8    that.  These are just sweeping, broad-brush "exclude their

9    entire expert" three weeks before trial.  That's impossible for

10   me to do.

11        MS. NUSSBAUM:  Your Honor?

12        MR. CHEFFO:  The problem with that is, you know,

13   again, that's because, again, January 8 was the deadline to do

14   that, so we all met -- we at least met the deadline to do that.

15        THE COURT:  You popped all these new doctors on them,

16   so there's blame to go around.  I am simply saying, what we

17   will do -- I think Mr. Sobol's idea is a good one -- we're

18   going to start arguing it.  We're going to see where we're

19   going to go.  I'm going to meet with the people tomorrow, and

20   then I'm going to see what I can do.  I am not holding -- if I

21   can try your case first, I will, and I'm not going to hold

22   evidentiary hearings.  You lose if you waited this long to

23   bring this motion, if I can't do it on the papers.

24        So let's start.  I think what makes the most sense is

25   to have you prioritize in your own mind what you need the most,

1    assuming a trial date by the end of February, and then

2    hopefully over the weekend I can spend some more time with

3    these and just sort of get a sense as to whether I

4    realistically could do any of this.

5            So are you arguing first?  What would you like,

6    Ms. Nussbaum?

7            MS. NUSSBAUM:  Your Honor, just to follow up, I think

8    that if you gave us a short break after the arguments that you

9    want now, we will be able to prioritize.  I also think, if it

10   would be helpful for the Court --

11           THE COURT:  So you want a few minutes right now to

12   prioritize?

13           MS. NUSSBAUM:  No.  Well, we can argue the non-Daubert

14   motions now.  I mean, what we tried to do was follow the

15   procedural order, but we can argue the non-Daubert motions now,

16   and then we can prioritize those motions for you.  And although

17   I understand that the motions are enormous, I think that if it

18   would be helpful to you and your clerks, we could also try to

19   do a five-page or so executive summary on those motions of the

20   key points, and then annotate them to the larger papers.

21           THE COURT:  As a practical matter, the first five

22   pages of all your Daubert motions are identical, right, other

23   than maybe --

24           MS. NUSSBAUM:  We could try to give a concise version

25   is what I'm saying.

1            THE COURT:  I don't need that.  I don't want another

2    piece of paper.

3            MS. NUSSBAUM:  Okay.

4            THE COURT:  So what's your first one that you would

5    like to argue?

6            MR. CHEFFO:  Do you want them to go first, your Honor?

7            THE COURT:  Unless you want to go first.  We'll at

8    least hit your top one or two.

9            MS. NUSSBAUM:  Of the Daubert or of the other

10   arguments, your Honor?

11           THE COURT:  Whatever you think is the most important

12   to your case.

13           MR. GREENE:  I can address the plaintiffs' Daubert

14   challenge of the defendants' five efficacy experts.  And you

15   are correct, your Honor, when you said the -- you know, we

16   refiled that, so the first ten pages are identical, so a number

17   of these arguments that I'm going to make apply to all ten.

18   And the key here is that the methodology that the defendants'

19   experts --

20           THE COURT:  Well, can we even back up because you're

21   doing it backwards for me.  I had trouble even reading these

22   things.  Pfizer ends up redacting huge amounts, most of which

23   are not, under any stretch of the imagination, confidential

24   when I started going side by side.  So we're going to unredact.

25   You redacted portions of Meredith Rosenthal's depositions.  It

1    was crazy.

2         But let me just say this:  What I haven't read is the

3    actual expert report itself, so what I don't know is exactly

4    what the opinion is that you are seeking to strike.  My guess

5    is, most experts have multiple opinions, and so maybe some

6    should be stricken and some shouldn't.  So what is it --

7         MR. GREENE:  The opinion we're seeking to strike

8    that's common for all the defendants' efficacy experts is that

9    Neurontin is effective based upon the totality of the

10   literature or medical literature that they've reviewed.  The

11   reason we're seeking --

12        THE COURT:  But can I just say, are there other

13   opinions too like, you know, a doctor might experiment with

14   this, or there's some anecdotal evidence to support it?  I

15   mean, because some of that stuff may be admissible on state of

16   mind.  Or is it just the ultimate opinion of effectiveness that

17   you're looking to --

18        MR. GREENE:  It's effectiveness because of what they

19   review and what they fail to review.  And for each one of the

20   indications in this case, there are DBRCTs, double-blind

21   randomized controlled trials, multiple DBRCTs for each of the

22   indications in this case that find that Neurontin is no more

23   effective than placebo.  Their experts ignore, wholly ignore

24   the DBRCTs.

25        THE COURT:  How do I know that?

1          MR. GREENE:  We set it forth in the papers.  It's

2   clear --

3          THE COURT:  How do I do that without a hearing?  That

4   they wholly ignore?  You didn't take a deposition.  How do I

5   know?

6          MR. GREENE:  It's clear from their reports.

7          THE COURT:  Well, let me ask you, did they wholly

8   ignore the double-blinded?

9          MR. GREENE:  We cited to their reports.

10          THE COURT:  Yes or no?

11          MR. CHEFFO:  No.

12          MR. HOOPER:  Absolutely not.

13          MR. GREENE:  They've wholly ignored the DBRCTs.

14   They've elevated Level 3 evidence, the clinical experience and

15   the clinical experience of their colleagues, above the DBRCTs.

16   All the experts, they admit the DBRCTs --

17          THE COURT:  You didn't take their depositions.  I have

18   nothing.

19          MR. GREENE:  You have their reports.  They lump --

20   when they acknowledge the existence of a DBRCT, they lump it in

21   with their clinical trial experience and case reports and

22   lesser forms of evidence.  If the plaintiff marched one of

23   their efficacy experts in here to say Neurontin was ineffective

24   based on their clinical experience, based on a case report,

25   based on an open-label study, that expert would be thrown out.

1           THE COURT:  Okay, fair enough, it would be.  Okay,

2      but --

3           MR. GREENE:  That's what they've done.

4           THE COURT:  But they say "no," and you haven't taken a

5      deposition, and it will take me two weeks of hearings to get

6      through what each person relied on.  That's my concern here.

7      It isn't -- I may end up striking their opinion on the stand,

8      but at the end of the day, I'm assuming --

9           MR. GREENE:  I agree with what you're saying.  You

10     would have to have an opportunity to ask them that question,

11     and that's why I suggested, I think it could be done by you

12     with five minutes of --

13          THE COURT:  Baloney.  It will take me a week.  That's

14     the thing.  Some of these people are Harvard-trained.  If they

15     can't talk their way around me, they're in trouble.  You'll

16     have your experts saying they did X.  It will be like the

17     Gibbons thing or the -- who's the guy from England?  It will

18     take me an eternity per expert.  You didn't bother taking their

19     deposition, so I don't know what they did.

20          MR. GREENE:  Well, you have their reports.  You have

21     what they say in their reports.

22          THE COURT:  And they say they didn't even look at the

23     double-blinded?

24          MR. GREENE:  They did not.  They elevated clinical

25     trial experience --

1          THE COURT:  When you say "elevated," do they say they

2     didn't consider at all the double-blinded?

3          MR. GREENE:  Well, a number of them don't make

4     reference to them.  Our experts point them out, and several of

5     their experts still don't respond to the existence of a DBRCT.

6     The DBRCT, according to Pfizer's research report, is negative.

7     It's published as positive.  And in this instance, migraine,

8     Rapaport, their expert who is a co-investigator on that trial,

9     makes no reference to the research report.  These guys didn't

10    even get it to him to review.

11         THE COURT:  You may be right, but how do I know that

12    without a hearing?

13         MR. GREENE:  Five minutes of questions.

14         THE COURT:  It's not five minutes, okay?  You know

15    that's true, Mr. Greene, it's not.  So what do I do?  I mean,

16    your brief is somewhat compelling, actually.  If they didn't

17    look at the double-blinded -- I'm not saying you can't look at

18    clinical and other things to supplement it or anecdotal.  I

19    think that you can't have that without blinders about what's

20    happening in the real world.  You can look at other stuff, but

21    you need to at least have considered the double-blinded.

22         But let's assume they say that they did.  And then

23    you're saying, well, the report is defective then, right?

24         MR. GREENE:  Yes.  It's clear they didn't.  And when

25    you have DBRCTs, there's no reason to go any further.  That's

1  what the FDA requires.  It's what Cochrane Collaborative

2  requires.  It's what their experts acknowledge in their expert

3  reports, that DBRCTs are the only way to prove causal effect.

4        THE COURT:  I am not doing this on this cold record.

5  So the issue really is, what do I do with this?  I don't know

6  why you didn't take depositions.  I gave the opportunity for

7  depositions, so what should I --

8        MR. GREENE:  Let me address something you raise which

9  is related.  I'm talking about their identified efficacy

10  experts.  There's another category of experts here, their

11  non-retained experts.

12        THE COURT:  Yes, I think those are a serious problem,

13  so I --

14        MR. GREENE:  Let me address that for a moment.  You're

15  right, they sprung those on us at the last minute after

16  discovery was over.

17        (Discussion between plaintiff counsel.)

18        MR. GREENE:  My colleagues here have pointed out to me

19  that -- want to go back to the efficacy experts.  Their reports

20  say what they reviewed.  So the shorthand answer to your

21  question, how do you know what they reviewed?  Look at the

22  reliance list.

23        THE COURT:  All right, so if I don't have a hearing,

24  if they didn't look at double -- the ones who said they did

25  you're out of luck on because I don't know what weight they

1    gave it, I can't weigh it, I don't know, we don't have a

2    deposition.  So the ones who don't even mention it, you say,

3    then as a matter of law it's unreliable; how can you not at

4    least have looked at the double-blinded?  So who are the ones

5    who didn't look at the double-blinded at all?

6              MR. GREENE:  I have them in my chart.  We set them out

7    in a chart, so it's on Page 3 of the memo.  So the first

8    approximately ten pages of every one of these memos, as you

9    point out, is identical once we split them up.

10             THE COURT:  Well, except for the charts.  So who are

11   the ones who say --

12             MR. GREENE:  Slaby.

13             THE COURT:  Slaby, and who's he on?

14             MR. GREENE:  For bipolar.

15             THE COURT:  And it doesn't list the double-blind?

16             MR. GREENE:  He ignored Guille, G-u-i-l-l-e, the DBRCT

17   that was known to Pfizer.

18             THE COURT:  Say it again?  I have no idea what you're

19   talking about.

20             MR. GREENE:  The principal author is Guille,

21   G-u-i-l-l-e.

22             THE COURT:  That's what he says he relies on?

23             MR. GREENE:  No.  That's the DBRCT that he ignored.

24             THE COURT:  Well, are there other DBRCTs that he

25   looked at?

1        MR. GREENE:  He presents Vieta as positive when the

2   research report shows it's negative.  Pfizer wrote it up as

3   positive.

4        THE COURT:  But that's --

5        MR. GREENE:  Okay, I'm telling you what Pfizer agrees

6   to.

7        THE COURT:  Is there anybody there for whom you have

8   double-blinded studies where they said they didn't even look at

9   them?

10       MR. GREENE:  Yes, so Dr. Slaby.

11       THE COURT:  Well, no, he did look at them.  He looked

12   at one of them.

13       MR. GREENE:  He did not look at Guille.

14       THE COURT:  He looked at one of two of them, is that

15   it?

16       MR. GREENE:  No, there are four.  He did not look at

17   Guille.  He ignores it.

18       THE COURT:  No, excuse me.  So that you're saying

19   there are four double-blinded, and he looked at the three of

20   the four?

21       MR. GREENE:  Slaby lumps Frye and Pande, two of the

22   DBRCTs, in a string cite with other less forms of evidence.  He

23   doesn't explain that they're negative in their primary outcome.

24   He lumps them in with inferior evidence and doesn't explain the

25   weight he's giving to the DBRCTs as opposed to his clinical

695b3236-e7a6-46ba-94de-27fa3a5b711e

1    experience.  He's blending them.

2            THE COURT:  All right, but just answer me.  Are there

3    any that didn't look at all at the double-blinded?

4            MR. GREENE:  Brenner on --

5            THE COURT:  So Brenner doesn't look at all at

6    double-blinded?

7            MR. GREENE:  He doesn't look at Gorson, Reckless,

8    Popp, Serpell, or the four nociceptive pains.

9            THE COURT:  Does he look at anything that's

10   double-blinded?

11           MS. ARMSTRONG:  Is this Brenner?

12           THE COURT:  Yes.

13           MS. ARMSTRONG:  Brenner looked at a meta-analysis that

14   included double-blinded studies that Cochrane reports their

15   expert admits is a reliable source.

16           MR. CHEFFO:  And, I mean, I want to give Mr. Greene a

17   chance, but you've asked him three or four times very clearly.

18   First of all, this whole thing, imagine a situation --

19           THE COURT:  Excuse me.  You know what, that isn't --

20   that's getting -- can I just say this:  Maybe you want to flip

21   through it.  Is there anyone there that's a slam dunk, there

22   are all these double-blinded studies, and they looked at

23   nothing other than their own personal clinical --

24           MR. GREENE:  I said Brenner and --

25           THE COURT:  They say that there was a meta-analysis he

1    looked at, which might be the same thing.

2         MR. GREENE:  They're referring to the Cochrane report.

3    Of course, Reckless and Popp were suppressed from -- Pfizer

4    suppressed them, so Cochrane never had it.

5         THE COURT:  That goes to the weight.  Is there anyone

6    who just never looked at the double-blinded data?  That could

7    be an easy across-the-board exclude them if there was

8    double-blinded data and they never looked at it.

9         MR. GREENE:  Again, Brenner.  I mean, all of them

10   there are DBRCTs they didn't look at, but Brenner is the --

11        THE COURT:  Well, she says he looked at a meta-analysis.

12        MR. GREENE:  And they didn't look at the eight DBRCTs.

13        THE COURT:  But she said he looked at a meta-analysis

14   of the eight.  Is that true?

15        MR. GREENE:  She says he looked at Cochrane.  He says

16   he look at Cochrane.

17        THE COURT:  That's the meta-analysis?  I don't know

18   what it is.

19        MR. GREENE:  Yes, Cochrane Collaborative, right.

20   That's the body, the international body.  Dr. Dickersin is a

21   director of the Cochrane Center here in the United States, and

22   they collect DBRCTs, and they publish the results.  They were

23   trying to get from Pfizer -- they e-mailed them, we have these

24   documents, and Pfizer suppressed Reckless and Popp.  Those are

25   the neuropathic pain trials that Brenner never reviewed the

1   DBRCTs.  Those are two of the eight.

2          THE COURT:  So you're saying, because he didn't look

3   at two of the studies, that his --

4          MR. GREENE:  What I'm saying, Judge, is that he didn't

5   look at any of the eight studies.  He looked at the Cochrane

6   Collaborative which did a meta-analysis.  They didn't have two

7   of the negative studies because Pfizer suppressed them from

8   Cochrane.  Cochrane communicated directly with Pfizer to get

9   the unpublished data in a series of e-mails -- and we have

10  these documents -- and they kept it from them.  I mean, they

11  discuss it back and forth in the e-mail.

12         Let me turn to -- I wanted to turn to the non-retained

13  experts because this, to me, is an easier issue for you to

14  address.  And, you know, as I said, as you said, according to

15  your phrase, they sprung these people on us after the

16  deadlines, after discovery.  And these experts are relying on

17  their so-called clinical experience.

18         THE COURT:  Yes, let me jump to you because I did read

19  this one.  Who's handling the non-retained?

20         MR. CHEFFO:  Mr. Hooper is going to address those,

21  your Honor.

22         THE COURT:  I understand that there is a distinction

23  between retained and non-retained experts.  However, under

24  Rule 26, you're required to list witnesses that you know about

25  at the start of the case and then to supplement as you learn

1    about them later.  In addition, I required that all expert

2    depositions be done by a certain point.  I did not draw the

3    distinction between retained and unretained.  And I said, if

4    someone's going to rely on their clinical -- and I deliberately

5    said both sides -- you had to produce the documentation that

6    they were relying on, expurgated so that privacy information

7    didn't come in.

8          Now, it would be a violation, it would be everything

9    that the rules are supposed to be preventing to allow someone,

10   after discovery is closed, to spring new names on people.

11         MR. HOOPER:  Your Honor, I don't believe these names

12   were sprung.

13         THE COURT:  Did you ever provide them through either

14   automatic disclosure under Rule 26 or under any supplementation

15   to it?

16         MS. ARMSTRONG:  Yes, your Honor.  We supplemented on

17   November 23 which was --

18         THE COURT:  Excuse me.  As you learned about them

19   before the discovery period was closed, you have ongoing

20   supplementation requirements under Rule 26.  And while it's

21   quite true that unretained experts aren't required to file

22   reports, fair game, I didn't draw that distinction with respect

23   to depositions of experts.  So while I did require that any

24   reports be filed by a certain date -- and you're right,

25   unretained people don't need to file reports -- I didn't draw

1    that distinction in discovery.  So it was quite clear I

2    intended -- I intended -- that everyone have an opportunity to

3    take discovery of people who are experts under, what is it,

4    701, 702 -- I honestly can't remember -- the 7s sequence.  And

5    to boot, I required that any documentation on their clinical

6    experiences be provided, deleting for privacy things.  So I

7    don't see how you think after discovery is over you're allowed

8    to just name eight doctors.

9              MS. ARMSTRONG:  Well, there are a couple of different

10   categories here because they're lumping in with some of these

11   doctors the physicians for the consumer plaintiffs in this

12   courtroom where there's been discovery and they participated in

13   this discovery, and your Honor has referred to the testimony of

14   those physicians in her decisions rendered in this case, so I

15   think --

16             THE COURT:  How many doctors fall in that category

17   where full-blown discovery has taken place?

18             MS. ARMSTRONG:  There are five doctors in that

19   category.

20             THE COURT:  Where full-blown discovery has taken

21   place?

22             MS. ARMSTRONG:  I believe.  I mean, this is --

23             THE COURT:  And the documents have been produced,

24   et cetera?

25             MS. ARMSTRONG:  The discovery has been taken in

1   connection with this case, in connection with the proceedings

2   here, the discovery for the consumer class plaintiffs.

3            THE COURT:  Excuse me, excuse me, excuse me.  You're

4   saying five of them were the doctors for the consumer class

5   plaintiffs, and all the documents --

6            MS. ARMSTRONG:  No, I'm sorry.  Three of them, three

7   of them.  It's Dhaduk, Rogers, and Arnez.

8            THE COURT:  What are their names?

9            MS. ARMSTRONG:  Dhaduk, D-h-a-d-u-k, Rogers, and

10  Arnez.

11           THE COURT:  Okay, where you say there's been a

12  full-blown deposition and all documents produced?

13           MS. ARMSTRONG:  I don't know what documents have been

14  produced.  I mean, I --

15           THE COURT:  I mean, just for that -- I mean, I assume

16  for that plaintiff, right?

17           MS. ARMSTRONG:  For that plaintiff, they would have

18  been produced.

19           THE COURT:  So they could talk about that plaintiff,

20  is that what you want, because nothing else could they talk

21  about?

22           MS. ARMSTRONG:  They can't -- I mean, are you saying

23  that we cannot call a treating physician who can say, "I

24  routinely prescribe Neurontin in my practice, and here's why,

25  and here's what my general experience has been"?

1      THE COURT:  Well, I don't know about that, but you

2  can't talk about other clinical experiences.

3      MS. ARMSTRONG:  Your Honor, I mean, part of this

4  case --

5      THE COURT:  I mean other specific:  "I had another

6  patient who this and this and this happened."  Can he say in

7  general he does this?  I don't know.  But let me put it this

8  way.

9      All right, let me just jump back to you.  They

10  violated the rule, I'll grant you that.  But to the extent that

11  these three doctors there was full-blown discovery on and I

12  limit them to what they testified on, there seems to be no

13  prejudice.

14      MS. NUSSBAUM:  Your Honor, if I might, two things:

15  First, I believe that there is prejudice to Kaiser.  These

16  apparently are physicians for individual consumer plaintiffs in

17  the class case, and Kaiser --

18      THE COURT:  Didn't we basically coordinate/consolidate

19  all discovery in this case?  I think we did.  This is part of

20  the MDL.  That's why we have it.

21      MS. NUSSBAUM:  This is part of the MDL, your Honor,

22  but on class certification issues in the class case, Kaiser

23  would not have been on notice that those individuals'

24  physicians would then be non-retained experts.

25      THE COURT:  Well, was there someone from this

Page 27

1    coordinated case who was defending the deposition?

2         MR. CHEFFO:  Mr. Sobol and Mr. Greene are the lead

3    counsel for the class.

4         THE COURT:  Were they there?

5         MS. NUSSBAUM:  Yes.

6         THE COURT:  All right, let me just cut this short.

7    There was a violation of the discovery order because there was

8    no supplementation of the identification, and I required all

9    expert discovery be completed long ago.  To the extent that

10   these three doctors have been fully deposed, I will allow them

11   to be witnesses, but only to the extent of the depositions.

12        Okay, so that handles that issue.  Is there anybody

13   else in here?

14        MR. HOOPER:  Your Honor, if I may, could I touch for

15   30 seconds?

16        THE COURT:  Are they willing to come, by the way?

17   Have you called them?  They're all from somewhere else, and

18   they hated being part of this case, didn't they?

19        MS. ARMSTRONG:  No, I think we're actually

20   contemplating deposition testimony from all of these people.

21        THE COURT:  Oh, you're just going to read in their

22   deposition about --

23        MS. ARMSTRONG:  Right.  And so, for example, the other

24   categories, the Judy and the Clark, those people have been

25   deposed, and we did give them their depositions.  They had an

1    opportunity --

2         THE COURT:  No, it's got to be part of this

3    litigation.  So if they were deposed as part of this

4    litigation, I will allow their testimony, you say deposition,

5    as a practical matter, testimony.

6         MR. CHEFFO:  Can I comment, your Honor, just for a

7    minute because the issues in Clark and Judy are very similar to

8    the issues here.  And basically what they want to come into

9    court and say, that this medicine doesn't work for anyone, it's

10   snake oil, it's inefficacious.  There have been people who have

11   had very strong financial interests, good plaintiffs' lawyers,

12   and they've deposed doctors, and these doctors say, "You know,

13   it's not true.  I actually wasn't detailed, and I actually use

14   it."  And I think that that's just fair game when you're

15   basically saying it doesn't work for anyone --

16        THE COURT:  Okay, overruled.  If they were deposed as

17   part of this case in front of me, the deposition may be used.

18   Otherwise, it was a violation of my discovery order, so

19   non-retained.

20        And I don't know what you're thinking about in

21   Patient Y.  Who's Patient Y?  That's not fair.  You'd be

22   screaming up a bloody storm if I did that; they're going to put

23   on Patient Y about they're about to commit suicide on

24   Neurontin?  I mean, you'd be off a chandelier by now.

25        MS. ARMSTRONG:  We disclosed him in connection with

Page 29

1    the motion to reconsider class certification.

2            THE COURT:  You can't have Patient Y.  Do you know who

3    Patient Y is?

4            MS. NUSSBAUM:  No, your Honor, and they're not a

5    Kaiser patient for sure.

6            MS. ARMSTRONG:  I mean, since October they've had his

7    records.  They know who he was, not his personal identity, but

8    they knew the nature of his issues.

9            THE COURT:  It wasn't identified in a timely way.  I

10   sustain the objection to him being on.

11           Now, it's their turn.  What's your next key issue?

12           MR. HOOPER:  Your Honor, if I could be heard just very

13   briefly?

14           THE COURT:  No.  We're moving on.  Move on.  Is there

15   any other witness I haven't dealt with on a non-retained basis?

16   There was that guy, the -- by the way, I got a strange e-mail.

17           MS. NUSSBAUM:  Dr. Phillips?

18           THE COURT:  No, no.  There's a woman who --

19           MS. ARMSTRONG:  We're not calling her.

20           THE COURT:  All right.

21           MS. NUSSBAUM:  Oh, Vickie Travis, your Honor.  Yes,

22   those were two of the other witnesses they sprung,

23   Dr. Phillips and Dr. Travis.

24           THE COURT:  Yes, but she's not coming.  And she was

25   very upset with me.  I had a pro se staff attorney call her.  I

1    don't think she wants any relief from me, but I hope you both

2    got a copy of that e-mail.

3              MS. ARMSTRONG:  Yes, we're aware of that issue.  I

4    mean --

5              THE COURT:  You don't want to impoverish someone, I

6    mean, if they're struggling --

7              MS. ARMSTRONG:  We did not impoverish her.  We tried

8    to explain to her that in fact a witness, we couldn't pay her

9    for her testimony, and she didn't like that answer.

10             THE COURT:  You can pay someone for their travel.

11             MS. ARMSTRONG:  For their time, and we explained that

12   to her, but she thought she would be able to be compensated

13   like an expert.

14             THE COURT:  I see.

15             MS. ARMSTRONG:  And we told her that we couldn't do

16   that.

17             THE COURT:  All right, we can move on past that.

18   What's the issue you want?  What's wrong?

19             MR. GREENE:  Can I just say one thing, Judge?  These

20   three doctors you've mentioned, two of them are deposed in the

21   class case.  They're treating physicians of the class reps.

22   The other one is a personal injury --

23             THE COURT:  Oh, it wasn't part of this consolidated

24   sales and marketing --

25             MR. GREENE:  Not the sales and marketing.  It was the

1   suicide patients.

2        THE COURT:  And were you all involved in that?

3        MS. NUSSBAUM:  We were not.

4        THE COURT:  All right, so the two that were involved

5   in this case can be used.

6        MR. GREENE:  And just to remind you --

7        THE COURT:  Just for the record, why don't you name

8   their names.

9        MR. GREENE:  Dr. Dhaduk, first name V-i-t-h-a-l, last

10  name D-h-a-d-u-k, and John Arness, A-r-n-e-s-s.

11       THE COURT:  All right, the two that were involved in

12  this sales and marketing case where you had a chance to defend,

13  you knew that they were coming, there's no prejudice.

14       MS. ARMSTRONG:  I don't have them broken down that

15  way.  I just would like to be able to verify that the third one

16  wasn't deposed in connection with this MDL.

17       THE COURT:  Sure, absolutely, that seems fair.

18       MR. GREENE:  Because of the suicide deposition, as I

19  understand it.

20       THE COURT:  Okay.  No, no, not your turn, their turn,

21  because we're going to try and get through some of this.  All

22  right.

23       MR. CHEFFO:  On the same issue, I guess one of these

24  folks is Dr. Charles Phillips?  Is that who you were --

25       THE COURT:  Well, I was worried --

1          MR. CHEFFO:  You told me to raise what our motion was.

2          THE COURT:  Charles Phillips, though, it wasn't a

3     hundred percent clear to me from reading the highly incensed

4     motions whether or not he was a fact witness or an expert

5     witness.  In other words, he, as I understand it, hates Kaiser,

6     but was an emergency room doctor and has no exposure to

7     Neurontin.  I don't know -- if he's a fact witness, I suppose

8     that he doesn't violate my rules on experts.  On the other

9     hand, he's only recently been part of the supplemental

10    disclosure.

11         MR. CHEFFO:  We only found out about -- I mean, your

12    Honor, again, you know, just as your Honor will recall, I don't

13    want to go back, but I think, you know, we talked about the

14    trial date in November after the summary judgment.  So at that

15    point, as soon as he was disclosed, we -- and in fact they

16    deposed him.

17         THE COURT:  Apart from whether he was -- let me take

18    your word for it for a minute that you recently discovered him.

19         MR. CHEFFO:  That's true, your Honor.

20         THE COURT:  Why is he relevant?

21         MR. CHEFFO:  Well, you know, we can talk about

22    Dr. Franklin.  You know, maybe that kind of dovetails.  Why is

23    he relevant?  Because he worked for 18 months for Kaiser.  He

24    has intimate information and knowledge.

25         THE COURT:  He worked with Neurontin?

1          MR. CHEFFO:  He works in an emergency room.

2          THE COURT:  No, please, sit down.  Let me talk to him.

3          He worked in an emergency room.  He didn't work on

4   Neurontin.  So did --

5          MR. CHEFFO:  He can talk about Neurontin.  He can talk

6   about how they deal with patient safety issues, how that their

7   doctors -- I mean, he can talk about a whole host --

8          THE COURT:  Overruled.  That's irrelevant.  We're only

9   talking about if he has any experience with prescribing

10  Neurontin or with the -- what do they call it? -- the P & T

11  committees.  It's irrelevant that he worked in an emergency

12  room.  So if you want to -- what I don't have in front of me,

13  which was difficult to follow, is what exactly the man would

14  say.  But if it's just about the emergency room --

15         MR. CHEFFO:  It's not, your Honor.

16         THE COURT:  Then what is it about?

17         MR. CHEFFO:  But, again, you know, this case is

18  broader than that.

19         THE COURT:  What's it about?  What's it about?

20         MR. CHEFFO:  It's about, he can talk about how Kaiser

21  makes decisions.  They talk about evidence-based --

22         THE COURT:  What kind of decisions?

23         MR. CHEFFO:  They talk about evidence-based medicine.

24  He can talk about how they have made decisions based on cost

25  that impact patient safety, and that drives -- some of the

1    issues they're going to raise probably in this case are why

2    doctors prescribed it, what messages they were given from

3    Kaiser; and he's going to talk about how the doctors have an

4    economic interest at Kaiser in certain prescriptions.  He was

5    there.  He worked for 18 months.

6         THE COURT:  Is there any evidence that those

7    motivations involved Neurontin?

8         MR. CHEFFO:  Yes.

9         THE COURT:  Well, I tell you what, you haven't given

10   me anything in your memo about why.  You just kept -- so if you

11   want him -- first of all, to the extent he's an expert, we're

12   past the deadlines.  He's not an expert on anything.  To the

13   extent he is a fact witness that you recently discovered, he

14   has to have firsthand -- firsthand -- observation of

15   prescription practices that are relevant here to somebody,

16   whether it's -- so right now I allow the motion to exclude

17   because you've billed him as an expert.  He's not going to be

18   an expert.  It wasn't presented in a timely way.  But if you

19   have some fact information from the man that is relevant to

20   Neurontin, move for reconsideration with what the proffer is.

21        MR. CHEFFO:  Your Honor, obviously we'll be guided --

22   I'm not going to -- I will just tell you that, you know,

23   ultimately when you see what I think you're going to see what

24   their proofs are going to be, it's not going to be as narrowly

25   tailored as that.  Okay, they're not going to come in and just

1  say, "This case is just about Neurontin."

2         If we can talk about Dr. Franklin for a minute,

3  Dr. Franklin testified --

4         THE COURT:  I haven't even gotten to Franklin.  Do you

5  want to use that as your next motion?

6         MR. CHEFFO:  Well, I do.  I mean, I think they've had

7  a chance.

8         THE COURT:  Yes, I've allowed the motion to exclude

9  Phillips as an expert for the reasons we've talked about:  He

10  wasn't noticed, it's too last-minute.  We're just not doing it

11  as an expert.

12         To the extent he is recently discovered as a fact

13  witness, he has to have firsthand observational admissible

14  evidence as to prescribing practices that are relevant to

15  Neurontin.  And so if you can make me a proffer that he has

16  that, I'll think about it.

17         MR. CHEFFO:  And I certainly at this point want to go

18  back and look at the transcript because I don't want to tell

19  your Honor.  I don't have it committed to memory.  I will

20  look --

21         THE COURT:  Yes, look at his deposition.  Was he

22  deposed?

23         MR. CHEFFO:  He was deposed.

24         THE COURT:  All right, so, I mean, he's a little

25  different than the others who there was no chance to depose.

1        MR. CHEFFO:  Right, no, he was deposed two weeks ago.

2        THE COURT:  All right, so I'm not as worried about

3    that as these people who came out of the blue.  But what I am

4    worried about is relevance and that he's an expert about

5    anything that's relevant here.  It sounds as if he has some

6    knowledge about something called "pill splitting," which no one

7    explained to me.

8        MR. CHEFFO:  Pill splitting is when you basically, you

9    take a pill that's like an 80-milligram, right?  And because

10   they pay a certain price for it, they had a policy of telling

11   their patients and giving them pill splits.  So say you had

12   40 milligrams a day, they'd tell you that you should get

13   80-milligram pill, and here's a pill splitter, cut it in half

14   and take two because it's cheaper to do that.  And of course

15   there's all kinds of issue about --

16       THE COURT:  What's wrong with that?

17       MR. CHEFFO:  Well, there can be safety issues.  It's

18   not required by the FDA.

19       THE COURT:  Maybe, but it has nothing to do with this

20   case.

21       MR. CHEFFO:  Well, okay, but then let's just

22   transition then for a second, if I could --

23       THE COURT:  Right.  I've allowed it.  I don't want to

24   hear anything --

25       MS. NUSSBAUM:  -- my motion?  Okay.

1        THE COURT:  I've allowed it.  Don't pluck defeat out

2    of the jaws of victory.

3        MS. NUSSBAUM:  Excellent, okay.

4        THE COURT:  All right, so go, your turn now.  You get

5    two because they took two.

6        MR. CHEFFO:  I mean, I think for all the reasons that

7    you just articulated, you know, you have to be specific to

8    Neurontin and have knowledge, this is exactly why I think you

9    should grant our motion as to Dr. Franklin.  Dr. Franklin,

10   David Franklin, works for four months for Parke-Davis.  We took

11   his deposition in connection with this case a month or so ago.

12   And I can cite you to and I think actually read it for the

13   Court so you don't have to find it, Page 113 to 116.  If you

14   indulge me for just two minutes, I can do this.

15        "Q.  There came a point in time while you were at

16   Parke-Davis where you became aware of a debate between

17   Magistro, Valentine and others about how conservative or

18   aggressive medical liaisons should -- should function; isn't

19   that right?  A.  I don't know who the debate was between, but I

20   did know that there were other employees who were concerned

21   that the Northeast CBU was being too aggressive in crossing the

22   line.  Q.  For example, the man who was in charge of the West

23   CBU --" California where Kaiser is -- "was somebody who told

24   you that he thought that the Northeast CBU was acting too

25   aggressively?  A.  Yes.  Q.  Suggesting to you that his CBU was

1    not doing the kinds of things that your CBU was doing; isn't

2    that right? A.  Yes.  Q.  In fact, you were at a meeting where

3    that man -- his name is Adrian Ball; is that right?

4    A.  Yes.  Q.  The man in charge of the West Customer Business

5    Unit was named Adrian Ball?"

6              He says, no, it was another guy, Phil Magistro's peer.

7              "Q.  Thank you.  So the man who was in charge of the

8    medical liaison program in the West -- A.  Yes.  Q. -- the

9    Customer Business Unit was a man named Adrian Ball?  A.  Yes.

10   Q.  And you were at a meeting where he openly criticized the

11   way medical liaisons in the Northeast Business Unit were being

12   used; isn't that right?  A.  Yes.  Q.  And he had some pretty

13   colorful language to describe your group, didn't he?  A.  Yes.

14   Q.  He thought you were doing things that were wrong, and it

15   was only a matter of time before you get into trouble; isn't

16   that right?  A.  Yes.  Q.  Were there other people at

17   Parke-Davis who pulled you aside at some point in your tenure

18   there and said that the Northeast medical -- the Northeast

19   Business Unit medical liaisons were too aggressive?

20   A.  Somebody referred to us as bottom dwellers at one point."

21             That's Dr. Franklin.  So if we want to talk about, you

22   know, as you just said, and we'll certainly abide by it, having

23   specific information and knowledge, it goes on.  He was deposed

24   for a few hours, and what he also said was, he only worked for

25   four months, and he only went to the nine states in the region,

Page 39

1    in his district, and of that, 85 percent of his time was in

2    Massachusetts.  He said there are different people who are in

3    charge of actually calling on Kaiser on formulary; all he did

4    was medical doctors here.

5             THE COURT:  Did he do Kaiser doctors here?

6             MR. CHEFFO:  No.

7             THE COURT:  Did he communicate at all with Kaiser?

8             MR. CHEFFO:  There's no information that he ever even

9    heard of Kaiser.

10            THE COURT:  Is there testimony that it was a national

11   policy as opposed to region by region?

12            MR. CHEFFO:  Well, I mean, that -- maybe not for

13   Dr. Franklin.  I mean, he basically said, "I was there for four

14   months.  I went to a training."  And in fact at the training,

15   that's where he met this guy who was essentially -- you may

16   have seen the name Phil Magistro.  Phil Magistro was a

17   supervisor of Franklin, right?  And they had five business

18   units.  There was the Southeast, the Northeast, and I believe

19   we get to the West.  I don't know what the other ones were

20   offhand.  And each one had essentially a person who was a

21   coordinator of Phil Magistro.  He didn't even know who these

22   other people were except he met Adrian Ball.  And he actually

23   said this in his information back to the government.  In other

24   words, he was using this when he went to the government as

25   evidence that what he was doing and his people were doing was

1   wrong because in fact the guy in the West said, "No way, no

2   how, that's not the way we do business out in the West."

3          So he never was in California.  He never talked to

4   anyone who called on a Kaiser doctor.

5          THE COURT:  Okay, I get the point.  Let me jump to

6   you.

7          MS. NUSSBAUM:  Your Honor, one factual thing, and then

8   Mr. Greene will argue the motion, but, for example, several

9   weeks ago there was a deposition of a Kaiser doctor in

10  California that was taken by Mr. Cheffo.  Now, that particular

11  doctor, who now practices in California, was in fact trained

12  here in Boston, trained at Harvard.  His first experience --

13         THE COURT:  A doctor?

14         MS. NUSSBAUM:  Yes, a doctor.  But his first

15  experiences in being detailed as a fellow, as a resident but

16  certainly then as a fellow, those experiences were here in

17  Boston.  So due to the nature of the fraud here, due to the

18  nature of the fact that people are detailed when they're in

19  medical school, when they're in physician training programs,

20  when they're in fellowship programs, doctors who are now

21  practicing in California today, they in fact have been trained

22  in Boston.  The fact of any geographic slicing and dicing here

23  and saying, "Well, this was happening here and this was

24  happening there," is really not relevant.

25         THE COURT:  Let me just say this:  There's no doubt

1    that Franklin has got some relevant information.  The question

2    is, under 403, if it's this one doctor and otherwise the

3    Northeast was an outlier in how they marketed -- I mean, I

4    remember at some point I allowed Mr. Greene -- I can't remember

5    which case it was -- to go national in discovery, right?  Or

6    maybe it was everybody.  So is there any evidence linking the

7    sales practices in New England with what happened in California?

8         MR. CHEFFO:  Wait, but just so we're clear, Dr. Wieder

9    never testified that he met with David Franklin.  In fact, this

10   doctor they're talking about, he was a speaker for Pfizer, and

11   you know what he testified?  He said, "I actually went and I

12   testified truthfully and honestly because I told Pfizer that's

13   what I was going to do out in California."  So let's just be

14   clear.  He went to school here, he did a fellowship.  There's

15   no evidence that he was ever detailed or he received any

16   message, certainly not from Dr. Franklin.  And if we're going

17   to hold the Phillips rule, there's no connection.  Then he went

18   back out to California and practiced, and he actually was on

19   the speakers' bureau for Pfizer, and he testified he gave an

20   honest, accurate message during that.

21        THE COURT:  You know what, I gave you your shot.

22        MR. CHEFFO:  I'm sorry.  You're right, your Honor.

23        THE COURT:  I'll let you come back.

24        So, Mr. Greene, so the question is, what evidence do

25   you have about the sales practices that happened in California?

1          MR. GREENE:  The evidence in this case will be that

2     all the marketing strategies came out of the home office,

3     Morris Plains.  They went to the CBUs around the country.  The

4     strategies were uniform.  The tactics, the marketing tactics

5     that were used to implement those strategies came out of the

6     home office and were implemented --

7          THE COURT:  Did you ever depose this guy that Pfizer

8     referenced, or did someone depose him?

9          MR. GREENE:  Who is that?

10         THE COURT:  He just cited it.

11         MR. CHEFFO:  Adrian Ball, the head?

12         MR. GREENE:  No.  He was never deposed.

13         MR. CHEFFO:  But they certainly knew about him.

14         THE COURT:  Both sides are.  Is he going to be your

15    witness?  Is he on the list?

16         MR. CHEFFO:  I don't think he's on the list, your

17    Honor.

18         MR. GREENE:  David Franklin received national training

19    in Ann Arbor, Michigan, for the position of medical liaison,

20    with medical liaisons from around the country from all of the

21    CBUs.  That's where, and he will testify, that they gave some

22    training.  They were videotaping it.  Then they shut off the

23    videotape camera, and then the Parke-Davis and Warner-Lambert

24    lawyers and employees got up before the group of medical

25    liaisons and criticized Kessler of the FDA and said, "Now, this

1    is how you're going to promote off-label," and he was trained

2    to promote off-label.

3          Now, he was a medical liaison.  A lot of the medical

4    liaisons from around the country had been elevated from sales

5    positions.  He wasn't.  He had no sales training.  So they sent

6    him to national sales training in New Jersey with other sales

7    reps, and all the training was uniform on how they were going

8    to implement the strategies through these tactics.  He has

9    direct knowledge of how the strategies were implemented in this

10   CBU --

11         THE COURT:  All right, excuse me.  All right, so let

12   me just stop you.  He says it isn't just a question of knowing,

13   that they have national sales meetings.  Why isn't that

14   relevant?

15         MR. CHEFFO:  Well, your Honor, I mean, again, let's

16   talk about who David Franklin is.  And he was very candid.  I

17   mean, he said -- he went to a sales meeting for like two days

18   in 19 --

19         THE COURT:  Well, why can't he testify about that?

20         MR. CHEFFO:  Because he doesn't know what -- in fact,

21   the only information he has -- I mean, you're hearing

22   Mr. Greene tell you that it's national.  He basically said he

23   went to a national center where he got training.  There's no

24   information that anything that he was told or happened to him

25   happened to anybody else.  In fact, the only evidence is just

Page 44

1    the opposite because Adrian Ball, the head of the entire CBU,

2    says, "We do not condone that."  So he's basically trying to

3    say a guy who had two days of training somewhere in Ann Arbor,

4    Michigan, you should draw --

5              THE COURT:  And additional training in New Jersey that

6    was focused from the center.  So it wasn't just training for

7    the New England people, is that right?

8              MR. GREENE:  That's right, your Honor.

9              MR. CHEFFO:  Well, I mean, at that time we don't know

10   exactly who was there.

11             THE COURT:  He says it wasn't, so --

12             MR. GREENE:  He will testify who was there.  He will

13   testify that there were sales reps from around the country at

14   the New Jersey training.

15             THE COURT:  Why isn't that relevant?

16             MR. CHEFFO:  Because there's no connection here to

17   Kaiser.  There's not a single -- they've had years to come and

18   find out those people, who they were detailed.  There's no

19   doctor, there's not a single doctor from Kaiser who says, you

20   know, "I was detailed by any of these people."

21             THE COURT:  I am likely to exclude his testimony in

22   its entirety.  There may be certain parts that come out, but

23   I'm likely to exclude it, certainly about the national sales

24   meetings.

25             What's the next issue?

1      MR. CHEFFO:  Just so we're clear, your Honor, I mean,

2  so he can only testify about the national --

3      THE COURT:  I don't know what else he would say, but I

4  certainly think that to the extent you're trying to regionalize

5  this, that might be true if there was only regional training,

6  but it is national training.

7      MR. CHEFFO:  But how can he impugn -- I mean, again, I

8  don't mean to ask you questions, your Honor.  You're here to

9  ask me questions, but --

10     THE COURT:  I'm just saying, 403 is relevance.  So is

11 it relevant?  Of course it's relevant.  The only issue is the

12 prejudice that outweighs the probative value.  I'd have to hear

13 it.  There may be discrete things that he's going to say that

14 are unique to New England that shouldn't be imputed to

15 California.  That may be, but I --

16     MR. CHEFFO:  Your Honor, it's not tethered.  That's

17 the point.  He could say he went to a national place, but

18 there's not a shred of evidence that it actually got to

19 California.

20     THE COURT:  I've got evidence from Rosenthal that

21 there was an off-label marketing that was national, right?

22     MR. CHEFFO:  Well, but we're talking about Franklin

23 right now.  Basically we talked about Phillips, right, and we

24 said he could very narrowly only talk about Neurontin and what

25 he prescribed in that case.

1        THE COURT:  Well, that's all Franklin can talk about,

2   is it not?

3        MR. CHEFFO:  But not only about Neurontin, but why

4   isn't he limited to just what he heard and saw and there's no

5   connection to Kaiser?  He can't say that "I talked to a sales

6   rep and he went out."  All we know is, the guy in the CBU said,

7   "This is not the way my doctors practice."  They had an

8   opportunity to go and depose him, and instead of doing that,

9   we're going to get a guy who said, "I don't know anything about

10  Kaiser."  That's what David Franklin said.

11       THE COURT:  All right, I understand your position.

12  What's the next motion that you want to raise?  You've

13  criticized them at some point for some new stuff that came up.

14  No?  No, maybe that was the --

15       MR. CHEFFO:  I mean, I think the things on our -- if

16  we take the Daubert motions, we had the issue of Dr. Franklin.

17  We had the Conti-Furberg issue.

18       MS. ARMSTRONG:  Are you talking about late

19  designations, your Honor?

20       THE COURT:  Maybe I'm not remembering it.

21       MS. ARMSTRONG:  We had made a motion to exclude

22  Dr. Conti and Dr. Furberg.  They had been designated by the

23  class plaintiffs but not by the coordinated plaintiffs.

24       THE COURT:  I view this as one litigation, so I don't

25  think that that's right as long as -- did you have the chance

1   to depose them and the like?

2          MS. ARMSTRONG:  Yes, your Honor, we did, but I would

3   say there are a couple of things.  First of all, Conti was

4   designated specifically to address an issue that was specific

5   to the class action, which was, was there a way to determine if

6   every member of the class had some impact?  She wasn't

7   really -- maybe, I think it's actually he -- but he didn't

8   express causation opinions.  He admitted he wasn't expressing

9   causation opinions.

10          THE COURT:  So he's limited, or she, to whatever

11   opinions were expressed.

12          MS. ARMSTRONG:  But those opinions had to do with

13   something that's sort of unique -- not sort of -- that's

14   actually unique to class and this idea of proving classwide

15   impact.  That's why Dr. Conti was designated.  So to say we

16   weren't prejudiced when --

17          THE COURT:  Let me just say this:  I am not excluding

18   it simply because if it was -- just like your doctors, if they

19   were deposed as part of this litigation, they're allowed in for

20   whatever they discussed or wrote a report about, but not

21   something new.

22          Now, there's the whole other issue as to whether or

23   not it's, A, relevant, and, B, reliable under Daubert, and

24   that's what I feel unprepared to do today.  I didn't even get

25   that far other than the basic procedural issue, because you're

1   challenging in general, right, some of these opinions on

2   Daubert grounds, and Rosenthal is one, right?

3          MS. ARMSTRONG:  We made a Daubert motion as to

4   Rosenthal.  We made a Daubert motion as to Hartman.  We made

5   a --

6          THE COURT:  See, what's sauce for the goose is sauce

7   for the gander.  If I have to do an evidentiary hearing, you

8   lose.  It's going to be only if I can figure it out on the face

9   of it.

10         MS. ARMSTRONG:  And then we incorporated into our

11  motion on Conti some of our arguments with respect to

12  Dr. Rosenthal because we felt that they extended to her as

13  well.  I will say that there's been shuffling around in terms

14  of them redoing their motions and withdrawing motions and

15  withdrawing witnesses.  We would have made a different motion

16  as to Dr. Conti had we known how many motions we were going to

17  have and what we were and weren't going to have to respond to.

18  So I'm not asking for a do-over, but I just want to say, you

19  know --

20         THE COURT:  All right, so let me just say this:  I've

21  got a series of Daubert hearing motions that I am not prepared

22  to rule on today.  I haven't even read -- have you all given me

23  courtesy copies of everything?  I mean, one of the problems

24  is -- maybe you feel constrained by the protective order -- I

25  can't even -- here's my problem:  I get them online.  They're

1   redacted.  I have to go find the sealed envelope.  When I

2   actually compare them, there's no possible confidentiality of

3   some of this stuff.

4          MS. ARMSTRONG:  I agree, I agree.  We designated

5   things confidential because they've been designated

6   confidential by Kaiser.  I wrote Kaiser in advance of filing

7   our motions and said, "You know, you've designated Rosenthal

8   and Hartman as confidential in the report.  Why do I have to

9   redact it?"

10         THE COURT:  Under what possible theory?  It makes it

11  unbearable for me, unbearable.  I have to go into the files,

12  find the sealed envelope.  It's redacted online.  I go and I

13  look at the redaction and I laugh.  One of them was redacted,

14  literally, the deposition citation pages.

15         MS. ARMSTRONG:  Well, that, we're just trying to be

16  comprehensive.  It's hard to do this technically, but, for

17  example, they designate all of their doctors who testified in

18  this case, they designate as confidential, and they refuse to

19  undesignate it.

20         THE COURT:  I now abrogate the protective order on

21  confidentiality.  I abrogate it.  The only thing that should be

22  retained as confidential at this point is protected information

23  for a patient, and, B, the standard identifiers, like nobody's

24  Social Security number, and you don't want people's private

25  bank information and that sort of thing, you know, something

Page 50

1   you wouldn't want on the Internet.  But basically, other than

2   patient information, nothing should be redacted.

3            MR. CHEFFO:  I mean, trade secrets for both sides?

4            THE COURT:  Like, what's a trade secret?

5            MR. CHEFFO:  Well, I mean, I think your Honor's point

6   is well-taken.  You want things to be confidential.  I mean, I

7   think to the extent --

8            THE COURT:  Like what would be a trade secret?  I just

9   had an antitrust trial where they designated information from

10  the 1990s on what you charge for sharps containers as

11  confidential.  I mean, if it's pricing from the 19 -- basically

12  I'm abrogating the protective order.  If there's some

13  independent basis that you feel unbelievably strongly about,

14  move for it.  And the one I'm of course giving you is patient

15  privacy.

16           MS. NUSSBAUM:  Okay, right.  Anything particularly

17  under the statute, patient name, patient diagnosis, anything

18  like that?

19           THE COURT:  Yes, HIPPA stuff.

20           MS. NUSSBAUM:  Okay, very good.

21           THE COURT:  And in fact, to the extent that there are

22  medical records of anyone, it shouldn't even be -- even if

23  their name isn't on it, all of that should be sealed, medical

24  information and the like.  Okay, so what's your --

25           MR. SOBOL:  Just so you understand something, your

1  Honor -- and this is actually helpful that you've done this --

2  in this case, as in other cases, IMS, we're supposed to get

3  data from IMS, that service that provides data for all these

4  calculations that the economists do.  Whether we get the

5  information directly from IMS or we get the information

6  indirectly through Pfizer, the license restrictions that IMS

7  imposes on that data require the acquirer of the data to keep

8  it confidential.  And that's why you see sometimes -- I can't

9  speak to a lot of the other redactions, but if you're talking

10  about an economist report that's redacting certain numbers,

11  it's been our effort to try to make sure that IMS --

12          THE COURT:  Okay, but in this court, there's a

13  presumption of openness.  I've overruled it.  So if you want

14  any order on the record, that's fine.  Now, I'm not saying that

15  you can wholesale shovel IMS's protected information; you know,

16  like, here are five pages from IMS's report.  I'm not going to

17  do that to the company.  But to the extent that Meredith

18  Rosenthal, or whomever, is basing her report on some of those

19  numbers, it doesn't render her opinion confidential; and that's

20  essentially what's happened here.

21          So, in any event, you've got --

22          MR. CHEFFO:  We have two really -- I'm sorry.

23          MS. ARMSTRONG:  Can I just ask for a clarification

24  because I understand your Honor does not want things filed

25  redacted or under seal, that they're not clearly confidential

Page 52

1  just because they've been designated under the protective

2  order, but when your Honor says you're abrogating the

3  protective order, there's been thousands of pages of documents.

4  We don't want to have to go back and make specific motions as

5  to things --

6          THE COURT:  No, no.  Only with respect to court

7  filings.

8          MS. ARMSTRONG:  Okay, thank you, your Honor.

9          THE COURT:  And if you want to protect yourself and

10  file that in case someone gets angry at you, I'm happy to sign

11  it.

12          MS. ARMSTRONG:  All right.

13          MR. CHEFFO:  The other two things, and I think they're

14  separate, but there's the issue of the Bextra, the 2009

15  settlement, and then there's Warner-Lambert 2004 plea, and I

16  don't know if your Honor even wants to talk about the 1404

17  motion today or if that's something that you're -- we have a

18  pending motion to transfer under 1404.

19          THE COURT:  Yes, that's not going to happen, so --

20  truthfully, if this weren't an MDL, the opportunity would be

21  overwhelmingly tempting.

22          MR. CHEFFO:  Well, I think under Lexicon, this is

23  exactly the kind --

24          THE COURT:  No, but Lexicon is when it's started

25  somewhere else.  It's here.  I have the expertise.  If I'm

1   dying over these Daubert, some other judge, this case wouldn't

2   be tried for two years.  So I at least have some firm backing.

3   I don't know what other cases are going to be tried or not

4   tried.  I haven't even gotten to the other motions for summary

5   judgment yet, the individual class plaintiffs, and then there

6   are a few additional health plans, not to mention the product

7   liability cases.  No, it makes no sense in the interest of

8   justice to transfer.  But I may be very tempted to do that on

9   the individual plaintiffs.  You know what I'm talking about,

10  the --

11          MR. SOBOL:  Personal injury.

12          THE COURT:  No, not just the personal injury.  I'm

13  talking about your individual --

14          MR. SOBOL:  Oh, yeah.

15          THE COURT:  The Sally Smith that wasn't -- I'm making

16  them up -- the people who weren't --

17          MR. SOBOL:  The class reps.

18          THE COURT:  -- the class reps who weren't filed here.

19  There are a few that weren't filed here.  They were filed

20  somewhere else.  I think, since I've not certified a class, I'm

21  going to send those back.  I think I have to under Lexicon.  I

22  think that's a different situation, so I'm likely to do that.

23  Anyway, I don't want to take that time right now.

24          MR. CHEFFO:  Okay.  I mean, you certainly could get to

25  do Daubert and transfer, but you certainly understand that.

1          The other issues are the Warner-Lambert 2004 plea, and

2    then there's the 2009 settlement and Bextra plea that we've

3    moved, and I think they're separate issues.

4          THE COURT:  Yes, they're very separate because one is

5    Neurontin and one isn't.

6          MR. CHEFFO:  Absolutely.

7          THE COURT:  The Neurontin one, why wouldn't I?

8          MR. CHEFFO:  You want to talk about Neurontin first?

9          THE COURT:  I mean, there's the conviction about this

10   issue.

11         MR. CHEFFO:  Well, again, it is, I think, as your

12   Honor knows, but I think sometimes all of us have gotten -- you

13   know, we call it a "plea," and we've gotten a little loose on

14   what it is and what it isn't, okay?  It was a misdemeanor that

15   was upgraded to a felony, and it was a violation of the Food,

16   Drug and Cosmetic Act.  It was a technical strict liability

17   violation because, as you know, if you talked about something

18   and if it's truthful, you could still violate the FDCA and pay

19   a lot of money, but it's not necessarily a fraud.  Otherwise we

20   wouldn't be here probably for years because you could just

21   grant summary judgment.

22         So here, you know, what you have basically is a

23   technical strict liability violation, and, again, it relates to

24   conduct that occurred in -- I think there was a few instances,

25   it talked in the Southeast, Northeast Business Unit, that it

1    does not, again, relate to any conduct with respect to Kaiser.

2            THE COURT:  That's overruled, but I am -- Bextra, what

3    is it in?

4            MR. CHEFFO:  There's a 2009 settlement, a civil

5    settlement which relates to a bunch of drugs other than

6    Neurontin.

7            THE COURT:  A completely different set of drugs,

8    right?

9            MR. CHEFFO:  Totally different.

10           THE COURT:  So, now, let me just say this:  What are

11   the causes of action here?  There is --

12           MS. NUSSBAUM:  RICO, your Honor, and the 17-200 claim.

13           THE COURT:  So the thought I had was, the subsequent

14   conviction may be very relevant to what -- are there multiple

15   damages at some point?

16           MS. NUSSBAUM:  There are, your Honor, plus it's not --

17   I would not quite say what Mr. Cheffo did, that it's all

18   totally different drugs.  The off-label promotion settlement

19   also has to do with Lyrica, which is pregabalin, which is the

20   follow-up drug to Neurontin.  So I would say, with respect to

21   that as opposed to Bextra, it's not a totally separate drug.

22           THE COURT:  Is there a punitive component to this

23   under RICO?  I forget.

24           MS. NUSSBAUM:  In terms of punitive damages, your

25   Honor, yes.  We intend when we put in the request to charge to

1  you to discuss punitive damages.

2          THE COURT:  Do I do that, or does the jury do that?

3          MR. CHEFFO:  It's a statutory issue.  It's not a

4  punitive damages issue.

5          MS. NUSSBAUM:  There are also claims for unjust

6  enrichment and other equitable claims here.  Under RICO,

7  there's no punitive damages.  It's treble.

8          THE COURT:  I was myself taken with that because I --

9  but wouldn't that go to whether or not the damages should be

10 doubled or trebled?  Is it an automatic trebling?

11         MR. SOBOL:  It's automatic.

12         MS. NUSSBAUM:  It's an automatic trebling, but --

13         THE COURT:  Then why is it relevant?

14         MR. CHEFFO:  And under the UCL, your Honor, there's no

15 punitive damages, so it's --

16         THE COURT:  Under the?

17         MR. CHEFFO:  The UCL, the 17-200 claim.

18         THE COURT:  California.

19         MR. CHEFFO:  So, I mean, you know, it's so far afield

20 and there's --

21         THE COURT:  There are no punitives under the UCL?

22         MR. CHEFFO:  That's correct.

23         THE COURT:  So why would it be relevant to anything

24 the jury heard?

25         MS. NUSSBAUM:  Well, I think it's relevant in a few

1   ways, your Honor.  With respect to the off-label settlement,

2   that concerns Lyrica, and there will be documents and testimony

3   in this case about Lyrica.  And Lyrica is pregabalin.  It's the

4   follow-up drug to Neurontin.

5        I think we also have a situation here where there's a

6   pattern and practice of asserting conduct.  There's impeachment

7   evidence here.  We should be able to use this for impeachment

8   evidence.  They have entered into agreements with the

9   government.  And, actually, for a little comic relief, we can

10  show you a photograph from the Wall Street Journal and one of

11  those agreements, your Honor.  But in fact, as part of the

12  settlement from the off-label case, they now are going to have

13  to require their detailers to take these tablets, these little

14  computers -- this is just last month's Wall Street Journal --

15  to all of their visits to doctors, and the second page of the

16  article explains why:  It's so that they stop promoting

17  off-label.  This is going to give the government, and they've

18  agreed -- it's like the baby-sitter.  This way the government,

19  there will be an actual record of every doctor, what the

20  specialty is, what they did, and the doctor needs to sign it.

21  And they agreed to do this.

22       THE COURT:  Excuse me.  You weren't planning on

23  introducing this into a trial, are you?

24       MS. NUSSBAUM:  Your Honor, I just thought for you to

25  know today when we were talking about -- I have a copy for you.

1          THE COURT:  Just let me say this:  I am going to allow

2     in the conviction with respect to Neurontin.  I'm unlikely to

3     allow in the conviction with respect to another drug from a

4     different time period.  So if something comes up, it may be

5     relevant in ways that I'm not anticipating.  Like, if someone

6     says, "And we stopped after Mr. Greene brought his case," maybe

7     you could impeach it and say, "No, you haven't, have you?"

8     But --

9          MS. NUSSBAUM:  Well, it's that time period actually,

10    your Honor.  In the off-label, it is --

11         THE COURT:  Excuse me.  You know what?  Under 403, I'm

12    likely to exclude another drug.  So I am going to allow in this

13    drug.  If something comes up -- this is always true for you --

14    and there's some new issue that comes up on both sides, it may

15    become relevant.  So you've had your several.

16         What's your turn?

17         MR. GREENE:  Judge, we were talking about retained

18    experts, and then we went to non-retained experts, but I wanted

19    to remind you that on September 27 of 2006, with regard to all

20    experts, you entered a one-sentence order:  "If either party

21    intends to call a treating physician to give an opinion on

22    effectiveness, sanitized patient records shall be produced to

23    the extent the physician is relying."

24         THE COURT:  Yes, I'm only allowing two in.  You've had

25    the depositions.  We know who the plaintiffs are.  You have

1   their records.  That's it.

2          MR. GREENE:  Well, we have the record of the consumer

3   rep.

4          THE COURT:  Yes, yes.

5          MR. GREENE:  I'm talking about efficacy experts that

6   are relying on --

7          THE COURT:  What efficacy?

8          MR. GREENE:  Their efficacy experts --

9          THE COURT:  I haven't --

10         MR. GREENE:  -- that are relying on clinical

11  experience, we have no sanitized records of that clinical

12  experience, none.

13         THE COURT:  If someone just says in a general way --

14  so I guess that's the question -- "I relied on my clinical

15  experience," as opposed to specific, I guess that's the issue.

16         MR. GREENE:  Well, that is the issue.  And I agree,

17  when you think of this, you say, "Wait a minute.  Doctors take

18  the stand all the time and give opinions based on their

19  clinical experience."  But what you have to ask yourself, what

20  is the issue in those cases?  A lot of times it's standard of

21  care.  It's not whether a drug is effective or ineffective.  An

22  opinion based on clinical experience that a drug is ineffective

23  or effective is not admissible.  That opinion should be

24  Daubert'd out.

25         THE COURT:  That may be, that may be.  See, that's

1   what I was trying to say to you before, which is, it may be

2   that I exclude certain aspects.  In other words, if you don't

3   produce documents as to why they're relying on their clinical

4   experience as to why it's effective -- you know, documents that

5   say, "I gave it to Patient X, and it worked out just

6   terrifically with him" -- I don't know that I'm going to allow

7   that as a basis for his opinion.

8           On the other hand, part of the issue here is, you're

9   claiming that the fraud is what induced these doctors to

10  prescribe.  They're claiming, essentially, even if the thing

11  isn't efficacious under the FDA standards, these doctors are

12  prescribing word of mouth.  It's not based on a fraud.  It's

13  based on, "Well, it worked on this other guy, so I'm going to

14  try it on this other guy," I mean, I'm assuming to the extent

15  that's what the doctor is saying.  That's different than it's

16  efficacious from a scientific point of view.  I'm not going to

17  allow it based on clinical unless they produce the evidence of

18  it.

19          MR. GREENE:  And they haven't, Judge.  They haven't.

20          THE COURT:  If what he's simply saying is, "The reason

21  I prescribe it is because it worked on somebody else, so I'm

22  doing it," that's different than, "I have a scientific opinion

23  that it's efficacious."  I agree, there are two different

24  things, and you may be allowed to say one and not the other.

25  But this is where I feel very unprepared to rule definitively

1   because I couldn't get through everything.  I didn't even read

2   their reports.  I can't rule on it if I haven't read their

3   report.

4           MR. CHEFFO:  And I agree, and I think what's fair is

5   fair.

6           Mr. Alba, could you just toggle back for a second.

7           I think you'll find this interesting, your Honor, if

8   we could just take a second.  This is today, this is live, the

9   Kaiser Permanente website.

10          Now, let's go to Health and Wellness.  This will take

11  just a minute, but I think you'll find this very instructive,

12  your Honor.  Go to Conditions and Diseases.  Each -- and I

13  won't take the Court's time, but if you go to this, and I

14  encourage you really to go to this -- it's kp.org -- you'll

15  find all kinds of things that say this is how you should -- we

16  help you make important decisions for medical care for how to

17  treat your family.  There's all kinds of stuff about conditions

18  using it.

19          Then go to Health Encyclopedia.  Okay, now we could

20  type in the word "Neurontin" here.  Again, I'm not reading all

21  of this to you, your Honor, but basically if you go in there,

22  it says these are important things.  On the Kaiser Permanente

23  website, if you type that in, what you find is -- let's go to

24  No. 5.  This is all the things for Neurontin.  This is today

25  what they're telling their patients, their eight million

1    patients.  And you know what it says, your Honor?  They're

2    coming in, "This doesn't work.  It's snake oil."  And --

3           Can you go up a little bit, please.

4           This is for -- and I won't go through twenty of them,

5    but there literally are twenty.  What's the top one, Katherine?

6    Anticonvulsants for chronic low-back pain.  It lists, as you

7    can see, Neurontin.  How it works:  Anticonvulsants are used to

8    help control or prevent abnormal increases.  It talks about how

9    anticonvulsants can reduce some persistent low back with lower

10   side effects than tricyclic antidepressants.  And it goes on

11   and on.  Now, let's go to No. 3 for a second.

12          THE COURT:  Go to bipolar.

13          MR. CHEFFO:  There's one on here for -- there's not

14   specific bipolar, your Honor, but there is under hot flashes,

15   Kaiser says this should be used for hot flashes.

16          THE COURT:  That's one issue where --

17          MR. CHEFFO:  But now look what it says here.  Look

18   under why it's used:  "Gabapentin may be used to treat hot

19   flashes."  Never heard any documents from Pfizer saying it

20   should be used for hot flashes.  "In addition to seizure

21   control, gabapentin is also commonly used to treat chronic

22   pain, migraine headache, panic disorder, and social phobia."

23          So today eight years after the lawsuit -- and I have

24   like twenty of these -- you can go and you can see that they

25   are telling their patients that this stuff works for things

1    well beyond the case, your Honor.

2         THE COURT:  -- at trial, but it gets to trial.

3         MR. CHEFFO:  Well, but here's the issue.  I just

4    wanted you to see this, and I can give you an easy chart so you

5    can click five or six different times.  When they tell you that

6    a doctor can't talk about personal experience, it has to be

7    double-blind placebo control, think about how that is when

8    they're telling their own patients to talk to their doctors.

9         THE COURT:  There are two different issues here.  One

10   is, I think a doctor can say, "I've used it and it's been

11   effective, and that's why I prescribe it."  That's different to

12   say it reaches the scientific levels of efficacy based on the

13   fact that for two clients it worked.

14        MR. CHEFFO:  And no one's going to talk about that.  I

15   mean, no one's going to say that.

16        THE COURT:  Well, that's why I have to read the

17   reports.  I mean, the thing is, to the extent -- I haven't read

18   your expert reports.  This all came in within the last three

19   days.  It's an overwhelming mass of information to read.

20   That's why I'm not prepared to rule today.  If you all raise

21   these huge issues two weeks before trial, I cannot do an

22   evidentiary hearing on a dozen Daubert motions for either side.

23   I just can't do it.  So you've all sort of taken that risk.

24   You know how to get to me.  They could have been filed

25   beforehand, and they haven't, so --

1          MR. CHEFFO:  Could I just -- I was actually going to

2     show you one more, unless you're tired with this, your Honor,

3     but pain originating from a nerve -- can you go back one

4     because this is about neuropathic pain.  This is under P.  Go

5     down, please, Katherine.  "Pain originating from a nerve," you

6     type on.  You know the only drugs that it says that Kaiser

7     tells its patients?  How much have you heard in this litigation

8     over the last seven years about snake oil, that this medicine

9     doesn't work?  You type on "pain originating from a nerve," and

10    it either says "gabapentin" or "Neurontin" today.  That's what

11    they're telling their eight million patients.

12         MS. NUSSBAUM:  A short response, your Honor, and

13    clearly I'm -- you know, Mr. Cheffo has ignored that this is

14    not Kaiser.  This is Healthwise.  That's what it said on top.

15    That's been ignored here, and that there are about half a dozen

16    different disclaimers.  This is not Kaiser material.  This is

17    material from an organization called Healthwise that provides

18    material to the Mayo Clinic, to Kaiser, to states.

19         What Kaiser does in their public website is, they

20    gather, just as WebMD, another customer of Healthwise, they

21    gather materials from the government, from private vendors, all

22    over.  Their disclaimers say very clearly:  "This is not health

23    advice.  Talk to your doctor."

24         This is in one place where it's out there.  This is

25    proof of their fraud.  That's what this is.

695b3236-e7a6-46ba-94de-27fa3a5b711e

1          THE COURT:  Excuse me, excuse me.  It's on your

2     website, so at some level they can introduce it.  So that will

3     be all for the jury.

4          MS. NUSSBAUM:  That's fine.

5          THE COURT:  That will be fun.  That's a different

6     issue than the Daubert issues which are not fun.  So I'm going

7     to have to sit and actually read the reports and read the

8     motion, and to the extent I can figure it out before trial, I

9     will write certain limitations.  I doubt any of you will get

10    knock-dead punches; i.e., an entire expert will be excluded,

11    except with -- let me ask you this:  An ethics expert?

12         MR. GREENE:  Yes.

13         THE COURT:  That's different.  That I can't --

14         MR. GREENE:  It's not an ethics expert.  Dr. Kay

15    Dickersin is the director of the clinical trial program at

16    Johns Hopkins University.  She's the director of the Cochrane

17    Collaborative here in the United States.  She's a

18    world-renowned expert in publication bias.  Publication bias

19    means -- it's the issue before the Court.  It's the

20    misrepresentation --

21         THE COURT:  What would she say?  What's her opinion?

22    She can't say they're fraudulent.

23         MR. GREENE:  No.  She's examined the 21 clinical

24    trials that Pfizer conducted for the indications in this case.

25    She's the only expert that's examined all the clinical trials.

1          THE COURT:  And what would she say?

2          MR. GREENE:  She's gone through all of them, and she's

3     pointed out -- she's looked at the protocols and the research

4     reports and compared them with the published article, and she

5     will say that the trials have been designed in such a way to

6     have a favorable outcome.  She'll say that they've

7     misrepresented the results of the trial, according to what's

8     been published in the research report, which the public has

9     never seen.  She'll say that they've conducted the analysis,

10    misrepresented the analysis that's been published, that they've

11    controlled the publication.  She cites seven or eight different

12    types of publication bias that appear in the 21 different

13    trials.  Part of her report --

14         THE COURT:  But she's not going to say what their

15    intent was or their motive was.  I mean, some of the quotes

16    make it sound as if she was going to say that.

17         MR. GREENE:  Well, that's the way they make it sound,

18    but --

19         THE COURT:  I mean, you can't ask, was this fraud?

20    You can't say, was this intentional misrepresentation?

21         MR. GREENE:  What she says -- if you just give me a

22    minute here, Judge, what she's reviewed, as I said, are all of

23    the trials, all of the protocols, all of the research reports,

24    thousands and thousands of pages.  She's also looked at

25    internal memoranda, the marketing assessments, and e-mails.

1          And let's talk about e-mails for a second.  The

2      e-mails have language in them about statistical significance,

3      p-values, spinning results, primary end points, secondary end

4      points, elevating the -- a lot of this, the majority of this

5      won't be understood by a jury.  I've been working on this case

6      almost fourteen years.  Come this August, you will have had

7      this case fourteen years, and it's really just in this past

8      year --

9          THE COURT:  Do we get steak and champagne?

10          (Laughter.)

11          MR. GREENE:  If we could ever get them to mediation,

12      maybe we would.

13          MR. SOBOL:  But that's year twenty.

14          MR. GREENE:  Suffice it to say --

15          THE COURT:  I'm almost done with you, though, AWP.

16      Moving on to --

17          MR. GREENE:  He's been causing more work than I did,

18      Judge.

19          THE COURT:  I'm now on to the next iteration, the

20      state of Massachusetts, Department of Justice.  I'm almost done

21      with Sobol.  He can't stand being away from here, which is he's

22      jumped into this thing, so --

23          MR. GREENE:  I'm ready to go back to plane crashes.

24          Her testimony is critical, Judge, it's critical, and

25      I'd ask you -- we filed an opposition to their Daubert

1    challenge.

2         THE COURT:  I will read it, but it just may be that

3    there are certain portions -- in other words, she can certainly

4    explain the e-mails.  She can certainly walk through -- this is

5    why I'm saying it's unlikely anyone's going to get a knock-dead

6    punch -- she can walk through the double-blind studies, explain

7    why what was published doesn't fairly represent the data,

8    et cetera, but what she can't say is, "This is fraud."

9         MR. GREENE:  No.  I mean, she talks about the, you

10   know, the scientific principle that study results have got to

11   be communicated to the medical community because they base

12   their prescription decisions on scientific results; and when

13   you skew those scientific results, when you suppress them, when

14   you misrepresent them, patients can be harmed, resources are

15   wasted.

16        THE COURT:  Sure, sure.  I'm just simply saying, I

17   have not read the reports yet, I keep reiterating.  I've just

18   read the briefs.  But there were certain things with quote

19   marks around them that looked as if they were over the edge.

20        MR. GREENE:  And part of it, just because they've

21   misrepresented her publication that appeared in the New England

22   Journal of Medicine in November, which is based on part of the

23   work she did in this case, what that publication is about, and

24   we've cited it for you, it's her review of the internal

25   protocols and research reports, and what the primary outcome

1    was, and then comparing it to what Pfizer published when they

2    wrote up the article.  And this is selective publication.

3             THE COURT:  Sure.

4             MR. GREENE:  And she reaches her opinion --

5             THE COURT:  You can do a chart and compare.  I'm

6    simply saying, what you can't do is get to the ultimate

7    question here because I don't find that that would be helping

8    the fact-finder.

9             MR. GREENE:  She doesn't.

10            THE COURT:  But didn't you all quote certain things

11   that she said about fraud and intentional misrepresentation?

12            MR. GREENE:  Four words, Judge:  shocking, insidious,

13   scientific misconduct, and what was --

14            THE COURT:  I think one of them was fraud.

15            MR. GREENE:  What was the fourth?  Unethical conduct,

16   four expressions.

17            THE COURT:  Yes, we're not going to do those.  But, in

18   any event, there's a lot she can do.

19            And I assume that that's a lot of what I'm going to do

20   with yours as well.  I don't think somebody can say, "Based on

21   my clinical experience, this is an efficacious drug," as one

22   says that scientifically, because that's not scientific.

23   That's the whole point of what I spent six months on.  That

24   having been said, you can't put blinders on, and they can take

25   into account their clinical experience.  But to the extent they

1    refer to any specific patient, the records have to be included.

2         MR. CHEFFO:  Just so I'm clear, I think I understood

3    you because we don't want to step on -- I mean, clearly, if

4    they're going to say, you know, "I can give you a specific

5    example of --" that's not what -- but to the extent that

6    doctors can talk about their clinical experience and they've

7    seen experience, you know, it may or may not be efficacious,

8    but that's what doctors do every day.  I mean, we can talk, and

9    your Honor is certainly aware, I mean, off-label medicines --

10        THE COURT:  "And, why, I had a guy just a few weeks

11   ago who had such bad back pain, I gave him Neurontin, and he

12   was skiing in Tahoe the next week."  That you can't do unless

13   you give me the files.  That's what you can't do.  So to the

14   extent he says, "Generally speaking, I tried this as a last

15   resort, and it's worked in some circumstances, so I try it in

16   someone else," that's different, but not, you know, the poster

17   child for the drug, just like Patient Y.  I mean, that's what

18   we can't do without the files.

19        So I think that that's a good balance there.  And it's

20   3:30.  I'm not sure how much more we can accomplish without my

21   actually reading the reports and the full -- I think, have I

22   missed any of what I would call the easy ones?

23        MR. SOBOL:  I think there's a couple of the discrete

24   issues.  So in the Arrowsmith-Lowe declaration of the

25   defendants, we brought two motions, a motion that addresses two

695b3236-e7a6-46ba-94de-27fa3a5b711e

1    very specific features of that.  First, there's one portion of

2    that declaration that purports to rely upon approvals of

3    Neurontin for various indications outside the United States as

4    a basis upon which to prove the efficacy of the drug.

5              THE COURT:  Yes, I did see that.

6              MR. SOBOL:  In response to that, the defendant, if I

7    understand their papers, does not say that they intend to use

8    that portion of the report to prove the efficacy of Neurontin

9    for the approved indications outside the United States, but

10   instead they should be allowed to use the non-U.S. approvals as

11   a reason why doctors in the United States happen to be

12   prescribing Neurontin for those indications.  Our response to

13   that is:  There's no evidence of that.  In other words, that's

14   an empirical question.  As Dr. Rosenthal said in her deposition

15   when cross-examined, "Did you account for outside the United

16   States Neurontin approvals?" to which she said, "You would need

17   empirical evidence to show that people actually do rely upon

18   that before you would account for that."

19             In this situation, our argument on this particular

20   piece -- there's another piece to the Arrowsmith-Lowe -- is, if

21   they're not using it for the purpose of proving that it's

22   efficacious --

23             THE COURT:  No, they can't use it for purposes of

24   efficacious, but why can't they use it for the causation thing,

25   maybe they heard about it from somewhere else?

1          MR. SOBOL:  Two reasons.  First, there is no evidence

2     that doctors in fact rely upon the approvals in Spain or Russia

3     or France, or even the UK, as a basis to prescribe drugs here.

4     You need evidence about that.  Until there would be evidence in

5     the court that doctors generally, or any doctors specifically,

6     relies upon approvals in Russia or Spain or Italy or Australia

7     or Germany or the Netherlands or the U.K., the jury ought not

8     be hearing that a foreign government approved it for that

9     indication.

10          THE COURT:  Do you have any evidence linking it up?

11          MS. ARMSTRONG:  Your Honor, I think that Dr. Rosenthal

12     conceded -- I think he's distorting what the cross-examination

13     of Dr. Rosenthal was.  She conceded that it would be a factor,

14     and it's undisputed that she did not account for it in her

15     modeling, and the lack of data is the reason why she didn't

16     account for it.  But one of our criticisms, one of our bases

17     for challenging Dr. Rosenthal --

18          THE COURT:  Going to the weight of what she --

19          MS. ARMSTRONG:  And that's fine if that's going to be

20     your ruling on Dr. Rosenthal, but there's a way in which she

21     can account for all of these sort of background factors through

22     a time trend that she didn't do.  She did it in Pennsylvania.

23     It didn't match up with what she wanted as a result, so she

24     scrapped that and --

25          THE COURT:  In where, in Transylvania?

1          MS. ARMSTRONG:  In Pennsylvania, in a class action in

2     Pennsylvania.  She tried a model with this time trend, which is

3     the econometrics method of dealing with all these sort of

4     background factors that you don't have concrete data on, and

5     she didn't do it; but she concedes that it would have been

6     something that could have possibly influenced doctors.

7          THE COURT:  All right, I am likely to allow in, A, the

8     fact that there were approvals, but I am likely to give a

9     limiting instruction that they don't have the same system, so

10    you cannot view that as evidence of efficaciousness.  I am not

11    going to allow in why the FDA didn't act on it.  The nonaction

12    is irrelevant under 403.

13          What's the next issue?

14          MR. SOBOL:  Well, that was the second part of --

15          THE COURT:  Yes, I did read that.  Anything else?

16          MR. SOBOL:  Then there was another motion, but I think

17    that -- there's a motion regarding the disclosures of Field.

18    The defendants have an expert, Field.  She basically testifies

19    regarding a series of -- to rebut what doctors did in terms of

20    the acquisition of the data, the churning of the data, and the

21    publication of the data.  In that declaration, in the Field

22    declaration, Dr. Field relies upon a series of declarations

23    that she has been provided where she basically becomes a funnel

24    for hearsay.  And in her --

25          THE COURT:  Let me just say this:  I did read that.

Page 74

1    Let me ask you, you weren't planning on having her actually

2    quote these other people, were you?

3              MS. ARMSTRONG:  No.  We're not planning on having her

4    read the declarations.  We do plan to have her describe what

5    type of investigation she did, which was finding out the

6    background of these things.

7              THE COURT:  Experts do this every day of the week.

8    She just can't read in the statements.  She can say, "I went

9    back and I read the declarations of people that did the study,

10   and in my view, X, Y, Z."  Now, I don't know if it stands up,

11   but you're allowed to rely on an expert.  But she's not allowed

12   to quote them because you're not allowed to shovel in hearsay

13   that way.

14             MR. SOBOL:  Okay.  Well, I mean, our concern was that

15   there was going to be all sorts of hearsay shoveled in through

16   these long quotes.

17             THE COURT:  Well, she's not going to read them in.  I

18   would prevent it.  But she can say, just like your experts do,

19   "In doing this, I went back and I read the people who generated

20   the reports to confirm that this was done, and this is what

21   professionals in my field would do," but she can't read them

22   in.  Okay?  That's how we're going to do it.

23             Now, let's go off the record for a minute.

24             (Discussion off the record.)

25             (Adjourned, 3:45 p.m.)

1                      C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 74 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 04-10981-PBS,

11  In Re:  Neurontin Marketing, Sales Practices, and Product

12  Liability Litigation, and thereafter by me reduced to

13  typewriting and is a true and accurate record of the

14  proceedings.

15       In witness whereof I have hereunto set my hand this 19th

16  day of February, 2010.

17

18

19

20

21            /s/ Lee A. Marzilli
             _____
22            LEE A. MARZILLI, CRR
             OFFICIAL FEDERAL COURT REPORTER
23

24

25