# EXHIBIT D

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**

## Jacobs, Douglas MD (Defense Expert)

**1/23/2008**

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
MDL Docket No. 1629
Master File No. 04-10981

* * * * * * * * * * * * * * *
IN RE: NEURONTIN MARKETING SALES *
PRACTICES AND PRODUCTS LIABILITY *
LITIGATION *
*
* * * * * * * * * * * * * * *

VOLUME I
PAGES 1-189

VIDEOTAPED DEPOSITION OF
DOUGLAS G. JACOBS, M.D.

DATE: WEDNESDAY, JANUARY 23, 2008
TIME: 9:16 A.M. TO 3:14 P.M.

2

STATE OF NEW YORK
COUNTY OF NEW YOUR
Index No. 765000

* * * * * * * * * * * * * * *
IN RE: NEURONTIN PRODUCT *
LIABILITY LITIGATION *
* * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF DOUGLAS G. JACOBS, M.D., a witness called on behalf of the Products Liability Plaintiffs, pursuant to the Federal and New York Rules of Civil Procedure, before Jessica L. Williamson, Registered Merit Reporter, Certified Realtime Reporter, Certified CART Provider and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Professional Psychiatric Associates, One Washington Street, Wellesley Hills, Massachusetts, on Wednesday, January 23, 2008, commencing at 9:16 a.m.

3

A P P E A R A N C E S

FINKELSTEIN & PARTNERS
(By Andrew G. Finkelstein, Esq.
and Kenneth B. Fromson, Esq.)
436 Robinson Avenue
Newburgh, New York 12550
(800) 634-1212, ext. 9451
afinkelstein@lawampm.com
kfromson@lawampm.com
-and-
THE LANIER LAW FIRM
(By Kenneth S. Soh, Esq.)
6810 FM 1960 West
Houston, Texas 77069
(713) 659-5200
kss@lanierlawfirm.com
Counsel for the Products Liability Plaintiffs

4

A P P E A R A N C E S, Continued

SHOOK, HARDY & BACON, L.L.P.
(By Lori Connors McGroder, Esq.
and Trey Alford, Esq. -
Present via Telephone)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
(816) 474-6550
lmcgroder@shb.com
talford@shb.com
Counsel for the Pfizer Defendants

LAW OFFICES OF STEVEN D. HILLYARD
(By Elena Gold, Esq.)
345 California Street
Suite 1770
San Francisco, California 54104
(415) 334-6880
egold@hdmlaw.com
Counsel for Raymond Jennings, M.D.

ALSO PRESENT:
Sean Budd, Videographer

PROCEEDINGS

THE VIDEOGRAPHER: Okay. We are on the record. This is the video operator speaking, Shawn Budd of Veritext Court Reporting. Today's date is January 23rd, 2008, and the time is 9:16. We're at the offices of Professional Psychiatric Associates located in Wellesley, Massachusetts to take the videotaped deposition of Dr. Douglas Jacobs in the matter of Neurontin Marketing Sales Practices and Products Liability Litigation.

Would counsel please introduce themselves.

MR. FINKELSTEIN: Andrew Finkelstein, Finkelstein & Partners, on behalf of the product liability plaintiffs.

MR. FROMSON: Kenneth Fromson, Finkelstein & Partners, on behalf of the products liability plaintiffs. Along with me is Ken Soh from The Lanier Law Firm.

MS. McGRODER: Laurie McGroder of Shook, Hardy & Bacon on behalf of Pfizer defendants.

MR. FINKELSTEIN: And on the phone?

MR. ALFORD: Trey Alford with Shook, Hardy & Bacon on behalf of the Pfizer defendants.

MS. GOLD: Elena Gold for Raymond Jennings, M.D.

THE VIDEOGRAPHER: And will the court reporter please swear in the witness.

DOUGLAS G. JACOBS, M.D., a witness called by counsel for the Product Liability Plaintiffs, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FINKELSTEIN:

Q. Doctor, do you agree that if a drug causes a physical disorder and the physical disorder leads to depression and the depression results in suicide, that there is a causal link between the drug and the suicide?

MS. McGRODER: Object to form. Go ahead.

A. The -- there are many questions I would need

to ask to answer that question yes or no. For example, what type of physical disorder?

Q. A physical disorder that renders somebody who's employable unemployable, a rheumatological disorder?

MS. McGRODER: Objection, improper and incomplete hypothetical.

A. And, of course, it would depend upon the nature of that rheumatologic disorder, the severity of it, how it impacted the person, but the -- are we -- so those would be other questions I would need to know.

Q. I would ask you to assume that the rheumatological disorder renders the person unable to work, causes depression and the depression leads to suicide. Would you agree that the drug is related to the suicide?

MS. McGRODER: Objection, improper hypothetical.

A. What I would agree with is that the drug, if it's demonstrated that it caused the rheumatologic disorder and that that caused the depression, that there is a link in that way, but not due to the pharmacologic

properties of the drug.

Q. Just so I'm clear, if you are confident that the drug, in fact, causes the rheumatological disorder and as a result of the rheumatological disorder there is depression which leads to suicide, you agree that the drug is associated with the suicide?

MS. McGRODER: Object to form.

A. Again, with the understanding that the connection with the suicide is the -- whatever physical properties of the drug caused the rheumatologic disorder and that there's no link between the drug itself and the depression, it goes through the rheumatologic disorder.

Q. You don't think any drug causes a psychiatric depression, do you?

MS. McGRODER: Object to form.

A. In terms of the diagnosis of depression, that's correct.

Q. Do you think any drug causes any psychiatric adverse event?

A. In terms of cause, I have not seen evidence that it causes an adverse event. I've seen

that it -- there's been reports of adverse events on drugs.
Q. Have you, yourself, ever seen, any of your patients report to you, an adverse -- psychiatric adverse event related to any pharmacological agent they are on?
A. I've had patients report events. I have not -- in my clinical practice I do not try to determine if it's, quote, related to the drug. I'll respond as a clinician, and I may or may not adjust the medication. I may change the medication depending upon the clinical needs of the patient.
Q. Can you describe one drug in your clinical practice that you prescribe for any psychiatric illness?
A. Celexa.
Q. Related to Celexa -- and I'm just asking a hypothetical with respect to Celexa -- if a patient of yours undergoes a course of medical treatment where you prescribe Celexa and they report back to you that they are feeling agitated while taking Celexa, do you do anything as a clinician?
A. It would depend when they report that, what

was the nature of their symptoms when they first came in, what is the level of agitation, are there any other -- what is the other relevant symptomatology? And so the course of action would be that I might do nothing for several days, I might decrease the Celexa to see if that's at all -- or that I might decide that it's -- after three or four weeks and there's been no response to the Celexa, I might say that I think we should be changing medication, and then I would taper the Celexa and start a different medication.
Q. Is there a difference as a physician between demonstrating a drug has the capacity to cause an adverse event generally versus whether the drug can cause an adverse event in an individual case?
A. Well, I'm not sure I understand your question when you say "as a physician," because most physicians are not, you know, researchers, they're not involved in, you know, demonstrating adverse events, if we're talking about physicians. As clinicians we're involved with prescribing medication

to patients for certain disorders and/or symptom complexes and treating that patient, looking at the symptoms, whether or not there are any -- how they're responding to the medication. So we're not focused on determining whether their symptoms that occur subsequent to the administration of medication are, quote, due to the medication.
Q. How about your role in this litigation; do you understand the difference between whether or not Neurontin has the capacity to lead to negative mood and behavioral changes versus evaluating whether it does it in an individual case?
A. Certainly I've -- in my role in this case I've certainly been focused on whether or not Neurontin has led to the suicides or suicide attempts that have been reported in the case, looking at both the general issues. I have looked also at 10 specific cases and determined whether or not there was a relationship between Neurontin and what happened, and it is my opinion that there is no relationship on a general basis

or in any of the specific cases, and that Neurontin, in my opinion, does not have the capacity to cause suicide, suicide attempts, suicide ideation.
Q. Do you think any drug has the capacity to cause suicide, suicide attempts or suicidal ideation?
A. I have not -- I have reviewed a number of medications, spending over this now close to 35 years in the field of suicide, and I have not seen any evidence that any medication causes suicide, suicide attempts or suicide ideation.
Q. Who contacted you first, which lawyer?
A. Scott Sayler.
Q. And when did that happen?
A. I believe it would have been in the -- could have been either in the summer or fall of 2005.
Q. And when he contacted you first, was it a phone call, e-mail or in person or something different?
A. Would be phone call.
Q. And when he contacted you first in 2005, did you have the opinion that in your 35-year

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**

## Jacobs, Douglas (Defense Expert-Bulger Smith)

**12/2/2008**

**Printed : 1/5/2009**

VOLUME: I
PAGES: 1-277
EXHIBITS: 1-10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN ) MDL DOCKET
MARKETING, SALES PRACTICES ) NO. 1629
AND PRODUCTS LIABILITY ) MASTER FILE
LITIGATION ) NO. 04-10981
______________________ )
)
THIS DOCUMENT RELATES TO: ) JUDGE PATTI
) B. SARIS
BULGER VS. PFIZER, ET AL. ) MAGISTRATE
07-11426-PBS ) JUDGE LEO T.
) SOROKIN
SMITH VS. PFIZER, ET AL. )
05-CV-11515-PBS )

VIDEOTAPED DEPOSITION OF DOUGLAS JACOBS, M.D., a witness called on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Jill Shepherd, Registered Professional Reporter, CSR, CLR and Notary Public, in and for the Commonwealth of Massachusetts, at the offices of Douglas Jacobs, M.D., One Washington Street, Suite 304, Wellesley Hills, Massachusetts, on Tuesday, December 2, 2008, commencing at 9:12 a.m.

Job No. 181811

APPEARANCES:

FINKELSTEIN & PARTNERS
By: Ronald Rosenkranz, Esquire
-- and --
Kenneth B. Fromson, Esquire
1279 Route 300
P.O. Box 1111
Newburgh, New York 12551
Tel: 800.634.1212, ext. 9442
E-mail: rrosenkranz@lawampm.com
Attorney for the Plaintiff.

SHOOK, HARDY & BACON
By: Lori Connors McGroder, Esquire
2555 Grand Boulevard
Kansas City, Missouri 64108
Tel: 816.474.6550
E-mail: lmcgroder@shb.com
Attorney for the Defendant, Pfizer.

ALSO PRESENT: Shawn Budd, Videographer

INDEX

| WITNESS | PAGE |
|---|---|
| DOUGLAS JACOBS, M.D. | |
| Examination by Mr. Rosenkranz | 5 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Report | 5 |
| 2 | Notice of Deposition | 6 |
| 3 | Peabody Police Report | 147 |
| 4 | Police Report | 147 |
| 5 | Doctor's Notes | 151 |
| 6 | AtlantiCare Medical Record | 168 |
| 7 | Doctor's Notes | 185 |
| 8 | Tax Returns | 223 |
| 9 | JAMA Report | 233 |
| 10 | Dr. Crognale's Records | 241 |

PROCEEDINGS

THE VIDEOGRAPHER: We are on the record. This is the video operator, Shawn Budd. Today's date is December 2, 2008, and the time is 9:22. We are here at the offices of Douglas Jacobs, M.D., located in Wellesley, Massachusetts, to take the videotaped deposition of Douglas Jacobs, M.D., in the In Re: Neurontin Marketing Sales Practices and Product Liability Litigation.

Would counsel please introduce themselves.

MR. ROSENKRANZ: Ron Rosenkranz, Finkelstein & Partners, for the plaintiff, Bulger.

MS. McGRODER: Ken, do you --

MR. FROMSON: Sure. Ken Fromson on behalf of plaintiff, Finkelstein & Partners.

MS. McGRODER: Lori McGroder of Shook, Hardy & Bacon, on behalf of Pfizer defendants.

THE VIDEOGRAPHER: The court reporter, Jill Shepherd, will you please swear in the witness.

MS. McGRODER: Object to form.
MR. ROSENKRANZ: You want him to answer that question?
MS. McGRODER: I'm sorry? What did you --
MR. ROSENKRANZ: You didn't want him to answer that?
MS. McGRODER: No, I wanted to get my objection on the record. If I don't want him to answer, I think it will be very clear on the record. I will tell him not to answer and then he will know and you will know.
MR. ROSENKRANZ: Okay.
Q. Are you of the opinion that no drug can cause clinical depression?
MS. McGRODER: Object to form.
A. The reason I'm struggling with the question, because clinical depression -- because I think that there are --
Q. As opposed to respiratory depression, I'm talking about.
MS. McGRODER: Object to form. If you don't understand the question --
A. I was trying to answer the question in terms

of --
Q. Okay.
A. Clinical depression, in my view, means satisfying criteria for a major depressive disorder. Are there drugs that can mimic some symptoms of depression? There are, such as beta blockers can make a person feel tired and lethargic. So there are examples of drugs that can mimic symptoms to have depression.
Q. Okay. Can I -- when you say mimic, can I assume that you mean create symptomatology that might appear to be depressive?
A. I would agree with that, yes.
Q. But really isn't?
A. Well, in terms of satisfying the full criteria and being -- since depression is correlated with suicide, I'm not aware, and I do not believe that a drug that can cause or is associated with some depressive symptomatology leads to suicide.
Q. Okay. Well, I was going to take it one step further, but you already answered that. You do not believe that there is any drug that can cause suicide?

A. That is my opinion, yes.
Q. Are you of the opinion that Neurontin has been proven to be safe and effective?
A. Certainly it's been proven to be safe. I think in terms of its efficacy in terms of the -- as a monotherapy and seizure disorder or post hepatic neuralgia, it's demonstrated to be effective. I think there are studies looking at anxiety or bipolar disorder that have demonstrated that in some of the studies, although I understand it's not approved in those conditions or with neuropathic pain for which it is a very common usage today.
Q. Would you agree that Neurontin has never been approved for neuropathic pain?
A. I would agree with that.
Q. Okay. Or for bipolar?
MS. McGRODER: Object to form. If you are talking U.S. versus European.
Q. Has not been proved by the FDA for neuropathic pain?
A. That's correct.
Q. Important for bipolar?
A. I believe that's correct. Although what's

important, if one looks at the FDA alert that it is acknowledged by the FDA that the antiepileptics are used in psychiatric and other conditions, and there's no prohibition by the FDA.
Q. Well, there's no prohibition because doctors can prescribe a drug for any kind of off-label use if they think it's appropriate, correct?
A. Although technically you're correct, that's not how it works. Doctors just don't prescribe for anything off-label.
Q. If they think it's going to work?
A. And if they've had some basis to --
Q. Okay.
A. -- to believe that.
Q. Do you know for what indication Neurontin was prescribed to Susan Bulger?
A. I believe initially it was prescribed for pain.
Q. And would that have been an indication that it had been approved by the FDA?
A. For the specific indication, the answer would be no.
Q. Okay. Would you agree that the FDA made an

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**

## Jacobs, Douglas (Defense Expert-Crone)

**1/15/2009**

**Printed : 2/2/2009**

IN THE SUPERIOR COURT OF THE STATE OF CA
COUNTY OF LAKE
--o0o--

NICOLETTE CRONE, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR CASSIE MARIE CRONE, A MINOR AND BENJAMIN JONATHAN CRONE, ALL INDIVIDUALLY AND AS SUCCESSORS IN INTEREST TO ESTATE OF RICK ARTHUR CRONE,

Plaintiffs,

vs. CASE NO. CV400432

PFIZER, INC., PARKE-DAVIS, A DIVISION OF WARNER-LAMBERT COMPANY AND WARNER-LAMBERT COMPANY, RAYMOND D. JENNINGS, M.D., AND DOES 1-100,

VOLUME I

Defendants.

Deposition of DOUGLAS JACOBS, M.D., at The Edgar Law Firm, 408 College Avenue, Santa Rosa, California 95401, commencing at 9:06 a.m., Thursday, January 15, 2009, before Megan F. Alvarez, RPR, CSR No. 12470.

PAGES 1 - 73

Job No.: 185766

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:

EDGAR LAW GROUP
408 COLLEGE AVENUE
SANTA ROSA, CALIFORNIA 95401
707.545.3200
REX@CLASSATTORNEYS.COM
BY: REX GRADY, ESQ.

FOR THE DEFENDANT, PFIZER:

SHOOK, HARDY & BACON, LLP
2555 GRAND BLVD.
KANSAS CITY, MO 64108-2613
816.474.6550
LMCGRODER@SHB.COM
BY: LORI CONNORS MCGRODER, ESQ.

2

FOR THE DEFENDANT, RAYMOND JENNINGS, M.D.

LAW OFFICES OF STEVEN D. HILLYARD
345 CALIFORNIA STREET
SUITE 1700
SAN FRANCISCO, CALIFORNIA 94104
415.334.6880
BY: GERHARD O. WINKLER, ESQ.

3

INDEX

INDEX OF EXAMINATIONS

Examination by Mr. Grady ..........................5

---o0o---

EXHIBITS MARKED FOR IDENTIFICATION

| No. | Description | Page |
|---|---|---|
| 1 | 6 pages, Notice of Deposition of Douglas Jacobs, M.D. | 6 |
| 2 | 13 pages, NDA to Pfizer; Robert Clark, Department of Health & Humans Services, FDA, NDA for Neurontin (gabapentin) | 64 |

--o0o--

CERTIFIED QUESTIONS

None.

We'll work on that together.
MS. MCGRODER: Okay.
BY MR. GRADY:
Q. Yes.
You have appeared as an expert in cases dealing with allegations of suicide resulting from drug use; is that true?
A. Yes, I have.
Q. And certainly those other Neurontin cases, the Bulger case, Smith case, would fall into that class of cases that you've been an expert in; is that true?
A. That's correct.
Q. Okay.
How many other occasions or cases have you appeared in as an expert dealing with the same kind of issues, allegations of suicide arising from drug use?
MS. MCGRODER: Well, are you asking some tir period? Are you just asking --
MR. GRADY: Ever.
MS. MCGRODER: Ever. Answer if you can.
THE WITNESS: I've appeared in matters involving the drug Accutane, Wellbutrin, Prozac, Zoloft.
BY MR. GRADY:
Q. And --
A. And those in terms of when I say appeared,

that would be less than -- collectively less than 10.
Q. On whose behalf were you appearing in those cases?
A. On behalf of the manufacturer.
Q. Was your testimony, if testimony was given by you, for your expert conclusion in those cases, howevei given, that the drug in question did not cause suicide or contribute to it?
A. That would be -- that would have been my opinion.
Q. Have you ever provided testimony or opinion in a legal case wherein you concluded that a drug did, in fact, contribute or in your opinion contribute to or cause suicide?
A. No, I did not. No, I have not.
Q. Do you believe that a drug could cause suicide?
A. No, I do not.
Q. So it's your opinion that drugs do not contribute to suicide ever?
A. That is my opinion.
Q. And it is your conclusion or expert opinion that Neurontin does not cause suicide or contribute to it?
A. That is correct.

Q. And that it did not do so in the case of Rick Crone?
A. That is correct.
MR. GRADY: Okay.
Doctor, I believe I am finished.
If counsel present have any questions they wish to ask you, they're free to.
MR. WINKLER: I have no questions. Thank you very much.
MS. MCGRODER: No. Thanks very much.
MR. GRADY: Okay.
THE REPORTER: Same copy orders as yesterd Counsel?
MS. MCGRODER: Yes.
MR. WINKLER: Yes.

(Whereupon, the deposition was adjourned at 11:08 a.m.)

I declare under penalty of perjury that the foregoing is true and correct. Subscribed at ________________, California, this _______ day of ___________, 2009.

______________________________
DOUGLAS JACOBS, M.D.