# EXHIBIT A

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3
 4   - - - - - - - - - - - - - - - - - - -X
 5   IN RE:  NEURONTIN MARKETING, SALES          MDL DOCKET
 6   PRACTICES, AND PRODUCTS LIABILITY           NO. 1629
 7   LITIGATION                                  MASTER FILE
 8                                               NO. 04-10981
 9   _____       JUDGE PATTI B.
10   THIS DOCUMENT RELATES TO:                   SARIS
11   SHEARER V. PFIZER, ET AL.;                  MAGISTRATE
12   1:07-CV-11428-PBS                           JUDGE LEO T.
13   - - - - - - - - - - - - - - - - - - -X     SOROKIN
14   VOLUME I                                    Pages 1-212
15
16        VIDEOTAPED DEPOSITION OF DAVID P. FRANKLIN, Ph.D.,
17   a witness called by counsel for the defendant,
18   Pfizer, Inc., taken before Kimberly A. Smith,
19   Certified Realtime Reporter, Registered Diplomate
20   Reporter, and Notary Public in and for the
21   Commonwealth of Massachusetts, at the Law Offices of
22   Greene, LLP, 33 Broad Street, Boston, Massachusetts
23   02109, on Friday, December 18, 2009, commencing at
24   9:16 a.m.
```

Page 2

```
 1   APPEARANCES:

 2

 3          Finkelstein & Partners, LLP

 4          By:  Keith L. Altman, Esq.

 5          1279 Route 300

 6          Post Office Box 1111

 7          Newburgh, NY   12551

 8          (800) 634-1212

 9              and

10          The Lanier Law Firm, P.C.

11          By:  Kenneth S. Soh, Esq.

12          6810 FM 1960 West

13          Houston, TX   77069

14          (713) 659-5200

15                      for the Plaintiffs;

16

17          Boies, Schiller & Flexner, LLP

18          By:  William S. Ohlemeyer, Esq.

19          and Daniel E. Holloway, Esq.

20          333 Main Street

21          Armonk, NY   10504

22          (914) 749-8200

23              and

24
```

Page 3

```
 1    APPEARANCES: (continued)
 2
 3         Skadden, Arps, Slate, Meagher & Flom, LLP
 4         By:  Mark S. Cheffo, Esq.
 5         Four Times Square
 6         New York, NY   10036
 7         (212) 735-2183
 8              and
 9         Pfizer, Inc.
10         By:  Danielle Gentin Stock, Esq.
11         235 East 42nd Street
12         New York, NY   10017
13         (212) 733-0303
14                       for the Defendant, Pfizer, Inc.;
15
16         Duran & Pandos, P.C.
17         By:  Sue-Ann Rowley, Esq. (via telephone)
18         1044 Route 22 West, Suite 5
19         Mountainside, NJ   07092
20         (908) 518-5000
21                       for the Defendant, Philip J.
22                       Obiedzinski;
23
24
```

```
 1   APPEARANCES: (continued)
 2
 3        Rawle & Henderson, LLP
 4        By:  Arthur B. Keppel, Esq.
 5        The Widener Building
 6        One South Penn Square
 7        Philadelphia, PA   19107
 8        (215) 575-4200
 9                         for Apotex Corp.;
10
11        Greene, LLP
12        By:  Thomas M. Greene, Esq.
13        33 Broad Street, 5th Floor
14        Boston, MA   02109
15        (617) 261-0040
16                         for the Witness.
17
18   Also Present:  George Dobrentey, Videographer
19
20
21
22
23
24
```

1  be sensitive to that, be aware of that, and in their
2  continuing care of a patient look for those kinds of
3  changes, wouldn't she?
4      A.  Good medical practice demands that they
5  would, yes.
6      Q.  And so just so I'm clear, you never told a
7  doctor during the four months you were at Parke-Davis
8  to prescribe Neurontin or any other medicine to a
9  patient in the face of a negative reaction that
10 patient had to that medicine, did you?
11     A.  What I told doctors was that it had a --
12 there was no side effect profile.  That Neurontin was
13 a drug that did not have side effects and did not
14 conflict with other neuroactive drugs.
15     Q.  And that was -- that was true, wasn't it?
16         MR. GREENE:  I'm sorry.  Have you finished
17 your answer?  Have you finished your answer?
18         THE WITNESS:  Yes.
19         MR. GREENE:  Okay.
20 BY MR. OHLEMEYER:
21     Q.  That's a true statement, isn't it?
22     A.  In retrospect, I don't know if it's a true
23 statement.  I -- I . . .
24     Q.  Did the doctors -- Let me ask you this,

```
 1    Dr. Franklin.  How many doctors do you think you saw
 2    during the four months you were at Parke-Davis?
 3         A.   You know what, we tried to pin that down
 4    before also.  I don't actually -- I don't know.
 5         Q.   So if I gave you a list of 1,000 doctors'
 6    names who had prescribed Neurontin, would you be able
 7    to tell me which of those doctors you actually saw?
 8         A.   I wouldn't because I may -- you know, if
 9    you gave -- if you produced every physician in
10    Massachusetts right now and asked me to check off the
11    ones I saw, my -- given that it was 13 years ago,
12    I -- I do not trust my ability to not conflate
13    doctors that I saw as a result of my experience at
14    Boston Scientific with doctors that I saw then.
15              So it would be purely a matter of
16    name recognition, and I would -- I cannot say that I
17    wouldn't blur those two together.
18         Q.   Did you ever meet with any -- and help me
19    with the terminology -- formulary committees or
20    groups of people who were in charge of deciding what
21    drugs to put on what lists --
22         A.   No.
23         Q.   -- for certain healthcare providers?
24         A.   No.
```

Page 82

```
 1        Q.   Did you ever meet with any third-party
 2   payers, like managed care facilities or hospitals or
 3   insurance companies --
 4        A.   No.
 5        Q.   -- to talk about off-label or on-label use
 6   of Parke-Davis products?
 7        A.   No.
 8        Q.   Did you -- Do you know whether you ever
 9   spoke with or visited any doctor that was involved in
10   the care and treatment of Hartley Shearer?
11        A.   Who?
12        Q.   Hartley Shearer.
13        A.   I don't know who Hartley Shearer is.  So I --
14   I couldn't tell you because I don't -- I'm assuming
15   it's one of the clients associated with this case,
16   but I couldn't tell you if I met with -- with the
17   physicians involved in that case or not.
18        Q.   When you talked with a doctor about
19   Parke-Davis medicine, did the doctors know whether
20   the usages you were talking about were on-label or
21   off-label?
22        A.   Yes.  They knew that they were off-label.
23   I would tell them effectively that they were -- I
24   wouldn't say, "This is an off-label use," but I would
```

Page 122

1  allegation you made of improper conduct?
2      A.   I don't know.
3      Q.   So in fact, you don't know whether some of
4  the things that you thought were improper were, in
5  fact, improper?
6      A.   I just remember the Department of Justice
7  press release and that sort of stuff where they laid
8  out what was improper --
9      Q.   Right.
10     A.   -- and -- and what the company -- and the
11 company's guilty plea.
12          MR. OHLEMEYER:  Let me mark -- Hopefully we
13 can do this quickly and then take a break.  Let me
14 mark -- Well, I'll find it.  Here we go.
15               Let me mark this as our next exhibit.
16                    (Franklin Exhibit No. 4 was
17                    marked for identification.)
18 BY MR. OHLEMEYER:
19     Q.   Dr. Franklin, I've handed you what we've
20 marked as Franklin Exhibit No. 4.  And I suspect
21 you'd agree with me it's a map of the United States?
22     A.   I do.
23     Q.   Can you tell me whether you ever visited a
24 doctor while you were employed at Parke-Davis in the

Page 123

```
 1   State of Washington?
 2       A.   No.
 3       Q.   Would you go ahead and write "no" in the
 4   State of Washington for me?  Or put "No visit" for
 5   me.  Write "No visit."
 6            MR. SOH:  You know, I will interject with --
 7   I will defer to Tom, but can we do like larger -- can
 8   we just -- instead of doing 40 states, can we do
 9   regions or something like --
10            MR. GREENE:  Can we just put a "Y" in the
11   state that he promoted in?
12   BY MR. OHLEMEYER:
13       Q.   Can you -- I'll rephrase the question.
14            Can you tell me, Dr. Franklin, which
15   states that you actually visited doctors in while you
16   were employed at Parke-Davis?
17       A.   I believe it was Maine --
18       Q.   Let me -- Let me stop you there.  Do you
19   recall how many doctors you visited in Maine?
20       A.   No.
21       Q.   All right.  Where else?
22       A.   Massachusetts, Rhode Island, Connecticut.
23   I believe Connecticut.  New Hampshire.  And possibly
24   New York.
```

```
 1        Q.   Can you -- can you tell me how many doctors
 2   you might have visited in Massachusetts?
 3        A.   The bulk of them would have been in
 4   Massachusetts, but I do not recall.
 5        Q.   When you say "bulk," is that, you know,
 6   90 percent --
 7        A.   80 percent --
 8        Q.   80 percent.
 9        A.   -- 85 percent.
10        Q.   How many doctors do you recall seeing in
11   Rhode Island?
12        A.   I don't recall.
13        Q.   Let me ask you this.  After Massachusetts,
14   what would the second most --
15        A.   Rhode Island.
16        Q.   Rhode Island.  You saw more doctors in
17   Rhode Island than anywhere else.  All right.  Can I
18   then -- can we -- Do you remember the names -- If I
19   didn't ask you that --
20        A.   Yes.
21        Q.   -- do you remember the names of any of the
22   doctors you actually saw in any of these states?
23        A.   I don't.
24        Q.   And it's fair to say that any of these
```

```
 1   doctors you saw you would have seen sometime between
 2   April 1 and August 1 of 1996?
 3        A.   Yes.
 4        Q.   Can you go ahead then for me and write the
 5   word "visit" -- or "no" --
 6        A.   It will be tough to fit "visit" in Rhode
 7   Island.
 8        Q.   Let me ask you to do this.  Why don't you
 9   take the pen and just kind of mark out the states
10   that you actually visited doctors in.
11        A.   (Witness complied.)
12                  That I believe I visited?
13        Q.   Right.
14        A.   Right.
15        Q.   And you can even put a question mark in New
16   York if that makes you feel more comfortable.
17        A.   (Witness complied.)
18        Q.   So -- so without belaboring this, doctor,
19   am I correct that when you were employed at
20   Parke-Davis, you never visited a doctor in any state
21   besides Maine, Massachusetts, Rhode Island,
22   Connecticut, New Hampshire, and perhaps New York;
23   is that right?
24        A.   Yes.  I'm not sure about Vermont.  I'm not
```

1    sure if you mentioned Vermont.  But yes.
2         Q.    You do or you don't recall Vermont?
3         A.    I don't recall Vermont.
4         Q.    And am I correct that while you were
5    employed at Parke-Davis -- while you were -- strike
6    that.
7               While you were employed at Parke-Davis,
8    doctor, the bulk of the visits you made -- probably
9    85 percent of them -- were to doctors in Massachusetts?
10        A.    Yes.
11        Q.    And I'm also correct that you never visited
12   any doctor in any other state in the United States?
13        A.    That's true.
14              MR. OHLEMEYER:  Do you want to take a break?
15              MR. GREENE:  Sure.
16              THE VIDEOGRAPHER:  The time is 11:54 a.m.
17   This is the end of Tape 2 and we're off the record.
18                       (Whereupon, at 11:55 a.m.,
19                        the deposition was recessed,
20                        to reconvene at 12:45 p.m.
21                        this same date.)
22
23
24

Page 127

1        AFTERNOON SESSION
2                                           (12:52 p.m.)
3           THE VIDEOGRAPHER:  The time is 12:52 p.m.
4    This is the beginning of Tape 3, and we are back on
5    the record.
6           DAVID P. FRANKLIN, Ph.D.,
7       the witness at the time of recess, having
8       been previously duly sworn, was further
9       deposed and testified as follows:
10              EXAMINATION (continued)
11   BY MR. OHLEMEYER:
12       Q.   All right.  Again, David -- or
13   Dr. Franklin -- David -- if you want to take a break,
14   let me know.  If you don't understand a question, let
15   me know.
16       A.   Yes.
17       Q.   Can you tell me what states were within the
18   Northeast CBU?
19       A.   I -- It was the New England states, so
20   Maine, New Hampshire, Vermont, Connecticut, Rhode
21   Island, Massachusetts, parts of New Jersey and parts
22   of New York.  And I believe Pennsylvania, parts of
23   Pennsylvania also.  Perhaps all of Pennsylvania.
24       Q.   So there were parts of the Northeast CBU

Page 128

```
 1    that either you were not responsible for or didn't
 2    visit during your Parke-Davis days?
 3         A.   That's right.  There were medical liaisons
 4    spread out throughout the Northeast.
 5         Q.   And what states were part of the Southeast
 6    CBU?
 7         A.   I don't recall specifically.  But North
 8    Carolina, South Carolina, Georgia, Florida.  The
 9    Southeast.
10         Q.   Did you ever have any personal involvement
11    or firsthand involvement in the Southeast CBU?
12         A.   No, I did not.
13         Q.   Do you -- Would you agree with me that in
14    general, a medical liaison program serves a legitimate
15    purpose?
16              MR. ALTMAN:  Objection.  Form.
17              THE WITNESS:  I don't know.  I . . .
18    BY MR. OHLEMEYER:
19         Q.   Well, let me rephrase the question.
20         A.   Okay.  Okay.
21         Q.   If you wanted to put a program together to
22    provide information to doctors, and if you followed
23    all the rules, then there wouldn't be anything
24    inherently wrong with that kind of program?
```