# EXHIBIT C

Page 1

```
 1                                    VOLUME:      I
                                      PAGES:    1-199
 2                                    EXHIBITS:  1-10
 3
              UNITED STATES DISTRICT COURT
 4              DISTRICT OF MASSACHUSETTS
 5
     IN RE:  NEURONTIN              ) MDL DOCKET
 6   MARKETING, SALES PRACTICES     ) NO. 1629
     AND PRODUCTS LIABILITY         ) MASTER FILE
 7   LITIGATION                     ) NO.  04-10981
                                    )
     _____)
 8                                  )
     THIS DOCUMENT RELATES TO:      ) JUDGE PATTI
 9                                  ) B. SARIS
     SHEARER VS. PFIZER, ET AL;     ) MAGISTRATE
10   1:07-CV-11428-PBS              ) JUDGE LEO T.
                                    ) SOROKIN
11                                  )
12
13
14           VIDEOTAPED DEPOSITION OF
15   WILFRED HYNES, M.D., a witness called on
16   behalf of the Plaintiff, pursuant to the
17   provisions of the Federal Rules of Civil
18   Procedure, before Jill Shepherd, Registered
19   Professional Reporter, CSR, CLR and Notary
20   Public, in and for the Commonwealth of
21   Massachusetts, at the Tufts Medical Center,
22   800 Washington Street, Boston,
23   Massachusetts, on Tuesday, November 13,
24   2009, commencing at 12:08 p.m.
25   Job No: 226411
```

Page 2

1
2  APPEARANCES:
3
4
5  FINKELSTEIN & PARTNERS
6  By: Kenneth B. Fromson, Esquire
7  1279 Route 300
8  P.O. Box 1111
9  Newburgh, New York 12551
10 Tel: 845.562.3492
11 E-mail: kfromson@lawampmmt.com
12 Attorney for the Plaintiff.
13
14
15
16
17 GOODELL, DeVRIES, LEECH, DANN, LLP
18 By: Richard M. Barnes, Esquire
19 One South Street, 20th Floor
20 Baltimore, Maryland 21202
21 Tel: 410.783.4004
22 E-mail: rmb@gdldlaw.com
23
24     -- and --
25

Page 3

1
2  APPEARANCES, CONTINUED
3
4
5  BOIES, SCHILLER & FLEXNER, LLP
6  By: Harlan A. Levy, Esquire
7  575 Lexington Avenue
8  7th Floor
9  New York, NY 10022
10 Tel: 212.446.2300
11 E-mail: hlevy@bsfllp.com
12 Attorneys for the Defendant, Pfizer.
13
14
15 ALSO PRESENT: Sam Krumholz
16       David Egilman, M.D.
17       Marissa Demonte, Videographer
18
19
20
21
22
23
24
25

Page 4

1        I N D E X
2  WITNESS                         PAGE
3  WILFRED HYNES, M.D.
4  Examination by Mr. Barnes         7
5  Examination by Mr. Fromson       91
6  Examination by Mr. Barnes       149
7  Examination by Mr. Fromson      186
8  Examination by Mr. Barnes       189
9
10
11
12
13
14
15
16        E X H I B I T S
17 NO.    DESCRIPTION              PAGE
18 1     Notice                     6
19 2     000374-37BWH-00205 -       6
        000374-37BWH-00426
20
   3    CV                        13
21
   4    Demand for Jury Trial     91
22
   5    Answer                    91
23
   6    US Package Insert of 2009 100
24
   7    Settlement Agreement      133
25

Page 5

1  8     Letter 9/9/09            142
2  9     FDA Article              168
3  10    Update                   194
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
                                                    Page 178
1           MR. FROMSON: Objection. Asked and
2      answered, and form.
3   Q. Let me ask another question.
4           Are you -- what is your experience
5      today prescribing Neurontin for pain
6      patients? How often do you prescribe it?
7   A. I'm not sure how often I prescribe it. Our
8      practice is here mainly -- we mainly do
9      injections. We don't do a lot of medication
10     prescribing, but I still use it on occasion.
11  Q. Since 2000, how many patients have you
12     written Neurontin prescriptions for?
13  A. I have no idea.
14  Q. Thousands?
15  A. Probably.
16  Q. Even today, how would you describe your
17     clinical experience with Neurontin for the
18     treatment of pain?
19          MR. FROMSON: Objection.
20  A. For neuropathic pain, I think it's a good
21     choice.
22  Q. Now, when you prescribe it today -- you
23     still prescribe Neurontin and other
24     antiepileptic drugs for the treatment of
25     pain, correct?
```

```
                                                    Page 179
1           MR. FROMSON: Objection.
2   A. Correct.
3   Q. Today do you advise patients that -- of the
4      latest information concerning the class
5      labeling for suicidal behavior or ideation
6      when you prescribe Neurontin?
7   A. Yes.
8   Q. Do you -- okay.
9           And what do you tell them?
10  A. I'm uncomfortable with this line of
11     questioning. I don't think what I do now is
12     relevant.
13  Q. Okay.
14  A. I mean, it's -- I don't have an attorney
15     with me. But, you know, this is if --
16          MR. BARNES: Off the record for a
17     minute.
18          THE VIDEOGRAPHER: The time is
19     3:39, and we're off the record.
20          (Short recess.)
21          THE VIDEOGRAPHER: The time is
22     3:56, and we're on the record.
23  Q. Dr. Hynes, following up on some of
24     Mr. Fromson's questions, was it your --
25     based upon what you reviewed today of the
```

```
                                                    Page 180
1      record for Mr. Shearer, is it your judgment
2      that he had both neuropathic pain and
3      nociceptive pain in 2000?
4   A. Yes.
5   Q. Mr. Fromson asked you a question about
6      the -- knowing about the class labeling with
7      regard to the risk of suicide behavior and
8      ideation. He asked you, knowing that, if
9      you would have considered alternatives, and
10     you responded that you had considered
11     alternatives.
12          Isn't it true that all the
13     antiepileptic drugs that were under
14     consideration for Mr. Shearer carried the
15     same class labeling regarding suicide
16     behavior, correct?
17          MR. FROMSON: Objection.
18  Q. You may answer.
19  A. Correct.
20  Q. Now, just briefly, you were asked some
21     questions regarding some visits with
22     pharmaceutical company sales representatives
23     in 1998 and 1999 by Mr. Fromson?
24  A. Yes. Yes. Yes.
25  Q. As you sit here today, do you have a
```

```
                                                    Page 181
1      specific recollection of the visits?
2   A. No.
3   Q. Okay.
4           Can you tell us, you stated that you
5      have a recollection of discussing
6      neuropathic pain in one or more visits with
7      the sales representatives?
8   A. I believe so.
9   Q. Do you have a specific recollection or just
10     a general --
11  A. General.
12  Q. Okay.
13          Could it be possible that these
14     discussions about neuropathic pain actually
15     occurred after 2002 when there was an
16     indication for postherpetic neuralgia?
17          MR. FROMSON: Objection.
18  A. It's possible that it was both before and
19     after.
20  Q. Is it possible that was only after 2000 when
21     there was an indication for postherpetic
22     neuralgia?
23          MR. FROMSON: Objection.
24     Argumentative, and asked and answered.
25  A. I'm not sure.
```

Page 182

1  Q. It could be before or after? Is that fair
2     to say?
3         MR. FROMSON: Objection.
4  A. I would -- my recollection is, is that it
5     could very well have been both.
6  Q. Okay.
7  A. I don't know when -- I mean, if drug reps
8     were going to call on me for Neurontin, it
9     would be for neuropathic pain. And it would
10    have been -- you know, like I said, I don't
11    know if there was a time period when they
12    started or when they --
13 Q. Is it vague in your mind?
14 A. Yes.
15        MR. FROMSON: Objection. Just note
16    my objection to the last question.
17 Q. Let me ask you this: How clear is your
18    recollection as to the dates of the
19    discussions regarding neuropathic pain that
20    you engaged with with the company sales
21    representatives?
22        MR. FROMSON: Form.
23 A. They are not clear.
24 Q. Okay.
25        Now, in these discussions, when

Page 183

1     neuropathic pain was discussed, is it your
2     recollection that you brought up the subject
3     of neuropathic pain and were asking them
4     questions?
5         MR. FROMSON: Objection. Hold on
6     one minute. Objection. Lack of foundation.
7  A. I would have no idea.
8  Q. That's fair. Let me ask it this way due to
9     the objection.
10        Do you have any recollection as to
11    whether or not you brought up the subject of
12    neuropathic pain or that the drug company
13    representatives brought up the subject of
14    neuropathic pain?
15        MR. FROMSON: Objection. Form.
16 A. I really would not have any idea about that.
17 Q. Do you recall anything the sales
18    representatives from the company told you
19    about Neurontin to be inconsistent with your
20    own clinical experience in the treatment of
21    patients with neuropathic pain?
22 A. No, not -- in the drug company visit, you
23    mean?
24 Q. Yes.
25 A. I don't believe so. Nothing stands out in

Page 184

1     my mind.
2  Q. Do you believe the information they would
3     provide you during -- strike that.
4         Is it your best recollection that the
5     information they provided you about
6     Neurontin was accurate?
7  A. Yes.
8  Q. Okay.
9         MR. BARNES: No further questions.
10        * * * * *
11        EXAMINATION BY MR. FROMSON
12 Q. Doctor, is it also fair to say you rely upon
13    the sales representatives to provide you
14    with accurate information, right? You
15    wouldn't want him to provide you with
16    inaccurate information?
17 A. That's correct.
18 Q. And they were a source of information for
19    you to rely upon for your prescribing
20    practices, right?
21        MR. BARNES: Objection.
22        MR. FROMSON: I'll withdraw the
23    question.
24 Q. They were there to provide you accurate
25    information to the best of your knowledge as

Page 185

1     Mr. Barnes said, right?
2  A. Yes, that was their job.
3  Q. And with the expectation they would provide
4     you with accurate information, you would
5     rely upon it, at least in part, as part of
6     your job as a prescribing physician; is that
7     fair?
8         MR. BARNES: Objection.
9  A. That is a fair statement.
10 Q. And they never discussed suicidality with
11    you; isn't that true?
12 A. I don't believe so.
13 Q. And when you were being trained as a speaker
14    in New York, the trainees -- the trainers
15    did not discuss suicidality with Neurontin
16    with you; is that true?
17        MR. BARNES: Objection.
18 A. I don't believe so.
19 Q. And when you were in Arizona, the trainers
20    did not speak about suicidality there
21    either; isn't that true?
22        MR. BARNES: Objection.
23 A. I don't believe so.
24 Q. And when you actually gave speeches as a
25    speaker, you were never told to discuss