# EXHIBIT D

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3                  MDL Docket No. 1629
 4                  Master File No. 04-10981
 5     ***********************************
 6     IN RE:  NEURONTIN MARKETING, SALES
 7             PRACTICES AND PRODUCTS
 8             LIABILITY LITIGATION
 9     ***********************************
10     THIS DOCUMENT RELATES TO:
       Bulger v. Pfizer, Inc., Et Al
11     Case No. 07-11426-PBS
              and
12     Smith, Et Al v Pfizer, Et Al
       Case No. 05-CV-11515-PBS
13
       ***********************************
14
15        VIDEOTAPED DEPOSITION OF CHARLES KING, III
16
                       Held At:
17           Greylock McKinnon Associates
                  One Memorial Drive
18             Cambridge, Massachusetts
19
20               October 28th, 2008
                    9:05 A.M.
21
22     Reported By:  Maureen O'Connor Pollard, RPR, CLR
23
       Videographer:  William Slater
24
```

Page 2

```
 1  FOR THE PLAINTIFF:
 2     BY:  RON ROSENKRANZ, ESQ.
 3          KEITH ALTMAN, ESQ.
 4          FINKELSTEIN & PARTNERS
 5          1279 Route 300
 6          Newburgh, New York 12551
 7          800-634-1212
 8          rrosenkranz@lawampm.com
 9
10  FOR THE DEFENDANTS:
11     BY:  PAUL S. MISHKIN, ESQ.
12          DAVID POLK & WARDWELL
13          450 Lexington Avenue
14          New York, New York 10017
15          212-450-4000
16          paul.mishkin@dpw.com
17          and
18     BY:  NICHOLAS P. MIZELL, ESQ.
19          JAMES P. MUEHLBERGER, ESQ.
20          SHOOK, HARDY & BACON
21          2555 Grand Avenue
22          Kansas City, Missouri 64105
23          816-559-2991
24          nmizell@shb.com
```

Page 3

```
 1                INDEX
 2  EXAMINATION                        PAGE
 3  CHARLES KING, III
 4   BY MR. MISHKIN                      5
 5
 6              EXHIBITS
 7  NO.        DESCRIPTION             PAGE
 8  Exhibit 1  Expert report of Charles
 9             King, III..................  4
10  Exhibit 2  One page billing document...  43
11  Exhibit 3  9/16/02 working paper by
12             Charles King, III..........  58
13  Exhibit 4  Copy of article by Mizik and
14             Jacobson................... 150
15  Exhibit 5  4/4/06 retention letter.... 233
16  Exhibit 6  Group of e-mails........... 233
17
```

Page 4

```
 1              P R O C E E D I N G S
 2
 3        (Whereupon, King Exhibit Number 1 was
 4         marked for identification.)
 5
 6        THE VIDEOGRAPHER:  This is Bill Slater
 7  of Veritext.  Today's date is October 28th,
 8  2008.  The time is 9:05 a.m..
 9        We are here at the offices of Greylock
10  McKinnon Associates located at 1 Memorial Drive,
11  Cambridge, Massachusetts to take the videotaped
12  deposition of Charles King, III in the matter of
13  In Re:  Neurontin Marketing, Sales Practices and
14  Products Liability Litigation in the United
15  States District Court, District of
16  Massachusetts, MDL Docket Number 1629, Master
17  File Number 04-10981, relating to Bulger versus
18  Pfizer, Incorporated, Et Al, Case Number
19  07-11426-PBS, and Smith, Et Al, versus Pfizer,
20  Et Al, Case Number 05-CV-11515-PBS.
21        Counsel will now voice introduce
22  themselves for the record and state whom they
23  represent, and then the court reporter
24  will swear in the witness.
```

Page 5

```
 1        MR. MISHKIN:  Paul Mishkin from Davis,
 2  Polk & Wardwell for the Defendants.
 3        MR. MUEHLBERGER:  Jim Muehlberger,
 4  Shook Hardy & Bacon.
 5        MR. MIZELL:  Nicholas Mizell, Shook
 6  Hardy & Bacon for the Defendant.
 7        MR. ROSENKRANZ:  Ron Rosenkranz,
 8  Finkelstein & Partners, for the product
 9  liability Plaintiffs.
10        MR. ALTMAN:  Keith Altman, Finkelstein
11  & Partners, for product liability Plaintiffs.
12
13        CHARLES KING, III,
14  having been satisfactorily identified, being
15  first duly sworn, was examined and testified as
16  follows:
17        DIRECT EXAMINATION
18        BY MR. MISHKIN:
19    Q.  Good morning.
20    A.  Good morning.
21    Q.  Could you state your full name,
22  please?
23    A.  Charles King, III.
24    Q.  Do you prefer Dr. King?
```

Page 126

1  it's my opinion that all physicians were
2  directly or indirectly -- or all or
3  substantially all physicians were directly or
4  indirectly influenced by Pfizer and
5  Warner-Lambert's marketing efforts, so to that
6  extent I am offering an opinion about individual
7  doctors, though I haven't considered any
8  individual doctor and the source of the
9  influence.
10         BY MR. MISHKIN:
11     Q.  Understood.
12         But certainly some off-label
13  prescriptions of Neurontin would have been
14  written in the absence of any of the alleged
15  improper promotion, is that right?
16     A.  Yes.
17     Q.  Okay. And you're not offering an
18  opinion specific to any Plaintiffs that their
19  particular prescriptions resulted from any
20  alleged improper promotion?
21         MR. ROSENKRANZ: Objection. Asked and
22  answered.
23     A.  Yes.
24         BY MR. MISHKIN:

Page 127

1     Q.  I'm correct?
2     A.  Yes.
3     Q.  Okay. Can you describe for me the
4  analysis that you did to support the conclusion
5  that you state here in Paragraph 5B? I'll just
6  read it for the record, you've concluded
7  "off-label sales of Neurontin would have
8  continued had Pfizer ceased off-label
9  promotional activities for Neurontin."
10        What is the work that you did to
11  support that conclusion?
12     A.  So generally speaking there are two
13  things that I did.
14        The first thing I did was look at the
15  academic literature to see what we know about
16  pharmaceutical promotions and their long-term
17  effects. And as you know from your own consumer
18  experiences, brand recognition has a lasting
19  value. And there have been academic studies of
20  the pharmaceutical market and other drugs to
21  see, you know, how-long-lived are promotional
22  activities. There are a number of reports --
23  sorry, academic articles published in peer
24  reviewed journals that I cite in here, Berndt is

Page 128

1  one, Azoulay, Gonul, Machanda, my own work, and
2  in each of those papers they look at the issue
3  of how long-lasting are the marketing effects,
4  and what they find is that these -- the effects
5  of promotion, they look at various types of
6  promotion, they look at detailing, they look at
7  detailing plus samples, they look at journal
8  advertising, and the consensus of, you know,
9  this broad base of literature is that these
10 things do have long lives, and that they do
11 persist.
12        So based on academic studies of the
13 pharmaceutical market and other drugs in the
14 market, it seems clear that, you know, even if
15 sales of -- or promotion of Neurontin had ceased
16 that sales would continue.
17        And one of the things that's
18 interesting about that is that the rate,
19 so-called rate of depreciation, in other words
20 how long does it take for this effect to wear
21 out, is quite low. So these are long-term
22 effects, and you can look at the specific papers
23 for estimates of it.
24        Now, I would add that the other

Page 129

1  interesting thing about this is that, you know,
2  now we don't have to speculate about how
3  long-lived those effects might have been, we
4  actually have data on that, and that's provided
5  by Meredith Rosenthal's report. And if I
6  remember correctly, her analysis of the
7  long-term effect of promotion is that it has a
8  depreciation rate of about three percent a
9  quarter, about twelve percent or so a year, so
10 this lasts for a long time. So even though --
11 even if you'd ceased promotion, the sales would
12 continue for some time.
13        So the academic studies is one source,
14 the Meredith Rosenthal's report --
15 Dr. Rosenthal's report corroborates that
16 analysis, and then sort of more -- less formal
17 analysis we can look at something like one of
18 the charts I've provided in here, if I can find
19 it.
20        (Witness reviewing document.)
21     A. Okay. So, you know, using the data
22 that was provided by the company in figure nine
23 on Page 41, what I've done here basically is I
24 asked Keith Altman to prepare an analysis of