UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING,
        SALES PRACTICES AND
        PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

*Shearer v. Pfizer Inc.,*
Case No. 1:07-cv-11428-PBS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T.
Sorokin

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF AND REFERENCE TO EDGAR ROSS, M.D.

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively "Defendants" or "Pfizer") respectfully submit this memorandum in support of their motion *in limine*, pursuant to Federal Rules of Evidence 104(a), 401, 402, and 403, to exclude evidence of and references to Edgar Ross, M.D.

### PRELIMINARY STATEMENT

Plaintiff may improperly attempt to offer evidence of, or testimony from or related to, Dr. Edgar Ross.  Dr. Ross was a former supervisor of Dr. Wilfred Hynes, one of Mr. Shearer's treating physicians who approved a resident's prescription of Neurontin for him.  Dr. Ross's testimony is completely irrelevant to this action – there is no evidence that he treated or even met Mr. Shearer. Even assuming that evidence about Dr. Ross holds some probative value – which it does not – it should nonetheless be excluded because its relevance would be substantially outweighed by the likelihood that it would cause unfair prejudice to Pfizer, mislead and confuse the jury, and waste time and judicial resources.

## ARGUMENT

### I.      Evidence About Dr. Ross Is Not Relevant to Any Material Issue

Evidence related to Dr. Ross is irrelevant in this case.  Dr. Ross did not prescribe Neurontin to Mr. Shearer, nor did he have any involvement in Mr. Shearer's treatment.  In order to be admissible, evidence must make the existence of a fact of consequence more or less probable. *See* Fed. R. Evid. 401, 402; *see also Bates v. Shearson Lehman Bros., Inc.*, 42 F.3d 79, 83 (1st Cir. 1994); *Pendleton v. City of Haverhill*, 156 F.3d 57, 64-65 (1st Cir. 1998); *United States v. Levy-Cordero*, 67 F.3d 1002, 1016 (1st Cir. 1995).  The crucial issues at trial will be whether Neurontin can cause suicidal behavior, whether the content of Neurontin's label should have been different, and whether Mr. Shearer's decision to take his own life resulted from his ingestion of Neurontin, or instead from any number of other factors.  Dr. Ross can say nothing that would make any of these issues more or less probable, and there is simply no other basis for relevancy.  Plaintiff has not designated Dr. Ross to offer expert testimony as to any issue of medical causation, and he lacks any first-hand knowledge to testify about Plaintiff's medical history since he did not treat Mr. Shearer.  Thus, Dr. Ross played no role in, and knows nothing about, the facts underlying this case.

Plaintiff may attempt to conjure up nominal relevancy by trying to link together Dr. Ross's association with Pfizer to Dr. Ross's work-relationship with Dr. Hynes.  They would then ask that the jury to speculate that Dr. Ross's relationship with Pfizer somehow influenced  Dr. Hynes' prescribing Neurontin to Mr. Shearer many years later.[1]  This argument is far too collateral, attenuated, and lacks any factual support.

According to Dr. Hynes, Dr. Ross supervised him as his attending physician during Dr. Hynes's one-year fellowship at Brigham & Women's Hospital from 1996 to 1997, and they may have discussed Neurontin at some point.  (Ex. A, Hynes Dep. at 126:16-21, 127:23-128:2.)[2]

---

[1]  Defendants have separately moved *in limine* to exclude evidence of Defendants' marketing and promotional activities.  Defendants incorporate that motion herein by reference.

[2]  All exhibits are attached to the accompanying Declaration of Mark S. Cheffo.

However, Dr. Hynes testified that he did not receive any information about Neurontin from Dr. Ross that proved to be inaccurate, and he was fully aware of Dr. Ross's relationship with Warner-Lambert at the time. (*Id.* at 126:22-127:6.) Further, when asked about Dr. Ross, Dr. Hynes testified as follows:

> Q:   . . . . Who's Dr. Edgar Ross?
>
> A:   He's the director of the pain management center at Brigham and Women's Hospital.
>
> Q:   Do you believe him to be an excellent doctor?
>
> A:   Yes.
>
> Q:   Is he one of your mentors?
>
> A:   Yes.
>
> Q:   Do you believe Dr. Ross told you anything that was not borne out by your own clinical experience concerning the use of Neurontin for the treatment of neuropathic pain?
>
>      . . . .
>
> A:   No.
>
> Q:   And do you believe Dr. Ross provided useful and accurate information based upon your own knowledge concerning the use of Neurontin for the treatment of neuropathic pain?
>
> A:   Yes.
>
> Q:   Do you think Dr. Ross provided any inaccurate information to you or your colleagues concerning the use of Neurontin in the treatment of neuropathic pain?
>
> A:   I don't believe so.

(*Id.* at 161:10-162:8.) While Dr. Ross gave a few lectures that Dr. Hynes vaguely remembered attending, Dr. Hynes testified that he did not "know how much" these lectures regarding Neurontin would have influenced him. (*Id.* at 130:3-11.) As such, there is simply no evidence that Dr. Hynes relied on anything said by Dr. Ross – or even what the content of such a

statement would have been – when he approved a resident's prescription of Neurontin for Mr. Shearer several years later.[3]  (*Id.* at 128:7-14.)

To the contrary, Dr. Hynes has consistently maintained that the basis for his decision to approve Neurontin was his own clinical experience.  At the time he treated Mr. Shearer, Dr. Hynes had extensive clinical experience with Neurontin; he had already used it to treat 500 to 1,000 patients, and observed that "a reasonable number of patients responded."  (*Id.* at 112:23-113:4; 162:24-163:10; 164:4-7.)  Dr. Hynes testified that his past clinical experience served as the reason he thought Neurontin was appropriate for Shearer.  (*Id.* at 189:1-11; *see also* 38:21-39:7; 40:2-10; 62:12-18.)  Dr. Hynes testified that he approved the prescription of Neurontin for Mr. Shearer because he had previously "[u]sed it extensively with good results" in his practice, he could not have used a narcotic or tricyclic antidepressant due to Shearer's medical history, and Neurontin had a good safety profile with regard to drug interactions as well as "[m]inimal side effects."  (*Id.* at 62:12-18, 62:20-63:5; 64:24-65:5; 173:17-19; 174:6-19.)

There is no evidence that Dr. Hynes's relationship with Dr. Ross had any bearing whatsoever on Dr. Hynes's approval of Neurontin for Mr. Shearer.  Further, Dr. Hynes testified that Dr. Ross provided only accurate information concerning the use of Neurontin for the treatment of neuropathic pain, and that nothing Dr. Ross had said turned out to be inconsistent with Dr. Hynes's own subsequent empirical observations of the use of Neurontin for the treatment of neuropathic pain.  (*Id.* at 161:18-162:8.)  In fact, Dr. Hynes still believes today that prescribing Neurontin to Mr. Shearer "was appropriate."  (*Id.* at 177:5-18.)  Even at the time of his deposition, Dr. Hynes testified that he still prescribes Neurontin and considers it to be a viable option for a patient with the same symptoms as those that were presented by Mr. Shearer.  (*Id.* at 90:23-91:7.)

---

[3]  Dr. Hynes was the attending physician in the pain service at Brigham & Women's Hospital in October 2000 when Mr. Shearer was admitted to that hospital.  A resident, who Dr. Hynes could not identify, prescribed Neurontin for Mr. Shearer and would have been the person who discussed Neurontin with Mr. Shearer.  Dr. Hynes simply approved the prescription of the resident.  (Hynes Dep. at 136:18-137:23.)

**II.    The Unfair Prejudice that Would Be Caused by Evidence Related to Dr. Ross Substantially Outweighs Any Conceivable Probative Value**

This Court may exclude otherwise relevant evidence if its probative value is "substantially outweighed" by unfair prejudice or a tendency to confuse or mislead the jury. Fed. R. Evid. 403. Conducting a Rule 403 balancing test here is a moot point since no probative value can be derived from testimony or evidence related to Dr. Ross. However, even assuming that there is some nominal relevance to Plaintiff's claims, admitting this evidence would present a substantial risk of unfair prejudice and jury confusion that would far outweigh any probative value. Evidence related to Dr. Ross would only serve as a red herring that would divert the jury's attention away from the genuine issues in the case. *See United States v. Brown*, 500 F.3d 48, 58 (1st Cir. 2007) (finding the disputed evidence to be "at most, marginally relevant to the case" and would raise a "significant risk of confusing the issues"). The resulting distraction would be more than a simple annoyance; it would prejudice Pfizer's ability to mount a defense in this already complex case.

Considering that it – at best – relates to a collateral issue, it would be inefficient and wasteful to squander precious trial time on a "butterfly effect" argument that attempts to show a vague connection between Dr. Hynes's interactions with Dr. Ross and a completely different intern's decision to prescribe a medication years later, which Dr. Hynes then approved. Allowing such a tangent would distract from the true issues in dispute. There is also a high risk that, because Dr. Ross is a physician, jurors will mistakenly assume he is either providing an expert opinion or was one of Shearer's treating doctors. Moreover, any attempt to use Dr. Ross's activities as a speaker to suggest to the jury that any lectures on Neurontin given in 1996 and 1997 resulted in the prescription of Neurontin to Mr. Shearer in 2000 is incredible on its face, relies on inference upon inference, and could not be afforded credence by a reasonable juror.

Quite simply, reference to unspecified hearsay statements that Dr. Ross *might* have made *years* before the prescription of Neurontin to Mr. Shearer has no probative value with respect to any material issue, though it has serious potential to befuddle jurors in this already complicated

case.  Thus, it should be excluded under Rule 403.  *See, e.g., United States v. Leon*, 47 Fed. App'x 539, 545 (10th Cir. 2002) (recognizing that exclusion is proper where "minimal probative value of the evidence was outweighed by the potential for confusion of the issues").

## CONCLUSION

For the reasons set forth above, Pfizer requests that the Court grant its motion *in limine* and exclude any evidence concerning or reference to Edgar Ross, M.D.

Dated: February 22, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Mark S. Cheffo
    Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Mark.Cheffo@skadden.com

-and-

BOIES, SCHILLER & FLEXNER LLP

By: /s/ William S. Ohlemeyer
    William S. Ohlemeyer

333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
WOhlemeyer@bsfllp.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 22, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo