# EXHIBIT A

Page 1

```
 1                                    VOLUME:     I
                                      PAGES:      1-199
 2                                    EXHIBITS:   1-10
 3
              UNITED STATES DISTRICT COURT
 4              DISTRICT OF MASSACHUSETTS
 5
    IN RE:  NEURONTIN                 )  MDL DOCKET
 6  MARKETING, SALES PRACTICES        )  NO. 1629
    AND PRODUCTS LIABILITY            )  MASTER FILE
 7  LITIGATION                        )  NO.  04-10981
                                      )
    _____    )
 8                                    )
    THIS DOCUMENT RELATES TO:         )  JUDGE PATTI
 9                                    )  B. SARIS
    SHEARER VS. PFIZER, ET AL;        )  MAGISTRATE
10  1:07-CV-11428-PBS                 )  JUDGE LEO T.
                                      )  SOROKIN
11                                    )
12
13
14           VIDEOTAPED DEPOSITION OF
15  WILFRED HYNES, M.D., a witness called on
16  behalf of the Plaintiff, pursuant to the
17  provisions of the Federal Rules of Civil
18  Procedure, before Jill Shepherd, Registered
19  Professional Reporter, CSR, CLR and Notary
20  Public, in and for the Commonwealth of
21  Massachusetts, at the Tufts Medical Center,
22  800 Washington Street, Boston,
23  Massachusetts, on Tuesday, November 13,
24  2009, commencing at 12:08 p.m.
25  Job No: 226411
```

Page 2

1
2  APPEARANCES:
3
4
5  FINKELSTEIN & PARTNERS
6  By:  Kenneth B. Fromson, Esquire
7  1279 Route 300
8  P.O. Box 1111
9  Newburgh, New York 12551
10  Tel: 845.562.3492
11  E-mail: kfromson@lawampmmt.com
12  Attorney for the Plaintiff.
13
14
15
16
17  GOODELL, DeVRIES, LEECH, DANN, LLP
18  By:  Richard M. Barnes, Esquire
19  One South Street, 20th Floor
20  Baltimore, Maryland 21202
21  Tel: 410.783.4004
22  E-mail: rmb@gdldlaw.com
23
24           -- and --
25

Page 3

1
2  APPEARANCES, CONTINUED
3
4
5  BOIES, SCHILLER & FLEXNER, LLP
6  By:  Harlan A. Levy, Esquire
7  575 Lexington Avenue
8  7th Floor
9  New York, NY 10022
10  Tel: 212.446.2300
11  E-mail: hlevy@bsfllp.com
12  Attorneys for the Defendant, Pfizer.
13
14
15  ALSO PRESENT:  Sam Krumholz
16          David Egilman, M.D.
17          Marissa Demonte, Videographer
18
19
20
21
22
23
24
25

Page 4

            I N D E X
WITNESS                              PAGE
WILFRED HYNES, M.D.
Examination by Mr. Barnes              7
Examination by Mr. Fromson            91
Examination by Mr. Barnes            149
Examination by Mr. Fromson           186
Examination by Mr. Barnes            189


            E X H I B I T S
NO.   DESCRIPTION                    PAGE
1     Notice                           6
2     000374-37BWH-00205 -             6
      000374-37BWH-00426
3     CV                              13
4     Demand for Jury Trial           91
5     Answer                          91
6     US Package Insert of 2009      100
7     Settlement Agreement           133

Page 5

8     Letter 9/9/09                  142
9     FDA Article                    168
10    Update                         194

Page 38

1   appropriate once you've evaluated the
2   patient, how do you select between a
3   tricyclic antidepressant versus narcotic
4   verse antiepileptic drug such as Neurontin?
5   A. In the chronic setting, we're probably more
6      likely to try non-narcotics first.
7   Q. Why is that?
8   A. Because of the risk of addiction, the
9      side-effect profile of narcotics.
10  Q. What are your concerns about the side-effect
11     profile for narcotics?
12  A. Nausea, constipation. Certainly, it's a
13     step up in terms of potency. Narcotics are
14     much stronger agents. They are closely
15     regulated. Clearly, if you are going to
16     treat a patient without narcotics, that
17     would be the preference.
18  Q. They are a heavier drug than the
19     antiepileptics?
20  A. That's correct.
21  Q. In terms of selecting a drug such as
22     Neurontin, an antiepileptic drug such as
23     Neurontin, for the treatment of a pain
24     condition in the year 2000, what information
25     would you rely upon in choosing that drug?

Page 39

1      What sort of information --
2   A. My prior experience.
3   Q. Was that the predominant --
4   A. Yes.
5   Q. Why is that?
6   A. I found it to be effective for neuropathic
7      pain.
8   Q. Did you begin using Neurontin during your
9      fellowship?
10  A. Yes.
11  Q. And you just carried it forward in your
12     private practice?
13  A. That's correct.
14  Q. In your training, did you have any -- I
15     think you already answered, but in your
16     training, your decision to use Neurontin was
17     basically based upon the information you
18     received from your colleagues here in
19     Boston?
20  A. The attending physicians, yes.
21  Q. And they were generally satisfied with
22     Neurontin to treat neuropathic pain?
23        MR. FROMSON: Objection. Hold on.
24     Objection. Form.
25        You can answer.

Page 40

1   A. Yes.
2   Q. What was their experience with Neurontin for
3      the treatment of neuropathic pain during
4      your fellowship?
5        MR. FROMSON: Objection. Form.
6   Q. You may answer.
7   A. Predominant feeling was that it was
8      effective for neuropathic pain.
9   Q. And that was your experience as well?
10  A. Yes.
11  Q. I have marked as an example -- you have it
12     in front of you -- Exhibit 2. I've given it
13     to counsel.
14        Exhibit 2, for the record, is the
15     records from Brigham and Women's from
16     October 2000 for Mr. Shearer.
17  A. Okay.
18  Q. You've had a brief moment prior to the
19     deposition.
20        Let me ask you this again: Other than
21     spending a moment prior to the deposition,
22     have you had a chance to familiarize
23     yourself with the records for Mr. Shearer
24     from his hospitalization at Brigham and
25     Women's Hospital in 2000?

Page 41

1   A. No.
2   Q. We'll take our time and go through them.
3      First of all, would you turn to Exhibit 2,
4      and it's the -- it's at Bates number 410 and
5      411, and it's a consult note.
6        Do you know Dr. Britton,
7      B-R-I-T-T-O-N? He requested a consult.
8   A. No.
9   Q. Okay.
10        Looking at the top of page 410, it's a
11     request to APS.
12        What is "APS"?
13  A. Acute Pain Service.
14  Q. And that would be you?
15  A. Yes.
16  Q. In fact, that was the name of the service,
17     correct?
18  A. Yeah.
19  Q. But also treated chronic pain forms,
20     correct?
21  A. That's correct.
22  Q. Okay. And there was a diagnosis number one.
23        What was the diagnosis number one?
24  A. Status post-mitral valve repair, status
25     post-stroke.

11 (Pages 38 to 41)

Page 62

1  be appropriate for him?
2  A. Correct.
3  Q. So did you consider other antiepileptic
4     drugs other than Neurontin for the treatment
5     of his neuropathic pain which you diagnosed
6     on the 14th of October?
7  A. I would have no idea.
8  Q. What were the clinical reasons why you would
9     have picked Neurontin at this time, other
10    than it was an antiepileptic drug?
11 A. Familiarity.
12 Q. And what was your familiarity with Neurontin
13    on October 14, 2000?
14 A. Used it extensively with good results.
15 Q. And had you used it extensively with good
16    results for patients such as Mr. Shearer?
17       MR. FROMSON: Objection. Form.
18 A. Yes.
19 Q. Okay.
20       Now, in terms of its side-effect
21    profile, what was your view of Neurontin on
22    October 14, 2000 with regard to side
23    effects?
24 A. It was a purely benign medicine.
25 Q. By being a fairly benign medicine, what does

Page 63

1     that mean to the layman?
2  A. Well tolerated.
3  Q. If it's well tolerated, what does that mean
4     to a layman?
5  A. Minimal side effects.
6  Q. Okay.
7        Now, in the past, had you
8     had -- strike that.
9        With regard to Neurontin being well
10    tolerated, was it important to you that it
11    did not have drug interactions? Was that
12    one of the factors you would have
13    considered?
14       MR. FROMSON: Note my objection to
15    the form of the question.
16 A. Yes.
17 Q. Let me ask you this: What other features
18    did you consider important for the patient
19    like Mr. Shearer with regard to Neurontin's
20    side-effect profile?
21 A. I'm not quite sure how to answer that.
22 Q. Was it your experience -- did you have any
23    experience with Neurontin and drug
24    interactions?
25 A. Yes.

Page 64

1  Q. And what was that?
2  A. There were very few.
3  Q. Is that important to a pain management
4     specialist?
5  A. Yes.
6  Q. Why is that?
7  A. There will be patients that you will see
8     that will be on multiple medications.
9  Q. What's the importance of having a drug that
10    doesn't interact with other medications?
11 A. If you -- you can have significant reactions
12    with other medications.
13 Q. Neurontin doesn't have that problem?
14 A. No.
15 Q. Do you agree with that?
16 A. Yes.
17       MR. FROMSON: You mean now or then?
18       MR. BARNES: Then.
19       MR. FROMSON: Note my objection to
20    form of the last question. I know you were
21    asking about 2000, that's why.
22 Q. You understood my last question?
23 A. Yes.
24 Q. Was it your experience in 2002 when you were
25    treating Mr. Shearer that Neurontin had a

Page 65

1     good safety profile with regard to drug
2     interactions?
3  A. Yes.
4  Q. Is that your experience today?
5  A. Yes.
6  Q. Do you still use gabapentin for the
7     treatment of neuropathic pain?
8  A. Yes.
9  Q. And do you use other AEDs for the treatment
10    of neuropathic pain today?
11 A. Yes.
12 Q. Do you still use tricyclic antidepressants
13    for the treatment of neuropathic pain?
14 A. Yes.
15 Q. And as to which type of medicine you
16    prescribed for neuropathic pain would be
17    based upon the patient's unique
18    circumstances?
19 A. Correct.
20 Q. I'd like for you to turn your attention to
21    page 413.
22 A. Okay.
23 Q. At the top of the page, I believe that is
24    your handwriting?
25 A. Correct.

Page 90

1  Mr. Shearer?
2       MR. FROMSON: Objection. Form.
3  A. Probably.
4  Q. Was there any evidence that Mr. Shearer had
5     side effects from Neurontin while he was in
6     the hospital?
7       MR. FROMSON: Objection.
8  A. It doesn't appear to be so.
9  Q. Was it the response of Mr. Shearer to the
10    combination of Neurontin, Flexeril, and
11    Vioxx something that you had hoped to
12    achieve when you initially prescribed the
13    Neurontin for Mr. Shearer?
14      MR. FROMSON: Objection. Just note
15    my objection to form.
16 A. Yes.
17 Q. Is Neurontin commonly used with other
18    medications to achieve pain control?
19 A. Yes.
20 Q. Is that one of its benefits to patients, it
21    can be used in combination?
22 A. Yes.
23 Q. Do you continue to prescribe Neurontin for
24    patients like Mr. Shearer even in your
25    practice today?

Page 91

1  A. Yes.
2  Q. Would Neurontin be -- today be one of the
3     choices you would consider to treat a
4     patient such as Mr. Shearer for symptoms he
5     complained of in October of 2000?
6       MR. FROMSON: Objection.
7  A. Yes.
8       (Pause.)
9       MR. BARNES: I will pass the
10    witness.
11      MR. FROMSON: Oh, great.
12      MR. BARNES: Two-minute break?
13      THE VIDEOGRAPHER: The time is
14    1:57, and we're off the record.
15      (Short recess.)
16      (Exhibit Nos. 4-5 marked.)
17      THE VIDEOGRAPHER: The time is
18    2:05. This is the beginning of tape two in
19    the deposition of Wilfred Hynes, M.D., and
20    we're back on the record.
21           * * * * *
22      EXAMINATION BY MR. FROMSON
23 Q. Good afternoon, Doctor.
24 A. Good afternoon.
25 Q. My name is Ken Fromson, and I represent the

Page 92

1     Shearer family, and I presume you probably
2     figured that out by now.
3  A. Yes.
4  Q. And there's a lawsuit that has been brought
5     against makers of a drug called "Neurontin."
6     I figured you figured that out as well by
7     now.
8  A. Yes.
9  Q. And before your deposition was scheduled
10    today, did the lawyers for the drug company
11    contact you to schedule the deposition?
12 A. I don't know who contacted who -- who
13    submitted the subpoena. I'm assuming it was
14    the drug company.
15 Q. Okay.
16 A. Pfizer.
17 Q. You had referenced earlier on in your
18    testimony that you had a very brief phone
19    call from Dr. David Egilman?
20 A. Right.
21 Q. Did you receive any phone calls from anyone
22    else before the deposition was scheduled?
23 A. No.
24 Q. Okay.
25      And did you have any documents to

Page 93

1     review regarding Mr. Shearer before your
2     deposition today?
3  A. None.
4  Q. Did you review any documents from anybody
5     related to Pfizer within the last two or
6     three months related to this lawsuit?
7  A. Dr. Egilman submitted a letter.
8  Q. Okay.
9       And did you read the letter?
10 A. Yes.
11 Q. Do you have a recollection of what was in
12    the letter?
13 A. Just that he wanted to talk about the case.
14 Q. Okay.
15      MR. BARNES: I asked you to produce
16    all the documents you had in this case,
17    including documents from Dr. Egilman.
18      Did you produce those today?
19      THE WITNESS: I don't know if I do
20    have that. I don't know if I just threw it
21    out. I think I might have thrown it out
22    when I got it.
23      MR. BARNES: You threw it out?
24      THE WITNESS: I think so. I don't
25    know if I brought it in or not. I don't

24 (Pages 90 to 93)

Page 110

1    were at Brigham -- correct me if I am
2    wrong -- was it from approximately '97 to
3    2000 that you were an attending?
4  A. '97 to 2005 I was an attending.
5  Q. It would have been for approximately three
6    years that you were practicing medicine
7    focusing on pain management up to the point
8    that you met and provided a Neurontin
9    prescription to Mr. Shearer; is that
10   correct?
11         MR. BARNES: Objection. Misstates
12   testimony.
13 Q. Let me rephrase then.
14        For what period of time were you a
15   practicing doctor in Massachusetts focusing
16   on pain management up to the point where you
17   met Mr. Shearer in October of 2000?
18 A. Approximately three years.
19 Q. And over that three years, I guess you
20   developed some experience with the use of
21   Neurontin? Would that be accurate?
22 A. Correct.
23 Q. As a practicing doctor, even up through just
24   2000, did you come to understand the
25   significance and importance of clinical

Page 111

1    trials as a way of determining the risk and
2    benefits of drugs in this country?
3  A. Yes.
4  Q. Is it fair to say you didn't participate in
5    any clinical trials related to Neurontin up
6    through 2000? Would that be accurate?
7  A. I don't believe so.
8  Q. Is it fair to say you were not -- let me ask
9    it this way: Were you ever an investigator
10   during a clinical trial for the drug
11   Neurontin before 2000?
12 A. I don't believe so, but on occasion, what
13   will happen, if there was a study being done
14   by the group, all the attendings' names were
15   on it. I don't know if that was the case.
16   I don't know if anybody was looking at
17   Neurontin in our group back then.
18 Q. To the best of your knowledge --
19 A. I was not a primary investigator, no.
20 Q. Thank you.
21        And so in terms of your experience
22   with the drug, it was not under controlled
23   circumstances like a clinical trial would
24   be?
25 A. Correct.

Page 112

1  Q. What you gained from your experience with
2    Neurontin was clinical?
3  A. Correct.
4  Q. It was anecdotal?
5         MR. BARNES: Objection.
6  Q. Would that be fair?
7         MR. BARNES: Objection.
8  Q. Let me ask you in a more active way.
9         Would you describe your experience
10   with Neurontin, in terms of your learning
11   about its benefits and risks with the use of
12   your patients, as being anecdotal?
13        MR. BARNES: Objection.
14 A. Anecdotal, in my mind, seems to be one case.
15 Q. How would you describe it? Did you have a
16   million cases?
17        MR. BARNES: Objection.
18 A. No.
19 Q. Did you have 1,000 cases?
20 A. Using Neurontin? Possibly.
21 Q. Before 2000?
22 A. Possibly.
23 Q. Okay.
24        Can you give us a fair approximation
25   of the amount of patients to whom you

Page 113

1    prescribed Neurontin up through 2000?
2  A. Approximately 1,000 would -- I don't know.
3    Not sure. Somewhere between 500 and 1,000 I
4    would guess.
5  Q. If I asked you, did you have control
6    patients, would you understand that
7    question?
8  A. Yes.
9  Q. Did you have control patients?
10 A. No.
11 Q. Okay.
12        And in terms of this approximate --
13   even up to 1,000 patients, can you give us a
14   percentage of how long you treated these
15   patients?
16        MR. BARNES: Objection.
17 Q. In other words, was it over four weeks?
18   Over three days? Something more or
19   something less?
20        MR. BARNES: Inpatient or
21   outpatient?
22        MR. FROMSON: That's a good point.
23   Thank you, Rick.
24        MR. BARNES: I'm just trying --
25        MR. FROMSON: I appreciate that.

29 (Pages 110 to 113)

Page 126

1  not Neurontin could cause suicidal behavior
2  in people using it?
3       MR. BARNES: Objection. Lack of
4  foundation, lack of evidence.
5       Go ahead.
6  A. I do not believe so.
7  Q. Did Dr. Ross -- well, did you consider
8  Dr. Ross to be someone upon whom you relied
9  for medical information?
10 A. Yes.
11 Q. Did you consider Dr. Ross to be a valuable
12 source of information regarding the drugs
13 you were considering prescribing to
14 patients?
15 A. Yes.
16 Q. Did Dr. Ross provide you information with
17 respect to Neurontin?
18      MR. BARNES: Objection.
19 A. I'm sure in the time period that we would
20 have at some point discussed Neurontin. He
21 was my attending when I was a fellow.
22 Q. Did he ever disclose to you any
23 relationships, business relationships, that
24 he had with Parke-Davis Warner-Lambert
25 regarding Neurontin?

Page 127

1       MR. BARNES: Objection. Lack of
2  foundation, assumes facts not in evidence,
3  relevance.
4  A. I can answer?
5  Q. You can answer.
6  A. Yes, he was a speaker.
7  Q. In terms of time frame, being from the point
8  up to Mr. Shearer's death -- let me withdraw
9  the question. I'm so sorry.
10      Referencing your attention to the time
11 up to the point where you prescribed
12 Neurontin to Mr. Shearer in October of 2000,
13 and any time in that time frame, did
14 Dr. Ross disclose to you that he was a
15 speaker for Warner-Lambert or Parke-Davis?
16      MR. BARNES: Objection.
17 A. Yes.
18 Q. Okay.
19      What did he explain that that meant,
20 if anything?
21 A. He was paid by the company to give lectures
22 on the use of Neurontin.
23 Q. Now, did he ever give a lecture in your
24 presence on the use of Neurontin before you
25 prescribed Neurontin to Mr. Shearer?

Page 128

1       MR. BARNES: Objection.
2  A. I'm sure he did when I was a fellow.
3  Q. And did he discuss Neurontin's use for
4  neuropathic pain?
5       MR. BARNES: Objection.
6  A. Sure.
7  Q. Any of the -- how many times did you attend
8  any lectures provided by Dr. Ross, Edgar
9  Ross, regarding Neurontin up to the point
10 that you had prescribed Neurontin to
11 Mr. Shearer?
12      MR. BARNES: Objection.
13 A. I don't know exactly, but maybe half a
14 dozen.
15 Q. On any of those occasions, did -- did he
16 disclose any risk of suicidal behavior with
17 Neurontin?
18      MR. BARNES: Objection.
19 A. I don't believe so.
20 Q. How many people attended these lectures in
21 general?
22 A. It varied with the lectures for the
23 residents and fellows. It would probably be
24 12, 12 people. Other venues, maybe 15 to
25 20. I can't speak to others that he gave

Page 129

1  that I wasn't in attendance.
2  Q. On any of the occasions that you attended
3  lectures provided by Dr. Ross during which
4  time Neurontin was discussed, did he provide
5  any handouts or materials?
6       MR. BARNES: Objection.
7  A. I'm not sure. It's possible.
8  Q. In terms of these lectures that you attended
9  given by Dr. Ross, and during which time
10 Neurontin was discussed, did you find these
11 lectures to be informative in terms of your
12 prescribing practices for Neurontin?
13      MR. BARNES: Objection.
14 A. Yeah.
15 Q. Was the information that you learned from
16 attending the lectures given by Dr. Ross
17 part -- or serve as part of a basis for your
18 prescribing Neurontin to your own patients?
19      MR. BARNES: Objection.
20 A. I would say most of my prescribing Neurontin
21 to patients was formed during my fellowship
22 year.
23 Q. When you say most of it, that leaves open
24 part of it.
25      So my question is -- let me ask it

33 (Pages 126 to 129)

Veritext Corporate Services
800-567-8658                                                                973-410-4040

Page 130

1  again then.
2  A. Okay.
3  Q. Did Dr. Ross' lectures regarding Neurontin,
4     which were given before you prescribed
5     Neurontin to Mr. Shearer, provide, at least
6     in part, a basis for your prescription of
7     Neurontin to Mr. Shearer?
8         MR. BARNES: Objection.
9         In 2000?
10        MR. FROMSON: Yes.
11 A. I don't know how much -- again, how
12    ingrained my prescribing pattern was at that
13    point. Granted, I was a young attending, so
14    it's clear that my director, you know, was
15    someone I looked up to and listened to. So
16    I can't imagine that it would not have
17    influenced me.
18 Q. After 2002, having nothing to do with your
19    prescription to Mr. Shearer, were you
20    contacted by sales representatives from
21    Pfizer regarding Neurontin?
22 A. I believe so.
23 Q. And did there come a point where you went to
24    a speaker training meeting in New York?
25 A. Yes.

Page 131

1  Q. Was that for Neurontin?
2  A. Yes.
3  Q. What calendar year did you go?
4  A. Good question. Honestly, I don't -- 2001,
5     2002. I'm not sure.
6         MR. BARNES: Don't guess. If you
7     know, you know.
8  A. I'm not exactly sure of the precise year
9     that I went.
10 Q. Was it before or after you prescribed
11    Neurontin to Mr. Shearer?
12 A. I don't know. I can tell you I went with my
13    girlfriend then, who is now my wife. When
14    did I meet her? I think I met her late 2001
15    or late 2000. So it might have been 2001
16    then.
17 Q. In terms of the speaker --
18        MR. BARNES: 2001 -- you met her
19    late 2000?
20        THE WITNESS: Yes, I believe so.
21        MR. BARNES: Late 2000 or 2001?
22        THE WITNESS: Late 2000. In
23    2001 -- we went to New York together in
24    2001.
25 Q. In terms of your attending this speaker

Page 132

1     training meeting --
2  A. Yes.
3  Q. -- who paid for the trip?
4         MR. BARNES: Objection.
5  A. The drug company.
6  Q. Who paid for your hotel?
7  A. Drug company.
8  Q. Did you drive or fly?
9  A. Flew.
10 Q. Who paid for the flight?
11 A. Drug company.
12 Q. At the meeting, did they discuss using
13    Neurontin for neuropathic pain?
14 A. Yes.
15 Q. Did they discuss using Neurontin for
16    migraine?
17 A. Not sure. I didn't really pay attention if
18    they did because it's not something that I
19    tend to treat.
20 Q. Did there come a point in time that you
21    became aware of a drug called Lyrica?
22 A. Yes.
23 Q. Are you familiar with the term pregabalin as
24    being the generic for Lyrica?
25 A. Yes.

Page 133

1  Q. Okay.
2         And did sales representatives from
3     Pfizer visit you and discuss Lyrica?
4         MR. BARNES: Objection.
5  A. Yes.
6  Q. Did they discuss with you whether Lyrica was
7     superior to Neurontin?
8         MR. BARNES: Objection.
9  A. I'm not sure how they phrased it. I think
10    the -- my recollection, the papers they
11    brought seemed to -- the papers they
12    brought, I believe it was patients that had
13    failed Neurontin as one of the inclusion
14    criteria.
15        MR. FROMSON: Can you mark this for
16    me, please.
17        (Exhibit No. 7 marked.)
18 Q. Doctor, I don't know how to ask you this
19    question.
20        Do you read the paper on a regular
21    basis?
22 A. Yes.
23 Q. Do you listen to the news on a regular
24    basis?
25 A. Probably less than I should.

Page 134

1  Q. Did you hear anything in the news this past
2     August --
3        MR. BARNES: Objection.
4  Q. -- about Pfizer, through a division, Upjohn,
5     reaching a settlement agreement with the
6     United States Department of Justice
7     regarding off-label promotion of drugs?
8        MR. BARNES: Objection.
9  A. I believe so. I don't know -- remember the
10    specifics of it.
11 Q. Can you turn to page five of this particular
12    exhibit, please.
13 A. (Witness complies.) Okay.
14 Q. On page five, there's a paragraph related to
15    Lyrica, where it is what is considered
16    number four.
17       Do you see that?
18 A. Yes.
19 Q. And can you simply read into the record the
20    first sentence?
21       MR. BARNES: Objection. Continuing
22    line of objection to the use of this
23    document.
24 Q. Go ahead, Doctor.
25 A. "Lyrica: During the period of September 1,

Page 135

1     2005, through October 31, 2008, Pfizer:
2     (a) illegally promoted the sale and use of
3     Lyrica for a variety of off-label conditions
4     (including chronic pain, neuropathic pain,
5     perioperative pain and migraine)."
6  Q. Thank you.
7        Do you have a recollection of sales
8     representatives from Pfizer discussing with
9     you the use of Lyrica for such conditions as
10    chronic pain, neuropathic pain,
11    perioperative pain and migraine?
12       MR. BARNES: Objection.
13 A. Chronic and neuropathic pain. I don't ever
14    recall them discussing perioperative pain;
15    and, again, migraines they might have
16    discussed, but that's not an area of
17    interest for me.
18 Q. In approximately 2004, did you attend any
19    training to become a speaker for pregabalin
20    or Lyrica?
21 A. Did I? Might have.
22 Q. It's only what you recall.
23 A. I'm not sure if it was Lyrica. I'm not
24    sure. I don't think I ever gave a lecture
25    for Lyrica.

Page 136

1  Q. As part of the sources of news that you may
2     or may not listen to when you have the time,
3     do you listen to NPR? That's National
4     Public Radio.
5  A. No.
6  Q. Did you ever listen to NPR on a regular
7     basis?
8  A. No.
9  Q. Okay. I'm done with that document, Doctor.
10       With respect to your prescription of
11    Neurontin to Mr. Shearer, is it fair to say
12    that you approved the attending's
13    prescription of Neurontin to Mr. Shearer?
14       MR. BARNES: Objection.
15 Q. I'm sorry.
16       You were the attending?
17 A. I was the attending.
18 Q. Is it fair to say you approved of the
19    resident's prescription of Neurontin to
20    Mr. Shearer?
21 A. Correct.
22 Q. Did you have a discussion with Mr. Shearer
23    or did the resident have a discussion with
24    Mr. Shearer about Neurontin?
25 A. I would assume the resident.

Page 137

1  Q. Do you have any reason to believe that the
2     resident discussed an increased risk of
3     suicidal behavior with Neurontin when he or
4     she prescribed Neurontin to Mr. Shearer?
5        MR. BARNES: Objection.
6  A. No.
7  Q. Do you know who the resident was?
8  A. No.
9  Q. Let me just see if we can find the signature
10    line on her record, on the October 2000
11    record.
12 A. Looks like Xiong.
13 Q. What is the number of the page that you are
14    looking at?
15 A. 411.
16       MR. BARNES: Let me catch up to
17    you.
18 Q. Are you able to read the full name into the
19    record or --
20 A. I believe it -- I can't read anything else.
21    Just Xiong, X.
22 Q. Was this a man or woman?
23 A. No idea.
24 Q. Do you know who was directly supervising
25    her, if not -- let me withdraw the question.

Page 158

1   did not agree with?
2   A. You know, the only thing that everyone at
3      the meeting had a problem with was the
4      initial dosing.
5   Q. What was that?
6   A. Of Neurontin, I think. I don't know what --
7      they recommended 600-milligrams three times
8      a day.
9   Q. What did you usually want to start at?
10  A. That included even elderly patients. And
11     most of us really didn't agree with that.
12  Q. If you were asked a question, would you tell
13     your practice about dosing patients in
14     context of a presentation?
15  A. Yeah.
16  Q. So what would you tell them if they asked
17     you about dosing?
18  A. Say it again.
19  Q. In other words, if you were asked a question
20     about the dosing at the meeting --
21  A. Yeah.
22  Q. -- what would you tell them about your
23     practice as to dosing patients with
24     Neurontin?
25  A. If they asked me specifically my practice?

Page 159

1   Q. Yes.
2   A. Then I would tell them what my practice was.
3      That it was usually I like to start low and
4      titrate up.
5   Q. Other than the dosing issue, was there any
6      other information that you disagreed with?
7   A. Not that stood out in my memory today from
8      that.
9   Q. So you were comfortable with what was
10     presented?
11         MR. FROMSON: Objection.
12  Q. Were you comfortable with what you presented
13     in the lectures on Neurontin?
14  A. I believe so.
15  Q. Is there anything that you -- well, strike
16     that.
17         Did you consider the presentation
18     materials prepared for you to be fair and
19     balanced with regard to the information
20     provided about the treatment of postherpetic
21     neuralgia?
22         MR. FROMSON: Objection. Form.
23  A. I believe so.
24  Q. Do you recall being asked unsolicited
25     questions about Neurontin from the audience

Page 160

1      during these lectures?
2   A. Yes.
3   Q. Do you recall that?
4   A. Yes. I don't specifically remember any
5      question, but I'm sure at any lecture there
6      would have been questions.
7   Q. Do you recall being asked questions from the
8      audience regarding off-label uses, as you
9      sit here today?
10  A. Yes, probably.
11  Q. Did you advise the members of the audience
12     that this was an off-label use?
13  A. Yes.
14  Q. And were you trained to do that by Pfizer?
15  A. Yes.
16  Q. And you said when you got a question
17     regarding off-label use, you were careful to
18     advise the audience that this was an
19     unapproved use of Neurontin?
20         MR. FROMSON: Objection. Form.
21  Q. You may answer.
22  A. I believe so.
23  Q. And when you were asked a question about an
24     off-label use, in those remarks, did you use
25     your independent medical judgment in

Page 161

1      responding?
2   A. Yes.
3   Q. Not something Pfizer told you to say, but
4      what you, Dr. Hynes, believed to be true?
5          MR. FROMSON: Objection. Form.
6          You can answer.
7   A. Correct.
8   Q. There's been a lot of questions about
9      Dr. Edgar Ross.
10         Who's Dr. Edgar Ross?
11  A. He's the director of the pain management
12     center at Brigham and Women's Hospital.
13  Q. Do you believe him to be an excellent
14     doctor?
15  A. Yes.
16  Q. Is he one of your mentors?
17  A. Yes.
18  Q. Do you believe Dr. Ross told you anything
19     that was not borne out by your own clinical
20     experience concerning the use of Neurontin
21     for the treatment of neuropathic pain?
22         MR. FROMSON: Objection. Form.
23  A. No.
24  Q. And do you believe Dr. Ross provided useful
25     and accurate information based upon your own

Page 162

1 knowledge concerning the use of Neurontin
2 for the treatment of neuropathic pain?
3 A. Yes.
4 Q. Do you think Dr. Ross provided any
5 inaccurate information to you or your
6 colleagues concerning the use of Neurontin
7 in the treatment of neuropathic pain?
8 A. I don't believe so.
9 Q. Have you ever had an experience where you
10 were asked questions about Neurontin where
11 you did not tell your colleagues what you
12 believed to be the truth based upon your
13 clinical judgment with regard to your
14 experiences for Neurontin for the treatment
15 of neuropathic pain?
16     MR. FROMSON: Objection. Form.
17 A. No. No.
18 Q. Do you believe you were unfairly influenced
19 by any activities by Parke-Davis or Pfizer
20 with regard to your opinions concerning the
21 use of Neurontin for the treatment of
22 neuropathic pain?
23 A. Not sure that's a fair question.
24 Q. Let me ask you this: Do you believe that
25 when you talked about Neurontin, you were

Page 163

1 using your own independent medical judgment
2 based upon your own personal clinical
3 experience?
4 A. Yes.
5 Q. And that was based upon -- by 2000 you had
6 some 500 to 1,000 patients you treated with
7 the Neurontin?
8 A. Yes.
9 Q. You followed some of them for years?
10 A. Yes.
11 Q. Can you describe for us your experience
12 using Neurontin prior to 2000 at the
13 inpatient and outpatient practice at Brigham
14 and Women's Hospital?
15 A. It was variable. Some patients responded
16 well to it and others didn't.
17 Q. When they didn't respond to it, what did you
18 do?
19 A. Try a different agent.
20 Q. And if they did respond, what did you do?
21 A. Kept trying different agents.
22 Q. If they did respond --
23 A. Oh, if they did respond. I'm sorry.
24 Continue the medicine.
25 Q. Compared to other anticonvulsants, how did

Page 164

1 Neurontin compare to the treatment of
2 neuropathic pain in terms of its
3 effectiveness in treating that condition?
4 A. I thought it was a reasonably good choice.
5 Q. Why is that?
6 A. I felt a reasonable number of patients
7 responded.
8 Q. Did you ever have any issues with Neurontin
9 with regard to alterations in the patient's
10 mood?
11 A. Not sure if that was a major problem.
12 Q. So with regard to psychiatric side effects,
13 did you find Neurontin to have a good safety
14 profile in your own practice?
15 A. Felt it to be the case, yes.
16 Q. Now, when pain patients come in, it was your
17 experience that sometimes they are
18 depressed?
19 A. Yes.
20 Q. Are you aware that the incidents of suicidal
21 behavior in pain patients is higher than
22 that of the general population?
23     MR. FROMSON: Objection. Form,
24 lack of foundation.
25 A. Yes.

Page 165

1 Q. Has that been your experience as a pain
2 doctor, that some patients who come in for
3 pain treatment develop depression and have
4 suicidal behavior?
5     MR. FROMSON: Objection. Form,
6 lack of foundation.
7 A. Yes.
8 Q. So you never thought about -- usually follow
9 a patient in the treatment of pain for
10 changes in mood and perhaps suicidal
11 activity irrespective of any warning,
12 correct?
13 A. Yes.
14 Q. Now, Mr. Fromson asked you some questions
15 regarding the package insert from 2009.
16     Are you aware that that package
17 insert, 2009 --
18 A. Yes.
19 Q. -- the part you read -- why don't you go to
20 page --
21 A. Page ten.
22 Q. Do you know what a class label is?
23 A. No.
24 Q. Okay.
25     Are you aware today that all

Page 170

1  Q. And I want you to go down to the italicized
2     statement about the -- what they conclude.
3  A. Okay.
4  Q. Would you read the italicized statement into
5     the record, please.
6  A. "This information reflects FDA's current
7     analysis of available data concerning these
8     drugs. Posting this information does not
9     mean that FDA has concluded there's a causal
10    relationship between the drug products and
11    the emerging safety issue. Nor does it mean
12    that FDA is advising healthcare
13    professionals to discontinue prescribing
14    this product. FDA intends to update this
15    document when additional information or
16    analyses become available."
17 Q. Okay.
18    Are you aware that it's not proper to
19    draw causal inferences about any specific
20    drug from a pooled analysis of ten drugs?
21    MR. FROMSON: Objection.
22 Q. Is that your experience?
23    MR. FROMSON: Objection.
24 A. That's a fair statement.
25 Q. Doctor, as to all the journals Mr. Fromson

Page 171

1     talked to you about, you don't have a
2     specific recollection reading any specific
3     medical article concerning Neurontin prior
4     to the time you treated Mr. Shearer,
5     correct?
6     MR. FROMSON: Objection. Leading.
7  A. I don't believe so.
8  Q. You agree with that --
9  A. I do not believe so.
10 Q. Okay. Make sure -- I may have asked a bad
11    question.
12 A. Okay.
13 Q. As you sit here today, do you recall reading
14    any specific article about Neurontin prior
15    to the time you treated Mr. Shearer in the
16    published medical literature?
17 A. I do not recall at this time whether or not
18    I did.
19 Q. I want to talk to you briefly about some of
20    the questions Mr. Fromson asked you
21    concerning the choices -- what you
22    considered in treating Mr. Shearer for his
23    pain in 2000, okay?
24    Do I understand your testimony, sir,
25    you considered narcotics and tricyclic

Page 172

1     antidepressants and antiepileptic drugs,
2     drugs that would have been considered for
3     Mr. Shearer at that time, correct?
4  A. Correct.
5  Q. And the narcotics under the practice here at
6     Brigham and Women's Hospital, the pain
7     service, was to try to wean -- keep people
8     off -- get people off narcotics as soon as
9     possible because it's a heavy drug with
10    unpleasant side effects, correct?
11    MR. FROMSON: Note my objection,
12    leading.
13    I think you're going over what you
14    already asked him.
15    MR. BARNES: I'm setting a
16    foundation.
17    MR. FROMSON: Okay.
18 Q. Is that your testimony?
19 A. The practice was basically to do what we
20    best could for the patient.
21 Q. Okay.
22 A. The preference would be to use non-narcotics
23    if at all possible, but the -- it wasn't
24    necessarily the goal to get every patient
25    that we put on narcotics off them.

Page 173

1  Q. Okay.
2     For somebody like Mr. Shearer, would
3     it have been part of your goal to remove him
4     from narcotics if possible?
5  A. Not necessarily. If he was responding well
6     to narcotics without side effects, and
7     nothing else was working for him, then I
8     would have recommended continuing narcotics.
9  Q. In this case --
10 A. And that's in general. I don't remember
11    this case.
12 Q. Okay.
13    In this case, he had issues with
14    narcotics, correct?
15    MR. FROMSON: Objection. Form.
16 A. According to the documentation.
17 Q. According to the documentation, how did
18    Mr. Shearer respond to narcotics?
19 A. He had paranoid ideation.
20 Q. And what was the response of the medical
21    staff at Brigham and Women's Hospital to
22    those complaints?
23 A. He was -- it appears he was stopped on the
24    PCA and switched to oral narcotics as an
25    option, but it didn't appear he was using

44 (Pages 170 to 173)

Page 174

1  the oral narcotics much at all.
2  Q. Was a PRN prescription, correct?
3  A. Correct.
4  Q. And that's as needed?
5  A. Correct. The PCA is also as needed.
6  Q. As to tricyclic antidepressants, it was the
7     judgment of the medical doctors treating
8     Mr. Shearer's pain in 2000 that they would
9     not be appropriate for Mr. Shearer because
10    he was a heart patient, correct?
11       MR. FROMSON: Objection. Form, and
12    it's been asked and answered on direct.
13 A. In general, the tricyclics we -- with a
14    patent with atrial fibrillation, the
15    preference would be to avoid tricyclics.
16 Q. Is that what the pain staff did at the
17    Brigham and Women's Hospital with respect to
18    Mr. Shearer?
19 A. That appears to be the case.
20 Q. Okay.
21       Now, we talked about antiepileptic
22    medicines, correct?
23       From reading the Exhibit 9, you now
24    understand that all antiepileptic drugs
25    carry a class labeling for suicidal behavior

Page 175

1  and ideation, correct?
2  A. Correct.
3       MR. FROMSON: Objection.
4  Q. Doctor, do you now understand that all
5     antiepileptic drugs carry a class label for
6     suicidal behavior and ideation?
7       MR. FROMSON: Objection.
8  A. Yes.
9  Q. Okay.
10      Now, as to Neurontin, Neurontin was
11    a -- it was ultimately the prescription that
12    you approved for Mr. Shearer in 2000,
13    correct?
14 A. Correct.
15 Q. You would agree that Mr. Shearer's pain
16    needed to be treated in October of 2000,
17    correct?
18      MR. FROMSON: Objection. Leading,
19    asked and answered.
20    You covered it very well on direct.
21      MR. BARNES: I understand.
22      MR. FROMSON: I know time is
23    precious, but...
24      MR. BARNES: "Objection" would be
25    fine.

Page 176

1       MR. FROMSON: Thanks.
2  Q. Okay. Now I've lost where I was. Don't
3     worry about it. I'll get back to it.
4       In follow-up to Mr. Fromson's
5     question, it is still your belief that
6     Mr. Shearer's pain needed to be treated with
7     medicines in October of 2000, correct?
8  A. Correct.
9  Q. And do you still believe, based upon the
10    information you've reviewed today and your
11    knowledge of the class-wide label that
12    Mr. Fromson has discussed, that Neurontin
13    was an appropriate choice for Mr. Shearer
14    and the treatment of his pain conditions in
15    2000?
16      MR. FROMSON: Objection.
17 A. I mean, are we talking about now?
18 Q. Looking back.
19      Given what you had available in 2000,
20    the choices you had, do you still believe
21    that Neurontin was an appropriate choice for
22    the treatment of Mr. Shearer's neuropathic
23    pain?
24      MR. FROMSON: Objection. Form.
25 A. Again, I -- my understanding is we are

Page 177

1  talking about now, right now -- or then as
2  opposed to now.
3  Q. Looking at what you did -- let me strike
4  that.
5     Do you believe that the use of
6  Neurontin was appropriate for Mr. Shearer
7  back in 2000 to treat his pain condition?
8      MR. FROMSON: Objection. Asked and
9  answered.
10 A. From what I see of basically what's in front
11   of me, it appears at the time that that was
12   appropriate.
13 Q. Okay.
14      And you still feel it was appropriate
15   based upon what you know today?
16      MR. FROMSON: Object. Form.
17 A. That's what I see in front of me is at that
18   time it appears it was appropriate.
19 Q. Okay.
20      Now, is it your practice to advise --
21   you still prescribe Neurontin today,
22   correct?
23 A. Yes.
24 Q. And you are comfortable prescribing
25   Neurontin today for pain?

45 (Pages 174 to 177)

**Page 186**

1  suicidality with Neurontin; isn't that true?
2      MR. BARNES: Objection.
3  A. I believe so.
4  Q. Thank you. I'm sorry.
5      Did you ever become aware of an
6  article published this month in the "New
7  England Journal of Medicine" entitled
8  "Outcome reporting in industry-sponsored
9  trials of gabapentin for off-label use"?
10 A. I didn't see that article.
11 Q. Okay.
12      Do you currently have a subscription
13 to the "New England Journal of Medicine"?
14 A. I don't believe so.
15 Q. Okay. Thank you, Doctor.
16              * * * * *
17      EXAMINATION BY MR. BARNES
18 Q. I'm going to ask you some follow-up --
19 strike that. Start over.
20     MR. BARNES: Everybody set?
21     MR. FROMSON: I didn't say
22 anything. She did.
23     MR. BARNES: Because you were
24 rummaging through your stuff. I want to get
25 out of here. The doctor has been very kind.

**Page 187**

1  Q. I want to follow-up on the three
2  questions -- three subjects Mr. Fromson
3  asked you, okay?
4  A. Okay.
5  Q. First on the subject of suicidality.
6      In your experience as a physician, is
7  it your experience that information
8  concerning side effects of drugs,
9  medications, changes over time?
10 A. Yes.
11 Q. Is it uncommon for information that emerges
12 after you treated a patient to be added
13 to -- strike that.
14     Do you have any understanding as to
15 whether there was any evidence that
16 Neurontin is associated with suicide
17 behavior or ideation at the time you were
18 treating Mr. Shearer?
19 A. I don't believe so.
20 Q. Are you aware that -- of the evidence that
21 Neurontin was associated with increase in
22 depression prior to 2009?
23 A. I don't believe so.
24 Q. You don't believe there was evidence?
25 A. I don't believe I was aware.

**Page 188**

1  Q. Would you expect a pharmaceutical company to
2  be able to warn physicians through a package
3  insert of information contained in a 2008
4  FDA analysis in 2000 when you were treating
5  Mr. Shearer?
6  A. 2008?
7  Q. In other words, the information regarding
8  suicidal ideation and behavior was
9  published --
10 A. In 2008.
11 Q. -- in 2008, and made known to the public in
12 late 2008 --
13 A. So could I be aware of that in 2000?
14 Q. Would you expect a drug company to be able
15 to warn of that information in 2000 when you
16 were treating Mr. Shearer?
17 A. Not if they didn't know about it.
18 Q. It would be impossible, wouldn't it?
19 A. 2008 in 2000?
20 Q. Yes.
21 A. Yes.
22 Q. It would be impossible?
23 A. Yes.
24 Q. He talked to you about what you relied upon,
25 so I'll go back to that for just a moment.

**Page 189**

1      When you were prescribing for
2  Mr. Shearer in 2000, is it your testimony
3  that the basis for your approving the
4  prescription by the resident was your own
5  clinical experience -- favorable clinical
6  experience with Neurontin for the treatment
7  of neuropathic pain conditions?
8      MR. FROMSON: Objection. Asked and
9  answered, form.
10 A. I can only assume that, again, looking at
11 the notes, that that's how I thought.
12     MR. BARNES: No further questions.
13 Thank you.
14              * * * * *
15     EXAMINATION BY MR. FROMSON
16 Q. I'd like to assume the following: That back
17 in 1992, when the drug was going through its
18 approval process for the epilepsy
19 indication, and the FDA did a review of the
20 clinical trials, safety, and the risks that
21 were -- about Neurontin, and that the FDA
22 clinical reviewer in '92 made the following
23 statement: "Less common, but more serious,
24 events may limit the drugs widespread
25 usefulness, depression, while it may not be

Veritext Corporate Services
800-567-8658                                               973-410-4040