UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                :

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES<br>        PRACTICES AND PRODUCTS<br>        LIABILITY LITIGATION | :  MDL Docket No. 1629<br><br>:<br>:  Master File No. 04-10981 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:       :  Judge Patti B. Saris

                                :

*Shearer v. Pfizer Inc., et al.*         :  Magistrate Judge Leo T.
Case No. 1:07-cv-11428-PBS     :  Sorokin
                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
### MOTION TO EXCLUDE THE SPECIFIC CAUSATION
### TESTIMONY OF DRS. GLENMULLEN AND KRUSZEWSKI

Pursuant to Federal Rules of Evidence 104 and 702, Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this reply memorandum of law in further support of their motion *in limine* to exclude at trial the report and testimony of Plaintiff's specific causation experts, Dr. Joseph Glenmullen, M.D., and Dr. Stefan Kruszewski, M.D.

### PRELIMINARY STATEMENT

Pfizer's opening brief established that the purported expert testimony of Drs. Glenmullen and Kruszewski that Neurontin caused Mr. Shearer's suicide lacks reliable methodology and should be excluded.  Indeed, although both experts use the words "differential diagnosis" in their expert reports, they failed to observe the proper analytic strictures of that technique required by this Court.  Instead of using a reliable methodology and "standard diagnostic techniques" to rule out other possible causes of Mr. Shearer's suicide, they reached their conclusions through resort to the fallacies of circular and *post hoc* reasoning.

Plaintiff's opposition largely fails to address these defects, simply insisting that her experts' testimony must be reliable, because they used the words "differential diagnosis."  But of course, "[t]he expert's assurances that he has utilized generally accepted scientific

methodology is insufficient." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). Rather, Plaintiff must establish that Drs. Glenmullen and Kruszewski's efforts to rule out other potential causes of Mr. Shearer's suicide were the "product of reliable principles and methods." Fed. R. Evid. 702.

Thus, it is not enough that Plaintiffs' experts considered other causes, they must have considered them *independent* of Neurontin. Similarly, Plaintiffs experts engage in circular reasoning when they characterize risk factors as "protective" because they did not previously result in acts of self-harm. And, as discussed in Defendants' opening memorandum, Plaintiff's experts fail to address the relevant causation standards applied in tort actions generally, which requires proof of "but for" causation, as well as the heightened standard applied to acts of suicide. Finally, Plaintiff does not undertake any defense of her experts' speculative "Prozac withdrawal plus Neurontin" hypothesis.

Accordingly, the expert opinions of Drs. Glenmullen and Kruszewski should be excluded in their entirety.

## ARGUMENT

### I.   Plaintiff Fails to Show that Drs. Glenmullen and Kruszewski Employed a Valid Methodology to Rule Out Other Causes

In its opening brief, Pfizer demonstrated that although Drs. Glenmullen and Kruszewski claim to have based their opinions on "differential diagnosis,"[1] they have used that method in name only, failing to employ "'standard diagnostic techniques by which doctors normally rule out alternative causes.'"  (*See* Defs.' Br. at 6 (quoting *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, No. 04-10981-PBS, 2009 WL 3756328, at *13 (D. Mass. Aug. 14, 2009) (citation omitted)).)  Instead of using the appropriate standard diagnostic techniques, Plaintiff's experts relied on the fallacies of circular and *post hoc* reasoning.  (*See id.* at 6-15.)  As set forth

---

[1] In addition to their differential diagnoses, both Dr. Glenmullen and Dr. Kruszewski claim to have also conducted psychological autopsies.  Because a psychological autopsy is simply a "retrospective evaluation" of the risk factors and protective factors decedent's psychology (*see* Ex. N, Glenmullen Dep., at 110:24-111:11), it is insufficient, in itself, to evaluate causation – a differential diagnosis must also be conducted to rule out factors other than the agent at issue as potential causes.

below, Plaintiff's opposition fails to adequately address the fundamental flaws of logic and science in her experts' opinions, and their testimony must therefore be excluded.

A.      **Plaintiff Does Not Meaningfully Address Her Experts' Use of Circular Reasoning**

As set forth in Pfizer's opening brief, to validly exclude other causes of an individual's injury, a differential diagnosis must consider whether those causes were sufficient to account for the injury *independent of the agent at issue*.   (Defs.' Br. at 7 (citing FED. JUDICIAL CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE – REFERENCE GUIDE ON MEDICAL TESTIMONY 464 (2d ed. 2000) ("FJC Manual")).)   To conclude that a given agent caused an individual's suicide, the expert must "offer an explanation" for why all of the individual's other risk factors were "not the sole cause" of the individual's suicide.   *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001); *see also* FJC Manual at 464-65.   To reach a determination about causation in a suicide case, the expert has to explain with reliable diagnostic techniques, how all of the other risk factors together could not have been the sole cause of the suicide.   (*See* Defs.' Br. at 15-16.)   Dr. Glenmullen failed to follow this process, because he did not evaluate the sufficiency of Mr. Shearer's other risk factors, such as his anger issues, anxiety, and depression, independently of Neurontin.   Instead, he used circular reasoning to assume that Neurontin also caused these other risk factors.   (*See* Defs.' Br. at 6-7; Ex. B, Glenmullen Report at 28-29.)[2]

Plaintiff argues that Dr. Glenmullen did not use circular reasoning because he "performed a thorough retrospective analysis" of many of the factual circumstances of Mr. Shearer's life. (Pl.'s Br. at 5.)   However, the fact that Dr. Glenmullen's analysis was "retrospective" does not make it any less circular.   As shown in Pfizer's opening brief (Defs.' Br. at 12-15), Dr. Kruszewski frequently characterized what were actually risk factors – such as Mr. Shearer's marital difficulties and his health problems – as protective factors, because they "did not result in his act of self-harm."   (Kruszewski Report at 14; *see also id.* at 15.)   But the very question at

---

[2] The designation "Ex. __" refers to the original Declaration of Mark S. Cheffo in support of this motion, or, for new Exhibits N-P, the accompanying Supplemental Declaration of Mark S. Cheffo.   The designation "Pl. Ex. __" refers to an exhibit to Plaintiff's opposition, attached to the supporting Declaration of Andrew Finkelstein.

issue is whether those other factors contributed to Mr. Shearer's act of self-harm.  Under Dr. Kruszewski's flawed logic, even Neurontin can be deemed a protective factor, because it can just as easily be said that Mr. Shearer's use of it "did not result in self-harm."

Similarly, Plaintiff argues that Mr. Shearer's anger was ultimately not with his wife, but rather, as Dr. Catapano-Friedman explained, a "railing at fate." (Pl.'s Br. at 9 (citing Catapano-Friedman Dep., Pl. Ex. E, at 85:2-5).)  But the target of Mr. Shearer's anger is not the issue, it is the fact of his anger that heightened his risk of suicide.  As Dr. Catapano-Friedman explained at her deposition – with a retrospective analysis and the benefit of the Neurontin warnings, in addition to her personal treatment of Mr. Shearer – people with narcissistic personality disorder, like Mr. Shearer, often commit suicide due to a loss of acclaim or validation.  (Ex. G, Catapano-Friedman Dep., at 155:16-157:12.)

### B.      Plaintiff's Experts Employed Invalid "Post Hoc" Reasoning

Plaintiff defends Dr. Glenmullen's improper *post hoc* reasoning (*see* Defs.' Br. at 8-9) by insisting this was simply a proper consideration of "temporal connection" with "numerous other factors." (Pl.'s Br. at 10.)[3]  But that is not what Dr. Glenmullen did.  In attempting to rule out other risk factors, such as Mr. Shearer's anger issues, anxiety, and depression, Dr. Glenmullen began with the circular inference that these other risk factors were also caused by Neurontin. (Glenmullen Report at 28-29.)  Next, he attempted to justify one fallacy with another by stating, contrary to Mr. Shearer's medical records, that because these other risk factors manifested after the Neurontin, they must have been caused by it.  (*Id.* at 30.)

---

[3] In the first case Plaintiff cites on this point, *Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999), the Third Circuit actually affirmed the exclusion of the expert's testimony because "the temporal relationship between the exposure to the [defendant's product] and the onset of [plaintiff's injury] was questionable at best and exculpatory at worst." *Id.* at 158.  The other cases that Plaintiff cites on this point all involved experts who, unlike Plaintiff's experts, considered other factors probative of causation in addition to temporal association and/or validly ruled out other causes. *See Westbury v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) (observing that "[a] differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation"); *Zuchowicz v. United States*, 140 F.3d 381, 389 (2d Cir. 1998); *Estate of Tobin v. Smithkline Beecham Pharms.*, 164 F. Supp. 2d 1278, 1283, 1284 (D. Wyo. 2001).

Notwithstanding Plaintiff's claims in her opposition, Dr. Glenmullen did not consider "numerous other factors" in addition to temporal connection.  To the contrary, he brushed off the abundant evidence that these risk factors were present before Mr. Shearer's use of Neurontin (*see, e.g.*, Ex. E, Kruszewski Dep., at 79:22-80:16; Ex. C, Catapano-Friedman Records, at 17DCR-1-6).  In a misguided attempt to justify Dr. Glenmullen's disregard of the evidence that Mr. Shearer's serious risk factors predated his use of Neurontin, including the nursing assessment at Brigham & Women's hospital that he "expressed feelings of depression" *before* he was ever prescribed Neurontin. (Ex. F, Brigham & Women's Records at 00374-37BWH-00394-97), Plaintiff attributes this depression to the paranoia and disorientation Mr. Shearer purportedly experienced on morphine (Pl.'s Br. at 11).  But, once again, the causation opinions of Plaintiffs' experts, this time that morphine caused Mr. Shearer's depression prior to taking Neurontin, is supported only by a temporal relationship.  Their opinions on this point are not supported by either science or medical records.  For example, the warning label for morphine does not indicate that it has any association with depression and Mr. Shearer's records show that morphine caused him paranoia, not depression. (*See* Ex. O, Morphine Injection PDR.)

Plaintiff also contends that Mr. Shearer's "records . . . indicate that during October 2000, after being prescribed Neurontin, Mr. Shearer began experiencing mood and behavioral changes including a 'new panicky anxiety,'" and an "'alteration in self-concept.'"  (Pl.'s Br. at 6.) However, the phrase "new panicky anxiety" appears nowhere in Mr. Shearer's medical records, but is simply Dr. Glenmullen's inference, unsupported by the records.  (*See* Glenmullen Report at 18-19; *accord* Kruszewski Dep., Pl. Ex. K, at 80:7-81:4.)  Likewise, Dr. Glenmullen cherry picks the records containing the observation of Mr. Shearer's treaters that he had experienced an "altered self-concept," as that change was specifically deemed "related to [his] left hemiparesis." (Ex. P, Supp. Brigham & Women's Records at 37BWH-00228, 37BWH-00234.)

Dr. Kruszewski's reasoning is similarly flawed.  While Plaintiff contends that, in addition to a temporal connection, Dr. Kruszewski "performed a retrospective analysis of Mr. Shearer's life and a differential diagnosis" (Pl.'s Br. at 17-18), her argument consists of nothing more than

Dr. Kruszewski's recitation of the factual materials he considered and an invocation of Dr. Kruszewski's "education, training, experience and extensive research." (*See* Pl.'s Br. at 18.) She fails, however, to address his unreliable methodology. (*Cf. id.* at 5, 12-14, 18.) This Court has recognized that "'professional experience, education, training, and observations,'" may have more relevance in evaluating expert testimony on social science, *In re Neurontin Mktg., Sales Practices & Prods. Litig.*, 2009 WL 3756328, at *4 (D. Mass Aug. 14, 2009) (citation omitted),[4] but it has still required experts to rule out other causes with "'standard diagnostic techniques.'" *Id.* at *13 (citation omitted).

For example, Plaintiff points to Dr. Kruszewski's suggestion that Mr. Shearer's purchase of a gun after he was prescribed Neurontin may be an indication of Neurontin-induced suicidality. (Pl.'s Br. at 15.)   Not only is this suggestion a clear example of *post hoc* reasoning, Dr. Kruszewski himself admitted that it was "obviously speculation." (Ex. Q, Kruszewski Dep., at 87:24-89:6 (explaining that he is "speculating about the gun" and suggesting that a desire to commit suicide "*could have* been there in [Mr. Shearer's] unconscious, preconscious level") (emphasis added).)

Finally, Plaintiff cannot justify her experts' *post hoc* inferences by relying on the Court's conclusion that "'there is scientific evidence that Neurontin puts some people at increased risk for depression and impulsive, aggressive, or suicidal behavior.'" (Pl.'s Br. at 10 (quoting *In re Neurontin*, 2009 WL 3756328, at *10).) It is well established that "[e]vidence that [a substance] *could have* caused plaintiffs' documented injuries in the abstract" – general causation – "is manifestly different from evidence that it *did* cause those injuries" – specific causation, *Henry v. St. Croix Alumina, LLC*, No. 1999-0036, 2009 WL 982631, at *9 (D.V.I. Apr. 13, 2009)

---

[4] Plaintiff also attempts to soften the *Daubert* standard to permit her expert testimony by arguing that for opinions involving psychiatry, "courts have *broad discretion* to determine if the opinions . . . were derived from reliable principles and methods." (Pl.'s Br. at 2; *see also id.* at 8 n.20.) However, this Court has held that reliability of the testimony remains the fundamental question "even when the proposed testimony is 'soft,' as opposed to 'hard' science." *In re Neurontin*, 2009 WL 3756328, at *5; *see also Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (prohibiting trial courts from "abdicat[ing] the responsibility for making [reliability and relevance] judgments by delegating them to the scientific community").

(emphasis added) – and the chasm between the two cannot be bridged with *post hoc* reasoning. *See Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 23 n.52 (D. Mass. 1995). This erroneous conflation of general causation with specific causation lies at the heart of Plaintiff's expert testimony.[5] For instance, when Dr. Glenmullen was asked how he knew that Mr. Shearer's alleged post-Neurontin mood changes were caused by Neurontin, he explained simply that "[t]he warning specifically says, mood and behavioral changes *may* be precursors to suicidality with Neurontin," as though the possibility of general causation somehow proved specific causation. (Ex. N, Glenmullen Dep., at 96:15-24 (emphasis added).) Specific causation is the very question Plaintiff's experts must answer with a valid methodology, and they cannot assume causation merely from a temporal sequence.

## II.   Drs. Glenmullen and Kruszewski Fail to Address the Pertinent Standard of Causation

Plaintiff argues that her experts have sufficiently addressed the pertinent standard of causation because they testified that Neurontin was a "substantial factor" in causing Mr. Shearer's suicide. (Pl.'s Br. at 18-19.) However, as set forth more fully in Pfizer's briefing in support of its motion for summary judgment, incorporated here by reference, "substantial factor" is not enough. Plaintiff must also show, through competent expert evidence, that Neurontin was a but-for cause of Mr. Shearer's suicide. In addition, Plaintiff must show that Mr. Shearer's Neurontin use created "delirium or frenzy" or an "uncontrollable impulse" that caused him to commit suicide. *See Daniels v. New York, N.H. & H.R. Co.*, 67 N.E. 424, 426 (Mass. 1903).

First, Plaintiff's experts completely ignore the but-for standard of causation, even though Plaintiff admits it is controlling in addition to the substantial factor test. As established above and in Pfizer's opening brief (*see* Defs.' Br. at 16), to offer a valid but-for differential diagnosis, Plaintiff's experts must "offer an explanation" for why all of Mr. Shearer's other risk factors

---

[5] For a similar reason, Plaintiff fails to adequately address Dr. Kruszewski's inappropriate use of the Bradford Hill criteria, which apply only to assessments of general causation. (Defs.' Br. at 10-11.)

together could not have been "the sole cause" of the individual's suicide. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001); FJC Manual at 464-65. Yet Dr. Glenmullen opined only that, were it not for Neurontin, Mr. Shearer could have coped with the events of October 2000 (Glenmullen Report at 30); he did not testify that all of Mr. Shearer's risk factors together could not have been the sole cause of his suicide. Nor is there any such testimony from Dr. Kruszewski, who simply stated "that he agreed with Dr. Glenmullen's expert [report]." (Pl.'s Br. at 20.)

Second, Plaintiff's opposition does not even mention, let alone attempt to satisfy, the *Daniels* standard, which is controlling for proof of causation in suicide cases. Plaintiff only refers in passing to Dr. Kruszewski's testimony that Neurontin resulted in Mr. Shearer's "'hopelessness and an irrational desperation . . . and the impulsive act to kill himself.'" (Pl.'s Br. at 20 (quoting Kruszewski Report at 11).) But an "impulsive act" is different than an "uncontrollable impulse," and Dr. Kruszewski later *specifically denied* that he made "a determination one way or the other" as to whether Mr. Shearer was "compelled to commit suicide." (*See* Ex. Q, Kruszewski Dep., at 40:18-25.) Plaintiff's experts thus fail to address the controlling standard of causation, and their testimony must be excluded.

## CONCLUSION

For the foregoing reasons and for those stated in Pfizer's opening brief, this Court should exclude the expert testimony of Dr. Glenmullen and Dr. Kruszewski.

Dated: February 22, 2010                    Respectfully submitted,

                                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                            By: /s/ Mark S. Cheffo
                                                Mark S. Cheffo

                                            Four Times Square
                                            New York, NY 10036
                                            Tel: (212) 735-3000
                                            Mark.Cheffo@skadden.com

-and-

BOIES, SCHILLER & FLEXNER LLP

By: /s/ William S. Ohlemeyer
     William S. Ohlemeyer

333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
WOhlemeyer@bsfllp.com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 22, 2010.

               /s/ Mark S. Cheffo
               Mark S. Cheffo