# EXHIBIT N

                                                                    Page 1

 1                                          Volume: I
                                            Pages: 1-218
 2                                          Exhibits: 1-8
 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4
                                    MDL DOCKET NO. 1629
 5                                  MASTER FILE NO. 04-10981
     * * * * * * * * * * * * * * * * * *
 6   IN RE: NEURONTIN MARKETING, SALES      :
     PRACTICES AND PRODUCTS LIABILITY       :
 7   LITIGATION,                            :
     ------------------------------------
 8   THIS DOCUMENT RELATES TO:              :  JUDGE PATTI
                                            :  B. SARIS
 9   SHEARER VS. PFIZER, ET AL;             :  MAGISTRATE
     1:07-CV-11428-PBS                      :  JUDGE LEO T.
10                                          :  SOROKIN
     * * * * * * * * * * * * * * * * * *
11
12       AUDIO-VISUAL DEPOSITION OF JOSEPH GLENMULLEN,
13   M.D., a witness called on behalf of Pfizer, Inc.,
14   pursuant to the provisions of the Federal Rules of
15   Civil Procedure, before Lisa McDonald Valdario, (CSR
16   #130093), a Registered Professional Reporter and
17   Notary Public in and for the Commonwealth of
18   Massachusetts, held at the Hotel Tria, 220 Alewife
19   Brook Parkway, Cambridge, Massachusetts  02138, on
20   Monday, January 11, 2010, commencing at 9:02 a.m.
21
22
23
24
25   Job No.: CS234482

### Page 2

```
 1  APPEARANCES
 2    FINKELSTEIN & PARTNERS
        The Injury Attorneys
 3      1279 Route 300
        P.O. Box 1111
 4      Newburgh, NY 12551
        BY: Kenneth B. Fromson, Esquire
 5         kfromson@lawampm.com
           1.800.law.ampm
 6         1.800.634.1212 ext.2755
           Attorney for the Plaintiff
 7
 8    JACOBY & MEYERS
        1279 Route 300
 9      P.O. Box 1111
        Newburgh, New York 12551
10      BY: Shareef Rabaa, Esquire
           srabaa@jmlawyer.com
11         800.890.3090 ext. 2653
           Attorney for the Plaintiff
12
13    LANIER LAW FIRM
        6810 TM 1960 WEST
14      HOUSTON, TEXAS 77069
        BY: Kenneth S. Soh, Esquire
15         kss@lanierlawfirm.com
           713.659.5200
16         Attorney for the Plaintiff
17
18    BOIES, SCHILLER & FLEXNER, LLP
        333 Main Street
19      Armonk, New York 10504
        BY: William S. Ohlemeyer, Esquire
20         wohlemeyer@bsfllp.com
        and Lisa M. Nousek, Esquire
21         lnousek@bsfllp.com
           914.749.8200
22         Attorneys for Pfizer, Inc.
23
24
25
```

### Page 3

```
 1  APPEARANCES CONTINUED:
 2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        Four Times Square
 3      New York, New York 10036
        BY: Catherine B. Stevens, Esquire
 4         Catherine.Stevens@skadden.com
           212.735.3353
 5         Attorney for Pfizer, Inc.
 6
 7  ALSO PRESENT: George Dobrentey, videographer
```

### Page 4

```
 1              I N D E X
 2  WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
 3  JOSEPH GLENMULLEN, M.D.
 4  BY MR. OHLEMEYER  6
 5
 6
 7           E X H I B I T S
 8  No.    Description              Page
 9  1   Williams College press release    199
10  2   Pharmacy record from Little's Pharmacy   199
11  3   Group of reports                 199
12  4   Dr. Catapano-Friedman's records for Linda  199
        Shearer
13
14  5&6 Dr. Glenmullen's invoices        199
15  7   Article on Neurontin             199
16  8   Study of the Effect of Neurontin and GABA  199
        in Humans
17
18       ***ATTORNEY FROMSON RETAINED EXHIBITS***
```

### Page 5

```
 1           P R O C E E D I N G S
 2       VIDEO OPERATOR: Good morning. My name is
 3  George Dobrentey of Veritext, New Jersey. Today's
 4  date is January 11, 2010 and the time is 9:02 a.m.
 5  This deposition is being held at the Hotel Tria in
 6  Cambridge, Massachusetts. In re: Neurontin
 7  Marketing Sales and Product Liability Litigation,
 8  in the U.S. District Court for the District of
 9  Massachusetts, M.D.L. No. 1629.
10       The name of the witness is Joseph
11  Glenmullen. At this time, the attorneys will
12  identify themselves and their parties they
13  represent, after which our court reporter, Lisa
14  Valdario of Veritext, New Jersey will swear in the
15  witness, and we can proceed.
16       MR. FROMSON: On behalf of the plaintiffs,
17  Kenneth Fromson with Finkelstein & Partners.
18  Along with me today is associate, Shareef Rabaa.
19       MR. OHLEMEYER: Bill Ohlemeyer from Boies,
20  Schiller & Flexner representing Pfizer.
21       MS. STEVENS: Catherine Stevens from Skadden
22  Arps for Pfizer.
23       MS. NOUSEK: Lisa Nousek with Boies,
24  Schiller & Flexner for Pfizer.
25       JOSEPH GLENMULLEN, M.D.
```

Page 94

```
 1    labels.
 2         MR. OHLEMEYER: That's exactly the question
 3    I'm asking.
 4         MR. FROMSON: I know, but you're asking him
 5    to do that without the benefit of the labels to
 6    even look at. So it's an overbroad question.
 7  A  Could you tell me which drugs in particular you're
 8    concerned about?
 9  Q  Whatever he was taking at the time of the incident
10    you just described to me as a warning sign for
11    suicidality that you relate to his taking
12    Neurontin.
13         MR. FROMSON: I'll object to the form of the
14    question because I was confused by it. I don't
15    know that he was.
16         MR. OHLEMEYER: I'll rephrase it.
17         MR. FROMSON: Thank you.
18  Q  How do you ascribe the events of the evening that
19    Mrs. Shearer was arrested for assaulting
20    Mr. Shearer to Neurontin?
21         MR. FROMSON: Hold on. Note my objection to
22    the extent it may have been asked and answered
23    when he previously described the circumstances
24    with Catapano-Friedman. Go ahead.
25  A  In my opinion, they're part of the fact pattern of
```

Page 95

```
 1    mood and behavioral changes in Hartley Shearer
 2    after he went on Neurontin, and with a warning,
 3    it's possible for a doctor to recognize that. And
 4    absent a warning, it's not.
 5  Q  In this case, doctor, we don't have a blood test
 6    postmortem that tells us what medicine Mr. Shearer
 7    had actually taken prior to his suicide, do we?
 8  A  Correct.
 9  Q  We don't have, as you mentioned earlier, any
10    hysto, chemical stains that we can do to
11    demonstrate what might have precipitated his
12    suicide, right?
13  A  Yeah, I think you mentioned that.
14  Q  There's no x-ray, or MRI, or DNA test that can
15    tell us what caused Mr. Shearer's suicide.
16  A  That's correct.
17  Q  What you have and what you think are significant
18    though are a series of what I think you called
19    changes in his behavior that you see post
20    Neurontin that you apparently don't see pre
21    Neurontin, is that right?
22  A  Right. Together with the warnings, the
23    metanalysis, the signals, et cetera, everything.
24  Q  All right. So back to my earlier question, if I
25    wanted to test your opinion, one way I could do it
```

Page 96

```
 1    would be to go through the medical records, as you
 2    have done, and look for evidence of pre Neurontin
 3    behavior that corresponds to what you've described
 4    as unique post Neurontin behavior, isn't that
 5    right?
 6  A  Yeah. Again, I said earlier, it may not have
 7    never existed, but there is a, in the three-year
 8    period that we have very good documentation, there
 9    is a distinct shift.
10  Q  In what?
11         MR. FROMSON: Objection as to form. That's
12    been asked and answered. And the question, in
13    what, is broad, is actually ambiguous. Go ahead.
14  A  His mood and behavior.
15  Q  So one of the keys to your opinion are changes in
16    his mood and behavior that you observe post
17    Neurontin.
18  A  Right.
19  Q  Now, how is it, in hindsight, without any chemical
20    or objective test, you connect those changes to
21    Neurontin?
22  A  Based on the warning. The warning specifically
23    says, mood and behavioral changes may be
24    precursors to suicidality with Neurontin.
25  Q  Have you looked at any of the clinical trial data
```

Page 97

```
 1    to see if any of those mood and behavioral changes
 2    are observed and measured in the clinical trials
 3    that were conducted with Neurontin?
 4  A  First of all, I'm not testifying on general
 5    causation, and my experience with other drugs is
 6    that the clinical trials are usually not
 7    evaluating that specifically. I don't know in the
 8    case of Neurontin.
 9  Q  So if I wanted to test your opinion, another thing
10    I could do would be to go into the clinical trial
11    data and look for the same kind of mood and
12    behavior changes and see if they occur more
13    frequently in the people taking Neurontin than the
14    people taking placebo, isn't that right?
15         MR. FROMSON: Objection. Form.
16  A  Again, I'm not testifying on general causation,
17    but most clinical trials do not systematically
18    monitor those potential side effects, which is why
19    they're of little use.
20  Q  My question though is, if I were to make a list of
21    things that I wanted to do to test your opinion,
22    and let's back up for a minute. There's nothing
23    wrong with me testing your opinion, is there?
24  A  No, no, not at all.
25  Q  In fact, you invite, I mean the reason you get
```

Page 110

```
1   Q   Okay.
2   A   Particularly, the tricyclics.
3   Q   Now, do tricyclic antidepressants increase
4       somebody's risk of committing suicide?
5   A   Well, they are so old that they were never studied
6       for this and were not part of the metanalysis done
7       by the FDA or the metanalyses done by the FDA.
8       But they do carry now the same warning just
9       because they're in the same class.
10          So I think to a reasonable degree of medical
11      certainty, the answer would be yes.
12  Q   If you had a patient, or if you had a case that
13      you were reviewing where you didn't have a history
14      of depression prior to an antidepressant
15      prescription, and you had a suicide, would you be
16      suspicious that the antidepressants had something
17      to do with the suicide?
18          MR. FROMSON: Objection as to form.
19      Incomplete hypothetical.
20  A   It wouldn't necessarily be for that reason. It
21      would be the fact pattern of the particular case.
22  Q   Bear with me just a second.
23          (Off the record.)
24  Q   What's a psychological autopsy, doctor?
25  A   It's looking back retrospectively on someone who's
```

Page 111

```
1       deceased. It's, the term's usually used in
2       relation to retrospectively analyzing the suicide.
3   Q   And is there a, is there a book or a publication I
4       could go to to kind of find the protocol -- strike
5       that. Do you use a protocol when you conduct a
6       psychological autopsy?
7   A   Sure. It's essentially a retrospective
8       evaluation. It's not much, it's not really any
9       different from an evaluation you would do of
10      someone who was alive. It's just, it's called a
11      psychological autopsy because the person is dead.
12  Q   Well, are there any published books or manuscripts
13      that describe for me what I should be doing if I
14      were going to conduct a psychological autopsy?
15  A   There may well be articles. There are certainly
16      people who lecture about it.
17  Q   Can you name any of those people?
18  A   Sure. Dr. Terry Maltzberger here at Harvard.
19  Q   Anybody else?
20  A   No.
21  Q   Do you recall the authors of any of the books or
22      publications that describe how to do it?
23  A   Not off the top of my head.
24  Q   Are there experts or recognized authorities in the
25      field of psychological autopsy?
```

Page 112

```
1   A   I think generally speaking, suicidologists
2       probably would be considered --
3   Q   And what is, what makes somebody a suicidologist?
4   A   People who specialize in suicides or evaluating
5       suicides.
6   Q   Are those people medical doctors?
7   A   Could probably be psychologists too.
8   Q   What insight would a medical doctor have that a
9       psychologist wouldn't in going about a
10      psychological autopsy?
11  A   Well, it would be the same difference that you
12      would have again evaluating someone who was still
13      alive, just that the medical doctor's, the
14      psychiatrists have training in the medication part
15      of the history.
16  Q   Have you ever heard of a guy named Ron Maris?
17  A   I have.
18  Q   Who is he?
19  A   He's a psychologist who is a suicidologist.
20  Q   Consider him an authority in the field of
21      suicidology?
22  A   I think he's generally recognized as one. I
23      believe he's published quite a lot. I think he's
24      a professor in maybe one of the Carolinas.
25  Q   Do you have any of his publications or books?
```

Page 113

```
1   A   I think I may have at times.
2   Q   You ever heard him speak?
3   A   Have I ever heard him speak. I don't think so.
4   Q   In a patient, doctor, who has pain and has a
5       history of some level of depression, no history of
6       suicide attempts, and he's taking a variety of
7       prescription medication that you or others
8       associate with increased risk of suicidality, how
9       do you figure out what the cause of that person's
10      suicide is?
11          MR. FROMSON: Can I have that read back,
12      please?
13          (Question read back.)
14          MR. FROMSON: Okay. I'll object to it being
15      an incomplete hypothetical.
16  A   It would depend on the fact pattern in the
17      specific case.
18  Q   Very important in any case, where you're trying to
19      find the cause of a disease, to carefully look at
20      the fact pattern, isn't it?
21  A   Sure. When you say the cause, there may be more
22      than one contributing factors, and in particular,
23      you're looking for the substantial contributing
24      factors in this case.
25  Q   Now, what is a substantial contributing factor?
```

29 (Pages 110 to 113)