# EXHIBIT Q

```
                                                              Page 1
 1            U.S. DISTRICT COURT OF MASSACHUSETTS
 2                   * * * * * * * *
 3       IN RE: NEURONTIN MARKETING SALES, PRACTICES AND
 4                     PRODUCTS LIABILITY
 5                   * * * * * * * *
 6                           *
 7     SHEARER,              *   Docket No.
 8         Plaintiff         *   1629
 9         vs.               *   Master File No.
10     PFIZER, INC.,         *   04-10981
11         Defendant         *
12                           *
13                   * * * * * * * *
14                      DEPOSITION OF
15              STEFAN P. KRUSZEWSKI, M.D.
16                    January 14, 2010
17
18
19
20
21
22
23
24
25     Job No. 234312
```

Page 2

```
 1         DEPOSITION
 2             OF
 3   STEFAN P. KRUSZEWSKI, M.D., taken on behalf of the
 4   Defendant, Pfizer, Inc., herein, pursuant to the
 5   Rules of Civil Procedure, taken before me, the
 6   undersigned, Sarah Wendorf, a Court Reporter and
 7   Notary Public in and for the Commonwealth of
 8   Pennsylvania, at the Hilton - Harrisburg, 1 North
 9   2nd Street, Harrisburg, Pennsylvania, on Thursday,
10   January 14, 2010, beginning at 10:11 a.m.
```

Page 3

```
 1          APPEARANCES
 2
 3   KENNETH B. FROMSON, ESQUIRE
 4   Finkelstein & Partners, LLP
 5   785 Broadway, 3rd Floor
 6   Kingston, NY  12401
 7      COUNSEL FOR PLAINTIFF
 8
 9   WILLIAM S. OHLEMEYER, ESQUIRE
10   Boies, Schiller & Flexner, LLP
11   333 Main Street
12   Armonk, NY  10504
13      COUNSEL FOR DEFENDANT
14
15   RICHARD BARNES, ESQUIRE
16   Goodell, DeVries, Leech & Dann, LLP
17   1 South Street
18   Baltimore, MD  21202
19      COUNSEL FOR DEFENDANT
```

Page 4

```
 1                INDEX
 2
 3   DISCUSSION AMONG PARTIES              7 - 8
 4   WITNESS: STEFAN P. KRUSZEWSKI, M.D.
 5   EXAMINATION
 6      By Attorney Ohlemeyer              8 - 148
 7   EXAMINATION
 8      By Attorney Fromson              148 - 152
 9   RE-EXAMINATION
10      By Attorney Ohlemeyer            152 - 153
11   RE-EXAMINATION
12      By Attorney Fromson                  153
13   RE-EXAMINATION
14      By Attorney Ohlemeyer            154 - 155
15   CERTIFICATE                             156
```

Page 5

```
 1              EXHIBIT                    PAGE
 2                       PAGE
 3   NUMBER  DESCRIPTION             IDENTIFIED
 4   One     Dr. Kruszewski's Invoice      43
 5   Two     Dr. Kruszewski's Map         129
 6   Three   Dr. Kruszewski's CV          129
```

2 (Pages 2 to 5)

Page 38

1  about Neurontin, and the only thing I've ever
2  published about Neurontin is the article about
3  gabapentin-induced delirium and dependence in The
4  Journal of Psychiatric Practice last summer, I
5  believe. I have an actual quotation here. So that's
6  the only thing I've ever published about Neurontin.
7  In terms of research, one of my two responsibilities
8  when I worked for the Department of Public Welfare
9  for the Commonwealth of Pennsylvania was to examine
10 drugs and drugs effects, and as I already said, I was
11 in charge of several death investigations and so was,
12 therefore, responsible for examining potential causes
13 of death.
14 BY ATTORNEY OHLEMEYER:
15 Q. I read an article in the paper yesterday,
16 Doctor, about trigeminal neuralgia. Are you familiar
17 with that disease?
18 A. A little bit. It's out of my specialty.
19 Q. And the reason it caught my eye was in the same
20 headline they described it as a suicide disease ---
21 the suicide disease.
22     ATTORNEY FROMSON:
23     Which was it, A or B?
24     ATTORNEY OHLEMEYER:
25     A. I might have it in my paper.

Page 39

1  BY ATTORNEY OHLEMEYER:
2  Q. But in the article, they talked about medical
3  treatments for those kinds of conditions, and one of
4  the things they talked about was prescribing
5  anticonvulsant drugs to treat that kind of pain?
6  A. Yes.
7  Q. That kind of prescription would be an off label
8  prescription of those medicines; wouldn't it?
9  A. For Neurontin, it would be. Neurontin is only
10 approved for postherpetic neuralgia, so it would be
11 for Neurontin. For Tegretol, I'm not sure. I think
12 Tegretol or carbamazepine, C-A-R-B-A-M-E-Z-E-P-I-N-E
13 (sic), is approved for trigeminal neuralgia.
14 Q. But in general, antiepileptic drugs are
15 equivalent with the --- I mean, you can quibble with
16 the adjustive --- sometimes frequently often
17 prescribed off label to treat certain types of pain;
18 aren't they?
19 A. Yes.
20 Q. And there's nothing inherently wrong with that;
21 is there?
22 A. There is not.
23 Q. And that practice, the practice of using
24 antiepileptic drugs to treat pain, predated the
25 introduction and first sale of Neurontin; didn't it?

Page 40

1  A. Yes.
2  Q. Do people who commit suicide, Doctor, exercise
3  free will in reaching that decision?
4     ATTORNEY FROMSON:
5     Objection as to form.
6  A. Boy, I don't think I can answer that question.
7  I haven't given it enough thought, whether it's a
8  voluntary decision or it's an involuntary decision.
9  BY ATTORNEY OHLEMEYER:
10 Q. Well, that was my next question. Is it --- is
11 there volition involved, or is it compelled?
12     ATTORNEY FROMSON:
13     Objection as to form.
14 A. On a philosophical basis, I don't think I can
15 answer it. On a case-by-case base, I can surmise how
16 it might be applicable.
17 BY ATTORNEY OHLEMEYER:
18 Q. Well, let's talk about Mr. Shearer. Was Mr.
19 Shearer on the day of his death compelled to commit
20 suicide, or did he exercise any free will in making
21 that decision?
22     ATTORNEY FROMSON:
23     Objection. Form.
24 A. I didn't make a determination one way or the
25 other.

Page 41

1  BY ATTORNEY OHLEMEYER:
2  Q. Do you think that Mr. Shearer would have
3  committed suicide on the day he died if there had not
4  been a firearm in the house?
5  A. I don't know.
6  Q. Have you ever talked with any of Mr. Shearer's
7  treating physicians or prescribing doctors?
8  A. No.
9  Q. In the Shearer case --- well, strike that.
10    You're familiar with a gentleman by the name of
11 Ron Maris?
12 A. Dr. Maris from the University of South
13 Carolina, ---
14 Q. Right.
15 A. --- that Maris professor? Yes.
16 Q. He's not a medical doctor; is he?
17 A. He is not. He's a Ph.D.
18 Q. And he's published a lot in the area of suicide?
19 A. He has, yes.
20 Q. And he's got a tool he calls a psychological
21 autopsy that he uses to examine postmortem potential
22 causes of suicide?
23 A. He does.
24 Q. Did you --- and you're familiar with that tool
25 or that --- whatever you want to call? Is it a tool?

Page 86

1  really quite limited. She basically has one or two
2  sentences often or a couple of phrases for a given
3  visit.
4      BY ATTORNEY OHLEMEYER:
5  Q. First visit she ever had, though, in her notes,
6  she describes him as seeing her and presenting with
7  anger issues?
8          ATTORNEY FROMSON:
9              Objection. Lack of foundation.
10 A. Yes.
11     BY ATTORNEY OHLEMEYER:
12 Q. And in her deposition describing her initial
13 impressions of Mr. Shearer --- we can all go back and
14 count it. I was looking at it this morning. She
15 uses the word angry seven times in that description;
16 doesn't she?
17         ATTORNEY FROMSON:
18             Objection. Lack of foundation.
19 A. Yeah, you'd have to show that to me, but I'm
20 going to take your word for it.
21     BY ATTORNEY OHLEMEYER:
22 Q. Yeah, we can count it.
23 A. I believe that she did, yeah.
24 Q. And she also pointed out --- and this is what I
25 want you to tell me whether you disagree with

Page 87

1  this --- is that when somebody with her background,
2  her education and her training is presented with a
3  patient like Mr. Shearer, that she is alert to and
4  looking for signs of suicidality?
5          ATTORNEY FROMSON:
6              Objection as to form. Lack of
7  foundation.
8  A. She certainly should be.
9      BY ATTORNEY OHLEMEYER:
10 Q. She should be?
11 A. Yes.
12 Q. And in fact, she said she was; didn't she?
13         ATTORNEY FROMSON:
14             Objection. Lack of foundation. You
15 can answer.
16 A. Yes.
17     BY ATTORNEY OHLEMEYER:
18 Q. And during the entire time she saw Mr. Shearer,
19 she never observed or recorded any such observation?
20         ATTORNEY FROMSON:
21             Objection. Lack of foundation.
22 A. That is what she said, yes.
23     BY ATTORNEY OHLEMEYER:
24 Q. I'm curious about your reference --- it doesn't
25 matter whether I'm curious. I'm going to ask you

Page 88

1  about your reference to the gun. Are you suggesting
2  that Mr. Shearer purchased the gun for a reason other
3  than that which has been described by Ms. Shearer,
4  Sean Wheeler and his son, Ivor?
5          ATTORNEY FROMSON:
6              Objection as to form and lack of
7  foundation.
8  A. What I'm speculating about the gun is that he
9  --- what facts do we know? We know that he purchased
10 the gun. He did it with Sean. He purchased a good
11 looking gun because it was consistent with his
12 personalty and demeanor, and the stated purpose and
13 what Sean went to was to shoot it at a shooting
14 range, I guess, as an another --- a hobby or
15 something that he could do being that he was somewhat
16 compromised. Whether it was known to him or not, it
17 could have been in the back of his mind, and this is
18 obviously speculation, that there are multiple
19 purposes for the use of a gun. So the --- and that's
20 consistent for me with the whole --- my opinion
21 within a reasonable degree of medical certainty that
22 Neurontin was a contributing factor to his suicide,
23 because he was already taking Neurontin. The
24 depressive adgenic effects of Neurontin could have
25 started and probably did, 'cause I agree with Dr.

Page 89

1  Glenmullen, long before he came to the point where he
2  was desperate and committed suicide. So even if it
3  was not --- I don't know what I want to say ---
4  absolutely known to him that he wanted to commit
5  suicide, it still could have been there in his
6  unconscious, preconscious level.
7      BY ATTORNEY OHLEMEYER:
8  Q. So if I understand your testimony, the Neurontin
9  he was taking unconsciously compelled him to purchase
10 a gun for a stated reason other than what his
11 subconscious was real telling him to do and that was
12 prepare to commit suicide?
13         ATTORNEY FROMSON:
14             Objection. Form.
15 A. No. No, that's not exactly my testimony. I
16 don't believe Neurontin compelled him to purchase a
17 gun. But we've already established in general
18 causality that --- and as we've already stated here
19 today, that Neurontin has the capacity and
20 capability, the biological plausibility to cause
21 serious mood changes and increase the risk of
22 suicide.
23     BY ATTORNEY OHLEMEYER:
24 Q. That's your opinion and I understand that, ---
25 A. Right.