UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------x
:
In re:  NEURONTIN MARKETING, SALES          :  MDL Docket No. 1629
        PRACTICES AND PRODUCTS              :
        LIABILITY LITIGATION                :  Master File No. 04-10981
---------------------------------------------------------x
:
THIS DOCUMENT RELATES TO:                   :  Judge Patti B. Saris
                                            :
*Shearer v. Pfizer Inc., et al.*            :  Magistrate Judge Leo T.
Case No. 1:07-cv-11428-PBS                  :  Sorokin
                                            :
---------------------------------------------------------x


**REPLY MEMORANDUM IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

ARGUMENT ............................................................................................................................. 1

I.  All of Plaintiff's Claims Fail Because Plaintiff Cannot Establish Cause in Fact ................ 1

    A.  There Is No Competent Evidence That Neurontin Use Caused Mr. Shearer to Commit Suicide ........................................................................................... 1

    B.  There Is No Competent Evidence That Additional Warnings Would Have Produced a Different Outcome ................................................................. 1

    C.  Plaintiff's Fraud Allegations Cannot Save Her Failure-To-Warn Claims ............... 5

II. All Plaintiff's Claims Fail Because Plaintiff Cannot Establish Proximate Causation ......................................................................................................................... 6

III. Plaintiff's Implied Warranty, Strict Liability, and Fraudulent Concealment Claims Should Be Dismissed as Duplicative of Her Negligent Failure-to-Warn Claim ............... 13

IV. Plaintiff Cannot Prove Essential Elements of Her Express Warranty Claims .................. 14

V.  Plaintiff's Chapter 93A Claim Fails Because She Did Not Give Prior Notice to Pfizer ................................................................................................................................ 14

CONCLUSION .......................................................................................................................... 14

# ARGUMENT

## I. All of Plaintiff's Claims Fail Because Plaintiff Cannot Establish Cause in Fact

To raise a triable issue regarding cause in fact, Plaintiff would have to present evidence that (1) all of the other risk factors in Mr. Shearer's life would have been insufficient to cause his suicide but for Neurontin, and (2) a different warning to Mr. Shearer's prescribing doctors would have changed his doctors' prescription decisions or otherwise changed the outcome. Plaintiff's failure to present any such evidence requires the entry of summary judgment as to all of her claims.

### A. There Is No Competent Evidence That Neurontin Use Caused Mr. Shearer to Commit Suicide

As discussed in the concurrently-filed reply brief in support of Pfizer's motion to exclude the specific causation testimony of Drs. Glenmullen and Kruszewski, Plaintiff has failed to show that these experts employed a reliable differential diagnosis, rather than basing their opinions on such fallacies as circular reasoning and *post hoc ergo propter hoc*. Because Plaintiff has no competent expert evidence of specific causation, there is no genuine issue of material fact, and her claims fail as a matter of law. *See, e.g., Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655, 668 (D. Mass. 1997) (Saris, J.) (granting summary judgment to defendants where plaintiffs failed to offer admissible expert evidence of causation).

### B. There Is No Competent Evidence That Additional Warnings Would Have Produced a Different Outcome

Plaintiff does not present any evidence that Mr. Shearer's doctors would have changed their decision to prescribe Neurontin to Mr. Shearer had a different or additional warning been given. As Plaintiff concedes, Dr. Angevine refused to give such testimony despite being specifically asked. (*See* Pl's Resp. to Defs' Local Rule 56.1 Statement [2524] ¶¶ 42-44.) Plaintiff emphasizes Dr. Sullivan's testimony that an additional warning "would be factored into a decision process," and Dr. Hynes's testimony that he would have "[c]onsidered" alternative drugs. (Pl's Mem. Opp. Summ. J. [2523] ("Pl. Opp.") at 8-9; Sullivan Dep. [2459-25] at 103:7-

16; Hynes Dep. at 141:4, Ex. CC.)[1] But neither doctor's testimony can support any non-speculative inference that they would not have prescribed Neurontin to Mr. Shearer had they received additional warnings. Dr. Sullivan testified that he did not "know what [he] would have done in 2001" if given an additional warning (Sullivan Dep. [2459-25] at 102:14-20), rendering the notion that he would have changed his prescription decision impermissibly speculative. As for Dr. Hynes, there is not even room for speculation; he still believes that Neurontin "was appropriate" for Mr. Shearer (Hynes Dep. at 177:5-18, Ex. CC), and he still "prescribe[s] Neurontin for patients like Mr. Shearer even in [his] practice today" (*id.* at 90:23-91:7; *see also id.* at 65:6-8). Nor is there any basis for Plaintiff's citation-free conclusory assertion that Mr. Shearer's doctors would have "monitored Mr. Shearer more closely for depression and suicidality and/or prescribed Neurontin in a lower dosage or for a more limited period of time." (Pl. Opp. at 9.) As this notice-pleading language makes clear, Plaintiff has no idea (let alone evidence) what (if anything) these doctors supposedly would have done differently.

As the party with the burden of proving causation at trial, Plaintiff cannot survive summary judgment by offering such "unsupported allegations, unreasonable inferences, and conclusory speculation," *Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision), or by pointing to "'some metaphysical doubt as to the material facts.'" *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see also McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) ("If the nonmovant's argument 'rests merely upon conclusory allegations, improbable inferences, and unsupported speculation,' summary judgment is appropriate." (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990))).

---

[1] All exhibits are attached to the accompanying Supplemental Declaration of Mark S. Cheffo in Support of Defendants' Motion for Summary Judgment.

Effectively conceding the lack of evidence on this point, Plaintiff argues that Pfizer "cite[s] to NO cases under Massachusetts law that the plaintiff must show that an adequate warning would have changed the treating physician's decision so as not to prescribe the product to the plaintiff." (Pl. Opp. at 8.) To the contrary, Pfizer cited *Haughton v. Hill Laboratories, Inc.*, No. 06-11217-RGS, 2007 WL 2484889 (D. Mass. Aug. 30, 2007), which applied Massachusetts law and granted summary judgment because of the plaintiff's failure to present evidence, *inter alia*, that her prescribing doctors' "decision to prescribe [the drug] for [her] would have been influenced by any additional instructions or warnings." *Id.* at *2. Thus, Massachusetts law accords with the numerous "non-Massachusetts" cases [2] Plaintiff unsuccessfully attempts to distinguish based solely on geography, without even discussing their facts or legal analysis. (Pl. Opp. at 8.) And aside from a single case regarding the heeding presumption, Plaintiff does not cite *any* authority in support of her position. (*See id.* at 8-9.)

Plaintiff's fallback argument – that these doctors would have at least passed an additional warning on to Mr. Shearer – fares no better. Initially, while Drs. Angevine and Sullivan testified that they would have taken an additional warning into account, they refused to testify that they would have passed an additional warning along to Mr. Shearer. When specifically asked this question, Dr. Angevine stated that she did not "know if [she] would have . . . advised the patient of that based on that information or not at the time," because "it may depend upon whether or not [she] felt that that particular side effect was potentially relevant to the individual patient." (Angevine Dep. [2459-24] at 111:8-112:12.) Likewise, when specifically asked whether he would have "spoken to Mr. Shearer about the increased risk of suicidality," Dr. Sullivan testified: "I don't know what I would have done." (Sullivan Dep. [2459-25] at 100:9-16.) Any notion that Dr. Hynes would have passed a warning along to Mr. Shearer is also patently speculative, given that Dr. Hynes merely approved a Neurontin prescription issued by a resident. (Hynes Dep. at 75:10-77:18, Ex. CC.) Dr. Hynes does not recall whether he personally saw Mr. Shearer or

---

[2] (*See* Defs.' Mem. Supp. Summ. J. [2457] ("Def. Mem.") at 10-11 n.5 (citing cases).)

made the decision to start him on Neurontin. (*Id.* at 75:10-77:14.) And while Dr. Hynes testified that it was not "unreasonable" for Plaintiff to suggest that he would have made an "effort" to communicate a warning to Mr. Shearer's caregiver or family, he emphasized that he is "not sure if [he] would have had the opportunity to do that or not." (*Id.* at 141:15-142:8.)

Moreover, even assuming *arguendo* that Mr. Shearer's prescribing doctors would have passed along any additional warning, there is not a shred of evidence that this would have changed the outcome. Even under the heeding presumption, "failure to warn will not constitute negligence if it is not the proximate cause of the plaintiff's injuries." *Wasylow v. Glock, Inc.*, 975 F. Supp. 370, 378 (D. Mass. 1996). Thus, to survive summary judgment Plaintiff must "offer evidence that would . . . justif[y] the jury in concluding that if the warnings had been given and heeded, the outcome would have been different." *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999); *see also Chamian v. Sharplan Lasers, Inc.*, No. 200000171, 2004 WL 2341569, at *7 (Mass. Super. Ct. Sept. 24, 2004) (granting summary judgment where plaintiff failed to produce "evidence that if an additional warning had been given, it would have been heeded ***and*** a different result would have obtained") (emphasis added).

In *Jones*, the plaintiffs argued that the medical device manufacturer should have given additional warnings regarding maintenance of the device. *See Jones*, 16 F. Supp. 2d at 126. But because the device had been disposed of prior to suit, there was "no evidence that poor maintenance . . . contributed to any malfunction during the surgery," *id.*, and thus no evidence that an additional warning would have produced a different outcome. Likewise, in *Vanderwerf v. SmithKlineBeecham Corp.*, 529 F. Supp. 2d 1294 (D. Kan. 2008), the court held that a physician's testimony that he would have monitored the patient more closely and warned the patient of risks did not bar summary judgment where plaintiff had no evidence that, given the additional monitoring and warning, the injury would have been avoided. *See id.* at 1313-14 & n.23.

Here, Plaintiff's notion that Mr. Shearer, if warned, would have refused to take Neurontin prescribed to him by his doctors is rank speculation unsupported by any evidence. Plaintiff may attempt to rely on the recent denial of summary judgment in *Smith v. Pfizer Inc.*, No. 3:05-cv-00444, Dkt. 63, slip op. (M.D. Tenn. Feb. 19, 2010). But the *Smith* court cited deposition testimony stating that, five days before his death, the decedent had expressed concerns and sought advice regarding side effects he was allegedly experiencing. *Id.* at 17. Based entirely on this hearsay testimony, the *Smith* court distinguished *Vanderwerf* and concluded that it was "not 'entirely speculative'" that the decedent would have stopped taking Neurontin had he been warned of the alleged risk of depression and suicidality. *Id.* Here, Plaintiff does not and cannot point to any such evidence. Accordingly, this case falls squarely within the holdings of *Jones*, *Chamian*, and *Vanderwerf*.

### C.  Plaintiff's Fraud Allegations Cannot Save Her Failure-To-Warn Claims

Plaintiff does not dispute that her remaining fraud claims are subject to the same causation requirements as her failure-to-warn claims. And as discussed in Pfizer's opening brief (Def. Mem. at 17 & n.9), but ignored by Plaintiff in her response, pharmaceutical manufacturers have no duty to warn *patients* under Massachusetts law, which only recognizes a duty to warn prescribing *physicians*. *See Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992).[3]

Likewise, Plaintiff does not dispute that none of Mr. Shearer's prescribing doctors testified that an additional warning on the product label would have affected their decision to prescribe Neurontin. Neither Dr. Angevine nor Dr. Sullivan recalled receiving *any* promotional statements by Pfizer before they prescribed Neurontin to Mr. Shearer. (Sullivan Dep. [2459-25] at 111:5-114:9; Angevine Dep. [2459-24] at 15:1-5.) And Dr. Hynes still believes that Neurontin "was appropriate" for Mr. Shearer (Hynes Dep. at 177:5-18, Ex. CC), and he still "prescribe[s] Neurontin for patients like Mr. Shearer even in [his] practice today" (*id.* at 90:23-

---

[3] The Supreme Judicial Court has recognized just one exception to the learned intermediary rule, in the inapposite context of oral contraceptives. *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 135, 475 N.E.2d 65, 68 (1985).

5

91:7; *see also id.* at 65:6-8). Nor can Plaintiff survive summary judgment by claiming that Mr. Shearer's prescribing doctors were indirectly influenced by statements or omissions to the medical community at large, because this Court has consistently rejected such impermissible fraud-on-the-market theories of reliance. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 618 F. Supp. 2d 96, 111-12 (D. Mass. 2009); *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 327 (D. Mass. 2009).

Plaintiff's only response to these arguments is as follows:

> Neither Dr. Angevine nor Dr. Sullivan testified that they would NOT have relied on the Physician's Desk Reference or any other source of information concerning the risks of ingesting Neurontin prior to prescribing Neurontin to Mr. Shearer.

(Pl. Opp. at 10-11.) Plaintiff fundamentally misunderstands her burden of proof at trial and her burden of production in response to Pfizer's summary judgment motion. Where, as here, the non-moving party has the burden of proof to establish her claim, the movant "need not produce evidence negating the claim that there is a material issue in genuine dispute." *NEC Elecs., Inc. v. New Eng. Circuit Sales, Inc.*, 722 F. Supp. 861, 863 (D. Mass. 1989) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, the "moving party's burden is to point out to the district court 'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325). Accordingly, Pfizer is entitled to summary judgment if Plaintiff fails "'to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Thomas v. Digital Equip. Corp.*, 880 F.2d 1486, 1489 (1st Cir. 1989) (citing *Celotex Corp.*, 477 U.S. at 323).

Because Plaintiff concedes the "absence of evidence" that Mr. Shearer's doctors relied on any statements or omissions made to them by Pfizer, summary judgment is required. *NEC Elecs., Inc.*, 722 F. Supp. at 863 (citation omitted).

II.   **All Plaintiff's Claims Fail Because Plaintiff Cannot Establish Proximate Causation**

Plaintiff's response to this motion fails to raise any issue of material fact as to proximate cause, and confirms that summary judgment must be granted as to all of her claims. Indeed,

Plaintiff affirmatively concedes that, "[u]nder Massachusetts law, an act of suicide is generally deemed an independent intervening cause that relieves a defendant of liability unless 'the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the [defendant], and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act.'" (Pl. Opp. at 11 (citing *Daniels v. N.Y., New Haven & Hartford R.R.*, 183 Mass. 393, 399-400, 67 N.E. 424, 426 (1903)).) Plaintiff further concedes that she cannot satisfy the "delirium or frenzy" exception. (*Id.*) Instead, Plaintiff argues that Mr. Shearer's suicide "was an uncontrollably impulsive act." (*Id.*) This argument must be rejected as a matter of law.

While Plaintiff's experts have speculated that Mr. Shearer's suicide was "impulsive," both experts were merely addressing how much time elapsed between Mr. Shearer's conscious decision to commit suicide and the act itself. For example, Dr. Kruszewski merely testified that, in his "subjective opinion," Mr. Shearer's *"decision"* to commit suicide was "somewhat impulsive." (Kruszewski Dep. at 72:2-3, Ex. DD, (emphasis added).) Dr. Kruszewski does not know the specific criteria psychiatrists use for characterizing a suicide as "impulsive," but explained that those criteria merely involve "some quantification of time" between the decision and the act. (*Id.* at 72:9-73:3.) Dr. Kruszewski believes Mr. Shearer made *"the decision . . . to commit suicide"* "somewhere between when he woke up that morning and the telephone call, . . . probably in combination with writing his suicide note as well." (*Id.* at 70:10-16 (emphasis added).) Mr. Shearer's suicide note tells us "that *the decision* was made to commit suicide," and its particular wording tells us that "he's in the process of making *the decision* to end his life." (*Id.* at 70:20-24, 75:16-23.)

> Likewise, Dr. Glenmullen testified:
>
> Well, obviously he was suicidal before he committed suicide, but how long in advance, we don't exactly know. It *looks* pretty impulsive, *but on the other hand, he wrote a note*. So, you know, had he been having suicidal thoughts for two hours, 24 hours, two days, two seconds, we don't know.
>
> * * *

7

> There isn't a big span of time between the phone calls and killing himself, and presumably he wrote the note in the interim. It appears to be part of an impulsive act.

(Glenmullen Dep. at 92:12-18, 151:17-20, Ex. EE, (emphasis added).)[4]

The issue under *Daniels* is not whether Mr. Shearer's decision to commit suicide was "impulsive" (Pl. Opp. at 11), but whether his suicide resulted from an "***uncontrollable** impulse*" and was carried out "*without conscious volition . . . or knowledge of the physical nature and consequences of the act*," *Daniels*, 183 Mass. at 399-400, 67 N.E.2d at 426 (emphasis added). Neither of Plaintiff's experts has ever suggested that Mr. Shearer did not have control of his actions, did not act with conscious volition, or did not understand the nature or consequences of his act. To the contrary, "more than an hour" elapsed between the Shearers' telephone call and Mr. Shearer's suicide. (Kruszewski Dep. at 73:13-74:2, Ex. DD.) In that time, Mr. Shearer had to: (1) "remove himself from the first floor of the house and travel to the second floor of the house," (2) "locate his handgun," and "sit down and write a note," before ultimately shooting himself. (*Id.* at 74:3-21; *accord* Glenmullen Dep. at 159:9-22, 160:13-16, Ex. EE.) In addition, Mr. Shearer took the time to lock the door after telling his caretaker that he needed to collect a few things prior to attending a scheduled medical appointment. (*See* Glenmullen Report [2459-15] at 26-27; Mass. State Police Records [2459-16] at 9; Wheeler Dep. [2459-17] at 38:15-39:2, 40:23-41:15.) These undisputed facts negate proximate causation as a matter of law. As in *Daniels*,

> [a]ll the evidence tended to show that the deceased, with deliberate purpose, planned to take his own life; that he closed the door, and locked it, with a view to exclude others to prevent interruption . . . . All this points to an understanding of the physical nature and effect of his act, and to a willful and intelligent purpose to accomplish it.

*Id.* at 400, 67 N.E. at 426.

Unable to respond to this argument, which is prominently set forth in Pfizer's opening brief (*see* Def. Mem. at 15-16), Plaintiff has simply ignored it. Instead, Plaintiff tries in vain to

---

[4] Despite speculating that Mr. Shearer's suicide was "impulsive," Dr. Glenmullen admits that a suicide note normally points to the opposite conclusion: "It's more the other way around; the absence of a suicide note I think I've sometimes cited as evidence of impulsivity." (Glenmullen Dep. at 151:13-15, Ex. EE.)

8

distinguish *Beer v. Upjohn Co.*, 943 S.W.2d 691 (Mo. Ct. App. 1997), which is squarely on point. As in this case, the plaintiffs in *Beer* argued that the decedent committed suicide because of an uncontrollable impulse caused by a prescription drug, but failed to present competent expert testimony that the decedent "could not understand the consequences of his act or [that] he could not resist" the alleged impulse. *Id.* at 695.

The only meaningful distinctions between *Beer* and this case underscore Pfizer's entitlement to summary judgment here. For example, in *Beer*, the plaintiff's expert actually proffered an opinion regarding "loss of impulse control," *id.* at 694,[5] whereas Plaintiff's experts have never suggested that Mr. Shearer was not in control of his actions. Moreover, in *Beer*, the decedent committed suicide in the middle of the night, left no note, and no one witnessed the surrounding circumstances. *See id.* at 692. This lack of evidence left the uncontrollable impulse question in the realm of "conjecture and speculation." *Id.* at 695. Here, as in *Daniels*, the affirmative and undisputed facts regarding Mr. Shearer's conduct and cogent suicide note preclude, as a matter of law, any finding that he acted based on an "uncontrollable impulse" and "without conscious volition . . . or knowledge of the physical nature and consequences of the act." *Daniels*, 183 Mass. at 399-400, 67 N.E. at 426.

Citing *Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 825 N.E.2d 554 (App. Ct. 2005), Plaintiff argues that the *Daniels* rule is not "ironclad." (Pl. Opp. at 11). But *Delaney* does not support any exception that could conceivably apply here. The *Delaney* court recognized the *Daniels* rule as being the "historical view" in Massachusetts and other states. 63 Mass. App. Ct. at 242, 825 N.E.2d at 557. The court suggested that an exception might apply where the defendant "'had custody of the decedent and knowledge of her suicidal ideation.'" *Id.* at 243, 825 N.E.2d at 555-57 (citation omitted). But there was no need to apply even this narrow exception – let alone create any broader exception – because there were fact question regarding

---

[5] Plaintiff pointlessly emphasizes that the *Beer* expert was "permitted to testify *at trial*" (Pl. Opp. at 11 (emphasis in original)), but the fact remains that the plaintiff's claims were dismissed *as a matter of law*. *Beer*, 943 S.W.2d at 695.

9

whether the plaintiff had shot herself by accident based on her "belief that the gun was unloaded." *Id.* at 244, 825 N.E.2d at 558. Here, Mr. Shearer left a suicide note, and there is no dispute that he knew the gun was loaded and intended to end his life. Moreover, the defendant in *Delaney* was a police officer who had knowingly given the plaintiff access to his service revolver after she had used illegal drugs and threatened suicide in his presence. *See id.* 239, 825 N.E.2d at 555-56. Even if the plaintiff had known the gun was loaded, those facts could arguably satisfy the "custody plus knowledge of suicidal ideation" exception. The facts here cannot.

Plaintiff also relies on inapposite decisions from other states. (*See* Pl. Opp. at 13-14.) Citing these same inapposite decisions, the *Smith* court recently denied summary judgment and held that there were fact questions regarding proximate causation. *See Smith*, slip op. at 18-22. With due respect to the *Smith* court, its analysis is directly contrary to controlling Sixth Circuit and Tennessee law in that case, and is directly contrary to controlling Massachusetts law here. Tennessee law, like Massachusetts law, holds "that suicide properly constitutes an independent intervening cause" unless the facts fit recognized, narrow exceptions to the presumptive rule. *MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 736 (6th Cir. 2007) (quoting *Rains v. Bend of River*, 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003)).

The *Smith* court cites *White v. Lawrence*, 975 S.W.2d 525 (Tenn. 1998), for the proposition that Tennessee's established framework for analyzing proximate cause in suicide cases can be jettisoned in favor of generic foreseeability arguments. *See Smith*, slip op. at 19-20. Likewise, Plaintiff resorts to generic foreseeability arguments that she does not even attempt to fit within any of the narrow exceptions to the presumptive rule. (Pl. Opp. at 12.) However, both Tennessee courts and the Sixth Circuit have confined *White* to a narrow and inapposite exception within the established framework. As the Tennessee Court of Appeals has explained, *White* merely carved out a narrow exception for cases involving "special relationships, such as a physician-patient relationship, when the caregiver knows or has reason to know that the patient might engage in self-destructive acts." *Rains v. Bend of River*, 124 S.W.3d 580, 594 (Tenn. Ct. App. 2003) (citing *White*, 975 S.W.2d at 531); *see also MacDermid v. Discover Fin. Servs.*, 488

10

F.3d 721, 736 (6th Cir. 2007) (citing *White* and discussing same narrow exception). Unlike in *White*, there was no "physician-patient relationship" or any other "special relationship" between Pfizer and Mr. Shearer, *Rains*, 124 S.W.3d at 594, and there is no evidence that Pfizer even knew who Mr. Shearer was, let alone that he was "depress[ed]" or a "'likely candidate' for suicide," *White*, 975 S.W.2d at 527.

Plaintiff's generic foreseeability arguments must be rejected. Plaintiff affirmatively concedes that *Daniels* is the law of this State. (*Id.* at 11.) The *Daniels* rule is not based on fact issues regarding foreseeability, but on policy determinations, *see Daniels*, 183 Mass. at 397-98, 67 N.E. at 425, regarding the necessary "limits to the scope or definition of reasonable foreseeability based on considerations of policy and pragmatic judgment." *Poskus v. Lombardo's of Randolph, Inc.*, 423 Mass. 637, 640, 670 N.E.2d 383, 386 (1996). Plaintiff cannot use general foreseeability arguments to do an end-run around Massachusetts' settled framework, comprising a presumptive rule subject to narrow (and inapplicable) exceptions.

The *Smith* court also attempted to distinguish between a defendant's "harassing or abusive behavior," which the decedent attempts to escape by committing suicide, and a defendant's conduct that allegedly "removes a patient's 'power of choice'" by causing a mental disturbance that "increases suicidality." *See Smith*, slip op. at 22 (citation omitted). Likewise, Plaintiff argues that suicide cannot be an "independent" intervening cause if the plaintiff claims that the decedent's suicide was "dependent on and caused by" the defendant's conduct or product. (Pl. Opp. at 14.)[6] But this distinction is already accounted for within the *Daniels* framework itself, and does not support any departure from the established framework. Under *Daniels*, it is simply not enough to allege that suicide is foreseeable in the circumstances the *Smith* court describes. Instead, the plaintiff must prove that the defendant's conduct or product "caused" "an uncontrollable impulse," or produced "delirium or frenzy," that led the decedent to commit

---

[6] Plaintiff's only citation is to a 1950 California intermediate appellate court case that did not involve suicide, and thus did not apply the particular proximate cause analysis courts have developed to address suicide claims. (*See* Pl. Opp. at 14 (citing *Werkman v. Howard Zink Corp.*, 218 P.2d 43 (Cal. Ct. App. 1950).)

11

suicide "without conscious volition to produce death" and "without . . . knowledge of the physical nature and consequences of the act." *Daniels*, 183 Mass. at 399-400, 67 N.E. at 426. Thus, judgment as a matter of law was required in *Daniels* even though the defendant's conduct caused head trauma and a resulting "mental condition" that led to the decedent's suicide. *See id.* at 396-97, 67 N.E. at 425. Likewise, summary judgment was required in *Beer* because, as in this case, there was no evidence that the defendant's drug caused an uncontrollable impulse to commit suicide. *See Beer*, 943 S.W.2d at 695.

Moreover, the two prescription drug cases the *Smith* court relied upon, *see Smith*, slip op. at 22, were decided within the established framework, and both are distinguishable from this case. In *Rimbert v. Eli Lilly & Co.*, 577 F. Supp. 2d 1174 (D.N.M. 2008), the decedent did not simply commit suicide, but also shot his wife (and dog) in a "homicide/suicide," *id.* at 1182-83, and the drug's alleged side-effects at issue were not just suicide, but also "delusions" and "psychosis," *id.* at 1181, 1186, 1234. Applying New Mexico law, the *Rimbert* court appeared to rely on the *Daniels* court's "delirium" exception, *id.* at 1232, 1234-35, which Plaintiff has admitted does not apply here (*see* Pl. Opp. at 11).

Likewise, in *Stupak v. Hoffman-La Roche, Inc.*, 287 F. Supp. 2d 968 (E.D. Wis. 2003), the plaintiffs alleged that the defendant's drug caused "psychosis" and caused the decedent to commit suicide based on "an uncontrollable impulse and without conscious volition." 287 F. Supp. 2d at 970, 975. These allegations, which were taken as true under Fed. R. Civ. P. 12(b)(6), *see id.* at 970, directly invoked the *Daniels* court's exception for suicide resulting from an "uncontrollable impulse" and carried out "without conscious volition . . . or knowledge of the physical nature and consequences of the act," *Daniels*, 183 Mass. at 399-400, 67 N.E. at 426. Here, the undisputed evidence regarding Mr. Shearer's conduct and cogent suicide note precludes any such finding. *See id.* at 400, 67 N.E. at 426.

In sum, there are no issues of material fact as to proximate cause, and summary judgment must be granted as to all of Plaintiff's claims.

### III. Plaintiff's Implied Warranty, Strict Liability, and Fraudulent Concealment Claims Should Be Dismissed as Duplicative of Her Negligent Failure-to-Warn Claim

Even if Plaintiff could present evidence of causation in support of her failure-to-warn theory (which she cannot), Plaintiff's duplicative claims should still be dismissed. Plaintiff argues that the procedural rules applicable in Massachusetts state courts "permit the pleading of alternative theories of relief." (Pl. Opp. at 15.) Likewise, Plaintiff cites two cases denying motions that requested dismissal of overlapping causes of actions at the pleadings stage.[7] But Pfizer's motion does not argue that alternative theories cannot be alleged in a complaint. Instead, Pfizer argues that duplicative claims cannot be submitted to the jury. *See* Restatement (Third) of Torts § 2 cmt. n (1998) ("[T]wo or more factually identical failure-to-warn claims should not be submitted to the trier of fact in the same case under different doctrinal labels.").

Plaintiff cites a single case denying partial summary judgment with respect to a contract claim that the defendant argued was duplicative of a negligence claim based on the same conduct. *See Christopher v. Glen-Mor Fuel Oil Co.*, No. 95-01505, 1996 Mass. Super. LEXIS 39, at *5 (Mass. Super. Ct. Nov. 8, 1996) (Pl. Opp. at 15). In *Christopher*, the defendant heating oil company had filled the wrong fuel tank, which leaked and damaged plaintiff's property. *See id.* at *4. It is far from clear that this conduct would be treated identically under tort law "reasonableness" standards and contract law standards based on the terms of the parties' fuel delivery agreement.

By contrast, Massachusetts courts treat claims for breach of implied warranty and negligence under Massachusetts law "as a consolidated, single claim of negligent failure to warn." *Sprague v. Upjohn Co.*, No. 91-40035-NMG, 1995 WL 376934, at *3-4 (D. Mass. May 10, 1994); *Kelley v. Eli Lilly & Co.*, 517 F. Supp. 2d 99, 110 (D.D.C. 2007) (same, applying Massachusetts law); *see also Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 637, 751 N.E.2d 848, 859 (2001) (holding that theories of negligent failure to warn and failure to warn as

---

[7] *See Chambers v. Gold Medal Bakery, Inc.*, No. 2009-00716, 2009 Mass. Super. LEXIS 344 (Mass. Super. Ct. Sept. 17, 2009) (Pl. Opp. at 15); *Frontier Ins. Co. v. A. Anthony Tappe & Assoc., Inc.*, No. 01-1344, 2002 WL 1493746 (Mass. Super. Ct. July 10, 2002) (Pl. Opp. at 15).

13

a breach of warranty "are to be judged by the same standard: the reasonableness of the defendant's actions in the circumstances"). Likewise, "there is no 'strict liability in tort' apart from liability for breach of warranty under the Uniform Commercial Code." *Swartz v. GM Corp.*, 375 Mass. 628, 629, 378 N.E.2d 61, 62 (1978). And the same principles apply to Plaintiff's duplicative fraudulent concealment claim. (*See* Def. Mem. at 17-18.) Plaintiff fails to address any of these authorities.

## IV. Plaintiff Cannot Prove Essential Elements of Her Express Warranty Claims

Plaintiff "does not oppose" Pfizer's motion for summary judgment dismissing her express warranty claims. (*See* Pl. Opp. at 1, 15.)

## V. Plaintiff's Chapter 93A Claim Fails Because She Did Not Give Prior Notice to Pfizer

Plaintiff "does not oppose" Pfizer's motion for summary judgment dismissing her Massachusetts Consumer Protection Act claims. (*See* Pl. Opp. at 1, 15.)

## CONCLUSION

For the foregoing reasons, Pfizer's summary judgment motion should be granted.

Dated: February 22, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Mark S. Cheffo
    Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Email: Mark.Cheffo@skadden.com

---

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 22, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo

---

BOIES, SCHILLER & FLEXNER LLP

By: /s/ William S. Ohlemeyer
William S. Ohlemeyer

333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
WOhlemeyer@bsfllp.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

15