UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:  NEURONTIN MARKETING, SALES          :   MDL Docket No. 1629
        PRACTICES AND PRODUCTS              :
        LIABILITY LITIGATION                :   Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :   Judge Patti B. Saris
THIS DOCUMENT RELATES TO:                   :
                                                              :   Magistrate Judge Leo T.
*Shearer v. Pfizer Inc., et al.*            :   Sorokin
Case No. 1:07-cv-11428-PBS                  :   **UNREDACTED**
                                                              :   **VERSION FILED**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X   **UNDER SEAL**

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE
TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS AND DEFENDANTS' RESPONSES
TO PLAINTIFF'S FURTHER STATEMENT OF MATERIAL FACTS[1]**

Defendants Pfizer Inc and Warner-Lambert Company LLC ("Defendants" or "Pfizer")

submit the following reply to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of

Undisputed Material Facts,[2] and response to Plaintiff's Further Statement of Material Facts.

**I.     DEFENDANTS' REPLY TO PLAINTIFF'S REPONSES TO DEFENDANTS'
        LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

       5.     The stroke forced him to abandon, or significantly alter, both teaching as well as

his pursuit of his degree, along with many of his favorite activities, including exercise, and his

volunteer work.

Plaintiff's Response:

       Disputed.  Plaintiff submits that paragraph [5] of Defendants' Statement of Facts is

incorrect or otherwise incomplete.  In the Spring of 2002, Mr. Shearer began teaching a course at

---

       [1]  The facts admitted herein are admitted for the purposes of Defendants' Motion for Summary Judgment
only.

       [2]  Defendants' reply to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed
Material Facts solely addresses those facts that Plaintiff did not admit without qualification.  Any facts that Plaintiff
admitted in full are not addressed herein, and should be deemed admitted by the Court for the purposes of
Defendants' Motion for Summary Judgment.

Williams College with Mrs. Shearer. It was a three and a half hour, one day a week, seminar. There were approximately 20 students enrolled. The class was a big success. Prior to that he was working on a CD-ROM and he wanted to complete that. (L. Shearer Dep. Vol. I at 211:16-24; 212:6-10; 214:6-7, 17; 213:7, attached to the Declaration of Andrew G. Finkelstein, Esq., as Exhibit A.) Mr. Shearer was working on an art college project. There were often students in the house working on this DVD. He also went to the computer center to work with a student there. (L. Shearer Dep. Vol. I at 161:25; 162:1-3; 168:4-6, Pl.'s Ex. A.) Mr. Shearer exercised very diligently; very rigorously after the stroke. He continued to walk and swim. He went target shooting twice a month. (L. Shearer Dep. Vol. I at 163:20-25; 164:1, Pl.'s Ex A; L. Shearer Dep. Vol. II at 268:3-8, Pl.'s Ex. B.) He walked the hill next to his house for exercise. (Wheeler Dep. at 14:5-6, Pl.'s Ex. C.) He used a universal gym in his house. (Wheeler Dep. at 14:9-10, Pl.'s Ex. C.)

**Defendants' Reply:**

This fact should be deemed admitted. The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

Further responding, Plaintiff's response states that "[i]n the Spring of 2002, Mr. Shearer began teaching a course at Williams College with Mrs. Shearer," however Mr. Shearer died in February 2002. The first, and only, class that Mr. Shearer taught after his stroke was a co-taught class with Mrs. Shearer on February 4, 2002, three days before his suicide. (Glenmullen Report at 26 [2459-15]; L. Shearer Dep. at 211:16-212:5, Ex. FF.)[3] According to Mrs. Shearer, Mr. Shearer "felt he wasn't ready" prior to teaching that class, (L. Shearer Dep. at 209:25-211:9), and was "very nervous that he could perform in the way he had in the past." (*Id.* at 213:1-16.) Plaintiff also ignores the following sworn testimony of Mrs. Shearer:

> Q. . . . did he go out on walks?
> A. We lived on the side of a – of a mountain or a hill. And there was one flat area that he would use for exercise.
> . . .
> Q. What would he do [to exercise after the stroke]?
> A. . . . the walking and swimming.
> Q. So he would go out and walk in the yard?
> A. On this – no. Because it was – it was too hard on the grass. But, no, there's one flat area at the – on the road on – on which we lived. That was – that he could walk up and down on that without – easily. And then – and then the swimming was – was more of a production . . .

---

[3] All exhibits are attached to the Supplemental Declaration of Mark S. Cheffo in Support of Defendants' Motion for Summary Judgment.

. . .

Q.  And how would – how would you get him into the pool and out of the pool?
A.  That was – that wasn't easy.  You're making me remember that it was actually very difficult, because it was – he would have to walk in the shallow end and he couldn't walk without the brace on and you couldn't take – you didn't want the brace in the water, so he had – I think he had a cheap brace that he used to get into the water.  It was a – it was a production.

(*Id.* at 163:16-165:3.)  Plaintiff also ignores the following sworn testimony of Edward A. Epping:

Q.  But in terms of physical limitations, he couldn't do the same things, physical discipline, he couldn't do the same things he used to do, could he?
A.  Correct.

(Epping Dep. at 19:20-23, Ex. GG; *id.* at 22:3-11 (noting that Mr. Shearer could not play hockey after the stroke, and that his swimming was only "occasional.").)  Plaintiff also ignores the following sworn testimony of Sean Wheeler:

A. . . . he couldn't move, you know, he couldn't do the things that he used to do anymore.

(Wheeler Dep. at 29:25-30:1, Ex. HH; *see also id.* at 26:23-27:14 ("A . . . I don't think he had much feeling in his arm . . . he had movement through his shoulder, but his arm was pretty dead . . . it was the same thing with his foot, you know, I mean, he had this brace on his foot that pretty much acted like – like a stilt. . . .").)

6.      His work as a part-time teacher also became limited.

Plaintiff's Response:

Disputed.  Plaintiff submits that paragraph 6 of Defendants' Statement of Facts is incorrect or otherwise incomplete. In the Spring of 2002 Mr. Shearer began teaching a course at Williams College with Mrs. Shearer. It was a three and a half hour, one day a week, seminar. (L. Shearer Dep., Vol. I at 211:16-24; 212:6-10, Pl.'s Ex. A.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

Further responding, Plaintiff's response states that "[i]n the Spring of 2002, Mr. Shearer began teaching a course at Williams College with Mrs. Shearer," however Mr. Shearer died in

February 2002.  The first, and only, class that Mr. Shearer taught after his stroke was a co-taught class with Mrs. Shearer on February 4, 2002, three days before his suicide.  (Glenmullen Report at 26 [2459-15]; L. Shearer Dep. at 211:16-212:5, Ex. FF.)  According to Mrs. Shearer, Mr. Shearer "felt he wasn't ready" prior to teaching that class, (L. Shearer Dep. at 209:25-211:9), and was "very nervous that he could perform in the way he had in the past." (*Id.* at 213:1-16.)

8.     Because Mr. Shearer was incapable of taking care of his daily needs on his own, such as grooming and dressing himself, the Shearers were forced to hire a caretaker, incurring $20,000 to $35,000 of credit card debt in the process.

Plaintiff's Response:

Disputed.  Plaintiff submits that paragraph 8 of Defendants' Statement of Facts is incorrect or otherwise incomplete. After the stroke, Mr. Shearer could walk up and down stairs (L. Shearer Dep. Vol. I at 152:1-6; 154:13-16, Pl.'s Ex. A); he could ambulate; he could go downstairs and fix coffee. (L. Shearer Dep. Vol. I at 159:13-15, Pl.'s Ex A); he could go to the bathroom by himself (L. Shearer Dep. Vol. I at 163:7-11, Pl.'s Ex. A); he could give himself a sponge bath. (L. Shearer Dep. Vol. I at 238:6-12, Pl.'s Ex. A.) Mr. Shearer's caregiver, Sean Wheeler, testified that Mr. Shearer did not need help eating meals, but that he would help get him situated. (Wheeler Dep. at 18:24-25; 19:1-8, Pl.'s Ex. C.) Mr. Shearer exercised very diligently; very rigorously after the stroke; he continued to walk and swim; and he went target shooting twice a month. (L. Shearer Dep. Vol. I at 163:20-25; 164:1; 268:3-8, Pl.'s Ex. A.) He walked the hill next to his house for exercise. (Wheeler Dep. at 14:5-6, Pl.'s Ex C.) He used a universal gym in his house. (Wheeler Dep. at 14:9-10 - Ex. C.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

Further responding, Plaintiff ignores the following sworn testimony of Mrs. Shearer:

Q.  You indicated earlier that he needed help getting dressed?
...
A.  Yes. Yes. . . . .
Q.  And did you help him get dressed every morning?
A.  Either I did or – or if I was going to work, which was usually the case, someone would be coming in to be with him. . . .
Q.  And whoever was coming in to be with him would get him dressed?
A. . . . . Yes.

(L. Shearer Dep. at 159:23-160:10, Ex. FF.)

Q.  And would someone come to the house when you left the house?

A. Generally. Sometimes there would be a lag, but that was mostly the case.

Q. And then would that person stay there until you got home in the evening?

A. Generally.

Q. And what types of things would that person – for what purpose was that person in the house?

A. Meals, shopping, exercise. . . . someone was always with him.

Q. And was someone always with him for – due to his – the physical damage from the stroke – stroke or the mental or both?

A. The physical.

(*Id.* at 162:14-163:6.)

Q. . . . did he go out on walks?

A. We lived on the side of a – of a mountain or a hill. And there was one flat area that he would use for exercise.

. . .

Q. What would he do [to exercise after the stroke]?

A. . . . the walking and swimming.

Q. So he would go out and walk in the yard?

A. On this – no. Because it was – it was too hard on the grass. But, no, there's one flat area at the – on the road on – on which we lived. That was – that he could walk up and down on that without – easily. And then – and then the swimming was – was more of a production . . .

. . .

Q. And how would – how would you get him into the pool and out of the pool?

A. That was – that wasn't easy. You're making me remember that it was actually very difficult, because it was – he would have to walk in the shallow end and he couldn't walk without the brace on and you couldn't take – you didn't want the brace in the water, so he had – I think he had a cheap brace that he used to get into the water. It was a – it was a production.

(*Id.* at 163:16-165:3.)

Q. Were you and Mr. Shearer in debt?

A. We were in credit card debt.

Q. Can you explain to what extent?

A. . . . Probably between 20- and $35,000.

. . .

Q. And what caused you and Mr. Shearer to go into that type of credit card debt?

A. Healthcare, and help that wasn't covered by insurance. Specifically, having people come in to help as caregivers . . . That's the main expense that I recall.

(*Id.* at 328:19-329:9.) Plaintiff also ignores the following sworn testimony of Edward A. Epping:

Q. But in terms of physical limitations, he couldn't do the same things, physical discipline, he couldn't do the same things he used to do, could he?

A. Correct.

(Epping Dep. at 19:20-23, Ex. GG; *id.* at 22:3-11 (noting that Mr. Shearer could not play hockey after the stroke, and that his swimming was only "occasional.").) Plaintiff further ignores the following sworn testimony of Sean Wheeler:

> A. . . . he couldn't move, you know, he couldn't do the things that he used to do anymore.

(Wheeler Dep. at 29:25-30:1, Ex. HH; *see also id.* at 26:23-27:14 ("A . . . I don't think he had much feeling in his arm . . . he had movement through his shoulder, but his arm was pretty dead . . . it was the same thing with his foot, you know, I mean, he had this brace on his foot that pretty much acted like -- like a stilt. . . .").)

13.     Mr. Shearer also had a "controlling" personality as described by himself and his family.

Plaintiff's Response:

Admit that on occasion the term "controlling" may have been used to describe Mr. Shearer, but the Spaulding records cited by Defendants actually say that Mr. Shearer 'has always been an in "control" person', which is distinguishable from "controlling".

**Defendants' Reply:**

This fact should be deemed admitted without qualification. The information Plaintiff cites does not contradict the fact stated by Pfizer. Further responding, Plaintiff's response ignores Defendants' additional citation to the records of Dr. Lisa Catapano-Friedman, which state that Mr. Shearer "sees himself as obsessive–compulsive, controlling . . ." (C-F at 17DCR-1-2 [2459-7].)

20.     ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████

Plaintiff's Response:

██████████████████████████████████████████████████████████

██████████████████

**Defendants' Reply:**

This fact should be deemed admitted without qualification.  Plaintiff's response does not contradict the fact stated by Pfizer.

22.    A nursing assessment of Mr. Shearer on October 14, 2000, reported that Mr. Shearer felt "on [the] edge of breakdown."

Plaintiff's Response:

Admit. However, Dr. Anne Hudson Angevine testified that when she wrote her admitting note on October 14, 2000, she did not get the sense that Mr. Shearer was on the edge of a breakdown. (Angevine Dep. at 48:21-25, Pl.'s Ex. D.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

Further responding, Plaintiff's response ignores the following sworn testimony of Dr. Anne Hudson Angevine:

Q.  Do you have any independent recollection of Mr. Shearer?
A.  No.
. . .
A.  I recall what is outlined in the chart, basically.
. . .
A.  Yes, well, but I don't remember, like the physical patient.  But I -- I am relying on the records as a document of the patient's hospitalization.

(Angevine Dep. at 31:23-32:18, Ex. II.)

Q.  . . . In terms of patient feels on the edge of breakdown, is that something that the patient would have communicated to the nurse upon arrival at the hospital and she documented it on the form?
A.  It appears so.

(*Id*. at 49:1-7.)

23.    Mr. Shearer became disoriented and had paranoid delusions on certain narcotics.

Plaintiff's Response:

Admit that Mr. Shearer experienced an episode of confusion and paranoia apparently attributable to heavy narcotics that had been prescribed to control pain during his admission to

Brigham & Women's Hospital in October, 2000. (Angevine Dep. at 69:18-25; 70:1-10, Pl.'s Ex. D.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

25.     Mr. Shearer later told Dr. Catapano-Friedman that he was "very traumatized" by this hospitalization.

Plaintiff's Response:

Admit the this is what Dr. Catapano-Friedman states Mr. Shearer told her. (Catapano-Friedman Dep. at 46:10-15, Pl.'s Ex. E.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

33.     Mr. Shearer shot himself as much as an hour or more after his telephone conversation with Plaintiff.

Plaintiff's Response:

Disputed.  Plaintiff submits that paragraph 33 of Defendants' Statement of Facts is incorrect or otherwise incomplete. After ending his phone call with Linda Shearer, Mr. Shearer "said he was tired and he was going to go upstairs and to give him a couple of minutes, you know, he had gone upstairs to his room, you know, and I said, all right, I'm just going to keep doing things down here and then we're going to be on our way." (Wheeler Dep. at 41:11-15, Pl.'s Ex. C.) When asked "and then what happened?," Sean Wheeler testified "I was downstairs, you know, dishwasher going, T.V. on, you know, I think I was actually in the sink, you know, just washing some things that, obviously, you just couldn't put into the dishwasher, so -- I used to be kind of meticulous in the house, just making sure if I was there, that it was not a mess, because there was, you know, down time -- and I just heard like a crack from upstairs. . . ." (Wheeler Dep. at 41:16-24, Pl.'s Ex. C.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

Further responding, Plaintiff's response ignores the statement that Sean Wheeler provided to the Williamstown Police Department following Mr. Shearer's death:

> I arrived to the Shearer house between 12:15 and 12:30 and Hartley was noticeably irritated for reasons unknown. For the next half hour to forty-five minutes he was on and off the phone with his wife speaking about what I'm not sure and contacting the doctor's office in Troy. . . . it was around 1:15 when I set Hartley up in the bathroom downstairs to fix his hair, teeth, and shave, much like we do everyday. Hartley was still noticeably upset and he was being very vocal about it at this point. I decided to give him some space and take care of the dishes in the kitchen by starting the dishwasher. Twenty to twenty-five minutes later Hartley was done so I helped him out of his chair and asked him if he wanted to get dressed for his appointment. He told me that he "had some things he wanted to take care of" and that he would call me when he needed me. At this point I went back to the kitchen turned on the television and waited for Hartley to call for my assistance. I was in the kitchen for almost 10 minutes when I heard a loud sound and a noise as if Hartley had fallen.

(Williamstown Police Dept. Records at 25WPD-9 [2459-18].)

Further responding, Plaintiff's response ignores Dr. Kruszewski's testimony that "more than an hour" elapsed between the Shearers' telephone call and Mr. Shearer's suicide. (Kruszewski Dep. at 73:13-74:2, Ex. DD.)

37.   The only drug found in Mr. Shearer's system was benzodiazepine.

Plaintiff's Response:

Disputed. Plaintiff submits that paragraph 37 of Defendants' Statement of Facts is incorrect or otherwise incomplete. The toxicology report is a screen of prescription and street drugs that people would abuse, such as cocaine, alcohol and benzodiazepine, and would not exhaustively include all of Mr. Shearer's prescription medications. (Glenmullen Dep. at 200:22-25; 201:1-3, Pl.'s Ex. F)

**Defendants' Reply:**

This fact should be deemed admitted. The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

Further responding, in her Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiff affirmatively states that "The only drug found in the toxicology test performed on Mr. Shearer was benzodiazepine." (Pl.'s Mem. Opp. Summ. J. [2523] at 3.) That is precisely the undisputed fact stated by Pfizer.

38.   Plaintiff's expert Dr. Trimble claims that benzodiazepines increase the risk of depression and suicide.

Plaintiff's Response:

Disputed. Plaintiff submits that paragraph 38 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Trimble testified that the FDA did not say whether "marketed antiepileptic drugs" is going to include other drugs not on the list. He did not have any evidence that the FDA analyzed any drugs other than the eleven on the list. (Trimble 2/27/08 Dep. at 100:6-25; 102:12-15, Pl.'s Ex. G.) Dr. Trimble's report as cited by Defendants states only that benzodiazepines "are known to precipitate depression in some people." Furthermore, Dr. Glenmullen notes that while "(b)enzodiazepines like Valium have precautions that they may disinhibit suicidal urges,... for Hartley's age group, the evidence that these other drugs make patients suicidal is not yet as strong as the evidence implicating Neurontin." (Glenmullen Report at p. 32, Pl.'s Ex. H.) And if Mr. Shearer was ingesting Ativan, Valium and Ativan are both in the same category "benzodiazepines", so what he said regarding Valium would be applicable to Ativan. (Glenmullen Dep. at 104:2-6; 105:7-8, Pl.'s Ex, F.) Dr. Glenmullen testified that with the level of evidence in regard to the other drugs which had warnings did not rise to the level of evidence required for proximate cause, like Neurontin did. (Glenmullen Dep. at 115:14-22, Pl.'s Ex. F.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.

Further responding, in her Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiff affirmatively states that "Plaintiff's expert, Dr. Michael Trimble, has claimed that benzodiazepines increase the risk of depression and suicide." (Pl.'s Mem. Opp. Summ. J. [2523] at 3.)  That is precisely the undisputed fact stated by Pfizer.

Further responding, Plaintiff's response ignores the following sworn testimony of Dr. Michael Trimble:

Q.  Is the increased risk of suicidality shared by all AEDs even those not included in this list?
A.  Well, the FDA – I'm not quite sure how many other drugs there would be not in this list, but they would certainly, the ones I'm thinking of, like Phenobarbitone, benzodiazepines, they would be sharing the risk . . . .

(Trimble Dep. at 98:8-17 [2459-22].)   Plaintiff's response also ignores the sworn testimony of Dr. Joseph Glenmullen:

A  . . . I think I mentioned the Valium, which is in the same class, and there is a class label, I can't remember if it's a warning or a precaution, for suicidality,

tends to fall more in the realm of disinhibition, but, and there are statistically significant findings and metanalyses, but I did name the Valium. And if he was on Ativan at the time of his death, it would fall in the same category.

(Glenmullen Dep. at 103:21-104:4, Ex. EE.)

42.     When asked whether she would have informed Mr. Shearer had she been aware in 2000 "that Neurontin was associated with suicidality," Dr. Angevine testified "[m]aybe...I don't know if I would have recommended or advised the patient of that based on that information or not at the time.... It may depend upon a particular patient and whether or not I felt that that particular side effect was potentially relevant to the individual patient."

Plaintiff's Response:

Admit that in general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 112:1-7, Pl.'s Ex. D.)

**Defendants' Reply:**

This fact should be deemed admitted. The testimony Plaintiff cites does not contradict the testimony cited by Pfizer. To the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Dr. Angevine would have changed her prescription decision, it does no such thing. Plaintiff has the burden of proving that an additional warning would have produced a different outcome. *See, e.g., Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999). The testimony Plaintiff cites does not support any such finding. Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial. *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

43.     Dr. Angevine testified that she did not know whether hypothetical knowledge in 2000 that Neurontin was a psychotropic drug would have impacted her decision to prescribe Neurontin to Mr. Shearer.

Plaintiff's Response:

      Admit that in general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 119:8-13, Pl.'s Ex. D.)

**Defendants' Reply:**

      This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the testimony cited by Pfizer.  To the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Dr. Angevine would have changed her prescription decision, it does no such thing.  Plaintiff has the burden of proving that an additional warning would have produced a different outcome.  *See, e.g.*, *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999).  The testimony Plaintiff cites does not support any such finding.  Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial.  *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

      44.    Dr. Angevine testified that she did not know whether knowledge of Neurontin's mechanism of action would "have played any role in her prescribing practice to Mr. Shearer."

Plaintiff's Response:

      Admit that in general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 120:17-23, Pl.'s Ex. D.)

**Defendants' Reply:**

      This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the testimony cited by Pfizer.  To the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Dr. Angevine would have changed her prescription decision, it does no such thing.  Plaintiff has the burden of proving that an additional warning would have produced a different outcome.  *See, e.g.*, *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999).  The testimony

Plaintiff cites does not support any such finding. Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial. *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

      46.    When asked had he seen "an analysis such as [the FDA alert] in 2001" whether he would have "spoken to Mr. Shearer about the increased risk of suicidality" when refilling his prescription, Dr. Sullivan testified: "I don't know. Because it didn't happen, so I don't know what I would have done."

Plaintiff's Response:

      Disputed. Plaintiff submits that paragraph 46 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

**Defendants' Reply:**

      This fact should be deemed admitted. The testimony Plaintiff cites does not contradict the testimony cited by Pfizer. To the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Dr. Sullivan would have changed his prescription decision, it does no such thing. Plaintiff has the burden of proving that an additional warning would have produced a different outcome. *See, e.g., Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999). The testimony Plaintiff cites does not support any such finding. Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial. *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997)

(per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Further responding, Plaintiff's response misstates the sworn testimony of Dr. Daniel Sullivan. Dr. Sullivan testified that he didn't know what he would have done in 2001 had he seen "an analysis such as [the FDA alert]" at that time, "[b]ecause it didn't happen." (Sullivan Dep. at 100:9-16 [2459-25]; *see also id.* at 102:14-20 (testifying that he "[didn't] know what [he] would have done in 2001" had an analysis of placebo-controlled clinical studies similar to the FDA alert been available in 2001); and *id.* at 103:4-6 ("With all due respect, I can only testify to my cognitive abilities today and not to what I would think or do in 2001.").) Dr. Sullivan testified only that "*[a]s of today* . . . [he] would certainly take [the FDA alert] into account." (*Id.* at 101:16-25-102:1-2.)

47. As to significance of the FDA alert, Dr. Sullivan testified that "each situation needs to be evaluated individually.... each FDA bulletin needs to be looked at carefully because the FDA unfortunately is not always in – in the best of studies providing information that is accurate."

Plaintiff's Response:

Disputed. Plaintiff submits that paragraph 47 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex I.)

**Defendants' Reply:**

This fact should be deemed admitted. The testimony Plaintiff cites does not contradict the testimony cited by Pfizer. To the extent Plaintiff suggests that the cited testimony raises fact

questions regarding whether Dr. Sullivan would have changed his prescription decision, it does no such thing. Plaintiff has the burden of proving that an additional warning would have produced a different outcome. *See, e.g., Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999). The testimony Plaintiff cites does not support any such finding. Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial. *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Further responding, Plaintiff's response misstates the sworn testimony of Dr. Daniel Sullivan. Dr. Sullivan testified that he didn't know what he would have done in 2001 had he seen "an analysis such as [the FDA alert]" at that time, "[b]ecause it didn't happen." (Sullivan Dep. at 100:9-16 [2459-25]; *see also id.* at 102:14-20 (testifying that he "[didn't] know what [he] would have done in 2001" had an analysis of placebo-controlled clinical studies similar to the FDA alert been available in 2001); and *id.* at 103:4-6 ("With all due respect, I can only testify to my cognitive abilities today and not to what I would think or do in 2001.").) Dr. Sullivan testified only that "*[a]s of today* . . . [he] would certainly take [the FDA alert] into account." (*Id.* at 101:16-25-102:1-2.)

50.    Dr. Hynes testified that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he was not sure whether he would have had an opportunity to inform Mr. Shearer's caregiver or family of the risk.

Plaintiff's Response:

Disputed. If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20.) If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. (*Id.* at 140:21-25; 141:1-4.) Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (*Id.* at 189:16-25; 190:1-23.) If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice

15

for Neurontin back in 2000. (*Id.* at 190:24-25; 191:1-14.) Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (*Id.* at 179:3-7.)

**Defendants' Reply:**

This fact should be deemed admitted.   The testimony Plaintiff cites does not contradict the testimony cited by Pfizer.   To the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Dr. Hynes would have changed his approval of the resident's prescription decision, it does no such thing.   Plaintiff has the burden of proving that an additional warning would have produced a different outcome.   *See, e.g., Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999).   The testimony Plaintiff cites does not support any such finding.   Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial.   *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at \*1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at \*3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Further responding, Plaintiff's response ignores the sworn testimony of Dr. Wilfred Hynes.   Dr. Hynes approved a Neurontin prescription issued by a resident of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization.   (Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].)   Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.   (Hynes Dep. at 75:10-77:14.) Dr. Hynes "would assume the resident" who issued the prescription had a discussion about Neurontin with Mr. Shearer, and not him.   (*Id.* at 136:18-25.)   Dr. Hynes testified that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he was not sure whether he would have had an opportunity to inform Mr. Shearer's caregiver or family of the risk.   (*Id.* at 141:15-23.)   Further, Dr. Hynes testified only that that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he would have "[c]onsidered" alternatives to Neurontin, ***including "other anticonvulsants."***   (*Id.* at 140:21-141:14 (emphasis added).)   Dr. Hynes still believes that prescribing Neurontin to Mr. Shearer "was appropriate."

(*Id.* at 177:3-18.)  Dr. Hynes testified that he continues to prescribe Neurontin, including to patients like Mr. Shearer, in his practice today.  (*Id.* at 65:6-8, 90:23-91:7.)

52.     None of Mr. Shearer's prescribing doctors testified that an additional disclosure in the label would have changed their decision to prescribe Neurontin to Mr. Shearer.

Plaintiff's Response:

Disputed.  Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25; 102:1-2, Ex I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.) If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.) If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.) Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.) If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Pl.'s Ex. J.) Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.  To the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Mr. Shearer's prescribing doctors would have changed their prescription decisions, it does no such thing.  Plaintiff has the burden of proving that an additional warning would have produced a different outcome.  *See, e.g.*, *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999).  The testimony Plaintiff cites does not support any such finding.  Instead,

Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial. *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Further responding, Plaintiff's response misstates the sworn testimony of Dr. Daniel Sullivan. Dr. Sullivan testified that he didn't know what he would have done in 2001 had he seen "an analysis such as [the FDA alert]" at that time, "[b]ecause it didn't happen." (Sullivan Dep. at 100:9-16 [2459-25]; *see also id.* at 102:14-20 (testifying that he "[didn't] know what [he] would have done in 2001" had an analysis of placebo-controlled clinical studies similar to the FDA alert been available in 2001); and *id.* at 103:4-6 ("With all due respect, I can only testify to my cognitive abilities today and not to what I would think or do in 2001.").) Dr. Sullivan testified only that "*[a]s of today* . . . [he] would certainly take [the FDA alert] into account." (*Id.* at 101:16-25-102:1-2.) Dr. Sullivan testified that he has prescribed Neurontin since treating Mr. Shearer. (*Id.* at 28:4-21.)

Plaintiff's response also ignores the sworn testimony of Dr. Wilfred Hynes. Dr. Hynes approved a Neurontin prescription issued by a resident of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization. (Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].) Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin. (Hynes Dep. at 75:10-77:14.) Dr. Hynes "would assume the resident" who issued the prescription had a discussion about Neurontin with Mr. Shearer, and not him. (*Id.* at 136:18-25.) Dr. Hynes testified that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he was not sure whether he would have had an opportunity to inform Mr. Shearer's caregiver or family of the risk. (*Id.* at 141:15-23.) Further, Dr. Hynes testified only that that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he would have "[c]onsidered" alternatives to Neurontin, *including "other anticonvulsants."* (*Id.* at 140:21-141:14 (emphasis added).) Dr. Hynes still believes that prescribing Neurontin to Mr. Shearer "was appropriate." (*Id.* at 177:3-18.) Dr. Hynes testified that he continues to prescribe Neurontin, including to patients like Mr. Shearer,

in his practice today. (*Id.* at 65:6-8, 90:23-91:7.) Because he is aware that suicidal behavior in pain patients is higher than that of the general population, when treating patients for pain, Dr. Hynes agreed that he usually follows them for changes in mood and suicidal activity irrespective of any warning. (*Id.* at 164:16-165:13.)

61.    Plaintiff's experts have not opined that Mr. Shearer's suicidal act was driven by any uncontrollable impulse or delirium or frenzy caused by Neurontin.

Plaintiff's Response:

Disputed. Dr. Glenmullen testified that Mr. Shearer's suicidal act looks pretty impulsive. (Glenmullen Dep. at 92:14, Ex. F.) The note looks as though it was written that morning. It looks as though it's still part of a very impulsive event. (Glenmullen Dep. at 149:24-25; 150:1, Pl.'s Ex: F.) It appears to be part of an impulsive act. (Glenmullen Dep. at 151:19-20, Pl.'s Ex. F.) Mr. Shearer doesn't cite something that might be considered a reasonable explanation for his suicide; he says his wife was hung up on him. This note doesn't indicate that the event was very premeditated, or that the note was premeditated. It looks like this particular note was part of an impulsive event. (Glenmullen Dep. at 154:9-24, Pl.'s Ex. F.) On Neurontin, Mr. Shearer developed worsening depression and mood and behavioral changes that led to his death. (Glenmullen Report at p. 31, ¶ 15, Pl.'s Ex. H.) Dr. Kruszewski testified that Mr. Shearer's decision to commit suicide was "impulsive". (Kruszewski Dep. at 72:2-3, Pl.'s Ex. K.) Dr. Kruszewski describes the suicidal act as an "impulsive decision to shoot himself in the head." "Neurontin and its depressogenic effect resulted in hopelessness and an irrational desperation (inferred in his suicide note), powerlessness and the impulsive act to kill himself." (Kruszewski Report, at p. 11, Pl.'s Ex. L.) "Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide." (Kruszewski Report, at p. 16, Pl.'s Ex. L.)

**Defendants' Reply:**

This fact should be deemed admitted. The testimony and documents Plaintiff cites do not contradict the fact stated by Pfizer. To the extent Plaintiff suggests that the cited testimony and documents raise fact questions regarding whether Mr. Shearer's suicidal act was driven by an uncontrollable impulse, they do no such thing. Plaintiff's experts have merely opined that Mr. Shearer's suicide was "impulsive." Plaintiff has the burden of proving that Mr. Shearer's "death is the result of an ***uncontrollable*** impulse, or is accomplished in delirium or frenzy caused by the [defendant], and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act." *Daniels v. N.Y., New Haven & Hartford. R.R.*, 183 Mass. 393, 399-400, 67 N.E. 424, 426 (1903) (emphasis added). The testimony and documents Plaintiff cites do not support any such finding. Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions

for trial. *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

62.    Dr. Kruszewski specifically denies making any "determination one way or the other" as to whether Mr. Shearer was "compelled to commit suicide."

Plaintiff's Response:

Admit, however, Dr. Kruszewski was of the opinion that to a reasonable degree of medical and psychiatric certainty, Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide. (Kruszewski Report, at p. 16, Pl.'s Ex. L.)

**Defendants' Reply:**

This fact should be deemed admitted without qualification.  The document Plaintiff cites does not contradict the fact stated by Pfizer.  Plaintiff has the burden of proving that Mr. Shearer's "death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the [defendant], and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act."  *Daniels v. N.Y., New Haven & Hartford. R.R.*, 183 Mass. 393, 399-400, 67 N.E. 424, 426 (1903).  The document Plaintiff cites does not support any such finding.  Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial.  *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

64.    There is no evidence of any affirmative representations about Neurontin by Pfizer concerning Neurontin's alleged risk of suicidality to Dr. Sullivan or Dr. Angevine.

Plaintiff's Response:

Admit; however, Plaintiff disputes Defendants' use of the term "alleged" inasmuch as the Food and Drug Administration has determined that anticonvulsants, including Neurontin, increase the risk of suicidality (Pl.'s Ex. M), and Defendants' own United States Package Insert

for Neurontin, since on or about April 2009, states that Antiepileptic drugs (AEDs), including Neurontin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication. (Pl.'s Ex. N.)

**Defendants' Reply:**

This fact should be deemed admitted without qualification. The documents Plaintiff cites do not contradict the fact stated by Pfizer.

65.   There is no evidence that, even if Dr. Hynes received any warranties from Pfizer, he relied on them in prescribing Neurontin to Mr. Shearer.

Plaintiff's Response:

Disputed. Dr. Hynes prescribed Neurontin to Mr. Shearer for neuropathic pain issues. (Hynes Dep. at 120:21-25; 121:1-2, Pl.'s Ex J.) When Dr. Hynes was visited by Parke-Davis Warner-Lambert sales representatives in 1998-1999, they discussed the use of Neurontin for the treatment of neuropathic pain. (Hynes Dep. at 121:11-19, Pl.'s Ex. J.) The sales representatives did not ever disclose to Dr. Hynes any information whatsoever about whether Neurontin could increase the risk of suicidal behavior in people taking Neurontin. Dr. Ross, who was Dr. Hynes' attending when Dr. Hynes was a fellow, did not ever disclose to Dr. Hynes that Neurontin could cause suicidal behavior in people using it. (Hynes Dep. at 121:21-25; 122:1-4; 185:10-12, Pl.'s Ex. J.) Dr. Ross had a business relationship with Parke-Davis Warner-Lambert. Dr. Ross was a speaker; that is, he was paid by the company to give lectures on the use of Neurontin. (Hynes Dep. at 126:22-25; 127:6, 10-22, 23-25; 128:1-6, Pl.'s Ex. J.) Dr. Hynes attended approximately a half a dozen of such lectures before prescribing Neurontin to Mr. Shearer. (Hynes Dep. at 128:7-14, Pl.'s Ex. J.) Dr. Ross's lectures regarding Neurontin influenced Dr. Hynes with respect to his decision to prescribe Neurontin to Mr. Shearer. (Hynes Dep. at 130:3-17, Pl.'s Ex. J.) Dr. Hynes relied on the information provided by the sales representatives as part of his job as a prescribing physician. (Hynes Dep. at 185:3-9, Pl.'s Ex. J.)

**Defendants' Reply:**

This fact should be deemed admitted. The testimony Plaintiff cites does not contradict the fact stated by Pfizer. Plaintiff does not oppose dismissal of her express warranty claim. As to Plaintiff's other claims, to the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Dr. Hynes would have changed his approval of the resident's prescription decision, it does no such thing. Plaintiff has the burden of proving that an additional warning would have produced a different outcome. *See, e.g.*, *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999). The testimony Plaintiff cites does not support any such finding. Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to

raise fact questions for trial.  *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Further responding, Plaintiff's response ignores the sworn testimony of Dr. Wilfred Hynes.  Dr. Hynes ***approved a Neurontin prescription issued by a resident*** of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization.  (Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].)  Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.  (Hynes Dep. at 75:10-77:14.)  Dr. Hynes "would assume the resident" who issued the prescription had a discussion about Neurontin with Mr. Shearer, and not him.  (*Id.* at 136:18-25.)   When deciding to prescribe Neurontin in 2000, Dr. Hynes testified that he would have relied upon his "prior experience," testifying that he "found it to be effective for neuropathic pain," (*Id.* at 38:21-39:13), and that he had "used it extensively with good results," including for patients like Mr. Shearer.  (*Id.* at 62:12-18.)  Dr. Hynes did not recall reading any specific published literature about Neurontin prior to the time he treated Mr. Shearer.  (*Id.* at 171:13-18.)  Dr. Hynes testified that he did not have a specific recollection of visits with sales representatives regarding Neurontin, and was "not sure" regarding the timing of those visits.  (*Id.* at 180:20-182:23.)   During the visits with sales representatives regarding Neurontin, Dr. Hynes "[didn't] believe" that the sales representatives told him anything about Neurontin that was inconsistent with this own clinical experience, and he believed that the information was accurate.   (*Id.* at 183:17-184:7.)  When asked about Dr. Ross, Dr. Hynes testified as follows:

> Q. . . . Who's Dr. Edgar Ross?
> A.  He's the director of the pain management center at Brigham and Women's Hospital.
> Q.  Do you believe him to be an excellent doctor?
> A.  Yes.
> Q.  Is he one of your mentors?
> A.  Yes.
> Q.  Do you believe Dr. Ross told you anything that was not borne out by your own clinical experience concerning the use of Neurontin for the treatment of neuropathic pain?

. . .

A. No.

Q. And do you believe Dr. Ross provided useful and accurate information based upon your own knowledge concerning the use of Neurontin for the treatment of neuropathic pain?

A. Yes.

Q. Do you think Dr. Ross provided any inaccurate information to you or your colleagues concerning the use of Neurontin in the treatment of neuropathic pain?

A. I don't believe so.

(*Id.* at 161:10-162:8.)   Dr. Hynes "[didn't] know how much" Dr. Ross' lectures regarding Neurontin would have influenced him. (*Id.* at 130:3-11.)

66.    There is no evidence that Mr. Shearer took Neurontin in reliance on any affirmation of fact by Pfizer that later proved false.

Plaintiff's Response:

Disputed. If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.) If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.) Dr. Hynes would have wanted to know abut the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.) If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Pl.'s Ex. J.) Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.) Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically 'increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

**Defendants' Reply:**

This fact should be deemed admitted.  The testimony Plaintiff cites does not contradict the fact stated by Pfizer.  Plaintiff does not oppose dismissal of her express warranty claim.  As to Plaintiff's other claims, to the extent Plaintiff suggests that the cited testimony raises fact questions regarding whether Mr. Shearer's prescribing physicians would have changed their approval of another's, or their own, prescription decision, it does no such thing.  Plaintiff has the burden of proving that an additional warning would have produced a different outcome.  *See, e.g.,* *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998) (O'Toole, J.), *aff'd*, 183 F.3d 67 (1st Cir. 1999).  The testimony Plaintiff cites does not support any such finding.  Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial.  *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

67.     There is no evidence that Mr. Shearer's prescribing physicians prescribed Neurontin based on an affirmation of fact by Pfizer that later proved false.

Plaintiff's Response:

Disputed. If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.) If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. (Hynes Dep. at 140:21-25; 141:1-4, Pl.'s Ex. J.) Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. (Hynes Dep.. at 189:16-25; 190:1-23, Ex. J.) If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Pl.'s Ex. J.) Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.) Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health

care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.) Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

**Defendants' Reply:**

This fact should be deemed admitted. The testimony Plaintiff cites does not contradict the fact stated by Pfizer. This Court has already dismissed Plaintiff's affirmative fraud claims, leaving only her fraudulent concealment claim. *See In re Neurontin Marketing, Sales Practices & Products Liability Litigation*, 618 F. Supp. 2d 96, 114 (D. Mass. 2009). The testimony Plaintiff cites does not support any finding that Mr. Shearer's treating doctors based their prescription decisions on any affirmation of fact by Pfizer that later proved false, or that different affirmations of fact would have changed their prescription decisions. Instead, Plaintiff relies upon unreasonable inferences, speculation, and conclusory assertions, which are insufficient to raise fact questions for trial. *See Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision); *Tayag v. Lahey Clinic Hosp., Inc.*, No. 08-10727-PBS, 2010 WL 26217, at *3 (D. Mass. Jan. 6, 2010) (Saris, J.); *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## II.   DEFENDANTS' RESPONSES TO PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1.      In the Spring of 2002, Mr. Shearer began teaching a course at Williams College with Mrs. Shearer. It was a three and a half hour, one day a week, seminar. There were approximately 20 students enrolled. The class was a big success. Prior to that he was working on a CD-ROM and he wanted to complete that. (L. Shearer Dep. Vol. I at 211:16-24; 212:6-10; 214:6-7, 17; 213:7, Pl.'s Ex. A.)

Defendants' Response:

Disputed. Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete. Plaintiff states that "[i]n the Spring of 2002, Mr. Shearer began teaching a course at Williams College with Mrs. Shearer," however Mr. Shearer died in February 2002. Further, the first, and only, class that Mr. Shearer taught after his stroke was a

co-taught class with Mrs. Shearer on February 4, 2002, three days before his suicide. (Glenmullen Report at 26 [2459-15]; L. Shearer Dep. at 211:16-212:5, Ex. FF.)  According to Mrs. Shearer, Mr. Shearer "felt he wasn't ready" prior to teaching that class, (L. Shearer Dep. at 209:25-211:9), and was "very nervous that he could perform in the way he had in the past." (*Id.* at 213:1-16.)

2.     Mr. Shearer was working on an art college project. There were often students in the house working on this DVD. He also went to the computer center to work with a student there. (L. Shearer Dep. Vol. I at 161:25; 162:1-3; 168:4-6, Pl.'s Ex. A.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Mrs. Shearer.

3.     Mr. Shearer exercised very diligently; very rigorously after the stroke. He continued to walk and swim. He went target shooting twice a month. (L. Shearer Dep. Vol. I at 163:20-25; 164:1, Pl.'s Ex. A; L. Shearer Dep. Vol. II at 268:3-8, Pl.'s Ex. B.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Plaintiff ignores the following sworn testimony of Mrs. Shearer:

Q. . . . did he go out on walks?
A.  We lived on the side of a – of a mountain or a hill.  And there was one flat area that he would use for exercise.
. . .
Q.  What would he do [to exercise after the stroke]?
A. . . . the walking and swimming.
Q.  So he would go out and walk in the yard?
A.  On this – no.  Because it was – it was too hard on the grass.  But, no, there's one flat area at the – on the road on – on which we lived.  That was – that he could walk up and down on that without – easily.  And then – and then the swimming was – was more of a production . . .
. . .
Q.  And how would – how would you get him into the pool and out of the pool?
A.  That was – that wasn't easy.  You're making me remember that it was actually very difficult, because it was – he would have to walk in the shallow end and he couldn't walk without the brace on and you couldn't take – you didn't want the

brace in the water, so he had – I think he had a cheap brace that he used to get into the water.  It was a – it was a production.

(L. Shearer Dep. at 163:16-165:3, Ex. FF.)  Plaintiff also ignores the following sworn testimony of Edward A. Epping:

> Q.  But in terms of physical limitations, he couldn't do the same things, physical discipline, he couldn't do the same things he used to do, could he?
> A.  Correct.

(Epping Dep. at 19:20-23, Ex. GG; *id.* at 22:3-11 (noting that Mr. Shearer could not play hockey after the stroke, and that his swimming was only "occasional.").)  Plaintiff also ignores the following sworn testimony of Sean Wheeler:

> A. . . . he couldn't move, you know, he couldn't do the things that he used to do anymore.

(Wheeler Dep. at 29:25-30:1, Ex. HH; *see also id.* at 26:23-27:14 ("A . . . I don't think he had much feeling in his arm . . . he had movement through his shoulder, but his arm was pretty dead . . . it was the same thing with his foot, you know, I mean, he had this brace on his foot that pretty much acted like – like a stilt. . . .").)

> 4.      He walked the hill next to his house for exercise. (Wheeler Dep. at 14:5-6, Pl.'s Ex. C.)

<u>Defendants' Response:</u>

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Sean Wheeler, however Plaintiff ignores the following sworn testimony of Mrs. Shearer:

> Q. . . . did he go out on walks?
> A.  We lived on the side of a – of a mountain or a hill.  And there was one flat area that he would use for exercise.
> . . .
> Q.  What would he do [to exercise after the stroke]?
> A. . . . the walking and swimming.
> Q.  So he would go out and walk in the yard?
> A.  On this – no.  Because it was – it was too hard on the grass.  But, no, there's one flat area at the – on the road on – on which we lived.  That was – that he could walk up and down on that without – easily. . . .

(L. Shearer Dep. at 163:16-164:7, Ex. FF.)

       5.      He used a universal gym in his house. (Wheeler Dep. at 14:9-10, Pl.'s Ex. C.)

Defendants' Response:

      Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Sean Wheeler.

       6.      After the stroke, Mr. Shearer could walk up and down stairs. (L. Shearer Dep. Vol. I at 152:1-6; 154:13-16, Pl.'s Ex. A.)

Defendants' Response:

      Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Mrs. Shearer.

       7.      He could ambulate; he could go downstairs and fix coffee. (L. Shearer Dep. Vol. I at 159:13-15, Pl.'s Ex. A.)

Defendants' Response:

      Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Mrs. Shearer.

       8.      He could go to the bathroom by himself. (L. Shearer Dep. Vol. I at 163:7-11, Pl.'s Ex. A.)

Defendants' Response:

      Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Mrs. Shearer.

       9.      He could give himself a sponge bath. (L. Shearer Dep. Vol. I at 238:6-12, Pl.'s Ex. A.)

Defendants' Response:

      Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Mrs. Shearer.  Plaintiff's statement, however, ignores the following sworn testimony of Sean Wheeler:

A. . . . he didn't shower every day just because that was like an inconvenience kind of, so he would use like baby wipes and things like that just to kind of clean himself up for the day.

(Wheeler Dep. at 13:12-16, Ex. HH.)

Q. . . . There were days that Mr. Shearer would not shower, in part, because of the -- I'm trying to find the word -- the difficulty involved in actually doing that? A. Yeah. I mean, they had a stand-up shower. I think that they before I started working there, they had a stand-up shower that was made in the spare bathroom for him. And there were like days when, you know, I would help him, you know, get in there and shower down and everything, but, I mean, it was just -- sometimes it was just -- it could be a little bit of a pain in the neck. It might have been something that he waited more for Linda to do with him than me. You know, I mean, I could probably count the times that, you know, in the, you know, year or so that I worked for him that, you know, on one hand how many times he took a shower in the stand-up shower, it was mostly us using some kind of like baby wipes or something like that. Or even if he wanted to wash his hair, you know, I'd help him wash his hair in the sink, you know, without taking a shower.

(*Id.* at 18:2-23.)

10.   Mr. Shearer's caregiver, Sean Wheeler, testified that Mr. Shearer did not need help eating meals, but that he would help get him situated. (Wheeler Dep. at 18:24-25; 19:1-8, Pl.'s Ex. C.)

Defendants' Response:

Admit.

11.   Dr. Anne Hudson Angevine testified that when she wrote her admitting note on October 14, 2000, she did not get the sense that Mr. Shearer was on the edge of a breakdown. (Angevine Dep. at 48:21-25, Pl.'s Ex. D.)

Defendants' Response:

Disputed. Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete. Plaintiff admits that a nursing assessment of Mr. Shearer on October 14, 2000, reported that Mr. Shearer felt "on [the] edge of breakdown." Plaintiff ignores the following sworn testimony of Dr. Anne Angevine:

Q.  Do you have any independent recollection of Mr. Shearer?
A.  No.
. . .
A.  I recall what is outlined in the chart, basically.

. . .

A.  Yes, well, but I don't remember, like the physical patient.  But I – I am relying on the records as a document of the patient's hospitalization.

(Angevine Dep. at 31:23-32:18, Ex. II.)

Q.  Now, in terms of your admitting note, which was on October 14, 2000, did you get the sense that from reading the note that you wrote that Mr. Shearer was on the edge of breakdown?
A.  No, **not based on my documentation.**
Q.  . . . In terms of patient feels on the edge of breakdown, is that something that the patient would have communicated to the nurse upon arrival at the hospital and she documented it on the form?
A.  It appears so.

(*Id.* at 48:21-49:7 (emphasis added).)

12.    Mr. Shearer experienced an episode of confusion and paranoia apparently attributable to heavy narcotics that had been prescribed to control pain during his admission to Brigham & Women's Hospital in October, 2000. (Angevine Dep. at 69:18-25; 70:1-10, Pl.'s Ex. D.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Anne Hudson Angevine.  Defendants further admit that Mr. Shearer became disoriented and had paranoid delusions on certain narcotics.

13.    After ending his phone call with Linda Shearer, Mr. Shearer "said he was tired and he was going to go upstairs and to give him a couple of minutes, you know, he had gone upstairs to his room, you know, and I said, all right, I'm just going to keep doing things down here and then we're going to be on our way." (Wheeler Dep. at 41:11-15, Pl.'s Ex. C.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Mr. Shearer's suicide note stated that "Linda has left me powerless by hanging up on me for the last time. . . ." (Suicide Note [2459-20].)  Therefore, Defendants dispute that Mr. Shearer "end[ed] his phone call with Linda Shearer."  Defendants admit that the remainder of this paragraph of Plaintiff's Further Statement of Facts sets forth certain testimony by Sean Wheeler.

14.    When asked "and then what happened?," Sean Wheeler testified "I was downstairs, you know, dishwasher going, T.V. on, you know, I think I was actually in the sink, you know, just washing some things that, obviously, you just couldn't put into the dishwasher, so -- I used to be kind of meticulous in the house, just making sure if I was there, that it was not a mess, because there was, you know, down time -- and I just heard like a crack from upstairs. . . ." (Wheeler Dep. at 41:16-24, Pl.'s Ex. C.)

Defendants' Response:

Admit.

15.    The toxicology report is a screen of prescription and street drugs that people would abuse, such as cocaine, alcohol and benzodiazepine, and would not exhaustively include all of Mr. Shearer's prescription medications. (Glenmullen Dep. at 200:22-25; 201:1-3, Pl.'s Ex. F.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Glenmullen.

16.    Dr. Trimble testified that the FDA did not say whether "marketed antiepileptic drugs" is going to include other drugs not on the list. He did not have any evidence that the FDA analyzed any drugs other than the eleven on the list. (Trimble 2/27/08 Dep. at 100:6-25; 102:12-15, Pl.'s Ex. G.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Further, responding, Plaintiff's statement ignores the following sworn testimony of Dr. Michael Trimble:

Q.  Is the increased risk of suicidality shared by all AEDs even those not included in this list?
A.  Well, the FDA – I'm not quite sure how many other drugs there would be not in this list, *but they would certainly, the ones I'm thinking of, like Phenobarbitone, benzodiazepines, they would be sharing the risk* . . . .

(Trimble Dep. at 98:8-17 (emphasis added) [2459-22].)

17.    Dr. Trimble's report states only that benzodiazepines "are known to precipitate depression in some people." (Trimble Report annexed to Defendants' Summary Judgment motion as Exhibit V, at 18.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Defendants admit that Dr. Trimble's report states that benzodiazepines "are known to precipitate depression in some people."  (Trimble Report at 18 [2459-23].)  Defendants dispute that this is the "only" statement in Dr. Trimble's report or testimony.

18.    Dr. Glenmullen notes that while "(b)enzodiazepines like Valium have precautions that they may disinhibit suicidal urges, ... for Hartley's age group, the evidence that these other drugs make patients suicidal is not yet as strong as the evidence implicating Neurontin." (Glenmullen Report at p. 32, Pl.'s Ex. H.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts sets forth a statement in the expert report of Dr. Glenmullen.

19.    If Mr. Shearer was ingesting Ativan, Valium and Ativan are both in the same category "benzodiazepines", so what he said regarding Valium would be applicable to Ativan. (Glenmullen Dep. at 104:2-6; 105:7-8, Pl.'s Ex. F.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Glenmullen.

20.    Dr. Glenmullen testified that with the level of evidence in regard to the other drugs which had warnings did not rise to the level of evidence required for proximate cause, like Neurontin did. (Glenmullen Dep. at 115:14-22, Pl.'s Ex. F.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Glenmullen.

21.    In general Dr. Angevine testified that she did not feel that she could tell in hindsight how her actions might have been affected by various hypotheticals that were posed to her. (Angevine Dep. at 112:1-7, Pl.'s Ex. D.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Defendants, however, admit that when asked whether she would have informed Mr. Shearer had she been aware in 2000 "that Neurontin was associated with suicidality," Dr. Angevine testified: "[m]aybe. . . . I don't know . . . I don't know if I would have recommended that or advised the patient of that based on that information or not at the time. . . . It may depend upon a particular patient's – it may depend upon whether or not I felt that that particular side effect was potentially relevant to the individual patient." (Angevine Dep. at 109:21-112:12, Ex. II.)  Defendants also admit that Dr. Angevine testified that she did not know whether hypothetical knowledge in 2000 that Neurontin was a psychotropic drug would have impacted her decision to prescribe Neurontin to Mr. Shearer.  (*Id.* at 119:8-16 ("I don't know.  Again, I think that is impacted by the patient's individual circumstances as to whether or not a side effect is potentially relevant to them.").)  Further, Defendants admit that Dr. Angevine testified that she did not know whether knowledge of Neurontin's mechanism of action would "have played any role in [her] prescribing practice to Mr. Shearer." (*Id.* at 120:17-23.)

22.    Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia,* that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. (Sullivan Dep. at 101:16-25-102:1-2, Pl.'s Ex. I.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Dr. Sullivan testified that he didn't know what he would have done in 2001 had he seen "an analysis such as [the FDA alert]" at that time, "[b]ecause it didn't happen."  (Sullivan Dep. at 100:9-16 [2459-25]; *see also id.* at 102:14-20 (testifying that he "[didn't] know what [he] would have done in 2001" had an analysis of placebo-controlled clinical studies similar to the FDA alert been available in 2001); and *id.* at 103:4-6 ("With all due respect, I can only testify to my cognitive abilities today and not to what I would think or do in

2001.").)  Dr. Sullivan testified only that "*[a]s of today* . . . [he] would certainly take [the FDA alert] into account."  (*Id.* at 101:16-25-102:1-2, Pl.'s Ex. I.)

23.     Dr. Sullivan always reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001. (Sullivan Dep. at 101:1-2; 102:22-25; 103:1-16, Pl.'s Ex. I.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Dr. Sullivan testified that he didn't know what he would have done in 2001 had he seen "an analysis such as [the FDA alert]" at that time, "[b]ecause it didn't happen."  (Sullivan Dep. at 100:9-16 [2459-25]; *see also id.* at 102:14-20 (testifying that he "[didn't] know what [he] would have done in 2001" had an analysis of placebo-controlled clinical studies similar to the FDA alert been available in 2001); and *id.* at 103:4-6 ("With all due respect, I can only testify to my cognitive abilities today and not to what I would think or do in 2001.").)  Dr. Sullivan testified only that "*[a]s of today* . . . [he] would certainly take [the FDA alert] into account."  (*Id.* at 101:16-25-102:1-2, Pl.'s Ex. I.)

24.     If Dr. Hynes had had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. (Hynes Dep. at 140:13-20, Pl.'s Ex. J.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Dr. Hynes *approved a Neurontin prescription issued by a resident* of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization. (Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].)  Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.  (Hynes Dep. at 75:10-77:14.)  Dr. Hynes "would assume the resident" who issued the prescription had a discussion about Neurontin with Mr. Shearer, and not him.  (*Id.* at 136:18-25.)  Dr. Hynes still believes that prescribing Neurontin to Mr. Shearer "was appropriate."  (*Id.* at 177:3-18.)  Dr. Hynes testified that he continues to prescribe Neurontin, including to patients like Mr. Shearer, in his practice today.  (*Id.* at 65:6-8, 90:23-91:7.)

25.    If Dr. Hynes had known at the time Neurontin was being prescribed to Mr.
Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking
Neurontin, he would have considered alternatives to Neurontin. (Hynes Dep. at 140:21-25;
141:1-4, Pl.'s Ex. J.)

<u>Defendants' Response:</u>

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts
is incorrect or otherwise incomplete. Dr. Hynes ***approved a Neurontin prescription issued by a
resident*** of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization.
(Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].)  Dr. Hynes does not recall
whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.  (Hynes
Dep. at 75:10-77:14.)  Dr. Hynes testified only that that if he had known in 2000 that Neurontin
increased the risk of suicidal behavior in patients, he would have "[c]onsidered" alternatives to
Neurontin, ***including "other anticonvulsants."***  (*Id.* at 140:21-141:14 (emphasis added).)  Dr.
Hynes still believes that prescribing Neurontin to Mr. Shearer "was appropriate." (*Id.* at 177:3-
18.)  Dr. Hynes testified that he continues to prescribe Neurontin, including to patients like Mr.
Shearer, in his practice today.  (*Id.* at 65:6-8, 90:23-91:7.)

26.    Dr. Hynes would have wanted to know about the 1992 FDA clinical review and
the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing
the drug to Mr. Shearer. (Hynes Dep. at 189:16-25; 190:1-23, Pl.'s Ex. J.)

<u>Defendants' Response:</u>

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts
is incorrect or otherwise incomplete. Dr. Hynes ***approved a Neurontin prescription issued by a
resident*** of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization.
(Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].)  Dr. Hynes does not recall
whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.  (Hynes
Dep. at 75:10-77:14.)  In the testimony cited by Plaintiff, Dr. Hynes testified only that "[he]
certainly would want to know as much as [he] could ***about any drug***." (*Id.* at 189:16-190:23
(emphasis added).)  Dr. Hynes also testified that it was not his practice to consider internal FDA
documents that were authored prior to the approval of the drug when considering the risks and
benefits of a medication.  (*Id.* at 192:5-11.)  Dr. Hynes also agreed that the formal, FDA-

approved labeling contains the information that the FDA wants physicians to consider when prescribing a medication. (*Id.* at 193:22-194:3.)

      27.    If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. (Hynes Dep. at 190:24-25; 191:1-14, Ex. J.)

Defendants' Response:

      Disputed. Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete. Dr. Hynes approved a Neurontin prescription issued by a resident of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization. (Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].) Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin. (Hynes Dep. at 75:10-77:14.) Dr. Hynes testified that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he was not sure whether he would have had an opportunity to inform Mr. Shearer's caregiver or family of the risk. (*Id.* at 141:15-23.) Further, Dr. Hynes testified only that that if he had known in 2000 that Neurontin increased the risk of suicidal behavior in patients, he would have "[c]onsidered" alternatives to Neurontin, ***including "other anticonvulsants."*** (*Id.* at 140:21-141:14 (emphasis added).) Dr. Hynes still believes that prescribing Neurontin to Mr. Shearer "was appropriate." (*Id.* at 177:3-18.) Dr. Hynes testified that he continues to prescribe Neurontin, including to patients like Mr. Shearer, in his practice today. (*Id.* at 65:6-8, 90:23-91:7.) Because he is aware that suicidal behavior in pain patients is higher than that of the general population, when treating patients for pain, Dr. Hynes agreed that he usually follows them for changes in mood and suicidal activity irrespective of any warning. (*Id.* at 164:16-165:13.)

      28.    Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. (Hynes Dep. at 179:3-7, Pl.'s Ex. J.)

Defendants' Response:

      Disputed. Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete. Dr. Hynes testified that he was "uncomfortable with this

line of questioning" and that "[he didn't] think what [he does] now is relevant."  (Hynes Dep. at 179:8-12, Ex. CC.)

29.    Dr. Glenmullen testified that Mr. Shearer's suicidal act looks pretty impulsive. (Glenmullen Dep. at 92:14, Ex. F.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Glenmullen.

30.    The note looks as though it was written that morning. It looks as though it's still part of a very impulsive event. (Glenmullen Dep. at 149:24-25; 150:1, Pl.'s Ex. F.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Glenmullen.

31.    It appears to be part of an impulsive act. (Glenmullen Dep. at 151:19-20, Pl.'s Ex. F.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Glenmullen.

32.    Mr. Shearer doesn't cite something that might be considered a reasonable explanation for his suicide; he says his wife hung up on him. This note doesn't indicate that the event was very premeditated, or that the note was premeditated. It looks like this particular note was part of an impulsive event. (Glenmullen Dep. at 154:9-24, Pl.'s Ex. F.)

Defendants' Response:

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain testimony by Dr. Glenmullen.

33.    On Neurontin, Mr. Shearer developed worsening depression and mood and behavioral changes that led to his death. (Glenmullen Report at p. 31, ¶ 15, Pl.'s Ex. H.) Dr. Kruszewski testified that Mr. Shearer's decision to commit suicide was "impulsive". (Kruszewski Dep. at 72:2-3, Pl.'s Ex. K.)

<u>Defendants' Response:</u>

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain opinions by Dr. Glenmullen in his expert report, and summarizes certain testimony from Dr. Kruszewski. Defendants' experts have opined that "Neurontin did not cause or contribute to Mr. Shearer's suicide." (Jacobs Report at 2, 26, Ex. JJ.) Instead, "[t]he precipitant for the suicide was the argument-leading to anger and intense feelings of powerlessness in a man who had lost control over his life." (Jacobs Report at 13.)

34.    Dr. Kruszewski describes the suicidal act as an "impulsive decision to shoot himself in the head." "Neurontin and its depressogenic effect resulted in hopelessness and an irrational desperation (inferred in his suicide note), powerlessness and the impulsive act to kill himself." (Kruszewski Report, at p. 11, Pl.'s Ex. L.)

<u>Defendants' Response:</u>

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain opinions by Dr. Kruszewski in his expert report. Defendants' experts have opined that "Neurontin did not cause or contribute to Mr. Shearer's suicide." (Jacobs Report at 2, 26, Ex. JJ.) Instead, "[t]he precipitant for the suicide was the argument-leading to anger and intense feelings of powerlessness in a man who had lost control over his life." (Jacobs Report at 13.)

35.    "Neurontin was a direct and significant contributing cause of Mr. Shearer's suicide." (Kruszewski Report, at p. 16, Pl.'s Ex. L.)

<u>Defendants' Response:</u>

Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts summarizes certain opinions by Dr. Kruszewski in his expert report. Defendants' experts have opined that "Neurontin did not cause or contribute to Mr. Shearer's suicide." (Jacobs Report at 2, 26, Ex. JJ; *see also* Boyer Report at 12, Ex. KK.) Instead, "[t]he precipitant for the suicide was the argument-leading to anger and intense feelings of powerlessness in a man who had lost control over his life." (Jacobs Report at 13.)

36.    The Food and Drug Administration has determined that anticonvulsants, including Neurontin, increase the risk of suicidality (Pl.'s Ex. M.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  The only way to definitively determine that a drug causes a side effect is with randomized controlled clinical trials.  The FDA's meta-analysis collected data for eleven antiepileptic drugs.  Only two of the eleven antiepileptic drugs included – Lamotrigine and Topiramate – showed increases in suicidal behavior when compared to placebo.  The remaining nine medicines, including Neurontin, showed no higher risk for suicidal behavior than what you would expect to find in the background population of patients being tested. Researchers at Pfizer and other organizations have completed and published nearly 2000 separate studies and articles about Neurontin, and none of those studies have demonstrated or concluded that taking Neurontin increases a patient's risk of committing suicide.

37.    Defendants' own United States Package Insert for Neurontin, since on or about April 2009, states that Antiepileptic drugs (AEDs), including Neurontin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication. (Pl.'s Ex. N.)

Defendants' Response:

Admit.

38.    Dr. Hynes prescribed Neurontin to Mr. Shearer for neuropathic pain issues. (Hynes Dep. at 120:21-25; 121:1-2, Pl.'s Ex J.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete.  Dr. Hynes *approved a Neurontin prescription issued by a resident* of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization. (Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].)  Dr. Hynes does not recall whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.  (Hynes Dep. at 75:10-77:14.)  Dr. Hynes "would assume the resident" who issued the prescription had a discussion about Neurontin with Mr. Shearer, and not him.  (*Id.* at 136:18-25.)  Mr. Shearer was prescribed Neurontin for pain, including neuropathic pain in his lower extremities.  (*Id.* at 60:22-61:5.)

39.     When Dr. Hynes was visited by Parke-Davis Warner-Lambert sales representatives in 1998-1999, they discussed the use of Neurontin for the treatment of neuropathic pain. (Hynes Dep. at 121:11-19, Pl.'s Ex. J.)

<u>Defendants' Response:</u>

Disputed. Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete. Dr. Hynes testified that he did not have a specific recollection of visits with sales representatives regarding Neurontin, and was "not sure" regarding the timing of those visits. (Hynes Dep. at 180:20-182:23, Ex.CC.) During the visits with sales representatives regarding Neurontin, Dr. Hynes "[didn't] believe" that the sales representatives told him anything about Neurontin that was inconsistent with this own clinical experience, and he believed that the information was accurate. (*Id.* at 183:17-184:7.)

40.     The sales representatives did not ever disclose to Dr. Hynes any information whatsoever about whether Neurontin could increase the risk of suicidal behavior in people taking Neurontin. Dr. Ross, who was Dr. Hynes' attending when Dr. Hynes was a fellow, did not ever disclose to Dr. Hynes that Neurontin could cause suicidal behavior in people using it. (Hynes Dep. at 121:21-25; 122:1-4; 185:10-12, Pl.'s Ex. J.)

<u>Defendants' Response:</u>

Disputed. Defendants submit that this paragraph of Plaintiff's Further Statement of Facts is incorrect or otherwise incomplete. Dr. Hynes testified that he did not have a specific recollection of visits with sales representatives regarding Neurontin, and was "not sure" regarding the timing of those visits. (Hynes Dep. at 180:20-182:23, Ex. CC.) During the visits with sales representatives regarding Neurontin, Dr. Hynes "[didn't] believe" that the sales representatives told him anything about Neurontin that was inconsistent with this own clinical experience, and he believed that the information was accurate. (*Id.* at 183:17-184:7.) When asked about Dr. Ross, Dr. Hynes testified as follows:

> Q. . . . Who's Dr. Edgar Ross?
> A. He's the director of the pain management center at Brigham and Women's Hospital.
> Q. Do you believe him to be an excellent doctor?
> A. Yes.
> Q. Is he one of your mentors?
> A. Yes.

Q.  Do you believe Dr. Ross told you anything that was not borne out by your
own clinical experience concerning the use of Neurontin for the treatment of
neuropathic pain?
. . .
A.  No.
Q.  And do you believe Dr. Ross provided useful and accurate information based
upon your own knowledge concerning the use of Neurontin for the treatment of
neuropathic pain?
A.  Yes.
Q.  Do you think Dr. Ross provided any inaccurate information to you or your
colleagues concerning the use of Neurontin in the treatment of neuropathic pain?
A.  I don't believe so.

(*Id.* at 161:10-162:8.)   Dr. Hynes "[didn't] know how much" Dr. Ross' lectures regarding
Neurontin would have influenced him.  (*Id.* at 130:3-11.)

        41.     Dr. Ross had a business relationship with Parke-Davis Warner-Lambert. Dr. Ross
was a speaker; that is, he was paid by the company to give lectures on the use of Neurontin.
(Hynes Dep. at 126:22-25; 127:6, 10-22, 23-25; 128:1-6, Pl.'s Ex. J.)

Defendants' Response:

        Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts
summarizes certain testimony of Dr. Hynes.

        42.     Dr. Hynes attended approximately a half a dozen of such lectures before
prescribing Neurontin to Mr. Shearer. (Hynes Dep. at 128:7-14, Pl.'s Ex. J.)

Defendants' Response:

        Defendants admit only that this paragraph of Plaintiff's Further Statement of Facts
summarizes certain testimony of Dr. Hynes.

        43.     Dr. Ross's lectures regarding Neurontin influenced Dr. Hynes with respect to his
decision to prescribe Neurontin to Mr. Shearer. (Hynes Dep. at 130:3-17, Pl.'s Ex. J.)

Defendants' Response:

        Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts
is incorrect or otherwise incomplete.  When asked about Dr. Ross, Dr. Hynes testified as follows:

        Q. . . . Who's Dr. Edgar Ross?
        A.  He's the director of the pain management center at Brigham and Women's
        Hospital.

Q. Do you believe him to be an excellent doctor?
A. Yes.
Q. Is he one of your mentors?
A. Yes.
Q. Do you believe Dr. Ross told you anything that was not borne out by your
own clinical experience concerning the use of Neurontin for the treatment of
neuropathic pain?
. . .
A. No.
Q. And do you believe Dr. Ross provided useful and accurate information based
upon your own knowledge concerning the use of Neurontin for the treatment of
neuropathic pain?
A. Yes.
Q. Do you think Dr. Ross provided any inaccurate information to you or your
colleagues concerning the use of Neurontin in the treatment of neuropathic pain?
A. I don't believe so.

(Hynes Dep. at 161:10-162:8, Ex. CC.)  Dr. Hynes "[didn't] know how much" Dr. Ross' lectures

regarding Neurontin would have influenced him.  (*Id.* at 130:3-11.)

44.    Dr. Hynes relied on the information provided by the sales representatives as part
of his job as a prescribing physician. (Hynes Dep. at 185:3-9, Pl.'s Ex. J.)

Defendants' Response:

Disputed.  Defendants submit that this paragraph of Plaintiff's Further Statement of Facts

is incorrect or otherwise incomplete.  Dr. Hynes ***approved a Neurontin prescription issued by a***

***resident*** of the Brigham & Women's Hospital pain service during Mr. Shearer's hospitalization.

(Hynes Dep. at 75:10-77:18, Ex. CC; 37BWH-00410-411 [2459-14].)  Dr. Hynes does not recall

whether he personally saw Mr. Shearer or made the decision to start him on Neurontin.  (Hynes

Dep. at 75:10-77:14.)  Dr. Hynes "would assume the resident" who issued the prescription had a

discussion about Neurontin with Mr. Shearer, and not him.  (*Id.* at 136:18-25.)  When deciding to

prescribe Neurontin in 2000, Dr. Hynes testified that he would have relied upon his "prior

experience," testifying that he "found it to be effective for neuropathic pain," (*Id.* at 38:21-39:13),

and that he had "used it extensively with good results," including for patients like Mr. Shearer.

(*Id.* at 62:12-18.)   Dr. Hynes did not recall reading any specific published literature about

Neurontin prior to the time he treated Mr. Shearer.  (*Id.* at 171:13-18.)  Dr. Hynes testified that

he did not have a specific recollection of visits with sales representatives regarding Neurontin,

and was "not sure" regarding the timing of those visits.  (*Id.* at 180:20-182:23.)  During the visits

with sales representatives regarding Neurontin, Dr. Hynes "[didn't] believe" that the sales representatives told him anything about Neurontin that was inconsistent with this own clinical experience, and he believed that the information was accurate.   (*Id.* at 183:17-184:7.)

Dated: February 22, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Mark S. Cheffo
      Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Mark.Cheffo@skadden.com

        -and-

BOIES, SCHILLER & FLEXNER LLP

By: /s/ William S. Ohlemeyer
      William S. Ohlemeyer

333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
WOhlemeyer@bsfllp.com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 22, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo