# EXHIBIT CC

Page 1

1                                    VOLUME:        I
                                     PAGES:        1-199
2                                    EXHIBITS:     1-10
3
              UNITED STATES DISTRICT COURT
4                DISTRICT OF MASSACHUSETTS
5
       IN RE:   NEURONTIN            ) MDL DOCKET
6      MARKETING, SALES PRACTICES    ) NO. 1629
       AND PRODUCTS LIABILITY        ) MASTER FILE
7      LITIGATION                    ) NO.  04-10981
                                     )
8                                    )
       THIS DOCUMENT RELATES TO:     ) JUDGE PATTI
9                                    ) B. SARIS
       SHEARER VS. PFIZER, ET AL;    ) MAGISTRATE
10     1:07-CV-11428-PBS             ) JUDGE LEO T.
                                     ) SOROKIN
11                                   )
12
13
14           VIDEOTAPED DEPOSITION OF
15     WILFRED HYNES, M.D., a witness called on
16     behalf of the Plaintiff, pursuant to the
17     provisions of the Federal Rules of Civil
18     Procedure, before Jill Shepherd, Registered
19     Professional Reporter, CSR, CLR and Notary
20     Public, in and for the Commonwealth of
21     Massachusetts, at the Tufts Medical Center,
22     800 Washington Street, Boston,
23     Massachusetts, on Tuesday, November 13,
24     2009, commencing at 12:08 p.m.
25     Job No: 226411

Page 2

```
 1
 2   APPEARANCES:
 3
 4
 5   FINKELSTEIN & PARTNERS
 6   By:  Kenneth B. Fromson, Esquire
 7   1279 Route 300
 8   P.O. Box 1111
 9   Newburgh, New York 12551
10   Tel:  845.562.3492
11   E-mail: kfromson@lawampmmt.com
12   Attorney for the Plaintiff.
13
14
15
16
17   GOODELL, DeVRIES, LEECH, DANN, LLP
18   By:  Richard M. Barnes, Esquire
19   One South Street, 20th Floor
20   Baltimore, Maryland 21202
21   Tel:  410.783.4004
22   E-mail: rmb@gdldlaw.com
23
24          -- and --
25
```

Page 3

```
 1
 2   APPEARANCES, CONTINUED
 3
 4
 5   BOIES, SCHILLER & FLEXNER, LLP
 6   By:  Harlan A. Levy, Esquire
 7   575 Lexington Avenue
 8   7th Floor
 9   New York, NY 10022
10   Tel:  212.446.2300
11   E-mail: hlevy@bsfllp.com
12   Attorneys for the Defendant, Pfizer.
13
14
15   ALSO PRESENT:  Sam Krumholz
16            David Egilman, M.D.
17            Marissa Demonte, Videographer
18
19
20
21
22
23
24
25
```

Page 4

INDEX

```
 1
 2   WITNESS                              PAGE
 3   WILFRED HYNES, M.D.
 4   Examination by Mr. Barnes              7
 5   Examination by Mr. Fromson            91
 6   Examination by Mr. Barnes            149
 7   Examination by Mr. Fromson           186
 8   Examination by Mr. Barnes            189
 9
10
11
12
13
14
15
16              E X H I B I T S
17   NO.    DESCRIPTION                   PAGE
18    1     Notice                 6
19    2     000374-37BWH-00205 -          6
             000374-37BWH-00426
20
      3     CV                     13
21
      4     Demand for Jury Trial        91
22
      5     Answer                 91
23
      6     US Package Insert of 2009   100
24
      7     Settlement Agreement        133
25
```

Page 5

```
 1    8     Letter 9/9/09                142
 2    9     FDA Article                  168
 3   10     Update                       194
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Corporate Services

800-567-8658                                    973-410-4040

Page 38

1   appropriate once you've evaluated the
2   patient, how do you select between a
3   tricyclic antidepressant versus narcotic
4   verse antiepileptic drug such as Neurontin?
5   A.  In the chronic setting, we're probably more
6   likely to try non-narcotics first.
7   Q.  Why is that?
8   A.  Because of the risk of addiction, the
9   side-effect profile of narcotics.
10  Q.  What are your concerns about the side-effect
11  profile for narcotics?
12  A.  Nausea, constipation.  Certainly, it's a
13  step up in terms of potency.  Narcotics are
14  much stronger agents.  They are closely
15  regulated.  Clearly, if you are going to
16  treat a patient without narcotics, that
17  would be the preference.
18  Q.  They are a heavier drug than the
19  antiepileptics?
20  A.  That's correct.
21  Q.  In terms of selecting a drug such as
22  Neurontin, an antiepileptic drug such as
23  Neurontin, for the treatment of a pain
24  condition in the year 2000, what information
25  would you rely upon in choosing that drug?

Page 39

1   What sort of information --
2   A.  My prior experience.
3   Q.  Was that the predominant --
4   A.  Yes.
5   Q.  Why is that?
6   A.  I found it to be effective for neuropathic
7   pain.
8   Q.  Did you begin using Neurontin during your
9   fellowship?
10  A.  Yes.
11  Q.  And you just carried it forward in your
12  private practice?
13  A.  That's correct.
14  Q.  In your training, did you have any -- I
15  think you already answered, but in your
16  training, your decision to use Neurontin was
17  basically based upon the information you
18  received from your colleagues here in
19  Boston?
20  A.  The attending physicians, yes.
21  Q.  And they were generally satisfied with
22  Neurontin to treat neuropathic pain?
23  MR. FROMSON:  Objection.  Hold on.
24  Objection.  Form.
25  You can answer.

Page 40

1   A.  Yes.
2   Q.  What was their experience with Neurontin for
3   the treatment of neuropathic pain during
4   your fellowship?
5   MR. FROMSON:  Objection.  Form.
6   Q.  You may answer.
7   A.  Predominant feeling was that it was
8   effective for neuropathic pain.
9   Q.  And that was your experience as well?
10  A.  Yes.
11  Q.  I have marked as an example -- you have it
12  in front of you -- Exhibit 2.  I've given it
13  to counsel.
14  Exhibit 2, for the record, is the
15  records from Brigham and Women's from
16  October 2000 for Mr. Shearer.
17  A.  Okay.
18  Q.  You've had a brief moment prior to the
19  deposition.
20  Let me ask you this again:  Other than
21  spending a moment prior to the deposition,
22  have you had a chance to familiarize
23  yourself with the records for Mr. Shearer
24  from his hospitalization at Brigham and
25  Women's Hospital in 2000?

Page 41

1   A.  No.
2   Q.  We'll take our time and go through them.
3   First of all, would you turn to Exhibit 2,
4   and it's the -- it's at Bates number 410 and
5   411, and it's a consult note.
6   Do you know Dr. Britton,
7   B-R-I-T-T-O-N?  He requested a consult.
8   A.  No.
9   Q.  Okay.
10  Looking at the top of page 410, it's a
11  request to APS.
12  What is "APS"?
13  A.  Acute Pain Service.
14  Q.  And that would be you?
15  A.  Yes.
16  Q.  In fact, that was the name of the service,
17  correct?
18  A.  Yeah.
19  Q.  But also treated chronic pain forms,
20  correct?
21  A.  That's correct.
22  Q.  Okay.  And there was a diagnosis number one.
23  What was the diagnosis number one?
24  A.  Status post-mitral valve repair, status
25  post-stroke.

11 (Pages 38 to 41)

1  A. Correct.
2  Q. Going back to page 411.
3  A. Okay.
4  Q. On page 411, do you have any -- did you
5     provide any of the information on Bates
6     number 00411 in Exhibit 2?
7  A. Yes.
8  Q. And when you wrote your note on page 00411,
9     did you have an opportunity to review the
10    senior staff consultant report prior to
11    signing this document?
12        MR. FROMSON:  Objection as to form.
13        My objection is only to the use of the
14    word "opportunity," as opposed to whether he
15    did.
16        MR. BARNES:  Thank you.
17 Q. Did you actually review the form prior to
18    signing it on page 411?
19 A. I'm not sure.
20 Q. Would that be your practice?
21 A. My practice is usually to get the whole
22    history from the resident or the fellow.
23 Q. First --
24 A. I wouldn't look at -- I probably would not
25    look at every single word that was written

1     on the consult form.
2  Q. Before you signed the note on page 411,
3     would you be satisfied that the information
4     on the note by the resident was accurate,
5     and fairly described the history and medical
6     condition of the patient?
7         MR. FROMSON:  Note my objection as
8     to form.  Lack of foundation.
9  A. I would assume when a resident presents the
10    history and physical to me, that what he
11    writes is the same because -- and that would
12    be an accurate assessment of the patient's
13    history and physical.
14 Q. In the course of your practice, you
15    routinely rely on the information obtained
16    by the resident in forming your plan for the
17    patient, correct?
18 A. Yes.
19 Q. Would you read what you wrote into the
20    record, please, on page 411.
21 A. I wrote under Plan: "PCA.  Morphine
22    sulfate.  1.5/7/0/0.  Start Neurontin.
23    Await MRI.  Patient seen and agree with
24    above."
25 Q. Now, what was the purpose -- what was a

1     "PCA"?
2  A. It's a patient controlled analgesia.  It's a
3     way to deliver narcotics intravenously; the
4     patient has complete control of it.
5  Q. He has a little button he pushes when he
6     needs relief?
7  A. That's correct.
8  Q. Is that morphine sulfate?
9  A. Yes.
10 Q. What is morphine sulfate?
11 A. It's a narcotic.
12 Q. And it's being delivered intravenously?
13 A. Intravenously.
14 Q. And what was your -- what was the purpose of
15    providing morphine sulfate?
16 A. To control the patient's pain.
17 Q. At time I stutter a bit at the end.  I will
18    try to help you out.  I will kind of nod,
19    all right?
20 A. Okay.
21 Q. Thank you.  All right.
22        Now, given the patient's medical
23    history and condition on October 14th, why
24    did you start Mr. Shearer on Neurontin?
25 A. To help him with his pain.

1  Q. What were the clinical indications for
2     including Neurontin among the medications to
3     treat his pain along with morphine sulfate?
4  A. Period -- for neuropathic pain in his lower
5     extremities.
6  Q. Did you consider -- would you have
7     considered -- let me ask you this:  Why
8     would you have chosen Neurontin as opposed
9     to a tricyclic antidepressant for the
10    neuropathic pain for Mr. Shearer?
11 A. Because of his heart condition.
12 Q. And what are the issues with tricyclic
13    antidepressants and Mr. Shearer's heart
14    condition?
15 A. He has atrial fibrillation, and tricyclic
16    antidepressants can cause accelerated heart
17    rate.
18 Q. So tricyclic antidepressants were not
19    appropriate for Mr. Shearer?
20 A. Correct.
21 Q. Can tricyclic antidepressants be prescribed
22    for chronic neuropathic pain?
23 A. Yes.
24 Q. And it was your judgment, in Mr. Shearer's
25    condition as a heart patient, that would not

1    be appropriate for him?
2  A. Correct.
3  Q. So did you consider other antiepileptic
4    drugs other than Neurontin for the treatment
5    of his neuropathic pain which you diagnosed
6    on the 14th of October?
7  A. I would have no idea.
8  Q. What were the clinical reasons why you would
9    have picked Neurontin at this time, other
10    than it was an antiepileptic drug?
11  A. Familiarity.
12  Q. And what was your familiarity with Neurontin
13    on October 14, 2000?
14  A. Used it extensively with good results.
15  Q. And had you used it extensively with good
16    results for patients such as Mr. Shearer?
17      MR. FROMSON: Objection. Form.
18  A. Yes.
19  Q. Okay.
20    Now, in terms of its side-effect
21    profile, what was your view of Neurontin on
22    October 14, 2000 with regard to side
23    effects?
24  A. It was a purely benign medicine.
25  Q. By being a fairly benign medicine, what does

1    that mean to the layman?
2  A. Well tolerated.
3  Q. If it's well tolerated, what does that mean
4    to a layman?
5  A. Minimal side effects.
6  Q. Okay.
7    Now, in the past, had you
8    had -- strike that.
9    With regard to Neurontin being well
10    tolerated, was it important to you that it
11    did not have drug interactions? Was that
12    one of the factors you would have
13    considered?
14      MR. FROMSON: Note my objection to
15    the form of the question.
16  A. Yes.
17  Q. Let me ask you this: What other features
18    did you consider important for the patient
19    like Mr. Shearer with regard to Neurontin's
20    side-effect profile?
21  A. I'm not quite sure how to answer that.
22  Q. Was it your experience -- did you have any
23    experience with Neurontin and drug
24    interactions?
25  A. Yes.

1  Q. And what was that?
2  A. There were very few.
3  Q. Is that important to a pain management
4    specialist?
5  A. Yes.
6  Q. Why is that?
7  A. There will be patients that you will see
8    that will be on multiple medications.
9  Q. What's the importance of having a drug that
10    doesn't interact with other medications?
11  A. If you -- you can have significant reactions
12    with other medications.
13  Q. Neurontin doesn't have that problem?
14  A. No.
15  Q. Do you agree with that?
16  A. Yes.
17      MR. FROMSON: You mean now or then?
18      MR. BARNES: Then.
19      MR. FROMSON: Note my objection to
20    form of the last question. I know you were
21    asking about 2000, that's why.
22  Q. You understood my last question?
23  A. Yes.
24  Q. Was it your experience in 2002 when you were
25    treating Mr. Shearer that Neurontin had a

1    good safety profile with regard to drug
2    interactions?
3  A. Yes.
4  Q. Is that your experience today?
5  A. Yes.
6  Q. Do you still use gabapentin for the
7    treatment of neuropathic pain?
8  A. Yes.
9  Q. And do you use other AEDs for the treatment
10    of neuropathic pain today?
11  A. Yes.
12  Q. Do you still use tricyclic antidepressants
13    for the treatment of neuropathic pain?
14  A. Yes.
15  Q. And as to which type of medicine you
16    prescribed for neuropathic pain would be
17    based upon the patient's unique
18    circumstances?
19  A. Correct.
20  Q. I'd like for you to turn your attention to
21    page 413.
22  A. Okay.
23  Q. At the top of the page, I believe that is
24    your handwriting?
25  A. Correct.

17 (Pages 62 to 65)

Page 74

1  Q. Okay.
2      Can you just briefly read the note as
3  it pertains to the pain evaluation -- what
4  was conducted -- on the 16th of October?
5  A. Sure. "Pain recommendations much
6  appreciated. Will convert to shorter-acting
7  narcotics PRN. D/C PCA. Psyche symptoms
8  likely medication's side effects. Continue
9  Flexeril, Neurontin."
10  Q. And then would you go down to the psyche
11  assessment, please?
12  A. "Patient reports feeling disoriented and
13  confused. Likely combination of
14  overmedication, new environment. Will cut
15  back on psychotropic meds. Follow mental
16  status. Haldol PRN for agitation. Psyche
17  consult if symptoms persist off heavy
18  narcotics."
19  Q. So at that time, was a staff at Brigham and
20  Women's concerned about the use of opioids
21  as they were psychotropic medications that
22  were affecting Mr. Shearer's mental status?
23      MR. FROMSON: Objection. Form.
24  A. That appears to be the case.
25  Q. And on the 16th of October, what medicines

Page 75

1  did the staff continue Mr. Shearer on for
2  the treatment of his pain?
3  A. Flexeril and Neurontin.
4  Q. Okay.
5      What is Flexeril?
6  A. Muscle relaxant.
7  Q. And Neurontin is an antiepileptic drug that
8  we've discussed previously?
9  A. Correct.
10  Q. Now, would you go back briefly -- I was
11  reviewing my notes -- to your original
12  consult at page 411.
13  A. Okay.
14  Q. I went back and checked my notes.
15      Did you -- what does the last sentence
16  in your notes say after you prescribe
17  Neurontin in the morphine sulfate?
18  A. "Await MRI."
19  Q. And then below that, what is that sentence
20  below?
21  A. "Patient seen and agree with above."
22  Q. Does that indicate you actually saw the
23  patient prior to administering him the
24  medicine, do you think?
25  A. No.

Page 76

1  Q. Was he seen by somebody?
2  A. Right.
3  Q. Okay.
4      And how did you know that he agreed
5  with the above plan? When you say "agreed
6  with above," what does that mean?
7  A. I agree with the resident's note.
8  Q. You agree with the resident's note?
9  A. Right.
10  Q. Okay.
11      So that's you agreeing with what had
12  been written above?
13  A. Right.
14  Q. Okay.
15      When did the resident prescribe
16  Neurontin, or did you prescribe Neurontin?
17  A. The resident.
18  Q. Where does it say that she prescribed the
19  Neurontin?
20  A. It doesn't. The resident inputs the orders
21  into the computer.
22  Q. I understand.
23      But when you say "start Neurontin," is
24  that something you told her to do or
25  something you just ratified by signing the

Page 77

1  note?
2  A. I don't know.
3  Q. Well, when you say "start Neurontin," you
4  were just saying that you noted Neurontin
5  had been prescribed, or you just don't know?
6  A. I think that was probably discussed and it
7  was decided to start it. I don't know
8  100 percent.
9  Q. So just so I understand, at this consult,
10  the pain service prescribed the Neurontin
11  for Mr. Shearer?
12  A. Yes.
13  Q. And you agreed with that?
14  A. Yes.
15  Q. Okay.
16      If you hadn't agreed with it, would
17  you have changed the order?
18  A. Yes.
19  Q. Do you believe that it was appropriate to
20  continue Mr. Shearer on Neurontin and
21  Flexeril after the physicians at Brigham and
22  Women's determined that Mr. Shearer was
23  suffering from paranoid delusions?
24      MR. FROMSON: Objection. Form.
25  A. I was no longer covering, but that appears

Page 90

1  Mr. Shearer?
2        MR. FROMSON: Objection. Form.
3  A. Probably.
4  Q. Was there any evidence that Mr. Shearer had
5     side effects from Neurontin while he was in
6     the hospital?
7        MR. FROMSON: Objection.
8  A. It doesn't appear to be so.
9  Q. Was it the response of Mr. Shearer to the
10    combination of Neurontin, Flexeril, and
11    Vioxx something that you had hoped to
12    achieve when you initially prescribed the
13    Neurontin for Mr. Shearer?
14       MR. FROMSON: Objection. Just note
15    my objection to form.
16 A. Yes.
17 Q. Is Neurontin commonly used with other
18    medications to achieve pain control?
19 A. Yes.
20 Q. Is that one of its benefits to patients, it
21    can be used in combination?
22 A. Yes.
23 Q. Do you continue to prescribe Neurontin for
24    patients like Mr. Shearer even in your
25    practice today?

Page 91

1  A. Yes.
2  Q. Would Neurontin be -- today be one of the
3     choices you would consider to treat a
4     patient such as Mr. Shearer for symptoms he
5     complained of in October of 2000?
6        MR. FROMSON: Objection.
7  A. Yes.
8        (Pause.)
9        MR. BARNES: I will pass the
10    witness.
11       MR. FROMSON: Oh, great.
12       MR. BARNES: Two-minute break?
13       THE VIDEOGRAPHER: The time is
14    1:57, and we're off the record.
15       (Short recess.)
16       (Exhibit Nos. 4-5 marked.)
17       THE VIDEOGRAPHER: The time is
18    2:05. This is the beginning of tape two in
19    the deposition of Wilfred Hynes, M.D., and
20    we're back on the record.
21       * * * * *
22       EXAMINATION BY MR. FROMSON
23 Q. Good afternoon, Doctor.
24 A. Good afternoon.
25 Q. My name is Ken Fromson, and I represent the

Page 92

1  Shearer family, and I presume you probably
2  figured that out by now.
3  A. Yes.
4  Q. And there's a lawsuit that has been brought
5     against makers of a drug called "Neurontin."
6     I figured you figured that out as well by
7     now.
8  A. Yes.
9  Q. And before your deposition was scheduled
10    today, did the lawyers for the drug company
11    contact you to schedule the deposition?
12 A. I don't know who contacted who -- who
13    submitted the subpoena. I'm assuming it was
14    the drug company.
15 Q. Okay.
16 A. Pfizer.
17 Q. You had referenced earlier on in your
18    testimony that you had a very brief phone
19    call from Dr. David Egilman?
20 A. Right.
21 Q. Did you receive any phone calls from anyone
22    else before the deposition was scheduled?
23 A. No.
24 Q. Okay.
25       And did you have any documents to

Page 93

1  review regarding Mr. Shearer before your
2  deposition today?
3  A. None.
4  Q. Did you review any documents from anybody
5     related to Pfizer within the last two or
6     three months related to this lawsuit?
7  A. Dr. Egilman submitted a letter.
8  Q. Okay.
9        And did you read the letter?
10 A. Yes.
11 Q. Do you have a recollection of what was in
12    the letter?
13 A. Just that he wanted to talk about the case.
14 Q. Okay.
15       MR. BARNES: I asked you to produce
16    all the documents you had in this case,
17    including documents from Dr. Egilman.
18    Did you produce those today?
19       THE WITNESS: I don't know if I do
20    have that. I don't know if I just threw it
21    out. I think I might have thrown it out
22    when I got it.
23       MR. BARNES: You threw it out?
24       THE WITNESS: I think so. I don't
25    know if I brought it in or not. I don't

24 (Pages 90 to 93)

Page 130

1      again then.
2   A. Okay.
3   Q. Did Dr. Ross' lectures regarding Neurontin,
4      which were given before you prescribed
5      Neurontin to Mr. Shearer, provide, at least
6      in part, a basis for your prescription of
7      Neurontin to Mr. Shearer?
8          MR. BARNES: Objection.
9          In 2000?
10         MR. FROMSON: Yes.
11  A. I don't know how much -- again, how
12     ingrained my prescribing pattern was at that
13     point. Granted, I was a young attending, so
14     it's clear that my director, you know, was
15     someone I looked up to and listened to. So
16     I can't imagine that it would not have
17     influenced me.
18  Q. After 2002, having nothing to do with your
19     prescription to Mr. Shearer, were you
20     contacted by sales representatives from
21     Pfizer regarding Neurontin?
22  A. I believe so.
23  Q. And did there come a point where you went to
24     a speaker training meeting in New York?
25  A. Yes.

Page 131

1   Q. Was that for Neurontin?
2   A. Yes.
3   Q. What calendar year did you go?
4   A. Good question. Honestly, I don't -- 2001,
5      2002. I'm not sure.
6          MR. BARNES: Don't guess. If you
7      know, you know.
8   A. I'm not exactly sure of the precise year
9      that I went.
10  Q. Was it before or after you prescribed
11     Neurontin to Mr. Shearer?
12  A. I don't know. I can tell you I went with my
13     girlfriend then, who is now my wife. When
14     did I meet her? I think I met her late 2001
15     or late 2000. So it might have been 2001
16     then.
17  Q. In terms of the speaker --
18         MR. BARNES: 2001 -- you met her
19     late 2000?
20         THE WITNESS: Yes, I believe so.
21         MR. BARNES: Late 2000 or 2001?
22         THE WITNESS: Late 2000. In
23     2001 -- we went to New York together in
24     2001.
25  Q. In terms of your attending this speaker

Page 132

1      training meeting --
2   A. Yes.
3   Q. -- who paid for the trip?
4          MR. BARNES: Objection.
5   A. The drug company.
6   Q. Who paid for your hotel?
7   A. Drug company.
8   Q. Did you drive or fly?
9   A. Flew.
10  Q. Who paid for the flight?
11  A. Drug company.
12  Q. At the meeting, did they discuss using
13     Neurontin for neuropathic pain?
14  A. Yes.
15  Q. Did they discuss using Neurontin for
16     migraine?
17  A. Not sure. I didn't really pay attention if
18     they did because it's not something that I
19     tend to treat.
20  Q. Did there come a point in time that you
21     became aware of a drug called Lyrica?
22  A. Yes.
23  Q. Are you familiar with the term pregabalin as
24     being the generic for Lyrica?
25  A. Yes.

Page 133

1   Q. Okay.
2          And did sales representatives from
3      Pfizer visit you and discuss Lyrica?
4          MR. BARNES: Objection.
5   A. Yes.
6   Q. Did they discuss with you whether Lyrica was
7      superior to Neurontin?
8          MR. BARNES: Objection.
9   A. I'm not sure how they phrased it. I think
10     the -- my recollection, the papers they
11     brought seemed to -- the papers they
12     brought, I believe it was patients that had
13     failed Neurontin as one of the inclusion
14     criteria.
15         MR. FROMSON: Can you mark this for
16     me, please.
17         (Exhibit No. 7 marked.)
18  Q. Doctor, I don't know how to ask you this
19     question.
20         Do you read the paper on a regular
21     basis?
22  A. Yes.
23  Q. Do you listen to the news on a regular
24     basis?
25  A. Probably less than I should.

34 (Pages 130 to 133)

Page 134

1   Q.  Did you hear anything in the news this past
2       August --
3           MR. BARNES:  Objection.
4   Q.  -- about Pfizer, through a division, Upjohn,
5       reaching a settlement agreement with the
6       United States Department of Justice
7       regarding off-label promotion of drugs?
8           MR. BARNES:  Objection.
9   A.  I believe so.  I don't know -- remember the
10      specifics of it.
11  Q.  Can you turn to page five of this particular
12      exhibit, please.
13  A.  (Witness complies.)  Okay.
14  Q.  On page five, there's a paragraph related to
15      Lyrica, where it is what is considered
16      number four.
17          Do you see that?
18  A.  Yes.
19  Q.  And can you simply read into the record the
20      first sentence?
21          MR. BARNES:  Objection.  Continuing
22      line of objection to the use of this
23      document.
24  Q.  Go ahead, Doctor.
25  A.  "Lyrica:  During the period of September 1,

Page 135

1       2005, through October 31, 2008, Pfizer:
2       (a) illegally promoted the sale and use of
3       Lyrica for a variety of off-label conditions
4       (including chronic pain, neuropathic pain,
5       perioperative pain and migraine)."
6   Q.  Thank you.
7           Do you have a recollection of sales
8       representatives from Pfizer discussing with
9       you the use of Lyrica for such conditions as
10      chronic pain, neuropathic pain,
11      perioperative pain and migraine?
12          MR. BARNES:  Objection.
13  A.  Chronic and neuropathic pain.  I don't ever
14      recall them discussing perioperative pain;
15      and, again, migraines they might have
16      discussed, but that's not an area of
17      interest for me.
18  Q.  In approximately 2004, did you attend any
19      training to become a speaker for pregabalin
20      or Lyrica?
21  A.  Did I?  Might have.
22  Q.  It's only what you recall.
23  A.  I'm not sure if it was Lyrica.  I'm not
24      sure.  I don't think I ever gave a lecture
25      for Lyrica.

Page 136

1   Q.  As part of the sources of news that you may
2       or may not listen to when you have the time,
3       do you listen to NPR?  That's National
4       Public Radio.
5   A.  No.
6   Q.  Did you ever listen to NPR on a regular
7       basis?
8   A.  No.
9   Q.  Okay.  I'm done with that document, Doctor.
10          With respect to your prescription of
11      Neurontin to Mr. Shearer, is it fair to say
12      that you approved the attending's
13      prescription of Neurontin to Mr. Shearer?
14          MR. BARNES:  Objection.
15  Q.  I'm sorry.
16          You were the attending?
17  A.  I was the attending.
18  Q.  Is it fair to say you approved of the
19      resident's prescription of Neurontin to
20      Mr. Shearer?
21  A.  Correct.
22  Q.  Did you have a discussion with Mr. Shearer
23      or did the resident have a discussion with
24      Mr. Shearer about Neurontin?
25  A.  I would assume the resident.

Page 137

1   Q.  Do you have any reason to believe that the
2       resident discussed an increased risk of
3       suicidal behavior with Neurontin when he or
4       she prescribed Neurontin to Mr. Shearer?
5           MR. BARNES:  Objection.
6   A.  No.
7   Q.  Do you know who the resident was?
8   A.  No.
9   Q.  Let me just see if we can find the signature
10      line on her record, on the October 2000
11      record.
12  A.  Looks like Xiong.
13  Q.  What is the number of the page that you are
14      looking at?
15  A.  411.
16          MR. BARNES:  Let me catch up to
17      you.
18  Q.  Are you able to read the full name into the
19      record or --
20  A.  I believe it -- I can't read anything else.
21      Just Xiong, X.
22  Q.  Was this a man or woman?
23  A.  No idea.
24  Q.  Do you know who was directly supervising
25      her, if not -- let me withdraw the question.

Page 138

1        You were directly supervising her?
2   A.  Yes.
3   Q.  Where would she -- this person -- I'm sorry.
4        Where would this person have gained
5        knowledge about the use of Neurontin, if not
6        from you?
7        MR. BARNES:  Objection.
8   A.  From rotating in the pain management center.
9   Q.  Under the same house you were practicing?
10  A.  Correct.
11  Q.  Under the same roof basically?
12  A.  Right.
13  Q.  You had mentioned a satellite office at that
14       time.
15  A.  Yes.
16  Q.  Where was the satellite office?
17  A.  Worcester Medical Center.
18  Q.  Was that an inpatient facility or outpatient
19       facility?
20  A.  It was an outpatient office.
21  Q.  Okay.
22       And is that the type of office where
23       patients could come make appointments and
24       come in and get a visit, get treatment,
25       prescriptions, and leave?

Page 139

1   A.  Yes.
2   Q.  Did sales representatives come to you at
3        that office before 2000 from Parke-Davis
4        Warner-Lambert?
5        MR. BARNES:  Objection.
6   A.  I believe so.
7   Q.  When I asked you earlier about visits from
8        sales representatives, I apologize, I didn't
9        make a distinction whether they came to the
10       hospital, Brigham and Women's, or your
11       satellite office.
12       Can you tell us whether they came to
13       either the hospital, the satellite office,
14       or both?
15  A.  When you say hospital, both settings were
16       hospital-based settings and outpatient
17       practices that they came to, and they would
18       come to both outpatient practices.
19  Q.  And would they -- and in both circumstances,
20       did they actually visit with you?
21  A.  Yes.
22  Q.  All right.
23       In terms of your prescription of
24       Neurontin to Mr. Shearer, is it fair to say
25       you did not discuss with Mr. Shearer the

Page 140

1        capacity for Neurontin to contribute to
2        suicidal behavior?
3        MR. BARNES:  Objection.  Assumes
4        facts not in evidence.
5   A.  I guess I'm not sure that it was common
6        knowledge at that time.
7   Q.  My question, however, is:  Did you speak to
8        Mr. Shearer about whether Neurontin had the
9        capacity to increase suicidal behavior when
10       Neurontin was prescribed to him?
11       MR. BARNES:  Objection.
12  A.  Probably unlikely.
13  Q.  In hindsight, this is a hypothetical
14       question, Doctor, if you did have knowledge
15       that Neurontin increased the risk of
16       suicidal behavior in patients taking
17       Neurontin, would you have shared that
18       information with Mr. Shearer?
19       MR. BARNES:  Objection.
20  A.  Yes.
21  Q.  If you had known -- again, in hindsight,
22       that is hypothetical -- if at the time the
23       Neurontin was being prescribed to
24       Mr. Shearer, if you knew Neurontin had the
25       capacity to increase the risk of suicidal

Page 141

1        behavior, would you have considered
2        alternatives to Neurontin?
3        MR. BARNES:  Objection.
4   A.  Considered?  Sure.
5   Q.  Okay.  Mr. Barnes asked you about a number
6        of different types of regimens that could
7        have considered, or maybe even were
8        considered.
9        Can you tell us what alternatives were
10       available to you back in October of 2000 if
11       you would have considered them in light of a
12       then known suicide risk with Neurontin?
13       MR. BARNES:  Objection.
14  A.  Certainly other anticonvulsants.
15  Q.  If, at the time Neurontin was being
16       prescribed to Mr. Shearer, you had knowledge
17       that Neurontin had the capacity to
18       contribute or cause suicidal behavior, would
19       you have informed Mr. Shearer's caregiver or
20       family about that fact?
21       MR. BARNES:  Objection.
22  A.  I'm not sure if I would have the opportunity
23       to do that or not.
24  Q.  To the extent that the package insert --
25       withdrawn.

36 (Pages 138 to 141)

Page 142

1  If the United States package inserts
2  for Neurontin had indicated in the warning
3  that physicians should inform family and
4  caregivers of an increased risk of suicidal
5  behavior, would you have made a good faith
6  attempt to do so?
7  MR. BARNES:  Objection.
8  A.  That's not an unreasonable statement.
9  Q.  If I can take a five-minute break, Doctor,
10  I'd very much appreciate it before I decide
11  whether to pass you off to Mr. Barnes.
12  A.  Okay.
13  THE VIDEOGRAPHER:  The time is
14  2:55, and we are off the record.
15  (Short recess.)
16  (Exhibit No. 8 marked.)
17  THE VIDEOGRAPHER:  The time is
18  3:01, and we are back on the record.
19  Q.  Doctor, during the break, you were kind
20  enough to provide us with a copy of the
21  letter that was provided to you by
22  Dr. Egilman on September 9, 2009.  We've
23  marked it as Exhibit 8.
24  Can you identify this as the letter
25  you received from Dr. Egilman?

Page 143

1  A.  Yes.
2  Q.  Okay.
3  In terms of the medical journals that
4  you regularly utilized before 2000, but up
5  to the point where you prescribed Neurontin
6  to Mr. Shearer, are you able to list for us
7  any subscriptions that you had?
8  A.  I'm not sure if I had, at that time,
9  "Anesthesia & Analgesia."  Basically, the
10  subscriptions came with the membership of
11  the medical society.
12  Q.  What medical society are you referencing?
13  A.  Any.  Any medical society.  Most medical
14  societies usually have a subscription that
15  came along with it.
16  Q.  Did you have a subscription to the
17  "New England Journal of Medicine" as of the
18  time you were providing Neurontin to
19  Mr. Shearer?
20  A.  I'm not sure if at the time, because I think
21  it basically just took up too much space in
22  the house, so I stopped it.
23  Q.  How about, did you have a subscription to
24  "Pain" journal?
25  A.  I'm not sure.

Page 144

1  Q.  Okay.
2  A.  I don't -- I'm not sure.  But they were all
3  basically in the practice.
4  Q.  When you say they were all in the practice,
5  is it your understanding that, as of 2000,
6  journals such as a journal entitled "Pain"
7  was within the practice?
8  A.  Yes.
9  Q.  Are you familiar with a journal called "The
10  Journal of Neurology, Neurosurgery and
11  Neuropsychiatry"?
12  A.  No.
13  Q.  Are you familiar with an article -- are you
14  familiar with a journal known as the
15  "Journal of Pain and Symptom Management"?
16  A.  Yes.
17  Q.  Did you ever subscribe to that personally?
18  A.  I'm not sure.
19  Q.  Do you know, was that a journal that was
20  available in-house within the practice as of
21  the year 2000?
22  A.  I believe so.
23  Q.  Was it a journal that you regularly read?
24  MR. BARNES:  Objection.
25  A.  Probably not.

Page 145

1  Q.  Have my questions at all refreshed your
2  recollection as to which journals you may
3  have regularly read as of the calendar year
4  '99 and 2000?
5  A.  No.
6  Q.  Okay.
7  I have to try and see if I can refresh
8  your recollection, okay?  I'm sorry.
9  How about a journal called "Headache,"
10  did you have a subscription to a journal
11  known as "Headache"?
12  A.  No.
13  Q.  Was the journal "Headache" available within
14  your practice as of the 2000 time period?
15  A.  I'm not sure if "Headache" would have been
16  available.
17  Q.  Did you ever actually become a speaker for
18  Neurontin?  In other words, a speaker who
19  was trained by the drug company to give
20  lectures about Neurontin?
21  A.  New York visit was for that.
22  Q.  Tell us -- can you tell me what happened
23  there?  How was the day spent?
24  A.  It was -- I don't know if it was one or two
25  full days of lectures.

37 (Pages 142 to 145)

1   did not agree with?
2   A.  You know, the only thing that everyone at
3       the meeting had a problem with was the
4       initial dosing.
5   Q.  What was that?
6   A.  Of Neurontin, I think.  I don't know what --
7       they recommended 600-milligrams three times
8       a day.
9   Q.  What did you usually want to start at?
10  A.  That included even elderly patients.  And
11      most of us really didn't agree with that.
12  Q.  If you were asked a question, would you tell
13      your practice about dosing patients in
14      context of a presentation?
15  A.  Yeah.
16  Q.  So what would you tell them if they asked
17      you about dosing?
18  A.  Say it again.
19  Q.  In other words, if you were asked a question
20      about the dosing at the meeting --
21  A.  Yeah.
22  Q.  -- what would you tell them about your
23      practice as to dosing patients with
24      Neurontin?
25  A.  If they asked me specifically my practice?

1   Q.  Yes.
2   A.  Then I would tell them what my practice was.
3       That it was usually I like to start low and
4       titrate up.
5   Q.  Other than the dosing issue, was there any
6       other information that you disagreed with?
7   A.  Not that stood out in my memory today from
8       that.
9   Q.  So you were comfortable with what was
10      presented?
11          MR. FROMSON:  Objection.
12  Q.  Were you comfortable with what you presented
13      in the lectures on Neurontin?
14  A.  I believe so.
15  Q.  Is there anything that you -- well, strike
16      that.
17          Did you consider the presentation
18      materials prepared for you to be fair and
19      balanced with regard to the information
20      provided about the treatment of postherpetic
21      neuralgia?
22          MR. FROMSON:  Objection.  Form.
23  A.  I believe so.
24  Q.  Do you recall being asked unsolicited
25      questions about Neurontin from the audience

1   during these lectures?
2   A.  Yes.
3   Q.  Do you recall that?
4   A.  Yes.  I don't specifically remember any
5       question, but I'm sure at any lecture there
6       would have been questions.
7   Q.  Do you recall being asked questions from the
8       audience regarding off-label uses, as you
9       sit here today?
10  A.  Yes, probably.
11  Q.  Did you advise the members of the audience
12      that this was an off-label use?
13  A.  Yes.
14  Q.  And were you trained to do that by Pfizer?
15  A.  Yes.
16  Q.  And you said when you got a question
17      regarding off-label use, you were careful to
18      advise the audience that this was an
19      unapproved use of Neurontin?
20          MR. FROMSON:  Objection.  Form.
21  Q.  You may answer.
22  A.  I believe so.
23  Q.  And when you were asked a question about an
24      off-label use, in those remarks, did you use
25      your independent medical judgment in

1   responding?
2   A.  Yes.
3   Q.  Not something Pfizer told you to say, but
4       what you, Dr. Hynes, believed to be true?
5          MR. FROMSON:  Objection.  Form.
6       You can answer.
7   A.  Correct.
8   Q.  There's been a lot of questions about
9       Dr. Edgar Ross.
10      Who's Dr. Edgar Ross?
11  A.  He's the director of the pain management
12      center at Brigham and Women's Hospital.
13  Q.  Do you believe him to be an excellent
14      doctor?
15  A.  Yes.
16  Q.  Is he one of your mentors?
17  A.  Yes.
18  Q.  Do you believe Dr. Ross told you anything
19      that was not borne out by your own clinical
20      experience concerning the use of Neurontin
21      for the treatment of neuropathic pain?
22          MR. FROMSON:  Objection.  Form.
23  A.  No.
24  Q.  And do you believe Dr. Ross provided useful
25      and accurate information based upon your own

Page 162

1   knowledge concerning the use of Neurontin
2   for the treatment of neuropathic pain?
3   A. Yes.
4   Q. Do you think Dr. Ross provided any
5   inaccurate information to you or your
6   colleagues concerning the use of Neurontin
7   in the treatment of neuropathic pain?
8   A. I don't believe so.
9   Q. Have you ever had an experience where you
10   were asked questions about Neurontin where
11   you did not tell your colleagues what you
12   believed to be the truth based upon your
13   clinical judgment with regard to your
14   experiences for Neurontin for the treatment
15   of neuropathic pain?
16       MR. FROMSON: Objection. Form.
17   A. No. No.
18   Q. Do you believe you were unfairly influenced
19   by any activities by Parke-Davis or Pfizer
20   with regard to your opinions concerning the
21   use of Neurontin for the treatment of
22   neuropathic pain?
23   A. Not sure that's a fair question.
24   Q. Let me ask you this: Do you believe that
25   when you talked about Neurontin, you were

Page 163

1   using your own independent medical judgment
2   based upon your own personal clinical
3   experience?
4   A. Yes.
5   Q. And that was based upon -- by 2000 you had
6   some 500 to 1,000 patients you treated with
7   the Neurontin?
8   A. Yes.
9   Q. You followed some of them for years?
10   A. Yes.
11   Q. Can you describe for us your experience
12   using Neurontin prior to 2000 at the
13   inpatient and outpatient practice at Brigham
14   and Women's Hospital?
15   A. It was variable. Some patients responded
16   well to it and others didn't.
17   Q. When they didn't respond to it, what did you
18   do?
19   A. Try a different agent.
20   Q. And if they did respond, what did you do?
21   A. Kept trying different agents.
22   Q. If they did respond --
23   A. Oh, if they did respond. I'm sorry.
24   Continue the medicine.
25   Q. Compared to other anticonvulsants, how did

Page 164

1   Neurontin compare to the treatment of
2   neuropathic pain in terms of its
3   effectiveness in treating that condition?
4   A. I thought it was a reasonably good choice.
5   Q. Why is that?
6   A. I felt a reasonable number of patients
7   responded.
8   Q. Did you ever have any issues with Neurontin
9   with regard to alterations in the patient's
10   mood?
11   A. Not sure if that was a major problem.
12   Q. So with regard to psychiatric side effects,
13   did you find Neurontin to have a good safety
14   profile in your own practice?
15   A. Felt it to be the case, yes.
16   Q. Now, when pain patients come in, it was your
17   experience that sometimes they are
18   depressed?
19   A. Yes.
20   Q. Are you aware that the incidents of suicidal
21   behavior in pain patients is higher than
22   that of the general population?
23       MR. FROMSON: Objection. Form,
24   lack of foundation.
25   A. Yes.

Page 165

1   Q. Has that been your experience as a pain
2   doctor, that some patients who come in for
3   pain treatment develop depression and have
4   suicidal behavior?
5       MR. FROMSON: Objection. Form,
6   lack of foundation.
7   A. Yes.
8   Q. So you never thought about -- usually follow
9   a patient in the treatment of pain for
10   changes in mood and perhaps suicidal
11   activity irrespective of any warning,
12   correct?
13   A. Yes.
14   Q. Now, Mr. Fromson asked you some questions
15   regarding the package insert from 2009.
16       Are you aware that that package
17   insert, 2009 --
18   A. Yes.
19   Q. -- the part you read -- why don't you go to
20   page --
21   A. Page ten.
22   Q. Do you know what a class label is?
23   A. No.
24   Q. Okay.
25       Are you aware today that all

Page 170

1   Q. And I want you to go down to the italicized
2     statement about the -- what they conclude.
3   A. Okay.
4   Q. Would you read the italicized statement into
5     the record, please.
6   A. "This information reflects FDA's current
7     analysis of available data concerning these
8     drugs. Posting this information does not
9     mean that FDA has concluded there's a causal
10    relationship between the drug products and
11    the emerging safety issue. Nor does it mean
12    that FDA is advising healthcare
13    professionals to discontinue prescribing
14    this product. FDA intends to update this
15    document when additional information or
16    analyses become available."
17   Q. Okay.
18     Are you aware that it's not proper to
19    draw causal inferences about any specific
20    drug from a pooled analysis of ten drugs?
21       MR. FROMSON: Objection.
22   Q. Is that your experience?
23       MR. FROMSON: Objection.
24   A. That's a fair statement.
25   Q. Doctor, as to all the journals Mr. Fromson

Page 171

1     talked to you about, you don't have a
2     specific recollection reading any specific
3     medical article concerning Neurontin prior
4     to the time you treated Mr. Shearer,
5     correct?
6       MR. FROMSON: Objection. Leading.
7   A. I don't believe so.
8   Q. You agree with that --
9   A. I do not believe so.
10   Q. Okay. Make sure -- I may have asked a bad
11    question.
12   A. Okay.
13   Q. As you sit here today, do you recall reading
14    any specific article about Neurontin prior
15    to the time you treated Mr. Shearer in the
16    published medical literature?
17   A. I do not recall at this time whether or not
18    I did.
19   Q. I want to talk to you briefly about some of
20    the questions Mr. Fromson asked you
21    concerning the choices -- what you
22    considered in treating Mr. Shearer for his
23    pain in 2000, okay?
24     Do I understand your testimony, sir,
25    you considered narcotics and tricyclic

Page 172

1     antidepressants and antiepileptic drugs,
2     drugs that would have been considered for
3     Mr. Shearer at that time, correct?
4   A. Correct.
5   Q. And the narcotics under the practice here at
6     Brigham and Women's Hospital, the pain
7     service, was to try to wean -- keep people
8     off -- get people off narcotics as soon as
9     possible because it's a heavy drug with
10    unpleasant side effects, correct?
11       MR. FROMSON: Note my objection,
12    leading.
13     I think you're going over what you
14    already asked him.
15       MR. BARNES: I'm setting a
16    foundation.
17       MR. FROMSON: Okay.
18   Q. Is that your testimony?
19   A. The practice was basically to do what we
20    best could for the patient.
21   Q. Okay.
22   A. The preference would be to use non-narcotics
23    if at all possible, but the -- it wasn't
24    necessarily the goal to get every patient
25    that we put on narcotics off them.

Page 173

1   Q. Okay.
2     For somebody like Mr. Shearer, would
3     it have been part of your goal to remove him
4     from narcotics if possible?
5   A. Not necessarily. If he was responding well
6     to narcotics without side effects, and
7     nothing else was working for him, then I
8     would have recommended continuing narcotics.
9   Q. In this case --
10   A. And that's in general. I don't remember
11    this case.
12   Q. Okay.
13     In this case, he had issues with
14    narcotics, correct?
15       MR. FROMSON: Objection. Form.
16   A. According to the documentation.
17   Q. According to the documentation, how did
18    Mr. Shearer respond to narcotics?
19   A. He had paranoid ideation.
20   Q. And what was the response of the medical
21    staff at Brigham and Women's Hospital to
22    those complaints?
23   A. He was -- it appears he was stopped on the
24    PCA and switched to oral narcotics as an
25    option, but it didn't appear he was using

Page 174

1   the oral narcotics much at all.
2   Q.  Was a PRN prescription, correct?
3   A.  Correct.
4   Q.  And that's as needed?
5   A.  Correct.  The PCA is also as needed.
6   Q.  As to tricyclic antidepressants, it was the
7       judgment of the medical doctors treating
8       Mr. Shearer's pain in 2000 that they would
9       not be appropriate for Mr. Shearer because
10      he was a heart patient, correct?
11          MR. FROMSON:  Objection.  Form, and
12      it's been asked and answered on direct.
13  A.  In general, the tricyclics we -- with a
14      patent with atrial fibrillation, the
15      preference would be to avoid tricyclics.
16  Q.  Is that what the pain staff did at the
17      Brigham and Women's Hospital with respect to
18      Mr. Shearer?
19  A.  That appears to be the case.
20  Q.  Okay.
21          Now, we talked about antiepileptic
22      medicines, correct?
23          From reading the Exhibit 9, you now
24      understand that all antiepileptic drugs
25      carry a class labeling for suicidal behavior

Page 175

1   and ideation, correct?
2   A.  Correct.
3          MR. FROMSON:  Objection.
4   Q.  Doctor, do you now understand that all
5       antiepileptic drugs carry a class label for
6       suicidal behavior and ideation?
7          MR. FROMSON:  Objection.
8   A.  Yes.
9   Q.  Okay.
10          Now, as to Neurontin, Neurontin was
11      a -- it was ultimately the prescription that
12      you approved for Mr. Shearer in 2000,
13      correct?
14  A.  Correct.
15  Q.  You would agree that Mr. Shearer's pain
16      needed to be treated in October of 2000,
17      correct?
18          MR. FROMSON:  Objection.  Leading,
19      asked and answered.
20          You covered it very well on direct.
21          MR. BARNES:  I understand.
22          MR. FROMSON:  I know time is
23      precious, but...
24          MR. BARNES:  "Objection" would be
25      fine.

Page 176

1          MR. FROMSON:  Thanks.
2   Q.  Okay.  Now I've lost where I was.  Don't
3       worry about it.  I'll get back to it.
4          In follow-up to Mr. Fromson's
5       question, it is still your belief that
6       Mr. Shearer's pain needed to be treated with
7       medicines in October of 2000, correct?
8   A.  Correct.
9   Q.  And do you still believe, based upon the
10      information you've reviewed today and your
11      knowledge of the class-wide label that
12      Mr. Fromson has discussed, that Neurontin
13      was an appropriate choice for Mr. Shearer
14      and the treatment of his pain conditions in
15      2000?
16          MR. FROMSON:  Objection.
17  A.  I mean, are we talking about now?
18  Q.  Looking back.
19          Given what you had available in 2000,
20      the choices you had, do you still believe
21      that Neurontin was an appropriate choice for
22      the treatment of Mr. Shearer's neuropathic
23      pain?
24          MR. FROMSON:  Objection.  Form.
25  A.  Again, I -- my understanding is we are

Page 177

1   talking about now, right now -- or then as
2   opposed to now.
3   Q.  Looking at what you did -- let me strike
4       that.
5          Do you believe that the use of
6       Neurontin was appropriate for Mr. Shearer
7       back in 2000 to treat his pain condition?
8          MR. FROMSON:  Objection.  Asked and
9       answered.
10  A.  From what I see of basically what's in front
11      of me, it appears at the time that that was
12      appropriate.
13  Q.  Okay.
14          And you still feel it was appropriate
15      based upon what you know today?
16          MR. FROMSON:  Object.  Form.
17  A.  That's what I see in front of me is at that
18      time it appears it was appropriate.
19  Q.  Okay.
20          Now, is it your practice to advise --
21      you still prescribe Neurontin today,
22      correct?
23  A.  Yes.
24  Q.  And you are comfortable prescribing
25      Neurontin today for pain?

Page 178

1      MR. FROMSON:  Objection.  Asked and
2  answered, and form.
3  Q.  Let me ask another question.
4      Are you -- what is your experience
5  today prescribing Neurontin for pain
6  patients?  How often do you prescribe it?
7  A.  I'm not sure how often I prescribe it.  Our
8  practice is here mainly -- we mainly do
9  injections.  We don't do a lot of medication
10  prescribing, but I still use it on occasion.
11  Q.  Since 2000, how many patients have you
12  written Neurontin prescriptions for?
13  A.  I have no idea.
14  Q.  Thousands?
15  A.  Probably.
16  Q.  Even today, how would you describe your
17  clinical experience with Neurontin for the
18  treatment of pain?
19      MR. FROMSON:  Objection.
20  A.  For neuropathic pain, I think it's a good
21  choice.
22  Q.  Now, when you prescribe it today -- you
23  still prescribe Neurontin and other
24  antiepileptic drugs for the treatment of
25  pain, correct?

Page 179

1      MR. FROMSON:  Objection.
2  A.  Correct.
3  Q.  Today do you advise patients that -- of the
4  latest information concerning the class
5  labeling for suicidal behavior or ideation
6  when you prescribe Neurontin?
7  A.  Yes.
8  Q.  Do you -- okay.
9      And what do you tell them?
10  A.  I'm uncomfortable with this line of
11  questioning.  I don't think what I do now is
12  relevant.
13  Q.  Okay.
14  A.  I mean, it's -- I don't have an attorney
15  with me.  But, you know, this is if --
16      MR. BARNES:  Off the record for a
17  minute.
18      THE VIDEOGRAPHER:  The time is
19  3:39, and we're off the record.
20      (Short recess.)
21      THE VIDEOGRAPHER:  The time is
22  3:56, and we're on the record.
23  Q.  Dr. Hynes, following up on some of
24  Mr. Fromson's questions, was it your --
25  based upon what you reviewed today of the

Page 180

1  record for Mr. Shearer, is it your judgment
2  that he had both neuropathic pain and
3  nociceptive pain in 2000?
4  A.  Yes.
5  Q.  Mr. Fromson asked you a question about
6  the -- knowing about the class labeling with
7  regard to the risk of suicide behavior and
8  ideation.  He asked you, knowing that, if
9  you would have considered alternatives, and
10  you responded that you had considered
11  alternatives.
12      Isn't it true that all the
13  antiepileptic drugs that were under
14  consideration for Mr. Shearer carried the
15  same class labeling regarding suicide
16  behavior, correct?
17      MR. FROMSON:  Objection.
18  Q.  You may answer.
19  A.  Correct.
20  Q.  Now, just briefly, you were asked some
21  questions regarding some visits with
22  pharmaceutical company sales representatives
23  in 1998 and 1999 by Mr. Fromson?
24  A.  Yes.  Yes.  Yes.
25  Q.  As you sit here today, do you have a

Page 181

1  specific recollection of the visits?
2  A.  No.
3  Q.  Okay.
4      Can you tell us, you stated that you
5  have a recollection of discussing
6  neuropathic pain in one or more visits with
7  the sales representatives?
8  A.  I believe so.
9  Q.  Do you have a specific recollection or just
10  a general --
11  A.  General.
12  Q.  Okay.
13      Could it be possible that these
14  discussions about neuropathic pain actually
15  occurred after 2002 when there was an
16  indication for postherpetic neuralgia?
17      MR. FROMSON:  Objection.
18  A.  It's possible that it was both before and
19  after.
20  Q.  Is it possible that was only after 2000 when
21  there was an indication for postherpetic
22  neuralgia?
23      MR. FROMSON:  Objection.
24  Argumentative, and asked and answered.
25  A.  I'm not sure.

Page 182

1  Q. It could be before or after? Is that fair
2     to say?
3        MR. FROMSON: Objection.
4  A. I would -- my recollection is, is that it
5     could very well have been both.
6  Q. Okay.
7  A. I don't know when -- I mean, if drug reps
8     were going to call on me for Neurontin, it
9     would be for neuropathic pain. And it would
10    have been -- you know, like I said, I don't
11    know if there was a time period when they
12    started or when they --
13 Q. Is it vague in your mind?
14 A. Yes.
15        MR. FROMSON: Objection. Just note
16    my objection to the last question.
17 Q. Let me ask you this: How clear is your
18    recollection as to the dates of the
19    discussions regarding neuropathic pain that
20    you engaged with with the company sales
21    representatives?
22        MR. FROMSON: Form.
23 A. They are not clear.
24 Q. Okay.
25        Now, in these discussions, when

Page 183

1     neuropathic pain was discussed, is it your
2     recollection that you brought up the subject
3     of neuropathic pain and were asking them
4     questions?
5        MR. FROMSON: Objection. Hold on
6     one minute. Objection. Lack of foundation.
7  A. I would have no idea.
8  Q. That's fair. Let me ask it this way due to
9     the objection.
10        Do you have any recollection as to
11    whether or not you brought up the subject of
12    neuropathic pain or that the drug company
13    representatives brought up the subject of
14    neuropathic pain?
15        MR. FROMSON: Objection. Form.
16 A. I really would not have any idea about that.
17 Q. Do you recall anything the sales
18    representatives from the company told you
19    about Neurontin to be inconsistent with your
20    own clinical experience in the treatment of
21    patients with neuropathic pain?
22 A. No, not -- in the drug company visit, you
23    mean?
24 Q. Yes.
25 A. I don't believe so. Nothing stands out in

Page 184

1     my mind.
2  Q. Do you believe the information they would
3     provide you during -- strike that.
4        Is it your best recollection that the
5     information they provided you about
6     Neurontin was accurate?
7  A. Yes.
8  Q. Okay.
9        MR. BARNES: No further questions.
10        * * * * *
11        EXAMINATION BY MR. FROMSON
12 Q. Doctor, is it also fair to say you rely upon
13    the sales representatives to provide you
14    with accurate information, right? You
15    wouldn't want him to provide you with
16    inaccurate information?
17 A. That's correct.
18 Q. And they were a source of information for
19    you to rely upon for your prescribing
20    practices, right?
21        MR. BARNES: Objection.
22        MR. FROMSON: I'll withdraw the
23    question.
24 Q. They were there to provide you accurate
25    information to the best of your knowledge as

Page 185

1     Mr. Barnes said, right?
2  A. Yes, that was their job.
3  Q. And with the expectation they would provide
4     you with accurate information, you would
5     rely upon it, at least in part, as part of
6     your job as a prescribing physician; is that
7     fair?
8        MR. BARNES: Objection.
9  A. That is a fair statement.
10 Q. And they never discussed suicidality with
11    you; isn't that true?
12 A. I don't believe so.
13 Q. And when you were being trained as a speaker
14    in New York, the trainees -- the trainers
15    did not discuss suicidality with Neurontin
16    with you; is that true?
17        MR. BARNES: Objection.
18 A. I don't believe so.
19 Q. And when you were in Arizona, the trainers
20    did not speak about suicidality there
21    either; isn't that true?
22        MR. BARNES: Objection.
23 A. I don't believe so.
24 Q. And when you actually gave speeches as a
25    speaker, you were never told to discuss

47 (Pages 182 to 185)

Page 186

1     suicidality with Neurontin; isn't that true?
2          MR. BARNES:  Objection.
3   A.  I believe so.
4   Q.  Thank you.  I'm sorry.
5          Did you ever become aware of an
6   article published this month in the "New
7   England Journal of Medicine" entitled
8   "Outcome reporting in industry-sponsored
9   trials of gabapentin for off-label use"?
10  A.  I didn't see that article.
11  Q.  Okay.
12         Do you currently have a subscription
13  to the "New England Journal of Medicine"?
14  A.  I don't believe so.
15  Q.  Okay.  Thank you, Doctor.
16              * * * * *
17         EXAMINATION BY MR. BARNES
18  Q.  I'm going to ask you some follow-up --
19  strike that.  Start over.
20         MR. BARNES:  Everybody set?
21         MR. FROMSON:  I didn't say
22  anything.  She did.
23         MR. BARNES:  Because you were
24  rummaging through your stuff.  I want to get
25  out of here.  The doctor has been very kind.

Page 187

1   Q.  I want to follow-up on the three
2   questions -- three subjects Mr. Fromson
3   asked you, okay?
4   A.  Okay.
5   Q.  First on the subject of suicidality.
6          In your experience as a physician, is
7   it your experience that information
8   concerning side effects of drugs,
9   medications, changes over time?
10  A.  Yes.
11  Q.  Is it uncommon for information that emerges
12  after you treated a patient to be added
13  to -- strike that.
14         Do you have any understanding as to
15  whether there was any evidence that
16  Neurontin is associated with suicide
17  behavior or ideation at the time you were
18  treating Mr. Shearer?
19  A.  I don't believe so.
20  Q.  Are you aware that -- of the evidence that
21  Neurontin was associated with increase in
22  depression prior to 2009?
23  A.  I don't believe so.
24  Q.  You don't believe there was evidence?
25  A.  I don't believe I was aware.

Page 188

1   Q.  Would you expect a pharmaceutical company to
2   be able to warn physicians through a package
3   insert of information contained in a 2008
4   FDA analysis in 2000 when you were treating
5   Mr. Shearer?
6   A.  2008?
7   Q.  In other words, the information regarding
8   suicidal ideation and behavior was
9   published --
10  A.  In 2008.
11  Q.  -- in 2008, and made known to the public in
12  late 2008 --
13  A.  So could I be aware of that in 2000?
14  Q.  Would you expect a drug company to be able
15  to warn of that information in 2000 when you
16  were treating Mr. Shearer?
17  A.  Not if they didn't know about it.
18  Q.  It would be impossible, wouldn't it?
19  A.  2008 in 2000?
20  Q.  Yes.
21  A.  Yes.
22  Q.  It would be impossible?
23  A.  Yes.
24  Q.  He talked to you about what you relied upon,
25  so I'll go back to that for just a moment.

Page 189

1          When you were prescribing for
2   Mr. Shearer in 2000, is it your testimony
3   that the basis for your approving the
4   prescription by the resident was your own
5   clinical experience -- favorable clinical
6   experience with Neurontin for the treatment
7   of neuropathic pain conditions?
8          MR. FROMSON:  Objection.  Asked and
9   answered, form.
10  A.  I can only assume that, again, looking at
11  the notes, that that's how I thought.
12         MR. BARNES:  No further questions.
13  Thank you.
14              * * * * *
15         EXAMINATION BY MR. FROMSON
16  Q.  I'd like to assume the following:  That back
17  in 1992, when the drug was going through its
18  approval process for the epilepsy
19  indication, and the FDA did a review of the
20  clinical trials, safety, and the risks that
21  were -- about Neurontin, and that the FDA
22  clinical reviewer in '92 made the following
23  statement:  "Less common, but more serious,
24  events may limit the drugs widespread
25  usefulness, depression, while it may not be

48 (Pages 186 to 189)

Page 190

1   an infrequent occurrence in the epileptic
2   population may become worse and require
3   intervention or lead to suicide and has
4   resulted in some suicidal attempts."
5       I'd ask you to assume that that is
6   evidence in this case at the time of trial.
7       Assuming that is true, did you know
8   that when you were prescribing the drug to
9   Mr. Shearer?
10      MR. BARNES:  Objection.
11  A. That?  No.
12  Q. Would you have wanted to know that
13  information about the FDA clinical review
14  and the FDA clinical reviewer's position on
15  the safety of Neurontin with respect to
16  depression and suicide when you were
17  prescribing the drug to Mr. Shearer?
18      MR. BARNES:  Objection.  Incomplete
19  evidence and beyond the scope of my
20  examination and irrelevant.
21      You may answer.
22  A. I certainly would want to know as much as I
23  could about any drug.
24  Q. And in particular, if you were using a drug
25  off label, and you knew that the drug had

Page 191

1   not been approved for the indication you
2   were prescribing it, but there was a
3   potential risk of depression and suicide
4   attempt with that drug, is it fair to say
5   that you would have wanted to know that?
6       MR. BARNES:  Objection.  Assumes
7   facts not in evidence.
8       You may answer the question.
9   A. Yes.
10  Q. Because knowing it could have affected your
11  prescribing practice for Neurontin back in
12  2000?  Would you agree with that?
13      MR. BARNES:  Objection.
14  A. Hypothetically, yes.
15  Q. Thank you.
16      MR. BARNES:  I have to ask some
17  more questions.  Take a short break.
18      THE VIDEOGRAPHER:  The time is
19  4:07, and we're off the record.
20      (Short recess.)
21      (Dr. Egilman not present.)
22      THE VIDEOGRAPHER:  The time is
23  4:11, and this is the beginning of tape
24  three in the deposition of Wilfred Hynes,
25  M.D., and we're back on the record.

Page 192

1   Q. Doctor, Mr. Fromson asked you some questions
2   regarding an internal FDA document from
3   1992, correct?
4   A. Correct.
5   Q. Now, is it your practice when considering
6   the risks and benefits of medicines to
7   consider internal FDA documents that were
8   authored prior to the approval of the drug
9   for distribution and sale but from the drug
10  administration?
11  A. No.
12  Q. Is it your experience that FDA uses internal
13  documents for its internal deliberations in
14  1992 in communicating risks of a drug that
15  was approved in the United States for sale
16  on December 30, 1993?
17      MR. FROMSON:  Objection.  Form.
18  A. Was I aware of that?
19  Q. Yes.
20  A. No.
21  Q. Have you ever seen that before?
22  A. No.
23  Q. Isn't it true that it's your experience that
24  the FDA actually uses the approved FDA
25  labeling to communicate safety information

Page 193

1   to physicians?
2       MR. FROMSON:  Objection.  Form.
3   A. Say that -- the FDA -- yes.  Yes.
4   Q. Okay.  Got to do an objection.
5       What is your experience with regard to
6   how FDA communicates safety information to
7   physicians about a medicine?
8   A. I don't know what you mean.
9   Q. In your experience --
10      MR. FROMSON:  I wasn't sure --
11      MR. BARNES:  Go ahead.
12      MR. FROMSON:  Are you saying press
13  releases?
14      MR. BARNES:  Press releases.
15  Q. Do you consider the labeling as part of the
16  information the FDA wants you to consider in
17  terms of whether or not --
18  A. Yes.
19  Q. -- in terms of safety information regarding
20  drugs?
21  A. Yes.
22  Q. So in your experience, when the FDA reviews
23  a drug, the information they want the
24  physicians to consider, it's not an internal
25  document, but it's the formal FDA-approved

49 (Pages 190 to 193)

Page 194

1   labeling, correct?
2           MR. FROMSON: Objection.
3   A. Yes.
4   Q. Now, Mr. Fromson read something to you about
5       a 1992 analysis of the FDA Neurontin data
6       concerning safety information in his
7       examination.
8           Do you remember that?
9   A. Yes.
10  Q. I'm going to show you a document dated
11      December 15, 1993.
12          MR. BARNES: If you would mark
13      that.
14          MR. FROMSON: Is that the update?
15          MR. BARNES: Yeah, that's the
16      update.
17          (Exhibit No. 10 marked.)
18  Q. I'm going to represent to you that this is
19      an internal FDA analysis from December 15,
20      1993, authored by Cynthia McCormick.
21          Do you see that?
22  A. Yes.
23  Q. And this is from the FDA Division of
24      Neuropharmacological Drug Products.
25          Do you see that?

Page 195

1   A. Yes.
2   Q. And December 15th, over a year after the
3       1992 document that Mr. Fromson read to you
4       from, correct?
5   A. Correct.
6   Q. I want you to turn to the eighth page,
7       please.
8   A. Okay.
9   Q. Would you read the statement by
10      Dr. McCormick, the FDA clinical reviewer, on
11      December 20th -- I'm sorry.
12          Would you read the statement on
13      "Depression" authored by Cynthia McCormick,
14      the clinical reviewer, on page eight of the
15      fourth safety update, dated December 15,
16      1993.
17  A. "The incidence of depression and suicidal
18      ideation" --
19  Q. Slow down.
20  A. -- I'm sorry -- "is reported in the Fourth
21      Safety Update as a severe adverse event,
22      bringing the total to ten causes reported.
23      There is a higher incidence of depression
24      among epileptics with partial seizures as
25      compared to the general population. One

Page 196

1   cannot determine based on the available
2   data, largely uncontrolled, whether the
3   reports here represent an increase in
4   incidence or intensity of depression
5   compared to that which is expected."
6   Q. So what is your understanding of what
7       Dr. McCormick is saying almost a year later
8       than the information that Mr. Fromson read
9       to you about her clinical review?
10  A. It's unclear whether there is an increase in
11      depression.
12  Q. And did this depression include suicidal
13      ideation as well?
14  A. That's what it says, yes.
15  Q. So in terms of wanting to have as much
16      information as possible, Doctor, are
17      internal update deliberations that predate
18      the U.S. -- their approval of the package
19      insert, is that something you would want to
20      see in your deliberations as to whether or
21      not to prescribe any medicine to a patient
22      or would you rely on the package insert?
23          MR. FROMSON: Objection as to form.
24  A. I mean, clearly, there's going to be a
25      debate about any medication. So, you know,

Page 197

1   I would defer to their general conclusions
2   that they feel fit to publicize.
3   Q. Where would that be, the package insert?
4   A. (No audible response.)
5   Q. Excuse me?
6   A. The package insert.
7   Q. Okay.
8           MR. BARNES: No further questions.
9   Thank you.
10          * * * * *
11          EXAMINATION BY MR. FROMSON
12  Q. And, Doctor, at the time that you were
13      treating and prescribing Neurontin to
14      Mr. Shearer, the package insert was limited
15      to the epileptic indication, right?
16  A. I believe so.
17  Q. And, therefore, the FDA had no understanding
18      as to the safety or risks in the neuropathic
19      pain population; would you agree with that?
20          MR. BARNES: Objection.
21      Speculation.
22  A. I don't know honestly.
23          MR. FROMSON: Thanks very much,
24      Doctor.
25          MR. BARNES: No further questions.