# EXHIBIT DD

```
 1            U.S. DISTRICT COURT OF MASSACHUSETTS
 2                  * * * * * * * *
 3       IN RE: NEURONTIN MARKETING SALES, PRACTICES AND
 4                     PRODUCTS LIABILITY
 5                  * * * * * * * *
 6                          *
 7   SHEARER,                *   Docket No.
 8        Plaintiff          *   1629
 9     vs.                   *   Master File No.
10   PFIZER, INC.,           *   04-10981
11        Defendant          *
12                           *
13                  * * * * * * *
14                      DEPOSITION OF
15              STEFAN P. KRUSZEWSKI, M.D.
16                    January 14, 2010
17
18
19
20
21
22
23
24
25   Job No. 234312
```

Page 2

```
 1              DEPOSITION
 2                  OF
 3   STEFAN P. KRUSZEWSKI, M.D., taken on behalf of the
 4   Defendant, Pfizer, Inc., herein, pursuant to the
 5   Rules of Civil Procedure, taken before me, the
 6   undersigned, Sarah Wendorf, a Court Reporter and
 7   Notary Public in and for the Commonwealth of
 8   Pennsylvania, at the Hilton - Harrisburg, 1 North
 9   2nd Street, Harrisburg, Pennsylvania, on Thursday,
10   January 14, 2010, beginning at 10:11 a.m.
```

Page 4

```
 1                  INDEX
 2
 3   DISCUSSION AMONG PARTIES                 7 - 8
 4   WITNESS: STEFAN P. KRUSZEWSKI, M.D.
 5   EXAMINATION
 6     By Attorney Ohlemeyer              8 - 148
 7   EXAMINATION
 8     By Attorney Fromson              148 - 152
 9   RE-EXAMINATION
10     By Attorney Ohlemeyer            152 - 153
11   RE-EXAMINATION
12     By Attorney Fromson                  153
13   RE-EXAMINATION
14     By Attorney Ohlemeyer            154 - 155
15   CERTIFICATE                            156
```

Page 3

```
 1           APPEARANCES
 2
 3   KENNETH B. FROMSON, ESQUIRE
 4   Finkelstein & Partners, LLP
 5   785 Broadway, 3rd Floor
 6   Kingston, NY 12401
 7     COUNSEL FOR PLAINTIFF
 8
 9   WILLIAM S. OHLEMEYER, ESQUIRE
10   Boies, Schiller & Flexner, LLP
11   333 Main Street
12   Armonk, NY 10504
13     COUNSEL FOR DEFENDANT
14
15   RICHARD BARNES, ESQUIRE
16   Goodell, DeVries, Leech & Dann, LLP
17   1 South Street
18   Baltimore, MD 21202
19     COUNSEL FOR DEFENDANT
```

Page 5

```
 1              EXHIBIT PAGE
 2                      PAGE
 3   NUMBER  DESCRIPTION           IDENTIFIED
 4   One    Dr. Kruszewski's Invoice    43
 5   Two    Dr. Kruszewski's Map       129
 6   Three  Dr. Kruszewski's CV        129
```

**Page 38**

1  about Neurontin, and the only thing I've ever
2  published about Neurontin is the article about
3  gabapentin-induced delirium and dependence in The
4  Journal of Psychiatric Practice last summer, I
5  believe. I have an actual quotation here. So that's
6  the only thing I've ever published about Neurontin.
7  In terms of research, one of my two responsibilities
8  when I worked for the Department of Public Welfare
9  for the Commonwealth of Pennsylvania was to examine
10  drugs and drugs effects, and as I already said, I was
11  in charge of several death investigations and so was,
12  therefore, responsible for examining potential causes
13  of death.
14.   BY ATTORNEY OHLEMEYER:
15  Q. I read an article in the paper yesterday,
16  Doctor, about trigeminal neuralgia. Are you familiar
17  with that disease?
18  A. A little bit. It's out of my specialty.
19  Q. And the reason it caught my eye was in the same
20  headline they described it as a suicide disease ---
21  the suicide disease.
22       ATTORNEY FROMSON:
23         Which was it, A or B?
24       ATTORNEY OHLEMEYER:
25  A. I might have it in my paper.

**Page 39**

1  BY ATTORNEY OHLEMEYER:
2  Q. But in the article, they talked about medical
3  treatments for those kinds of conditions, and one of
4  the things they talked about was prescribing
5  anticonvulsant drugs to treat that kind of pain?
6  A. Yes.
7  Q. That kind of prescription would be an off label
8  prescription of those medicines; wouldn't it?
9  A. For Neurontin, it would be. Neurontin is only
10  approved for postherpetic neuralgia, so it would be
11  for Neurontin. For Tegretol, I'm not sure. I think
12  Tegretol or carbamazepine, C-A-R-B-A-M-E-Z-E-P-I-N-E
13  (sic), is approved for trigeminal neuralgia.
14  Q. But in general, antiepileptic drugs are
15  equivalent with the --- I mean, you can quibble with
16  the adjustive --- sometimes frequently often
17  prescribed off label to treat certain types of pain;
18  aren't they?
19  A. Yes.
20  Q. And there's nothing inherently wrong with that;
21  is there?
22  A. There is not.
23  Q. And that practice, the practice of using
24  antiepileptic drugs to treat pain, predated the
25  introduction and first sale of Neurontin; didn't it?

**Page 40**

1  A. Yes.
2  Q. Do people who commit suicide, Doctor, exercise
3  free will in reaching that decision?
4       ATTORNEY FROMSON:
5         Objection as to form.
6  A. Boy, I don't think I can answer that question.
7  I haven't given it enough thought, whether it's a
8  voluntary decision or it's an involuntary decision.
9  BY ATTORNEY OHLEMEYER:
10  Q. Well, that was my next question. Is it --- is
11  there volition involved, or is it compelled?
12       ATTORNEY FROMSON:
13         Objection as to form.
14  A. On a philosophical basis, I don't think I can
15  answer it. On a case-by-case base, I can surmise how
16  it might be applicable.
17  BY ATTORNEY OHLEMEYER:
18  Q. Well, let's talk about Mr. Shearer. Was Mr.
19  Shearer on the day of his death compelled to commit
20  suicide, or did he exercise any free will in making
21  that decision?
22       ATTORNEY FROMSON:
23         Objection. Form.
24  A. I didn't make a determination one way or the
25  other.

**Page 41**

1  BY ATTORNEY OHLEMEYER:
2  Q. Do you think that Mr. Shearer would have
3  committed suicide on the day he died if there had not
4  been a firearm in the house?
5  A. I don't know.
6  Q. Have you ever talked with any of Mr. Shearer's
7  treating physicians or prescribing doctors?
8  A. No.
9  Q. In the Shearer case --- well, strike that.
10     You're familiar with a gentleman by the name of
11  Ron Maris?
12  A. Dr. Maris from the University of South
13  Carolina, ---
14  Q. Right.
15  A. --- that Maris professor? Yes.
16  Q. He's not a medical doctor; is he?
17  A. He is not. He's a Ph.D.
18  Q. And he's published a lot in the area of suicide?
19  A. He has, yes.
20  Q. And he's got a tool he calls a psychological
21  autopsy that he uses to examine postmortem potential
22  causes of suicide?
23  A. He does.
24  Q. Did you --- and you're familiar with that tool
25  or that --- whatever you want to call? Is it a tool?

Page 70

1  Shearer's decision to commit suicide an abrupt
2  decision?
3  A. I believe it was --- let me ask you before I
4  answer that, your definition of abrupt is?
5  Q. Let me rephrase the question. When do you
6  believe that Mr. Shearer decided to commit suicide?
7  A. I believe that it was --- there's no way
8  specifically of knowing when the decision was made,
9  that it happened on the day in question ---- which
10 it's not meant as a rhetorical answer. It's that my
11 sense is that somewhere between when he woke up that
12 morning and whatever problems occurred that morning
13 and the telephone call, that his mood and behavior
14 was such and that the decision was made to commit
15 suicide, probably in combination with writing his
16 suicide note as well.
17 Q. What's that significance of a suicide note in
18 trying to determine when and why somebody's made a
19 decision to commit suicide? Let me withdraw that.
20    Let me just ask you simply, what's the
21 significance --- of what significance do you attach
22 to a suicide note, if any?
23 A. I think it gives us a reasonable understanding
24 that the decision was made to commit suicide as
25 opposed to not having one where it could have been a

Page 71

1  homicide, obviously, and the investigation that
2  ensued, someone had to make a decision, was this a
3  suicide, a homicide or accidental. And it --- like
4  all of the other evidence in any case, it gives some
5  reflection of what was in the person's mind prior to
6  the actual act itself.
7  Q. We could --- I guess we could disagree about
8  whether it was the best evidence of what was in his
9  mind prior to the act, but it appears to be the only
10 evidence we have as to what was in this mind prior to
11 the act; isn't that right?
12       ATTORNEY FROMSON:
13          Objection. Form.
14 A. Just rephrase it for me. Are you asking was it
15 the only evidence?
16 BY ATTORNEY OHLEMEYER:
17 Q. Well, let me put it this way. You know, it goes
18 without saying, in a case without a note, I mean, we
19 have the benefit --- let's put it this way, with
20 respect to Mr. Shearer and what might have been going
21 on in this mind prior to the suicide, the note is of
22 some significance to try to make that determination?
23 A. It is. I mean, we still --- you know, I use my
24 clinical judgment and expertise to draw a conclusion
25 about the meaning as, would anybody, but I take from

Page 72

1  it that he says that he loves Linda and Ivor and that
2  he's been --- that the decision is still somewhat
3  impulsive, and that's just a subjective opinion
4  because he feels like he's been hung up on, I think,
5  as he says for the last time. And so I think the
6  rest is probably my looking into what he might have
7  meant, but it strikes me as an impulsive statement,
8  the depressed statement and irritable statement.
9  Q. Is there a definition of an --- strike that.
10    In your profession, do you define impulsive
11 suicides as opposed to, you know, more --- again,
12 I'm not trying to be cute --- more thoughtful
13 suicides?
14       ATTORNEY FROMSON:
15          Objection. Form.
16 A. I don't know that there's a specific --- there
17 probably are specific definitions, let me put it that
18 way. I think carefully thought out suicides
19 occur --- you know, for people who live in Oregon,
20 and I'll use that as an example, and are critically
21 ill, they make a decision that they can't live that
22 way any longer and can be basically euthanized, which
23 is different process than the process of I'm so
24 uncomfortable and I'm so hurt and I'm so --- in such
25 a state of mind that I can't continue to live like

Page 73

1  this, and that becomes relatively abrupt. So, you
2  know, it implies some quantitation of time, obviously
3  shorter if it's impulsive and longer if it's not.
4  BY ATTORNEY OHLEMEYER:
5  Q. Is the a range of time within which you would
6  character it as impulse outside of which you would
7  have your doubts?
8        ATTORNEY FROMSON:
9          Objection as to form.
10 A. There isn't one that I use.
11 BY ATTORNEY OHLEMEYER:
12 Q. Because if --- well, strike that.
13    There was a fair amount of time that passed
14 between the telephone call that we discussed and the
15 actual suicide; isn't that right?
16       ATTORNEY FROMSON:
17          Objection to form.
18 A. More than an hour ---.
19       ATTORNEY FROMSON:
20          Hold on a second. Objection to form,
21 reference to fair amount of time.
22 BY ATTORNEY OHLEMEYER:
23 Q. Go ahead.
24 A. Yeah, it's --- what you described is fair. It
25 was not instantaneously.

Page 74

1  Q. And it was, as you just said, more than an hour?
2  A. I believe so, yes.
3  Q. And in that time, Mr. Shearer had to remove
4  himself from the first floor of the house and travel
5  to the second floor of the house?
6  A. Yes.
7  Q. Presumably he would have had to locate his hand
8  gun?
9  A. Correct.
10 Q. He took the time to sit down and write a note?
11 A. Yes.
12 Q. And then at some point, obviously, he shot
13 himself. What do you make of the reference in the
14 note to for the last time?
15       ATTORNEY FROMSON:
16       Just note my objection to the preface
17 leading to the question.
18 BY ATTORNEY OHLEMEYER:
19 Q. Well, let me back up. You don't disagree with
20 the chronology I laid out; do you?
21 A. I don't.
22 Q. Now, at the point where Mr. Shearer decided to
23 write a note, he says very clearly, Linda has left me
24 powerless by hanging up on my for the last time.
25 What, if anything, does that suggest to you about the

Page 75

1  --- about his clinical course or about the temporal
2  chain of events here?
3        ATTORNEY FROMSON:
4        Objection. Form.
5  A. I'll do the best I can to answer your question.
6  I mean ---.
7  BY ATTORNEY OHLEMEYER:
8  Q. Here's what I --- let me rephrase it. This
9  would have been a very different note if he said
10 Linda has left me powerless by hanging up on me
11 period?
12       ATTORNEY FROMSON:
13       Objection. Form.
14 A. Yes.
15 BY ATTORNEY OHLEMEYER:
16 Q. So I mean, his decision to include the words for
17 the last time presumably had some meaning for him,
18 and I want to know if it has any meaning for you
19 knowing what you know about Mr. Shearer.
20 A. It implies to me that there will be no further
21 phone calls, that he's making --- he's in the process
22 of making the decision to end his life, and that we
23 know in retrospective because he did. If he had not
24 ended his life and still wrote the note, it would be
25 different.

Page 76

1  Q. And I mean no disrespect to Mr. Shearer's family
2  by asking this question, but do you find it unusual
3  that he signed his last name to his note?
4        ATTORNEY FROMSON:
5        Just objection as to form, and my
6  objection is to the use of the term unusual.
7  A. I can only answer that as he was referred to in
8  the medical records by someone as somewhat of a
9  dilettante, and what comes to mind is that signing
10 your name Hartley Shearer as opposed to Hartley is
11 removing himself from the situation. I'm not sure
12 where I'm going with that, but --- so I probably
13 don't know.
14 BY ATTORNEY OHLEMEYER:
15 Q. He was self described as a dilettante?
16 A. Self described as a dilettante. That's correct.
17 Wait, wait. No, not self described. Hold on a
18 second. Let me think who said that.
19 Q. Well, either way, the record ---
20 A. Yeah.
21 Q. --- will reflect what it says and that's ---
22 we're both talking about the same record, I think.
23 Prior to the day of his death, do you find any
24 evidence in the medical records, in the depositions,
25 in your discussion with Ms. Shearer that at any point

Page 77

1  in time Mr. Shearer was suicidal?
2  A. I think there is virtually no evidence that he
3  was suicidal prior to that time. The one caveat that
4  I can think of is some --- of the comments by Vito
5  whose last name is ---.
6  Q. We just refer to him as the performance artist.
7  A. Yeah. Okay. Vito A. I forgot --- it's Acconci
8  something, who --- I can't make sense of a lot of his
9  comments, but he makes --- at times he implies that
10 he, like Shearer, has been suicidal and then, of
11 course, maybe not, but maybe --- or not.
12 Q. And that gentleman was a friend who may or may
13 not have been in close contact or frequent contact
14 with Mr. Shearer prior to this death?
15 A. That's correct.
16 Q. But in terms of his ---?
17 A. He admitted that he was ---.
18 Q. But in terms of his wife, his son, his
19 caregivers, his doctors, can you find any evidence of
20 suicidality?
21 A. No, Mrs. Shearer said he was not suicidal and
22 Ivor said he was not suicidal and Sean said he was
23 not suicidal.
24 Q. What about any change in his mood or behavior
25 prior to the suicide that might suggest he was or

20 (Pages 74 to 77)