# EXHIBIT FF

Confidential

1

1    UNITED STATES DISTRICT COURT
         MDL DOCKET NO. 1629
2     MASTER FILE NO. 04-10981
          JUDGE PATTI B. SARIS
3    MAGISTRATE JUDGE LEO T. SOROKIN

4

5    IN RE: NEURONTIN                    )
     MARKETING, SALES                    )        CONFIDENTIAL
6    PRACTICES, AND PRODUCTS             )
     LIABILITY LITIGATION                )
7    _____        )

8    THIS DOCUMENT RELATES TO:          )
                                        )
9    PRODUCTS LIABILITY ACTIONS         )   HIGHLY CONFIDENTIAL
                                        )
10   HARDEN MANUFACTURING               )
     CORPORATION ET AL.                 )
11                                      )
12   VS.                               )
                                        )
13   PFIZER, INC. AND                  )
     WARNER-LAMBERT COMPANY             )

14

15   ***********************************************************

16            ORAL AND VIDEOTAPED DEPOSITION OF
                     LINDA B. SHEARER
17                  FEBRUARY 25, 2008
                       VOLUME 1
18   ***********************************************************

19

20        ORAL AND VIDEOTAPED DEPOSITION of LINDA B.
     SHEARER, produced as a witness at the instance of the
     Defendant Pfizer, Inc., and duly sworn, was taken in
21   the above-styled and numbered cause on FEBRUARY 25,
     2008, from 9:11 a.m. to 5:30 p.m., before Denyce M.
22   Sanders, CSR, RPR, in and for the State of Texas,
     recorded by machine shorthand, at the offices of The
23   Lanier Law Firm, 6810 FM 1960 West,, Houston, Texas,
     pursuant to the Federal Rules of Civil Procedure and
24   the provisions stated on the record or attached
     hereto; that the deposition shall be read and signed
25   before any notary public.

*Condensed Copy*

Confidential

**Page 2**

APPEARANCES

FOR THE CLASS PLAINTIFFS:

THE LANIER LAW FIRM
6810 FM 1960 West,
Houston, Texas 77069
Mr. Kenneth S. Soh

FOR THE DEFENDANT PFIZER, INC. AND WARNER-LAMBERT
COMPANY:
SHOOK, HARDY & BACON, L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Ms. Lori Schultz

VIDEOGRAPHER:

Corey Laborde

**Page 3**

EXAMINATION INDEX

WITNESS:   LINDA B. SHEARER
EXAMINATION                          PAGE
  BY MS. SCHULTZ                        4
SIGNATURE REQUESTED                    249

REPORTER'S CERTIFICATION               251

EXHIBIT INDEX

                                      PAGE

SHEARER EXHIBIT NO. 1                  128
  Death certificate and various
  medical records

SHEARER EXHIBIT NO. 2                  174
  Williamstown Police Department
  Case Sheet

SHEARER EXHIBIT NO. 3                  191
  Complete hospital records and
  itemized billing

SHEARER EXHIBIT NO. 4                  219
  Psychiatric records

**Page 4**

LINDA B. SHEARER,
having been first duly sworn, testified as follows:
EXAMINATION
BY MS. SCHULTZ:
Q. Would you please state your full name.
A. Linda Balding Shearer.
Q. What is your current residence address?
A. 1616 Kipling Street, Houston, Texas.
Q. Does anyone live there with you?
A. No.
Q. How long have you lived at Kipling Street?
A. Since early August.
Q. Where did you live before that?
A. Cincinnati, Ohio.
Q. And what was your address there?
A. 224 East 8th Street.
Q. And how long did you live at that address?
A. Two years.
Q. Did anyone live with you in Cincinnati, Ohio?
A. No.
Q. And prior to Cincinnati?
A. Williamstown, Massachusetts.
Q. And your address there?
A. 202 Pine Cobble Road.
Q. And how long did you live at that address?

**Page 5**

A. We moved there in 1995.
Q. Until?
A. 2004.
Q. And who lived with you at the Pine Cobble Road address?
A. My husband, until he died in 2002.
Q. Did anyone else at any time live with you?
A. I'm trying -- our son, I think, was away at school at -- by that point. But he would be home for vacations.
Q. And prior to your address at Pine Cobble Road, did you live somewhere else in Williamstown?
A. Yes.
Q. Where was that?
A. 32 South Street.
Q. And how long did you live there?
A. Oh, approximately six years.
Q. And who lived with you at that address?
A. My husband and my son.
Q. And what is your son's name?
A. Ivor Hartley Shearer.
Q. Where does Ivor currently live?
A. New Orleans.
Q. What does he do in New Orleans?
A. He does freelance carpentry and is a video

Confidential

```
                                          66
1    A.  Yes.
2    Q.  -- in the 1980s?
3    A.  Yes.
4    Q.  How much of a profit?
5    A.  I don't remember.  Because the money all went
6    back into renovating the third building.
7    Q.  And what caused you to sell the third
8    building in 1994?
9    A.  In order to buy up in Williamstown.
10   Q.  To buy a home --
11   A.  Yes.
12   Q.  -- in Williamstown?
13       Did you turn a profit on the sale of the
14   third building?
15   A.  Very little.
16   Q.  Approximately?
17   A.  We had huge capital gains.  Approximately
18   like 30-, 40,000.
19   Q.  Now, did you ever live in any of those three
20   buildings?
21   A.  Yes, we did.
22   Q.  The entire time that you owned them?
23   A.  No.  We renovated the one and we lived --
24   lived in that one and then had six tenants.
25   Q.  During the time that -- that Mr. Shearer was
```

```
                                          67
1    operating as a landlord --
2    A.  Uh-huh.
3    Q.  -- of these buildings, what kind of income
4    did you have coming in from the buildings?
5    A.  I really don't remember.  We -- we -- it was
6    substantial.  It was enough so that we were living
7    rent-free.
8    Q.  Between 1980 and 1990 --
9    A.  Uh-huh.
10   Q.  -- was Mr. Shearer doing anything other than
11   operating as the landlord for these buildings?
12   A.  He was doing his artwork.
13   Q.  His freelance work?
14   A.  No, not the free -- not the freelance
15   commercial work, but doing his own artistic work.
16   Q.  Describe that work for me.
17   A.  He did -- he worked in video and did
18   performance work.
19   Q.  And what kind of video work did he do?
20   A.  I think the best way to -- to describe it is
21   conceptual experimental work.  I don't know how else
22   to describe it.
23   Q.  What -- give me an example of one of the
24   videos he created?
25   A.  He was very interested in the history of film
```

```
                                          68
1    and in -- particularly in the -- genre known as
2    "film noir," of -- films from the '40s, American films
3    from the '40s.  And he would often do almost
4    re-creations of some of these movies that were very --
5    let me put it another way.  He was very interested in
6    the stereotyping of particular kinds of characters
7    through film.
8    Q.  Did he have titles for the videos he created?
9    A.  Probably.  I don't remember.
10   Q.  Did he sell them?
11   A.  No.
12   Q.  Did he show them?
13   A.  Yes.
14   Q.  Where would he show the videos?
15   A.  He showed at a -- at a well-known performance
16   place called The Kitchen.  And then after I had left
17   Artists Space, he was -- his work was shown there.
18   Q.  And to have it shown, was there a theater or
19   would it just be a place --
20   A.  Be -- like an exhibition.  Would be like a
21   museum, a gallery.  So in other words, it was not
22   about -- it was not about going to a performance
23   and -- necessarily and sitting down and watching a --
24   something that was started at 8 o'clock and ended at
25   10 o'clock.  It would be integrated into -- into a
```

```
                                          69
1    gallery exhibition.
2    Q.  And so if you walked in the gallery, would it
3    just be playing on a screen?
4    A.  Yeah, probably.
5    Q.  And then did you say he did individual
6    performances, as well?
7    A.  Not -- no.  No.
8    Q.  Do you know why Mr. Shearer stopped teaching
9    his course at --
10   A.  The School of Visual Arts?
11   Q.  -- The School of Visual Arts?
12   A.  I think they cut back in general, and
13   particularly on the part-time faculty.
14   Q.  And his position was eliminated?
15   A.  Uh-huh.  Uh-huh.  I think.
16   Q.  Is that a "yes"?
17   A.  Yes.
18   Q.  Is -- that did he want to continue teaching
19   there?
20   A.  No.  I think he had been there, you know,
21   long enough and enjoyed it and -- and I think the
22   timing was fine.
23   Q.  Were you satisfied with his -- I don't know
24   if "employment" is the right word, but with what he
25   was doing and the amount of income he was bringing in
```

18 (Pages 66 to 69)

Confidential

74

1    Q.  He wanted to do that?
2    A.  Uh-huh.
3        MR. SOH:  You have to say "yes" --
4    A.  Yes.
5        MR. SOH:  -- and you have to let her
6    finish her questions.  Okay?
7    Q.  (BY MS. SCHULTZ) Prior -- during this time
8    period prior to 1990, when you moved to
9    Williamstown --
10   A.  Uh-huh.
11   Q.  -- tell me what kind of things Mr. Shearer
12   enjoyed doing in his spare time.
13   A.  Well, you've heard he was a hockey player.
14   And he resumed hockey in New York and played a lot of
15   ice hockey in his spare time.  He also -- Ivor joined
16   a traveling team based in New Jersey and -- and
17   Hartley would often be, you know, like -- would be
18   very involved with that and sometimes an assistant
19   coach.  And that takes up a lot of time.
20   Q.  Did he exercise in any manner, other than
21   playing hockey?
22   A.  Yes.  He was -- he started off as a runner.
23   Q.  What time frame was that?
24   A.  Oh, probably -- I remember when we -- when we
25   were living in New York.  Say, the late '60s, starting

75

1    in the late '60s.
2    Q.  And would he run every day?
3    A.  Yeah.
4    Q.  Approximately how long?
5    A.  He'd do -- he'd run in Central Park and -- an
6    hour.
7    Q.  And then did he at some point stop running
8    and start a different form of exercise?
9    A.  His -- the running on the concrete hurt his
10   knees and -- and then he began biking.
11   Q.  And how -- would he bike every day?
12   A.  Pretty much.
13   Q.  And how long would he bike each day?
14   A.  I just don't remember.
15   Q.  And then did he change and start playing
16   hockey?
17   A.  I think this was simultaneously.
18   Q.  So he played hockey the entire time you were
19   in New York?
20   A.  Probably starting in the early -- starting in
21   the '80s.
22   Q.  Tell me what his typical day of exercise,
23   then, would entail.  Some hockey and some running or
24   biking?
25   A.  Probably.  Yeah, that would be about right.

76

1    And the hockey was not necessarily every day, and it
2    was usually late at night when they -- when they could
3    have the rink.
4    Q.  Approximately how many days a week would he
5    play hockey?
6    A.  Oh, approximately three.
7    Q.  And when they played hockey, how long would
8    they play?
9    A.  A couple of hours.
10   Q.  And then in addition to his hockey playing,
11   he either rode a bike --
12   A.  Uh-huh.
13   Q.  -- or ran for an hour each day?
14   A.  You know, I'm -- I'm not remembering because
15   I'm -- as I'm talking to you, I'm thinking that maybe
16   that he didn't do the biking until we got up to
17   Williamstown.  But he did have a stationary bike in
18   New York.
19   Q.  And would he run for an hour or ride his
20   stationary bike each day in New York?
21   A.  One or the other.
22   Q.  Did you think he had somewhat of a compulsive
23   need for exercise?
24   A.  I don't know if I'd put it that way, but he
25   felt better from exercise.

77

1    Q.  Did he tell you how he felt better?
2    A.  It was calming, centering, physically just
3    felt healthy.
4    Q.  Was he suffering from any depression while
5    you were living in New York prior -- prior to your
6    move to Williamstown?
7    A.  Well, when you use the word "depression," I
8    don't know -- I mean, I -- I'm not a doctor.  He, at a
9    certain point, was seeing a doctor in New York; and I
10   don't know that it was -- I don't know that it was
11   depression -- it was clinically diagnosed as
12   depression.
13   Q.  But was he feeling depressed in -- from what
14   you saw?
15   A.  Not really.  And -- and -- and I honestly
16   don't remember.  He -- he was a very intense
17   personality, so -- I don't remember specifically
18   depression, per se.
19   Q.  Was he seeing a psychiatrist?
20   A.  Yes.
21   Q.  And do you remember how many years prior to
22   moving to Williamstown he started seeing the
23   psychiatrist?
24   A.  It was sometime in the '80s.  I don't
25   remember how many years.

20 (Pages 74 to 77)

Confidential

78

1    Q.   What was the name of the psychiatrist?
2    A.   Dr. Chambers.
3    Q.   Do you remember the first name?
4    A.   William.
5    Q.   And why did Mr. Shearer tell you that he was
6  going to see Dr. Chambers?
7    A.   He told me that he was going to see
8  Dr. Chambers because he read an article in the NEW
9  YORK TIMES about adult ADD and felt that he had that,
10  that he -- that was -- it sounded very familiar to
11  him. So he went and saw the doctor.
12    Q.   What symptoms of adult ADD did he think he
13  had?
14    A.   A certain amount of inattention, moving from
15  one thing to another.
16    Q.   Anything else?
17    A.   (Shakes head.) No.
18    Q.   When he went for that first appointment, did
19  you ask him what the doctor thought?
20    A.   Well, I'm sure I did. But do I remember?
21  No.
22    Q.   Did -- was he diagnosed with having adult --
23    A.   Yes, he was.
24    Q.   -- ADD?
25         MR. SOH: Let her finish her question.

79

1    Q.   (BY MS. SCHULTZ) And what was he prescribed?
2    A.   Ritalin.
3    Q.   Could you tell a difference in his behavior
4  after he started taking Ritalin?
5    A.   Yes.
6    Q.   In what way?
7    A.   He was more focused.
8    Q.   How so?
9    A.   Well, he would -- I -- I can't remember
10  exactly. I can't remember any particular instances;
11  but he just seemed more -- "focused" is the best word
12  I can think of.
13    Q.   Did he have difficulty accomplishing or
14  completing tasks?
15    A.   Sometimes, yeah. Yeah. Yeah.
16    Q.   Such as?
17    A.   Oh, I just can't remember. I'm sorry.
18    Q.   Did you ever sense that Mr. Shearer was
19  suffering from any kind of anxiety prior to moving to
20  Williamstown?
21    A.   Not -- not that I can remember.
22    Q.   And did you ever sense that he seemed
23  depressed at any time prior to moving to Williamstown?
24    A.   No. No. He was very verbal about how he
25  felt. So he would -- if he was unhappy about

80

1  something, he'd say it and it would be taken care of.
2    Q.   Did he ever tell you that he was sad?
3    A.   Oh, sure. Must have.
4    Q.   About what type of things?
5    A.   Sad would be about, you know, family things
6  or a death, something like that.
7    Q.   How would you describe your marriage just
8  prior to moving to Williamstown in 1990.
9    A.   I think I would repeat what I said to you
10  before, that it was a very -- very complementary
11  relationship. We -- we helped each other, we enjoyed
12  the same -- many of the same things. We didn't always
13  agree about something, but we always would talk. It
14  was -- there -- there was a lot of communication
15  between us.
16    Q.   Did you think that you had any problems in
17  your marriage prior to 1990?
18    A.   Not really. I mean, like any marriage. I
19  mean, you have arguments or disagreements. But we had
20  a very -- I think we had a very, very solid marriage.
21    Q.   Did you and he ever discuss getting marriage
22  counseling prior to your move to Williamstown?
23    A.   No.
24    Q.   When was the -- did you ever have marriage
25  counseling?

81

1    A.   Well, I guess that's what we had with Elaine
2  Hantman at some -- at some level.
3    Q.   When did you first discuss getting the
4  counseling of some type?
5    A.   It was soon after we moved to -- to
6  Williamstown.
7    Q.   Prior to your move to Williamstown, did you
8  and Mr. Shearer argue?
9    A.   No more so than anybody.
10    Q.   Did you ever raise your voice with each
11  other, that kind of argument?
12    A.   I don't -- probably.
13    Q.   What type of things would you argue about?
14    A.   You know, I can't remember.
15         MR. SOH: I've got a list that my wife
16  always yells at me about. I can share that with you
17  if that would be helpful.
18    A.   And -- and I know -- God knows, I know there
19  were things, obviously, but I --
20         MR. SOH: Can I check -- let me just
21  check on the sandwiches and I'll check -- we'll just
22  take a quick, few-minute break and then we'll go until
23  the sandwiches come. How about that?
24         MS. SCHULTZ: Sounds good.
25         THE VIDEOGRAPHER: Off the record.

21 (Pages 78 to 81)

Confidential

---

**98**

1  than one.
2      Q.  Tell me about the discussion you had with
3  Mr. Wheeler after Mr. Shearer's death.
4      A.  It was Ivor and I and Sean and his mother.
5  And we discussed the tragedy of it and we expressed
6  our -- what's the word I want -- our apologies that
7  Sean had -- had to deal with this.
8      Q.  Did Sean tell you anything about that day?
9      A.  I -- I don't -- I don't remember.  Might
10  have, but I honestly don't remember.
11      Q.  Did you ask him any questions about how
12  Mr. Shearer was doing prior to the suicide that day?
13      A.  Yes.
14      Q.  What did he tell you?
15      A.  Everything was pretty normal.
16          MR. SOH:  Lori, when you get to a break,
17  we've just had lunch ready.
18          MS. SCHULTZ:  Okay.
19      Q.  (BY MS. SCHULTZ)  Did he say anything else?
20      A.  He was just shocked.
21      Q.  Is there a reason that his mother met with
22  you, as well?
23      A.  No.  I think it was -- it was a -- everyone
24  was emotionally charged and I think he wanted his
25  mother's -- you know, the -- the comfort of his mother

---

**99**

1  being there.
2      Q.  Other than conveying to you that the day was
3  pretty normal, did he tell you anything else about
4  Mr. Shearer that day?
5      A.  No.
6          MS. SCHULTZ:  All right.  Why don't we
7  take a break.
8          THE VIDEOGRAPHER:  We're off the record.
9          (Lunch break.)
10          THE VIDEOGRAPHER:  We're on the record
11  at 1:02.
12      Q.  (BY MS. SCHULTZ)  I'm going to ask you some
13  questions about the decision to move to Williamstown.
14      A.  Uh-huh.
15      Q.  What -- what position were you hired for
16  in -- at the college?
17      A.  I was the director of the Williams College
18  Museum of Art.
19      Q.  And were you looking for another position at
20  the time you learned of this position?
21      A.  Yes.  Yes.
22      Q.  And your last position that you held was --
23      A.  I was curator at the Museum of Modern Art.
24      Q.  And was there a reason you did not want to
25  continue in that position?

---

**100**

1      A.  Yes.
2      Q.  What was that?
3      A.  There were a number of reasons.  But I think
4  the simplest one is that we felt it was time for
5  something new.
6      Q.  And who is "we"?
7      A.  Hartley and I.
8      Q.  And when you say you felt it was time for
9  something new, what -- what do you mean?
10      A.  Well, we had always lived in New York.
11  New York was very expensive.  Our son was becoming a
12  teenager.  And as much as I loved my work at the
13  Museum of Modern Art, it's a very big organization and
14  very hard -- it was very hard to get things done in
15  a -- in a quick way.  So it was -- all of these things
16  came together to let's see what else is out there.
17  And it was -- we saw it as a new adventure.
18      Q.  Did Mr. Shearer have any -- anything he
19  disliked about your position at the museum?
20      A.  Which museum?
21      Q.  Your most recent position as curator.
22      A.  At the -- at the Modern?
23      Q.  At the Modern, yes.
24      A.  No.  It -- no.  No.
25      Q.  Did -- were your hours --

---

**101**

1      A.  It was a very demanding job.
2      Q.  Did he ever feel like it was too demanding;
3  in other words, it took up too much of your time and
4  attention?
5      A.  No.
6      Q.  When did you make the decision that you
7  wanted to look for something else to do?
8      A.  Probably sometime in 1988.
9      Q.  And how is it that you recall it was 1988?
10  Was something happening that year?
11      A.  No, because we moved in 1989.  So I know it
12  was before the beginning of that year that we started
13  talking about it.
14      Q.  And at that time when you were talking about
15  it, was Mr. Shearer operating as a landlord -- for how
16  many of the buildings?
17      A.  Just the one.
18      Q.  One building?
19      A.  Uh-huh.
20      Q.  And how much of his time did that take in a
21  day?
22      A.  Very -- very little.
23      Q.  Well, in other words, what kind of things did
24  he have to do as a landlord?
25      A.  Oh.  Deal -- deal with the tenants, which was

---

26 (Pages 98 to 101)

Confidential

**106**

1  along with your position as director?
2      A.  That's right.
3      Q.  And you said that was a bone of contention?
4      A.  Not for me, it wasn't.  But it was something
5  that was -- that they -- people talked about all the
6  time who were in a similar situation, that they
7  thought they should have been compensated for the
8  extra work.
9      Q.  When you were offered the position, were you
10  told approximately how many credit hours you would be
11  teaching per semester?
12      A.  I didn't start off teaching.
13      Q.  When did they add the teaching to your
14  responsibilities?
15      A.  Approximately the following year.  It was --
16  it was an option when I went into the position, the
17  possibility of teaching.
18      Q.  And so teaching was added to your
19  responsibilities the following year, but you did not
20  receive an increase in your salary for the teaching?
21      A.  No.
22      Q.  Is that --
23      A.  No.
24      Q.  Is that correct?
25      A.  That's correct.

**107**

1      Q.  Did you want to take on the additional
2  teaching responsibilities?
3      A.  Yes.
4      Q.  When was the decision made to accept the
5  position?
6      A.  I think in the spring of '89.
7      Q.  And when did you begin your position?
8      A.  July 1.
9      Q.  Of '89?
10      A.  Yes.
11      Q.  At the time you accepted the position, what
12  was the plan for Mr. Shearer?  In other words, what
13  was he planning to do in Williamstown?
14      A.  He was -- had talked to some of the faculty
15  there and it was a pretty open situation and -- and
16  there was talk right away of him doing some part-time
17  teaching.
18      Q.  Was that his hope, that he would be able to
19  do part-time teaching when he got there?
20      A.  Yes.
21      Q.  Was there anything else he was interested in
22  doing in Williamstown?
23      A.  He wanted to continue with the volunteer work
24  that he did in New York and -- which was with troubled
25  adolescent boys.  And so he -- he found a -- a place

**108**

1  to do that.
2      Q.  In Williamstown?
3      A.  In -- it was actually in New York state, but
4  we -- Williamstown is right on the border.  It was
5  about 45 minutes away.
6      Q.  And what was the name of that place?
7      A.  The Berkshire -- Berkshire Boys Farm Center
8  or something like that.
9      Q.  When did he start -- I don't want to say
10  working there, but working with the Berkshire Boys
11  Farm Center?
12      A.  I don't remember.
13      Q.  Who was he -- you said he was doing some
14  things with volunteer services while you were in New
15  York City?
16      A.  Yes.
17      Q.  Where?
18      A.  Rikers Island.
19      Q.  What did he do there?
20      A.  This is ironic.  He was -- he participated in
21  a -- a volunteer suicide prevention program.
22      Q.  And when you say "a volunteer suicide
23  prevention program," can you tell me about that?
24      A.  He would go once a week to Rikers Island.
25  And -- and the concept behind it was that the boys who

**109**

1  were not receiving visits from friends and families
2  were the -- the most likely to attempt or commit
3  suicide.  And so they would be this -- people who
4  volunteered would be paired up with young men at
5  Rikers Island.
6      Q.  And so he would go visit with youth there?
7      A.  Yes.
8      Q.  How -- how often would he do that?
9      A.  Once a week.
10      Q.  A particular day?
11      A.  I don't remember.  It was a particular day.
12  I don't remember what day.
13      Q.  And was this a boys home at Rikers Island or
14  where was he going to visit?
15      A.  The prison.
16      Q.  The prison.  Okay.
17      A.  Yeah.
18      Q.  Well, when you said "boys" --
19      A.  Yeah.  Adolescent -- yeah.
20      Q.  Okay.  When you moved to Williamstown in July
21  1989, where did you live?
22      A.  We lived at 32 South Street.
23      Q.  Was that a home?
24      A.  That was -- it was a -- it was a two-family
25  house that was college housing.

28 (Pages 106 to 109)

Confidential

**110**

1  Q. So like a duplex type of situation?
2  A. I don't know -- everyone has a different
3  terminology. There were two houses that shared a
4  common wall.
5  Q. Okay.
6  MR. SOH: Townhouse?
7  THE WITNESS: See, you guys down here
8  have weird terms.
9  MR. SOH: We like to think that everyone
10  else is weird. But okay.
11  MS. SCHULTZ: Well, when I think of a
12  two-family house, I think of two families in the same
13  house.
14  THE WITNESS: Yeah.
15  MS. SCHULTZ: So that's why I call it a
16  duplex.
17  A. Yeah. I don't know what this is. I don't
18  know what it was.
19  Q. (BY MS. SCHULTZ) Okay. And did you rent
20  that?
21  A. Yes.
22  Q. And how long did you rent that place?
23  A. Approximately six years.
24  Q. When you moved in July of '89, was
25  Mr. Shearer hired to teach a course at Williams

**111**

1  College?
2  A. He was hired to teach what they call a winter
3  study, which is during the month of January.
4  Q. And did he teach a course during that month?
5  A. Yes.
6  Q. What did he teach?
7  A. I don't remember.
8  Q. From July of '89 to July of '90, is that the
9  only course he taught, that one-month course in
10  January?
11  A. He started giving lectures for -- for
12  different classes. But was that the only actual
13  course? I think at that point, it was.
14  Q. What did he do with his time from July to the
15  first of January and the first of February to July of
16  1990?
17  A. He did not move up to Williamstown until
18  August or September, in time -- he and Ivor moved up
19  later. And it was a major move coming out of
20  New York. So that was -- occupied a lot of his time,
21  preparing for the course and doing his artwork.
22  Q. So he -- he moved up in August or early
23  September?
24  A. Yeah.
25  Q. And so you're saying in that fall time

**112**

1  period, he was preparing for the course he was going
2  to teach in January?
3  A. Yeah. And -- and he still -- we still owned
4  the building. So we had to figure all that out in
5  terms of how to -- you know, who would manage it, what
6  would happen.
7  Q. And what about from February 1st until the
8  summer?
9  A. I believe he was going to teach an
10  independent course. Some students had come to him,
11  but I -- I may have the years wrong.
12  Q. And your job that first year, tell me what
13  that was like coming into the role of director of the
14  museum.
15  A. Let's see. Because it was an -- it is an
16  academic museum, it was very important to learn and
17  know the different departments. The different
18  academic departments interacted with the museum. So
19  it was like, I think, any job, learning -- learning
20  the ropes.
21  Q. Did you find that you were spending more or
22  less time in this position than you had in your
23  position in New York?
24  A. It was a different quality of time because
25  you lived five minutes from work; whereas, in

**113**

1  New York, you could have lived -- you know, we lived,
2  depending on traffic, half an hour or an hour from
3  work. So it was a -- it was a much more integrated
4  kind of life.
5  Q. Approximately how many hours a day would you
6  spend working?
7  A. 8 to 10, sometimes 12.
8  Q. When would you generally get home in the
9  evenings?
10  A. That would all depend. Because we often
11  did have -- we often had events in the evenings or
12  there was something to go to. But otherwise, I would
13  say 6:30, 7:00.
14  Q. Did you find the new position to be something
15  you really enjoyed, something stimulating for you?
16  A. Yes.
17  Q. And were you pleased with your move?
18  A. Yes.
19  Q. What -- how was Mr. Shearer feeling about the
20  move during that first year?
21  A. Well, I -- as we said earlier, I think there
22  was a period of adjustment, just to the lifestyle and
23  the -- and the environment and figuring out where he
24  could contribute the most. And that all resolved
25  itself very nicely.

29 (Pages 110 to 113)

Confidential

### 118

1   A.  That sounds right.
2   Q.  Did that bother Mr. Shearer in any regard,
3   that he was making about $7500 and you were making in
4   excess of 50-?
5   A.  No.  We -- we had -- we had set up our lives
6   in exactly this way.  And we still had money coming
7   from the building.
8   Q.  Now, when Ivor -- when did Ivor leave for
9   boarding school?  What year would that have been?
10   A.  I don't remember.  I don't remember.
11   Q.  Do you remember the year he graduated?
12   A.  '93, maybe.  I'm sorry.  I really don't...
13   Q.  I know earlier you had said part of his --
14   what kept him occupied during the day was taking care
15   of Ivor --
16   A.  Uh-huh, uh-huh.
17   Q.  -- Ivor's school, homework, et cetera, et
18   cetera.
19   A.  Uh-huh.
20   Q.  Once Ivor went off to boarding school, how
21   did that affect Mr. Shearer and what he did with his
22   time?
23   A.  He became very engaged and occupied with the
24   academic life of the college.  He had lots of --
25   Q.  In what way?

### 119

1   A.  He had lots of students who were doing
2   independent studies with him.  He was often asked to
3   come and meet with another class, someone else's class
4   and to have him come as a visiting lecturer.  He was
5   also doing his own artwork and then Berkshire Farm on
6   top of it.
7   Q.  Now, how was it that you and he came to teach
8   a class together?
9   A.  You know, I honestly don't know how that
10   happened.  It -- it fell into place and became --
11   became a staple of the art department and the graduate
12   program.  I think it was just very spontaneous and
13   then became institutionalized.
14   Q.  Now, it looks to me like beginning in
15   '94-'95, the only course that Mr. Shearer taught was a
16   course with you.  Would you agree with that?
17   A.  Could be.
18   Q.  And just one course one semester each year?
19   A.  Sounds right.
20   Q.  Did you ever advise anyone at the college
21   that Mr. Shearer needed to have more teaching
22   opportunities, more employment opportunities?
23   A.  I think he did.
24   Q.  Mr. Shearer did?
25   A.  This is a -- it was a very, very small

### 120

1   community and you were friends with the people you
2   worked with.  So conversations were -- covered
3   everything.
4   Q.  Was he not satisfied with the amount of
5   teaching he was doing?
6   A.  Oh, he -- oh, he was.
7   Q.  But he wanted to do more, or is that what
8   you're saying?
9   A.  No.  No.  I'm -- I'm -- I'm mixing up time.
10   I think at the beginning, he made it clear -- tried
11   to make it -- did make it clear that he would like to
12   do more -- like to be teaching.
13   Q.  Let me ask you this, then:  From the
14   beginning when he was only teaching one course one
15   semester of each year with you --
16   A.  Uh-huh.
17   Q.  -- at that point in time, did he ever make it
18   known to you or anyone else that he really needed to
19   be doing more teaching?
20   A.  No.
21   Q.  We talked about Mr. Shearer's activities and
22   exercise up until the move to Williamstown.
23   A.  Uh-huh.
24   Q.  And now I want to cover the period from 1989
25   until 1999 when he had his stroke.  Okay?

### 121

1   A.  Yeah.
2   Q.  Tell me about his exercise regime during that
3   time.
4   A.  He was playing ice hockey.  He was -- oh, I
5   forgot that he was coaching the high school hockey
6   team.  He was the assistant coach to the high school
7   hockey team.  And he biked and he swam.
8   Q.  During what years did he play and coach ice
9   hockey?
10   A.  I want to say until the stroke.
11   Q.  And tell me about his coaching.  Did he go to
12   practices every day?  Go to all the games?
13   A.  Yes.
14   Q.  And that was from 1989 to 1999?
15   A.  I don't remember.  I don't think he started
16   coaching right away, but it was soon after.
17   Q.  And then he coached up until '99 when he had
18   his stroke?
19   A.  You know, I don't remember.
20   Q.  Do you ever remember a time when he stopped
21   coaching?
22   A.  Not really.
23   Q.  Do you ever remember a time when he stopped
24   playing ice hockey?
25   A.  I -- I think he may have stopped -- you know,

31 (Pages 118 to 121)

Confidential

122

1 no, I don't -- I don't remember.
2 Q. Well, after his stroke, he stopped?
3 A. Yeah.
4 Q. But up until the stroke?
5 A. Up until then, I don't remember.
6 Q. Biking, did he bike every day?
7 A. Pretty much.
8 Q. And did he swim every day?
9 A. No.
10 Q. Where did he swim?
11 A. He swam mostly in the pool at the Williams
12 Inn.
13 Q. When did he start swimming?
14 A. Oh, I think he started back in New York. You
15 know, not -- not all the time, but...
16 Q. Did he ever tell you that he had a need to
17 exercise to the point of exhaustion?
18 A. Not to the point of exhaustion. It was -- it
19 was -- he loved his exercise and it was exhilarating
20 and, you know, helpful.
21 Q. Did he ever tell you that any doctors told
22 him to cut back on his exercise?
23 A. No. No, he never told me.
24 Q. Was that one of the things he liked to do the
25 most, exercise?

123

1 A. He -- he enjoyed his exercise. The most, I
2 don't -- I don't know if I would say that.
3 Q. Was it one of the things he liked to do the
4 most?
5 A. Yes. Yes.
6 Q. What are the other things he liked to do the
7 most between '89 and 99?
8 A. He loved the teaching and the interaction
9 with the students and his -- his colleagues. And he
10 loved working at Berkshire Farm.
11 And actually, I forgot something critical,
12 but I don't know the dates. But he -- because of his
13 work at Berkshire Farm, which involved his video work,
14 he decided to go back to school and get his MSW.
15 Q. And he was working on that at the time of his
16 stroke?
17 A. Yes.
18 Q. Was he ever able to complete that degree?
19 A. No.
20 Q. Did you ever accompany him out to Berkshire
21 Farm?
22 A. Yes. For -- for some event. I -- I never
23 accompanied him on his -- you know, when he was
24 working there.
25 Q. What did he do there?

124

1 A. His particular initiative was to develop a
2 program with the -- a group of the boys to do with
3 film and video. And it was very successful.
4 Q. How often would he go there each week?
5 A. I think once, maybe twice a week.
6 Q. Anything else that he really enjoyed doing
7 between '89 and '99?
8 A. Well, we -- we really had a good time in
9 general. Everything was -- was positive.
10 Q. What type of things would the two of you like
11 to do together?
12 A. Oh. What is -- oh. He liked to shop, and I
13 was not a shopper. I'm not a shopper. So, yeah, we'd
14 go to the mall. We saw friends, went out for dinner.
15 Pretty normal stuff.
16 Q. What kind of shopping did he like to do?
17 A. Bargain shopping. Anything for a bargain.
18 Q. Did he like shopping for clothes?
19 A. Yes.
20 Q. Can you describe Mr. Shearer for me prior to
21 his stroke?
22 A. Physically?
23 Q. Physically, personality.
24 A. He -- he was very handsome. He was very
25 confident, creative. I think cared most about his

125

1 family and enjoyed his friends; enjoyed -- you know,
2 worked hard on his artwork. But really -- but really,
3 I think it's fair to say, really thrived in that
4 community.
5 Q. Personalitywise, was he -- you said he was
6 confident. Was he outgoing?
7 A. He was outgoing on a -- on a one-to-one
8 basis. He wasn't good at cocktail chatter; but once
9 he started talking to you, it was inevitably a good
10 conversation.
11 Q. I think you stated earlier that he was a very
12 intense person.
13 A. Yes.
14 Q. Is that the word you used?
15 A. Yes.
16 Q. What did you mean by that?
17 A. Passionate, opinionated, caring. He was very
18 thoughtful of other people.
19 Q. Would you have described him prior to the
20 stroke as an angry person?
21 A. He could be angry, but I wouldn't say he was
22 an angry person.
23 Q. Why -- what would make him angry?
24 A. Oh, if someone cut him off on the road. You
25 know, typical things.

32 (Pages 122 to 125)

Confidential

| 126 |
|---|
1    Q.   Anything around the home ever make him angry?
2    A.   Not that I can think of.  If something didn't
3    work or broke or be -- but, no.  No.
4    Q.   Now, can you contrast that individual for me
5    with Mr. Shearer after his stroke?
6    A.   I can try.  I think I used the word earlier
7    with you of "compromised" and -- and he was very
8    compromised.  This was someone who was very, very
9    active physically, mentally, and his world had changed
10   because of the stroke.  He became -- he was dependent
11   on other people and he had always been very, very
12   independent.  So I would say that, in a way, is the --
13   the -- the -- you know, the biggest contrast.
14   Q.   And then -- and we'll talk a little bit
15   about -- in a moment about physical and mental
16   changes.
17   A.   Uh-huh.
18   Q.   But from a -- how did that manifest itself in
19   his personality?
20   A.   He would be very -- he became very, very
21   careful about -- well, it was hard for him to be -- to
22   pull together.  It was -- he -- he couldn't -- he
23   couldn't get dressed by himself.  And this was a --
24   you know, this was a big difference.  So it was -- it
25   was a big effort.  Everything was a big, big effort.

| 127 |
|---|
1    But he put up a very strong front.  So most
2    people didn't realize how -- how hard it was on him.
3    And he was -- I think -- I mean, he was -- you know,
4    one whole side was paralyzed.
5    Q.   In -- in just the course of a normal day, was
6    there really anything he could do the way he used to
7    do it prior to his stroke?
8    A.   He -- no.  No.  There was no way.  There was
9    no way.
10   Q.   Let me talk with you -- let's -- let's go
11   through some of his medical records prior to his
12   stroke.  Okay?
13   A.   Okay.
14   Q.   What I'm going to do is -- I think the
15   easiest way -- I'm just going to hand you --
16   MS. SCHULTZ:  I'm sorry, this is the
17   only --
18   MR. SOH:  Uh-huh.
19   MS. SCHULTZ:  -- copy I've got.
20   MR. SOH:  Sure.
21   Q.   (BY MS. SCHULTZ) I'm going to hand you this
22   set of records.  And these are all documents produced
23   by you, which are marked "Plaintiff 0001 through
24   Plaintiff 0683."  Okay?  And there's a mixture of
25   documents and records in here.  But as opposed to us

| 128 |
|---|
1    trying to divide them up and dig back and forth --
2    A.   Uh-huh.
3    Q.   -- I think it's just easier if we look
4    through them this way.  Okay?
5    MS. SCHULTZ:  Why don't -- yeah, let's
6    just go ahead and mark this set as Exhibit 1 so I have
7    something to refer to.  Okay?
8    (Shearer Exhibit 1 marked.)
9    MR. SOH:  And, Linda, when you look at
10   the document, just show it to me real quickly so -- I
11   know -- I may have to get up and look over your
12   shoulder or something like that, but just let me know.
13   Q.   (BY MS. SCHULTZ) Let me ask you first:  When
14   you moved to Williamstown, did you find new doctors?
15   A.   Yes.
16   Q.   And who was your primary doctor that you saw?
17   A.   I don't remember.  I mentioned a Dr. Whately
18   to you, but I think she came -- I think she was later.
19   I don't remember.
20   Q.   And who was Mr. Shearer's primary care
21   physician?
22   A.   I believe it was Dr. Sullivan.  It was
23   Dr. Sullivan, you know, certainly the later half of
24   our time there.
25   Q.   Okay.  Let's -- the first entry I found was

| 129 |
|---|
1    on -- if you'll you look at page 88 in those
2    documents.  I'm not sure this is his first visit to --
3    to Dr. Sullivan, but it's dated November 19, 1990.
4    And it does say -- you'll see that first paragraph, it
5    says, "He is followed by a psychiatrist in New York
6    City."  Do you see that?
7    A.   Yes.
8    Q.   Was he still seeing the psychiatrist in New
9    York City when you moved to Williamstown?
10   A.   I don't remember.
11   Q.   It says in the second paragraph that
12   Mr. Shearer has a history of cervical spine arthritis.
13   Were you aware of that?
14   A.   Yes.
15   Q.   What -- what kind of discomfort did that give
16   him?
17   A.   Nothing really out of the ordinary.
18   Q.   It also says that he has a history of
19   varicose veins and wears stockings for compression of
20   extremities?
21   A.   Yes.
22   MR. SOH:  Is that a question or --
23   MS. SCHULTZ:  Yes.
24   Q.   (BY MS. SCHULTZ) That's -- were you aware of
25   that fact, I take it?

33 (Pages 126 to 129)

Confidential

150

1  anything could be possible.
2      Q.  Did they give you any kind of a time frame
3  within which you would know how long the -- the effect
4  of this drug was going to stay?
5      A.  I -- you know, I think they'd say things
6  like, well, after the first three months, you know
7  what -- what it's going to be or after the next six
8  months or the first six months.  So it was all --
9  everyone had a different concept of time and what you
10  could tell.
11      Q.  Now, while he was in the hospital that three
12  months -- well, first -- first of all, where is the
13  rehabilitation hospital located?
14      A.  Boston.
15      Q.  So were you staying in Boston while he was in
16  the hospital?
17      A.  Yes.
18      Q.  And is that when you took a leave of absence?
19      A.  Yes.
20      Q.  And where was Ivor at that time?
21      A.  This is '99.  Ivor was in college.  Ivor was
22  in college.  And he -- and he came over to Boston.
23      Q.  And how many days was he in Boston during
24  this time period?
25      A.  I don't remember.

151

1      Q.  Did you just stay in Boston the entire three
2  months?
3      A.  Yes.  His -- his cousin Charlotte had an
4  apartment that she gave me.
5      Q.  And then would you go over to the rehab
6  hospital each day?
7      A.  Yes.
8      Q.  And spend the entire day there?
9      A.  Pretty much.
10      Q.  Throughout the entire time he was at the
11  rehabilitation hospital, did he always believe he was
12  going to get his life back to normal or did that
13  assumption start to change at some point in time while
14  he was there?
15      A.  Normal took on another meaning, I think, in a
16  way.  He was -- he was determined to -- to regain as
17  much strength as he could.  I -- everything -- you
18  know, it -- it changed, obviously.  But he was pretty
19  determined.
20      Q.  Did he believe that he was ever going to play
21  hockey again?
22      A.  I think he did.  I think he thought he could.
23      Q.  Did he believe that he was going to be able
24  to teach again?
25      A.  Oh, yes.

152

1      Q.  When you took him home from the
2  rehabilitation hospital, describe for me his condition
3  at that point in time.
4      A.  About ten days before going home, he was able
5  to walk up and down stairs.  He was able to -- to
6  manage the stairs.  And so that made a big difference
7  in terms of reality of -- of the house, of, you know,
8  everything and gave him, obviously, greatly increased
9  mobility.  But to all effects, his left side was --
10  was paralyzed.
11      Q.  When you say his left side was paralyzed, the
12  left shoulder and arm and hand --
13      A.  Uh-huh.
14      Q.  -- was all paralyzed?
15      A.  Yes.
16      Q.  Is that right?
17      A.  Yes.
18      Q.  And then left hip, leg and foot?
19      A.  Yes.
20      Q.  And was it -- I understand when it -- it was
21  paralyzed, he could not move the left side.  Could he
22  feel the touch on the left side of his body?
23      A.  Not really.  I don't -- I don't think so.
24      Q.  Did the left side paralysis extend into his
25  neck at all?

153

1      A.  A little bit, but he wasn't greatly affected
2  beyond that.  I mean, you couldn't see the effects of
3  it.
4      Q.  What about into his face?
5      A.  That's what I -- I jumped the gun there.
6      Q.  Okay.  It did --
7      A.  It was a little -- it was -- it was a little
8  bit -- you could tell a little bit on -- with his
9  mouth, but it wasn't extreme.
10      Q.  Would someone talking to him be able to see
11  that from his face --
12      A.  Ever so slightly.
13      Q.  Looking at him, let's say if he were sitting
14  in a chair, could you tell that he had left-side
15  paralysis?
16      A.  Not necessarily.
17      Q.  What about standing?
18      A.  You could tell something was -- was wrong.
19      Q.  Based upon the way he held his --
20      A.  Yes.
21      Q.  -- arm and shoulder?  Now, how would he get
22  up and down stairs with complete left-side paralysis?
23      A.  As I say, this -- this happened at Spaulding,
24  where they -- he was fitted for a -- a made-to-order
25  brace on his left leg.  And so that -- and -- well, on

39 (Pages 150 to 153)

Confidential

---

**158**

1    A.   The -- the summer we returned to
2  Williamstown, that summer.
3    Q.   So the summer of '99?
4    A.   Yes.
5    Q.   Did he ever drive himself anywhere?
6    A.   Yes.  Yes, he did.
7    Q.   And when I say "himself," just himself with
8  no one else in the car?
9    A.   We -- I'm trying to -- I'm trying to think.
10  Yes, he did.  I think at a certain point, he didn't
11  like to do that.  He -- he needed -- he wanted someone
12  with him.
13    Q.   And why was that?
14    A.   Just -- just because of his condition.
15    Q.   What about his condition made him want --
16    A.   Well --
17    Q.   -- someone with him?
18    A.   -- he was -- you know, he was partially
19  paralyzed.  So, you know, should anything happen or --
20  and he -- he eventually decided that he didn't want to
21  drive.  I think it was a -- initially being able to
22  drive was a sign for him of independence.  And then I
23  think he felt it was, you know, kind of a risk.
24    Q.   So did he then at some point stop driving?
25    A.   I -- I think so.

---

**159**

1    Q.   Did he have difficulty getting in and out of
2  a car?
3    A.   To the -- to the extent that he was partially
4  paralyzed, yes.
5    Q.   From the time Mr. Shearer came home from the
6  hospital in the summer of '99 until his death, can --
7  can you describe his ability or inability to perform
8  the functions of daily life, let's say, from getting
9  up in the morning; what type of assistance did he
10  need?
11          MR. SOH:  Objection.  Vague.  Go ahead
12  and answer if you can.
13    A.   He needed to have his brace on in order to
14  get around.  And he could -- you know, he could go
15  downstairs and, you know, fix coffee.
16  (BY MS. SCHULTZ)  Who would put his brace on?
17    A.   Usually me.
18    Q.   And did he need anything in addition to his
19  brace to get around?
20    A.   A cane.
21    Q.   What kind of cane did he use?
22    A.   Just a -- a straight -- a straight cane.
23    Q.   You indicated earlier that he needed help
24  getting dressed?
25    A.   Uh-huh.

---

**160**

1    Q.   Is that a "yes"?
2    A.   Yes.  Yes.  Sorry.
3    Q.   And did you help him get dressed every
4  morning?
5    A.   Either I did or -- or if I was going to work,
6  which was usually the case, someone would be coming in
7  to be with him.  And it -- it all depended on timing.
8    Q.   And whoever was coming in to be with him
9  would get him dressed?
10    A.   Uh-huh.  Yes.
11    Q.   When you got home, did you have in-home care?
12    A.   We had therapists coming to the house.  Is
13  that what you mean?
14    Q.   Therapists or, if you needed to leave the
15  house, did you have someone come stay with him?
16    A.   Oh, yes.
17    Q.   Who did you have come stay with him at the
18  house?
19    A.   Well, it was probably a pretty long time
20  before I left him -- you know, wasn't there at night.
21  To begin with, it would have been our son.
22    Q.   And then who?
23    A.   Then we had a -- a series of caregivers,
24  young men who were friends of students who -- and this
25  only -- this happened very rarely, that they would --

---

**161**

1  if Ivor wasn't available or if I wasn't available,
2  then one of these guys would stay with him.
3    Q.   What were their names?
4    A.   Well, Sean Wheeler was the most recent one.
5    Q.   Right.
6    A.   John Kroesen, K-R-O-E-S-E-N.  There were a
7  number -- a number, and I can't remember the -- the --
8  the other names.  All fabulous young men who were
9  really good.
10    Q.   And how did you get in touch with these men?
11    A.   I said -- as I said, for the most part they
12  were friends of students or, you know, one -- you
13  know, one was the son of a local doctor.
14    Q.   Now -- so Mr. Shearer came home in the end of
15  spring/summer of '99, correct?
16    A.   Correct.
17    Q.   And then when did you start back to work?
18    A.   I started back to work soon after he came
19  home.
20    Q.   And when you were at work during the day --
21    A.   Uh-huh.
22    Q.   -- was anyone home with Mr. Shearer?
23    A.   For the most part.  Not always, but for the
24  most part there would be either a student or one of
25  these young men caregivers.  He was working on a -- an

---

41 (Pages 158 to 161)

Confidential

162

1  art college project that different students were
2  helping him with. So there were often students in the
3  house working on this DVD project.
4      Q. You had made the statement earlier that some
5  would come to the house, but that didn't happen very
6  frequently. Do you mean for overnight?
7      A. For overnight, yes.
8      Q. Now, when you went back to work, you went
9  back to work every day, correct?
10     A. Correct.
11     Q. So when you left in the morning, was
12 Mr. Shearer out of bed, generally?
13     A. Generally.
14     Q. And would someone come to the house when you
15 left the house?
16     A. Generally. Sometimes there would be a lag,
17 but that was mostly the case.
18     Q. And then would that person stay there until
19 you got home in the evening?
20     A. Generally.
21     Q. And what type of things would that person --
22 for what purpose was that person in the house?
23     A. Meals, shopping, exercise. He was going to
24 the hospital -- going to the hospital for therapy,
25 lasted through the summer. And -- and then after

163

1  that, he would -- he would swim and walk, and always
2  with -- someone was always with him.
3      Q. And was someone always with him for -- due to
4  his -- the physical damage from the stroke -- stroke
5  or the mental or both?
6      A. The physical.
7      Q. Could Mr. Shearer use the rest room just
8  fine --
9      A. Yes.
10     Q. -- by himself?
11     A. Yes.
12     Q. The people that came to the house fixed him
13 meals?
14     A. Pretty much, yeah.
15     Q. -- is that right?
16         Could he -- when -- did he go out on walks?
17     A. We lived on the side of a -- of a mountain or
18 a hill. And there was one flat area that he would use
19 for exercise.
20     Q. And how was it that he exercised after the
21 stroke?
22     A. Very diligently, very rigorously. He felt --
23 he felt that this would help his recovery.
24     Q. What would he do?
25     A. Well, it would be the -- the walking and

164

1  swimming.
2      Q. So he would go out and walk in the yard?
3      A. On this -- no. Because it was -- it was too
4  hard on the grass. But, no, there's one flat area at
5  the -- on the road on -- on which we lived. That
6  was -- that he could walk up and down on that
7  without -- easily. And then -- and then swimming
8  was -- was more of a production, but he was
9  determined.
10     Q. What -- tell me, with respect to the
11 swimming --
12     A. Uh-huh.
13     Q. -- did someone get in the pool with him?
14     A. Yes. Yes.
15     Q. Okay. And was that the caretaker or --
16     A. Actually, I take that back. Because
17 sometimes when I went with him, I didn't get in with
18 him. Yeah.
19     Q. And how would -- how would you get him into
20 the pool and out of the pool?
21     A. That was -- that wasn't easy. You're making
22 me remember that it was actually very difficult,
23 because it was -- he would have to walk in the shallow
24 end and he couldn't walk without the brace on and you
25 couldn't take -- you didn't want the brace in the

165

1  water, so he had -- I think he had a cheap brace that
2  he used to get into the water. It was a -- it was a
3  production.
4      Q. Tell me about your sex life after the stroke.
5  Did it continue?
6      A. Yeah. I mean, he was -- you know, he was
7  paralyzed, so he obviously had some difficulty and --
8  but we made do.
9      Q. Did that bother him?
10     A. Well, I think it would have bothered anybody.
11     Q. What -- was he able to have an erection?
12     A. Yes.
13     Q. But not always when he wanted to?
14     A. Exactly.
15     Q. After the stroke, tell me about your
16 relationship, you Mr. Shearer's relationship, how that
17 changed.
18     A. Well, it -- we had been married for a very
19 long time already and we were very close already. And
20 it made us closer.
21     Q. So do you think the marriage was better after
22 the stroke?
23     A. It was different. In certain ways -- in
24 certain ways, it was.
25     Q. Did you fight more after the stroke than

42 (Pages 162 to 165)

Confidential

170

1  never going to regain the use of his arm, hand and
2  leg?
3      A.  I can't say.  I can't say.  I may have
4  blocked that out in some way.  I – I don't know.
5      Q.  Did you reach that realization?
6      A.  No.  I – yes and no.  You know, you – you
7  hope you're going to see progress.
8      Q.  Would others around you describe your
9  relationship with your husband after the stroke in a
10  different way than you have in this deposition so far?
11      MR. SOH:  Objection.  Form.
12      A.  I don't know how to answer that.  I – I – I
13  don't know.  I don't know the answer to that.
14  (BY MS. SCHULTZ)  Let me ask you:  It's my
15  understanding that – that at some point after his
16  stroke, about a year and a half after his stroke, that
17  you were arrested for assault and battery?
18      MR. SOH:  Objection.
19      Q.  (BY MS. SCHULTZ)  Is that correct?
20      MR. SOH:  Objection.  Form.
21      Q.  (BY MS. SCHULTZ)  Were you ever arrested for
22  assault and battery on Mr. Shearer?
23      A.  Yes.
24      Q.  And was – would you have considered that to
25  be within the normal course of your relationship and

171

1  marriage as you've described it to me in this
2  deposition?
3      MR. SOH:  Objection.  Form.
4      A.  No, I wouldn't say that was the norm.
5  (BY MS. SCHULTZ)  Well, earlier when I asked you about
6  anger or fights –
7      A.  Uh-huh.
8      Q.  – you indicated that really it wasn't any
9  different after the stroke than it was –
10      A.  Uh-huh.
11      Q.  – before, correct?
12      A.  Uh-huh.  Yes.
13      Q.  And that's why – is that not different in
14  your mind?
15      A.  On the – on the – on the surface, yes.
16      Q.  What do you mean, "on the surface"?
17      A.  To say someone is arrested for assault and
18  battery sounds extreme.  And under the circumstances,
19  I – I don't think it was extreme.
20      Q.  Why don't you describe the circumstances for
21  me.
22      A.  We got into a squabble about something, an
23  argument about something, I think pretty irrelevant.
24  He said something that I felt was really
25  inappropriate.  I slapped him.  He called 911.  The

172

1  police came.  I was charged, and the case was
2  ultimately dismissed.
3      Q.  And so you say that that is not abnormal on
4  the surface?
5      MR. SOH:  Objection.  Form.
6      Q.  (BY MS. SCHULTZ)  Well, what – what was your
7  point?
8      A.  My – my point is that – I think it was an
9  aberration.  I would have never slapped him, but it
10  was – it was late at night, whatever he said really
11  got me angry.  And it was – it was a simple slap.
12  No.  He called 911.  And as I said, the police came
13  and we explained – he explained, no, we don't mean –
14  I'm not trying to charge her or press charges.  I
15  don't want to press charges.  I wanted – I wanted
16  help.  And – and – but I was charged and taken down
17  to the police station.
18      Q.  Why – you don't recall what you were arguing
19  about that night?
20      A.  I think it was something as – I think it
21  was – had to do with politics.  I think it was – as
22  I said, I think it was something very petty.  It might
23  have been even something on television.
24      Q.  And that caused you to slap Mr. Shearer?
25      MR. SOH:  Objection.  Form.

173

1      Q.  (BY MS. SCHULTZ)  Is that correct?
2      A.  It was the – it was – it escalated to – to
3  a point where he was out of line.  And it – it was a
4  way of, you know, of – a wake-up call on my part.
5      Q.  A wake-up call –
6      A.  To him.  To get over it, forget it, this is
7  over.  It's time to go to bed.
8      Q.  Had you hit him before?
9      A.  No.
10      Q.  And where was he when you slapped him?
11      A.  We were downstairs.  I don't remember.  I
12  think it was the kitchen, the front hall.
13      Q.  Was he standing or sitting?
14      A.  Yes, he was standing.
15      Q.  And why did he call 911?
16      MR. SOH:  Object –
17      A.  I think –
18      MR. SOH:  Objection.  Form.  Go ahead.
19      A.  I think he – he was – he didn't know what
20  was happening.  I think it – it alarmed him and he –
21  he wanted intervention, wanted a third party to come
22  and just calm things down.
23  (BY MS. SCHULTZ)  Was he afraid of you at that time?
24      A.  Oh, I don't think so.
25      Q.  Could he have gotten away from you if he

44 (Pages 170 to 173)

Confidential

178

1    MR. SOH: No, I'm saying I'm sandbagged
2  by this. That's -- this is my objection, is that I
3  sent you an e-mail saying, basically these are the
4  records that we have that you've gotten from an
5  authorization. And you show me this report that you
6  got from the authorization. That's not all the
7  documents I got.
8    MS. SCHULTZ: I didn't say I got it from
9  an authorization. I said I don't know.
10    MR. SOH: You said you assumed you got
11  it from an authorization.
12    MS. SCHULTZ: I am tell you now I can't
13  answer as to whether this came from an authorization.
14  I don't know. I don't know one way or the other.
15    MR. SOH: All right. Look, we're taking
16  a break. We're going off the record. We'll stay in
17  here. I just want a chance to read it.
18    MS. SCHULTZ: That's fine. Read it.
19  It's -- it's really just this first page.
20    MR. SOH: I just want to read this
21  because I've never seen this before.
22    MS. SCHULTZ: That's fine.
23    THE VIDEOGRAPHER: Off the record then?
24  We're off the record.
25    (Break.)

179

1    THE VIDEOGRAPHER: We're on the record
2  at 3:32.
3    MR. SOH: I'm going to object to this
4  document for two main reasons. Number one, I sent
5  opposing counsel an e-mail asking for all documents
6  that were obtained through the authorization. This
7  was not. We never had a copy of this police report,
8  and opposing counsel indicated that she understood
9  that she -- this was obtained through a authorization.
10  If it was not, then, there is obviously no objection.
11    Secondly, I object on completeness.
12  This document has a fax stamp on there that starts
13  page 2 of 9 and goes through 9 of 9. I want to know
14  what page 1 of 9 is, since I've never seen this
15  document before.
16    Those are my objections. Go ahead,
17  Counsel.
18    MS. SCHULTZ: Let me state for the
19  record that I've stated on three or four prior
20  occasions that I don't know if this was obtained
21  through any type of authorization and I don't know
22  that your client filled out an authorization for
23  release of a police record. But I'm assuming it's a
24  public record and I'm assuming that you could have
25  gotten the very same document from the police had you

180

1  asked for it. So I am not stating that this was
2  obtained through an authorization. I can get an
3  answer for that to you and give that to you in the
4  morning, but I am not stating that that was the manner
5  in which this was obtained.
6    MR. SOH: The record is what the record
7  is. Go ahead.
8    Q. (BY MS. SCHULTZ) Ms. Shearer, have you had
9  an opportunity to look at this document?
10    A. Yes.
11    Q. Do you recall that this argument that you got
12  into with Mr. Shearer was on February 28, 2001?
13    A. I remember it was in the winter.
14    Q. And how is it you remember it was in the
15  winter?
16    A. Because it was very cold and I had flip-flops
17  on.
18    Q. When you opened the door?
19    A. When I went out.
20    Q. And this would have been approximately two
21  years after -- a little more than two years after
22  Mr. Shearer's stroke, correct?
23    A. I'm sorry. Correct.
24    Q. I think you testified earlier that you hit
25  your low about a -- with respect to his situation

181

1  about a year after his stroke?
2    MR. SOH: Objection. Form.
3    Q. (BY MS. SCHULTZ) Is that correct?
4    A. That was when I -- I hit a low, yeah.
5    Q. Would this have been another occasion in
6  February of '01 where you would have considered
7  that -- the fact that you had hit a low had occurred
8  again?
9    MR. SOH: Objection. Form.
10    A. I am not recalling at all the overall tone
11  or -- or what state we were in at that -- at that
12  general period. I do know that it was -- it was very
13  difficult. It -- you know, every day was -- was a
14  challenge. And I think it's fair to say, as it
15  reports here, that I just lost it.
16    (BY MS. SCHULTZ) Did you have arguments like this
17  argument you had this night with your husband with
18  some frequency?
19    A. I don't think so. I mean, no.
20    Q. Can you describe for me, then, what it was
21  about this argument that made you lose it?
22    A. I don't know that I can describe it. It
23  was -- it was late at night, I was tired, I probably
24  had a glass or two of wine and it just -- I just lost
25  it. And I was -- I held myself together pretty well

46 (Pages 178 to 181)

Confidential

**182**

1 over all of this.
2    Q. Throughout his stroke?
3    A. Yes.
4    Q. This indicates that there was, first of all,
5 a hang-up call at the Shearer residence. Do you
6 recall that now?
7    A. Now that I'm seeing this, I -- I think what
8 happened was, I realized he was calling 911. And I
9 basically said "Hang up the phone" or I hung up the
10 phone. And so that created more tension. And then he
11 called again. I had forgotten that.
12    Q. Do you -- do you know one way or the other if
13 he hung up the phone or if you took it from him and
14 hung it up?
15    A. I don't remember.
16    Q. So then did he call back again?
17    A. That's what this says.
18    Q. Do you recall him calling back?
19    A. He must have. I don't -- I -- I don't recall
20 totally. I know that he called.
21    Q. What do -- do you recall what he said to the
22 911 operator?
23    A. No, I don't.
24    Q. This report says that you met the officers at
25 the door and it says, quote, She told the officers

**183**

1 that she and her husband had been arguing and that she
2 had smacked him in the head, unquote. Is that what
3 you told the officers?
4    A. I imagine I used the word "slapped," but I
5 don't -- I don't remember. I wouldn't -- that doesn't
6 sound like me, to say "smacked in the head."
7    Q. How -- how did you hit him in the head?
8    A. Like a --
9    Q. Will you show me what part of your --
10    A. Like a slap.
11    Q. So in the cheek --
12    A. Cheek.
13    Q. -- not the head?
14    A. Not the head, the cheek.
15    Q. Did you tell the officers that he was
16 verbally abusing you?
17    A. I think I -- it says I did here. I think
18 basically I said we were having a fight.
19    Q. When they placed you under arrest, did they
20 handcuff you?
21    A. Yes.
22    Q. In the house?
23    A. Yes.
24    Q. And walk you out to the police car?
25    A. (Nods head.)

**184**

1    Q. What was Mr. Shearer doing while they were
2 handcuffing you?
3    A. He was panicking. And I -- I said, "I can't
4 leave him alone." To which they said, "Well, he looks
5 like he's doing just fine." So it was -- it was
6 pretty bad.
7    Q. Did you tell the officers he'd had a stroke?
8    A. Yes. Yes.
9    Q. Did you tell the officers, "He needs someone
10 here with him"?
11    A. I did. Made no difference.
12    Q. So they took you, put you in the police car?
13    A. (Nods head.)
14    Q. And left Mr. Shearer there?
15    A. (Nods head.)
16    Q. Is that correct?
17    A. Yes.
18    Q. Did Mr. Shearer call anyone, to your
19 knowledge?
20    A. I -- I don't remember. He probably called
21 our son.
22    Q. And where was your son at that time?
23    A. He was at -- at school. He was at school.
24    Q. When the police arrived, did they arrive with
25 their lights on or sirens or just come to the door?

**185**

1    A. You know, I don't remember.
2    Q. You were taken to the police station,
3 correct?
4    A. (Nods head.)
5    Q. And tell me how long you stayed there.
6    A. Well, it's probably more accurate here than
7 what I remember. I think -- I think I read --
8    Q. Looks like arrival time, 1:28.
9    A. And I think it said --
10    Q. Oh, time released, 2:20 a.m.?
11    A. Yeah. Yes.
12    Q. Does that sound about right?
13    A. Uh-huh.
14    Q. And it says here you were transferred to home
15 by a friend?
16    A. I had to pay $25. Would it -- not bail --
17 bail? Would that have been bail? Whatever. I had to
18 pay $25. And, of course, I left the house with
19 nothing. And -- and I -- I called a friend.
20    Q. Who did you call?
21    A. I called Shawn Rosenheim.
22    Q. And who is that?
23    A. He is a professor of English at the college.
24    Q. How do you know him?
25    A. He's a good friend.

47 (Pages 182 to 185)

VERITEXT CORPORATE SERVICES (800) 567-8658

Confidential

206

1  is grossly equivalent to that of a six-and-a-half-
2  year-old child.  Ability to look ahead when completing
3  mazes was also at the level of a 6.5-year-old child."
4      Do you recall being -- having that
5  assessment conveyed to you?
6      A.  No, I don't.
7      MR. SOH:  Can you read the next sentence
8  for optional completeness?
9      MS. SCHULTZ:  Sure.
10     Q.  (BY MS. SCHULTZ)  "Curiously, formal
11  assessment of facial recognition revealed it to be in
12  the average range."
13     MR. SOH:  Thank you.  Are you done with
14  that document, or is there more?
15     MS. SCHULTZ:  No.
16     Q.  (BY MS. SCHULTZ)  You can tell me -- and if
17  you look under "Conclusions" --
18     MR. SOH:  Page 72?
19     Q.  (BY MS. SCHULTZ)  Same page, just next
20  paragraph, it says, "There has been significant
21  improvement in all affected functions."  And this
22  would have been, looks like, as of March 4, '99.
23  Would you agree with that assessment, that from the
24  time of his stroke until March 4, '99, there had been
25  significant improvement in all of his functions?

207

1      A.  Yes, I would.
2      Q.  All right.  It then says, "While visual
3  attention and visual perceptional" -- "perceptual
4  constructional functioning had been devastated,
5  performances now in many ways at the level of a
6  beginning elementary school-age child."  Was -- was
7  that fact ever conveyed to you, to your knowledge?
8      A.  If it was, I interpreted it in a way that
9  made it possible for me to say we can go on.
10     MR. SOH:  Can you just read the rest
11  of -- take a second and read the rest of the
12  paragraph.
13     Q.  (BY MS. SCHULTZ)  "Neglect is still" --
14     MR. SOH:  Not you.
15     MS. SCHULTZ:  Oh, okay.
16     MR. SOH:  I just -- I just wanted her to
17  read the rest of the paragraph.
18     MS. SCHULTZ:  Okay.  That's fine.  Sure.
19     MR. SOH:  Are you going to ask any more
20  things on that?
21     MS. SCHULTZ:  Yes.
22     Q.  (BY MS. SCHULTZ)  If you'll look down the
23  page with me at "Employability" --
24     MR. SOH:  Let me just read some things
25  into the record real quick.

208

1      MS. SCHULTZ:  Sure.
2      MR. SOH:  "Verbal functioning was not
3  retested as it was above average at the January test
4  section.  Verbal memory is fully functional, but
5  probably below premorbid levels."  Thank you.
6      Q.  (BY MS. SCHULTZ)  If you'll look with me under
7  "Employability" --
8      A.  Uh-huh.
9      Q.  -- and you see the reference to teaching?
10     A.  Yes.
11     Q.  It says that "The patient's current
12  difficulties reading and his visuospatial impairments
13  prevent him from teaching the art
14  history/philosophical deconstruction course which he
15  had taught for many years."
16     Do you -- do you know whether
17  Mr. Shearer was told that he would be prevented from
18  teaching this course?
19     A.  Prevented by whom?  By his condition or by
20  the college?
21  By his -- from his -- by his condition.
22     A.  I don't know that he was told that.  And I
23  think he would have had not paid attention to it.
24     Q.  It then says, "His capacity to think on his
25  feet may now be sufficient to support his teaching the

209

1  class"?
2      A.  That sounds like him.
3      Q.  And it then goes on to say, "If he wishes to
4  resume teaching with his current deficits, he would
5  have to dramatically alter the teaching demands of the
6  class to greatly reduce his reading demands and to
7  make the course more verbal and less visual.
8  Visuospatial impairment is of very serious concern in
9  the teaching of any art course."
10     Do you agree with that statement?
11     A.  No.  I don't -- I don't agree with what
12  Dr. Cline is saying about art.  I'm -- I'm not
13  disagreeing that he said this.
14     Q.  Right.  But you disagree with the fact that
15  visuospatial impairment is a very serious concern in
16  the teaching of an art course?
17     A.  Of any art course.  And the way Hartley
18  taught, I don't think it -- it was -- it would have
19  been a problem.
20     Q.  And why -- why is that?
21     A.  Because I think I said this earlier, that I
22  think Dr. Cline -- and I do remember him now.  I think
23  he was thinking a much more traditional kind of art
24  history course than what Hartley and I taught.
25     Q.  Well, was Mr. Shearer able to teach a course

53 (Pages 206 to 209)

Confidential

210

```
1   in the fall of '99?
2       A. No. At his -- I believe at his -- at
3   Hartley's recommendation, he didn't feel he was ready
4   for that.
5       Q. And what did he feel was prohibiting him from
6   teaching?
7       A. Well, I think it goes back to he -- he
8   couldn't read as much as he would want to. I think he
9   didn't feel completely -- you know, he didn't feel
10  back to himself, both, you know, physically and in
11  terms of the material. But I think -- he wanted to
12  take his time. He wanted to take his time and be --
13  and -- and really feel confident and ready.
14      Q. In his course, would he have had to use any
15  kind of equipment?
16      A. We always had people helping anyway.
17      Q. Would he have had to use equipment?
18      A. Well, he wouldn't have used equipment, but
19  there would be -- like slide projectors and computers
20  would be used, sure.
21      Q. So you're saying someone else --
22      A. Yeah.
23      Q. -- could have done that --
24      A. Yes.
25      Q. -- though, for him?
```

212

```
1       A. I want to say that was February 4th.
2       Q. Which would have been a --
3       A. Monday.
4       Q. -- Monday?
5       A. It's a Monday.
6       Q. How many days a week was the course taught?
7       A. It was a seminar that was taught once a week.
8       Q. How many hours each week?
9       A. The class itself was, I think, three and a
10  half hours.
11      Q. So three and a half hours, one day a week?
12      A. Yes.
13      Q. And was it a three-credit course?
14      A. We taught both in the undergraduate art
15  department and the graduate program. I -- so I don't
16  remember. I imagine it was.
17      Q. And did you and Mr. Shearer teach that class
18  together on Monday, February 4?
19      A. Yes, we did.
20      Q. And was that a three-and-a-half-hour
21  course --
22      A. I --
23      Q. -- that day?
24      A. I think it -- it must have been. It was the
25  first class.
```

211

```
1       A. Yes.
2       Q. So was he able to teach any courses in the
3   spring of 2000?
4       A. He waited till the course that started in the
5   spring of 2002.
6       Q. And why did he not teach any courses in the
7   spring of 2000?
8       A. I honestly don't know. I think he felt he
9   wasn't ready.
10      Q. And then what about the fall of 2001, do you
11  know why he -- was he not ready in the fall of 2001 to
12  teach a course?
13      A. I -- I believe that he was devoting all his
14  time to this CD-ROM. That was -- that was taking up
15  all of his time and he wanted to complete that.
16      Q. And then you're saying he was planning to
17  teach a course starting in the spring of 2002?
18      A. '02.
19      Q. When was that course supposed to start?
20      A. It started -- it started about -- on the
21  Monday before the Thursday when he died.
22      Q. And this was a course that he was team
23  teaching with you?
24      A. That's correct.
25      Q. And when was the first day of the course?
```

213

```
1       Q. Tell me about that first class and any
2   differences in the way that was -- class was taught
3   versus the classes that you had taught together
4   previously.
5       A. I know that Hartley was very nervous that he
6   could perform in the way that he had in the past, and
7   I would say it was a -- it was a big success.
8       Q. Did he convey to you before the class that he
9   was really nervous with it?
10      A. Well, what -- what you have to understand is
11  that we did this together. We taught the class
12  together. So we mapped out exactly, you know, the --
13  the -- not only the syllabus, but the actual --
14  what -- what happened in the -- in the actual class.
15  So, yes, I knew that he was anxious about it and
16  wanted -- you know, wanted to do his very best.
17      Q. Did he -- for his portion of the course, did
18  he teach it seated, standing?
19      A. I don't remember.
20      Q. Okay. What about you?
21      A. I don't remember.
22      Q. Do you generally teach your courses standing
23  or sitting?
24      A. Usually -- usually they're seminars, so it
25  would actually be like this. We'd be seated around a
```

54 (Pages 210 to 213)

Confidential

## 214

1  table. And occasionally you might get up to -- to --
2  to give a specific, you know, lecture for a moment.
3  But for the most part, it was seated.
4       MR. SOH: So a deposition is just like
5  an art history seminar? Is that what you're saying?
6       Q. (BY MS. SCHULTZ) How many students were
7  enrolled in that course?
8       A. As we're talking, I'm thinking that that was
9  the introductory course -- class in which everybody
10 who wanted to be in it attended. And we did an
11 introduction to the course to a certain extent with
12 the intention of scaring people to not take it.
13 Because we needed to get it down in numbers, because
14 we knew that it would be -- it's a much better class
15 when you have smaller numbers.
16      So my answer to your question is I don't
17 know. I think something like 20 enrolled, and we had
18 intended to get it down to like 10 or 11.
19      Q. And what was the name of the course?
20      A. You had to ask me that. Something
21 contemporary art. I -- I can't remember.
22      Q. Now, when did you leave town that week?
23      A. Tuesday.
24      Q. And what time of day on Monday was the course
25 taught?

## 215

1       A. In the evening.
2       Q. And when did you leave the next day?
3       A. I don't remember.
4       Q. And where did you go?
5       A. I went to a conference in Hawaii.
6       Q. And what kind of conference?
7       A. Museum directors. There's an association
8  called The Association of Art Museum Directors that
9  holds an annual conference in January -- January or --
10 in this case, early February.
11      Q. Where in Hawaii?
12      A. Honolulu.
13      Q. And where were you staying?
14      A. I don't remember.
15      Q. How long did you plan to be in Hawaii?
16      A. I honestly don't remember. It was -- it was
17 a short trip. It was intended to be a short trip. I
18 think I was planning to come back on Saturday or
19 Sunday.
20      Q. Do you recall if -- if the conference was
21 during the week or over the weekend?
22      A. It was during the week and over the weekend,
23 I believe.
24      Q. Did you consider taking Mr. Shearer with you
25 to the conference in Hawaii?

## 216

1       A. You know, I think we might have talked about
2  that, but it would have been very difficult.
3       Q. And why is that?
4       A. It was -- it was very hard for him to -- to
5  travel.
6       Q. And what kind of things were difficult about
7  traveling?
8       A. Well, just if -- if you're taking an
9  airplane, you know, he would have -- he would probably
10 have had to have a wheelchair to go from the curbside
11 to the gate. His -- his mobility was -- was very
12 limited. That was the -- that was the -- the problem.
13      Q. Any other reasons that you did not take him
14 with you?
15      A. Well, probably I would have been in meetings
16 all day and it wouldn't have been much of a vacation.
17      Q. I'm just thinking, Williamstown in the
18 winter --
19      A. Yeah, you're right.
20      Q. -- Hawaii. Where would you rather be?
21      MR. SOH: You're just transferring --
22 that's just transference on your part, Lori.
23      MS. SCHULTZ: That's probably true.
24      Q. (BY MS. SCHULTZ) Did Mr. Shearer express any
25 desire to go with you to Hawaii?

## 217

1       A. I don't think so.
2       Q. Did you plan to be back for the class to be
3  taught the next Monday?
4       A. Yes. Thank you. That's when I needed to be
5  back by.
6       Q. And how many seminars would you give in this
7  course? In other words, how many Mondays?
8       A. I think it's usually like 13. I think that's
9  a semester.
10      Q. And I know you can't remember the name of
11 this course, but was it a course that you and
12 Mr. Shearer had taught in previous years?
13      A. We -- it -- it was -- the basis of it was
14 very much the same. It changed each year in different
15 ways. I think it was called "Art and Theory" --
16 "Contemporary Art and Theory," something like that.
17 So it would -- we always did a field trip to New York.
18 It would depend what exhibitions were on view. In
19 Williamstown, what artists were coming to speak, so we
20 would work it around art that they -- art and artists
21 that they could have contact with.
22      Q. Let me ask you a few questions about his
23 master's degree that he was trying to obtain.
24      A. Yeah.
25      Q. Tell me what he wanted to do with that

55 (Pages 214 to 217)

VERITEXT CORPORATE SERVICES (800) 567-8658

Confidential

218

1  master's degree when he started taking the courses.
2      A.  I think what he wanted to do was to be able
3  to practice social work in -- in addition to the
4  teaching.
5      Q.  Now, you said earlier that due to his stroke,
6  he was not able to complete the coursework, correct?
7      A.  Correct.
8      Q.  And what was it that kept him from completing
9  the coursework?
10     A.  I think initially, pragmatically, the -- he
11 was at the -- at SUNY -- Albany, the State University
12 of New York in Albany.  And it was a -- an hour's
13 drive there and back.  So that represented a hurdle.
14 And I think because, even though it was part time, it
15 was very, very demanding in terms of the -- the papers
16 to be written and the research to be done.  And I -- I
17 think he felt that he just couldn't do it.
18     Q.  Was that a blow to him, to not be able to
19 complete that degree?
20     A.  Yes.  I think so.
21         MR. SOH:  SUNY is an hour away from
22 Albany?
23         THE WITNESS:  Yeah.  It's the nearest
24 airport.
25         THE VIDEOGRAPHER:  Ms. Schultz, we have

219

1  about seven minutes of tape.
2          MS. SCHULTZ:  Okay.  All right.  Do you
3  want to go ahead and change the tape now so we don't
4  have to stop?
5          THE VIDEOGRAPHER:  We're off the record.
6          (Break.)
7          (Shearer Exhibit 4 marked.)
8          THE VIDEOGRAPHER:  We're on the record
9  at 4:45.
10     Q.  (BY MS. SCHULTZ)  Ms. Shearer, I've handed you
11 Deposition Exhibit 4, which are records that we've
12 received from the Dr. -- the office of
13 Dr. Catapano-Friedman.  And just -- just so I'm clear,
14 it's my understanding that you, yourself, had
15 individual sessions with Dr. Catapano-Friedman,
16 correct?
17     A.  I think so.
18     Q.  And you and Mr. Shearer had sessions together
19 with Dr. Catapano-Friedman, correct?
20     A.  That -- that I remember.
21     Q.  And it appears -- so -- so -- and the reason
22 I say that is it appears that these are simply entries
23 from her session with Mr. Shearer and not the other
24 sessions.  But in case you think something's missing,
25 that's my understanding.  We -- we can depose her and

220

1  find that out.  But I want to ask you a few questions
2  about some of the entries in here.
3          First of all, it looks like the first
4  entry is dated February 18, 2000.  Do you recall
5  whether Mr. Shearer saw Dr. Catapano-Friedman prior to
6  February of 2000?
7      A.  Do you mean by himself?
8  By himself or with you.
9      A.  I'm not remembering.  I'm not remembering.
10     Q.  Do you recall if he saw her, either by
11 himself or with you, prior to the stroke?
12     A.  Yes.  Yes, we did.
13     Q.  Okay.  So we don't have those records, then,
14 apparently.  Like I said, the first entry I have is
15 February 18, 2000.  Let me -- let me talk through some
16 of these notes.  And they are handwritten, so -- and
17 -- and some of it I won't probably try to read.  But
18 it will at least serve as a basis upon which I can ask
19 you some questions.
20         "55-year-old" -- and I'm not going to
21 try to read that entry -- "concerned about his anger
22 and venting it on Linda."  Do you recall Mr. Shearer
23 taking out any anger on you in -- this would be about
24 a year after his stroke?
25         MR. SOH:  Let me just put something on

221

1  the record real quick, Lori.  I can -- I saw these --
2  these are all the records that I've ever seen from
3  Dr. Catapano-Friedman.  And I will just make the
4  comment that, in general, I find her handwriting to be
5  almost illegible.  So I don't have any specific
6  objection with what you just read, but I'm pretty sure
7  we're going to be crosswise over interpretation of her
8  handwriting.
9          So I'm going to object to -- to the
10 extent that the witness can't understand or doesn't
11 agree that that's what's written in Dr. Catapano's
12 handwriting, I'm going to object to the line of
13 questions by trying to interpret this poor doctors
14 handwriting -- or this doctor's poor handwriting.
15 Excuse me.  All right.
16     Q.  (BY MS. SCHULTZ)  Do you recall Mr. Shearer
17 venting his anger on you during this period of time
18 after his stroke?
19     A.  Looking at the date, this would coincide
20 roughly to the time when I really fell apart.  So it
21 was early 2000.  And that's, I think, where that would
22 come from -- have come from, was a -- you know, an
23 awareness on his part that I wasn't as strong as I
24 thought I was.
25     Q.  What type of things would Mr. Shearer get

56 (Pages 218 to 221)

Confidential

252

UNITED STATES DISTRICT COURT
MDL DOCKET NO. 1629
MASTER FILE NO. 04-10981
JUDGE PATTI B. SARIS
MAGISTRATE JUDGE LEO T. SOROKIN

IN RE: NEURONTIN                )
MARKETING, SALES                )   CONFIDENTIAL
PRACTICES, AND PRODUCTS         )
LIABILITY LITIGATION            )
                                )
_____         )
                                )
THIS DOCUMENT RELATES TO:       )
                                )
PRODUCTS LIABILITY ACTIONS      )   HIGHLY CONFIDENTIAL
                                )
HARDEN MANUFACTURING            )
CORPORATION ET AL.              )
                                )
VS.                             )
                                )
PFIZER, INC. AND                )
WARNER-LAMBERT COMPANY          )

*****************************************************
          ORAL AND VIDEOTAPED DEPOSITION OF
                  LINDA B. SHEARER
                 FEBRUARY 26, 2008
                     VOLUME 2
*****************************************************

     ORAL AND VIDEOTAPED DEPOSITION of LINDA B.
SHEARER, produced as a witness at the instance of the
Defendant Pfizer, Inc., and duly sworn, was taken in
the above-styled and numbered cause on FEBRUARY 26,
2008, from 9:08 a.m. to 1:08 p.m., before Denyce M.
Sanders, CSR, RPR, in and for the State of Texas,
recorded by machine shorthand, at the offices of THE
LANIER LAW FIRM, 6819 FM 1960 West, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record or attached
hereto; that the deposition shall be read and signed
before any notary public.

Confidential

253

1  APPEARANCES
2
3  FOR THE CLASS PLAINTIFFS:
4  THE LANIER LAW FIRM
   6819 FM 1960 West
   Houston, Texas 77069
5  Mr. Kenneth S. Soh
6
7  FOR THE DEFENDANT PFIZER, INC. AND WARNER-LAMBERT
   COMPANY:
8  SHOOK, HARDY & BACON, L.L.P.
   2555 Grand Boulevard
9  Kansas City, Missouri 64108-2613
   Ms. Lori Schultz
10
11 VIDEOGRAPHER:
12 Corey Laborde
13
14
15
16
17
18
19
20
21
22
23
24
25

254

1      EXAMINATION INDEX
2
3  WITNESS:    LINDA B. SHEARER
4  EXAMINATION                   PAGE
5    BY MS. SCHULTZ              255
6
   SIGNATURE REQUESTED           347
7
8  REPORTER'S CERTIFICATION      349
9
10     EXHIBIT INDEX
11                PAGE
12 SHEARER EXHIBIT NO. 5         274
      Pharmacy Records from Hart's
13 Pharmacy
14 SHEARER EXHIBIT NO. 6         288
      Williamstown Police Department
15 Incident Report
16 SHEARER EXHIBIT NO. 7         310
      Plaintiff's Response to Defendants'
17 First Set of Interrogatories
18 SHEARER EXHIBIT NO. 8         337
      Records from Williamstown College
19
20
21
22
23
24
25

255

1              LINDA B. SHEARER,
2  having been previously duly sworn, testified as
3  follows:
4              EXAMINATION
5  BY MS. SCHULTZ (CONTINUED):
6      Q.  Ms. Shearer, do you understand that you are
7  still under oath?
8      A.  Yes.
9      Q.  I'd like to ask you some questions now about
10 the days immediately preceding Mr. Shearer's death.
11 Okay?  It's my understanding that you left for Hawaii
12 that Tuesday morning of that week?
13     A.  Yes.
14     Q.  Did anyone travel with you?
15     A.  Yes.
16     Q.  Who went with you?
17     A.  The -- Michael and Alicia Conforti.  He's the
18 director of the Clark Art Institute.
19     Q.  Michael -- can you spell the last name?
20     A.  Conforti, C-O-N-F-O-R-T-I.
21     Q.  And his position is?
22     A.  Director of the Clark Art Institute.
23     Q.  And where is the Clark Art --
24     A.  In Williamstown.
25     Q.  -- Institute?

256

1          MR. SOH:  Let her finish her question.
2          THE WITNESS:  Yeah.
3      Q.  (BY MS. SCHULTZ)  And you said Alisa Conforti
4  also went along?
5      A.  Licia, L-I-C-I-A.
6      Q.  And who is Licia Conforti?
7      A.  Michael's wife.
8      Q.  Were you friends with the Confortis?
9      A.  Yes.
10     Q.  Is this a trip that you were required to make
11 in your position at the museum or one that you had the
12 choice of whether to go on?
13     A.  I -- they -- they have -- let me think a
14 minute.  There were two meetings a year.  You are --
15 as a member, you are expected to attend at least one;
16 but my attendance since the January '99 meeting had
17 been very spotty, and we were agreed that this would
18 be a good one to try and go to.
19     Q.  Did the fact that Michael Conforti was taking
20 his wife make Mr. Shearer decide that he'd like to go?
21         MR. SOH:  Objection.  Form.  Asked and
22 answered.  Go ahead.  Answer it.
23     A.  No.  It -- it's a very sexist organization.
24 The wives often go as spouses.  The husbands tend not
25 to go.  What can I say?

2 (Pages 253 to 256)

Confidential

**325**

1  A. Oh. Oh, I see where you are.
2  Q. Are you aware that Mr. Shearer had fallen on
3  several occasions at the home?
4  A. I'm not remembering.
5  Q. Do you -- you don't recall one way or the
6  other?
7  A. I don't recall. It's certainly possible.
8  Q. If Mr. Shearer were to fall down, was he
9  able to get up from the floor?
10  A. Not easily. Not easily. He would require
11  help.
12  Q. When -- after the assault and battery arrest,
13  you had to have a court hearing or two; is that
14  correct?
15  A. That is correct.
16  Q. Did -- did you go to the first court hearing
17  and then was it continued for some reason?
18  A. You know, I don't remember. I -- I don't
19  remember.
20  Q. Did you retain an attorney?
21  A. Yes, I did.
22  Q. Did Mr. Shearer accompany you to the
23  courthouse for one or more hearings regarding the
24  charge?
25  A. I don't believe so. I don't -- I don't

**326**

1  believe so.
2  Q. Was there any discussion about whether he
3  should or should not go with you?
4  A. He -- I -- I think there must have been
5  discussion. There must have been discussion. And for
6  whatever reasons, I'm pretty sure he didn't go.
7  Q. Did your neighbors ever question you about
8  the police being at your house and the arrest?
9  A. I think they -- I had -- I was -- we were
10  very close to our neighbors across the street, and
11  they would have known the whole situation. No, they
12  didn't -- I mean, it was a topic of conversation.
13  Q. What were your -- what were those neighbors'
14  names?
15  A. Jim Mahon, M-A-H-O-N, and his wife, Paula
16  Consolini, C-O-N-S-O-L-I-N-I.
17  Q. And were they associated with --
18  A. The college.
19  Q. -- the college?
20  A. Yes, they were.
21  Q. In what capacity?
22  A. He taught in the political science department
23  and she ran the Williams in New York program. And we
24  were very close to their daughter and their cats.
25  Q. I take it a fairly large percentage of

**327**

1  residents of Williamstown are -- work or are
2  associated with the college?
3  A. That's correct.
4  Q. Other than the college, are there other
5  industries, companies, that provide a good deal of
6  employment for people in the town?
7  A. The college is the largest employer in the
8  town.
9  Q. And how large is the town?
10  A. I knew you were going to ask me that. I want
11  to say between 6- and 8,000. And the 2,000 difference
12  has to do with the student body. So...
13  Q. So there are approximately 2,000 students
14  that attend the college?
15  A. Yes.
16  Q. Can -- can you tell me physically after -- at
17  the time of Mr. Shearer's death, he had suffered from
18  the paralysis on the left side of his body for about
19  three years?
20  A. That's correct.
21  Q. Can you -- can you tell me from a physical
22  perspective, did the left arm and left leg look
23  significantly different from the right side of his
24  body at -- by that point in time?
25  A. Yes. Yes. They looked limp and paralyzed

**328**

1  and -- and non -- nonfunctioning or -- or I take it
2  back. The arm was often very rigid and -- and tight,
3  like this, and his hand like that (indicating). So
4  not limp, per se.
5  Q. Did he have to do any continuing type of
6  exercise of the left arm and leg?
7  A. We were always trying to -- to -- to move the
8  arm, to activate the arm, to -- and -- and because he
9  was walking with the leg, he was -- he was always
10  exercising the leg. The arm was -- was harder. But
11  we were always trying to make it more flexible.
12  Q. When was the last time he had physical
13  therapy on his arm or leg?
14  A. I don't remember.
15  Q. At the time of Mr. Shearer's death, I want to
16  ask you some questions about your financial situation
17  at that time.
18  A. Uh-huh.
19  Q. Were you and Mr. Shearer in debt?
20  A. We were in credit card debt.
21  Q. Can you explain to what extent?
22  A. I honestly don't remember, because I -- I
23  blocked it out. Probably between 20- and $35,000.
24  Q. And was the 20- to $35,000 on various credit
25  cards?

20 (Pages 325 to 328)

Confidential

329

1    A. Yes, it was.
2    Q. How many different credit cards?
3    A. I don't remember.
4    Q. And what had caused you and Mr. Shearer to go
5    into that type of credit card debt?
6    A. Healthcare, and help that wasn't covered by
7    insurance. Specifically, having people coming in to
8    help as caregivers. And I'm -- I can't remember what
9    else. That's the main expense that I recall.
10   Q. Now, what -- what type of insurance did
11   Mr. Shearer have at the time?
12   A. The -- the medical insurance I'm referring
13   to.
14   Q. Right. But through what company?
15   A. Oh, through the college.
16   Q. And are you saying that that medical
17   insurance would not pay for the caregiver help during
18   the day?
19   A. Yes, that's what I'm saying.
20   Q. Tell me the amount of money spent on a weekly
21   basis on the caregivers, if you can give me an
22   estimate.
23   A. I honestly don't remember. Several hundred.
24   That's a guess.
25   Q. Approximately several hundred a week?

330

1    A. Yes.
2    Q. And did you look at whether or not there
3    would be other means of providing or -- or getting
4    compensated or help with respect to the caregiver
5    situation, other than just his medical situation?
6    MR. SOH: Objection. Form.
7    MS. SCHULTZ: Let me rephrase that. I
8    agree with you.
9    Q. (BY MS. SCHULTZ) Did you look into any social
10   service programs to see if you could get any help
11   whatsoever in paying his caregivers?
12   A. I don't remember.
13   Q. Other than the credit card debt, did you have
14   other debt at the time of his death?
15   A. We had the mortgage on the house.
16   Q. And how -- how large of a mortgage did you
17   have at that time?
18   A. I'm afraid I still don't remember that.
19   Q. Did you take out an additional mortgage on
20   the house after his stroke? Do you recall that?
21   A. I don't think so. Oh, after his stroke. I
22   don't think so. I don't -- I do not recall.
23   Q. So you had the mortgage on the house, the
24   credit card debt. Any additional debt?
25   A. We were paying -- or we had tuition, college

331

1    tuition for Ivor.
2    Q. And how much was that?
3    A. That was approximately -- we -- we had a
4    grant -- he had a grant. So I think it was about
5    13,000 a year. And we took -- took a loan. So for --
6    I think it was -- it -- it was probably about 25,000
7    at that point.
8    Q. Where did you get the loan?
9    A. Through the college -- through Skid -- his
10   college. It was a private loan.
11   Q. And did you take out the loan or did Ivor?
12   A. I took out the loan -- or we did it together.
13   Q. All right. So you had the $25,000 loan from
14   the college, 20- to 35,000 in credit card debt, and
15   the mortgage?
16   A. I think that's right.
17   Q. Any other debt?
18   A. I don't think so.
19   Q. Did -- did you have discussions with
20   Mr. Shearer about finances and what you were going to
21   do about this debt?
22   A. I don't -- we -- I don't think so. I think
23   it was -- I mean, this is a "yes" and a "no." It
24   was -- we knew that there was a mounting debt, but we
25   also didn't know what to do about it at that point and

332

1    we kept going.
2    Q. And I'm assuming that debt would only
3    continue to mount in terms of his -- the caregiver
4    responsibilities?
5    A. That's correct.
6    Q. Were you receiving any calls from creditors
7    on these credit calls -- credit cards?
8    A. Not that I recall.
9    Q. After his death or -- since his death,
10   have you been able to pay down that credit card debt?
11   A. Yes, I have.
12   Q. And did you just do that by paying on each
13   credit card, or did you combine them through a
14   service?
15   A. I worked with my bank and my accountant to --
16   to get that debt down.
17   Q. Did you and Mr. Shearer ever consider
18   claiming bankruptcy?
19   A. At one point, we did.
20   Q. You did claim bankruptcy?
21   A. No. I'm sorry. At one point we considered
22   it.
23   Q. When was that?
24   A. I don't remember.
25   Q. Do you know when it was in the context of his

21 (Pages 329 to 332)