**EXHIBIT GG**

Page 1

```
 1                                    PAGES 1 - 44
 2                                    EXH.  1
 3              UNITED STATES DISTRICT COURT
 4            FOR THE DISTRICT OF MASSACHUSETTS
 5
 6                    MDL Docket No. 1629
                      Master File No. 04-10981
 7                    Judge Patti B. Saris
                      Magistrate Judge Leo T. Sorokin
 8
 9    * * * * * * * * * * * * * * * * * * *
      In Re:                             *
10                                       *
      Neurontin Marketing, Sales Practices *
11    and Products Liability Litigation  *
                                         *
12    - - - - - - - - - - - - - - - - - -
      THIS DOCUMENT RELATES TO:          *
13                                       *
      Shearer v. Pfizer Inc., et al.     *
14    Case No. 1:07-cv-11428-PBS         *
                                         *
15    * * * * * * * * * * * * * * * * * * *
16
17         Video Deposition of Edward A. Epping
18              Wednesday, October 28, 2009
19                   The Orchards Hotel
20                    222 Adams Road
21            Williamstown, Massachusetts 01267
22
23
          ----------- J. Edward Varallo, RMR, CRR  ----------
24            Registered Professional Reporter
```

Page 2

Counsel for the Shearer family and Edward Epping:
   Kenneth S. Soh, Esq.
   The Lanier Law Firm
   6810 F.M. 1960 West
   Houston, Texas 77069
   713.659.5200 ~ Fax 713.659.2204
   kss@lanierlawfirm.com

Counsel for Pfizer Inc.:
   William S. Ohlemeyer, Esq.
   Daniel E. Holloway, Esq.
   Boies Schiller & Flexner LLP
   333 Main Street
   Armonk, New York 10504
   914.749.8200 ~ Fax 914.749.8300
   wohlemeyer@bsfllp.com
   dholloway@bsfllp.com

Videographer:
   Sean McDonald, CLVS, Videographer
   Veritext

Page 3

INDEX

DEPONENT                                   PAGE

Edward A. Epping
  by Mr. Ohlemeyer............................ 5

EPPING EXHIBITS    FOR IDENTIFICATION    PAGE

1  Letter dated July 15, 1994, from Ed Epping  25
   to Al Goethals, Provost, Williams College

   (ORIGINAL EXHIBIT RETURNED TO ATTORNEY OHLEMEYER)

   COUNSEL'S DIRECTION TO DEPONENT NOT TO ANSWER

   At page 33, line 20

Page 4

PROCEEDINGS
2:07 p.m.

        THE VIDEOGRAPHER: My name is Sean
McDonald of Veritext New Jersey.
        Today is October 28, 2009, and the time is
2:07 p.m.
        This deposition is being held at The
Orchards Hotel located at 222 Adams Road,
Williamstown, Massachusetts. The caption of this
case is Neurontin Marketing, Sales Practices and
Products Liability Litigation versus Pfizer,
Incorporated pending in the United States District
Court for the District of Massachusetts, Master File
Number 04-10981.
        The name of the witness is Ed Epping.
        At this time the attorneys will identify
themselves and the parties they represent; after
which our court reporter, Ed Varallo of Veritext New
Jersey, will swear in the witness and we can
proceed.
        MR. OHLEMEYER: My name is Bill Ohlemeyer.
I represent the Pfizer defendants.

Page 5

        MR. HOLLOWAY: Dan Holloway, Boies
Schiller & Flexner, for the defendants.
        MR. SOH: Ken Soh for the plaintiffs and
the witness.
        EDWARD A. EPPING,
  having been first duly sworn on oath,
  was examined and testified as follows:
        EXAMINATION
BY MR. OHLEMEYER:
   Q.  Good afternoon, Mr. Epping. Tell us where
you live.
   A.  1097 Main Street, Williamstown,
Massachusetts.
   Q.  And how long have you lived there?
   A.  At that particular residence? Fifteen
years.
   Q.  And how long have you lived in
Williamstown?
   A.  Thirty-two years.
   Q.  And what do you do here?
   A.  I teach art, studio art at Williams
College.
   Q.  And tell me briefly what that involves.
What is studio art?

2 (Pages 2 to 5)

Page 18

1  A. Fourteen, yeah, twelve years.
2  Q. Saw him on a regular basis during that
3  time?
4  A. More frequently as we came to know them.
5  And you have to extract two years from that because
6  we were living in Chicago in 1999 through 2001.
7  Q. When did you learn about Mr. Shearer's
8  stroke?
9  A. Within days of its happening.
10 Q. And how did you learn about it?
11 A. That I do not remember.
12 Q. Were you in Chicago at the time --
13 A. No.
14 Q. -- or in Williamstown?
15 A. Williamstown.
16     MR. SOH: And you guys are talking over
17 each other a bit, so if you could wait for him to
18 finish his question before you start your answer.
19 I'm doing the court reporter here a favor.
20     THE WITNESS: Mm-hmm, gotcha.
21 BY MR. OHLEMEYER:
22 Q. How did the stroke affect Mr. Shearer?
23 A. Physically it incapacitated the left side
24 of his body and the recuperation was directed at

Page 19

1  recuperating that left side.
2  Q. And did you ever discuss with Mr. Shearer
3  his prognosis or the prospects for recuperation?
4  A. Yes.
5  Q. And what did he tell you about that?
6  A. It was going to be a tough slog.
7  Q. Did there ever come a time where he
8  suggested to you that he might -- Well, strike that.
9  Did he ever become less optimistic, if that's a fair
10 characterization of his attitude about it, about his
11 recuperation?
12 A. No.
13 Q. Well, you're smiling. Why do you say
14 that?
15 A. Hartley maintained even with the stroke
16 the same kind of physical discipline and mental
17 discipline that he had prior to the stroke, and so
18 to admit that something was not going to happen was
19 not in the realm of his possibility.
20 Q. But in terms of physical limitations, he
21 couldn't do the same things, physical discipline, he
22 couldn't do the same things he used to do, could he?
23 A. Correct.
24 Q. But you're telling me that mentally he was

Page 20

1  very determined to improve?
2  A. And did.
3  Q. Did there come a point in time where that
4  improvement plateau'd or regressed?
5  A. Plateau'd?
6  Q. Correct.
7  A. Yes.
8  Q. And when and how?
9  A. Don't remember exact time on that. How?
10 Seeing that the left hand was never going to be
11 totally recuperated.
12 Q. And did he discuss his feelings about that
13 with you?
14 A. No.
15 Q. Did you observe any changes in his
16 attitude at that point in time?
17 A. No.
18 Q. How much could Mr. Shearer do for himself
19 after the stroke?
20 A. Time frame?
21 Q. Well, you know, immediately after, working
22 our way forward; I mean, if it changed.
23 A. It changed dramatically from immediately
24 after to right up to the point where he died.

Page 21

1  Q. Did you ever meet a man by the name of
2  Sean Wheeler?
3  A. No, I did not.
4  Q. Do you know who Sean Wheeler is?
5  A. I believe I do, yes.
6  Q. And what is your understanding of who
7  Mr. Wheeler is in relationship to Mr. Shearer?
8  A. That he worked with Hartley.
9  Q. In what way?
10 A. I think as an ongoing kind of physical
11 assist, you know, to help Hartley get to places
12 where he needed to go, do the things that he could
13 not do by himself.
14 Q. So notwithstanding his determination and
15 his efforts to recuperate he still needed help and
16 physical assistance up until the time of his death?
17 A. Yes.
18 Q. Prior to his stroke, Mr. Epping, was
19 Mr. Shearer a runner, do you know?
20 A. That I do not know.
21 Q. Do you know whether he played hockey?
22 A. Yes.
23 Q. Would you describe him as a casual hockey
24 player, a frequent hockey player, an avid hockey

Page 22

1  player?
2   A.  Frequent.
3   Q.  And am I correct that after the stroke he
4  was not able to play hockey?
5   A.  Correct.
6   Q.  Do you know whether Mr. Shearer swam for
7  exercise prior to the stroke?
8   A.  That I do not.
9   Q.  Do you know whether he swam as part of his
10 physical therapy or exercise after the stroke?
11  A.  If so, occasional.
12  Q.  Do you know of any other physical problems
13 Mr. Shearer had suffered from besides the stroke?
14  A.  No.
15  Q.  Did he ever talk to you about medical
16 conditions or medical problems he had?
17  A.  No.
18  Q.  What do you know about any artistic work
19 Mr. Shearer did after the stroke?
20  A.  He worked on a video project that was an
21 analytical piece that focused on and primarily dealt
22 with kind of current French thinking, philosophy,
23 and its shaping influence on current art,
24 contemporary art.

Page 23

1   Q.  Did he exhibit that?  Is that the right
2  word?
3   A.  Yeah, it's the right word.  I'm not sure
4  if it was ever meant to be exhibited.
5   Q.  Do you know when it was completed?
6   A.  Hmmm.  Sorry.  No, I don't remember the
7  exact date.
8   Q.  Was Mr. Shearer able to get out of bed by
9  himself after his stroke?
10  A.  Time frame?
11  Q.  Well, within a year or two after the
12 stroke.
13  A.  Yes.
14  Q.  Did he get dressed by himself?
15  A.  Yes.
16  Q.  Did he shower and bathe by himself?
17  A.  Yes, if we're still talking time frame.
18  Q.  How do you know that?
19  A.  Because of talking.
20  Q.  So he would tell you what his limitations
21 were and what they weren't?
22  A.  Not every conversation.
23  Q.  Could he drive after the stroke?
24  A.  No.

Page 24

1   Q.  Do you know what sort of income
2  Mr. Shearer was generating after his stroke?
3   A.  No idea at all.
4   Q.  Did he have a regular position at the
5  university after his stroke?
6   A.  I don't believe after.
7   Q.  Did he have one before the stroke?
8   A.  Yes.
9   Q.  What position was that?
10  A.  Lecturer in art.
11  Q.  And did you help Mr. Shearer obtain that
12 position?
13  A.  Yes.
14  Q.  How did you help?
15  A.  As a means of retaining Linda to stay on
16 as the director.
17  Q.  You'll have to explain that for me.
18  A.  Okay.  Small town, not much to do for
19 partners and spouses of people working for the
20 college.  Very often the college loses really good
21 people because there's not enough for the partner to
22 do here.  And this was a way for me to sort of --
23 This was a way for me to intercede and to help make
24 that retention possible.

Page 25

1       MR. OHLEMEYER:  Let me ask the court
2  reporter to mark this as Exhibit Number 1 for this
3  deposition.
4       (Epping Deposition Exhibit 1 marked for
5  identification.)
6  BY MR. OHLEMEYER:
7   Q.  Mr. Epping, let me hand you what we've
8  marked as Epping Number 1 and ask you if you can
9  identify that for me.
10  A.  Mm-hmm.  (Pause) Yes, I wrote that
11 letter.
12  Q.  And was this letter written in connection
13 with the discussion we just had about trying to get
14 Mr. Shearer a position at the --
15  A.  Yes.
16  Q.  There's a line on the second page that I
17 want to ask you about; and I'm just curious.  It
18 says "Everyone needs to have a reason to get out of
19 bed each day."  Do you remember writing that?
20  A.  Yes.
21  Q.  Explain to me what you meant by that.
22  A.  I grew up in the Midwest and that's a
23 fairly common phrase for describing the need to have
24 a reason for doing what you do.

Veritext Corporate Services
800-567-8658                                          973-410-4040