# EXHIBIT II

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
 2   -------------------------------x
     IN RE:  NEURONTIN MARKETING,    MDL DOCKET
 3           SALES PRACTICES AND     NO. 1629
             PRODUCTS LIABILITY      MASTER FILE
 4           LITIGATION,             NO. 04-10981
 5   _____x
 6   THIS DOCUMENT RELATES TO:       JUDGE PATTI B.
                                     SARIS, MAGISTRATE
 7   SHEARER VS. PFIZER, ET AL;      JUDGE LEO T.
        -CV-11428-PBS,               SOROKIN
 8
                 Defendant.
 9   -------------------------------x
10
11          DEPOSITION OF ANNE HUDSON ANGEVINE
12
          The deposition of Anne Hudson Angevine was
13
     taken on November 17, 2009, at Hyatt Regency
14
     Greenwich, 1800 East Putnam Avenue, Old Greenwich,
15
     Connecticut, before Susan Wandzilak, Registered
16
     Professional Reporter and Notary Public in the
17
     State of Connecticut.
18
19
20
21          Susan Wandzilak   License No. 377
22
23
24
25   Job No. 225429
```

Page 2

```
 1  APPEARANCES
 2  KENNETH B. FROMSON, ESQUIRE
    SHAREEF RABAA, ESQUIRE
 3  SHARON SCANLAN, ESQUIRE
       Finkelstein & Partners
 4     1279 Route 300
       Post Office Box 1111
 5     Newburgh, New York 12551
       800-634-1212 Phone
 6     845-562-3492 Fax
       kfromson@lawampm.com
 7
           Attorney for Plaintiffs
 8
    CATHERINE B. STEVENS, ESQUIRE
 9    Skadden, Arps, Slate, Meagher & Flom, LLP
       Four Times Square
10     New York, New York 10036
       212-735-3353 Phone
11     917-777-3353 Fax
       Catherine.Stevens@skadden.com
12
           Attorney for Defendant Pfizer
13
    RICHARD M. BARNES, ESQUIRE
14     Goodell, DeVries, Leech & Dann, LLP
       One South Street
15     20th Floor
       Baltimore, Maryland 21202
16     410-783-4004 Phone
       410-783-4040 Fax
17     rmb@gdldlaw.com
18         Attorney for Defendant Pfizer
19  Also Present: Samuel Krumholz
               Emily Ardolino
20
21
22
23
24
25
```

Page 4

```
 1
 2                    INDEX
 3
    TESTIMONY OF ANNE HUDSON ANGEVINE
 4
      Direct Examination by Mr. Barnes     5
 5
      Cross Examination by Mr. Fromson    96
 6
 7
 8
 9  CERTIFICATE OF REPORTER              123
10
11
12
13           EXHIBITS
14  Angevine Exhibit No. 1         Premarked
    Angevine Exhibit No. 2             8
15  Angevine Exhibit No. 3             8
    Angevine Exhibit No. 4             8
16  Angevine Exhibit No. 5            11
    Angevine Exhibit No. 6            12
17  Angevine Exhibit No. 7            31
    Angevine Exhibit No. 8            96
18  Angevine Exhibit No. 9            99
    Angevine Exhibit No. 10          102
19
20
21
22
23
24
25
```

Page 3

```
 1            STIPULATIONS
 2        IT IS HEREBY STIPULATED AND AGREED by
 3  and between counsel representing the parties that
 4  each party reserves the right to make specific
 5  objections at the trial of the case to each and
 6  every question asked and of answers given
 7  thereto by the deponent, reserving the right to
 8  move to strike out where applicable, except as to
 9  such objections as are directed to the form of
10  the question.
11        IT IS HEREBY STIPULATED AND AGREED by
12  and between counsel representing the respective
13  parties that proof of the official authority of
14  the Notary Public before whom this deposition is
15  taken is waived.
16        IT IS FURTHER STIPULATED AND AGREED by
17  and between counsel representing the respective
18  parties that the reading and signing of the
19  deposition by the deponent is not waived.
20        IT IS FURTHER STIPULATED AND AGREED by
21  and between counsel representing parties that all
22  defects, if any, as to the notice of the taking
23  of the deposition are waived.
24        Filing of the Notice of Deposition with
25  the original transcript is waived.
```

Page 5

```
 1              ANNE HUDSON ANGEVINE,
 2  having been first duly sworn, testified as
 3  follows:
 4         THE COURT REPORTER: What is your full name
 5  and address for the record?
 6         THE WITNESS: Anne Hudson Angevine, 14 West
 7  Way, Bronxville, New York 10708.
 8              DIRECT EXAMINATION
 9  BY MR. BARNES:
10     Q.  Good morning, Dr. Angevine. My name is Rick
11  Barnes. I represent Pfizer in this case. And you
12  have been subpoenaed to appear for a deposition this
13  morning. Do you understand that?
14     A.  Yes.
15     Q.  Have you ever been deposed before?
16     A.  No.
17     Q.  This is going to be an enjoyable morning,
18  okay?
19     A.  I hope so.
20     Q.  Okay, there are two notices. One is the
21  notice from Pfizer and the other notice is from the
22  plaintiff's counsel. In this case on behalf of the
23  Shearer family, are you aware of that?
24     A.  Yes.
25     Q.  I am going to hand you what has been marked
```

Page 14

1  interaction with sort of pharmaceutical
2  representatives related to -- I believe related to
3  Neurontin.
4      And my reply to him was that in my training
5  programs at the Brigham and Women's and other
6  institutions where I've worked that interactions of
7  pharmaceutical representatives and house staff members
8  was prohibited. That is the extent of what I recall
9  from that conversation.
10 Q. That's fine. Thank you. So let me just work
11 my way back through this if I can, all right?
12 A. Sure.
13 Q. Did -- prior to your conversation with
14 Dr. Egilman, did you have -- were you aware of whether
15 or not Pfizer had been implicated with regard to
16 violation of regulations and laws pertaining to
17 off-label marketing of medicine?
18 A. No, I was not.
19 Q. And prior to October of 2000, is it correct
20 to say you had no personal experience with Pfizer
21 pharmaceutical representatives of any kind; is that
22 correct?
23     MR. FROMSON: Objection to form.
24     THE WITNESS: That is correct.
25 BY MR. BARNES:

Page 15

1  Q. Let me ask you this. What, if any, contact
2  did you have with pharmaceutical representatives from
3  Pfizer prior to October of 2000 and -- prior to
4  October of 2000?
5  A. None.
6  Q. Had you ever received any information
7  concerning Neurontin prior to October 14 of 2000 from
8  any source?
9  A. In pharmacology class in medical school I
10 would have learned about the use -- the, you know, the
11 medication Gabapentin and its pharmacology.
12 Q. In the ordinary course of your training as a
13 physician.
14 A. Exactly.
15 Q. And did you recall receiving any information
16 from the attending staff at Brigham and Women's
17 Hospital concerning the use of Neurontin for the
18 treatment of any conditions?
19 A. Yes.
20 Q. Okay. And did you personally prescribe
21 Neurontin in October of 2000 during your training at
22 Brigham and Women's Hospital?
23 A. Yes, although I didn't see the order sheets
24 in that particular stack of papers, but I am assuming
25 that I ordered the medication.

Page 16

1  Q. So you either would renew it --
2  A. Oh, I know why. Because it was all done by
3  computer.
4  Q. Yeah, I think you can help explain that to me
5  then. That would be fine.
6  A. Okay.
7  Q. I may mark a few other pages on a break, but
8  that would help me. Thank you very much for that.
9  A. Sure.
10 Q. Let me go through your c.v. and we will work
11 our way back, but one other question in the materials
12 in Exhibit No. 6. Was that information relevant to
13 you in any way with regard to your care and treatment
14 of Mr. Shearer in 2000?
15 A. Which information? I am sorry.
16 Q. Right here, in this, the packet of
17 information Dr. Egilman sent to you.
18 A. Can you clarify what you mean by relevant?
19 Q. Well, in other words, does it have anything
20 to do in your mind with the case, your care of Hartley
21 Shearer?
22 A. Not in my recollection of the details of the
23 case based on the document, you know, the records that
24 you provided me for review today.
25 Q. Okay. And other than reading the abstract of

Page 17

1  the article in the Annals of Internal Medicine, did
2  you read any of this other material?
3  A. No, I did not.
4  Q. Okay. Did you have any reaction to the
5  receipt of these documents in the mail from
6  Dr. Egilman as to why would someone be sending you a
7  group of documents out of the blue?
8      MR. FROMSON: Objection. Form.
9      THE WITNESS: You -- yes, I had that exact
10 reaction. That had not happened to me
11 previously, so --
12 BY MR. BARNES:
13 Q. What was your reaction?
14 A. I was uncertain as to how to -- what to do
15 with that information and why I was being specifically
16 mailed that information.
17 Q. Did you ask Dr. Egilman why he sent that
18 material to you?
19 A. I don't remember if I asked him that specific
20 question.
21 Q. Um-uh. What was your -- based upon your
22 conversation with Dr. Egilman, did you come to an
23 understanding as to why he sent those documents to
24 you?
25 A. Yes, yes.

### Page 22

1   A. Yes.
2   Q. Do you prescribe pain medications off-label
3   for your cancer patients?
4   A. Not to my knowledge.
5   Q. What medicines do you prescribe to your
6   patients for the alleviation -- to alleviate pain in
7   association with cancer?
8   A. The most frequent medications I prescribe are
9   narcotics.
10   Q. Do you prescribe any other medicines, pain
11   medicines to help patients deal with cancer?
12   A. Occasionally, I have prescribed Neurontin,
13   NSAIDs such as Ibuprofen or Motrin. That's it.
14   Q. Okay. And have you ever prescribed tricyclic
15   antidepressants for the treatment of pain in your
16   practice?
17   A. Infrequently, but yes.
18   Q. Would it be fair to say that your use of
19   tricyclic antidepressant and anti-epileptic drugs such
20   as Neurontin for the treatment of cancer pain would be
21   off-label uses of those drugs? If you know.
22   A. Well, I didn't previously know that
23   Neurontin -- that treatment of pain was considered an
24   off-label use of Neurontin.
25       But based on this information I do now know

### Page 23

1   that that is considered an off-label use. So the
2   answer to your question would be yes. I don't know
3   about the tricyclic antidepressants.
4   Q. Okay, so in your decision to treat some of
5   your patients who are suffering from cancer pain with
6   Neurontin, what did you base your decision on in
7   selecting Neurontin to treat their pain?
8   A. Some therapeutic agents can cause what is
9   called a peripheral neuropathy, which is characterized
10   by burning pain in the extremities. And that is the
11   indication for which I sometimes try Neurontin.
12   Q. Has it been effective to help your patients
13   who are suffering from peripheral neuropathies from
14   chemotherapeutic agents?
15       MR. FROMSON: Objection.
16       THE WITNESS: For some patients.
17   BY MR. BARNES:
18   Q. For some patients?
19   A. But not all.
20   Q. Do you have enough confidence in the
21   selection of Neurontin that it's worth trying to help
22   your patients deal with peripheral neuropathies due to
23   chemotherapeutic agents?
24       MR. FROMSON: Objection.
25       THE WITNESS: Yes.

### Page 24

1   BY MR. BARNES:
2   Q. What was it that led you to prescribe -- to
3   decide that Neurontin may be of use to you in treating
4   the pain associated or the complications associated
5   with chemotherapeutic agents, specifically peripheral
6   neuropathies? How did you come to that conclusion?
7   A. I would say that probably based on my
8   training in internal medicine that it was part of the
9   teaching, part of the clinical teaching in my training
10   that one option for treatment of peripheral neuropathy
11   is Gabapentin and another option would be something
12   like Elavil.
13   Q. Have you used both Gabapentin and Elavil to
14   treat peripheral neuropathies that are caused by
15   chemotherapeutic agents?
16   A. Yes.
17   Q. And how would you decide to use Neurontin or
18   Gabapentin as opposed to Elavil for a particular
19   patient? What's the decision process?
20   A. For me, honestly, Gabapentin is three times a
21   day. And it depends to some degree on whether or not
22   I think that the patient has the sort of wherewithal
23   to be compliant with that regimen.
24       It also is recommended to titrate the
25   medicine gradually, which is complicated for some

### Page 25

1   people. So Elavil in contrast is once a day. And so
2   it kind of depends to some extent on whether or not I
3   think the patient can, can do the Gabapentin titration
4   and be compliant with that.
5   Q. So you look at the patient and determine for
6   yourself whether or not it's -- one or the other is
7   better suited for the particular needs of a particular
8   patient?
9       MR. FROMSON: Objection. Form.
10       THE WITNESS: Right.
11   BY MR. BARNES:
12   Q. In terms of efficacy for the treatment of
13   peripheral neuropathies, how do you find Gabapentin?
14       MR. FROMSON: Objection. Lack of
15   foundation.
16       THE WITNESS: Variable.
17   BY MR. BARNES:
18   Q. How about Elavil?
19   A. Variable.
20   Q. Is it uncommon in treating cancer pain to
21   have a variable response to the medications?
22       MR. FROMSON: Objection. Form.
23       THE WITNESS: Yes. Is it uncommon?
24   BY MR. BARNES:
25   Q. Yes. Let me ask you another question. In

Page 30

1   Medicine, Columbia University College of
2   Physicians and Surgeons.
3   BY MR. BARNES:
4       Q.  Very good.  Thank you.  I am going to circle
5   back to your years as an intern.  Was part of your
6   responsibility at the Brigham and Women's Hospital as
7   an intern to monitor the use of medications?
8       A.  Yes.
9       Q.  Did you actually prescribe medications while
10  you were on the floor?
11      A.  Yes.
12      Q.  And did you take people -- patients off of
13  medicines when you felt necessary?
14      A.  Yes.
15      Q.  Even as a first-year doctor, you had the
16  responsibility for managing medications on the floor?
17      A.  Yes.
18      Q.  Okay.  And did you -- who did you -- how were
19  you assigned your work during your -- the reason I am
20  focusing on 2000 is that's the year that Mr. Hartley
21  was under your care.  So how were you assigned your
22  workload at that time?
23      A.  Patients would be assigned to me according to
24  the days that I was on call for admissions and
25  generally arrived to the hospital through the

Page 31

1   emergency room or as a direct transfer from an outside
2   hospital.
3       Q.  Okay, let's do this.  I am going to hand you
4   what has been marked as Exhibit -- what will be marked
5   as Exhibit No. 7.
6           MR. FROMSON:  For the record, why don't you
7       read the first Bates number and the last Bates
8       number.
9           (Whereupon, Angevine Exhibit No. 7 was marked
10      for identification.)
11          MR. BARNES:  Yes, thank you.  What we have
12      done is we have marked as Exhibit No. 7 a portion
13      of the medical records pertaining to Mr. Shearer
14      from the Brigham and Women's Hospital.
15          There was a prior admission.  This pertains
16      to the admission from October of 2000.  And the
17      Bates number ranges are 000374-37(b) WH-00205
18      through 00426, okay?
19  BY MR. BARNES:
20      Q.  And, Dr. Angevine, prior to this morning, you
21  had an opportunity to review these records?
22      A.  No.
23      Q.  Do you have any independent recollection of
24  Mr. Shearer?
25      A.  No.

Page 32

1       Q.  Do you have any independent recollection of
2   Mrs. Shearer?
3       A.  No.
4       Q.  Did your brief opportunity to review the
5   medical records this morning refresh your
6   recollection?
7       A.  Yes.
8       Q.  So you now have a recollection of some of
9   these events?  Well, just tell me you what recall.
10  Let me just do that.
11      A.  I recall what is outlined in the chart,
12  basically.
13      Q.  So this is consistent with your
14  recollection?
15      A.  Yes, well, but I don't remember, like the
16  physical patient.  But I -- I am relying on the
17  records as a document of the patient's
18  hospitalization.
19      Q.  Sure, sure.
20      A.  It's hard to separate out what you remember
21  and what you are just reading.  So I don't know.
22      Q.  Right.  It kind of refreshes your
23  recollection?
24      A.  Right.
25      Q.  Yeah, that's fine.  So I am going to hand

Page 33

1   these to you, all right?  And what I tried to do in
2   the brief time is mark some pages for you to look at.
3   And I apologize.  I didn't put them out separately
4   this morning.
5           I want to ask some general questions about
6   the process of admitting a patient.  When a patient
7   comes into Brigham and Women's Hospital, what is the
8   role of the admitting intern?
9       A.  To perform what is called a history and
10  physical, which means collecting the patient's medical
11  history and the reason that they are being admitted to
12  the hospital, as well as their past medical problems,
13  their current medications, their allergies, any
14  relevant social or family history, and to summarize
15  that information along with laboratory testing to
16  develop a plan of care.
17      Q.  And when you do that, are you working under
18  the supervision of an attending or do you do that on
19  your own authority as an intern?
20      A.  That's done under the supervision of a
21  resident and an attending.
22      Q.  Okay.  So looking at -- would you turn to
23  page 401.  And maybe what I can do is take out the
24  binder clip.  And it's toward the end here.  So I
25  think I have got it there for you, okay?

Page 46

1  Q. Just read briefly the notes three, four,
2  five, and six with regard to your plan.
3  A. Oh, starting here, you mean? (Indicating.)
4  Q. Right under pain.
5  A. Oh, okay. Number three, FEN, which stands
6  for fluids, electrolytes, and nutrition. He was
7  dehydrated. The plan was to administer gentle
8  intravenous hydration.
9      Number four, cardiovascular. The plan was to
10 continue cardiac medications from the outside hospital
11 except withholding Coumadin, given the risk of
12 hemorraghic transformation of embolic stroke in the
13 setting of endocarditis. A cardiac monitor and daily
14 electrocardiogram.
15     Number five, infectious disease. The plan
16 was to continue penicillin and Gentamicin for
17 endocarditis and to follow up the minimal inhibitory
18 concentrations from the outside hospital. Daily blood
19 cultures.
20     And number six says psych, continue Prozac.
21 Q. Now, is that your signature on page 403?
22 A. Yes.
23 Q. And that was your maiden name, correct?
24 A. Yes.
25 Q. Now, would you turn back to page 393 -- I am

Page 47

1  sorry, 394.
2  A. Um-uh.
3  Q. This is a document called patient health
4  history, correct?
5  A. Yes.
6  Q. What is the purpose of a patient health
7  history at Brigham and Women's Hospital?
8  A. This appears to be a form filled out by the
9  nurse.
10 Q. And when is it filled out in terms of the
11 admitting process in October of 2000?
12 A. The form states that the patient health
13 history form is used whenever a patient is being
14 admitted to the hospital.
15 Q. So is this at the time of your admission note
16 or subsequent or don't you know?
17 A. I don't know.
18 Q. Okay. Did you have -- would you have an
19 opportunity to review this prior to seeing Mr. Shearer
20 in the ordinary course of your practice at Brigham and
21 Women's Hospital?
22 A. I don't know.
23 Q. Okay. Take a look at the note number 2 on
24 the first page.
25 A. Um-uh.

Page 48

1  Q. Basically, this is in response to a question
2  that, Can you tell me why you were seeking help at
3  Brigham and Women's Hospital? Include what the
4  patient states caused the situation to occur and what
5  will improve the situation.
6     What was the response to that question as
7  indicated by the patient health history?
8  A. Here for pain control starting September 17.
9  Also needs mitral valve evaluated.
10 Q. Going to the next page, would you read the
11 line under physical assessment.
12 A. Skin warm and dry. Color within patient's
13 norm. Skin intact. No rash, petechiae, or
14 ecchymosis.
15 Q. Is there any indication there as to whether
16 or not that question was answered yes or no?
17 A. If no, specify. There is a written statement
18 that says unable to assess. Patient unable to tear?
19 I am not sure exactly what that word says. Patient
20 feels on edge of breakdown.
21 Q. Now, in terms of your admitting note, which
22 was on October 14, 2000, did you get the sense that
23 from reading the note that you wrote that Mr. Shearer
24 was on the edge of breakdown?
25 A. No, not based on my documentation.

Page 49

1  Q. Okay. There is a note going down about the
2  -- let me ask you this. In terms of patient feels on
3  the edge of breakdown, is that something that the
4  patient would have communicated to the nurse upon
5  arrival at the hospital and she documented it on the
6  form?
7  A. It appears so.
8  Q. Okay, when you were going through the level
9  of pain, if you go down to the pain score --
10 A. Um-uh.
11 Q. Do you see where I am?
12 A. Yes.
13 Q. Okay, what is a 7 out of 10 for pain?
14 A. Usually a pain scale is from 0 to 10, 0
15 meaning no pain, 10 being the worst pain a patient
16 being imagine. So 7 out of 10 would be in the higher
17 range of the patient's imaginable pain.
18 Q. Okay. Now, how does he describe the pain?
19     MR. FROMSON: Objection. Form.
20 BY MR. BARNES:
21 Q. You may answer. How is the pain described on
22 Bates number 395?
23 A. It is written that the pain was in the middle
24 of the back to lower back. 10 while talking, 10- to
25 15-minute episodes back and forth lasting 10 seconds.

13 (Pages 46 to 49)

### Page 106

1  Q. What do you call the names of supervising
2  physicians in terms of you being an intern? They were
3  considered what? Fellows or attendings or something
4  else?
5  A. Attending physicians.
6  Q. All right. Do you recall a physician then in
7  the 2000 time period named Edgar Ross?
8  A. No.
9  Q. With respect to the attending physicians that
10  would be from whom you would be learning about the
11  uses of Neurontin, can you give us the names of any of
12  them that you recall?
13  MR. BARNES: Objection. Don't speculate.
14  BY MR. FROMSON:
15  Q. By the way, I don't want you to ever
16  speculate today. I don't want you to ever guess
17  today. Nor did Mr. Barnes in any of his questions.
18  Let me re-ask the question again. Let me establish
19  the foundation.
20  Number one. It's true you learned the uses
21  of Neurontin through speaking with attending
22  physicians? Is that fair?
23  A. Correct.
24  Q. Through which attending physicians did you
25  learn about the uses of Neurontin back in the 2000

### Page 107

1  time period?
2  A. I can't remember the specific names of any
3  attending physicians who may have given me teaching
4  about the uses of Neurontin.
5  Q. You had indicated that you learned about
6  Neurontin's pharmacology in school. Do you recall
7  generally testifying to that earlier today?
8  A. Yes.
9  Q. When you referenced school, did you mean
10  Columbia medical school?
11  A. In medical school.
12  Q. Did you have a professor named Martha -- do
13  you recall a physician named Martha Morrell?
14  A. No.
15  Q. Okay. That makes that line of questioning
16  much shorter. In terms of the pharmacology of
17  Neurontin back in 2000, had you ever received any
18  information from the defendants in this case that the
19  pharmacology of the drug could contribute to mood and
20  behavioral disturbances?
21  MR. BARNES: Objection.
22  THE WITNESS: No.
23  BY MR. FROMSON:
24  Q. By the way, when you were prescribing --
25  withdrawn.

### Page 108

1  When you were prescribing Neurontin to
2  Mr. Shearer, were you deferring to the pain service
3  physicians' prescription of Neurontin?
4  MR. BARNES: Objection.
5  THE WITNESS: What do you mean by deferring
6  to?
7  BY MR. FROMSON:
8  Q. Well, my understanding is that you had a
9  request for a consult, both a neurological consult and
10  a pain consult. Is that accurate?
11  A. Yes.
12  Q. And so the pain service physicians made
13  recommendations for what pain management should be
14  done to control Mr. Shearer's pain. Is that fair?
15  MR. BARNES: Objection.
16  THE WITNESS: Yes.
17  BY MR. FROMSON:
18  Q. And is it fair to say that the pain regimen
19  included Neurontin?
20  A. Yes.
21  Q. So was the decision to prescribe Neurontin to
22  Mr. Shearer a decision made by the pain management
23  physician initially?
24  MR. BARNES: Objection.
25  THE WITNESS: Yes.

### Page 109

1  BY MR. FROMSON:
2  Q. And did you consider the risks and benefits
3  of Neurontin when you prescribed Neurontin to
4  Mr. Shearer or did you continue what had previously
5  been prescribed by the pain management physician?
6  MR. BARNES: Objection. You may answer.
7  THE WITNESS: I guess I would say that I was
8  -- my prescription was following the
9  recommendation of the pain service.
10  BY MR. FROMSON:
11  Q. Good enough.
12  MR. BARNES: Did you finish your answer?
13  THE WITNESS: Yes.
14  BY MR. FROMSON:
15  Q. Notwithstanding that your recommendation or
16  prescription was following the recommendation, did you
17  yourself consider the risks and benefits of Neurontin
18  before prescribing Neurontin to Mr. Shearer?
19  A. I don't have any specific recollection.
20  However, it would be customary for me to do so.
21  Q. And if you had known back in 2000 that
22  Neurontin was associated with suicidality, would you
23  have informed Mr. Shearer of that fact?
24  MR. BARNES: Objection. You may answer.
25  THE WITNESS: Maybe.

Page 110

1  BY MR. FROMSON:
2  Q. Okay, let me ask you this. Back in 2000,
3  were you familiar with the package insert for
4  Neurontin?
5  A. I don't know.
6  Q. Was it your custom and practice to be
7  familiar with the drugs in terms of their package
8  inserts before prescribing them to a patient?
9     MR. BARNES: Objection. You may answer, if
10    you know.
11    THE WITNESS: No.
12 BY MR. FROMSON:
13 Q. What was your custom and practice during the
14 time period of 2000 to learn about the drugs you were
15 prescribing?
16 A. To review any potential drug interactions and
17 major side effects, usually based upon consultation
18 with the PDR, Physician's Desk Reference.
19 Q. Okay, so back in 2000 and before, and
20 specifically before you prescribed Neurontin to
21 Mr. Shearer, were you generally familiar with the
22 Physician's Desk Reference for Neurontin?
23    MR. BARNES: Objection. Asked and answered.
24    If you recall.
25    THE WITNESS: With specific regard to

Page 111

1 Neurontin, I don't know, but in general, yes.
2 BY MR. FROMSON:
3 Q. Did you have a custom and practice to review
4 the Physician's Desk Reference in each calendar year
5 it was published to be up to date on the drugs you
6 were prescribing?
7 A. No.
8 Q. So with respect to Neurontin back in 2000,
9 okay, I would ask you to consider a hypothetical.
10 Assuming that you did review the Physician's Desk
11 Reference for Neurontin before you prescribed it to
12 Mr. Shearer -- and I don't mean immediately before,
13 but if you had read the Physician's Desk Reference
14 before prescribing Neurontin to Mr. Shearer and if the
15 Physician's Desk Reference had said that patients,
16 their families, and caregivers should be informed
17 about an association with suicidality, then would you
18 have informed Mr. Shearer about Neurontin and
19 suicidality?
20    MR. BARNES: Objection. It assumes facts not
21    in evidence and improper hypothetical. She is a
22    fact witness, not an expert witness. So I would
23    object to the question. But you may answer. On
24    the grounds as an incomplete hypothetical. But
25    go ahead.

Page 112

1    THE WITNESS: I don't know. Can I answer I
2    don't know?
3 BY MR. FROMSON:
4 Q. You can answer whatever way is honest.
5 A. I don't know if I would have recommended that
6 or advised the patient of that based on that
7 information or not at the time.
8 Q. Is there a reason why you would not?
9 A. It may depend upon a particular patient's --
10 it may depend upon whether or not I felt that that
11 particular side effect was potentially relevant to the
12 individual patient.
13 Q. Do you have an independent recollection --
14 let me withdraw the question. There were references
15 in the record to -- actually, let me withdraw that.
16    I want to know whether Mr. Shearer's
17 condition, the pain syndrome he was suffering from,
18 was non-susceptive or neuropathic, okay. And I don't
19 know the distinction. Can you first tell us what does
20 it mean to suffer from non-susceptive pain?
21    MR. BARNES: Objection.
22    THE WITNESS: That's not really my area of
23    expertise so I don't really feel comfortable
24    trying to define that.
25 BY MR. FROMSON:

Page 113

1 Q. Do you know from a review of the notes from
2 the treatment that was provided to Mr. Shearer whether
3 the treatment regimen was provided for non-susceptive
4 pain versus neuropathic pain?
5 A. The notes do not specifically indicate that
6 distinction.
7 Q. Okay. And I asked you about non-susceptive
8 pain earlier. Are you able to describe for me what is
9 meant by neuropathic pain? Or are you not an expert
10 in that issue?
11 A. I am not an expert in that issue either.
12 However, my impression of neuropathic pain is that is
13 something that is felt to be as a result of coming
14 from, coming from the nerves themselves.
15 Q. Are you able -- is it fair to say you don't
16 have an independent recollection of treating
17 Mr. Shearer back in 2000?
18 A. Yes.
19 Q. Does a review of your notes, the treatment
20 record from Brigham Hospital, provide you any
21 information as to whether the treatment regimen was
22 for neuropathic pain?
23 A. No.
24 Q. Okay. At page 227 of the medical records
25 that were earlier provided to you today, if you could

Page 118

1  term psychotropic?
2      MR. BARNES: Objection. You may answer.
3      THE WITNESS: Well, that's a good point
4  because sedation may not necessarily --
5  psychotropic would refer to a symptom that is
6  somehow psychiatric in nature, such as paranoia
7  or anxiety or delusions or things of that
8  nature.
9  BY MR. FROMSON:
10     Q. Okay, so now going back to my earlier
11 question, did you have an understanding as to whether
12 Neurontin was a psychotropic drug back in 2000?
13     MR. BARNES: Objection.
14     THE WITNESS: No, no.
15 BY MR. FROMSON:
16     Q. Had you ever been provided with any
17 information from the defendants Park Davis, Warner
18 Lambert or Pfizer indicating whether Neurontin was a
19 psychotropic drug?
20     MR. BARNES: Objection.
21     THE WITNESS: No.
22 BY MR. FROMSON:
23     Q. If Neurontin was a psychotropic drug -- and
24 using psychotropic in the way you defined it -- would
25 that have been important for you to know in

Page 119

1  prescribing Neurontin to Mr. Shearer?
2      MR. BARNES: Objection.
3      THE WITNESS: Yes.
4  BY MR. FROMSON:
5      Q. Why?
6      A. In general, it's important to know about any
7  potential side effects of medications.
8      Q. Well, would -- assuming hypothetically that
9  Neurontin was a psychotropic drug and assuming you
10 knew it back in 2000, would it have affected your
11 prescribing practice of Neurontin for Mr. Shearer?
12     MR. BARNES: Objection.
13     THE WITNESS: I don't know.
14     Again, I think that that is impacted by the
15 patient's individual circumstances as to whether or
16 not a side effect is potentially relevant to them.
17     Q. Do you -- have you ever heard of the word
18 serotonin?
19     A. Yes.
20     Q. What is your understanding of what serotonin
21 is?
22     A. It's a, it's a substance that circulates in
23 the body that has an impact on -- a neurohormone I
24 guess is how it would be defined. And so it can be,
25 it can have an impact in the pathogenesis of

Page 120

1  depression, for example.
2      Q. Did you have any knowledge as to whether --
3  well, withdrawn.
4      Do you prescribe antidepressants as a cancer
5  doctor, as an oncologist?
6      A. Not frequently.
7      Q. Are you generally familiar with whether --
8  let me withdraw the question.
9      Did you have any knowledge back in 2000 when
10 prescribing Neurontin to Mr. Shearer as to whether the
11 mechanism of action with respect to Neurontin resulted
12 in a decrease in the release of serotonin from the
13 brain?
14     MR. BARNES: Objection.
15     THE WITNESS: No.
16 BY MR. FROMSON:
17     Q. In terms of its pathogenesis to depression,
18 if you knew that Neurontin back in 2000 had a
19 mechanism of action that could decrease the release of
20 serotonin in the brain, would that have played any
21 role in your prescribing practice to Mr. Shearer?
22     MR. BARNES: Objection.
23     THE WITNESS: I don't know.
24 BY MR. FROMSON:
25     Q. You had indicated in your initial testimony

Page 121

1  your reliance in part on clinical trial information in
2  your practice as an oncologist. Do you recall,
3  generally, that?
4      A. Yes.
5      Q. And so are you familiar in 2008 with the
6  United States Food and Drug Administration's
7  meta-analysis of clinical trials regarding anti-
8  epileptic drugs?
9      A. No.
10     Q. Were you -- do you have any knowledge as to
11 whether the United States FDA in April of 2009, of
12 this year, required a classwide labeling change to
13 include the term suicidal behavior and ideation in the
14 package inserts for certain anti-convulsants?
15     MR. BARNES: Objection.
16     THE WITNESS: No, I was not aware of that.
17     MR. FROMSON: Let me take five minutes. I
18 might be done. Five minutes.
19     (Briefly off the record, as a break is
20 taken.)
21     MR. FROMSON: I will pass the witness. Thank
22 you very much, Doctor.
23     THE WITNESS: Sure. Thank you.
24     MR. BARNES: I would love to spend more time
25 with you today, but I think we are done. Thank