UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------x
In re:  NEURONTIN MARKETING, SALES              :  MDL Docket No. 1629
        PRACTICES AND PRODUCTS                  :
        LIABILITY LITIGATION                    :  Master File No. 04-10981
                                                :
------------------------------------------------------x  Judge Patti B. Saris
                                                :
THIS DOCUMENT RELATES TO:                       :
                                                :  Magistrate Judge Leo T.
                                                :  Sorokin
Barlow v. Pfizer Inc, et al.                    :
Case No. 1:05-cv-11501-PBS                      :
                                                :
AND ALL PRODUCTS LIABILITY ACTIONS              :
                                                :
------------------------------------------------------x
```

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR PROTECTIVE ORDER IMPOSING COST-SHIFTING
AND IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") submit this memorandum in support of their Motion for Protective Order Imposing Cost-Shifting and in Opposition to Plaintiffs' Motions to Compel.[1] Pfizer seeks a protective order providing that the substantial costs necessary to comply with Plaintiffs' burdensome and unwarranted discovery requests be shifted, in whole or in part, to the requesting party. Further, Plaintiffs' motions to compel should be denied accordingly.

**PRELIMINARY STATEMENT**

In the course of this multi-district litigation, Pfizer has produced millions of pages of documents to Plaintiffs' counsel,[2] including several interactive databases and marketing materials related to Pfizer sales representatives that detailed Neurontin-prescribing physicians. Additionally, Pfizer has agreed to produce certain case-specific materials to Plaintiffs, including

---

[1] This includes the amended motion filed by Plaintiff Irene Barlow individually [2480] and the motion filed by Members of the Plaintiffs' Product Liability Steering Committee [2482].

[2] Plaintiffs will point out that Pfizer agreed to produce certain materials for the original 13 Track One cases. The expense and feasibility of what may be produced changes dramatically, however, when 110 plaintiffs are demanding separate discovery, as opposed to 13.

the sales representative call notes and other materials relating to Plaintiffs' specific prescribing physicians.[3] Pfizer's voluntary production of this information, despite its questionable relevance to the underlying claims – which chiefly claim that a pharmaceutical product failed to include a warning on a product label – stands as a testament to Pfizer's commitment to cooperation in the discovery of materials relating to this litigation. Even though Pfizer has produced exhaustive documents related to sales representatives and other collateral marketing matters, Plaintiffs now seek to impose enormous additional costs by demanding the production of additional marketing materials, including ancillary paper and electronically-stored custodial files, which cannot be produced without imposing an undue burden on Pfizer. Even in the face of these burdensome requests, Pfizer will agree to produce this information but simply asks that Plaintiffs bear some responsibility for their fair share of the costs of this voluminous, expensive, and time-consuming production.

Plaintiff Irene Barlow and the Plaintiffs' Product Liability Steering Committee ("Steering Committee" or together with Barlow as "Plaintiffs") filed separate motions to compel. Barlow's motion seeks various discovery materials,[4] including case-specific custodial files. The Steering Committee also demands production of custodial files[5] for current and former Pfizer

---

[3] In the sales representatives' deposition transcripts, these materials are alternatively referred to as "call sheets" and "call logs." This includes, but is not necessarily limited to, data that was entered through a system called Sherlock. (Ex. A, Meager depo. at 34:7-24.) Also, the term "call notes" is sometimes used to refer to specific notes written by the sales representatives, which was an optional feature. (Ex. B, Gamer depo. at 53:7-12.) For the purposes of this memorandum, however, the term "call notes" will encompass all the information that would have been recorded and could be found in the database.

[4] Based on the "short-hand description" in Barlow's memorandum, the materials she seeks are redundant and duplicative of materials that have already been produced. (*See* Barlow Memo. In Support of Mot. to Compel [2474] at 2.) Many have been provided as part of generic discovery. Nevertheless, Pfizer has agreed to produce several categories of documents.

[5] While most of the custodial files are in the form of electronically-stored information, some are only available in hard-copy. In particular, the files of the sales representatives who left the company long ago will be primarily in paper form.

sales representatives relating to each individual plaintiff.[6] While the motions submitted by Barlow and by the Steering Committee are different in some respects, they both suffer from the same fatal flaw: They seek to impose disproportionate, undue discovery costs in a purported attempt to search for information that is substantially available from materials that have already been produced. Even if some cumulative information could be uncovered after arduous and expensive searching, it would provide only nominal relevance to the core issues in the underlying lawsuits—e.g., whether the Neurontin label should have included a suicide warning, whether a causal connection exists between Neurontin and suicidal ideation, or whether a failure to warn actually caused any particular suicide-related injury.

Neither memorandum accompanying Plaintiffs' motions even attempts to explain why this information is critical to the litigation, when examples in Track One cases show the opposite. Instead, they merely posit that Pfizer should produce these materials at its expense because it did so in earlier cases within the MDL and the New York coordinated proceedings. The discovery experience in the Track One cases referred to by Plaintiffs, however, illustrates that the ancillary marketing materials requested will have minimal utility. For example, when deposing sales representatives, the Track One plaintiffs did not materially utilize the analogous information that was produced at great cost to Pfizer – presumably because they found that the information gained from these materials was not useful for the purposes of their cases. Instead, they primarily relied on the sales representatives' call notes and generic marketing materials while conducting these depositions, and these materials have already been produced to the MDL

---

[6] During the generic discovery phase of this litigation, the Steering Committee sought and received ever-increasing amounts of information concerning its marketing of Neurontin. They even obtained an extension of that discovery period permitting them to conduct further discovery into marketing evidence and other matters. Now, although generic discovery has closed, the remaining Plaintiffs in this litigation intend to use case-specific discovery to obtain duplicative discovery on the same tangential marketing issues. They have filed template requests for production, primarily seeking even more marketing evidence, such as the various promotional materials and souvenirs given to Plaintiffs' prescribing physicians. (*See, e.g.*, Plaintiffs' Requests for Production [2484-3], at 6, 8.) Of course, most of this information would be equally available from the deposition testimony of Plaintiffs' prescribing physicians.

Plaintiffs. In fact, a review of the available transcripts from the sales representatives who have been deposed uncovers very few references to documents from the custodial files.

Even assuming some nominal utility exists, it would be significantly outweighed by the great costs of production and undue burden imposed. Based on individual plaintiffs' answers to interrogatories, multiple physicians may have prescribed Neurontin to each plaintiff, and a conservative estimate would be that at least 200 prescribing physicians will be at issue in discovery that is to be complete by September 2010. Additionally, about 3-4 different sales representatives may have (at one time or another) called on each of these physicians. As such, each plaintiff's individual discovery requests could necessitate collection, review, processing, and production of the custodial files for five or six sales representatives. The aggregate cost of production for a single custodian has been estimated at $91,999, without accounting for privilege review, relevance review, redaction,[7] and other accompanying costs. (Affidavit of Deena Coffman, at ¶ 3.) When these costs are multiplied across the 110 plaintiffs, who possibly visited multiple Neurontin-prescribing physicians, who had been detailed by a number of sales representatives, all seeking specific materials for each of their cases, it becomes clear that Plaintiffs are demanding that Pfizer spend millions of dollars to obtain information that may or may not offer some minimal support to a minor point in their individual cases. In essence, they seek to use a cannon to kill a mosquito.

Despite the attenuated connection between the requests and the relevant issues in this case, in the spirit of cooperation, Pfizer has agreed to produce the materials requested by Plaintiffs – to the extent they are deemed to be properly within the scope of discovery and non-privileged after appropriate review. Because of the disproportionate financial burden relative to the potential benefit, however, Pfizer has maintained that Plaintiffs should bear the costs of retrieving, reviewing, and producing the materials necessary to satisfy their burdensome

---

[7] Privilege review, relevance review, and redaction costs have been estimated at $23,359 per custodian. (Affidavit of Deena Coffman, at ¶ 3.)

4

requests. (*See* Response to Requests for Production [2484-3] at 9.) As evinced by Pfizer's discovery efforts in producing similar materials – which were barely utilized by the Track-One plaintiffs – and its expert's cost projections, obtaining information responsive to Plaintiffs' requests will require many man-hours and cost-intensive searches of Pfizer's databases and document depositories, not to mention extensive attorney review for privilege, placing the financial burden in the multi-million dollar range. (Affidavit of Deena Coffman.) Plaintiffs cannot impose such costs on Pfizer in service of their whim to obtain more and more tangentially relevant documents. Rather, the Federal Rules of Civil Procedure and basic notions of fairness dictate that Plaintiffs justify their need for these documents and be held accountable for these overreaching requests by shouldering the costs associated with production. Accordingly, this Court, pursuant to its authority under Rule 26(b)(2), should order that Plaintiffs will bear some or all of the costs of retrieving, reviewing, and producing the materials necessitated by their own discovery requests related to the collateral issue of marketing.

## ARGUMENT

### I. Plaintiffs Should Take Responsibility For The Costs Of The Unduly Burdensome Retrieval And Production Process Necessitated By Their Marginally Relevant And Redundant Discovery Requests

This Court should enter a protective order that shifts the costs of Plaintiffs' overly-burdensome and unnecessary discovery requests. With regard to electronically stored information, the Federal Rules of Civil Procedure provide:

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

Fed. R. Civ. P. 26(b)(2)(B); *see also* Fed. R. Civ. P. 26(c) (providing that the district court may issue an order to protect a party from "undue burden or expense" in discovery). The district

courts have "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *In re Fosamax Prods. Liab. Litig.*, No. 1:06-md-1789, 2008 WL 2345877, at *8 (S.D.N.Y. June 5, 2008) (citation omitted) (internal quotation marks omitted). Rule 26 authorizes the Court to formulate conditions where document production becomes burdensome. Such conditions include shifting the cost of the production to the requesting party. *See* Fed. R. Civ. P. 26(b)(2)(B) advisory committee's note (2006 Amendments) ("The conditions may also include payment by the requesting party of part or all of the reasonable costs of obtaining information from sources that are not reasonably accessible."); *see also* The Sedona Principles, Second Edition, Best Practices Recommendations & Principles for Addressing Electronic Document Production, 2007 Annotated Version, 206 ("[C]ost-sharing and cost-shifting remains separately available under Rule 26(b)(2)(C) and Rule 26(c) [the protective order provision]."). Even prior to the e-discovery amendments to Rule 26, courts shifted costs of responding to discovery where the burden or expense of the proposed discovery outweighed its likely benefit. *See, e.g., Schweinfurth v. Motorola, Inc.*, No. 1:05CV0024, 2008 WL 4449081, at *2 (N.D. Ohio Sept. 30, 2008) (applying pre-2006 amendment version of federal rules and holding that "[b]ecause [of] the sheer size of the discovery already produced – i.e. over 200,000 pages of documents – and the immense size of the discovery now ordered to be produced – i.e. allegedly over 1,000,000 pages – the court finds cost shifting is reasonable and fair"); *MultiTechnology Servs., L.P. v. Verizon Sw.*, No. Civ.A. 4:02-CV-702-Y, 2004 WL 1553480, at *1-2 (N.D. Tex. July 12, 2004).

In addition to the provisions specifically related to electronically stored information, cost-shifting is justified under the generally-applicable standard articulated at Rule 26(2)(C) because, due to the same cost-benefit considerations, "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" and "the burden or expense of the proposed discovery outweighs its likely benefit." Thus, cost-shifting is likewise warranted – apart from any determination as to whether the materials are reasonably accessible – because of undue

6

burden or costs. *See* Fed. R. Civ. P. 26(b)(1) ("All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).").

Pfizer has shown that the minimally-relevant electronically-stored information in the custodial files cannot be reasonably accessed and produced without imposing an undue burden because – as evinced by the accompanying affidavit of Deena Coffman – it is estimated to cost $91,999 to obtain such case-specific information for each sales representative and potentially millions of dollars in the aggregate. (Affidavit of Deena Coffman, at ¶ 3.) Coffman's affidavit provides a brief explanation of the expensive production process that would be involved with these materials: An email archive infrastructure and an index of prior collection data sources are used in collection, and email is collected from one or more archives. (*Id.* at ¶ 4.) Electronically stored information is collected from the custodians' personal computers, from share drive locations in the event it is relevant, and from "home drive" locations. (*Id.*) After the data is collected, it is processed, which prepares the various types of electronic files for import into the review database. (*Id.* at ¶ 6.) This involves both expansion of any compressed files, which increases volume by approximately 30-40% based upon data provided by Pfizer's processing vendor, and the creation of "TIFF" image files. (*Id.*) After processing the data, it must be loaded and hosted with the hosting provider that Pfizer uses. (*Id.* at ¶ 7.) Generally, each step in the process is accompanied by various expenses, calculation of which are explained in greater detail in Coffman's affidavit.

In this case, the total value of expenses that Plaintiffs seek to impose far exceeds the discovery cost estimates at issue in other cases where cost-shifting has been found appropriate. *See, e.g., Major Tours*, 2009 WL 3446761, at *6 (imposing cost-shifting where estimated cost of discovery was $81,425 to $114,100); *Laethem Equip. Co. v. Deere & Co.*, 261 F.R.D. 127, 145 (E.D. Mich. 2009) (imposing cost-shifting where estimated cost of discovery was $107,821); *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 570 (N.D. Ill. 2004) (imposing cost-shifting where estimated cost of discovery was up to $249,000); *MultiTechnology Servs.*, 2004 WL 1553480, at *1 (imposing cost-shifting where estimated cost of discovery was

7

$60,000); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 431 (S.D.N.Y. 2002) ("[T]he costs of the proposed discovery would be substantial by any definition. Even the plaintiffs project that the costs for [one defendant] would be between $24,000 and $87,000, for [another defendant] between $10,000 and $15,000, for [another defendant] between $60,000 and $70,000, and for [two more defendants] approximately $64,000. *The magnitude of these expenses favors cost-shifting.*" (emphasis added)); *cf. Guy Chem. Co. v. Romaco AG*, 243 F.R.D. 310 (N.D. Ind. 2007) (shifting costs from a non-party to the requesting party where the disputed amount was $7,000).

Because Pfizer has demonstrated undue burdens and costs "required to search for, retrieve, and produce" the responsive documents, the custodial files are presumptively not discoverable and the burden shifts to Plaintiffs to show "good cause" for production. *See* Fed. R. Civ. P. 26(b)(2)(B) advisory committee's note (2006 Amendments) ("The requesting party has the burden of showing that its need for the discovery outweighs the burdens and costs of locating, retrieving, and producing the information."). In determining whether Plaintiffs have met this burden, the following factors related to the costs and benefits[8] of the proposed discovery should be weighed:

> (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.

Fed. R. Civ. P. 26(b)(2)(B) advisory committee's note (2006 Amendments). Taken together, these factors illustrate why cost-shifting is warranted with respect to Plaintiffs' pending

---

[8] Rule 26(b)(2)(C) specifically references in Rule 26(b)(2)(B) as the touchstone for whether there is "good cause." Additionally, many of the cost-benefit considerations are incorporated in the seven factors enumerated by the Advisory Committee. As such, the same seven factors seem to be likewise relevant in determining whether discovery "must" be limited under the proportionality rule at Rule 26(b)(2)(C).

discovery requests.

The first factor weighs in favor of cost-shifting due to the open-ended, sprawling nature of Plaintiffs' request and the numerosity of the documents to be reviewed. Plaintiffs demand broad categories of information from the "entire custodial file." (Plaintiffs' Request for Production.) As Plaintiffs are well aware, and the review of these documents for privileged materials and responsiveness alone is a daunting endeavor. It should also be noted that, almost invariably, a far larger number of documents must be reviewed than produced in order to isolate those that are responsive from those that are non-responsive.

Additionally, due to the extensive information about marketing that has already been made available through generic and specific discovery, the second factor weighs in favor of cost-shifting. Pfizer has produced an abundance of materials related to its sales representatives and on the subject of marketing generally, which provide Plaintiffs access to the same information sought in their most recent requests. For example, Pfizer made available its database of call notes comprising records of sales representatives' contact with physicians and access to their notes on communications with such physicians. This already-available resource provides the same information sought by many of Plaintiffs' current requests. The call notes provide the identity of the healthcare professional contacted, their specialty, their address, and their practice group, as well as the call date, the call ID, the territory, the representative's name, the call address, the number of calls, product identity, whether and how many samples were dispersed, and any specific notes the representatives may have made. Even the sales representatives acknowledge that the call notes are their primary points of references with regard to contact with particular physicians. (*See, e.g.*, Ex. C, Brabham depo. at 34:15-35: 4, Ex. B, Gamer depo. at 53:7-12.) Accordingly, these call notes and some generic marketing materials related to Neurontin were the primary materials that were actually used by Track-One plaintiffs when deposing sales representatives. (*See, e.g.*, Ex. A, Meager depo. at 30:3-31:18.) In contrast, a review of the available transcripts from the sales representatives who have been deposed reveals that information utilized from the custodial files was extremely rare. Furthermore, Pfizer has

9

consented to produce numerous other materials containing the information sought, including case-specific Neurontin-related Medwatch reports, case specific call notes, and various case specific continuing medical education resources, among other things.

Similarly, the fourth factor weighs in favor of cost-shifting because experience shows that the likelihood of finding new useful information, not redundantly available in more easily-accessible sources, is low. *See, e.g., Major Tours*, 2009 WL 3446761, at *5 ("Given the resources already spent by the parties, and the Court's finding that the requested e-mails are likely to be cumulative of other available evidence, the expenditure of another $100,000 is not justified."); *Murphy Oil U.S.A., Inc. v. Fluor Daniel, Inc.*, No. Civ.A. 99-3564, 2002 WL 246439, at *5 (E.D. La. Feb. 19, 2002) (determining that "the marginal value of searching the e-mail is modest at best" and weighing in favor of cost-shifting because "Murphy has not pointed to any evidence that shows that 'the emails are likely to be a gold mine'" (citations omitted)). While Plaintiffs call attention to the fact that case-specific custodial files have been provided in the more mature Track-One cases, their memoranda do not point to a single piece of relevant information that was extracted from those materials and put to use in those cases. Rather, their bald assertion that these materials may contain relevant information is based on pure speculation. *See Major Tours*, 2009 WL 3446761, at *3 ("Plaintiffs have not produced evidence that the backup or archived e-mails contain relevant information that is not otherwise available or cumulative of other evidence. There is, of course, a possibility that some of the requested e-mails contain 'smoking gun' information. However, this is pure conjecture."). Additionally, the information sought is equally available to Plaintiffs from the deposition testimony of the prescribing physicians. By design, the MDL court promotes efficiency by applying the lessons learned from discovery in earlier cases to guide its decisions in subsequent cases. Considering that earlier cases in this complex litigation have demonstrated that the production of the case-specific electronically-maintained custodial files of current and former Pfizer sales representatives is inefficient, duplicative, expensive, and likely to be primarily fruitless, the MDL court should adjust the discovery strategy for subsequent cases accordingly, by limiting

Plaintiffs' free discovery.

The fifth factor weighs heavily in favor of shifting costs because the "importance and usefulness of the further information" – even assuming what Plaintiffs are looking for actually exists and disregarding the fact it would be duplicative of information available elsewhere – is minimal. Fundamentally, Plaintiffs assert product liability claims for failure to warn. The key disputed issues at trial likely will involve general and specific causation, as well as the appropriate content of the product's label. Thus, the evidence pursued by the Plaintiffs' unduly burdensome requests, though it may satisfy some academic definition of relevancy, actually provides little insight on the ultimate question of liability in this products liability litigation. *Cf. Cognex Corp. v. Electro Scientific Indus., Inc.*, No. Civ.A 01CV10287RCL, 2002 WL 32309413, at *5 (D. Mass. July 2, 2002) (denying request for burdensome discovery request even though requesting party offered to pay the costs and noting that "the adversary system needs to . . . recognize that the costs of seeking every relevant piece of discovery is not reasonable").

The remaining factors are neutral. The third factor does not apply because the information requested was not available in a source that was more easily accessible.[9] The sixth factor – importance of the issues at stake – does not weigh against cost-shifting because the impact will be limited to the parties in this case. Any arguable interest of the public-at-large tied to the marketing of Neurontin has already been resolved in the 2004 civil and criminal settlement. The parties' respective resources is also a neutral factor, considering that the Steering Committee has shown a willingness and ability to front substantial resources in support

---

[9] Barlow's memorandum makes a baseless assertion about how Pfizer should have stored these mostly-electronic materials "at the top of the drawer" because of the likelihood of litigation. (Barlow Memo. In Support of Mot. to Compel [2474] at 6.) She also accuses Pfizer of "burying" documents, though she does not even attempt to support these serious accusations with evidence or even a cogent argument. (*Id.*) If anything, Barlow's allegations merely demonstrate her misapprehension regarding ordinary record-keeping procedures, the sheer magnitude of her broad requests, and the nature of the materials requested. (*See generally* Affidavit of Deena Coffman.)

11

of the claims of the multiple plaintiffs it represents.[10]

Given that four of the applicable factors support Pfizer's argument and the remaining three are neutral, cost-shifting is clearly appropriate in this case because Plaintiffs will be unable to meet their burden of showing "good cause" for production under Rule 26(b)(2)(B). Alternatively and additionally, cost-shifting is appropriate because "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C). Such a result is entirely consistent with the policy behind this discovery device. One of the main reasons for imposing cost-shifting is "to create an incentive for plaintiffs to narrow their requests to focus on the documents they really want." *In re Fosamax*, 2008 WL 2345877, at *11; *see also Laethem Equip.*, 261 F.R.D. at 145 ("[I]t is apparent that by bearing the cost of production, each party will have an incentive to tailor its ESI request to that which is genuinely relevant to the issues that remain."); *Cognex Corp.*, 2002 WL 32309413, at *3 n.1 ("It has also been argued that cost-shifting . . . serves an important purpose of counterbalancing the tendency to ask for more discovery material than economic efficiency would justify because the cost of producing is not being borne by the party making the request."); Manual for Complex Litigation (Fourth) § 11.433 (2009) (observing that "the court's authority to shift costs will give the parties an incentive to use cost-effective means of obtaining information and a disincentive to engage in wasteful and costly discovery activity."). In this respect, it is an effective tool for curbing tendencies toward discovery excesses. *See Laethem Equip.*, 261 F.R.D. at 146 (observing that

---

[10] Because one purpose of cost shifting is to create a disincentive for requesting parties to seek burdensome productions of marginally relevant documents, the relative resources of the parties is not a determinative factor. As one court has observed, "[n]o party . . . has an unlimited litigation budget to pay for document production efforts that in all likelihood are of marginal benefit." *See Major Tours, Inc. v. Colorel*, No. 05-3091, 2009 WL 3446761, at *4 (D.N.J. Oct. 20, 2009) (shifting half of approximately $100,000 in discovery costs to plaintiffs in case brought against the New Jersey Department of Transportation). In addition, it should not be assumed that the Plaintiffs have meager resources. *See Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 288 (S.D.N.Y. 2003) (stating that "it is not unheard of for plaintiff's firms to front huge expenses when multi-million dollar recoveries are in sight").

that the most "practical way to curb" a party's tendency toward excess in discovery "is to require the party seeking discovery to pay for the cost of finding and producing it"). If Plaintiffs sincerely believe the custodial files will actually lead to relevant information, their resolve should not be swayed merely because they are forced to weigh the economic consequences of their requests. Otherwise, "the adversary system needs to say 'enough is enough' and recognize that the costs of seeking *every* relevant piece of discovery is not reasonable." *Cognex Corp.*, 2002 WL 32309413, at *5 (emphasis in original).

## II. The Steering Committee Mischaracterizes A 2004 Discovery Protocol As A Blank Check To Conduct Oppressive Discovery For Marginally Relevant Materials Regardless Of The Costs

The Steering Committee argues that a document, prepared in 2004 and entered before its cases were transferred to the MDL, somehow eliminates the well-recognized discovery management tool of cost-shifting, despite that fact that this document is silent as to which party bears the primary costs of production in discovery. This argument is baseless for several reasons. First, the five-year-old stipulation from the nascent stages of this litigation was not intended to re-allocate discovery costs for all cases. Pfizer is not altering any longstanding "agreement," and the stipulation does not have the talismanic effect of saddling Pfizer the costs of responding to all of Plaintiffs' discovery requests, regardless of how minimally relevant and disproportionably burdensome they are. Second, even incorrectly assuming it is still valid, the plain words of the document cited by the Steering Committee do not address cost-allocation at all, aside from one sentence providing that the party receiving electronic documents should be responsible for the cost of the disk or hard drive. The agreement merely addresses procedure and is silent on the matter of production costs. To argue that this constitutes an intent by the drafters to foreclose all possibility of cost-shifting *by implication* amounts to grasping at straws. Finally, "*with or without a prior agreement*, the judge may engage in benefit-and-burden analysis under Rule 26(b)(2)(iii) at each stage and enter an appropriate order under Rule 26(c), which may include cost sharing between the parties or cost shifting to the requesting party." Manual for

Complex Litigation (Fourth) § 11.423 (2009) (emphasis added).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that a protective order be entered providing that Plaintiffs bear the cost of retrieving, reviewing, and producing the information responsive to their discovery requests.

Dated: February 23, 2010

Respectfully submitted,
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

By: /s/ Mark S. Cheffo
    Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Mark.Cheffo@skadden.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 23, 2010.

By: /s/ Mark S. Cheffo
    Mark S. Cheffo