# EXHIBIT C

Page 1

```
 1                                    VOL. I
                                      Pp. 1 - 76
 2                                    Exhibits 1 - 7

 3              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 4

 5                              C.A. NO. 05CV10639-PBS

 6                     MDL DOCKET NO. 1629
                       MASTER FILE NO. 04-10981
 7                     JUDGE PATTI B. SARIS
                       MAGISTRATE JUDGE LEO T. SOROKIN
 8   * * * * * * * * * * * * * * * * * *

 9   IN RE:  NUERONTIN(SIC) MARKETING,
     SALES PRACTICE AND PRODUCTS
10   LIABILITY LITIGATION,
     *********************************
11   MARY P. DORSEY, INDIVIDUALLY AND
     AS ADMINISTRATOR OF THE ESTATE OF
12   JAMES DORSEY,
            Plaintiff
13   VS.
     PFIZER, INC., WARNER-LAMBERT
14   COMPANY, AND PARKE-DAVIS, A
     DIVISION OF WARNER-LAMBERT
15   COMPANY,
            Defendants
16
     * * * * * * * * * * * * * * * * * *
17        Deposition of JENNIFER HOLDEN BRABHAM, a witness

18   called by counsel for the Plaintiff, pursuant to the

19   applicable rules, before Lorreen Hollingsworth,

20   CSR/RPR, CSR NO. 114793, and Notary Public in and for

21   the Commonwealth of Massachusetts, at the Offices of

22   Perry, Krumsiek & Jack, LLP, One McKinley Square,

23   Boston, Massachusetts, on Monday, March 31, 2008, at

24   1:02 p.m.
```

Page 2

1  APPEARANCES:
2  LAUREN M. BURKE, ESQUIRE
     Perry, Krumsiek & Jack, LLP
3  One McKinley Square
     Boston, Massachusetts 02109
4  On behalf of the Plaintiff,
     Mary Dorsey
5
   VINCENT E. GUNTER, ESQUIRE
6  Shook, Hardy & Bacon, LLP
   2555 Grand Boulevard
7  Kansas City, Missouri 64108
   On behalf of the Defendant,
8  Pfizer, Inc.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2  Deposition of:    DIRECT    CROSS
3  JENNIFER HOLDEN BRABHAM
4  (by Ms. Burke)       6
5  (by Mr. Gunter)              68
6
7              E X H I B I T S
8
9  No.                    For Ident.
10
11  1   The five-page document containing   32
         charts
12
    2   The seven-page document              46
13
    3   The eight-page document containing   48
14       graphs from the Sherlock system
15  4   The ten-page document entitled,       52
         "Adjunctive Therapy in Epilepsy"
16
    5   The three-page document on            55
17       Neurontin
18  6   The four-page document entitled,      57
         "Neurontin POA 1 Strategy"
19
20
21
22
23
24

Page 4

1              S T I P U L A T I O N S
2         It is hereby stipulated and agreed
3  by and between counsel for the respective
4  parties that the deposition will be read
5  and signed by the witness, under the pains
6  and penalties of perjury, and that the
7  sealing, filing, and notarization of the
8  deposition are waived.
9         It is further stipulated and agreed
10 that all objections, except as to form, and
11 motions to strike are reserved until the
12 time of trial.
13        JENNIFER HOLDEN BRABHAM,
14 a witness called on behalf of the
15 Plaintiff, having first been duly sworn,
16 deposes and says as follows:
17        MS. BURKE: I'm Lauren Burke.
18 I'm here at Perry, Krumsiek & Jack on
19 behalf of plaintiff, Mary Dorsey. And
20 we're here -- usual stipulations?
21        MR. GUNTER: Yes.
22        MS. BURKE: And if -- we're
23 here with Jennifer Holden Brabham.
24        THE WITNESS: Yes.

Page 5

1         MS. BURKE: And how do you
2  prefer to be referred to?
3         THE WITNESS: I'm Jennifer
4  Brabham now.
5         MS. BURKE: I may go back and
6  forth. I think in some of our records you
7  were just plain Jennifer Holden, that type
8  of thing.
9         Have you ever been deposed
10 before?
11        THE WITNESS: No.
12        MS. BURKE: You haven't. It's
13 fairly informal. I'm going to ask you a
14 couple questions.
15        If you have any questions or
16 need clarification, please don't hesitate
17 to stop me. You can consult with your
18 lawyer, anything you need. And if you want
19 to take a break at any minute, just let me
20 know.
21        THE WITNESS: Thank you.
22        MS. BURKE: And your attorney
23 may object to some of the questions. A lot
24 of times it's to form, which he will do so

Page 34

```
 1      said there was one point where you left the
 2      sample?
 3   A  Okay, yeah.
 4   Q  So that date --
 5   A  Would be --
 6   Q  August '98.
 7   A  So it would be the top one.
 8   Q  Yes. So there was at least one point in
 9      August of '98 when you left a sample of
10      Neurontin?
11   A  It looks like there was one time that I
12      left a sample.
13   Q  Upon making sales calls to doctors such as
14      this, would you keep any notes or anything?
15   A  We had a software system on the company
16      computer where you could make call notes,
17      if you chose to.
18   Q  Was it your normal practice to make notes
19      within the system?
20   A  I would occasionally make notes, not
21      always. I don't remember specifically.
22   Q  So if you -- I guess if you didn't always
23      make notes, if you had wanted to reference
24      something and you went back, would you have
```

Page 35

```
 1      any, kind of, way, to, sort of, spark your
 2      memory of what happened?
 3   A  It would be call notes in that software
 4      program. It's now called Sherlock. I
 5      don't remember what it was called with
 6      Parke-Davis.
 7   Q  Currently with Pfizer it's called the
 8      Sherlock.
 9   A  It's called Sherlock?
10   Q  And the chart that I, sort of, showed you
11      were in '98 where you have a couple calls
12      to Dr. Alpert --
13   A  Mm-hmm.
14   Q  Do you know what his specialty is?
15   A  I've been told psychiatry.
16   Q  Psychiatry. So upon calling upon him,
17      would it be for the purpose of promoting
18      Neurontin?
19   A  I believe at the time the main reason for
20      seeing Dr. Alpert would have been to
21      promote Celexa, which, as I said, is an
22      antidepressant.
23   Q  And what would be the purpose that you left
24      Neurontin with him?
```

Page 36

```
 1   A  If he asked for Neurontin samples, I could
 2      provide Neurontin samples. I could have
 3      told him about Neurontin and its
 4      indication.
 5   Q  So it was permissible to leave samples with
 6      the doctor?
 7   A  Yes. And we usually get requests for
 8      samples from the psychiatrists all the
 9      time.
10   Q  Specifically for Neurontin?
11   A  Yes, specifically Celexa, as well. The
12      physicians like receiving samples. It's
13      helpful to their patients.
14   Q  And when a physician would, sort of, ask
15      you about the use of Neurontin for what he
16      may be using it for -- which, I'm assuming
17      would not have been for seizures -- or
18      maybe it was -- but say he had questions or
19      inquiries regarding any off-label use, what
20      was your reaction?
21   A  I would directly request -- request for
22      information to Medical Affairs.
23   Q  And how did you do that?
24   A  I believe there was -- you could do it in
```

Page 37

```
 1      the computer system or you could also call.
 2      But I think I usually did it through the
 3      computer.
 4   Q  To Medical Affairs. What was Medical
 5      Affairs?
 6   A  Medical Affairs was a -- where you directed
 7      people within the company -- if doctors
 8      asked a question that was outside of the
 9      realm of the label, they could speak with
10      Medical Affairs, which was separate from
11      sales. That was in headquarters. I never
12      actually saw anyone there, but that's where
13      we directed the calls.
14   Q  To the best of your knowledge, who
15      comprised Medical Affairs, the department?
16   A  I believe it was physicians and
17      pharmacists.
18   Q  Sort of, directing it now towards your
19      responsibilities as district manager.
20   A  Yes.
21   Q  What is your response -- you said you
22      accompany your sales reps and do the
23      training and, sort of, guide them, but
24      letting them do the sales presentation.
```

10 (Pages 34 to 37)