UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC., 04 CV 10739 (PBS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO STRIKE THE TESTIMONY OF JOHN ABRAMSON**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum in support of their motion to strike the testimony of John Abramson. Defendants incorporate by reference their prior Memorandum In Support Of Defendants' Motion In Limine To Exclude The Testimony Of John Abramson, M.D. [2308]. For the reasons discussed below, Dr. Abramson's opinions should be excluded.

## ARGUMENT

### I. Dr. Abramson's Testimony Regarding The Efficacy of Neurontin Was Beyond Both His Expertise And The Scope of His Report

At several points during his direct examination, Dr. Abramson was permitted to testify, over the Defendants' objections, regarding his opinions as to whether Neurontin was effective for treatment of certain conditions. (*See* 2/23 Tr. at 100:22-25 (stating opinion that Neurontin is not effective for bipolar); *id.* at 138:6-9 (stating opinion that Neurontin in ineffective for pain other than post herpetic neuralgia); 2/24 Tr. at 69:15-17 (stating opinion that Neurontin is ineffective for migraine prophylaxis). Initially, Dr. Abramson was not designated as an expert on efficacy. Instead, his report addressed the dissemination of information about Neurontin. (8/11/08 Report at 4.)

In addition, Dr. Abramson lacks sufficient qualifications to render opinions on the efficacy of Neurontin for pain, bipolar disorder, migraine or anything else. Dr. Abramson is a family practitioner, who has not treated patients since 2002. He holds no specialty in neurology or psychiatry. (2/24 Tr. at 76:17-25)  He admits that he is not a pain specialist (*id.* at 77:1-4). And, as a family doctor, he would not treat a severely ill bipolar patient, but would refer him or her to a psychiatrist. (*Id.* at 103:21-23.).  The sole basis for allowing Dr. Abramson to testify regarding efficacy was that he completed a two-year fellowship in research and clinical design early in his career.  (2/24 Tr. at 9:19-21.)  However, he has never conducted a randomized controlled clinical trial of any medication, never designed a clinical trial, never been responsible for drafting a study report with clinical trial results, and never been responsible for drafting a clinical trial protocol.  He has never had responsibility for analyzing the data and drafting the results of a clinical trial for a prescription medication? (*Id.* at 77:5-68:10.)  Nothing in Dr. Abramson's background qualifies him to render opinions on the efficacy of Neurontin to treat neuropathic pain, bipolar disorder or migraine.  Such testimony should have been excluded.

II.  **Dr. Abramson Was Allowed To Provide Generic Testimony About Continuing Medical Education Programs And Publications Without Establishing Relevant Connections to Either Pfizer of Kaiser**

Before Dr. Abramson took the stand, the Court admonished the Parties as followed:

> Let me just say this on Dr. Abramson. I don't know if he's here or not. It was a very, very thick report, and I did not read the whole report. I could have spent an entire weekend reading the whole report. But this is not a trial of the pharmaceutical industry. It's a trial of Pfizer. So he does a lot of interesting research and writing about the impact of money on the pharmaceutical industry. This has got to be about Pfizer, not an indictment of the industry as a whole.

(Feb. 22 Tr. at 15:6-14.)  Even after this, Dr. Abramson proceeded to give testimony without regard to whether the conduct he was discussing could be linked to Pfizer or not, or whether it had any impact on Kaiser or Kaiser physicians.  For example, Dr. Abramson described his assignment as follows:

> My assignment was to be to review the scientific evidence about several off-label indications or uses of Neurontin to review the scientific evidence that was not

2

>available to practicing physicians but came from the corporate documents to review what doctors were told about that science in publications, in continuing medical education and otherwise and then to compare it to see how the real science compared to what doctors were led to believe about the science and whether that was accurate or not.

(*Id.* at 90:19-91:3.) However, this case is not about the medical literature in general and it is not about physicians in general. Plaintiffs are required to prove misrepresentation made by *Pfizer* and relied upon by *Kaiser*.

Initially, Dr. Abramson was allowed to intermingle studies and CMEs that were, allegedly "sponsored" by Pfizer with others for which Dr. Abramson could make no nexus to Pfizer whatsoever. For example, when asked by the Court whether "these positive studies that were flooding the market, were those issued by Pfizer or someone else," 12/24 Tr. at 26:20-22, the witness responded, "It's hard to tell," *id.* at 23; *see also id.* at 137:13-20 (responding "we don't know" when asked by the Court whether an unblinded RCT was "a Pfizer study.") As a result, Dr. Abramson's testimony was entirely unclear confusing and hopelessly confusing as to what conduct Plaintiffs were even attempting to establish a Pfizer nexus and what was completely generic. In addition, Dr. Abramson was allowed to testify that studies or CMEs were sponsored by Pfizer without establishing any foundation regarding whether "sponsor" referred to Pfizer providing an unrestricted grant (which is permissible under FDA regulations) or whether Pfizer exercised control over the content. (*See, e.g.* 2/23 Tr. at 116:3-118:24; 128:2-17.)

Plaintiffs keep promising that an appropriate nexus will be established through other evidence, but so far they have not identified a witness who will address this issue and instead keep making vague references to "documents." (2/24 Tr. at 6:21-7:17.) But Dr. Abramson is not a fact witness. His testimony is not limited by his personal knowledge. Plaintiffs selected the documents that Dr. Abramson so that any gaps in his testimony are of their own making. They cannot make his opinions relevant through the testimony of another witness that he has not even considered or documents that he has not seen.

Likewise, Dr. Abramson's testimony had nothing to do with what information influenced formulary decisions made by Kaiser P&T Committees or prescribing decisions made by Kaiser

3

physicians.  Again, Dr. Abramson was allowed to provide completely generic testimony untethered to the specific dispute at issue here.  (*See, e.g.,* 2/23 Tr. at 94:6-21) (describing the importance of continuing medical education ("CME") programs to physicians).)   For example, Dr. Abramson testified that the *only* information available to physicians are primary literature, CMEs, and review articles (*id.* at 95:2-9), which is contrary to Kaiser's theory of the case that it conducts its own reviews of the medical literature and seeks to educate Kaiser physicians.  And Dr. Abramson repeatedly testified about what hypothetical, unnamed doctors relied upon.  Thus, Dr. Abramson testified:  "[T]he key point here is that doctors have to rely on what's published in the literature, and if they're seeing just a positive side of things, they're going to be forming conclusions about how to treat their patients that aren't  based on the scientific evidence." (2/23 Tr. at 126:22-127:1; *see also id.* at 127:17-20 ("doctors who are hearing this in a continuing medical education course, especially for difficult to treat patients, are very likely to be persuaded to try Neurontin for bipolar disorder."); 2/24 Tr. at 49:7-19 (testifying regarding the knowledge of unnamed physicians); *id.* at 54:19-55:6 (testifying regarding what would have been material to unnamed physicians); *id.* at 70:16-18 (testifying regarding what information unnamed physicians had access to).  As a result, Dr. Abramson was allowed to testify essentially to a fraud-on-the-market theory that has been disallowed by this Court.  (*See id.* at 132:20-133:20.)

Indeed, whenever he was asked anything specific about Kaiser, Dr. Abramson responded that he had know knowledge about Kaiser.  (2/24 Tr. at 76:3-14 (stating that he had no knowledge of Kaiser's formulary restrictions).  He could not name a single Kaiser physician who attended one of the CMEs he discussed. (*Id.* at 79:1-9.)  In fact, Dr. Abramson testified:

> Q.  Your role in this case is not to offer -- I want to make sure I understand it -- your role in this case is not to offer an opinion as to what caused specific Kaiser physicians to write prescriptions for Neurontin in any of its various regions; is that right?
>
> A.  I think that's correct.  My role is to opine about the influences that came to bear on all physicians, including Kaiser physicians.

(*Id.* at 79:14-21.)  For example, Dr. Abramson was unaware that after the Kaiser learned of the

Pande and the Frye studies, it actually expanded use of Neurontin by psychiatrists.  (*Id.* at 118:23-119:2; *id.* at 126:9-13 (stating that he "could not say which Kaiser doctors read this [Carta report] or were affected by it").)  Kaiser's counsel attempted to excuse Dr. Abramson's failure to consider Kaiser specific material by stating:  "Just so it's clear, the scope of Dr. Abramson's assignment was not the formulary practices at Kaiser.  There will be other witnesses on that subject."  (*Id.* at 119:21-24; *see also id.* at 138:15-18 (Dr. Abramson's assignment did not address Kaiser in any way.")  However, Plaintiffs cannot shield Dr. Abramson from appropriate cross-examination simply by failing to show him Kaiser-specific document.  That Kaiser's internal documents directly contradict the premises of Dr. Abramson's testimony is appropriate impeachment.  Dr. Abramson's failure to even consider such material renders his testimony unreliable.

**III.    Dr. Abramson Was Permitted To Provide An Impermissible Narrative Description Of The Evidence Colored By His Personal, Non-Expert Interpretations**

As discussed in Pfizer's memorandum in support of its motion to exclude Dr. Abramson's testimony, parties are not permitted to elude the rules excluding hearsay and requiring appropriate foundations for evidence to be established by witnesses with personal knowledge in the guise of expert testimony.  Nor can an expert usurp the role of the jury.  It is impermissible for an expert to simply review in narrative fashion a series of documents, provide his own interpretation of them and then tells a jury what to conclude.  *See United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979); *United States v. Buchanan*, 964 F. Supp. 533, 537 (D. Mass. 1997) (Gertner, J.); *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 546, 551 (S.D.N.Y. 2004).

In fact, this Court previously ruled that Plaintiffs' experts would not be allowed to testify that Defendants acted fraudulently.  (Hr'g Tr. 1/28/10 at 65:22.)  But that is exactly what Dr. Abramson did.  This Court overruled Defendants' objection, stating:  "[H]e's not saying that they acted fraudulently.  He's never said that. . . .  He's just said these documents are inconsistent with the results of these clinical trials."  (2/24 Tr. at 10:22-25.)  However, Dr. Abramson's

5

testimony went beyond saying that the documents were "inconsistent." He testified that the documents or studies were misleading and characterized them as misrepresentations. For example, Dr. Abramson testified:

> A. My opinion is that the information that the manufacturer communicated to physicians was biased in terms of communicating the positive effect of bipolar, was incomplete in terms of the timing of the disclosure of that information. I forget the third part of the question.
>
> Q. Whether or not it was misleading?
>
> A. And that it would lead physicians to believe that they were serving their patients to use Neurontin for bipolar disorder when I believe that the manufacturer knew that the drug was not effective for bipolar disorder.

(2/23 Tr. at 101:18-102:2; *id.* at 115:19:23; *id.* at 139:2-5; 2/24 Tr. at 70:1-4.) Similarly, even though the Vietta study was published after the relevant time period for this litigation and even though the Court limited its admissibility to the issue of efficacy, Dr. Abramson proceeded to testify that the study was misleading. (2/23 Tr. at 112:15-113:19.)

Dr. Abramson was also allowed to testify regarding motive and intent, contrary to this Court's prior ruling. (1/28 Hr'g Tr. at 66:14-16.) For example, Dr. Abramson testified, over Defendants' objection:

> Q. As far as you understand it, was there anything that could have stopped Pfizer from giving the data to could being rain and letting them undertake the study?
>
> . . . .
>
> A. There was nothing that prevented Pfizer from making all of its data available to the could being rain review except for its business goals of maintaining its sales of Neurontin.

(2/23 Tr. at 125:19-126:2.) Dr. Abramson also gave the following improper testimony regarding intent:

> What the documents show is that the manufacturer of Neurontin was -- had used the publication of studies as a marketing tool so that they were undertaking studies, not randomized control trials at this point but case reports and open label trials, and they were using those as marketing tools. They were saying, as you can see in this slide, the results, if positive, will be publicized, but the results if negative aren't going to be shown. So when they do a study, they're basically

6

saying heads we win, tails we don't lose.

(2/23 Tr. at 126:11-20; *see also* 2/24 Tr. at 25:15-26:1; 37:17-38:5; *id.* at 51:1-5 ("What it means is that Pfizer's goal was . . . .")  The following is another example of Dr. Abramson's improper testimony:

> This is a communication from Medical Action Communications, and they're pondering a problem.  The author of this article, the review article, is going to be Dr. Backonja, the same doctor who wrote the article in JAMA in 1998.  And they are saying that they're not reviewing all of the published trials.  There are unpublished trials.  Reckless is unpublished, and there are other unpublished trials.  They're saying:  How are we going to get these published trials into this review article if Backonja is the only author because he's not a Pfizer employee and he doesn't have access to the data that we haven't shown to anybody?  So what the quote says is, "The real issue is deciding how to justify only reviewing 4 of the 6 randomized placebo-controlled studies and the rationale for why Dr. Backonja has access to unpublished papers and Pfizer data on file."  So that's their problem.

(2/24 Tr. at 45:10-24.)  This testimony is simply not the proper subject of expert testimony.  It is not appropriate for an expert to read from a document about which he has no personal knowledge and then interpret the document for the jury by telling them "what they're really saying is."  There is nothing about this testimony that required specialized training.  Documentary evidence such as this should be introduced, if it is otherwise admissible, through witnesses with personal knowledge and the jury should be left to draw its own conclusions.

## **CONCLUSION**

For all of the foregoing reasons, Pfizer respectfully requests that the Court strike the testimony of John Abramson.

7

Dated: February 25, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:     /s/ Mark S. Cheffo
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Email:  Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:     /s/ Raoul D. Kennedy
        Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400
Email:  Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:     /s/ James E. Hooper
        James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800
Email:  hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on February 25, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo