IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: )
) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 63
AND PRODUCTS LIABILITY LITIGATION )

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 17, 2010, 2:08 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

FOR THE PLAINTIFFS:

JACK W. LONDON, ESQ., Jack W. London & Associates, P.C., 3701 Bee Cafe Road, Suite 200, Austin, Texas, 78746.

KEITH L. ALTMAN, ESQ., Finkelstein & Partners, 1279 Route 300, Newburgh, New York, 12551.

FOR THE DEFENDANTS:

MARK S. CHEFFO, ESQ. and STEVEN F. NAPOLITANO, ESQ., Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times Square, New York, New York, 10036.

RICHARD M. BARNES, ESQ. and DEREK M. STIKELEATHER, ESQ., Goodell, DeVries, Leech & Dann, LLP, One South Street, 20th Floor, Baltimore, Maryland, 21202.

P R O C E E D I N G S

THE CLERK: In Re: Neurontin Marketing, Sales Practices, and Products Liability Litigation, Civil Action No. 04-10981, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. LONDON: Plaintiffs' Products Liability Steering Committee, I'm Jack London.

MR. ALTMAN: Keith Altman on behalf of the plaintiffs.

MR. BARNES: Rick Barnes on behalf of Pfizer, your Honor.

MR. NAPOLITANO: Steven Napolitano on behalf of Pfizer.

MR. CHEFFO: Mark Cheffo, your Honor.

MR. STIKELEATHER: Derek Stikeleather on behalf of Pfizer.

THE COURT: You're up for the week?

MR. CHEFFO: I am, your Honor, maybe longer than that.

THE COURT: Maybe the month?

We had had an initial hearing on Dr. Gibbons a long time ago, and I essentially never ruled because the case resolved a different way. Part of my concern, why I chopped things off, was because it was too close up against the last trial. There's now been a supplementation and a preliminary dispute about whether or not I should permit the supplementation. And while I wouldn't have for the last trial

because it was too late, the next trial isn't till sometime in April or May, depending on -- isn't it? When's Shearer?

MR. LONDON: I may be mistaken. I think it's the last day of March, the 29th of March, something like that. We're about five weeks out.

MR. CHEFFO: March 29, your Honor.

THE COURT: As a practical matter, it's not clear when we're going to reach it because I am, as far as I know, spending a month on Neurontin, the sales and marketing side. And right now that's still on, right?

MR. CHEFFO: It is, your Honor.

THE COURT: Yes. And so following on that, I have a huge criminal case, or, if that resolves, the Mylan case, which is an AWP case. So my guess is, it's more likely to be, unless everything and I'm the luckiest woman in America, like everything goes away, it could possibly go. It will go sometime this spring, but just for your scheduling purposes, we're just going to need to get closer to it. He will have just -- are you trying both cases?

MR. CHEFFO: There's going to be overlap with people, folks, I mean, but obviously we're prepared for that.

THE COURT: So in a way he'll be the most current as to how the other case goes. We know for a fact, what's it, 28 hours a side? So we know almost to the hour how long the sales and marketing case will go. But, in any event, I'm inclined,

because this is a new case and farther off, I'm going to allow the supplementation.

So I think we should get into the merits. So I don't know that we need a whole lot of debate about that. It is true I ruled all those things. I was enormously frustrated that it kept coming out, and I would have excluded it because it's right up against that last trial. But now we've had time in between, so I don't want to spend a lot of time skirmishing over whether I'll allow the supplementation.

So you filed that on January 10, right, or something along that line?

MR. CHEFFO: I think that's right.

THE COURT: And I didn't even look to see whether or not you had filed anything in response to that on the merits.

MR. LONDON: I believe the sequence is that they filed the supplementation in early January.

THE COURT: Right.

MR. LONDON: And the plaintiffs filed a motion to strike the supplementation. The defendants filed a reply to that motion, and then the Court set this hearing. I believe that's the sequence.

THE COURT: I'm inclined to deny the motion to strike the supplementation, but then what of course I'm going to allow you to do is respond to it on the merits, if you choose to, but I'm not reopening discovery. I'm not reopening depositions.

I'm not reopening it. So the big issue now is, what is left of the Daubert motion? And that's where I needed a hearing today. If I allow the motion to be supplemented, I need to hear from you what issues remain because I'll have to rule on it.

MR. LONDON: Yes, ma'am. And if I may, may we stay with that issue just a moment longer?

THE COURT: Yes.

MR. LONDON: What has been provided by way of a new supplementation, which, as I understand, the Court is going to let it stay as such, from our perspective contains, as I recall, a new hazard graph chart, a new analysis of a function, maybe a new paragraph responding to Dr. Greenland, something --

THE COURT: Already I don't understand what you're saying. So they supplemented --

MR. LONDON: Well, and that's why I'm saying that.

THE COURT: So you need to walk me through that. There was one thing that I did want to just jump to him and ask whether there was a mistake made on one part of it, which is, he says that there's no increase, in his view, in suicidal ideation or attempts, but that's got to be wrong because he doesn't look at ideation.

MR. CHEFFO: I was going to ask your Honor's indulgence. I know I'm usually the one who does a lot of the talking. I was going to ask -- Mr. Barnes and Mr. Napolitano are prepared to address the substance of it today, if that's

okay with your Honor?

THE COURT: Yes. You know, throughout the whole thing he talks about "attempts, attempts, attempts," and we all knew last time around that there was a big difference in what he was looking at from what the FDA was looking at because the FDA looks at people who have suicidal ideas as well as people who make suicide attempts. I think that's right, right? So as I understand, he then goes into the pharmaceutical data, which only picks up suicides and suicide attempts but not suicide ideas. And I was following his expert report right along, I was reading it, understanding it, until at the tail end he says, "So my opinion is, it doesn't affect suicidal ideation," and with no basis for that.

MR. BARNES: You're right on. Let me just walk you through it a little bit differently, okay? The FDA report, the meta-analysis that is part of his expert report, concerns suicidal behavior and ideation.

THE COURT: Right.

MR. BARNES: Part of his report deals with the FDA meta-analysis and suicidal behavior and ideation, which would encompass suicide --

THE COURT: But that's just in responding to the FDA.

MR. BARNES: Correct. That's part of his opinion, correct. That's the part that responds to FDA. He kind of did a global summary at the very end where he --

THE COURT: Well, that's confusing. But he didn't do his own data analysis about ideation. Am I right?

MR. BARNES: That's correct.

THE COURT: That would be brand new, and I don't want it.

MR. BARNES: Absolutely correct. What he's done is focused on only suicide attempts in his own work product.

THE COURT: Okay. I want to make sure there wasn't something else coming down the pike because nothing else can be filed at this point other than your rebuttal.

MR. LONDON: Thank you. And here is the question I wanted to ask the Court to flesh out. As I understand, the Court doesn't want us to launch off another round of depositions.

THE COURT: No.

MR. LONDON: And I appreciate that.

THE COURT: It's done, it's done.

MR. LONDON: And we're not going to ask the Court to do that. What did not come with this report that we can tell are the underlying data for the new material, and I would ask the Court to ask him to go ahead and send us his new underlying data, his sensitivity analysis --

THE COURT: Of course.

MR. LONDON: -- things that would be appropriate for us to be able to analyze what his new paragraphs are

completely.

THE COURT: Yes, of course.

MR. NAPOLITANO: The only point that I was going to add to it is, I'm not sure to what extent the data has already been produced to them. I assume we don't need --

THE COURT: I would be shocked if it hasn't been because I'm going to -- you know, we can't keep doing this, so if it hasn't been already, it should have been, and it should be done by the end of the -- what's today, the 16th? -- it should be done by the end of the month, okay, which should give you more than enough time. If we end up trying it at the end of March because everything else miraculously settles and goes away, great, and if not, you know, you'll at least have had the 30 days with it and with your expert.

MR. LONDON: Yes.

THE COURT: When can you file a response to his --

MR. LONDON: Well, now that we have direction from the Court, I'd like to contact Dr. Greenland today or tomorrow, as soon as telephoning permits, get a reply from him, but I would think --

THE COURT: Within how many days of getting their data? Let's assume you get it by the end of the month. Can he do it two weeks later?

MR. LONDON: I would like to say two weeks, and I'm estimating that because of spring break.

THE COURT: Fine, it sounds totally reasonable. And if it's a little more time, let us know. Obviously, it's got to be before the trial, but as I said --

MR. LONDON: Okay, you'd like it before the trial? You don't want it after the trial or toward the middle of their case?

THE COURT: Yes, but can I just say, the more basic issue, the reason I needed this hearing, what he purports to have done, assuming the data backs him up, is to have met the criticisms that Dr. Greenland had launched, some of which I found compelling.

MR. LONDON: Yes.

THE COURT: But it seems as if he addressed it, addressed the various issues of what is the suicide date, you know, how do you count the suicide itself that triggered the treatment, how do you deal with the time progression? And there was a third one.

MR. BARNES: Yes, he deals with the months on and off drug primarily, then looks at it from a couple of different angles to verify it, but it's basically your Honor's concern about after the patient goes on Neurontin, you pointed out, as did Dr. Greenland, that there were months where a patient could be on drug or off drug. And what this paragraph does is essentially meets head on the question about what happens if you adjust for the months that the patient has a prescription

filled and the months that the patient does not have a prescription filled. He goes back, he does a seventh -- he did six sensitivity analyses. He does one more to address that concern, and it absolutely validates his initial judgment that Neurontin in fact does not increase the risk of suicide attempts.

THE COURT: All right, so let me just -- I don't know if you're prepared to talk about it. I'm assuming you've consulted with your experts.

MR. LONDON: I wouldn't bet the farm on that.

THE COURT: Right, but you're here. So the question is really, do you want to argue? We've got everybody here. At this point, unless the data doesn't back him up, which may be the case -- I'm sure you have a good expert who could look at that -- but it strikes me that methodologically he's addressed the key concerns. Is that wrong?

MR. LONDON: Well, I think we have an issue between the Court and counsel as well as between the experts about what it means to be methodological. I do think that his report does as your Honor suggests; it tries to fill the space of the missing person/time analysis that he said had not been done in the July hearing. I think your Honor took that as, if that were done, it would have achieved the methodological reliability that your Honor had given to the bipolar report. From our perspective, it would have achieved the mathematical

equivalent of it, but a document that we didn't even have then, a document we just received a week ago, shows that other peers had criticized Dr. Gibbons --

THE COURT: A week ago from now?

MR. LONDON: Two weeks ago. We just received new documents from the defense.

THE COURT: I didn't know anything about that.

MR. LONDON: We filed them with you in this case under seal.

THE COURT: Oh, they're under seal.

MR. LONDON: And I'm referring to documents that are called AA and CC. And if I may just describe AA and CC for you generically, and if the Court doesn't have them --

THE COURT: That would be great. I may have just --

MR. LONDON: We filed three documents --

THE COURT: It's possible that I just didn't look at the under-seal documents.

MR. LONDON: The third document is BB, and I don't think BB will trouble the Court much because it's Dr. Gibbons' slides from a couple years ago. You all have AA and BB handy? And I'm going to ask, if it helps, to bring AA and CC up on the computer, or if the Court would rather just look at these documents?

THE COURT: No, bring them up. That's great.

MR. LONDON: And when the Court would like me to talk

about them, I will. I'll pause until I hear from you.

THE COURT: So tell me what in your view AA is.

MR. LONDON: Let's talk about AA first. AA is a document whereby Pfizer employees, who had to do with this statistical analysis and with Dr. Gibbons and with the FDA statistical analysis, went to Harvard in October or so of 2008. That is before Dr. Gibbons filed any of the bipolar papers or the gabapentin papers as supplemental reports in the case. Dr. Gibbons told us that he had gone to Harvard and had presented the bipolar paper to these folks, and that they had suggested that he do some sensitivity analyses. As it turns out, this document that just surfaced is a Pfizer employee's survey of what Dr. Gibbons really heard from the faculty there at Harvard.

Going over to the last page of the document, those middle paragraphs address Dr. Gibbons addressing the Harvard meeting. Now, when I say "Harvard faculty," that's a misnomer. It's the members of his peer groups who went to Harvard for his presentation. I don't know if they were Harvard or other. In the middle it says he did some analyses looking at the incidents of suicide before and after drug use, and then the next paragraph, he then discussed problems as a statistician.

The questions from the audience centered around benefit/risk, "What is the comparison group: placebo, no treatment, and other active; are his analyses more of a

function to the regression to the mean and are expected results? Some faculty noted the need for much greater statistical development work in this area if any causal relationships are to be drawn. The group also discussed how to measure causality and separate it from just descriptive statistics. Obviously this is a topic we all need to discuss. Gibbons summary -- you show me no insight on statistics (descriptive)," and then it goes off into a personal conversation between Mr. Whalen and another Pfizer employee.

The reason I mentioned a moment ago that when the Court discusses methodology as, once he does this other sensitivity analysis, he's achieved home run --

THE COURT: No. I said he responded to what the criticisms were in the last -- that I remember from Dr. Greenland, his key criticisms.

MR. LONDON: Well, that key criticism was that he had done in the bipolar paper something he had not done in the gabapentin study. But once he's done that, all he has done, as I understand it, is achieved a number of sensitivity analyses. He has, to use their word --

THE COURT: Just say in English, what's the challenge here?

MR. LONDON: The challenge is that his sensitivity analysis, regardless of how many he does them or how he manipulates the data, will never achieve the causality level

fd736870-b7d2-4abf-9a4d-d491dac7cbe1

because it does not account for the other Dr. Greenland criticisms.

THE COURT: Well, that's what I'm trying to get at, so help me. Truthfully, as soon as you told me that that last case resolved, I threw the papers in the wastebasket; not literally, but I put them on a shelf, and I did not think about them again. So there were certain key criticisms that Greenland had, some of which resonated, in why he was not accepted into the peer-review journal, and those have been now addressed. No?

MR. LONDON: Yes, key criticism number one has now been addressed. He didn't do all of the same analyses for both papers.

Greenland key criticism number two, though, has never been addressed.

THE COURT: Which is what? Bring me up to speed. What are you pressing now? Now that that's been taken care of, what's the issue?

MR. LONDON: Dr. Gibbons chose to exclude comparator drugs in the benzodiazepine group, in the Valium and Xanax group, which both account for suicides before the index date in patients who take those drugs, because they're given for those kinds of patients, or the removal of those after an index date would count for the reduction in number of suicides. No matter how many times you may look at the numbers of before and after

patients, you can't eliminate the selectivity bias of this particular study.

THE COURT: Just say it in -- because these people may have been taking other drugs? Is that the issue?

MR. ALTMAN: Yes.

MR. LONDON: Not only may have been taking other drugs, but almost certainly were taking drugs.

THE COURT: Just say it. I'm just learning. I'm back in the saddle. So you're saying, now that that's been taken care of --

MR. LONDON: Judge, I have given you --

THE COURT: The issue that hasn't been taken care of is the fact that these patients may have been or likely were on other drugs?

MR. LONDON: Very likely were on other drugs.

THE COURT: Because that data isn't available in this data set?

MR. LONDON: That's correct.

THE COURT: All right, so you're saying no matter what he does -- I'm just trying to understand it. Take me in baby steps.

MR. LONDON: May I give you an analogy?

THE COURT: No. I just want to hear the basic criticism.

MR. LONDON: The basic criticism is that he sets out

to study patients on antiepileptics and gabapentin before and after suicide attempts, or he sets out to study bipolar patients before and after antiepileptics. He never studies all of the other drugs that can cause the conditions before the index date. That's key criticism number one.

THE COURT: So all the other drugs that can cause what?

MR. LONDON: Attempted suicides. And he never studies those same drugs after the index date because the removal of those drugs would tend to explain why there are fewer suicides. For example, if you have a patient who's --

THE COURT: Okay, okay, I'm understanding that.

MR. LONDON: Okay.

THE COURT: And so you're saying that that goes to the heart methodologically --

MR. LONDON: Yes, ma'am.

THE COURT: -- of something that no matter how many tests he does he can't do because that data set won't give it to him?

MR. LONDON: That's correct.

THE COURT: It's not fixable?

MR. LONDON: It's not fixable with his data set.

THE COURT: Okay. So the example you were going to give me was?

MR. LONDON: The example is watching the Olympics.

I'm watching the Olympics a day or two ago, and these figure skaters are out there figure skating along, and one of them just goes kapow, lands on his nose --

THE COURT: More than one.

MR. LONDON: Well, I worked so hard to get ready for this hearing, I didn't get to watch all of it. But this poor guy goes skidding across the ice on his nose, and the commentators act like it didn't happen. They're saying this fellow is a Russian great, you know, he spins and he jumps in the air, and he gets his toe into the ice, and he does these little axels and salchows, or whatever they're called, it's fantastic. And he gets up and he skates off, and they go, you know, "Well, that was pretty good." Then the judges come out, and the judges go "40, 46, 48, 49, 60." One judge acted like he didn't fall at all. One judge acted like he didn't even put his skates on and come out and skate, and then you have all these middle judges who make up the score.

No matter how many times you skew those middle judges' numbers around, the guy fell. You can't act like he didn't fall. No matter how many times you skew the presence or absence of these other drugs, you cannot account for whether patients he studied probably attempted suicide because of those drugs or didn't attempt suicide after the index because they were no longer taking those drugs. It can't be fixed. Those drugs are always going to be skidding across the ice on their

face.

Here's the second really core problem.

THE COURT: Can I just say, as I understand, he's only looked at the people who took the antiepileptic drugs after the index date, right?

MR. LONDON: I'm sorry?

THE COURT: He's looking a year before and a year after, right?

MR. LONDON: Well, there are two different studies. In one study, the bipolar study, he in theory is looking at bipolars the year before and the year after. And while he does look at the antiepileptics, he's also looking at patients that he ordered 79 drugs to use as the background drugs in addition to the eleven antiepileptics; and I think he makes an attempt to account for the presence or absence, the concomitant effect of the drugs he did order. We don't criticize that.

Yes, ma'am?

THE COURT: So the supplementation that he just filed, which is what I focused on for this hearing, doesn't deal with that issue at all?

MR. LONDON: It does not address it.

THE COURT: But your criticism is one that you made to his initial report?

MR. LONDON: Yes.

THE COURT: So there's no problem with the -- I know

you may disagree with it -- you're not claiming there's a methodological problem with the supplementation. We're actually going back to just the criticism point two from a year ago?

MR. LONDON: Yes, ma'am.

THE COURT: All right.

MR. LONDON: And then I want to go --

THE COURT: So the papers, the back-and-forth on that I can look at that without having to deal with the supplementation?

MR. LONDON: Yes, ma'am. Yes, ma'am. And then the second problem that most assuredly the supplementation does not address, nor do any of the reports address, is that he's comparing suicide attempts before with suicide attempts after to see if there's a change in the numbers. But in his own testimony he admitted that in the after period he stopped counting suicide attempts at the first attempt. I mean, it's in the transcript. Mr. Altman asked him on the stand, "Isn't it true that in doing the after study of comparator suicide attempts, you got to the first attempt and stopped?" And he said "Yes."

So we don't know if in that one- or two-year period after the index date a patient who had an attempt had more than one attempt. So we're now in the sort of odd position of having a gentleman who's done an extraordinary amount of

sophisticated statistical analysis to compare on drug/off drug, suicide attempts/no suicide attempts, when he admits he doesn't know if they were on or off the drugs and when he admits he doesn't know how many suicide attempts there are.

THE COURT: I thought he did check to see if they were on or off the drug.

MR. LONDON: No. I believe what he did was, he checked to see what their prescriptions were, and he would check them a month at a time. He did a sensitivity analysis to go back to see what difference it made if he analyzed them over a different person-time analysis, but he never --

THE COURT: I thought, though, he did look to see whether they had gotten a prescription or didn't get the prescription.

MR. LONDON: No.

THE COURT: Is that right?

MR. BARNES: Yes.

THE COURT: What you're saying is, you don't know if they actually took the drug?

MR. LONDON: Well, that is --

THE COURT: I'm looking at --

MR. LONDON: God bless him, he's with us in every one of these hearings, and he's an 88 percent benefit and a 12 percent burden. It's sort of the kitchen cabinet syndrome.

Your Honor probably doesn't have this problem, but

some people in America have a bunch of drugs that they never take --

THE COURT: That's just -- I think you can at least reasonably infer that if someone keeps filling a prescription or doesn't, that they're taking it. Now, you can make an argument that -- that doesn't go to the heart of it. I'm not as worried about that.

MR. LONDON: Right.

THE COURT: But you say that they stop at the first attempt. I thought they went for an entire year out.

MR. LONDON: But once any particular patient index number gets a suicide attempt, he stops looking at that patient. He looks at --

THE COURT: Is that still true?

MR. LONDON: Keith needs to correct that one, so before Rick says that's not true, let Keith say what is true.

THE COURT: Let him correct it or at least explain it to me.

MR. ALTMAN: In his primary analysis, Dr. Gibbons looked at how many suicide attempt codes there were in the database. That's his primary analysis that he did his numbers on. When he did his sensitivity analysis to try to look at the time issue, whether they were on or off the drug, he looks at on a month-by-month basis whether they were on or off the drug, but he stops -- this is only for the sensitivity analysis -- he

stops after their first suicide attempt. Now, let's say a person had a suicide attempt and three --

THE COURT: So he stops at the -- this is the thing he's just supplemented.

MR. ALTMAN: This is the sensitivity analysis he's just done.

THE COURT: So what does it matter that he stopped at the first suicide?

MR. ALTMAN: Because maybe the person attempted suicide a second time while on the drug or a third time while they were on the drug after that point. He only counts one suicide attempt, even though they may have attempted suicide multiple times.

THE COURT: Is that just a guess, though? Do people -- I mean, within a year, how many people try to commit suicide two and three times in a year?

MR. ALTMAN: With bipolar patients, it's actually not an uncommon event.

THE COURT: How do I know that?

MR. ALTMAN: Well, that's the problem. He didn't take that into account, and the data is there that supports it. I mean, there are in fact people with multiple suicide attempts.

THE COURT: You have the data. How many people?

MR. ALTMAN: It's probably, I would say --

THE COURT: I mean, don't make me guess. Are there

people there who committed suicide more than once?

MR. ALTMAN: Attempted suicide more than once, yes, absolutely there are people --

THE COURT: I mean attempted.

MR. ALTMAN: There are people who absolutely attempted suicide on multiple times --

THE COURT: How many? Does it matter?

MR. ALTMAN: Yes, it does.

THE COURT: I mean, here's the thing: I don't want to have to guess. I don't want to be doing this on the fly. Maybe this is something you'll submit an expert affidavit. I don't know, if it's just maybe one or two and it doesn't matter. But you have the data too, so don't make me guess if there are a bunch of them.

MR. ALTMAN: It's a lot. It's a lot. I will get you an exact number. It's not one or two. It is a significant number of people have multiple attempts.

THE COURT: Who?

MR. ALTMAN: Possibly if I sit here for a few minutes, I could get you an answer.

THE COURT: Well, I'd probably need it in an affidavit, because you've looked at the data?

MR. ALTMAN: Yes. I can tell you as an absolute fact, there are many people who have multiple attempts in the bipolar cohort.

THE COURT: But can you tell whether they were on gabapentin at the time that they tried to commit suicide the second time, the third time, the fourth time?

MR. ALTMAN: Yes. In the same way that you can tell it through the first one, you can tell the second time and the third time.

THE COURT: So let me ask you this: Do you know whether he addressed that issue of multiple attempts?

MR. BARNES: I think they've recast it, a lot of the discussion. Yes, he does adjust for multiple attempts. It's in one of his sensitivity analyses. Your Honor asked him about that in the transcript, and he explained to you exactly what he did. So if I can respond to their description of --

THE COURT: So you're saying, no, he didn't, and you're saying, yes, he did.

MR. BARNES: As I understand what Dr. Gibbons did and my understanding of Dr. Greenland's criticisms, Dr. Greenland missed the mark. You asked Dr. Gibbons and Dr. Gibbons explained to you as to how he dealt with multiple attempts.

But let me go back to first principles, okay, to respond just where we are on this. We asked Dr. Greenland these questions. I asked him questions, your Honor asked him questions, and he conceded that the methodology was sound and reliable. He did not quarrel with it and -- okay.

THE COURT: Here's my problem.

MR. BARNES: Yes, ma'am.

THE COURT: The hearings were endless. We spent a huge amount of time with Dr. Gibbons, a huge amount of time with Dr. Greenland, I remember at one point late into the afternoon. I never got briefing afterwards. I took it all under advisement, and the case resolved. It was right up against the trial, if I remember, and I don't remember. You've got to reteach me what is left in the case. That's why I held this hearing today. I'm not expecting to see them again. I just need a full-blown argument on what's left.

MR. BARNES: What we left before your Honor was the criticism that Dr. Gibbons addressed in the supplemental report, which was the months on drug, the months off drug following the first prescription of gabapentin, and the gabapentin study only. That was the issue that your Honor was concerned about. It's the issue that is addressed in this report completely.

THE COURT: But here is my issue, which is, assume for a minute the data bears out, you know, once they get the data, they are pressing two or three other criticisms, and we hadn't ever had oral argument after the evidentiary hearings because the case ultimately resolved and we were all exhausted. I mean, we didn't really -- I didn't -- I need somebody to crisply put in place what are the remaining issues that I need to address. That's why I'm holding this. It's a year later.

MR. BARNES: Let me try, okay?

THE COURT: Okay.

MR. BARNES: I think I can do it as best -- I have studied the transcript, and let me show you what Dr. Greenland himself said in response to your Honor's questions on methodology. And I have the transcript for you if you want.

THE COURT: I don't even care what he says at this point. I just want to know what the issues are, and then I want to hear what each side had to say about them. What do you perceive as the remaining issues when the case -- it didn't even settle -- was disposed of?

MR. BARNES: The only issue that we had left before your Honor was whether Dr. Gibbons accounted fully for the exposure to the drug after the index date. In other words, you were concerned, as was Dr. Greenland, that Dr. Gibbons had biased the study in favor of the drug by counting all patients as being on drug for twelve months. Remember those discussions? That was the only issue left, and that's what he set out to address.

Dr. Gibbons assumed every suicide attempt after the index date was attributed to the drug, whether the patient was on or off the drug. He said to your Honor: That's a conservative assumption, and it's biased against the drug and risk. Dr. Greenland, on the other hand, came in and said: Well, that may be so, but you're not taking patients out of the

denominator at the same time in the months they're off drug. Dr. Gibbons said: When I did that in the bipolar paper, which has been peer reviewed, method and data, it showed that my assumption was correct that it actually was a conservative assumption, and if you account for it, you will show month by month the drug looks far better if you do the person-time logistic regression analysis than if you don't. So he had proved his point in spades.

But to address the issue from Dr. Greenland, he went and did the same exact analysis that was done in the bipolar paper in the gabapentin paper, and indeed what it showed was that Dr. Gibbons in his original primary analysis had been very conservative; and when you account for time on and off drug, the drug actually looks far better in terms of the rate of suicide attempts goes down on drug if you address Dr. Greenland's criticism.

THE COURT: So the bipolar was accepted into a peer-reviewed journal?

MR. BARNES: It was fully published and it's available.

THE COURT: What about the gabapentin?

MR. BARNES: It is pending, pending peer review.

THE COURT: And were there criticisms like the last one?

MR. LONDON: It's in peer review.

THE COURT: No, but you'll produce all criticisms?

MR. BARNES: As far as I am concerned, there are no criticisms in the peer review, but --

THE COURT: You have an obligation to have him produce all criticisms. That didn't happen last time till the last minute.

MR. BARNES: We will produce it. May we produce this in a way that's under seal so that it doesn't go into a public domain to protect the peer-review process?

MR. CHEFFO: Your Honor, if I could, I mean, here's the issue. We have no problem producing it. The only issue, as you know from the literature, we don't want to do anything to interfere with a journal that's -- sometimes the fact that they even know that it's out there, it's been submitted, if we do that, they may --

THE COURT: I'm happy to do that under a protective order.

MR. CHEFFO: Thank you.

MR. BARNES: So that's pending review, and so to be quite -- I prepared for this hearing looking very carefully at your Honor's concerns and Dr. Greenland's concerns, and it boiled down not to the -- these are new and they are cast differently. And so what I am saying to your Honor, we left here with one concern your Honor had. You stressed it three times.

THE COURT: I don't believe, though, I ruled on the other ones because, you know, just say it's easy if there's a glaring problem not to then deal on points two, three, and four. They're not waiving them, as I understand it. So basically walking out of there, I had one concern which I may well have excluded that report under. That's now been taken care of. So now I have to get to points two, three and four, which I don't believe that I explicitly ruled on.

MR. BARNES: Let me take a step back for your Honor.

THE COURT: Is that -- did I --

MR. BARNES: I think we did go through all of this. I took Dr. Gibbons, if you recall --

THE COURT: Excuse me. I recall nothing. Let me start there. I do recall that it was right up against the trial, and I never wrote an opinion. So as far as I am concerned, I don't think I ruled from the bench. Did I? I didn't make a ruling from the bench on --

MR. BARNES: On the gabapentin paper, no, your Honor, you did not. On the bipolar paper you did.

THE COURT: Did, right.

MR. BARNES: Yes. So if I can just take a step --

THE COURT: So that's why I'm on the gabapentin paper now.

MR. BARNES: Okay, but let me address your concern in this way. The gabapentin paper and the bipolar paper, two

different studies, have essentially the same methodology. Dr. Greenland explained to your Honor that the two studies have the same methodology and consult the same data. That's number one, and I can show you his testimony on that.

Number two, the peer-reviewed paper has this index date, date of diagnosis, okay. The gabapentin paper has the index date where it's pre- and post- the date of the prescription, okay? So the issue that you had was this issue of accountability about how you count the events after. That was an issue that he did not take account of in the gabapentin paper; he did in the bipolar paper. That's where he left it.

But at this hearing your Honor was very appropriate, and I'll paraphrase you: You wanted to have Dr. Greenland's bottom-line opinion as it pertains to the overall methodology, and you asked him specifically: Is this sound? Is this reasonable? He said to you: Yes, it was reasonable. The issue is not Dr. Gibbons' methodology; the issue is the conclusions he draws from that. I believe they're, quote, "overdrawn."

Remember we had forty-five minutes with Dr. Greenland for his examination, so of course I couldn't cover four reports and all of that, but your Honor went right to the bottom line: "This method has been peer reviewed and accepted," and you went to them, "Isn't this reasonable?" and he said "Yes." And I have the transcript for you to look at online here.

So the question then becomes -- and your Honor was very pointed -- "I want to know your bottom-line opinion," and he said, "Yes, it is reasonable. It is reliable."

The second point is, when I had his deposition, the only other problem on Daubert that I had to connect before your Honor to make the record, I needed to make under Rule 702, was application of the methodology to the case at hand, was it applied reasonably? I asked Dr. Greenland and I played the videotape, "Did Dr. Gibbons' report support the hypothesis, is it in support of the hypothesis that Neurontin does not increase the risk of suicide attempts?" He said, "It supports it, but it's not a randomized trial, but, yes, it supports the hypothesis."

The second question: "What about suicidal thinking and behavior in psychiatric patients, does it support that hypothesis that gabapentin does not increase the risk in those patients?" He said, "Yes, weakly, but, yes, it is supportive."

So what is joined before your Honor is a battle of two Fellows of the American Statistical Association, the pinnacle of the profession, agreeing on the data, the methods, and the fact that, when applied to this question, it supports the hypothesis that Dr. Gibbons set out to prove. What we're talking about is the strengths of the conclusions that one may draw from that, the inferences that one may draw. That's all that was before your Honor when we left the courtroom, and I

got that concession from Dr. Greenland, and you got several concessions along the same line during the hearing, which I can review with you if you wanted to take the time, but that's my --

THE COURT: So your position is, the only thing left is whether he has adequately dealt with the concern raised by Dr. Greenland?

MR. BARNES: Yes, your Honor.

THE COURT: About the on the drug/off the drug for the year following the suicide event, the index event?

MR. BARNES: Yes.

THE COURT: All right, so that's what he thinks is left.

MR. LONDON: In that hearing, at Page 64, you said, "Did Dr. Greenland really say, if you look at the doctrine of completeness, that he agreed with the full methodology of the gabapentin study?" You then sent us off to get his deposition and bring it to you because you wanted to read it before you made any decisions. The case cratered. We apparently never brought you the deposition.

In his deposition he says --

THE COURT: Do I have it now? I think --

MR. LONDON: We filed it, we filed it.

THE COURT: Somebody -- I never had to read it because the case went away.

MR. LONDON: That's correct, and I'm going to encourage you because if Rick's theory is, all that was left was to do what you asked us to do, here's what you asked us to do: What is the completeness of his full methodology? We're not quibbling with his math. Dr. Greenland in his deposition, Page 93 --

MR. BARNES: One second, Counsel. I just want to catch up.

MR. LONDON: Sorry. I'll give you the pages. Rick, let me begin on Page 90. Are you there?

(Discussion off the record.)

MR. LONDON: Okay? On Page 90, Rick asked Dr. Greenland whether it was a deceptive aspect of his analysis that "The Gibbons paper attempts to convey the impression that all concomitant psychotropic medications were accounted for?" and Dr. Greenland says "Yes." Going on, he says, according to this statement, "It's other AEDs, antidepressants, antipsychotics, and lithium. However, the data didn't actually include all psychotropic medications. They did not include stimulants. If not, ace anti-anxiety drugs and various antipsychotics weren't included or pain medications."

Going across the page to Page 93, Dr. Greenland goes on to say, "I don't have the list in front of me, but it was a relatively short list, and there are thousands of medications out there, literally. In fact, you can find some database

studies that come from pharmacoepidemiology groups where they have lists that exceed a thousand medications from their databases, and they attempt to adjust for all of them in some fashion."

Rick asks him a couple of questions about whether or not he had read Dr. Greenland's list, and he said that he had, and then over on Page 96 --

THE COURT: So just --

MR. LONDON: Yes, ma'am?

THE COURT: All right, go ahead.

MR. LONDON: And he repeats that criticism five or six times. He then says, not only did he not adjust for those medications, he didn't fully adjust for the concomitant medications that he did include. And then he goes on to conclude that -- and this is the most critical part -- that the null hypothesis, the one that Rick just described to you, that there's no difference in before and after, from this pharmaceutical database study can be got to purely by chance alone.

Now, that's not just a matter of degree. That's the entire purpose of an epidemiology statistical study is to reduce or eliminate chance. And Dr. Greenland makes it very clear that his criticism is that his study gets you down to the point where you cannot eliminate the probabilities of increased or reduced suicides based on chance alone, nor can one get

there on chance alone without accounting for the drugs that cause people to do the things they do. So the full completeness --

THE COURT: That's because what? Because --

MR. LONDON: Well, for example, many patients who -- I think most psychiatrists would probably tell you that in their practice, patients who tend to attempt suicide tend to be drug or alcohol patients to begin with. Over 110,000 of the 140,000 patients in the PharMetrics database were pain patients. There's no morphine, there's no methadone, there are none of the drugs that pain patients take under prescription or by abuse that, first, will address their pain, or, secondly, lead them into attempted suicides. They're just not in there. Yet we have 110,000 of the 140,000 patients in the database are pain patients and they're psychiatric patients. Yet how do we exclude methadone -- I hate to say heroin, but for better or for worse, that's one of those things -- morphines, morphates, opiates, and then act like this is a complete analysis of the drugs that would explain the suicides before and the absence of suicides after?

And, respectfully, it's not just a problem with the gabapentin paper. It's a problem with the bipolar paper.

THE COURT: That was accepted in a peer-reviewed journal.

MR. LONDON: Yes, it was accepted in a peer-reviewed

journal. I have no quibble over the fact that --

THE COURT: That is coming into evidence now. That's been accepted. And he says it's the same methodology. Is that true?

MR. LONDON: I think it is the same methodology. And certainly with the new supplemental paper, the hazard function graph that is addressed in the bipolar paper that was published appears to me on an idiot's reading to be the similar type study in the new supplemental paper. I can't offer more than allowing Dr. Greenland to take his look at it, as you've told us to do. But none of them cure this absence of suicide-causing drugs from Dr. Gibbons' paper.

THE COURT: You say the null hypothesis exists in the bipolar study that was accepted?

MR. LONDON: Yes, the null hypothesis. May I tell you about CC, the document that we also just got? CC filed under seal --

THE COURT: Why are these under seal, by the way?

MR. LONDON: Caution. They're marked "confidential" and --

THE COURT: AA, I don't know what --

MR. LONDON: Yes, ma'am?

THE COURT: I don't understand why AA was sealed. I don't understand why you seal ninety percent of what you seal.

MR. LONDON: We didn't mark it as confidential. They

marked it --

THE COURT: I don't see why it's confidential.

MR. ALTMAN: Your Honor, the only reason, for caution. If you remember, there was an issue with Dr. Egilman and the disclosure of certain documents, and they made a very big deal out of documents being disclosed, so out of an abundance of caution --

THE COURT: I'm unsealing AA. BB is Dr. Gibbons' slides. How can that be sealed? I'm unsealing BB. Now, what's Exhibit CC?

MR. LONDON: May I discuss CC with you, your Honor?

THE COURT: Yes, of course.

MR. LONDON: CC we received two weeks ago. We did not receive it from Dr. Gibbons. It did not come out of Dr. Gibbons' files. It did not come out of Ms. McGroder's files or Rick's files. It came from another Pfizer employee named Christopher Wahlberg, who you may remember was involved in presenting Pfizer's position to the FDA. This is a document that Dr. Gibbons composed two weeks before you granted Pfizer's motion to allow Dr. Gibbons to be a witness. This document sets out his plan on how he's going to get PharMetrics data --

THE COURT: This is unsealed too. Why should this be sealed?

MR. LONDON: Thank you.

THE COURT: I'm just looking at it. Unsealed.

MR. LONDON: Now, what's interesting about this is that his plan, before you ever gave him permission to testify, sets out an intention to do a pharmacoepidemiological study, not a response to the FDA.

The other part of that which I find interesting is that he sets out his objectives in that paper, and a plain reading of them is, he intends to compose documents to defend gabapentin, not to go out and do a scholarly article. In fact, when you read the objectives --

THE COURT: So he's a hired gun.

MR. LONDON: Sorry?

THE COURT: So he's a hired gun. I mean, that's an expert that was hired by Pfizer. I mean, that's --

MR. LONDON: Well, the Court seemed to discount the nature of his being a hired gun if he succeeded in getting it peer reviewed and thereby published, but what happened --

THE COURT: Because theoretically they're not hired guns.

MR. LONDON: Well, in theory, but the problem is, when we talk about Daubert and giving some respect to having peer review as one test, Daubert is not looking at people like Pfizer, who, frankly, have the history and the ability to manipulate the scholarly journal process just to give something the evidence that they can use in court.

THE COURT: Okay, so I'm unsealing AA, BB, and CC.

It's my overall concern that too much is being sealed here. Nothing else should be sealed in this case, nothing else, unless it involves patient privacy issues. That's really where -- I have too much trouble finding it. It shows up differently. So no more sealing unless patient privacy is involved.

So you have the null hypothesis. That's the issue with the peer review study that was accepted by peer review, but would you explain what the problem is again.

MR. LONDON: Well, the problem is --

THE COURT: Because Gibbons disagrees with you, right?

MR. LONDON: I beg your pardon?

THE COURT: As I understand, Gibbons disagrees that the null hypothesis is included, right?

MR. LONDON: Has Dr. Gibbons agreed that his null hypothesis --

THE COURT: Gibbons doesn't agree with Greenland on the null hypothesis at all?

MR. LONDON: That's correct, they do not agree.

THE COURT: It's a statistical point, right?

MR. LONDON: That's correct.

THE COURT: He says, no, it doesn't include the null hypothesis.

MR. LONDON: Well, I think that Dr. Greenland's philosophical position is that a null hypothesis is a

hypothesis towards which all studies can be biased. In other words, if you don't start out with a statistical plan, as Dr. Gibbons did not, then you can continually adjust the data back to prove the null hypothesis, rather than simply looking at the data and allowing them to fall where they do. I believe that's the philosophical difference.

THE COURT: I don't understand what you just said, so help me out on it. So Greenland's position is what?

MR. LONDON: Well, again, you have all of Dr. Greenland's position --

THE COURT: Yes, and we went through --

MR. LONDON: He has not seen CC yet, Dr. Greenland has not seen CC, but CC is a document that essentially tells --

THE COURT: I just want to understand the issue. I don't remember what a null hypothesis is in statistics, so baby steps for me.

MR. LONDON: His hypothesis is, the null hypothesis, according to his testimony and his project paper, is that by comparing patients who were on gabapentin, bipolar patients who were on gabapentin before the suicide attempt with patients who took AEDs after the suicide attempt, there would be no change. And then his hypothesis in his report and in his published paper --

THE COURT: "Him" meaning Gibbons?

MR. LONDON: Dr. Gibbons, yes, ma'am. His hypothesis,

his null hypothesis in the report and paper was, patients who did not take gabapentin or any antiepileptic before and took it afterward would have no change. The null hypothesis is "no increased suicidality."

THE COURT: All right, so it's just a hypothesis.

MR. LONDON: It's just a hypothesis.

THE COURT: All right, it's the basic premise. And so what's wrong with Gibbons doing that?

MR. LONDON: Well, his basic premise was set out as an objective that is different in the work he did for Ms. McGroder than the work he told the psychiatric journal his objective to be. Now, Keith, can you pull that up.

THE COURT: So your contention is, he lied about what his hypothesis is.

MR. LONDON: That is true.

THE COURT: So that's not a Greenland criticism from a statistical point of view. That's more a credibility thing.

MR. LONDON: It is a credibility problem that -- yes, ma'am.

THE COURT: So that's not something Greenland is talking about?

MR. LONDON: That's correct.

THE COURT: I just want to understand. So Greenland's big challenge is that -- this is what's remaining -- Greenland's statistical challenge is that the study that

Gibbons did did not take into account other medications.

MR. LONDON: And his second criticism is that because of the statistical methods he employed, which are good methods, reliable methods for certain purposes, you cannot eliminate the result as being purely the consequence of chance.

THE COURT: Because there are other drugs that the patients may or may not have been taking.

MR. LONDON: Yes.

THE COURT: All right, so that's a statistical challenge. And then Part B is your challenge based on this document called CC, which is that the hypothesis that Gibbons was theoretically following was a phony?

MR. LONDON: That's correct.

THE COURT: All right, I understand it. Those are the challenges. So that's different from the challenges that he thought were left on the table.

MR. LONDON: And it is a different challenge, but it's one that I feel like I need to make today.

THE COURT: Fine. I'm here. Just like they brought up something new, fine. But this is it. There will be no more depositions.

MR. LONDON: Let me just finish.

THE COURT: So we have really two issues on the table: the effects of these other drugs and whether they're properly accounted for in the data, and the second is whether or not

there was a lie about what the null hypothesis is.

MR. LONDON: And that is really a challenge that we raised earlier with Dr. Gibbons when you said this is all just so much happening right before trial.

Do you remember, who was the fellow who said "And now for the rest of the story"? Paul Harvey. With Dr. Gibbons, there's never "the rest of the story." You will recall that the first time we --

THE COURT: He's from here, isn't he?

MR. LONDON: I did not know that. So you do remember Paul Harvey. And do you remember, the first time that we set out to do discovery on Dr. Gibbons' new opinions we asked also to depose the coauthors? He filed an affidavit under penalty of perjury telling Judge Sorokin that these coauthors, specifically Dr. Hur, played no role in his expert report. We take a deposition, and he says, "Well, yes, actually, Dr. Hur did the computer programming, and I paid him $10,000 for it." Dr. Gibbons then tells us, "You have all the records." The day after the deposition we get a letter from counsel saying, "Well, you have all the records except for all the Fortran analysis, all of the ASCII disks, all of the sensitivity analyses, but there are no e-mails." We take his deposition. He changes his report again because he's composed a new sensitivity analysis that he didn't give us.

THE COURT: I remember this is --

MR. CHEFFO: Your Honor, can we --

THE COURT: No. Just let him finish this sentence, and then I'll hear you talk all you want.

MR. LONDON: The problem that I'm bringing to the Court's attention is, even when you tell him, "Don't do anything more," we never get everything, and we never get the last word.

THE COURT: That's a very fair point, and I will be issuing an express order at the conclusion of this hearing.

MR. LONDON: And so I'm making what I would call not merely a 702-04 objection but also a Rule 26 and Rule 37 objection, and the best evidence of it is AA, CC, two documents that have been in existence for almost two years that directly talk about Dr. Gibbons' methods that we got about ten days ago.

THE COURT: I tell you what, that's taking them by surprise. If you want to file a motion for sanctions, do it, but I'm not ruling on a motion for sanctions right now.

MR. CHEFFO: Can I just talk about that for a second, your Honor?

THE COURT: Yes.

MR. CHEFFO: You talk about spinning the Olympics? We heard more spinning here than I think I've seen in the entire Olympics. You know, what they don't tell you is that -- you know, they act like this was a nefarious thing, like all of a

sudden out of the blue we just, like, throw out two documents in the last two weeks. We've had briefs, more than you can imagine, before Judge Sorokin. They moved for sanctions. They said he's the worst guy in the world, he's done all -- this has been, like, total old news.

THE COURT: I guarantee you, if they file a motion for sanctions, it will be referred to Judge Sorokin.

MR. CHEFFO: And let me, just so the record is very clear, we went back -- and this goes back to the fall -- and they wanted to open discovery for all kinds of purposes. We made motions, and Judge Sorokin said there are two kinds of discovery that he can produce: one regarding Shearer specific with respect to Dr. Edwards, which we did, and then we also produced documents pursuant to that order regarding Dr. Wahlberg. So it was only after they moved, and he had a very limited targeted discovery. So we've given them documents. It's kind of like Goldilocks: You know, you give them documents; they complained about it. So just so that the Court is clear, it's not like this was stuff that we never had before.

THE COURT: You know what, I'm actually not ruling on it. If there's a motion for sanctions, they can file it.

So as I understand it right now, then what's on the table is, A, did your sensitivity analyses deal with the problem, which they're going to have their expert look at and

provide a report within two weeks after they get the underlying data? And your expert may, if he chooses to, file a rebuttal affidavit if he thinks the data is insufficient. That will be a completely separate issue. That rebuttal affidavit will be the only additional thing that will be filed. There shall be no surrebuttal affidavit from your expert. There's going to be nothing, nothing more from him, no supplemental -- because even if we're six weeks away from a trial rather than one month away from a trial, we can't do what we did last time. It was too quick. I didn't get it. I'm going to have to sit and go back and reread everything, which I've only read the briefs, if you will, not the full record before.

So the second thing is, they have now -- and I'm going to look at the earlier one -- have challenged his credibility on the null hypothesis based on the CC, which I will look at.

And last but not least is what I call the only remaining methodological issue that I know about, which is the effects of these concomitant drugs. And that's the point at which if you want to respond to right now, because I'm not going to hear any more argument on it. He says that's still on the table. I don't remember whether or not I actually ruled on it. I remember coming out of it thinking "yes" on the bipolar study not being sure on the gabapentin.

MR. NAPOLITANO: That's exactly how you fell out, your Honor, at the end of the hearing.

THE COURT: So on the gabapentin, how do I deal with the concomitant drugs?

MR. BARNES: First of all, he addressed it very --

THE COURT: Maybe he addressed it, but I haven't ruled on it, okay?

MR. BARNES: Well, my recollection of where we left it was as how we've described it. I want to show you --

THE COURT: Regardless, I'm thinking about it now. He's raised the issue. What's the response for how we address the issue of the other drugs?

MR. BARNES: Cross-examination at trial of Dr. Gibbons.

THE COURT: But help me scientifically.

MR. BARNES: Okay, the concomitant medications issue, here's the chronology: Dr. Gibbons consulted with a pharmacoepidemiologist, Dr. Valek, and I believe Dr. Main at Columbia, and said, "I want to adjust for concomitant medications. Give me an appropriate list." He didn't get thousands. He got the most appropriate list from two well-qualified experts in the field. It's a similar list to the list that was used in the published paper on SSRIs, had been peer reviewed in the VA paper on that, so that basically that's that same list.

THE COURT: So your argument is that this just boils down to a difference of opinion among experts as to what are the appropriate drugs to cross-check against?

MR. BARNES: Precisely.

THE COURT: All right, that's all I want to know. So you say that goes to the weight of rather than to the methodology. His people think that lithium and some of the other drugs he mentions were appropriate. You think, no, these other drugs were appropriate. And so you're just saying that goes to the weight of it; it's just a question of whether or not you think that he missed enough key drugs that it undercuts the --

MR. BARNES: Precisely. It's a question of --

THE COURT: -- strength of his opinion.

MR. BARNES: Strength of the opinions and conclusions, that's what this is about. Yes, that's well summarized.

MR. NAPOLITANO: The only other point I wanted to clarify, your Honor, is the supplemental submission that they're going to do from Dr. Greenland, I think from your comments today it's clear that that's going to be limited to addressing the new material in January 10 of this year and not -- this argument, to the extent the plaintiffs have claimed, it's already on the record.

THE COURT: Yes, yes. So flat out order -- maybe Robert can get this for the docket -- no further expert submissions other than Dr. Greenland's response, if any, to the January 10 Gibbons report. Okay, that's the only thing I expect in addition.

Now, I have another question: When is the Tennessee case scheduled for trial?

MR. CHEFFO: May 11.

THE COURT: So regardless of when my case goes, I should get something out because is this issue going to come up in the Tennessee case?

MR. LONDON: I believe the parties believe that what you rule will control the Tennessee case. Is that what your understanding is?

THE COURT: I never ruled on it.

MR. LONDON: Because we understood this was a crosscutting MDL-wide --

THE COURT: I never ruled on it. And so I don't know if that judge is doing his own Daubert hearing or whether I should rush to try and finish this by May 10. It sounds as if the cases are going. Either one is before the other, and it's hard to figure out who's going to be first, given my other schedule. Is that right?

MR. CHEFFO: I'm sorry?

THE COURT: So the Tennessee case is May 10?

MR. CHEFFO: May 10, right. It's before Judge Trauger, but she set trial for --

THE COURT: Is she doing her own Daubert hearing on this?

MR. CHEFFO: My understanding is she's not. There are

summary judgment motions pending, but if you recall, remember --

THE COURT: There are some Tennessee law issues.

MR. CHEFFO: Exactly, so that's being teed up. My understanding is that they haven't -- I haven't seen the order. I'm not sure that the schedule as I stand here right now requires them to file Daubert, so I don't know if they've made Daubert challenges in Tennessee yet.

THE COURT: Well, if she's doing it, I'd love it, but the reality is, I mean, it is part of my hunt. And normally I would have ruled on it, but the other case went away. So that case is going to go first unless it settles, right?

MR. CHEFFO: Well --

THE COURT: Given Pfizer's settlement history in this, I'm not expecting it to settle, right?

MR. CHEFFO: Well, I mean, I guess it's going to continue on your Honor's schedule, but our view is that even with these other cases, we certainly can do Shearer before. I mean, the problem is, we have -- you know, the experts have been pretty well lined up --

THE COURT: The issue --

MR. CHEFFO: I'm sorry.

THE COURT: Go ahead.

MR. CHEFFO: I was going to say, if you can't do it, then obviously, but we would say we could actually do Shearer

before or at the same time as the Smith case.

THE COURT: And, truthfully, I'll be happy to do it. My biggest issue is my time because unless your case settles, which it doesn't sound as if it is, then I'm blocked, I mean, literally starting next month.

MR. CHEFFO: We'll have some Daubert motions in that case as well, you Honor. I think Mr. Sobol was here before, so --

THE COURT: I don't know that I have any Daubert --

MR. CHEFFO: The other is the Rosenthal Daubert issue.

THE COURT: Oh.

MR. LONDON: May I ask the Court for a little guidance on this scheduling issue?

THE COURT: That's one I didn't -- I ruled on the double-blinded random controlled test ones, but I have not ruled on Rosenthal yet, and so I'm glad you brought that to my attention. But my point is that my time is -- I have four huge commitments this spring. One is your case, one is the Mylan AWP case, one is a major criminal case that will take about a month, I'm told, and then I have Shearer. And I've got some First Circuit judicial conferences and Federal Judge Association things at the end of May. So, I mean, I am going to fit you all in, but I don't know exactly --

MR. CHEFFO: And, obviously, your Honor, we're going to do whatever the Court thinks we need to. What I would say

is, if you do determine that it's not going to happen in the spring, you know, I would ask the Court to consider moving the Shearer case to early fall. We found it very, very difficult with experts. People now have scheduled summers because they thought, frankly --

THE COURT: Well, I won't -- I know how hard you've all been working -- I won't do it midsummer, but it could be June.

MR. LONDON: If it's not May or June, I think Mr. Cheffo is proposing September, and I think we probably would feel the same way.

THE COURT: Okay. I want some of these cases to go to trial just so that we can then try and settle the rest of them. I plan on sending everything back to their home jurisdictions in September when the basic discovery is done and all the little -- not the little cases but the separate product liability cases. But before I do that, the reason I haven't sent them back yet is to have a couple of verdicts and to try a global resolution, and that's the only reason I've kept them here. So I think Judge Sorokin -- I just talked to him today -- designed the discovery to be able to do that. And so my goal would be to at least have two trials done by the end of September. Does that make sense from everyone's point of view?

MR. LONDON: We do.

THE COURT: And we have another Massachusetts case

that I can see.

MR. CHEFFO: There was actually two. There was the Dorsey and Huberman case. My understanding is -- well, I think the Huberman case is going to be dismissed by the plaintiffs or voluntarily discontinued. The Dorsey case is another D Mass. case, and discovery closed in that case actually January 31.

THE COURT: So that's ready. If I ship that out to some other judge?

MR. CHEFFO: There's minor discovery, but it's something that --

THE COURT: So it's worth my finishing out this Daubert hearing. And let me just play this one out for you: Suppose I'm immersed in this huge export case involving electronics to China, or the Mylan AWP, and they don't all settle, I'm just, like, stuck and there's this little two-weeker -- you know, I'm assuming that's what it's going to take, roughly, right, for some of these individual cases, two or three weeks, right?

MR. CHEFFO: Probably about three weeks, depending on schedules.

MR. LONDON: Are you talking about Kaiser or Shearer?

THE COURT: I'm talking about Shearer or Dorsey, I guess.

MR. LONDON: We understood Shearer would be twenty-eight hours to the side, which we gathered would be --

THE COURT: Shearer?

MR. CHEFFO: Twenty-four.

MR. LONDON: Twenty-four to the side?

MR. CHEFFO: Well, Bulger was twenty-four you gave. You gave twenty-eight for Kaiser.

THE COURT: So the issue is -- well, let's deal with it. I'm going to be seeing him every single day for the next month, so --

MR. LONDON: Should we send roses or --

THE COURT: You get them cheap now after Valentine's Day. But, in any event, so we'll play with the schedule. Is the Tennessee case a real go?

MR. LONDON: We're told that it is.

MR. CHEFFO: You know, obviously we feel confident in our summary judgment motion, but putting aside that, my understanding is that Judge Trauger, you know, usually sticks to her calendar unless some major criminal issue comes up.

THE COURT: How do you spell her name?

MR. CHEFFO: It's T-r-a-g-e-r. There's a U in there too.

THE COURT: You know, it's funny, I've met a lot of Federal District Judges. I just haven't met her.

MR. CHEFFO: She's got an unusual first name. It's Aleeta or Aleta?

THE COURT: I may call. All right, so --

MR. LONDON: May we ask this kind of guidance? Do you think that we're safe, both sides, in telling our various witnesses in the Shearer case that even though it's scheduled for the end of March, the high likelihood is that it won't go then, but that the Court will try to give us something like two weeks of a heads-up for planning purposes? So if you set it later in April or May --

THE COURT: Can you wait a little on that?

MR. LONDON: Yes, ma'am. I'm asking and not --

THE COURT: I'm not making comments. Let's suppose -- I just did a monthlong antitrust trial which almost killed me, and it settled the day before it went to the jury, after I had done my jury instructions, and it was a very hard and complicated case. So I don't know, maybe midstream Kaiser and Pfizer will come up -- maybe the evidence will go in poorly, or maybe it will go in really well. I mean, you just -- they could settle it, right? And then I might be able to jump in and do Shearer right away. So can we wait a week or two and let me see what's going on with the other trial?

MR. LONDON: We can. It was --

MR. CHEFFO: We're really going full steam in Shearer, and I think that in fact on Monday there's filing, so at this point --

THE COURT: I don't want to take anyone off the hook yet, but I promise you I'm not one of these judges who says

you'll have to wait till the Friday before. I'm not going to do that to your weekends. If it looks as if Pfizer and Kaiser are just going gangbusters and there's no way it's going to settle -- I always take them to side bar, right, and I do almost a daily temperature feeling as to what's happening. And I have no problems with your coming in or having -- who's your local counsel?

MR. LONDON: Local?

THE COURT: Tom is, Sobol.

MR. LONDON: Tom has generally been here.

THE COURT: Is he still here?

MR. CHEFFO: Tom Sobol only is on the class action side.

MR. LONDON: But Tom and Ilyas keep us posted.

THE COURT: So they can keep you posted on how it's going.

MR. CHEFFO: I mean, one option is, would you consider having the Shearer case be tried by another judge?

THE COURT: Yes.

MR. CHEFFO: In Boston?

THE COURT: Yes.

MR. CHEFFO: Because that might be something we can all talk about, you know, because --

THE COURT: At some point, once I've ruled on all these crosscutting issues, it's just a trial.

MR. CHEFFO: Right, and I think that we've all, frankly, been geared up, our experts have been told, and everyone -- you know, there is some benefit that -- you know, we all thought that --

THE COURT: So if I ask Judge Young, who's always looking for a trial -- you probably don't know him but --

MR. LONDON: I have to say we don't know Judge Young.

THE COURT: I'm thinking, you know, he sometimes is available for a trial, Judge Gertner. I'm swamped because I've got these two MDLs. I'd be happy. Why don't I see if someone else can take it?

MR. LONDON: And can we not commit to saying that's a good idea until I have a chance to talk to the people?

MR. CHEFFO: It's your Honor's decision.

THE COURT: It is my decision, but unlike criminal where actually I can't do it, it wouldn't be a random draw. Essentially it would be who's available and willing to do it. Judge Young has said that he might be able to.

MR. LONDON: I just need to be able to report this back to the Finkelstein and Lanier folks and make sure that they understand what's going on. I appreciate it's absolutely your decision and Judge Young's or the other judge's decision.

THE COURT: I mean, anyway, he'd be the one who I would go to first probably.

MR. LONDON: Yes, I understand.

MR. CHEFFO: And the motions in limine, you know, if they are going to be filed, the deadline is Monday. So, you know, our experts have been fully prepared for this because, you know, the problem is going to be, we've scheduled this with Judge Trauger that, you know, if we go in March, we're then going to be finishing experts because some of them will be the same -- I'm sorry. We finished March 23, we'll still be prepared for the May, and that's why it's been triaged. So to the extent that --

THE COURT: All right, let me start calling around judges, see if anyone -- this may be a moot issue. Maybe no one can do it. Keep the motions on track. I was horrified when I received the motions in limine that I got. I don't usually get it till the opposition has been filed. Then two weeks before trial I have ten unbelievably serious motions in limine that couldn't possibly have been done in the time frame I was given.

MR. LONDON: In the Kaiser case?

THE COURT: That's the sales and marketing case, the Kaiser case. I could not possibly have given full Daubert hearings on six different experts. It was just not possible, and so I had to make some broad-brush rulings --

MR. LONDON: Well, the only glitch that we have on the immediate horizon -- I agree with everything Mr. Cheffo said about planning -- we're not asking you to actually do anything

about this, but we just received 210,000 more pages of documents within the last week or two.

THE COURT: What kinds of documents?

MR. LONDON: Well, some of them were -- I believe 50,000 of them were the documents from Dr. Wahlberg's file that produced AA and CC and a lot of others. Most of them, we honestly can't tell you, but the reason I'm bringing this up is because we have to read them somehow and figure out whether or not to list any of them as exhibits. And they're so new and so voluminous that we don't know how to do that before the actual exhibit list date.

THE COURT: Just work it out.

MR. CHEFFO: -- at 8:45 this morning. You know, I'd like an opportunity to respond to them, but, you know, again, most of --

THE COURT: If you just got that number of documents, of course I'm not going to make you mark those as exhibits. But what I can't do is, when I get fully briefed motions in limine two weeks before a trial date and they're really substantive, I mean, they're the kind of things you can't just fly by the seat of your pants on: "Oh, yeah, that's hearsay or it isn't." You've got to understand my time limitations.

MR. LONDON: We do.

THE COURT: So --

MR. CHEFFO: And that's why I'm trying to keep to this

because in the Kaiser case, if your Honor will recall, we said we have very complicated motions, and the plaintiffs -- I don't want to talk out of school because they're not here -- said, "Oh, we're not going to make any motions." So we actually filed our motions not after the deadline but on the deadline that was in the scheduling order.

THE COURT: Sure. No, no, you -- no, we're sticking to the whole schedule because for all I know Kaiser will settle and Mylan will settle and the criminal case will plead, and then I have you. So you call Mr. Alba all you want. He'll be as honest as he can. We will not keep you by the -- you know, I don't think you're going to settle it just because you're sort of in crisis mode. They haven't, as far as I know, is this still true, settled any of them? So I'm just assuming everything is going to go.

MR. LONDON: May I ask an out-of-state question?

THE COURT: Yes.

MR. LONDON: Is the experience here in the kind of criminal case that you have coming up predictable towards trial or plea bargaining or --

THE COURT: No. This is not cocaine or heroin. It's whether or not certain people unlawfully exported certain military items to the People's Republic of China.

MR. LONDON: Yikes.

THE COURT: It's not my normal case, not at all, so I

have no prediction on it. I have no prediction on it.

MR. LONDON: And that's the kind of insight I was hoping for.

THE COURT: You're welcome to look at the indictment if you want to. It's a matter of public record.

MR. LONDON: We have those other 210,000 pages to read before we read Republic of China's pages.

THE COURT: Okay, thank you.

MR. LONDON: Your Honor, thank you very much.

THE COURT: Thank you very much. We will take this under advisement.

MR. BARNES: Your Honor, just for clarification, after Dr. Greenland files his declaration in response to the sensitivity analysis that Dr. Gibbons did that we say is back in the case, will there be another hearing to pick this up again?

THE COURT: Yes, I'll read it.

MR. BARNES: Just read it, and you'll --

THE COURT: But no more surrebuttals, no more briefs. If I don't understand it, I'll call you back in here. What happened last time was basically unacceptable in terms of my learning curve. You can't do -- I found this again in the recent case we're doing with Kaiser. I can't have it come up a week before trial. That's what just can't happen.

MR. BARNES: I just want to leave you with -- I didn't

get a chance to respond to any of his points.

THE COURT: Yes, you did. We've been here since -- what are you talking about? I let you stand up and -- no way. Good-bye.

MR. BARNES: All right, thank you, your Honor.

MR. LONDON: Thank you again, your Honor.

THE COURT: Off the record.

(Discussion off the record.)

(Adjourned, 3:23 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 63 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 04-10981-PBS, In Re: Neurontin Marketing, Sales Practices, and Product Liability Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 28th day of February, 2010.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER