```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS




IN RE:                              )
                                    ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION   )
------------------------------------)
This document relates to:           )
KAISER FOUNDATION HEALTH PLAN, et al, )
                                    )
                 Plaintiffs         )
                                    )
        -V-                         )No. 04-10739-PBS
                                    )Pages 1 - 186
PFIZER, INC., et al,                )
                                    )
                 Defendants         )
```

```
                      JURY TRIAL - DAY ONE

            BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE




                       United States District Court
                       1 Courthouse Way, Courtroom 19
                       Boston, Massachusetts
                       February 22, 2010, 8:35 a.m.




            LEE A. MARZILLI and VALERIE A. O'HARA
                   OFFICIAL COURT REPORTERS
                United States District Court
                1 Courthouse Way, Room 7200
                   Boston, MA  02210
                     (617)345-6787
```

1    A P P E A R A N C E S:

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ., Greene, LLP,
     33 Broad Street, 5th Floor, Boston, Massachusetts, 02109.
4
         THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
5    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
     Suite 301, Cambridge, Massachusetts, 02142.
6
         LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
7    850 Third Avenue, New York, New York, 10022.

8        DON BARRETT, ESQ., Barrett Law Office,
     404 Court Square North, P.O. Box 987, Lexington, Mississippi,
9    39095.

10       BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
     Bernstein, Embarcadero Center West, 275 Battery Street,
11   San Francisco, California, 94111-3339.

12
     FOR THE DEFENDANTS:
13
         KATHERINE ARMSTRONG, ESQ.,  MARK S. CHEFFO, ESQ., and
14   THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
     Four Times Square, New York, New York, 10036.
15
         RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
16   LLP, Four Embarcadero Center, San Francisco, California, 94111.

17       JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
     Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
18   Denver, Colorado, 80202.

19

20

21

22

23

24

25

```
 1                        I N D E X

 2    OPENING STATEMENTS:                              PAGE

 3    By Mr. Greene:                                   79
      By Ms. Nussbaum:                                 101
 4    By Mr. Kennedy:                                  188

 5

 6    WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS

 7    David Kessler, M.D.

 8          By Mr. Greene:      154

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2           THE CLERK:  The case of Kaiser Foundation Health Plan,

3    et al V. Pfizer, Incorporated, et al, Civil Action 04-10739,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6           MR. SOBOL:  Good morning, your Honor.  Tom Sobol,

7    Hagens Berman Sobol Shapiro, LLP, of counsel to Kaiser.

8           MS. NUSSBAUM:  Good morning, your Honor.  Linda

9    Nussbaum for Kaiser.

10          MR. GREENE:  Good morning, your Honor.  Tom Greene for

11   Kaiser.

12          MR. CHEFFO:  Good morning, your Honor.  Mark Cheffo

13   for Pfizer.

14          MR. HOOPER:  Good morning, your Honor.  James Hooper

15   for Pfizer.

16          MR. KENNEDY:  Your Honor, Raoul Kennedy, good morning,

17   also for Pfizer.

18          MR. FOX:  Good morning, your Honor.  Tom Fox for

19   Pfizer.

20          MS. ARMSTRONG:  Good morning, your Honor.  Katherine

21   Armstrong for Pfizer.

22          MR. BARRETT:  Good morning.  I'm Don Barrett for

23   Kaiser.

24          THE COURT:  For Kaiser?  Since they sound alike, I

25   just wanted to make sure.

1        (Laughter.)

2        THE COURT:  All right.  Of course, we begin this

3   morning.  I think we have a dedicated pool of 60 jurors, so

4   that we should be getting them fairly soon.  I'm not going to

5   be handing out written questionnaires, although I will be

6   orally asking a fair number of the questions that you've asked

7   in your pretrial submissions.

8        I was reading the pretrial memo over the weekend, and

9   actually there are a few new issues that I just didn't know had

10  existed, and just so I can make evidentiary rulings that make

11  sense, the defense for starters raised an issue of statute of

12  limitations.  So does anyone know what that's about?  It may be

13  it was briefed somewhere along this long history.

14       MS. ARMSTRONG:  It's not in our trial brief.  It's in

15  our jury instructions.  We do have an affirmative defense on

16  statute of limitations.

17       THE COURT:  It just raised one of the many issues, and

18  it caught me by surprise because I don't know what it is.

19       MS. ARMSTRONG:  I don't think it's something that we

20  raised by summary judgment motion because I think it will

21  require evidence at trial.

22       THE COURT:  I understand.  I just need to understand

23  what the issue is so when I make rulings I understand it.

24       MS. ARMSTRONG:  RICO has a four-year statute of

25  limitations.  It's a discovery of injury rule, and we're going

1  to present evidence during trial that they were on notice, had

2  sufficient facts to bring this lawsuit more than four years

3  before when it was filed.  The UCL also has a four-year statute

4  of limitations, and there's no discovery rule there, so --

5         THE COURT:  Well, thank you.  No, I just want to

6  understand it.  That's fine.  Just it was one of the issues

7  that was new to me, and no one really sort of briefed it.

8         So let me ask this:  How far back are you seeking

9  damages?

10        MR. SOBOL:  1996 to 2004.  I believe that the Kaiser

11 complaint was brought in 2005, if my memory serves me

12 correctly.

13        THE COURT:  So if they're right, then the damages go

14 back to 2001.

15        MR. SOBOL:  Correct.

16        THE COURT:  And if you're right, it goes back to 1996.

17        MR. SOBOL:  '96, correct.

18        THE COURT:  Okay, I just want to understand the issue.

19        MR. CHEFFO:  It could be, I mean, under the statute of

20 limitations, you know, if they were on notice prior, even if

21 there's damages later, they could be barred from having brought

22 their lawsuit.  In other words, let's say in 2005 they brought

23 their lawsuit but in fact they had notice back in 1999, they

24 couldn't then file it six years later and get damages only

25 after the time that they filed it.

1          MS. ARMSTRONG:  Your Honor?

2          THE COURT:  Well, we can fight about it and discuss

3    it.

4          MR. CHEFFO:  Sure.

5          THE COURT:  I just want to understand the issue

6    because it sometimes is relevant to how I rule on evidentiary

7    issues, that's all.

8          MS. ARMSTRONG:  Yes, from our perspective, if they

9    discovered their injury in 2000 or 1999 or before that time, it

10   would bar all of their damages, not just up until four years

11   prior to they filed suit.

12         THE COURT:  You can leave it for argument.  I just

13   want to understand it.  So the second issue, which I will not

14   rule on unless -- but I want to know if it matters, okay, is

15   whether or not I should try the California statute.  And the

16   only reason I say that -- and I'm turning to you now -- is, it

17   turns out there's a choice-of-law issue which may be

18   fact-based.  In other words, were the decisions made out of

19   California, in which case there's a very strong argument

20   California law would apply, as opposed to whether it was more

21   locally based, in which case I might have to decide, well, it

22   was, you know, all the other states' laws might apply.  I think

23   it's likely to be a decision I don't make right off the bat,

24   but what could make a difference is, are they all jury or

25   bench?  In other words, if any of them are jury, I will --

1    let's say there was a P&T Committee in Arizona, and they made a

2    separate decision from the one in California, is that a jury

3    trial?

4            MS. ARMSTRONG:  The only one that would be nonjury

5    would be California.  Under First Circuit law, if they're

6    seeking damages as opposed to restitution, it is jury trial.

7    And the only one -- the only statute that does not permit

8    recovery of damages or where it's limited to restitution is

9    California, so as to the other states, it would be a jury

10   trial.

11           THE COURT:  So I almost have to try this to a jury

12   unless I can clearly make a choice-of-law decision.  Is that

13   right?

14           MR. SOBOL:  The long and short of the answer is "yes,"

15   your Honor.  I'm not sure whether or not one or more of the

16   other states might have it as an equitable rather than as a

17   legal claim, but I'm pretty sure that the other states, at

18   least one of them does require a jury, so --

19           THE COURT:  I'll be listening to the facts as they

20   come in because that's another new issue for me.  In other

21   words, I've been focusing pretty much on whatever you gave me

22   in summary judgment, as opposed to suddenly it appears that

23   maybe there was more autonomy than I thought there was in

24   different P&T committees.  So I'm going to have to be thinking

25   about, does each state's laws separately apply, or do I have

1    one central decision-making point?  I think that may be

2    fact-bound.  But if any one of the states requires a jury

3    trial, I've got to send this to a jury.

4          MR. SOBOL:  Sure.  Just so you understand, I agree

5    with everything you've just said.  The plaintiffs' position

6    will be that you should be listening, obviously, to the

7    evidence during the course of the next month because for two

8    reasons:  First, regardless of what the choice-of-law issue is

9    for the non-California matters, you will be deciding the

10   California where obviously the largest part of the operations

11   are, so you'll be doing that.  And then the question will be at

12   the end of the trial, and the parties can have argument, as to

13   whether or not the choice of law applies to California, you

14   know, writ large, or that the other states come in.  And that's

15   an issue that I think you can simply resolve once the evidence

16   has been in, and you can deal with it at that point.

17         MR. CHEFFO:  I would say, not to argue the evidence --

18   I actually agree largely with what Tom just said.  I would say,

19   as your Honor said, you know, a week or so ago, I think,

20   because of this issue that your Honor is raising, I find it

21   more prudent to consider the jury, either to decide those

22   issues outside of California or use them as an advisory jury

23   throughout so that they can be asked and consider those

24   questions, you know, both at the same time they're seeking

25   RICO, because I think what you're going to hear, and I don't

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1   think there's much dispute, is that if someone is on a P&T

2   Committee in Northern California, they don't know what's going

3   on with the Ohio P&T Committee to a large extent.

4          THE COURT:  That may be, so we'll talk about that.  My

5   instinct was exactly where you are, which is to send this to a

6   jury.  I think it's a good thing to do.  However, I did take a

7   look at your proposed verdict form, which could take a jury a

8   lifetime to get through.  So I'm just trying to figure out at

9   this point what's doable.  We have a 28-hour-a-side rule.  Has

10  anyone done the math as to what day that ends?

11         MR. SOBOL:  March 19 at 1:00 o'clock.

12         (Laughter.)

13         MR. CHEFFO:  -- probably going to schedule a vacation

14  on March 20.  I wasn't that calculated.

15         THE COURT:  I think probably I should schedule a jury

16  that could swing into that following week in case there's some

17  storms.  So I think what I should probably do is have a jury

18  that can stay until the 26th?  What do you think?

19         MR. CHEFFO:  I think that's reasonable, your Honor.

20         MR. SOBOL:  I think that's reasonable too, but, again,

21  you don't want to end up in a situation where someone's made

22  plans -- oh, you mean the 26th.  You mean a week later.  Yes,

23  that makes sense, yes.

24         THE COURT:  Because I think, for example, there may be

25  a storm later this week.  What if a witness gets the flu?  I

1    don't know, just I'm a little worried about scripting it so

2    tightly.  I'm hoping today that we can do the impanelment and

3    do openings.  How long will openings take for each of you?

4         MR. GREENE:  Your Honor, we were going to ask the

5    Court if we could have an hour.  Ms. Nussbaum and I are going

6    to split the opening for Kaiser, and it will be less than an

7    hour, your Honor, but just to be safe.

8         MR. CHEFFO:  I was actually going to ask if we

9    could -- we'll probably be an hour and ten minutes, but if I

10   could ask for an hour and fifteen minutes just as a --

11        THE COURT:  Why don't we just both ballpark it at an

12   hour.  I mean, I'm not going to be so tight.  I can't remember,

13   did we include openings in my 28 hours?

14        MR. GREENE:  No.

15        MR. CHEFFO:  I think you didn't, your Honor.  You did

16   rule on what the closing would be, but you said the openings

17   would not be included.

18        THE COURT:  So I notice you have it down to twenty

19   minutes a witness, and that brings me down to witnesses, which

20   is the following:  The list could take me the morning to read.

21   Is that the real list for both sides, or is there a pared-down

22   list?

23        MR. CHEFFO:  Well, the plaintiffs have given us a list

24   actually up until I think Monday that's significantly pared

25   down, though I can't say with specificity, since they've told

Page 12

1    us, you know, for example, video testimony will be shown.  I

2    don't know if they've told us yet who the video is, but I think

3    they've given us seven or eight, nine witnesses up until

4    Monday.

5              THE COURT:  I have Kaiser's list dated February 15 and

6    defendants' list -- for some reason the date was hard for me to

7    figure out, but these are the ones I'm going to read, but they

8    are quite lengthy.

9              MR. CHEFFO:  I think there's been a significant amount

10   of narrowing of the actual witnesses.  Now, to some extent --

11             THE COURT:  Do you have something I can read to the

12   jury?

13             MS. ARMSTRONG:  Your Honor, our list, we filed it on

14   November 23.  If you would like me to mark it up, there were

15   some that you ruled on that we're not going to be permitted to

16   call, and I can cross those names off.

17             THE COURT:  November 23, yes, that's the most recent

18   one I have from you.  And the most recent one I have from you

19   is February 15?  Is that the list?  Can I while we're waiting

20   for the jury have you just look through them and cross off

21   who's not realistic?

22             MR. CHEFFO:  Absolutely.

23             MS. ARMSTRONG:  May I approach, your Honor?

24             THE COURT:  Yes.  And not fancy, just scribble it out.

25             MR. CHEFFO:  And I don't want to belabor it, your

Page 13

1   Honor, but Mr. Kennedy is going to do the opening.  If he goes

2   over a few minutes, I don't want you to charge it against our

3   opening.  Thank you, your Honor.

4           THE COURT:  The key is finishing it at the same time

5   and not flipping over till tomorrow.  That's my main concern.

6   Have you shared chalks with each other?

7           MR. CHEFFO:  We have, and I know what the chalks are

8   from our last trial, and we do have some --

9           MR. SOBOL:  Issues.

10          MR. CHEFFO:  -- objections to talk about.

11          THE COURT:  Did you hear about the chalks at the last

12  trial?

13          MR. SOBOL:  No.  Please tell us.

14          THE COURT:  Actually it was sensational, literally.

15  There was a big --

16          MR. SOBOL:  They're not supposed to be, right?

17          THE COURT:  There was a big bottle of snake oil, a big

18  picture.  I think there was one of them anyway that caught my

19  attention.

20          MR. CHEFFO:  And the little girl versus the --

21          THE COURT:  Yes, a picture of an absolutely adorable

22  child and then a giant corporate building, like out of sci-fi,

23  so it was interesting.

24          MR. GREENE:  We've got a box of snakes here that I was

25  going to take out for my opening.

1            THE COURT:  So I have voir dire, and what I'll do at

2     the end of it is ask you if there are any questions I've

3     missed.  I've done this before with all of you.  Let me just

4     ask one strategic question if you all agree because I don't

5     want to embarrass anyone.  So if I ask whether you or any close

6     family members or friends have taken Neurontin, I think that's

7     an essential, or gabapentin -- what's the other one, pregabalin

8     and --

9            MR. CHEFFO:  It's actually gabapentin or Neurontin.

10            THE COURT:  Just gabapentin or Neurontin, not those

11     other drugs, the more recent versions you asked?

12            MR. SOBOL:  Pregabalin.

13            MR. CHEFFO:  Pregabalin is Lyrica.

14            THE COURT:  Should I just say Lyrica?  Is it the same

15     thing?

16            MR. CHEFFO:  No.  Well, pregabalin is the same as

17     Lyrica, but, you know --

18            MR. SOBOL:  It's the follow-on drug.

19            THE COURT:  Somebody asked me to ask about it.

20            MR. GREENE:  It's a stronger version of Neurontin.

21            MR. CHEFFO:  Well, I'm not going to strenuously

22     object.

23            THE COURT:  Regardless of how I do it, is that an

24     automatic disqualifier?

25            MR. SOBOL:  No.

1         THE COURT:  Both sides agree?  No?

2         MR. SOBOL:  You'd have to inquire further, I

3   suggest --

4         THE COURT:  I just want to understand.  It's an

5   automatic disqualifier, for example, to have stock in Pfizer or

6   to have worked at Pfizer, as far as I'm concerned.  So I just

7   wanted to know, and I don't know, it's an automatic

8   disqualifier -- let me ask an embarrassing question:  Do you

9   have stock in Kaiser?

10         MS. NUSSBAUM:  It's a nonprofit.

11         THE COURT:  It's a nonprofit, all right, or to have

12   worked at Kaiser.  So I just wanted to understand what your

13   perspectives were on Neurontin.

14         There were a multitude of preliminary kinds of legal

15   issues that I'm not sure that we want to start engaging in now,

16   but let me start with the basic one:  Who's your first witness?

17         MR. SOBOL:  Our first witness is Dr. Kessler.

18         THE COURT:  Is he in the room right now?

19         MR. GREENE:  No, he's not.

20         THE COURT:  Have you shared with the other side the

21   documents you would be using with Dr. Kessler?

22         MR. CHEFFO:  Well, they've shared with us, as your

23   order instructed them.  There was, I think, about sixteen

24   exhibits.  We have basically, we have some objections with --

25   five of those exhibits were actually not part of his reliance,

1    so we've objected and said, you know, at this point it's a

2    little bit late in the game; he was not deposed on them, and

3    they were never referenced in his report.  So there are

4    eleven --

5            THE COURT:  Well, it depends on how basic they are,

6    if they're very well-known documents.  I don't know if he's

7    going to be asked an opinion.  I don't know.

8            MR. RONA:  Two of the documents, your Honor, are

9    identical except for the Bates number.  Two of them are, as you

10   said, very basic.  One is a --

11           THE COURT:  Well, here is the issue, which is, this is

12   exactly what I want to go through before he testifies.  So

13   every day at 8:30 I'll come in and go through the documents.

14   So if you want to give me the documents at some point today,

15   someone should gather them, and then I can -- do you have a

16   little binder for me for every set of documents?  Is that your

17   only Kessler binder?  Do you have a binder?

18           MR. RONA:  We have a binder, your Honor.

19           THE COURT:  Why don't you give me a binder.  Is it

20   tabbed?  The disputed documents are which ones?

21           MR. FOX:  Well, they're put into categories, so we're

22   just going to argue by categories, your Honor.  So they're

23   tabbed into categories.

24           MR. CHEFFO:  I think, your Honor, we've tried to

25   obviously meet and confer, and there are a large number of

1   issues that remain, but I think that what our suggestion has

2   been, you know, obviously, to the extent we had guidance on

3   certain categories, you know, if they're very similar, we're

4   not going to take up the Court's time, but there seems to be

5   some significant disputes about even the categories of the

6   parties.  So we can go document by document --

7            THE COURT:  Let me ask you this:  Do you agree that

8   they were never shared with the other side, the Kessler

9   documents, that they were never part of his report?

10           MR. RONA:  No, your Honor.  As I was explaining, two

11   of the documents are identical to documents that are on his

12   reliance list.  Just they have a different Bates stamp.

13           THE COURT:  All right.

14           MR. RONA:  So they have seen those.  Two of the

15   documents are, as you said, very basic, and he actually quotes

16   them or identifies the fact that's in those documents in his

17   report.  That's how basic they were.  And one of them is

18   pure -- we're not offering it to him as an expert witness.

19   It's purely to authenticate he was head of the FDA at the time.

20   He'll be able to recognize the logo, recognize some of the

21   individuals.

22           THE COURT:  But that may be brand-new.

23           MS. ARMSTRONG:  And, your Honor, we did ask Mr. Rona

24   to provide us with this information before we ever made our

25   objections.  We said --

1          THE COURT:  Well, why don't you confer about them.  If

2     it's really just a different Bates number or if in fact he's

3     used the information but this is the document it comes from, I

4     have no problem with it.  If it's a brand-new document no one's

5     ever seen before, that shouldn't be happening at trial.

6          MR. RONA:  It's not a brand-new document.

7          THE COURT:  Well, I don't know.

8          MS. ARMSTRONG:  And we don't know either because we

9     said, "Give us the correspondence," and he wouldn't do it.

10         THE COURT:  So why don't you confer at some point on

11    that, and that's how we'll do it every morning kind of thing,

12    because I can't rule on 1,500 objections.  It's just hard for

13    me.

14         The next thing is, when's the first deposition you're

15    going to introduce?

16         MR. SOBOL:  It may be tomorrow toward the end of the

17    day.

18         THE COURT:  Have I received a notebook on that

19    deposition transcript?

20         MR. SOBOL:  I believe you received a set of the

21    designations.

22         THE COURT:  I know, but I'm not doing that because it

23    takes me an eternity to do the matching.  So what I was

24    hoping -- and I have so many of these huge trials and I can't

25    remember what I said -- what I was hoping was a little notebook

1   with your designations and just literally not a brief, just

2   what your objections are, "objection, relevance, objection

3   foundation," or something.  And then if there's a document

4   referenced which is the core of the problem, then just an

5   attachment of the document.  Then I just whip through it.

6   Otherwise it takes me a really long time to find it.

7          MR. CHEFFO:  If they give us that, we'll turn it

8   around and have it for your Honor.

9          THE COURT:  Let me just back up and say, I understand

10  how hard you've all been working, but the reality is, I've got

11  to be able to have time to rule on them.

12         MR. RONA:  Your Honor, one question.  We have the

13  entire transcripts.  Do you want them?  Remember, there are two

14  days, so there are 600, 700 pages.

15         THE COURT:  I really don't.

16         MR. RONA:  You want just the pages?

17         THE COURT:  Or maybe a page on either end, whatever

18  you think makes sense in terms of my understanding the context

19  of it.  That's all.  But, remember, if there are hundreds --

20  when I saw the list of objections, I'm not ruling on that,

21  hundreds and hundreds of objections.  You know, distill it

22  down, confer and give me what's left, but you've got to have

23  give me 48 hours to rule on it.  Like, for example, every

24  afternoon I think this week I'm really busy.

25         MR. RONA:  Well, we have been paring it down, your

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1    Honor.  We've --

2           THE COURT:  I know, but I don't have it.  So if you

3    want to put a video on tomorrow, I don't have it.  What am I

4    going to do?  And I know you've been killing yourselves, so

5    this is not meant as any kind of criticism, but you've got to

6    get it to me in time for me to rule on it.

7           Now, the plaintiffs, you both listed -- I actually had

8    a little preliminary list of the key indications that you're

9    going to all worry about, but you state them differently in the

10   pretrial memo.  So let me hear, what are the indications you're

11   worried about?

12          MR. GREENE:  Bipolar disorder, two types of pain, your

13   Honor, nociceptive and neuropathic pain.

14          THE COURT:  All right, neuropathic.

15          MR. GREENE:  There are two types of pain.

16          THE COURT:  All right, I just want to understand.  So

17   when you say four and they say five, they've just divided out

18   the fourth, that category?

19          MR. GREENE:  Yes, they broke it down.  So bipolar

20   disorder, two types of pain.  Migraine headache would be No. 4,

21   and doses above 1,800 milligrams would be No. 5.

22          THE COURT:  So you both agree?

23          MR. CHEFFO:  Yes.

24          THE COURT:  So let me show you a draft instruction

25   that I've created for this jury.  And my concern is, it's taken

1    me so long to learn this case, and they're going to hear

2    "nociceptive" and turn off.  So it essentially just lists the

3    indications, and I flagged for them that they have to track

4    each one separately.  So let me show you what we drafted, and I

5    was hoping to hand it to them before they listen to your

6    opening arguments so they understand that there are four

7    different conditions plus the dosage issue.  And I have an

8    assistant upstairs who can change it right now so we can hand

9    it out to them.  The definitions we just got out of Black's, I

10   think, Medical --

11            THE LAW CLERK:  Stedman's Medical Dictionary.

12            THE COURT:  Stedman's Medical Dictionary.

13            MR. GREENE:  So, Judge, you've got four enumerated

14   ones, and then the fifth one doesn't have a number in front of

15   it.  It just says "in addition."

16            THE COURT:  Well, because it's not a condition.  It's

17   a dosage strength.

18            MR. GREENE:  It's a dosage, it's an off-label, yes.

19            MR. CHEFFO:  I don't have a problem with this.  I'm

20   just going to ask my colleagues to make sure that I'm not

21   talking to them if they do.  The only thing that just jumped

22   out at me, I think migraine people understand; but to the

23   extent we're defining even neuropathic pain, perhaps we could

24   use the same dictionary for bipolar disorder.  I think people

25   may generally know what that is, but I think a definition for

Page 22

1    bipolar would probably be helpful.

2           THE COURT:  You think most people know what it is?

3    Why don't we just say a psychiatric condition or something.

4           MR. CHEFFO:  Psychiatric condition is fine.

5           MR. SOBOL:  So just to flag for your attention -- and

6    it's correct, it says, you know, that the claim is, I think,

7    that Kaiser claims that Pfizer made certain misrepresentations.

8    There's a claim also in the UCL claim that in addition to

9    misrepresenting, it also engaged in off-label promotion, which

10   itself in and of itself is, we say --

11          THE COURT:  You know what, I don't think they'll

12   remember this or hold it against --

13          MR. SOBOL:  That's fine.

14          THE COURT:  I can't get into that here now, especially

15   since I'm not positive if I'm going to give it to a jury.  I'm

16   leaning that way if I can, but if it gets too complicated, that

17   form is impossible, so --

18          MR. SOBOL:  The only reason I brought it up now is

19   just to make sure there's no misunderstanding on the part of

20   the Court not to change this to the jury.

21          THE COURT:  The way I was actually thinking of doing

22   this form, it's premature, but is indication by indication but

23   more along the lines of, "Do you find that the defendant has

24   engaged in a RICO violation with respect bipolar?" and go down

25   each of them.  Then say, "Do you think they've engaged in

1    unfair and deceptive trade practices?" whatever the term is

2    under California law, "with respect to bipolar?"  That's what

3    I'm thinking, and then have a causation question and then a

4    damages question; in other words, instead of going through each

5    enterprise separately.  I think that makes it too complicated.

6         But getting to the issue of enterprise, I don't have

7    to decide it now.  I just was starting to really focus in and

8    get into the weeds this weekend, but the real issue that I have

9    is, it strikes me that -- and I haven't heard oral argument

10   yet -- that if in fact that one enterprise has been listed in

11   the complaint, there's no surprise prejudice for adding it

12   formally into the complaint as a sub-enterprise.

13        MS. ARMSTRONG:  Your Honor, it's not been listed as an

14   enterprise, and they do not have any enterprise allegations

15   with respect to it.

16        THE COURT:  But it was mentioned in the complaint,

17   right?

18        MS. ARMSTRONG:  It's mentioned in the complaint, but

19   there's a very big difference between pleading fraud and

20   pleading enterprise.  There are, like, three separate, discrete

21   parts of the complaint that contain their enterprise

22   allegations.  This MAC, Medical Action Communications, is not

23   mentioned in any of those three discrete parts.

24        THE COURT:  I understand, but there was discovery done

25   of it, right?

1          MS. ARMSTRONG:  There was discovery done, but there

2     was discovery done with respect to allegations of fraud having

3     been made with respect to this organization.  It was never ever

4     listed as an enterprise.

5          MR. RONA:  Your Honor, the third amended complaint, if

6     you read the section that discusses MAC, which if you recall

7     was the last amendment we were permitted, we wanted to put in

8     one section, not fully change and repopulate the whole

9     complaint with an allegation.  If you read that section, it

10    clearly shows there is an enterprise:  regular meetings, there

11    was a publication --

12         THE COURT:  Yes, I'm inclined to allow that amendment.

13    I have a harder problem with the new plaintiffs at this point.

14    So talk to me about that.  What's happening there?  We're going

15    to just say Kaiser at this point.  We're not going to be going

16    through all the subgroups.  So I'm not ruling at this point

17    because my concern is, have you had discovery in all these

18    other groups?

19         MR. CHEFFO:  No.  In fact just the opposite, your

20    Honor.  They've basically been saying, well, those are really

21    separate groups.  I think they haven't done any.

22         THE COURT:  So help me because that's really where

23    there might be prejudice.

24         MR. SOBOL:  The entity which has filed the complaint

25    is the parent company.  The way that the case has proceeded is

1   that all of the damages for Kaiser, the parent and its

2   organization, will be at play in the case.  There's never been

3   any disaggregation of damages among one entity or another.

4         MS. ARMSTRONG:  And that's the problem.

5         THE COURT:  So why do you need it?

6         MR. SOBOL:  Well, if I may?

7         THE COURT:  Yes.

8         MR. SOBOL:  I don't think there is any need to do it.

9   The way that the parties have proceeded for the past five years

10  in the litigation and the way all the economic experts have

11  done things is, it's damages to the Kaiser organization.  And

12  if that's clear and there's no other question about it because

13  that's the way that the parties have proceeded, then the way

14  that the parties have pled would be fine.

15        MS. ARMSTRONG:  Your Honor, that's the problem is the

16  fact that they have not disaggregated.  They have presented as

17  if all of these damages were the one party that had been pled

18  in the complaint, Kaiser Foundation Health Plan.  They never

19  say in the complaint that it is suing on behalf of

20  subsidiaries.  They never identify the subsidiaries.  They

21  present it in the complaint as if these are all of Kaiser

22  Foundation Health Plan's damages; and then when we approach

23  trial, they start dropping footnotes in their pleadings saying,

24  "Oh, by the way, we're seeking damages on behalf of these

25  subsidiaries."

1          THE COURT:  Let me put it this way:  You filed an

2    objection which I haven't read yet over the weekend, which I

3    will.  I've got greater concerns on shifting legal theories at

4    this point.  The enterprise was listed.  If you can proceed on

5    an aggregate, proceed on an aggregate.  To suddenly now have to

6    figure out, well, how much goes to this entity and how much

7    goes to that entity, is a problem for us because you haven't

8    done discovery that way if you've done it in the aggregate.

9          MR. SOBOL:  Yes, we were trying to go in the

10   aggregate.  We're completely content to go in the aggregate.

11         THE COURT:  Well, then go in the aggregate.

12         MR. CHEFFO:  We don't think they can.  I mean,

13   basically --

14         THE COURT:  Well, I'm not prepared to rule on that, so

15   that's the only thing I need to focus on.  What I don't think

16   we're going to do is, can they sue on behalf of the affiliates,

17   for want of a better word?  I don't know.  But at this point

18   what we can't do is then find out because you have to start a

19   whole new discovery thing.  If you're right, how can I at this

20   point ask everyone to figure out, well, how much goes to

21   Arizona and how much goes to --

22         MR. CHEFFO:  And there's a reason why -- I mean, on

23   the one hand, they're saying it doesn't matter at all; but, on

24   the other hand, they're saying they have to amend the complaint

25   because we need these people in.

1    THE COURT:  I don't know, I don't know.  Yes?

2    MS. NUSSBAUM:  Your Honor, we are willing and ready to

3  proceed in the aggregate.  The testimony will clearly show that

4  the information from one central Drug Information Services then

5  went to all of the regions.  It will also show contracting,

6  purchasing is all from the parent company.  We are ready to

7  proceed in the aggregate as we've had discovery and as we've

8  proceeded here.

9    THE COURT:  All right, end of issue.

10   So there was a list of motions that went on and on and

11  on where you say I haven't ruled, and I sort of thought I had.

12  And I'm wondering whether the pretrial memo was written before

13  a lot of my rulings?

14   MS. ARMSTRONG:  It was, your Honor.

15   THE COURT:  Okay.  So there may be some I missed.  In

16  fact my law clerk found one I missed.  But could you look

17  through and just prune it and see what it is I owe you because

18  so much has come in.  And I don't want to not rule on

19  something, but I think I have, although I may have done it

20  orally at a hearing rather than in writing, and so someone may

21  not have been able to match it on the docket.  Fair enough.  I

22  don't know that --

23   MR. CHEFFO:  Your Honor, I think you've generally --

24  we'll confirm this, but I think you've hit most of the issues

25  that we were tracking.

1          THE COURT:  I was trying to catch up with you.

2     Finally, I just "stop" because I couldn't keep up with the

3     volume of papers coming in, and I do have other cases.  So I

4     think I'm current with the exception of one motion which I'm

5     going to look at.  Is there any other preliminary issue?

6          MR. SOBOL:  There are a couple of things, your Honor.

7     First, going back just to the juror questionnaires, two things:

8     First, the plaintiffs' position with respect to the question,

9     "Have you or a close family member taken Neurontin or

10    gabapentin or pregabalin or Lyrica?"  Okay, if the affirmative

11    answer to that is "yes" and it is the juror who has taken it or

12    is taking it, our view of it, that would be an automatic

13    disqualification.

14         THE COURT:  Oh.  Oh, so that's different from what you

15    were talking about.

16         MR. SOBOL:  It is.  That's what the commotion was back

17    here, and I misspoke, and that's why I'm correcting it right

18    now, okay?  If it was from a family member, right --

19         THE COURT:  We'll see.

20         MR. SOBOL:  -- we'll see.  If it's, you know, in the

21    past and once for pregabalin last year or something like that,

22    that might be a different issue.  I would just put it that way.

23         Second, I don't know what your ruling has been.  Both

24    parties submitted lengthy questionnaires.  Obviously the

25    plaintiffs' version of the questionnaire was much shorter than

9df5ec2b-e745-4aef-ba95-6249c4727bbf

Page 29

1    the defendants' questionnaire.

2            THE COURT:  I'm not giving a written questionnaire.

3            MR. SOBOL:  Thank you.

4            THE COURT:  I did in the last trial because we asked

5    about suicide and some very private emotional issues, and I

6    think this is different here.  I'm just going to ask have you

7    taken the drug, not whether you had suicidal thoughts.

8            MR. CHEFFO:  And I think your Honor asked actually

9    only one written question.  You took our questions and asked a

10   lot of them, but you didn't use the questionnaire.

11           THE COURT:  And then remember I asked you to come up

12   if I left something out that you really cared about, so I'll do

13   that again.

14           MR. CHEFFO:  Correct.  That was fine, your Honor.

15           The only other thing, at some point, and it doesn't

16   have to be necessarily this minute, but we do have a few issues

17   that I don't think either one of us wants to be fielding and

18   have the Court be fielding objections during opening statements

19   to demonstratives chalks, so, you know, whatever time is

20   convenient.

21           THE COURT:  No pictures of snake oil?

22           MR. CHEFFO:  I don't think we have.  They may have my

23   picture on there again, you know, snake oil or something, but I

24   don't think there's anything quite that egregious.  I think

25   they're more nuanced issues.

1          MR. SOBOL:  Well, let me just finish the juror

2     questionnaire.  We've taken notice, your Honor, that there are

3     two members of the venire, right?  I'm sorry, I don't have

4     sensational pictures for Mr. Cheffo.  There are two doctors who

5     are on the venire.  You probably don't need to ask them whether

6     they prescribed Neurontin, gabapentin, pregabalin, or Lyrica.

7          MR. CHEFFO:  Well, I mean, you can ask them.  I think

8     that's a different issue than the patients.  I mean, if the

9     doctors ever prescribed the medicine, I don't think that's in

10    any way an automatic bar.  I think doctors are likely to

11    prescribe a very well-used medicine like Neurontin.

12         THE COURT:  Does it say what their specialties are?

13         MS. NUSSBAUM:  It just says they're physicians.

14         THE COURT:  What number are we?

15         MS. NUSSBAUM:  21 is the first, and 28, your Honor, is

16    the second.

17         THE COURT:  Okay.  So the reality is, they're going to

18    come up screaming that they can't take that amount of time off,

19    so I think the odds of them --

20         MR. CHEFFO:  I think we're not going to be having this

21    fight when they tell you about the fifteen different things

22    they have every day to do, so --

23         MR. SOBOL:  I do agree with Mr. Cheffo that there are

24    a handful of things we should probably address before the

25    opening statements, and I don't know if you want to address

1    those now or after we go to the jury.

2          THE COURT:  You've got me.

3          MR. SOBOL:  Let's go to the demonstratives, how does

4    that sound, for each side on the openings?  Do you want to do

5    that first?

6          THE COURT:  The demonstratives make sense because if

7    we impanel quickly, we'll start with openings right away.

8          MR. CHEFFO:  Right.  Just so we're clear, just for

9    preparation, we're only going to do the openings today, and

10   we'll start with witnesses tomorrow?  Is that your Honor's --

11         THE COURT:  It depends on timing.  You have Kessler

12   here, right?

13         MR. SOBOL:  Yes.

14         MR. GREENE:  He's not in the courtroom, but --

15         THE COURT:  Sure, you should have him here now.  We

16   have the day for you.

17         MR. SOBOL:  Mr. Alba called us and said we had the

18   day.

19         Yours first or mine?

20         MR. CHEFFO:  I mean, they have a few, if it's okay.

21   The first issue is, they have -- let me give this to your

22   Honor.  We're not going to reargue the issue of the plea, your

23   Honor.  You know, obviously we've made our point on that, and I

24   think your Honor has said that it's coming in; but you've also

25   commented on that it was a matter of emphasis, this case

Page 32

1   shouldn't be 20 hours of talking about the plea.  But more

2   specifically to that document, that's a press release, and it

3   has information about the plea.

4           THE COURT:  The press release shouldn't come in.

5           MR. CHEFFO:  And that shouldn't be used because it's

6   just inflammatory.  If they want to mention --

7           THE COURT:  And also it says civil and healthcare --

8   what's relevant here is the criminal and not the civil

9   settlement.  So, fine.  What's the next issue?

10          MR. CHEFFO:  The next issue is, there are excerpts of

11  the information that are filed by the Department of Justice,

12  and I think they're all in order there for your Honor.  You can

13  just flip through.

14          MR. SOBOL:  We're on 1.2 right now?

15          MR. CHEFFO:  Yes, 1.2.  Excuse me.  And, you know --

16          THE COURT:  What's wrong with that?  They agreed to

17  it.  It's a statement.

18          MR. CHEFFO:  It is.  It basically -- we agreed to the

19  allegations in the information.  However, I think that, you

20  know, again, it goes beyond what I think your Honor's ruling

21  was.

22          THE COURT:  I'll allow it.  I'm likely to allow in the

23  information if they've agreed to it.

24          MS. ARMSTRONG:  Your Honor, I think the point on this

25  one is that if you read the entire statement in context, it's

Page 33

1    specific to the Northeast Business Unit.  It doesn't have the

2    national marketing that your Honor --

3                 THE COURT:  I understand, and that's a dispute you've

4    had all along and I've ruled against you on.  I do have a

5    problem with the press release; but the information is a court

6    document, you can take judicial notice, and they plead guilty

7    to it.  And I think you'll see the "kick ass" comment several

8    times, so --

9                 MR. CHEFFO:  Well, and just so we're clear, I think,

10   again, what your Honor said at the motions in limine was to the

11   extent there was that national meeting that he was at.  What I

12   think a lot of those comments and those voice mails were David

13   Franklin, you know, sitting in his office in Boston and got

14   that.

15                THE COURT:  Actually, this has been argued.

16                MR. CHEFFO:  Well, but, I mean, you ruled on the issue

17   that you said national information comes in at a national

18   meeting turning off the --

19                THE COURT:  I'm not going to exclude it at this point,

20   so --

21                MR. CHEFFO:  1.3, again, I think this basically

22   doesn't show -- candidly, your Honor, I think we have the same

23   objections to 1.3.

24                THE COURT:  So that's the Northeast office.

25                Damages, I think we shouldn't be doing this, right, at

1    this point?  Is that your point?

2            MR. CHEFFO:  I'm sorry?

3            MR. SOBOL:  Jump to the end.

4            MR. CHEFFO:  Yeah, I think that --

5            MR. SOBOL:  It's like the other ones.  The other ones

6    were fine.

7            MR. CHEFFO:  Are you talking about Demonstrative 2?

8            THE COURT:  Never mind.  Go ahead.

9            MR. CHEFFO:  The chart, the third quarter chart.

10           THE COURT:  That's their case.  That's part of it.

11   That's the correlating promotions with the spending.

12           MR. CHEFFO:  Well, they don't talk about the different

13   regions.  There's not one formulary --

14           THE COURT:  Overruled.  So what's the next one?

15           MR. CHEFFO:  The next one is the composite issue.

16   There's a document with the target.  That's a composite

17   document that was just created by the plaintiffs that talks

18   about different statements.  Many of those are not even related

19   to Kaiser directly, and it's argumentative for an opening.

20           THE COURT:  Yes, where are all these quotes from?

21           MS. NUSSBAUM:  Your Honor, those quotes are from

22   Pfizer documents.  We also used them in our summary judgment

23   motion, and the Court saw the entire documents.

24           THE COURT:  Maybe I saw them, but that doesn't mean

25   everything -- are they all --

1          MS. NUSSBAUM:  They're sourced on the bottom, your

2    Honor.  It says which trial documents they are, and they're

3    from three different documents, all of which --

4          THE COURT:  Are they all Pfizer documents?

5          MS. NUSSBAUM:  Yes, they are, your Honor.

6          THE COURT:  Then what's the problem?

7          MR. CHEFFO:  Well, they're not all related to -- they

8    all may not be related to Kaiser, and they haven't been

9    admitted, your Honor.

10         THE COURT:  Overruled.  But I don't want a chart on

11   damages now.  What are you doing here?

12         MS. NUSSBAUM:  That's fine, your Honor.

13         THE COURT:  It's not the custom here.  Now, I don't

14   know if that's true nationally.  Until I've ruled on -- as you

15   know, you all filed maybe eight Daubert motions within the last

16   month, so I couldn't go through each one in detail, but there

17   was some concern I had about just using a fraction approach

18   because of the claim that Kaiser is unique.  Now, because it's

19   unique, it survived summary judgment.  On the other hand, I

20   couldn't figure out whether the uniqueness of it affected using

21   a fraction approach, a proportionate approach.  In other words,

22   whether if it was 13 percent of all Neurontin prescriptions

23   nationally translate into Kaiser because, as you know, you did

24   a study, and you explained why 4 percent isn't really 4

25   percent.  That goes to the weight of it.  But, more

1    importantly, can you just do a proportional response?  I don't

2    know.  And so I'm a little reluctant to have you throw numbers

3    out.

4            MR. SOBOL:  Is the plaintiff still permitted to say to

5    the jury that they're going to be asking for a substantial jury

6    award or something to that effect without qualifying it, right?

7            THE COURT:  Sure, sure.

8            MR. GREENE:  You just don't want any number mentioned

9    in the opening?

10           THE COURT:  Because what if I ruled to the contrary

11   and he has to readjust his numbers?

12           MR. SOBOL:  No, I'm just saying.  That's fine.

13           THE COURT:  It may just be that I say you've got to

14   reduce by 30 percent what they've spent because that's what

15   they've shown.  I mean, you know, that's -- all right, in any

16   event, that's fine.

17           Now, What are the questions that you have?

18           MR. GREENE:  Judge, putting the chart aside, just to

19   stay on this for a moment, are we permitted to say an amount

20   that Kaiser is seeking, you know, say close to $100 million for

21   sugar pills?

22           MR. CHEFFO:  You know, you just said you can't use

23   damages and --

24           MR. GREENE:  Not a chart but just a number, or no?

25           MR. CHEFFO:  Your Honor, that's just asking to

1    speculate.

2          THE COURT:  Well, it's not speculating.  Here's the

3    issue:  Why don't you just say millions of dollars for sugar

4    pills because what if I don't rule your way, or I rule your way

5    for some indications and not for other indications?  It just

6    puts the number out there in a way that may not prove up.

7          MR. GREENE:  All right, your Honor.

8          THE COURT:  All right?  And especially if we go with

9    instead of with the completely ineffective to the alternative

10   medications, I don't know what this is, and I'm reluctant to

11   have you put it out there.  That was for me the area I felt the

12   weakest in is whether or not the Hartman proportional numbers

13   made sense, A, for every indication, and, B, because Kaiser is

14   unique.  That's why we're here.

15         MR. SOBOL:  Can I just have a moment with --

16         THE COURT:  Do you have anything?

17         MR. SOBOL:  I do.  Just one second, please?

18         (Discussion off the record between attorneys.)

19         (Discussion off the record.)

20         MR. CHEFFO:  Basically we'll give you a copy, but this

21   is a 2004 operating plan that I think they just dropped

22   recently.  It only has two references to Neurontin in it, and

23   it's basically at the very tail end of --

24         THE COURT:  So I'm confused.  You don't need a new

25   demonstrative now, do you?

Page 38

1          MR. SOBOL:  Ms. Nussbaum raised an issue.

2          MS. NUSSBAUM:  Your Honor, we have an entire copy of

3   the document if you'd like to see it.

4          THE COURT:  I know, but at this point I'm just

5   worried.  They're going to be up here any second.  So before we

6   start on brand-new demonstratives, are there any issues that

7   you have with Pfizer?

8          MR. SOBOL:  Yes.

9          THE COURT:  Well, we'd better go right now to them

10  because we're about to get this jury, I think.

11         MR. SOBOL:  The first slide, your Honor, which is

12  not -- I handed you a copy of Pfizer slides.  The first slide

13  is not numbered.  You'll see later that the slides are

14  numbered.  Our objections to this slide are the following:

15  First --

16         THE COURT:  Is this the graph?

17         MR. SOBOL:  Yes.

18         MR. CHEFFO:  This is a board, your Honor, by the way.

19  It's a pre -- and we can show your Honor, this has been -- we

20  exchanged this with them, I guess -- when did we exchange it?

21         MR. SOBOL:  Friday.

22         MR. CHEFFO:  Friday, Friday, your Honor.

23         THE COURT:  Well, what's the problem here?

24         MR. SOBOL:  Okay, the data line, the squiggly line

25  that you see goes up the front there, they've actually added

Page 39

1   several years of data that is not in any of their expert

2   reports.

3           THE COURT:  Which years?  Which years?

4           MR. SOBOL:  From January 1, 2008, forward.

5           THE COURT:  All right, so just put something over it.

6           MR. CHEFFO:  Well, your Honor, I mean, basically what

7   they're trying to do here -- this goes to the core issue you're

8   going to hear throughout -- they're basically trying to say,

9   let's not have reality.

10          THE COURT:  No, excuse me.  The issue is, is it in any

11  of the expert reports?  I don't think that we go to 2008 if

12  it's in someone's report.

13          MR. CHEFFO:  It is.  All that Dr. Keeley updated was

14  to follow the data that both party's experts have used to show

15  the use of gabapentin --

16          THE COURT:  You can't update.  No, take it out.  Let

17  me see the board.  Let me see how we can fix it.  If it's not

18  in an expert report, we're not doing it, both sides.

19          MR. SOBOL:  While they're pulling it out, let me move

20  on, and then we'll come back to that.  I'll also point out to

21  you, in the bottom right-hand corner, your Honor, of this

22  exhibit it says "September 2009 website, 22 off-label uses."

23  Pfizer's position, my understanding, in their opening is that

24  they plan on talking about the website clips.

25          THE COURT:  Sure.  I certainly expect they will.

1        MR. SOBOL:  I understand, but for indications that are

2    not at issue in this case, so for restless leg syndrome, for

3    certain other kinds of things, and, you know, we're going to

4    try whether or not all of those issues are or are not

5    fraudulent or not.

6        THE COURT:  You know what, it's a weak point in their

7    case.  You know, they've got the conviction; you've got the

8    website.  There we are.  So --

9        MR. SOBOL:  Okay.

10       THE COURT:  You know, speaking of that, I understand

11   in one of your pleadings, as I went through that skirmish at

12   the end, you've agreed to the authenticity of the website

13   materials, right?

14       MR. SOBOL:  Generally, yes.

15       THE COURT:  So that shouldn't be a problem.  I mean,

16   it's a fair point.  It's up on the website.  It's like a

17   statement.  It's an adoptive statement.  I understand it's

18   someone else's publication.  It's an adoptive statement.

19       MR. SOBOL:  Kaiser, like large corporations, is not

20   perfect.

21       THE COURT:  I understand.  Both have some big problems

22   here, but that's what a trial is about.

23       MR. SOBOL:  Okay.  If you go to the slide that's

24   marked 3 at the bottom, your Honor, it's the fourth slide in --

25       THE COURT:  Yes, all right.

1           MR. SOBOL:  I mean, I'm sorry, Mr. Cheffo tells me

2     they agree to strike this, so that should be stricken.

3           THE COURT:  Okay.

4           MR. SOBOL:  If we go to Slide 9.

5           THE COURT:  The jurors are waiting for us.

6           (Discussion between the Court and Clerk.)

7           THE COURT:  All right, go ahead.

8           MR. SOBOL:  The slide that's marked 9 in the bottom

9     right-hand corner, two things about this:  First, your Honor,

10    you'll see that what we're talking about is general about

11    off-label prescriptions by doctors, and there are two things

12    about this:  First, this case is about Neurontin.  It's not

13    about the off-label prescription of antipsychotic medications

14    or cancer drugs or anything else.  The testimony is all going

15    to be limited to Neurontin, and the opening statement should be

16    limited to Neurontin, not talking about general issues about

17    what goes on in the marketplace and everything.

18          MR. CHEFFO:  Your Honor --

19          MR. SOBOL:  Second -- please.

20          MR. CHEFFO:  I'm sorry.

21          MR. SOBOL:  Second, the slide is essentially

22    discussing the law and saying what it is that is allowed under

23    the law and what is not allowed under the law.  That's your

24    province.

25          And, third, I don't see any foreshadowing of evidence

Page 42

1    here.  This really does seem to be an argument about what kinds

2    of things and how often it's done off-label as opposed to

3    on-label.

4         THE COURT:  I don't have a problem with this.  I have

5    a jury waiting downstairs.  That's not a big problem.  What are

6    the ones that really hurt you?

7         MR. SOBOL:  Well, none of them hurt us, your Honor,

8    but I'm just finding the objectionable ones.

9         This is important to understand, your Honor.  If you

10   go to 15, Slide 15, this is a screen shot of a report that was

11   published by a doctor from the Permanente Medical Group, PMG,

12   which is associated with Kaiser but is not Kaiser.  And it is

13   not a double-blind random controlled trial.  In this case, our

14   view of things will be that these documents cannot go in for

15   proof of efficacy and cannot go in as being associated with

16   Kaiser, the plaintiff, the health benefit provider, and there

17   will be major disputes on the evidence of this.  We think that

18   at opening it's not necessary.  Opening it shouldn't come in

19   because if it turns out that these things don't come in, then

20   there will be major prejudice with the jury seeing things that

21   are being associated with -- we think incorrectly being

22   associated with Kaiser doctors.

23        MR. CHEFFO:  This is the height of -- I can't believe

24   we're arguing this this morning.  These doctors still work for

25   Kaiser.  This is not just some review.  This is a peer-reviewed

Page 43

1    journal article that was written by Kaiser doctors after and

2    published in a peer-reviewed journal after they filed the

3    lawsuit which talks about the benefits of using Neurontin for

4    neuropathic pain.

5              THE COURT:  I know, but here's the issue:  It's the

6    first I've thought about this issue.  I don't know about the

7    issue.

8              MR. CHEFFO:  Well, these people have been deposed,

9    your Honor, and all this is basically saying, that there is --

10             THE COURT:  I know, but there's a challenge to it, and

11   I'm not ready to rule on it.  So I think you can say Kaiser

12   doctors have said.  I don't have a problem with you saying it,

13   but for you to actually quote it at length and put it out there

14   without my ruling on it --

15             MR. CHEFFO:  This, I think, is all that's going to be

16   quoted.  It's basically just quoting an article and saying

17   that --

18             THE COURT:  I know, but I don't know if the article is

19   admissible yet.  Is he being called as a witness?

20             MR. CHEFFO:  Yes, he is going to be called as a

21   witness, sure.  I mean, not live, but he's been deposed and --

22             THE COURT:  Is he part of --

23             MR. CHEFFO:  Yes.

24             THE COURT:  So he's going to come in and he's going to

25   testify about it, and he's going to --

Page 44

1        MR. CHEFFO:  By videotape he's going to come in.  This

2   is a Kaiser --

3        THE COURT:  All right, all right.  So if he's

4   testifying, what's the issue?

5        MS. NUSSBAUM:  Your Honor, if I might, number one,

6   these are not Kaiser doctors.  These doctors work for a medical

7   group that has a contract with Kaiser.  Kaiser doesn't hire

8   them, it doesn't fire them, it doesn't control them.

9        Number two, these doctors both had relationships with

10  Pfizer, okay, that the plaintiffs here didn't even know about.

11  One of them is not only on the Pfizer's speakers bureau but is

12  also a consultant for Pfizer, and the other is in the speakers

13  bureau --

14       THE COURT:  At this point I'm not ruling on it.  I'm

15  striking those two initial ones.  You can refer to

16  Kaiser-related or people working --

17       MR. CHEFFO:  It says on Page 17 "Kaiser Permanente."

18  This is how he's listed, as a Kaiser Permanente doctor.

19       THE COURT:  It goes on for pages and pages.  I can't

20  rule on this now.  I'll just have to think about this for a

21  minute.  I'll do it during the break at some point.

22       MR. CHEFFO:  It's just 15, 16, and 17, and it

23  basically just highlights that he listed himself as a Kaiser

24  Permanente doctor, and he still works -- just one issue, your

25  Honor.  I know you're going to hear a lot about this, but, you

1    know --

2           THE COURT:  I just don't know.  I mean, so the issue

3    is that he works for one of the related entities, but he's also

4    on the Pfizer speakers bureau?

5           MR. CHEFFO:  This is the problem.  This is the basis

6    of our --

7           THE COURT:  I know, but I can't rule on it right now.

8    The jury is downstairs.  I'll think about it.  We're hours away

9    from it.

10          MR. CHEFFO:  Absolutely.

11          MR. SOBOL:  The final thing I'll just flag for you so

12   you're aware of it then is that Slide 29 has two -- tell me

13   when you're there, your Honor.  The issue that we just

14   addressed is identified in the second and the fourth bullet.

15   Again, it's the same issue, so when we address this later --

16          THE COURT:  No.  This 29 is vague enough.  This is

17   different because I have to rule on the admissibility of it,

18   or, more accurately, how it's portrayed.  It sounds admissible.

19   The question is whether it's fair to say "Kaiser doctors."  Do

20   you have some --

21          MR. CHEFFO:  We changed it actually to say "Kaiser

22   Permanente doctors" just for purposes -- you know, again, these

23   are the only doctors who treat the patients in here, but all of

24   a sudden for court they're acting like these people are totally

25   foreign to this lawsuit.

1        THE COURT:  Do you have a way of saying Kaiser

2  Permanente doctors?

3        MR. CHEFFO:  We changed it.  I'm sorry, what I think

4  we gave to Mr. Sobol, "Kaiser Permanente doctors exercise sound

5  medical judgment" -- we changed "the trick" as well -- "when

6  prescribing Neurontin."

7        MS. NUSSBAUM:  Your Honor, if I might, these doctors

8  were deposed as third parties in this case.  They were not

9  deposed as party witnesses.

10       THE COURT:  If they changed it to Kaiser Permanente, I

11  don't know how that's misleading, and you'll have to explain

12  that.  I mean, you'll have to impeach their credibility with

13  it.  You can say it in your opening:  "These people may say

14  Kaiser Permanente, but they're all on Kaiser's payroll."

15       One thing you're going to have watch me on and each

16  other on is, you sound so alike, Kaiser and Pfizer.  I was

17  trying to explain it to my family and --

18       MR. CHEFFO:  Oh, I thought you meant me and

19  Ms. Nussbaum.

20       (Laughter.)

21       THE COURT:  You know, I think we should probably get

22  going because the jury is ready for us downstairs.  I just want

23  to say, I know this has been -- how long now?

24       MS. NUSSBAUM:  Five years.

25       THE COURT:  -- five years in the making, and with

Page 47

1    Mr. Greene and I, it goes back to 1996.  So I've got some of

2    the best lawyers in the country in this room, and I appreciate

3    the really excellent briefing everyone has given, and I guess

4    we'll all pull together as officers of the court to get through

5    this.  So if there's anything that's going on in your life that

6    creates a problem, let me know, if you're not feeling well or

7    something like that.  So we have 28 days together, and it's a

8    great case.  It's why you become a lawyer and a judge.  So I

9    thank you all, and we'll get through it, I hope.

10           MS. ARMSTRONG:  Your Honor, if I could just compare

11   witness lists, I will cross off the redundancy, but it doesn't

12   mean that we're not going to call them.

13           THE COURT:  That's fine, and can I just ask you off

14   the record with two key people up here.

15           (Discussion off the record.)

16           (A recess was taken, 9:30 a.m.)

17

18

19

20

21

22

23

24

25

1           THE CLERK:  All rise.  United States District

2     Court for the District of Massachusetts is now in session,

3     the Honorable Patty Saris presiding.  Please be seated.  The

4     case of Kaiser Foundation Health Plan, et al vs. Pfizer,

5     Incorporated, et al, Civil Action 04-10739 will now be heard

6     before this Court.

7           THE COURT:  Good morning.  My name is Judge Saris,

8     and this morning we will be impaneling a jury in a civil

9     case.  In order to do that, I will introduce you to the

10    attorneys, I will introduce you to the parties, I will ask

11    you a series of questions designed to ensure that you can

12    serve in a fair and impartial manner.  I'll read you the

13    witness list, and I'll tell you a little about the length of

14    the case and what hours we sit.

15          Before we get going, I want to ask Mr. Alba, who's

16    our courtroom deputy, to please swear you in because all

17    your answers to my questions will be under oath.  Thank

18    you.

19          (Jurors were sworn)

20          THE COURT:  Oaky.  As I said, I'm going to ask you

21    a bunch of questions.  If you have an affirmative response,

22    you raise your hand.  At the end of all of the questions,

23    I'm going to ask you to come see me at sidebar so we'll be

24    right up here, and sometimes the answers will be quite

25    simple, oh, I know that guy, I went to high school with him,

1    or I can't sit on this case because of a bias I might have,

2    so what we do is we do that up here at sidebar.  Probably

3    the most important thing I can do as a Judge and I rule on

4    the evidentiary issues, and I give you instructions of law,

5    and I do all sorts of things, but the most important thing

6    that I can promise the parties here is a fair and impartial

7    jury.

8              So a lot of these questions are designed to ensure

9    that you can sit in a fair and impartial way, and some of

10   the answers might be a little bit confidential so that's why

11   we do it up here at sidebar.  Nonetheless, it's under oath

12   and it's being transcribed.  So let me start off by talking

13   to you about the parties in this case.

14             So in this case this is a case brought by Kaiser,

15   and I'm going to read the affiliated entities right here.

16   It's all the Kaiser Foundation Health Plans, and I have

17   somewhere the whole list of them, but I'm going to ask

18   plaintiffs' counsel to sit and read all the list of the

19   affiliated entities with Kaiser.

20             Do you have all the lists right there?  You can

21   read the lead plaintiffs, if you choose.

22             MS. NUSSBAUM:  The lead plaintiffs, your Honor,

23   are Kaiser Foundation Health Plans and Kaiser Foundation

24   Hospitals.

25             THE COURT:  All right.  So does anybody here have

Page 50

1   any affiliation with the Kaiser Health Care Plans, which are

2   located, there used to be some here in Massachusetts, now

3   they're primarily located in California and I think nine

4   other states, not ours.  So has anyone here ever worked for

5   Kaiser?  No hands raised.  Anyone here ever reviewed health

6   care insurance from Kaiser?  One did.  Anyone here, close

7   family, friends that are covered that you know of by Kaiser?

8   One person.

9            So at the end of these, you'll remember, you'll

10  come up and tell me about it.  There are certain affiliated

11  entities, like Kaiser Permante and other places that you'll

12  hear about.  Is there anybody here who either works there or

13  have any stock or any kind of financial interest in those

14  groups which are not directly the plaintiffs in this case,

15  but you might hear about them?  No hands raised.

16           Now, the defendant in this case is Pfizer, but you

17  might also hear about a company Pfizer Corporation but

18  there's also Parke-David and Warner-Lambert, so Pfizer is

19  the current corporation, but you may hear about predecessor

20  companies.  Is there anyone here who has stock in Pfizer?

21  Anybody here works for Pfizer?  Anyone here does business

22  with Pfizer?  Four or five.  Anybody here have a financial

23  interest in Pfizer that I've not just asked about?

24           All right.  Now, I want the attorneys to please

25  stand up and introduce themselves to you.

1           MR. SOBOL:  Good morning, everyone.  My name is

2   Thomas Sobol, Hagens Berman Sobol Shapiro in Cambridge,

3   Massachusetts.

4           MS. NUSSBAUM:  Good afternoon, Linda Nussbaum from

5   Kaplan Fox & Kilsheimer in New York.

6           MR. GREENE:  Good morning, my name is Tom Greene

7   and my firm is here in Boston.

8           MR. BARRETT:  Good morning, my name is

9   Don Barrett, and I'm from Mississippi.

10           MR. RONA:  Good morning, my name is Ilyas Rona,

11   and I work with Tom Greene in Boston.

12           MS. PARKER:  Good morning, I'm Kristen Johnson

13   Parker, and I work for Hagens Berman Sobol Shapiro here in

14   Boston.

15           MR. CHEFFO:  Good morning, my name is Mark Cheffo

16   from Skadden Arps, and I represent Pfizer, Inc.

17           MR. HOOPER:  I also represent Pfizer.

18           MR. KENNEDY:  Good morning, Raoul Kennedy, also

19   with Skadden Arps, and I also represent Pfizer.

20           MR. COOPER:  My name is Dan Cooper, and I'm here

21   working with Pfizer.

22           THE COURT:  So those are lots of lawyers.  Does

23   anyone here know any of the lawyers personally?  Anyone here

24   ever been represented by any of the law firms?  No hands

25   raised on either those.  Anyone been on the opposite side of

Page 52

1    those law firms?  Anyone have a financial interest of any

2    those law firms?  I found the list I was hoping to find, so

3    let me go through the various, so there's Kaiser Foundation

4    Health Plan, I think, and I've already asked about that.

5            You may also here mention of Kaiser Foundation

6    Health Plan of Colorado, Kaiser Foundation Health Plan of

7    Georgia, Kaiser Foundation Health Plan of Mid-Atlantic

8    States, Kaiser Foundation Health Plan of the Midwest and

9    Kaiser Foundation Health Plan of Ohio.  You may hear

10   mention -- I want to make sure no one has a financial

11   interest in those entities.  I think I at this point

12   captured most of them.  If not, you'll tell me about it at

13   sidebar.

14           So the gist of this suit is that there are

15   allegations that are made by Kaiser, the health plan, that

16   Pfizer made certain representations about a drug called

17   Neurontin.  That's N-e-u-r-o-n-t-i-n, a drug called

18   Neurontin.

19           Another name it sometimes goes by is Gabapentin,

20   that's G-a-b-a-p-e-n-t-i-n.  So Pfizer has denied this, and

21   there's arguments that it has made certain

22   misrepresentations about this drug, and you'll hear a lot

23   about the law later on and the facts with respect to certain

24   kinds of medical conditions, including migraines,

25   neuropathic pain, nociceptive pain, and I'll be telling you

Page 53

1    what all of this is, bipolar, and certain dosages over a

2    certain amount.  So those are the allegations.  Pfizer

3    denies them, and this is what the trial is about.

4           So has anybody here -- now this is what I want you

5    to think about here.  Has anyone here to your knowledge,

6    either themselves or any close family members, close family

7    members, a parent, a child, a spouse, taken Neurontin?  Five

8    or six.  Anyone here -- and I forget, I'm going to ask it

9    the same way, although it's the same drug, that's the brand

10   name -- anyone taken Gabapentin in generic form?  A couple

11   of people.  Anybody here taken, either you or a close family

12   member, taken Pregabalin or Lyrica?  No hands raised that

13   you remember.

14          Now, I want to go through some additional

15   questions here.  Does anyone here, has anyone heard about

16   this case?  It has received some coverage.  Anyone heard --

17   one person does.  Is anyone here in the medical profession

18   and has prescribed Neurontin, Gabapentin, Pregabalin or

19   Lyrica?  Anyone prescribed it?  One person.

20          Is there anyone here who -- I'll go through the

21   kinds of businesses that may have had.  Is there anyone here

22   who has worked for a pharmacy benefit manager that may have

23   been involved with selling Neurontin or these other drug

24   names I've given you?  Is there anyone who is involved in a

25   hospital and dispensing these drugs?  Is there anyone here

Page 54

1    who's worked in another HMO that's dispensed these drugs

2    where yourself have been involved with salespeople or in

3    some way dispensed these drugs?  No hands raised.

4         This would be true anyone, involved as a managed

5    care provider in selling or providing these drugs?  Anyone

6    in a medical marketing firm in selling or prescribing these

7    drugs, or I should say, actually any drugs for Pfizer or any

8    of these companies, Parke-David or Warner-Lambert?  No hands

9    raised.  Anyone involved in the medical publishing field

10   where you've been involved in reviewing articles, scientific

11   journals, the like involving these drugs?  Okay.  No hands

12   raised.

13        Anyone aware of a bias that you may have in this

14   case or this kind of a case?  Anyone aware of a financial

15   interest you have in this case or this kind of a case?

16   Anyone involved in any of these kinds of involvement,

17   pharmaceutical positions, pharmacy benefit managers, all

18   companies I just listed that might give you a bias or

19   prejudice in this case or this kind of a case?

20        Is there anyone here -- let me just go through

21   this, let me just ask this more broadly -- is there anyone

22   here involved in the marking of any drug, either as a member

23   of a pharmaceutical team or on a marketing team?  Anyone

24   here on any committees or any HMOs or health care

25   maintenance organizations or any hospitals that are involved

1    in approving drugs?  One person.  For a prescription on a

2    formulary.  Anyone here involved at all in putting together

3    formularies for any kind of a health care institution?  No

4    hands raised.

5           Anyone here -- I'm going through the list of

6    witnesses right here, is there anyone based on anyone who

7    said so far you might not be able to serve fairly on this

8    jury?  One person.  Keep thinking of that.  I'm going to be

9    reading a list of trial witnesses, and, once again, it's

10   quite lengthy, but some of these people are coming in

11   through deposition, through videotapes, I'm reading you

12   anybody who could possibly be brought in, so it's a

13   lengthier list than may actually show up:

14          John Abramson, who's a doctor; Brian Alldredge,

15   who's a pharmaceutical.  Pharm. D, what's that, Doctor of

16   Pharmacy?  All right.  Jeffrey Barkin, who's a doctor;

17   Rena Conti, a Ph.D.; Kay Dickersin, who's a Ph.D.;

18   Curt Furberg, who's a doctor and a Ph.D.; Raymond Hartman,

19   who's a Ph.D.

20          I don't go through all the titles, it will take me

21   too long.  Nicholas Jewell; David Kessler; Douglas McCrory;

22   Thomas L. Perry; Meredith Rosenthal; David Campen;

23   Ambrose Carrejo; Albert Carver; Dale Daniel; Robin Dea,

24   D-e-a; Sean Jones; Joel Hyatt; Mirta Millares; Calvin

25   Togashi; Lucy Castro; George Cavic; Clare Cheng;

1    David Cooper; John Crook; Christopher DeSimone; Suzanne

2    Doft; Allison Fannon; Leslie Fierro; Bruce Fleischman; John

3    Ford; David Franklin; Timothy George; Robert Glanzman;

4    Christine Grogan; Frances Kivel; Lloyd Knapp; John Knoop,

5    K-n-o-o-p; Phil Magistro; Nancy Mancini; John Marino, Tamela

6    Martin; Cynthia McCormaick; Avanish Mishra; Bina O'Brien;

7    Atul Pande; Joseph Pieroni; John Richter; Jennifer Samuels;

8    Drusilla Scott; Connor Smith; Leslie Tive; Janeth Turner;

9    Stephen Valerio; Adrian Vega; Timothy Windhom; Margaret

10   Yoder.

11          Nicholas Weider, W-e-i-d-e-r; Debra Kubota;

12   Dale Kramer; David Chandler; Mitchell Danesh; Morris Maizel,

13   M-a-i-z-e-l; Bruce McCarberg; Vithal Dhaduk; John Arness,

14   Anthony Anderson; Shawn Bird; Gary Brenner; Pradeep

15   Chintagunta; Elizabeth A. Field; Robert Gibbons; Henry

16   Grabowski; Michael Keeley; Michael McLean; Fiona Scott

17   Morton; Anthony Rothschild; Andrew Slaby; Dr. Backonja;

18   Dr. Mathew; Dr. Gorson; Dr. Gerner; Carol Janney; Mark

19   Buchfuhrer; Dr. Charles Phillips; Mitchell Cohen, Jim

20   Callandrillo; Stephen Valerio; Michael Vinegra.

21          Now, that's a long list; however, many of them are

22   just in case.  Some of them are rebuttal witnesses, and some

23   of them are video depositions and the like.  So, does anyone

24   know any of those people?  Two, three, four.  Once again, if

25   you end up on this jury, maybe you missed one of the names I

1   read, tell me, I know this person, and I'll figure out what

2   to do about it.

3          Now, at this point I want to tell you a little bit

4   about the length of this case and the hours that we will be

5   sitting.  This is an important case.  Let me start off

6   saying we are one of the few countries, in fact, the only

7   country left in the world where the parties have a right to

8   a jury trial given by the United States Constitution.

9          In criminal cases, of course, there's a

10  constitutional right, but there's also a right in civil

11  cases, like this one, that involves important issues.  This

12  is an important case.  Both sides care a lot about this

13  case.  I've been working hard on it.

14         So it is both their constitution right to have a

15  jury and your obligation and right to serve.  This is a

16  longer trial.  It's about a month, a month long.  I know

17  almost certainly because I've given both sides sort of a

18  clock and limits, so they've been trying to make the case as

19  tight as they can possibly do it.

20         I can never tell you exactly how long something is

21  because of a very important principle known as Murphy's Law,

22  so that while I have it scripted, where both sides get a

23  certain number of hours, et cetera, I just heard on the

24  radio coming in that there may be a snowstorm, so what do I

25  do if I lose that hour or what if one of the witnesses gets

1    the flu, or what if somebody's plane is grounded in bad

2    weather.  There's only so much I can do, and, therefore, we

3    want somebody who can be available through the 25th, which

4    is essentially a month from now.

5            There's one day in there, I haven't even told the

6    lawyers this yet, where I have to be out at a conference and

7    that sort of thing, so at the end of the day, we believe

8    that we will get you the case and even build in a couple of

9    days for deliberations by the third week in March, and then

10   it's up to you at that point to deliberate.

11           So, that's basically the length of the trial.

12   Because we understand this is a long trial, we are sitting

13   from 9 to 1, that means that people with children can get

14   home and get their kid off the bus.  It also means that if

15   you're working or a sole practitioner, you can work in the

16   afternoons.  It also means that I do other stuff in the

17   afternoon.

18           Today simply because you've all allocated the day,

19   we'll work a full day, but it will primarily be 9 to 1ish,

20   it can be 1:05, or three minutes of one, depending when we

21   finish a witness.  We break typically between 11 and 11:30,

22   and there's food out for those who get chosen for this jury.

23   We'll feed you.

24           Sometimes it's a little later getting out if

25   somebody is stuck in traffic, but basically our day is 9 to

1    1.  On the day or days you deliberate, we hold you to 5:00,

2   we give you lunch, and we treat you with tender loving care,

3   but primarily on the days that you, deliberate unless

4   there's a problem, you stay from 9 until 5.

5           So on what grounds will I excuse someone?  I will

6   excuse you if you are the parent or the legal guardian of a

7   preschool child and there is no childcare to take care of

8   your child, not the baby-sitter, not the nanny, I will

9   excuse you.  I will excuse you if you have a surgery or

10  other medical appointment schedule that can't be

11  rescheduled.  I don't mean a routine dental cleaning, minor,

12  the kind of thing you can't postpone, and, of course, I will

13  excuse you, you won't miss your surgery or whatever because

14  of this trial.

15          The third thing is if you are the sole caregiver,

16  a parent, a child, a spouse, and there's no other person who

17  can give that person care, you don't have a situation,

18  assisted living or something, you're the person caring for

19  that person, I will excuse you.

20          Now, let's get to business inconvenience.  I don't

21  excuse for mere business inconvenience.  I have to believe

22  there are lots of busy people on this list, people with

23  important other lives as a parent or working in business or

24  in law, medicine.  I looked through the list.  I can't

25  excuse simply because you have a business trip.  It will

1  have to be rescheduled.

2         I do understand that some people are solely

3  employed by themselves and that might be a huge hardship,

4  tell me about it.  If you feel most of it can be adjusted

5  four in the afternoon, but if there's a reason, it can't be,

6  tell me about it.  So I don't excuse for mere business

7  inconvenience.  On the other hand, what I will excuse is,

8  but I'll send you back downstairs, if you have plane tickets

9  for your two weeks on vacation and you're going to lose that

10  money, those kinds of things, I will let you go down, and

11  there are other trials being scheduled for today.  I won't

12  make you miss your vacation if it's something that you can't

13  reschedule.

14         Now, or sometimes if there are college students

15  here, I won't make you miss your mid terms, but basically I

16  will not excuse for mere business inconvenience, given those

17  parameters, did I say the 27th or something, we need someone

18  who can stay here through March 27th.  Is there anyone here

19  who it will cause a substantial personal hardship?  So I

20  will see you, and if we excuse you for that, remember, I

21  will send you downstairs because I think other judges are

22  still impaneling this morning, is that correct, and then

23  we'll send you up to another room.

24         Is there anyone here for religious reasons cannot

25  pass judgment on another, is not permitted to pass judgment

Page 61

1   as a member of a jury?  Maybe one person there.  Is there

2   any other question that you all wanted me to ask that was on

3   your list?

4           MR. CHEFFO:  No your Honor.

5           MR. SOBOL:  No, your Honor.  Thank you.

6           THE COURT:  I will promise I will get to you, so

7   this doesn't need to be like the old Filene's basement, I'm

8   dating myself, we're going to go by row by row coming up

9   here.  As I excuse you, go back down to the jury pool and

10  see if some other Judge needs you, and in the mean time for

11  those of you who want to sit back here and read, it

12  shouldn't take that long to get through this impanelment

13  process.

14          (Jury impanelment was held.)

15                   - - - -

16          (Jurors were sworn)

17          THE CLERK:  Thank you, you may be seated.

18          THE COURT:  At this point I'm going to give you a

19  set of preliminary jury instructions, then we're going to

20  take our break.  The jury instructions are quite brief.

21  They're just intended to give you a preview about what to

22  expect over the course of the next month or so.  Again, I'm

23  Judge Saris.  Welcome to the federal court in Boston, and

24  there are certain things I want to talk to you about.

25          First is although I wear the black robe here, in

1    every true sense, you are the judges, because you're the

2    judges of the facts, and you're the judges of the

3    credibility of the witnesses.  Over the course of this

4    trial, I will be making various rulings, but nothing I say

5    is intended to indicate to you what I think about this case.

6    You are the judges here of what the facts are and the

7    credibility of the witnesses, and, as I said, nothing I say

8    or do is intended to indicate to you what the appropriate

9    verdict is.  You will be expected to render a unanimous

10   verdict at the close of all of the evidence.

11          Now, what should you expect over the course of the

12   next several days?  What you should expect is that you're

13   going to hear from many witnesses.  Some of those witnesses

14   are going to testify live in front of you.  They'll take the

15   oath, and you'll have to assess their credibility.  Other

16   witnesses will come to you through video depositions because

17   they're beyond the subpoena power of the court.  You'll see

18   many, many documents.  They'll receive a number and come

19   with you into the jury room.

20          Sometimes you're going to see graphs and pictures,

21   and sometimes those will be marked as exhibits and come with

22   you into the jury room.  Sometimes they'll be something that

23   we quaintly call chalks, as in the olden days, when you used

24   to have a chalkboard, and now we have fancy-chmancy

25   graphics, but they're essentially a tool to present one side

1    or the other's position, but they're not exhibits and they

2    won't come with you into the jury room.

3              In many situations you will have stipulations of

4    fact, and we'll tell you about those as we go along.  Many

5    of the things that happen over the course of the trial are

6    not evidence.  The openings statement are not evidence,

7    rather, they're the efforts by the attorneys to give you a

8    preview about what to expect.

9              This case has been going on for a while.  There's

10   been something called pretrial discovery so they've had an

11   opportunity to hear from many of these witnesses and get

12   documents.  They'll give you opening statements about what

13   they expect to happen, but, remember, the opening statement

14   is not evidence.  We'll give you notebooks.  I encourage you

15   to take notes, but the opening statements are not in

16   evidence.

17             Similarly, the arguments at the end of the case,

18   the closing arguments are not evidence.  Questions by

19   lawyers are not evidence.  You'll hear many, many questions,

20   I'll make one up.  "It was raining out that day, wasn't it?"

21   You shouldn't assume it was raining.  Sometimes other

22   evidence comes in to support that information, but it's the

23   witness' answer, not the attorney's question, that is the

24   evidence in the case.

25             Objections, you're going to hear lots of

1    objections in this case, I guarantee you, objection,

2    leading; objection, hearsay; objection, irrelevant.  You've

3    all heard these things.  I'll say sustained, I'll agree with

4    the objection and you can't consider the evidence or hear

5    it.  I say overruled, which means I disagree with the

6    objection, and you can treat that evidence like any other.

7           Sometimes I do that right off the bench, we have

8    this little thing quick in front of you.  Please don't

9    consider anything we've said in front of you as evidence in

10   the case.  Sometimes it's more complicated, look at all

11   those lawyers, so they ask to come up to sidebar.  I try and

12   do that before court or after court so I'm not taking your

13   time, but every once in a while, they know the case so much

14   better than I do because they've been in the weeds that they

15   say, Judge, I really need to explain something to you, we

16   will have sidebar over here.  Please don't try to listen.

17          It's a great opportunity to stand up, do aerobics,

18   but don't try and listen.  And, in fact, while these are

19   gorgeous courtrooms, sometimes you can hear too well,

20   sometimes when we speak, there, you see that arch like in

21   the roman coliseum, it goes right into the jury box, so

22   please don't try and Listen.

23          Sometimes I use -- you can, if you're taking

24   notes -- put a big L, you can hear what was someone's state

25   of mind, why did someone prescribe something, why did

Page 65

1    someone do something.  It doesn't mean it's necessarily

2    true, but it helps you understand why someone took a course

3    of action, they heard something that's hearsay, not subject

4    to cross-examination, but it explains why they did

5    something, or an expert explains why he came to a certain

6    opinion, but a lot of the information is limited to

7    understanding why someone did something or has a certain

8    opinion.

9          Now, anything you may have seen or heard outside

10   the courtroom is not evidence and must be disregarded.  Let

11   me say this as strongly as I know how.  Do not do Internet

12   research about this case.  As soon as extraneous information

13   comes in, as soon as you look up something about this drug

14   or these kinds of drugs, or you look it up, there has been

15   press coverage, I don't want you to look it up.  I don't

16   want you looking anything up that has to do with this case.

17         I feel very strongly that jurors should be allowed

18   to ask questions, some of this is technical, write it down

19   and ask it.  Sometimes if you want to raise your hand, ask

20   it, but you can't look up the information on the Internet.

21   There's a lot of stuff on the Internet, some of it is true,

22   some of it is not.  We don't want you looking through

23   Wikipedia.  No one should look up anything.  No one should

24   Twitter, no one should Twitter, no one should MySpace,

25   anything.  Don't do anything about the Internet on this

1   case.  That's a flat-out instruction.

2           Many of you might have doctors or friends who have

3   this opinion or might work for one of these health care

4   places.  Don't talk about the case.  Everyone has an opinion

5   about something.  You can't talk.  A fair number of people

6   came up and said they couldn't serve, some of them really

7   did have opinions, either through personal experience one

8   way or through another, please we do not want anyone's

9   opinions to bias your case.

10          There's two kinds of evidence you'll be able to

11  consider.  There's direct evidence and circumstantial

12  evidence.  Direct evidence is direct proof of facts from

13  someone who has perceived an event and then tells you about

14  it.  Circumstantial evidence is different, it's proof of

15  facts from which you may reasonably infer or conclude that

16  other facts exist.

17          That sounds pretty extract, but let me give you

18  the most basic example that has nothing to do with this case

19  and we'll explain the distinction perfectly.  If your

20  daughter sees the letter carrier deliver the mail, she sees

21  it, she tells you about it, that's direct evidence.  Someone

22  has seen something, tells you about it.  You may decide you

23  don't believe her.

24          Fine, maybe she wasn't wearing her glasses.  Maybe

25  she had a horrific day and she was remembering it wrong, or

1   maybe she had a reason to lie about whether the mail letter

2   carrier had been there or not.  She had seen something.

3   Somebody who had seen something or felt or touched

4   something, has use one of his five senses to perceive an

5   event and tells me about it, that's what we mean by direct

6   evidence.

7            Circumstantial evidence is different.  What if

8   nobody saw the letter carrier deliver the mail, you come

9   home from work, you find the mail shoved through your mail

10  slot.  You know based on your every day experience of life

11  that the letter carrier must have been there, how else did

12  the mail get through the slot?  That's circumstantial

13  evidence.

14           Now, you can consider both direct evidence and

15  circumstantial evidence because it's your duty as the jurors

16  to find the facts and decide what the reasonable inferences

17  are that are to be drawn from those facts, you find the

18  facts and the reasonable inferences to be drawn.

19           So, to go back to my example, so while it may be

20  reasonable to infer that the letter carrier had been there,

21  how else would the mail have gotten through the slot, maybe

22  it wasn't your regular letter carrier.  Perhaps he or she

23  was sick or on vacation, so you have to decide what's

24  reasonable or infer based on all of the evidence in the

25  case, but you can consider both direct and substantial.  As

Page 68

1   I mentioned to you before, the heart of case is what

2   witnesses to believe and which ones not to believe.

3          This is a civil case.  The burden of proof is

4   different from that in a criminal case.  The burden here is

5   proof by a preponderance of the evidence, a preponderance of

6   the evidence.  That means that the plaintiff, Kaiser -- I

7   sometimes say Kaiser, sometimes I say plaintiffs -- but

8   Kaiser needs to prove that its claims are more likely true

9   than not true.  More likely true than not true.

10          There are those of you who sat on a criminal case.

11   The burden there is proof beyond a reasonable doubt, very

12   high standard, proof beyond a reasonable doubt.  That is the

13   standard that applies in a criminal case, not a civil case.

14          The burden in this case is that the plaintiff must

15   prove its case that its claims are more likely true than not

16   true, and when I sit on this, and you should be thinking

17   this way, on all the key facts on the elements as, I'll tell

18   it to you later, you think about blindfolded lady justice,

19   she stands there, right, with the scales of justice, the

20   plaintiffs must make that scale tilt, albeit slightly, in

21   plaintiff's favor or the plaintiffs have not met their

22   burden, so if the scales are balanced or balanced against

23   them, the plaintiffs have met their burden of proof.  If the

24   plaintiffs make the scale tilt, albeit slightly, the

25   plaintiffs have met their burden of proof.

1           Now, let me discuss for a minute, I'm not going to

2     go through an elaborate set of preliminary jury

3     instructions, but I'm going to hand these out because I'm

4     going to be giving you notebooks, and I want to go through

5     with you the specific conditions that are at issue here

6     because at the end of this rainbow, at the end of all of it,

7     it's like a final exam question, there are going to be five

8     different issues for you to resolve, and I want you to, you

9     know, sometimes jurors say to me why didn't you tell me in

10    the beginning what the key issues were so I could follow the

11    evidence as we went along?

12          So there are claims about five different kinds of

13    misrepresentations, and I'm going to hand them out to you so

14    you can keep them in mind as you're taking notes.  You're

15    going to hear different things.

16          Can I ask Mr. Alba to hand you this out and you

17    can keep in it your notebook.

18          I feel like I'm sort of reading with a bouncing

19    ball, but let me just read along with you so you can focus

20    on this.  So, in this case, Kaiser claims that Pfizer -- can

21    you believe they rhyme?  Kaiser claims that Pfizer made

22    certain misrepresentations about a drug called Neurontin.

23    I'd also refer to that as Gabapentin, and you'll hear those

24    names used almost interchangeably.  Pfizer has denied the

25    claim, that's why you're here.

1          During the trial you'll hear about the use of the

2    drug and the treatment of four different medical conditions,

3    and at the end of it, at least with respect to most of them,

4    it's hard to see how it plays out, I'll ask, did they make

5    it with respect to bipolar, which you'll hear about is a

6    psychiatric disorder you may have heard about.  Did

7    plaintiffs prove their case with respect to migraines?  You

8    know, that's a headache.

9          Has plaintiff proven its case with respect to

10   neuropathic pain, which is a kind of pain caused by damage

11   to a dysfunction of the nervous system.  You're going to

12   hear a lot more about this.  There's something that's less

13   well-known called nociceptive pain, which you'll hear about,

14   which is a different kind of pain, and, finally, there's a

15   claim that there's a fifth type of a misrepresentation with

16   respect to use of Neurontin at dosages greater than 1800

17   milligrams a day.

18          You'll hear a lot more about this.  They're going

19   to explain it to you in perfect detail.  You're going to be

20   hearing some of the leading experts on the land on some of

21   these issues, but I want you to at least focus.  At the end

22   of this case, I'm going to be asking you about most or all

23   of these indications.  Indications is another word for

24   medical conditions, so keep them in mind over the course of

25   the trial.

1            Now, how is this going to progress?  I'm going to

2    let you go right now, and we'll have a 20-minute break.

3    Each of the opening statements are about an hour.  We will

4    then send you for lunch, then we will hear the second

5    opening statement after lunch, and if we have time, we'll

6    start the evidence and probably be out of here in the

7    vicinity of four o'clock today.  You're here, so I'm going

8    to take advantage of that.

9            I'm going be sitting from 11 to 1, excuse me,

10   9 to 1, then we're going to take a break usually between

11   11:00 and 11:30.  We provide muffins and juice and healthy

12   things.  If there's something you do or don't like, let

13   Mr. Alba know.  In any event, that's the rough day.  You

14   will first hear Kaiser's witnesses, you'll hear direct

15   examination, cross-examination, redirect examination,

16   recross onto the next witness.  Direct, cross, redirect,

17   recross until you hear the statement that Kaiser rests.

18           Now, there may be certain scheduling issues, I

19   have to take someone out of order.  In fact, some of these

20   witness may be applicable to both.  It's not a perfect

21   thing, but, in general, that's how it will go.  Pfizer's

22   witnesses, direct, cross, redirect, recross to the next

23   witness, and at the end of all the evidence, you'll hear

24   Pfizer say that it rests.  Well, you have closing arguments,

25   then we'll have the instructions of law.

1          As I mentioned, we'll be giving you notebooks.  I

2    urge you to take notes.  I urge you to create timelines.

3    This spans a fairly long period of time.  You'll hear back

4    into the mid-1990s, and I keep a timeline.  I urge you to

5    keep a timeline.  We'll be giving you a notebook to do that

6    because it sometimes gets confusing.

7          At the end of this trial, we do not have any ATM

8    machine that spits out transcripts, so while it might be

9    possible to put together certain transcripts if you ask for

10   it, it takes a while to put it together.  We have great

11   court reporters, they can certificate transcripts, but it's

12   not like an instant transcript, so you should take notes or

13   you will forget.  At least take down the name of every

14   witness and maybe a few key facts, but don't take down so

15   much that you're going to lose the forest through the trees

16   because after all you'll have to assess the credibility of

17   the witnesses.

18         Now, as I said, you can ask questions, you can

19   raise your hand, or if you're shy, write it down.  I ask

20   questions.  I don't understand a lot of it.  What do you

21   mean, nociceptous?  What does Mg mean, 1800 Mg.  They might

22   assume you understand and you don't.  Ask.

23         Now, with respect to certain other things, as I

24   said, take notes but don't have your head buried in a

25   notebook.  Watch the witnesses.  No one should talk to

1    anyone about the case.  I alluded to that before.  You can't

2    talk to any -- really, I brag a little, we have some of the

3    best lawyers in the country here, very skilled, but you

4    can't talk to them.  You can't even say, "What do you think

5    about March Madness?"  You can't say, "What do you think

6    about the weather?"  Because as soon as one side sees the

7    other side talking to a lawyer, I get the other side all

8    paranoid and come to me.  I don't want to embarrass you or

9    them, so please just be rude.  The first thing is be rude to

10   everyone that's involved in this case.

11        Secondly, if you use our excellent cafeteria or

12   you go out to the local restaurants in the area, please

13   don't talk.  Some of these folks might talk about the case

14   because they don't recognize you, just move way from them if

15   you hear they're talking about a case, say, "I'm a juror, be

16   quiet."  All the people involved in this case, I urge you

17   not to talk about the case while in the building, it's just

18   too fraught with a possible problem.

19        The third thing I would say at home you can't talk

20   about the case with anyone who asks, "Isn't this neat you're

21   on this case?"  "How come you couldn't get off this case?"

22   Whatever they say, don't talk about it.

23        Also, and probably this is the hardest instruction

24   to explain to you, please don't talk about it in the jury

25   room.  It's not so much that there might be a point of

1    confusion, somebody can explain.  What we don't want you

2    doing is deliberating about the case before you've heard

3    everything.  It's a complex, important case.  You want to

4    hear both sides' experts, you want to hear both sides' point

5    of view until you start deciding.

6           What we found over the years, we've had jury

7    trials, if you let people start talking about the case

8    early, three decide after the first witness and a four after

9    the next one after that.  Wait until you've heard all the

10   witnesses and the instructions of law.

11          Now, with respect to logistics then I'm going to

12   let you go, we'll have a 15-minute break or so.  With

13   respect to logistics, there are a lot of people involved in

14   this case.  If you are going to be late, we all wait.

15   That's the problem, and it happens.  You know, you get stuck

16   on the Southeast Expressway or there's a snowstorm or

17   there's a problem, a problem with your kid is sick, things

18   happen.  The key here is communication.  Let us know because

19   if you're not here at 9:00, we don't know what to do.  So

20   call.  Mr. Alba will give you phone numbers.

21          I probably shouldn't say this, it violates some

22   laws in some states, but call us if you're stuck in a

23   traffic jam.  Let us know what's happening, okay, so that we

24   can know how to plan from there.  Our basic rule of thumb is

25   if there's no school in Boston, there is no court, so if

1    there's a snowstorm, you wake up in the morning, like a

2    school kid, no school in Boston, no court, delayed school in

3    Boston, no court, delayed kindergarten in Boston, no

4    court.

5              We do that because there's no other way, we use

6    Boston as our proxy for how bad the weather is.  Now, of

7    course, there was a dismal failure just a week ago, as you

8    all know, they called off school and nothing happened.  We

9    can't plan for those contingencies, so the basic rule is no

10   school in Boston, no court.  I understand that that does not

11   deal with all of your problems because, for example, in the

12   last storm there was absolutely nothing here but actually

13   the South Shore got hit pretty badly.

14             If you're going to have a problem, do your best,

15   but if you can't get in, tell us.  If there's going to be a

16   snowstorm, I actually think and you want to know if there's

17   a possibility of staying in town, let Mr. Alba know.  It's

18   an important trial.  So let us know how we can help and

19   assist you.  So, essentially, I think I've gone through

20   everything, but most of all thank you for being here, keep

21   an open mind, no research, and we'll take a break now until

22   about noon.  The first opening statement should be no longer

23   than an hour.  We'll take lunch from around 1 to 2, then

24   we'll do the second opening statement, which would roughly

25   be in the vicinity of an hour-ish, then we're going to go to

Page 76

1     the first witness.  So stand in recess.  Thank you.

2                 THE CLERK:  All rise for the jury.

3                 (JURORS EXITED THE COURTROOM.)

4                 THE COURT:  It will be a pretty fast turnaround.

5     I don't know how else to get it to the point where we get it

6     to the jury, have lunch and come back.  It's not going to be

7     perfect, it's going to be basically a 10- or 15-minute

8     break.

9                 MS. NUSSBAUM:  Your Honor, can I just ask, I don't

10    think we ever had a decision on Exhibit 250, which we intend

11    to use in our opening.  It's this Pfizer 2004 operating

12    plan.  It's their document.

13                MR. CHEFFO:  I think you ruled on it.

14                THE COURT:  No, I didn't rule on it.  I haven't

15    seen it, at least it's upstairs.  What's the problem with it

16    again?

17                MS. NUSSBAUM:  I don't believe there's any

18    problem, it's their operating plan with respect to Kaiser.

19                THE COURT:  What's the issue?

20                MR. CHEFFO:  You said the only document, it only

21    has two references to Neurontin, it's a very complicated

22    document, and this is 2004, so I think at this point without

23    determining whether it comes in, it's a 2004 operating plan.

24    It's not specific.

25                THE COURT:  Was there something that refers to

1   Neurontin?

2            MS. NUSSBAUM:  Yes, your Honor, twice.

3            MR. CHEFFO:  There's only two references to the

4   entire document so I think before you've had a chance to

5   evaluate --

6            THE COURT:  Why wouldn't it come in?

7            MR. CHEFFO:  Because there's a host of information

8   in it that's objectionable.  It's about other drugs.

9            THE COURT:  Just put in the part about Neurontin

10  if you want to use it, otherwise it shouldn't come in.  I'm

11  going to allow in the part about Kaiser Permante.  There's

12  enough of a proffer that goes in as long as that's fixed

13  that refers to that other group and not Kaiser.

14           MR. CHEFFO:  Thank you, your Honor.

15           THE COURT:  Oh, we got a problem already.  One of

16  the one explained that she's a Jehovah's Witness, and

17  although I asked the question about passing judgment, she

18  didn't come up, so I need to deal with her.  Why don't we

19  bring her out right now.

20           I'll have a lawyer at least from each side.

21           THE JUROR:  I'm sorry, I didn't realize what this

22  was going to entail until you started saying everything.

23           THE COURT:  What's the issue?

24           THE JUROR:  Well, I told him that I'm one of

25  Jehovah's witnesses.

Page 78

1          THE COURT:  That's why I asked the question.

2          THE JUROR:  I know.  I thought I could do it, but

3    I'm not going to be able to make a decision.

4          THE COURT:  Why?

5          THE JUROR:  I'm just not because I live by The

6    Bible, I live by Bible principles.  It says in the

7    scriptures about not judging.

8          THE COURT:  I asked that question.

9          THE JUROR:  I know, I'm sorry.  I didn't realize

10   until you started talking what it would entail.  I don't

11   know what I thought.

12         THE COURT:  It's too late for me to get another

13   juror now, as you just saw.

14         THE JUROR:  I'm sorry.  I just can't do it.

15         THE COURT:  You can't do it.  Could you please

16   step back there.

17         I don't have a choice.

18         MR. GREENE:  No, she wouldn't be suited.

19         THE COURT:  It's too late to go back and find

20   another juror.

21         Please come up here.  Hi.  I have to excuse you.

22   It's just too bad you didn't tell me.

23         THE JUROR:  I'm really sorry.

24         THE COURT:  Goodbye.

25         I'll see you about five past.

Case 1:04-cv-10981-PBS   Document 2591   Filed 03/01/10   Page 79 of 189

1          THE CLERK:  She's juror No. 29 in seat No. 9.

2          (A recess was taken.)

3          THE CLERK:  All rise.  Please be seated.

4          MS. NUSSBAUM:  I really hate to do this, your

5    Honor, can we show you what we would like to show?

6    Mr. Cheffo says he does not agree with the pages.

7          THE COURT:  The jury is being lined up now.  Just

8    use the page that has to do with Neurontin.

9          MS. NUSSBAUM:  If it doesn't have the word

10   Neurontin on it, you can't use the page.

11         THE COURT:  It's brand new.  It's not going to

12   make or break this case, it's not going to.  Just use, if

13   you want to, the pages that deal with Neurontin.

14         THE CLERK:  All rise for the jury.

15         (JURORS ENTERED THE COURTROOM.)

16         THE COURT:  Please be seated.  All right.  We're

17   about to hear opening statements.  It should be no longer

18   than an hour, maybe even a little less, then we'll break for

19   lunch.  Mr. Greene.

20              OPENING STATEMENT BY MR. GREENE

21         MR. GREENE:  Your Honor, counsel.  This is a case

22   about fraud.  The reason we're here is because of the

23   Defendants Pfizer and the Warner-Lambert Company lied about

24   the effectiveness of their drug, Neurontin, and Kaiser, my

25   client, paid millions of dollars for Neurontin prescriptions

1    that were worth no more than sugar pills.

2            The defendants knew the drug didn't work, and they

3    lied to my client, Kaiser, and they claim it was effective

4    for bipolar disorder, it was effective for pain, it was

5    effective for migraine headache, it was effective at doses

6    above 1800 milligrams.  Had Kaiser been told the truth, they

7    would have stopped prescribing Neurontin.  It would have

8    saved millions of dollars.  That's why we're here.  Kaiser

9    wants their money back, and they want the truth revealed to

10   the public.

11           Good afternoon, my name is Tom Greene again.

12   You've met my co-counsel here.  I'd like to take a moment

13   and just tell you a bit about my client, Kaiser.  I

14   represent Kaiser Health Plan and Kaiser Foundation

15   Hospitals.  These two organizations are nonprofit, they're

16   not like your typical health plan or health insurance

17   company.  They own hospitals, they own pharmacies, they

18   employ nurses, they employ many, many medical personnel,

19   nonphysician medical personnel, and they deliver medical

20   services to 8.6 million Americans across this country in

21   eight different states and in the District of Columbia.

22           The defendants in this case you know, the

23   Warner-Lambert Company, Warner-Lambert Company originally

24   developed the drug Neurontin, and they manufactured it and

25   sold it through their pharmaceutical division, the

1   Parke-David Company.  So, during the course of the trial you

2   may hear reference to Warner-Lambert or to Parke-David.

3   Warner-Lambert is the defendant in this case, and the second

4   defendant in the case is the Pfizer Company.  You've heard

5   of Pfizer, the biggest drug company in the world, and in

6   June of 2000, they purchased the Warner-Lambert Company,

7   including the Parke-David pharmaceutical division, and they

8   continued with the manufacture, sale and marketing of the

9   drug Neurontin.

10          Now, Judge Saris mentioned to you that Neurontin

11   goes by another name.  It's chemical name or sometimes the

12   compound called Gabapentin, and Neurontin is the brand name.

13   They're the same thing, so if you hear witnesses referring

14   to Gabapentin or Neurontin, they're talking about Neurontin,

15   the brand drug in this case.

16          Now, Pfizer is in the business of making money,

17   and they make a lot of money, and the way they make their

18   money is by selling drug products.  The more prescriptions

19   that they can convince physicians to write, the more money

20   they make.  Let me say that again, the more Pfizer can

21   convince physicians to write prescriptions, the

22   prescriptions they write, the more they make.

23          When I say convince physicians, that's a big part

24   of this case because convincing those physicians is

25   marketing to those physicians, promoting the drug to those

1   physicians to get them to write prescriptions that my

2   client, Kaiser, paid for.

3          Now, I want to talk to you a little bit about how

4   a drug company goes about bringing a drug to market and how

5   they market it, just give you a brief overview of some of

6   this evidence you'll see.  First, they start off with an

7   idea, an idea the drug might work.  It's an educated guess,

8   it's called a hypothesis, so they conduct some experiments,

9   and they conduct them on animals.  If the results of those

10  experiments are favorable, then they move onto human

11  testing.

12         They're called clinical trials, and they conduct

13  the clinical trials, and if those results come back

14  favorable, then what they do is they package up all the

15  clinical data and they bring it to the FDA, and it's called

16  the new drug application.  You might hear reference to that

17  during the course of the trial, NDA, new drug application,

18  and they submit the data to our Food & Drug Administration,

19  United States Food & Drug Administration, and they have a

20  team of experts, and they're charged with reviewing all of

21  this clinical data to see if the manufacturer has

22  demonstrated that the drug is safe and that the drug is

23  effective.

24         They look for a certain type of evidence, a

25  certain type of clinical trial, it's called a double blind

Page 83

1    randomized control trial, and you'll hear experts use that

2    term, again, double blind randomized control trial or DBRCT,

3    and the experts will do a good job of defining what type of

4    trial that is, what type of evidence it is, but that's the

5    type of evidence that our Food & Drug Administration

6    requires to determine is the drug safe and is the drug

7    effective?

8           There's two reasons that they look for that type

9    of evidence.  One reason is they want to make sure that when

10   a drug goes to market it's safe for you and I to take.  The

11   second reason they do it is they want to make sure it's

12   effective, that it will work.  They don't want a

13   manufacturer out there promoting and selling a drug that

14   they haven't approved that could be just sugar pills.

15   That's what happened in this case.  That's what the evidence

16   will show.

17          Let me talk a minute about the FDA approval

18   process.  I mentioned the trials have to be submitted.  Once

19   they're submitted, if they prove it, then the manufacturer

20   is allowed to bring the drug to market.

21          Now, we have the good fortune to be able to call

22   as our first witness in the case the former commissioner of

23   the Food & Drug Administration, Dr. David Kessler, and

24   there's a number of topics he's going to talk to you about.

25   I'd like to highlight two of those areas right now.  He'll

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1    introduce you to this concept of evidence-based medicine.

2         Evidence-based medicine.  What that simply means

3    is that Kaiser, as a health plan, and physicians, they look

4    for the best available evidence to guide them in making

5    their treatment decisions, and in the context of this case,

6    I'm talking about their drug treatment decisions, whether to

7    prescribe a drug or what drug to prescribe, and they look to

8    the evidence, and the evidence is found in the medical

9    literature.

10        That's one sort of that evidence, and they rely on

11   drug companies to give them information about the drug.

12   They rely on drug companies to give them truthful

13   information and complete information and accurate

14   information because that's what they base their decision on

15   to prescribe a drug.

16        Dr. Kessler will tell you that the FDA requires

17   rigorous scientific studies, these double blind randomized

18   control trials I've talked about.  They're the gold

19   standard.  They're internationally recognized.  They're

20   recognized by all experts that will come into this courtroom

21   to testify.  They're the only type of trial that can answer

22   the question, Is the drug effective?

23        He'll tell you that's called Level I evidence.

24   It's the most reliable evidence.  He'll describe Level II

25   evidence as derived from clinical trials, but these trials

1    may not be randomized or controlled or blinded, and the

2    evidence from these trials is not reliable.  The FDA won't

3    accept this evidence to demonstrate or answer the question

4    is the drug effective?

5           This Level II evidence can be used, it's called

6    hypothesis-generating evidence.  It can be used to say the

7    drug might work, it might be effective but only Level I.

8    The DBRCTs can answer the question, Is the drug effective?

9    Only Level I can prove that the drug is effective, and

10   finally Dr. Kessler will describe Level III evidence.

11          Level III evidence is not derived from clinical

12   trials at all.  Level III evidence comes from a physician's

13   clinical experience, the experience with his patients.  If a

14   physician were to give a pill to a patient that had a

15   migraine headache and the headache subsided two or three

16   days later and the physician wrote up that clinical

17   experience in a case report, that case report would be Level

18   III evidence.

19          Level III evidence is not reliable, and as you sit

20   here and you listen to this, you can probably guess why it's

21   not reliable, and the experts will explain this to you.

22   It's not reliable because how do you know the headache

23   didn't just run its natural course and subside on its own?

24          What if that patient was taking another medication

25   and the other medication improved his condition, caused the

1   headache to subside, or what if because of the placebo

2   effect, the placebo effect, you've probably heard of that,

3   that's a phenomenon the experts will explain to you, but

4   basically that means if you, as a patient, take a drug, you

5   have an expectation that your condition is going to be

6   improving.

7          There's something also called the observer effect.

8   If the physician gives you a drug, he expects your condition

9   will improve, so these are all other possibilities or

10  factors that could explain why that patient's headache

11  subsided.  That's why Level III evidence, the case reports,

12  a physician's clinical experience can never be used to

13  establish that a drug is effective.  In summary, the Food &

14  Drug Administration looks for Level I, double blind

15  randomized controlled trials.

16         Now, I'd like to talk to you for a moment about

17  the defendants and how they brought this drug to market.  I

18  mentioned that Warner-Lambert developed the drug, and it was

19  Warner-Lambert that brought the data to the FDA in the early

20  1990s.  They had done their preclinical data, the

21  experiments on animals, then they did their clinical data

22  and they submitted a number of double blind randomized

23  controlled trials.  They had evidence they wanted the FDA to

24  review that demonstrated Neurontin might be effective in

25  treating seizures in epilepsy patients.

1    The FDA reviewed that data in December of 1993.

2    They approved the drug Neurontin for treatment in the

3    epilepsy population if used in combination with another

4    anti-seizure drug and only up to the dose of 1800 milligrams

5    a day.  That's what the FDA approved it for.

6          Warner-Lambert launched the drug into the

7    marketplace through Parke-David.  You recall I mentioned

8    that company beginning in 1994.  They marketed it to

9    physicians.  They promoted it to physicians for the FDA

10   approved use, and physicians began to prescribe it to their

11   epilepsy patients.

12         Now, about that time they made some projections.

13   I mean, these companies are in the business of making money,

14   selling drug products, and they wanted to know how much

15   could they make by selling Neurontin to be used in

16   combination with another drug just to treat seizures, and

17   their projections came they were going to make $500 million

18   over the lifetime of sales.  $500 million, it sounds like a

19   lot of money to me, I know it probably sounds like a lot of

20   money to you, but it wasn't enough for these defendants.

21   They wanted to make more, but there were two problems, two

22   problems they faced.

23         One of them, I know you can already guess, the FDA

24   had only approved it for this limited patient population.

25   There's only a limited population of epilepsy patients in

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1    the country, so if they wanted to grow the use, they had to

2    market it for something aside from seizures.

3            The other problem, challenge they faced is the

4    patent that Warner-Lambert held for the drug Neurontin was

5    going to expire, and you've probably heard about patents,

6    you'll hear some of this evidence during the course of the

7    trial, they have a limited window in which they could sell

8    the product.

9            So let me describe what happened.  A high level

10   committee convened called the new product committee, had the

11   highest executives in the company, and they charged the

12   marketing planning company with a task.  They said go out

13   and find the medical conditions that we can sell Neurontin

14   for, the ones that will make us the most money, and the

15   marketing planning department came back to the executive

16   committee, and here's what they said:

17           If you sell it for bipolar disorder, two types of

18   pain, neuropathic pain and nociceptive pain, and as

19   Judge Saris told you, nociceptive pain is the type of pain,

20   if you cut your finger on a piece of paper or if you slammed

21   your thumb in the car door, that's nociceptive pain.

22   Neuropathic pain is the burning type pain you might feel.

23   So, bipolar disorder, the two types of pain, migraine

24   headache, those are the medical conditions if we can sell

25   the product for that we're going to make the most money.

1          But there's one other thing, if you can sell more

2    doses of it, higher than 1800 milligrams, we'll be able to

3    sell more pills, so that's another way we could make more

4    money.

5          Now, the problem with this is if they were going

6    to develop these, they had to conduct clinical trials, they

7    had to study every one of these medical conditions, they had

8    to take that data and submit it to the Food & Drug

9    Administration.  It would take time and expense, and the

10   clock was kicking on the patent expiration.

11         The other option was not to go to the FDA, to

12   market the drug directly to physicians.  I want to stop here

13   and take a sidestep and explain something to you.  I've told

14   you it's illegal for the drug company to market the drug

15   without FDA approval.  They've got to prove safety and

16   efficacy, but physicians are allowed to write a prescription

17   off-label, and when I say off-label, I mean the unapproved

18   use, for use that the FDA hasn't approved, so a drug company

19   can't promote for an off-label use or unapproved use, but a

20   physician can write.  Our law permits it.

21         The reason for that, and the evidence will show,

22   it's because of the physician's education and training, but,

23   most importantly, because of his reliance on the evidence

24   base, on the literature and on information he gets from the

25   drug companies because the physician is in the position

Page 90

1   based on his education and training to review the literature

2   and to receive information from the drug companies, and we

3   can make the call whether to prescribe a prescription for an

4   unapproved use but the government, the FDA is not going to

5   allow the drug company to do that.

6           With that in mind, coming back to the decision

7   before this high level committee, do we go to the FDA for

8   approval for the new uses, or are we going to promote it to

9   physicians?  They make the decision to promote it to

10  physicians.  Blatantly illegal, but that's the decision they

11  make, and we're going to introduce to you the plan.  They

12  had a plan for the pain indications, they had a plan for

13  migraine headache, they had a plan for the psychiatric

14  condition, bipolar disorder, and they laid out their

15  strategy in the plan.

16          The plan called for a publication strategy, that's

17  what they called it, this in-run around the FDA, they called

18  it a publication strategy.  They had to have something to

19  say to the physicians when they went to market it for these

20  unapproved uses, so they said they were going to conduct a

21  clinical trial for migraine and a clinical trial for bipolar

22  disorder and a couple for pain, and they did another one for

23  doses above 1800 milligrams, and if those trials came back

24  positive, if the results were positive, they were going to

25  use those to market to physicians.

1    The trials came back negative, boxed them up, in

2    the filing cabinet, they'd be suppressed.  So they launched

3    this fraudulent marketing plan.  They wanted to market to

4    physicians while they waited for these few trials to be

5    done.  So they did two things to jumpstart the sales.  They

6    paid some physicians to write up some case reports

7    describing their clinical experience using the drug for

8    these four medical conditions we've been talking about, and

9    they used those case reports to create a buzz in the

10   community, to get the medical community interested in

11   prescribing this drug.

12   The other thing they did is they hired an

13   advertising company, a New York ad agency, Cline, Davis &

14   Mann.  Cline, Davis, Mann helped with this strategy to

15   promote off-label uses, and Cline, Davis, Mann helped them

16   developed marketing tactics to implement that strategy, and

17   we'll talk about those marketing strategies in a few

18   minutes.  Cline, Davis, Mann also had an employee that sat

19   on the Neurontin marketing committee, met regularly with the

20   marketing committee.

21   Now, some of the tactics they developed were used

22   to get the message, the marketing message to the medical

23   community and to health plans, and those marketing tactics

24   would include things like dinner meetings where they'd bring

25   physicians in and they'd describe the off-label use of

1    Neurontin or teleconferences where they'd have, for example,

2    psychiatrists call in and they'd have a psychiatrist

3    speaking who would describe Neurontin being used for bipolar

4    disorder, and they used other things like advisory boards

5    where they brought physicians in, and they would train them

6    to become speakers to taut the message that Neurontin was

7    effective for these four medical conditions.

8           And they even formed relationships with some

9    physicians, and they'd call them consultants, and they'd

10   send them on trips, and those consultants would be used to

11   deliver the message that Neurontin was effective and they

12   have what were called Neurontin champions and key opinion

13   leaders, some physicians from the best teaching hospitals

14   across this country.

15          Now, while this effort was underway, the results

16   from some of those clinical trials came back that I

17   mentioned to you a few minutes ago.  Migraine came back.

18   Neurontin was no more effective than a sugar pill for

19   treating migraine headache.  The pain studies started to

20   come back.  Neurontin was no more effective for treating

21   than sugar pills.  The dose studies came back.  They were

22   studying doses above 1800 milligrams.

23          Remember, the more they can sell, the more they

24   can make, the more pills it takes to deliver a higher dose.

25   Those studies came back and showed those didn't have or

1    confer any greater benefit above 1800 milligrams.  And

2    bipolar disorder came back.  That was negative, too, but the

3    sugar pill outperformed Neurontin in the bipolar study.

4          Now, you might think that when these came back,

5    the defendants put a brake on the marketing, two feet on the

6    brake pedal, just stop it completely and take the results of

7    these negative trials, these double blind randomized control

8    trials, get them out to the medical community, get them to

9    the health plans, get them to my client, Kaiser, and let

10   them know we were wrong.

11         The scientific proof in our own research reports

12   show the drug isn't effective, that the sugar pill is more

13   effective for bipolar disorder, but they didn't.  The

14   evidence will show they didn't because they were making too

15   much money.

16         So they took some of the negative trials, and they

17   boxed them up and they sent them out to warehouse out in

18   Kalamazoo, Michigan.  Some of the other negative trials they

19   took, and they cherry picked some data out of, and they

20   misrepresented those negative trials as favorable, then they

21   boxed up those research reports and sent them out to

22   Kalamazoo, Michigan.  They never thought anybody would ever

23   see these research reports, but in this case, as Judge Saris

24   told you, we had this discovery process.  We were able to

25   get those boxes in, we cut them open, and we had our experts

1    review the data in those boxes from the clinical trials, the

2    ones that were suppressed and misrepresented, and you're

3    going to hear from those experts during the course of this

4    trial.

5            There's another thing that they did.  The

6    defendants hired a second company.  Once they made a

7    decision to conceal this information, they hired a company

8    called Medical Action Communications, Inc.  It's a company

9    out of New York.  It's a medical writing company.  Pfizer

10   hired them.  An employee from Mac sat on the defendant's

11   committee again.  This committee was called the Neurontin

12   Publication Committee, and they met regularly with Pfizer

13   employees.

14           What they did is they took, key messages, that's

15   what they call them, key messages.  That's their phrase, key

16   messages that Neurontin was effective for migraine and for

17   bipolar and for the two types of pain and at doses greater

18   than 1800, and they planted them in journal articles,

19   medical journals, articles that are published in medical

20   journals, and they disseminated that to the medical

21   community, and they used those journal articles to market

22   the drug.  They'd use the journal articles at continuing

23   medical education seminars and events where doctors come

24   together to learn information about a drug, and these

25   defendants, they sponsored those continuing medication,

1    excuse me, continuing medical education meetings.  Nowhere

2    in the medical literature did these defendants ever reveal

3    the truth that was contained in their research reports.

4              Now, we're going to call Dr. David Franklin as a

5    witness in this case.  He worked for the defendants as a

6    medical liaison.  He'll describe that position for you and

7    his duties and responsibilities as a medical liaison, but

8    for my purposes here basically he's going to tell you it was

9    a sales position and he worked with sales representatives.

10   That's another position, another type of employee that these

11   companies employ.

12             He was working there about three months, and he

13   saw that they were pushing Neurontin for these off-label

14   uses, and he was concerned that they didn't have the

15   scientific support, the scientific proof rather to support

16   what they were claiming when they went to visit doctors.

17             He's going to describe some of the marketing

18   tactics that were used, the dinner meetings I talked about,

19   the teleconferences, the key opinion leaders, the Neurontin

20   champions, and he'll describe how these defendants

21   disseminated the message that Neurontin was effective for

22   these four conditions to the medical community.

23             We'll also call Dr. John Abramson as an expert in

24   this case.  He's a physician that has expertise in how drug

25   companies impact physician prescription writing practices.

1    He'll describe for you the different sources of information

2    that physicians rely upon to get information about a drug,

3    and he's reviewed the defendant's documents that were

4    produced in this case, and he'll tell you that all of those

5    sources of information, all the channels of information that

6    a physician has to trust and rely on to make his

7    prescription decisions, that none of them, none of them

8    disclosed that Neurontin was no more effective than a sugar

9    pill for these four medical conditions that are at issue in

10   this case.

11            Now, I mentioned to you this publication strategy.

12   They wanted to create a "drum beat in the literature," and

13   that's their words from their document, "drum beat in the

14   literature" that Neurontin was effective for treating these

15   four conditions, and they polluted the literature and

16   corrupted the literature with that deceitful message.

17            We're going to call as an expert witness in this

18   case, Dr. Kay Dickersin.  She's the head of the clinical

19   trials department down at Johns Hopkins University.  She's

20   world renown, her expertise is publication bias, publication

21   bias.

22            What that term means in the context of this case

23   is that the evidence, the medical literature has become

24   skewed for some improper purpose, and the evidence will show

25   that the improper purpose here was their greed, was how much

1  money they were going to make, and they corrupted the

2  medical literature.

3            Dr. Kay will explain the process of when a

4  scientific study is done how important it is to get the

5  results of the study out to the medical community.  Whether

6  it's positive or negative, you have to get that to the

7  medical community, and she'll describe how that's done.

8  It's simple, you take the research report, and you write it

9  up in the published article as it appeared in the research

10 report.  You send it out and it gets published.  That's how

11 health care plans, like my client, Kaiser, get information

12 about a drug.  She's explain to you the importance that when

13 you write it up, it's done completely and accurately and

14 truthfully because physicians rely on that to write

15 prescriptions for payments, for their payments.

16           She'll explain to you the various ways.  She's

17 reviewed all the documents in this case.  She's reviewed the

18 21 clinical trials.  She's looked at the protocols.  The

19 protocol is a document that comes from the defendants that

20 show how the experiments, how the clinical trials are going

21 to be conducted.  The research reports show the actual

22 results of those trials.  She's looked at all that

23 documentation, and she looked at the way they wrote it up

24 and published it in the medical literature, and she'll tell

25 you that nowhere did they disclose in the medical literature

1    that Neurontin was no more effective than a sugar pill.

2          Now, we have some other experts, specialists in

3    each one of the medical conditions that are at issue here

4    before you.  Each one of them is going to testify, and they

5    were asked two questions.  They were asked to look at the

6    double blind randomized controlled trials and answer the

7    question, Is the drug effective for the particular medical

8    indication, pain, bipolar disorder, migraine, doses above

9    1800, then they were asked to look at the defendant's

10   marketing materials, what they were saying to health care

11   plans and to physicians.

12         Each one of these experts will testify that all of

13   the double blind randomized controlled trials for the four

14   indications unequivocally demonstrate Neurontin is no more

15   effective than a sugar pill.  Bipolar, the sugar pill is

16   more effective than Neurontin.  They've looked at the

17   marketing materials, and they'll say nowhere in the

18   marketing materials did they disclose that Neurontin was no

19   more effective than sugar pills.

20         Now, the defendants in this case have been

21   marketing this deceitful message to the medical community

22   for 15 years now.  For 15 years they've been convincing

23   physicians that Neurontin is effective, but they've never

24   disclosed their own scientific proof that shows it's not.

25         You're going to hear some testimony from some

1    physicians that will say that they think Neurontin is

2    effective.  Some of them are Kaiser physicians.  This drum

3    beat in the literature, as I said, has had a 15-year head

4    start, and it takes time to reverse that.

5            Just recently Dr. Kay Dickersin published an

6    article in the prestigious New England Journal of Medicine

7    that describes some of her work in this case and some of her

8    findings in this case.  As I said, that was published in

9    November, 2009.  That's the first article that's been

10   circulated now in the medical community that describes the

11   extent and the breadth and the depth of the defendant's

12   fraud in the way that they marketed Neurontin for the four

13   medical conditions we have before you.

14           It's a drop in the bucket.  The drum beat in the

15   literature has been deafening, but it's a drop in the

16   bucket, but the truth is coming out slowly.  I mentioned to

17   you a few minutes ago that Dr. David Franklin, who was

18   employed by the defendant for four or five months before he

19   left and be called as a witness to testify.  He brought out

20   some of the truth as well.  He had the courage to go to the

21   Department of Justice and tell them that this company was

22   promoting the drug off-label and that the science wasn't

23   there to support what they were saying, and the Department

24   of Justice conducted an investigation, and in May of 2004,

25   Pfizer had Warner-Lambert take the fall and plead guilty to

1    off-label promotion, to plead guilty to a felony.

2            Pfizer paid $430 million in civil penalties and a

3    criminal fine.  I want to say two things about that.  One is

4    not a penny of the $430 million went to my client Kaiser or

5    to the Kaiser patients, it all went to the federal and state

6    governments to pay them back for the fraud, the off-label

7    promotion that the Medicaid program paid for for the scripts

8    paid for by the Medicaid program.

9            Not a penny of that $430 million went to any

10   patient cross this country or any private health plan across

11   this country.  Again, it didn't go to my client, Kaiser.

12   The second thing I want to say about that $430 million is a

13   drop in the bucket.  Remember I told you the evidence will

14   show that they expected $500 million of sales if they had

15   marketed it for the FDA approved use, and I told you they

16   weren't satisfied with that, and I told you greed drove

17   these decisions.  Well, this fraudulent marketing program,

18   this scheme was very, very successful.  They blew past the

19   $500 million.  They made over $10 billion, and between 90 to

20   95 percent of it was for off-label use, for use the

21   government hadn't approved.

22           My point here is, and the evidence will show that

23   it takes time for the truth to come out, it takes time to

24   change physician prescription practices, especially after 15

25   years of polluting the literature with lies that the drug is

Page 101

1    effective.

2           Well, I want to thank you for your attention, and

3    I won't get to talk to you again until the conclusion of the

4    case, but I want to introduce you to my co-counsel,

5    Ms. Linda Nussbaum who represents Kaiser as well, and she

6    has a few things she'd like to say to you so thank you very

7    much.

8                  OPENING STATEMENT BY MS. NUSSBAUM

9           MS. NUSSBAUM:  Good morning and thank you very,

10   very much for serving as jurors here and for your attention.

11   I wanted to focus a little more on Kaiser, which is the

12   plaintiff here and which is a charitable nonprofit

13   organization.  I want to explain to you exactly what that

14   means.  Unlike the defendant, Pfizer, the biggest

15   pharmaceutical company in the world, which is clearly a for

16   profit company, Kaiser is not.  It doesn't have

17   shareholders.

18          THE COURT:  Why don't you pull up the mic. just a

19   little.

20          MS. NUSSBAUM:  Certainly, your Honor.  It doesn't

21   have shareholders.  The money that it spent is money that

22   would have otherwise been spent on patient care.  It doesn't

23   have corporate executives who makes millions of dollars a

24   year in bonuses based on profitability.  The millions and

25   millions of dollars that we used here to pay for these sugar

1    pills, that same money could have bought MRI equipment, a

2    cancer care unit, patient care, community outreach and

3    instead that money went to defendants for useless sugar

4    pills.  So the people who are really harmed here are the

5    members of Kaiser, and if they are successful, if Kaiser is

6    successful here, that's who will be benefited.

7          Now, Kaiser does not employ physicians.  There's

8    no such thing as a Kaiser physician.  It has contracts with

9    groups called the Permante Medical Groups, and these groups

10   employ physicians throughout the eight regions in the

11   United States that Kaiser does business, and there are

12   12,000 of these physicians, 12,000.

13         The defendants here are going to come up with a

14   handful of these physicians, and they're going to say oh,

15   Dr. X says this drug is effective or Dr. Y continues to

16   prescribe the drug, and when they do that, I want you to

17   remember there are 12,000 physicians in every specialty you

18   can think of, and these physicians do not work for the

19   plaintiffs here.  They are not controlled by the plaintiffs

20   here, they're not hired by them, they're not fired by them,

21   they work for separate groups that have a contract with the

22   plaintiffs.

23         In fact, through discovery in this case, the

24   plaintiffs were shocked to learn that some of these

25   physicians worked for the defendants.  Some of these

1   physicians were on speakers bureaus for Pfizer, were

2   consultants for Pfizer.  One in particular who we'll talk

3   about later made between $750 and $1500 per speech to

4   promote Neurontin plus expenses, and he was a regular

5   speaker who spoke 15, 20 times a year just on Neurontin.

6   There are other products in addition for Pfizer.

7           So if you hear about Kaiser physicians, please

8   remember Kaiser physicians is a misnomer, there's no such

9   thing, and if you hear articles or speeches about Kaiser

10  physicians, please think, were these physicians who were

11  duped, which were the vast majority of Kaiser physicians, or

12  were these physicians who were also working for the

13  defendants here, for Pfizer?

14          Kaiser has recently put in conflict of interest

15  rules, because of this kind of conduct, because of other

16  conduct within the pharmaceutical rules, they now have

17  rules, they've strengthened rules, they want to know are

18  these physicians also working for the pharmaceutical

19  companies, but at the time in this case, they were shocked

20  when they learned through the discovery, through the

21  defendants' own documents that some of the physicians

22  working for the Permante Group also in fact were also

23  working for the defendants.

24          Now, Kaiser here, they were a premediated victim

25  of this fraud from the very beginning.  The defendants knew

1    that their rather ingenuous plan to get billions of dollars

2    in sales for this drug, which were not deserved, would only

3    be successful if they could get the drug on the formularies

4    of the nation's biggest HMOs and insurance companies, and

5    you all probably know or think you know what a formulary is

6    if people have health care, but Kaiser is different, it's

7    not an insurance company, and its formulary is different.

8         First of all, they have their own formulary, and

9    the goal, and we'll show you the documents, and we'll give

10   you evidence here, the goal is to choose drugs for the

11   formulary that are safe and most effective for their

12   members, so the formulary is a mixture.

13        There are some generic drugs, there are some

14   extremely expensive brand name drugs, and what they do is

15   every time a new drug comes to market, they look at that

16   drug, they look at the evidence, they have their drug

17   information service look at that drug, and they then make a

18   determination as to whether or not the evidence shows that

19   that drug should be put on the formulary for the benefit of

20   their members.

21        And because they use this evidence, because it's

22   evidence-based, there is very, very high compliance with the

23   formulary.  95 percent of prescriptions that are written for

24   Kaiser members are drugs on the formulary, and this is

25   despite the fact that if your particular doctor wants you to

1    have a drug that's not on the formulary or wants you to have

2    the brand name version of a drug even though a generic is

3    available, they just check off a checkmark on the

4    prescription and the prescription is filled.

5              So these defendants understood exactly how Kaiser

6    operated.  They knew the importance of the formulary, and

7    they knew that if they could get on the formulary that the

8    flood gates would be opened and there would be prescribed.

9    Can we see Exhibit No. 3.  Defendants, when they were

10   first --

11             THE COURT:  That's not even going to be visible.

12   Maybe we can bring it closer to the jury.  Do you know

13   whether you can get it on the cameras, document cameras?

14   Can everybody see it now?  Okay.  Good.

15             MS. NUSSBAUM:  So the very first thing to remember

16   here is this just didn't accidentally happen, the off-label

17   promotion of Neurontin.  This was really a premediated plan

18   from the very beginning.  Before the drug even came to

19   market in the early 1990s, there was a plan, and Kaiser,

20   unbeknownst to Kaiser, was a key target to that plan.

21             As you can see, there was a plan to have the top

22   10 HMOs targeted for Neurontin, and plan No. 2 in that top

23   10 was the Kaiser Health Plans, and what the defendants

24   wanted to do was get on the formularies because they knew

25   that if they were on the formulary, there would be

1  prescribing.  So managed care organizations such as Kaiser

2  were key targets here from the very, very beginning, and the

3  defendants were absolutely right.

4          If we could please see Exhibit 2.  Once the drug

5  went on the formulary --

6          MR. KENNEDY:  Your Honor, I don't know what

7  exhibit they're referring to.  Could we see it?

8          MS. NUSSBAUM:  These are the --

9          THE COURT:  Just show it to them.

10          MR. KENNEDY:  Fine, your Honor.  Thank you very

11  much.

12          THE COURT:  If you want, you can move up here a

13  little.

14          MS. NUSSBAUM:  Now this exhibit shows you Kaiser's

15  prescriptions for Neurontin.

16          THE COURT:  Just make sure your voice goes in the

17  mic.

18          MS. NUSSBAUM:  This shows Kaiser prescriptions for

19  Neurontin, and what it shows you in the beginning, there's

20  not a lot of prescribing, okay, the drug is an epilepsy

21  drug.  It's limited.  You then have the promotion, you have

22  the drugs on the formularies, you have restrictions lifted,

23  and you see the upward curve there, the flood gates opened,

24  prescribing went rampant, and all the way until the top

25  where it says, "Truth about Neurontin begins to emerge," and

1    that truth is what Mr. Greene referred to earlier,

2    Dr. Franklin's whistleblower suit where Kaiser became

3    alarmed and says, "What's going on here?"

4           They then began a re-education effort which we'll

5    talk about later, and that's the top of the curve, and then

6    you can see that Kaiser-Neurontin prescriptions declined

7    substantially as a result of trying to re-educate the PMG

8    physicians.

9           Now, as you heard earlier, there's something

10   called evidence-based medicine, and Kaiser practices that

11   evidence-based medicine, and before they do anything, before

12   a drug goes on their formulary, they have people from their

13   department called a drug information service, and all these

14   people do is research drugs.  What they do is they do a

15   Monograph, which is a research report.  They go out to all

16   of the available publications about a drug, and they analyze

17   that drug, and they need to rely on the integrity of the

18   medical information that's published.  They cannot think

19   that that information is corrupted or tainted.  There would

20   be no way that they could do their own research.  There

21   would be no way that they could do their own scientific

22   studies, that simply would not be possible.  They don't have

23   access to do that or they don't have access before these

24   drugs come to market.

25           So the researchers at Kaiser need to rely on

1   what's published in medical journals, they need to rely on

2   the information that they get from the pharmaceutical

3   companies, and they then evaluate that information and they

4   do a report that then is considered by their P & T

5   committees in making formulary decisions.

6          Kaiser physicians are just like any other

7   physician, and that is they are influenced and they are

8   vulnerable to marketing.  There's no question.  You will see

9   a Kaiser document, and you will hear from a witness who

10  tells you that after a lunch sponsored by these defendants

11  concerning Neurontin, prescribing of that drug went up over

12  50 percent.  So there is absolutely no question that when

13  doctors are marketed to, when they're detailed, as it's

14  called, when they meet with drug representatives, when they

15  receive gifts from drug representatives, that all works

16  detailing marketing.  It equals prescribing, and it's just

17  logical.

18         The world's biggest pharmaceutical companies like

19  Pfizer would not spend millions and millions and millions of

20  dollars a year on marketing efforts if it didn't work, if

21  their promotion efforts were not successful.

22         Now, Mr. Greene talked to you a little bit about

23  the criminal case, and he talked to you a little bit about

24  the guilty plea.  The United States of America charged

25  Warner-Lambert with a criminal information.  This is 1.2.

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1   That criminal information, and we're going to show that to

2   you, the criminal case was here in Boston, and

3   Warner-Lambert pled guilty.

4          That information says "Warner-Lambert promoted the

5   sale and use of Neurontin for certain conditions other than

6   the approved use in Massachusetts and elsewhere."  And as

7   part of that information, they quoted verbatim a voice mail

8   that was left by a Warner-Lambert medical director to their

9   staff with respect to off-label promotion.  That voice mail

10  said, "What we'd like you to do is, any time you're called

11  out just make sure that your main focus out of what you're

12  doing is on Neurontin.  When we get out there, we want to

13  kick some ass, we want to sell Neurontin on pain.  All

14  right?"

15         The defendants here, Warner-Lambert, they pled

16  guilty to that information, and on May 13th, 2004, there was

17  a guilty plea, and as you'll see, Warner-Lambert expressly

18  and unequivocally admits that it committed the crimes

19  charged in the information.  Warner-Lambert agrees that the

20  facts set forth in the information are true.

21         So there's no question here that the off-label

22  promotion for the very indications that Kaiser has brought

23  its suit happened.  They pled guilty to it.  They admitted

24  it.  In addition to that though, Kaiser as a target was

25  specifically targeted here by these defendants in other

1    ways, and some of those ways are pretty shocking.

2         First, Kaiser was victimized by the publication

3    strategy that was just talked about.  The medical

4    publications were false, they were misleading, they were

5    corrupted, and, therefore, since they were relied upon by

6    Kaiser in doing their research, in doing their monograph,

7    those monographs were not accurate.  They were not fully

8    correct, and they were then relied on by Kaiser in making

9    its decisions.

10        Second, there were letters, there were verbal

11   representations that were made specifically by the

12   defendants to people at Kaiser.

13        One example, somebody from Kaiser working on the

14   monograph called, and they called Pfizer, and they said, "Do

15   you guys have any more information?  We're doing a Monograph

16   here.  We want all the information out there."  Pfizer said,

17   "No, there's nothing else."  That you will learn was a clear

18   lie because they knew about negative information that they

19   had.

20        Third, Permante Medical Group Physicians were

21   detailed, they were misled into believing that this drug was

22   effective for pain, it was effective for migraines, it was

23   effective for bipolar.  They heard that drum beat.  They

24   wrote the prescriptions, and those prescriptions would not

25   have been written but for the defendants' fraud.

1          Fourth, and this is really a little shocking, what

2     happens at Kaiser, they have something called an inquiry

3     service, so let's say you go to your doctor and you have a

4     problem and the doctor looks at the literature and he's not

5     sure, he wants further information about a drug before he

6     tries it for you.

7          You may be on other medication, you may have other

8     conditions, and so your doctor goes to the inquiry

9     department with a specific patient question.  They say, I

10    have a patient, she's A, B and C, she has this disease,

11    she's on this medication, she's this age, please contact the

12    pharmaceutical company, do the research, get me the answer.

13         This was done about Neurontin, and time and time

14    again there were lies.  Answers were given that were simply

15    not true, most outrageously in the dosing area where Kaiser

16    was told repeatedly dose these patients up to 6,000

17    milligrams a day, when Pfizer knew anything over 1800

18    milligrams a day, the FDA approved dosage was ineffective

19    and there would be no reason to dose anybody more than 1800

20    milligrams a day except for dollars, dollars in Pfizer's

21    pocket.

22         Fifth, the last reason is that defendants in their

23    business plan determined that it would make sense for them

24    to infiltrate different groups, to get to doctors who were

25    leaders in their field because a leader in the field then

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1    speaks to others, there's peer-to-peer marketing and we'll

2    get more and more people to prescribe.

3             They did that, and they did that at the Permante

4    Medical Groups.  One example is Dr. McCarberg who was a

5    "regular Neurontin speaker."  Dr. McCarberg in addition to

6    earning up to $1500 a speech for Neurontin also secretly

7    contacted his handler at Pfizer requesting information about

8    Neurontin that he could put into an article that otherwise

9    might be negative so he could put on a positive spin for the

10   company.

11            Now, this e-mail from Dr. McCarberg to the

12   defendants here was totally unknown to the plaintiffs here.

13   They had no idea that a Permante Medical Group doctor was

14   not only working for Pfizer but was secretly contacting

15   Pfizer letting Pfizer know that a co-author is going to be

16   writing something negative about this drug, so give me the

17   ammunition so I can change that and spin it and put

18   something positive in.

19            That article is an article that defendants may

20   talk to you about.  It was written by Dr. Maizel's and

21   Dr. McCarberg, the article wound up saying positive things

22   as Dr. McCarberg wanted it to, and if you learn about that

23   article, and we'll talk about it later on, let's just

24   remember two things:  No. 1, what Dr. McCarberg did to put

25   on the positive spin there; and No. 2, that both of these

1    doctors were on the Pfizer speakers bureau, and Dr. Maizel's

2    was also a consultant for Pfizer.

3            Now, once Kaiser started to learn about the

4    off-label promotion, once they learned about Dr. Franklin's

5    suit, the whistleblower suit, they started to re-evaluate

6    Neurontin.  They knew that prescribing, as we had seen on

7    the graph, went higher and higher and higher, they knew that

8    much of that prescribing was for off-label use, and they

9    decided that under all of these circumstances, they needed

10   to look again, they needed to try to re-evaluate the

11   evidence, and they needed to try to re-educate their

12   physicians and to let their physicians know about this

13   unlawful marketing that had occurred.

14           And so they started what they called re-education

15   programs to try to educate the Permante physicians and to

16   try to let them know that there had been this rampant

17   off-label marketing and that those that had been detailed,

18   those who had heard this drum beat, they had been misled,

19   and the re-education program was successful, but not 100

20   percent successful, and that's for several reasons.

21           First, it's only through this lawsuit that the

22   real fraud has started to come out.  Second, it is very hard

23   to change prescribing habits once doctors get into the habit

24   of writing prescriptions, once patients get in the habit of

25   taking a drug, it is very hard to change that, and the

1    choice of the conditions for which they marketed this drug

2    were very clever, very clever, just like the rest of this

3    whole scheme was very clever.

4          I mean, they didn't use this drug for cholesterol,

5    for example, where you could go to your doctor, you could

6    get a blood test and your doctor would know yes, it's

7    working or it's not working.  They didn't market this drug

8    for diabetes where the same thing, you could test your blood

9    sugar and you would know, yes, it's effective or no, it's

10   not.

11         They marketed this drug to very vulnerable people,

12   they marketed this drug to people with psychiatric

13   conditions, people with pain conditions, people who

14   ordinarily are on multiple medications where you're really

15   not sure what the drug interaction is, what's working, where

16   the patient is talking to the doctor saying I'm not any

17   worse, I'm not sure if I'm better.

18         THE COURT:  Ms. Nussbaum, we've got to start

19   wrapping this up.

20         MS. NUSSBAUM:  Yes, your Honor.  So the

21   re-education programs had happened, but they were not 100

22   percent successful.  Now, Kaiser has a website, and that

23   website is similar to Web MD or other websites out there.

24   What they do is they license medical information from

25   others, from Healthwise, Health Media, they get information

1   from the American Lung Society, the American Cancer Society,

2   and it's all put on this website for the public so people

3   can get health care information in one place and then go,

4   when they visit their doctor, be able to ask questions.

5         And we are embarrassed to say that that website

6   did have some information on off-label uses of Neurontin.

7   That information was not created by us.  It wasn't edited by

8   us, it was from a company called Healthwise, but it was

9   there, and we recently took that down, and we understand

10  that Healthwise is examining that, and they're examining it

11  in light of the kinds of evidence that Kaiser looks at, the

12  kinds of evidence that Healthwise looks at, which is the

13  New England Journal article that Dr. Dickersin recently had

14  published, and that article says we examined reporting

15  practices for trials of Gabapentin funded by Pfizer and

16  Warner-Lambert's subsidiary Parke-David, and the conclusion

17  of that study is we identified selective outcome reporting

18  for trials of off-label use of Gabapentin.

19        This practice threatens the validity of evidence

20  for the effectiveness of off-label indications, and so we

21  have taken that off of our website.  We are re-evaluating

22  all of this.  Healthwise is re-evaluating all of this, and

23  it's just further proof of the spider web of lies here that

24  once the misinformation is out there, once the genie gets

25  out of the bottle, it is very, very hard to put it in.

1        Thank you very much.  We look forward to trying

2   this case in front of you.

3        THE COURT:  Thank you.  Let's stand.  We'll come

4   back after lunch 2:15.  Feel to go there's a great cafeteria

5   that really is pretty good, Barking Dog, there's a Daily

6   Catch there, a little sandwich place across the parking lot.

7   I will see you back in an hour.  All rise for the jury.

8        (JURORS EXITED THE COURTROOM.)

9        THE COURT:  So, 2:15, hopefully go for an hour to

10  an hour and 15 minutes is what you said.  Then we're going

11  to start with Kessler, and what I'd ask you to do, although

12  I know you're probably all tired, is to just look through

13  those exhibits and confer and see if there's anything I need

14  to address.

15       MR. CHEFFO:  I think you said earlier that the

16  criminal can come in, the civil, and we all know, certainly

17  know Mr. Greene, he talked specifically $430 million.  It's

18  directly to what you ruled five minutes before that.  At

19  this point, you know, I don't want to draw more attention to

20  it, but I think you had made it.  You also said the Ned

21  Bulger trial, you're going to allow some of it.  We're not

22  going to hear criminally about the plea, it's ultimately

23  about some science here.  I think this can clearly become --

24       THE COURT:  You've made your comments.  It's too

25  late now to do anything.  Let me just say one concern I had

1   about yours was actually I wasn't going to interrupt because

2   I don't know the evidence well.  Will there be a witness

3   from Healthwise?  I was worried that you were sort of

4   injecting this information.  Was there someone on that list

5   from Healthwise?

6            MS. NUSSBAUM:  We have people on that list who had

7   conversations with people from Healthwise.  We also gave you

8   an affidavit.

9            THE COURT:  That's hearsay.  We do it now, it was

10  like it was just a new issue for me.  By no means is the

11  website a new issue, but you can't testify.  With respect to

12  Healthwise, if there's no witness there, there should be no

13  reference to it.

14           MR. CHEFFO:  Just so your Honor knows it, after

15  they made an affidavit, we made a motion to have the

16  deposition of Healthwise, and it was denied, so we couldn't

17  ask the person.

18           THE COURT:  We're not doing any of that.  There

19  are tough parts for both sides' cases, but you can't inject

20  through your testimony what Healthwise is doing.  So,

21  anyway, see you at 2:15.

22           MR. CHEFFO:  Thank you, your Honor.

23           (A recess was taken at 1:10 p.m.)

24

25

Page 118

1          (Resumed, 2:19 p.m.)

2          THE COURT:  Okay, bring in the jury.

3          MR. KENNEDY:  Your Honor, it takes a bit of time for

4     me to get around.  Should I get started setting --

5          THE COURT:  I would.

6          MR. KENNEDY:  Or would you rather that I waited till

7     the jury was seated?

8          THE COURT:  No.  Come on up.  How soft-spoken are you?

9          (Laughter.)

10          THE COURT:  Do we need a mike?

11          MR. KENNEDY:  I don't think so, your Honor.  I haven't

12     needed one up until now, but --

13          THE COURT:  Okay.

14          (Discussion off the record.)

15          (Jury enters the courtroom.)

16     OPENING STATEMENT BY MR. KENNEDY:

17          MR. KENNEDY:  Your Honor, counsel, ladies and

18     gentlemen, let me reintroduce myself.  My name is Raoul

19     Kennedy, and I along with my colleagues, Jim Hooper and Mark

20     Cheffo, will have the privilege of representing Pfizer in these

21     proceedings.  And what I want to do this afternoon is spend the

22     time that's been allotted for me trying to give you a preview

23     of what we believe the evidence in this case is going to look

24     like when everything has been presented and you've heard from

25     all of the witnesses.

Page 119

1        Let me start by just briefly recapitulating.  As you

2   know, this is a case about one medicine with two names.  This

3   has already been touched upon, but we have Neurontin --

4        THE COURT:  And I am sorry to interrupt, but it's my

5   fault.  So this is going on the screen.  Those of you in the

6   back row can pull up your screens.  Do you see it's right in

7   between you?  It's like an airline tray table.  So I'm sorry to

8   do this, but if you're going to put stuff up, they might as

9   well have it there.

10        MR. KENNEDY:  Thank you, your Honor.

11        THE COURT:  Are they all working?  Everyone's is on?

12   All right, so as you'll notice -- is it mostly going to be on

13   the screen, or maybe one is up here?

14        MR. KENNEDY:  There will be some of each, your Honor.

15        THE COURT:  Okay.  So I'm sorry for the interruption.

16   There we go.

17        MR. KENNEDY:  Thank you.  Recapitulating, you'll hear

18   in this case "Neurontin," and you'll hear "gabapentin."  People

19   will use them interchangeably.  There won't be any dispute, as

20   Mr. Greene has already said, they are the same substance, the

21   same chemical.  They work in the same way.  You'll find this is

22   the first of a number of things in this case for which there

23   turn out to be multiple names or multiple words meaning the

24   same thing.

25        You also heard this case is about a dispute between a

Page 120

1    major health insurance company, Kaiser and -- I've got a map

2    here of the United States showing where Kaiser is based, and I

3    bring that up at this point because, as you've heard, they're

4    in different regions, and not everybody does things exactly the

5    same in one place versus another.  You've heard this word

6    "formulary" is what you'll be going into.  There isn't one

7    formulary.  There are different formularies for different

8    regions.  But basically they now have about 8 million insureds.

9    The bulk of them are in California where they got started, but

10   they also do business, as you can see, in a number of other

11   states that are indicated there.

12          The other side of this case is Pfizer, our client, and

13   as you've heard, we're the world's largest pharmaceutical

14   company.  We are responsible for everything from Lipitor to

15   Viagra.  I'm sure you're familiar with a number of our

16   products.  We've been around for 150 years, and the evidence in

17   this case is going to show we didn't stick around for 150 years

18   and get to be the world's largest pharmaceutical company by

19   selling sugar pills to doctors.

20          Now, I want to talk very briefly about what this case

21   is not about.  When you hear a case involving a drug company,

22   some of us think, "Well, I wonder if somebody was killed or

23   injured."  This is not that kind of a case.  There will be

24   absolutely no claim in this case that anybody has been injured

25   or killed by Neurontin or gabapentin.  There will be no claim

Page 121

1    in this case by any individual patient that they were

2    prescribed Neurontin and they didn't get what they thought they

3    were promised.  This is a dispute between Kaiser and Pfizer

4    over money.

5         In addition, unlike a lot of drug cases, this doesn't

6    involve a drug that the FDA has ordered off the market or that

7    some manufacturer withdrew under pressure.  Neurontin,

8    gabapentin, are still for sale today and are available, and

9    we'll have more to say about that.

10        Now, as we talk this afternoon, I'm going to be using

11   this time line.  And don't worry if you can't read everything

12   on it.  It isn't all that important to get the actual words,

13   but I'm going to be tracing the development and reasons for

14   gabapentin going all the way back to the 1960s through the

15   present.  But I can't resist jumping ahead and talking a little

16   bit about the end of the story because until two weeks ago,

17   February 9 -- Austin -- you've heard about Kaiser's patient

18   information website, and as of February 9 and for an extended

19   period before that, if you went to the website, it would tell

20   you, if you had various physical problems or conditions or

21   symptoms and wanted to know how to find care and treatment for

22   them, to click on, and you would get to places.  And up until

23   February 9, the Kaiser website recommended Neurontin, or

24   gabapentin, for more than twenty off-label uses, more than

25   twenty uses in addition to just treating epileptics.  And those

1    off-label uses included psychiatric conditions such as panic

2    disorder, social phobia; included numerous kinds of pain,

3    including cancer pain and chronic pain, and included headaches

4    under "migraine" as well as a number of other conditions.  And

5    what the evidence in this case is going to show is, what

6    Kaiser's lawyers are telling you in this courtroom doesn't

7    square with what Kaiser's doctors do and what Kaiser tells its

8    own patients outside this courtroom.

9           Now, for some reason, on February 9, thirteen days

10   before the start of this trial, the website got revised, and

11   all of those good things and positive statements about

12   Neurontin and gabapentin got taken off, and we were told that

13   Kaiser is embarrassed about that.  Well, I'm sure the lawyers

14   are embarrassed, but I don't think you're going to hear from

15   any Kaiser doctor who says, "On February 8, 2010, I suddenly

16   woke up and realized that Neurontin is really a sugar pill and

17   that all these things we've been telling our patients were

18   really a fraud," and that it was doctors who took it down.

19          We heard that that isn't really Kaiser material.  That

20   was Healthwise material, an outside group.  And watch and

21   listen -- your Honor told you to take notes -- and watch and

22   see if you hear anybody from Healthwise come in here and tell

23   you that on February 8, they had a revelation and suddenly

24   decided that those twenty off-label uses for some reason didn't

25   work.

1          What the evidence is going to show is, Neurontin

2     according to Kaiser seems to be a strange drug.  It works

3     everywhere except when you get close to a courthouse and a jury

4     that you're asking for money, and then it suddenly becomes

5     sugar tablets, but it seems to do pretty well the rest of the

6     time.  In any event, as of today, this morning while Mr. Greene

7     was talking, you could still go to the Kaiser patient website,

8     and -- they teach you the first thing in trial lawyers' school,

9     never do anything live in a courtroom, so we're going to try to

10    access the website directly.  And contrary to what we were told

11    in trial lawyers' school, we have at least gotten to the sign-in

12    page.  Mark -- we also brought along hard copies.  We tried to

13    get Vanna White for today, but she wasn't available, so Mark is

14    filling in.

15          With one click you go to the log-in page, and with a

16    second click, if you hit on "Drugs," you will go to "Drugs and

17    Natural Medicines," where you're told, if you want to look up

18    prescriptions and nonprescription drugs, including how to use

19    them, side effects, interactions and more -- and this is Kaiser

20    Permanente -- another click on "Drug encyclopedia" and an

21    alphabet comes up.  And if you were to hit on "P" and then

22    scroll down to "Pain originating from a nerve" and hit on

23    there, on the fourth click, you would get to a slide saying

24    that "drugs for managing pain originating from a nerve," they

25    list two of them, gabapentin and Neurontin, which we know is

9df5ec2b-e745-4aef-ba95-6249c4727bbf

Page 124

1    one and the same drug.

2         So as of this morning, while Kaiser's lawyers were

3    telling you gabapentin and Neurontin are sugar pills, Kaiser's

4    website, even after clearing up the embarrassing parts, are

5    still telling people that if you have pain emanating from a

6    nerve -- that's just neuropathic pain that we were talking

7    about -- gabapentin and Neurontin are not only an acceptable

8    remedy, it's the only one that's being recommended.

9         Now, let me pick up with the time line as I told you I

10   was going to do, and as you've already heard, in 1993 the Food

11   and Drug Administration granted approval to Warner-Lambert --

12   and once again we've got two names for the same thing.

13   Warner-Lambert was the company, Parke-Davis was the division,

14   and you'll hear them referred to interchangeably here today;

15   but whenever you hear one, for purposes of this case, it means

16   the other as well.  In 1993 Parke-Davis/Warner-Lambert gets

17   approval for Neurontin -- and this is after those double-blind

18   controlled studies that you've heard about -- and approved for

19   treatment of seizures in epileptics.

20        Now, even today, nobody is exactly sure how that drug

21   works.  The best thinking is, there are neurotransmitters in

22   the brain, and the drug acts to have, to use a lay term, a

23   "calming effect," and by calming the neurotransmitters, that

24   keeps epileptics from having seizures.  As a result, Neurontin

25   is what's known as a -- once again, two names for the same

1  thing -- an antiepileptic drug or an AED.  And to confuse

2  things further, you may hear those referred to as

3  anticonvulsants as well.

4       In any event, Neurontin was not the first AED.  AEDs

5  had been around going back to the '60s, and they had been

6  approved, like Neurontin, for dealing with epilepsy.  However,

7  the way doctors practice medicine, I'm told, at some point some

8  doctor was treating an epileptic who also had migraine

9  headaches, found the headaches were improving as well as the

10  seizures going down.  And through trial and error and comparing

11  notes, over the course of several decades, before Neurontin

12  ever came on the market, neurologists, psychiatrists, pain

13  specialists had found that these AEDs could be prescribed other

14  than for the reason approved by the FDA to treat at least five

15  hard-to-treat conditions for some people.

16       And here again we start with neuropathic pain.  That's

17  pain emanating from a nerve, the one we were talking about on

18  the website; chronic pain, I don't think that needs any

19  explanation; migraine, anxiety disorder, and bipolar disorder.

20  I assume most people are familiar with bipolar.  It's what we

21  used to call manic depression is now known as bipolar.  What

22  doctors had found before Neurontin ever came along was some --

23  not all -- some people with these conditions responded

24  favorably to having an AED added to the mix.

25       Now, the reason you're going to hear that these

1    conditions are hard to treat is, one, almost all of them are

2    chronic.  They're also incurable.  The doctor can't make them

3    go away.  The best the doctor can do is manage it and try to

4    make the patient's life less stressful.  In addition, there's

5    no silver bullet drug, even today, for these.  Different people

6    respond differently, and practically nobody gets satisfactory

7    relief with only one medicine.  So almost everybody, especially

8    when you get into the bipolar and pain areas, will be on

9    multiple drugs, and the multiple that works for me won't work

10   for you.

11          In addition, a number of these drugs are addictive.  A

12   number of them also have really pretty heavy-duty side effects.

13   You hear about people, they're not on their meds any longer

14   because they're finding the consequences are worse than what it

15   was supposed to cure.  And because they're taken for a long

16   time, a lot of them lose their effectiveness.  They work for a

17   patient for a while, but they don't work further along.

18          And, again, the AEDs are not miracle drugs.  What they

19   do is, added in combination to other medicines, help some but

20   not all people.  That was the history of AEDs.  So when we get

21   to 1993 and Neurontin, a new AED, comes along, there's

22   absolutely no question but what doctors with these

23   hard-to-treat conditions, with patients that aren't reacting

24   well to side effects, are going to be interested in trying a

25   new drug.

1          And, incidentally, there are no double-blind random

2    controlled studies demonstrating that AEDs are helpful in any

3    of these conditions.  This is something that doctors figured

4    out for themselves, and to this day, they don't have FDA

5    approval for that.  I'll be talking more about that.

6          So Neurontin comes along, and the evidence is going to

7    show not only was it obvious for doctors who had been working

8    with AEDs to add Neurontin to the mix, Neurontin had a number

9    of characteristics that made it almost an ideal candidate for

10   trial and error with one of these difficult conditions.

11   Neurontin does have side effects.  It's not side-effect-free,

12   but there will be agreement that its side effects are far

13   milder and can be tolerated by people more than almost any

14   other AED, so it's an easy-to-take drug.

15         Second, there's a low risk of toxicity.  It's almost

16   impossible to overdose on the stuff.  If you take too many,

17   you'll go to sleep and wake up with a headache, but it isn't

18   going to kill you or do brain damage or whatever.  And when

19   you're talking about prescribing something to people for a

20   prolonged period of time in a chronic condition, toxicity is

21   obviously a concern.

22         Next, it's nonaddictive, and that's not true of a

23   number of the other AEDs, and, again, we're talking about long

24   term conditions.  And, finally, and this one is a little

25   technical, minimal, not no -- there are no absolutes here --

Page 128

1    minimal drug/drug interaction.  What do I mean by that?  Most

2    drugs that you take get metabolized in the liver and then go

3    into the bloodstream.  And one drug, that's fine, but when

4    you're dealing with these hard-to-treat conditions and you've

5    got people who are taking six, seven, or eight drugs, all of

6    which are metabolizing, the doctor has to start worrying, is

7    drug one going to cancel out the effect of drug seven, or worse

8    than that, are drugs two and five going to combine in some way

9    that's going to be harmful to the patient?  One of Neurontin's

10   beauties is, the patient voids it as part of their urine.  It

11   never gets metabolized in the liver.  So while it's in your

12   body, it's doing its thing, but it's not interfering with or

13   affecting how other drugs that you may be taking are affecting

14   you.

15        So I think the evidence is going to show that if the

16   people at Parke-Davis had been willing to leave things alone,

17   over time doctors, through trial and error, just as they'd done

18   with the other AEDs, would have recognized that Neurontin was a

19   good candidate to try for people who weren't getting total

20   relief otherwise, and would be helpful to some group of people,

21   not all, but here's a drug, you've got somebody who isn't happy

22   with their present state, you can have them try it, knowing

23   nothing bad will happen.  At least the first sentence of the

24   Hypocratic oath "Do no harm," with Neurontin, the doctor knows

25   that at least will be discharged, and can trial and error with

1   the combinations to see if maybe this will do something more

2   for a particular migraine sufferer, a chronic pain sufferer, or

3   whatever.

4           There are a group of people at Parke-Davis, largely in

5   the Northeast part of the United States, but elsewhere as well,

6   who couldn't leave things well enough alone.  They thought they

7   had something that doctors were going to find really

8   attractive, and they weren't willing to wait for the party

9   line, as it were, to take effect.  And they embarked on --

10          (Discussion off the record.)

11          MR. KENNEDY:  Parke-Davis people couldn't leave well

12  enough alone and embarked on a not only improper but totally

13  illegal campaign to try to hasten the speed with which doctors

14  came to learn about Neurontin.  There will be absolutely no

15  question it was illegal, and I'll be talking more about it.

16  However, the evidence is going to show there is no claim that

17  any patient was injured as a result of any of that happening,

18  and, also, as I'll be talking more about, were waiting for

19  evidence that any doctor got adversely affected, but we'll pick

20  up that later.  But for now, we're not here to dispute there

21  was an illegal off-label campaign.  And let's talk about what

22  off-label means.

23          As you already heard -- well, first, "off-label," it

24  just sort of sounds sneaky like off-color or off-putting or

25  something like that.  They can't be up to all good.  It's an

1   unfortunate label, but this is one thing all the lawyers will

2   be able to agree on:  For doctors to prescribe medicines for

3   purposes other than what the FDA has approved is not only

4   totally okay, it's essential to the practice of medicine,

5   because there are a lot of conditions for which there is no

6   specific FDA-approved drug.  So if you didn't prescribe

7   off-label, it would be a matter of having to tell people, "Go

8   rub dirt on it, and I'll let you know if the FDA ever is able

9   to approve a drug."

10      So you will hear that doctors prescribe off-label

11  regularly, and it's not only okay, it's essential.  And there

12  are any number of people whose lives are better today because

13  off-label prescribing goes on.

14      Not so with off-label promotion.  The FDA -- and we'll

15  be hearing from Dr. Kessler, who I believe will be the first

16  witness in the case, will be telling us about that -- has some

17  absolute rules against drug companies, drug manufacturers,

18  affirmatively promoting off-label uses, uses other than the one

19  the FDA approved.  Interestingly, if the doctor comes to the

20  drug company and asks for information, "Will Neurontin work for

21  migraine?" the drug company is allowed to answer, but the drug

22  company can't initiate the conversation.  And it's a crime to

23  promote off-label whether you say false things or whether you

24  say absolutely true things.  It doesn't matter whether you had

25  the best of intentions and thought you were going to help

1   somebody, it's still a crime.  And it doesn't make any

2   difference whether your efforts are successful.  Even if no

3   prescriptions get written, it's still a crime.

4          And one of the big issues, as her Honor will be

5   telling you, in this case is whether this admittedly off-label

6   promotion resulted in Kaiser doctors being defrauded and

7   prescribing Neurontin under conditions when they otherwise

8   would not do so.  And what the evidence is going to show is,

9   off-label promotion, take all the doctors you want to dinner,

10   put them on committees, but until a doctor gets out his or her

11   prescription pad and writes "Neurontin" on it and tears it off

12   and gives it to a patient, there hasn't been any wrong --

13   neither the doctor hasn't been tricked and the patient hasn't

14   been harmed.

15          Now, in this case, as we'll be telling you, Kaiser

16   claims that over, I don't know, an eight- or ten-year period,

17   its doctors were tricked into prescribing sugar pills.  We were

18   told that Kaiser today has 12,000 doctors.  In the course of

19   this case, they've provided us with a list of their doctors who

20   prescribed Neurontin during those years.  There are just over

21   25,000 doctors' names on the list, so the question is:  How did

22   those 25,000 doctors come to be defrauded and keep being

23   defrauded for ten years?  And I don't know what's going to

24   happen when people start testifying from the witness stand in

25   this case.  I'm not a mind reader.  I'll have to watch along

Page 132

1    with you.  I do know this lawsuit has been on file for five

2    years, and as her Honor has said, during that time we've gotten

3    to conduct discovery, try to find out the other side's

4    documents, what they have.  So far, not one Kaiser doctor has

5    come forward to say, "I was tricked, fooled," or in any other

6    way harmed by the defendants in this case with regard to

7    Neurontin.  So far, not one of these 25,000 has said, "I really

8    feel terrible.  I had a chronic pain patient for whom I thought

9    I was doing something, but because I was tricked by

10   Parke-Davis, or Pfizer, I prescribed this sugar pill to them,

11   and that patient went on suffering," or, "I had a bipolar

12   patient.  Had I known about that, I never would have prescribed

13   this drug to them."  So far, not one doctor has been willing to

14   make that statement.

15           Similarly, those, whatever it is, 25,000 doctors wrote

16   something close to 1.2 million prescriptions during that period

17   of time, and so far in the five years of the case, not one

18   patient has come forward to say, "I couldn't figure out why my

19   doctor kept giving me this stuff.  It just seemed like sugar

20   pills, and then I found out it was because he was a consultant

21   for Pfizer, or Pfizer had bought him a round of golf, and I'm

22   really unhappy about what happened."  Again, I don't know what

23   will happen from the stand, but so far in five years we don't

24   have a single Neurontin unhappy patient that we've heard from.

25           Now, picking up with the chronology, as I told you,

1    the FDA approves the drug in 1993.  And we have a little

2    squiggly blue line along here, and what that represents is

3    filled prescriptions for Neurontin and gabapentin.  And you'll

4    notice, as time progresses and people learn more and more about

5    the drugs, what happens?  There are more and more prescriptions.

6    and I assure you there will be no evidence that there's been an

7    epidemic of epilepsy in America and that this is due to the

8    vastly increasing number of -- I don't mean to make a joke

9    about anything where epilepsy is concerned, but my point is,

10   this is off-label prescribing for the very uses that it's

11   supposedly a sugar pill and doesn't work.  Fifteen years after

12   it's first been released, the number of prescriptions being

13   filled keeps going up and up and up.  And Kaiser hasn't told us

14   yet so far, but obviously a large number of those we know are

15   refills.

16          And one of the questions you're going to have to

17   answer in this case is, how do you defraud somebody with a pain

18   medicine that doesn't work?  How many times does somebody whose

19   pain hasn't gotten any better come back and say, "Doc, will you

20   give me another 30 days' supply of that stuff that didn't work

21   before," and the doctor happily says, "Oh, yeah, I'll give it

22   to you again.  Your pain really is feeling better, even though

23   you don't seem to understand it"?

24          But, in any event, the sales pick up, and part of that

25   may have been due to those illegal promotional efforts at

Page 134

1    Parke-Davis, but, again, no claim anybody was harmed as a

2    result of that.

3           The year 2000, a couple things happen:  Pfizer

4    acquires Warner-Lambert.  And when you acquire a company, you

5    take the good with the bad.  We got an excellent drug in

6    Neurontin, and we also inherited a pile of problems with the

7    FDA because of the Parke-Davis activity.

8           In 2000 the FDA also approved Neurontin for pediatric

9    epilepsy so that it could be given to children as well to

10   prevent seizures.

11          Going ahead, 2001, 2002, prescriptions continue to

12   increase, and in 2002 the FDA approves Neurontin for yet

13   another use.  It's called "postherpetic neuralgia."  Some of

14   you may have had shingles or know somebody who had them, adult

15   chicken pox as they're sometimes called; and in most people,

16   they result in an unpleasant week or two.  It isn't fun, but

17   after that it's over.  There's a group of people for whom it

18   isn't over.  After the shingles have gone away, another

19   condition "postherpetic neuralgia" sets in, which is a kind of

20   chronic and continuing pain.  And the sugar pills in question

21   in 2002 were found by the FDA to be suitable for postherpetic

22   neuralgia in addition to epilepsy.

23          In addition, in 2002, you heard about this

24   Mr. Franklin, the marketing agent from Parke-Davis who filed

25   the whistleblower suit that started a lot of the things here in

Page 135

1   question.  His suit became public, was attendant with

2   widespread publicity, and the response was, off-label

3   prescriptions for Neurontin and gabapentin continued to

4   increase.

5          One of the people who obviously heard about Franklin,

6   the unsealing, was Kaiser, and in January of 2003 they

7   instituted -- you already heard about this -- the Neuropathic

8   Pain Initiative.  The evidence in this case will be that

9   Kaiser, most of the time, has multiple initiatives going on to

10  try to persuade their doctors to use cheaper drugs, or at least

11  to try a cheaper drug before a more expensive one.  And the

12  goal of the Neurontin Pain Initiative was to say:  Use things

13  called TCAs, tricyclics -- you knew there would be more than

14  one name for them -- which were a relatively inexpensive form

15  of AED, not approved by the FDA for pain or bipolar any more

16  than Neurontin was, and no DBRCT study affirming the goodness

17  of TCAs for these purposes.  And Kaiser sent out memos and

18  other things to encourage its doctors to try the patients on

19  this cheaper drug first, and don't use Neurontin unless they

20  don't succeed on TCAs, or for some reason TCAs aren't available

21  to them.

22         And Kaiser, I think, will tell you they tracked their

23  Neurontin Initiative through all of 2003 and into the middle of

24  2004, and found that there was something like a 35 percent

25  decline in new patients being put on Neurontin, and they

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1    applauded themselves on the success of their initiative.  And

2    that's the last we heard of it because in early 2004, the

3    patent, as you've heard, on Neurontin expired, and therefore it

4    became possible for generics to market this same drug,

5    gabapentin.  And that isn't Pfizer.  It's other companies that

6    are doing it.  But as of early 2004, the generic version came

7    along.  There was now a less expensive form of Neurontin, and

8    the Neurontin Initiative was no longer concerned about whether

9    TCAs got prescribed first or not.  So the evidence in the case

10   is going to show the Neurontin Initiative was driven by

11   cost-saving considerations and not because of any conclusion

12   that somehow Neurontin was a flawed medicine.

13        In addition -- the case, as I told you, has been on

14   trial for five years -- not one Kaiser doctor has come forward

15   and said, "Boy, was the Neurontin Initiative a wake-up call for

16   me.  The scales fell from my eyes, and I realized I had been

17   shnookered by Pfizer, and I stopped using Neurontin."  Not one

18   doctor has come forward so far to say that that was the reason

19   for any of those 35 percent declines.

20        Continuing on -- backing up for a second, May of 2004,

21   as you've heard, is when Warner-Lambert entered a guilty plea

22   to a felony; and since they were now owned by Pfizer, we wrote

23   out the checks and paid $430 million in both criminal and civil

24   penalties to the United States government as well as to various

25   state governments.  Clearly, that was a significant plea, and

1    we recognized that there was fault there.  We didn't ask a jury

2    to come in and decide that one.  We pled "guilty" and agreed to

3    take our medicine.

4           However, in that plea, the government, the Department

5    of Justice, made no claim there had been any fraud in

6    connection with off-label promotion.  Remember, as I told you,

7    even if you tell totally true things in off-label promotion,

8    it's a crime.  Even though nobody issues a prescription, it's a

9    crime.  There was no admission or even charge that any

10   promotional statement was false, no charge or admission that

11   Neurontin is unsafe, no charge or admission that Neurontin

12   harmed anybody, and no charge or admission of an improper

13   communication with any Kaiser doctor or pharmacist, and no

14   charge or admission that any Kaiser doctor or pharmacist was in

15   any way tricked or misled.  So that was obviously a big event.

16   That was this case.  This is this case.  Nobody in the FDA

17   proceedings decided the issues her Honor is going to be calling

18   on you to decide here.  You are the first jury to be asked to

19   decide what effect any of this had on Kaiser.  That hasn't been

20   determined by others.  That's going to be your job here today.

21          As I told you, later in 2004 generic entry came on the

22   market, and as a result, what we've done here is starting from

23   2004, we've tracked Neurontin and gabapentin sales.  This

24   morning you saw a chart, we see it again from the plaintiffs,

25   which was correctly labeled "Kaiser Neurontin Prescriptions By

1    Quarter."  And what you'll find that chart is limited to is

2    prescriptions for Neurontin, not including gabapentin.  And

3    just at the point where the generic gabapentin comes on the

4    market -- and there will be no dispute that Kaiser started

5    buying gabapentin because it was cheaper -- not surprisingly,

6    Neurontin prescriptions went down because the same drug was

7    being given to people under a different name at this point.

8         In addition, regardless of what was going on at

9    Kaiser, there will be no dispute that following the plea

10   agreement, following the generic entry, Neurontin gabapentin

11   sales don't drop off the cliff because somebody's realized

12   they're really snake oil or sugar pills or whatever else.  They

13   continue their upward path through the last time for which we

14   have information, January 1, 2008.

15        Moving ahead, in February of 2005, this is when Kaiser

16   filed the present lawsuit.  It takes a while to get cases to

17   trial.  We've been battling, we've gotten to know each other

18   pretty well over the last five years.  Interestingly, the case

19   will celebrate its fifth birthday some day this month, so it's

20   been around for a while.

21        To start a case like that, you have to file a document

22   called a "complaint," and in the complaint in this case,

23   Kaiser's lawyers say that there are other drugs that are better

24   than Neurontin for these uses we're talking about here,

25   including aspirin and ibuprofen, which I think is Advil.

1   Kaiser's lawyers file a suit in 2005 saying this stuff is sugar

2   pills, and aspirin and Advil are actually superior to it.

3           You're going to hear that in that same month,

4   February, 2005, two Kaiser pain specialists wrote an article in

5   a peer-reviewed journal.  And that means there are academics in

6   the field who examine the manuscript and check it for accuracy.

7   You just can't, you know, like writing a short story if the

8   editor likes it.  This has to have your peers -- it has nothing

9   to do with boats at docks.  It's your equivalents, your

10  colleagues in the field, those kind of peers reviewing it, in

11  which they talk about the effectiveness of Neurontin and

12  gabapentin for dealing with a number of chronic kinds of pain

13  diseases.  So, once again, what the Kaiser lawyers are saying

14  in court turns out not to be the same as what Kaiser doctors

15  are saying.

16          And speaking of Kaiser doctors, as you probably are

17  aware, when a lawsuit like this gets started, we can only deal

18  with the other people's employees through their lawyers.  I

19  can't go over to a Kaiser hospital and just start chatting with

20  people.  Mr. Greene can't wait outside the Pfizer plant and

21  start interviewing our employees.  We can only talk to each

22  other's employees with the Court's permission.  And in 2007,

23  two years after this case has been on file, the Court gave us

24  permission to take what's called a deposition.  It's an

25  examination under oath with a reporter present just like here,

1   and there's a video camera, and the Kaiser doctors were

2   represented by a Kaiser lawyer in the room to make sure they're

3   not taken advantage of.  And one of the doctors we deposed was

4   a Dr. Maizels.  He's in Woodland Hills in the LA area, and he's

5   a pain specialist, and I want to show you a snippet from

6   Dr. Maizels.  This isn't the whole thing.  We'll be playing

7   more later.  In the interest of time, it's only a snippet.  I

8   assure you, however, there isn't another passage where

9   Dr. Maizels says, "And, oh, yeah, I was tricked by Pfizer, and

10  I'm really angry about what you've done to me."  And if that

11  testimony did exist, I think the folks here would present it to

12  you.  So this is not the entire testimony, but I think this is

13  representative and illustrative of Dr. Maizels' views in 2007,

14  two years after Kaiser's lawyers have said this stuff isn't any

15  better than aspirin or Advil.

16          "Q.  Have you ever prescribed medication for an

17  indication not approved by the FDA?

18          "A.  Yes.

19          "Q.  Are you familiar with the phrase 'off-label' as

20  used in connection with prescription drugs?

21          "A.  Yes.

22          "Q.  In your practice, do you currently prescribe

23  drugs off-label?

24          "A.  Yes.

25          "Q.  About how frequently?

1          "A.   Certainly daily.

2          "Q.   Why would you prescribe a drug off-label?

3          "A.   There's often good scientific basis for a drug's

4     efficacy, but the pharmaceutical may choose not to seek the

5     approval, or the patient may have tried a series of medications

6     that are approved, either without efficacy or having had side

7     effects, leaving me only to choose drugs that are not approved.

8          "Q.   Are you familiar with the treatment of

9     neuropathic pain?

10         "A.   Yes.

11         "Q.   How many patients do you treat a year that are

12    suffering from neuropathic pain?

13         "A.   Let me guesstimate 50 to 100.

14         "Q.   Are there any other challenges faced to treating

15    neuropathic pain?

16         "A.   Doesn't respond well to almost no matter what you

17    treat it with.

18         "Q.   What's the typical response rate for a medication

19    and neuropathic pain?

20         "A.   Good response rate would be 30 percent

21    improvement on an 11-point pain scale.

22         "Q.   If a patient fails to respond to neuropathic pain

23    treatment, do you normally try a second type of treatment?

24         "A.   I would offer a second treatment.

25         "Q.   Have you used antiepileptics in the treatment of

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1    neuropathic pain?

2         "A.   Yes.

3         "Q.   Which ones?

4         "A.   Carbamezapine, or tegretol, gabapentin and

5    Neurontin, and Clonazepam.

6         "Q.   Would you be willing to prescribe a patient

7    gabapentin today?

8         "A.   For?

9         "Q.   The treatment of neuropathic pain?

10        "A.   Yes.

11        "Q.   Have you found gabapentin effective in the

12   treatment of neuropathic pain?

13        "A.   As I stated before, roughly 30 to 50 to less than

14   50 percent of patients.

15        "Q.   So you have found gabapentin effective in the

16   treatment of neuropathic pain?

17        "A.   Yes.

18        "Q.   Have studies found gabapentin effective for the

19   treatment of neuropathic pain?

20        "A.   Yes.

21        "Q.   Have you found Neurontin effective in the

22   treatment of headaches?

23        "A.   Yes.

24        "Q.   Do you know colleagues that have used

25   antiepileptics in the treatment of headaches?

1       "A.  Yes.

2       "Q.  Do you know if they have found antiepileptics

3  effective in the treatment of headaches?

4       "A.  Yes.

5       "Q.  Do you know if they found Neurontin effective in

6  the treatment of headaches?

7       "A.  Yes."

8       MR. KENNEDY:  As I said, difficult-to-treat diseases,

9  no silver bullet medicines, nothing works for everybody, but

10  that's 2007, that's fourteen years after the adoption of

11  gabapentin, that's Dr. Maizels' view, and there's nothing to

12  suggest he would testify any differently if we were to bring

13  him here today.

14       In 2007 we also had a chance to depose a Kaiser

15  psychiatrist, Dr. Chandler, also based in Southern California,

16  and again let's watch a snippet of what he had to say:

17       "Q.  Besides the antiepileptic drugs we have

18  mentioned, have there been any other antiepileptic drugs that

19  you've prescribed treatment -- prescribed to patients for

20  treatment of psychiatric conditions?

21       "A.  Yes, there are.

22       "Q.  Do you recall what those are?

23       "A.  Examples would be Neurontin and gabapentin.

24       "Q.  So most of the antiepileptic drugs you prescribe

25  in your practice are for the treatment of bipolar affective

9df5ec2b-e745-4aef-ba95-6249c4727bbf

Page 144

1    disorder?

2              "A.  Primarily, yes.

3              "Q.  Have you ever prescribed the drug Neurontin?

4              "A.  Yes.

5              "Q.  For what uses?

6              "A.  I tried it for bipolar disorder in the past, and

7    I tried it for anxiety disorder.

8              "Q.  Do you currently have patients that are on

9    Neurontin?

10             "A.  Yes.

11             "Q.  For what conditions?

12             "A.  Primarily for anxiety disorder.

13             "Q.  In your opinion, has Neurontin proven effective

14   for treating anxiety for those patients?

15             "A.  In a few individual patients, it seems to be

16   helping.

17             "Q.  On the patients that are currently being

18   prescribed it, do you think it's being helpful for them?

19             "A.  Yes, I do.

20             "Q.  Are you aware that Neurontin interacts less with

21   other drugs than most medications?

22             "A.  I'm aware there are relatively few interactions.

23             "Q.  The last sentence in this e-mail reads, 'More

24   recently, we've also had similar success in treating anxiety

25   disorders with Neurontin, again with many patients being able

1    to get off benzodiazepines.'  What are benzodiazepines?

2          "A.  Those are medications that are both anxiolytic

3    and hypnotic medications.  The parent drug of that class is

4    Valium.  They are medications that are used for anxiety and

5    sleep disorder.  They are addictive and habit-forming.

6          "Q.  Do you know if Neurontin is addictive?

7          "A.  It is not."

8          MR. KENNEDY:  Again, no silver bullets, and you're

9    going to have to decide whether Dr. Chandler, who's one of the

10   25,000 names in 2007, was the product of some trickery, or

11   whether this was a man who through trial and error had found

12   the limited but nonetheless helpful role of Neurontin in

13   treating various of his psychiatric patients.

14          I mentioned earlier the word "formularies."  I want to

15   talk on it just briefly.  You'll hear much more about this in

16   the course of the case.  Every hospital has kind of their own

17   drugstore inventory with drugs that they recommend.  They may

18   urge different disciplines to use them, et cetera.

19   Interestingly, as you've heard, they're not mandatory.  A

20   doctor is always free to prescribe off formulary.  For example,

21   Hawaii didn't add Neurontin to its formulary out in their

22   region until something like 2000.  Other formularies like

23   California and so on added it in 1994.  No dispute, Kaiser

24   doctors in Hawaii prescribed it off formulary.  So the

25   formulary is a guideline, as it were, not a mandate.

1          But, in any event, over the course of 1993 through

2    2007 or 2008, there have been numerous occasions when you'll

3    hear pharmacy and therapeutics committees, P&T committees -- it

4    will roll off your tongue by two days of this trial -- meet to

5    reevaluate whether Neurontin should or should not be treated in

6    some different way.  And you're going to find that there have

7    been, I don't know, any number of reports and considerations by

8    various P&T committees with one consistent result:  They have

9    continuously expanded the recommendation and availability of

10   Neurontin for use by Kaiser doctors.  Initially it would be

11   only neurologists could use it on the formulary.  Then they

12   extended it to anesthesiologists, then to psychologists.

13          There has never been one contraction, one going

14   backwards saying, "Whoops, this stuff isn't what Pfizer

15   represented it to be, and we're now going to limit it.  It may

16   be okay for epileptic seizures but not for neuropathic pain and

17   other things of that sort."  Not one reversal.  So just as

18   prescriptions in toto keep going up across the country,

19   Kaiser's doctors' approval continues to expand at the same time

20   its lawyers are telling you it's a sugar pill.

21          Now, as I mentioned earlier, if you had gone to

22   Kaiser's patient website as recently as thirteen days ago, you

23   would have found things like the following:  "Description of

24   Neurontin, How Well It Works:  Some anticonvulsant drugs may

25   work better than others.  Gabapentin and pregabalin," also

1    known as Lyrica, another Pfizer product, "are the only drugs

2    that have been proved to help relieve some types of chronic

3    pain," the only drugs that have been helped to do it.  That's

4    what Kaiser was telling its patients.  Its lawyers, however,

5    say, Advil and aspirin were equally effective.  If you've got

6    chronic pain and run out of Neurontin, if you've got a bottle

7    of aspirin around, according to the lawyers, you'll be okay.

8           Going further on the website as of thirteen days ago,

9    "Neurontin, Why It is Used:  Can reduce persistent low-back

10   pain with fewer side effects than tricyclic antidepressants."

11   Tricyclic antidepressants, TCAs, the alternative cheaper drug

12   that the Pain Initiative was trying to get doctors to use

13   before they put patients on Neurontin.  "The anticonvulsant

14   gabapentin may be your best bet for safely treating chronic

15   pain because, among other things, it's less likely to interact

16   with other drugs."  Best bet or sugar pill?  The evidence is

17   going to show, what Kaiser tells its patients isn't what

18   Kaiser's lawyers are telling you here.

19          Now, what is, against all of that, the evidence that

20   Kaiser was defrauded?  As I've told you, so far we haven't

21   heard from a single -- these are the people who were defrauded.

22   Their names are in this book, the Kaiser doctors who got

23   shnookered, duped as it was.  And they may not work for Kaiser,

24   but they certainly work for Kaiser Permanente which they

25   contract with, so there shouldn't be any problem getting access

1   to them and talking to them.  We haven't heard from them yet,

2   and I didn't hear any indication that any of them are going to

3   be taking the stand in Kaiser's case here.

4           We're also told they, as I say, produced almost

5   1,200,000 prescriptions, and we haven't heard yet about one of

6   those.  So I think we're going to find that instead of trying

7   to prove their case with their own doctors and their own

8   patients, they're going to do it with a series of expert

9   witnesses.  And these include some very impressive people.  I

10  think the first witness here this afternoon is going to be

11  Dr. Kessler who used to be head of the FDA.  He's both a doctor

12  and a lawyer.  And you'll say, well, that's not a big deal.

13  It's my understanding, though, he got both degrees at basically

14  the same time in different cities, not your average student.

15  He's had a stellar career.  He's been the head of the FDA.

16  That's why he's able to charge $1,000 an hour for coming here.

17          However, you're going to find that Kaiser's lawyers

18  have not asked Dr. Kessler to go interview any Kaiser doctors

19  or to go through this book and try to figure out who was

20  defrauded, or to go do any analysis at all; and I think we're

21  going to find he didn't do it because Kaiser's lawyers didn't

22  ask him to do it.

23          In addition to that, Kaiser has hired two statisticians

24  to determine damages in this case, whether harm occurred as

25  well as the amount.  One of them is a Dr. Rosenthal.  The other

1    is Dr. Hartman.  He's from Illinois.  And Dr. Hartman is an

2    interesting guy.  I think he is going to be the only Neurontin

3    patient who testifies in this case.  The economist who's going

4    to tell you --

5             MR. SOBOL:  Objection, your Honor.

6             THE COURT:  Yes, why don't we move on.

7             MR. KENNEDY:  Okay.  The two economists are, as I say,

8    Dr. Rosenthal and Dr. Hartman, and the evidence is going to be

9    undisputed that they have not gone and talked to a single

10   Kaiser doctor.  They have not conducted any kind of a survey of

11   Kaiser doctors.  Rather, the testimony will be, they sat down

12   at computers with spreadsheets called "multiple regression

13   analyses," and were able to determine without ever leaving

14   their offices that there had been a massive fraud and that

15   thousands and thousands of the people in this book were

16   cheated.  And in fact, according to them, 632,000 fraudulent

17   prescriptions were written; Pfizer caused Kaiser doctors

18   632,000 times, somebody at Kaiser supposedly got out their

19   prescription pad, wrote Neurontin, gave it to a patient, and

20   did so not because that was sound medical judgment but because

21   they had been defrauded.  And Dr. Rosenthal and Dr. Hartman

22   aren't going to be able to tell you the names of a single one

23   of those doctors who were tricked or a single one of the

24   patients who got any of those 632,000 prescriptions.

25             I'm about through.  I think to try to summarize,

1    though, the evidence in this case is going to show -- you're

2    all familiar with that old saw about "You can lead a horse to

3    water, but you can't make him drink."  Here you're going to

4    find:  You can take a doctor to dinner, they'll gladly let you

5    pick up the bill, but you can't make them put a substance in

6    another human being's body unless that doctor is convinced that

7    it would be safe and helpful to do so.

8          So the doctors have had, like the rest of us, not

9    reluctant to accept a freebee if there is one; but afterwards

10   when they get back to the office, you're not going to find that

11   there are doctors at Kaiser or elsewhere that are looking

12   across the examining room table at somebody with chronic pain

13   or bipolar disorder, and basing what to give them on who bought

14   their last round of golf or what pharmaceutical company has

15   hired them as a consultant.  And therefore in some ways -- her

16   Honor will be telling you the issues, and I don't mean to

17   preempt her, but -- can we go to the map?

18         I showed you at the outset Kaiser does business in

19   California and eight or nine other regions, and according to

20   them, thousands -- I mean, how many doctors does it take to

21   write 632,000 prescriptions? -- thousands of doctors in each of

22   those regions are the victim of this fraud that you've heard

23   about.  And it will be a while before I get back up here and

24   get to talk to you in final argument, and it will be

25   interesting to see if by then we have names and addresses for

1    any of those question marks as to who those people were that

2    got tricked and got shnookered, and not only got tricked but

3    stayed tricked for eight years.  We're told it's very difficult

4    to undo misinformation.  I'll be interested to see why it's

5    difficult to send out a memo to every Kaiser doctor saying,

6    "Neurontin is no better than sugar pills.  Think hard before

7    you use it."  It doesn't sound like that would be particularly

8    difficult at all.  You aren't going to hear any evidence,

9    though, that that memo has gotten sent out or that anybody on

10   the Kaiser medical staff has proposed, "Hey, what about the

11   sugar pill memo?  When are we going to tell our doctors about

12   that?"

13           Without further belaboring the point, the evidence in

14   this case is going to show that some salespeople at Parke-Davis

15   and perhaps some at Pfizer did things that not only were

16   improper, they were illegal.  And the illegal ones by

17   Warner-Lambert got dealt with by the FDA, and there was no

18   dispute about that.  This case, though, is who at Kaiser, what

19   Kaiser doctor and what Kaiser patient got taken in by any of

20   that, as opposed to just learning about Neurontin faster than

21   they might otherwise have done so, since, as history

22   demonstrates, the more doctors know about Neurontin and

23   gabapentin, the more it gets prescribed?  So our position is:

24   It's illegal, it shouldn't have happened, but at most it helped

25   some people learn about this drug sooner than they should have

Page 152

1   and get some benefit from it.

2          I appreciate your patience and your attention.  You've

3   been very kind.  It may be a while before we get to put on our

4   side of the case.  I hope you'll remember we are here, and we

5   will be putting on our portion, and I'll be back to talk to you

6   eventually.  Thank you very much.

7          THE COURT:  Thank you.  Maybe we can take down these

8   charts.  Why don't we stand and stretch while they organize

9   them.  The first witness is here, right?  It would be a good

10  time for you to stand and stretch as Dr. Kessler comes.  Is he

11  here?  There you are, all right.

12  SIDE-BAR CONFERENCE:

13         THE COURT:  What's the issue?  We should go quickly

14  and get to the witness.

15         MR. SOBOL:  So four things very quickly just to make

16  the record:  First, there were comments during the opening to

17  the effect that no patient has ever complained about the side

18  effects of Neurontin, and yet you know that there's an MDL here

19  where there are --

20         THE COURT:  All right, so think about how to fix that.

21         MR. SOBOL:  That's an issue, number one.

22         THE COURT:  So come up with a proposal to fix that.

23         MR. KENNEDY:  No issue in this case.

24         THE COURT:  No, no, but it creates a misimpression, it

25  does, but I'll have to worry about it.

Page 153

1          MR. SOBOL:  And I'll say, first it was said about no

2    Kaiser patient, but then it was more general.

3          The second thing is, there was a statement about how

4    no personal Kaiser patient or no consumer, no individual has

5    come forward and complained about the fact that they're paying

6    for a sugar pill.  You have a class action here in which every

7    consumer in the country --

8          THE COURT:  Right, I understand that.

9          MR. SOBOL:  But I'm saying that the complaint was

10   made --

11         THE COURT:  What's the next issue?

12         MR. SOBOL:  We'll have to deal with that issue.

13         THE COURT:  Come on, I need to get to this witness.  I

14   agree we need to deal with the "no one's complained about side

15   effects" issue.

16         MR. SOBOL:  Right.  The first chart that the

17   defendants used are national prescription numbers, and that's

18   what they said in their opening.  They're using the national

19   numbers --

20         THE COURT:  All right, all right.

21         MR. SOBOL:  All right?  I'm not trying to --

22         THE COURT:  You used national numbers too, but we're

23   not trying the case now.  What's the next thing?

24         MR. SOBOL:  That's it.

25         THE COURT:  Okay, all right.

Page 154

1          MR. FOX:  There are some documents that they're

2     planning on using with Dr. Kessler that we have objections to.

3          THE COURT:  Well, we'll just take them as they go.

4     Let's go because I want to jump start this.

5          (End of side-bar conference.)

6          (Discussion off the record.)

7          THE COURT:  Okay, action, first witness, please.

8          MR. GREENE:  Kaiser would like to call Dr. Kessler as

9     its first witness.

10          THE COURT:  All right.

11              DAVID KESSLER, M.D.

12     having been first duly sworn, was examined and testified as

13     follows:

14          THE CLERK:  Would you please state your name and spell

15     it for the record.

16          THE WITNESS:  David Kessler, K-e-s-s-l-e-r.

17     DIRECT EXAMINATION BY MR. GREENE:

18     Q.   Dr. Kessler, good afternoon.  You are a medical doctor; is

19     that correct?

20     A.   I am.

21     Q.   I'd like to ask you some questions about your educational

22     background.  Could you tell us what your educational background

23     is, please.

24     A.   I went to college in the western part of Massachusetts at

25     Amherst, went to medical school here at Harvard, went to law

9df5ec2b-e745-4aef-ba95-6249c4727bbf

Page 155

1   school.  My degree is from the University of Chicago, spent a

2   year at Harvard Law School.  I did my residency at the Johns

3   Hopkins Hospital in pediatrics, and have some business

4   training.

5   Q.   Did you ever practice law, Doctor?

6   A.   No.  I leave that to all of you.

7   Q.   After receiving your medical degree, were you a practicing

8   physician?

9   A.   Yes, primarily hospital-based in an emergency room setting

10  and on the hospital floors in pediatrics, sir.

11  Q.   What hospitals?

12  A.   A number of different hospitals.  Trained at Mass. General

13  during medical school, Hopkins, as I mentioned, then Bronx

14  Municipal Hospital Center, the Albert Einstein College of

15  Medicine, Yale University, Yale-New Haven Medical Center, and

16  UCSF Medical Center in California.

17  Q.   Doctor, you mentioned you were board-certified in

18  pediatrics.  Could you explain to the jury what board

19  certification is.

20  A.   All medical doctors take an exam, and you're licensed as a

21  physician.  Board certification is the next step.  It's

22  specialty training.  It involved three years of training beyond

23  medical school and then special exams and recertification

24  processes thereafter.

25  Q.   I want to ask you about your employment history after you

1   received your medical degree.  Could you describe that for us.

2   A.    Medical school, I already mentioned my residency training,

3   went on to be a consultant, actually during my residency, to

4   the United States Senate Health Committee, the Committee on

5   Labor and Human Resources; then became special assistant to the

6   president of a hospital in the Bronx, got promoted to be the

7   medical director of that hospital, was appointed to be

8   Commissioner of the United States Food and Drug Administration,

9   became dean after that of Yale medical school, was dean and

10  vice-chancellor at the University of California San Francisco,

11  currently professor of pediatrics, epidemiology, and

12  biostatistics at the University of California San Francisco.

13  Q.    Who first appointed you as Commissioner of the Food and

14  Drug Administration?

15  A.    I was appointed in 1990 by the first President Bush.

16  Q.    And did you serve under President Clinton as well?

17  A.    Yes.  I was asked to stay as Commissioner of FDA under

18  President Clinton.

19  Q.    So what years did you serve as Commissioner of the FDA?

20  A.    From 1990 to 1997.

21  Q.    And could you tell us what you're currently doing now.

22  A.    I'm professor of pediatrics, epidemiology, and

23  biostatistics at the University of California San Francisco.

24  Q.    And I think you described for us what pediatrics entailed,

25  but could you give us a simple explanation of what

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1   biostatistics is and epidemiology.

2   A.   Both are concerned with, certainly epidemiology, broader

3   public health issues.  So epidemiology is really the study not

4   of only individuals but groups of individuals.  So it could

5   cover everything from clinical trial design to population-based

6   disease outbreaks.  And biostatistics are the tools that

7   physicians and scientists use, for example, in clinical trials

8   to determine whether something works or not.

9   Q.   Could you tell us briefly what subjects you lecture on.

10  A.   I lecture on a range of subjects:  the regulation of

11  drugs, the regulation of food, the regulation of tobacco.  I

12  also lecture on a number of medical topics.

13  Q.   Have you taught courses other than in medical school?

14  A.   Yes, sir.  I taught for about five years at Columbia Law

15  School in the area of food and drug law before I was

16  Commissioner of FDA.  I teach in schools, School of Public

17  Health, and give lectures throughout the country.

18  Q.   I just want to go back because I'm thinking of something

19  Mr. Kennedy said.  Is it true you went to law school and

20  medical school at the same time?

21  A.   Only for one year.  I have overlap.  My third year of

22  medical school and my third year of law school I was allowed to

23  take the Red Line back and forth between the medical school

24  here in Boston and the law school.

25  Q.   Have you published, Dr. Kessler?

Page 158

1    A.    I have, sir.

2    Q.    Approximately how many articles have you published?

3    A.    Maybe two dozen or so.

4    Q.    Can you identify some of the subjects that you've

5    published on.

6    A.    Articles, the regulation of drugs, regulation of

7    investigational drugs, the regulation of stem cells, the

8    regulation of medical devices, so a broad range of issues in

9    food and drug regulation, as well as in some specific medical

10   areas.

11   Q.    Could you describe or name some of the journals that you

12   published in.

13   A.    New England Journal of Medicine, the Journal of the

14   American Medical Association, Science.

15   Q.    Have you published in any law reviews at all, doctor?

16   A.    I have.  I published some articles when I was back in law

17   school and more recently published Georgetown Law Journal, for

18   example.

19   Q.    Have you written any books, Doctor?

20   A.    I have.

21   Q.    On what subjects or areas have you written on?

22   A.    I've written -- actually, I edited one book on the care of

23   the elderly.  More recently I wrote a book called The Question

24   of Intent that chronicled really our battle of taking on the

25   tobacco industry while we were at FDA.  And most recently I

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1   wrote a book that's called The End of Overeating.  It's about

2   obesity in the United States.

3   Q.   Doctor, have you received any awards?

4   A.   I have.  I have been privileged to have honorary degrees

5   from a number of universities, received a Public Welfare Medal

6   from the National Academy of Sciences, a member of the

7   Institute of Medicine, so I've been privileged to receive those

8   honors.

9   Q.   Now, I want to ask you a little bit about your

10  compensation in this case, but, first, do you have any personal

11  interest in this litigation?

12  A.   I have, other than my compensation that I receive as an

13  expert, which is standard, I have no personal interest, no

14  personal financial interest.  Obviously the issues that are

15  raised in a question like this when you've been -- I mean, have

16  some personal relevance to me because I'm a student and a

17  teacher of food and drug law, but I have no personal financial

18  interest, if that's what you're asking.

19  Q.   You're being compensated on an hourly rate for the work

20  you've done for us in this case?

21  A.   That's correct, sir.

22  Q.   And that's at a rate of your standard rate of $1,000 an

23  hour?

24  A.   That's correct, sir.

25  Q.   And that's no different if you are consulting for us or

1    consulting for Pfizer; is that correct?

2    A.    That's correct.

3    Q.    And you don't have a financial stake in the outcome of

4    this litigation, do you, Doctor?

5    A.    That's correct.

6    Q.    It doesn't matter to you who wins or loses, does it?

7    A.    That's correct, sir.  I have no stake.

8    Q.    I want to ask you about the scope of your assignment or

9    work that we asked you to undertake in this case, Doctor.  Did

10   we ask you to review certain documents?

11   A.    Yes, sir.

12   Q.    And could you tell the jury, just give us a description of

13   maybe the type of documents we asked you to review.

14   A.    They were primarily documents that related to the

15   interaction by Parke-Davis, Pfizer, with the FDA.

16   Q.    Okay.  Did we ask you to review any of the clinical trials

17   concerning Neurontin?

18   A.    I did not go beyond what was -- the documents that I

19   reviewed really were the documents, the interchanges between

20   Pfizer and Parke-Davis and the FDA.  And, again, I only saw a

21   sample of those documents.  I didn't look at, nor do I -- I

22   have some experience, obviously, in looking at clinical trials,

23   but in this case, you know, I'm not here and wasn't asked by

24   the lawyers to talk about, for example, whether a drug itself

25   works.  I understand my assignment to really explain how FDA

1    works, what the standards are, and how a company interacts, and

2    some of those interactions between Parke-Davis and the FDA.

3    Q.    I just wanted to make it clear for the jury.  We didn't

4    ask you to testify concerning whether Neurontin is effective

5    for certain uses, did we, Doctor?

6    A.    That's correct.

7    Q.    What did we ask you to do?  Maybe you could describe that

8    assignment for the jury.

9    A.    The first was to, as part of my assignment, obviously, to

10   prepare a report to set out -- in setting that out was really

11   to explain how FDA works and the standards by which a drug gets

12   approved and can be used in the United States, and then to go

13   through that drug regulatory process with regard to Neurontin

14   and that review process.

15   Q.    Okay.  So why don't we start there then, and let's start

16   with the FDA, the FDA review process.  You testified a few

17   moments ago that from 1990 to 1997 you were the Commissioner of

18   the Food and Drug Administration.  Could you explain to the

19   jury what the Commissioner's role in the FDA is.

20   A.    So FDA is a government agency.  You found it on an

21   organizational chart under Department of Health and Human

22   Services.  Some agencies have -- the head can be a group of

23   commissioners, there are multiple commissioners.  In fact FDA

24   has a history, there's only one Commissioner.  So the

25   Commissioner by statute, by law, is delegated the authority

1    from the Secretary of Health and Human Services to carry out

2    and enforce the laws of the country with regard to food, drugs,

3    medical devices.  So the Commissioner is in charge of enforcing

4    the federal Food, Drug and Cosmetic Act.

5    Q.   Is the Commissioner the highest officer?

6    A.   Yes, sir.  When I was Commissioner, there were about

7    10,000 people, and I was in charge of the agency.

8    Q.   And could you tell the jury, how is the Commissioner

9    appointed?  What is that process, if you could just describe it

10   briefly?

11   A.   Sitting in my office in the Bronx one day, I was teaching

12   food and drug law at Columbia University School of Law.  I had

13   worked on the Senate Health Committee and had done issues on

14   food and drug law, and I got a phone call that said, "This is

15   White House personnel.  The President would like to nominate

16   you to be Commissioner of the Food and Drug Administration."

17   That will entail a full field FBI check, and it requires

18   confirmation by the United States Senate.  It is a Presidential

19   appointee with confirmation, advice and consent by the United

20   States Senate.

21   Q.   Could you tell the jury, what does the FDA do?

22   A.   The FDA regulates 25 percent of the consumer dollar.  It

23   has broad and vast regulatory responsibilities.  So almost

24   everything we put in our bodies, I mean, our food, our drugs,

25   our blood supply, medical devices -- I was watching

Page 163

1    "60 Minutes" one night, and I realized I had --

2              THE COURT:  I think we get a --

3              THE WITNESS:  A sense.

4              THE COURT:  Let's focus on the case.

5    Q.   So this case deals with a prescription drug, Doctor.  Can

6    you tell the jury, how does the FDA regulate drug companies

7    like Pfizer?

8    A.   A prescription drug cannot go on the market, a new drug

9    cannot go on the market unless FDA gives specific authority for

10   that drug, unless that drug is approved by the FDA.  And the

11   FDA oversees the clinical trials that are done in humans, so

12   you can't do a clinical trial without FDA approval.  The new

13   drug -- so an investigational New Drug Application gets

14   submitted.  The company does trials.  The company submits a new

15   drug application a, an NDA.  The FDA reviews that.  It can take

16   action.  It could approve it; it could not approve it.  The FDA

17   will monitor the safety of the drug after the drug is on the

18   market, and it will also look at the marketing and promotion

19   activities of the drug company.

20   Q.   Could you describe for the jury what the mission of the

21   FDA is.

22   A.   The FDA is the most important consumer protection agency

23   in the world.  It is to protect and promote the public health.

24   It is to assure that the medicines we take are safe and

25   effective.

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1   Q.   You mentioned a moment ago, you made a reference to

2   performing clinical trials, and we're going to come to them in

3   a moment, but who is it that conducts the clinical trials that

4   are submitted to the FDA and they're asked to look at whether a

5   drug is safe or effective?

6   A.   It's the drug company.  Many people don't understand this:

7   FDA doesn't itself test drugs.  It's the drug company that will

8   test the drug.  Those tests get submitted to the FDA, and FDA

9   reviews those tests.

10  Q.   Now, in connection with prescription drugs, does the FDA

11  protect American consumers?

12  A.   I think the -- that is the goal.  The FDA works very hard

13  to do that.  It has very dedicated people.  As in any set of

14  responsibilities that are that vast, there are times when FDA

15  performs better than others, but FDA tries -- at its heart,

16  it's a consumer protection agency.

17  Q.   Can you tell me, does the FDA use a standard when they're

18  trying to determine whether a drug is safe and effective?

19  A.   Yes, and --

20  Q.   What is that?

21  A.   So that's set out in the Food, Drug and Cosmetic Act, and

22  that's substantial evidence that a drug is safe and effective.

23  There are six words in that Act that really changed, I think,

24  the course of almost modern medicine.  And I don't think it's

25  overstating it, and I don't think Congress knew exactly what it

1   was doing at the time, but it's been more profound than

2   anything we could have imagined.  It says that substantial

3   evidence has to be shown by adequate and well-controlled

4   clinical trials.  That was the part of the law that was enacted

5   back in 1962.  And that really changed, certainly in my

6   opinion, it changed the face of modern medicine.  Before that,

7   we didn't have a science-based pharmaco-armamentarium.  It

8   changed how we know something works, adequate and well-

9   controlled clinical trials, and it's matured into a very

10  significant science and a whole discipline in itself of drug

11  evaluation and review.  There are experts who spend their lives

12  in drug evaluation and review.

13  Q.   Now, with regard to these FDA standards of approval, could

14  you tell the jury, what does a drug company have to prove to

15  get the FDA to approve a new drug?

16  A.   So a drug company has to prove both safety and

17  effectiveness.  And those terms are somewhat interrelated.

18  Safety is a risk/benefit equation:  Are the risks acceptable in

19  light of the benefit?  The drug has to be safe, but it also has

20  to work.  It has to do what it says in the drug's label, and it

21  has to do it by adequate and well-controlled clinical trials.

22  Q.   Now, you used the word "label."  You said the drug's

23  label, it has to do what it says on the label.  Explain to us,

24  what is the label?

25  A.   So the label is the material that really accompanies or is

1   part of the drug when it gets shipped by the manufacturer.

2   Sometimes you'll see it -- we're not talking about what the

3   patient receives.  It's certainly what gets shipped to the

4   pharmacy.  So sometimes you open this piece of paper that's

5   folded, and it's in this very small font.  It's really the

6   information for physicians.  It's almost the physicians'

7   package insert.  Sometimes you'll see portions of that in a

8   drug advertisement that's in very small print, and it has a lot

9   of information.  That's generally referred to as the drug's

10  label.

11  Q.   You mentioned a moment ago a drug manufacturer must prove

12  the drug is safe and effective, and you said it's done by --

13  and I think I have your phrase here correct -- correct me if

14  I'm wrong -- adequate and well-controlled clinical

15  investigations?

16  A.   Adequate and well-controlled investigations, adequate and

17  well-controlled clinical trials.

18  Q.   Now, can you tell us, what does that mean?  Tell the jury,

19  what does that mean?

20  A.   So that has certain very specific requirements.  An

21  adequate and well-controlled clinical investigation -- and

22  usually there's an S, it's plural, and it's meant to be at

23  least two, at least in most cases -- those are in essence

24  experiments, all right?  And people can join a clinical trial.

25  And there's a group usually that gets the drug; there's a group

1    that doesn't get a drug, gets a comparator.  And those patients

2    are studied, and they're followed, and the outcomes are

3    studied.  And that's evolved into a very mature science, and

4    there's very specific standards in order to assure that these

5    clinical investigations are adequate and well controlled.

6    Q.   Okay.  And is there a document that describes what the

7    objectives of the trial would be or the design of the trial,

8    the number of subjects, how they're going to minimize bias?  Is

9    there a document that describes all that?

10   A.   Sure.  I think what you're referring to is the clinical

11   protocol.  These can be, there are a number of documents,

12   investigative brochures, that set all that out before a trial

13   is begun.  And they're usually part of the IND, that

14   Investigational New Drug Application gets submitted to the FDA.

15   So before a drug gets used in a clinical trial, if it's going

16   to be marketed, it's part of that IND.

17   Q.   So the IND, the Investigational New Drug Application, has

18   to go into the FDA before the trials can start; is that

19   correct?

20   A.   Certainly if that trial is going to be used for a drug

21   that's going to be marketed, that's the standard practice that

22   a drug company will use, yes.  You can't ship a drug for an

23   investigational purpose without having an IND in place.

24   Q.   Okay.  Can you tell us, what does the FDA need to

25   determine whether a drug is effective?  Can't physicians tell

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1    whether a drug is effective?

2    A.   This was the real change in modern medicine that I

3    mentioned going back to 1962 and a whole set of drug hearings

4    that the Senate or Congress held.  You know, if I give a drug

5    to -- let's say I have a drug for the common cold, and I give

6    it to people, and they get better.  Well, do I know that they

7    got better because of the drug, or were they going to get

8    better anyway?  So I need to do an adequate and well-controlled

9    clinical trial.  If I have a cancer patient and I give a drug

10   and the patient -- and it's an aggressive form of cancer, and

11   let's say the patient lives four months, or another one lives

12   six months, another one lives ten months, I don't know whether

13   it was due to the drug.  And at the time that Congress enacted

14   the requirement that there be adequate and well-controlled

15   trial, there were thousands of drugs that were being used that

16   ultimately, when you went back and did the adequate and well-

17   controlled clinical trials, were found not to be effective.

18   That was a process that was called, you know, by the expert a

19   DESI review.  So physicians -- I mean, trial and error is not,

20   you know, the ultimate -- was really replaced, I mean, in vast

21   measure by a scientific method of adequate and well-controlled

22   trial.

23   Q.   Now, Doctor, does each Commissioner of the FDA establish

24   the standards that a drug company has to meet to get the drug

25   approved during the time the Commissioner has the agency?

1   A.   No, sir.  Those are set by the Congress.  Those are set by

2   regulations.  Those have been in many cases set for decades.

3   The Commissioner can be involved in promulgating new

4   regulations, but there's a process that sets those standards;

5   and in many cases, certainly, the process for drugs has been in

6   place for decades.

7   Q.   The standards that we've been talking about this afternoon

8   that drug companies have to meet for safety and effectiveness,

9   how long have those standards been in place?

10  A.   As I mentioned earlier, in 1962 the New Drug Amendments

11  required adequate and well-controlled clinical investigations.

12  It is fair to say that the science underlying what an adequate

13  and well-controlled clinical trial is has evolved over the last

14  four or five decades, but those standards really go back now

15  close to fifty years.

16  Q.   And those standards are well understood by the industry?

17  A.   Absolutely.  That's what the industry is charged with, and

18  they have experts who spend their years understanding those

19  standards.

20  Q.   And the FDA standards for demonstrating proof of safety

21  and efficacy, they're recognized as appropriate standards?

22  A.   Yes.

23  Q.   When a drug meets the FDA's standard for safety and

24  efficacy, has there been scientific proof that the drug is

25  effective for its intended use?

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1   A.   Exactly.  It's one of the reasons why when a drug has FDA

2   approval, that approval is viewed as the gold standard around

3   the world.

4   Q.   Now, you mentioned a few moments ago that the -- you used

5   the word "sponsor," and I just want to make sure the jury

6   understands.  Sponsor is the drug company that's submitting the

7   application to the FDA seeking approval, correct?

8   A.   Yes.  I may have used the term "manufacturer," the drug

9   industry, the sponsor.  It's the sponsor of the application.

10  That's the term.

11  Q.   So you said that the sponsor or the drug company must

12  perform clinical trials.  Can you tell the jury what a clinical

13  trial is.

14  A.   I think I may have alluded to it.  It's an experiment

15  whereby people are given the drug.  It's controlled, so you

16  select people with the same conditions.  And it's very

17  important that you have the right groups.  You can have two

18  groups; you can have more than two groups.  You give the drug

19  to one group.  You can give another, you know, a placebo or a

20  comparator to the other group.  You --

21        THE COURT:  What's a placebo?

22        THE WITNESS:  A placebo is an inert chemical that

23  doesn't have an effect.  So it has no active pharmacological

24  effect, and so you would -- just take my example of a cold, a

25  common cold.  You have two groups.  You match them for age.

1   You match them for sex.  You match them for the same area that

2   they live in.  They both have colds, for example.  I mean, you

3   know, it's the same severity cold.  You would give one, see if

4   a drug worked.  You give one group -- you randomize the groups.

5   You do it in a blinded fashion so you can't tell who's getting

6   what, and you then look at the effect of the active drug versus

7   the placebo, and then you measure and see which -- whether the

8   drug works.

9   Q.   I just want to follow up on Judge Saris' question.  Is a

10  placebo also called a sugar pill?

11  A.   I think so.  I think that's -- in general, I think that's

12  the reference.  It doesn't necessarily have to be sugar.  It's

13  rarely sugar.

14  Q.   But a number of studies are done measuring the drug's

15  effectiveness?

16  A.   Basically sugar pill, placebo.  It has no effect and it's

17  known to have no effect in that condition.  That's really the

18  term of art.

19  Q.   I want to talk about clinical trials, but I have a

20  question here.  Do all trials or all investigations that are

21  performed on humans provide acceptable evidence of

22  effectiveness?

23  A.   No.  So there are requirements for clinical trials in

24  order to meet the standard of being adequate and well

25  controlled.  So there are many clinical trials that get done

1   that don't meet those standards.

2   Q.   I want to head there now.  What are the characteristics of

3   the type of trial that will establish that a drug is safe and

4   effective?

5   A.   So the study has to have, for example -- and these are all

6   spelled out in FDA's regulations and FDA's guidances, and

7   they're also part of the international standards.  So a study

8   has to have clear objectives.  It has to have a way so that the

9   groups can be controlled.  It has to have methods for the

10  proper selection of patients.  It has to have clear

11  measurements at the end so you could measure whether a drug has

12  an effect and whether the drug works.

13  Q.   That last point you made, clear measurements at the end.

14  In laymen's terms, what do you mean by that, Doctor?

15  A.   So just take again the example of the common cold.  You're

16  testing a drug to see whether it works in the common cold.

17  Well, what are you going to measure in that trial at the end to

18  see whether the common cold gets better?  You can ask for it --

19  it could be a diary, "I feel better."  Well, that's pretty

20  subjective.  That's not objective, okay?  So it's not always

21  obvious what the right end point is, and it's very important to

22  the end point.  I mean, you can measure the number of Kleenexes

23  you use on a given day.  Is that more objective?  So, again, an

24  image, if a tumor gets smaller on a cat scan, is that an

25  appropriate end point?  Or does in fact the patient have to

9df5ec2b-e745-4aef-ba95-6249c4727bbf

1  survive or live longer?  So there's a lot of discussion and a

2  lot of expertise on choosing what is an objective end point.

3          The key here is to find -- in all clinical trials, you

4  want to reduce the chances for what's called bias.  You want to

5  reduce the chances for any subjectivity to enter into it.  You

6  want to make sure that when you get the result, the result in

7  fact is going to be a valid result, it's going to be true.  So

8  you want to limit the amount of bias, and you want as many

9  aspects of the trial to be controlled and objective as

10  possible.

11  Q.   And do the double-blind randomized controlled trials, are

12  they designed to eliminate bias?

13  A.   Yes.  No trial is absolutely -- no trial is perfect, but

14  the double-blind randomized controlled clinical trial is the

15  best, and it's the standard that is generally required by FDA

16  for approval.

17  Q.   Okay, I think when you were describing these types of

18  trials, double-blind randomized controlled trials, you defined

19  randomized for us.  You said you pick patients with certain

20  conclusion criteria, and you divide them at random into two

21  different groups; is that right?

22  A.   Right, because, again, you don't want to have one group

23  that's a little healthier than the other.  You want to limit

24  that bias, so you want to make sure that patients end up in

25  these two groups by some objective measure, and that's why you

1   have randomization.  Everything is to reduce the subjectivity,

2   to reduce the opportunities for bias.

3        You know, bias, if I may, you know, when we think about

4   bias and just in the ordinary sense, we think about it, well,

5   that's a prejudice.  I mean, you know, something is going to

6   affect our judgment on whether something is actually, you know,

7   the way it is.  In scientific ways, I mean, everything -- the

8   way we design trials are to eliminate bias.  Bias results in

9   getting the wrong result, and there's a lot of ways, if a trial

10  is not well designed, that bias can creep in; you know, not

11  necessarily intentionally, but it enters the trial.  So there's

12  a whole science.  Drug companies have contributed to it, the

13  FDA has contributed, the academic community has contributed, to

14  eliminate bias from clinical trials.

15  Q.   The other phrase you used, "double-blinded" when we were

16  talking about this type of trial, the DBRCT.  Would you tell us

17  what does double-blinded mean?

18  A.   Blinded means you don't know who's getting the drug, so

19  you don't know who in which group is getting the drug.

20  Double-blinded means both the doctor and the patient don't

21  know, so neither can bring bias.  That's when it's

22  double-blinded.

23  Q.   Okay.  And then the last word in this type of trial,

24  "controlled."  In laymen's terms, can you explain in the DBRCT,

25  what does controlled --

Page 175

1      THE COURT:  You might want to write that down, DBRCT,

2   because you might not know that term, if you have your

3   notebooks.  So that again, it means what?

4      THE WITNESS:  "Double-blinded" meaning both the

5   physician and the patient don't know.  That's the double part

6   of "blinded."  "Randomized" meaning that there's a process by

7   assignment to the two groups, that it's done randomly.

8   "Controlled" means that the characteristics of the two groups

9   are the same except for giving the drug.  So the average age,

10   the sex, the socio demographics, anything that could

11   potentially affect outcome you control; you try to make sure

12   that these different groups have the same characteristics.

13   Q.   And these randomized controlled trials, are they

14   considered the gold standard of scientific proof as to whether

15   a drug is effective or not?

16   A.   Yes.  They are the adequate and well-controlled trials.

17   They are the ones that are accepted.  They are the gold

18   standards.

19   Q.   And are they internationally recognized --

20   A.   Yes.

21   Q.   -- as the gold standard?

22   A.   Yes.

23   Q.   And the FDA recognizes them as the gold standard?

24   A.   Generally, yes, they are certainly the gold standard.

25   Q.   And they're the only type of trial that can answer the

Page 176

1    question, is the drug effective, correct?

2    A.    That's true in the vast majority of cases.  There's always

3    individual cases, there are exceptions where it's not possible.

4    I don't think that's what you're dealing with here where you

5    can't do something that's double-blinded.  If you were

6    comparing a drug versus physical therapy, you can't blind that

7    kind of instance; but when we're doing a drug trial, that can

8    be double-blinded.

9              THE COURT:  We're approaching 4:00 o'clock.  How much

10   longer do you think you have?

11             MR. GREENE:  I'd say I have a good hour, your Honor.

12   I mean, not today, but I'm just saying --

13             THE COURT:  All right, so we'll see you tomorrow

14   morning at 9:00 o'clock.  The beautiful thing is, I have this

15   computer on my desk, so I just shot into Weather.Com, and

16   tomorrow is supposed to be wet, hopefully, right on that cusp

17   there between wet and snow.  So please leave nice and early so

18   we can get going at 9:00 o'clock, and we'll probably break at

19   around 1:00.  See you tomorrow.

20             THE CLERK:  All rise for the jury.

21             (Jury excused.)

22             THE COURT:  So see you tomorrow morning, and I'll see

23   counsel just on scheduling at side bar.

24   SIDE-BAR CONFERENCE:

25             THE COURT:  So, Mr. Greene, I was very polite to you

1    today, but -- he's obviously a knowledgeable witness, but we've

2    got to move it along.  You've already used up a lot of time,

3    and I don't want at the end of this for you to say, "Oh, I

4    don't have enough time here."  So he's, you know,

5    knowledgeable, but an hour seems like a long time.

6            In any event, how long will we have on cross?

7            MR. KENNEDY:  No more than ten minutes, at least on

8    what's happened so far.  If he starts talking about the case,

9    I'll probably have more.

10           THE COURT:  At some point we'll talk about the

11   documents that are in issue, but who is your next witness?

12           MR. GREENE:  Dr. Carver?

13           MS. NUSSBAUM:  Yes, Dr. Carver.

14           THE COURT:  He's a live witness?

15           MS. NUSSBAUM:  Yes.

16           THE COURT:  Who is he?

17           MS. NUSSBAUM:  He's from Kaiser.

18           THE COURT:  And what does he talk about?

19           MS. NUSSBAUM:  He's a corporate person.  He's the

20   person that authorized the lawsuit.  He can talk about the

21   corporation --

22           THE COURT:  He's not an expert.  I don't even have an

23   expert report sitting here.

24           MS. NUSSBAUM:  No.

25           THE COURT:  Okay, who's the next person?

Page 178

1          MR. SOBOL:  Our schedule was to have certain

2    deposition transcripts and then after that Dr. Abramson.

3          THE COURT:  It's not going to happen.  When am I going

4    to rule on the --

5          MR. SOBOL:  Well, that's why I mentioned that because

6    I think the issue came up this morning.

7          THE COURT:  So Carver will take how long?

8          MS. NUSSBAUM:  An hour.

9          THE COURT:  How long on cross?

10         MR. KENNEDY:  A half hour, maybe an hour.

11         MR. CHEFFO:  Maybe an hour, between a half hour and an

12   hour.

13         THE COURT:  Okay, we'll still have time tomorrow.

14   We're going to have space to fill, so I think you should have

15   Abramson here.  Where is he from?  He's from Ipswich, right?

16         MR. SOBOL:  He's from Ipswich.  He's a medical doctor.

17         THE COURT:  No, I remember him because I just read his

18   report.  But is he down here normally?  Could we call him at

19   the break and have him here?

20         MR. SOBOL:  We'll have him here.

21         THE COURT:  It's not a hundred percent clear we're

22   going to get to him, but it's likely, you know.

23         MR. SOBOL:  I can call him by 10:30, and he could be

24   here in 45 minutes.

25         THE COURT:  Doesn't that make the most sense?  You can

1    do what you want with the witness, but I don't need to have him

2    sitting here unless he wants to.

3              MR. SOBOL:  Sure.  And what we'll do with

4    Dr. Abramson, tomorrow morning I'll bring you -- we provided

5    the defense counsel with the chalks that we would use with him.

6    We'll provide you a copy also of those chalks.  There is an

7    issue regarding exhibits that we would want to have admitted at

8    the time, to which I will turn to Mr. Barrett to address if we

9    need to address that now.

10             THE COURT:  So tomorrow morning at 8:30 we'll come in

11   here.  You will have shared with them exhibits for Carver and

12   Abramson.

13             MS. NUSSBAUM:  We've already done that.

14             THE COURT:  To the extent that there's an objection,

15   I'll try and address them tomorrow morning.  And what I'm

16   hoping to do right now is deal with the objections that you

17   might have to Dr. Kessler's -- remember there were some.  Have

18   you had a chance to confer?

19             MR. CHEFFO:  We really haven't.  I mean, we can do it

20   now, your Honor, if you want, but we might be able to actually

21   resolve a lot of the issues tomorrow morning.

22             THE COURT:  All right, you can do it tomorrow morning.

23   That's fine.  Excuse me, I think the Kessler situation, I

24   wanted to make sure you two had a chance, or whoever is

25   involved here, to confer and see what you can work out.

1        MR. CHEFFO:  Some of our -- there may have been Bates

2    number issues that we just didn't know about, and obviously I

3    think it would serve us all well if we had ten minutes to talk

4    to each other.

5        THE COURT:  Okay, so I'll see you tomorrow morning on

6    that.  Now, the big one is, when am I going to get these

7    deposition transcripts?  Just know I have a criminal trial, and

8    I'm booked all tomorrow afternoon.  I have some stuff in the

9    evenings.  I mean, I'm not 24-7 for you, so when am I going to

10   have the --

11       MR. RONA:  I guess it depends on who's submitting it.

12   Is it the party who's offering the deposition, or is it the

13   objecting party?

14       THE COURT:  Well, here's the issue:  You've

15   designated.  I'm assuming there have been some objections.  You

16   need to confer and narrow them down.

17       MR. RONA:  We have.

18       THE COURT:  So what's the next deposition you're

19   anticipating introducing?

20       MR. RONA:  I would say Dr. Pande, Leslie Tive and --

21       THE COURT:  All right, so Pande, how many objections

22   are there?

23       MR. FOX:  There are objections to it, your Honor.

24       THE COURT:  How many?  I'm not going to do a thousand

25   in a night.  See, so if there are three, I can handle it.

1      MR. RONA:  It's more than three, probably less than

2   twenty.

3      THE COURT:  Less than a thousand, so where are we in

4   the -- huh?

5      MR. RONA:  It's about a dozen to two dozen per person.

6      MR. FOX:  But they're grouped.

7      THE COURT:  But can I tell you, for me, I can't just

8   say "sustained" because unlike you where I hear it evolve, I

9   have to read before and afterward and I have to understand the

10   context.  It actually takes me a long time.  So I need it.  I

11   can't do it on the fly.  So when can I have these two

12   depositions?  What you have to give me is the deposition with

13   the part that you want, let's say yellow highlighted, okay?

14      MR. RONA:  Okay.

15      THE COURT:  You then need to, let's say, pink

16   highlight any sections that you want for doctrine of

17   completeness or just you want.  Okay.  And then if there are

18   objections, I need, like, ideally on the side, "Objection,

19   relevance, objection, hearsay," or alternatively you could have

20   an index page on the front page, you know, with a little

21   snippet of "Object on the grounds of hearsay.  No, it's not

22   hearsay, it's limited to state of mind," I mean, just if you

23   wanted.  But we don't have time for that in the beginning.  We

24   just need to get me to rule on them.  And then a lot of times

25   the battle is over a document, and then you forget to give me

1    the document, not you personally, but I see this in the past,

2    so I've got to see the document.  So someone needs to give me

3    essentially a binder with the designations from each side, the

4    objections from each side, and I need to be able to have a way

5    of ruling.  Like, how am I going to rule so you can edit it in

6    time?

7            MR. RONA:  What we had proposed, your Honor, was to do

8    it on a rolling basis, to do them in groups, and so if we gave

9    you, let's say, three people tomorrow and then maybe another

10   three in a couple of days, or I don't know how we're going to

11   sequence it.

12           THE COURT:  I'm willing to do that, but what you can't

13   expect is that I'm going to spit it back, especially if you're

14   talking about two dozen objections.  It's not going to happen.

15   You need to give me a --

16           MR. CHEFFO:  If they give us what they are -- first, I

17   think, you don't have multiple copies, you don't want theirs

18   and ours.  If you give us what you have, what you want, we'll

19   then designate it, we'll put any objections, we'll give it back

20   to you, and you can object to ours, and then you can submit it

21   to the Court.

22           THE COURT:  Right, and ideally you'll confer.  I don't

23   want to deal with leading or some sort of vague lack of

24   foundation thing.  I mean, I want it when it's like a big issue

25   for you.

Page 183

1        MR. GREENE:  They've spent, as I understand it, days

2   doing this, and there are still objections from them.

3        THE COURT:  Well, maybe.  I'm assuming, yes.  That's

4   what you have when you have two dozen lawyers standing in this

5   room.  So I'm assuming that, but at some point I've got to have

6   it in enough time to rule, or you can't count on that to fill

7   your time.

8        MR. BARRETT:  And one thing, your Honor.  Both sides

9   understand that once you rule a certain way, it's going to

10  affect a lot of depositions, and a lot of objections will be

11  withdrawn.

12       THE COURT:  Or at least preserved for the record.

13       MR. FOX:  I'm not sure about that.  It depends.

14       THE COURT:  Preserved.  But here's the issue:  How

15  long do you need to get it edited?  In other words, let's say

16  you give this to me tomorrow, and I rule on it, let's say, the

17  next day, what's your turnaround time?

18       MR. RONA:  I think it would be quick.  One deposition

19  could be done in a day.  But my thought was maybe we just get

20  the edit made now, and then we could skip over the

21  objectionable testimony manually.  If you ruled, if you

22  sustained --

23       THE COURT:  Technically it's up to you how as to

24  handle it.  And let me just say about this also, I was almost

25  jumping out of my skin with the parts of the deposition that

1   were read today because it's so slow.  Oh, my gosh, you know.

2   So while I do understand there's a limit to what you can

3   control, just think of it from the point of view of a jury

4   because at some point they fall asleep.  So I think that's all.

5   We can go off the record right now.

6            MR. GREENE:  Can I bring one issue to your attention?

7            THE COURT:  Yes, but I have a criminal case right now.

8            MR. GREENE:  There's an issue.  They listed a witness,

9   the only live Pfizer witness, Lloyd Knapp, who is a 30(b)(6).

10  And I called counsel last week because we want to call him in

11  our case, and they won't produce him, they won't accept a

12  subpoena.  And we did a motion and a brief that we didn't

13  submit because you told us, you said no more submissions

14  Friday.

15           MR. CHEFFO:  You also represented in there, though,

16  that in fact he was subpoenaed.  This has been going on.  They

17  asked me about a week and a half ago.  I told them straight

18  out.  We basically said -- you know, this is the same thing

19  that happened in the Bulger case.  They wait till three days

20  before, and they say, "Oh, we want to have someone next week."

21  They never served a subpoena on this person.

22           THE COURT:  Well, see if you can work it --

23           MR. HIMMELSTEIN:  We tried to serve a subpoena on him

24  in New York City.  They said, no, he's in their New London

25  headquarters.  We went there.  They refused to let the process

Page 185

1    server on the premises.  They claimed, believe it or not, that

2    because they have government contracts, they had government

3    immunity, and the process server was not allowed on the

4    premises.

5              MR. GREENE:  Well, no one told me any of that.

6              THE COURT:  Let me just discuss it.  Here you are, a

7    fount of rationality.  So are you going to be able to produce

8    him?

9              MR. CHEFFO:  I'll talk to them about getting at

10   least -- well, we're not going to agree to produce it on their

11   schedule.

12             THE COURT:  No, I understand that, fair enough.

13             MR. CHEFFO:  I mean, as far as getting a subpoena

14   served, they can do that, but we're going to move to quash it.

15             THE COURT:  Because it's beyond the --

16             MR. CHEFFO:  Well, yeah, I mean, there's a host of

17   reasons.  Again, it will probably take us more than five

18   minutes that you have.

19             THE COURT:  No, but let me put it this way:  If it's

20   beyond the subpoena power of the court, you're not entitled to

21   it.

22             MR. HIMMELSTEIN:  Your Honor, we have case law, we

23   have authority, we have a five-page brief.  We can file it

24   tonight.

25             THE COURT:  On what?

1          MR. HIMMELSTEIN:  On this issue.

2          THE COURT:  Excuse me.  Is it beyond the 120 miles?  I

3     forget, 100 miles.

4          MR. HIMMELSTEIN:  That does not apply to corporate

5     officers, or, according to the case law, designees.  A

6     corporation is not a actual person.  Now, there is case law.

7     Judge Fallon just ruled that way in Vioxx.  There are two MDLs

8     with recent rulings on this.  We'd like to show them to you.

9          THE COURT:  No, I'm not doing this now.  I'm

10     exhausted.  I've been doing this since 8:30.  I don't know, if

11     this was such an important issue, why it wasn't filed before,

12     even broached before Friday.

13          MR. HIMMELSTEIN:  We wrote the brief.  We were told

14     not to file it, your Honor.

15          THE COURT:  Absolutely not.  It was hemorrhaging

16     paper.  It was hemorrhaging paper back and forth.  I stopped

17     you all.  It was equal opportunity stoppage, okay?  I couldn't

18     handle the amount that was coming in.  All right, so why don't

19     you see -- I don't know what the legal issue is for corporate

20     officers.  I don't know.  Typically you can't subpoena someone

21     beyond the 100 miles.  If it's a corporate officer and that's a

22     different rule of law, I don't know.  I don't know.

23          MR. SOBOL:  So why don't we confer and raise it with

24     you in the morning.

25          THE COURT:  Yes, and if there are some cases, I'd be

1    happy to take a look at them.  Okay, so off the record.

2            (Discussion off the record.)

3            (Adjourned, 4:10 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 188

1                C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT )

5   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
6

7

8        We do hereby certify that the foregoing transcript,

9   Jury Trial Day Two, was recorded by us stenographically at the

10  time and place aforesaid in Civil Action No. 04-10739-PBS,

11  Kaiser Foundation Health Plan, et al, v. Pfizer, Inc., et al,

12  and thereafter by us reduced to typewriting and is a true and

13  accurate record of the proceedings.

14      In witness whereof we have hereunto set our signatures

15  this 23rd day of February, 2010.

16

17

                 /s/ Lee A. Marzilli
18               LEE A. MARZILLI
                 OFFICIAL FEDERAL COURT REPORTER
19
                 /s/ Valerie A. O'hara
20               VALERIE A. O'HARA
                 OFFICIAL FEDERAL COURT REPORTER
21

22

23

24

25

1