IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                     )
                                           ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,  ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION      )
----------------------------------------)
This document relates to:              )
KAISER FOUNDATION HEALTH PLAN, et al,  )
                                       )
                Plaintiffs             )
                                       )
        -V-                            )No. 04-10739-PBS
                                       )Pages 1 - 152
PFIZER, INC., et al,                   )
                                       )
                Defendants             )



JURY TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT JUDGE



United States District Court

1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 23, 2010, 8:45 a.m.


LEE A. MARZILLI and VALERIE A. O'HARA

OFFICIAL COURT REPORTERS

United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210

1    A P P E A R A N C E S:

2

3    FOR THE PLAINTIFFS:

4

5        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ., Greene,

6    LLP, 33 Broad Street, 5th Floor, Boston, Massachusetts, 02109.

7

8        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,

9    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
     Suite 301, Cambridge, Massachusetts, 02142.

10

11       LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.

12       DON BARRETT, ESQ., Barrett Law Office,
     404 Court Square North, P.O. Box 987, Lexington, Mississippi,

13   39095.

14       BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
     Bernstein, Embarcadero Center West, 275 Battery Street,

15   San Francisco, California, 94111-3339.

16

     FOR THE DEFENDANTS:
17
         KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
18   THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
     Four Times Square, New York, New York, 10036.
19
         RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
20   LLP, Four Embarcadero Center, San Francisco, California, 94111.

21

22       JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
     Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
23   Denver, Colorado, 80202.

24

25

```
 1                        I N D E X

 2

 3     WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 4     DAVID KESSLER, M.D.    16      60        74         76

 5

 6     JOHN ABRAMSON, M.D.    84

 7

 8     EXHIBITS                                PAGE

 9     207                                      33

10     9                                        34

11     91                                       39

12     173                                      47

13     188                                      47

14     200                                      47

15     195                                      50

16     87                                       60

17     227                                      98

18     383                                     102

19     1477                                    104

20     1345                                    106

21     1845                                    107

22     159, 237, 236                           123

23     213                                     129

24     1995                                    139

25     19, 30                                  140
```

1           P R O C E E D I N G S

2           THE COURT:  Good morning, everybody.  Sorry, it was my

3      delay, but there was an accident in the Pru tunnel, so what can

4      I say, getting in here.  So what are the issues we need to deal

5      with?

6           MR. GREENE:  Good morning, your Honor.

7           THE COURT:  Good morning.

8           MR. GREENE:  Kessler exhibits, we've narrowed them way

9      down to -- do we have a deal or no?

10          MR. CHEFFO:  We can argue about one if we can take one

11     out.

12          MR. GREENE:  All right, we'll take one out, and we

13     have one left, Exhibit 190.

14          MR. CHEFFO:  Right, so, Tom, so we're going to take

15     out 133, and we just probably can do this -- we had a lot of

16     objections, your Honor, but in the sake of cooperation and

17     time, we're going to both try and work cooperatively and just

18     address one additional.  The one we're going to talk about is

19     Exhibit 190.  Do you have that in front of you, your Honor?

20          THE COURT:  Yes, I do.

21          MR. CHEFFO:  Tell me if you'd like me to give you 30

22     seconds.

23          THE COURT:  Well, let me start off, had you seen this

24     before?

25          MR. CHEFFO:  It's not an issue of delay or not seeing

1    it.  We worked through those issues.

2              THE COURT:  Okay.  So this is an FDA document.

3              MR. CHEFFO:  The issue really boils down to this, your

4    Honor:  It's an FDA document.  It's a document that was sent to

5    Pfizer, so, again, these are not those issues.  The issue here

6    is that after the PHN, the postherpetic neuralgia, indication

7    was approved, as often happens, the company and the FDA

8    exchange information about marketing and promotional materials

9    for the on-label use of PHN.  This entire letter, as I

10   understand it, talks about promotional materials for PHN, so

11   there's no issue here about any of the off-label uses that are

12   at issue in the case.  And, you know, it's highly misleading.

13   They're basically saying, you know, "We've looked at X, Y, Z.

14   When you talk about PHN, you should do X, Y, and Z in your

15   promotional materials," and there's a response to that.  So

16   it's not a situation of a DDMAC letter with respect to even an

17   on-label issue.

18             THE COURT:  What's a DDMAC?

19             MR. CHEFFO:  A DDMAC is the Division of -- and I

20   should know the acronym, but it's an FDA division that --

21             MR. GREENE:  Drug Marketing, Advertising and

22   Communications.

23             THE COURT:  Why is it relevant here?

24             MR. GREENE:  Because it directly addresses dosage and

25   calls it misleading --

1          THE COURT:  So it's a five-page single-spaced letter,

2     so where does it discuss dosage?

3          MR. GREENE:  Can I give you my highlighted copy?

4          THE COURT:  Yes.  Right in the beginning?

5          MR. GREENE:  Right in the beginning.

6          MR. CHEFFO:  It is dosage in PHN, your Honor.  I mean,

7     that's the distinction here.

8          (Pause.)

9          THE COURT:  Well, why do you think it's relevant if

10    it's PHN?  I'm not even seeing where it says dosage.

11         MR. GREENE:  Well, it points out to them in that

12    paragraph under General Comments, "Promotional materials are

13    false or misleading if they state or imply that a drug is

14    better, safer, or more effective than has been demonstrated by

15    substantial evidence."  The proposed materials they were going

16    to use to market Neurontin for PHN they had submitted, and then

17    on the second page they point out misleading dosage

18    information.

19         THE COURT:  Where?  Where exactly is the misleading?

20         MR. GREENE:  The paragraph entitled "Misleading Dosage

21    Information."

22         THE COURT:  All right, so it wasn't what you sort of

23    highlighted.

24         MR. GREENE:  "In clinical trials, the efficacy and

25    safety of Neurontin in the management of PHN were demonstrated

1    at doses of 1,800 to 3,600."

2              MR. CHEFFO:  I mean, again, your Honor -- sorry.

3              MR. GREENE:  Drop down to the second sentence in the

4    paragraph right below it, it says, "While Neurontin was studied

5    up to 3,600, the package insert recommends a titration up to

6    1,800 milligrams as needed and clearly states that additional

7    benefits of using doses of greater than 1,800 were not

8    demonstrated."

9              MR. CHEFFO:  Again, your Honor, this is all about PHN,

10   and it's --

11             THE COURT:  But it's another bad act, I mean,

12   essentially.

13             MR. CHEFFO:  No, no, no, this is not.  I mean --

14             THE COURT:  Doesn't this fall under that --

15             MR. CHEFFO:  There's a number of -- I mean, I don't

16   want to belabor it, but there's a number of things that the FDA

17   can do.  They can basically, after you've done something, they

18   can issue warning letters, you know, a whole host of

19   information.  Often what happens is, there's an exchange of

20   information back and forth where you ask the FDA for comments

21   on promotional pieces.

22             THE COURT:  But just under 404(b), other wrong acts,

23   isn't it -- unless --

24             MR. GREENE:  Yes, it is, your Honor.  It's even

25   simpler than that.  Our case is 1,800.  Anything, even PHN

Page 8

1   above 1,800, is in our case.

2          THE COURT:  Objection overruled.  So but not the whole

3   letter, just that piece of it.  The rest of it's confusing.  I

4   mean, I haven't sat and read it line by line, but that piece of

5   it.

6          MR. GREENE:  Why don't I do this, Judge, just to move

7   things on, when I come to it, mark it for identification.

8          THE COURT:  And then just put in that snippet.

9          MR. GREENE:  And then we'll deal with redactions or

10  snippets --

11         THE COURT:  So your claim of overdosage includes the

12  on-label uses as well?

13         MR. GREENE:  Sure.

14         THE COURT:  That's a wrinkle, so --

15         MR. CHEFFO:  Your Honor, has ruled, so 190 will be

16  out, and that's fine.  I think we've addressed those.  We have

17  another issue or two.

18         THE COURT:  Yes.

19         MR. CHEFFO:  One issue, and Mr. Kennedy is going to --

20  actually we have two issues.  One is whether we should be

21  excluding witnesses from trial, I think, going forward.

22         THE COURT:  Sure, sequestration is typical.

23         MR. KENNEDY:  We would request it, your Honor.

24         THE COURT:  Typically, though I don't exclude experts

25  necessarily, so just fact witnesses, I think that makes sense.

1          MR. CHEFFO:  That's fine, your Honor.

2          THE COURT:  And usually one side each gets to keep a

3     corporate agent in.

4          MR. CHEFFO:  And the other issue, your Honor, which

5     Mr. Kennedy is going to address, you know, we've seen some

6     documents today, or last night more accurately, regarding

7     Dr. Abramson, and it's a stack like this.  And we're concerned

8     about what your Honor has addressed you're concerned about,

9     which is a document dump using experts, but I'll let

10    Mr. Kennedy address those.

11         MR. KENNEDY:  As I understand it, they not only want

12    to let Dr. Abramson refer to a number of documents, but have

13    asked that some sizable stack be admitted into evidence so they

14    potentially could be taken into the jury room.  And obviously

15    an expert can read, consider, or rely, but the idea that

16    especially in a case of this shortness where we're not even

17    going to be able to ask questions about all of those

18    documents --

19         THE COURT:  Well, let me ask this:  Are they otherwise

20    admissible?  Are they corporate documents that meet the

21    business record rule?

22         MR. SOBOL:  If I may, your Honor, just so that we can

23    tee up the issue correctly, there should be a binder that has

24    Abramson's direct in front of you somewhere.

25         THE COURT:  Yes.

1           MR. SOBOL:  And just to orient you just so we can

2    frame the issue appropriately, you'll see that there are some

3    slides, some chalks that we have for Dr. Abramson.  That's your

4    first tab.  The second tab is a timeline, which is obviously a

5    chalk.  And then there are two lists of trial exhibits, the TX

6    direct and TX reliance, and then there are lists of documents.

7           To properly frame this issue is the following, your

8    Honor:  First, I recognize, we recognize, that in order for

9    Dr. Abramson to simply give his opinion, it's technically not

10   necessary for us to admit the underlying reliance materials, so

11   we know that that's the case, number one.

12          However, second, during the presentation of

13   Dr. Abramson's direct testimony, we do intend to have him, in

14   terms of explicating the reasons/basis for his opinion, refer

15   either to exhibits that we think are admissible, and there are

16   corporate documents that are admissible in the case, or are

17   medical literature, or are the key studies in the case.  So we

18   think that they appropriately, you know, can be and should be

19   admitted.

20          Now, I'll turn to that in one second to address that.

21          THE COURT:  Wait, wait, can we just -- I'm not

22   obviously going to be able to rule on each and every document

23   right now.  Have you gone through them to demonstrate that each

24   one of the corporate documents is admissible as a business

25   record?

1          MR. SOBOL:  Yes.

2          THE COURT:  Now, have you had a chance to go through

3     them first to see that?

4          MR. KENNEDY:  I have not checked on the corporate

5     documents.  The documents I'm referring to now are only journal

6     articles.

7          THE COURT:  That's fine.  Let me just deal with, if

8     the corporate document is admissible, and that's probably what

9     folks should be looking at, they can come in.

10          All right, now, journal articles are a different

11     story.  On journal articles, I don't know what -- both sides

12     are going to be looking -- I haven't dealt with that as an

13     evidentiary matter yet -- both sides are looking to put those

14     in, right, at some point?

15          MR. SOBOL:  Correct.

16          MR. KENNEDY:  Well, there may be selected ones with a

17     foundation.

18          THE COURT:  Sure.  So if this expert says, "This is a

19     journal article that doctors look to or experts rely on, it's

20     in a peer-reviewed journal," both sides will be doing that,

21     right?  We're not calling in all the authors of these journal

22     articles, right?

23          MR. SOBOL:  Yes, but sometimes you just need to

24     recognize, your Honor, sometimes --

25          THE COURT:  What's sauce for the goose is sauce for

1    the gander, right?

2          MR. SOBOL:  Yes, but sometimes you need to understand,

3    sometimes the medical literature is being offered for what it

4    is that Pfizer was saying about the product.  Sometimes it's

5    being offered for the actual study about what it actually

6    shows; you know, double-blind random controlled trial shows,

7    right?  So it will depend upon what the purpose it is.

8          But, also, just so it's clear, all of these documents

9    we identified to the defendants, whatever -- and Mr. Rona will

10   get into this if we need to -- months ago, a couple of months

11   ago.  We have been out there, and there has been a process that

12   the plaintiffs have been very frustrated with because the

13   defendants, although we gave them a notice of about 400 and

14   some odd documents that we sought to have admitted in this

15   case, they have only agreed to stipulate to a handful.

16         THE COURT:  All right, but so now they've objected.

17         MR. SOBOL:  So at some point there's going to have to

18   be an expert to address it.

19         THE COURT:  Yes, well, right now we're at a reckoning

20   point, so I need to deal with it.  Both sides are going to look

21   to put in scientific journal articles, my guess is, through

22   their experts, right?

23         MR. KENNEDY:  To some limited extent, your Honor, this

24   is almost a 403 issue.  What I'm concerned about is having a

25   lay jury go into the jury room with 200 or 300 or 400 medical

1    articles, and because of time constraints, nobody's really had

2    a chance to explore with any witness --

3              THE COURT:  I completely agree that we're not going to

4    have a document dump; but if the expert says he agrees with

5    this and this is something that people in the field agree on

6    and it was medical literature that were available to doctors

7    and scientists and the FDA, it might be admissible.  I'm not

8    going to allow them to shovel it in without discussing it.  So

9    and the same would be true with your experts, right?  I mean,

10   as long as it's not a dump.

11             MR. CHEFFO:  That's really what our concern is.  You

12   know, if someone literally talks about the article and explains

13   and we have a chance to cross-examine, but, you know, what we

14   understood was, you know, "Are these 57 articles generally

15   relied on?" and all of a sudden --

16             THE COURT:  No, we're not doing that.  I completely

17   agree with that.

18             MR. RONA:  Your Honor, if I could just add one point.

19             THE COURT:  Yes.

20             MR. RONA:  We have a limited number of documents, it's

21   about 40, that represent the fraud itself.  These are the

22   articles that have the false messages.

23             THE COURT:  Sure, but just have him --

24             MR. RONA:  Right, we're not offering them for the

25   truth of the matter.  We're offering them --

1           THE COURT:  They're agreeing to the -- what I think

2      the gist of this is, you can't just do a dump:  Here are the 40

3      articles that are the fraud, move to admit.  You'll have to

4      walk through them.  That's fine.  That's fine.

5           Now, let's go see if the jury here.  Is there anything

6      else?

7           MS. NUSSBAUM:  Can we just go back to the

8      sequestration issue.  We have somebody in court today, Albert

9      Carver, who's a senior person from Kaiser, who is a corporate

10     representative who would like to be here.  He also will be a

11     witness, I believe tomorrow.  Can Mr. Carver stay?

12          THE COURT:  If he's your corporate representative,

13     yes.  And, also, right now we just have an expert talking,

14     so -- not just an expert, a very renowned expert, but, I mean,

15     it's not an overlap of fact witnesses, so I don't have a

16     problem with him being here for that.

17          So today we're going to see, ideally speaking, who?

18          MS. NUSSBAUM:  Kessler and Dr. Abramson.

19          THE COURT:  We'll finish up Dr. Kessler and move it

20     along, right?  And Carver.

21          MR. GREENE:  Your Honor, I will move it along, but he

22     is an important witness in the case.

23          THE COURT:  I understand.  Just what I don't want is

24     at the end that you to say to me, "I don't have enough time."

25     Okay?  He is important, but we just need to --

1           MR. GREENE:  Just to sort of set the framework and

2     foundation for a lot of what's going to come later.

3           THE COURT:  I understand.  It's your 28 hours.

4           MS. NUSSBAUM:  It will be Dr. Abramson after

5     Dr. Kessler and then Mr. Carver.

6           THE COURT:  All right, but let me just say this on

7     Dr. Abramson.  I don't know if he's here or not.  It was a

8     very, very thick report, and I did not read the whole report.

9     I could have spent an entire weekend reading the whole report.

10    But this is not a trial of the pharmaceutical industry.  It's a

11    trial of Pfizer.  So he does a lot of interesting research and

12    writing about the impact of money on the pharmaceutical

13    industry.  This has got to be about Pfizer, not an indictment

14    of the industry as a whole.

15          Are you Dr. Abramson?  There you are nodding back

16    there.  Great.  It sounds great, I'd love to read some of this

17    stuff, but this isn't what this trial is about.  And I couldn't

18    micromanage every single opinion, what was Pfizer and what

19    wasn't.  This is about what happened in this case.

20          Okay, so see if the jury is here.

21          Can I ask you just one question.  As far as I could

22    tell -- I quickly scanned The Wall Street Journal -- there's

23    nothing in the paper that some juror would have seen, is there?

24          MR. CHEFFO:  The only thing I saw was a Bloomberg News

25    piece.  I believe there might have been one reporter from

1    Bloomberg in the courtroom, but I'm not aware of anything in

2    the Times or --

3            THE COURT:  Was it just a factual summary?  I won't

4    even raise it if it's not worth raising.

5            MR. CHEFFO:  It was more like a business-type news

6    thing, I think.

7            MR. SOBOL:  We haven't had time to read the newspaper.

8            MS. NUSSBAUM:  I did while working out this morning,

9    and I did not see anything in the local paper, the Times or

10   the Journal.

11           THE COURT:  All right, I won't say anything.

12           (Jury enters the courtroom.)

13           THE COURT:  Good morning to everyone.  Did anyone

14   speak about this case or see anything in the press?  I find

15   that the jury has complied.

16           Dr. Kessler is still on the stand continuing with

17   direct examination.  You're still under oath.  Thank you.

18                      DAVID KESSLER, M.D.

19   having been previously duly sworn, was examined and testified

20   further as follows:

21   CONTINUED DIRECT EXAMINATION BY MR. GREENE:

22   Q.   Good morning, Doctor.

23   A.   Good morning.

24   Q.   Yesterday we had left off, I think you had described

25   randomized trials, explaining how patients were selected,

Page 17

1    broken into two groups, double-blinded, the doctor doesn't know

2    what he's giving the patient, the patient doesn't know what

3    he's receiving, whether it's the study drug or the placebo, and

4    you explained controlled.  Do you recall that?

5    A.    Yes, sir.

6    Q.    We were just ready to move on to the principles of trial

7    design.  We talked about randomized, and we got up to blinded.

8    Will you define blinded for the jury.  I'd like to pick up

9    there, all right?

10   A.    Blinded means if you have a drug and you have a placebo,

11   the active drug you're going to give to one group, and placebo

12   you give to the other group.  Blinding means that you don't

13   know which is which, so you don't know which you're getting.

14   Q.    What does open label mean?

15   A.    Open label means it's not blinded.  Open means that you

16   know what you're getting.

17   Q.    Why should a trial be blinded?

18   A.    Because there can be bias.  Bias can creep into that

19   trial.  The trial results can be distorted.  You can get an

20   invalid result if you don't control for both groups and both

21   groups not knowing what they're getting.  If you know what

22   you're getting and you think that's going to work, if you think

23   that's the active, that may work.  If you think you're getting

24   a placebo and you think placebos don't work, it may not work.

25   So it introduces this concept of bias.  You have a potential

b946f79a-1ae6-4295-87d1-3730705d1152

1    for getting the wrong result.

2    Q.   Does the FDA generally consider trials that are not

3    blinded when determining whether or not a drug is effective?

4    A.   No.   In general, FDA requires that trials be

5    double-blinded, meaning both the patient and the doctor does

6    not know who's getting what.

7    Q.   Could you define for us, what is an objective end point?

8    A.   So let's start with the term "end point."  An end point is

9    what you measure in the trial.  So let's take a drug that's

10   going to be used for cancer, and it's a serious cancer, and

11   it's a cancer that causes death, and you want to test whether

12   the drug works in that cancer.  So what you measure, you're

13   going to give one group the cancer drug, another group placebo.

14   And what are you going to measure in the trial, right?  You're

15   going to measure -- you have to measure something to see

16   whether the drug works, so what are you measuring?  In that

17   case you're measuring survival, so survival is the end point.

18        Now, survival is a very objective end point.  It doesn't

19   allow for subjectivity.  Either someone's alive or someone

20   regrettably is not alive.  And with objective end points, the

21   reason you want objective end points is because there's not a

22   subjective bias.  Take a condition with pain, or we talked even

23   yesterday about a cold.  What's the treatment result?  I feel

24   better, I have less sniffling, I have less cough, I go back to

25   work.  So there are different end points.  And depending on

1   which end point is chosen -- and it's a very important part of

2   trial design -- what you want is, you want as objective an end

3   point, not how I feel but something that can be measured, can

4   be measured accurately and repeatedly, and really correlates

5   with what you want to know, whether the drug works.

6   Q.   All right.  So when the trial is designed, is the design

7   contained in a protocol, a document called a "protocol"?

8   A.   A trial design is set out before the trial is conducted.

9   Q.   Excuse me.  Are the end points selected before the trial

10  is started?

11  A.   Yes.  Those are called prospective end points, and that's

12  a very important part of trial design, that you specify what

13  you're going to measure, what your groups are, what your

14  treatments are, and what you're going to measure, what your end

15  points are, before you undertake the trial.

16  Q.   What happens when a trial's objective end point is

17  negative, but after the trial is concluded, the investigator

18  notices a different factor observed in the trial that was

19  positive?

20  A.   So that's basically, you know, you're data mining the

21  results.  That could be interesting, but it's not going to work

22  for FDA approval or review.  Let me explain why.  If you do a

23  trial and you don't set your end points ahead of time, and you

24  do a trial and you want to see whether a drug works, and you

25  start looking at the data and you start looking for things,

1    well, what could the end point and associations be?  And you

2    start looking -- let's take something that's ridiculous.  You

3    have a cancer drug, and you've tested that drug on patients in

4    a clinical trial, and you want to go through and see whether --

5    after the fact you go through, well, let's see, do people with

6    the last name A get better with that drug?  Well, that doesn't

7    make any sense to you.  And you go through and you search all

8    the data, and it doesn't come through.  Then you search again,

9    and you go, B, well, last name B, well, that doesn't come up.

10   But if you do enough searches post-hoc, oh, well, just

11   statistically, just by chance, people with the last name T

12   respond, right?  So if you do something enough times, if you

13   look repeatedly and you search, you're going to find certain

14   correlations that don't make any sense.

15   Q.   Okay.  And when you do that, you can't write that point up

16   as if it were the primary end point that was studied; is that

17   correct?

18   A.   It can give you an idea, it can suggest an idea that you

19   want to then go back and test again through a randomized

20   controlled clinical trial.  So it's enough to generate --

21   they're good to generate hypotheses, but they're not good when

22   you don't do things prospectively to get the answers.

23   Q.   Okay.  Yesterday I think we referred to double-blind

24   randomized controlled trials, do you recall that, DBRCTs?

25   A.   Yes, sir.

1   Q.   And I think you testified that DBRCT stands for

2   double-blind randomized controlled trial?

3   A.   Yes, sir.

4   Q.   It's what the FDA looked at to determine safety and

5   efficacy; is that correct?

6   A.   That's correct.   That meets the substantial evidence

7   requirements.

8   Q.   You said it minimizes bias if you do a DBRCT, correct?

9   A.   Yes, sir.

10  Q.   And you referred to the placebo effect, and that's what I

11  would like to talk about now.   Could you define for us what the

12  placebo effect is.

13  A.   Placebo effect, you have two groups.   One you give the

14  test drug to.   The other group you give the placebo to.   And in

15  that group you're giving the placebo to, sometimes that placebo

16  is going to show a positive effect.   It's going to -- people

17  who have that condition will get that end point, will get

18  better just if you give them that placebo.

19  Q.   Okay.   And you explained to us observer and patient

20  expectation.   Do you recall that?

21  A.   Yes, sir.

22  Q.   The observer being the physician that gives the drug?

23  A.   Yes.

24  Q.   Now, could you tell us, what is placebo response rate?

25  A.   A placebo response rate in that group that you're giving

1    the placebo is what percentage of those patients are going to

2    improve on that placebo.  So you can have 0 percent respond,

3    you can have 20 percent, you can have 50 percent respond

4    positively.  So it's the response of those patients to the

5    placebo.  It's a placebo response rate.

6    Q.   And the study drug is being measured or compared with how

7    the placebo patients did, in laymen terms; is that correct?

8    A.   Exactly.  Two groups, one getting the drug, one getting

9    the placebo.

10   Q.   In what type of conditions is there a high placebo

11   response rate?

12   A.   Especially those conditions where there is a psychological

13   component.  People have spent a lot of time studying placebo

14   response, and we're learning a lot more about placebo

15   responses, and they're very real.  And in those conditions

16   where there's especially a psychological component underlying

17   the condition or disease, you can have a greater placebo

18   response rate.

19   Q.   Can you give the jury a couple of examples of a condition

20   or disease where you have a high placebo response rate.

21   A.   Sure, those conditions I said that have a psychological

22   underlying basis.  So pain, depression, manic depression, those

23   are the conditions where when you test placebos, you see higher

24   placebo response rates.

25   Q.   In those conditions that you just identified, when you

b946f79a-1ae6-4295-87d1-3730705d1152

1    have a high placebo response rate, how do you know if the drug

2    is working or if the patients think their condition is

3    improving because of this placebo response rate that you just

4    described?

5    A.    That's why you do double-blind randomized controlled

6    clinical trials because you control for the placebo.  So if the

7    placebo response, let's say, is 25 percent and the drug is

8    25 percent, the drug is no greater than the placebo response.

9    So that's the reason why doing double-blind randomized

10   controlled clinical trials is so important.

11   Q.    Okay.  So a physician who gives Neurontin to his patient,

12   is there any way the physician can tell whether the drug

13   improved their condition?

14          MR. KENNEDY:  Object.  Lack of foundation, beyond the

15   scope of what he's been designated to talk about.

16          MR. GREENE:  Let me withdraw the question, your Honor.

17   I'll rephrase it.

18   Q.    If a physician gives a drug to a patient, is there any way

19   that that physician can tell if the drug improved the condition

20   or whether it was the placebo rate?

21   A.    The physician has to be part -- they have to do the

22   double-blind randomized controlled clinical trial to know

23   whether the response, the patient getting better, is the result

24   of the placebo effect or the drug.

25   Q.    Thank you, Doctor.  Could you tell the jury what is meant

1   by selection bias.

2   A.   Selection bias is a bias that gets introduced in selecting

3   the patients for both groups.  You want to make sure that you

4   don't put, for example, younger patients or healthier patients

5   in one arm, one group, compared to the other group.

6   Q.   I'd like to move on to a topic now, evidence-based

7   medicine.  Are you familiar with that term?

8   A.   I am.

9   Q.   And can you define it for us, please.

10  A.   Evidence-based medicine is making decisions, clinical

11  decisions, based on scientific evidence.

12  Q.   Where did the principles of evidence-based medicine come

13  from?

14  A.   It came, because it's a relatively new concept over the

15  last several decades that have been used in medicine, this term

16  "evidence based," and it really came from FDA's use and the

17  pharmaceutical industry's use of double-blind randomized

18  controlled clinical trials.  That became the gold standard, not

19  just in the pharmaceutical industry but in medicine.  So

20  knowing whether something works and knowing whether they work

21  from double-blind randomized controlled clinical trials when

22  those trials can be done is the basis for evidence-based

23  medicine, and it ushered in the modern era of medicine.

24  Q.   Are there different levels of evidence, and can you

25  describe them just briefly for the jury?

1  A.   So the United States Preventive Health Task Force was the

2  first to use this concept of different levels of evidence in

3  medicine, and there are three levels of evidence:  The best

4  evidence is called level one.  Level one evidence is evidence

5  that results from double-blinded randomized controlled clinical

6  trials.  That's the best evidence.

7      Level two is evidence that results from clinical trials

8  but that are not necessarily well controlled.  They can be

9  unblinded.  They could be nonrandomized.  They're not the

10  double-blinded randomized controlled clinical trial.

11  Q.   Can I stop you there.  Level two evidence that you just

12  described, possibly not blinded, not controlled, not

13  randomized, can they be used to prove whether a drug is

14  effective?

15  A.   Not generally.

16  Q.   How about level three?

17      THE COURT:  When you say not generally, you mean what,

18  not generally accepted in the scientific community?

19      THE WITNESS:  Your Honor, there are certain rare

20  instances where you can't blind a study and you just can't

21  design a trial.  So I used an example yesterday, comparing a

22  drug versus physical therapy.  You can't blind the physical

23  therapist interacting with the patient.  You're going to know

24  which is which.  So there are limits to how well you can

25  control that trial.  But your Honor is, I think the basis for

1    your question, when it comes to a drug, right, you can do

2    double-blind randomized controlled trials in the vast majority

3    of cases, and that is the evidence certainly the FDA is using.

4    The rest of the medical community, depending on whether you're

5    comparing the other therapies to drugs, that's broader than

6    just the FDA.

7    Q.    Could you define for us or describe level three evidence.

8    A.    Level three evidence is the least strong evidence.  Level

9    three evidence is the result of clinical judgment, so

10   physicians saying, "In my clinical judgment, in my experience,

11   in my twenty years of experience, this drug works."  That's

12   level three.  Or sometimes a group of doctors getting together

13   and sitting around and developing what's called a "consensus

14   statement."  That's level three type evidence.

15   Q.    Does the FDA ever rely on level three type evidence to

16   prove that a drug is effective?

17   A.    No, not generally.

18   Q.    Level three evidence, is that what you refer to as

19   "hypothesis-generating"?  It gives you the idea the drug might

20   work?

21   A.    And then you can do a double-blind randomized controlled

22   clinical trial to get your definitive answer.

23   Q.    Would it be fair to say that levels two and levels three

24   are hypothesis-generating levels of evidence:  Does the drug

25   work?  Then you go to level one to prove whether it works or

1    not?

2    A.    That's correct, sir.

3    Q.    I'm going to ask you about a physician's personal

4    experience with a drug.  If a doctor frequently gives his

5    patient a drug and it appears to work, is that scientific

6    evidence of efficacy?

7    A.    No.  That's anecdotal evidence.  That's not evidence-

8    based.

9    Q.    That's level three evidence?

10   A.    Yes, sir.

11   Q.    I'd like to move to a different subject now, off-label

12   prescribing.  Could you define for us, what is the drug's

13   label?

14   A.    The drug's label is the information that accompanies a

15   drug.  As I mentioned yesterday, the label according to FDA is

16   really the information that FDA -- let me back up for a second.

17   FDA does not approve a drug.  Well, people say, "What do you

18   mean?  Of course FDA approves a drug."  FDA approves a drug for

19   its intended conditions of use.  FDA doesn't just approve a

20   molecule; it approves a drug for a specific intended condition

21   for use with its dosage and how it should be used.  That

22   information of how a drug should be used, for what indications,

23   what diseases, what conditions, what doses, is contained in

24   what's called the drug's "label."  It's that fine print that I

25   talked about yesterday.  Sometimes you see it on an

1  advertisement, right?  It's generally meant for physicians, but

2  a lot of times consumers read that drug label.

3  Q.   Is it legal for a doctor to prescribe a drug for an

4  off-label use?

5  A.   Yes.

6  Q.   And why is that?

7  A.   FDA over the decades has respected the judgment of an

8  individual physician taking care of his or her patient, and

9  that's been long respected by the Federal Food, Drug and

10 Cosmetic Act and the FDA.

11 Q.   Is that in part because of the physician's education,

12 training, and ability to review the scientific evidence-based

13 literature?

14 A.   Once a drug is approved and is legally marketed, the FDA

15 has always taken the position that it does not want to

16 interfere in the patient-doctor relationship.

17 Q.   Is it legal for a drug manufacturer to promote a drug to a

18 doctor for an off-label use?

19 A.   No, and that's a distinction.  So while a doctor can use a

20 drug for an off-label use, the drug sponsor, the drug

21 manufacturer, the drug industry who makes the drug, they cannot

22 promote the drug for an off-label use.  That has been the clear

23 law for decades.

24 Q.   Okay, I want to move to a new subject now, the FDA

25 approval process.  You've been talking about these double-blind

1   randomized controlled trials that a sponsor or a drug company

2   conducts; is that correct?

3   A.   Yes, sir.

4   Q.   And these trials are submitted to the Food and Drug

5   Administration by the drug manufacturer; is that correct?

6   A.   As part of what's called the New Drug Application, the

7   NDA, and they're usually submitted, those protocols are

8   submitted before they're done as part of the IND, the

9   investigation.  So to be able to do the trial, you say in the

10  protocol, "This is what I want to do."  In the IND, when you

11  get the results back, you put those results, and that's part of

12  the NDA, and that gets reviewed to see whether the drug can be

13  approved to get on the market.

14  Q.   This NDA you referred to, it can be thousands and

15  thousands and thousands of pages that the FDA reviews, correct?

16  A.   It could fill many more of those, not even -- it would

17  fill more than those bookcases behind your honor.

18  Q.   Can you compare what the FDA has to review when they look

19  at one of these NDAs compared to what a doctor might learn when

20  he picks up a journal article and reads about the drug.

21  A.   So there are many dedicated professionals, doctors,

22  statisticians, that work on reviewing each NDA, and it takes

23  months.  And they look at the data for each trial.  They don't

24  just rely on what the pharmaceutical company says as its

25  conclusions or its analysis.  FDA doesn't rely on just what's

1    in the published literature, even if that published literature

2    is peer reviewed.  The FDA looks at all the case reports,

3    certainly looks at what the manufacturer is saying, but then it

4    does its own statistics, its own review.  It takes a lot of

5    time.  It's a very thorough review by a lot of dedicated

6    individuals.

7    Q.    Why must there be two favorable DBRCTs to prove efficacy?

8    Why does the FDA require that?

9    A.    The statute, the Food, Drug and Cosmetic Act that gives

10   the FDA all its authority, said when it was enacted "adequate

11   and well-controlled clinical investigations," and there was an

12   S on it.  And it wasn't just because Congress said it that FDA

13   has interpreted it.  Obviously, if you do a clinical trial, you

14   want to make sure that that's the right result, so you want to

15   duplicate it, you want to replicate it, you want to make sure

16   that that is a valid result.  So FDA in the vast majority of

17   cases requires that there be two double-blind randomized

18   controlled clinical trials, again, to duplicate, to make sure

19   the results are replicable.

20   Q.    How long does the FDA approval process take?

21   A.    We've spent the last several decades reducing the amount

22   of time.  FDA is down to -- about twelve months is the review

23   cycle for a standard drug.  On a high-priority drug, a drug to

24   treat a life-threatening condition, FDA can review a drug in as

25   little as six months.

1    Q.    Once the FDA approves the drug, how long is the approval

2    good for?

3    A.    For the drug sponsor, once a drug is approved, it's for

4    the life of the drug.

5    Q.    And could you just explain to us what an FDA Advisory

6    Committee is.

7    A.    When FDA does its analysis of that NDA, in many instances,

8    before it will make its decision, it will call together a group

9    of experts in public view.  It will present the data that's

10   part of that NDA to those experts, and it will ask those

11   experts for their judgment, and FDA will take the judgment and

12   the recommendations of the Advisory Committee into

13   consideration in making its determination.

14          MR. GREENE:  Your Honor, may I approach the witness to

15   show him a document?

16          THE COURT:  Yes.

17          MR. GREENE:  Is it all right if I stand here for a

18   moment?  I'll keep my voice up, your Honor.

19          Counsel, I've shown him what we've premarked as

20   Exhibit 207.

21   Q.    Doctor, I just want you to look at that just for a moment,

22   and can you identify it?

23   A.    This is a document that's labeled "FDA FOI documents for

24   Neurontin NDA approval."

25   Q.    Okay.  And that document contains the medical-statistical

1   review that was conducted by the FDA during the FDA approval

2   process for Neurontin?

3   A.   So I am turning to --

4   Q.   Let me direct your attention to Page 22 of Exhibit 207.

5   A.   I think I'm on Page 22.  It's not labeled as Page 22.  I

6   have a Bates number.  Should I read that Bates number?

7   Q.   Can you identify that page?

8   A.   So that page, the title is "Division of Neuropharmacological

9   Drug Products, Combined Medical-Statistical Review."  It's for

10  a NDA by Parke-Davis Pharmaceuticals for the brand name

11  Neurontin, the generic name gabapentin.

12          THE COURT:  Look on the screens.  Do you all have them

13  up?  Okay.

14  Q.   And if you turn to Page 142 of that document.

15  A.   Can I just ask that my screen be turned on or if I may

16  turn it on?  I have this, but I just want to make sure.

17          THE COURT:  Is it not on?

18          THE WITNESS:  There we go.  Thank you, your Honor.

19  It's now on.

20  Q.   Page 142, is that signed by the appropriate FDA officials?

21  A.   The page that's on this screen, this page is signed by

22  Cynthia McCormick and Russell Katz, Rusty Katz.  They're the

23  medical review officers and the supervisor as well as the

24  mathematical statistician.  Those are who would sign a combined

25  medical-statistical review of a drug under NDA review, yes,

1    sir.

2              MR. GREENE:  Your Honor, we offer this as Kaiser's

3    Exhibit No. 207.

4              MR. KENNEDY:  No objection, your Honor.

5              THE COURT:  All right.

6              (Plaintiff Exhibit 207 received in evidence.)

7              MR. GREENE:  Exhibit 9, Counsel.

8    Q.   Let me show you this document, Doctor.  Do you recognize

9    this document?

10   A.   Yes, sir.

11   Q.   Is that the FDA approval letter for the initial NDA

12   application for adjunctive treatment of partial seizures with

13   and without secondary generalization?

14   A.   And it's also with epilepsy, yes, yes, sir.

15   Q.   Effectiveness had been established, according to the FDA,

16   through three double-blind randomized controlled trials up to a

17   maximum effective dose of 1,800 milligrams?  Is that what that

18   document indicates?

19   A.   Yes.  Let me just turn so I've flipped through the entire

20   document, if I may.

21             (Witness examining document.)

22   A.   Yes, sir.

23   Q.   And the approval date from the FDA is for December 30,

24   1993; is that correct?

25   A.   Yes, sir.

Page 34

1   Q.   Thank you.

2          THE COURT:  So remember I suggested possibly making a

3   timeline just so you can place events that happened.  Don't

4   forget, they're going to go over a decade, so just to think

5   about what's going on here.

6          MR. GREENE:  I just want to offer it and have it

7   marked as Plaintiff's Exhibit 9.  Your Honor, as you know,

8   these are going out of order, but we'll backfill the numbers.

9          (Plaintiff Exhibit 9 received in evidence.)

10         THE COURT:  So just to state it straight up, what

11  happened in 1993?

12         THE WITNESS:  Dr. Robert Temple, the head of the

13  Office of New Drug Evaluation, approved Parke-Davis' drug

14  Neurontin for a specific indication.  Should I give that

15  indication, your Honor?

16         THE COURT:  Yes.

17         THE WITNESS:  So it is for adjunctive therapy, and I'd

18  be happy to explain that.  Let me get it exactly.  It says,

19  "Neurontin/gabapentin," same name, "is indicated as adjunctive

20  therapy in the treatment of partial seizures with and without

21  secondary generalization in adults with epilepsy."  Let me go

22  through that --

23         THE COURT:  You can state that in plain English for

24  the rest of us.

25         THE WITNESS:  Yes, your Honor.  Neurontin is indicated

1    to be used in -- adjunctive therapy means to be used as an

2    add-on, not alone, adjunctive as in add-on -- in the treatment

3    of partial seizures, not all seizures, partial seizures.

4    Partial seizures are a type of seizures where a part of the

5    brain is excessively electrically activated.  So it is to be

6    used with other drugs as an add-on to other drugs for partial

7    seizures.  The rest of it is less material.  Sometimes those

8    partial seizures can result in -- they change over time.  The

9    patient has partial seizures in the first few minutes, and then

10   they result in broader seizures of the entire body, but this is

11   a specific type of seizure.  It's to be used as an add-on for

12   those patients.

13   Q.   Is Neurontin an antiepileptic drug, or AED?

14   A.   Yes.  That's the class of drugs to which Neurontin,

15   gabapentin, same thing, belong.

16   Q.   Do all AEDs have the same properties?

17   A.   No.

18   Q.   At the time the FDA approved Neurontin, did Neurontin have

19   similar properties to other AEDs that had previously been

20   approved by the FDA?

21        MR. KENNEDY:  Objection, your Honor.  Beyond the

22   designated scope to talk about FDA procedures.

23        THE COURT:  Without going through the expert report, I

24   don't know.  Is this within --

25        MR. GREENE:  Just one or two questions.  I think this

1    is in the report.  We've talked about mechanism of action.

2          THE COURT:  I'm not going to take the time, and it's

3    fairly harmless.  I'll allow it.

4    A.   No.  At the time that this application was being reviewed

5    and approved, Neurontin's mechanism of action was unknown, so

6    it was not of the same -- the mechanism was not known to be of

7    the same class as any of the other drugs as AEDs.

8          THE COURT:  You just didn't know one way or another?

9          THE WITNESS:  As you can see in this document, the

10   mechanism is unknown.  There was some information about the

11   chemical structure and the chemical pharmacology, but it was

12   unknown.  And I think your Honor's question is, yes, the FDA,

13   the medical community, just didn't know at the time.

14   Q.   And when you say just didn't know mechanism of action, you

15   didn't know how it worked; is that right?

16   A.   That mechanism of action is -- if you look at Page 3 of

17   this document, under the term, if you go halfway down the page,

18   under Clinical Pharmacology Mechanism of Action, the first

19   sentence --

20         THE COURT:  You know what, I think we're going off

21   here beyond where the report is.  I don't have it in front of

22   me, I'm about to get it, but let's just -- we need to keep this

23   pace up, all right?

24   Q.   Supplemental New Drug Application, an SNDA, just very

25   briefly, what is that?

1    A.    So if a manufacturer wants to amend what's in the drug

2    labeling, it submits an S, supplemental NDA.

3    Q.    Now, did the defendant in this case, did Parke-Davis file

4    an SNDA for monotherapy and high dosage?

5    A.    Yes, Parke-Davis submitted a supplemental NDA for use of

6    Neurontin for monotherapy, for use alone, not adjunctive

7    therapy, for partial seizures, and also an increased dose than

8    was approved by this labeling.

9    Q.    Let me show you what we've premarked as Exhibit 91 and ask

10   you if you recognize that document, Doctor?

11   A.    I do, sir.

12   Q.    And that is the SNDA that sought monotherapy approval and

13   doses above 1,800; is that correct?

14   A.    That's correct.

15   Q.    I just want to talk about the part of the application that

16   sought approval for doses above 1,800.  Did the defendants seek

17   a labeling change to raise the effective dose to 3,600

18   milligrams a day?

19   A.    Yes.

20   Q.    To a maximum dose of 4,800 milligrams a day?

21   A.    Yes.  That's stated on the first page of this document.

22   Q.    Okay.  And with regard to just that application, increased

23   dose, what did the FDA say?

24   A.    So if you turn to Page 2, the last paragraph going over to

25   Page 3, FDA said that they were not able to grant changes in

1    the labeling statements with regard to the request of

2    Parke-Davis.

3    Q.   On Page 3, did the FDA say, quote, "The evidence from the

4    controlled trials fails to provide evidence that higher doses

5    of Neurontin are more effective than recommended"?

6    A.   Yes.   Those words are on Page 3.

7    Q.   If a patient took a higher dose above 1,800 milligrams,

8    would he get any benefit?

9         MR. KENNEDY:   Objection, your Honor.   This is not an

10   efficacy expert.   He's expressly told us in deposition he

11   wouldn't be talking about it.

12        MR. GREENE:   It's just that question, your Honor.

13        THE COURT:   Well, no, sustained.   If it's not in a

14   report, it's going to apply to both sides.

15   Q.   Dr. Kessler, given that FDA rejection, would it be

16   appropriate for Parke-Davis to promote Neurontin to physicians

17   as effective at dosages above 1,800 milligrams?

18   A.   It would not, sir.

19   Q.   Would FDA consider promotional materials that claimed

20   Neurontin was more effective at doses above 1,800 milligrams to

21   be false?

22   A.   Yes.

23   Q.   Now, I'd like to move on to another SNDA that the

24   defendants filed.   The topic is neuropathic pain.   In August,

25   2001, did Pfizer file an application for a supplemental --

1          THE COURT:  So just to understand, you put in No. 9

2   and No. 91?  You put in 91?

3          THE CLERK:  Not yet.

4          MR. GREENE:  Thank you, your Honor.  The plaintiff

5   would offer No. 91, your Honor.

6          MR. KENNEDY:  No objection.

7          (Plaintiff Exhibit 91 received in evidence.)

8   Q.   In August of 2001, did Pfizer file another application, a

9   supplemental NDA for Neurontin?

10  A.   Yes.

11  Q.   And that was for neuropathic pain?

12  A.   The management of neuropathic pain.

13  Q.   And you've defined neuropathic pain for us as pain caused

14  by nerve injury?

15  A.   As injury within the nervous system generally, yes.

16  Q.   Are there different etiologies or reasons that would cause

17  various types of neuropathic pain?

18         MR. KENNEDY:  Objection, your Honor.  Again, beyond

19  the scope of the report.

20         THE COURT:  What is neuropathic pain?  Like what?

21         THE WITNESS:  Neuropathic pain can result from

22  shingles.  HIV can cause it, certain kinds of chemotherapy,

23  chemotherapy drugs.  They injure the nerves themselves.

24  Q.   So do drugs that can treat one type of neuropathic pain

25  automatically work for another type of neuropathic pain?

1    A.    No.

2    Q.    At the time Pfizer filed its supplemental NDA for

3    neuropathic pain, had the FDA decided whether all neuropathic

4    pain, regardless of what disease or condition caused it, could

5    be treated the same way?

6    A.    There was discussion within the agency, and there was also

7    discussion with Parke-Davis at the time about that question.

8    Q.    What studies did the defendants submit to support their

9    application for neuropathic pain?

10   A.    They submitted two trials in a disease called postherpetic

11   neuralgia, they submitted two trials for a condition called

12   diabetic peripheral neuropathy, and they submitted one trial

13   for a mixed set of conditions they call mixed neuropathic pain.

14   Q.    In laymen's terms, can you tell us, what is DPN, or

15   diabetic peripheral neuropathy?

16   A.    It's the nerve injury that results from diabetes.

17   Q.    Based on the materials you reviewed, did the two DPN

18   studies appear to be positive?

19   A.    According to Pfizer, the documents that I reviewed,

20   Pfizer's judgment was that one was positive and one was

21   negative.

22   Q.    Can you tell the jury just briefly, what is a pre-NDA

23   meeting that the FDA will have with a manufacturer?

24   A.    So FDA, as it's getting ready to review all those

25   documents, or somewhere along that process, FDA will sit down

1    with the drug sponsor, the drug manufacturer, discuss with the

2    drug company its questions, and give the drug company advice on

3    the design of clinical trials.  The goal is to make the drug

4    development process more efficient.

5    Q.   Was there a pre-NDA meeting with Pfizer with regard to

6    their neuropathic pain application?

7    A.   Yes.

8         MR. GREENE:  I'm sorry.  I got that one out of order,

9    your Honor.

10   Q.   Let me show you what we marked as Exhibit 200.  Do you

11   recognize that document, and can you identify it for us?

12   A.   Yes.  This is a document, and if you turn to Page 2, these

13   are referred to as the official minutes of that meeting.  I've

14   seen a number of different versions of these minutes.

15   Q.   I want to direct your attention to Page 4 of that exhibit.

16   I want you to tell us what the FDA's --

17        THE COURT:  Is there way of zooming in because it's a

18   little hard to read?

19        MR. GREENE:  Exhibit 200, Page 4.

20        THE COURT:  Beautiful, all right.

21        MR. GREENE:  Do you have it, your Honor?

22        THE COURT:  Yes.

23   Q.   Do you have it, Dr. Kessler?

24   A.   I have the very top of that Page 4 of the document.  It's

25   Page 2 of the minutes on top.

1   Q.   Correct.  Could you tell the jury, what did the FDA tell

2   Pfizer with regard to their application for Neurontin for

3   management of neuropathic pain?

4   A.   So whoever is controlling, if you could move the screen

5   down, still stay on that page, but if you can move down to the

6   heading, the "FDA Response," and let's start with the first

7   paragraph under that.  It says, "The general neuropathic pain

8   indication cannot be granted for Neurontin based on the

9   clinical trials in painful diabetic peripheral neuropathy and

10   postherpetic neuralgia," and it gives the reason.  It says

11   these two conditions are distinct, there's different

12   pathophysiology, and therefore they will be treated as two

13   separate indications.  You can't go in for a broad neuropathic

14   pain indication.  You have to go in specifically for

15   postherpetic neuralgia and diabetic peripheral neuropathy.

16   Q.   Okay, what was the problem or was there a problem that

17   Pfizer had with regard to the DPN?

18   A.   So if you look at the next paragraph, it says the drug

19   sponsor, Parke-Davis, must provide evidence of efficacy

20   replicated in a second study for DPN, and that trial must be

21   twelve weeks in length.  Remember I said that there were two

22   trials that Pfizer had undertaken, and according to its

23   judgment and in discussions with the FDA, one was positive, one

24   was negative.  And what the FDA is saying here is:  You need to

25   replicate.  You need two adequate and well-controlled clinical

Page 43

1    trials for DPN, and therefore you must do -- we must have a

2    second replicated positive result, and that trial must be

3    twelve weeks in length.

4    Q.   Okay.  Could you tell us, what is an FDA Advisory

5    Committee?

6    A.   I think I mentioned an FDA Advisory Committee is a group

7    of outside experts that will come give opinions to FDA on

8    either the specific data in an NDA or to help FDA answer

9    certain important scientific questions.

10   Q.   All right.  And if you turn to the very next page of that

11   exhibit, in the third paragraph down, did the FDA offer that

12   Advisory Committee meeting to Pfizer where it says, "The

13   division will be holding an Advisory Committee meeting in the

14   fall to discuss neuropathic pain issues in detail with the

15   advisory panel members"?

16   A.   Yes.  The FDA said it was planning to convene those

17   outside experts to help discuss the issues involved in

18   neuropathic pain.

19   Q.   And did Pfizer go to that meeting, take advantage of it?

20   A.   I believe the answer to that question is "no."

21   Q.   Now, did you review some minutes of a meeting that

22   occurred --

23           THE COURT:  Just get us in a timeline.  What year was

24   it that it was rejected or at least not going forward on the

25   diabetic neuropathy?

1    THE WITNESS:  Your Honor, this is a meeting that is

2  dated May 14, 2001, where FDA tells Pfizer it will need another

3  study to be submitted.  It doesn't reject it because there's no

4  SNDA in front of the agency, but the agency is clearly

5  signaling Pfizer at this time that it will not approve for DPN

6  without another study.  So it was not rejected because there

7  wasn't an application.

8  Q.   Let me show you what we've marked as Exhibit 173.  These

9  are Pfizer consultant meeting minutes dated September 6, 2001,

10  held at the Crowne Plaza in Ann Arbor, Michigan.  Have you seen

11  that document before?

12  A.   I've seen a number of versions of these minutes.  The

13  answer is "yes."

14  Q.   And you've reviewed the minutes?

15  A.   I have, sir.

16  Q.   Okay.  Did Pfizer convene a group of experts at the Crowne

17  Plaza?

18  A.   Yes.  This is Pfizer's own meeting.  This is not a meeting

19  with FDA.  This is its bringing in experts to advise the

20  company.

21  Q.   Can I direct your attention to the Executive Summary

22  there.

23  A.   Yes, sir.

24  Q.   Did Pfizer's experts have an opinion that the clinical

25  trials Pfizer had conducted constituted adequate evidence of

1    Neurontin's efficacy for broad neuropathic pain?

2    A.   Yes, their experts did have an opinion, and that opinion

3    was that based on the preclinical and clinical data to date,

4    that evidence was not convincing to support a broad neuropathic

5    pain claim.  It's in the first sentence under that Executive

6    Summary.

7    Q.   And one of those experts is a former official of the Food

8    and Drug Administration; is that correct?

9    A.   Yes.  If you look under "Attendees," one of the

10   consultants was Paul Leber, who previously headed the Division

11   of Neuro-Pharm Drug Products at FDA.

12   Q.   Can you turn to the second page of that exhibit.

13   A.   Yes, sir.

14   Q.   I'd like to direct your attention to the third, fourth,

15   and fifth paragraphs of that.

16   A.   Yes, sir.

17   Q.   Did Pfizer's experts have an opinion as to whether the

18   results of particular studies of theirs supported the broad

19   application for neuropathic pain?

20   A.   Yes, Pfizer's experts had an opinion, and that opinion, as

21   reflected in the Executive Summary, was those studies do not

22   support the broad claim; quote, "They provide evidence contrary

23   to a broad indication."  That's in the Executive Summary on the

24   first page, and those three bullets that you refer specifically

25   go into the studies that show that there is not evidence --

1   that's evidence against a broad neuropathic claim.

2   Q.   Okay.  And, finally, with regard to this meeting, did the

3   experts find that the evidence for DPN is confounded by the

4   negative DPN study?

5   A.   Yes.  If you move further down Page 2 -- oh, actually, if

6   you move back to Page 1, sir, those exact words were used in

7   the Executive Summary under the second paragraph, "Evidence for

8   DPN, diabetic peripheral neuropathy, is confounded by the

9   negative DPN study."

10  Q.   Did Pfizer ever submit their SNDA, Supplemental New Drug

11  Application, for neuropathic pain?

12  A.   Yes, sir.

13  Q.   Did they withdraw their request for a broad neuropathic

14  pain application?

15  A.   After they submitted -- as I understand the timeline,

16  after this meeting -- sorry.  There was a submission of another

17  SNDA for broad neuropathic pain, and then that SNDA, that

18  supplemental NDA, was amended subsequent to that supplemental

19  NDA being filed.

20  Q.   You mentioned you had seen a couple of versions of the

21  minutes of the Crowne Plaza meeting, and I want to show you

22  Exhibit 188.  Would you say, is this the other version you had

23  seen?

24          (Witness examining documents.)

25  A.   Yes, this is another version, and I've seen this.

Page 47

1          MR. GREENE:  Your Honor, Kaiser would offer both of

2    these exhibits, Nos. 173 and 188.

3          MR. KENNEDY:  No objection, your Honor.

4          (Plaintiff Exhibits 173 and 188 received in evidence.)

5          MR. GREENE:  And we would offer Exhibit 200, your

6    Honor.

7          MR. KENNEDY:  No objection there either.

8          (Plaintiff Exhibit 200 received in evidence.)

9    Q.   Let me show you what we've marked as Exhibit 195.  Have

10   you seen this document?

11   A.   Yes, I -- just give me one second, sir.

12          (Witness examining document.)

13   A.   Yes, I have, sir.

14   Q.   And is this the FDA approval of Pfizer's NDA for

15   postherpetic neuralgia dated May 24, 2002?

16   A.   For the management of postherpetic neuralgia, it is.  You

17   can tell the date.  You have to turn to the very last page.

18   It's on the electronic signature page.

19   Q.   Why did the FDA refuse an indication for the management of

20   neuropathic pain concerning PHN?

21   A.   Because, I mean, FDA was, I mean, concerned about any drug

22   being labeled for neuropathic pain or giving any suggestion

23   that it be used for neuropathic pain; and FDA wanted to, I

24   believe, wanted to be very specific and reflect what the data

25   supported.  So the data supported use in treating postherpetic

1    neuralgia.  Neuralgia is pain, but FDA is very careful in the

2    words that are used on the label.  So if you say "in the

3    management of the neuropathic pain associated with postherpetic

4    neuralgia," would that lead someone to believe that it's useful

5    in other types of neuropathic pain?  So FDA is very precise.

6    Q.   In this Pfizer application for Neurontin to treat or for

7    the management of PHN, did Pfizer ask FDA to approve doses

8    above 1,800 milligrams?

9    A.   Could you just repeat your question.

10   Q.   Sure.  Did Pfizer seek the FDA approval for doses above

11   1,800 milligrams?

12   A.   Yes.  In reviewing the various labels that went back and

13   forth, Pfizer had asked for doses above 1,800.

14   Q.   And after the FDA looked at those clinical trials, what

15   did the FDA find with regard to doses above 1,800 milligrams?

16   A.   If you give me one second, I just want to turn to the -- I

17   want to be precise here.  I can't find the exact page.

18        (Witness examining document.)

19   A.   So if you turn in this exhibit to Page 31 of the label, it

20   says under "Postherpetic Neuralgia" -- okay, this is under the

21   doses -- there are a number of sentences, and it starts off,

22   the first sentence really talks about where you can start

23   therapy.  So therapy can be started at a single dose of 300 or

24   600 or 900 milligrams per day, on day one, day two, and day

25   three.  That's how it would be started.  And then the second

1   sentence, and I think this is the answer to your question is,

2   the second sentence says, "The dose can subsequently be

3   titrated up as needed for pain relief to a daily dose of

4   1,800 milligrams (divided three times a day)."  So it says the

5   dose can subsequently be titrated up to a dose of 1,800.  So

6   you can start 300; you can go up to 1,800.

7        And then there's other clinical pharmacology information

8   in the next two sentences that says clinical studies

9   demonstrate efficacy over a range of doses, from 1,800 to

10  3,600, but additional benefit of using doses greater than 1,800

11  was not demonstrated.  So the instructions, the directions for

12  use is, you can start at 300, you can go up to 1,800.  Above

13  that, while there may be efficacy, there's no increased

14  efficacy above 1,800.

15            THE COURT:  And, again, postherpetic neuralgia, is

16  that just shingles?

17            THE WITNESS:  Yes.  That's the pain that's

18  associated -- so let me, if I may, shingles is a condition from

19  chicken pox.  Some patients, somewhere between 5 and

20  15 percent, go on to have pain for an extended period of time.

21  The older you are, the greater the risk you'll have.  It's

22  almost a complication, your Honor, of shingles.  So it's

23  postherpetic, post-shingles neuralgia pain.

24            THE COURT:  So you'll hear that mentioned a lot, PHN,

25  so that's what they're always referring to

Page 50

1          MR. GREENE:  I offer Exhibit 195, your Honor.

2          THE COURT:  We might actually at some point -- it's

3    taken me five years to learn the abbreviations -- so just maybe

4    have a chart so people remember AED, PHN, all these things.

5          MS. NUSSBAUM:  We will do that, your Honor.

6          MR. CHEFFO:  That's a good idea, your Honor.  We'll

7    work together.

8          (Plaintiff Exhibit 195 received in evidence.)

9    Q.   Could you tell us what the Division of Drug Marketing,

10   Advertising and Communication is?

11   A.   Let me address another acronym, all right?  This is DDMAC.

12         THE COURT:  By the end of this, you won't believe how

13   much you're going to have.

14         THE WITNESS:  I'm sorry, your Honor, for doing that.

15         THE COURT:  So DD --

16         THE WITNESS:  It's the Division of Drug Advertising,

17   Marketing and Communications.  So it's within the center at FDA

18   that deals with drugs, and its responsibility is to oversee the

19   advertising and promotion of drugs.

20         MR. GREENE:  Excuse me, your Honor.  I think this

21   morning I gave you two copies of that, one that had a sticker

22   on it and then a marked-up copy?

23         THE COURT:  You think I've still got it, huh?  Good

24   luck to you.

25         MR. GREENE:  I've been searching for it.

1      THE COURT:  No, here it is.  I think this is it.

2      MR. GREENE:  Thank you.

3   Q.   Let me show you what we've marked as Exhibit 190?

4      THE COURT:  You know, if they're not objected to, you

5   can just throw them up on the machine so you don't have to --

6      MR. KENNEDY:  No objection.

7   Q.   Exhibit 190.

8      (Witness examining document.)

9   Q.   Now, is this a letter from the FDA's DDMAC division that

10  you just defined to the jury to Pfizer?

11  A.   It's from Laurie Lenkel to Pfizer, yes, and it's by the

12  Division of Drug Marketing, Advertising and Communications.

13  Q.   I wanted to direct your attention to the first page.  Do

14  you have that in front of you?

15  A.   Yes, sir.

16  Q.   And dropping down a little bit, do you see the paragraph

17  "Overstatement of Efficacy"?  Do you have that?

18  A.   Yes, I do.

19  Q.   And was there a statement there made with regard to

20  promotional materials?  Could you read that to the jury.

21  A.   The first sentence of the last paragraph, "Promotional

22  materials are false or misleading if they state or imply that a

23  drug is better, safer, or more effective than has been

24  demonstrated by substantial evidence."

25  Q.   Okay.  And does the next sentence indicate that

1    Neurontin -- well, why don't you read the next sentence to the

2    jury, please.

3    A.    "Your proposed materials contain the above claims and

4    related graphic representations that suggest that Neurontin has

5    been proven to provide significant reductions in pain in the

6    majority of patients when such has not been demonstrated by

7    substantial evidence."

8    Q.    Then I'd like to direct your attention to the next page,

9    the heading, do you see it about three-quarters of the way

10   down, "Misleading Dosage Information"?

11   A.    I do.

12   Q.    And could you read that to the jury.

13   A.    So the first paragraph talks about what is being stated by

14   the drug sponsor, by Pfizer, wants to state in its materials,

15   and it says, the second sentence -- the first sentence says,

16   "Efficacy and safety of Neurontin were demonstrated at doses of

17   1,800 to 3,600 milligrams a day, with comparable effects across

18   the dosing range.  In clinical trials, the efficacy and safety

19   of Neurontin in the management of PHN," postherpetic neuralgia,

20   "were demonstrated at doses of 1,800 to 3,600 milligrams per

21   day."

22   Q.    What does that mean when it says it was demonstrated at

23   those doses for the management of PHN?

24   A.    FDA would require that demonstration is by adequate and

25   well-controlled clinical trials.

Page 53

1    Q.    Dropping down to the paragraph just below that second

2    sentence, would you read that to the jury.

3    A.    I'm sorry, which paragraph?

4    Q.    It begins with "The above claims."

5    A.    It says, "The above claims along with the chart and the

6    visual aid titled 'Target doses by week' depict dosing

7    information from an 8-week clinical trial.  While Neurontin was

8    studied at doses up to 3,600 milligrams per day, the PI," this

9    is the package insert, the drug label as I describe,

10   "recommends a titration up to 1,800 milligrams a day as needed

11   and clearly states that additional benefits of using doses

12   greater than 1,800 milligrams per day were not demonstrated.

13   Further, the adverse event profile of the drug increased as

14   dosage increased above 1,800 milligrams per day."  So that last

15   sentence says the number of adverse events increased at doses

16   above 1,800 milligrams per day.

17   Q.    Doctor, let me see if I can kind of put this in laymen

18   terms and sort of sum it up.  Was the gist of this letter that

19   claims that Pfizer was making in some promotional materials

20   that Neurontin was effective at doses above 1,800 milligrams

21   were false and misleading because their clinical trials had

22   shown no additional benefits of using doses greater than

23   1,800 milligrams?

24   A.    Yes, and if you turn to the next page, the first new

25   sentence says, "In fact, 1,800 milligrams per day represents

1    the maximum dose recommended in the PI," the package insert,

2    the drug label.

3    Q.    Thank you.

4          MR. GREENE:  Exhibit 190, your Honor.

5    Q.    I think during the past two days you've testified that the

6    FDA approved Neurontin for partial seizures as adjunctive

7    therapy and for the management of postherpetic neuralgia; is

8    that correct?

9    A.    Yes, sir.

10   Q.    In doses up to 1,800 milligrams; is that correct?

11   A.    Yes, sir.

12   Q.    Did the FDA approve Neurontin to be used for any other

13   condition?

14   A.    No, sir.  (Pause.)  It also approved the pediatric use,

15   just a footnote, the pediatric use for partial seizures.

16   Q.    Okay, Doctor, were you aware in 2004 that Parke-Davis pled

17   guilty -- strike that.  Were you aware in 2004 that

18   Warner-Lambert pled guilty to criminal violations of the Food,

19   Drug and Cosmetic Act due to off-label promotion?

20   A.    Yes, I'm aware of that.

21   Q.    And in preparing your opinions today, did you see

22   documents that indicated when the FDA first became concerned

23   with the defendant's off-label marketing?

24   A.    I saw documents when FDA became -- when FDA is indicating

25   awareness.  I can't testify that it was the first, but I can

1   testify I saw documents where FDA was concerned about off-label

2   promotion.

3   Q.   Let me show you what we've premarked as Exhibit 87 and ask

4   you if you'd take a look at that for a moment, and then tell

5   us, do you recognize the document?

6   A.   Yes, I do.

7   Q.   Could you describe the document for us.

8   A.   This is a document from Dr. Leslie Frank, who is from

9   DDMAC, the Division of Drug Marketing, Advertising and

10  Communications at FDA, to Parke-Davis dated July 19, 1996.  And

11  FDA says, "FDA is concerned that Parke-Davis may be promoting

12  Neurontin for off-label uses."  It defines that as any use

13  beyond the FDA-approved indications, and that FDA is initiating

14  an inquiry that will focus on these concerns, and that that

15  off-label use that it was investigating, those promotions were

16  included, but not limited to, chronic pain, bipolar disorders,

17  and other psychiatric conditions.

18  Q.   And did the FDA request certain categories of documents

19  and specifications from the defendant?

20  A.   Yes.

21  Q.   And I'd like to direct your attention to Specifications 12

22  and 13.  Do they request documentation with regard to the

23  defendant's relationship with certain physicians?

24  A.   Yes.  On Page 6 of the document, certain physicians,

25  certain doctors are -- information about the company's

Page 56

1   relationship, the financial information, compensation,

2   et cetera, with certain doctors is requested.

3   Q.   And one of those doctors was Dr. Michael McLean; is that

4   correct?

5   A.   His name is listed, yes, sir.

6   Q.   And another one was a Dr. Mellick.  What's Dr. Mellick's

7   first name?

8   A.   Gary Mellick, M-e-l-l-i-c-k.

9   Q.   Why is the FDA asking these questions about what the

10  defendant's relationships were with these physicians?

11  A.   So when FDA's authority --

12       MR. KENNEDY:  Object, your Honor.  Lack of foundation.

13  He wasn't there at this time.  He may know generally, but I

14  don't think he can talk to this letter.

15       THE COURT:  Why don't you lay a foundation.

16  Q.   Does the FDA have a concern if a physician is promoting a

17  drug off-label for a drug company?

18  A.   The answer is "yes."

19  Q.   Let me give it one at a time.

20  A.   Yes.

21  Q.   Can a drug company pay a physician to promote their drug

22  off-label?

23  A.   That would be considered violative of the Act.

24  Q.   So a drug company is prohibited from promoting off-label,

25  correct?

1   A.   Yes.

2   Q.   And they can't hire a physician to do it for them and get

3   around the law that way, can they?

4   A.   Promotion, no.

5   Q.   So does the FDA have a concern if drug companies are

6   paying physicians money to promote their drugs off-label?

7   A.   Yes.

8   Q.   And is the FDA interested in what the financial

9   relationships are between drug companies and physicians that

10  they pay to speak if they're promoting off-label in those

11  speeches?

12  A.   It's evidence that the company is involved.

13  Q.   And can you tell us then, why would the company be

14  interested in the financial relationship between Dr. McLean and

15  Dr. Mellick and the defendant?

16  A.   You asked the question the company or --

17  Q.   Why would the FDA be concerned or want information about

18  the financial relationship between the defendant and

19  Dr. Mellick?

20       MR. KENNEDY:  Objection.  Lack of foundation.

21       THE COURT:  Overruled.

22  A.   If I'm a physician, and in my independent judgment I have

23  nothing to do with a drug company, and I want to talk about a

24  drug, I am free to do that.  If, however, I am being paid by

25  the drug company, I cannot promote off-label uses.  There is a

1  footnote that needs to be added because there's a question of,

2  is it promotion or is it educational?  And there's been a lot

3  of discussion, but if you're paid by a pharmaceutical company,

4  and if you're a doctor paid by a pharmaceutical company, you

5  cannot promote an off-label use.

6        MR. GREENE:  I just have one or two more questions and

7  I'll complete Dr. Kessler's testimony.

8  Q.   Doctor, you started off your testimony by telling us that

9  the FDA was the most important consumer protection agency.  Do

10  you remember that?

11  A.   That's my judgment, yes.

12  Q.   And you've testified concerning the off-label promotion of

13  drugs; is that right?

14  A.   Yes, sir.

15  Q.   And you told us that drug companies are prohibited from

16  doing that, but physicians are allowed to write off-label; is

17  that right?

18  A.   Yes, sir.

19  Q.   If physicians are free to prescribe, how does the FDA

20  off-label rule protect patients and health plans that pay for

21  prescriptions?

22  A.   The judgment that it's okay for doctors to use his or her

23  judgment to prescribe a drug but it's not okay for a drug

24  company to promote an off-label use is really the result of

25  five, six decades of United States policy, right, that that

1    balance is the most appropriate balance to protect patients.

2    It allows a doctor to use their judgment, take care of a

3    patient.  And this is key:  The reason why the FDA has said

4    pharmaceutical companies can't promote or those being paid by

5    pharmaceutical companies can't promote an off-label use is that

6    if you do that, if you allow that to happen -- and it was

7    recognized back in 1962 when the law was written, the new drug

8    amendments, Senator Kefauver recognized it -- if you allow a

9    drug company to promote off-label uses, what will happen is,

10   the drug company will study the drug in a very narrow

11   indication, and that narrow indication will be supported by the

12   science.  Then if you allow the drug company to promote

13   off-label use, and without that science, the drug company not

14   doing the clinical trials can sell drugs for other uses, and

15   you don't have that scientific basis.  So if you allow a drug

16   company to promote for off-label uses, you're basically getting

17   around the requirement that all drugs be scientifically tested.

18   So if you allow the promotion of off-label uses, you're in

19   essence dismantling the whole drug regulatory apparatus.

20   That's why there's balance.  You allow the doctor to use his or

21   her individual judgment, but you have a rule against a

22   pharmaceutical company promoting off-label uses.  That's been

23   the law over the last several decades.

24              MR. GREENE:  I offer Exhibit 87.

25              Thank you, Doctor.  Your witness.

1          (Plaintiff Exhibit 87 received in evidence.)

2          MR. KENNEDY:  Is it all right to proceed, your Honor?

3          THE COURT:  Yes.

4     CROSS-EXAMINATION BY MR. KENNEDY:

5     Q.   Good morning, Dr. Kessler.  I'd introduce myself except we

6     already know each other, correct?

7     A.   Yes, we do.  It's a pleasure, sir.

8     Q.   Up until now, our contacts have been social, and while

9     this isn't exactly social, I will try to keep it sociable,

10    okay?

11    A.   Thank you, sir.

12    Q.   I would like to talk for a few minutes about what your

13    assignment from the Kaiser lawyers in this case has or has not

14    included.  As you explained to us yesterday, and correct me if

15    I'm wrong, they gave you the assignment of explaining how the

16    FDA works, what the standards are, and how a company interacts,

17    and some of those interactions between Parke-Davis and the FDA.

18    Would that be an accurate summary of what you've been asked to

19    do?

20    A.   Generally, yes, sir.

21    Q.   Okay.  And in terms of making sure I understand, what the

22    lawyers didn't ask you to do is, you also told us yesterday,

23    they didn't ask you to talk about whether the drug Neurontin

24    actually works or doesn't work?

25    A.   Independent of what FDA saw, that's correct, sir.

1    Q.   Approximately how many hours have you spent on this case

2    since the Kaiser lawyers first hired you?  A ballpark is fine.

3    A.   My guess, dozens of hours, but I don't have my records in

4    front of me, but it would be in the dozens is my guess.

5    Q.   Fifty, seventy-five?

6    A.   Again, I don't have my records in front of me.

7    Q.   Okay.  Well, whatever number of hours it is, you haven't

8    at Kaiser lawyers' direction spent any of that time talking to

9    any Kaiser physicians, have you?

10   A.   No.  I've looked at the correspondence and the documents

11   that are from FDA and Pfizer.  That's correct, sir.

12   Q.   And, for example, if I were to show you a list of what

13   Kaiser says have been all of the doctors who wrote Neurontin

14   prescriptions for them, your assignment in this case wouldn't

15   allow you to go through and say, "I think this doctor was

16   tricked and this doctor wasn't tricked."  That just wasn't part

17   of what you were asked to do in this case, was it?

18   A.   It was not part of what I was doing.  It didn't have to do

19   with the company's relationship with the FDA or what FDA

20   thought.

21   Q.   And likewise you weren't asked to talk to any members of

22   any Kaiser pharmacy and therapeutics committees to try to

23   determine why they did or didn't do something with regard to

24   Neurontin on one of their formularies?

25   A.   My review was based on FDA documents and Pfizer

1    documents --

2    Q.    Okay.  And you mentioned --

3    A.    Primarily.

4    Q.    Excuse me.  I didn't mean to interrupt.

5    A.    I just wanted to add, Pfizer documents and FDA documents

6    primarily.

7    Q.    And you mentioned placebo this morning.  It's also been

8    referred to sometimes as sugar pills and the placebo effect.

9    A.    Yes, sir.

10    Q.    And the placebo effect is, as I understand it, that even

11    though a drug, for example, isn't making a patient's pain

12    actually get any better, the patient thinks it's improving?

13    A.    Oh, no, sir.

14    Q.    Okay.  Well, you tell us, what is the placebo effect?

15    A.    So -- and I think that's the -- a placebo, your pain is --

16    I mean, if you respond to a placebo, I mean, that's real.  And

17    let me explain that.  Your pain is getting better.  You

18    perceive your pain is getting better.  Our understanding of

19    pain and many of these other disorders, these psychological

20    disorders, has -- we understand the psychological component,

21    the emotional reactivity of the brain.  And placebos have a

22    real effect.  If I perceive something as working, that may

23    calm/reduce certain areas of my brain, and that may make me not

24    only feel better, I mean, that will reduce how I perceive the

25    pain.  So it's just very important when you use the word

Page 63

1    placebos don't have an -- I think your word was a "real effect"

2    on the pain, it really does have an effect on the pain because

3    pain works in large part by how our brains process.  So the

4    more we understand placebos, placebos have a very -- can

5    have -- can have a real effect on the brain.

6    Q.    Thank you.  Your work in this case has not included, for

7    example, talking to any Kaiser patients who received Neurontin

8    to try to determine whether they were experiencing real benefit

9    or placebo?  That wasn't something the Kaiser doctors (Sic)

10   asked you to do, was it?

11   A.    No.  That wouldn't be the kind of scientific part of

12   adequate and well-controlled clinical trials.

13   Q.    So, again, so you're just not in a position to offer any

14   opinion in this case on that subject?

15   A.    On that type of anecdotal evidence, no.

16   Q.    And, finally, the Kaiser lawyers didn't ask you to talk to

17   whoever it is over at Kaiser that decides what does and does

18   not get included on Kaiser's patient website, did they?

19   A.    No.  That was not part of my assignment.

20   Q.    Now, let's go through your assignment and your report in

21   particular.  Do you have your report?  Do you need a copy?

22   A.    I would appreciate a copy, sir.

23   Q.    I'm not sure I've got an unmarked-up one.

24           THE COURT:  I actually do.

25           MR. CHEFFO:  I think I have it, your Honor.

Page 64

1    MR. KENNEDY:  I think we have one.

2    MR. CHEFFO:  May I give it to Dr. Kessler?

3    THE COURT:  Sure.

4    MR. KENNEDY:  Thank you, your Honor.

5    THE WITNESS:  Thank you, sir.

6   Q.   And if I could ask you to turn first to Page 9,

7   Paragraph 19, under the topic the "Approved Uses of Neurontin."

8   A.   Yes, sir.

9   Q.   And that says that "Neurontin was approved for adjunctive

10  therapy (used in addition to other drugs) for some specific

11  types of seizures," correct?

12  A.   Yes, sir.

13  Q.   And that happened basically on December 30, 1993?

14  A.   Yes, sir.

15  Q.   And that followed Parke-Davis' --

16  A.   Uhm -- yes, sir, I'm sorry, yes.

17  Q.   Sometime in 1993?

18  A.   Yes, sir.

19  Q.   And that approval followed Parke-Davis' submission of what

20  you talked about, a New Drug Application, or NDA, correct?

21  A.   That's correct, sir.

22  Q.   And as you pointed out before, a New Drug Application will

23  be what?  You indicated it would be bigger than all the

24  bookcases behind her Honor.  I realize they're on disks now,

25  but back in the days when we used to have paper, these things

1    could be 20, 30 feet long, correct?

2    A.    Yes, sir.

3    Q.    Maybe more.  And that would express the work that

4    Parke-Davis had done.  That isn't work that the FDA has done

5    yet, correct?

6    A.    That's exactly correct, sir.

7    Q.    Okay.  And that New Drug Application included not one but

8    two of those gold standard double-random controlled clinical

9    trials, correct?

10   A.    I believe that approval letter that we saw cited three

11   double-blind randomized controlled clinical trials.  And it's

12   important to emphasize that that application contains not only

13   those double-blinded controlled trials but all trials that were

14   done up to that date because you want to see the safety

15   experience in those trials.  So it's going to include those

16   trials and a lot of other trials that the company has

17   undertaken.

18   Q.    And turning to Page 10 of your report, you said -- and

19   this is with regard to the 1993 approval of Neurontin for the

20   partial seizures -- "The FDA concluded that the effectiveness

21   of Neurontin as adjunctive therapy was established in three

22   multicenter placebo-control double-blind parallel group

23   clinical trials involving 705 adults with refractory partial

24   seizures."  I've read that correctly, haven't I?

25   A.    Yes, sir.

1    Q.   So there were actually in this case three gold standard

2    studies that Parke-Davis did in support of this application,

3    right?

4    A.   Yes, sir.

5    Q.   And when it says 705 adults with refractory partial

6    seizures, "refractory" is a medical word for saying they were

7    resistant or weren't responding to other drugs or other

8    treatment, correct?

9    A.   Yes, sir.

10   Q.   Okay.  Now, in addition to granting this approval in 1993,

11   there was nothing that the FDA did that said, any doctor who

12   thought Neurontin might be appropriate for treating some other

13   condition couldn't use his or her sound medical judgment to use

14   it for that other purpose, correct?

15   A.   So there is no prohibition, right?  It's not a violation

16   of the Act.  But certainly the label doesn't come out and say

17   that, and that use is not necessarily encouraged.  FDA is

18   staying with the science in front of it and what that science

19   says with regard to a particular condition.

20   Q.   And as you've told us, for decades it's been the FDA's

21   policy that the FDA only approves things that meet its

22   standards, of course, correct?

23   A.   Only meets its standards. . .

24   Q.   To get FDA approval, you've got to meet FDA requirements,

25   don't you?

Page 67

1    A.    Those requirements set out by the Congress in the statute,

2    yes.

3    Q.    It's also for decades been FDA's policy that individual

4    doctors are entitled to use their independent medical judgment

5    to prescribe drugs for reasons other than the specific ones

6    approved by the FDA?

7    A.    That's correct.  FDA does not want to interfere in --

8    wants to limit its interference in the practice of medicine,

9    yes.

10   Q.    And that's called off-label prescribing by doctors?

11   A.    Yes, sir.

12   Q.    Okay.  And there's nothing wrong with off-label

13   prescribing?

14   A.    Oh, that's a much broader question.

15   Q.    Well, then let me withdraw it.  Let me ask you this:  As a

16   pediatrician, you are required by the nature of things to

17   prescribe off-label, aren't you?

18   A.    Regrettably.  Let me explain that.  I wish I weren't.  I

19   really -- I mean, for decades, and we worked very hard at FDA

20   to try to fix this, but as you can understand, the vast

21   majority of drugs, as you saw in this case, were for partial

22   seizures.  The first NDA was for use in adults.  Subsequently,

23   Pfizer -- give Pfizer credit here -- submitted a supplemental

24   NDA for use in kids.  Between that time frame, between that

25   first NDA and that supplemental NDA, there was nothing in the

1    drug information that could tell me as a pediatrician, or if I

2    were a pediatric neurologist, what was the right dose to use in

3    kids.

4         Now, Pfizer did undertake that study and submitted a

5    supplemental NDA, got that dose.  That was in the application,

6    and therefore it was approved.  But there was that time period

7    where that information regrettably didn't exist.

8         I don't like prescribing off-label, you know, and the

9    system really has to be geared to trying to get information

10   onto the label.  And when it's not on the label, you know,

11   there's something -- the system is not working optimally.

12   Q.   And under the FDA's system, however, to get FDA approval,

13   you've got to spend the time and the money necessary to prepare

14   a New Drug Application that's as long and as big as all the

15   Judge's bookcases, right?

16   A.   Not necessarily, sir.  So that was the length.  These

17   lengths vary depending on the application.  A supplemental NDA,

18   right, for a particular new indication, you know, doesn't have

19   to repeat all the chemistry, all the manufacturing or all the

20   toxicology.  So the supplemental NDA need not be as big as the

21   original NDA, and certainly -- I mean, the policy, I mean,

22   should be, and I think we all at FDA, certainly when I was

23   there, want to get -- it's very important that information be

24   on the label, that that science be there.  Sometimes it's not,

25   and sometimes we get stuck, but it's not a great thing to

Page 69

1   prescribe off-label.  It's much better when you have the

2   science.

3   Q.   So if you were running the world, you'd require that there

4   be formal FDA approval with dual studies for every drug for

5   every indication.  Would that be better?

6        MR. GREENE:  Object to the form.

7        THE COURT:  Sustained.

8   Q.   In any event, in late 1993, Parke-Davis did it correctly,

9   and properly got FDA approval for this use for seizures, and as

10  you've told us --

11  A.   Partial seizures.

12  Q.   Partial seizures.  And then in 2000, after again doing it

13  correctly, the FDA gave Pfizer approval for that same treatment

14  in children for partial seizures, correct?

15  A.   Yes, age three and above.

16  Q.   And then in 2002, after Pfizer had submitted a further one

17  of those big New Drug Applications, Neurontin also got approved

18  for the management, as you've told us, of postherpetic

19  neuralgia, or PHN, correct?

20  A.   Essentially, but just you said Pfizer submitted a New Drug

21  Application.  Not to quibble, but it's the Supplemental New

22  Drug Application for postherpetic neuralgia, for PHN.

23  Q.   And as you tell us in your report, the FDA's approval of

24  Neurontin for use in postherpetic neuralgia was based on the

25  data in two randomized double-blind placebo-controlled

1    multicenter studies, correct?

2    A.   Yes, sir.

3    Q.   Okay.  So, again, you're not opining here that Pfizer or

4    Parke-Davis cheated in any way in getting the three FDA

5    approvals that they got?

6    A.   Absolutely not, sir.

7    Q.   And there, again, was nothing in any of those FDA

8    approvals that told doctors, "Don't use these drugs for any

9    reason other than the ones allowed by the FDA"?  That was not

10   prohibited, was it?

11   A.   I have never seen an NDA approved with that stipulation,

12   sir, for Neurontin or for any other indication.

13   Q.   And even as of today, with everything we now know about

14   Neurontin and gabapentin and everything the plaintiffs are

15   saying in this case, the FDA today still says each doctor can

16   prescribe Neurontin off-label in his or her sound medical

17   judgment, right?

18   A.   FDA has issued warnings about the use of Neurontin, and it

19   has cautioned doctors about not only Neurontin but the whole

20   class of AEDs for suicide.  So it's not -- so, I mean, FDA has

21   given physicians additional information about Neurontin.

22   Q.   Okay.  And your job in this case was not to try to

23   determine whether any Kaiser patient who was prescribed

24   Neurontin committed suicide as a result of that?  That's not

25   part of your assignment, is it?

1   A.    No, it was not, sir.

2   Q.    And aside from suicide, as of today, February, 2010, the

3   FDA in no way limits any doctor's ability to prescribe

4   Neurontin, gabapentin, for neuropathic pain, for example?  No

5   FDA restriction, right?

6   A.    I'm not sure where that restriction would be.  I'm not

7   sure the -- an NDA is approved, right, for a specific

8   indication for use.  It's based on that science.  That's what

9   the label says.  FDA doesn't send in its law enforcement

10  officials to tell a doctor, "You can't prescribe a drug."  So

11  I'm not sure where in the label you're asking -- you're saying

12  FDA should say that.  That's --

13  Q.    My question isn't restricted to the label.  The FDA hasn't

14  done anything by way of a press release, a singing telegram,

15  whatever method of communication you want to talk about, to

16  tell doctors as of 2010, "You shouldn't be using Neurontin for

17  neuropathic pain"?

18  A.    It's issued certain warnings, sir, about cautioning

19  doctors about certain serious risks.  It's done that recently,

20  yes.

21  Q.    Neuropathic pain?

22  A.    About suicide.

23  Q.    Okay.  Aside from suicide -- well, so there is a mechanism

24  available where if after the New Drug Application is issued and

25  the FDA becomes concerned about some aspect of the drug, the

Page 72

1    FDA can take corrective action.  There is a mechanism.  You

2    just said they've done it with suicide.

3    A.   The tools that the agency has -- let's understand that --

4    so the agency can approve a drug; it can withdraw a drug; it

5    can warn about a drug.  But FDA finds itself, because of those

6    limited tools, in a difficult position sometimes.  So let's say

7    doctors are using a drug off-label for a certain use.  Well,

8    FDA could withdraw the drug entirely, but then it would be

9    hurting those patients who would be using the drug.  So there

10   are limited tools.  The agency can approve a drug, it could

11   withdraw a drug, it could warn about the drug, it can regulate

12   the pharmaceutical company's promotion; but it does not take

13   the position, it doesn't go in and tell doctors what to

14   prescribe.

15   Q.   Whatever it can or can't do, as of today, right now,

16   you're not aware of the FDA's having sent any particularized

17   directive to doctors concerning the off-label prescribing of

18   Neurontin or gabapentin for neuropathic pain, correct?

19   A.   I'm not aware of any of those statements, no, I'm not.

20   Q.   The same question, nociceptive pain?

21   A.   The same answer, sir.

22   Q.   The same question, bipolar disorder?

23   A.   Press releases or statements, no, I'm not aware.

24   Q.   Or any other form of limitation, black box warning,

25   anything at all, label change, anything?

1   A.    Label change, I mean, I'm not aware of whether there's

2   been any label changes for Neurontin.

3   Q.    The same question, migraine headaches?

4   A.    Not aware, sir.

5   Q.    And, finally, you were asked about Exhibit 87.

6         MR. KENNEDY:  Austin, do you have that one?  Or maybe

7   we can just do it on the Elmo.

8   Q.    It was Exhibit 87.  It was this July, 1996 letter from

9   Department of Human Resources to Mr. Merino at Parke-Davis, and

10  you were asked in particular about Page 6, Specification 12.

11  Can we get that up.  That included that list of doctors,

12  LeeAnne Fogelman and others that Mr. Greene asked you about.

13  You recall that, Doctor, don't you?

14  A.    I recall that, yes, sir.

15  Q.    And in your assignment in this case, you haven't been

16  directed to try to find out whether any of those doctors ever

17  spoke with a Kaiser physician about Neurontin, have you?

18  A.    Not part of my assignment, sir.

19  Q.    And again your assignment hasn't included finding out

20  whether any Kaiser doctors attended a lecture if any of these

21  doctors gave it?

22  A.    Not a part of my assignment, sir.

23  Q.    So your assignment was not to try to determine whether the

24  doctors named in Specification 12 have had any impact

25  whatsoever on the prescribing of Neurontin to Kaiser patients?

1  A.   I've not spoken to any of those physicians with regard to

2  this matter.

3           MR. KENNEDY:  Thank you very much, Dr. Kessler.  I

4  hope that I kept it sociable.  I appreciate it.

5           THE WITNESS:  Thank you very much.

6           MR. GREENE:  Just a few questions.

7           THE COURT:  Redirect?

8           MR. GREENE:  Redirect.  Thank you.

9  REDIRECT EXAMINATION BY MR. GREENE:

10  Q.   Dr. Kessler, Mr. Kennedy directed your attention to your

11  report.  Is that your report you have?

12  A.   Yes, sir.

13  Q.   He put it up on the screen, and actually his copy had some

14  highlighted portions that he directed your attention to in your

15  report?  Is that correct?

16  A.   I don't recall whether it was highlighted or not.  I

17  assume it was.  I was looking at the actual report.  I

18  apologize.

19  Q.   He asked you about Paragraph 19 on Page 9, which was the

20  paragraph in your report that described the initial approval

21  for treatment of partial seizures as adjunctive therapy,

22  correct?

23  A.   Yes, sir.

24  Q.   And that part of the report deals only with the approval

25  for treating partial seizures as adjunctive therapy, correct?

1    A.   Yes, sir.

2         MR. GREENE:  Your Honor, at this time we would offer

3    Dr. Kessler's report.  They put it up on the screen.  The jury

4    has seen it --

5         THE COURT:  Well, wait, wait.

6         MR. GREENE:  I'm sorry.

7         MR. KENNEDY:  We would object to the entire report.

8         THE COURT:  Sustained.

9    Q.   Doctor, Mr. Kennedy asked you some questions about the

10   Pfizer physicians, do you recall that line of questions,

11   whether you had talked to them?

12   A.   Yes.

13   Q.   Would talking to Kaiser physicians concerning whether they

14   prescribe Neurontin today or find it to be effective today,

15   would that be a level three evidence, anecdotal evidence?

16   A.   Yes, sir.

17   Q.   And would that evidence demonstrate scientifically that

18   Neurontin is effective for treating whatever condition they're

19   prescribing it for?

20   A.   No, sir.

21   Q.   Mr. Kennedy asked you about talking with Kaiser patients.

22   Do you recall?

23   A.   Yes, sir.

24   Q.   And if you talked to Kaiser patients and they told you

25   that they found it to be effective, let's say for pain, in

1    talking to that patient, is there any way you could tell

2    whether they found it effective for pain because the drug

3    really worked or because it was due to the placebo effect?

4    A.    No, you could not by talking to the patient.

5    Q.    And has that been the point of your testimony the past two

6    days, that all of that is anecdotal evidence, level three

7    evidence, and that's why the FDA requires a drug company to

8    conduct several double-blind randomized controlled trials to

9    establish whether a drug is effective to treat a condition like

10   bipolar or pain?

11   A.    Exactly.  That's the kind of medicine we all want to

12   practice.

13           MR. GREENE:  Thank you.

14   RECROSS-EXAMINATION BY MR. KENNEDY:

15   Q.    Doctor, as I understand it, you don't think it would be at

16   all helpful in trying to determine whether Kaiser was defrauded

17   to go and interview each of the 25,000 doctors that are in this

18   report and discuss with them whether they ever even were

19   contacted by Pfizer and what their reasons were for prescribing

20   Neurontin over a ten-year period?  You don't think that would

21   be of any benefit whatsoever?

22           MR. GREENE:  Objection, your Honor.

23           THE COURT:  Sustained.

24   Q.    You'd agree with me, you would be in a better position to

25   say whether Kaiser had been defrauded than you are right now if

1   you got to talk to some of the Kaiser doctors who actually

2   prescribed Neurontin, wouldn't you?

3           MR. GREENE:  Objection, your Honor.

4           THE COURT:  Overruled.

5   A.   I'm not here as a witness to opine on fraud.  My goal in

6   coming here was to explain how we know whether a drug works,

7   how we can sometimes think a drug works but it not work.  Your

8   list of 25,000 physicians, when you have a drug and a

9   condition, a psychiatric condition where the end points are not

10  always that objective, where there's a psychological component,

11  where there's a high placebo response rate, when you have high

12  placebo response rates, doctors can think, right, the drug's

13  working.  Patients can think the drug is working.  The point of

14  my being here, my testimony, was to show you and try to explain

15  and explain to the Court the science needed and the science

16  that's required before a drug company goes and promotes a

17  product.  That was my objective in the last two days, sir.

18  Q.   Thank you.  And as I think you said at the outset of that

19  answer you just gave, your job was not to come here and try to

20  prove that Kaiser had been defrauded?

21  A.   It was not to look at the question.  That to me is a legal

22  conclusion.  That's not a scientific judgment that I as an

23  expert thought I could opine on.

24  Q.   If Kaiser is going to prove they were defrauded, they're

25  going to have to do it through witnesses other than you, right?

1          MR. GREENE:  Objection, your Honor.

2          THE COURT:  Sustained.  Are you done?

3          MR. KENNEDY:  Okay, I have nothing further, your

4     Honor.

5          THE COURT:  Thank you very much, sir.

6          THE WITNESS:  Thank you, your Honor.

7          (Witness excused.)

8          THE COURT:  Your next witness?

9          MR. SOBOL:  Dr. Abramson.  It might take a minute to

10     get oriented because I've got some boards.  Can we take the

11     break now and then start in fresh?

12          THE COURT:  Sure.  So it's about seven minutes of.  So

13     we'll come back at, let's say, 11:20 from our morning break.

14          THE CLERK:  All rise for the jury.

15          (Jury excused.)

16          THE COURT:  Are there any documents I need to worry

17     about?

18          MR. SOBOL:  Well, I think that's for the defendants to

19     tell you, but just so that you know --

20          THE COURT:  I'm sure they will.  I'm just trying to

21     figure out so I don't suddenly come out at 11:20 and suddenly

22     have fifteen documents in issue.

23          MR. SOBOL:  During Dr. Abramson's testimony, I will be

24     offering each of the documents that are set forth in the

25     document that you have in your notebook that's called "Exhibits

1    referenced in Dr. Abramson's direct examination."

2           THE COURT:  Sure.  And so are any of those objected

3    to?  You're saying they're all objected to?

4           MR. SOBOL:  As far as I know, the defendants won't

5    agree to a single document until it's paraded in front of the

6    witness.

7           MR. CHEFFO:  Well, let's try and keep it, you know,

8    professional.  I don't think that's true.  We worked out a lot.

9           THE COURT:  What's your stance on these?  Have you had

10   a chance to look at them?

11          MR. CHEFFO:  No, I haven't had a chance to go through.

12   I mean, I want to talk to Mr. Fox, if I could, and I think we

13   can resolve a lot of the issues.  And we'll point out, as we

14   did the last time, if we have any specific, if we could just

15   have a few minutes, if we have specific objections to specific

16   documents, we'll bring them to the Court's attention.

17          THE COURT:  Yes, but, again, what I don't want to have

18   happen is me to come out at 11:20 just as the jury is ready to

19   go and have us have a twenty-minute debate.  So as far as I'm

20   concerned, I've dealt with that general objection that there

21   not be a document dump.  I certainly agree with that.  But to

22   the extent Dr. Abramson walks us through the documents and

23   they're otherwise authenticated, I'm going to allow them in

24   unless I hear something.

25          MR. CHEFFO:  And that's fair, your Honor.  If we could

Page 80

1    have five minutes, what I'll do is, if I have any objections,

2    I'll try and group them, quickly tell you, and you can rule on

3    them.

4              THE COURT:  All right, I will see you here at, why

5    don't we say 11:15.  Well, why don't you let Mr. Alba know if

6    you need me five minutes early.  I'd like very much getting

7    these binders, Abramson direct, for example.  You already have

8    it.  Are you going to give me one?

9              MR. RONA:  Your Honor, I was going to give you the

10   deposition designations.

11             THE COURT:  Oh, my homework, okay.  Both sides have

12   had a chance to see it?

13             MR. CHEFFO:  With respect to those, that's a joint

14   submission.

15             MR. RONA:  There's only a few objections.

16             THE COURT:  Fine.  When were you hoping to show these?

17             MR. RONA:  Not until you've had a chance to look at

18   them, but not today and not tomorrow.  If needed, we could do

19   it Thursday.

20             THE COURT:  All right.

21             (A recess was taken, 10:55 a.m.)

22

23

24

25

Page 81

1           THE CLERK:  All rise.

2           THE COURT:  So we are not dispute-free?

3           MR. CHEFFO:  I think they're quick, but they're

4   not dispute-free, but there's not a dispute to every

5   document.

6           THE COURT:  Okay.

7           MR. CHEFFO:  Obviously I think we've moved along

8   because of your Honor's rulings.  With respect to the ethics

9   and the industry rulings, I think we have just a general

10  objection on these documents or to many of the documents.

11  To the extent that they're not tied in any way, putting

12  aside whether they're industry or not, but they're not tied

13  in any way to Kaiser or Kaiser doctors or that Kaiser ever

14  saw them, so to the extent they want to show a document, you

15  know, here's a marketing plan.

16          THE COURT:  I can't do this in the abstract.

17          MR. CHEFFO:  Again, that's why I'm saying, we

18  haven't hear -- I don't have a copy of his direct

19  examination, if he gets up and can talk about issues in

20  specific that I think what you said earlier, this is how it

21  relates to Pfizer, this is how it talks to Kaiser, then I

22  think --

23          THE COURT:  If it's specific to Pfizer or specific

24  to Kaiser, it's fair game.

25          MR. CHEFFO:  I mean, to the extent that it's

Page 82

1   Pfizer did X, but there's no connection whatsoever to

2   Kaiser, we just have a --

3           THE COURT:  It depends, if it's about Neurontin,

4   it's probably relevant, if it's about some other drug like

5   Xtra or something, it probably isn't.

6           MR. CHEFFO:  I understand.  I'm in the same

7   position, I don't know how the foundation --

8           THE COURT:  What's the next one?

9           MR. CHEFFO:  The only other issue, I think we have

10  worked this out, but I just want to make sure for the record

11  we're clear.  There are some references to reprints,

12  Mr. Sobol has indicated to me that only to the extent that a

13  reprint -- they're going to talk about that to the extent

14  that a document, their allegation was not entirely accurate,

15  but our concern was under the Supreme Court Washington Legal

16  Foundation case, the fact that reprints are distributed,

17  that's a First Amendment right.

18          THE COURT:  Which case?

19          MR. CHEFFO:  The Washington Legal Foundation.  It

20  actually went all the way to the Supreme Court.  They said

21  the fact that you're issuing reprints, as long as they are

22  accurate reprints --

23          THE COURT:  You're bringing in a major

24  constitutional issue which hasn't really been briefed before

25  me.  I'm not prepared to rule on it.  It may there's some

1   First Amendment component to it, but it certainly is not,

2   I'm not going to rule that any off-label promotion is going

3   to be labeled.  I think I've hit that issue before.  You can

4   preserve that for the Supreme Court.  Maybe after Citizens

5   United they'll be right with you.  Right now as far as I'm

6   concerned, off-label marketing is illegal.

7           MR. CHEFFO:  I'm not looking to get to the

8   Supreme Court on this.

9           THE COURT:  Exciting, I'll come watch, but the

10  reality right now I'm not going to rule that way, okay, in

11  terms of I just don't feel like I have a record for making

12  that.

13          MR. CHEFFO:  I understand that, your Honor.  I

14  just wanted it for the record.  Thank you.

15          THE COURT:  Okay.  All right, let's go.  Let's

16  bring this jury in here.

17          THE CLERK:  All rise for the jury.

18          THE COURT:  Next witness.

19          MR. SOBOL:  Your Honor, Kaiser calls Dr. John

20  Abramson.

21          THE COURT:  Come up Dr. Abramson.

22          JOHN ABRAMSON, M.D., having been duly sworn by the

23  Clerk, testified as follows:

24          THE CLERK:  Would you please state your name and

25  spell it for the record.

1            THE WITNESS:  John Abramson, A-b-r-a-m-s-o-n.

2            MR. SOBOL:  May I inquire, your Honor?

3            THE COURT:  Yes.

4                      DIRECT EXAMINATION

5    BY MR. SOBOL:

6    Q.  Good morning.  My name is Tom Sobol, as you know,

7    Dr. Abramson, and I'll be asking some questions on direct

8    examination.  Please tell the jury your formal educational

9    background.

10   A.  I graduated from Harvard College, went to Dartmouth and

11   Brown Medical Schools, was an intern in family practice at

12   the University of North Carolina, completed family practice

13   residency at Case Western and then completed a two-year

14   Robert Wood Johnson fellowship at Case Western.

15   Q.  When did you graduate medical school?  And keep your

16   voice up, as I'm trying to do, too.

17   A.  I'm sorry, 1976.

18   Q.  And then you did what?

19   A.  I was an intern in Chapel Hill, North Carolina in family

20   practice, then I spent two years in the public health

21   service in Appalachia in eastern West Virginia then went

22   back and completed my residency and did a fellowship.

23   Q.  And your residency was in what?

24   A.  Family practice.

25   Q.  And your fellowship, please describe that.

1    A.   It was a Robert Wood Johnson fellowship.  The purpose of

2    the fellowship was to create a cadre of academic family

3    docs, doctors, so the fellowship was a two-year program in

4    which we studied research designs, statistics, epidemiology

5    and conducted research.

6    Q.   So you received training during your fellowship in

7    statistics, epidemiology and research design?

8    A.   That's correct.

9    Q.   After your fellowship, what did you do?

10   A.   After my fellowship, I decided to go into practice and

11   move back.  I had grown up in the Boston area and moved back

12   to the North Shore area to Hamilton, Massachusetts and went

13   into family practice.

14   Q.   Okay.  And so for how many years did you have a family

15   practice in the Hamilton, Massachusetts area?

16   A.   For 20 years.

17   Q.   And what kinds of things did you do there?

18   A.   I was a family doctor.  I took care of people, provided

19   primary care to people of all ages, made some house calls

20   and was engaged in the full-time practice of family medicine

21   and did some teaching as well.

22   Q.   During that time, did you receive any sort of awards or

23   recognition in connection with your clinical practice?

24   A.   I did.  Twice I was named the best doctor in the

25   Beverly, North shore area out of about 400 doctors and three

1   times was named one of the best of a handful of family

2   doctors in Massachusetts.

3   Q.  Have you taught medicine?

4   A.  Yes, I have.

5   Q.  Where?

6   A.  At Harvard Medical School.

7   Q.  For how many years?

8   A.  I've been teaching Harvard medical students since about

9   1992.

10  Q.  And describe to the jury the kinds of things you've

11  taught Harvard medical students?

12  A.  While I was practicing, Harvard medical students would

13  come to my office, and I would teach them primary care.

14  There was a longitudinal program that lasted nine months at

15  the Harvard Medical School for third and fourth medical

16  students, so one medical student, I would have one medical

17  student come to my office three afternoons a month for nine

18  months and teach them the practice of primary care.

19  Q.  Have you taught anything else other than clinical

20  practice?

21  A.  Yes, I have, for the past years, I've been teaching

22  health policy at Harvard Medical School.

23  Q.  Have you had any professional activities in connection

24  with Lahey?

25  A.  I have.  When I first went into practice, it was an

1    independent family practice.  In 1993, I merged my family

2    practice center into the Lahey Clinic, though we stayed

3    right where we were, we essentially changed the sign, but

4    when that happened, I became the chairman of the Department

5    of Family Practice at Lahey Clinic.

6    Q.  And for how long was that?

7    A.  That was until I left practice at the end of 2001.

8    Q.  Now, I take it your professional activities took a

9    pretty significant term in the time period around 2001,

10   correct?

11   A.  That's correct.

12   Q.  Can you briefly describe the circumstances of that to

13   the jury?

14   A.  Yes.  I was teaching students in my office, and I was

15   also teaching an elective course at Harvard Medical School

16   that was about the doctor-patient relationship, and in 2000,

17   maybe the end of 2000, beginning of 2001 decided I would

18   take a year off and write a book about the doctor-patient

19   relationship to help medical students understand that as

20   they learn the science of medicine not to forget that

21   they're taking care of human beings, people, and that

22   personhood isn't the kind of thing that science can study

23   and that good doctors have to put together clear-headed

24   science along with this appreciation that the person they're

25   taking care of is a human being and planned to write that

1    book and planned to take a year off to write that book.

2    Q.  But what stopped that?

3    A.  What stopped that was that in August and September of

4    2001 --

5    Q.  Let me also interject.  Without mentioning obviously

6    this episode involves a particular drug and particular

7    company.  Don't name the drug or the company, just tell the

8    jury very quickly what it is.

9    A.  In August or September of 2001, I became aware of a

10   couple of drugs that were widely used by primary care

11   physicians as well as other doctors that had been written up

12   in our most trusted journals, and the articles that appeared

13   in the journals were not accurate.  There was data on the

14   FDA's website that showed the true science about these

15   drugs, and the articles in our journals misrepresented that

16   science, and when I found that and tried to communicate that

17   to my colleagues to say, look, we've got a problem now

18   because the sources that we trust to learn about how best to

19   take care of our patients aren't necessarily accurate.

20   Q.  Let me interrupt you then, okay?

21   A.  Okay.

22   Q.  So did you change your book topic?

23   A.  Exactly.  I changed, put away the first book and decided

24   that it was more important to write a book to explain to

25   physicians and to patients, consumers, about the influence

Page 89

1   on the information that doctors and patients were

2   trusting.

3   Q.  And so during this time period of about 2002 to 2004,

4   you were essentially, you didn't have your clinical practice

5   and you were writing this book and the book got published

6   some time in 2004?

7   A.  Correct, September of 2004.

8   Q.  Okay.  Again, without mentioning this drug or the name

9   of the company, what happened?

10  A.  One of the drugs that the book turned on was withdrawn

11  from the market just nine days after the book came out, and

12  things changed very quickly.  I was suddenly on the Today

13  Show and national TV, and the article that I had been

14  working on that we can't always trust the information in the

15  journals my colleagues thought was an odd argument suddenly

16  got validity.

17  Q.  So, since the time period of 2004 to the present then

18  please describe to the jury the kinds of professional

19  activities you've been involved in and the rough percentages

20  of your time devoted to it.

21  A.  Yes, I've continued to teach at Harvard Medical School,

22  and that takes up maybe 5 to 10 percent of my time.  I

23  consult in legal matters, and that takes up perhaps 75

24  percent of my time, and I work as a consultant to Wells

25  Fargo Insurance Services to try to help companies buy drugs,

1  have prescription drug pharmaceutical policies that are

2  rational and based on the true science instead of the

3  marketing of the drugs.

4  Q.  Okay.  You're getting paid in this case, correct?

5  A.  Yes, I am.

6  Q.  How much?

7  A.  $550 an hour.

8  Q.  Would you estimate for the jury about how much time

9  you've devoted in connection with this matter?

10  A.  I would guess around 400 hours.

11  Q.  A lot of time?

12  A.  A lot of time.

13  Q.  Now, please describe to the jury what you understood

14  your assignment to be at the outset.  You were approached

15  about two years ago or so?

16  A.  I think so.

17  Q.  Describe to the jury what you understood your assignment

18  to be.

19  A.  My assignment was to be to review the scientific

20  evidence about several off-label indications or uses of

21  Neurontin to review the scientific evidence that was not

22  available to practicing physicians but came from the

23  corporate documents to review what doctors were told about

24  that science in publications, in continuing medical

25  education and otherwise and then to compare it to see how

1    the real science compared to what doctors were led to

2    believe about the science and whether that was accurate or

3    not.

4    Q.  Now, you've told the jury that cumulatively you spent

5    about 400 hours.  That's a lot of time in connection with

6    this?

7    A.  It is.

8    Q.  Could you describe to the jury generally how the process

9    proceeded from the time that you were first approached until

10   ultimately I think you were asked and you submitted a

11   declaration or a report in this matter?

12   A.  Yes.  Initially there was a discussion about the nature

13   of my involvement in the case.  It involved my receiving

14   documents from plaintiffs' attorneys that are not available

15   to physicians that were available only because of the

16   litigation.  It involved my looking at the literature that

17   was published and reviewing what was available to physicians

18   and putting together a report that compared and contrasted

19   those things.

20   Q.  Okay.  And during this process did you -- well, let me

21   describe this.  First, the medical literature that you

22   reviewed, can you describe just generally to the jury the

23   magnitude of the medical literature you reviewed, where you

24   got it and how you made a decide as to what to look at?

25   A.  What I looked at first was the publication of the

b946f79a-1ae6-4295-87d1-3730705d1152

1    research that was -- that the manufacturer had done about

2    the drug and that's available.  Because I'm on the faculty

3    of Harvard, I have access to the digitized medical

4    literature, and I can get that on my own.

5              There were certain documents that were provided to

6    me by plaintiffs' counsel that helped me to understand that

7    more drafts of these articles that were published or not

8    published, as it were.  There were other documents that were

9    provided by plaintiffs' counsel that allowed me to see how

10   this information was being presented to physicians, the

11   information that I was looking, that I was figuring out,

12   sort of deciphering what the truth was, how that was

13   presented to physicians.

14   Q.  Now, the people you worked with were some people from

15   Mr. Greene's office, correct?

16   A.  Yes.

17   Q.  Maybe some people from my office less often?

18   A.  Yes.

19   Q.  And you mentioned some corporate documents, maybe some

20   depositions that you reviewed, the discovery that happened

21   in this case?

22   A.  Yes.

23   Q.  Some of it, yes, but you didn't go through everything,

24   of course?

25   A.  I did not.  There were enormous volumes of material and

Page 93

1    I was sent large volumes and went through what I thought was

2    relevant.

3    Q.  Okay.  I assume that your declaration went through many

4    drafts?

5    A.  It did.

6    Q.  Okay.  And did lawyers contribute in the drafting

7    process, or why don't you describe to the jury that?

8    A.  There was a give and take with lawyers.  In the drafting

9    process, some of the discussions that I would have with

10   attorneys would be reflected.  Occasionally there were small

11   amounts of language that were brought in, but the bottom

12   line is that the report is mine, that everything that is in

13   that report is my findings and my opinion, and I signed it

14   and take responsibility for it.

15   Q.  Now, Dr. Abramson, let's talk about briefly the sources

16   of information that are available to physicians.  Do you

17   have that in mind?

18   A.  Yes.

19        MR. SOBOL:  And, Raoul, may I use this book before

20   the jury?

21        MR. KENNEDY:  Sure.

22   Q.  Dr. Abramson, here you been here in the court when the

23   lawyers for Pfizer have demonstrated that there is a long

24   list of physicians at Kaiser, excuse me, at Kaiser that

25   wrote prescriptions for Neurontin?

Page 94

1    A.   Yes.

2    Q.   And in the medical practice, are there sources of

3    information that are generally available either to the

4    doctors that are in this book or the doctors that are

5    anywhere in the United States?

6    A.   Yes.   There are sources of information that doctors

7    typically rely upon.   Of course, there's an enormous amount

8    of material that doctors have to stay current with, and

9    typically doctors rely on some set, some subset of published

10   articles of original research and review articles of the

11   research.

12          Continuing medical education is very important to

13   doctors.   Doctors have to go to 50 hours of continuing

14   medical education to maintain their medical license in most

15   states, if not all states, and then so there's continuing

16   medical education, there are drug lunches that occur often

17   where doctors will come and hear a lecture about something,

18   get some food for lunch or supper.   Those tend to be, and,

19   of course, there's advertisements that occur in journals,

20   and there's drug reps. that come to offices and provide

21   material about the drugs.

22   Q.   Okay.   Is that the case regardless of whether or not

23   they're a PMG, a Permante Group doctor or you're a doctor

24   from South Carolina or New York or anywhere in the country?

25          MR. HOOPER:   Objection, foundation.

1          THE COURT:  Overruled.

2    A.  Yes, it is the case.  There are only those sources of

3    information for physicians.  Physicians have different

4    styles.  Some may rely more on reading the primary

5    literature, some may rely more on continuing education or

6    review articles, but that's the universe of information that

7    doctors have available to them that they have to rely on so

8    they can make a decision about how to best treat their

9    patients.

10   Q.  Now, Dr. Kessler has testified yesterday and today.  Did

11   you hear the testimony about Level I, Level II and Level III

12   evidence?

13   A.  Yes.

14   Q.  And is it your understanding that doctors when they're

15   trained in medical school and their experience understand

16   those differences?

17   A.  For the most part.

18   Q.  And you also described to the jury I think a difference

19   between publishing an article as opposed to presenting an

20   article as opposed to do something else.  Can you just

21   explain that briefly?

22   A.  Yes.  When an article -- the best presentation of an

23   article is to have it published in a peer review journal, so

24   the study and only that study are written up, the design of

25   the study, what the study was, why the study was done, what

1    it's set up to determine, how the statistics were done, what

2    the prespecified end points were and then to lay out the

3    results and a discussion of the results, and that would be

4    the best way to present research, and then that's submitted

5    to a journal that has a peer review process, and when the

6    peer reviewers evaluate whether this article -- whether they

7    would recommend this article to be published or not

8    published or published if it's changed, the peer reviewers

9    have access to the manuscript that is submitted but not to

10   the basic data from the study that gave rise to the

11   manuscript.

12   Q.  So when doctors are receiving information out there, can

13   you just describe to the jury what the difference is between

14   a published as opposed to like presenting an article and the

15   format that that information might be available?

16   A.  Yes.  When the article is published in a peer review

17   journal, that's a level of accreditation.  It's sort of the

18   like the Good Housekeeping seal because it's gone through,

19   the manuscript has gone through the process of having peer

20   reviewers, experts look at it and comment about the

21   accuracy, the consistency of the study, so that's like got

22   the highest Good Housekeeping seal of approval.

23          Then if you have studies that are presented at

24   meetings or that are presented as abstracts or letters to

25   the editor, that's a much less hardy presentation of the

Page 97

1    evidence because there's not been a critical review of that

2    publication.

3    Q.  Now, in connection with your activities, your recent

4    professional activities, do you engage in the peer review

5    process?  Are you the kind of person that actually peer

6    reviews articles?

7    A.  I do.  I frequently get requests to peer review

8    articles.

9    Q.  And in what kind of journals?

10   A.  There's a journal called Psychiatrist Services in which

11   I've peer reviewed three articles and just got a request a

12   couple days ago to peer review another article about the use

13   or the cost of antipsychotic or psychotic medications.  I've

14   reviewed articles for the family practice literature, I've

15   reviewed two or three articles for the American Journal of

16   Public Health.

17   Q.  Now, when you first set out to look into this issue, did

18   you make some general observations about the utilization,

19   excuse me, the writing of prescriptions of Neurontin and for

20   what kinds of disease states over time?

21   A.  Well, I did, and that came from the manufacturers'

22   documents, their reports showing the increase in the use of

23   Neurontin and the uses for which it was being prescribed.

24             MR. SOBOL:  I offer Exhibit 227.

25             THE COURT:  Is there no objection?

1          MR. HOOPER:   No.

2          (Plaintiff Exhibit No. 227 was marked and admitted into

3     evidence.)

4     Q.   Slide 4, please.   Dr. Abramson, I've put on the screen

5     and I hope the jurors have available to them slide 4.   Do

6     you see this?

7     A.   I do.

8     Q.   First, can you describe to the jury what this is?

9     A.   This is a slide that comes from Pfizer's 2001 Neurontin

10    global operating plan, so this slide, the plan would have

11    been published some time in the second half of 2000.

12    Q.   And what initial observations, if any, did you make with

13    respect to this?

14    A.   Well, there's a lot of information in this slide.

15    Q.   Let me also interrupt, the black and white version of

16    this graph comes this way because, as you understand, the

17    lawyers pass documents between one another, we simply

18    photocopy them and we don't necessarily capture the color;

19    is that correct?

20    A.   I don't know that's correct, but I know it's correct

21    that I got a black and white copy.

22    Q.   Very good.   Go ahead.   What was your initial

23    observation?

24    A.   My initial observation, there are layers of information

25    in this graph.   The first is that if you just look at the

1  top of the dark line on top and the way that goes up, you're

2  seeing the increase in the total use of Neurontin.  If you

3  look at the fine print at the top of the vertical access on

4  the left, it says "drug uses per hundred thousand," so

5  that's how many prescriptions, how many times Neurontin is

6  used.

7          That scale could be dollars, and it would be the

8  same thing, it would be different numbers.  It's the change

9  in the use of Neurontin.  You can see the change of use in

10 Neurontin goes up pretty steeply and the slope of that

11 increase goes up as you get to 1997, 1998.  That's the first

12 observation.

13 Q.  Go ahead, what observation did you make about the use

14 for the on label use of epilepsy?

15 A.  The top line, the dark line on this chart or graph is

16 the on label use of Neurontin for second drug in for

17 epilepsy, and if you use between 1994 and 1995, almost all

18 of the use of Neurontin is on label.  It's for adjunctive

19 therapy for partial seizures, and if you just look at that

20 dark line as you go along towards 2000, you can see that

21 that dark line gets narrower, so the amount of use of

22 Neurontin for on label indication of adjunctive therapy for

23 partial seizure disorder actually goes down over time when

24 you go from 1994 to 2000.

25 Q.  And briefly what observations did you make about the

Page 100

1  off-label uses?

2  A.  Well, as you see, the use of Neurontin went up

3  dramatically during this time, and all of the increase, once

4  you get past the initial year, when it's used entirely on

5  label, all of that increase is for off-label uses.

6  Q.  Now, Dr. Abramson, I want you to listen to this

7  question, expert witness kind of question, okay?

8  A.  Yes.

9  Q.  Based upon your education, training and experience and

10  upon your concluding your review of the medical literature

11  and science, did you form an opinion to a reasonable degree

12  of certainty in the area of statistics, epidemiology and

13  research design as to what the reliable scientific evidence

14  shows regarding the effectiveness of Neurontin for

15  bipolar?

16  A.  I did.

17  Q.  What was your opinion?

18          MR. HOOPER:  Objection, your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  I'm sorry.

21          THE COURT:  You can answer.

22  A.  My opinion is that the scientific evidence, the Level I

23  evidence about bipolar disorder shows that Neurontin is

24  either not effective for bipolar disorder or may actually be

25  significantly worse than a sugar pill or a placebo.

1   Q.  Now, we'll get into the reasons for that in a moment.   I

2   want to ask you another similar question.  Did you compare

3   that reliable scientific evidence to the documents showing

4   what Warner-Lambert, Parke-David and Pfizer communicated

5   regarding the effectiveness of Neurontin for bipolar?

6   A.  I did.

7   Q.  And based upon your education, training and experience

8   and upon your review of that documentation showing what

9   Pfizer, Warner-Lambert and Parke-David communicated

10  regarding the effectiveness of Neurontin, did you form an

11  opinion to a reasonable degree of certainty as to whether

12  Pfizer's communications regarding Neurontin were

13  inconsistent, complete or fairly accurate when compared to

14  the scientifically reliable medical evidence concerning the

15  effectiveness of Neurontin for bipolar?

16  A.  I did.

17  Q.  And what was your opinion?

18  A.  My opinion is that the information that the manufacturer

19  communicated to physicians was biased in terms of

20  communicating the positive effect of bipolar, was incomplete

21  in terms of the timing of the disclosure of that

22  information.  I forget the third part of the question.

23  Q.  Whether or not it was misleading?

24  A.  And that it would lead physicians to believe that they

25  were serving their patients to use Neurontin for bipolar

1    disorder when I believe that the manufacturer knew that the

2    drug was not effective for bipolar disorder.

3    Q.  Now, Dr. Abramson, your opinions are two parts, they

4    first deal with the science, then they talk about the

5    communication, correct?

6    A.  Correct.

7    Q.  So now I want to address first the science about

8    bipolar, and we'll stick to the science before we get to the

9    communication by and large.  Do you have that in mind?

10   A.  I do.

11   Q.  Isn't it true that the first study that you could find,

12   the first randomized control trial you could find regarding

13   bipolar was a study by Pande?

14   A.  Correct.

15              MR. SOBOL:  I offer 383.

16              THE COURT:  All right.

17              ( Exhibit No. 383 was marked and admitted into

18   evidence.)

19   Q.  Slide 6.  Dr. Abramson, I put up Slide 6, which is a

20   summary of the Pande study.  Please describe to the jury

21   briefly, we have a lot of things, I'm trying to move this

22   thing along, briefly what was the study and what did it

23   include?

24   A.  The study was to see whether Neurontin was better than a

25   placebo in the treatment of bipolar disorder for people who

b946f79a-1ae6-4295-87d1-3730705d1152

1    were already taking one drug, so like seizure disorder as

2    used as adjunctive disorder in seizure disorder, this would

3    be adjunctive therapy for bipolar disorder.

4    Q.  And so, again, is it correct then that what was the

5    conclusion?

6    A.  The conclusion of the article is it says the results

7    show that Neurontin is not effective for bipolar disorder.

8    I think that's a little bit generous because the conclusion

9    really was that the patients who took placebo actually did

10   significantly better than the patients who took Neurontin on

11   one of the two primary outcome measures.

12   Q.  Turn to slide 7, please.

13            THE COURT:  What is the Pande report?

14            THE WITNESS:  The Pande, it's a study that was

15   sponsored by the manufacturer.  It was completed in 1997.

16   The research report was written by the manufacturer, and it

17   was published as an independent article in 2000.

18   Q.  So you're saying, Dr. Abramson, that although the study

19   was completed in 1997, it actually wasn't published in

20   2000?

21   A.  That's correct.

22   Q.  And in Slide 7, what event is it that you're depicting

23   here that happens in the middle of those two time periods in

24   July of 1998?

25   A.  After a company completes a clinical trial, it writes a

1    research report that contains most of the details of that

2    study, and the timing of that writing of the research report

3    can vary.  In this case, the study was completed in '97.

4    The research report was issued in '99, but contained in the

5    research report was a letter that was written to the

6    investigators that conducted this study, so Pande was the

7    chief investigator, but the study was conducted at many

8    sites to find patients who might benefit from the drug, and

9    this is a letter that was written to the investigators to

10   inform them of the results.

11          The data is July 28th, 1998, so no later than that

12   date the manufacturer was clearly aware that not only did

13   Neurontin not help people who were on Bipolar but the people

14   who took Neurontin did significantly worse than the people

15   who were given the placebo.

16   Q.  And that's Pande?

17   A.  That's Pande.

18   Q.  Now, there was a next study.  Was there a Frye study

19   that you looked at?

20   A.  Yes.

21   Q.  And that was the next RCT?

22   A.  Yes.

23          MR. SOBOL:  I offer 1477.

24          ( Exhibit No. 1477 was marked and admitted into

25   evidence.)

1   Q.  Go to slide 9.  Please describe, Dr. Abramson, to the

2   jury your observations regarding the Frye study.

3   A.  Now the Frye study is a little different than the Pande

4   study.  The Pande study was funded by the manufacturer.  The

5   Frye study was funded by the National Institute of Mental

6   Health, so this is not a commercially-sponsored trial, and

7   this compared the effectiveness of two drugs, Lamotrigine

8   and Neurontin to placebo to treatment of patients with

9   bipolar disease.

10  Q.  And it indicated what?

11  A.  It indicated that Lamotrigine provided significant help

12  to people with bipolar disease, that Neurontin did not, and

13  that not only was Neurontin not better than placebo, but

14  Lamotrigine was better than Neurontin.

15  Q.  So, and then you indicate at the bottom of this slide

16  published in 2000, December, 2000?

17  A.  It was published in December of 2000, but the results

18  were made available sort of in a stuttering way up to that,

19  but the results from published in a review article in 1998,

20  so those results were known available certainly available to

21  a manufacturer of Neurontin no later than October of 1998.

22  Q.  Then there was how do you pronounce, the Guille study?

23  A.  Correct.

24  Q.  Not bad.  The Guille study.  Was that the next study you

25  looked at?

Page 106

1   A.   Yes.

2           MR. SOBOL:  I offer 1345.

3           THE COURT:  All right.

4           ( Exhibit No. 1345 was marked and admitted into

5   evidence.)

6   Q.   Slide 10.   Dr. Abramson, describe to the jury the Guille

7   study.

8   A.   The Guille was a small study that was done at Mass.

9   General Hospital that compared, it looked at 18 patients

10  with bipolar disorder, 9 in each group, and it found that

11  Neurontin did not provide significant benefit over

12  placebo.

13  Q.   And, again, this one was presented when and published

14  when?

15  A.   It was presented in May, 1999, and it was not published

16  as an independent article, it was only published as a

17  compendium of abstracts that were present at the American

18  Psychiatric Association annual meeting.

19  Q.   The final, bipolar science?

20          THE COURT:  What does refractory mean?

21          THE WITNESS:  Refactory means that these patients

22  are very hard to treat so they haven't responded.  Bipolar

23  can be a terrible disease, and drugs -- it can be very hard

24  to treat, so what this study is looking at is that subset of

25  bipolar patients who are very hard to treat, and they

1  haven't responded well to other drugs, they're refractory to

2  other drugs.

3  Q.  The final study you looked at for the science of bipolar

4  was the Vietta study, correct?

5  A.  That's correct.

6          MR. SOBOL:  I offer 1845, slide 11.

7          ( Exhibit No. 1845 was marked and admitted into

8  evidence.)

9  Q.  Dr. Abramson, please describe to the jury at least first

10  the study designed here about the Vietta?

11  A.  Vietta is a study that also tests whether Neurontin is

12  better than placebo as second drug in adjunctive therapy for

13  people suffering from bipolar disease.

14  Q.  Now, there's a little bit of a nuance here, so we have

15  to talk about something called "intent to treat" and "per

16  protocol."  Describe to the jury what's meant by "intent to

17  treat"?

18  A.  When you analyze a clinical trial, you have to lay out

19  which patients you're going to include in your statistics.

20  It's very important because if you change the population of

21  patients in the study that you analyze, you can get

22  different results, so the hard I way to do an analysis is

23  called intent or intention to treat, the intention to treat

24  population, and that best reflects what actually happens in

25  clinical practice.

1        What that means is that everybody who gets

2    random -- so, what happens is you find a pool of patients

3    who fit the criteria for inclusion in the study, so these

4    are bipolar patients, they're not doing well --

5    Q.   Whatever?

6    A.   -- whatever, these are bipolar patients, and they fit

7    the criteria of inclusion into the study, and they're

8    randomized to take placebo or Neurontin.  So the question is

9    when you do the statistics to find out if there's

10   significance, if it helps, do you do the statistics on all

11   the patients in the study, or do you just do the patients

12   who completed the study or who took a certain dose of

13   medicine.

14        As a clinician what you want to know, how is a

15   patient going to do when you start them on a drug, and the

16   best way to determine that is to do the intent to treat

17   population analysis which means every patient who was

18   randomized and took a dose of the medicine is counted.

19        So as a family doctor, if I want to know whether a

20   drug is going to help for the patient in front of me, it's

21   really the intent to treat population that I want to know

22   the answer to because I don't know whether my patient's

23   going to comply, I don't know whether my patient's going to

24   drop out of the study because they have side effects, I just

25   know that at that point in time, I want to know what's most

Page 109

1    likely to help, so that's the intent to treat.

2    Q.  Per protocol?

3    A.  Protocol is the sub of the intent to treat population,

4    and that definition has to be made before the study is

5    begun, and that's patients who meet certain criteria, they

6    completed the study or they achieved a certain dose of

7    medicine or they kept a diary appropriately, so there are

8    subcriteria besides the fact they were randomized and took

9    one dose.

10   Q.  Now, did you make any -- well, actually was Vietta

11   sponsored by Pfizer?

12   A.  I believe it was.

13   Q.  And, in any event, did you make any observations then

14   about the way that the results of the Vietta study were

15   published as opposed to what had been planned in terms of

16   the study?

17   A.  Yes, and this is very important.

18            MR. HOOPER:  Objection, your Honor.  The study was

19   published in '06, 2006.

20            THE COURT:  So?

21            MR. HOOPER:  Relevance.

22            MR. SOBOL:  Sidebar?

23            THE COURT:  What study?

24            MR. HOOPER:  Vietta.

25            THE COURT:  I'm happy to do a sidebar.

1            THE COURT:  What's the issue?

2            (THE FOLLOWING OCCURRED AT SIDEBAR:)

3            THE COURT:  What's the issue?

4            MR. HOOPER:  The issue study was published in

5     2006, the case goes to 2004.  How could we understand if

6     that's published in 2006 or yesterday?

7            MR. SOBOL:  Well, two things.  First, the

8     defendants have already raised many events happening after

9     2004 as undermining the position of Kaiser, i.e., what the

10    doctor said in 2005, what the website said last week.

11           THE COURT:  Can we fastforward this?  The reality,

12    they're claiming it's ineffective, so it's ineffective, if

13    it's proven at any time it's relevant, it may be true that

14    it may be different what the doctors did at various periods

15    of time.  I'm going to admit this in.  It's going to

16    effectively not necessarily what the doctors knew.  You're

17    going to have to go to a different time perhaps.

18           MR. SOBOL:  It's also ineffective.  He just

19    testified it was ineffective.

20           THE COURT:  Yes.

21           (SIDEBAR CONFERENCE WAS CONCLUDED)

22           THE COURT:  Let me explain what that sidebar was

23    about.  Eventually you're going to be asked to make certain

24    rulings, you know, factual decisions on the various issues.

25    One is, as you've noticed, Kaiser is alleging that the drug

1    is ineffective, it doesn't work for bipolar, and the second

2    is though there's a claim of fraud, whether or not anybody

3    intentionally did something or whether or not doctors

4    reasonably relied on something, so what his point was

5    really, while this may or may not be relevant as to the

6    first point whether it's effective for treating bipolar.

7          The second question is what did Pfizer know and

8    when did it know it, and what did Kaiser know and when did

9    it know it, so when you're following the ball, there are

10   multiple subparts, so I'm allowing it in as relevant for one

11   point, whether or not it was effective at all with respect

12   to Bipolar, but he's pointing out that it isn't necessarily

13   relevant, well, it isn't relevant for what Pfizer knew for

14   the period of damages alleged, which is what, 2004?

15          MR. SOBOL:  I think we should not instruct them

16   that, we should say go to the weight on it, it was

17   published, it was completed in '04 and the report issued in

18   June of '04.

19          THE COURT:  All right.  So, in any event, what

20   we'll do is we'll talk about that later, that is what the

21   debate is.  You can think of the reports, what did Pfizer

22   know and when did it know it, and the second basic

23   scientific point, was it effective for the treatment of this

24   condition?  As you've noticed "indication" means

25   "condition."

1   Q.   So, Dr. Abramson, what observation did you make

2   regarding the difference between the results as reported and

3   as contemplated in the Vietta study?

4   A.   Right.

5   Q.   This would be Slide 12.

6   A.   Yes.   The research report for the Vietta study stated

7   that the primary population that would be included in the

8   analysis to determine the outcome of the study was the

9   intent to treat population, the bigger population, everyone

10  who took one pill.   And there were 41 patients or 42

11  patients in that population.   And based on that intent to

12  treat analysis, the study showed that Neurontin was not

13  superior to placebo, but when the study was published, the

14  article said it was publishing the intent to treat

15  population, but it presented a different population, instead

16  of 41 or 42 patients, it only presented 25 patients, and, in

17  fact, the article substituted the per protocol population

18  for the intent to treat population.

19          Now, had that been identified in the original

20  research report, then that's the right thing to do, but what

21  happened is the per protocol population wasn't identified

22  and the doctors who read this article had no way of knowing

23  that the manufacturer had substituted one population for the

24  other.

25          The article doesn't say that there were originally

Page 113

1   42 patients but we culled it down to 25 because those are

2   the only people that complied, so the manufacturer knew in

3   2004 that the intent to treat analysis showed that this

4   study also showed that Neurontin was not superior to

5   placebo.

6   Q.  And the study was completed when?

7   A.  February, 2004.

8   Q.  And the report issued when?

9   A.  June, 2004.

10  Q.  And eventually it ended up being published when?

11  A.  In March, 2006.

12          THE COURT:  So just to clarify for a minute, did

13  the published report state that it was intent to treat?

14          THE WITNESS:  The published report in the medical

15  journal that the doctors read said it was the intent to

16  treat population when in fact it was the per protocol

17  population, and there was no clue in the published report to

18  tip even the sharp reader off that the populations had been

19  switched and that changed the entire outcome of the study.

20  Q.  Now, Dr. Abramson, you've described I think either four

21  or five studies regarding Bipolar that have informed your

22  opinion regarding the lack of effectiveness of Neurontin for

23  bipolar, correct?

24  A.  Yes, I think it's four studies.

25  Q.  Four studies.  And then I have a timeline, your Honor.

1          THE COURT:  Also the Vietta study, whose study is

2    that?

3          THE WITNESS:  Pfizer's.

4          THE COURT:  Pfizer's study?

5          THE WITNESS:  Yes.

6    Q.  I haven't used this pointer.  It's also going to show

7    how nervous I am.

8    A.  Neurontin could help.

9    Q.  Dr. Abramson, the science you just described along the

10   top is in the green, correct?

11   A.  That's correct.

12   Q.  And so just if you can briefly just tell the jury again

13   the timing of the studies along this line, and I think you

14   can pull it up here or not so you can see it.  Actually what

15   we'll do is this.

16          THE COURT:  Where do you think I have this

17   timeline?

18          MR. SOBOL:  In the notebook, your Honor.  I have

19   it so it would nicely unfold for you.

20          THE COURT:  I'll find it, go ahead.

21          MR. SOBOL:  Second tab, your Honor.

22   Q.  Dr. Abramson, just describe the timeline very briefly to

23   the jury again on the science side.

24   A.  On the science side, the Pande study was completed in

25   July of 1997, and that showed that Neurontin was -- that

1    placebo was significantly better than Neurontin as second

2    drug in for bipolar disorder.

3              In July, 1998, the investigators that participated

4    in that study were made aware of it so that it's very clear

5    that the manufacturer understood that outcome in July of

6    '98.

7              In May of '99 the Guille study was presented to

8    the American Psychiatric meeting, the study with nine

9    patients in each group, and that showed no benefit.

10             In December of 2000, the Frye study was published

11   as an independent study, but it had been published in a

12   review article in October of '98 showing that Gabapentin or

13   Neurontin was no better than placebo and Lamotrigine was

14   better than placebo, and finally in June, 2004, the Vietta

15   study was completed, and that showed that the intent to

16   treat population that was in the intent to treat population

17   was no benefit of Neurontin over placebo.

18   Q.  Okay.  Now, Doctor, I want to move from the science to

19   the opinion that you've given to the jury regarding what

20   doctors were told and whether it was inconsistent,

21   incomplete or misleading regarding Bipolar.  Do you have

22   that in mind?

23   A.  I do.

24   Q.  And you've told the jury that -- well, among the

25   observations that you made, did you make certain

1    observations in November of 1998?  Yes or no.

2    A.   Yes.

3    Q.   Slide 13.  Now, this was what document appears here?

4    A.   This is a slide that was shown in a continuing medical

5    education conference called New Options in Bipolar stores

6    that was presented to physicians November 21st, 1998.

7    Q.   So, at what time in relationship to the Pande study was

8    this marketing effort undertaken?

9    A.   The Pande study was completed in '97, but the

10   investigators were notified in July of '98, so it's very

11   clear, it takes some time to analyze the data, but it's very

12   clear that by July 28th of 1998, the manufacturer was aware

13   of the results of the Pande study that the drug was

14   significantly inferior to a sugar pill.

15   Q.   And this Young, et al, what does Young, et al mean?

16   A.   Young, et al was an article that was published in 1997

17   by Young and other authors.

18   Q.   Sponsored by?

19   A.   I think it was Pfizer, the manufacturer.

20   Q.   And, again, available to physicians whether they're with

21   the Permante Medical Group or elsewhere in the country,

22   correct?

23   A.   Correct.

24   Q.   And what observations did you make when you compare

25   Young to Pande?

1    A.  Well, this is the "scientific evidence," quotes around

2    "scientific evidence" that were told about the efficacy of

3    Neurontin for bipolar disease in November of 1998.  The

4    Young study -- can we go back to?

5    Q.  Yes, go back to slide 13.  Let me ask it this way first,

6    there's information about Young, the Young study here,

7    correct?

8    A.  Yes.

9    Q.  But there's nothing about what?

10   A.  There's nothing about the size of the study, the design

11   of the study, the population of the study.

12   Q.  Or about Pande?

13   A.  There's nothing about Pande for sure, yes.

14   Q.  Now, please just take a step to the side from this for a

15   moment.  Can you describe to the jury why it is important

16   for a medical doctor to receive not only some of the

17   information that might go one way but all of the information

18   if it cuts another way?

19   A.  It's important for doctors to get accurate and

20   reasonably complete information about what the scientific

21   evidence that's known at the time is because when we go to

22   continuing medical education courses, we're trusting that

23   experts who understand the field way better than we can as

24   practicing physicians, not focusing on these issues.

25            It's essential that we get a full and accurate

1   representation of the current state or knowledge because

2   when doctors go to continuing medical education, they trust

3   what they are presented with.  Our job is not to go back to

4   the medical library and look up the Young article and see

5   what the study really was.

6           So it's critically important that in continuing

7   medical education courses that doctors get presented a fair

8   and accurate and balanced representation of scientific

9   evidence.

10  Q.  Now, is this a lot of sort of theory that you're

11  espousing, or is this real world the way doctors needed

12  information?

13  A.  It couldn't be more real world.  I was a busy practicing

14  family doctor, and when I went to continuing medical

15  education courses, I wanted to be told by the experts how

16  best to take care of my patients, and I think I was a pretty

17  critical reader of the literature, and I was better trained

18  than the vast majority of docs because I did that extra

19  two-year fellowship, but I relied on what experts told me

20  and came back from continuing medical education courses and

21  implemented that information on my patients right away.

22          THE COURT:  So who's CME's presentation was this?

23          THE WITNESS:  This was Pfizer's or the defendant,

24  the manufacturer's CME presentation.  They had sponsored it.

25  Q.  Now, did you make any comparisons the doctor had an

1  opportunity to compare Young to Pande what that would have

2  shown?

3  A.  Yes.  First I looked at Young, and you can look up the

4  article, and you see that this dramatic improvement that's

5  presented to physicians, if we can go back to the other

6  slide.

7  Q.  13?

8  A.  Yes.  As a physician, if you're looking at that slide,

9  you're thinking, whoa, 20 percent of these difficult to

10 treat people got markedly improved and 53 percent got a

11 moderate improvement, but if you look at the article, there

12 were only 15 people in this study, and this was not a

13 randomized control trial, these were people that were given

14 Neurontin.  There's no control group, so there's no

15 comparison how people are doing with the placebo.

16      So when they say there's a 20 percent of the

17 people in the study got a marketed improvement, that means

18 three people got a marked improvement in this open label

19 study that included not just Bipolar I, which is the severe

20 kind of Bipolar which was what Neurontin, excuse me, it

21 included not just the most severe kind of Bipolar but

22 Bipolar I and II, the less severe.

23      So when they say a marked improvement and the docs

24 are saying, gees, if I can get 20 percent improvement in my

25 Bipolar patients, that would be great, we're talking about

1   three patients without a control group, and when you about

2   the 53 percent in the moderate improvement, you're talking

3   about five patients in an open label study.

4   Q.  And did you compare that to Pande?

5   A.  I did compare that to Pande.

6   Q.  What conclusions do you make?

7   A.  The conclusion that I came to.  Now we go to the next

8   slide.  The conclusion that I came to is that the Young

9   study was 15 patients with Bipolar I or II with no control

10  group, open label, so everyone knew what they were getting.

11          The Pande study included 117 patients with

12  Bipolar I, and it was what Dr. Kessler called Level I

13  evidence.  The 117 patients were randomly assigned to take

14  Neurontin or a placebo, and they didn't know what they were

15  getting, and the doctors and the other clinical people in

16  the study didn't know what they were getting, and when you

17  did the study that way, you found not only that Neurontin

18  wasn't superior to placebo, but you found that the people

19  who took the placebo did significantly better, and that data

20  was available no later than July 28th, 1998, and yet it was

21  the young study that was presented to doctors in November of

22  1998, not the Pande study.

23  Q.  Now, Dr. Abramson, let's take a step back from the

24  slides for a moment.  There's something called the could

25  being rain review, correct?

1   A.   Yes.

2   Q.   Now, the Cochrain Review isn't Pfizer, correct?

3   A.   That's correct.

4   Q.   It's not Kaiser, correct?

5   A.   That's correct.

6   Q.   So what is it?

7   A.   Cochrane Review is the most trusted review articles, and

8   let me take a step back.  Level I evidence is randomized

9   control trials that are conducted well.  Even better than

10  Level I evidence is a systematic discipline review of the

11  Level I evidence so that a doctor, instead of a doctor

12  having to look, read each article and make up his or her

13  opinion about what that article says, a systematic review,

14  unbiased review, is experts who understand research design

15  and statistics looking at all the Level I evidence, putting

16  it together so that a doctor can just look at one source and

17  know what the current scientific evidence is.

18          And so that's our highest reliance.  The Cochrain

19  Review is a nonprofit organization.  It grew out of the UK's

20  National Health Service to inform the UK what the best

21  medical care was.  Now it's a bigger thing than that, it's

22  an international nonprofit organization to put together the

23  best scientific evidence available so doctors can have a

24  go-to source so they can know what the scientific evidence

25  shows about a certain drug and a certain disease.

1   Q.  And so when you undertook your review as to the

2   information that was available to doctors, did you look into

3   whether or not doctors could go to the could being rain

4   review in order to learn anything about Neurontin and

5   Bipolar?

6   A.  I did.

7   Q.  Describe the kinds of documents you looked at.

8   A.  Well, we'll look at the could being rain review and

9   other review articles that looked at the literature that was

10  available.

11  Q.  In connection with your preparation in this case, did

12  you also review documents about an effort that Cochrain

13  Review engaged in in order to try to put together the kind

14  of study you just mentioned about Bipolar?

15  A.  I did, and I could do that because I was working as an

16  expert in the case, but practicing physicians wouldn't have

17  access to those documents.

18  Q.  And that's because the documents in this case, many of

19  the documents are under a confidentiality order as far as

20  you understand it?

21  A.  That's correct.

22          MR. SOBOL:  I offer Exhibits 159, 2037 and 2088.

23          MR. HOOPER:  Just one moment.  Can I please take a

24  look.

25          MR. SOBOL:  159, 237, I'm sorry, it's 2088.

Page 123

1          THE COURT:  236.

2          MR. SOBOL:  236.

3          THE COURT:  All right.

4          ( Exhibits 159, 237 and 236 were marked and

5     admitted into evidence.)

6     Q.  Slide 15, please.  Dr. Abramson, please describe to the

7     jury the bottom line observation you made when you looked

8     into the information whether there was something in Cochrain

9     regarding Neurontin and bipolar?

10    A.  The bottom line is that there wasn't something, and this

11    slide that has a lot of text on it explains why there wasn't

12    something, and the short of it is if you look in red,

13    Dr. Macrichae of the Cochrain Review had requested documents

14    that Pfizer had about the efficacy of Neurontin to treat

15    Bipolar patients, and you can see various communications,

16    but in July, 2003, Dr. Macrichae wrote to Pfizer requesting

17    information, both published and unpublished, complete or

18    ongoing, which would meet our inclusion criteria that the

19    Cochrain Review needed to do its review, and you can see

20    from the Pfizer internal e-mail of December, 2003 that their

21    response written by Bruce Parons was, "I would not send

22    unpublished Neurontin data to anyone outside Pfizer," and

23    Pfizer did not comply with the requests of the Cochrain

24    Review, and the Cochrain Review was eventually abandoned.

25    Q.  So it was as late as of April of 2007 then the Cochrain

1  Review withdrew the protocol and there was a delay in being

2  able to do a review?

3  A.  Right.

4         THE COURT:  So essentially there was nothing in

5  Cochrain about Neurontin for bipolar at all?

6         THE WITNESS:  Correct.

7  Q.  Dr. Abramson, if I understand it correctly then, you

8  said something how the Cochrane Review, if it wants to

9  undertake the study, it needs to access all of the

10  underlying data from all of the double blind randomized

11  control trials?

12  A.  That's the goal, and if Cochrane is going to be able to

13  do what it wants to do for physicians to provide them in one

14  place with the totality of scientific evidence, that would

15  be what would happen, but Cochrane has to rely on the

16  voluntary compliance of the manufacturers.  They don't have

17  a subpoena, so the problem is the Cochrane Review can only

18  be what's publicly available and what the drug company

19  chooses to send them.

20  Q.  And is that because whoever funds the study owns the

21  data essentially?

22  A.  That's correct.  Now, 85 percent of clinical trials are

23  commercially funded, and the reason why those trials are

24  undertaken is to fulfill the primary responsibility of the

25  drug company, which is to maximize its profits.  That

1   doesn't mean that they're bad or anything else, but that's

2   the fact.

3           And when a drug company sponsors a trial, it owns

4   the data like the recipe for coke, it's secret, and it

5   doesn't have to turn that data over or make it available

6   unless a regulatory agency asks for it or unless there is a

7   subpoena in litigation.

8           So the primary data for most of the clinical

9   trials is kept proprietary, and that gives the drug

10  companies wide range to present their version of the data.

11  Q.  As far as you understand it, with respect to this

12  particular situation, was there anything that prevented

13  Pfizer -- strike that, let me ask this:  If I understand it

14  correctly, Dr. Abramson, the requests that were being made

15  by Cochrane and which were being rejected occurred in 2003,

16  two or three years after Pfizer purchased Warner-Lambert and

17  Parke-David, correct?

18  A.  Correct.

19  Q.  As far as you understand it, was there anything that

20  could have stopped Pfizer from giving the data to could

21  being rain and letting them undertake the study?

22          MR. HOOPER:  Objection, foundation, your Honor.

23          THE COURT:  Overruled.

24  A.  There was nothing that prevented Pfizer from making all

25  of its data available to the could being rain review except

1   for its business goals of maintaining its sales of

2   Neurontin.

3   Q.  Now, let's go back in time a little bit to the time

4   period of 1995.  Did you review some general marketing

5   assessments put together by Parke-David?

6   A.  I did.

7   Q.  And what observations -- we can go to the next slide,

8   which is slide 17.  What observations, if any, did you make

9   about marketing assessment in 1995 with respect to

10  Bipolar?

11  A.  What the documents show is that the manufacturer of

12  Neurontin was -- had used the publication of studies as a

13  marketing tool so that they were undertaking studies, not

14  randomized control trials at this point but case reports and

15  open label trials, and they were using those as marketing

16  tools.  They were saying, as you can see in this slide, the

17  results, if positive, will be publicized, but the results if

18  negative aren't going to be shown.  So when they do a study,

19  they're basically saying heads we win, tails we don't

20  lose.

21          They can only win by doing these studies.  Now,

22  doctors, the key point here is that doctors have to rely on

23  what's published in the literature, and if they're seeing

24  just a positive side of things, they're going to be forming

25  conclusions about how to treat their patients that aren't

1   based on the scientific evidence.

2   Q.  Again, drawing your attention to November of 1997, now

3   moving ahead a couple of years, did you make any

4   observations about some CMEs that you saw regarding Bipolar

5   and Neurontin then?

6   A.  Yes.

7   Q.  Slide 18.  Go ahead.

8   A.  This is a slide that was presented at a November 15th,

9   1997 continuing medical education course.  Now, Pande had

10  been completed, the Pande study had been completed.  The

11  research report hadn't been issued yet, but what this is

12  presenting is as if there's validity to this evidence that

13  mood stabilizing effects of Neurontin are under

14  investigation, but for bipolar disorder, you can use

15  Neurontin, and you can go up to 4800 milligrams a day.

16         Now, there isn't any Level I evidence that

17  supports this, yet doctors who are hearing this in a

18  continuing medical education course, especially for

19  difficult to treat patients, are very likely to be persuaded

20  to try Neurontin for bipolar disorder.

21  Q.  Now, turning your attention now ahead to November of

22  2001, and you recall by November of 2001, there were at

23  least a couple of studies that Pfizer knew about in terms of

24  not showing the effectiveness of Neurontin for bipolar?

25  A.  Correct, three actually.

Page 128

1    Q.  Did you look at a situation analysis --

2              THE COURT:  Can I back up, when you say CME

3    presentation, you keep saying that, what do you mean by

4    that?

5              THE WITNESS:  I apologize.  That's a continuing,

6    CME means continuing medical education, so those are

7    lectures that doctors go to to fulfill their --

8              THE COURT:  Right, you've said that.  But run by

9    whom?

10             THE WITNESS:  They're generally run by the

11   manufacturer of the drug.

12             THE COURT:  Do you know in these particular ones

13   when it says CME presentation, the last one you said was a

14   Pfizer one.  Do you know whether this one was something that

15   Pfizer was presenting or was an independent CME?

16             THE WITNESS:  My recollection is this is before

17   Pfizer took over.

18             THE COURT:  Do you know one way or another?

19             THE WITNESS:  My recollection is that it is, but I

20   want to go back and look at the document.

21             MR. CHEFFO:  Could we have a sidebar for a minute?

22             THE COURT:  No, I'm going to strike it, and if you

23   go and check, and that's true, then you'll supplement it.

24             THE WITNESS:  Fair.

25   Q.  Did you review an internal Neurontin 2001 situational

1   analysis?

2   A.  I did.

3          MR. SOBOL:  I offer 213, slide 20.

4          ( Exhibit No. 213 was marked and admitted into

5   evidence.)

6   Q.  Dr. Abramson, my understanding is that is an internal

7   document from the manufacturer, correct?

8   A.  Correct.

9   Q.  Discussing the progress of marketing and the success or

10  lack thereof of the sales, among other things, of Neurontin

11  for bipolar, correct?

12  A.  Correct.

13  Q.  What observation did you make?

14  A.  This is the Neurontin 2001 situation analysis, so it

15  would have been prepared in the second half of 2000, and you

16  can see it's been brought out that the text says that

17  currently Bipolar disorder represents half of all

18  psychiatric drug uses for Neurontin.

19          The increased use comes despite the results of the

20  Pande study, Study 209 which showed no significant

21  improvement when compared to placebo, actually it was

22  significantly worse than placebo, so it's very clear that

23  Neurontin knows that, excuse me, that the manufacturer knows

24  that it's selling a lot of drugs for bipolar disease and

25  that its own study showed not just that it was not effective

1   but significantly worse than a sugar pill.

2   Q.  Now, if I understand it correctly, Dr. Abramson then in

3   this document, the manufacturer is looking at how much it's

4   selling Neurontin for bipolar even though it doesn't work

5   for bipolar, it's basically it?

6   A.  Correct, or may actually -- their own study showed that

7   it was worse than a sugar pill.

8   Q.  Now, did you review documents to determine whether or

9   not certain channels of information that doctors rely upon

10  the manufacturer used to communicate information about

11  Bipolar and Neurontin?

12  A.  Yes.

13  Q.  I turn to the next slide.  Here we're talking about --

14  describe to the jury what this is?

15  A.  This is from the same document that the last slide came

16  from, the Neurontin 2001 situational analysis, so it's

17  prepared in the last half of 2000, and the situational

18  analysis acknowledged the fact that their own study showed

19  no efficacy but yet contains their marketing plan going

20  forward to support psychiatry continuing medical education

21  events, meetings, symposia, half day courses, dinner

22  meetings and publication about the psychiatric use of the

23  drug even though their evidence shows that it's not

24  effective.

25          MR. HOOPER:  Your Honor, rule of completeness,

1   106, I'd ask that the first full sentence on the top of page

2   20 of that document referring to Pande outcome be read.

3           THE COURT:  I'm not sure where you're talking

4   about, but I'm happy to have you read it.  Where is it?

5           MR. HOOPER:  It's in their Exhibit 213, your

6   Honor, page 20 thereof.

7           THE COURT:  So read what it is you think needs to

8   be read.

9           MR. HOOPER:  It actually begins on the preceding

10  page, and it says quote, "The increased use comes despite

11  the results of the Gabapentin and bipolar disorder trial,

12  945, 209 which showed no significant improvement when

13  compared to placebo among psychiatric thought leaders, trial

14  design shortcomings were responsible for the outcome, not

15  efficacy."

16          THE COURT:  Okay.  What's the next question?

17  Q.  Did you make any other observations regarding the

18  situation analysis, Dr. Abramson, slide 22?

19  A.  That, again, despite the lack of evidence of the

20  efficacy of Neurontin for bipolar disorder, the manufacturer

21  was going to continue to bring information to physicians

22  that would increase the use of that drug, and the direct

23  quote is "Parke-David plans to continue to support

24  educational initiatives in the psychiatric arena that will

25  discuss the broad utility of AED is anti-epileptic drugs in

1    the range of medical conditions such as bipolar and

2    other --" I'll read it, "bipolar disorders, anxiety states

3    and substance abuse, alcohol withdrawal and cocaine

4    treatment."

5    Q.  Now, Dr. Abramson, during this timeline and even maybe

6    before the publication of the very first study, Pande --

7    well, you've gone through, I take it the science you've gone

8    through is the Level I evidence, correct?

9    A.  Correct.

10   Q.  Were there nevertheless case studies that were

11   reported and certain other kinds of non-Level I evidence out

12   there?

13   A.  Yes, there were.  In fact, a review article looked at

14   the evidence that was available for physicians and then saw

15   29 articles that had been published that doctors would see

16   if they looked at the literature, and what they found is

17   that of the 29 articles, 25 of them were case studies and

18   case reports, not Level I randomized control trials.

19          Those publications universally, universally said

20   bipolar was effective.  The four randomized control trials

21   that had been published said that Neurontin is not

22   effective, so you're getting sort of this 29 studies and the

23   docs are trying to figure out what's the sense of this and

24   how they can help their patients, and 25 of the 29 are

25   positive, but they're not Level I evidence.

1    Q.  If we can go to slide 23.  I offer Exhibit 1995.

2    A.  This is the article.

3           MR. SOBOL:  Hold on one moment.

4           THE WITNESS:  I'm sorry.

5           ( Exhibit 1995 was marked and admitted into

6    evidence.)

7    Q.  Go ahead.

8    A.  This is the article that I was just describing, so they

9    comment on the positivity of these less than Level I

10   publication, and the authors use the word "echo chamber,"

11   they say the large number of case series and case reports,

12   encouraging case reports reported encouraging results that

13   were not confirmed by later small randomized trials.

14          The number of reports and their distribution in a

15   number of journal created a type of echo chamber, in other

16   words, the buzz was created that this was an effective drug

17   by the panoply of less than Level I articles that were

18   published, and that drowned out the evidence from the

19   Level I studies that show that the drug didn't work and

20   maybe worse than a sugar pill.

21   Q.  And finally in this area of bipolar, did you review the

22   2002 operating plan of Pfizer for Neurontin?

23   A.  I did.

24   Q.  Go to the next slide.  What observations did you make?

25   A.  That despite the fact that the evidence, that the

1    Level I evidence showed that the drug did not work for

2    bipolar disease, the manufacturer continued to have a

3    marketing plan that would increase the use of bipolar, the

4    use of Neurontin for bipolar disease, so here you see key

5    messages.

6           Now, the key messages in the publication strategy

7    are the messages that the manufacturer wants to get out to

8    physicians to have them -- what they want the physicians to

9    think about the drug.

10          Now, doctors usually think of the medical

11   literature as unbiased and coming from researchers.  The

12   word is disinterested researchers who are looking at science

13   and trying to figure out what the truth of the science and

14   how best to communicate, here and here we see sort of behind

15   the curtain that wasn't necessarily the case because the

16   manufacturer in its business plan had a publication

17   strategy, and the manufacturer developed the key messages

18   that it wanted to communicate in that communications

19   publication strategy, and it's not just sort of the totality

20   of independent researchers that creates what doctors believe

21   to be the scientific evidence.

22          Here you see that it is going to be manipulated by

23   having key messages imbedded in future publications.

24   Q.  Dr. Abramson, yesterday my recollection is that the

25   Pfizer lawyers put a screen up during the opening statement

Page 135

1    indicating that bipolar is one of something called --

2    bipolar can be difficult to treat, something like that.  You

3    even mentioned that earlier, correct?

4    A.  Correct.

5    Q.  First, just briefly, describe to the jury what is

6    bipolar.

7    A.  Bipolar disease is a very serious disorder of mood, and

8    you can have bipolar implies you go up and you go down, and

9    most of the patients who suffer from bipolar will go up or

10   down, and many will go up and down, so you can have a

11   cycling or you can have Bipolar depression or Bipolar man

12   yeah.

13   Q.  And when you say difficult to treat, what do you mean?

14   A.  That there's no medication that works perfectly and that

15   it's a very serious disease, and there is clearly a

16   reasonable attempt to find drugs that will work, that will

17   help these seriously ill patients, but that doesn't mean

18   that you throw science out the window.  It means that you do

19   randomized control trials, and you integrate the results of

20   those trials into what you try to do for these many times

21   desperately ill patients.

22   Q.  And so is it even more an issue, I'm not sure exactly

23   how to say it, you have a difficult to treat psychiatric

24   population, why is it important that the science that is

25   made available to practitioners be consistent with the

1    science, be complete, be fairly accurate?  Why is that

2    important in this setting?

3    A.  It's critically important because you don't have a slam

4    dunk go-to drug, you have patients that aren't going to

5    respond to the drugs that are out there, so doctors are

6    going to try, and what Dr. Kessler was saying about

7    off-label prescribing, this would be a situation where you

8    might consider prescribing off-label.

9         The key is that when doctors make a decision to

10   prescribe off-label, they have to have accurate science

11   because they don't have the FDA to back them up, they don't

12   have the FDA to say, look, we have a staff of hundreds of

13   people who have examined these issues, and we've looked at

14   it for 6 months or 12 months, and we've determined that it's

15   effective.

16        The doctors are on their own when they're

17   prescribing off-label, so on the one hand you could say

18   well, these are seriously ill patients why not try anything?

19   Well, you wouldn't try penicillin.  There's no evidence that

20   an antibiotic would help bipolar disease, so doctors who are

21   in the position of trying to help desperately ill people

22   need to have the evidence from the randomized control trials

23   in order to know what to try.

24   Q.  Is it your testimony then, Dr. Abramson, that when

25   someone is prescribed Neurontin they might have been

1    prescribed something else for their bipolar that truly would

2    have been effective?

3    A.   That would have had a higher likelihood of being

4    effective.

5    Q.   Now, let's turn to the category of pain.

6              THE COURT:  Well, are there drugs that are

7    approved by the FDA for bipolar?

8              THE WITNESS:  Yes, there are.  There are a number

9    of antipsychotic drugs, and there are a couple of

10   antiepileptic drugs that are approved but not Neurontin.

11   Q.   Now, let's turn, and so when Neurontin is prescribed,

12   perhaps some other drug that's approved by the FDA, after

13   double blind randomized control trials have established its

14   effectiveness, those drugs could otherwise have been

15   prescribed?

16   A.   That's correct.

17   Q.   Now, I want to turn to the category of pain, both

18   neuropathic pain and nociceptive pain.

19   A.   Yes.

20   Q.   Based upon your education, training and experience and

21   upon concluding your review of the medical review of the

22   science with respect to the pain, did you form an opinion to

23   a reasonable degree of certainty in the area of statistics,

24   epilepsy deeming and research design as to what the reliable

25   scientific evidence shows regarding the effectiveness of

1    Neurontin for pain, both nociceptive pain and neuropathic?

2              MR. HOOPER:  Objection.  Foundation.

3              THE COURT:  Overruled.

4    A.  I did.

5    Q.  What is your opinion?

6    A.  My opinion is that there is scientific evidence that

7    Neurontin is effective for post herpetic neuralgia, but

8    there is not good scientific evidence to show that Neurontin

9    is effective for the treatment of other kinds of pain.

10   Q.  Did you compare the reliable science to what the

11   documents of Warner-Lambert, Parke-David and Pfizer showed

12   regarding its communications regarding Neurontin and pain?

13   A.  I did.

14   Q.  And based upon your education, training and experience

15   and upon your review of the documents showing what Pfizer,

16   Warner-Lambert and Parke-David communicated regarding the

17   effectiveness of Neurontin for pain, did you form an opinion

18   to a reasonable degree of medical certainty as to whether

19   Pfizer's communications regarding Neurontin were consistent,

20   complete and fairly accurate when compared with

21   scientifically reliable medical evidence of the

22   effectiveness of Neurontin for pain?

23             MR. HOOPER:  Objection.  Foundation.

24             THE COURT:  Overruled.

25   A.  I did.

1   Q.   What is your opinion?

2   A.   My opinion is that the evidence that was available to

3   practicing physicians did not accurately or completely

4   reflect, reasonably reflect the science that was available

5   at the time.

6        MR. SOBOL:   May I approach and do the timeline on

7   this one?

8   Q.   I guess we know the drill now, Dr. Abramson, the first

9   study you looked at was the gore son study?

10  A.   Well, that's chronologically the first one.  I can't

11  remember which was the first study.

12  Q.   Very good.

13       MR. SOBOL:   I offer 1271, slide 26.

14       THE COURT:   All right.

15       ( Exhibit No. 1271 was marked and admitted into

16  evidence.)

17  Q.   Dr. Abramson, please describe to the jury what your

18  findings showed regarding the first chronological study that

19  you looked at.

20  A.   The first study randomized control trial was the

21  so-called Gorson study of patients with painful diabetic

22  neuropathy.  It was completed in March of 1997, and it

23  showed that Neurontin was no more effective than placebo for

24  the treatment of painful diabetic neuropathy.

25  Q.   I'm a bit curious about something, the second bullet

1    though says that an abstract that was published in April of

2    1998 said that Gabapentin, that's Neurontin, may be

3    effective for the treatment of painful diabetic neuropathy.

4    It sounds like the opposite of what you just said?

5    A.  That's correct.

6    Q.  Can you explain that?

7    A.  That's a good question.  It's a different --

8    Q.  I finally got one.

9    A.  It's a different interpretation of the research results

10   of this study than the authors who wrote the original

11   manuscript came to.

12   Q.  If you can go to -- did you review some of the drafting

13   and the abstracts regarding this study in connection with

14   your review here?

15   A.  I did.

16              MR. SOBOL:  I offer Exhibits 19 and 30.

17              THE COURT:  All right.

18              ( Exhibit 19 was marked and admitted into

19   evidence.)

20              ( Exhibit 30 was marked and admitted into

21   evidence.)

22   Q.  Go to slide 28.  Dr. Abramson, describe to the jury what

23   you're showing here between the comparison of what the

24   authors wanted the article to say as opposed to what

25   somebody else wanted it to say?

1  A.  This is important because practicing physicians would

2  not have this information available to them, it's available

3  because of the litigation.  The authors faxed their

4  manuscript describing the research that was done to the

5  manufacturer in August of 1997, and the conclusion, the

6  authors' original version is on top, and a version that came

7  back from the manufacturer is on the bottom.

8        And if you look just at the conclusion, and

9  sometimes physicians just read the abstract of the article

10  and want to know what's the bottom line.

11        If you look at the conclusion of the abstract from

12  the manufacturers' version, they looked at the study, and

13  they concluded that Gabapentin, Neurontin, at a dose of 900

14  milligrams per day is probably no more effective than

15  placebo in the treatment of painful diabetic neuropathy.

16  That's the author's version.

17        When the revised version came back attached to an

18  e-mail from the manufacturer, that conclusion was quite

19  different, and it said, "Gabapentin may be effective in the

20  treatment of painful diabetic neuropathy.  Our results

21  suggest further studies evaluating higher doses of

22  Gabapentin are warranted."

23  Q.  Now, essentially what is it when you looked at how they

24  were trying to justify the change?

25        THE COURT:  Before the date, from the abstract,

Page 142

1    can you tell who wrote the second version?

2              THE WITNESS:  I can only tell that it was attached

3    to an e-mail that came from -- that was written by

4    Mr. Magistro from the manufacturer.

5              THE COURT:  Who's Magistro?

6              THE WITNESS:  He's an employee of the

7    manufacturer.

8              THE COURT:  Of Pfizer or Warner-Lambert?

9              THE WITNESS:  I don't know it was Pfizer or

10   pre-Pfizer.

11             MR. GREENE:  Phil Magistro, an employee of

12   Parke-David.

13   Q.  Did you look behind how it is that Parke-David was

14   trying to justify this change in the characterization of the

15   conclusion?

16   A.  Yes, and this is really important.  The abstracts of the

17   two articles are very different.  The substance of the

18   articles don't change that much, but the authors, the

19   original research manuscript was analyzed the proper way, so

20   you give Neurontin and you give placebo, and the test is --

21   Q.  May I interrupt you, Dr. Abramson.  Would it be helpful

22   to draw a brief diagram to show this or no?

23   A.  Sure.

24             THE COURT:  Easier said than done.  Do you have

25   a --

1          MR. SOBOL:  Yes, I do, my little blue pen, if he

2     could write on the back of this, if that's okay.

3          THE COURT:  Okay.  Now remember the court

4     reporter's here so keep your voice up, okay?

5          THE WITNESS:  Yes.

6          THE COURT:  This will probably be the last line of

7     discussion today.

8     A.  So there were three measures of improvement.  Now pain,

9     as Dr. Kessler said, is a subjective experience, so there

10    are three measures of subjective improvement of pain, and

11    the goal is to help people with diabetic neuropathy to have

12    less pain, so it's a randomized control trial.  Some of the

13    patients got Neurontin and some got placebo, and so this

14    would be the measure of pain that would be involved, and

15    this would be the time.

16         So I forget I think it goes 12 weeks, I can't

17    remember, it's possibly 10.  So you'd see that the patients

18    who took Neurontin would get better over time in the three

19    scales, but you also see that the patients that took placebo

20    get better over time on the three scales.

21         Now, the way you do the analysis is that you find

22    out what the average pain relief on each of the three scales

23    is at the end of the trial for the Neurontin patients and

24    for the placebo patients, and you compare these two to see

25    if they're statistically significant.  That's the way the

1  analysis is done.

2         In the abstract of the Gorson article that was

3  submitted by the authors, that's what they do, for each of

4  the three pain scales, they look to see so they'd have three

5  of these charts for each of the pain scales, and they'd look

6  to see whether this difference is statistically significant,

7  and it came out statistically for one of the three measures

8  but not the other two.

9         But in the abstract that came back from the

10 manufacturers, they changed it around so they weren't

11 looking at the difference between the average outcome

12 measure, they were looking at the difference between the

13 start of Neurontin and the end of Neurontin, and you see

14 that if you're a doctor and you give your patient Neurontin

15 and there's an expectation that they'll be an improvement,

16 there is in fact a significant improvement from start to

17 finish.

18        So that if a doctor gave his or her patient

19 Neurontin or a placebo, they would think that there was a

20 significant improvement because there's a nice improvement

21 here as well.

22        So the first abstract does it right and looks at

23 this difference, but the second abstract does it wrong and

24 compares Neurontin at the beginning and Neurontin at the end

25 and says that's statistically significant and then does

1  placebo at the beginning and placebo at the end.

2          The reason it's a little geeky, the reason why

3  it's important is because it shows if the doctor didn't know

4  whether he or she were giving Neurontin or placebo, the

5  doctor would conclude that the therapy was effective because

6  from start to finish, the patients got better.

7          That's why it's so important when we say why do

8  doctors believe that their patients get better, well, a

9  belief has been created that the drug is effective and the

10  doctors are seeing an improvement in the patients, but it

11  doesn't mean that it wasn't this getting better.  There are

12  a couple of comments about this so-called placebo effect.

13  Q.  I can't have you running off.

14  A.  Okay.

15          THE COURT:  You just finish this up and then we'll

16  break for now.

17          MR. SOBOL:  This is the last question on this.

18  Q.  If you're comparing rather than Neurontin to a placebo,

19  but instead, as the manufacturer did, you're comparing

20  Neurontin to Neurontin, have you essentially gotten rid of

21  your control?

22  A.  You have, and you have an open label trial so you don't

23  have a randomized control trial.

24          THE COURT:  Thank you.  See you tomorrow.

25          THE CLERK:  All rise for the jury.

1          THE COURT:  I'll See counsel at sidebar for a

2     minute.

3          (THE FOLLOWING OCCURRED AT SIDEBAR:)

4          THE COURT:  So just a factual question, so one

5     portion of the case we haven't talked very much about, but

6     it's critical here, is what's the enterprise?  So if these

7     CMEs are what you're referring to as part of the enterprise

8     and that's the fraud of the enterprise, I sort of need to

9     know that both for purposes of directed verdict and to

10    explain it to a jury, so this is why I keep saying when you

11    say what doctors are told, it may be relevant even if it's

12    an independent CME, but what's directly important to me is

13    it one of these so-called enterprises that's disseminating,

14    or is it completely where it goes back to his First

15    Amendment point, so that's why it's important to me and

16    maybe does some other witness do this?

17         MR. SOBOL:  Yes.

18         THE COURT:  Who does this?

19         MR. SOBOL:  I think many of the documents

20    Mr. Greene will get into, many of the documents will

21    establish that Cline, Davis, Mann was behind much of the

22    early efforts and that it was just the first enterprise, and

23    the second enterprise is the Bach enterprise that comes into

24    effect in 2001.

25         THE COURT:  Maybe.  My only point, when you throw

1  this, what doctors were told, and I understand he was doing

2  his best to remember and he couldn't remember, I'm sure he

3  can look it up and figure it out, we have to know which

4  bucket they fall into.

5       MR. GREENE:  These CMEs, your Honor, are sponsored

6  by the defendants in the case, sponsored by the defendant in

7  the case; and, 2, they're tactics that Cline, Davis came up

8  with to implement the off-label strategy, and so there are

9  some documents.  I'll let you know.

10      THE COURT:  You need to hook it up.  My only point

11  for point of understanding it, some of it looked like a

12  misrepresentation, but I don't know whether that was an

13  independent doctor from an independent CME or whether it was

14  promoted or sponsored by the enterprise, so I'm simply

15  saying I'm looking at the big picture right now, and that's

16  what I didn't understand.  So I struck that one answer, I

17  think that's what you were driving at.

18      MR. CHEFFO:  I think the actual instruction, I

19  think what you're hearing is not accurate.  What we have

20  here is when we have this stuff about CME, when they say

21  it's a Pfizer CME, they're making it sound like Pfizer

22  published an article.  If Pfizer has an independent grant

23  and someone goes out and runs a CME, that's very different.

24  When you ask is this a Pfizer CME, they get up and say yes.

25  That could mean they wrote an unrestricted check and they

1    never got any information.

2              THE COURT:  I don't understand.

3              MR. CHEFFO:  Let's say I was to host something for

4    the federal judiciary, pay for lunch for something.

5              THE COURT:  We get nothing.

6              MR. CHEFFO:  My point is there's different levels,

7    so if they wrote a check to X,Y,Z Company, it's

8    unrestrictive, have nothing to do with it, it's actually

9    misleading and unfair to say this is a Pfizer CME if the

10   doctors had no connection with Pfizer.

11             THE COURT:  Well, my guess --

12             MR. CHEFFO:  Every CME in the world gets mixed

13   here as a Pfizer CME.

14             THE COURT:  It's a part of the case we haven't

15   focused that much on.  I've been focusing on other issues,

16   so just be careful, that's all I'm trying to say, when it

17   says the doctors were told that a CME, it was confusing at

18   least to me whether this was a part of an enterprise or

19   whether this was just showing, well, this is what the market

20   in general is reflecting.  They might both be relevant, but

21   they're not relevant what's going to cut it for directed

22   verdict.

23             MR. CHEFFO:  Again, we keep hearing this broad

24   national, no one has ever said one Kaiser doctor went to any

25   of these CMEs.

1      THE COURT:  I can hear the closing now.

2      MR. CHEFFO:  At some point there has to be a

3 causal nexus between this broad conduct and there's 25,000

4 Kaiser doctors in there.  When are they coming?

5      MR. RONA:  If I could answer, there's not a single

6 CME that we talk about in this case not only sponsored by

7 Parke-David or Pfizer, they saw the slides.

8      THE COURT:  I just needed that part, that's all, I

9 hadn't heard it, just said CME general speaking.  I just

10 needed to hear it.  How much longer do you have with him

11 tomorrow?

12      MR. SOBOL:  An hour.

13      THE COURT:  Okay.  I mean, it is moving along.  So

14 how long, I imagine there will be serious cross?

15      MR. CHEFFO:  There will be cross-examination, yes, I

16 would expect.

17      THE COURT:  So let's say at least an hour?

18      MR. HOOPER:  At least.

19      THE COURT:  Let's bring us up to the break

20 assuming for a minimum people get here on time tomorrow.  I

21 think my weather forecast was off by a day, let's assume we

22 really get out of here, we get going at nine, which we did

23 this morning, and we really are done by him let's say 11,

24 who's next?

25      MS. NUSSBAUM:  If I think it takes that long, it

Page 150

1    will probably be Mr. Al Carver, corporate representative.

2              THE COURT:  How long is he again?

3              MS. NUSSBAUM:  He'll probably be a half hour on

4    direct.

5              THE COURT:  Are there any debate on the documents?

6              MS. NUSSBAUM:  We've given them to Katherine.  If

7    there are any, we purposely did it yesterday morning.

8              THE COURT:  Let me know.  You said how long?

9              MS. NUSSBAUM:  Half hour.

10             MR. CHEFFO:  We could probably go 45 minutes to an

11   hour.

12             MR. GREENE:  Can we keep talking about this, I

13   have Dr. Barkin, the psychiatrist, who can talk about

14   bipolar disorder.  He's ready to go on tomorrow.

15             THE COURT:  Where is Barkin from?

16             MR. GREENE:  Maine.  She'll drive down.  He's

17   coming down from Maine, he's down today, and then Kay

18   Dickersin is flying in from Baltimore Wednesday night late.

19             MS. NUSSBAUM:  Carver is retired and is leaving on

20   a vacation with his wife.  He must go on tomorrow.

21             THE COURT:  Whatever, the doctor.

22             MR. CHEFFO:  How can he be the company

23   representative if he's retired?

24             MS. NUSSBAUM:  He retired a few months ago.

25             MR. CHEFFO:  Why is he in the courtroom?

1          MS. NUSSBAUM:  He spent 40 years at the company,

2     he's here as a corporate representative.

3          MR. CHEFFO:  He's a fact representative in the

4     case.

5          THE COURT:  I don't want to do this right now, you

6     may have to play it safe and have him here or if there's a

7     deposition.

8          MR. GREENE:  Let me ask you this, Judge.  He's

9     coming down this afternoon, and my intention was to put him

10    on tomorrow, but I have Kay Dickersin that can only be here

11    Thursday.  If I did put on Dr. Barkin and assuming he would

12    agree to this to be interrupted so I could put on Kay

13    Dickersin, is that all right?

14         THE COURT:  That's fine with me.  What's he's

15    going to say, they go up and come down?

16         MR. GREENE:  He's a psychiatrist and he

17    specializes in it.  He's reviewed all the DBRCTs.

18         THE COURT:  He's doing the science, not just

19    talking about clinical practice?

20         MR. GREENE:  Yes.  He went through the DBRCT.

21         THE COURT:  All right.  That's fine.  I'm happy to

22    break for anyone to accommodate people's schedules.  If

23    there are anybody's experts.  Do you have any problems with

24    the Pfizer experts?

25         MR. CHEFFO:  I don't think so.

Page 152

1      THE COURT:  There's a time somewhere where I'm

2  going to New Orleans for a day to speak at a conference.

3  I'll have to find out from Robert the date, March 16th kind

4  of thing, so I'll let you know as that comes closer.  Good.

5  Off the record.

6          (Whereupon, the trial was suspended at 1:10 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 153

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    ) ss.

5    CITY OF BOSTON               )

6

7              I, Lee A. Marzilli and Valerie A. O'Hara, Official

8    Federal Court Reporters, do hereby certify that the

9    foregoing transcript, Pages 1 through 152 inclusive, was

10   recorded by us stenographically at the time and place

11   aforesaid in Civil Action No. 04-10981-PBS, In Re:

12   Neurontin Marketing, Sales Practices, and Product Liability

13   Litigation, and thereafter by us reduced to typewriting and

14   is a true and accurate record of the proceedings.

15             In witness whereof we have hereunto set our hands

16   this 23d day of February, 2010.

17

18                    /s/ Lee A. Marzilli

19                    /s/ Valerie A. O'Hara

20                    _____

21                    LEE A. MARZILLI, CRR

22                    VALERIE A. O'HARA, RPR

23                    OFFICIAL FEDERAL COURT REPORTERS01:09 PM

24

25