IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                    )
                                          ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,     ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION         )
----------------------------------------  )
This document relates to:                 )
KAISER FOUNDATION HEALTH PLAN, et al,     )
                                          )
                    Plaintiffs            )
                                          )
        -V-                               )No. 04-10739-PBS
                                          )Pages 1 - 139
PFIZER, INC., et al,                      )
                                          )
                    Defendants            )


JURY TRIAL - DAY THREE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 24, 2010, 8:52 a.m.


LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
         DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
         BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14       KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16       RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
         JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

1

I N D E X

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| JOHN ABRAMSON, M.D. | 16 | 71 | 133 | 138 |

4

5

6

7   EXHIBITS                                    PAGE

8   Plaintiff

| | PAGE |
|---|---|
| 4, 100, 1197, 1393 | 16 |
| 1282 | 21 |
| 71 | 26 |
| 382 | 28 |
| 1660 | 29 |
| 109 | 32 |
| 203 | 33 |
| 183, 185 | 34 |
| 136 | 34 |
| 192 | 35 |
| 1552 | 36 |
| 200 | 38 |
| 165 | 43 |
| 1339 | 43 |
| 262 | 45 |
| 209 | 46 |
| 1772, 2046 | 47 |
| 219 | 50 |
| 239 | 53 |
| 374 | 56 |
| 396 | 56 |
| 2082 | 58 |
| 397 | 63 |
| 159, 2086 | 64 |
| 349 | 66 |
| 590 | 104 |
| 1305 | 104 |
| 0630 | 110 |
| 1610 | 121 |
| 544 | 131 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.  I was told there was one

3    critical issue.

4          MR. CHEFFO:  Okay.

5          MR. SOBOL:  The bar is high for you.

6          MR. CHEFFO:  About the lunch break, your Honor -- no.

7    I actually have three issues that are related.  I think what

8    you were told yesterday about this whole CME -- and this is

9    very important because I think we're kind of getting to the

10   point of no return with prejudicing the jury.  The document

11   that was marked, the citation was to a document, as I

12   understand it, that was produced by a nonparty.  It is the 11th

13   Annual U.S. Psychiatric and Mental Health Congress.  It says

14   about three or four times on it the program is supported in

15   part by an unrestricted educational grant from Parke-Davis, and

16   it goes on.  And the point of this, your Honor, is that there's

17   no evidence that the document that they're relying on was

18   produced even by Pfizer, that any CME person was influenced by

19   that.  And I think the impression -- the jury doesn't

20   understand what really CMEs are.  The impression for the jury,

21   I think fairly, is that they keep saying it's a Pfizer, that

22   all of a sudden all these folks come to Pfizer, and everything

23   that is said in here is endorsed, that Pfizer promotes this,

24   that it has complete control over it, and that's just an

25   absolute --

1        THE COURT:  Well, that's got to be their cause of

2   action because otherwise they lose on a RICO claim.

3        MR. CHEFFO:  Well, but, I mean, it's just simply

4   not --

5        THE COURT:  I'm the one who raised this yesterday

6   because it wasn't clear what CME meant.  I got a proffer they

7   were going to hook it up.  Does that still exist?

8        MR. SOBOL:  Yes.

9        MR. CHEFFO:  But let me just say this because it's

10  beyond just hooking up, your Honor --

11       THE COURT:  Is that right?

12       MR. SOBOL:  Yes, your Honor.  He was saying "Yes,

13  ma'am," but I'm telling him around here it's "Yes, your Honor."

14       MR. CHEFFO:  Well, let me just say this:  The document

15  is not even on their exhibit list that they're citing to.  And

16  it's not just a matter of hooking it up.  This goes not only to

17  the First Amendment issue that I raised, but there's FDA

18  regulations that allow a pharmaceutical company.  So whether

19  it's hooking up or not, it's highly prejudicial because the

20  company is allowed legally to provide an unrestricted grant.

21       THE COURT:  Maybe I'll give that instruction, but if

22  in fact -- there's no First Amendment right to unlawfully

23  promote drugs.  There is no First Amendment right to do that.

24       MR. CHEFFO:  I agree.

25       THE COURT:  So if in fact this is a sham for

1    promotion, they win.  I'll tell them, if it's not a sham for

2    promotion, you have the First Amendment right to do that.  So

3    I'll give them that instruction.  But at this point they've

4    made a proffer that they're going to -- and you didn't object

5    yesterday to the slide, and I've got to believe --

6            MR. CHEFFO:  Well, frankly, we didn't even know what

7    this slide was because this document is not even on the exhibit

8    list.  You know, they came in very quickly and we saw No. 57,

9    and we're raising it now, so --

10           THE COURT:  You're raising it now.  It's too late now,

11   but we'll go for it if there's another objection to another one

12   of these.

13           You've got to put in a predicate for all CME exhibits.

14   What is the predicate for the one that you put yesterday in?

15           MR. SOBOL:  So the proffer, your Honor, is this:  In

16   or about 1987, Cline, Davis & Mann worked with Parke-Davis to

17   set out a tactic or a strategy to market Neurontin for bipolar

18   through continuing medical education grants.  Thereafter,

19   Parke-Davis hired CME, Inc., an entity to undertake those

20   continuing medical education activities.

21           THE COURT:  Am I going to get this through a

22   deposition somewhere?  Where am I going to get this evidence

23   from?

24           MR. SOBOL:  At least through documents that we have

25   marked as trial exhibits and which will come in evidence.  I

1    haven't finished the proffer, but --

2            THE COURT:  No, go ahead.

3            MR. CHEFFO:  I'm sorry.

4            MR. SOBOL:  There then were a series of -- this is my

5    understanding -- there were a series of multimillion-dollar

6    contracts between Parke-Davis and CME, Inc. to undertake the

7    activities.  Parke-Davis knew the content, knew that the

8    content was promoting bipolar, knew that the content was false,

9    and continued to do it year after year.

10           THE COURT:  And so what's the evidentiary support for

11   that?  You're going to be giving documents, and anything else?

12           MR. SOBOL:  My understanding is we have documents, and

13   we have been trying to have the Pfizer witness, this guy Knapp,

14   come in so that we can authenticate, because they've only

15   marked one witness who was willing to come, to try to put in

16   evidence through him these documents, or otherwise just put the

17   documents in because they're admissible.

18           THE COURT:  Well, I'll have to see if they hook up, so

19   I'm not doing it now.

20           MR. CHEFFO:  I have two other just quick things, your

21   Honor.

22           MR. SOBOL:  Can I just finish the proffer?  So the

23   proffer is, the Cline, Davis & Mann enterprise -- there are two

24   enterprises -- this enterprise starts at the beginning of the

25   case.  It is a strategy to market off-label.  There are then

1   things that occur, not necessarily through Cline, Davis & Mann,

2   but having set that in operation, that occur throughout the

3   critical period here that caused the damages.

4        THE COURT:  Well, let me just say this:  You've got to

5   prove an enterprise.  I'll wait and look and see if you do, but

6   at this point any document that goes in has got to have a

7   foundation, either as a business record of Pfizer's or

8   something that's authenticated through someone else, so --

9        MR. CHEFFO:  Would you consider instructing the jury

10  to at least --

11       THE COURT:  Not now.  I don't know enough about it.

12  Nobody has really focused on this issue.  I thought about it

13  for the first time yesterday.  I'm not ready to -- but I am now

14  very cognizant because actually what was quite helpful -- I'm

15  not likely to give your verdict form, but it focused me on the

16  enterprise issue, which no one else has -- we haven't done yet,

17  we haven't really thought about the enterprise issue.  You've

18  got to prove an enterprise.  I do this a lot in criminal, you

19  know, what's the enterprise.  I may just give one of my

20  criminal instructions with the civil burden of proof, but we've

21  got to prove an enterprise.  And so you're right, we've got to

22  focus on it.  I thought about it yesterday.

23       What's the next issue because it's almost --

24       MR. CHEFFO:  Absolutely, and I'm going to be quick,

25  your Honor.  The next issue here just goes to quickly who

1   Dr. Abramson is.  He's a family practice doctor.  He's been a

2   professional witness who's never been an expert in bipolar,

3   neuropathic pain.  He wrote a book, and he was on CNN

4   apparently for something.  Basically he has testified beyond

5   what I think your Honor would probably allow most of the

6   efficacy experts to testify as far as efficacy.  He's talked

7   about how he's looked at some documents, he's looked at

8   literature, and he now knows that this medicine doesn't work.

9   He has never been qualified to even treat a psychiatric patient

10  as far as the foundation shows.

11         THE COURT:  At least so far, all I've seen is that

12  he's looked at clinical trials that show they work, which he

13  does have a background to look at.  He doesn't have any

14  independent knowledge, and you can cross him on that.  He's

15  just looking at the results of a clinical trial.

16         MR. CHEFFO:  Well, but he's stating much more than

17  that, your Honor.  First of all, there's no evidence that he's

18  an expert in clinical trials.

19         THE COURT:  He had a three-year fellowship in it.  I

20  mean, I listened to the background; Robert Wood Johnson Fellow

21  in biostatistics something, something, epidemiology and

22  something else.

23         MR. CHEFFO:  I think what he certainly can talk about

24  are his expertise there.  My point, your Honor, you know, for

25  the record is, I think he's gone far beyond.  He's basically

1  drawn the conclusion through Mr. Sobol's questions, you know,

2  "So based on this, will you conclude that there's no efficacy?"

3  He's getting up here and he's basically doing -- and he's also,

4  "Will you conclude that they misled?"  He's doing what your

5  Honor said they shouldn't be doing, which is drawing fraud.

6  He's doing what the jury should be doing.

7          THE COURT:  Excuse me.  At least what I hear them

8  doing, and I'll be conscious of it, is, do these tests

9  demonstrate efficacy?  Answer, no.  He's got the experience to

10  do that.  Point two:  He doesn't have independent expertise.

11  He's just looking at the tests, the results of the tests,

12  which, by the way, I don't think is disputed.

13          MR. CHEFFO:  Well, it is --

14          THE COURT:  But, anyway, as far as the double-blind

15  controlled random tests.  You've got other reasons for thinking

16  it's effective, but even your own people are saying, "Despite

17  this, we think it is because of clinical --" but putting Part B

18  on the horizon, and then they say, do these documents disclose

19  that?  That's their case.  They've got to put this in.  He's

20  their summary document witness basically.

21          MR. CHEFFO:  Well, but he's --

22          THE COURT:  You know what, he's not saying that they

23  acted fraudulently.  He's never said that.  I've watched for

24  it.  He's just said these documents are inconsistent with the

25  results of these clinical trials.  And you're, I understand,

1   going to punch holes because, yes, there's another clinical

2   trial that maybe it's consistent with for, and you can ask him

3   those questions.  But even your own witnesses, as I read their

4   reports, do not dispute that the double-blind random controlled

5   clinical trials defeat efficacy.  You have other reasons for

6   thinking it's effective, the people's personal experience, and

7   you'll have a debate about it.

8           MR. CHEFFO:  I wouldn't concede that, your Honor,

9   but --

10          THE COURT:  Anyway, what's point three?  You're not

11   going to win your case on these preliminary skirmishes.

12          MR. CHEFFO:  I understand, but I just need --

13          THE COURT:  Yes, go.  You objected.

14          MR CHEFFO:  But it's not just for the record, your

15   Honor.  I just think that we need to --

16          THE COURT:  What's point three?  No, the jury is here.

17          MR. CHEFFO:  Again, I think what he's doing is, if we

18   had an expert look at the Kaiser documents and websites and

19   draw conclusions that they determined there was efficacy and

20   conclusions based on the documents -- I think that's

21   essentially what he's doing -- I think that would be improper.

22   So --

23          THE COURT:  All right, fine.  Anything else?

24          Now, I was misled, speaking of which, looking at these

25   depositions.  I think what it said was, let's just see:

1    Plaintiffs' in yellow, Pfizer's counterdesignations in orange,

2    either party's objections and designations and counter-

3    designations are highlighted in pink.

4            Well, it turns out that's not true.  There is no

5    orange, and the counterdesignations are in pink.  And so I

6    spent some time ruling on things when I finally, light dawns on

7    a marble top, I finally figured it out.  So I think maybe the

8    color code didn't project --

9            MR. RONA:  Your Honor, the plaintiffs' designations

10   are yellow, the defendants' are pink.

11           THE COURT:  I know, but somebody wrote a brief, Bench

12   Memo in Support Defendants' Objections, where you maybe --

13           MR. FOX:  Yes, your Honor, sorry.  That was due to

14   some of the confusion.

15           THE COURT:  I know, but -- it's a long way of

16   apologizing, but this is sort of messy because I started ruling

17   on the pink, and then I realized, what are they talking about?

18   And then I realized that was just the counterdesignations.  So

19   when I finally figured it out -- let me just say in general

20   what my rulings are, and then maybe someone can look at them if

21   you can't figure out because I end up having to go back and

22   cross out.

23           Basically, with respect to the patent, I allowed in a

24   lot, but there were patents because I think that is relevant,

25   but not the issue about obviousness and novelty because that

1    gets confusing.  So that was my intent there, that you can talk

2    about the patent.  I don't know how you apply for a patent on

3    something that's so vague, since I do a lot of patent law, but,

4    in any event -- but the bottom line is, the novelty/obvious

5    thing is excluded under 403 as more confusing than it is

6    helpful because the standards are so different.  I completely

7    agree with that.

8           And I overruled, I think, the objections on Pande, did

9    you make any effort to disseminate?  I overruled that.  And I

10   think that was the basic Atul Pande dispute.  There may have

11   been a few other things in there that I ruled on in the

12   margins, mostly overruling.

13          On the -- well, apparently I misspoke.  One of the

14   jurors is running late.

15          On the John Marino thing, he was the head of

16   nationwide, so I didn't understand the hearsay objections.  I

17   don't understand why it wasn't an admission of a party

18   opponent, but there were some things where he -- let me just

19   turn to plaintiffs for a minute.  While I do think it falls

20   under a party admission issue, let me look at you and say, a

21   lot of this stuff went on and on and on about saying, "I don't

22   know, I don't recall, I don't know."  Now, technically someone

23   could do that on the stand here, so it's not inadmissible, but

24   we have so much to do here.  I mean, you have so overdesignated.

25   I started reading some of these.  On both sides, it's rambling

1    answers.  At one point I sustained an objection just simply

2    because the answer was unintelligible.  So someone needs to use

3    some editing judgment here.  Why are we going on for pages

4    about "I don't know, I don't know, I don't recall"?

5              MR. RONA:  Well, your Honor, one section in particular

6    where he was asked -- he's a worldwide marketing team leader.

7    He has a goal to achieve a 20 percent increase in sales for the

8    next year, and he's asked, "How can you do that on-label if

9    your on-label sales are a tiny fraction?"  He said, "I don't

10   know what percentage of my sales are --"

11             THE COURT:  I understand, but it's more than one

12   question.  There are just whole pages that go "I don't know, I

13   don't recall."  It just should be edited out.  At some point

14   you're stuck with the 28 hours, if you want to spend your

15   28 hours on "I don't know, I don't recall" or rambling answers.

16   It's not that it's inadmissible; it's just that it's boring and

17   not helpful.

18             MR. RONA:  We will take a pen to it, your Honor.

19             THE COURT:  Yes.  And I have to say, some of the pink,

20   which I originally sustained an objection to the pink, not

21   understanding that it wasn't objected to, I think one of the

22   answers you all want went on for a page, and I sustained an

23   objection, what I thought was an objection, because it was

24   unintelligible.

25             MR. CHEFFO:  We'll be guided by your Honor and think

1    about --

2          THE COURT:  So, anyway, I've ruled on these.  If you

3    can't understand it, I'm sorry, because I was originally

4    laboring under what I thought the color code meant.  Otherwise,

5    it was well presented.

6          Do I have anything else at this point?  Is the juror

7    here?

8          THE CLERK:  No, not yet.

9          (Discussion off the record.)

10         (A recess was taken, 9:10 a.m.)

11         (Resumed, 9:19 a.m.)

12         (Jury enters the courtroom.)

13         THE COURT:  Good morning to everyone.  Did anyone

14   speak about the case or see anything in the press?  I find the

15   jury has complied.

16         I also wanted to thank whoever was running late for

17   following exactly the right procedure, which is calling us up,

18   telling us you were at the Bunker Hill Monument.  We let the

19   attorneys go down and get a cup of coffee or whatever they did,

20   and you came back about the time you said you'd come back.  So

21   ideally we'll all be on time.  I understand traffic sometimes

22   makes that impossible, but just to call and let us know is the

23   right thing.

24         We're all set.  Dr. Abramson, come on up.  Oh, there

25   you are.  All right, you're still under oath.  How much longer

Page 16

1   did we say we had on direct?

2          MR. SOBOL:  I'm going to shoot for an hour, your

3   Honor.

4          THE COURT:  Okay.  I do understand that there's

5   another witness who's on today who I understand there are some

6   time constraints.

7          MR. SOBOL:  There are a couple of housekeeping matters

8   first, your Honor, and I've reviewed this with the Pfizer

9   lawyers.  First, the plaintiffs offer Plaintiff's Exhibit 4,

10  which was a document that I referenced in connection with

11  Slide 17, and plaintiffs offer Exhibit 100, which was

12  referenced in connection with Slide 19, and there was also

13  Exhibits 1197 and 1393 which were discussed in connection with

14  Slide 14.  I understand there's no objection to those four.

15         THE COURT:  All right, fine.

16         (Plaintiff Exhibits 4, 100, 1197, and 1393 received in

17  evidence.)

18         THE COURT:  All right, let's go.

19                  JOHN ABRAMSON, M.D.

20  having been previously duly sworn, was examined and testified

21  further as follows:

22  CONTINUED DIRECT EXAMINATION BY MR. SOBOL:

23  Q.   Okay, Dr. Abramson, yesterday you referenced this notion

24  of confidentiality.  Before you got involved in this project,

25  did you have to sign some kind of document or read some kind of

1   document regarding confidentiality?

2   A.   I did.

3   Q.   And just describe very briefly, what was your

4   understanding about some of the information --

5          THE COURT:  You know, can we move beyond this?  Let's

6   just go.

7   Q.   Then let's move to the science of pain.  We had finished

8   the Gorson study, correct?

9   A.   Correct.

10  Q.   And then you had also described to the jury this notion

11  that had happened with respect to the rearticulation of the

12  Gorson study, correct?

13  A.   Correct.

14  Q.   Now, yesterday you mentioned that there were -- something

15  about three prongs of the study.  Did you want to make a

16  correction on that?

17  A.   I did.  I said that there were three end points in the

18  Gorson study, one of which was positive for Neurontin, but I

19  spoke in error.  There were four end points, one of which was

20  positive for Neurontin.

21  Q.   Okay.  Now, moving from the Gorson study, and before we

22  talk about the next study, which is the Backonja study,

23  correct?  Can you just spell that for the jury because it's

24  spelled a little bit differently than the way I'm saying it.

25  A.   Yes.  B-a-c-k-o-n-j-a.

1  Q.   Now, let's talk about several aspects of research design.

2  You have experience and training and you actually review

3  research design issues, correct?

4  A.   Correct.

5  Q.   Describe briefly -- Dr. Kessler has already said this, but

6  describe briefly, if you want to do a study regarding pain and

7  Neurontin, what is the placebo effect issue?

8  A.   When you measure pain in a clinical trial, pain is a

9  subjective experience.  There's a reason why there's pain,

10  there's an objective cause of the pain, but the experience of

11  the pain is subjective.  So the pain scales are subjective

12  scales; how much pain do you feel on an 11-point scale, or how

13  much pain do you feel on a questionnaire?  So it's important,

14  because pain is subjective, when you design a study, that you

15  design the study so that the blind isn't broken by a side

16  effect of the drug.

17  Q.   What do you mean, when the blind isn't broken?  So what

18  does that mean in this context with respect to pain and trying

19  to test Neurontin?

20  A.   If you designed a study so that a drug had side effects

21  and the placebo had no side effects, and you gave the drug in a

22  dose that caused side effects, then many of the people who were

23  taking the active drug would surmise that they were on the

24  active drug.  People in the placebo group would not surmise

25  they were on the active drug.  So what you've basically done is

1    partially created an open-label study instead of a double-blind

2    study.

3    Q.   Now, I'm going to Slide 31.  Are there things that can be

4    done to address this issue of unblinding, particularly when

5    you're testing a subjective issue like pain?

6    A.   Yes, there are things.  There are three things that you

7    could do.  One is to give an active comparator -- in other

8    words, another drug that relieves pain that also has side

9    effects -- so that there would have been an equal chance of

10   people in both arms of the study surmising that they were

11   taking the drug.

12       A second thing you could do is give a placebo that has

13   side effects.  So in this case an example would be, you could

14   treat the placebo group with a drug like Valium that cause some

15   sleepiness, people knew they were on something, so that both

16   groups would have an equal chance of knowing they were on

17   something, even though there's no argument that Valium would

18   help neuropathic pain, but you then wouldn't be breaking the

19   blind.

20       The third thing you could do, if you didn't do either of

21   those things and you knew that some of the people taking the

22   active drug in the study were going to experience side effects

23   and surmise they were on the active drug, you could subtract

24   the results of their pain scores out at the first time -- you

25   would count their last pain score before they had a side

1    effect.  So you could correct after you got the data, and when

2    they had a side effect, you would take their pain score just

3    before that.

4    Q.   Now, let's talk about something else, again before we get

5    to the Backonja study, about dosing, okay?  If one wants to

6    dose for the effectiveness of a drug rather than for safety,

7    what would be an appropriate research design?

8    A.   The best research design for that would be to give the

9    drug at several doses so you could measure what the effect of

10   the drug was at a given dose.

11   Q.   So you give it at a dose and keep it at that dose?

12   A.   Yes, have several different groups within this -- within

13   the broad group of people who are taking the experimental drug,

14   have several different doses, and you keep the dose at that

15   level.

16   Q.   And in contrast to that, what is forced titration?

17   A.   Forced titration means that people -- there's a schedule

18   of increasing the dosage so that people, everybody in the

19   study, whether they're having benefit or not, have their dose

20   increased up to a certain limit, regardless of whether they're

21   feeling better, whether they're having relief from their

22   symptoms or not.

23   Q.   Now, this study that we're about to get into, the Backonja

24   study, is it your understanding that that was funded and in

25   part reviewed by the manufacturer before it was reported and

1    published?

2    A.    Yes.

3    Q.    Now, before the launch of the Backonja study, did you

4    review any information that identified that the manufacturer

5    knew of this problem of a placebo effect and the potential for

6    unblinding before it actually went into the Backonja study?

7    A.    Yes.  The manufacturer was aware that there were central

8    nervous system side effects, dizziness or sleepiness; and in a

9    1996 article that they published, it was a study to see if

10   Neurontin would slow the progression of Lou Gehrig's disease,

11   it didn't work, but in that article that was published in 1996,

12   it says that we were concerned about unblinding because people

13   were having the side effects.

14   Q.    Okay, go to Slide 32.  Does this slide show the article

15   that you were just talking about, this 1996 Neurology article?

16   A.    Yes, that's the first article, yes.

17           MR. SOBOL:  I offer Exhibit 1282.

18           THE COURT:  All right.

19           (Plaintiff Exhibit 1281 received in evidence.)

20   Q.    Now, let's turn to the Backonja study undertaken with the

21   manufacturer for pain.  Go to Slide 33.  When was that?

22   A.    The study was completed in 1997.

23   Q.    And begun, though, months after the Neurology study?

24   A.    Yes.

25   Q.    And describe to the jury, how did this Backonja study get

1  designed in order to ostensibly try to address whether or not

2  Neurontin was effective for pain?

3  A.    So the question that was asked in the Backonja study, is

4  Neurontin better than placebo to treat people who are suffering

5  from painful diabetic neuropathy?  And the way the study was

6  designed, remembering that the maximum dose that was approved

7  by the FDA is 1,800 milligrams a day, the way that the study

8  was designed is, people would increase their dose on a weekly

9  basis to go from 900 milligrams the first week, to 1,800

10  milligrams the second week, to 2,400 milligrams the third week,

11  and then on to 3,600 milligrams.  Regardless of whether or not

12  they were having symptomatic relief, their dose would be

13  increased.

14  Q.    And that was forced titration, correct?

15  A.    That's correct.

16  Q.    Was there any situation in which the forced titration

17  would be stopped?

18  A.    Yes.  It would be stopped if people had side effects.

19  Q.    So people were dosed up continually until they either got

20  to 3,600 milligrams or they were reporting a side effect?

21  A.    Correct, and then their dose was brought back down.

22  Q.    And they were comparing to a placebo, not to an active

23  placebo or an active comparator?

24  A.    That's correct.

25  Q.    Now, what were the ostensible results as reported -- oh,

1    I'm sorry.  The comparisons also were essentially a comparison

2    of whether there was a difference at the end of eight weeks

3    between placebo and Neurontin, correct?

4    A.    Correct.

5    Q.    Okay.  And it was just basically looking at that end

6    point?

7    A.    Correct.

8    Q.    Now, what were the ostensible results, turning to

9    Slide 33, that were at least reported in the Backonja study?

10   A.    That Neurontin was effective for neuropathic pain, painful

11   diabetic neuropathy.

12   Q.    Now, let's talk a little bit more about the unblinding.

13   Did you come to a view as to whether or not there was potential

14   or actual unblinding in the Backonja study?

15   A.    Well, in the results of the study, it shows that about

16   55 percent of people taking Neurontin had side effects -- it's

17   called central nervous system side effects -- that would

18   include dizziness, sleepiness, or headache, compared to about

19   15 percent of the people in the placebo group.  And in the --

20   Q.    So half the people who were taking Neurontin had some kind

21   of a side effect in the study?

22   A.    More than half, more than half, compared to 15 percent in

23   the placebo group.

24   Q.    Go ahead.

25   A.    And the manuscript acknowledged that the central nervous

Page 24

1   system side effects might cause unblinding, and what they did

2   is, they looked at the two most frequent side effects, which

3   were dizziness and sleepiness.  But instead of removing all the

4   people who experienced dizziness and sleepiness and then seeing

5   if the results were still statistically significant, what they

6   did is, they removed the sleepy people but left in the dizzy

7   people, and checked statistical significance, saw it was

8   statistically significant.  Then they reversed it, took out the

9   other group but put the other one back, and saw it was still

10  statistically significant.  But what they didn't do is pull out

11  all the people who had these symptoms to see if the results

12  were still statistically significant.

13  Q.   Now, turning to Slide 34 --

14       THE COURT:  So when was the Backonja study made

15  public?

16       THE WITNESS:  It was published December 2 of 1998, I

17  believe.

18       THE COURT:  And so I understand the nuances, but the

19  bottom line was what for the Backonja study?

20       THE WITNESS:  Well, the bottom line that was published

21  is that Neurontin is effective, significantly better than

22  placebo, in reducing the pain of diabetic neuropathy.  But if

23  you correct for the unblinding effect and you remove the

24  patients who experience pain, or take their last pain

25  measurement before they had the side effect, then there's no

1   significance.

2   Q.   Slide 34.   Just give the jury an idea about how many

3   patients were in the Backonja study.   Can you describe this

4   briefly.

5   A.   Yes.   There were 84 patients in the Neurontin group and 81

6   patients in the placebo group, and you can see from the green

7   and yellow columns or print the difference in the rate of side

8   effects in the people taking Neurontin compared to the people

9   taking placebo.   So you can see that 23.8 percent of people got

10  dizzy taking Neurontin; 4.9 percent of the people who took

11  placebo experienced dizziness; and similarly 22.6 percent of

12  the people taking Neurontin got sleepy; and only 6.2 percent of

13  the patients taking placebo got sleepy.   The difference in the

14  headache rates isn't on this slide.

15  Q.   Did you review internal documents from the manufacturer

16  regarding, once they had the data of the results of the

17  Backonja study, how they were going to address this issue of

18  unblinding?

19  A.   I did.

20  Q.   And what did you conclude?

21  A.   What I concluded is that the manufacturer was aware of

22  this problem.   In fact, they had been made aware of it because

23  there was another study in the pipeline, and they were asked to

24  look at it.   They were aware of the problem, and they didn't do

25  the correction that would have removed the bias from the

1   unblinding effect of the side effects.

2   Q.   There's another expert that's going to testify in this

3   case about this issue, you understand, correct?

4   A.   Yes.

5   Q.   Independent of the things that he has to say, did you

6   reach a conclusion as to whether or not it would be accurate,

7   complete, and not misleading to publish the results in the

8   manner that Backonja did after the communications with the

9   manufacturer?

10          MR. HOOPER:  Objection, your Honor.

11          THE COURT:  Sustained.

12   Q.   If we can turn to Slide 67 for a moment.  Dr. Abramson,

13   did you review a public relations campaign that included the

14   materials from the Backonja study?

15   A.   I did.

16   Q.   And turning to Slide 67, is this one of the documents that

17   you reviewed?

18   A.   It is.

19          MR. SOBOL:  I offer Exhibit 71.

20          THE COURT:  Don't move so fast.  There's no objection?

21          MR. HOOPER:  No.

22          THE COURT:  All right, 71.

23          (Plaintiff Exhibit 71 received in evidence.)

24   Q.   Dr. Abramson, what does this show the jury?

25   A.   What this shows is that the manufacturer of Neurontin --

1  let me just backtrack a second.  This article that we're

2  talking about, the Backonja article, was published in the

3  Journal of the American Medical Association December of 1998,

4  and it was published with another article about Neurontin for

5  postherpetic neuralgia.  Both articles were in the same issue

6  of JAMA.

7          THE COURT:  And Journal of American Medicine is a

8  peer-reviewed journal, right?

9          THE WITNESS:  It's a peer-reviewed journal, yes.

10 A.   And the manufacturer of Neurontin hired a PR firm to make

11 these positive results known of the Backonja study, as well as

12 the other study, to as many people as possible.  And in the PR

13 firm's report back to the manufacturer, they said basically:

14 This is what we did, and there were 85 million views of the

15 positive results of this study in the United States.

16 Q.   Now, let's go to the next study which is called Reckless.

17         THE COURT:  Wait.  85 million views on what?

18         THE WITNESS:  85 million views means that the public

19 relations company was saying that 85 million times in the

20 United States the positive results -- or 85 million people

21 perceived the positive results of this study, not individual

22 people.

23         MR. HOOPER:  Your Honor, objection.  This is hearsay,

24 and the document says "impressions."  We have no foundation for

25 what that means.  It doesn't say "views."

1          THE COURT:  I think you need to lay a foundation for

2     what it means.

3     Q.   Dr. Abramson, looking at Slide 67, it indicates 85 million

4     impressions, correct, not people?

5     A.   That's correct.

6     Q.   And so is it your understanding that what that means is

7     that the --

8          THE COURT:  Well, lay a foundation.  Do you know what

9     it means?

10         THE WITNESS:  It means that the PR firm created news

11    clips and radio news clips, TV news clips, airline videos, and

12    so forth that were seen 85 million times.

13         MR. HOOPER:  Objection, your Honor.

14         THE COURT:  Sustained.  I'll just allow in that the PR

15    firm said in excess of 85 million impressions, and we'll just

16    leave it there.

17    Q.   Now, the next report was Reckless, correct?

18    A.   The next study, yes.

19    Q.   The next study.  Go to Slide 39.

20         MR. SOBOL:  And I offer Exhibit 382.

21         (Plaintiff Exhibit 382 received in evidence.)

22    Q.   Please describe to the jury what the Reckless study was.

23    A.   The Reckless study was also a study of painful diabetic

24    neuropathy.  It had a different design.  It wasn't forced

25    titration, so all the patients didn't go up to 3,600

1    milligrams.   There were three groups of patients taking

2    Neurontin in the Reckless study.   One group was taking

3    600 milligrams a day, one 1,200 milligrams a day, and one group

4    2,400 milligrams a day against a placebo group to see if any of

5    those doses were superior to placebo in treating the pain of

6    diabetic neuropathy.

7    Q.   And the result?

8    A.   The result was, no groups were superior to placebo.

9    Q.   Now, did you review when it is that Reckless was completed

10   and when it was published?

11   A.   Yes.

12        MR. SOBOL:   We're going to go to Slide 40, and I offer

13   Exhibit 1660.

14        (Plaintiff Exhibit 1660 received in evidence.)

15   Q.   Dr. Abramson, what did you conclude regarding when it was

16   completed and when it was published?

17        THE COURT:   You know, I just need to rule.   I'm

18   assuming since you're not popping up, because you guys are

19   pretty, you know, assertive when you want to be, that there's

20   no objection.

21        MR. CHEFFO:   Generally that's true.   On this one we're

22   actually trying to find the exact --

23        THE COURT:   So I allow in 382, and what's the next

24   one?

25        MR. SOBOL:   1660.

1    MR. CHEFFO:  That's fine, your Honor.  No objection.

2  Thank you.

3    THE COURT:  All right.

4  Q.   When was the study completed and when was it published,

5  the Reckless study, which I think -- I've got my pointer

6  here -- was in this area here?  Go ahead.

7  A.   The study was completed -- in other words, the last

8  patient completed the study -- in September of 1999.  The

9  manufacturer wrote up the research report in February of 2000,

10  and the study was never published.  It was never published as

11  an independent study.

12  Q.   Now, have you compared the science between the Backonja

13  study, which the manufacturer did publish, and the science

14  behind Reckless, which was not published as an independent

15  study?

16  A.   Yes.

17  Q.   Turn to Slide 41.

18    THE COURT:  Well, was Reckless a Pfizer study?

19    THE WITNESS:  Yes.

20    THE COURT:  As was Backonja?

21    THE WITNESS:  Yes.

22    THE COURT:  Now, I'm asking all these questions.

23  Don't forget, you all can ask questions too if you don't

24  understand something.  Just raise your hand or pop up.

25    All right, go ahead.

1       MR. SOBOL:  Your Honor, I think one of the jurors

2  might need some water.

3       A JUROR:  Sorry.

4       THE COURT:  That's okay.

5       MR. GREENE:  I'll get it.

6       (Discussion off the record.)

7       THE COURT:  Sorry.  Go ahead.

8  Q.   The Slide 41 shows your comparison between Backonja and

9  Reckless, correct?

10 A.   That's correct.

11 Q.   Okay.  And, again, the Backonja study the manufacturer

12 published, as far as you understand it, and the Reckless was

13 not published as an independent study, correct?

14 A.   That's correct.

15 Q.   And show the jury what the difference is between these two

16 studies.

17 A.   Well, we talked a little bit about the study design.  So

18 the Backonja study that was published was the forced titration

19 where everybody was brought up to 3,600 milligrams, unless they

20 had side effects and then went down a dose.

21      The Reckless study had three groups of people taking

22 Neurontin but at fixed doses.  So if this drug were effective

23 at a lower dose that didn't induce side effects, the Reckless

24 design would have found that.  The Reckless design had about as

25 many people in each of those three groups, 600, 1,200, and

1    2,400 milligrams a day, as the entire Backonja study did.  So

2    there were 84 people on Neurontin in the Backonja study, and

3    there were 248 people on Neurontin in the Reckless study.

4    Q.    Now, did you review any documents that discussed whether

5    or not to publish one or the other of these two studies?

6    A.    Yes.

7    Q.    Go to Slide 42.

8          MR. SOBOL:  And I offer Exhibit 109.

9          (Plaintiff Exhibit 109 received in evidence.)

10   Q.    What does this indicate, Dr. Abramson?

11   A.    This is an internal Pfizer communication, and it's

12   responding to the known results of the Reckless study that

13   showed that Neurontin was not effective for painful diabetic

14   neuropathy.  And the quote that's brought out here is,

15   "Although I would love to publish something about 945-224 --"

16   that's Pfizer's code name for Reckless, the Reckless study --

17   "Donna McVey made it very clear that we should take care NOT to

18   publish anything that damages Neurontin's marketing success, so

19   I will rather not phone him until we have heard from marketing

20   what they suggest."

21   Q.    Now, Reckless, is this a physician from the U.K.?

22   A.    Yes, it is.

23   Q.    That's his last name?

24   A.    Yes.

25   Q.    Did you review documents in which Dr. Reckless from the

1    U.K. actually wanted his study to be published?

2    A.    Yes, I did.

3    Q.    Turn to the next slide, 43.

4          MR. SOBOL:  And I offer Exhibit 203.

5          (Plaintiff Exhibit 203 received in evidence.)

6    Q.    What did you observe, Dr. Abramson?

7    A.    This communication shows Pfizer's understanding that

8    Dr. Reckless wanted to publish the study of which he was the

9    chief investigator, and the quote that's brought out is, "The

10   main investigator in the U.K. (Dr. Reckless) is keen to

11   publish, but this will have several ramifications.  The route

12   that we have all agreed to now is that we will publish the

13   study but not until we have published the results of NN25 and

14   NN26."

15       So what this is saying is that Pfizer is going to delay

16   the publication of this study, that has three times more

17   patients than the Backonja study had that was published in

18   JAMA, until two other positive studies, not about painful

19   diabetic neuropathy but two other positive studies about

20   Neurontin are published first.

21         MR. SOBOL:  Now, in order to move things along,

22   Counsel, I would just offer Exhibits 183 from Slide 44 and 185

23   from Slide 45.  44 has 183 and 45 has 185.

24         THE COURT:  All right.

25         (Plaintiff Exhibits 183 and 185 received in evidence.)

1   Q.   Dr. Abramson, did you review any documents regarding a

2   group called Medical Action Communications?

3   A.   I did.

4   Q.   That related to this Reckless study?

5   A.   I did.

6   Q.   Turn to Slide 46.

7          MR. SOBOL:  And I offer 136.

8          (Plaintiff Exhibit 136 received in evidence.)

9   Q.   What did you observe?

10  A.   This is a communication from Medical Action

11  Communications, and the highlighted part says, "The 224 study

12  by Reckless:  The team agrees that this study should not be

13  pushed for publication."

14         THE COURT:  Well, what's Medical Action

15  Communications?  What is it, do you know?

16         THE WITNESS:  Medical Action Communications is a

17  company that was hired by Pfizer -- it wasn't Pfizer at that

18  point, I don't think, but hired by the manufacturer -- to

19  coordinate the publications and communications about Neurontin.

20  Q.   And if I draw your attention to the first page of that

21  Medical Action Communications document that's in the slide, I

22  think where it says "present" and then there's the word

23  "Pfizer," does that refresh your memory as to whether this is a

24  Pfizer era document?

25  A.   Yes, it does.  It's a Pfizer era document.

1          THE COURT:  Dated?  Excuse me, what's the date of it?

2          MR. SOBOL:  Yes, I'm trying to find that, your Honor.

3    I think it's July of '01.

4          THE COURT:  Is that the date in the lower left-hand --

5          THE WITNESS:  Yes, yes.

6    Q.   The next study regarding pain and Neurontin I want to turn

7    you to is POPP, P-O-P-P, all caps.  Did you review that study?

8    A.   I did.

9          MR. SOBOL:  Slide 49.  I offer Exhibit 192.

10         (Plaintiff Exhibit 192 received in evidence.)

11   Q.   What did POPP conclude or what was the POPP study?

12   A.   POPP was a study of a different kind of neuropathic pain,

13   postsurgical or traumatic nerve injury pain; and the study was

14   designed to see whether Neurontin was beneficial for people who

15   were suffering from post-traumatic or traumatic nerve injury

16   pain.

17   Q.   And the conclusion?

18   A.   The conclusion was that Neurontin was not significantly

19   better than placebo for people suffering from that kind of

20   pain.

21   Q.   And can you turn to Slide 50.  When was the POPP study

22   completed and issued?

23   A.   The POPP study was completed -- in other words, the last

24   patient completed the study -- in November of 2001.  The

25   research report was issued in 2003.

1  Q.   But when was it published?

2  A.   It was not published until 2008.

3  Q.   Five years later?

4  A.   Well, it's actually seven years after the last patient

5  completed, five years after the research report was completed.

6  Q.   Then the next study on pain you reviewed was Serpell,

7  S-e-r-p-e-l-l, correct?

8  A.   Correct.

9          MR. SOBOL:  Slide 51, and I offer Exhibit 1552.

10         (Plaintiff Exhibit 1552 received in evidence.)

11 Q.   What was the Serpell study, Dr. Abramson?

12 A.   The Serpell study was a study of people with many

13 different kinds of painful neuropathy, and tested the efficacy

14 of Neurontin against placebo in people who were symptomatically

15 suffering from neuropathic pain rather than having a specific

16 diagnosis.

17 Q.   So having lots of people in the Serpell study, I take it

18 that there were some people who suffered what?  What kinds of

19 conditions were being treated?

20 A.   Well, there was traumatic neuropathy; 14 percent of the

21 people had neuropathy; 2 percent of the people in the study,

22 which I think is three patients, had painful diabetic

23 neuropathy.

24 Q.   And did you review the results of the Serpell study?

25 A.   I did.

1   Q.   Go to Slide 52.

2          THE COURT:  You know, it's just -- Serpell was whose

3   study?  Was that an independent study?

4          THE WITNESS:  No.  That's Pfizer's study again.

5          THE COURT:  And what about POPP?

6          THE WITNESS:  POPP is Pfizer's study.

7   Q.   Going to Slide 52, what were the results of the Serpell

8   study, and how was that compared to the way that the results

9   were articulated publicly?

10  A.   The Serpell study was published in 2002, and the

11  conclusion of the --

12  Q.   Was it completed in 2002 but published in 2008?

13  A.   Serpell.  No, that's POPP.  Serpell was published in 2002.

14  Serpell was one of those studies that Reckless wouldn't be

15  published before Serpell was published.

16  Q.   Okay, so go ahead.  I'm sorry.

17  A.   So the conclusion of the article that was published said

18  that the study shows that gabapentin reduces pain and improves

19  some quality-of-life measures in patients with a wide range of

20  neuropathic pain syndromes.  But Pfizer's own pain consultants

21  said that that wasn't the conclusion that they drew.  The

22  conclusion that they drew from looking at the data in Serpell

23  was that the majority of the benefit was in the patients

24  suffering from postherpetic neuralgia, the indication that the

25  FDA approved, and a minor bit from the few patients with

1    diabetic painful neuropathy.  But the patients suffering from

2    those two kinds of neuropathic pain accounted for the vast

3    majority of the improvement that was seen, and Pfizer's pain

4    expert said this in fact does not support the claim that

5    Neurontin is effective for a broad range of neuropathic pain.

6    Q.   And so internally at Pfizer, Pfizer itself concluded that

7    there could not be reliable scientific evidence for a broad

8    claim of effectiveness for neuropathic pain?

9    A.   Correct.  That's what the experts concluded on

10   September 6, 2001.  And they reviewed this data from the

11   Serpell article September 6, 2001, said it doesn't support the

12   broad indication of neuropathic pain, and then the article was

13   published in 2002 with the opposite conclusion, saying that

14   Neurontin is effective for patients with a wide range of

15   neuropathic pain syndromes.

16   Q.   Now, leading up to this conclusion internally at Pfizer in

17   December of '01, were there communications between Pfizer and

18   the FDA on this issue of Neurontin and pain?

19   A.   Yes.

20           MR. SOBOL:  Slide 53, and I offer Exhibit 200.

21           THE COURT:  All right.

22           (Plaintiff Exhibit 200 received in evidence.)

23   Q.   What did you observe?

24   A.   Well, you said December, and it's May.

25   Q.   Sorry.  Well, I was talking about -- first I talked about

1    leading up to the later in 2001 internal Pfizer discussions,

2    were there communications with the FDA earlier that year?

3    That's what I meant to say.

4    A.    Yes.

5    Q.    And what did you observe?

6    A.    The highlighted portion of this memo, which is FDA meeting

7    minutes that discussed this issue about whether, given the

8    scientific evidence that was available, the FDA would consider

9    an application for approving Neurontin for the broad indication

10   of neuropathic pain rather than for a specific cause of

11   neuropathic pain, like postherpetic neuralgia for which it did

12   get approved, and the comment here is, "The sponsor inquired as

13   to whether the agency would accept, for filing, their completed

14   studies of diabetic painful neuropathy and postherpetic

15   neuralgia, accompanied by their single study in a mixed group

16   of neuropathic pain patients --" that's the Serpell study that

17   we just looked at -- "for general neuropathic pain indication,"

18   meaning the drug would be approved for everybody with

19   neuropathic pain regardless of what the cause of neuropathic

20   pain was.  And then it says, "Dr. McCormick stated that the

21   agency would not file such an application," the agency would

22   not consider the application.

23   Q.    Is the FDA telling Pfizer "no way"?

24          MR. HOOPER:  Objection, your Honor.

25          THE COURT:  Sustained.

1   Q.   Let's go to September of '01.  Did you review internal

2   Pfizer documents regarding what they thought about the

3   situation at that time?

4   A.   I did.

5   Q.   Let's jump to Slide 55.  What does this show?

6   A.   These are notes from a meeting September 6, 2001, where

7   Pfizer convened experts to advise Pfizer about how to proceed

8   seeking FDA approval for neuropathic pain indications.  And

9   what's highlighted here is Study 945-271.  That's POPP, the

10  study of postsurgical and traumatic nerve pain that was

11  negative.  It says:  Study 945-271, patients with

12  post-traumatic and postsurgical neuropathic pain, was negative

13  in the primary outcome measure.  Upon hearing these results,

14  Dr. Max, who was one of the consultants that Pfizer brought in,

15  commented "You're done," meaning you're not going to get a

16  broad indication for neuropathic pain.

17  Q.   Now, also in this time frame of 2001, did you review

18  documents about how there was a planned Backonja/Glanzman

19  review article?

20  A.   I did, though it wasn't called that at the time.

21  Q.   Okay, describe to the jury what this was, as far as you

22  understood it.

23  A.   Pfizer had a Publications Committee and --

24  Q.   Actually, let me interrupt you.  Let's go to Slide 56.

25  "MAC introductions," is that what you understood to be Medical

1    Action Communications again?

2    A.    Yes.

3    Q.    In the middle of 2001?

4    A.    Yes.

5    Q.    All right, I interrupted you.  Describe to the jury what

6    the plan was for this review article.

7    A.    So there were key messages that were developed by the

8    Publication Committee at Pfizer, and these key messages were

9    messages that would help Pfizer to sell more Neurontin.  And

10   what happened -- I mean, we doctors think, and I think most of

11   the public thinks, that science is developed because hypotheses

12   are made, and then studies are designed to test those

13   hypotheses, and then the results, whatever they may be, are

14   made known so doctors can practice evidence-based medicine.  In

15   this case what we see is sort of the history of an article that

16   was published in 2003, beginning in 2001, where key messages

17   were identified that Pfizer wanted to put into an article; and

18   the key messages that were identified were that Neurontin is

19   effective for neuropathic pain, even though their own experts

20   said that they didn't think the evidence supported that, and

21   that the dose that should be used is higher than the dose that

22   the FDA approved, 1,800 milligrams; the article should say you

23   can go up to 3,600 milligrams.

24   Q.    Now, if we go to Slide 57, did you review documents that

25   showed the timeline for the development of this review article?

Page 42

1   A.   Yes.   This is a sample timeline process.   This isn't the

2   specific review article.   This is the way articles were

3   developed.   And, again, there is an impression that when a

4   scientific --

5           THE COURT:   Excuse me.   Whose document is this?

6           THE WITNESS:   This is, uhm --

7           MR. SOBOL:   If you look in the bottom left-hand

8   corner, your Honor, this was sourced to us as internal to Lloyd

9   Knapp.

10          THE COURT:   I don't know who Lloyd Knapp is.   Who is

11  he?

12          MR. SOBOL:   A corporate executive at Pfizer.

13          THE COURT:   Oh.

14          MR. HOOPER:   What's the exhibit number, please?

15          MR. SOBOL:   It's Bates No. 038967.

16          MR. HOOPER:   Exhibit number, please?

17          MR. SOBOL:   I don't think it has an exhibit number.

18          MR. HOOPER:   Objection, your Honor.

19          THE COURT:   Was it premarked?

20          MR. SOBOL:   No, but I'm not offering it.   He's just

21  giving the jury -- this is a chalk for him to be -- I'm not

22  offering it into evidence.   It's a chalk for how it is that

23  these kind of things get designed.

24          MR. HOOPER:   Objection, your Honor.

25          THE COURT:   Sustained.   Move on if it wasn't

Page 43

1    disclosed.

2            MR. SOBOL:  Well, it was disclosed, but it's not

3    marked.  We're not offering it into evidence, but it was

4    closed.  It's their document.

5    Q.   Dr. Abramson, did you look at the conclusions that were

6    provided in this ultimate review article?

7    A.   I did.

8    Q.   Go to Slide 59.

9            MR. SOBOL:  And I offer Exhibits 165 and 1339.

10           (Plaintiff Exhibits 165 and 1339 received in

11   evidence.)

12   Q.   Please describe to the jury what you're depicting here,

13   Dr. Abramson.

14   A.   This is sort of a historical account of how this article

15   was born and developed.  So these are the key messages on

16   neuropathic pain and dosing that Pfizer wanted to include in

17   this review article.  So a note from July 30, 2001, says

18   "Neurontin publication plan," which is first on their list in

19   the publication plan, "proven efficacy for neuropathic pain,"

20   though efficacy for neuropathic pain hadn't been proven.

21           The next day it says, "One key message --" they're talking

22   about putting key messages into the article -- "One key message

23   I would like to see supported is 1,800 milligrams by week 2 --"

24   that means bring the patient up to 1,800-milligram dose by the

25   second week -- "before evaluating the patient response."  So

1   don't even think about whether the patient got better at a dose

2   lower than 1,800, just bring the patient up to --

3           THE COURT:  Go ahead, finish.

4   A.   -- just bring the patient up to 1,800 milligrams before

5   even reevaluating the patient.  And then it acknowledges, "I

6   know some patients will do better at lower doses, but we want

7   to write that we want to bring everybody up to 1,800

8   milligrams."  And --

9           THE COURT:  One of the jurors has a question.  Go

10  ahead.

11          A JUROR:  Your Honor, I just want to get some

12  clarification.  I don't want to assume what an acronym means.

13  NeP?

14  Q.   Yes, Dr. Abramson, N-e-P, what's your understanding?

15  A.   NeP means neuropathic pain, and the particular meaning of

16  the way it's used is the broad indication.  So it means

17  neuropathic pain of any etiology.

18          THE COURT:  And "etiology" means cause?

19          THE WITNESS:  Of any cause, yes.  So it's not

20  neuropathic pain that -- it doesn't -- postherpetic neuralgia

21  would be a subset of NeP, painful diabetic neuropathy would be

22  a subset of NeP, and then there are many other kinds of

23  neuropathic pain, like traumatic, like postsurgical, like

24  neuropathic back pain, sciatica.

25          THE COURT:  Thank you.  Thank you for asking.

1          MR. SOBOL:  Broke the ice.

2     Q.   Dr. Abramson, did you review correspondence between

3     Medical Action Communications, MAC, and Pfizer regarding how to

4     best publish the review article?

5     A.   Yes, I did.

6     Q.   Let's skip to 64.

7          MR. SOBOL:  And I offer Exhibit 262.

8          (Plaintiff Exhibit 262 received in evidence.)

9     Q.   Dr. Abramson, what did you observe?

10    A.   This is a communication from Medical Action

11    Communications, and they're pondering a problem.  The author of

12    this article, the review article, is going to be Dr. Backonja,

13    the same doctor who wrote the article in JAMA in 1998.  And

14    they are saying that they're not reviewing all of the published

15    trials.  There are unpublished trials.  Reckless is

16    unpublished, and there are other unpublished trials.  They're

17    saying:  How are we going to get these published trials into

18    this review article if Backonja is the only author because he's

19    not a Pfizer employee and he doesn't have access to the data

20    that we haven't shown to anybody?  So what the quote says is,

21    "The real issue is deciding how to justify only reviewing 4 of

22    the 6 randomized placebo-controlled studies and the rationale

23    for why Dr. Backonja has access to unpublished papers and

24    Pfizer data on file."  So that's their problem.

25    Q.   And how do they resolve this, as far as you know?

a169d3ed-5681-41c6-887b-8be556536a8d

1   A.   They resolved it by bringing in another author.   They

2   brought in a Pfizer-employed author named Dr. Glanzman.

3   Q.   And then turning to Slide 65.

4        MR. SOBOL:   I offer Exhibit 209.

5        (Plaintiff Exhibit 209 received in evidence.)

6   Q.   And what does this show, Doctor?

7   A.   This shows how Pfizer planned to publicize the results of

8   this study that had been born in 2001 with key messages and was

9   now being published, and it shows that they're going to use --

10  they're going to make this widely known, so it says, "Because

11  this is a key publication for Neurontin --" this is the review

12  article that was going to support the broad indication of

13  neuropathic pain, even though their pain consultant said it

14  didn't work for neuropathic pain broadly and support the dosage

15  goals they had identified -- "Because this is a key publication

16  for Neurontin, information from this study should be used in

17  all neuropathic pain initiatives," which means when they're

18  doing continuing medical education, when they're having their

19  drug reps call on doctors, when they're talking about

20  neuropathic pain, "subject to your local regulations.   Examples

21  of such activities include promotional detail aids --" that's

22  what the drug reps will carry and show to the docs, the

23  doctors -- "speakers programs --" so those would be speakers

24  who are paid by Pfizer to educate doctors about how to treat

25  patients with neuropathic pain will use this review article --

1    "regional promotional and scientific meetings --" so doctors

2    who go to their local chapter of whatever kind of doctor they

3    are will see it -- "public relations programs.  And if you are

4    thinking about organizing any local public relations

5    activities, please don't initiate them until the end of

6    January," until the paper is published.

7    Q.    Now, yesterday we talked about the Cochrane review.

8    Cochrane reviews things other than just bipolar, lots of

9    different things, correct?

10   A.    That's correct.

11   Q.    And there was an effort to review neuropathic pain,

12   correct?

13   A.    That's correct.

14   Q.    Slide 66.

15         MR. SOBOL:  And I offer Exhibits 382, 1772, and 2046.

16         (Plaintiff Exhibits 1772 and 2046 received in

17   evidence.)

18   Q.    Doctor, please describe to the jury how neuropathic pain

19   was treated in the Cochrane review.

20   A.    Well, I think it's best just to go to 2005.  The Cochrane

21   Review writes reviews, and then it periodically updates those

22   reviews when there's new information, so that when doctors are

23   accessing it, the doctors can get the latest information that's

24   available.

25         So just to backtrack a little bit, in the review article,

1    when Dr. Glanzman became an author, the data from the Reckless

2    trial was presented in a table and in the text of the Reckless

3    article, which concluded that Neurontin is effective for

4    neuropathic pain; but they brought that data into the review

5    article, not as a separate study, but one could not say that

6    there was no access to that data.  It was in the review

7    article.  But when we look at the --

8    Q.   Is that when they brought in Dr. Glanzman to bring that

9    in?

10   A.   When Dr. Glanzman became the author, then the data that

11   was heretofore, you know, just within Pfizer was then brought

12   into the review article.  It was brought in -- you can see the

13   data there, but it was brought into this review article that

14   concluded that Neurontin is effective for neuropathic pain, so

15   it was sort of a damage control project.

16        But the key point I want to get across here is, when

17   Cochrane reviews neuropathic pain in 2005 -- so this is after

18   the data from the Reckless study has been brought into the

19   review article -- they don't include that data in the review

20   article.  So if we can just look at the third bullet here, in

21   2005 Cochrane updated gabapentin for acute and chronic pain and

22   concluded that "There is evidence to show that gabapentin is

23   effective for neuropathic pain."

24        Now, when Pfizer's pain experts evaluated the same data

25   that was available to Cochrane in 2001, they said there's not

1    evidence to support this claim, and we saw Dr. Max saying

2    "You're done."

3          Four randomized control trials of Neurontin were included,

4    and those four trials that were included in the Cochrane review

5    had a total of 142 patients in them treated with Neurontin

6    studies.

7          Now, the results of the Reckless study, 945-224, and the

8    results of the POPP study, 945-271, were not included in the

9    Cochrane review.  There were 2.4 times more patients who had

10   taken Neurontin in studies that were not included in the

11   Cochrane review than were included in the studies that were

12   included in the Cochrane review.  And the point that I want to

13   make here is, Cochrane tried to find out -- they do their best

14   to get all the data and see what the data shows.  So if

15   Cochrane couldn't find this data in a way that they felt was

16   suitable to integrate into their review in 2005, there's no way

17   that practicing doctors could possibly be expected to be

18   cognizant of these negative studies that far overshadow the

19   positive studies that they presented.

20   Q.   Dr. Abramson, did you review some of the marketing plans

21   of Pfizer with respect to their plans to market pain,

22   regardless of this scientific evidence you just testified

23   about?

24   A.   I did.

25   Q.   Go to Slide 68.

1        MR. HOOPER:  Your Honor, objection for the record to

2   all this testimony.  This man is not a marketing expert.

3        THE COURT:  Untimely.  Overruled.

4   Q.   Let's go to Slide 68.

5        MR. SOBOL:  And I offer Exhibit 219.

6        (Plaintiff Exhibit 219 received in evidence.)

7   Q.   Dr. Abramson, what does this communicate?

8   A.   This is a page from Pfizer's 2001 Global Operating Plan.

9   Now, this is global.  It's important to remember that the vast

10  majority of Neurontin that was used in the world was used in

11  the United States.  I think a statistic I saw was 88 percent of

12  Neurontin use was in the United States.  And what this says --

13  this is the 2001 Global Operating Plan.  It would have been

14  created in the second half of 2000.  And what it says is, one

15  of their strategies is to "create a new standard of care for

16  neuropathic pain treatment."  And this is the NeP that means

17  the broad range of neuropathic pain.  So --

18  Q.   Let me interrupt you.  When you say "standard of care,"

19  what do you mean in terms of the practice of the physician and

20  the standard of care?

21  A.   Standard of care means that it's the standard that a good

22  medical doctor will live up to when treating patients who are

23  suffering from neuropathic pain.

24  Q.   And so what does this mean in terms of real world practice

25  for physicians day in and day out?

1    A.    What it means is that Pfizer's goal was to establish

2    Neurontin as the drug that was to be used for the treatment of

3    neuropathic pain, when they did not have evidence that

4    Neurontin was effective for the broad indication of neuropathic

5    pain.

6    Q.    Now, if we go to Slide 69, did you find elsewhere in the

7    same operating plan further strategies?

8    A.    Yes.  This is a little bit of a coned-down view of the

9    strategy, and they say, we want to make Neurontin the standard

10   of care.  And how are they going to do it?  They're going to

11   educate primary care physicians, because primary care

12   physicians see the most people who are suffering from

13   neuropathic pain, and specialists in diagnosis and treatment.

14   They're going to educate primary care doctors and specialists

15   in the diagnosis and treatment of neuropathic pain.

16   Q.    Did you also review the U.S. Operating Plan, not the

17   global plan but the U.S. Operating Plan?

18   A.    Yes.  Let me -- I didn't quite finish on that slide, I'm

19   sorry.  And they also had a goal that they were going to

20   increase Neurontin field force.  What that means is the drug

21   reps that call on the doctors, they're going to increase the

22   number of drug reps that are calling on the doctors, field

23   force presence in primary care and specialist offices, to

24   establish Neurontin as the standard of care for neuropathic

25   pain, when the scientific evidence wasn't there.

1    Q.   And did you review documents that educated you that Pfizer

2    planned on approaching upwards of 28,000 physicians across the

3    country?

4    A.   Yes.

5    Q.   Let's also then go to --

6             THE COURT:  Yes, a juror question.

7             A JUROR:  Just from a -- is it legal to promote

8    off-label applications?  Is any of this legal?

9             THE WITNESS:  It is not legal to promote -- to market

10   off-label.  If a doctor would ask -- if a drug rep were asked

11   unsolicited -- "unsolicited" is the key word -- if a drug rep

12   came in and said, "Hey, Neurontin is a good drug for adjunctive

13   therapy for seizures," and the doctor asked, "Well, it's an

14   antiseizure medicine, might it work for neuropathic pain?"

15   then the drug rep is allowed, having received an unsolicited

16   request, to show information that would make that case.  But

17   unless the drug rep is specifically asked that question, it's

18   not legal.

19            A JUROR:  So this was arming them with the information

20   should they be asked?

21            THE WITNESS:  No, I don't think that's true.

22            A JUROR:  Okay.

23            THE WITNESS:  I think this was proactive.

24            A JUROR:  Understood.

25   Q.   And, Dr. Abramson, did you review the 2003 two-year-later

1    operational and tactical plan?

2    A.    I did.

3    Q.    And what did you observe?  Oh, go to Slide 72.

4          MR. SOBOL:  And I offer Exhibit 239.

5          (Plaintiff Exhibit 239 received in evidence.)

6    A.    So this is now 2003, probably produced in the second half

7    of 2002.  This is after Pfizer's experts have said, "Your

8    scientific evidence doesn't justify the claim of efficacy

9    against the broad category of neuropathic pain," and after the

10   FDA has said, "You don't have adequate information to file an

11   application, to get granted the indication for neuropathic

12   pain," this is long after that, with no new information that

13   would change those judgments.  At the end of 2002, Pfizer is

14   saying, "One of our global strategies is to grow the

15   neuropathic pain market with Neurontin."  So they are, despite

16   the fact that their own experts have told them that Neurontin

17   is not effective for neuropathic pain, their strategy is to

18   grow the neuropathic pain market to increase Neurontin sales.

19   Q.    Now, Dr. Abramson, if an unsolicited request for

20   information were made by a physician to a Pfizer drug rep and

21   the only information provided in response were the Backonja/

22   Glanzman study, right -- strike that.  Let me put the question

23   this way:  Describe to the jury why it's important, when a

24   physician asks for information about an off-label use, that the

25   information that the doctor receives is complete, meaning it

1   provides all the information rather than only some of the

2   information.

3   A.   Right, the reason why it's important is because the

4   information could be cherry-picked.  So the Backonja/Glanzman

5   article could be produced, as we saw in the public relations

6   strategy, the Backonja/Glanzman article could be produced, but

7   Reckless had not been published as an independent study, and

8   the doctor wouldn't get a fair and balanced view of the

9   effectiveness of Neurontin for neuropathic pain.

10  Q.   And until the dates of their publication, were Reckless or

11  POPP available even to be given to doctors?

12  A.   No.  The only way that Reckless was available was

13  integrated in a small way into the Backonja/Glanzman review

14  article that we talked about; but the conclusion of that

15  article was, even though there was this negative data,

16  Reckless, that Neurontin was effective for neuropathic pain and

17  effective in doses higher than 1,800 milligrams.  The POPP

18  study wasn't available until 2008.

19  Q.   Similarly, when doctors/physicians are receiving the

20  85 million impressions of the Backonja article, what further

21  information would have been material in getting that

22  information, in receiving those impressions?

23       MR. HOOPER:  Objection, your Honor.

24       THE COURT:  Overruled.

25  A.   It would have been important for doctors to understand

1  that there were problems with the study design that were not

2  adequately corrected -- statistically weren't corrected in the

3  proper way to conclude that it wasn't the central nervous

4  system side effects that created the unblinding, essentially,

5  partially open-label study that made this not quite a

6  randomized controlled trial.

7  Q.   And why is that material to doctors rather than just sort

8  of a geeky statistical thing that you just talked about?

9  A.   Well, that is really important because doctors work very

10 hard, and they want to get the bottom line of the research:

11 Does this study show that the drug works for patients with

12 diabetic neuropathy or not?  And these fine details that are

13 hard for doctors -- you know, this is, you know, a hard pull,

14 but these fine details really change the meaning of the study.

15 So it's essential for doctors to understand the fine print

16 here, and yet there's no way you can expect a practicing

17 physician to unravel -- there are a few clues, but there's no

18 way you can expect a practicing physician to unravel the

19 incomplete correction for the unblinding that happened by the

20 forced titration design of the study.

21 Q.   Doctor, now I'm going to move to migraine, and I'm going

22 to see if we can go through this in ten minutes.  I'm going to

23 really put you through the pace.  I'm going to try to move this

24 along, okay?  Go to the next slide, please.  Describe for the

25 jury the first study in migraine you reviewed.

Page 56

1   A.   The first study in migraine was very early.  It was a

2   so-called Phase 2 study before Neurontin was ever approved.

3   It's study CT 879-200.  And this is a study where patients with

4   migraine headache were randomized to get Neurontin or placebo,

5   and it found that Neurontin was not significantly better than

6   placebo.

7   Q.   Published when?

8   A.   Not published.

9            MR. SOBOL:  I offer 374.

10            THE COURT:  All right.

11            (Plaintiff Exhibit 374 received in evidence.)

12   Q.   The next study is Mathew, if we can go to Slide 75-A.

13            MR. SOBOL:  And I offer 396.

14            (Plaintiff Exhibit 396 received in evidence.)

15   Q.   Dr. Abramson, what did the Mathew study show?

16   A.   Well, the research report, Pfizer's research report for

17   Mathew showed something very different than the publication of

18   Mathew in a peer-reviewed medical journal.  And this is another

19   situation where the details seem kind of geeky in small print,

20   and they're critically important to understanding whether

21   Neurontin is effective for migraine headache or not.

22            THE COURT:  Wait, we can't go too fast here because

23   it's going too fast for me.  So the study CT on migraine, when

24   was that available, the results?

25            THE WITNESS:  Never.

Page 57

1        THE COURT:  No, no.  When did Pfizer know it?

2        THE WITNESS:  When did Pfizer?  Pfizer, the study was

3    completed in 1988, and the research report was issued in 2000,

4    so that would be pre-Pfizer.

5        THE COURT:  Well, just --

6        THE WITNESS:  Yes, the manufacturer.

7    Q.   Is it 1990 rather than 2000?

8    A.   I'm sorry, yes.

9        THE COURT:  Say it again?

10        THE WITNESS:  Thank you.

11        THE COURT:  What's the timing of it?

12        THE WITNESS:  Once again, the study was completed in

13    1988.

14        THE COURT:  '88.

15        THE WITNESS:  '88.

16        THE COURT:  All right.

17        THE WITNESS:  And the research report was completed in

18    1990.

19        THE COURT:  All right.

20        THE WITNESS:  So this is three years before the drug

21    is approved.

22    Q.   Not effective for migraine?

23    A.   Not effective for migraine.

24    Q.   And then the Mathew study, just briefly, what did it show?

25    A.   The Mathew study showed that Neurontin is not effective

1   for migraine headache.  And what is blown up on the slide is,

2   this is a page from the research report, from the

3   manufacturer's research report.  And the bottom line is that

4   the population that was identified as the primary population to

5   analyze was called the efficacy-evaluable population.  And the

6   results of the study showed that for the efficacy-evaluable

7   population, there was not a statistically significant reduction

8   in migraine headaches in the people who were treated with

9   Neurontin instead of placebo.

10       THE COURT:  And the date that those results became

11  available?

12       THE WITNESS:  That study was completed in March of

13  1998, and it was published, I believe, in 2000.

14  Q.  And then the Study 217, going to Slide 78.

15  A.  Well, can we talk about what was published of Mathew?

16       MR. HOOPER:  Objection.

17  Q.  I'm sorry, yes.  I forgot to do that.  First let's go to

18  Slide 76.

19       MR. SOBOL:  And I offer Exhibit 2082.

20       (Plaintiff Exhibit 2082 received in evidence.)

21  Q.  Yes, what was published in terms of Mathew?  Rather than

22  the result, what was actually said about Mathew?

23  A.  The result in the manufacturer's research report said,

24  Neurontin is no more effective than placebo.  What was

25  published in the journal Headache, which is what doctors would

1    see -- doctors don't have access -- your Honor?

2            THE COURT:  Oh, I'm sorry.

3            THE WITNESS:  The juror has a question.

4            THE COURT:  I'm taking notes.  I didn't even notice

5    you.  Go ahead.

6            JUROR:  Could I ask who the sponsor of the Mathew

7    study was, please?

8            THE WITNESS:  Yes.  It was the manufacturer.

9            THE COURT:  When you say the manufacturer instead of

10   Pfizer, why is that?

11           THE WITNESS:  Because this was pre-2000, so

12   Parke-Davis was at the helm, I think.

13   Q.   When you said "manufacturer," you're using that as a

14   shorthand for Pfizer or Parke-Davis or Warner-Lambert, correct?

15   A.   Yes, all three.

16   Q.   Go ahead.

17   A.   So the manufacturer's research report said Neurontin is

18   not better than placebo for migraine headache when we look at

19   the prespecified population, the efficacy-evaluable population.

20   The study that was published in Headache, which is what doctors

21   see -- they don't have access to the research report -- the

22   bottom line that doctors saw was, "Gabapentin is an effective

23   prophylactic agent for patients with migraine," 180 degrees

24   different.

25   Q.   And then can you explain how that was attempted to be

Page 60

1    justified, if we go to the next slide, please.

2            THE COURT:  So where is the Headache study?  Is it on

3    a slide here?

4            THE WITNESS:  I'm sorry.  If you go back, this study,

5    945-220, is the Mathew study.

6            THE COURT:  Right.

7            THE WITNESS:  And the first study was the one that was

8    completed in 1988, and this is the second study of migraine

9    headache, and it was published in the journal Headache.

10           THE COURT:  Right, but do we have a quote from the

11   journal Headache here?

12           THE WITNESS:  That is a quote.  I'm sorry.  The

13   "Pfizer said/did:  Opposite:  Gabapentin is an effective

14   prophylactic agent for patients with migraine" is from the

15   journal Headache, so that's what doctors would see.

16           THE COURT:  I see.  So that's the Headache quote.

17           THE WITNESS:  Yes.

18   Q.   So Slide 77 I think is an aid for you to describe for the

19   jury what was done in terms of what was planned and then how it

20   was published.

21   A.   Yes, this is a fine "The devil is in the details issue,"

22   and I apologize.  The prespecified population that was going to

23   be analyzed was the efficacy-evaluable population, and that's

24   the middle column in this slide.  And if you just look at the

25   top of it, 62 patients were on Neurontin and 33 were on

1    placebo.  The research report said:  We're going to look at a

2    larger population than that, the modified intention-to-treat

3    population, if you look to the left, and that had 77 patients

4    taking Neurontin and 36 taking placebo.  So efficacy-evaluable

5    population was a subset of that that took more of their

6    medicine and did a better job keeping their diary.

7         When the study was published in Headache, they didn't

8    publish the efficacy-evaluable population which showed

9    Neurontin is not better.  They published what they called the

10   "modified intention-to-treat population."  But it wasn't what

11   the modified intention-to-treat population had been identified

12   in the research protocol.  They added, after the research

13   protocol was written, they added a new criteria for modified

14   intention to treat, and the article, the study allowed people

15   to go up to 2,400 milligrams of Neurontin.  And it's called

16   "post hoc," but after the fact, the population that was going

17   to be evaluated was changed, so that it was only people who got

18   to 2,400 milligrams and stayed at 2,400 milligrams that were

19   reported in the journal Headache.  So this is all that the

20   doctors knew about the results of the study.

21        And if you look at the chart, just the top line here, the

22   efficacy-evaluable population is 62 patients on Neurontin and

23   33 on placebo.  The modified intention to treat should be

24   higher than that, but if you look at the right-hand column

25   which was published in Headache, there's actually fewer people

1   because the authors only included the people who stayed on

2   2,400 milligrams.  And physicians had no way of knowing that

3   this was a different population, and that the way the rules of

4   the game had been established before the article, before the

5   blind was broken, was that it would be the efficacy-evaluable

6   population.  So if they stuck to the rules, the report would

7   have been:  Neurontin is not effective, does not reduce

8   migraine headaches compared to placebo.

9   Q.   So if a doctor said to a sales agent, "I've heard it might

10  be good for migraines, do you have something?" they were given

11  the results of this study as published?

12  A.   They might be given the results of this study, but this

13  study was amplified because Dr. Mathew, who authored the

14  article in Headache, also wrote a review article about migraine

15  headache in the same journal, and he used the same data that

16  was misrepresented in the first study in the review article.

17  And then it got amplified again because there was a study that

18  was done by a man named Adelman in 2002 that showed that

19  migraine headaches can be treated with Neurontin and that it

20  cost about $138 per migraine prevented, and he was relying on

21  the post hoc population, the misrepresentation of the results

22  of the Mathew study.  So it got published once in Headache,

23  twice in Headache, and then again as a cost-effectiveness

24  study, all on the wrong population.

25  Q.   Finally, turning to the 217 study on migraines, Slide 78.

1          MR. SOBOL:  I offer Exhibit 397.

2          (Plaintiff Exhibit 397 received in evidence.)

3   Q.   What was this study?

4   A.   This is a study that was designed much like the Mathew

5   study.  The only difference is that the patients -- this is

6   people with chronic migraine headache, and the goal is to

7   decrease the frequency of their headaches by giving the

8   treatment group Neurontin and the placebo group placebo.  The

9   only difference is that this study went to 1,800 milligrams,

10  not to 2,400 milligrams of Neurontin.  And this study found --

11  this is a quote from the research report:  "For efficacy-

12  evaluable patients --" this is the same population that had

13  been identified in the Mathew study -- "For efficacy-evaluable

14  patients, no statistically significant differences were seen at

15  any study point between the placebo and the Neurontin groups

16  with respect to 4-week migraine headache rates."  In other

17  words, Neurontin was not effective for migraine headache.

18          THE COURT:  And when were the results of this study

19  available?

20          THE WITNESS:  The study was completed in January of

21  1999, but the study was never published.

22          THE COURT:  And this is a Pfizer study?

23          THE WITNESS:  This is a Pfizer study.  The results

24  were not published.  So Mathew wasn't positive, was published

25  as a positive study.  217 was not positive and was not

a169d3ed-5681-41c6-887b-8be556536a8d

Page 64

1    published.

2    Q.   Cochrane review on migraine, I'm going to jump to

3    Slide 82.

4              MR. SOBOL:   And I offer Exhibits 159 and 2086.

5              (Plaintiff Exhibits 159 and 2086 received in

6    evidence.)

7    Q.   Can you please describe to the jury how migraine was

8    treated in the Cochrane review.

9    A.   Right, and if we go to the 2004 bullet, I think we'll save

10   some time.  It's about halfway down the page.

11        So this is an update of the Cochrane review in 2004.  And

12   this again, like the previous Cochrane review that we talked

13   about, this would be the best information that practicing

14   physicians could get.  This is the best that the Cochrane

15   reviewers could get.  It's certainly the best that practicing

16   physicians could get.  And in 2004, among -- this is a Cochrane

17   review of migraine prophylaxis, and among 14 placebo-controlled

18   randomized controlled trials -- not all Neurontin -- only two

19   were Neurontin -- included in the 2004 Cochrane review were two

20   randomized controlled trials that evaluated the efficacy of

21   gabapentin.  Di Trapani, which we didn't talk about,

22   Di Trapani is a study that was done in Italy, published in

23   Italy, and showed positive results, though there are problems

24   with the publication.  But the Cochrane review includes

25   Di Trapani and Mathew from 2001, the study that was published

1    with the changed end point as a positive study.  But the

2    Cochrane reviewers don't have access to the two negative

3    randomized controlled trials that the manufacturer did, the one

4    that was completed in 1988 and 217 that was completed in 1999.

5    Q.   And so what was the result, the last bullet on this slide,

6    in terms of Cochrane and migraine?

7    A.    Neither of the defendants' two negative randomized

8    controlled -- well, let me say, the conclusion of the Cochrane

9    review that doctors would have seen is that "The evidence

10   derived from trials of gabapentin, Neurontin, suggest a

11   beneficial effect in migraine prophylaxis, but this drug needs

12   further evaluation."  So they're looking at the Mathew study,

13   which was really negative but was published as positive, and

14   they're not seeing the two negative randomized controlled

15   trials.

16   Q.   Now, Dr. Abramson, did you review an article that was an

17   effort to try to take an overview about the effectiveness of

18   Neurontin for a variety of indications, the so-called Mack

19   article?

20   A.    I did.

21   Q.   And so, again, describe what this article is and what the

22   purpose of it is.

23   A.    The article was published in the Journal of Managed Care

24   Pharmacy, which is the journal that's published by the Academy

25   of Managed Care Pharmacy.  So these are managed care

1    pharmacists are reading this to decide what the best drug

2    treatment in a managed care context is.

3    Q.    When you say "managed care," you're meaning like what?

4    A.    It could be Harvard Pilgrim here.  It could be Kaiser.  A

5    managed care organization.

6    Q.    Okay.  And let's go to Slide 83.

7              MR. SOBOL:  And I offer Exhibit 349.

8              (Plaintiff Exhibit 349 received in evidence.)

9    Q.    And you'll note, Dr. Abramson, that I put up at the top

10   "The Last Slide," okay?

11   A.    I do note that.

12   Q.    There is a color scheme here that we've put on the graph.

13   Do you see that?

14   A.    I do.

15   Q.    Okay.  And the color scheme over on the right, why don't

16   you describe for the jury what the color scheme is.

17   A.    I will, but I need to go back before that.  I need to say

18   that the title of the article is an evaluation -- these aren't

19   the exact words, but it's an evaluation of the scientific

20   evidence to support off-label uses of Neurontin.  So this is a

21   review article for managed care pharmacists to review the

22   evidence that's available about the real science about

23   off-label efficacy.

24        And the color scheme here, they looked at three

25   indications:  diabetic neuropathy, migraine prophylaxis, and

Page 67

1    bipolar disorder.  And the second from the left side, these are

2    randomized controlled trials that were included in the review,

3    which means available to the person who wrote the review,

4    Dr. Mack -- actually, I'm not sure it's Dr. Mack.  She may be a

5    pharmacist and not an M.D.  But these are the studies that she

6    found that were published, so --

7    Q.   Okay.  And then you've got two columns.  One is "RCTs

8    Included."  Those are the ones that were available to Mack,

9    correct?

10   A.   Those are the ones that she found when she searched the

11   literature that would have been available to practicing

12   physicians.

13   Q.   And then "RCTs Not Included" column, what is that?

14   A.   Those are the randomized controlled trials that we've

15   talked about yesterday and today that were completed but were

16   not published as independent studies, and therefore were not

17   available in the so-called scientific evidence for practicing

18   physicians.

19   Q.   Now, the color scheme within here, is the orange those

20   articles which, at least on the face of things, seem like they

21   were reporting some support for Neurontin and a condition?

22   A.   Yes.

23   Q.   And the purple are those articles which on the face of

24   things would have, if published, shown, or when they were

25   published, shown no benefit?

1    A.   That's correct.  And had Mathew been published accurately,

2    then the second, third, and fourth articles in that first

3    column in "Migraine Prophylaxis" would be purple, not orange.

4         THE COURT:  So that final column is the conclusion

5    drawn by Mack?

6         THE WITNESS:  Exactly.  That's exactly right.  So Mack

7    said that there was solid research support for diabetic

8    neuropathy, but she didn't have access to three very important

9    studies:  Gorson, Reckless, or POPP.  And she concluded, based

10   on the evidence that she had available to her, that there was

11   solid research support and wrote in her review article that

12   there was solid research support for migraine prophylaxis.  But

13   she didn't have access to the 1988 study, to the 217 study, or

14   to the accurately published Mathew study.  And then she

15   concluded based on what was published about bipolar disease

16   that there was not significant evidence -- that the evidence

17   was -- that the evidence -- the evidence that was published,

18   the two randomized controlled trials that were published did

19   not provide support for use in bipolar.

20   Q.   Now, Dr. Abramson, on the basis of your education,

21   training, and experience, and upon your review of the reliable

22   scientific literature concerning the effectiveness of Neurontin

23   for migraine, do you have an opinion to a reasonable degree of

24   certainty as to whether or not the reliable scientific evidence

25   demonstrated that Neurontin was effective for migraine?

Page 69

1   A.   I do.

2   Q.   And what was your opinion?

3          MR. HOOPER:  Objection.

4          THE COURT:  Overruled.

5   Q.   What's your opinion?

6   A.   My opinion is that the --

7          THE COURT:  Now, this isn't his opinion based on

8   independent research.  This is just based on the literature.

9   Is that right?

10          THE WITNESS:  It's based on the literature and the

11   documents that I've seen from Pfizer, which is the unpublished

12   articles that doctors didn't have access to.

13          THE COURT:  All right, fine.  I'll allow that.  Your

14   answer is?

15          THE WITNESS:  My answer is that the scientific

16   evidence does not show that Neurontin is effective for migraine

17   prophylaxis.

18   Q.   And do you have an opinion to a reasonable degree of

19   certainty as to whether or not the communications by Pfizer,

20   Warner-Lambert, and Parke-Davis regarding migraine were either

21   consistent, complete, or not misleading regarding the true

22   scientific information regarding migraine?

23   A.   I do.

24          MR. HOOPER:  Objection, your Honor.

25          THE COURT:  Overruled.

1   Q.   And what's your opinion?

2   A.   My opinion is that the communication, through published

3   literature and otherwise, misrepresented the evidence about

4   migraine headache and communicated efficacy.

5   Q.   Now, on the basis of your education, training, and

6   experience, and upon your review of the reliable scientific

7   evidence concerning the effectiveness of Neurontin, do you have

8   an opinion to a reasonable degree of certainty as to whether

9   the communications by Warner-Lambert, Parke-Davis, and Pfizer,

10  if proven by the plaintiffs, affected the traditionally

11  independent and trusted sources of information upon which

12  physicians rely in making informed prescribing decisions?

13          MR. HOOPER:   Objection.

14  A.   I do.

15  Q.   And what is your opinion?

16  A.   My opinion is that physicians, even the most hard-working

17  disciplined physicians, could not have had access to the

18  scientific evidence that was available.

19  Q.   And does your opinion apply for all the conditions that

20  we've been talking about here:  bipolar, both the forms of

21  pain, migraine, and doses over 1,800 milligrams?

22  A.   It does.

23  Q.   You haven't attempted, though, to quantify this impact,

24  meaning in terms of which physicians or how many physician or

25  anything, correct?

1    A.   I have not.

2           MR. SOBOL:  I have nothing further, your Honor.

3           THE COURT:  Who's doing the cross?

4           Now, can we just take a break?  You stand and stretch,

5    and I'll see counsel just for a second on scheduling.

6           (Discussion off the record.)

7           THE COURT:  Okay, we'll probably take a real break at

8    around 11:10.  I'm just trying to catch up a little bit with

9    some of the time we lost this morning.  And then we'll have a

10   break until 11:30-ish.

11          Okay, Mr. Hooper, are you ready?

12          MR. HOOPER:  I'm ready, your Honor.

13          THE COURT:  All right, go for it.

14          MR. HOOPER:  May it please the Court, ladies and

15   gentlemen, I'm Jim Hooper, and I have some questions for

16   Dr. Abramson.

17   CROSS-EXAMINATION BY MR. HOOPER:

18   Q.   Dr. Abramson, good morning.

19   A.   Good morning.

20   Q.   Nice to meet you.

21   A.   Likewise.

22   Q.   Dr. Abramson, you are a family practice doctor, correct?

23   A.   That's correct.

24   Q.   Right.  And so you're familiar with a document called a

25   Physician's Desk Reference --

1          THE COURT:  You know, get the mike right near you, not

2     that I anticipate a big problem, just so we can all hear.  It's

3     a big courtroom.

4          (Discussion off the record.)

5     Q.   Dr. Abramson, you're familiar with a document called the

6     Physician's Desk Reference, correct?

7     A.   I certainly am.

8     Q.   This is a compendium of all the FDA-approved labeling for

9     prescription drugs in the United States; is that correct?

10    A.   That's right.

11    Q.   Right.  And do you recall earlier this morning you defined

12    neuropathic pain, and you used your arms, and you used "NeP" or

13    "neuropathic pain" to mean neuropathic pain broadly, all forms,

14    correct?

15    A.   That's correct.

16         MR. HOOPER:  May I approach the witness, your Honor?

17         THE COURT:  Yes.

18    Q.   Dr. Abramson, would you please identify any prescription

19    drug in the United States that has an FDA-approved indication

20    for neuropathic pain as you defined it.

21    A.   There is none.

22    Q.   Thank you.  The assignment given to you by Kaiser's

23    lawyers was to look at documents that Kaiser's lawyers had

24    chosen and sent to you, a great deal of them, correct?

25    A.   It was to look at documents that plaintiffs' attorneys

1    sent to me, as well as to look at the literature independently.

2    Q.   You also did your own research of what I believe you

3    called the "digital medical literature."  You got on the

4    computer, and you went and looked for things that might be

5    relevant, correct?

6    A.   Through the Harvard Library, so it's into the journals.

7    Q.   Dr. Abramson, you wrote a 122-page report in this case,

8    correct?

9    A.   I think it was 123 pages.

10   Q.   123, I'm sorry.

11              MR. HOOPER:  Your Honor, may I?

12              THE COURT:  I don't need another one.

13              (Laughter.)

14              MR. SOBOL:  No objection if it's being offered in

15   evidence, your Honor.

16   Q.   Dr. Abramson, your report is signed and dated August 11,

17   2008, correct, Page 123.

18   A.   That's correct.

19   Q.   And that report sets out your opinions and reasoning, the

20   same things you told the jury about here earlier, yesterday and

21   today, correct?

22   A.   Yes.

23   Q.   So you completed that report what, 18 months ago?

24              (Witness examining document.)

25   A.   That sounds right.

a169d3ed-5681-41c6-887b-8be556536a8d

1  Q.   And you gave that report to Kaiser's lawyers when you

2  completed it and signed it, correct?

3  A.   Yes.

4  Q.   Okay.  And in fact Kaiser's lawyers were involved with you

5  in I think what you called yesterday a "give-and-take" with the

6  drafting of the report?

7  A.   Yes.

8  Q.   And you say in that report, much as you told us earlier,

9  that you've concluded that Neurontin is no better than a

10  placebo and in some cases worse than a placebo for several

11  medical uses, correct?

12  A.   Well, the "worse than" was the result of the Pande study

13  for bipolar disease, yes.

14  Q.   Dr. Abramson, if your August, 2008 report is correct,

15  Kaiser patients using Neurontin for off-label conditions are

16  not only taking something that's snake oil, no better than a

17  sugar pill, but they're also doing without some alternative

18  treatment, correct?

19  A.   Yes, that's correct.

20  Q.   Would you knowingly give a patient suffering from

21  neuropathic pain something that you truly believed was snake

22  oil, no better than a placebo?

23  A.   No.

24  Q.   Would you approve of any other physician giving a patient

25  in terrible pain something that they thought was snake oil and

1   useless?

2   A.   I wouldn't approve, but I don't have control over other

3   physicians and didn't when I was in practice.

4   Q.   Is that a "yes"?

5   A.   Can you repeat the question.

6   Q.   Would you approve of any other physician giving a patient

7   in pain something they believed was snake oil, useless?

8   A.   If a physician asked me, I would opine, but I didn't

9   control other physicians.

10          THE COURT:  No, just answer his question.  We'll never

11   finish this, so --

12          THE WITNESS:  Okay.

13   Q.   You would not approve of that, would you?

14          THE COURT:  Yes or no.

15   A.   In my opinion or in my authority is my problem.

16          THE COURT:  In your opinion.

17   A.   In my opinion, no.

18   Q.   How about a patient with psychiatric problems like bipolar

19   disorder, would you give them something that you think is a

20   sugar pill instead of something that you think is effective?

21   A.   I would not, but I may have cared for patients who were

22   being cared for by other doctors, psychiatrists, who may have

23   done that.

24   Q.   Since you wrote your report and gave it to Kaiser's

25   lawyers 18 months ago, has Kaiser stopped allowing its doctors

Page 76

1    to prescribe Neurontin for off-label uses in its patients?

2    A.   I'm not aware.

3    Q.   Since your report, have any of the various Kaiser regions,

4    Northern California, Southern California, Oregon, Washington,

5    Hawaii, Ohio, or any of the rest of them, removed Neurontin

6    from its formulary?

7    A.   I'm not aware of that.

8    Q.   Have there been any new formulary restrictions imposed on

9    gabapentin, anything saying that gabapentin can only be used

10   for this and never for that, since they got your report?

11   A.   I'm not aware.

12        THE COURT:  So they're not, or you don't know anything

13   about Kaiser?

14        THE WITNESS:  I don't know anything about it.

15        THE COURT:  All right, so we need to move on.  He

16   knows nothing about Kaiser.

17   Q.   Dr. Abramson, you're board-certified in family medicine,

18   correct?

19   A.   That's correct.

20   Q.   You haven't treated patients since 2002, correct?

21   A.   That's correct.

22   Q.   You're not a specialist in neurology?

23   A.   I am not.

24   Q.   You're not a specialist in psychiatry?

25   A.   I'm not.

a169d3ed-5681-41c6-887b-8be556536a8d

Page 77

1    Q.   Apart from any pain that you treated in the context of

2    your family practice eight years ago, you're not a pain

3    specialist, are you?

4    A.   That's correct.

5    Q.   You've never personally conducted a randomized controlled

6    clinical trial of any medication, have you?

7    A.   That's correct.

8    Q.   You've never designed a clinical trial?

9    A.   I have not.

10   Q.   You've never been responsible for analyzing the data from

11   a clinical trial of a prescription medication other than in the

12   context of your work with lawyers, correct?

13   A.   No, that's not correct.

14   Q.   Dr. Abramson, you've never been responsible for drafting a

15   study report with clinical trial results; is that correct?

16   A.   That's correct.

17   Q.   And you've never been involved in drafting a clinical

18   trial protocol, the plan going in, have you?

19   A.   That's correct.

20   Q.   And in your lectures to medical students, you've never

21   lectured on Neurontin, right?

22   A.   I did lecture on Neurontin to family practice residents

23   about a year ago.

24   Q.   And as of the time of your deposition in this case in

25   January, you had not done so, correct?

1   A.    That's correct.

2   Q.    You've never lectured on antiepileptic drugs or AEDs

3   generally, have you?

4   A.    No.

5   Q.    That's not something you teach about, right?

6   A.    Not AEDs in general, no.

7   Q.    Dr. Abramson, have you ever had responsibility for

8   analyzing the data and drafting the results of a clinical trial

9   for a prescription medication?

10  A.    No.

11  Q.    Before you wrote your report in this case, you never

12  contacted any of the doctors and scientists who actually

13  conducted the research that you talked about earlier today, did

14  you?

15  A.    I did not.

16  Q.    Just to be sure, did you pick up the phone and call

17  Dr. Ken Gorson at St. Elizabeth's here in Boston and say, "I've

18  got concerns about your study.  I'd like to hear your side of

19  it"?

20  A.    I didn't.  I think that would be an awkward thing to do as

21  a consultant to plaintiffs' attorneys.

22  Q.    And I take it that you've not spoken with Dr. Frye on your

23  chart, Dr. Young, Dr. Backonja, Dr. Vieta, or any of the rest?

24  You haven't spoken with those folks, have you?

25  A.    That's correct.

1   Q.   You mentioned some CMEs or continuing medical education

2   events yesterday and showed some slides that referred to those,

3   right?

4   A.   I did.

5   Q.   Can you tell us the names of five Kaiser Neurontin

6   prescribers who attended any of them?

7   A.   I can't.

8   Q.   Can you tell us the name of one?

9   A.   I can't.

10  Q.   Do you know anything about any questions that any Kaiser

11  doctors may have posed to a Warner-Lambert or Pfizer

12  salesperson about Neurontin?

13  A.   No.

14  Q.   Your role in this case is not to offer -- I want to make

15  sure I understand it -- your role in this case is not to offer

16  an opinion as to what caused specific Kaiser physicians to

17  write prescriptions for Neurontin in any of its various

18  regions; is that right?

19  A.   I think that's correct.  My role is to opine about the

20  influences that came to bear on all physicians, including

21  Kaiser physicians.

22  Q.   Let's turn to the timeline that you put up yesterday that

23  you've titled "Bipolar Disorder."  That's a chart you prepared,

24  right?

25  A.   Yes.

1    Q.   The first event you have on there, Doctor, is in July,

2    1997, where you indicate by the words saying the Pande study

3    was quote/unquote "completed," correct?

4    A.   Yes.

5    Q.   That's the earliest your timeline goes, right?

6    A.   It is.  I mean, there's not room to put everything on it.

7    Q.   On your timeline in December, 2000, you highlight the

8    publication of a study by Dr. Frye, F-r-y-e, and colleagues,

9    correct?

10   A.   Yes.

11   Q.   Dr. Frye was a researcher from the National Institute of

12   Mental Health; is that right?

13   A.   That's correct.

14   Q.   And the National Institute of Mental Health, or known as

15   NIMH, is part of the federal government, not Pfizer, correct?

16   A.   That's correct.

17   Q.   And you based these events and entries on the timeline on

18   the documents that Kaiser's lawyers chose and sent to you, plus

19   the material that you found in your research and literature,

20   correct?

21   A.   Plus the restrictions of how much information you can put

22   on one sheet.

23   Q.   Sure, sure.  By the way, were you told that you couldn't

24   use a bigger board?  Were you under the impression that it had

25   to be three by five?  Nobody told you that, did they?

1    A.   Well, frankly, I was kind of new to this software, and

2    that's as much as I could squeeze in.

3    Q.   If you would, Doctor, would you please look at your

4    report, Page 56, Paragraph 136.  You mention in your report

5    that the results of the study by Dr. Frye, the researchers for

6    the National Institute of Mental Health, was presented at two

7    meetings of the American Psychiatric Association, in 1997 and

8    then the next year in 1998, correct?

9    A.   Yes, that's correct.  Let me just say, those results were

10   interim results.  Those were not the results, the final results

11   from the study.

12   Q.   We're about to go right there.  Do you see, Dr. Abramson,

13   that what's on the screen now is "Continuing Medical Education

14   Syllabus and Scientific Proceedings" from that 150th annual

15   meeting of the American Psychiatric Association?  Do you see

16   that?

17   A.   I do.

18   Q.   And right below that it says where the meeting was held,

19   San Diego, California, correct?

20   A.   Correct.

21   Q.   Kaiser is based in California, correct?

22   A.   Yes.

23   Q.   And it's dated May 17 through 22, 1997.  This is the APA

24   meeting that you refer to in your report, correct?

25   A.   Yes.

1    Q.   Go to the next page.  Let me direct your attention to

2    Abstract No. 33C in the lower leftmost column.  Dr. Abramson,

3    do you see the abstract or summary by Dr. Frye of the National

4    Institute of Mental Health beginning at the bottom left of the

5    column?

6    A.   Yes.

7    Q.   And it's titled "No. 33C, Gabapentin and Lamotrigine

8    Monotherapy in Mood Disorder," correct?

9    A.   Yes.

10   Q.   Would you look at the first sentence, bottom --

11            MR. SOBOL:  I'm sorry, exhibit or Bates?

12            THE COURT:  He can be looking it up while he asks

13   about it.  Go ahead.

14   Q.   Would you prefer a paper copy?

15   A.   Yes, please.  Thank you.

16   Q.   Dr. Abramson, let me direct your attention to the first

17   sentence of the abstract.  Dr. Frye of the National Institute

18   of Mental Health says, "There is a pressing need for new

19   management options in mood disorders, as many patients are

20   commonly seen with illness refractory to conventional mood

21   stabilization treatments, either alone or in various

22   combinations."  Did I read his words correctly first?

23   A.   You did.

24   Q.   And treatment refractory, we know what treatment is.

25   Refractory means like a light ray refracting or bouncing off --

1    the treatment refracts and bounces off those patients, correct?

2    A.    They're resistant to the treatment, yes.

3    Q.    The same thing as treatment-resistant, right?

4    A.    Yes, yes.

5          THE COURT:  Excuse me.  What are we looking at now?

6          MR. HOOPER:  We're looking at an abstract cited in

7    Dr. Abramson's report.

8          THE COURT:  That's from 1997.  So that's different

9    from the Frye result of December, 2000?

10         MR. HOOPER:  Yes, it is, your Honor.  There are three,

11   and we're going to look at all of them.

12         THE COURT:  So this is an earlier report?

13         MR. HOOPER:  Exactly.

14         THE COURT:  Not the same report?

15         MR. HOOPER:  Exactly, your Honor, exactly.

16         THE COURT:  All right.

17   Q.    And, Dr. Abramson, Dr. Frye goes on next to say, "In this

18   paper, we discuss the emerging evidence that lamotrigine and

19   gabapentin, two drugs recently approved as adjunctive treatment

20   for partial epilepsy, hold promise as adjunctive or alternative

21   therapies for patients with mood disorder."  First, did I read

22   that correctly?

23   A.    You did.

24   Q.    And mood disorder encompasses things like depression and

25   bipolar disorders, among others, right?

1    A.    Yes.

2    Q.    And then he talks in the very next paragraph about his

3    double-blind randomized placebo-controlled trial, the DBRCTs

4    we've been talking about, correct?

5    A.    Yes.

6    Q.    And then look at the second sentence of the next

7    paragraph, if you will.  He says there, "The preliminary

8    monotherapy response data to date, based on various scales, for

9    lamotrigine was 53 percent and for gabapentin was 43 percent."

10   Did I read that correctly?

11   A.    You did.

12   Q.    And then just quickly, his concluding sentence at the

13   bottom of the abstract at the 1997 APA annual meeting is, "This

14   preliminary evidence of clinical efficacy suggests that

15   lamotrigine and gabapentin may ultimately become important

16   additions to the mood disorder pharmacopeia."  Did I read his

17   words correctly?

18   A.    Yes, "may become."

19   Q.    Pharmacopoeia means a set of available medications,

20   correct?

21   A.    That's correct.

22   Q.    Dr. Abramson, I take it you can't tell us how many Kaiser

23   psychiatrists attended this meeting in San Diego of the annual

24   meeting of the APA, can you?

25   A.    I cannot.

1   Q.    That's not something the Kaiser lawyers asked you to look

2   at?

3   A.    No.

4   Q.    Dr. Abramson, I take it you also never considered the

5   influence on Kaiser doctors that this presentation by Dr. Frye

6   from the NIMH might have had on their prescribing decisions,

7   did you?

8   A.    I did not.  No, I looked at the other publications, the

9   volume of the nonrandomized controlled trials that were being

10  published.

11  Q.    Let's look at --

12          MR. HOOPER:  One moment, your Honor.  I'll have

13  exhibit numbers.  It will be a little faster.

14          THE COURT:  So that was marked and admitted or not?

15          MR. SOBOL:  It hasn't been offered, but we would want

16  it in, your Honor.

17          THE COURT:  You would what?

18          MR. SOBOL:  We would like to have it marked as an

19  exhibit.

20          THE COURT:  Were you offering that or not?

21          MR. HOOPER:  No, ma'am.  We would later through

22  another witness.

23  Q.    Dr. Abramson, would you please look at your report,

24  Pages 55 to 56, the bottom line on 55, including footnote

25  references 192 and 193.  Are you there, Doctor?

Page 86

1   A.   Yes.

2   Q.   Okay.  First, let me ask you, have you ever heard anyone

3   say that the negative results in certain Pfizer studies were

4   "suppressed" or put into a box in a warehouse in Kalamazoo,

5   Michigan?  Were you aware that that has been said here?

6   A.   Yes.

7   Q.   And you mention in your report that the Pande study --

8   that's by Dr. Pande from Pfizer -- was presented in June, 1999,

9   at something called The Third International Bipolar Conference,

10  and you cite a website at the University of Pittsburgh for

11  that.  Do you see?

12  A.   I do.  Well, I don't see the website -- oh, yes, I do.

13  Q.   It is in your footnote, isn't it?

14  A.   Yes.

15  Q.   Let me show you a hard copy of that.

16  A.   Thank you.

17           THE COURT:  So when was it published in that website?

18           MR. HOOPER:  This is June, 1999, your Honor.  We're

19  about to --

20           THE COURT:  You're going to go through that?

21           MR. HOOPER:  Yes, your Honor, I will.

22           THE COURT:  Excuse me.  When was it put on Internet?

23  Do you know?

24           THE WITNESS:  I don't.

25  Q.   Dr. Abramson, you cite in your report the date of the

1   presentation which is June, 1999, correct?

2   A.   Yes, but your Honor asked a different question, and I

3   don't know the answer.

4   Q.   Dr. Abramson, you put up a lot of PowerPoint slides

5   yesterday saying what doctors were told.  Do you remember that?

6   A.   Yes.

7           MR. HOOPER:  Austin, would you please go live to the

8   website for The Third International Bipolar Conference that's

9   cited in Dr. Abramson's report, and if you could, please scroll

10  to the 2:45 p.m. presentation by Dr. Pande on day two.

11          THE COURT:  Excuse me.  What are you showing us?  Is

12  this something on the Internet or a private agenda?

13          MR. HOOPER:  Yes, ma'am, this is live from the

14  Internet.  It's cited in his report.  It's a page cited --

15          THE COURT:  And the date of it?  When did it go up on

16  the Internet, do we know?

17          MR. HOOPER:  I don't know, your Honor.  It's obviously

18  there as we speak.

19          MR. SOBOL:  Well --

20          MR. HOOPER:  It's cited in Footnote 193 of

21  Dr. Abramson's report, I believe, so it's certainly been there

22  since he prepared his report two years ago as well.

23          THE COURT:  Okay.

24  Q.   Dr. Abramson, in fact doctors can go to that website you

25  mentioned even today, and with the click of a mouse, they can

1   click on that audio file and hear Dr. Pande's presentation for

2   themselves, can't they?

3   A.   I didn't do the clicking, but I believe you.

4   Q.   Well, let's --

5        MR. HOOPER:  Your Honor, I'd like to play just a

6   couple of very brief clips and see what Dr. Abramson or other

7   doctors might hear and might be told if they do push the

8   button.

9        MR. SOBOL:  Objection.

10       THE COURT:  All right, a good time for a break.  See

11   you at 11:30.

12       THE CLERK:  All rise for the jury.

13       (Jury excused.)

14       (A recess was taken, 11:11 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1        MR. SOBOL:  Your Honor, can I address one thing

2    briefly?

3        THE COURT:  Very briefly.  I literally have to

4    leave.

5        MR. SOBOL:  I don't know how much of the Pande

6    clip is planned to be played and whether they're going to

7    apply the rule of completeness to this because apparently

8    there's a variety of things that Pande says.

9        THE COURT:  All right, then you play your piece.

10   You can play whatever you want to play.  Bring it back on

11   redirect.  At this point I'd love to try and finish

12   Dr. Abramson today.  There's no way we're going to finish

13   the next witness today, and that's the way it is, but let's

14   bring this jury in.

15       Can I just say as a stylistic thing, I know this

16   case, and I had trouble keeping up with all the different

17   studies.  It's a lot when you're referring, so when you

18   refer to Frye, maybe you just sort of say something quick

19   like in relation to what indication, you know, just like

20   bring us...

21       MR. HOOPER:  I'd be happy to, your Honor, sure.

22       THE COURT:  Maybe you could just insert Frye which

23   deals with X.

24       THE CLERK:  All rise for the jury.

25       (Jurors entered the courtroom.)

Page 90

1          THE COURT:  Please be seated.

2          THE COURT:  Mr. Hooper, go ahead.

3   Q.  Dr. Abramson, when we left, we were talking about

4   something called the 3rd International Bipolar Conference

5   that you cited in footnote 193 of your expert report.  Do

6   you recall that?

7   A.  Yes.

8   Q.  And we were talking about a presentation that you

9   describe in your report by Dr. Atul Pande about his study in

10  certain patients with bipolar disorder that is referenced on

11  your chart yesterday.  Do you recall that?

12  A.  Yes.

13  Q.  And yesterday you displayed a number of Power Point

14  slides that had the legend what doctors were told; do you

15  recall that?

16  A.  Yes.

17  Q.  Let's listen to the audiotape available on the website

18  that you cited to an audio recording of Dr. Pande's

19  presentation at the 3rd International Bipolar Conference on

20  his bipolar study in June of 1999.  Before we do that, let

21  me just ask one quick question.  You testified yesterday

22  that your reading of the study was that the results showed

23  in that study Neurontin not only did no better than placebo

24  but it was a little worse than placebo; do you recall that?

25  A.  Which study are we talking about?

1    Q.  Pande, sir.

2    A.  Yes.

3            MR. SOBOL:  Your Honor, I just want to know what

4    portion of the 30-minute clip that we're talking about,

5    that's all.

6            THE COURT:  He's about to play it so you'll see.

7            (AUDIOTAPE WAS PLAYED AS FOLLOWS:)

8            DR. PANDE:  I'd like to thank the organizers of

9    this conference for inviting me to speak.  I should,

10   however, point out before I begin this talk that I am

11   employed by Parke-Davis Pharmaceutical Research, and in the

12   interests of making it very clear that anything I say may be

13   motivated by conflict of interest, I want you to know that.

14   After hearing the data, however, I don't think you will have

15   any concern whatsoever to the results.

16           So this shows the change by visit in the total

17   YMRS score from baseline.  You can see that both groups

18   start out being fairly similar, and then over the course of

19   the study, both groups show a reduction in the YMRS score.

20   What you will, of course, have noticed is that the placebo

21   group shows a greater reduction in YMRS scores than the

22   Gabapentin group.

23           (AUDIOTAPE PAUSED.)

24           THE COURT:  Can you stop it, in the what scores?

25   Can you understand what he's saying?

Page 92

1          THE WITNESS:  I can, but I know what the -- it's

2     the YMRS score, which is the young mania rating score, which

3     is a way to evaluate the extent of manic symptoms in people

4     who are suffering from bipolar disease.

5          MR. HOOPER:  He's correct.  Continue.

6          (AUDIOTAPE WAS PLAYED AS FOLLOWS:)

7          DR. PANDE:  For those of you interested in axiom

8     numbers, they're now here at the bottom.  There was

9     approximately a 9 point decrease in the YRMS in the placebo

10    group and about a 6 point decrease in the Gabapentin group,

11    and this interestingly is statistically significantly in

12    favor of placebo.

13         (AUDIOTAPE PAUSED.)

14    Q.  Same results you told the jury about yesterday, correct,

15    Dr. Abramson?

16    A.  Yes, and the results that were published, you know, this

17    doesn't differ from what doctors were informed about the

18    study when it was published.

19    Q.  Dr. Abramson, in the documents you were assigned to

20    review in this case, did you see or hear anything from the

21    Kaiser lawyers that there appeared to have been a number of

22    Kaiser doctors who were present at the conference and heard

23    Dr. Pande disclose the negative study results?

24    A.  No.

25         MR. HOOPER:  This is Exhibit 571, notarized copy

1   of the proceedings and registration records from the 3rd

2   International Bipolar Conference.  Your Honor, I'd also like

3   to use simultaneously our 300-pound exhibit, 923, the list

4   of Neurontin providers introduced by Kaiser.

5            THE COURT:  Do you want to introduce it?

6            MR. HOOPER:  I don't think I want to introduce it

7   right at the moment --

8            THE COURT:  Oh, you're just putting it up there.

9            MR. HOOPER:  -- but I just want to use it for the

10  witness.

11  Q.  Also, would you please go to page 1 of the registration

12  list for medical doctors.  Dr. Abramson, what I've showed

13  you beneath the affidavit of Mary K. Healey, the custodian

14  from the University of Pittsburgh, if you turn to the next

15  page, you'll see records from the 3rd International Bipolar,

16  3rd International Conference on Bipolar, June 17, 1999.

17  That's the same conference that we were just listening to

18  where Dr. Pande presented his study, correct?

19  A.  Yes.

20  Q.  And let's try to finally connect the names of some

21  Kaiser doctors to this conference.  Page 1 of the conference

22  records, Dr. Abramson, that you have, page 1 of the MD

23  provider records has the name Linda Bond.  Do you see that?

24  A.  Yes.

25  Q.  And now if you wouldn't mind, look over at the big thick

1   list of Neurontin providers, and would you turn to page 339,

2   please.  Do you see on page 339 from Ohio the name

3   Linda Bond?

4   A.  I do.

5   Q.  And if you look back, and we'll put on the screen for

6   you, Doctor, on page 2 of the 3rd International Bipolar

7   Conference registration records, you'll see three names.

8   The first one is Mark Frye.  Do you see that on the bipolar

9   conference records?  It's about two inches from the bottom.

10  A.  Yes.

11  Q.  Now, would you look at the list of Kaiser providers to

12  your left there?  If I could please direct your attention to

13  page 162 and tell us if on the Neurontin providers list the

14  name Mark Frye appears?

15  A.  It does.

16  Q.  And, Dr. Abramson, looking back to the 3rd International

17  Bipolar Conference, page 2, the next name is listed

18  Fred Goodwin, correct?  I'm sorry, about one inch from the

19  bottom.

20  A.  Yes.

21  Q.  And now if you look at the Neurontin providers list

22  produced by Kaiser at page 74, please.  Can you tell us if

23  the Neurontin providers list includes the name Fred Goodwin?

24  A.  It does.  The city is different.  In the book it says

25  the region is Mass., and in the book the region is

1  Washington, D. C.

2          THE COURT:  Mass. means Massachusetts?

3          THE WITNESS:  I assume so.  This is the first time

4  I've seen this.

5  Q.  Would you look at the very last name on page 2 of the

6  conference records from the 3rd International Bipolar

7  Conference, and do you see the name Elizabeth Hill?  Do you

8  see that?

9  A.  I do.

10  Q.  From Ohio, and if you would now please look at the

11  Neurontin providers list, page 344.  Does the name

12  Elizabeth Hill that appears in the conference records also

13  appear in the Neurontin providers list?

14  A.  It does.

15  Q.  All right.  Next name, and I think you're getting the

16  hang of the drill --

17          THE COURT:  Let's not do this.  It's taking too

18  long.  How many names are like this?

19          MR. HOOPER:  Your Honor, I have six more.

20          THE COURT:  You're not to take the time to do it.

21  You can put a stipulation as to what those names are so we

22  can move it along.  Altogether how many names are in both

23  lists?

24          MR. HOOPER:  Ten, your Honor.

25          MR. SOBOL:  We'll see what the stipulation is,

Page 96

1    your Honor.

2              THE COURT:  I'm not going to take the time now.

3              MR. SOBOL:  This is the first time we've all seen

4    it.

5              THE COURT:  We're trying to finish the witness.

6    Q.  Dr. Abramson, let's turn now to what doctors were told

7    not in a live presentation but in the article that Dr. Pande

8    published about his bipolar study in 2000.  First, you never

9    put on your chart yesterday that the Pande study was

10   published, did you?  That doesn't appear on your chart, does

11   it?

12   A.  I don't know that, but --

13   Q.  But you acknowledge it was published, correct?

14   A.  It was published, and I'd be very surprised if I didn't

15   say that yesterday.

16   Q.  Let me show you a copy of that.  It's Exhibit 586.

17   Dr. Abramson, you recognize this as a copy of an article

18   titled, "Gabapentin In Bipolar Disorders, A

19   Placebo-Controlled Trial of Adjunctive Therapy" in September

20   of 2000, lead author, Dr. Atul Pande of Parke-Davis, same

21   study you mentioned on page 56 of your report?

22   A.  Yes.

23   Q.  Would you please direct your attention, Doctor, to the

24   methods section.  First, doctors were told that this was a

25   DBRCT, a double-blind randomized placebo-controlled clinical

1  trial at a dosage range of 900 to 3600 milligrams per day,

2  correct?

3  A.  Correct.

4  Q.  In the next sentence, Dr. Abramson, doctors were told

5  about what kinds of bipolar patients were included in this

6  study.  It says -- follow along with me, there's some words

7  that begin "patients with," do you see that?

8  A.  Yes.

9  Q.  And it says, "Patients were a lifetime diagnosis of

10 Bipolar Disorder, Type I and who were currently suffering

11 from symptoms of either mania, hypomania or a mixed state,

12 despite ongoing therapy with Lithium, Valproate or Lithium

13 and Valproate in combination were eligible for inclusion."

14 Did I read that correctly?

15 A.  You did.

16 Q.  And that means, Dr. Abramson, that patients to get into

17 Dr. Pande's study at all had to be patients who were trying

18 the standard medications, Lithium or Valproate, or both of

19 them, and were still bipolar, correct?

20 A.  Yes, that would be what adjunctive therapy is.

21 Q.  Those are called treatment refractory patients, patients

22 who are still suffering despite ongoing therapy; correct?

23 A.  That's right.

24 Q.  And, Dr. Abramson, would you please look at the results

25 section right below that.  It talks about that young mania

1   rating scale score that was measuring how well they did,

2   right?

3   A.  Yes.

4   Q.  And the article says beginning on the second line, "This

5   decrease was significantly greater in the placebo group than

6   in the Gabapentin group," correct?

7   A.  Correct.

8   Q.  Doctors were told that, right?

9   A.  Yes.

10  Q.  And what that means that the decrease is greater, if you

11  can follow me, I think we'll agree on this, the scores for

12  the patients who took Gabapentin got lower and lower week by

13  week, and the scores for placebo patients also got lower and

14  lower week by week, correct?

15  A.  You have to keep going.

16  Q.  All the way to the end of the study, and, in fact, the

17  placebo patients scores got lower more even than the

18  Gabapentin patients did, right?

19  A.  Correct.  There was a significant difference between the

20  two.

21  Q.  Then, Dr. Abramson, it talks about some of the

22  differences in the result section, some of the differences

23  between the Gabapentin and the placebo patients that 12

24  placebo patients had their Lithium adjusted compared to only

25  4 who had their Lithium upped on Gabapentin and that blood

1    plasma levels indicated that some of the Gabapentin patients

2    had not taken the Gabapentin the way they were supposed to.

3    That's what it says, right?

4    A.  That's correct.

5    Q.  However we may disagree on things, we can certainly

6    agree on what the conclusions in the published article

7    state, and they're right at the bottom of the abstract.

8    Let's look there.  Those say, "Conclusions, the findings of

9    the study did not demonstrate that Gabapentin is an

10   effective adjunctive treatment when administered to

11   outpatients with bipolar disorder."  That's what was

12   published and what doctors were told if they read

13   Dr. Pande's article, correct?

14   A.  That's correct.  I don't think I represented anything

15   other than this article to the best of my knowledge conveyed

16   what the research showed.

17   Q.  So we agree on that, we agree that this is what doctors

18   were told, correct?

19   A.  Yes, we do.

20   Q.  This information certainly was not boxed up and buried

21   in the basement of a warehouse in Kalamazoo; is that

22   correct?

23   A.  That's correct.  That's not correct for all of the

24   trials that were funded by Pfizer or the manufacturer, but

25   it is certainly correct for this trial, yes.

1  Q.  Dr. Abramson, do you recall showing the jury yesterday

2  some documents called operating plans that mentioned the

3  word "psychiatric" and I think we may have had a little fuss

4  about that, but that word "psychiatric," do you remember

5  that?

6  A.  Yes.

7  Q.  There were bullets up on the slide?

8  A.  Yes.

9  Q.  You're familiar with the diagnostic and statistical

10  manual of mental disorders known as the DSM−IV−TR, are you

11  not?

12  A.  Yes.

13  Q.  Dr. Abramson, the DSM−IV is the sort of the handbook of

14  psychiatry; is that right?

15  A.  It's the handbook of diagnostic criteria for

16  psychiatry.

17  Q.  Is it fair to say it's the book that explains what kinds

18  of symptoms constitute what kinds of illnesses and how you

19  can tell that somebody's got Bipolar I vs. Bipolar II vs.

20  depression versus social phobia, et cetera, right?

21  A.  Correct.

22  Q.  And this book is developed by committees of

23  psychiatrists and widely used by the FDA and by the

24  profession to classify and differentiate the various kinds

25  of psychiatric disorders, correct?

1  A.  That's correct.

2  Q.  Dr. Abramson, is panic disorder a psychiatric

3  condition?

4  A.  Yes.

5  Q.  It's in the group of conditions known as anxiety

6  disorders, correct?

7  A.  Yes.

8  Q.  Anxiety disorders, one of which is panic disorder?

9  A.  Yes.

10  Q.  And social phobia is also a recognized psychiatric

11  illness, correct?

12  A.  Yes.

13  Q.  And it, too, is classified as an anxiety disorder,

14  correct?

15  A.  Yes.

16  Q.  Okay.  Dr. Abramson, there are many things we agree on,

17  and I think one of them is this.  You told us all yesterday

18  what a terrible illness bipolar disorder can be.  Do you

19  recall that?

20  A.  Yes.

21  Q.  It can be in fact completely debilitating for some

22  patients, correct?

23  A.  Yes.

24  Q.  Managed in some and in some patients it's treatment

25  resistant, correct?

1   A.  Yes.

2   Q.  Let me ask you to please take a look at page 382.

3          MR. HOOPER:  And can we, Mr. Alba, could we switch

4   to the Elmo, please.

5   Q.  Doctor, if you could look in your hard copy, and we'll

6   put it on the Elmo device as well.  On page 382 of the

7   diagnostic and statistical manual for mental disorders is

8   the beginning of the section on Bipolar I disorder,

9   correct?

10  A.  Yes.

11  Q.  And if you look at the heading, that's within the

12  section called mood disorders, correct?

13  A.  Yes.

14  Q.  So there are mood disorders, one of which is bipolar

15  disorder, correct?

16  A.  Yes.

17  Q.  And there's a Bipolar I disorder and Bipolar II disorder

18  and yet a third and yet a fourth kind of bipolar disorder,

19  correct?

20  A.  Yes.

21  Q.  And let me ask you now while you're in the section on

22  Bipolar I Disorder to turn the facing page and get onto page

23  384 with me and look at the section at the bottom listing

24  the "Associated features and disorders for bipolar

25  disorder."  Do you see it?

Page 103

1   A.  Yes.

2   Q.  And let's look together at that last full sentence in

3   that second paragraph from the bottom.  "Other associated

4   mental disorders include anorexia nervosa, bulimia,

5   attention deficit hyperactivity, panic disorder and social

6   phobia."  Did I read that correctly?

7   A.  Yes.

8   Q.  And, Dr. Abramson, you don't dispute that these two

9   anxiety disorders, panic disorder and social phobia, are in

10  fact associated mental disorders for some Bipolar I

11  patients, do you?

12  A.  That's correct.

13  Q.  And, Dr. Abramson, you don't doubt, and I presume it's

14  been your experience that psychiatrists sometimes treat

15  bipolar patients for both bipolar disease and for anxiety

16  disorders at the same time, correct?

17  A.  It could be.

18  Q.  And is that something you've ever done yourself, treat a

19  patient for both bipolar and anxiety disorders at the same

20  time?

21  A.  As a family doctor with a severely ill bipolar patient,

22  I would refer a patient to the psychiatrist and let the

23  psychiatrist manage the patient.

24  Q.  I see.

25          MR. HOOPER:  I'm sorry, Mr. Alba, we can go back

1    to the laptop.  Thank you very much.

2    Q.  Let's look very quickly at some double-blind randomized

3    placebo-controlled clinical trials for "psychiatric," the

4    word that was on your slide yesterday, conditions that the

5    DSM tells us are associated with Bipolar I Disorder.  I'm

6    going to bring both at one time, if you don't mind.

7             MR. HOOPER:  Your Honor, these are Exhibits 1305,

8    "Pande and Social Phobia" and 590, a third study by Pande,

9    "Panic Disorder."

10            THE COURT:  Are you seeking to introduce them or

11   just simply show it to him?

12            MR. HOOPER:  Your Honor, I'll move to admit both

13   these, sure, if there's no objection.

14            THE CLERK:  What numbers are they?

15            MR. HOOPER:  DX-590 is Pande's study on "Panic

16   Disorder" published in 2000, and 1305 is Pande's "Social

17   Phobia" study published in 1999.

18            ( Exhibit 590 was marked and admitted into

19   evidence.)

20            ( Exhibit No. 1305 was marked and admitted into

21   evidence.)

22            THE WITNESS:  Your Honor, speaking of disorders,

23   may I go to the men's room?

24            THE COURT:  Yes.

25            THE WITNESS:  I apologize to everybody.

1    THE COURT:  We'll stand and stretch.  Do you have

2    an objection to these, by the way?

3    Okay.  Mr. Hooper, let's get going.

4    Q.  Dr. Abramson, we were just talking about panic and

5    social phobia and their association with bipolar and I

6    showed you Exhibit 1305.  I'd like you to look at that one

7    first.

8    MR. SOBOL:  No objection to that or 590.

9    THE COURT:  Good.

10   Q.  Dr. Abramson, what you see in Exhibit 1305 is a study

11   titled, "Treatment of Social Phobia with Gabapentin, A

12   Placebo-Controlled Study."  Did I read that correctly?

13   A.  Yes.

14   Q.  And was this among the documents that the Kaiser lawyers

15   asked you to review and comment on?

16   A.  I don't recall whether I've seen this before.

17   Q.  Okay.  Take a look at the first line of the text, if you

18   would.  This is a randomized double-blind placebo-controlled

19   clinical trial, one of those DBRCTs, as we're calling them

20   here, isn't it?

21   A.  Yes.

22   Q.  And if you read the rest of the text, they're just in

23   the abstract, Doctor, you'll see that it's a positive study

24   with the results of Gabapentin statistically significantly

25   reducing symptoms of social phobia compared with placebo; do

Page 106

1  you see that?

2  A.  Yes.

3       THE COURT:  So on our timeline here, when was that

4  published?

5       MR. HOOPER:  That was published, your Honor,

6  in -- this was published in 1999.

7  Q.  And now if you would, Doctor, would you please look at

8  the other item that I handed to you, Exhibit 590, Pande's

9  2000, year 2000 publication on the panic disorder study; do

10 you see that one?

11 A.  I do.

12 Q.  That is entitled, "Placebo-Controlled Study of

13 Gabapentin Treatment of Panic Disorder," correct?

14 A.  Yes.

15 Q.  Lead author, along with several others, is our friend

16 Dr. Pande, correct?

17 A.  Yes.

18 Q.  And if we look at the top left of the journal article,

19 we see it was published in the Journal of Clinical

20 Psychopharmacology in 2000, right?

21 A.  Yes.

22 Q.  And this is among the medical literature that doctors

23 would find when they go on their computers and do the kind

24 of research that you did in this case, right?

25 A.  Yes.

a169d3ed-5681-41c6-887b-8be556536a8d

1    Q.  And I take it this, too, was not something that the

2    Kaiser lawyers asked you to look at in this case?

3              MR. SOBOL:  Objection to form.

4              THE COURT:  Overruled.

5    A.  I can't recall.

6    Q.  If you look at the first line of the abstract,

7    Dr. Abramson, you see that this, too, was a randomized

8    double-blind placebo-controlled parallel group study in

9    patients with panic disorder, correct?

10   A.  Yes.

11   Q.  And if you read the  -- this one had mixed results, I

12   think.  If you look in the middle about 1, 2, 3, 4, 5, 6, 7,

13   8 lines down beginning with the words "no overall"?

14   A.  Yes.

15   Q.  It says right upfront, "No overall drug/placebo

16   difference was observed in scores on the panic and

17   agoraphobia scale, (PAS.)"  That's a way of measuring panic

18   disorder, right?

19   A.  Yes.

20   Q.  And the next sentence is, "A post hoc --" that's the

21   word you used earlier, "a post hoc"?

22   A.  Correct.

23   Q.  "A post hoc analysis was used to evaluate the more

24   severely ill patients, as defined by PAS, and in those more

25   seriously ill patients, the Gabapentin-treated patients

1    showed significant improvements in that panic score,"

2    correct?

3    A.  Yes.

4    Q.  And I think we agree on what post hoc is, it's after,

5    you look back and say do another analysis, right, "after" is

6    the post part, right?

7    A.  If you look back, you do an analysis that wasn't

8    indicated as a primary analysis.

9    Q.  Correct.

10   A.  So you're looking for significant relationships that you

11   hadn't preidentified in the protocol.

12   Q.  Right.  Dr. Abramson, we certainly agree that for

13   doctors who read the article, they were told in black and

14   white that that was a post hoc analysis, the words were

15   there, right?

16   A.  Yes.  I would take a little bit exception with the last

17   sentence of the abstract that says, "The results of this

18   study suggest that Gabapentin may have anxiolytic effects in

19   more severely ill patients with panic disorder."  I think my

20   opinion would be that the way to conclude the abstract would

21   be to say the primary outcome measure was negative.  A post

22   hoc analysis had produced this finding, and we would

23   recommend further research.

24   Q.  We can agree, it certainly does not say we've done a

25   double-blind study and it was positive on the primary

1    outcome, it works, it certainly doesn't say that, does it?

2    A.  It doesn't say that, and yet to offer an opinion, as I

3    did in my direct testimony, I would want to see the research

4    report and see what was identified, what the statistics were

5    if we were going to offer an opinion on this.

6    Q.  And those documents were not among the documents that

7    you were asked to review in this case, correct?

8    A.  I don't believe so.

9           MR. HOOPER:  Your Honor, I'm going to mark it

10   myself, it's Defense Exhibit 0630.  We'll clean up the

11   sticker momentarily.

12   Q.  Dr. Abramson, handing you defense Exhibit 0630,

13   Dr. Abramson, would you please look at the exhibit I just

14   handed you, and directing your attention to the upper

15   left-hand corner, do you see that it's entitled, "Drug

16   Monograph"?

17   A.  I do.

18   Q.  And let me ask you to now, it's not my document, but I

19   want to ask you to look at the bottom right page and see the

20   Bates numbers are KAIS 04403; do you see that?

21   A.  Yes.

22   Q.  And if you look at the third page from the end of the

23   document, I'm sorry, second page from the end of the

24   document, at the very top, do you see there that it says the

25   document was prepared by Debbie R. Kubota, Drug Information

1    Services, Kaiser Permanente California Division in January,

2    2002; do you see that?

3    A.  Yes, I do.

4    Q.  And if you look, there are three separate editors listed

5    below her, one of which the second one down is a woman, I

6    believe it's a woman named Mirta Millares, and she is

7    manager of Drug Information Services for Kaiser Permanente

8    California Division; do you see that?

9    A.  I do.

10   Q.  Now, if you would please, Dr. Abramson, would you --

11           MR. HOOPER:  Your Honor, I'll offer 0630.

12           THE COURT:  Is this the Kaiser document?

13           MR. HOOPER:  Yes, ma'am.

14           ( Exhibit No. 0630 was marked and admitted into

15   evidence.)

16   Q.  Doctor, if you look back at the first page of the

17   document, under background, the last bullet point beginning

18   with the word "AEDs;" do you see that?

19   A.  I do.

20   Q.  AEDs are anti-epileptic drugs, correct?

21   A.  Yes.

22   Q.  Same thing as the anti-convulsants, correct?

23   A.  Yes.

24   Q.  That's the class of drugs to which Gabapentin and others

25   belong, right?

1   A.   Correct.

2   Q.   And it says there, "AEDs often used off-label for the

3   treatment of bipolar disorders," and it includes several,

4   and then one of those is Gabapentin, correct?

5   A.   Yes.

6   Q.   And this is Kaiser's statement in 2002, correct?

7   A.   Yes.

8   Q.   Okay.  And then if you would look at the second to last

9   sentence of that same paragraph, in 2002, the drug monograph

10   folks at Kaiser write, "Two controlled studies of Gabapentin

11   Mono and add-on therapy in bipolar disorder did not confirm

12   the positive findings from earlier open label and case

13   reports.  Results of these controlled studies demonstrated

14   no difference between Gabapentin and placebo treatments."

15          Did I read their words correctly.

16   A.   You did.  It's not a correct statement.

17   Q.   You don't -- you certainly don't dispute that those

18   words refer precisely to the Frye and Pande studies, do

19   you?

20   A.   I'm not sure I understand your question.

21   Q.   You understand when they say two controlled studies

22   demonstrated no difference between placebo and bipolar,

23   they're talking about, Doctor, the same Pande study and the

24   same Frye study that you put on your chart, right?

25   A.   Yes, it refers to those two studies, but I don't think

1    it's an accurate statement.

2    Q.  Not the way you would have written it, right?

3    A.  Not the way Dr. Pande wrote it.

4    Q.  Let's look at the last page of that document, if you

5    will.  We'll go back to the end, Dr. Pande.  Do you see

6    there there's a list of Kaiser people cited in the

7    document?

8    A.  Yes.

9    Q.  And if you look at the last page, you'll see references

10   38 and 40; do you see that?

11   A.  Yes.

12   Q.  Reference 38 that the Kaiser drug information services

13   folks cited is Frye, a placebo-controlled study of

14   Lamotrigine and Gabapentin in refractory mood disorders

15   published in 2000, right?

16   A.  Yes.

17   Q.  It's the same one on your chart, right?

18   A.  Yes.

19   Q.  And if you look down at 40, you see the citation to the

20   Pande bipolar study published in 2000, correct?

21   A.  Yes.

22   Q.  So they clearly had the published studies of both Frye

23   and Pande when they wrote this in 2002 because they cite it,

24   right?

25   A.  Correct.

1   Q.  Now let me ask you to look, please, at the chart on the

2   page that's Bates numbered, that's the smaller numbers on

3   the bottom right, 44060; do you see the chart?

4   A.  Yes.

5   Q.  In the middle of the page, and Dr. Abramson that chart

6   is entitled, "Evidence Table, Gabapentin in Bipolar Disorder

7   (does not contain four open-label trials published in

8   1999.)"  Do you see that?

9   A.  Yes.

10  Q.  Let's look at the Kaiser's people evidence table and see

11  what they put in their evidence table.  The first study

12  listed is Frye, correct?

13  A.  Yes.

14  Q.  That's the NIMH study that was negative in treatment

15  refractory patients, correct?

16  A.  Yes.

17  Q.  The very next study listed under it is Pande, the Pfizer

18  study that was negative in treatment refractory patients,

19  correct?

20  A.  Yes.

21  Q.  And then it goes on, doesn't it, below that there is an

22  McElroy study cited, correct?

23  A.  Yes.

24  Q.  Do you know that one?

25  A.  No.

1   Q.  If you look at the table, Doctor, they not only list the

2   studies by name, they analyzed them or break out the number

3   of patients in the study and various other characteristics,

4   don't they?

5   A.  Yes.

6   Q.  And you see in the McElroy study, if you look at the

7   second column over, it says, "Seven patients showed moderate

8   or marked improvement one month," and so forth, correct?

9   A.  Yes.

10  Q.  That's a case series, isn't it?

11  A.  Yes.

12  Q.  It's not Level I evidence?

13  A.  No.

14  Q.  Clearly you'd agree with me, when the Kaiser DIS people

15  write this monograph, they're not limiting themselves to

16  DBRCTs, are they, they're including lots more in their

17  table, aren't they?

18  A.  They are.

19  Q.  And it goes on, let's turn the page, next item listed in

20  their evidence table at Kaiser, you got Gahemi, 1998; do you

21  see that?

22  A.  I do.

23  Q.  No indication that that's a DBRCT, is it?

24  A.  No.

25  Q.  The next one down is Frye, 1999, that's yet another Frye

1   study; do you see that one?

2   A.  Yes.

3   Q.  And below those there's one by Schaffer, this one the

4   Kaiser people describe as an "open naturalistic study,

5   1 to 9 months, add-on and monotherapy."  What would you tell

6   the jury what a naturalistic study is?

7   A.  They treat people with Neurontin and see what happens.

8   Q.  No DBRCT, is it?

9   A.  No.

10  Q.  Kaiser sure doesn't limit itself to those in this chart,

11  do they?

12  A.  No.

13  Q.  And if you look below that, there's Knoll and Erfuth,

14  those aren't DBRCTs either, are they?

15  A.  They are not.

16  Q.  And it goes on, let's turn the page.  Next one listed is

17  Young, 1997, case series, open label add-on, that's the same

18  Young study you had on your slide yesterday it looks like to

19  me.  Does it to you?

20  A.  It is.

21  Q.  Rybach, Stanton, McElroy, Sheldon, more pieces of

22  literature that the Kaiser DIS people included in their drug

23  monograph, correct?

24  A.  Yes.

25  Q.  So to sum up, they have started their table with the two

1    negative DBRCTs in those treatment refractory patients, Frye

2    and Pande, and then they go on to analyze and talk about a

3    number of other studies that are naturalistic, case series,

4    open and so forth, correct?

5    A.  Yes.

6    Q.  Let's see what they did with the information when they

7    had it.  If you would, Dr. Abramson, let's look at the third

8    page in from the front, and it has numbers 44045 on the

9    bottom.  Do you see that?

10   A.  Yes.

11   Q.  And I want to start, if you don't mind, at the very top

12   block, OPMG, that's Ohio Permanente Medical Group

13   Psychiatry, "Recommend to extend prescribing restrictions of

14   the newer anti-epileptic drugs, specifically Gabapentin,

15   Lamotrigine and Tipiramate to the psychiatry specialists as

16   third-line agents for the management of bipolar disease."

17   Did I read that correctly?

18   A.  You did.

19           THE COURT:  What does that mean in English?  What

20   does it mean so we can understand it as a third-line agent?

21           THE WITNESS:  Yes.  What it means is that, first

22   of all, the drugs can be prescribed only by psychiatrists

23   and only as a third-line agent means that it would be a

24   category of drugs that would be used third, either in

25   addition to, or to replace a category, one from first line

1    and second line that wasn't working.

2              THE COURT:  Your third bite at the apple?

3              THE WITNESS:  Yes, exactly.

4              THE COURT:  If other things weren't working?

5              THE WITNESS:  Except you can add on.

6              THE COURT: You could have two drugs at the same

7    time?

8              THE WITNESS:  Or three.

9              THE COURT:  Or three?

10             THE WITNESS:  Yes.

11   Q.  Dr. Abramson, is one scenario -- well, let's begin this

12   way, agents that are specifically approved for the manic

13   phase of bipolar, it looks like Lithium and Valproate, those

14   would be considered first line agents for the bipolar

15   itself, right?

16   A.  Yes.

17   Q.  And sometimes in some patients you might add on a second

18   drug, let's say an anti-depressant like an SSRI to help with

19   the depressive phase, right?

20   A.  It could be.

21   Q.  That could happen?

22   A.  It could be.

23   Q.  And then if that patient came in and said, you know, I'm

24   really anxious, you might add a third line agent like an

25   anxiety medication like a Benzodiazapine or a different SSRI

1    or an AED to help with that, right, that would be the third

2    line?

3    A.  Yes.  You might or you might be concerned that the

4    second line anti-depressant was increasing anxiety and

5    rearrange things.

6    Q.  If you would, let's look at the fourth block in the

7    Kaiser 2002 drug monograph prepared by Debra Kubota and

8    Mirta Millares, the ones with the Pande and the Fryes

9    studies discussed in there.  In the fourth block, tell me if

10   I read correctly, "Ohio Region Drug Information, recommend

11   to accept the prescribing of Gabapentin, Lamotrigine and

12   Tipiramate for psychiatric disorders by psychiatry

13   specialists."  Did I read that correctly?

14   A.  You did.

15            THE COURT:  Have you ever seen this document

16   before?

17            THE WITNESS:  I have not.

18            MR. HOOPER:  It literally was the next question.

19   Q.  Before you came here today and showed the jury the

20   chart, Doctor, had the Kaiser lawyers specifically ever

21   shown you this document?

22   A.  I have not seen this document before.

23   Q.  Did you have any information that after the Kaiser folks

24   learned of the Pande and the Frye studies, the two failed

25   studies in the treatment refractory, that they actually

1    expanded use of Neurontin by psychiatrists?

2    A.  No, I didn't know that.  This was happening not in a

3    vacuum, it was happening as Pfizer was marketing Neurontin

4    to psychiatrists for bipolar disease with continuing

5    education courses and drug reps and so forth.

6    Q.  And while they were publishing the negative results of

7    those studies in the literature for all to see, correct?

8    A.  That's correct.

9           THE COURT:  Before we go on, are these

10   recommendations, do you know, from various aspects of

11   Kaiser, or is this a final decision?

12          THE WITNESS:  The document's new to me.

13          THE COURT:  Yes, go ahead.

14          THE JUROR:  I had a quick question.  To extend

15   providing prescriptions, does that mean that you have

16   greater restricted use of it, or does that mean --

17          THE WITNESS:  That would be my impression reading

18   it.

19          THE JUROR:  You're restricting it further, you're

20   not expanding its use?

21          MR. SOBOL:  If I may, just so it's clear, the

22   scope of Dr. Abramson's assignment was not the formulary

23   practices at Kaiser.  There will be other witnesses on that

24   subject.

25          THE COURT:  It may be appropriate for cross, but I

Page 120

1   think it's clear that he hasn't seen this before, and he

2   doesn't know what this is, so it's inappropriate for you to

3   ask at least from here what the bottom line was.

4          MR. HOOPER:  Sure, your Honor.  The reason I was

5   offering this line, your Honor, is because he talked about

6   what doctors were told.

7          MR. SOBOL:  Objection.

8          THE COURT:  Well, this is not admitted for what

9   Kaiser eventually did with it.  I think it seems to be -- I

10  don't know what it is, hopefully someone from Kaiser will

11  talk about it, but he doesn't know.

12         MR. HOOPER:  We'll look forward to that, your

13  Honor.

14  Q.  Dr. Abramson, at page 54 of your report, again, in a

15  footnote you cite an article by Carta, C-a-r-t-a, titled,

16  "The Clinical Use of Gabapentin in Bipolar Spectrum

17  Disorders," and that's in the Journal of Effective

18  Disorders.  Do you see that citation in your report?

19  A.  Yes, I do.

20         MR. HOOPER:  This is Exhibit 1610 that I'll offer

21  if you don't object.

22         THE COURT:  What is it?

23         MR. HOOPER:  Exhibit 1610, Special Review by

24  Dr. Carta, "Clinical Use of Gabapentin in Bipolar Spectrum

25  Disorders," cited on page 54 of the witness' report.

1          MR. SOBOL:  Just a moment, your Honor.

2     Objection.

3          THE COURT:  Is it cited in his report?

4          MR. HOOPER:  Yes, your Honor.

5          THE COURT:  Overruled.

6          ( Exhibit No. 1610 was marked and admitted into

7     evidence.)

8     Q.  Dr. Abramson, you've seen this before, correct?

9     A.  Yes.

10    Q.  Okay.  You told the jury yesterday, I think, that about

11    how important review articles were, that is to say, articles

12    that look at a lot of literature and put it in one place.

13    You referred to them several times yourself, correct?

14    A.  Yes.

15    Q.  And this one is titled, "Special Review," right, so it's

16    that type of article, right?

17    A.  Yes.

18    Q.  This is where a team of people look at the literature,

19    much as you have done, and try to distill and summarize that

20    for the rest of the profession, right?

21    A.  Yes.

22    Q.  Okay.  And if you look right under the title, you'll see

23    that this review article is done by a team of researchers

24    from Europe, Italy and Germany and so forth; is that

25    right?

1   A.   Yes.

2   Q.   They have no connection to Pfizer that you're aware of,

3   correct?

4   A.   Not that I'm aware of.

5   Q.   Let's look in the abstract at the methods section, just

6   see what they did here.  They say in the methods section,

7   "They did a computer-generated search of the biomedical

8   literature and abstract books of the more important

9   scientific congresses undertaken to identify all pertinent

10  case reports in a series and studies of Gabapentin as

11  monotherapy or adjunctive therapy in mood disorders."

12  That's what they say they did?

13  A.   Yes.

14  Q.   That's somewhat similar to what you did in this case to

15  go out and collect literature and express an opinion about

16  it, right?

17  A.   Yes.

18  Q.   And then let's look at the results part of the abstract,

19  which is six lines up.  Let's see what they chose to comment

20  on in terms of what they found.  "Results, the 40 open label

21  studies and two of the controlled trials suggest Gabapentin

22  may have a role as an adjunctive in patients for the

23  treatment of bipolar disorder."  Do you see that there?

24  A.   Yes, I do.

25  Q.   If you look at the preceding words before it, they

1   didn't just find two controlled studies, they actually came

2   up with four; do you see that?

3   A.  I do.  There are some problems with the four studies,

4   the four randomized controlled studies they included in this

5   article with two of the four.

6   Q.  Okay.  And if you look down at the conclusions of the

7   team of researchers led by Carta, in their 2003 special

8   review, their conclusion was "Although failing to show clear

9   anti-manic efficacy in randomized trials, Gabapentin still

10  remains a clinically useful agent when it comes to

11  combination treatment in refractory and co-morbid patients."

12  Did I read their words correctly?

13  A.  You read their words correctly.

14  Q.  That's very similar to the concept you just told us

15  about three different drugs and you might have to change one

16  and use multiple drugs, right?

17  A.  It is, though I would take exception to that conclusion,

18  the analysis of the four randomized controlled trials in

19  this review article.  They count Guille as a positive study,

20  and it clearly wasn't a positive study, and the other

21  positive randomized controlled trial was a two-week

22  non-blinded study, so it creates the impression that the

23  score, that it's a tie score 2 to 2 with the randomized

24  controlled trials, and that's not the case.

25  Q.  They certainly do say it's their conclusion that it

1  failed to show anti-manic efficacy in randomized trials

2  though, don't they?

3  A.  No, they don't.  They say although failing to show clear

4  anti-manic efficacy, and that would be if the randomized

5  controlled trials split 2 and 2, I think that would be a

6  reasonable conclusion.  My read of this article was that the

7  literature contains 40 open label trials, that all are

8  positive, and it contains three randomized controlled trials

9  that are all negative and that the literature has been

10 flooded with these open label trials that bias readers of

11 the medical literature into thinking creating a so-called

12 echo chamber that was described in the other review article

13 that I cited on this page.

14 Q.  You certainly wouldn't have written it this way,

15 right?

16 A.  I would not have.

17 Q.  Let's look at page 89 of their article, Section 7 where

18 the conclusions are elaborated on, and we'll see if that's

19 any better, 7 conclusions, "On the basis of the available

20 literature, Gabapentin may have a role only as an adjunctive

21 treatment of bipolar patients showing components of

22 depression, anxiety and impulsiveness.  Thus, it may be a

23 valuable tool, particularly in patients with co-morbid

24 psychiatric disorders."  Did I read those words correctly?

25 A.  You did.

1   Q.  Then it goes on, "A further potential use may be in

2   patients affected by concomitant substance abuse."  Did I

3   read that part correctly?

4   A.  You did.

5   Q.  And that refers to the fact that it's not addictive,

6   correct?

7   A.  No.

8   Q.  You don't think that's what it refers to?

9   A.  No.  I think that it is saying -- although I don't agree

10  with it -- I think it's saying that it may have potential

11  use in bipolar patients who are also suffering from

12  concomitant substance abuse disorder.

13  Q.  You've never communicated with Dr. Carta or any of the

14  authors to see what they meant by that, have you?

15  A.  No.

16  Q.  And just to be sure, Doctor, that they had taken into

17  account the Frye and Pande studies, the negative studies in

18  the treatment of refractory patients that you told us about,

19  let's look very briefly at pages 90 and 91, the list of

20  citations.  Would you confirm with me that they do in fact

21  cite in two studies by Frye including this 2000 one, right

22  column, upper near the top?

23  A.  Yes.

24  Q.  Okay.  Then on the next page, they cite I think all

25  three of Dr. Pande's studies, so they've seen all of those,

1    correct?

2    A.  Yes.

3    Q.  Now, when you cited this review in the footnote of your

4    report, I presume you cannot tell -- let me back up.  Though

5    you cited this in your report, you're not the person to tell

6    us the names of any Kaiser doctors who may have come to the

7    same conclusions as the Carta reviewers, are you?  That's

8    not your assignment in the case?

9    A.  Well, two parts to the question.  One is I'm not the

10   person to tell you which Kaiser doctors read this or were

11   affected by it, but part 2 is that I cited this article for

12   opposite reasons than I think you're bringing it to me.

13            This article shows that there were 40 positive

14   nonrandomized controlled clinical trials, 40 positive

15   open-label, not RCTs, and there were three negative RCTs in

16   the literature, and that's quite astonishing in balance, and

17   it shows how the literature was flooded with these positive

18   studies that were not RCTs.

19   Q.  I'll ask a different question than that, Doctor.

20            THE COURT:  Let me ask you this, these positive

21   studies that were flooding the market, were those issued by

22   Pfizer or someone else?

23            THE WITNESS:  It's hard to tell.  Pfizer is

24   associated with some of them and many of them don't have an

25   attrition.

1    THE COURT:  Many are independend as far as you --

2    THE WITNESS:  I wouldn't draw that conclusion.

3    THE COURT:  You don't know?

4    THE WITNESS:  You don't know.

5    THE COURT:  All right, you don't know.

6    THE WITNESS:  I don't know, correct.

7  Q.  Those open label studies would be Level II or III

8  evidence, correct?

9  A.  That's right.

10  Q.  And we all agree that double-blind placebo-controlled

11  trials are the most convincing kinds of evidence where you

12  have it, correct?

13  A.  We do, and we agree that reporting them accurately is

14  very important, and this article reports Guille as a

15  positive study, and it's not positive.

16  Q.  And if you notice on page --

17    THE COURT:  What does it report as a positive

18  study?  What did you just say?

19    THE WITNESS:  The Guille, G-u-i-l-l-e, study that

20  was done at Mass. General which did not produce

21  significantly, there wasn't significant benefit.

22    THE COURT:  I just didn't hear what you said.

23    THE WITNESS:  Yes.

24    THE COURT:  How are we doing time-wise?

25    MR. HOOPER:  We're doing fine.

1          THE COURT:  One minute.

2          MR. HOOPER:  No.

3          THE COURT:  We're finishing today.  We're

4    finishing today, and I have to leave at one.  You can bring

5    him back tomorrow then.

6    Q.  Very briefly, Doctor, Dr. Abramson, earlier you talked

7    to the jury at some length about the two studies by

8    Dr. Gorson and Dr. Backonja; do you remember that?

9    A.  Yes.

10   Q.  The Gorson study was a study in diabetic neuropathy,

11   correct?

12   A.  Yes.

13   Q.  And Dr. Gorson studied Neurontin at 900 milligrams a day

14   max, right?

15   A.  That's correct.

16   Q.  And the Backonja, the other one you talked about,

17   studied, also studied Neurontin in diabetic neuropathy but

18   he let the dose go up to 3600, correct?

19   A.  I'd say slightly differently.  He forced the dose up to

20   3600.

21   Q.  He forced the dose up to 3600, pushed patients, right.

22   Okay.  Let's look at Exhibit 1250, a copy of the Backonja

23   article again really quickly.  when you talked about the

24   Backonja article, you mentioned this issue of something

25   called unblinding, didn't you?

1   A.  Yes.

2   Q.  You had concern that that might have impacted the

3   results of the study and made a positive study, made it look

4   like a positive study when it really wasn't, correct?

5   A.  Correct.

6   Q.  And unblinding, see if you agree with my definition,

7   unblinding is when the patients take the medication and they

8   develop something that they think is a side effect and that

9   tells them, oh, I'm on the real drug and they think they're

10  supposed to get better and that influences the results; is

11  that essentially it?

12  A.  Slightly different.  They develop something that is a

13  side effect and think it might be caused by the drug, they

14  think it might be caused, they might be experiencing that

15  side effect because they're taking the active drug instead

16  of the placebo.

17  Q.  And just very briefly, if you would, let's look at the

18  published account of the article on page 1835 and in the

19  first full paragraph there beginning with the words "because

20  the study."

21  A.  Yes.

22  Q.  Do you see that?

23  A.  Yes.

24  Q.  The first sentence says, "Because the study at end point

25  of pain was subjective, we explored the possibility that the

1    occurrence of adverse events resulted in unblinding biasing

2    the results of our efficacy analysis," correct?

3    A.  Yes.

4    Q.  And then let's flash forward to the end of the paragraph

5    because we're in a hurry.  They do this analysis and then

6    they say, "Thus," and it takes lines and lines to explain

7    what they did, and then they say, "Thus, inclusion of

8    patients who experience these central nervous system adverse

9    effects in the original analysis did not account for the

10   overall efficacy seen in the trial."  That's what they say,

11   correct?

12   A.  They say that, yes.

13   Q.  And this is published in the Journal of the American

14   Medical Association, correct?

15   A.  That's correct.

16   Q.  And it is a peer review journal, correct?

17   A.  It is a peer review journal.

18   Q.  Have you done any independent statistical analysis

19   yourself on this subject?

20   A.  Dr. Jewell has, I haven't, but I do want to point out --

21             THE COURT:  No, you don't have time.  Go ahead.

22   What's the next question?

23             MR. HOOPER:  One last one.

24   Q.  Exhibit 544.  Dr. Abramson, I'm showing you Exhibit 544.

25   Please confirm for me that that, too, is a drug monograph

1   prepared by Kaiser very similar to the one we looked at

2   earlier --

3   A.  Yes.

4   Q.  -- with a P & T review date for the Southern California

5   Permanente Group of September, 1999.  Is that what you

6   have?

7   A.  Yes.

8            MR. HOOPER:  Move to admit, your Honor.

9            MR. SOBOL:  No objection.

10           ( Exhibit No. 544 was marked and admitted into

11   evidence.)

12  Q.  If you would, Doctor, let's turn to the --

13           THE COURT:  Have you ever seen it before?

14           THE WITNESS:  I have not.

15  Q.  Doctor, if you turn to the second page, fourth bullet

16  down, read with me -- I'm going to go fast -- "The efficacy

17  and safety of Gabapentin for the treatment of diabetic

18  peripheral neuropathy studied in two randomized double-

19  blind placebo-controlled trials."  Next sentence, "In the

20  first study, S6, 67 percent of Gabapentin-treated patients

21  received 3600 a day, Gabapentin significant pain relief."

22  Then it says, "There was potential bias from unintentional

23  unblinding resulting from secondary dose titrations

24  according to side effects."  That's the word you used to

25  describe the Backonja study, right?

1   A.   Yes.

2   Q.   And then the next sentence says, "The second study,

3   crossover trial S7 failed to demonstrate significant pain

4   relief in three of the four efficacy measures at a

5   Gabapentin dose of 900 a day."  We all recognize that by now

6   as the Gorson study, right?

7   A.   Yes.

8   Q.   And if you need to look at the footnotes, you can

9   confirm that they were aware of Backonja and Gorson on

10  blinding, et cetera.  If you would now, would you look to

11  the very last page of the document and just at the bottom of

12  the footnote reference, do you see that it says, "Prepared

13  by Debbie Kubota in February, 1999."  Do you see that?

14  A.   Yes.

15  Q.   Okay.  Now, let's go back to the third page of the

16  document entitled, "Formulary Recommendations."

17  A.   Yes.

18  Q.   And, if you would, let's look at the sixth block where

19  it says, "Drug Information, Professional Services, Formulary

20  Recommendation:  "Remove prescribing restrictions, add

21  guidelines for use in the treatment of neuropathy."  Did I

22  read that correctly?

23  A.   You did.

24  Q.   So this one doesn't have that language about extend the

25  restriction and accept the use, this says, "Flatly remove

Page 133

1    prescribing restrictions," correct?

2    A.  It does.

3             THE COURT:  For what, can you tell?

4             THE WITNESS:  For the treatment of neuropathy.  I

5    don't know whether they're talking about neuropathy in

6    general or diabetic neuropathy or postherpetic neuropathy.

7    Q.  And those adjectives, those qualifying limiting words,

8    diabetic, postherpetic, any of that stuff, it isn't there,

9    in fact, what their words say is neuropathy, period;

10   correct?

11   A.  Yes.

12            MR. HOOPER:  Your Honor, I'll pass the witness.

13            THE COURT:  Thank you.

14            MR. SOBOL:  I only have a couple hours, your

15   Honor.

16            THE COURT:  Seriously, because --

17            MR. SOBOL:  I'll be very short.

18            THE COURT:  -- don't forget, there's got to be a

19   chance for recross or we bring him back.

20            MR. SOBOL:  Yes.

21                      REDIRECT EXAMINATION

22   BY MR. SOBOL:

23   Q.  Dr. Abramson, you were shown a document, the conference

24   that was held in 1999 at which a small portion of an audio

25   clip was played, correct?

1  A.  Yes.

2  Q.  And that was the audio clip of Dr. Pande presenting or

3  purporting to present the results of his study, correct?

4  A.  Yes.

5  Q.  Now, in your testimony to the jury earlier today and

6  yesterday, you've indicated to the jury that with respect to

7  Pande, that was eventually made public in the year 2000,

8  correct?

9  A.  Yes.

10  Q.  You haven't had any question about whether or not that

11  was disclosed at that particular period of time, correct?

12  A.  That's correct.

13  Q.  Nevertheless, going back to this conference in 1999, are

14  you aware that Dr. Pande at no point in time during that

15  30 minutes ever said that Neurontin is not effective for

16  bipolar?

17  A.  I don't know that.  I'm not aware of that.

18  Q.  Are you aware that during that conference Dr. Pande

19  spent most of his time explaining the placebo effect and

20  trying to figure out why the placebo had had a bigger effect

21  than Neurontin?

22  A.  I'm not aware of that.

23  Q.  Or that he spent most of his time talking about --

24      THE COURT:  He's not aware so he can't testify.

25  What's the next question?

1    Q.  You were shown a document, if you can look at

2    Defendant's Exhibit 590, this is the Pande article regarding

3    panic disorder.  Do you see that?

4    A.  Yes.

5    Q.  And first your assignment in this case was to look at

6    literature regarding bipolar, correct?

7    A.  Yes.

8    Q.  Not panic disorder, correct?

9    A.  Within the psychiatric realm, yes.

10   Q.  Not bulimia, not anxiety, not the myriad other things

11   you were asked questions about, right?

12   A.  Yes.

13   Q.  But, nevertheless, in Exhibit 590, Dr. Pande is writing

14   this again in the end of 1999, I believe, or 2000, excuse

15   me?

16   A.  2000, yes.

17   Q.  And so shortly beforehand he had finished his bipolar

18   study, correct?

19   A.  I'm sorry.

20   Q.  Shortly beforehand then he had finished his bipolar

21   study, Dr. Pande?

22   A.  I think he finished it in 1998 or 1997.

23   Q.  Right.  If you look at page 468 on this document about,

24   I don't know, 12 lines down, it says, "In clinical

25   studies"?

1    A.  Yes.

2    Q.  Okay.  Anywhere in this 2000 article by Dr. Pande does

3    he disclose his bipolar results from the year earlier?

4    A.  Not in what I'm looking at.

5    Q.  Well, they go to the references also.  Do you see any

6    reference to the bipolar study that he had finished the year

7    earlier which had proven that placebo is more effective than

8    Neurontin; did he disclose that in this article?

9           THE COURT:  Well, you know what, it's a long

10   article, and he's testifying under oath.

11   A.  I don't see it in the references.

12   Q.  Very good.  Just briefly, Exhibit 1305, this was the

13   Pande article regarding social phobia, correct?

14   A.  Yes.

15   Q.  And do you see in the background section on page -- the

16   first page and the second page, there is some discussion

17   regarding how Gabapentin has produced improvements in mood

18   and general well-being, the second page?

19   A.  Yes.

20   Q.  All right.  But, again, Dr. Pande doesn't mention his

21   study the year earlier where he proved that placebo is more

22   effective than Neurontin in treating bipolar, correct?

23   A.  I do not see it here.

24   Q.  All right.  Now, finally, I think you were trying to get

25   out an answer to a question, Mr. Hooper was asking you

1    questions about Exhibit 1610, and this is the review

2    article.  Do you have that?

3    A.  The Carta review?

4    Q.  Yes.

5    A.  Yes.

6    Q.  The Carta review?

7    A.  Yes.

8    Q.  And, again, you said that something to the effect that

9    two of the four DBRCTs were not accurately presented this

10   this article.  What did you mean by that?

11   A.  Well, if I said that, I didn't mean to quite say it.

12   What I meant is of the four RCTs, one is represented as

13   showing a benefit when it didn't show a benefit, and one of

14   the RCTs is technically an RCT, but in point of fact, it was

15   a two-week study that was not blinded.

16          Let me -- it will just take a second, your

17   Honor.

18          THE COURT:  Is that a Pfizer study or somebody

19   else's study?

20          THE WITNESS:  We don't know.  It says "results" on

21   page 88, I believe it is, results of controlled studies of

22   Gabapentin, and it presents the Frye study, and it presents

23   the Pande study, and then it says the Guille study, which we

24   know didn't show a benefit, the double-blind randomized

25   trial of Guille presented at the APE, American Psychiatric

1  Association Annual Meeting in 1999 compared 18 refractory

2  bipolar patients, 9 patients with Gabapentin, 9 patients

3  with placebo, and then it says, "As a result, treatment

4  groups did not differ in the change of young mania rating

5  scale, but there was a trend for better improvement of the

6  Gabapentin treatment group as depicted by the Hamilton

7  depression score."

8          Well, that was not a significant trend, and

9  there's no way that should be counted as a positive study,

10 and then finally the fourth randomized control trial is a

11 two-week nonblinded randomized controlled trial, so I think

12 the conclusion of this article that of the four randomized

13 controlled trials, two were positive is a

14 misrepresentation.

15 Q.  Finally, Dr. Abramson, you have been asked the scope of

16 your assignment did not address Kaiser in any way, correct,

17 that's for many other witnesses, not for you?

18 A.  That's correct.

19          MR. SOBOL:  Nothing further.

20          THE COURT:  Stay right there.

21                  RECROSS-EXAMINATION

22 BY MR. HOOPER:

23 Q.  Dr. Abramson, since the time you gave Kaiser's lawyers

24 your report in 2008, are you aware of Kaiser telling any of

25 its doctors that they should stop prescribing Neurontin

Page 139

1   because it's snake oil?

2          MR. SOBOL:  Objection.

3          THE COURT:  Sustained.  Beyond the scope.

4   Q.  Dr. Abramson, are you aware since you gave your report

5   to Kaiser up until ten days ago it had a website that told

6   its patients --

7          THE COURT:  Come on, this is beyond the scope.

8   No, we're not doing this.

9          THE COURT:  Thank you very much.  Bye, see you

10  tomorrow.  I keep threatening snow because they keep

11  threatening snow, and it never happens.  I'll see you at

12  9:00.

13          (Whereupon, the trial was suspended at

14  1:00 p.m.)

15                              - - - -

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS    ) ss.

5   CITY OF BOSTON               )

6

7

8          We, Lee A. Marzilli and Valerie A. O'Hara, Official

9   Federal Court Reporters, do hereby certify that the

10  foregoing transcript was recorded by us stenographically at

11  the time and place aforesaid in Civil Action No. 04-10981-PBS,

12  In Re: Neurontin Marketing, Sales Practices, and Product Liability

13  Litigation, and thereafter by us reduced to typewriting and

14  is a true and accurate record of the proceedings.

15          In witness whereof we have hereunto set our hands

16  this 24th day of February, 2010.

17

18                  /s/ Lee A. Marzilli

19                  /s/ Valerie A. O'Hara

20                  _____

21                  LEE A. MARZILLI, CRR

22                  VALERIE A. O'HARA, RPR

23                  OFFICIAL FEDERAL COURT REPORTERS

24

a169d3ed-5681-41c6-887b-8be556536a8d