IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
IN RE:                                  )
                                        ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,   ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION       )
----------------------------------------)
This document relates to:               )
KAISER FOUNDATION HEALTH PLAN, et al,   )
                                        )
                      Plaintiffs        )
                                        )
          -V-                           )No. 04-10739-PBS
                                        )Pages 1 - 147
PFIZER, INC., et al,                    )
                                        )
                      Defendants        )
```

JURY TRIAL - DAY FOUR

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 25, 2010, 8:50 a.m.

LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3         THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5         THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7         LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
          DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
          BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14        KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16        RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
          JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1                          I N D E X

2

    WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

3

    KAY DICKERSIN              14      73       119

4

5   JEFFREY S. BARKIN, M.D.

6

7   JEFFREY S. BARKIN, M.D.    119

8

9

10  EXHIBITS                          PAGE

11  Plaintiff

12  384-389                            38
    1056, 612                          51
13  383, 469, 1393, 1540, 1965         55
    192, 194, 373, 381,1250, 1552, 1986   71
14  263                                72
    175                                72
15  2091                               72

16  1477                              132

17  398                               137

18  1865                              141

19

20

21

22

23

24

25

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1                    P R O C E E D I N G S

2          THE COURT:  I understand there's a challenge to the

3    slides?

4          MR. GREENE:  Yes.  I just want to put on --

5          THE COURT:  Is that right?

6          MR. CHEFFO:  Yes, there's just three issues, but, yes,

7    I just got them two minutes ago.  I don't really have a copy of

8    them.

9          MR. GREENE:  I just had them to give them to him this

10   morning.

11         THE COURT:  I know, but you'd be screaming if it

12   happened to you.

13         MR. GREENE:  I'm mindful of the time.  We have two

14   witnesses we're going to try to get on and off today, starting

15   with Dr. Dickersin, and these slides pertain to her.

16         THE COURT:  Well, what about this other guy?

17         MR. GREENE:  Dr. Barkin.

18         THE COURT:  No.  Mr. Carver.

19         MR. GREENE:  Oh.  I think that's --

20         THE COURT:  Yes, the same guy.  I mean, I've been

21   having constant pressure to finish him so he can get out of

22   here on his vacation.

23         MR. GREENE:  Well, he left yesterday.

24         MR. CHEFFO:  That's another problem, your Honor.

25         THE COURT:  Well, when is he coming back?

1          MS. NUSSBAUM:  Your Honor, Mr. Carver is not going to

2     testify.  We told this to the defendants yesterday.  Mr. Carver

3     cannot come back.  So instead we're going to do the testimony

4     that we would have put in through Mr. Carver with other

5     witnesses, and we've let the defendants know what witnesses

6     those are.

7          MR. CHEFFO:  Your Honor, this is a significant problem

8     because they said he was testifying live.  They brought him

9     here.  They sat him as the corporate witness.  I heard at

10    1:00 o'clock, after they said he's on his way to the airport to

11    leave for a month and leave the jurisdiction, that he wasn't

12    going to testify.  Had we known that -- and they had told us

13    last week three times that he was going to testify, so not only

14    did we spend time and effort preparing for him, but we

15    expected, we had information to elicit fairly, we didn't serve

16    a subpoena because we assumed the man was sitting here.

17         THE COURT:  There's nothing I can about it now.  You

18    didn't serve a subpoena.  There's nothing I can do.

19         MR. CHEFFO:  I understand, your Honor, but in terms of

20    when we talk about the fairness, you know, in dealing with

21    this, we were represented that he was actually going to be

22    here, and then all of a sudden at 1:00 o'clock after he leaves,

23    they say he's gone.

24         THE COURT:  If you need to subpoena someone in his

25    stead, you can, or use a deposition transcript, I'll let you

1    adjust for it, but there's nothing I can do about him.  He's

2    gone.

3            All right, next issue.

4            MR. CHEFFO:  Just on the slides issue again, not only

5    do we only have drafts, I just got them, if they were

6    nonsubstantive, your Honor, just so we're clear, we're not

7    being picayune here, they're very dense.  You know, they're

8    going to put a witness on in two minutes, so, you know, it's

9    just really --

10           THE COURT:  I do agree it's unfair, so let me find out

11   what the challenge is.  Which chart is it?

12           MR. CHEFFO:  I don't even have a copy of it.

13           THE COURT:  You don't have a copy of the chart?

14           MR. GREENE:  No, I just gave it to him.

15           MR. CHEFFO:  You showed them to me.  I don't have --

16           THE COURT:  You can't just --

17           MR. CHEFFO:  He showed me a draft that had handwriting

18   over it.

19           MR. GREENE:  It's the same set you have, your Honor,

20   and on his there was just a little arrow.

21           MR. CHEFFO:  These are incredibly dense --

22           THE COURT:  Where did you get them from?

23           MR. GREENE:  They're from his report, all the

24   information --

25           THE COURT:  Exactly, identically?  These charts are in

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1  the report?

2       MR. GREENE:  No.  The information in the report is now

3  on a slide.

4       THE COURT:  Listen, how would you like it done to you?

5  I don't know if this is -- it's now five of.  We can start

6  walking through it, but it's --

7       MR. GREENE:  Could we just take one minute?  The first

8  chart just takes the -- it doesn't even take all of them.  It

9  takes a few of the definitions of publication bias, not all of

10  them, just a few of them, and sets it out, one slide.

11       The second slide takes the six nociceptive studies

12  that she looked at -- we've been talking about them for three

13  days -- and it just says, was an article published, yes or no?

14  Was there bias?  There was because no article was published.

15  And migraine is three, bipolar is four, and then the dose

16  studies.  So it's just setting out a very simple format.

17       MR. CHEFFO:  This is not a surprise.  I mean, why are

18  we getting this, like, literally now?  I don't understand that.

19       THE COURT:  Why is he getting it literally now?

20       MR. GREENE:  Well, they were finished sometime between

21  1:00 and 2:00 this morning.

22       THE COURT:  Yes, so shoot it to him.  At least he

23  could have gotten it this morning.  I mean, to hand it to him

24  at five of 9:00, I don't know if they're fair or they're not

25  fair.  That's what I don't know.  To the extent it's a blowup

1    of a document in the record, I have no problem with that, and

2    that appears to be one of them here.  The Serpell and the POPP

3    blowups, that's fine.

4        MR. CHEFFO:  I would just say, I mean, you know, the

5    last one is just misleading.  It says results took 16 years to

6    publish.  Mr. Hooper is showing me it's published in this

7    document here.  I mean, these are the kind of things that we

8    would need to have at least a few minutes in order to

9    effectively cross-examine, you know, to read through.

10       THE COURT:  All right, at least at this point, all I'm

11   allowing to go up is the blowups of the two documents.  That

12   seems fair enough.  And then you can start going through the

13   documents.

14       Mr. Alba, why don't you go find out where the jury is.

15   They're all here.

16       MR. CHEFFO:  Can we just have two other quick things?

17   One is, your Honor, we actually have an affidavit from the

18   person.  You asked us to find out when that was put up on the

19   website, the Dr. Pande clip.

20       THE COURT:  Yes.

21       MR. CHEFFO:  And the person who actually put it up was

22   kind enough and got us an affidavit.  I can give a copy to

23   counsel.  It was actually put up on or about the time of the

24   conference.  He doesn't remember exactly in 1999, but it's been

25   on the website --

1            THE COURT:  All right, so that's enough of a proffer

2      to have it up there.  I'm not saying it comes in as evidence

3      because it's an affidavit, but the affidavit but --

4            MR. CHEFFO:  If I can just report, I think -- well,

5      we'll try and work out if we have a stipulation of that, but

6      the point is, I wanted to make sure we responded to your

7      Honor's question about that.

8            THE COURT:  That's fine, okay.  So that's fine.  I

9      think I let that in anyway, right?

10           MR. CHEFFO:  I think you did, but you asked, you know,

11     when did it go up there?

12           THE COURT:  I appreciate it.

13           MR. CHEFFO:  We have an objection to a few of the --

14     really, we could probably have one objection that covers a few

15     of the documents.  This goes to the CME, the Dickersin

16     documents.  Basically what we have, at least what they've given

17     us, is copies that say, you know, "unrestricted grant."

18     They're not produced from Pfizer or that they are Pfizer

19     documents -- I'm sorry -- or they have a Pfizer Bates stamp,

20     but really all it is is a document, it's a slide deck of a CME.

21     So, in other words, what I understood, at least from the prior

22     folks, is that they are trying to say this is a Pfizer CME; and

23     all the document really is, if you look at it, it's a thick

24     document, and it says "unrestricted grant," and it has another

25     organization.

1          THE COURT:  But is it an unrestricted grant from

2    Pfizer?

3          MR. CHEFFO:  Unrestricted grant from Pfizer.  But,

4    again, you know, they can talk about something that has an

5    unrestricted grant, but the First Amendment and the regs allow

6    Pfizer to provide unrestricteds.

7          THE COURT:  It's relevant.  I'm going to allow it in.

8    But -- I don't want to say it till I'm blue in the face -- at

9    the end of this plaintiffs' case, when I hear the motion for

10   directed verdict, the problem with RICO cases -- and I've seen

11   it on the criminal side -- it's not just the fraud.  It's got

12   to be the fraud through the enterprise.  So it's got to be the

13   fraud on bipolar through an enterprise, the fraud on the

14   migraine through an enterprise.  Now, you may win up everything

15   under the California Unfair Trade Practices Act, but RICO

16   carries a burden.

17         MR. GREENE:  I expect we have the evidence for it, or

18   we wouldn't be here, Judge.  We will tie it up.

19         THE COURT:  So it's not going to be good enough simply

20   that it says "CME unrestricted grant."  It's relevant that

21   Pfizer paid for it, but I need more than that.  And so, I mean,

22   if that's your point, it's fair enough.

23         MR. CHEFFO:  Well, my point is that, but it's also --

24   I wasn't even arguing the relevance.  You've ruled on that,

25   your Honor.  It's also the inference that can be drawn.  In

1    other words, you can't say Pfizer put on a CME and allow the

2    jury to think that all of a sudden these folks came up to

3    Pfizer's offices.

4            THE COURT:  Well, maybe, but it's relevant.  It's

5    relevant to their claim of enterprise.  Now, whether or not

6    they can meet a burden to show that through this CME, Pfizer

7    was promoting something fraudulently is a different story.

8            MR. CHEFFO:  My only point is, it's unfair to say --

9            THE COURT:  There's no First Amendment right to

10   promote fraud, all right, so let me just start there.

11           MR. CHEFFO:  I agree.

12           THE COURT:  So I deny your motion to exclude evidence

13   as long as there's a hookup that Pfizer paid money for it.

14           That doesn't necessarily meet your burden.  If it's

15   truly an unrestricted grant and I have no evidence that they

16   used it as a shill, a sham, a conduit for fraudulent

17   information, then the enterprise hasn't been proven.  There's

18   no association in fact.

19           Now, whether there's a fraud under the California

20   Unfair Trade Practices law is a different story, but RICO

21   carries its own burden.  So at the end of this on the directed

22   verdict, I'm hoping I'm going to get a brief that connects up

23   the dots because otherwise he's going to win on that

24   indication.

25           MR. CHEFFO:  And, finally, your Honor, you probably

1    don't want to hear argument on this, but just before the next

2    witness comes on, I would move to strike the testimony of

3    Abramson as beyond -- essentially he was testifying to fraud on

4    the market.  It's beyond his expertise, and also it didn't link

5    any of the conduct to Kaiser.  We're going to submit a very

6    short two- or three-page bench memorandum.  I just wanted to

7    make that for the record, your Honor.

8         THE COURT:  You can.  I'm not sure it's timely at this

9    point, but, in any event, do what you need to do.

10        MR. GREENE:  Your Honor, you mentioned two of the

11   slides, the last two.  The third one from the back is also in

12   evidence.  It's a Reckless e-mail.

13        THE COURT:  Sure, I have no problem with you blowing

14   up a document that's going to go into evidence.  I'm certainly

15   fine with that.

16        MS. NUSSBAUM:  Just a tiny housekeeping point, your

17   Honor.  Dennis Helling, who is in senior management at Kaiser,

18   is hear to observe the trial, so if he could just be introduced

19   to the jury.

20        THE COURT:  Have you told them yet who you're putting

21   on as your Kaiser representative?

22        MS. NUSSBAUM:  We've told them who the witnesses are,

23   yes, your Honor.

24        THE COURT:  And who are the witnesses on the -- what

25   order are people coming?

1        MR. GREENE:  We start with Dr. Kay Dickersin.  I've

2   mentioned to you several times she's from Baltimore, and she

3   has to get out of here today.  And we have Dr. Barkin.  Those

4   are the two witnesses we hope to get on and off today.

5        THE COURT:  The jury is here.  Let's go.

6        (Discussion off the record.)

7        THE COURT:  So just to go back through on the slides,

8   as far as I'm concerned, if you had them ready at 1:00, I'm not

9   expecting you to respond at 1:00 in the morning, I think that's

10  inhumane, but it means that -- this might happen again for each

11  side -- at least get it to them when they're available.  Then

12  I'll be able to deal with whether or not it's timely or not.

13       THE CLERK:  All rise for the jury.

14       (Jury enters the courtroom.)

15       THE COURT:  Thank you.  Everyone is bright and early

16  today.  Did anybody speak about the case or see anything in the

17  press?  I find the jury has complied.

18        Your next witness?

19       MR. GREENE:  Good morning, your Honor.  Good morning.

20  We call Dr. Kay Dickersin.

21                         KAY DICKERSIN

22  having been first duly sworn, was examined and testified as

23  follows:

24       THE CLERK:  Would you please state your name and spell

25  it for the record.

Page 14

1          THE WITNESS:  My name is Kay Dickersin.  You spell the

2     first name K-a-y, last name D-i-c-k-e-r-s-i-n.

3     DIRECT EXAMINATION BY MR. GREENE:

4     Q.    Good morning, Dr. Dickersin.

5     A.    Good morning.

6     Q.    Could you tell us where you reside.

7     A.    I live in Baltimore, Maryland.

8     Q.    And you're a professor at Johns Hopkins University; is

9     that correct?

10    A.    Yes, I am.

11    Q.    You're the head of the Clinical Trial Department there?

12    A.    Yes.

13    Q.    And are you originally from Massachusetts?

14    A.    Yes, I am.

15    Q.    You grew up in Milton, Massachusetts?

16    A.    Did I what?

17    Q.    Grow up in Milton, Massachusetts?

18    A.    Yes, I grew up in Milton.

19    Q.    Well, welcome back, and I want to ask you a few questions

20    about your educational background.  Could you tell us where you

21    attended college and what you studied.

22    A.    I started out in college at Bennington College in Vermont.

23    I intended to study art, but I changed my mind after a work

24    experience here in Boston, and I transferred colleges to

25    University of California Berkeley.  I majored in zoology.  At

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1  that time there was no major in biology, so you chose between

2  zoology and botany.  And then I went on, did a master's degree

3  in zoology as well, focusing on cell biology.

4  Q.   And that master's degree, did you do that at Berkeley?

5  A.   I did that at Berkeley.

6  Q.   And then following that, did you continue your education?

7  A.   Yes.  I worked for a while, had kids, and I continued my

8  education at Johns Hopkins where I did my Ph.D.

9  Q.   And you received your Ph.D. in what, Doctor?

10  A.   My Ph.D. is in epidemiology, and I got it in 1989.

11  Q.   Now, following your Ph.D. degree, can you describe for us

12  what your work experience was.

13  A.   After my Ph.D., we stayed in Baltimore, and I went to

14  University of Maryland for ten years.  I was an assistant

15  professor, first in the Department of Ophthalmology and later

16  in the Department of Epidemiology.  After ten years, I moved to

17  Providence, Rhode Island, where I was a professor at Brown

18  University in the Department of Community Health, and after

19  seven years there was lured back to Baltimore to Johns Hopkins.

20  Q.   Okay, at Brown you were in the Department of Community

21  Health; is that what you said?

22  A.   Yes.  That's part of the medical school.

23  Q.   And did you do some teaching while you were at Brown?

24  A.   Yes.

25  Q.   What did you teach there?

1    A.    I taught two courses.  One was a course on evidence-based

2    healthcare for the medical students, and the other course was a

3    course on clinical trials and systematic reviews for the

4    graduate students.

5    Q.    While at Brown, were you the director of the Center for

6    Clinical Trials and Evidence-Based Healthcare?

7    A.    Yes.

8    Q.    And I want to just step back again.  You mentioned you

9    were at the University of Maryland School of Medicine from 1989

10   to 1998; is that correct?

11   A.    That's correct.

12   Q.    And you taught courses there -- you didn't tell us this,

13   but I'm looking at my outline here -- you taught some courses

14   in systematic reviews and clinical trials at the medical

15   school; is that right?

16   A.    I was in the medical school, and we had both medical

17   students and master's and Ph.D. students.  So the master's and

18   Ph.D. students took clinical trials and systematic reviews, and

19   then I also taught in the evidence-based healthcare

20   epidemiology course for medical students.

21   Q.    And that phrase, we're going to come to it later,

22   "systematic reviews" and a little bit about clinical trials in

23   a moment.  Now, following your stint at, I think you said ten

24   years at Brown, did you return to Johns Hopkins University?

25   A.    Yes.  I returned to Johns Hopkins in 2005.

1   Q.   And what have you been doing at Johns Hopkins since 2005,

2   Doctor?

3   A.   I returned to be the director of the Center for Clinical

4   Trials in the School of Public Health.  Sorry.

5           THE COURT:  I think that's water.  That's water in

6   there.

7           THE WITNESS:  Oh, that would be great.

8           THE COURT:  But beware.  That pitcher sometimes

9   explodes in the lap.

10          THE WITNESS:  All right, I'll hold it far away.

11          THE COURT:  Can you imagine being nervous about being

12  a witness and then have the whole pitcher of water fall into

13  your lap?  I've seen it happen.  There we go.

14  A.   Okay, at Johns Hopkins, I also -- it's one of my titles,

15  but it's not part of my Johns Hopkins job, is I direct the U.S.

16  Cochrane Center, the United States Cochrane Center.  And that's

17  a job that I have held, a post that I've held under one name or

18  another since about '93 or '94.

19  Q.   Okay, I'm going to come to that in a minute because I

20  think we heard about that earlier this week, but it was

21  pronounced Cochrane Center, but you're the director of the U.S.

22  Cochran (Phonetic) Group, right?

23  A.   That's right.

24  Q.   You know how it should be pronounced.  How is it

25  pronounced?

1   A.   It's pronounced Cochran (Phonetic).  It has an E on it,

2   though, and you often hear it referred to different ways,

3   Cochrane, or people sometimes call it the Cochran (Phonetic)

4   Collaborative, but it's the Cochran (Phonetic) Collaboration.

5   Q.   Okay, we're going to come to that in a moment, but I

6   just --

7         THE COURT:  And is that the same review that we saw

8   documents of earlier?

9         MR. GREENE:  Yes, it is, and I'll spend a couple

10  minutes on that in a moment, your Honor.

11  Q.   So you said you're the director of the Center for Clinical

12  Trials at Johns Hopkins?

13  A.   Yes.

14  Q.   That's what you've been doing.  And just very briefly, in

15  that position, can you explain to us what you do.

16  A.   The Center for Clinical Trials is mainly the educational

17  hub for people who want to learn about how to do and how to

18  interpret clinical trials.  So we have a curriculum for

19  master's and Ph.D. students.  We also teach students who are

20  coming there for an MPH, a master of public health; M.Ds who

21  might come and want to learn a little bit about how to do a

22  clinical trial or how to interpret a clinical trial.  And so

23  our major focus is education in the center, but of course all

24  of us do research, and our research is either doing clinical

25  trials or doing research about the methods that you use to do

1  clinical trials and the ways to interpret them.

2  Q.   And the jury has been here for three days, and we've heard

3  about clinical trials, but just in a sentence or two, what is a

4  clinical trial?

5  A.   A clinical trial is a research study that examines how

6  well a treatment or a prevention or a rehab method works and

7  doesn't work and what the side effects might be.

8  Q.   Now, I just want to ask you this because I think it's

9  important for the jury to know, and I know you don't like to

10  brag, but you've received rewards, haven't you, Doctor?

11  A.   Yes, I have.

12  Q.   And one of them is from the Institute of Medicine in 2007?

13  A.   Yes.

14  Q.   And can you tell us about that honor.

15  A.   Yes.  This is an incredible honor, and it's a little

16  difficult to talk about oneself this way, so -- it's from the

17  National Academies of Science, and the Institute of Medicine is

18  the medical arm.  There's also an engineering arm and people in

19  the basic sciences.  And you're elected, you're nominated.

20  It's secret.  You don't know you've been nominated.  And

21  somebody nominates you, and there's a seconder, and then the

22  academy, the people who already have been elected, they vote.

23  And so there's first a shorter list, and then a very short

24  list, and then either you're elected or not.  So as far as I'm

25  concerned, this is the highest honor I can get in my career.

1    Q.    Now, you've been elected to the American Epidemiological

2    Society, and that was back in 1999?

3    A.    Yes.  That's the honorary society for epidemiologists.

4    Q.    You're president of the Society for Clinical Trials?

5    A.    I'm the immediate past president now.

6    Q.    You were elected into the Society For Research Synthesis

7    Methods in 2006?

8    A.    Yes.  That's also an elected society.

9    Q.    You can't just join that?

10   A.    No.

11   Q.    You're cochair of the World Health Organization Scientific

12   Advisory Group to the International Clinical Trials Registry

13   Platform; is that correct?

14   A.    That cochair position has now ended.  The committee has

15   been changed because of how the WHO works, but that's true,

16   except it's not current right now.

17   Q.    You're on the National Cancer Advisory Board, and you were

18   appointed by President Clinton; is that correct?

19   A.    President Clinton.

20   Q.    And you're on the editorial board of major journals

21   relating to clinical trials?

22   A.    Yes.

23   Q.    You've been given awards by consumer advocacy groups?

24   A.    Yes.

25   Q.    You're the author of journal publications?

1    A.    Yes.

2    Q.    Many?

3    A.    Yes.

4    Q.    Do you want to estimate?

5    A.    How many?  I'm sorry, I haven't counted.

6    Q.    A lot.  The articles have been published in refereed

7    journals?

8    A.    Yes.

9    Q.    What topics do you publish on?

10   A.    I publish on a variety of topics.  Some of my publications

11   are about clinical trials that I have either coordinated or

12   been part of, and some are about the methods of clinical trials

13   or relating to clinical trials, such as I would say most people

14   would identify me as a person who is focused on reporting

15   biases, how clinical trials are reported in the literature and

16   how this affects what we know when you synthesize the

17   literature as a whole.

18   Q.    And have you been published in New England Journal of

19   Medicine?

20   A.    Yes, I have.

21   Q.    And Lancet?

22   A.    Yes.

23   Q.    The British Medical Journal?

24   A.    Yes.

25   Q.    And have you sat on any of their editorial boards?

1  A.   Yes.  I'm on the editorial board for the British Medical

2  Journal.

3  Q.   And some of the work you did in this very case that you're

4  going to talk about in a few minutes was just recently

5  published in the New England Journal of Medicine; is that

6  right?

7  A.   Yes.

8  Q.   And that was in the November 12, 2009 issue?

9  A.   Yes.

10  Q.   We'll move to introduce that in a few minutes.

11      Now, Dr. Dickersin, when you first met me, you hadn't met

12  me before; is that correct?

13  A.   That's right.

14  Q.   And I came down to Baltimore to meet you and talk to you a

15  little bit about the case, and you agreed to get involved,

16  correct?

17  A.   Yes.

18  Q.   And in terms of compensation for this case, if you were to

19  get paid, you were getting paid an hourly rate.  And I've

20  forgotten, but is it $400 an hour?

21  A.   It's $400.

22  Q.   And you asked that all of that money be contributed to

23  Johns Hopkins?

24  A.   Yes.

25  Q.   And I think you disclosed that in the New England Journal

1    of Medicine article too?

2    A.   Yes, I did.

3    Q.   Prior to me coming to you, had any lawyers ever asked you

4    to testify in a case, and had you ever testified at all?

5    A.   I've been asked many times to testify, and I've never said

6    "yes" before this.

7    Q.   What was it about this case that you agreed to testify in

8    it?

9    A.   Well, I think, number one, the topic was one that I feel

10   confident that I know something about, reporting biases and how

11   the results of clinical trials are presented in the literature.

12   And I did talk to people about it before I decided to do it,

13   and I think the real reason I did it is, I feel that the people

14   had a right to know the truth, and who's going to represent the

15   people?  And that's why I did it.

16   Q.   Okay.  Now, we're going to try to cover your testimony

17   over the next hour or so, but I'm going to ask you if you could

18   give her Honor and the jury kind of a road map, what it is you

19   did, were asked to do, and where we're headed in this next

20   forty-five minutes.

21   A.   Okay, so maybe, if it's all right, I'd just like to

22   explain my own experience looking at the information that was

23   sent to me.  So you sent me information after I agreed to do

24   this, and I read through all of it, which involved what are

25   called "protocols," the plans that the company makes for doing

1    a research study.  And everybody writes a protocol before doing

2    a research study, not just companies.  And then they write up

3    an internal company report about what happened, what are the

4    results of the study, and then publications, if they did

5    publish the findings.  There were also e-mails and copies of

6    letters and things like that in the boxes.  And so I read

7    through everything.

8         And I was astounded at what was there because as an

9    investigator, as a scientist, I really only see published

10   material, other than my own research.  And so the publication

11   is the record for the public, for scientists, for doctors, for

12   everybody, and that's all you see.  But this behind-the-scenes

13   information that I was seeing in what was sent to me showed

14   that what was in the published record didn't agree with what

15   was actually planned or what had been done.

16        And so my overall feeling was, oh, wow.  You know, stuff's

17   going on here that science doesn't know about.  And these

18   things were a failure to publish results that were known, a

19   changing around of some of the things that were originally

20   intended and reported differently in the literature, and some

21   of the changes in how many patients were counted as well.

22   Q.   So that's what you're here to discuss with the jury this

23   morning, correct?

24   A.   Yes.

25   Q.   All right.  Now, you've used a couple of words.  The jury,

1    I think, has heard them earlier in the week, but if you could

2    give us kind of a layman's definition, I'd appreciate.  The

3    word "epidemiology," in simple terms, could you tell us what

4    that means.

5    A.   The root word is "epidemic," and people know what epidemic

6    is.  So it's the study of patterns of disease and how to treat

7    disease, what causes disease, or any sort of health condition.

8    It doesn't necessarily mean epidemics the way we think of it,

9    but it could be heart attacks, it could be alcoholism.

10   Q.   Okay.  And you've defined for us clinical trials.

11   A.   A clinical trial is a formal testing of how well an

12   intervention, either a treatment or some other kind of

13   intervention, works.

14   Q.   You mentioned that you teach systematic reviews.  Does

15   that come into play in the assignment you had here and what

16   you're going to testify about?

17   A.   Yes.  Systematic reviews are a formal synthesis of all the

18   evidence that addresses a particular research question.  So if

19   you have a question, "Does aspirin prevent heart attack?" it

20   would be a compilation of all the studies that ask that

21   question.  That's a systematic review, and you try to find

22   absolutely every study that asks that question that's out

23   there.  And then you can synthesize the evidence essentially by

24   adding up all the results of the studies in something called a

25   "meta-analysis."

1  Q.   Does the term "science" have anything to do with your

2  assignment and what you're going to testify about?

3  A.   I think that everything that I'm talking about is science.

4  That's my focus is science.  I'm a Ph.D., and I want to see

5  that good science is done so that we get answers that are the

6  truth.

7  Q.   And the other word we've heard, you mentioned today and

8  we've heard earlier in the week, "evidence-based medicine."  So

9  if you could just remind us what your definition is and how

10 that will apply to what we're going to talk about in the next

11 forty-five minutes.

12 A.   So the idea of evidence-based medicine is that when

13 patients are given treatments or told what to do to take good

14 care of their health, that's based on evidence from research.

15 It's not just somebody's idea of what to do.  In evidence-based

16 medicine, there are three overlapping circles, is the way it's

17 drawn; and one of them is evidence, and another one is the

18 doctor's experience and training, and another one is patient

19 values.  But the core of evidence-based medicine is the

20 research evidence.

21 Q.   And do the principles of evidence-based medicine require

22 that clinical research concerning drugs, because that's what

23 we're talking about here, be published accurately, completely,

24 and truthfully?

25 A.   Yes.  Evidence-based medicine is based on high-quality

1    studies.  You wouldn't want to base your treatment on

2    low-quality studies.  And when we're trying to do a systematic

3    review of all available evidence, the way science is

4    disseminated to the public and to doctors is by publication.

5    So when we do a research study, we write up a paper, and then

6    we publish it in what's called a journal, magazines but formal

7    magazines that present in a very structured way what you did

8    and what you found.  And the only way to find out what was done

9    in research is to go to those journals and look up the studies.

10        As it turns out, and we'll probably get there, not all

11   studies are published, but the only way we have of finding out

12   what that evidence is is to go to the publications.

13   Q.   And that's because the medical community that reads those

14   publications, doctors, they don't have access to the internal

15   research reports or the internal protocols?

16   A.   That's right.  The only way you would have access to

17   internal information is to be part of that internal system or

18   to be in a law case like this one.

19   Q.   Now, I want to come back to the Cochrane Collaborative.

20   You're the director of the U.S. center, but we heard about this

21   the other day.  Could you tell us, what is the Cochrane

22   Collaborative?  Where is it located, and what do they do?

23   A.   So the Cochrane Collaboration is, it's a global

24   enterprise, and we started out in about 1993 with 70 people who

25   said, "Hey, we want evidence, we want to make sure evidence is

1   part of how patients are treated."  But the trouble is, doctors

2   had trouble finding all the evidence.  Every time they have a

3   patient in front of them, they can't look up every single

4   journal article that's out there.  They need to go to one

5   place, a sort of one-stop shopping.  I have a patient in front

6   of me who's pregnant and in labor early, how do I make sure she

7   gets the best treatment?  We want them to be able to go to one

8   place and look that up.  And so in the Cochrane Collaboration,

9   people have joined together based on their medical interests,

10  and they've said, "All right, we're going to pull together all

11  the studies in a systematic review and meta-analysis about how

12  a woman in early labor should be treated."  And the idea was to

13  put all that evidence in one place so that doctors could find

14  it, and part of that effort is to make sure we find absolutely

15  everything.

16  Q.   And how do you go about trying to find, as you put it,

17  absolutely everything?

18  A.   That's a challenge.  It's a huge challenge, and it's been

19  a big focus of my research because I want to make sure patients

20  are getting treatments based on everything that's known.  So

21  the first thing you do is, you search the published literature.

22  And even that is hard to do.  There are ways to do it that are

23  sort of mainstream, but the published literature, it's just

24  like there are probably -- if you go to an airport and you look

25  at the magazine rack, there are some magazines that you've

1    never seen before if you're in Atlanta, Georgia, than would be

2    on the rack here in Boston.  They still exist, that information

3    still exists, but you might not see it.  So some medical

4    journals are easy to see, and some aren't.  And so doctors may

5    see the New England Journal of Medicine but not see some other

6    journals, so we had to make sure in the Cochrane Collaboration

7    they see everything that's out there that's good evidence.  We

8    also look for unpublished evidence as well.

9    Q.   And when you look for unpublished evidence, tell us what

10   you do.

11   A.   How would we do it?

12   Q.   Yes.

13   A.   It's really hard to do.  There are some ways now that have

14   recently come out because of concern about failure to publish,

15   which unfortunately happens.  So, for example, now, because of

16   legislation, federal law, and also the journal editors have

17   pressed on this, you can register at a clinical trials register

18   called ClinicalTrials.gov through the federal system, and that

19   would be trials that have been initiated.  So at least we would

20   know the trial had been started, even if we didn't know about

21   the results.

22   Q.   There's been some testimony and some e-mails in this case,

23   and I know you've seen them, that Cochrane Collaborative

24   reached out to Pfizer and tried to get internal data.  Do you

25   recall those documents you reviewed?

1    A.    Absolutely.

2    Q.    Is that another way that Cochrane --

3    A.    That's another way.  Another way to do this -- and when I

4    teach how to do a systematic review, we ask our students to do

5    it -- when you think there are trials done by a particular

6    company that makes a drug, you would write to the company and

7    say, "Are there any trials that you have that we haven't found

8    that haven't been published?"

9    Q.    All right, I want to move on to a new area here, and this

10   is the subject matter of your expertise, bias and the topic

11   publication bias.  In laymen's terms, can you tell us, what is

12   publication bias?

13   A.    Well, let's start with bias, if that's all right.  So a

14   bias is any deviation from the truth.  Is it all right if I

15   tell you a little more about bias or go straight to

16   publications?

17   Q.    No, go right ahead.

18   A.    Okay.  So a bias isn't like a prejudice in scientific

19   terms.  It's really a statistical term in some ways.  And so a

20   bias can be either a bias that's what we would call a random

21   bias, or it could be a systematic bias:  It always goes in a

22   particular direction.  And an analogy of this might be, if you

23   were working at a store, and, you know, every day what's in

24   your cash register, the number in your cash register might not

25   agree perfectly with the dollars in the drawer.  And some days

1   you have more in the drawer, and sometimes you have less than

2   what the cash register says you should have.  So that's a

3   deviation from the truth, but if you're honest, some days it's

4   high, some days it's low.  If, however, every day the drawer is

5   short $20, there's some systematic thing going on there.  So

6   that would be the type of bias I'd be talking about.

7        So a publication bias has been defined as a failure to

8   publish related to the direction and the strength of the

9   results that you get in a study.

10  Q.   And that's what you did when you looked at all these

11  internal protocols and research reports and then compared them

12  to the way the defendants wrote them up and published them, if

13  they were published; is that right?

14  A.   That's right.  We looked to see, since we had these

15  internal reports that -- there are very few examples where

16  people have had the internal reports about what happened at the

17  drug company, and then followed them through to see what was

18  published and what wasn't, and we could see whether the results

19  were positive or negative based on these internal reports.

20  Positive would mean favoring the drug, and negative would mean

21  not favoring the drug.  And then we follow them to see whether

22  they were published or not.

23  Q.   And you prepared a report in this case, correct?

24  A.   Yes, I did.

25  Q.   And given the report to the defendants in this case?

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1    A.    Yes.

2    Q.    And in that report you lay out the different types of

3    bias, of deviation from the truth, right?

4    A.    Yes.

5    Q.    And there are different ways that this can appear that are

6    relevant to the case here; is that right?

7    A.    Yes.

8    Q.    And why don't you tell us about a couple of them, and

9    maybe we'll start --

10   A.    So the biases that I focused on, because they're related

11   to my area of expertise, are called "reporting biases."  So, as

12   I said, when you do a study, the only way the public knows that

13   study happened and the results of the study have to do with the

14   reporting.  We call it "reporting," meaning publication.  But

15   so you can report it or not.  You can publish it or not.  You

16   can have a reporting bias where you take a long time to report

17   it so the public doesn't know about it for a long time.  You

18   could have a reporting bias where you report some outcomes but

19   not others.  So, for example, you might report that a drug did

20   very well on this outcome that you measured but not so well,

21   you don't report on the outcome where it didn't do so well.

22   That's called "selective outcome reporting," so I select which

23   outcomes I report.

24        You can also choose to publish in a journal where people

25   would be likely to see it, or you could publish someplace where

1    people would be less likely to see it.

2    Q.   During the past few days the jury has heard a couple of

3    terms like "cherry-picking" in the context of the evidence in

4    this case, cherry-picking data out of clinical trials.  Is that

5    a type of bias or deviation from the truth?

6    A.   Yes.  That's what I would call "selective outcome

7    reporting."  So -- I don't want to get into too much detail

8    here, but I want to explain how it happens?

9    Q.   Sure.

10   A.   So in the protocol -- that is, the plan for how you're

11   going to do a study -- you say ahead of time, "This is the

12   primary outcome, this is the main outcome I'm interested in,"

13   which might be a pain score at seven weeks.  "But I'm also

14   interested in these other outcomes, like, can a person sleep at

15   night?  What was my pain like at four weeks?  What was my pain

16   like at three weeks?  What was my pain like at six weeks?"

17        And so maybe, if I don't find that a drug is beneficial at

18   pain at seven weeks, I might not report that.  I might report

19   pain at three weeks because that was the one place where I saw

20   what's called a "statistically significant effect."

21   Q.   And what if the study was done in one of these other

22   points that -- not your primary point you're studying but one

23   that fell down lower, let's say, did you sleep better, what if

24   the study was written up and published so that was brought up

25   as if it were the primary thing studied, and there was no

1    mention in the article of what really had been studied, what

2    kind of a deviation from the truth is that called?

3    A.   This is serious.  It's called "selective outcome

4    reporting," and it's increasingly recognized just how important

5    it is and how it biases our interpretation of the findings, so

6    we don't realize as the reader that this isn't what was

7    intended to be the primary outcome.  Why is that important,

8    what people intended?  Well, when you are testing whether

9    something works or not, you use statistical tests.  And if you

10   do -- let's say you had twenty outcomes in a study, which you

11   might.  You might have pain at one week, three weeks, five

12   weeks.  You might have sleep at one week, three weeks, five

13   weeks, et cetera.  You might have twenty outcomes you're

14   measuring.  Well, the way the statistical testing works is that

15   one out of twenty times you'd get a result just by chance that

16   would show something was effective even though it wasn't.

17   That's just by chance.

18        And so if we test twenty outcomes and we present the one

19   that was just by chance, what we call "statistically

20   significant," then you might think it really works for that

21   outcome and that was the main outcome we were looking for, but

22   it doesn't work, it was just by chance.

23   Q.   Okay.  What if you have a negative result in your study

24   and you publish it in a journal that has a small circulation --

25   you know, 400 or 500, let's say -- is that a type of deviation

1    from the truth or bias?

2    A.    Yes.   We would call this a "location bias" or a

3    "gray literature bias" in some cases.   And it's been shown that

4    industry trials tend more often to show up in the gray

5    literature and these journals where articles are less likely to

6    be seen.

7    Q.    Now, I want to move on and get right to your assignment

8    and your opinions in this case.   So we met, and you asked that

9    I produce certain things for you; is that correct?

10   A.    Yes.

11   Q.    In fact, repeatedly and repeatedly you'd call and want

12   more material from me; is that right?

13   A.    Yes, and I did apologize for it, but I always asked for

14   more material, yes.

15   Q.    The reason I'm asking the question, I think the jury

16   knows, is that the defense counsel have asked the experts that

17   testified before, "Did you get everything from the plaintiffs'

18   lawyer?"   But I gave you everything you asked for; is that

19   right?

20   A.    Absolutely.   And sometimes, I mean, you really looked

21   through a lot of materials to get us what we were looking for.

22   Q.    And you ended up looking at the protocols, the defendants'

23   protocols and research reports for twenty-one different

24   clinical trials, correct?

25   A.    Yes.

1   Q.   It was an enormous amount of work that you undertook; is

2   that right?

3   A.   Yes.

4   Q.   And you had the assistance of another physician and

5   student of yours; is that correct?

6   A.   Yes.

7   Q.   And that's?

8   A.   Swaroop Vedula.

9   Q.   In fact he was one of your coauthors?

10  A.   Yes.

11  Q.   And you let him be a lead author in this publication,

12  right?

13  A.   Yes.

14  Q.   He's getting a -- is it a Ph.D. or a master's degree?

15  A.   A Ph.D.

16  Q.   So he's an M.D., and he's getting a Ph.D.?

17  A.   Right, and MPH.

18  Q.   And there were some other internal documents I sent.   I

19  mentioned some e-mails, but I also sent you the marketing

20  assessments that these defendants put together, right, back in

21  the '90s, right?

22  A.   Yes.

23  Q.   There was a marketing assessment for migraine headache

24  that you looked at, marketing assessment for pain, neuropathic

25  pain, and migraine --

Page 37

1   A.   Bipolar.

2   Q.   Excuse me, a marketing assessment for bipolar disorder; is

3   that right?

4   A.   Yes.

5   Q.   And those marketing assessments, in them -- and I think

6   the jury saw one, and they'll see the rest of any them in a

7   couple days -- they indicated they're only going to publish the

8   positive results; is that right?

9   A.   They indicated that they had a publication strategy.  In

10  these marketing assessments, they discussed how should the

11  company address this particular condition that they wanted to

12  treat with Neurontin:  Should they try to go to the FDA to get

13  approval for marketing, or should they simply publish and alert

14  the medical community about using the drug for this condition?

15  And they chose the publication strategy.

16  Q.   And we're going to put them up on the board, the jury will

17  see them later in the week, but they say "if positive,"

18  correct?

19  A.   "If positive."

20  Q.   And if positive, they were going to take the results and

21  publicize them in congresses and in the literature to the

22  medical community?

23  A.   Exactly.

24  Q.   And maybe to just give an overview here to let the jury

25  know where we're headed, you looked at all twenty-one trials,

1  and can you tell us, did all of the trials show or exhibit some

2  form of bias or deviation from the truth?

3  A.   Each study showed some deviation from the truth, and in

4  some cases, there was quite a bit of deviation from the truth.

5  I mean, there were numerous biases.  That's a better way to say

6  it.

7  Q.   So let's start off with nociceptive pain.

8       MR. GREENE:  And I would move to admit Exhibit

9  Nos. 384, 385, 386, 387, 388, and 389.

10      Mr. Alba, would it be all right if I just move to

11  admit?  I have a series of exhibits, and then I can talk with

12  you later, or do you want to mark them right now?

13      THE COURT:  No.  We'll do it later.

14      (Plaintiff Exhibits 384-389 received in evidence.)

15 Q.   These exhibits that I've just introduced, these are the

16 trials that studied Neurontin for nociceptive pain in

17 combination with another drug.  Did you look at those protocols

18 and research reports?

19 A.   Yes, I did.

20 Q.   And some of them were for dental pain and orthopedic

21 surgery; is that correct?

22 A.   Yes.

23 Q.   And did these studies, in fact all of them -- and if we

24 can take the six of them and handle this with one question --

25 did they all show a deviation from the truth, these nociceptive,

Page 39

1   a bias, a publication bias, a deviation from the truth?

2   A.   Yes.   None of the studies were published, and the results

3   were negative.

4   Q.   Let's move to --

5            THE COURT:   What do you mean by negative?

6            THE WITNESS:   The negative results means they did not

7   favor Neurontin.

8            THE COURT:   For which indication?

9            THE WITNESS:   This is for nociceptive pain, which was

10  a combination -- depending on the study, sometimes it was

11  dental pain, sometimes osteoarthritis.   And these studies often

12  had as many as six groups, so it wasn't just Neurontin against

13  placebo, but these were combination therapies.   But when you

14  looked -- for example, a combination therapy might be Neurontin

15  plus Naproxen versus Naproxen alone, or versus placebo; and so

16  when you looked at them across all six groups, you could not

17  see a benefit of Neurontin on its own.

18  Q.   So let me just take one or two questions and stay with

19  nociceptive pain.   Study No. 103-001 was the defendants' study

20  on postoperative dental pain.   That result was negative and not

21  published, correct?

22  A.   Correct.

23  Q.   Study No. 103 --

24           THE COURT:   Well, can I see you at side bar just for

25  one second.

1    SIDE-BAR CONFERENCE:

2           THE COURT:  So in a way, this shows the inefficiency

3    of not having produced it.

4           MR. GREENE:  I'm sorry.  And it was even later than

5    1:00 o'clock, Judge.  I apologize, and I apologize to you

6    counsel.

7           MR. CHEFFO:  The real point is, we need to understand

8    what --

9           THE COURT:  But let me just ask you this.  The jury is

10   never going to get this down, so we could either have her sit

11   and handwrite it out, or if she's just going to go down this

12   list --

13          MR. GREENE:  That's what she's going to do.

14          THE COURT:  -- it makes sense to put it in.

15          MR. HOOPER:  The objection to this is, it implies

16   nociceptive pain as if it were about Neurontin, gabapentin.

17   These were all studies about a combination product that never

18   went to market, that no patient has ever taken and never will

19   take.

20          THE COURT:  Okay, I'm going to allow this chart

21   because otherwise he's just reading numbers.  Not in but as a

22   chalk.

23          (End of side-bar conference.)

24          THE COURT:  Now, let me say this:  Rather than have

25   him just read the numbers of the studies, he's going to put up

1   one of these chalks.  They're not exhibits, and the other side

2   disagrees with one of the characterizations of what the studies

3   show, and you'll hear about that in cross-examination, I'm

4   assuming.  So this is just a chalk.  You won't get it back in

5   the jury room, but we'll essentially just include these numbers

6   and these studies so you can see it, not just hear him read the

7   numbers.

8          MR. GREENE:  Thank you, your Honor.

9   BY MR. GREENE:

10  Q.   Dr. Dickersin, do you have that on your screen now, that

11  slide?

12  A.   Yes, I do.

13  Q.   And just for the record, this slide pertains to exhibits

14  that we just introduced, 384 --

15         THE COURT:  It's on the bottom of this.

16         MR. GREENE:  I'm trying to get it on the record.

17         THE COURT:  All right.

18  Q.   384, 385, 386, 387, 388, and 389, these are the six

19  nociceptive pain studies you were testifying about a moment

20  ago, correct?

21  A.   Yes.

22  Q.   And the jury is now looking at this slide.  You've listed

23  the studies in the column on the left; is that right?

24  A.   Yes.

25  Q.   And these are the defendants' studies, correct?

1    A.    Yes.

2    Q.    And you looked at the study protocols for each one of

3    those and the research reports; is that correct?

4    A.    Yes.

5    Q.    And then the next column over is entitled "Article," is

6    that right?

7    A.    Yes.

8    Q.    And that column is there to indicate whether the study was

9    published, an article was written up and published; is that

10   right?

11   A.    Yes.

12   Q.    And for the six studies, there was no publication; is that

13   right?

14   A.    That's right.

15   Q.    In the next column you're listing the type of bias, and

16   you say "publication bias" for all six studies; is that right?

17   A.    Yes.

18   Q.    And that's because there was no article written up and

19   published, the results were never published; is that right?

20   A.    That's right.

21   Q.    And you've reviewed all the results, and you've said that

22   they're negative; is that right?

23   A.    Yes.

24   Q.    And these studies, were some of these done with Neurontin

25   in combination with another drug like Naproxen?

1    A.    Yes.

2    Q.    And what other types of combinations were done here?

3    A.    As I recall without looking at the details of each of the

4    studies, they were in combination with Naproxen much of the

5    time.  I would have to look at the details.  I'm happy to if

6    you want.

7              THE COURT:  Well, how is that significant here?  If it

8    was with Naproxen, why was it negative for Neurontin?

9              THE WITNESS:  Most of these studies had multiple

10   groups rather than just two groups.  They might have had

11   multiple doses of Naproxen and multiple doses of Neurontin.  So

12   it might have been Naproxen at a low dose, Neurontin at a low

13   dose, that's one combination; Neurontin at a higher dose,

14   Naproxen at a higher dose, and then a couple of combinations

15   there, and testing them against placebo or against Naproxen

16   alone or Neurontin alone.  So they often had up to, say, six or

17   so groups that were comparing -- they were comparing

18   combinations of drugs, so would Neurontin work well in

19   combination with another drug, not just alone?

20             How is that relevant here?  I think -- I'm not sure

21   where we're going with this, but sometimes when you have that

22   many combinations, the question is, well, what works?  And so

23   you want to look, if you have, for example, Neurontin plus

24   Naproxen, what's your comparison?  If Naproxen works against

25   placebo, then your comparison of Neurontin plus Naproxen, you

1    want to make sure that the reason it's working is not because

2    Naproxen works, that it's working even better because Neurontin

3    works even better in combination with Naproxen.

4         Is that too confusing?

5         THE COURT:  Let me ask, when it says negative results,

6    is that negative for the combination or negative just for

7    Neurontin?

8         THE WITNESS:  It's negative for Neurontin.  Neurontin

9    provides no extra benefit.  And I will say just as an add-on

10   here, when I'm talking about results, I'm talking about the

11   outcome that was designated in the protocol as set out by the

12   company as the one they were interested in.

13        THE COURT:  I think there's a couple of questions.

14   Yes, go ahead.

15        A JUROR:  Okay.  How often, how common is it to

16   publish -- if you've got a hypothesis that is disproven, how

17   often is that published?  Is it common practice to publish

18   something saying "This did not work"?

19        THE WITNESS:  It's less common than publishing

20   something works, and the source of funding can depend on how

21   often that happens.  So if you look at how often positive

22   results, the results that are published are positive, the

23   percentage is much higher for industry funding than for other

24   types of funding.

25        THE COURT:  Was there another?  Okay, thank you.

Page 45

1          MR. GREENE:  Could we have the next slide.

2          THE WITNESS:  Can I just add to my answer?  Is that

3    allowed?  We don't know the true number, certainly for industry

4    studies, because we don't know what the starting number of

5    studies is.  For industry, all we see is what's published,

6    unless there are law cases like this.  And now with clinical

7    trial registration, we'll see much better, but that's really

8    just started.  So we don't really know for industry for the

9    most part.

10         A JUROR:  Are the early numbers in on what's coming

11   out of the registration?  Are you seeing percentage published

12   out of that so far?

13         THE WITNESS:  Well, we don't -- it's really too early

14   there.  There are studies, though, that have followed all

15   studies that came through ethics committees.  So when a study

16   is conducted in humans, it has to go through an ethics

17   committee at the institutions where those humans are recruited;

18   and they sign a form that say, "By participating in this study

19   one of the benefits is, I will be contributing to medical

20   knowledge."  And so there have been a few studies, and I've

21   done one of them, where we followed all studies that came

22   through an ethics committee to look at what proportion were

23   published, and the ratio of publication of positive results to

24   publication of negative results over all these studies is about

25   three to one.

Page 46

1   Q.   Do we have a slide on migraine studies?  Okay.  Now, there

2   were three migraine studies, is that correct --

3   A.   Yes.

4   Q.   -- that you looked at?  And you looked at the protocols

5   and the internal research reports; is that right?

6   A.   Yes.

7   Q.   And for the first one there, Study 879-200, there was an

8   article, there was an interim result and then no final result;

9   is that right?  Can you explain that?

10  A.   Yes.  This study, the one that's called Wessely 1987, was

11  interesting because the results were published in what's called

12  an "abstract," a short form that was presented at a congress, a

13  conference for medical doctors.  And this is what's called the

14  "gray literature" because these conference abstracts are seen

15  by people who go to that conference, but they're not easily

16  accessible otherwise.  And they published the results as the

17  study was partway through, and at that point -- and this is not

18  typical and it's not considered good science -- and at that

19  point they had positive results favoring the drug for migraine.

20       When the study was finished, if you look at the internal

21  reports, the internal company reports, the drug Neurontin was

22  not useful for migraine, but that was never published.  All

23  that is in the published literature are these interim results

24  where it looks good.

25  Q.   And for that same article, staying on that line, you put

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1    under the heading "Bias," you put "Publication, selective

2    outcome, selective analysis," and "spin."  Could you just

3    briefly take each one of those -- I think you might have

4    covered one of them already -- and tell the jury what you mean

5    by those phrases.

6    A.   So this research study was never published in full.  The

7    final results were never published in full.  They reported on

8    some of the outcomes that they planned to look at but not in

9    the way that they said they were going to look at it.  And one

10   of the ways that you can do this is to say you're going to

11   study all patients with certain characteristics, and then at

12   the end only analyze patients who had different

13   characteristics; let's say everyone who completed all eight

14   weeks of the study and didn't drop out, or everyone who took

15   all their pills, or something else.  So by including this

16   special population that you didn't designate ahead of time, you

17   may be able to get different results than you would have if you

18   included absolutely everybody who entered the study.

19        And then spin is seen when you have results, and let's say

20   your results are, well, for -- I'm making it up because I don't

21   know the exact case here for Wessely.  I'm explaining spin,

22   though.  Let's say you looked at five outcomes or even twenty,

23   and you did have a beneficial effect at three weeks but no

24   other time.  In your conclusion section, you can say, "We found

25   this drug really worked," but in fact it only worked for one of

1    the outcomes that you examined.  That's what I would call

2    "spin."

3                THE COURT:  So who's Wessely?

4                THE WITNESS:  Wessely is the author of the abstract,

5    the conference abstract with the interim results.

6                THE COURT:  Is he a Pfizer doctor?

7                THE WITNESS:  You know, I don't know offhand.  I'd

8    have to look it up.

9                MR. GREENE:  These are the defendants' paid-for

10   studies, your Honor.

11               THE COURT:  Excuse me?

12               MR. GREENE:  These are the defendants' studies.

13               THE COURT:  Is this a Pfizer study?

14               THE WITNESS:  All these studies were funded by Pfizer.

15               THE COURT:  All funded by Pfizer but not necessarily a

16   Pfizer employee?

17               THE WITNESS:  Sometimes Pfizer's employees were

18   authors and sometimes not.  And when we give the first author

19   name, the first author may be someone from an academic

20   institution, but there may be Pfizer employees who aren't the

21   first author, or in some cases they are.

22   Q.   The next study, 945 --

23               THE COURT:  Where did you say this was published?  Not

24   in the --

25               THE WITNESS:  This was published as a conference

1    abstract.  Would you like me to look up the actual conference?

2    Q.   You said that the interim positive results were written up

3    as an abstract; is that right?

4    A.   That's right.

5    Q.   When the study was completed, the results were negative,

6    and they were never disclosed or published; is that right?

7    A.   Right.  We were able to tell that from the internal

8    company research report.

9    Q.   Study 945-217, that's another one of the defendants'

10   studies, correct?

11   A.   Yes.

12   Q.   And you looked at the defendants' protocol and the

13   defendants' research report, right?

14   A.   Yes.

15   Q.   And there was no article written up and published

16   concerning the results of that, right?

17   A.   That's right.

18   Q.   And we're talking about migraine studies here.  That one

19   was also negative; is that right?

20   A.   Right.

21   Q.   And you have there the type of bias, publication bias, and

22   again --

23   A.   That's the only type of bias we can look at since there

24   was no publication.  There was failure to publish.

25   Q.   But you did look at the results, and they were negative;

1    is that right?

2    A.   That's right.

3    Q.   And, finally, the last one, 945-220, you have there Mathew

4    2001.  Well, first of all, 945-220 again is one of the

5    defendants' studies, correct?

6    A.   All of the studies that we're talking about are.

7    Q.   And you looked at the protocol and the research report,

8    right?

9    A.   Yes.

10   Q.   And there was an article written up by Mathew in 2001,

11   correct?

12   A.   Yes.

13   Q.   He was one of the investigators on that study, correct?

14   A.   Yes.

15   Q.   Now, you've written down there under Bias, "Selective

16   analysis; primary outcome redefined."  What do you mean by

17   that, can you tell us?

18   A.   So in this case, the study population was redefined in the

19   publication compared to in the protocol and the research

20   report; and by defining which patients are included in your

21   analysis, you can exclude some patients, and it may make the

22   study look as if the drug works better by excluding some

23   patients.

24   Q.   And that's what you wrote there, "negative results,"

25   correct?

Page 51

1    A.    Yes.

2          MR. GREENE:  We'd move to admit now Exhibits 1056 and

3    612.  The others have been admitted into evidence, your Honor.

4          THE COURT:  All right.

5          (Plaintiff Exhibits 1056 and 612 received in

6    evidence.)

7          MR. GREENE:  Can we have the next slide?  Thank you.

8    Q.    Now, did I provide you with research reports and protocols

9    for bipolar studies that the defendants had conducted?

10   A.    Yes.

11   Q.    And is that what's represented on this slide?

12   A.    Yes.

13   Q.    It's a summary of your findings?

14   A.    Yes.

15   Q.    Let's take the defendants' Study 945-209.  That's by

16   Dr. Pande.  He was an employee of Parke-Davis; is that correct?

17   A.    Yes, that's correct.

18   Q.    And there you say there's an article in 2000, correct?

19   That was published in October, 2000?

20   A.    Yes.

21   Q.    And for that study, under "Bias" you have "Time lag bias,

22   location bias, citation bias," and "spin."  And then you

23   describe the result as "Negative result --"  Well, why don't

24   you start with time lag bias and explain to us, how did this

25   study show a time lag bias?

Page 52

1    A.   So a time lag bias is a systematic tendency to publish

2    later based on study results.  And in this case we have

3    internal documents that show that there was a delay that, you

4    know, was discussed internally.  And so it's not just guessing,

5    is this too long, but there are internal documents that show

6    that there was a plan to delay.

7         So then location bias, this was published in what's called

8    a low-circulation journal, not many people subscribe, and it

9    was a fairly new journal.  It was not handed out as extensively

10   as some of the other articles.  And what was really interesting

11   about the published article from my perspective and the

12   scientist's perspective is that although there were negative

13   findings and this article was published, it really set up a

14   rationale for these negative findings.  And if you look at the

15   internal company documents, there's a lot of discussion about,

16   how do we train our staff when they're questioned out in the

17   medical community to deal with negative results?  And there's a

18   fair amount in internal documents that "Here's the rationale

19   about why we got negative results:  It was our patient

20   population, it was we had a high number of people who responded

21   to placebos," and various rationales.  And this paper sets out

22   a rationale that can be used by anybody, including doctors, for

23   why this study found negative results.

24   Q.   Then the next study is Wang, 945-250, and under the "Bias"

25   column you have "Spin."  Could you explain that.

1   A.   This study was a study that had what's called no control

2   group or no comparison group.  The only group in the study took

3   Neurontin.  And so if you have nothing to compare it with, how

4   can you say it did better?  Did better than what?  And also

5   this is what's called an "open-label study," and that is,

6   everybody knew what the patients were getting.  And so to claim

7   that a drug works when there's no comparison and the patients

8   know what they're getting, that's not considered high-level

9   evidence.

10  Q.   And the final study under bipolar, 945-291, the Vieta

11  study, under "Bias" you have "Selective outcome reporting,

12  selective analysis, spin, misrepresentation of data."  Could

13  you explain those findings.

14  A.   So this is a case -- again, when we get into a lot of the

15  detail, there were so many outcomes in some of these, depending

16  on how much detail you want, I'd really like to look at my

17  notes, but this was a case particularly where -- that you do

18  see from time to time, but there's something -- I guess I'll

19  explain intent to treat here, since it's on the slide.  Is that

20  all right?

21  Q.   Yes, that's quite all right.

22  A.   This is a complex concept for me, for my students, but

23  it's a very important concept, and that is that when patients

24  are randomized, the whole reason that we randomize in a study

25  is that if you -- let's say I'm a surgeon, and I have a

1   brand-new surgery that I'm doing.  It may be that

2   unconsciously, or consciously, I choose people who are less

3   sick to have my new surgery, and patients who are older or more

4   sick I may give that older surgery.  And so we randomize so

5   that the patients in the two groups are as similar as possible

6   on known characteristics that might influence their outcome and

7   unknown characteristics, and that's why we randomize.

8        Now, one of the non-intuitive things here is, some

9   patients don't get what they were randomized to get.  So they

10  may have been randomized to get a particular surgery, but

11  because they were sick on the day, they had a low blood count

12  or whatever, they couldn't get that surgery and they got the

13  other surgery.  They still have to be analyzed as part of the

14  group to which they were randomized as the first analysis.  So

15  even if they didn't take all the drugs or they didn't finish

16  the study, they are still analyzed as part of that group that

17  they were randomized to.

18        That's pretty non-intuitive to most of us, I think, but

19  here's the reason why, and at least why when I learned it as a

20  student it made sense to me, and that is, as soon as you take

21  people out because let's say they didn't finish the study, you

22  have a nonrandomized study.  You're back to the place where you

23  could assign patients to this treatment or that.  And so our

24  rule in analyzing a randomized trial is, the first analysis

25  includes everybody in the group to which they were originally

1   assigned, and then your second analysis can include people who

2   finish the study or who complied.  And what this study did is,

3   they did not do that intention-to-treat analysis; and, as a

4   matter of fact, they chose a very different group for analysis

5   than was originally assigned to each group.

6   Q.   And so what you've been describing is the intention to

7   treat and the per protocol, and this study wrote up the per

8   protocol?

9   A.   Exactly.

10  Q.   And did they disclose that the per protocol that they

11  wrote up was not the intention-to-treat group?

12  A.   No.  They said they randomized -- I forget the exact

13  number in the study but, "We randomized X number of patients."

14  And that's not the number they randomized.  That was the number

15  they analyzed.

16        MR. GREENE:  So I'd move to admit Exhibits 383, 389,

17  469, 1393, 1540, and 1865.

18        THE COURT:  All right.

19        (Plaintiff Exhibits 383, 469, 1393, 1540, and 1865

20  received in evidence.)

21  Q.   The next slide, please.  You looked at nine neuropathic

22  pain studies; is that correct?

23  A.   Yes.

24  Q.   And the study numbers of each one are in the left-hand

25  column?

1    A.    Yes.

2    Q.    Gorson didn't have a study number; is that right?

3    A.    That's right.

4    Q.    That was the defendants' study, though, correct?

5    A.    Yes.

6    Q.    And under "Bias" you have "Location bias, time lag bias,"

7    and "spin," three different types of bias, correct?

8    A.    Yes.

9    Q.    It was published as a letter to the editor after Backonja.

10   Can you explain to us what the biases were and the result

11   there.

12   A.    So in this case, Dr. Gorson had negative results, and

13   there are internal e-mails saying, "We have to delay

14   publication of these results because they're negative."  And

15   eventually the results were published after a long time as a

16   letter to the editor.  Again, this is hard-to-locate

17   literature, and it's not considered as "serious" as a

18   full-length article in a journal.  And so eventually the

19   results were put out there, but there was spin as to the

20   results.  Again, I'd have to look at my notes.  As I recall,

21   something in the conclusions about -- that seemed to favor the

22   drug even though the results were negative.  And they were

23   published in a hard-to-find location, and it took a long time

24   to get those results out there.

25   Q.    Okay, the jury will hear from Dr. Perry next week, a pain

1  specialist, who's going to spend time talking about this, but

2  just to finish this first line, you have there in the "Result"

3  section "Published as a letter to the editor after Backonja."

4  We've heard some testimony about Backonja.  Backonja was the

5  one that was published in JAMA, correct?

6  A.   That's correct.

7            THE COURT:  And to remind the jurors what JAMA is?

8            THE WITNESS:  Oh, sorry.  JAMA stands -- it used to

9  actually be called the Journal of the American Medical

10 Association, but it was shorthand to JAMA formally, I don't

11 know, ten or fifteen years ago.  But of the U.S. general

12 medical journals -- that is, covering all of medicine -- I

13 would say it's one of the two big ones, the New England Journal

14 of Medicine and JAMA.

15 Q.   And, again, the jury has heard some testimony about this,

16 but both of these, Gorson and Backonja, were studying Neurontin

17 and neuropathic pain, correct, DPN?

18 A.   Correct.

19 Q.   And Gorson was negative and was published as a letter to

20 the editor, correct?

21 A.   Yes, after Backonja.

22 Q.   And the Gorson results were available before the Backonja

23 results; isn't that correct?

24 A.   Yes.  Because of the time lag bias, what the company did,

25 and you can tell this from the internal documents, is, they

1   delayed publication of Gorson till after the positive results

2   were published in a journal that has a high impact, that has

3   high visibility.  So they waited till that news was out to

4   publish the negative results.

5   Q.   Now, I didn't provide you with the marketing materials,

6   the CMEs and things like that, correct?

7   A.   No.  I didn't see those.

8   Q.   You concentrated on the protocols and the research reports

9   and documents, internal documents that pertained to those, not

10  the marketing side; is that correct?

11  A.   From my perspective, I focused on whether good science

12  happened.

13  Q.   And the next study, 945-210, that's Backonja.  And you

14  have "Design bias" and then "Results:  Investigators aware that

15  CNS side effects could unmask patients."  By "unmask," do you

16  mean unblind?

17  A.   Yes.  I'm sorry, I use the term "unmasked" because some of

18  my research is in eyes and vision, and blindness is an outcome,

19  and we use the term "masking."

20  Q.   But it means blinding?

21  A.   It means blinding.

22  Q.   So why did you write --

23            THE COURT:  Just back up because --

24            THE WITNESS:  What does "blinding" mean?

25            THE COURT:  So just to give us a short summary, what

Page 59

1  does Backonja say, and why in your view was that not correct,

2  just because without understanding the --

3           THE WITNESS:  What does this say?

4           MR. GREENE:  This is the line I'm on, your Honor.

5           THE COURT:  If you could do that on each one, what

6  actually was the result, and why do you think, if you do, that

7  it was unfair or biased?

8           THE WITNESS:  What are the results, and why was it

9  unfair?

10          THE COURT:  In other words, we heard a little bit

11  about each one of these studies, but it's hard to remember, so

12  just maybe -- so they're smiling because everyone went through

13  it really fast yesterday, so we may not remember what Backonja

14  said.

15          THE WITNESS:  Right.  Okay, yes, I agree.  I agree

16  very much.

17          So Backonja found that Neurontin worked for

18  neuropathic pain, and it was probably the most dramatic

19  publication from this list of studies, and it was published in

20  a high-impact journal.  However, I think you'll hear from

21  someone else that there was a design problem with Backonja, in

22  that when you give Neurontin at very high doses, it may be

23  possible to detect, because of the side effects, which drug the

24  patient is on.

25          There are different kinds of bias with the design of

1   clinical trials that are very important.  I've been mainly

2   talking about reporting and how you can keep from getting the

3   correct results out into the literature, but in the design of

4   the study itself, you can have problems so that it's not a very

5   well-designed study, and maybe it shouldn't be given as much

6   weight when you're deciding what the evidence is.

7           So Backonja had a design problem that meant that the

8   patients and/or the doctors might be able to figure out which

9   drug the patient was on.

10  Q.   And when the patient can figure out which drug he's on or

11  if a doctor can figure it out due to the side effects, what

12  impact does that have on the study?

13  A.   Well, within the design of the study, there are two things

14  you do to minimize bias; that is, a systematic diversion from

15  the truth.  The first is to randomize so that you get those two

16  groups as similar as possible.  And the second is what's

17  called -- this is jargon, I apologize -- it's called

18  "information bias."  That is, the bias you get back from the

19  patients and the doctors you want to be unbiased.  So if

20  they're asking a patient, "Well, how's your pain doing?" you

21  don't want the patient or the doctor to know what drug they're

22  on because that might influence whether they think they're

23  getting better.  If I knew I was on placebo, what are the

24  chances I'm going to say that I feel better?  If I knew I'm on

25  the test drug, and I think often people want to be on the new

1    or test drug, it might influence you to say, "I feel better."

2         And what double blinding is about, blinding is of

3    either/or, or both, the patient where the patient doesn't know

4    what they're getting, the doctor so the doctor doesn't know

5    what they're getting, and sometimes it can be the person doing

6    this statistical analysis so they aren't influenced.  And in

7    this case, if the patients or the doctors know what the drug is

8    because at a high dose there are lots of side effects, it might

9    influence them to say that their pain is getting better.

10   Q.   And the reason you have design bias for Backonja is

11   because the patients knew they were experiencing side effects?

12   A.   Because there was possible unblinding because of the side

13   effects.

14   Q.   Because of the side effects.  And when a double-blind

15   randomized controlled trial was unblinded, then does it fall

16   from level one evidence to level two evidence?

17   A.   Level one -- again, I wouldn't say it that way.  Here's

18   how I'd say it, is that level one evidence is classically the

19   randomized control trial or systematic reviews of randomized

20   trials.  But within a randomized trial, just because it's

21   called a "randomized trial" doesn't mean that it's high-level

22   evidence because of these design biases.  So if I were

23   analyzing the results of a clinical trial and looking at

24   potential bias, I would say, is it randomized?  Did the

25   randomization appear to be well done?  Did people know what

1   they were going to get next, and was there blinding?  And if it

2   wasn't blinded, then it would still be a randomized trial, but

3   I would think there was a big chance for bias.

4   Q.   All right, I want to drop down to Reckless, 945-224.  You

5   looked at the study protocol and research report for that?

6   A.   Yes.

7   Q.   Okay.  Now, you have under Article "Not published as full

8   article."  Can you explain that?

9   A.   Yes.  This is another case where the internal company

10  documents showed that they did their best to prevent the data

11  from this trial to get into the public domain, and Dr. Reckless

12  was very concerned about this.  As the lead investigator, he

13  wanted his results to be published and was concerned, and there

14  was a lot of back-and-forth with the company, and you can read

15  the company's e-mails saying how they're going to try to delay

16  him and that they don't want this information out.

17       At the end of the day -- these were negative results, by

18  the way.  They did not show a benefit for Neurontin for

19  neuropathic pain.  And at the end of the day, what they did

20  was, they inserted the Reckless results into a combined

21  analysis that was also published in another article by

22  Backonja.  So you actually never got the results of the

23  Reckless study alone.  You couldn't tell what was done.  You

24  couldn't tell what the statistical significance was.  There

25  really was very little information about it.  It was inserted

1    as a line in a table with several other studies.

2            THE COURT:  And what year was it put in that article

3    by Backonja?

4            THE WITNESS:  This is another article by Backonja.

5    It's not the Backonja 1998 article.  It's a different one in a

6    different journal.

7            THE COURT:  Do you know when that was published?

8            THE WITNESS:  Was it 2003?  I'm sorry, I would have to

9    look up the exact date.

10           MR. GREENE:  It was Clinical Therapeutics in 2003.

11           THE COURT:  Does that sound right?

12           THE WITNESS:  Yes.

13           MR. GREENE:  Dr. Perry will be talking about that.

14   Q.   Can we just have the next slide because you mentioned, in

15   connection with the Reckless study you mentioned e-mails.  Can

16   we have that up.  We just highlighted some of the e-mails here

17   over a period of time from April, 2000, down to July, 2001; is

18   that correct?

19   A.   Yes.

20   Q.   And these are the defendants' e-mails, correct?

21   A.   Yes.

22   Q.   The first e-mail, it says they'd love to publish something

23   about -- again, that's Reckless, 224 -- "But Donna McVey made

24   it very clear that we should take care not to publish anything

25   that damages Neurontin's marketing success."  Is that right?

1    A.    Yes, that's correct.

2    Q.    The next one down, October, 2000, again, now this is

3    commenting upon how they're going to write it up.  They want to

4    delay the publication as long as possible and from where it's

5    published; is that right?

6    A.    That's right.

7    Q.    And this indicated to you that when they say "we" write up

8    the study, the company was going to write up the study?

9    A.    Yes.  So when a company writes up the study, this is

10   considered a serious deviation from scientific practice, unless

11   it's acknowledged that that's what's happened, because it gives

12   those who stand to benefit the chance to frame how everything

13   is stated.  You really want the scientific investigators to

14   write up what happened.  That doesn't mean that a drug company

15   can't be part of a publication if those were investigators on

16   the study, but you don't want somebody writing up a study who

17   is trying to frame how things are presented rather than the

18   science.

19   Q.    In the next line they say they're using a medical agency

20   to write up the study, to put the paper together; they'll show

21   it to Dr. Reckless; they're not allowing him to write it up

22   himself.  Is that correct?

23   A.    That's correct.

24   Q.    Then in November, 2000, another internal e-mail of the

25   defendants; is that right?

Page 65

1    A.    Yes.

2    Q.    The negative study is Reckless, and they're not in a hurry

3    to publish it; is that right?

4    A.    Yes.

5    Q.    And then, finally, in July, 2001, another company

6    reference, internal reference to Reckless:  "The team agrees

7    the study should not be pushed for publication."

8    A.    Yes.

9    Q.    They'll follow up with study manager in Germany to confirm

10    this decision, correct?

11    A.    Yes.

12    Q.    All right, if we could go back one slide, I think we have

13    a couple more of these, and then we'll be finished with the

14    neuropathic pain studies.  The next one is Serpell.  I'm on

15    Line 945-306.  That was a defendants' study as well, correct?

16    A.    Yes.

17    Q.    And Serpell was one of the investigators; is that right?

18    A.    Yes.

19    Q.    You say there's an article published in 2003?

20    A.    Yes.

21    Q.    "Various biases," and the results, "Negative findings were

22    obscured."  Could you explain what you mean with various biases

23    and that the negative findings were obscured?

24    A.    Well, again, for me to be highly specific, I'd like to

25    look at my notes here just so I'm precise.  But as I recall

Page 66

1   with Serpell, what happened is that he did write up his results

2   which were negative; and by the time they made it into print,

3   when you looked at the results, it didn't match what was in the

4   internal company report.  It was said in a way that was more

5   positive than what really happened.

6   Q.   Did you read a study, the POPP study, the next line,

7   945-271?

8   A.   Yes.  That study actually was published after my report to

9   you, and it was a study that took a long time to publish, and

10   again there are e-mails about delaying this publication because

11   of the negative results.

12        MR. GREENE:  Could we have that e-mail up.  I think

13   it's the slide after Reckless.

14   Q.   This is the e-mail you're referring to?

15   A.   Yes, it is.

16   Q.   And again the defendants' e-mail, they've written, "We now

17   have two studies that are negative for the primary efficacy

18   parameter, both of which have authors who are eager to publish.

19   The delay created by completion of the substudy would allow us

20   to optimize the timing between the release of the two studies."

21   A.   Right, so in this case the company undertook a substudy in

22   four of the clinical sites where patients were being recruited

23   as part of a way to delay publication, according to the e-mail,

24   so that they could say, "Well, we aren't done yet."

25   Q.   You say it took six to eight years to publish, and that's

1   time lag bias; is that correct?

2   A.   Yes, we would call that time lag bias because it was

3   negative results, which were eventually published but they were

4   delayed, in this case you can see deliberately.

5   Q.   945-276, that's another one of the defendants' studies,

6   correct?

7   A.   Yes.  Dr. Caraceni is the first author, I think.

8   Q.   And there was an article in 2004, and why do you say that

9   that shows various biases?

10  A.   Again, this is a case where, if it's all right with you,

11  I'd like to look at my notes.

12  Q.   Yes, please do.  You brought them with you.

13  A.   Yes.

14       (Witness examining documents.)

15  Q.   Okay, so with Dr. Caraceni's paper, he misreported the

16  dates of enrollment that patients were enrolled and did not --

17  it was interesting because in the paper there's -- remember I

18  told you that when you look at a randomized study, just because

19  it's randomized, which is considered level one evidence, the

20  highest level of evidence, that doesn't mean it's necessarily a

21  good study, and it might be because it's not blinded.  But

22  another one of the ways randomized studies are judged is

23  whether the doctors could see which treatment was going to be

24  the next one.  Even if they didn't know what it was, A or B,

25  they might be guessing.  They're only human.  And if you can

1    see that B is going to be next -- for example, by a list on the

2    wall that says A, B, B, B, A, and you can see B is next -- you

3    might say, "Oh, this patient in front of me is very sick, and I

4    believe B is placebo, and so I'm going to wait.  I'm going to

5    say, 'Why don't you sit over there till we do this other

6    patient, we're going to put this other patient in here.'"  And

7    so not being able to see which treatment is next is very

8    important in a good study, and it's become very important in

9    the literature that people do this.

10       Well, there is nothing in the internal company documents

11   to show that this study concealed the allocation from the

12   doctors about what was next, but they put in the paper that

13   they did conceal allocation.  We don't know if it happened or

14   not.  So if a study is being judged as to its quality, that

15   would be -- all of a sudden now it would be elevated to a

16   higher quality, which it may be, but it certainly didn't appear

17   anywhere in its internal documents.

18       Also, the patients to be included in the

19   intention-to-treat analysis were defined differently in the

20   internal company documents than were defined in the

21   publication, so that was switched around, how they defined an

22   intention-to-treat analysis.

23   Q.   How about the next study, 945-411, Gomez-Perez?

24   A.   Yes.

25   Q.   An article in 2004, again various biases, and you say

1    "Repeats Backonja design bias."  Can you explain the biases to

2    us?

3    A.   So there were a number of issues with the Gomez-Perez

4    articles.  The first is that they had this problem.  It was an

5    open-label study.  That is, patients could see what they were

6    getting.  It was randomized, but everybody knew what they were

7    getting, so they weren't blinded or masked to the treatment.

8    And so that might change how either doctors or patients

9    responded and said they were responding.

10       The higher doses, patients may have known definitely what

11   they were on, even though it was unmasked, so that was a

12   problem.

13       Let's see.  It was interesting here.  Citation bias is one

14   that we haven't talked about, but it's a reporting bias where

15   if you're writing up your results in your publication and you

16   want others to see my results are bolstered by the results

17   found by these other studies, you could cite other studies, or

18   you could cite studies that were different from your own.  Now,

19   a good scientist would cite all the other studies, and, as a

20   matter of fact, good journals like Lancet require that you look

21   at all the other studies when you report a clinical trial and

22   not just cite whichever ones you want.

23       They cited what they called positive results.  In this

24   case they cited Dr. Gorson's study and Dr. Serpell's study,

25   which I would call negative, but they cited them as positive

1    results.  So if somebody hadn't had the time to go back and

2    read all the studies, they would say, "Oh, wow, there are three

3    positive studies now.  This must really work."  In fact those

4    two studies that were cited weren't positive.

5    Q.   How about the next study?  It just has a number there,

6    A9451008.

7    A.   This study had no publication.  And so it actually had

8    statistically significant findings.  Now, this is a quirk of

9    statistics, but you can imagine that if you had a lot of people

10   in a study, you could find that there's a difference between

11   two groups, let's say two families and their heights.  So if

12   you had, you know, an extended family over here and their

13   heights and an extended family over here and their heights,

14   they could be statistically different, on average, five-foot

15   three and five-foot three and a half, but does that matter?

16   And so in this case they had a statistically significant

17   difference but not what we call a clinically significant

18   difference, something that doctors would be interested in.  So

19   there was a difference in pain scores, but, you know, it was

20   hardly anything.

21   Q.   And, finally, Dallocchio, there's no study number, but

22   Dallocchio you have citation bias and it doesn't cite Morello.

23   Can you explain that to us.

24   A.   So there was a study by Dr. Morello done a year before

25   that had shown no benefit, but they failed to cite that.

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1          MR. GREENE:  I move to introduce Exhibits 192, 194,

2     373, 381, 382, 1250, 1552, and 1986.

3          (Plaintiff Exhibits 192, 194, 373, 381, 382, 1250,

4     1552, and 1986 received in evidence.)

5          MR. GREENE:  If you could go to the slide on Serpell

6     he will.

7     Q.   Serpell, 945-306, that was one of the studies you

8     reviewed, correct?

9     A.   Yes.

10    Q.   And the subject here is "Spinning Serpell."  Did you see

11    that?

12    A.   Yes.

13    Q.   This is a document from David Cooper, who's MAC, Medical

14    Action Communications, Inc. to Angela Crespo, a Pfizer

15    employee; is that right?

16    A.   Yes.

17    Q.   It's an e-mail that we've blown up?

18    Q.   The second sentence there states, "If Pfizer wants to use,

19    present, and publish this comparative data analysis in which

20    two of the five studies compared make the overall picture look

21    bad, how do we make it sound better than it looks on the

22    graphs?"  Right?  This is concerning the Serpell study?

23    A.   Yes.  So what this e-mail or mail is asking, and it's from

24    this company, what I would call ghostwriters but a Medical

25    Action Communications company, they are preparing a poster that

1   includes the Serpell study, and they want to make the Serpell

2   results look better than they were, and they're saying, "How

3   can we spin the results of the Serpell study?  How can we write

4   it up so that it looks better?"

5          MR. GREENE:  I'd move to introduce this as

6   Exhibit No. 263.

7          THE COURT:  All right.

8          (Plaintiff Exhibit 263 received in evidence.)

9          MR. GREENE:  And I'd move to introduce Exhibit 175,

10  the POPP slide that we reviewed a little bit earlier.

11         (Plaintiff Exhibit 175 received in evidence.)

12  Q.   Now, Doctor, a little bit earlier in the morning you had

13  talked about the Cochrane Collaborative, and I want to ask you

14  a question about that.  The medical literature that the

15  Cochrane Collaborative reviews and puts out there, are they

16  available to physicians all across the country?

17  A.   Yes.  It's available through John Wiley & Sons.

18  Q.   And that's the scientific evidence, the evidence-based

19  that physicians and health plans like Kaiser would rely upon?

20  A.   Yes.

21         MR. GREENE:  I move to introduce a copy of your

22  journal article as Exhibit 2091.

23         (Plaintiff Exhibit 2091 received in evidence.)

24  Q.   Now, I want to ask you just one or two more questions.  If

25  there is bias, a deviation from the truth that directs the

1   negative results to be represented as positive or negative

2   results to be suppressed, does that impact the medical

3   community?

4   A.   Yes.   The way the practice of medicine works is that

5   researchers, who often treat patients as well, but some people

6   are just researchers, do the research.   And then the research

7   is judged by the journals to be of sufficient quality to be

8   published, and that publication is the record of the research

9   that has been conducted.

10       Now, how does a doctor who either graduated yesterday or

11  graduated twenty years ago stay up with the times and what's

12  known in research?   And they want to know what's known in

13  research so they can give the best treatments to patients.

14  They know it through the medical literature.   That is the only

15  source of information they have about what works and what

16  safety is.   And so if we don't have an accurate scientific,

17  transparent picture of what happened, then doctors can't

18  practice good medicine.

19       MR. GREENE:   Thank you, Doctor.

20  CROSS-EXAMINATION BY MR. HOOPER:

21  Q.   Good morning, Dr. Dickersin.

22  A.   Good morning.

23  Q.   How are you?   I'm Jim Hooper, and I have a few questions.

24  I just want to start by talking about and making sure I

25  understand what your assignment in this case did not include.

1    You understand this case is about whether Kaiser doctors were

2    tricked into prescribing Neurontin?  You understand that?

3    A.   I know what my assignment was.  I don't know the legal

4    details.  I know what my assignment was to look at and report

5    on.

6    Q.   Let me show you and move Exhibit 923, a document Bates

7    number Kaiser 040152 entitled "Neurontin Providers."  And,

8    Dr. Dickersin, if you would, you'll see this document is titled

9    "Neurontin Providers," and I'll represent to you it's a

10   document we've been talking about --

11            THE COURT:  You need to keep your voice up.

12   Q.   This is a document we've been talking about a lot in the

13   case, and it's a list of Neurontin providers who wrote

14   prescriptions that Kaiser is seeking to recover for.  I take it

15   you wouldn't be able to tell us the names of any Kaiser doctors

16   who read one of the publications you talked about by name.  No?

17   A.   I wouldn't be able -- if I knew anybody on the list, I

18   wouldn't know what publications they've read.

19   Q.   So, Doctor, your assignment didn't include identifying the

20   specific Kaiser doctors that were defrauded or duped or tricked

21   according to the plaintiffs?  That was not part of your job,

22   right?

23   A.   No.  Mine was to look at the science and the reporting

24   of -- the transparent and accurate reporting of what had been

25   learned in the Pfizer-sponsored studies.

1    Q.    How much time did you spend on this case, Doctor?

2    A.    For writing up my report, 190 hours.

3    Q.    And what was the hourly rate of compensation you were paid

4    for your work in this case?

5    A.    I wasn't paid.  The money that I would have made, which

6    was $400 an hour, was given to Johns Hopkins University to an

7    educational fund for a scholarship related to reporting biases.

8    Q.    You created a fund at the department where you work at

9    Johns Hopkins, right?

10   A.    Yes, it is.

11   Q.    And you control that fund?

12   A.    Yes, I do, but they certainly -- I will say that my

13   department controls how I use funds.  So, for example, if I

14   wanted to go out to dinner and buy you a bottle of wine, they

15   would not allow that.

16   Q.    180 hours you said, is that right?

17   A.    190 hours.

18   Q.    190 hours.  You were retained by Mr. Greene beginning in

19   February, 2008, as I understand; is that right?

20   A.    Yes.

21   Q.    And you wrote and signed an expert report in this case in

22   August, 2008?

23   A.    Yes.

24   Q.    And your report sets out your opinions and reasoning?

25   A.    Excuse me?

1   Q.   Your report sets out your opinions and reasoning in the

2   case?

3   A.   Yes, yes.

4   Q.   And during those 190 hours, you didn't do any research in

5   connection with preparing your report to determine whether

6   doctors and decision-makers were led to believe that Neurontin

7   was effective when it is not; is that correct?

8   A.   Sorry, that was a long thing.  During the time I was not

9   doing the 190 hours or I was doing the 190 hours?

10  Q.   Let me ask it again, Doctor.  In the 190 hours that you

11  spent preparing your report, you did not do any research to

12  determine whether doctors and decision-makers were led to

13  believe that Neurontin was effective when in fact it's not; is

14  that correct?

15  A.   That's right.

16  Q.   And you gave a deposition in this case in January, 2009;

17  is that right?

18  A.   Yes.

19  Q.   And between the time you were retained and your

20  deposition, you spoke with Kaiser's lawyers between ten and

21  twenty times; is that right?

22  A.   Kaiser's lawyers?  I -- oh, certainly I spoke with

23  Mr. Greene and other lawyers, yes.  I was thinking Kaiser.

24  Q.   You understand Kaiser is your client in the case?

25  A.   Yes, I do.  I'm sorry.

1    Q.    No problem.

2    A.    I tend to think of people by name rather than their

3    company.

4    Q.    I understand.  And up to the time you completed your

5    report, you hadn't met any Kaiser doctor in connection with

6    this case, had you?

7    A.    Not about this case.

8    Q.    And you hadn't spoken with any Kaiser doctor about

9    Neurontin, right?

10   A.    No.

11   Q.    In your report and in your testimony today, I believe you

12   expressed the opinion that the Neurontin studies you looked at

13   had deceived the medical community about the effectiveness of

14   Neurontin for migraine and bipolar disorders and pain.  Is that

15   a fair summary?

16   A.    Yes.

17   Q.    And your opinion is that, according to the material you

18   looked at, Neurontin is not effective for migraine or bipolar

19   or pain patients; is that fair?

20   A.    The studies that I looked at overall did not appear to

21   show efficacy.

22   Q.    Do you know whether since you signed your report in

23   August, 2008, and gave it to Kaiser's lawyers, has Kaiser

24   stopped its doctors from prescribing Neurontin?

25   A.    I don't know.

1    THE COURT:  Do you know anything about what Kaiser has

2    or hasn't done?

3    THE WITNESS:  I know nothing about what Kaiser is

4    doing on this particular issue.

5    Q.   Dr. Dickersin, you mentioned something you called a

6    "cherry-picking" as a source of bias earlier today.  Do you

7    recall that?

8    A.   Yes.

9    Q.   And does that mean choosing the information you like

10   rather than considering all of the information?

11   A.   It's not exactly how I was using it.  I was using it, for

12   example, in the case of one designates per scientific rigor

13   which outcome you're going to be examining in the protocol, and

14   then highlighting a different outcome in the publication.

15   That's how I was using the term "cherry-picking."

16   Q.   So it's a selection of information that favors you?

17   A.   But I was being quite specific about which information,

18   just so that's there.

19   Q.   And you told the jury that you were, if I got your words

20   right, "always asking for more information in this case."  Do

21   you remember telling them that?

22   A.   Yes.

23   Q.   When Mr. Greene first contacted you back in February,

24   2008, or thereabouts, you and Mr. Greene agreed that you would

25   be given documents to review, correct?

1  A.   Yes.

2  Q.   And Mr. Greene and his colleagues, not you, identified the

3  specific materials that you'd be sent?  True?

4  A.   True.

5  Q.   And the lawyers, not you, chose which documents that you

6  would review, correct?

7  A.   In the initial mailing, yes, but as I read, I saw there

8  was additional information that I needed.  For example, not all

9  of the research reports and the protocols included a

10 statistical analysis plan.  And so one of the times -- many of

11 the times I went back to them, it was, "We don't have a

12 statistical analysis plan for every single study.  Could you

13 please check and make sure it's not everywhere?"  And then what

14 we got back wasn't always called a statistical analysis plan,

15 which I expected.  Sometimes it had another name.  And so I

16 said, "Would you please go back and check and make sure there

17 is nothing else with a different or similar name so that we're

18 not missing anything."

19      Another example is, sometimes it was hard to determine the

20 timing of the document, so we couldn't tell whether a report

21 was done -- and in one case it was -- after the publication, or

22 in the right order things should have been done.  And so we

23 asked and said, "This isn't dated" or "This isn't signed, could

24 you please look and see if there are documents with the dates

25 or the signatures," and they would go back and look for more

1   documents.  So I had every opportunity to ask for documents

2   that might have helped me verify that what we thought we were

3   seeing was in fact true, and we were able to verify that.

4   Q.   Isn't it fair to say, Dr. Dickersin, that you had in fact

5   a specific agreement that you would only review key documents

6   because you didn't have time to review the rest of it?

7   A.   I wouldn't say that was our agreement.  We actually wanted

8   to make sure -- we had a specific topic that I was responsible

9   for but not specific documents.  As a matter of fact, at one

10  point, because we weren't seeing everything that we wanted to

11  see, I asked, where is the document that shows exactly what we

12  should have?  And I looked at that -- that is, from the

13  defendants -- and in fact, if those documents really existed,

14  they should have been sent to us.  And we didn't have signed

15  documents all the time or a statistical analysis plan all the

16  time, so either they weren't done or they weren't sent to us.

17  Q.   Dr. Dickersin, you recall giving a deposition in this case

18  back in January, 2009, correct?

19  A.   Yes.

20  Q.   You remember that.  And you remember you were sitting with

21  a court reporter and testifying under oath and that sort of

22  thing.  Let me ask you to look at a transcript of your

23  deposition.  Let's go to Page 54.  And we may use this some, if

24  you'd follow along with me from Line 7 down.  Tell me if I read

25  correctly.  "Question:  Do you recall what Mr. Greene said you

1    were expected to do?"  Your answer, "Write an expert report

2    after reviewing documents."

3             MR. HOOPER:  Mr. Alba, can we have the Elmo, please.

4    Q.   This is Page 54 Line 7, Doctor.  "Do you recall what

5    Mr. Greene said you were expected to do?  Answer:  Write an

6    expert report after reviewing documents.  Question:  And

7    anything else you recall about that?  Answer:  No.

8    question:  Number 2 referring to your notes refers to

9    'agreement only to get key documents.'  Do you know what that's

10   referring to?  Answer:  I did not want to, ah -- I understand

11   that there are many pages of documents related to this case.  I

12   did not want to have to read them all.  Question:  Because

13   there were just too many and you didn't have enough time?

14   Answer:  I didn't have time.  I wanted to focus on what I was

15   supposed to do.  Question:  So this is reflected in your

16   agreement that you wouldn't get all the documents, you would

17   only get the key documents; is that correct?"  Your answer,

18   "Yes."

19        Dr. Dickersin, the fact is, everything you received in

20   this case came in a box from the plaintiffs' lawyers in this

21   case, right?

22   A.   That's not true because -- that was the initial thing that

23   we received, but I probably received almost as much by all the

24   requests that I put in subsequently where I felt I wanted

25   additional information.

1    Q.    That testimony that you gave in January was given after

2    you had signed your report in this case, correct?

3    A.    After I had decided to report this case?

4    Q.    After you had signed your expert report in this case six

5    months earlier, correct?

6    A.    Yes, that's true.  But I did ask for extra documents in

7    preparing that report as well.  I guess I -- I mean, I don't

8    want to beat a dead horse.  I just want to make it clear what I

9    reviewed.  I asked for and received everything that I asked

10   for, no questions asked, and so I did not just review what was

11   handed to me.

12   Q.    Dr. Dickersin, did you ever, just out of curiosity, go on

13   the computer and see just how many publications there are about

14   Neurontin and gabapentin?

15   A.    When we first got the documents, we looked to see

16   whether -- we started with migraine and went on to say, well,

17   what's been done in migraine?  And, you know, as a systematic

18   reviewer, trying to identify all the available evidence is not

19   a quick and dirty MEDLINE search.  And so I decided this really

20   wasn't the task that I had been asked to do.  The task was to

21   say, what was the science behind what was reported in the

22   literature in the studies conducted by Pfizer?  And so I stuck

23   to that.

24   Q.    You have access, particularly as someone who reviews

25   literature as a large part of your career, correct, you have

1    access to a number of databases where copies of publications

2    can be found, sort of like doing a Google search, don't you?

3    A.    Yes.

4    Q.    How long would it have taken you to go on, say, the

5    National Library of Medicine's PubMed or MEDLINE database and

6    just check how many publications there are that not only have

7    gabapentin or Neurontin somewhere in the article but that have

8    it in the title?  It would take what, ten seconds?

9    A.    I can answer your question, but I don't think that that's

10   informative.  So it would take me very few seconds to say how

11   many articles have gabapentin in the title, but that doesn't

12   mean anything.  That isn't studies that examined gabapentin.

13   It's not high-quality studies.  They may have nothing to do

14   with gabapentin other than having it in the title.  So doing a

15   search like that, this is something very important that we

16   teach is, doing a quick and dirty search like that really tells

17   you nothing.  You have to do a very complex series of steps to

18   get you good information about a treatment.

19   Q.    Sure.  You'd have to actually read all those other studies

20   to see what you made of them, right?

21   A.    I'm talking about just the search.

22   Q.    Sure, you'd have to start with the search term and then go

23   read the articles, right?

24   A.    My search would go beyond typing in the term "gabapentin."

25   Q.    And you didn't do that in this case, did you?

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1  A.   No.

2  Q.   And you can't tell us anything about whether any Kaiser

3  doctors have done those kind of searches and read other

4  materials that they found that way either, can you?

5  A.   No.  I -- I'm sorry, I don't see how that relates to

6  looking at whether the papers from Pfizer reflected the science

7  behind them.

8  Q.   Dr. Dickersin, the sum total of all the studies that were

9  on the slides that you showed us today number twenty-one; is

10 that correct?

11 A.   Yes.

12 Q.   Do you have any idea whether that represents 100 percent

13 or half or 10 percent or 1 percent of all of the randomized

14 controlled clinical trials that are available about Neurontin?

15 A.   I don't know, but I asked the lawyers for this case

16 repeatedly whether there were any Pfizer-conducted studies on

17 these topics, so I think that was the relevant question here.

18 Q.   Doctor, you said you teach a course in systematic reviews?

19 A.   Yes.

20 Q.   Certainly looking at twenty-one studies given to you by

21 someone else without double-checking to even know if that's all

22 of it, that's not the way you teach your students to do it, is

23 it?

24 A.   What is the question that you would be addressing by

25 asking me to do that?  That's -- I wasn't doing a systematic

1    review here.  I was looking at the publications funded by

2    Pfizer on these topics to see whether the publications

3    reflected the science.  I was not doing a systematic review of

4    all the literature on Neurontin.

5            MR. HOOPER:  Can we switch back to the laptop, sir.

6    Q.   Dr. Dickersin, you talked earlier this morning about three

7    circles that you typically use in looking at evidence-based

8    medicine.  Is that it on the screen?

9    A.   I haven't seen "Best External Evidence," but, I mean, it's

10   not usually worded that way, but --

11   Q.   That's essentially what you're talking about?

12   A.   But it's the idea.

13   Q.   And these circles are called a Venn diagram, right?

14   A.   Uhm, yeah.  I haven't seen EBM in the middle like that

15   either, and I certainly have never seen a title like "The EBM

16   Triad," but there are many ways to depict these things.

17   Q.   And the three rings of the circle are "Best external

18   evidence."  That would be studies and publications like we've

19   been talking about, correct?

20   A.   We would call this a three-legged stool, for example,

21   that --

22   Q.   Well, one leg of the stool would be --

23            THE COURT:  Excuse me.  For what?

24   A.   Yeah, for what?  For evidence-based healthcare.

25   Q.   For evidence-based healthcare.

1    A.    That's why I'm not sure it's just that center.

2    Q.    And that EBM refers to evidence-based medicine, something

3    that we've all heard about a lot, correct?

4    A.    Yes.

5    Q.    So it's a three-legged stool, Doctor, and one leg is "Best

6    external evidence," and in that leg would be things like

7    randomized controlled trials?

8    A.    Yes.

9    Q.    Publications, correct?  And another leg would be

10   "Individual clinical expertise," and another --

11   A.    It's not just expertise, by the way.  It's knowledge is

12   what goes there, not just expertise.

13   Q.    And a third leg would be "Patient values and

14   expectations"?

15   A.    I haven't seen it written exactly that way, but that's the

16   gist.

17             THE COURT:  Well, what does that mean?

18             THE WITNESS:  "Patient values" is the way it's usually

19   written.

20   Q.    And as the diagram indicates, it's the intersection of

21   each of those three things that makes up evidence-based

22   medicine, correct?

23   A.    No, I have to say that I have not seen the intersection.

24   As I said, there are three legs to a stool, and the top of the

25   stool is evidence-based healthcare.  It's not -- I haven't seen

Page 87

1    it written this way where it's that very small intersection.

2            MR. HOOPER:  Can we go back to the laptop, please.

3    Q.   Dr. Dickersin, I'd like to turn now from your role in the

4    case and what you reviewed to some of your views on publication

5    bias.

6            MR. HOOPER:  Your Honor, I'm going to admit this.

7    Q.   Dr. Dickersin, let me show you this paper and ask you if

8    you recognize it.  I think you'll recognize it as one of your

9    own.

10   A.   Yes, I do.

11   Q.   Doctor, you've been writing about publication bias since

12   1993 or earlier, correct?

13   A.   Yes.

14   Q.   When did you first begin studying publication bias and

15   publishing on it?

16   A.   Well, I think my first -- let me see.

17           (Witness examining document.)

18   A.   I think my first article was 1990 on publication bias.

19   Q.   And you wrote this article that I've just shown you in

20   1993, correct?

21   A.   Yes.

22   Q.   And this is titled "NIH Trials and Publication Bias."  NIH

23   refers to National Institutes of Health, correct?

24   A.   Yes.

25   Q.   That's part of the federal government, not a

1    pharmaceutical company, correct?

2    A.    Yes, it is.

3    Q.    It's the part of the federal government that funds medical

4    research like clinical trials, right?

5    A.    That's right.

6    Q.    And you looked at in this study -- if we can look at the

7    abstract on the next page, in this case of federal government

8    sponsored trials of yours in 1993, you examined 293

9    government-sponsored trials that had been funded in 1979,

10   correct?

11   A.    Yes.

12   Q.    Okay.  And these National Institutes of Health studies

13   that you looked at in your 1993 paper, those were completed

14   before Neurontin even existed, correct?

15   A.    Uhm, yes.  Yes, it's 1979, yes.

16   Q.    And, Doctor, those National Institutes of Health studies

17   in this paper, they didn't pertain to Neurontin or Pfizer, did

18   they?

19   A.    No.

20   Q.    And the primary outcome that you looked at in your 1993

21   paper on these government-funded studies was whether something

22   you called "significant results" were more likely to be

23   published than results that weren't significant, true?

24   A.    Right.

25   Q.    And by "significant," you meant either statistically

1    significant or results that the investigators themselves

2    considered qualitatively significant?  That's how you defined

3    it, correct?

4    A.   Right.

5    Q.   And you didn't just test that one possible source of bias,

6    but you also looked at nine others, nine other possible sources

7    of bias in this paper, right?

8    A.   Yes.

9    Q.   And I think we can agree, Dr. Dickersin, there was nothing

10   wrong with your having a primary hypothesis that you tested and

11   also looking at nine other factors, correct?

12   A.   Right.

13   Q.   And you published your results for both the main

14   hypothesis and for all the secondary factors --

15   A.   Right.

16   Q.   -- in your conclusions, right?

17   A.   Right.

18   Q.   You obviously thought, and I think we agree, the results

19   of your secondary hypothesis testing was important enough to

20   mention in your publication, correct?

21   A.   Yes.

22   Q.   Yes, sure.  And let's look at the results that you found

23   when you looked for publication bias in this large group of

24   hundreds of government-funded clinical trials.  "Results:  Of

25   the 198 clinical trials completed by 1988, 93 percent have been

1    published.  Trials with 'significant' results were more likely

2    to be published than those showing 'nonsignificant' results."

3    Did I read that correctly?

4    A.    Yes.

5    Q.    And you measured the rate or captured the difference

6    between significant results being published and nonsignificant

7    results not being published by something called an "odds ratio,"

8    or OR, correct?

9    A.    Yes.

10   Q.    And you stated it there as an odds ratio of 12.3, right?

11   A.    Right.

12   Q.    And, Dr. Dickersin, that means, does it not, that in your

13   study of these government-sponsored trials, the chances that a

14   published study was positive were 12.3 times greater than the

15   chance that a study that wasn't significant would be published?

16   That's essentially --

17   A.    The odds.  It's the ratio, the odds.

18   Q.    And your conclusion before we leave this one briefly,

19   Dr. Dickersin, your stated conclusion right at the very bottom

20   of that page was, in 1993 looking at government trials, you

21   concluded, "Even when the overall publication rate is high,

22   such as for trials funded by the National Institutes of Health,

23   publication bias remains a significant problem."  That was the

24   first sentence of your conclusion, right?

25   A.    This is.  I'd like to say, however, that this is one study

1    out of many that have been done, including the systematic

2    review on publication bias that was presented in my first

3    questioning.  And what I said then still stands true, is that

4    there is publication bias no matter who funds the study; that

5    is, if you followed the study from inception to publication.

6    We have information about NIH trials, but we don't have

7    information like this for all trials.  And with a 93 percent

8    publication rate, this is the highest publication rate that's

9    ever been seen, and I think it was something like fourteen

10   unpublished trials.

11   Q.   Dr. Dickersin, let's look briefly at the document --

12              THE COURT:  Let me ask you, how much longer do you

13   have?

14              MR. HOOPER:  It would be a good time to break, your

15   Honor.

16              THE COURT:  So how much longer?

17              MR. HOOPER:  Twenty minutes.

18              THE COURT:  Yes, I think we should break.

19              THE CLERK:  All rise for the jury.

20   SIDE-BAR CONFERENCE:

21              THE COURT:  We'll go off the record in a minute, but I

22   want counsel to think about a rule as to what's fair on these

23   slides because, on the one hand, I could have had her just

24   stand up there and handwrite it out.  That's crazy, that's

25   crazy.  On the other hand, it is unfair to pop it on someone

Page 92

1    ten minutes before we're about to walk into trial or fifteen

2    minutes because you can't get through it fast enough to know

3    how to address it.  Whereas in testimony, when someone's

4    writing it down, it moves at a speed you can address as opposed

5    to having it flash on the screen.  I understand how hard

6    everyone is working here, and everyone is working to midnight

7    too.  I understand.

8           So what's the fair rule here to sort of guide both

9    sides?  Two hours in advance, twenty-four hours in advance?  It

10   will guide everyone.  Maybe you could just go talk about that.

11          MR. CHEFFO:  We can talk about it, but I think there

12   should be a general hard-fast rule, and then if there are

13   exceptions in unusual circumstances, we don't want the rule to

14   swallow it, but an emergency, change of schedule, but I think

15   we've tried to --

16          MR. GREENE:  And I'll cut them the same break.  If

17   they want to spring something on me -- you know, I deserve it

18   for this -- they can do it.

19          THE COURT:  Well, you've all been so amicable.  I

20   understand part of this is how hard everybody's working, but I

21   also know that as a trial lawyer, it's just, I remember, you

22   get handed it two minutes before, you're just trying to

23   remember what you're supposed to be asking, never mind

24   reviewing the chart.  So I'm thinking that you should all at

25   least come up with a presumptive rule subject to exceptions.

1          MR. CHEFFO:  That's fair.

2          THE COURT:  So, I mean, just as a guiding principle

3     for all of you.  Just the flip side of it is, you know, someone

4     will stand there with an easel and write it down.  But the jury

5     couldn't possibly remember or even get it right as to which

6     study goes with which.  There's a lot of information here, and

7     seeing is part of learning.  So just come up with something.

8     Anyway, maybe propose something tomorrow or Monday.

9          MR. BARRETT:  We'll do that, your Honor.

10          THE COURT:  Because this will happen again.  It's just

11     human nature.

12          MR. HOOPER:  That's a great idea.  One very, very --

13          THE COURT:  Do you want it on the record?

14          MR. HOOPER:  Sure, your Honor.  Just Dr. Dickersin is

15     so nice, and I know it's her first time testifying, and

16     sometimes she's -- just to move things along, I don't want to

17     have to ask her "Would you please answer the question" thing.

18          THE COURT:  Ask her.

19          MR. GREENE:  She's been answering the questions very

20     well.

21          THE COURT:  Ask her.

22          MR. HOOPER:  Others have different views.

23          THE COURT:  We'll go off the record for a second.

24          (Discussion off the record.)

25          (A recess was taken, 11:02 a.m.)

1        THE CLERK:  All rise.  Please be seated.  All rise

2    for the jury please be seated.

3    Q.  Dr. Dickersin, before we left, you recall we were

4    talking about an article you published in 1993 discussing a

5    publication bias that you found in 198 clinical trials

6    sponsored by the Federal Government?

7    A.  Yes.

8    Q.  And you mentioned a more recent article that you had

9    published I believe in 2009, correct?

10   A.  Uh-hum.

11   Q.  I just want to show you a copy of this in case you need

12   to refer to it.  I have some questions about that.  Doctor,

13   that is a review article or a Cochrane Review that you and

14   others published last year, and it's a systematic review of

15   publication bias in a variety of clinical trials, isn't

16   it?

17   A.  Yes.

18   Q.  Dr. Dickersin, if you would, with reference to pages 4

19   and 5, I want to be sure exactly what clinical trials you

20   were looking in the study.  First, first question, these

21   studies that you examined here, they were not studies that

22   you examined here, they were not studies that had to do with

23   Pfizer or Warner-Lambert or Neurontin, were they?

24   A.  These studies were studies of trials, and so I don't

25   know if there were any clinical trials relating to Neurontin

1    within these cohorts that these looked at, so, for example,

2    you can see that the first study we've already looked at 188

3    trials, I don't know what any of those trials were about.

4    These studies were about publication bias, but I know

5    nothing about the studies that were included in those

6    studies.  It's kind of confusing, it's studies of studies.

7    Q.  Well, Dr. Dickersin, did you read the article before you

8    put your name on it and published it?

9    A.  Yes, but this is a systematic review, so if I do a

10   systematic review of studies of studies, I don't have access

11   to the data set that each of these individuals used.

12   Q.  So this systematic review looked at five studies of

13   publication bias that themselves in turn looked at clinical

14   studies?

15   A.  Exactly.

16   Q.  So if you're writing a study of studies of studies; is

17   that right?

18   A.  A studies of studies, a study of studies.

19   Q.  One studies of five studies of a whole bunch of other

20   studies?

21   A.  A studies of a whole bunch of other studies.

22            THE COURT:  Is that right?

23            THE WITNESS:  I tended only to have two layers, so

24   let me think about it.  It's a study of a study of a whole

25   bunch of studies.

1   Q.   A study of studies of studies, so let's look at page 5,

2   Dr. Dickersin right here in the middle of the page?

3   A.   All right.

4   Q.   And you cite the five by name, and you say right there

5   that Ioneetes --

6   A.   Ioneetes(sic).

7   Q.   -- 1998, assessed the publication of AIDs trials funded

8   by the National Institute of Health, that's one of them,

9   right?

10  A.   Right.

11  Q.   Then Stern, 1997, that's one of the other five studies

12  you looked at, they looked at publication bias in clinical

13  trials approved by a local ethics committee from 1979 to

14  1988, right?

15  A.   Right.

16  Q.   And then you looked at two of the other five studies are

17  actually published by you, correct, one was the study we

18  talked about earlier where you looked at NIH trials, your

19  1993 study, right?

20  A.   Right.

21  Q.   You know that was all clinical trials, wasn't it?

22  A.   That was all clinical.

23  Q.   And then you had another one published in 1992, where

24  you looked at the publication of clinical trials approved by

25  two institutional review boards in 1980, correct?

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1   A.  They weren't all clinical trials, but they pulled --

2   this study pulled out the clinical trials in that

3   database.

4   Q.  And this first study you mentioned, Bardy, that assessed

5   the publication of a cohort of clinical trials notified to

6   the National Agency for Medicine in Finland in 1987,

7   right?

8   A.  Right.

9   Q.  In fact, it's all clinical trials now that we've looked

10  at it together, you see that, don't you, Doctor?

11  A.  Yes.

12  Q.  The study of the five studies are five studies of

13  clinical trials from Finland and Ethics Review Board and The

14  National Institutes of Mental Health and I forgot them

15  all?

16  A.  In drug studies going to the drug regulatory in Finland

17  is the top one.

18  Q.  In Finland.  If we could look to the very first page of

19  the article.  I'm sorry, page 2 under the heading author's

20  conclusions, Dr. Dickersin, do you see that?

21  A.  Yes.

22  Q.  In all of these studies from Finland and NIH and these

23  ethics review boards, all these clinical trials you looked

24  at, your conclusion was -- can we get the Elmo, please --

25  your conclusion was trials with positive findings are

1    published more often and more quickly than trials with

2    negative findings?

3    A.   Yes.

4    Q.   That's your conclusion, correct?  That doesn't have

5    anything to do with Pfizer or Neurontin trials, does it?

6    A.   None of these trials were specifically related to

7    Pfizer, but as I pointed out, one of the studies is related

8    to drug studies sent to the drug regulatory authority.

9    That's the study with the lowest publication rate.

10   Q.   Do you have any evidence whatsoever that there was a

11   Pfizer-Neurontin study included in this group of studies

12   looked at by Finland in 1987?

13   A.   I have no idea.

14   Q.   Dr. Dickersin, you've looked at this subject of

15   publication bias for many years, as you told us, correct?

16   A.   Yes.

17   Q.   And you've looked at it in a variety of different places

18   from Finland to the Federal Government to the industry,

19   correct?

20   A.   Yes.

21   Q.   And everywhere you've looked for it, you found it,

22   haven't you?

23   A.   Absolutely.

24   Q.   Let's look at, if we could, could we go back.  I just

25   want to turn very briefly, Dr. Dickersin, we were talking

1    about this evidence-based medicine, I call it a Venn

2    diagram, you called it a three-legged stool.  If you could

3    label it, what are the three legs of the stool in your

4    opinion?

5    A.  High quality evidence, research evidence, clinical

6    knowledge and patient values.

7    Q.  And, Dr. Dickersin, if we only relied on one leg of a

8    three-legged stool, that might not be such a good thing,

9    agree?

10   A.  I guess I'm not making judgment about that.  I guess I'm

11   not sure what you're asking.  I'm not sure what you're

12   asking, I'm sorry.

13   Q.  In the three-legged stool of evidence-based medicine

14   that you just described, you certainly wouldn't advocate

15   anyone ignoring any leg of a three-legged stool, would

16   you?

17   A.  No, it should take all of these into consideration.

18   Q.  Thank you.  Let's look at some of the specific studies

19   that you told the jury about earlier this morning.  Elmo,

20   please.  Dr. Dickersin, do you recall earlier Mr. Greene put

21   up the slide and you told the jury about a study by a

22   researcher named Wang published in 2002, correct?

23   A.  Yes.

24   Q.  Do you know where Dr. Wang works?

25   A.  I don't recall.

1  Q.  You work at I believe you said Johns Hopkins down in

2  Baltimore, correct?

3  A.  I don't know.

4  Q.  You worked?

5  A.  Yes, I do, yes.

6  Q.  And have you ever, did you ever see when you read the

7  publication that Dr. Wang is associated with the Stanford

8  University school of Medicine in Palo Alto, California?

9  A.  I'm sure I took note of it, but I didn't recall at this

10 moment.

11 Q.  Just like Johns Hopkins, Stanford is a fantastic medical

12 research center, wouldn't you agree?

13 A.  Yes, it's a good medical school, yes.

14 Q.  They are both among the leading universities on planet

15 earth, aren't they, Stanford and Johns Hopkins?

16 A.  It's hard for me to agree with a statement like that,

17 you know, because of all these characteristics, it's an

18 excellent university, no question about it.

19 Q.  Sure, that does the trick.  If we could, could you take

20 a peak at -- I'll hand you a copy in case you don't have

21 it -- Exhibit 1540, which I think is already admitted.

22           THE COURT:  Is 1540?

23           MR. HOOPER:  Yes, your Honor.

24           THE CLERK:  1540 is in evidence, yes.

25 Q.  You told the jury on the slide that you put in about the

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1   study by Dr. Wang that it was spin and that your criticism

2   was that it implied the drug was effective when there was in

3   fact no comparison group; do you recall telling the jury

4   that this morning?

5   A.  I do.

6   Q.  And, Dr. Dickersin, my question is simply this.  If you

7   direct your attention to the abstract of the article on

8   page 1 about seven lines down, there's a section that says,

9   "methods," and first let me ask you, you know that an open

10  study, open refers to -- well, what does open refer to?

11  A.  What does open refer to, it means that the study isn't

12  blinded.

13  Q.  And it's very common place in publications, many of

14  which we've all seen in the past couple days when a study is

15  placebo-controlled it's mentioned in the methods section,

16  correct?

17  A.  Yes.

18  Q.  And if there's an active control, that's mentioned in

19  the methods section, correct?

20  A.  It should be.

21  Q.  Right.  And do you see -- let me direct your attention

22  down to the conclusion of Dr. Wang's article.  In fact, the

23  last sentence, it says, "This open pilot study must be

24  viewed with caution, and randomized controlled studies are

25  warranted."  Do you see that?  Did I read that correctly?

1    A.   Yes, I do.

2    Q.   So, Dr. Dickersin, any doctor who actually read the

3    publication that you criticized his spin would be able to

4    see for him or herself those very words, wouldn't they, if

5    they only read the abstract, they'd see that, right?

6    A.   Well, I'm first going to give you my opinion here, which

7    is, the first sentence says --

8    Q.   Would you answer my question first, Doctor?

9    A.   Which was?

10   Q.   Any doctor who picked up the article and read the

11   publication would be able to see those words for him or

12   herself?

13   A.   Anybody would be able to see those words, however, the

14   first line says that it's affected and well tolerated, and I

15   think that if you ask people like me and doctors whether

16   most research articles end with the admonition that

17   additional studies must be conducted, they will agree that's

18   a typical ending to most studies that many of us would write

19   being, you know, trying to be fair, so it's also something I

20   have to say that many people take with a grain of salt.

21   They would look at results that say something works and

22   align that more studies need to be done is something that is

23   often seen and isn't necessarily taken in as equally

24   important to the clinical message.

25   Q.   Could we switch back to the Elmo, please.  It's a little

1    different what you just said in your explanation than what

2    was on your slide that you showed the jury today where you

3    claim that the Wang study claims efficacy despite being open

4    label and that that was spin.  That's what you told the jury

5    earlier today, correct?

6    A.  Well, --

7             THE COURT:  What handwriting is on there?

8             THE WITNESS:  Excuse me.

9             MR. CHEFFO:  It's a copy that we were provided,

10   your Honor.

11   A.  I think what it says is true, that is, if a study is

12   unblinded, if people know what they're getting, regardless

13   of whether there's a comparison group or not, and you're

14   saying, the way I hear you, since it doesn't say that there

15   was no comparison group, then I've left something very

16   important out, and perhaps I have, but you still can have

17   spin even by saying that an unblinded study was effective,

18   so I would stick by that that there's still spin if it's an

19   unblinded study.

20            There's also spin in that it doesn't have a

21   comparison group if it was left out, okay, then it was left

22   out, but there's still spin.

23   Q.  Because they used --

24   A.  It was an unblinded study.

25   Q.  Right.  Which I think we agree it says?

1   A.   Yes.   It was open label.

2   Q.   And your criticism is the use of the word "effective"?

3   A.   Yes.   It says it was effective.   It says it was

4   effective, so if I'm reading this, and I can't say how a

5   doctor would act, but if I am reading it, I would interpret

6   this and I'm in a hurry and I move straight to the

7   conclusion section, I would see that GBP was effective.

8   That's the message that I would get.

9        It doesn't -- and it says this study must be

10   viewed with caution, which, as I said, is a classic

11   statement in a conclusion section.   It doesn't say we saw it

12   as effective even though we knew what drug and the patients

13   knew what drug they were getting.

14   Q.   You don't think it was proper to use the word

15   "effective" because there was no blinding of placebo

16   control; is that right?

17   A.   It wasn't controlled.   It wasn't placebo-controlled, but

18   it didn't have a comparison group, so it's effective

19   compared to what?   So I think that most scientists would

20   agree that to say something is effective, you have to have a

21   comparison.   So, for example, you know, if I were to take a

22   drug for some symptoms and I take that drug, I can't say

23   that my symptoms went away because of that drug in a way

24   that studies is typically done is you take a group of

25   people, not one person, because with a group of people you

1    get an average effect, and you compare people who took a

2    drug and then some comparison group and you compare those

3    two groups to see on average what happened.

4    Q.  Dr. Dickersin, did you know that the former chairman of

5    the Food & Drug Administration, Dr. David Kessler, testified

6    on the first day of this trial?

7    A.  I had heard that.

8    Q.  Were you informed that Dr. Kessler told the Court and

9    the jury that a placebo, an inactive sugar pill, is

10   effective and emphatically told them that?

11            MR. GREENE:  I object to the question, your

12   Honor.

13            THE COURT:  Sustained.

14   Q.  Do you agree that placebo has an effect,

15   Dr. Dickersin?

16   A.  There is something called the placebo effect.  As a

17   matter of fact, in some of the studies I read, people who

18   responded to placebo were dropped out of the study, which

19   means then you have a bigger effect than probably would be

20   effective in real life.

21            THE COURT:  Does effective have a meaning in the

22   scientific world of drugs?

23            THE WITNESS:  That's a good question, where to

24   start because there's a big debate, but, in general, people

25   use the word "efficacy" to mean working with a placebo

1   control or in a clinical trial situation and effectiveness

2   to apply to a more general population.  That's not an agreed

3   definition, it's not a definition that you could hang your

4   hat on, I'm just telling you a differentiation.

5           The problem with research in general is that it's

6   very difficult to prove something, and so we use statistical

7   tests which tell us on average what are the chances we would

8   have seen this effect by chance, and that's what that P

9   value, the P less than .05 means, and people have to go on

10  something.  What is the chance that we've seen this effect

11  by chance rather than it's really true, and so that's why

12  the P values have been so important in my testimony because

13  we believe P values less than .05, as meaning there's only a

14  five percent that this happened by chance.

15          It doesn't definitely mean it's an important

16  effect, and we saw that in earlier testimony that it could

17  be a really tiny change in pain, which isn't that

18  meaningful, but it's statistically significant, and there's

19  no -- there's nothing that says five percent means that it

20  never happens by chance, it has a five percent chance of

21  happening by chance, so that's sort of a long-winded way of

22  talking about what's effective.

23  Q.  You told us "efficacy" is the term that scientists

24  usually use when they're specifically referring to a

25  superiority to placebo, inactive sugar?

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1   A.   I said some people use that.

2   Q.   And would you look back at the Wang article --

3   A.   Yes.

4   Q.   -- Dr. Dickersin.  Dr. Wang and his colleagues, they

5   didn't use the word "efficacy," did they?

6   A.   They used "effective," which is actually a term that

7   doctors use frequently.  That's where this debate comes up,

8   that the debate is, will this work in my patient, and

9   "effective" is used as a word often in the clinical field to

10  mean it's generalizable to a patient population, so this is

11  a pretty strong statement.

12  Q.   And I think just to go back a little bit, I think you

13  agreed with Dr. Kessler that there absolutely is something

14  called a placebo effect, correct?

15  A.   Yes.

16  Q.   Okay.  Can you identify for me, Dr. Dickersin, any

17  clinical trial where a placebo has been tested against a

18  placebo to prove that effect?

19  A.   You know, this may have been studied, but I'm not

20  familiar with that literature.

21  Q.   Do you recall showing the jury earlier today,

22  Dr. Dickersin, a slide about six nociceptive pain studies?

23  A.   Yes.

24  Q.   These were studies of design, design, to test the

25  effectiveness of a potential new combination drug product;

1   do you recall that?

2   A.  Yes.

3   Q.  And that combination product would be either a

4   combination of Gabapentin with either Naproxen or

5   hydrocodone, correct?

6   A.  Right.

7   Q.  And in those studies they tested a whole bunch of

8   different combinations and different doses and across the

9   six in various types of pain, correct?

10  A.  Yes.

11  Q.  And in those studies and all the different combination

12  of doses they tested, in one or two of the studies there was

13  one group that was Gabapentin only, correct?

14  A.  I would have to look back to be absolutely sure of

15  that.

16  Q.  That sounds generally correct, your recollection?

17  A.  It might be good if I could look at my notes.  Would

18  that be all right from the expert report?

19          THE COURT:  Yes.

20  Q.  Absolutely.

21  A.  001 does have a Gabapentin only group.

22  Q.  Among how many groups, Dr. Dickersin?

23  A.  In this case, 1, 2, 3, 4, 5, 6, 7, 8, 9 in that one.

24  Q.  We can stop right there and finish this out.  We had one

25  Gabapentin only in the study among nine different groups,

1    correct?

2    A.   Correct.

3    Q.   The Gabapentin group was one of nine subgroups,

4    correct?

5    A.   I wouldn't call it a subgroup, I'd call it comparison

6    groups.

7    Q.   Nine different groups.  You're aware, are you not,

8    Dr. Dickersin, that the combination drug product that these

9    products were designed to test was never developed and

10   marketed?

11   A.   I'm not aware of that -- I didn't look at these

12   marketing reports, so, I'm sorry, I don't know that.  What I

13   do know is what was stated in the protocols and the research

14   reports that I got, and in each of those, there was a stated

15   objective, and there was with one exception the study that

16   ended early, a statistical test performed, so there was a

17   hypothesis and a hypothesis that was tested.  A hypothesis

18   is something you expect to see, for example, that Gabapentin

19   is effective in nociceptive pain.

20   Q.   And the hypothesis in each one of those studies, the

21   primary outcome was oriented to a combination product of

22   Gabapentin and something else, correct?

23   A.   I would have to look that up to read the exact primary

24   outcome, which I'm happy to do, if you want.

25   Q.   Wouldn't you agree with me, Dr. Dickersin, if that one

1   Gabapentin group had turned out positive and Pfizer had

2   taken that and published it, you'd be talking about a

3   different kind of bias, selective outcome reporting,

4   wouldn't you?

5   A.   I'm sorry, I really, to answer your question, I have to

6   look at what the objective was, and I don't remember it

7   being a complex objective, so if you're going to ask me that

8   question, I'd like to be able to look at what they said the

9   objective of the study was.

10  Q.   Laptop, please.

11  A.   I will say there was absolutely nothing in the protocol

12  or the research report I read, and since there was no

13  publication and no publications to look at that implied that

14  these studies were any different from the other studies.

15  Q.   Dr. Dickersin, do you have a copy of DX 2091?  It was

16  admitted in evidence, and I want to make sure you have a

17  copy handy.  No?

18  A.   I have my own copy.

19  Q.   You have your own copy.  That's fine, Doctor.  Do you

20  have it handy, Dr. Dickersin, this is the article by lead

21  author Vedula in the New England Journal of Medicine?

22  A.   Yes.

23  Q.   This is the article that you referred to in which you

24  published essentially your analysis of the data that

25  Mr. Greene had sent you in this case, correct?

1   A.   This was a piece of it.

2   Q.   Would you turn -- and it's entitled, "Outcome Reporting

3   in Industry-Sponsored Trials of Gabapentin for Off-Label

4   Use," correct?

5   A.   Correct.

6   Q.   I'd like you to turn to 1969 in the lower left-hand

7   column beginning with the words, "Our study."  There you

8   wrote, "Our study has several limitations.  It is possible

9   that we missed important information contained in

10  unidentified, inaccessible, or unavailable documents,

11  including protocols, statistical analysis plans, and

12  research reports."  Did I read those words correctly?

13  A.   Yes.

14  Q.   And you go on in the last line of that column to say,

15  "In another example, if changes to the primary outcome were

16  made before the randomization code was broken, these changes

17  could be justifiable."  You wrote that?

18  A.   That's right.

19  Q.   Now, let me ask you to look just over halfway down in

20  the right most column right after footnote 38 at the words

21  in addition.  You wrote there in the New England Journal of

22  Medicine, "In addition, we cannot be certain that selective

23  reporting was a decision made by employees of Pfizer and

24  Parke-Davis since the authors of the published reports

25  included nonemployees."  That's something else you included

1  in your article, isn't it?

2  A.  Yes.

3  Q.  And if we could now turn, Dr. Dickersin --

4          THE COURT:  So what was that referring to?

5          THE WITNESS:  Well, so, what was this referring

6  to?  Yeah, I mean I'd like to say some things about the

7  things that you're saying if I get a chance.

8          THE COURT:  Unfortunately that's not a part of it

9  unless they ask.  You're saying selective reporting by

10  Pfizer in this article.  Was that Gabapentin or a completely

11  different drug?

12          THE WITNESS:  I'm just trying to find where it is.

13  Okay.

14          THE COURT:  Do you know?

15          MR. HOOPER:  Your Honor, Dr. Dickersin's entire

16  article is entitled Gabapentin.

17          THE COURT:  So it's all about Gabapentin?

18          MR. HOOPER:  Yes, ma'am.

19          THE WITNESS:  It's only from our articles and

20  research reports and protocols related to these 20, 20 in

21  this case because for one of them we didn't have a research

22  report or a protocol.

23  Q.  Dr. Dickersin, could I now ask you to look at the very

24  end of the text of your article in the New England Journal.

25  Right after footnote 49, there's some language in small

1    print, a little bit smaller font there, let me ask you to

2    start with the words, "Dr. Vedula."  Dr. Vedula is your

3    student; is that correct?

4    A.   That's correct.

5    Q.   And Dr. Vedula is the person who got the information and

6    did the data extraction from the materials that Mr. Greene

7    sent to you, correct?

8    A.   We both did.

9    Q.   Vedula, your student, he was also paid by Mr. Greene,

10   correct?

11   A.   He was paid for the work that he did, yes.

12   Q.   And you say here, "Dr. Vedula reports receiving fees

13   from plaintiffs' lawyers in litigation concerning Neurontin.

14   Dr. Dickersin reports serving as an expert witness in the

15   litigation."  That's what it says, correct?

16   A.   Yes.

17   Q.   And then the next full paragraph says, "We thank

18   Thomas M. Greene, the lead lawyer for class plaintiffs

19   in -- " such and such litigation -- "United States District

20   Court, District of Massachusetts."  That's this court right

21   here, right?

22   A.   Uh-hum.

23   Q.   "And his colleagues, Ilyas J. Rona and

24   Dr. Palco S. Goldman, who provided assistance in collating,

25   clarifying, and verifying information regarding the trials

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1    included in this study."  That's what it says, right?

2    A.  Yes.

3    Q.  So, Dr. Dickersin, you got information here about 21

4    studies, you didn't do anything to look at other studies

5    that might be out there, you relied on and thanked people

6    from the plaintiffs' firm for helping you collate, clarify

7    and verify the information in those boxes that they sent

8    you, and you wrote your report in this case and your

9    article, correct?

10   A.  Correct.

11   Q.  Is that the way you teach your students at Johns Hopkins

12   to do science?

13   A.  Absolutely.  It's to be completely transparent about

14   what we've done.  So I'm not sure how you read the sentences

15   that you showed me highlighted, but when we said here are

16   the limitations of our study, we teach them to write the

17   limitations.  We may not have found everything.

18            As I said to you, we contacted Dr. Greene's office

19   numbers times when we couldn't find signed documents, dated

20   documents, statistical analysis plans, things that should

21   have been there, and we even requested to see what was

22   requested of Pfizer, since we didn't have everything, were

23   there any loopholes in there that these were not sent

24   because a question wasn't asked right.

25            The question was asked right, we thought, and the

1   response implied that we had absolutely everything Pfizer

2   had, but we're missing a lot of information which means

3   Pfizer didn't have it or couldn't find it or something but

4   it wasn't sent, so that's what means is that we realize we

5   don't have all the information here, but we tried to get it,

6   and we tried to get it through Mr. Greene's office because

7   that was legally how we could get it.

8          We see it as a real advantage that we have access

9   to data the public doesn't because, as I said before, the

10  public doesn't know what really goes on behind the scenes.

11  All they have is that published article, and we took what we

12  were able to get from Pfizer to say what happened in these

13  21 cases.

14         As it turns out, it is only for these conditions,

15  these four conditions and for Pfizer drugs, but that's what

16  this is about.  As far as noting our potential conflicts of

17  interest, this is absolutely how we teach our students to be

18  completely truthful about what happened and to say everybody

19  who was involved so that our work is transparent, too.

20  Q.  Would you ever teach your students to look at 21 studies

21  when there are in fact many, many more that you could look

22  at?

23  A.  For the question we were asking, we looked at the full

24  data set.  I will say we also went to the University of

25  California-San Francisco which has drug company documents

Page 116

1    from other lawsuits to make sure we weren't missing

2    anything, and we did not find additional documents, so we

3    teach our students to look for everything that addresses the

4    question you're asking.

5             We certainly don't look for stuff that doesn't

6    address the question we're asking.  There's no reason to do

7    that.  We have a question we're asking, and that's what we

8    go after.

9             MR. HOOPER:  I pass the witness, your Honor.

10            THE COURT:  Anything?

11            MR. GREENE:  Just A couple questions.

12            THE COURT:  Literally?

13            MR. GREENE:  Don't hold me to it.  It may be

14   three.

15            REDIRECT EXAMINATION BY MR. GREENE:

16   Q.  Dr. Dickersin, there are a lot of lawyers sitting on

17   these two tables representing Pfizer, and they asked you

18   whether there was anything, excuse me, Mr. Hooper asked you

19   whether there was anything that you weren't given, any

20   Pfizer document that we withheld from you or not given to

21   you.  Do you recall that line of questioning?

22   A.  Yes.

23   Q.  Okay.  Has Mr. Hooper presented you with any Pfizer

24   study that I didn't present you with?

25   A.  I haven't heard about any information we weren't

1   given.

2   Q.  So when Mr. Hooper says have you looked at any other

3   studies, your task in this case was to examine the 21

4   clinical trials that I gave you, correct?

5   A.  Yes.

6   Q.  The study protocols and the research reports, correct?

7   A.  Yes.

8   Q.  And when they were written up to look at the published

9   articles, correct?

10  A.  Yes.

11  Q.  And to compare what was in the research with what they

12  said in the published articles?

13  A.  That's right.

14  Q.  That's what you were called here to do?

15  A.  That's right.

16  Q.  It wasn't to go do a literature search, to get on

17  Medline and to see what other trials said that weren't

18  sponsored by Pfizer, correct?

19  A.  That's right.  Our job was to see how accurate what was

20  really done was represented in the published articles, which

21  is all the medical community has access to.

22  Q.  And you asked me time and time again if there any other

23  studies out there?

24  A.  Yes, I did.

25  Q.  And you looked for them, didn't you?

1   A.  Yes.

2   Q.  And when you mentioned my name here and my colleague,

3   Dr. Rona, Dr. Goldman assisting you and Dr. Vedula, they

4   responded to many questions you asked; isn't that right?

5   A.  Yes, they did.  They probably didn't tell you all the

6   times I called.

7   Q.  They gave you every single document you asked for?

8   A.  Yes, they did.

9   Q.  They shipped you boxes of documents, didn't they?

10  A.  Yes.

11  Q.  And Dr. Vedula, your student, he's a physician,

12  correct?

13  A.  Yes, he is.

14  Q.  Is he getting a Ph.D.; is that what you told us?

15  A.  He's getting a Ph.D.

16  Q.  He just got married about a year ago or so?

17          THE COURT:  All right.  We're so far behind.

18  Where did he get married?  No.

19          MR. GREENE:  India, your Honor.

20  Q.  And I paid him an hourly rate; is that right?

21  A.  That's right.

22  Q.  What was the hourly rate?

23  A.  $35 an hour.

24  Q.  And that's what you suggested?

25  A.  Yes.

Page 119

1    Q.  All right.

2             THE COURT:  Thank you.  Anything else?

3             MR. HOOPER:  One question.

4             THE COURT:  Stay there.

5                RECROSS-EXAMINATION BY MR. HOOPER:

6    Q.  Did any of those calls, Dr. Dickersin, after you saw all

7    the information that Mr. Greene just told you, did you ever

8    tell them make sure you go tell Kaiser's doctors what I

9    found; did you ever tell them that?

10            MR. GREENE:  I got to object to that.  Beyond the

11   scope.

12            THE COURT:  Sustained.  Goodbye.  Who's next?

13            Thank you very much.

14            MR. GREENE:  Dr. Barkin.

15            THE COURT:  Who's up next?

16            MR. GREENE:  Dr. Barkin.

17            JEFFREY S. BARKIN, M.D., having been duly sworn by

18   the Clerk, testified as follows:

19               DIRECT EXAMINATION BY MR. GREENE:

20            THE CLERK:  Would you please state your name and

21   spell it for the record.

22            THE WITNESS:  My name is Dr. Jeff Barkin.

23   Q.  Dr. Barkin, can you tell us where you're from?

24   A.  I live and work in Portland, Maine.

25   Q.  And your specialty is psychiatry?

Page 120

1   A.   Yes.

2   Q.   You're a board certified pscyhiatrist?

3   A.   I am.

4   Q.   Would you please tell us your educational background?

5   A.   I went to Swarthmore College where I majored in the

6   biochemistry of psychiatric disorders.  After graduating, I

7   went to the Yale School of Medicine.  After medical school,

8   I interned at Boston University Medical Center here in

9   Boston for a year and then returned to Yale and did my

10  residency in psychiatry.

11  Q.   And what year did you complete your residency?

12  A.   1991.

13  Q.   How long was that residency?

14  A.   Well, internship and residency is four years.

15  Q.   Four years.  And did you enter private practice upon the

16  completion of your residency?

17  A.   I did.

18  Q.   And where was that?

19  A.   In Massachusetts and Connecticut.

20  Q.   And have you been in private practice since then?

21  A.   Well, I spent some time in private practice, and then I

22  went on faculty at the University of Massachusetts Medical

23  Center as assistant professor of psychiatry in Worcester.

24  In 1998, we moved my family and I from Massachusetts to

25  Maine.  For a bunch of years I was doing hospital-based

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1   work, and I've been in private practice for ten years since

2   2000 in Maine.

3   Q.  And what type of patients do you treat in your private

4   practice now?

5   A.  I'd say 90 percent of my patients have mood disorders,

6   bipolar disorder, maybe depressive disorder, other

7   disorders.

8   Q.  Have we met prior to this case?

9   A.  Not prior to this case, no.

10  Q.  And you're being compensated an hourly rate for the time

11  you've put into this case?

12  A.  Yes.

13  Q.  And I forgot what that is.  Could you remind us what it

14  is?

15  A.  It's 400 an hour.

16  Q.  You did some work for the State of Maine?

17  A.  I do some work for the State of Maine, and I also spent

18  approximately 40 percent, 50 percent of my professional time

19  analyzing clinical trials in my capacity as a consultant for

20  Gould Health Systems, which is a company in Augusta, Maine,

21  and what that company does is it advises different states

22  Medicaid systems.

23          Medicaid is the program each state has in the

24  United States that funds patients or people who are poor,

25  okay, Medicare is folks 65 and up and some disabled people.

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1   Medicaid is the state program for the poor.

2              One of the components of Medicaid is to pay for

3   prescription medications, and it requires analysis.

4   Prescriptions medications, as people know, can be rather

5   costly, so one of the things that Maine and other states

6   look to as guidance, objective guidance in terms of what

7   medications work, are they safe, are they effective, this

8   sort of thing.

9   Q.  And that's called drug utilization review?

10  A.  Yes.  Each state has a drug utilization review board.

11  The states ask the drug utilization review board basically

12  to determine what medications the state will pay for, and I

13  also chair the State of Maine Drug Utilization Board.

14  Q.  That was my next question, you sit on that board, you're

15  the chairman of that board?

16  A.  Yes.

17  Q.  I want to ask you just some background.  The jury has

18  heard a little bit about bipolar disorder so they have some

19  familiarity with it, but could you give us a definition?

20  They haven't heard it from a psychiatrist yet, so if you

21  could define bipolar disorder for us.

22  A.  Sure.  Yes, bipolar disorder is a major mental illness.

23  It's a mood disorder, and it is a cyclical mood disorder bi,

24  obviously, two poles like north and South.  People with

25  bipolar disorder have mood episodes that can vacillate

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1    between the upper pole, the northern pole, if you will, and

2    that is typically experienced as feeling too happy,

3    euphoric, elated or more commonly really irritable.

4          These patients are proned to getting really angry,

5    potentially violent.  And when people are in that upper

6    pole, which is defined as what's called mania, okay, because

7    bipolar disorder is synonymous with manic depressive

8    illness, they also will have other associated behaviors such

9    as increased productivity, on the go, go, go, no need for

10   sleep, spending excessive amounts of money, making foolish

11   impulsive and bad business decisions.  Sometimes these

12   patients will become very hypersexual, and that's in the up

13   phase.

14         There's also a down phase, which is the depressive

15   phase.  The patients typically vacillate between the upper

16   phase, the hypomania and the mania, as well as the

17   depressive phase, and I'd say that most bipolar patients

18   spend the vast amount of their lives in the depressed phase,

19   so there's a lot of burden.

20         Bipolar patients have really, really, bad

21   treatment outcomes, they have high rates of divorce, high

22   rates of criminality, increase risk of dropping out of

23   school, increase risk of being fired or leaving jobs, this

24   sort of thing, so it's a disorder of mood predominantly.

25         Patients with bipolar disorder can also have what

1   are called psychotic symptoms.  Psychotic symptoms are like

2   a disconnect from reality, hallucinations which are

3   perceptions that are false, hearing voices, seeing things or

4   delusions, and delusions are ideas that are false.

5           So, for example, a paranoid delusion might be the

6   erroneous belief that you're being followed or an idea of

7   reference might be the erroneous delusional belief that

8   they're talking about you on the television or they're

9   talking about you in a newspaper article, so patients with

10  manic depressive illness have mood disturbance, but they

11  also can have psychotic disturbances as well as poor

12  insight, if you will, and it's the poor insight or the

13  cognitive part of the disorder that makes these folks prone

14  to really impulsive and bad decisions, and that can drive a

15  lot of the very bad outcomes, if you will.

16  Q.  A few quick questions here, can bipolar disorder be

17  cured?

18  A.  No, no.

19  Q.  There are effective treatments for bipolar disorder?

20  A.  Yes.  Like so many other disorders in medicine and

21  certainly in psychiatry, there's no cure for bipolar

22  disorder, rather it's a disorder that we manage

23  chronologically over time, so like high blood pressure,

24  there's no cure for it, it's something that one manages, the

25  same thing with bipolar disorder.

1    Q.  And are there medications that have been approved by the

2    FDA for treatment of bipolar disorder?

3    A.  Yes, there are.

4    Q.  Can you name a couple of them or a few of them?

5    A.  Sure, Lithium, Valproic Acid, known as Depakote, another

6    mood stabilizer called Lamotrigine named Lamictal,

7    Carbamazepine with a brand name of Tegretol, and there are

8    about 10 FDA-approved medications for bipolar disorder.

9    Q.  Now, we met some time ago, I came up to your office when

10   I asked you if you'd get involved in this case and get

11   involved in this assignment, correct?

12   A.  Yes.

13   Q.  And that's the first time the two of us ever met; is

14   that correct?

15   A.  Yes.

16   Q.  And I asked you the assignment I wanted you to undertake

17   had two parts, to look at the double-blind randomized

18   controlled trials in the medical literature for Neurontin

19   treating bipolar disorder and answer the question, did those

20   DBRCTs answer the question is Neurontin effective or

21   ineffective for treating bipolar disorder, that's all I

22   asked you to look at, correct?

23   A.  Yes, simply bipolar disorder.  I understand other folks

24   have testified that Neurontin has been used in other

25   diseases like migraine or neuropathic pain, but that was out

1    of the purview of what I was asked to look at, simply was

2    Neurontin effective in bipolar disorder.

3    Q.  You weren't asked to look at Neurontin treating social

4    phobia, social anxiety, were you?

5    A.  No.

6    Q.  And you undertook a review of four double-blind

7    randomized controlled trials, two the defendant had

8    conducted and two that were independent; is that

9    correct?

10   A.  Yes, I looked at all of the double-blind

11   placebo-controlled randomized clinical trials that are in

12   the entire world literature looking at whether Neurontin

13   works in bipolar disorder, yes.

14   Q.  Were you here for Dr. Dickersin's testimony or part of

15   it?

16   A.  Yes.

17   Q.  Okay.  You were specifically asked to study and to look

18   at what was out there in the literature for bipolar

19   disorder, correct?

20   A.  Yes.

21   Q.  And you conducted your own literature review, didn't

22   you?

23   A.  Yes, I conducted an extensive literature review looking

24   at the entire world literature on Neurontin or Gabapentin in

25   bipolar disorder.

Page 127

1    Q.   And were you looking to see if you had all the

2    double-blind controlled trials; is that what you were

3    looking for?

4    A.   Yes.

5    Q.   And why were you looking for the DBRCTs?

6    A.   Well, the double-blind or placebo-controlled randomized

7    clinical trials are really the only Level I evidence that

8    answers the question is Neurontin effective in the case that

9    I was looking at in treating bipolar disorder.

10   Q.   And there were four of them, correct?

11   A.   Yes.

12   Q.   The ones that the defendants had conducted, Pande and

13   Vieta, you were provided with protocols and research

14   reports, you reviewed those?

15   A.   Yes, these were the internal confidential reports of the

16   defendant, and I, of course, reviewed them and looked at the

17   articles that ultimately derived from those reports and was

18   asked in essence do the research reports, these internal

19   confidential documents, which outline the research study,

20   how it's done, all of this sort of thing, do they equal, if

21   you will, the published clinical trials that derive from

22   those reports.

23            MR. GREENE:  We move to offer Exhibit 383,

24   Protocol 945-209.

25            ( Exhibit 383 was received in evidence.)

1   Q.  The Pande study, that's a scientific research report

2   that you reviewed, correct?

3   A.  Yes, it is.

4   Q.  That was one of the defendants', the lead author was

5   Atul Pande; is that correct?

6   A.  Yes, he was a Parke-Davis employee at the time.

7   Q.  And that's one of the studies you analyzed?

8   A.  Yes, it is.

9   Q.  And just very briefly, what kind of study design was

10  that?

11  A.  Okay.  The 291 was really the first attempt to answer

12  the question does Neurontin work in bipolar disorder, and it

13  was a double-blind placebo-controlled randomized trial where

14  either Neurontin or placebo was offered in a double-blinded

15  fashion, meaning that neither the physicians nor the

16  patients knew who was getting what, remember, they can get

17  Neurontin or placebo, and these were patients who were

18  treated with two other mood stabilizers, I mentioned Lithium

19  and Depakote, Valproic Acid, so the patients were treated

20  with either Lithium or Valproic Acid or a combination of

21  Lithium and Valproic Acid, and the group was then split

22  where half got Gabapentin, Neurontin, and half got placebo,

23  and the idea was to answer the question, do the patients get

24  better when given the Neurontin compared to the placebo in

25  the mania and the depression?

1   Q.  So there were two scales that were measured, mania and

2   depression?

3   A.  Yes, in clinical research in mood disorders, we look at

4   standardized rating scales.  That's really important.  You

5   can't just ask a patient, you know, are you better today,

6   this sort of thing, instead you have to do more of a

7   formalistic assessment.

8           So there are two rating scales, one is the YMRS or

9   the Young mania rating scale, and that's a rating scale that

10  measures symptoms of mania, that upper pole of bipolar

11  disorder.  There's another scale called the Hamilton

12  depression rating scale, which I'll call Ham-D for short,

13  and that's a depression rating scale that measures

14  depressive symptoms.

15  Q.  What were the results of protocol 945209, the Pande

16  study?

17  A.  Well, 209 had basically two looks.  One was the impact

18  of Neurontin vs. placebo on mania, and the other was the

19  impact of Neurontin vs. placebo on depression, and in the

20  YMRS, the Young rating scale, which looked at mania, the

21  placebo outperformed the Neurontin.

22  Q.  How about in the other half?

23  A.  In the depression part of the trial, the Neurontin was

24  no different, no better than placebo.

25  Q.  Would it be fair to describe those results as

1    negative?

2    A.   That would be generous.

3    Q.   What conclusion did you draw from those results?

4    A.   That Neurontin is ineffective in the manic part of

5    bipolar disorder, that Neurontin is ineffective in the

6    depressive pole, that in fact in the mania part, the placebo

7    acted better than the Neurontin, and the ultimate conclusion

8    is that Neurontin is ineffective, did not work in the

9    treatment of patients with bipolar disorder.

10   Q.   And in looking at the research report that we just

11   marked and introduced into evidence the periods covered were

12   from 3-96 to July of '97; is that correct?

13   A.   Yes.

14   Q.   And do you know when the results of this Pande study

15   were available for the company?

16   A.   Well, the results were done, were sealed by July of '97.

17   Dr. Pande had written a letter to the investigators, the

18   folks who actually did the study, in July of 1998 and

19   informed those investigators then that Neurontin was

20   ineffective, so the company would have known some time

21   between July of '97, when the study was done, until July of

22   '98, so some time in between that when the letter to the

23   investigators was sent out.

24   Q.   So those are the only two reference points in the

25   documents that were produced to me that I gave you that

1    would answer the question when did the company know the

2    results of the study?

3    A.  Yes.

4    Q.  The best we can say, some time between July, '97, when

5    the study is dated to end and Pande's letter to his

6    co-investigators July, '98; is that correct?

7    A.  Yes.

8    Q.  I will ask you about Dr. Pande's article, Exhibit 1393.

9    You've referenced that, correct?

10   A.  Yes.

11   Q.  Excuse me, you've reviewed that study, you're familiar

12   with it?

13   A.  Yes, it's one of the four double-blind

14   placebo-controlled RCTs on bipolar disorder.

15   Q.  Does Dr. Pande's article disclose the negative

16   results?

17   A.  It does.

18   Q.  And was that published in October of 2000?

19   A.  Yes.

20   Q.  In the Journal of Bipolar Disorders?

21   A.  That's where it was published, yes.

22   Q.  You're familiar with that journal as a psychiatrist?

23   A.  Yes.

24   Q.  Would you tell the jury what kind of journal that is?

25   A.  Bipolar disorder is a fairly narrow journal that only

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1    looks at and publishes results relative to mood disorder.

2    It's a small journal, it has a small circulation, it's not a

3    journal that I get or anybody I know gets, it would be

4    something more that a library would get.

5    Q.  What's the circulation of that journal?

6    A.  I believe it's 450, 455.

7            MR. GREENE:  I'm going to move on to Frye,

8    Exhibit 1477, offer that.

9            ( Exhibit 1477 was received in evidence.)

10   Q.  Are you familiar with the Frye study?

11   A.  Yes.

12   Q.  Can you describe that for the jury?

13   A.  Yes.  Frye offered another double-blind

14   placebo-controlled randomized trial again looking at a bunch

15   of bipolar patients treated either with Neurontin or with

16   placebo, and the idea was to look at improvement using a

17   scale called the CGI or Clinical Global Improvement, which

18   is a rater rated scale, it's not the patients who do that,

19   in a double-blinded fashion of patients with bipolar

20   disorder.

21   Q.  And that was authored by Dr. Mark Frye, correct?

22   A.  Yes.

23   Q.  Is that a trial you analyzed?

24   A.  Yes, it is, it's one of the double-blinded trials.

25   Q.  That trial was not conducted by the defendants, was

1  it?

2  A.  No, it was not.

3  Q.  What were the results of that trial?  What did that

4  show?

5  A.  That trial also showed that Neurontin was no better than

6  placebo in treating bipolar patients.

7  Q.  And the results of that trial were published?

8  A.  Yes, they were.

9  Q.  There was some, you've reviewed the documents that show

10 there were preliminary results that Dr. Frye disclosed in an

11 abstract we had here the other day.  Are you familiar with

12 the abstract?

13 A.  Yes, I am.

14 Q.  And they showed that the preliminary results showed that

15 the trial was favorable; is that right?

16 A.  That's correct.

17 Q.  Ultimately it was negative, and that was published?

18 A.  It was.  It was a very interesting trial because in

19 addition to looking at Neurontin, Gabapentin, it also looked

20 at another medication that we now know to be effective in

21 bipolar disorder.  I had mentioned it when you asked me

22 about other treatments.  This is a medication called

23 Lamotrigine or Lamictal, so in addition to looking at

24 Neurontin and placebo, there is also a Lamictal arm, and

25 what was quite remarkable about this study is that it was

1   a --

2   Q.   This is the Frye study you're describing, correct?

3   A.   Yes, Frye.  Is that it was a study where patients got

4   the Neurontin, the Lamictal and the placebo, okay, but what

5   was amazing about it which made it such a good study is that

6   it was a crossover study so each patient got each of the

7   three treatments.

8   Q.   Can you give us a little more detail on that, a little

9   more explanation, what you mean by that, crossover, they

10  each got three, for what period of time and how did that

11  happen?

12  A.   Well, each patient got six weeks of each treatment, so

13  let's say that you had -- and it was randomized, so patients

14  didn't know if they were getting placebo or Lamictal or

15  Neurontin first.

16          In a random way blinded to the patients and the

17  doctors doing this, the patients received each of those

18  treatments sequentially, so it's called a crossover because

19  let's say a patient started on -- I'm being kind of random

20  with this -- started with Neurontin, they would get that for

21  six weeks, they'd be rated, then they'd be crossed over to

22  one of the other two treatments, in that case, Lamictal or

23  placebo.  Of course you could start at placebo and then

24  cross over to Neurontin or Lamictal and so on and so forth,

25  but what was remarkable about that trial is that it was a

1    crossover design.

2    Q.  Now, having described that for us, what were the

3    results?  How did Neurontin compare to the placebo and

4    Lamictal, the other drug?

5    A.  Well, Neurontin failed to beat placebo, so compared to

6    placebo Neurontin was ineffective.  Lamictal, not

7    surprisingly, because we use it a lot today, was very

8    effective and treated patients by beating out placebo, so

9    Lamictal was effective, Neurontin was not effective.

10   Q.  I want to move on to the third double-blind randomized

11   controlled trial, and that is the Guille study.  That's what

12   we call it; is that correct?

13   A.  Yes.

14   Q.  And have you reviewed that?

15   A.  Yes, I have.

16            MR. GREENE:  We move to offer Exhibit 211.

17            MR. SOBOL:  It's in.

18   Q.  Can you describe that study for us, please?

19   A.  Yes, Guille, Constance Guille, and the other folks that

20   conducted this study, were associated with the Massachusetts

21   General Hospital here in Boston, and, again, it was a

22   double-blind placebo controlled randomized trial where

23   patients were given Neurontin or placebo, and they were

24   measured in terms of how well they did in both the mania,

25   using the YMRS, that Young mania rating scale I had

1  mentioned, and the depressed phase, again using the Ham-D

2  that I had mentioned.

3  Q.  What was the primary end point being studied in that

4  clinical trial?

5  A.  Improvement of neither the Ham-D or the YMRS.

6  Q.  And the Young is mania, and the Hamilton is the

7  depression scale?

8  A.  Yes.

9  Q.  And tell us what the results of that trial were?

10  A.  That Neurontin was ineffective at beating placebo in

11  treating the mania and that Neurontin was ineffective at

12  treating the depression, again compared to placebo in a

13  double-blinded fashion.

14  Q.  Fair to describe those as negative results?

15  A.  Yes.

16  Q.  What conclusionS do you draw from the analysis of that

17  trial?

18  A.  That Neurontin is ineffective in treating the manic

19  phase or the depressed phase of bipolar disorder, and since

20  it's not effective in treating either of those two poles

21  that Neurontin is not effective in treating patients with

22  bipolar disorder.

23  Q.  Now, I want to move on to the Vieta study, that's the

24  final and fourth double-blind randomized controlled trial,

25  and this was the defendant's study, correct?

Page 137

1    A.  Yes.

2         MR. GREENE:  And I move to introduce Exhibit 398,

3    Protocol 945-291.  I also move to introduce the research

4    report which we have study Exhibit 469.

5         ( Exhibit 398 and 469 were received in evidence.)

6    Q.  You've seen those documents and you've reviewed them,

7    correct, Doctor?

8    A.  Yes, I have.

9    Q.  Could you summarize for us what the defendants, just

10   describe the study if you would, please.

11   A.  Sure.  I'm going to refer to it as the Vieta study,

12   okay, even though it will just spare us all of saying

13   945-291 many, many times over.

14        So, again, this is a double-blind

15   placebo-controlled randomized trial, Level I evidence, and,

16   again, what we're doing is we're looking at patients who

17   have bipolar disorder, both mania and depression, and we're

18   giving them Neurontin vs. placebo, and these were patients

19   who are being treated with Lithium, which is one of those

20   treatments for bipolar disorder, or Carbamazepine, Tegretol,

21   which is another treatment for bipolar disorder or a

22   combination of the two, and it's looking at a measure called

23   the CGI, which I had mentioned earlier, which is the

24   clinical global depression again done by a rater, so we're

25   not just asking the patients do you feel better today.

1    And the study was conducted using something called

2  an intention to treat analysis, so the idea is to look at

3  the impact, the positive or negative impact of Neurontin vs.

4  placebo on these patients.

5  Q.  And we've heard some testimony the last couple days

6  about intention to treat and per protocol populations.  Can

7  you describe for the jury what was done in this trial with

8  regard to the intention to treat population and the per

9  protocol population?

10  A.  Right.  Okay.  So, the whole group we'll call the

11  intention to treat.  I was here when Dr. Dickersin

12  testified, but the idea is that the ITT or intention to

13  treat group is everybody that you intend to treat or

14  everybody that's going to get a dose or be included in the

15  study, so that's the first thing that you need to know about

16  this study.

17    The study also broke out a subgroup or

18  cherry-picked population, if you will, of patients that

19  entry into the study were more healthy and patients that

20  were compliant, meaning that let me put it to you in a

21  slightly different way.  There were two populations in the

22  trial, the ITT or intention to treat group, so let's say

23  that you're going to do a study measuring what percent of

24  the time the green line is on time at Park Street.

25    The ITT group would be looking at what percent of

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1    the time do trains, all green line trains, arrive on

2    Park Street.  By defining a subpopulation of patients who

3    were more healthy going in, that would be analogous to

4    looking at the green line trains that are new, maybe that

5    are two years old or newer, and the group that's compliant

6    let's just say that those are the trains that actually make

7    it to the train station.

8              So what we're looking in the subpopulation is

9    we're starting out with looking at all of the trains, all of

10   the people, and in the train analogy what percent of the

11   time they make it on time.

12             In the subpopulation or the per protocol group,

13   we're looking exclusively at a smaller subset, and we're

14   only looking at trains that are less than two years old and

15   the ones that didn't break down, if you will, when they're

16   on their way.  So the PP or per protocol subgroup is a very

17   small population of the ITT group.

18   Q.  Right.  Now, if we bring that back to the Vieta study

19   and we actually use the numbers of the subjects that were in

20   the study, can you tell us how many were in the ITT group?

21   A.  There were 41 subjects in the ITT group.

22   Q.  And the per population group, how many?

23   A.  In the PP or per protocol group there were 25.

24   Q.  So when the protocol was written up, and the protocol,

25   was it designed to look at the ITT group?

1   A.  Yes, it was.

2   Q.  And the research report was written up, and we had the

3   results of the ITT group?

4   A.  We did.

5   Q.  And what were they?

6   A.  In the case of the whole group, the ITT group, Neurontin

7   was no better than the placebo, Neurontin was ineffective.

8   Q.  Now, did the company pull out the PP group, per protocol

9   group?

10  A.  Yes.

11  Q.  And did they analyze that?

12  A.  Yes.  The company analyzed the subgroup, the PP group

13  separately than the ITT group, and in that analysis the

14  bottom line is that Neurontin did outperform placebo in that

15  subgroup.

16  Q.  And can you tell us how this was written up?

17  A.  Well, ultimately this was written up by a man named

18  Vieta who is a psychiatrist from Spain, I think he's from

19  Barcelona.

20  Q.  This is the same Vieta, this is the defendant's company,

21  he was just one of the investigators, right?

22  A.  Yes, that's right.  That's why I wanted to call it

23  Vieta, not to throw numbers out at everyone in the

24  courtroom.

25  Q.  When you say written up, you're not talking about the

1    research group, you're talking about a published article?

2    A.  Yes, that's right.

3         MR. GREENE:  We'll introduce 1865, the Vieta

4    article.

5         ( Exhibit 1865 was received in evidence.)

6    Q.  Now, you saw that and reviewed that document, correct?

7    A.  I did.

8    Q.  And it purports to write up the results of the

9    defendant's internal research report, correct?

10   A.  That's correct.

11   Q.  So describe or tell us how it's described in the

12   article?

13   A.  Well, the article states that they're looking at an IT

14   or intention to treat group.

15        THE COURT:  Could you show us?  Do you have it?

16        MR. GREENE:  We do.

17        THE CLERK:  It's already in evidence.

18        MR. GREENE:  It's in evidence.  We'll put it up.

19        THE WITNESS:  It would be helpful to have a copy.

20        THE COURT:  I assume it's in evidence.  Do you

21   have it in front of you?

22        THE WITNESS:  No, I don't.  It would be helpful to

23   have a copy.

24        MR. GREENE:  We're going to put it up on the

25   screen.  One second.

Page 142

1   Q.  Do you have that there, Doctor?

2   A.  Yes, I do.

3          MR. GREENE:  Your Honor, may I approach the

4   witness so he has a copy in front of him?

5          THE COURT:  Yes.

6   Q.  I'm just going to give you a hard copy, Doctor.

7   A.  Thank you.

8   Q.  So that's the article that's written up, and it

9   indicates it's sponsored by Pfizer, correct?

10  A.  It does.

11  Q.  Now, I think I asked you how did they write it up, and

12  can you direct the jury's attention how they describe the

13  results in the article?

14  A.  Yeah.  The results are described looking at the change

15  from the baseline, okay.

16  Q.  Just show us where you are.

17         THE COURT:  Put your finger on the screen.

18  There's a little yellow dot that will come up.  You can show

19  the jury.

20  A.  I'm just looking at the results actually.

21  Q.  That's on the first page?

22  A.  Yes.

23         THE COURT:  Why don't you put it.  (HAM-D)

24  Q.  Touch where you're referring to.

25  A.  The article was looking at a bunch of results.

1        MR. GREENE:  We don't do it as well as Pfizer, but

2   we're getting there.

3        THE COURT:  So you press clear.

4   A.  So the article looks at a tremendous number of different

5   things, they look at this clinical global impression scale,

6   they look at the YMRS, they look at the Ham-D scale, they

7   look at a scale called the PSQI, which is a scale that looks

8   at parameters of sleep.

9        They look at another scale called the Hamilton

10  Anxiety Rating Scale or the Ham-A, so there are a bunch of

11  outcomes.  The primary outcome, the most important efficacy

12  measure is the change from the end of the study to the

13  baseline using the CGI, the clinical global compression

14  scale, and all of those other scales are secondary measures,

15  so primarily they're looking at the CGI, and, secondarily,

16  they're looking at those other scales that you see up there,

17  the YMRS, Ham-D, Ham-A and the PSQI.

18  Q.  So, does the article accurately report the negative

19  results from the defendant's research report?

20  A.  No, and that's the trouble here.

21  Q.  In layman's terms can you tell us why it does not?  You

22  can point to the language in the article because I think it

23  would be good for us to see.

24  A.  Well, if you go to the next page, which is page 474, and

25  if you go to the right column -- I guess I get to do the

13cc2cfa-8501-4a9b-9ad9-680de512d39a

1  thing with the circle again -- down at the bottom on the

2  right, if you could slide that over, all statistical

3  analyses were done by intention to treat and last

4  observation carried forward, which basically to translate

5  purports that this article is reporting on all of the

6  subjects initially in the intention to treat, the ITT group,

7  and is taking all of the folks, even if they dropped out,

8  and is carrying forward the last ratings that the problem

9  here is that that's not what happened.

10        The thing that happened is only the per protocol

11  group, that subgroup of the original ITT, is written up and

12  included in the paper by Vieta.

13  Q.  I'm going to put the research report up so the jury can

14  see that, but are there any ways that the peer reviewers of

15  that article, the Vieta article, would know what the study

16  design was and the research report?

17        MR. HOOPER:  Objection, calls for hearsay.

18  A.  They would have had to.

19        THE COURT:  Whoa, would you know one way or

20  another what the peer reviewers saw?

21        THE WITNESS:  Well, I would assume that the peer

22  reviewers saw the completed manuscript, which is what was

23  published in this manual.

24        THE COURT:  Is it standard in the industry to get

25  the underlying data?

1        THE WITNESS:  If the question is when you're doing

2   peer review --

3        MR. GREENE:  I can rephrase it.

4        THE COURT:  Yes, why don't you.

5   Q.  This article was presented to the journal for

6   publication, correct?

7   A.  Yes.

8   Q.  And the article was peer reviewed before it was

9   published?

10  A.  Yes.

11  Q.  You don't know who the peer reviewers were, correct?

12  A.  No, one wouldn't know that, when the article is peer

13  reviewed, the authors don't know who peer reviewed that.

14  Q.  Once the article is published, it's in the medical

15  literature and physicians can read it, correct?

16  A.  Yes.

17  Q.  And you've read articles that get published, right?

18  A.  Yes, all the time.

19  Q.  You don't have access to the internal research reports

20  that the published article is describing the results from,

21  do you?

22  A.  Oh, no, no, the internal research reports are

23  confidential.  One wouldn't have access to that.

24  Q.  So the peer reviewers for this Vieta article, would they

25  have been given the research reports?

1      MR. HOOPER:  Objection, your Honor.

2      THE COURT:  Sustained.

3   Q.  Is it common practice for the peer reviewers to be given

4   the confidential research reports of a drug company when an

5   article is going to be published --

6      MR. HOOPER:  Objection, your Honor.

7   Q.  -- describing the results of the --

8      THE COURT:  Overruled.

9   Q.  -- research report?

10  A.  That wouldn't be something that the peer reviewers would

11  have access, and it wouldn't be anything that the reader of

12  the article, we'd only have access to the article itself

13  once it's published, not the internal confidential

14  protocol.

15  Q.  This Vieta study is a double-blind randomized controlled

16  trial, correct?

17  A.  Yes, it is.

18  Q.  Again, this is Level I evidence, this is the fourth

19  trial that we looked at this morning, that is Level I all

20  with negative results showing that Neurontin is no more

21  effective than placebo or comparative drug for one of those

22  studies?

23  A.  That's correct, right.

24  Q.  Doctor, did you look at any other double-blind

25  randomized controlled studies that studied Neurontin's

Page 147

1    affectiveness in treating bipolar disorder?

2    A.  I tried to.  The reason I say I tried to, there were no

3    other double-blind randomized controlled RCTs, Ham-D, are

4    all they are.

5    Q.  That was something you asked me for, correct?  Are there

6    any out there?

7    A.  Well, I asked you on several occasions, but I first

8    consulted my literature.

9    Q.  You did a literature search looking for that?

10   A.  Yes.

11   Q.  And those are the four that were out there when you

12   undertook your search?

13   A.  That's correct.  I redid the research a few weeks ago,

14   and there are no other double-blind RCTs looking at

15   Neurontin and bipolar disorder.

16              THE COURT:  How much longer do you have?

17              MR. GREENE:  Less than half an hour.

18              THE COURT:  We won't wait.  A couple minutes we'd

19   finish direct, but it's not worth it.  See you tomorrow.

20              THE CLERK:  All rise for the jury.

21              (Whereupon, the trial was suspended at 1:00 p.m.)

22                        - - - -

23

24

25

1                C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    ) ss.

5    CITY OF BOSTON               )

6

7

8           I, Lee A. Marzilli and Valerie A. O'Hara, Official

9    Federal Court Reporters, do hereby certify that the

10   foregoing transcript, Pages 1 through 147 inclusive, was

11   recorded by us stenographically at the time and place

12   aforesaid in Civil Action No. 04-10981-PBS, In Re:

13   Neurontin Marketing, Sales Practices, and Product Liability

14   Litigation, and thereafter by us reduced to typewriting and

15   is a true and accurate record of the proceedings.

16          In witness whereof we have hereunto set our hands

17   this 25th day of February, 2010.

18

19                    /s/ Lee A. Marzilli

20                    /s/ Valerie A. O'Hara

21                    _____

22                    LEE A. MARZILLI, CRR

23                    VALERIE A. O'HARA, RPR

24                    OFFICIAL FEDERAL COURT REPORTERS

25

13cc2cfa-8501-4a9b-9ad9-680de512d39a