IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                    )
                                          ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,  ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION         )
----------------------------------------)
This document relates to:                 )
KAISER FOUNDATION HEALTH PLAN, et al,  )
                                          )
                  Plaintiffs              )
                                          )
          -V-                             )No. 04-10739-PBS
                                          )Pages 1 - 149
PFIZER, INC., et al,                      )
                                          )
                  Defendants              )



JURY TRIAL - DAY FIVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 26, 2010, 8:55 a.m.



LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3         THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5

6         THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
7    Suite 301, Cambridge, Massachusetts, 02142.

8         LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,

9    850 Third Avenue, New York, New York, 10022.

10        DON BARRETT, ESQ., Barrett Law Office,

11   404 Court Square North, P.O. Box 987, Lexington, Mississippi,

12   39095.

13        BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &

14   Bernstein, Embarcadero Center West, 275 Battery Street,

15   San Francisco, California, 94111-3339.

16

17   FOR THE DEFENDANTS:

18        KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and

19   THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,

20   Four Times Square, New York, New York, 10036.

21        RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
22        JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,

23   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.

24

25

1                          I N D E X

2     WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3

4     JEFFREY S. BARKIN, M.D.   19      34       75        79

5     AMBROSE CARREJO          81     133

6

7     EXHIBITS                          PAGE

8     110                                23

9     2079                               24

10    1324                               27

11    166                                29

12    63-for ID                          30

13    139-for ID                         30

14    360-for ID                         32

15    17, 18                             48

16    523                                58

17    63                                 77

18    268                                89

19    268-B                              89

20    268-A                              92

21    139                                95

22    286                               102

23    250                               107

24    357                               113

25    319                               117

Page 4

| | | |
|---|---|---|
| 1 | 273 | 117 |
| 2 | 353 | 122 |
| 3 | 352 | 123 |
| 4 | 333 | 125 |
| 5 | 340 | 126 |
| 6 | 366 | 129 |
| 7 | 371 | 129 |
| 8 | 798 | 138 |
| | 812 | 141 |
| 9 | 820 | 145 |

10

11                    P R O C E E D I N G S

12          THE COURT:  Are you all ready to work tomorrow?

13          (Laughter.)

14          MR. GREENE:  I remember when I used to enjoy Friday

15    nights, Saturdays reading the newspaper, Sundays.  It's been a

16    long time.

17          THE COURT:  It's a great trial, but it's a hard one.

18    I understand that.  So, anyway, what do we have here today?

19          MR. CHEFFO:  I did tell Mr. Alba I would be quick, and

20    just to give the Court a quick road map, I have an issue with

21    Barkin, a document.  And to the extent we have any issues with

22    Carrejo, I'd like to address those at the 11:00 o'clock break,

23    but Ms. Nussbaum and I are going to talk about that.

24          We have a new, I guess, record.  Not only do we have

25    it like two minutes before, but I got slides about Dr. Barkin

1    during the middle of his now direct examination last night,

2    so --

3              THE COURT:  I thought we were past this.

4              MR. GREENE:  We did, we addressed it, and you said to

5    talk and come up with a rule.  And we didn't talk about it, but

6    I sent these at 6:15 last night.  And I talked to Mark, I said,

7    "How about a 6:00 o'clock rule?"  We talked this morning.  He

8    wanted to talk to his team.  I said, you know, with the

9    exception of my 6:14 --

10             THE COURT:  When did you see these?

11             MR. CHEFFO:  Well, I got these at 6:15, but he's been

12   testifying for forty-five minutes.  And I think going forward

13   we can probably agree to a 6:00 o'clock rule.  I mean, I just

14   think the man has been testifying for forty-five minutes and --

15             THE COURT:  You had these last night?

16             MR. CHEFFO:  No, I got these last night.

17             THE COURT:  All right, well, but no new ones, no new

18   ones.  All right.

19             MR. CHEFFO:  Well, these are new because we never had

20   them before, but --

21             MR. SOBOL:  Can we make it 5:00 o'clock going forward?

22             MR. CHEFFO:  I think 6:00 o'clock will probably work,

23   but we --

24             THE COURT:  Because you guys don't get -- I mean,

25   you've got to eat lunch.

1    MR. GREENE:  That's what happened, we went back and we

2  were working.  These are the exhibits, and it's literally

3  language, documents that he relied on right from his report.

4    THE COURT:  All right, but right now, memorialize,

5  short of somebody getting sick or something just couldn't be

6  foreseen, do 6:00 o'clock the night before.  Guillotine

7  otherwise.  I'm not saying you can't write it down.  I'm just

8  simply saying no fancy-shmancy graphics because it's too hard

9  to follow and make sure they're accurate.  You've had them

10  since last night?

11    MR. CHEFFO:  Yeah.  I mean, it's not just the, you

12  know, kind of a whiny thing.  It's sometimes you'd like an

13  opportunity not only to get them and read them but to actually

14  do your own slides.  And if you get them at 6:00, 7:00, 8:00,

15  9:00, 10:00 o'clock, then people have to work all night long to

16  do it.  So that's really my issue.  It's not that we can't look

17  at them and respond to them, but in order to prepare another

18  graphic, it's virtually impossible to do that.

19    THE COURT:  I one hundred percent agree with you it is

20  a problem.  We now have a 6:00 o'clock rule, but since you got

21  it at about 6:00, I'm not going to exclude it.

22    Ms. Nussbaum, you weren't here yesterday.  I know you

23  had a real problem with your client in terms of -- so right

24  now, do you want to put your two people on and just finish up?

25  I mean, because otherwise one of them is inevitably going into

1  Monday, and there's a weekend issue.

2          MS. NUSSBAUM:  That's fine, your Honor.  We can put

3  them on now.

4          MR. CHEFFO:  Well, we're not actually prepared to do

5  both of them right now, your Honor.  I mean --

6          THE COURT:  I thought you were told about this.

7          MR. CHEFFO:  No.  We were told last night at

8  7:00 o'clock that we were going to finish with this witness, we

9  were going to do -- Jewell was quick, and then they were going

10  to put on Carrejo.

11          THE COURT:  Oh, is that all?

12          MS. NUSSBAUM:  No, no, and Daniel.

13          THE COURT:  I heard two of them.

14          MR. BARRETT:  We did.  We told them at side bar

15  yesterday.

16          MR. CHEFFO:  Well, if they both finish.  I don't think

17  Carrejo is going to be finished today.

18          THE COURT:  Well, that's the issue I am going to

19  accommodate Kaiser on, which is I don't want somebody to be

20  split and have to come back on Monday.  We talked about that

21  last night.  So if you want to put Carrejo on first after the

22  psychiatrist, I am going to let them do it.

23          MS. NUSSBAUM:  Thank you, your Honor.

24          THE COURT:  Because we totally lost the last witness,

25  and that's your fault because -- not fault but your scheduling

1    decisions, but if they want to put Carrejo on so he can get out

2    of here --

3             MR. CHEFFO:  I don't have a problem with that.  I'm

4    just saying, but then Carrejo and Daniel, I don't know that --

5    if Daniel is next, I just don't think -- we'll see what

6    happens, but I just don't think that we're going to be able to

7    finish both of them today.

8             MS. NUSSBAUM:  Daniel will be very brief.

9             THE COURT:  Is the jury here?

10            MR. CHEFFO:  I have actually two documents, your

11   Honor.

12            THE COURT:  Oh, all right, let's go.

13            MR. CHEFFO:  This is in connection with Mr. Greene's

14   examination.  These were exhibits that were provided to us.

15   This is a fat CME.  It's Exhibit No. 360.

16            THE COURT:  And, by the way, I don't get these

17   exhibits.  Is someone giving me exhibits?

18            MR. CHEFFO:  360?

19            THE COURT:  Well, what do you want to do about it?  It

20   looks like it's about 100 pages thick.

21            MR. CHEFFO:  Right.  What it is, it's from the CME

22   organization.  There's nothing you can even tell on it that it

23   even has anything to do with gabapentin, Pfizer, Neurontin.  It

24   basically just says "New Frontiers of Social Phobia," and it's

25   lists of names, and it's apparently some internal document

1    that's hard to even decipher that hasn't been --

2              THE COURT:  Well, what's the relevance of it?

3              MR. GREENE:  This is a series of tactics, CME, and

4    it's sponsored by Parke-Davis that I think Cline, Davis & Mann

5    ran.  They ran them across the country.  And that's one

6    exhibit.  There's the two that preceded --

7              THE COURT:  No, but what is this one since he's

8    challenging this one?

9              MR. CHEFFO:  360.

10             MR. GREENE:  Those are the metrics that have the

11   cities they ran it in and the attendees and the dates across

12   the country.

13             THE COURT:  Will you have other evidence that links

14   this up to --

15             MR. GREENE:  The exhibit before it is the slides at

16   the presentation the same day.

17             THE COURT:  That's given around the country?

18             MR. GREENE:  That's given around the country.

19             MR. CHEFFO:  That's not --

20             THE COURT:  Well, but I'll hear it then.

21             MR. CHEFFO:  That's wrong.  I mean, and if you look at

22   63, your Honor --

23             THE COURT:  I don't have these exhibits.  Where are

24   they?  By the way, it's useful sometimes -- some of you are

25   giving me exhibits and some aren't, and so -- what is it?  What

1   page?

2           MR. CHEFFO:  It's Exhibit 63.  If you look at just the

3   headings, one is --

4           THE COURT:  I don't have Exhibit 63 still.

5           MR. CHEFFO:  I know you don't have it, but my issue

6   is, they're basically saying this document, which I have an

7   independent objection to, and this one I do, relate to each

8   other.  And the title says "New Frontier:  Anxiety, Substance

9   and Bipolar Disorder."  This one says "Social Phobia and

10  Bipolar Disorders."  This one has information about -- this is

11  63 -- has information about Neurontin/gabapentin.  I have

12  hearsay objections and foundation, but it does talk about

13  Neurontin/gabapentin.  What I understand at least they're

14  trying to do is say, Here's the presentation, and here's all

15  this metrics and other information.  But they're different

16  studies.  They're different presentations.

17          MR. RONA:  Your Honor, if I can explain, 30 seconds,

18  your Honor?

19          THE COURT:  I can't do it until I see the exhibits.

20          MR. RONA:  Your Honor, 30 seconds or less.

21  Dr. Abramson reviewed annual meetings by the same company, CME,

22  Inc.  The company then signed the contract to do thirty or more

23  of these around the country every year, '98, '99, 2000.  So

24  Dr. Barkin has reviewed slides for '98 and '99, and he talks

25  about them.

1          THE COURT:  But how do you know that those slides were

2     shown at these meetings?

3          MR. RONA:  He reviewed the slides for those meetings.

4          MR. CHEFFO:  This is from a third party.  That's just

5     not true.  This is, first of all, from a nonparty.  There's no

6     foundation.  Abramson could have talked about this.  He didn't

7     link up any of these.  What we have is basically one

8     presentation --

9          THE COURT:  Excuse me.  What is the foundation?  Who's

10    authenticating these documents?  What's the foundation?

11         MR. GREENE:  That they come from the marketing

12    company --

13         MR. RONA:  CME, Inc.

14         MR. GREENE:  -- CME, Inc., and they're relied upon by

15    Barkin in his file.  They're part of the marketing tactics that

16    were --

17         THE COURT:  I understand why they're relevant.  I got

18    it.  Who puts in the documents that this is what you say they

19    are, that they're a business record of Cline or somebody else?

20         MR. GREENE:  We would tie them with the marketing grid

21    through Knoop deposition testimony that this was a tactic, this

22    type of a --

23         THE COURT:  I need to see the foundation.  It's

24    relevant if it's authenticated.

25         MR. CHEFFO:  This goes to all --

1        THE COURT:  Yes, but, you know, at this point, is the

2   jury here?

3        THE CLERK:  Yes, they are.

4        MR. SOBOL:  May I be heard?

5        THE COURT:  Yes.  What's the authentication?

6        MR. SOBOL:  The authentication, this is a document

7   that was produced to us in the course of discovery.  For about

8   four years we've tried to have a protocol with the defendants

9   about authenticating and business records.  We had an order

10  from the magistrate before trial.  That was supposed to be a

11  process.  Please, if I may.  Then, in the months before this

12  trial, we have sat down with the defendants time and time again

13  trying to find out:  Are you going to be making objections like

14  authenticity or business record if it's something that is

15  produced from a company?

16       MR. CHEFFO:  It's not --

17       THE COURT:  Well, they haven't agreed, so you need --

18  there's nothing I can do now.  I'm mid-trial.  What?

19       MR. SOBOL:  Can we subpoena a witness from CME?

20       THE COURT:  Fine, fine, subpoena a witness from CME.

21       MR. SOBOL:  Very good.  Thank you.

22       MR. CHEFFO:  So until they establish a foundation --

23       THE COURT:  This is what we'll do:  We will mark them

24  for identification.  Barkin will testify.  They will not come

25  into evidence until they're authenticated.

1          MR. CHEFFO:  And that's fine, your Honor.  And just so

2     the Court is clear, because I know you don't have the documents

3     and I think they need to give it to you, we are talking about

4     two different documents, okay?  Here's the one that was shown,

5     and here's 150 pages of analysis on a different program that

6     doesn't even mention gabapentin.  So it's not like they have

7     this --

8          THE COURT:  I don't know.  No one has shown me the

9     documents.  If you say the second one hasn't discussed

10    gabapentin, what is your basis for hooking them up?

11         MR. RONA:  If he's saying the document that says who

12    attended the meetings doesn't address gabapentin, the meeting

13    addresses gabapentin.

14         MR. CHEFFO:  No, Ilyas, it doesn't.

15         MR. RONA:  We have the slides, and Barkin reviewed it.

16         MR. CHEFFO:  This one is called "Anxiety --"

17         THE COURT:  You know, I can't do this now, okay?

18    There are hundreds and hundreds of pages in each one of these

19    documents.  There is at this point no foundation.  So if

20    Dr. Barkin thinks it's the same one, then he can say it, but

21    it's not coming into evidence.  I don't know what to say at

22    this point.  I'm hearing it for the first time, so --

23         MR. CHEFFO:  I mean, I would ask, your Honor, that we

24    not allow them to be shown because the headings --

25         THE COURT:  I said I wouldn't allow them to be shown,

Page 14

1    but the expert can talk about them.

2         MR. CHEFFO:  Even though the headings are different of

3    the two programs on the two documents?

4         THE COURT:  I don't know because I haven't been given

5    them yet.  So let me -- I mean, you know, there's a basic

6    problem here.

7         MR. CHEFFO:  I can give you my copy.

8         THE COURT:  I know, but there's hundred and hundreds

9    of pages for me to go through.  Now, let's call up the doctor.

10        MR. CHEFFO:  I would just say, if you look at the

11   first page of each one, the names of the program --

12        THE COURT:  What number is it?

13        MR. CHEFFO:  63.

14        THE COURT:  I don't have 63.  63 isn't in there.

15        MR. CHEFFO:  63 and 360, the names of the programs,

16   your Honor, that's my only point.  You just have to look at the

17   first page.  They're different programs.

18        MR. RONA:  Your Honor, we're not representing them to

19   be the same programs.  Dr. Barkin has reviewed the slides for

20   '98 --

21        THE COURT:  Then how do we know 63 refers -- show me

22   where 63 refers to Neurontin.

23        MR. CHEFFO:  And 360 I think is the one that

24   doesn't --

25        THE COURT:  It may be relevant for other reasons to

1    show that there's an association between the parties, but

2    that's different from whether fraud --

3              MR. CHEFFO:  I agree.  The other one is the one that

4    doesn't refer to Neurontin.  That one does refer to Neurontin.

5              THE COURT:  All right, I'm allowing in 63 as long as

6    it's authenticated.

7              MR. CHEFFO:  And then 360 is the one that is a

8    different program that doesn't refer -- as best as I can tell,

9    it doesn't refer to Neurontin at all, the fat one.

10             THE COURT:  It's the same organization.  It says

11   "Supported by an unrestricted grant from Parke-Davis."  Does it

12   mention Neurontin in here?

13             MR. RONA:  The program slides do, and Dr. Barkin --

14             THE COURT:  Excuse me.  Let me see the program slides.

15             MR. GREENE:  Can I help with the foundation a little

16   bit?

17             THE COURT:  Yes.

18             MR. GREENE:  Exhibit 139 which is the Neurontin 2000

19   situation analysis --

20             THE COURT:  I don't have 139.

21             MR. GREENE:  It's going to be introduced as --

22             THE COURT:  Well, I know, but I can't rule.  139 says

23   what?  Let me see it.

24             MR. CHEFFO:  What's 139, Tom?  That's not a Barkin

25   exhibit, is it?  I don't even know what you're talking about

1    giving to the Judge.

2         THE COURT:  Excuse me.  No one's memorized every

3    number.  Here, show him what you're referring to.  Is that a

4    Pfizer document you just showed me?

5         MR. GREENE:  Yes, it is.

6         THE COURT:  And the Pfizer document references

7    the social -- which one does the Pfizer document reference,

8    number what?

9         MR. GREENE:  "New Frontier:  Anxiety, Substance and

10   Bipolar Disorder" conducted in the -- but it's a CME program.

11        THE COURT:  And that's that big thick thing.  So why

12   isn't that enough of a hookup?

13        MR. CHEFFO:  Well, first of all, it's not

14   authenticated.  There's no foundation for it.

15        THE COURT:  Well, that's a Pfizer document, he said.

16        MR. CHEFFO:  It refers to something.  The Bates stamps

17   on that document, your Honor, are from a different company.

18        THE COURT:  Excuse me.  Authentication is different

19   than relevance.  This is clearly relevant.  Now, how are you

20   going to authenticate it?

21        MR. CHEFFO:  Can I say one thing, your Honor?

22        THE COURT:  Yes.

23        MR. CHEFFO:  I think they're going to show one slide

24   deck and then this other irrelevant one.  They don't have the

25   slide deck that they've given us that relates to that analysis.

1          THE COURT:  I don't know.  They said they're looking

2     for it.

3          MR. CHEFFO:  Well, but they haven't.

4          THE COURT:  I know, but it's now ten past 9:00.  Is

5     this all Barkin stuff?

6          MR. GREENE:  Barkin is going to take less than fifteen

7     minutes.

8          THE COURT:  Well, how do you hook up the slide to this

9     program on social phobia and bipolar disorders?

10         MR. GREENE:  This is a business record, a Pfizer

11    business record.

12         THE COURT:  I understand.  How do you hook up the

13    slide?

14         MR. GREENE:  The slide is in the program materials.

15         MR. CHEFFO:  They're different, Tom.

16         THE COURT:  He's saying, no, it isn't.

17         MR. CHEFFO:  It's a different heading.  This one is

18    called "Anxiety, Substance and Bipolar Disorder."  The other

19    one is called "Social Phobia and Bipolar Disorder."  They're

20    absolutely two different presentations.

21         MR. RONA:  Your Honor, this is the cover of --

22         THE COURT:  Let me see it, let me see it.

23         It's the same title.

24         MR. CHEFFO:  Well, your Honor, this is what I was --

25         THE COURT:  Excuse me.  Let me show you what I'm

1    looking at.

2             MR. CHEFFO:  "Social Phobia and Bipolar Disorder."

3             THE COURT:  Well, here's what they're giving me.  So

4    it looks like it's hooked up, and it cannot be introduced until

5    it's authenticated as a business record.  Either you subpoena

6    Cline Davis -- where is Cline Davis?

7             MR. RONA:  It's CME.

8             THE COURT:  Where is CME?

9             MR. RONA:  In California.

10            MR. SOBOL:  We'll figure it out.  We'll get them.

11            THE COURT:  How?

12            MR. SOBOL:  Very politely ask.  Obviously you've

13   ruled, so we're going to do what we can.  Just so you know, we

14   spent months and years --

15            MR. CHEFFO:  Tom, that's not fair.

16            THE COURT:  You know, excuse me.  I've got a jury out

17   there.  Let's go.

18            MR. CHEFFO:  That's not fair, Tom.  You know that.

19            THE COURT:  Right now, the bottom line is, unless

20   they've agreed, they have the right to challenge it.  What I

21   don't love is doing it at quarter past 9:00.  Now, I was here

22   at quarter of.  Maybe I just got down too late.  I didn't

23   realize what a big deal it was.  I mean, it's a huge big deal.

24   So let's go.  It's taken us a half an hour to work it out.

25            MR. GREENE:  I'm going to use the slides, and when I

Page 19

1    come to that, I'll have it marked for identification, your

2    Honor.

3            THE COURT:  For identification only.  It is reliable

4    enough for an expert to rely on, but it's not authenticated for

5    separate admission at this point.  The Pfizer document is.

6            Excuse me.  Does that make sense to have one total set

7    of binders of all the documents so that I'm not doing this

8    again?

9            THE CLERK:  All rise for the jury.

10           (Jury enters the courtroom.)

11           THE COURT:  Good morning to everyone.

12           THE JURY:  Good morning.

13           THE COURT:  I was thinking, Saturday tomorrow want to

14   sit?  Our first nice day with sunshine out there.  Anybody

15   speak about the case or see anything in the press?  I find the

16   jury has complied.

17           I have to apologize.  We did have one legal dispute,

18   and that is why you're getting out at quarter past, so my

19   fault.

20           Mr. Greene, why don't you continue with Mr. Barkin.

21                   JEFFREY S. BARKIN, M.D.

22   having been previously duly sworn, was examined and testified

23   further as follows:

24           MR. GREENE:  Good morning.

25   CONTINUED DIRECT EXAMINATION BY MR. GREENE:

Page 20

1    Q.    Good morning, Doctor.

2    A.    Good morning.

3    Q.    Yesterday at the conclusion of your testimony, I think you

4    had completed testifying about the four randomized controlled

5    trials.  Do you recall that?

6    A.    Yes.

7    Q.    We were getting ready to move on to another area.  Now, as

8    part of your assignment in this case, I asked you two things:

9    One, to look at all the scientific evidence, the double-blind

10   randomized controlled trials, and determine, is Neurontin

11   effective or ineffective for treating bipolar disorder?  And

12   we've talked about that.

13        The second assignment I asked if you would undertake is if

14   you would look at the defendants' marketing materials and

15   answer the question:  Were the marketing materials supported by

16   the science that the defendants had, the double-blind

17   randomized controlled trials?  Did you do that?

18   A.    Yes, I did.

19   Q.    And did you do that by reviewing internal documents that

20   the defendants had produced in this litigation?

21   A.    Yes, I did.

22   Q.    And was one of those what we've previously marked as

23   Exhibit 4, the defendants' marketing assessment for psychiatric

24   disorders?

25   A.    Yes.

Page 21

1   Q.   I think we have that up on the screen.  Do you see that?

2   A.   I do, yes.

3   Q.   And just a couple of questions about this document, and I

4   want to move on.  But you reviewed this document, correct?

5   A.   I did.

6   Q.   And this marketing assessment pertains in part to bipolar

7   disorder, does it not?

8   A.   It does.

9   Q.   And the page we have on our screen is a memo signed by an

10  Oliver Brandicourt, correct?

11  A.   Yes.

12  Q.   And it says that the New Product Committee decisions have

13  been incorporated in exploratory study in bipolar disorder, and

14  a Phase II study in social phobia and panic disorder were to be

15  conducted; is that correct?

16  A.   Yes.

17  Q.   And the jury is going to have this exhibit.  It goes on

18  for many pages.  I just want to point out two or three things.

19  The next paragraph indicates, "The results, if positive, will

20  be publicized in medical congresses and published in peer-

21  reviewed journals, but there is no intention to fully develop

22  these indications at this point," correct?

23  A.   Correct.

24  Q.   By "indications," they're referring to the medical

25  treatments, bipolar disorder, social phobia, and panic

Page 22

1   disorder, correct?

2   A.   That would be correct, yes.

3   Q.   And, again, this case is just concerned with bipolar

4   disorder, and that's all we asked you to look at, correct?

5   A.   That's correct.

6   Q.   Now, this is an excerpt from, I think it may be Page 2 or

7   3 of the exhibit.  Again, the jury will have it.  You reviewed

8   this material, this statement, did you?

9   A.   Yes.

10  Q.   And this states that "Due to the lack of scientific

11  rationale, since Neurontin has a different mechanism of action

12  than the mood stabilizing antiepileptics, it is recommended to

13  implement only an exploratory study in outpatients with bipolar

14  disorders with the results highlighted through a peer-reviewed

15  publication," correct?

16  A.   Yes.  That's the psychiatric marketing assessment.

17  Q.   Can you tell us what, just in general terms, what a

18  congress is, a medical congress?

19  A.   Sure.  Physicians have a large amount of information at

20  their disposal, and one way that we get information is to go to

21  meetings, and a congress would be a large collection of

22  physicians to be exposed to education.

23  Q.   Okay, thank you.  And then the next slide, please, and

24  this is the last question I have about the marketing

25  assessment.  This is showing the market for Neurontin; is that

Page 23

1    correct?

2    A.    Yes.

3    Q.    Market share?

4    A.    Market share for Neurontin, specifically in bipolar

5    disorder.

6    Q.    For these years, '92.  So it wasn't approved till

7    December, '93, for epilepsy to treat seizures.  So there's no

8    market share in '92-'93, and then they're projecting no market

9    share '94, '95, '96, and then a 1 percent market share in '97,

10   4 percent '98.  Then it says the patent expires, and then in

11   '99 6 percent and in 2000 5 percent.  So those were projections

12   they were making back at the time the marketing assessment was

13   done in May of 1995, correct?

14   A.    Yes.

15   Q.    The next slide.

16         MR. GREENE:  We'd move to introduce Exhibit 110.

17         (Plaintiff Exhibit 110 received in evidence.)

18   Q.    Now, you've reviewed this document, have you not, this

19   exhibit?  And I've highlighted for the jury on this slide just

20   a couple excerpts from the exhibit, is that right, Doctor?

21   A.    Yes, that's right.

22   Q.    And Page 3 of the exhibit is one of these quotes I want to

23   highlight here.  First of all, tell us what the Cleveland

24   Clinic Journal of Medicine Supplement is.

25   A.    The Cleveland Clinic is a large clinic in Cleveland, Ohio,

1   and they publish a journal of medicine that's considered quite

2   good.  A supplement to a journal is a non-peer-reviewed

3   typically compendium of discussion.  People are brought

4   together.  They're put in a room.  They have a discussion.

5   Typically that's transcribed.  It's not peer reviewed.  It's

6   not Level I evidence as you might find in a typical medical

7   journal if it is publishing Level I double-blind studies.  So

8   this is a supplement, a discussion of the use of Neurontin in

9   different disease states.

10  Q.    And this is a quote that was -- well, first of all, the

11  publication was sponsored by Parke-Davis; is that correct?

12  A.    Yes.  That's clear.

13  Q.    And we have that highlighted at the bottom, the

14  acknowledgment?

15  A.    Yes.

16  Q.    Again, this is an exhibit the jury will see, but that's

17  lifted from there.  Okay, and those quotes are lifted from

18  that.  Can you read the first quote.

19  A.    Sure.  "Beneficial effects of gabapentin," or Neurontin,

20  "on mood and quality of life were observed in the original

21  treatment population of patients with epilepsy."

22       That's one quote, and the other is that "The data

23  presented here indicate that Neurontin," gabapentin, "holds

24  promise for the treatment of bipolar disorder."

25  Q.    And you've reviewed this supplement, correct?

1   A.   I have.

2   Q.   And was the negative Pande trial results for bipolar

3   disorder disclosed in this supplement?

4   A.   No.   That was the big problem here.

5   Q.   And can you tell us how many psychiatrists this was sent

6   to?

7   A.   43,000.   That's a lot of psychiatrists.

8   Q.   Now, I'd like to direct -- the next exhibit, please.

9        MR. GREENE:   I move to introduce Exhibit No. 2079.

10       (Plaintiff Exhibit 2079 received in evidence.)

11  Q.   Now, this is a journal article that appeared in Epilepsia;

12  is that correct?

13  A.   It is.

14  Q.   And the jury, again, will have this exhibit.   Leslie

15  Magnus, she's the author of this article?

16  A.   Yes, she is.

17  Q.   And we've just excerpted a couple slides, material from

18  the article.   Is that right, Doctor?

19  A.   Yes, you did.

20  Q.   She's listed here as an employee of Parke-Davis?

21  A.   Yes, she is.

22  Q.   And could you turn to the next page.   Well, before you do

23  that, this appeared in 1999.   Do you see the upper left-hand

24  corner of the slide?

25  A.   Yes, that's when this was published.

Page 26

1   Q.   Tell us what Epilepsia, please.

2   A.   Sure.  Epilepsia is a journal that is specific and

3   describes relevant issues, relevant treatments about epilepsy.

4        MR. GREENE:  Could I have the next slide.

5   Q.   Again this is from the same exhibit, 2079, and this is the

6   section of an article that discusses gabapentin, or Neurontin,

7   in psychiatric disorders; is that correct?

8   A.   Yes.

9   Q.   Again, this came out in 1999, right?

10  A.   That's correct.

11  Q.   And can you tell us what you observed and why we've

12  highlighted for the jury this page.

13  A.   Sure.  This is a real problem.  This is a journal that

14  would go typically to neurologists, though other folks, other

15  physicians might see this too.  And primarily in this journal

16  article is a section looking at the use of Neurontin/gabapentin

17  in patients with different psychiatric disorders, and it

18  references three different studies.  Of course, none of these

19  studies are double-blind placebo-controlled trials like we

20  discussed yesterday, and I take it you've probably heard enough

21  about what a DB placebo-controlled RCT is.  But the point is

22  that the journal article references case studies, case series,

23  and actually at one point it references a single patient case

24  report.

25       It goes on.  I'm going to sort of go through this more

1   quickly in the interest of time, but it concludes that

2   "Neurontin," or gabapentin, "a novel antiepileptic drug has a

3   unique mechanism of action.  Its favorable safety profile and

4   lack of drug interactions make it an attractive alternative for

5   use in a wide array of neurologic and psychiatric conditions.

6   The usefulness of gabapentin has been demonstrated in

7   neuropathic pain syndromes, bipolar disorder, movement

8   disorders, migraine (prophylaxis) and cocaine dependence."

9        Unfortunately, again, even though this was published in

10   1999, the results of the Pande article -- remember, that was

11   the article that showed that placebo was better than Neurontin

12   in mania and that there was no difference between placebo and

13   Neurontin in the depressed part of bipolar disorder -- was not

14   disclosed.

15   Q.   And, again, this was written by a Parke-Davis employee,

16   correct?

17   A.   Yes.

18   Q.   And the circulation of this journal we have here is 5,000;

19   is that correct?

20   A.   That's correct.

21        MR. GREENE:  The next slide, please.  We move to

22   introduce Exhibit No. 1324.

23        (Plaintiff Exhibit 1324 received in evidence.)

24   Q.   We've highlighted on this slide, Doctor, a couple excerpts

25   from that Exhibit 1324.  Could you tell the jury what we're

Page 28

1    looking at.

2    A.    Yes.   This is an article by Dr. Pande, Atul Pande, who's

3    an employee of Parke-Davis, and he's the same Pande that

4    published the Article 945-291, okay, and that was the study

5    that looked at Neurontin and bipolar disorder.  In this article

6    he's looking at the use of Neurontin in a different disease,

7    not bipolar disorder, a disease called "social phobia."  And

8    social phobia is a disease basically where people are very,

9    very afraid of social situations.  It's an exaggerated form, I

10   suppose.  We all have, or I can speak for myself, some level of

11   shyness.  Social phobia is a potentially disabling condition

12   where patients may not be able to interact, they're that

13   fearful with others.  So this is a study, a double-blind

14   placebo-controlled trial of Neurontin in social phobia, by the

15   same guy, Pande, who did the initial trial of Neurontin in

16   bipolar disorder.

17   Q.    Can I just interrupt you and direct your attention then to

18   the sentence in the big block there, I think it might be the

19   second complete sentence.  It starts, "In clinical studies of

20   patients with epilepsy, gabapentin produced improvements in

21   mood and general well-being."  Is that what Dr. Pande wrote in

22   this article?

23   A.    That's correct.

24   Q.    And there's a footnote there.  Again, the jury will have

25   that reference.  He doesn't make any mention of his

1   double-blind randomized controlled trial that showed it had no

2   effect.  In fact, placebo outperformed Neurontin for bipolar

3   disorder, correct?

4   A.   That's correct, yes.

5        MR. GREENE:  The next slide, please.

6        THE COURT:  Is social phobia connected to bipolar in

7   any way?

8        THE WITNESS:  Social phobia is a distinct disorder.

9   Certainly some patients with bipolar disorder have other

10  disorders.  I think we spoke briefly about comorbidities or

11  other disorders yesterday, but it's a different disorder,

12  though of course patients with bipolar disorder can have other

13  disorders like social phobia.

14       THE COURT:  So when you were referring to comorbid

15  disorders, would this have been one of them?

16       THE WITNESS:  Yes.  But it's distinct.  The point is

17  that social phobia is a distinct diagnosis.  It's a

18  comorbidity.  It's not bipolar disorder in and of itself.

19       MR. GREENE:  Do we have the next slide?  Thank you.

20  We've moved to introduce Exhibit No. 166.

21       (Plaintiff Exhibit 166 received in evidence.)

22  Q.   Now, this is an e-mail from John Cook, a Parke-Davis

23  employee, regarding the social phobia article distribution; is

24  that correct?

25  A.   Yes.

1    Q.   And what does this show us, Doctor?

2    A.   Okay, well, what this shows us is how this article by

3    Pande on social phobia was disseminated or distributed, and it

4    shows that it was essentially mailed to psychiatrists on a

5    list, 25,150 of us.  That's a lot of psychiatrists.  You

6    wouldn't necessarily want to be in a room with that many

7    psychiatrists.  And then it was delivered by reps.  125,850

8    copies of this article were printed, and the reps would go door

9    to door and hand this article to different psychiatrists.  And

10   this was published in a Journal of Clinical Psychopharmacology,

11   which is a good journal, a lot of folks would be looking

12   towards this, with a circulation of 8,000.

13            MR. GREENE:  Could we have the next slide, please.

14   We'd ask Exhibit No. 63 be marked for identification and

15   Exhibit No. 139 be marked for identification.

16            (Plaintiff Exhibits 63 and 139 marked for

17   identification.)

18            THE COURT:  All right.

19   Q.   Did you review these materials?

20   A.   I did.

21   Q.   And what are we looking at here, Doctor?

22   A.   Okay, what we're looking at is a continuing medical

23   education program, and that's how doctors keep their currency

24   in terms of the literature.  We actually for licensure have to

25   have a certain number of credit hours.  This is published or

1    presented by a company called CME, or Continuing Medical

2    Education, Inc., and it was a presentation done in 1999.  It

3    was supported by Parke-Davis, so this presentation was paid for

4    by Parke-Davis.  And it was presented in twenty different

5    markets in the U.S. that are large markets and thirty smaller

6    markets to approximately 8,500 folks, predominantly

7    psychiatrists.  And this is a series looking at the use of

8    neural mood stabilizers, and in it, in this conference they

9    talk about Lamictal, lamotrigine, which I had mentioned

10   yesterday as a mood stabilizer, as well as Neurontin,

11   gabapentin.  And it purports -- and this was what was presented

12   to us at this conference in '99 -- that gabapentin has

13   beneficial effects in mania, bipolar depression, bipolar

14   maintenance, and so on and so forth.  And it even tells us how

15   to use it, how to dose Neurontin when using it in these

16   conditions.

17        And then it presents advantages and disadvantages of using

18   Neurontin in these conditions, these conditions where there are

19   reports of benefit.  And what's important here is that it shows

20   under the advantages part -- and this is, I don't know if you

21   all can see it, but this is the -- if you look at the right

22   side of this slide --

23   Q.   Can you point on the screen to what you're referring to.

24   A.   Sure.  "Gabapentin:  Advantages and disadvantages."  And

25   it cites under advantages, reports and open-label data

1    suggesting efficacy; but it also states under disadvantages the

2    need for controlled studies that are under way.  But it was

3    presented in 1999 and makes no reference to the Pande data,

4    which would be the controlled studies that were completed.

5    Q.   And dosing, it's recommending a range from 900 to 3,600

6    milligrams; is that correct?

7    A.   Yes.

8         MR. GREENE:   Could you turn to the next slide.

9    Q.   This is part of the same series for the year 1998; is that

10   correct?

11   A.   Yes.

12   Q.   And the same information appears on the slides that we've

13   highlighted here.  For reports of benefit for gabapentin, which

14   is Neurontin, it shows a benefit for bipolar depression,

15   bipolar maintenance, rapid cycling, treatment resistance, mood

16   instability; is that correct?

17   A.   It is.  And again it's supported by Parke-Davis.  It's

18   kind of small.

19   Q.   Recommending a range of 900 to 3,600 milligrams.  That

20   means daily, does it not?

21   A.   Yes, dose three times a day.

22        MR. GREENE:   If we could have the next slide, please.

23   And I'd ask that this Exhibit 360 be marked for identification.

24        (Plaintiff Exhibit 360 marked for identification.)

25   Q.   This is a single page we've highlighted from Exhibit 360.

Page 33

1    Is that correct, Doctor?

2    A.    Yes.

3    Q.    This lists the cities and shows 5,645 attendees in thirty

4    different cities between July '98 and October '98, correct?

5    A.    Yes.

6    Q.    And during that period of time, that's when they ran these

7    series around the country?

8    A.    Yes.

9    Q.    And psychiatrists attended these meetings?

10   A.    That's correct.

11   Q.    I just have a couple questions, and then I'm finished,

12   Doctor.  Now, based on your education, training, and

13   experience, and based on the work you undertook in this case in

14   review of all the defendants' internal research reports and

15   protocols, and based on your review of the other documents that

16   were produced in this case, and they're referenced in your

17   report, do you have an opinion to a reasonable degree of

18   medical certainty whether any reasonable physician would

19   prescribe Neurontin for bipolar disorder if the physician were

20   fairly informed of the reliable medical evidence concerning the

21   risks and benefits of Neurontin?

22            MR. HOOPER:  Objection.

23            THE COURT:  Overruled.

24   A.    In my education --

25   Q.    Well, first, do you have an opinion?

1   A.   I do.

2   Q.   Then my next question is, what is that opinion?  Would you

3   tell the jury, please.

4   A.   My opinion is that reasonable physicians would not

5   prescribe Neurontin for bipolar disorder based upon the four

6   double-blind placebo-controlled randomized clinical trials.

7   Q.   And why is that?

8   A.   Well, I mean, had they had full access to all of this

9   information, there is no way that they would prescribe an

10  ineffective medication, right?  I mean, that would be

11  unethical.  It would be something that could subject a

12  physician to a malpractice suit and potential loss of license,

13  and most importantly hurt your patient.

14  Q.   That would be a violation of your Hippocratic oath to

15  prescribe an ineffective medication that could hurt your

16  patient?

17  A.   Yes.

18       MR. GREENE:  Thank you, Doctor.

19  CROSS-EXAMINATION BY MR. HOOPER:

20  Q.   Dr. Barkin, no reasonable physician would prescribe

21  Neurontin knowing what you know?

22  A.   Correct.

23  Q.   You filed your report in this case outlining the opinions

24  you shared with us a moment ago in July, 2008, correct?

25  A.   Yes.

1   Q.   Six months later you were deposed in this case under oath

2   in January of 2009, correct?

3   A.   Yes.

4   Q.   It would be unethical to prescribe Neurontin for a bipolar

5   patient, Dr. Barkin?

6   A.   It would be unethical to prescribe a treatment that you

7   knew was not effective.

8   Q.   And you consider Neurontin one of those, don't you, for

9   bipolar?

10  A.   Based upon --

11  Q.   You told us that three minutes ago, right?

12  A.   Based upon the available Level I evidence, yes.

13  Q.   Malpractice to prescribe Neurontin for a bipolar patient,

14  Dr. Barkin?

15  A.   It would be very wrong and it would be malpractice to

16  prescribe an ineffective treatment, yes.

17  Q.   Hurt patients to prescribe Neurontin for a bipolar

18  patient, Dr. Barkin?

19  A.   Yeah.

20  Q.   When you were deposed in this case in January, six months

21  after filing your report setting out those opinions, you were

22  in fact prescribing Neurontin for two of your own patients with

23  bipolar disorder, correct, sir?

24  A.   That's quite a distortion.  While I wrote prescriptions,

25  those were patients that I had inherited who were on it, but

1    that were also on effective mood stabilizers; and those were

2    patients where they were very reluctant to come off Neurontin,

3    principally because they liked the physician who they were

4    seeing before me who had left the area.  So --

5    Q.   You refiled those gabapentin prescriptions, Neurontin

6    prescriptions for those two bipolar patients for three to three

7    and a half years, did you not, sir?

8    A.   In one case, yes, but, again, the Neurontin wasn't being

9    used for bipolar disorder primarily.  It was being used -- the

10   patient was being treated with other effective mood

11   stabilizers.

12   Q.   In fact both those patients had bipolar disorder as part

13   of their clinical presentation, didn't they, Dr. Barkin?

14   A.   They did, but, like I said, they were being effectively

15   treated with other mood stabilizers, and in both of those cases

16   we were ultimately able to get the Neurontin off board without

17   any deterioration.

18   Q.   Let's talk a little bit more about those patients when you

19   were deposed, at which time you were prescribing Neurontin for

20   them.  Patient one had bipolar, anxiety, and sleep problems,

21   correct?

22   A.   Yes.

23   Q.   The other medications you were giving and prescribing for

24   that patient, Doctor, in addition to Neurontin were Seroquel,

25   an antipsychotic, correct?

Page 37

1   A.   Well, I'd have to look at the deposition.  I mean, that

2   deposition was taken what, over a year ago?  I mean, I'll

3   believe you because you have the deposition in hand that that's

4   what I said.

5            THE COURT:  Do you have an extra copy for him if

6   you're going to be using it a lot?

7            THE WITNESS:  May I refer to this?

8            THE COURT:  Yes.  What page do you want him to look

9   at?

10           MR. HOOPER:  208, your Honor.

11  Q.   Dr. Barkin, the first patient --

12           THE COURT:  Are you there?

13  Q.   I direct your attention, Doctor, to Page 208, Line 14,

14  please.  Are you there?

15  A.   I'm sorry, which line?  I'm on 208.

16  Q.   Page 208, Line 14.  The first patient you were prescribing

17  Seroquel, correct?

18  A.   Yes.

19  Q.   That's an antipsychotic medication, correct?

20  A.   It's an antipsychotic medication that has FDA approval for

21  the use in bipolar disorder and has been extensively researched

22  in double-blind placebo-controlled trials for that, yes.

23  Q.   That patient you were also prescribing a thyroid

24  medication, correct?

25  A.   Thyroid, Lamictal, lithium, those mood stabilizers that

1    are effective and FDA approved.

2    Q.   You were prescribing three separate mood stabilizers for

3    this bipolar patient, correct?

4    A.   Yes.

5    Q.   You were also prescribing that patient Xanax, correct?

6    A.   Yes.

7    Q.   That's a benzodiazapine and an antianxiety drug, correct?

8    A.   It is.

9    Q.   It's an addictive drug, correct?

10   A.   It's potentially addictive.  This was somebody who had an

11   anxiety disorder.  A lot of patients do quite well with benzos.

12   It's appropriate use, FDA approved.

13   Q.   You were also prescribing for that patient Ambien, a

14   sleeping medication?

15   A.   Yes.

16   Q.   You were also prescribing for that patient Remeron, an

17   antidepressant?

18   A.   Yes.

19   Q.   You were also prescribing a second sleeping aid for that

20   patient, Rozerem, correct?

21   A.   Yes.  I was trying to get her off the Ambien onto Rozerem

22   for ongoing use for sleep, yes.

23   Q.   For that one patient, you were prescribing nine different

24   psychotropic medications at one time, correct?

25   A.   Yes.  This was a very tough-to-treat patient, and it's not

1    unusual to use medications in combination therapy, that's

2    correct.

3    Q.   And one of the non-medications was gabapentin, Neurontin,

4    correct?

5    A.   Yeah, I had inherited this patient on that, so it wasn't a

6    medication that I started.  This is somebody who had come to me

7    that somebody else had previously put on gabapentin, Neurontin.

8    Q.   And you refilled those prescriptions for in excess of

9    three years, correct, Doctor?

10   A.   Yeah, I mean, I refilled it.  The patient sort of liked

11   it.  It was what's called a "transference," which is where if

12   somebody likes their prior treater, they can like the

13   medications that are prescribed, which is sort of a concrete

14   representation, kind of like -- and I realize this may sound

15   odd -- what a blankie would be to a child or a baby.  And yet,

16   as I got to know her, we were able to effectively get her off

17   of the Neurontin, and actually the Xanax and the Ambien.  So

18   many medications I inherited her on but I wouldn't have started

19   in the first place, refilled, and then tapered and successfully

20   discontinued.

21   Q.   Six months after you signed your report, you were still

22   refilling prescriptions for Neurontin and eight other

23   medications for that patient, correct?

24   A.   Possibly.  I don't remember.  I don't have the patient's

25   chart in front of me.

1  Q.   You just told us that you prescribed the medication

2  because the patient liked it?

3  A.   That's what she said, and then we were able to discontinue

4  medications that had no purpose, so as to streamline her

5  medication regimen, again, without any deterioration, and that

6  was my wish.

7  Q.   In fact that patient, you told us at your deposition that

8  while taking Neurontin and eight other medications, that

9  patient was, quote, "doing beautifully," correct?

10  A.   Yes.

11  Q.   Dr. Barkin, you just told us that there was no Level I

12  evidence that would make prescribing Neurontin for a bipolar

13  patient anything short of unreasonable, unethical, malpractice,

14  and hurtful to the patient, didn't you?

15  A.   I did, and that's why I tapered her off of the medications

16  that I considered unnecessary and ineffective.

17  Q.   And the only reason you've articulated for the exception

18  in your case is that the patient liked it and was doing

19  beautifully?

20  A.   That's not what I said.  What I said was, I inherited this

21  patient on these medications.  When she came to me, she liked

22  these medications.  There are different reasons that patients

23  like medications.  I continued her on different medications and

24  successfully tapered her off the medications that I felt were

25  unnecessary or potentially harmful, or just, you know, not

Page 41

1    relevant to her care.

2    Q.   You kept right on prescribing medication that you thought

3    wasn't doing anything useful for the patient for at least six

4    months, correct?

5    A.   Yeah, and then I successfully tapered her off that which I

6    considered useless and unnecessary.

7    Q.   Let's talk about the second patient you told us about.

8    That patient had bipolar disorder and attention deficit

9    disorder, correct?  I direct your attention to Page 212,

10   Lines 2 and 4 of your deposition.

11           (Witness examining transcript.)

12   A.   Yes.

13   Q.   That patient as of the time of your deposition six months

14   after you filed your report in this case was taking, in

15   addition to Neurontin, lithium, Lamictal, and Concerta,

16   correct?

17   A.   Yes.

18   Q.   So this patient with your prescriptions was taking four

19   different psychotropic drugs at one time, correct?

20   A.   Yes, again, not unusual for treating bipolar disorder and

21   other mood disorders.

22   Q.   The second patient when you tried to take them off

23   Neurontin, told them you ought to stop, told you, quote, "I'm

24   doing too well," correct?

25   A.   Yes.  He indicated, his words were, "I don't want to rock

Page 42

1    the boat."

2    Q.    And both of your own patients, Doctor, are a perfect

3    example of a physician prescribing medications for a patient

4    based on factors other than the Level I evidence you told us

5    about, aren't they?

6    A.    Well, in this case, these were patients that I inherited

7    on medications that though I found ineffective continued and

8    then were able to successfully get off of.

9    Q.    Dr. Barkin, you realize this case is about prescriptions

10   of medications?

11   A.    What do you mean is "about prescriptions of medications"?

12   Q.    It's about Neurontin prescriptions by Kaiser, correct?

13   A.    Yeah.  I'm not really familiar with the legal issues.  I

14   had a very narrow assignment, which was to review the

15   scientific and medical evidence on Neurontin and bipolar

16   disorder, so I'm not familiar with the legal issues in this

17   case.

18   Q.    Well, you must be familiar enough to have just sat here

19   about ten minutes ago and told us that it would be

20   unreasonable, unethical, malpractice, and hurtful to patients

21   to prescribe Neurontin, correct?

22   A.    And medications that they knew to be ineffective.

23   Q.    Dr. Barkin, do you think you're the best person to be

24   testifying about how doctors ought to prescribe medications?

25   A.    I think that I represent a reasonable physician who's in

Page 43

1    the frontline, in the trenches, who specializes in treating

2    these patients; and I certainly have contact with so many other

3    physicians that I think I can accurately represent the standard

4    of care in the community.

5    Q.   Dr. Barkin, isn't it true, sir, that your license was

6    suspended for five years for mishandling controlled substances?

7    A.    It was not suspended for five years.  Twenty years ago

8    when my mother had breast cancer, I ordered controlled

9    substances wholesale, and my license had a stayed suspension.

10   I never missed a day of work.  And these are events from twenty

11   years ago.

12   Q.   And you told the authorities in this state and others, or

13   in the states you practiced, about all that, and they imposed a

14   suspension on your license and stayed it for five years,

15   correct?

16   A.   They stayed it for five years, correct.

17   Q.   And you just said that you gave the medications to your

18   mother who had cancer.  In fact, Dr. Barkin, some of them you

19   took yourself, correct?

20   A.    Yeah.  These are events from twenty years ago, but that's

21   correct, and they're outlined in publicly available documents,

22   that's correct.

23   Q.   Dr. Barkin, let's talk a little bit about what your

24   assignment in this case did not include.  You understand this

25   case is about whether Kaiser doctors were tricked into

Page 44

1  prescribing Neurontin?

2  A.   Well, I can't speak for the Kaiser doctors because, as I

3  said a minute ago, I'm not familiar with the legal issues in

4  this case.  My assignment was much more narrow, right?  It was

5  to look at the available evidence of Neurontin in bipolar

6  disorder, to review the marketing material, essentially to

7  answer:  Did the internal Pfizer research report when they

8  tried to look at the use of Neurontin in bipolar disorder,

9  which was ultimately published in peer-reviewed journals, did

10  they match up?  Was there a disconnect?

11      In terms of the marketing component, I was asked to

12  essentially review the marketing material to ascertain whether

13  the science supported what was said on a large scale in the

14  marketing material.  That was the context of my assignment

15  here.

16  Q.   Your assignment did not include identifying any specific

17  Kaiser doctors that were defrauded, duped, or tricked, did it?

18  A.   No, it did not.

19  Q.   You weren't asked by Kaiser to talk with any of the

20  Neurontin providers that they listed, all 25,000 plus of them,

21  were you?

22  A.   No, sir.

23  Q.   Your assignment did not include reviewing any Kaiser

24  patient records?

25  A.   No.

1    Q.    Now, if we wanted to know how many Kaiser patients with

2    bipolar disorder were prescribed Neurontin after they had

3    failed to respond to some other medication, you wouldn't be

4    able to tell us that, would you?

5    A.    No.   That wasn't part of the assignment, as I just

6    outlined.

7    Q.    If we wanted to know how many Kaiser patients had bipolar

8    disorder and also social phobia and were prescribed Neurontin

9    for social phobia, you wouldn't be able to tell us that, would

10   you?

11            MR. GREENE:   Objection, your Honor.

12            THE COURT:   Overruled.

13   A.    No, I would not.

14   Q.    If we wanted to know how many Kaiser --

15            THE COURT:   Do you know anything about the Kaiser

16   doctors?

17            THE WITNESS:   I don't.

18            THE COURT:   All right.

19            THE WITNESS:   Again, that was not within the scope of

20   my assignment.

21   Q.    How much time did you spend on this case, Dr. Barkin?

22   A.    I'd have to review my notes.   It was a case where I put in

23   a large number of hours for a period of time, and then it would

24   go dormant.   So really I haven't spent much time on this case

25   since the deposition, which you referenced which was over a

1    year ago.  I don't know, perhaps 200 hours over two years,

2    something like that.

3    Q.   And that was after you were retained by Kaiser's lawyers

4    in March, 2008, correct?

5    A.   Yes.

6    Q.   And before you were retained in this lawsuit, you hadn't

7    worked for Kaiser, had you?

8    A.   No.

9    Q.   In those 200 hours that you've worked on the case,

10   Dr. Barkin, did you do anything to make sure that the message

11   in your report was going not just to Kaiser's lawyers but

12   getting out to their doctors and patients?

13   A.   How so do you mean?  Did I take my report and try to

14   publish it, is that what you mean, or mail it to physicians

15   around the country?

16   Q.   Let's start with that.  Your report is not published, is

17   it?

18   A.   No, although it is publicly available on the Internet now.

19   Q.   Let's go to the next thing you mentioned.  You haven't

20   sent your report out around the country, have you?

21   A.   No.

22   Q.   Let's go to the next thing.  You haven't put your report

23   on the Internet or a website so that doctors across America can

24   see it, have you?

25   A.   Well, I didn't.  It is on the University of California

Page 47

1   San Francisco website called DIDA, which is Drug Information

2   Document Archives.  So my full report is available to anybody

3   and everybody.

4   Q.   And since your report, have you been informed in any way

5   whether Kaiser has taken Neurontin off its formulary?

6   A.   No.

7   Q.   Since your report, has Kaiser, to your knowledge,

8   restricted its doctors' ability to prescribe Neurontin for

9   bipolar?

10          MR. GREENE:  Objection.

11          THE COURT:  Sustained.  It's been established he knows

12  nothing about the effect of anything on Kaiser, so let's just

13  move on.

14          MR. HOOPER:  1477.

15  Q.   Dr. Barkin, in talking about the Level I evidence, you

16  told us about a study by Dr. Frye.  It's admitted as

17  Exhibit 1477.  Do you recall telling us about Dr. Frye's study?

18  A.   Yes.

19  Q.   Dr. Frye was the researcher from the National Institutes

20  of Mental Health, not Pfizer, correct?

21  A.   That's correct.

22  Q.   His study was in treatment refractory bipolar patients,

23  patients that were not adequately treated with existing bipolar

24  drugs, correct?

25  A.   Yes.

1   Q.   And I think, as you mentioned yesterday, his preliminary

2   results had been presented at two different APA annual meetings

3   in 1997 --

4           THE COURT:   American Psychiatric Association?

5           MR. HOOPER:   American Psychiatric Association.

6   Q.   They had been presented at two separate American

7   Psychiatric Association meetings in 1997 and 1998.  Do you

8   recall referring to that?

9   A.   Yeah, but that statement is a little more complicated.

10  The data that Dr. Frye presented in '97 and '98 were interim

11  data.  It wasn't the complete data set.

12  Q.   And so we agree, those were his preliminary results,

13  correct?

14  A.   Right.  That was his interim data.

15  Q.   And we agree that his study was ultimately published in

16  full and ultimately turned out negative for gabapentin in 2000,

17  correct?

18  A.   Yes.

19  Q.   That was Dr. Mark Frye's study, right?

20  A.   Correct.

21          MR. HOOPER:   I want to identify and show the witness

22  Exhibit 17 and 18 and move its admission.  Your Honor, this is

23  Third Edition of the American Psychiatric Publishing Textbook

24  of Psychopharmacology published in 2004.

25          (Plaintiff Exhibits 17 and 18 received in evidence.)

1   Q.   Dr. Barkin, do you agree what you've been handed is an

2   excerpt --

3            THE COURT:  Is there an objection to this?

4   Q.   Dr. Barkin, what you've been handed --

5            MR. GREENE:  Can we be seen at side bar, your Honor?

6   I object.

7   SIDE-BAR CONFERENCE:

8            THE COURT:  Before you flip them up, just make sure

9   that -- are you seeking to introduce this as an exhibit?

10           MR. HOOPER:  Yes, ma'am.

11           THE COURT:  Had you shown that to him before?

12           MR. GREENE:  I haven't seen this.

13           MR. HOOPER:  It's on our exhibit list.

14           THE COURT:  Had you objected?

15           MR. GREENE:  They're introducing the whole book.

16           MR. HOOPER:  The chapter on gabapentin written by

17   Frye, the guy we just talked about.

18           THE COURT:  If it's on the list, then what's the

19   objection?

20           MR. RONA:  The whole book is.  Are we supposed to read

21   the whole book?

22           THE COURT:  You would expect one to look at the

23   gabapentin chapter.  Okay, that's fine.  I just wanted to make

24   sure there was enough.  So this is a learned treatise.

25           Let me just say while you're up here, the issue that I

Page 50

1    have with the two exhibits you had an objection to is, there

2    was no objection to authenticity.  It was just on 401 or 403

3    grounds.

4           MR. HOOPER:  He didn't move to admit, your Honor.  He

5    just identified.

6           THE COURT:  Well, that's because I told him to, and so

7    if there's no objection in here on authenticity --

8           MR. CHEFFO:  There's been stipulations.  We've said we

9    don't.  There's an agreement between the parties that we

10   preserve our rights on authenticity.

11          THE COURT:  Yes, I'm not pulling this stuff.  It says

12   here "Objection, basis for objection."  I've got it down here.

13   So I'm allowing it in.

14          MR. CHEFFO:  But, your Honor, there's a stipulation

15   between the parties.

16          THE COURT:  I think it's just -- I mean, you talk a

17   lot about fairness.  The morning of trial to say you object on

18   authenticity, I want to see that because I'm looking through

19   here now.  You haven't agreed to one document.

20          MR. CHEFFO:  That's not true, your Honor.

21          THE COURT:  Well, it's not on here.  Let me put it

22   this way:  On the objections to the exhibits, it does not

23   mention authenticity.  Now, if there's some other stipulation,

24   then I want to see it because at this point I sort of feel a

25   little hoodwinked that I'm going to sit here with custodians of

Page 51

1    records in the middle of the trial.

2              (End of side-bar conference.)

3    BY MR. HOOPER:

4    Q.   Dr. Barkin, we were talking earlier about the study that

5    you cited and told the jury about by Dr. Mark Frye from the

6    National Institutes of Mental Health, correct?

7    A.   Yes.  That was one of the four studies.

8    Q.   I would like for you to turn to Page 607 of the exhibit

9    you were shown from the Textbook of Psychopharmacology.  Do you

10   see there that there is a chapter called "Gabapentin"?

11   A.   Yes, and I'm seeing this today for the first time, so --

12   Q.   And this is written -- what is the author's name?

13   A.   Mark Frye.

14   Q.   That is the same Mark A. Frye we were talking about,

15   correct?

16   A.   Presumably.

17   Q.   And let's look at what Dr. Mark Frye, the researcher you

18   cited, said about gabapentin in 2004.

19             THE COURT:  Why don't you let him read it.

20             MR. HOOPER:  Sure.

21             THE COURT:  To himself.  Now, where do you want him to

22   read?

23             MR. HOOPER:  I want to turn, your Honor, to Page 611,

24   his conclusions, cut right to the chase.

25             THE COURT:  Let him sit and read it.  He's never seen

1    it before.

2          (Witness examining book.)

3    Q.    Ready to proceed?

4    A.    Yes.

5    Q.    Dr. Barkin, the first sentence of Dr. Frye's conclusion

6    was that "Controlled studies of gabapentin clearly have

7    suggested efficacy in several medical conditions, including

8    complex partial epilepsy, migraine (prophylaxis), diabetic

9    neuropathy, postherpetic neuralgia, and social phobia."  Did I

10   read that correctly?

11   A.    Yes.

12   Q.    Dr. Mark Frye, the researcher you cited, said in the

13   second sentence, "Conclusions are less clear, either because of

14   positive controlled studies of a small sample size or because

15   of negative studies, in ALS," or Lou Gehrig's disease,

16   "essential tremor, Parkinsonism and panic disorder."  Did I

17   read his second sentence correctly?

18   A.    Yes.

19   Q.    His third sentence of his conclusion, Mark Frye, the

20   researcher you cited, saying in 2004 was, "Its roles as a mood

21   stabilizer and in the treatment of alcohol withdrawal are not

22   clearly established."  Did I read that correctly?

23   A.    Yes, you did.

24   Q.    His next sentence of his conclusions, "However, the

25   therapeutic potential of gabapentin in mood or substance use

1   disorders complicated by comorbid pain syndromes, comorbid

2   anxiety, tremor, or insomnia is substantial."  Did I read his

3   words correctly?

4   A.   Yes, you read that correctly.

5   Q.   And the last sentence of Dr. Mark Frye's conclusion in the

6   Textbook of Psychopharmacology in 2004 was, "Gabapentin has a

7   favorable pharmacokinetic profile --" that's how the drug acts

8   in the body, correct, how it's metabolized, correct?

9   A.   Yes.

10  Q.   He went on to say, "-- with particular advantage in

11  patients with compromised hepatic function."  That's patients

12  with impaired liver function, correct?

13  A.   Yes.

14  Q.   And, finally, "Its minimal drug-drug interactions, low

15  risk of toxicity, and favorable side-effect profile make it a

16  useful addition to the pharmacopeia."  Correct?

17  A.   Yes.  It's unclear, though, if he's referring in its

18  useful addition to the pharmacopeia as a treatment for bipolar

19  disorder, it's unclear to me, but you read that correctly.

20  Q.   And when he mentions its minimal drug-drug interactions,

21  that means that it has a very low risk of interacting with

22  other medications, correct?

23  A.   That's correct.

24  Q.   And is that one of the reasons that made you feel

25  reasonable or ethical, like you were not committing malpractice

1    and like you were not hurting your patients, when you were

2    prescribing Neurontin for your own patients?

3    A.   I felt that it didn't have harm, even though it lacked

4    efficacy, yes.  That's a reasonable statement.

5    Q.   Dr. Barkin, you also referred to a study by Dr. Pande.

6         MR. HOOPER:  It's Exhibit 1393, your Honor, and I

7    think it's in as well.

8    Q.   Of Dr. Pandy's three different studies, this is the one in

9    bipolar disorder.  Do you recall talking about that?

10   A.   Yes.

11        MR. SOBOL:  What exhibit number is this?

12        MR. HOOPER:  1393.

13        MR. SOBOL:  Thank you.

14   Q.   Dr. Pande was an investigator, a researcher from Pfizer,

15   correct?

16   A.   Yes.

17   Q.   And Dr. Pande's study was conducted by teams of

18   researchers at multiple sites around the country, right?

19   A.   Yes.

20   Q.   And like Dr. Frye's study, Dr. Pande's study was in

21   treatment refractory or what Dr. Abramson called treatment

22   resistant bipolar patients, correct?

23   A.   Treatment resistant, though when they went into the study,

24   these patients were not particularly ill.

25   Q.   In fact, Dr. Barkin, the patients to get into Dr. Pande's

1    study had to be in ongoing treatment with lithium, valproate,

2    or both, and still have a manic or hypomanic or mixed state

3    symptoms, even to get into his study, correct?

4    A.   That's actually not a fair representation of the trial,

5    and I'd like to elaborate on that because that's a really

6    important point.  You had brought up his presentation at the

7    conference in Pittsburgh --

8           THE COURT:  You know, is your mike working?

9           (Discussion off the record.)

10   A.   I'd like to talk a bit about Dr. Pande's study because

11   it's really important because you're putting --

12   Q.   Dr. Barkin, your lawyers can ask you about that.

13          MR. GREENE:  May he be allowed to answer the question?

14          THE COURT:  No.  He can't have a narrative.  He gets

15   to ask the questions.  You can redirect.  So what's your

16   question?

17          THE WITNESS:  What he said was that these patients

18   were mixed and manic.

19          THE COURT:  Wait, wait, I lost the question.  What's

20   the question?

21          MR. HOOPER:  Let me strike it and start again.  Maybe

22   we can move a little faster.

23   Q.   Dr. Barkin, would you please look in the copy of the Pande

24   study that you've been handed at the "Methods" section of the

25   abstract, second sentence:  "Patients with a lifetime diagnosis

1   of bipolar disorder (Type I) and who were currently suffering

2   from symptoms of either mania --"

3   A.   I don't have that page in what you gave me.

4   Q.   It's the first page of the study.

5   A.   Under "Methods"?  Yes, my copy doesn't seem to have that

6   section.  It goes from Page 249 to Page 251.  It just didn't

7   copy.  Oh, you're looking at the abstract.

8   Q.   Right there.  Quote, "Patients with a lifetime diagnosis

9   of bipolar (Type I) and who were currently suffering from

10  symptoms of either mania, hypomania, or a mixed state, despite

11  ongoing therapy with lithium, valproate, or lithium and

12  valproate in combination, were eligible for inclusion."

13       That's what the study says, correct?

14  A.   That's what the abstract said, but that's not how the

15  study was conducted.  They were not sick patients.  It was an

16  outpatient study.  Dr. Pande in his own presentation in

17  Pittsburgh of '99 made it clear it was an outpatient study.  So

18  his concern was that the patients couldn't be too sick going

19  into it.  They had to have low YMR scores at entry because he

20  didn't want the patients to end up hospitalized.

21  Q.   Dr. Barkin, I'm not asking you about outpatient or

22  inpatient, whether someone is in or out of the hospital.  My

23  question is, do you have any evidence whatsoever that the

24  patients in Dr. Pande's study were not patients with a

25  lifetime diagnosis of bipolar who had mania, hypomania, or

Page 57

1   mixed state despite ongoing therapy?

2   A.   That was the entry, but at entry these patients were not

3   particularly ill.  That's my point.  I read the transcript of

4   Pande's own presentation in Pittsburgh.

5           MR. HOOPER:  Your Honor, I want to show the witness

6   Exhibit 383 which is already admitted.

7   Q.   Dr. Barkin, what you've been handed, Exhibit 383, is a

8   copy of the research report or study report for Dr. Pande's

9   study, correct?

10  A.   Yes.

11  Q.   And if you look at the bottom of the page, you'll see that

12  it lists some of the investigators, the doctors who actually

13  did the study.  Do you see that?

14  A.   I do.

15  Q.   And do you see that one of the investigators who actually

16  did the research in the Pande study was a Dr. J.R. Calabrese,

17  M.D.?

18  A.   Yes.

19  Q.   And if you look to the right column, do you see that

20  another investigator in the Pande study who actually did the

21  research was a Dr. Timothy Ketter?

22  A.   Yes.

23  Q.   Would you turn to Page 8 and 10 of Exhibit 383, the study

24  report.  The numbers are at the top of the page actually,

25  Dr. Barkin.  Are you on Page 8 of the study report?

1    A.    Where it says 8 of 231?

2    Q.    Correct.

3    A.    Yes.

4    Q.    And do you see there partly down the page on Page 8, it

5    says Section 2, "Letter to investigators"?

6    A.    Yes.

7    Q.    And, again, the investigators are the clinical researchers

8    who actually do the study, correct?

9    A.    Yes.

10   Q.    And if you look at the top of Page 9, the rest of the

11   letter to investigators, do you see that the negative results

12   are disclosed to the investigators at this point in time?

13   A.    Yes.

14   Q.    We can move on.  Let's go to --

15           MR. HOOPER:  Your Honor, let me show the witness and

16   move Exhibit 523, Parke-Davis Investigator's Meeting for

17   Protocol 945-209, the Pande study from March 8, 1996.

18           THE COURT:  Any objection?

19           MR. GREENE:  No, your Honor.

20           THE COURT:  Okay.

21           (Plaintiff Exhibit 523 received in evidence.)

22   Q.    Dr. Barkin, what you've been handed is entitled

23   "Parke-Davis Investigator's Meeting," correct?

24   A.    Yes.

25   Q.    And do you see there that in the main part of the document

1   on Page 1, it begins to list various sites, Site 1, Site 2, and

2   Site 3 and so forth?

3   A.   Yes.

4   Q.   And having testified as an expert on this study, you're

5   aware those refer to the different research sites where the

6   patients are actually being studied in the clinical trial,

7   correct?

8   A.   Yes.

9   Q.   And would you look at Site 1 near the top of the page.  Do

10  you see that that lists Robert Gerner, Dr. Robert Gerner from

11  the VAMC in Los Angeles, California?

12  A.   Yes.

13  Q.   And if you look down at Site 4, do you see that that lists

14  Joseph Calabrese from Cleveland, Ohio?

15  A.   Yes.

16  Q.   And if you would turn to the next page, about one-third of

17  the way down, Site 9, do you see that that lists Drs. Terence

18  Ketter and Charles Debattista from Stanford in Palo Alto,

19  Northern California?

20  A.   Yes.

21  Q.   Do you see that?

22  A.   Those are among the investigators for the Pande study,

23  according to this document, right?

24  A.   Yes.

25  Q.   And your belief, as you testified earlier, I believe, is

Page 60

1   that the Pande study wasn't disclosed to Neurontin providers as

2   fast as it should have been, correct?

3   A.   Well, you just showed me the prior exhibit, and the

4   exhibit is confidential.  It was an internal Pfizer document,

5   so it was not disclosed to the world at large.  Obviously the

6   investigators would know the trial that they're doing, I would

7   assume.

8          MR. HOOPER:  Your Honor, I want to show the witness

9   Exhibit 923, the list produced by Kaiser in this case entitled

10  "Neurontin Providers."

11  Q.   Dr. Barkin, would you please look at Page 146 of the big

12  book of Kaiser's Neurontin providers.  Do you see Charles

13  Debattista, the Pande study investigator from their Northern

14  California region?

15  A.   Yes.

16  Q.   That's the same name you saw listed as a clinical

17  investigator a moment ago from Stanford University of the Pande

18  study, correct?

19  A.   Yes, it's the same name.

20  Q.   Also listed as a Neurontin provider on Kaiser's list,

21  right?

22  A.   Yes.

23  Q.   Page 194 of the big book of Kaiser's Neurontin providers,

24  do you see Dr. Terence Ketter listed from their Northern

25  California region?

1    A.    Yes.

2    Q.    Another investigator in the Pande study, correct?

3    A.    Yes.

4    Q.    Would you please turn to Page 339 of the Kaiser Neurontin

5    providers list.  Do you see Dr. Joseph Calabrese from Ohio?

6    A.    Yes.

7    Q.    The same name we saw listed as an investigator in

8    Dr. Pande's study, correct?

9    A.    Yes.

10   Q.    Page 401 from the big book of Neurontin providers, Robert

11   Gerner from Southern California in Kaiser's list, correct?

12   A.    Yes.

13   Q.    And he too is listed as one of the investigators, the

14   doctors who did the research and got a special letter in

15   Dr. Pande's study, correct?

16   A.    Yeah, but, I mean, this is confidential information of a

17   clinical trial nature.  It's not disseminated treatment

18   information to the world at large, but, yes, those names are

19   listed.

20          A JUROR:  These doctors that were just named who were

21   the study people, they are Kaiser people or Kaiser Permanente?

22          THE COURT:  Is that what list you were reading off of?

23          THE WITNESS:  Yeah, I don't know --

24          A JUROR:  It was, like, the big thick thing.

25          THE WITNESS:  Right.

Page 62

1          A JUROR:  Okay.  They're providers which means --

2          THE COURT:  It means the doctors, they're Kaiser

3    doctors.

4          MR. GREENE:  Your Honor, they're Kaiser Permanente.

5          THE COURT:  Yes.  You'll at some point hear -- I stand

6    corrected.  They're doctors who prescribe, as I understand it,

7    Neurontin, and they are employed by Kaiser Permanente.

8          MR. GREENE:  Yes, not one of the plaintiffs in the

9    case.  The jury will hear about this.

10         THE COURT:  You'll be hearing from Kaiser people soon

11   to hear the relationship.  Go ahead.

12         A JUROR:  Do we know whether or not these

13   prescriptions were for on- or off-label use?

14         THE WITNESS:  I don't know.

15         MR. HOOPER:  And, your Honor, just to be clear, the

16   document is entitled "Neurontin Providers," so it's not just a

17   telephone book of all Kaiser doctors.

18         MR. GREENE:  I think we have a question from a juror.

19         A JUROR:  My question was, do we know whether or not

20   these prescriptions were for on- or off-label use?

21         THE COURT:  I think you're going to have to wait and

22   hear that.  That has not come in yet.

23         How are we doing timewise?

24         MR. HOOPER:  Moving right along, your Honor.

25         Your Honor, I'd like permission to show the witness

Page 63

1    Exhibit 630 which has already been admitted, 630, a Kaiser

2    document.

3    Q.   Dr. Barkin, you told us --

4              MR. GREENE:  I'm going to object to questions from

5    Kaiser documents or further about Kaiser.  This witness knows

6    nothing about Kaiser.  We --

7              THE COURT:  Let me hear the question.  I don't know.

8    Are you moving to introduce this or just ask a question?

9              MR. HOOPER:  It is admitted, your Honor.  I'm going to

10   ask him about the very studies he talked about on direct which

11   are cited in this Kaiser document.

12             THE COURT:  That's fair.

13   Q.   Dr. Barkin, yesterday you talked about the Pande study,

14   and you said it was published in a journal with a circulation

15   of only 455.  Do you recall saying that?

16   A.   Yes.  It was published in Bipolar Disorder, a very

17   low-impact journal.

18   Q.   And for all you know, those 455 --

19             THE COURT:  I couldn't hear.  It's very low in --

20             THE WITNESS:  I'm sorry.  A low-end journal, not a

21   widely circulated journal.

22   Q.   And for all you know, the 455 could refer to 455 different

23   medical libraries, correct?

24   A.   True.

25   Q.   And you certainly know that the Pande study is available

f3140d82-ad18-443e-8483-31d3e17c51b4

Page 64

1    online and has been for some time, don't you?

2    A.    Yes.

3    Q.    Would you please turn to the last page of this drug

4    monograph.  Do you see there that this document was prepared

5    by -- I'm sorry, the second-to-the-last page, Doctor,

6    second-to-the-last page up at the top right above the

7    references.

8    A.    Let me get there.  I haven't seen this document until

9    today, so I haven't had an opportunity to read it or review it,

10   but, yes, I see what you've highlighted.

11   Q.    Do you see that this document was prepared by Kaiser's

12   Debbie Kubota and Mirta Millares, among others, from January,

13   2002?  Do you see that?

14   A.    Yes.

15   Q.    And if you look through the references down to

16   Reference 38 and 40, you see the Frye and the Pande studies

17   listed there, correct?

18   A.    Yes.

19   Q.    So Kaiser apparently had no trouble finding a copy of the

20   Pande publication, did it?

21   A.    They certainly have it on their reference list.

22   Q.    And would you please turn back inside the document using

23   the numbers on the lower right-hand corner to the page that has

24   the numbers 44060.  Do you see that page, Doctor, 44060?

25   A.    Yes.

1    Q.   And you see there in Kaiser's document a table entitled

2    "Evidence Table:   Gabapentin and Bipolar Disorder"?

3    A.   Yes.

4    Q.   And do you see that the Frye and Pande studies are listed

5    and summarized in the first two rows of Kaiser's table in 2002?

6    A.   Yes.

7    Q.   And in Kaiser's table from January, 2002, do you see that

8    there are more publications listed below those, beginning with

9    McElroy?  Do you see the McElroy study listed third?

10   A.   Yes.

11   Q.   And right under the name of McElroy, it says "Open

12   prospective study," correct?

13   A.   Yes.

14   Q.   That means it's not one of these double-blind randomized

15   controlled trials, but rather an open study, correct?

16   A.   Yes.

17   Q.   And Kaiser put that in their table of evidence, correct?

18   A.   Yes.

19   Q.   Not Level I evidence, is it, according to your definition,

20   correct?

21   A.   That's correct.

22   Q.   Would you turn to the next page.  Do you see there that

23   they've listed a study by a Gahemi, G-a-h-e-m-i?  That's the

24   fourth item in their evidence table, correct?

25   A.   Yeah, I think that's Ghaemi, who's a Boston doc, but, yes.

1    Q.   And Kaiser says right below that that it is a

2    "Retrospective naturalistic case review."  That's not Level I

3    evidence, is it, Doctor?

4    A.   No, it's not.

5    Q.   And there's a mention to a Frye publication in 1999 below

6    that, and then let's go to the one right below that, Scheffer,

7    1997.  That says "Open naturalistic study."  Not Level I

8    evidence, is it, Doctor?

9    A.   No, it's not.

10   Q.   And if you look at the next two, Knoll "Open study" and

11   Erfurth "Open naturalistic study."  Not Level I evidence, are

12   they?

13   A.   No.

14   Q.   And it goes on.  Turn to the next page.  Listed in

15   Kaiser's evidence table in January, 2002, Young, 1997, "Case

16   series, open label."  Not Level I evidence, is it, Doctor?

17   A.   No.

18        MR. GREENE:  Your Honor, can we stipulate that this

19   information is listed here?  We're going to hear from a witness

20   that prepared this document.  As Dr. Barkin has said --

21        THE COURT:  It's his time.  He can use it as he wants.

22   Q.   And you told the jury and showed the jury something from a

23   publication by Leslie Magnus from Parke-Davis, right,

24   Dr. Barkin?

25   A.   Yes.

1    Q.    You thought that was misleading, correct?

2    A.    Yes.

3    Q.    Is that listed in their table?

4    A.    No.

5    Q.    Not something they considered when they wrote this, is it?

6    A.    Well, I don't know if they considered it or not.  It's not

7    listed in this table.  A lot of articles get looked at,

8    considered; but when I do drug reviews for different states, we

9    don't look at, you know, every case report, open label, you

10   know.

11   Q.    They certainly didn't see reason to include it in their

12   table of evidence, did they, Dr. Barkin?

13   A.    It's not listed.

14        MR. HOOPER:  Can we switch to the Elmo, please,

15   Mr. Alba.  Exhibit 63.

16   Q.    Dr. Barkin, you told the jury about a CME presentation,

17   correct?

18   A.    Yes.

19   Q.    This was in the "marketing" part of your testimony.  If

20   you look down at the bottom of the page, Dr. Barkin, you see

21   that it says not simply that Pfizer paid for it, but it was

22   supported by something called an "unrestricted educational

23   grant" from Parke-Davis.  Do you see that?

24   A.    Yes.

25   Q.    You didn't tell the jury about that, did you?

Page 68

1   A.   I said it was funded by Parke-Davis.  I didn't specify

2   how.  I wouldn't know about that.

3   Q.   Now, let's turn to the third page in on the document with

4   the last three 492.  Do you see that there is a list of the

5   series faculty?

6   A.   Yes.

7   Q.   And you see, for example, that there is listed as

8   presenters at this function Gregory Asnis from the Albert

9   Einstein College of Medicine, Charles Bowden from the

10  University of Texas, and a whole range of about twenty doctors,

11  correct?

12  A.   Yes.

13  Q.   Which one addressed Neurontin or gabapentin in this

14  presentation?  Do you know?

15  A.   I don't.  It was my understanding that this series faculty

16  had presented the slide deck that I referenced.

17  Q.   In fact, you don't claim to have attended this

18  presentation, do you, Doctor?

19  A.   No.

20  Q.   You don't know a word that was said there, do you?

21  A.   I don't.

22  Q.   You know what was in the slides on this paper that you

23  looked at, correct?

24  A.   Yes.

25  Q.   And would you look, if you would, at the --

Page 69

1          THE COURT:  What slides?

2          MR. HOOPER:  The slides he showed on direct, your

3    Honor.

4    A.   Can I have a copy of what you're referring to?

5    Q.   It's on the screen, Doctor.

6    A.   No, I mean, the whole thing.  I don't have a copy of the

7    whole thing.

8          THE COURT:  63, is that what it is?

9          MR. HOOPER:  63, your Honor.

10         THE COURT:  And what were the slides, what number?

11         Is that what you want?

12         THE WITNESS:  Yes.

13         THE COURT:  Yes.

14         MR. HOOPER:  The slides or the full deck?

15         THE WITNESS:  If you can give me the full deck.  It's

16   just that it's hard --

17         THE COURT:  If you're going to ask about it, he should

18   probably have it in front of him.

19         THE WITNESS:  It's hard for me to see the screen.

20   It's coming out as very small.

21   Q.   You can see here on the second page --

22         THE COURT:  Is that the document?  Robert, we marked

23   it, didn't we?

24         THE CLERK:  It's right here, yes.

25         THE COURT:  Well, give it to him.

1          (Document passed to the witness.)

2          THE WITNESS:  Thank you.

3    Q.   Go to the second page of this CME presentation,

4    Dr. Barkin.

5    A.   Let me just get there.  Okay.

6    Q.   If you look nine presenters down, who do you see listed

7    there as a presenter at this CME event?

8    A.   Terry Ketter.

9    Q.   One of the investigators in the Pande study, correct?

10   A.   Yes.

11   Q.   And as you page through the succeeding pages slowly for

12   us, Dr. Barkin, I'm going to go through them slowly on the

13   screen, you see that there are many, many, many slides on a

14   variety of topics presented over the course of this continuing

15   medical education event, do you not?

16   A.   Yes.

17   Q.   And let's go to Page 5.  For example, at the bottom, one

18   of the presenters presented some information about the costs of

19   panic disorder, for example, correct?

20   A.   Yes.

21   Q.   And if you turn on through there to Page 11, you see that

22   there begins a presentation about social phobia, correct?

23   A.   Yes.

24   Q.   And as you told us in your deposition, there is positive

25   Level I evidence for the use of gabapentin in social phobia,

Page 71

1    correct?

2    A.   Yes.   That was the Pande article on social phobia that he

3    published later on after knowing the results of his prior study

4    of bipolar disorder, the lack of efficacy, but, yes.

5    Q.   And as you turn on through the slides from this

6    presentation through Pages 14, 15, 16, 17, there's more and

7    more information about social phobia, correct?

8    A.   Yes.

9    Q.   And if you turn to Page 25, Doctor --

10   A.   Yes.

11   Q.   -- and you look at the middle slide there, you see there

12   is a slide "Gabapentin in social phobia," the indication that

13   you just told us a minute and a half ago has Level I evidence,

14   correct?

15   A.   Yes.

16   Q.   And it refers to the same Pande 2000 study in social

17   phobia that you just mentioned, correct?

18   A.   Uhm, I'm not sure about that.   It actually mentions not

19   his article.   It mentions a presentation that he gave at a

20   conference.

21   Q.   Oh, I see.   I stand corrected.   You're right.   The same

22   indication, social phobia, correct?

23   A.   Right, but not his presentation.

24   Q.   And if you turn on, Dr. Barkin, let's go to Page 40, which

25   I believe is the one slide from the presentation that you chose

1   to show the jury.

2          THE COURT:  It's just hard to read.  Could someone

3   blow it up.

4   Q.   You see there that it says, 40 pages into the presentation

5   there is a slide that says "Gabapentin, Reports of Benefit."

6   And it lists "Mania, bipolar depression, bipolar maintenance,

7   rapid cycling, treatment resistance, mood instability, social

8   phobia, chronic pain."

9          First, Doctor, it says "reports," correct?

10  A.   Yes.

11  Q.   Nowhere on the slide does it say there is double-blind

12  randomized placebo-controlled Level I evidence for any of

13  those, does it?

14  A.   No.

15  Q.   And you weren't at the conference, and you can't tell us

16  what the presenter, whoever that may have been, said when they

17  presented these bullet points, correct?

18  A.   Yes.

19  Q.   And if you turn to Page 49 of the document, let's look at

20  something else that you didn't bring up.  There's a chart there

21  that says "Drugs used in the treatment of psychiatric and

22  neurological disorders," correct?

23  A.   Yeah, I mean, this is a listing of drugs just in general

24  used in psychiatry and neurology.

25  Q.   And there are scores and scores of them, correct?

Page 73

1   A.   Yes.

2   Q.   We saw earlier when we were looking at the first page,

3   Dr. Terence Ketter was listed as a presenter here, correct?

4   A.   Yes.

5   Q.   And that's the same Dr. Terence Ketter that was listed in

6   the Neurontin providers book, correct, the same name anyway,

7   right?

8   A.   Yes.

9   Q.   Let's turn to some of your own speaking engagements.

10  Dr. Barkin, you've served on speakers bureaus for a number of

11  pharmaceutical companies, have you not?

12  A.   I have.

13  Q.   You served on Eli Lilly & Company's speakers bureau,

14  right?

15  A.   Yes.

16  Q.   You served on Eli Lilly's speakers bureau in the early

17  mid-2000s and gave talks on bipolar disorder and other mood

18  disorders, correct?

19  A.   That's correct, yes.

20  Q.   You spoke on a speakers bureau for GlaxoSmithKline

21  Company, correct?

22  A.   That's correct.

23  Q.   You served on speakers bureau for Forest Laboratories,

24  correct?

25  A.   Yes.

Page 74

1   Q.   You've served on the speakers bureau for Pfizer, correct?

2   A.   Yes.

3   Q.   You've served on the speakers bureau for Wyeth

4   Pharmaceuticals, correct?

5   A.   Yes.

6   Q.   You've served on the speakers bureau for Novartis,

7   correct?

8   A.   Yes.

9   Q.   You've served on the speakers bureau for AstraZeneca,

10  correct?

11  A.   Yes.

12  Q.   And over the past six or seven years, typically you've

13  received about $1,500 per speech that you've given on behalf of

14  one of these eight or nine pharmaceutical companies, correct?

15  A.   Yes.

16  Q.   And as you told us in your deposition a year ago, none of

17  those companies, Pfizer or any of the rest, gave you material

18  to present, did they?

19  A.   No, not -- I mean, sometimes they do, but often they

20  don't.

21  Q.   None of those companies drafted the content of your

22  presentation, did they?

23  A.   Again, sometimes they do, but often they don't.

24  Q.   Pfizer certainly did not, did it?

25  A.   No.

Page  75

1   Q.   They didn't have any impact on the content of your

2   presentation, did they?

3   A.   They did not.

4   Q.   And they didn't review the content of your presentation

5   before you gave it, did they?

6   A.   They did not.

7   Q.   Dr. Barkin, you agree there is Level I evidence for social

8   phobia.  Do you still agree, as you told us in your deposition,

9   that there is also Level I evidence for panic disorder?

10  A.   You know, I didn't review the panic disorder literature,

11  and it's been over a year since the deposition, so I don't have

12  that in front of me, the article.

13  Q.   You can't tell us about that?

14  A.   I can't.

15          MR. HOOPER:  I pass the witness.

16          MR. GREENE:  Exhibit 63.

17          THE CLERK:  I think it's up there.

18          THE COURT:  Do you want it up on the screen?  Are you

19  the poor guy who carries those documents around?

20          FROM THE FLOOR:  I'm so big and strong.

21          (Laughter.)

22  REDIRECT EXAMINATION BY MR. GREENE:

23  Q.   At the beginning of counsel's questions to you,

24  Dr. Barkin, he asked you about your practice.  Do you recall

25  that?

Page 76

1   A.   Yes.

2   Q.   And I think you said you had been in private practice how

3   many years?

4   A.   Eleven years in private practice, and hospital-based

5   practice three years before that, and academic medicine three

6   years before that.

7   Q.   So during that tenure of academic practice, hospital

8   practice, and your private practice, how many years did that

9   period of time cover?

10  A.   Since 1991, so, you know, what is that, nineteen, twenty

11  years?

12  Q.   And during that period of time, can you tell us how many

13  psychiatric patients that you've treated?

14  A.   I haven't ever kept a tally.  It would be in the many

15  thousands, possibly tens of thousands.

16  Q.   And he brought up that two patients that you inherited

17  were on Neurontin; is that correct?

18  A.   He did.

19  Q.   But you never -- just accept your figure, a thousand or

20  two thousand patients.  Have you ever prescribed Neurontin to

21  any of those aside from those two patients?

22  A.   I've prescribed Neurontin for patients but never for

23  bipolar disorder.

24  Q.   Now, the two patients that he wanted to highlight, those

25  are the patients you said you had inherited?

Page 77

1  A.   Yes.

2  Q.   And another physician had been treating them and put them

3  on Neurontin, correct?

4  A.   Yes.

5  Q.   And I think that you said that you tapered one or both of

6  the patients off Neurontin?

7  A.   Yes.

8  Q.   I want to direct your attention here to Exhibit 63, and

9  counsel reviewed some of the pages of this CME with you.

10      MR. GREENE:  We'd move to introduce Exhibit 63 in its

11  entirety at this time, your Honor.

12      THE COURT:  Allowed.

13      (Plaintiff Exhibit 63 received in evidence.)

14  Q.   So the jury will be able to see all the pages in it, but

15  the ones that I brought to the jury's attention, those were the

16  pages that dealt with presentations that discussed Neurontin or

17  gabapentin for the treatment of bipolar disorder; isn't that

18  correct?

19  A.   Yes.

20  Q.   And the other pages that he brought to your attention

21  concerning panic disorder or social phobia, they're not in this

22  case, are they, Doctor?  That's not what I asked you to

23  address?

24  A.   That's correct.

25  Q.   And I think the point that we made on direct examination,

Page 78

1    but I'd like to bring it to the jury's attention again, is the

2    page that, I think it was Page 40 -- if we could get that up on

3    the screen, if you could blow that up.  This is the page, it

4    says "The newer mood stabilizers," and gabapentin is introduced

5    as one of them, correct?

6    A.   Yes, it is.

7    Q.   And they list the benefits, and then if we can blow up the

8    benefits of gabapentin, if we could blow up the box just below

9    it.  And this was case studies that we looked at when I

10   questioned you, correct?

11   A.   Yes.

12   Q.   And case studies are Level III evidence; isn't that right?

13   A.   That's correct.

14   Q.   And the point I think you made to the jury is that there

15   was Level I evidence, the DBRCT, Pande's own study, an employee

16   of Parke-Davis at the time who paid for this presentation

17   through an unrestricted education grant, made no reference to

18   Pande here; is that right?

19   A.   Right, there's no reference.  That's a big problem here,

20   in my opinion.

21   Q.   You were asked some questions concerning an Exhibit 46,

22   the Kaiser monograph; is that right?  You remember about the

23   evidence that had been collected by Kaiser in this case?

24   A.   Yes.

25   Q.   You haven't seen this document before?

1   A.   No, not until right now.

2   Q.   You have no idea what Kaiser was undertaking when they put

3   that information together?

4   A.   No idea.

5   Q.   You were also asked and I think you were shown an exhibit

6   with a lot of prescribers of Neurontin.  I think it's referred

7   to as "Kaiser Physicians."

8   A.   I don't have that in front of me, but that was one of the

9   things that that other opposing counsel showed.

10  Q.   Neurontin providers, a list of doctors.  Do you know

11  whether those doctors are employed by Kaiser, the plaintiffs in

12  this case, or Kaiser Permanente, a different organization?

13  A.   I have no idea.

14          MR. GREENE:  That's all I have.  Thank you.

15          THE COURT:  Anything?

16          MR. HOOPER:  Very briefly, your Honor.

17          THE COURT:  Stay right there.

18  RECROSS-EXAMINATION BY MR. HOOPER:

19  Q.   Dr. Barkin, you said you prescribed Neurontin but not for

20  bipolar, correct?

21  A.   Never for bipolar.

22  Q.   What have you prescribed Neurontin for, social phobia?

23  A.   Never.  The only other times I've prescribed Neurontin

24  were for patients that I were covering for that were patients

25  of another physician.

1   Q.   What medical problem were you trying to treat with the

2   Neurontin?

3   A.   Well, when you're covering for another doctor and a

4   patient calls in and needs a refill, often you don't know, but

5   typically epilepsy, other neurologists that I work with.

6   Q.   Anything else, Doctor?

7   A.   Not that I recall.

8             MR. HOOPER:   No further questions.

9             THE COURT:   Thank you.   Your next witness?   Oh, you

10  have a question before he goes.   Go ahead.

11            A JUROR:   I wonder if you could help clarify something

12  for me.   Both the plaintiffs and the defendants are going to be

13  and have introduced a number of expert witnesses, and I'm not

14  familiar with how, for example, you would be chosen as an

15  expert witness.   I would assume that --

16            THE COURT:   Well, let me jump in here.   Plaintiffs get

17  to choose a certain number of experts.   You've heard from them.

18  You'll continue to hear from them.   Then you're going to hear

19  from a host of experts chosen by Pfizer.   So he wouldn't

20  necessarily be able to answer your question, how experts are

21  chosen.   I don't even know how they go about choosing the

22  experts, if that was the gist of the question.

23            Yes, go ahead.

24            A JUROR:   What was the date on that last CME we were

25  just looking at?

1          THE WITNESS:  It's dated 1999.

2          THE COURT:  Thank you.  Anything else, anybody?

3  Great.  Thank you.

4          THE WITNESS:  Thank you.

5          (Witness excused.)

6          THE COURT:  Your next witness?  Ms. Nussbaum?

7          MS. NUSSBAUM:  Your Honor, thank you.  We'd like to

8  call Dr. Ambrose Carrejo to the stand, your Honor.

9          THE COURT:  Thank you.

10

11                     AMBROSE CARREJO

12  having been first duly sworn, was examined and testified as

13  follows:

14          THE CLERK:  Would you please state your name and spell

15  it for the record.

16          THE WITNESS:  I'm sorry, I didn't hear you.

17          THE CLERK:  Would you please state your name and spell

18  it for the record.

19          THE WITNESS:  My name is Ambrose Carrejo,

20  A-m-b-r-o-s-e C-a-r-r-e-j-o.

21  DIRECT EXAMINATION BY MS. NUSSBAUM:

22  Q.   Good morning, Dr. Carrejo.  Are you presently employed?

23  A.   Yes, I am.

24  Q.   And who do you work for?

25  A.   I work for Kaiser Permanente.

Page 82

1   Q.   And what is your position?

2   A.   I'm the pharmaceutical contracting leader for Kaiser.

3   Q.   How long have you worked for Kaiser Permanente?

4   A.   Twenty years.

5   Q.   And what was your first position?  What did you start as?

6   A.   I started as a drug education coordinator in February of

7   1990.

8   Q.   What is your highest education?

9   A.   I received my doctorate in pharmacy from University of

10  California at San Francisco.

11  Q.   When did you receive that?

12  A.   1986.

13  Q.   Now, can you describe the plaintiffs in this matter for

14  the jury, please.

15  A.   Yes.  It's Kaiser Foundation Hospitals, Incorporated, and

16  Kaiser Foundation Health Plan.  Kaiser Foundation Hospitals

17  provides and manages the hospital organizations for our

18  8.6 million members in nine states throughout the United

19  States, including the District of Columbia.  Kaiser Foundation

20  Health Plan provides the medical coverage for these members,

21  and both entities are nonprofit charitable organizations.

22  Q.   And what does that mean to be a nonprofit charitable

23  organization?

24  A.   Well, I think in short, nonprofit, they don't pay out

25  large dividends to stockholders.  Any revenue generated is put

1    back in the company in the form of hospitals, medical office

2    buildings, capital expenditures of that sort.  We also invest

3    heavily in our technology.  We're rolling out an electronic

4    healthcare record right now called Health Connect.  It's very

5    important.  And there's also a significant charitable

6    contribution.  Last year, 2009, Kaiser contracted --

7              MR. KENNEDY:  Objection, your Honor.  Irrelevant.

8              THE COURT:  Overruled.

9    A.    -- Kaiser contributed $1.7 billion in charity.

10             THE COURT:  Well, actually I --

11             MR. KENNEDY:  Move to strike.

12             THE COURT:  I strike that as irrelevant.

13   Q.   Dr. Carrejo, you stated that Kaiser presently has

14   approximately 8.6 million members.  Where are they located?

15   A.    Throughout the United States.  We have members in Hawaii.

16   We have two regions in California.  We break it into Northern

17   California and Southern California.  We have the Northwest

18   which comprises Oregon and Washington.  Then we have Colorado,

19   Ohio, Georgia, the Midatlantic states, which is Virginia and

20   Maryland, and the District of Columbia.

21   Q.   And can you tell me the approximate percentage of Kaiser

22   members that are located in each of those states?

23   A.    Roughly, it's 75 percent of the members are located within

24   the Californias, and the other 25 percent are divided quite

25   equally throughout the other regions.

1  Q.   Now, do you know in 1994 approximately how many members

2  Kaiser had?

3  A.   Approximately 6.2 million members.

4  Q.   And were the approximate percentages of where those

5  members lived the same as they are today?

6  A.   Yes.  It's been quite stable.

7  Q.   Now, does Kaiser have members who are on Medicare?

8  A.   Yes.

9  Q.   And do you know approximately what percent of Kaiser's

10  members are on Medicare?

11  A.   Approximately 12 to 13 percent of our members are

12  Medicare.

13  Q.   And is that roughly the same percentage as the general

14  population?

15  A.   Very similar.

16  Q.   Do you know of any reason that Kaiser's patient population

17  would be different from the general population?

18  A.   No, I don't.  The 8.6 million lives represent a good

19  sample of the United States.  The geographical distribution

20  represents a good portion of the United States from both

21  coasts, and we're very similar in our distribution of Medicare

22  lives and commercial lives.  Within those commercial lives, the

23  vast majority come from employer groups.  If you enter Kaiser

24  through an employer group, there's no prescreening.  You don't

25  have to undergo a medical evaluation before you're granted

1    health coverage.  So, no, there's no reason they would be

2    considered different from the national.

3    Q.    What is the Kaiser mission?

4    A.    In short, it's to provide high-quality healthcare at an

5    affordable price and accessible to our members.

6    Q.    Now, I think you told the jury that you are presently the

7    head of prescription drug purchasing for Kaiser; is that right?

8    A.    That's correct.

9    Q.    And does Kaiser actually have brick and mortar pharmacies?

10   A.    Yes.  In each of our regions we have our own pharmacies

11   that are managed by the Kaiser Foundation Health Plan.

12   Q.    Now, do those pharmacies fill prescriptions that are

13   written by doctors who do not work for PMG medical groups?

14   A.    Absolutely.  By law, we accept all prescriptions that walk

15   in the front door.  The vast majority are our members, but even

16   within our members, they may have our health benefit and our

17   drug benefit, but they could have duplicate benefits through

18   perhaps their spouse, and they'll see a doctor on the outside

19   and come into Kaiser and use the prescription benefit and have

20   their prescription filled.  Or they can be involved in a

21   workmen's comp case, see an outside workmen's comp doctor, and

22   have those prescriptions brought in as well.

23   Q.    Now, if I may, Dr. Carrejo, I want to show you what's

24   previously been identified by defense as Exhibit 923, and I

25   think the jury has seen this copy.

1        THE COURT:  Could you clarify for us what the

2   difference is?  At some point you say you work for Kaiser, and

3   at one point you said you started off at Kaiser Permanente?

4        THE WITNESS:  I'm sorry.  Kaiser Permanente is the

5   collection of the three entities.  There's the Permanente

6   Medical Group, Kaiser Foundation Health Plan, and Kaiser

7   Foundation Hospitals.  Specifically, I'm employed by the Kaiser

8   Foundation Health Plan.

9   Q.   Now, Dr. Carrejo, looking at that large binder, which I

10  believe has been identified as Defendants' Exhibit 923, can you

11  tell me what that is?

12  A.   Well, it's labeled "Neurontin Providers," and we have the

13  region in an alphabetical listing of each of the providers in

14  some sort of list.

15  Q.   Now, the fact that a particular name is mentioned in that

16  book as a Neurontin provider, does that mean that that

17  physician is a PMG physician?

18  A.   No.  It doesn't exclusively mean that.  Like I said

19  earlier, we do take prescriptions from the outside, and even

20  our members could be seen by outside doctors for a variety of

21  reasons and repatriate those prescriptions in our brick and

22  mortar pharmacies.

23  Q.   Now, Dr. Carrejo, was there a request yesterday that

24  individuals at Kaiser search their databases and search all of

25  their records and business documents to determine whether a

Page 87

1    Mark Frye, F-r-y-e, M.D. is or has ever been a physician in a

2    PMG medical group?

3    A.    That's correct.

4    Q.    And what was the result of that search, Dr. Carrejo?

5    A.    That search did not produce any evidence that he ever

6    worked for the Permanente Medical Group.

7    Q.    Similarly, Dr. Carrejo, was there a search to determine

8    whether a Terence Ketter, K-e-t-t-e-r, either presently or has

9    been a physician for any Permanente Medical Group?

10   A.    That's correct, and similarly he has not been employed by

11   the Permanente Medical Group.

12          THE COURT:  Well, what's the relationship between the

13   Permanente Medical Group and the other two Kaiser entities?

14          THE WITNESS:  Permanente Medical Group is contracted

15   by Kaiser Foundation Health Plan to provide the medical

16   services to our patients.  So the health plan contracts with

17   Permanente Medical Group so those physicians can take care of

18   all of the 8.6 million lives.

19   Q.    Now, Dr. Carrejo, as the person in charge of purchasing

20   drugs for Kaiser, do you have contacts with drug manufacturers?

21   A.    Yes.

22   Q.    And have you had contacts with people at Pfizer?

23   A.    Yes.

24   Q.    And have you purchased drugs from Pfizer?

25   A.    Yes.

Page 88

1    Q.    And that's included the drug Neurontin?

2    A.    Yes.

3    Q.    And are you familiar with Kaiser's utilization of the drug

4    Neurontin from 1994 to 2004?

5    A.    Yes.

6    Q.    And is it your understanding that Kaiser has produced

7    information in this litigation about its purchases of Neurontin

8    over that period of time?

9    A.    Yes.

10   Q.    Now, do you know how that data was collected?

11   A.    Yes.  Calvin Togashi in our pharmacy analytical service in

12   Downey, California, his department is charged with maintaining

13   a database of every prescription that is dispensed throughout

14   the Kaiser program, all of the regions.  Each night from each

15   of the pharmacies, that information is downloaded, collated

16   into our database, and aged, scrubbed for appropriateness.  And

17   we use it for a variety of information.  For the example of

18   Accutane, that's a very potent teratogenic medication.  It

19   causes birth defects.  And in that example, we cannot dispense

20   that medication to a female unless there's a proven pregnancy

21   test, a negative pregnancy test on file.  So that type of data

22   is looked to see before it's dispensed if there's a negative

23   pregnancy test.

24        We also use it for a variety of quality measures.  If an

25   emergent message comes out that a medication is removed from

Page 89

1    the market, patients can be identified instantaneously, lists

2    can be generated, patients can be called, that medication can

3    be removed.

4        And we also look for if they're on the appropriate

5    medications.  With asthma, inhaled corticosteroids must be

6    taken with a product called Serevent.  A report came out from

7    the FDA that taking Serevent without an inhaled corticosteroid

8    was dangerous.  We were able to find those patients and make

9    sure they had the combination of both agents.

10   Q.   Now, Dr. Carrejo, did you supervise the process whereby

11   Kaiser's data was collected and produced in this matter?

12   A.   Yes.

13   Q.   I show you what's been marked as Plaintiff's Exhibit 268.

14   Can you identify that, Dr. Carrejo?

15   A.   Yes.  It's a CD, "Neurontin Sales and Marketing Practice

16   Litigation," TX 268.

17          MS. NUSSBAUM:  Your Honor, I would move that into

18   evidence.

19          MR. KENNEDY:  No objection, your Honor.

20          (Plaintiff Exhibit 268 received in evidence.)

21   Q.   Now, Dr. Carrejo, can you describe the utilization of

22   Neurontin from approximately 1994 until 2004?

23          MR. KENNEDY:  Object.  Narrative answer.

24          THE COURT:  When did you begin there?

25          THE WITNESS:  I'm sorry?

1          THE COURT:  What year did you begin there?

2          THE WITNESS:  1990.

3          THE COURT:  Overruled.

4   A.   It was a steep uphill curve that climbed with a peak in

5   about 2004 and then start to decline rapidly, ending -- the

6   utilization dropped in 2003, 2004 at peak right around the top,

7   and at the end the fourth quarter of 2004, generic gabapentin

8   was launched, so Neurontin fell off the cliff at that point.

9   Q.   Now, Dr. Carrejo, let me show you what's been marked as

10  Plaintiff's Exhibit 268-B, and please tell me if you can

11  identify this document.

12  A.   Yes.

13  Q.   What is that document, Dr. Carrejo.

14  A.   I created this myself.  This is a graph beginning in the

15  first quarter of 1994 of the entire program-wide Kaiser, all of

16  the regions for the prescriptions that were dispensed on a

17  quarterly basis throughout, ending in the third quarter of

18  2004.  There was a very well-defined peak in the first, second,

19  third quarter of 2003, with a drop-off that began in the first

20  quarter of 2004.

21         THE COURT:  So this is just the brand name Neurontin.

22  This doesn't include gabapentin, is that right?

23         THE WITNESS:  Yes.  In the third quarter of '04, late

24  in the third quarter, gabapentin does enter, and I believe

25  there's 300, 350 prescriptions of gabapentin in that quarter,

Page 91

1    but it wasn't till fourth quarter --

2            THE COURT:  Is that reflected in this graph?

3            THE WITNESS:  Yes.  Those 350 or so are included in

4    that last dot.

5    Q.    Now, Dr. Carrejo, did you create this graph?

6    A.    I did.

7    Q.    And was this graph based on the material in Exhibit 268?

8    A.    That's correct.

9            MS. NUSSBAUM:  Your Honor, I would move this into

10   evidence.

11           THE COURT:  All right.

12           MR. KENNEDY:  Your Honor, as long as it's understood

13   it's just Neurontin plus 350 gabapentins, we have no objection.

14   To the extent it's intended to cover both, we object.  I think

15   you've clarified it.

16           MS. NUSSBAUM:  I believe that was the witness's

17   testimony, your Honor.

18           THE COURT:  Whatever he said, this is what it

19   reflects.  So what number is that?

20           MS. NUSSBAUM:  That's Exhibit 268-B, your Honor.

21           (Plaintiff Exhibit 268-B received in evidence.)

22   Q.    Now, Dr. Carrejo, during the period of time from 1994 to

23   2004, do you know approximately how much money Kaiser spent on

24   purchasing Neurontin?

25   A.    Approximately $200 million.

1    Q.   And let me show you what's been marked as Exhibit 268-A,

2    and please tell me if you can identify this document.

3    A.   Yes.   That's the spend for, again, the entire Kaiser

4    program.   Those are the dollars spent by year beginning in '94

5    and ending in 2004.   And that's analogous to the graph showing

6    the number of prescriptions.

7              MS. NUSSBAUM:   Your Honor, I would move Exhibit 268-A

8    into evidence.

9              MR. KENNEDY:   No objection, your Honor.

10             THE COURT:   All right.

11             (Plaintiff Exhibit 268-A received in evidence.)

12   Q.   Now, Dr. Carrejo, does Kaiser have the ability to analyze

13   Neurontin data by indication?

14   A.   At that time, no.

15   Q.   So, for example, you could not tell us which prescriptions

16   were for bipolar, could you?

17   A.   No.

18   Q.   Now, is there such a thing as Kaiser doctors?

19   A.   No.   No, they're Permanente Medical Group physicians that

20   contract as a group with the Kaiser Foundation Health Plan.   So

21   specifically it's a misnomer to call them "Kaiser doctors."

22   They're Permanente physicians.

23   Q.   And are those physicians controlled by the plaintiffs in

24   this case?

25   A.   No.   Again, that's by Permanente Medical Group.   Kaiser

1   Health Plan has no ability to hire, fire, promote.

2   Q.   Presently, do you know approximately how many Permanente

3   Medical Group, or PMG, physicians there are?

4   A.   Roughly 12,000 physicians.

5   Q.   And are those physicians in various specialties?

6   A.   Yes.

7   Q.   Now, can you explain to the jury what detailing is, the

8   word "detailing."

9   A.   Yes.  Detailing is a methodology used by the

10  pharmaceutical companies to inform doctors about a medication.

11  In its pure sense, it's marketing.  It's governed by the FDA.

12  Messages from those representatives should remain on-label by

13  law.

14       They're very effective at what they do, trying to increase

15  the number of prescriptions that are written by a physician.

16  The visit can revolve around sharing of information from the

17  latest published studies, providing trinkets in the form of

18  pens or pads of paper, and also some glossy advertisements, if

19  you will.  And they generally close with, "Can we count on you

20  to write a prescription for X?"

21       And subsequently there's --

22            MR. KENNEDY:  I object, your Honor.  Move to strike,

23  lack --

24            THE COURT:  Sustained.

25            MR. KENNEDY:  And could the jury be instructed to

Page 94

1    disregard what's stricken, please?

2         THE COURT:  Yes, I'm striking this testimony.  It's

3    too general.  Do you know what the promotions were like by

4    Pfizer?

5         THE WITNESS:  Not specifically.

6    Q.   As --

7         THE COURT:  You know what, as much as I'm eager for

8    the very next question, it's 11:00 o'clock, so do you want to

9    finish up this examination, or can we break now?

10        MS. NUSSBAUM:  Whatever the jury's preference, your

11   Honor.  We can finish just the detailing portion, or we can

12   break, whatever their preference.

13        THE COURT:  How many questions?

14        MS. NUSSBAUM:  Half a dozen, one document.

15        THE COURT:  Well, then let's just take a break.

16        THE CLERK:  All rise for the jury.

17        (Jury excused.)

18   SIDE-BAR CONFERENCE:

19        THE COURT:  Mr. Greene, I just wanted to give Lee a

20   break.  Is there something you want to say on the record?

21        MR. GREENE:  Dr. David Franklin is going to testify

22   all about detailing, consistent with this and much more --

23        THE COURT:  Maybe, but it was sort of prejudicial, I

24   mean, you know, all glossy and make sure -- I mean, it's just a

25   generalization.

1            MR. GREENE:  He's got the same line he's going to

2     give --

3            THE COURT:  Well, good.  Well, then he'll talk about

4     Pfizer, but we're not going to talk about in generality.

5            So how much longer do you think you have?

6            MR. GREENE:  Could I have one thing on the record I

7     just thought of?

8            THE COURT:  Yes, Mr. Greene.

9            MR. GREENE:  I meant to move for the introduction of

10    63 and 139, and I forgot to say 139.  They were the slides.

11           THE COURT:  Yes, I'll admit 139.

12           MR. GREENE:  Thank you.

13           (Plaintiff Exhibit 139 received in evidence.)

14           MS. NUSSBAUM:  Well, I thought 923 went into evidence

15    yesterday.  It was being referred to today as if it was still

16    just an exhibit.  If there's any question, I would move --

17           THE COURT:  Which one was that?

18           MS. NUSSBAUM:  My favorite exhibit, which is the

19    Neurontin list.  It's in, okay?

20           THE COURT:  923 has got to be in.  923 is in.

21           MS. NUSSBAUM:  I apologize.  Maybe we can change the

22    record then to reflect that.  I apologize if I referred to it

23    inappropriately.  I said it had been marked.  I didn't say it

24    was in evidence.

25           THE COURT:  All right.

Page 96

1          (Discussion off the record.)

2          (A recess was taken, 11:02 a.m.)

3

4          THE CLERK:  All rise.

5          THE COURT:  At this point, let me go on the

6   record.  We were trying to get this gentleman out of here

7   today so you can go home.

8          THE WITNESS:  Thank you.

9          THE COURT:  I know you've been here for a few

10  days, and the representation by Kaiser is that you were

11  going to have your other witness here as part of your case,

12  but you don't know what day; is that right?

13         MS. NUSSBAUM:  That is correct, he is a surgeon,

14  we will have two people from Southern Califnoria, Dr. Daniel

15  and Mirta Millares, and they will both be here, and they

16  will be available to be examined by Mr. Kennedy.

17         THE COURT:  Fine.  I will make sure if the timing

18  doesn't work quite right, that we will not let their case

19  close without an end so you can move on that basis.

20         MR. KENNEDY:  Thank you, your Honor, and as I

21  said, we can skinny down our examination of this gentleman.

22  I notice, however, that plaintiffs have Southern Califnoria

23  documents on their exhibit list that they intend to

24  discuss.

25         THE COURT:  I don't know.

Page 97

1          MR. KENNEDY:  We'll do them one at a time.

2          THE COURT:  I'm don't know enough, actually I'm

3  dying myself to learn a little bit about Kaiser since I

4  actually don't know about them.  All right.  Bring in this

5  jury.  I should add for the record for Kaiser which is there

6  was a motion to transfer venue back a month ago, very late

7  in this litigation.  You wanted to litigate here.  I just

8  want to make it clear to everyone, I kept it here because it

9  was so late in the game and because I have unique expertise

10  from the MDL.  That means it's an inconvenience for Kaiser,

11  so you just have to live with the inconvenience, you just

12  need to understand that.

13          THE WITNESS:  Understood.

14          THE CLERK:  All rise for the jury.

15          ( JURORS ENTERED THE COURTROOM.)

16          THE CLERK:  Please be seated.

17  Q.  Dr. Carrejo, have you ever personally been detailed by

18  Pfizer with respect to a pharmaceutical product?

19  A.  Yes, I have.

20  Q.  And to your knowledge were PMG physicians and drug

21  information specialists at Kaiser detailed by Pfizer with

22  respect to Neurontin?

23  A.  Yes.

24  Q.  And do you know approximately when Pfizer started

25  detailing PMG physicians with respect to Neurontin?

1      MR. KENNEDY:  I object, your Honor, lack of

2  foundation unless he was there and this isn't just

3  hearsay.

4      MS. NUSSBAUM:  This is not hearsay.  He was at the

5  company.

6      THE COURT:  Do you know personally?

7      THE WITNESS:  In '99, I had knowledge of detailing

8  at Kaiser Oakland, where I worked, one of the medical

9  centers.

10      MR. KENNEDY:  Your Honor, I still object as lack

11  of --

12      THE COURT:  Overruled.

13  Q.  Now, did there come a time that Kaiser did a study to

14  see if Pfizer's detailing of Neurontin worked?

15  A.  Yes, there's one analysis that was done that I'm aware

16  of in the northwest, my colleague, Nancy Louie Lee condensed

17  it down in an e-mail for distribution.  In short, there was

18  a CME put on --

19      MR. KENNEDY:  Objection, your Honor, no foundation

20  that the CME was in any way the product of Pfizer.  As a

21  document --

22      THE COURT:  Hold on, I don't want a speaking

23  objection in front of a jury.

24      MR. KENNEDY:  Yes, your Honor.

25      THE COURT:  Objection, let me just ask you this,

1    were you present at the CME?

2              THE WITNESS:  No.

3              THE COURT:  Sustained, hearsay.

4              MS. NUSSBAUM:  Your Honor, let me show the witness

5    what's been marked as Exhibit 286.

6              THE COURT:  Do you have that?  Don't flash it up

7    until I hear there's an objection or not.

8              MR. KENNEDY:  We object, and I hate to suggest a

9    sidebar, but I think one may be appropriate here.

10             THE COURT:  They object.  Is this an e-mail you

11   received?  Why don't you lay a foundation and I'll see.

12             MS. NUSSBAUM:  Okay.

13   Q.  Mr. Carrejo, Dr. Carrejo, in or around November of 2003,

14   were you part of an inter-regional effort with respect to

15   trying to curb the overutilization of Neurontin?

16   A.  Yes.

17   Q.  And as part of that inter-regional effort, were you

18   regularly in communication with people in other Kaiser

19   regions?

20   A.  Yes, twice annually the entire Kaiser program gets

21   together, a variety of disciplines to meet and discuss in

22   this case the drug management initiatives.

23   Q.  And in addition to that, did the different regions share

24   their materials with respect to the overutilization of

25   Neurontin?

1   A.  Yes, we had monthly teleconferences across the program

2   for those individuals who were heading up those

3   initiatives.

4   Q.  And did you become aware in or about November of 2003

5   that the northwest division did an analysis of Neurontin

6   prescriptions before and after a 1999 CME at which Neurontin

7   was promoted?

8   A.  Yes.

9   Q.  And what did you learn about the analysis that was done

10  by the northwest division?

11             MR. KENNEDY:  Objection, your Honor.  Hearsay.

12             THE COURT:  Let me see you at sidebar.

13             (THE FOLLOWING OCCURRED AT SIDEBAR:)

14             THE COURT:  So I'm assuming the objection is

15  hearsay, so why is it not hearsay?

16             MS. NUSSBAUM:  Well, it's not hearsay because this

17  is a business record kept in the ordinary course.  He got a

18  copy of it.  It was part of his inter-regional national

19  committee trying to curb --

20             THE COURT:  All right.  So it's a business record.

21  Was it before or after the start of litigation?

22             MS. NUSSBAUM:  This was before.

23             THE COURT:  So why isn't it a business record?

24             MR. FOX:  1, they never produced anything to us to

25  show that he got it, so all that was produced to us; 2, it

1   doesn't talk about what the CME was, who provided it, what

2   was said.

3           THE COURT:  Overruled, it's a business record.

4   You have to establish it.

5           (THE FOLLOWING OCCURRED AT SIDEBAR:)

6           MS. NUSSBAUM:  Your Honor, we move Exhibit 286

7   into evidence.

8           THE COURT:  First of all, you have to establish it

9   was a business record.

10  Q.  Dr. Carrejo, can you identify Nancy Louie Lee?

11  A.  Yes, she's a pharmacist in the northwest region,

12  responsibility for drug use management.

13  Q.  And in or about November of 2003, was she working with

14  you and others throughout Kaiser on the effort to curb

15  overutilization of Neurontin?

16  A.  She had a parallel position in the northwest region

17  while I was in the Northern California region, so we

18  collaborated on monthly teleconferences as well as these

19  live face-to-face meetings twice a year.

20  Q.  And the analysis that is reflected in this document that

21  is looking at Neurontin prescriptions before and after May,

22  1999 CME in which Neurontin was promoted, did Ms. Louie Lee

23  do that in the ordinary course of her job at Kaiser?

24  A.  Yes.

25          MS. NUSSBAUM:  I would move this document into

Page 102

1    evidence at this point, your Honor.

2                THE COURT:  All right.

3                ( Exhibit 286 was received in evidence.)

4    Q.  Now, Dr. Carrejo can you tell me what conclusions

5    Ms. Louie Lee drew with respect to the promotion of

6    Neurontin at a CME in May of 1999?

7    A.  In short, this CME, this detailing effort worked

8    dramatically.  It increased new starts for Neurontin after

9    the fact, after the CME was conducted by 62 percent.

10   Q.  Did Ms. Louie Lee also analyze what happened to new

11   starts of Neurontin four years after the May, 1999 CME?

12   A.  So there was a sustained effect, and she estimated over

13   100 percent new starts increase.

14   Q.  So the conclusion drawn by Ms. Louie Lee was that after

15   a CME at which Neurontin was promoted, there was an

16   immediate increase in new starts by 62 percent and four

17   years later that increase was seen as 100 percent new

18   starts; is that correct?

19   A.  That is correct.

20   Q.  Now, Dr. Carrejo, I think you testified earlier that you

21   are one of the people that interfaces with Pfizer with

22   respect to Kaiser's purchase of prescription drugs; is that

23   correct?

24   A.  That is correct.

25   Q.  Let me show you what's been marked as Exhibit 250 and

1    tell me if you recognize this document, please.

2    A.  Yes, I do.

3    Q.  What is it, Dr. Carrejo?

4    A.  This is a Pfizer document.  It's the 2004 operating plan

5    as it pertains to Kaiser Permanente.

6    Q.  And drawing your attention to that document and looking

7    at either the physical page 10 or the page that bears the

8    number 001623, would you please look at that page?

9    A.  Yes.

10   Q.  What is reflected on that page?

11   A.  This is a statement that three of the medications that

12   Pfizer manufactures, Neurontin, Zithromax and Zoloft are on

13   formulary in all of our regions.

14   Q.  And that was true with respect to Neurontin; is that

15   correct?

16   A.  That's correct.

17            THE COURT:  What's a formulary?

18            THE WITNESS:  I'm sorry, a formulary is a list of

19   medications that have been added to that formulary based on

20   a review of the evidence by our physicians and is the

21   suggested medications that should be used in our population

22   of patients.

23            It's remarkable in that with that formulary

24   doctors at Kaiser can use any medication they choose for any

25   indication, but with a formulary, it's a remarkably high

1   number for the industry.  95 percent of the time they select

2   medications from the formulary.  It's a remarkable number.

3   They do it because it's not drugs that are selected by an

4   administrator, by myself or by anyone else, it's selected by

5   physicians.

6          If it's a drug for the heart, the cardiologists

7   review the evidence; if it's a drug for psychiatric

8   conditions, it's reviewed by our psychiatrists.  That review

9   of the evidence, that consensus opinion is delivered to

10  P & T, pharmacy and therapeutics.  Those doctors grant the

11  addition or deny the addition of a certain medication to our

12  formulary, so our physicians have all the confidence

13  evidence in the world the medications on that formulary is

14  the correct medications for our patients.

15  Q.  Dr. Carrejo, looking at page 14 of the document in front

16  of you, Exhibit 250 where it says "Kaiser strategies," do

17  you see that?

18  A.  Yes.

19  Q.  And can you read what it says on top?

20  A.  Yes.  This is shocking.  "Strategies, --"

21          THE COURT:  No, no comment, just read.

22  A.  -- "performance.  Drive utilizations by continuing focus

23  on the physician.  There's four bullets describing

24  physician, drivers, up and comers, information

25  disseminators, and the last one is whistleblowers.

1   Q.  And what is a whistleblower, do you know?

2   A.  A whistleblower is commonly an insider at the company

3   that turns over evidence to the government to criminal

4   investigations against a company for breaking the law.

5   Q.  And, Dr. Carrejo, looking at page 16 of the Exhibit 250,

6   it says, "Product strategies" at the top.  Do you see that

7   page, sir?

8   A.  Yes.

9   Q.  And can you read what it says with respect to

10  Neurontin?

11  A.  "Neurontin, it's one of several medications," it says,

12  "to continue to support field detailing activities."

13  Q.  And what are field detailing activities?  Do you know,

14  Dr. Carrejo?

15  A.  It relates to the pharmaceutical representatives

16  detailing in the field the physician offices.

17  Q.  So as of 2004, based on Pfizer's own document, their

18  Kaiser business plan, Pfizer's intention was to continue to

19  support field detailing activities with respect to

20  Neurontin; is that correct?

21          MR. KENNEDY:  Leading.

22  A.  That is correct.

23          THE COURT:  Sustained.

24  Q.  Now, turning to page 25, Dr. Carrejo, on the top it

25  says, "Kaiser tactics," do you see that?

1  A.  Yes.

2  Q.  Then it says, "Access"?

3  A.  Yes.

4  Q.  Can you please read the first bullet?

5  A.  "Work with targeted TACUs and Kaiser senior DMs to

6  identify regional P & T members and develop relationships

7  with those who are not considered whistleblowers."

8  Q.  And what does that mean to you with respect to Pfizer's

9  plan at Kaiser?

10 A.  It looks like they have a concerted effort to work with

11 the physicians that have the ability to put a drug on

12 formulary or deny its access to formulary.  Again, in

13 addition to that formulary is quite important because 95

14 percent of the time our physicians choose medications that

15 are on the formulary, so not being on the formulary would

16 relegate your product to a low use position.

17         THE COURT:  Would you happen to know what those

18 initials mean, TACU?

19         THE WITNESS:  No, I can only speculate.

20         THE COURT:  Do you know what DM is?

21         MS. NUSSBAUM:  By counsel, your Honor, based on

22 discovery in the case we believe that TACU is targeted area

23 customer unit, and DM we believe is drug managers.

24         THE COURT:  And P & T means?

25         THE WITNESS:  Pharmacy and Therapeutics.  Again,

Page 107

1    the physician group that is responsible for determining what

2    medications are on our formulary list.

3    Q.  And I ask you to look at page 28, Dr. Carrejo, that will

4    be the last page that you look at.

5    A.  Yes.

6    Q.  It says, "Relationship strategy, many opportunities to

7    interact with Kaiser;" do you see that?

8    A.  Yes.

9    Q.  And there's been a chart reflecting all of the different

10   ways that the Pfizer team can interact with the Kaiser

11   staff; do you see that?

12   A.  Yes.

13   Q.  And is there anything incorrect on that chart that

14   you're aware of?

15   A.  No.

16        MS. NUSSBAUM:  Your Honor, I would move Exhibit

17   250 into evidence.

18        THE COURT:  All right.

19        ( Exhibit 250 was received in evidence.)

20        MR. KENNEDY:  Your Honor, I'm sorry, no objection

21   to the pages that have been referred to, however, there are

22   many other pages in the document.  We'd object to some of

23   those.

24        THE COURT:  All right, we'll put in at least those

25   pages, and I'll deal with the rest of it later on.

1   Q.  Dr. Carrejo, I think that your Honor asked you what a

2   formulary is.  Can you tell us what the goal of the Kaiser

3   formulary is, please.

4   A.  The goal would be based on the evidence to select the

5   most efficacious and safest drugs for our patients.

6   Q.  Are there any financial or nonfinancial incentives for

7   PMG physicians to prescribe drugs that are on the

8   formulary?

9   A.  No.

10  Q.  And can PMG physicians prescribe drugs that are not on

11  the formulary?

12  A.  Yes, and quite free to do so.  There's no draconium

13  measures in place, there's no hard stops, there's no what's

14  referred to in the industry as prior authorization.  A

15  physician would have to call up a number and talk to an

16  individual on the other end of the line to justify why that

17  medication that is not on the formulary needs to be used in

18  his or her patient.  That doesn't go on at Kaiser.

19          If a doctor determines that a given medication,

20  regardless if it's on the formulary or not, is required for

21  his or her patient, if he writes that medication, it will be

22  dispensed from the Kaiser Foundation Health Plan pharmacy

23  and paid for.

24  Q.  So at any time from 1994, when Neurontin went on

25  formulary at Kaiser, through 2004, PMG physicians could have

1  written a prescription for Neurontin and Kaiser would have

2  paid for the prescription; is that correct?

3  A.  That is correct.

4  Q.  Now, I think you talked about the P & T committee very

5  briefly.  Do you presently sit on a P & T committee?

6  A.  Yes, I attend the Northern California's Pharmacy &

7  Therapeutics Committee, and I also attend in Southern

8  Califnoria from time to time.

9  Q.  And can you tell us very briefly what does the P & T

10  committee consider before it either puts a drug on the

11  formulary or changes the drugs' placement on the

12  formulary?

13  A.  Quite simply, it's the evidence, the medical literature.

14  That evidence is prepared, summarized into a monograph

15  format that is shared with each of the physicians as well as

16  the specialists of a given medication, so this monograph is

17  prepared by individuals in our drug information service.

18  These are pharmacists.  They received their doctorate in

19  pharmacy, and then they went on to specialize in the

20  evaluation of the medical literature.

21          Further they specialize once within Drug

22  Information Service into broad therapeutic categories, so we

23  have a drug information service pharmacist that is

24  specialized in psychiatric conditions, we have one in the

25  cardiology sector, rheumatology, gastroenterology and so on,

1    depending on where that medication lines up, a given

2    individual will review the literature, prepare the monograph

3    and then share that monograph with the specialists for the

4    given drug in each region.

5            So now you have a pharmacist that has culled all

6    the literature into a document, and these documents can be

7    thick with lots of evidence, and they're just shared with

8    the chief of specialty, chief of psychiatry, chief of

9    gastroenterology at each medical center.  Those chiefs come

10   together in a regional meeting and discuss the product and

11   vote their opinion and that consensus opinion, that vote, is

12   then delivered to the P & T committee, the Regional Pharmacy

13   and Therapeutics Committee.  That specialist's opinion, that

14   monograph of evidence is what the physicians on P & T

15   evaluate for the addition or the denial of that product to

16   the formulary.

17   Q.  Dr. Carrejo, are the monographs that are done by the

18   drug information service in Downey, California shared and

19   available to people in all of the Kaiser regions?

20   A.  Absolutely, shared, there's monthly teleconferences

21   between the formulary committees, the formulary personnel in

22   each of the regions.  Also, that monograph is archived and

23   is available on our internal website.

24   Q.  Now, is it fair to say that from 1999 forward Kaiser

25   essentially had an open formulary with respect to

1  Neurontin?

2  A.  That is fair.

3  Q.  And what happened once Kaiser had an open formulary with

4  respect to Neurontin?

5  A.  We can recall that image of the graph I put together for

6  the uptake of the prescriptions.  The genie was out of the

7  bottle.  It just took off.  It was quarter over quarter

8  utilization growing in 10 percent, quarter over quarter,

9  there was a dramatic increase.  It was that increase that

10  kind of triggered a review by Kaiser to determine is that

11  utilization appropriate.  There's nothing wrong with

12  increased utilization for an appropriate medication.

13          In fact, we take steps to increase medications in

14  some therapeutic categories that have value.  In this case,

15  we found that the predominant indications that were being

16  used for this medication after discussing with our key

17  opinion leaders, our physicians, had very little to know

18  evidence.

19          So we undertook a re-education campaign to make

20  sure that physicians knew the appropriate use, the

21  appropriate positioning of Neurontin for our patients.

22  Q.  Now, Dr. Carrejo, in late September of 2001, did you

23  become concerned about the overutilization of Neurontin, and

24  did you raise that with others at a P & T committee?

25  A.  Yes.

1  Q.  Let me show you what's been marked as Plaintiff's

2  Exhibit 357 and I ask whether you can identify this

3  document, please.

4  A.  These are the approved minutes from the Permanante

5  Medical Group's regional pharmacy and therapeutics committee

6  and the formulary subcommittee.  This is Northern

7  California's regional P & T committee.

8  Q.  And were you at that meeting, sir?

9  A.  Yes, I was.

10  Q.  And turning to the --

11         THE COURT:  One thing, so if you decide to put

12  restrictions on it, it's only restriction for that region?

13         THE WITNESS:  Yes, Pharmacy and Therapeutics' has

14  regional oversight.  Each region has their own separate

15  pharmacy and therapeutics that determines their commercial

16  formulary.  The Medicare formulary is a national formulary,

17  the entire program ascribes to one single formulary for the

18  Medicare lines.

19  Q.  But are the regional formularies substantially

20  similar?

21  A.  Yes, classically because those decisions are made on the

22  evidence.  This evidence is collated into a monograph form,

23  shared with specialists, their consensus opinion determines

24  if a drug is added or not.  Those specialists review the

25  evidence in a given region and come to the same conclusion

1  for the most part.

2  Q.  Now, turning to Exhibit 357, Dr. Carrejo, to the second

3  physical page under No. 4, I draw your attention to the

4  sentence that reads, "Neurontin initiative, Dr. Carrejo

5  reported that Neurontin is currently used for many off-label

6  indications with little evidence to support its use.

7  Currently, the drug purchase expenditure for Neurontin

8  is $1 million a month."  Do you see that?

9  A.  Yes.

10  Q.  And do you recall this meeting?

11  A.  Yes.

12  Q.  And do you recall discussing that with your colleagues

13  at the meeting?

14  A.  Yes.

15        MS. NUSSBAUM:  Your Honor, I would offer Exhibit

16  357 into evidence.

17        MR. KENNEDY:  No objection, your Honor.

18        THE COURT:  All right.

19        ( Exhibit 357 was received in evidence.)

20  Q.  Now, Dr. Carrejo, as one of the steps that your

21  committee concerning the overutilization of Neurontin

22  determined to take, there's something to do with detailing

23  of the product?

24  A.  Yes.

25  Q.  And what was that?

1  A.  That was to remove the ability of the pharmaceutical

2  sales reps to detail that product to our physicians.

3  Q.  And why did you do that?

4  A.  The alarming growth and the belief that predominantly

5  the use of Neurontin was not evidence-based.

6  Q.  Now, let me show you --

7          THE COURT:  So what year did you stop Pfizer from

8  detailing?

9          THE WITNESS:  Well, the decision was December of

10  2001.  I don't think it was fully enacted until the spring

11  of 2002.

12  Q.  Let me show you what's been marked as Plaintiff's

13  Exhibit 273.  Can you identify that document, Dr. Carrejo?

14  A.  Yes.  This is again minutes from the Permanente Medical

15  Group regional pharmacy and therapeutics meeting, and it's

16  dated December 12th, 2001.  On 13.3 of that page the request

17  to designate Gabapentin, a non-detailable formulary product,

18  and that was approved.

19  Q.  And was the reason that you sought to make Neurontin a

20  nonformulary product because detailing works and drives

21  prescriptions?

22  A.  That's absolutely correct.

23  Q.  Now, Dr. Carrejo, what other steps were taken as part of

24  the Neurontin initiative?

25  A.  We had a very formal process.  Drug was the acronym in

1   the north, DUAT was the acronym in the south.  DUAT is Drug

2   Utilization Action Team, and in the north, Regional Drug

3   Utilization Group.  It's a collection of pharmacists and

4   physicians who headed up the re-education campaign and

5   disseminated that information out in a myriad of ways to the

6   medical group.

7              THE COURT:  Just the ones in California?

8              THE WITNESS:  Yeah, that was north and south, and

9   there's examples in other regions, and Dr. Louie Lee's

10  e-mail we saw the DUIT team, D-U-I-T was referenced.  That

11  was also an analogous group that was there to re-educate and

12  change the prescribing pattern.

13             THE COURT:  Where was that one?

14             THE WITNESS:  Northwest.

15             THE COURT:  Like Oregon?

16             THE WITNESS:  Yes, Washington and Oregon.

17  Q.  Now, Dr. Carrejo, shortly after Kaiser on its own became

18  alarmed about the overutilization of Neurontin, did you

19  become aware of a whistleblower suit or the Franklin suit?

20  A.  Yes, so in December of 2001, we were taking great steps

21  to try to turn the tide, get that genie back in the bottle,

22  if you will, and the whistleblower case was later in 2002

23  that now the whole story is starting to unfold, that there

24  is some, there is --

25             MR. KENNEDY:  I object.  Move to strike everything

1    beyond yes, he's aware of it.

2            THE COURT:  Well, what's the next question?

3    Q.  Let me show you what's been marked as Plaintiff's

4    Exhibit 319.  Can you identify that document, please?

5    A.  Yes.  This is an RX update.  It has a summary of the

6    messages that we were trying to get out to the medical

7    group, and that first paragraph refers to that whistleblower

8    case.  "Despite exaggerated promotional claims by the

9    manufacturer," it reads, and then the activity is

10   referenced, "the manufacturer was recently under fire in the

11   press for alleged illegal promotion of Gabapentin for

12   unproven indications.  A former Parke-Davis physician and

13   medical liaison alleges being forced to participate in a

14   national marketing campaign where he and others made

15   exaggerated or false claims about the safety and efficacy of

16   the drug."

17           The last bullet, "Wall Street Journal reported

18   that in order to encourage doctors to write more Gabapentin

19   prescriptions, the manufacturer decided to pay more for

20   studies showing efficacy for Gabapentin's off-label uses

21   instead of seeking approval for new uses."

22   Q.  Dr. Carrejo, at or about the time that the information

23   about the whistleblower suit, Dr. Franklin's suit became

24   public in November and December of 2002, did Kaiser start to

25   focus more on its re-education efforts with respect to the

1   drug Neurontin?

2   A.  Yes.

3   Q.  And why was that, sir?

4   A.  Now we have our internal data showing us this upward

5   climb.  We have discussion with our physicians that the

6   indications are not for the labeled indications that the

7   medication was approved for by the FDA, and, again, now

8   outside evidence that we've been led astray.

9           MS. NUSSBAUM:  Your Honor, I would move

10   Plaintiff's Exhibit 319 into evidence.

11           THE COURT:  All right.

12           ( Exhibit 319 was received in evidence.)

13           MS. NUSSBAUM:  Your Honor, I believe I forgot to

14   move Exhibit 272 into evidence.  I would do that at this

15   time.

16           THE COURT:  I don't remember hearing about 272.

17           MS. NUSSBAUM:  273, sorry.

18           MR. KENNEDY:  No objection on that one, your

19   Honor.

20           ( Exhibit 273 was received in evidence.)

21   Q.  Now, as part of the re-education campaign that Kaiser

22   launched, did you have teleconferences at which all PMG

23   physicians were invited to attend?

24   A.  Yes.

25   Q.  Now, let me ask you why didn't Kaiser just take the drug

1  off its formulary when it learned about the whistleblower

2  suit and it learned about the off-label promotion for the

3  very indications that Kaiser had lifted its restrictions for

4  and its physicians were prescribing for?

5  A.  Well, the drug did have appropriate indications,

6  FDA-approved indications, and that type of draconium

7  approach isn't the way we do business at Kaiser.  It is on

8  formulary, it was a re-education effort to get out the

9  message to each one of our physicians about the evidence,

10  where it was appropriate to use and where it was not.

11  Q.  Now, let me show you what's been marked as Exhibit 355.

12  Could you please identify that for the jury.

13  A.  Yes.  This is our TCA or tricyclic anti-depressant vs.

14  Gabapentin, Gabapentin, of course, the generic name for

15  Neurontin utilization.  This was a teleconference that was

16  chaired by Dr. Gerald Frank.  Gerald Frank is a physical

17  medicine doctor at Kaiser in Northern California.

18  Q.  Now, at the time of that teleconference, do you know

19  about what percentage of Neurontin was being used for

20  off-label indications?

21  A.  It was estimated that more than 95 percent of the use

22  was for off-label indications.

23  Q.  And what is a TCA?

24  A.  TCA is a tricyclic anti-depressant, brand name Elavil

25  was a common TCA at the time, Amitriptyline, there was

1    Nortriptyline which was analogous to Amitriptyline lien but

2    was less sedating, less side effects, and these medications

3    were introduced for depression initially, but it was also

4    found that there was good evidence to support their use for

5    neuropathic pain, that type of pain, nerve pain, if you

6    will.

7    Q.   Now, Dr. Carrejo, I would draw your attention to four

8    pages of the document, if you can review them and if we can

9    show them and just tell us what they mean in layman's terms,

10   and that is the page with the last three digits 743, 744,

11   745 and 746.

12   A.   743?

13   Q.   Yes, sir.

14   A.   This is evidence supporting the use of Nortriptyline, a

15   is tricyclic and a depressant for neuropathic pain.  It

16   states that TCAs are drugs of choice.  They're underutilized

17   due to the belief there are more side effects.  The next

18   bullet stating that there's a false belief that Gabapentin

19   is more effective than TCAs, and, lastly, tight glycemic

20   control, controlling the blood sugar of a diabetic is a very

21   effective way in controlling the nerve pain or neuropathy

22   associated with diabetes.

23   Q.   Now, looking at page 745, where it says drug selection,

24   what is that referring to?

25   A.   This is again the evidence, this is the type of

1    controlled randomized placebo-controlled studies that we use

2    to determine the medication safety and efficacy, and the

3    number needed to treat and number needed to harm is pretty

4    straightforward in that you have to treat a given number of

5    patients so that one patient receives benefit.

6           So the lower that number, of course, the better.

7    If you have to treat 100 patients before one patient

8    receives benefit, that might not be so attractive, but if

9    that number is three, quite attractive.  At the opposite end

10   of the scale, how many patients do you have to treat before

11   you harm one?  You want that number to be maximized, so

12   that's how you get at the benefit to risk ratio of a given

13   medication.

14   Q.  Now, Dr. Carrejo, in Exhibit 355, Kaiser is focused on

15   TCAs vs. Gabapentin utilization, and as part of the

16   re-education program, what was it suggested that TCAs be

17   considered for?

18   A.  For neuropathic pain.

19   Q.  But were Kaiser's re-education efforts limited just to

20   Neuropathic pain?

21   A.  No, no, Nortriptyline was just one tool to offset the

22   inappropriate use of Gabapentin.  We were also looking at

23   other indications, in fact, all indications that we could

24   become aware of that it was being used for, but specifically

25   bipolar disease and also treatment of migraine headache and

Page 121

1    generalized pain or nociceptive pain.

2           MS. NUSSBAUM:  Your Honor, I would move

3    Exhibit 355 into evidence.

4           MR. KENNEDY:  No objection to the specific pages

5    that have been referred to, object to the balance of the

6    document.

7           MS. NUSSBAUM:  We would move the entire exhibit

8    in, your Honor.

9           THE COURT:  I'm not going to deal with it right

10   now.  Let's just keep going.  Right now we'll put in the

11   pages that you designated.  I'll have to worry about that

12   later.  How much longer do you think you have?

13          MS. NUSSBAUM:  Ten minutes.

14   Q.  Dr. Carrejo, was there another sponsored teleconference

15   about Neurontin in August of 2004?

16   A.  Yes.

17   Q.  Let me show you what's been marked as Exhibit 353.  Can

18   you please identify that document is for the jury.

19   A.  Yes, this is August 31st, 2004.  It's our drug-sponsored

20   teleconference in Neurontin and Lyrica, another Pfizer

21   medication.

22   Q.  And in that drug teleconference, what were the

23   objectives?  What were the indications that were being

24   looked at there?

25   A.  We were looking at psychiatric indications for

1  Gabapentin, where it was being used and also review of the

2  evidence for the neurology indications and to provide

3  evidence-based alternatives for those diagnoses.

4  Q.  And looking at the third physical bullet and then the

5  seventh bullet, are there references to Frye study and to a

6  Pande study?

7  A.  Yes.

8  Q.  And as part of this teleconference, were you telling

9  Kaiser physicians that based on Frye and Pande, Gabapentin

10  is not as effective as Mono or add-on therapy in the

11  treatment of bipolar disorder?

12  A.  That's correct, that's what the evidence showed.

13  Q.  And so that evidence was very material to Kaiser in

14  making its decisions as to what Neurontin should be used

15  for; is that correct?

16  A.  That is correct.

17        MS. NUSSBAUM:  Your Honor, I would move Exhibit

18  353 into evidence.

19        MR. KENNEDY:  No objection, your Honor.

20        ( Exhibit 353 was received in evidence.)

21  Q.  Dr. Carrejo, was there an additional teleconference with

22  respect to Neurontin at which bipolar and other conditions

23  were discussed?

24  A.  Yes.

25  Q.  Let me show you what's been marked as Exhibit 352.

Page 123

1    Could you please identify that document.

2    A.   This is, again, a Gabapentin-Neurontin teleconference

3    with Dr. Paul Wilson, who's the chair of the chiefs of

4    psychiatry for Northern California, Alan Bernstein, a noted

5    neurologist, and senior counsel for Kaiser,

6    Mitchell Cohen.

7    Q.   Now, looking at the page that ends in 771 where it says,

8    "Specific objectives," can you tell us what the objectives

9    of that teleconference were?

10   A.   They wanted to address the psychiatric indications for

11   Gabapentin, review the evidence for other neurologic

12   indications, provide the evidence for alternatives and

13   review some of the Pregabalin evidence as well, and, lastly,

14   Mitch was there to apprise participants of the impact of

15   industry-marketing strategies.

16   Q.   And was this teleconference available for all PMG

17   physicians?

18   A.   Yes.

19            MS. NUSSBAUM:  Your Honor, I would move Exhibit

20   352 into evidence.

21            MR. KENNEDY:  No objection to the page that was

22   read from, object to the balance, your Honor.

23            ( Exhibit 352 was received in evidence.)

24            THE JUROR:  Excuse me, was there a date for this?

25            THE COURT:  What date?

1        THE WITNESS:  I can't recall the specific date on

2   that, but I believe it was in 2004.  I believe it was

3   2004.

4   Q.  Now, Dr. Carrejo, were the re-education efforts that

5   you've just discussed with the jury and some of the

6   materials that you've shown them, were they successful?

7   A.  Yes.

8   Q.  And can you describe the success and the measure of

9   success that Kaiser had?

10  A.  Generally it was about 33, 34 percent, and across all

11  specialties, we saw a decline of those new starts for

12  Neurontin.  It wasn't just localized to one specialty or

13  another, but the message was getting out in all specialties,

14  inappropriate use of Neurontin was decreasing markedly.  At

15  the same time Neurontin use was continuing to go up in the

16  United States.

17  Q.  Now, let me show you what's been marked as Exhibit 333.

18  Can you identify the document, and then I would draw your

19  attention to page 1413.

20  A.  Okay.  These are minutes of the Regional Drug

21  Utilization Group, acronym, DRUG, from Northern California.

22  These are dated January 8th, 2004, and, again, that drug

23  group was a collection of physicians and pharmacists

24  designed to create the re-education effort and get the

25  message out on appropriate use of Neurontin.

1  Q.  And with respect to the success of the TCA vs. Neurontin

2  Education Program on page 001413, can you tell me what the

3  document states?  The bottom of the page, sir.

4  A.  "New starts cut in half.  Northern California was able

5  to decrease new starts for Neurontin by 50 percent."

6         MS. NUSSBAUM:  I would put Exhibit 333 into

7  evidence, your Honor.

8         THE COURT:  Allowed.

9         ( Exhibit 333 was received in evidence.)

10  Q.  Now, Dr. Carrejo, I believe that you stated that

11  overall, overall indications Neurontin utilization declined

12  by 34 percent since the initiative had started?  Do you

13  recall that?

14  A.  Yes.

15  Q.  Let me show you what's marked as Exhibit 340.  Can you

16  please identify that document?

17  A.  Yes, this is DUAT, DUAT, Drug Utilization Team, the

18  Southern Califnoria parallel group to drug.

19         THE COURT:  When you say Neurontin, do you include

20  the generic Gabapentin?

21         THE WITNESS:  At this point generic Gabapentin is

22  not commercially available, it's not available until late

23  2004, the third quarter, so it is not included.

24  Q.  Now, Dr. Carrejo, looking at the second physical page of

25  the document, date of summary, can you tell me what's shown

1   on that page?

2   A.   The summary talked about the utilization data by

3   specialists, and this was 13 months of data ending in June

4   of 2004.   80 percent of this utilization was from family

5   medicine, internal medicine, neurology, psychiatry and

6   physical medicine, and there was a 34 percent decrease since

7   the initiative began.

8   Q.   And, Dr. Carrejo, turning your attending to the page

9   that is 001295 on the top, it says, "Overall Neurontin

10   utilization."   Can you tell me what is reflected in that

11   graph?

12   A.   Yes, this is data that's been normalized for

13   prescriptions per one thousand members per month, and what

14   it shows is a steep downward decline in the utilization of

15   Neurontin during that time period.

16          MS. NUSSBAUM:   Your Honor, I would move Exhibit

17   340 into evidence.

18          MR. KENNEDY:   No objection, your Honor.

19          THE COURT:   All right.

20          ( Exhibit 340 was received in evidence.)

21   Q.   Dr. Carrejo, is the overuse of Neurontin a continuing

22   problem?

23   A.   Yes.

24   Q.   And why is that, sir?

25   A.   Well, you know, we saw some performance here that was

f3140d82-ad18-443e-8483-31d3e17c51b4

1    pretty good, 34 percent, 50 percent.  There was

2    approximately a 10-year start on the side of Pfizer to

3    market this medication, to establish prescription habits

4    by --

5              MR. KENNEDY:  I move to strike everything after

6    yes, is there a continuing problem.

7              THE COURT:  Yes, I'm going to sustain that.

8    Q.  Dr. Carrejo, is it hard to change prescribing habits?

9              MR. KENNEDY:  Objection.  Lack of foundation.

10             THE COURT:  Overruled.

11   A.  Yes, it is.

12   Q.  And is the Neurontin initiative at Kaiser still

13   ongoing?

14   A.  Yes.

15   Q.  So, for how many years now has Kaiser been trying to

16   re-educate physicians about the appropriate use of

17   Neurontin?

18   A.  It's a decade-long effort.

19   Q.  And is new evidence still emerging?

20   A.  Yes, as early as -- as late as November, 2009, we saw

21   that Dr. Dickersin article that produced more evidence for

22   us, quite shocking.  A lot of the evidence that we had taken

23   on face value was --

24             THE COURT:  That's a narrative, so stop at this

25   point.  What's the next question?

1   Q.  Can you approximate how much time and money Kaiser has

2   spent on trying to educate its physicians to counter the

3   off-label promotion, the fraudulent off-label promotion of

4   Neurontin?

5          MR. KENNEDY:  Objection.  Irrelevant.

6          THE COURT:  Overruled.

7   A.  I can't come up with a good number for you.  It's

8   involved significant number of physicians and pharmacists

9   that have dedicated a lot of resource to coming up with the

10  appropriate alternatives.  You've seen evidence of

11  teleconferences, you've seen preparation of documents,

12  you've seen a lot of activity to get that medication out,

13  that information out.  If we weren't charged with trying to

14  re-educate on Neurontin --

15         MR. KENNEDY:  Your Honor.

16         THE COURT:  Sustained.  You know, you can't just

17  keep talking.

18         How much more at this point?

19         MS. NUSSBAUM:  Five minutes, your Honor.

20  Q.  Did there come a time, Dr. Carrejo, that you learned

21  that the United States of America brought a criminal

22  information against the Warner-Lambert Company with respect

23  to the illegal off-label promotion of Neurontin?

24  A.  Yes.

25  Q.  Let me show you what's been marked as Exhibit 366.  Do

1   you recognize that document?

2   A.   Yes.

3   Q.   And what is it?

4   A.   This is the United States vs. Warner-Lambert Company

5   litigation against Warner-Lambert.

6   Q.   And did you learn that Warner-Lambert pled guilty and

7   said in their guilty plea Warner-Lambert expressly and

8   unequivocally admits that it committed the crimes charged in

9   the information, Warner-Lambert agrees that the facts set

10  forth in the information are true?  Did you learn that?

11  A.   Yes.

12  Q.   Let me show you what's been marked as Plaintiff's

13  Exhibit 371.  Can you identify that document for the jury?

14  A.   This is a letter to Robert B. Fisk, Jr., Esquire and

15  James P. Rouhandeh, Esquire regarding Warner-Lambert.

16          THE COURT:  I'm wondering whether this is

17  necessary of this witness.

18          MS. NUSSBAUM:  Your Honor, I would move Exhibits

19  366 and 371 into evidence, your Honor.

20          THE COURT:  Allowed but, you know.

21          ( Exhibits 366 and 371 was received in evidence.)

22          MS. NUSSBAUM:  We're going to be done very

23  quickly, your Honor.

24          MR. KENNEDY:  Objection, your Honor.

25  Q.   After the guilty plea of Warner-Lambert --

Page 130

1    MR. KENNEDY:  Objection, your Honor.

2    THE COURT:  She's is going to be done very

3    quickly.  That isn't binding you.

4    Q.  Dr. Carrejo, after the guilty plea by Warner-Lambert,

5    did the plaintiffs bring this action?

6    A.  Yes, 2005 this action was brought.

7    Q.  Now, at Kaiser had you received training on patient

8    privacy?

9    A.  Yes.

10   Q.  Is it appropriate for you to ask a doctor about an

11   individual patient's medical record?

12   A.  No.

13   Q.  Is it appropriate for you to ask a doctor about an

14   individual patient's condition or treatment or

15   prescriptions?

16   A.  No.

17   Q.  Would Kaiser know whether any Kaiser member who was

18   prescribed Neurontin later sued the defendants here because

19   of suicide or suicide attempt or any other adverse

20   reaction?

21   A.  I don't believe so.

22   Q.  Now, does Kaiser maintain a website?

23   A.  Yes, they do.

24   Q.  And do they have a public website?

25   A.  Yes.

1  Q.  And what is the purpose of that website?

2  A.  Central place where our members can go to get

3  information on how to get a prescription refilled, what

4  their current lab results are or message their physician in

5  a confidential manner.

6  Q.  So that would be a Kaiser website for Kaiser members?

7  A.  Yes.

8  Q.  Is there also a public website?

9  A.  Yes, there's a public website that doesn't require a

10 password to log into and lots of information on medications,

11 disease states and proper nutrition.

12 Q.  And does Kaiser create the materials that are on the

13 public website?

14 A.  No, the bulk of that information is provided by

15 third-party vendors.

16 Q.  And can you give us some examples of the third-party

17 vendors who provide that information?

18 A.  Healthwise is a vendor for medications, we have Health

19 Media, we have Eating Well that gives a lot of information

20 on nutrition and appropriate diet.

21 Q.  And does Kaiser edit that information in any way?

22 A.  No.

23 Q.  And are there any disclaimers on this website?

24 A.  Yes, disclaimers from Healthwise, there's disclaimers

25 from Kaiser throughout document.

1    Q.   And what do you mean by disclaimer?

2    A.   Well, in short, it's advising patients that they

3    shouldn't take this as the end-all, check with your

4    physician, your concurrent disease states or concurrent

5    medications may differ here and create a different situation

6    or outcome for you, so check with your physician for the

7    bottom line.

8    Q.   Has Kaiser recently removed some information from its

9    public website with respect to Neurontin?

10   A.   Yes.   The Dickersin article re-energized the effort,

11   brought to our attention not only Kaiser but apparently

12   Healthwise had been misled by the information that was in

13   the literature --

14           MR. KENNEDY:   Objection, lack of foundation.

15           THE COURT:   Sustained.   I strike it.   So what did

16   you do?

17           THE WITNESS:   We've taken down some content from

18   the web page.

19   Q.   And why did Kaiser take that down?

20   A.   It was misleading based on the evidence.

21   Q.   Are you aware as to whether Healthwise or any other

22   vendor is also re-evaluating their material in light of the

23   Dickersin article?

24           MR. KENNEDY:   Objection.   Hearsay.

25           THE COURT:   Sustained.

Page 133

1   Q.  Was Kaiser embarrassed that this material was on their

2   website?

3            MR. KENNEDY:  Objection.  Irrelevant.

4            THE COURT:  Sustained.  Leading.

5   Q.  Why did Kaiser choose to take down the material?

6   A.  It was unfortunate that that information was on the

7   website.  It was misleading based on the evidence, and, you

8   know, regrettably it's there.  We've taken steps to remove

9   it and we'll go forward.

10           MS. NUSSBAUM:  Thank you very much, Dr. Carrejo, I

11  have no other questions.

12           CROSS-EXAMINATION BY MR. KENNEDY:

13  Q.  Good afternoon, Dr. Carrejo.  Just to clarify, you're

14  not a medical doctor, you're a pharmacist; is that

15  correct?

16  A.  That is correct.

17  Q.  Okay.  So you, yourself, are not authorized to prescribe

18  Neurontin, correct?

19  A.  Correct.

20  Q.  Okay.  You obviously have never done that?

21  A.  I've never done that.

22  Q.  And you testified on direct that the lawsuit, Kaiser's

23  case against Pfizer, got filed in 2005, right?

24  A.  Correct.

25  Q.  February of 2005?

1   A.  Yes.

2   Q.  And have you seen the document called complaint that

3   Kaiser filed in order to set forth its claims in the case?

4   A.  I haven't seen the whole document, no.

5           MR. KENNEDY:  Your Honor, if I might, just a

6   matter of judicial notice, paragraph 173 from the third

7   coordinated amended complaint.

8           THE COURT:  Just shoot it up on the document

9   camera.  Robert, switch over to the camera.  They call it an

10  Elmo, I don't know why.  Is the camera on?  Which paragraph

11  are we looking at?

12          MR. KENNEDY:  173, your Honor, page 64.

13          THE COURT:  There we go.

14  Q.  And that states there were numerous --

15  A.  I can't read it.

16          THE COURT:  Could you focus it in.  Beautiful.

17  You've all got it.

18  Q.  Can you see it now, Doctor?

19  A.  Yes.

20          THE COURT:  It's the complaint, the thing that

21  started this action, but I think the second or third

22  amendment?

23          MR. KENNEDY:  Whatever the current operative

24  version is, your Honor.

25  Q.  In February of 2005, part of what Kaiser said in filing

1  this lawsuit was, "There were numerous alternative

2  medications that were cheaper and more optimal," the fancy

3  word for better?

4  A.  Yes.

5  Q.  "Cheaper and better than Neurontin to treat the

6  conditions for which the defendants were touting Neurontin

7  including several medications such as aspirin and Ibuprofen,

8  not ordinarily covered by plaintiffs' formulary."  Have I

9  read that correctly, right?

10  A.  Yes.

11  Q.  Okay.  Ibuprofen, that's another name for Advil?

12  A.  Or Motrin.  Motrin is covered by the formulary, Advil is

13  an over-the-counter, which is not covered.

14  Q.  And that was Kaiser's position concerning the

15  effectiveness of Neurontin in its complaint in February of

16  2005, you'll agree with me there, won't you?

17          MS. NUSSBAUM:  Objection, your Honor.

18          THE COURT:  Do you know?

19          THE WITNESS:  From what I've been shown, from

20  what's in the paragraph.

21          MS. NUSSBAUM:  It's way over 100 pages, the date

22  is 2006, and I think the witness stated that he hasn't seen

23  it.

24          THE COURT:  We don't want to have this discussion

25  in front of the jury.

1        MS. NUSSBAUM:  Can we have a sidebar?

2        THE COURT:  I'd strike your comments.

3   Q.  You'd agree that is an accurate statement of your

4   position as well as Kaiser's in February of 2005, there are

5   numerous cheaper and more effective drugs out there than

6   Neurontin, right?

7   A.  No.

8   Q.  You don't agree with that?

9   A.  No.  It shows me there, but I haven't read the whole

10  document, so, no, I wouldn't agree with you.

11  Q.  Well, I'm not asking about the whole document.  Can you

12  go back, take paragraph 173, forget where it came from, when

13  you get to something you disagree in that paragraph, let me

14  know.

15  A.  From what you read to me, yes, I agree with that

16  statement.

17  Q.  Okay.  And Mr. Greene told this jury on Monday that at

18  least for the off-label purposes in question, Neurontin

19  really isn't any better than a sugar pill; you'd agree with

20  that, too, wouldn't you?

21  A.  Yes.

22  Q.  And that's the way you felt going back to 2001, wasn't

23  it, when you first became skeptical about Neurontin

24  overusage?

25        MS. NUSSBAUM:  Objection, your Honor.

1          THE COURT:  Overruled.

2     A.  No.  In 2001, there was evidence that showed Neurontin

3     had efficacy.  It's not until the Dickersin article that

4     that comes into question.

5     Q.  Well, Dickersin was some time in 2009.  How about back

6     in February of 2005, when this lawsuit was filed?

7     A.  There was articles that showed that there was --

8     Q.  Do you want to know what the question is?

9     A.  Okay.

10    Q.  Could you wait, please, Doctor.  Back in 2005, when the

11    lawsuit was filed, did you believe then that Neurontin was

12    no better than a sugar pill?

13    A.  For certain indications, yes.

14          MS. NUSSBAUM:  Objection.

15    Q.  Now, you work out of the Northern California region of

16    Kaiser, correct?

17    A.  Yes.

18    Q.  And you've got your own regional, was it Pharmacy and

19    Therapeutics, P & T committee there?

20    A.  Yes.

21    Q.  And there is a David Campen, C-a-m-p-e-n, who's at least

22    been the chair of that committee, right?

23    A.  Yes.

24    Q.  Is he still the chair?

25    A.  No.

1  Q.  How about going back to we'll say March of 2005, a month

2  after the lawsuit got filed, was Dr. Campen head of the

3  P & T committee at that point?

4  A.  I believe so.  I can't say completely.  I believe it was

5  Fred Hom at that time though.

6          THE COURT:  I can't hear you.  It's been a long

7  week for all of us.

8          THE WITNESS:  I apologize.  I believe it was

9  Fred Hom at that time.

10          MR. KENNEDY:  Your Honor, at this time I would

11  offer Exhibit 798 into evidence.

12          THE COURT:  All right.

13          ( Exhibit 798 was received in evidence.)

14  Q.  Can we put that up?  That's a March, 2005, March 2, 2005

15  e-mail exchange between a Karen Pantazis and Dr. Campen,

16  right?

17  A.  Yes.

18  Q.  And this is the month after the lawsuit's been filed?

19  A.  Yes.

20  Q.  And this is after a month Kaiser is taking the position

21  that this stuff, at least for some uses, is no better than a

22  sugar pill, correct?

23  A.  Correct.

24          MS. NUSSBAUM:  Objection, your Honor.  I believe

25  it misstates the complaint.

1        THE COURT:  Overruled.

2    Q.  In March of 2005, a month after the lawsuit got filed,

3    Karen Pantazis, do you know who she is?

4    A.  I do not.

5    Q.  You can see down at the bottom of the page though that

6    she is a medical doctor and she's chief or at least was

7    chief of the Department of Pain Medicine at the Kaiser

8    region in Sacramento at that time, correct?

9    A.  Correct.

10   Q.  And I represent this is a document that was produced by

11   Kaiser.  So as far as we know, this is true and accurate.

12   In any event, she wrote and said, "Why is Gabapentin not

13   listed as a second line option after TCAs in diabetic

14   neuropathy and postherpetic neuralgia in a similar manner to

15   So. Cal.?"  And from that you'd gather she's referring to

16   Kaiser's Southern California region, right?

17   A.  Correct.

18   Q.  And apparently from this you'd deduce that as of March

19   of 2005, a month after the lawsuit had been filed, the

20   Southern Califnoria region was still listing Gabapentin,

21   Neurontin, as a second line option for treating diabetic

22   neuropathy and postherpetic neuralgia, that's what you'd

23   gather, wouldn't you?

24   A.  I believe so.

25   Q.  Okay.  And then on March 2, Dr. Campen, who at least

f3140d82-ad18-443e-8483-31d3e17c51b4

1  according to this was at that point medical director of drug

2  information, utilization and technology, pharmacy operations

3  for the California division, and this is the same Dr. Campen

4  who had been chair of the P & T committee for Northern

5  California, correct?

6  A.  Yes.

7  Q.  And he would have been chair of the P & T committee

8  certainly going back to at least 1999?

9  A.  You know, I'm sorry, I can't recall when he stepped down

10  and was replaced by Fred Hom.

11  Q.  Do you have any reason now to doubt that Dr. Campen was

12  present at a number of the P & T meetings you've described

13  this morning?

14  A.  He was present at the meeting.  He's a sitting member,

15  yes.

16  Q.  So he would have been there when overuse of Neurontin

17  was brought up, right?  Correct?

18  A.  Correct.

19  Q.  And he would have been there throughout the re-education

20  program of doctors, correct?

21  A.  Correct.

22  Q.  And he would have been there through hearing about your

23  presentations on the overuse of Neurontin, right?

24  A.  Right.

25  Q.  And as of March, 2005, Dr. Campen wrote back and said,

1    "I think it should be as long as we make it clear that

2    Nortriptyline should be tried first."  That's what he said,

3    didn't he?

4    A.  Absolutely.

5    Q.  That was 2005.

6         MR. KENNEDY:  I'd like next to mark Exhibit 812.

7    I'm sorry, it's been marked.  We move into evidence, Exhibit

8    812.

9         ( Exhibit 812 was received in evidence.)

10   Q.  On direct examination you mentioned that Kaiser has this

11   northwest region, Oregon, Washington, that area of the

12   country, and you talked about how they had a Neurontin

13   initiative somewhat similar to the one that you were

14   involved in Southern Califnoria, correct?

15   A.  Correct.

16   Q.  And this tells us that the minutes of an October 13,

17   2005 meeting of that northwest regional, well, they call it

18   a formulary in therapeutics committee, so we're now out to,

19   what, ten months after the lawsuit had been filed, right,

20   and if we go to the second page of that document under

21   Gabapentin titration, and can you tell the jury what

22   "titration" is as applied to a drug?

23   A.  Step-wise escalation of the dose.

24   Q.  And now could you tell the jury -- can you do it any

25   simpler than that, Doctor?

1   A.  Step-wise, increase the dose incrementally over time.

2   Q.  Start low to see if the patient can handle it and then

3   gradually move up?

4   A.  Yes.

5   Q.  And under Gabapentin and titration, again, this is now

6   October of 2005, "Criteria-based prescribing was removed for

7   Gabapentin at the September, 2005 meeting at which time

8   Gabapentin was also added back to the formulary.  Gabapentin

9   is the most commonly used anti-epileptic drug for the

10  management of neuropathic pain, and gradual dosage titration

11  to therapeutic effect is advised to lessen severity of side

12  effects.  The effective dose should be individualized

13  according to patient response and tolerability, but clinical

14  trial results indicate that most patients require at least

15  1600 milligrams per day in divided doses in order to achieve

16  significant neuropathic pain relief.  Doses up to 3600

17  milligrams a day may be needed in some patients."

18          Do you see that?

19  A.  I do.

20  Q.  Okay.  And going back to the beginning of that, do you

21  know what criteria-based prescribing means?

22  A.  I don't know exactly how they're using it here, but I'm

23  assuming that they're for specific indications.

24  Q.  Okay.  And what you deduce from this is before September

25  of 2005, there were limitations on the conditions for which

Page 143

1    Gabapentin was recommended, at least, in the formulary up in

2    the northwest region, right?

3    A.  Guidelines for its appropriate use, yes.

4    Q.  Okay.  And those guidelines or limitations were removed

5    in September of 2005, correct?

6    A.  Correct.

7    Q.  Expanding the uses for which Gabapentin could be used in

8    the northwest region 10 months after the lawsuit had been

9    filed, right?

10   A.  I don't think that's a fair statement.  I don't think it

11   says anything about expanding its use.

12   Q.  Well, they've added back to the formulary, correct?

13   A.  That's a correct statement.

14   Q.  And as you've told us here, being on the formulary is

15   really important at Kaiser, right?

16   A.  That's correct.

17   Q.  Because 95 percent --

18        THE COURT:  So was Gabapentin ever removed

19   completely from the formulary?

20        THE WITNESS:  I don't know the history in the

21   northwest.  I didn't attend their P & T committee meetings,

22   but it was never removed in the north or the south, Northern

23   or Southern Califnoria.

24        THE COURT:  So, reading this, you don't know one

25   way or another whether it was taken off altogether?

Page 144

1        THE WITNESS:  I don't.  It's speculation on my

2   part.

3   Q.  So when you said on direct that the regions are

4   substantially similar, there are differences among them,

5   aren't there?

6   A.  There are differences amongst the regions.

7   Q.  And if we wanted to understand what's really gone on in

8   the northwest region, we'd need somebody, at least other

9   than you, to at least come in and explain it to us, wouldn't

10  we?

11  A.  That would be a fair statement.

12  Q.  And at least at this point the northwest region is

13  acknowledging the doses up to 3600 milligrams a day may be

14  needed to help some patients, correct?

15  A.  Yes.

16  Q.  And you can't tell us exactly --

17        THE COURT:  You got to keep us going here.

18        THE WITNESS:  Sorry.

19        THE COURT:  Five minutes before our big break for

20  the weekend, but you got to keep us going here.  Was the

21  answer to that yes?

22        THE WITNESS:  Yes.

23        THE COURT:  All right.

24  Q.  You can't tell us for sure what it means when it says it

25  was added back to formulary?

1  A.  I think we have to take it at face value that it was

2  added back to the formulary.

3  Q.  Okay.  And being on formulary would tend in Kaiser's

4  world to increase the prescriptions for the drug, wouldn't

5  it?

6  A.  To the extent that they're appropriate, yes.

7            MR. KENNEDY:  I ask to have it marked next.

8            THE COURT:  Basically you don't know anything

9  about this statement yourself?

10            THE WITNESS:  I don't.

11            MR. KENNEDY:  I'm off that one, your Honor.  We'll

12  try another one closer to home.  Exhibit 820, and I offer

13  that into evidence, your Honor.  May we put that one up on

14  the overhead?

15            ( Exhibit 820 was received in evidence.)

16  Q.  This is a Kaiser Permanente Drug Information Services

17  bulletin; do you see that?

18  A.  Yes.

19  Q.  And you talked about that on direct that Kaiser has this

20  location down in Southern Califnoria, Downey that is kind of

21  the central repository of knowledge about drugs, right?

22  A.  Yes.

23  Q.  And this is a response to a physician request that's

24  come in in March of 2006, right?

25  A.  Yes.

1   Q.  So this is over a year after the lawsuit was filed,

2   right?

3   A.  Yes.

4   Q.  Okay.  The doctor has asked is there any literature

5   available comparing Neurontin and Lyrica for diabetic

6   neuropathy; do you see that question?

7   A.  Yes.

8   Q.  And Lyrica is another Pfizer drug, isn't it?

9   A.  That's correct.

10   Q.  And as of March of 2006, Lyrica had been approved by the

11   Federal Drug Administration for treatment of diabetic

12   neuropathy, hadn't it?

13   A.  I believe so.

14   Q.  Lyrica had undergone what we've been told in this case

15   are gold standard double-blind controlled tests in order to

16   get FDA accreditation, right, correct?

17   A.  Correct.

18   Q.  For diabetic neuropathy, so it's a gold standard

19   treatment for diabetic neuropathy, right?

20   A.  No, I wouldn't call it a gold standard treatment, no, I

21   would support that the evidence proves it's more effective

22   than placebo.

23   Q.  Well, we've been told in this case that only

24   double-blind controlled studies are the only way you can

25   determine if something's really effective; you'd agree with

1    that, wouldn't you?

2    A.  Yes, but I wouldn't call it a gold standard.

3    Q.  Okay.  So you disagree with Dr. Kessler, the head of the

4    FDA, when he says that's a gold standard, you think he's

5    wrong?

6    A.  The modality for proving is a gold standard but that

7    doesn't make Lyrica the gold standard for treating

8    neuropathy, okay.

9    Q.  Okay.  As of March of 2006, you'd agree that Lyrica had

10   undergone gold standard testing and been found to be

11   appropriate for treatment of diabetic neuropathy, right?

12   A.  I could agree with that.

13   Q.  So now this physician is saying as between a drug that

14   the FDA has submitted to gold standard treatment and has

15   been found appropriate for the treatment of diabetic

16   neuropathy and Neurontin, Kaiser Drug Center, what do you

17   recommend we do?  What do they say?  "Treat Pregabalin --"

18   which is also the same name as Lyrica, isn't it?

19   A.  Correct.

20   Q.  So we could read, "Lyrica is a Gaba analogue with a

21   nearly identical mechanism of action as Gabapentin.  There

22   are no published head-to-head trials that have shown the

23   superiority of Pregabalin or Lyrica over the more

24   established treatment options for neuropathic pain such as

25   tricyclic antidepressants and Gabapentin."  I've read up to

1   there correctly, haven't I?

2   A.  Yes.

3   Q.  So, as of March, 2006, the Kaiser Drug Information

4   Center was saying that they thought Gabapentin was at least

5   equal, if not superior, to this drug that had gotten

6   expressed FDA approval for neuropathy, right?  Isn't that

7   what they're saying?

8   A.  Yes.

9   Q.  And isn't the fact the reason they made that

10  recommendation that in 2006 Neurontin was generic and was

11  much cheaper than Lyrica, which is still a branded drug,

12  correct?

13  A.  I could only speculate that's why they said that.  I

14  wasn't there when they wrote it.

15  Q.  So, sometimes evidence-based medicine at Kaiser means

16  getting drugs that have been a gold standard testing and

17  sometimes it means using the cheaper one, doesn't it?

18          MS. NUSSBAUM:  Objection, your Honor.

19          THE COURT:  Overruled.

20  Q.  Can you think of any reason here why Kaiser's

21  Centralized Drug Information Center would not be saying,

22  Hey, this is a no-brainer, Gabapentin is no better than a

23  sugar pill, Lyrica is a gold standard?  Why didn't they say

24  that?

25  A.  There is evidence, and I think that's why we're here in

1    this case is that the evidence that was available was

2    tainted that showed that Gabapentin worked in neuropathy and

3    it was third line after Nortriptyline, that's where we had

4    it positioned.

5    Q.  As of 2006, a year after the complaint has been filed,

6    Kaiser's Central Drug Administration was still being

7    hypnotized by Pfizer over the abilities of Gabapentin?

8    A.  We're still under the impression based on the literature

9    that Gabapentin works for neuropathy, albeit less than

10   Nortriptyline.

11   Q.  And you're still under the impression that it works

12   better than a drug that the FDA expressly approves for that

13   purpose?

14   A.  There's no evidence to support that Gabapentin and

15   Pregabalin are different.  There's no superiority trials for

16   Pregabalin.  Pregabalin was not compared head to head for

17   neuropathy against Gabapentin.

18            THE COURT:  Let me ask you this, it's 1:02, how

19   much more do you have of him?

20            MR. KENNEDY:  Much more, your Honor.

21            THE COURT:  Ten minutes?  Higher?

22            MR. KENNEDY:  Like over an hour.

23            THE COURT:  I'll see you Monday.

24            THE CLERK:  All rise for the jury.

25

Page 150

1

2

3                        C E R T I F I C A T E

4

5    UNITED STATES DISTRICT COURT )

6    DISTRICT OF MASSACHUSETTS    ) ss.

7    CITY OF BOSTON               )

8

9           We, Lee A. Marzilli and Valerie A. O'Hara, Official

10   Federal Court Reporters, do hereby certify that the

11   foregoing transcript, Pages 1 through 149 inclusive, were

12   recorded by us stenographically at the time and place

13   aforesaid in Civil Action No. 04-10981-PBS, In Re:

14   Neurontin Marketing, Sales Practices, and Product Liability

15   Litigation, and thereafter by us reduced to typewriting and

16   is a true and accurate record of the proceedings.

17           In witness whereof we have hereunto set our hands

18   this 26th day of February, 2010.

19

20               /s/ Lee A. Marzilli

21               /s/ Valerie A. O'Hara

22               _____

23               LEE A. MARZILLI, CRR

24               VALERIE A. O'HARA, RPR

25               OFFICIAL FEDERAL COURT REPORTERS

f3140d82-ad18-443e-8483-31d3e17c51b4

1

f3140d82-ad18-443e-8483-31d3e17c51b4