UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**KAISER'S OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE THE TESTIMONY OF DR. ABRAMSON**

On January 8, 2010, Defendants filed a motion *in limine* to exclude the testimony of John Abramson, M.D. Dkt. # 2308. On January 22, 2010, Kaiser[1] filed its opposition to Defendants' motion to exclude Dr. Abramson's testimony. Dkt. #2407. On February 18, 2010, the Court denied Defendants' motion with respect to Dr. Abramson's principal conclusions, but stated that it would exclude testimony regarding the pharmaceutical industry as a whole or testimony on whether Defendants' misconduct violated ethical standards. Electronic Order dated February 18, 2010. On February 23-24, 2010, Dr. Abramson testified within the parameters set by the Court's Order. Nonetheless, on February 25, 2010, Defendants filed a motion to strike Dr. Abramson's testimony, largely

---

[1] Plaintiffs are Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser"). Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries: Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

1

rehashing the arguments raised in their failed motion *in limine*. For the reasons stated in Kaiser's Opposition to Defendants' motion *in limine* [Dkt #2407], and the reasons stated herein, Kaiser opposes Defendants' second attempt to exclude Dr. Abramson's testimony.

**ARGUMENT**

Dr. Abramson's testimony explained the lack of scientific support for Neurontin's off-label uses and the actions taken by Defendants to promote these uses despite the lack of scientific evidence. Realizing how effectively Dr. Abramson communicated this misconduct, Defendants have offered several untimely, repetitive, and frivolous reasons to strike Dr. Abramson's testimony. These arguments lack merit.

**I.)     ABRAMSON'S TESTIMONY MIRRORED HIS REPORT**

Defendants argue that Dr. Abramson's testimony went beyond the scope of his report by addressing the ineffectiveness of Neurontin in treating off-label conditions, including bipolar disorder, pain, and migraine. Mem. in Support of Mot. To Strike Abramson Test. [Dkt. #2587] ("Mem.") at 1. This argument ignores key statements from Dr. Abramson's report. Dr. Abramson concludes that Defendants' strategy began "when there was insufficient evidence to support claims of efficacy and was continued in the face of either ongoing lack of evidence or the existence of good evidence that Neurontin was not effective for such uses." Abramson Report at 122. This conclusion follows Dr. Abramson's extensive analysis of clinical trials that revealed Neurontin's ineffectiveness in treating bipolar disorder, pain, and migraine. Abramson Report at 52-76. Dr. Abramson also highlights that Defendants' activities promoted "scientifically unsubstantiated use of Neurontin." Abramson Report at 4. At his deposition, Dr.

Abramson similarly stated that Defendants attempted to cause "physicians to believe that the evidence showed benefit when that benefit was inaccurate or incomplete or exaggerated." Dep. Tr. 209:8-10. In short, Dr. Abramson's conclusions at trial were completely consistent with his report and deposition testimony.

## II.) DR. ABRAMSON HAS STRONG QUALIFICATIONS

Defendants also restate their argument that Dr. Abramson lacks sufficient qualifications to render opinions on the efficacy of Neurontin for bipolar disorder, pain, and migraine. Mem. at 2; *see also* Mem. Supporting Motion *in Limine* to Exclude Abramson Test. [2308] at 1. Dr. Abramson's credentials are superb. He graduated from Harvard College, attended Dartmouth Medical School, and received a degree in Medicine from Brown Medical School. 2/23 Trial Tr. at 84:10-11. He practiced medicine as a family doctor for 20 years, was twice named the best doctor in the Beverly/North Shore area, and three times was named one of the best family doctors in Massachusetts. *Id.* at 85:14-86:2. He has also taught Harvard medical students since 1992, including classes on health policy. *Id.* at 86:3-22. These credentials all make him well-qualified to testify as to the sources of information used by doctors in assessing the effectiveness of drugs. Moreover, Dr. Abramson has further education and experience that qualify him to analyze clinical trials. Dr. Abramson completed the two-year Robert Wood Johnson Fellowship at Case Western University, which focused on studying "research designs, statistics, epidemiology, and conduct[ing] research." *Id.* at 84:25 – 85:8. This fellowship taught Dr. Abramson in depth about research design and gives him ample expertise in evaluating clinical trials. In addition, Dr. Abramson serves as a consultant to Wells Fargo Insurance Services to help companies buy drugs and develop pharmaceutical

3

policies that are "based on the true science instead of the marketing of the drugs." *Id.* at 89:17-90:3. Dr. Abramson's academic and real-world experience more than qualify him to testify regarding the evidence presented by clinical trials.

**III.) DR. ABRAMSON'S TESTIMONY IS TIED TO DEFENDANTS**

Defendants also argue that Dr. Abramson's testimony was not sufficiently tied to Pfizer. Mem. at 2-3. This argument ignores the vast majority of Dr. Abramson's testimony, which directly connected the misconduct to Defendants. Examples abound of testimony directly tied to Defendants' marketing tactics:

- Dr. Abramson testified regarding Parke-Davis's 1995 Marketing Assessment, which stated that studies will only be published if positive. 2/23 Trial Tr. at 126:3-25.

- Dr. Abramson testified that internal Pfizer communications showed their decision to delay publication of the negative study on pain by Dr. Reckless. 2/24 Trial Tr. at 32:4-33:20.

- Dr. Abramson testified about Defendants' own statements indicating their refusal to provide unpublished Neurontin data to the Cochrane reviewers. 2/23 Trial Tr. at 123:6-24.

- Dr. Abramson testified that Defendants' own experts indicated that their attempt to secure a general indication for neuropathic pain was "done." 2/24 Trial Tr. at 40:5-16.

- Dr. Abramson testified about communications between Pfizer and Medical Action Communications ("MAC") regarding the best way to present the negative Reckless study's conclusions. 2/24 Trial Tr. at 45:9 – 46:2.

Dr. Abramson's testimony was directly tied to Defendants' misconduct.

Defendants, however, focus on Dr. Abramson's testimony regarding CME presentations funded by Defendants. Mem. at 3. As Plaintiffs indicated in court, evidence tying each of these presentations to Defendants has either already been entered or will be entered by the close of trial. *See, e.g.*, 2/24 Trial Tr. at 6:15-7:17 (noting that there "were a series of multimillion-dollar contracts between Parke-Davis and CME, Inc. to undertake [marketing Neurontin through continuing medical education grants] Parke-Davis knew the content, knew that the content was promoting bipolar, knew that the content was false, and continued to do it year after year."). By the end of trial, the connection between Defendants and the CME documents referenced by Dr. Abramson will be clear.

## IV.) IMPACT ON KAISER IS ADDRESSED BY OTHER WITNESSES

Defendants' motion also argues that Dr. Abramson's testimony should be stricken because he does not tie Defendants' misconduct directly to Kaiser. Mem. at 3-5. First of all, some of Dr. Abramson's testimony about Defendants' misconduct applies to all doctors. For example, Defendants' documents indicate that they intentionally delayed publication of Dr. Reckless's negative study on neuropathic pain. 2/24 Trial Tr. at 32:4-33:20. Dr. Reckless's study was in fact never published as an independent study and only published as part of a review article co-authored by Pfizer employee Robert Glanzman, an article that painted a more favorable picture of Neurontin's treatment of pain than was scientifically justified. 2/24 Trial Tr. 30:4-11; 45:25-46:2. In this instance, Defendants' misconduct left the entire medical community in the dark, including Kaiser's physicians.

5

Second, other witnesses have testified or will testify to the impact of Defendants' misconduct on Kaiser. For example, Ambrose Carrejo testified on February 26, 2010, that Kaiser relied on scientifically available evidence in making its decisions on how Neurontin should be used. 2/26 Trial Tr. at 122:13-16. Kaiser representatives, such as Dr. Carrejo and Dr. Daniel, address the impact on Kaiser of the misconduct about which Dr. Abramson testified. To the extent that Defendants are arguing that an expert witness must touch on every aspect of a case in order for his or her testimony to be admissible, such an argument borders on the absurd – experts frequently testify within their area of expertise while fact witnesses connect the expert's testimony to the specific facts of the case. Plaintiffs are permitted to use Dr. Abramson's testimony to show Defendants' misconduct and Kaiser witnesses will testify to the impact of the misconduct on Kaiser.

**V.) DR. ABRAMSON'S TESTIMONY DOES NOT RELY ON SPECULATION**

Defendants also object to Dr. Abramson's "narrative description of the evidence" and cite to a handful of excerpts from Dr. Abramson's testimony while citing to the same pre-*Daubert* case on which they relied in their previous motion. Mem. at 5 (citing *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979)). Contrary to Defendants' argument, experts may synthesize a large amount of technical, scientific information and explain its meaning to the jury. *See, e.g.*, *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at *17 (N.D. Ohio Aug. 8, 2005) (explaining that "[i]t is through the application of his expertise that Dr. Levy may allow the trier of fact to better understand what the documents do (and don't mean)."). Dr. Abramson's testimony regarding the science on Neurontin's off-label uses aided the jury in understanding the highly technical data from clinical trials. Similarly, Dr. Abramson's testimony on what Defendants told doctors

6

assisted the jury in evaluating complex evidence, such as the difference between claiming the results of the Vieta study measured an "intent to treat" group or a "per protocol" group. 2/23 Trial Tr. at 112:1-113:19. As a result, each of Defendants' arguments as to why Dr. Abramson's expert testimony was improper must fail.

First, Defendants try to argue that Dr. Abramson testified that they acted fraudulently. Mem. at 5-6. Dr. Abramson never classified Defendants' misconduct as "fraudulent" in his testimony, nor did he offer a legal conclusion that Defendants behaved fraudulently – his testimony focused on the scientific data and Defendants' inaccurate portrayal of these data.

Second, Defendants argue that Dr. Abramson tried to testify to their intent. Dr. Abramson's testimony, however, focuses on what Defendants' documents state, so the testimony contained no speculation about what Defendants may have been thinking. The two excerpts quoted by Defendants – Defendants' refusal to provide the Cochrane reviewers with data and Defendants' 1995 Marketing Assessment in which they state that studies will only be published if positive – both stem directly from Defendants' documents. *See* 2/23 Trial Tr. at 123:6-24; 126:3-25.

Lastly, Defendants quote to a passage from Dr. Abramson's testimony in which he addresses communications between MAC and Pfizer regarding how to release the data from the negative Reckless study without damaging Neurontin's marketing success. Defendants cannot conjure up a basis for their objection, so they merely state that "[t]his testimony is simply not the proper subject of expert testimony." Mem. at 7. Dr. Abramson, however, merely explained the manner in which Defendants failed to

7

accurately present the results of the negative Reckless study to the medical community –

a topic well within his area of expertise.

## **CONCLUSION**

For all of the foregoing reasons, Defendants' motion to exclude the testimony of

Dr. Abramson should be DENIED.


Dated:  March 5, 2010                                                  Respectfully submitted,


                                                                       By:    */s/ Linda P. Nussbaum*
                                                                              Linda P. Nussbaum

                                                                       KAPLAN FOX & KILSHEIMER LLP
                                                                       Linda P. Nussbaum, Esq.
                                                                       850 Third Avenue, 14th Floor
                                                                       New York, New York 10022

                                                                       *Attorneys for Plaintiffs Kaiser Foundation
                                                                       Health Plan, Inc. and Kaiser Foundation
                                                                       Hospitals*

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
 BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
 SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142


Don Barrett, P.A.
404 Court Square
Lexington, MS  39095-0987

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 5, 2010.

>                                    */s/  Elana Katcher*
>                                    Elana Katcher