label indications, rather than merely responding to existing interest.

### 6. *Control of Purportedly Independent Medical Education*

Parke-Davis also used its control over continuing medical educational programs that were ostensibly, but not in fact, independent, as part of its strategy to promote off-label uses of Neurontin. Use of medical education programs for this purpose was a separately labeled and funded tactic in its annual marketing plans. For example, a March, 1996 SCCBU Situation Analysis says: "A premise used in developing the 1996 SCCBU Operating Plan is that Neurontin is more responsive to certain types of promotional media. The most effective promotional media utilized in 1995 were Medical Education programs." (i.e., consultants meetings, regional CME and local speaker events). Similarly, a draft NCCBU Situational Analysis states:

> The medical education strategy has been and will continue to be the main tool used to promote Neurontin.... 134 speaking events were held in the 1st quarter... The most significant adjustment made to the implementation of the 1996 plan has been the increased emphasis placed on the Life Cycle Management strategy or the non-epilepsy uses of Neurontin. Physicians have a very high level of interest in the use of Neurontin for pain and the Medical Liaisons along with the CME programs are being used to address these areas that are off limits to TM promotion.

The evidence demonstrates that Parke-Davis influenced the content of purportedly independent medical education, while the programs explicitly disclaimed any such influence, and concealed and made false statements about the payments that it had made to doctors who acted as speakers and faculty for such education. For example, Parke-Davis entered into an undisclosed partnership with a company known as Physicians World. The agreement called for the two parties to participate in a "Partnering Program," in which Physicians World offered a reduction in fees in return for a commitment from Parke-Davis for a minimum level of projects

40

and Physicians World's access to Parke-Davis's office space and networks.   As part of the arrangement, Parke-Davis employees were transferred to Physicians World to run Parke-Davis' speakers' bureau.

A division of Physician's World, known as Professional Post-Graduate Services, held itself out as an independent medical education provider without revealing Parke-Davis's influence, and created a major program entitled "Use of Antiepileptic Drugs in the Treatment of Chronic Pain Syndromes" at the Company's request. In fact, the program was designed to promote Neurontin for pain, and Parke-Davis' staff planned, and participated in, each stage of its development including curriculum planning meetings, creation of "home study groups" and dinner meetings carrying out the program, and the recruitment of doctors to participate and to be speakers for each segment of the program.

This program was provided to thousands of doctors around the country.  In each instance, the materials distributed to the participants falsely stated that they were created in compliance with ACCME guidelines, which prohibited such content control by Parke-Davis as a condition of program accreditation, and required disclosure of all financial affiliations.  The materials did not, however, disclose the relationship between Physicians World and Parke-Davis, nor did they disclose the known financial and other affiliations between Parke-Davis and each of the faculty members, all of whom were paid consultants to Parke-Davis -- and several of whom had received many thousands of dollars in speaker payments and /or grants from Parke-Davis. One physician in particular was a regular Neurontin speaker who had received payments from Parke-Davis of more than $10,000. To the contrary, by the listing of each of these faculty, there was an asterisk indicating "no significant financial or other affiliation reported" – even while

affiliations with other drug companies were listed and despite the knowledge of the financial relationships by both Physicians World and Parke-Davis. This evidence demonstrates that Parke-Davis knew that these events were unlawful promotional activities.

Similarly, in 1996, Parke-Davis sponsored a mailing to 10,000 neurologists in the United States. The mailing was ostensibly prepared by the Medical Education Network with a grant from Parke-Davis. However, the only drugs mentioned in the mailing (called a "Medi-Fax Express Report") were Neurontin and Cerebyx, another Parke-Davis product.[8] In the Medi-Fax mailing, all of the Neurontin topics concerned off-label uses of the drug and several discussion were misleading as well.

## IV.   DETERMINING THE APPROPRIATE SENTENCE

### A.   Overview

There are five principal areas of harm that resulted from Parke-Davis' illegal off-label promotion, or which were made more likely by that conduct. The first harm is to health care reimbursement programs such as Medicaid which paid more in prescription reimbursement as a result of the unlawful marketing. The second and third types of harm are to consumers, who may have paid money for ineffective, experimental use of Neurontin and who may have been improperly medicated. Improper medication could have resulted from prescribing Neurontin for an unapproved use for which it was not effective or not as effective as another medication which was approved for that use. A fourth harm is the unnecessary exposure of patients to adverse side

---

[8] This mailing is referenced in a December 12, 1995 memorandum to a senior executive from the Portfolio Manager in headquarters.

effects of Neurontin.[9] The Government notes that in a May 18, 2004 letter to the Court, an attorney, who stated that he represents thousands of former Neurontin users, objected to the proposed criminal resolution on, apparently, the ground that it does not go far enough. The United States believes that evaluation of thousands of claims by individual Neurontin users, each of whose experience is unique, would unduly complicate and prolong sentencing. See U.S.S.G. § 5E1.1(b)(2). Moreover, the proposed global settlement does not foreclose the rights of non-governmental victims to seek redress.[10]

A fifth form of harm is to the regulatory scheme itself; by foregoing FDA approval while nonetheless marketing Neurontin for off-label uses, Parke-Davis circumvented the safeguards inherent in the drug approval regulatory scheme and undermined the fairness, reliability and integrity of that program.

Both Title 18 and the sentencing guidelines look to the financial loss or gain caused by illegal conduct as a principal, but not a sole, basis for determining the appropriate punishment for a corporation. The cumulative financial (and non-financial) impact of the illegal promotion of Neurontin by Parke-Davis is very difficult to calculate with precision. The Company engaged in both on-label and off-label promotion of Neurontin. There is no direct way to measure exactly the fiscal impact of the off-label promotion.

---

[9] One doctor told the Government that he believed much use of Neurontin was for the placebo effect, i.e., a patient gets some positive results because he or she believes the medication will work, even if it does not. But Neurontin is an expensive placebo, and it has more significant potential side effects than a sugar pill.

[10] The Government notes that the proposed resolution does include a significant state consumer protection component, which has not routinely been part of prior health care fraud settlements arising out of federal Department of Justice investigations.

43

B.  **Violations of the Food, Drug & Cosmetic Act**

The maximum fine provided by statute for a violation of the Food, Drug & Cosmetic Act, 21 U.S.C. §§ 331(a) and 333(a)(2) (introducing and delivering for introduction into interstate commerce a misbranded drug) by an organization is the greatest of: (1) the amount specified in the law setting forth the offense (in this case, $10,000, pursuant to 21 U.S.C. § 333(a)(2)); (2) $500,000; (3) twice the gross pecuniary gain derived by the organization from the offense; or (4) twice the pecuniary loss suffered by another person because of the offense. See 18 U.S.C. §§ 3571(c) and (d). In addition, or in the alternative, an organization may also be sentenced to a term of organizational probation of up to five years. See 18 U.S.C. §§ 3561(a) and (c). The court may also order restitution. See 18 U.S.C. § 3663.

Clearly, twice the gross pecuniary gain is the largest of the statutory alternatives in this case. Because this calculation is common to either a statutory or a guidelines-based calculation, the method of calculating pecuniary gains is set out below within the guidelines discussion.

C.  **Calculation of the Appropriate Fine under the Guidelines**

*1. Determining the applicable guidelines:* Warner-Lambert has agreed to plead guilty to two violations of 21 U.S.C. § 331, which are felonies by virtue of its prior FD&C Act conviction. See 21 U.S.C. § 333(a)(2). Therefore, U.S.S.G. Chapter 8 applies.

Although Chapter 8 applies generally, the fine guidelines in Chapter 8, U.S.S.G. §§ 8C2.2 through 8C2.9, apply only to specified types of offenses. See U.S.S.G. §§ 8A1.1, app. n. 2; 8C2.1. To determine whether the fine guidelines apply to these FD&C Act violations, the court must look at U.S.S.G. § 8C2.1 (Applicability of Fine Guidelines). This section states that the fine guidelines apply to "each count for which the applicable guideline offense level is

44

determined under" one of those listed in subsections (a) and (b).

The applicable guideline offense level for Warner-Lambert's violation of 21 U.S.C. §333(a)(2) (which is based upon a prior FD & C Act violation and not an intent to defraud or mislead) is determined under U.S.S.G. § 2N2.1. See U.S.S.G. Appendix A. Section 2N2.1 is not listed under § 8C2.1(a) or (b). Accordingly, the fine guidelines of Chapter 8 do not directly apply to these FD&C Act violations.

In the absence of an applicable fine guideline, U.S.S.G. § 8C2.1 instructs the court to apply U.S.S.G. § 8C2.10 (Determining the Fine for Other Counts). Section 8C2.10 states: "For any count or counts not covered under § 8C2.1 ("Applicability of Fine Guidelines"), the court should determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572."

Determining an appropriate fine for Warner-Lambert's FD&C Act offenses, therefore, requires evaluating the general factors to be considered in imposing a sentence under 18 U.S.C. § 3553(a) and to the factors specific to fines set forth in 18 U.S.C. § 3572, including, "the need to deprive the defendant of illegally obtained gains from the offense."[11] Many of the same considerations before the court in a statutory analysis are considerations under a guidelines analysis. Title 18 U.S.C. § 3553 (a)(4) also references the sentencing guidelines, providing a

---

[11] 18 U.S.C. § 3572(a)(5). Section 3572 of Title 18 also directs the sentencing court to consider: (1) defendant's resources; (3) any pecuniary loss to others; (5) the need to deprive the defendant of illegally obtained gains from the offense....; and (8) the size of the organization. See, e.g., United States v. Bertoli, 854 F. Supp. 975, 1154 (D.N.J. 1994). Among the factors set out in section 3553 of Title 18 are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. Id.

45

basis for using the guidelines to calculate the appropriate sentence for a violation which is a second-offense felony. Moreover, where there is no applicable sentencing guideline the court must "have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders." 18 U.S.C. § 3553(b).

*2. Pecuniary Gain Generally:* Whether the court operates under the sentencing guidelines or the statutory fine provisions to determine the appropriate fine amount, the court must first estimate the pecuniary gain to the company as a result of its illegal conduct. Under the fine guidelines, in this case, the pecuniary gain would determine the "base fine" amount.[12] The background commentary to U.S.S.G. §8C2.4 offers a useful interpretation of this guideline:

> As a general rule, the base fine measures the seriousness of the offense. The determinants of the base fine are selected so that, in conjunction with the multipliers derived from the culpability score in §8C2.5 (Culpability Score), they will result in guideline fine ranges appropriate to deter organizational criminal conduct and to provide incentives for organizations to maintain internal mechanisms for preventing, detecting, and reporting criminal conduct. In order to deter organizations from seeking to obtain financial reward through criminal conduct, this section provides that, when greatest, pecuniary gain to the organization is used to determine the base fine.

If the Court applies the sentencing guidelines, Guideline 2B1.1 is the analogous guideline for these offenses. The sentencing guidelines expressly take the position that sentencing under § 2B1.1 is based on losses, or gains, which the defendant *intended* to result from its conduct, whether or not such losses or gains did, in fact, result. See U.S.S.G. § 2B1.1 App. Note 3(A) (the "loss is the greater of actual loss or intended loss." Application Note 3(A)(i) states that "actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense."

---

[12] See U.S.S.G. §8C2.4; 18 U.S.C. §§ 3571(c),(d); U.S.S.G. § 8A1.2, app. n. 3(h)("pecuniary gain" is derived from 18 U.S.C. § 3571(d) and is defined as "the additional before-tax profit to the defendant resulting from the relevant conduct of the offense.").

46

Note 3(A)(ii) defines "intended loss," and includes within the definition those losses which were intended but which were impossible or unlikely to occur. See United States v. Johnson, 16 F.3d 166, 170-71 (7th Cir. 1994); United States v. Johnson, 908 F.2d 396, 398 (8th Cir. 1990). Application Note 3(b) states that gain may be used if there is a loss but it reasonably cannot be determined. Accord United States v. Andersen, 45 F.3d 217 (7th Cir. 1995); United States v. Galbraith, 20 F.3d 1054 (10th Cir. 1994).[13]

Furthermore, the Court is not required to identify each and every fraudulently obtained prescription. Thus, for example, the Court need not specifically identify particular victims when sentencing a defendant convicted of transporting forged bank instruments; so long as there likely are such victims, or that defendant intended them to exist, it is sufficient to show actual or intended loss. See United States v. Resurreccion, 978 F.2d 759 (1st Cir. 1992); United States v. Berndt, 86 F.3d 803 (8th Cir. 1996).

**3. *Pecuniary Gain to Warner-Lambert:*** Because the Government's proof of Warner-Lambert's intent to increase its off-label sales is so overwhelming, the Court should have no difficulty in finding that it intended to cause all of the off-label sales.[14] The fact that

---

[13] The Government has the burden of establishing only that defendant attempted to inflict the loss. United States v. McCormac, 309 F.3d 623, 627 (9th Cir. 2002)("2001 amendments adopt a broad definition of intended loss. Intended loss includes the "pecuniary harm that was intended to result from the offense, whether or not that pecuniary harm would have been impossible or unlikely to occur"); United States v. Joetzki, 952 F.2d 1090 (9th Cir. 1991); United States v. Holloman, 981 F.2d 690 (3rd Cir. 1992). In this case, there was loss to the federal Medicaid program.

[14] In numerous marketing assessments, Parke-Davis projected revenue from off-label uses pursuant to a non-approval strategy in which it would promote via publication and medical education (e.g., the company's Core Marketing Team noted expected revenue of $100 million from five principle off-label uses).

47

some portion of those sales might have been caused by other factors for which Warner-Lambert is not, at least directly, responsible, is of no legal consequence given its intent to cause off-label sales. The Court need not engage in analysis of whether Warner-Lambert's intent was to cause less than all off-label sales because it is irrelevant whether the Company's unlawful promotion was more successful than it anticipated. Section 2B1.1, Application Note 3(C) provides that "the court need only make a reasonable estimate of the loss [or gain]."

The Government sets forth below what it believes is a reasonable method of calculating the pecuniary gain to Parke-Davis, looking at (1) when the unlawful promotion began for each unapproved use, when the promotion developed momentum and when it tapered off, and (2) what independent reasons (i.e., not the result of unlawful sales promotional activities by Parke-Davis) could have caused an increase in the prescription of Neurontin for off-label uses. The Government's goal was to craft a reasoned estimate of the proportion of total off-label sales which was caused by the criminal conduct.[15]

The evidence demonstrates that the illegal off-label promotion began to have an impact midway through 1995. The evidence also demonstrates that the conduct diminished somewhat after September of 1997 and thereafter tailed off after the first quarter of 1999. Although it is impossible to determine the precise beginning and ending points, these dates were used in calculating the pecuniary gain. The end point for the impact of the off-label marketing was particularly difficult to establish; however, in light of other independent factors that would have

---

[15] The Company is liable for all off-label sales it intended to cause through its unlawful marketing, and there is no clearly defined limit to that intent. Nonetheless, it is reasonable to take into account factors which may have increased off-label prescribing of Neurontin which Parke-Davis neither created nor controlled.

48

resulted in an increase in off-label prescriptions, the end point selected appears reasonable.[16] In this time period, the total number of new Neurontin prescriptions was 5,540,000. The quarter-by-quarter figures are shown in a spreadsheet attached hereto as Exhibit A.

The percentage of Neurontin prescriptions that were for off-label uses was next calculated, using contemporaneous documents from the company, testimony, and third-party commercial sources of sales data that are routinely relied upon by the pharmaceutical industry. The information showed that the percentage of total sales that were off-label ranged from 40% in the third quarter of 1995 to 84% in the first quarter of 1999. See Exhibit A for the quarterly breakdown.

The Government also sought to determine how many of the off-label prescriptions, within the four year time period described above, were attributable to the company's illegal conduct. By examining contemporaneous documents showing how much Neurontin was sold for off-label uses before the scheme began, and by looking at levels of experimentation with other anti-seizure medications, the evidence demonstrates by a preponderance that approximately 26% of Neurontin sales would have been for off-label uses even if there had been no improper promotion. This reflects the degree to which neurologists and pain specialists experimented with anti-epileptic drugs in general, as well as the fact that Neurontin's safety profile made it an

---

[16] For example, two major positive studies of Neurontin for use in certain types of pain were published in 1997. In addition, in 1998, one of the drug use compendia (listed in the Medicaid statute, 42 U.S.C. §1396r-8 (g)(1)(B)(i)) included references to off-label uses for Neurontin. It is possible to conclude that these events would have resulted in an increase in off-label prescriptions by physicians wholly independent of any conduct by Parke-Davis. The United States does not concede that, in the facts of this case, any compendia references during the time period investigated constituted adequate support of the referenced uses, beyond the FDA approved use, for purposes of Medicaid reimbursement.

49

attractive choice for this type of experimentation.[17] Further, because such experimentation may have led to additional experimentation, particularly if the drug showed some promise, as Neurontin did for certain types of pain, the Government calculated a modest growth factor of 4.345% per year for this "credit" of untainted off-label sales. The percentage of total sales that was not attributable to the criminal conduct is set out in Exhibit A as well.

This credit was then deducted from the total off-label sales for each quarter. The Government thereafter multiplied the remaining off-label prescriptions by an average per-prescription profit figure of $80.00 obtained from Parke-Davis but verified from documentation and public records.[18] In sum, the pecuniary gain to Parke-Davis from its off-label promotion of Neurontin can be calculated using the following equation: (Neurontin new prescriptions) x (percentage of off-label Neurontin sales attributable to the Company's illegal conduct) x (per prescription profit) = pecuniary gain. As is shown in Exhibit A, this calculation leads to a pecuniary gain figure of approximately $150,000,000. The parties have agreed that this figure represents the pecuniary gain Warner-Lambert derived from its illegal scheme.

    *4. Culpability score and multiplier:* Once the court determines the base fine (in this case, the pecuniary gain) the next step is to determine the organization's culpability score. See U.S.S.G. § 8C2.5. The culpability score is the sum of numeric points which are assigned for

---

[17] If the level of experimentation found for the anti-epileptic class of drugs was influenced by illegal off-label marketing, either by Warner-Lambert or other manufacturers, the appropriate adjustment for this factor would have to be re-considered. Evaluation of such influence would unduly complicate and delay sentencing, however.

[18] A sound argument can be made that the calculation should be based on total revenues, rather than profit; however, in this case it makes relatively little practical difference since the profit margin on Neurontin was so high.

50

certain organizational behavior, such as the organizational involvement in or tolerance of the criminal activity, U.S.S.G. § 8C2.5(b)(1), the prior history of the organization, U.S.S.G. § 8C2.5(c)(2), and the organization's cooperation and acceptance of responsibility U.S.S.G. § 8C2.5(g)(2), among other things. The result of this tally yields a number from 1 to 10 (the "culpability score") which corresponds to a maximum and minimum multiplier, ranging from 0.05 to 4.0. The guidelines start with **5** points, then add **5** more if the organization had 5,000 or more employees and:

    (i)    an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense; or

    (ii)    tolerance of the offense by substantial authority personnel was pervasive throughout the organization.

Warner-Lambert had more than 5,000 employees; in addition, for the reasons stated above regarding the knowledge and approval of the off-label marketing scheme among senior management, the conditions of either subsection (i) or (ii) are met and the additional 5 points apply.

Warner-Lambert is entitled to a **2** point reduction under § 8C2.5(g) for cooperating with the investigation and accepting its responsibility. This leads to a total of **8** points, and a multiplier range of 1.6 to 3.6. However, because the statutory maximum penalty is two times the amount of gain or loss, the effective range is **1.6 to 2.0**. The parties have agreed upon a multiplier of **1.6** as leading to a fair fine and one that comports with the factors that the Court is required to consider under 18 U.S.C. §§ 3553(a) and 3572(a). See U.S.S.G. § 8C2.8. By multiplying the pecuniary gain of $150,000,000 by 1.6, the criminal fine is $240 million.

If the court were proceeding under a statutory fine analysis, the court could consider the

51

factors set forth in 18 U.S.C. §§ 3553(a) and 3572(a) to derive similar "multipliers" of up to two times[19] the pecuniary gain to arrive at an appropriate fine.

## V.  THE RECOMMENDED GLOBAL RESOLUTION

The Government recommends that the Court approve the proposed criminal sentence as part of the global resolution of Warner-Lambert's criminal and civil liabilities under the factors set forth in 18 U.S.C. § 3553(a)(2). The criminal fine of $240,000,000 and the total civil payment of $190,000,000, plus interest, for total payments of $430,000,000, plus interest, will provide just punishment of Warner-Lambert, and full and fair restitution to the Medicaid program. The amendment to the Corporate Integrity Agreement between Warner-Lambert, its parent Pfizer Inc and the Office of Inspector General of the Department of Health and Human Services, attached as Exhibit C to the Plea Agreement, will insure that going forward, the public will be better protected because, among other things, Warner-Lambert (and Pfizer) will engage in comprehensive training and certification of its employees regarding appropriate marketing practices, reviews of its marketing practices by an independent review organization, and reports and certification of the information to the Department of Health and Human Services.[20]

## VI.  CONCLUSION

For the foregoing reasons, the Government urges that the Court approve the sentence of a

---

[19] Since the maximum statutory fine is twice the gross pecuniary gain, see 18 U.S.C. 3571(d), any "multiplier" could not exceed two.

[20] Pfizer Inc instituted policies, or applied its existing policies, when it took over Warner-Lambert, by which the parent company says it intended to curtail improper marketing. The United States does not vouch for the company's intent or the effectiveness of those policies, however. In addition, the United States notes that Pfizer has cooperated with the United States' investigation.

52

criminal fine in the amount of $240,000,000 as set forth in the Plea Agreement dated May 11, 2004, together with a special assessment of $400.

MICHAEL J. SULLIVAN<br>
UNITED STATES ATTORNEY<br>
DISTRICT OF MASSACHUSETTS

_____<br>
THOMAS E. KANWIT<br>
SARA M. BLOOM<br>
Assistant U.S. Attorneys<br>
U.S. Attorney's Office, Dist. of Massachusetts<br>
JILL FURMAN<br>
Trial Attorney<br>
Department of Justice

June 2, 2004

## Certificate of Service

I hereby certify I served a copy of the foregoing on counsel for Warner-Lambert by overnight courier on this date.

_____<br>
Thomas E. Kanwit