# EXHIBIT A

1

```
                                VOLUME:       I
                                PAGES:     1-199
                                EXHIBITS:   1-10
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
IN RE:  NEURONTIN              ) MDL DOCKET
MARKETING, SALES PRACTICES     ) NO. 1629
AND PRODUCTS LIABILITY         ) MASTER FILE
LITIGATION                     ) NO.  04-10981
                               )
                               )
THIS DOCUMENT RELATES TO:      ) JUDGE PATTI
                               ) B. SARIS
SHEARER VS. PFIZER, ET AL;     ) MAGISTRATE
1:07-CV-11428-PBS              ) JUDGE LEO T.
                               ) SOROKIN
                               )
```

VIDEOTAPED DEPOSITION OF

WILFRED HYNES, M.D., a witness called on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Jill Shepherd, Registered Professional Reporter, CSR, CLR and Notary Public, in and for the Commonwealth of Massachusetts, at the Tufts Medical Center, 800 Washington Street, Boston, Massachusetts, on Tuesday, November 13, 2009, commencing at 12:08 p.m.

Job No: 226411

1      What sort of information --
2   A. My prior experience.
3   Q. Was that the predominant --
4   A. Yes.
5   Q. Why is that?
6   A. I found it to be effective for neuropathic
7      pain.
8   Q. Did you begin using Neurontin during your
9      fellowship?
10  A. Yes.
11  Q. And you just carried it forward in your
12     private practice?
13  A. That's correct.
14  Q. In your training, did you have any -- I
15     think you already answered, but in your
16     training, your decision to use Neurontin was
17     basically based upon the information you
18     received from your colleagues here in
19     Boston?
20  A. The attending physicians, yes.
21  Q. And they were generally satisfied with
22     Neurontin to treat neuropathic pain?
23             MR. FROMSON: Objection. Hold on.
24     Objection. Form.
25             You can answer.

1  A.  Yes.
2  Q.  What was their experience with Neurontin for
3      the treatment of neuropathic pain during
4      your fellowship?
5          MR. FROMSON:  Objection.  Form.
6  Q.  You may answer.
7  A.  Predominant feeling was that it was
8      effective for neuropathic pain.
9  Q.  And that was your experience as well?
10 A.  Yes.
11 Q.  I have marked as an example -- you have it
12     in front of you -- Exhibit 2.  I've given it
13     to counsel.
14         Exhibit 2, for the record, is the
15     records from Brigham and Women's from
16     October 2000 for Mr. Shearer.
17 A.  Okay.
18 Q.  You've had a brief moment prior to the
19     deposition.
20         Let me ask you this again:  Other than
21     spending a moment prior to the deposition,
22     have you had a chance to familiarize
23     yourself with the records for Mr. Shearer
24     from his hospitalization at Brigham and
25     Women's Hospital in 2000?

1        You may answer.
2   A.   That appears to be the case from the
3        documentation.
4   Q.   Now, we discussed earlier some of the
5        sources of information upon which you might
6        rely to provide a prescription to a patient.
7        The next one I want to ask you about
8        is sales representatives from drug
9        companies, so here's my line of questioning
10       on that.
11       Do you recall being visited by sales
12       representatives from the company Parke-Davis
13       Warner-Lambert back in 1998 and 1999?
14            MR. BARNES:  Objection.
15  A.   I believe so.
16  Q.   Now, and I'm sorry if I am stating the
17       obvious, but you were not and you are not
18       and you never have been an epileptologist;
19       is that correct?
20  A.   That's correct.
21  Q.   And when these sales representatives came to
22       visit you in '98 and '99, did they discuss
23       with you the use of Neurontin for
24       nociceptive pain?
25            MR. BARNES:  Objection.

1          If you recall.
2  A.  I believe it was for neuropathic pain.
3  Q.  Okay.
4          Did these sales representatives
5  discuss with you broad neuropathic pain as a
6  use of Neurontin?
7          MR. BARNES:  Objection.
8          If you recall.
9  A.  I believe so.
10 Q.  Can you -- I know it's been quite some time.
11         Can you give us any sense of the
12 discussion that took place between yourself
13 and any sales representative from the
14 Parke-Davis Warner-Lambert era, '98 and '99,
15 and that discussion?
16         MR. BARNES:  Objection.
17 A.  I would be -- pretty much, as you said, that
18 it was mainly using Neurontin for the
19 treatment of neuropathic pain.
20 Q.  Did they -- withdrawn.
21         Did any sales representative who
22 visited you in '98 or '99 from Parke-Davis
23 Warner-Lambert ever disclose to you any
24 information whatsoever about whether
25 Neurontin could increase the risk of

1           MR. BARNES:  Objection.
2  Q.  Let me withdraw the question.  I want to
3      make sure it's clear.  We have to preserve
4      our record.
5          Back in the '98 or '99 time frame, did
6      sales representatives from Parke-Davis
7      Warner-Lambert come to you and provide you
8      with samples of Neurontin?
9           MR. BARNES:  Objection.
10 A.  I know we had samples in the pain center
11     that were provided by representatives that
12     were held in a locked cabinet we had to sign
13     out.  The exact year that that practice
14     started, I couldn't honestly tell you.  But,
15     you know, I do recall that.  I just don't
16     know when exactly.  If it was there from the
17     very beginning, I honestly couldn't tell you
18     that.
19 Q.  Back during the time frame before 2000, when
20     you prescribed Neurontin to Mr. Shearer,
21     who, if anyone, was your supervising
22     physician?
23 A.  The director of pain management center was
24     Dr. Edgar Ross, R-O-S-S.
25 Q.  Did Dr. Ross ever disclose to you whether or

1     not Neurontin could cause suicidal behavior
2     in people using it?
3         MR. BARNES: Objection. Lack of
4     foundation, lack of evidence.
5         Go ahead.
6 A.  I do not believe so.
7 Q.  Did Dr. Ross -- well, did you consider
8     Dr. Ross to be someone upon whom you relied
9     for medical information?
10 A.  Yes.
11 Q.  Did you consider Dr. Ross to be a valuable
12    source of information regarding the drugs
13    you were considering prescribing to
14    patients?
15 A.  Yes.
16 Q.  Did Dr. Ross provide you information with
17    respect to Neurontin?
18        MR. BARNES: Objection.
19 A.  I'm sure in the time period that we would
20    have at some point discussed Neurontin. He
21    was my attending when I was a fellow.
22 Q.  Did he ever disclose to you any
23    relationships, business relationships, that
24    he had with Parke-Davis Warner-Lambert
25    regarding Neurontin?

1    MR. BARNES: Objection. Lack of
2    foundation, assumes facts not in evidence,
3    relevance.
4  A. I can answer?
5  Q. You can answer.
6  A. Yes, he was a speaker.
7  Q. In terms of time frame, being from the point
8    up to Mr. Shearer's death -- let me withdraw
9    the question. I'm so sorry.
10        Referencing your attention to the time
11    up to the point where you prescribed
12    Neurontin to Mr. Shearer in October of 2000,
13    and any time in that time frame, did
14    Dr. Ross disclose to you that he was a
15    speaker for Warner-Lambert or Parke-Davis?
16        MR. BARNES: Objection.
17 A. Yes.
18 Q. Okay.
19        What did he explain that that meant,
20    if anything?
21 A. He was paid by the company to give lectures
22    on the use of Neurontin.
23 Q. Now, did he ever give a lecture in your
24    presence on the use of Neurontin before you
25    prescribed Neurontin to Mr. Shearer?

128

1        MR. BARNES:  Objection.
2   A.   I'm sure he did when I was a fellow.
3   Q.   And did he discuss Neurontin's use for
4        neuropathic pain?
5        MR. BARNES:  Objection.
6   A.   Sure.
7   Q.   Any of the -- how many times did you attend
8        any lectures provided by Dr. Ross, Edgar
9        Ross, regarding Neurontin up to the point
10       that you had prescribed Neurontin to
11       Mr. Shearer?
12       MR. BARNES:  Objection.
13  A.   I don't know exactly, but maybe half a
14       dozen.
15  Q.   On any of those occasions, did -- did he
16       disclose any risk of suicidal behavior with
17       Neurontin?
18       MR. BARNES:  Objection.
19  A.   I don't believe so.
20  Q.   How many people attended these lectures in
21       general?
22  A.   It varied with the lectures for the
23       residents and fellows.  It would probably be
24       12, 12 people.  Other venues, maybe 15 to
25       20.  I can't speak to others that he gave

Case 1:04-cv-10981-PBS   Document 2619-2   Filed 03/08/10   Page 11 of 13

129

1    that I wasn't in attendance.
2  Q. On any of the occasions that you attended
3    lectures provided by Dr. Ross during which
4    time Neurontin was discussed, did he provide
5    any handouts or materials?
6         MR. BARNES: Objection.
7  A. I'm not sure. It's possible.
8  Q. In terms of these lectures that you attended
9    given by Dr. Ross, and during which time
10   Neurontin was discussed, did you find these
11   lectures to be informative in terms of your
12   prescribing practices for Neurontin?
13        MR. BARNES: Objection.
14 A. Yeah.
15 Q. Was the information that you learned from
16   attending the lectures given by Dr. Ross
17   part -- or serve as part of a basis for your
18   prescribing Neurontin to your own patients?
19        MR. BARNES: Objection.
20 A. I would say most of my prescribing Neurontin
21   to patients was formed during my fellowship
22   year.
23 Q. When you say most of it, that leaves open
24   part of it.
25        So my question is -- let me ask it

800-567-8658                                          973-410-4040

130

1       again then.
2   A.  Okay.
3   Q.  Did Dr. Ross' lectures regarding Neurontin,
4       which were given before you prescribed
5       Neurontin to Mr. Shearer, provide, at least
6       in part, a basis for your prescription of
7       Neurontin to Mr. Shearer?
8               MR. BARNES:  Objection.
9           In 2000?
10              MR. FROMSON:  Yes.
11  A.  I don't know how much -- again, how
12      ingrained my prescribing pattern was at that
13      point.  Granted, I was a young attending, so
14      it's clear that my director, you know, was
15      someone I looked up to and listened to.  So
16      I can't imagine that it would not have
17      influenced me.
18  Q.  After 2002, having nothing to do with your
19      prescription to Mr. Shearer, were you
20      contacted by sales representatives from
21      Pfizer regarding Neurontin?
22  A.  I believe so.
23  Q.  And did there come a point where you went to
24      a speaker training meeting in New York?
25  A.  Yes.

Case 1:04-cv-10981-PBS   Document 2619-2   Filed 03/08/10   Page 13 of 13

185

1           Mr. Barnes said, right?
2    A.    Yes, that was their job.
3    Q.    And with the expectation they would provide
4          you with accurate information, you would
5          rely upon it, at least in part, as part of
6          your job as a prescribing physician; is that
7          fair?
8                  MR. BARNES: Objection.
9    A.    That is a fair statement.
10   Q.    And they never discussed suicidality with
11         you; isn't that true?
12   A.    I don't believe so.
13   Q.    And when you were being trained as a speaker
14         in New York, the trainees -- the trainers
15         did not discuss suicidality with Neurontin
16         with you; is that true?
17                 MR. BARNES: Objection.
18   A.    I don't believe so.
19   Q.    And when you were in Arizona, the trainers
20         did not speak about suicidality there
21         either; isn't that true?
22                 MR. BARNES: Objection.
23   A.    I don't believe so.
24   Q.    And when you actually gave speeches as a
25         speaker, you were never told to discuss

Veritext Corporate Services
800-567-8658                                           973-410-4040