UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                             :
In re:  NEURONTIN MARKETING,       :
       SALES PRACTICES AND        :
       PRODUCTS LIABILITY LITIGATION  :
                             :
-------------------------------------------------------------x
                             :
THIS DOCUMENT RELATES TO:     :
                             :
*Shearer  v. Pfizer Inc.*, 1:07-cv-11428-PBS   :
                             :
-------------------------------------------------------------x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE
OF MARKETING OR ADVERTISING MATERIALS AND CONDUCT**

Plaintiff Linda B. Shearer, as Administrator of the Estate of Hartley Shearer, Deceased,

by and through his attorneys, respectfully requests that this Court deny in its entirety Defendants'

Motion *in Limine* to exclude evidence of marketing or advertising materials and conduct on the

grounds that:  (1) on June 5, 2009, this Court denied Defendants' motion, *inter alia,* to exclude

the marketing documents, ECF Doc. # 1816, by electronic order on July 24, 2009, Judge Patti B.

Saris denied Defendants' motion *in limine* to exclude the marketing documents in *Bulger v.*

*Pfizer Inc.*, 1:07-cv-11426-PBS, and this motion *in limine* is nothing more than Defendants'

attempt to obtain a third bite of the apple; (2) pursuant to Fed. R. Evid. 401, such information is

relevant to various salient issues in this litigation, including Defendants' negligence, failure-to-

warn, and suppression, and recklessness in not demonstrating the safety of Neurontin in off-label

populations to whom the company had notice were using Neurontin; (3) Plaintiff does not intend

to use the subject material as evidence of prior bad acts (which is not an issue since these are not

**prior** bad acts but Defendants' acts that form the facts and circumstances of this very litigation),

but to demonstrate Defendants' negligence in knowingly and recklessly promoting Neurontin to off-label populations without performing the adequate pharmacovigilance to ascertain whether Neurontin was safe for such uses; and (4) the probative value of the evidence at issue greatly outweighs any potential unfair prejudice to Defendants.

## INTRODUCTION

On June 5, 2009, this Court issued an electronic order relating to Defendants' motion to, *inter alia*, exclude national marketing documents from evidence, and stated the following: "[t]he request to remove evidence related to national marketing is denied." On June 22, 2009, Defendants again attempted to exclude evidence of marketing or advertising which this Court denied by electronic order on July 24, 2009. Defendants' motion *in limine* to exclude the national marketing documents is merely an attempt to gain a third bite of the apple and should not be considered by this Court.

## ARGUMENT

### POINT I

**PLAINTIFF'S USE OF NATIONAL MARKETING OR ADVERTISING OF DEFENDANTS' OFF-LABEL PROMOTION OF NEURONTIN IS PROPER BECAUSE SUCH EVIDENCE IS RELEVANT TO PLAINTIFF'S CLAIMS THAT DEFENDANTS BREACHED THEIR DUTY OF CARE, INCLUDING PERFORMING ADEQUATE PHARMACOVIGILANCE, AND PUNITIVE DAMAGES**

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Moore's Fed. Rules Pamphlet 2009, Fed. R. Evid. 401. Defendants' national marketing documents relating to off-label marketing are admissible at trial to the extent they are relevant to Plaintiff's negligence, failure-to-warn, and negligent pharmacovigilance claims against Defendants. *See* ECF Doc. # 1790 at 33.

Judge Saris, in her May 26, 2009 Order, succinctly described the heightened duty to warn that a pharmaceutical manufacturer bears when it engages in off-label marketing of a drug:

> Based on the reasoning of this caselaw, the Court concludes that a manufacturer of a pharmaceutical has a duty to disclose to physicians and patients material facts about the risks of the drug, <u>particularly when it is engaged in off-label marketing</u> for uses not approved by the FDA, if it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts.

ECF Doc. # 1790 at 25 (emphasis added).

The manufacturer's <u>knowledge</u> of off-label use with its drug is inextricably intertwined with a manufacturer's duty to disclose material facts about risks with the drug. While off-label prescribing by physicians is not itself improper, a manufacturer with knowledge of both extensive off-label use and material facts about risks inherent with taking the drug (e.g., depression and suicide), has a duty to take action. As explained below, Defendants were on notice both of the risks of depression and of the substantial off-label use of Neurontin. Defendants' national marketing documents are probative of Defendants' negligence.

First, Defendants' marketing documents are relevant to Plaintiff's proof that Defendants had a regulatory duty to create, establish and execute a pharmacovigilance plan to evaluate and analyze suicide and depression adverse events. Defendants were on notice of risks since at least 1992. The FDA stated at that time: "Less common but more serious events <u>may limit the drug's widespread usefulness</u> . . . [D]epression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts." ECF Doc. # 1790 at 4-5 (emphasis added).

Defendants knew of Neurontin's subsequent <u>widespread</u> off-label use. Sales of Neurontin for off-label uses were at approximately 90% before Hartley Shearer's death. *See* ECF Doc. # 1790 at 8. Central to Plaintiff's cause of action is to establish when the duty to take

action through warning and enhanced pharmacovigilance arose.  Plaintiff intends to prove that duty arose when the off-label use of Neurontin substantially increased.  Plaintiff intends to use the national marketing documents to establish when Defendants should have undertaken to create a pharmacovigilance plan.  Defendants' negligent actions continued at least through 2004 (subsequent to the time that Mr. Shearer died) when Pfizer Defendants (not just the Parke-Davis and Warner-Lambert entities) failed to recognize and fully disclose suicide risks with Neurontin and, instead, sought to compare Neurontin as safer than competing drugs which did have specific warnings related to suicide.  *See* Declaration of Andrew G. Finkelstein, Ex. A at 27; ECF Doc. # 1790 at 8.

Second, not only did Defendants know of the widespread off-label use of Neurontin — indeed they engaged in off-label promotion — Defendants were on notice that patients using Neurontin for off-label uses were at risk.  Separate and apart from the FDA's concern in 1992, the risk was confirmed by Defendants' pharmacovigilance witness, Manfred Hauben, whose internal Pfizer documents included the following salient language:

> With the post marketing use of gabapentin in patients other than with epilepsy, it is important to identify whether these new populations may be particularly susceptible to specific adverse drug effects, both labeled and unlabeled, and to identify conditions under which specific adverse events may be more likely to occur in these new patient populations.

Finkelstein Decl., Ex. B.

It is axiomatic that Defendants had a duty to apply this knowledge about Neurontin's off-label usage to research the risks of suicidality, which Defendants negligently chose not to undertake.  Instead of researching and investigating the safety of Neurontin when used in off-label populations that were particularly susceptible to specific adverse drug effects, Defendants negligently promoted Neurontin for off-label uses not approved by the FDA including

unapproved "pain", the indication for which Hartley Shearer was prescribed Neurontin.  *Id.* at 5.
*See* Finkelstein Decl., Ex. C.  Not until 2006 did Defendants' own Risk Management Strategy
Department implement a purported investigation of suicidality (i.e., the Gabapentin Data Capture
Aid).  *See* Finkelstein Decl. Ex. D.  In sum, central to Plaintiff's cause of action is to establish
when the duty to take action through warning and enhanced pharmacovigilance arose.  Plaintiff
intends to prove that the duty arose with known substantial increase of off-label use of
Neurontin.  Defendants knowledge is established through the national marketing documents.

Applying the language and reasoning of this Court, for purposes of Plaintiff's negligence
claims, Plaintiff shall pursue at trial the foundational evidence that Defendants "engaged in off-
label marketing" and thus had a "particular[]" "duty to disclose to physicians and patients
material facts about the risks of [Neurontin]."  *See* ECF Doc. # 1790 at 25.  Defendants were
negligent and breached their duty of care to Plaintiff's decedent, Hartley Shearer, by failing to
adequately warn about the increased risk of suicidality with Neurontin ingestion, <u>particularly</u>
where Defendants had knowledge of the substantial off-label use with Neurontin.  Defendants'
knowledge of substantial off-label use and subsequent failure to warn of suicidality proximately
caused Mr. Shearer to commit suicide.

Defendants' actions in seeking to preclude all evidence related to national marketing
blatantly disregards that such documents and witness designations are probative of matters other
than fraud.  Defendants seek to expand improperly upon this Court's decision of May 26, 2009,
ECF Doc. # 1790, relating the Court's limitation of evidence on Defendants' national marketing
campaign and Plaintiff's fraudulent concealment claims.  The cases cited by Defendants are quite
distinguishable from the situation here where Plaintiff will proffer national marketing evidence
to demonstrate Defendants' breach of duty and negligence.  *In re Norplant Contraceptive Prods.*

*Liab. Litig.*, MDL No. 1038, 1997 U.S. Dist. LEXIS 11091 (E.D. Tex. Feb. 21, 1997), involved FDA-approved direct-to-consumer advertising and the issue of dilution of the warning, not a manufacturer's use of a marketing campaign for off-label uses to circumvent the FDA approval process and failure to provide adequate warnings regarding the risk of suicide.  In *In re Seroquel Prods. Liab. Litig.,* No. 6:06-md-1769-Orl-22DAB, 2009 WL 223140 (M.D. Fla. Jan. 30, 2009*),* plaintiff was going to utilize the promotional materials in regard to their claims of omission and misrepresentation.  In *Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1095 (D. Kan. 2002), Defendants' citation refers to a plaintiff's assertion that a physician had subliminally received the manufacturer's fraudulent marketing message, and the court granted defendants' summary judgment on their fraud based claims.  But, here, Plaintiff's is not utilizing the documents to demonstrate fraud or dilution of the warning in this case, but is utilizing the documents to demonstrate Defendants' intentional breach of their common law and statutory duty of care.

Moreover, Plaintiff's decedent's prescribing physician, Dr. Hynes, testified that in discussing his prescribing practices and risk/benefit analyses for prescribing a drug wanted to know about (a) the 1992 FDA Clinical review and the FDA Clinical reviewer's position on the safety of Neurontin (b) suicide attempts during clinical trials; (c) depression adverse events during clinical trials and (d) that patients taking Neurontin may suffer mood and behavioral disturbances and increased risk for suicidal behavior.  ECF Doc. # 2524 at pp. 11-12,15-16. Defendants' actions, in breaching their duty of care, and in failing to perform adequate pharmacovigilance which inevitably led to their failure to warn that the ingestion of Neurontin causes adverse mood and behavior changes and increases the risk for suicidality, resulted in preventing Hartley Shearer and his prescribing physician(s) from being able to fully assess the risk-benefit analysis for the underlying off-label condition for which Neurontin was prescribed to

him, and from being able to fully monitor changes in his mood and behavior caused by Neurontin.

## POINT II

### PLAINTIFF'S USE OF DEFENDANTS' NATIONAL MARKETING AND ADVERTISING FOR THE OFF-LABEL PROMOTION OF NEURONTIN IS PROPER BECAUSE SUCH EVIDENCE IS RELEVANT TO DEFENDANTS', INCLUDING PFIZER'S, INTENTIONAL AND RECKLESS PROMOTION OF THEIR DRUG NEURONTIN TO OFF-LABEL POPULATIONS WITHOUT PERFORMING THE ADEQUATE PHARMACOVIGILANCE TO ASCERTAIN WHETHER NEURONTIN WAS SAFE FOR SUCH USES

Defendants argue that the marketing evidence is not relevant to the question of "whether Pfizer knew or should have known about such a risk at the time Neurontin was prescribed to Mr. Shearer." Defs. Mem., ECF Doc. # 2564 at 5. What is perfectly clear is that Defendants were negligent and reckless in knowingly not performing adequate pharmacovigilance to ascertain whether the drug was safe for the off-label uses by the population for which they were promoting the drug off-label. Plaintiff requires the national marketing documents to demonstrate that Defendants were negligent and reckless when they knowingly disregarded the safety of the off-label population taking Neurontin while promoting Neurontin for off-label uses.

Moreover, Pfizer itself is complicit in this failure and perpetuated the breach of duty and negligence when they took control of the manufacture of Neurontin. An April 1, 2003 e-mail by Defendants' employee John Marino demonstrates that after Pfizer took control of Neurontin, Pfizer was well aware that Neurontin was only approved for epilepsy yet boasted of sales well in excess of that which was anticipated (an in excess of the adjunctive epileptic drug market place) and noted that there were "lots of legal problems." Finkelstein Decl., Ex. E. The e-mail demonstrates that Pfizer, instead of performing the required pharmacovigilance so that it could

apply for FDA approval for the off-label indications, knowingly sat on their hands and sought to just continue to reap the profits from the illegal off-label marketing boon.

Moreover, in December 2000, although Pfizer Defendants were concerned with legal challenges in regard to prior off-label practices to illegally promote Neurontin and were going to refrain from same, Pfizer knowingly did nothing to ascertain the risks of the Neurontin to off-label users — they failed to evince any concern regarding the safety of the drug which had not been properly tested or approved by the FDA for these off-label uses. Finkelstein Decl., Ex. F. Further, contrary to Defendants' assertions that "the risk was unforeseeable," the attached chart, entitled "Percentage of Serious Reports For Suicide and Self injurious Behavior" prepared by Plaintiff from data extracted from the Neurontin Adverse Event Database, indicates that as of June 30, 1999, there were indications that there was an increased risk for suicide for off-label indications.[1]  Finkelstein Decl., Ex. G.  Defendants' duty of care was to ascertain the risks, the risks were apparent, but Defendants simply made an intentional decision to sit on their hands and not perform the adequate pharmacovigilance.  The marketing documents demonstrate the negligence of Defendants, both Warner-Lambert and Pfizer, and their reckless disregard for the safety of the off-label population to whom they were either actively promoting the drug illegally or sitting idle and reaping the benefits of the off-label promotion, without performing the required pharmacovigilance to assess the risks to this population.

---

[1] Although Defendants' memorandum cites to case law insinuating that Defendants' could not have known of the risks (ECF Doc. # 2564 at 5) this Court recognized that Plaintiffs sufficiently countered that misplaced argument in their opposition (ECF Doc. # 1197) briefing to Defendants' *Daubert* and Summary Judgment briefing, the Court noted in its decision at pages 81-89 and further stated that: In fact, when hired by Warner Lambert to investigate the relationship between gabapentin and behavioral disturbances in the mid-1990s, Dr. Trimble (now one of Plaintiffs' experts) advised the company that one of the strongest associations with anticonvulsant drugs generally was to depression. (Trimble Rep. 29; *see* Michael Trimble, Psychosis with Gabapentin (Neurontin), May 20, 1995) (Pls.' Ex. 17.)) ECF Doc. # 1775 at 21.

# POINT III

**THE NATIONAL MARKETING DOCUMENTS ARE RELEVANT TO SALIENT ISSUES IN THIS CASE AND PLAINTIFF WILL BE SEVERELY PREJUDICED IF THE DOCUMENTS ARE EXCLUDED; THE PROBATIVE VALUE OF THE DOCUMENTS SUBSTANTIALLY OUTWEIGHS ANY POTENTIAL FOR UNFAIR PREJUDICE, WILL NOT CONFUSE THE ISSUES OR WASTE THE COURT'S TIME, AND PLAINTIFF DOES NOT SEEK TO INTRODUCE SAME AS EVIDENCE OF DEFENDANTS' BAD ACTS — THE NATIONAL MARKETING DOCUMENTS ARE NOT PRIOR ACTS FROM ANOTHER LITIGATION BUT DEFENDANTS' ACTS FORM THE FACTS AND <u>CIRCUMSTANCES OF THEIR NEGLIGENCE IN THIS LITIGATION</u>**

To be admissible, evidence must be relevant. Fed. R. Evid. 401; *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252 (1st Cir. 1998). Relevant evidence is defined as evidence which may tend to prove or disprove a material fact that is of consequence to the determination of the action.. Fed. R. Evid. 401. Further, the Federal Rules of Evidence provide that "relevant evidence <u>may</u> be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added). Plaintiff is not seeking that the marketing documents be admitted under Fed. R. Evid. 404(b), to prove conformity with **prior** bad acts, but instead for a wholly permissible purpose: to prove Defendants' breach of duty, negligence and their intentional disregard for the safety of off-label users of Neurontin. *See Flebotte v. Dow Jones & Co. Inc.*, Civil Action No. 97-30117-FHF, 2001 U.S. Dist. LEXIS 1525, at *5 (D. Mass. Jan. 24, 2001). The court remarked that the admission of any relevant evidence "carries a danger of prejudice." *Id.* at *4. The First Circuit has held that "the admitted evidence must not only be prejudicial, but be unfairly prejudicial, and not only outweigh relevance but substantially outweigh relevance." *United States v. Rivera*, 83 F.3d 542, 545 (1st Cir, 1996). The First Circuit also stated that "where the reviewing court finds the balancing close, Rule 403 tilts the balance in favor of admission." *Id.*

Initially, to make it perfectly clear, the facts are what the **facts are in this case** — these are not allegations or prior bad acts from an unrelated prior case or drug litigation — Defendants pled guilty to illegally promoting Neurontin for off-label uses, **they intentionally failed to perform the adequate pharmacovigilance even though they were aware of the risks for the off label uses which relegated Neurontin unsafe for off label uses in this litigation.** It is rather troubling that Defendants allege that Plaintiffs will utilize the marketing materials to encourage jurors to base their decision on "inflammatory allegations against Pfizer." Plaintiff does not seek to utilize the national marketing documents to show that Defendants have a propensity for any **prior** bad acts. Defendants are playing with words and being cavalier in their terminology and not accepting any responsibility for their illegal actions which is the cause and at the **forefront in this litigation**. Plaintiff is going to utilize the marketing documents, part of the very facts and circumstances which formed this litigation, to demonstrate Defendant' breach of the duty of care and negligence. Unfair prejudice does not mean "no prejudice" at all, as noted in *Flebotte, supra.*

As explored in detail above, Plaintiff seeks to introduce the national marketing documents for salient issues in this case, Defendants' breach of their duty of care and their negligence and knowing and reckless disregard for the safety of the off-label population to whom Defendants marketed the drugs without performing the requisite pharmacovigilance or receiving FDA approval. These issues are critical in this case and Plaintiff will be severely prejudiced if he is not permitted to introduce this evidence to prove his claims. Defendants did not perform adequate pharmacovigilance for theses drugs to ascertain the safety for off-label users. Both of these facts go to proving Defendants' breach of duty of care and negligence. Defendants can, and probably will, claim that any evidence that Plaintiff's desires to proffer in this case will be

prejudicial.   But admitting the national marketing documents for the proper purpose — to demonstrate negligence and duty, will not cause Defendants to receive unfair prejudice for the actions that they intentionally took in relation to off-label uses of Neurontin.

On the other hand, the probative values of these documents substantially outweigh any potential prejudice to Defendants.   Plaintiff will suffer severe prejudice if she is unable to utilize the national documents to show Defendants' negligence and breach of duty of care.   Plaintiff's claim for the breach of duty and his negligence claim is fairly straightforward, and Plaintiff's use of the national marketing documents will not confuse the jury.

**POINT IV**

**PLAINTIFF'S MARKETING EXPERT PROVIDES EXPERT
TESTIMONY IN REGARD TO DEFENDANTS' RECKLESS BREACH OF
THEIR DUTY OF CARE THROUGH DEFENDANTS' INTENTIONAL
FAILURE TO PERFORM PHARMACOVIGILANCE AND
DEFENDANTS' INTENTIONAL OFF-LABEL MARKETING**

Plaintiff's marketing expert Dr. Charles King, III, provides expert testimony relevant to Defendants' breach of their duty of care to perform adequate pharmacovigilance and Defendants' actions to just reap the benefits of illegally promoting Neurontin for off-label uses.   Dr. King provides expert opinions regarding the fact that Defendants' breach of their duty of care was intentional, that they had a plan, had a motive and had the opportunity to avoid their duty of care. Dr. King opined regarding Defendants' marketing for off-label uses:

> Warner-Lambert estimated that the "ultimate" sales potential for Neurontin over the life of its patent was on $500 million because of the limited adjunctive use for which it had been approved.   To expand the market for Neurontin, Warner-Lambert developed a "publication strategy."   Its goal was "to disseminate the information [about Neurontin's potential use for psychiatric disorders, including bipolar and mood and anxiety disorders] as widely as possible through the world's medical literature" as a means of generating excitement in the market and stimulating off-label prescriptions despite the lack of FDA approval.   Warner-Lambert calculated that this strategy would avoid the costly and time-consuming clinical trials required for FDA approval.

11

Finkelstein Decl., Ex. H at 11.

Dr. King opines concerning the insidious details of how Defendants were well aware that they were thwarting the FDA approval process and intentionally breaching of their duty of care in the promotion of Neurontin for off-label uses:

> In the case of Neurontin, it was crucial for Warner-Lambert and allegedly Pfizer to maintain that these expenditures were for education, not promotion, so that it could evade legal constraints on its marketing activities.

*Id.* at 24.

Dr. King also opined concerning Defendants' intentional breach of their duty of care to off-label users:

> After evaluating the potential markets for other clinical uses, such as treatment of bipolar disorder, painful diabetic neuralgia, and chronic pain, Warner-Lambert calculated that seeking FDA approval would not be worthwhile because of the expense of clinical trials, the short remaining patent life for Neurontin, and potential adverse impact on the sales of a new drug that Warner-Lambert was developing.  Warner-Lambert decided to promote off-label uses of Neuron tin even though off-label promotion is expressly prohibited by the FDA.

*Id.* at 29

Further, Dr. King opined in regard to Defendants' failure to adequately disclose to physicians the risks from the ingestion of Neurontin for an off label use:

> Warner-Lambert and Pfizer allegedly promoted off-label uses of Neurontin by making false claims about its uses and efficacy.  Warner-Lambert and Pfizer allegedly failed to disclose or omitted information about Neurontin's lack of efficacy and its side effects.  Both of these actions would have affected the prescribing habits of physicians.

*Id.* at 24-25.

Dr. King's expert opinions, like the national marketing documents, are relevant to Defendants' intentional failure to perform adequate pharmacovigilance and their marketing Neurontin for off-label uses without consideration of the risks of depression and suicidality in the

off-label user population.  Dr. King's opinion should be admitted for the same reasons as articulated above for the national marketing documents.  Plaintiff requires Dr. King's opinion to prove Defendants' negligence, breach of duty and their intentional and reckless disregard for the health and safety of Neurontin off-label users, because Defendants made a conscious decision not to perform the required pharmacovigilance for the off-label uses.  Dr. King's opinion provides evidence of Defendants' elaborate plan, motive and opportunity, and its probative value substantially outweighs any potential for unfair prejudice to Defendants.

**POINT V**

**DEFENDANTS' BREACH OF THEIR DUTY OF CARE AND THEIR
RECKLESS INDIFFERENCE TO THE SAFETY OF OFF-LABEL
USERS OF NEURONTIN AS DEMONSTRATED BY THE NATIONAL
MARKETING DOCUMENTS AND TESTIMONY, ETC., ARE
PROPERLY EVIDENCE FOR THE ISSUE OF PUNITIVE DAMAGES**

Once again, Defendants are citing to case law which is inapposite and does not apply in this case — they reference instances where the facts and circumstances of the lawsuits are not related to the case at hand or improperly based on prior unrelated lawsuits.  In direct contrast, in this situation, the other claims and lawsuits in question all emanate from the same breach of Defendants' duty of care and will be utilized to demonstrate notice — not punishment.  As noted in detail above, what is perfectly clear, is that Defendants were negligent and reckless in knowingly not performing adequate pharmacovigilance to ascertain whether the drug was safe for the off-label uses by the population for which they were promoting the drug off-label, and their breach, which is demonstrated by the national marketing documents, harmed and caused the death of Hartley Shearer.

Pursuant to Mass. Gen. Laws ch. 229 § 2, "a plaintiff in a wrongful death action may recover 'punitive damages in an amount of not less than five thousand dollars in such case as the

13

decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant." The Supreme Judicial Court of Massachusetts has defined willful, wanton or reckless conduct to be 'intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another.'" *O'Neil v. Electrolux Home Prods*, Civil Action No. 06-10433-DPW, 2008 U.S. Dist. LEXIS 39998 at *23 (D. Mass. May 14, 2008) (citing to *Manning v. Nobile,* 411 Mass. 382, 387-388 (1991)). The highest state court in Massachusetts, in regard to what it defines as gross negligence in comparison with regular negligence, has stated:

> substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.

*Id.* (citing to *Altman v. Aronson,* 231 Mass. 588, 591-92 (1919)).

Plaintiff requires the national marketing documents to demonstrate that Defendants were malicious, willful, wanton or reckless when they knowingly disregarded the safety of Hartley Shearer, an off-label user, to risks, **about which Defendants were aware but did not warn,** and thereby intentionally breached their duty of care in promoting Neurontin for such an off-label use rather than performing pharmacovigilance. Defendants' intentional and reckless conduct is intertwined and directly related, and not independent, with their breach of their duty of care for which Plaintiff claims that Defendants are liable for the injuries and death sustained by Mr.

14

Shearer in this case. Plaintiff is using the national marketing documents or other litigations as evidence to demonstrate that Defendants had knowledge of the risks of increased suicidality and that, instead of performing the pharmacovigilance required, intentionally breached their duty of care by sitting on their hands and not warning Mr. Shearer and his prescribers of such risks. This is the conduct that is reprehensible and for which punitive damages should be considered.

**POINT VI**

**THE MARKETING DOCUMENTS ARE RELEVANT TO
PLAINTIFF'S CLAIMS THAT DEFENDANTS' FRAUDULENTLY
CONCEALED AND/OR SUPPRESSED THE RISKS FOR ADVERSE
MOOD AND BEHAVIOR CHANGES AND THE INCREASED
RISK FOR SUICIDE FROM THE INGESTION OF NEURONTIN FROM
HARTLEY SHEARER AND HIS PRESCRIBING PHYSICIAN, DR. HYNES**

Dr. Hynes prescribed Neurontin to Mr. Shearer for neuropathic pain issues. Finkelstein Decl., Ex. I at 120:21-25; 121:1-2. When Dr. Hynes was visited by Parke-Davis Warner-Lambert sales representatives in 1998-1999, they discussed the use of Neurontin for the treatment of neuropathic pain. Finkelstein Decl., Ex. I at 121:11-19. The sales representatives did not ever disclose to Dr. Hynes any information whatsoever about whether Neurontin could increase the risk of suicidal behavior in people taking Neurontin. Finkelstein Decl., Ex. I at 185:10-12. National marketing documents regarding Defendants' strategy to promote Neurontin through sales representative contact with physicians, sales representative training, etc., is relevant to Plaintiff's claims of fraudulent concealment or suppression of the risks of increased suicide for Neurontin.

Moreover, Dr. Hynes' decision to prescribed Neurontin to treat neuropathic pain — an unapproved use — was based upon the information received from attending physicians during his training. Finkelstein Decl., Ex. I at 39:14-40:1. Dr. Hynes testified that Dr. Ross was his supervising physician during the time that he prescribed Neurontin to Hartley Shearer. Dr. Hynes

relied upon Dr. Ross for prescribing information while he was a fellow, and at some point the

two of them discussed Neurontin; Dr. Ross did not disclose that Neurontin could cause suicidal

behavior in patients:

> Q.    Back during the time frame before 2000, when you prescribed Neurontin
> to Mr. Shearer, who, if anyone, was your supervising physician?
>
> A.    The director of pain management center was Dr. Edgar Ross, R-O-S-S.
>
> Q.    Did Dr. Ross ever disclose to you whether or not Neurontin could cause
> suicidal behavior in people using it?
>
> MR. BARNES:  Objection.  Lack of foundation, lack of evidence. Go ahead.
>
> A.    I do not believe so.
>
> Q.    Did Dr. Ross -- well, did you consider Dr. Ross to be someone upon
> whom you relied for medical information?
>
> A.    Yes.
>
> Q.    Did you consider Dr. Ross to be a valuable source of information
> regarding the drugs you were considering prescribing to patients?
>
> A.    Yes.
>
> Q.    Did Dr. Ross provide you information with respect to Neurontin?
>
> MR. BARNES:  Objection
>
> A.    I'm sure in the time period that we would have at some point discussed
> Neurontin.  He was my attending when I was a fellow.

Finkelstein Decl., Ex. I at 125:19-126:21.

Dr. Hynes was aware the Dr. Ross was paid by Warner-Lambert or Parke-Davis to

lecture and attended a lecture of Dr. Ross where he advocated prescribing Neurontin for the off-

label use of neuropathic pain, the condition for which it was prescribed for Hartley Shearer.

> Q.    In terms of time frame, being from the point up to Mr. Shearer's death --
> let me withdraw the question. I'm so sorry. Referencing your attention to the time
> up to the point where you prescribed Neurontin to Mr. Shearer in October of

2000, and any time in that time frame, did Dr. Ross disclose to you that he was a speaker for Warner-Lambert or Parke-Davis?

MR. BARNES:  Objection.

A.      Yes.

Q.      Okay. What did he explain that that meant, if anything?

A.      He was paid by the company to give lectures on the use of Neurontin.

Q.      Now, did he ever give a lecture in your presence on the use of Neurontin before you prescribed Neurontin to Mr. Shearer?

MR. BARNES:  Objection.

A.      I'm sure he did when I was a fellow.

Q.      And did he discuss Neurontin's use for neuropathic pain?

MR. BARNES:  Objection.

A.      Sure.

Finkelstein Decl., Ex. I at 127:7-128:6.

Prior to prescribing Neurontin to Hartley Shearer, Dr. Hynes attended approximately 6 lectures of Dr. Ross regarding Neurontin where Dr. Ross failed to disclose the any risk of suicidal behavior with the ingestion of Neurontin.

Q.      Any of the -- how many times did you attend any lectures provided by Dr. Ross, Edgar Ross, regarding Neurontin up to the point that you had prescribed Neurontin to    Mr. Shearer?

MR. BARNES:  Objection.

A.      I don't know exactly, but maybe half a dozen.

Q.      On any of those occasions, did -- did he disclose any risk of suicidal behavior with    Neurontin?

MR. BARNES:  Objection.

I don't believe so.

Finkelstein Decl., Ex. I at 128:7-19.

Dr. Hynes admitted that his prescribing practices for Neurontin had to be influenced by the lectures given by Dr. Ross regarding Neurontin and provided the basis for Dr. Hynes prescribing Neurontin to Hartley Shearer:

> Q.      Was the information that you learned from attending the lectures given by Dr. Ross part -- or serve as part of a basis for your prescribing Neurontin to your own patients?
>
> MR. BARNES: Objection.
>
> A.      I would say most of my prescribing Neurontin to patients was formed during my fellowship year.
>
> Q.      When you say most of it, that leaves open part of it. So my question is -- let me ask it again then.
>
> A.      Okay.
>
> Q.      Did Dr. Ross' lectures regarding Neurontin, which were given before you prescribed Neurontin to Mr. Shearer, provide, at least in part, a basis for your prescription of Neurontin to Mr. Shearer?
>
> MR. BARNES: Objection.
>
> In 2000?
>
> MR. FROMSON: Yes.
>
> A.      I don't know how much -- again, how ingrained my prescribing pattern was at that point. Granted, I was a young attending, so it's clear that my director, you know, was someone I looked up to and listened to. So I can't imagine that it would not have influenced me.

Finkelstein Decl., Ex. I at 129:15-130:17.

Dr. Ross' longstanding involvement and financial ties to Defendants and their promotion of Neurontin for off-label unapproved uses is well documented. Defendant Parke-Davis provided an money to sponsor dinner meeting on off-label uses (neuropathic pain) where Dr. Ross was a speaker. Finkelstein Decl., Ex. J. There is documentary evidence of a 2002 Falon

18

Medica (3rd party vendor) collaboration with Pfizer for a publication plan on off-label uses, including Neuropathic Pain, in which Dr. Ross was being utilized.  Finkelstein Decl., Ex. K.  Dr. Ross' curriculum vitae demonstrates that his primary involvement was in the treatment of pain, an off-label unapproved use that Dr. Hynes prescribed Neurontin to Hartley Shearer.  Finkelstein Decl., Ex. L.  Moreover, Dr. Ross was a principal investigator for Defendant Parke-Davis in 1996.  Finkelstein Decl., Ex. M.  Dr. Ross also spoke on behalf of Parke-Davis regarding neuropathic pain in 1999, prior to the time that Dr. Hynes prescribed Neurontin to Hartley Shearer.  Finkelstein Decl., Ex. N.  Dr. Ross attended a Pfizer MAP-PM advisory board for marketing meeting in 2002.  Finkelstein Decl., Ex. O.  Defendant Pfizer funded an August 2000 publication in which Dr. Ross discussed neuropathic pain.  Finkelstein Decl., Ex. P.  Further, the extent of Dr. Ross' involvement in the illegal marketing scheme of Pfizer for the off-label use of Neurontin for unapproved uses is exemplified by the fact that Dr. Ross was a was a member of Neurobehavioral Working Group, which was supported by money from Parke-Davis, whose stated purpose by Parke-Davis was to disseminate "emerging use" information and "infuse the market" with medical education on not only epilepsy, but on pain and psychiatry uses.  Finkelstein Decl., Ex. Q.  Additionally, Defendants were in possession of a manuscript of Dr. Ross regarding uses of anticonvulsants for pain management, presumably to review/revise as necessary.  Finkelstein Decl., Ex. R.

Dr. Ross was at the forefront of, the first line of physician to physician promotion, and part and parcel of Defendants' strategy to nationally market Neurontin off-label for unapproved uses.  Defendants' national marketing campaign is relevant because in this case, there is direct evidence that one of Defendants' "Key Opinion Leaders" influenced Plaintiff's decedent, Hartley Shearer's, physician Dr. Hynes to prescribe Neurontin to him off-label for treatment of his pain

from lumbar spasm, an unapproved use. Dr. Ross suppressed or fraudulently concealed the risks of adverse mood and behavior changes and increased risk for suicidality from Mr. Shearer's physician.

## CONCLUSION

Plaintiff respectfully requests that this Court deny Defendants' Motion *in Limine* to exclude evidence of marketing or advertising materials and conduct, as these materials are relevant to Defendants' knowledge of the risks of Neurontin, duty of care, negligent and reckless disregard and punitive damages, and Plaintiff's claim of fraudulent concealment and suppression of the risks of Neurontin and their probative value greatly outweighs any alleged prejudice to Defendants by the admission of these documents into evidence.

Dated: March 8, 2010                    Respectfully submitted,


By:     /s/ **W. Mark Lanier**
        W. Mark Lanier, Esquire
        THE LANIER LAW FIRM, P.L.L.C.
        126 East 56th Street, 6th Floor
        New York, NY  10022


By:     /s/ **Andrew G. Finkelstein**
        Andrew G. Finkelstein, Esquire
        Finkelstein & Partners, LLP
        1279 Route 300, P.O. Box 1111
        Newburgh, NY  12551

        *Attorneys for Plaintiff Linda B. Shearer*


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 8, 2010.

                        /s/ **Andrew G. Finkelstein**
                        Andrew G. Finkelstein