UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
In re: NEURONTIN MARKETING,
SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION
---------------------------------------------------------------x

THIS DOCUMENT RELATES TO:

*Shearer v. Pfizer Inc.*, 1:07-cv-11428-PBS
---------------------------------------------------------------x

MDL Docket No.: 1629

Master File No.: 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE AND REFERENCE TO EDGAR ROSS, M.D.

Plaintiff Linda B. Shearer, as Administrator of the Estate of Hartley Shearer, Deceased, by and through her attorneys, respectfully requests that this Court deny in its entirety Defendants' Motion *in Limine* to exclude evidence and reference to Edgar Ross, M.D., on the grounds that: (1) pursuant to Fed. R. Evid. 401, such information is relevant to various salient issues in this litigation, including Defendants' negligence, failure-to-warn, and suppression, and recklessness in not demonstrating the safety of Neurontin in off-label populations to whom the company had notice were using Neurontin; (2) it demonstrates Defendants' negligence in knowingly and recklessly promoting Neurontin to off-label populations without performing the adequate pharmacovigilance to ascertain whether Neurontin was safe for such uses; (3) the evidence will serve as Plaintiff's defense to Defendants' affirmative defense of the learned intermediary rule; and (4) the probative value of the evidence at issue greatly outweighs any potential unfair prejudice to Defendants.

## PRELIMINARY STATEMENT

Defendants certainly would like to see any evidence or mention of Dr. Ross swept right under a rug — Dr. Ross is a stark example of Defendants' reckless, insidious and intentional plan to market and promote Neurontin for off-label uses, contrary to FDA prohibitions, while at the same time suppressing information of suicide-related events regarding the ingestion of Neurontin. Moreover, mention of Dr. Ross is extremely relevant and in fact, crucial to Plaintiff's ability to oppose Defendants' learned intermediary defense. Dr. Wilfred Hynes prescribed Neurontin to Plaintiff's decedent, Hartley Shearer, during his October 2000 hospitalization at Brigham and Women's Hospital in Massachusetts for pain from lumbar spasm after his stroke. *See* Declaration of Andrew G. Finkelstein, Ex. D at 40:18-43:11. Unfortunately for Mr. Shearer, Dr. Hynes was supervised and relied upon the advice of a key opinion leader for Pfizer who even participated in clinical trial research for Pfizer, his attending physician, Dr. Ross.[1] As noted in testimony cited below, Dr. Ross influenced Dr. Hynes' prescribing of Neurontin for off-label unapproved uses for pain, and Dr. Ross never disclosed critical information concerning the fact that Neurontin was associated with adverse mood and behavior changes that lead to suicide.

## FACTUAL BACKGROUND

Dr. Hynes' decision to prescribe Neurontin to treat neuropathic pain — an unapproved use — was based upon the information received from attending physicians during his training. Finkelstein Decl., Ex. D at 39:14-40:1. Dr. Hynes testified that Dr. Ross was his supervising

---

[1] In light of the fact that Defendants have strategically raised this issue of Dr. Ross in a motion *in limine* in order to flush out Plaintiff's evidence presentation prior to trial, Plaintiff has been forced to disclose documents intended for cross-examination. Consequently, on February 25, 2010, Plaintiff amended her exhibit list with the very documents included as exhibits to Plaintiff's' opposition to Defendants' motion *in limine*. Finkelstein Decl., Ex. A (Edgar Ross was at one point a clinical investigator who participated for Defendants in their peripheral neuropathy trial back in approximately 1996; in fact he was principal investigator; *see* Finkelstein Decl., Ex. B); *see also* Finkelstein Decl., Ex. C (Defendants refer to Dr. Ross in 2001 as one of their "key US advisors/investigators" regarding both Neurontin and Lyrica (pregabalin)).

physician during the time he prescribed Neurontin to Hartley Shearer. Dr. Hynes relied upon Dr. Ross for prescribing information while he was a fellow, and at some point the two of them discussed Neurontin; Dr. Ross did not disclose that Neurontin could cause suicidal behavior in patients:

> Q. Back during the time frame before 2000, when you prescribed Neurontin to Mr. Shearer, who, if anyone, was your supervising physician?
>
> A. The director of pain management center was Dr. Edgar Ross, R-O-S-S.
>
> Q. Did Dr. Ross ever disclose to you whether or not Neurontin could cause suicidal behavior in people using it?
>
> MR. BARNES: Objection. Lack of foundation, lack of evidence. Go ahead.
>
> A. I do not believe so.
>
> Q. Did Dr. Ross -- well, did you consider Dr. Ross to be someone upon whom you relied for medical information?
>
> A. Yes.
>
> Q. Did you consider Dr. Ross to be a valuable source of information regarding the drugs you were considering prescribing to patients?
>
> A. Yes.
>
> Q. Did Dr. Ross provide you information with respect to Neurontin?
>
> MR. BARNES: Objection
>
> A. I'm sure in the time period that we would have at some point discussed Neurontin. He was my attending when I was a fellow.

Finkelstein Decl., Ex. D at 125:19-126:21.

Dr. Hynes was aware the Dr. Ross was paid by Defendants Warner-Lambert or Parke-Davis to lecture, and he attended a lecture by Dr. Ross where he advocated prescribing Neurontin for the off-label use of neuropathic pain, the condition for which it was prescribed to Hartley Shearer.

Q. In terms of time frame, being from the point up to Mr. Shearer's death -- let me withdraw the question. I'm so sorry. Referencing your attention to the time up to the point where you prescribed Neurontin to Mr. Shearer in October of 2000, and any time in that time frame, did Dr. Ross disclose to you that he was a speaker for Warner-Lambert or Parke-Davis?

MR. BARNES: Objection.

A. Yes.

Q. Okay. What did he explain that that meant, if anything?

A. He was paid by the company to give lectures on the use of Neurontin.

Q. Now, did he ever give a lecture in your presence on the use of Neurontin before you prescribed Neurontin to Mr. Shearer?

MR. BARNES: Objection.

A. I'm sure he did when I was a fellow.

Q. And did he discuss Neurontin's use for neuropathic pain?

MR. BARNES: Objection.

A. Sure.

Finkelstein Decl., Ex. D at 127:7-128:6.

Prior to prescribing Neurontin to Hartley Shearer, Dr. Hynes attended approximately six lectures of Dr. Ross regarding Neurontin where Dr. Ross failed to disclose any risk of suicidal behavior with the ingestion of Neurontin.

Q. Any of the -- how many times did you attend any lectures provided by Dr. Ross, Edgar Ross, regarding Neurontin up to the point that you had prescribed Neurontin to   Mr. Shearer?

MR. BARNES: Objection.

A. I don't know exactly, but maybe half a dozen.

Q. On any of those occasions, did -- did he disclose any risk of suicidal behavior with Neurontin?

MR. BARNES: Objection.

I don't believe so.

Finkelstein Decl., Ex. D at 128:7-19.

Dr. Hynes admitted that his prescribing practices for Neurontin had to be influenced by the lectures given by Dr. Ross regarding Neurontin and provided the basis for Dr. Hynes prescribing Neurontin to Hartley Shearer:

> Q. Was the information that you learned from attending the lectures given by Dr. Ross part -- or serve as part of a basis for your prescribing Neurontin to your own patients?
>
> MR. BARNES: Objection.
>
> A. I would say most of my prescribing Neurontin to patients was formed during my fellowship year.
>
> Q. When you say "most of it", that leaves open part of it. So my question is -- let me ask it again then.
>
> A. Okay.
>
> Q. Did Dr. Ross' lectures regarding Neurontin, which were given before you prescribed Neurontin to Mr. Shearer, provide, at least in part, a basis for your prescription of Neurontin to Mr. Shearer?
>
> MR. BARNES: Objection.
>
> In 2000?
>
> MR. FROMSON: Yes.
>
> A. I don't know how much -- again, how ingrained my prescribing pattern was at that point. Granted, I was a young attending, so it's clear that my director, you know, was someone I looked up to and listened to. So I can't imagine that it would not have influenced me.

Finkelstein Decl., Ex. D at 129:15-130:17.

Dr. Ross' longstanding involvement and financial ties to Defendants and their promotion of Neurontin for off-label unapproved uses is well documented. Defendant Parke-Davis

5

provided money to sponsor dinner meetings on off-label uses (neuropathic pain) where Dr. Ross was a speaker. Finkelstein Decl., Ex. E. There is documentary evidence of a 2002 Falon Medica (3rd party vendor) collaboration with Pfizer for a publication plan on off-label uses, including Neuropathic Pain, in which Dr. Ross was being utilized. Finkelstein Decl., Ex. F. Dr. Ross' curriculum vitae demonstrates that his primary involvement was in the treatment of pain, an off-label unapproved use. Finkelstein Decl., Ex. G. Moreover, Dr. Ross was a principal investigator for Defendant Parke-Davis in 1996. Finkelstein Decl., Ex. B. Dr. Ross also spoke on behalf of Parke-Davis regarding neuropathic pain in 1999, prior to the time that Dr. Hynes prescribed Neurontin to Hartley Shearer. Finkelstein Decl., Ex. H. Dr. Ross attended a Pfizer MAP-PM advisory board for marketing meeting in 2002. Finkelstein Decl., Ex. I. Defendant Pfizer funded an August 2000 publication in which Dr. Ross discussed neuropathic pain. Finkelstein Decl., Ex. J. Further, the extent of Dr. Ross' involvement in the illegal marketing scheme of Pfizer for the off-label use of Neurontin for unapproved uses is exemplified by the fact that Dr. Ross was a member of the Neurobehavioral Working Group, which was supported by money from Parke-Davis, whose stated purpose by Parke-Davis was to disseminate "emerging use" information and "infuse the market" with medical education on not only epilepsy, but on pain and psychiatry uses. Finkelstein Decl., Ex. K. Additionally, Defendants were in possession of a manuscript of Dr. Ross regarding uses of anticonvulsants for pain management, presumably to review/revise as necessary. Finkelstein Decl., Ex. L.

## ARGUMENT

## POINT I

### EVIDENCE OF DR. ROSS' LONGSTANDING FINANCIAL TIES TO DEFENDANTS AND HIS PROMOTION OF NEURONTIN FOR OFF-LABEL UNAPPROVED USES IS RELEVANT TO PLAINTIFF'S FAILURE-TO-WARN CLAIMS AND DEMONSTRATES DEFENDANTS' INTENT TO FRAUDULENTLY CONCEAL THE RISKS OF ADVERSE MOOD AND BEHAVIOR CHANGES AND SUICIDALITY FROM INGESTION OF NEURONTIN

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Moore's Fed. Rules Pamphlet 2009, Fed. R. Evid. 401. *See* ECF Doc. # 1790 at 33. To be admissible, evidence must be relevant. Fed. R. Evid. 401; *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252 (1st Cir. 1998). Further, the Federal Rules of Evidence provide that "relevant evidence <u>may</u> be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added). Plaintiff alleges that making mention of, or reference to Dr. Ross or utilizing documentary evidence regarding Dr. Ross will serve to prove Defendants' breach of duty, negligence and their intentional disregard for the safety of off-label users of Neurontin. *See Flebotte v. Dow Jones & Co. Inc.*, Civil Action No. 97-30117-FHF, 2001 U.S. Dist. LEXIS 1525, at *5 (D. Mass. Jan. 24, 2001). The court remarked that the admission of any relevant evidence "carries a danger of prejudice." *Id.* at *4. The First Circuit has held that "the admitted evidence must not only be prejudicial, but be unfairly prejudicial, and not only outweigh relevance but substantially outweigh relevance." *United States v. Rivera*, 83 F.3d 542, 545 (1st Cir, 1996). The First Circuit also stated that "where the reviewing court finds the

7

balancing close, Rule 403 tilts the balance in favor of admission." *Id.* It strains credulity that Defendants are moving to preclude any mention or reference to Dr. Ross, who was at the forefront of the first line of physician-to-physician promotion, and part and parcel of Defendants' strategy to nationally market Neurontin off-label for unapproved uses. In this case, there is direct evidence that one of Defendants' "Key Opinion Leaders" influenced Hartley Shearer's physician, Dr. Hynes, to prescribe Neurontin to him off-label for treatment of his pain from lumbar spasm, an unapproved use.

Judge Patti B. Saris, in her May 26, 2009 Order, succinctly described the heightened duty to warn that a pharmaceutical manufacturer bears when it engages in off-label marketing of a drug:

> Based on the reasoning of this caselaw, the Court concludes that a manufacturer of a pharmaceutical has a duty to disclose to physicians and patients material facts about the risks of the drug, <u>particularly when it is engaged in off-label marketing</u> for uses not approved by the FDA, if it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts.

ECF Doc. # 1790 at 25 (emphasis added).

The manufacturer's <u>knowledge</u> of off-label use with its drug is inextricably intertwined with a manufacturer's duty to disclose material facts about risks with the drug. While off-label prescribing by physicians is not itself improper, a manufacturer with knowledge of both extensive off-label use and material facts about risks inherent with taking the drug (e.g., depression and suicide), has a duty to take action. Evidence that Dr. Ross, one of Defendants' Key Opinion Leaders, failed to disclosed, fraudulently concealed or suppressed the fact that ingestion of Neurontin may cause adverse mood and behavior changes and increase the risk for suicide is relevant and material to Plaintiff's claim that Defendants' breached their duty of care to warn of such risks. As noted *supra,* Defendants were aware that Dr. Ross was promoting

8

Neurontin; indeed, Defendants knew Dr. Ross was a member of the Neurobehavioral Working Group, which was supported by money from Parke-Davis, whose stated purpose by Parke-Davis was to disseminate "emerging use" information and "infuse the market" with medical education on not only epilepsy, but on pain and psychiatry uses. Finkelstein Decl., Ex. L. Making mention and reference to, and admission of documentary evidence concerning Dr. Ross, is crucial to Plaintiff's claim that Defendants failed to warn Hartley Shearer's physicians of the increased risk for suicide from the ingestion of Neurontin. Dr. Hynes spoke with Dr. Ross concerning Neurontin, attended Dr. Ross' lectures regarding Neurontin, and relied on information he received from Dr. Ross concerning prescribing Neurontin for off-label uses for pain. Dr. Hynes stated that the information that Dr. Ross provided regarding Neurontin influenced his prescribing of Neurontin to Mr. Shearer. Dr. Hynes also stated that Dr. Ross did not advise him that the ingestion of Neurontin could increase the risk for suicide. Clearly, Defendants, through one their "Key Opinion Leaders" failed in their duty to warn Dr. Hynes, who was Mr. Shearer's prescribing physician. There can be no clearer chain of evidence regarding Defendants' failure in their duty to warn and their intent to fraudulently conceal adverse mood and behavior changes and the increased risk for suicide from the ingestion of Neurontin.

## POINT II

### DR. ROSS IS RELEVANT AND MATERIAL TO PLAINTIFF'S REBUTTAL TO DEFENDANTS' AFFIRMATIVE DEFENSE OF THE LEARNED INTERMEDIARY RULE

Defendants alleged in their motion for summary judgment that Plaintiff's claims must fail due to the learned intermediary rule. ECF Doc. # 2457, at pp. 2, 9. Due to the fact that Hartley Shearer's prescribing physician relied upon the information received from Dr. Ross, *supra,* that

reference to Dr. Ross is not only relevant and material to this case, but is of great import to defeat Defendants' learned intermediary defense.

Dr. Hynes stated that if he had knowledge that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. Finkelstein Decl., Ex. D at 140:13-20 Dr. Hynes stated that had he known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. Finkelstein Decl., Ex. D at 140:21-25; 141:1-4. Moreover, Dr. Hynes would have wanted to know abut the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. Finkelstein Decl., Ex. D at 189:16-25; 190:1-23. Further, Dr. Hynes testified that if he had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. Finkelstein Decl., Ex. D at 190:24-25; 191:1-14. Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin. Finkelstein Decl., Ex. D at 179:3-7. As noted in depth *supra*, Plaintiff alleges that Defendants, through one of their "Key Opinion Leaders," Dr. Ross, suppressed or fraudulently concealed information concerning the risks of adverse mood and behavior changes and the increased risk for suicide from the ingestion of Neurontin. Dr. Ross is an integral part of this case and Plaintiff will suffer extreme prejudice if she is precluded from mentioning Dr. Ross. Any evidence that is admitted may inure some prejudice to one side or the other — but in this case, mention of Dr. Ross or documentary evidence concerning Dr. Ross does not unfairly prejudice Defendants and definitely does not substantially outweigh its relevance to Plaintiff's claims.

Plaintiff respectfully requests that this Court deny Defendant's motion *in limine* to exclude any evidence concerning or reference to Dr. Ross.

Dated: March 8, 2010                                  Respectfully submitted,

By: /s/ W. Mark Lanier
W. Mark Lanier, Esquire
THE LANIER LAW FIRM, P.L.L.C.
126 East 56th Street, 6th Floor
New York, NY 10022

By: /s/ Andrew G. Finkelstein
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY 12551

*Attorneys for Plaintiff Linda B. Shearer*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 8, 2010.

/s/ Andrew G. Finkelstein
Andrew G. Finkelstein, Esquire