EXHIBIT D

1

```
                              VOLUME:        I
                              PAGES:      1-199
                              EXHIBITS:    1-10


            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS


IN RE:   NEURONTIN            ) MDL DOCKET
MARKETING, SALES PRACTICES    ) NO. 1629
AND PRODUCTS LIABILITY        ) MASTER FILE
LITIGATION                    ) NO.  04-10981
_____)
                              )
THIS DOCUMENT RELATES TO:     ) JUDGE PATTI
                              ) B. SARIS
SHEARER VS. PFIZER, ET AL;    ) MAGISTRATE
1:07-CV-11428-PBS             ) JUDGE LEO T.
                              ) SOROKIN
                              )
```

VIDEOTAPED DEPOSITION OF

WILFRED HYNES, M.D., a witness called on

behalf of the Plaintiff, pursuant to the

provisions of the Federal Rules of Civil

Procedure, before Jill Shepherd, Registered

Professional Reporter, CSR, CLR and Notary

Public, in and for the Commonwealth of

Massachusetts, at the Tufts Medical Center,

800 Washington Street, Boston,

Massachusetts, on Tuesday, November 13,

2009, commencing at 12:08 p.m.

Job No: 226411

1            What sort of information --
2   A.   My prior experience.
3   Q.   Was that the predominant --
4   A.   Yes.
5   Q.   Why is that?
6   A.   I found it to be effective for neuropathic
7        pain.
8   Q.   Did you begin using Neurontin during your
9        fellowship?
10  A.   Yes.
11  Q.   And you just carried it forward in your
12       private practice?
13  A.   That's correct.
14  Q.   In your training, did you have any -- I
15       think you already answered, but in your
16       training, your decision to use Neurontin was
17       basically based upon the information you
18       received from your colleagues here in
19       Boston?
20  A.   The attending physicians, yes.
21  Q.   And they were generally satisfied with
22       Neurontin to treat neuropathic pain?
23              MR. FROMSON:  Objection.  Hold on.
24       Objection.  Form.
25              You can answer.

1   A.   Yes.
2   Q.   What was their experience with Neurontin for
3        the treatment of neuropathic pain during
4        your fellowship?
5             MR. FROMSON:  Objection.  Form.
6   Q.   You may answer.
7   A.   Predominant feeling was that it was
8        effective for neuropathic pain.
9   Q.   And that was your experience as well?
10  A.   Yes.
11  Q.   I have marked as an example -- you have it
12       in front of you -- Exhibit 2.  I've given it
13       to counsel.
14            Exhibit 2, for the record, is the
15       records from Brigham and Women's from
16       October 2000 for Mr. Shearer.
17  A.   Okay.
18  Q.   You've had a brief moment prior to the
19       deposition.
20            Let me ask you this again:  Other than
21       spending a moment prior to the deposition,
22       have you had a chance to familiarize
23       yourself with the records for Mr. Shearer
24       from his hospitalization at Brigham and
25       Women's Hospital in 2000?

41

1   A.   No.
2   Q.   We'll take our time and go through them.
3        First of all, would you turn to Exhibit 2,
4        and it's the -- it's at Bates number 410 and
5        411, and it's a consult note.
6             Do you know Dr. Britton,
7        B-R-I-T-T-O-N?  He requested a consult.
8   A.   No.
9   Q.   Okay.
10            Looking at the top of page 410, it's a
11       request to APS.
12            What is "APS"?
13  A.   Acute Pain Service.
14  Q.   And that would be you?
15  A.   Yes.
16  Q.   In fact, that was the name of the service,
17       correct?
18  A.   Yeah.
19  Q.   But also treated chronic pain forms,
20       correct?
21  A.   That's correct.
22  Q.   Okay.  And there was a diagnosis number one.
23            What was the diagnosis number one?
24  A.   Status post-mitral valve repair, status
25       post-stroke.

1  Q.  And then diagnosis number two was?
2  A.  Lumbar spasm.
3  Q.  Okay.
4      Is that your handwriting, or is this
5      your resident's handwriting?
6  A.  That's a resident's.
7  Q.  Would you have been present because you
8      signed the note on page 411?
9  A.  For the full history physical? No.
10 Q.  In terms of just reviewing it and signing
11     off on it?
12 A.  Yes.
13 Q.  Okay.
14     So in ordinary practice, at the time
15     this note was created, you would have
16     reviewed the note written by the resident
17     and would have personally seen the patient
18     as well?
19 A.  Yes.
20 Q.  You have to speak up.
21 A.  Yes.
22 Q.  Okay.
23     Let's go through the history and
24     physical on October 14th that was obtained
25     by your resident under your supervision.

1         Would you read that into the record,
2    please, the HPI?
3　A.　Read the whole thing?
4　Q.　Yes, please.
5　A.　"55-year-old male with history of
6    hypertension, myxomatous mitral valve
7    leaflets, status post mitral valve repair
8    consistent with right hemisphere stroke in
9    1/1999 presented to North Adams Regional
10   Hospital with lumbar and right lower
11   extremity spasms, pain is 9/00 [sic]."
12　Q.　Pain in September of 2000.
13　A.　Okay.
14　Q.　Continue.
15　A.　Okay.  That was -- okay.
16        "Over there, patient was treated with
17   morphine sulfate and Celebrex, but there was
18   not significant improvement.  He is
19   therefore transferred to Brigham and Women's
20   Hospital this morning for further workup and
21   treatment.  Patient states that the spasm
22   mainly from low back and sometimes radiating
23   down the right leg.  Occasionally up to the
24   right arm.  Spasm pain is shooting, sharping
25   [sic], total body movement related, relieved

125

1       MR. BARNES:  Objection.
2  Q.   Let me withdraw the question.  I want to
3       make sure it's clear.  We have to preserve
4       our record.
5            Back in the '98 or '99 time frame, did
6       sales representatives from Parke-Davis
7       Warner-Lambert come to you and provide you
8       with samples of Neurontin?
9            MR. BARNES:  Objection.
10 A.   I know we had samples in the pain center
11      that were provided by representatives that
12      were held in a locked cabinet we had to sign
13      out.  The exact year that that practice
14      started, I couldn't honestly tell you.  But,
15      you know, I do recall that.  I just don't
16      know when exactly.  If it was there from the
17      very beginning, I honestly couldn't tell you
18      that.
19 Q.   Back during the time frame before 2000, when
20      you prescribed Neurontin to Mr. Shearer,
21      who, if anyone, was your supervising
22      physician?
23 A.   The director of pain management center was
24      Dr. Edgar Ross, R-O-S-S.
25 Q.   Did Dr. Ross ever disclose to you whether or

126

1      not Neurontin could cause suicidal behavior
2      in people using it?
3          MR. BARNES: Objection. Lack of
4      foundation, lack of evidence.
5         Go ahead.
6 A. I do not believe so.
7 Q. Did Dr. Ross -- well, did you consider
8      Dr. Ross to be someone upon whom you relied
9      for medical information?
10 A. Yes.
11 Q. Did you consider Dr. Ross to be a valuable
12     source of information regarding the drugs
13     you were considering prescribing to
14     patients?
15 A. Yes.
16 Q. Did Dr. Ross provide you information with
17     respect to Neurontin?
18         MR. BARNES: Objection.
19 A. I'm sure in the time period that we would
20     have at some point discussed Neurontin. He
21     was my attending when I was a fellow.
22 Q. Did he ever disclose to you any
23     relationships, business relationships, that
24     he had with Parke-Davis Warner-Lambert
25     regarding Neurontin?

1        MR. BARNES:  Objection.  Lack of
2    foundation, assumes facts not in evidence,
3    relevance.
4  A. I can answer?
5  Q. You can answer.
6  A. Yes, he was a speaker.
7  Q. In terms of time frame, being from the point
8    up to Mr. Shearer's death -- let me withdraw
9    the question.  I'm so sorry.
10       Referencing your attention to the time
11   up to the point where you prescribed
12   Neurontin to Mr. Shearer in October of 2000,
13   and any time in that time frame, did
14   Dr. Ross disclose to you that he was a
15   speaker for Warner-Lambert or Parke-Davis?
16       MR. BARNES:  Objection.
17 A. Yes.
18 Q. Okay.
19       What did he explain that that meant,
20   if anything?
21 A. He was paid by the company to give lectures
22   on the use of Neurontin.
23 Q. Now, did he ever give a lecture in your
24   presence on the use of Neurontin before you
25   prescribed Neurontin to Mr. Shearer?

1                MR. BARNES:  Objection.
2  A.   I'm sure he did when I was a fellow.
3  Q.   And did he discuss Neurontin's use for
4       neuropathic pain?
5                MR. BARNES:  Objection.
6  A.   Sure.
7  Q.   Any of the -- how many times did you attend
8       any lectures provided by Dr. Ross, Edgar
9       Ross, regarding Neurontin up to the point
10      that you had prescribed Neurontin to
11      Mr. Shearer?
12               MR. BARNES:  Objection.
13 A.   I don't know exactly, but maybe half a
14      dozen.
15 Q.   On any of those occasions, did -- did he
16      disclose any risk of suicidal behavior with
17      Neurontin?
18               MR. BARNES:  Objection.
19 A.   I don't believe so.
20 Q.   How many people attended these lectures in
21      general?
22 A.   It varied with the lectures for the
23      residents and fellows.  It would probably be
24      12, 12 people.  Other venues, maybe 15 to
25      20.  I can't speak to others that he gave

1   that I wasn't in attendance.
2   Q. On any of the occasions that you attended
3      lectures provided by Dr. Ross during which
4      time Neurontin was discussed, did he provide
5      any handouts or materials?
6          MR. BARNES: Objection.
7   A. I'm not sure. It's possible.
8   Q. In terms of these lectures that you attended
9      given by Dr. Ross, and during which time
10     Neurontin was discussed, did you find these
11     lectures to be informative in terms of your
12     prescribing practices for Neurontin?
13         MR. BARNES: Objection.
14  A. Yeah.
15  Q. Was the information that you learned from
16     attending the lectures given by Dr. Ross
17     part -- or serve as part of a basis for your
18     prescribing Neurontin to your own patients?
19         MR. BARNES: Objection.
20  A. I would say most of my prescribing Neurontin
21     to patients was formed during my fellowship
22     year.
23  Q. When you say most of it, that leaves open
24     part of it.
25         So my question is -- let me ask it

1   again then.
2  A.  Okay.
3  Q.  Did Dr. Ross' lectures regarding Neurontin,
4      which were given before you prescribed
5      Neurontin to Mr. Shearer, provide, at least
6      in part, a basis for your prescription of
7      Neurontin to Mr. Shearer?
8          MR. BARNES:  Objection.
9          In 2000?
10         MR. FROMSON:  Yes.
11 A.  I don't know how much -- again, how
12     ingrained my prescribing pattern was at that
13     point.  Granted, I was a young attending, so
14     it's clear that my director, you know, was
15     someone I looked up to and listened to.  So
16     I can't imagine that it would not have
17     influenced me.
18 Q.  After 2002, having nothing to do with your
19     prescription to Mr. Shearer, were you
20     contacted by sales representatives from
21     Pfizer regarding Neurontin?
22 A.  I believe so.
23 Q.  And did there come a point where you went to
24     a speaker training meeting in New York?
25 A.  Yes.

1     capacity for Neurontin to contribute to
2     suicidal behavior?
3          MR. BARNES: Objection. Assumes
4     facts not in evidence.
5 A. I guess I'm not sure that it was common
6     knowledge at that time.
7 Q. My question, however, is: Did you speak to
8     Mr. Shearer about whether Neurontin had the
9     capacity to increase suicidal behavior when
10     Neurontin was prescribed to him?
11          MR. BARNES: Objection.
12 A. Probably unlikely.
13 Q. In hindsight, this is a hypothetical
14     question, Doctor, if you did have knowledge
15     that Neurontin increased the risk of
16     suicidal behavior in patients taking
17     Neurontin, would you have shared that
18     information with Mr. Shearer?
19          MR. BARNES: Objection.
20 A. Yes.
21 Q. If you had known -- again, in hindsight,
22     that is hypothetical -- if at the time the
23     Neurontin was being prescribed to
24     Mr. Shearer, if you knew Neurontin had the
25     capacity to increase the risk of suicidal

1      behavior, would you have considered
2      alternatives to Neurontin?
3           MR. BARNES:  Objection.
4  A.  Considered?  Sure.
5  Q.  Okay.  Mr. Barnes asked you about a number
6      of different types of regimens that could
7      have considered, or maybe even were
8      considered.
9           Can you tell us what alternatives were
10     available to you back in October of 2000 if
11     you would have considered them in light of a
12     then known suicide risk with Neurontin?
13          MR. BARNES:  Objection.
14 A.  Certainly other anticonvulsants.
15 Q.  If, at the time Neurontin was being
16     prescribed to Mr. Shearer, you had knowledge
17     that Neurontin had the capacity to
18     contribute or cause suicidal behavior, would
19     you have informed Mr. Shearer's caregiver or
20     family about that fact?
21          MR. BARNES:  Objection.
22 A.  I'm not sure if I would have the opportunity
23     to do that or not.
24 Q.  To the extent that the package insert --
25     withdrawn.

1           MR. FROMSON:  Objection.
2  A.   Correct.
3  Q.   Today do you advise patients that -- of the
4       latest information concerning the class
5       labeling for suicidal behavior or ideation
6       when you prescribe Neurontin?
7  A.   Yes.
8  Q.   Do you -- okay.
9            And what do you tell them?
10 A.   I'm uncomfortable with this line of
11      questioning.  I don't think what I do now is
12      relevant.
13 Q.   Okay.
14 A.   I mean, it's -- I don't have an attorney
15      with me.  But, you know, this is if --
16           MR. BARNES:  Off the record for a
17      minute.
18           THE VIDEOGRAPHER:  The time is
19      3:39, and we're off the record.
20                (Short recess.)
21           THE VIDEOGRAPHER:  The time is
22      3:56, and we're on the record.
23 Q.   Dr. Hynes, following up on some of
24      Mr. Fromson's questions, was it your --
25      based upon what you reviewed today of the

1           When you were prescribing for
2   Mr. Shearer in 2000, is it your testimony
3   that the basis for your approving the
4   prescription by the resident was your own
5   clinical experience -- favorable clinical
6   experience with Neurontin for the treatment
7   of neuropathic pain conditions?
8           MR. FROMSON:  Objection.  Asked and
9   answered, form.
10  A.  I can only assume that, again, looking at
11  the notes, that that's how I thought.
12          MR. BARNES:  No further questions.
13  Thank you.
14              *  *  *  *  *
15          EXAMINATION BY MR. FROMSON
16  Q.  I'd like to assume the following:  That back
17  in 1992, when the drug was going through its
18  approval process for the epilepsy
19  indication, and the FDA did a review of the
20  clinical trials, safety, and the risks that
21  were -- about Neurontin, and that the FDA
22  clinical reviewer in '92 made the following
23  statement:  "Less common, but more serious,
24  events may limit the drugs widespread
25  usefulness, depression, while it may not be

1  an infrequent occurrence in the epileptic
2  population may become worse and require
3  intervention or lead to suicide and has
4  resulted in some suicidal attempts."
5      I'd ask you to assume that that is
6  evidence in this case at the time of trial.
7      Assuming that is true, did you know
8  that when you were prescribing the drug to
9  Mr. Shearer?
10         MR. BARNES: Objection.
11 A. That?  No.
12 Q. Would you have wanted to know that
13  information about the FDA clinical review
14  and the FDA clinical reviewer's position on
15  the safety of Neurontin with respect to
16  depression and suicide when you were
17  prescribing the drug to Mr. Shearer?
18         MR. BARNES: Objection.  Incomplete
19  evidence and beyond the scope of my
20  examination and irrelevant.
21      You may answer.
22 A. I certainly would want to know as much as I
23  could about any drug.
24 Q. And in particular, if you were using a drug
25  off label, and you knew that the drug had

191

1  not been approved for the indication you
2  were prescribing it, but there was a
3  potential risk of depression and suicide
4  attempt with that drug, is it fair to say
5  that you would have wanted to know that?
6      MR. BARNES: Objection. Assumes
7  facts not in evidence.
8      You may answer the question.
9  A. Yes.
10 Q. Because knowing it could have affected your
11 prescribing practice for Neurontin back in
12 2000? Would you agree with that?
13     MR. BARNES: Objection.
14 A. Hypothetically, yes.
15 Q. Thank you.
16     MR. BARNES: I have to ask some
17 more questions. Take a short break.
18     THE VIDEOGRAPHER: The time is
19 4:07, and we're off the record.
20     (Short recess.)
21     (Dr. Egilman not present.)
22     THE VIDEOGRAPHER: The time is
23 4:11, and this is the beginning of tape
24 three in the deposition of Wilfred Hynes,
25 M.D., and we're back on the record.