# EXHIBIT A

```
                                                                    Page 1
 1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4    IN RE:                                   )
                                               ) CA No. 04-10981-PBS
 5    NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 107
      AND PRODUCTS LIABILITY LITIGATION        )
 6
 7
 8
 9              FINAL PRETRIAL CONFERENCE - DAY ONE
10              BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE
11
12
13
14
                                     United States District Court
15                                   1 Courthouse Way, Courtroom 19
                                     Boston, Massachusetts
16                                   July 20, 2009, 9:15 a.m.
17
18
19
20
21
22
                             LEE A. MARZILLI
23                        OFFICIAL COURT REPORTER
                         United States District Court
24                       1 Courthouse Way, Room 7200
                             Boston, MA  02210
25                             (617)345-6787
```

Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
       ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4  and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
       KENNETH S. SOH, ESQ. and DARA GRISBEE HEGAR, ESQ.,
6  The Lanier Law Firm, 126 East 56th Street, 6th Floor,
   New York, New York, 10022.
7
8  FOR THE DEFENDANTS:
9      DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
   100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
10
       KATHRINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
11 Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
   Square, New York, New York, 10036.
12
       WILLIAM S. OHLEMEYER, ESQ., Boies, Schiller & Flexner,
13 575 Lexington Avenue, 7th Floor, New York, New York, 10022.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           PROCEEDINGS
2       THE CLERK:  In Re:  Neurontin Marketing, Sales
3  Practices, and Products Liability Litigation, Civil Action
4  No. 04-10981, will now be heard before this Court.  Will
5  counsel please identify themselves for the record.
6       MR. FINKELSTEIN:  Good morning, your Honor.
7  Andrew Finkelstein, Finkelstein & Partners, on behalf of
8  Dr. Egilman.
9       MR. FROMSON:  Good morning, your Honor.  Kenneth
10 Fromson, Finkelstein & Partners.
11      MR. ALTMAN:  Good morning, your Honor.  Keith
12 Altman, Finkelstein & Partners.
13      MS. ARMSTRONG:  Good morning, your Honor.
14 Katherine Armstrong from Skadden Arps.
15      MR. CHEFFO:  Good morning, your Honor.  Mark
16 Cheffo from Skadden Arps.
17      MR. OHLEMEYER:  Good morning, Judge.  Bill
18 Ohlemeyer, Boise Schiller.
19      MR. GOODELL:  Good morning, your Honor.  Charlie
20 Goodell, Goodell DeVries.
21      THE COURT:  You're representing?
22      MR. GOODELL:  Pfizer.
23      MR. CHEFFO:  Good morning, your Honor.  Rick
24 Barnes for Pfizer as well, Goodell DeVries in Baltimore.
25      MR. CHAFFIN:  Good morning, your Honor.  David

Page 4

1  Chaffin.
2       MR. SOH:  Ken Soh for the plaintiffs, your Honor.
3       MS. HEGAR:  Dara Hegar, Lanier Law Firm.
4       THE COURT:  Are you all going to be here next
5  week?  That's huge.  All right.
6       So we start with basics.  Next Monday we will be
7  impaneling a jury.  The one thing I probably didn't tell you
8  is, to make matters more complicated, I am sitting with the
9  First Circuit by designation for four cases in the morning.
10 And so I'm not sure a hundred percent when that's going to
11 finish, and what I'm thinking of doing is asking the jury
12 clerk to bring in a group of people for a 2:00 o'clock
13 impanelment.  That might be just as easy for you all, it's a
14 Monday morning, rather than just having all the jurors
15 sitting downstairs stewing and annoyed until I'm done with
16 the First Circuit.  So they will have eaten lunch.  We will
17 impanel.  I do not expect that it should take longer than
18 three hours, but what it essentially does mean is that you
19 need to block off your afternoon.  So that's for starters.
20      The second thing is, I was thinking -- I saw
21 somewhere on the list -- you were possibly on the same page
22 with me -- of ten jurors.  Given the fact that we were going
23 into three weeks, I could possibly lose some.  So if that's
24 so, it's essentially five peremptories a side.  The way I do
25 things is, there are no back challenges.  So I'll first ask

Page 5

1  plaintiffs to exercise their challenges, then defendants.
2  We'll strike people.  We'll put people in the box for those
3  empty seats.  The next time around defendants go first.  The
4  defendants will challenge, then plaintiffs will challenge,
5  and so on until you use up your peremptories.  But I don't
6  let you go back.  In other words, if you've already passed
7  on a juror, you're stuck with the juror.
8       Because it's vacation time, I wanted to play out a
9  procedure for you.  One of the things that annoys me no end,
10 but there seems to be no clear solution, is when I get my
11 pool of 50 jurors and half of them say, "I don't want to
12 serve because I'm going on vacation."  I was thinking of
13 giving the jury clerk essentially a questionnaire to be
14 filled in under oath so that we don't bring up jurors who
15 have already prepaid vacation plans.  I'm thinking about
16 that.  The problem is, it's too easy an out for people.
17 It's a three-week trial which would be hard for people
18 anyway.  So another way to do it is to simply ask for more
19 people, and then just have everybody who's got a vacation
20 plan come up and swear to me, and then just let them go.
21 Judge Gertner tried a technique which I really liked a lot,
22 which she had them fill it in under oath, a questionnaire
23 downstairs, and basically gave the -- I think brought up the
24 questionnaires, I okayed them so it was a judge's blessing,
25 and then we either sent them to another court or we

Page 54

1  2005, if the company received a report of completed suicide,
2  they sent it to the FDA saying that "This is an unlabeled
3  event, it's not in our label." But yet all of their experts
4  want to get up in front of the jury and say, "But it really
5  was in the label." The company --
6      THE COURT: It does say that, "suicidal." It says
7  "suicidal."
8      MR. ALTMAN: But from a regulatory perspective,
9  the company considered a completed suicide report to be
10 unlabeled. Their own records, there's a statement by the
11 company that suicide is an unlabeled event.
12     THE COURT: Can I say something? This is one of
13 these things where maybe you all put a lot of -- but when I
14 hear "suicidal" and when a jury hears it, they're going to
15 think that it means anything -- actually, I would have
16 thought it meant trying to commit suicide or committing it.
17 Now, if it doesn't, you've got to be careful how you word
18 this, but they're allowed to put in the package insert.
19     MR. ALTMAN: But if that were true, your Honor,
20 then why did they tell the FDA it's not in the label?
21     THE COURT: I don't know. Ask them that question.
22     MR. FROMSON: Your Honor, we're not saying they
23 can't utilize the package insert. They just can't say "We
24 warn for suicide" as the term is used in the industry. That
25 would be untrue.

Page 55

1      THE COURT: Just say "suicidal."
2      MS. ARMSTRONG: Your Honor, just to be clear, we
3  are not going to argue that the label in 2005 or in 2004
4  contained a warning for suicide. They are confusing
5  different components of the label to the warning section and
6  an adverse events section. Our experts are going to talk
7  about what was contained in the adverse events section,
8  which does include references to suicidal and suicidal
9  gesture; and they're going to explain why that was
10 appropriate in light of what was known at the time, what it
11 would mean to a reasonable physician. That's going to be
12 the type of testimony we present.
13     THE COURT: All right, fine.
14     Motion in limine to preclude any testimony or
15 discussion by defendants that they could not have amended
16 the Neurontin label or issued strengthened warnings without
17 prior FDA approval. That's just a legal argument.
18     MR. FROMSON: I don't really think there's a
19 disagreement. After having read their papers, they didn't
20 deny that there were federal regulations --
21     THE COURT: So allowed.
22     MR. FROMSON: Thank you, Judge.
23     THE COURT: Allowed.
24     MR. BARNES: Your Honor, if I may?
25     THE COURT: Yes, yes.

Page 56

1      MR. BARNES: We're not going to argue that we were
2  legally prohibited from putting in a CBE. We do want to
3  talk about, and it goes with what Katherine was saying, we
4  do want to talk about the whole context of what we did and
5  why we did it and why we did not feel it was appropriate.
6  We're not making a legal argument we couldn't have, but we
7  want to explain the context.
8      THE COURT: All right, that's got to be part of
9  your -- just as they're putting in all this marketing stuff,
10 you've got to be able to put in what the corporation was
11 thinking about.
12     MR. BARNES: Absolutely. Okay, thank you.
13     THE COURT: Fair enough.
14     Plaintiffs' motion in limine to preclude the
15 testimony of all the defendants' expert witnesses other than
16 Dr. Gibbons concerning the FDA alert and related FDA
17 subjects. I don't know --
18     MR. CHEFFO: I mean, I'm not sure I really
19 understand. I mean, I think that they say that because he
20 was somehow qualified, that no one else can refer to it? I
21 mean --
22     THE COURT: Well, let me put it this way: This is
23 denied, but to the extent it starts getting cumulative, you
24 don't have that much time. I mean, time is a fabulous
25 discipline.

Page 57

1      MR. CHEFFO: We don't disagree with that at all,
2  your Honor.
3      MR. FROMSON: Judge, very briefly -- and I
4  understand your order clearly -- they went out and got
5  Gibbons for the FDA alert because he was the only one in the
6  world uniquely qualified to do it.
7      THE COURT: You know, come on, that's just all
8  litigation posturing.
9      MR. FROMSON: Well, that's the way to posture to
10 the Court in order to get the Court to allow him to do the
11 rebuttal.
12     THE COURT: He's a statistician, just like
13 Greenland is. It's very hard stuff. So, I mean, he's the
14 only guy who's qualified, as far as I know, on statistics,
15 but there may be other aspects about the regulatory system
16 that other people can comment on.
17     MR. FROMSON: So then I think we're in agreement
18 that all the other experts couldn't come in and give
19 statistical opinion.
20     THE COURT: They can't give a statistical analysis
21 unless they're qualified.
22     MR. FROMSON: Thank you, Judge.
23     THE COURT: I mean, I don't think any --
24     MR. CHEFFO: But that's how this motion was. I
25 don't think we're going to have nonstatisticians talking,