# EXHIBIT B

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
2
3
4      IN RE:                              )
                                           ) CA No. 04-10981-PBS
5      NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 107
       AND PRODUCTS LIABILITY LITIGATION    )
6
7
8
9               FINAL PRETRIAL CONFERENCE - DAY ONE
10              BEFORE THE HONORABLE PATTI B. SARIS
                   UNITED STATES DISTRICT JUDGE
11
12
13
14
                           United States District Court
15                         1 Courthouse Way, Courtroom 19
                           Boston, Massachusetts
16                         July 20, 2009, 9:15 a.m.
17
18
19
20
21
22
                       LEE A. MARZILLI
23               OFFICIAL COURT REPORTER
                 United States District Court
24               1 Courthouse Way, Room 7200
                   Boston, MA  02210
25                    (617)345-6787

Page 2

1  A P P E A R A N C E S :
2
   FOR THE PLAINTIFFS:
3
      ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4  and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
      KENNETH S. SOH, ESQ. and DARA GRISBEE HEGAR, ESQ.,
6  The Lanier Law Firm, 126 East 56th Street, 6th Floor,
   New York, New York, 10022.
7
8  FOR THE DEFENDANTS:
9      DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
   100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
10
      KATHRINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
11 Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
   Square, New York, New York, 10036.
12
      WILLIAM S. OHLEMEYER, ESQ., Boies, Schiller & Flexner,
13 575 Lexington Avenue, 7th Floor, New York, New York, 10022.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           P R O C E E D I N G S
2       THE CLERK:  In Re:  Neurontin Marketing, Sales
3  Practices, and Products Liability Litigation, Civil Action
4  No. 04-10981, will now be heard before this Court.  Will
5  counsel please identify themselves for the record.
6       MR. FINKELSTEIN:  Good morning, your Honor.
7  Andrew Finkelstein, Finkelstein & Partners, on behalf of
8  Dr. Egilman.
9       MR. FROMSON:  Good morning, your Honor.  Kenneth
10 Fromson, Finkelstein & Partners.
11      MR. ALTMAN:  Good morning, your Honor.  Keith
12 Altman, Finkelstein & Partners.
13      MS. ARMSTRONG:  Good morning, your Honor.
14 Katherine Armstrong from Skadden Arps.
15      MR. CHEFFO:  Good morning, your Honor.  Mark
16 Cheffo from Skadden Arps.
17      MR. OHLEMEYER:  Good morning, Judge.  Bill
18 Ohlemeyer, Boise Schiller.
19      MR. GOODELL:  Good morning, your Honor.  Charlie
20 Goodell, Goodell DeVries.
21      THE COURT:  You're representing?
22      MR. GOODELL:  Pfizer.
23      MR. CHEFFO:  Good morning, your Honor.  Rick
24 Barnes for Pfizer as well, Goodell DeVries in Baltimore.
25      MR. CHAFFIN:  Good morning, your Honor.  David

Page 4

1  Chaffin.
2       MR. SOH:  Ken Soh for the plaintiffs, your Honor.
3       MS. HEGAR:  Dara Hegar, Lanier Law Firm.
4       THE COURT:  Are you all going to be here next
5  week?  That's huge.  All right.
6       So we start with basics.  Next Monday we will be
7  impaneling a jury.  The one thing I probably didn't tell you
8  is, to make matters more complicated, I am sitting with the
9  First Circuit by designation for four cases in the morning.
10 And so I'm not sure a hundred percent when that's going to
11 finish, and what I'm thinking of doing is asking the jury
12 clerk to bring in a group of people for a 2:00 o'clock
13 impanelment.  That might be just as easy for you all, it's a
14 Monday morning, rather than just having all the jurors
15 sitting downstairs stewing and annoyed until I'm done with
16 the First Circuit.  So they will have eaten lunch.  We will
17 impanel.  I do not expect that it should take longer than
18 three hours, but what it essentially does mean is that you
19 need to block off your afternoon.  So that's for starters.
20      The second thing is, I was thinking -- I saw
21 somewhere on the list -- you were possibly on the same page
22 with me -- of ten jurors.  Given the fact that we were going
23 into three weeks, I could possibly lose some.  So if that's
24 so, it's essentially five peremptories a side.  The way I do
25 things is, there are no back challenges.  So I'll first ask

Page 5

1  plaintiffs to exercise their challenges, then defendants.
2  We'll strike people.  We'll put people in the box for those
3  empty seats.  The next time around defendants go first.  The
4  defendants will challenge, then plaintiffs will challenge,
5  and so on until you use up your peremptories.  But I don't
6  let you go back.  In other words, if you've already passed
7  on a juror, you're stuck with the juror.
8       Because it's vacation time, I wanted to play out a
9  procedure for you.  One of the things that annoys me no end,
10 but there seems to be no clear solution, is when I get my
11 pool of 50 jurors and half of them say, "I don't want to
12 serve because I'm going on vacation."  I was thinking of
13 giving the jury clerk essentially a questionnaire to be
14 filled in under oath so that we don't bring up jurors who
15 have already prepaid vacation plans.  I'm thinking about
16 that.  The problem is, it's too easy an out for people.
17 It's a three-week trial which would be hard for people
18 anyway.  So another way to do it is to simply ask for more
19 people, and then just have everybody who's got a vacation
20 plan come up and swear to me, and then just let them go.
21 Judge Gertner tried a technique which I really liked a lot,
22 which she had them fill it in under oath, a questionnaire
23 downstairs, and basically gave the -- I think brought up the
24 questionnaires, I okayed them so it was a judge's blessing,
25 and then we either sent them to another court or we

Page 50

1  done it on March the 15th.  He had submitted that to the
2  journal on April the 20th.  We took his deposition.  They
3  got us to agree to certain topics because we didn't even
4  know he had submitted --
5      THE COURT:  Did you ask to inquire --
6      MR. ALTMAN:  At the deposition, yes.
7      THE COURT:  And they wouldn't let you?
8      MR. ALTMAN:  They would not let us.
9      THE COURT:  Why?
10     MR. ALTMAN:  They said we had an agreement that
11 said we were not going to ask about certain things.  For
12 example, Dr. Gibbons said we didn't have any e-mails, and
13 then the day before we find out he's got 1,000 pages of
14 e-mails --
15     THE COURT:  You know, I've heard that.
16     MR. ALTMAN:  But we didn't get to ask him any
17 questions about it.
18     THE COURT:  You didn't get to get about the
19 e-mails?  Did you ask to have another deposition?
20     MR. ALTMAN:  Yes.
21     THE COURT:  Did you move to compel it?
22     MR. ALTMAN:  We talked about it, and then --
23     THE COURT:  No, excuse me.  You know what, I'm
24 here all the time.  It's really a problem in my family.  And
25 Leo Sorokin is here.  So you can move to compel if you got

Page 51

1  e-mails you didn't get to ask questions about.
2      MR. ALTMAN:  We did, and we moved to compel the
3  deposition of Dr. Hur, and then we were granted a very
4  limited deposition of Dr. Hur --
5      THE COURT:  Excuse me.  I'm talking about the
6  e-mails.  Did you ask Judge Sorokin for an opportunity to
7  take a deposition on the e-mails or the new paper?
8      MR. ALTMAN:  No, we did not.
9      THE COURT:  All right, so that's the end of it.
10 If there are a few smoking gun ones, you're going
11 to have him here Thursday, ask.  But at this point, if
12 anything, if I were you, I would want the peer-reviewed
13 paper because whatever I saw was a lot softer than the
14 expert declaration, so you don't want that excluded.  That
15 is -- he's saying it's only possible, so I'll hear about
16 that.
17     But let's go through.  The plaintiffs' motion in
18 limine to preclude any evidence proffered by defense at
19 trial that any drug other than Neurontin caused or was
20 associated -- how can I say that?  She was on Effexor.  She
21 was --
22     MR. FINKELSTEIN:  Well, just as we had to go
23 through an entire Daubert hearing and challenge to prove
24 that the drug has capacity to lead to suicide, they can't
25 just pick any drug and say, "This one causes suicide."

Page 52

1      THE COURT:  No, of course they can't pick any
2  drug, but she was taking Effexor, right?
3      MR. FROMSON:  Believe me, your Honor, the makers
4  of Effexor deny the drug causes suicide just as much as
5  Pfizer does.  What --
6      THE COURT:  Excuse me.  They're allowed to point
7  out she was on other medications.  They're allowed to point
8  out that there's evidence that she was taking cocaine.  Of
9  course they can do that.  I would be reversed in a
10 millisecond.
11     MR. FINKELSTEIN:  We're not saying that -- we
12 simply ask for a motion in limine that they can't say that
13 cocaine leads to suicide.  It's a very limited -- we're not
14 saying the cocaine use is out.  We don't want them to stand
15 up and argue that she committed suicide because of cocaine,
16 because of Effexor, because of all these things.  They have
17 to withstand Daubert scrutiny if they want to argue that.
18     THE COURT:  Well, let me just put it this way:  Of
19 course you're allowed to point out that she was possibly a
20 drug addict and was on Effexor and all sorts of other meds,
21 but it is in fact true that you can't say "and Effexor has
22 depressive side effects" unless you have some medical expert
23 who talks about that that's a warning from the FDA or some
24 regulatory things.  In other words, I can't do a whole
25 Daubert thing on that.

Page 53

1      MR. OHLEMEYER:  We have no expert who's going to
2  come to court and say Effexor caused her suicide.  They have
3  an expert who's actually said that in another case.
4      THE COURT:  I know.
5      MR. OHLEMEYER:  We also have testimony from their
6  experts as well as our experts that substance abuse is a
7  risk factor for suicide.
8      THE COURT:  Sure, you can do all of that, but what
9  you can't do is --
10     MR. OHLEMEYER:  I think we're all on the same
11 page.
12     THE COURT:  I can't start a whole Daubert hearing
13 on Effexor, so --
14     MR. OHLEMEYER:  Understood.
15     THE COURT:  I understand that Dr. Maris said that
16 was a tipping point in what, the Giles case?
17     MR. CHEFFO:  Correct.
18     THE COURT:  All right, so that's denied.
19     Motion to preclude any evidence proffered by
20 defendants at trial that any drug -- oh, that was --
21     Motion in limine to preclude any mention at trial
22 by defendants that the Neurontin package insert was labeled
23 to warn against completed -- what are you talking about?  Of
24 course they can put in what was in the insert.
25     MR. ALTMAN:  Your Honor, up until December of