UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------x
In re:  NEURONTIN MARKETING,  :   MDL Docket No. 1629
SALES PRACTICES AND PRODUCTS  :   Master File No. 04-10981
LIABILITY LITIGATION  :   Judge Patti B. Saris
------------------------------------x
THIS DOCUMENT RELATES TO:  :
IRENE BARLOW  :   Magistrate Judge Leo T. Sorokin
 :
 :
 :
 :
------------------------------------x

### PLAINTIFF BARLOW'S RESPONSE TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER IMPOSING COST-SHIFTING

COMES NOW Plaintiff Irene Barlow, by and through her attorney of record, and files this her Response to Defendants' Motion for Protective Order Imposing Cost-Shifting, and in support thereof would respectfully show the Court as follows:

### I.
### PRELIMINARY STATEMENT

On October 28, 2009 Plaintiff Barlow submitted specific discovery requests to Defendant Warner-Lambert / Pfizer targeted at getting information relevant to the upcoming depositions of Plaintiff Barlow's prescribing doctors and Defendant's sales representatives who had contact with them. Such depositions must be concluded by September 10, 2010, pursuant to this Court's order. Defendants had not produced any responsive information at the time Plaintiff Barlow filed

her Motion to Compel and since has produced only limited information. Defendant Pfizer's responded to the Motion to Compel by filing a Motion for Protective Order Imposing Cost-Shifting. For further details, argument and authorities, Plaintiff Barlow incorporates by reference her previously filed Motion to Compel (Doc 2474) and supporting memorandum (Doc 2475).

## II.
## DISCOVERY SOUGHT IS HIGHLY RELEVANT AND NOT PREVIOUSLY PRODUCED

Plaintiff Barlow's discovery requests primarily target the documents in the possession of Defendant's sales representatives and their communications among themselves and with Plaintiff Barlow's prescribing doctors. Contrary to Defendant's assertions that this is only "minimally relevant," such information goes to the heart of Plaintiff's claims that she received Neurontin as a direct result of Defendant's criminal and felonious off-label marketing of that product to her doctors for treatment of her bi-polar disorder. Defendant has previously asserted and continues to assert the learned intermediary doctrine as a defense. Plaintiff Barlow's discovery requests are for documents and information that is specifically relevant to establish what information Plaintiff Barlow's treating doctors received from Defendants in any manner and what Defendants knew but failed to divulge to such doctors regarding the use of Neurontin to treat bipolar patients. Illustrative of Plaintiff Barlow's discovery requests that go to the heart of Plaintiff Barlow's case is the request for the "custodial files" of the specific sales representatives who called upon her prescribing physicians and the communications exchanged between Defendant and Plaintiff's treating doctors, including direct mailings and in Continuing Medical Education (CME) programs. The interrogatories and requests were modeled on the template discovery worked out by

the parties three years ago in the MDL proceedings. Defendant Pfizer had not previously provided this information as it relates specifically to Plaintiff Barlow.

III.

COST SHIFTING

Defendant Pfizer's response to the request for this highly relevant and specific discovery was not to provide discovery but, rather, to file a motion to shift the burden of the cost of providing such discovery to Plaintiff Barlow. Pfizer is one of the largest drug manufacturers in the world with net sales exceeding $48 billion dollars for the year ending 2008 and with net income exceeding $8 Billion dollars for the same year, according to its 2008 financial report, the relevant portion of which is attached hereto and incorporated herein for all purposes as Exhibit 1. It earned almost $10 Billion in revenues from Neurontin before Warner-Lambert pleaded guilty to both felony off-label marketing and to felony misbranding, the failure to provide doctors adequate instructions for use of the product. Plaintiff Barlow, as evidenced by her affidavit which is attached hereto and incorporated herein for all purposes as Exhibit 2, is a homemaker who has not been employed outside the home in the past twenty years and who lives with her husband on her husband's pension. Defendants, by seeking to impose discovery costs on Plaintiff, is in effect making discovery so expensive as to be impossible. By refusing to provide discovery readily available to it, in response to the template discovery forms, Defendants seek to obstruct the discovery schedule ordered by this Court.

IV.
ARGUMENT AND AUTHORITIES

The presumption under the Federal Rules of Civil Procedure is that the producing party bears the cost of complying with the discovery requests. The court may shift the burden of the cost to requesting party only in the event that the discovery

request seeks information not reasonably accessible and to prevent undue burden and expense. *Peskoff v. Faber*, 251 F.R.D. 59, 61 (D.D.C. 2008) (holding cost of forensic search for e-mail and other electronic records in response to discovery requests does not represent burden or expense so undue as to justify shifting to plaintiff as requesting party). *See also, Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 309 F. Supp.2d 459, 465-467 (S.D.N.Y. 2003) (holding cost-shifting not required despite the fact discovery requests would cost $400,000 because responding party was worth $5.7 billion and potential damages in case also exceeded $68 million).

The case law and the rules are clear that the party asserting the "unduly burdensome" objection to a discovery request has the burden to show (i) not only the undue burden or expense, but that (ii) expense is unreasonable in light of the benefits to be secured from the discovery. *Hagemeyer North America, Inc. v. Gateway Data Sciences Corp.*, 222 F.R.D. 594, 602-603 (E.D. Wis.2004) (holding order shifting costs of production in response to discovery request should only issue when request truly threatens to subject responding party to undue burden or costs).

There are seven different factors used by Federal Courts to determine whether cost-shifting measures are appropriate, known as "The Zubulake Factors;" (1) the extent to which request is specifically tailored to discover relevant information, (2) availability of such information from other sources, (3) total costs of production, compared to amount in controversy, (4) total costs of production, compared to resources available to each party, (5) relative ability of each party to control costs and its incentive to do so, (6) importance of issues at stake in litigation, and (7) relative benefits to parties of obtaining information. The factors are weighed in descending order of importance, not equally. *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 322 (S.D.N.Y. 2003); *Hagemeyer*, 222 F.R.D. at 602-603; *Xpedior*, 309 F. Supp.2d at 465-466.

Such factors all weigh in favor of Plaintiff Barlow in the instant case. In particular, Barlow has made very specific requests primarily directed toward the communications Defendants had with Defendant's prescribing physicians. It is hardly conceivable that Defendant Pfizer would not have readily identifiable and accessible records ("custodial files") of their sales representatives and other promotional communications to physicians in light of the history of this litigation. There is no dispute that Defendant Pfizer had knowledge that Neurontin had "lots of legal problems" when in the year 2000 it undertook to make it a "blockbuster drug" by selling an additional "$10 Billion" of it "beyond its expected original life (the Year 2000)." (Pfizer memo dated April 10, 2003 attached as Ex. 5 to Plaintiff's Barlow Memorandum (Doc. 2476-6)). We now know from their admissions in the criminal prosecution that they accomplished that through their off-label marketing schemes. As such, Defendants had the duty and responsibility to identify and preserve the types of documents sought here, not to make them more difficult to find and produce. *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securites*, 2010 WL 184312 (S.D.N.Y. Jan. 15, 2010). Any problem Defendant claims regarding the inaccessibility of the records sought is a problem of their own making and consequently, "the expense and burden of the forensic examination can hardly be described as 'undue.'" *Peskoff v. Faber*, 251 F.R.D. *supra* at 63 (holding no reason to deviate from traditional rule because costs were attributable to failure of responding party to properly preserve information). Scanning of such documents and digitally producing them to an opposing party in a searchable format is a common litigation function in this day and time and in this type of case. Plaintiff Barlow has no other source for the information sought. Obviously, when comparing the resources of Pfizer to one or all of the individual Plaintiffs in this case, the total costs of production should

be borne by Defendants and Defendants alone. The evidence Defendant presents to support a claim of "undue burden" is wholly insufficient and conclusory. Even if the estimates of costs set out by Deena Coleman were accurate, which is vigorously denied, the burden of those costs should still remain on Defendant Pfizer because of the Zubulake factors, including the respective financial position of the parties, and Defendant Pfizer's "unclean hands." The notion that the criminal should be able to shift the expense of the burden of disclosing the seeds of its crimes to the victims in this case is as repugnant as if Bernie Madoff were to claim it would cause him undue hardship and expense to search his records to determine where the money went that he stole from his victims.

## V.
## SUMMARY

In summary, Defendant says it cannot produce "custodial files" of present or past employees, nor can it produce communications and promotional records it had with Plaintiff Barlow's prescribing doctors, both directly and indirectly through CME programs, samples, publications, and the like, without placing an extreme financial burden on Plaintiff Barlow. Such position should be rejected. There is no reason to deviate from the traditional rule and accepted practice that a responding party bears the costs of production, especially when the responding party is a convicted felon who is being required to produce evidence if its criminal conduct. It is clear that Defendant is attempting to make discovery expensive and eventually impossible for this Plaintiff and to obstruct the schedule this Court has ordered.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Barlow prays that Defendants Motion for Cost-Shifting be denied in all respects and that Defendants be ordered to produce all records sought by her Motion to Compel.

Respectfully submitted,

LAW OFFICES OF JACK W. LONDON
3701 Bee Cave Road, Suite, 200
Austin, Texas  78746
(512) 478-5858 (telephone)
(512) 478-1120 (facsimile)


By: _____
Jack W. London
State Bar No. 12512500

WRIGHT & GREENHILL, P.C.
221 West 6th Street, Suite 1800
Austin, Texas  78701
(512) 476-4600 (telephone)
(512) 476-5382 (facsimile)

By: _____
Archie Carl Pierce
State Bar No. 15991500

ATTORNEYS FOR PLAINTIFF
IRENE BARLOW


CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 9, 2010.

_____
Archie Carl Pierce

# Financial Review
Pfizer Inc and Subsidiary Companies

amount of cash flows approximate the estimated payouts of the plans. For our international plans, the discount rates are set by benchmarking against investment grade corporate bonds rated AA or better, including where there is sufficient data, a yield curve approach. Holding all other assumptions constant, the effect of a 0.1 percentage-point decrease in the discount rate assumption is an increase in our 2009 U.S. qualified pension plans' pre-tax expense of approximately $12 million and an increase in the U.S. qualified pension plans' projected benefit obligations as of December 31, 2008, of approximately $97 million.

## Analysis of the Consolidated Statement of Income

| (MILLIONS OF DOLLARS) | YEAR ENDED DECEMBER 31, | | | % CHANGE | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 08/07 | 07/06 |
| Revenues | $48,296 | $48,418 | $48,371 | — | — |
| Cost of sales | 8,112 | 11,239 | 7,640 | (28) | 47 |
| % of revenues | 16.8% | 23.2% | 15.8% | | |
| SI&A expenses | 14,537 | 15,626 | 15,589 | (7) | — |
| % of revenues | 30.1% | 32.3% | 32.2% | | |
| R&D expenses | 7,945 | 8,089 | 7,599 | (2) | 6 |
| % of revenues | 16.5% | 16.7% | 15.7% | | |
| Amortization of intangible assets | 2,668 | 3,128 | 3,261 | (15) | (4) |
| % of revenues | 5.5% | 6.5% | 6.7% | | |
| Acquisition-related IPR&D charges | 633 | 283 | 835 | 123 | (66) |
| % of revenues | 1.3% | 0.6% | 1.7% | | |
| Restructuring charges and acquisition-related costs | 2,675 | 2,534 | 1,323 | 6 | 92 |
| % of revenues | 5.5% | 5.2% | 2.7% | | |
| Other (income)/deductions—net | 2,032 | (1,759) | (904) | * | 95 |
| Income from continuing operations before provision for taxes on income, and minority interests | 9,694 | 9,278 | 13,028 | 4 | (29) |
| % of revenues | 20.1% | 19.2% | 26.9% | | |
| Provision for taxes on income | 1,645 | 1,023 | 1,992 | 61 | (49) |
| Effective tax rate | 17.0% | 11.0% | 15.3% | | |
| Minority interest | 23 | 42 | 12 | (45) | 235 |
| Discontinued operations—net of tax | 78 | (69) | 8,313 | * | * |
| Net income | $ 8,104 | $ 8,144 | $19,337 | — | (58) |
| % of revenues | 16.8% | 16.8% | 40.0% | | |

\* Calculation not meaningful.
Percentages in this table and throughout the Financial Review may reflect rounding adjustments.

## Revenues

Total revenues were $48.3 billion in 2008, essentially flat compared to 2007, primarily due to:

- an aggregate increase in revenues from Pharmaceutical products launched in the U.S. since 2006 and from many in-line products in 2008;

- the weakening of the U.S. dollar relative to many foreign currencies, especially the euro, Japanese yen and Canadian dollar, which increased revenues by approximately $1.6 billion, or 3.3%, in 2008; and

- increased revenues in our Animal Health segment and other businesses of $128 million in 2008,

offset by:

- a decrease in revenues for Zytec/Zyrtec D of $1.4 billion in 2008, primarily due to the loss of U.S. exclusivity and, in connection with our divestiture of our Consumer Healthcare business, the cessation of selling this product in late January 2008;

- a decrease in revenues for Norvasc of $757 million in 2008, primarily due to the loss of U.S. exclusivity in March 2007;

- an increase in rebates in 2008 due to a 2007 favorable adjustment recorded in 2007 based on the actual claims experienced under the Medicare Act, as well as the impact of our contracting strategies with both government and non-government entities in the U.S.;

- a decrease in revenues for Camptosar in the U.S. of $457 million in 2008, primarily due to the loss of U.S. exclusivity in February 2008;

- a decrease in revenues for Lipitor in the U.S. of $863 million in 2008, primarily resulting from competitive pressures from generics, among other factors; and

- an adjustment to the prior years' liabilities for product returns of $217 million recorded in the third quarter of 2008 (see the "Certain Charges: Adjustment of Prior Years' Liabilities for Product Returns" section of this Financial Review).

In 2008, Lipitor, Norvasc (which lost U.S. exclusivity in March 2007), Lyrica and Celebrex each delivered at least $2 billion in revenues, while Geodon/Zeldox, Zyvox, Viagra, Detrol/Detrol LA and Xalatan/Xalacom each surpassed $1 billion.



2008 Financial Report | 17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------x
In re: NEURONTIN MARKETING,                    :   MDL Docket No. 1629
                                               :
SALES PRACTICES AND PRODUCTS                   :   Master File No. 04-10981
                                               :
LIABILITY LITIGATION                           :   Judge Patti B. Saris
------------------------------------x
THIS DOCUMENT RELATES TO:                      :
                                               :
IRENE BARLOW                                   :   Magistrate Judge Leo T. Sorokin
                                               :
                                               :
                                               :
                                               :
                                               :
------------------------------------x

## AFFIDAVIT OF IRENE BARLOW

I, IRENE BARLOW, being duly sworn depose and state as follows:

1. My name is Irene Barlow. I am the Plaintiff in the above styled and numbered cause. I was born on August 28, 1949 and am 60 years of age.

2. I am a housewife. I have been a housewife most of my adult life. I have not been employed outside the home in over 20 years.

3. I am married to Fred Barlow. We have been married over 40 years. My husband retired in 2004 after 17 years with Continental Airlines as a First Officer. We have lived on his retirement since that date.

Exhibit 2

FURTHER AFFIANT SAYETH NAUGHT.

*Irene Barlow*
Irene Barlow

SUBSCRIBED AND SWORN TO before me on this the 5th day of March 2010, to certify which witness my hand and seal of office.

[Notary seal: CAMERON HEARN SNIDER, Notary Public, STATE OF TEXAS, My Comm. Exp. 11-10-12]

NOTARY PUBLIC, STATE OF TEXAS
My Commission Expires: 11/10/2012