UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
: MDL Docket No. 1629
In re: NEURONTIN MARKETING, :
SALES PRACTICES AND : Master File No. 04-10981
PRODUCTS LIABILITY LITIGATION :
: Judge Patti B. Saris
------------------------------------------------------------x
: Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
ALL PRODUCTS LIABILITY CASES :
:
------------------------------------------------------------x

### PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER IMPOSING COST-SHIFTING

Products Liability Plaintiffs submit this memorandum in opposition to Defendants' Motion For Protective Order Imposing Cost-Shifting.[1]  For the reasons set forth below, Defendants' motion should be denied and Defendants should be compelled to comply with the template discovery already authorized by this Court.

### PRELIMINARY STATEMENT

425 Pages Per Sales Representative.  This is the average size of a Defendants' sales representative custodial file thus far produced in this litigation.  In fact, this figure doesn't even consider that half of the sales representative custodial files in the Track One cases were not produced at all.  Defendants thus bring this motion making unsubstantiated claims of burden and expense that simply have not been borne out from the previous experience of the parties.

Defendants claim that such a production would cost nearly $114,000 per custodial file.  Defendants' motion is nothing more than a thin-veiled attempt to frustrate Plaintiffs' legitimate

---

[1] ECF Doc. # 2577.

discovery needs in this litigation: Defendants' reasoning is misplaced, their representation of the facts is inaccurate, and their purported math calculations are simply wrong. Even more troubling is that their expense calculations appear to change from venue to venue depending on which judge is presiding over their argument. In this regard, defense counsel Mark S. Cheffo represented to the Hon. Marcy S. Friedman in the New York Coordinated Litigation that the costs of custodial file production would be from $10,000-$40,000 (even still an unfounded figure). Yet here, that figure has been dramatically increased.

Plaintiffs incorporate by reference the arguments previously submitted in Plaintiffs' Memorandum (ECF Doc. # 2483) filed in support of Plaintiffs' motion to compel (ECF Doc. # 2482) the very discovery from which Defendants now seek a protective order. In essence, Defendants come before this Court to prevent discovery of the custodial files of the very individuals who had direct contact with Plaintiffs' prescribing doctors, and who illegally promoted Neurontin for "off-label" uses and suppressed or otherwise failed to disclose risks of suicidality: the sales representatives (a/k/a Territory Managers). Such discovery is crucial to each individual Plaintiff's case inasmuch as Defendants have consistently opposed the introduction of evidence concerning their strategies and conduct in the marketing of Neurontin unless a Plaintiff could show a direct nexus between an employee of the Defendants and the Plaintiff's prescribing physicians. Now, for the first time, Defendants seek to prevent Plaintiffs from learning what information was in the sales representative's possession, as part of their day-to-day business activities and which assuredly played a role in their interaction with Plaintiffs' doctors. Indeed, the presence of materials related to "off-label" sales/promotion, and the risk of suicidality with Neurontin are all areas of information to which individual Plaintiffs are entitled. The absence of information regarding suicidality with Neurontin from the sales representatives'

2

custodial files is equally important so as to understand whether such information was not disclosed or was otherwise suppressed from Defendants' very own sales representatives and thus not disclosed to physicians. In either case, what the sales representatives had in their files is of paramount importance in assessing whether the doctor was a true learned intermediary.

Defendants argue that the information sought in the custodial files is not relevant and is duplicative of other information. This is simply not true. While Plaintiffs do have certain "sales call" notes via Defendants' disclosure of database data (an electronic production), this is not the same as having access to the sales representative's custodial file documents and emails.

Next, Defendants claim that the production of the sales representative's files is burdensome and costly. Using the experience from the Track One plaintiffs, about half the representatives had no file, and of those that did have files, the average file size was approximately 425 pages. Defendants then make the wild claim that the average cost to produce a sales representative custodial file is more that $114,000.

To support Defendants' costs claim, Defendants put forth an Affidavit from Deena Coleman of Deloitte Financial Advisory Services, Inc. Ms. Coleman makes wild, unsupported statements concerning the costs and although she claims she will provide an explanation for the calculations of the costs, no such explanation is provided. Even assuming that her percentages and per page costs are correct, the volume of material per custodian, 425 pages on average, supports a cost of less than $500 plus the costs of searching for materials the company has been maintaining since 1999. Surely, it is absurd to suggest it would cost $113,500 to search for and collect the documents from one custodian. In fact, Ms. Coleman's Affidavit falls so far below what is necessary to establish a production burden that it, along with Defendants' entire motion,

3

should be viewed as frivolous and this Court should impose appropriate sanctions for wasting the Court and Plaintiffs' time in responding.

Defendants, while ignoring that the actual average production has been about 425 pages per custodian, conduct an analysis of factors and conclude that contrary to well-established case law, each Plaintiff should be responsible for costs associated with the production. To make matters worse, their analysis attempts to place on Plaintiffs' shoulders more than solely the costs of duplicating the documents. Defendants likewise ignore their written agreement with Finkelstein & Partners, LLP, wherein Defendants agreed to be responsible for these costs, and which is no doubt why the parties have never before had this dispute when Defendants were represented by previous counsel who abided by the agreement.[2] Absent a previous agreement of the parties, Defendants might be able to make a colorable argument on only the copying costs; however, their argument fails to articulate even a justification for those costs.

Defendants' entire motion is short on facts and long on case law that has nothing to do with the facts of this case. When the facts of this matter are considered, it is clear that Defendants' motion is completely frivolous and should be denied. Furthermore, the Court should compel Defendants to comply with Plaintiffs' template discovery requests already authorized by this Court and to comply with the parties' 2004 discovery agreement.

---

[2] *See* Finkelstein Decl., Ex. C (ECF Doc. # 2484-4), at 1, which was filed in support of Plaintiffs' now pending motion to compel discovery (ECF Doc. # 2482). Defendants would like this Court to dismiss an agreement freely entered into by the parties in 2004. Since that time and up until Defendants' current counsel (Skadden, Arps, Slate, Meagher & Flom LLP) became active in the case in 2009, the parties have operated under the 2004 agreement with no disputes. Now, Defendants' current counsel, who was not part of the drafting of the agreement, doesn't like the terms and wants the Court to ignore those terms.

4

**ARGUMENT**

I. **THE DISCOVERY SOUGHT BY PLAINTIFFS IS RELEVANT AND NON-DUPLICATIVE**

Throughout this case, Plaintiffs have pled that part of their claims are based upon a suppression of negative information (suicidality) to individual plaintiff's doctors, and that Defendants' sales representatives illegally promoted Neurontin for off-label uses to individual plaintiff's doctors  Defendants have steadfastly maintained that despite the fact that Warner-Lambert Company LLC is a convicted felon for illegally promoting Neurontin, such promotion is irrelevant to individual plaintiffs unless the plaintiff can demonstrate a direct nexus between the illegal marketing and the plaintiff's doctor.  Plaintiffs seek only to prove their case and demonstrate the nexus.  Discovery of the sales representative custodial files falls squarely within the scope of relevant discovery.

Plaintiffs concede that Defendants have produced certain information about each sales representative, such as their sales call notes; these notes located in two databases provided electronically to Plaintiffs' counsel.  What has never been produced, though, outside of Track One cases, are the actual custodial file documents possessed by the aforementioned sales representatives concerning Neurontin.  From experience in the Track One cases, there is no dispute that these files have handwritten notes, communications between the representative and management concerning Neurontin, and other materials used by the representative in the detailing of Neurontin to individual doctors.

Next, Defendants argue that custodial file documents are of no value to Plaintiffs because documents have not been extensively used during the depositions of the sales representatives.  This argument is laughable as it ignores that the materials have been used, and may still be used during trial.  Incredulously, Defendants seek to mislead the Court when they assert on page nine

5

of their Memorandum that Plaintiffs did not make use of the custodial files of Michelle Meagher, one of the representatives in the *Bulger* case. As is clear from an e-mail from defense counsel dated March 11, 2008, Defendants did not even produce documents for Ms. Meagher.[3] It is dishonest for Defendants to use Ms. Meagher as an example, and this is clear evidence of Defendants' gamesmanship with respect to this motion and their continued attempts to frustrate discovery.

Furthermore, the assertion that certain materials are already in the possession of Plaintiffs is meaningless. Such documents were produced in the context of Defendants general disclosure with bates numbers unassigned to the sales representatives for whom Plaintiffs seek discovery. In the totality of the document production, how are Plaintiffs to know which documents were in the possession of any particular sales representative absent being identified as such. To the extent that Defendants identify materials already in the possession of Plaintiffs and which are also located in the files of a particular sales representative, Plaintiffs are willing to accept a listing of bates numbers. Nevertheless, there will still be materials that only exist in the files of the individual sales representatives, never before disclosed in this case.

## II.   DEFENDANTS' COST ESTIMATES OF $114,000 ARE ABSURD AND FRIVOLOUS

Applying defense counsel Mr. Cheffo's math applications to his argument, the current national inflation rate is between 300% and 1000% in the four months between October 19, 2009, through the filing of the instant motion. There is simply no merit to his cost calculations. On October 19, 2009, Mr. Cheffo represented in open court before Judge Friedman in the New York Coordinated Litigation the same argument he is making here. He said, "we're talking about between ten and $40,000 is the number that I have been given with respect to each of the sales

---

[3] See e-mail from Angela Seaton, Esq., dated March 11, 2008, attached hereto as Exhibit A.

6

reps. That includes identifying, harvesting, reviewing and producing it."[4] Now Mr. Cheffo comes before this Court claiming that the very same process will cost approximately $114,000. This redefines the definition of hyperinflation. In reality, it demonstrates that Mr. Cheffo is simply fabricating numbers that have no bearing on reality. Even the estimate of $10,000 to $40,000 is patently absurd.

The suggestion that the average sales representative custodial file of 425 pages would cost defendants $114,000 is so fantastic and redefines the meaning of absurdity. Worse still, Defendants provide no cogent support for these estimates. All that is provided is a single, unsupported Affidavit that is incomprehensible and fails to make even a basic showing of support for these estimates. Furthermore, using the information that is provided in the Affidavit shows that Defendants' estimates are nonsensical. As such, this Court should dismiss Defendants' estimates.

As a matter of law, the Affidavit of Deena Coleman fails to establish the burden alleged by Defendants. In the Affidavit, Ms. Coleman claims that it would cost $91,999 per custodian to search, retrieve, and produce documents plus an additional $23,359 per custodian for attorney review. Ms. Coleman states in paragraph 3 that a detailed explanation of these costs will be provided, yet there the explanation is missing from the document.

At paragraph 5, Ms. Coleman states that she used data from thirty two custodians identified in paragraph 4 of the Affidavit. To date, far less than thirty two custodial files for sales representatives have been produced in this litigation, so Ms. Coleman's estimates cannot possibly be relevant to the past history of production in this litigation. A review of paragraph 4 provides no information as to which custodians were considered. The volume of material is also not specified, further making Ms. Coleman's estimates dubious.

---

[4] *See* Transcript of October 19, 2009 Hearing, attached hereto as Exhibit B, at 6:11-15.

7

In the end, past history demonstrates that the cost claims by Defendants are not only fantasy, but are absolutely reckless and undeserving of the Court's attention. In the *Shearer* litigation, pending for trial on March 29, 2010, Defendants produced less than 300 pages for Michael Fagan, one of the sales representative who detailed Mr. Shearer's doctor. Below is a chart identifying several sales representatives from the Track One cases and the numbers of pages produced.

| Custodian | Track One Plaintiff | Pages Produced |
|---|---|---|
| Michael Fagan | Shearer | 244 |
| Paresh Desai | Shearer | 0 |
| Richard Schlect | Valentine & Woolum | 922 |
| April Mosebrook | Valentine | 221 |
| Kenneth West | Woolum | 0 |
| Joel Sidney | Dixon | 311 |
| Jeffrey Banchand | Dixon | 0 |
| Patrick Mulhern | Dixon | 0 |
| Michelle Meagher | Bulger | 0 |

As seen above, half the representatives had no file and of the others, the average file size is 425 pages with 922 pages for Richard Schlect as the largest file produced. It is an absurdity for the defendants to suggest it would cost almost $114,000 to produce files such as the above. In fact, it shocks the conscious to think that Defendants would actually so claim.

To demonstrate the absurdity, Richard Schlect's file from the *Valentine* and *Woolum* cases can be used as an example. His file at 922 pages represents the largest of the above custodial files. At paragraph 9 of Ms. Coleman's Affidavit, she maintains that 61.94% of the documents from a given custodian are produced. Therefore, the Schlect file would have contained 1489 pages as collected. Also in paragraph 9, Ms. Coleman states that a GB contains 65,000 pages. Therefore, the Schlect file contains approximately 1/40 of a GB. In paragraph 6, Ms. Coleman states that it costs $650 per GB for processing. Taking 1/40 of a GB, this yields

$16. According to paragraph 8 of Ms. Coleman's declaration, it would cost $37 to produce this file at $0.04 per page. Therefore, the cost of processing the data for the Schlect file is $53.

Using the figures from Ms. Coleman's Affidavit and taking Richard Schlect's custodial file of 922 pages, the cost to review and redact the file is $492[5]. Other custodial files, if they exist, would cost less. Therefore, Defendants' claimed estimate of $23,359 to review and redact the Schlect file is nonsensical and bears no relationship to the likely costs.

The only remaining unknown factor to Plaintiffs (in light of the inarticulate manner of Ms. Coleman's Affidavit) is the cost of collecting Richard Schlect's documents. If, as Ms. Coleman asserts, it costs $91,199 to produce a sales custodial file, then in Defendants' world of math, it must cost $91,199 less $53 or $91,146 to collect the documents! This figure is completely without any basis in the Affidavit and is far beyond the imaginable to be taken seriously.

In fact, Defendants' search and collection burden should be minimal because they have already been working under a "litigation hold" (to save all Neurontin related documents) no later than September 15, 1999. At that time, the company distributed a document entitled Warner-Lambert Company Records Management Philosophy and Policy.[6] On page five of the policy in point "G", the employees of the company were specifically instructed that records referencing Neurontin were not to be destroyed. Presumably, this "litigation hold" was because of the investigation by the Justice department which did not resolve until May 2004, after several personal injury actions were filed. Therefore, all Neurontin documents from at least 1999 should have been maintained. It is presumed that in maintaining these files, the company would know

---

[5] If 922 pages represents 61.94% of the files collected, then there were 1489 pages collected. 1489 pages at $0.25 per page = $372.25. 922 pages produced x 15.65% for redactions = 144 pages to redact. 144 pages at 60 pages per hour times $50 per hour = $120.24. The total is $492.49.

[6] PFIZER_INRE_0000929-935.

where to locate the documents for a custodian. It is inconceivable that it would take more than a nominal amount of time to locate a given sales representative file.

In summary, the cost estimates provided by the Defendants are not consistent with the reality of the document production to date. These figures and Defendants' motion should be denied in its entirety.

### III.     DEFENDANTS HAVE FAILED TO ESTABLISH UNDUE BURDEN

Defendants have failed in every way to establish that the production of sales representative files in case-specific actions is burdensome. If anything, Defendants' motion is nothing more than an attempt to frustrate Plaintiffs' legitimate case-specific discovery and to mislead the Court with wild, unsupported allegations of relevance and burden. Defendants' tactics have delayed Plaintiffs in moving forward with sales representative discovery depositions notwithstanding this Court's September 2010 deadline for such discovery.

Given that a more realistic figure for the processing of a sales representative file is at most $550, this figure can hardly be said to be unduly burdensome. Furthermore, Defendants claim that there are hundreds of plaintiffs, doctors, and sales representatives. Based on the Track One experience, less than five sales representatives had files produced for any of the cases. That means that the cost for Defendants to comply with discovery for all of the representatives associated with a case is likely to be on the order of $2500. This is approximately 1/50 of what Defendants claim their cost would be for a single custodian.

None of the case law cited by Defendants looks at discovery that would cost $2,500 per Plaintiff. As such, the case law is completely irrelevant and does not assist the Court in any way.

## IV.   EVEN ASSUMING PLAINTIFFS' REQUEST WERE UNDULY BURDENSOME, FED. R. CIV. P. 26(b)(2)(B) FACTORS DO NOT SUPPORT COST-SHIFTING

Plaintiffs' requests yield an average of 425 pages for sales representatives that actually have files, about half the representatives based upon past history, and do not rise to the level of burden contemplated under Fed. R. Civ. P. 26(b)(2)(B) and the advisory committee notes. In fact, Defendants spend far more than this obtaining the medical records for each Plaintiff.

Contrary to Defendants' arguments, while this is a coordinated Multidistrict Litigation, the requests at issue are case-specific to individual plaintiffs regarding discovery to which they are entitled. Defendants have indicated that they intend to try each case on its own individual merits. As such, it is unfair to consider Plaintiffs as an aggregation when looking to the burden of case-specific discovery issues.

Even if this Court were to consider Plaintiffs' requests burdensome, and Plaintiffs maintain that 425 pages per custodian is not, Defendants' analysis of the factors suggested by the advisory committee notes to Fed. R. Civ. P. 26(b)(2)(B) is simply wrong and do not support cost-shifting.

Factor one does not favor cost-shifting. Here, Plaintiffs are seeking the custodial files of those individuals from Defendants who interacted with Plaintiffs' doctors or in some cases, those individuals' managers. That is a very specific request. Past history in the Track One cases has demonstrated that these files, if they exist, are generally less than 300 pages and 425 pages on average.

Similarly, factor two does not favor cost-shifting. The sales representative's personal files are not available from any other source. and Defendants have provided no evidence that it is difficult to locate the requested materials. There is no other source available to Plaintiffs that would provide the sales representative's documents, emails and other materials that may have

11

influenced the detailing to Plaintiffs' doctors. To the extent that a portion of the materials have been produced to Plaintiffs in the past, in the context of Defendants' generic MDL discovery production, Plaintiffs have no way to know whether such documents were in any way related to a given case-specific sales representative.

Factor three does not favor cost shifting in that Defendants have been required to maintain Neurontin materials since no later than 1999. Defendants were involved in litigation and were on notice that materials such as sales representative files might be requested. From that point in time, the company should have implemented procedures for the efficient collection of materials that could be responsive to the litigation. For sales representatives that were still employed by the company, this should have been a relatively simple task. If the company failed to take reasonable measures, this is not the fault of Plaintiffs, and Defendants should not be rewarded.

Factor four also does not support cost-shifting. Nowhere in their oppositions and motions do Defendants suggest that individualized materials such as notes, memos, and e-mails for the sales representatives could be located anywhere else. Defendants' naked assertions that such information is irrelevant to Plaintiffs has no merit. Furthermore, there is no other source for the information available to Plaintiffs, and Defendants have failed to show any meaningful burden.

Plaintiffs predict that the information is important to understand the state of the knowledge of the case-specific sales representative, and to what extent negative information concerning Neurontin was in their possession. These are important elements in the case. Therefore, factor five does not favor cost shifting.

Factor six is supposed to take the importance of the issues at stake in this litigation. Defendants dismiss this factor as being unimportant because this is an individual plaintiff's case.

12

Plaintiffs disagree. For an individual plaintiff, this lawsuit represents enormously important issues. This is not some simple business contract dispute. Plaintiffs have brought actions alleging wrongful death and personal injuries resulting from Defendants' negligent and reckless, felonious conduct. Therefore, factor six is not neutral and does not support cost-shifting.

Lastly, we come to factor seven. It is insulting to this Court for Defendants to consider comparing the resources of the parties. In an April 2003 memo, John Marino, Defendants' Worldwide Team Leader for Neurontin, was proud that despite Neurontin's legal problems, Neurontin had generated $10 Billion in sales beyond its life expectancy[7] of 2000. Furthermore, he went on to state that this was not bad for a drug that was only expected to have $100 Million a year in sales. It is well known to this Court that shortly after this memo, Defendants pled guilty to criminal charges associated with the illegal marketing of Neurontin. It is also clear that the majority of the sales of Neurontin, regardless of the conduct of Defendants, were for unapproved indications, for which Defendants admit the Neurontin labeling had inadequate directions for use. Even assuming that there are 1000 plaintiffs in all of the Neurontin litigation, that means Defendants have in effect reaped a windfall profit of more than $10 Million for every lawsuit and wants to waste this Court's time claiming that spending about $2500 per Plaintiff (assuming five custodial files per case are actually produced) is burdensome. Factor seven does not favor cost-shifting.

Taken together, even if the Court were to conclude that the requested discovery was burdensome, the factors suggested by Defendants do not support cost shifting. Therefore, this court should conclude that Defendants must produce the requested materials.

---

[7] ECF Doc. # 2476-6.

## V. THE PARTIES' 2004 AGREEMENT IS VALID AND SHOULD BE ENFORCED BY THE COURT

An agreement is not an agreement when Defendants and their new lawyers decide that after five years of operating under the terms, Defendants don't like the deal anymore. Even if Defendants argue that Plaintiffs should bear the costs of reproducing paper materials, if any, the 2004 agreement between the parties indicates that Plaintiffs do not need to bear these costs unless Defendants can make the original documents available for Plaintiff to review. If the Defendants would need to make a copy of the materials for Plaintiff to review or they already exist in electronic form, then Defendants are to provide those materials in electronic format to Plaintiffs at no cost, other than the nominal cost of the electronic media. Defendants seek to have the Court ignore this 2004 agreement and the conduct of the parties for more than five years.

First, Defendants' current counsel, Skadden, Arps, Slate, Meagher & Flom LLP, was not part of the negotiations of the agreement in 2004. For Skadden Arps to argue the intent of the agreement for which they never participated in the drafting should be dismissed by the court. The Affidavit of Keith L. Altman, Esq. (ECF Doc. # 2484-5), dated October 15, 2009, sets forth details of the negotiations of the agreement as he was an active participant in those negotiations.

The agreement does address cost-shifting: there was to be no cost-shifting. If the parties needed to photocopy materials in order to make them available for review by the opposing party, the producing party scanned the materials and provided them to the requesting party at no cost, except for the cost of the electronic media (e.g., the actual external hard-drive). If the materials could be made available without the necessity of photocopying, then the requesting party scanned the materials at their cost and provided the materials to the producing party.

Before Skadden Arps became involved in this litigation, the parties had operated under this agreement without a single dispute over costs. Defendants provided materials to Plaintiffs at no cost, not even for the media. Plaintiffs went to two depositories of the Defendants and scanned, at their expense, more than 500,000 pages and provided them to Defendants at no charge.

There is no basis for Defendants to break an agreement that has been in force for almost six years. Even if this Court were to find that the agreement lacks terms as to cost-shifting, the conduct of the parties has shown that the agreement was for there to be no cost-shifting for any materials, other than paper materials already existing in a depository. Therefore, the Court should order that Defendants provide the requested discovery in accordance with the 2004 agreement.

## VI. DEFENDANTS' MOTION IS A FRIVOLOUS ATTEMPT TO STALL DISCOVERY AND SHOULD BE DENIED WITH THE IMPOSITION OF SANCTIONS

"A district court has the inherent power to manage its own proceedings and to control the conduct of litigants who appear before it through orders or the issuance of monetary sanctions for bad-faith, vexatious, wanton or oppressive behavior. [Citations omitted.] Vexatious conduct occurs where a party's actions are frivolous, unreasonable or without foundation. [Citations omitted.]" *Strahan v. Simon Prop. Group, Inc.*, Civ. Action No. 08cv10764-NG, 2008 U.S. Dist. LEXIS 102848 at *3-4 (D. Mass. Dec. 11, 2008) (citing, *inter alia*, *United States v. Kouri-Perez*, 187 F.3d 1, 6-8 (1st Cir. 1999).

In *Pan Am. Grain Mfg. Co., Inc. v. Puerto Rico Ports Auth.*, 295 F.3d 108 (1st Cir. 2002), the district court imposed sanctions under its inherent powers in response to Pan American's "bad-faith litigation tactics" in relation to several motions to compel, upon finding that "Pan

American's failure to cooperate with PRPA's discovery requests was clearly without justification and served only to impede the discovery process and to make life as difficult as possible for PRPA." *Id.* at 116-17. In rejecting Pan American's appeal from the district court's award of sanctions, the First Circuit noted: "Pan American offers no compelling explanations to justify its behavior; it simply cries about the fact that the district court chose to discount Pan American's version of events. This simply will not carry the day." *Id.* at 117.

Similarly, here, as discussed in detail above, it is clear that the behavior of Defendants and their counsel was in bad faith, vexatious, wanton or oppressive. Sanctions should therefore be assessed against Defendants under this Court's inherent powers.

## CONCLUSION

For all of the foregoing reasons, Defendants have not met their burden for cost-shifting or for the issuance of a protective order. Defendants should be compelled to provide responses to Plaintiffs' discovery requests and sanctions should be awarded against Defendants.

Dated:  March 9, 2010                                         Respectfully submitted,

*Members of Products Liability*
*Plaintiffs' Steering Committee*


By: **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551


By: **/s/ Jack W. London**
Jack W. London, Esquire
Law Offices of Jack W. London
  & Associates
3701 Bee Cave Road, Suite 200
Austin, TX  78746

## **CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 9, 2010

Dated: March 9, 2010

                                           **/s/ Andrew G. Finkelstein**
                                            Andrew G. Finkelstein