EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY - CIVIL BRANCH - PART: 57

------------------------------------------X

IN RE:  NEURONTIN

Products Liability Litigation

                                        INDEX NO.
                                        765000/06
------------------------------------------X

                        80 Centre Street
                        New York, New York  10007

                        October 19, 2009

B E F O R E:

      HONORABLE MARCY S. FRIEDMAN, Justice


A P P E A R A N C E S:

      FINKELSTEIN & PARTNERS, LLP
      Attorneys for Plaintiffs
            785 Broadway
            New York, New York  12401
      BY:  KEITH L. ALTMAN, ESQ., and
           KENNETH B. FROMSON, ESQ., of Counsel

      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
      Attorneys for Defendant
            Four Times Square
            New York, New York  10036
      BY:  MARK S. CHEFFO, ESQ., of Counsel




                              ANGELA TOLAS, CSR
                              OFFICIAL COURT REPORTER




                        AT

1          Proceedings

2          THE COURT:  On the record.  Good

3     afternoon, counsel.  Your appearances, please.

4          MR. FROMSON:  For the plaintiff, Kenneth

5     Fromson, Finkelstein & Partners.  With me today is

6     Keith Altman, an attorney at my office who's

7     admitted in the State of California.

8          MR. CHEFFO:  Good afternoon, your Honor.

9     My name is Mark Cheffo, Skadden Arps.  I'm hear

10    with my colleague Rachel Passeretti, also with

11    Skadden Arps.

12          THE COURT:  The record will reflect that

13    counsel had a conference call with my Court

14    attorney, Lee Gregory, regarding certain discovery

15    issues.  And as a result of that call we determined

16    that this matter should be set down for a

17    conference and for an oral application.

18          The parties have submitted brief

19    memoranda in connection with today's application

20    which concerns discovery costs, and a spoliation

21    application.  And we will mark the memoranda

22    Court's Exhibits I and II.  One will be the Pfizer

23    memorandum, and two will be the plaintiff's

24    memorandum.

25          I would ask, or make that 2A and B since

26    there was a little violation by the plaintiffs at

AT

Proceedings

my request that there be one five page submission,

and there were in fact two, one on each of the

issues.  These transgressions do not go unnoticed.

Now, please cooperate with me on the

paper.  It's very, very important.  There is a lot

of needless paper, and I don't mean to bring any

levity to this subject.  I need you to cooperate

with me on the paper limitations.  When we have an

issue that really requires a lot of paper, I will

work with you.

Now, would counsel please try to confine

themselves to ten minutes per side.  We'll here

from Mr. Cheffo first.

MR. CHEFFO:  Absolutely, your Honor.

Maybe I can even do it in less if I can.  Thank

you.

Essentially if I can start with the cost

issue.  I think where we are today is I feel a

little bit like no good deed has gone unpunished.

In other words there has been a significant

history, as the Court is aware lots of discovery in

the case.  A fair amount of, a substantial amount

of discovery has been produced by Pfizer Wolf both

by electronic and paper.

There was some agreements.  The parties,

AT

Proceedings

certainly as they should, have had worked together with respect to protocols and various mechanisms to do that.

We've gotten to a point, however, where it just appears that the plaintiff's kind of appetite for discovery is insatiable to the point where frankly I felt it necessary to bring it to the Court's attention here.

And I want to be very clear because I think it really guides the Court to understand what we're talking about.

In this case we have, we've done, essentially we're going to be doing tier one track one discovery which would be the plaintiff, it would be the prescriber, and it would be the sales reps who called on those prescribing physicians.

Pfizer has produced the entire database previously that would basically allow them to understand who those actual sales reps are. In that database it also has the call notes. So in other words what they said, if they left any information.

They also certainly have, and this is only the initial discovery, they have the plaintiff's records. They have an opportunity to

AT

1                              Proceedings

2          talk to the sales reps.  They have experienced from

3          other sales reps in other emails throughout the

4          company.

5                    And what we're talking about here today

6          is they want, you know, this litigation goes back

7          some time, not before the Court, but in terms of

8          certain of the claims.

9                    Really what they are asking for now is

10         not only what I just articulated that we've

11         provided and given them databases, but they want us

12         to go back and search for essentially personal or

13         custodial files for each of the sales reps who

14         would have called, for basically emails and all

15         types of information.

16                   And frankly, your Honor, I said while I

17         didn't think that it was appropriate even from a

18         relevance perspective, we didn't make a relevance

19         objection.  I said, okay, if you really think you

20         need this information, we're not going to bother

21         the Court with it, we're going to produce it.

22                   But there does come a point,

23         particularly I think the overlap here is we're

24         working really very hard to try to meet the Court's

25         deadlines.  If we have to essentially overlap doing

26         what really is tertiary types of discovery on sales

                              AT

1                          Proceedings

2          rep files, many of these folks may not be with the

3          company for five or more years, that we think the

4          law is very clear if you really want this

5          information that you should bear the cost for it.

6          And we're not talking about insignificant costs.

7                    Now I didn't, and we certainly can, I

8          didn't, you know, want to attach all kinds of

9          affidavits.  I thought it was more appropriate to

10         talk and give the Court and you can ask for the

11         information, but we're talking about between ten

12         and $40,000 is the number that I have been given

13         with respect to each of the sales reps.  That

14         includes identifying, harvesting, reviewing,

15         producing it.  With hundreds you very easily get up

16         to three to five million dollars worth for just

17         these kind of tertiary costs.

18                    So we essentially came forward and said,

19         you know, we tried to work it out as we work out

20         many things, and said, look, if you want this you

21         need to pay for it.  The law I think is very clear.

22         We think we satisfied the Sulick Federal Court

23         standards, but for today we're not in Federal

24         Court, we're in State Court.  And the State Court

25         rules are fairly clear.  I think at least.  And

26         certainly in the First Department.  Now there has

                              AT

Proceedings

1

2      been certainly commentary, we're well aware of

3      that, we're all following that.  This is a new and

4      developing area.  But at best that's kind of law

5      review type analysis and speculation about maybe

6      ways to do it.

7                   As we stand right now the party

8      requesting discovery needs to pay for it.  Now just

9      two quick things --

10                  THE COURT:  Excuse me.  Can you address

11     with a little bit more specificity how what the

12     plaintiff is asking for now, and I gather what they

13     are asking for is in the Exhibit A to your

14     submission, the request dated September 1, 2009,

15     how what they are asking for now differs from what

16     they already have or what you've already produced?

17                  MR. CHEFFO:  Well, Exhibit A is very

18     broad.  I've really only talked about the sales

19     reps custodial files.  I think they asked for data

20     on, for IMS data.  In other words how much each

21     prescriber would have prescribed.  And just so the

22     Court's aware of that, that's information that we

23     have that, we Pfizer, have to go to a separate

24     company and actually pay to obtain.

25                  I think the crux of our dispute, at

26     least today, is this custodial file sales rep data.

                              AT

Proceedings

What we've given them is the names of each sales
rep who called.  In fact, they have it because we
gave them, as I understand it, the entire database
which says, let's say it said Dr. Friedman, they
can punch in your Honor's name, if you were a
prescribing physician.

They would see the folks who called
upon, plus to the extent that any of the sales reps
put notes in, you know, said, "Spoke with Dr.
Friedman, left some samples, did X, Y and Z."  And
they have all that information.

What they are asking for now is to
basically go to those sales reps, non parties,
folks who may not be here, go to their files and
actually do full kind of email custodial type
searches.  Did they possibly receive an email
regarding Neurontin or something else.

That's why at least in my view it's very
far afield to the core issues.  They have said,
"well, we couldn't possibly depose these sales
reps."

This happens every single day in New
York Courts.  We never have custodial files of
sales reps.  They have the sales reps.  They know a
lot about Neurontin, they know about the structure.

AT

1                    Proceedings

2        They have the call notes, they have the medical

3        records.

4                    THE COURT:   And the call notes show

5        which of the doctors the sales reps contacted?

6                    MR. CHEFFO:   Yes, and it's very

7        specific.   So in other words let's say we're only

8        talking about the prescribers.

9                    So if someone prescribed Neurontin,

10       they'd want to talk to that doctor as to find out

11       what they did, what they knew.   Then they said,

12       well, they also have claims of marketing and

13       promotion, so they want to talk to the sales reps

14       to find out what information they may have told the

15       prescribing doctors.   We don't object to that.

16       That's what we've all determined is the protocol.

17                   And to help them prepare for both the

18       sales rep and the prescriber, they certainly have

19       all the medical records for the plaintiff in the

20       case.   We have given them a database that says for

21       that specific prescriber you can type in his or her

22       name and it will tell you every visit that the

23       sales rep had.   And sometimes there is five or six,

24       I think in the Ballo case, which is one of our

25       cases just to give you an example, there is eight

26       sales reps who called on that prescribing.   So they

                           AT

1                        Proceedings

2       know the names of it.

3                    And every time the sales rep goes to

4       visit, every single time, there is an opportunity

5       for the sales rep to enter something into the

6       computer every single time they go to the doctor,

7       whatever it is.  They have that database.

8                    So in our view there is a huge amount of

9       information.  Certainly enough to get to the point

10      of asking some depositions.  If they take the

11      deposition and they find out there is some errant

12      document or something that's new, obviously we

13      think we're reasonable, we can talk about that.

14                   But in advance to basically have to

15      spend, you know, five million dollars to search

16      every custodial rep doesn't seem what the law would

17      require.  If that answers your question, I will

18      move, your Honor, to the second point.

19                   The second point is, you know, and it's

20      somewhat ironic, and I will tell you I kind of

21      hesitate ever to use the sanctions word.  We've

22      been talking about asking your Honor for an order

23      with respect to an adverse inference.  But I guess

24      under the rubric of how you get that relief, it is

25      a sanction.

26                   And I want to be clear, I don't impute

                              AT

Proceedings

1

2      any bad motive or conduct on plaintiff's counsel.

3      But I think it's a very timely situation, because

4      at the same time that they are asking us to spend

5      probably millions of dollars for tertiary

6      information, we've now taken two plaintiff's

7      depositions.  The first two and the five initial

8      cases.

9              And Mr. Young, I took his deposition I

10      think a week ago Wednesday, and what Mr. Young said

11      was he was the first plaintiff to ever file a

12      Neurontin case in New York.  I think he started the

13      entire litigation.  He was the first one back in

14      2004.

15              Mr. Young said he has never saved

16      information, he has never been told that he should.

17      And, you know, they have harped on or focused on

18      things like calendars and medical records, because

19      I asked them essentially four or five questions,

20      "Do you have this kind of information?  Do you have

21      this kind of information?"

22              And I didn't want to spend two hours

23      going through every single piece of information.

24      So I think what he said was he was never told to

25      save any information.  He also said, again

26      ironically in light of what we're here for today on

AT

1          Proceedings

2          plaintiff's request, even though he was appearing

3          for the deposition on last Wednesday, a well

4          noticed deposition, he never searched any of his

5          custodial files, which he had at home, which he has

6          in storage, which he has at his father's house.

7                    So there is really two issues, it's a

8          lack of diligence by the plaintiff to even

9          investigate whether he had responsive documents,

10         and then it's essentially going through a

11         litigation for five years without saving any

12         documents whatsoever.

13                    And, you know, I will tell you that

14         Mr. Wargo was another plaintiff.  So our experience

15         has really been not positive in regard to what we

16         found.  The second person said he also was not told

17         to retain documents.

18                    So in conclusion, your Honor, I want to

19         be respectful of the Court's time, at the same time

20         we're kind of having Pfizer produce millions and

21         millions of pages and ask to reproduce millions of

22         dollars worth of more tertiary information.  We

23         have the plaintiffs in the litigation, the first

24         two plaintiffs.

25                    And I will point out, Mr. Young, that's

26         a case that plaintiffs picked, that's their pick.

                         AT

Proceedings

The first picked plaintiff comes and says, "I never was told to save any documents."

THE COURT:  Mr. Fromson.

MR. FROMSON:  Thank you, your Honor. There has been no demonstration here that any of the information that plaintiffs have sought is not reasonably accessible, or that there would be an undue burden in providing the information.

Mr. Cheffo went from $10,000 per case to five million dollars per case during his ten minute presentation.  And so I certainly don't think there is enough information for us to even understand that type of spectrum of costs.

But more importantly the standard in New York is whether the information is reasonably accessible and whether there is an undue burden or cost.  And I don't believe that the defendants can shift the burden to provide discovery based on either of those two facts.

We start with the fact that there is an agreement in 2004 which governed the conduct of discovery in this case, and that the defense wants to now depart from without any basis to do so.

That agreement in 2004 was negotiated between the parties.  The conduct of the parties

AT

Proceedings

1

2      was that the producing party would bear the costs

3      of production and specifically in that November of

4      '04 agreement there is a specific clause in the

5      first paragraph that discusses what costs would be

6      borne by the receiving party, and that's just the

7      media, meaning the hard drive.

8              We are not asking -- there was some

9      phraseology in sum and substance the issue was what

10     plaintiffs are asking for now is A, B and C.

11     That's not the way I would characterize it.

12             Plaintiffs are not asking for anything

13     new.  Plaintiffs are asking today for exactly what

14     they asked for in 2004.  In the MDL this is the

15     conduct that has been going on since 2005 or so

16     when our products cases were put there.  We're

17     asking for nothing new, nothing different.

18             In the pilot cases here, just as in the

19     track one cases in Boston, the core discovery for a

20     sales rep was as follows:  The sales call notes,

21     the sales rep deposition, and the sales rep file.

22     Nothing else.  For core discovery.

23             We are asking for nothing more, nothing

24     less, than for the parties to engage in the same

25     conduct that has been going on in the MDL, and

26     which this Court stated in it's 2006 CMO would be

AT

Proceedings

2  going on here.  No change in conduct.

3          We've also appeared before you either by

4  phone or in person to discuss the management of

5  these five pilot cases.  We went through at least

6  two orders.  And at no time was there a request to

7  change the conduct of the case in terms of costs.

8          And so this is the first time the Court

9  now is being presented with this issue at a late

10  juncture when the core discovery in these cases is

11  due in less than a month.

12          As far as the law is concerned, there is

13  no presumption that plaintiffs pay the costs.  For

14  example, if the Court were to consider departing

15  from the 2004 agreement, and the Court went to New

16  York Law, we believe that 202.19 of he New York

17  trial rule is instructive if not dispositive of the

18  issue, and that there is no presumption that

19  plaintiffs pay the costs there would first be a

20  burden that they have not demonstrated.

21          So at the very least our suggestion to

22  the Court was during our telephone conference and

23  to Mr. Cheffo, it was go forward now with exactly

24  the same conduct that the parties have been going

25  forward with since 2004 on these five cases, and

26  then if you need to raise this issue, which we

AT

Proceedings

don't believe you should, at least raise it in the
future where there is no tight discovery deadline
with which the Court and the parties are
confronted.

There was a reference that the entire
database was given.  It's simply not true.  Only
portions of the database regarding the sales call
notes were provided and only went through
approximately 2004, May 2004.  And so even to the
extent that we have been given a sales call
database, it's incomplete.

Before I move on to the spoliation
portion, your Honor, I just want to make sure if
you have any specific questions on the issue I'd be
obviously willing to entertain them.

As far as spoliation is concerned,
Judge -- also the assembly bill on the costs issue.
The assembly bill, while not dispositive of the
issue, demonstrates and clarifies New York law that
the CPLR places the burden on the defendants, on
the producing party, to come forward with an
argument that it's not reasonably accessible, or
that there is a burden in terms of undue cause.
And there is no such thing here.

One, they haven't provided that type of

AT

Proceedings

1

2    discovery.  We would need that discovery to address

3    whether there is something regarding reasonable

4    access, and whether there is an undue cost which we

5    haven't been given.

6         As to the spoliation issues, your Honor,

7    I was given the opportunity to read the rough draft

8    at Mr. Young's deposition.  And I stand obviously

9    on the papers we submitted.

10        There is an issue here of

11    sophistication, or lack thereof, with respect to

12    the witness.  The questions themselves were

13    essentially over broad in terms of asking him what

14    he saved and what he didn't save.

15        And he was not represented by counsel

16    for the two years from his date of accident to the

17    time when he brought the suit in '04.  And so he

18    was never asked to save anything during that period

19    of time.

20        And taking the defendant's request to

21    its logical end, if Mr. Young had gone into Rite

22    Aid yesterday and bought Sudafed for a cold, they

23    would want him to keep the box and the receipt.

24    And it's really not logical end to which I believe

25    they are seeking the spoliation motion, it just

26    doesn't make sense.

AT

Proceedings

1

2          In terms of Mr. Wargo, I was present at

3     his deposition.  There were objections to the

4     testimony, or rather the questions that were posed.

5     And I don't believe in the characterization that he

6     hasn't saved what is necessary for the case.

7          I don't believe there is any prejudice

8     in terms of the spoliation on either side, and I'd

9     ask you simply to rely on the five and quarter

10    pages we submitted to the Court in that respect.

11         My primary concern is the cost issue on

12    the first issue, your Honor, because they are

13    trying to change the rules of the game in the

14    fourth quarter.  We're simply trying exactly what

15    has been done since the beginning and stick with

16    the conduct that this Court asked these parties to

17    engage in, and it's consistent with the MDL.

18    That's it, Judge.  Thank you.

19         THE COURT:  Mr. Cheffo, when you reply

20    would you address this issue of whether this

21    discovery that is now being sought is the same as

22    the discovery for the worked up plaintiffs that was

23    obtained in the MDL or whether it exceeds it in any

24    way.

25         MR. CHEFFO:  Sure, absolutely, your

26    Honor.  Two things, and if I misspoke as

                        AT

1              Proceedings

2     Mr. Fromson pointed out, what I meant to say is

3     there is ten to $30,000 per case.

4              When I said case I meant the hundreds of

5     cases would be the three to five million just to be

6     clear.  I wasn't saying it's ten to five million in

7     any individual case.

8              But absolutely, your Honor, was this

9     discovery my understanding is the type of discovery

10    that Mr. Fromson is talking about of searching for

11    this custodial files.

12             I do believe in the tier one track one

13    MDL cases that was done.  So to that regard it is

14    not new discovery in this litigation.

15             What I think the issue here is, one,

16    we're not arguing here relevance.  We're basically

17    saying first of all New York law is much clearer we

18    believe on this point than federal law as far as

19    the burden.

20             So I think the issue here is not whether

21    they are entitled to it, and I think this point of

22    there is somehow going to be delay, we raised it

23    last minute, I take issue with that.  Basically we

24    said we'll meet the deadlines.  Basically we want

25    you to bear the cost.

26             The truth is, your Honor, I guarantee if

                      AT

1                           Proceedings

2          you were to shift or even have some accommodation

3          here where there was some sharing, all of a sudden

4          I guarantee you we wouldn't need the five million

5          worth of discovery.

6                    So it's essentially a little bit of we

7          have an all you can eat buffet mentality as long as

8          Pfizer agrees to pay for everything.  So that's the

9          first part.

10                   The agreement, with all due respect to

11         Mr. Fromson, I think you can read it just as well

12         as we can, only a few cases back in 2004, in fact,

13         I think it supports our position because it says to

14         the extent you want information you basically have

15         to pay for the disks or everything else that you're

16         using.

17                   Certainly the law and timing has moved

18         since 2004.  And I think we're just really being

19         guided by not an assembly bill, but we're being

20         guided by the First Department rules here.

21                   And I also don't think this wasn't an

22         opportunity, I think again maybe Mr. Fromson

23         doesn't recall this, but we had met very early on

24         when I got involved, and I've always raised this

25         issue of costs.

26                   Because I don't think it's something

                              AT

Proceedings

1               that we needed to bother the Court with in terms of

2               our point is not impossibility.  There may come a

3               time where they are asking for impossible, but our

4               point here is we will get it done, we just think

5               that they need to bear their fair share of the

6               discovery burden in this litigation.

7

8                          THE COURT:  We will take a five minute

9               recess and then I am going to rule.

10                       (Brief recess.)

11                       THE COURT:  Back on the record.  The

12              Court's ruling is as follows.  First Pfizer seeks a

13              ruling that plaintiff should bear Pfizer's costs

14              for production of the sales representative's

15               custodial or personal files requested in

16              plaintiff's requests for production of documents

17              dated September 1, 2009, and annexed as Exhibit A

18              to Pfizer's submission.

19                     The Court is of the opinion that the

20              status quo should be maintained at this time.

21              Given the party's course of conduct, and given that

22              the discovery that is now sought is no more

23              extensive than the discovery for the tier one

24              plaintiffs in the federal MDL, the Court finds that

25              as to the five tier one plaintiffs in the State

26              Court litigation as to which discovery is now being

AT

1                           Proceedings

2          conducted, Pfizer should continue to bear the costs

3          of production.

4                   In so holding, the Court notes that

5          under the party's November 29, 2004 agreement,

6          Pfizer did have and does have the right to come to

7          this Court and seek a determination with respect to

8          the responsibility of the parties for the costs of

9          the discovery.

10                  However, the Court will for the reasons

11         just stated maintain the status quo at the present

12         time.  Pfizer will reserve the right in the event

13         the plaintiffs seek similar discovery for

14         additional plaintiffs, or on the conclusion of the

15         discovery of the plaintiffs whose cases are being

16         prepared for trial in the State Court litigation,

17         to seek to shift the burden of the cost of

18         production to plaintiffs, or otherwise to seek an

19         allocation of the costs which Pfizer has or will

20         have born with respect to these five plaintiffs.

21                  In other words this is an interim

22         decision and the ultimate responsibility of the

23         costs of production of this discovery will be

24         subject to further order of the Court.

25                  Pfizer also seeks a ruling determining

26         that plaintiffs have failed to preserve relevant

                              AT

Proceedings

1

2    evidence and imposing sanctions for spoliation,

3    particularly with respect to plaintiff Young,

4    although defendant's written submission appears to

5    seek a broader ruling extending beyond plaintiff

6    Young's case.

7            This Court will not entertain spoliation

8    motions on a piecemeal basis.  When the cases are

9    reached or about to be reached for trial and when

10   it is determined which of these cases is going to

11   be tried, the Court will entertain spoliation

12   motions.

13           The spoliation application is therefore

14   denied without prejudice to spoliation motions at

15   the appropriate time which the Court has just

16   outlined.  This concludes the Court's ruling on

17   Pfizer's two applications.

18           Pfizer shall promptly obtain a copy of

19   this transcript and file it with the Clerk of Part

20   57 for transmission to me for so orthopedic ring in

21   which event the transcript shall constitute the

22   order as well as the decision of the Court.

23           Counsel are advised that the Court may

24   correct transcripts, therefore if the transcript is

25   needed for any further purpose, counsel should be

26   sure that they have a copy of the transcript as so

AT

```
1                    Proceedings

2         ordered by the Court and not merely as signed by

3         the Court Reporter.  This concludes the Court's

4         ruling.

5                    Now I would like to conference with the

6         parties off the record to see whether there are any

7         other issues that anyone wishes to address today,

8         and then if we need to go back on the record we can

9         do that.  Off the record.

10                   (Discussion held off the record.)

11                   THE COURT:  Back on the record.  The

12        record will reflect that I have conferred with

13        counsel and there are no additional issues to be

14        addressed this afternoon.  The record is closed for

15        this session.

16                    *       *       *

17

18   CERTIFIED TO BE A TRUE AND CORRECT
     TRANSCRIPT OF THE FOREGOING PROCEEDINGS.

19

20   ANGELA TOLAS, OFFICIAL COURT REPORTER

21

22

23

24

25

26

                         AT
```