# EXHIBIT 5

1

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 3
 4
     IN RE:  NEURONTIN           MDL DOCKET NO. 1629
 5   MARKETING, SALES            MASTER FILE NO. 04-10981
     PRACTICES AND PRODUCTS      JUDGE PATTI B. SARIS
 6   LIABILITY LITIGATION        MAGISTRATE JUDGE LEO T.
                                 SOROKIN
 7
     - - - - - - - - - - - - - - - -
 8                          DATE:  January 23, 2008
                            TIME:  9:00 a.m.
 9
10              Confidential videotape deposition of
11   JOHN M. KNOOP, taken by and before JOYCE SILVER, a
12   Certified Shorthand Reporter and Notary Public of the
13   State of New York, held at the office of DAVIS, POLK
14   & WARDWELL LLP, 450 Lexington Avenue, New York, New
15   York.
16
17
18
19
20
21
22
23
24
25
```

```
 1                JOHN M. KNOOP - CONFIDENTIAL
 2         A.    I don't recall.
 3         Q.    Or the department that may have created
 4   it?
 5               MR. ROCHE:  Same objection.
 6         A.    I don't recall.
 7         Q.    Do you see the first two letters are SK?
 8         A.    Yes.
 9         Q.    I think you had mentioned that there was
10   a Stuart Kolinski in the legal department?
11         A.    Yes.
12         Q.    Do you know if Stuart Kolinski generated
13   documents that had his initials in the lower left
14   corner?
15               MR. ROCHE:  Object to form.
16         A.    I don't.
17         Q.    I'd like to show you what will be marked
18   as Exhibit 6.
19               (Knoop-6, Memo dated 12/20/95, Bates Nos.
20   WLC Franklin 0000199943-51 is received and marked for
21   identification.)
22         Q.    Have you had a chance to review this
23   document?
24         A.    Not yet.
25               Okay.
```

157

```
 1              JOHN M. KNOOP - CONFIDENTIAL
 2       Q.     Have you seen this document before?
 3       A.     I don't recall ever seeing it.
 4       Q.     And just for the record when I call this
 5  a document, I'm referring to what was -- the way this
 6  document was produced by Pfizer.  And I'm not trying
 7  to represent that these pages necessarily all belong
 8  together, but this was back noted as a single
 9  document by Pfizer.
10              Do you know who LeeAnne Fogelman was?
11       A.     I don't recognize the name.
12       Q.     Do you see the date of the document,
13  December 20, 1995?
14       A.     Yes.
15       Q.     On or about December 20, 1995, were you
16  Director of the Epilepsy Disease Team?
17       A.     No, I was a senior product manager.
18       Q.     You were still a senior product manager?
19       A.     Yes.
20       Q.     Just so that I'm clear for this next line
21  of questioning, when did you become Director of the
22  Epilepsy Disease Team?
23       A.     On or about September of '95 -- oh, I'm
24  sorry.  I'm sorry.  I apologize.  I was the director
25  then, I'm sorry.  My fault.  I was thinking January
```

158

```
 1              JOHN M. KNOOP - CONFIDENTIAL
 2     '95, sorry.
 3          Q.    And this memo is to district TM
 4     contacts/ABMs.  Based on your experience at
 5     Parke-Davis, can you identify what a district TM is?
 6          A.    I believe the initials TM meant territory
 7     manager.
 8          Q.    And those are sales representatives?
 9          A.    Yes.
10          Q.    And specifically sales representatives
11     out of one of the various CBUs?
12                MR. ROCHE:  Object to form.
13          A.    It would be in reference to one of the
14     CBUs, yes.
15          Q.    Let me put my question a different way.
16     Did Morris Plains have its own sales reps?
17          A.    No.
18          Q.    So all sales reps worked out of one of
19     the CBUs?
20          A.    Right.
21          Q.    Is that correct?
22                MR. ROCHE:  Object to form.
23          A.    One of the five CBUs, yes.
24          Q.    And ABMs, do you recall what those were?
25          A.    Areas business managers.
```

```
 1              JOHN M. KNOOP - CONFIDENTIAL
 2        Q.    And does that also refer to the sales
 3   representatives structure?
 4              MR. ROCHE:  Object to form.
 5        A.    Yes, in the CBUs.
 6        Q.    In the CBUs.  Okay.  At the top of this
 7   document, do you see where it says, "Southeast
 8   Customer Business Unit"?  It's a little hard to read.
 9        A.    I can't really make it out, but I have to
10   take your word for it.  I can't make it out on this.
11        Q.    And did Morris Plains have its own staff
12   of medical liaisons?
13              MR. ROCHE:  Object to form.
14        A.    No.
15        Q.    So medical liaisons were, also, part of
16   the CBU structure?
17              MR. ROCHE:  Object to form.
18        A.    Yes.
19        Q.    Now the subject of this memorandum is
20   Neurontin teleconferences; is that correct?
21        A.    Yes.
22        Q.    Do you have any recollection on or around
23   December 1995 of Parke-Davis either nationally or
24   through the CBUs holding Neurontin teleconferences?
25              MR. ROCHE:  Object to form.
```

```
 1              JOHN M. KNOOP - CONFIDENTIAL
 2      A.      I don't recall.
 3      Q.      And do you see there's a reference to
 4   there being a limit of 25 physicians per call?
 5      A.      Yes.
 6      Q.      So this is referring to group
 7   teleconferences; is that correct?
 8              MR. ROCHE:  Object to form.
 9      A.      That would be the conclusion I would take
10   from that.
11      Q.      And then in the second to last paragraph
12   it says, "Please encourage reps to bring lunch or at
13   least attempt to be in the office to ensure that the
14   doctors call in at the appropriate time."
15              Do you see that?
16      A.      Yes.
17      Q.      Was bringing lunch or being in the office
18   a marketing tactic that Parke-Davis used at the time
19   that you were employed there?
20              MR. ROCHE:  Object to form.
21      A.      I wouldn't really call it a marketing
22   tactic.
23      Q.      What would you call it?
24      A.      I would call it more of a sales,
25   salesman's tool to get in the door.
```

```
 1                JOHN M. KNOOP - CONFIDENTIAL
 2         Q.     Okay.  Now turning to the second page
 3  which has a title.  It says, "Neurontin Conference
 4  Call Schedule."  Do you see that?
 5         A.     Yes.
 6         Q.     And can you identify what the topics were
 7  for this 10 or so calls that are listed?
 8                MR. ROCHE:  Object to form.  You just
 9  want him to read the document?
10                MR. RONA:  I just want him to identify
11  what the topics are.
12         A.     Pain, and let's see, one, two, three,
13  four, five, six, seven, eight, nine, 10 pain topics
14  and two bipolar.
15         Q.     And are any of them epilepsy -- do any of
16  them list epilepsy as a topic?
17         A.     No.
18         Q.     And do you see a reference to
19  Dr. Longimire in some of the events?
20         A.     Yes, that person is mentioned twice.
21         Q.     And do you have any recollection of who
22  Dr. Longimire is?
23         A.     I really don't, no.
24         Q.     Now, turn, if you could, to the -- using
25  the small numbers again, the last two digits 49, and
```

```
 1                JOHN M. KNOOP - CONFIDENTIAL
 2     do you see that about a third of the way down it
 3     says, "Non-Epileptic uses of gabapentin conference
 4     calls"?
 5          A.    Yes.
 6          Q.    Do you recall at the time that you were
 7     Director of the Epilepsy Disease Team there being
 8     non-epileptic uses of gabapentin conference calls?
 9          A.    I don't recall.
10          Q.    Now there's a couple of sentences under
11     that heading.  Do you see those?
12          A.    Yes.
13          Q.    Okay.  And one of them says, "12
14     physicians per call"?
15          A.    Yes.
16          Q.    And then the next sentence says, "Leaders
17     of conference calls are our non-epileptic uses of
18     gabapentin consultants"?
19          A.    Yes.
20          Q.    Do you recall there being non-epileptic
21     uses of gabapentin consultants for Parke-Davis?
22                MR. ROCHE:  Object to form.
23          A.    I don't recall.
24          Q.    And just for the record, gabapentin means
25     Neurontin.  Is that correct?
```

```
 1              JOHN M. KNOOP - CONFIDENTIAL
 2       A.     Yes.
 3       Q.     Do you remember who Beth Attias-Yon was?
 4       A.     Yes, she was a medical director in the
 5   Atlanta or southeast CBU.
 6       Q.     Now jumping down a little bit, do you see
 7   where it says, "Territory Managers may not call up to
 8   listen to the call"?
 9       A.     Okay, yes.
10       Q.     Do you recall why territory managers were
11   not allowed to call up to listen to the call?
12              MR. ROCHE:  Objection, lack of
13   foundation.  Calls for speculation.
14       A.     I'm really not -- I can't recall.
15       Q.     Well, based on your experience at
16   Parke-Davis, are there reasons that you can think of
17   that territory managers would not participate in a
18   conference call?
19              MR. ROCHE:  Object to form.
20       A.     If the call was off label, you wouldn't
21   want them involved in it.
22       Q.     Now can you read the next sentence into
23   the record?
24       A.     "However, if they are in a luncheon
25   situation with a participating physician, they may
```

164

```
 1              JOHN M. KNOOP - CONFIDENTIAL
 2     listen."
 3          Q.    And I believe looking back at the first
 4     page that TMs and ABMs were encouraged -- were asked
 5     to encourage reps to bring lunch to the office.  Do
 6     you see that?
 7          A.    Yes.
 8                MR. ROCHE:  Object to form.
 9          Q.    Now turning your attention back to
10     Exhibit 3, and the second page of Exhibit 3, do you
11     recall that I asked you a couple of questions about
12     Section 5?
13          A.    Yes.
14          Q.    And specifically the statement "...no
15     group meetings or teleconferences"?
16          A.    Yes.
17          Q.    Based on your experience at Parke-Davis,
18     are the telephone conferences described in Exhibit 6
19     the type or an example of a group teleconference that
20     would not be allowed under the standard operating
21     procedures contained in Exhibit 3?
22                MR. ROCHE:  Object to form, lack of
23     foundation, calls for speculation.
24          A.    I would say the conference calls that
25     were described in Exhibit 6 would have gone through
```

```
 1            JOHN M. KNOOP - CONFIDENTIAL
 2   the MERC to be able to be conducted.  I think what's
 3   in this other document is talking about unsolicited
 4   requests is just in general.  At least that's the way
 5   I read it.
 6        Q.    I mean is the purpose of the
 7   teleconferences described in Exhibit 6 to respond to
 8   unsolicited requests for information?
 9              MR. ROCHE:  Object to form.
10        A.    I don't know exactly the context here.
11        Q.    And you say that these went through MERC;
12   is that correct?
13              MR. ROCHE:  Object to form.
14        Q.    These conference call?
15        A.    I don't know if they did.
16              MR. ROCHE:  Mischaracterizes his
17   testimony.
18        A.    I don't know if they did.  In fact, all
19   I'm saying is for them to be able to do that, they
20   would have had to have gone through MERC.
21        Q.    So you're not sure if they did, but
22   you're saying they would have had to?
23        A.    Right.
24        Q.    I would like to show you what's going to
25   be marked as Exhibit 7.
```