UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**<u>KAISER'S RICO EVIDENCE</u>**

Pursuant to the Court's directive, Kaiser respectfully submits the following compilation of evidence admitted, or to be admitted, at trial in support of its RICO claims.[1]

## I.   OVERVIEW

The Third Coordinated Amended Complaint alleges substantive RICO claims under §1962(c) for the Cline Davis & Mann ("CDM") enterprise and the Medical Action Communications ("MAC") enterprise.  [Docket 583, pp. 101-104].[2] The complaint also alleges a conspiracy count under §1962(d) in connection with these RICO enterprises.  [Docket 583, pp.125-6].  There is no doubt that the Plaintiffs here were intended victims of their fraud, and were, in fact, affected by it.

The CDM enterprise began in 1995, and while it involved large, strategic and tactical plans for the marketing of Neurontin widely and across the United States, the overall primary focus was to generate off-label sales of Neurontin for unproven indications or for dosages over 1800 mg.  The CDM enterprise was succeeded by the MAC enterprise in 2000, and its primary focus was to ensure the financial success of Neurontin for unproven off-label uses by obscuring or falsifying the reliable scientific evidence doctors trust in making prescription decisions. While one enterprise generally followed the other, the two enterprises formed a continuum of unlawful off-label marketing for each of the indications at issue in this trial – bipolar and other mood disorders, pain, migraine and doses over 1800 mg.

---

[1] Plaintiffs reserve their right to respond to any Rule 50 motion before it is ruled upon.

[2] The Kaiser Plaintiffs requested a technical amendment to the Third Coordinated Complaint to "formally add MAC to the list of RICO enterprises" in the Joint Pretrial Memorandum submitted prior to trial.  Joint Pretrial Mem., filed December 15, 2010, Docket No. 2500, at pp. 58-59.  The Third Coordinated Complaint alleged that Defendants and MAC conspired to commit the wrongs alleged, which constitute a pattern of racketeering activity under RICO, but did not formally add a count for the MAC subenterprise.  TAC at paras. 244-334.  On February 22, 2010 the Court allowed the amendment.  February 22, 2010 Trial Tr. at 23-24:6-12 (stating "if in fact that one enterprise has been listed in the complaint, there's no surprise prejudice for adding it formally into the complaint as a sub-enterprise," and "Yes, I'm inclined to allow that amendment.")

In 1995, Parke-Davis terminated its relationship with an earlier advertising company and began years of cooperation with CDM.  Acting as a "partnership", Parke-Davis would, each Fall, annually review the overall marketing strategy and tactics for Neurontin, including each of the off-label conditions at issue in this case.  Sometimes Parke-Davis devised the strategies; sometimes CDM proposed them to Parke-Davis. However generated, the overall strategies and tactics were outlined by these two participants to the CDM enterprise, and for the balance of the year the tactics and strategies were implemented.

By January of 2001, Parke-Davis had been acquired by Pfizer.  By this time Neurontin was widely successful, almost entirely on its unproven off-label uses.  In January of 2001, Pfizer joined with MAC, a medical marketing firm, and collaborated in a scheme to flood the medical publications market with articles fraudulently promoting Neurontin for off-label uses and to suppress the increasing number of negative clinical trials that would have revealed Neurontin's inefficacy for various indications.  The details of this enterprise, of course, follow.

The CDM and MAC enterprises are discussed sequentially below.  In each section we first provide a brief overview, and then we provide examples of the facts for each of the indications.  The facts in this document are sourced to (i) trial exhibits, (ii) those trial exhibits which have been submitted to the Court but on which the Court has yet to rule, (iii) portions of the trial transcript, or (iv) portions of deposition testimony which have been or will be introduced during the trial.

The trial testimony has been clear and unequivocal that Permanente Medical Group ("PMG") physicians are subject to the same influences as other physicians in the United States.  PMG physicians are recruited from all over the country.  They read the same published journals that every physician has access to.  PMG physicians attend meetings, specialty society meetings,

conferences and national meetings and drug company sponsored dinners and meetings.[3]  For example, the evidence shows that thirty-three different PMG physicians from four different regions, including six chiefs of psychiatry attended a CME devised by Defendants and Cline Davis & Mann on social phobia and bipolar disorders.[4]

There are over 12,000 PMG physicians practicing in the eight Kaiser regions located throughout the United States.[5]  These PMG physicians, as well as Kaiser's Drug Information Specialists were specifically detailed by Defendants with respect to Neurontin.[6]  In fact, Pfizer's own Kaiser operating plan states in pertinent part "continue to support field detailing activities."[7]

Dr. Abramson testified that Permanante doctors, like all doctors, rely on several sources of information, such as the published biomedical literature, CMEs, drug lunches, journal advertisements and information provided by pharmaceutical sales representatives.[8]

Dr. Dickersin testified that Kaiser, as a healthcare provider, relies on the evidence-based, which is contained in the biomedical literature.  If that literature is biased through misrepresentation or suppression, Kaiser, as part of the medical community, is directly impacted.[9]

The head of Kaiser's Drug Information Services testified that the published medical literature provides the foundation for its evaluation of drugs.[10]  In articulating the fraud perpetrated on Kaiser Dr. Millares stated: "The core of the problem is we have thousands of physicians who believe that Gabapentin or Neurontin works for these indications. . . we're an evidence-based organization, and that's how we practice, and they depend upon the literature,

---

[3] Hyatt Tr., 3/3/2010, 99:9 – 100:3
[4] Ex. 360. A list of the PMG physicians is attached as Exhibit A.
[5] Carrejo Tr., 2/26/2010, 83:16; 93:2-4
[6] Carrejo Tr., 2/26/2010, 97:20-25
[7] Ex. 250.
[8] Abramson Tr., 2/23/2010, 93:15-95:9
[9] Dickersin Tr., 2/25/2010, 72:12 – 73:18
[10] Millares Test., 3/4/2010, 44:9 – 49:23

what was out in the literature. . ."[11] "Drug Information Services depended upon the evidence, and so we came to the wrong conclusions."[12]

While most RICO cases involve *some* use of the mails and/or wires in furtherance of a scheme to defraud, this case involves little else.  Fundamentally, this case is about communications:  communications between Defendants and their co-conspirators, CDM and MAC; communications within each organization in furtherance of their shared, unlawful objective; communications between individuals within each organization charged with implementing their unlawful scheme and the "authors" of misleading publications; and direct and indirect communications between the RICO enterprises and their principal targets, prescribing physicians.

Aside from face-to-face communications at CMEs and periodic meetings of the RICO co-conspirators, *all* of the communications at issue in this case occurred via the mails and/or wires. And the meetings and CMEs themselves were the end *result* of those communications.  As the Supreme Court has repeatedly held, to qualify as a predicate act of mail (or wire) fraud:

> [T]he use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part of the scheme, a step in [the] plot. . .. '[I]nnocent' mailings—ones that contain no false information—may supply the mailing element. . . . The Court has found the elements of mail fraud to be satisfied where the mailings have been routine.

*Schmuck v. United States*, 489 U.S. 705, 710-11, 714 (1989) (internal quotations and citations omitted).

Applying this standard, Defendants' violations of the mail and wire fraud statutes are so pervasive as to be incalculable.  A few of the more significant of these violations are presented below.

---

[11] Millares Test., 3/4/2010 94:2 – 96:8
[12] Millares Test., 3/4/2010 94:2 – 96:8

One final comment is order.  In this document we have generally not argued *inferences* which may be drawn from the subsidiary facts we have outlined, nor have we generally included "Pfizer-only" or "Parke-Davis-only" evidence.  While we believe it is permissible for the jury to use such "manufacturer-only" evidence in conjunction with the other subsidiary evidence regarding the RICO enterprises to draw appropriate inferences regarding overall marketing activities that were commenced pursuant to and in furtherance of the RICO enterprises, we have chosen instead to stick generally to the discreet facts that clearly link the participants to each enterprise in order to enable this Court to "connect the dots" between the defendants and CDM or MAC.

## II.    THE DEFENDANTS-CDM ENTERPRISE

### A.    Formation of the Enterprise and Agreement on Its Unlawful Objectives

In 1995, Parke-Davis changed advertising agencies, replacing the existing agency with Cline Davis & Mann.[13]  CDM was retained to consult with Parke-Davis on all aspects of Parke-Davis's Neurontin business.[14]  CDM also joined Parke-Davis's internal Extended Neurontin Disease Team, an interdisciplinary team that had primary oversight over the marketing of Neurontin.[15]  Between June 1995 and June 2000, CDM prepared marketing strategy proposals for Neurontin.[16]  CDM then prepared marketing tactics to implement those strategies, including Parke-Davis's strategy to "Expand Emerging Uses."[17]

The Neurontin account manager at CDM, who was a member of Parke-Davis's Neurontin Extended Marketing Team from May 1996 through June 1999,  testified that the nature of the

---

[13] Knoop (2002) 42:5 – 42:14; 49:3 – 49:10
[14] Crook Tr. at 199:3-200:3 (testimony of Neutontin product manager for Parke-Davis).
[15] Knoop Tr. at 41:23-43:16.
[16] Knoop Tr. at 44:8-18.
[17] *Id.* at 37:21-24; 38:3-39:1; 41:23-43:16.

relationship between CDM and Parke-Davis regarding the promotion of Neurontin was that of a partnership.[18]

On June 5, 1996, a high-level "Face-to-Face" meeting took place between Parke-Davis and CDM to discuss the marketing of Neurontin.  Parke-Davis was represented at the meeting by its President, as well as its VP of Medical & Scientific Affairs, and its Director of Advertising Operations and Marketing Logistics.  CDM was represented by two of its three founding partners, as well as its Executive Vice President and Director of Operations.[19]

Meeting slides show that CDM and Parke-Davis conducted a "Wargames" meeting on March 1, 1996, at which point CDM "began formulating strategies based on that meeting." CDM also hired a "dedicated Neurontin account executive.[20]  Meeting slides further show that CDM's "Neurontin Goals" for the second and third quarters of 1996 included: "[f]ull development of 1997 strategic and tactical plan."  In keeping with that strategy, CDM and Parke-Davis planned a "Strategy Meeting" for the following day, after which CDM would "develop and submit [a] strategy document and tactical plan in keeping with the Parke-Davis timetable."[21]

The next day, June 6, 1996, CDM and Parke-Davis held the "Strategy Meeting."  The meeting, which took place at the offices of CDM, consisted of an "interdisciplinary team…of representatives from the Parke-Davis CNS marketing, medical, market research and managed care groups" on one hand, and CDM representatives relating to "medical education, creative services and account service" on the other hand.  The purpose of the meeting was "to develop 1997 objectives and strategies for marketing and promoting… Neurontin."[22]  The meeting focused on Neurontin "Life Cycle Planning."  The planning included various off-label uses of

---

[18] Cheng Tr. at 49:23-50:13.
[19] Exhibit 26 (Slides for "Second Quarter Face-to-Face Meeting").
[20] *Id.* (referring to Clare Cheng).
[21] *Id.*
[22] Ex. 73 (CDM Memo to Parke-Davis regarding "Minutes- June 6, Strategy Meeting").

Neurontin including monotherapy, high doses, and migraine, and contained a discussion specifically devoted to "the use of technology and other forms of non-personal promotion to both augment the efforts of the sales force and reach non-called-on targets."[23]  At the meeting, the SWOT (a marketing acronym which refers to "strengths, weaknesses, opportunities and threats") Analysis prepared at the April Wargames meeting was updated.  Under "Opportunities," CDM listed "neuropathic pain/migraine use," the "positive results of -88 monotherapy study," (referring to the results of study 945-88, which compared a low dose of Neurontin to 3600mg/day), that "Abbott [was] focusing on bipolar disorders and psychiatrists," and finally "STEP data." Under "weaknesses," CDM noted Neurontin's "perceived lack of efficacy."  The outcome of the meeting was a joint decision by Parke-Davis and CDM on the "[t]op line Neurontin strategies for 1997," which included a strategy for "publications/education efforts to support the life cycle plan."[24]

On June 7, 1996, CDM prepared and signed a contract addendum adding Neurontin as one of the drugs that CDM was retained "to advertise."   The contract, which was retroactive to April 1, 1996, set CDM's fee for "strategic management services relating to Neurontin" at $165/hour, not to exceed $150,000 for the contract term without written approval from Parke-Davis.  CDM also earned fees for "execution of core deliverables," which was also not to exceed $150,000 without written approval from Parke-Davis. The contract addendum was signed by CDM's Director of Operations, and Parke-Davis's Director of Marketing Logistics.[25]

CDM regularly communicated with the Parke-Davis marketing team by phone, e-mail, and fax.[26]  Parke-Davis and CDM maintained various systematic linkages between the two

---

[23] *Id.*
[24] Ex. 73 (CDM Memo to Parke-Davis regarding "Minutes- June 6, Strategy Meeting").
[25] Ex. 49 (CDM/Parke-Davis Contract Addendum).
[26] Samuels Tr. at 236:19-22; Cheng Tr. at 61:11-14; 61:17-61:23; 61:25-62:8..

organizations.  CDM sat on the Extended Neurontin Disease Team.  An internal, Parke-Davis presentation of its1998 marketing plan to area sales business managers in September 1997 lists the members of the Extended Disease Team, which included not only members of the Neurontin Marketing Team (John Knoop, Allen Crook, and Vic Delimata), Product Planning (Phil Magistro), Medical Affairs, and the various CBUs, but also Clare Cheng, on behalf of CDM.[27] A Neurontin Extended Disease Team Distribution List dated December 1, 1997 shows that Clare Cheng had both a voicemail box and extension in Parke-Davis's ASPEN system, which allowed Parke-Davis employees to exchange messages by voice throughout the company.[28]  Parke-Davis gave CDM a mailbox on its internal system so it could easily communicate with CDM and so that CDM could receive all system-wide voice mail messages relating to Neurontin.[29]

On September 13, 1996, CDM sent Parke-Davis a memo attaching "our recommendation for the 1997 tactical plan."  The two attached tactical grids showed "the strategies and audience addressed by each tactic." CDM's proposed "Neurontin 1997 Tactical Plan, "Strategy #1" was: "Execute publication/educational plan and clinical trials program to support product expansion in emerging uses."[30] This was the first time one of Parke-Davis's annual marketing strategies was devoted to the expansion of Neurontin's off-label use.   In fact, according to the deposition testimony of John Allen Crook, CDM proposed the 1997 marketing strategies, without input from Parke-Davis.[31]  In the first tactical grid attached, the strategy for the expansion of Neurontin's off-label use called for two sets of tactics: "Third Party Education Programs," and "High dose meetings."  According to the second tactical grid, these tactics were directed not at

---

[27] Exhibit 44 ("Neurontin gabapentin capsules" slides for presentation for CNS ABMs).
[28] Exhibit 69  ("Neurontin Extended Disease Team Distribution List" and Parke-Davis Memorandum regarding "CME Supplement – Psychiatric Times").
[29] Cheng Tr. at 202:14-16; 202:18-203:2.
[30] Ex. 75 (CDM Memo to Parke-Davis Product Manager regarding "Neurontin 1997 Tactical Plan").
[31] Crook Tr. at 202:24-204:8; 204:16-205:5.

high "decile" neurologists (the highest prescribers of AEDs) that were the normal targets of

Neurontin marketing, but instead at a broad swath of "Others," including anesthesiologists,

physicians who are primarily concern with the treatment of pain.

CDM's detailed explanation of the "Third Party Education Program" shows that the

"objective" of the tactic was to "support product expansion in emerging areas." According to

CDM, this objective could be met through the use of "Symposia dinner meetings hosted by third

party on topics [including]:

- Diabetic neuropathy
- Low back pain
- AIDS related neuropathy
- Post radiation pain in cancer patients

The target audience for these third party medical education tactics included

endocrinologists and diabetic nurse educators (who typically would see many diabetic peripheral

neuropathy cases) and infectious disease specialists (who typically would see many postherpetic

neuralgia cases).

A handwritten notation below this description lists "Proworx," a division of CDM that

provided medical education to doctors.[32] According to CDM Proworx produced medical

education programs for Neurontin where doctors were brought together in furtherance of the

marketing strategies and marketing tactics designed to implement those strategies.[33]

CDM's proposal for "High dose meetings" (which was subsequently crossed out and

annotated by hand to read "STEPS speakers bureau") had a stated "objective" to: "Encourage

titration to higher doses through peer-to-peer influence." The common purpose for this proposed

---

[32] Ex. 75 (CDM Memo to Parke-Davis Product Manager regarding "Neurontin 1997 Tactical Plan").
[33] Samuels Tr. at 24:5-14.

tactic is clear, as CDM specifically recognized that "[s]peakers should be recruited locally by CBUs as a closer relationship between the speaker and the audience will have a larger impact."[34]

CDM recommended "fictionalized" communications to physicians concerning off-label use of Neurontin.  Its suggestion for "case studies" designed to "[u]se peer-to-peer influence to give non-users reassurance that Neurontin can be safely titrated to higher doses until individualized maximum therapeutic effect is reached,"  stated that these cases studies could either be "[r]eal" or "fictionalized."

Parke-Davis adopted CDM's recommendations, budgeting $3.86 million towards its 1997 strategy to "[s]upport product expansion in emerging uses."[35] More than half of this budgeted amount was for "CME Education Programs," and $200,000 was allocated for "Publications." These amounts are reflected in a document dated October 26, 1996.

In January 1997, CDM prepared its year-end fee tracking report for Neurontin.  The report showed that CDM exceeded its budget for strategic management services by $327,675. When adjusted for amounts where CDM came in under budget, Parke-Davis's past due amount owed to CDM was in excess of $160,000.  However, "[i]n the spirit of partnership and commitment to a long term relationship and in recognition of the shared learning attendant to transitioning the Neurontin account," CDM allowed Parke-Davis to pay only half of the amount owed; CDM wrote off the other half.[36]

On June 11, 1997, CDM's Proworx division recommended various tactics to Parke-Davis to increase Neurontin's use in the area of bipolar disorders.[37]  CDM informed Parke-Davis of the results of an APA advisory board meeting held in California in May 1997 to "discuss how

---

[34] Ex. 75 (CDM Memo to Parke-Davis Product Manager regarding "Neurontin 1997 Tactical Plan").
[35] Ex. 48  ("1997 National Strategies and Tactics" Grid for Neurontin).
[36] Ex. 50 (CDM letter to Parke-Davis VP of Portfolio Management).
[37] Ex. 68 (CDM division Proworx Memo regarding "APA Advisory Board Meeting Summary").

anticonvulsants are currently being used in the area of psychiatric disorders… and determine whether there is a need for further clinical studies in the area of anticonvulsants and psychiatric disorders."  Based on the "Educational Suggestions" received during this meeting, CDM recommended that Parke-Davis implement that following tactics:  "CME Programs"; "Blanket Psychiatric convention market with satellite symposia, posters and papers"; "Create a slide kit which would entail new data from the ongoing and future studies, Neurontin slides, and summary slides"; "…write and publish papers in psychiatric journals"; and "Develop journal supplements."  Proworx shared intent to work with Parke-Davis to increase Neurontin's sales for bipolar is revealed in the conclusion of the memo.  It states that "it is important to execute the studies and educational tactics mentioned above in order to bypass the other anticonvulsants within this market."[38]

On July 30, 1997, CDM sent Parke-Davis a proposal for "1998 Neurontin Tactics."[39] Once again, CDM recommended adoption of a strategy to grow off-label prescriptions. According to the "1998 Neurontin Tactics/Strategy Grid," CDM advocated adoption of a strategy to "Maximize opportunities in 'emerging uses' market through publications, educational activities and clinical trials."  Within this strategy, proposed tactics included:

- "Diabetic Neuropathy CME…to increase awareness of Neurontin's efficacy in the treatment of diabetic neuropathy," to be directed to anesthesiologists, endocrinologists, diabetic nurse educators, and infectious disease specialists, all of whom were considered pain practitioners;

- "Bipolar CME…to increase awareness of Neurontin's efficacy in the treatment of bipolar disorders," to be directed to psychiatrists and psychiatry residents/fellows;

- "AIDS Neuropathy Ad Bd [Advisory Board] …to increase awareness of Neurontin's efficacy in the treatment of neuropathy related to AIDS," to be directed to pain management specialists and infectious disease specialists; and

---

[38] *Id.*
[39] Ex. 17 ("1998 Neurontin Tactics" Presentation prepared by CDM).

-11-

- "Migraine Ad Bd…to increase awareness of Neurontin's efficacy in the treatment of migraines," to be directed to neurologists and pain management specialists.

As part of its partnership, CDM kept abreast of the most up to date scientific evidence relating to Neurontin.[40] Thus CDM knew, or should have known, that the above efficacy messages contained in its proposal for "1998 Neurontin Tactics" were false.  Moreover, the CDM proposal marks the first time that psychiatrists became a primary target for Neurontin prescriptions.  In total, the CDM proposal listed 11 separate tactics to be directed at psychiatrists.

Parke-Davis adopted CDM's proposal nearly verbatim, as is reflected in its 1998 Strategic Plan and A&P Allocation Grid.[41]  Parke-Davis's Strategic Plan called for a strategy to "maximize opportunities in the 'emerging uses' through clinical trials, publications, and educational events."  After approving strategies and tactics proposed by CDM, Parke-Davis budgeted $11.1 million dollars to implement tactics in support of its strategy of expanding the "emerging use" market.[42]  Tactics included the publications, US Psychiatric and Mental Health Congress, weekend conference CMEs, and Dinner Meetings.  As set forth below, each of these tactics was implemented.[43]  The 1998 Strategic Plan and A&P Allocation Grid also included various tactics for pain, including publications of the DPN and PHN studies in JAMA, and public relations activities surrounding the publications of these articles.

The plan also called for tactics in the area of migraine.[44]  According to the testimony of John Knoop, all CME events proposed in the Neurontin Strategic and Neurontin Tactical Plans between 1996 and 2000 were paid for out of Parke-Davis' Marketing Budget.[45]

---

[40] Cheng Tr. at 49:4-49:15.
[41] Ex. 33 ("1998 Strategic Plan and A&P Allocation Grid" for Neurontin).
[42] Knoop Tr. at 300:17-302:6.
[43] Ex. 100; Ex. 110; Ex. 360
[44] Ex. 33 ("1998 Strategic Plan and A&P Allocation Grid" for Neurontin).
[45] Knoop Tr. at 277:6-16.

An internal Parke-Davis sales presentation contained a "Proposed Strategies Summary," which included "Medical Education" and "Publications."[46]  The presentation also noted: "Titration message effective – titrating beyond 1800 mg."  The presentation also referenced various CME activities under neuropathic pain, which included the ADA Post Symposia Case Study Mailing, and a supplement to Internal Medicine that was sent to 56,000 doctors.  Both of these tactics were implemented.[47]  Under psychiatry, the presentation listed various tactics, including a symposium at the US Psychiatric & Mental Health Congress, a supplement to be mailed with Psychiatric Times, and "Psychiatry Dinner Programs" held in the first quarter of 1988.  These tactics were implemented.[48]

On December 29, 1997, "members of the Parke-Davis CNS Disease Team and CDM met to discuss the 1998 plans for the CNS portfolio."[49] For Neurontin, the teams conducted a review and update of the SWOT analysis for Neurontin and its competitors.  The teams also conducted a review of the Neurontin 1998 tactics, in large part because "we were not granted the expected monotherapy indication and there are new entrants in the adjunctive segment of the market…" CDM proposed ways for Parke-Davis to overcome the monotherapy setback.  CDM recognized that "Neurontin has QOL [Quality of Life] and cognition data which may not be used in direct promotion," but recommended that such data "be presented in regional education meetings or widely disseminated by the medical liaisons to further strengthen Neurontin position." CDM still deemed the "Established group of high-dose thought leaders" to be a strength of Neurontin," and proposed that misleading STEPS efficacy data be presented to PCPs, neurologists and

---

[46] Ex. 44 ("Neurontin gabapentin capsules" slides for presentation for CNS ABMs).
[47] *See* Ex. 17; Ex. 40
[48] Ex. 100; Barkin Test., 2/26/2010, 32:12 – 33:10
[49] Ex. 86 (CDM Memo to Parke-Davis regarding "CNS Strategy Meeting").

psychiatrists as part of a "Direct Mail-Sampling Program."  CDM further recognized that

"Neuropathic pain/migraine use" represented an opportunity for Neurontin.[50]

On July 16, 1998, CDM and Parke-Davis met "to discuss 1999 strategies and broad

tactics.  At the meeting, CDM proposed dissemination of off-label articles pursuant to the FDA

Modernization Act:

> The team discussed the benefits to the brand should an exemption
> be granted under the FDA Modernization Act.  The team agreed
> that areas which may be worthwhile pursing are post-herpetic
> neuralgia, diabetic neuropathy, psychiatry, migraine…ACTION:
> Conduct a literature search to assemble all articles on emerging
> uses which may qualify for dissemination…studies on Neurontin
> efficacy in bipolar disorders, generalized anxiety, social phobia,
> post-herpetic neuralgia, diabetic neuropathy, cancer pain…may
> also be disseminated.[51]

CDM then agreed to "develop tactics on how information can be disseminated to PCPs,

psychiatrists, oncologists, and endocrinologists if the FDA Modernization Act legislation passes

and an exemption is granted to Neurontin."

Parke-Davis's "1999 Strategy Plan and A & P Allocation Grid for Neurontin" allocated

more than $12 million toward the strategy to "Execute publication/educational activities in

emerging uses." While most of the off-label tactics presented were similar to those tactics used in

the previous year, one big difference was the $1 million allocated to "JAMA reprints and sample

fulfillment."[52] Other proposed tactics included CME meetings and monographs for bipolar, pain

and migraine.

For 2000, CDM proposed the use of a "Migraine Program Highlights on Toll-Free '800'

Number" to "extend the life" of the prior year's migraine program and to "provide encapsulated

program highlights for physicians who may not have the time to participate in the full CME

---

[50] *Id.*
[51] Ex. 83 (CDM Memo to Parke-Davis regarding "Neurontin Strategy Meeting Minutes").
[52] Ex. 79 ("1999 Strategic Plan and A&P Allocation Grid" for Neurontin).

program."  CDM proposed to "edit the audiotape down to the most salient points and post the

abbreviated content on a toll-free number for a requested length of time." CDM also proposed a

Migraine "Fax Broadcast," which would target physicians who had not yet responded to the

original migraine program mailing.[53]  CDM also proposed "On-Line CME programs on

Neuropathic Pain."  Under this proposal, CDM's Proworx division "would work with recognized

faculty and medical writers to develop the content and initiate the web site posting" of

promotional material for off-label indications at sites like pain.com or Medscape.[54]

**B.** **Bipolar and Other Mood Disorders**

On June 11, 1997, CDM recommended to Parke-Davis various tactics to increase

Neurontin's use in the area of bipolar disorders.[55]  CDM informed Parke-Davis of the results of

an APA advisory board meeting held in California in May 1997 convened to "discuss how

anticonvulsants are currently being used in the area of psychiatric disorders… and determine

whether there is a need for further clinical studies in the area of anticonvulsants and psychiatric

disorders."[56]  CDM made various "Educational Suggestions", including "CME Programs,"

"Blanket Psychiatric convention market with satellite symposia, posters and papers," "Create a

slide kit which would entail new data from the ongoing and future studies, Neurontin slides, and

summary slides," "…write and publish papers in psychiatric journals" and "Develop journal

supplements."[57]  Proworx concludes "it is important to execute the studies and educational

tactics mentioned above in order to bypass the other anticonvulsants within this market."[58]

On July 30, 1997, CDM sent Parke-Davis a proposal for "1998 Neurontin Tactics."

---

[53] Ex. 97 (CDM division Proworx summaries on "Programs for 2000").
[54] *Id.*
[55] Ex. 68 (CDM division Proworx Memo regarding "APA Advisory Board Meeting Summary").
[56] *Id.*
[57] *Id.*
[58] *Id.*

Proposed tactics included a "Bipolar CME…to increase awareness of Neurontin's efficacy in the treatment of bipolar disorders," to be directed to psychiatrists and psychiatry residents/fellows; The CDM proposal marks the first time that psychiatrists became a primary target for Neurontin prescriptions.  In total, the CDM proposal listed 11 separate tactics to be directed at psychiatrists. Only high decile (i.e. high prescribers of AEDs)  neurologists, hospital residents, and high decile PCPs were the targets of more tactics.[59]

Parke-Davis adopted CDM's proposal to target psychiatrists nearly verbatim, as is reflected in the company's 1998 Strategic Plan and A&P Allocation Grid.[60]  Tactics included various activities relating to bipolar, including publications, US Psychiatric and Mental Health Congress, weekend conference CMEs, and Dinner Meetings.  As set forth below, each of these tactics were implemented.  For example, in late 1998, Parke-Davis sponsored the publishing of the "proceedings of a closed symposium held on July 24, 1998" in a supplement to the *Cleveland Clinic Journal of Medicine* entitled "New Treatment Strategies in Psychiatry: Role of Anticonvulsants."  Papers in the supplement state "gabapentin holds promise for treatment of bipolar disorder" and that "[d]espite few controlled studies on the efficacy of gabapentin in human pain management, this new drug has become the anticonvulsant of choice among many pain specialists….  There are several reports of gabapentin's efficacy in mixed neuropathic pain….  It has been tried with some success, as well, in postherpetic neuralgia, thalamic pain, and erythromelalgia."  The "Anticonvulsants for neuropathic pain and detoxification" submission includes gabapentin among "appropriate treatments for neuropathic pain" while the "Bipolar disorder: Current treatments and new strategies" concludes "the recently available anticonvulsants lamotrigine and gabapentin seem to be useful in treating both depression and

---

[59] Ex. 17 ("1998 Neurontin Tactics" Presentation prepared by CDM).
[60] Ex. 33  ("1998 Strategic Plan and A&P Allocation Grid" for Neurontin).

mania in some treatment-resistant patients."[61]  This submission was mailed to 43,000 psychiatrists.[62]

Beginning in late March 1998, Parke-Davis convened a series of "CME Psychiatry Dinners & Teleconferences."  According to the event slide deck that it received in advance of the events, Parke-Davis knew that physicians would not be told of the completed negative Pande study.  Instead, the slide deck told attendees that "early evidence suggests antimanic, antidepressant, and mood stabilizing effects" and "data are increasing but currently limited to favorable case reports and open trials."  For neuropathic pain, "data [is] limited to open trials and case reports."[63]

Beginning in July 1998, Parke-Davis supported numerous CMEs held throughout the country.[64]  The CME series had roughly 6,000 attendees.[65]  Among those attendees were 33 Permanent Member Group doctors, including six chiefs of psychiatry and numerous other doctors, most of whom were psychiatrists, from various Kaiser regions, including Southern California, Northern California, Colorado, and the Mid-Atlantic.[66]  The slide deck used at these meetings was part of the same series used in 1999, neither of which disclosed the known, negative results of the Pande study.[67]

Parke-Davis's "1999 Strategy Plan and A & P Allocation Grid for Neurontin" called for numerous programs related to bipolar disorder.[68] The evidence shows that such tactics were implemented.  In fact, in December 1998, Parke-Davis gave its "approval" for an "Unrestricted

---

[61] Ex. 110 (Cleveland Clinic Journal of Medicine Supplement 1 to Volume 65: "New Treatment Strategies in Psychiatry: Role of Anticonvulsants"); Ex. 100; Ex. 360.
[62] Barkin Test., 2/26/2010, 23:16 – 25:7
[63] Ex. 100 (Parke-Davis memorandum regarding "CME Psychiatry Dinners and Teleconferences" and attachments).
[64] Ex. 360 (1998 National Outcomes Report for Social Phobia meeting series).
[65] Ex. 64 (Quarterly Brand Review – Neurontin).
[66] *See* Ex. 360.
[67] Barkin Test., 2/26/2010, 30:16 – 33:8
[68] Ex. 79 ("1999 Strategic Plan and A&P Allocation Grid" for Neurontin).

Educational Grant" of "$2.5 million" to conduct "30 NATIONAL MEETINGS" and "23 REGIONAL MEETINGS" of a program entitled "New Treatment Frontiers in Social Phobia and Bipolar Disorder." [69] According to Dr. Barkin, the slides used at these programs were false and misleading and failed to disclose the known negative results of Parke-Davis's Pande study.[70] The slides refer to gabapentin as one of the "Newer Mood Stabilizers." The "reports of benefit" associated with gabapentin include "mania," "bipolar depression," "bipolar maintenance," "rapid cycling," "treatment resistance," and "mood instability." As for "Using Gabapentin," the slides list a "range 900-3600 mg (sometimes higher)." According to the slides, an advantage of gabapentin includes "reports and open-label data suggesting efficacy," and a disadvantage includes the "need for controlled studies (under way)."[71] 8,700 physicians were exposed to this message.[72]

## C.    Pain

On September 13, 1996, CDM sent Parke-Davis a memo attaching "our recommendation for the 1997 tactical plan." The two attached tactical grids showed "the strategies and audience addressed by each tactic." According to CDM's proposed "Neurontin 1997 Tactical Plan, "Strategy #1" was: "Execute publication/educational plan and clinical trials program to support product expansion in emerging uses." This was the first time one of Parke-Davis's marketing strategies was devoted to the expansion of Neurontin's off-label use. In the first tactical grid attached, the strategy for the expansion of Neurontin's off-label use called for two sets of tactics: "Third Party Education Programs," and "High dose meetings." According to the second tactical grid, these tactics were directed not at high "decile" neurologists (the highest prescribers of

---

[69] Ex. 361 (Grant request to Allen Crook at Parke-Davis for creation of "New Frontiers in Social Phobia and Bipolar Disorders" meeting series).
[70] Barkin Test., 2/26/2010, 30:21 – 32:7
[71] Ex. 63 ("New Frontiers in Anxiety, Substance Abuse and Bipolar Disorder" workbook).
[72] *Id.*

AEDs) that were the normal targets of Neurontin marketing, but instead at a broad swath of "Others," including anesthesiologists, physicians who are primarily concern with the treatment of pain.   CDM's detailed explanation of the "Third Party Education Program" shows that the "objective" of the tactic was to "support product expansion in emerging areas."   According to CDM, this objective could be met through the use of "Symposia dinner meetings hosted by third parties on topics [including]:

- Diabetic neuropathy
- Low back pain
- AIDS related neuropathy
- Post radiation pain in cancer patients

The target audience for these symposia dinner meetings included endocrinologists and diabetic nurse educators (who typically would see many diabetic peripheral neuropathy cases) and infectious disease specialists (who typically would see many postherpetic neuralgia cases). A handwritten notation below this description lists "Proworx."[73]

On March 18, 1997, CDM's Proworx division sent Parke-Davis a proposal to conduct a Satellite Symposium CME in connection with the 57th Annual Meeting of the American Diabetes Association.[74]   The proposal includes a program agenda, objectives, and budget for the program.   The proposal "recommends that Parke-Davis sponsor an accredited symposium to be held in conjunction with the 57th Annual Meeting of the American Diabetes Association" because "an educational effort spearheaded by leaders in pain management with the use of anticonvulsants appears to be warranted."

After the program was approved, "Proworx contacted Allen Crook, at Parke-Davis Portfolio to determine whether there were any faculty or physicians that he would like to

---

[73] Ex. 75 (CDM Memo to Parke-Davis Product Manager regarding "Neurontin 1997 Tactical Plan").
[74] Ex. 15 ("Anticonvulsants in the Treatment of Diabetic Neuropathy" overview prepared by CDM division Proworx).

recommend for this program."  Parke-Davis employees informed Proworx that they "would need to confer…as to who would be the best possible speakers."  One of the speakers selected by Parke-Davis was Dr. Vera Bril.  Upon learning of Parke-Davis's selection of the speakers, CDM contacted them to advise them of the topics "we wished for them to discuss."  Proworx also advised the speakers "what we wished their presentations to include."[75]

Proworx then spoke with Dr. Garofalo, a clinical researcher at Parke-Davis.  While there was a discussion of what data from ongoing DPN studies would be available for Dr. Bril's presentation, there was no reference to the completed negative trial of Dr. Gorson, the publication of which was suppressed by Parke-Davis.[76]

On June 18, 1997, CDM sent Parke-Davis a copy of Dr. Bril's abstract.[77]  Even prior to Parke-Davis seeing the abstract, CDM expressed "concerns regarding some of her comments."[78]  Specifically, the comment that CDM found concerning was Dr. Bril's truthful assertion that "Newer AED such as gabapentin (Neurontin)…cannot be recommended until efficacy is proven in double-blind, placebo-controlled trials due to their high cost."[79]  When Parke-Davis received the abstract, it immediately called Proworx to express concerns.[80]  Realizing that Dr. Bril would not change her presentation to conform to Parke-Davis's wishes, "Proworx immediately looked at all possible options.  They considered options from canceling her talk to counteract a possible "negative" presentation.  Proworx then met with the CDM account team to identify "what key issues needed to be presented to give attendees a "positive message" to go away with.[81]  CDM's

---

[75] Ex. 43 (CDM division Proworx Memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").
[76] *Id.*
[77] Ex. 41 (CDM division Proworx Memo to Parke-Davis Product Manager regarding "Vera Bril's Abstract").
[78] *Id.*
[79] Ex. 42 (CDM division Proworx Memo to Parke-Davis regarding "Dr. Bril's slides").
[80] Ex. 43 (CDM division Proworx Memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").
[81] *Id.*

solution was to "present questions at the Q & A session, which would take place immediately following [Dr. Brill's] presentation."[82]  The questions drafted by Proworx were sent to Parke-Davis for its review and approval on June 20, 1997.[83]

The Symposium took place in Boston on June 23, 1997 at the Boston Marriot in Copley Place.  Immediately following Dr. Bril's presentation, planted members of the audience, "skills", asked prewritten questions to Dr. Bril which, according to CDM, "did indeed lead Dr. Bril to address some of the positive aspects of anticonvulsants and of Neurontin."[84]  In CDM's opinion, these questions were necessary to "reverse the message that was delivered."  Because attendees were not informed of the role that Parke-Davis or CDM played in selecting the speaker or trying to counter the presentation with loaded questions planted in the audience, ordinary physicians would have assumed that this was an independent educational activity that was not under the control and influence of Parke-Davis.

The following day, CDM wrote a memo to Parke-Davis apologizing for what happened at the Symposium.  In its own words, Proworx stated:

> To the end, Proworx must take responsibility for not following up with a more in depth investigation of those physicians suggested by the [Parke-Davis] research team in Ann Arbor….In other situations, such as at the APA Advisory Board Meeting [*see* Section III.A, *supra*], it is Proworx policy to complete a literature search to determine who authors favorable articles on the topics outlined… Based on research Proworx had conducted previously, there is limited data published in this area.  Therefore, any recommendations identifying speakers who had actually worked with anticonvulsants in this manner, especially those with known ties to Parke-Davis were considered leads.[85]

---

[82] *Id.*
[83] Ex. 41 (CDM division Proworx Memo to Parke-Davis Product Manager regarding "Vera Bril's Abstract").
[84] Ex. 43 (CDM division Proworx Memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").
[85] *Id.*

CDM assured Parke-Davis that "additional guidelines have been set to ensure that this type of situation does not occur again."[86]

CDM then recommended "generating a mailing for [Symposium attendees] which would encompass clinical reprints, investigation summaries, or any articles that recognize anticonvulsants as a successful treatment option for diabetic neuropathy.[87] CDM was hopeful to continue "working with [Parke-Davis] in the future and turning an unfortunate situation into a positive one."

One month later, in July 1997, CDM sent Parke-Davis a proposal for a "Investigator CME Case Study Series."[88] The "objective" for a CME case study series was to "[c]onvey a positive message about the efficacy of anticonvulsants in the treatment of Diabetic Neuropathy." Proworx proposed to conduct "an in-depth screening process to determine the most appropriate faculty for this project…. After the screening process is complete, three physicians will be chosen to write a 2-3 page case report from their work on the Parke-Davis study… Content of the case studies will include two positive AED case studies and one specific to a positive experience with Neurontin." The case studies would be "[d]istributed to the 350 registrants who attended the ADA Satellite Symposium" the prior month. As part of this, "[e]ditorial" would "[e]dit case studies" and Proworx would "review changes from editorial" before sending them to the participants.[89]

One month later, in August 1997, CDM provided Parke-Davis with the results of its physician screening interviews for the authors of the case studies.[90] Of the 4 physicians interviewed, CDM determined that one physicians would be a "good candidate" because of his

---

[86] *Id.*
[87] *Id.*
[88] Ex. 37 ("Investigator CME Case Study Series" Presentation prepared by CDM division Proworx).
[89] *Id.*
[90] Ex. 38 (CDM division Proworx Memo to Parke-Davis regarding "Investigators CME Case Study Series").

"his enthusiasm for Neurontin."  Two other physicians were deemed possible candidates, either because they had a "positive outlook for Neurontin in this market" or they had "positive experiences with the drug."   The fourth candidate, however, could not be recommended by CDM because "we feel he is not as enthusiastic about Neurontin as are the other physicians who were interviewed for this program."[91]

By August 1997, it is indisputable that Parke-Davis was aware of the results of the negative study in diabetic neuropathy conducted by Dr. Gorson.[92]  Nevertheless, neither Parke-Davis nor CDM sought to interview Dr. Gorson or to include his work in any of their materials or presentations.

In December 1997, a printed publication entitled "Investigator CME Case Study Series" was mailed to the attendees of the ADA meeting earlier in the year in Boston.[93]  Although the publication was funded by Parke-Davis, neither this financial backing nor the actions that CDM conducted in putting together the publication are disclosed.  Thus, ordinary physicians would assume that this was an independent educational activity not under the influence or control of Parke-Davis.

In late 1997, Parke-Davis also supported an Internal Medicine supplement on "Managing the pain of diabetic neuropathy,"which included an article entitled "Anticonvulsants" by Gloria M. Galloway, MD, who writes "Gabapentin can be used as a first-choice anticonvulsant, added as a second agent, or reserved for cases in which carbamazepine and phenytoin have been

---

[91] Id.
[92] Ex. 19 (Kenneth Gorson, M.D. letter to Parke-Davis regarding "Gabapentin in painful diabetic neuropathy manuscript" and enclosing manuscript).
[93] Ex. 3 ("Emerging Treatments in Diabetic Neuropathy Investigator CME Case Study Series" packet).

unsuccessful" and that "[a] daily total of 1,800-3,600 mg may be needed."[94]   This supplement was mailed to 56,000 doctors.[95]

CDM's proposal for 1998 Neurontin strategies and tactics called for Parke-Davis to "Maximize opportunities in "emerging uses" market through publications, educational activities and clinical trials."  Parke-Davis adopted these strategies, and in late 1998, it sponsored the publication of a supplement to the *Cleveland Clinic Journal of Medicine* entitled "New Treatment Strategies in Psychiatry: Role of Anticonvulsants."  A chapter entitled "Anticonvulsants for neuropathic pain and detoxification" includes gabapentin among "appropriate treatments for neuropathic pain."[96]

In late 1998 and early 1999, Parke-Davis, through Makovsky & Company, a public relations firm, "launched a public relations initiative" to "educate both consumer and medical professionals about the results" of two Neurontin studies published in the December 2 issue of the *Journal of the American Medical Association* (JAMA) [that] showed that Neurontin was effective in the treatment of neuropathic pain associated with… post herpetic neuralgia… and diabetic peripheral neuropathy."   One of the articles was the Backonja paper, which contained the results of 945-210.  Neither the Backonja article, nor the public relations activities publicizing the article, disclosed the fact that the study was probably unblinded, if anything, and thus showed that Neurontin was ineffective.  The initiative included a "national media launch" with "three press releases and collateral materials," "video news release," "radio news release," "radio health journal," "airline video news release" and "mat release."  The report concludes that "Makovsky's campaign reached all key U.S. markets, generating in excess of 85 million

---

[94] Ex. 40 ("Managing the pain of diabetic neuropathy" supplement to Internal Medicine).
[95] Ex. 58 (Parke-Davis memorandum regarding "Review/analysis on Neurontin" enclosing "Neurontin gabapentin capsules Brand Update").
[96] Ex. 110 (Cleveland Clinic Journal of Medicine Supplement 1 to Volume 65: "New Treatment Strategies in Psychiatry: Role of Anticonvulsants").

impressions."[97] Accompanying the public relations activities were a series of CMEs and advisory boards, at which a slide deck created by CDM was used.[98]

In March 1999, Parke-Davis supported, with "an educational grant," the publishing of "Pharmacology of Painful Peripheral Neuropathies" in *Progress in Neurology* which concludes "the TCAs and gabapentin are first line therapy for the treatment of painful peripheral neuropathies" citing the fact that "[i]n two recent large clinical trials, gabapentin was found to be effective as a symptomatic treatment for painful diabetic neuropathy and postherpetic neuralgia (Backonja et al. 1998; Rowbotham et al. 1998)."[99] This was mailed in 4 waves to all neurologists throughout the United States.[100] This included PMG neurologists.

In March 2000, Parke-Davis sponsored, through an "unrestricted educational grant," the publishing of "Management of Neuropathic Pain Syndromes." The supplement contained an article entitled "Painful Diabetic Peripheral Neuropathy" stating "[o]f the new anticonvulsants, gabapentin was shown to be effective in the treatment of DN [Diabetic Neuropathy] in a double-blind, placebo-controlled, eight-week dose-titration trial using doses from 900 to 3,600 mg/d."[101]

A mid-2000 brand review called for pain CMEs through Dannemiller and a PCP monograph and tactics in the area of migraine. Each of these tactics was implemented, as shown in the below slides from a May 2000 "Neurontin Update."[102]

---

[97] Ex. 71 (Letter from Makovsky & Company enclosing "Neurontin (gabapentin) Final Media Results Report").
[98] Ex. 102 (Memo from Tammy Martin to CNS Marketing Managers).
[99] Ex. 80 (Progress in Neurology Volume 1, Number 1: "Pharmacology of Painful Peripheral Neuropathies").
[100] Ex. 92 (Neurontin Update).
[101] Ex. 82 (Neurology Reviews Supplement: "Management of Neuropathic Pain Syndromes").
[102] Ex. 40; Ex. 102; Ex. 71; Ex. 92

## Summary of 2000 CME Pain Programs for PCPs



- **"New Treatment Options for the Management of Pain-The Role of Anticonvulsants"**
  - Saturday 1/2 CME Program
  - CME through Dannemiller
  - 75 programs scheduled in 2000

- **"Diabetic Neuropathies & Microvascular Complications"**
  - CME Weeknight Dinner Programs
  - CME through Joslin Diabetes Center
  - 37 programs scheduled in 2000

- **"Re-evaluating Neuropathic Pain Treatment Algorithms" & "Applications of Anticonvulsants in Neurological Conditions"**
  - CME Dinner & Grand Rounds Series
  - 125 Dinner Program Events in 2000
  - 75 Grand Round Programs in 2000

WLC_CBU_04



## 2000 CME Pain Publications



- **Progress in Neurology -Dannemiller (2nd Year)**
  - 4 Waves in 2000 to all US Neurologists
  - "Entrapment Neuropathies of Upper Extremities"-Mailed in March
  - "Entrapment Neuropathies of Lower Extremities"-June 2000
  - "Treatment Advances in Parkinson's Disease"-September 2000
  - "Treatment Advances in Multiple Sclerosis"-November 2000

- **Progress in Pain Management for the Primary Care Physician** (Editor: Brad Galer, MD)
  - 4 Waves in 2000 to 50,000 PCPs (June, August, October, December)
  - "Diagnosis and Treatment of Painful Peripheral Neuropathies Pain"-Miroslav Backonja, MD
  - "Treatment Advances in Chronic Headache Pain"-Laurence Newmann, MD
  - "Chronic Neck and Back Pain"-Stewart Kahn, MD
  - "Diabetic Neuropathy"-David Hewitt, MD



D.       **Migraine and Headache**

In early 1999, CDM proposed to Parke-Davis a "multi-media medical education program to promote awareness of migraine treatment with a special focus on prevention." Program components included: a "printed monograph," "audiotape," and "teleconferences." The cost was $362,429. The proposed faculty advisor was Dr. Ninan Mathew, who was the lead investigator on the 945-220 study and the lead author of the publication that misleadingly reported the results of that negative study as positive. According to the proposal, CDM's "Proworx will work with the CME institution to ensure that all program components are successfully implemented."[103] Successful implementation involved several steps, including the following: Proworx drafted an invitation letter that was distributed to physicians.[104] In April 1999, Proworx also prepared an outline for the audiotape. The outline listed gabapentin as a "First-line option for migraine prophylaxis."[105]

Proworx was also involved in the drafting of the audiotape master script for the program. A draft of the script in May 1999 shows that the intent of the script was to convey an efficacy message concerning Neurontin's use in migraine. The script falsely describes the negative results of the Mathew study as positive, and also states falsely: "Gabapentin was found to be…effective in the prophylactic treatment of migraine in that particular study." No reference is made to the negative results of the 879-200 or 945-217 studies. The conclusion of the audio script is that "gabapentin…may be considered as first line under many circumstances." (The script also notes that "recent anecdotal evidence also suggests that Gabapentin may be equally effective in patients with bipolar illness, migraine and epilepsy…Gabapentin has been shown to

---

[103] Ex. 98 ("Advances in Migraine Management" presentation).
[104] Ex. 245 (Dear Doctor letter regarding "Advances in the Preventive Treatment of Migraine" and outline for audiotape of the program).
[105] *Id.*

have beneficial effects on neuropathic pain states such as diabetic neuropathy. . . and complex regional pain syndrome."[106] In July, 1999, Dr. Mathew received a honorarium for $20,000.[107]

On June 22, 1999, CDM prepared a status report for the migraine program. According to the status report, over "22,000 invitations were mailed to neurologists and primary care physicians." Proworx also offered to "work with Parke-Davis to research and track prescriptions for those physicians who completed the program. This additional investment could be worthwhile to track the ROI (return on investment) for the program.[108]

The final monograph repeats the same misrepresentations and omissions as the draft audio script. It claims that "gabapentin…may be considered first line under many circumstances," but fails to accurately disclose the negative results of 945-220, and doesn't disclose the negative results of 945-217 or 879-200.[109]

For 2000, CDM proposed the use of a "Migraine Program Highlights on Toll-Free '800' Number" to "extend the life" of the prior year's migraine program and to "provide encapsulated program highlights for physicians who may not have the time to participate in the full CME program." CDM proposed to "edit the audiotape down to the most salient points and post the abbreviated content on a toll-free number for a requested length of time." CDM also proposed a Migraine "Fax Broadcast," which would target physicians who had not yet responded to the original migraine program mailing.[110]

---

[106] Ex. 246  (Transcript of Audiotape of "Advances in Preventative Treatment of Migraine").
[107] Ex. 248 (Communications from CDM division Proworx to Dr. Ninan Mathew and Steve Biddle concerning "Advances in the Preventive Treatment of Migraine" program).
[108] Ex. 99 (CDM division Proworx Status Report for Parke-Davis regarding "Advances in the Preventive Treatment of Migraine").
[109] Ex. 99 (363 Monograph for "Advances in the Preventive Treatment of Migraine").
[110] Ex. 97 (CDM division Proworx summaries on "Programs for 2000").

E.     **Dosages Over 1800 mg/day**

On September 13, 1996, CDM sent Parke-Davis a memo attaching "our recommendation for the 1997 tactical plan."  The two attached tactical grids showed "the strategies and audience addressed by each tactic." According to CDM's proposed "Neurontin 1997 Tactical Plan, "Strategy #1" was: "Execute publication/educational plan and clinical trials program to support product expansion in emerging uses." This was the first time one of Parke-Davis's annual marketing strategies was devoted to the expansion of Neurontin's off-label use.  In the first tactical grid attached, the strategy for the expansion of Neurontin's off-label use called for two sets of tactics: "Third Party Education Programs," and "High dose meetings."  According to the second tactical grid, these tactics were directed not at high "decile" neurologists but instead a broad swath of "Others," including pain, physicians.

CDM's proposal for "High dose meetings" (which was subsequently crossed out and annotated to read "STEPS speakers bureau") had a stated "objective" to: "Encourage titration to higher doses through peer-to-peer influence."  The common purpose for this proposed tactic is clear, as CDM specifically recognized that "[s]peakers should be recruited locally by CBUs as a closer relationship between the speaker and the audience will have a larger impact."[111]

CDM again recommended using "peer-to-peer influence to give non-users reassurance that Neurontin can be safely titrated to higher doses until individualized maximum therapeutic effect is reached." CDM stated these cases studies could either be "[r]eal" or "fictionalized."

III.    **THE PFIZER-MAC RICO ENTERPRISE**

In June 2000, Pfizer's acquisition of Parke-Davis became finalized.  On June 30, 2000, a Pfizer Integration Meeting was held in order to bring Pfizer up to speed on the Neurontin

---

[111] *Id.*

brand.[112]  The Neurontin Brand Review was interesting, both in what was presented and what

was not presented.  What was presented was that Neurontin was a blockbuster, a drug with gross

sales of $1 billion dollars, against an Advertising & Promotion budget of only $54 million.  Only

$10 million was spent on detailing.[113]  What was not presented was that Neurontin was the

subject of a grand jury investigation that commenced in late 1999, or that a *qui tam* lawsuit had

been unsealed and served on Pfizer just one month earlier.[114]

Pfizer's first U.S. Operating Plan for Neurontin, prepared in October 2000, called for a

continuation of the previous Parke-Davis strategies, including a "Medical Education Plan" that

involved CME symposia and publications on pain and bipolar.[115]  Again, there was no mention

of any criminal or civil investigations relating to Neurontin.

Less than one month later, Pfizer apparently became very aware of the problems with

Neurontin.  In a memorandum written by Pfizer's Executive Vice President to the VP of Sales

and Marketing, Pfizer recognized the "unique challenges" of Neurontin:

> As we near finalization of the 2001 Operating Plan, a number of decisions have
> been made relevant to the promotion and marketing of Neurontin which I believe
> appropriately respond to these challenges….**Analysis of numerous market
> analyst reports (e.g. Scott-Levin, IMS), indicates that continued or even
> increased non-epilepsy uses of Neurontin and other AEDs is predictable.
> While this may occur independently, there will be no marketing or
> promotional activities intended to drive such growth**…Neurontin detailing will
> be limited only to the US RON sales force…RON reps will call only on
> Neurologists and institution based epilepsy centers for Neurontin…[A]ll detailing
> will be for epilepsy only.[116]

Recognizing that overt marketing of Neurontin for off-label uses would run afoul of this new

Pfizer policy, and possibly add to the legal problems the company faced, Pfizer instead opted for

---

[112] Ex. 143: Neurontin Brand Review—Pfizer Integration Meeting.
[113] *Id.*
[114] Ex. 206: Memo from Karen Katen.
[115] Ex. 129 (Neurontin 2001 U.S. Operating Plan).
[116] Ex. 206 (Memo from Karen Katen) (emphasis added).

even more covert means to disseminate the off-label messages to physicians.  Within the next 12
months, Pfizer implemented a "Publications Strategy" to ensure the placement of key messages
relating to neuropathic pain, high doses, and psychiatric uses in journal articles.[117]  The goal of
the publication strategy was two-fold: (1) to continue the fraudulent off-label marketing to grow
sales in a manner that was capable of evading detection, and (2) perhaps more importantly, to
delay, suppress, and bury the growing body of negative clinical trial data that would reveal the
dishonesty of the earlier marketing campaigns and cause sales to crash precipitously.  In order to
achieve these twin objectives, Pfizer needed assistance, and so Medical Action Communications
(MAC) was hired to manage publications.[118]

A.      **Formation of the Enterprise and Agreement on Its Unlawful Objectives**

From January 2001 through December 2002, MAC and Pfizer collaborated in a scheme
to flood the medical publications market with articles promoting off-label uses of Neurontin.[119]
By the time MAC joined forces with Pfizer, the CDM-Parke-Davis enterprise had already earned
billons of dollars in off-label Neurontin sales.  MAC's role was to develop a publications
strategy that both continued to promote Neurontin off-label and also helped suppress or spin
negative studies that could damage the Neurontin franchise.

MAC and Pfizer worked together through the joint Publications Subcommittee ("PSC"),
which developed "key messages" to be used in Neurontin publications.[120]  In early 2001, MAC
received a copy of the Global Branding Guide in order to develop key messages, including

---

[117] Ex. 138 (Neurontin 2002 Operating Plan).

[118] *Id.*

[119] *See* Marino Tr. at 250:4-12, 252:3-12 (Pfizer worked closely with MAC to create publication plans and
publication strategies, and used 8,000 publications, including those created by MAC and Fallon Medica, to influence
the medical community prescribing Neurontin); Glanzman Tr. at 183:12-15 (explaining that MAC was retained by
Pfizer to develop manuscripts containing key messages).

[120] *See* Tive Tr. at 573:5-9 (explaining that MAC, in conjunction with the Publications Subcommittee developed key
messages for Neurontin publications); Cooper Tr. at 29:2-21 (MAC helped develop key messages for Neurontin
publications).

messages regarding Neurontin's efficacy for neuropathic pain.[121]  The Global Branding Guide

was created by CDM.[122]  MAC developed a set of key messages by July 25, 2001 and circulated

it for comment.[123]  On August 16, 2001, Pfizer circulated the key messages developed by the

Neurontin PSC, noting that "[i]t is interesting to know that the company has such input in which

journals they would like this print to be and to whom we would like to target these articles to

[sic] by utilizing the correct journals for that audience."[124]  These key messages included

multiple off-label claims, such as that "[g]abapentin is safe and effective at high doses (>3600

mg)," "[g]abapentin is effective against a wide range of neurologic and psychiatric conditions,"

"[g]abapentin should be considered the first choice of therapy for neuropathic pain,"

"[g]abapentin is effective against a broad spectrum of neuropathic states," and "[p]roven efficacy

in neuropathic pain."[125]  MAC and Pfizer met regularly to discuss these key messages.[126]  These

"key messages" regarding off-label topics infused MAC and Pfizer's marketing strategy.

---

[121] Glanzman Tr. at 248:25 – 249:9.

[122] Samuels Tr. at 117:18-25.

[123] Ex. 136 (July 2001: MAC Action Report summarizes discussions of Neurontin Publications Subcommittee meeting attended by MAC and Pfizer personnel and states that "MAC updated the [Publications Subcommittee] regarding the development of key messages… and that it was anticipated that the draft key message list would be circulated to the team by 25-July.").

[124] Ex. 210 (August 2001: Pfizer emails members of its Neurontin team and notes "the key messages that Pfizer/Neurontin team will be targeting to display to the audience directly or indirectly in the article that is produced." These "key messages" include "Gabapentin is safe and effective at high doses (>3600 mg)," "Gabapentin is effective against a wide range of neurologic and psychiatric conditions," "Gabapentin should be considered the first choice of therapy for neuropathic pain," "Gabapentin is effective against a broad spectrum of neuropathic states," and "Proven efficacy for neuropathic pain.").

[125] Id.

[126] See Ex. 169 (September 2001: MAC and Pfizer meet regarding, among other items, "manuscript review" and a "key message update." MAC also attaches after the agenda a "Key Message Sign-off Sheet," including the messages, "Gabapentin is safe and effective at high doses (>3600 mg)," "Gabapentin has proven efficacy against a wide range of neurologic and psychiatric conditions," and "Gabapentin should be considered a first choice of therapy for neuropathic pain."  The document also includes a MAC Action Report, summarizing an August 15, 2001 meeting of the Neurontin Publications Subcommittee.  The Action Report reports that "MAC provided the team an expanded key message list."  It notes that "LT reminded the group that these messages are not to be viewed solely as claims but also as possible and desirable messages to develop for the future."); Ex. 251 (April 2002: MAC prepares agenda meeting of Neurontin Publications Plan Meeting, beginning with "strategic issues."  Agenda mentions "Neurontin Key Message References," including Neurontin "[s]hould be considered a first choice of therapy for neuropathic pain," "proven efficacy against a wide range of neurologic and psychiatric conditions," and "proven efficacy in large, controlled, randomized studies," citing Rowbotham, et al., Backonja, et al., and Rice and Maton, and "Dose up to 3600 mg/d can be safely and effectively administered.").

MAC and Pfizer incorporated the "key messages" into every promotional tool they could, including publications and CME presentations.  MAC tracked every manuscript to make sure they contained the proper key messages.[127]  MAC also explained that infusing marketing messages into the abstracts describing clinical study data would help align key messages between manuscripts, symposia presentations and CME monographs and attached the following diagram to illustrate the point.[128]



Given legal pressures that they came under to cease promoting off-label uses through sales representatives, Pfizer and MAC decided to further the off-label promotion campaign. Pfizer e-mailed MAC in July 2001 and stated that it:

> should be giving MAC everything and anything we would like to see
> supported with data and publications next year and the year after that.

---

[127] Glanzman Tr. at 182:24 – 183:15; 184:4-9; 184:17 – 185:9 (MAC and Fallon Medica tracked all manuscripts to assure they were moving forward and contained key messages).
[128] Ex. 259.

> The messages will be different from the branding guidelines because
> the branding guidelines are what we can say today based on legal,
> regulatory, and medical support, today.  The publications strategy
> needs to incorporate what we want to say in the future and how we want
> data and publications to support that.  If we agree on this, then we should
> be laying out the 'ideal Neurontin story' down and start figuring out how to support it and
> what the gaps are… [A]s publications come across our desk from now on, what are the
> things we want it to help us with?  [W]hat publications can we create or encourage to
> help us with our message?[129]

Pfizer reiterated this point in October 2002, stating that "publications are slightly different in that they are not limited by information in the label. . . . In the US, rapid titration cannot be promoted due to label restrictions.  However, we can provide this information via publications."[130]

Knowing that the best way to sell Neurontin for off-label indications was through publications, MAC and Pfizer sought authors who would be "pro-Neurontin."[131]  MAC had medical writers write all initial drafts of Pfizer medical publications related to Neurontin.[132]  They also prepared outlines of manuscripts that identified the key messages to be emphasized in the publication.[133]  MAC began writing so much for Pfizer that Pfizer requested that Dr. Backonja be listed as an author of a poster that MAC basically wrote, even though "Dr. Backonja's involvement in the IASP poster was to review and sign off on what MAC/Pfizer wrote and present it."[134]

---

[129] Ex. 165; *see also* Valerio Tr. at 45:13-15, 46:3-25.

[130] Ex. 126.

[131] *See* Ex. 125 (August 2001: MAC and Pfizer discuss who will author a paper on the dosing of Neurontin and a paper on Neurontin and pain.  On dosing, Pfizer's senior marketing manager suggests Michael McLean, noting that "he is so pro-Neurontin perhaps he can do it.  I am sure he will support our claim."  Another Pfizer employee states "I know Dr. McLean is an advocate of higher doses, and he is able to deliver a good message on why and how Neurontin should be used at higher doses."  On the paper on pain, Pfizer's senior marketing manager writes, "For the pain one I prefer David Rowbotham (UK) or Misha Backonja (USA). I am sure they will agree with our message (that is very important).").

[132] *See* Valerio Tr. at 38:23 – 39:10.

[133] *See* Ex. 255 (September 2001: Pfizer provides comments on a draft outline of a manuscript prepared by MAC on "Neuropathic Pain Dosing" whose "authorship [was] to be confirmed," although "MAC [was] in contact with Backonja."  The "[k]ey messages included… "Gabapentin is an anticonvulsant that has proven effective in the treatment of neuropathic pain," "some patients may require doses as high as 3600 mg/d," "Gabapentin doses up to 3600 mg/d have been proven well tolerated and effective in clinical studies.").

[134] Ex. 266 (November 2002: MAC emails Pfizer to convey that it is "a little confused about your proposed use of the non-peer reviewed IASP poster that MAC ghost-wrote along with the Neurontin PSC for Dr. Backonja as a justification for an alternative dosing and titration recommendation to the actual peer-reviewed article the memo is supposed to describe… Dr. Backonja's involvement in the IASP poster was to review and sign off on what

MAC and Pfizer planned to continue this strategy in 2003, planning to "[f]acilitate worldwide burst[s] of independent positive case reports to reinforce local/regional key messages," "[c]reate independent reviews to reinforce global marketing messages and off-label best practices," and "[d]evelop CME/symposia content through PSC to create consistent key messages and resources."[135]

MAC also helped Pfizer to spin or suppress negative findings. This approach was most evident with the results of Dr. Reckless's study on neuropathic pain. On July 18, 2001, MAC reported that "the team agrees that [Study 224 by Dr. Reckless] should not be pushed for publication."[136] The Reckless study never appeared in a stand-alone article, but was incorporated into a positive review article, for which MAC outlined the key points before it had even secured an author.[137] When MAC and Pfizer decided to have Dr. Backonja present the article, MAC expressed concern that "the real issue is deciding how to justify only reviewing 4 of 6 randomized placebo controlled studies and the rationale for why Dr. Backonja has access to unpublished papers and Pfizer data on file. Dr. Backonja and I welcome your input."[138] The study ultimately added a Pfizer employee to address the confidentiality issue, and spun the Reckless study in a way that minimized its negative results. In reconciling its account with

---

MAC/Pfizer wrote and present it." MAC adds, "To my knowledge, that poster and the pain dosing manuscript itself did not go through global RC and Bruce Parsons at that time or subsequently, which may explain why the scientifically unsubstantiated recommendation dosing by day 6 remained." MAC also states that "[a]s soon as we get some clarification we'll be happy to create a slide set that satisfies both your promotional goals and speaks of the scientific messages of the manuscript.").

[135] *See* Ex. 260 (October 2002: MAC states as strategies for 2003 to "[f]acilitate worldwide burst of independent positive case reports to reinforce local/regional key messages," "[c]reate independent reviews to reinforce global marketing messages and off-label best practices," and "[d]evelop CME/symposia content through PSC to create consistent key messages and resources." MAC also diagrams the steps to "Aligning Marketing and Scientific Key Messages," including coordinating CME presentations with publications.).

[136] Ex. 136.

[137] *See* Ex. 255

[138] Ex. 262. There were actually seven studies, including Gorson's negative study pain.

Pfizer, MAC noted that "[p]er PSC request, MAC attempted to slow the potential publication of [the Reckless] paper."[139]

MAC and Pfizer similarly minimized both the Serpell and POPP studies.[140]  MAC explained its common purpose with Pfizer in an e-mail entitled "spinning Serpell": "If Pfizer wants to use, present, and publish this comparative data analysis in which 2 of 5 studies compared make the overall picture look bad, how to [sic] we make it sound better than it looks on the graphs."[141]  With respect to the POPP studies, the message of delay was similarly clear: "maximize the time interval between the Reckless paper and the POPP study."[142]  A MAC Action Report the next month stated that "the team decided that [the POPP] manuscript would be placed on hold until the subanalysis is completed."[143]  These instances reflect only a few examples of the collaboration between MAC and Pfizer to develop publications to promote off-label use of Neurontin – examples exist for each indication.

B.    **Bipolar and Other Mood Disorders**

MAC and Pfizer worked together to develop off-label promotions for bipolar and other mood disorders.  The "key messages" that MAC developed included the claim that "[g]abapentin is effective against a wide range of neurologic and psychiatric conditions."[144]  MAC listed

---

[139] Ex. 261 (December 2002: MAC's "explanation of additional charges" lists "-NeP Dosing – 4 additional rounds of significant revisions[.]  Significant revisions were required to address multiple rounds of comments from the internal team to balance differences in opinion between marketing and medical….  –NeP (Reckless) – 2 submissions[.]  The paper was reformatted and resubmitted by MAC twice after the authors' initial submission had been rejected.  Per PSC request, MAC attempted to slow the potential publication of this paper.").

[140] The POPP Study was completed in November 2001 and found that Neurontin was not significantly better than placebo in treating post-surgical or traumatic nerve injury pain.  Abramson Test., 2/24/2010, 35:6 – 36:5.

[141] Ex. 263.

[142] Ex. 217 (September 2001: Pfizer employee Elizabeth Mutisya states: "I assume that we would like to maximize the time interval between the Reckless paper and the POPP study."  Pfizer's Neurontin Worldwide Team Leader responds: "Your assumptions are correct.").

[143] Ex. 166.

[144] Ex. 210 (August 2001: Pfizer emails members of its Neurontin team and notes "the key messages that Pfizer/Neurontin team will be targeting to display to the audience directly or indirectly in the article that is produced."  These "key messages" include "Gabapentin is effective against a wide range of neurologic and psychiatric conditions"); *see also* Ex. 169 (September 2001: MAC and Pfizer meet regarding, among other items,

psychiatry as a "key message" despite the fact that it had compiled negative literature on

Neurontin's use in bipolar disorder.  In September 2001, a Pfizer employee wrote that "I was

reviewing all literature MAC sent us regarding the use of our product [Neurontin] on [bipolar

disorder]...I know the best clinical trial we have is negative (A. Pande) but I wonder if we can do

something more."[145]  Pfizer employee Atul Pande, who had conducted that negative study,

responded that "I think we are whistling in the wind to think that we can easily get an indication

in bipolar disorder.  The disease is complicated, the studies are difficult and prolonged, and

gabapentin has a weak, if any, anti-manic effect."[146]  An October 2001 plan nonetheless

contained a slide on Publications Strategy identifying "Psychiatry" under "Key Message

Development."[147]  MAC also identified "Psychiatry" as a "Target indication" in its own

presentation in January 2002.[148]  These documents show that MAC and Pfizer included

psychiatry, and more specifically, bipolar disorder in their key messages, which they promoted

through CMEs and publications.

### C.   Pain

MAC and Pfizer also developed key messages for off-label marketing Neurontin's use for

chronic pain conditions.  Among MAC and Pfizer's "key messages" were that "Gabapentin

---

"manuscript review" and a "key message update."  MAC also attaches after the agenda a "Key Message Sign-off Sheet," including the message "Gabapentin has proven efficacy against a wide range of neurologic and psychiatric conditions."  The document also includes a MAC Action Report, summarizing an August 15, 2001 meeting of the Neurontin Publications Subcommittee.  The Action Report reports that "MAC provided the team an expanded key message list."  It notes that "LT reminded the group that these messages are not to be viewed solely as claims but also as possible and desirable messages to develop for the future.").

[145] Ex. 170.

[146] *Id.*

[147] Ex. 138 (October 2001: Pfizer's Neurontin 2002 U.S. Operating Plan contains a slide entitled "Publication Strategy," under which "Medical Action Communications (MAC)" is listed as the second bulleted item.  The third bulleted item is "Key Message Development," under which "Psychiatry" is listed).

[148] Ex. 130 (January 2002: MAC presentation identifies "Neurontin Publications Planning" team as including Pfizer and MAC; MAC lists 8 personnel as part of the team.  Presentation states that "Neurontin has demonstrated efficacy against a broad range of CNS disorders," including neuropathic pain, anxiety disorders, bipolar disorder, and migraine.  Presentation lists neuropathic pain, "migraine" and "psychiatry" as "[t]arget indications."  The document identifies as a "challenge" to "[f]acilitate greater control over ongoing publications and data" and to "[e]nsure a consistent implementation of key medical and marketing messages in support of Neurontin for each target indication with the various target audiences.").

should be considered the first choice therapy for neuropathic pain," Gabapentin is effective against a broad spectrum of neuropathic states," and "Proven efficacy for neuropathic pain."[149] In October 2001, Pfizer identified "Neuropathic Pain" as a topic for "Key Message Development."[150]  In late 2001, Pfizer circulated a global branding guide for Neurontin, which also listed under "Key Messages," that Neurontin has "Proven efficacy in patients with neuropathic pain."  In April 2002, MAC prepared an agenda for a Neurontin Publications Plan Meeting, which identified "Neurontin Key Message References" as including that "Neurontin "[s]hould be considered a first choice of therapy for neuropathic pain."[151]  Similarly, in July 2002, Pfizer and MAC prepared a publications planning presentation identifying neuropathic pain as a "strategic focus area to be monitored."[152]  In late 2002, Pfizer's second branding guide identified the "[b]rand positioning for neuropathic pain" as "Neurontin is an ideal first-line therapy for neuropathic pain, providing improvement in quality of life, proven efficacy, favorable onset of action, excellent safety and tolerability, and convenience."[153]  MAC and Pfizer worked together to find authors who "agree with our message."[154]

---

[149] Ex. 210; Ex. 169 (Agenda for Neurontin Publications Plan Meeting, repeating key messages in September 2001); Ex. 255 (Key Messages in Manuscript include "Gabapentin is an anticonvulsant that has proven effective in the treatment of neuropathic pain.").

[150] Ex. 138 (October 2001: Pfizer's Neurontin 2002 U.S. Operating Plan contains a slide entitled "Publication Strategy," under which "Medical Action Communications (MAC) is listed as the second bulleted item.  The third bulleted item is "Key Message Development," under which "Neuropathic Pain" is listed.).

[151] Ex. 251 (April 2002: MAC prepares agenda meeting of Neurontin Publications Plan Meeting, beginning with "strategic issues."  Agenda mentions "Neurontin Key Message References," including Neurontin "[s]hould be considered a first choice of therapy for neuropathic pain" and "proven efficacy in large, controlled, randomized studies," citing Rowbotham, et al., Backonja, et al., and Rice and Maton).

[152] Ex. 12 (July 2002: Pfizer and MAC prepare a publication planning presentation, identifying "strategic focus areas to be monitored," including neuropathic pain.  Under "Strategic Focus – Neuropathic Pain," the presentation lists under "Efficacy," the Serpell and Nicholson studies for "neuropathy in general," and the Latin America 411 for diabetic neuropathy).

[153] Ex. 228 (Late 2002: Pfizer's "second branding guide" identifies the "[b]rand positioning for neuropathic pain" as "Neurontin is an ideal first-line therapy for neuropathic pain, providing improvement in quality of life, proven efficacy, favorable onset of action, excellent safety and tolerability, and convenience."  A section on "neuropathic pain" states "[u]se these messages to communicate the features and benefits of Neurontin as a first-line treatment option for neuropathic pain."  A "Summary of key messages" for "neuropathic pain" includes "Proven efficacy for in patients with neuropathic pain," and continues, "As always, the proven efficacy of NEURONTIN is the most important message for you to convey to physicians in all communications.  Data from 2 large, multicenter, placebo-

MAC and Pfizer generated and promoted these key messages on Neurontin's "proven efficacy" despite knowing the negative results of studies on pain.  In 2001, MAC found the Morello study, a negative double-blind randomized controlled trial on DPN.[155]  In September 2001, Pfizer acknowledged that "it is no longer evident that such a meeting [with the FDA on a broad neuropathic pain indication] would be a positive outcome for us."[156]  In October 2001, Pfizer wrote that "we do not have a clinical data package that can in any way be approved for a broad claim of 'neuropathic pain' . . . Our Neurontin DPN data is so weak that it simply will not allow approval for that indication without additional completed clinical studies."[157]  With respect to a general neuropathic pain indication, Pfizer's own expert told them, "you're done."[158]

Pfizer and MAC went one step further when their studies were negative -- they tried to suppress or spin them.  A July 18, 2001 MAC Action Report indicated that "the team agrees that [the 224 study by Reckless] should not be pushed for publication."[159]  MAC further indicated in reconciling its 2002 budget with Pfizer that "[p]er PSC request, MAC attempted to slow the

---

controlled studies conducted by Backonja et al and Rowbotham et al should already be incorporated into your selling messages for neuropathic pain."  Under "Competitive review," the branding guide states, "Overcoming the misperception that there is no effective treatment for neuropathic pain may be one of your biggest challenges in the marketing of Neurontin….  The evidence supporting the proven efficacy of NEURONTIN for the relief of neuropathic pain should be the key to furthering this progress.").

[154] Ex. 125 (August 2001: MAC and Pfizer discuss who will author a paper on Neurontin and pain.  On the paper on pain, Pfizer's senior marketing manager writes, "For the pain one I prefer David Rowbotham (UK) or Misha Backonja (USA). I am sure they will agree with our message (that is very important).").

[155] Glanzman Tr. at 476:11-23.

[156] Ex. 168 (September 2001: Pfizer's Neurontin Worldwide Team Leader states: "To me, the key question is 'How can we avoid an Advisory Committee to review NTN'? After listening to Paul Leber et al, I am convinced that it would be in our best interest to pursue that objective, even if it means sacrificing our currently stated indication-Mgt of NeP...Plus, it is no longer evident that such a meeting would be a positive outcome for us.")

[157] Ex. 164.

[158] Ex. 173 (September 2001: Pfizer conducts a "consultants meeting" "focused on the broad neuropathic pain indication" and observes that "[e]xpert opinion on the preclinical and clinical data to date is that the evidence is not convincing to support a broad neuropathic pain claim….  New analyses/data not only do not support the broad claim, they provide evidence contrary to a broad indication" and "new analyses from the 945-306 study in the NDA and a recently completed Nordic study (945-271) add substantial evidence against a broad neuropathic pain claim…. Upon hearing these results, Dr. Max commented, 'you're done.'").

[159] Ex. 136; *see also* Abramson Testimony, 2/24/2010, 34:1-25; Dickersin Testimony, 2/25/2010, 63:22-65:11); Glanzman Tr. at 235:11 – 236:1.

potential publication of [the Reckless] paper."[160]  This study was ultimately referenced in highly condensed and fragmentary form in the middle of a review article that favorably reviewed 4 other studies.  MAC participated in the discussions over whether even this limited disclosure should take place, noting that it had to be decided "how to justify only reviewing 4 of the 6 randomized placebo controlled studies."[161]  The Backonja & Glanzman article became available in January 2003.[162]  While it is unclear whether the 6th study is Gorson or POPP, it is clear that neither is referenced in the published article.[163]

With respect to the POPP study, the message of delay was similarly clear: "maximize the time interval between the Reckless paper and the POPP study."[164]  A MAC Action Report the next month stated that "the team decided that [the POPP] manuscript would be placed on hold until the subanalysis is completed."[165]  Pfizer noted that "[t]he delay created by completion of the substudy would allow us to optimize [sic] timing between the release of the two studies."[166] Pfizer also contemplated developing a "well-designed study [that] could counter the negative halo on efficacy created by the POPP study," explaining that "[t]he choices are to do nothing (and hope that our competitors don't notice the negative -224 study and this study) or to

---

[160] Ex. 261.

[161] Ex. 262; *see also* Abramson Testimony, 2/24/2010, 45:2 – 47:6; Deposition of David Cooper.

[162] Ex. 209 (January 2003: Pfizer circulates a memorandum noting the posting of the Backonja and Glanzman on "Clinical Therapeutics Website" and identifying "promotional messages" including "reinforce the dosing message: initiation of 900 mg/day by day 3, with planned increase to a target of 1800 mg/day over 2 weeks as tolerated.  If needed, titrate above 1800 mg/day to a maximum of 3600 mg/day as tolerated to achieve maximal benefit" and "reinforce the **efficacy message** of gabapentin in DPN, PHN, and in treating neuropathic pain of many causes with onset of pain relief within 1-2 weeks.")

[163] *See* Ex. 1660

[164] Ex. 217 (September 2001: Pfizer employee Elizabeth Mutisya states: "I assume that we would like to maximize the time interval between the Reckless paper and the POPP study."  Pfizer's Neurontin Worldwide Team Leader responds: "Your assumptions are correct.").

[165] Ex. 166.

[166] Ex. 175 (September 2001: Pfizer observes that as to neuropathic pain, "[w]e now have two studies that are negative for the primary efficacy parameter, both of which have authors who are eager to publish.  The delay created by completion of the substudy would allow us to optimise [sic] timing between the release of the two studies." Following a "POPP Study Investigator meeting," Pfizer notes that "there were some striking comments made that need to be communicated to the Neurontin team as an fyi....  Neurontin may be a drug for overall 'well-being' and not NeP.  This comment stemmed from an underlying negative halo about Neurontin's efficacy and the negative POPP study.").

proactively design a study based on our experiences that may provide better results."[167]  The

strategy to delay publication of the POPP results clearly worked, as POPP study results were not

published until 2008, after the existence of its negative results were already in the public

domain.[168]

The Serpell study offered yet another example of the enterprise's spin.  In an e-mail

entitled "spinning Serpell," MAC e-mailed Pfizer and stated "[o]ur concern, not having seen

Penny's PR spin on the results as part of your promotional campaign on the manuscript, is that

we make sure that we don't make up different ways of explaining away the results to different

audiences."[169]  MAC further explained the concern as follows: "[i]f Pfizer wants to use, present,

and publish this comparative data analysis in which 2 of 5 studies compared make the overall

picture look bad, how to [sic] we make it sound better than it looks on the graphs."[170]  The next

month, MAC and Pfizer identified key messages for the Serpell paper, including that "[t]here is a

compelling body of evidence to support the first-line use of gabapentin to treat neuropathic pain

– this trial follows in the wake of 3 published, large, placebo controlled studies in specific

neuropathic pain syndromes."[171]  This approach led Dr. Dickersin to conclude that MAC sought

to "spin the results of the Serpell study" for Defendants' benefit.[172]

### D. Migraine and Headache

MAC and Pfizer worked together to develop off-label promotions for migraine and

headache.  In a January 2002 presentation in which MAC identified the "Neurontin Publications

Planning" team as including Pfizer and MAC, and described "[t]arget indications" as including

---

[167] Ex. 137.
[168] Ex. 1986 (Gordh TE, Stubhaug A, Jensen TS, et al. *Gabapentin in traumatic nerve injury pain: a randomized double-blind, placebo-controlled, cross-over, multi-center study.*  138 Pain 255-66 (2008)).
[169] Ex. 263.
[170] *Id.*
[171] Ex. 141.
[172] Dickersin Testimony, 2/25/2010, 71:7 to 72:6.

migraine.[173]  A separate January 2002 presentation created by MAC also stated that "Neurontin

has demonstrated efficacy against a broad range of CNS disorders," including migraine.[174]

Despite their goal of targeting the indication of migraine, when the Cochrane review sought

information regarding the use of Neurontin to treat migraines in April 2002, Pfizer stated that "I

don't understand why Cochrane cant [sic] do a search to find the literature they want.  If they are

looking for unpublished data, I would be reluctant to send it.  I would not even send actual

articles."[175]

### E.   Dosages Over 1800 mg/day

MAC and Pfizer promoted Neurontin as being effective at doses over 1800 mg/day.  In

developing their "key messages," MAC and Pfizer emphasized that "Gabapentin is safe and

effective at high doses (>3600 mg)."[176]  In September 2001, MAC reiterated this key message.[177]

In October 2001, Pfizer identifies a strategy for "achieving message and dosing alignment," as

"Publication Strategy to increase average dose."[178]

---

[173] Ex. 258 (July 2002: Pfizer and MAC prepare a publication planning presentation, identifying "strategic focus areas to be monitored," including migraine).

[174] Ex. 130 (January 2002: MAC presentation identifies "Neurontin Publications Planning" team as including Pfizer and MAC; MAC lists 8 personnel as part of the team.  Presentation states that "Neurontin has demonstrated efficacy against a broad range of CNS disorders," including migraine.  Presentation lists neuropathic pain, "migraine" and "psychiatry" as "[t]arget indications."  The document identifies as a "challenge" to "[f]acilitate greater control over ongoing publications and data" and to "[e]nsure a consistent implementation of key medical and marketing messages in support of Neurontin for each target indication with the various target audiences.").

[175] Ex. 122 (April 2002:  Pfizer understands that "through Pfizer Netherlands we have been asked by Cochrane for information regarding use of Neurontin in migraine prophylaxis treatment" and states "I don't understand why Cochrane cant [sic] do a search to find the literature they want.  If they are looking for unpublished data, I would be reluctant to send it.  I would not even send actual articles."  The Neurontin Director/Team Leader for Major Markets writes "[t]he suggestion I would throw out there is to have someone from medical just tell them that we are not indicated for this condition and that we are only aware of two double-blind placebo controlled trials done independently of Pfizer and which we had no involvement and send them the reference.").

[176] Ex. 210 (August 2001: Pfizer emails members of its Neurontin team and notes "the key messages that Pfizer/Neurontin team will be targeting to display to the audience directly or indirectly in the article that is produced."  These "key messages" include "Gabapentin is safe and effective at high doses (>3600 mg).").

[177] Ex. 169 (Agenda for Neurontin Publications Plan Meeting attaching "Key Message Sign-off Sheet," including the message "Gabapentin is safe and effective at high doses (>3600 mg); Ex. 255 (incorporating key message of "Gabapentin doses up to 3600 mg/d have been proven well tolerated and effective in clinical studies.").

[178] Ex. 219.

In late 2001, Pfizer circulated its global branding guide for Neurontin, which included a message to "[t]itrate to efficacy: up to 3600 mg/day."[179]  In January 2002, MAC identified as a "Critical Success Factor" to "[e]stablish a position for tolerability and utility of higher doses – rapid titration and high dose."[180]  The same presentation identified as a "key area[] of focus" for the strategy in dosing for 2002 the topic of "Highest Dose (how to achieve the higher doses?)."[181]  In April 2002, MAC prepared an agenda for the Neurontin Publications Plan meeting, in which it identified as a key message that "[d]ose up to 3600 mg/d can be safely and effectively administered."[182]  In July 2002, Pfizer and MAC prepared a presentation that identified "[d]osing to efficacy (up to 3600 mg/d)" as a key area of focus.[183]  In late 2002, Pfizer's Neurontin 2003 Operating Plan contains slides that noted that the "Neurontin Average Daily Dose 1,100 mg" was "Low" and identified the expected maximum dose as 2,800 mg, compared to the current maximum dose of 1,700 mg."[184]  Even though this key message was not available by label, Pfizer made clear that "if there [is] information on dosing that is important, but not necessarily in the label, that information can be disseminated by publications."[185]

MAC and Pfizer promoted these key messages even though Neurontin showed no additional benefit above 1800 mg/day.  In May 2002, Pfizer requested that the FDA permit the

---

[179] Ex. 178 (Late 2001: Pfizer circulates global branding guide for Neurontin, which includes a message to "[t]itrate to efficacy: up to 3600 mg/day.").

[180] Ex. 130.

[181] *Id.*

[182] Ex. 251 (April 2002: MAC prepares agenda meeting of Neurontin Publications Plan Meeting, beginning with "strategic issues."  Agenda mentions "Neurontin Key Message References," including "Dose up to 3600 mg/d can be safely and effectively administered.").

[183] Ex. 258 (July 2002: Pfizer and MAC prepare a publication planning presentation, identifying "strategic focus areas to be monitored."  In a section on "[r]efining the message," the presentation also identifies "[d]osing to efficacy (up to 3600 mg/d)" as a key area of focus.).

[184] Ex. 238.

[185] Ex. 126 (October 2002: Pfizer writes "Let's try to work out key messages around dosing that work for both the US and global markets.  As publications have global influence, we must develop messages that work for all markets.  Also publications are slightly different in that they are not limited by information in the label.  That is, if there [is] information on dosing that is important, but not necessarily in the label, that information can be disseminated by publications (as long as it is supportable). . . . In the US, rapid titration cannot be promoted due to label restrictions.  However, we can provide this information via publications.").

package insert to identify doses up to 3600 mg/day.  The FDA agreed, but said that "this section

will need to indicate that additional benefit above 1800 mg/day was not demonstrated."[186]  In

August 2002, Pfizer's promotional claim that "[e]fficacy and safety of Neurontin were

demonstrated at doses of 1800 to 3600 mg/day," the FDA instructed that the package insert

"clearly states that additional benefits of using doses greater than 1800 mg/day were not

demonstrated. . . . In fact, 1800 mg/day represents the maximum dose recommended in the

PI."[187]

    MAC and Pfizer actively developed an article on dosing that misstated this science.

MAC and Pfizer decided to write an article advocating higher dosing and suggested Dr. Michael

McLean as a possible author, noting that "he is so pro-Neurontin perhaps he can do it.  I am sure

he will support our claim."[188]  MAC reached out to Dr. McLean and he suggested himself as one

of the authors.[189]  MAC drafted the manuscript and highlighted key messages, including "3600

mg/day has better efficacy than lower doses."[190]  The manuscript also said that "[a] dose of 3600

mg/day represents the minimum requirement for an adequate trial of gabapentin, assuming that

intolerable side effects do not develop and that an unacceptable frequency of seizures does not

---

[186] Ex. 196.

[187] Ex. 190.

[188] Ex. 135 (August 2001: In a set of emails exchanged between employees of Pfizer and MAC, Pfizer employee Angela Crespo stated: "To have both dosing papers asap I assume next step will be contacting authors...From the 4 regarding epilepsy, any favorite?...What about Michael McLean? I saw it at the NeP list but as he is so pro-Neurontin perhaps he can do it.  I am sure he will support our claim."  Pfizer employee Allison Fannon responds: "I know Dr. McLean is an advocate of higher doses, and he is able to deliver a good message on why and how Neurontin should be used at higher doses." Pfizer employee Elizabeth Mutisya responds: "I would like us to keep from defaulting to the same person, in this case, McLean.  Ultimately it benefits neither Pfizer nor the person."  Finally, Pfizer employee Robert Glanzman responds: "I am currently at an advisory board chaired by Dr. Devinsky 'as we speak.'....I don't know how Pfizer friendly he is."); see also Ex. 125.

[189] Ex. 169; see also Ex. 166 (discussing MAC's conversation with Dr. McLean regarding article).

[190] Ex. 254 (December 2001: MAC drafts manuscript on dosing, with cover page identifying "[k]ey messages," including "[t]itrating up to 3600 mg/day is recommended for those able to tolerate this dose, since 3600 mg/day has better efficacy than lower doses."  The draft manuscript states that "more recent studies . . . have provided evidence that many patients will derive greater benefit from even higher gabapentin doses of up to 3600 mg/day" and "In general, doses up to 3600 mg/d should be considered."  The draft manuscript also says that "[a] dose of 3600 mg/day represents the minimum requirement for an adequate trial of gabapentin, assuming that intolerable side effects do not develop and that an unacceptable frequency of seizures does not persist.").

persist."[191]   The McLean article was published in June 2003, with a key message of reinforcing "the dosing message: initiation of 900 mg/day by day 1 or 3, with planned increase to a 3600 mg/day as tolerated to achieve maximal benefits."[192]

MAC recognized that the promoted claims lacked scientific justification.  In an October 2002 e-mail, after Pfizer contacted MAC regarding a statement on rapid titration in a manuscript, MAC noted "[i]t's the same issue over and over.  The medical team has acknowledged that there isn't real data to support this statement.  It's in the branding guide, it's in Backonja, etc. without any documentation other than 'anecdotes.'"[193]   In November 2002, when Pfizer requested that Dr. Backonja be listed as an author of a poster supporting the same rapid titration principle, MAC stated that "that poster and the pain dosing manuscript itself did not go through global RC and Bruce Parsons at that time or subsequently, which may explain why the scientifically unsubstantiated recommendation dosing by day 6 remained."[194]   Despite recognizing that the marketing message was scientifically unsupported, MAC stated that "[a]s soon as we get some clarification we'll be happy to create a slide set that satisfies both your promotional goals and speaks of the scientific messages of the manuscript."[195]

Many of MAC and Pfizer's off-label promotions regarding pain described above also involved promotions of improper dosing.  For example, MAC and Pfizer agreed that the Reckless study should not be pushed for publication, even though that study demonstrated that Neurontin was no more effective at higher doses.[196]   The development of the Backonja & Glanzman manuscript and its key messages on pain dosing – before the author was even

---

[191] Id.
[192] Ex. 208.
[193] Ex. 265; see also Cooper Tr. at 119:20-120:2; 121:17-122:5.
[194] Ex. 266; see also Cooper Tr. at 122:20-123:13.
[195] Id.
[196] Ex. 136.

determined – similarly involves off-label promotion of pain.[197]  Similarly, MAC's outline of the

Serpell mixed symptoms identifies key messages, including "gabapentin (up to 2400 mg/day)

significantly reduces pain."[198] With dose, as with the other off-label indications, MAC and Pfizer

promoted off-label uses of Neurontin.

## IV.    CONTINUATION OF THE CDM ENTERPRISE UNDER PFIZER

Even after Pfizer's acquisition of Parke-Davis, CDM stayed on as the advertising agency

of record on the Neurontin account.  CDM created the first Neurontin Global Branding Guide for

Neurontin, which was prepared in 2001.[199]   A second branding guide was launched in March

2002.[200]  CDM continued to play a role in the marketing of Neurontin, attended marketing events

where off-label use of Neurontin were being discussed.  For example, CDM's Jennifer Samuels

attended Pfizer's Neuropathic Pain PBM Advisory Board held on March 3-4, 2002 in Orlando,

Florida.[201]

In 2003, Pfizer ceased to employ MAC, and replaced it with CDM's medical division

known as Fallon Medica, to aid in the "Neurontin Publication Planning and Execution."[202] Fallon

Medica then occupied the positions on the Publications Subcommittee formerly occupied by

MAC.[203]  Fallon Medica was actually staffed by holdovers from Proworx, who provided Fallon

Medica with "tactical expertise."  Fallon Medica boasted that it "partners with the best clinical

writers and data strategists in the industry…" and that it is able "to translate theory and clinical

---

[197] Ex. 262; Cooper Tr. at 86:16-87:13; 89:1-90:1.
[198] Ex. 141 (October 2002: Key messages for Serpell paper are identified.  Key messages include that "gabapentin (up to 2400 mg/day) significantly reduces pain and improves certain quality of life measurements in patients with a range of neuropathic pain syndromes").
[199] Samuels Tr. at 117:18-25; Ex. 178 (Global Branding Guide)
[200] Ex. 239 (2003 Operational & Tactical Plan; Ex. 228: Expanding the Global Brand)
[201] Ex. 117 (Pfizer Neuropathic Pain PBM Advisory Board Executive Summary)
[202] Ex. 232 (Fallon Medica Proposal)
[203] Glanzman Tr. at 184:4-9; Tive 810:15-18.

experience into marketing strategies, messages and tactics." [204] Fallon Medica's proximity to

Pfizer was also seen as an advantage: "Team members are located in the office across the street

from Pfizer, allowing ease of spontaneous, face-to-face communication as needed.  Internal

efficiencies, such as twice-daily mail deliveries between the two offices, provide additional

value." [205]

For 2003, Pfizer requested $5 million "to implement a media plan for the NeP and

Epilepsy indications…This amount includes reaching new target audiences for Neurontin

including PCP's, Pain Specialists, Geriatricians, Long Term Care as well as the existing

audiences of Neurologists and Epileptologists."[206]

Fallon Medica provided the same ghostwriting services as MAC; Fallon's responsibilities

were to "Write, copy edit and format manuscripts for approval and submission."[207]  In fact, the

manuscript drafting process was no different under Fallon Medica than under MAC.  Regardless

of the vendor, either MAC or Fallon Medica wrote the first draft of all Pfizer medical

publications.[208]  Like MAC, Fallon Medica then tracked all manuscripts to assure they were

moving forward and that they contained the proper key messages.[209]  At all times, Fallon Medica

was under the control and direction of Pfizer's Neurontin Publications Subcommittee.[210]

Fallon Medica continued to execute and enforce the key message development that had

been commenced by MAC.  Fallon Medica issued memos instructing Pfizer sales representatives

how to use the false and misleading Backonja and Glanzman dosing article ghostwritten by

MAC to support "Promotional Messages," including the key message that: "If needed, titrate

---

[204] *Id.*
[205] *Id.*
[206] Ex. 120 (Neurontin Media Budget)
[207] Ex. 232 (Fallon Medica Proposal; Ex. 241: Neurontin PSC SOPs—Roles and Responsibilities of the Manuscript Teams)
[208] Fannon Tr. at 354:11-16; Valerio Tr. at 38:23-39:10.
[209] Glanzman Tr. at 182:24-183:15; 184:4-9; 184:17-185:9.
[210] Tive Tr. at 866:15-867:23.

above 1800mg/day to a maximum of 3600 mg/day as tolerated to achieve maximal benefit." A secondary message was: "To reinforce the efficacy message of gabapentin in DPN, PHN, and in treating neuropathic pain of many causes…"[211]  Fallon Medica also tracked the same misleading key messages for all remaining publications.[212]  Similarly, Fallon Medica issued memo to the field force that contained the misleading conclusion of the McLean dosing article that was ghostwritten by MAC.[213] In sum, Pfizer used the "8,000" publications on Neurontin, including publications created by MAC and Fallon Medica, to influence the medical community regarding prescribing Neurontin.[214]

## V.   **CONCLUSION**

At the outset of the trial, the Court informed the jury that this was an "important" case. Indeed it is.  Never before—as far as anyone knows—has a "respectable" pharmaceutical company lied to so many people about so many things, and reaped such handsome rewards as a result.

The evidence painstakingly amassed, carefully organized, and systematically presented in this case should be put to the jury for their verdict.  After six years of litigation, it is high time.

---

[211] Ex. 29 (Email From: Stampp To: DL-Neurontin MM PM & PP, DL-PPG Neurology Group, AA DDEV 945 Neuro Team List Cc: several recipients); Ex. 1660
[212] Ex. 189 (Spreadsheet: Neurontin Manuscript Tracking Grid: PSC Sponsored Manuscripts)
[213] Ex. 208 (Email From: Stampp To: DL-NTN/Pregabalin MM PM & PP Cc: several recipients); Ex. 1666
[214] Marino Tr. at 252:3-12.

Dated:  March 10, 2010

Respectfully submitted,

By:     */s/ Linda P. Nussbaum*
        Linda P. Nussbaum

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 10, 2010.

*/s/ Elana Katcher*
Elana Katcher
