```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


    IN RE:                            )
                                      ) CA No. 04-10981-PBS
    NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
    AND PRODUCTS LIABILITY LITIGATION    )
    ------------------------------------
    This document relates to:         )
    KAISER FOUNDATION HEALTH PLAN, et al, )
                                      )
                   Plaintiffs         )
                                      )
            -V-                       ) No. 04-10739-PBS
                                      ) Pages 1 - 151
    PFIZER, INC., et al,              )
                                      )
                   Defendants         )
```

JURY TRIAL - DAY SIX


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 1, 2010, 9 a.m.


LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
         DON BARRETT, ESQ., Barret Law Office,
9    404 Court Square North, P.O. Box 987, Lexington,
     Mississippi, 39095.
10
         BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12
     FOR THE DEFENDANTS:
13
         KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ. and
14   THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
     Four Times Square, New York, New York, 10036.
15
         RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meagher &
16   Flom, LLP, Four Embarcadero Center, San Francisco,
     California, 94111.
17
         JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite
     3600, Denver, Colorado, 80202.

19

20

21

22

23

24

25

1                            INDEX

2    EXAMINATION
     Witness Name              Direct     Cross     Redirect     ReCross
3

4    DOUGLAS C. McCRORY, M.D.    16        42        92

5

6    NICHOLAS P. JEWELL          95        123       131

7

8    THOMAS L. PERRY, M.D.      134

9

10   EXHIBITS

11

12   PLAINTIFF:                                      PAGE

13

14   No. 216                                         30

15   Nos. 31, 122                                    42

16   No. 1056                                        67

17   No. 1401                                        76

18   No. 416-A, 416-B

19   [

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                THE CLERK:  All rise.

3                THE COURT:  Good morning.  So what issue do we

4       have?  I understand that the subpoena issue has been

5       deferred.  You've given me a stipulation?

6                MR. CHEFFO:  Correct.

7                THE COURT:  What else do I need to discuss?

8                MR. CHEFFO:  I have two or three issues.

9                THE COURT:  Okay.

10               MR. CHEFFO:  Let me start with the authentication

11      issue for a minute.  I think Mr. Sobol had represented that

12      we didn't agree, and I just wanted to clarify for the Court

13      we negotiated this on February 12th with Mr. Barrett, and

14      just so we're also clear both sides had agreed that it

15      should be limited to --

16               THE COURT:  This is a stipulation for the record?

17               MR. CHEFFO:  Correct.  We had some colloquy where

18      I said it's not fair to Mr. Sobol, I think you were a little

19      bit annoyed because you thought appropriately that I was

20      raising it three seconds before, and what I wanted the Court

21      to understand, this was a heavily negotiated stipulation two

22      weeks before trial in which both parties agreed that

23      documents that were essentially not in the files of either

24      Pfizer or Kaiser, for example, the Kaiser Permanente Group

25      doctors because they were not in their files --

1          THE COURT:  But it also said you needed to

2    factually object to authenticity on the list, which you

3    didn't.  I think it does.

4          MR. CHEFFO:  In this document, yes.  That's

5    correct.

6          THE COURT:  So you didn't, you didn't?

7          MR. CHEFFO:  With respect to?

8          THE COURT:  The two that we talked about.

9          MR. CHEFFO:  I don't recall with those, I just

10   wanted your Honor to understand with respect to this.

11         THE COURT:  Fair enough.  Let's just go through

12   the documents now.  I think McCrory is next, is that it?

13         MR. BARRETT:  Yes.

14         THE COURT:  Are there documents you need for him?

15         MR. CHEFFO:  There's one document that -- we've

16   resolved most of the issues.  There's one document that we

17   don't believe it was included in their reference list.

18         THE COURT:  Did you confer?  Is it on the

19   reference list?

20         MR. BARRETT:  We have, and, your Honor, that

21   document was mentioned in his report.  I mean, that's the

22   very document that was mentioned in his report.

23         THE COURT:  Did you show him?

24         MR. BARRETT:  I did show him.

25         MR. CHEFFO:  I'm sorry, there's a statement on one

1    page of this entire document that he says is in the report.

2    I take it at his word.

3               THE COURT:  Do that statement and not the whole

4    document.

5               MR. CHEFFO:  Just so we're kind of getting to the

6    area of duplicative testimony, I mean, just so we're clear,

7    Dr. McCrory testified at his deposition, he was asked, "You

8    don't have any experience or expertise in the field of

9    marketing, correct?  I think we talked about that.  No, he

10   says.

11              So, you know, when we talk about all these

12   witnesses who are basically as I understood it

13   efficacy-based witnesses, again, repeating the whole

14   marketing story, I would object to that to the extent that

15   we are essentially having duplicative, cumulative testimony

16   of the same thing we've been hearing over and over.

17              THE COURT:  That's the beauty of this 28-hour rule

18   so they can economize their testimony as they choose.

19              MR. CHEFFO:  Well, I think it does go a little

20   more than that.

21              MR. SOBOL:  You think the 28-hour is beautiful?  I

22   think it's hell on wheels.

23              THE COURT:  For me because --

24              MR. BARRETT:  It's awful.

25              MR. CHEFFO:  I think it's a great rule, your

1  Honor, because it keeps us on track.  So I would just raise

2  that, I think the Court, it's not just a matter of economy

3  or efficiency, it's a matter of prejudice and duplication of

4  effort with someone who is not a marketing expert.

5          THE COURT:  I'm assuming I'd have to listen to it

6  as I went.  Is he just putting it on a timeline?

7          MR. CHEFFO:  I don't really know what he's doing,

8  your Honor.

9          MR. BARRETT:  What we've asked Dr. McCrory to do

10 is to look at what they've said, as a scientist, what did

11 they say compared to what the science was at the time.

12         MR. CHEFFO:  He was also asked, "Have you ever

13 done any work in analyzing corporate intent?"  And he says,

14 "No."  He says, "Have you ever evaluated information like

15 this, of this kind before?"  "No."  So, I mean, he may well

16 be qualified to talk about the underlying efficacy issues,

17 but he's not a marketing person.  I think that's the point.

18 It's basically trying to have every doctor --

19         THE COURT:  This is their case, which is, what did

20 they say to the market and what do they say in the science,

21 and so if it's just a correlation, if anyone could do it.

22         MR. CHEFFO:  But we've heard it from Dr. Abramson,

23 we've heard it from Dickersin.  My point is that at some

24 point you have people who are not experts in marketing, and

25 I think your Honor will have to hear it and rule on it.

Page 8

1          THE COURT:  I need to hear line by line.

2          MR. CHEFFO:  I appreciate that.  I'm not asking

3   you to make a blanket ruling.  The other thing, there's two

4   more quick things -- I know you want to bring the jury in --

5   this is particularly important to us.  We've heard some

6   testimony about this phone book document, right.  We asked

7   back -- and Ms. Nussbaum signed interrogatory responses,

8   this was the question in response to the interrogatories,

9   "State the names of all providers employed by plaintiffs who

10  have prescribed Neurontin for an off-label use and provide,

11  A, the date of the prescription; B, the purpose for which

12  the Neurontin prescription was used; and, C, the dosage of

13  which it was prescribed," so it essentially said give us

14  that information.

15          You know, typical objections in an interrogatory

16  but dated 2007, Kaiser supplements its response in this

17  interrogatory by referring defendants to the following

18  documents, which includes every one of these, so now you

19  have a situation where Ms. Nussbaum puts her own corporate

20  witness on the stand and says, oh, in fact, that's not true,

21  those aren't really providers.  You know, because she knew

22  that because they did some research over the weekend to find

23  that which essentially were never supplemented and which

24  impeached their own interrogatories.

25          THE COURT:  I hear your problem.  So what's the

1    answer?

2           MS. NUSSBAUM:  The answer is, first of all,

3    Mr. Cheffo just raised this ten seconds ago so I need to

4    look at the document.  Second of all, it was not our

5    corporate witness, okay, so that's a misnomer, and that's a

6    continuing misnomer, we have not put on Dr. Carrejo as a

7    corporate witness.  Third of all, as I told Mr. Cheffo he

8    didn't seem to be very interested as part of the summary

9    judgment record, there is an affidavit from Calvin Togashi

10   that explains that and that explains that Kaiser's pharmacy

11   has also filled prescriptions for other physicians, so more

12   than that, your Honor, he literally just raised this seconds

13   ago.  I will have to look at it.

14          THE COURT:  You will have to look at it.

15          MR. CHEFFO:  What I would ask for, I mean, we'll

16   talk, but if someone raised something a year later in an

17   affidavit, this was never supplemented, and it leaves a

18   false impression, so what I would ask, and we can talk at

19   the break, but I think the jury needs a stipulation that

20   basically this includes all or substantially all, and it was

21   provided by Kaiser and we asked for that specific

22   information.  You can't come at trial.

23          THE COURT:  Read it in.

24          MR. CHEFFO:  I'm sorry.

25          THE COURT:  Read it in that they've agreed that

1    this is the list.

2            MR. CHEFFO:  Okay.  If you will stipulate, we

3    won't get in the back and forth of an interrogatory

4    response.

5            THE COURT:  The problem is if you asked the

6    specific person was or was not, there may be a few that

7    aren't, but read it in.

8            MR. CHEFFO:  But they've impeached him with it.

9            THE COURT:  I don't know how to resolve it right

10   now.

11           MR. CHEFFO:  Okay.

12           THE COURT:  If you want to read in their

13   stipulation that this is the list, do it and let them have

14   to wiggle out of it.

15           MR. CHEFFO:  Fair enough, your Honor.  I'm not

16   going to say if there's some of them in there, I've got to

17   assume the vast majority of that huge book is Neurontin.

18           MR. CHEFFO:  That's what I'm for, I'm not asking

19   them to change the facts, but I'd like a stipulation that

20   just says --

21           THE COURT:  Why have a stipulation, you have their

22   admission.

23           MR. SOBOL:  Right.

24           MS. NUSSBAUM:  You have an affidavit saying what

25   it is.

1          THE COURT:  You have their admission.

2          MR. CHEFFO:  Well, your Honor, we will do that, if

3    I had said here's the five people, these are actually Pfizer

4    studies and we let them go through their case --

5          THE COURT:  I'll let you read the admission in.

6          MR. CHEFFO:  Okay, fair enough, your Honor.

7          THE COURT:  You've argued that they've admitted

8    it.  That's fine.  Then it puts the onus back on them to

9    wiggle out of it if it isn't true.  She may have made a

10   mistake or whoever told her may have misstated it, I don't

11   know.  Maybe there's a stipulation as to what it actually

12   does and doesn't represent.  That's mainly what you can work

13   on.  I can't ask you to stipulate to something that's wrong,

14   it could be that the person who told her that was just

15   wrong.

16         MR. CHEFFO:  But we relied up until a few minutes

17   ago.

18         THE COURT:  I understand, read in the admission.

19         MR. CHEFFO:  The last thing I wanted to just ask

20   your Honor, we've agreed, as you know, that Dr. Carrajo --

21   actually two things, Dr. Carrajo will be coming tomorrow, if

22   your Honor would just advise the jury that the reason why

23   he's not going to be here today.

24         THE COURT:  I don't even know what the reason

25   was.

1          MR. CHEFFO:  The reason is his schedule, it was

2     more convenient for him to come on Tuesday because he's in

3     California.

4          THE COURT:  I'd be happy to do that.

5          MR. CHEFFO:  Just the final thing, I promise, it's

6     a short one, I may have missed this earlier on, your Honor,

7     but I think in the earlier instructions, I don't know if

8     your Honor articulated for the jury what it meant when you

9     granted a motion to strike or struck something from the

10    record, so I would ask your Honor to consider --

11         THE COURT:  Next time I do it, I will.

12         MR. CHEFFO:  Fair enough.

13         THE COURT:  Great.

14         MS. NUSSBAUM:  One second, your Honor, Friday

15    afternoon right before court ended, Mr. Cheffo on

16    Dale Daniel, who's sitting here waiting to testify, with a

17    subpoena, and we at sidebar told you and told Mr. Cheffo

18    that we would bring Dr. Daniel back this coming Friday to

19    testify.  Mr. Cheffo now tells me that that's not

20    sufficient, that I can bring him back on Friday to testify,

21    but in addition to that, he wants him to come back again the

22    following week in his case.

23         MR. CHEFFO:  That's not accurate.

24         MS. NUSSBAUM:  Your Honor, we would like an

25    understanding that when Dr. Daniel is here on Friday to

1  testify, Mr. Cheffo can ask him whatever he wants and that

2  that will be in satisfaction.

3          MR. CHEFFO:  This is the core issue of the problem

4  with the 1404 motion, your Honor.

5          THE COURT:  And they've got to live with it.  They

6  wanted it here.

7          MR. CHEFFO:  Right.  We've heard about

8  Calvin Togashi, we want Dr. Miezel's, we want McCarver, we

9  want McCrory, and do you know what they say if they have a

10 Kaiser doctor who works there, it's not our doctor, but, you

11 know what, you're going to see a few of them who happen to

12 show up here.  It's absolutely unfair.  We should be able to

13 have doctors in our case because the jury is going to hear

14 the case come in --

15         THE COURT:  You have the right to take their

16 depositions, that's the true of Knapp, you all took

17 depositions, you're going to have to live with the

18 depositions.  This is an MDL case.  There was a last motion

19 to transfer, I have unique expertise to deal with those

20 zillion Daubert issues, but Kaiser has to live with the

21 inconvenience, that's the just the way it is.  And so that's

22 the inconvenience of the witnesses.  You guys poo-poo'd, it

23 does turn out to be inconvenient for some of you, with his

24 trip to that, that happened with Carver.  That had more to

25 do with the trip to New Zealand.

1        MR. CHEFFO:  The point is we could have sent out

2   to ten different if we're in California.  Now we can't do

3   that.

4        THE COURT:  You're the largest pharmaceutical

5   company in the world, I'm told, and you could have taken

6   your depositions out there.  You took Knapp's deposition,

7   you're going to have to live with that, and, you took -- you

8   know, at this point it's too late to re-invent this thing.

9   I think what happened to everyone in fairness, I think what

10  happened no one thought that Kaiser would be the last person

11  standing, I think, so we have to live with that, but not the

12  last one, but sort of the first major trial.

13       MR. GREENE:  Thank you.  You were getting me

14  nervous.

15       THE COURT:  I saw Mr. Greene turn green, and I

16  thought I should have misphrased it.  What I mean is that no

17  one anticipated that Guardian and Aetna would fall out was

18  sort of the trilogy I was talking about.  Let's bring this

19  jury in.

20       MS. NUSSBAUM:  Your Honor, I need clarity, we are

21  going to bring Dr. Daniel on Friday.  This would have been

22  his second trip to Boston.  Mr. Cheffo can examine him as

23  much as he wants on Friday.  That should be sufficient.

24  He's never gone to depose -- they deposed a million.

25       THE COURT:  I'm not going to make him come back a

1    second time unless you're not done on Friday.

2          MR. CHEFFO:  Here's my point, your Honor, we

3    subpoenaed him, and what they're trying to do is again only

4    give us select witnesses and put in their case.  We're going

5    to have our witness are going to talk, and in the context of

6    that, they're basically saying we're not allowed to have

7    anybody from Kaiser in our case because they won't bring

8    him, we can't make him available.

9          THE COURT:  Excuse me, I'm not bringing Daniel

10   back again.

11         MR. CHEFFO:  They don't have to bring him on

12   Friday.

13         THE COURT:  No, they need him as part of their

14   case.  Now let's bring in the jury.

15         MS. NUSSBAUM:  Thank you, your Honor.

16         THE CLERK:  All rise for the jury.

17         ( JURORS ENTERED THE COURTROOM.)

18         THE CLERK:  Good morning to everyone.  I hope you

19   had a nice weekend.  Did anyone speak about the case or see

20   anything in the press?  The Olympics are over, but we're

21   not, so I think I wanted to explain to you that the witness

22   on Friday couldn't get back here till Tuesday, so, as I

23   said, sometimes we would be accommodating their schedules

24   since he's coming in from California, and so we are starting

25   today with another expert, Dr. McCrory.  Is that who it is?

1          MR. BARRETT:  That's correct, your Honor.

2          THE COURT:  Okay.

3          MR. BARRETT:  May we proceed?

4          THE COURT:  Yes.

5          MR. BARRETT:  Plaintiff calls Dr. Douglas

6    McCrory.

7          DOUGLAS C. McCRORY, M.D., having been duly sworn

8    by the Clerk, testified as follows:

9          DIRECT EXAMINATION BY MR. BARRETT:

10         THE CLERK:  Thank you.  You may be seated.  Would

11   you please state your name and spell it for the record.

12         THE WITNESS:  Yes, Dr. Douglas C. McCrory,

13   M-c-C-r-o-r-y.

14   Q.  Where do you live, Dr. McCrory?

15   A.  In Chaple Hill, North Carolina.

16   Q.  And what profession are you in?

17   A.  Doctor of medicine.

18   Q.  And do you have any advanced degree besides being an

19   M.D.?

20   A.  Yes, I have a master of health sciences degree in

21   biometry.

22   Q.  Where are you employed, Dr. McCrory?

23   A.  I'm an associate professor of medicine with tenure at

24   Duke Univiserty Medical Center and a research associate at

25   the Center for Health Services Research in Primary Care at

Page 17

1   the Durham V.A. Medical Center.

2              THE COURT:  Excuse me, is your mic. working?  You

3   can adjust it.

4   Q.  Pull it up a little closer.

5   A.  I'm sorry.  I'll speak up.

6   Q.  Explain to the jury the type of work you do on a daily

7   basis.

8   A.  Well, about a third of my time I see patients in an

9   internal medicine clinic at the Durham V.A. Hospital.  About

10  ten percent of my time I teach physicians in training in

11  ambulatory care in internal medicine, and the balance of my

12  time, I spend conducting systematic reviews, reviewing

13  health sciences literature, producing reports, doing

14  statistical analysis and sometimes modeling.

15  Q.  And you do statistical analyses of what?

16  A.  In general, clinical trials or other types of scientific

17  studies.

18  Q.  Why do you evaluate clinical trials?

19  A.  Well, clinical trials would be the most -- we look for

20  the most reliable evidence to inform our evidence of health

21  care decision-making.  In general, clinical trials are the

22  best quality evidence.

23  Q.  Okay.  In everyday terms, you're looking at the

24  scientific evidence to see if a drug in fact works; is that

25  correct?

1    A.  Yes, so, in the case of drug studies like we're

2    concerned with here, yes.

3    Q.  Do you have a position with the Cochrane Collaboration

4    which has been mentioned in the court previously?

5    A.  Yes, I'm the leader editor for reviews on headache in

6    the Cochrane Collaboration.

7    Q.  Tell the jury what the Cochrane Collaboration and

8    explain its importance.

9    A.  It's an international nonprofit organization whose aim

10   is to produce and maintain and publicize systematic reviews

11   across all areas of health, and it's generally

12   well-regarded, it's been a leader in developing methodology

13   for doing systematic reviews, and it's generally regarded as

14   an unbiased source of reliable health care information.

15   Q.  Sir, as a scientist who does this for a living, when

16   you're trying to find out whether a drug works or not, did

17   you ever go interview patients or interview doctors?

18   A.  No, we would look towards well-designed scientific

19   studies.

20   Q.  Have you had experience in the evaluation of clinical

21   trials on migraine separate and apart from the research that

22   we asked you to do in this case?

23   A.  Yes.  We've since about 1994, when our group at Duke was

24   awarded a large contract to produce a series of reviews on

25   clinical trials in attention type migraine we've done a lot

1    of work in this area.

2    Q.  Have you written articles in peer reviewed literature

3    concerning migraine head?

4    A.  Yes, I believe I have over 20 articles published

5    regarding headache and migraine.

6    Q.  And have you in fact assisted in the clinical practice

7    guideline for migraine treatment?

8    A.  Yes, following the technical reviews we did for the

9    Federal Government regarding attention-type migraine

10   headache, I worked with the headache guidelines consortium,

11   which was a group of professional organizations that came

12   together to use those data and turn them into clinical

13   practice guidelines.

14   Q.  Describe for the jury your educational background.

15   A.  Well, I graduated high school in 1978 and senior high

16   went to Duke University graduating magnum cum laude in 1982,

17   from there I went to medical school at the University of

18   Miami and got my M.D. degree in 1986.  From there I did an

19   internship and residency at the Medical College of Virginia

20   Hospitals in Richmond, Virginia and then returned to Duke

21   for a fellowship in ambulatory care and general internal

22   medicine.

23   Q.  Did that fellowship lead to your master of science

24   degree in biometry?

25   A.  Yes, and I completed the masters of health sciences,

1   master of science in 1994.

2   Q.  Okay.  Are you a licensed physician in North Carolina?

3   A.  Yes, I am.

4   Q.  And board certified?

5   A.  In internal medicine, yes.

6   Q.  Dr. McCrory, did we give you an assignment to review all

7   of the available clinical trial reports published and

8   unpublished for the purpose of finding out whether Neurontin

9   is an effective treatment for the prevention of migraine

10  headache?

11  A.  Yes, you did, I was given that assignment.

12  Q.  Did you complete your study and analysis of this

13  question and reach a conclusion to a reasonable degree of

14  scientific certainty whether or not Neurontin is an

15  effective treatment for the prevention of migraine

16  headache?

17  A.  Yes, I did.  After reviewing all the trials published

18  and unpublished, I concluded that Neurontin was not an

19  effective drug for migraine prophylaxis.

20  Q.  Dr. McCrory, why is it important to have clinical

21  studies for a pain drug anyway?  Why can't you find out if

22  it works simply by asking a patient, calling up some

23  doctors, looking at a case study?  Why can't you do that?

24  A.  Well, migraines -- there's several reasons.  Migraine is

25  a variable condition, both over time, migraine headaches

1   come and go, and they come with an unpredictable frequency,

2   and there's also a fairly large placebo effect, in other

3   words, migraine headaches can respond 20 to 40 percent of

4   the time, an individual headache, so it's acute migraine

5   drug trials.

6   Q.  Let me ask you about that, if a doctor came in here and

7   said that apparently 40 percent of his patients were helped

8   by taking a drug, by taking Neurontin for migraine

9   prevention, would that be within the range of normal placebo

10  effect?

11  A.  Yes, I think it would.  It's hard to tell when an

12  individual patient says that they've benefited from a drug

13  because the placebo response of migraine is so great.

14  Q.  So, how then does the medical community deal with the

15  problem of figuring out if a drug like Neurontin is

16  effective for a particular indication?

17  A.  Well, the standard way of dealing with that is by doing

18  a controlled clinical trial where you have a controlled

19  group, so at the same time you have one group of patients

20  taking the active drug, you would have a second group of

21  patients at the same time to who take a placebo.

22  Q.  Tell the jury what you reviewed which made you reach

23  your negative conclusion about Neurontin for migraine

24  prevention.

25  A.  Well, we reviewed all the controlled clinical trials

1   that we could identify, those published and the unpublished

2   data that I received from the court, from you.

3   Q.  Okay.  Did you use the generally accepted techniques and

4   methods ordinarily used by health science researchers?

5   A.  Yes, we used the standard techniques I use in my work.

6   Q.  How many double-blind randomized placebo controlled

7   trials are there for migraine prevention?

8   A.  Well, we identified four separate double-blind placebo

9   controlled randomized trials.

10  Q.  Did you perform a meta-analysis of all four of these

11  DBRCTs?

12  A.  Yes, I did, as part of my analysis.

13  Q.  What is a meta-analysis?

14  A.  Well, it's a statistical technique for combining

15  individual studies that looked at the same drug, the same

16  types of patients and combining them together in a way to

17  get a summary idea about what those four, in this case, four

18  studies in aggregate showed using appropriate statistical

19  techniques to avoid bias or overstating or understating.

20  Q.  Okay.  What did your analysis demonstrate in plain

21  English?

22  A.  Well, the result of my meta-analysis was that the

23  Neurontin was not an effective agent for headache

24  prevention.

25  Q.  Okay.  Let's talk about these four DBRCTs for migraine

Page 23

1   in chronological order.  What was the first one?

2   A.  Well, the first was a study done in the I believe in the

3   mid-'80s, a multi-center trial done in Germany and Austria

4   that used I think 900 milligrams of Gabapentin per day and

5   didn't find that there was a statistical significant effect

6   of Neurontin compared with placebo.

7   Q.  So it was a negative result?

8   A.  Yes.

9   Q.  Did Parke-Davis do this?  Was this a Parke-Davis

10  study?

11  A.  To the best of my knowledge, yes.

12  Q.  And, well, what happened to that study?

13  A.  Well, there was one published abstract in their

14  conference proceedings very early on that showed interim

15  results before the trial had been completed, and then there

16  was never a report that appeared in the peer review

17  literature describing their complete results of that

18  trial.

19  Q.  Where did the data come from?  You reviewed the data.

20  Where did you get the data?

21  A.  So I reviewed a research report that was provided to me

22  from Pfizer's files, as I understand.

23  Q.  From this lawsuit?

24  A.  Yes.

25  Q.  Dr. McCrory, did we also ask you to look at Parke-Davis,

1   Pfizer's marketing documents concerning Neurontin and

2   migraine?

3   A.  Yes, you did.

4   Q.  In spite of their own negative study, that's 879-200,

5   that's the number of that study, wasn't it?

6   A.  Yes.

7   Q.  In spite of that study that they had in their files, did

8   Parke-Davis decide to market Neurontin for off-label, for

9   migraine anyway?

10  A.  Yes, it appeared to me that there were numerous

11  conferences and other gatherings where Neurontin for

12  migraine prevention was discussed based on lower level

13  evidence like case reports and uncontrolled trials.

14  Q.  And the off-label promotion of Neurontin for migraine is

15  actually a federal crime, is it not?

16  A.  Yes.

17  Q.  Did the defendants' marketing plan call for telling the

18  medical community about this negative study?

19  A.  No.  It wasn't mentioned in any of the proceedings that

20  I saw.

21  Q.  Is it an acceptable practice to hide a negative DBRCT

22  while marketing a drug claiming it to be effective for a

23  certain condition?

24  A.  No, I don't believe it is.  I don't think it's

25  acceptable to not present the best quality control data at

1    the same time using lower quality, less reliable data to

2    promote it.

3    Q.   In connection with a marketing plan, did the defendant

4    decide to do further clinical trials?

5    A.   Yes, it developed a plan to conduct two further

6    controlled trials.

7    Q.   All right.  Let's look at Exhibit 216, which you have

8    there.  Is this the Parke-Davis marketing assessment for

9    Neurontin and migraine?

10   A.   Yes, it appears to be.

11   Q.   Okay.  I want to look over on the fourth page of it.

12   This is the cover letter where the Parke-Davis employee,

13   John T. Boris distributes this document to the Parke-Davis

14   Neurontin Marketing Group.  Do you see that July 31, 1996

15   memo?

16   A.   Yes, I do.

17   Q.   Read to the jury -- I want to blow it up.  Read to the

18   jury and for the record what it says about publicizing the

19   results of the migraine prevention that they're going to

20   conduct?

21   A.   It says, "The results, if positive, will therefore be

22   publicized in medical congresses and published in peer

23   reviewed journals."

24   Q.   Is having a premeditated plan to publish only positive

25   clinical trials an acceptable practice in medical science or

1    not, and explain why?

2            MR. HOOPER:  Objection, your Honor.

3            THE COURT:  Overruled.

4    A.  No, I don't believe it is.  I mean, when you undertake a

5    trial and enroll patients, gather the data, there is an

6    obligation to present the results, whether positive or

7    negative.

8    Q.  Why is it important to do that?

9    A.  Well, it's important to get the knowledge out to help

10   health care providers understand what's available, the best

11   data to help their patients.

12   Q.  What about the patients who volunteer for these

13   studies?

14   A.  I mean, I think there's an issue with patients who

15   volunteer for trials.  There's a lot of evidence to suggest

16   that patients who volunteer to participate in clinical

17   trials and agree to be randomized between a real drug and a

18   placebo are doing that not only for their own benefit to

19   help move the state of science forward, help their fellow

20   migraine sufferers, so I think it's important to use the

21   results of that effort in promoting the advancement in our

22   state of science.

23   Q.  Okay.  Did the defendants follow through with this 1996

24   plan to conduct more clinical trials?

25   A.  Yes, I reviewed research reports from two additional

Page 27

1  studies that were completed.

2  Q.  Okay.  Tell us about those two trials that they

3  conducted.

4  A.  So there were two studies, the first was I believe

5  945-217, which was a large, well-designed trial comparing

6  Neurontin and placebo, and the results of that trial

7  showed -- didn't find any statistically significant result,

8  didn't find that Neurontin was effective for migraine

9  prophylaxis.  That study was not published.

10  Q.  Wait a minute, they never published 945-217?

11  A.  That's right.  That has never appeared in the peer

12  review literature anywhere.

13  Q.  Did they ever mention it in their promotional

14  material?

15  A.  No, never.

16         THE COURT:  I'm sorry, there's a question here.

17  Go ahead.

18         THE JUROR:  Just for clarity, is there another

19  name that 945-217 is?  That's it?  We've heard other

20  testimony that they've referenced a particular study by

21  name.

22         MR. BARRETT:  Let me ask a question that I think

23  will clear it up.

24         THE COURT:  Do you know if there's a lead author

25  or a lead doctor assigned to it?

Page 28

1          THE WITNESS:  There are several authors that are

2    listed on the cover page.

3          THE COURT:  Sometimes we've referred to things as

4    the Gorson study, no one is referring to this by any

5    particular name to your knowledge?

6          THE WITNESS:  Not to my knowledge.

7    Q.  Dr. McCrory, it gets a name when it's published, when

8    the lead author -- it's called by the name of the lead

9    author; is that correct?

10   A.  That's generally the way it works.

11   Q.  So if it's hidden in the files of Pfizer, it's not going

12   to get a name because it's not going to be published,

13   correct?

14   A.  That's correct.

15   Q.  Okay.  So that was 945-217, they started that in 1996,

16   1997?

17   A.  I believe that's correct.

18   Q.  About that same time, were they also doing another

19   study, 945-220?

20   A.  Yes, so Study 945-220 was designed very similarly to

21   945-217, and that study also, the primary analysis, primary

22   variable showed that Neurontin was not effective for

23   migraine prophylaxis, they failed to find a statistically

24   significant result, but with this study, it did appear in

25   the medical literature, and the patient had first author

55917d02-9b52-42a6-8c4d-9774beba262a

1  Matthews.  It's generally referred to as the Matthews

2  study.

3  Q.  Okay.

4  A.  However, the Matthews study represented it as a positive

5  study, in other words, in the Matthew paper, they reported a

6  statistically significant finding in favor of Neurontin

7  compared with placebo, so they misrepresented or changed the

8  results from the research report to their published

9  report.

10 Q.  I see.  And prior to our getting these, the underlying

11 data through a subpoena, had that underlying data ever been

12 made available to researchers anywhere?

13 A.  No, not to my knowledge, never.

14 Q.  And, in fact, did Pfizer use the Matthew study

15 thereafter to promote the Matthew study with the manipulated

16 data to promote the sale of Neurontin for migraine

17 prevention headache?

18          MR. HOOPER:  Objection.  Foundation, your Honor.

19          THE COURT:  Why don't you lay a foundation.

20 Q.  Did you see in the materials that you reviewed where

21 they had used the Matthew study?

22 A.  I saw numerous references to the Matthew study in the

23 transcripts of professional meetings.

24          THE COURT:  Wait a minute.  I'm losing the end of

25 your sentence.

Page 30

1              THE WITNESS:  I'm sorry, I'll try to speak up.
2    A.  I saw numerous references to the Matthew study in a lot
3    of promotional materials that I reviewed.
4              THE COURT:  When was the study complete?
5              THE WITNESS:  I think it was published in 2001.
6    Q.  So, the defendants conducted in all that we know of
7    three DBRCT trials for Neurontin as a preventative for
8    migraine, 879-200 back in the mid to late '80s and 945-217
9    and 945-220 in the mid to late 1990s, right?
10   A.  Yes.
11   Q.  And all of them were negative?
12   A.  Yes.
13   Q.  And they hid two of the studies, and they phonied up the
14   third study to make it appear positive; is that correct?
15              MR. HOOPER:  Objection, your Honor.
16              THE COURT:  Overruled.
17   A.  Yes.
18   Q.  Is that appropriate conduct?
19   A.  No, absolutely not.
20              MR. BARRETT:  Your Honor, I should have moved on
21   216 earlier and move now to introduce 31.
22              ( Exhibit 216 was received in evidence.)
23              THE COURT:  What's 31?
24   Q.  Would you take a look at Exhibit 31, Dr. McCrory.
25   A.  Yes.

Page 31

1   Q.  You've seen that document before, haven't you?

2   A.  Yes.

3   Q.  Is Exhibit 31 a Parke-Davis memo dated September 29,

4   1995, where they are discussing the illegal off-labeling for

5   Neurontin for pain including migraine?

6           MR. HOOPER:  Objection.  Your Honor.

7           THE COURT:  Sustained.  I think you need to bring

8   us to the passage.

9   Q.  Turn to page 6 of this document.  Do you find it

10  there?

11  A.  Yes.

12  Q.  Does this document suggest the ways that they might

13  convince physicians to prescribe Neurontin for migraine

14  prevention?

15  A.  Yes, it appears to outline a series of techniques to --

16  Q.  This is a plan, it's something, and it says here, "If

17  it's GBP is Gabapentin, it said, If it's analgesic, this is

18  what we can do?

19          THE COURT:  Do you all have it?

20          MR. BARRETT:  It's on the --

21          THE COURT:  All right.  So analgesic means?

22          THE WITNESS:  Pain relieving.

23  Q.  So it's a forward-looking plan, correct?

24  A.  Yes.

25  Q.  Okay.  I want to go over these things that they've

1    listed, it says, "Booth at APS."  What's APS?

2    A.  I believe that's the American Pain Society.

3    Q.  "Conferences, symposia with invited MDs."  What are

4    those sorts of things?

5    A.  Well, I think they're venues to communicate a message to

6    physicians where you've got a big physician audience.

7    Q.  "CME," for the record what's CME again?

8    A.  Continuing medical education.

9    Q.  Okay.  Are doctors required every year to have a certain

10   number of hours in order to maintain their license?

11   A.  Right.  For example, in North Carolina, 50 hours a

12   year.

13   Q.  Do doctors take this seriously?  Are the CMEs

14   important?

15   A.  Well, yes, very seriously.  I mean, if they don't do it,

16   they don't keep their licensure.

17   Q.  But as a learning tool is it important?

18   A.  Yes, I believe so.

19   Q.  "Sponsored publications of seeding trials," and then it

20   says, "a drumbeat in the literature."  What does that

21   mean?

22   A.  Well, "the seeding trials" I think is placement of peer

23   reviewed articles in the literature to keep the message in

24   the forefront, and "the drumbeat" I think just refers to the

25   echoing and repetitious of the same message.

55917d02-9b52-42a6-8c4d-9774beba262a

Page 33

1  Q.  Dr. McCrory, can you tell from your overall review of

2  the defendant's marketing documents whether defendants

3  actually carried out this marketing plan relative to

4  Neurontin for migraine?

5          MR. HOOPER:  Objection.  Foundation, your Honor.

6          THE COURT:  Well, I'll allow it.  Yes or no.

7          THE WITNESS:  Only yes or no?

8          THE COURT:  All right.

9  Q.  Yes or no to start off with.

10 A.  Yes, I reviewed numerous transcripts of various

11 conferences and symposia where Neurontin was discussed for

12 migraine prophylaxis.

13 Q.  And did you see evidence of all of these different types

14 of events in the materials that you looked at?

15 A.  Yes, I believe I did.

16 Q.  Okay.  And how much information did physicians around

17 the country, especially neurologists, get about Neurontin as

18 effective for migraine?

19 A.  Well, I think that message got out there very

20 effectively.

21 Q.  And the message was that Neurontin was effective for

22 migraine prevention, and they had three negative studies

23 showing that it was not; is that correct?

24          MR. HOOPER:  Objection, your Honor.

25          THE COURT:  Sustained.

1   Q.  Did Parke-Davis continue to promote Neurontin for

2   migraine even after both clinical trials they conducted in

3   1996 came back negative, no better than a placebo?

4   A.  Yes, they did and continued to site the Matthew paper

5   and its positive findings.

6   Q.  All right.  Did Parke-Davis and Pfizer, did they just

7   simply keep quiet about these unpublished studies, or did

8   they affirmatively lie about their existence?

9            MR. HOOPER:  Objection.

10           THE COURT:  Sustained.  You need to bring us into

11  the document for the transcripts that he's referring to.

12           MR. BARRETT:  All right.

13  Q.  Dr. McCrory, you've told us about your work on the

14  Cochrane Collaboration.  Have the defendants ever withheld

15  negative data from the independent researchers at the

16  Cochrane Collaboration?

17  A.  Yes, they did, Dr. Winn Mulliners, who's a headache

18  researcher in the Netherlands, and whom I had communicated

19  with about --

20           THE COURT:  No, sustained.  Hearsay.

21           MR. BARRETT:  The documents show it.

22           THE COURT:  Then let's see the document.

23           MR. BARRETT:  All right.

24  Q.  Let's look at Exhibit 122.  Is this an e-mail string

25  generated at Pfizer by Dr. Mulliners' request?

1   A.  Yes, it is.

2   Q.  All right.  As you know, e-mails start at the bottom and

3   work to the front.  Let's look at the e-mail where it's

4   stated it's in Spanish, 15th of March, 2002 from

5   Angela Crespo at Pfizer, and it gives Angela Crespo on page

6   4, she is the senior marketing manager, Neurontin Major

7   Markets, Pfizer Pharmaceuticals, and what is she saying?

8   Read what she says for the record about the Cochrane.

9   A.  She writes, "Through Pfizer Netherlands, we've been

10  asked by Cochrane for information regarding use of Neurontin

11  in migraine prophylaxis treatment.  You know that this

12  institution specializes in treatment review.  In Europe, it

13  is very well considered by physicians (I'm not sure if this

14  is true, too, of the U.S."

15  Q.  Is the Cochrane Collaboration well considered in the

16  United States?

17  A.  Yes, I believe it is, well regarded.

18  Q.  Then the next e-mail in this string would be at the top

19  of page 3.  Here Angela Crespo says, "What they're asking

20  for is any papers or abstract published on Neurontin in

21  migraine."  Was that in fact what was requested?

22  A.  Well, I believe what would have been requested would be

23  both published and unpublished data.

24  Q.  Okay.  And as a matter of fact, they get into that, do

25  they not?  Where Elizabeth Mutisya responds to Angela Crespo

Page 36

1   on April 5, and said, "We would not be since they're based

2   in the UK, the UK Medical Information Group can them a

3   general letter on migraine prophylaxis, and the published

4   literature, we would not be able to provide them with our

5   databases, which is what they are ultimately interested in."

6   That's correct, that's what they were interested in,

7   correct?

8           MR. HOOPER:  Objection, your Honor.

9           THE COURT:  Sustained.  The document speaks for

10  itself.

11          MR. BARRETT:  Right.

12  Q.  Then what did Leslie Tive or Tive respond, Doctor?

13  A.  Well, she writes, "I don't understand why Cochrane can't

14  do a search to find the literature they want.  If they are

15  looking for unpublished data, I would be reluctant to send

16  it."

17  Q.  All right.  Then let's look on the first page of

18  Exhibit 122.  This is where Marino Garcia at Pfizer tells

19  all of them, let's look down at the bottom, does it say, "We

20  definitely will not supply any internal data, we all agree

21  on that;" is that correct?

22  A.  Yes, it is.

23          MR. HOOPER:  Your Honor, for completeness, I'd ask

24  that we read the preceding paragraph beginning with "the

25  suggestion"?

1          THE COURT:  Sure.

2          MR. BARRETT:  Oh, we're going to read that,

3   absolutely, I'm going to right now.

4   Q.  "The suggestion I would throw out there is to have

5   someone from medical just tell them that we are not

6   indicated for this condition and that we are only aware of

7   two double-blind placebo controlled trials done

8   independently of Pfizer in which we had no involvement and

9   send them the reference."  What does that tell you as a

10  research scientist?

11  A.  Well, two things, one, I'm surprised it's the marketing

12  people at Pfizer that are making the decision about whether

13  to release the data; and, secondly, it describes the intent,

14  you know, to deny the existence of these studies rather than

15  just, you know, not to provide them.  They actually are

16  proposing to lie about the existence of those studies.

17  Q.  Doctor --

18          THE COURT:  So just to back us up, so which two

19  double-blinded placebo controlled trials done independently

20  are they referring to?  Can you tell?

21          THE WITNESS:  I believe one of them would be the

22  Di Trapani study, which was done in Italy published in 2002,

23  I believe, and --

24  Q.  Would that be the Matthew study?

25  A.  I'm not sure whether they are trying to suggest that the

1    Matthew study is the other one, and that was done

2    independently of Pfizer.  I'm not sure I understand exactly

3    what -- I mean, those were the two that would be available

4    in the published literature at that time.

5    Q.  Doctor, is the withholding of unpublished data from

6    independent research at Cochrane an acceptable or

7    appropriate practice for the pharmaceutical industry or in

8    the medical community?

9              MR. HOOPER:  Objection.

10             THE COURT:  Overruled.

11   A.  No, I don't believe it's acceptable or appropriate.

12   Q.  And why not?

13   A.  Well, again, I mean, public health depends on having

14   access to this information, and it violates the goodwill of

15   participants in clinical trials.  There's been a movement to

16   require --

17             THE COURT:  No.  Well, no.

18   Q.  Let's be specific.  Tell the jury what, if any, effect

19   the withholding of this unpublished negative data had on the

20   subsequent publication of Dr. Mulliner's Cochrane Review

21   article in 2004?

22   A.  The effect was huge because the Cochrane Review was then

23   conducted with only the published literature available, the

24   Di Trapani study and the Matthew study.

25   Q.  First of all, talk about the Di Trapani study.

1   A.  So that was a somewhat smaller double-blind study that

2   was done in Italy that reached a positive conclusion

3   regarding the efficacy of Neurontin compared with placebo.

4   Q.  What about the design of that study?

5   A.  Well, it was somewhat smaller.  It had a little less

6   statistical power.  It was done using repeated measures

7   analysis.  There were a few irregulatories in the

8   statistical analysis that I commented on in my report, and

9   it had some flaws, you know, altogether the data they

10  presented supported the conclusion that Neurontin is

11  effective.

12  Q.  And the other thing that the Cochrane Review, the only

13  other thing they had was the Matthew study; is that right?

14  A.  Yes.

15  Q.  And the Matthew study was the one that had falsely

16  reported the 945-220 as a positive study; is that correct?

17  A.  Yes, that's correct.

18  Q.  Did you consider and include all of the data -- you said

19  you did a meta-analysis.  Did you include all the data from

20  the Di Trapani study when you conducted your meta-analysis

21  of all four of these studies?

22  A.  Yes, I included the three unpublished research reports

23  and the published Di Trapani study.

24  Q.  Okay.  And, again, the meta-analysis for all of those

25  studies together was what?

Page 40

1    A.   The finding of the meta-analysis was negative, that

2    Neurontin was not effective.

3    Q.   Do you know Dr. Allen Rapoport?

4    A.   Yes, I do.

5    Q.   Was Dr. Rapoport involved in both of the Neurontin files

6    that you testified about, that is 945-217 and 945-220?

7    A.   Yes, he was listed as an investigator on both those

8    studies.

9    Q.   He also in his report said that he was an author and

10   helped to design 945-220, did he not?

11   A.   Yes.

12   Q.   Are you aware that Dr. Rapoport has given two reports in

13   this case on behalf of the defendants and also that they

14   listed him as a witness to testify here?

15   A.   Yes, I'm aware, and I've reviewed of both his reports.

16   Q.   What is your overall professional opinion of both the

17   work product and the actions of Dr. Rapoport in this matter?

18           MR. HOOPER:   Objection, your Honor.

19           THE COURT:   Sustained.

20   Q.   Did you examine his -- you did say that you've examined

21   his reports that he's filed in this case?

22   A.   Yes, I've reviewed two reports he's filed.

23   Q.   All right.   And what is your professional analysis of

24   those reports?

25           MR. HOOPER:   Objection, your Honor.

1        THE COURT:  Sustained.  You could get into the

2   weeds if there's some specific data he disagrees with.

3        MR. BARRETT:  I will.

4   Q.  Did Dr. Rapoport characterize Neurontin as being

5   effective for migraine?

6   A.  Yes, he did.

7   Q.  And how does that jive with the private information that

8   he had to have been aware of with these negative studies?

9        MR. HOOPER:  Objection, your Honor.

10       THE COURT:  Overruled.

11  A.  I think the conclusion he reached is completely at odds

12  with the randomized double-blind controlled trials, the

13  data, the three negative trials, two of which he must have

14  had access to as being an investigator on those studies.

15  Q.  Is there any way that could have been an accident?

16  A.  I don't see how it could have been an accident.

17  Q.  Dr. McCrory, considering all of the data and the

18  materials that you've reviewed and testified about in

19  considering your specialized experience in the clinical

20  treatment of migraine headaches, do you have an opinion as

21  to whether or not any reasonable physician would have

22  prescribed Neurontin for migraine headache prevention if

23  they had available to them the reliable scientific

24  information about Neurontin and migraine?

25  A.  Yes, I don't think that a reasonable physician when

Page 42

1   presented with the totality of evidence, those two

2   well-designed negative randomized controlled trials would

3   consider migraine for prophylaxis.

4   Q.  Why in your opinion did physicians not have this

5   reliable scientific evidence?

6   A.  Because those data were withheld by Pfizer.

7   Q.  The defendants have produced their list of what's been

8   called the 25,000 Kaiser physicians, and there's been

9   testimony, well, there are only 12,800 Kaiser Permanente

10  physicians.  Whatever the number, whatever the number, when

11  you say that no reasonable physician would have used

12  Neurontin for migraine, would that include the Kaiser

13  doctors?

14  A.  Well, of course, yes.

15        MR. BARRETT:  That's all the questions we have.

16  Oh, I offer 31 and 122 into evidence if I haven't done it.

17        THE COURT:  All right.

18        ( Exhibits 31 and 122 were received in evidence.)

19          CROSS-EXAMINATION BY MR. HOOPER:

20        MR. HOOPER:  Your Honor, may I?

21        THE COURT:  Yes.

22  Q.  Dr. McCrory, good morning.  My name is Jim Hooper.  I

23  have a few questions for you.

24  A.  Good morning.

25  Q.  You were speaking earlier about something called the

1   Cochrane Review.  Do you recall that?

2   A.  Yes.

3   Q.  And you referred to an e-mail exchange talking about the

4   Cochrane request and what to send them and so forth; do you

5   recall that?

6   A.  Yes.

7   Q.  And I take it your understanding is that Cochrane,

8   first, there's nothing in the exhibit that shows us what

9   Cochrane's request actually was, was there?

10  A.  Only they describe the nature of the request.

11  Q.  It's an e-mail exchange between people at Pfizer talking

12  about a request that is itself not part of the document,

13  right?

14  A.  Yes, that's correct.

15  Q.  And your sense was that Cochrane would have been asking

16  for unpublished data?

17  A.  That would be standard practice for a Cochrane Review.

18  Q.  But you didn't see a Cochrane document asking for

19  unpublished data, did you?

20  A.  I cannot remember entirely.

21  Q.  And did you just tell us that it would be standard

22  practice for a Cochrane Review to ask for unpublished

23  data?

24  A.  In general, yes, I know that in the way the Cochrane

25  Collaboration is organized, the individual review groups,

Page 44

1    collaborative review groups set their own editorial

2    policies, pain palliative care group in which we do the

3    headache reviews, that is standard policy.

4    Q.  Pain group.  Let me show you a document.

5           MR. HOOPER:  Your Honor, I move to admit this.

6    Q.  Dr. McCrory, what you've been handed will you confirm is

7    an e-mail string -- Dr. McCrory, will you confirm that what

8    you've been handed is an e-mail string with the words

9    "Tom Perry" at the top?

10   A.  Yes, it is.

11   Q.  And if you look, do you know you'll see that there's a

12   separate message in the center there from Phil Wiffen to

13   T. Perry?

14   A.  Yes.

15   Q.  And do you see the subject line there is "Cochrane

16   Systematic Review of Gabapentin for pain, 2005 version," do

17   you see that?

18   A.  Yes.

19   Q.  Would you look down at item No. 2 in the letter.  First,

20   Phil Wiffen is a director of pain group in the UK for

21   Cochrane, isn't he?

22   A.  Former director of the pain group, yes.

23   Q.  And what does item No. 2 say, Dr. McCrory, would you

24   please read that into the record.

25   A.  It says, "Since we did not seek unpublished data and

55917d02-9b52-42a6-8c4d-9774beba262a

1    generally as a group have not done so."

2    Q.  Thank you.  Dr. McCrory, let's talk about what your

3    assignment in this case did not include, just so I'm clear

4    what your role is.  You understand this case is about

5    whether Kaiser doctors were tricked into prescribing

6    Neurontin?

7    A.  Yes.

8    Q.  Your assignment, as I understand it, did not include

9    identifying any specific Kaiser doctors who were tricked; is

10   that right?

11   A.  That's correct.

12   Q.  How much time did you spend on this case, Doctor?

13   A.  I spent approximately 50 hours reviewing materials,

14   preparing my report, et cetera.

15   Q.  And during that time, you weren't asked by Kaiser to

16   talk with any of the Neurontin providers who actually

17   prescribed Neurontin, correct?

18   A.  That's correct.

19   Q.  Not part of your job, right?

20   A.  Yes.

21   Q.  And so if we wanted to know about Kaiser doctors'

22   prescriptions for Kaiser patients with migraine or any other

23   headache disorder, you wouldn't be in a position to tell us

24   that, would you?

25   A.  Well, to the extent that I'm a physician and attend

1   professional meetings and know in general what physicians

2   see, how physicians make decisions, I am under the

3   assumption that Kaiser physicians are similar to other

4   people that I interact with.

5   Q.  But you can't tell us anything about any specific

6   prescriptions at Kaiser, can you?

7   A.  No.

8   Q.  I understand you were retained by Mr. Greene beginning

9   in April, 2008; is that right?

10  A.  I believe so.

11  Q.  And you wrote and signed an expert report in August,

12  2008; is that right?

13  A.  Yes.

14  Q.  And your report sets out your position and reasoning in

15  this case?

16  A.  Yes.

17  Q.  And then you gave a deposition in this case, sworn

18  testimony like you're giving today in January, 2009, about a

19  year ago, right?

20  A.  Yes.

21  Q.  Doctor, you're an internal medicine specialist, that's

22  your certified specialty?

23  A.  Yes, it is.

24  Q.  Also called an internist; is that correct?

25  A.  Yes.

Page 47

1   Q.  You're not a neurologist, a doctor who specializes in

2   treating nervous disorders, are you?

3   A.  No, I'm not board certified in neurology.

4   Q.  You're not certified in pain medicine or pain

5   management, are you?

6   A.  No.

7   Q.  And at the time you gave your deposition testimony in

8   this case, back in January of 2009, you were seeing patients

9   at the Duke V.A. Hospital for a half day three days a week,

10  true?

11  A.  The Durham V. A. Medical Center, yes.

12  Q.  Durham Veterans Administration Hospital, still true?

13  A.  Yes.

14  Q.  Okay.  And you typically saw six to twelve patients on

15  each of those half days; is that right?

16  A.  Yes, that's correct.

17  Q.  So, a total of somewhere between 18 and 36 patients a

18  week; is that right?

19  A.  Yes.

20  Q.  And, as I understand it, about 20 percent of your

21  patients have some type of headache problem, right?

22  A.  That would be about right.

23  Q.  So that would work out to about six per week with some

24  kind of headache problem?

25  A.  Yes.

1    Q.   And about half of the six headache patients that you see

2    on average have migraine, about three per week; is that

3    right?

4    A.   That's probably about correct, yes.

5    Q.   And of the migraine patients that you do have, about

6    three per week, you prescribe a migraine preventative

7    medication for half of them and for the other half you do

8    not, correct?

9    A.   That would probably be about right.

10   Q.   And as an internist, Dr. McCrory, you sometimes refer

11   your patients to doctors who are specialists in neurology,

12   right?

13   A.   Yes.

14   Q.   And as an internist, you sometimes refer your patients

15   to other doctors who are pain specialists; is that right?

16   A.   Yes.

17   Q.   And you also sometimes refer your migraine patients to

18   see other doctors, specifically to neurologists for

19   treatment of their migraine condition, right?

20   A.   Occasionally.  At the Durham V.A., they have until

21   recently had restrictions in place on the availability of

22   certain anti-migraine drugs, so that was a consequence of

23   the prescribing restrictions in place at our institution.

24   Q.   Is that a yes?

25   A.   Yes.

55917d02-9b52-42a6-8c4d-9774beba262a

Page 49

1   Q.  Thank you.  You got into this case when you got a

2   message from a friend of yours, a Dr. Dickersin; is that

3   right?

4   A.  Yes.

5   Q.  And soon after that you were on the phone with

6   Mr. Greene; is that right?

7   A.  Yes.

8   Q.  And Mr. Greene asked you to look at the migraine studies

9   you told us about; is that right?

10  A.  I believe the first thing he asked me to do is to look

11  at the Matthew paper.

12  Q.  And then subsequently asked you to look at the other

13  three studies you discussed?

14  A.  Yes.

15  Q.  Did you ever ask Mr. Greene, Dr. McCrory, why Kaiser

16  didn't ask one of its own migraine doctors to take on the

17  tasks that were assigned to you?

18  A.  No, I don't believe I did.

19  Q.  And, again, Dr. McCrory, just to orient us real quickly,

20  you wrote your report in August, '08, correct?

21  A.  Yes.

22  Q.  Deposition six months later, January of last year,

23  correct?

24  A.  Yes.

25  Q.  Okay.  At the time of your deposition, I understand you

1   had made it your policy for quite some time to avoid meeting

2   with any sales representatives from any pharmaceutical

3   companies, correct?

4   A.  I seldom met with, yes, seldom met with sales reps.

5   Q.  Your institution, the V.A. Hospital, where you see

6   patients part time has policies that limit salespeople's

7   access to doctors, doesn't it?

8   A.  Yes.

9   Q.  And you don't find interacting with salespeople helpful,

10  correct?

11  A.  In general, that's true, yes.

12  Q.  You want to avoid even the appearance of bias in your

13  treatment decisions, correct?

14  A.  Yes.

15  Q.  And even something as common as journal advertisements

16  for prescription medications, even ads about approved

17  on-label uses, those are something you view with skepticism,

18  correct?

19  A.  I suppose I have a healthy skepticism when I look at any

20  data.

21  Q.  And particularly journal ads, you told us in your

22  deposition under oath that you view them with skepticism,

23  don't you?

24  A.  I would certainly agree with what I said under oath,

25  yes.

Page 51

1   Q.  In fact, Doctor, visits from sales reps you told us are

2   not a factor at all in your prescribing decisions, are

3   they?

4   A.  I suppose I try to avoid it, yes.

5   Q.  And as to detailing, that is, doctors being visited by a

6   sales rep, you've never been detailed on Neurontin,

7   correct?

8   A.  To the best of my knowledge, no, I don't remember ever

9   being detailed on Neurontin.

10          MR. BARRETT:  Could you speak up.

11  A.  I don't remember ever being detailed on Neurontin.

12  Q.  Doctor, skeptical of advertising as you are and never

13  having been detailed, let's look at your prescribing

14  decisions in your internal medicine practice.  Do you recall

15  telling us at your deposition in this case six months after

16  you signed your report about the medications that you were

17  prescribing for migraine prevention at that time, do you

18  recall talking about that with us?

19  A.  Yes.

20  Q.  And you told us you prescribe first drugs called beta

21  blockers for some of your own patients for migraine

22  prevention, correct?

23  A.  Yes.

24  Q.  And two beta blockers that you mentioned in your report

25  were Timalol and Propranolol; do you remember that?

1  A.  Yes.

2  Q.  And those two beta blockers, as you indicate in your

3  report, have FDA-approved indications for migraine, right?

4  A.  Yes.

5  Q.  So to get their FDA approvals as migraine preventive

6  drugs, those two beta blockers that you mentioned had to

7  present the FDA with these DBRCTs, this gold standard

8  quality test results, right?

9  A.  Yes.

10  Q.  And you also prescribed a drug called Valproic Acid for

11  some of your migraine patients, right?

12  A.  Yes.

13  Q.  And one form of Valproic Acid is called Depakote,

14  correct?

15  A.  Yes.

16  Q.  And Depakote, too, is approved by the FDA with a

17  specific indication for migraine prevention, is it not?

18  A.  Yes, it is.

19  Q.  Just got that very recently, didn't it?

20  A.  Fairly recently, yes.  I'm not aware of the exact

21  date.

22  Q.  And so that brand of Valproic Acid, Depakote, also had

23  to submit this gold standard evidence to FDA to get that

24  migraine indication, right?

25  A.  Yes.

55917d02-9b52-42a6-8c4d-9774beba262a

1  Q.  And for some of your migraine patients, others, I

2  presume, you've also prescribed a drug called Amitriptyline,

3  one of the tricyclic anti-depressants or TCAs, right?

4  A.  Yes, that's correct.

5  Q.  And Amitriptyline is approved and labeled solely for

6  depression, right?

7  A.  That's correct.

8  Q.  Amitriptyline doesn't have an FDA-approved indication

9  for migraine or any other form of headache, does it?

10  A.  That's correct.

11  Q.  Your prescriptions of Amitriptyline for migraine

12  prevention were off-label prescriptions, right?

13  A.  Yes.

14  Q.  You've decided in your medical judgment that the TCA

15  drug, Amitriptyline, that doesn't have the approval, and not

16  one of the first three drugs we talked about that does have

17  the FDA approval should be prescribed for those particular

18  patients, correct?

19  A.  Yes.  Not just based on my medical opinion but informed

20  by clinical trial data.

21  Q.  And some of your migraine patients were prescribed as of

22  the time of your deposition a year ago something called

23  nonsteroidal anti-flammatory drugs or NSAIDS such as

24  Naproxen, correct?

25  A.  Yes.

1  Q.  And Naproxen doesn't have any FDA-approved indication

2  for migraine, does it?

3  A.  No, for pain, but not migraine.

4  Q.  And your medical judgment was to prescribe for some

5  patients, Naproxen rather than a drug with the FDA approval

6  for migraine, right?

7  A.  Yes.

8  Q.  And you told us in your deposition that you had tried

9  another anticonvulsant called Carbamazepine for some of your

10  migraine patients as well, right?

11  A.  Yes.

12  Q.  And that, like Neurontin, Carbamazepine is approved as

13  an anti-epileptic drug, right?

14  A.  Yes.

15  Q.  And it also, like Neurontin, it's approved for one form

16  of neuropathic pain in its case, trigeminal neuralgia,

17  correct?

18  A.  Yes.

19  Q.  And Carbamazepine has no FDA-approved indication for

20  migraine in its labeling either, does it?

21  A.  No, it does not.

22  Q.  And, again, you decided in your medical judgment to

23  prescribe Carbamazepine for some of your migraine patients

24  rather than an FDA-approved drug, correct?

25  A.  Right, based on the availability of some randomized

1    controlled trial evidence supporting its use.

2    Q.  And as of the time of your deposition in this case in

3    January, 2009, six months after you wrote your report, you

4    had also described Gabapentin, Neurontin, for your migraine

5    patients on multiple occasions, correct?

6    A.  Yes, that's true.

7    Q.  Dr. McCrory, I want to show you a study about one of the

8    drugs you just told us about, Divalproex, Valproic Acid, and

9    I'm just going to ask you about the first page and some very

10   basic information about this.  First, what you've been

11   handed is a study in the Journal of Headache published last

12   year, correct?

13   A.  Yes.

14   Q.  And the title of the article is Divalproex Extended

15   Release -- that's one of the drugs you prescribed to some of

16   your patients for migraine, right?

17   A.  Yes.

18   Q.  -- In Adolescent Migraine Prophylaxis Results Of A

19   Randomized Double-blind Placebo Controlled Study; did I read

20   that correctly?

21   A.  Yes.

22   Q.  And the lead author of the study is a George

23   A-p-o-s-t-o-l, Apostol, correct?

24   A.  Yes.

25   Q.  And you understand, I realize you may not have read

1    this, Doctor.  I just want to --

2              THE COURT:  Well, have you ever seen that?

3              THE WITNESS:  No, I'm not familiar with this

4    paper.

5    Q.  I only want to ask you about the conclusions at the

6    bottom of the abstract at this point, Doctor.  Tell me if I

7    read the conclusions correctly.  "In the current study,

8    Divalproex Sodium Extended Release did not differentiate

9    from placebo in the prophylactic treatment of migraine

10   headaches but was generally well tolerated in adolescents

11   age 12 to 17 years."  Did I read that correctly?

12   A.  Yes.

13   Q.  This is a drug you prescribed some of your own

14   patients?

15   A.  Yes, it is.

16   Q.  For the purpose in this study, correct, migraine

17   prophylaxis?

18   A.  Not quite.  The study population is quite different than

19   the population of patients that I treat, and I would not

20   really use this as being representative of the literature

21   that supports the use of Valproic Acid in my practice.

22   Q.  You anticipated my next question perfectly, so let me

23   start.  For one, because it did not differentiate from

24   placebo, this is a negative study, correct?

25   A.  Yes, it is.

Page 57

1  Q.  And it is a negative study in migraine prophylaxis,

2  correct?

3  A.  Yes, it is.

4  Q.  And it is at specific doses and in a specific

5  population, namely adolescents age 12 to 17 years,

6  correct?

7  A.  Yes.

8  Q.  And, Doctor, you don't think that this negative study of

9  the drug that you prescribed in migraine prophylaxis, you

10  don't think that this negative study means that the drug

11  doesn't work for migraine prophylaxis anywhere any time

12  under any conditions, do you?

13  A.  Well, I'm aware of a lot of other controlled clinical

14  trial evidence that suggests it is effective, so I wouldn't

15  reach a conclusion that the drug is ineffective.

16          THE COURT:  Which drug are we talking about now,

17  this drug?

18          THE WITNESS:  We're talking about Valproic Acid,

19  yes.

20          THE COURT:  So, excuse me, so there are other

21  studies?

22          THE WITNESS:  There are several other studies that

23  were used by the FDA to, you know, approve this indication

24  for migraine prevention.  I've looked at some of them and

25  summarized some of them in some of my own work, so, I mean,

1    I'm somewhat familiar with these.  This I haven't seen

2    before.

3    Q.  Doctor, my point is or my question goes to the question

4    that a jury may have to wrestle with, which is a negative

5    study in a trial under the conditions of that trial, when it

6    comes out negative and the drug doesn't look better than

7    placebo, you do not infer from that that the drug does not

8    work in that condition, period, do you?

9    A.  One of the -- one of the hallmarks about medical

10   decision-making and the scientific method is replication,

11   so, you know, it's difficult to draw a conclusion from a

12   single study, and there's a lot of factors that go into that

13   evaluation of efficacy.  In addition to whether the

14   population studied in a particular trial is representative

15   to the population you're trying to play it to, the dosing,

16   et cetera.  You also need to consider it in the context of

17   other trials that have been done, so to draw a conclusion

18   based on a single trial when you haven't looked at the bulk

19   or the rest of the evidence I think would not be wise.  It

20   would be improper.

21   Q.  I'd like you to answer my question, which is in science,

22   in clinical trials, a negative trial result in a randomized

23   controlled clinical trial conducted at certain doses in

24   certain patients understand certain conditions, when it

25   comes out negative, that does not permit scientists to

1   conclude that the drug is ineffective, period, does it?

2   A.  Well, it gets to the issues of what does it mean to be

3   ineffective.  I mean, I think that if we look at the

4   framework for medical decision-making, the hypothesis

5   testing, the default position is that a drug is ineffective

6   unless it's proven otherwise, unless it's proven to be

7   effective, and we set up what's called a null hypothesis,

8   and then we conduct an experiment and test the results using

9   statistics to determine whether or not you can reject the

10  null hypothesis, the null hypothesis being that the drug

11  is no different from placebo.

12          So, in this case, if this were the only data

13  available on Divalproex Acid and you did not find a

14  statistically significant benefit of Divalproex Acid over

15  placebo, you would say we would not able to reject the null

16  hypothesis, and I believe the correct conclusion would be

17  that Divalproex Acid has not been shown to be effective.

18  It's ineffective absent any evidence to the contrary.

19  Q.  And, Doctor, if some parameter of the study was changed

20  in a subsequent study and it came out positive, you'd change

21  your conclusion, right?

22  A.  Yes.

23  Q.  Another of the drugs that you prescribed for your own

24  patients for migraine Propranolol; is that correct,

25  Doctor?

Page 60

1    A.  Yes.

2    Q.  Doctor, what I've handed you is a study entitled,

3    Propranolol In Acute Migraine, A Controlled Study, Author,

4    GN Fuller.  Do you see that?

5    A.  Yes.

6    Q.  Perhaps, if you would, Doctor, I only want to ask you to

7    the conclusion, if you would turn to the second to the last

8    page of the document.  There's a section called Discussion.

9    Right above the acknowledgements about two inches from the

10   bottom, do you see the words "this study"?

11   A.  Yes, I do.

12   Q.  And tell me if I read correctly, "This study has shown

13   that in an unselected group of consecutive, common and

14   classical migraine sufferers, Propranolol at a dose of 40

15   milligrams is not clinically useful in the treatment of

16   acute attacks."  Did I read that correctly?

17   A.  Yes, you read that correctly.

18   Q.  This, too, is a negative study, correct?

19   A.  It appears to be, yes.  I don't recall reviewing this

20   study before and would need some time to look at it.  It has

21   some glaring deficiencies that I would be reluctant to

22   believe its conclusions.

23   Q.  But certainly the facts, if I just assume the author's

24   conclusions are correct and that you haven't been able to

25   tell that it, too, is a flawed study in the minute that you

55917d02-9b52-42a6-8c4d-9774beba262a

1  had to look at it, you'd certainly agree that with

2  Propranolol, the drug you prescribed, if someone did a

3  different study in a different patient population at a

4  different dose and that study came up positive, the drug

5  might well work, correct?

6  A.  I would agree that this study reporting a negative

7  result would not change my conclusion based on looking at

8  other evidence that Propranolol is effective.

9  Q.  Doctor, in your internal medicine practice, you

10  prescribe Neurontin not only for some migraine patients but

11  to an even greater extent, as I understand it, for some

12  off-label pain uses; is that right?

13  A.  Yes.

14  Q.  When you sat for your deposition in January of last

15  year, six months after writing your report in this case, you

16  were prescribing Neurontin at that time, weren't you?

17  A.  Yes.

18  Q.  And you began prescribing Neurontin, as I understand it,

19  when it became available generically about six years ago; is

20  that right?

21  A.  Prior to that time, I had to get -- that was one of the

22  drugs that I had to get a neurologic consultation in order

23  to prescribe.

24  Q.  You had prescribed Neurontin first as an anticonvulsant,

25  an approved use, right?

Page 62

1    A.   I have renewed prescriptions for patients with epilepsy

2    on Gabopentin.   I rarely started an anticonvulsant.   That

3    was something I would usually refer to neurology for.

4    Q.   When you were deposed a year ago, six months ago after

5    writing your report, you were still prescribing Neurontin

6    for neuropathic pain complaints, correct?

7    A.   Yes, that's correct.

8    Q.   In particular, you were prescribing Neurontin for

9    patients with a form of neuropathic pain called diabetic

10   peripheral neuropathy, right?

11   A.   Yes, that's correct.

12   Q.   And you also refilled prescriptions of Neurontin for

13   patients with diabetic peripheral neuropathy, correct?

14   A.   Yes.

15   Q.   And at this moment you have patients taking Neurontin

16   for off-label use in diabetic peripheral neuropathy, don't

17   you?

18   A.   Yes, I do.

19   Q.   And because Neurontin is -- I'm sorry, strike that.   And

20   you prescribed Neurontin for your patients if the patients

21   say it's working for them, correct?

22   A.   I'm sorry, I didn't quite understand the question.   Can

23   you repeat it?

24   Q.   One of the reasons you prescribed Neurontin for your

25   patients, one of the circumstances under which you

55917d02-9b52-42a6-8c4d-9774beba262a

1    prescribed Neurontin for your patients is if the patients

2    say it's working for them, correct?

3    A.   Well, can I clarify a little bit?  Yes, if a patient has

4    been on Neurontin and they find it's effective, then I have

5    continued Neurontin to renew Neurontin prescriptions for

6    them.

7    Q.   True, is this a true summary of your opinions, if a

8    patient has been on it and had a good response, you,

9    Dr. McCrory, are willing to continue it under the belief

10   that the patient may be getting some benefit from it?

11   A.   Yes.

12   Q.   When you were writing and refilling Neurontin

13   prescriptions a year ago, six months after your report in

14   this case, you certainly didn't think you were engaging in

15   unreasonable medical practice, did you?

16   A.   No.

17   Q.   And you certainly didn't think you were doing anything

18   unethical by prescribing Neurontin, did you?

19   A.   No, but, you know, my prescribing practices have changed

20   over time with regard to Neurontin.

21   Q.   And, Doctor, I'm talking about your prescribing

22   practices six months after you filed your report in this

23   case.  You certainly didn't think you were committing

24   malpractice when you were prescribing Neurontin then, did

25   you?

Page 64

1    A.   No.

2    Q.   And you didn't think you were harming your patients by

3    prescribing Neurontin then, did you?

4    A.   I don't think so.

5    Q.   Dr. McCrory, would you please confirm for me what you've

6    been shown is a document labeled Exhibit 953 at the

7    bottom?

8    A.   Yes, it is.

9    Q.   This is the first of the four studies that you began

10   talking about with us this morning?

11   A.   Yes, it is.

12   Q.   And you had seen this research report in connection with

13   this case, had you not?

14   A.   Yes.

15   Q.   Do you recall telling the jury this morning that you

16   thought it was a Parke-Davis study?

17   A.   Yes.

18   Q.   If you look at the top, Doctor, do you see that it says

19   beginning with the word, "confidential," after that it says,

20   I believe it's pronounced "Goedecke, G-o-e-d-e-c-k-e, AG

21   Research and Development;" do you see that?

22   A.   Yes.

23   Q.   Do you know what Goedecke is?

24   A.   No.

25   Q.   And if you look down on the first line, it says,

Page 65

1    "Research report" and it ends in 66; do you see that?

2    A.   Yes.

3    Q.   And if you look over on the right-hand column, it lists

4    the investigators.  Do you see those names?

5    A.   Yes.

6    Q.   And do you notice that they're all German and Austria

7    names, Feuerstein, Kuber Felling, Saltouri, Klingler, not

8    Wessely but Wessely, Shuit and Keplinger; do you see they

9    are all German names?

10   A.   Yes, they appear to be.

11   Q.   What was the basis for your telling the jury this

12   morning that this was Parke-Davis, this study?

13   A.   I was told that the source of these documents was from

14   Pfizer.

15   Q.   Correct.  Do you know anything about the history of

16   Goedecke Labs, Parke-Davis and then later Pfizer?

17             THE COURT:  You mean the source, the files they

18   came out of as opposed to who sponsored the study?

19             THE WITNESS:  Where the documents were obtained,

20   yes, right from whom the documents were obtained.

21   Q.   And my question, Doctor, is do you know anything about

22   the history or the relationship between Goedecke AG, a

23   German firm, Parke-Davis and then Pfizer?

24   A.   No, I don't.

25   Q.   The lawyers told you, and that's the basis, correct, of

1    you're saying, I'm sorry, what the lawyers told you is the

2    basis for your saying it's a Parke-Davis study?

3    A.   Yes, I believe so.

4    Q.   And you have no independent knowledge of that?  You

5    haven't spoken with any of the people that are listed as

6    investigators here or anything else, correct?

7    A.   That's correct.

8    Q.   Okay.  And let's focus on one investigator's name,

9    Doctor, it's the middle name in the outside investigators

10   and the name is W-e-s-s-e-l-y, Dr. Wessely; do you see that

11   one?

12   A.   Yes.

13   Q.   And then right below that it refers to a Study 200,

14   CT 879-200, right?

15   A.   Yes.

16   Q.   So this is the study that you told us about as the

17   earliest first study back in 1987, correct?

18   A.   Yes.

19   Q.   And you told us that that study was negative, right?

20   A.   Yes.

21   Q.   And I think your exact words were it didn't show a

22   statistically significant difference in favor of Gabapentin

23   or words to that effect, correct?

24   A.   Yes.

25   Q.   And this is the study that I think you claim or these

1    are study results that you claim were hidden; is that

2    right?

3    A.  Yes.

4            MR. HOOPER:  Your Honor, I want to show the

5    witness and move to admit Exhibit 1056.

6            ( Exhibit 1056 was received in evidence.)

7    Q.  Recalling that name from the 200 study, Dr. Wessely,

8    Dr. McCrory, do you see that this is an interim or

9    preliminary analysis of that study, the 200 study with lead

10   author Dr. Wessely?

11   A.  Yes.

12   Q.  And this was presented at something called the Third

13   Congress of the International Headache Society and published

14   in a journal called Cephalagia, correct?

15   A.  Yes.

16   Q.  And it was published according to this in 1987, correct?

17   A.  Yes.

18   Q.  You agree that the Wessely paper here, two pages, refers

19   to the same study in the research report that we just looked

20   at, that 200 study, correct?

21   A.  Yes.  I'll characterize this as an abstract rather than

22   a full publication.

23   Q.  Certainly.  And it's two pages in length, correct, the

24   actual substantive part about the study?

25   A.  Yes.

1   Q.  Let's turn to the second page of the exhibit, the one

2   that begins with preliminary results at the top.  Do you see

3   there it's titled, "Preliminary Results Of A Double-Blind

4   Study with the New Migraine Prophylactic Drug Gabopentin."

5   Do you see that?

6   A.  Yes.

7   Q.  And the first listed author is Dr. Wessely, and as you

8   may recognize some of those german names, Baumgartner, those

9   are the german investigators that carried out the study?

10  A.  Yes.

11  Q.  And then it describes the study and goes on two pages?

12  A.  Yes.

13  Q.  And let's look at the very back page.  You see there

14  that you can tell now where Dr. Wessely is from and why that

15  W is pronounced like a V, it's Peter Wessely, M.D. and

16  professor at the Neurologic University Clinic in Vienna,

17  Austria, correct?

18  A.  Yes.

19  Q.  All right.  And Dr. McCrory, in your report, if you

20  don't recall, I'll be happy to give you a copy, you

21  identified at least four separate deficiencies in the way

22  this study was set up and carried out; do you remember

23  that?

24  A.  Yes.

25  Q.  One is that it was a small study with only 53 patients

1   total in the efficacy analysis, correct?

2   A.  I believe so.

3   Q.  And there were what you call an effective

4   cointerventions group, that is patients who are allowed to

5   take other anti-migraine drugs in the study, correct?

6   A.  Yes.

7   Q.  And you say it was poorly designed and executed in

8   several respects, correct?

9   A.  Yes.

10  Q.  And you noted in your report that a fourth flaw in the

11  study was that the dose of the Gabapentin was the lowest

12  used among the four you reviewed; do you recall that?

13  A.  Yes.

14  Q.  It's fair to call this a flawed study, at least in the

15  four respects that you articulated in your report,

16  correct?

17  A.  Yes.

18  Q.  And the main outcome of the study was headache

19  frequency, right?

20  A.  I believe so.

21  Q.  And without getting into the tedious statistics, we can

22  agree your take on the German and Austria Study 200, it did

23  not show efficacy that the results were not statistically as

24  you say in your report, correct?

25  A.  Yes.

55917d02-9b52-42a6-8c4d-9774beba262a

Page 70

1    Q.  And this is one of the migraine studies that you contend

2    was not disclosed properly in the 1995 and forward time

3    frame, right?

4    A.  Yes.

5    Q.  Okay.  But it wasn't hidden from you, was it,

6    Dr. McCrory?

7    A.  I was aware of the interim analysis published in

8    abstract form but was not aware -- I never saw a report of

9    the full results as described in the research report.

10   Q.  Dr. McCrory, what I've shown you, if you would, please,

11   confirm is a document entitled, "Drug Treatments For

12   Prevention of Migraine Headache;" is that correct?

13   A.  Yes, it is.

14   Q.  And the front page indicates that this document was

15   prepared for the Agency for Health Care Policy and Research

16   of the Department of Health and Human Services and the U.S.

17   Public Health Service, correct?

18   A.  Yes.

19   Q.  This document was prepared for the Federal Government,

20   right?

21   A.  Yes.

22   Q.  And if you turn to page --

23               THE COURT:  What's the date of this?  You can't

24   see this.

25               MR. HOOPER:  I apologize, your Honor.

Page 71

1   Q.  If you look at the bottom of the front page, we see this

2   document was prepared in February, 1999, correct?

3   A.  Yes.

4   Q.  About 11 years ago?

5   A.  Yes.

6   Q.  Okay.  Now let's look at if you turn in to page -- the

7   page with the small little i, roman numeral page, it's about

8   four pages in, there is a list there of the project director

9   for this paper.  Do you see that, Dr. McCrory?

10  A.  Yes.

11  Q.  And who was the project director of this paper to the

12  Federal Government in 1999?

13  A.  I was.

14  Q.  And below that there are some contributing authors, and

15  who is the third contributing author on the paper listed

16  there?  That's you as well, right?

17  A.  Yes, it is.

18  Q.  Okay.  This report in total is 400 pages in length where

19  you count all the appendices you prepared?

20  A.  Yes.

21  Q.  And this is something you and your team prepared again

22  for the Federal Government, right?

23  A.  Yes.

24  Q.  And if you would please turn to page 29 of your 1999

25  paper.  Second full paragraph, there you talk about the

Page 72

1    inclusion criteria for the Wessely study cited in the last

2    line, correct?

3    A.  I'm sorry, last line of --

4    Q.  The second full paragraph on page 30, I'm sorry.  Page

5    30.

6    A.  Yes.

7    Q.  Okay.  And if you look at page 31 of your 1999 paper,

8    next page, right at the bottom and then carrying over to the

9    next page, it says, "Gabapentin."  Do you see that part?

10   A.  Yes.

11   Q.  And there you talk about it being a single parallel

12   group trial with a low quality score of 2, correct?

13   A.  Yes.

14   Q.  And you say it compared Gabapentin 900 kilograms with a

15   placebo?

16   A.  Yes.

17   Q.  And you cite Wessely, 1987, correct?

18   A.  Yes.

19   Q.  And you go on on the next page to talk about what the

20   investigators reported and that they reported that the

21   analyzed continuous data on headache frequency, correct?

22          MR. BARRETT:  Objection.  He left out a sentence

23   there.  For completeness, would you read the previous

24   sentence?

25   Q.  "A single parallel group trial with a low quality score

Page 73

1   of 2 compared Gabapentin with a dose of 900 milligrams a day

2   with placebo (Wessely, Baumgartner, Klingler, et al, 1987.)

3   Is that it?

4          MR. BARRETT:  No, the next sentence.

5   Q.   "Limited results were reported in abstract form only."

6   Did I read that correctly?

7   A.  Yes.

8   Q.  Next sentence, "The investigators reported but did not

9   analyze continuous data on headache frequency," correct?

10  A.  Yes.

11  Q.  And then you said, "We were not able to use these data

12  to calculate an effect size.  (Variance data were not

13  reported and could not be estimated.)"  Correct?

14  A.  Yes.

15  Q.  Let's turn to page 4 of your 1999 paper.  Page 34,

16  second full paragraph captioned, "Gabapentin."  There you

17  again talk about the Wessely study, and you talk about side

18  effects that you gleamed from the abstract you looked at,

19  correct?

20  A.  Yes.

21  Q.  And now, if you would, let's look down at the bottom of

22  that same page, 34, in your conclusions and the last

23  sentence of the first full paragraph there, you say "Neither

24  Clonazepam nor Gabapentin appears to be an effective

25  migraine preventative drug," correct?

Page 74

1  A.  Yes.

2  Q.  So at least as of February, 1999, Dr. McCrory, you were

3  publishing in a report to the Federal Government both the

4  existence of Study 200, Dr. Wessely's flawed study over in

5  Austria as well as your conclusion from it, however limited,

6  the results may be that Gabapentin did not appear to be a

7  effective Gabapentin drug?  You knew that as of 1999,

8  right?

9  A.  We knew of the existence of a study.  We did not have a

10  full reporting of the results, and as noted in the report,

11  the results were insufficient to draw to the conclusion

12  about it, yes, I was aware of the abstract.

13  Q.  You were certainly -- you certainly though had enough

14  information to conclude that "Neither Clonazapin nor

15  Gabapentin appears to be an effective migraine preventative

16  drug," correct?

17  A.  Yes.

18  Q.  Now, last thing on this Wessely study, Doctor, you did

19  your medical analysis on four separate studies, correct?

20  A.  Yes.

21  Q.  And this one, as we've already been through in detail,

22  is one that you consider to be flawed from the outset, isn't

23  it?

24  A.  Yes.

25  Q.  And, Doctor, you could have pretty easily taken the

1  flawed study out of the pool of four and looked at the

2  remaining three, couldn't you?

3  A.  That wouldn't be consistent with our standard procedure

4  for looking at data when one has to make an independent

5  judgment about where one would draw the line between a study

6  that's so flawed that you wouldn't want to conclude it.  In

7  general, when we usually would be inclusive with regard to

8  randomized controlled trials and then use other techniques

9  to look at differences among the studies to decide based on

10  data where results differ, why those differences may

11  occur.

12  Q.  So, in the method you used in this case, what we can say

13  about it is it was a method that allowed the inclusion of

14  studies that are flawed in at least four specific respects

15  that you identified, correct?

16  A.  It had methodological deficiencies.  One of the benefits

17  of doing a meta-analysis, that you overcome the problem of

18  small sample sizes, so one of those four deficiencies you

19  mentioned, the fact that the Wessely had a small sample size

20  is not a good reason to omit it from a meta-analysis.

21  Q.  As someone who treats at least some migraine patients,

22  weren't you just curious to see what the result would be if

23  you did the analysis without the study with the four

24  deficiencies in it?

25  A.  One of the things that we try to avoid is

1    overinterpreting or overanalyzing the data.  I can't

2    remember off the top of my head whether I did a sensitivity

3    analysis in the context of my report that omitted one study.

4    Sometimes we use a technique that leaves one study out

5    sequentially.

6            MR. HOOPER:  Your Honor, I'm going to show the

7    witness and move to admit Exhibit 1401, which is a copy of

8    the Di Trapani study that the witness referred to on his

9    direct examination.

10           ( Exhibit 1401 was received in evidence.)

11   Q.  Dr. McCrory, this is another of the four studies that

12   you included in your meta-analysis, correct?

13   A.  Yes, it is.

14   Q.  This is a study by an Italian team, a Dr. Di Trapani and

15   his colleagues published in 2000, correct?

16   A.  Yes.

17   Q.  And the Di Trapani group did a placebo controlled study

18   comparing Gabapentin 1200 milligrams a day with placebo,

19   correct?

20   A.  Yes.

21   Q.  That's a somewhat higher dose than had been used in the

22   Wessely study, isn't it?

23   A.  Yes.

24   Q.  And, first, I don't think you mentioned it on direct,

25   you're aware, are you not, the Di Trapani was not a

1    Parke-Davis study at all, correct?

2    A.  To the best of my knowledge, it was not.

3    Q.  And you weren't involved in the study at all, correct?

4    A.  That's correct.

5    Q.  You've never talked to the authors of the study,

6    correct?

7    A.  That's correct.

8    Q.  And you've never communicated in any way with the

9    authors about the study, right?

10   A.  To the best of my knowledge, that's correct.

11   Q.  Other than what you've read in the four-age publication

12   itself, you don't have any personal knowledge of how they

13   conducted their analysis, correct?

14   A.  Right.

15   Q.  Let's see what the doctors who actually did this study

16   say about it.  If you would, please, look at the first page,

17   the abstract --

18              THE COURT:  So when did this come out?

19              MR. HOOPER:  2000, your Honor.

20   Q.  Let's look again at the abstract, the discussion

21   section, last two lines, "Gabapentin shows to have an

22   effective therapeutic action in the prophylactic treatment

23   of migraine."  Correct?

24   A.  Yes.

25   Q.  So this is a situation like the one we were discussing

Page 78

1   with the other drugs you prescribed in at least this

2   respect, there had been negative studies and now there is a

3   positive study, correct?

4   A.  Yes.

5           THE COURT:  And did you consider this in the

6   meta-analysis?

7           THE WITNESS:  We included this study in our

8   meta-analysis.

9   Q.  Dr. McCrory, would you confirm for us what I've handed

10  you is a copy of your expert report in this case?

11  A.  Yes, it is.

12  Q.  Could you turn first to page 8.  Just turning back

13  briefly to that 200 study, the one by Wessely from Germany

14  and Austria, in the middle of the page, those four bullets

15  on page 8 of your report, those four bullets are the several

16  deficiencies that you outlined in that Wessely study,

17  correct?

18  A.  Yes.

19  Q.  Now, if you would, please, Doctor, would you turn to

20  page 17 of your report.  There is a chart about two-thirds

21  of the way down on the right-hand side.  Dr. McCrory, this

22  chart on page 17 that is now up on the screen, do you have

23  it on your screen, Doctor?

24  A.  Yes, I do.

25  Q.  That's a type of chart called a forest plot, right?

1   A.  Yes, it is.

2   Q.  And this chart to begin with shows the results that you

3   calculated for the four studies that you included in your

4   analysis, right?

5   A.  Yes.  It appears to.

6   Q.  In the center, the very center of the chart, there is a

7   line that's labeled zero, right?

8   A.  Yes.

9   Q.  And am I correct, the vertical line labeled zero is

10  where a result would fall if a study found there was no

11  difference between Gabapentin and placebo, right?

12  A.  The zero line in the middle indicates null effect, and

13  it's best interpreted in this context as being the

14  confidence interval around an estimate of efficacy has to be

15  to the right of the zero line in order for it to be

16  statistically significant.

17          THE COURT:  Could you say that again?  Explain it

18  to them.

19          THE WITNESS:  What we're seeing on the graph, each

20  study is represented by a box with what we call whiskers,

21  the line out to the side, so the box represents the point

22  estimate of the effect of the drug vs. placebo.  And the

23  whiskers out to either side represent the confidence about

24  that estimate, so if your whiskers are very wide, you don't

25  have a lot of confidence as to exactly where the true effect

1   is, and if the true effect, that confidence limit, crosses

2   the zero line, then you can't really tell whether it's

3   statistically significant or not.

4         So in order for a given study to be certainly

5   better than placebo with a better than 1 out of 20 chance,

6   the entire box and the whiskers have to be to the right of

7   the zero line.

8   Q.   And, Doctor, results that fall on the right side of the

9   zero line are results that favor Gabapentin to use your

10  words on the chart, correct?

11  A.   Yes, correct.

12  Q.   And results that fall on the left side of the line are

13  results that favor placebo, right?

14  A.   Yes.

15  Q.   And the four boxes between the whiskers -- I love that

16  term, whiskers -- the box is the actual value that you

17  calculated, correct, that is the result?

18  A.   That would be what I would call an estimate of the

19  magnitude of the effect.

20  Q.   Okay.  And the lines that come out to the side indicate

21  the range of values where with 95 percent confidence you

22  would expect the true answer to fall, correct?

23  A.   Yes.

24  Q.   And each of the four boxes represents the point result

25  that you calculated in each of the four studies you looked

Page 81

1  at, right?

2  A.  Yes.

3  Q.  And the lines that come out to the side represent those

4  59 percent confidence bounds or that range for each of the

5  four studies, correct?

6  A.  That's correct.

7            THE COURT:  Is this the meta-analysis that you did

8  these studies?

9            THE WITNESS:  This is one part of the

10 meta-analysis.  This is the main analysis, I believe.

11           THE COURT:  We don't see what's on the scription

12 of this.

13           MR. HOOPER:  We can figure this out right now,

14 your Honor.  Does that help your Honor, it's 1, 2, 3, 4

15 listing the particular studies and the numerous --

16           THE COURT:  These are the ones we've been

17 discussing all day?

18           THE WITNESS:  Yes, in chronological order.

19 Q.  If we could go back to the forest plot section, please.

20 Also on your chart, there is a diamond at the bottom,

21 Dr. McCrory, do you see that?

22 A.  Yes.

23 Q.  Okay.  And that, too, and the diamond represents the

24 overall result or the meta result when you put all these

25 data together, right?

1    A.   Yes.

2    Q.   And that, too, the point estimate there also falls on

3    the right side of the line, correct?

4    A.   Well, in those, there's not a box of whiskers in this

5    diagram, so what the summary estimate, the range for the

6    summary estimate falls a little bit to the left of zero

7    indicating there's not a statistically significant

8    difference between null effect.

9    Q.   And when you say now, first we can agree that all of the

10   point estimates are on the right side of the line that

11   favors Gabapentin, right?  Then we'll get to the statistical

12   significance.  I know you want to talk about that.  The

13   point estimates are all on the right side of the line, are

14   they not?

15   A.   Yes, they are.

16   Q.   And when you get out to the 95 percent confidence range,

17   some of the lines cross zero, correct?

18   A.   All the lines cross zero.

19   Q.   And that is what tells you they are to use this term,

20   "not statistically significant," right?

21   A.   Yes.

22   Q.   And you calculate those lines, those whiskers that you

23   told us about based on a tolerance of random chance.  We've

24   heard of this P value, but you choose that as the

25   statistician as the random error you will or won't be able

1   to accept?

2   A.  I'm sorry, I don't quite understand the question.  We

3   accept the level, there's a convention, .05 being the

4   standard amount of risk of making an incorrect conclusion

5   about the efficacy of a drug.

6   Q.  And that standard, the five percent chance, that's

7   conventional and commonly used, correct?

8   A.  Yes, it is.

9   Q.  But you can use a 10 percent chance, can't you?

10  A.  That's -- I mean, that would be unconventional.

11  Q.  You could use 7 percent if you chose, couldn't you?

12  A.  That's not the standard by which drugs are evaluated in

13  the U.S.

14  Q.  And but if you did, Doctor, did you tell us in your

15  deposition if you used 90 percent confidence intervals

16  instead of 95 percent confidence intervals, the results

17  would be significantly --

18  A.  Yes, if I deviated from accepted practice in that way,

19  then I suppose according to those criteria, the results

20  would be statistically significant, although I would have to

21  repeat the analysis under those circumstances to be sure.  I

22  believe the P value was somewhere .07, between .05 and .1.

23  Q.  And, Doctor, you'd agree looking at your forest plot,

24  there is a statistical trend favoring Gabapentin over

25  placebo, even under your own meta-analysis, correct?

1  A.  Right.  A range between .05 and .1 is commonly referred

2  to as a trend.

3  Q.  Doctor, you would agree that there's a statistical trend

4  favoring Gabapentin over placebo even under your own

5  meta-analysis, correct?

6  A.  Yeah.  I'm sorry, I believe the figure 2 that you're

7  showing was one that in my report there was an error, and I

8  think I had to correct it.  I'm not sure whether we're

9  looking at the incorrect or the correct version of that

10 figure.  This came up in the context of the deposition that

11 it was just a cut and paste error where I hadn't replaced

12 the figure, so, I mean, I'm looking at the P values with the

13 summary estimate here, and it's reading .1.1, and I think

14 after the correction or before the correction it's .07 or

15 somewhere.

16 Q.  First, Doctor, you're coming here to court today and

17 telling us your report is erroneous?

18        MR. BARRETT:  Objection.

19 A.  This was cleared up in the deposition, and I think

20 that --

21        THE COURT:  He says it was cleared up.  What's the

22 next question?

23 Q.  Dr. McCrory, you haven't set out in your opinions in

24 this case to prove that Gabapentin is ineffective, not

25 effective in treating migraine in all patients, have you?

1    A.  Well, the task that I was given was to assess all the

2    evidence and to reach a conclusion as to whether or not

3    Gabapentin was effective.

4    Q.  Doctor, I'm going to ask you very specifically, you have

5    not set out in your opinion to prove that Gabapentin is

6    ineffective in treating migraine in all patients, have

7    you?

8    A.  I have a little trouble understanding the question.  By

9    "set out," what do you mean?

10   Q.  Dr. McCrory, I have to hand you your deposition in this

11   case taken January 29, 2000.  Do you recall giving your

12   deposition in this case, Doctor?

13   A.  Yes, I do.

14   Q.  Do you recall that you were under oath and testified

15   just like you are in court today?

16   A.  Yes, I do.

17   Q.  Would you please look at page 173, last line, page 24.

18   Tell me if I read correctly, I'm sorry, page 173, last line,

19   No. 24.

20   A.  Yes.

21   Q.  Tell me if I read correctly, the question was, "You have

22   not set out in your opinion to prove that Gabapentin is

23   ineffective in treating migraine in all patients, have you?"

24   Your answer:  "No, by no means."  Did I read that

25   correctly?

Page 86

1   A.  Yes, you did.  And when I answered that question, my

2   interpretation of the question was that I had set out with a

3   particular goal in mind, that was whether Neurontin was or

4   was not effective.  In fact, when I set out on my

5   assignment, it was with equipose, with no preconceived

6   notions about what I was trying to find.

7          THE COURT:  So when you say effective, you mean

8   effective as compared to a placebo as opposed to effective

9   in all patients?  In other words, what do you mean -- strike

10  my own question.  What do you mean by "effective"?

11         THE WITNESS:  Right, so that effective in the

12  context in which I work means that the drug is more

13  effective than placebo, the drug has been shown to be more

14  effective than placebo.

15         THE COURT:  Is that the generally accepted meaning

16  in the scientific community of the word "effective"?

17         THE WITNESS:  Yes, it is.

18         THE COURT:  So now you might want to ask your

19  question.

20         MR. HOOPER:  I'm right on track with your Honor.

21  Q.  Dr. McCrory, these data that you have looked at in this

22  case do not show that Gabapentin is inert or totally --

23         THE COURT:  Can I see you for one question?

24         (SIDEBAR WAS HELD AS FOLLOWS:)

25         THE COURT:  Now they teach you in law school

1    sometimes you have so many double negatives in there, I

2    notice with other witnesses and sometimes witnesses get

3    lost.

4              MR. HOOPER:  I'll try.

5              THE COURT:  You are not saying that it is not

6    ineffective.  I think it's hard sometimes to follow I've

7    noticed myself in trying to figure out what the answer is.

8    It may be even okay for an uncooperative witness, you might

9    want to ask for all the double negatives.

10             MR. HOOPER:  I'll try.  I am getting negatives

11   about the proper use of "ineffective."

12             THE COURT:  I'm just saying he's lost you in the

13   last question, lost you when he says I don't understand.

14   Remember, just so we all understand what you're driving

15   at.

16             (SIDEBAR CONFERENCE WAS CONCLUDED)

17             THE COURT:  You know what I was saying, sometimes

18   it's sometimes hard because when you're asking a question,

19   there are double negatives, I was just making that point

20   here.  So if you don't understand, just ask and he'll

21   rephrase it, all right.

22             THE WITNESS:  All right, thank you.

23   Q.  Doctor, one proposition could be that Neurontin is

24   effective for some migraine patients, correct?

25   A.  Yes.

Page 88

1  Q.  And the converse way of saying that would be Neurontin

2  is not effective for any migraine patients, correct?

3  A.  That's another way we could say it or the opposite of

4  the first.

5  Q.  Neurontin is effective, Neurontin is never effective,

6  two different propositions, correct?

7  A.  Logically I see your point.  It's foreign to my idea, my

8  conception of how we study effectiveness.

9  Q.  Let me see if I can tie it this way.  You're not

10  offering an opinion in this case about --

11           THE COURT:  Are you offering an opinion in this

12  case?

13  Q.  I'll do that.  Are you offering an opinion in this case

14  about Gabapentin's effectiveness for every single patient

15  who takes the medication for migraine prophylaxis?

16  A.  We establish effectiveness by studying groups of

17  patients and comparing those who take Neurontin to those who

18  take a placebo, and we come up with, you know, data that

19  suggests whether Neurontin does or does not meet the

20  standard necessary to say it's effective.

21           If it doesn't reach that standard, the null

22  hypothesis, which we would be forced to accept, would be

23  that Neurontin is not effective or does not rise to that

24  level necessary to show it's effective, that's the way I

25  think about the construct, that's the way I carry out my

1    analysis.

2              I find it very difficult to answer your question.

3    I do not have the capability of proving beyond the shadow of

4    a doubt that there may be some groups of patients for whom,

5    you know, Neurontin could be effective, but absent data to

6    support that hypothesis, I wouldn't suggest that that's the

7    case.

8    Q.  And for migraine prophylaxis a study like the Di Trapani

9    would be data that would support that hypothesis, wouldn't

10   it?

11   A.  No, I don't believe so.  Like I said before, the

12   scientific process requires replication.  I don't know that

13   the Di Trapani study was systematically different from the

14   other studies we've looked at in such a way that you could

15   call that population a subgroup that responded differently

16   to the medication than the other groups studied, for

17   example, Wessely or the other two studies.

18   Q.  If someone took the Di Trapani authors' conclusion that

19   we looked at earlier that it shows that it's effective as

20   true, they could certainly consider that as some evidence

21   for effectiveness, couldn't they?

22   A.  Yes, and that's why it's so important to do a systematic

23   review where you look at all of the evidence that's

24   available.

25   Q.  And just you mentioned the way you looked at the data

1   and these words, just one last question, we're already done,

2   I promise, I believe you told us in your deposition that

3   your use of the term "efficacy" in relation to a study is

4   not the same thing as whether a drug works in a clinical

5   setting with patients?  Do you agree with that?

6   A.  I think the idea of whether a patient would respond that

7   I had, I had a good response from this medication is, you

8   know, subject to a number of biases including placebo

9   effect, et cetera, so the idea, the common or colloquial of

10  whether a drug works is somewhat different from whether it's

11  been demonstrated to be effective, I grant you.

12  Q.  That's exactly my question.

13  A.  Semantic difference.

14  Q.  That's exactly my question.  I think we agree, I heard

15  you correctly, whether a drug works is different from the

16  question whether it's demonstrated to have efficacy in

17  clinical study, correct?

18  A.  I think you're going beyond what I said.  I was talking

19  about assessing an individual patient and what they would

20  say, it works for them or whether they have a good outcome

21  is different from scientifically studying the efficacy of a

22  drug in the controlled trial.

23          MR. HOOPER:  Almost finished, your Honor.

24          THE COURT:  Finish.

25  Q.  You talked with the jury about a couple of marketing

1   documents that had been provided to you, correct?

2   A.  Yes.

3   Q.  You don't have any experience or expertise in the field

4   of marketing, do you?

5   A.  No.

6   Q.  It was Kaiser's counsel, Mr. Greene, who asked you to

7   review marketing materials; is that right?

8   A.  Yes.

9   Q.  You've never evaluated this kind of marketing

10  information before, correct?

11  A.  Not in precisely this way.  I've participated in a

12  number of professional meetings and senior programs and have

13  been familiar with the context in which those things

14  occurred.

15  Q.  You never published anything before onto the subject of

16  pharmaceutical marketing before you came to this case,

17  right?

18  A.  No, that's correct.

19  Q.  You've never done any work in this case in analyzing

20  corporate intent, have you?

21  A.  No.

22  Q.  You don't consider yourself an expert in corporate

23  intent, do you?

24  A.  No.

25  Q.  You didn't attend any of the events that are described

Page 92

1   in the marketing portion of your testimony, did you?

2   A.  To the best of my knowledge, no.

3   Q.  And you didn't speak to anyone who actually did attend

4   the events that are described in the marketing portion of

5   your testimony this morning, did you?

6   A.  I haven't spoken, I know some of the people that were

7   involved, but I haven't spoken to them about their

8   participation in any of those events.

9   Q.  And you didn't try or make -- you didn't make any

10  efforts to contact and speak with the people who were at the

11  events that you described, correct?

12  A.  That's correct.

13  Q.  And you didn't review any deposition testimony of other

14  witnesses taken in connection this litigation, did you?

15  A.  I don't believe so, no.

16  Q.  And, Doctor, just to wrap up, again, as we sit here

17  today, you, yourself, currently have patients who are taking

18  Neurontin for off-label uses, correct?

19  A.  I do.

20          MR. HOOPER:  I pass the witness, your Honor.

21          THE COURT:  How long?

22          MR. BARRETT:  Two minutes or less.

23          REDIRECT EXAMINATION BY MR. BARRETT:

24  Q.  You testified that you once prescribed Neurontin for

25  migraine.  Do you do so now?

Page 93

1    A.  No, no longer.

2    Q.  When did you quit?

3    A.  Well, I think after I began to see this data, I changed

4    my prescribing practices for migraine.  I'm reluctant to

5    change people when they believe they're getting benefit.  I

6    think it's accurate to say at this moment I no longer have

7    any patients who are taking Neurontin for migraine

8    prophylaxis, although I do have patients who are taking it

9    for diabetic neuropathy and some other chronic pain

10   disorders.

11   Q.  You prescribe it now for diabetic neuropathy but not for

12   migraine?

13   A.  Yes.

14   Q.  And then, finally, I showed you the 879-200 report, is

15   that correct, and they went over the German names, and they

16   made a big deal of saying it was Goedecke was the company;

17   is that right?

18   A.  Yes.

19   Q.  Are you aware, as I hope counsel opposite is not aware,

20   that Parke-Davis bought Goedecke AG?

21            MR. HOOPER:  Objection, your Honor.

22            THE COURT:  Do you know that one way or another?

23            THE WITNESS:  No.

24   Q.  Are you aware that we got --

25            THE COURT:  No, you can't testify.

55917d02-9b52-42a6-8c4d-9774beba262a

Page 94

1    Q.  Had you seen the unpublished data prior to the lawyers

2    giving it to you?

3    A.  No.  That was the first time I saw the full report.

4    Q.  Was it available to any researcher?

5    A.  Not to my knowledge.

6    Q.  Did you see any of the pain research reports?

7    A.  I don't recall.  I believe I looked at one other

8    research report to see the format for what my report should

9    look like.

10   Q.  My point is it wasn't your job to evaluate the

11   nociceptive pain or neuropathic pain?

12   A.  No, I didn't take on any work in regard to this trial

13   other than the migraine prevention work.

14             MR. BARRETT:  That's all.

15             MR. HOOPER:  No questions, your Honor.

16             THE COURT:  Thank you.  We'll take our morning

17   recess.

18             THE CLERK:  All rise for jury.

19             ( A recess was taken at 11:00 a.m.)

20             (Resumed, 11:37 a.m.)

21             THE COURT:  Okay.  Where's your witness?

22         MR. SOBOL:  Right there.

23         THE COURT:  Come on, Dr. Jewell.

24             (Discussion off the record.)

25             (Jury enters the courtroom.)

Page 95

1          THE COURT:  Great.  Thank you.

2          MR. SOBOL:  May I inquire, your Honor?

3          THE COURT:  Yes.

4          MR. SOBOL:  Kaiser calls Professor Nicholas Jewell.

5                    NICHOLAS P. JEWELL

6    having been first duly sworn, was examined and testified as

7    follows:

8          THE CLERK:  Would you please state your name and spell

9    it for the record.

10         THE WITNESS:  My name is Nicholas Patrick Jewell,

11   spelled J-e-w-e-l-l.

12   DIRECT EXAMINATION BY MR. SOBOL:

13   Q.   Good morning.

14   A.   Good morning.

15   Q.   Professor Jewell, you are a statistician, correct?

16   A.   Correct.

17   Q.   For about the next twenty minutes we're going to be

18   discussing your work in connection with the Backonja pain

19   study.  Do you understand that?

20   A.   I do.

21   Q.   That's the scope of your assignment, nothing else,

22   correct?

23   A.   That is correct.

24   Q.   Briefly describe to the jury your educational background.

25   A.   I did my undergraduate degree in applied mathematics from

Page 96

1   the University of Edinburgh, and then a Ph.D. in mathematics,

2   also at the University of Edinburgh.  I then came to the United

3   States --

4   Q.   When you say Edinburgh, is that in the UK?

5   A.   In Scotland.  I then came to the United States on a

6   Harkness Fellowship that I spent a year at the University of

7   California Berkeley and a year at Stanford University.

8   Q.   What's a Harkness Fellow?

9   A.   It's a program that's designed to bring a half dozen or so

10  young people over to the United States from the UK and the

11  Commonwealth.

12  Q.   Which I guess you were thirty years ago?

13  A.   At least thirty years ago.

14  Q.   And after you finished your doctoral Harkness Fellow,

15  where did you first work?

16  A.   I went back to the University of Edinburgh and taught

17  there for a year and then was recruited and taught at Princeton

18  University in New Jersey.

19  Q.   Teaching what?

20  A.   Statistics.

21  Q.   And after that, what did you do?

22  A.   My wife was a native Californian, and she dragged me back

23  to the University of California Berkeley where I've been for

24  the last thirty years.

25  Q.   Doing what?

55917d02-9b52-42a6-8c4d-9774beba262a

1    A.    Primarily teaching and research in statistics, but I spent

2    a long period in the 1990s in the administration of the

3    University of California Berkeley campus as the vice provost of

4    the entire campus.

5    Q.    And so what does it mean to be the vice provost?

6    A.    Well, for me, I was in charge of all academic

7    administration for the Berkeley campus.

8    Q.    And for how long have you been, I think the formal title

9    is Professor in Biostatistics at the School of Health and in

10   the Statistics Department at UC Berkeley?

11   A.    School of Public Health, since 1981, so 29 years.

12   Q.    And have you published in the area of statistics?

13   A.    Yes, I have.

14   Q.    Any books?

15   A.    Yes, one book.

16   Q.    What?

17   A.    One book that I wrote myself and two edited volumes.

18   Q.    Is it a general book, a specific book?

19   A.    The book I wrote myself is called Statistics For

20   Epidemiology.

21   Q.    And what's that about?

22   A.    It's about teaching people how to use statistics to design

23   and analyze epidemiologic studies, studies of health outcomes.

24   Q.    Like the issues that are involved in this case, sir?

25   A.    Similar to that, yes.

1    Q.    And I believe that your CV also indicates that you have

2    about 120 peer-reviewed articles in the field of biostatistics?

3    A.    130 now.

4    Q.    Okay.  And then, finally, you also got something called

5    the Snedeker Award?  Did I say that right?

6    A.    Snedeker Award.

7    Q.    Snedeker Award.  And what's that?

8    A.    That's a lifetime achievement award and also given by all

9    the worldwide statistical societies, and it's also in

10   connection with what's judged to be the best paper in the last

11   three years in biostatistics.

12   Q.    So of all the articles that have been published anywhere

13   over three years, this is considered the best?

14   A.    Yes, and that award is given biannually, every other year.

15   Q.    Now, please describe to the jury what your assignment was

16   in this case.

17   A.    Well, originally my assignment was to look at the study of

18   pain relief in diabetics as represented in a paper written,

19   first author was Backonja.  And I got the data to do my own

20   analysis of that trial, and then subsequently I reviewed a

21   critique of my analysis.  That was what I thought was my

22   objective.

23   Q.    So please describe then to the jury what process you

24   undertook to undertake a critique and evaluation of the

25   Backonja study.

Page 99

1    A.    Well, I read the paper --

2    Q.    Not getting into the results yet, obviously, just the

3    process.

4    A.    Right.  I read the paper carefully.  I reviewed some

5    related papers around the topics, and then I requested and was

6    provided the raw data from the original trial and reanalyzed it

7    myself, and then wrote my report.

8    Q.    And when you say you got the raw data, is that something

9    that's generally available or no?

10   A.    Normally you would have to ask for that.  Certainly back

11   when that paper was written in 1990, it was not publicly

12   available on a website, so I had to ask to get it.

13   Q.    So you got it through the lawyers in this case?

14   A.    Correct, but I believe it came from their original

15   database.

16   Q.    Okay.  And so then I take it you did some calculations,

17   some recalculations, and you came up with some results that

18   you're about to testify; is that correct?

19   A.    That is correct.

20   Q.    Okay.  So now let's turn to the Backonja study and first

21   talk about the variety of features that you first observed

22   about it or what your initial observations were about the

23   Backonja study.  What was your initial observation?

24             THE COURT:  Can we back up, since we've heard a lot of

25   information in this case.  What was the conclusion of the

Page 100

1   Backonja study, just the bottom line so that we can reorient

2   ourselves?

3          THE WITNESS:  This was a study of pain relief

4   associated with peripheral neuropathy in diabetic patients, and

5   the conclusion of the paper was that Neurontin was effective in

6   reducing pain compared to placebo.

7   Q.   And this was a manufacturer's study, correct?

8   A.   I believe it was, yes.  Several of the authors were

9   employed by the pharmaceutical company.

10         THE COURT:  And when was it published?

11         THE WITNESS:  I think it was 1998.

12   Q.   Now, drawing your attention to some observations you first

13   made about the study, first pain -- well, what was, first, your

14   initial observation about the study itself before you undertook

15   any reevaluation or analysis or anything else?

16   A.   Well, there's two things I would say to that.  When I

17   first was given the assignment and looked at it, I looked at

18   the nature of the trial that I just described.  It was a trial

19   of pain relief, and therefore it involved patients subjectively

20   responding and assessing their own pain.  And so from a

21   statistical point of view, it's absolutely crucial to do a

22   double-blind study in those settings, and so I noticed that

23   they in fact had carried out a double-blind trial.

24         Then I went to the conclusion, the bottom line, and looked

25   at that, and read through the paper and realized that I was a

55917d02-9b52-42a6-8c4d-9774beba262a

1  little surprised by their conclusion because the trial was

2  clearly a failure from what the investigators had anticipated

3  in terms of pain relief, even though they reported it as

4  efficacious.  And so I didn't find the results clinically

5  important.

6  Q.   Okay.  So let's describe that a little bit in detail so

7  that you can communicate to the jury a little bit more about,

8  what was the expectation, or I think the design, if you will,

9  and what was the conclusion that you just identified?

10 A.   Well, to design a trial like this, people use

11 statisticians to determine how many participants you need to

12 enroll to insure yourself a reasonable chance of finding a

13 positive result if you get the efficacy you hope from your

14 drug; and that calculation was done, and the investigators,

15 using their experience and knowledge of previous pain trials,

16 assessed that they expected a 30 percent benefit amongst the

17 placebo patients just because of the placebo effect that you

18 heard a little bit about earlier this morning.

19 Q.   A 30 percent effect in what?

20 A.   Meaning a 30 percent reduction in pain for patients under

21 placebo.

22 Q.   And how is pain measured here?

23 A.   Pain was pressured on an 11-point scale, going from no

24 pain to a very extreme pain, and people were asked to record

25 this daily.

55917d02-9b52-42a6-8c4d-9774beba262a

Page 102

1   Q.   And so did you make a comparison between the expected or

2   the hoped-for 30 percent or more reduction in pain versus what

3   was reported?

4   A.   Well, to design the trial, the investigators then had to

5   say what would be a best hope for the drug; and the expectation

6   in the trial was that Neurontin, or gabapentin, would reduce

7   pain by substantially more than placebo, and that substantially

8   more was translated as a 55 to 60 percent reduction in pain.

9   And when you compare 30 percent to 60 percent, that tells the

10  statistician how many people to recruit in the trial.   And

11  that's what they did, and that generated the numbers that they

12  then recruited.   Unfortunately, they never saw anything like a

13  60 percent reduction in pain in the results.

14  Q.   And what did they see, as reported, and given the

15  methodologies that they chose to use before you even did any

16  reanalysis?

17  A.   Well, taking the results at face value, which I then went

18  on to look at in more detail, but just taking the results at

19  face value, they only reported a 39 percent reduction in pain

20  under gabapentin and a slightly smaller reduction under

21  placebo.

22            THE COURT:   What was under placebo?

23            THE WITNESS:   22 percent.

24            THE COURT:   And why isn't that significant?

25            THE WITNESS:   It's not a question of statistical

1    significance here.  It was clinically, the investigators judged

2    that 55 to 60 percent would be what they would need to achieve

3    to reach clinical significance because the average pain scores

4    in this trial and similar trials, around 6 or 7 out of 10 from

5    a 0 to 10.  So, you know, 60 percent reduction on a score of 7

6    is, you know, a reduction of three or four.  So your pain would

7    drop from feeling 7, which is quite a lot of pain, to 3 which

8    is less.  But a 20 percent reduction would only be dropping a

9    score of about one in that, so it probably would not be -- and

10   clearly, by these investigators, a one-point drop was not

11   considered clinically important.

12   Q.   Now, when you say "not clinically important," what do you

13   mean by that?

14   A.   It's not a big enough change in a subjective score to be

15   worth treating someone with an active drug.

16   Q.   Now, putting aside the face value of the observation you

17   just made from the face value of what was reported in the

18   study, what observations did you make about the potential for

19   unblinding in the way that the study was designed?

20   A.   Well, as I mentioned at the beginning, whenever you see a

21   subjective outcome, you must go to extreme lengths to blind

22   both the participants, the patients, and also the investigators

23   who are prescribing the treatments, to avoid bias because

24   statisticians have observed for a long time that when there's

25   not blinding, the results are usually very strongly biased, and

1    usually biased in favor of an active treatment.  So maintaining

2    the double blinding is crucial because of the subjective nature

3    of the outcome.

4         The investigators themselves were aware that there was a

5    real danger in this trial that despite the blinding being done

6    correctly at the beginning of the trial, that because of

7    treatment-related side effects, that patients would become

8    unblinded through their experiencing a side effect that

9    indicated that they were on an active drug.  That might not be

10   a concern if treatment-related side effects just by chance

11   happened equally in the two groups, but, of course, because

12   they were treatment-related, those side effects, those central

13   nervous system side effects, occurred far more frequently in

14   the Neurontin group.  So far more of the patients in the

15   Neurontin group were likely unblinded, and Backonja and his

16   colleagues recognized this and tried to attempt to deal with

17   this in their paper, but I felt dealt with it inappropriately

18   and unsuccessfully, but that was the nature.  When I went to

19   analyze the data, I used more appropriate, straightforward but

20   more appropriate statistical methods to deal with that issue.

21   Q.   There's been some testimony in this trial that there was

22   also forced titration in the Backonja study.  Did you make any

23   observations about the forced titration and how that might

24   influence unblinding in this case?

25   A.   Not specifically.  To me, my concern was more on the

1    treatment-related side effects than on the titration.

2    Q.    In terms of the results of what people reported rather

3    than how they got there?

4    A.    Correct.

5    Q.    Okay.  Now, let's just talk a little bit about the numbers

6    of the people that were in each arm of the study.  About how

7    many people were on placebo, and how many people were on

8    Neurontin?

9    A.    My memory is there was about 80 people originally

10   allocated randomized to Neurontin and 80 to placebo, and they

11   lost a few at the beginning, but it was roughly 70 to 80, I

12   think, in each group.

13   Q.    And, again, without sticking you to the particular numbers

14   because there's nothing in front of you, about how many of the

15   80 Neurontin patients suffered some form of side effect?

16   A.    Well, my memory is, there was a little bit more than 40 of

17   the Neurontin group that reported a treatment -- not just any

18   side effect because there were other side effects, but this is

19   specifically a treatment-related side effect of the central

20   nervous system.  And just to make that more understandable, and

21   I'm not a neurologist, so I wouldn't understand that terribly

22   well myself, but these side effects were in a list, and they

23   are in English easily understood.  Dizziness was one of the

24   main side effects.  Somnolence, feeling sleepy, was another

25   one, and then there were others that occurred less frequently.

1  Q.   And so of the CNS, the central nervous system effects,

2  about half of the Neurontin arm, if you will, reported

3  sleepiness, dizziness, or some other kind of CNS effect?

4  A.   Confusion, yes, nervousness, yes.

5  Q.   Why would that increase a risk of unblinding?

6  A.   Well, Backonja and his colleagues felt that with patients

7  who had been told the potential for side effects associated

8  with the active drug as part of their enrollment in the trial,

9  that they would identify through that experience that they were

10  in fact receiving an active drug as against a placebo, and

11  therefore unconsciously or subconsciously report lower pain

12  scores, more pain relief, because of the tendency of humans to

13  be positive when they know they're getting something active.

14  Q.   And just to round it out, on the placebo side, I take it

15  that there were far fewer people who reported CNS effects of

16  sleepiness and dizziness and others?

17  A.   Of the treatment-related side effects, some of them also

18  occurred in the placebo patients, and that was about a dozen of

19  the 80.

20  Q.   Now, how is it that the Backonja authors decided to

21  address the issue?

22  A.   So they decided to take the two most common side effects,

23  which were the two I mentioned, dizziness and sleepiness,

24  somnolence.  And they took out, I think it was probably

25  somewhere between 10 and 15 in the Neurontin group and maybe

1    just a couple in the placebo group who suffered, let's say,

2    dizziness, they removed that data entirely from their analysis

3    and saw if it made any difference, and it didn't.  And then

4    they took that data and put it all back in again.  And then

5    they moved to the second most common side effect, somnolence,

6    again, about a dozen versus a handful, a couple in the placebo

7    group, and they took all of that data out.  That dropped the

8    treatment effect by more than 30 percent, but they then said

9    that wasn't enough to change their conclusion, and so they

10   stopped there.

11   Q.   So if I understand it then, Professor Jewell, your

12   understanding of how the Backonja study addressed this issue of

13   sleepiness and dizziness is, it first kept the sleepy people

14   in, removed the data from the dizzy people and did the

15   analysis, and then vice versa, but never took both out to see

16   what the result was?

17   A.   That is correct.

18   Q.   Now, before we go to how the results were reported in the

19   Backonja study, can you describe to the jury what the end

20   result is that was being tested in this study.

21   A.   The primary outcome that was being measured was an average

22   of your last seven days of pain scores.  It was an eight-week

23   trial, so in the eighth week they took your measurements for

24   the last seven days and averaged them as your end, your final

25   pain score, and they compared that between the placebo group

1   and the Neurontin group.  That was the primary end point.

2   Q.   So if I understand what you're saying correctly is, it's

3   an eight-week study, and what you care about primarily is, how

4   are people reporting at the end of two months of this

5   treatment?

6   A.   Well, it wasn't what I cared about.  That's what the

7   protocol for the trial called the primary end point.

8   Q.   Now, the other day you gave me an analogy I thought was

9   interesting, given the Olympics.  What was the analogy that you

10  gave me that helps describe this issue?

11  A.   Well, the data that was provided had data on all eight

12  weeks' pain studies, so there was a lot of information about

13  how you got from A to B.  And it's important, I think, in

14  understanding their analysis that they did not care how you got

15  from A to B but just where you ended up.  Both groups started

16  at the same because they were randomized, so they both had the

17  same average pain scores right at the beginning, and then they

18  changed over time.  And Backonja said, basically by choosing

19  that as your primary end point, don't pay attention to how you

20  get there but just where you end up.

21      So the analogy I was using to explain that to you earlier

22  was -- and you'll excuse my Olympics metaphor, but I can't help

23  it -- if you're judging the length of a ski jump and you've got

24  a judge down there at the end measuring the length -- and we've

25  all seen that on the TV -- the judge doesn't look up to see how

1   the ski jumper got there, whether he laid flat on the skis or

2   stood up, or did a flat trajectory or a more curved trajectory;

3   he just keeps his eye on the ground where the skis land.

4   That's what's important, that's what's measured, and that's

5   what judges performance.  That's exactly what happened here,

6   not how you got there but how you ended up at the eighth week.

7   And that was what was used --

8              THE COURT:  So how you got where?  How you got --

9              THE WITNESS:  How you got from day one when you

10  started:  Did your pain go up a little bit when you first

11  started and then go down?  Did it go down immediately and then

12  stay flat?  That didn't matter.  It was where you ended up

13  after eight weeks.  So what was your pain like at eight weeks?

14  To take Reagan's metaphor, you know, where are you now?  Are

15  you better off at eight weeks than you were at the beginning?

16  That was the measure that was used to describe efficacy.

17             THE COURT:  And why is that statistically wrong to

18  look at the --

19             THE WITNESS:  It's not wrong.  No, no, that's fine.

20  I'm just describing.  That was the end point.  No, that's fine.

21  That's what I used, that's what they used.

22  Q.   The design of the study was to look at the end of eight

23  weeks.  You took that as a given, correct?

24  A.   I took that as a given, yes.

25  Q.   Can we go to Exhibit 416-A.  I've placed it on the

Page 110

1    monitor.  Can you see it there, Professor?

2    A.   Yes, I can.  Just let me get some glasses out now.  Okay,

3    I can see it.

4    Q.   This is a chart from your report in this case, correct,

5    Professor?

6    A.   That is correct.

7    Q.   Okay.  Now, I think if you touch the screen, actually, a

8    mark will come out, and I'll ask somebody to clear it because I

9    want to just sort of walk this through.

10        If I understand it, Professor, this is actually an

11   analysis of just one patient of the 160 odd or so people,

12   correct?

13   A.   That is correct.

14   Q.   And this is from the raw data that you got, correct?

15   A.   That is correct.  You can see the figures.  This is from

16   Subject No. 4017, so this is an individual patient who was

17   actually assigned to Neurontin.

18   Q.   So please describe to the jury the X, what the X axis is,

19   what the Y axis is, and what's being measured there.

20   A.   Okay, so the X axis down here at the bottom is describing

21   the day after treatment began.  So you can see Day 20 there,

22   there's a dot above that.  That's your reported pain score for

23   this patient on Day 20.

24        The Y axis is the pain score on a scale -- actually the

25   scale was 0 to 10.  No one ever got higher than 7, or this

1   patient never got higher than 7, I should say, and never got

2   lower than 1.  And then each of the dots tells you what that

3   person reported after one day on treatment, after two days,

4   after three days and so on.

5   Q.   Now, so if we could just look at a couple of the first

6   three dots, if I can just walk through that briefly.  So the

7   first couple of days they reported a 6, I take it, and then a

8   5?

9   A.   That is correct.

10  Q.   And then a bunch of 6s, but then they went up to 7?  Is

11  that it?

12  A.   Yes.  They did deteriorated a small amount when the pain

13  got worse, and they went up to 7.

14  Q.   But it does appear that overall, if you look from -- well,

15  the Backonja study, by the way, looks at the mean of the last

16  seven days, meaning basically the last week, correct?

17  A.   The last seven dots for this patient, yes.

18  Q.   Right.  Now, because this is only one patient, of course

19  we're not going to make any conclusions from this, correct?

20  A.   That is correct.

21  Q.   All right.  But what kind of observations do you make then

22  about one patient in terms of the ski jump issue that you were

23  talking about before?

24  A.   Well, so this issue here, why I used this plot was to

25  point out the general problem with the treatment-related side

Page 112

1    effects and why they worried about it and why I was concerned

2    about it.  If you look at the overall pattern of those dots,

3    you can see that down at the end, the patient is reporting a

4    pain score of 2 for the last four days and 3 for the three days

5    before that.  So, roughly, their average for the last week is

6    about 2.5.  And they started, as you can see, though that's not

7    on the plot, they started around 6 because they had a week

8    where they measured their pain before any treatment was

9    applied.  So this gave the impression for this patient of a

10   fairly substantial drop in pain.

11       But then I looked to see for this particular patient, when

12   were they potentially unblinded, because of the concerns I

13   indicated at the beginning about unblinding and a subjective

14   score, and this patient was unblinded on day 11, and you can

15   see that.  That's right where that point is.  That's when the

16   patient became unblinded.

17       And you can see if you now put your hand over or try and

18   block out for a minute the observations after that date to the

19   right, you can see that in fact up until that patient got the

20   side effect, their pain score actually didn't improve at all,

21   and, if anything, went up to 7.  But very rapidly after they

22   were unblinded or potentially unblinded, their pain scores

23   improved, meaning they went down substantially.  It's quite

24   plausible that at least for many of these patients, they were

25   now aware or thought they were on an active drug; and that's

1   known to tend to make you lower your reported subjective pain

2   scores.  So this particular patient illustrates what different

3   kind of conclusion you might come to if you take account of the

4   unblinding.

5        Now the statistician's problem is -- as you've said, this

6   is just one data -- the next patient might be quite different,

7   and they might go up after they have a side effect, or they

8   might not change at all.  So the idea here is that you have to

9   take all of the data and account for this phenomenon overall in

10  all the patients.

11  Q.   So having looked at that issue and that problem then of

12  unblinding, let's first depict the data as you understood it

13  that the Backonja study depicted.  Let's go to 416-B and the

14  portion of that that's capital A the one at the top, Corinne.

15       Now, Professor Jewell, is this the data as reported in

16  Backonja generally?

17  A.   This is essentially very similar to a plot that Backonja

18  provided in their paper, yes.

19  Q.   Okay.  And will you circle the score, the primary end

20  score that we're supposed to be focusing on in connection with

21  this data.

22  A.   Yes.  Just before I do that, I want to make sure that

23  people understand the dots here now.  To keep the plots from

24  getting very hard to follow, the dots now are the means for the

25  patients over each week.  And as I indicated, at the end

55917d02-9b52-42a6-8c4d-9774beba262a

1    Backonja wants the eighth one there, the week eight, as the

2    primary end point.  But you can see now I've got much less dots

3    because I have just one dot for each week.  So each week now

4    we're averaging the patients' pain scores for that week and

5    then averaging across all patients in the two groups.

6    Q.   And will you put a circle around the mean score for the

7    last week for the placebo group.

8    A.   So there's the mean score at week eight for the placebo

9    group right there, that dot.

10   Q.   And put a circle around the Neurontin group as reported in

11   Backonja.

12   A.   There it is right there.  And you can see there a

13   difference there between the two groups.  And actually, after

14   Backonja did their analysis, to go along with this graph, they

15   reported a mean difference or a mean drop of 1.2 in pain scores

16   comparing the Neurontin patients to the placebo.

17   Q.   And that 1.2 was from your testimony the clinically

18   insignificant result according to their earlier projections?

19   A.   Clinically unimportant.

20   Q.   Clinically unimportant.  Now, before we go on to your

21   reanalysis, I think --

22             THE COURT:  So but what did they say?

23             THE WITNESS:  Sorry?

24             THE COURT:  What did the Backonja study say?

25             THE WITNESS:  Backonja said this is a statistically

1   significant difference, and so they said this showed the drug

2   was efficacious.

3   Q.   And although internally in their report Backonja had

4   indicated earlier in his report that they were looking for a

5   clinical significance at the level you testified earlier, did

6   you see anywhere in the Backonja report an analysis that

7   described the lack of clinical significance of the 1.2?

8   A.   I want to use the word "importance" rather than

9   "significance" so that people don't get confused with

10  statistical significance.  No.  They mentioned that at the

11  beginning in the design of the trial, but once they got to the

12  end, they reported the differences, and that they were a

13  statistically significant difference, so this is these two

14  points here were statistically separable, and then just

15  reported that that established efficacy for the drug.

16  Q.   Is there any report anywhere in the Backonja study about

17  the clinical unimportance of that result?

18  A.   No.

19  Q.   Now, did you come to an opinion as to whether or not it

20  was acceptable statistical practice to fail to back out both

21  the sleepy people and the dizzy people from doing the analysis

22  as Backonja did?

23  A.   It didn't make sense to me.  I mean, if you're testing an

24  elevator, and you're going to put a sign up that says, "This

25  elevator can hold five men and ten women," and somebody says,

1    "Prove it," and I say "Okay."  And so I put five men in the

2    elevator, and I run it up and down and it works.  Then I take

3    the five men out, and I put ten women in, and I run it up and

4    down and it works.  And then I say, "See, I proved it works for

5    five men and ten women."  That doesn't make sense to me.  You

6    have to put the five men and the ten women in together, and

7    then you see it.  So for me, taking the side effects out one at

8    a time wasn't the right thing to do.  What you should do is

9    take them all out and see what the results were then.  And then

10   if you saw that it didn't make much of a difference, I would

11   have been convinced that the results were insensitive to that

12   issue.

13   Q.   Was there some problem, was there some burden of having to

14   undertake the additional calculation or no?

15   A.   No, nothing I did was anything that -- I basically tried

16   to do exactly what they did but more comprehensively.

17              THE COURT:  So you took out the dizzy and the sleepy

18   people?

19              THE WITNESS:  And a few other small ones, yes,

20   independently of whether they actually substantially were like

21   that patient we just saw.  Some of the patients actually did

22   worse after they did a side effect, but, to be honest, I just

23   left them all in and just took the data out after they had

24   experienced a treatment-related side effect.

25   Q.   So let's go then to 416-BB.  And, Professor Jewell, I take

1    it that this now is the results after you've undertaken the

2    recomputation by taking both the -- well, the CNS-affected

3    likely or potentially unblinded people out of the study?

4         THE COURT:  And that's out of both studies, right, the

5    placebo and the --

6         THE WITNESS:  Right.  This is the same plot now.

7    Patients are left in, and so the early dots at week one and two

8    still have everyone in because people on average didn't

9    experience these side effects until somewhere into the second

10   week, eleven, ten, eleven, twelve days.  So the first couple of

11   dots, maybe even up to the third dot, don't change it that much

12   if you could see the graphs side by side; but you can see a

13   clearly dramatic difference in the later part where the

14   patients who have now been potentially unblinded are removed

15   from the calculation of the means.

16        But this, again, is just the raw means.  There's no

17   statistics going on here.  I'm not doing any modeling.  I'm not

18   trying to extrapolate or do anything.  This is just exactly

19   those same means again, dropping the data after a patient has

20   experienced a treatment-related side effect.

21   Q.   And again can you draw a circle around then the placebo

22   group once you have undertaken the recalculation by backing out

23   the --

24   A.   Yes, it's this one here, and it didn't actually change

25   that much because, as I said earlier, only about a dozen

1   placebo patients experienced these treatment-related side

2   effects.

3   Q.   And you circled the Neurontin arm?

4   A.   So the Neurontin one is right here, and that made a much

5   bigger difference.  It brought the mean much more closer to the

6   placebo because there was a much larger fraction.  As you

7   indicated, a little bit more than half of the patients

8   experienced a treatment-related side effect.

9   Q.   And so as a result of this, did you reach a conclusion to

10  a reasonable degree of certainty in biostatistics as to whether

11  or not there was a clinically significant difference between

12  the placebo group and the Neurontin group?

13  A.   Yes, so I did exactly what Backonja did, focused exactly

14  on this week eight results.  I compared those means just as you

15  see them on the graph.  Then I did exactly what Backonja did in

16  a more sophisticated statistical analysis to adjust for some

17  baseline variables, and both analyses show that there was no

18  statistically significant difference.  But, more importantly,

19  more than 80 percent of the difference you saw in the previous

20  graph disappeared after you did the Backonja analysis taking

21  everyone out.  So my end result was, instead of reporting a

22  difference in pain scores of 1.2, it had dropped to somewhere

23  around .15 or .1, depending on the method I used.  So basically

24  there was no difference at the end.  Here there's no difference

25  once you deal with the treatment-related side effect issue.

1   Q.   Now, anywhere in the Backonja study was there ever a

2   report that calculated the results if you back out all of the

3   CNS-affected people?

4   A.   No.  This plot wasn't given in the Backonja paper.  It

5   could have been.  And these means that I just highlighted, they

6   were not reported.  They reported them when they backed them

7   out one at a time for the two primary side effects but not when

8   you took them together, and that made a very big difference

9   when you took them out together, but that was not reported in

10   the original paper.

11   Q.   Now, just quickly, Professor Jewell, so I recognize that

12   when you backed out the sleepy and the dizzy people, if you

13   will, you lost a lot of the data.  Did you undertake some kinds

14   of analyses to try to see if there was a way to at least save

15   some of that data to, if you will, do a favor to Backonja to

16   see if there was a way to not lose all that data and still come

17   up with a result?

18   A.   Right, as I indicated, I actually did it a little bit

19   differently from -- this here reflects exactly what Backonja

20   did, the part I just circled, but I tried to -- since I was

21   losing about half the data from the Neurontin group and a small

22   fraction from the placebo, I then went back and used the data

23   from patients who -- I didn't throw all the data out the way

24   that Backonja did.  I kept the patient in the analysis up until

25   they experienced the side effects so that we could get a

1   sense -- as we showed in that previous slide for that

2   particular patient, I used the first eleven days for that

3   patient so that I could get a sense of what the trajectory of

4   their pain score was before they were potentially unblinded;

5   and I used that to get a better, more precise estimate of the

6   difference to try to use as much of the data as possible.

7   Q.   And your result?

8   A.   As I indicated, even with that more sophisticated

9   approach, it gave pretty much the same as here:  a very, very

10  small increased drop in pain under Neurontin, about a .1 on the

11  pain score.

12  Q.   Now, I notice that in this slide, Exhibit 416-B, it does

13  appear that after week one or maybe in week one, but then in

14  week two there seems to be a pretty decent size difference, in

15  week three there seems to be decent size difference, but then

16  they start coming back together.  Why focus on week eight?

17  A.   Well, initially, just going back to our conversation

18  earlier, week eight was the primary end point of the trial.

19  The trouble with looking at each of the weeks separately is

20  that statistically you will tend to detect a difference by

21  chance much more frequently because you're looking at the

22  comparison, in this case, eight different times.  That's a very

23  familiar danger to statisticians.  It's known as a multiple

24  comparisons issue.  Backonja recognized that was an issue and

25  so did not use these simple comparisons, let's say at week

1   three, just on their own.  They made an adjustment, so that

2   these error bars get bigger when you account for the fact that

3   you're convicting, you're trying a defendant eight different

4   times.  You're trying the case eight different times, and, of

5   course, just by chance you'll find differences in one or two of

6   those times.  So you have to make an adjustment for that.  So

7   that's one of the reasons why it's dangerous to look at each

8   week separately.  You have to focus at the primary end point.

9   No statistician in the world would let you say, "Well, there

10  wasn't a difference at week eight, but whereby after the fact

11  we noticed that there was a difference at week three, and

12  therefore the drug is effective," because of that danger.

13  Q.   Later on in this trial the jury may hear from a witness by

14  the name of Gibbons on behalf of Pfizer.  Why is it that in

15  your view the jury should focus on the primary end point here,

16  the week eight, the end of the ski jump, if you will, rather

17  than prior weeks?

18       MR. HOOPER:  Objection to everything before "why,"

19  your Honor.

20       THE COURT:  Overruled.

21  A.   Well, could I flash Slide 8 back up again?  So the key

22  point to me that I would like the jurors and the Court to

23  remember -- not that one, the next one, the top part.  I just

24  want to highlight what I think is the key issue.  Or just leave

25  them both there, I think it's fine, because we've seen both of

Page 122

1    these in detail.

2         So the key point here is, you see a difference of 1.2 when

3    you don't deal with the side effects.  The difference

4    essentially, almost 80 percent of it disappears when you deal

5    with the unblinding issue.  And that's without any modeling,

6    without any sophisticated method I used or that Dr. Gibbons

7    used.  And it's absolutely key that you on either side of the

8    court here do not let me or anyone else try and explain away

9    that fact.  That's the data.  That's what the data says.  You

10   should not let any modeling or changing the scale try and

11   distort that.  The conclusion of what I did is right in front

12   of your eyes right now.  It's unequivocal.  The treatment

13   effect disappears once you take out data after people have been

14   potentially unblinded.

15   Q.   And the treatment effect in the above bar, the Backonja

16   data, if you look at the above chart, you've already testified

17   was clinically unimportant, even according to Backonja's own

18   standard.

19   A.   That is correct.  So this is unimportant to me, and an

20   unimportant distinction actually even disappears when you deal

21   with the unblinding.

22   Q.   Right, and even less important, if you will, if it ever

23   was important --

24        THE COURT:  You know, if we're going to finish this

25   today --

1      MR. SOBOL:  Sure.

2   Q.   And then, finally, Professor Jewell, no doctor, no

3   statistician, whatever, could have come to the results in your

4   analysis, your B, without access to the underlying data that

5   you got in this case, correct?

6   A.   That is correct.

7   Q.   Or have seen it in the Backonja study itself?

8   A.   That is correct.

9      MR. SOBOL:  I move in 416-A and 416-B.

10      THE COURT:  Okay.

11      (Plaintiff Exhibits 416-A and 416-B received in

12   evidence.)

13   CROSS-EXAMINATION BY MR. HOOPER:

14   Q.   Good morning, Dr. Jewell.

15   A.   Good morning.

16   Q.   In all of those -- was it 120 or 130 publications of

17   yours?

18   A.   It's now about 130.

19   Q.   About 130?  And you finished your report in this case in

20   June, 2008, correct?

21   A.   Sounds reasonable.

22   Q.   Do any of those 130 publications include an article with

23   your critique of Backonja?

24   A.   No.  I have not published this as yet.

25   Q.   All right.  And do I understand correctly, your role in

Page 124

1   this case and your assignment in this case did not include at

2   all analyzing anything specific to Kaiser or whether any of its

3   doctors had been defrauded, correct?

4   A.   No.   I analyzed, as I indicated, the Backonja trial.

5   Q.   How much time did you spend preparing your report in this

6   case, Doctor?

7   A.   You know, I don't really recall.  As you said, it's been

8   well over a year, and I've worked on many other projects since

9   then.   I did submit my time as part of the -- when I was

10  deposed, so you must have that on record, but I don't remember.

11  Q.   Estimate, more than twenty?

12  A.   I can't remember.  Probably -- certainly more than twenty

13  hours, I suspect, yes.

14  Q.   Perhaps as many as fifty?

15  A.   You know, you can try and pin a statistician down, but if

16  I can't remember, I can't remember.  And you have it.  I did

17  tell you, so --

18        (Laughter.)

19  Q.   At least twenty, though?

20  A.   I'm pretty sure it was more than twenty.  I will give you

21  that.

22  Q.   Even as a statistician, you're secure with that one.

23  A.   Even as a statistician, right.

24  Q.   Okay.  And your report in this case sets out the same

25  opinions and reasoning that you just gave us this morning,

1  correct?

2  A.    Yes, I believe so.

3  Q.    And the gist of your criticism of Dr. Backonja's study, as

4  I understand it, is that that was problem called "unblinding"

5  in the study that you don't think made it into the published

6  article in the correct form; is that right?

7  A.    Well, they identified the issue correctly, but I think the

8  way they dealt with it was ineffective and inappropriate.

9  Q.    And we agree that there is a full paragraph in

10  Dr. Backonja's study that discusses this unblinding issue,

11  correct?

12  A.    Yes, absolutely.

13  Q.    And the article, the publication of Dr. Backonja's study

14  appeared in the Journal of the American Medical Association,

15  correct?

16  A.    That is correct.

17  Q.    And that's a peer-reviewed journal, correct?

18  A.    It was when I published in it, yes.

19  Q.    And it's a leading -- it is one of the -- we'd agree

20  that's one of the two or three leading medical journals in the

21  United States, correct?

22  A.    It's a good journal, yes.

23  Q.    You were not privy to nor do you know anything about any

24  discussions that Dr. Backonja and the Journal of the American

25  Medical Association's peer reviewers may have had about the

1    unblinding issue, correct?

2    A.    No.  I was not involved in the review for the journal.

3    Q.    And, Doctor, the unblinding phenomenon that you're talking

4    about is something that happens when a patient believes,

5    because of a side effect, for instance, that they are taking an

6    active agent, and that belief influences them for the rest of

7    the course of the trial, correct?

8    A.    That is correct.  There's many ways a patient can be

9    unblinded.  Sometimes the investigators inadvertently unblind

10   patients.  In this particular case, the concern was the

11   unblinding due to the occurrence of known treatment-related

12   side effects.

13   Q.    And "side effects" occur on patients who take a placebo,

14   an inactive sugar pill, as well as patients who take an active

15   drug, correct?

16   A.    That is correct.

17   Q.    Dizziness occurs in patients who take placebo?

18   A.    At a much lower rate, yes.

19   Q.    But in some patients it does occur, correct?

20   A.    Well, we just talked through the numbers.  About 12, I

21   think, had one of these -- I think dizziness was maybe a

22   handful in the 80 placebo patients felt dizzy at some point.

23   Q.    And the rest of the events you talked about, somnolence or

24   sleepiness, that manifests in patients who are taking a placebo

25   as well, doesn't it?

1   A.   I think again it was about three or four of the placebo

2   out of the 80, about a fifth of what you were seeing in the

3   Neurontin group.

4   Q.   And you would agree with me, Doctor, that all active

5   medications have side effects, correct?

6   A.   I don't know if all active medications have side effects.

7   Q.   Well, even placebo pills have side effects?

8   A.   Well, in certain situations, but I certainly don't -- you

9   won't pin a statistician down to saying something always

10  happens.  I have no idea.  It's not uncommon.

11  Q.   Doctor, let me just ask you as a human being, have you

12  ever heard of a prescription medication in your life that

13  didn't have side effects?

14  A.   No, not particularly.

15  Q.   And so the problem that you're describing, a patient

16  developing a side effect, and then forming a belief about

17  whether they're on active drug or not, that could happen on

18  drug or placebo can't it?

19  A.   Well, that's not -- the issue here is that if patients are

20  aware that the side effect is associated with taking a

21  particular treatment, then those people experiencing that

22  particular side effect immediately will come to the conclusion

23  that they're on the active drug, most of the time correctly in

24  this case, a few times incorrectly because they were actually

25  on placebo.

Page 128

1  Q.   Dr. Jewell, unblinding is a problem that can happen in

2  lots of different kinds of clinical trials of lots of different

3  kinds of medications, isn't it?

4  A.   That is correct.

5  Q.   Let me show you a copy of Exhibit 559.  It's already in

6  evidence.  Dr. Jewell, what you've been handed is a drug

7  monograph prepared by your client in this case, Kaiser, in

8  September of 1999.  Do you see that at the very top left

9  corner?

10  A.   I do.

11  Q.   All right, and it's entitled "Drug Monograph."  Do you see

12  that?

13  A.   Yes.

14  Q.   And the second line refers to gabapentin, the drug that

15  this case is about.  Do you see that?

16  A.   Yes.

17  Q.   And, sir, if you could, would you please turn your

18  attention to the penultimate page, the second-to-the-last-page

19  of the document with the Nos. 24563 at the bottom.  Do you see

20  that, sir?

21  A.   Yes.  You understand I've never seen this before.

22  Q.   I understand, yes.

23  A.   What page is it you want me to look at?

24  Q.   The very last page where the references are listed.  And

25  do you see that the last two references there are S6 and S7?

1    Do you see those?

2    A.    I do.

3    Q.    And you see that S6 is the Backonja study?

4    A.    I do.

5    Q.    And it refers to JAMA 1998, publication of that study?

6    A.    Yes.

7    Q.    And that's the same study that you just told us about this

8    morning, correct?

9    A.    I believe so, yes.

10   Q.    All right.  And now, sir, if you would look to the second

11   page from the front of the document, and do you see that

12   there's a section entitled "Clinical Trial Analysis" in the

13   Kaiser 1999 Drug Monograph?

14   A.    I see that.

15   Q.    And if you would, look at the fourth bullet down in the

16   Clinical Trials Analysis section that begins with the words

17   "the efficacy."

18   A.    Right.

19   Q.    And tell me if I read correctly:  "The efficacy and safety

20   of gabapentin for the treatment of diabetic peripheral

21   neuropathy was studied in two randomized, double-blind,

22   placebo-controlled trials involving a total of 205 patients."

23   First sentence read correctly?

24   A.    Yes.

25   Q.    All right.  And then the next sentence refers to that

1    study S6, Backonja that we are here about, correct?

2    A.    Correct.

3    Q.    And that says in Kaiser's 1999 Drug Monograph, "In the

4    first study S6, Backonja, in which 67 percent of

5    gabapentin-treated patients received 3,600 milligrams a day,

6    gabapentin demonstrated significant pain relief, usually by

7    week 2."  Did I read it correctly so far?

8    A.    Yes.

9    Q.    And then the very next sentence, sir, if you'd follow,

10   this is our last one:  "There was a potential of bias from

11   unintentional unblinding resulting from secondary dose

12   titrations according to side effects."

13   A.    I see that, yes.

14   Q.    That refers to precisely the unblinding phenomenon that

15   you contend occurred in this study, correct?

16   A.    That's essentially correct.

17   Q.    And would you turn to the next page of the document, sir,

18   and there is a table towards the bottom there that says

19   "Formulary Recommendations."  Do you see that?

20   A.    I do.

21   Q.    And if you would, please, look to the -- I think it's

22   about the seventh block down, it says "Drug Information."  Do

23   you see that block?

24   A.    Yes, I do.

25   Q.    And tell me if I read that first sentence correctly:

Page 131

1   "Drug information/professional services formulary

2   recommendation:  Remove prescribing restrictions.  Add

3   guidelines for use in the treatment of neuropathy."

4       Do you see those, sir?

5   A.   I do.

6   Q.   Since you filed your report in this case in June of 2008,

7   are you aware of any steps that Kaiser has taken to stop its

8   doctors from prescribing this medication for patients with

9   diabetic neuropathy?

10  A.   I've had no communications with Kaiser whatsoever.

11  Q.   And I take it you've had no communications with other

12  experts on the team like Dr. McCrory who told us earlier this

13  morning that he is, as we sit here, prescribing the drug for

14  patients with diabetic neuropathy?

15  A.   I've had no communication with any other expert on either

16  side.

17       MR. HOOPER:  Pass the witness, your Honor.

18  REDIRECT EXAMINATION BY MR. SOBOL:

19  Q.   Just briefly, Professor Jewell, the comments that are made

20  in the Clinical Trial Analysis section in the Bullet 4 --

21       THE COURT:  Do you want to shoot that up there again,

22  please.  I think he's got it on the machine.  Just go back to

23  where we were, right?

24       (Discussion off the record.)

25  Q.   Professor Jewell, the comments that are made in Bullet 4

1   regarding the Backonja study --

2   A.   Yes.

3   Q.   -- how, if at all, would Kaiser have been better educated

4   if it had the information that you had from your analysis?

5   A.   They would have seen that there was essentially no

6   treatment effect at all and certainly nothing of any clinical

7   importance.

8           MR. SOBOL:  I have nothing further.

9           THE COURT:  Thank you.

10          (Witness excused.)

11          MR. GREENE:  We call Dr. Perry to the stand.

12          MR. HOOPER:  Your Honor, could we get a very brief

13  side bar?

14          THE COURT:  Sure.

15  SIDE-BAR CONFERENCE:

16          MR. CHEFFO:  It can't be an accident, your Honor, but

17  when they first came in this morning, they put this chart up.

18  I thought this witness was going to refer to it.  But they put

19  their timeline up when no one's referred to it in the entire

20  case.

21          THE COURT:  Are you going to be using it in Perry?

22          MR. GREENE:  Well, we just put it up at the break.

23          MR. CHEFFO:  It's been up since 11:30.

24          THE COURT:  Are you using it for Perry?

25          MR. GREENE:  I may.  I haven't decided.

1          THE COURT:  Why don't you take it down.  If you need

2     it, just put it right back up again.

3          (End of side-bar conference.)

4                    THOMAS L. PERRY, M.D.

5     having been first duly sworn, was examined and testified as

6     follows:

7          THE CLERK:  Would you please state your name and spell

8     it for the record.

9          THE WITNESS:  My name is Dr. Thomas L. Perry.  May I

10    just say, I'm a little bit deaf in a courtroom like this, so I

11    may have some trouble articulating.

12         THE COURT:  Which side?

13         THE WITNESS:  It doesn't make a difference.  I can

14    hear fine.  It's just if people speak very rapidly, I might

15    miss something and ask them to repeat it.

16         THE COURT:  Just ask us to repeat it.  Most of us have

17    mikes.  Do you want, Mr. Greene, not that you're so

18    soft-spoken, but maybe you could pull up the mike here.  And if

19    the jury has any questions because sometimes they're asking

20    questions, I'll try and repeat it to make sure.

21         THE WITNESS:  Thank you.  Thank you, your Honor.

22         THE COURT:  They've been quiet this morning, though.

23         MR. GREENE:  May I proceed, your Honor?

24         THE COURT:  Yes.

25

1   DIRECT EXAMINATION BY MR. GREENE:

2   Q.   Good afternoon Dr. Perry.  Can you hear me?

3   A.   Yes, I can.

4   Q.   Will you tell the jury where you're from.

5   A.   I'm from Vancouver, British Columbia.  I think they know

6   where that is now.

7            (Laughter.)

8            THE COURT:  Did you go to any of the games?

9            THE WITNESS:  I didn't, but my son got some tickets on

10  the spur of the moment and was able to see Alexandre Billedeau

11  win in one of the jumping events.  I forget what it was called.

12  He was very lucky.

13           MR. GREENE:  Well, we want to extend our

14  congratulations to Canada for the Olympic gold last night.

15           THE WITNESS:  I want to make an apology for the

16  closing ceremony if anyone saw it.  As they said, we like to

17  say we're sorry, and that was appalling.  I'm sorry.  The

18  opening was pretty good.

19           MR. GREENE:  We still ended up with more medals

20  than --

21           THE COURT:  All right.

22           (Laughter.)

23  Q.   Can you tell us what your occupation is, Doctor.

24  A.   I'm a physician, general internist in hospital medicine

25  mostly, and a university professor.

1  Q.   And could you tell us where you practice.

2  A.   I practice at University Hospital in Vancouver and also at

3  the Vancouver General Hospital, which is the largest hospital

4  in the province.

5  Q.   Do you currently teach?

6  A.   Yes, I do.  I teach medical students, postgraduate

7  trainees, residents and interns, and I teach continuing medical

8  education.

9  Q.   How long have you been teaching, Doctor?

10  A.   Since 1985, with one hiatus when I was in the provincial

11  legislature.

12  Q.   And do you have a specialty that you practice?

13  A.   Yes.  I'm what's called a general internist.  I think the

14  Americans know what that means better than Canadians.  It's a

15  specialty with, in my case, five years of training after -- or

16  six years or seven, I've forgotten exactly, after my medical

17  degree.

18  Q.   I want to ask you a little bit about your educational

19  background.  Can you tell us what your education is.

20  A.   I did a bachelor's degree in biology at the University of

21  British Columbia, and then a medical degree in McGill

22  University, and then a rotating internship in Halifax, Nova

23  Scotia, and then internal medicine residency in Vancouver, and

24  clinical pharmacology additional subspecialty training in

25  Karolinska Institute in Stockholm and back in Vancouver at UBC.

Page 136

1  Q.   And when did you complete your fellowship?

2  A.   1989 I decided that was enough.  I had my fellowship in

3  general internal medicine in 1985.

4  Q.   And you have a fellowship in the Royal College of

5  Physicians of Canada?

6  A.   Yes.  That's the specialty designation, equivalent to the

7  American boards of specialties.

8  Q.   And you were certified by the American Board of Internal

9  Medicine board certification in 1997?

10  A.   I sat for their examination, which qualified me for ten

11  years in the American system, I guess.

12  Q.   Are you regularly involved in the academic or

13  evidence-based assessment of drugs?

14  A.   Yes.  That's a major part of my professional and academic

15  work.  I work with a group called the University of British

16  Columbia Therapeutics Initiative that exists primarily to

17  understand new drugs well and to explain what we understand

18  about them to doctors and pharmacists.

19  Q.   Could you tell us what the University of British Columbia

20  Therapeutics Initiative is, just take a minute and explain it

21  to the jury.

22  A.   Well, we were started in 1994 when the government, I

23  think, realized that, and certainly we at the university, that

24  doctors did not have good access to reliable information about

25  drugs that was coming without bias from independent academics.

1    They were getting deluged with advertising from drug companies,

2    and there was very limited supply of solid, reliable information

3    from people who did not have a vested interest.  And the

4    government realized, once having established us, that they

5    could also use us for advice on formulary, the drugs that they

6    cover under drug benefit plan.  So we became from 1994 on one

7    of the -- I don't know how to say this modestly, but we

8    developed an international reputation for excellence in

9    understanding what new drugs really do.

10       A good example would be Avandia, which has been in the

11   press recently, or Celebrex.  We were amongst the first in the

12   world to recognize that Avandia and Celebrex or Vioxx did not

13   have advantages over other comparator drugs.

14            THE COURT:  So when you say "we," you mean the

15   University of British Columbia Therapeutics Project, or you

16   mean Canada?

17            THE WITNESS:  No.  The University of British Columbia

18   Therapeutics Initiative, of which I'm one, one of many people.

19   Q.   The jury has heard some testimony this past week

20   concerning the Cochrane Collaborative.  Is Canada part of the

21   Cochrane system?

22   A.   Yes, we are.  My senior colleague, for example, at UBC

23   Dr. Jim Wright, is the editor of the Cochrane Hypertension

24   Group, which I think the jury will understand hypertension

25   affects up to one quarter of people, possibly even half, and

1    therefore it's a huge problem internationally; and our group is

2    the Cochrane group for the world in trying to understand

3    studies in high blood pressure.  And there are other Canadian

4    groups in back pain, I think in Ottawa, and I think there

5    probably are Cochrane groups in Toronto as well.

6    Q.    Have you peer reviewed manuscripts for medical journals?

7    A.    Yes, I have.

8    Q.    And could you tell us some of the journals.

9    A.    I've reviewed occasionally for the New England Journal of

10   Medicine as a peer reviewer.  I'm currently reviewing for the

11   Canadian Medical Association Journal and have.  I've reviewed

12   for the Cochrane Collaboration, maybe some minor journals that

13   I've forgotten about.

14   Q.    So you've served as a peer reviewer for the Cochrane

15   Collaboration?

16   A.    Yes, I have.

17   Q.    Has that been for pain?

18   A.    Yes.

19   Q.    And you've published articles as well?

20   A.    I've published a relatively modest number of articles.  My

21   father was a big publisher, and I'm more modest, and I tend to

22   work largely in a group.  So some of our publications are done

23   to physicians in British Columbia and on the World Wide Web and

24   are accessible and widely read, but they're not attributed

25   because we work in a group.  They don't bear my name when

1    they're published.

2    Q.   And you're being compensated for the time you've worked on

3    this case; is that correct?

4    A.   Yes.

5    Q.   And you're compensated at about $400 an hour?

6    A.   Exactly $400 per hour.

7    Q.   And you've put a lot of time into your work in this case;

8    is that right?

9    A.   I didn't realize what I was getting into, Mr. Greene.  I

10   knew it was going to be hard, but I think it's come to over 300

11   hours for me, at least, and 400 for two associates at UBC who

12   helped me at one point.

13   Q.   We'll get to it in a few moments, but there were a number

14   of trials that you conducted a meta-analysis on, correct?

15   A.   Yes.  I think I looked at just over 30 experimental

16   trials, double-blind randomized controlled trials, or in some

17   cases nonblinded trials, and 25 qualified for meta-analysis.

18   Q.   In your report in this case, when you have the appendices

19   attached to it, exceeds 300 pages; isn't that correct?

20   A.   That's correct.

21   Q.   I want to ask you a little bit about pain treatment.  You

22   say that the large part of your practice is treating patients

23   who experience pain; is that right?

24   A.   It's quite a bit of my outpatient practice.  I would say

25   the majority of the referrals I get are from around British

1    Columbia, which is a province as big as California, Nevada,

2    Washington, Oregon, and something else thrown in and has about

3    four million people.  So a lot of the people referred to me for

4    outpatient opinions are people with chronic pain; and inpatient

5    work, it's more people sick with pneumonia or heart disease or

6    infection, but many of them also have pain.  Pain is common, so

7    it's a big part of my day every day.

8    Q.   When you say outpatient, you're referring to patients you

9    see in your office; is that correct?

10   A.   That's correct.

11   Q.   When you say inpatient, that refers to patients you see in

12   the hospital; is that right?

13   A.   Yes, or in an emergency room.

14   Q.   What percent of your practice, your outpatient practice,

15   deals with patients who experience pain?

16   A.   I would guess definitely more than 50 percent, but maybe

17   75 percent.  There aren't very many doctors that want to work

18   in this field, and I'm stuck as one of the ones in British

19   Columbia who gets the consultations.  So I don't mean to say

20   that I don't like to do it, but it's a hard area to work in.

21   Q.   Now, can you tell the jury, what's the goal of pain

22   treatment when you're treating a patient?  What's the goal that

23   you're trying to reach as a physician?

24   A.   Well, the first thing that doesn't necessarily meet the

25   eye is that one is trying not to do any harm to people, and in

1   particular not to kill them.  That's why Vioxx is off the

2   market because it turned out it was killing people.  And

3   knowing or hoping that one is safe, the next goal is not to

4   harm them in some other major way.  And then the more obvious

5   goals are to relieve suffering in a meaningful way so that the

6   patient comes back and says, "Thank you, Doctor.  I really

7   appreciate what you did for me."

8        And the other goal that I always consider critically

9   important and try to teach to people I work with is to improve

10  function, that pain tends to be disabling for people.  And

11  we're talking in general about people not, in my practice,

12  people not dying from cancer where death is expected usually

13  relatively soon and where palliation has some different

14  purposes, but in people in the general community who don't have

15  cancer pain, a commonsensical is to improve their function,

16  allow them to go back to work, allow them to work within a

17  family, if a woman is working at home, allow her to take care

18  of her children, et cetera.

19  Q.   So you're looking to deliver a clinical meaningful

20  reduction of the pain for your patient?

21  A.   Yes, something where the patient has no doubt in their

22  mind that they're better and comes back and ideally gives me a

23  Christmas card.

24  Q.   Okay.  Well, on a scale of 1 to 10, is a reduction of one

25  point clinically meaningful?

55917d02-9b52-42a6-8c4d-9774beba262a

Page 142

1   A.   No, absolutely not.  It's a construct devised perhaps

2   originally at my old alma mater McGill University for research,

3   but primarily promoted by pharmaceutical companies because one

4   can do statistics on it, as you just heard from Professor Jewell;

5   and it has nothing, in my opinion, to do with reality in

6   treating the pain of a human being.

7          MR. HOOPER:  Your Honor, objection.  Move to strike

8   everything after the words "absolutely not."

9          THE COURT:  Overruled.

10  Q.   Now, Doctor, just moving on, the jury has been introduced

11  to the two different types of pain that are at issue in this

12  case, nociceptive pain and neuropathic pain, but just briefly,

13  could you give us an example of nociceptive pain.

14  A.   I think good nociceptive pain is hitting your thumb nail

15  with a hammer and having a blood blister, in the sense that if

16  you know the trick of heating up a paper clip and burning

17  through the nail or if you've ever seen that done in an

18  emergency department, the pain disappears suddenly, or a

19  fracture that heals.

20  Q.   Thank you.  Are there effective drugs or medications to

21  take for that type of pain?

22  A.   Yes, there are, and there are also nonmedical treatments

23  like stabilizing a fracture.

24  Q.   And can you list a couple of the effective drugs that

25  could be taken for nociceptive pain?

1    A.    The greatest is acetaminophen or brand name Tylenol in

2    generics.  That's the drug that comes closest, if any, to not

3    having any side effects and is very effective for most kinds of

4    pain.  And then there are nonsteroidal antiinflammatory drugs

5    like ibuprofen --

6          THE COURT:  You know, we're just losing you.  Could

7    you say that again.

8    A.    And there are nonsteroidal antiinflammatory drugs like

9    ibuprofen and Naproxen, and there are opioids like morphine or

10   similar drugs, codeine, Tylenol 3, which is a combination.

11   Potentially dozens of different drugs, depending on the

12   country.

13   Q.    Just try to keep your voice up and speak a little bit more

14   slowly.  What is neuropathic pain, if you give us an example of

15   that?

16   A.    Neuropathic pain, I think a good example is -- well, a

17   reasonable example is diabetic neuropathy when it causes pain.

18   And diabetes, unfortunately, many people who have had the

19   disease for years get damaged nerves, particularly in their

20   feet.  And most commonly they lose sensation and have numbness,

21   which is one of the reasons they're in danger of getting

22   infections and amputations.  But sometimes they develop a

23   burning sensation and often at night an unpleasant sensation

24   that may keep them awake, a burning.  And in this case the pain

25   is thought to derive intrinsically from the nerve itself;

1   there's something wrong with the nerve, and you can't fix it by

2   fixing something else in the foot like an infection.

3   Q.   Doctor, I'd like to talk to you about your assignment in

4   this case.  When I contacted you, did I ask you if you would be

5   willing to undertake and answer two questions:  one, to review

6   the scientific proof, the double-blind randomized controlled

7   trials, and determine whether Neurontin is effective in

8   treating two types of pain you've just identified, neuropathic

9   pain and nociceptive pain?

10  A.   Yes, you did, sir.

11  Q.   And in addition to that, did I ask you to review the

12  defendants' marketing materials, what they were saying out in

13  the medical community, and see if those statements they were

14  making were supported by the double-blind randomized controlled

15  trials with scientific proof?

16  A.   Yes, you did.

17  Q.   Let's turn to nociceptive pain.  Did you review -- and I

18  can direct your attention to the monitor there.  Were these the

19  five double-blind randomized controlled trials that the

20  defendants had conducted that we've referenced here by numbers?

21  And I'll just refer to the last number, 001 through 002/3, are

22  those the five that you reviewed in this case?

23  A.   Yes, that's correct.

24  Q.   And those are all the defendants', correct?

25  A.   They were all sponsored by Parke-Davis.

Page 145

1   Q.   And after reviewing --

2   A.   Sponsored and designed by Parke-Davis.

3   Q.   We can go into those trials in a little bit of detail, but

4   I want to come right to your ultimate opinion.  Based on your

5   education, training, and experience, did you form an opinion

6   whether those double-blind randomized controlled trials

7   answered the question whether Neurontin was effective for

8   treating nociceptive pain?

9   A.   Yes, I did.

10  Q.   Will you tell the jury what your opinion was.

11  A.   My opinion was that Neurontin, or gabapentin, the generic

12  name, is completely ineffective for acute nociceptive pain.  In

13  those cases, the model was someone who had a tooth extraction

14  and were given placebo or gabapentin or Naproxen or codeine, or

15  I think it's Dr. House's drug, hydrocodone, or combinations of

16  those after the tooth was extracted or for acute knee pain.

17  And in no case did gabapentin work whatsoever compared with

18  placebo; whereas all the other drugs did work.

19       MR. GREENE:  May I just approach the witness, your

20  Honor?

21       THE COURT:  Yes.

22       MR. GREENE:  I want to just give him --

23  Q.   This is the appendices to your report; is that correct?

24  A.   Yes, that's right.

25  Q.   Just so that the jury has some sense of these five trials

1    we're talking about, they were studying Neurontin versus a

2    placebo versus a combination product, Neurontin and Naproxen,

3    for example, correct?

4    A.   Yes.   This is what's called a comparative effectiveness

5    experiment, which is what the United States government and

6    various other agencies are promoting these days so you can

7    understand how a drug stacks up against not only placebo but

8    against whatever else is available.

9    Q.   And all of those trials were negative, correct?

10   A.   That's correct, they were all negative.

11   Q.   Let me turn to neuropathic pain.   Now, there were more

12   trials for you to analyze that fall under neuropathic pain; is

13   that correct?

14   A.   Much more difficult.   There were about 25 that I found.   I

15   also found some trials which still have not been reported by an

16   independent company in California, reported slightly on the Web

17   but not fully anywhere that I know of.

18   Q.   Now, before you undertook your analysis of these

19   approximately 30 trials -- is that correct?

20   A.   Yes, 30 or 31.

21   Q.   Before you undertook the analysis, did you turn to the

22   Cochrane Collaborative to see what they had done?

23   A.   Yes, I did.   The Cochrane Pain Group in Oxford, England

24   had --

25   Q.   Will you tell the jury what you observed about the

1    Cochrane's analysis of neuropathic pain.

2    A.   Well, it was very peculiar.  I remember it because I was

3    here in Boston deciding whether or not to become involved in

4    offering an opinion to you, and you showed me or one of your

5    staff showed me the Cochrane review, which is approximately six

6    pages long, which struck me as very, very brief.  And the

7    graphs were inappropriately labeled.  It was such a sloppy job

8    that literally the graphs did not have the correct titles or

9    labels on them.  And I couldn't believe it.  I sat in your law

10   office and went to the Web to look.  But what it showed me was

11   that I would have to do my own job basically to actually

12   understand the facts.  I couldn't rely on their --

13   Q.   Let me draw your attention to the screen.  The jury has it

14   before you, but did the Cochrane review indicate that they had

15   looked at 14 studies?

16   A.   Yes, correct.

17   Q.   And the flaws or limitations in the Cochrane review is,

18   they had no access to the unpublished reports, Reckless and

19   POPP; is that correct?

20   A.   Yes.  I learned this partly from my own study.  It was

21   apparent from the initial Cochrane review that they had not

22   gained access to unpublished trials, or not sought it, or both.

23   But subsequently, looking at the materials available through

24   this lawsuit, I understood much better how flawed their

25   analysis was.

55917d02-9b52-42a6-8c4d-9774beba262a

1    Q.   I just want to focus on what you observed about the

2    Cochrane review when you first undertook the assignment.

3              THE COURT:  Can I just back up.  When you say

4    neuropathic pain, do you mean all the different kinds of

5    neuropathic pain or neuropathic pain in general?  What are you

6    referring to?

7              THE WITNESS:  Well, it's a good question because it is

8    clinically such a vague term.  At least I consider it a

9    relatively vague term, and there are varying definitions of it.

10   I've tried to give an example that I thought made sense to both

11   doctors and lay people, but the Cochrane review examined a

12   fairly broad range of indications or possible indications or

13   uses for the drug, different conditions.  My review examined

14   even more because I found more studies, and then some of the

15   unpublished studies that could not have been found without the

16   U.S. court system I was also able to look at; whereas the

17   Cochrane reviewers in 2005 were not able to look at those.

18             THE COURT:  Well, so if you have neuropathic pain from

19   diabetes and neuropathic pain from shingles, would you refer to

20   those both as neuropathic pain, or would you have to

21   differentiate?

22             THE WITNESS:  Well, people have.  I feel much more

23   comfortable as a physician, and as someone attempting to

24   understand evidence from experiments rationally, considering

25   each condition on its own merits.  After all, there are people

1   with a slipped disk or prolapsed vertebral disk, one could say

2   that there is pressure on the nerve, and that could be

3   conceived of as neuropathic pain, but typically that condition

4   improves fairly rapidly over time in most people.  And is it

5   nociceptive when the disk is out of place, or is it --

6           THE COURT:  Well, did Cochrane treat them in an

7   umbrella kind of way?

8           THE WITNESS:  They tended to, yes, and they did their

9   best with the available information, which was a small subset

10  of the real available information at the time.

11          THE COURT:  So would it be fair to say the scientific

12  community isn't completely clear about what it means when it

13  says "neuropathic pain"?

14          THE WITNESS:  That would be a very astute observation.

15  Q.   Looking at the Cochrane review, which you've told the jury

16  is what you did before you dove into the assignment, did you

17  observe that the Cochrane review had no access to the complete

18  data from Backonja, Serpell, and Gorson?

19  A.   Well, I learned that as part of the review.  I don't think

20  in looking at the Cochrane review I would have been aware of

21  how misinformed they were about the Gorson study until I saw

22  the real data.  There was no way to know that without seeing

23  the truth.

24  Q.   Maybe I phrased that incorrectly.  Based on your work in

25  this case and review of the documents, did you see -- I think

1    your testimony is, there are certain limitations of the

2    Cochrane review, and that's what this slide is intended to

3    point out.

4    A.    Yes, indeed.  As the slide shows, I felt it was

5    irremediably compromised by publication bias, which means they

6    only saw the information which the proponents of the drug

7    wanted them to see, and they did not see the other information

8    that the Court and the jury are in a position to understand.

9    Q.    Did you undertake a meta-analysis in this case?

10   A.    Yes, I did.

11   Q.    And, once again, how many trials were included in your

12   meta-analysis?

13   A.    Twenty-five.

14   Q.    And why don't you describe for us, the jury has heard it

15   through one or two witnesses, but just briefly how you define

16   meta-analysis.

17   A.    The purpose is to look at all of the available

18   information, much in the same way a jury is attempting to

19   understand all of the facts, not just some of them.  If there

20   are some facts that are favorable but others that are

21   unfavorable, it's not scientific to only look at the nice

22   stuff.  And similarly it's not scientific to only look at the

23   bad stuff.  So the purpose is to get one's hands on every

24   possible bit of scientifically valid information, and, where

25   possible, combine the information.  Sometimes it's not

Page 151

1    possible.  For example, in treating cancer pain in someone

2    who's dying, it would not be common sense to combine that with

3    treatment of a young child with pain who's not dying.  But in

4    some cases one can.  For example, experiments where the

5    condition being treated was diabetic peripheral neuropathy,

6    painful feet in someone with advanced diabetes, it's reasonable

7    to look at all of those experiments, not just some of them.

8    Q.   Please define meta-analysis, and now I can go on with

9    it --

10          THE COURT:  It's probably a good breaking point

11   because I think he'll be coming back tomorrow anyway, so I'll

12   see you tomorrow morning.  Thank you.

13          THE CLERK:  All rise for the jury.

14          (Jury excused.)

15          THE COURT:  Thank you, Doctor.  I'll see you tomorrow

16   morning.

17          (Side-bar conference off the record.)

18          (Adjourned, 1:05 p.m.)

19

20

21                 C E R T I F I C A T E

22

23

24   UNITED STATES DISTRICT COURT )

25   DISTRICT OF MASSACHUSETTS     ) ss.

Page 152

1    CITY OF BOSTON                    )

2

3

4           We, Lee A. Marzilli and Valerie A. O'Hara, do hereby

5    certify that the foregoing transcript, Pages 1 through 151

6    inclusive, was recorded by us stenographically at the time and

7    place aforesaid in Civil Action No. 04-10739-PBS, Kaiser

8    Foundation Health Plan, et al, v. Pfizer, Inc., et al, and

9    thereafter by us reduced to typewriting and is a true and

10   accurate record of the proceedings.

11      In witness whereof we have hereunto set our signatures

12   this 1st day of March, 2010.

13

14

15           /s/ Lee A. Marzilli

16           LEE A. MARZILLI

17           OFFICIAL FEDERAL COURT REPORTER

18

19           /s/ VALERIE A. O'HARA

20           VALERIE A. O'HARA

21           OFFICIAL FEDERAL COURT REPORTER

22

23

24

25

Page 153

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55917d02-9b52-42a6-8c4d-9774beba262a