IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                 )
                                       ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,  ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION      )
---------------------------------------)
This document relates to:              )
KAISER FOUNDATION HEALTH PLAN, et al,  )
                                       )
                Plaintiffs             )
                                       )
        -V-                            )No. 04-10739-PBS
                                       )Pages 1 - 165
PFIZER, INC., et al,                   )
                                       )
                Defendants             )


JURY TRIAL - DAY SEVEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE



United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 2, 2010, 8:45 a.m.



LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210

1                         (617)345-6787

2     A P P E A R A N C E S

3     FOR THE PLAINTIFFS:

4         THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
      Greene, LLP, 33 Broad Street, 5th Floor, Boston,
5     Massachusetts, 02109.

6         THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
      Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
7     Suite 301, Cambridge, Massachusetts, 02142.

8

9         LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
      850 Third Avenue, New York, New York, 10022.
10
          DON BARRETT, ESQ., Barrett Law Office,
11    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
      39095.
12
          BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
13    Bernstein, Embarcadero Center West, 275 Battery Street,
      San Francisco, California, 94111-3339.
14

15    FOR THE DEFENDANTS:

16        KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
      THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
17    Four Times Square, New York, New York, 10036.

18

19        RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
      LLP, Four Embarcadero Center, San Francisco, California, 94111.
20
          JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
21    Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
      Denver, Colorado, 80202.
22

23

24

25

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

Page 3

1                    I N D E X

2

3   WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

4

5   THOMAS L. PERRY, M.D.     21      53       90         95

6

7   AMBROSE CARREJO                  98

8

9   EXHIBITS                          PAGE

10

11  7                                 29

12  40                                38

13  80                                51

14  974                               54

15  991-A                             63

16  816                               99

17  819                               102
    824                               104
18  829                               121
    837, 828                          125
19  831                               125
    902-A, 902-B, 902-C               142
20  918                               142
    902, 917                          148
21  323                               155
    757                               155
22  729                               157
    810                               160
23

24

25

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1                        P R O C E E D I N G S

2            THE COURT:  Good morning.

3            MR. SOBOL:  Good morning, your Honor.

4            MR. GREENE:  Good morning, your Honor.

5            THE COURT:  What are the issues?  Somebody said that

6    there was something we needed to talk about?  Nothing?

7            MR. BARRETT:  The Knapp issue.

8            THE COURT:  The what?

9            MR. BARRETT:  The quashing the subpoena on Knapp

10   issue.  They had a motion to quash the subpoena.

11           MR. CHEFFO:  I actually thought you addressed it

12   yesterday by saying they can rely on depositions like we have

13   to with our witnesses.

14           THE COURT:  Yes, I think this is too late to be in

15   this whole world.  Both sides have depositions on these two

16   witnesses.  Just use the depositions.

17           MR. CHEFFO:  Thank you.

18           MR. BARRETT:  Ma'am, could we please be heard on it?

19           THE COURT:  Yes, you can, but that's where I'm leaning

20   here.

21           MR. SOBOL:  Just so it's clear, your Honor, we haven't

22   been heard on this yet, and it's important to us, so we'd like

23   you to hear it.

24           THE COURT:  All right.  I'm down here.  I came down

25   early.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1          MR. BARRETT:  Knapp is not like any other witness

2     issue that we have faced.  He lives relatively close by.  He

3     lives in Connecticut.  This is not a California issue.  If this

4     case had been tried out in California, they would be saying it

5     was inconvenient.  It's not inconvenient.  Both sides listed

6     Knapp as a live witness.  For many weeks pretrial, we had every

7     reason to believe that he was going to show.  I've been

8     trying --

9          THE COURT:  Well, he might show as part of their case.

10    Is that right?

11         MR. BARRETT:  Well, but, your Honor, I've been trying

12    lawsuits for over forty years.  Not one single time have I ever

13    been in a trial where the defendant didn't show up, where, if

14    there's a corporate defendant, they didn't have a suit and a

15    tie in the courtroom sitting at counsel table.

16         THE COURT:  Point it out to the jury.

17         MR. BARRETT:  Well, the fact is, this is not about

18    inconvenience to Mr. Knapp.  It's about gamesmanship.  We have

19    acted promptly, and we've acted in a responsible way.  As soon

20    as we found out before trial that they weren't going to bring

21    him, we set about to subpoena him.  And it was difficult, but

22    we did subpoena him.  He resisted it and dodged it, but we

23    worked it out.  He got the subpoena.  And, I mean, requiring

24    the largest drug company in the world to produce one person,

25    one person at trial for us -- we produced three, we will

1    produce three -- to have one person to defend their conduct --

2              THE COURT:  Don't you have his deposition?

3              MR. BARRETT:  His deposition was a discovery

4    deposition that had nothing to do with -- it was a routine

5    discovery deposition.  It is useless to us.  It is absolutely

6    useless to us.

7              MR. CHEFFO:  But they have designated substantially

8    from it, this useless deposition.

9              THE COURT:  You know what, I'll give you a chance,

10   okay?  Let him.  Here's the problem:  This is so last minute.

11   We're about to finish your case.

12             MR. BARRETT:  Your Honor, it's not last minute.

13             THE COURT:  You're going to finish your case Friday or

14   Monday.  It's Tuesday.

15             MR. BARRETT:  Your Honor, I believe that we would be

16   able to work out a convenient time for him to come.  That's not

17   a problem.  The only legal issue is the 100-mile -- and when we

18   talked about that at side bar the other day, you said you

19   thought that that was controlling and we couldn't have him, but

20   the law is clearly not that way.

21             THE COURT:  That's not the argument they've raised.

22             MR. BARRETT:  Okay, that's right.  And, you know, the

23   fact is, a deposition -- in the first place, the deposition is

24   useless to us.

25             THE COURT:  Well, why did you subpoena him so late in

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    the game?  It was like the Friday before.

2              MR. BARRETT:  We thought he was --

3              THE COURT:  No, you never thought he was going to be

4    part of your case.  You thought he was going to be part of

5    their case.

6              MR. BARRETT:  No, ma'am.  We thought --

7              THE COURT:  Well, let me ask you this:  Did they make

8    a promise to produce him as part of your case?

9              MR. GREENE:  Your Honor, I called Mr. Cheffo on this

10   issue --

11             MR. CHEFFO:  Never ever.

12             MR. GREENE:  May I --

13             MR. CHEFFO:  Well, the Court asked a question.  It's

14   just not true.

15             MR. GREENE:  They listed Mr. Knapp as a live witness

16   on their witness list.  We listed him as a witness on our

17   witness list.  I called Mr. Cheffo and said, "Will you produce

18   him in our case?  I want him on a --" I think I said a Friday

19   originally.  He said, "I'll have to get back to you.  I've got

20   to talk to my client."  And a day or two went by.  He called me

21   and left me a voicemail.  Another day passed.  I called him the

22   Wednesday.  He may have been on the way back to New York, and

23   he didn't have an answer for me.  Then I said, "Well, will you

24   serve a --" I think in that conversation -- no, excuse me, he

25   did have an answer for me, "No."  I said, "Will you accept a

1    subpoena on him?  Would you accept a subpoena?"  He would have

2    to get back to me.  Then in another conversation, he couldn't

3    answer that question.  I said, "I have to serve a subpoena,"

4    and he said "Go ahead."

5           So we were under the impression that we were going to

6    be able to call him.  He had been listed as a live witness on

7    both witness lists, and then when I called him, I said, "Will

8    you produce him on this day?"  The answer wasn't, "No, I won't

9    produce him.  I'll have to get back to you."  What he said to

10   me is, "Mr. Knapp travels a lot.  He's in Europe.  He's here,

11   he's there.  I'll have to get back to you," not, "No, we're not

12   producing him," not, "No, you have his deposition transcript."

13   And as Mr. Barrett says, that transcript is useless for us.  It

14   was a discovery deposition.  We have numerous documents here

15   that we need to authenticate, introduce as business records

16   through a witness.  They have nobody they're bringing that that

17   can be done through.

18          THE COURT:  Well, I thought authentication was

19   basically agreed to.

20          MR. GREENE:  Well, authentication is, but business

21   record --

22          THE COURT:  As I read that stipulation.

23          MR. BARRETT:  We need to ask him about some of these

24   documents, and it's an important --

25          THE COURT:  Why didn't you ask him during his

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    deposition?

2         MR. GREENE:  Well, his deposition was taken some time

3    ago.  The case --

4         MR. BARRETT:  It was taken years ago.

5         MR. GREENE:  The case evolved --

6         THE COURT:  It's so late.  Are you bringing him on as

7    your witness live?

8         MR. CHEFFO:  It's unclear at this point.  I think it's

9    our prerogative at this point.

10        THE COURT:  I know, but one of the problems you keep

11   doing to them is, you keep saying -- let me just say this:  You

12   don't give them an answer, so you say, "Maybe I'll get back to

13   you, maybe I'll get back to you."  So they can't rely on it.

14   It's not a "yes," but it's still --

15        MR. CHEFFO:  Excuse me, your Honor.  I mean, I want to

16   respond.  That's just simply not true.  When he talks about --

17   it's a matter of, if you call, I respond a few hours later.  I

18   mean, I call him every single day for things, and what I

19   usually get, as lawyers do, is, "I need to confer with my

20   team."  So this, I mean --

21        THE COURT:  Why aren't you producing them?

22        MR. CHEFFO:  Let me --

23        THE COURT:  No, answer my question first.

24        MR. CHEFFO:  Sure, sure.

25        THE COURT:  Let me just get a straight answer, not a

1    "maybe."  Are you producing him as part of your case?

2          MR. CHEFFO:  No.  We were not planning to produce him.

3    There's deposition transcripts.

4          THE COURT:  So you're not planning on introducing

5    anyone from Pfizer?

6          MR. CHEFFO:  At this point, we don't think we need to.

7    And they're not producing anyone from Kaiser in our case.

8    They've moved to quash today.  We subpoenaed Dr. Helling when

9    he was here.  They've moved to quash, and we're not going to

10   have a single person --

11         THE COURT:  Why don't you both exchange witnesses?

12         MS. NUSSBAUM:  Your Honor, Dr. Helling was simply here

13   watching the trial.  His name is not on one piece of paper.  He

14   knows nothing about this case.

15         THE COURT:  I understand, I understand.  I'm not

16   inclined to grant their motion either.  It's all last minute.

17   This is last-minute skirmishing.  I deny both motions.

18         Now, at this point it's just too late in the game to

19   be doing this.  I understand that there may be some issues on

20   "maybe, maybe, maybe," but it is too late in the game to be

21   subpoenaing people and having a debate about it on the Tuesday

22   before you're supposed to wrap up on Friday.  It's too late.

23         MR. BARRETT:  We're not going to wrap up --

24         THE COURT:  You have a three-day deposition.  Do it.

25   Now, I'm not going to be very sympathetic to any authenticity

1   issues or business record issues.  Introduce the documents.

2   Introduce them.  And if you want to refute them, refute them.

3           MR. CHEFFO:  We have a stipulation, your Honor.  On

4   those issues --

5           THE COURT:  They're not challenging them.

6           MR. BARRETT:  Your Honor, we accept that.

7           MR. SOBOL:  Just so you understand, though, your

8   Honor, they've objected repeatedly to hearsay issues and all

9   the rest of --

10          THE COURT:  They're not objecting.  You just heard him

11  say it.  Well, to authenticity or business record.

12          MR. CHEFFO:  We're not waiving all of our objections

13  to documents on relevance and other things, but I think the

14  core issues --

15          THE COURT:  Relevance is different.  Business records

16  and authenticity are waived.  So as far as I'm concerned, we're

17  moving on with this case.

18          Now, let me ask you about the suicide doctor.  Are you

19  really planning on the issue on suicide?  It does seem to be

20  not directly irrelevant but just sort of off on a side.

21          MR. GREENE:  The issue there is, they had that data

22  from the suicide trial -- and you know it well -- about

23  clinical depression, suicidal ideation, risk of suicide.  They

24  had that data in '92.

25          THE COURT:  No, I understand.  I've got hundreds of

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    products cases.  You have a decent case on it.  It's just not

2    critical to this case.

3            MR. GREENE:  Well, it is on bipolar disorder because

4    they had that data, and they approved the marketing assessment

5    to promote it for bipolar disorder, and then they started the

6    teleconferences.  They hired Drs. Marcotte and Stein and

7    started the teleconferences in the fall of '95, never told

8    those doctors.  And then they wrote an article published in

9    June --

10           THE COURT:  Oh, I see.  So this is part of the

11   argument that they didn't disclose the depression rather than

12   that it caused suicides because --

13           MR. GREENE:  Yes.  It's got nothing to do with causing

14   suicide.

15           THE COURT:  -- I don't want to be off in that world.

16           MR. GREENE:  We're not.  One other thing, Judge,

17   that's very important.  In June of '96, the company wrote and

18   published an article saying Neurontin improved mood, and cited

19   the epilepsy data and circulated that article, and made no

20   reference to what the FDA had found in their analysis, so it's

21   part of our fraud case.

22           MR. CHEFFO:  First of all, it's in the label.  This

23   deals with epilepsy.  We haven't heard anything in this case

24   about -- I mean, none of these witnesses have said --

25           THE COURT:  Excuse me.  As long as it's just about the

1  marketing end of it and not mentioning it in the marketing

2  materials rather than -- I'm not going to go off into the

3  hundreds of suicide cases.  Unfortunately, Mr. Kennedy said, I

4  remember, in his opening something about no one's complained

5  about the drug.  Well, he may not have known about these.  He's

6  been in the sales and marketing side and not -- in fact they

7  have, but -- then he tripped into it when some witness said,

8  "Yeah, what about the suicides?"  So, I mean, that's sort of

9  out there.

10      MR. CHEFFO:  Your Honor, and I do understand that, and

11  your recollection is exactly right on that, but I think here

12  it's not -- this is not like what I think Dr. Carrejo talked

13  about, you know, a genie out of the bottle.  Once the whole

14  issue of the suicide comes out, it's not something that -- it

15  requires lots of explanation.  You know, if they can just throw

16  it on the wall, this trial can be long enough with enough --

17      THE COURT:  Well, we're not getting into the suicides.

18  We're talking about the depression, that you can't market

19  something for bipolar knowing that it increases in some subset

20  of the population depression and not disclose it.  I think

21  that's their theory anyway.

22      MR. CHEFFO:  We haven't seen any documents about

23  marketing, you know, with respect to those issues.

24      THE COURT:  Anyway, this is a late-filed motion just

25  like the motions to quash.  I am almost midway through this

1    trial.  I shouldn't be dealing with new witnesses, motions to

2    quash.  We're done, we're done.  This case is set in path, it's

3    going.

4          MR. BARRETT:  Thank you, your Honor.

5          THE COURT:  So short of something brand-new that comes

6    up, like some of the scheduling of witnesses has turned out to

7    be complicated, but, you know --

8          MR. BARRETT:  Your Honor, I have a modest proposal to

9    increase the efficiency of this trial.

10         THE COURT:  Yes.

11         MR. BARRETT:  We've been working hard, I mean, really

12   hard on the videos, getting them down, getting them down,

13   getting them down.  It would be --

14         THE COURT:  Ooh, I forgot, I have those two

15   depositions upstairs for you.

16         MR. BARRETT:  We need to get those two.

17         THE COURT:  Yes, if you could run up and get them.

18   Yes, I'm sorry.

19         MR. BARRETT:  We have somebody here waiting to take

20   them and work on them.

21         Your Honor, we suggest that we be allowed to prepare

22   ours, make the cuts, and play ours now.  So many times we find

23   that, you know, for example, we've got one witness that we have

24   her in to authenticate one document, and that's it.  And then

25   they designate just a bunch of stuff that hasn't got anything

1  to do with that document particularly, you know.  And that's

2  okay, but what we find is, I mean, it does what Judge Fallon

3  says:  The deposition is deadening, you know, and it just takes

4  away from, you know, the point we're trying to make.  And the

5  important thing is, if they had to play that in their trial,

6  you know, if they had to wait, the stuff is just useless.  It's

7  put there for deadening purposes, and you'll find that this

8  case will move a lot quicker --

9           THE COURT:  Well, excuse me, excuse me.  There will be

10  two kinds of designations on their part.  If it's the doctrine

11  of completeness -- in other words, you designate three lines

12  and they want Line 4 and 5 -- it needs to happen now.  It can't

13  happen because otherwise I'll listen to the same darn

14  deposition twice.  If it's like a whole new chunk at the end, I

15  don't think I have radical problems with having them play it as

16  part of their case.

17           MR. CHEFFO:  Your Honor, I mean, what happens in these

18  depositions, as you've obviously seen many of them, someone

19  takes it.  They have a lay person.  They ask questions.  And

20  then at the end of it, there's often clarification information,

21  and that's exactly the point of the deposition.  So to

22  basically say, "We're only going to have our side," and if

23  there's a clarifying question, "When you answered this way, did

24  you mean this?" or "Let's talk about this --"

25           THE COURT:  My preference is to have the depositions

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    played at once.

2         MR. CHEFFO:  And that's all we --

3         THE COURT:  But --

4         MR. CHEFFO:  Sorry.

5         THE COURT:  But there is some truth in the fact that

6    sometimes there's only like a little bit of yellow, and it goes

7    for pages on the pink.  So there may be some depositions where

8    it really won't matter.

9         MR. CHEFFO:  And if they point those out to us, we'll

10   look at them with your Honor's guidance.  In other words, if

11   they're just doing it for one thing and the designations don't

12   impact their part of the case, we will consider working with

13   them about that.

14        THE COURT:  Why don't you just confer.  And on other

15   things, I can't do it that way because I'll end up listening to

16   the same depositions twice, and if it's deadening once, it will

17   be deadening twice, because otherwise they won't remember what

18   it is that the clarification goes to.

19        MR. BARRETT:  If it's a clarification, we understand.

20   I'm not raising it for a clarification.

21        THE COURT:  I'm just going to have to go deposition by

22   deposition, and, you know, I don't know how much it's going to

23   streamline anything.  It's 9:00 o'clock.  We have Dr. Perry

24   here.  Is the jury here?

25        THE CLERK:  Yes.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1          THE COURT:  The jury is here.  Let's bring them out.

2          MR. SOBOL:  Your Honor, we have a stipulation the

3     parties would like to read to the jury before --

4          MS. NUSSBAUM:  Have you read it to the jury, your

5     Honor.  We have it on the screen.

6          MR. CHEFFO:  It's regarding this book of names, your

7     Honor, that we conferred on, 973, I think it is.  923, I'm

8     sorry.

9          MS. NUSSBAUM:  We have a stipulation, your Honor, with

10    respect to that, and we thought that if you'd like to read it

11    to the jury --

12         THE COURT:  Why don't you just put it on the screen.

13    Let me see it.  How long is it?

14         MS. NUSSBAUM:  One paragraph for you to read, your

15    Honor.

16         THE COURT:  Oh.

17         MR. SOBOL:  May I approach, your Honor?

18         THE COURT:  Yes, you may.

19         MR. SOBOL:  It's the circled part.

20         THE COURT:  Oh, that's huge.  That's not -- I can't

21    just read this.  Why don't we do this:  Why don't we type this

22    up.

23         MS. NUSSBAUM:  We did.

24         THE COURT:  Oh.

25         MR. SOBOL:  We have it on the computer.

1        THE COURT:  And we'll mark it as an exhibit.  We'll

2  send it in with them, and then we'll put it up on the screen

3  now for them to read.  It's complex.  It's not --

4        MR. SOBOL:  Okay.

5        THE COURT:  Let me see, is it up on the screen?

6        MR. SOBOL:  They're in the process of doing that.

7        (Discussion off the record.)

8        MR. CHEFFO:  Can we later give it, because it's kind

9  of dense, can we later give it printed up nice and neat so they

10  can understand it?

11        THE COURT:  Absolutely.

12        MR. CHEFFO:  Great.

13        THE COURT:  My reading it would be impossible for them

14  to remember.  We'll print it up, we'll mark it as an exhibit,

15  we'll send it in; and if you feel the need to actually clarify

16  it soon, we can just have them read it on the screen.

17        MR. CHEFFO:  I think probably -- I don't know about

18  for Dr. Perry but probably for their witness Dr. Carrejo we'd

19  probably at least want to understand what that is and isn't.

20        THE COURT:  Okay.  So to make it clear, I'm

21  quashing -- what's your person's name?

22        MR. CHEFFO:  Dr. Knapp.

23        THE COURT:  -- Dr. Knapp.  And I'm quashing -- what's

24  the person's name from Denver?

25        MR. CHEFFO:  Dr. Helling.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1          THE COURT:  Yes, who wasn't on anybody's list.  We're

2    not playing the games midway through trial.

3          Now, the next issue is, I'm denying the motion on --

4          MR. SOBOL:  Furberg.

5          THE COURT:  -- Furberg.

6          MR. HOOPER:  He's going to be depression, not suicide,

7    right, if I understood what you said correctly?

8          THE COURT:  Yes, not the fact that it caused suicides,

9    the fact that it -- well, it might be that it causes suicidal

10   ideation.  I don't even know what the things are that it does,

11   but not that people have committed suicide while on it.  That's

12   where we're not getting into it because that's just too

13   complicated.  Whatever the science showed, I have that very

14   learned gentleman from England who used to be a consultant to

15   Pfizer and now was plaintiffs' expert.

16         MR. GREENE:  Dr. Trimble, yes.

17         THE COURT:  Trimble, I mean, what he learned, right?

18   Isn't he the --

19         MR. GREENE:  Well, Dr. Furberg filed a report in this

20   case.  They've had it for over a year, and the opinion is

21   fairly narrow.  He looked at that data that shows suicidal

22   ideation, clinical depression, and suicide, and says it's a

23   safety signal, and if you're going to market the drug -- I'm

24   paraphrasing now, Judge -- if you're going to market the drug,

25   this has got to be disclosed.  They were marketing it for

1    bipolar disorder to treat depression.

2          THE COURT:  Right, but you're not going to go into any

3    that in fact all these people who have committed suicide have

4    brought cases and that sort of thing.

5          MR. GREENE:  No.  I haven't done it yet, but I was

6    going to make up a couple slides which I'll show Mr. Cheffo

7    from the FDA analysis, just one or two line items there.  I'll

8    get them to him -- I think he's testifying Thursday, so I'll

9    get them to him by Wednesday.  I think it might be one slide,

10   it might be two slides.

11         THE COURT:  I don't know.  I'll have to see it, but

12   let's get the jury here.

13         MR. GREENE:  Sure.

14         (Jury enters the courtroom.)

15         THE COURT:  Good morning.  Did anybody speak about the

16   case or see anything in the press?

17         In case I forget, tomorrow we may leave ten or fifteen

18   minutes early.  I have to fly down to Washington for the

19   afternoon for something, so I'm going to jump on a 2:00 o'clock

20   shuttle.  But it just will be maybe fifteen minutes, and I may

21   try and make up for it during the break, so just if I forget to

22   tell you later.

23         Go ahead.

24         MR. GREENE:  Thank you, your Honor.

25

1              THOMAS L. PERRY, M.D.

2  having been previously duly sworn, was examined and testified

3  further as follows:

4  CONTINUED DIRECT EXAMINATION BY MR. GREENE:

5  Q.   Good morning, Dr. Perry.

6  A.   Good morning.

7  Q.   Yesterday when we took our break you had defined a

8  meta-analysis for the jury.

9              THE COURT:  What's your problem?

10             MR. SOBOL:  Did you want to read the stipulation

11  first, your Honor -- it's on the screen -- or we'll deal with

12  it later?

13             THE COURT:  I think we'll deal with it later.  There's

14  a stipulation that the parties are working out about the big

15  telephone book of doctors so that it will explain exactly what

16  it is and what it isn't, and they're going to get it to you,

17  and we'll mark it as an exhibit.

18             MR. SOBOL:  I'm sorry.

19             THE COURT:  All right.  I'm sorry.  Dr. Perry, welcome

20  back.

21             THE WITNESS:  Thank you.  Good morning, your Honor.

22  Q.   Dr. Perry, yesterday just before we broke you had told the

23  jury you conducted a meta-analysis of the 25 different trials

24  that studied Neurontin's treatment for neuropathic pain,

25  correct?

1  A.   That is correct.

2  Q.   A number of those trials were conducted by the defendants

3  in this case, correct?

4  A.   Most, the majority, and the greatest number of patients by

5  far.

6  Q.   The Backonja trial was one of those, correct?

7  A.   Yes.

8  Q.   And the Gorson trial?

9  A.   That's correct.

10 Q.   The Reckless trial and the POPP trial, they were all

11 included in your meta-analysis, correct?

12 A.   Correct.  The Gorson trial was the first trial

13 commissioned by the defendants.

14 Q.   And you defined "meta-analysis" for us as putting all of

15 the trials together and then analyzing them, and I'm

16 paraphrasing now, so correct me if I'm wrong, but analyzing

17 them as one large trial?

18 A.   Well, we're in a courtroom, so by analogy, the truth, the

19 whole truth, and nothing but the truth, that's what

20 meta-analysis is intended to disclose.

21 Q.   Can you tell us what you found as a result of your

22 meta-analysis with regard to Neurontin's treatment for

23 neuropathic pain.

24 A.   Well, I looked first -- I think the jury perhaps

25 understands from previous testimony and I think I said

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    yesterday, the goal, the technique of meta-analysis is to lay

2    out what one is going to look for first, lay out the rules

3    before you start looking.  And you don't change the rules in

4    order to be fair during the meta-analysis.  And it should be a

5    technique that anyone else could replicate and come up with the

6    same results.

7         So we looked at, in terms of the outcomes meaningful in

8    this case, we looked first of all at the mean or the average

9    reduction in the pain score, which was in nine experiments the

10   principal outcome that the investigators chose to look at

11   themselves, and that the sponsor of the trials, which was

12   typically Parke-Davis, had chosen to look at.  And in that

13   case, the pain is rated by the patients on a scale that runs

14   from 0 at the level of nominally or no showing, no pain, to 10

15   at the upper limit.  And there are 11 points on that scale if

16   you include 0.  And on that scale, the average effect of the

17   drug was 0.78 in all of the experiments out of 11.

18   Q.   So that means it reduced pain less than one point on an

19   11-point scale?

20   A.   That is correct, less than one point out of 11.  So it was

21   something which was statistically significant, but I think most

22   doctors and probably most patients would consider clinically

23   meaningless.

24   Q.   When you say "clinically meaningless," what do you mean?

25   A.   Well, you would not, or I, or a member of the jury, or her

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    Honor, the Judge, or anyone else, would not be able to tell the

2    difference of one point on a pain scale.  It's a concept that

3    doesn't have any meaning to human beings.  It may to

4    statisticians, but to say, for example, that "My pain yesterday

5    was 8 out of 10 and it's now a 7" typically is not meaningful

6    to people.

7    Q.   Was there another type of analysis you did in your

8    meta-analysis concerning --

9    A.   Yes, we looked at many outcomes, including the adverse

10   outcomes, but in terms of the efficacy data, the notion of

11   whether the drug works for what it was intended to do.  We

12   looked also at the percentage of people who achieved a

13   reduction of 50 percent or greater on their pain score between

14   the start of the experiment, which is the baseline, and the end

15   of the experiment.

16   Q.   What did you find there?

17   A.   In that one we found that approximately one out of eight

18   people would have achieved or did achieve a 50 percent or

19   greater reduction in their pain score, thanks to gabapentin.

20   Q.   And then how about the remaining seven out of eight in

21   that analysis, can you explain to the jury what they achieved

22   as a result of taking gabapentin in these trials that you

23   analyzed?

24   A.   The remaining seven out of eight people, or the vast

25   majority of the people, did not achieve a 50 percent pain

1  score.  Some of them may have had more pain, some of them the

2  same pain, some of them somewhat less pain, but not as much as

3  a 50 percent reduction.  And there were fewer experiments that

4  set that out as one of the variables or experimental outcomes

5  that they set out to study, so we were able to use somewhat

6  less than nine.  I have to look at my binder to remind myself

7  how many.

8  Q.  And did you conduct a third analysis that looked at the

9  efficacy of Neurontin for treating neuropathic pain?

10  A.   Yes.  The third efficacy analysis is those patients who

11  said that on a so-called Patient Global Impression of Change,

12  PGIC, that they felt moderately or much improve.  On this

13  scale, a patient has no rating at the start because they start

14  at wherever they were when they went to the doctor or were

15  enrolled in the experiment.  At the end of the experiment

16  they're asked to say, at typically 1, they are much worse; 4,

17  they are the same; 7, they are much better; and there are

18  gradations in between, 7, 6, 5, 4, 3, 2, 1.  On that one, one

19  out of six people would have said at the end that they were

20  moderately or much improved, and the remaining five out of six

21  would have said, "No, I'm not moderately or much improved.  I'm

22  something less than that," anywhere from minimally improved to

23  much worse as the effect of gabapentin.

24  Q.  And those are the three analyses you did of all these

25  trials in your meta-analysis that looked at whether Neurontin

1   was effective or not for treatment of neuropathic pain?

2   A.   Yes.   Now, it's important to understand in the

3   experimental world of a clinical trial takes the best possible

4   chance of showing something, and in the real world the results

5   are always not as good as what comes out in an experiment.   We

6   never -- we never basically for any kind of outcome in medicine

7   see such good results as we do in an experiment because of the

8   way the experiments are designed.   They exclude people who will

9   have problems with the drug, for example.

10  Q.   Based on your analysis, did you reach a conclusion whether

11  Neurontin is effective for treating neuropathic pain?

12  A.   Yes, I did.   I did not consider it effective for treating

13  neuropathic pain.

14  Q.   Now, based on your review of all the documents that were

15  produced in this case, including the research reports of the

16  defendants for the trials they conducted studying Neurontin to

17  treat neuropathic pain, did you compare what the science was,

18  what the defendants knew based on the science, with what they

19  were saying in their marketing materials?

20  A.   Yes, I did.   I was invited to review about three binders,

21  very large binders of marketing materials, and went through

22  those carefully, and it was a very revealing exercise.   I'd

23  never seen anything quite like that before.

24  Q.   That was the second assignment you undertook, to review

25  the marketing materials that were produced in this case and to

1  give an opinion of whether the science supported what was being

2  said in the marketing materials; is that correct?

3  A.   That is correct.

4  Q.   Before we get to that area, there's a question here that I

5  overlooked and I want to ask you.  You've made reference to the

6  Reckless trial.  That was one of the trials you analyzed,

7  correct?

8  A.   Yes.

9  Q.   And that's named after Dr. Reckless, correct?

10 A.   Yes.

11 Q.   And that was one of the defendants' --

12 A.   We hope he's not appropriately named, yes.

13 Q.   That was one of the defendants' trials that studied

14 Neurontin to treat neuropathic pain, correct?

15 A.   That's correct.  That was done in Britain and Ireland, if

16 I recall.

17 Q.   Did that trial look at Neurontin dosages above 1,800

18 milligrams to see if it had any effect?

19 A.   Yes, it did.  It divided the patients into a placebo

20 group, a group receiving 900 milligrams per day, 1,200

21 milligrams per day, and 2,400 milligrams per day.

22 Q.   And the results of that trial were negative, correct?

23 A.   The trial overall showed no effect of the drug on pain.

24 Q.   And specifically addressing the part of the trial that was

25 looking at doses above 1,800 milligrams, will you tell the jury

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    what the result of that study was.

2    A.    There was no difference at the higher dose of 2,400

3    milligrams compared with either of the lower doses or placebo.

4    Incidentally, I think that's the largest of all the trials.

5    There were 404 patients, if I remember correctly, in that

6    trial.  So it was probably singly the single most significant

7    of all the trials in scientific terms.  That trial was not

8    published, as you know.

9              THE COURT:  What year was it again?

10             THE WITNESS:  May I refer to my own binder?

11             THE COURT:  Yes.

12             THE WITNESS:  It was completed, I believe, in 1998.  I

13   can answer that very rapidly by reference to my original report

14   in the appendices, Study No. 6.  It was completed on

15   September 7, 1999, and started on May 29, 1998.  Those are the

16   dates the patients were enrolled.  The reporting was made, a

17   final report of February 7, 2000.  The results were being

18   analyzed from October 26, 1999, on.

19   Q.    Now, Doctor, I've provided you with some marketing

20   materials I want to ask you some questions about.  We've marked

21   as Exhibit 7 the defendants' "Marketing Assessment For

22   Neurontin in Neuropathic Pain and Spacticity."  Do you see that

23   up on the screen?

24   A.    Yes, I do.

25   Q.    This is Exhibit 7.  This is a document you reviewed,

1    correct?

2    A.    Correct.

3    Q.    I'd like to direct your attention to the first page, a

4    cover note signed by Oliver Brandicourt do you see that?

5    A.    Yes, I do.  It's rather difficult to read on my monitor,

6    but I'm quite familiar with it.

7    Q.    It's dated July 31, 1995.  The jury has seen the marketing

8    assessments for migraine and for bipolar.  This is the one for

9    neuropathic pain; is that correct?

10   A.    Yes, it is.

11            MR. GREENE:  This is Exhibit 7, your Honor.  We'd

12   move --

13            (Plaintiff Exhibit 7 received in evidence.)

14            THE COURT:  I'm sorry, go ahead.

15            A JUROR:  Would you explain what spacticity is.  I'm

16   not familiar with the term.

17            THE WITNESS:  Spacticity means a condition in which

18   muscles are hyperactive and jerky and stiff, typically

19   resulting from a spinal cord injury, or also multiple sclerosis

20   would be a common example.  So if you're familiar with a tap on

21   the reflexes that might look like this normally, a spastic

22   person might look like this (Indicating).

23   Q.    So this marketing assessment that you reviewed was both

24   for Neurontin use in neuropathic pain, and spacticity is a

25   different medical condition, correct?

1   A.   Yes.  For example, someone with diabetic peripheral

2   neuropathy, which may or may not be painful, degeneration of

3   the furthest nerves from the brain in your feet typically would

4   not be spastic.  They would be the exact opposite.  They would

5   have reduced reflexes.

6        MR. GREENE:  I think I moved to admit Exhibit 7 at the

7   time that question was being offered, your Honor, but I move to

8   admit again.

9   Q.   I direct your attention to the first page of that and ask

10  if you'd read that second paragraph there to the jury.  It's

11  two sentences.

12  A.   "The results of the recommended exploratory trials in

13  neuropathic pain, if positive, will be publicized in medical

14  congresses and published, but there is no intention to fully

15  develop this indication at this point.  No investment is

16  recommended for spacticity."

17  Q.   And medical congresses, are they considered continuing

18  medical education events?

19  A.   Yes, they typically are.  They're where the first word of

20  an experiment or buzz, depending on how you look at it, is

21  created, and where typically a drug company will have --

22  medical congresses are expensive to put on.  Doctors seldom, if

23  ever, pay the full price of the congress.  There are such cases

24  but very rare.  Typically they're subsidized by pharmaceutical

25  companies which have booths and which have an often dominant

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    presence at the congress.

2    Q.   Let me direct your attention to Page 7 of the document,

3    the overall conclusions and recommendations page.  Do you have

4    that in front of you?

5    A.   I do.  Again I'm going to have to get close to read it.

6    Q.   We're going to blow up that first main paragraph there.

7    Do you see that?

8    A.   Yes, I do.

9    Q.   "Start 'exploratory' trials in neuropathic pain associated

10   with peripheral nerve damage due to diabetes mellitus,

11   trigeminal neuralgia, postherpetic pain, neuropathic facial

12   pain, reflex sympathetic dystrophy in some of the larger pain

13   centers, the Carolina Pain Center and St. Elizabeth's Hospital

14   in Boston, with a clinical grant and drug supply, and

15   disseminate the results through publication and key

16   neurological pain congresses," correct?

17   A.   That's correct.

18   Q.   Dr. Gorson's study was done at St. Elizabeth's Hospital,

19   correct?

20   A.   That's right.  That was the first study of which we know

21   through this case in which gabapentin was studied for

22   peripheral diabetic neuropathy.

23   Q.   And they were going to disseminate the results through

24   publication.  What does that mean, Doctor?

25   A.   Well, publication normally means -- in this sense

1   publication in -- well, I don't know what they meant.

2   Publication to a physician would typically mean publication in

3   a peer-reviewed journal where there is some filter or screen to

4   reassure one that the publication is of quality and real.

5   That's how I would have interpreted this.  What they meant,

6   they may have meant publication through advertising vehicles as

7   well.

8   Q.   And key neurological and pain congresses, those are

9   continuing medical education events?

10  A.   Yes.  I interpreted this reading it myself to mean that if

11  they, in conjunction with the earlier message from

12  Mr. Brandicourt that you just showed me, that if they liked the

13  results of the trials, they would attempt to publish them in

14  medical journals, and if they didn't like them, the implication

15  is obvious.

16  Q.   Let me have Exhibit 19, please.  This has already been

17  introduced into evidence.  Do you have Exhibit 19 before you?

18  A.   Yes, I do.

19  Q.   And this is a letter from Dr. Gorson; is that correct?

20  A.   Yes.

21  Q.   And it's to Phil Magistro at the Parke-Davis

22  Pharmaceutical Company?

23  A.   That's correct.

24  Q.   And the date of this is 8/23/97?

25  A.   I would interpret that as August 23, 1997.

1    Q.   And you've read this document, correct?

2    A.   Yes, I have.

3    Q.   And so certainly by this date, August 23, 1997,

4    Parke-Davis was aware of Dr. Gorson's results?

5             MR. HOOPER:  Objection.  Foundation.

6             THE WITNESS:  I'm sorry?

7             THE COURT:  Well, do you have a documentary basis for

8    knowing that?

9             THE WITNESS:  Yes, I do.  If I may just refer again to

10   my table, to my original report, I can confirm the precise

11   dates of the experiment.

12   Q.   Well, isn't it the very next page?

13   A.   Yes, this is the initial report, August 23, 1997.  This is

14   where Dr. Gorson provided his results to Mr. Magistro at

15   Parke-Davis for the first time.

16   Q.   The Exhibit 19, we just have the cover note up, but

17   attached to it is the results of the study, correct?

18   A.   Yes.

19   Q.   They're on our screen now?

20   A.   Yes.

21   Q.   They're part of Exhibit 19?  For the record, they're part

22   of Exhibit 19?

23   A.   Yes.  They're part of the same document.  If you say it's

24   Exhibit 19, I accept that.

25   Q.   As of August, 1997, Parke-Davis was aware of the negative

1    results of Dr. Gorson's study, correct?

2    A.    That is correct.

3    Q.    I'd like to show you Exhibit 40.  Do you have that up on

4    the screen?  You've reviewed this document as part of your

5    review?

6    A.    Yes.  Yes, I did.

7    Q.    This document was supported by a grant from Parke-Davis?

8    A.    Yes.  It's not only supported.  That's all of the support

9    for it.  That's where it came from.

10   Q.    It's dated November, 1997, correct?

11   A.    Correct.

12   Q.    Could you tell the jury, this is entitled "A Supplement to

13   IM," Internal Medicine.  Could you explain to the jury what a

14   supplement is?

15   A.    Well, a supplement in a legitimate medical journal is --

16   there are not very many of them left anymore.  They were a

17   common vehicle to avoid peer review, to avoid expert

18   independent review by people who might have disagreed with the

19   conclusions of scientific papers.  Typically, for example, a

20   company might sponsor a meeting in a nice place, and the

21   proceedings of the meeting would then be published as a

22   supplement to a journal like, let us say, Neurology, a

23   prominent neurology journal.  And by publishing in a

24   supplement, one can get away with things that one would not get

25   into the regular numbers of the journal, which are subjected to

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    close scrutiny.  But this is even different because the

2    journal, if it existed, is not a known journal, Internal

3    Medicine.  It sounds like one, but it's not something I had

4    ever heard of before, and a supplement in this is an

5    advertising vehicle.  It's as simple as that.

6    Q.   Thank you.  I'd like to direct your attention to just a

7    couple excerpts in this, and then I'm going to ask you a

8    question about it, so if we can move to the next page, 13 in

9    the journal, highlight the box there.  Could you read that to

10   the jury.

11   A.   "Gabapentin can be used --" I'm reading, emphasize this,

12   I'm reading what you asked me to.  This is not my opinion.

13   "Gabapentin can be used as a first-choice anticonvulsant, added

14   as a second agent, or reserved for cases in which carbamazepine

15   and phenytoin have been unsuccessful."

16   Q.   The next page, I'd like to point out a couple of excerpts

17   for you.  Under "Gabapentin," just read the first sentence of

18   that paragraph.

19   A.   "In a recent study, a third antiepileptic, gabapentin, has

20   reportedly reduced cold and tactile hyperesthesia in animals,

21   though how it accomplishes this is unclear."  A reference is

22   given.  "The drug may also have an anxiolytic effect, which may

23   further aid in pain control."

24   Q.   And if I could direct your attention to --

25              THE COURT:  Well, you know, we don't know those terms,

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   so could you just go back and explain.  What did that just say?

2            MR. GREENE:  Thank you.

3            THE COURT:  What's hyperesthesia?

4            THE WITNESS:  In my field it says nothing, but what

5   it's saying is that hyperesthesia would be an enhanced

6   sensitivity to, in this case, cold or a stimulus.  This may be

7   appear rat tail, the tail of a live rat touched onto a hot

8   plate or put into some very cold water.  And the reference is

9   likely to an experiment in which if gabapentin was given in a

10  sufficient dose to a rat, the rat may not have been bothered as

11  much when its tail was put in cold water.  That can be an

12  indication, for example, that it was asleep or doped out.

13  Alcohol might have a similar effect.  And so it's

14  meaningless --

15            THE COURT:  How about the drug may also have an

16  anxio- --

17            THE WITNESS:  Anxiolytic means it would reduce

18  anxiety.  It would tend to make you relaxed and sleepy, or

19  relaxed or sleepy, or both.

20  Q.   And it may be a further aid in pain control, correct?

21  A.   I'm sorry, where is it?  Oh, yes, "which may further aid

22  in --"  They're making the argument that if you're relaxed, you

23  may not feel as much pain.

24  Q.   And in the box, if we could blow up the middle cells there

25  in that box next to "Gabapentin."

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   A.    I can see it from here.

2   Q.    Okay, fine, recommending a dosage of 1,800 to 3,600

3   milligrams a day three times a day?

4   A.    It's a Latin expression.  T.i.d. means three times per

5   day, so if it were 1,800, it would be 600 milligrams three

6   times a day, and at 3,600 it would be 1,200 milligrams taken

7   three times a day.

8   Q.    Then the final thing I want to direct your attention to is

9   the last paragraph, the last sentence above the references, if

10  we could blow that up.  And that says, "Gabapentin can be used

11  as a first-choice anticonvulsant, added as a second agent, or

12  reserved for cases in which carbamazepine and phenytoin have

13  been unsuccessful.  It also requires multiple daily doses,"

14  right?

15  A.    Correct.

16  Q.    And this is in a journal, Managing the Pain of Diabetic

17  Neuropathy, correct?

18  A.    Correct.  Well, it's not a journal.  It's a supplement,

19  which was an advertising vehicle, in my opinion.

20  Q.    Did the science that the defendants have at the time that

21  this supplement was prepared in November, 1997, support the

22  statements they were making concerning pain?

23  A.    Absolutely not, absolutely not.

24  Q.    And why not?

25  A.    It pointed out exactly the opposite.  The experiment they

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   had at this -- remind me of the date of this one?

2   Q.   November, 1997.

3   A.   No.  At that time they had the Gorson trial, which had

4   shown that gabapentin at 900 milligrams per day did not have an

5   effect on pain in diabetic peripheral neuropathy.  And they had

6   no other experimental evidence.  They had trials in the

7   planning phase or already under way but no evidence in their

8   hand, so this was not supported in any way by evidence.

9           MR. GREENE:  I move to admit Exhibit 40, your Honor.

10          THE COURT:  Yes.

11          (Plaintiff Exhibit 40 received in evidence.)

12  Q.   I'd like to direct your attention to Exhibit 110 which is

13  in evidence.  This is the Cleveland Clinic Journal of Medicine

14  from July 24, 1998, again for the record, Exhibit 10, and I'd

15  like to direct your attention to the section by an Edward

16  Covington that concerns neuropathic pain and detoxification.

17  You've reviewed this material, correct?

18  A.   Yes, I did.

19  Q.   Again this is a supplement; is that right?

20  A.   It's a supplement.  In this case it's a genuine medical

21  journal and one with considerable prestige, I think, in the

22  United States, but this is a supplement which is, if I remember

23  correctly, it has a very subtle indication that it was

24  sponsored by the company.  One had to look quite closely to see

25  that.

1   Q.   Well, if you turn to Page 4 of it, it says the publication

2   and the proceedings have been made possible through an

3   educational grant from Parke-Davis, Division of Warner-Lambert,

4   correct?

5   A.   Yes, and that's -- I think the jury can see that most of

6   that page is blank, and depending where it was positioned in

7   the original document, it might have been surprisingly

8   difficult to spot that.  An experienced doctor used to looking

9   with a skeptical eye would have found it.

10  Q.   Again directing your attention to the article written by

11  Dr. Covington, if you turn to the fourth page of that article,

12  under the heading "Gabapentin," there's some references to

13  gabapentin there.  Can we blow up the first sentence.

14      It reads, "Despite few controlled trials on the efficacy

15  of gabapentin in human pain management, this drug has become

16  the anticonvulsant of choice among many pain specialists,"

17  correct?

18  A.   That's what it says.

19  Q.   If drop down to the second paragraph, third sentence,

20  "Gabapentin's efficacy was reported as well by Hunter, et al,

21  who compared lamotrigine, felbamate, and gabapentin in rat

22  models of acute and neuropathic pain (chronic constriction

23  injury and spinal nerve ligation)."

24      Dr. Gorson's double-blind randomized controlled trial was

25  known by this date; is that correct?

1    A.    That's correct.

2    Q.    This was July 24, 1998?

3    A.    Correct.

4    Q.    Is there any reference in this article to Dr. Gorson's

5    study?

6    A.    I don't believe so, no.

7    Q.    Will you turn to the next page.  The top of the page

8    there, the first main paragraph, if we could highlight that.

9          THE COURT:  At that point, was Reckless out?

10         THE WITNESS:  Reckless was being done.  I just told

11   you the dates, but I have to refer --

12         THE COURT:  Reckless you said in 1998, and this came

13   out, Cleveland Clinic, in 7/24/98, so I'm just trying to

14   understand the timing of it.

15         MR. GREENE:  Gorson, August, 1997, out of

16   St. Elizabeth's, negative.  This article is July 24, 1998.

17         THE COURT:  I'm just trying to understand when

18   Reckless came out.  Was it after this?

19         MR. GREENE:  Yes, it was.

20         THE COURT:  Yes, all right.

21         THE WITNESS:  Yes, it had been planned and it was

22   under way, but the results were not yet available at that time.

23   Q.    So this paragraph that I've directed your attention to,

24   first sentence, "There are several reports of gabapentin's

25   efficacy in mixed neuropathic pain.  In addition, Mellick and

1    Mellick reported six cases of intractable complex regional pain

2    syndrome that responded well to gabapentin therapy."  And then,

3    finally, "In a double-blind study, gabapentin effectively

4    alleviated pain from diabetic neuropathy," with a citation.

5         There's no reference in this paragraph to Dr. Gorson, is

6    there?

7    A.   You're going to have to remind me what No. 44 refers to,

8    which reference that is.

9    Q.   Well, we can turn to it.  We can highlight it.  That's the

10   Backonja study.

11   A.   Yes.  That shows you that whoever wrote this was aware of

12   the results of the Backonja study even before it had been

13   published, but they did not choose to cite the results of

14   Dr. Gorson's study, which had been completed a year earlier.

15        MR. HOOPER:  Objection.  Foundation, your Honor.  Even

16   though it says "in press," that doesn't follow.

17        THE COURT:  Overruled.

18   Q.   You made two points here, and I want to bring them to the

19   attention of the jury.  If we go back to the text of the

20   article, the sentence reads, "In a double-blind study,

21   gabapentin effectively alleviated pain from diabetic

22   neuropathy," and the Footnote 44 cited the Backonja study.

23   There's no reference to the double-blind randomized controlled

24   trial of Gorson that showed it was ineffective, correct?

25   That's the first question I have.

Page 42

1    A.   That's correct, and a reader of this article would not

2    have been in a position to look for himself or herself because

3    a paper referred to as "in press" is not available to anybody.

4    It's only available to the select few who have seen it

5    privately.

6    Q.   You're getting ahead of me.  That's my second point.

7    A.   I'm sorry.

8    Q.   The footnote now, if we can go back to it, refers to

9    Backonja.  It doesn't mention Gorson, but now it says the "JAMA

10   1998, in press."  We're going to come to that in a moment, but

11   Backonja appeared in the December, 1998 issue of JAMA, correct?

12   A.   Correct.  I think you've heard in this case from

13   Professor Dickersin as a world authority on how doctors can be

14   controlled through biases in publication, and this is an

15   example of not only citation bias but citation distortion,

16   really, that the failure to mention the Gorson trial which was

17   negative left any doctor who was exposed to this information in

18   a sense deliberately misled.

19   Q.   All right, so that's --

20   A.   It would have misled me.

21   Q.   That was July, 1998.

22   A.   Yes.

23   Q.   Now I want to move to October, 1998, to Exhibit 102, if we

24   could bring that up.  This has been introduced into evidence,

25   and this is a memo from Parke-Davis employee Tammy Martin to

1   the CNS marketing managers.  You reviewed this, correct?

2   A.   Yes, I did.

3   Q.   If we could just blow up the subject line there.  Thank

4   you.  Again, this is October 1, 1998.  The subject is "JAMA

5   Article, Conference Call Minutes," and copies to John Knoop and

6   Allen Crook.  And we'll have some deposition testimony from

7   John Knoop later in the trial, and he was one of the marketing

8   managers for the Neurontin drug.

9        I want to drop down to the fourth bullet item, and this

10  sets forth what the PR campaign was going to be.  Let me read

11  this sentence to you, Doctor.  "The CBUs --" and you know that

12  stands for customer business units; is that correct?

13  A.   Yes.

14  Q.   "-- will band together for the CME teleconferences and

15  dinner meetings.  The plans will include a core faculty content

16  developed meeting in November and a faculty training meeting

17  for December.  The roll-out will begin first quarter of '99."

18       This is referring to the JAMA article and the publicity

19  attendant with that?

20  A.   That's correct.  I think it was ultimately published on

21  December 7, or thereabouts, 1998.

22  Q.   And then the next paragraph refers to CME teleconferences

23  and dinners:  "Each CBU needs to submit five potential thought

24  leaders for the core faculty from the specialties of neurology

25  (pain management) anesthesiology, endocrinology, and

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    immunology.  This list needs to be submitted to Tammy Martin

2    via e-mail by October 9," correct?

3    A.    Correct.

4    Q.    Let me direct your attention to now going into the actual

5    document, the strategy page, if we could bring that up.

6          Now, you've reviewed this document, correct?

7    A.    Yes, I did, in detail.

8    Q.    Can you read that first sentence to the jury.

9    A.    "The approach to disseminate this new information will

10   come from three areas; central marketing, CBUs, and public

11   relations."

12   Q.    If you could highlight the next sentence.

13   A.    You want me to read that?

14   Q.    Sure, go ahead.  Thank you.

15   A.    "Central marketing will focus efforts on the mailing of

16   articles to all key specialists, coordinate development of the

17   core slide kit, and direct the PR efforts," PR as in public

18   relations.

19   Q.    And if we drop down to the next-to-the-last sentence under

20   "Strategy," can you highlight that.

21   A.    "The PR campaign will seek to maximize the exposure of the

22   clinical data to both the professional audience and consumers."

23   Q.    And, again, you've reviewed this document, but the

24   clinical data they're referring to is the Backonja trial for

25   DPN that was appearing --

1        THE COURT:  DPN is?

2   Q.   Diabetic peripheral neuropathy, Dr. Backonja's study that

3   we talked about yesterday?

4   A.   Yes, that is correct.

5   Q.   That was scheduled to come out in the Journal of the

6   American Medical Association in December of 1998, correct?

7   A.   Yes, and they were also marketing the other robe study in

8   PHN.

9   Q.   PHN, postherpetic neuralgia?

10  A.   Published in the same edition of the Journal of the

11  American Medical Association.

12  Q.   So this document, and the jury will have it, Exhibit 102,

13  sets out what the PR campaign was going to be to roll out word

14  that Neurontin was effective for treating neuropathic pain; is

15  that right?

16       MR. HOOPER:  Objection, leading.

17       THE COURT:  Sustained.

18  Q.   What does this document set forth, if you could summarize

19  it in a sentence or two?

20  A.   It's an exceptionally ambitious, aggressive marketing

21  campaign for Neurontin, for -- I interpret it from reading it

22  carefully and looking at the associated slide sets, not only to

23  market for painful diabetic peripheral neuropathy and

24  postherpetic neuralgia but for, by implication, for almost any

25  kind of pain.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

Page 46

1    Q.   Doctor, I have just two more documents I want to move on

2    to, but I want to highlight a few pages in here and do it

3    quickly.  Again, the jury will have this, but if we could

4    quickly move to the next page under "Central Marketing

5    Activities," does it show that there was going to be a slide

6    kit development for use by speakers for DPN -- that's diabetic

7    peripheral neuropathy -- and PHN, postherpetic neuralgia,

8    clinical trials, 500 slide kits for $50,000?

9    A.   Yes, it does.  This is -- I don't know if the jury would

10   understand this, but this implies that up to 500 different

11   doctors would receive these kits, would ultimately use them to

12   give lectures in which the intent is to make it look as though

13   the doctor knows what he or she is talking about, but in

14   reality the content, it was coming directly from this marketing

15   firm.

16   Q.   Sticking with the same page, if we move to the No. 2

17   bullet item, "JAMA Reprints."  They were going to order 130,000

18   copies for sales reps to hand out?

19   A.   Yes.  That would be enough to cover most of the --

20   probably most or a large percentage of the physicians in the

21   United States who would be likely to prescribe this drug.

22   Q.   Can we move to Page 5.  This is the Neurontin/JAMA

23   Publicity Campaign Recommendations."  The objective in

24   Paragraph 2 is to establish Neurontin as the treatment of

25   choice for postherpetic neuralgia and diabetic neuropathy,

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    correct?

2    A.   Yes.  That's what it says.

3    Q.   And I just want to drop down to "Strategies."  They were

4    going to leverage the study publications in JAMA to generate

5    interest in and coverage of gabapentin's efficacy in chronic

6    pain management; is that correct?

7    A.   That's right, and it fits with the one you skipped over

8    rapidly there which says they wanted to expand the patient

9    pool, not just the people with diabetic peripheral neuropathy

10   but potentially anyone.  That's what "expand the patient pool"

11   means.

12   Q.   All right.  So, just quickly, let's go to the next page,

13   "Tactics --"

14           THE COURT:  Yes, how much longer do you think you

15   have?

16           MR. GREENE:  Ten minutes.

17   Q.   Yes, I think I might -- let me just ask you three or four

18   quick questions.  You had a video news release entitled

19   "Medical Breakthrough in Chronic Pain Management," correct?

20           MR. HOOPER:  Objection, leading.

21           THE COURT:  Overruled.

22   A.   I'm sorry, if I'm supposed to see that, I can't.

23   Q.   No, I'm just asking.  Do you recall that they had a

24   video --

25   A.   Yes.  Yes, they did.

Page 48

1    Q.    Do you recall they had an in-flight VNR dissemination that

2    they were going to play to captive audiences or airplanes?

3    A.    That one particularly struck me, yes.

4    Q.    Do you recall they were going to be on the Today Show, the

5    Good Morning America show, CBS Evening News with Dan Rather,

6    and they were going to announce significant new studies of

7    gabapentin published in JAMA?

8            MR. HOOPER:  Objection, leading.

9    A.    Yes.  It was an absolute saturation plan.

10   Q.    Well, they use that word "saturation" --

11           THE COURT:  It's got to be rooted in the document.  Is

12   this all in the document?

13           MR. GREENE:  Page 9 of the exhibit, your Honor.

14   Q.    On Page 9 of the exhibit, they have a paragraph

15   "Controlled Media:  A packaged radio news story made available

16   to more than 300 radio stations around the country has the

17   potential to generate more than seven million listener

18   impressions."

19           Isn't that what you reviewed as part of the PR campaign?

20   A.    Yes, yes.  It's very, very extensive.

21   Q.    Page 11, "A 20-city Local Market Publicity Tour:  The

22   agency will work with Cline, Davis & Mann and Parke-Davis to

23   identify key regional centers and physicians to explain how

24   gabapentin can effectively treat postherpetic neuralgia and

25   diabetic neuropathy through a series of local television and

1   print interviews."

2        Is that in the document you reviewed?

3   A.   Correct.

4   Q.   They were going to have the Web placement of material on

5   third-party websites, correct?

6   A.   Basically you wouldn't be able to escape the message.

7   Q.   And they had the American Pain Society website, the

8   American Chronic Pain Society website, Diabetes Research

9   Institute Foundation website, the American Academy of Pain

10  Management website, and many, many more on Page 12 of the

11  exhibit, correct, Doctor?

12  A.   That's correct.

13        THE COURT:  What is the date --

14  A.   And generally some money traded hands, at least in the

15  case of the Dannemiller Memorial Education Foundation.  I had

16  to look that up to figure out what it is, but what Dannemiller

17  did to promote the drug was done in return for money from

18  Parke-Davis.

19        THE COURT:  So, again, what was the date of this

20  document?

21        MR. GREENE:  The date of the document is October 1,

22  1998.

23  Q.   So this was a plan that was being put in effect before

24  JAMA was published?

25  A.   Yes.  The company knew when the publication date was

1  because it was the company statisticians who probably wrote the

2  paper.  I don't actually know who wrote the paper, but --

3          MR. HOOPER:  Objection, your Honor.

4          THE COURT:  Sustained.

5  Q.   Moving to Exhibit 71, this is in evidence.  This document,

6  again Exhibit 71, is entitled "Neurontin Program."  You've

7  reviewed this, Doctor, correct?

8  A.   Yes, I have.

9  Q.   And this is by Makovsky & Company?

10 A.   That's right.

11 Q.   And did this document report back to Warner-Lambert/

12 Parke-Davis the final media results report, which appears on

13 Page 1 of the document?

14 A.   Yes.  Yes, it did.

15 Q.   And they report on market by market the video news release

16 media results, correct?

17 A.   Correct.

18 Q.   They report on the World Wide Web edition where it

19 appeared?

20 A.   You're showing me now the video news release results which

21 covered the whole country.  You see there New York,

22 Los Angeles, Chicago, Philadelphia, San Francisco, Boston, for

23 example.

24 Q.   Let me move on.  The jury will have this Exhibit 71.  Let

25 me move on to Exhibit 80.

1          MR. GREEN:  I move to admit it.

2          (Plaintiff Exhibit 80 received in evidence.)

3     Q.   You've reviewed this document entitled "Progress in

4     Neurology, Volume 1, Number 1," dated March, 1999, and

5     sponsored by an educational grant from Parke-Davis.  Do you

6     have that up on the screen?

7     A.   Yes, I do.  This is another journal that a lay person

8     might think is a journal, but it's not.

9     Q.   Doctor, you reviewed this, and on Page 5 there was a

10    reference to gabapentin, citing the Backonja study in 1998 and

11    failing to cite Dr. Gorson's negative study; is that correct?

12    A.   Yes.  I think you're going to show it to me in a readable

13    form in a minute.

14    Q.   Page 5.

15    A.   Yes, I think it's fairly obvious there because rather than

16    using numbers, they use the name of the references.  They do

17    not cite Gordon, whereas they do cite Backonja and Rowbotham.

18    Q.   Again, that's Exhibit 80.  The jury will have that.  I'd

19    like to move to 82 entitled "Management of Neuropathic Pain

20    Syndromes."  This is my last exhibit.  Do you have that in

21    front of you?

22    A.   Yes, I do.

23    Q.   And this came out in 2000, the year 2000, according to

24    Page 2 of the document, and it was made possible through an

25    unrestricted educational grant from Parke-Davis, correct?

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    A.    Correct.

2    Q.    And if you direct your attention to Page 11 of that

3    document, the paragraph under "Anticonvulsants," the second

4    paragraph reads, "Of the new anticonvulsants, gabapentin was

5    shown to be effective in the treatment of DN --" is that

6    diabetic neuropathy?

7    A.    Yes.

8    Q.    "-- in a double-blind, placebo-controlled eight-week

9    dose-titration trial using doses from 900 to 3,600 milligrams."

10   That's the Backonja study, isn't it?

11   A.    Correct.

12   Q.    There's no mention of Gorson here, is there?

13   A.    No.

14   Q.    And no mention of Dr. Reckless' study either?

15   A.    No, nor do they mention the problems that Dr. Jewell,

16   Professor Jewell identified for you in testimony yesterday,

17   that the Backonja study almost certainly exaggerated benefit.

18   Q.    Doctor, based on your review of the marketing materials,

19   some of the materials which we've reviewed now with the jury,

20   did you reach an opinion concerning whether the marketing was

21   supported by the scientific evidence that the defendants

22   possessed?

23   A.    I did reach an opinion.

24   Q.    And what is your opinion?

25   A.    I don't think that the marketing was supported by the

1    science.

2           MR. GREENE:  That's all I have.

3    CROSS-EXAMINATION BY MR. HOOPER:

4    Q.   Good morning, Doctor.  You told us about the Gorson and

5    Backonja studies, correct --

6    A.   Yes.

7    Q.   -- just a moment ago?  And you referred to various

8    publications where Backonja was cited, Gorson wasn't cited in

9    the particular publication; is that right?

10   A.   Correct.

11   Q.   Were you sitting in this courtroom yesterday, sir?

12   A.   Yes, I was.

13   Q.   You were?  Did you see on the screen the Kaiser document

14   that we showed that showed Kaiser in 1999 citing both Gorson

15   and Backonja and expanding the use of Neurontin?  Did you see

16   that, sir?

17   A.   I think I saw it.  I can't recall it very precisely, but I

18   believe I saw it, yes.

19   Q.   So whatever you may mean by --

20   A.   That would be the first time I've seen it, so I'm not

21   familiar with it.

22          THE COURT:  Well, why don't you put it up there?  Do

23   you have it?

24          MR. HOOPER:  I don't have it with me, your Honor.

25   A.   I've never seen it before.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   Q.   You hadn't seen it before yesterday?

2   A.   No.

3   Q.   But you did see it yesterday, didn't you, on the screen?

4   A.   I saw it from back there.  I heard it discussed briefly,

5   but I'm afraid I don't remember it very well.

6   Q.   And you mentioned a study by Dr. Reckless?

7   A.   Yes.

8   Q.   You contend that wasn't published?

9   A.   That was published much later in some limited form, but

10  the only real way to understand that study is to look at the

11  Pfizer -- at the Parke-Davis or Warner-Lambert complete study

12  reports.

13  Q.   You were shown the Parke-Davis study report?

14  A.   Yes.

15  Q.   Were you shown anything else about the study from the

16  Parke-Davis documents?

17  A.   You'd have to ask me specifically.  I'm not sure what you

18  mean by the question.

19  Q.   Exhibit 974, please.

20       MR. HOOPER:  Your Honor, I move to admit Exhibit 974.

21       (Defendant Exhibit 974 received in evidence.)

22  Q.   A memorandum to Leslie Tive from Dr. Beate Roder,

23  R-o-d-e-r, dated March 31, 2003.

24  A.   This is the same thing that's on the screen?

25  Q.   Yes, it is, Doctor.  Kaiser's lawyers showed you a large

1   volume of documents when they hired you to work in this case,

2   correct?

3   A.   Ah, yes.

4   Q.   Did they show you this one?

5        (Witness examining document.)

6   A.   I can't tell you because -- well, a lot of documents were

7   sent to me in compact disk format, and some were sent to me in

8   print.  The print documents, which were mostly marketing

9   related or they were labeled marketing documents, it was

10  convenient to read through page by page and make sure I at

11  least opened every page and looked at it, and read those in

12  detail that seemed relevant.  The CD documents, I believe I

13  looked at everything but not necessarily at every page.  When

14  there were 3,500 pages in a PDF, I can't claim to have looked

15  at every single page, but I can tell you this one doesn't look

16  familiar to me.

17  Q.   Sir, did you read this document before you came to court

18  to testify about the Reckless study and its publication

19  history?

20  A.   I don't think so.  I just told you I don't think it looks

21  familiar to me, but I'm only seeing the first couple of lines

22  of it on the screen.

23  Q.   You recognize on the subject line it refers to publication

24  of 945-224 results?  Do you see that?

25  A.   I see that where you've highlighted that, yes.

1   Q.   And you know that that refers to the Reckless study, do

2   you not, Study 224?

3   A.   Reckless, yes, correct.

4   Q.   Please turn to Page 00285 of the document.   20885, I'm

5   sorry.

6   A.   Oh, you want me to follow here?

7   Q.   Yes, 20885.

8   A.   Those are the numbers at the bottom right?   That's a

9   letter entitled "Dear Professor Heller"?   Is that what you're

10  referring to?

11  Q.   Do you see that this page is a letter --

12  A.   Yes.

13  Q.   -- from Dr. Roder of Pfizer, one of Dr. Reckless'

14  co-investigators, addressed to Professor Simon Heller of the

15  Journal of Diabetic Medicine?

16  A.   I can see that, yes.

17  Q.   You see it's dated Valentine's Day, 2002?

18  A.   Correct.

19  Q.   Read the first sentence of the letter please with me:

20  "Enclosed are four copies of our manuscript, 'Gabapentin in

21  Painful Diabetic Neuropathy:   A Randomized Double-Blind

22  Placebo-Controlled Study,' for submission to Diabetic Medicine

23  for consideration for publication."

24       Did I read that correctly?

25  A.   Yes, you did.

1   Q.   You were never shown this document again, right, sir?

2   A.   I don't think I've seen that one, no.

3   Q.   Would you now turn to Page 20881, about four pages earlier

4   in the document.

5   A.   That's what you're showing on the screen as well?

6   Q.   Yes, sir, it is.  Sir, do you see there an e-mail from

7   Dr. Simon Heller, the editor of Diabetic Medicine, to Pfizer's

8   Dr. Roder, Dr. Reckless' co-investigator, dated Monday, 13 May

9   2002?

10  A.   It looks like it.  The salutation is in German, which I

11  don't speak, but if that's what you say the German means, I

12  accept that.

13  Q.   Pardon me, sir, but doesn't it say "Dear Dr. Roder" in the

14  English language?

15  A.   Yes, it does.

16  Q.   All right.  And would you look at the first line of

17  text --

18  A.   It's the "von/und" that I'm not quite as sure about, but I

19  take it it means "from/to."

20  Q.   Would you look at the first line of text addressed to

21  Dr. Roder:  "Thank you for submitting your paper in to

22  Diabetic Medicine.  I regret that it has not been accepted for

23  publication as it stands."  Do you see that?

24  A.   Yes, I do.

25  Q.   You weren't shown this e-mail either, were you, sir?

Page 58

1    A.    I don't think so, no.

2    Q.    Would you now please turn to Page 20844 of the document.

3    Are you there, sir?

4    A.    Yes.   That appears to be the same as what you have on the

5    screen.

6    Q.    Do you see there a letter dated October 21, 2002, from

7    Dr. Roder of Pfizer, Dr. Reckless' co-investigator, addressed

8    to Dr. Waldhausl at the office of a second journal, this one

9    called Diabetologia?

10   A.    Yes.

11   Q.    And looking at the first sentence, you see that this is a

12   letter just like the one we just looked at submitting the

13   manuscript for consideration for publication?   Do you see that?

14   A.    Yes, I see that.

15   Q.    And now would you please turn to Page --

16         THE COURT:   So this manuscript is what?   This is

17   Reckless?

18         MR. HOOPER:   This is Reckless, yes, your Honor.

19         THE COURT:   So Reckless was finished in what year,

20   '99?

21         MR. HOOPER:   I believe it's '99.

22         THE COURT:   All right, so this is 2002.   And all these

23   documents relate to Reckless trying to get it into publication?

24         MR. HOOPER:   Yes.   Exactly, your Honor, precisely.

25         THE WITNESS:   Well, you're not -- does this

Page 59

1    document --

2            THE COURT:  Wait.  What were you saying?

3    Q.   Page 20841, sir, three pages earlier than the one we were

4    just on.  Do you see there a letter dated November 14, 2002,

5    from Dr. Waldhausl at the second journal back to Dr. Roder?  Do

6    you see that?

7    A.   Yes, I do.

8    Q.   And the first sentence says, "Your above-referenced

9    manuscript has been read by two experts in the field, but I

10   regret to inform you that we are not able to offer publication

11   in Diabetologia," correct?

12   A.   Correct, yes.  Do you know what the referee said, by the

13   way?  Is that part of this document?

14   Q.   Sir, you're answering questions; I get to ask them.

15   A.   Yes, I'm just interested because I've never seen it

16   before.  In order to understand the editorial process for a

17   journal accurately, one would need to know, what did the

18   referee say?  For example, there are other journal papers I

19   found like BMC Neurology which have a policy of disclosing the

20   peer reviewer's review and the name of the reviewer.  There's

21   one, for example, in which Dr. Backonja failed to disclose his

22   conflicts of interest, but --

23           MR. HOOPER:  Your Honor, objection.  I move to strike

24   as nonresponsive.

25           THE COURT:  Yes, you need to answer his questions, so

1  I'll strike that.  And start again, what's the question?  You

2  know, we need to just finish this.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  It's his turn to sort of focus the

5  inquiry.  What's the question?

6  Q.   The Reckless manuscript has now been submitted and

7  rejected twice to two separate journals, correct?

8  A.   That's what it looks like, and also I see here in this

9  document --

10         THE COURT:  No, no, this is where we can't go.  What's

11 the next one?

12 Q.   Exhibit 1660, please.

13         THE COURT:  We're going to try and finish you before

14 the break.

15 Q.   You're now looking at a copy on your screen of

16 Exhibit 1660.  Do you want a hard copy?

17 A.   I can see it fine on the screen, but if you have a hard

18 copy, either way.

19 Q.   This is a copy of an article by Dr. Backonja and Dr. Bob

20 Glanzman of Pfizer published in January, 2003, in the Journal

21 of Clinical Therapeutics.  Do you see that?

22 A.   Yes.

23 Q.   And if you look down at the very bottom of the page, the

24 small print in the lower left-hand corner, you'll see that this

25 article was accepted for publication October 14, 2002, correct?

1   The lower left-hand corner of the first page.

2   A.   Yes, that's very intriguing, sir, because that's earlier

3   than the date of submission to the journal Diabetologia.

4   That's proof that the company was trying to publish in two

5   places at once, which is not ethical, if this is the same study

6   that I've seen previously that includes part of the results of

7   the Reckless trial.  This is a beautiful example of what

8   Dr. Dickersin has gotten out in her New England Journal of

9   Medicine article about publication bias that gives people the

10  impression that there's more research than there really is by

11  citing things over and over and over again.  And they're sort

12  of caught in the act here as having had it accepted already in

13  October 14, 2002, when they then submit the paper, the real

14  paper again on October 21, 2002.  It's very intriguing.

15  Q.   I just want to make sure the jury understands what you're

16  saying, Doctor.  More publication in two journals about a study

17  is a bad thing; is that it?

18  A.   It's a bad thing if it makes it look like they are

19  different studies, and that's the problem perpetually in the

20  last thirty to forty years.  I am not supposed to submit one

21  thing to your journal and a different to a journal edited by

22  her Honor because I'm attempting to get credit for the same

23  work twice, and it makes people think that more work has been

24  done than really had been done.  That's why it's a bad thing.

25  It's called multiple publication, and you're not supposed to do

Page 62

1    it, and you can get fined or disciplined by your university if

2    you're caught doing it.

3    Q.   Please turn to Page 90 of Dr. Backonja's article, and

4    we'll see if anyone would have trouble identifying this as the

5    Reckless study.  Do you see the first line of that study talks

6    about --

7    A.   Yes, I do.

8    Q.   -- Study 945-224, and on the very first line it says "The

9    unpublished clinical trial of gabapentin in painful diabetic

10   neuropathy by Reckless"?  Do you see that, sir?

11   A.   Yes, I do, and I'm just comparing the numbers that are

12   reported there with the real numbers in the experiment, which

13   were --

14   Q.   Do you see in the first sentence of the last paragraph on

15   that page, sir, that the description of the Reckless study says

16   there were no differences between any treatment group and the

17   placebo group?

18           (Witness examining document.)

19   Q.   Do you see that language, sir?

20   A.   Yes, I do.

21   Q.   Nobody would mistake that for a positive study, would

22   they?

23   A.   Well, that's part of the problem again --

24           THE COURT:  You know what?  We've got to finish this.

25   Would anyone mistake it?

1       THE WITNESS:  No, they wouldn't mistake it because the

2  sentence begins, "Mean pain scores decreased from baseline to

3  end point in all groups."  I'm not sure.  Maybe it's better to

4  answer "I'm not sure."

5       MR. HOOPER:  I want to move to admit --

6       THE WITNESS:  Because it goes on to say there was a

7  significant --

8       THE COURT:  No, no.  They can redirect it.  We won't

9  finish.  So he gets to ask.

10       THE WITNESS:  I apologize.

11  Q.   One more thing on this Reckless study, Dr. Perry.  What

12  I'm showing you is Exhibit 991-A.

13       (Plaintiff Exhibit 991-A received in evidence.)

14  Q.   991-A I'll represent to you is six pages from the table of

15  contents of New Drug Application 21-397, the application by

16  Pfizer for approval of the postherpetic neuralgia indication

17  that was filed with the U.S. Food and Drug Administration in

18  2001.  Do you know what a New Drug Application is, sir?

19  A.   I know generally.  We have a somewhat similar but

20  different, slightly different process in Canada, but I know

21  generally what it is.

22  Q.   Do you see the label "Table of Contents" at the top and

23  the reference to NDA, or New Drug Application, 21-397 in the

24  right-hand lower?

25  A.   Yes, I do.

1   Q.   And looking down the left column on the first page, you

2   see that near the bottom Item 6.6 says "Clinical Pharmacology

3   References"?

4   A.   I see that, yes.

5   Q.   And to the right of that, do you see references to various

6   volumes and pages?

7   A.   I don't see it to the right of that.  You mean below and

8   to the right?

9   Q.   Yes.

10  A.   I see that, yes.

11  Q.   Volume 010, et cetera, do you see that?  Now, please look

12  at the second-to-last page of the exhibit from the New Drug

13  Application table of contents.  Do you see there as Item 22

14  listing the materials submitted to the FDA, research report

15  720-04130 for study No. 945-224, which we all know by now is

16  the Reckless study?  Do you see that listed as Volume 37 of the

17  New Drug Application, sir?

18  A.   Yes, I do.

19  Q.   And do you see now that the study report that you think

20  wasn't properly disclosed was submitted to the Food and Drug

21  Administration back in 2001?

22  A.   Yes, and I think the FDA or the consultants to Parke-Davis

23  advised not to proceed with it because they knew the FDA would

24  not approve it.

25  Q.   Did you know that in fact that New Drug Application was

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   approved in this country, sir, and that Neurontin is approved

2   for the form of neuropathic pain known as PHN?

3   A.   Well, you're confusing me because you're referring to a

4   New Drug Application for PHN.  I thought you were talking about

5   peripheral diabetic neuropathy, which is what the Reckless

6   study was about.

7   Q.   Are you unaware, sir, that New Drug Applications include

8   submission of studies not just in the indication for which

9   approval is sought but other related studies as well?  Did you

10  not know that when you came down here to testify?

11  A.   No, I told you I'm not an expert in how the FDA handles

12  data or its requirements.  I don't purport to be.  I know that

13  they were considered by Parke-Davis to be very unlikely to

14  approve a New Drug Application for gabapentin for treating

15  painful diabetic neuropathy because it was felt by the

16  consultants to Parke-Davis, one of whom I believe was

17  Professor Reckless in Britain, that it would not be approved.

18          MR. HOOPER:  Objection, move to strike.

19          THE COURT:  I strike the entire.  Really, Doctor --

20          THE WITNESS:  I'm sorry, your Honor.

21          THE COURT:  -- I understand you want to tell your

22  side, but this is his turn.

23          THE WITNESS:  Forgive me, I'm --

24          THE COURT:  So we will not get out of here today, and

25  we're trying to finish this on a timetable.  So I strike it.

1   So, now, do you want to ask another question?

2          MR. HOOPER:  Absolutely, your Honor, changing gears.

3          THE COURT:  Can I see counsel just for a minute at

4   side bar.

5   SIDE-BAR CONFERENCE:

6          THE COURT:  Here's the problem:  You move to strike

7   after he's spoken for ten minutes, okay?  If you want to

8   control your witness, control him.

9          MR. HOOPER:  I'm going to jump in there faster now.

10          THE COURT:  You can clean it up on redirect, but I

11   think he feels as if he's got to shovel in every last bit of

12   information on cross.  How long do you have?

13          MR. HOOPER:  I'll finish by the break.

14          THE COURT:  So we're now running behind what you would

15   all anticipate, and I have in mind the whole Kaiser issue.  You

16   jump in there and I'll sustain it, I'll strike it, okay?

17          MR. HOOPER:  Absolutely.  I don't want to be rude, but

18   I will now.

19          (End of side-bar conference.)

20   BY MR. HOOPER:

21   Q.   Dr. Perry, how much time did you spend working on this

22   case?

23   A.   I think I -- I'm going from memory only -- I think about

24   300 hours, and then two colleagues, maybe another in one case

25   80 hours, and in the more junior person, about 120 hours.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   Q.   The junior person was a twenty-two-year-old woman named

2   Innis, correct?

3   A.   I can't remember her age, but her name is Kelsey Innis

4   yes.

5   Q.   A recent college graduate who had applied to medical

6   school, not been accepted, and went to work for you, right?

7   A.   Oh, she's a medical student now, but she had a very good

8   degree in statistics and mathematics.  That's why I chose her.

9   Q.   In your assignment in this case, you were not asked to

10  analyze anything specific to Kaiser, its doctors, or its

11  patients, correct?

12  A.   Correct.

13  Q.   Since you wrote and signed your report in this case,

14  August, 2008 -- correct? -- to your knowledge, has Kaiser done

15  anything to distribute your opinions and findings to its

16  patients?

17  A.   I wouldn't have any idea.

18          THE COURT:  Do you know anything about Kaiser?

19          THE WITNESS:  Virtually nothing or nothing.

20          THE COURT:  With respect to this case?

21          THE WITNESS:  No.  I've -- nothing.

22          THE COURT:  All right, let's move on off the Kaiser

23  questions.

24  Q.   Doctor, I'm going to show you a hard copy of the Food and

25  Drug Administration's approved labeling for Neurontin in this

1    country.  I'm going to ask you to look at Page 42 of the

2    document, the section entitled "Dosing and Administration For

3    Postherpetic Neuralgia."  Do you see that?

4    A.    I'm sorry, mine, the copy you just gave me I don't think

5    goes to Page 42, unless I'm missing something.  It's 29 pages

6    long?

7    Q.    Why don't you take a look on the screen, Doctor.

8    A.    Is that a different document from this?

9    Q.    No.

10   A.    This definitely does not have 42 pages.  You're referring

11   to this one is dated February, 2005?

12   Q.    I'm sorry, Page 25 of 29, Doctor, take a look at that.  Do

13   you see there that it says "Dosing and Administration For

14   Postherpetic Neuralgia"?

15   A.    Yes.

16   Q.    Do you see there that it says, "In adults with

17   postherpetic neuralgia, Neurontin therapy may be initiated as a

18   single 300-milligram dose on day one, 600 milligrams on

19   day two, and 900 on day three."  Do you see that?

20   A.    I see that, yes.

21   Q.    So the starting dose for Neurontin is 300 milligrams to be

22   taken on day one, right?

23   A.    In the United States anyway.

24   Q.    And then it goes to 600 on day two, correct?

25   A.    Correct.

1   Q.   And to 900 on day three, correct?

2   A.   Well, it says may be initiated.  I'm afraid I'm not

3   familiar with how American doctors interpret product

4   monographs, so --

5           MR. HOOPER:  Objection, move to strike.

6           THE COURT:  Sustained.

7   Q.   Slide 1, please.  Do you recall yesterday you showed the

8   jury this slide, and you titled it "Neurontin for Acute Pain"?

9   A.   Yes.

10  Q.   Did you prepare this slide, or did the lawyers prepare it?

11  A.   No.  The lawyers prepared this one.

12  Q.   But you talked about it to the jury, didn't you?

13  A.   Yes.  It's an attempt to summarize a very complex report

14  that I prepared.

15  Q.   And it lists by number five study numbers, six if you

16  count that 2/3 at the bottom, right?

17  A.   Yes.

18  Q.   And then you said at the bottom, quote --

19  A.   Well, the sixth one is completely unrelated to Neurontin.

20  I've forgotten what it was.  It had nothing to do with

21  Neurontin.  It was a substudy where they were looking at what

22  happened to the stomachs of people, if I remember --

23          MR. HOOPER:  Objection, move to strike.

24          THE COURT:  Well, that was explaining it.

25  Q.   I'm sorry, Doctor, do you want to finish?

Page 70

1    A.    Finished.

2    Q.    You then said at the bottom of the slide, "Neurontin has

3    no beneficial effect whatsoever (i.e., completely

4    ineffective)."  Do you see that?

5    A.    In acute pain, yes.

6    Q.    Did you type those words, or did the lawyers type those

7    words?

8    A.    They typed those.  I think they extracted the quotation

9    from my report.

10   Q.    Let's look a little more at some of the studies that you

11   listed there only by number, beginning with the study report

12   for Protocol 1045-001?

13         THE COURT:  You know, the problem with all these

14   numbers is, I lose track of them, and I'm sure the jury is too.

15   I mean, it's just --

16         THE WITNESS:  So do I, your Honor.  That's why I have

17   to follow in my report.

18   Q.    Flip back to that slide.  The first number, 1035-01 from

19   your slide yesterday, correct?

20   A.    Yes, sir.

21   Q.    Let's look at the study report for that same study.

22   Confirm that this is the study report for that first study

23   listed on your slide?  Do you see that?

24         (Witness examining document.)

25   A.    The numbering is incredibly confusing.  Can you go back

1   one slide and ask which one you're referring to?

2   Q.   The first one listed on your slide, Doctor, 1035-001.

3   A.   Oh, I'm sorry, 1035-001, that's --

4   Q.   Are you holding the study report marked study --

5   A.   If you had highlighted, it would be easier to find it.

6        THE COURT:  It is highlighted on the screen.  Look on

7   the screen.

8   A.   Oh, I'm sorry.  Yes.

9   Q.   Turn to Page 6 of the study report, Doctor.

10  A.   Yes, I see that.

11  Q.   Do you see the objective of the study was to "evaluate the

12  analgesic or pain-relieving effects and the safety of a single

13  oral administration of gabapentin-hydrocodone combination

14  therapy in patients with pain resulting from dental surgery"?

15  Do you see that?

16  A.   Yes.

17  Q.   The study was designed, its objective was to evaluate a

18  combination of gabapentin with another drug, hydrocodone,

19  correct?

20  A.   Well, that's what it says here.  I don't -- to understand

21  the objective of the study, one would have to go back to the

22  original protocol because study objectives change over time.

23  That's what the other very detailed study reports and

24  statistical protocols in the neuropathic pain show is that the

25  statisticians at Parke-Davis were trying to get something out

Page 72

1   of the study at times and changing the rules as they went

2   along.  So in order to comment fairly on what the objective was

3   and definitively, I would have to know what the original

4   protocol said.

5   Q.   You can certainly comment on what the study report in your

6   hand says, though, can't you?

7   A.   I can agree with you that you're quoting it correctly, but

8   beyond that I can't go.

9   Q.   Look at Page 12, Doctor.  The middle of the page, do you

10  see that there were five different treatment groups in this

11  study?

12  A.   Yes.

13  Q.   One placebo group, one gabapentin plus hydrocodone, one

14  gabapentin?

15  A.   Yes.

16  Q.   One hydrocodone only, and one hydrocodone plus

17  acetaminophen, or Tylenol, correct?

18  A.   Correct.

19  Q.   And you see that the dose of gabapentin alone was

20  250 milligrams?

21  A.   Correct.

22  Q.   That's below the 300 milligrams starting dose on day one

23  for PHN, isn't it?

24  A.   Well --

25  Q.   Yes or no, Doctor?

1    A.    Yeah, well -- yes, but --

2    Q.    You know, do you not, Doctor, that a combination product

3    of gabapentin and hydrocodone was never developed, marketed, or

4    sold to anybody?  You do know that, don't you?

5    A.    Yes, I know that, but to understand dosing of gabapentin,

6    you have to understand this is an unusual drug that isn't

7    absorbed linearly.  Smaller doses would be more effective

8    relatively than larger doses.  Larger doses were dumping a lot

9    into the toilet in effect.

10          MR. HOOPER:  Objection, move to strike.

11          THE COURT:  Overruled.  You waited too long.  Now, you

12   need to answer directly, and when he starts going off the

13   reservation, you need to object directly.  We need to finish

14   this by the break.  We have someone in California.

15   Q.    Let's look at another one, Doctor.  Can we get back to his

16   Slide 1 from yesterday.  Do you see that the second study you

17   cited on this slide was 1035-001-B?

18   A.    Yes.

19   Q.    That's what you showed the jury yesterday, right?

20   A.    Correct.

21   Q.    And that was what you showed them above the conclusion

22   that Neurontin has no beneficial effect whatsoever, right?  The

23   bottom of your slide?

24   A.    Yes.  That's what the plaintiffs' counsel showed.

25   Q.    Turn to the study report that I just handed you for that

1    same study that you listed on your slide and turn to Page 6,

2    please.

3    A.    I've got that.

4    Q.    Do you see the objective?  Do you see the objective?  This

5    study was "To gather data for pharmacokinetic/pharmacodynamic

6    modeling --"  That's about how the drug is metabolized and

7    works in the body, right, Doctor?

8    A.    Correct.

9    Q.    "-- to determine optimal doses for gabapentin and

10   hydrocodone used in combination therapy."

11   A.    Right.

12   Q.    That's what it says, right, Doctor?

13   A.    Right.

14   Q.    This wasn't an efficacy study of anything, much less

15   gabapentin alone, was it?

16   A.    Yes, but what I don't think you understand, sir, is that

17   when you do experiments on human beings, you undertake a

18   serious responsibility --

19            MR. HOOPER:  Objection.

20            THE COURT:  Sustained.  I strike it.  So your attorney

21   will have the right to come back.

22            So what's your question?

23            MR. HOOPER:  I'll move quickly through this.

24            THE COURT:  Yes, move on.

25            MR. HOOPER:  Let's go right to Slide 2.

1    Q.   In fact, Doctor, if we looked at your slide from yesterday

2    and went through this drill with each one of these different

3    studies that you cited on there, what we'd find is that they're

4    all about combination; the objective of every study is to test

5    a combination product; that three of these were in different

6    kinds of surgery -- dental surgery, orthopedic surgery, dental

7    surgery -- and that two of the studies, the second one, was

8    this pharmacokinetic study we just looked at; and the last one

9    was a safety study that didn't set out to measure the efficacy

10   of anything, much less gabapentin, correct?

11   A.   I stand by my conclusion.

12   Q.   You say no effect whatsoever for acute pain, and you cited

13   those studies on dental surgery and one on orthopedic surgery.

14   What I've just shown you is an article by Dr. Grover titled

15   "A Single Dose of Preoperative Gabapentin For Pain Reduction

16   and Requirement of Morphine After Total Mastectomy and Axillary

17   Dissection:  Randomized placebo-controlled double-blind trial."

18   Do you see that, sir?

19   A.   Yes, I do.

20   Q.   And do you see that this was published in the Journal of

21   Postgraduate Medicine, October, 2009?

22   A.   Yes, I do.

23   Q.   Let's look at the conclusion in the abstract of the

24   article.  Tell me if I read it correctly.  "Conclusions:  A

25   single low dose of 600 milligrams of gabapentin administered

1    one hour prior to surgery produced effective and significant

2    postoperative analgesia," pain relief, "after total mastectomy

3    and axillary dissection without significant side effects."

4         Did I read the conclusion correctly?

5    A.   Yes, you did.

6    Q.   It wasn't on your slide, so you didn't show that to the

7    jury, did you?

8    A.   Well, it's a completely unrelated topic.  I can't even

9    tell who wrote this study.

10        MR. HOOPER:  Objection, move to strike.

11        THE COURT:  Overruled.

12   A.   It's not a -- it wasn't relevant to my opinion, which was

13   about the treatment of -- primarily concerned the issues in

14   this case, which is the treatment of chronic pain and chronic

15   neuropathic pain, and it's a completely different situation, a

16   postoperative recovery --

17        THE COURT:  Well, you can't go on and on.

18   A.   It's just not relevant to my opinion.

19   Q.   In fact the slide you showed the jury wasn't titled

20   "chronic pain."  It was titled "acute pain," and you cited five

21   studies by number only, three of which were in surgery

22   patients, right?

23        THE COURT:  Yes or no.

24   A.   Yes.

25   Q.   This one.  What you've been handed is an article by

Page  77

1   Dr. Sen and colleagues, S-e-n, published in the journal of

2   Pain Medicine entitled "A Comparison of Gabapentin and Ketamine

3   in Acute and Chronic Pain After Hysterectomy."  Do you see

4   that?

5   A.   Yes.

6   Q.   Let's look at the conclusion there.

7           THE COURT:  You're just going so fast.  Were these

8   these double-blind controlled tests?

9           MR. HOOPER:  It sure was, your Honor.  Let's look at

10   the second line of the abstract.

11          THE WITNESS:  Well, you can't say that without

12   reading -- I'm sorry, I can't agree with you.  I can't comment

13   on whether it was double blind or not, but I would not want my

14   name associated with saying that it was without having studied

15   the paper very carefully.

16   Q.   Look at line 2.  You have to go all the way to Line 2 of

17   the text to learn that.  Quote --

18          THE COURT:  Well, you know, he's never seen --

19          THE WITNESS:  That's not true.  That's not true, sir.

20   You can't tell that.  You can't tell that without a critical

21   appraisal.  It's impossible to believe that without actually

22   reading the paper and knowing the details and knowing how it

23   compares with the original study and what was actually done.  I

24   can't even tell who wrote this from the authors.  It's not as

25   simple as it looks.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    Q.    Would you look at the second line on the first page.

2    A.    The one you have highlighted?

3    Q.    Yes, sir.

4    A.    Yes.

5    Q.    Would you read it.

6    A.    It says, "We designed this double-blind placebo-controlled

7    study to test and compare the preventive effects of

8    perioperative ketamine and gabapentin on early and chronic pain

9    after elective hysterectomy."

10   Q.    Now would you please look at the conclusion, sir.

11   "Gabapentin and ketamine are similar in improving early pain

12   control and in decreasing opioid consumption.  However,

13   gabapentin also prevented chronic pain in the first six

14   postoperative months," correct?  Is that what it says?

15   A.    That's what you just read.  I can't in any way endorse or

16   disagree with that without knowing the study.  It's absurd to

17   ask me that.  And I wouldn't want a jury to misunderstand me

18   thinking that this is true.  I have no idea whether it's true

19   or not.

20   Q.    Earlier this morning you referred to that publication

21   from, I believe it was the Cleveland Clinic, and you talked

22   about an article that said "in press," and from that you

23   concluded the author must have had access to the as yet

24   unpublished study results, right?

25   A.    I'm not sure I concluded that.  It certainly made me

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

Page 79

1    wonder about it.  It implied that.

2    Q.   Would you please look at that.  This is a study by Dr.

3    Menda, M-e-n-d-a.

4              THE COURT:  When is this?

5              MR. HOOPER:  This is from 2010, your Honor.

6              THE COURT:  Oh, so this year?

7              MR. HOOPER:  That's right.

8    Q.   And if you notice, it says right at the top "Article in

9    Press," correct?  A big banner at the top, it says "Article in

10   Press," right?

11   A.   All of the studies you've just shown me are from the last

12   six months.  The one you're asking about now, you're saying

13   Menda, et al?  Well, this looks like it's something published

14   online.

15             THE COURT:  So, excuse me, this is going so fast.  So

16   are these essentially studies that have come out in the last

17   year or so after he gave his report?

18             MR. HOOPER:  That's correct, your Honor, all in

19   surgery, all showing the effect of this medication.

20             THE COURT:  And you haven't seen these before, right?

21             THE WITNESS:  Never.

22             THE COURT:  Okay.  So take whatever time you need to

23   look at it, and what's the question that we have about it?

24   Q.   This is another DBRCT showing effectiveness of a single

25   dose of gabapentin after surgery, in this case, cardiac

Page 80

1  surgery, correct?

2  A.   That's what the title is, yes.  This is not in press in

3  the conventional sense.  This appears to be published online,

4  so it would be accessible to anyone who wants to see it.

5  Presumably that's how you obtained it, but I haven't seen it

6  before, and I just --

7         THE COURT:  Is this an independent study, or is it a

8  Pfizer study?

9         MR. HOOPER:  It's independent, your Honor, all three.

10        THE WITNESS:  Yes, I mean, no self-respecting

11  physician would comment on a study handed to him or her like

12  this without reading it carefully.

13        THE COURT:  All right, so you can't comment.  He

14  hasn't seen it.

15  Q.   Do you have a copy of your report, sir?

16  A.   Yes, I do.

17  Q.   All right, let's turn to your opinions about neuropathic

18  pain, Slide 3 from yesterday.

19  A.   Are you happy if I follow on my own copy?

20        THE COURT:  Yes, go ahead.

21  Q.   Sure.  Your statistical review or meta-analysis in this

22  case was limited to double-blind randomized controlled trials,

23  correct?

24  A.   Correct.

25  Q.   And you looked at 25 separate DBRCTs, double-blind

1    controlled trials, in your meta-analysis, did you not?

2    A.   I looked at other trials.   Twenty-five were eligible for

3    the meta-analysis.

4    Q.   And you looked at three separate outcomes, correct?

5    A.   No.   I looked at more outcomes than that.   I think there

6    are nine outcomes all together.

7    Q.   Three primary outcomes?

8    A.   Three efficacy outcomes.

9    Q.   Correct.   One was the number of patients who had a

10   50 percent or more reduction in their pain?

11   A.   Correct.

12   Q.   The next was the --

13   A.   Where that was a prespecified outcome of the experiment,

14   and in only a very small minority of the experiments did the

15   investigators say in advance, "We're going to look for a

16   50 percent reduction."

17   Q.   And the next was the average decrease in scores on a

18   standard pain scale, correct?

19   A.   Correct.   That was the most common outcome, so that one

20   had the largest number of experiments.

21   Q.   And the third was the percentage of patients who reported

22   that their pain was moderately or much improved, right?

23   A.   Correct.

24   Q.   That's the three things you looked at.   Sir, if you turn

25   to Page 33 of your expert report toward the bottom, Section 7

1    titled "Greater Than or Equal to 50 Percent Reduction in Pain

2    Score."

3    A.    Yes.

4    Q.    Here you looked at -- this is the first outcome that we

5    just mentioned, and the first sentence of text below that you

6    wrote in your report in this case, "In short-term studies there

7    is a statistically significant difference between gabapentin

8    and placebo --" you have the statistics there -- "favoring

9    gabapentin over placebo."  That's what you wrote in your report

10   in this case, correct?

11   A.    Right.

12   Q.    Now, would you look at Page 34 of your report, the one

13   Paragraph 8 titled "Mean change --"  Mean, by the way, means

14   average, correct?  The same thing we call average?

15   A.    Yes.

16   Q.    And it's an average because it's the results of the group

17   as a whole, correct, average?

18   A.    Correct.

19   Q.    Right.  It doesn't purport to represent the variation in

20   individual patients in the group, does it?

21   A.    Correct.

22   Q.    Your report says there, "In short-term studies there is a

23   statistically significant difference between gabapentin and

24   placebo --" you have the statistics in there -- "favoring

25   gabapentin over placebo."  Did I read that correctly?

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

Page 83

1   A.    Yes.

2   Q.    And then let's look at the third conclusion on those

3   efficacy outcomes you looked at.  The next section of your

4   report, Section 9, and this is the one that refers to the

5   moderately or much improved outcome, correct?

6   A.    Correct.

7   Q.    And your report says, "In short-term studies, there is a

8   statistically significant difference between gabapentin and

9   placebo --" again with the statistics in the brackets --

10  "favoring gabapentin over placebo."  Did I read your words

11  correctly?

12  A.    Yes, you did.

13  Q.    Go to Slide 4.  So, Doctor, what we just looked at are the

14  statistical results of the outcomes you chose to examine in

15  your meta-analysis, correct?

16  A.    Correct.

17  Q.    In each case, you had statistically significant results,

18  correct?

19  A.    Correct.

20  Q.    And in each case, that difference favored gabapentin over

21  placebo, correct?

22  A.    Correct.  The problem was that I didn't consider them

23  clinically meaningful.  And I also cited the adverse effects,

24  which roughly balance off any possible benefit.

25  Q.    Doctor, let's look at --

1          THE COURT:  Excuse me.  What did you just say?

2    They're statistically significant but not clinically

3    significant?  What does that mean?

4          THE WITNESS:  Well, let us say your cholesterol is

5    high, in American units, 240 or 280.  And in a group of

6    patients who are randomized, split in half, one group gets a

7    drug and the other does not, and the average cholesterol comes

8    down from 280 to 270, there may be a statistically significant

9    difference, but clinically it makes no difference.  270 is not

10   actually better than 280.

11         THE COURT:  So going into here, so you're saying that

12   there's a statistically significant number of people who have a

13   drop in the pain scale, but that the drop isn't enough to be

14   clinically significant?  Is that what you're saying?

15         THE WITNESS:  The average drop of 0.78 I think would

16   be meaningless to the typical patient, and the percentage of

17   people who say, "Well, yeah, but I'm not average, I found I was

18   moderately or much improved," if it were one out of six, which

19   is the best possible outcome in an ideal world where the

20   experimental patients are highly selected -- they don't

21   represent the real world -- is balanced by roughly the same

22   number of people who get an adverse effect, such as dizziness

23   or somnolence or difficulty concentrating, being unable to

24   perform in a setting like we're all in now because we're just

25   too muddled.  So that what one is looking for clinically, as I

1    tried to explain yesterday, is when you're a doctor treating a

2    patient --

3            THE COURT:  I don't need the long answer, but

4    essentially you're referring to there's a statistically

5    significant drop in the sense of -- but you're saying that the

6    amount of the drop isn't clinically significant?  Is that it?

7            THE WITNESS:  Correct.

8            THE COURT:  All right, I'm just trying to understand.

9            MR. HOOPER:  Sure, sure, sure.

10   Q.   Well, Doctor, "clinical" refers to doctors and patients,

11   correct?

12   A.   Yes.

13   Q.   And whether something is clinically significant, wouldn't

14   you agree, is a matter for the judgment of the doctor, from

15   Kaiser or elsewhere, who's treating the patient from Kaiser or

16   elsewhere, correct?

17   A.   Well, yes, but we rely on controlled experiments --

18   Q.   Is that a "yes," sir?

19   A.   We can't always tell what is the effect of natural

20   improvement or chance or drug, and only an experiment like this

21   can tell us what to expect on average.  And on average what it

22   tells us is, the effect is meaningless.

23   Q.   Document 228, please.  Your standard is very different

24   when you're not in a courtroom, isn't it, Doctor?  Let's look

25   at this document --

1  A.     Excuse me.  May I answer that?

2        THE COURT:  Yes, answer.

3  Q.   Your standard of what you just told us about, that's very

4  different when you're outside a courtroom, isn't it?

5  A.   No, sir.  I've always been concerned.  I was in politics

6  where the test was, what if it shows up on the front page of

7  the Vancouver Sun, how am I going to feel?  And ever since

8  then, if not before, I've assumed that anytime I deliver a

9  report, I may be called to testify, and I'd better be in a

10  position to tell the truth and say the same thing to my

11  patients, and I would tell the patients exactly the same thing

12  I tell you always.

13  Q.   You'll recognize this as an article that you published in

14  2000 entitled "Treatment of Pain in the Older Patient" you told

15  us about in your deposition?

16  A.   Yes, sir, yes.  I was the principal author.  We write as a

17  group in our academic group at UBC.

18  Q.   I'm going to ask you to look at Page 3 beginning with the

19  words "Insufficient evidence."  You wrote in your first -- by

20  the way, this is posted on the Internet of the University of

21  British Columbia's website today, correct?

22  A.   Yes, yes.

23  Q.   A doctor from Kaiser or elsewhere who went on there would

24  see this live right now, correct?

25  A.   I regret that because it's not accurate.  I learned from

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1  the work I did in this trial that I was effectively duped and I

2  provided wrong information in this report, not through my own

3  fault but because of the withholding of the accurate

4  information.

5  Q.   And you wrote your report in this case saying that

6  eighteen months ago, right, sir?

7  A.   Yes.

8  Q.   And you've done nothing to remove this article since, have

9  you?

10  A.   No.  It's under revision, and it will be -- a revised

11  version should appear imminently.

12  Q.   Let's look at what you said, sir, in your article that is

13  posted on the website to this day.

14  A.   And recall, there were some constraints that the Court had

15  sealed the documents, and for some months I wasn't at liberty

16  to disclose them.

17  Q.   The first sentence, sir, "Insufficient evidence about a

18  drug is less critical in managing pain and other symptoms than

19  when prescribing preventive therapy."  Did I read your words

20  correctly?

21  A.   Yes.

22  Q.   The next sentence, "The randomized controlled trial (RCT)

23  evidence tells us that for most analgesics," pain relievers,

24  "only a minority of patients with chronic pain will respond.

25  It is therefore up to the physician to establish that the

1  therapy is in fact helping each individual patient."

2      That's what you wrote?

3  A.   Yes.

4  Q.   The next sentence, "This can be achieved with a short

5  therapeutic trial (usually two weeks)."

6      That's trying the medication out in the patient for two

7  weeks, isn't it, Doctor?

8  A.   That part we got almost right.  It turns out you can

9  probably tell in a day or two whether a drug like Neurontin

10  would have beneficial or adverse effects on people.

11  Q.   So for a doctor like Dr. McCrory who was here yesterday

12  and had patients on Neurontin for off-label use in diabetic

13  peripheral neuropathy, even as he sat testifying, he'd be able

14  to tell whether it worked in one or two days according to you,

15  right?

16  A.   It's not quite that simple because some people get better

17  on their own, but he'd be able to tell either -- he should at

18  least be able to tell whether the patient was suffering adverse

19  effects, and he might be able to perceive a dramatic effect,

20  but very unlikely to.

21  Q.   If you look at the next sentence that you wrote and that

22  is on the Internet today, you say, "If the patient's pain or

23  suffering are not substantially reduced, or if the side effects

24  outweigh the benefit, then the therapy should be stopped."

25  That's what you wrote, right?

1   A.   That's why I've stopped gabapentin in virtually every

2   patient I've ever met since, and almost none of them have ever

3   regretted that.

4   Q.   And you depart from Dr. McCrory and Dr. Barkin who

5   prescribed it months after --

6   A.   I think --

7   Q.   -- while he was testifying, correct?

8   A.   I think having the privilege to sit in the court and

9   listen to Dr. McCrory yesterday, he's a very intelligent man,

10  very erudite, very scholarly, but he too was duped just the

11  same way I was because he didn't have access to the real data

12  in this case.  He was falsely led to believe that gabapentin

13  was a highly effective drug when it was not.  And even this

14  report that you're citing to me I feel badly about because I

15  too was duped, but I don't accept fault in the sense that I had

16  no way of knowing better because trials like Reckless were not

17  available to me at that time.

18  Q.   You go on in your article to say in the bottom sentence,

19  Doctor, "Ultimately improvement in function is the real goal of

20  therapy."  Correct?

21  A.   Correct.  That's the argument I made in my entire opinion.

22            THE COURT:  Redirect?

23            MR. GREENE:  Just less than five minutes.

24            THE COURT:  What do you need to switch to?

25            THE CLERK:  Sorry about that.

1          THE WITNESS:  May I keep these copies, by the way?  Or

2     are they in evidence, these ones?

3          MR. GREENE:  No.  You can keep those.

4     REDIRECT EXAMINATION BY MR. GREENE:

5     Q.   I'd like to start off with those studies that they just

6     handed up to you.  I think you said they were done in the last

7     few months, November, 2009, I think there were two, and one in

8     2010.  Had you seen those before today, Doctor?

9     A.   No, I had not.

10    Q.   Did you say that you'd want to review the study protocol

11    and the research report before you commented on what was

12    written in the article?

13    A.   Yes, I did.

14    Q.   And have you reviewed articles and testified to the jury

15    about the defendants' articles not supported by what was in the

16    research report?

17    A.   Correct.

18    Q.   If you had the research reports for those three studies,

19    could you have added them to your meta-analysis?

20    A.   Well, they're not relevant to the question that you had

21    asked me because they're relevant to a different situation of

22    postoperative pain where other drugs are being given:  A

23    patient is in a recovery room, just had a general anesthetic,

24    for example, after cardiac surgery.  That's a huge operation.

25    The brain is profoundly disturbed by the open heart surgery.

1  Many narcotic drugs are being given, and they're throwing in

2  gabapentin.  It's completely irrelevant to this case.  So I

3  would not have put it into my meta-analysis, even if I knew it

4  perfectly.

5  Q.   You were shown a document that contained a series of

6  e-mails between the company and Dr. Roder concerning the

7  Reckless study.  Do you recall that?

8  A.   Yes.

9  Q.   And they had attempted to submit the Reckless study to a

10  journal.  Do you recall that?

11  A.   Yes.

12  Q.   And you said you hadn't seen the document before.  Do you

13  recall that?

14  A.   Correct.

15  Q.   You said to the jury you'd like to see what the referee's

16  comments were from the journal article?

17  A.   It would be very interesting.

18       MR. GREENE:  May I approach the witness, your Honor?

19  A.   I'm not aware of them either.  I've never -- this was a

20  complete surprise to me.

21  Q.   Do you have the referee comments?  It's my copy, but do

22  you have it before you?

23       (Witness examining document.)

24  A.   This appears to be referee comments, yes.  Was that what

25  you're showing on the screen here?

Page 92

1          MR. HOOPER:  Can you read the dates.

2          MR. GREENE:  Leslie Tive, underscore, 0020842.

3          THE WITNESS:  Mr. Greene, is that what I'm seeing on

4     the monitor here?  It's too small for me.

5          MR. GREENE:  Yes, it is.

6          THE COURT:  Do you want to magnify it?

7     Q.   Do you have that?  This is the referee's comment,

8     Paragraph 8.  Could you read that to the jury.

9     A.   That says -- this is apparently whoever the referee was --

10    "My concern that this is a pharmaceutical house prepared paper

11    seems to be confirmed by my observation that Reference 6 is

12    even listed as a Parke-Davis study!"  I think that's what it

13    says.

14    Q.   Can we turn to the next page.  There were two referees

15    here, correct?

16    A.   I don't know.

17    Q.   Well, will you look at the first page.  Referee Code A,

18    doesn't that refer to one referee?

19    A.   I'm sorry, I just can't read it.  It's too small for me.

20    If I can look at your copy, I should be able to read that.

21    Yes, it says Referee Code A.

22    Q.   And if you flip -- this is a document the defendants just

23    handed to me, but if you flip to the other side, it's

24    Referee Code B.  That's the second reviewer?

25    A.   That's what it would imply, yes.

1   Q.   Their identity is kept confidential?  That's why they use

2   A and B; is that correct?

3   A.   Typically journals keep referees confidential.  There are

4   some that have an open refereeing policy.

5   Q.   Could we blow up the second document here beginning with

6   "The data from this trial."  Can you read that to the jury.

7   A.   "The data from this trial clarifies some misconceptions of

8   the supposed efficacy of gabapentin and enables clinicians

9   treating patients with painful diabetic neuropathy to evaluate

10  the potential of this drug."

11  Q.   Just below that, "Important lessons," I just want to read

12  a few points here.

13  A.   "Important lessons to be --"

14  Q.   We're going to blow it up for the jury.  Can you just wait

15  a moment.

16  A.   You wish me to read it?

17  Q.   Yes, will you read it to the jury now, please.

18  A.   "Important lessons to be learned from this study:

19  (1)  For pain scores gabapentin is not effective.  (2)  If it

20  is effective, then 600 milligrams gabapentin does not work,

21  which should allow us to start at a more effective dose.

22  (3)  There is no apparent dose response curve, as there was no

23  difference between 1,200 and 2,400 milligrams.  Perhaps 1,200

24  milligrams may be the optimal dose, but even this is not

25  significantly different from placebo."

1   Q.   I just have one other area I have a couple questions for

2   you.  Concerning your report -- and Judge Saris asked you about

3   this a few minutes ago -- you gave three opinions concerning

4   the efficacy in your analysis, correct?

5   A.   Correct.

6   Q.   And the first one showed a statistically significant

7   difference between gabapentin and placebo, correct?

8   A.   Correct, in the numerical rating pain scale.

9   Q.   And explain what the difference again was for the jury.

10  A.   On an 11-point scale that ran from 0 to 10 -- from 1 to 10

11  there are ten numbers, from 0 there are eleven -- the average

12  difference was 0.78.  And if we took out, as you asked me to

13  do, if we removed the trials in postherpetic neuralgia, for

14  which there was eventually an FDA indication, then the

15  difference shrank to 0.36 out of 11.

16  Q.   So that meant there was an improvement on the pain scale

17  of less than a point, 0.36?

18  A.   When we looked at the trials other than postherpetic

19  neuralgia, it became 0.36 out of 11.

20  Q.   Is that why you told Judge Saris it was clinically

21  meaningless?

22  A.   Yes.  Just it's not plausible to anyone who's thinking

23  clearly that 0.36 out of 11 in pain would be meaningful, and

24  that's what the document you just showed me that I've never

25  seen before, whoever that reviewer was, made the same

1    conclusion.

2              MR. GREENE:  Thank you, Doctor.

3              MR. HOOPER:  Very briefly, your Honor.

4    RECROSS-EXAMINATION BY MR. HOOPER:

5    Q.   Turning to the conclusions expressed in your report,

6    Dr. Perry, that we have verbatim on the slide, as to that first

7    one, reduction in pain score, as we just discussed, that's an

8    average, correct?

9    A.   Correct.

10   Q.   Some patients have fewer points than that, and some have

11   more than that, correct?

12   A.   Correct.

13   Q.   Some may have two-, three-, or four-point changes,

14   correct?

15   A.   Correct, but the average is the only meaningful -- well,

16   in the way that experiment was designed, it's the only

17   meaningful or the most meaningful expression of what they

18   studied because that is precisely what they set out to study.

19   When they designed the experiment, they said, "We will look at

20   this as our primary outcome.  The success or failure of the

21   experiment will depend on whether we show a difference."  And

22   in those nine experiments for which this outcome was measured

23   in that way, then the average was 0.78; and if you take out the

24   postherpetic neuralgia trials, then it was 0.36.

25   Q.   And if you look at the last of your three outcomes where

1    you found a statistically significant difference favoring

2    gabapentin over placebo for patients who reported they were

3    moderately or much improved, Doctor, my question is this:  For

4    patients who have a terrible painful condition like neuropathic

5    pain, do you think that it might be clinically significant to

6    them to feel like they are moderately to much improved?

7    A.    If that were the only effect, it would be interesting, but

8    the problem is that with that came the toxicity of being

9    muddled, being dizzy, falling over, falling off of a bicycle

10   when one had not done that previously in one's life -- when you

11   learn how to ride a bike, you generally learn how to ride it

12   for life -- having problems with memory problems, et cetera,

13   et cetera, et cetera.  And the two are inseparable, and in the

14   real world where real patients were getting the drug, not just

15   those who were qualified for experiments, including people who

16   had tried gabapentin and didn't like it, in the real world the

17   effect would have been even less.

18           MR. HOOPER:  Nothing further, your Honor.

19           (Witness excused.)

20           THE COURT:  All right, thank you.  Why don't we take

21   our morning break now.

22           THE CLERK:  All rise for the jury.

23           (Jury excused.)

24           THE COURT:  Thank you.  We'll see you on scheduling.

25   Have a nice trip back.  Let's talk about where we are.

Page 97

1          (Side-bar conference off the record.)

2          (A recess was taken, 10:58 a.m.)

3          THE CLERK:  All rise.  Please be seated.

4          MR. KENNEDY:  Your Honor, we do have a

5    stipulation, if we could have the Court's permission to read

6    it, it's regarding 923.

7          THE COURT:  The big phone book.

8          MR. KENNEDY:  We'd like you to read it.

9          THE COURT:  I don't know we need to read it.  It

10   was very long.  We could put it up on the screen or we could

11   make photocopies of it and hand it to each person.

12         MS. NUSSBAUM:  That's great.

13         THE COURT:  I just want to finish this witness.

14         MR. KENNEDY:  We'll do our best.

15         THE COURT:  Let's bring in this jury right now.

16   Let's go.  Let me ask you this while he's getting the jury,

17   Mr. Hooper, I think one of the reasons I felt frustrated at

18   the cross-examination, I was trying to dissect my own

19   concerns, were all those new documents he had never seen

20   before, had those been shown to him before?

21         MR. HOOPER:  No, your Honor.

22         THE COURT:  Are they marked as exhibits?

23         MR. HOOPER:  The three, the acute pain studies

24   that he didn't mention are not, no.

25         THE COURT:  Let me just sort of articulate as I

1   go, it's hard for someone like me, and I'm sure for the

2   jury, when you're whipping studies up there.  He hasn't

3   seen, we haven't seen, are pretty new, they're not even on

4   the exhibit list --

5           MR. GREENE:  I understand.

6           THE COURT:  -- I just felt I wasn't in control of

7   understanding what was happening, if you sense some

8   frustration, and so we shouldn't be putting documents on the

9   screen that aren't exhibits, and what we might want to do if

10  there's a brand new document for both sides, give it to the

11  witness the night before so they can at least read it.

12          MR. HOOPER:  I'll be happy to do that.

13          THE COURT:  Then we're all more literate about it,

14  for both sides.  If there's some new document that's not an

15  exhibit list, it's a better protocol, I think.

16          THE CLERK:  All rise for the jury.

17          ( JURORS ENTERED THE COURTROOM.)

18                  AMBROSE CARREJO, RESUMED

19          CONTINUED CROSS-EXAMINATION BY MR. KENNEDY:

20  Q.  Good morning, Dr. Carrejo.

21          THE COURT:  You remember Dr. Carrejo, he had to go

22  back to California and now he's back again, and we're going

23  to resume the cross.  I can't remember how long we were on

24  cross before, but we're picking up.

25  Q.  Dr. Carrejo, given that it's been to my count Four days

Page 99

1    and four witnesses since we were last together, let me just

2    remind everybody, when we were here on Friday, we talked

3    about the fact that the complaint in this case got filed in

4    February of 2005.  You remember that, don't you, Doctor?

5    A.  Yes, sir.

6    Q.  Okay.  Then we talked about some of the things that

7    Kaiser had said and done after the complaint got filed, and

8    I'd like to continue in that vain offering Exhibit 816 into

9    evidence.

10              ( Exhibit 816 was received in evidence.)

11   Q.  It's another Kaiser document.  Now, this is another

12   request from a Kaiser document, and she's in Antioch, which

13   is Northern California, right?

14   A.  Yes.

15   Q.  Okay.  And this is to the Kaiser Permanente Drug

16   Information Services that we talked about on Friday.  These

17   are the people who are the centralized repository of

18   knowledge about drugs within Kaiser Permanente, right?

19   A.  Yes.

20   Q.  And they're down in Downey, California in Southern

21   California, right?

22   A.  That's correct.

23   Q.  And so what we have here is a request in February of

24   2006.  Would you just put that one up so we have a

25   chronology as to where we are.  This is a year after the

1   complaint has been filed, and Carolyn Manson, who's a

2   psychiatrist, is writing to explain that she has a patient

3   who is "refractory," and we know that's a fancy word for

4   doesn't respond to, right?

5   A.  Yes.

6   Q.  Okay.  And other medications for bipolar.  Now this

7   patient is six years old and he's got bipolar, correct?

8   A.  Correct.

9   Q.  And she's asking for information concerning that case,

10  and turning to the next page, we can see the advice that the

11  Drug Information Service  gave, it says, "This question

12  refers to a pediatric patient who has obvious with

13  psychomotor seizure.  Neurontin has been used and has

14  stabilized the seizures.  Tegretol and Depakote separately

15  have activated bipolar again.  Requestor already has

16  literature on Tegretol as a bipolar activating agent.

17  Requestor wants some literature evidence for Depakote as a

18  bipolar activating agent."  I've read that correctly,

19  haven't I?

20  A.  Yes.

21  Q.  So as of a year after the complaint in this case had

22  been filed, somebody apparently concluded that Neurontin

23  wasn't exactly a sugar pill, even for dealing with a child

24  with bipolar, correct?

25          MS. NUSSBAUM:  Objection, your Honor.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1          THE COURT:  Overruled.

2    Q.  Can you answer the question, Doctor?

3    A.  I don't see it that way, no.

4          THE COURT:  Well, could you just say this, I know

5    you're not a doctor, but you have a Ph.D. in pharmaceutical.

6    What does this mean, "Neurontin has been used and has

7    stabilized the seizures?"  Do you know?

8          THE WITNESS:  Well, that was its primary

9    indication for add-on treatment of epilepsy or seizures, so

10   it has been used effectively to treat seizures.

11   Q.  Precisely.  So when we see some reference that a doctor

12   was prescribing Neurontin for bipolar, that doesn't

13   necessarily mean that the doctor was prescribing it for the

14   manic phase of the condition, does it?

15   A.  I have no idea what the doctor was prescribing it for.

16   Q.  Here it looks like we had a patient who was bipolar,

17   right, we agree on that?

18   A.  Mr. Kennedy, I have no idea by looking at the document.

19   Maybe this is best reserved for Dr. Mirta Millares, she's

20   the chair of or the chief of drug information.  Maybe she

21   can answer it better, but to ask me what doctor that was

22   using it for, I think that's a little bit out of my

23   expertise.

24   Q.  Do you have trouble --

25          THE COURT:  He doesn't know, let's move on.

Page 102

1          MR. KENNEDY:  Then we offer into evidence

2    Exhibit 819, and I believe I offered 816 into evidence

3    previously, if I didn't, I would offer it at this time.  I'm

4    offering 819, and this is an April 25, 2006.

5          ( Exhibit 819 was received in evidence.)

6    Q.  So we're now 14, 15 months after the lawsuit has been

7    filed and Carolyn Manson again from Antioch writes to the

8    Drug Information Service saying, "Needs a mood stabilizer or

9    a neuroepileptic for a patient with elevated ALT."  And ALT

10   is a liver condition, right?

11   A.  ALT is a liver enzyme.

12   Q.  And the background is, "We have an uncontrolled bipolar

13   patient on various drugs.  The Depakote level is normal,

14   needs to treat, Haldo, Tripetal suggestions," then coming

15   down to the bottom of the page --

16   A.  Could you go back, please?

17   Q.  Sure.  Do you see the question in the background?

18          THE COURT:  Can I ask, what's a neuroleptic, do

19   you know?

20          THE WITNESS:  Neuroleptic are the antipsychotics,

21   Haldo is a good example there.

22   Q.  And coming down, the Drug Information Service under mood

23   stabilizers lists Lithium, anticonsulvants, and coming over

24   it lists including Gabopentin, so this is now 2006, so

25   Kaiser would have been using the generic form of Neurontin,

1   Gabapentin, right?

2   A.  Correct.

3   Q.  And scrolling down further, the Drug Information Service

4   also advises that Gabapentin has no hepatic impairment.

5   That means no liver impairment?

6   A.  Correct.

7   Q.  But then it says, "There are case reports of abnormal

8   liver function," correct?

9   A.  Correct.

10  Q.  Okay.  And as of April, 2006, at least with regard to

11  this request, the Drug Information Service didn't write back

12  and say Gabapentin is a sugar pill, don't try that, did

13  they?

14  A.  You know, that's the regrettable point of this whole

15  case in my opinion is that the science at the time --

16  Q.  Well, did they write back and say that?

17  A.  It was incomplete and inaccurate.

18  Q.  Doctor, can you answer the question?  I realize you're

19  trying to earn your money here.

20  A.  I don't know if they wrote back.  I don't know if they

21  wrote back.  All you're showing me is one page.

22          MS. NUSSBAUM:  Your Honor, I would move to strike

23  the comment, "You're trying to earn your money here."  This

24  is a fact witness, an employee of the company.

25          THE COURT:  Yes, I'll strike that comment.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1      MR. KENNEDY:  I apologize to the witness and the

2  Court, sorry, your Honor.

3  Q.  Let me ask you this, outside of this courtroom when

4  you're treating real patients for real conditions, at any

5  time since 2005 has Kaiser told a real patient Neurontin is

6  a sugar pill or no better than a sugar pill to your

7  knowledge?

8  A.  That's your word.  We haven't used that word.  I don't

9  have any knowledge of anyone saying it's a sugar pill.

10  Q.  That's a word that only gets used in court as far as you

11  know?

12  A.  That's not a word I've heard outside of this courtroom

13  with relation to Neurontin.

14      MR. KENNEDY:  I'd ask to have marked in evidence

15  next Exhibit 824, and this one is a December, 2006

16  information request to DIS.

17      ( Exhibit 824 was received in evidence.)

18  Q.  So we're now, what, 22, 24 months after the complaint

19  has been filed, and this time we've got a Marcy Wong, who's

20  in Stockton.  That would be Northern California, correct?

21  A.  That's correct.

22  Q.  And her question is, "Do Kaiser doctors prescribe

23  Topamax for migraines," correct?

24  A.  Correct.

25  Q.  And she goes on to explain that, "There's a female

1  patient currently on Topamax for migraines, but she's not a

2  Kaiser member and she'd like to be a Kaiser member, and

3  there's open enrollment on Friday, and we're aware that

4  Topamax is on the formulary, and the question is does Kaiser

5  authorize or do Kaiser doctors prescribe Topamax?"  You see

6  that, correct?

7  A.  Yes.

8  Q.  Now, in December of 2006, Topamax was an FDA-approved

9  treatment for migraine, wasn't it?

10  A.  I'm not sure.  I cannot recall that.  I'll take your

11  word if you say that that's FDA approved.

12  Q.  Why don't we go to page 2, Austin, under summary, and

13  you'll see there Topamax is indicated, and when it says,

14  "Topamax is indicated," that means it's FDA-approved,

15  correct?

16  A.  Okay.

17  Q.  I'll tell you when the trick questions are coming, this

18  isn't one, take my word for it.

19  A.  I'm sorry, you know, you can be indicated on off-label

20  indications with some evidence, a peer review journal, but

21  it doesn't always mean it's FDA-approved, but in this case

22  we'll say it's FDA-approved.

23  Q.  Which is we've heard already in this trial means it's

24  based on Level I evidence and multiple double-blind

25  controlled studies, et cetera, correct?

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   A.   Correct.

2   Q.   And scrolling down on page 1 to the very bottom of the

3   page, the last paragraph, page 1, under "Northern California

4   Clinical Guidelines," and picking up the last paragraph,

5   "There are other preferred prophylactic treatments for

6   migraines such," and they list various preferred treatments,

7   including Neurontin, correct?

8   A.   That's correct.

9   Q.   So, as of December, 2006, the Drug Information Service

10  is telling Marcy Wong that even though Topamax is

11  FDA-approved and based on Level I evidence for migraine

12  within Kaiser, Gabapentin is a preferred treatment over

13  Topamax for migraine; isn't that what she's saying?

14          MS. NUSSBAUM:   Your Honor, I don't believe that's

15  what the exhibit is saying, and I'd like to show a physical

16  copy to the witness because scrolling is very hard to see.

17  I don't think that's what the summary says.

18          THE COURT:   I strike the comment, I strike her

19  comments, yes, you can give him a complete document.

20          THE WITNESS:   Thank you.

21  Q.   Doctor, feel free to read whatever you want.   What I was

22  asking about though at this point is the bottom paragraph on

23  page 1, "There are other preferred prophylactic treatments

24  for migraines such as --" various ones "and Neurontin"?

25  A.   You know, it's regrettable that it's there, but at that

1  time even throughout after we filed the complaint, this was

2  the evidence.  It was incomplete, it was inaccurate, but

3  that is what the drug information pharmacists had to go on,

4  and I think through the discovery phase of this trial, we

5  found that that's not true.  We were duped.  This is just --

6  it's blatantly wrong reading it here.  If we're going to

7  Monday morning quarterback what this individual did, you're

8  right, it's wrong, but at the time that was the evidence.

9  Q.  Let me see if I understand this.  By February of 2005,

10  Kaiser had determined that it had been duped enough to go

11  hire lawyers and file a lawsuit, correct?

12  A.  That's incorrect.

13  Q.  That's incorrect?

14  A.  All we knew at the time was that Warner-Lambert had

15  pleaded guilty to off-label marketing of Neurontin.  We did

16  not know the evidence was polluted.

17  Q.  So you filed this complaint without knowing you had been

18  duped?

19  A.  I didn't file the complaint.

20  Q.  Well, in February, 2005, somebody decided there was

21  enough of a problem to use an old phrase, "make a federal

22  case out of it," correct?

23  A.  Your word.

24  Q.  Okay.  And after you decided to make a federal case out

25  of it in February of 2005, did a memo go out to all of

1    Kaiser's doctors saying --

2    A.   I don't believe this is a federal case.

3    Q.   Would you like to wait for the whole question, Doctor?

4    A.   I'm having trouble with the federal case, sorry.

5    Q.   You're aware we're here in a federal courthouse?

6    A.   Okay.

7    Q.   There's no doubt in your mind this is a federal case and

8    this is a federal Judge, is there?

9    A.   Sorry, okay.

10   Q.   And somebody at Kaiser decided in February of 2005 that

11   this was the worth the attention of a federal Judge and a

12   federal jury, right?

13                MS. NUSSBAUM:  Objection, your Honor.

14                THE COURT:  Overruled.  Someone filed suit, right,

15   in federal court, here?

16                THE WITNESS:  A complaint, someone filed suit,

17   yes.

18                THE COURT:  All right.

19   Q.   And you filed suit over certain off-label uses of

20   Neurontin, right?

21   A.   Illegal marketing of Neurontin for off-label indications

22   that was agreed to by Pfizer's folks.

23   Q.   And after you filed that lawsuit, there was no memo sent

24   out to Kaiser doctors saying you should consider stopping

25   prescribing Neurontin for these following off-label uses,

Page 109

1    that wasn't done, was it?

2    A.  We didn't have the evidence to say or not to say that.

3              THE COURT:  You know, we've been through this.

4    All right.  What's the next question?

5              MR. KENNEDY:  I don't think I've gotten an answer

6    yet, your Honor.

7    Q.  That wasn't done, was it?

8    A.  We didn't have evidence to say that.

9              THE COURT:  Wait, that's the fourth iteration of

10   it.  Was there any memo sent out once the suit was filed?

11             THE WITNESS:  No, not to my knowledge.

12   Q.  And back by 2005, you, at least, yourself, believed that

13   Neurontin was no better than a sugar pill, correct?

14   A.  That's not true.

15   Q.  Doctor, reading from your testimony --

16             THE COURT:  You need to ask about what

17   indication.

18             THE WITNESS:  Thank you.

19   Q.  As of February, 2005, when this lawsuit was filed, you

20   believed that Neurontin was no better than a sugar pill for

21   certain indications, correct?

22   A.  At the time Neurontin had efficacy based on the

23   evidence, did not believe it was a sugar pill.

24   Q.  Doctor, I'm sorry, I know I talk way too quickly.  Let

25   me try it again.  Back in 2005, when the lawsuit was filed,

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   you believed that Neurontin was no better than a sugar pill

2   for certain indications, correct?

3   A.   I can't think of what indications those might be, but at

4   the time we believed there was evidence for Neurontin to be

5   used in neuropathic pain, there was also evidence of

6   migraines, there was evidence in bipolar, and there was some

7   evidence in nociceptive pain.

8   Q.   Let me read the following question and answer to you and

9   ask if you agree with it, and so it won't sound like a trick

10  question, this is a question and answer from your testimony

11  on Friday.  Question:  "Could you wait, please, Doctor.

12  Back in 2005, when the lawsuit was filed, did you believe

13  that Neurontin was no better than a sugar pill?"  Answer:

14  "For certain indications, yes."  Do you still feel that way

15  today?

16  A.   Yes.

17  Q.   So, at least as of February, 2005, you felt that

18  Neurontin was no better than a sugar pill for certain

19  indications, correct?

20  A.   Correct.

21  Q.   And you can't point us to any memo that you wrote after

22  February of 2005 saying anything to the effect of I think

23  we've got an obligation to our patients who have been taking

24  what's no better than a sugar pill to warn them about what's

25  going on, you can't identify any memo you wrote like that,

1   can you?

2   A.   No, we were re-educating on the evidence of where

3   Neurontin could be used appropriately.

4   Q.   And down to and including today, Kaiser has never sent a

5   memo to its patients who are on Neurontin or Gabapentin to

6   the effect of, We regret to report that we were duped and

7   we've prescribed you something that may be no better than a

8   sugar pill and you really ought to consult your doctor to

9   try to get something that works, no memo of that general

10  sort has gone out to Kaiser patients down to and including

11  today, correct?

12  A.   Mr. Kennedy, it's only after the exploratory phase of

13  this trial that that evidence has become completely true.

14  It was November, 2009, when Dr. Dickersin's article came

15  out.   We didn't have knowledge of your operating plan that

16  had whistleblowers on it, we didn't know about

17  communications with the FDA on the mood problems with

18  Neurontin.   We didn't have that knowledge until just

19  recently.

20  Q.   You at least got it recently enough to start telling

21  this jury about it starting a week ago Monday, correct?

22  A.   That's correct.

23  Q.   When does Kaiser plan to share with its doctors and

24  patients the information it spent the last seven days

25  sharing with the jury?

1    A.   I'm not quite sure on the actual plans.   We're having

2    teleconference and discussing issues about Neurontin right

3    now.

4    Q.   Let me make sure I got this straight.   When Kaiser

5    finally realized that it had been duped and that this drug

6    that hundreds of thousands of people were taking was really

7    no better than a sugar pill, Kaiser said, Let's spread the

8    word in the following way:   First, there are nine people in

9    Boston on a jury, we'll advise them, and then we'll get

10   around to telling our doctors and patients; is that the way

11   it worked?

12   A.   It's an interesting way of phrasing it, but I don't

13   believe that's the way it worked, no.

14   Q.   That's the way it's happened so far, correct?

15   A.   No.

16   Q.   You've yet to tell your patients any of the things

17   you've told the jury over the last six days, have you?

18   A.   Specifically I don't have patients, I'm just a

19   pharmacist that works in pharmaceutical contracting, but

20   there are efforts going on within Kaiser right now.

21   Q.   Why wasn't everything that's been said in this case

22   simultaneously put up on your website so your patients and

23   doctors would know at least as much as the jury was

24   knowing?

25   A.   I can't answer you completely, but it would be premature

1   to go off and just fire off a letter to thousands of

2   patients telling them what's going on in a court.

3   Q.  It would be premature because even as of today, 2010,

4   you think it's premature to pass judgment on Neurontin?

5   A.  I think that the evidence that has come to bear has to

6   be reviewed by all of our specialists and a concerted

7   discussion take place if a memo were to go out for that memo

8   to be drafted and agreed to.  We don't just sit down and

9   say, oh, look what Ambrose found in court, we need to send a

10  memo.

11          There's all the specialists in the diagnoses and

12  indications that we talk about have to sit down and review

13  this new evidence and to make sure that the most appropriate

14  steps are taken.  It's not as simple as just sending out a

15  memo because one court case took place.

16  Q.  And it's so complicated it would take more than five

17  years since the filing of the lawsuit to do that memo; is

18  that correct?

19  A.  It has not been five years, it is just recently that

20  this evidence is coming clear.  Dr. Dickersin's trial was

21  just November of 2009.  We did not have knowledge of all of

22  the internal documents of Pfizer's, the e-mails that went

23  on, and we weren't even clear that the evidence was

24  presented until specialists reviewed that for us.  We had no

25  idea of the Backonja trial.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

Page 114

1   Q.  Well, what did you file the lawsuit over then?

2   A.  I didn't file the lawsuit, I'm just a pharmacist.  I

3   don't work in the legal department.

4           THE COURT:  Can I see you at sidebar just for one

5   second?

6           (THE FOLLOWING OCCURRED AT SIDEBAR:)

7           THE COURT:  A concern I'm running into, this is

8   verging on confusing because to understand this you'd have

9   to understand multi district litigation, and some of the

10  litigation process issues were broader because I threw out

11  some of the legal claims.

12          MR. CHEFFO:  We have a chart, your Honor, that

13  will show exactly when they got the expert reports, so

14  that's --

15          THE COURT:  The bigger issue, there were positions

16  being taken that all off-label marketing was illegal.  I

17  denied that.  I, at some point, I can't even remember if I

18  said it had to be fraudulently off-label marketing, there

19  were positions on causation.  Once you had fraud and

20  bipolar, it affected all doctors, and at least so far

21  there's a motion for reconsideration have rejected that sort

22  of strong argument about aggregate, so, I mean, he's a

23  pharmacist.  I've got six or seven still pending cases

24  anyway, which is probably why I kept the thing here.

25          So it's a little unfair without getting into the

Page 115

1    history of this litigation because some of it was a position

2    that you weren't involved, which is any off-label marketing

3    that you could collect.  In fact, I think that still

4    exists.

5             MS. NUSSBAUM:  That is in the California.

6             THE COURT:  Right, in the California.

7             MR. CHEFFO:  He is a vice-president, he testified

8    very broadly on direct.  I think the point that Mr. Kennedy

9    can talk about, we can talk about the three and four of the

10   bipolar, and the questions are fair.  I think the jury can

11   know because any action or steps.

12            THE COURT:  I've allowed all that, I'm just simply

13   sayING why did you bring it, there are claims under the

14   California Unfair Practices Act that off-label is an unfair

15   trade practice.  There were claims earlier on that

16   everything RICO -- that's how it started, he's no lawyer.

17            MS. NUSSBAUM:  He's never seen the complaint.

18            THE COURT:  I think we need to move on.

19            MR. KENNEDY:  Okay.

20            THE COURT:  You weren't involved early on.

21            MR. KENNEDY:  Sure enough, your Honor.

22            (SIDEBAR CONFERENCE WAS CONCLUDED)

23   Q.  Doctor, staying with what Kaiser did or didn't do --

24            THE COURT:  Let me just say this to the jury, and

25   what I said here at sidebar, this case has had a long

1  history, and without going into how complicated it's been,

2  various lawyers have taken various legal positions over the

3  course of it, some of which I've accepted, some of which I

4  haven't.

5          It's not relevant to you here, but he may not have

6  been familiar with that earlier course of the litigation,

7  and that's why I've sort of -- there are certain things that

8  are fair game, you know, what have you done recently with

9  respect to the drugs, but some of the early history of the

10  litigation he just might not be familiar with, and I think

11  we shouldn't get into it.  So Let's just leave it there.

12          MR. KENNEDY:  Thank you.

13  Q.  You do say the time the Dickersin article came out in

14  the fall of 2009, at that point the scales fell away from

15  your eyes and you realized you had fully been duped,

16  right?

17  A.  That was one component of it.

18  Q.  And since, what, November, December, January, and we're

19  into mid-February, there have been people, Kaiser patients,

20  with conditions like neuropathic pain and bipolar who have

21  been going along on Gabapentin prescriptions, aren't

22  there?

23  A.  That's correct.

24  Q.  And that's a source of concern to you, isn't it, that

25  Kaiser has gotten around to telling a jury in Boston about

1   all the problems but hasn't since hearing about the

2   Dickersin article shared that information with its own

3   patients who are on the drug?

4   A.  It's regrettable the fact that, you know, we were misled

5   by that evidence, but we are taking steps.  In fact, content

6   has been taken down from the website already, and there are

7   plans to reinvigorate the effort to get appropriate use if

8   there is an --

9   Q.  Excuse me, Doctor, I'm sorry.

10  A.  Go ahead.

11  Q.  You took the content down, but when you did so, you

12  didn't provide any explanation, particularly to the patients

13  who were on the drug as to why you were taking the website

14  down, did you?

15  A.  I believe that's still ongoing.

16  Q.  Well, it hasn't started yet, has it?  There isn't one

17  Kaiser patient who's on Gabapentin today who's been told,

18  "You ought to be aware, on February 9, we took down a whole

19  bunch of website material because it was misleading?"  No

20  Kaiser patient has been told that yet, have they?

21  A.  Not to my knowledge.

22  Q.  And no Kaiser patient has been told yet, You really

23  ought to see your doctor as soon as possible because what

24  you've been prescribed may be no better than a sugar pill,

25  no Kaiser patients have been told that either, have they?

1   A.  I don't believe we'd go directly to the patient, we'd

2   work with the doctors to give them their patient list once

3   all the specialists have approved the direction that we

4   should take and the evidence, if it exists, as to what

5   should be the replacement.

6   Q.  And since November of 2009, nobody's gone to the Kaiser

7   doctors who are listed in the book as being Neurontin

8   prescribers and saying, Alert, Doctor, you really ought to

9   get all your patients who you've given Gabapentin to for

10  these certain off-label indications in because we have new

11  evidence, you may have prescribed a sugar pill?

12  A.  It's been an ongoing effort since 2001 to decrease the

13  inappropriate use of Gabapentin.  It's not as you sound that

14  we've been doing nothing or asleep at the wheel, we've been

15  re-educating on the appropriate use for over ten years.  Not

16  to reinvigorate that trial, that effort and to find the most

17  appropriate stance to take after this evidence has been

18  presented to us is our next step.

19  Q.  And as of today, Kaiser doctors, excuse me, as of today,

20  Gabapentin is on the formulary, Kaiser's list of approved

21  drugs in your area, Northern California without restriction,

22  right?

23  A.  That is correct.

24  Q.  There's nothing in the formulary today that says,

25  Doctors, even as a cautionary advice, don't prescribe

Page 119

1    Gabapentin for these five off-label indications, that isn't

2    there, is it?

3    A.  That's correct.

4    Q.  And you told us on Friday, you're involved in drug

5    purchases at Kaiser.  Does that include buying Gabapentin?

6    A.  It does.

7    Q.  And right now you've got how many contracts with generic

8    makers to buy Gabapentin?

9    A.  I believe there's two contracts.

10   Q.  Okay.  And how much money did Kaiser spend on Gabapentin

11   in 2009?

12   A.  I'm not sure.

13   Q.  $1 million, $2 million, $10 million?

14   A.  It would just be a guess at this point.  I'm not sure.

15   Q.  You can't give us any kind of an estimate whether it's

16   closer to a million or a hundred million?

17   A.  Truly it would be a guess.  I don't total up the total

18   purchases for the entire program, and I'm under oath, that

19   oath thing, I couldn't just speculate what that number might

20   be.

21   Q.  It would certainly be in the multi millions of dollars

22   though, wouldn't it?

23   A.  I would imagine.

24   Q.  And the budget for 2010 comtemplates buying multi

25   million dollars worth of Gabapentin, doesn't it?

1  A.  I don't have knowledge of the budget for 2010.

2  Q.  And if we went back to 2006 and 2007 and 2008, Kaiser

3  was spending tens of millions of dollars for Gabopentin in

4  each of those years, wasn't it?

5  A.  That's exactly what the issue is because we were relying

6  on incomplete and faulty evidence.  We were, you know, to

7  use that word again, "duped" into thinking that there was an

8  appropriate place for Neurontin.

9  Q.  In November of 2009, when you read the Dickersin

10  article, did you say we're canceling the Gabapentin

11  contracts?

12        MS. NUSSBAUM:  Objection.  Your Honor, this is

13  confusing.  There are FDA-approved indications here.

14        THE COURT:  Right.  So maybe rephrase it to deal

15  with the nonapproved indications.

16  Q.  Since reading the Dickersin article in November of 2009,

17  have you taken any steps to cancel purchases of Gabapentin

18  other than for specific use for FDA certified purposes?  You

19  haven't done that, have you?

20  A.  And how would we do that?  How would we cancel just for

21  the -- I can't even envision how we would do that, sir.

22        THE COURT:  Well, have you put on any

23  restrictions?

24        THE WITNESS:  In purchasing?

25        THE COURT:  I don't know.  You have those

Page 121

1    guidelines you were telling us about, those restrictions,

2    has anything changed?

3            THE WITNESS:  Again, I'm in pharmaceutical

4    contracting.  I don't sit in the guideline department, but I

5    know that there's an effort going on to reinvigorate the

6    approach.  I know that there's been continuous education on

7    the appropriate use of Neurontin for the last ten years.

8            MR. KENNEDY:  I ask to have marked next in

9    evidence another Kaiser document, Exhibit 829.  This is a

10   February, 2007.  I don't know if you can put that up.

11           ( Exhibit 829 was received in evidence.)

12   Q.  This is another request for the Drug Information

13   Services, and this is from a Sidney Gold in psychiatry on

14   Sherman Way in Reseda.  That would be down in Southern

15   California, correct?

16   A.  That's correct.

17   Q.  I don't have an extra copy, but I'll be glad to give you

18   mine, and I'll work off the screen.  This is Dr. Gold who's

19   a psychiatrist down in Southern California and he's writing

20   in in February of 2007, two years after the lawsuit's been

21   filed and asking any information on use of Gabapentin in the

22   treatment of anxiety disorder, and scrolling down, let's see

23   under, "Lexicomp, mental health comment, large double-blind

24   studies have failed to differentiate this drug from placebo

25   when used as an adjunctive," that means additional, right,

1    "treatment for bipolar disorder, Gabapentin may be useful

2    for some of the anxiety disorders."

3         That's what that says, correct?

4    A.  That's what that says, correct.

5    Q.  And that was said with knowledge that Gabapentin had not

6    been proved successful on large double-blind studies,

7    correct?

8    A.  The evidence at the time did state that, yes.

9    Q.  So this is another example of where Kaiser is willing to

10   prescribe drugs that don't meet Level I double-blind

11   criteria, correct?

12   A.  No.  I don't believe that's a correct statement based on

13   that sentence.

14   Q.  Gabapentin certainly has never been approved by the FDA

15   for anxiety disorders, has it?

16   A.  That's correct.

17   Q.  Okay.

18   A.  All that sentence says is that Gabapentin may be useful

19   for some of the anxiety disorders from Lexicomp.

20   Q.  So this thing that's a sugar pill can also be useful for

21   anxiety disorders, correct?

22   A.  Your word, "sugar pill" but at the time, again, the

23   incomplete and inaccurate evidence at the time supported

24   that statement.

25   Q.  So these people again were completely duped, correct?

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    A.   The evidence at the time was incomplete and inaccurate,

2    and that was all they had to go on.   They did not know that

3    at the time.   That's a fair statement based on the evidence

4    that was available to this individual.

5    Q.   In preparation for your testimony here, you haven't gone

6    and interviewed any of the people in the Drug Information

7    Service who wrote these responses, have you?

8    A.   No, sir.

9    Q.   So you're basically practicing mind reading without a

10   license when you tell us that they were duped into doing

11   this, correct?

12            MS. NUSSBAUM:   Objection, your Honor.

13            THE COURT:   Sustained.

14   Q.   Doctor, you're speculating as to what the state of mind

15   of people you haven't talked to was when they wrote these

16   responses?

17   A.   No, my statement is the evidence available at the time.

18   I'm not speculating about what's in his or her mind, I'm

19   saying that the evidence at the time was incomplete and

20   inaccurate.   That's my statement.

21   Q.   You'd agree with me the people who would be best able to

22   comment on what their state of mind was are the people who

23   wrote these things, correct?

24   A.   Were you asking me about the state of mind, or were you

25   asking me about the statement?   You asked me about a

1   statement for Gabapentin being used for anxiety disorders.

2   Q.  Doctor, you'd agree the person in DIS who would best be

3   able to state what his or her --

4   A.  I could not speculate on his or her state of mind.

5   Q.  Would you like to hear the whole question?

6   A.  Okay.

7   Q.  Okay.  You'd agree with me that the best person to

8   testify about what the DIS people meant or knew or

9   understood would be the DIS people themselves, correct?

10  A.  Yes.

11  Q.  Do you know if we're going to see any of them in this

12  courtroom?

13  A.  Dr. Mirta Millares is going to be testifying, and she's

14  the manager in charge of DIS.

15  Q.  Do you know if she wrote any of these particular

16  exhibits that we're talking about?

17  A.  I do not.

18          THE JUROR:  I'm curious, what is Lexicomp?  Is

19  that something they're quoting from?

20          THE COURT:  What's Lexicomp?  Good question.

21          THE WITNESS:  It's an online formulary service for

22  us.  It contains copies of articles.  It's a reference tool

23  for the Drug Information Service pharmacists.

24          THE JUROR:  So it's something you buy, you don't

25  create that?

Page 125

1          THE WITNESS:  Correct, it's a commercial

2     database.

3          MR. KENNEDY:  Your Honor, I think I've already

4     offered 824 and 837.  If I haven't, I would at this time.

5          THE COURT:  We have 824, but I don't have 837, so

6     we'll add that.

7          MR. KENNEDY:  We'd offer 837.  At this time, we'll

8     also offer 828, another internal Kaiser document, and if I

9     might approach the witness, I have a copy for him as well.

10          ( Exhibits 837 and 828 was received in evidence.)

11     Q.  And, Doctor, you'll see this is an internal Kaiser

12     document entitled, "Management of Fibromyalgia In Adults"

13     dated February, 2007.  Do you see that, two years after the

14     complaint was filed?

15     A.  Correct.

16     Q.  And you'll see up in the upper right-hand corner, it

17     says, "National Practice Resource, CMI, Pain Management

18     Advisory Group."  Do you see that?

19     A.  Yes.

20     Q.  And turning to the eighth page, the last page of the

21     document, they actually list who the members of the CMI Pain

22     Management Advisory Group are, and that includes a number of

23     doctors up in the Care Management Institute The third name

24     is Karen Pantazis.  We saw her name on Friday in connection

25     with one of the documents; do you remember that?

Page 126

1   A.   Yes.

2   Q.   And looking down the rest of the people that were on the

3   CMI Pain Management Advisory Group as of February, 2007, any

4   of those you believe are just shills or paid consultants for

5   Pfizer?

6          MS. NUSSBAUM:   Objection, your Honor.   How would

7   the witness know?

8          THE COURT:   Sustained.

9   Q.   Doctor, you told us on Friday how shocked you were to

10  find out certain people were consulting for Pfizer; do you

11  remember that?   Let me move on.   Do you know any of the

12  doctors here?

13  A.   I don't recognize the names of these doctors.

14  Q.   Okay.   And turning back to page 1, turning back to page

15  1, what is up in the upper right-hand corner, what's Care

16  Management Institute, do you know?

17  A.   I don't.   I don't know.   I've heard it referred to as

18  CMI, but to tell you the truth, I couldn't tell you exactly

19  what it was.

20  Q.   And then it goes under management of fibromyalgia, it

21  tells us, "This material reflects the consensus of the -- is

22  that Kaiser CMI Pain Management Advisory Group based on its

23  clinical experience, and when we hear clinical experience,

24  that means experience with patients, right?

25  A.   Yes.

1   Q.   And a review of selected relevant publications, that's

2   what it says, right?

3   A.   Correct.

4   Q.   And then it goes on to explain that fibromyalgia

5   syndrome is a condition of unknown "etiology," again, a

6   fancy medical word for cause, right?

7   A.   Yes.

8   Q.   So it's a condition we don't know what causes it, but it

9   results in chronic and diffuse pain and tenderness on

10  palpitation at specific musculoskeletal areas, right?

11  A.   Yes.

12  Q.   And then if you go with me over to page 4 of 8, under

13  medications, they talk about various ones that are

14  available, and if we come down to anticonsulvants?

15  A.   You know, Mr. Kennedy, I've never seen this document

16  before, and we're hoping around pretty fast.  I'm not going

17  to be able just to comment from page to page.  This is a

18  pretty extensive document, pretty rich, and we're going from

19  the back page to the middle page.  Where are we going with

20  this?

21  Q.   Well, if you let me ask the questions, you'll find out,

22  and your lawyers will certainly have a chance --

23          THE COURT:  If you need to take a few seconds to

24  flip through the document, do it.

25  Q.   Take whatever time you want, Doctor.  I assure you

1    though the only thing I'm going to be asking you about is

2    the paragraph I've already identified on page 4 dealing with

3    the use of anticonsulvants to treat fibromyalgia as of

4    February of 2007.

5    A.   Okay.

6            THE COURT:  He's looked through it.

7    Q.   And under anticonsulvants the medications that the pain

8    management group discusses starts with Gabapentin in 1200 to

9    2400 milligrams, and what's qd?

10   A.   Daily, once a day.

11   Q.   "Once a day in divided doses is an option for pain

12   relief and improvement in function."  Then it goes on to say

13   that Pregabalin, what we talked about also is Lyrica is an

14   option that should be used if Gabapentin is not effective or

15   tolerated.  That's the secondary drug; is that correct?

16   A.   That's correct.

17   Q.   And do you know if any time down to and including today

18   the pain management group has changed any of its language in

19   this particular recommendation?

20   A.   I don't believe so, and, you know, not to sound like a

21   broken record, Mr. Kennedy, but, again, at the time that was

22   the evidence that was available, and it's come to our

23   knowledge that it's incomplete and it was inaccurate.

24   Q.   And going back to the anticonsulvants on page 4 that we

25   were reading, Gabapentin, the preferred drug, was generic by

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   2007, wasn't it?

2   A.  That's correct.

3   Q.  That's why it's called Gabapentin, it's no longer

4   Neurontin?  On the other hand --

5   A.  No, that's not why.  A lot of the guidelines are only

6   spoken in the generic, that's why it's not Lyrica, it's

7   Pregabalin.

8   Q.  Pregabalin, as we know, is Lyrica?

9   A.  Is Lyrica.

10  Q.  And as of 2007, Lyrica was still a branded drug.  There

11  was no generic version available, was there?

12  A.  That's correct.

13  Q.  And Gabapentin was a whole lot cheaper than Pregabalin

14  as of February, 2007, right?

15  A.  Correct statement.

16  Q.  And that was part of the reason why Gabapentin got

17  recommended over Pregabalin, right?

18  A.  You know, I don't know that that was part of the reason

19  or not.  I didn't -- I wasn't there when these reasons came

20  about.  You know, that would be speculation on my part.

21  Q.  You'd certainly agree with me that cost is a factor that

22  Kaiser takes into account in deciding what order to

23  recommend drugs, correct?

24  A.  Well, safety, efficacy and cost are always taken into

25  consideration when reviewing medications, and, you know,

1    when Kaiser spent over $200 million on Neurontin when we

2    believed there was efficacy for it wasn't a question.  You

3    know, it was expensive then when it was added to the

4    formularies in all of our regions.

5    Q.  And while it was a branded drug, as you told us on

6    direct, it became the subject of an initiative, didn't it?

7    A.  Because of the rapid and escalating use and what was

8    determined to be inappropriate indications without

9    evidence.

10   Q.  And it wasn't the only drug that was the subject of an

11   initiative, was it?

12   A.  No.

13   Q.  And each of the others also happened to be a brand as

14   opposed to a generic drug, correct?

15   A.  That's incorrect.  We've gone after generic medications

16   in the antibiotic arena trying to decrease inappropriate

17   antibiotic, prescribing of all antibiotics, we've gone after

18   numerous generics in those drugs that shouldn't be given to

19   the elderly because of risk of falls and fractures, go after

20   drugs branded or generic.

21            THE COURT:  You know what, we're going to try to

22   keep his answers to his questions to try and finish you

23   today, if it's possible, so let's just move this along.

24            THE WITNESS:  Thank you.  Sorry.

25            MR. KENNEDY:  I think I've offered 828 into

1   evidence, if I haven't, I would; and at this time I'd also

2   like to offer 831 in evidence.

3           MS. NUSSBAUM:  Your Honor, I object to 828, and we

4   can discuss it later at sidebar, if you'd like.

5           THE COURT:  We'll discuss it later.  Was 828 what

6   we just saw?

7           MS. NUSSBAUM:  Yes.

8           THE COURT:  It's been all over the screen.

9   Overruled.

10          THE JUROR:  The last document, fibromyalgia, is

11  that nociceptive pain?

12          THE COURT:  Would that be considered nociceptive

13  pain, fibromyalgia, or is it neuropathic, or does it have

14  anything to do with either.

15          THE WITNESS:  You know, I don't know, I don't know

16  if the experts know, but you can see by the description

17  there, it's an unknown cause etiology.  We don't really know

18  what causes, it's just a loose collection of symptoms that

19  they classify as fibromyalgia.  It's kind of a nebulous

20  disease, if you will.

21          MR. KENNEDY:  May I proceed, your Honor?

22          THE COURT:  Yes.

23          MR. KENNEDY:  I next offer 831 in evidence.

24  Q.  I'm sorry, I don't have an extra copy on this one, but

25  I'll try to keep it brief, Doctor.

1        MS. NUSSBAUM:  Your Honor.

2        THE COURT:  Now you're objecting?

3        MS. NUSSBAUM:  I would object, your Honor, so

4   unless there's an appropriate foundation, I'd ask it not be

5   put on the screen, and I'd object.

6        THE COURT:  Whose document is it?

7        MR. KENNEDY:  It's Kaiser's document.

8        THE COURT:  All right.  Let me see you at sidebar.

9        (THE FOLLOWING OCCURRED AT SIDEBAR:)

10        THE COURT:  It says Kaiser Permanente Medical Care

11   Program to be used within Kaiser Permanente only.  Why isn't

12   it a Kaiser document?

13        MS. NUSSBAUM:  I don't think the witness has any

14   knowledge of this document, and I don't think we're asking

15   authenticity, but I don't think these documents should go in

16   with this witness.

17        THE COURT:  Overruled.  That may be.  Let me ask

18   you this --

19        MS. NUSSBAUM:  He's never seen these documents, he

20   knows nothing about it.

21        THE COURT:  Both sides, that was the deal, no

22   challenge, authenticity, business records, we're putting in

23   Pfizer's on that basis, we're putting in Kaiser's on that

24   basis.  What's good sauce for the goose is sauce for the

25   gander.  Whether he knows anything about it we'll have to

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

Page 133

1    see.

2              MR. KENNEDY:  Yes, your Honor.

3              (SIDEBAR CONFERENCE WAS CONCLUDED)

4              ( Exhibit 831 was received in evidence.)

5    Q.  And asking you to take a look at the first page of 831,

6    if we can scroll down the bottom, that says, "Kaiser

7    Permanente Medical Care Program."  That's in the same

8    department as purchasing, right?

9    A.  No, sir.

10   Q.  It's not the same.  It's a document to be used within

11   Kaiser Permanente only; do you see that?

12   A.  Yes.

13   Q.  No doubt in your mind it is a Kaiser document --

14   A.  It is a Kaiser document.

15   Q.  -- dated May, 2007?  We're now, what, two years plus

16   after the lawsuit and this deals with neuropath --

17   A.  Mr. Kennedy, this is going to be another huge document

18   that I haven't seen before, and you're going to ask me to

19   comment on it.

20             THE COURT:  Flip through it and if you can't

21   comment, say you can't comment.

22             THE WITNESS:  Okay.

23   Q.  I think you'll be find the questions are simple enough,

24   it's entitled, "Management Of Neuropathic Pain In Adults,"

25   correct?

1   A.   Correct.

2   Q.   And then it gives a brief description of neuropathic

3   pain as being, "A chronic pain condition which results from

4   dysfunction of or damage or injury to the nerves which cause

5   a change in nerve function at the site of injury and

6   surrounding areas.  It is often described as numbness or as

7   a shooting, burning or tingling pain.  The most common types

8   of neuropathic pain are diabetic neuropathy, postherpetic

9   neuralgia, complex regional pain syndrome, (regional

10  sympathetic dystrophy) -- " and I knew how to pronounce this

11  last night.

12  A.   "-- trigeminal neuralgia."

13  Q.   Thank you very much, Doctor.  I've read that correctly,

14  haven't I?

15  A.   Yes.

16  Q.   And if we turn over to page 2 in the middle of the page,

17  it talks about medications, correct?

18  A.   Correct.

19  Q.   And if we go to page 3 under the discussion of

20  medications, we get to anticonsulvants, or it says,

21  "Gabapentin is recommended as the second line agent in the

22  management of neuropathic pain," correct?

23  A.   That's correct.

24  Q.   And that's May of 2007, correct?

25  A.   That's correct.  Not for the sake of sounding like a

1    broken record, that was our stance, it was after

2    Nortriptyline, one of the tricyclic antidepressants, and

3    that was supported by the evidence at the time.

4    Q.  Tricyclic, would that be things like Amitriptyline?

5    A.  Amitriptyline is one of the TCAs, yes.  Our preferred

6    was Nortriptyline.

7    Q.  Okay.  Why don't you turn back to page 2 of document

8    831.  Under medications again where it says, "Tertiary

9    amines, such as Amitriptyline, Doxaphene, Imipramine and

10   Tri --" well, the other one -- "are generally not

11   recommended for adults greater than 65 years old with

12   chronic pain because of their strong sedative,

13   anticholinergic and orthostatic hypotensive effects," and

14   the first one of those, anticholinergic, that's the ability

15   to pass water, isn't it, retention of water?

16   A.  No.  If I could cut to the chase on that, we did not

17   recommend the tertiary amines.  That statement is absolutely

18   correct, we went with the secondary amine, which was

19   Nortriptyline, which did not share the side effects

20   mentioned there to the same extent.  It was a much lower

21   risk, and we packaged it such that it was in a titration

22   pack, and we went to great effort to package it so patients

23   could slowly titrate up to the most effective dose and avoid

24   the side effects.

25   Q.  Changing topics, you're aware that as of today, there

1    are still references to Neurontin and Gabapentin on Kaiser's

2    patient information website, correct?

3    A.  Correct.

4    Q.  And assuming technology will cooperate twice in one

5    trial, Austin, can you take us to KP.org, and can we click

6    on Health and Wellness, and now let's click on Drugs and

7    Natural Medicines, and now click on Drug and Encyclopedia,

8    and then going to looking up a drug by a condition, why

9    don't we pick a random letter like P.  Then why don't we

10   scroll down to pain originating from a nerve, and let's

11   click.  Drugs from managing pain, Doctor, originating from a

12   nerve, Gabapentin and Neurontin, correct?

13   A.  Correct.

14   Q.  And that's what it says on the website today, correct?

15   A.  So the website is not managed by Kaiser, we purchase it

16   from a third-party vendor, first point, and, you know, I

17   think what it shows is, you know, the pervasive nature of

18   Pfizer's ability to market this.

19           MR. KENNEDY:  Motion to strike.

20           THE COURT:  Yes, why don't you ask the question.

21   Q.  What I've just read, when you go through that series of

22   clicks, that is what you get on Kaiser's patient's website

23   today at this moment; is that correct?

24   A.  Correct.

25   Q.  And is Kaiser misleading its patients, or is Kaiser

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   misleading the jury, which is it?

2   A.   The information there is provided by the third-party

3   vendor Healthwise.   It's not meant to be medical advice.

4   They're told to check with their doctor by both health media

5   or Healthwise as well as Kaiser, if you go through and look

6   at -- if you click on some of those, you'll see the

7   disclaimer, but, again, it's evidence that we were relying

8   on at the time this was created.

9   Q.   The answer is yes, as of today, the seventh or eighth

10   day of this trial, that's still what a Kaiser patient gets

11   when they go to the information website, correct?

12   A.   And Healthwise is also reviewing the content of those.

13          MR. KENNEDY:   Move to strike.

14          THE COURT:   Yes, just answer.

15          THE JUROR:   Does Kaiser maintain editorial control

16   over the website?

17          THE WITNESS:   No, it's a third-party vendor that

18   puts together the whole database for us.   When we call out

19   issues to them, they'll re-review it, but they have a whole

20   medical board that reviews the evidence, and they create

21   their content.

22   Q.   Doctor, you believe that what we're looking at now is a

23   website that was put together by Healthwise?

24   A.   Is one of the vendors that contributes to this website,

25   yes.

1  Q.  Can you show us -- we'll revisit, but it's your

2  testimony you think this is a third-party material, this

3  isn't Kaiser Permanente's own material?

4  A.  Kaiser doesn't create the content for the member of the

5  public website.

6  Q.  Let's click on Neurontin or Gabapentin, either one on

7  this site.  That takes us to various dosages that they

8  discuss Neurontin between 100 milligrams going up to 800

9  milligrams, and let's click on one of those.  That then, if

10  we scroll, contains an important note, keep scrolling, and

11  we get to other uses.

12          "This section contains uses of this drug that are

13  not listed in the approved professional labeling for the

14  drug but that may be prescribed by your health care

15  professional.  Use this drug for a condition that is listed

16  in this section only if it's been prescribed by your health

17  care professional.  Gabapentin may also be used to treat

18  other nerve pain conditions such as diabetic neuropathy,

19  peripheral neuropathy and trigeminal neuralgia," correct?

20  A.  That's correct.

21  Q.  And now keep scrolling.  Go back to KP.org, then let's

22  go to pain management, then let's go to select your region.

23  Now I'm picking Northern California where the doctor is

24  from.  Then how about clicking on medications, and then

25  could you scroll down slowly stopping at anti-seizure

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    medications.  "Anti-seizure medications, like

2    antidepressants, anti-seizure medications are often used for

3    pain involving the nerves.  Common types include," and we've

4    got Neurontin and Gabapentin in there, and we also have

5    Lyrica, the one that's still a branded drug listed last,

6    don't we?

7    A.  Yes.

8    Q.  Keep scrolling.  Then can we click on "complete list of

9    reviewer," I'm sorry, scrolling down, "Reviewed by

10   Karen Pantazis."  We've seen that name before, she's part of

11   the CMI pain committee, that's a Kaiser pain doctor,

12   correct?

13   A.  Uh-hum.

14   Q.  And Andrew Bertognoli, he's a Kaiser pharmacist,

15   correct?

16   A.  No, he's not a pharmacist, Ph.D.

17   Q.  Ph.D., okay.  They reviewed this site in December, 2009,

18   correct?

19   A.  That's what it says, yes.

20   Q.  That would be a month after Dickersin, wouldn't it?

21   A.  Yes.

22   Q.  So far we haven't seen Healthwise mentioned on any of

23   these pages, have we?

24   A.  No, we have not.

25   Q.  But regardless of who prepared this material, we know

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1   here that at least in December of 2009, it was reviewed by a

2   Kaiser pain specialist and a Kaiser Ph.D., correct?

3   A.  Yes.

4   Q.  Austin, can we go back to KP.org.  Let's do anyone quick

5   search, Health and Wellness, and click on Conditions and

6   Diseases, and then let's type in Neurontin.  And, again, if

7   I were a Kaiser patient going on this website today, Doctor,

8   this is what I'd find, anticonsulvants, which of course

9   Neurontin is one for treatment of cerebral palsy, correct?

10  A.  Correct.

11  Q.  And when we are talking cerebral palsy, we generally

12  think children, don't we?

13  A.  No.  Yes and no.  I mean, it's a birth defect, but it

14  affects adults as well.

15  Q.  Have you written a memo to anybody saying there are

16  people out there with kids with cerebral palsy that we're

17  talking about a sugar pill for them, we got to do something

18  about this?

19  A.  There's no mention of a sugar pill.  We haven't

20  mentioned -- there's anticonsulvants.  It doesn't say

21  Gabapentin or not.

22  Q.  Do you think you ought to make clear that other

23  anticonsulvants may be okay, but at least you wouldn't want

24  people getting confused into thinking that Gabapentin, the

25  sugar pill, might be able to help a child with cerebral

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1  palsy?

2  A.  I'm not familiar with the evidence on cerebral palsy, I

3  apologize.

4  Q.  Thank you for clicking.  I apologize, under

5  anticonsulvants, if you click on that, what do you get as

6  examples, Doctor?

7  A.  Several of the anticonsulvants.

8  Q.  Including Neurontin?

9  A.  Including Neurontin.

10  Q.  So, Neurontin is specifically cited as an example of an

11  anticonsulvant that you should consider in connection with

12  treating somebody for cerebral palsy?  Can we go back,

13  Austin.  It goes on to say Gabapentin for epilepsy.  Of

14  course, we know that's the FDA-approved effort on it, then

15  it goes on under Neurontin to list various other conditions

16  for which if you check with your doctor you might find it

17  helpful?

18  A.  It doesn't say that Gabapentin is -- I'm sorry, could

19  you repeat that statement.

20  Q.  I'll withdraw it.

21       MR. KENNEDY:  In the interest of time, your Honor,

22  at this point we've made slide shots of the portions of the

23  website that we've just scrolled through and those have been

24  marked as 902A, B and C and I would offer those in evidence

25  at this time.  As I say, I'll represent they are screen

Page 142

1    shots of what we just saw live on the Internet.

2            THE COURT:  All right.

3            ( Exhibits 902A, B and C were received in

4    evidence.)

5    Q.  Now, in addition to what's on the website today up until

6    February 8 or 9 of this year, the Kaiser website also

7    contained a considerable amount of other information about

8    Neurontin, didn't it, Doctor?

9    A.  It may, yes.

10           MR. KENNEDY:  Before I go further, I'd like to

11   move Exhibit 918 into evidence, and, your Honor, I'll

12   represent these are again screen shots from actually a disk

13   that was provided to us by Kaiser of materials that's been

14   taken down from the website a couple weeks ago.

15           ( Exhibits 918 were received in evidence.)

16           MR. KENNEDY:  May I proceed, your Honor?

17           THE COURT:  Yes.

18   Q.  Going to the first page of 918, Austin, entitled,

19   Doctor, you see, "Anticonsulvants for cancer pain," and the

20   examples, the second one given is Neurontin.  Do you see

21   that?

22   A.  Yes.

23   Q.  And, again, this was up on the Kaiser website for a

24   number of years until about two weeks before this trial

25   started, correct?

1    A.  Yes.

2    Q.  And do you know who made the decision to take that

3    material down two weeks before?

4    A.  There's a logo for Healthwise.  They're the company that

5    does the content for the website, and it was our suggestion

6    that they relook at it, and they agreed based on the

7    available evidence to date it should be taken down.

8    Q.  And who's the "we" from Kaiser?  For example, did you

9    bring the people from the pain committee like Ms. Pantazis

10   who had signed off on the website in December of 2009 and

11   ask her if she thought this was misleading?

12   A.  I don't exactly know who was involved in that discussion

13   or who took that information forth, but I do know that

14   Healthwise reviewed it and made the decision to take it

15   down.

16   Q.  This is Kaiser's website?

17   A.  That is maintained by a third-party vendor, yes,

18   Healthwise.

19   Q.  Healthwise can't just hack into that website and take

20   things off, they have to do it with Kaiser's permission?

21   A.  Right, we ask them to review based on the new evidence,

22   could you please review the new content.

23   Q.  And that was Kaiser that made that request, not

24   Healthwise, correct?

25   A.  Correct.

1   Q.  And the people from Kaiser made that were either lawyers

2   or administrators, correct?

3   A.  I can neither confirm or deny that statement.

4   Q.  You certainly didn't take a poll of pain doctors or

5   neurologists before deciding to take material off the

6   website, did you?

7   A.  I'm not sure that happened or did not happen.

8   Q.  Can you name one real doctor who works with Neurontin

9   who was even consulted with regard to taking material off

10  the website?

11  A.  Mr. Kennedy, I'm a pharmacist that works in

12  pharmaceutical contracting.  I wasn't privy to that

13  discussion, so I cannot name a doctor that was involved.

14  Q.  Thank you very much.  Going back to, again, this was

15  material was on the website that was taken off two weeks

16  ago, under "Anticonsulvants," second one, as you mentioned,

17  listed was "Neurontin" and under, if we can scroll down to

18  "How Well It Works, Anticonsulvants help control cancer pain

19  related to the nerve system, neuropathic pain."  And if we

20  can scroll down further, Austin, the second page, and

21  there's a medical reviewer listed there, Anne Poinier; are

22  you familiar with her?

23  A.  No, I'm not.

24  Q.  You don't know who she works for?

25  A.  I do not.

Page 145

1    Q.  Let's go to another portion that was taken off the

2    website, "Anticonsulvants For Chronic Low Back Pain."

3    Again, up until two weeks ago, under that topic, Neurontin

4    was listed as the second example, and then scrolling down

5    under why it is used, "Kaiser's patients were told

6    anticonsulvants can reduce some persistent low back pain

7    with fewer side effects than tricyclic antidepressants?"

8    I read that correctly, right?

9    A.  Yes.

10   Q.  And those are TCAs, tricyclic antidepressants, right?

11   A.  Right.

12   Q.  So Kaiser was telling its patients for anticonsulvants,

13   for at least some people would have fewer side effects than

14   TCAs, right?

15            MS. NUSSBAUM:  Your Honor, I would object to

16   Kaiser telling its patients which has become a mantra here,

17   and I don't think there's been testimony.  The testimony was

18   this was on a website --

19            THE COURT:  I strike the comments.  Do you have an

20   objection to the question?

21            MS. NUSSBAUM:  Yes.

22            THE COURT:  This is the former website, right?

23   What does it have on there, Kaiser Permanente, okay.

24            MR. KENNEDY:  I'll represent this was the

25   patient --

1          THE COURT:  Yes, I understand.

2    Kaiser Permanente.

3    Q.  Okay.  Going back again to, "Why It Is Used," in the

4    last paragraph, last paragraph, last sentence under, "Why It

5    Is Used, the anticonsulvant Gabapentin may be your best bet

6    for safely treating chronic pain because it is not used by

7    the body in the same way as many other medicines.  This

8    makes it less likely to interact with other drugs."

9          And at some point within the last two weeks, was

10   there some new medical research that came out that indicated

11   Gabapentin is less likely to interact with other drugs?

12   A.  No, the evidence that came out is that it's

13   nonefficacious for the treatment of the pain that we're

14   talking about here, so, regardless, if it doesn't interact,

15   it's not the drug of choice for treating the pain.

16   Q.  Again, you told you weren't directly involved, but the

17   evidence that you're aware of is the Dickersin article,

18   correct?

19   A.  And several other articles and memos that have come out

20   through discovery, yes.

21   Q.  And you're not aware, for example, Kaiser pain doctors

22   or Kaiser psychiatrists circulating a petition saying we

23   found that Neurontin just doesn't work for these purposes,

24   and we'd like to see it removed from the website, you never

25   saw anything like that, did you?

Page 147

1  A.  No.

2  Q.  In fact, before the material was taken down from the

3  website, you can't recall one Kaiser doctor taking the

4  trouble to write an e-mail or a letter saying, I think we're

5  really misleading our patients by having all this stuff

6  about chronic back pain and Neurontin on the website, not

7  one letter, correct?

8  A.  I can't really answer that question truthfully because,

9  again, I'm in pharmaceutical contracting in Livermore, and

10  that letter would not come to me.

11            MR. KENNEDY:  Your Honor, in the interests of

12  time, I think there's something like 20 or 21 different

13  conditions.  Under Rule 1006, we've prepared a summary.

14            THE COURT: Have you given it to them in advance?

15            MR. KENNEDY:  They saw it during opening

16  statement.  I don't think we're going to finish today.

17            THE COURT:  I would like to try and finish today,

18  so let's keep going.

19            MR. KENNEDY:  Meanwhile, I'll show them a copy of

20  what I would offer as the 1006 summary of what would be in

21  there if we bored everybody by going through --

22            THE COURT:  Have you seen this before?

23            MS. NUSSBAUM:  Your Honor, we have not seen

24  this.

25            THE COURT:  Are you objecting to it?

Page 148

1          MS. NUSSBAUM:  We're objecting to it.

2          THE COURT:  Sustained because she hasn't seen it

3     before.

4          MS. NUSSBAUM:  Your Honor, if I might also the

5     screen shots don't have the website addresses on them which

6     would indicate Healthwise, so we think that the screen shots

7     should show the entire thing.

8          THE COURT:  Keep going.

9          MR. KENNEDY:  I asked to have marked next

10    in evidence Exhibit 917, and then moving next we're offering

11    into evidence Exhibit 902, which I mentioned before is

12    further information from the Kaiser website.

13          ( Exhibits 902 and 917 were received in evidence.)

14          THE COURT:  You seen those before?

15          MS. NUSSBAUM:  No, they've just been handed to me,

16    your Honor, 902 and 917.

17          THE COURT:  I don't know, you're supposed to show

18    it to her in advance, that's part of the game rules, so give

19    her two seconds to look at it.

20          MR. KENNEDY:  I'm not asking any questions about

21    them.  We can take it up outside the presence of the jury in

22    the interests of time.

23          THE COURT:  Okay, that's fine.

24          MR. KENNEDY:  This is an exhibit that plaintiff's

25    counsel has seen and did not object to and we showed it in

1    opening statement.

2         THE COURT:  Yes.

3    Q.  Doctor, Kaiser has a number of different regions around

4    the country, doesn't it?

5    A.  Yes.

6    Q.  For example, you work in Northern California, and that's

7    called, what, the Permanente Medical Group?

8    A.  The physicians that treat the Kaiser patients are

9    referred to as the Permanente Medical Group in Northern

10   California.

11   Q.  How about the region, what's it called?

12   A.  Northern California.

13   Q.  What's TPMG?

14   A.  That is the physicians that treat our members, that is

15   contracted with by the health plan, Permanente Medical

16   Group.

17   Q.  And what's SCPMG?

18   A.  It's an analogous body that treats the Southern

19   California patients in the Southern California region.

20   Q.  Okay.  Make sure I get these right, we're talking about

21   Northern California, TPMG is the group that treats the

22   patients up there?

23   A.  Yes.

24   Q.  And there's a separate P & T Committee for approving

25   formulary in Northern California?

Page 150

1   A.  Yes, its region has its own P & T.

2   Q.  And then Southern California, the doctors down there are

3   the SCPMG; is that right?

4   A.  Southern California Permanente Medical Group.

5   Q.  Okay.  And so we've got Northern California, we've got

6   Southern California, and they each have their own formulary

7   and their own committee of people that decides what should

8   go on the formulary, right?

9   A.  Correct.

10  Q.  And then we got this Drug Information Service, DIS,

11  that's based near Southern California, isn't it?

12  A.  Yes.

13  Q.  And then we've got a different region, the northwest

14  group up in Washington and Oregon, and they have their own

15  P & T Committee, right?

16  A.  Yes.

17  Q.  And their own formulary, and then we've heard reference

18  to the initiatives, what was the name of the initiative in

19  Northern California to deal with Neurontin, the DRUG or

20  DUAT?

21  A.  The DRUG was the committee that dealt with it.

22  Q.  If we go to Northern California, we got DRUG was the

23  acronym that was put together that was looked into you said

24  the overuse of Neurontin in Northern California, then there

25  was something called DUAT, wasn't there, in Southern

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1    California?

2    A.   Correct.

3    Q.   And then up in the northwest, they had something called

4    DUIT, right, D-U-I-T, then in addition to all of that, at

5    least, there's another region and a different P & T

6    committee and a different formulary out in Hawaii?

7    A.   That's correct.

8    Q.   And then if we go to Colorado, they've got their own

9    formulary and their own P & T committee?

10   A.   Correct.

11   Q.   Same question for Ohio, correct?

12   A.   Correct.

13   Q.   And the same thing, do the middle atlantic states

14   include Georgia?

15   A.   No, the Georgia and mid-Atlantic states are two

16   different regions.

17   Q.   So we have to make up a different pile for Georgia, and

18   mid-Atlantic states are referred to as MIS, correct?

19   A.   Mid-Atlantic states, yes.

20   Q.   And somebody in this courtroom had referred to MAS

21   referred to Massachusetts, that would have been a slip of

22   the tongue, it's not referring to MAS, it's referring to

23   these mid-Atlantic states?

24   A.   Correct.

25   Q.   And you at various times sat up on the P & T committee

1    in Northern California?

2    A.  That's correct.

3    Q.  And you also, you visited, was that as a guest or as a

4    member?

5    A.  As a guest.

6    Q.  In Southern California, and you don't regularly attend

7    P & T committee meetings in Hawaii?

8    A.  No.

9    Q.  So sorry about that.  Or Oregon?

10   A.  No.

11   Q.  Or Colorado or any of the other regions, and as far as

12   knowing exactly what the P & T committees have done in those

13   other regions to decide what use to make or not use of

14   Neurontin, you wouldn't be intimately familiar with any of

15   that, would you, Doctor?

16   A.  That's correct.

17   Q.  Now, in addition to having different regions, and you'll

18   agree with me those regions don't always do things exactly

19   the same way, correct?

20   A.  That's correct.

21   Q.  In addition to differences among the regions, Kaiser

22   doctors also prescribe and have prescribing patterns that

23   are somewhat different than those for the nation as a whole,

24   correct?

25   A.  I'm sorry, could you restate that?

1  Q.  Sure.  Let me see if I can't do better.  You explained

2  on direct that you felt Kaiser's 8 million patients were a

3  pretty good cross-section of Americans generally?

4  A.  Correct.

5  Q.  However, the way doctors prescribe to those 8 million

6  Kaiser patients is different than the way doctors prescribe

7  to the rest of America, correct?

8  A.  I would not agree with that statement.

9  Q.  Well, you would agree with me that Kaiser prescribes a

10  greater percentage of generic drugs than the national

11  average?

12  A.  Yes.

13  Q.  Okay.  It's already in evidence, Exhibit 323 under drug

14  use management, this is a 2004 clinical performance report

15  for Kaiser Permanente Southern California.  It's been

16  referred to before.  Austin, can we scroll down and last

17  paragraph in the right column, "Generic medications allow

18  our pharmacies to provide medications at significant cost

19  savings.  In 2003, approximately 75 percent of our total

20  prescriptions were filled with generic drugs, compared with

21  a national average --" I'm sorry, "filled with generic

22  drugs, compared with a national average of 43 percent."

23          So you've got something like a 30 percent greater

24  use of generic drugs within the Kaiser system than was true

25  nationally back in 2003, right?

1    A.   Correct.

2    Q.   And you testified before a senate committee in March of

3    2008; do you remember that?

4    A.   Yes.

5    Q.   And you told the senate committee by then approximately

6    80 percent of all prescriptions written by Kaiser physicians

7    or for generic drugs, whereas only 63 percent of

8    prescriptions written in the U.S. are for generic drugs,

9    correct?

10   A.   That's correct.

11   Q.   And as far as you know, that's been true throughout the

12   period covered by this case, Kaiser has been more

13   conscientious in trying to make sure patients are treated

14   with generic rather than branded medicines?

15   A.   Correct.  Thankfully the body doesn't have to

16   differentiate between Gabapentin or Neurontin.  If it's a

17   pink label or a blue label, it's still --

18   Q.   Doctor, there's no question pending.

19            MR. KENNEDY:  I apologize, I'm told Exhibit 323

20   was not yet introduced into evidence?

21            THE CLERK:  That's correct.

22            MR. CHEFFO:  It's a Kaiser document.  I will offer

23   it at this time.

24            MS. NUSSBAUM:  No objection, your Honor.

25            ( Exhibit 323 was received in evidence.)

Page 155

1   Q.  Now, I want to turn back to a topic that we addressed on

2   Friday, and that dealt with this northwest region up in

3   Oregon and Washington, and remember you saw a memo that

4   talked about returning Neurontin to the formulary up in the

5   northwest.  Do you recall that testimony, Doctor?

6   A.  Yes, sir.

7           MR. KENNEDY:  This time I'd offer Kaiser 35 in

8   evidence, a June 17, 2004 memo from Sean Jones.  I have an

9   extra copy, your Honor, and, Austin, if you put that up, I

10  think that may help provide some context for that testimony.

11  It's 757 I'm offering in evidence, your Honor.

12          THE COURT:  Wait a minute, hold it.

13          THE CLERK:  Is it 35 or 7 --

14          THE COURT:  You've got two numbers.

15          MR. KENNEDY:  I have referenced Kaiser 35 earlier,

16  Exhibit 757, I'm sorry, Mr. Alba, my mistake.  I wish I

17  could say the last one.

18          ( Exhibit 757 was received in evidence.)

19  Q.  Now, this is a June 17, 2004 letter, it's being written

20  to people up in that northwest region by the

21  Kaiser Permanente Group up there.  Do you remember that?

22  A.  Uh-hum.

23  Q.  And read it as much of it as you want.  You'll see in

24  the second paragraph, the second sentence, "Some

25  nonformulary drugs will now have criteria to define medical

1   necessity, and they say criteria-based drugs will include,"

2   and you'll see Gabapentin and Neurontin is there.  On Friday

3   we weren't sure exactly what criteria-based, and it goes on

4   to say --

5   A.  Mr. Kennedy, if I could say, it doesn't look like it's

6   going to Permanente physicians, it looks like it's going to

7   outside consultants.

8   Q.  Okay.  In any event, it was a letter certainly generated

9   up in the northwest region of Kaiser, correct?

10  A.  It was generated in the northwest region, correct.

11  Q.  And, in fact, it's signed by the chairman of that

12  region's they call it a Formulary In Therapeutics Committee,

13  that would be the equivalent of a P & T committee here?

14  A.  Yes, but he starts out as a consultant or referral

15  providing, so he's definitely not talking to Permanente

16  Medical Group physician.

17  Q.  And he's talking about he makes clear in the first

18  sentence, "We'd like to update you about our formulary

19  process," correct?

20  A.  Uh-hum.

21           MR. KENNEDY:  And going next, and I offer next in

22  evidence Exhibit 729.

23           ( Exhibit 729 was received in evidence.)

24  Q.  And this is a Kaiser document entitled criteria-based

25  prescribing effective June 21, 2004, and do you remember the

Page 157

1    last letter we looked at, Exhibit 757, if we might go back,

2    it was dated June 17, 2004, saying, "I'd like to update

3    about changes in our formulary process and about

4    criteria-based drugs," and then going to Exhibit 729, 729 --

5              MR. KENNEDY:  Which I'm not sure if I offered into

6    evidence, Mr. Alba?

7              THE CLERK:  Yes.

8              MR. KENNEDY:  Thank you.

9    Q.  That's dated June 21sT, four days later, and it's

10   called, "Criteria-based prescribing," and it lists

11   Neurontin, the same other drugs that were referenced in the

12   June 17 letter, correct?

13   A.  Uh-hum.

14   Q.  And then turning to the second page of Exhibit 729, and,

15   I apologize, this is as good as our copy came out, it's drug

16   price scale, patient price supply for 30 days, and you get

17   one dollar sign if it's less than $25 and you get five

18   dollar signs or more if it's more than $200, correct?

19   A.  Correct.

20   Q.  And turning to page 4337 --

21             THE COURT:  What is that -- are you going to be

22   clarifying what you're getting to?

23             MR. KENNEDY:  I'm hoping to.

24             THE COURT:  All right.

25   Q.  Going to page 1 of the document, and, I'm sorry, it's

1  numbered page 1 that says, "Gabapentin criteria forms."

2  There we go, page 1 at the bottom.  And for Gabapentin, dose

3  change and Neurontin gets a five dollar sign, most expensive

4  category, doesn't it?

5  A.  Yes.

6  Q.  And then it's listed for seven or eight uses at that

7  point, correct?

8  A.  Correct.

9  Q.  It doesn't say anything though about neuropathic pain,

10 does it?

11 A.  No.

12        MR. GREENE:  Wait a minute, neuropathic pain?

13        THE COURT:  Yes, it is.

14 A.  Yes, it's the second one.

15 Q.  It doesn't say anything about postherpetic neuralgia?

16 A.  I don't know if they meant to include that in the

17 neuropathic pain because PHN is one of the neuropathic pain

18 syndromes, but, you're right, it's not specifically called

19 out.

20 Q.  That does now acquaint us with what criteria-based

21 prescribing refers to in the northwest.

22        MR. KENNEDY:  And going back I'd like to move into

23 evidence Exhibit 810, which is meetings, 810 being the

24 Regional Formulary and Therapeutics Committee minutes.

25        THE COURT:  Well, can you explain, do you know

1    what criteria-based means?

2            THE WITNESS:  I don't.  This is the second time

3    I've heard that phrase.  I don't know if it's guidelines.

4    We use guidelines in Northern California, Southern

5    California.  You know, I've never attended a P & T up in the

6    northwest, so I couldn't really comment, but it would just

7    be a guess at this point.

8    Q.  So you really aren't the witness we ought to be talking

9    to?

10           THE COURT:  About this issue.

11           MR. KENNEDY:  Okay.

12   Q.  Or likewise exactly when DIAT, the Neurontin initiative

13   up in the northwest, you weren't there when that was

14   started?

15   A.  That's correct.

16   Q.  And did you attend any DIAT meetings with regard to what

17   the northwest was doing with regard to controlling or not

18   controlling excessive use of Neurontin, did you?

19   A.  I did not attend a meeting in the northwest.

20   Q.  And in the interests of time, that would also be true if

21   we talked about any of the other Kaiser regions outside of

22   California, you aren't familiar enough with either their

23   formulary decisions or their dealings with regard to trying

24   to control Neurontin to be able to really comment

25   intelligently on those, are you?

Page 160

1   A.  Today, no.

2        MS. NUSSBAUM:  Objection, your Honor, if he wants

3   to ask him what his knowledge is of those, I would object to

4   those questions.

5        THE COURT:  Well, do you have any knowledge based

6   on your position what all of these committees have been

7   doing?

8        THE WITNESS:  At the time in my position as a drug

9   use manager, we met biannually face-to-face, and once a

10  month on the phone, we'd discuss the various initiatives, so

11  I had good knowledge of what was going on through each

12  region as a whole for the program but not granular knowledge

13  of P & T minutes at the P & T level.

14        MR. KENNEDY:  Your Honor, one more, and we'd get

15  off the midwest.  We'd offer Exhibit 810 which I was just

16  referring to.

17        ( Exhibit 810 was received in evidence.)

18  Q.  Going to 810, and even though you're not familiar with

19  the northwest, we do know Regional Formulary and

20  Therapeutics Committee is the name of the group that they

21  have up there, it's like your P & T, correct?

22  A.  Yes.

23  Q.  And this is minutes of September 8, 2005, six months

24  after the complaint has been filed, correct?

25  A.  Correct.

6d016ce6-9a47-4701-96d6-fa1cb9d427f6

1  Q.  And scrolling down about four paragraphs, the one that

2  begins, "Gabapentin," and it says, "Gabapentin has been

3  available for drug benefit coverage if criteria were met for

4  epilepsy, neuropathic pain, restless legs syndrome, hot

5  flashes, essential tremor, spasticity and headache

6  prophylaxis.  With the availability of similar but more

7  expensive Pregabalin and with the decreasing cost of

8  Gabapentin tablets, the prescribing criteria for Gabapentin

9  are removed and Gabapentin is added back to the formulary."

10        Now, what happened here is you agree with me, even

11  though you may not be intimately familiar with it, when

12  Gabapentin was Neurontin and was expensive for some reason,

13  it was taken off the formulary up in the northwest, right?

14  A.  I don't know that it was on and taken off or never on,

15  but it was not on the formulary it looks like at one

16  point.

17  Q.  And then it says, "With the availability of similar but

18  more expensive Pregabalin --" that's Lyrica " -- and with

19  Gabapentin being decreased because it's now generic tablets,

20  it now meets prescribing criteria and it's added back to the

21  formulary," correct?

22  A.  That's what that says.

23  Q.  And reading that that looks like it was a 100 percent

24  dollars and cents decision, wasn't it?

25  A.  You know, I really can't state that factually.  It may

Page 162

1   appear to you, but I don't know what went on to make that

2   decision or what evidence they had at that time.  I can't

3   really state that factually.

4   Q.  Well, you're certainly not aware of any evidence that

5   came out around September of 2005 that indicated Gabapentin

6   was better than it used to be, was there?

7   A.  No.

8   Q.  This is during the period of time when Kaiser is slowly

9   learning the truth about how they've been duped and that

10  Gabapentin really isn't as good as it used to be, correct?

11  A.  They had not learned the evidence at that time.  They

12  knew it was being marketed for off-label indications

13  inappropriately.

14  Q.  And for some reason, eight or nine months after the

15  lawsuit has been filed, the people up in the northwest add

16  Gabapentin back to the formulary, right?

17  A.  That's what it looks like here, yes.

18  Q.  And you've told us that's where 95 or 96 percent of

19  Kaiser prescriptions come from is off the formulary,

20  correct?

21  A.  Yes.

22  Q.  So criteria-based prescribing apparently has something

23  to do with dollar signs, doesn't it?

24          THE COURT:  Well, he says he doesn't know.  I

25  think we need to move on.  How much longer do you think you

1   have?

2            MR. KENNEDY:  Certainly more than three minutes.

3            THE COURT:  About how long?

4            MR. KENNEDY:  Right now, I think it's an hour.  I

5   think if we had an overnight, I could probably streamline

6   things.

7            THE COURT:  We'll do another two or three minutes

8   and then break.

9   Q.  Now, Doctor, you told us on Friday that while you could

10  calculate the total expenditures that Kaiser had made on

11  Neurontin, Gabapentin, during the 1994 to 2004 period, you

12  couldn't break it down by indication as to how much was

13  spent for bipolar or how much was spent for pain or

14  whatever; did I understand that correctly?

15  A.  We didn't have a system that specifically tied the

16  prescription and the indication together beyond a shadow of

17  a doubt.

18  Q.  Well, did you have --

19            THE COURT:  Could you back up a little bit?

20            THE WITNESS:  Yeah, so there's a database that has

21  what the doctor diagnoses a patient with during a visit.

22  It's not until recently with our health connect system that

23  both are tied to a diagnosis with a headache and I'm giving

24  you aspirin, it's married in the visit in the doctor's note,

25  but what we had previously is a doctor saw a patient on this

1    day with a diagnosis of X and on this day in the pharmacy

2    the patient showed up with a prescription for it, so a

3    temporal correlation but not a definitive marriage of those

4    two items, diagnosis and prescription.

5    Q.   Doctor, what's an ICD-9 code?

6    A.   To be honest, I don't know what it stands for, but

7    suffice to say it's a number that translates to a specific

8    diagnosis.

9    Q.   Well, do you remember signing a declaration in this case

10   on January 21st of this year, just about a month ago?  You

11   remember that, don't you?

12   A.   Yes.

13   Q.   And declaration, feel free, counsel is approaching with

14   a copy.  Maybe we can get that into focus.  Can you read

15   that okay, Declaration of Ambrose Carrejo, Doctor of

16   Pharmacy, correct?

17   A.   Correct.

18   Q.   And turning to page 2, paragraph 7, paragraph 6, you

19   talked about collecting certain data, and we'll pick this up

20   when we resume tomorrow, but we only collected data for

21   ICD-9 code, 296.7, bipolar disorder, et cetera and did not

22   collect data for ICD-9, Code 296.4 or 296.6.  Reading that I

23   certainly was led to believe you knew a lot about ICD

24   codes?

25   A.   I do know what ICD-9 codes stand for, but I do know the

Page 165

1   codes are analogous to the diagnosis.  I can't recall what

2   the ICD-9 stands for.

3              THE COURT:  What are you saying, you don't know

4   what the I stands for and the C stands for?

5              THE WITNESS:  Yes.

6              THE COURT:  So what's the --

7              THE WITNESS:  The numbers, we use the numbers,

8   it's just the way the diagnosis is coded into the computer.

9   I don't remember what the abbreviation is.  I couldn't tell

10  you what it means.

11  Q.  International Classification of Diseases.

12             THE COURT:  I think we were both talking past each

13  other.

14  Q.  So you are familiar with the concept of ICD codes, you

15  just didn't remember International Classification of

16  Diseases?

17  A.  Thank you.

18  Q.  That might be a good point?

19             THE COURT:  That sounds good to me.

20             THE CLERK:  All rise for the jury.

21             (Whereupon, the trial was suspended at 1:01 p.m.)

22

23

24

25

1              C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS     ) ss.

5   CITY OF BOSTON                )

6

7

8          We, Lee A. Marzilli and Valerie A. O'Hara, Official

9   Federal Court Reporters, do hereby certify that the

10  foregoing transcript, Pages 1 through 165 inclusive, was

11  recorded by us stenographically at the time and place

12  aforesaid in Civil Action No. 04-10981-PBS, In Re:

13  Neurontin Marketing, Sales Practices, and Product Liability

14  Litigation, and thereafter by us reduced to typewriting and

15  is a true and accurate record of the proceedings.

16          In witness whereof we have hereunto set our hands

17  this 2nd day of March, 2010.

18

19                  /s/ Lee A. Marzilli

20                  /s/ Valerie A. O'Hara

21          _____

22          LEE A. MARZILLI, CRR

23          VALERIE A. O'HARA, RPR

24          OFFICIAL FEDERAL COURT REPORTERS