IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                )
                                      ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION     )
--------------------------------------)
This document relates to:             )
KAISER FOUNDATION HEALTH PLAN, et al, )
                                      )
                    Plaintiffs        )
                                      )
          -V-                         )No. 04-10739-PBS
                                      )Pages 1 - 146
PFIZER, INC., et al,                  )
                                      )
                    Defendants        )



JURY TRIAL - DAY EIGHT

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE



United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 3, 2010, 8:53 a.m.



LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

```
 1    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
      Greene, LLP, 33 Broad Street, 5th Floor, Boston,
 4    Massachusetts, 02109.

 5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
      Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
 6    Suite 301, Cambridge, Massachusetts, 02142.

 7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
      850 Third Avenue, New York, New York, 10022.
 8
          DON BARRETT, ESQ., Barrett Law Office,
 9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
      39095.
10
          BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11    Bernstein, Embarcadero Center West, 275 Battery Street,
      San Francisco, California, 94111-3339.
12

13    FOR THE DEFENDANTS:

14        KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
      THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15    Four Times Square, New York, New York, 10036.

16        RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
      LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
          JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18    Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
      Denver, Colorado, 80202.
19

20

21

22

23

24

25
```

9fe5251f-ac91-4e2f-b529-c03207c8c042

```
 1                      I N D E X

 2

 3    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 4

 5    AMBROSE CARREJO                 9       82

 6    JOEL HYATT, M.D.      99      125

 7

 8

 9    EXHIBITS                        PAGE

10    918-A                            4
      742                             11
11    528                             23
      543                             26
12    629                             28
      938                             33
13    902-D                           38
      741                             38
14    561                             42
      692                             56
15    760                             63
      339                             70
16    690                             71
      506                             75
17    324                            101
      344                            111
18    348                            113
      338                            114
19    272                            116
      276, 278, 279                  119
20    795                            122

21

22

23

24

25
```

1              P R O C E E D I N G S

2         (Exhibit 918-A received in evidence.)

3         THE COURT:  Good morning.  I understand there are some

4    document issues?

5         MR. SOBOL:  Yes, your Honor.  So that on these

6    documents, the plaintiffs, from the approximately 500 exhibits

7    that we have provided to the defendants a couple of months ago

8    and which the parties have all reviewed, we have selected 31

9    business records of Pfizer.  Actually, one of the 31 is also a

10   monograph by a company that it contracted with to do a migraine

11   study.  The 31 documents are all business records of Pfizer.

12   They all relate to the Cline, Davis & Mann enterprise, so we

13   offer them in evidence.  In terms of --

14        THE COURT:  What's the objection?

15        MR. CHEFFO:  This is not authentication or business

16   records.  Just one example:  "Attached please find a situation

17   analysis of the preliminary program development for ADA

18   satellite preliminary program for ADA satellite symposium which

19   took place on Monday, June 23, in the Boston Copley Marriott."

20        The point of this is, this is a document dump.  Now,

21   they had an opportunity to -- they have deposition transcripts.

22   They have people they could have --

23        THE COURT:  I don't understand what you mean by

24   "document dump."

25        MR. CHEFFO:  Well, these have nothing to do, your

1   Honor.  I mean, here the issue --

2        THE COURT:  They're directly relevant to their

3   enterprise issue, right?  They've got to do this.

4        MR. CHEFFO:  They're not at all tied in any way to

5   Kaiser.  These are preliminary analyses of a meeting that may

6   have occurred.  I mean, the point --

7        THE COURT:  Excuse me.  That's overruled.  They need

8   to prove an enterprise.  I've heard nothing about an

9   enterprise.  If you all want to bring in a Pfizer rep, who is

10  basically not available apparently, to discount it, fine; but

11  it's relevant, it's authentic, and it's a business record.  If

12  you want to say, no, this never happened, or it only happened

13  on the East Coast rather than the West Coast, bring someone in.

14       MR. CHEFFO:  But, just, your Honor, it's not a matter

15  of whether it's a business record or authentic.  We're past

16  that.  But the point is, they have the burden of tying it.  It

17  shouldn't just be that they can kind of --

18       THE COURT:  Well, is it about Neurontin?

19       MR. CHEFFO:  Well, but that's like saying anything

20  that --

21       THE COURT:  Excuse me.  Is it about Neurontin?

22       MR. CHEFFO:  It appears to be about Neurontin.

23       THE COURT:  All right, so it's about your promotion.

24       MR. CHEFFO:  But that's not the standard, your Honor,

25  with respect to Kaiser.  This is a Boston document --

1          THE COURT:  Excuse me.  Then bring in someone from

2    Pfizer, who seems to be hiding from these proceedings, to say

3    it only happened in Boston and didn't happen in California,

4    because from what I can tell, it's run out of a national

5    headquarters.  So if it isn't run out of a national

6    headquarters, don't hide.  I have the sense that people from

7    Pfizer are hiding.

8          MR. CHEFFO:  I don't think that's true, your Honor.

9    They have the burden --

10          THE COURT:  So then you bring them on and discount it.

11    At this point, if they're authentic and they're business

12    records, and it relates to Neurontin, and it's in the time

13    period, and it involves the indications that we're talking

14    about, it's relevant.

15          MR. CHEFFO:  Just so we're clear, your Honor, no one

16    is hiding here.  They have the burden of proof --

17          THE COURT:  Excuse me.  Overruled if that's the

18    objection.  If it involves the alleged enterprise -- I'm

19    assuming that's the point of it, right?

20          MR. SOBOL:  Yes, your Honor.  A housekeeping matter

21    briefly?

22          THE COURT:  Yes.

23          MR. SOBOL:  We had a stipulation of the parties

24    yesterday.  We reduced it to writing.  I think the parties

25    agree that it should be marked as Exhibit -- I've lost

1    Mr. Alba, but --

2            THE COURT:  What are we talking about now?

3            MR. SOBOL:  This is about the provider list and what

4    the parties say about the provider list.  I'm just trying to

5    put the stipulation in.

6            THE COURT:  Yes, that's fine, the stipulation, but I

7    don't want to sit and read it like a parrot.

8            MS. NUSSBAUM:  We don't have to do it today because it

9    turns out that the last three doctors where there was a

10   question mark, we've now provided the answer, so we can just

11   update it so that it's --

12           THE COURT:  Mark it as an exhibit.

13           MS. NUSSBAUM:  Okay, we'll update it.  We'll bring it

14   in tomorrow.

15           THE COURT:  Put it on the screen, let them read it.

16   It's a record on appeal, and it's also -- they can sit and read

17   it, that's fine.  It's too long and convoluted.

18           I think Robert is checking on --

19           THE LAW CLERK:  Robert is over there.

20           THE COURT:  As has been our course, we've given the

21   deposition transcript to whomever, the white binder.

22           THE LAW CLERK:  I just gave it to Mr. Sobol.

23           THE COURT:  Oh, there you are.  So I will not be -- as

24   I said, assuming the snow doesn't cancel out all the flights, I

25   will be leaving probably a few minutes early today.  I have a

1    2:00 o'clock flight, and I think if I get a cab here, I can get

2    there in time.

3              So, Robert, are they here?

4              THE CLERK:  I'm going to check right now.  They should

5    be.

6              THE COURT:  You said you were able to slim it down a

7    little bit, Mr. Kennedy.  What happened after the treadmill?

8    What are we down to?

9              MR. KENNEDY:  We're certainly going to be going until

10   the recess.  I think I'll have a much better idea --

11             THE COURT:  So two hours?  No.  You told me one hour.

12   Keep it at one hour.

13             MR. KENNEDY:  Your Honor, I'm sorry, this is the

14   witness --

15             THE COURT:  Excuse me.  You told me an hour.  This was

16   your number.  This was your number.  You said, and, quote,

17   "I'll try and slim it down."  So try and move it along a bit.

18             MR. KENNEDY:  Your Honor, again, I recognize this is

19   your courtroom, and I'm here --

20             THE CLERK:  All rise for the jury.

21             (Jury enters the courtroom.)

22             THE COURT:  Anybody speak about the case or see

23   anything in the press?  All right, so just in case I forget, if

24   the snow doesn't stop it, I'm trying to fly down to Washington

25   for some event at 5:00 o'clock tonight and come back tonight.

1    In the off chance I get snowed in there -- as you heard, it hit

2    the Mid-Atlantic states -- I am going to make sure that Robert

3    has your phone numbers because I'll call him and cancel or tell

4    him I'll be in later.  All right, if you could do that during

5    the break.  I'm still crossing my fingers I'll be able to make

6    it, but we'll see what goes on.

7              All right, thank you.

8              MR. KENNEDY:  Thank you, your Honor.

9                        AMBROSE CARREJO

10   having been previously duly sworn, was examined and testified

11   further as follows:

12   CONTINUED CROSS-EXAMINATION BY MR. KENNEDY:

13   Q.   Good morning again, Dr. Carrejo.  I'd like to turn for a

14   moment to the subject of control of the Kaiser patient website,

15   and I'd offer next in evidence Exhibit 902-G.  And may we

16   display the -- we have screen shots.  In the interest of time,

17   rather than going directly to the website, we've made screen

18   shots --

19              THE COURT:  Is this the same website you played

20   yesterday?

21              MR. KENNEDY:  No, your Honor.  The same Kaiser patient

22   website, a different portion of it dealing with the subject of

23   control, which was raised on cross yesterday, your Honor.

24              THE COURT:  Oh, I see.  All right.

25   Q.   And if we might, going to the "Terms and Conditions"

1    section of the website -- and, Dr. Carrejo, just for context,

2    this is not one of the portions that's been deleted.  This is a

3    portion that would still be up if a Kaiser patient went there

4    this morning.  And, Austin, going to the "Terms and

5    Conditions" -- and it's on your screen right there, Doctor, and

6    under "Purpose," the first paragraph tells us, does it not,

7    "Kaiser Permanente provides this website," and it gives the

8    addresses, "to allow our members and other users to view

9    health-related information, communicate with our practitioners,

10   our staff and each other, arrange for clinical and health plan

11   services and access additional services"?  And then moving, if

12   you would, please, to the --

13          MR. KENNEDY:  Your Honor, I'm not sure if this is on

14   the screen.

15          MR. CHEFFO:  It is.

16          THE COURT:  I have it on.  You don't have it on?

17          THE JURY:  No.

18          THE COURT:  I wonder why that is.

19          (Discussion off the record.)

20   Q.   What I was reading from is the highlighted portion

21   entitled "Purpose."  I'll give the jury a chance to look at

22   that.

23          Okay, hopefully, that was enough time.  Austin, can you

24   now scroll to what is said about copyrights.  Okay, thank you.

25   And under "Copyrights," if you could highlight the first

1    paragraph:  "Except as otherwise indicated, all content on this

2    website, including text, graphics, logos, button icons, photos,

3    images, forms, audio, video, questionnaires and software, is

4    the property of Kaiser Permanente or its licensors and is

5    protected by the United States and international copyright

6    laws.  Kaiser Permanente allows you to view or download a

7    single copy of the material. . .solely for your personal or

8    noncommercial use."

9         Doctor, I've read that accurately, have I not?

10   A.    You have.

11   Q.    And I'd like to now turn to Exhibit 742, which is a Kaiser

12   press release from January 28, 2004.  And you're familiar with

13   Kaiser press releases from the Kaiser News Center, correct?

14   A.    Yes.

15   Q.    Okay.  And this says "Click to Kaiser Permanente."

16         MR. KENNEDY:  And, your Honor, I thought I'd offered

17   742 into evidence.  I'm not sure if it's up on the jurors'

18   screens yet.

19         THE COURT:  I think everything should be up, right?

20         MR. KENNEDY:  Okay, thank you.

21         (Exhibit 742 received in evidence.)

22   Q.    And this is a press release announcing that "More and more

23   of us are turning to Web research," and second sentence,

24   "Kaiser Permanente invites everyone, members and nonmembers, to

25   access trustworthy, up-to-date, physician-approved health

1    information by visiting our redesigned website, Kaiser

2    Permanente."

3         And next going to Exhibit 783, another Kaiser press

4    release, this one from November 11, 2004, "Kaiser Permanente

5    showcases online health programs during open enrollment."  And,

6    Austin, if we could scroll down to the fifth paragraph starting

7    with "Kaiser's online tools," and the second sentence, "The

8    site also features health calculators, online drug medical

9    encyclopedias, reviewed and approved by Kaiser Permanente

10   physicians, and more."

11        I've read that correctly, have I not?

12   A.   You have.

13   Q.   You would agree with me, wouldn't you, that Kaiser

14   controls the content of what's on its website?

15   A.   Knowing what I know, not what you presented here, I

16   wouldn't say that they're in complete control.  They do

17   contract with a third party.  We don't have editorial control

18   over that.  At the end of the day, Kaiser is responsible for

19   everything on that website.  It is our website.  It's

20   regrettable that some of this information is up there.  You

21   know, it shows that Healthwise and us were misled, duped, if

22   you will.  I apologize for that.  We're taking steps to take it

23   down --

24             MR. KENNEDY:  Your Honor, move to strike starting with

25   "Healthwise --"

9fe5251f-ac91-4e2f-b529-c03207c8c042

1        THE COURT:  Yes, yes.  We're going to try and finish

2   this as soon as possible, the slimmed-down version.  But in

3   order to do that, you have to answer only his questions.  So

4   ask it again.

5   Q.   It was Kaiser, not Healthwise, that suggested taking

6   material off the website in February of this year, correct?

7   A.   That's correct.

8   Q.   Because Healthwise also contracts with numerous other

9   people, including, for example, WebMD, and if you want we can

10  go to the website --

11       THE COURT:  Wait.  Do you know that one way or

12  another?

13       THE WITNESS:  I'm sorry, one more time?

14  Q.   You know Healthwise is an outside service.  They contract

15  with more than just Kaiser?

16  A.   Absolutely.

17  Q.   And they contract with the Mayo Clinic and Harvard and

18  WebMD?

19  A.   Absolutely.

20  Q.   And you would agree with me -- we can do it if

21  necessary -- that if you go to the WebMD website right now, all

22  of the material about Neurontin that's been deleted from the

23  Kaiser website is still on the WebMD website, right?

24  A.   I don't know if that's true or not, but if it is true, it

25  proves that, you know, you guys are real effective at pulling

1    the wool over not only us but WebMD.

2            THE COURT:  You know, I think you're not hearing me,

3    okay?

4            THE WITNESS:  I'm sorry, your Honor, sorry.

5            THE COURT:  We are trying to finish this.  You

6    predicted about an hour, but that's never going to happen if

7    you keep doing this.  It will go forever.  So I strike the

8    answer.  You ask the question, and why don't we ask it again,

9    and then we'll get an answer.

10           MR. KENNEDY:  I'll withdraw the question.

11   Q.   Let's just go to Exhibit 999-A, which, Doctor, I'll

12   represent to you we downloaded from the WebMD website last

13   night.  And it's under "Back pain health center," and if you

14   scroll down you'll see that it talks about, "Anticonvulsants

15   are used to help control pain," and right up above that there's

16   a box where it talks about gabapentin and Neurontin.  We can

17   keep scrolling and using up time, Doctor, but wouldn't you

18   agree with me that it's only Kaiser that's decided that the

19   Healthwise material ought to be taken off its website?

20           (Witness pausing.)

21   Q.   Is there any doubt in your mind about that?

22   A.   No.

23   Q.   Thank you.  Now, as you've told us, you were not

24   intimately involved in filing this lawsuit back in 2005.

25   However, I'd like to show you what I'll represent are

1    allegations from that original complaint.  This is a February,

2    2005 -- Slide 1, First Amended Coordinated Complaint, February

3    1, 2005.

4         Doctor, you'll see that when Kaiser filed its original

5    complaint five years ago, Paragraph 29 said things such as,

6    "Scientific data and evidence did not exist supporting such

7    off-label uses, and defendants made, and caused others to make,

8    misrepresentations, false statements."  Coming down to the last

9    sentence in Paragraph 29, "No clinical trial showed that

10   Neurontin was safe or effective for any of these conditions."

11        I read that correctly, right?

12        And in 2005 the Kaiser lawyers, at least, also alleged,

13   "With the exception of Neurontin's use for postherpetic

14   neuralgia, there is no clinical trial evidence that supports

15   any claim that Neurontin is effective for the treatment of

16   pain."  And then it goes on in Paragraphs 108 and 109 to

17   actually discuss the Gorson study that came back with negative

18   results and concluded that "Neurontin is probably no more

19   effective than a placebo in the treatment of painful diabetic

20   neuropathy."  And that's material that Kaiser's lawyers at

21   least filed in this court five years ago, correct?

22        THE WITNESS:  You know, I need to talk, your Honor.  I

23   can't answer that yes or no.

24        THE COURT:  That's fine.

25   A.   You know, this is an amendment.  I don't know how many

1    other amendments have been put forth.  I don't know how many

2    other pages are in this document.  I'm not a lawyer.  I've

3    never seen the complaint.  I'm a pharmacist.  I can't comment

4    on that.

5            THE COURT:  All right, you can't comment.  What's the

6    next question?

7            This case, as you know, has had a long history -- I

8    won't go into it -- but he's not a lawyer here.

9    Q.   So when you told us yesterday that you thought the

10   complaint was based solely on claims of off-label promotion,

11   that really isn't a subject that you're fully knowledgeable

12   about, correct?

13   A.   I'm not fully knowledgeable about the complaint.  I've

14   never seen the complaint.

15   Q.   Okay.  And you'd certainly defer to what your lawyers

16   filed with the court over your understanding, correct?

17   A.   They filed a complaint --

18           MS. NUSSBAUM:  I'm going to object, your Honor.

19           THE COURT:  Sustained.

20   Q.   Now, you told us that it was the publication of the

21   Dickersin article in the New England Journal of Medicine in

22   November of last year that really caused you for the first time

23   to recognize the enormity of the duping?  Is that a fair

24   summary of your personal situation?

25   A.   That was a significant component of it, yes.

1    Q.    What was the passage in the Dickersin article that most

2    caught your attention?

3    A.    There are several passages in there.  She talked about

4    conspiracy.  She talked about removing primary outcomes and

5    substituting them with secondary.  There was a reintroduction

6    of primary outcomes that never existed in the protocols, of the

7    research protocol.  There was -- there was a very robust

8    article.

9    Q.    How much time have you spent reading Dickersin?

10   A.    I've read the article twice.

11   Q.    How many studies did she analyze?

12   A.    I believe there was twenty-one studies listed in total.

13   Q.    How many with neuropathic pain?

14   A.    I can't recall.

15   Q.    What were the limitations discussed in the article?

16   A.    Well, they had to have primary outcomes listed that they

17   could tie back to the research protocol, and they had to be

18   listed in the study themselves.

19   Q.    Are you aware that Dr. Dickersin's article is a summary of

20   a report that she filed in this case back sometime in the

21   middle of 2008?

22   A.    I was not aware of that.

23   Q.    So if Dr. Dickersin filed a report in 2008, that wasn't

24   something that was at least shared with either of the P&T

25   committees that you sit on, was it?

1    A.    Those are legal proceedings.  Where we picked up

2    Dr. Dickersin's article is from the literature, the evidence.

3    That's what we monitor through our Drug Information Services.

4    We don't talk to the lawyers in the middle of a case.

5    Q.    I'm sorry, my question was a little different.

6    A.    Okay.

7    Q.    There's something like eleven plaintiffs' experts in this

8    case who filed, I'll represent to you, expert reports back in

9    the middle of 2008, and my question is whether at any time

10   through, say, the end of 2008 Kaiser's lawyers ever provided

11   you with copies of any of those reports?

12   A.    Personally they did not provide me with those reports.

13   Q.    Okay.  And you were sitting as a member of at least the

14   Northern California and the Southern California P&T Committees

15   in 2008 and 2009, correct?

16   A.    I was just a member of Northern California.  I was a

17   visitor to Southern California.

18   Q.    And in those positions, you were included on the

19   distribution list for the information that was supplied to the

20   P&T Committees, correct?

21   A.    That is correct.

22   Q.    Okay.  And what I'm holding here, it's approximately ten

23   inches high, are ten expert reports in this case, starting

24   alphabetically with Dr. Abramson and going on through a lot of

25   other names that the jury is now familiar with.  Is it your

1   testimony that, as far as you know, the Kaiser lawyers and

2   management never provided your P&T Committees, as you were

3   trying to decide what to do with formulary decisions, with

4   copies of any of those reports?

5   A.    That is my testimony.

6   Q.    Thank you very much.  And, again, you're testifying just.

7   As to when you first tumbled to what Dr. Dickersin had to say?

8   You're not purporting to say there aren't other people at

9   Kaiser --

10           THE COURT:  Objection sustained.

11           MS. NUSSBAUM:  Thank you.

12   Q.    Now, remind us again, who do you work for, which

13   particular Kaiser entity?

14   A.    I work for the Northern California.

15   Q.    Your paycheck doesn't say "Northern California"?

16   A.    Kaiser Foundation Health Plan.

17           THE COURT:  You know, you're swallowing your words.

18   A.    Kaiser Foundation Health Plan, KFHP.

19   Q.    And that's a major health insurer, right?

20   A.    Yes.

21   Q.    And the other plaintiff in this case is also a major

22   health insurer, right?

23   A.    No.

24   Q.    Kaiser Foundation Hospitals?

25   A.    It's not an insurer.  It's a provider of hospital

1    services.

2              MR. KENNEDY:  Your Honor, I'd ask the Court to take

3    judicial notice, and I'm reading from the currently offered

4    Third Coordinated Amended Complaint filed December, 2006,

5    Paragraph 1, "Plaintiffs, Kaiser Foundation Health Plan and

6    Kaiser Foundation Hospitals, collectively plaintiffs," quote,

7    "are large health insurers that were among the principal

8    victims of defendants' wrongful scheme."

9    Q.   Did they get it wrong the first paragraph?

10             MS. NUSSBAUM:  I would object, your Honor.  The

11   complaint goes on to specifically define, so if he wants to

12   show the whole complaint --

13             THE COURT:  No, we're not taking the time to do the

14   whole complaint.  It's mammoth.  Is that wrong what was just

15   said?

16             THE WITNESS:  It's my understanding that the health

17   plan provides the medical coverages.  The hospital, KFH,

18   provides the hospital operations.

19   Q.   So they aren't both large health insurers, but the company

20   you work for is a large health insurer, right?

21   A.   Yes.

22   Q.   As I understand it, your understanding of this case is, my

23   clients tricked the doctors into prescribing Neurontin

24   off-label, right?

25   A.   They detailed for the off-label uses for Neurontin, yes.

1    Q.   And that resulted in numerous Kaiser patients not getting

2    the treatment they should have gotten, right?

3    A.   Being put on the drug without evidence, yes.

4    Q.   The lawsuit, however, is being brought by a health insurer

5    that charged premiums to all these people, correct?

6              MS. NUSSBAUM:  I object, your Honor.

7              THE COURT:  Sustained.

8    Q.   Now, you work for Kaiser, the health insurer, but you're

9    based, however, in Northern California, and that's where most

10   of your knowledge is concentrated, correct?

11   A.   Correct.

12   Q.   And if we go back to 1994 when Neurontin first came out,

13   that was placed on formulary in Northern California, right?

14   A.   Yes.

15   Q.   And it was placed without any restrictions at all?

16   A.   Yes.

17   Q.   And "without restrictions" means any doctor from any

18   discipline can prescribe it, correct?

19   A.   That's correct.

20   Q.   On the other hand, in Southern California, the other half

21   of the state, Neurontin came on with restrictions, correct?

22   A.   That's correct.

23   Q.   And, now, I want to have you help me with a term that

24   confused me; I think it may have confused one of the jurors.

25   When Kaiser talks about expanding a restriction, that means

1    expanding the number of people that can use the drug, correct?

2    A.    The number of prescribers that have ability to or within

3    guidelines write the prescription, yes.

4    Q.    So let me try that again because when you say expand a

5    restriction dramatically, that would mean the restriction

6    should be becoming bigger, and fewer things should be

7    happening, correct?

8    A.    Uh-huh.

9              THE COURT:    Is that "uh-huh," yes?

10             THE WITNESS:    Yes.  I'm sorry.

11   Q.    But Kaiser, for example, if you've got a restriction just

12   to neurologists, you talk in terms of expanding the restriction

13   to allow psychiatrists or anesthesiologists to also be on

14   formulary?

15   A.    Yes.

16   Q.    Correct?

17   A.    Yes.

18   Q.    Okay, so --

19   A.    I understand the confusion.  It's expanding those that are

20   included within the restricted pool of prescribers that can

21   write for the drug, so it's increasing the number of

22   specialists that have on-guidelines access to write the

23   prescription.

24   Q.    Just the opposite as to what an English teacher might --

25   A.    Semantically incorrect, yes.

1    Q.   Okay, thank you very much.  Now, against that background,

2    let's talk about Southern California, and originally it

3    restricted Neurontin just to use by neurologists in its

4    formulary, correct?

5    A.   Correct.

6    Q.   And going to Exhibit 528.

7            MR. KENNEDY:  I offer that in evidence, your Honor.

8            (Exhibit 528 received in evidence.)

9    Q.   And this is a 1997 document.  I'm sure you're familiar

10   with these.  This is how a formulary goes about getting changed

11   in some way if they want, correct?

12   A.   Correct.

13   Q.   And you'll see that under -- if we can scroll down to

14   "Efficacy," stopping there, as of 1997, "Randomized clinical

15   trials of gabapentin for treatment of RSD --" will you remind

16   us again what RSD is?

17   A.   Reflex sympathetic dystrophy, I believe.

18   Q.   "-- could not be found in the literature --"

19           THE COURT:  And that is what?  Do you know?

20           THE WITNESS:  I don't have real good familiarity with

21   that disease state, no.

22           MS. NUSSBAUM:  Your Honor, can we approach for one

23   moment?

24           THE COURT:  Yes.

25

Page 24

1   SIDE-BAR CONFERENCE:

2          THE COURT:  What's the issue?

3          MS. NUSSBAUM:  This is way outside the scope of his

4   direct, and we're going to have another witness all day

5   tomorrow on all these documents.

6          THE COURT:  I don't know what the document is, so I

7   don't know if it was on direct or not.

8          MR. KENNEDY:  This pertains to a P&T Committee that he

9   testified about on direct.  He talked about the P&T Committee

10  up in Oregon and what they did.

11         MS. NUSSBAUM:  No --

12         THE COURT:  Excuse me.  Is it not that P&T?

13         MS. NUSSBAUM:  No, he didn't join till 2000.  As I

14  say, we have another witness who is just here on all of this

15  tomorrow for the whole day.

16         MR. FOX:  He talked about Drug Information Service.

17         THE COURT:  Let me put it this way:  I'm going to be

18  riding him hard to finish it, but it's his time and it's within

19  the realm of it.  I don't know.  If he doesn't know what RSD

20  is, I don't want to waste the time.

21         MR. KENNEDY:  Your Honor, I'm doing my best, but --

22         (End of side-bar conference.)

23  BY MR. KENNEDY:

24  Q.   Going back to Exhibit 528, at that point there were no

25  indication there were any randomized clinical trials, and they

1    then talk about two letters to the editor is the extent of the

2    evidence that they discuss, correct?

3    A.    Correct.

4    Q.    Down at the bottom of the page, it says, "The chiefs of

5    anesthesia recommend to expand the restriction for gabapentin

6    to anesthesiology."  Again that confusing word.  This means

7    that the anesthesia doctors in Southern California want the

8    people in the formulary that are authorized to use Neurontin to

9    be expanded to include anesthesiologists as well as

10   neurologists, right?

11   A.    That's correct.

12   Q.    Okay.  So that's what expand the restriction means, to

13   increase the disciplines that can use it, correct?

14   A.    Yes.

15   Q.    And I can go through the documents if you want, but that

16   recommendation was adopted and --

17   A.    Can we see the bibliography here, the references, please?

18   Q.    Sorry, Doctor?

19   A.    May we see the references at the end of the monograph,

20   please?

21   Q.    Oh, sure.  Turning to the next page --

22        THE COURT:  Well, will that tell you -- we're not

23   going to expand beyond the question.  That won't tell you

24   whether it was expanded, will it?

25        THE WITNESS:  Okay.

1          THE COURT:  All right, let's go.

2     Q.   Any doubt in your mind that the anesthesia --

3          THE COURT:  No, I'm not letting him go to the

4     bibliography.  That's an expanded beyond the question.

5     Q.   Doctor, you are aware that the request was granted, and

6     the use of Neurontin in Southern California was expanded in

7     1997 to include anesthesiologists, correct?

8     A.   That's correct.

9     Q.   And that expansion affected only Southern California.

10    That didn't have any effect anywhere else, correct?

11    A.   That is correct.

12    Q.   Then in 1999 --

13         MR. KENNEDY:  I offer Exhibit 543 in evidence.

14         (Exhibit 543 received in evidence.)

15    Q.   This is a drug monograph dated June, 1999, correct?

16    A.   Correct.

17    Q.   And you told us about drug monographs on direct.  These

18    are the things that the Drug Information Service with the

19    specially trained people research and analyze what literature

20    is available on a drug, correct?

21    A.   Correct.

22    Q.   And this tells us that in '99, the chiefs of psychiatry in

23    Southern California now want to expand the restrictions for

24    gabapentin to include psychiatrists for mood disorders,

25    correct?

1    A.    Correct.

2    Q.    And going next in that same transaction to Exhibit 557,

3    another Southern California drug monograph, and turning, if we

4    could, Austin, to the last page of the document in the

5    references.  Would you come down to References S6 and S7, if

6    you could highlight those.

7         So the references are Backonja, a report dealing with

8    gabapentin for symptomatic treatment of painful neuropathy; and

9    S7 is Gorson, a study dealing with the treatment of painful

10   diabetic neuropathy.  So as of September, 1999, at least the

11   Southern California region of Kaiser is aware of what I think

12   the jury now knows well is the Backonja and Gorson studies,

13   correct?

14   A.    Correct.  They believed those were evidence at the time.

15   Q.    Well, Doctor, haven't you understood that this case is

16   about the fact that those studies were supposedly concealed?

17            MS. NUSSBAUM:  Objection, your Honor.

18            THE COURT:  Sustained.

19   Q.    Now, Austin, can we scroll to Page 3264, please, and it

20   takes us to Reference S6, diabetic peripheral neuropathy, and

21   that explains that there was an initial dose at only 900,

22   correct?

23   A.    Yes.

24   Q.    Okay.  And this was a randomized double placebo-controlled

25   study, correct?

1    A.    Randomize double-blind, yes.

2    Q.    And it doesn't show that there were any positive results,

3    does it?

4          (Witness examining document.)

5    Q.    I'll withdraw the question.  In any event, clearly the

6    people at the DIS in Southern California had the Backonja study

7    and evaluated it in 1999?  You will agree with me there, won't

8    you?

9    A.    Yes.

10   Q.    Okay.  And then go to the next page, if we can, Austin,

11   3265, and highlighting on S7.  And we know S7 is the Gorson

12   study, and over in the right-hand column it says the mean

13   change was not significantly different from placebo.  So in

14   1999 Southern California knew from that study that there wasn't

15   a significant improvement from placebo, correct?

16   A.    That's correct.

17   Q.    And again in terms of keeping things moving along,

18   nonetheless, in 1999 Southern California granted the

19   recommendation to expand the use of gabapentin to other

20   specialists within its group, right?

21   A.    That's correct.

22   Q.    And moving ahead to 2002 and to Exhibit 629 which I move

23   into evidence --

24         (Exhibit 629 received in evidence.)

25   Q.    -- and you'll see is a drug monograph for both -- coming

1    down to about the fourth line, it says TPMG and SCPMG, March

2    and June.  That's referring to the Northern California and the

3    Southern California regions, correct?

4    A.    That's correct.

5    Q.    And this is analyzing various drugs, including Topamax and

6    gabapentin, correct?

7    A.    Yes.

8    Q.    And, Austin, if you can take us to Page 6797, and there's

9    an evidence table there.  And, again, this is a monograph

10   that's been prepared by the Drug Information Service, those

11   specialists, right?

12   A.    Yes.

13   Q.    And it is an evidence table for gabapentin in bipolar

14   disorder, and they have two studies that they discuss, don't

15   they?  They've got the Frye study, correct?

16   A.    Correct.

17   Q.    And that was a study that analyzed, as you can see,

18   Topamax, or Topiramate, gabapentin, and placebos.  And you see

19   over in the third column the data favored the Topamax, but with

20   no significant difference between gabapentin and placebo,

21   right?

22   A.    That's correct.

23   Q.    So 2002 California at least is aware of the Frye study,

24   and they're aware that it doesn't show any improvement between

25   gabapentin and placebo.  And then also on the evidence table,

1    the next one is the Pande study, correct?

2    A.   Correct.

3    Q.   And the Pande study was double-blind placebo-controlled.

4    And coming over to Column 3, it's got gabapentin and -- GBP is

5    gabapentin, and PLC is placebo.  That's correct, isn't it?  And

6    it's showing a minus 6 for gabapentin and a minus 9 for

7    placebo, showing placebo actually did better on the study than

8    gabapentin, correct?

9    A.   Correct.

10   Q.   And then over in the final column, "Authors conclude that

11   the study did not demonstrate the efficacy of gabapentin as an

12   adjunctive treatment in outputs with bipolar disorder,"

13   correct?

14   A.   Correct.

15   Q.   And after getting all of that information, the Southern

16   California region approved gabapentin for use by psychiatrists,

17   correct?

18           MS. NUSSBAUM:  Objection, your Honor.  Totally

19   misleading.  The approval is --

20           THE COURT:  No, there's no talking -- no, no.

21   Overruled.

22           Do you want to hear the question again and see if you

23   think that that's right?

24           THE WITNESS:  Please.

25           THE COURT:  What's the question again?

1    MR. KENNEDY:  I'll withdraw the question.  Let me

2    try --

3    Q.   After getting that information --

4    MS. NUSSBAUM:  Then I would move to strike the answer,

5    your Honor.

6    THE COURT:  Yes, I will.

7    Q.   After seeing that analysis of the Frye and Pande study --

8    THE COURT:  Actually, I don't see that there was an

9    answer, but, in any event --

10   MS. NUSSBAUM:  An abundance of caution.

11   Q.   In 2002, after seeing that analysis of the Frye and Pande

12   study, the Southern California region didn't take any steps to

13   limit the use of gabapentin, or prohibit it for bipolar in

14   particular, did they?

15   A.   The evidence is reviewed in total, not just the two

16   studies, but it was the total bulk of that evidence and the

17   recommendations from the chiefs that drives that decision.

18   Just these two studies wasn't enough to say "no" to the chiefs

19   for their request to expand restrictions, or remove

20   restrictions.

21   Q.   The answer to my question is that there was no action

22   taken to restrict gabapentin for bipolar in Southern California

23   after they saw those two studies, was there?

24   THE COURT:  Yes or no.

25   A.   No.

1        MR. KENNEDY:  I next move to have admitted

2    Exhibit 630.

3        (Exhibit 630 received in evidence.)

4    Q.   And, Doctor, to speed things along, I'll represent to you

5    this is essentially the same monograph except you'll see up

6    under "P&T review," this is now also included for the Ohio

7    region.  So we've got it being distributed to Northern

8    California, Southern California, and Ohio.  Do you see that?

9    A.   I do.

10   Q.   Okay.  And again in the interest of time, I won't go

11   through it, but if we were to parse Exhibit 630, it includes

12   the same discussion of the Frye and Pande study that was

13   included in the previous exhibit, correct?

14       MS. NUSSBAUM:  Your Honor, I would object.  These are

15   very dense documents.  The witness has not testified that he's

16   seen them before or worked on them.  If he really wants to ask

17   substantive questions, he has to let him look at them.

18       THE COURT:  Excuse me.  Overruled.  I keep asking you

19   not to have these speaking objections.

20       MS. NUSSBAUM:  Sorry, your Honor.

21       THE COURT:  If he can't answer it, he'll say he can't

22   answer it.  630 is already in evidence.

23   Q.   Doctor, the question is:  Isn't it a fact that in 2002,

24   the Ohio region, after seeing the results of the Frye and Pande

25   study, expanded the restriction, as you call it, to include

9fe5251f-ac91-4e2f-b529-c03207c8c042

1   psychiatrists in Ohio?  There's no doubt in your mind that

2   happened, is there?

3   A.   I'm not aware of that, no.

4   Q.   Okay.  Let me see if I can call your attention to

5   Exhibit 638, which I would offer into evidence.

6         (Exhibit 638 received in evidence.)

7   Q.   And I represent this is a Kaiser document.  And, Austin,

8   can we go to the back page of it bearing production No. 4091,

9   and can you go to the middle column under "Formulary

10  restrictions."  About two-thirds of the way down highlight

11  "Formulary restrictions," and then coming down to the bottom of

12  the page, "Neurontin, restricted to use by or in consultation

13  with neurology, psychiatry, pain management,

14  ortho/rheumatology, or with chief lead approval currently (Sic)

15  restricted to neurology or pain management specialists only."

16       Are you familiar with that document?

17  A.   No, I'm not.

18  Q.   So, again, if we want to know what the Ohio region was

19  doing, we'd have to bring somebody else in from Kaiser to talk

20  about that; is that correct?

21  A.   That's correct.

22            MS. NUSSBAUM:  Objection, your Honor.

23            THE COURT:  Sustained.

24            MS. NUSSBAUM:  We move to strike the witness's answer.

25            THE COURT:  Please.  We're trying to move this

1    forward.  Go ahead.

2    Q.   Doctor, you'd agree with me there are people besides you

3    who are more knowledgeable about Colorado and Ohio and

4    Midatlantic states, correct?

5    A.   Absolutely.

6    Q.   And that you're not personally familiar with what was

7    being done on formulary decisions with regard to gabapentin in

8    all of those other regions around the country, were you?

9    A.   With the ongoing initiative, we met monthly on a

10   teleconference with our ICPSS.  We had face-to-face biannual

11   meetings to talk about the initiatives.  I had knowledge,

12   topical knowledge of what was going on throughout the program.

13   Q.   But you don't know, for example, whether Ohio increased

14   the use of gabapentin to psychiatrists in 2002?

15   A.   I don't have that granularity, no.

16   Q.   Now, going back again to Exhibit 630.

17        MR. KENNEDY:  And this has already been admitted in

18   evidence, your Honor.  Austin, this time could we turn to the

19   page that bears production 44046.  And it goes the other way.

20   You may have to flip it, okay?

21   Q.   This again is the drug monograph from 2002 --

22   A.   Mr. Kennedy, you're getting a bit too granular for me.  I

23   haven't seen this monograph.  Perhaps this is better for Mirta

24   Millares when she testifies.  I'd need time to review this if

25   we're going to talk about this one.

1  Q.   Are you going to represent to us that Ms. Millares will be

2  intimately familiar and will be able to answer all my questions

3  about this one?

4  A.   No, I can't represent that, but she would be in a better

5  position to answer.

6        THE COURT:  There will be another witness coming who's

7  going to be the head of the Drug Information, so he's not

8  necessarily the right person to ask these questions to.

9  Q.   Well, she may be able to do better, but let's just try on

10 this.  I don't think you're going to have that much trouble

11 with this one.

12 A.   Mr. Kennedy, I --

13       THE COURT:  Well, just let him ask the question.  If

14 you don't know, say, "I don't know," but at some point we're

15 trying to wrap up this exam if he doesn't know a series of

16 these questions.

17 Q.   This is showing AED costs, and those are antiepileptic

18 drugs, correct?

19 A.   Correct.

20 Q.   In the California division, correct?

21 A.   Correct.

22 Q.   There are a number of AEDs listed over on the right,

23 including gabapentin and Topiramate, and a number of things

24 we've heard called TCAs, correct?

25 A.   There are no TCAs there.

1   Q.   Okay.  There are AEDs other than gabapentin, aren't there?

2   A.   Yes.

3   Q.   Okay.  And then the chart shows increased costs for AEDs,

4   correct?

5            (Witness examining document.)

6   A.   It's a curve of the costs for each of the AEDs, yes.

7   Q.   Right.  And the percentage increases are summarized in the

8   upper left-hand corner.  Do you see those?

9   A.   Yes.

10  Q.   And those show that other AEDs are going up -- excuse me.

11  That shows that the cost for gabapentin has been going up,

12  correct?

13  A.   It shows that the cost for all AEDs have been going up,

14  correct.

15  Q.   Right.  It shows there are AEDs other than gabapentin that

16  have been going up even faster than gabapentin, correct?

17  A.   That's correct.

18  Q.   And you told us on direct that you were concerned about

19  the overuse of gabapentin.  That was something you became

20  concerned about in about 2001, correct?

21  A.   Correct.

22  Q.   And you didn't become concerned about the increase in

23  these other AEDs, did you?

24  A.   I think what's different here is, about the same time we

25  were starting, we learned of a whistleblower case, so that gave

1    us a little bit more fuel.  And, further, later on we saw that

2    Warner-Lambert, Pfizer, pled guilty to those charges.  So it

3    was a bit different.  And I'm not familiar with the evidence

4    intimately with the other two agents, but we did see that there

5    was lack of evidence for these indications where gabapentin was

6    being used.  So I think that's quite different.  I don't think

7    that's a fair comparison to the other two agents.

8    Q.   And back in 2001 when you first became concerned about

9    increasing cost of gabapentin, you hadn't heard about any

10   whistleblower suit at that time, had you?

11   A.   No, but it was real temporal.  It was early 2002 when the

12   whistleblower case, I believe, became apparent.

13   Q.   So you got concerned in 2001 just sort of having a feel

14   that a whistleblower suit --

15   A.   No.  2001 was the utilization, and then seeing that the

16   indications where it was being used according to our physicians

17   was questionable.

18   Q.   Isn't it a fact you became concerned about Neurontin

19   because it cost a lot more than the other drugs?

20   A.   That's not a fact.

21   Q.   That wasn't a factor?

22   A.   No.  I can point out --

23        THE COURT:  No.

24        MR. KENNEDY:  Next we'd like to offer in evidence

25   Exhibit 902-D.

1           (Exhibit 902-D received in evidence.)

2    Q.   And again in the interest of time, I'll represent these

3    are screen shots from Kaiser's patient website as it exists

4    today.  And under "Frequently asked questions," can we come

5    down to, Austin, at the bottom of the page, "Does Kaiser

6    Permanente use 'gag clauses' that prevent physicians from

7    discussing healthcare options with their patients?

8    Answer:  No.  Kaiser Permanente strongly opposes 'gag clauses'

9    that prevent physicians from discussing treatment --"

10          Next paragraph, "Keeping information from patients to

11   benefit a health plan's bottom line is wrong and forces

12   patients to second-guess their practitioners."

13          I've read that correctly, haven't I, Doctor?

14   A.   Yes, you have.

15          MR. KENNEDY:  Next I'd offer in evidence Exhibit 741.

16          (Exhibit 741 received in evidence.)

17   Q.   And, Doctor, this is a PharmaFAX, and you're familiar with

18   PharmaFAXs, aren't you?

19   A.   Yes.

20   Q.   And can you tell whether this came out of some particular

21   region or whether this was systemwide?

22   A.   I cannot.

23   Q.   And the first line is:  "PharmaFAX -- confidential -- do

24   not file in permanent medical record," correct?

25   A.   That's correct.

1    Q.   This is information that would be being kept from the

2    patients, correct?

3              MS. NUSSBAUM:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.   You agree with me it does say, "Do not file in permanent

6    medical record," correct?

7    A.   It does say that.

8    Q.   Then under "Action requested," it deals with, "For a

9    patient on gabapentin (Neurontin) verify the pain diagnosis.

10   If not neuropathic pain, stop gabapentin and start effective

11   pain management and methods and consider a referral."

12       And then it comes down to "Recommended first-line

13   alternative medications:  For painful diabetic neuropathy and

14   postherpetic neuralgia, try less-sedating TCAs like

15   nortriptyline," et cetera.

16       I've written what I've gotten to accurately, haven't I?

17   A.   Yes, you have.

18   Q.   Now, as of January 21, 2004, gabapentin had been approved

19   by the FDA for postherpetic neuralgia, correct?

20   A.   It had.

21   Q.   And the suggested alternatives on the list had not been

22   approved by the FDA, had they?

23   A.   It had evidence to support and actually evidence that

24   showed it was better than gabapentin in several studies.

25   Q.   So there were studies that showed this was really

1    better -- the others were actually better than the FDA-approved

2    drug; is that correct?

3    A.    Yes.

4    Q.    And why would you not want to include -- if you know, why

5    did Kaiser decide not to include that good news in the

6    patients' permanent medical records?

7            MS. NUSSBAUM:  Objection, your Honor.

8            THE COURT:  Sustained.

9    Q.    Doctor, you'll agree that when you're trying to decide

10   whether something is really effective, what counts is, do you

11   have Level 1 evidence, the kind of stuff that's in those

12   double-blind random-controlled studies, correct?

13   A.    That's the best evidence, yes.

14   Q.    And as of 2004, gabapentin was the only drug on this list

15   that had been shown to be effective on that best evidence,

16   wasn't it?

17   A.    That's not correct.

18   Q.    Okay, who else did the FDA approve?

19   A.    It doesn't have to be approved by the FDA to be involved

20   in a double-blind randomized controlled trial.  Nortriptyline

21   was generic at that time, and there was no one to submit those

22   studies to the FDA.  It's a laborious process.  The evidence

23   did exist.  There was head-to-head trials with tricyclic

24   antidepressants and gabapentin.  Tricyclic antidepressants on a

25   number needed to treat, number needed to harm, was superior to

9fe5251f-ac91-4e2f-b529-c03207c8c042

1  gabapentin, and we've seen that evidence in this trial on my

2  testimony.

3  Q.   Sometimes evidence-based medicine is whatever the FDA has

4  found to be best, correct?

5  A.   Always evidence-based medicine is evidence-based medicine,

6  always.

7  Q.   However, there are occasions when evidence-based medicine

8  would indicate that a drug that hasn't been approved by the FDA

9  is better than the FDA drug?

10       MS. NUSSBAUM:  Objection, your Honor.

11       THE COURT:  Sustained.

12  Q.   Doctor, didn't you just tell us that there were studies

13  showing that nortriptyline was more effective than gabapentin

14  for PHN?

15  A.   It seems like you want it both ways here, Mr. Kennedy.

16  Pfizer was off-label detailing these products, but when there's

17  evidence for off-label use of nortriptyline, you don't want to

18  accept that.  When there's evidence to support that one agent

19  is superior, regardless of price, that's the agent that is

20  used.  That's what the evidence supports; that's what we do.

21       FDA can make the indications, and drug companies can

22  submit those studies to the FDA for approval for marketing by

23  that indication, but if the evidence submits that nortriptyline

24  is superior, we will go to great lengths.  We will create a

25  starter pack.  We will titrate patients effectively.  We will

1  use the most effective agent for our patients.

2  Q.   And in 2004 Kaiser decided that less-expensive

3  nortriptyline was at least as good as FDA-approved Neurontin,

4  correct?

5  A.   And in 1994 we added it to the --

6         THE COURT:  Just yes or no.

7  A.   Yes.

8  Q.   And nortriptyline was considerably less expensive than

9  Neurontin at the time Kaiser made that decision, correct?

10 A.   Correct.

11 Q.   And that was also considerably less expensive at the time

12 Kaiser decided not to include this material in the patients'

13 medical records, correct?

14        MS. NUSSBAUM:  Objection, your Honor.

15        THE COURT:  Sustained.  I sustained that before.

16        MR. KENNEDY:  Your Honor, in the interest of time, I

17 think there's one here we can skip.  I would first offer

18 Exhibit 561 in evidence.

19        (Exhibit 561 received in evidence.)

20 Q.   And, Doctor, you see this is an internal Kaiser e-mail

21 involving a Debbie Kubota, and she's one of the monograph

22 preparers, right, in the Drug Information Service?

23 A.   Yes, she is.

24 Q.   And do you know who Rich Lieblich is or was as of 1999?

25 A.   Yes.

1    Q.    Okay, what was his title or position?

2    A.    He was Assistant Director of Pharmaceutical Contracting.

3    Q.    Was he a medical doctor?

4    A.    No.  He's a pharmacist.

5    Q.    And you'll see the exchange starts with Ms. Kubota writing

6    to Rich saying, "As Neurontin may be losing patent either early

7    or mid-2000, does it appear that Parke-Davis may offer us a

8    better contract at the end of this year?  (Please say 'yes').

9    The SCAL --" that's Southern California, right?

10   A.    Correct.

11   Q.    "-- general practitioners have requested we move

12   prescribing restrictions so that they may use this drug for

13   various neuropathies, including diabetic peripheral

14   neuropathy," correct?

15   A.    Correct.

16   Q.    And it says Neurontin may be losing patent.  What that's

17   referring to is, when a drug is patented and comes out

18   initially, only the manufacturer has the right to market it?

19   A.    Correct.

20   Q.    That's the power they get under the patent?

21   A.    That's correct.

22   Q.    And that's what Parke-Davis did with Neurontin, correct?

23   Neurontin was a Parke-Davis product, and it was patented by

24   Parke-Davis?

25   A.    That's correct.

1  Q.   And that's what's called a "branded" drug in the business,

2  correct?

3  A.   Correct.

4  Q.   Okay.  And then once the patent expires, then other people

5  are free to manufacture the drug, correct?

6  A.   Correct.

7  Q.   And that's called "generic" drugs, as we've been hearing

8  about.  And traditionally generic drugs are cheaper to much

9  cheaper than branded drugs, correct?

10  A.   Correct.

11  Q.   And what this exchange is referring to is that Kaiser is

12  tracking that it looks like the patent on Neurontin is going to

13  be expiring, and that there may be generic drug competition in

14  the near future, right?

15  A.   Correct.

16  Q.   And then he writes back saying, "I haven't heard anything

17  from them.  More importantly, it would have to be a sensational

18  offer because I'm sure there will be some competition the

19  minute there is no more patent protection, since Parke-Davis

20  has been gouging us until now."  And that was because they

21  wouldn't give you as big a discount as you wanted, correct?

22          MS. NUSSBAUM:  Objection, your Honor.

23          THE COURT:  Overruled.

24  Q.   Let me withdraw the question.  Kaiser traditionally uses

25  its buying power to try to get discounts from suppliers,

9fe5251f-ac91-4e2f-b529-c03207c8c042

1   correct?

2   A.   Correct.

3   Q.   Okay, and there had been some negotiation.  Referring to

4   gouging is when you don't get as big a discount as you want,

5   correct?

6   A.   I don't know that that's what he was referring to.

7            THE COURT:  Do you know what he was referring to?

8            THE WITNESS:  I don't.

9   Q.   Now, going to the top e-mail in the sequence, he says,

10  "Per the May 24 Pink Sheet, Parke-Davis is involved in

11  litigations with several potential generic competitors."

12       Tell the jury what The Pink Sheet is.

13  A.   The Pink Sheet is a trade journal.  It lists the various

14  happenings in industry:  Drug A is going generic in March,

15  there's been a merger between two drug companies, that type of

16  thing.  Just industry news.

17  Q.   And that's something that people at Kaiser, particularly

18  in purchasing, follow quite seriously?

19  A.   It's one of the many texts that we follow, yes.

20  Q.   It's something you read regularly, isn't it?

21  A.   I don't read it regularly, to tell you the truth.

22  Q.   You are familiar with it and have seen other people in

23  your department checking The Pink Sheets, haven't you?

24  A.   My predecessor used to read it regularly, but I do not,

25  and we have other people within Kaiser that read it.

1   Q.   And, again, as we've already discussed in this case,

2   Kaiser strives to use generics as much as possible, correct?

3   A.   Absolutely.

4   Q.   And Kaiser prides itself on the fact that its percentage

5   use of generics is higher than the rest of the healthcare

6   industry generally, correct?

7   A.   "Pride" might be a strong word, but it's something that we

8   definitely manage.

9            THE COURT:  Yes, go ahead.

10           A JUROR:  To be clear, is the generic the exact same

11   thing as the name brand?

12           THE WITNESS:  That's a very good question.  We have

13   bioavailability curves that are submitted by both

14   manufacturers.  What a bioavailability curve is is the blood

15   concentration in a patient over time.  So what our PharmD PhD

16   looks at when reviewing that material is that these curves are

17   very close.  You want them almost superimposable so the effect

18   is very similar.  You can get a range of generics with --

19           THE COURT:  Well, we don't want -- just is gabapentin

20   substantially the same as Neurontin?

21           THE WITNESS:  It's exactly the same.

22   Q.   And in this case --

23           THE COURT:  All right, so there's another question

24   here.  Go ahead.  No, no, go.

25           A JUROR:  The removing restrictions for the GPs,

1   general practitioners, what does that mean?

2         THE COURT:  What does remove restrictions mean?

3         A JUROR:  In plain English.

4         THE WITNESS:  They're gone.

5         THE COURT:  They're gone.

6         THE WITNESS:  It's kind of the floodgates were open at

7   that time.  It was completely open to everybody within Southern

8   California to prescribe.

9   Q.   And following up, eventually Neurontin went off patent

10  in -- what did you tell us, the third quarter, about, of --

11  A.   Late third quarter 2004.  It was fourth quarter 2004 when

12  it really took off within Kaiser.

13  Q.   So when did the generics come out, first quarter what

14  date?

15  A.   We can call it late November, 2004.  I'm sorry, late

16  September, 2004.

17  Q.   I'll put it up.  So somewhere around late September of

18  2004 is when the patent on Neurontin expires, and other people

19  are now able to start producing gabapentin, selling under that

20  name rather than as Neurontin, correct?

21  A.   Correct.

22  Q.   And as far as Kaiser was concerned, they were one and the

23  same, correct?

24  A.   Correct, absolutely.

25  Q.   And the generic gabapentin was considerably cheaper than

1    Neurontin, correct?

2    A.    Considerably cheaper than Neurontin.

3    Q.    And at least in the regions where you work, as soon as

4    generics were available, Kaiser switched from buying branded

5    Neurontin and started buying generic gabapentin, correct?

6    A.    Correct.

7    Q.    And that continues to be true today?  You're still buying

8    generic gabapentin, correct?

9    A.    Absolutely.

10   Q.    And you're not aware of any information indicating that

11   your patients' reaction to gabapentin in a bottle that says

12   "gabapentin" has been any different than a bottle that said

13   "Neurontin" on it?

14   A.    There is no information.  I'd be fully aware of that in my

15   position.

16   Q.    And you would expect them to be chemically, physically, in

17   terms of efficacy, every other way to be the same, right?

18   A.    Because of the work we do, we would expect that, yes.

19   Q.    And see if that refreshes your recollection at all.  Going

20   back to Exhibit 810 which is in evidence, we discussed

21   yesterday, this was September 8, 2005.  This is after the

22   generic is on the market, and this is the "Regional Formulary

23   and Therapeutics Committee" up in the Northwest.

24             THE COURT:  Are you going back through this document?

25             THE WITNESS:  I didn't, I didn't recall it then.

1      THE COURT:  I think we went through this yesterday.

2      MR. KENNEDY:  Very well, your Honor.  We will move on.

3  Q.  Changing topics, there's been some suggestion in this case

4  that Kaiser lacks research abilities.  That isn't correct, is

5  it?

6  A.   No, sir.

7      MR. KENNEDY:  Offering Exhibit 902-I in evidence.

8  Q.  And putting the cover up, that's a report from the Kaiser

9  Division of Research, isn't it?

10 A.   It is.

11 Q.  And in fact Kaiser has five research divisions, doesn't

12 it?

13 A.   I believe so.

14 Q.  And in fact Kaiser has unique research abilities, doesn't

15 it, because of its huge database?

16 A.   I don't know that they're unique, but we have research

17 capabilities.

18 Q.  And in fact the database is located right near here in

19 Framingham, isn't it?

20 A.   I wasn't aware of that.

21 Q.  My mistake perhaps.

22 A.   That's another database.

23 Q.  Turning to Page 5 of the current exhibit -- and this is a

24 report that Kaiser issues from time to time concerning its

25 research abilities, correct?

1  A.   This is the first I've seen of it.  I'll take your word

2  that that's true.

3  Q.   Well, going to the introductory paragraph on Page 5, the

4  author --

5          THE COURT:  Excuse me.  Is this being offered as an

6  exhibit?  Is this on your exhibit list?

7          MR. KENNEDY:  Yes, your Honor.  I offer it into

8  evidence.  It's off their website.

9          THE COURT:  Is it an exhibit?

10         MS. NUSSBAUM:  I don't believe so, your Honor.

11         MR. FOX:  It's part of the website exhibit, Exhibit --

12         THE COURT:  Excuse me.  Was it marked as an exhibit?

13         MR. KENNEDY:  Yes, as part of the website exhibit,

14 your Honor.  We've got an exhibit for miscellaneous website.

15         THE COURT:  Is this off your website?

16         MS. NUSSBAUM:  Yes, when was this marked?

17         THE COURT:  Take it off if it hasn't been marked.

18         MR. KENNEDY:  Your Honor, in the interest of time,

19 let's deal with this one at the break, and we'll move on now.

20 Q.   Without regard to the exhibit, in the course of the five

21 years this case has been around, are you aware whether Kaiser

22 has given any of its experts in this case access to any of its

23 databases?

24 A.   I'm not aware of that.

25 Q.   Has Kaiser done any research of its own to try to

1    determine the effectiveness or ineffectiveness of gabapentin in

2    any way?

3    A.   I'm not aware of that.

4    Q.   You mentioned, for example, that there have been no

5    head-to-head trials between Lyrica and gabapentin for diabetic

6    neuropathy.  You remember discussing that, don't you?

7    A.   Yes.

8    Q.   And Lyrica is approved by the FDA for diabetic neuropathy,

9    and gabapentin isn't, correct?

10   A.   That's correct.

11   Q.   However, since gabapentin went generic and got cheaper,

12   Kaiser has been recommending gabapentin over Lyrica for

13   diabetic neuropathy, correct?

14   A.   I'm not aware of that.

15   Q.   You don't remember going through that on the slide on

16   Friday?

17   A.   I don't recall that.  I'm sorry.  Refresh me.

18         THE COURT:  Well, I think we're going to have this

19   other person on, so maybe that person is a better person.

20   Q.   In any event, you mentioned here that there weren't any

21   head-to-head trials between Lyrica and gabapentin for diabetic

22   neuropathy, correct?

23   A.   That's correct.

24   Q.   That's something that Kaiser could do if they wanted,

25   isn't it?

1    A.    It's something we could do.

2    Q.    But if you did it, it might turn out that the more

3    expensive drug worked better, wouldn't it?

4    A.    I cannot comment on that.

5    Q.    That isn't something you'd want to learn, is it?

6    A.    It is something I'd like to learn.  We did learn that when

7    we reviewed the evidence for gabapentin when it was added to

8    the formulary, despite high cost.

9    Q.    Well, pursuant to your request to refresh you, let's go

10   back to Exhibit 820.  I'm sure you'll remember this.  We

11   discussed it just as we were closing on Friday.  I realize it's

12   been a while ago.  Remember, this was a request from a doctor

13   in 2006 after the generic product is on the market:  "Is there

14   any literature comparing Neurontin and Lyrica for diabetic

15   neuropathy?"  Remember this now?

16   A.    Yes, it's coming back.

17   Q.    And as of 2006, Lyrica had FDA approval for diabetic

18   neuropathy, didn't it?

19   A.    I'll take your word.

20   Q.    I assure you it did.

21   A.    Okay.

22   Q.    And gabapentin did not have FDA approval for diabetic

23   neuropathy, did it?

24   A.    That's correct.

25   Q.    However, in Exhibit 820, the Drug Information Service said

1    that Kaiser recommends gabapentin and TCAs over Lyrica for the

2    FDA-approved condition, correct?

3    A.   That is consistent with what the evidence showed when we

4    reviewed it.  It did show that gabapentin did have a place

5    after TCAs, and that's how we positioned it, and it's continued

6    to be positioned here.

7    Q.   So is it correct then that gabapentin is both no better

8    than a sugar pill and better than FDA-approved drugs?

9         MS. NUSSBAUM:  Objection.

10   A.   That is not a correct statement.

11   Q.   What's wrong with that statement?

12   A.   Your statement that it's no better than a sugar pill, you

13   have an all-inclusive statement there that's not correct.  This

14   is a drug that is full of active pharmaceutical ingredient,

15   that has very significant powerful effects, including adverse

16   reaction, and has even been linked to suicidality by the FDA.

17   It is not a sugar pill.

18   Q.   So if somebody got up in opening statement and told this

19   jury it was no better than a sugar pill, that person would have

20   been, certainly not intentionally but accidentally saying

21   something was incorrect, right?

22        MS. NUSSBAUM:  Objection, your Honor.

23        THE COURT:  Sustained.

24   Q.   Have you heard that your lawyers referred to it as a

25   "sugar pill" in opening statement?

Page 54

1    A.    I have not heard that.

2          MS. NUSSBAUM:  Objection, your Honor.

3          THE COURT:  Sustained.

4    Q.    And before we get off of 820, is it your testimony that

5    the fact that generic gabapentin is considerably cheaper than

6    Lyrica had absolutely nothing to do with the Drug Information

7    Service's decision to recommend gabapentin over Lyrica?

8    A.    I don't know all of the components that went into it, but

9    it is significantly cheaper than Lyrica.

10   Q.    Changing topics, you've provided information to the

11   economists or statisticians that the plaintiffs are going to be

12   using in this case, correct?

13   A.    I don't recall if it went to an economist or a

14   statistician, but I provided some information in this case.

15   Q.    For people to use in calculating damages, you provided

16   numbers?

17   A.    Yes.

18   Q.    To somebody?

19   A.    Yes.

20   Q.    And you supervised doing that, or did you do it yourself?

21   A.    I didn't supervise.  I worked with Calvin Togashi to pull

22   the data.

23   Q.    What I'd like to know is, the information that you

24   provided, was it normalized to 100-day prescriptions, or would

25   somebody else have to tell us that?

1   A.   It was not normalized.  Those are just raw prescriptions,

2   and it varies throughout the program on the prescription drug

3   benefit.  It could be 30-day, it could be 100-day.

4   Q.   Well, would two 50-day prescriptions have been counted as

5   two prescriptions or one prescription in the information that

6   you provided?

7   A.   Each one of those prescriptions is unique regardless of

8   quantity size.  So if it went to a patient on a prescription

9   number, that was a prescription.

10   Q.   Regardless of the size?

11   A.   I believe so.

12   Q.   So you didn't make any attempt to figure out how many

13   pills were in the prescription?  It was just by prescription?

14   A.   No, right.

15   Q.   Thank you.  Now, picking up where we left off yesterday,

16   we were talking about these things called ICD9 codes.

17   A.   Yes.

18   Q.   And as we established, that means International

19   Classification of Diseases, correct?

20   A.   Correct.

21   Q.   And those are used at least throughout the United States,

22   if not throughout the world, correct?

23   A.   Throughout the United States.

24   Q.   And what those do is allow a doctor or somebody in the

25   healthcare business to assign a particular code to a particular

1    condition, correct?

2    A.    That is correct.

3    Q.    And in this case -- let me save the rest of the question

4    until after we put Exhibit 692.

5              MR. KENNEDY:  I offer that in evidence.  It's

6    Plaintiffs' Exhibit 347, I believe, Defendants' 692.

7              (Exhibit 692 received in evidence.)

8    Q.    This is entitled a "DUAT Video Conference" from 2003,

9    correct, Doctor?

10   A.    That is correct.

11   Q.    And DUAT was the acronym for the organization in Southern

12   California that checks out when it's perceived to be excessive

13   use or excessive cost in drugs, correct?

14   A.    Correct.

15   Q.    And that's what's called DRUG, a separate operation up in

16   Northern California, and then there's DUIT up in Oregon,

17   correct?

18   A.    Correct.

19   Q.    And have you ever been a member of the DUAT team in

20   Southern California?

21   A.    I've not been a member of DUAT.

22   Q.    Have you ever been an invited guest at any of their

23   meetings?

24   A.    Yes, I have.

25   Q.    Do you know if you were at the March 12, 2003 meeting

1   dealing with gabapentin, anticonvulsant, or pain medication?

2   A.   I can't specifically recall if I was at this meeting, but

3   I was at a version of this with Dr. Gerald Frank.  I'm not sure

4   if it's this meeting.  Maybe if we go through the slides, it

5   will come back.

6   Q.   You were certainly aware of the DUAT initiative on

7   Neurontin, correct?

8   A.   Absolutely.

9   Q.   And turning to Page 7 of that exhibit, one of the things

10  that was apparently shown or distributed at that point was a

11  comparison of the cost on a yearly basis of Neurontin and --

12  how would you describe the other drugs?  Are those AEDs?

13  A.   These are all tricyclic antidepressants.

14  Q.   These are TCAs?

15  A.   Yes.

16  Q.   And this shows there was a considerable cost differential

17  between gabapentin and the tricyclics, right?

18  A.   Absolutely.

19  Q.   However, not everybody can take a tricyclic, can they?

20  A.   That's correct.

21  Q.   If you've got a heart problem, it can kill you, right?

22  A.   That might be a bit of an overstatement, but, yes.

23  Q.   You certainly wouldn't want to take one if you had a heart

24  condition?

25  A.   Depending on the condition.

1   Q.   And they don't work very well for the elderly, do they?

2   A.   They work great for the elderly.

3   Q.   No problem with the elderly?

4   A.   It has problems just like gabapentin does, and that's why

5   we had it in a titration pack, the nortriptyline starter kit.

6   Q.   And, as you mentioned, Kaiser's three concerns are safety,

7   efficacy, and cost, correct?

8   A.   Correct.

9   Q.   And this is an example of where Kaiser is focusing on the

10   cost portion of that equation, correct?

11   A.   Well, I think if we look at the entire slide deck here,

12   they're focusing on efficacy.

13   Q.   Well, I'm sure your lawyer can do that.  Let's flip over

14   to Page 13, a chart called "Gabapentin Utilization," and that's

15   actually a chart that you prepared or caused to be prepared,

16   isn't it?

17   A.   That's correct.

18   Q.   And this shows a breakdown -- you've taken 20,429

19   prescriptions, and those were people who were given gabapentin

20   up in Northern California in your region, correct?

21   A.   Yes, in Northern California.

22   Q.   And using ICD9 codes, you broke those prescriptions down

23   according to what condition they were prescribed for, correct?

24   A.   Well, that's how I'd like to represent it, but that's a

25   bit of an overstatement.  Back at that time, we didn't have the

1    ability to hard code a prescription to a diagnosis.  We just

2    recently gained that ability with a large expenditure on our

3    HealthConnect system that electronically ties diagnosis and

4    prescription at the time the prescriber prescribes it.  Here

5    what we had is two separate databases:  a database that was

6    created by doctors writing down on a piece of paper what the

7    diagnosis was at the end of the visit, which was hit or miss,

8    and collection of that paper and recorded into a database.

9         The only reason we did this study was to show that

10    gabapentin at the time had very little utilization for its

11    primary indication, epilepsy.  It was adjunct therapy for the

12    control of seizures.  Only 208 out of the 20,000 some odd

13    prescriptions were for epilepsy.

14         You know, when I presented this, I got a lot of pushback

15    because it's just a temporal sequence and there's not a real

16    good tie.  Just by fact of the number of prescriptions for DJD,

17    it doesn't make a lot of sense that gabapentin was used

18    primarily for DJD.

19              THE COURT:  What's DJD?

20              THE WITNESS:  Degenerative joint disease, more

21    commonly, osteoarthritis or sore joints.

22              THE COURT:  So when you said 4 percent was for

23    bipolars, you think it's likely it's more or less?

24              THE WITNESS:  It's not a real good estimate.  I don't

25    know what the true number is for bipolar, but this isn't a very

1   good estimate.  It didn't include all ICD9s for bipolar.  And

2   we were just really concentrating on trying to get the epilepsy

3   right here.  And you can tell there's a lot of junk here, a lot

4   of garbage in/garbage out, if you will.  DJD being 20 percent

5   of the prescriptions just doesn't make sense to a clinician.

6   That's not where Neurontin is being used.  So you could show up

7   at the medical center and have four visits that day, and there

8   could be a code for DJD and a prescription for Neurontin; and

9   in this exercise, we would have said, well, they're using

10  Neurontin for DJD.  It's not how it was being used, and I

11  received a lot of pushback when I did this work, pushback from

12  our medical group.

13  Q.   This was, however, your best effort to try to reflect what

14  Kaiser's prescribing practices were, at least among those

15  20,000 prescriptions, right?

16  A.   I thank you.  You're very generous.  It was my best

17  effort, but, again, it didn't pass muster.

18  Q.   Don't grade yourself so harshly.  We think more of it than

19  you do, Doctor.

20          (Laughter.)

21  A.      You're too kind, Mr. Kennedy.

22          THE COURT:  Go ahead.

23          A JUROR:  This gabapentin utilization, this was

24  presented at this DUAT, the previous slide?

25          THE WITNESS:  Yes.  So my boss, I reported up to the

Page 61

1    same boss, Richard Wagner.  It was part of DUAT.  He had both

2    north and South.  But this is just new starts.  It was not all

3    the refills, so it's a very small component of the overall use,

4    and, again, the diagnosis tie-in is very loose.

5            THE COURT:  So this is new starts in what year?

6            THE WITNESS:  I believe this is 2001.

7            THE COURT:  And so what you did is, if somebody went

8    to a psychiatrist -- I just want to understand -- if they went

9    to a psychiatrist --

10           THE WITNESS:  Well, no, there's no specialty here.

11   They just went to a doctor on a given day, and the doctor wrote

12   down at the end of the visit on his paper, checked off a box,

13   DJD, radiculopathy, spinal stenosis, what have you.

14           THE COURT:  So did the doctor check off bipolar?

15           THE WITNESS:  He could have checked off bipolar, yes.

16           THE COURT:  So 4 percent of the doctors checked off

17   bipolar?  That's how you got this?

18           THE WITNESS:  Yes, but the denominator here, 4 percent

19   of a very large number that contains a lot of garbage.  So I

20   don't know that the 4 percent is very representative.  I would

21   not hang my hat on that number.  Because we had so much

22   inclusion, I don't know that DJD was the diagnosis, don't know

23   that spinal stenosis was the diagnosis.

24           THE COURT:  Well, did they check off DJD?

25           THE WITNESS:  Someone did during that day.

Page 62

1    Twenty-four hours before the Neurontin prescription was picked

2    up, someone checked off.  But you can come to the medical

3    center and have several visits, or a doctor can check off

4    several diagnoses for you in one visit, or just your primary

5    diagnosis.  It's not a real good science.

6             Now, with the advent of HealthConnect --

7             THE COURT:  All right, go ahead.

8             THE WITNESS:  Okay.

9    Q.   Doctor, are you aware of anybody at Kaiser who's gone and

10   done a more accurate breakdown of Neurontin prescriptions for

11   any period of time than what you've got here?

12   A.   There's been some small medical center level -- you know,

13   several medical centers build up into a region -- small medical

14   center level chart reviews.  And that's the definitive look:  a

15   Drug Utilization Evaluation, a DUE is what it's called, and is

16   done at several hospitals, several health plans, medical

17   centers throughout the United States.  At that time, that

18   was --

19            THE COURT:  Those are Kaiser medical centers?

20            THE WITNESS:  I'm sorry?

21            THE COURT:  Kaiser medical centers?

22            THE WITNESS:  A DUE was the only way to get the

23   definitive number of what it's being used for.

24            THE COURT:  So what is it?

25            THE WITNESS:  I don't have those numbers.

1          MR. KENNEDY:  Your Honor, with that in mind, we'll get

2    back to Exhibit 692, the 2003 DUAT conference, in a second, but

3    meanwhile let me turn for just a moment to Exhibit 760.  I

4    offer that in evidence.

5          (Exhibit 760 received in evidence.)

6    Q.   And that was produced by Kaiser in this case, and that's

7    saying a year to date, that some portion -- excuse me -- "July

8    2004, diagnoses associated with gabapentin (Neurontin)," again,

9    new prescriptions, and this one shows bipolar as being 225

10   prescriptions out of a total of 9,011 reviewed, correct?

11   A.   That's correct.

12   Q.   So 1 percent would be 90, 2 percent would be 180,

13   225 would be 2.5 percent would be bipolar, correct?

14   A.   Impressive math, yes.

15          THE COURT:  So that's in 2004, and where would that

16   be, in what center?

17          THE WITNESS:  This is all of Northern California.

18   Again, it's just new prescriptions.  It's interesting that the

19   DJD had dropped down here, so there's some fluctuation here.

20          MR. KENNEDY:  Austin, is there any way to display both

21   charts at the same time?  Could we put one on the Elmo?  We

22   can't.  In any event, maybe we can take notes.

23   Q.   According to Exhibit 760, spinal stenosis is No. 1,

24   anxiety panic attacks is 2, and degenerative joint disease --

25   is that what that is? -- DJD is 3.  So whatever they are,

Page 64

1   let's --

2          THE COURT:  Are you marking this as an exhibit?

3          MR. KENNEDY:  I offered it in evidence already, your

4   Honor.

5          THE COURT:  Oh, it's in evidence.  All right.

6          MR. KENNEDY:  Sorry.

7   A.   Can we track those primary indications for gabapentin

8   while we're at it, the bipolar, the migraine, epilepsy, and the

9   postherpetic neuralgia?

10  Q.   Sure.  Bipolar we've already talked about, on 760 is about

11  2.5 percent, correct?

12  A.   Correct.

13  Q.   Migraine at 81, that's less than 90, that's going to be

14  less than 1 percent, correct?

15  A.   Yeah, this is the bulk of the use, and it just wasn't

16  showing up on this treatment here.  It kind of spoke to my

17  inability to tie the diagnosis and the prescription very well

18  at all.

19         THE COURT:  Well, once again, was this a doctor

20  checking off bipolar or migraine?

21         THE WITNESS:  Yes, on a piece of paper.

22         THE COURT:  So I don't understand why you're saying

23  that's not accurate if the doctor is checking off bipolar.

24         THE WITNESS:  Yeah, I'm not making it clear.  So can I

25  elaborate?  Can I tell you the process?

1           THE COURT:  Yes.

2           THE WITNESS:  Okay.  So you could show up at the

3    medical center and have several visits in one day, okay?  And

4    the doctor for each visit is supposed to code this OSCR form.

5    An OSCR form is where they collect the diagnosis.  It's

6    something that's done at the end of the visit.  And it's kind

7    of hit-or-miss; it doesn't happen all the time.

8           THE COURT:  Is the doctor the one who fills it in?

9           THE WITNESS:  The doctor is the one who fills it in.

10   And it's paper, and this paper is then imported, collected, and

11   collated into a database.  And on that day, however many

12   diagnoses you were given and however many diagnoses were

13   captured are in this database.  What I then did was look to

14   see, for the given patient that received that diagnosis, you in

15   this case, did you have a Neurontin prescription picked up at

16   the pharmacy?  A brand-new one, you'd never had Neurontin

17   before.  And the answer is "yes" for this number of

18   prescriptions that were associated with these diagnoses.

19          THE COURT:  So it's the best you can do in terms of

20   new starts on bipolar in whatever, 2004, it's the best that not

21   you personally, Kaiser has to give us?

22          THE WITNESS:  Yeah, and Mr. Kennedy was very generous.

23   It was my best effort, but, you know, it's garbage.

24          THE COURT:  All right.

25   Q.   Doctor, part of the reason for your false modesty is, the

Page 66

1   numbers that you got for bipolar and migraine are a lot lower

2   than the national averages, aren't they?

3   A.   Yeah, I couldn't tell you what the national averages are.

4   I can just tell you what we have here.

5            THE COURT:  When did your reeducation campaign kick

6   in?

7            THE WITNESS:  Probably right there where that curve

8   starts to dip, late 2003 we start to really see we had some

9   traction.

10  Q.   Doctor, you're aware that if you looked at the national

11  percentages of Neurontin or gabapentin for bipolar, you'd get a

12  considerably higher number than 4 percent, correct?

13  A.   I'll take your word.

14  Q.   More like 13 or 14 percent, correct?

15  A.   I'll take your word.

16  Q.   And one of your goals in this case is to try to get this

17  jury to accept national percentages rather than Kaiser's own

18  numbers, correct?

19            MS. NUSSBAUM:  Objection, your Honor.

20            THE COURT:  Well, let me focus you to hear this

21  debate.  I mean, there are obviously a lot of issues you're

22  going to have to resolve as the jury, and it may be that you

23  decide there's no liability, in which case you don't get to

24  damages.  But if you decide there's liability, then the issue

25  is going to be, you're going to be hearing from a damage

1   expert, and the issue is how are you going to calculate

2   damages?  And this is what this little back-and-forth is, is

3   trying to figure out what numbers are talking about.  And it's

4   only if you get there, but, you know, we only do this one time,

5   so that's what this debate is about.

6          MR. KENNEDY:  Thank you, your Honor.

7   Q.   And, again, at least according to your work, in 2004 the

8   top three are spinal stenosis, anxiety/panic, and DJD; and

9   bipolar is down at 2 1/2 percent, migraine is at less than

10  1 percent.

11      Now let's go back to the 2003 DUAT conference and the

12  earlier gabapentin utilization.

13          THE COURT:  Can I see counsel just on scheduling for

14  one second.

15  SIDE-BAR CONFERENCE:

16          THE COURT:  So here's our problem:  We have another

17  witness here -- we did a whole scheduling thing at the end of

18  yesterday -- who we assumed was going to be a half an hour for

19  direct and a half an hour for cross.  As you know, I'm leaving

20  at quarter of.  So in order to have this accomplished, you had

21  said yesterday, not once but twice, that you thought you'd be

22  done in an hour and try and skinny it up.  It's now been about

23  an hour and 25 minutes.  Now, this piece was critical.  I mean,

24  I have no problems with what you just did.  Some of it wasn't.

25  It could have been done better through another witness.  I need

1    you to finish by quarter of.

2         MR. KENNEDY:  Your Honor, I'll do my best.  We're

3    being sued for a couple hundred million dollars, and we've got

4    28 hours --

5         THE COURT:  Excuse me.  You have other witnesses to

6    go, and now I've got somebody -- we had a whole scheduling

7    discussion.  I do this for a reason.

8         MR. CHEFFO:  Your Honor, that's the thing.  We're not

9    going to have these other witnesses.  I keep saying it.

10   There's only --

11        THE COURT:  Excuse me.  Finish it by quarter of.

12        (End of side-bar conference.)

13   BY MR. KENNEDY:

14   Q.   Doctor, to wind this up, you can't point to any Kaiser

15   record showing that the bipolar percentage of gabapentin

16   prescriptions has ever been higher than 4 percent, can you?

17   A.   No.  No, I cannot.

18   Q.   The same:  You can't show that migraine has ever been more

19   than 4 percent either, correct?

20   A.   This is all I have.

21   Q.   Now, going back to the DUAT organization that we were

22   talking about, did doctors at Kaiser have any financial

23   incentive to try to hold down costs by, for example,

24   prescribing generics rather than branded drugs?

25   A.   By financial incentive, are you talking personal incentive

1    like a bonus?  Or what do you mean by financial incentive?

2    Q.   Let me withdraw the question and show you Exhibit 902-D,

3    which I would offer in evidence, your Honor.  I'm sorry, it is

4    in evidence.  902-D, that's that "Frequently asked questions"

5    section from the website that we talked about earlier.  And

6    coming down on the second page, Austin, "Health Plans and

7    Medical Group:  And each year Kaiser Permanente, the health

8    plan and the medical group in each region, negotiate on the

9    total amount of money that it's estimated will enable our

10   physicians," et cetera.

11        And then continuing on over to the next page, "Physician

12   Compensation Health Plan Medical Group:  In the event that the

13   total of all payments, as adjusted throughout the year, is

14   insufficient to provide the needed care, Kaiser Permanente dips

15   into its reserves for shortfalls.  Then, during the following

16   year, dues may be raised and reserves replenished."

17        Do you know if that was done because of the extra costs

18   you generated paying for gabapentin?

19   A.   I have no idea.

20   Q.   That would be normal policy, though?

21   A.   I have no idea.

22   Q.   Okay, going on with Exhibit 902-D, "If the basic

23   contractual payments, including the capitated payments, are

24   greater than the actual cost of the medical care, then the

25   medical group, as a whole, is permitted to share in some of the

1  surplus."

2       So if the medical group comes in below budget, they get to

3  share in the savings, correct?

4  A.   That looks like what it says there.  This is news to me.

5  Q.   Well, let's go back to another DUAT meeting, Exhibit 339,

6  which I would offer into evidence.

7            (Exhibit 339 received in evidence.)

8  Q.   And this is another DUAT meeting, Southern California.

9  This is still on the Neuropathic Pain Initiative, which is

10  another name for the Gabapentin Initiative, correct?  And this

11  is September 10, 2003, and going to Page 2, there's a regional

12  strategy update, and one of the things on -- that's discussion

13  summary, Austin.  That is Page 2.  You were right; I was wrong.

14  How about Page 3.  My apologies.

15       "Regional strategy update," coming down to the third

16  paragraph, "Rx update:  (Paycheck stuffer) nortriptyline for

17  neuropathic pain," and it says go over to Page 13 to learn more

18  about the paycheck stuffers.  And can we go over to Page 13.

19  And we have two Rx updates.  In fact, I think you referred to

20  one of these on your direct examination.  These are documents

21  that were actually put in the doctors' paychecks by Kaiser,

22  weren't they?

23  A.   Yes.

24  Q.   And among the information that was put in the doctor's

25  paycheck stuffer was the comparative cost of Neurontin and

Page 71

1   other drugs that Kaiser thought would work better for treatment

2   of various conditions?  Were you aware that that happened?

3   A.   Yes.

4   Q.   Didn't that strike you as a trifle heavy-handed?

5   A.   To tell you the truth, I could see how it would appear

6   that way, but it doesn't strike me as that.

7   Q.   It wouldn't have that effect at all?

8   A.   Well, I could tell you why we put it in the paycheck

9   stuffer, because --

10         THE COURT:  No.  What's the next question?  We're

11   going to try and wrap this up here.

12         MR. KENNEDY:  Yes, your Honor.

13   Q.   Turn next to Exhibit 690.

14         MR. KENNEDY:  Offering 690 in evidence.

15         (Exhibit 690 received in evidence.)

16   Q.   This is a February 6, 2003, meeting of the DUAT team in

17   Southern California, and if we see down in the fourth box, you

18   were actually at this meeting, the one that starts "Greg

19   Adams"?

20   A.   Yes, as a guest.

21   Q.   You attended this meeting?

22   A.   I did.

23   Q.   And this was to discuss the reeducation campaign of

24   doctors that you talked about on direct examination, correct?

25   A.   Correct.

1    Q.   And gabapentin was one of the subjects about which doctors

2    were going to be reeducated, correct?

3    A.   Correct.

4    Q.   And, Austin, can we go to Page 1167.  And under

5    "Outcomes," there are a number of bullet points, the third one

6    being "Peer utilization data systematically reviewed for each

7    targeted drug class.  Outliers are identified and appropriate

8    interventions are determined."

9        That's fancy language for doctors that are prescribing too

10   much gabapentin are identified, and steps are taken to

11   reeducate them, correct?

12   A.   Yes.

13   Q.   And the next bullet point explains that the initial

14   intervention is done via e-mail, and that "The e-mail will

15   contain a cover memo from the DUAT leader explaining why the

16   data is being sent, and an unblinded peer graph."

17       So that's saying that DUAT is going to be bringing this

18   doctor's overuse of gabapentin to his or her attention, and

19   then there's going to be an unblinded peer graph, and that

20   shows that doctor's prescriptions versus everybody else's,

21   correct?

22   A.   Correct.

23   Q.   So like those country clubs that post the unpaid dues for

24   everybody to see?

25   A.   I don't belong to country clubs, but that's an interesting

Page 73

1    analogy.

2         (Laughter.)

3    Q.   This was intended to let all the other doctors know who

4    the outliers were that were overusing gabapentin, correct?

5    A.   It was intended to let the individual at one extreme of

6    the scale, let him know where he lines up compared to his

7    colleagues, him or her.

8    Q.   And then the next bullet point, "Thank you messages are

9    sent to providers that show improvement --"  Almost like being

10   back in grade school where you get gold stars, isn't it,

11   Doctor?

12   A.   Almost.

13   Q.   Okay.  And then going to -- oh, I'm sorry.  The next

14   column out to the right, Austin, under "Key success factors,"

15   you need buy-in and active support from opinion leaders in the

16   specialty areas in order to bring pressure to bear on the

17   doctors that you think are prescribing too much gabapentin,

18   correct?

19   A.   Incorrect.

20   Q.   And then there's "Academic detailing."  You told us on

21   direct about detailing, the way drug companies sell drugs.  You

22   were adopting the same sorts of tactics to try to sell doctors

23   on prescribing less gabapentin, weren't you?

24   A.   Yeah, this is accepted science by Jerry Avorn.  They're

25   referring to an academic detailing.

Page 74

1    Q.   Okay, well, let's talk about that.  Can we go over to

2    Page 1171.

3              THE COURT:  By whom?

4              THE WITNESS:  Dr. Jerry Avorn.  He was the father of

5    academic detailing, so --

6    Q.   And over on Page 71, second column from the left, about

7    two lines down where we get to "Academic detailing," can you

8    pick that one up.  The overview of the training, there's a

9    one-day course to provide an overview of academic training.

10   These are for doctors that are going to be trained to teach

11   other doctors not to prescribe as much gabapentin, correct?

12   A.   Teach other doctors about the evidence on gabapentin, yes.

13   Q.   And coming down under "Components of training," at the

14   one-day detailing course, the persuaders are taught how to

15   structure their conversation, how to get their foot in the

16   door, the opening statements.  Did Fuller Brush come in to help

17   out on that one?

18             MR. KENNEDY:  I withdraw the question, your Honor.

19             THE COURT:  Sustained.

20   Q.   Then you also took steps to try to maximize credibility

21   and request specific action, and those steps were all

22   implemented, weren't they, Doctor?

23   A.   I don't know that they were implemented, but they were

24   part of that training, yes.

25   Q.   And that may have had something to do with how you

1   achieved a 34 percent decline in branded Neurontin

2   prescriptions, correct?

3   A.   I think it was a large component.  Having doctors talk to

4   doctors about the evidence is always powerful, and that's been

5   borne out by Dr. Avorn in the literature, and that's where that

6   model came from.

7   Q.   And you believe in order to get the doctors to really

8   focus on the science, it's necessary to put a stuffer in their

9   paycheck telling them how much more gabapentin costs than the

10  other drugs; is that correct?

11          MS. NUSSBAUM:  Objection, your Honor.

12          THE COURT:  Sustained.

13          MR. KENNEDY:  Now, next we'd offer Exhibit 506 in

14  evidence.

15          (Exhibit 506 received in evidence.)

16  Q.   And this is a copy of The Pink Sheet that we referenced

17  earlier today.

18  A.   Yes.

19  Q.   And what's this come out, weekly?

20  A.   Yes.

21  Q.   Okay.  And if somebody wants to know whether a drug is

22  going generic or something else has happened in the drug field,

23  this is one of the places you'd go to look for it?

24          THE COURT:  Has this been marked as an exhibit?

25          MR. KENNEDY:  Yes, your Honor.  It's Exhibit 506.

1       THE COURT:  Was there an objection?  Just before we

2  flash it on, we should just --

3       MS. NUSSBAUM:  No objection, your Honor.

4  Q.   And coming down to the second item IN -- this is the

5  April 3, 2000 issue of the Pink Sheet, so this would be

6  something like four and a half years before the lawsuit

7  started.  And the second item, can we zero in on that one,

8  Austin.  That's an article about Warner-Lambert Neurontin

9  promotions being the subject of a grand jury investigation in

10 Boston, and then over on Page 3, there's an article about that.

11 Do you see that, Doctor?

12 A.   I do.

13 Q.   So somebody who regularly read The Pink Sheets and saw the

14 April 3, 2000 edition would know that the grand jury

15 investigation that ultimately led to the plea agreement here

16 was already under way in April of 2000, correct?

17       MS. NUSSBAUM:  Objection, your Honor.

18       THE COURT:  Overruled.

19 A.   They would know it was ongoing, but, you know, I don't

20 know what leg up that would give us, and we were already

21 engaged in taking on or beginning to -- it was very early

22 in our -- it wasn't until 2001, 2002 that we became active.

23 Q.   When you say "we," you're talking about you and the people

24 in Northern California?

25 A.   DRUG, DUAT.

1   Q.   So you can't speak for the rest of Kaiser around the

2   country as to who was reading The Pink Sheet and who was or was

3   not aware of Warner-Lambert's sales practices in April of 2000

4   or May of 2000?  You can't speak to that, can you?

5   A.   I can't, and it looks by this article no one could be

6   aware of their sales practices.  They just know they were under

7   investigation.

8   Q.   Now, on direct you talked about -- Exhibit 366, it's in

9   evidence.  Let's put it up, Austin.  And this is what's called

10  an "information," which is a document that the federal

11  government files when they are going after somebody, and this

12  is the one with United States of America versus Warner-Lambert

13  that you talked about on direct.  Remember that?

14  A.   Yes.

15  Q.   And you've read through this document, I trust, before

16  testifying about it, correct?

17  A.   Scroll down.  It all looks the same at this point.

18  Q.   Well, you'll agree with me that none of the Kaiser

19  entities are mentioned anywhere in this exhibit, are they?

20  A.   I'm not sure.  All I see is the --

21          THE COURT:  He doesn't know.  You'll have this

22  exhibit.

23          MR. KENNEDY:  The jury will have it so they can see

24  for themselves.

25  Q.   And going over to Page 13, Count One, what Warner-Lambert

Page 78

1    was actually charged with, notice it says "Beginning as early

2    as April, 1995, and continuing thereafter until at least in or

3    about August 20, 1966 --"

4              THE COURT:  No.  1966 would be --

5              MR. KENNEDY:  1996.  Thank you, your Honor.  I'm

6    trying to multitask.

7              THE COURT:  It's like what's that, Benjamin Button,

8    we're going backwards here?

9              MR. KENNEDY:  I'll try that one again.

10   Q.   The conduct that was charged was from April, '95, to

11   August 20, 1966 --

12             THE COURT:  1996.

13             MR. KENNEDY:  I adopt your Honor's --

14   Q.   And it goes on to say that what they're charged with is

15   transporting an improperly labeled drug in interstate commerce,

16   correct?

17   A.   I don't see that, I'm sorry.

18   Q.   Under --

19             THE COURT:  We don't need to do this with this

20   witness.

21             MR. KENNEDY:  Yes, your Honor.

22   Q.   In any event, you have no knowledge suggesting that the

23   action against Warner-Lambert in '95 and '96 had anything to do

24   with their improperly detailing a Kaiser doctor or otherwise

25   making improper conduct towards Kaiser, as far as you

1    personally know?

2              MS. NUSSBAUM:  Objection, your Honor.

3              THE COURT:  Sustained.

4              MR. KENNEDY:  268-A.  And offering -- well, I withdraw

5    that.  In the interest of time, I'll start with 268-B to try to

6    shorten things up.

7    Q.   And this is a plaintiffs' exhibit.  You saw this on direct

8    examination.  This was your charting of total Neurontin

9    prescriptions by quarter through Q3 '04, correct?

10   A.   Yes.

11   Q.   And I think we've already established this chart does

12   literally what it says:  It tracks Neurontin, the branded

13   product, only, correct?

14   A.   Correct.

15   Q.   It does not include gabapentin, the chemically and

16   physically identical product that Kaiser started buying when

17   generics became available, does it?

18   A.   For the most part, that's correct.

19   Q.   And these prescriptions, they include refills, correct?

20   A.   Total, total Rx's, refills and news.

21   Q.   So if there's somebody who's been on Neurontin for three

22   and a half years and seems happy with the product and gets a

23   refill, that shows up on this chart, correct?

24   A.   Correct.

25   Q.   And this also includes on-label uses, neuropathic pain,

1   et cetera, correct?

2   A.   I don't know that neuropathic pain was on-label, but --

3   Q.   I misspoke, you're absolutely right, Doctor.  I apologize.

4   It includes --

5   A.   All use, all use, everything.

6   Q.   -- PHN, all uses, et cetera.  It also includes uses that

7   were within the Kaiser guidelines, doesn't it?

8   A.   Absolutely.

9   Q.   It also includes patients who are totally happy with the

10  treatment they got, correct?

11  A.   I don't know if the patients were happy with the treatment

12  they got, but it includes all use.

13  Q.   Okay.  So it has nothing to do with whether the doctor who

14  prescribed it thought it worked.  That doesn't factor in here?

15          (Witness pausing.)

16  Q.   Do you not understand the question?

17  A.   Well, I think it is a factor in there.  If the doctor

18  didn't think it worked, he or she would discontinue therapy,

19  and that would be included in here.  If the patient took it for

20  a short period or a long period, it's included in here.

21  Q.   Correct.  So anytime a doctor prescribes Neurontin, they

22  at least thought it was going to do some good for the patient,

23  and you've included all of those in here, correct?

24  A.   Correct.

25  Q.   And this includes whether it's on or off formulary,

9fe5251f-ac91-4e2f-b529-c03207c8c042

1    correct?

2    A.   Correct, all use.

3            THE COURT:  You need to finish up here.

4    Q.   On Friday on direct examination you told us that in your

5    pharmacy department, you have a database of every prescription

6    which is dispensed throughout the Kaiser program, all of the

7    regions.  Each night each of the pharmacies, that information

8    is downloaded, collated, aged and scrubbed for appropriateness.

9    And you told us how Accutane that causes birth defects, you can

10   identify that to make sure a pregnant woman doesn't get it, and

11   then you went on to say, "We also look to see if the people are

12   on appropriate medications.  With asthma, inhaled

13   corticosteroids," et cetera; and from this, the patients can be

14   identified instantaneously, lists can be generated, patients

15   can be called, and that medication can be removed.  Those are

16   all within Kaiser's powers, aren't they?

17   A.   Yes, sir.

18   Q.   You've yet to do any of them with regard to Neurontin,

19   correct?

20   A.   Correct.  We're reeducating physicians on the appropriate

21   use.

22           MR. KENNEDY:  Thank you.  I have no further questions.

23           THE COURT:  Thank you.

24           MR. KENNEDY:  I have lots of further questions, but I

25   think I'm through.

Page 82

1    THE COURT:  Thank you.  Ten minutes.  We have a

2    doctor, Hyatt.  What is he, he's a surgeon?  He's a doctor?  A

3    doctor.  Hopefully we can finish him today so that he can -- we

4    can finish both witnesses today, so ten minutes.

5    REDIRECT EXAMINATION BY MS. NUSSBAUM:

6    Q.   Dr. Carrejo, looking at what's been marked as Exhibit 760,

7    do you believe that this is a reliable document?

8    A.   I'm trying to find 760.  Can you tell me what it looks

9    like?

10   Q.   760 is the year-to-date July, 2004 diagnoses.

11   A.   Yes.  I don't think it's reliable.

12   Q.   Do you think it's an accurate document?

13   A.   Well, it's accurate for what it tried to do.  It's new

14   starts, that's true, and it's tried to temporarily tie to a

15   diagnosis, but it doesn't fully capture what it was intended to

16   do.

17   Q.   Would you use this information for any business purpose?

18   A.   No.

19   Q.   Did Kaiser recently put in a system which would allow it

20   now to tie condition to indication?

21        MR. KENNEDY:  Object, leading.

22        THE COURT:  Sustained.

23   Q.   Doctor, from 1994 to 2004, did Kaiser have the ability to

24   analyze its Neurontin data by indication?

25   A.   We did not.

1   Q.   Now, the reeducation programs that you talked about, DUAT

2   and DRUG, those are focused on the physician; is that correct?

3   A.   That's correct.

4   Q.   And is the understanding that the physician will then deal

5   with their individual patients?

6   A.   Absolutely.

7   Q.   And is it your understanding that physician-patient

8   conversations with respect to Neurontin have been going on

9   since at least 2002?

10          MR. KENNEDY:  Leading.

11          THE COURT:  Well, it's redirect.  I'll allow that.  Go

12   ahead.

13   A.   Yes.

14   Q.   Now, Dr. Carrejo, Neurontin is not a sugar pill, is it?

15   A.   No.

16          THE COURT:  Well, you know, you don't have to go to an

17   extreme here.  It's redirect but --

18   Q.   Now, is it fair to say that for some indications,

19   Neurontin has been proven to be no more effective than a

20   placebo?

21   A.   That is fair to say.

22   Q.   And in laymen terms, is a placebo sometimes referred to as

23   a "sugar pill"?

24   A.   That is correct.

25   Q.   Now, Dr. Carrejo, has Neurontin been a very expensive

1    drug?

2    A.   Yes.   When back in --

3            MR. KENNEDY:   Object.   Move to strike everything after

4    "yes."

5            THE COURT:   Overruled.

6    A.   When we added the drug to the formulary, it was

7    exceedingly expensive relative to alternatives.   In fact,

8    during the previous discussion, we saw that it was $1,000,

9    while nortriptyline could be as little as $20 or $50 a year.

10   The ranges of neuropathic doses for gabapentin could be up to

11   $4,000 a year.   And that cost did not dissuade its use.   In

12   fact, we have a graph showing remarkable growth of its use, its

13   addition to the formulary, expansion of restrictions in

14   Southern California.   Cost was not an issue.   If the evidence

15   showed that it had a place in therapy, it was added and it was

16   used.

17   Q.   And looking at what was marked by Mr. Kennedy as

18   Exhibit 543, and looking at the chart on the second page, does

19   that indicate that gabapentin or Neurontin would be $1,900 a

20   year for a patient as opposed to lithium for bipolar, which

21   would be $22 to $44 a year?

22   A.   That's correct.

23   Q.   And yet there was a decision made by the P&T Committee to

24   put Neurontin on the formulary for mood disorders; is that

25   correct?

Page 85

1   A.   Correct.

2   Q.   Now, looking again at that exhibit, and I would ask you to

3   look at the references, do you see the Pande study listed in

4   the June, 1999 monograph when the P&T Committee determined to

5   add psychiatrists and mood disorders to the people who could

6   prescribe Neurontin?

7   A.   I don't believe so.  I do not.

8   Q.   Now, I'd ask you to look at Exhibit 561 that was marked by

9   Mr. Kennedy, and he read two sentences of an e-mail, and I

10  would just like to read the rest of that e-mail.  It's just one

11  more sentence.  This is the e-mail from Rich Lieblich to Debbie

12  Kubota concerning the possibility of generic entry in 1999,

13  which did not occur; is that correct?

14  A.   Correct.

15  Q.   And entry actually didn't occur for another five years,

16  did it?

17  A.   That's correct.

18  Q.   And he wrote to Debbie and he said, "I haven't heard

19  anything from them.  More importantly, it would have to be a

20  sensational offer because I'm sure there will be some

21  competition the minute there is no more patent protection,

22  since P-D has been gouging us until now.  That being said, if

23  this is an appropriate drug to use, shouldn't we be using it

24  anyway?"

25       Is that the complete e-mail?

1    A.    That's the complete e-mail.

2           MS. NUSSBAUM:  I have no further questions at this

3    time, your Honor.

4           MR. KENNEDY:  No redirect at this time.  We would have

5    a request that the witness not be excused so that we can call

6    him in our case.

7           THE COURT:  Please, please, we're not doing this in

8    front of the jury.  All right, we'll take our morning break

9    right now and get back here around 11:15, I think.

10          THE CLERK:  All rise for the jury.

11          (Jury excused.)

12   SIDE-BAR CONFERENCE:

13          THE COURT:  So Hyatt is how long?

14          MS. NUSSBAUM:  He's here, your Honor.  We have a piece

15   of videotape conference which is approximately twenty minutes,

16   and I would say his testimony --

17          MR. CHEFFO:  We object to it.

18          THE COURT:  Wait, wait, wait.  Hyatt is the doctor.

19   We thought he was going to be a half an hour.  That was the

20   whole theory behind this.

21          MS. NUSSBAUM:  He will be basically a half hour.

22   There's a video --

23          THE COURT:  A half an hour plus the video?

24          MS. NUSSBAUM:  No, your Honor.  I think it's thirty,

25   thirty-five minutes all together.

1        THE COURT:  Well, what is it?

2        MS. NUSSBAUM:  That's the reeducation program, this

3    DUAT program.  This is the videotape that was shown to all the

4    doctors.  It's a business record.

5        MR. CHEFFO:  Excuse me, your Honor.  First of all, I

6    just need to put this on the record.  I mean, you've given us

7    28 hours, okay?  We're not going to have a single Kaiser person

8    in our case.

9        THE COURT:  I'm told we are.

10        MR. CHEFFO:  No, in our case we're not getting

11    anybody.  No one's coming, okay?

12        THE COURT:  Listen, you're not producing any Pfizer

13    people.  It's tit for tat.

14        MR. CHEFFO:  Your Honor, can I just finish for one

15    second, please, because this is very, very important.  And I

16    normally don't say it's very important unless it really is.

17    You've given us 28 hours, okay?  They are over 11 hours in

18    their case.  We're still under 11 hours, okay, so we have not

19    been going on and on.

20        THE COURT:  I know.

21        MR. CHEFFO:  We have a right until we are done -- we

22    have at least another hour of questions that are legitimate

23    that are important for Dr. Carrejo.

24        THE COURT:  Excuse me.  I followed what he told me

25    yesterday twice, that it would be under an hour, twice.  We

9fe5251f-ac91-4e2f-b529-c03207c8c042

1  planned a whole thing around getting Hyatt out of here.  I'm

2  putting this on the record.  We did this all off the record

3  yesterday on scheduling to get this doctor out of here today,

4  which is what I'm doing.  We planned on it; I'm counting on it.

5         MR. CHEFFO:  Can I just say one thing, your Honor?

6         THE COURT:  Now, as far as I'm concerned, she promises

7  she's bringing in someone else who can answer half of these

8  questions, and I'm going to hold you to that.  So you can put

9  on your case through this other person.

10        MR. CHEFFO:  I just want to be able to do that on our

11  case.

12        THE COURT:  It doesn't matter whose case it is.  Just

13  put it in.  It is irrelevant whose case it is in.  Just put it

14  in.

15        MR. CHEFFO:  I just want to be --

16        THE COURT:  All right, no.  At this point I'm going to

17  take a break.  You've made your objection.  Who are you putting

18  in that's the other Kaiser person?

19        MS. NUSSBAUM:  Dr. Millares, who's the head of Drug

20  Information Service.

21        MR. KENNEDY:  Your Honor, we just want to make clear

22  we are not excusing this witness.

23        THE COURT:  All right, that's fine, that's fine.

24        MR. KENNEDY:  I want to make sure it's on the record.

25        THE COURT:  That is fine.  I gave you double what you

1   asked for yesterday.

2         MR. KENNEDY:  So I was very wrong.

3         THE COURT:  Excuse me.  We planned around it, and I

4   want this doctor out of here today.

5         MS. NUSSBAUM:  We have a suggestion.

6         MR. CHEFFO:  That's not going to happen, your Honor.

7         MS. NUSSBAUM:  We'll just do the testimony today, and

8   we can do the video another day, your Honor.

9         THE COURT:  That's fine.

10        MR. CHEFFO:  Again, we object.  It's going to take at

11  least an hour with Dr. Hyatt.  And, again, we have our time.

12  We can use it in this case.

13        THE COURT:  Well, they promised yesterday that we can

14  do this.

15        MR. KENNEDY:  We didn't make any promises as to Hyatt.

16        MR. CHEFFO:  It took us a half an hour, your Honor, to

17  correct all of the misstatements that he made about the

18  websites.

19        THE COURT:  You went on and on and on about stuff that

20  didn't need to be done through that witness.  You can put in

21  all those documents, but you promised yesterday, and we

22  scheduled around it.  I'm going to hold people to their

23  scheduling.

24        MR. CHEFFO:  Can we just start with the video then,

25  your Honor?  What it is is twenty minutes.  The first thing --

1    it's absolutely the hearsay rule, okay.  The first thing, it's

2    a copy of an MSNBC seven-minute videotape about Dr. Franklin

3    walking in, a recorder --

4              THE COURT:  Oh, you're not going to do that, are you?

5              MR. CHEFFO:  It's ridiculous.

6              THE COURT:  I agree with that.

7              MR. SOBOL:  What the video is, your Honor, let me tell

8    you what the video is.  The video is a copy of an actual

9    teleconference that was conducted that was of the DUAT program.

10   You start with four members on a panel --

11             MR. CHEFFO:  It's hearsay.

12             MR. SOBOL:  It starts with --

13             THE COURT:  Excuse me, excuse me.  That's fine, but

14   not Dr. Franklin.

15             MR. CHEFFO:  But it's even hearsay.  What they want to

16   do is --

17             MR. SOBOL:  I don't want to be interrupted either by

18   you or by Mr. Cheffo when I'm trying to explain to the Court

19   what the document is so she can make a rational decision on

20   what it is.

21             MR. CHEFFO:  As long as I get a chance to tell you my

22   objection.

23             THE COURT:  All right, what is the document?

24             MR. SOBOL:  The document in realtime is what is

25   actually happening.  You know, it's the actual teleconference.

Page 91

1    It's the full teleconference of the doctors explaining, "This

2    is the information we have now."  And they do, at the beginning

3    of it, they say, "We're going to roll the clip from Dateline."

4    First, they roll the clip from Dateline.

5              THE COURT:  But what's in the clip from Dateline?

6              MR. SOBOL:  In Dateline it says there are allegations

7    about off-label, you know, drug things.  There's this thing by

8    Franklin.  It's got pictures of Franklin.  Okay, if I may,

9    okay?  And so what that is is not being offered -- and there's

10   other stuff too which I'll turn to in a moment so you can

11   understand what it is -- it's not being offered, the portion of

12   it about Dateline is not being offered for the truth of the

13   matter asserted but, rather, for the information that's coming

14   to Kaiser about what the allegations are, what the issues are,

15   which, you know --

16             THE COURT:  I cannot judge this without seeing it.

17             MR. SOBOL:  That's right, and let me just also say --

18             MR. CHEFFO:  Can I --

19             MR. SOBOL:  You are interrupting.  I just want to

20   finish so the Court understands.  After the Dateline, there

21   then are comments that are made by the physicians about the

22   information that they have, about the medical information they

23   have, and what they're going to do and struggle with Neurontin

24   on.

25             So what we did is, we said, because this is realtime,

Page 92

1   and you also have doctors saying, "We're outraged that this is

2   going on and we're learning about it," so in the end, we offer

3   the whole thing in evidence, and we planned on publishing a

4   portion of it to the jury.  And I don't think that you can

5   properly, frankly, make a decision without seeing at least the

6   clips that we plan on publishing to the jury.

7            THE COURT:  Okay.  Now, what's your objection?

8            MR. CHEFFO:  This is like a home video, your Honor.  I

9   mean, basically they prepared this thing.  The guy who's

10  talking about it is one of the witnesses.

11           MS. NUSSBAUM:  It's Dr. Hyatt.

12           MR. SOBOL:  Don't interrupt him.

13           MR. CHEFFO:  Can I just please talk for a second?

14  This person, it wasn't subject to any cross-examination.  It's

15  basically they publish this clip, and it's people talking about

16  allegations of what they -- you know, we have the witnesses.

17  That's what the court is about.  This wasn't a deposition

18  transcript.

19           THE COURT:  Excuse me.  I'm going to see it.  I

20  understand that there may be a 403 objection to the Dateline

21  production.

22           MR. CHEFFO:  And it's hearsay.

23           THE COURT:  Well, no, because it's not for the truth

24  of it.  It's what the reeducation campaign is, so I will

25  probably allow that unless it's excludable under 403.  So can I

Page 93

1    have it?

2              MR. SOBOL:  Yes.

3              MR. CHEFFO:  And we also are going to have the same

4    witness here who can testify to these issues.

5              THE COURT:  Who?

6              MR. CHEFFO:  I mean, the person on the video is

7    Dr. Hyatt.  That's my point.

8              MS. NUSSBAUM:  He's not the only person.  There are

9    five physicians.

10             MR. CHEFFO:  Dr. Hyatt is here --

11             THE COURT:  Excuse me.  Let me see it.  I can't do

12   anything until I see it.

13             MR. CHEFFO:  My point, your Honor, this video, it's

14   him amongst others talking --

15             THE COURT:  Let me see it.

16             MR. CHEFFO:  And just so you understand, there's also,

17   the slide deck that accompanied this, it's already in evidence.

18             THE COURT:  I don't even know that I'll have time to

19   watch it all.  I think that I'm only going to watch --

20             MS. NUSSBAUM:  That's why our suggestion is this, your

21   Honor:  We'll do Dr. Hyatt today.  We're going to offer it into

22   evidence, and we can play the video tomorrow when there's less

23   pressure so we can get Dr. Hyatt finished.

24             MR. CHEFFO:  But then we can't cross-examine him on

25   it.

9fe5251f-ac91-4e2f-b529-c03207c8c042

Page 94

1          THE COURT:  I understand that, yes.  So let me see it,

2    at least part of it.

3          MS. NUSSBAUM:  Mr. Sobol will continue.  Let me go out

4    to Dr. Hyatt and see how I can cut to the bone the rest of his

5    examination, okay, to really try to get in the --

6          THE COURT:  We want him out of here.  That was the

7    whole deal.

8          MS. NUSSBAUM:  I understand, so let me go out and do

9    that, and Mr. Sobol will deal with this issue.

10         THE COURT:  And we wouldn't have time left over for a

11   video.  That's why we do these planning sessions because last

12   time you went over, and so --

13         MR. SOBOL:  Right.  We're just doing Hyatt today, and

14   you have the clips there, your Honor, and then you have the

15   full if you want your law clerks to read all of it, watch the

16   whole thing.

17         THE COURT:  Read what?

18         MR. SOBOL:  The whole thing is an hour.  There's clips

19   that reduce something down to fifteen minutes.

20         THE COURT:  I'm not going to put the whole thing in.

21         MR. CHEFFO:  Even fifteen minutes would be too much if

22   they're talking about putting this guy on for a half hour.

23         MR. SOBOL:  We're not doing it today, Mark.  We're not

24   going to do it today.

25         THE COURT:  He needs to --

1          MR. CHEFFO:  I can't cross-examine him on something --

2     are you going to send him back off to California again?

3          MR. SOBOL:  Okay, and the clips are fifteen minutes

4     long.

5          MR. BARRETT:  We'll just offer the clips.

6          THE COURT:  Did you want the whole thing or just the

7     clips?

8          MR. CHEFFO:  No.  We don't want any of it.

9          THE COURT:  I understand, but I can't listen to it for

10    an hour right now, and right now I need a break, so --

11         MR. CHEFFO:  There's fifteen minutes of clips.  We

12    object to it.  I think we also cross-designated another -- it

13    would be another few minutes of someone stands up and said, "I

14    think this is a great drug."  Again, it's all absolute hearsay.

15         THE COURT:  Is that in the clips?

16         MR. SOBOL:  I don't know about the cross-designations.

17    We'll address that.

18         THE COURT:  Well, how are we going to do that?  Do you

19    have it?

20         MR. CHEFFO:  I think your Honor needs to listen to

21    that and --

22         THE COURT:  I understand.  Do you have the cross-clip

23    that you need?

24         MR. CHEFFO:  Tom, Mr. Fox?  Tom, do we have the cross-

25    clips, there's that one section, or is it Steve who has it?

9fe5251f-ac91-4e2f-b529-c03207c8c042

1        MR. FOX:  I think Steve has it.

2        MR. CHEFFO:  We'll see if we can try and find that,

3   your Honor.

4        THE COURT:  All right.

5        MR. SOBOL:  Thank you, your Honor.

6        (End of side-bar conference.)

7        (A recess was taken, 10:59 a.m.)

8         THE CLERK:  All rise.  Please be seated.

9         THE COURT:  I allowed the defendant's motion to

10   strike the tape under Rule 403.  This is as prejudicial as

11   exists.  It's like the snake oil, and to have lies and

12   corruption or whatever it is across the Dateline banner, to

13   have the drumbeat of an excellent news program, I didn't get

14   through the whole thing, but I started the rest of the

15   re-education campaign, and it's rampant hearsay, it's like

16   this doctor telling his story and this doctor telling his

17   story, it's hearsay.

18        I can't do that.  Now Dr. Hyatt is here.  If

19   there's a snippet that's what Dr. Hyatt said, I don't have a

20   serious problem about that because he's here to be

21   cross-examined on it but not the whole thing and not the

22   snippets, granted, so at this point, as I say for the

23   record, I didn't get through the whole thing, I got about

24   halfway through it, so let's bring this jury in.

25        What worries me, Mr. Sobol, is if I had let you

Page 97

1    start playing it, you know, it couldn't be admitted.

2           MR. SOBOL:  Well, actually, we thought because

3    this was the information that the doctors were getting and

4    Kaiser's defense has been, you know, how would you react in

5    response to the information?

6           THE COURT:  We all have to live in a sphere of

7    trust here.  It would be impossible that that would have

8    been admitted, impossible.

9           MR. SOBOL:  Well, if I may, your Honor, it was

10   produced in discovery.  We gave it to the defendants a

11   couple of months ago, so there was no surprise effort

12   here.

13          MR. CHEFFO:  She's talking about the fact that you

14   knew no Judge would have admitted that because it's

15   hearsay.

16          THE COURT:  It's so clearly inadmissible.

17          MS. NUSSBAUM:  Your Honor, but this is what every

18   physician at Kaiser saw.

19          THE COURT:  It's so clearly inadmissible.  So,

20   half an hour and half an hour, maybe five or ten minutes for

21   redirect.  I'm going to hold you to it.  If we can, we'll

22   get you out of here today.  I don't even think you'll need

23   the half hour now, will you, because the tape isn't being

24   played?

25          MR. SOBOL:  I don't know.  Ms. Nussbaum is trying

9fe5251f-ac91-4e2f-b529-c03207c8c042

Page 98

1    to cut it down as much as she can.  I mean, now that the

2    tape isn't going to be played, she'll probably ask Dr. Hyatt

3    questions about the program and what they were doing.

4            THE COURT:  Sure, but not people what said, like,

5    and, oh, I was approached by the drug company and these

6    nefarious people slipped under my door.  It was all

7    hearsay.

8            MR. SOBOL:  It sounds horrible to me.

9            MR. CHEFFO:  I'm saying on the direct, too, we're

10   not cover a career with this point, but, you know, if you

11   look back -- we talk about it later.

12           THE CLERK:  All rise for the jury.

13           ( JURORS ENTERED THE COURTROOM.)

14           THE CLERK:  Please be seated.

15           THE COURT:  Do you want to swear him in, Robert.

16           JOEL HYATT, M.D, having been duly sworn by the

17   Clerk, testified as follows:

18           THE CLERK:  You may be seated.  Would you please

19   state your name and spell it for the record.

20           THE WITNESS:  My name is Joel Hyatt, H-y-a-t-t.

21              DIRECT EXAMINATION BY MS. NUSSBAUM:

22   Q.  Good morning, Dr. Hyatt.  Are you a medical doctor?

23   A.  Yes, I am.

24   Q.  Do you have a specialty?

25   A.  I'm a board certified family physician.

1   Q.  Are you employed?

2   A.  I work as a partner physician with the Southern

3   California Permanente Medical Group, SCPMG.

4   Q.  And how long have you been a physician with the Southern

5   California Permanente Medical Group?

6   A.  I started in September, 1979, so this is my 31st year.

7   Q.  And, Dr. Hyatt, are you here voluntarily today?

8   A.  Yes, I am.

9   Q.  And what is the relationship between the medical group

10  in which you're a partner and the plaintiffs here?

11  A.  The medical group that I'm a partner in, the SCPMG, has

12  a contractual relationship with the Kaiser Foundation Health

13  Plan and hospitals.  We, as the physician group, provide the

14  medical care to all of the Kaiser health plan members, and

15  there's an exclusive relationship between us.

16  Q.  Now, are PMG physicians subject to the same influences

17  as other physicians in the United States?

18  A.  I would say yes, for many reasons.  One, we recruit

19  physicians from all over the country who attend medical

20  schools, residency programs all across the country.  Our

21  physicians read the same published journals that every

22  physician has access to in the United States.  Our

23  physicians attend meetings, specialty society meetings,

24  specialty meetings, American Medical Association meetings,

25  national meetings.  Our physicians are sometimes invited

Page 100

1   even to drug company sponsored dinners and meetings, so, you

2   know, I think that we're a pretty good cross-section of the

3   kinds of physicians that exist in America.

4   Q.  Now, does Kaiser use a drug formulary?

5   A.  Yes.

6   Q.  And can you compare their drug formulary to the

7   formulary of other health plans?

8          MR. KENNEDY:  I object.  Assuming facts not in

9   evidence, if there's a single formulary.

10         THE COURT:  Sustained.

11  Q.  Can you describe the Kaiser drug formulary?

12  A.  In Southern California, we have a Kaiser Permanente drug

13  formulary.  I don't know how much you want me to explain

14  about how that's put together, but there's a physician

15  committee that makes decisions about what drugs are on and

16  not on the formulary.  The key thing to understand about the

17  formulary is it's just one tool to manage drugs and

18  medication use.  We have other methods, you know, to manage

19  medication use which really are much more educational, much

20  more, you know, peer-to-peer contact.

21  Q.  Now, do the Kaiser formularies require free

22  authorization for prescriptions?

23  A.  No, no, and that really is a difference from the way

24  other health plans, other insurance companies manage their

25  formulary like a stick.  Ours is much more, you know, again,

1    the formulary is a guide to what drugs are covered by the

2    drug benefit, but our physicians are free.  I, as a family

3    physician, are free to prescribe whatever medication I feel

4    is appropriate for an individual patient.

5    Q.  And do the Kaiser formularies use a risk-sharing

6    contract to influence providers to reduce cost?

7    A.  No, not at all.

8    Q.  And can you explain to the jury what that would be?

9    A.  Some insurance companies, some HMOs, health care

10   organizations actually put the physicians at risk if they

11   overutilize certain medications.  It actually comes out of

12   their pay, their reimbursement.  It's a very coercive

13   mechanism to try to use the formulary as a tool to guide

14   prescribing.  That's just unheard of within the

15   Kaiser Permanente organization.

16   Q.  Now, did you write an article called, "Improving

17   Appropriate Prescription Drug Use To Best Practice

18   Supporting Evidence-Based Drug Use"?

19   A.  Yes, I did.

20            MS. NUSSBAUM:  I'd offer into evidence Exhibit

21   324, your Honor.

22            MR. KENNEDY:  No objection, your Honor.

23            ( Exhibit 324 was received in evidence.)

24   Q.  Dr. Hyatt, looking at the first page of your article,

25   it says, "Multiple region category."  What does that

1   mean?

2   A.   It says --

3   Q.   At the very top?

4   A.   "Multiple region category," yes, we wrote this article

5   after receiving the highest Vohs award which is the highest

6   quality award that Kaiser Permanente gives to projects and

7   programs within the Kaiser national program.

8   Q.   And was this article available to Permanente physicians

9   in all regions of Kaiser?

10   A.   Yes, it was published in the Permanente Journal, which

11   is widely circulated and actually available to the public.

12   Q.   Now, on the right-hand side of the first page, it has

13   Table 1 and Table 2, and it refers to DUAT and DRUG, and it

14   indicates that you're a co-chair of DUAT.  Can you please

15   explain to the jury what DUAT and DRUG are?

16   A.   Yes, DUAT, D-U-A-T, stands for the Drug Utilization

17   Action Team, and that's the title of the name we gave to our

18   committee in Southern California that was focused on trying

19   to support our physicians in prescribing appropriate

20   medications, and DRUG, D-R-U-G, is the name that Northern

21   California Permanente Medical Group in the north, so we had

22   two different names but basically do the same thing.

23   They're equivalent kinds of committees.

24   Q.   And did there come a time that both DUAT and DRUG

25   started initiatives with respect to Neurontin?

9fe5251f-ac91-4e2f-b529-c03207c8c042

1  A.  Yes.

2  Q.  And did they share their materials with respect to the

3  Neurontin initiatives?

4  A.  Yes, the DRUG and the DUAT collaborated a lot on all

5  DUAT activities, but, you know, certainly the Neurontin

6  activity.

7  Q.  And with respect now to the Neurontin activity, were the

8  Neurontin materials that were developed by DUAT and DRUG

9  shared with the other regions?

10  A.  Yes, in fact, as a result of winning this quality award,

11  we were obligated, we were required to actually disseminate,

12  share all of the information, the way we organized DUAT and

13  DRUG in both regions.  I personally, for example, made a

14  site visit to our mid-Atlantic Permanente Medical Group,

15  mid-Atlantic states region to talk to those physicians about

16  how can they organize better to educate and help physicians

17  practice appropriate prescribing.

18  Q.  Is there also something called an inter-regional P & T

19  committee meeting?

20  A.  Yes.

21  Q.  And was the Neurontin initiative discussed as part of

22  that inter-regional meeting?

23  A.  Yes, and, in fact, that was one of the other ways that

24  this kind of information was disseminated.  The pharmacy and

25  therapeutics chairs and staffs from all of the Kaiser

1    regions meet on a regular basis.

2    Q.  Now, when your committee first became concerned about

3    the overutilization of Neurontin, what did you look at and

4    what steps did you take?

5    A.  Well, first of all, we became alerted to the issue of

6    Neurontin about the middle of 2002, and we were informed

7    that the Northern California committee, DRUG, had already

8    started looking into this, and one of the first things we

9    did was basically get some data.  We wanted to get some data

10   on what was happening with the use and prescribing rates of

11   Neurontin, and what we saw was there was a rapid increase in

12   prescribing of Neurontin by our physicians.  It was about a

13   two to three percent increase every month.

14   Q.  And did your committee ever consider putting

15   restrictions on Neurontin to try to curb use?

16   A.  Our committee basically goes through a checklist of all

17   of the different kinds of interventions that we could

18   consider to help our physicians understand appropriate

19   prescribing, and one of those things we certainly

20   considered was whether we should put restrictions on the

21   medication.

22   Q.  And did you decide to do that?  Were restrictions put

23   on?

24   A.  No, we didn't put any restrictions on it.  Our

25   physicians felt that at that time it was in pretty wide use

1    and it would be very difficult to restrict the drug that was

2    sort of already out of the gate, and we had better ways, we

3    felt, through educational means to try to educate and inform

4    our physicians about, you know, what were the right

5    medications, what was the evidence behind the medications,

6    so we preferred the Educational approach.

7    Q.  Now, what conditions, what medical conditions did DUAT

8    and DRUG focus their re-education efforts on with respect to

9    Neurontin?

10   A.  Well, as we looked at the data that I mentioned, we

11   started noticing that this drug was being used for many

12   indications that were not necessarily FDA-approved, they

13   were off-label uses, and one of the primary uses was for

14   pain, was for neuropathic pain and other pains, so that

15   really became our primary focus initially.

16   Q.  And as the initiative went on, did it expand to other

17   medical conditions?

18   A.  Well, I would say, you know, we talked with many of our

19   physician leaders, neurologists, rheumatologists, family

20   physicians, internal medicine physicians, pain management

21   specialists, psychiatry, so we explored, you know, who was

22   using the drug and what they thought about, you know, an

23   initiative in their area, so, you know, we primarily focused

24   on pain of all different sorts initially because it was

25   being used the most in that condition by the most physicians

1    and affected the most patients.

2    Q.  And as the initiative went on, did you also then focus

3    on bipolar, mood disorder and migraines?

4    A.  To some extent, yes.  Migraine, I mean, we considered

5    headaches part of pain, and that was certainly included.

6    One of our pain physicians was part of the DUAT initiative,

7    and, you know, we did again talk with psychiatry about its

8    use in bipolar disorder and some other off-label uses.  They

9    felt that at the time they had a good handle on its use and

10   that we should come back to them at a later date, which we

11   were comfortable with because, as I said, we really wanted

12   to go where the most use was and the most opportunity was.

13   Q.  Now, let me show you what's been marked as Exhibit 344,

14   I believe you have it in front of you, and this is an

15   interoffice memorandum, and it's from you to a whole large

16   list of patients, I'm sorry, physicians, family practice,

17   internal medicine, pain management, anesthesia; do you see

18   that?

19   A.  Yes, I have that in front of me.

20   Q.  And the list of people that that went to, can you

21   describe what percentage of physicians at Kaiser that would

22   be?

23   A.  Well, as you can see, it went to a list of our various

24   physicians including PAs, which is physician assistants, and

25   nurse practitioners, and this particular memo probably hit

9fe5251f-ac91-4e2f-b529-c03207c8c042

1    about 80 percent of our providers, but I would just add that

2    this same content was also printed and distributed as part

3    of what we call a paycheck stuffer.  It went out with every

4    paycheck to every one of our physicians, so this message

5    went to 100 percent of our providers.

6    Q.  And is the paycheck stuffer methods a method that's used

7    when you want to disseminate information, a memo, to all

8    physicians at Kaiser?

9    A.  Yes, we use it pretty often.  People pay attention to

10   their paycheck and the messages that go along with their

11   paycheck, so we use this very often with DUAT and other

12   important messages.

13   Q.  Now, focusing on the first two sentences, it says,

14   "Despite exaggerated promotional claims by the manufacturer,

15   the anti-seizure drug Gabapentin (Neurontin) is not a

16   general pain medication.  Scientific studies and the FDA

17   have indicated that Neurontin is effective for certain forms

18   of neuropathic pain, but not all kinds of pain."  Now, at

19   the time that you wrote that in July of 2003, did you

20   believe that that was accurate?

21   A.  Yes, at the time based on the scientific evidence that

22   we had and that we had reviewed, we felt that was true.  The

23   main message we were trying to get across here is we were

24   seeing this medication, Neurontin, being used essentially

25   like a pain pill, and one of the key messages we wanted to

Page 108

1  get through was it's not a general pain medication.  It has

2  at that point in time certain indications, that we wanted to

3  make sure our physicians recognized that.

4  Q.  Now, knowing today what you know, do you believe that

5  what you said in that first paragraph, it is the same, would

6  you make the same recommendations today?

7  A.  Knowing today -- let me put it this way, if I had known

8  then what I know today, we could not have made this

9  statement.

10  Q.  And if you had known then what you know today, what

11  statement would you have made?

12  A.  We would have made a statement that Gabapentin,

13  Neurontin, is not effective in neuropathic pain, period, and

14  we would have done everything we could to discourage our

15  physicians from using that medication at all.

16  Q.  Now, going down halfway on your letter to all

17  physicians, it says, "Drug company antics," and you say,

18  "You should be aware that the manufacturer has recently been

19  under fire in the press regarding alleged illegal promotion

20  of Gabapentin for unproven indications."  Now, why would you

21  think that it was important to tell this to all of the

22  physicians at Kaiser?

23  A.  Well, a couple reasons:  One, these kinds of messages

24  came out in the Wall Street Journal, New York Times.  I can

25  guarantee not all the physicians in Southern California read

1    the Wall Street Journal and New York Times, and this was

2    pretty serious information.  I wanted our physicians to

3    understand what the drug company was doing that was possibly

4    influencing our prescribing.

5              In fact, it started to make more sense why our

6    rate of use of Neurontin was increasing at such a rapid

7    rate, you know, and so, you know, we wanted to alert our

8    physicians.  I think this also by alerting our physicians

9    allows them to have better conversations with their

10   patients.

11             These drugs are being promoted direct to consumer

12   advertising.  You know, they may have been in meetings where

13   they've heard Neurontin being discussed, and I think it

14   allows them to have better conversations with their patients

15   about treatment alternatives and to start thinking twice

16   about, you know, am I using this drug for the right reason

17   with the right patient?

18   Q.  And so it's your understanding as the co-chairman of

19   DUAT that you re-educate the physicians and the physicians

20   then have conversations, privileged, private conversations

21   with their individual patients about that particular

22   patient's condition and the drugs that they're taking; is

23   that right?

24             MR. KENNEDY:  I object.  Leading.

25             THE COURT:  Sustained.  Leading.

Page 110

1    A.   That's correct.

2         MR. KENNEDY:  Move to strike the answer and ask

3    the jury be told to disregard it.

4         THE COURT:  Yes.

5    Q.  Dr. Hyatt, what is the most important factor that is

6    considered by you and other PMG physicians in writing a

7    prescription?

8    A.  Well, if we are committed, as we are, to practicing

9    evidence-based medicine, the most important thing is the

10   information we have about the effectiveness or efficacy of

11   the medication, that's No. 1, does the medicine work, does

12   the science show that the medicine works or not.

13   Q.  And if two drugs are equally efficacious, does cost then

14   become a consideration?

15   A.  Yes, generally, and I think that happens to all of us.

16   You know, if there are multiple drugs, as there often are,

17   to treat a particular condition and they are equally

18   effective, I think most of us and doctors and patients

19   consider cost as one factor.  I'll just illustrate it in my

20   mind, if we all go to the drugstore, we have back pain --

21        THE COURT:  You know, I don't think we have time

22   for that, so what's the next question?

23        MS. NUSSBAUM:  I move Exhibit 344 into evidence,

24   your Honor.

25        MR. KENNEDY:  No objection, your Honor.

1          ( Exhibit 344 was received in evidence.)

2    Q.  Now, are the Neurontin initiatives started in 2002 in

3    the California and other regions, are those initiatives

4    still ongoing?

5    A.  Yes, they are.  We still have a focus on Neurontin,

6    Gabapentin, prescribing, and actually we're starting to

7    focus also on the next generation of Gabapentin, Neurontin,

8    which is Lyrica and Pregabalin.

9    Q.  And these initiatives are ongoing despite the fact that

10   Gabapentin went generic in 2004; is that right?

11   A.  That's correct.

12   Q.  Now, did there come a time that DUAT and DRUG did a

13   video conference for physicians concerning the Neurontin

14   initiative?

15   A.  Yes.

16   Q.  I would ask you to look in your binder at Exhibit 348.

17   Does that document reflect the video conference that

18   occurred on September 10th, 2003?

19   A.  Yes, it does.

20   Q.  And that was joint between Northern and Southern

21   California; is that correct?

22   A.  Yes, I was the moderator.  This was a live video

23   broadcast, and we had a certain panel of members who would

24   talk.  It was broadcast through Northern and Southern

25   California Kaiser Permanente.

1    Q.  And was this video conference then made available to all

2    other PMG physicians in all regions of the United States?

3    A.  Yes, we recorded this, and we mailed it, and sent it to

4    all of the Permanente Medical Groups in all of the other

5    regions as well as the fact that it was available online for

6    viewing by any of our physicians on the KP intranet.

7    Q.  Now, focusing on the other participants, can you tell me

8    the specialty of each doctor, Dr. Maizel, what is his

9    specialty?

10   A.  Dr. Morris Maizel is a family physician, and he has a

11   specialty in pain management, headache management, I should

12   say, he's one of our headache experts in the region.

13   Patricia Harrison is a pain management specialist from

14   Los Angeles Medical Center.  Dr. Randy Lehmer is the chief

15   of internal medicine and a rheumatologist from our orange

16   county medical center and Dr. Rodrigo Rodriguez is a

17   neurologist and chief of neurology from our Baldwin Park

18   Medical Center.

19   Q.  So, did this video conference concern not only

20   neuropathic pain but other types of pain and other

21   indications for which Neurontin was being widely

22   prescribed?

23   A.  Yes, at that time, this is in September, this after that

24   memo that you showed earlier.  This is another way we were

25   trying to communicate and educate our physicians about what

1    the status of pain management was and certainly what was the

2    place of Neurontin among the treatment alternatives.

3              MS. NUSSBAUM:  Your Honor, I'd move Exhibit 348

4    into evidence.

5              MR. KENNEDY:  No objection to this portion, your

6    Honor.

7              THE COURT:  All right.

8              ( Exhibit 348 was received in evidence.)

9              THE COURT:  Just so make sure, it's a multi-page

10   document, you're referring to the thing you discussed

11   earlier at the break?

12             MR. KENNEDY:  Yes, your Honor.

13   Q.  Has the Neurontin initiative been successful?

14   A.  Yes, I believe it has.

15   Q.  Nevertheless it's ongoing?

16   A.  It's ongoing.  Absolutely I'm not going to be satisfied

17   until we have totally appropriate evidence-based prescribing

18   of Neurontin and Gabapentin.

19   Q.  And what are the challenges that you face with

20   physicians in trying to re-educate them about the

21   appropriate use of Neurontin?

22   A.  Well, there are many challenges.  One is our physicians

23   are exposed to a lot of information, drug company promotion.

24   They have patients who are already on the medication, and

25   even if they're now convinced that that patient shouldn't be

Page 114

1   on the medication, patients are often sometimes reluctant to

2   stop certain medications.  Some physicians don't want to

3   look stupid in front of their patients by suggesting that,

4   you know, maybe I put you on a medicine that really wasn't

5   indicated for you.  So there are a lot of challenges, as

6   well as just, you know, physicians get used to prescribing

7   certain drugs.

8   Q.  And why hasn't Kaiser simply withdrawn Neurontin from

9   its formularies?

10  A.  Well, one, it does have FDA-approved indications for

11  seizures, and so it remains on the formulary, as it does the

12  Medicare formulary, and I think we again felt that we would

13  be much more effective trying to educate our physicians as

14  to what are the appropriate indications for Neurontin rather

15  than just trying to restrict it like other health plans.

16  Q.  Doctor, let me show you what's been marked as

17  Exhibit 338, which I'm also moving into evidence, your

18  Honor, and it's an update report written by yourself.

19          ( Exhibit 338 was received in evidence.)

20  Q.  It says, "Drug Utilization Action Team Supporting

21  Evidence-Based Drug Use, March 24th, 2004?

22  A.  Yes.

23  Q.  Do you recognize that document?

24  A.  Yes, I do.

25  Q.  And, Doctor, turning to the page that has the numbers on

1    the bottom, 00-1343, and there's a chart.  It says,

2    "Neurontin use is trending lower (DUAT impact)"?

3    A.  Yes.

4    Q.  Do you see that?

5    A.  Yes, I do.

6    Q.  Can you explain to me what that chart represents?

7    A.  Yes.  Across the bottom is time, so I think I got to

8    take my glasses off to see.  I think this is monthly.  It's

9    tracking the prescribing rate or the utilization of

10   Neurontin from January of 2002 through January of 2004, and

11   I think you can clearly see there was a slope upward of

12   Neurontin prescribing and utilization until about the early

13   2003, and then the slope just absolutely switched, and it

14   dropped precipitously down to actually below the levels that

15   it started in January of 2002.

16          So, to me, what this represents is the impact, the

17   effect, that our educational approach, our communication

18   approach, our peer review approach had in trying to drive

19   appropriate prescribing of Neurontin.

20   Q.  And, of course, Doctor, this impact was based on the

21   state of the medical literature as you understood it in 2003

22   and 2004; is that correct?

23          MR. KENNEDY:  I object.  Leading.

24          THE COURT:  Sustained.

25   Q.  Dr. Hyatt, when this initiative occurred in 2003 and

1    2004, at that time were you aware that the medical

2    literature had been compromised with respect to Neurontin?

3    A.  At that time, no.  We only learned that recently.

4    Q.  And so if you had the knowledge that you learned

5    recently in 2003 and 2004, do you believe that the decrease

6    in use would have been substantially steeper?

7              MR. KENNEDY:  Objection.  Speculation.

8              THE COURT:  Sustained.

9              THE WITNESS:  Should I make no comment?

10             THE COURT:  No, not to that question.  I don't

11   know if there's another question.

12             MS. NUSSBAUM:  I would offer into evidence Exhibit

13   272, your Honor.

14             ( Exhibit 272 was received in evidence.)

15   Q.  Now, looking at Exhibit 272, which is an article that

16   you authored that appeared in the Regional Rounds, can you

17   tell me what's represented by that article?

18   A.  The Regional Rounds is a newsletter that our medical

19   group, SCPMG puts out.  It's actually sponsored by our

20   executive medical director.

21   Q.  And looking at the third physical page, what does that

22   represent?

23   A.  So actually one of the articles I co-authored,

24   "Permanente Medicine, Ahead Of The Curve, SCPMG and DUAT

25   Evidence-Based Efforts To Counter Off-Label Promotion Of

1  Neurontin."

2  Q.  Focusing on the first paragraph, "Pfizer recently

3  acknowledged that Warner-Lambert, a company it bought in

4  2000, spent hundreds of thousand of dollars promoting

5  off-label uses for its anti-seizure drug, Neurontin,

6  (Gabapentin).  Pfizer agreed to pay the second largest

7  criminal fine ever imposed in a health care fraud

8  prosecution, $430 million."

9          Now, why did you think that it was important for

10  all physicians in the Permanente Medical Groups to know

11  that?

12  A.  Well, several reasons:  One, I think earlier I had sent

13  out an e-mail communicating that at the time these claims

14  were alleged, and, you know, basically at the time alerting

15  our physicians to think twice about prescribing Neurontin,

16  you know, recognize the kind of drug company antics that

17  were going on to promote it and its off-label uses.  Now the

18  drug company pled guilty and paid at the time the largest

19  fine ever paid by a drug company.

20          I thought it was important that our physicians

21  understand that this was no longer alleged, this was real

22  and we need to take again seriously, you know, what are we

23  hearing from the drug company and pay attention to the kind

24  of evidence-based information and education that we're

25  trying to promote within the medical group.

1   Q.  Now, Dr. Hyatt, did there come a time that you learned

2   that Pfizer, the defendant in this case, specifically had a

3   2004 operating plan with respect to Kaiser Permanente?

4   A.  Can you repeat the question?

5   Q.  Yes.  Did you learn that Pfizer, the defendant here, had

6   a 2004 operating plan concerning Kaiser?

7   A.  I learned about this yesterday when you showed it to

8   me.

9   Q.  Okay.  I ask you to look at Exhibit 250 already in

10  evidence.

11  A.  Okay.  I don't have that in front of me.

12          THE COURT:  Look up on the screen, Doctor.

13          THE WITNESS:  Okay, thank you.

14  Q.  Now, focusing your attention on page 12 of that

15  document, were you aware in 2004 when you were chairing the

16  DUAT committee that Pfizer had a national account

17  performance vision with respect to Kaiser to enhance and

18  develop relationships at Kaiser and to focus on physicians

19  DECs, drug information, administrative staff, Kaiser

20  research entities and brokers?

21  A.  No, I just learned about this yesterday, and it's

22  shocking to me to see that Pfizer had targeted --

23          MR. KENNEDY:  Objection to everything after the

24  yes, your Honor.

25          THE COURT:  Well, I'll stop it right here.

Page 119

1  Q.  Were you aware when you were doing your DUAT effort that

2  Pfizer, looking now at page 216, with respect to their

3  product strategy concerning Neurontin and concerning Kaiser

4  was going to continue to support field detailing

5  activities?

6  A.  At the time, no, I just learned about this yesterday.

7  Q.  Looking at page 25, were you aware in 2004 when you were

8  chairing the DUAT that the tactic that Pfizer had with

9  respect to Kaiser was to work with the targeted area

10 customer units and Kaiser senior drug managers to identify

11 regional P & T members and develop relationships with those

12 who are not considered whistleblowers?

13 A.  I was not aware of this tactic, and, again, it surprises

14 me.

15       MR. KENNEDY:  Objection.  Move to strike

16 everything after he was not aware.

17 Q.  You were not aware of that, were you?

18 A.  I was not aware of that.

19       MS. NUSSBAUM:  I move now Exhibits 276, 278 and

20 279 into evidence.

21       ( Exhibits 276, 278 and 279 were received in

22 evidence.)

23       MR. KENNEDY:  Your Honor, we have objections other

24 than certain pages.  I think it's something we can deal with

25 outside of the presence of the jury.

1          THE COURT:  I'll allow them in with respect to

2     those pages, then we'll discuss later what should be

3     sanitized.

4

5     Q.  Now, do you know a Dr. William McCarberg?

6     A.  Yes, I do.

7     Q.  And who is Dr. McCarberg?

8     A.  Dr. McCarberg is a family physician in the Southern

9     California Permanente Medical Group.  He practices out of

10    our San Diego Medical Center.

11    Q.  So he's a partner of yours; is that right?

12    A.  That's right.

13    Q.  And he's a pain specialist?

14    A.  He represents himself as a pain specialist.

15    Q.  Were you aware before you learned it in this litigation

16    that Dr. McCarberg was trained to speak for Neurontin and

17    does so regularly?

18    A.  Again, can you repeat --

19          MR. KENNEDY:  Objection, assuming facts not in

20    evidence.

21    A.  Can you repeat the question?

22    Q.  Looking at Exhibit 279.

23    A.  266?

24    Q.  266.  I'm sorry, no, Exhibit 279.

25    A.  279, okay.

1    Q.  I believe it's up on the screen.  Were you aware that

2    Dr. McCarberg was trained by Pfizer to speak for Neurontin

3    and that he did so regularly?

4    A.  I was not aware of that, no.

5    Q.  Were you aware that Dr. McCarberg was receiving up to

6    $1500 a speech to make speeches for Pfizer concerning

7    Neurontin?

8    A.  No, I was not aware of that.

9    Q.  Focusing your attention now at Exhibit 276, which is a

10   document that says, "Pain experts mentor list;" do you see

11   that?

12   A.  Yes, I do.

13   Q.  Focusing on the second page where it says

14   Bill H. McCarberg, M.D.?

15   A.  Yes.

16   Q.  Were you aware that your partner, Dr. McCarberg, was

17   listed in Pfizer's documents as a pain expert mentor with

18   respect to other physicians?

19   A.  No, I was not aware of this.

20   Q.  Now, did Dr. McCarberg author an article with

21   Dr. Maizels, another PMG physician that was published in the

22   American Family Physician?

23   A.  Yes.

24           MS. NUSSBAUM:  I would move Exhibit 795 or 275,

25   our marking, into evidence.

Page 122

1       MR. KENNEDY:  No objection, your Honor.

2       ( Exhibit 795 was received in evidence.)

3   Q.  Have you ever read that article?

4   A.  Yes, I have.

5   Q.  And does that article talk about the overuse of

6   Neurontin for pain?

7   A.  It does not talk about the overuse of Neurontin for

8   pain.

9   Q.  Now, focusing your attention, Dr. Hyatt, on Exhibit 278,

10  which is a series of e-mails between Dr. McCarberg and

11  somebody at Pfizer, David Probert.  It says, "Hi, Dave, I am

12  co-writing an article for the American Family Physician on

13  treatment of pain.  The underlying message that the other

14  author is trying to get out is the overuse of Neurontin for

15  questionable pain conditions.  Of course, I am not happy

16  with this --" were you aware that Dr. McCarberg reached out

17  to Pfizer to ask them to help him so that the article that

18  he and Dr. Maizels were going to have published would not

19  complain about the overuse of Neurontin for pain?

20  A.  No, I was not aware that he would be reaching out to

21  someone at Pfizer to get advice on how to influence one of

22  his co-authors on an article.

23  Q.  Now, as a result of learning about the off-label

24  promotion of Neurontin and other antics of the

25  pharmaceutical company that's here today, have any steps

1    been taken at the PMG Medical Groups?

2    A.  Well, yes.  First of all, we are continuing our efforts,

3    our DUAT and DRUG effort focusing on Neurontin (Gabapentin)

4    use, and as I also said earlier, the next generation of that

5    drug, Lyrica (Pregabalin) we have not stopped or ever, you

6    know, stepped back from that.  We are still, you know, based

7    on the evidence that we had available to us until recently,

8    we're still, you know, recommending other first line

9    treatments for pain.

10         We have continued to develop decision support.

11   What that means is we have the ability with our electronic

12   medical record and our data systems to actually alert

13   physicians at the time they're seeing patients who may be on

14   Gabapentin or Neurontin, "Doctor, this patient is on

15   Neurontin for a possible inappropriate indication.  Please

16   re-evaluate this patient," so we've implemented decision

17   support in that respect.

18         You know, more recently I've communicated the

19   results or the publication that appeared in the New England

20   Journal by Dr. Dickersin, et al that disclosed the kind of I

21   can't even think --

22         MR. KENNEDY:  Your Honor, may I ask what he did,

23   not to critique it.

24   A.  I sent that article around to our physicians and DUAT

25   leaders so that they could get a sense of the questionable

1    evidence now that we now know about.

2              MS. NUSSBAUM:  I have no further questions at this

3    time, your Honor.

4              THE COURT:  Can I see you at sidebar.

5              (THE FOLLOWING OCCURRED AT SIDEBAR:)

6              THE COURT:  Let me just revisit this.  You went

7    about 45 minutes roughly.

8              MR. BARRETT:  37.

9              THE COURT:  We got out of bat at 11:30, but, in

10   any event, what were the time limitations on this guy

11   because you remember this was the day I was going to leave

12   early?

13             MS. NUSSBAUM:  I kept with my time.

14             THE COURT:  He's going to have to stay tomorrow.

15             MS. NUSSBAUM:  Had I known that, I would have done

16   my whole examination and not rushed through it.  I cut my

17   examination in half.

18             THE COURT:  Last time around he actually had three

19   times what you had on Ambrose, he had three times.  I need

20   to leave at quarter of.  I can't cut him off.  I don't know

21   how long you actually have.

22             MS. NUSSBAUM:  Let's start and see where we are.

23             THE COURT:  Is he literally not available

24   tomorrow?  I remember we were talking --

25             MS. NUSSBAUM:  It would be very difficult.  Let's

1   start and see where we are.  We've cut our examination all

2   the way down.

3            THE COURT:  I warned three times I had to leave.

4   Maybe it could be ten of.  I can't cut him off, okay, at

5   this point because, I mean, this time he at least gets to

6   have what you have, at the least.

7            CROSS-EXAMINATION BY MR. KENNEDY:

8   Q.  Good afternoon, Dr. Hyatt.  I wanted to clarify, you

9   work for who exactly?

10  A.  I work with the Southern California Permanente Medical

11  Group.

12  Q.  They're not a complaining party in this case, correct?

13  A.  I don't know who the complaining party is.  I know that

14  Kaiser Foundation Health Plan --

15  Q.  You don't work for Kaiser Foundation Health Plan?

16  A.  That's correct, I do not work for the health plan.

17  Q.  And you don't work for Kaiser Foundation Hospitals?

18  A.  That's correct.

19  Q.  And you're not represented by any of these lawyers

20  here?

21  A.  I'm not represented, that's --

22            MS. NUSSBAUM:  Objection, your Honor.

23            THE COURT:  Well, overruled.

24  Q.  Are you represented by these lawyers?

25  A.  I assume I am.

1    Q.   Okay.  And so they represent all of Kaiser Permanente or

2    just you personally?  How did that come about?

3              MS. NUSSBAUM:  Objection, your Honor.

4    A.   I don't know how to answer the question.

5    Kaiser Permanente is a sort of hybrid organization.  It's a

6    relationship between the health plan, the hospitals and the

7    medical groups.  Kaiser Permanente, you know, covers all of

8    those entities.

9              THE COURT:  Well, his understanding is he's

10   represented.

11   Q.   Okay.  You're not here under subpoena, correct?

12   A.   That's correct.

13   Q.   When they called up and said would you come and testify,

14   you were willing to get on the plane and take out time to do

15   it, correct?

16   A.   I did, yes.

17   Q.   And you're a family doctor?

18   A.   I'm a family physician.

19   Q.   You also do a lot of administration, don't you?

20   A.   Yes.

21   Q.   Do you see patients at all?

22   A.   Yes, I do still see patients.

23   Q.   How often?

24   A.   I see patients about one or two days a month.

25   Q.   One or two days a month?

Page 127

1   A.   Uh-hum.

2   Q.   For how long has that been the case?

3   A.   That's been the case for about the last 15, 20 years.

4   Q.   And have you ever prescribed Neurontin to a patient?

5   A.   I personally have never prescribed Neurontin to a

6   patient.

7   Q.   We've got a big book here of a whole bunch of Neurontin

8   prescribers.  We didn't see your name in it, so that's

9   correct, you've never prescribed Neurontin, correct?

10  A.   That's correct.  That's what I said.

11  Q.   Okay.  So, if there are Kaiser doctors in this book who

12  have been duped into prescribing Neurontin, you're not one

13  of them?

14  A.   First of all, there are no Kaiser doctors, they're

15  Permanente physicians.

16          THE COURT:  So just explain, so is that a separate

17  entity?

18          THE WITNESS:  The medical group, the Permanente

19  Medical Group is a separate entity.  We are self-governed,

20  we have our own Board of Directors, we have our own medical

21  director, et cetera, and we have a contract with the health

22  plan, so there are no Kaiser doctors.  We are Permanente

23  doctors, Permanente physicians.

24  Q.   And you're a partner in that group, correct?

25  A.   In Southern California Permanente Medical Group, we are

1   a partnership, so I am a partner, yes.

2   Q.  As a partner, you share in the profits of the group,

3   correct?

4   A.  I share in the profits or the losses of the group, of

5   the medical group, yes.

6   Q.  And if the Permanente group has a better than expected

7   year and there's money left over, that gets distributed or

8   can be distributed among the partner doctors, correct?

9   A.  Yes.  We are paid though on a capitated basis by the

10  health plan, so we're paid a fixed fee and our physicians

11  are salaried, so I don't make any more or less depending on,

12  you know, how I practice what I prescribe and what I don't

13  prescribe.

14  Q.  Let's take a look at Exhibit 902D in evidence.  I

15  suspect you're familiar with it.  It's the Frequently Asked

16  Questions portion off the Kaiser Permanente website, and if

17  we can, scroll down to Physician Compensation.  Do you see

18  that?

19  A.  Yes.

20  Q.  And How Are Kaiser Permanente Physicians Compensated,

21  then if we can go to the top of the next page, keep

22  scrolling.  We'll get to, In The Event.  Health Plan Medical

23  Group, keep scrolling.  Then In The Event, can you

24  highlight.  Doctor, is that on your screen where you can see

25  that?

1    A.  Yes, in yellow?

2    Q.  Yes.  That talks about what happens if the basic

3    payments result in a shortfall, and then at the end of the

4    paragraph, it explains, "If the basic contractual payments,

5    including the capitated payments, are greater than the

6    actual cost of the necessary medical care, then the medical

7    group --" that's Permanente Medical Group, "-- as a whole is

8    permitted to share in some of the surplus," correct?  You

9    were aware of that, weren't you?

10   A.  Yes.

11   Q.  And when you said on direct that putting something in a

12   paycheck stuffer tends to get people's attention, in the

13   case of Kaiser Permanente doctors, that's one of the

14   reasons, isn't it?

15            MS. NUSSBAUM:  Objection, your Honor.

16            THE COURT:  Overruled.

17   A.  No, I don't agree with that statement.  The reason we

18   put information in paycheck stuffers is try to educate and

19   inform our physicians about clinical care issues, and that's

20   ones of the sort of venues that we have.

21   Q.  And with regard to Neurontin, you thought one of the

22   ways to educate them was by putting in a paycheck stuffer

23   that showed the cost of Neurontin vs. various other drugs,

24   correct?

25   A.  In that particular paycheck stuffer, we included the

9fe5251f-ac91-4e2f-b529-c03207c8c042

Page 130

1    information about all of the alternative medications that

2    were available to treat neuropathic pain, and we did include

3    the information about cost.

4    Q.  And didn't it occur to you that putting information

5    about comparative costs as a stuffer in a paycheck might

6    just cause doctors to think that what they prescribed might

7    have something to do with their compensation?

8    A.  Well, our doctors don't have that relationship with the

9    drugs that we prescribe.  The drugs we prescribe comes out

10   of the hospital health plan budget, not the Permanente

11   Medical Group budget, so there's no direct relationship

12   between what I prescribe and, you know, the reimbursement

13   that I get.

14           And, furthermore, I think it's important to point

15   out, we use the paycheck stuffer for informing our

16   physicians about, you know, when to give flu shots, how to

17   immunize children, how to screen for cancer and, you know,

18   this is just one of the ways that we communicate and educate

19   our physicians as well as memos and publications and

20   everything else that we use.

21   Q.  It never occurred to you that that might be somehow tied

22   to compensation by putting dollar figures as a stuffer in

23   paychecks?

24   A.  No, not in our environment.

25   Q.  And that was part of this education effort that you

1    launched back in what, 2002?

2    A.  We began the planning and kicked off the effort in 2002.

3    It really took off in 2003.

4    Q.  And when did you get the award you told us about for

5    doing that?

6    A.  We got the award in 2003, late 2002 and had to do that

7    publication in 2003.

8    Q.  Okay.  It was after that you got the award that you then

9    went and told other regions around the country about DUAT,

10   correct?

11   A.  That's correct.

12   Q.  So if we mark here the map of the United States showing

13   various Kaiser regions, it would be correct, wouldn't it,

14   that DRUG and DUAT got started going after Neurontin earlier

15   than at least some of the other regions around the country,

16   correct?

17   A.  Yes.  It had to start somewhere.

18   Q.  And the folks in the other regions were entitled to a

19   level of autonomy as to what they wanted to do to re-educate

20   their doctors, correct?

21   A.  A level of autonomy, I would say that the materials that

22   we used, again, were wildly shared even before the Vohs

23   award that we got because there are, as I stated earlier,

24   inter-regional meetings, inter-regional pharmacy and

25   therapeutics committee meetings, so the other regions knew

9fe5251f-ac91-4e2f-b529-c03207c8c042

1    what we were already doing.  We gave them a lot more detail

2    and personal attention after we received the award.

3    Q.  Going to Exhibit 690, which has been marked in evidence,

4    that's a 2003 region-wide meeting of the DUAT Action Team

5    that was held at the Hilton Hotel in Pacadena; do you see

6    that?

7    A.  Yes, I do.

8    Q.  And you're listed as the chairperson, you were an

9    attendee there, correct?

10   A.  I am the chair and I attended, yes.

11   Q.  And going over to -- scrolling down to -- if we can,

12   Doctor, I'm going to wait until we can find the exact

13   sections, I'm going to direct your attention from the

14   previous witness.  Let me move onto another topic.  You

15   mentioned Morris Maizels on direct examination, correct?

16   A.  Yes.

17   Q.  And he's one of your partners in the Southern California

18   region?

19   A.  Yes, he's now retired, but he's one of our partner

20   physicians.

21   Q.  And Dr. Maizels is a pain specialist, right?

22   A.  I would say he's, again, a family physician who does

23   focus work on headache, yes.

24   Q.  And you consider him a competent doctor, don't you?

25   A.  I do.

1  Q.  Okay.  Do you know any reason why he wouldn't be willing

2  to come and testify here and testify and tell us his

3  experiences with Neurontin?

4  A.  I would have no reason to know.

5  Q.  One way or another?

6  A.  One way or the other.

7  Q.  And then you mentioned Dr. McCarberg?

8  A.  Yes.

9  Q.  Is he still with Kaiser?

10  A.  Yes, he's still with Kaiser Permanente, yes.

11  Q.  And you said you weren't aware that he had had contacts

12  with Pfizer and been on their speakers bureau?

13  A.  That's correct, I wasn't aware until very recently in

14  preparation for this.

15  Q.  As far as you know, was Dr. McCarberg under any

16  obligation to fill you in on his contacts with Pfizer?

17  A.  Well, me, personally, no, but there are rules and

18  regulations and policies and procedures within the medical

19  group and the health plan hospitals.  In the medical group,

20  any physician who has any relationship with a vendor or does

21  any publication is supposed to alert their chief and their

22  medical director, and in the case of publications, they're

23  supposed to inform our research department and institutional

24  review board so that we can make sure that anything that's

25  published is kosher.

1  Q.  And do you know if Dr. McCarberg failed to do any of

2  that?

3  A.  I don't know one way or the other.

4  Q.  Okay.  So your comments about Dr. McCarberg weren't

5  intended to constitute criticism of him for violating any

6  Kaiser rules or regulations, correct?

7  A.  Which particular activity are you asking about?

8  Q.  When you said you were surprised to find out about this,

9  that was a truthful answer, that doesn't mean that

10 Dr. McCarberg did anything wrong because he didn't tell you

11 about it, is it?

12 A.  I still am surprised that he would have this kind of a

13 relationship with a pharmaceutical company, be accepting

14 money to do speaking engagements, and, you know, that that

15 would not have come to my attention as the chair of regional

16 DUAT.

17 Q.  Did he have some obligation to report to you as chair of

18 regional DUAT?

19 A.  Not to me personally.

20 Q.  Is that written down somewhere?

21 A.  Excuse me?

22 Q.  Is that written down somewhere so that Dr. McCarberg

23 would know he's supposed to do that?

24 A.  No, Dr. McCarberg should have known that he should have

25 alerted his chief and medical director.

9fe5251f-ac91-4e2f-b529-c03207c8c042

1    Q.  And you got Exhibit 275 there, don't you, the article

2    that Dr. McCarberg, co-authored with Dr. Maizels?

3    A.  I have it all except the first page it looks like.

4    Q.  Well, the first page is, "Antidepressants and

5    Antiepileptic Drugs For Chronic Noncancer Pain," and you see

6    this is an article that was published in American Family

7    Physician, February 1, 2005.  Do you have that in the book,

8    or at least it's up on the screen?

9    A.  I see it on the screen, and I've got everything except

10   but the first page in the book.

11   Q.  Okay.  You won't need that.  Let's go over to page 489

12   of the article, and if you can scroll down to the footnote

13   at the bottom.  The authors indicate that they do not have

14   any conflicts of interest.  Dr. Maizels is on the speaker

15   bureau of Merck and Pfizer, I think, and has been a

16   consultant for GlaxoSmithKline.  Dr. McCarberg is on the

17   speakers bureau for Endo Pharmaceuticals, Janssen Products,

18   Ortho McNeil Pharmaceutical, Pfizer, Inc. and Purdue

19   Frederick Company.  So it appears that Dr. McCarberg and

20   Dr. Maizels certainly disclosed their relationships in the

21   article, didn't they?

22   A.  Yes, but I would question that they have no conflict of

23   interest given what we know now about accepting money and

24   publishing.

25   Q.  Has Dr. McCarberg been disciplined in any way?

1  A.  Not to my knowledge at this point.

2  Q.  You're still letting him work on Kaiser patients; is

3  that correct?

4  A.  I believe so.

5  Q.  And he's allowed to work on children and the lame and

6  disabled and everybody else, Kaiser is perfectly willing to

7  let him do that, correct?

8          MS. NUSSBAUM:  Objection.

9          THE COURT:  Sustained, sustained.

10         MR. KENNEDY:  I'll withdraw the question, your

11 Honor.

12 Q.  Now, going back to this DUAT education effort, you say

13 it began in 2002 in Southern California?

14 A.  Yes.

15 Q.  And it's still going today?

16 A.  It absolutely is.

17 Q.  Are there a lot of people that are having to repeat the

18 course?  Why is the effort taking eight years?

19 A.  Well, several reasons.  One is the drug company has had

20 ten years before that to infiltrate and influence the

21 prescribing practices of our physicians.  Secondly, it's

22 only come to light recently that the evidence is lacking for

23 support of this, the use of this drug in neuropathic pain,

24 so, you know, many of our physicians take time to hear,

25 believe, understand and learn.

1           I mentioned before that there are many patients

2    who are on these medications who are either themselves

3    reluctant to stop the medication, they may feel that there's

4    been some impact and many physicians who are reluctant to

5    sort of change, rock the boat and change the medications

6    that somebody's on.

7    Q.  You found there are patients who are on a pain

8    medication that isn't working that are reluctant to rock the

9    boat and stop taking the pain medication that doesn't work,

10   you found that to be a problem?

11   A.  I mean, in my personal experience, it's sometimes very

12   difficult to convince patients the medications that they are

13   taking may not be effective and it's time to discontinue it.

14   Patients get very used to take the medications that they

15   take.

16   Q.  Even when they're in pain and the medication doesn't

17   help them, you found that in your practice?

18   A.  I have found that in my practice, yes.

19   Q.  Now, at Kaiser you've told us you have these

20   formularies.  What are there, eight or nine of them around

21   the country?

22   A.  I don't know how many formularies there are.

23   Q.  There's certainly one for each region, right?

24   A.  There probably is one for each region.

25   Q.  And there's certainly one in Southern California where

1   you're based, correct?

2   A.   Yes.

3   Q.   And originally when Neurontin was placed on that

4   formulary, it was restricted to use by neurologists; you're

5   aware of that, aren't you?

6   A.   Yes, way back in 19 -- I don't remember, mid-1990s.

7   Q.   1994, almost ancient history, right?  Then over the

8   years, the formulary in Southern California got changed to

9   increase the doctors who could prescribe Neurontin, and they

10  included anesthesiologists and psychiatrists and various

11  other people, correct?

12  A.   Well, yes, restrictions removed.

13  Q.   And when you say restrictions removed, that increases

14  the number of doctors who the formulary says the doctors can

15  prescribe the drug?

16  A.   That's correct, and that kind of decision was made based

17  on the kind of evidence that we would be reviewing at the

18  time that suggested it might be appropriate in other

19  clinical conditions.

20  Q.   Obviously.  And as we've heard, Kaiser physicians tend

21  to put, what, about 95 or 96 percent of their prescriptions

22  on drugs that are approved in the formulary, right?

23  A.   Permanente physicians do that, yes.

24  Q.   I'm sorry, Permanente physicians do that.  So if you

25  wanted to limit the use of Neurontin for the five off-label

1   purposes in this case, a great place to start would be by

2   amending the formulary to make Neurontin not approved for

3   bipolar and neuropathic pain and migraine; that would be a

4   great place to start, wouldn't it?

5   A.  Well, at the time, we're talking in 2002, 2003, 2004,

6   the evidence that we were reviewing suggested that those

7   might be appropriate uses of the drug, so why would we do

8   that then?

9   Q.  Well, you were talking 2003.  I was talking 2010.  Why

10  haven't you done it as of today?

11  A.  Well, one, the drug is still FDA-approved.

12  Q.  For off-label, I'm sorry, Doctor, this is for the five

13  off-label uses that are issue in this case.  That isn't

14  FDA-approved for those?

15  A.  That's correct.

16  Q.  So why haven't you amended the formulary in Southern

17  California to just tell doctors Neurontin is not approved

18  for bipolar or neuropathic or migraine or whatever it is

19  they're complaining about?

20  A.  To be very honest with you, the formulary is not the

21  stick that we want to use and that we use in our

22  organization.  We believe it's best to try to educate

23  physicians on what drugs are appropriate or not, whether

24  they're on the formulary or not.

25  Q.  If they're not on the formulary, there's only a four

1  percent chance a doctor is going to write them, correct?

2  A.  Well, our experience is that 96 percent of the time our

3  physicians are prescribing drugs that are on the formulary,

4  but our physicians have the ability to prescribe drugs that

5  are not on the formulary.  They don't have to get health

6  plan approval or be second guessed about that kind of

7  practice.

8  Q.  Sure.  Let me try it another way.  The lawyers in this

9  case have said at least for the off-label uses in question

10 these drugs, Neurontin is no better than a sugar pill.

11 You'd agree with that, wouldn't you?

12          MS. NUSSBAUM:  Objection, your Honor.

13          THE COURT:  Overruled with respect to the

14 off-label indications.

15 A.  Well, I wouldn't use the word "sugar pill," I think this

16 drug has side effects.  It's not just like taking sugar,

17 so -- could you repeat your question?

18 Q.  Yes, would it be your opinion for the five off-label

19 uses in question, Neurontin is not only ineffective but it's

20 worse than a sugar pill because it carries with it side

21 effects that sugar pills don't have, right?

22 A.  Yes, I'd be concerned, and that's why I think we're

23 going to be doing everything we can to turn this ship around

24 to now educate, convince our physicians that they should do

25 everything they can to get patients off this drug for

Page 141

1   indications for which it's not effective.

2   Q.  And let me guess, you first learned about the true

3   problems when you read the Dickersin article in November of

4   last year; is that correct?

5   A.  That's correct.

6   Q.  And up until then you were still under the impression

7   Neurontin was an effective drug for these off-label

8   purposes?

9   A.  Up until then, you know, other than what we heard about

10  the illegal off-label promotion of the drugs, it wasn't

11  until after the Dickersin article in November, last year,

12  the New England Journal of Medicine that I had and most of

13  our physicians would have had any knowledge that this drug

14  was probably ineffective.

15  Q.  And going back to 2008, nobody provided you with copies

16  of any of the expert witness reports that the witnesses for

17  the plaintiffs in this case have generated?  They didn't get

18  you those in 2008?

19  A.  That's correct, I did not see those until very recently

20  in preparation for this trial.

21  Q.  Just so they'll be no misunderstanding, I want to

22  represent the plaintiffs expert reports are about eight

23  inches high.  You'd remember if you got that in your mail

24  one morning, wouldn't you have?

25  A.  I would have.

1  Q.  You haven't gotten a report from a Dr. Abramson or you

2  didn't get a report from Dr. Dickersin, did you?  They

3  didn't distribute that to you?

4  A.  Other than the article that was published in the

5  New England Journal.  Again, let me just emphasize,

6  physicians generally read medical journals.  We aren't using

7  getting transcripts of depositions and things that are

8  prepared for court.

9  Q.  In any event, if Kaiser, anyplace within the

10 organization, when they learned that Neurontin was not only

11 worthless for these five purposes, bipolar, migraine, as you

12 say, was worse than a sugar pill, you'd have to agree that's

13 a medical scandal that's been caused, correct?

14 A.  I don't know if I could characterize it as a medical

15 scandal.

16 Q.  Well, the idea that you would have a bipolar patient

17 with all the problems that they have being prescribed

18 something that would do absolutely no good for them, as a

19 doctor, you find that alarming, don't you?

20 A.  I would find that alarming, and I think, you know --

21 Q.  Likewise, a bipolar child that was being treated with

22 something you say is worse than a sugar pill, that's

23 something you'd would want to take immediate action on,

24 correct?

25 A.  If I had that information, I would.

1   Q.  And if it were a child with cerebral palsy that was

2   being given Neurontin for a use that was no better than a

3   sugar pill, you'd find that equally alarming, wouldn't

4   you?

5          MS. NUSSBAUM:  Objection, your Honor.

6          THE COURT:  Sustained.

7   Q.  Tell us, since November of last year, December, January,

8   middle of February, what's been done to alert Kaiser doctors

9   and Kaiser patients that they're putting something in their

10  body that's worse than a sugar pill?

11  A.  Well, several things.  One, as you pointed out, this

12  article came out in the New England Journal in November,

13  which is sort of over the holiday season, Thanksgiving,

14  Christmas, Hannakah, New Years, et cetera, I, as I mentioned

15  earlier, sent copies of this article out to physicians

16  within the medical group alerting them to this issue.  I

17  expect, and I encouraged them to have conversations and

18  communicate this with all of their peers, again, starting

19  the planning to turn this ship around.

20          We've got, you know, we've got a lot of

21  prescribing going on that we've got to somehow figure out

22  how to change.  You know, we have had some initial planning

23  meetings to strategize about how do we do that in our

24  medical group in a way that is caring and thoughtful for our

25  patients and doesn't embarrass and compromise the trust that

1   patients have with their doctors.

2          You know, so those are just a few of the things

3   we've done.

4   Q.  Kaiser has the ability with its databases to get a

5   message overnight if they think their patients are facing

6   some serious medical problem, doesn't it?

7   A.  Well, again, I have communicated --

8          THE COURT:  Yes or no.

9   A.  Kaiser Health Plan has that ability, yes.

10  Q.  So this is something if somebody felt we really had a

11  problem going on, doctors and patients could be notified

12  overnight that we've got these five uses of Neurontin that

13  really don't do any good and may do harm?  That could be

14  done overnight, correct?

15  A.  It could be.  The FDA could also issue warnings like

16  that.

17  Q.  And is that Kaiser's position, if the FDA isn't going to

18  issue a warning, we're not going to do anything?

19  A.  No, no.

20          MS. NUSSBAUM:  Objection.

21  Q.  You say you haven't seen any of the expert witness

22  reports in this case.  Have any of the experts that have

23  testified for the plaintiff come and talked at any Kaiser

24  doctor meetings that you've attended?

25  A.  Well, what I did say is I have now seen some of those

1   reports in preparation for this trial.

2           THE COURT:  Just yes or no because we're trying to

3   finish.

4   A.  I'm unaware that they've spoken to any Kaiser doctors

5   individually.

6   Q.  As far as you know?

7   A.  I said Kaiser doctors, didn't I?  Permanente doctors.

8   Q.  Okay.  And have you been a party to any conversations

9   within Permanente or Kaiser as to when the patients that are

10  taking Neurontin for these off-label uses are going to be

11  provided with the information that's already been provided

12  to the jury?

13  A.  Well, I hope some of that, I hope that some of those

14  conversations are happening right now because of the

15  communication that I have made to our Permanente physicians.

16  That is how we encourage the doctor-patient conversations to

17  happen.

18  Q.  This educational method?

19  A.  Yes.

20  Q.  That hasn't worked after eight years?

21  A.  I'm sorry, it was very effective, and I don't agree that

22  it hasn't worked after eight years.

23          THE COURT:  How is the timing going?  What do you

24  think?

25  A.  That's a misinterpretation of the data and my

Page 146

1  testimony.

2       MR. KENNEDY:  I think it's unlikely.  Let me keep

3  trying and see how we do here.

4  Q.  I'd like to turn next --

5       THE COURT:  Don't forget, this is the reason I'm

6  asking, this is the day I have to leave a little bit early,

7  and I don't know if we can finish him before I leave or not,

8  I don't know.

9       MR. KENNEDY:  Your Honor, I'm certainly not going

10  to be able to finish within five or ten minutes to allow you

11  to meet what you had to do.

12       THE COURT:  That's fine.  We'll break in a few

13  minutes when you think it's appropriate.

14       MR. KENNEDY:  I was about to turn to another

15  topic.

16       THE COURT:  All right.  Why don't we do this, I

17  have a two o'clock plane, and I'm willing to be edgy about

18  this, some people look shocked, but only so edgy, and as I

19  say, I don't know if Mr. Alba, you'll give the phone number

20  and I'll see you tomorrow.

21       THE CLERK:  All rise for the jury.

22       (Whereupon, the trial was suspended at 1:48 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    ) ss.

5    CITY OF BOSTON               )

6

7

8              We, Lee A. Marzilli and Valerie A. O'Hara, Official

9    Federal Court Reporters, do hereby certify that the

10   foregoing transcript, Pages 1 through 146 inclusive, was

11   recorded by us stenographically at the time and place

12   aforesaid in Civil Action No. 04-10981-PBS, In Re:

13   Neurontin Marketing, Sales Practices, and Product Liability

14   Litigation, and thereafter by us reduced to typewriting and

15   is a true and accurate record of the proceedings.

16             In witness whereof we have hereunto set our hands

17   this 3rd day of March, 2010.

18

19                      /s/ Lee A. Marzilli

20                      /s/ Valerie A. O'Hara

21                      _____

22                      LEE A. MARZILLI, CRR

23                      VALERIE A. O'HARA, RPR

24                      OFFICIAL FEDERAL COURT REPORTERS