```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS


    IN RE:                            )
                                      ) CA No. 04-10981-PBS
    NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
    AND PRODUCTS LIABILITY LITIGATION  )
    ------------------------------------
    This document relates to:         )
    KAISER FOUNDATION HEALTH PLAN, et al, )
                                      )
                    Plaintiffs        )
                                      )
            -V-                       ) No. 04-10739-PBS
                                      ) Pages 1 - 140
    PFIZER, INC., et al,              )
                                      )
                    Defendants        )
```

JURY TRIAL - DAY NINE


BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 4, 2010, 9:08 a.m.


LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

 1    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3

 4        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
      Greene, LLP, 33 Broad Street, 5th Floor, Boston,
 5    Massachusetts, 02109.

 6

 7        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
      Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
 8    Suite 301, Cambridge, Massachusetts, 02142.

 9

10        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
      850 Third Avenue, New York, New York, 10022.
11
          DON BARRETT, ESQ., Barret Law Office,
12    404 Court Square North, P.O. Box 987, Lexington,
      Mississippi, 39095.
13
          BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
14    Bernstein, Embarcadero Center West, 275 Battery Street,
      San Francisco, California, 94111-3339.
15
      FOR THE DEFENDANTS:
16
          KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ. and
17    THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
      Four Times Square, New York, New York, 10036.
18
          RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meagher &
19    Flom, LLP, Four Embarcadero Center, San Francisco,
      California, 94111.
20
          JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
21    Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite
      3600, Denver, Colorado, 80202.
22

23

24

25

Page 3

1                           INDEX

2

3   WITNESS              Direct    Cross    Redirect    Recross

4   JOEL HYATT, M.D.                6        30          35

5   MIRTA MILLARES       41       100

6

7   EXHIBITS                                  PAGE

8   747                                       26

9   290                                       53

10  23, 24, 25, 27                            54

11  301                                       67

12  291, 327                                  72

13  365

14  461, 461-A

15  296

16  309

17  294

18  292

19  309, 432

20  952-A

21  952-D

22  952-C

23  952-B

24  952-E

25

2b11d2bb-817d-42b4-9053-ae565ae05494

1           P R O C E E D I N G S

2           THE CLERK:  All rise.

3           THE COURT:  I hear there are no issues right now

4      so we'll bring in the jury.

5           MR. BARRETT:  Your Honor, it's not an issue, but

6      if I could give these transcripts to you.  These are

7      depositions.

8           THE COURT:  I know, somebody handed me yesterday,

9      apparently somebody sent something upstairs.  I don't know

10     when I'm going to get it to you.  I've been trying to get to

11     you on a daily basis.  It depends.  You can give it to me.

12          MR. BARRETT:  There's a short one, if we get it to

13     you today.

14          THE COURT:  When am I going to do it?  Yesterday I

15     took the entire break listening to that tape.  There's only

16     so much I can do, and every time I try and focus on

17     something, someone objects and I haven't listened.  I'm

18     willing to take them, I'm just not promising when I'm going

19     to get to them.  You know what, I have edited or ruled on

20     maybe four already, maybe more.  Why can't you use those?

21          MR. BARRETT:  We're going to use one of them.

22     It's sequential.

23          THE COURT:  I don't know.

24          MR. BARRETT:  If you play some of them, it will

25     make sense.

1            THE COURT:  If I can.  I don't know.

2            MR. GREENE:  I think, your Honor, there were short

3    transcripts we would read from 2002.  They were from the

4    Franklin case.

5            THE COURT:  Maybe.  I'm simply telling you you

6    handed them to me at 9:06.  You want to play them today.

7    That's what we agreed we wouldn't do.  If it's one objection

8    and it's easy, I'll look at it; if there's a bunch of them,

9    I'm not going to do them.

10           MR. BARRETT:  We have one, John Morris that we're

11   going to read, and that's ready.  That probably will take us

12   through today.  We just got them back.

13           THE COURT:  We'll see.  Yesterday we were so

14   dismally off on timing.  I'm not so worried.  Let's bring in

15   the jury and see where we're going.

16           MR. BARRETT:  Yes.

17           MR. SOBOL:  Your Honor, while we're waiting for

18   Mr. Alba, there were some documents that the defendants gave

19   us notice about after the 6:00 thing.  We're not objecting

20   to that.  I've spoken to Mr. Cheffo, I think we all realize

21   that if the witness is being asked questions about a

22   document that was received late in the evening, it may be

23   that the witness is not familiar with it.  We'll deal with

24   it that way.

25           MR. CHEFFO:  That's fair, your Honor.  There were

2b11d2bb-817d-42b4-9053-ae565ae05494

1   a few documents up to 9:00 that we were trying our best, but

2   we'll accommodate that.

3          THE COURT:  All right.  You know, I was going to

4   say both sides have done various charts and chalks.  If this

5   case were ever to go up on appeal, not that it will, I think

6   it might be helpful to an appellate court to see the chalks

7   that are being referenced to just mark them as ID on both

8   sides.  You've done this big super board, just take a

9   picture.

10          MR. KENNEDY:  Certainly, your Honor, we'll do

11   that.

12          THE CLERK:  All rise for the jury.

13          ( JURORS ENTERED THE COURTROOM.)

14          THE CLERK:  Please be seated.

15          THE COURT:  Good morning.  Luckily the snow did

16   not keep away from you, although I was late getting in last

17   night, the wind.  Did anyone speak about the case?  See

18   anything in the press?  Great, you're still under oath.

19   We'll finish up with Dr. Hyatt this morning.

20          MR. KENNEDY:  May I proceed, your Honor?

21          THE COURT:  Yes, go ahead.

22                  JOEL HYATT, M.D., RESUMED

23      CROSS-EXAMINATION, CONTINUED BY MR. KENNEDY:

24   Q.  Good morning, Dr. Hyatt.

25   A.  Good morning.

1    Q.  Yesterday you mentioned that your area,

2    Southern California, hires doctors from around the

3    United States?

4    A.  That's correct.

5    Q.  And you hire actually from around the world, don't

6    you?

7    A.  Yes.

8    Q.  Can you give us any estimate as to the total number of

9    countries that have doctors represented in your region?

10   A.  I don't understand the question.  I can tell you we have

11   about 4500 physicians that currently practice in the

12   Southern California Permanente Medical Group.

13   Q.  Do you have any estimate for us as to what percentage of

14   those were trained in foreign medical schools?

15   A.  I have no idea.

16   Q.  It would be an appreciable percentage, particularly in

17   California, wouldn't it?

18   A.  I don't believe that's correct.

19   Q.  How about for the other regions around the country, they

20   don't restrict their hiring just to American trained

21   doctors, do they?

22           MS. NUSSBAUM:  Objection, your Honor.

23           THE COURT:  I'll allow it.  Do you know one way or

24   the other?

25           THE WITNESS:  I don't know one way or the other.

1  Q.  You're not aware of Kaiser having higher

2  American-trained doctors --

3           THE COURT:  He doesn't know.

4  Q.  Before we get off the subject of geography, I mistakenly

5  said yesterday in a question suggesting that Kaiser had a

6  facility in Framingham; that's not correct, is it?

7  A.  We do not have a facility that I know of in

8  Framingham.

9  Q.  There's a study with that name to, it but Kaiser doesn't

10 have any presence in this state at this time, does it?

11 A.  That's correct.

12 Q.  Again, going back for a minute to definitions, can you

13 tell us one more time exactly what a formulary is?

14 A.  A drug formulary?

15 Q.  Yes.

16 A.  A drug formulary certainly in our environment is a

17 listing of medications that have been judged by in our case,

18 our Pharmacy and Therapeutics Committee, which is composed

19 of physicians from our medical group who have evaluated

20 these drugs with input and information from our Drug

21 Information Service, et cetera, and approved them to be safe

22 and effective and approved for use by our physicians and

23 that will be covered by the drug benefit that the insurance

24 company covers.

25 Q.  Now, after a drug is placed on --

1   A.   There's a lot of echo.

2   Q.   Okay now, Doctor?

3   A.   Okay.

4   Q.   And once a drug is on formulary, it can be there either

5   on a unrestricted or restricted status, correct?

6   A.   Actually it can be approved for general use on the

7   formulary, it can be approved with restrictions, it can be

8   approved with guidelines, and it can be approved with

9   restriction and guidelines.

10   Q.   Thank you, you anticipated my next four questions.

11   Could you tell, give the jury an example of how each of

12   those restrictions, guidelines, restrictions with guidelines

13   would operate?

14   A.   Okay, I'll do my best.  I'm really not directly involved

15   in the formulary process.  I think it's pretty clear what it

16   means when a drug is accepted to the formulary for general

17   use.  It means any doctor can make a decision to use or not

18   use that drug and that it would be covered by the drug

19   benefit for the members.  A drug that is restricted,

20   approved for the formulary and then restricted would usually

21   be a high risk drug, a drug, for example, I always use the

22   example, as a family physician, it would be unlikely that I

23   would be prescribing cancer chemotherapeutic drugs, so those

24   drugs would be approved to the formulary restricted to

25   certain specialists, certain physicians who could prescribe

1    them, okay.

2              In some cases, we approve the drug to the

3    formulary with restrictions and guidelines.  We want to make

4    sure that, you know, even when it's restricted, there are

5    clear guidelines that have been evaluated based on the

6    evidence, published evidence, and proposed then by usually

7    that specialty to guide the other physicians within the

8    specialty.  Then, of course, there are medications that can

9    be approved to the formulary without restriction but with

10   guidelines.

11   Q.  And as of today in your region, Southern California,

12   what is the status of Neurontin or Gabapentin on the

13   formulary?

14   A.  Okay.  I'm not exactly sure.  I believe that it is on

15   the formulary without restrictions.

16   Q.  And determining whether a drug gets on formulary is

17   something that these pharmacy and therapeutic or P & T

18   committees decide, correct?

19   A.  Yes, and, again, these P & T committees are composed of

20   physicians, the voting members are physicians.

21   Q.  And have you ever been on a P & T committee?

22   A.  Yes.  In fact, I was on our Southern California P & T

23   committee from about 1990 to 1996.

24   Q.  And you would have been provided with access to whatever

25   monographs and other material were prepared concerning

1  Neurontin or Gabapentin during that period of time, correct,

2  Doctor?

3  A.  Well, I don't recall specifically, but as I was a part

4  of the P & T committee process, I would have been, I would

5  have seen whatever was presented during that period of

6  time.

7  Q.  Were you a voting member?

8  A.  As a physician, yes.

9  Q.  Okay.  Do you remember if you ever voted against any

10  recommended action with regard to Neurontin or Gabapentin

11  while you were on the P & T committee in

12  Southern California?

13  A.  I don't recall one way or the other.  It was many years

14  ago.

15      THE COURT:  So, what's the status of Neurontin

16  right now on the formulary?

17      THE WITNESS:  My understanding is Neurontin is on

18  our formulary without restrictions.

19      THE COURT:  Does it have guidelines?

20      THE WITNESS:  It doesn't have guidelines on the

21  formulary.  Again, maybe I need to clarify.  The P & T

22  committee can establish formulary status with guidelines,

23  but even without the P & T committee, the medical group

24  establishes clinical practice guidelines for care of, you

25  know, conditions and the use of medications all the time.

1    It's not tagged to the formulary status.

2            THE COURT:  So what's the status right now in your

3    area?

4            THE WITNESS:  My understanding is as far as

5    formulary status, it's on the formulary --

6            THE COURT:  So, no restrictions, no guidelines?

7            THE WITNESS:  As far as the formulary, correct.

8    We have guidelines within the medical group.  We have

9    published guidelines, you know, for our physicians, but it's

10   not linked to the formulary status.

11   Q.  You say there are other guidelines for what Gabapentin

12   aside from the formulary within your region?

13   A.  Yes.

14   Q.  And what are those?

15   A.  Those are clinical practice guidelines for the

16   management of pain.

17   Q.  And do those -- those guidelines are written, I assume,

18   or on a website, at least?

19   A.  They're written and on a website.

20   Q.  And do they say anything to the effect of Gabapentin is

21   not recommended for neuropathic pain?

22   A.  What our guidelines say is it gives recommendations for

23   how to treat neuropathic pain.  It makes recommendations

24   about what the preferred medications are for neuropathic

25   pain based on the evidence that, you know, we've reviewed as

Page 13

1    an organization.

2              The preferred medications for neuropathic pain are

3    the tricyclic antidepressants like Nortriptyline and

4    Despiramine, but the guidelines do include Neurontin

5    (Gabopentin) as an option but not as a first line drug, as a

6    second or third line drug if those first line drugs don't

7    work.

8    Q.  Those other preferred drugs, they're cheaper than even

9    the generic form of Gabapentin, aren't they?

10   A.  I guess they are.

11   Q.  Because, well, Gabapentin in the generic form is cheaper

12   than what the branded Neurontin used to be, the TCAs are

13   cheaper than even the generic, aren't they?

14   A.  Well, they're less expensive.  I wouldn't say cheaper

15   drugs, less expensive drugs, they're very effective drugs,

16   and they've been shown to be.

17   Q.  And is there anything though in the guidelines to the

18   effect of some studies have demonstrated that Gabapentin is

19   no better than a sugar pill, or no better than a placebo,

20   and Doctor, you ought to be aware of that?

21   A.  During what period are we talking about?

22   Q.  Today, February of 2010, how about March of 2010?

23   A.  Okay.

24   Q.  I'm having so much fun here, time has just been flying

25   here for me, Doctor.

1    A.  I know, it is March now.  Again, I am not an expert in

2    review of the evidence, so I don't know the details of the

3    evidence, and I don't have the guidelines here in front of

4    me, so it's hard for me to comment specifically.  What I

5    recall from attending certain educational programs,

6    moderating certain educational programs and having reviewed,

7    you know, I certainly read these guidelines in the past is

8    statements to the effect that tricyclic antidepressants and

9    Gabapentin may have similar efficacy based on the evidence

10   that we were aware of, you know, from 2002 to today.

11   Q.  What you told us yesterday, the Neurontin or Gabapentin

12   initiative is still continuing; isn't it?

13   A.  That's correct.

14   Q.  So, therefore, you do try to keep track of the status of

15   Gabapentin and keep yourself informed on it, don't you?

16   A.  Yes, and this trial has helped us a lot.

17   Q.  You're welcome, Doctor, glad we've been of assistance.

18   Can we turn to Exhibit 690, please, and you'll have no

19   trouble recognizing this, Doctor, this was the fourth annual

20   region-wide, and this is the DUAT group from Southern

21   California, correct?

22   A.  That's correct.

23   Q.  And when it says region-wide, what does that refer to?

24   A.  It means this we have a face-to-face meeting of the

25   regional DUAT in Southern California once a year, and so

1   what we do, all of our other DUAT meetings are telephonic so

2   we don't take doctors out of the office -- they should be

3   seeing patients -- so this was the region-wide meeting where

4   we brought together all the DUAT leaders and the drug

5   education coordinators and the regional DUAT members all to

6   a meeting at one place.  In this case it was the Hilton

7   Hotel in Pasadena.

8   Q.  And so this is Southern California, it doesn't include

9   other regions?

10  A.  It does not include other regions.  This was a

11  Southern California meeting.

12  Q.  Okay.  Turning to page 1171, and you obviously were

13  present at this meeting, correct?

14  A.  I chaired the meeting.

15  Q.  Okay.  And if we can highlight the overview of training

16  discussion on page 1171 and coming down to the bottom of the

17  page.  At that meeting, one of things that was discussed was

18  a one-day course on academic detailing, correct?

19  A.  Yes.

20  Q.  And this is a course for doctors to try to educate other

21  doctors, correct?

22  A.  Yes.

23  Q.  And the doctors who were going to become teachers go

24  through a one-day course in learning techniques to try to --

25  learning techniques, correct?

1  A.  Well, they learn methods to talk to their peers about

2  medication use and appropriate use of medications, yes.

3  Q.  And coming down to the page after completing the one-day

4  course -- well, during the one-day course, they get to

5  complete a personal conversation plan with specific opening

6  and closing statements and requests for specific actions to

7  use with their fellow doctors, correct?

8  A.  That's what I read also.

9  Q.  And then they get to actually practice those techniques

10  to go through a dry run before they go out and try them on a

11  real doctor, correct?

12  A.  Yes, this is a description of the training program on

13  academic detailing.

14  Q.  And one of the reasons academic detailing was being

15  taught was to have some Kaiser doctors go try to educate

16  other Kaiser doctors that you thought were prescribing too

17  much Neurontin, right?

18  A.  No.

19  Q.  This wasn't intended?

20  A.  This is not directed specifically at Neurontin, no.

21  Q.  Not specifically among the drugs that this training was

22  intended to apply to was what you considered to be the

23  overuse of Neurontin, right?

24  A.  Well, let me back up so you understand the context of

25  this training program.

1  Q.  Can you answer my question?

2  A.  No, I can't.

3  Q.  Then let me withdraw it.

4  A.  Okay.

5  Q.  Were the people that attended this course told that none

6  of these course objectives or training have anything to do

7  with Neurontin, don't use them there?

8  A.  I honestly specifically can't recall whether we focused

9  on Neurontin at all with this academic training.  What I can

10  tell you is that, you know, for all of the physicians who

11  were involved in DUAT, to support this kind of educational

12  approach, we depend on our physicians to talk with our

13  physicians about, you know, colleague to colleague about

14  what, you know, what are the medications we're focusing on

15  in DUAT, why we believe we should be following these

16  guidelines, what's the evidence, et cetera.

17          Doctors aren't trained to have these kind of

18  conversations, and it can be rather uncomfortable to talk to

19  a colleague about how they might be using a drug

20  inappropriately.  So, you know, this is basically a course

21  to try to train doctors to be more comfortable about having

22  these face-to-face conversations, and we expect our

23  physicians involved in DUAT, our leaders, our chief of

24  service to be equipped to have these peer-to-peer

25  conversations.

1        So, you know, in general having trained our

2   physicians to do this, they can apply these skills to any of

3   the conversations for any of the DUAT initiatives that we're

4   involved in.

5   Q.  Including the initiative for doctors that you think are

6   prescribing too much Neurontin, correct?

7   A.  Correct.  There may be doctors who did have

8   conversations about Neurontin with some of their

9   colleagues.

10       MR. KENNEDY:  Your Honor, I believe we have a

11   question from the jury.

12       THE COURT:  Yes.

13       THE JUROR:  You've described the Neurontin

14   initiative that you guys have undertaken.  Can you compare

15   that so some other drug initiatives where new science, new

16   data has come out, I think Celebrex a couple years ago --

17       THE WITNESS:  Right.

18       THE JUROR:  -- how would those two initiatives,

19   did you have a major initiative on that, and was there was a

20   protocol to disseminate major drug information?

21       THE WITNESS:  Very good question.  We have about

22   8 to 10 DUAT initiatives, we have an initiative around

23   appropriate antibiotic use, so there are a lot of different

24   antibiotics, there are new antibiotics coming out all the

25   time.  We want to make sure that our doctors understand when

1   it's appropriate to use some of the newer antibiotics

2   because there's a concern about resistance, et cetera.

3           We had a major initiative around the Cox-2 drugs

4   at the time, and that again was one of our more successful

5   initiatives.  There were Cox-2 drugs coming out, Vioxx, et

6   cetera.  Some of our doctors were very concerned with some

7   of the small reports that they saw in the literature about,

8   you know, harm that Vioxx, for example, could cause to the

9   heart, and as a result, you know, we focused on educating

10  our doctors, academic detailing.  Our doctors would talk to

11  their peers about, you know, were you aware that this drug

12  could be harmful to the heart, you know, maybe we shouldn't

13  be using it.  We have initiatives around allergy

14  medications.

15          THE COURT:  Okay.  I think we have a sense what

16  you mean.

17          THE WITNESS:  There are a number of initiatives,

18  if that answers your question, I hope.

19          THE JUROR:  Would the Neurontin initiative follow

20  a similar path, the same path as these other initiatives?

21  Is it an ad hoc, we're going to treat this one this way,

22  this way or this way?

23          THE WITNESS:  We develop -- in general, in general

24  we use a similar approach, but there's a separate strategy

25  for each drug initiative, for each DUAT initiative, you

1   know, based on the evidence, based on, you know, how it's

2   being used, based on, you know, how much promotion it's

3   getting by the drug companies, et cetera.

4          Academic detailing, by the way, is our way of our

5   counter detailing what the drug companies are promoting, and

6   we know that the drug companies aren't always giving a

7   balanced, you know, set of information to physicians.

8   Q.  And at least since Gabapentin became generic in 2004,

9   nobody's been detailing it, have they?

10  A.  You mean has any Pfizer drug company representative been

11  detailing it?

12  Q.  Anybody.  Once it goes generic, you don't have drug

13  companies sending representatives around to detail drugs, do

14  you?

15  A.  I don't believe that's true.  I don't know about

16  Neurontin, but some --

17  Q.  You can't tell us right now of any Kaiser doctor who's

18  been detailed for generic Gabapentin since 2005?

19  A.  Well, that's a different question, and, again, they are

20  Permanente physicians.

21  Q.  Okay.

22  A.  But I can't tell you one way or another that any Pfizer

23  representative has detailed Neurontin when there's a generic

24  available.

25  Q.  And if Kaiser or Permanente is concerned about improper

1   detailing by drug companies, you can just say keep them off

2   the premises and disallow it, can't you?

3   A.   Keep who off the premises?

4   Q.   The drug companies?

5   A.   We could make that policy, and, in fact, some of our

6   regions have.

7            THE COURT:   Have done what?

8            THE WITNESS:   Have actually restricted

9   pharmaceutical representatives from coming onto our

10  facilities to detail drugs.

11  Q.   Now, just to close off on 690, among the techniques that

12  are taught in academic detailing are how to get your foot in

13  the door including the timing and opening of statements to

14  your fellow doctor, correct?

15  A.   Yes, I read that statement.

16  Q.   And you also talk how to identify useful questions to

17  ask and how to gain rapport with your colleague?

18  A.   Yes.

19  Q.   And how to deal with push-back, correct?

20  A.   Yes.

21  Q.   And the reason you had these courses is because you

22  found that just sending a memo to the doctors didn't seem to

23  be getting the desired result, correct?

24  A.   Well, this is one of many methods that we --

25  Q.   Can you answer the question, Doctor?

1   A.  No, that's not the only reason.

2   Q.  You did find that just sending memos wasn't sufficient

3   to deal with what you thought was overuse of Neurontin?

4   A.  Well, what I can tell you is --

5   Q.  Can you?

6   A.  One method is never enough.

7   Q.  And one of the problems you found in trying to get

8   doctors to cut Neurontin prescriptions was doctors get

9   evaluated by their patients on something called a MAP,

10  M-A-P, score, don't they?

11  A.  Yes.

12  Q.  And that allows the patient to fill out a report card on

13  the doctor and say whether the patient is happy with the

14  treatment they were getting, correct?

15  A.  Correct.  The MAP, the Member Assessment of Patient

16  Care, MAP survey, it's actually a survey we send out to our

17  patient after they've seen their doctors so we can evaluate

18  the doctor-patient relationship and that experience that our

19  patients have with our doctors.

20  Q.  And you didn't find that there was any problem with the

21  MAP scores with patients complaining that their doctors were

22  giving them Neurontin and it didn't seem to work; didn't

23  find any of that, did you?

24  A.  I can't tell you specifically one way or the other.

25  Q.  Before going off on the DUAT initiative, did you say at

1   least let's check the MAP scores and see if these patients

2   who are receiving Neurontin have any complaints about it?

3   A.  First of all --

4   Q.  You didn't do that, did you, Doctor?

5   A.  No.

6   Q.  You haven't done that down to and including today, have

7   you?

8   A.  No.  The MAP is a survey, patients are entitled to put

9   comments on there, but there's nothing specific about drug

10  treatment on the MAP survey.

11  Q.  And there were doctors, however, who pushed back saying

12  they were concerned if they cut prescribing, stopped

13  prescribing Neurontin to keep DUAT happy, they were worried

14  their patients were going to be downgrading on the MAP

15  scores, weren't they?

16  A.  I don't know that's the case.

17  Q.  Let's turn next to Exhibit 692, another DUAT meeting,

18  this one from March 12, 2003.  This was a video conference

19  that was intended to be shown throughout all of the Kaiser

20  regions, correct?

21  A.  No.  This is a video conference for Southern California.

22  I don't recall whether it was also broadcast -- oh, it was

23  broadcast for Northern California and Southern California,

24  just the two regions.

25  Q.  Okay.  Obviously, as with all things with DUAT, you

1  tried to have the conference presentation as accurate as

2  reasonably possible, correct?

3  A.  We tried to do the best we can, yes.

4  Q.  Sure.  Nobody's perfect but within the bounds of human

5  capabilities, you tried to do your best, correct?

6  A.  Yes.

7  Q.  And turning to page 13 of that March 12, 2003 video

8  conference, you had a graph of Gabapentin utilization,

9  correct?

10  A.  This isn't a graph, it's a chart.

11  Q.  Excuse me, you had a chart breaking down how Neurontin

12  prescriptions broke down according to various conditions or

13  problems, correct?

14  A.  I see this table, yes.

15  Q.  Okay.  And it shows, for example, that bipolar is

16  responsible for 4 percent of all prescriptions; you see

17  that, don't you?

18  A.  Well, that's what it says, but let me --

19  Q.  That's all we asked.  And migraine shows 4 percent,

20  correct?

21  A.  That's what this chart says.

22  Q.  Okay.  At any time after March 12, 2003, did you send

23  out or did anybody at DUAT send out any kind of a memo

24  saying we want to correct any misimpression you may have

25  had, the Gabapentin utilization chart on page 13 isn't

1    accurate; did that happen, Doctor?

2    A.  Not that I'm aware of, but this is a --

3    Q.  Doctor, thank you, you've answered the question.

4    A.  Okay.

5          MS. NUSSBAUM:  Your Honor, can he answer the

6    question?  He wanted to say something?

7          THE COURT:  Are you aware of any, of sending out

8    that document?

9          THE WITNESS:  This document as far as I know was

10   not sent out, no.  These are speakers' notes, these are

11   notes that are used by the speakers.

12         THE COURT:  All right.  We're just trying to

13   finish it up.

14   Q.  These were slides that were shown to the audience,

15   weren't they?

16   A.  I don't know if this slide was shown.

17   Q.  Okay.

18   A.  I'd have to look at the videotape which is what

19   ultimately is circulated to our physicians.

20   Q.  In any event, let's go next to Exhibit 747.

21         MR. KENNEDY:  I'm not sure if we offered 692 into

22   evidence.

23         THE CLERK:  It's in.

24         MR. KENNEDY:  It's in already.  Then I would offer

25   Exhibit 747 in evidence, your Honor.

1          ( Exhibit 747 was received in evidence.)

2    Q.  Now, this is an April, 2004 Kaiser inter-regional

3    meeting.  The one we were just looking at was March, 2003,

4    so this is 13 months later.  We're now in April, 2004, and

5    this is another inter-regional pharmacy meeting, and turning

6    to -- Austin, can we go to Bates number 3823.  That turns

7    out to be essentially the same chart we just talked about

8    except now the Kaiser Permanente logo has been put on it,

9    and it indicates that it's -- what's that, Kaiser Northern

10   California Gabapentin utilization?

11   A.  Yes.

12   Q.  And that, again, that's in fact the same chart, it even

13   still includes page 13 from the earlier document, doesn't

14   it?

15   A.  Yes.

16   Q.  And, Austin, can we just turn back to the previous page,

17   3822.  That says chart review, and then let's go back to

18   3823.  That's what the presentation said, based on a chart

19   review, this is what Northern California Gabapentin

20   utilization had been, correct?

21   A.  Well, the title of the chart says, "Kaiser Permanente

22   Northern Cal., Gabapentin utilization."

23   Q.  Thank you.  And same question as before, are you aware

24   at any time after April, 2004 anybody from Kaiser or

25   Permanente sending out a memo saying you ought to be advised

1    that Gabapentin utilization chart we used at the April, 2004

2    meeting really isn't reliable?

3    A.  Well, two things.

4    Q.  Did that happen, Doctor?

5    A.  I am not aware that that happened.

6    Q.  Thank you very much.

7                    MR. KENNEDY:  Can we now ask to have marked

8    in evidence Exhibit 760.  It's in already, I believe,

9    Mr. Alba.

10   Q.  This is a July, 2004, so we've gone from March of 2003

11   to April of 2004, and then to July of 2004, and this time

12   there's been a total of something like 9,000 prescriptions

13   that have been analyzed, correct?

14   A.  The grand total at the bottom says 9,011.

15   Q.  And based on a review of those 9,011 prescriptions,

16   bipolar is now, it was responsible for 225 of them, right?

17   A.  Bipolar says 225 identified by what's called an OSCR

18   diagnosis.

19   Q.  Okay.  And you'd agree with me, 225 is about 2.5 percent

20   of 9,000, correct?

21   A.  On this tally with this chart using this OSCR diagnosis

22   methodology, yes.

23   Q.  So it looks like maybe the Neurontin initiative was

24   working and that bipolar has been cut from 4 percent to 2.5

25   percent?

1    A.   I could not conclude that at this point.

2    Q.   Okay.  Then coming down --

3    A.   This is a snapshot.  I don't know where this data came

4    from.  I don't know who did this analysis.  The OSCR

5    diagnosis, just so you understand is not --

6    Q.   Doctor, if somebody wants to know what an OSCR diagnosis

7    is, they'll have lots of time to ask you.

8    A.   Fine.

9    Q.   On 760, migraine is shown to be 81 of the total

10   prescriptions, correct?

11   A.   On this chart, yes.

12   Q.   Which would be less than one percent, correct?

13   A.   If you say so.

14   Q.   And this was a document that was prepared in connection

15   with the DUAT initiative?

16   A.   I don't know that.

17   Q.   Have you ever seen this before?

18   A.   No, I haven't.

19   Q.   No idea where it came from?

20   A.   This is the first time I've seen this particular chart

21   that I recall.

22   Q.   You're certainly not aware of anybody within Kaiser

23   having sent out a memo since July of 2004 saying that that

24   chart was inaccurate, have you?

25   A.   I'm not aware of any statement after this.

1    Q.  As you told us yesterday, you practice, what, one or two

2    days a month?

3    A.  Now I do.

4    Q.  And that's been true for the last 15 years, I think you

5    told us, right?

6    A.  Correct.

7    Q.  And even when you were practicing, you weren't a

8    neurologist, were you?

9    A.  I'm a family physician.

10   Q.  It is, however, your opinion that Kaiser neurologists

11   are still using too much Gabapentin, correct?

12   A.  Well, I don't know.

13   Q.  Why is the initiative still going if the problem hasn't

14   been taken care of?

15   A.  The initiative is still going because we're trying to

16   follow evidence-based guidelines which suggest that

17   tricyclic antidepressants are the first line of preferred

18   drugs and Neurontin (Gabapentin) should be reserved, so one

19   of the metrics that we're following, I mean, it gets

20   complicated, but one of the metrics we're following is

21   whether the physicians are trying the tricyclics, the

22   preferred medicine, first before they would try Gabapentin,

23   so I don't recall any recent analysis of neurology

24   prescribing over any other department.

25   Q.  The initiative is still continuing as to neurology,

1   isn't it?

2   A.   It's continuing throughout Kaiser Permanente, yes.

3   Q.   And you're not a pain specialist now and never have

4   been, have you?

5   A.   I'm not a pain specialist.

6   Q.   However, you're continuing to head up an initiative

7   because you believe pain specialists are prescribing too

8   much Gabopentin, right?

9   A.   I believe that throughout Kaiser Permanente physicians

10   are prescribing too much Gabapentin-Neurontin without having

11   also tried the tricyclic antidepressants first based on the

12   evidence that we have known about, you know, in published

13   literature.

14   Q.   For eight years you still can't get them to use the

15   cheaper, less expensive drugs you'd like them to use?

16   A.   It's not an issue of whether to use the cheaper drugs,

17   sir, it's an issue of whether to use the drugs that we feel

18   are more effective and more cost effective.

19             MR. KENNEDY:   Thank you, I have no further

20   questions.

21             REDIRECT EXAMINATION BY MS. NUSSBAUM:

22   Q.   Now, Dr. Hyatt, would DUAT make decisions based on

23   expert reports filed in a lawsuit?

24   A.   No.  We make our decisions based on published studies

25   that have been analyzed and evaluated by our analytical

1   units, our guidelines units but not on the basis of

2   depositions or testimony in a trial.

3   Q.  Now, yesterday Mr. Kennedy showed you what he had marked

4   as I believe as Exhibit 275, and that was this article,

5   antidepressants and anti-epileptic drugs for chronic

6   noncancer pain written by Dr. McCarberg and Dr. Maizels; do

7   you remember that?

8   A.  Yes.

9   Q.  And turning to the last page, Mr. Kennedy pointed out

10  that it said, "The authors indicate that they do not have

11  any conflicts of interest."  Do you recall that?

12  A.  Yes.

13  Q.  Now, does it say anyplace there that Mr. McCarberg was a

14  paid speaker for Pfizer on Neurontin receiving $1500 per

15  speech and being called a "regular speaker"?

16  A.  No, it doesn't say that.

17  Q.  Does Dr. McCarberg disclose there that he was one of

18  Pfizer's "pain mentors" for Neurontin, the very drug which

19  is the subject of the article?

20  A.  No, it doesn't reveal that.

21  Q.  Does Dr. McCarberg reveal there that he had secretly

22  consulted with Pfizer on the topic of the very article to

23  help to change it from an article that was critical of

24  overuse for pain to a drug that would be positive?

25           MR. KENNEDY:  I object, leading.

1   A.  No, it doesn't say that.

2              THE COURT:  Overruled.

3   Q.  So, by looking at this disclaimer that the authors

4   indicate that they do not have any conflicts of interest,

5   would you at all know about the truth of the relationship

6   between Dr. McCarberg and Pfizer with respect to

7   Neurontin?

8   A.  Other than it says that Dr. McCarberg is on the speakers

9   bureau for Pfizer and he claims that that's not a conflict

10  of interest, I mean, all I can see is what I would read

11  here.

12  Q.  Okay.  So it says absolutely nothing about his

13  relationship with Pfizer regarding Neurontin, the drug

14  that's the subject of the article?

15  A.  That's correct, nor that he's accepting money, which I

16  would consider a conflict of interest.

17  Q.  Now, looking at a document that was just shown to you by

18  Mr. Kennedy.  It's Exhibit 692, and it is the chart that he

19  just showed you.  It was on page 13, then he pointed out

20  that the same or substantially similar chart is reflected in

21  Exhibit 747.  Do you see that chart?

22  A.  Yes, I see that again.

23  Q.  Now, is that chart a reliable analysis of the number of

24  prescriptions written for Neurontin for any specific

25  indication?

1        MR. KENNEDY:  I object.  Lack of foundation.

2        THE COURT:  Well, do you know anything about it?

3        THE WITNESS:  Do I know anything about what, I'm

4   sorry?

5        THE COURT:  How those numbers were generated?

6        THE WITNESS:  No.  What I can talk about is the

7   state of our data systems at the time that these numbers

8   might have been generated.

9   Q.  At the time that these numbers were generated, did

10  Kaiser have any accurate way of tieing a particular

11  diagnosis to a particular prescription?

12  A.  No.  We did not have an accurate way of identifying

13  diagnoses and tieing it to prescriptions at the time.

14  Q.  And I think you used the word that this was a snapshot.

15  What did you mean by that?

16  A.  Well, somebody, again, this was a Northern California

17  Kaiser Permanente report analysis, and by a snapshot, what I

18  assume is that, you know, somebody said go look at, you

19  know, all of the Neurontin prescriptions and see what you

20  could find out.

21        THE COURT:  Are you guessing?  Do you know

22  anything about it?  You just said you didn't know anything

23  about it.  I think we've moved on.  We've heard from, who

24  was it, Carrejo, was the one who generated this?

25        MS. NUSSBAUM:  Correct.

Page 34

1        THE COURT:  All right, so...

2    Q.  Looking at Exhibit 760, which was just shown to you by

3    Mr. Kennedy.  That says, "Year to date, July, 2004 diagnoses

4    associated with Gabapentin;" do you see that?

5    A.  Yes.

6    Q.  Now, at the time in July of 2004, did Kaiser have the

7    ability to accurately tie the diagnosis of a particular

8    patient with the prescription?

9    A.  Again, this is a Northern California report, and the

10   answer to the question is no, these OSCR coding -- and I

11   forgot what OSCR stands for -- is coding that we did on a

12   piece of paper, and doctors were asked to put, you know,

13   their best guess of one code for a particular patient of a

14   particular visit.  So a patient could come in with multiple

15   conditions and they have to pick one code.

16        So this would not be a complete and accurate

17   picture, and so I consider it sort of a broadbrush sort of

18   snapshot, early view of just an exploration of where these

19   prescriptions --

20        MR. KENNEDY:  Move to strike.  Speculative.

21        THE COURT:  Yes, sustained.  The last sentence

22   only.

23   Q.  Dr. Hyatt, on the top of that Exhibit 760, it says new

24   RXs.  Do you see that?

25   A.  Yes.

1   Q.  And what does that mean?

2   A.  It means these would have been prescriptions that were

3   new, not refills.

4   Q.  Okay.  So that would not have covered all Neurontin

5   prescriptions but whatever this means, it was just looking

6   at new; ones, is that right?

7   A.  That's correct.  This would not have counted all of the

8   patients that are on refills, already on the medicine.

9            MS. NUSSBAUM:  I have no further questions at this

10  time.

11           MR. KENNEDY:  I'll be brief, I promise your Honor.

12            RECROSS-EXAMINATION BY MR. KENNEDY:

13  Q.  Do you know Dr. McCarberg?

14  A.  I know of Dr. McCarberg, yes.

15  Q.  He's been with Kaiser for, what, 25 years?

16  A.  I think about that.  I mean, I have been there 31 years.

17  I think he's been there 20 some years, yes.

18  Q.  As far as you know, he's seeing patients in San Diego

19  today, right?

20  A.  That's correct.

21  Q.  And if Kaiser had a doctor who would compromise his or

22  her medical integrity for a $1500 honorarium, you'd get him

23  out of there, wouldn't you?

24  A.  Well, it's not that simple, but I think --

25            THE COURT:  The answer is no, so what's the next

1   one?

2   A.   The answer is no, not necessarily.

3   Q.   And you're not concerned yourself about having

4   Dr. McCarberg as a partner and a colleague today, are you?

5   A.   I am very concerned.

6   Q.   Oh, really?

7   A.   Yes, after learning what I've just been learning in the

8   course of this trial, I'm very concerned about some of the

9   actions he's taken, the money he's accepted and the

10  influence that he's had on our prescribing --

11  Q.   But like Gabapentin --

12  A.   -- as an individual physician in this medical group.

13  Q.   And like other things in this case, you're concerned

14  about it, but you haven't got around to doing anything about

15  it, correct?

16  A.   Not yet.

17  Q.   Could we go back to Exhibit 690, and that was the

18  Hilton Hotel meeting, February 6th, 2003.

19             MR. KENNEDY:  Austin, can we go to 1167?

20             MS. NUSSBAUM:  Objection.  Sustained.  Beyond the

21  scope.

22             MR. KENNEDY:  May I approach, your Honor?  I'll

23  tie it up.  It's with regard to the ability to have accurate

24  records of prescriptions for Neurontin in particular.

25             THE COURT:  Yes, I will see you up here because

Page 37

1    we're trying to wrap this up.

2              (THE FOLLOWING OCCURRED AT SIDEBAR:)

3              MR. KENNEDY:  They claim that they're able to

4    identify outliers of systematic reviews for each class,

5    and --

6              THE COURT:  I don't know even know what document

7    this is.

8              MR. KENNEDY:  This the DUAT meeting 690, and what

9    they're saying is they're able to identify outliers, people

10   who prescribe too much Gabapentin for off-label uses, so

11   appropriate interventions can be taken, and they have the

12   ability to send thank you messages to providers that show

13   improvement.

14             THE COURT:  Okay, I'll allow it.

15             MR. KENNEDY:  Thank you, your Honor.

16             (SIDEBAR CONFERENCE WAS CONCLUDED)

17             THE COURT:  I'll allow that.

18             MR. KENNEDY:  Thank you, your Honor.

19             Austin, if we put 690 back up and can you

20   highlight for us regarding third utilization coming down to

21   the bottom of the page.

22   Q.  Now, as of February 6th, 2003 at the DUAT conference, it

23   was explained that peer utilization data and peer means

24   other doctors, correct?

25   A.  It means individual physician prescribing utilization,

1    yes.

2    Q.  So individual doctors utilization data for drugs

3    including Neurontin is systematically reviewed for each

4    targeted drug class, correct?

5    A.  That's correct.

6    Q.  And outliers, and those would be people who are

7    prescribing what you consider to be excessive amounts,

8    correct?

9    A.  No.

10   Q.  What's an outlier in this paragraph?

11   A.  The metrics we were using were looking at prescribing of

12   the preferred medications, which is the tricyclic

13   antidepressants, so we were looking at the percent of

14   prescribing of the preferred medications compared to the

15   Neurontin as a first line drug, so an outlier in this would

16   be a doctor who's prescribing Neurontin without having first

17   tried the tricyclic antidepressants, which were the

18   preferred drug.

19   Q.  And as of 2003, you were able to identify the doctors

20   that you thought were prescribing Neurontin too early,

21   correct?

22        MS. NUSSBAUM:  Objection, your Honor.  As I look

23   at this document it's referring to other drugs in that

24   portion of it, it's not referring to Neurontin I don't

25   believe.

1     THE COURT:  I've sort of asked you not to do the

2   speaking objections.  Can you answer it one way or another?

3   A.  Can you repeat the question?

4   Q.  Sure.  As of February, 2003, DUAT had the ability to

5   identify specific doctors who were in your view prescribing

6   too much or too little, correct?

7   A.  For all of our DUAT initiatives, we look at utilization,

8   and we have specific metrics, measures that we look at, and

9   we are able to drill those metrics down to individual

10  doctors, if that's what you're asking.

11  Q.  That's what I'm asking.  And in 2003, going to the next

12  bullet point, you were able to identify individual doctors

13  so you could do what you call interventions by starting

14  first with an e-mail to specifically identify doctors,

15  correct?

16  A.  Correct, and this applies to all of the DUAT

17  initiatives.

18  Q.  And that was a capacity that Kaiser had in 2003,

19  correct?

20  A.  And this is describing what Bellflower is doing at their

21  medical center.

22  Q.  Okay.  And coming down to the next bullet point, in

23  2003, you were also able to track individual doctors

24  prescribing patterns with sufficient accuracy to be able to

25  send them thank you notes if they were doing it correctly,

1   right?

2   A.   Thank you messages were sent to providers at Bellflower.

3   We were evaluating what each medical center was doing when

4   they saw an improvement in prescribing.

5   Q.   Okay, that's right.   At least Bellflower had the ability

6   in 2003 to track whether individual doctors were improving,

7   and if they were, they got a thank you note, correct?

8   A.   That's correct.   If they were improving in prescribing,

9   you know, based on all of the different DUAT initiatives, if

10  they were improving according to the metric we were

11  tracking.

12  Q.   And Bellflower is a Kaiser facility, correct?

13  A.   Yes.

14  Q.   Thank you very much.

15  A.   In fact, we recognized this as a best practice, and we

16  tried to promote it to be done at our other medical

17  centers.

18  Q.   - I think you've answered the question.   Thank you very

19  much, Dr. Hyatt.

20            REDIRECT EXAMINATION BY MS. NUSSBAUM:

21  Q.   Dr. Hyatt, from 1994 to 2004, did Kaiser have any

22  overall accurate way --

23            THE COURT:   Wait a minute, why are you back here

24  now?

25            MS. NUSSBAUM:   This is one question.

Page 41

1        THE COURT:  No, isn't this re-, re-, re-?  No.

2   Thank you.  Goodbye.  As I said, we have one round, or,

3   excuse me, two rounds or we'd go forever here.  Goodbye,

4   have a nice trip back.

5        THE WITNESS:  Thank you.

6        THE COURT:  Who's our next witness?

7        MS. NUSSBAUM:  Mirta Millares, your Honor.

8        THE COURT:  While she's coming, can I see counsel

9   for a second at sidebar?

10       (THE FOLLOWING OCCURRED AT SIDEBAR:)

11       THE COURT:  Here's one of them.  The other two are

12  too complicated.  There are a million objections on one of

13  them, and on the other one it's a document that's not been

14  admitted.

15       MR. BARRETT:  Did you get the one that had the

16  note on it?

17       THE COURT:  Yes.

18       MR. BARRETT:  That's all we need, that's great.

19       THE COURT:  I can't do them on the fly.

20       (SIDEBAR CONFERENCE WAS CONCLUDED)

21       MIRTA MILLARES, Having been duly sworn by the

22  Clerk, testified as follows:

23          DIRECT EXAMINATION BY MS. NUSSBAUM:

24       THE CLERK:  Would you please state your name and

25  spell it for the record.

1    THE WITNESS:  My name is Mirta Millares,

2    M-i-r-t-a, last name is M-i-l-l-a-r-e-s.

3    Q.  Good morning, Dr. Millares.

4    A.  Good morning.

5    Q.  Thank you.  Can you tell us your educational background,

6    please.

7    A.  Sure, my undergraduate work was at the University of

8    South Florida at San Francisco State University, I have a

9    doctor of pharmacy degree from the University of California,

10   San Francisco, School of Pharmacy, I did a one-year

11   postgraduate, 12-month training in clinical pharmacy

12   practice at UC San Francisco and then a subsequent 12-month

13   residency in drug information practice also at

14   UC San Francisco.

15   Q.  Are you currently employed?

16   A.  Yes.

17   Q.  By who?

18   A.  Kaiser.

19   Q.  And what is your job title?

20   A.  I'm the manager of Drug Information Services.

21        MR. SOBOL:  Your Honor, could I ask the witness to

22   bring the microphone closer?

23        THE COURT:  Yes.

24   Q.  And what is Drug Information Services?

25   A.  My department is involved in providing information about

Page 43

1  pharmaceuticals to our health care providers, our

2  organization.  We evaluate evidence in the literature about

3  pharmaceuticals, we monitor new drugs, we monitor medication

4  safety issues, drug recalls and shortages and help with

5  evaluation of drugs for formulary consideration.

6       We also have a telephone consultation service

7  whereby any of our health care providers, physicians or

8  nurses, can call in with a question, if they have a question

9  regarding pharmaceuticals, they call in, we research the

10  question for them and provide either a verbal or written or

11  both type of response.

12  Q.  How long have you been working at Kaiser's Drug

13  Information Services?

14  A.  I started there in August of 1988.

15  Q.  And are Drug Information Services at Kaiser located in

16  Downey, California?

17  A.  Correct.

18  Q.  And how many employees does Kaiser have in its Drug

19  Information Service?

20  A.  Right now I think we have 38 total in the department.

21  Q.  And does the Drug Information Service in Downey provide

22  information, monographs and other services for all of the

23  Kaiser regions?

24  A.  Yes, all the materials and all the information that we

25  prepare we provide to all of our Kaiser Permanente regions

Page 44

1    across the United States.  We have mechanisms for doing

2    that.  We have also numerous inter-regional committees that

3    meet over teleconference with the other regions.

4              THE COURT:  You know, I have the concern, too, do

5    you see how you can hear yourself being picked up?  You're

6    soft spoken, so you can pull it in, adjust it, make sure we

7    all hear you.

8              THE WITNESS:  Okay.  Is that coming in better?

9              THE COURT:  See how I'm directly into it.

10             THE WITNESS:  Okay. I've never being accused of

11   soft spoken.  Thank you.

12             THE COURT:  Maybe as it heats up, we'll hear the

13   volume but for right now just make sure.

14             THE WITNESS:  Okay.

15   Q.  Can you tell us what a monograph is?

16   A.  Yes.  A drug monograph is a document that we prepare at

17   Drug Information Service, and it provides a summary of

18   information about a drug, a pharmaceutical, and it's

19   formatted that's easy for people to read and consume the

20   information.  It's divided into various sections and that's

21   basically what a drug monograph is.

22   Q.  Now, when a new drug is coming to market, does Kaiser do

23   a monograph of that drug?

24   A.  Yes.  When new drugs are approved by the FDA, we review

25   the evidence on that drug and we prepare a drug monograph.

1   Q.  And do you worry about the cost of the drug or do you do

2   a monograph when new drugs are approved by the FDA

3   regardless of cost?

4   A.  No, we evaluate new drugs approved by the FDA regardless

5   of the cost or anything else.

6   Q.  Once you actually have the monograph, that then is sent

7   to all of the regions?

8   A.  Yes.  We have, as I mentioned, we have some

9   inter-regional committees.  There's one called the

10  inter-regional formulary subcommittee, which I chair, and we

11  meet monthly over teleconference, and we share all the

12  monographs, and we discuss the evidence and we do, you know,

13  strategic planning and such, so those are shared with all

14  the other regions.

15  Q.  Do you also have an intranet or an internal intranet

16  site where people from all regions can have access to the

17  information that Drug Information Services has done?

18  A.  Yes, my department manages the national pharmacy

19  intranet site for Kaiser Permanente, and it is an intranet

20  site where we basically post just about everything that we

21  create in Drug Information Services, whether it's a drug

22  monograph or an alert or a medication safety issue, so we

23  post all the information there, and all of the -- actually

24  all Kaiser employees across the program, across the U.S. can

25  access any of the information on that site.

1   Q.  Now, once the initial monograph is done, does Drug

2   Information Services on occasion do additional monographs

3   with respect to a particular drug?

4   A.  Yes, the initial monograph would be upon FDA approval of

5   the drug.  We may do another monograph or evidence review

6   if, for example, a drug is on the formulary but with

7   restrictions and there is a request to re-evaluate that drug

8   for, you know, for a change in the restriction status.

9   Q.  And, again, would this second or third or fourth

10  monograph also be available to people in all of the Kaiser

11  regions?

12  A.  Yes, same mechanism.

13  Q.  Now, is there a particular protocol that people in your

14  department follow when they're doing a drug monograph?

15  A.  Well, yes, there's certain things that are done in

16  preparation for writing the drug monograph, so the goal

17  really is to find the best available evidence that we can

18  regarding the efficacy and safety of that product, so the

19  first thing that's done is a search of the published

20  literature using PubMed or Medline.

21          We have a librarian who has a standard way of

22  searching for articles and publications, so there's a search

23  done.  Appropriate articles are retrieved.  We also, there's

24  a thing called the AMCP drug formulary Dossia, which is a

25  document that's sometimes put together by pharmaceutical

1    companies.  We always request it if they have it that they

2    would send it to us with data.

3          So, let's see, the Medline, we also outreach to

4    the pharmaceutical company.  A lot of times they come and

5    visit the author, the person who's writing that monograph,

6    they'll visit them and bring any information they have

7    internally at the company that may not be published yet or

8    they may have access to, or sometimes we would call them and

9    request that they send us whatever information they have

10   internally to help us in looking at all the available

11   information.

12   Q.  And so when you reach out to the drug manufacturer as

13   part of the research that you were doing in creating a

14   monograph, what is your expectation?

15   A.  Well, our expectation is that they will provide our Drug

16   Information Service with a summary or the actual data of any

17   information that they have on the question at hand, the use

18   of that particular drug for a particular indication.

19   Q.  And is it your expectation that they are going to be

20   complete and honest and give you all of the information that

21   they have available to them?

22         MR. KENNEDY:  I object.  Vague and indefinite as

23   to what all information is, your Honor.

24         THE COURT:  Why don't you rephrase that.

25   Q.  When a contact is made to the manufacturer as part of

1    the process of creating a monograph, is it your expectation

2    that the information that you receive from the manufacturer

3    is going to be accurate and reliable?

4    A.   Absolutely.   We're reaching out to the pharmaceutical

5    company for, you know, scientific evidence that they may

6    have and we expect to receive it and that it should be

7    honest and truthful.

8    Q.   And you don't try to trick them, in other words, you

9    tell them we're doing a monograph, we're researching this

10   drug and we need everything that you have; is that right?

11   A.   That's correct.

12   Q.   And in your experience working at Drug Information

13   Service, have there been times that drug manufacturers

14   provide you with information about a drug that's not yet

15   published or not yet complete, or do they tell you we're in

16   the midst now --

17           THE COURT:   Can we jump to this drug?

18           MS. NUSSBAUM:   We're getting there in one minute,

19   your Honor.

20   A.   Yes.

21   Q.   Do you sit on any P & T committee?

22   A.   Yes.   I attend the regional P & T or Pharmacy and

23   Therapeutic Committee meetings for Northern California and

24   Southern California.

25   Q.   And can you describe what your role is at the P & T

1   committee meetings?

2   A.  Okay.  As manager of Drug Information Services, there's

3   a lot of things that we're responsible with regards to P & T

4   committee meetings.  One, we have a pre-P & T committee with

5   the chair of that committee who's a physician, and so I help

6   put that agenda together.  We meet to basically plan the

7   agenda for the regional P & T meeting and to assure that we

8   have all the appropriate speakers in line and the materials

9   and all of that.

10       I'm also responsible at the P & T meeting -- well,

11  my department is responsible for getting out all the

12  materials before the meeting so that all the attendees have

13  all the documents they need plus the agenda ahead of time so

14  they have time to read it, and then at the meeting, I'm

15  responsible ultimately for the minutes of that meeting, so

16  I'm taking notes, and then I'm the final editor of the

17  minutes that then go to the chair for his signature.

18       Sometimes I participate verbally in discussions

19  during those meetings as well.

20  Q.  Let me show you what's been marked and what we're moving

21  into evidence, Exhibit 322, which is a drug monograph with

22  the date September, 1997.  Can you identify that document?

23  A.  Yes.  It's a drug monograph from September, 1997 on

24  Gabapentin, Neurontin.

25  Q.  With respect to Neurontin?

1  A.  Yes, it is.

2  Q.  And at that time what was the point of the September,

3  1997 drug monograph?

4  A.  Okay.  The point of this particular monograph, at this

5  time in September, '97, Neurontin -- this is for Southern

6  California.  Neurontin was on the formulary with

7  restriction.  When it first was approved by the FDA, back in

8  '93, we had reviewed it and added it to the formulary with

9  restrictions to neurology because at the time that was its

10  only approved indication, the treatment of epilepsy in

11  adults.

12          So, at this time in September, 1997, we had a

13  formal request by chiefs of anesthesiology, and they wanted

14  to have us re-review the status such that they wanted us to

15  relax the restriction on Neurontin so that they could also

16  prescribe, be part of the restriction and specifically for a

17  type of pain called RSD.

18          That was the niche pain area that they wanted to

19  prescribe this drug in.  So this monograph is our assessment

20  and analysis of all the available literature we could find

21  on the treatment of RSD with Neurontin.

22  Q.  Now, looking at Exhibit 322 under efficacy, the first

23  bullet, it says, "Randomized clinical trials of Gabapentin

24  for the treatment of RSD could not be found in the

25  literature."  Can you tell the jury what that's referring

1   to?

2   A.   That means that we did a search using PubMed or Medline

3   and there were no randomized clinical trials that were found

4   at all.

5           THE COURT:   RSD again is what?

6           THE WITNESS:   It's a type of pain, it's called

7   reflex sympathetic dystrophy.

8           THE COURT:   So, what kind of pain is it,

9   neurological, nociceptive?   We're all learning these

10  terms.

11          THE WITNESS:   Right.   I think it's been classified

12  as nociceptive in some places and neuropathic in another.

13  I'm not a pain specialist, I'm not sure I could tell you

14  exactly what type it is, you know, in terms of that

15  categorization.

16          THE COURT:   Where is it?   Where is it?   Can it be

17  anyplace in the body?

18          THE WITNESS:   I believe so.

19          THE COURT:   You don't know anything about it?

20          THE WITNESS:   Not really.   It's called complex

21  pain syndrome also.   I really don't know.   The

22  anesthesiologists were the ones who were specifically

23  interested in treating that.

24  Q.   Under efficacy it then says, "Two letters to the editor

25  reported the efficacy of Gabapentin in relieving symptoms in

1   a total of 14 refractory RSD patients."  Do you see that?

2   A.   I do.

3   Q.   Do you know what that's referring to?

4   A.   Yes.  In this monograph, if you look at the reference

5   section, in the reference section in our search for

6   information, we found two citations, No. 6 and No. 7, and

7   these are reports, the two reports, they're letters to the

8   editor, so they're just reporting on their experience with a

9   couple of patients, this is what happened.  It's not a

10  randomized trial or anything formal, it's just a report to

11  the editor, so those are the two that we were referring to

12  there.

13  Q.   And can you tell me who the authors of those were?

14  A.   That's Dr. Gary Mellick and the other Dr. Mellick, I

15  don't know his first name, the two of them together both

16  letters to the editor.

17  Q.   Now, does the monograph also state that the chiefs of

18  anesthesia, who were the pain specialists, recommend to

19  expand the restriction for Gabapentin to anesthesiology?

20  A.   They did, they recommended that.

21  Q.   Now, were you at a P & T meeting where this monograph

22  was then discussed and where the P & T committee voted to

23  expand the restriction so that Neurontin then could be used

24  for RSD and pain physicians including and anesthesiologists

25  could prescribe it?

1    A.  Yes, I was.

2    Q.  Let me show you what's been marked as Exhibit 290.

3            MS. NUSSBAUM:  We'd offer that into evidence.

4            ( Exhibit 290 was received in evidence.)

5    Q.  And please tell me whether or not that is the meeting

6    you attended.

7    A.  Yes, these are the minutes of that meeting.

8    Q.  And at the meeting, the P & T committee voted to expand

9    the restrictions so that pain clinic physicians and

10   anesthesiologists could prescribe the drug; is that

11   correct?

12   A.  Yes, that's correct.

13   Q.  And you were present at the discussion at that meeting;

14   is that right?

15   A.  Yes, I was.

16   Q.  Now, at that meeting, did Kaiser know that the FDA was

17   looking at the unlawful promotion of Neurontin in areas

18   including pain?

19   A.  No, in 1997, we were not aware of that at all.

20   Q.  At that meeting, did Kaiser know that the FDA had

21   initiated an inquiry into the financial relationships

22   between Gary Mellick, the author or co-author of both of

23   those case reports with respect to being paid for working

24   for the defendants here on Neurontin?

25           MR. KENNEDY:  I object.  Assuming facts not in

2b11d2bb-817d-42b4-9053-ae565ae05494

1    evidence.

2             THE COURT:  Overruled.

3    A.  No, we did not know that, and I now know that because

4    I've seen documents to that effect.

5    Q.  And had you personally known at the time that the FDA

6    was investigating --

7             THE COURT:  Well, you know, unless you put in

8    these documents.

9             MS. NUSSBAUM:  We'll do it right now then, your

10   Honor.

11   Q.  Let me give you collectively all of which we're moving

12   into evidence except for 87, which is already in evidence,

13   Exhibit 87, Exhibit 23, Exhibit 27, Exhibit 25, and

14   Exhibit 24.

15            ( Exhibits 23, 24, 25 and 27 were received in

16   evidence.)

17   Q.  Now, turning your attention first to Exhibit 87 --

18            MR. KENNEDY:  Your Honor, I object unless that

19   there's some foundation established that this witness knows

20   anything about it.

21            MS. NUSSBAUM:  Exhibit 87 is already in

22   evidence.

23            THE COURT:  If it's in evidence, she can look at

24   it.

25   Q.  Looking at Exhibit 87, which is a letter from the

1    Department of Health and Human Services, Public Health

2    Service to Parke-Davis regarding Neurontin, and in the first

3    paragraph, it says, "FDA is initiating an inquiry that will

4    focus on these concerns.  These promotions of Neurontin for

5    off-label uses include but are not limited to its use in

6    chronic pain, bipolar disorders and other psychiatric

7    conditions."

8            At the time in 1997 that the P & T committee was

9    considering lifting restrictions concerning Neurontin for

10   pain, were you aware of the government initiating this

11   investigation?

12   A.  No.  At this time we were not aware about any of this.

13   Q.  And the search that you did for your monograph, could

14   that search have located this?

15   A.  No, this is a memo directly from the FDA to the

16   regulatory affairs at Parke-Davis.

17   Q.  And did anybody at Parke-Davis tell Kaiser when they

18   were doing investigation of this drug that they were being

19   investigated for off-label promotion for the very indication

20   you were considering?

21   A.  No.

22   Q.  And turning in that same document, Exhibit 87, to

23   Specification 12, it's on the page that has the Bates stamp

24   057870, page 6 of the document?

25   A.  I actually don't have the document here, so I'm looking

1    at it on the screen.

2    Q.  It's page 6.

3    A.  I'm looking at it here.

4    Q.  And it asks for documents sufficient to identify the

5    following persons explaining their respective titles,

6    responsibilities and relationships to Parke-Davis in the

7    context of Neurontin.  One of those persons is Gary Mellick.

8    Do you see that?

9    A.  I do.

10   Q.  And at the time that you were considering, your P & T

11   committee, lifting restrictions and you were relying only on

12   two case reports, both of which had been authored by

13   Dr. Mellick --

14           MR. KENNEDY:  I object, leading.

15   Q.  -- did you know that Dr. Mellick was being investigated

16   in terms of his financial contacts with the defendants?

17           MR. KENNEDY:  I object.  Summarization of

18   testimony and leading.

19           THE COURT:  Overruled.

20   A.  No, we were not aware of any of this at the time that we

21   were -- at the time of this monograph.

22           THE COURT:  So you approved it based on those two

23   letters to the editor?

24           THE WITNESS:  Yes.  I can explain further if you

25   want.

1            THE COURT:  Yes, go ahead.

2            THE JUROR:  Exhibit 87, what's the date on that?

3     I couldn't see it.

4            MS. NUSSBAUM:  July 19, 1996.

5     Q.  Now, had you known at the time that you were preparing

6     your monograph in 1997, both about the government initiating

7     an investigation of off-label promotion for the very

8     indication that you were investigating and also their

9     investigation with respect to Dr. Mellick and his financial

10    ties to the defendants here, would that have been material

11    to you?

12    A.  It would have.  It kind of ties into the question you

13    just asked, so, first of all, for this particular

14    indication, all we really had were these two letters to the

15    editor.  That's kind of very tenuous information.  It's not

16    a high level type of studies or anything like that.  So had

17    we -- obviously, had we known that these folks were

18    consultants and paid for by the company, we probably would

19    have totally disregarded these studies.

20    Q.  And as somebody who was attending the P & T committee

21    meetings, is it your view that that would be material

22    information to the other members of the committee?

23            MR. KENNEDY:  I object.  Speculation.

24            THE COURT:  Sustained, sustained.

25    Q.  Now, I ask you to look at Exhibit 23 that we're offering

1    into evidence.  That says, "Please prepare a consultants'

2    agreement for $1,250 a month times 4 months starting

3    September 1, 1995 for Dr. Gary Mellick."  Were you aware of

4    that?

5    A.  I'm seeing it, yes.

6    Q.  Were you aware of that information in 1997?

7    A.  No, not in 1997, only through the discovery process in

8    this trial, we've come to see that Dr. Gary Mellick was

9    receiving money from Parke-Davis as a consultant.

10   Q.  And, again, looking at Exhibit 27, which we're offering

11   into evidence, it's a letter containing a check for $750 for

12   Dr. Mellick.  Were you aware of that?

13   A.  Not at that time, no.

14   Q.  Looking at the next Exhibit, Exhibit 25, it's a letter

15   to Dr. Mellick from Parke-Davis dated August of 1995, and it

16   says in pertinent part, "Over the past few months I have

17   appreciated receiving the information you have sent on

18   Neurontin and its potential role outside of epilepsy."  Were

19   you aware of that in 1997, when you relied on the case

20   reports that were co-authored by Dr. Mellick?

21   A.  No, we didn't know anything about that.

22   Q.  Looking at Exhibit 24, that's a multi-page consulting

23   agreement between Dr. Mellick and Parke-Davis dated

24   August of 1995.  We offer it into evidence.  Were you aware

25   of that consulting agreement concerning Neurontin?

1    A.  Not at all.

2    Q.  And would all of that information been material to you

3    and your department in analyzing whether or not the

4    restriction should be limited -- to be lifted on Neurontin

5    for pain?

6    A.  Yeah, as I mentioned, absolutely, because, first of all,

7    there wasn't a lot of great evidence, and what there was was

8    being -- were these letters to the editor submitted by

9    someone who's basically a paid consultant of Parke-Davis, so

10   that would not be something that we would accept as, you

11   know, good evidence.

12            THE COURT:  Yes, go ahead.

13            THE JUROR:  Some clarification, as it relates to

14   these two letters from Dr. Mellick, were those like a

15   clinical assessment of one patient, or was this -- I think I

16   just referred to it as a case study.  I just don't

17   understand what the scope of these letters were based on.

18            THE WITNESS:  They were case reports of about I

19   think a total of nine patients between the two letters, some

20   of them were the same patients, they overlapped in one

21   letter versus the other, so it would be a letter that says,

22   hey, I, you know, I treated five patients who had this

23   problem with this drug and here's what I observed, they all

24   did better.  So they're just picking out several cases of

25   the many that you may have treated and just reporting on

1   those.  That's the extent of what that is.

2   Q.  Now, the jury has previously heard Dr. David Kessler and

3   he's described Level I, II and III evidence.  So the case

4   reports from Dr. Mellick, what level evidence would that

5   be?

6   A.  III.

7   Q.  And I note in the monograph that you said that you

8   looked for Level I evidence, randomized clinical trials but

9   you could not find any; is that right?

10  A.  That's correct.

11  Q.  And so would it have been particularly important to you

12  when the only available evidence was Level III evidence to

13  know about the investigation as to both off-label promotion

14  and also about the financial relationship of Dr. Mellick to

15  the defendants?

16  A.  It would have been, and that's why financial disclosures

17  are very important when someone's writing a report or a

18  paper that they financially disclose, if they're related in

19  any way, shape or form to that pharmaceutical company or any

20  person who has an interest in the outcome.

21          THE COURT:  Did you actually call anyone over at

22  Parke-Davis about this?

23          THE WITNESS:  At the time, we had -- this was just

24  two letters in. --

25          THE COURT:  No, you didn't?

1          THE WITNESS:  No.

2          THE COURT:  So you were relying on these two

3    letters to the editor to prove an off-label use basically?

4          THE WITNESS:  Yes, at the request of our

5    anesthesiologist who wanted to be able to use it for that

6    niche population, yes.

7    Q.  Now, in 1999, did the Drug Information Services do

8    additional drug monographs on Neurontin?

9    A.  Yes, in 1999 there were two separate reviews that were

10   done.

11   Q.  Did one of those reviews have to do with mood

12   disorders?

13   A.  Yes, I believe it was in June of 1999.

14   Q.  Let me show you what's been marked as Exhibit 311, which

15   we're offering into evidence, and that is a drug monograph

16   dated June, 1999.

17   A.  Yes, I have it.

18   Q.  You have it.  Now, at that time were the chiefs of

19   psychiatry requesting to expand Gabapentin for the treatment

20   of mood disorders which would include bipolar?

21   A.  That's right, they were asking for the restrictions to

22   be relaxed so that they would be added to the group of

23   providers.

24   Q.  And in 1999, Kaiser was still not aware that the

25   Government was looking at the unlawful promotion of

1  Neurontin for psychiatric conditions including bipolar, was

2  it?

3  A.  No.  They were not aware.

4  Q.  You had no way of knowing that, did you?

5  A.  No.

6  Q.  Now, going down the first page and looking at potential

7  disadvantages, it says, "The use of Gabapentin as an

8  injunctive or first line anti-epileptic drug for the

9  treatment of bipolar disorder would result in a potentially

10  significant cost impact."  Can you explain in plain English

11  what that means?

12  A.  Well, part of what we look at when we're evaluating

13  pharmaceuticals in our drug monograph, we look obviously at

14  safety, we look at efficacy, we also look at cost impact,

15  and so in this sentence or bullet here what we're saying is

16  that when we evaluated the potential cost impact of it being

17  used for bipolar in our patient population, it was pretty

18  large.

19  Q.  And turning in fact to the next page of the monograph,

20  it has a chart in the middle of the page, it says, "Drug,

21  dose and cost per year," it indicates that Neurontin would

22  be between $1100 and $1900 a year per patient as opposed to

23  Lithium, which would only be $22 to $44 a year; is that

24  right?

25  A.  That's correct, cost per year per patient.

1    Q.  But the P & T committee voted to approve this request

2    and voted to open the formulary for this prescribing?

3    A.  That's correct.

4    Q.  So despite the huge cost impact, that didn't make a

5    difference, did it?

6    A.  No.

7    Q.  And why is that?

8    A.  Well, because at the time of this review, based on the

9    evidence we were able to find and put together here and the

10   request of the psychiatrist, the P & T committee agreed with

11   our recommendation and the chiefs of psychiatry

12   recommendation to expand, to relax the prescribing

13   guidelines and include them in it.

14   Q.  Now, at the time that the monograph on new disorders and

15   bipolar was being prepared, was there a conversation with

16   the defendants here, with the manufacturer?

17   A.  Yes.  If you go to the reference --

18              MR. KENNEDY:  I object.  Lack of foundation.

19   Hearsay.

20              THE COURT:  Did you have the conversation?

21              THE WITNESS:  I personally, no.

22              MS. NUSSBAUM:  Your Honor, I would turn to the

23   document.  It says --

24              THE COURT:  All right.  We can turn to the

25   document.

Page 64

1    Q.  It says, "As the manufacturer does not intend to seek

2    FDA approval for the use of Gabapentin in the treatment of

3    bipolar affective disorder --

4              THE COURT:  Could you wait until we get there so

5    we can read along.

6              MS. NUSSBAUM:  Sorry.

7    Q.  It's on the first page on the bottom.

8    A.  First page, last bullet.

9    Q.  First page of the monograph on the bottom of the page.

10   "As the manufacturer does not intend to seek FDA approval

11   for the use of Gabapentin in the treatment of bipolar

12   affective disorder, it would seem unlikely that large

13   randomized clinical drug trials to study the efficacy and

14   safety of Gabapentin for this indication would be

15   forthcoming."  Do you see that?

16   A.  I do.

17   Q.  And then if you go to the page of references, which is

18   the last physical page, and you go to R-3, it says,

19   "Personal communication, W. Martin, Pharm.D., Parke-Davis,

20   February, 1999."  Do you see that?

21   A.  That's correct.

22   Q.  And what does that indicate?

23   A.  It's providing a reference to the comment, to a comment

24   in the monograph saying that it was received, that's the

25   reference to the comment based on a communication with

Page 65

1   Dr. Martin at Parke-Davis.

2   Q.  Now, when the communication was made, did Parke-Davis

3   tell Kaiser about the Pande study?

4           MR. KENNEDY:  Objection.  Lack of foundation if

5   she was a party.  Hearsay.

6           THE COURT:  You need to lay a foundation.

7   Q.  The conversation that was had between Parke-Davis and

8   Kaiser --

9           THE COURT:  Let's just get down to names.  Who was

10  it at Kaiser who talked to Parke-Davis?

11          THE WITNESS:  This would have been Dr. Debbie

12  Kubota.

13  Q.  Does Dr. Debbie Kubota work for you?

14  A.  Yes.

15  Q.  And did she do the first graph of this monograph and

16  then did you review this graph before it was given to the

17  P & T committee?

18  A.  Yes.

19  Q.  And so you supervised the monograph and you were

20  somebody that did the final on this monograph before it went

21  to the P & T committee and relied on; is that correct?

22  A.  That's correct.

23  Q.  So you were aware of the content of the conversation

24  between Dr. Kubota and Parke-Davis which is reflected on the

25  last page of the monograph as reference 3; is that

1    correct?

2            MR. KENNEDY:  I object.  Lack of foundation.  It's

3    hearsay.

4            THE COURT:  Sustained so far.  There may be

5    certain things that are permissible from her state of mind,

6    but it's hearsay for the truth of the matter.

7    Q.  Let's just right now, if Parke-Davis had informed Kaiser

8    of a randomized controlled study that had been negative,

9    would that be reflected in this drug monograph?

10           MR. KENNEDY:  Objection.  Speculation.

11           THE COURT:  Overruled, overruled.

12   A.  Yes.  Well, in reaching out to Parke-Davis, we are

13   asking for information that they may have in their files in

14   any unpublished data, any information that they would share

15   with us regarding the use of this product for the indication

16   that we're asking them about.

17   Q.  And certainly it would have been relevant to Kaiser if

18   they had known that there was a negative randomized

19   controlled study; is that right?

20   A.  Yes, because that is the Level I evidence that we would

21   be seeking mostly, yes.

22   Q.  And as part of the protocol that people in Drug

23   Information Services follow when they have conversations

24   with the drug manufacturer concerning investigation of the

25   drug for a monograph, are those conversation recorded and

1    then put into the document?

2    A.  Generally, obviously, for some of these we get a written

3    response from the company, so we would have a written

4    document, and any information that we're getting from them

5    would be -- that we're including in the drug monograph we

6    would reference under references, so everything in the

7    monograph is referenced to some source so we know where

8    that's coming from.

9    Q.  So, if Pfizer had told you about an RCT, that would have

10   been referenced in the monograph; is that right?

11   A.  Of course, yes.

12   Q.  Now, let me show you what's been marked as Exhibit 301,

13   which I'm offering into evidence.

14           MR. KENNEDY:  Can we have a second, your Honor?

15   No objection, your Honor.

16           ( Exhibit 301 was received in evidence.)

17   Q.  And Exhibit 301 is a letter from Wanda Martin at

18   Parke-Davis to Debbie Kubota, the date reflecting the same

19   date that Ms. Kubota has in the monograph and in R-3 in the

20   monograph.  Do you see that?

21   A.  Yes, that's correct.

22   Q.  So this is the letter that Parke-Davis sent to Kaiser in

23   response to Kaiser's question about all information

24   concerning Neurontin and its use in mood disorders; is that

25   right?

1    A.   That's correct.  It's from Parke-Davis to Dr. Kubota,

2    and it says, "This is in response to your request for

3    information regarding Neurontin and treatment of bipolar

4    depression and mood disorder."

5    Q.   Now, I would ask you to look at the document for a

6    moment.  Please look at Exhibit 301 and tell me whether that

7    document which you received from Parke-Davis which states

8    that it's in response to Kaiser's request for information

9    regarding Neurontin in treatment of bipolar depression and

10   mood disorder, does Parke-Davis' document reveal the Pande

11   study?

12   A.   No, it does not.  It omits any mention of the Pande

13   study.

14   Q.   Does it reference any DBRCT?

15   A.   No, it's a summary really of most of the studies that

16   are summarized in this letter are case reports again,

17   nonblinded studies, certainly no DBRCTs.  There's quite a

18   few of them, as you can see.

19   Q.   So when Kaiser reached out to Pfizer and told them that

20   they were doing a monograph on bipolar and mood disorders

21   and they wanted all available information that Pfizer had

22   with respect to that, Pfizer did not disclose to Kaiser the

23   Pande study; isn't that right?

24            MR. KENNEDY:   I object.  Assuming facts not in

25   evidence.

1          THE COURT:  Overruled.

2    A.  Yes, this letter is in response to that exact question,

3    and it has no mention of the Pande study and verbally that

4    we received nothing as well, or it would have been

5    referenced to that conversation.

6          THE COURT:  And, again, it's been a week.  What

7    did the Pande study disclose, do you know?

8          THE WITNESS:  Well, the Pande study basically was

9    a negative study looking at the use of Neurontin in bipolar

10   patients, and this letter is in February of 1999 and I have

11   seen the document.

12         THE COURT:  And the Pande study was what year?

13         THE WITNESS:  Well, the summary of the study,

14   Dr. Pande, I've seen the letters that Dr. Pande wrote out to

15   the investigators on that study giving them the results of

16   that study, and that was back in some month in '98, so I

17   think it was July of '98.

18   Q.  So it's fair to say that the negative Pande study was

19   not disclosed to you by Pfizer, and, therefore, you could

20   not have considered that in June of 1999 when you were

21   making your recommendation to the P & T committee about the

22   use of Neurontin for mood disorders including bipolar?

23   A.  That's right.  We had no information about the Pande

24   study at all.

25   Q.  Now, did the P & T committee in fact vote to expand

1   restrictions to include psychiatrists and to allow Neurontin

2   to be prescribed for mood disorders and bipolar?

3   A.  For psychiatry, yes, we did relax the prescribing

4   restrictions to include psychiatry.

5            THE COURT:  This is which P & T committee?

6            THE WITNESS:  This is the Southern California

7   regional P & T committee.

8   Q.  And at that time Drug Information Services, you, made a

9   recommendation to do that; is that right?

10  A.  That's correct.

11  Q.  Now, in June of 1999, if you had known that the FDA was

12  investigating the defendants here for off-label promotion of

13  this drug for bipolar, for mood disorders, would that have

14  been material to your recommendation?

15  A.  Absolutely, I think it would be material to everyone

16  involved in the decision-making.

17            MR. KENNEDY:  I object.  Move to strike.  Beyond

18  her own reaction.

19            THE COURT:  Yes, I'll leave it up to her opinion.

20  I'd leave it up to her opinion, not what everybody else's

21  opinion was.

22  Q.  Would it have been material in putting together the

23  monograph that there was a negative study, the Pande study,

24  the conclusion of which was already known at the time?

25  A.  Yes.

1   Q.  And is it fair to say that if you had known about the

2   negative Pande study and you had known about the

3   investigation for the off-label promotion of Neurontin for

4   this very indication --

5             THE COURT:  This is leading.

6   Q.  Doctor, at the time that you made your recommendation to

7   the P & T committee, had you known about the Pande study and

8   had you known about the investigation of off-label promotion

9   to psychiatrists for mood disorders, would that have changed

10  your recommendation?

11  A.  It would have changed the Drug Information Service's

12  recommendation.

13  Q.  And what would the change have been?

14  A.  Well, that the best study, the randomized double-blind

15  controlled study was negative showing that Neurontin did not

16  work for bipolar, so that would have more weight than case

17  reports or letters to the editor and that type of evidence

18  that was included here.

19  Q.  So you would not have recommended the action?

20  A.  Right.

21  Q.  Now, again in 1999, in September of 1999, did Drug

22  Information Services do a second monograph concerning

23  Neurontin at that time at the request of primary care

24  physicians and others for the treatment of postherpetic and

25  diabetic neuralgias in consultation with neurology and

Page 72

1   others?

2   A.  Yes, in September of 1999.

3   Q.  And can you describe to us what is diabetic neuralgia?

4   A.  Diabetic patients have damage to their nerves

5   peripherally, usually in the feet, legs, and they get

6   symptoms, numbness and tingling and sometimes difficulty in

7   walking, that kind of thing.

8   Q.  I'd like to show you Exhibits 327 and 291 and move them

9   both into evidence.  327 is a monograph dated September,

10  1999, and 291 are minutes from a P & T committee meeting

11  dated September 14th, 1999.

12          MR. KENNEDY:  No objection, your Honor.

13          ( Exhibits 291 and 327 were received in

14  evidence.)

15  Q.  Now, looking at the first document, Exhibit 327, at the

16  monograph.

17  A.  Okay.

18  Q.  And looking at the first page of that.

19  A.  Okay, I'm there.

20  Q.  The fourth bullet down?

21  A.  Correct.

22  Q.  At the time that you were considering adding Neurontin

23  for this additional use, the diabetic neuropathy, did you

24  already have on the formulary other drugs?

25  A.  Yes.

1   Q.  And what were those other drugs that you had on the

2   formulary for that indication?

3   A.  That could be used to treat neuropathies, we had

4   numerous tricyclic antidepressants called TCAs; we had

5   numerous narcotic analgesic agents; we had numerous other

6   anti-epiletic agents including Carbamazepine, Phenytoin,

7   Valproic Acid, Lamotrigine; we had the topical capsalcin

8   cream; we had lidocaine cream and a lidocaine patch called

9   Lidoderm all on the formulary.

10  Q.  And looking at the very bottom of the first page,

11  there's a recognition in your drug monograph that the use of

12  Gabapentin for diabetic neuropathy would result in a

13  potentially very significant cost impact; is that right?

14  A.  That's correct.  That's part of the analysis done for a

15  direct monograph.

16  Q.  And turning to the third physical page, the top, you

17  have a chart, and it says, "Gabapentin," and there are two

18  different doses there, and the larger dose, it would be

19  2300 to 3450 a year.  That's up to $3,450 a year per

20  patient.  Do you see that?

21  A.  I do.

22  Q.  And underneath that, you have other drugs listed, two

23  TCAs, I believe.  One of them would be four to seven

24  dollars, another $30 to $165.  Do you see that?

25  A.  Yes.  It's not two TCAs, it's one TCA, Amitriptyline and

Page 74

1    Carbamazepine is a different class, it's not a TCA, but,

2    yes, they're both listed and those are the correct costs

3    there, yes.

4    Q.  And it would be fair to say that the other drugs that

5    were already on your formulary for this indication were

6    much, much cheaper, a fraction of the cost; is that right?

7    A.  Yes.

8    Q.  And despite that the P & T committee voted to approve

9    lifting the restrictions and including Neurontin for

10   diabetic neuropathies; is that right?

11   A.  Lifting the restrictions, yes.

12   Q.  So the fact that the cost was many, many times more in

13   comparison of $30 a year per person versus over $3,000 a

14   year per person, that didn't stop Kaiser from lifting the

15   restrictions?

16           MR. KENNEDY:  Leading, your Honor.

17           THE COURT:  It's leading.  You need to rephrase.

18   A.  All the data here was presented --

19           THE COURT:  Would you ask another question since

20   she's not allowed to lead you, so she needs to ask an

21   open-ended question.

22   Q.  What was the cost consideration and then what was the

23   effect of that?

24   A.  Well, the cost consideration you summarized previously,

25   and in the estimated cost impact section of the monograph,

1    we talk about –– I'll just read it –– "So that Gabapentin

2    use in the California division, meaning all of California,

3    North and South, could increase by 2.7 million by the end of

4    this year for a total of approximately 8 million."  That's

5    what would happen without the removal of the restrictions.

6    Then it says, "The removal of prescribing restrictions could

7    add significantly to the estimated increase in cost," so

8    we're predicting that by removing the restrictions,

9    obviously our utilization is going to go up, and obviously

10   the cost is going to go up significantly.

11   Q.  And did that stop the P & T committee from removing the

12   restrictions?

13   A.  No, it did not.

14   Q.  Were you at that meeting?

15   A.  I was.

16   Q.  And why didn't that stop them?  Why didn't they say this

17   drug is way too expensive?

18           MR. KENNEDY:  Objection, hearsay.

19           THE COURT:  Were you at the meeting?

20           THE WITNESS:  I was.

21           THE COURT:  Overruled.

22   A.  Okay.  Well, because cost is one of the elements that's

23   evaluated by the P & T committee.  We have obviously the

24   evidence review, the evidence that we believe is true and

25   accurate and current that's presented here, and then we have

1    a specific request from the chiefs of the internal medicine

2    and family practice chiefs, both are requesting that they be

3    included or that the restrictions be lifted basically so

4    those things are all weighed and then the decision is made

5    depending on the weight of all that.

6    Q.  Now, this particular monograph, the monograph dated

7    September, 1999, if you go to the second page, the first

8    bullet says, "As the manufacturer does not intend to seek

9    FDA approval for the use of Gabapentin in the treatment of

10   pain or neuropathies, it would seem unlikely that further

11   large randomized clinical drug trials to study the efficacy

12   and safety of Gabapentin for this indication would be

13   forthcoming."

14   A.  That's correct.

15   Q.  Okay.  If you turn to the last physical page under the

16   references, R-2 indicates, "Personal communication,

17   Monica Patel, Pharm.D., information specialist, Parke-Davis,

18   May 1999."  Do you see that?

19   A.  Yes, I do.

20   Q.  And so what does that mean?

21   A.  Well, this is a reference again, it's the same type of

22   outreach from the person writing the monograph,

23   Debbie Kubota, to the pharmaceutical company requesting

24   information from them on this particular use of Neurontin,

25   and that's referenced in two sections in the monograph.

1   Q.  So at the time that Kaiser in studying whether or not

2   restrictions should be lifted for diabetic neuropathy

3   contacted Pfizer for whatever information they had, were

4   they told about the Reckless trial?

5   A.  No, there was no mention.

6   Q.  Were they given any additional information about the

7   Gorson study?

8   A.  No.

9        MR. KENNEDY:  Hearsay.

10  A.  No, we got no additional information.

11  Q.  Now, looking at your references S-6, you say Backonja.

12  What can you tell me about the Backonja study?

13  A.  Well, at the time of this monograph, September, 1999,

14  when we did our usual seeking out all the available

15  information, then we pulled one randomized controlled

16  clinical trial that was published in a major journal, JAMA,

17  and that was the Backonja trial, and so obviously we

18  included that trial in our evidence review.

19        It would have been a Level I evidence, and we talk

20  about it in the monograph.  We mention it, and then the

21  other -- the only other double-blind randomized controlled

22  trial information that we found is the one that's

23  referenced, S-7, the Gorson trial.  The problem was that

24  this one for some reason --

25        THE COURT:  It's been a while, so just a quick

1    summary of what each said.

2            THE WITNESS:  Okay.

3    A.  So the Backonja trial, which is the S-6, looked at

4    Gabapentin for neuropathy and diabetes.  It was a randomized

5    controlled trial, JAMA, and it found positive effect.  Now,

6    in our monograph, you'll note, let's see if I can find it,

7    when we talk about the Backonja trial, we mention that,

8    let's see, here we go, I will read it, "There was a

9    potential of bias from unintentional, unblinding resulting

10   from secondary dose titrations according to side effects.

11           So I'm sure that you have heard discussions of the

12   Backonja trial where they force titrated patients up to a

13   high dose, and by force titrating patients up to the higher

14   dose, then people developed side effects which in effect

15   unblind you because you figure out that you're on the

16   drug.

17           So we mention it there, but at the time we did not

18   have the benefit of, for example, Dr. Jewell's statistical

19   analysis.  He's performed a more sophisticated statistical

20   analysis that could have been done on the Backonja trial to

21   test and see if in fact there was unblinding, and he

22   showed --

23           THE COURT:  I just wanted a quick synopsis.

24           THE WITNESS:  Oh, I'm sorry.

25           THE COURT:  Gorson said?

Page 79

1    THE WITNESS:  Nothing in pharmacy is short, you're

2    probably tired of that, right?  We never have one sentence

3    for anything.

4    THE COURT:  We're just reorienting the jury to

5    make sure they remember what they said.

6    THE WITNESS:  Sure, sure, Gorson is the one

7    that -- so, Gorson is showing positive, a positive study,

8    but it was again in a letter to an editor.  That gets lower

9    consideration because it's not in a peer review journal, it

10   hasn't gone through the peer review process.

11   We didn't understand why a placebo controlled

12   double-blind crossover trial would end up in a letter to the

13   editor.  That was kind of funkie I guess would be a good way

14   to put it.

15   Q.  And so the Gorson study which I believe reported

16   negative findings, that study because there was a letter to

17   the editor wasn't given much consideration; is that right?

18   A.  Right.

19   Q.  Okay.  Now, had they told you at the time that the

20   Reckless study was being concluded and that that was the

21   large fixed dose parallel group DBRCT investigation, would

22   that have been important to you?

23   A.  Well, yes.  We didn't know about the Reckless trial at

24   this time, and they did not reveal to us that that trial

25   was -- what the design of that trial was or that it was

Page 80

1   nearing completion.  Because of the large number of patients

2   in that trial, the design of that trial, that did not

3   include force titration, we definitely would want to

4   consider that study in this evaluation of the use of

5   Neurontin.

6           THE COURT:  So when was that completed, the

7   Reckless study?

8           THE WITNESS:  The Reckless study I believe was

9   completed around I believe like September of '99.

10          THE COURT:  When was your drug monograph

11  completed?

12          THE WITNESS:  Before that.  So the Reckless trial

13  was almost complete, but it was not complete, so not the

14  results but just knowing that that trial was forthcoming.

15  Q.  Isn't that one of the reasons that you make a personal

16  communication in R-2, it indicates you made a personal

17  communication to Monica Patel, so if Ms. Patel had told

18  you --

19          THE COURT:  It's leading.

20  Q.  Did Kaiser make a personal communication to

21  Monica Patel?

22  A.  Yes, it's reference No. 2, so, again as our normal

23  procedure, we would have reached out --

24          MR. KENNEDY:  Objection.  Lack of foundation if

25  she made it, your Honor.

Page 81

1   Q.  You supervised this monograph; is that correct?

2   A.  Yes, and my employee, Debbie Kubota, referenced

3   Parke-Davis and referenced that communication in this

4   monograph.

5   Q.  And I think as you told us earlier, you have a regular

6   protocol for how you do monographs, and one of the reasons

7   that you reach out to the pharmaceutical company is --

8                MR. KENNEDY:  Leading.

9                THE COURT:  It's leading.

10  Q.  You have a regular protocol that you call pharmaceutical

11  companies as part of the monograph process; is that right?

12               THE COURT:  I'll allow it.  Do you have a

13  protocol?

14               THE WITNESS:  Yes, we talked about that earlier,

15  yes.

16  Q.  And what are the reasons that you reach out and call the

17  pharmaceutical company when you're doing a monograph?

18  A.  Well, because the pharmaceutical company may have

19  knowledge of clinical trials that are in progress, clinical

20  trials that are planned to be done, or they might even have

21  internal data that's already completed, a study that's

22  already been completed, they have internal data that has not

23  yet been published, and they are able to share that with

24  us.

25  Q.  Well, the evidence in this case, and the jury has now

2b11d2bb-817d-42b4-9053-ae565ae05494

1   heard that the same month that you were doing this monograph

2   in September of 1999, the Reckless study was being

3   concluded --

4           MR. KENNEDY:  Objection, your Honor.

5   Q.  -- would it have been your expectation that Parke-Davis

6   would have told you about the Reckless study?

7           THE COURT:  Break it down, baby steps, open

8   questions.

9   Q.  Do you now know that the Reckless study --

10          THE COURT:  Can we just take a break?

11          MS. NUSSBAUM:  Sure.

12          THE CLERK:  All rise for the jury.

13          ( JURORS EXITED THE COURTROOM.)

14          THE COURT:  I'm worrying you and I aren't

15   connecting here.  So obviously she's your witness.  I allow

16   a little bit more leading on redirect just to bring someone

17   to a point, but here you just have to ask open-ended

18   questions.  "So when you now know, don't you, that..." or

19   "Pfizer having told you that such and such, you wouldn't

20   have done this..." that's leading so you got to open it up,

21   let her talk.

22          You must be tired from a long week, but it just

23   keeps happening, so he, Mr. Kennedy, has a good point, he

24   tends to wait to the end of the question, but at some point

25   it's been like six in a row, so just sort of take a

1   breather, drink some coffee, just sort of open-end it

2   because she's your witness.  Now we can go off the record on

3   scheduling.

4            (Discussion was held off the record.)

5            THE COURT:  What I just said, one of the reasons I

6   had trouble ruling while I was just sitting there, this is

7   the second or third time it's come up, which is, there's a

8   document that's not been marked as a trial exhibit.  On the

9   other hand, it's been used to launch a line of inquiry which

10  sometimes might be independently admissible, but it's

11  predicated on a statement in the document.  I'm having

12  trouble ruling on that.

13           Typically you could ask a witness on the bench to

14  ask questions about it.  You can't then include the

15  statement in the document unless it's been offered, so I'm

16  having trouble with this, how to dissect the line of

17  questioning, and I didn't know, and you're both objecting

18  and there are brackets going all over the place, and some of

19  the questions might be quite admissible but not the actual

20  statement from the document, if you hear my problem.

21           MR. GREENE:  I do hear your problem, and I think

22  you need the document in front of you.

23           THE COURT:  A, I should have the document; and, B,

24  I don't know whether somebody else is putting in the

25  document.

1          MR. GREENE:  Can I?  Two things I'd like to point

2     out to you.  I think this is happening in Boris, in Knoop

3     and maybe Crook, which were all taken in the Franklin case

4     in 2002.  The document in question is a lot of them are

5     about advertising and promotion grids, which they are in

6     evidence, and they've been marked, so if you looked at the

7     document, you'd see, and it's just a page or two, you'd see

8     the content of the information is in an exhibit that's been

9     marked and has been introduced.

10          THE COURT:  Give me the documents.  I'm having

11    trouble because, on the other hand, it happens every day of

12    the week, somebody is shown a document, the document is not

13    actually admitted, but it launches a line of inquiry.  On

14    the other hand, you can't backfill and read the statements

15    in the document as if it were evidence.

16          When I was complaining before that I couldn't

17    quite do this on the fly, as you were asking, that's the

18    problem I'm having.  I don't know if there's a cure for it

19    or whether I just need to rule.

20          MR. GREENE:  I think there is, and to be fair to

21    you, we should get you the document.  They're not that

22    long.

23          THE COURT:  And the reason they're not being

24    marked as a trial exhibit, they come from some other case?

25          MR. RONA:  They're from this case --

1          THE COURT:  Somebody neglected --

2          MR. RONA:  -- if you can believe it.  It was a

3    volume issue, your Honor.  We have literally thousands of

4    documents.

5          THE COURT:  It's never been a problem with you

6    guys before.  If it was an oversight, I understand it,

7    you've just all been working so hard.  Volumes, somebody

8    handed me this this morning, I have to read it, see if it's

9    self-explanatory.

10          MR. GREENE:  We'll get you the document.

11          THE COURT:  See what I can do, that's my problem.

12    The other one I couldn't rule on just because there were so

13    many.

14          MR. GREENE:  Can I make this last point, some of

15    the questions, it's not that long, we've cut it down, is

16    really relevant.

17          THE COURT:  It definitely is relevant?

18          MR. GREENE:  The content of the document is the

19    document we're introducing, so I don't think there's any

20    prejudice here.  It's not that this document contains new

21    information that is not in another document.

22          THE COURT:  That's what I can't see, what I don't

23    know.  You need to help me on that.  Have a nice break.

24    We're assuming for the moment I'll see you again at the

25    break.  I'm assuming this is the rest of the day.  I don't

Page 86

1    know who else you have sitting out there.  I hope nobody.

2         MS. NUSSBAUM:  No.

3         (SIDEBAR CONFERENCE WAS CONCLUDED)

4         (A recess was taken at 11:05 a.m.)

5         (Resumed, 11:41 a.m.)

6         (Jury enters the courtroom.)

7    BY MS. NUSSBAUM:

8    Q.   All set?  Okay, we're still on Exhibit 327, and we're

9    going to just look at the last page, which is the list of

10   references.  Now, what have you learned during the course of

11   this trial in this case about the Backonja study?

12   A.   Well, I have been able to read a lot of the expert

13   testimony, and so, for example, I was able to read

14   Dr. Jewell's --

15        THE COURT:  Just keep that voice up, okay?

16        THE WITNESS:  Okay, sorry.

17   A.   I was able to read Dr. Jewell's report and analysis of the

18   Backonja trial, and, you know, his analysis basically has shed

19   light on the issue that was at hand here with the study design

20   as to whether or not there was unintentional or there was

21   intentional, or whatever, there was unblinding of the subjects,

22   and so that was not available to us at the time.

23   Q.   And what have you learned about the Gorson study?

24   A.   Well, the Gorson study, as I mentioned, at this time we

25   couldn't quite understand why a placebo-controlled double-blind

1   crossover trial would be published as a letter to the editor.

2   And what I've learned is, I was able to look at some documents,

3   and I actually saw the letter from Dr. Gorson to the company,

4   you know, showing his desire for taking the manuscript that had

5   the study results and submitting that to Neurology, which is a

6   pretty prestigious journal.  And that was quite a ways back,

7   and so, you know, it's unclear to me how it ended up as a

8   letter to the editor in 1999.

9   Q.   And what have you learned about the Reckless trial?

10  A.   Well, what I've been able to see from some of the

11  documents from discovery, we're able to see the results of the

12  Reckless trial reported.  There's a summary, protocol summary

13  report that's created to summarize the data, and we were able

14  to see those study results around February of 1999, and that

15  reveals, you know, the study design, the number of patients,

16  and the negative findings.

17  Q.   And had you known at the time that you were making your

18  recommendation to the P&T Committee what you know now about

19  Reckless, about Backonja, about Gorson, would your

20  recommendation have been different?

21  A.   If we knew all that, yes.

22  Q.   And would your recommendation have been negative?

23  A.   Uhm, yes.

24  Q.   And based on your experience in attending P&T Committee

25  meetings and based on your experience at actually attending the

Page 88

1    P&T Committee meeting, Exhibit 291, do you believe that the

2    committee would have acted differently with respect to

3    Neurontin?

4            MR. KENNEDY:  Speculation, lack of foundation.

5            THE COURT:  Overruled.

6    A.    I believe so.

7    Q.    Now, in this litigation, do you recall submitting an

8    affidavit about drugs that were cheaper or less expensive and

9    more optimal than Neurontin?

10   A.    I do.

11   Q.    Let me show you what's been marked as Exhibit 365.  I

12   believe it's in the binder in front of you.

13           MS. NUSSBAUM:  We would move that into evidence, your

14   Honor.

15   Q.    And can you look at it for a moment and tell me, is that

16   the affidavit that you submitted?

17           THE COURT:  Wait, hold it.  Take it off.  Is there an

18   objection?

19           MR. KENNEDY:  Your Honor, there are four --

20           THE COURT:  Just is there an objection to the

21   affidavit?

22           MR. KENNEDY:  I don't know which one it is, having not

23   seen it.  There are four of them.  If I can have the date, I'll

24   know.

25           MS. NUSSBAUM:  It's Exhibit 365.  It's dated

1    December 5, 2008.

2           MR. KENNEDY:  We have no objection to that one, your

3    Honor.

4           THE COURT:  All right.

5           (Exhibit 365 received in evidence.)

6    Q.   Now, can you tell me the process that you went through to

7    come up with the list of drugs that are set forth in

8    Exhibit 365?

9    A.   Well, I was asked to develop a list of drugs that would be

10   considered more optimal than Neurontin for these various

11   indications, taking in various factors, including their safety,

12   their efficacy, their cost, the whole picture for the

13   pharmaceutical drugs.  And so we looked at what agents were FDA

14   approved for those indications and what agents we had on the

15   formulary, what agents were available for treatment of these

16   various disorders, and that's how the list was created.

17   Q.   And specifically what indications were you looking at?

18   A.   These list agents for the treatment of migraine, for the

19   treatment of bipolar disorder, for the treatment of neuropathic

20   pain, and then for the treatment of nociceptive pain.

21   Q.   Did you consult with your colleagues at Kaiser and other

22   people having involvement in the formulary and in the pharmacy

23   department in coming up with the list?

24   A.   I did.

25   Q.   Now, does Kaiser as part of its Drug Information Service

Page 90

1    have an inquiry department or an inquiry service?

2    A.   We do.   We call it the "inquiry service" or the "telephone

3    consultation service."   It's like a call center where we take

4    in questions from many healthcare providers across the Kaiser

5    Permanentes nationally that have to do with the

6    pharmaceuticals.   We research the question using lots of

7    available references, and then we supply them with a response,

8    either verbal or written or both.

9    Q.   To your knowledge, does Pfizer have an inquiry service or

10   a similar department?

11   A.   Yes, a drug information services.   It's very typical for

12   pharmaceutical manufacturing companies to also have a drug

13   information service, or sometimes they call it professional

14   services, where healthcare providers can call and ask questions.

15   Q.   And, to your knowledge, do people at Kaiser regularly call

16   their counterparts at Pfizer with respect to questions about a

17   pharmaceutical product that they may have?

18   A.   Yes.   We do reach out to the pharmaceutical manufacturers

19   as part of one of the resources that we have available to us to

20   obtain information.

21        MS. NUSSBAUM:   Your Honor, I would move Exhibit 461

22   into evidence.   This is what's called the Merlin Database.

23   It's a database that has been produced by defendants here

24   reflecting requests for medical information about Neurontin.

25   And I would also move Exhibit 461-A into evidence, and that

Page 91

1    reflects a search of the database, 461, for inquiries made on

2    behalf of either PMG physicians or Kaiser Drug Information

3    Services with respect to Neurontin.

4            MR. KENNEDY:  No objection to either exhibit, your

5    Honor.

6            (Exhibits 461 and 461-A received in evidence.)

7    Q.   Now, let me show you what's been marked as Exhibit 296.

8            MS. NUSSBAUM:  We offer that into evidence.  It's an

9    August 21, 2000, drug inquiry document from Kaiser.

10           MR. KENNEDY:  No objection, your Honor.

11           (Exhibit 296 received in evidence.)

12   Q.   Now, looking at that and looking at the request, it says

13   "The maximum dose for Neurontin for diabetic neuropathy."  Do

14   you see that?

15   A.   I do.

16   Q.   And can you tell me then what the person at Kaiser did to

17   respond to that request, which was from a physician with

18   respect to a patient in their forties, and the request was,

19   "What would be the maximum dose for Neurontin to give this

20   patient?"

21   A.   Okay, so this is a typical form that we fill out when

22   someone calls our inquiry service, and we document what the

23   question is, the background of the patient or the situation,

24   and then we log in the response.  In the response section

25   you'll note that summarizes what was done.  It says, "I called

1  Parke-Davis (Warner-Lambert)."  It's got the phone number

2  there.  And it talks about that we are in receipt of a document

3  from Parke-Davis on this topic, on the dosing of Neurontin for

4  diabetic neuropathy.  It was faxed to us.  And then it

5  summarizes -- the document stated that the dose for a

6  particular study was titrated to tolerability up to 3,600

7  milligrams per day, regardless of efficacy achieved at the

8  lower dose, meaning all patients, even if they were responding

9  to a lower dose, would be pushed up to the 3,600.

10  Q.  So the response from the defendants here was that even if

11  a patient with diabetic neuropathy was responding to a lower

12  dose of Neurontin, that patient should be pushed up to

13  3,600 milligrams a day; is that right?

14       MR. KENNEDY:  Objection.  The document speaks for

15  itself.  No indication she was on the call.

16       THE COURT:  Overruled.

17  A.  So basically the document, as it's described here, stated

18  that that was what they had information on, pushing the dose up

19  to 3,600 milligrams.

20  Q.  Now, if you look at the list, 461-A, and you go to Page 22

21  of that, it shows you a copy of the response that Kaiser

22  received from Pfizer, and that's been marked as Exhibit 309.

23       MS. NUSSBAUM:  And I would offer that into evidence.

24       THE COURT:  All right.

25       (Exhibit 309 received in evidence.)

Page 93

1  Q.   Now, looking at Exhibit 309, which is a standard response

2  letter from Pfizer that was sent to Kaiser in response to the

3  inquiry, and in particular starting on the second page at the

4  bottom where it says "Pain," do you see any mention of the

5  Reckless study?

6  A.   No, there's no mention of the Reckless study.

7         THE COURT:  Well, so what's the date of this letter?

8         MS. NUSSBAUM:  The inquiry, your Honor, is August 21,

9  2000, and the document states that on August 21, 2000, at

10 2:52:09 p.m., the inquiry was made and the response was

11 received.

12 Q.   Now, was the Reckless study a study of high doses of

13 Neurontin in neuropathy?

14 A.   Yes.

15 Q.   And at the time in August of 2000 that Kaiser received

16 Exhibit 309 from the defendants, based on what you know about

17 this litigation, was the Reckless study and its results known

18 to the defendants?

19 A.   Yes.  I saw the report of that Reckless trial, internal

20 report.

21 Q.   Now, let me show you what's been marked as Exhibit 294.

22        MS. NUSSBAUM:  Which we would move into evidence.

23        THE COURT:  That was just too quickly.  So that study

24 that was being referred to was not the Reckless study?

25        THE WITNESS:  In this paper here?

1          THE COURT:  Yes.

2          THE WITNESS:  They have no mention of the Reckless

3    study or the Reckless paper.

4          THE COURT:  So what study are they referring to?  Was

5    that the --

6          THE WITNESS:  Well, there's several listed in the

7    reference here.

8          THE COURT:  There's one random controlled test

9    mentioned right in the beginning.  Which one was that, do you

10   know?

11         THE WITNESS:  I'm sorry, at the very beginning of the

12   memo?

13         THE COURT:  The beginning.

14         THE WITNESS:  Oh, in the very beginning they're

15   talking about epilepsy.  So it's divided into sections.  So the

16   first section is their summary of dose --

17         THE COURT:  No, it says diabetic --

18         THE WITNESS:  Oh, I'm sorry.  No, there's a first

19   page.  I guess what page are you looking at?  That's, I

20   believe, the third page.

21         THE COURT:  It's an eight-week double-blinded

22   placebo-controlled --

23         THE WITNESS:  Yes, there we go.  That's the third

24   page.

25         THE COURT:  All right, I'm sorry.  What's that, do you

1    know?

2            THE WITNESS:  Which one?

3            THE COURT:  Do you see where it says "diabetic

4    neuropathy"?

5            THE WITNESS:  Yes, that's Reference No. 4, and it's

6    referenced to Backonja.

7            THE COURT:  All right.

8            THE WITNESS:  So they do mention the Backonja trial,

9    uh-huh.

10   Q.   Now, turning now to Exhibit 294, which is another drug

11   inquiry document, this one dated December 12, 2000.

12           MS. NUSSBAUM:  And we would move this into evidence,

13   your Honor.

14           MR. KENNEDY:  No objection.

15           (Exhibit 294 received in evidence.)

16   Q.   I'd ask you to look at this document.

17           THE COURT:  No objection?

18           MR. KENNEDY:  No objection, your Honor.

19   Q.   And this appears to be a request from a physician, and the

20   request states, "What is the maximum dose per day for

21   Neurontin?"  Do you see that?

22   A.   Yes.

23   Q.   Okay.  And then looking at the response, it says, "Called

24   Parke-Davis at 800-223-0432, spoke with Diane.  The maximum

25   dose that they have seen is for 6,000 milligrams a day in

1    non-Parke-Davis studies."  Do you see that?

2    A.   Yes.

3    Q.   So at the time that Kaiser made this request in December

4    of 2000, is it fair to say that they were advised by Pfizer

5    that a dose of up to 6,000 milligrams a day would be

6    appropriate?

7    A.   They're reporting that doses up to 6,000 milligrams a day

8    have been used appropriately, yes.  I just want to clarify one

9    thing.  This is a pharmacist calling, not a physician.

10   Q.   Okay, thank you.  So the inquiry here was from a

11   pharmacist?

12   A.   Yes, from a pharmacist, not a physician, yes.

13   Q.   Thank you.  I'd ask you now to look at Exhibit 292, and

14   that is an inquiry dated May 16, 2005.

15           MS. NUSSBAUM:  We'd move that into evidence, your

16   Honor.

17           MR. KENNEDY:  No objection, your Honor.

18           (Exhibit 292 received in evidence.)

19   Q.   And the question in this inquiry, "Neurology patient is on

20   5,400 milligrams of gabapentin daily.  Wants to know what the

21   guidelines are on the dosage and if this is okay."  And then

22   under "Response" about two-thirds of the way down, it says,

23   "Called manufacturer.  One case of 8 grams --" is that the same

24   as 8,000 milligrams?

25   A.   Yes, 8,000 milligrams.

1   Q.   "-- was documented in a patient with lumbar pain, but

2   nothing as high as 9.6 --" that's referring to 9,600 milligrams?

3   A.   Yes.

4   Q.   " -- has been documented, although manufacturer states

5   that it is relatively safe as long as the titration is slow and

6   patient is under medical supervision."

7            MR. KENNEDY:  Object as irrelevant, your Honor.

8   Manufacturer --

9            THE COURT:  Overruled.

10            MR. KENNEDY:  Your Honor, we're in the generic period.

11            THE COURT:  Overruled.

12   Q.   Do you see that?

13   A.   Yes.

14   Q.   And does that indicate that Kaiser was told that a dose of

15   9,600 milligrams is relatively safe as long as the patient is

16   under the supervision of a doctor?

17   A.   Yes.  "Titration is slow and the patient is under

18   physician supervision," that's their statement, correct.

19   Q.   Now, I'd like to show you what's been marked as

20   Exhibit 432, and if you look back at Exhibit 461-A and you go

21   to Page 5, this is the response to an inquiry made by a

22   Dr. Barbara Livermore; and the response, Exhibit 432, concerns

23   peripheral neuropathies.  Do you see that?

24   A.   Yes, I do.

25   Q.   Now, do you see any reference in Exhibit 432 to the

1    Reckless study?

2    A.    No.  Again, this one references Backonja but does not

3    mention the Reckless study.

4    Q.    Do you see any reference to the negative result of

5    Dr. Gorson's study?

6    A.    There was no mention of Dr. Gorson's results in this

7    letter as well.

8    Q.    Now, turning, if you would, to the section that says

9    "Migraine Headaches," and unfortunately this document does not

10   have page numbers, but it's about halfway through, and it says

11   "Migraine Headaches," and then that's underlined.

12   A.    Okay, I've found it.

13   Q.    In the "Migraine Headaches" section, do you see any

14   reference to the negative results of any of the three

15   double-blind random controlled studies that the jury has heard

16   about, 879, 200, 945, 217, or the Mathew study, 945-220?

17   A.    No, I don't see that there.

18          THE COURT:  What document are we looking at?

19          MS. NUSSBAUM:  Exhibit --

20          THE COURT:  No, I know what the exhibit is.  I don't

21   know what it is.  What is it?  Could you explain it?

22          THE WITNESS:  This is a standard response letter from

23   the manufacturer, and it was, as you can see, on the Merlin

24   database.

25          THE COURT:  So this is from Pfizer to Kaiser in

Page 99

1    response to an inquiry?

2            THE WITNESS:  To a Kaiser physician.  So this time

3    it's not the Drug Information Services calling them, but this

4    is one of our physicians directly calling the pharmaceutical

5    company, and then they have a record of that call coming in and

6    what they sent out.

7            THE COURT:  And do you as a matter of course get these

8    copies?

9            THE WITNESS:  No.

10           THE COURT:  All right, so this is something that came

11   through discovery?

12           THE WITNESS:  Yes, yes.  I mean, the physician could

13   have shared it with us once she has it, but, no.

14           THE COURT:  What is the date of this?  See, the

15   problem is, we don't have a front page, so it's hard for us

16   to --

17           MS. NUSSBAUM:  The date is -- it's in 2000, your

18   Honor.  The numbers are very small here.  It looks like

19   March 6, 2000.

20           THE COURT:  So this is the response from March, 2000,

21   to an inquiry from a Kaiser doctor about migraines?

22           MS. NUSSBAUM:  Correct, Dr. Barbara Livermore.

23   Q.   Now, looking at this response and looking at the section

24   on migraines, is there any reference made to any of the

25   negative results of the three double-blind random controlled

1    studies, 879, 200, 945, 217, or the Mathew 2001 study, 945-220,

2    that the jury has already heard testimony about?

3    A.   No.

4         MS. NUSSBAUM:  I move Exhibit 309 and 432 into

5    evidence, your Honor.

6         MR. KENNEDY:  No objection on either of those, your

7    Honor.

8         (Exhibits 309 and 432 received in evidence.)

9         MS. NUSSBAUM:  I have no further questions at this

10   time.

11   CROSS-EXAMINATION BY MR. KENNEDY:

12   Q.   Good afternoon, Doctor.  Is it Millares?

13   A.   Yes, correct.

14   Q.   With a name like Raoul, I'm conscious of how people

15   pronounce names.  So it's Millares?

16   A.   The double L is like a Y.

17   Q.   Millares.  Okay, I'll do my best.

18   A.   That's okay.

19   Q.   You're a doctor of pharmacy; you're not a medical doctor,

20   correct?

21   A.   Doctor of pharmacy.

22   Q.   And which of the various Kaiser companies do you work for?

23   A.   I am part of Kaiser Foundation Hospitals.

24   Q.   And as I understand it, the central criteria there when

25   you're evaluating drugs is always to think in terms of safety,

1   efficacy, and cost, correct?

2   A.   Those are three primary variables we look at.  There might

3   be other variables that are also included.

4   Q.   And if we could, I'd like to go to your declaration in

5   this case we talked about on direct, Trial Exhibit 365.  Can

6   you put that up, Austin.  And that's the declaration that you

7   signed in this case.  That's basically a statement under

8   penalty of perjury, correct?

9   A.   Do I have that here, 365?  I don't think so.  It was a

10  different number, wasn't it?

11  Q.   I know your lawyer asked you about it.

12  A.   Right, but I don't have it as 365, I guess.  All right,

13  there we go.  Sorry.  I can't remember the numbers.  Yes,

14  uh-huh.

15  Q.   And if we go to Page 2, that's your signature that you

16  signed it on December 5 of 2008, correct?

17  A.   Yes.

18  Q.   And scrolling up a little bit, if we could, Austin -- yes,

19  can you get the box in there? -- this is where you attempted to

20  identify various drugs that you thought were as safe and

21  performed as well as but were less expensive than Neurontin,

22  correct?

23  A.   Well, I included in the list drugs that I consider more

24  optimal because of either efficacy, safety, cost, or

25  combination of those.

1   Q.   In evaluating a drug, you'd agree with me, the first thing

2   you look for is whether it's safe?

3   A.   That's a primary concern.

4   Q.   If it's going to harm the patient, you don't even worry

5   about efficacy or cost, right?

6   A.   Well, that's not quite correct.  Basically all

7   pharmaceuticals have side effects, so it depends on how you

8   define "safe."  But, you know, we understand that

9   pharmaceuticals have lots of side effects, some worse than

10  others.  It doesn't mean that they aren't safe to use in the

11  clinical setting under the supervision of a physician for a

12  particular indication.  You have to weigh the situation and the

13  benefits versus the harm and that kind of thing.

14  Q.   And the FDA, as we've heard, obviously requires material

15  about drugs and their side effects to be included in package

16  inserts, correct?

17  A.   That's correct.

18  Q.   And then the FDA also has something called a "black box

19  warning," don't they?

20  A.   Yes.

21  Q.   And a black box warning is something that the FDA requires

22  the manufacturer to put on, correct?

23  A.   In a package insert, yes.

24  Q.   Okay.  And that's because the FDA has concluded that this

25  drug poses some special risk, that the package insert isn't

Page 103

1    enough, right?

2    A.   It is in the package insert.  It's just included in the

3    package insert as a box with the statement regarding the safety

4    issue enclosed in a box.  That's why it's called a "boxed

5    warning."

6    Q.   And on the actual bottle of medicine, is there a

7    requirement that the black box warning be there as well?

8    A.   On where?

9    Q.   On the actual bottle or box of medicine?

10   A.   No.

11   Q.   Just in the --

12   A.   Right.

13   Q.   -- package insert?

14   A.   Package insert.

15   Q.   It has to be set off in black, hence the term "black box

16   warning," right?

17   A.   All of the package insert is in black.  We don't call it a

18   black box warning anymore.  We just call it a boxed warning.

19   Q.   A boxed warning, okay.

20   A.   A boxed warning.

21   Q.   Now, taking the first of your recommended alternative

22   drugs, amitriptyline hydrochloride, that comes with a black box

23   warning, doesn't it?

24   A.   Yes.

25   Q.   Can we see 952-A, please.

Page 104

1          MR. KENNEDY:  I'd offer 952-A in evidence, your Honor.

2          (Exhibit 952-A received in evidence.)

3   Q.   And you'll see this is a discussion of characteristics of

4   amitriptyline hydrochloride, and the first thing below the name

5   of the drug is a copy of the black box warning, correct?

6   A.   That's correct.

7   Q.   And amitriptyline hydrochloride carries a "suicidality and

8   antidepressant drugs" black box, and as we scroll down to about

9   the fourth or fifth sentence, it says, "Patients of all ages

10  who are started on antidepressant therapy should be monitored

11  appropriately and observed closely for clinical worsening,

12  suicidality, or unusual changes in behavior.  Families and

13  caregivers should be advised of the need for close observation

14  and communication with the prescriber.  Amitriptyline

15  hydrochloride is not approved for use in pediatric patients."

16       Do you see that?

17  A.   That is correct.

18  Q.   Neurontin doesn't have a similar black box warning, does

19  it?

20  A.   Well, Neurontin --

21  Q.   It doesn't have a similar black box warning, does it,

22  Doctor?

23  A.   Not yet.

24  Q.   Not yet?

25  A.   It's being investigated for suicidality as well.

2b11d2bb-817d-42b4-9053-ae565ae05494

1    Q.   Okay.  And certainly as of December 5, 2008, when you

2    wrote your declaration --

3    A.   Right.

4    Q.   -- there wasn't any black box warning on Neurontin --

5    A.   No.

6    Q.   -- like there is on amitriptyline chloride, correct?

7    A.   Well, in 2008 there probably was the patient information

8    sheet that must be given to patients describing Neurontin

9    problems as well.

10   Q.   We can agree, Neurontin did not have a black box warning,

11   correct?

12   A.   You're correct.

13   Q.   And if we could go back to your declaration, Exhibit 365,

14   and coming down, the third drug that you list is carbamazepine,

15   correct?

16   A.   That's correct.

17   Q.   And feel free to correct me on any of my pronunciations on

18   these.

19   A.   No, you're doing fine so far.

20   Q.   Okay.  And carbamazepine also carries a black box warning,

21   doesn't it?

22   A.   Yes.

23   Q.   Okay, and can we see 952-D, please.

24        MR. KENNEDY:  And I'd offer that into evidence.

25        (Exhibit 952-D received in evidence.)

1   Q.   And for carbamazepine, we're told, first, it has in the

2   black box "Serious dermatologic reactions," and it goes on in

3   the third line to describe Stevens-Johnson Syndrome, correct?

4   A.   That's correct.

5   Q.   And Stevens-Johnson Syndrome is almost like a modern form

6   of leprosy, isn't it?

7   A.   I don't know if I'd call it that way, but --

8   Q.   Doesn't it involve skin flaking off --

9   A.   Yes.

10   Q.   -- both outside and even inside your mouth?

11   A.   It can, yes.

12   Q.   And it's frequently fatal?

13   A.   It can be.

14   Q.   Like, isn't it almost always fatal?

15   A.   I don't know that.  I'm really not an expert in

16   Stevens-Johnson, but --

17   Q.   Okay.  And you did tell us you are a pharmacist, not a

18   doctor --

19        THE COURT:  She doesn't know, she doesn't know.

20   Q.   In addition, the black box warning for carbamazepine talks

21   about a plastic anemia and granulotosis (Sic), right?

22   A.   A granulocytosis, yes.

23   Q.   Thank you.  And that refers to basically cutting off your

24   body's ability to make new red and white blood cells, correct.

25   A.   Yes, something like that.

1   Q.   And that also carries with it a risk of fatality?

2   A.   It can.

3   Q.   And Neurontin doesn't have that, does it, that black box?

4   A.   It does not have this box warning.

5   Q.   Okay.  Can we go back to your declaration, Exhibit 365,

6   and under carbamazepine, the next thing you recommend is

7   codeine sulfate.  That's addictive, it's a narcotic, isn't it?

8   A.   It's a narcotic analgesic, yes.

9   Q.   And Neurontin isn't a narcotic, is it?

10  A.   It is not.

11  Q.   And then -- don't worry, I'm not going to do all of these,

12  but the desipramine, is that the next one, hydrochloride?

13  A.   Desipramine.

14  Q.   Desipramine, thank you.  And that one also carries a black

15  box warning, doesn't it?

16  A.   Yes.

17  Q.   For suicidality and antidepression, much as we've already

18  discussed for amitriptyline, correct.

19  A.   All the antidepressants do, all of them.

20       MR. KENNEDY:  And I'd offer 952-C in evidence as well.

21  If I didn't offer 952-D, Mr. Alba, I'd offer that as well.

22       THE CLERK:  It's in.

23       (Exhibit 952-C received in evidence.)

24  Q.   And if we can go back to your declaration again,

25  Exhibit 365, please, we've got nortriptyline right down under

1   Neurontin, nortriptyline hydrochloride.  And that also carries

2   a black box warning for suicidality and depression, correct?

3   A.   They're all in the same class, antidepressants.  They all

4   have the same box warning.

5             MR. KENNEDY:  I offer 952-B in evidence.

6             (Exhibit 952-B received in evidence.)

7   Q.   And if we can go back to your declaration one more time,

8   and coming down to valproic acid -- or excuse me -- yes,

9   valproic sodium or valproic acid, either one, one of them is

10  just the sodium of the acid, correct?

11  A.   Uh-huh.

12  Q.   And both of those also carry a black box warning?

13  A.   Correct.

14            MR. KENNEDY:  And I'd offer 952-E and ask that that be

15  put up on the screen.

16            (Exhibit 952-E received in evidence.)

17  Q.   And the black box warning there is for multiple matters,

18  isn't it?  The first one is hepatoxicity?

19  A.   Hepatoxicity.

20  Q.   And that talks about hepatic failure, and tell the jury

21  what that's referring to.

22  A.   Hepatic failure is liver failure, failure of your liver to

23  work appropriately.

24  Q.   And then if we scroll down, we get to teratogenicity,

25  correct?

Page 109

1       THE COURT:  Are you introducing all of these?  Are

2   these all in evidence?

3       MR. KENNEDY:  Yes, your Honor.  I'm offering them as I

4   go.

5   A.   I'm sorry, where are you now?  Teratogenicity.

6   Q.   Thank you.  And can you tell the jury what that pertains

7   to.

8   A.   Teratogenicity has to do with whether or not a drug can be

9   harmful to a fetus.

10  Q.   And can cause birth defects?

11  A.   Can cause injury to the fetus, yes.

12  Q.   And coming further down, there's also a black box warning

13  for pancreatitis, correct?

14  A.   Yes.

15  Q.   And that's referring to failure of the pancreas, which can

16  be fatal, correct?

17  A.   That's correct.

18  Q.   And it's your belief that the drugs we've been talking

19  about are acceptable substitutes for Neurontin in terms of

20  safety?

21  A.   Absolutely.

22  Q.   Nothing about the black box warnings cause you to believe

23  any of these pose any safety problems that Neurontin doesn't?

24  A.   No, they can cause safety problems.  I'm talking about use

25  of these drugs by physicians who are familiar with medications,

1    and I can speak to each one of these box warnings about how you

2    manage these in the clinical setting, what the incidence is.

3    Yes, these drugs are very useful drugs in the armamentarium of

4    physicians to treat these indications.

5    Q.   You have found in your career that there are a number of

6    doctors who are reluctant to take a drug with a black box

7    warning and prescribe it for anything off-label as opposed to

8    what it's actually been approved by the FDA for?  You've found

9    that, haven't you?

10   A.   I don't know that for a fact, no.

11   Q.   Never run into a doctor who said, "I'm a little edgy about

12   taking something when it's got a black box warning and then

13   prescribing it for something that the FDA hasn't given approval

14   for"?

15   A.   Not at all.  You're not understanding box warnings.  Box

16   warnings can be even for something that has occurred, you know,

17   one in a million.  In fact, one of the examples you showed us

18   was something like that.  So, no, physicians are not going to

19   not use a drug because it has a box warning.  They take it into

20   context in terms of, you know, the patient, the situation, what

21   the options are, et cetera.

22   Q.   Of course, that would be the ultimate decision of the

23   doctor who is treating the patient?  It wouldn't be your

24   department, would it?

25   A.   It would be a decision between the physician and the

1   patient.

2   Q.   Thank you.  Next can we go to Exhibit 322 that was talked

3   about on direct examination.  Is this a drug monograph?  Is

4   that the proper word for this?

5   A.   Yes, sir, it is.

6   Q.   Okay.  And this was the drug monograph that was prepared

7   for the September, 1997 P&T review, correct?

8   A.   That's correct.

9   Q.   And although the P&T review took place in September of

10  1997, if we scroll down to the very bottom of the page, Austin,

11  it tells us, second line up from the bottom, that this was

12  actually prepared by your department, the Drug Information

13  Services for the Southern California region, in April of '97,

14  correct?

15  A.   Well, sometime in April of '97 this particular author

16  would have put that date into the footer.  There's also another

17  date at the back, but I don't know if that's exactly when it

18  was finished or when she started to use this template.

19  Q.   There's a 4/97 date on the other side of the page as well?

20  A.   Okay, then that's good.

21  Q.   I mean, that's standard practice.  You don't prepare the

22  drug monograph on the night before the P&T meeting?

23  A.   Oh, no, not at all.

24  Q.   A lot of work goes into these?

25  A.   That's correct.

1  Q.   So that you get started months before the P&T Committee

2  meeting?

3  A.   Well, it depends on how much data we have to go through

4  and how much evidence there is.  Some monographs take a lot

5  longer than others, obviously, depending upon the depth and

6  difficulty of the trials that we need to go through and write

7  up.  But, yes, we prepare them ahead of time of the meeting.

8  Q.   Generally months ahead of time?

9  A.   It can be months.

10  Q.   And scrolling up just a tad to "Formulary Recommendation."

11  You see it says, "Formulary Recommendation:  The chiefs of

12  anesthesia recommend to expand the restriction for gabapentin

13  to anesthesiology."  Do you see that?

14  A.   That's correct.

15  Q.   Now, this document is referring just to the Southern

16  California region, correct?

17  A.   Yes.

18  Q.   Okay, because the DIS, your department, covers the whole

19  United States?

20  A.   That's correct.

21  Q.   But in this case, this particular request is just Southern

22  California?

23  A.   That's correct.

24  Q.   And as of 1997, the Southern California region had

25  restricted gabapentin in the formulary to neurologists,

1   correct?

2   A.   That's correct.

3   Q.   And then what are the chiefs of anesthesia?  What does

4   that mean?

5   A.   The chiefs are a committee of -- we have numerous medical

6   centers throughout the region, Southern California region.

7   Each medical center has a chief of anesthesiology.  This is the

8   group of chiefs together, so they are representative of the

9   anesthesiology group for Southern California.

10   Q.   And they were the ones who recommended this phrase

11   "expand the restriction"?

12   A.   Relaxing the restrictions to include anesthesiologists in

13   the restriction.

14   Q.   Okay.  And then scrolling back up to "Efficacy" --

15   A.   They're actually the ones who requested that this be done.

16   Q.   The doctors made the request?

17   A.   Yes.

18   Q.   And then under "Efficacy," as you discussed on direct

19   examination, this wasn't a situation where there was Level 1

20   double-blind random controlled studies, was there?

21   A.   That's correct.

22   Q.   And that's not a requirement, as far as you know, within

23   the Kaiser organization that a drug only gets on formulary if

24   there's been a double-blind random controlled study, correct?

25   A.   We don't have a requirement.  We have -- with the best

Page 114

1    available evidence, we present the best available evidence, and

2    Level 1 evidence is obviously the highest and best evidence we

3    could have.

4    Q.   And here you didn't have any Level 1?

5    A.   We don't have that, no.

6    Q.   You didn't have any Level 2 evidence either, did you?

7    A.   No.

8    Q.   And Level 2 evidence would be such things as?

9    A.   This would be cohort studies, for example.

10   Q.   Okay, thank you.

11        THE COURT:  What's a cohort study?

12        THE WITNESS:  I knew that was coming.  Basically, it's

13   taking a group of patients and reporting on their experience.

14   It's not necessarily randomized.  It's not necessarily set up

15   in that way, but just a group of patients, all who have been

16   exposed, let's say, for example, to Neurontin.  I'm going to

17   report on these 100 patients who have taken Neurontin.

18   Q.   And as far as you know, the anesthesiologists wanted to

19   use Neurontin to deal with pain problems?

20   A.   The anesthesiologists specifically wanted us to consider

21   this for this one type of pain that they wanted to use

22   Neurontin for.

23   Q.   Now, when you hear "anesthesiology," I generally think of

24   putting people to sleep.  They weren't trying to use Neurontin

25   as a sedative.  They were trying to use it to treat a form of

1  pain, as far as you knew, correct?

2  A.   That's right.  Anesthesiologists do see some refractory

3  cases of pain.

4        THE COURT:  And "refractory" means?

5        THE WITNESS:  Well, usually an anesthesiologist is not

6  the first person that sees someone with pain.  They might be

7  referred to them later on.

8        THE COURT:  So "refractory" means hard to treat?

9        THE WITNESS:  Right, right.  They've been through a

10 couple of docs maybe.

11 Q.   And refractory, somehow they're resistant to treatment?

12 A.   Or it could -- well, okay, or it could be that this

13 particular type of pain -- again, I'm not that familiar with

14 RSD -- is something they would refer to the anesthesiologist.

15 I'm just saying, anesthesiologists are not the first-line

16 physician that you go see when you have some pain.

17 Q.   But we are talking about pain rather than putting people

18 to sleep for this drug?

19 A.   Absolutely.

20 Q.   And then under "Efficacy," what you had were two letters

21 to the editor that said gabapentin, Neurontin, had been helpful

22 in relieving symptoms in a total of fourteen refractory RSD --

23 and again can you remind us, RSD is?

24 A.   Reflex sympathetic dystrophy.

25 Q.   And you've never seen any information to indicate that

1   what Dr. Mellick or the people who wrote the letters to the

2   editor, that that wasn't a true and correct statement of what

3   they had experienced?

4   A.   I don't know what -- no, I don't have any information

5   about those fourteen patients other than what they reported in

6   their letter.

7   Q.   And you told us on direct that you learned that

8   Dr. Mellick have been investigated for having accepted money or

9   something from Parke-Davis?

10  A.   Correct.

11  Q.   Okay.  However, you are not here to testify that

12  Dr. Mellick was lying when he said that he noted efficacy for

13  gabapentin in fourteen of his patients, correct?

14  A.   I don't know if he lied or he didn't lie.  I know that he

15  was paid by the company for which he was reporting results for

16  a drug.  And in general in my work, when we look at evidence,

17  we don't want the authors or the people doing studies to be

18  paid consultants from the company because there's a bias,

19  potential bias.

20  Q.   In this case, you've never talked to Dr. Mellick?

21  A.   I have not talked to Dr. Mellick.

22  Q.   You've done nothing to check out whether Dr. Mellick did

23  or did not experience --

24  A.   That's correct, you're right.

25  Q.   And then coming down to the next-to-the-last line, Austin,

1    picking up with the last sentence under "Efficacy," the

2    authors.

3    A.    "Both concluded --"

4    Q.    Actually the last two:  "The information presented in

5    these two letters was very limited as these were not clinical

6    trials."  And what's a clinical trial?

7    A.    A clinical trial is a study that we've been talking about

8    here, a study of a medication, for example, in patients set

9    up --

10   Q.    And then it goes on to say, "The authors both concluded

11   that gabapentin treatment of RSD appeared promising and that

12   randomized, double-blind, clinical trials were needed to

13   further investigate this new use."

14   A.    That's correct.

15   Q.    So if Dr. Mellick was trying to talk people into

16   prescribing Neurontin, he certainly wasn't a very effective

17   salesman by saying we need double-blind studies before we know,

18   was he?

19   A.    I don't know.

20   Q.    And did Kaiser decide to hold off the approval on this

21   until you could get some double-blind studies?

22   A.    No.  The chiefs of anesthesiology were very -- they wanted

23   to use this drug for this very small niche of patients.  And in

24   the judgment of the P&T Committee, based on the fact that this

25   was a small group of physicians, a very specific type of pain,

1    then they voted to allow them to be a part of that restriction.

2    Q.   And we'll get to that in a minute.  The approval happened

3    in September of 1997?

4    A.   I believe that's the date on this, yes.

5    Q.   Something over twelve years ago, correct?

6    A.   That would be over twelve years ago.

7    Q.   And in the intervening twelve years, to your knowledge,

8    have those chiefs of anesthesiology ever come back and said,

9    "We'd like to have that expansion rescinded because we found

10   Neurontin really doesn't work for us"?

11   A.   That doesn't make any sense to have something rescinded.

12   The product is not restricted today at all.

13   Q.   No, I'm --

14   A.   That just wouldn't happen.  You can't go back and rescind

15   something that happened in 1997.

16   Q.   No, but you could disapprove the use going forward,

17   couldn't you?

18   A.   No.  The drug is on the formulary with no restrictions.

19   That means physicians can use it for any indication.

20             THE COURT:  But why couldn't you add restrictions?

21             THE WITNESS:  Add restrictions to who?

22             THE COURT:  To the doctors' use of this drug if it

23   doesn't work.

24             THE WITNESS:  But he's saying that --

25             THE COURT:  No, but I'm asking you a different

1    question.  So now you believe it doesn't work at all for

2    certain indications, right?

3              THE WITNESS:  Yes.

4              THE COURT:  So why can't you add restrictions?

5              THE WITNESS:  But what would be the restriction?  To

6    whom?  In other words --

7              THE COURT:  The doctor can't -- I mean, you saying it

8    doesn't work, sugar pill for bipolar, why can't you add a

9    restriction that says we won't --

10             THE WITNESS:  Oh, for a particular indication?

11             THE COURT:  Yes.

12             THE WITNESS:  Oh, okay, because a restriction is to a

13   specialty group.  I'm restricting it to prescribing by

14   neurology, I'm restricting to prescribing by anesthesiology

15   because that's where the evidence is.  There are no

16   restrictions to an indication.  Like, if you write Neurontin

17   for this indication, it's not -- I mean, we don't -- that's not

18   something that's within the realm of restrictions.  A product

19   that's on a formulary can be prescribed for whatever the

20   physician feels is medically necessary for the patient.  We

21   don't prevent -- there's no prevention of prescribing.  The

22   physician has the ultimate decision-making in terms of medical

23   necessity.

24             THE COURT:  Go ahead.

25             A JUROR:  So if I understand you correctly, what

1   you're saying is, your restrictions apply to what medical

2   specialty can use it, and there has to be some evidence, I

3   believe, in you doing that.  Within the specialty, the docs

4   take over?  In other words, the doctors decide what they're

5   going to do?

6          THE WITNESS:  Yes, yes.

7          A JUROR:  Okay.

8          THE WITNESS:  If we wanted to, for example, in the

9   example you just posed, if we said this is not useful for this,

10  we would use educational techniques to get the information out

11  to our physicians.  You don't use a formulary to micromanage

12  every single prescription and what it's coming in for.  In

13  fact, until very recently, prescriptions were written on paper.

14  We're now computerized, but before it's written on paper, and

15  physicians are not required to put the indication on the

16  prescription.  So a pharmacist wouldn't even know what the

17  indication was for.

18  Q.   Before September of 1997, Neurontin in Southern California

19  was restricted to use by neurologists, correct?

20  A.   Before what date?  I'm sorry.

21  Q.   September of 1997.

22  A.   Yes.

23  Q.   Okay.  And then after September of 1997, it became

24  accepted for use by both neurologists and anesthesiologists,

25  correct?

1   A.   And pain specialists, yes.

2   Q.   And there's nothing in Kaiser's rules that you can't come

3   along at some later date and say, "Let's go back and restrict

4   it just to neurologists"?

5   A.   Oh, no, I suppose we could -- I don't know.  It doesn't --

6   it's nonsensical.  I don't understand why we would go back and

7   restrict to a particular specialty group, but -- so you're

8   saying that we would find that it doesn't work for postherpetic

9   neuralgia, even though it's an indication, and we don't think

10  it should be used by anyone, and only epilepsy, you're saying,

11  because the neurologists were -- it was restricted to neurology

12  for the use in epilepsy.  Is that what you're saying?  I'm

13  trying to follow what you're saying.

14  Q.   There's no reason why Kaiser couldn't take Neurontin off

15  the formulary altogether, at least in Southern California,

16  correct?

17  A.   We can take Neurontin off the formulary if there was a

18  reason to take the drug off the formulary.

19  Q.   And, for example, if it were no better than a sugar pill,

20  that would be a pretty good reason to take it off the

21  formulary, wouldn't it?

22  A.   Well, it isn't no better than a sugar pill, so you're

23  saying something that's nonsensical.

24  Q.   So if somebody said that it was no better than a sugar

25  pill, that would be talking nonsense?

1  A.   No, but let's talk indications.  I am saying that

2  Neurontin is an effective drug for the treatment of seizures in

3  adults and pediatric patients.  There's evidence that shows

4  it's a good antiseizure med.  We have neurologists who treat

5  epilepsy patients at Kaiser Permanente with Neurontin, and

6  there's no reason to take it off the formulary.  They should

7  use it for epilepsy whenever they feel it's medically

8  necessary.  The same with postherpetic neuralgia.

9  Q.   Okay.  So you believe Neurontin, gabapentin, is effective

10  for postherpetic neuralgia and epilepsy; is that correct?

11  A.   Yes.

12  Q.   Is there any reason why the formulary can't restrict use

13  of Neurontin to those two purposes?

14  A.   We don't restrict to an indication.  We restrict to

15  chiefs.  We restrict to a certain specialty group.  So it

16  depends on who sees postherpetic neuralgia, generally

17  internists, family practitioners.

18          A JUROR:  Is this a one-way process where you can only

19  expand a drug's use by specialties, or could you go back?  Have

20  you ever gone back?  In other words, you had anesthesiology,

21  say, or something like that --

22          THE WITNESS:  Correct.

23          A JUROR:  -- pediatrics.  I'm not even sure if it's a

24  separate specialty.

25          THE WITNESS:  It is.

1        A JUROR:  And all of a sudden you say, "Well, you

2   know, we found evidence, and now we want to back up."  This is

3   not you were wrong.

4        THE WITNESS:  I think that we could eliminate a

5   restriction if it was warranted, if we had information and it

6   was warranted to do that.  We'd have to -- there's, you know, a

7   little bit of reality that plays in.  So, for example, whatever

8   that indication is that now you're saying we're going to

9   restrict it to, there's a bunch of patients maybe, potentially,

10  who are on that drug prescribed by a physician who thought it

11  was medically necessary for that patient or for some reason

12  thought the drug worked for that.  So now we probably wouldn't

13  just take it off the formulary.  We would work with the

14  physicians and the patients to transition those patients over

15  to some effective drug.  That would take a while.

16       A JUROR:  So what you're saying is, once it was there,

17  it's written in stone to leave this --

18       THE WITNESS:  No, no.

19       A JUROR:  I thought that was what you just said.

20       THE WITNESS:  No, no, no.  I'm sorry.  No, what I'm

21  saying is, we would take care in, you know, assuring that the

22  patients who are still on the drug are able to continue it

23  until they're moved over to some other product, if in fact

24  that's what we're going to do with the patients; we're going to

25  change them all from some drug to another drug.

2b11d2bb-817d-42b4-9053-ae565ae05494

Page 124

1        A JUROR:  I have a road map that says take a right at

2   the end of this block, and that's a wrong direction, I found.

3   I never change the road map, but I put something at end of that

4   corner telling people to do things.  Is that what we're saying?

5   I'm sorry, I didn't mean --

6        MR. KENNEDY:  You're doing better than I am.

7        (Laughter.)

8        THE WITNESS:  No.  If I remember correctly, the

9   original question was, is there a possibility of going back and

10  adding a restriction that was removed previously?

11       A JUROR:  At this point in time.

12       THE COURT:  Yes, yes.

13       THE WITNESS:  Yes.

14       THE COURT:  All right, the answer is "yes."  But you

15  haven't done it?

16       THE WITNESS:  Not to my knowledge, no.

17       THE COURT:  All right.  Yes, go ahead.

18       A JUROR:  Doctor guidelines and restrictions, are

19  there guideline changes you would make as new science and

20  information --

21       THE WITNESS:  Absolutely.  As I was saying to the

22  Judge, that we would use an educational approach much more so

23  than, you know, kind of changing restrictions back and forth.

24  So an educational program would be, for example, guidelines,

25  guidelines for use, you know, programs and other means of

1    disseminating the new information to the physicians.

2             A JUROR:  Would those be on the actual formulary, or

3    would that be through a separate --

4             THE WITNESS:  No.  The guidelines go through the same

5    process, the formulary process.  They're approved.  They're

6    written with the help of the physicians that would be using the

7    drug, so we'd work with whoever.  We'd develop the guidelines.

8    It would go through the P&T Committee and get approved.  And

9    then it goes along with the drug monograph and the statement of

10   what the formulary status is of the drug.  It would say

11   "Formulary with guidelines" as opposed to "Formulary with

12   restrictions."  Those are just two different statuses.

13            THE COURT:  Okay, why don't we move on.

14   Q.  So, for example -- and this would have to go through the

15   P&T Committee -- they could adopt guidelines for Neurontin that

16   say it's recommended and approved for epilepsy and postherpetic

17   neuralgia; it is not recommended for neuropathic pain or

18   bipolar or migraine or nociceptive pain because there isn't any

19   solid evidence to support its efficacy?  You could have a

20   guideline like that, couldn't you?

21   A.   You can have a guideline that says whatever the physicians

22   agree to and the P&T Committee agrees to, based on the

23   evidence.

24   Q.   Okay.  And is there any such guideline today for Neurontin

25   or gabapentin?

1    A.    One that says exactly what you just said?

2    Q.    Let's start with exactly what I said.

3          THE COURT:  Any guidelines.

4    A.    Yes, there are guidelines.

5    Q.    Okay.  And tell us, those guidelines deal with things like

6    no more than 30 days prescription at one time, correct?

7    A.    I don't think that part is still in effect.

8    Q.    Okay, what guidelines are in effect today?

9    A.    Uhm --

10   Q.    In Southern California.  I'll just keep it there.

11   A.    Right.  Without having them precisely in front of me, I'd

12   hate to quote what they say, but I believe they're similar to

13   what was put forth here in this monograph, somewhere around

14   that, but I really can't remember exactly what they say.

15   Q.    There's nothing in the guidelines about not using

16   gabapentin or Neurontin for any of the off-label uses that are

17   in dispute in this lawsuit, is there?

18   A.    Not yet.

19   Q.    Not yet?

20   A.    Well, the stuff is just coming to light during this trial.

21   I mean, I basically became aware of the selective outcome

22   reporting through a New England Journal article written in

23   November of 2009 by Dr. Dickersin in the New England Journal of

24   Medicine.  So, I mean, we're just now dealing with this as an

25   organization.

1   Q.   You're just now dealing with it as an individual is what

2   you're telling us, correct?  Let me withdraw --

3   A.   My department, our physician group, we're all just dealing

4   with this.

5   Q.   You're aware that this lawsuit has been on file for five

6   years, and your lawyers -- in fact, you've got one of your

7   in-house lawyers right here today, don't you?  Your lawyers

8   have been tracking the lawsuit for five years, haven't they?

9   A.   Well, there's been two different issues.  One was

10   off-label marketing of Neurontin for -- so the company was

11   marketing it for things that were not on the label.  That's

12   been known for a while.  In fact there's a great report Annals

13   of Internal Medicine in 2006, I believe, that discusses all of

14   that data.  So that became published in a journal that all of

15   us would see around 2006.  That's off-label promotion.

16      I became aware of the manipulation of studies and the

17   results of the studies and how they were published through the

18   work of Dr. Kay Dickersin and Lisa Bero, and this was published

19   in the New England Journal of Medicine November, 2009.

20   Q.   And you're aware that Dr. Dickersin was hired by Kaiser to

21   do that work?

22   A.   Yes.

23   Q.   And you're aware that Dr. Dickersin supplied Kaiser with a

24   report sometime back in April or May of 2008, correct?

25   A.   I believe that whatever report she prepared was given to a

1   legal team.  I had not seen it until just, you know, a month or

2   two ago when I started preparing for this trial.

3   Q.   So if it should develop, the evidence in this case is the

4   Kaiser legal team had a report from Dr. Dickersin in April or

5   May of 2008, as far as you know, they didn't share that with

6   you until you actually got to trial here?

7   A.   No, a little bit before this trial.  In preparation for

8   this trial, I was given the expert reports, including

9   Dr. Dickersin's report.  I read it.

10  Q.   And were you given Dr. Abramson's report?

11  A.   Yes.

12  Q.   And Dr. McCrory's report?

13  A.   Yes.

14  Q.   A stack of reports like that correct, 8 or 10 inches high?

15  A.   I have them so electronically, so they're not --

16  Q.   Okay.

17  A.   They're on a thumb drive.

18  Q.   A lot of reports.

19  A.   Yes.

20  Q.   And when were those provided to you?

21  A.   In preparation for this trial.  I can't remember exactly

22  when we started, but, you know, some months ago?

23  Q.   Can you be any more precise than that?

24  A.   Sorry.  It's all blending in to me at this point.

25  Q.   Well, some months ago.  Was it sometime back in 2009, at

1    least?

2    A.    Uhm, yeah, I think so.

3    Q.    Fall, summer?  Can you give us a season?

4    A.    I think it would have been winter maybe.

5    Q.    And since reading those reports, you came to the

6    conclusion that for the off-label uses in question, gabapentin

7    is ineffective, correct?

8    A.    Uhm, okay, due to reading those reports, I came to. . .

9    Yes, you're correct.

10   Q.    And so for several months it's been your opinion, to quote

11   your lawyers, that gabapentin is no better than a sugar pill

12   for various of the off-label --

13          MS. NUSSBAUM:  Objection, your Honor.

14          THE COURT:  Sustained.

15   Q.    Do you agree that for the off-label uses in question,

16   gabapentin is no more effective than a sugar pill?

17   A.    When you say "sugar pill," you mean placebo?

18   Q.    Yes.

19   A.    Yes.

20   Q.    Okay.  And for several months you've been of that opinion,

21   that Neurontin is no more effective for these off-label

22   conditions than a placebo, correct?

23   A.    Well, I've been reading each one separately.  They're

24   really big documents.  So I read one that had to do with

25   migraine.  I read another one that had to do with bipolar.  You

1    know, I've been reading through them one at a time.

2    Q.   And as you were reading through those, it occurred to you

3    that there were Kaiser doctors prescribing these basically

4    worthless drugs for people with bipolar, pain conditions,

5    migraines, other problems, et cetera, correct?

6    A.   Well, what you're implying is that placebo is worthless,

7    and we can get into a whole discussion about that, but, yes,

8    that they are prescribing it.  We have a lot of work to do to

9    go back and bring forth the truth to our physicians based on

10   all that we know today, we do.

11   Q.   And for several months, I assume this has been a source of

12   tremendous concern to you that Kaiser patients are being

13   treated with totally worthless drugs.  As a long-term Kaiser

14   employee, that is a source of concern, isn't it?

15   A.   Okay, of course it's concerning that we now have evidence

16   that a drug that is used by many physicians, and that there are

17   a lot of patients taking this product, does not have evidence

18   of efficacy in clinical studies.  There's no way to go and take

19   thousands of people off a medication overnight because we have

20   new information.  We're going to have to reeducate all our

21   physicians.  We're going to have to summarize all this data,

22   because we're a data organization, we're an evidence-based

23   organization.  They're going to want to know, "What is the

24   evidence?  Show us why Neurontin isn't effective."  This is

25   going to take analysis, time, reports getting out to our

1    physicians, and then deciding what to do with the patients who

2    are on the medication.

3    Q.   Why do you need any time lag at all to take patients off a

4    worthless medicine that isn't doing them any good?

5    A.   Well, no, I didn't say it's not doing them any good.  In

6    some cases, placebo -- I mean, there's a lot of data that shows

7    even when patients are on placebo, they improve in certain

8    types of situations.  So you can't say that no one's getting

9    any benefit from it.  They could be getting a placebo effect,

10   absolutely.  And if a patient thinks, "Gee, I feel better, my

11   Neurontin is working really well," then maybe they feel better.

12   It doesn't mean that the drug inherently has a better effect

13   than giving them a sugar pill.  So we could take the Neurontin

14   and give them a sugar pill, and maybe they would have the same

15   effect.  But they are having an effect.  Do you see what I'm

16   saying?

17   Q.   So anybody who's benefitting from these is having a

18   placebo effect, in your opinion?

19   A.   For the indications, based on the data, there's no data to

20   show that it works any better than a placebo, that's correct.

21   Q.   And what about new starts?  What steps, if any, has Kaiser

22   taken to make sure that at least there are no new patients that

23   get started on this worthless drug?

24   A.   Well, like I said, we are just getting all this evidence.

25   And we have had a couple of telephone conversations with

1    physicians.  We're starting our planning.  We're a very huge

2    organization.  We're an evidence-based organization.  We need

3    to put all this together and educate the physicians, make some

4    decisions, and then figure out how we're going to handle this

5    situation.

6    Q.   How long does it take to send a two-page e-mail to each of

7    Kaiser's 12,000 physicians saying, "There's no evidence to

8    support using Neurontin for bipolar or nociceptive or

9    neuropathic --"

10   A.   Who would send that e-mail, sir?

11   Q.   Could I finish the question, please, Doctor.

12   A.   Sorry.

13   Q.   And that "We're encouraging you not to prescribe this for

14   any new patients, and to start working on trying to wean your

15   existing patients off the drug," how long would it take to type

16   up and send that e-mail?

17   A.   Who would be typing up and sending such an e-mail?

18        THE COURT:  Well, just if you can answer.

19   A.   Well, in order to develop an e-mail of that sort, we, as

20   an evidence-based organization, one, have to put forth to our

21   physicians who want to know -- they don't know they've been

22   duped.  They don't know the information that we know.  They

23   haven't read the Jewell report and the McCrory report.  And,

24   you know, all that stuff takes a long time to decipher and go

25   through and understand.  We don't -- we can't just say stop

Page 133

1   doing something --

2        THE COURT:  All right, that's the answer.  What's the

3   next question?

4        THE WITNESS:  Okay.

5   Q.   So I take it you're saying we'd have to go through one of

6   the P&T committees to do that?

7   A.   That would definitely be an avenue for making a decision,

8   yes.

9   Q.   Has there been any emergency meetings of the P&T Committee

10  in Southern California in late 2009 or early 2010 to get

11  started on that project?

12  A.   No.  We've had teleconferences with physicians.

13  Q.   How many?

14  A.   How many what?

15  Q.   Physicians have you talked to by teleconference?

16  A.   I would say we've had some key leaders, DUAT leaders, P&T

17  leaders, probably ten.

18  Q.   And how long have those been going on?

19  A.   Probably a few weeks.

20  Q.   You've been concerned yourself about Neurontin since back

21  in 2002, haven't you?

22  A.   I've been concerned about Neurontin. . .  We have had --

23  we have been doing a lot of education, as I mentioned, around

24  Neurontin, yes, since 2002.  In fact, we had what's called a

25  California-wide video conference where we called in a couple of

1   our experts, and we taped a discussion about Neurontin.  We had

2   two of those.  One I believe was 2002, one was 2003.  That was

3   available for all physicians across Kaiser Permanente to view.

4   So, yeah, we've done educational programs.  We've talked to our

5   physicians.  We've made -- we started talking about the

6   off-label problem since we learned about it, but we did not

7   know about the selective reporting and the manipulation of the

8   data until more recently.  So we talked about off-label

9   prescribing.  We said, "Okay, let's go look at the evidence."

10  But when we were looking at the evidence, the evidence was not

11  real, so now we know the evidence is flawed.

12  Q.  Who, if anybody, within the Kaiser organization has the

13  power, when it turns out there's no evidence to support a drug,

14  to take steps to having Kaiser physicians stop prescribing that

15  drug?  Have you got anybody with that title?

16  A.  There's not a title.  This would be a P&T decision.  P&T

17  would look at the evidence.  We'd have, you know, the same

18  process.  We have to come forth with evidence, we have to come

19  forth with data.  And then, you know, we talk to the

20  physicians, and we reach a decision on how best to handle it

21  for our patients where we're not disrupting their lives.

22  Q.  First off, you've got all the evidence you need, correct?

23  A.  I just now finished reading all of these expert -- I can't

24  just give -- I can't send out --

25             THE COURT:  No.  We'll finish this if -- do you have

1    what you need now?

2              THE WITNESS:  I do.  I have what I need --

3              THE COURT:  No.

4              THE WITNESS:  Thank you.

5              THE COURT:  We're just going to try and --

6              THE WITNESS:  Okay, sorry.

7    Q.   And as you were given this information, you saw the date

8    on most of those reports is back in April or May of 2008 when

9    the experts signed them, correct?

10   A.   Uhm, I don't remember all the dates, but I do remember

11   some were, yes, 2008, uh-huh.

12   Q.   And when you saw those May or April 2008 dates, did you

13   ask anybody, "Why didn't you send this to me earlier?  This

14   would have been of great importance to me in trying to run the

15   DIS department"?

16   A.   Well, frankly, this is the very first time I've ever read

17   expert reports of this nature.  I don't normally read legal

18   reports.  It would be something new to have that come to my

19   department, but I don't know why the legal department -- maybe

20   they had to sit through it and they didn't know precisely what

21   it meant for us.

22   Q.   My question is a little different.  After you saw that it

23   had been something over a year had elapsed between the time

24   Kaiser got the reports and they shared them with you, did you

25   come to anybody and say, "You know, as the person who's in

1   charge of DIS, the Drug Information Service, this is vital

2   information.  Why wasn't it shared with me earlier?"

3   A.   No, I didn't.

4   Q.   And as you've told us, if you'd known then what you know

5   now today, you would have made different recommendations

6   concerning Neurontin, correct?

7   A.   In 1997 and 1999, yes.

8   Q.   And if Kaiser would have provided you with this

9   information a year or a year and a half ago, you could have

10  started making different decisions then, couldn't you?

11  A.   Uhm, we could have started our planning and putting

12  together some of this evidence.  I don't know because these are

13  expert testimony for this trial.  The trial is not over.  I

14  don't know that we can use that.

15  Q.   Well, you aren't suggesting that Kaiser is waiting to see

16  what the jury does here before deciding whether to take steps,

17  are you?

18  A.   No.

19  Q.   You're sure of that?

20  A.   I'm sure of that.

21          THE COURT:  How are you doing timewise here?

22          MR. KENNEDY:  I'm certainly not going to finish today

23  but --

24          THE COURT:  No, we'll go to 1:00 then.

25          MR. KENNEDY:  Okay.

1   Q.   Let me pick up with the chronology, back where we were in

2   1997.  Let me show you another exhibit that you talked about on

3   direct, Trial Exhibit 290, and this is the minutes of the

4   Southern California P&T Committee in September of 1997.

5   A.   Okay.

6   Q.   And that's where the requests by the anesthesiologists to

7   expand Neurontin to them was considered, correct?

8   A.   Yes.

9   Q.   And this shows a number of people present, and virtually

10  all of those are doctors, correct?

11  A.   Yes.  Well, not present.  Oh, you mean in the section

12  called "Present"?

13  Q.   Yes.

14  A.   Yes, those are physicians and the area chief pharmacists

15  for each of the medical centers that was at that meeting that

16  day.

17  Q.   And then guests are listed, and you're included as a

18  guest, correct?

19  A.   That's correct.

20  Q.   And as a guest, you didn't get to vote at that meeting,

21  did you?

22  A.   There's only one pharmacist that votes at P&T at this

23  time, only one.  It's all physician votes.

24  Q.   So the decision to expand the restriction to include

25  anesthesiologists was voted on by the doctors and pharmacists

1    listed in the "Present" category, correct?

2    A.   No.   The present lists both -- there's voting members of

3    P&T and there's nonvoting members of P&T.   Okay, the voting

4    members are physicians, P&T chairs from each of the medical

5    centers, and one pharmacist, the vice president.   The other

6    people listed there are pharmacy directors from the different

7    medical centers.   They are not -- they are considered P&T

8    members.   They're nonvoting members, so they don't vote.

9    Q.   And this is just the Southern California committee, right?

10   A.   These minutes, yes.

11   Q.   And how many doctors are there on the Southern California

12   committee, seventeen, eighteen, something like that?

13   A.   Uhm, I think it's more like twelve.

14   Q.   And then Northern California has its P&T Committee.   How

15   many doctors on that?

16   A.   Uhm, I'm not a hundred percent sure but more.   I would say

17   maybe twenty.

18   Q.   And those aren't the same doctors on the two committees?

19   A.   No.

20   Q.   And then the other regions around the country have P&T

21   committees with still other doctors, correct?

22   A.   Yes.

23   Q.   And if we wanted to know why any particular person who

24   voted the way they did at the September 8 meeting did so, a

25   number of these people still work for Kaiser, don't they?

1   A.   Let's see.

2        (Witness examining document.)

3   A.   The voting members?  I see Dr. Daniel there, the chair.

4   He's still the chair.

5   Q.   Okay.  I understand he may be coming to talk to us?

6   A.   Yes.

7   Q.   Okay.  And no reason why any of the other voting members

8   couldn't be brought here as witnesses, as far as you know, is

9   there?

10       MS. NUSSBAUM:  Objection, your Honor.

11       THE COURT:  Sustained.

12  Q.   In any event, September 8, 1997, restriction expanded,

13  Neurontin can now be used by neurologists and

14  anesthesiologists, correct?

15  A.   And pain specialists.

16  Q.   Okay.  And jumping ahead now to 1999, Exhibit 311, and

17  this was a drug monograph you did in response to a request by

18  the chiefs of what to do what?

19  A.   This is the June, 1999.  Here we have a request by the

20  psychiatrists, the chiefs of psychiatry, to relax the

21  prescribing restrictions to include them for the treatment of

22  mood disorders, bipolar disorder.

23  Q.   Okay.  And as you've told us, there was then a meeting in

24  September where that was approved, correct?

25  A.   No.  This is June.

Page 140

1   Q.   I show you Exhibit 291.  Oh, I'm sorry.  I apologize.

2   June.  At any point since that vote was taken, have any of the

3   chiefs of psychiatry come around and said, in words or

4   substance, "We find Neurontin just really isn't effective for

5   bipolar or mood disorders, and we'd recommend that the

6   restriction be contracted to take psychiatry off the

7   formulary"?

8   A.   I haven't heard that exact statement made, no.

9   Q.   Or restricted to prevent use by psychiatrists, you haven't

10  heard anybody --

11          THE COURT:  You know what, we've sort of been through

12  this.  No?

13          MR. KENNEDY:  Well, okay, if your Honor has gotten it,

14  let me move on.

15          THE COURT:  It's 1:00 o'clock anyway so a good time to

16  break.  See you tomorrow.

17          THE CLERK:  All rise for the jury.

18          (Jury excused.)

19          (Side-bar conference off the record.)

20          (Adjourned, 1:20 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS     ) ss.

5    CITY OF BOSTON                )

6

7

8        We do hereby certify that the foregoing transcript,

9    Pages 1 through 140 inclusive, was recorded by us

10   stenographically at the time and place aforesaid in Civil

11   Action No. 04-10739-PBS, Kaiser Foundation Health Plan, et al,

12   v. Pfizer, Inc., et al, and thereafter by us reduced to

13   typewriting and is a true and accurate record of the

14   proceedings.

15       In witness whereof we have hereunto set our signatures

16   this 4th day of March, 2010.

17

18

19               /s/ LEE A. MARZILLI

20               LEE A. MARZILLI

21               OFFICIAL FEDERAL COURT REPORTER

22

23               /s/ VALERIE A. O'HARA

24               VALERIE A. O'HARA

25               OFFICIAL FEDERAL COURT REPORTER