IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                    )
                                          ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,     ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION         )
----------------------------------------)
This document relates to:                 )
KAISER FOUNDATION HEALTH PLAN, et al,     )
                                          )
                    Plaintiffs            )
                                          )
          -V-                             )No. 04-10739-PBS
                                          )Pages 1 - 156
PFIZER, INC., et al,                      )
                                          )
                    Defendants            )


JURY TRIAL - DAY TEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 5, 2010, 9:00 a.m.


LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

 1    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
      Greene, LLP, 33 Broad Street, 5th Floor, Boston,
 4    Massachusetts, 02109.

 5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
      Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
 6    Suite 301, Cambridge, Massachusetts, 02142.

 7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
      850 Third Avenue, New York, New York, 10022.
 8
          DON BARRETT, ESQ., Barrett Law Office,
 9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
      39095.
10
          BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11    Bernstein, Embarcadero Center West, 275 Battery Street,
      San Francisco, California, 94111-3339.
12

13    FOR THE DEFENDANTS:

14        KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
      THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15    Four Times Square, New York, New York, 10036.

16        RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
      LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
          JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18    Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
      Denver, Colorado, 80202.
19

20

21

22

23

24

25

1

                            I N D E X

2

3    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

4
     MIRTA MILLARES                 10        79
5
     MEREDITH ROSENTHAL
6

7    EXHIBITS                       PAGE

8    573                            24
     773                            25
9    594                            56
     581                            58
10   559                            63
     961                            69
11   433                            73

12   433-A                          77

13   405-A                          122

14   405-B                          124

15   405-C                          126

16   405-D                          127

17   405-E                          129

18   405-F                          130

19   405-G                          130

20   405-H                          132

21   405-I                          140

22   405-J                          141

23   405-L                          145

24

25

1              P R O C E E D I N G S

2         THE COURT:  Okay, what do we need to do, anything?  We

3    don't need anything for Ms. Millares, right?

4         MR. HOOPER:  Just to take ten seconds, your Honor?

5    The third binder, in addition to the two we discussed

6    yesterday, the same objections to those.  There are some

7    objections with Hartman and Rosenthal exhibits that we'll need

8    to discuss with you promptly --

9         THE COURT:  I looked at some of these.  Some of these

10   seemed like "of course."  I don't know why you have to go

11   through them.  You're not going to put in her report, right?  I

12   mean, I just went through the heading.

13        MR. SOBOL:  Oh, with respect to Professor Rosenthal,

14   most of that we're going to come to an agreement on.  I just

15   got that this morning, so we'll meet and confer, and that's

16   all --

17        MR. HOOPER:  At the break?

18        MR. SOBOL:  Yes.

19        THE COURT:  Most of it is --

20        MS. ARMSTRONG:  I did e-mail them last night setting

21   out all these objections in detail.  I don't want to --

22        THE COURT:  Of course you don't put in the report.

23   That's just against the rules.

24        MS. ARMSTRONG:  But we conferred a little bit this

25   morning.  We're willing to confer further at the break, but I

1   think there will still be some issues after we've conferred.

2          MR. HOOPER:  We might need to chat at the break about

3   whatever remains.  We've resolved a good bit of it.

4          THE COURT:  Well, maybe whoever is handling -- who's

5   doing the examination of Dr. Rosenthal?

6          MR. SOBOL:  I am, your Honor, but my associate can

7   take care of it too.  We are in the process of dealing with it,

8   so --

9          THE COURT:  Sure, why don't you just step outside.

10         MR. SOBOL:  Yes.

11         THE COURT:  At the risk of missing even one

12  scintillating moment.

13         MR. SOBOL:  Exactly.

14         THE COURT:  By the way, I was trying to sketch this

15  through.  If you were ball-parking it now, when do you think

16  we'd be charging the jury?  Will there be rebuttal cases on

17  your part?  You don't know yet?

18         MS. NUSSBAUM:  We don't know yet.

19         MR. SOBOL:  Somewhere around St. Patrick's Day, which

20  is probably right when you're going to be going away.  That's

21  what I'm thinking.

22         THE COURT:  I'm giving you St. Patrick's Day off.

23  Don't push it, you know.  Otherwise no one in Boston is --

24         THE CLERK:  Evacuation Day.

25         THE COURT:  Yes, Evacuation Day, when the British left

fd415135-7d33-460d-b1d1-bd7d81c1a3ce

1    Boston.

2           (Laughter.)

3           THE COURT:  A delayed laugh.

4           MR. BARRETT:  Your Honor, that brings up a really good

5    question about our plan.  We have operated since the trial

6    started on the local rule, the one-week rule.  We've been

7    giving them -- of course, it's changed a lot, but every day we

8    give them what we think the rest of the trial is going to be,

9    and it's time for them to give us theirs.

10          THE COURT:  Yes, we need to start doing this.

11          MR. BARRETT:  They've given just one.

12          THE COURT:  And then if there are any issues on

13   rebuttal cases, we should start thinking about it, subpoenas

14   that might go out.  I mean, I don't even know whether there's

15   going to be a rebuttal case.  I don't know what the deal is,

16   and I need to know when it's going to go to the jury so we can

17   start planning around what I view as may be healthy arguments.

18          MS. ARMSTRONG:  We will, your Honor.  I will say that

19   what they've given us every day has been a constantly,

20   constantly moving target.

21          THE COURT:  Yes, but you've probably given them

22   nothing.

23          MS. ARMSTRONG:  We've given them our first witness.

24          THE COURT:  Yes, I know, but give them something

25   because I am concerned about the way that subpoena thing came

1    up.  It's hard for me to unravel and tease out, you know, one

2    person says one, one says another.  But if you say "yes," then

3    you've got to do it.  If you say "no," then they know that they

4    have to just, you know, hustle.  But when you say "maybe" or

5    "yeah" and then don't do it, it just creates a whole other

6    realm of problems, and that's what came up.  And so I don't

7    want to be mid-trial scrapping about things that should have

8    happened a long time ago.

9              MS. ARMSTRONG:  Yes, your Honor.

10             THE COURT:  So let's call the jury in.  Yes?

11             MS. NUSSBAUM:  One more second, your Honor?  The

12    parties jointly agreed to withdraw what was previously marked

13    as Exhibit 2092, the stipulation with respect to the provider

14    list, and instead to substitute a complete copy now of 2092.

15             MR. HOOPER:  So stipulated.

16             THE COURT:  Okay, good.  Is the jury here?

17             THE CLERK:  I'm going to check right now.

18             THE COURT:  Dr. Millares, come on up.

19             (Discussion off the record between the Court and

20    Clerk.)

21             THE COURT:  Which days am I out?  Wednesday and

22    Thursday of that week, which is the 17th and 18th, are the two

23    days I'm out.  If we go exactly according to schedule, the

24    evidence will finish either just before that or just after

25    that, and we can spend that time working on instructions and

1  closing arguments and the like.  Or we could agree to just push

2  it to the following week.  But we're not even close.  But what

3  I do need to do is figure out basic things like whether I send

4  the California thing to the jury or not, or what about unjust

5  enrichment?  I mean, there are certain key issues.

6          MR. HOOPER:  Sure.

7          THE COURT:  Let me ask -- both sides are more familiar

8  with California law than I am -- do I have to write an opinion

9  no matter what?

10         MS. ARMSTRONG:  Yes, your Honor, you do.

11         THE COURT:  So what do I gain by sending this to a

12 jury?  I'd love to send it to a jury if that was it.

13         MS. ARMSTRONG:  Well, you're going to have to send it

14 to a jury on the RICO claim and some of their other state law

15 claims.

16         THE COURT:  That I understand.

17         MS. ARMSTRONG:  And so all you do is, you obtain the

18 advice of the jury, the advice of, you know, nine honest

19 citizens.

20         THE COURT:  I just think that in 93A, I always still

21 have to write.

22         MS. NUSSBAUM:  That's our understanding.

23         THE COURT:  And I don't have to follow their advice,

24 but I've got to give it weight, kind of thing.  That's the same

25 as under California law?

1          MS. ARMSTRONG:  Well, I actually think it's governed

2     by federal law.

3          THE COURT:  No, no, no.  A state cause of action?

4          MS. ARMSTRONG:  The right to a jury trial, whether

5     there's a right to a jury trial and the extent to which you're

6     bound by jury?

7          THE COURT:  I'm not talking about RICO.  I'm talking

8     about the state --

9          MS. NUSSBAUM:  What you said is correct, your Honor,

10    and our understanding of how it would be.  The jury, if you

11    determine it's advisory, it will be advisory.  You need to

12    write in any event.

13         MS. ARMSTRONG:  I agree with that.

14         THE COURT:  Do you all want to agree that it's

15    binding?

16         MS. ARMSTRONG:  Excuse me?

17         THE COURT:  The jury verdict?

18         MS. NUSSBAUM:  No, we don't agree to that, your Honor.

19         MS. ARMSTRONG:  We would be willing to consider that.

20         MR. SOBOL:  I've noticed that your law clerks haven't

21    been taking notes, so --

22         MS. NUSSBAUM:  The jury is here.

23         THE CLERK:  All rise for the jury.

24         (Jury enters the courtroom.)

25         THE COURT:  Good morning.  Anybody speak to the press,

1    speak to anyone, see anything in the press?  I find the jury

2    has complied.  Go ahead.

3              MR. KENNEDY:  Thank you, your Honor.

4                        MIRTA MILLARES

5    having been previously duly sworn, was examined and testified

6    further as follows:

7    CONTINUED CROSS-EXAMINATION BY MR. KENNEDY:

8    Q.   Good morning, Dr. Millares.

9    A.   Good morning.

10   Q.   You filed a number of declarations under penalty of

11   perjury in this case, correct?

12   A.   Yes.

13   Q.   And we talked about one of them yesterday concerning

14   optimal alternative drugs.  I'd like to turn your attention now

15   to a declaration that you filed on March 26 of 2009, almost

16   exactly one year ago.  We're at the end page.  That is your

17   signature, isn't it, March 26, 2009?

18   A.   Yes.

19   Q.   Okay.  And can we go back to the first page, Austin, and

20   Paragraph 1 starts off, or even above Paragraph 1, that "I,

21   Mirta Millares, declare under penalty of perjury under the laws

22   of the United States of America that the following is true and

23   correct."  I've read that accurately, haven't I?

24   A.   Yes, correct.

25   Q.   And coming down to Paragraph 3 on Page 1, it reads, "I

1    have personal knowledge of the matters stated herein," correct?

2    A.   Correct.

3    Q.   And then going over to Page 7 and Paragraph 18, you

4    stated, "Between 1994 and mid-2002, Kaiser evaluated several

5    requests from physicians to expand its initial formulary."

6         Stopping right there, that isn't totally accurate, is it?

7    A.   Uhm, to expand -- Kaiser evaluated several requests from

8    physicians to expand the formulary restrictions.

9    Q.   Kaiser doesn't have just a single formulary, does it?

10   A.   Kaiser, we and -- okay, the formularies are, there's a

11   commercial formulary for the commercial members, and there's a

12   Medicare Part D formulary for Medicare Part D members.  Those

13   are two separate types of formularies.

14   Q.   Well, also, Kaiser has multiple regions around the

15   country, doesn't it?

16   A.   Oh, sure, yes, uh-huh.

17   Q.   And there's a separate formulary in each region, correct?

18   A.   Correct.

19   Q.   So when you used Kaiser "formulary" in the singular, that

20   wasn't completely accurate, was it?

21   A.   Well, as I spoke to yesterday, usually when we have a

22   formulary request, what we prepare in California is shared with

23   all of the different regions, and most of the time it's all in

24   concert.  So whatever formulary decisions or formulary things

25   we are considering are generally considered at about the same

1    time in all the regions.

2    Q.   In taking just Northern California, they put Neurontin on

3    formulary in 1994 on a totally unrestricted basis, didn't they?

4    A.   That's correct.

5    Q.   So between 1994 and mid-2002, Northern California wasn't

6    evaluating requests to expand its initial formulary?

7    A.   That's correct.

8    Q.   So the first sentence really here is referring to the

9    Southern California region, to be completely accurate, wouldn't

10   it?

11   A.   And other regions.  Each of the regions deals with

12   restrictions or guidelines in various different ways, but, yes,

13   we dealt with in Southern Cal and many of the other regions

14   different expansions or relaxation of the restrictions to other

15   physician groups.

16   Q.   But not in all regions?

17   A.   Not in all, no.

18   Q.   Okay.  And going on in that same paragraph, "The

19   expansions were to include physicians from practice groups

20   other than neurology, and allowed those physicians to prescribe

21   Neurontin for off-label indications."  And, again, that

22   wouldn't be applicable to Northern California?

23   A.   In Northern California, there were no restrictions.

24   Q.   Correct.  And then you go on to say, "Kaiser would not

25   learn until news began to become publicly available in mid-2002

1  that Neurontin's manufacturers had engaged in a misinformation

2  campaign that, among other things, suppressed key negative

3  evidence that demonstrated Neurontin's lack of efficacy --"

4  and "efficacy" means effectiveness, correct?

5  A.   Yes.

6  Q.   "-- for these off-label indications."  So as of March of

7  2009, you had personal information that by mid-2002, Kaiser was

8  aware of the statements in that paragraph, correct?

9  A.   Kaiser --

10       MS. NUSSBAUM:  Objection, your Honor.

11 A.   -- was aware of the off-label promotion techniques that

12 were being used by Pfizer, yes.

13 Q.   No.  What you say in this declaration, in fact you don't

14 even mention -- well, excuse me.  What you say here is that the

15 manufacturers engaged in a misinformation campaign, right?

16 A.   Correct.

17 Q.   Okay.  And Kaiser had personal knowledge in mid -- or you

18 had personal knowledge in mid-2002 that the manufacturers were

19 engaged in a misinformation campaign, correct?

20 A.   Yes.

21 Q.   And as of mid-2002, you also know that Kaiser was aware

22 that these people had suppressed key negative evidence that

23 demonstrated Neurontin's lack of efficacy, correct?

24 A.   Correct.

25 Q.   For these off-label indications, correct?

Page 14

1  A.   Correct.

2  Q.   So you knew considerably more than that there was just an

3  off-label promotion going on, correct?

4  A.   Uhm, well, the misinformation is in promoting and showing

5  evidence that Neurontin was useful for some of these off-label

6  indications when in fact not all the evidence was there.

7  Q.   And it's illegal to promote off-label?

8  A.   Correct.

9  Q.   Even if what you're saying is a hundred percent correct?

10 A.   Uhm, correct.

11 Q.   Okay.  So here Kaiser was aware that not only were there

12 off-label promotions going on, but that the material in the

13 off-label promotions was false, correct?

14 A.   Some of that.

15 Q.   Well, they certainly "engaged in a campaign of information

16 and suppressed key negative evidence"?

17 A.   Correct.

18 Q.   Okay.  And the key negative evidence would include things

19 like the Pande report, correct?

20 A.   Well, at the time --

21 Q.   Can you answer that, Doctor?  Would the key negative

22 evidence include the Pande report?

23 A.   Yes, correct.

24 Q.   Okay, would it include the Frye report?

25 A.   Sure.

1  Q.   Would it include Gorson?

2  A.   Uhm, I don't know for a fact.  I mean, I testified about

3  Gorson, and I don't know exactly why it ended up being a letter

4  to the editor.

5  Q.   I'm sorry, Doctor, we're talking about your personal

6  knowledge in a sworn declaration about key negative evidence.

7  What was the key negative evidence that you know Kaiser knew by

8  mid-2002?

9  A.   Uhm, I'm trying to remember exactly in 2002 what I was

10 aware of.

11 Q.   So you can't tell us now what you were referring to when

12 you talked about key negative evidence last year?

13 A.   Well, I -- I was aware of some key negative evidence that

14 had been suppressed, yes.

15 Q.   Would it include Reckless?

16 A.   Uhm. . .you're asking did I know it in 2002?

17 Q.   Yes, I'm asking, when you signed your declaration a year

18 ago and said there was key negative evidence that was

19 suppressed in mid-2002, what did you have in mind?

20 A.   Right.  Well, now I know that --

21 Q.   I'm sorry, Doctor.  No, no.  When you said under penalty

22 of perjury under the laws of the United States in March of

23 2009, what did you have in mind?

24 A.   Uhm --

25          MS. NUSSBAUM:  Your Honor --

1          THE COURT:  If you don't remember, say "I don't

2     remember."  If you remember, tell him.

3     A.    Well, I'd have to sit through and look at exactly when I

4     became aware of each of the different trials.  I don't want to

5     sit here and say something that's incorrect.

6     Q.    In the interest of time, let me move on then.

7     A.    Okay.

8     Q.    Staying with that same paragraph, "I have since --" and

9     this is since mid-2002, correct?

10    A.    Yes.

11    Q.    "-- learned that there were numerous biases and flaws in

12    studies supported or, if bad, suppressed by defendants."

13    A.    Right.

14    Q.    And that was information that you acquired before March of

15    last year, correct, Doctor?

16    A.    Yes.  I had become aware of some of that, uh-huh.

17    Q.    And that was as a result of reading the Dickersin report,

18    among other things, correct?

19    A.    No.  The Dickersin report was published on November 12,

20    2009, in the New England Journal of Medicine.

21    Q.    Okay, the article was published in November?

22    A.    Yes, right.

23    Q.    However, she filed a report in this case considerably

24    earlier than that?

25    A.    Right.

1   Q.   And you saw that report sometime before March of 2009,

2   didn't you?

3   A.   Again, I have read, like, many, many expert reports.

4   They're really huge.  I can't remember exactly in what sequence

5   I read them and what exact date I read which one, but I have

6   read every single one of the expert reports over time since,

7   you know, during this trial in preparation for this trial.

8   Q.   In any event, when you saw the New England Journal of

9   Medicine article in November of 2009, that wasn't the first

10  time that you'd come to understand that there were numerous

11  biases and flaws in the studies, correct?

12  A.   That was the first time that it had been published in a --

13  Q.   Doctor, the Judge has asked me to please try to move this

14  along.

15  A.   Sure.

16  Q.   The question is, prior to November of 2009, you learned

17  that there were numerous biases and flaws in the studies,

18  correct?

19  A.   Via the expert witness reports that I was reading, yes.

20  Q.   Okay.

21  A.   Uh-huh.

22  Q.   Now, I want to show you a portion of your testimony in

23  this case from Page 127, Line 9, through Page 128, Line 9, from

24  yesterday's daily transcript.  These reporters are fast.

25  Picking up at 127, Line 9, you have an answer:  "Well, there's

1   been different issues.  One was off-label marketing of

2   Neurontin for -- so the company was marketing it for things

3   that were not on the label.  That's been known for a while.  In

4   fact there's a great report," and you talk about the Annals of

5   Internal Medicine.

6        Then at Line 15, "That's off-label promotion."  Then you

7   say, "I became aware of the manipulation of the studies and the

8   results of the studies and how they were published through the

9   work of Dr. Kay Dickersin and Lisa Bero, and this was published

10  in the New England Journal of Medicine November, 2009."

11       "Question:  And you're aware that Dr. Dickersin was hired

12  by Kaiser?"  And continuing on, and if we could, Austin, scroll

13  just a little bit onto the next page to Line 3.

14       "Question:  So if it should develop, the evidence in this

15  case is the Kaiser legal team had a report from Dr. Dickersin

16  in April or May of 2008, as far as you know, they didn't share

17  that with you until you actually got to trial here?

18  Answer:  No, a little bit before this trial.  In preparation

19  for this trial, I was given the expert reports, including

20  Dr. Dickersin's report.  I read it."  Scroll down to Line 21.

21       "Question:  And when were those provided to you?

22  Answer:  In preparation for this trial.  I can't remember

23  exactly when we started, but, you know, some months ago.

24  Question:  Can you be more precise than that?  Answer:  Sorry,

25  it's all blending.  Well, some months ago.  It was sometime

1    back in 2009 --"

2        Can you scroll, next page.  "Question:  Sometime back in

3    2009, at least?  Fall, summer?  Can you give us a season?

4    Answer:  I think it would have been winter maybe."

5        Now, you'd agree with me that based on what we've now

6    refreshed your memory from your declaration, you were aware of

7    Dickersin well before the winter of 2009, correct?

8    A.   May I clarify?  I don't know that I was aware of Dickersin

9    before then.  I was aware of this trial.  I was aware of the

10   case that we were bringing forth as an organization.  I had met

11   with -- you know, I'd heard that we were pursuing this with a

12   legal team.  I'm not -- I'm a drug information pharmacist.  I'm

13   not involved with the legal side of what our company does.

14       Now, when I actually read the Dickersin report, I can't

15   tell you that.  I don't remember.  And when I became aware of

16   all this was not necessarily -- you know, it was before I read

17   all these expert reports because I knew that Kaiser as an

18   organization, we were hiring a legal team to pursue this case.

19   And I knew what the basis of the case was, and the basis of the

20   case is that, you know, there was information out that was

21   suppressed.  There was information that was incorrect and

22   fraudulent.  So that's what I'm trying to say.  I knew about

23   this case, I knew what we were doing.  I can't tell you the

24   exact date I read Dickersin and Perry and Jewell and Abramson.

25   I mean, there's tons of them.

1   Q.   Do you even remember the question you're answering?

2   A.   Uhm, I think I was trying to make -- I think I answered

3   your question well, sir.

4        MS. NUSSBAUM:  Your Honor, this is argumentative.

5        THE COURT:  Yes, sustained.  I strike it.

6   A.   I think so.

7   Q.   We can offer this in just a second, but is there any doubt

8   in your mind that in March of 2009 when you filed your

9   declaration and you said, "I knew there were numerous biases

10  and flaws in the studies," you'd gotten that from somewhere as

11  of that time, correct?

12  A.   That's correct.

13       MS. NUSSBAUM:  Your Honor, I object.  This was asked

14  and answered already.

15       THE COURT:  Sustained.  Let's move on.

16  Q.   Now, before we get totally off of Dickersin -- can we put

17  up the Dickersin report, 2091.  I believe it's in evidence.

18  Now, Dr. Dickersin, as you know, isn't a medical doctor,

19  correct?

20  A.   She is a doctor of philosophy, a Ph.D., yes.

21  Q.   And you've read her article carefully now, as you've said,

22  correct?

23  A.   Well, it's not just her article.  It's --

24  Q.   Have you read her article carefully?

25  A.   It's not her article.  She has coauthors, including

1    physicians that are coauthors.  That would be a

2    misrepresentation to the jury.

3    Q.   Have you read the article that Dr. Dickersin --

4    A.   Co-wrote, yes.

5    Q.   With other people, okay.

6    A.   Yes, with physicians and others, absolutely I have.

7    Q.   And nowhere in that article do they say that Neurontin

8    lacks efficacy or effectiveness for any of the off-label

9    purposes in question, do they?

10   A.   Okay, so you're wanting me to remember every single line

11   in this article right now?

12        THE COURT:  You know, we are never going to finish.

13   If you say you don't remember, you don't remember.  If you

14   remember, tell him the answer.

15   A.   I personally don't remember that --

16        THE COURT:  She doesn't remember.  What's the next

17   one?  We have to finish --

18        THE WITNESS:  Okay, I'm sorry, Judge.

19        THE COURT:  -- or you'll never get back to California.

20   You'll be a resident of Massachusetts.

21        THE WITNESS:  I do.  I feel like one already, I'm

22   telling you.  I've got my Boston Red Sox shirt.

23   Q.   And what Dr. Dickersin focused on was the methodology that

24   had been used in various studies, correct?

25   A.   The article focuses on not necessarily the methodology,

1  okay.  It is more complex than that.  It deals with looking at

2  the original research report, okay.  So the original research

3  document that exists in the drug company explains, "This is

4  what I'm going to do.  This is the study.  This is how many

5  people I'm going to enroll.  This is what I'm going to look at.

6  This is my primary objective in doing the study.  I'm studying

7  this.  And if it proves that it works for this, then I will

8  conclude that the drug is effective because that's my primary

9  outcome."

10       What it shows is, it deals with -- that's why it's called

11  "Outcome Reporting in Industry-Sponsored Trials of Gabapentin

12  for Off-Label Use."  They looked at the fact that the outcome,

13  the primary outcome as designated in that protocol in the

14  company, when it got published, it got totally changed to

15  something else.  So the original study and what got reported

16  were changed, flipped.  That's not exactly how you said it.

17  That's why I needed to explain that.

18  Q.   Nowhere does Dr. Dickersin say, if you study a particular

19  report correctly, you'll find that gabapentin in fact does not

20  work for any of the conditions in question?  She never says

21  that, does she?

22  A.   I don't think so because that's not the gist of this paper

23  at all.

24  Q.   Okay, exactly.  And what she was doing was looking at --

25  what's the word you prefer rather than "methodology"?  She

fd415135-7d33-460d-b1d1-bd7d81c1a3ce

1    didn't like the way the studies were done, correct?

2    A.   That's part of it.  The other part is, the studies were

3    done.  They were conducted correctly.  When they got results

4    they didn't like, they lied in the final report that went into

5    the literature, into the literature that we read.

6    Q.   We agree, that's a wrong --

7    A.   It's called "selective outcome reporting," changing my

8    outcomes and reporting whatever I decide I want people to see

9    and not reporting the absolute truth.

10   Q.   And that was her criticism, she did not go the step

11   further and say, "And what's more, read correctly, these

12   reports demonstrate that gabapentin in fact does not work for

13   the indications in question," did she?

14   A.   That was not the purpose of her paper, no.

15   Q.   So if you were trying to find scientific evidence that

16   gabapentin does not work for the uses we're talking about here,

17   you'd have to go someplace other than Dr. Dickersin's article,

18   wouldn't you?

19   A.   Yes.  We'd go to the randomized double-blind clinical

20   trials that we have spoken of in this case.

21   Q.   Now, in addition to Dr. Dickersin's article and report, as

22   you said, you've read reports by a number of other Kaiser

23   experts in this case, correct?

24   A.   You mean experts that are on the case -- they're not from

25   Kaiser.  They were hired by Kaiser.  Yes, okay.

1   Q.   And have you asked anybody at any time if you could see

2   any of the defendants' expert reports?

3   A.   I have them.

4   Q.   You've got those as well?

5   A.   Yes.

6   Q.   You've considered all of them?

7   A.   Yes.

8   Q.   Now, before we get off of articles, you've written a

9   couple articles yourself, haven't you?

10  A.   I have.

11          MR. KENNEDY:   I offer Exhibit 573 into evidence.

12          (Exhibit 573 received in evidence.)

13  Q.   And ask if that's an article that you co-wrote with others

14  concerning Kaiser Permanente's Prescription Drug Benefit

15  Program?

16  A.   Yes.

17  Q.   And scrolling down to the bottom of the first page,

18  Austin, this was published in "Health Affairs," the March and

19  April 2000 issue, correct?

20  A.   Yes.

21  Q.   And, Austin, if you could scroll over to Page 188.   The

22  page numbers are on the side in the margins.   I think it's the

23  fourth page of the document actually.   Under "Considering new

24  drugs for the formulary" and coming down to the second full

25  paragraph that starts "Between November --"  Do you have the

1    article in front of you, Doctor?

2    A.   Yes, it's up here on the screen.

3    Q.   It says, "Between November 1997 and December 1998, the

4    Southern California P&T Committee accepted fifty-four drugs to

5    the formulary; did not accept twenty-six drugs; and deleted

6    twenty-three drugs, strengths, or dosage forms of drugs that

7    were previously on the formulary.  During that same period the

8    Northern California P&T Committee accepted forty-five drugs;

9    did not accept twenty-one drugs; and deleted eighteen drugs,

10   strengths, or dosage forms."

11        I've read that correctly, haven't I?

12   A.   Yes, you did.

13   Q.   And in 1997 it was common practice for the P&T committees

14   to add drugs, drop drugs, reject drugs, correct?

15   A.   Consider them for formulary addition, formulary deletion,

16   expansion of dosage forms, all of those things.

17   Q.   And that's continued to be the practice from 1997 to

18   present, correct?

19   A.   That's correct.

20   Q.   And looking at Exhibit 773, which I would offer in

21   evidence --

22           (Exhibit 773 received in evidence.)

23   Q.   And, Doctor, I'll represent to you that this was produced

24   by Kaiser, being a newsletter from one of the regions.  Perhaps

25   you can tell us which one.  It looks like it's Ohio from the

1    first paragraph.  It says, "In order to improve care for Kaiser

2    Permanente (KP) Ohio members with diabetes," do you see that?

3    A.    I do, uh-huh.

4    Q.    Okay.  And, Austin, turning to the second page, middle

5    column, can you highlight "Formulary Changes."  And this sets

6    forth formulary restrictions that were effective in Ohio as

7    of -- then they may have additions.  Let's see, "Formulary

8    restrictions," and then coming down you've got "Criteria

9    restricted medicines," and then if you go to the next column

10   it's got "Generic conversion," correct?

11   A.    That's correct, yes.

12   Q.    And this is an example of the sort of thing that goes on

13   within the different regions as they make additions, deletions,

14   and restrictions to drugs on formulary, correct?

15   A.    Uhm, partially correct, except the formulary with

16   criteria, that specific classification is only used by a few of

17   the regions, including Ohio.

18   Q.    Let's take a look at Defendants' 904, which I believe is

19   already in evidence.  I'm sorry.  We'll get back to that.

20        MR. KENNEDY:  My mistake, your Honor.  We'll get back

21   to that in a second.

22   Q.    So today within the regions, for example, Lyrica is not on

23   the Southern California formulary, is it?

24   A.    That's correct.

25   Q.    It is, however, on other formularies throughout the Kaiser

1   system, correct?

2   A.   I'm not certain about that, no.

3   Q.   Now, changing topics, you believe Lyrica is not on the

4   formulary anywhere?

5   A.   No, I didn't -- I don't remember really.  I'd have to

6   look, but I don't recall that it is.

7   Q.   Exactly, because there are differences, and without

8   checking with each region, it's really hard to keep track of

9   what's on one formulary --

10          MS. NUSSBAUM:  Objection.

11  A.   No, it's not hard to keep track.

12          THE COURT:  Excuse me?  When she objects, just hold on

13  a second.  What did you say?

14          MS. NUSSBAUM:  Argumentative.

15          THE COURT:  Overruled.

16  A.   I have a fairly simple way of checking the formulary

17  status in each region.

18  Q.   But you do keep separate records for the formulary status

19  of each region, correct?

20  A.   We have one online formulary that has the status of the

21  drug in each of the regions that anybody can access and look

22  at.

23  Q.   But there are differences among the regions?

24  A.   Yes, definitely.

25  Q.   Okay, now, yesterday we talked about Gorson, Backonja,

1   Pande, Frye, and Reckless.  You mentioned all of those on

2   direct examination, correct?

3   A.    Yes.

4   Q.    Now, we can all agree, can't we, that by 2003 the results

5   of the Reckless study had been published, correct?

6   A.    Not to my knowledge.

7   Q.    Okay, let me turn to Exhibit 1660, which is in evidence,

8   an article by Drs. Backonja and Glanzman.  And if we scroll

9   down to the bottom of the page, it's accepted for publication

10  October 14, 2002, and then "Printed in USA, Reproduction in

11  whole or in part," and if you come further down, it's copyright

12  2003 by Excerpta Medica.  Do you see that?

13  A.    I sure do.

14  Q.    Okay.  And do you have any reason to doubt that that

15  article did get published sometime in 2003?

16  A.    That's not -- that's not a publication of the Reckless

17  trial.  This article, yeah, it's published.  This is a

18  published review article.

19  Q.    These are really simple questions.

20  A.    I'm sorry.  You're asking it in a way that I would

21  respond, and it wouldn't be accurate.

22  Q.    So far, all I've asked is whether this article got

23  published in 2003, and we can agree that it did, can't we?

24  A.    This article, but before you were asking about Reckless.

25  I wasn't sure if you were asking me was Reckless.  Is this

1    Reckless?  No.  Is it an article published?  Absolutely.

2    Q.   Okay, let's go over to Page 90 of this article, under

3    "Multinational Study:  The unpublished clinical trial of

4    gabapentin in PDN --" and PDN is?

5    A.   Peripheral diabetic neuropathy.

6    Q.   "-- by Reckless, et al," and they give a number, "included

7    325 patients," and they describe who they were.  And coming

8    down to the middle of that paragraph, Austin, maybe twelve

9    lines down, "The primary efficacy end point was changed in

10   weekly mean pain score measured on an 11-point pain scale."

11   And then coming down to the next paragraph starting, "Mean pain

12   scores decreased from baseline to end point in all groups, but

13   there were no significant differences between any treatment

14   group and the placebo group."

15        I've read that correctly, haven't I?

16   A.   That's correct.

17   Q.   So at least as of 2003, the fact that the Reckless study

18   had failed to show an improvement over placebo was something

19   that had been published in the literature, correct?

20   A.   The Reckless trial was not published.  This is a review

21   article.  It's just mentioning unpublished data.  They

22   themselves call it unpublished data in the first sentence.

23   It's unpublished.  They themselves said that.

24   Q.   Doctor, you'll agree with me, in 2003 there was an article

25   in black and white disclosing what the Reckless --

1          THE COURT:  Excuse me.  What's the source of the

2     confusion here?  Can we see on the front page of the article

3     what it is?

4          MR. KENNEDY:  Sure.

5          THE COURT:  All right, so that's the Backonja study?

6     Is that it?

7          THE WITNESS:  No, ma'am.

8          MR. KENNEDY:  No.  This is not the Backonja study,

9     your Honor.

10          THE COURT:  This is just an abstract?

11          THE WITNESS:  This is a review article.

12          THE COURT:  It's a review article.  So was the review

13     article published?

14          THE WITNESS:  Yes.  Good question.

15     Q.   So we can agree that as of 2003, Reckless, or at least the

16     results of Reckless, were out there in the public literature,

17     correct?

18     A.   In a review article, yes.

19     Q.   Now, let's turn to Exhibit 559, which I believe is already

20     in evidence, and that's a drug monograph.  In fact this would

21     have been one that you prepared or your group prepared,

22     correct?

23     A.   That's correct.

24     Q.   And it says September '99 on it, correct?

25     A.   That's correct.

1    Q.   But it actually would have been prepared sometime before

2    that, correct?

3    A.   Right.

4    Q.   And, Austin, let's go to the last page, 25463, and if you

5    could scroll down starting at S6 and S7, and can you highlight

6    everything in yellow through the bottom.

7        And we find that this was prepared by Debbie Kubota.

8    She's one of the people that works for you, correct?

9    A.   That's correct.

10   Q.   It's dated June '99.  So even though the monograph is for

11   a September '99 meeting, the material was at least known by

12   June of 1999, correct?

13   A.   That's correct.

14   Q.   And then it was edited by the boss, correct, you?

15   A.   Yes, it was edited by me.  I don't call myself the boss.

16   Q.   Then scrolling up under the references, Reference S6 is

17   Backonja, isn't it?  That's the Backonja report we've been

18   talking about, right?

19   A.   That's correct.

20   Q.   And under S7 is Gorson, and that's the Gorson study that

21   we've been talking about, correct?

22   A.   That's correct.

23   Q.   And now if we go back to the second page of the monograph,

24   Page 4556, and if we come to the one, two, three, fourth bullet

25   point that starts with "The efficacy and safety."

Page 32

1   A.   Correct.

2   Q.   What you and your staff wrote in June of 1999 was, "The

3   efficacy and safety of gabapentin for the treatment of diabetic

4   peripheral neuropathy --" sometimes called DPN, right?

5   A.   Correct.

6   Q.   "-- was studied in two randomized, double-blind,

7   placebo-controlled trials involving a total of 205 patients.

8   In the first study (S6) --" and as we've already learned, S6 is

9   Backonja, right?

10  A.   Yes.

11  Q.   "-- 67 percent of patients were treated with 3,600

12  milligrams a day."  And then in the next sentence it says,

13  "There was a potential bias from unintentional unblinding

14  resulting from secondary dose titrations according to side

15  effects."  Correct?

16  A.   Correct.

17  Q.   So as of June of 1999, at least your group was aware that

18  the Backonja study was potentially compromised and might not be

19  totally valid because there was this potential bias from

20  unintentional unblinding, right?

21  A.   That's correct.

22  Q.   And as you told us yesterday, I believe, what happened

23  was, at these doses, 3,600 milligrams, the people who were

24  getting the drug actually started having side effects and were

25  able to figure out that they weren't part of the placebo group,

1   correct?

2   A.   That's correct.

3   Q.   At least in this case, gabapentin behaved differently from

4   a sugar pill, didn't it?

5   A.   Uhm, I'm not sure what you're asking.

6   Q.   Well, the people who got gabapentin recognized it as

7   opposed to those who weren't getting it, correct?

8   A.   No, placebo can cause side effects for sure, so it behaved

9   just like placebo.  In that sense, placebo can also cause side

10  effects.

11  Q.   And continuing on in that same paragraph, it goes on to

12  say, "The second study crossover trial --" and it says S7, and

13  we know already because we've looked to the back that S7 is

14  Gorson.  And it goes on to say, "The second study failed to

15  demonstrate significant pain relief in three of the four

16  efficacy measures at a GBP dose of 900 milligrams a day, a dose

17  which may have been too low."

18       So by June of 1999, your group was aware that the Gorson

19  study had failed to demonstrate efficacy, correct?

20  A.   We had read that letter to the editor regarding that study

21  and included it here in our monograph, absolutely.

22  Q.   The material that we just read about 205 patients being on

23  3,600 milligrams a day or 900 milligrams a day, you didn't get

24  that from reading a letter to the editor, did you?

25  A.   The Gorson?

1   Q.   Doctor, let me withdraw the question.  In June, by June of

2   1999, you had the Backonja study and the Gorson study, didn't

3   you?

4   A.   We had the Backonja study that was published in JAMA, and

5   we have the reference to the Gorson material, which is a letter

6   to the editor.  It's referenced there in the monograph.

7   Q.   And from the letter to the editor --

8   A.   Yes.

9   Q.   -- you knew that the Gorson study had failed to

10  demonstrate that gabapentin did anything, correct?

11  A.   That's what was reported in the letter to the editor, yes.

12  Q.   And knowing that information about Backonja and that

13  information about Gorson, the Southern California, the P&T

14  Committee went ahead in September and expanded the uses for

15  gabapentin in their formulary, correct?

16  A.   Yes, and I think I explained that yesterday pretty well.

17  I can do it again, but --

18  Q.   That's Backonja and Gorson.  Two other studies you

19  mentioned yesterday were Pande and Frye, correct?

20  A.   Not regarding this indication.  Are we talking about

21  something different?  Okay.

22  Q.   In your testimony yesterday --

23  A.   Okay.

24  Q.   -- you were critical of my clients for not having shared

25  Pande and Frye, okay?

1   A.   Okay, yes.

2   Q.   Let's take a look now at Exhibit 629 which is in evidence,

3   another drug monograph prepared by your group, correct?

4   Correct?

5   A.   Oh.  Yes.  Sorry, yes.

6   Q.   And this talks about this is going to be for a P&T

7   Committee meeting in Northern California in March of 2002 and

8   in Southern California in June of 2002, correct?

9   A.   Correct.

10   Q.   And if we go over to, Austin, the next-to-the-last page,

11   Bates No. 804 up at the top, and that was prepared by again

12   Debbie Kubota, and she prepared it in January of 2002.  So the

13   information that's in this report is something that would have

14   been known to your group in or before January of that year,

15   correct?

16   A.   Correct.

17   Q.   And, again, you edited this report as you've done with --

18   you edited this report, correct?

19   A.   Yes.  The January 2002 date would be the date that Debbie

20   submits to the two editors her version.  We may have added or

21   subtracted things as it went through the editorial process.

22   There's two editors, Natalie Hendrickson and myself.

23   Q.   Thank you.  And, Austin, let's turn to the last page of

24   that document, 6805.  And what this is is a list of the

25   references that you relied on in preparing this article,

1    correct?

2    A.    That's correct.

3    Q.    Can we highlight R38 and R40.  So R38 is a

4    placebo-controlled study by Frye and others, isn't it?

5    A.    That is an abstract of that study, yes.

6    Q.    Okay.  And R40 is an article dealing with a study by Pande

7    and others, correct?

8    A.    An abstract, yes.

9    Q.    Okay.  Now let's turn to Page 6797, and, Austin, if you

10   can pick up at the evidence table at the lower half of the page

11   on 6797, the bottom of the page.

12        "Evidence Table – Gabapentin in bipolar disorder (does not

13   contain 4 open-label trials published in 1999)."  Then the next

14   thing we get to is "Frye, et al, 2000 double-blind randomized

15   crossover," and when we come over to the third column, it says,

16   "The data favored LTG --"  That's Topamax or some other drug,

17   correct?

18   A.    It's Lamictal, lamotrigine.

19   Q.    Okay, thank you.  "-- with no significant difference

20   between gabapentin and PLC."  That means placebo.  Correct?

21   A.    That's correct.

22   Q.    So certainly sometime in 2002, Kaiser was aware that the

23   Frye study had failed to show that gabapentin was significantly

24   better than placebos, correct?

25   A.    We had knowledge of it as an abstract, yes, not a

Page 37

1    published study.

2    Q.   Okay.  And coming down, the next box deals with Pande,

3    et al, 2000, right?

4    A.   Yes.

5    Q.   And coming over to the third column there, there is a

6    GBP minus 6 and PLC minus 9.  And what that's referring to is,

7    there was a downward movement among the gabapentin recipients,

8    correct?

9    A.   Well, a downward movement, we're talking about a specific

10   scale that's used in psychiatry.

11   Q.   I was trying --

12   A.   Well, a downward movement, I don't know that -- what does

13   that mean?

14   Q.   If any of these questions you don't understand, let me

15   know.  I'll keep trying.

16   A.   That's what I was trying to --

17   Q.   What the minus 6 and the minus 9 means is --

18   A.   It's a score.

19   Q.   -- gabapentin didn't do as well as the placebo in that

20   trial, did it?

21   A.   That's right.

22   Q.   Okay, so by 2002 you knew that fact.  So we can agree,

23   can't we, that by sometime in 2002, you were aware of the

24   results of both the Frye and Pande studies, correct?

25   A.   Correct.

1   Q.   And with that information, neither Southern California nor

2   any other region took any steps to restrict gabapentin from use

3   by psychiatrists, did they?

4   A.   We do not restrict the use by a group.  We restrict to

5   specialist groups.  That's not how restrictions are used.  I

6   know that's confusing, and I tried to explain it yesterday, but

7   that's not how restrictions are used.

8   Q.   And in fact, since 2003 when Reckless had been published

9   and Frye and Pande and Gorson and Backonja had become known to

10  you, there have been no measures taken within Kaiser to try to

11  limit the patients to whom gabapentin can be prescribed,

12  correct?

13  A.   That's not true.  Do you want to repeat your question so I

14  make sure I answer it perfectly correct?

15  Q.   Again, let me move to another topic, and we can circle

16  back to it.  Let's take a look at Exhibit 557 already in

17  evidence, and this is yet another drug monograph prepared by

18  your group?

19  A.   Yes.

20  Q.   This one was in September, 1999, correct?

21  A.   It is, yes.

22  Q.   And, Austin, can you go over to Page 3261, and can you

23  highlight "Guidelines" which is in the box.  You got it?  That

24  box.

25       You mentioned yesterday that you can have -- well, you can

1   keep a drug off the formulary altogether?

2   A.   Correct.

3   Q.   And if a drug is on the formulary, you can kick it off if

4   you decide it was really a threat to people, can't you?

5   A.   A threat?  Absolutely.

6   Q.   And that's something that could be done overnight if there

7   was some threat to physical health?

8   A.   Well, uhm, overnight --

9   Q.   Within a very short period of time?

10   A.   To what?  Make the designation go from formulary to

11   nonformulary?  I mean, even when the FDA recalls a product

12   because it's killing people, right, the FDA issues a recall.

13   It goes out to the news stations, it goes out to Kaiser

14   Permanente, it goes out to Massachusetts General, whatever.  In

15   order to -- you know, we immediately take action on something

16   like that; but even that, we have to identify all patients on

17   that drug.  We have to identify all prescribers.  We have to

18   get the information out.  We have to send letters to the

19   patients, tell them to come in with their meds.  I mean, even

20   in the case of a drug that the FDA pulls off the market, it

21   can't be done overnight, but, okay.

22   Q.   You'd agree with me, it wouldn't take eight years to do

23   it, though?

24   A.   To recall a drug?

25   Q.   Yes.

Page 40

1    A.    Absolutely not.

2    Q.    Now, what we're reading from here, this is yet again this

3    drug monograph for the September 1999 P&T Committee meeting,

4    and it would have been prepared some months before, and this is

5    for Southern California only, correct?

6    A.    Yes.

7    Q.    Okay.  And, again, you referred yesterday to guidelines,

8    and these are the guidelines that Southern California adopted

9    in September of 1999, correct?

10   A.    Yes.

11   Q.    And those are still the same guidelines that are in effect

12   today in Southern California, correct?

13   A.    Uhm, I don't know that we haven't made changes in these

14   guidelines over time.  I'm not -- I'm not -- I don't think that

15   the entire guideline is still in effect.  I know for a fact

16   that we are not doing initial prescription quantities are

17   limited to a one-month trial.  That's definitely no longer in

18   place.

19   Q.    So you've gotten rid of that guideline?

20   A.    Like I said, I don't know if we have officially removed

21   the guideline or we've made changes to the guideline.

22   Q.    Well, first off, if we talked about Northern California,

23   they've never had restrictions or guidelines at all, have they?

24          MS. NUSSBAUM:  Asked and answered, your Honor.

25          THE COURT:  Sustained.

Page 41

1   Q.   Since 1999, has Southern California, by guidelines or

2   otherwise, done anything to try to limit the patients for whom

3   gabapentin can be prescribed?

4   A.   Yes.

5   Q.   Okay.  And what has Southern California done since 1999 to

6   limit or restrict the patients for whom the drug can be

7   prescribed?

8   A.   Okay, when you say "limit or restrict," you don't prevent

9   physicians from prescribing what they believe is a medically

10  necessary drug.

11  Q.   That's my question.

12  A.   So --

13  Q.   That's my question.

14  A.   So I'm about to tell you what we have done.  We have had

15  lots, lots and lots of programs in place to bring physicians

16  together to talk about and educate them on the situation

17  regarding the off-label promotion, what's been going on.  And

18  through that, then they, who are the people who basically write

19  the prescriptions, unless they understand what's going on, then

20  they're not going to stop writing the prescription or refilling

21  prescriptions for patients.

22  Q.   And after that length of education, you'd assume that any

23  doctor that was still prescribing gabapentin today must think

24  it's for a good reason, right?

25          MS. NUSSBAUM:  Objection, your Honor.

Page 42

1          THE COURT:  Sustained.

2   Q.   Let's move next to Exhibit 810 which is in evidence.  And

3   it's our understanding that these are Regional Formulary and

4   Therapeutics Committee minutes from the Northwest region.  Is

5   that consistent -- when you see "Regional Formulary and

6   Therapeutics Committee," is that what the people up in Oregon

7   and Washington call their P&T?

8   A.   I don't know which region this is from, but it certainly

9   has a Kaiser Permanente logo.  It says "Regional Formulary and

10  Therapeutics Committee."  I assume it's from one of the

11  Regional Formulary and Therapeutics Committees, one of the

12  regions.

13  Q.   Okay.  It isn't Southern California, though?

14  A.   It's not Southern California, and it's not Northern

15  California.  I know that.

16  Q.   Okay.  And, again, if I'm taking you out of your area of

17  expertise, just let me know if you can't answer any of these

18  questions.

19  A.   Okay.

20  Q.   Going to the box on Page 1 that starts with "Gabapentin

21  100 milligrams," et cetera.  Then it says, "Gabapentin has been

22  available for drug benefit coverage if criteria were met for

23  epilepsy, neuropathic pain, restless legs syndrome, hot

24  flashes, essential tremor, spacticity, and headache --" can you

25  pronounce that one for us?

1    A.    Prophylaxis.

2    Q.    Thank you very much.

3    A.    It means prevention of headaches.

4    Q.    And as far as you know, that was the status of what the

5    doctors in the Northwest were prescribing gabapentin for in

6    September of 2005, right?

7    A.    I don't know for sure that this is from the Northwest.  If

8    we said it was, then it is from the Northwest.

9    Q.    You've told us earlier about criteria-based prescribing?

10   I think you mentioned that in an earlier answer?  Am I

11   mistaken?

12   A.    I mentioned that it's only used in one or two regions.

13   Q.    Okay.  And what does "criteria-based" mean?

14   A.    My understanding of how they use it in one of the other

15   regions is, it's like a guideline, so the patient -- there's

16   criteria set forth.  So if a patient has failed this drug, or

17   the patient has a certain age, or the patient has a certain

18   renal function, they're criteria by which you then say, okay,

19   then this is an appropriate product for that type of patient.

20   Q.    Turning to the next sentence in Exhibit 810, it reads,

21   does it not, "With the availability of similar but more

22   expensive pregabalin --" and that's the generic name for

23   Lyrica, right?

24   A.    Yes, uh-huh.

25   Q.    "-- and with the decreasing cost of generic gabapentin

1   tablets, the prescribing criteria for gabapentin are removed,

2   and gabapentin is added back to the formulary."  And, again,

3   this may not be your region.  Can you tell what they're talking

4   about?

5   A.   Precisely what it says there.  It looks like now -- this

6   must have been around the time that generic gabapentin became

7   available, and what they're doing is taking the criteria part

8   of the formulary status away.

9   Q.   So apparently at some point when the drug came in the

10  expensive branded form of Neurontin, it was taken off of

11  formulary for some reason?

12  A.   No.  I don't know that.

13  Q.   Well, how can you add something back if it wasn't

14  previously --

15  A.   Oh, added back.  I'm sorry.  I wasn't sure it said back to

16  the formulary.

17  Q.   It does say added back.

18  A.   Again, I don't know exactly what happened in this region.

19  I'm just reading this sentence, so added back would imply that

20  it must have been taken off the formulary at some point.  I

21  don't know when or why.

22  Q.   So apparently some region at some point found a way to

23  remove Neurontin from formulary, correct?

24  A.   Again, I'm presuming based on what I'm reading here that

25  that might have happened.

1   Q.   And then it appears that when the drug went generic and

2   became less expensive, it was then added back to formulary,

3   correct?

4   A.   That's what it says there.

5   Q.   You wouldn't consider that evidence-based medicine, would

6   you?

7   A.   Well, let me explain that.  If you have medications, okay,

8   that based on the literature and evidence that you have

9   available to you at the time, and the medications are generally

10  equally effective based on the evidence you have, equally

11  useful based on the evidence you have, the safety is about the

12  same based on the evidence you have, an evidence-based decision

13  can also be if one of these products cost $300 a month, and

14  it's going to cost the patient a lot more, because it's a brand

15  and it's going to cost them a brand co-pay instead of a generic

16  co-pay, and now you have a generic product that the co-pay is

17  lower for the patient, the cost to the organization is lower,

18  and the efficacy is similar, based on the evidence that you

19  have available to you, that is an evidence-based decision.

20  And, as I mentioned, you look at safety, you look at efficacy,

21  you look at cost.  All those things are part of the decision.

22  Q.   So the same drug may or may not be suitable for formulary

23  depending on how much it costs; is that correct?

24  A.   I would say that when a very expensive drug where there's

25  lots of options is available, and it's like a third line or

1    fourth line, there's other agents available, and their cost is

2    more advantageous to the patient in terms of their co-pay or

3    more advantageous to the overall cost of care, then that

4    product would be preferable to the brand.

5    Q.   Let's take a look next at Exhibit 816, which I believe is

6    in evidence already, and this is a February 2006 information

7    request to your department, the Drug Information Services,

8    correct?

9    A.   That's correct.

10   Q.   And this is from a psychiatrist in Antioch.  That's

11   Northern California, right?

12   A.   That's correct.

13   Q.   And this deals with -- I think the jury is familiar with

14   this one -- a patient who's six years old and is bipolar and

15   has been refractory to other medications, correct?

16   A.   Well, let me look.  I haven't seen this inquiry probably

17   since February of 2006, so let me check it out.

18             (Witness examining document.)

19             THE COURT:  Are these the documents we saw before?

20             THE WITNESS:  No.  I've never seen this.

21             MS. NUSSBAUM:  This witness has not seen this

22   document.

23             THE COURT:  No, right, but it's in evidence, right?

24             MR. KENNEDY:  We offered it in evidence.  We tried to

25   ask Dr. Carrejo about it.  I think you told us we should wait

Page 47

1    till Dr. Millares --

2             THE COURT:  No, right.  It's in evidence, right?

3             MR. KENNEDY:  Yes, your Honor.  When you ask me, I

4    assume you're always trying to cut me off.  I'm sorry.

5             THE COURT:  No, no, no.

6             MR. KENNEDY:  My defensiveness.

7    Q.   Have you had a chance to take a look at that now, Doctor?

8    A.   Okay.

9             (Document passed to witness.)

10   A.   Thank you.

11   Q.   And the doctor has various questions relating to lithium

12   and other things.  And then if we go over to the next page,

13   693, and there's a note down "Spoke with requestor."  Can you

14   highlight that one, Austin, about two-thirds of the way down.

15        "This question refers to a pediatric patient who has

16   bipolar with psychomotor seizure.  Neurontin has been used and

17   has stabilized the seizures.  Tegretol and Depakote,

18   separately, has activated bipolar again.  Requestor already has

19   literature on Tegretol as a bipolar activating agent.

20   Requestor wants some literature evidence for Depakote as a

21   bipolar activating agent."

22        Do you see that?

23   A.   Yes.

24   Q.   And there's nothing on that page that says you wrote back

25   and said, "Neurontin wouldn't be appropriate for a bipolar

1    patient that has seizure problems as well," did you?

2    A.    I can't see what we wrote back.  Do you want me to read

3    the whole inquiry?  I can't see what our response is here.  You

4    don't have it up.

5    Q.    Well, in the interest of time, let me move on to

6    Exhibit 820, another information request, again, March 7, 2006.

7    A.    Yes.

8    Q.    And this is a doctor in Los Angeles who's asking, "Are

9    there any literature available comparing Neurontin and Lyrica

10   for diabetic neuropathy?"  Correct?

11   A.    Yes, that's the question.

12   Q.    And as of March, 2006, Lyrica was a branded drug, correct?

13   A.    Yes.

14   Q.    And it had been expressly approved by the FDA for diabetic

15   neuropathy, correct?

16   A.    I believe so, uh-huh.

17   Q.    And as of 2006, as we know, gabapentin was a generic drug,

18   correct?

19   A.    Yes.

20   Q.    Which had not been approved by the FDA for diabetic

21   neuropathy, correct?

22   A.    That's correct.

23   Q.    However, as of that point in time, gabapentin would have

24   been considerably less expensive than Lyrica, correct?

25   A.    That's correct.

1   Q.   And then coming down on the page under the Kaiser

2   monograph for Lyrica or pregabalin, "Drug Information Services

3   Formulary Recommendation:  Do not accept to the formulary.

4   Pregabalin is a GABA analog with a nearly identical mechanism

5   of action as gabapentin.  There are no published head-to-head

6   trials that have shown the superiority of pregabalin over more

7   established treatment options for neuropathic pain (e.g.,

8   tricyclic antidepressants and gabapentin) or antiepileptic

9   drugs for the adjunctive treatment of partial onset seizures.

10  Pregabalin is a Schedule V controlled substance with no

11  clinical advantage over gabapentin.  Although limited data

12  suggest that pregabalin may be dosed --" what does BID refer

13  to?

14  A.   BID is two times a day.

15  Q.   "-- without lengthy titration, TID dosing with titration

16  is better tolerated.  In addition, there is some evidence that

17  gabapentin may be titrated rapidly and dosed BID."

18       Have I read that correctly?

19  A.   That's correct.

20  Q.   So as of 2006, with all the knowledge that you had at that

21  point in time, your department was recommending gabapentin over

22  the FDA-approved drug for treatment of neuropathic pain; is

23  that correct?

24  A.   This piece right here in the inquiry is an excerpt.  You

25  can see that came from the Lyrica monograph.  So when we put

Page 50

1   the information into this database, we take information from

2   various sources, and we plug it into this inquiry template.

3   That piece is there from the Lyrica monograph.

4   Q.   You would agree with me from reading this exchange --

5   A.   Let's go down to the summary to see what the, you know,

6   final, if you'd like.

7   Q.   You would agree with me that at least as of 2006, your

8   department was actually recommending gabapentin for neuropathic

9   pain, correct?

10  A.   My department was recommending?  No.  I don't think so.

11  Q.   Well, doesn't this message say that they want to know --

12  at least as between Neurontin and Lyrica, Neurontin or

13  gabapentin is superior to Lyrica, right?

14  A.   Well, I don't think -- we said -- certainly Lyrica is

15  non-formulary, and we absolutely have no interest in using

16  Lyrica at this time.

17  Q.   You certainly didn't write back in 2006 when they said,

18  "Are there any literature available comparing Neurontin and

19  Lyrica for diabetic neuropathy?" and say, "You ought to be

20  aware that Neurontin is a little better than a sugar pill for

21  that purpose."  That isn't what this said, did it?

22  A.   Did it say that?  No.

23  Q.   Okay.  And even today, if you got an inquiry like this,

24  your department would not be writing back saying, "Neurontin is

25  really no better than a sugar pill.  Better try something

1  else"?

2  A.   I don't -- that's not exactly true.  I mean, I don't know.

3  It depends on what the question is and the situation what

4  exactly our response would be.  We don't have pat answers to

5  things.

6  Q.   Is there any off-label condition that's at issue in this

7  case -- migraine, bipolar, nociceptive pain, neuropathic

8  pain -- where you have instructed the people in your

9  department, "If you get an inquiry about gabapentin, advise

10  that it just isn't any good for that purpose, no better than

11  placebo," any one of those conditions?

12  A.   Well, actually, basically our inquiry service that we've

13  been talking about, due to financial constraints, we had to

14  shut it down last year, so it's no longer available to anyone.

15  Q.   Okay.

16  A.   But, I mean, you know, so --

17  Q.   Score one for the witness.  Let's --

18  A.   No, I'm just telling you the truth that we don't have one.

19  Q.   Okay, I'm sorry, I did not intend -- you got me.  You

20  can't do it today.

21  A.   I didn't mean to get you.  I'm just answering your

22  question, okay?

23  Q.   I know you are.  Let's go back a year or eighteen months,

24  whenever the department closed down, when you still had a

25  budget, was there --

1    A.    The department did not close down.  I'm sorry.  The

2    telephone consultation service, the call center where we take

3    calls and answer, that part we had to shut the phones down.  We

4    still have all the department, minus a few individuals who lost

5    their jobs, but we have the entire department still there doing

6    formulary reviews, evidence reviews, education of patients,

7    education of -- you know, that's still going.  We don't have

8    that telephone consultation service, this part.

9    Q.    During the last month that you had the telephone

10   consultation service, were there any instructions to your

11   people that if you got an inquiry about one of the off-label

12   uses in this case, they were to advise the doctor that

13   Neurontin was simply ineffective, non-efficacious for that

14   purpose?

15   A.    No.  That would have been closed in July of 2009.  No, I

16   did not give any instruction like that to the staff.

17   Q.    Up through July of 2009?

18   A.    June 30 we closed.

19   Q.    Changing topics, can we turn to Exhibit 561, which is in

20   evidence.

21   A.    Now, they may have provided that information to the

22   caller, but I let them use their professional judgment in terms

23   of, you know, looking at whatever evidence we have and

24   providing that.

25   Q.    You certainly didn't give them that instruction?

1    A.    I didn't instruct them on how to answer a question, no.

2    Q.    Turning to Exhibit 561, which I believe is already in

3    evidence.  If not, we offer it at this time.  This is an e-mail

4    exchange involving Debbie Kubota, and that's the Debbie Kubota

5    we've talked about who's in your department, correct?

6    A.    That's her, yes.

7    Q.    And was the author on some of the monographs that we

8    looked at, correct?

9    A.    Yes, uh-huh.  Yes, uh-huh.

10   Q.    And still works there, as a matter of fact?

11   A.    She sure does.

12   Q.    Okay.  And do you know who Rich Lieblich is or was in June

13   of 1999?

14   A.    He at that time worked in our National Pharmacy

15   Contracting Department.  I don't know what his title was.  He

16   wasn't the director.  He was lower down.

17   Q.    And the top e-mail, top of the page, makes reference to

18   the May 24 Pink Sheet.  Do you see that?

19   A.    Yes.

20   Q.    And you're familiar with The Pink Sheet, aren't you?

21   A.    Yes.

22   Q.    And can you describe for the jury what The Pink Sheet is.

23   A.    Sure.  The Pink Sheet is a publication that happens to be

24   pink, and it comes out weekly.  And it's kind of like a

25   watch-dog group that watches what's going on at the FDA,

1    watches what's going on in the pharmaceutical products, in the

2    pharmacy industry; and they write up, you know, news clips on

3    these newsy kinds of information on what's going on in that

4    kind of realm.

5    Q.    And The Pink Sheet is something that you or your

6    department read regularly?

7    A.    Some of us do, yes.

8    Q.    You're a regular reader of it?

9    A.    Pretty much.  Well, I try to be.  It's weekly.  It's, you

10   know --

11   Q.    In your business, it's a pretty good source of

12   information --

13   A.    Yes.

14   Q.    -- on a lot of things you won't get out of the New York

15   Times or the LA Times, right?

16   A.    No.

17   Q.    Yes, it is, correct?

18   A.    Yes.  And, no, you would not get -- some of the

19   information that's in The Pink Sheet would not appear in the

20   New York Times or LA Times.

21   Q.    Let's go next to Exhibit 506, and this is the April 3,

22   2000 edition of The Pink Sheet, and even though it's showing up

23   white here, this is The Pink Sheet, isn't it?

24   A.    Yes, it's pink.

25   Q.    And coming down in the first box, second bullet, Austin,

1   and that tells about the Warner-Lambert Neurontin promotions

2   are subject of a grand jury investigation in Boston.  Do you

3   see that?

4   A.   I sure do.

5   Q.   Okay.  Do you remember reading that article?

6   A.   Uhm, I remember first hearing about the fact that there

7   was some sort of investigation that was launched around this

8   time.

9   Q.   And was that a subject of discussion with you and your

10  colleagues within Kaiser?

11  A.   Uhm, not -- not too much.  I mean, this reports on all

12  kinds of issues that are going on.  I mean, grand jury

13  investigation is just the beginning of something, but I

14  don't -- who knows?  We may have chitchatted about it, but --

15  Q.   Can we go to the next page of that edition of The Pink

16  Sheet, Austin.  And you can see basically all of Page 3 has

17  been devoted to the U.S. Attorney's investigation of

18  Warner-Lambert, and employees have been subpoenaed, and there's

19  a grand jury investigation proceeding.  Do you see that?

20  A.   Yes.

21  Q.   And in your regular course of business, it would have been

22  your practice to read The Pink Sheet back at that point in

23  time, correct?

24  A.   Yes.

25  Q.   Let's go next to Exhibit 594.

1          MR. KENNEDY:  I don't believe this one is in evidence,

2     your Honor.  We offer it at this time?

3          THE COURT:  Any objection?

4          (Exhibit 594 received in evidence.)

5          MR. KENNEDY:  Can we publish it to the jury, your

6     Honor?

7          THE COURT:  Sure.

8     Q.   This is entitled --

9          THE COURT:  What number are we at?

10         MR. KENNEDY:  594, your Honor.

11    Q.   And this is a memo, if we look up at the top, that

12    apparently is out of the Kaiser Permanente Northwest Division,

13    correct?

14    A.   I would assume so.  It says "NW Perm clinicians."  I think

15    it's from the Northwest, yes.

16    Q.   And the subject is "Gabapentin For Neuropathic Pain"?

17    A.   Correct.

18    Q.   And coming down, Austin, on the first page in

19    "Background," if you can go to the second paragraph, third

20    line.

21    A.   The third line?

22    Q.   The third line.

23    A.   "In fact"?  Yes.

24    Q.   "Background," it starts, "Neurontin sales grew

25    78 percent," and it says, "In fact, the U.S. Attorney's office

1    is investigating the manufacturer's off-label promotions of the

2    drug."

3         So at least as of August 25, 2000, James Norris -- if we

4    can scroll back up to the top -- who wrote this memo had

5    learned about that investigation from The Pink Sheet or

6    otherwise?

7    A.   Right, right.  He mentions it there.

8    Q.   And next can we go to Defendants' 599.  I understand

9    Dr. Daniel is going to be here.  If this should be kept for

10   him, let me know, but see if we can deal with it with you.

11   This appears to be a drug inquiry from Dr. Daniel, and he's a

12   surgeon in Southern California, right?

13   A.   Yes, he is.

14   Q.   And this request is October 27, 2000, and he's asking,

15   "What are some examples of drugs that are on formulary, not

16   restricted, but have the potential for off-label use and

17   abuse?"  And the response -- and can you tell who the response

18   is from?

19   A.   Dan Powers.

20   Q.   And is that somebody who works for you?

21   A.   Yes.

22   Q.   And the response from Mr. Powers says, "In discussing with

23   Joe --" I realize this is going back a while.  Was there a Joe

24   that would have been a logical person to be discussing this

25   with?

Page 58

1    A.    Uhm, in 2000. . .I'm not sure.

2    Q.    "In discussing with Joe, we thought of gabapentin," and

3    then he lists a couple of other drugs that I'm not going to try

4    to pronounce.  I've gotten that accurately so far, correct?

5    A.    Yes, uh-huh.

6    Q.    "And Dr. Daniel was happy with this, close inquiry,"

7    correct?

8    A.    That's correct.

9    Q.    And, again, we can ask more of Dr. Daniel when he's here,

10   but at least as of October 27, 2000, gabapentin was on

11   Mr. Powers' radar screen as a potential subject for abuse; is

12   that correct?

13   A.    For off-label use, yes.

14   Q.    And Dr. Daniel, at least now, is head of the Southern

15   California P&T Committee, isn't he?

16   A.    He's the chair of the regional P&T Committee for Southern

17   California.

18   Q.    And going back to October of 2000 when he made this

19   inquiry, was he also chair of the Southern California P&T

20   Committee?

21   A.    Yes.

22   Q.    Thank you.  Let's turn next to Exhibit 581.

23         MR. KENNEDY:  That I would offer in evidence, your

24   Honor, another Kaiser internal document.

25         (Exhibit 581 received in evidence.)

1    Q.    And this is dated May 9 of 2000, correct?

2    A.    Yes.

3    Q.    And can you tell which region this comes out of from the

4    people that are listed up there at the top?

5    A.    No.  I don't recognize those particular individuals,

6    sorry, unless it says here somewhere where it's from.  I don't

7    see a regional name on here, but --

8    Q.    And you'll see, just looking at the first paragraph under

9    "Background," that discusses the use of chart selections from

10   patients to track use of gabapentin, correct?

11   A.    I'm sorry, which sentence did you want me to look at?

12   Q.    Sure, let's just read it.  Under "Background" it says,

13   "The appropriate utilization of gabapentin (Neurontin) is a new

14   initiative for year 2000."  Do you see that?

15   A.    Yes.

16   Q.    So apparently, whatever region this was, they had started

17   their own initiative on gabapentin in 2000?

18   A.    Sure.

19   Q.    Southern California started theirs in 2002, as I

20   understand; is that correct?

21   A.    Uhm, I don't -- there's a lot of different initiatives.

22   There's DUAT.  There's CMOP.  I don't know who had targeted

23   what part of Neurontin utilization.  There may have been

24   various different initiatives ongoing.

25   Q.    Some region apparently started an initiative in 2000?

1    A.    It looks like it's Colorado, actually, in the next

2    sentence.

3    Q.    I was going to point that out.  It says, "Kaiser

4    Permanente Colorado region is the leading prescriber for

5    anticonvulsants compared to other Kaiser regions.  A 36 percent

6    increase in the anticonvulsant class occurred in 1998 to 1999."

7    Then skipping down, they say, "To better understand this trend,

8    70 charts were randomly selected from 3,468 patients who

9    received a prescription of either gabapentin or lamotrigine."

10        Did I get that second one right?

11   A.    Yes, that's right.

12   Q.    "Forty-four charts originated from primary care, of which

13   25 patients were treated for various pain syndromes (primarily

14   neuropathies).  This review revealed that approximately

15   40 percent (10 out of 25) of the time gabapentin was the

16   first-line drug prescribed for the treatment of pain

17   syndromes."

18        I've read that accurately, haven't I?

19   A.    That's correct, yes.

20   Q.    So as of May of 2000, the Colorado region apparently had

21   the ability through chart reviews to track prescriptions for

22   gabapentin, correct?

23   A.    Well, a chart review can be done at any time at any place

24   in a health environment, so -- a chart review is like taking

25   random sampling of patients and taking a look at -- you know,

1   going through their charts and trying to find out what's going

2   on.

3   Q.   And that's an accepted way of trying to do research and

4   get numbers, correct?

5   A.   Well, for research purposes, chart review requires

6   research assistance with chart reviewers so that they can go

7   out and flip through all the charts and log everything down

8   into, you know, a database and collect the data.  A chart

9   review can be used in research, sure.

10  Q.   And if you were trying to figure out the reason why

11  gabapentin had been prescribed, a chart review would be one way

12  to go about doing that, wouldn't it?

13  A.   You can look at charts.  You have to look at a certain

14  percentage of charts, depending on your population, to get an

15  accurate picture of what's going on.  So in a smaller region,

16  you would look at a smaller number of charts than a larger

17  region.  It's very time-consuming.

18  Q.   Let's go to the second page of this May 2000 memo from

19  Colorado, and there is a discussion of cost on that page that

20  compares gabapentin with various other drugs, including

21  amitriptyline, correct?

22  A.   Yes.

23  Q.   And carbamazepine, correct?

24  A.   That's right.

25  Q.   A couple of those drugs we discussed the black box

Page 62

1    warnings on yesterday, correct?

2    A.    That's right, uh-huh.

3    Q.    Then under "Summary" it tells that "Gabapentin is an

4    alternative for the treatment of neuropathic pain.  However, it

5    does not appear to offer any advantage over TCAs, and it is

6    more expensive.  Therefore, gabapentin prescribing for pain

7    syndromes should be reserved for patients who fail traditional

8    therapies."  Correct?

9    A.    That's correct.

10   Q.    Let's go next to --

11         THE COURT:  Can I see folks at side bar just for a

12   second?  Why don't you stand up and stretch.

13   SIDE-BAR CONFERENCE:

14         MR. KENNEDY:  The answer is --

15         THE COURT:  Actually, it's a long week and it's

16   Friday, and I was starting to see them gaze off.  This is more

17   of a stretch break than anything.

18         MR. KENNEDY:  Thank you.

19         THE COURT:  At some level you've got to sort of -- but

20   you will be done.  When do you figure?

21         MR. KENNEDY:  It's getting shorter by the moment.  It

22   will definitely be before the break, and I was judging the same

23   thing.

24         MR. GREENE:  Is somebody snoring?

25         THE COURT:  I just thought it was time.  Maybe

1    infusions of caffeine through the -- but it's just been a long

2    week.  I just thought everyone should stand and stretch, take a

3    break.

4            (End of side-bar conference.)

5            THE COURT:  I didn't have much substantive to discuss.

6    I just thought we all needed a stretch.

7            (Laughter.)

8            MR. KENNEDY:  Call it a break from Kennedy.

9            THE COURT:  No, it's just been a long week for

10   everyone.  So he's moving right along, and we'll probably be

11   done, I think, at least with his by the break.

12           MR. KENNEDY:  Your Honor, I believe we may have

13   neglected to offer 559 into evidence, and if so, thanks with an

14   assist from Mr. Alba, we'd offer it at this time.

15           THE COURT:  Which one was that, the Denver thing?

16           MR. KENNEDY:  No.  It was the Dr. Daniel inquiry.

17           (Exhibit 559 received in evidence.)

18           MR. KENNEDY:  If we can take 30 seconds here, your

19   Honor, I think we can shave off 30 minutes.

20   Q.   Let's go to Exhibit 292.  This was used on direct

21   yesterday, already is in evidence.  Reflecting back to

22   yesterday, remember this was an inquiry from a Mark Smith, a

23   pharmacist, in May of 2005 saying, "There is a neurology

24   patient who's on 5,400 milligrams of gabapentin daily, wants to

25   know what the guidelines are on the dosage and if this is okay.

Page 64

1   He did not have other information on the patient.  Requestor

2   does not know the indication for use."

3        Now, if somebody's up to 5,400 milligrams, it would

4   suggest that this is somebody with a pretty serious pain

5   problem, doesn't it?

6   A.   It says that they don't have any information.  I don't

7   know if this is for pain.  Let's see, but -- it doesn't have a

8   complete history on the patient.  It could be pain; it could be

9   something else.  It could be seizures.  I don't know.

10  Q.   Okay.  In any event, coming down to the middle in the part

11  that's really hard to read -- and, Austin, under "Called

12  manufacturer" in the dark box, if we yellow that, will it

13  look --

14        THE COURT:  Yes, that's a little hard to read.  Maybe

15  if somebody read it.  Can you read it?

16        THE WITNESS:  I can read it, sure.  Okay, I'll read

17  it.  It says under "Response:  Called manufacturer.  One case

18  of 8 grams was documented in a patient with lumbar pain, but

19  nothing as high as 9.6 has been documented, although the

20  manufacturer states that it's relatively safe as long as the

21  titration is slow and the patient is under MD supervision.

22  Manufacturer will fax documentation of case for the 8 grams."

23  Q.   And then it goes on to say "No documentation of dosage."

24  Can you read that for us.

25  A.   Sure, okay.  Under "Summary" it says, "No documentation of

1    dosage as high as 9.6 gram was documented.  The highest dose

2    that had been used was 8 grams for back pain.  In this

3    documented case of 8 grams, the patient stopped abruptly and

4    resulted in a seizure.  Most overdosage cases had full

5    recovery."

6    Q.   Okay, now, it says "Called manufacturer."  It doesn't say

7    who the manufacturer was, and in May of 2005, as we've heard,

8    the drug had gone generic.  What was your practice as far as

9    questions about the drug after the generic form came out?  Did

10   you call the generic maker, or did you still call Pfizer?

11   A.   No.  We would call the originator of the drug, the big --

12   Q.   Why?

13   A.   Because some generic companies don't even have a drug

14   information service.  They're usually smaller companies that

15   don't even have the data.  The data is with Pfizer on this

16   drug.

17   Q.   So it would be correct to say that as of May, 2005, after

18   the lawsuit has been filed, your people at least trusted Pfizer

19   enough to call them with questions of this sort, correct?

20   A.   Absolutely.  We're still dealing with Pfizer today as an

21   organization.  We have to.

22   Q.   And despite all the information withholding that you think

23   Parke-Davis or Warner-Lambert did, you still call them and use

24   them as a source of information today; is that correct?

25   A.   Well, I recently sent a request for information to Pfizer

1   recently, yes, actually.

2   Q.   And again sticking with Exhibit 292, this was not a

3   recommendation by Pfizer that the patient ought to be dosed up

4   to 5,400 milligrams, was it?

5   A.   We're not asking for a recommendation.  We're asking for

6   information about what they feel is rational dosing for their

7   product, based on what they have internally at their company.

8   Q.   Some doctor in his or her judgment had decided that

9   5,400 milligrams was appropriate?

10  A.   The 5,400?  Yes.

11  Q.   Thank you.  Going next to another exhibit you were shown

12  yesterday, 294, and this was a drug inquiry.  This is again

13  from a pharmacist in the Fontana area out east of Los Angeles?

14  A.   That's right.

15  Q.   And this is September 12, 2000, and the request is, "What

16  is the maximum dose per day for Neurontin?"  Correct?

17  A.   That's correct.

18  Q.   And they called Parke-Davis who was told the maximum dose

19  that they had seen so far was 6,000 milligrams per day in

20  non-Parke-Davis studies, correct?

21  A.   That's what it says, yes.

22  Q.   And you don't interpret this as some sort of a

23  recommendation by Parke-Davis that this patient ought to be

24  dosed at 6,000 milligrams per day?

25  A.   What they're saying is, "We have evidence in our files

1    that 6,000 milligrams per day is an okay dose to use."

2    Q.   Correct, but there's nothing here that you read as

3    suggesting that the Parke-Davis person is trying to play doctor

4    and recommend the dosage?

5    A.   Right.

6    Q.   Another document you were shown yesterday, 296, and this

7    is another drug inquiry.  This one's from August of 2000 from a

8    Vincenza Sorrells, who apparently is in the family practice out

9    in the San Gabriel Valley in Southern California, right?

10   A.   Yes.

11   Q.   And the request is "The maximume dose for Neurontin for

12   diabetic neuropathy," and the background we're told is a

13   patient who is in his forties with normal renal function.  And

14   what's renal function?

15   A.   Is a measure of how well your kidneys work.

16   Q.   "And is prescribed Neurontin for diabetic neuropathy, and

17   the doctor wants to know the maximume dose for Neurontin."

18   A.   I think that's a misspelled word.  I think it's "maximum."

19   Q.   "She states that the formulary book states 1.8 grams for

20   maximume dose, but the neurology department increased the dose

21   to higher than the maximume dose."  And again the recipient

22   called Parke-Davis, and they faxed a document that stated that

23   the dose was titrated.  And "titrated" means increasing dosages

24   to see what the patient can tolerate?

25   A.   It's increasing doses.  It's not necessarily up to where

Page 68

1    they can tolerate.  It's just increasing doses.

2    Q.   "And dose for the study was titrated to tolerability of

3    3,600 milligrams."

4    A.   Oh, okay, it says "to tolerability" there.  Sorry, yes.

5    So that means to when they develop a side effect.

6    Q.   "Up to 3,600 milligrams per day regardless of efficacy

7    achieved at the lower dosage."  Have I read this correctly?

8    A.   Right.

9    Q.   And I'm going to violate the rule against asking an open

10   question on cross-examination.  Is there something wrong with

11   what Parke-Davis said here that you're critical of?

12   A.   Uhm, it's basically -- I think so.  It's stating that the

13   dose can be increased up to whatever based on tolerability, not

14   based on a patient response.  You know, usually we dose drugs

15   to patient response, not to when they developed their first bad

16   side effect.  And especially since it says "regardless of

17   efficacy achieved at the lower dosage."  So even if they're

18   doing whatever the drug is meant to do, if they're responding

19   or they don't have a problem anymore at a low dose, this

20   implies that you just keep going, even if they're already at an

21   effective -- you know, they already don't have the problem that

22   they're being treated for.

23   Q.   Ever get a complaint from Dr. Sorrels about the advice

24   that he was given?

25   A.   Me personally?  No.

1    Q.   Or your department?

2    A.   I don't know of any.

3    Q.   Or any record that a patient was adversely affected by any

4    of this?

5    A.   No, I don't have the record.

6    Q.   Thank you.  Next I want to turn to another document you

7    were shown yesterday, Exhibit 301.  And you recall that was a

8    1999 memorandum from a Wanda Martin at Parke-Davis to Debbie

9    Kubota, the woman who works in your department, and the letter

10   is dated February 22, 1999, and it didn't mention the Pande

11   study.  Remember you talked about that?

12   A.   That's correct.

13        MR. KENNEDY:  Your Honor, next I'd offer in evidence

14   Exhibit 961, a Parke-Davis Pharmaceutical Research Division

15   report from March 26, 1999.

16        (Exhibit 961 received in evidence.)

17   Q.   And again for the chronology, the letter from Wanda Martin

18   to Debbie Kubota, Exhibit 301, is dated February 22, 1999.

19   This Exhibit 961 is dated March 26, a little over a month

20   later, and at the top you'll see it's entitled "Research

21   Report" and it has authors Crockatt, Janney, Pande, and Werth.

22   Do you see that?

23   A.   Yes.

24   Q.   And coming down, if we scroll a little bit further,

25   Austin, stop at "Title," and the title here is "Gabapentin

1   Adjunctive Treatment in Patients With Bipolar Disorder."  Do

2   you see that?

3   A.   Yes.

4   Q.   And that's March 26, 1999.  And next I want to go to

5   Plaintiff's Exhibit 461-A, which is Kaiser's "Summary of

6   standard response letters sent by Parke-Davis or Pfizer to

7   Kaiser."

8   A.   Uh-huh.

9   Q.   Do you see that?

10  A.   I do.

11  Q.   Okay.  Is that a document that you prepared, by the way?

12  A.   No.

13  Q.   Or your department?

14  A.   No.

15       MR. GREENE:  And the pages aren't numbered, your

16  Honor, but, Austin, can you go over to the page that starts

17  with 2/18/99, the one that shows Debbie Kubota in the very top

18  of the page.  Is it going to be easier to go to the Elmo on

19  this one?

20       THE COURT:  Yes.  It's not legible, so --

21       MR. KENNEDY:  Your Honor, could I approach the

22  witness?  I think if I was standing next to her, we might be

23  able to work our way through this.

24       THE COURT:  Yes.  Will they be able to follow without

25  the document?

Page 71

1        MR. KENNEDY:  Can we see if it will play on the Elmo?

2   Maybe that will help.

3        THE CLERK:  Go ahead.  It's all set up.

4        MR. KENNEDY:  Thank you, Mr. Alba.

5        THE COURT:  Can you use the zoom function there?

6   Beautiful.  Can you all see it?  All right.

7        Can you see it?

8        THE WITNESS:  Yes, I can read it.  I can read it.

9        THE COURT:  So just because it's zoomed in, what are

10  we looking at again, Mr. Kennedy?

11       MR. KENNEDY:  Your Honor, we're looking at a page of

12  letters from Parke-Davis to Kaiser, and the very top of the

13  page shows a letter to Debbie Kubota dated 2/22/99, the letter

14  we were talking about just a second ago that didn't mention

15  Pande.  And if you come all the way over to the right-hand

16  column, there's a column titled "Version."

17  Q.   And under "Version," you'll see it's 1.0.  Do you see

18  that, Doctor?

19  A.   1.0 under your "Version," I do.

20  Q.   Okay.  And you'll see there are other letters, one to

21  Kushner and one to Ted Tasch and one to Pamela Behlmer, all of

22  which have Version 1.0.  Do you see that?

23  A.   I see the Version 1.0, but I don't see the name just yet.

24  Q.   Okay, let's go back over to the other side, and you'll see

25  there are letters dated 3/21 and 2/26 and 3/19 that are

Page 72

1  Version 1.0.  Do you see that?

2  A.   Yes, for Kushner, Tasch, Behlmer, yes.

3  Q.   Those are all before March 26, the date of Exhibit 961,

4  the Pande report, correct?

5  A.   Yes.

6  Q.   Okay.  And then on that same page, you'll notice that

7  starting with Dr. Fran Stott, if you go over to the "Version"

8  column, the version is now 2.0, correct?

9  A.   It says Version 2.0.

10 Q.   Yes.  And you'll see that there are then one, two, three,

11 four, five, six Kaiser people who received Version 2.0 on that

12 page, correct?

13 A.   I think there's five?  One, two, three, four, five, and

14 then I didn't catch whether they were Kaiser people or not,

15 but -- so I'm assuming that it says "Kaiser" somewhere over

16 here on the left.

17 Q.   Well, the whole document is "Summary of letters --"

18 A.   Oh, okay.  I'm sorry, I didn't know what this document --

19 Q.   And then going to the next page over, you'll see there

20 Version 3.0 that other Kaiser people got, okay?

21 A.   Okay.

22 Q.   Now, let's go to -- and what I'd like to put in now is --

23 A.   I'm assuming that's true that this is all Kaiser people.

24 You know, I'm assuming that's correct.

25 Q.   Yes, I'll represent that Kaiser produced --

Page 73

1   A.   Yes, it says "Kaiser" there.  I see.

2   Q.   They're the ones that's so hard to read.  This isn't my

3   document.  It's theirs.

4           MR. KENNEDY:  And I now would like to offer in

5   evidence --

6           THE COURT:  Excuse me.  Whose document is it?

7           MR. KENNEDY:  This is a summary of the Kaiser

8   database.

9           THE COURT:  The Kaiser?

10          MR. KENNEDY:  I'm sorry, the Pfizer database.  I

11  apologize.  My mistake.

12          THE COURT:  So the Pfizer database of all the letters

13  sent out on bipolar, is that it?  To Kaiser or to everyone?

14          MR. KENNEDY:  It's letters to Kaiser from Parke-Davis,

15  and there are two versions of the letter.

16          THE COURT:  I see.

17          MR. KENNEDY:  And we saw Version 1.0 yesterday that

18  didn't include Pande.  And at this time I'd like to offer

19  Plaintiff's Exhibit 433, which was not offered yesterday, which

20  is Version 2.0 of the letter.

21          (Exhibit 433 received in evidence.)

22  Q.   And, Doctor, taking a look at Exhibit 433 --

23          MR. KENNEDY:  And may we publish it?

24          THE COURT:  Yes.

25          MR. KENNEDY:  Okay, thank you.  Oh, I'm sorry,

Page 74

1    Mr. Alba, can we switch back.

2    Q.    Version 2.0, and under "Bipolar disorder" --

3            THE COURT:  Give us a second here.

4    Q.    And then coming down to the second paragraph under

5    "Bipolar disorder," about the middle of the paragraph, third

6    sentence, "In two reports, placebo (existing mood stabilizer

7    therapy, i.e., lithium and/or valproate) performed better than

8    gabapentin by the HAM-D rating."  Do you see that?

9    A.    Yes.

10   Q.    And it continues on, "Rating placebo was equal to

11   gabapentin by YMRS."  So this is saying that there's a study,

12   and it showed that gabapentin was not superior to placebo,

13   correct?

14   A.    Yes.  That would be Reference 16 and 17.

15   Q.    Exactly.  And why don't we go to Page 3 and focus in on

16   References 16 and 17.  And 16 is the Guille study that we've

17   heard about, and 17 is "Data on file at Parke-Davis, and 18 is

18   Frye, correct?

19   A.    Yes.

20   Q.    And then going back to Page 2 of the document, if we

21   could, under "Mania and other disorders," coming down about

22   seven lines, the line that starts CGI, and then picking up

23   there with, "A double-blind placebo for which gabapentin was

24   shown not to be effective in bipolar illness was also not

25   effective in controlling mania-related symptoms."  Correct?

1  A.   Correct.

2  Q.   And that's what Version 2.0 of the letter says, correct?

3  A.   Correct.

4  Q.   And at least seven or eight different people from Kaiser

5  other than you received copies of Version 2.0, didn't they?

6  A.   Uhm, that's what I was going to ask.  Please show me where

7  they sent it to us who were doing the formulary review on this

8  product for this indication.

9         THE COURT:  Yes, to whom?  Maybe go back, I think

10  she's asking for that chart.

11         THE WITNESS:  Let's see if they sent it to us.

12         THE COURT:  You don't have that chart, you don't have

13  a copy?  Ms. Nussbaum, you didn't show her the full thing?

14         MR. KENNEDY:  Your Honor, if I might approach the

15  witness, and I will give her --

16         (Document passed to the witness.)

17         THE COURT:  Was it 2.0?

18         THE WITNESS:  2.0, okay.

19  Q.   If you come down to the fifth box starting with

20  12/28/99 --

21  A.   Right.

22         THE COURT:  Can we throw that up on the screen too so

23  that we can follow along with what she's saying, to whom it was

24  sent?

25         MR. KENNEDY:  Sure.  Can we go back to the Elmo,

Page 76

1   Mr. Alba?

2   A.   Okay, so I've looked, and it was sent to one physician in

3   San Francisco, a nurse in Redwood City, a physician in -- I'm

4   not sure where that is.

5           THE COURT:   Can we just go one by one, so --

6           MR. KENNEDY:   Sure.

7   Q.   The fifth line down is 12/28/99?

8   A.   Right.

9   Q.   And that's going to Fran Stott, who's Director of Chronic

10  Pain Management Center at Kaiser on Geary Boulevard in

11  San Francisco?

12  A.   That would be the open facility, the open Kaiser facility,

13  yes.

14  Q.   Okay, and then the next one is Nancy Stocks --

15  A.   No, actually that's a Ph.D. under degree.  They're not a

16  physician but a Ph.D.

17  Q.   And then Nancy Stocks at the Department of Psychiatry on

18  Veterans Boulevard got a copy, correct?

19  A.   Right.  She's a psychiatric nurse.

20  Q.   And then Stephen Ramondino at the Permanente Medical Group

21  Psychiatry Department on Morse Avenue got a copy of

22  Version 2.0?

23  A.   In Sacramento, right.

24  Q.   And then Suzanne Watson at Kaiser Permanente on

25  3900 Broadway got a copy?

Page  77

1  A.    A psychologist, right.

2  Q.    And then a nurse named Sunday Oyewole got a copy in

3  Stockton, right?

4  A.    Right, that's right.

5  Q.    And then going to the next page, a physician at Permanente

6  in care of Michelle Dickerson got a copy, and then somebody at

7  Kaiser Permanente on Bunker Hill, a physician, got a copy.  Do

8  you see that?

9  A.    Right.  We're into 2000 now, mid-2000?  Uh-huh.

10 Q.    So eight people at Kaiser received Version 2.0 of the

11 letter, didn't they?

12 A.    Two or three, I think, the third version also.

13 Q.    Or the second or third --

14       THE COURT:  Excuse me.  What did you just say, two or

15 three what?

16       THE WITNESS:  I think he said Version 2.0.  I think

17 there's 2.0 and 3.0 versions, the Version 2.0 and Version 3.0.

18 Did you go over both 2.0 and 3.0 or just 2.0?

19       MR. KENNEDY:  I'm going over 2.0 and 3.0, you're

20 absolutely right.  And I would now like to offer Version 3.0 in

21 evidence, which is Plaintiff's Exhibit 433-A.  And again in the

22 interest of time, your Honor, I'll represent it's exactly the

23 same with regard to the discussion of Pande and gabapentin.

24 I'll go through it if the Court --

25       THE COURT:  Sure, no.  Perfect.

1          (Exhibit 433-A received in evidence.)

2   Q.   Now, finally, Doctor, I'd like to go to Exhibit 902, which

3   is an article off of one of Kaiser's public websites.

4          MR. KENNEDY:  Mr. Alba, I'm sorry, could we flip it

5   one more time.

6          THE CLERK:  Sure.  All set.

7   Q.   And go to the Permanente roundtable, Austin.  I'm showing

8   you a document.  I assume you're at least familiar with the

9   publication, if not the exact issue, the Permanente Journal?

10  A.   Yes.

11  Q.   And this is the Winter 2000 edition, and you'll see it's

12  devoted to "A roundtable:  Defining our practice principals,"

13  and it tells about a conversation among a number of Kaiser

14  representatives.  Do you see that?

15  A.   Yes.  It looks like it's in Denver, so it would be our

16  Colorado region, maybe?  Uh-huh.

17  Q.   And, Austin, if we could go over to Page 8, and if you

18  could focus in on Les Zendle.  And Les Zendle, he's a Kaiser

19  doctor, correct?

20  A.   Yes.

21  Q.   Do you know Dr. Zendle?

22  A.   I may have spoken with him a couple of times.  We don't

23  know each other in that way, but, I mean, I do know who he is.

24  Q.   At the roundtable he said, "Evidence-based medicine means

25  so many different things to different people.  To some people,

1    it means you don't do something unless you have double-blind

2    randomized control studies that prove that something works.  Of

3    course, if we only did things when we had double-blind

4    randomized control studies, we wouldn't do a whole lot.  It is

5    also used as a reason to withhold certain things or not to do

6    things or to cut costs."

7        Would you agree with Dr. Zendle's assessment of

8    evidence-based medicine?

9    A.   Sure, in the realm of all therapeutic options for all

10   indications, oncology, HIV, everything, yes, absolutely.

11           MR. KENNEDY:  Thank you very much.  I have no further

12   questions, your Honor.

13           THE COURT:  Thank you.

14   REDIRECT EXAMINATION BY MS. NUSSBAUM:

15   Q.   Now, let me just bring up and show you documents that have

16   just been referred to by Mr. Kennedy so that you'll have them

17   all before you, Exhibits 311, 301, and 327.

18           (Documents passed to the witness.)

19   Q.   Now, in June of 1999, the P&T Committee voted to lift

20   restrictions and to allow psychiatrists and others to prescribe

21   Neurontin for bipolar and mood disorders; is that right?

22   A.   In June, '99?

23   Q.   Right.

24   A.   They added psychiatry, expanded the -- relaxed the

25   restriction to include psychiatry, correct.

1    Q.   And a monograph was done by Drug Information Services

2    prior to the P&T Committee doing that; is that right?

3    A.   Right.

4    Q.   And I think if you look at that monograph which is

5    Exhibit 311, if you look at the last page, the references, it

6    indicates that there was a personal communication with

7    W. Martin of Parke-Davis; is that right?

8    A.   Yes, Reference No. 3.

9    Q.   And that personal communication was in February of 1999;

10   is that right?

11   A.   Yes.

12   Q.   I think you told us yesterday that Drug Information

13   Services has a regular protocol that they follow before putting

14   a drug on formulary or expanding restrictions, and that

15   protocol includes a Drug Information Service person reaching

16   out to their counterpart at the manufacturer, here Pfizer --

17        MR. KENNEDY:  It's leading, your Honor.

18   Q.   -- to ask, is there anything else we should know?

19        THE COURT:  Sustained.  Wait, wait.  Start again.

20   It's too compound.  And there's some leading during redirect,

21   but why don't we break it down.

22   Q.   What was the purpose of the call to Pfizer?

23   A.   Well, in development of a formulary, a drug monograph for

24   a formulary review at P&T, we seek out all the evidence that's

25   available through various means.  We have set ways in which our

1    formulary pharmacists seek that information, including PubMed

2    searches, MEDLINE searches, and including reaching out to the

3    pharmaceutical company that makes that particular product and

4    asking them to provide us with whatever information they have

5    on that same indication, including if they have any unpublished

6    data or information, you know, that they might have that's in

7    process of getting published that we wouldn't have found

8    otherwise.

9    Q.   And in response to the communications made by Drug

10   Information Services to Pfizer letting them know, "We're doing

11   a monograph, do you have any unpublished data?" did Debbie

12   Kubota get a letter back from Pfizer?

13   A.   Yes.  We got a letter back from Dr. Martin at Pfizer.

14   Q.   And I draw your attention to that letter which is

15   Exhibit 301.  Do you see that?

16   A.   Yes.

17   Q.   And the letter says, "Dear Dr. Kubota:  This is in

18   response to your request for information regarding Neurontin

19   and treatment of bipolar depression and mood disorder."

20        Do you see that?

21   A.   Yes.

22   Q.   And have you before today had the opportunity to look at

23   this letter?

24   A.   Yes.

25   Q.   And does this letter disclose the negative Pande study?

Page 82

1    A.    No.   There's no mention of it.

2    Q.    Now, I turn your attention to Exhibit 961 which

3    Mr. Kennedy showed you in his examination.  Do you have that in

4    front of you?

5    A.    Which one?  Oh, is that --

6    Q.    It says "Confidential Parke-Davis --"

7    A.    Yes, I have it, yes.

8          MS. NUSSBAUM:  Can we put this on the Elmo?  Would you

9    mind putting this up, 961, please.

10   Q.    Now, this is a confidential document from the defendants

11   here that Kaiser did not have; is that correct?

12   A.    That's correct.

13   Q.    And Mr. Kennedy drew your attention to the date, which is

14   March 26, 1999.  That's the date on the cover; is that right?

15   A.    That's correct.

16   Q.    But now I would draw your attention to the eighth page of

17   the document.  It says "Letter to investigators."  Do you see

18   that?

19   A.    Yes, on Page 8, right.

20   Q.    And that letter is dated July 28, 1998.  Do you see that?

21   A.    Yes, that's correct.

22   Q.    And if you read that letter, that indicates that "The

23   findings of the study did not demonstrate that gabapentin is an

24   effective adjunctive treatment for bipolar disorder."

25         Do you see that?

1    A.   Right.  This is a letter from Dr. Pande to the

2    investigators on that study informing them of the results.

3    Q.   So as of July 28, 1998, it was known that the Pande study

4    was negative; is that right?

5    A.   That's correct, uh-huh.

6    Q.   But when Dr. Kubota contacted Pfizer a year later and

7    said, "We're doing a monograph.  We need any unpublished data,"

8    did they let her know that?

9    A.   No.

10   Q.   Now, the other people, the other names that were just read

11   to you by Mr. Kennedy, a number of them are nurses and others,

12   are any of them part of the Drug Information Services?

13   A.   No.

14   Q.   And, to your knowledge, did Pfizer ever send a corrective

15   letter to Dr. Kubota saying, "Oops, we lied.  We lied about a

16   year, and now here's the truth"?

17        MR. KENNEDY:  Objection, your Honor.

18        THE COURT:  Sustained.  I mean, you can ask her

19   whether there was a corrective letter, but you can't phrase it

20   that way.

21   Q.   Did you or did Debbie Kubota ever get a corrected letter

22   from Pfizer saying that "A year ago we lied to you and didn't

23   disclose the Pande study"?

24        MR. KENNEDY:  Your Honor --

25        (Laughter.)

1          THE COURT:  Objection sustained.

2    Q.   To your knowledge, did Pfizer ever contact Kaiser and tell

3    them that "When we gave you the information in June of 1999, we

4    failed to disclose to you a negative study that we had notice

5    of one year earlier"?

6    A.   No.  We don't have any such communication.

7    Q.   Now, looking at the monograph that was done several months

8    later in September of 1999, it's Exhibit 327.

9    A.   Yes, I have it.

10   Q.   And this is the monograph that was done at Kaiser with

11   respect to pain; is that right?

12   A.   Correct.

13   Q.   Diabetic neuropathy?

14   A.   Yes.

15   Q.   And if you look at the last physical page, this letter

16   also indicates in the references that there was again a

17   personal communication with an information specialist at the

18   defendants'.  Do you see that?

19   A.   Yes, I do.

20   Q.   And that that communication was in May of 1999?

21   A.   Correct.

22   Q.   With a PharmD there, Monica Patel?

23   A.   Right.

24   Q.   And does this document reflect that Monica Patel told Drug

25   Information Service at Kaiser about the Reckless study?

1   A.   No.

2   Q.   Does it reflect that Kaiser was told that the results of

3   the Reckless study, a very large Level 1 study, were going to

4   be had very shortly?

5   A.   No.  There's no mention of that associated with that

6   reference.

7   Q.   Now, looking at S7 which is the Gorson reference, do you

8   see that?

9   A.   Yes.

10   Q.   Would it be fair to say that that is a letter to the

11   editor that was Level 3 evidence, as the evidence has been

12   described to the jury by Dr. Kessler?

13   A.   Yes.  The reason a letter to the editor is not given as

14   much weight as a published study in a peer-reviewed journal is

15   because as a researcher, I would just write up my experience or

16   my results in that study, and I would submit it to an editor.

17   An editor looks at it and says, "This is interesting, I'm going

18   to publish it as a letter to me."  That editor is the only

19   person who has reviewed it or looked at it.  It hasn't gone

20   through a peer-review process.  So before publishing in a

21   journal, there's a peer-review process where experts in that

22   field take a look at the evidence, take a look at the study,

23   and there's a back-and-forth between the author and the peer

24   reviewers in order to, you know, clarify any questions on

25   methodology --

1          THE COURT:  I think, let's just wrap --

2          THE WITNESS:  Okay, I sorry.  I love what I do, as you

3     can tell.  Sorry.

4          THE COURT:  How much longer do you have?

5          MS. NUSSBAUM:  Maybe ten minutes, your Honor.  It's

6     fast.

7          THE WITNESS:  Sorry, sorry.

8          MS. NUSSBAUM:  No more documents.  It will be quick.

9          THE COURT:  All right, I think we should, though, take

10    our break.

11         MS. NUSSBAUM:  Okay.

12         THE COURT:  With three minutes, I might have --

13         THE CLERK:  All rise for the jury.

14         (Jury excused.)

15         THE COURT:  Okay, so let me just off the record see

16    folks on scheduling, and then we'll all take a break.

17         (Side-bar conference off the record.)

18         (A recess was taken, 11:10 a.m.)

19          THE CLERK:  All rise.  Be seated.

20          THE COURT:  Okay.  You've settled, resolved,

21    handled all of the exhibit issues?

22         MS. ARMSTRONG:  We have a couple.  Your Honor, the

23    first one is going to be Demonstrative Exhibit 5.

24         MR. SOBOL:  You should probably have it.

25         MS. ARMSTRONG:  Do you have a set of the exhibits?

1          THE COURT:  Where is the set of the exhibits?

2          MR. SOBOL:  I'm bringing this to you right now.

3     This is the first one that there is an objection to

4     apparently.

5          MS. ARMSTRONG:  It is a chalk, but it does not

6     have anything to do with Dr. Rosenthal's opinions.

7          THE COURT:  Did she give an opinion on this?

8          MS. ARMSTRONG:  No.

9          THE COURT:  Why are you putting it in?

10         MR. SOBOL:  Because it's directly relevant.

11         THE COURT:  Is it anything new?

12         MS. ARMSTRONG:  Yes, it is, your Honor,

13    Dr. Rosenthal, she takes promotional spending and correlates

14    it to prescriptions.  She doesn't talk about conduct.

15         THE COURT:  Objection is overruled.  What's the

16    second issue?  There's nothing prejudicial in here.

17         MS. ARMSTRONG:  The second issue is Demonstrative

18    Exhibit 6.2.

19         MR. SOBOL:  It might be immediately before or

20    after that, your Honor, in the binder.

21         MS. ARMSTRONG:  This data that's on this chart --

22         THE COURT:  Actually, I have 6.1.

23         MR. SOBOL:  If I may, I'll find it for you, your

24    Honor.

25         THE COURT:  I see the chalk.

Page 88

1          MS. ARMSTRONG:  It's a chart, yes.

2          THE COURT:  Is it a by chart?

3          MS. ARMSTRONG:  It's a demonstrative, it's a pie

4    chart.  It's not from a report.  The numbers are not from

5    her report.  She doesn't do this kind of analysis and

6    aggregation in her report.

7          MR. SOBOL:  It is, your Honor, if you look on the

8    right side, those are precisely the percentages that she

9    determined and she articulated in her report.

10          THE COURT:  Are there any percentages that are

11   different?

12          MS. ARMSTRONG:  If you go to Attachment G, which

13   is the source for this, it doesn't look like this.  The

14   numbers don't come from Attachment G, we don't know where

15   they come from.

16          MR. SOBOL:  If I may, your Honor, the numbers come

17   exactly from the percentages that she determined after the

18   regression.

19          THE COURT:  I don't know, she says they do.

20          MR. SOBOL:  Right.

21          THE COURT:  She says they don't, you say they do,

22   I don't know, you're going to have to sort of --

23          MS. ARMSTRONG:  Can I --

24          THE COURT:  It's just a pie chart, it's not too

25   complicated, if in fact it comes from the report, I'm going

Page 89

1  to let it in, if it does or what her testimony is, if not, I

2  won't.

3          MS. ARMSTRONG:  Could I just get my copy of

4  Attachment G and show you?

5          THE COURT:  Why don't the two of you confer?

6  Where do you think it came from?

7          MR. SOBOL:  I think it came directly from her

8  report where she has the percentages applicable to the

9  alleged fraud.

10          THE COURT:  You'll show it afterwards where it is,

11  okay.  Anything else, any other problems?  If the

12  percentages are in there, I'll allow it.  If they're not in

13  there, or, you know, in the deposition, if they're new brand

14  percentages, I won't allow them.  Why don't you show that to

15  defendants where you're referring to.

16          Well, you know, let's not do the go-between.  The

17  issue is the bipolar?

18          MS. ARMSTRONG:  No, the percentages on this chart

19  don't match the percentage document.

20          THE COURT:  What do the percentages say?

21          MR. SOBOL:  If I may, your Honor, what I'll

22  suggest, this is the very last item that Professor Rosenthal

23  would address.  She's probably not going to get to it today.

24  Let's get the jury back in here and go forward.

25          THE COURT:  Don't put it in.  If she says that

Page 90

1    it's not in there, you haven't shown me where it is in

2    there --

3             MR. SOBOL:  Right.

4             THE COURT:  -- so maybe there's one statistic

5    that's off.  It's the problem with producing the charts at

6    the last minute.  You sort of loose if it's not doable.

7             MR. SOBOL:  That's what I'm saying, there's no

8    reason to make a tempest out of a teapot today.

9             THE COURT:  Good.  Let's bring the jury in and

10   let's get going.  While he's getting them, what depositions

11   do I owe you, anything?  Where is the deposition man?  Where

12   is he?

13            MR. BARRETT:  I'm the deposition man in the

14   absence of my son.

15            THE COURT:  Is that your son?  I didn't know that.

16   Not enough to have one miserable person, but two in the

17   family.

18            MR. BARRETT:  That's right.  I think you owe us a

19   couple of them, but they're not -- we're not going to get to

20   them any time soon, and we're okay.

21            THE COURT:  I'm not sure what I have because a

22   bunch were taken back, so I'm thinking I'm current with you,

23   and if I'm not, then I need to get new drafts.

24            MR. BARRETT:  We're way ahead of the game, we have

25   enough players, so we can deal with them over the weekend

Page 91

1   and get you what you need.

2           MR. GREENE:  Would you have time with two issues,

3   one issue we talked about yesterday with Boris and the Tive

4   transcript?  It will just take a minute.  We can do it when

5   we break.

6           THE CLERK:  All rise for the jury.

7           ( JURORS ENTERED THE COURTROOM.)

8           THE CLERK:  Please be seated.

9   Q.  Yesterday Mr. Kennedy talked about some FDA mandated

10  warnings.  Now, let me ask you, does Neurontin carry any FDA

11  mandated warnings?

12  A.  Yes, it does.

13  Q.  For what does Neurontin carry FDA mandated warnings?

14  A.  Warning mandated by the FDA in the package insert of

15  Neurontin deals with suicidality, potential for suicidal

16  thoughts, actions, worsening of depression and some language

17  to the health care provider about, you know, monitoring

18  patients and being careful with that.

19  Q.  Can you tell us presently about how many FDA-approved

20  drugs have box warnings?

21  A.  Yes, it's over 400 products on the U.S. market.

22  Q.  And can you give any examples of those drugs?

23          THE COURT:  No, I don't think we need to do.

24  Q.  Now, in your experience, does the fact that a drug has

25  an FDA mandated warning stop physicians from prescribing the

1    drug?

2    A.   No, it doesn't stop them from prescribing the drug when

3    it's appropriate, when it's the right drug for the right

4    patient and it's a part of the package insert, just like the

5    warning section, the precaution section which lays out

6    information for them that can happen, usually serious events

7    that are very, very rare, but, no, it would not stop using a

8    physician from using those 400 and some odd products.

9    Q.   Mr. Kennedy asked you about some of the smaller regions.

10   What percentage of Kaiser's 8.7 million members presently

11   live in Georgia?

12   A.   In Georgia, it's about two percent.

13   Q.   What about Ohio?

14   A.   About two percent.

15   Q.   Colorado?

16   A.   About six percent.

17   Q.   Hawaii?

18   A.   About three percent.

19   Q.   Mid-Atlantic regions?

20   A.   Mid-Atlantic I think is about six percent also.

21   Q.   Northwest?

22   A.   About six percent.

23   Q.   And Northern California?

24   A.   Northern California is about 38 percent.

25   Q.   And Southern California?

Page 93

1    A.   Another 38 percent.

2    Q.   And what can you tell us about the drug formularies of

3    these eight regions of Kaiser?

4    A.   Well, the drug formulary is pretty much, as I mentioned,

5    and tried to explain how the process works, all of the P & T

6    committees across Kaiser Permanente rely on the same

7    evidence, rely on the Drug Information Service's review of

8    that evidence, rely on the same literature, and they make

9    decisions on the products.

10           The decisions that they can make are similar.

11   They're not mandated to make the exact same decision, and a

12   lot of it has to do with the culture of how the health

13   environment is in Ohio vs. Hawaii and whether they prefer

14   using restrictions as a way to let physicians know, you

15   know, how they want that drug used vs. a guideline vs. an

16   educational program, so there's nuances that are different

17   and some differences in the formulary status, but it's very,

18   very similar.

19   Q.   One of the jurors yesterday asked a very good question.

20   They asked why can't Kaiser simply remove Neurontin from a

21   formulary.  Would that be a quick practical solution for

22   dealing with the patient care issues that Kaiser now

23   faces?

24   A.   Well, I wish it were that simple because if it were that

25   simple, we could take that action and get it done, and it's

1   just not that simple.

2   Q.  Well, why not?  Why isn't it that simple?

3   A.  Well, as I tried to explain before, there's numerous

4   issues.  One is that, first of all, Neurontin does have

5   FDA-approved indications for which it is useful and it's

6   prescribed.  We have physicians in our organization who are

7   treating epileptics or people with seizures with Neurontin,

8   it works, and there's no reason for that to be prevented,

9   from them to be prevented from doing that.

10          There's also a PHN, and, you know, family

11  practitioners prescribe and family practitioners and

12  pediatricians and all kinds of folks, they'll refill

13  prescriptions for patients on those meds.  The product is

14  also on the national Medicare formulary, so we have to have

15  it available for our Medicare patients which make up, you

16  know, a good portion of our Kaiser membership, and then, you

17  know, just why can't we just do that, well, because it

18  doesn't get really to the core of the problem.

19          The core of the problem is we have thousands of

20  physicians who believe that Gabapentin or Neurontin works

21  for these indications.  They depended on, you know, we're an

22  evidence-based organization, and that's how we practice, and

23  they depended upon the literature, what was out in the

24  literature, they depended upon Drug Information Services,

25  and we depended upon the evidence, and so we came to wrong

Page 95

1    conclusions, and then they depended on the P & T committee,

2    and they depended on what we said and we depended on the

3    literature, and so we've had this, you know, these lies

4    basically that have permeated all this information, and now

5    our physicians are convinced that this stuff, you know, has

6    evidence to support it.

7             They've told their patients, here I'm going to

8    prescribe Neurontin for you, it's going to work really

9    great.  The patient trusts their physician, the patient's

10   going to believe that's working for them, so just changing a

11   status from formulary to nonformulary, nothing is going to

12   happen, the physician will just continue to write, and

13   unless they have the information, the education so that they

14   understand what's happened here.

15   Q.  Now, since the Dickersin article appeared in the

16   New England Journal a couple of months ago, what you

17   personally and those working with you at Kaiser taken?

18   A.  Okay.  So the Dickersin article I became aware of in,

19   you know, November, and so this has been published now in

20   the New England Journal of Medicine, a very prestigious

21   journal, and I took that article, I read it myself, and then

22   I sent it to some key individuals like the head of DUAT, the

23   head of DRUG, the P & T chairs, for example, to let them

24   know that this is now available, this information is now

25   available for us to look at and take into consideration.

1       So that was the first thing, and since then we've

2   also had some teleconferences with key physicians, we're

3   planning, we're trying to figure out how to deal with this

4   situation, you know, because we really don't know how to

5   deal with it in the best way possible.

6       So the other thing we did is, you know, Pfizer

7   makes a lot of other products, and, for example, with

8   Lyrica, we spoke about that earlier.

9           THE COURT:  We can't have this.

10          MS. NUSSBAUM:  This is relevant, your Honor.

11          THE COURT:  We can't have a narrative, just ask

12  questions.

13          MS. NUSSBAUM:  Okay.

14  Q.  What steps have you taken with respect to Lyrica?

15  A.  Okay.

16          MR. KENNEDY:  Objection.  Irrelevant.  Lyrica?

17          THE COURT:  Overruled.

18  A.  We, I contacted, I had someone on my staff contact

19  Pfizer, I asked them to provide the same type of information

20  that they -- that was used by Dr. Dickersin to make her

21  analysis of what happened with the Neurontin data.  I want

22  to know that information for Lyrica because unfortunately

23  now I can't trust anything that is coming from Pfizer.  How

24  do I know that the Lyrica study --

25          MR. KENNEDY:  Your Honor, move to strike.

1          THE COURT:  Sustained.  Just really tie it in.

2     We're at the final thing here.  So now what's the question

3     and a short answer?

4          THE WITNESS:  Okay.

5     Q.  Have you heard back from Pfizer with respect to the

6     request that you've made for all of their unpublished and

7     underlying data concerning Lyrica?

8     A.  I haven't heard anything yet.

9     Q.  Now, has Kaiser ever faced a situation like this with

10    any other drug?

11         MR. KENNEDY:  Objection.  Irrelevant.

12         THE COURT:  Sustained.

13    Q.  Has Kaiser ever faced a situation where they have

14    learned that a drug that they have been using that's been

15    wildly prescribed based on evidence that they thought was

16    reliable now has questions about the reliability of that

17    evidence?

18         MR. KENNEDY:  Objection.  Irrelevant.

19         THE COURT:  Sustained.

20    Q.  Have you in your 20 odd years of your experience in Drug

21    Information Services ever encountered a situation --

22         MR. KENNEDY:  Irrelevant.  403.

23         THE COURT:  Sustained.  Move on.  Next topic.

24    Q.  Ms. Millares, what is your understanding of what the

25    role is of Kaiser's plan with respect to Neurontin?

1   A.  Well, again, you know, this is something that's new to

2   us.  I don't know exactly how to deal with this, but we need

3   to re-educate our physicians.  We need to give them the

4   information, and what we have now is the Dickersin paper

5   that's published in New England.  I hope there will be more

6   of that type of communication in the medical literature for

7   people to understand what's happened and certainly, you

8   know, that's why we're here.

9          We're here at this case, Kaiser Permanente is

10  taking this to a public forum before a jury of people so

11  that the truth can get out and that people hopefully will

12  get, you know, a finding of something and then, you know,

13  the entire United States can know what happened because this

14  is the only way that the information is going to get out.

15          THE COURT:  No, no.

16          MR. KENNEDY:  I do not move to strike.

17          THE COURT:  All right.

18          MS. NUSSBAUM:  I have nothing further.  Thank you.

19          RECROSS-EXAMINATION BY MR. KENNEDY:

20  Q.  Doctor, if this jury in this trial finds in favor of

21  Kaiser, you're going to use that verdict as an excuse to

22  take Gabapentin off your formulary, aren't you?

23  A.  No, sir.

24  Q.  No plans like that at all?

25  A.  We have never -- excuse me, you asked me a question.  We

1    have never, ever put that forth as a potential outcome of

2    this trial.

3    Q.  And, likewise, if this jury were to find for Pfizer,

4    that's the last we're ever going to hear of DUAT, you're

5    going to go on letting your patients have Gabapentin?

6    A.  You are so wrong, I can't tell you.

7    Q.  Speaking of people who are wrong, you told us the

8    national Medicare formulary today requires Gabapentin as an

9    option for Medicare patients?

10   A.  Requires all anti -- there are six categories of drugs

11   that Medicare requires to be on the Medicare formulary

12   including all antidepressants, all anti-epileptic drugs.

13   Q.  Including Gabapentin?

14   A.  All anti-epileptic drugs including Gabapentin that has

15   an FDA approval for epilepsy.

16   Q.  So in your opinion there's an education program that's

17   also needed over at Medicare to bring them up to speed with

18   the evidence, correct?

19   A.  Epilepsy, it works for epilepsy, it's a good drug for

20   epilepsy.  It should continue to be used for epilepsy.  I've

21   said that many times.

22   Q.  And I think you said in response to one of your answers

23   on redirect, "Our physicians believe it works," correct?

24   A.  Our physicians, many of our physicians, yes.

25   Q.  And that's why we haven't seen any Kaiser physicians in

1    here as witnesses, correct?

2    A.  I have no idea why.  I'm not on the legal team.

3              MS. NUSSBAUM:  Objection.

4              THE COURT:  Sustained.

5    Q.  So you see it as your function as a pharmacist to try to

6    educate Kaiser's 12,000 doctors who have been fooled by

7    Pfizer; is that correct?

8    A.  I'm the manager of Drug Information Services for

9    Kaiser Permanente.  I work with lots of physicians and

10   pharmacists, and part of my job is to evaluate the evidence

11   available on pharmaceuticals and to help get that

12   information out to all health care providers, physicians,

13   pharmacists, nutritionists, absolutely, that's part of my

14   job.

15   Q.  And for some reason, Kaiser physicians can't evaluate

16   that same evidence and come to the same conclusion you've

17   had; is that correct?

18             MS. NUSSBAUM:  Objection.

19             THE COURT:  Sustained.  Argumentative.

20             MR. KENNEDY:  No further questions, your Honor.

21             THE JUROR:  Yes, question.  She's about to leave,

22   get on that plane back.

23             THE JUROR:  If I understand your testimony

24   correctly, you asked Pfizer for all of the information that

25   they had about Gabapentin and Neurontin, and all you got

Page 101

1    back was positive test results?

2              (Witness nodding head.)

3              THE COURT:  Wait, wait, is that a yes?

4              THE WITNESS:  Well, you know, I think we went

5    through each of the letters that went back, so some of the

6    positive, for example, in that big ol' Wanda Martin letter

7    that they sent back, a lot of what they gave us was case

8    reports, letters to the editor, unblinded stuff, and that

9    did not include the double-blind randomized, you know, the

10   better level evidence, so it wasn't a complete picture.

11             THE JUROR:  So you didn't get any negative

12   reports?

13             THE WITNESS:  I don't know.  There might have been

14   some negative reports in terms of some of those letters to

15   the editor or I can't remember right now.

16             THE JUROR:  Is there some kind of a regulatory

17   requirement or an FDA requirement that manufacturer's

18   negative test results are required to be shared with the

19   rest of the world?

20             THE COURT:  I think more accurately, was there at

21   that time?

22             THE WITNESS:  Unfortunately, no, there is no

23   requirement for anybody in the scientific community who

24   conducts research to share that with us.  It's not a

25   requirement, it's just ethically part of science and what

1    scientists depend on.

2              THE JUROR:  One last question, if I might.  You've

3    been in the business for quite a long period of time?

4              THE WITNESS:  A little bit.

5              THE JUROR:  Is it common practice for

6    manufacturers not to share negative test results?

7              THE WITNESS:  I sure hope not.  This is the first

8    time in my 22 years at doing this kind of work, working in

9    evidence-based medicine that I have seen this type of, you

10   know, off-label promotion, lying, lying and then followed by

11   we reach out to the evidence to, you know, because let's go

12   look at the evidence, and then we find out, guess what, the

13   evidence is not honest either.  So it's a double wammy.

14             THE COURT:  Anything else?  Thank you.

15             THE WITNESS:  Thanks.

16             MR. SOBOL:  Your Honor, Kaiser calls Professor

17   Rosenthal.

18             Your Honor, could I be seen briefly at sidebar?

19   It can wait until later.

20             THE COURT:  Why don't we wait until later.  We'll

21   get through as much as we can here.

22             MEREDITH BEVIN ROSENTHAL, having been duly sworn

23   by the Clerk, testified as follows:

24             THE CLERK:  Would you please state your name and

25   spell it for the record.

1          THE WITNESS:  Meredith Beaven Rosenthal,

2    M-e-r-e-d-i-t-h B-e-a-v-e-n R-o-s-e-n-t-h-a-l.

3          MR. SOBOL:  May I inquire, your Honor?

4          THE COURT:  Yes.

5                    DIRECT EXAMINATION

6    BY MR. SOBOL:

7    Q.  Good morning, Professor.

8    A.  Good morning.

9    Q.  You get the lucky of talking health care economics on a

10   Friday at noon.  Please describe to the jury what you do.

11   A.  I'm an associate professor of health economics and

12   policy at the Harvard School of Public Health.  I teach a

13   course in health economics to masters of public health

14   students, I advise and mentor doctoral students and post

15   doctoral fellows, those in training, and I do grant-funded

16   research related to domestic health policy issues largely in

17   the area of physician payment as well as insurance design,

18   including things like formularies.

19   Q.  During this trial, Professor, there's been some

20   testimony regarding an impact of the alleged wrongful

21   conduct by Pfizer.  Do you understand that?

22   A.  I do.

23   Q.  And that comes in a variety of forms, correct?

24   A.  Yes.

25   Q.  What is your understanding of the task you have in your

1   testimony to this jury today in terms of the impact and the

2   estimation of it in this case?

3   A.   To my understanding is that to date the jury has heard

4   from clinicians and Kaiser staff who have talked about how

5   the alleged misconduct affected the way they treat patients,

6   the way they do business and have shared a logical

7   connection between the allegations and the amount of

8   Neurontin that they paid for.

9            MR. KENNEDY:   I object, move to strike, assuming

10  facts not in evidence.

11           THE COURT:   Well, it's up to the jury to know if

12  that's true or not.

13           MR. SOBOL:   Right.   It's just background.

14           THE COURT:   I know.   She wasn't here so it's up to

15  you to understand what links have been made by the Kaiser

16  witnesses.   All right, go ahead.

17  Q.   So what's your understanding as to your assignment here

18  then in connection with that, Professor?

19  A.   My assignment specifically is to quantify the impact of

20  the alleged misconduct on units of Neurontin paid for by

21  Kaiser.

22  Q.   So then let's talk briefly about your background.

23  Please describe to the jury your formal education.

24  A.   I have a Ph.D. in health economics from Harvard

25  University, so my training is in economics including

1  econometrics, statistics as well as public health and other

2  aspects of health policy, and for that training I learned

3  applied economics and writing dissertation doing analyses

4  with empirical data from the U.S. health care system.

5  Q.  When did you get your Ph.D.?

6  A.  My Ph.D. was received and conferred in 1998.

7  Q.  And so for about the past --

8  A.  12.

9  Q.  -- 12, thank you, years describe to the jury how you

10  spent your professional activities?

11  A.  So for the past 12 years, I've been on the faculty at

12  the Harvard School of Public Health.  During that time, as I

13  noted earlier, I've conducted both grant-funded research

14  studies and teaching among masters and doctoral students at

15  Harvard.  My work has been widely published in academic

16  journals, including the New England Journal of Medicine, the

17  Journal of the American Medical Association.

18          I've also used my work to inform policymakers and

19  have testified in Congress and in state legislatures on

20  matters concerning health insurance, health care payment.

21  Q.  And you've also consulted or testified in connection

22  with pharmaceutical and other litigation matters?

23  A.  That's true.  During the last 10 years, I have worked on

24  a number of litigation matters concerning the pharmaceutical

25  industry and in particular looking at matters of antitrust,

1   so situations in which there was alleged foreclosure of

2   generic entry, in particular, as well as allegations

3   relating to pricing misconduct and allegations similar to

4   the ones in this matter where manufacturers are alleged to

5   have promoted their products off-label in the context of

6   committing fraud.

7   Q.   And approximately how much time do you spend between

8   your academic activities and your litigation consulting

9   activities?

10  A.   I spend approximately 15 to 20 percent of my time on the

11  litigation activities and 80 to 85 percent of my time on the

12  academic activities.

13  Q.   About how many peer reviewed articles have you been the

14  author or co-author on?

15  A.   I've been author or co-author on 50 peer reviewed

16  articles.

17  Q.   And turning then generally to your general assignment in

18  this case, I take it that you were asked whether you could

19  come to an opinion to a reasonable degree of certainty in

20  the area of health care policy and economics as to the

21  percentage of Neurontin prescriptions that might have been

22  caused by a set of alleged unlawful conduct, correct?

23  A.   Yes, that's correct.

24  Q.   Okay.  So, with that background then of that kind of an

25  assignment, let's do just a brief say five topics of health

1   care economics that serve as the background of that study.

2   You approached this with some kind of knowledge about health

3   care economics, correct?

4   A.   That's correct, and, in particular, in my work I look at

5   the effective incentives, financial incentives as well as

6   promotional activities on the use of various health care

7   services.

8   Q.   Let me ask you questions about five aspects then of

9   health care economics that might serve as the basis of your

10  opinion generally.  First, what is the most basic

11  proposition that health care economics teaches about the

12  relationship between pharmaceutical promotions and

13  pharmaceutical sales?

14  A.   Essentially that the reason manufacturers promote their

15  products is so that consumers and physicians in this

16  instance will choose to buy those products so that there's a

17  belief that companies put money into promotional activities

18  because they believe they'll be a return.

19  Q.   And how does that simple proposition find its way into

20  this case?

21  A.   Well, in essence, the model I estimate that I used to

22  calculate the prescriptions that were caused by the alleged

23  misconduct takes as its premise this basic theory that sales

24  of prescription drugs are driven over time by promotional

25  activities of the manufacturer in the context of the larger

1   competitive context.

2   Q.  Turning to a second proposition, what does health care

3   economics teach about how long the effect of pharmaceutical

4   marketing might last in terms of pharmaceutical sales?

5   A.  So one of the basic findings of the literature in

6   pharmaceutical promotion is that physicians, once they

7   develop practice patterns, tend to perpetuate those practice

8   patterns, so as a result promotional spending has a

9   long-lived effect, so it's like building up an asset.

10  Goodwill develops by physicians, they begin to use products,

11  they continue to use products over time.  This is both

12  theory and evidence to suggest this.

13  Q.  So, again, how does this proposition then that

14  pharmaceutical and marketing lasts find its way into your

15  approach of the estimation of the impact of Neurontin

16  marketing on Neurontin sales?

17  A.  I explicitly allow for the treatment of promotional

18  spending as an asset and examine in the data the extent to

19  which expenditures in a given period appear to have effects

20  that go beyond that period.

21  Q.  Okay.  And is that something that at some point I think

22  you term something called promotional stock, if you will?

23  A.  That's correct.  I measure promotion cumulatively over

24  time, as it were, so it builds up over time, as in this

25  instance, the defendant continues to spend money on

1   promotional activities related to Neurontin.

2   Q.  Does it also though have some kind of a depreciation

3   factor, if you will, or some kind of wearing off effect?

4   A.  In the model, I explicitly look using data to see how

5   much that stock appears to depreciate.  This is a standard

6   technique for these kinds of models in the published

7   literature.  This has been done as well, and so I find that

8   in fact there is some evidence of depreciation.  It varies

9   across the different models I look at by indication and

10  suggests that these messages have staying power that differs

11  from specialty to specialty.

12  Q.  Now, I want to turn to a third feature.  Does health

13  care economics employ certain tools routinely to estimate

14  how much pharmaceutical promotion or marketing has caused

15  certain level of sales?

16  A.  Yes, that's right.  So I mentioned earlier the notion of

17  econometrics, which is the idea of measuring certain

18  economic relationships, the central approach that

19  econometricians use is multiple regression, so a regression

20  analysis looks in data at a set of different characteristics

21  of those data and examines and quantifies relationships

22  among the various dimensions, so you could imagine if we

23  were looking at Neurontin use in a population, things like

24  age and health conditions like diabetes and other

25  co-morbidities might be factors that would affect whether

1   someone got a prescription, and a regression analysis would

2   parse out the extent to which those factors mattered.

3   Q.   Now, is this notion of using econometrics or a

4   regression to measure or estimate the amount of drug sales

5   were caused by drug marketing, is that something that just

6   is used in academia?

7   A.   This is a standard technique that is used in academia.

8   If you pick up any economics journal, you'll find regression

9   analyses.   It's also used in industry, so, for example, both

10  individual pharmaceutical marketing departments and the

11  consulting companies they hire like IMS Health you may have

12  heard something about.   They're a big consulting company

13  that gathers data on pharmaceutical sales, gathers data on

14  pharmaceutical promotion.

15        They also endeavor to provide companies with

16  information about what they call sales force effectiveness,

17  so they'll go out and examine prescribing patterns for

18  physicians after they have been visited by a detailing

19  representative, or they'll do studies of the effectiveness

20  of a particular continuing medical education program by

21  again looking at what physicians do in terms of prescribing

22  patterns before versus after those continuing medical

23  education programs, so this is done in industry as well as

24  in academia.

25  Q.   And so is it fair to say that at least at a very general

1   level what you decided to do in this case is nothing new in

2   terms of what's done in academia and industry?

3   A.  I use a very standard approach to calculating the impact

4   of the alleged misconduct on prescriptions.

5           MR. SOBOL:  We can go to Demo 5.  Don't put it on

6   the screen, just get it ready.

7   Q.  Professor Rosenthal, the fourth feature, we're getting

8   to five, the fourth feature, does health care economics

9   teach us something about how physicians acquire information

10  and something called diffusion effects of marketing?

11  A.  So for new technology, adoption in general, health care

12  economics, as well as economics more broadly, often looks at

13  the question of diffusion, this notion that there may be a

14  new technology, the classic example actually is hybrid corn.

15          A new technology that farmers or physicians learn

16  about, someone tries this new technology, and over time

17  there's gradual adoption often in the form of an S curve, so

18  in health care economics, there are a lot of influences that

19  we might think about on that diffusion curve.

20          An important role for promotion in the development

21  of information and the dissemination of easily accessible

22  information to physicians and pharmaceutical, in the

23  pharmaceutical industry, but there may be also be the

24  scientific literature that we've talked about and word of

25  mouth.

1    Q.  So, I think we have would a graph help you in explaining

2    this concept to the jury?

3    A.  Yes, thank you.

4         MR. SOBOL:  If we could put Demo 5 on, please.

5    Q.  This is a demonstrative, we're not asking it to be

6    admitted in evidence, but just in order to assist you,

7    Professor, in explaining to the jury this notion of

8    diffusion effects, can you please explain what they see here

9    and how it's relevant to your testimony?

10   A.  So this is just again intended to convey the

11   informational environment, as it were, for physician

12   prescribing, physicians have to learn about new products

13   from somewhere, and I've mentioned a couple of

14   industry-sponsored pieces of this already detailing as well

15   as continuing medical education, articles, the letters that

16   I heard about this morning, letters to the editor as well as

17   FDA-approved materials, including the products label, and

18   this information reaches physicians through a variety of

19   ways.

20        It may come through the medical group they work

21   with, they may seek it on the Internet, they may get dear

22   doctor letters, for example, from pharmaceutical

23   manufacturers from time to time, and they may directly

24   contact a medical information service to get information.

25        It's well understood also among professionals that

1   this information is often shared peer-to-peer as well, and

2   so perhaps one physician goes to a continuing medical event

3   but practices in a larger group and shares that information

4   in the forum of grand rounds, for example, physicians share

5   expert information from time to time through a variety of

6   mechanisms, or perhaps they refer a patient or cross-cover

7   one another, so there's a lots of ways that physicians

8   diffuse information among the larger group that they

9   practice with.

10  Q.   Is one way to restate your assignment in this case is to

11  tease out of these various influences the influence, the

12  alleged influence of Pfizer on the sales of Neurontin as

13  opposed to the other potential influences to physicians?

14  A.   That's correct.

15  Q.   Now, the fifth and final piece of the education of

16  health care economics, let me ask you this question:  What

17  does health care economics teach us about the reliability of

18  determining the extent of prescription marketing on

19  prescription sales by simply going and asking doctors one by

20  one, doctor by doctor whether they were influenced or not?

21  What does health care economics teach us about that?

22  A.   In general in social science and in particular in health

23  care economics, there is a body of both theory and empirical

24  work to suggest that eliciting self-report from a physician

25  about patterns of practice that may be controversial will

1    yield a bias estimate of the effect, and so just to be

2    really concrete, if you ask physicians if they're influenced

3    more by the scientific literature or by commercial

4    literature, that is, the materials the detailing person

5    brings to the office, they will feel a social desirability

6    bias, that is, they'll be inclined to not want to report

7    that they rely on pharmaceutical company information more

8    often than the scientific literature.

9         Again, this has been shown in randomized

10   controlled trials, in fact, it's published in the literature

11   and intuitively any of us can understand that.  Moreover,

12   there's evidence of unconscious biases, so not just a

13   reluctance to admit consciously, but unconsciously

14   professionals may have biases that develop from the context

15   in which they practice.

16        As you know, physicians are not only

17   professionals, but they have a sworn duty to serving their

18   patients, an ethical responsibility to serving their

19   patients.  They may develop these unconscious biases that

20   would make it very difficult for us to tell from simply

21   asking physicians if they were influenced by fraudulent

22   marketing.

23   Q.  Anywhere in the peer reviewed literature as far as you

24   know, are there any reliable studies that look into the

25   question of the influence of drug marketing on drug sales by

1  going and actually just asking the doctors one at a time

2  whether or not they were influenced or not?

3  A.  The only thing I can think of is one that does that and

4  compares that to actual beliefs about the effectiveness of a

5  drug and finds that physicians report that they do not rely

6  on commercial information, and yet their beliefs about a

7  drug contradict the scientific information and perfectly

8  align with the commercial information.

9           I don't know of any paper that has tried to

10  conclusively suggest that physicians are not influenced by

11  drug company information by asking them whether or not they

12  were influenced.

13  Q.  So then please tell the jury what is the one way and one

14  way only that health care economics teaches by which you can

15  estimate the amount of drug sales that was caused by drug

16  marketing?

17  A.  To examine objectively the causal association between

18  promotion and sales using these econometric models that I've

19  described earlier.

20  Q.  So now let's turn to your assignment specifically in

21  this case and to Neurontin.  I take it, first, you don't

22  have anything to do with the liability in this case,

23  correct?

24  A.  That's correct.

25  Q.  All right.  So what did you assume by way of liability,

1   and your whole testimony is basically predicated on is

2   what?

3   A.  I assumed that the allegations in the complaint are

4   true, that the allegations again that unlawful conduct

5   concerning uses of Neurontin.

6   Q.  So you don't come before this jury to tell them one way

7   or another whether or not what was undertaken was lawful or

8   not or anything else like that, correct?

9   A.  That's correct.

10  Q.  And so if there's an effort to prove an enterprise

11  through the Cline, Davis, Mann, you don't have any opinion

12  whether or not that occurred or not, you're simply assuming

13  it occurred, correct?

14  A.  That's correct.

15  Q.  And, similarly, if there's an enterprise of medical

16  action communications, you're just assuming that occurred,

17  you're not telling this jury one way or another whether or

18  not it occurred or not, correct?

19  A.  That's correct.

20  Q.  And assuming that there is liability, you then estimate

21  a percentage, but then let me also ask you on the other end,

22  your testimony here today is only to estimate a percentage,

23  correct?

24  A.  That's correct.

25  Q.  Okay.  So, I take it that the scope of your assignment

1  was not then to convert that percentage into a damage number

2  for Kaiser, correct?

3  A.  Yes, that's right.

4  Q.  That's a different expert that will testify on that

5  subject, correct?

6  A.  Yes.

7  Q.  Okay.  Now, let's turn then to the data sources and the

8  information that you inquired.  Just very briefly tell the

9  jury the kinds of information you tried to acquire in order

10  to undertake your assignment.

11  A.  There were two important pieces of information,

12  fundamental pieces of information from my analysis, not

13  surprisingly from what has gone before, the first one would

14  be the sales of Neurontin, and, in particular, I look at the

15  number of prescriptions of Neurontin, and those data come

16  from this organization I mentioned earlier, IMS Health,

17  which is a consulting company.

18        Some pieces of data also come from a company

19  called Verispan, which is another data and consulting

20  company well known in the pharmaceutical industry.  All of

21  these companies produce data for the industry that is used

22  for strategic and competitive purposes, so those are the

23  quantities that I use in my model.

24        Then --

25  Q.  Let me just ask questions.  IMS, I did interrupt you,

1  but, sorry.  In terms of quantities, the kinds of data that

2  you acquired is this data that only you rely upon or only

3  people from Harvard rely upon, or does everybody rely upon

4  it?

5  A.  These data are very widely used by people like me in

6  economic research.  I have used these data in economic

7  research.  They are used, as I noted before, by the

8  industry, including Pfizer, in its own strategic planning

9  and marketing efforts, and they are used very broadly in

10  cases like these as well.

11  Q.  So I interrupted you about quantity.  What else?

12  A.  So, in addition to quantity, also from the same data

13  source, we have information on prices, and so these data,

14  just so you know, they come from actual transactions that

15  occur in pharmacies, and so the data are captured in those

16  pharmacies, exactly what was paid, exactly what was filled

17  in terms of the prescription, so they're very detailed

18  data.

19        We get them at the month level down to the dosage

20  and the specific formulation of the drugs.  Then the other

21  key piece of the analysis relies on data on promotional

22  spending, so, again, these come from IMS Health.  IMS Health

23  tracks promotional spending in a variety of channels.  The

24  most important in terms of the dollar amounts is detailing.

25  So they look at individual sales visits to physician

1   offices, what drugs were talked about, and they have a

2   formula for quantifying the dollars spent on detailing drug

3   by drug.

4   Q.  And, again, both in terms of price and promotional

5   spending regularly used in the industry and in academia?

6   A.  That's correct.

7   Q.  Do you also require data that disaggregates or separates

8   out the spending into indications?

9   A.  So there are two pieces that we look at also in terms of

10  disaggregation.  One is separating out uses of a product by

11  indication.  That is by diagnosis, and so there's a separate

12  data set that IMS Health has developed.  It asks physicians

13  to fill out a diary for a set of patients and connects a

14  specific prescription to a specific use in that diary.

15          So they keep track of when they write a

16  prescription for Neurontin, they'll say what diagnosis it

17  was for using that same diagnosis coding system that I

18  believe has been discussed already, the ICD-9 codes.  So

19  that's one set of disaggregation.  We can look at Neurontin

20  by very detailed diagnosis.

21          The other place where we can disaggregate is to

22  look at promotional spending by specialty, and so the

23  promotional spending data are tracked by major specialty

24  categories according to an American Medical Association

25  classification system.

1   Q.  Now, all of these data sources that you so far testified

2   about, IMS, Verispan, the promotional spending, the price,

3   the disaggregation by indication is all national data,

4   correct?

5   A.  That's correct.

6   Q.  Sometimes actually including Kaiser data, sometimes just

7   being national data, correct?

8   A.  That's correct.

9   Q.  Now, focusing on disaggregating on the off-label, is one

10  of the sources you used NDTI?

11  A.  Yes, that's correct, the National Disease and

12  Therapeutic Index.

13  Q.  And is that what you used here to disaggregate by

14  indication in part?

15  A.  Yes.

16  Q.  Why?

17  A.  These data, again, as I noted earlier, they connect a

18  specific use to a specific indication.  It's very -- there

19  are very few data sources that allow one to look at the

20  diagnosis for which a prescription was written, so the

21  pharmacy sales data that I mentioned earlier that

22  essentially are captured in CVS and Rite-Aid and other

23  pharmacies, there's no diagnosis code there because it's not

24  required for reimbursement, so in health care economic

25  analysis, the best data are the ones that you have to report

1   to get paid, and the way pharmaceutical reimbursement works,

2   the pharmacy doesn't care about the diagnosis, and so it's

3   not recorded.  The NDTI is a good source of data because it

4   not only reports --

5               THE COURT:  NDTI?

6               THE WITNESS:  Sorry, National Disease and

7   Therapeutic Index, Mr. Sobol mentioned the NDTI.  It's the

8   only source that reports on a one-to-one basis, prescription

9   diagnosis.

10  Q.  Were you in the courtroom earlier today when some chart

11  reviews were discussed?

12  A.  I was.

13  Q.  Can you describe to the jury and to the Court what the

14  difference is between the way that information for NDTI is

15  acquired as opposed to, for instance, a chart review on 40

16  people?

17  A.  So the NDTI --

18              MR. KENNEDY:  Objection, lack of foundation, your

19  Honor.

20              THE COURT:  I'm not even sure I remember the chart

21  review thing myself.  Why don't you just explain to us what

22  NDTI does and how it differs from any other sources.

23              THE WITNESS:  It's a fairly straightforward

24  distinction, I think the NDTI has a form that asks for some

25  structured pieces of information about a prescription, so it

1    asks prospectively for a doctor to record those.

2             A medical record has a lot of unstructured fields,

3    and physicians record -- in many cases they record

4    incomplete sentences, and whether or not one can go to the

5    chart and find out what a particular prescription was

6    written for is not necessarily clear, so you may review 40

7    charts, and half of them the doctor doesn't say I prescribe

8    this for X.  Patient had these three conditions, I gave them

9    these four prescriptions, you can't make that one-to-one

10   match.

11   Q.  In health care economics, what is the single data source

12   which is most commonly looked to in order to disaggregate

13   pharmaceutical sales by indication?

14   A.  To my knowledge, it is the NDTI.

15   Q.  Now, did you make some initial observations once you

16   acquired all of this data before you began your

17   econometrics, if you will?

18   A.  Yes.  You mean examining the underlying data, yes.

19             MR. SOBOL:  Let's go to Plaintiff's 405A which I

20   offer in evidence.  I don't think there's an objection.

21             MR. KENNEDY:  That's correct, your Honor.

22             ( Exhibit 405A was received in evidence.)

23   Q.  Professor Rosenthal, we've put up Plaintiff's Exhibit

24   405A.  Please describe to the jury what this shows.

25   A.  So these data are sales of Neurontin in terms of the

1   numbers of prescriptions for all formulations and strengths.

2   They come from Verispan, which I mentioned was the

3   alternative company to IMS Health, these data, and so this

4   shows Neurontin prescriptions over the entire period, 1994

5   to September, 2007.

6   Q.  Now, I notice -- well, first this is all Neurontin sales

7   regardless of indication, correct?

8   A.  That's correct.  This is all sales.

9           THE COURT:  When you say indication, you mean --

10          THE WITNESS:  Diagnosis.

11          THE COURT:  All right.  Does this include

12  Gabapentin?

13          THE WITNESS:  This chart does not include generic

14  Gabapentin.  So if you see in 2004, late 2004, there's the

15  data drop off precipitously.  That's the entry of generic

16  Gabapentin, so this is only for brand name Neurontin.

17  Q.  And in this case you were asked to, for a time period

18  beginning in 1995 up until the time of generic entry to

19  undertake your analyses, correct?

20  A.  That's correct.

21  Q.  And just so that the jury understands, this trend line

22  in terms of the entry of a bioequivalent, an AB-rated

23  bioequivalent generic is pretty common, correct?

24  A.  This is the common scenario with generic entry in the

25  most recent period.  When a generic enters, it very rapidly

Page 124

1  captures market share from the brand name product.

2  Q.  Now, did you make any observations comparing off-label

3  and on label sales over time?

4  A.  Yes.  So in the next step, I looked at the NDTI data set

5  which allows me to separate out the diagnoses for Neurontin

6  was used, and I looked at the trend over time and uses,

7  prescriptions for Neurontin for the approved uses vs. uses

8  that are not approved.

9          MR. SOBOL:  So if we could go to 405B which I

10  offer.  I don't think there's any objection to this,

11  Mr. Kennedy?

12          MR. KENNEDY:  There is not.

13          ( Exhibit 405B was received in evidence.)

14  Q.  What does this show, Professor Rosenthal?

15  A.  So in this chart, as I noted, instead of looking at the

16  total, at all prescriptions, I'm looking at uses as reported

17  in the NDTI, and I make just a high level distinction

18  between those uses for which there was ever an indication

19  and those uses for which there is no FDA approval for

20  Neurontin.

21          The green line is the set of uses for which

22  Neurontin was approved.  As you see, this is a relatively

23  small proportion of the total, and it is relatively

24  unchanged over time.

25          The red line includes all uses that were not

1    included on the FDA label.  That line clearly climbs to a

2    peak around 2003 and begins to fall thereafter.

3    Q.  Unlike the first chart that we saw which did not have

4    any Gabapentin in it, the generic, does this chart show some

5    of the Gabapentin after the third quarter of 2004?

6    A.  In essence, so the NDTI reports what the physician wrote

7    the prescription for.  As the jury may be aware, a choice

8    about whether to fill with a generic or a brand name drug no

9    matter what the physician wrote is generally a decision of a

10   pharmacist, so what's captured in the NDTI is what was

11   written, and that would be for Neurontin or possibly

12   Gabapentin, but pharmacists may fill a prescription with a

13   generic, even if it's not written for a generic, depending

14   on various state regulations, and so this does not make the

15   distinction between generic and brand name drugs for that

16   reason.

17   Q.  And just so that we can clarify to the jury, if you

18   actually take your finger and tap the screen and draw a line

19   down, it will do that, to draw a line down to the third

20   quarter of 2004.  And so the time period to the left of that

21   is the time period you were doing your analyzes on,

22   correct?

23   A.  That's correct.

24   Q.  And, again, this is the NDTI data, correct?

25   A.  That's correct.

1   Q.  And also before you continued on, did you make any

2   observations about the first year or so as compared to the

3   balance of the years in terms of the relative use of on

4   label vs. off-label Neurontin?

5   A.  Well, it's fairly apparent in looking at the chart that

6   the off-label indications began to grow after about six

7   quarters where they overtake the approved indications, and,

8   again, the red line crosses the green line and remains well

9   above it.

10  Q.  Now, did you look into specific indications in sales

11  over time, too?

12  A.  Yes, I did.

13          MR. SOBOL:  And so let's go to 405C which I offer

14  and I don't think there's an objection to.

15          MR. KENNEDY:  There is not, your Honor.

16          ( Exhibit 405C was received in evidence.)

17  Q.  What does 405C show us, Professor?

18  A.  This chart shows uses solely for bipolar disorder.  The

19  chart like the other chart is using data from the NDTI and

20  plotting uses by quarter over time from 1994 through 2007,

21  the most recent period we have the data for.

22  Q.  And, again, so obviously it grows over time, and then it

23  spikes and goes down somewhat, correct?

24  A.  That's correct.  It has a pretty clear peak in late 2003

25  and declines pretty substantially after that.

1    Q.  And turning your attention again, did you make any

2    observations about the early period of when Neurontin was

3    launched and for about a period of a year or so after

4    that?

5    A.  Again, like the aggregate chart, from launch uses of

6    Neurontin for bipolar disorder were close to zero, and two,

7    three years into Neurontin's life cycle, they began to climb

8    very dramatically, and, again, you can see, you can see here

9    in 1999, there's a very dramatic and steep incline.

10   Q.  Drawing your attention to 405D -- which I offer in

11   evidence -- what is this?

12          ( Exhibit 405D was received in evidence.)

13   A.  This chart --

14          THE COURT:  Yes, go ahead.

15          THE JUROR:  In 405C, does that include branded and

16   generic?

17          THE WITNESS:  So, 405C would include branded and

18   generic for the post generic entry period, so after 2004, in

19   essence, that from 2004 to 2007 in this chart.

20          THE JUROR:  Thank you.

21          MR. SOBOL:  Another question, your Honor.

22          THE COURT:  Yes, go ahead.

23          THE JUROR:  Is it all new prescriptions or is it

24   new plus, you know, prior refills?  Does it cover

25   everything, or is it just new?

1      THE WITNESS:  That's a good question.  So these

2   will be new prescriptions but not necessarily new patients,

3   so it does relate to a physician actually undertaking the

4   act.  Perhaps it's more like pressing a computer button

5   these days but undertaking the act of writing a new

6   prescription.

7      THE COURT:  But it may be the second or third or

8   fourth?

9      THE WITNESS:  Absolutely.

10  Q.  And, Professor, can you just draw the line again on the

11  generic entry time periods so the jury understands that with

12  respect to 405C?

13  A.  Generic entry is, I'm sorry, straight lines aren't my

14  forte, it's roughly there.

15  Q.  All right.  Let's turn to 405D, which I think I offered

16  in evidence?

17      MR. KENNEDY:  No objection, your Honor.

18  Q.  Again, draw the line for us, Professor.  What does this

19  show us?

20  A.  This chart shows Neurontin uses for neuropathic pain

21  excluding postherpetic neuralgia for which Neurontin was

22  approved by the FDA.

23  Q.  And, again, observations here?

24  A.  Again, these data suggest zero, relatively low, close to

25  zero uses in the first four or five quarters, gradually

1   climbing, and particularly I would say, a particularly

2   robust growth during this period in the late 1990's, early

3   period of 2000.

4            MR. SOBOL:  Then 405E, which I offer in evidence.

5            MR. KENNEDY:  No objection, your Honor.

6        ( Exhibit 405E was received in evidence.)

7   Q.  What does this show, Professor?  You're getting better.

8   A.  So this shows Neurontin uses for nociceptive pain.

9   Again, the data show that these uses were essentially zero

10  for the first year, year and a half of Neurontin's life

11  cycle and began to grow over time with more substantial use

12  in the early 2000 period.

13  Q.  Now, I note that this chart, unlike some of the others

14  looks a little more spiky, if you will, if that is a word

15  even, why is that?

16  A.  These data are quarterly, and the number of uses for

17  nociceptive pain nationally is somewhat lower than some of

18  the other indications, and so there's a little bit of noise

19  of random variation, if you sample a certain number of

20  patients and you have a relatively small number of patients,

21  you get more random variation, just like when you see those

22  news polls on TV and they say sample variation of plus or

23  minus two percent, this is sample variation.

24  Q.  And, again, just a general observation about the early

25  period as compared to that later?

1   A.  Again, that early period starts out essentially at zero

2   and doesn't really begin to climb until roughly 1997 and has

3   again this much a later peak in the late '90s, early 2000

4   period.

5          MR. SOBOL:  405F, which I offer in evidence.

6          MR. KENNEDY:  No objection.

7          ( Exhibit 405F was received in evidence.)

8   Q.  What does this show, Professor?

9   A.  This is the analogous chart for migraine, and, again, in

10  this chart, uses of Neurontin for migraine essentially start

11  off at zero and begin to pick up a year and a half, two

12  years after launch.  This chart again has a peak in the

13  early 2000 period and also you can see some sampling

14  variation from quarter to quarter.

15         MR. SOBOL:  And 405G which I offer in evidence.

16         ( Exhibit 405G was received in evidence.)

17  Q.  First, what is this chart?

18  A.  This chart shows the number of Neurontin uses where the

19  daily dose was greater than 1800 milligrams per day.

20  Q.  And this is a different source of information?

21  A.  No.  In fact, these data also come from the NDTI data,

22  so it's the same NDTI data.

23  Q.  Now, if we go back to just take one of these examples,

24  for example, let's go back to bipolar which is 405C for a

25  moment.  Now, Professor, can you describe to the jury what

1  the difference is between a correlation and causation?

2  A.  Well, a correlation is just, it's the association of two

3  trends, in essence, it could be the association of two

4  phenomena.  It happens that when one is high that the other

5  is high, and, likewise, when one is low that the other is

6  low, so that's essentially the intuition.

7          You can see it visually between, for example, two

8  trend lines that seem to go together, so you can imagine

9  that there is a correlation between unemployment and

10  consumer spending, and a causation is when one economic

11  variable truly affects a second variable causing them to be

12  correlated in some way as well.

13          And, again, going back to my unemployment and

14  consumer spending example, there's not just a correlation

15  between unemployment and consumer spending, there's a causal

16  relationship, we know it from economic theory that there

17  should be a causal relationship and certain kinds of

18  econometric analyses can be used to establish causation.

19  Q.  Now, in this case you've been asked to assume that the

20  plaintiffs produce evidence and the jury agrees with it that

21  certain unlawful activities occurred with respect to bipolar

22  in the time period of 1994 to 1995, that it commenced around

23  then, correct?

24  A.  Yes, that's correct.

25  Q.  Would there be any correlation, not causation, that one

1    might make with respect to this chart?

2    A.   Again, a correlation analysis informally could be made

3    with any chart like this, so again, if we -- if you had in

4    mind that there was an activity that began say in 1995 and

5    that it picked up over time, you could say as a layperson

6    that these two things are correlated, that when one

7    increased, clearly the other increased.  Clearly this chart

8    reflects an increase that begins around 1995 and really, as

9    I noted earlier, picks up in 1998, 1999.

10   Q.   From your point of view and from the point of view of

11   health care economics, that's not causation, correct?

12   A.   That's correct.

13   Q.   All right.  And you have to do what you did in this case

14   to go further for causation, correct?

15   A.   That's correct.

16   Q.   So, I take it then in addition to looking at sales

17   information, as we've looked at, you also looked at

18   promotional spending, as you indicated, correct?

19   A.   Yes.

20             MR. SOBOL:  So let's go to slide 405H, please,

21   which I offer in evidence.

22             THE COURT:  All right.

23             ( Exhibit 405H was received in evidence.)

24   Q.   Professor, what's this show?

25   A.   So this slide shows a number of promotional spending

1    components that are tracked by IMS Health in what they call

2    their IPS data, so this is their promotional tracking system

3    that they use, and so the first one I'd call your attention

4    to is the blue line.  This is the dollar spending for

5    detailing, that is those salesperson visits from physician

6    office to physician office that occur, so that's dollar

7    spending for detailing with the target being Neurontin by

8    the detailer, and that you can see has a fairly steady

9    pattern in the early years of Neurontin overall reaching as

10   high as a million dollars a month.

11            I believe these are monthly data even though not

12   every month is reported there.  It's a little hard to see,

13   but those are monthly data, which is, again, why you get the

14   sampling variation that you see here.  It's monthly data,

15   and spending on detailing for Neurontin is running roughly

16   around $500,000 a month with some higher peaks there in the

17   beginning.

18   Q.  Let me stop you there, just in terms of the blue line

19   then, just to make it clear, is this spending by the

20   manufacturer of Neurontin?

21   A.  Yes.

22   Q.  Reported in IMS?

23   A.  Yes.

24   Q.  And is this, at least, a component of the kind of thing

25   that you're sort of filling the bucket or making your

1   promotional stock, if you will, over time?

2   A.  Yes.  Again, as I noted earlier, detailing is a very

3   important component of pharmaceutical spending simply as a

4   percentage of the dollar amount that pharmaceutical

5   companies spend on promotion.  Detailing is the biggest

6   component, depending upon how you count samples, but

7   detailing's the biggest component.

8            If you look at the IMS Health website, they talk

9   about the sales force being the linchpin of pharmaceutical

10  promotion.

11  Q.  And then what are the other two?

12  A.  So the next one is journal advertising dollars in the

13  green line, and so these are professional journal

14  advertisements.  You may be familiar with direct-to-consumer

15  advertisements, but over this period, there were virtually

16  no direct-to-consumer advertisements for Neurontin.

17           In the early part of the period, there was

18  regulatory ambiguity about what could be done on consumer

19  advertisements.  In any case, just to be clear, these are

20  professional journal ads.

21           So that's the green line.  Obviously a much

22  smaller dollar amount is spent on professional journal

23  advertising.  That dollar spend is relatively flat,

24  although, again, given the scale and how little it is, other

25  than the period 2002 to 2004 where it appears to really pick

Page 135

1    up.

2    Q.   And the RVOS?

3    A.   RVOS stands for the retail value of samples, and that

4    data stream is only available from IMS beginning in 1998, so

5    you see it's truncated there.  That doesn't mean that the

6    defendant wasn't using samples to promote its product.  IMS

7    Health wasn't tracking them.  So I show it here for

8    illustration purposes.

9              It's also worth noting that the samples here are

10   valued at the retail price of Neurontin which economically

11   speaking is not quite how you'd like to value them, but it's

12   the simplest way to value them for IMS Health, and so that's

13   why you see they're quite substantial in terms of the retail

14   value of samples.

15             THE COURT:  So IMS values them at retail?

16             THE WITNESS:  That's correct.

17   Q.   Now, these three lines of data, if you will, regarding

18   drug marketing, detailing, retail value of samples and

19   journal advertising, not direct-to-consumer advertising,

20   these were data that you could acquire not from the

21   manufacturer, from Pfizer, but from where?

22   A.   These were purchased from IMS Health.

23   Q.   What other data sources were available for to you

24   purchase from IMS Health, other kinds of marketing data

25   could you acquire from IMS Health?

1   A.   These were all the data that were available.  Again, IMS

2   Health in the more recent years has tracked

3   direct-to-consumer advertising, so TV ads that you may see

4   about drugs on TV, that's a relatively recent phenomenon,

5   and it's my understanding that there were no such data

6   available for Neurontin.

7   Q.   And so I take it that during the course of this

8   litigation, you made an effort to acquire all the kinds of

9   data that you could get your hands on regarding the

10  marketing of Neurontin by Pfizer and Warner-Lambert and

11  Parke-Davis, correct?

12  A.   Yes.  And in addition to going to the usual data sources

13  that I'm aware of what I use for my own work, I was in this

14  instance able to look at discovery materials and to request

15  data to come from the defendants, and I also looked through

16  thousands and thousands and thousands and thousands of pages

17  of discovery documents for similar kinds of data.

18  Q.   And in the end, I take it, that this was the data you

19  were able to acquire, correct?

20  A.   That's correct.

21  Q.   Now, were you comfortable, I take it there were other

22  kinds of marketing activities that get undertaken then for

23  which there would be a spend but for which you don't have

24  here, correct?

25  A.   That's correct.

1   Q.  And describe that to the jury, please.

2   A.  Again, from looking through discovery, I have pieces of

3   information on spending for things like continuing medical

4   education, for activities that I believe we heard about

5   today, the kinds of activities that might happen that I

6   would call peer selling, so a physician is paid to speak at

7   a dinner with peers about a product, these kinds of

8   activities that involve the professional education

9   mechanisms that physicians use to learn about new

10  products.

11          Many of these kinds of activities, again, their

12  existence is documented through discovery, and in some cases

13  I was able to find marketing budgets that would identify

14  them but no systematic types of data.

15  Q.  Now, you understand, Professor, that in this case the

16  plaintiff, Kaiser, is not complaining only about detailing

17  or journal advertising or sampling but about a variety of

18  other marketing activities, correct?

19  A.  I understand that the complaint discusses a variety of

20  other marketing activities, and I would say also more

21  broadly the omission of certain kinds of information, the

22  alleged suppression of scientific information, I'm not sure

23  if you put that under marketing activities, but that's a

24  much broader set of levers.

25  Q.  So if you only had data on certain kinds of activities

fd415135-7d33-460d-b1d1-bd7d81c1a3ce

1   and despite trying, you don't have other kinds of data that

2   you might otherwise want, did you reach a conclusion that

3   you did have a sufficient amount of data to undertake the

4   task at hand?

5   A.   In my view, the data that I have are sufficient for a

6   couple of primary reasons.  First, as I noted before,

7   detailing and the use of the sales force is widely

8   understood both in the industry and in academia to be a

9   central piece of the marketing strategy of pharmaceutical

10  companies, and when I say central, you can imagine a

11  detailing representative brings journal articles with them.

12         That is a vehicle to inviting people to medical

13  education events, and so having tracking the trends in

14  detailing, in my experience in doing work in this area will

15  pick up in the sense of these correlations, they'll pick up

16  the effects of all the other pieces that are used to

17  compliment detailing, and so we understand in pharmaceutical

18  economics that companies use a variety of strategies

19  together in kind of a synchronous way to accomplish market

20  share and market growth.

21         And so from an econometric or statistical

22  approach, not having data on these other mechanisms, if

23  they're used in concert with detailing, is not a very big

24  limitation because the analysis.  It's not critical to get

25  the levels of spending correct, what's critical is to get

1   the patterns of changes over time correct.

2          That's really the mechanism for calculating the

3   relationship between promotion and sales is about the

4   changes over time and not the levels, and so if the changes

5   are occurring in concert, the analysis will pick up the

6   right magnitude of effect anyhow.

7   Q.  That last concept that it was less important to have the

8   total quantity than the patterns over time, was there

9   anything specific about this case in terms of your review of

10  the documents and the data that you had that gave you a

11  particular level of comfort that the data that you were

12  getting and its laying out over time was going to be

13  sufficient for your purposes?

14  A.  Well, a number of things.  Again, assuming the

15  allegations are true, the promotional spending that I do

16  have detailing in journal advertising had patterns over time

17  that were consistent with the allegations, that were

18  consistent with what was in the complaint about documenting

19  specific CME programs, for example -- sorry, continuing

20  medical education programs -- that occurred at points in

21  time where I also see increases in detailing, so that's one

22  piece.

23          I also looked through many strategic plans that

24  suggested that Pfizer understood that these mechanisms

25  worked together, talked about using continuing medical

Page 140

1   education and detailing to target, for example, primary care

2   physicians; and, moreover, there's this database that I was

3   able to look at that records, for example, letters written

4   to physicians as well as record some of the content of

5   detailing visits and things like invitation to continuing

6   medical education are specifically mentioned in that

7   database.

8   Q.  So the long and the short of it was that you felt

9   comfortable to a reasonable degree of certainty in the area

10  of your profession with the data you had with regard to

11  promotional spending?

12  A.  That's correct.

13        MR. SOBOL:  Now let's turn to 405I which I offer

14  in evidence.

15        ( Exhibit 405I was received in evidence.)

16  Q.  We're going to address this concept of promotional

17  stock.  Before we get there, I want you to describe to the

18  jury first what we have here.

19  A.  So this exhibit pulls out just the detailing spending,

20  much easier to look at, and so detailing spending for

21  Neurontin for the period 1994 through 2007 -- again, as

22  noted in the early period, there's a slightly higher

23  activity in the very first year, relatively stable over time

24  with a few discrete peaks.

25        This is detailing to all kinds of physicians, and

1    you will note that in the period 2002 to 2004, there's a

2    fairly dramatic increase in detailing expenditures for

3    Neurontin.  Through document review, it became apparent that

4    those activities were related to the anticipation of the

5    launch of Lyrica.

6    Q.  Now, did you --

7              MR. KENNEDY:  Move to strike, lack of foundation

8    on the last answer, your Honor.

9              THE COURT:  Just the piece about Lyrica.

10             MR. KENNEDY:  The jury can be instructed to

11   disregard it?

12             THE COURT:  Yes, I'll strike the part about

13   Lyrica.

14   Q.  Now, did you use this data in an effort to look at

15   promotional stock?

16   A.  Yes, I did.  So these are the flows, the actual monthly

17   dollar spending.

18             MR. SOBOL:  Let's go to 405J, please, which I

19   offer in evidence.

20             ( Exhibit 405J was received in evidence.)

21   Q.  What does this show, Professor?

22   A.  So in this chart, I have constructed the stock of

23   detailing as described before, and this is simply the

24   cumulative of the spending over time, and so cumulative

25   promotional spending, and in particular here I'm looking at

Page 142

1   detailing to psychiatrists.

2           So there's a depreciation rate that has been

3   applied here.  This is the blue line.  So --

4   Q.  Can I interrupt you one second.  I don't want to lose

5   that, you saw you're looking at detailing to psychiatrists.

6   So this is a particular cut, if you will, of the detailing

7   data?

8   A.  That's correct.

9   Q.  Describe to the jury what you did in order to make sure

10  that you were looking at different kinds of promotional

11  spends for different kind of specialties.

12  A.  So IMS Health makes available their promotional spending

13  data by these major specialty categories as defined by the

14  American Medical Association, they capture a specialty of

15  physician that's being detailed, and so we were able to

16  disaggregate all the promotional spending variables by

17  specialty.

18          And so in this instance, I'm looking only as

19  psychiatrists, and I'm doing, as I noted, I accumulate over

20  time spending for detailing of psychiatrists adding the last

21  month to this month and again continued to accumulate, but I

22  assume that at a quarterly level, so quarter by quarter,

23  there's a small depreciation rate that I estimated in my

24  model.  I applied that small depreciation rate.

25          So the spending in this quarter depreciates by

1  three percent.  It's a fact until next quarter, and so that

2  cumulative means that that depreciation is applied over

3  time.

4  Q.  And so as a general matter then looking at the blue

5  line, what does this show about the promotional stock of

6  Neurontin over time?

7  A.  So --

8  Q.  Well, promotional stock of Neurontin for psychiatrists

9  over time?

10  A.  Right.  So the promotional stock for psychiatrists over

11  time, as you recall, it was very low.  The flows were very

12  low in the early years, and so the stock grows very slowly

13  until late in 1998, and as those flows pick up, the stock

14  grows fairly rapidly because the depreciation rate that we

15  estimated is relatively low, just three percent.  The stock

16  continues to grow very steeply, I would say until about

17  2001.

18  Q.  Can you just with your finger draw a circle around the

19  depreciated value of promotional stock, the legend you have

20  on the right-hand side?

21  A.  The legend?

22  Q.  Yes.

23  A.  That.

24  Q.  Right.  And so that's, if you will, the depreciated

25  value of the stock over time, those are the numbers on that

1    side of the chart?

2    A.  Yes, that's right, I'm sorry if this chart is confusing.

3    It has two axes, one for each of the lines, and so the blue

4    line corresponds to that right-hand access, the red line

5    corresponds to the left-hand access, and the red line is

6    just the NDTI data we already discussed of bipolar use but

7    in this case restricted to psychiatrists.

8    Q.  And that would be then the TRX over on the left-hand

9    side, correct?

10   A.  That's correct.

11   Q.  Thank you.  Now, Professor Rosenthal, making these

12   observations about the data, acquiring the data, did you set

13   out to construct a reliable health care economics model to

14   estimate over time the impact of the manufacturer's

15   marketing on the sales of Neurontin by indication?

16   A.  That's right.  I set out to estimate and calculate a

17   time series model that would quantify the specific

18   contribution of promotion to sales.

19   Q.  And I take it that one of the first things you did as

20   you've indicated before is you assumed liability; you

21   weren't making any opinions about liability, correct?

22   A.  That's correct.

23   Q.  You were also assuming the scope of any enterprises that

24   were in the complaint as well, Cline, Davis, Mann or the

25   medical action committee, correct?

Page 145

1   A.   That's correct.

2   Q.   And second I think that counsel also asked you to assume

3   certain starting periods for the alleged unlawful conduct,

4   correct?

5   A.   Yes, that's right.

6          MR. SOBOL:   Let's go to 405L and make sure it's

7   the correct one which I offer in evidence, if that's

8   acceptable Mr. Kennedy.

9          MR. KENNEDY:   No objection, your Honor.

10          ( Exhibit 405L was received in evidence.)

11   Q.   This shows the assumptions you were given regarding the

12   beginning and end of certain periods.  Can you please

13   describe this to the jury.

14   A.   Yes.  So each of the four diagnoses, indications that

15   we've been discussing, I was instructed by counsel to assume

16   the associated time period, that that was the period of time

17   for which damages would ultimately be calculated and for

18   which I was to quantify the share of prescriptions that were

19   caused by the alleged fraud.

20          So for bipolar mood disorders, that time period is

21   November, '95 through December, 2004.  They all end in

22   December, 2004.  For neuropathic pain, it begins in July of

23   1995; for migraine, September, 1995; nociceptive pain,

24   September, 1995; then the last category, of course, is not

25   really an indication, but it's the dosages exceeding 1800

Page 146

1    milligrams per day with the period for which plaintiffs

2    intended to prove the allegations allowed for them to claim

3    damages for the period of March, 1995 through 2004.

4    Q.  And, again, it was not your selection in terms of the

5    starting periods, correct, that was lawyers?

6    A.  Yes.

7    Q.  And the ending period you understood to be essentially

8    what?

9    A.  Generic entry.

10   Q.  Now, you undertook to undertake your analysis separately

11   for each indication, correct?

12   A.  That's correct.

13   Q.  And that you made a set of additional assumptions

14   regarding the legitimacy or not of certain kinds of

15   promotion by indication, correct?

16   A.  That's correct.

17        MR. SOBOL:  If I may, your Honor, this topic is

18   going to be a little tricky and confusing, and if we stop in

19   the middle, I'll just have to repeat it.

20        THE COURT:  I'm sure the jury wants to use every

21   last minute before Friday at 1:00.  That's fine.  That's

22   fine.  See you Monday.

23        THE CLERK:  All rise for the jury.

24        (JURORS EXITED THE COURTROOM.)

25        THE COURT:  If there's a revised chart, I don't

1    know, so...

2             MR. SOBOL:  We'll take care of it before Monday

3    morning.

4             THE COURT:  I want to make sure that they get it

5    beforehand.

6             MR. SOBOL:  Right.  We'll try to get it to them by

7    the end of business today.

8             THE COURT:  Just a couple of things on the record.

9             (THE FOLLOWING OCCURRED AT SIDEBAR:)

10            THE COURT:  On the record, what are you handing me

11   in terms of the deposition?

12            MR. GREENE:  Leslie Todd which you ruled on.

13            THE COURT:  But you want me to rule on it again

14   before I see the exhibit?

15            MR. GREENE:  What happened was when it was

16   submitted to you, the defendants didn't highlight that.  You

17   made your rulings, and then when it came back to us, the

18   defendants inserted that.

19            MR. BARRETT:  The question and answer that didn't

20   get picked up.

21            THE COURT:  Is there an objection to it?

22            MR. BARRETT:  Plaintiffs are objecting.

23            THE COURT:  I'll look at it.  Just give that to

24   me.  I'll try to rule on that.

25            MR. BARRETT:  Did you mark the one question and

1    answer for her?

2              THE COURT:  I haven't been reading any of them.

3              MR. GREENE:  This one piece, it's white.

4              THE COURT:  You have a sticky on it?

5              MR. GREENE:  Yes.

6              THE COURT:  Good, fine.

7              MR. GREENE:  There's the page and line.  You'll

8    see they stuck it in afterwards, and we didn't pick it up.

9              THE COURT:  Maybe.

10             MR. GREENE:  This is Boris, that's what I spoke to

11   you about.

12             THE COURT:  I'll look at it with Exhibit 40.

13             MR. GREENE:  41 is the marketing assessment, which

14   is in evidence, but if you pull out these few words and

15   we're reading it, Mr. Sobol and I are going to do this, you

16   need it in the context.

17             THE COURT:  This is in evidence?

18             MR. GREENE:  No, 41 is the marketing assessment.

19             THE COURT:  Is this just a copy of what's already

20   in evidence?  Is this the same document essentially?

21             MR. GREENE:  No.  This is the document, and there

22   are --

23             THE COURT:  Exhibit 40 is the document, but you

24   say Exhibit 41 is in.  Is 41 the same kinds of information?

25             MR. GREENE:  Yes.

1          THE COURT:  Can I have then 41 to see whether

2     there's any prejudice from it?

3          MR. BARRETT:  The part about 41 is in.  He wants

4     testimony in about 40, which is not in.

5          THE COURT:  If they're essentially -- it's a

6     problem I've had throughout, which is sometimes there's

7     questions on an exhibit which is perfectly acceptable if the

8     exhibit isn't marked, then you just don't put the exhibit

9     in, but in other cases it's essentially reading in the

10    document, which you can't do unless it's in, so sometimes

11    I'll letting it in, and sometimes I'm not, and it's just

12    more nuance.

13         MR. GREENE:  I'll give you this and I'll get you

14    41.

15         THE COURT:  Maybe we can do this Monday afternoon,

16    and I hate to do this to you, and I know it's springing it

17    on you, and you've all been working very hard, you've got at

18    least three volumes of documents probably going to the

19    enterprise issue, my guess most of them anyway, which are,

20    as I understand it, relevant and business records, but

21    they're not necessarily self-explanatory, and I don't want a

22    document dump when a jury couldn't understand them on their

23    own, so what I was going to be getting from you, and now

24    we've had three volumes, is who are these people, why is

25    this relevant, and then, for example, if it's not

1   self-explanatory that these people are Pfizer people, for

2   example, a quote from a deposition transcript to show who

3   they are, so it's just not making you making argument that

4   aren't in the evidence.

5          As I'm now understanding it, Pfizer, at least

6   right now is not bringing in their own people, so this is

7   really what's in the record from your case.  Who's that man

8   who you got three days of deposition from Pfizer?

9          MR. GREENE:  Knapp.

10          THE COURT:  Knapp.  Maybe he identifies the

11   people, I don't know, but you had three days of deposition.

12   It's got to be somewhere in here who these people are.

13          MS. ARMSTRONG:  Just so the record is clear, they

14   originally designated about 15 Pfizer people to testify

15   about marketing, four Davis Mann people and two Mac people,

16   so if they can get the documents in through deposition

17   testimony, that's fine.  Our objection is they should just

18   come in as freestanding exhibits with no explanation.

19          THE COURT:  If they're authentic, nonhearsay and

20   relevant, I'm going to let them in if they're

21   self-explanatory.  If they're not, I'm not going to let you

22   argue to the jury and put in information.  That's the line

23   I'm drawing here.  So I don't know, it's not the best

24   advocacy in the world, on the other hand --

25          MR. SOBOL:  I'm used to being told that.

1            THE COURT:  You know, it's not your fault.  Crew

2       was too late to subpoena, which is why I was sitting the

3       third or fourth day of trial having debates about the

4       witness, on the other hand, they have his deposition, so he

5       may put in a lot of background, right?

6            MR. SOBOL:  We intend to meet that requirement,

7       your Honor.

8            THE COURT:  How long did you depose him for, three

9       or four days?

10           MR. SOBOL:  I didn't do any of the depositions.

11           THE COURT:  I assume someone is going to play that

12      deposition?

13           MR. SOBOL:  Some portions of some depositions in

14      order to meet the burden that you've just articulated will

15      be coming into evidence, your Honor.

16           THE COURT:  Yet I'm putting this all on the record

17      because I've set it all up, if Pfizer hasn't had one

18      corporate representative here and now they're telling me

19      they're not introducing any witnesses, so at some level

20      you'll need to put on a witness to refute what the documents

21      say, either that or say the documents aren't sufficient.

22      You've got your own bind in this.  So as I understand it,

23      that's still the case, right, they'll be no Pfizer

24      witnesses?

25           MS. ARMSTRONG:  Well, the plaintiffs haven't

1   rested.

2           THE COURT:  You'll just make your decision?

3           MS. ARMSTRONG:  We'll make our decision.

4           THE COURT:  Fair enough.  So I need that because I

5   can't do that at the last minute.  Monday afternoon I have

6   some time.  You won't believe, I've done the schedule, did

7   you see what I have on Monday afternoon?  I have another

8   Pfizer case on, Rost.  It's another off-label marketing

9   case.

10          MR. SOBOL:  Is it a whistleblower case?

11          THE COURT:  Yes, it has to do with human growth

12  genotropin.  Anyway, I don't know, do you know who the

13  lawyers are?

14          MR. GREENE:  I think from Washington.

15          THE COURT:  They're on at four, then I have time,

16  I think, in between three and four, something like that or

17  two-thirty and four if people want to use that to start

18  going through these documents because I won't be able to do

19  it on the fly as we're doing at the 11:00 break.

20          MR. SOBOL:  We'll plan that, your Honor.  I do

21  remember five years ago you saying from the bench, "I am not

22  going to become the drug court, Mr. Sobol, I am not."

23          THE COURT:  I am not.  I don't know how I got

24  this.  I did not get Bextra, so that's a blessing.  I've got

25  the depositions, I've got these documents.  At some point

1   you're going to be resting when, next week?  Let's say

2   Wednesday?

3           MR. GREENE:  We're hoping Wednesday.

4           THE COURT:  I assume I'm going to see a brief

5   somewhere around there, I'll get a brief, I probably won't

6   stop to hear argument at some point.  At some point I'll

7   want a brief from all of you, too.  I think I've got the

8   alleged fraud, I think I've got the issues of causation, I

9   do not yet have statute of limitations from your end.  I'm

10  assuming some of what you were doing statute of limitations,

11  enterprise on your end, in other words, in terms of my

12  understanding it?

13          MR. SOBOL:  May I?

14          MS. ARMSTRONG:  Just another evidentiary issue

15  since the plaintiffs are also calling Dr. Hartman on Monday

16  after Rosenthal concludes, we had a couple of issues with

17  his demonstrative as well.  One of them was his chart which

18  has its class action damages.

19          Now, the input that he takes from that are the

20  percentages, and I've worked that out with Ms. Parker, but

21  she indicated they wanted to put in the entire chart which

22  had the class damages.

23          MR. SOBOL:  We can work that out.

24          THE COURT:  Is there anything else?  Thank you for

25  raising.

1          MS. ARMSTRONG:  The other thing, right before

2     trial we got updated charts with them that took the

3     prejudgment interest through to the date, and you had told

4     us we couldn't take Gabapentin prescriptions up through

5     2010, and we had to mark our chart, but they just gave us

6     this with updating.

7          THE COURT:  It's been a long weekend, I'm phasing

8     out.

9          MS. ARMSTRONG:  They gave us right before trial

10    charts that updated the prejudgment interest, and I

11    understand why they did that.

12         THE COURT:  Updated the prejudgment interest?

13         MS. ARMSTRONG:  In Dr. Hartman's damage

14    calculation.

15         THE COURT:  Through 2004 with interest to the

16    present, is that it?

17         MS. ARMSTRONG:  I think through December, 2004.

18         THE COURT:  The interest.

19         MS. ARMSTRONG:  I understand that, but we had

20    updated one of our expert charts to take Gabapentin

21    prescription through 2010, and we were told --

22         THE COURT:  But this is the interest rate.

23         MS. NUSSBAUM:  We're not asking for damages after

24    2004.

25         THE COURT:  It shows through the interest rate,

1   the same interest rate, it's math, times the interest rate?

2           MR. SOBOL:  It shows the math, too.

3           THE COURT:  That's not new data.

4           MS. ARMSTRONG:  Neither is Gabapentin for our

5   purposes.

6           THE COURT:  Overruled.  So the interest rates,

7   other than that, they can orally state it and then have the

8   jury do the math wrong and then I get a motion for

9   remittitur.  They're entitled, if they win, I would say that

10  as a jury instruction.  I'd rather have him do the math and

11  do it right.  Is the math wrong?

12          MS. ARMSTRONG:  It was a sort of goose and gander

13  rule.

14          THE COURT:  Excuse me, it's very different.  One

15  is a brand new set of prescriptions, another is an interest

16  rate because when they gave you the chart it's not bringing

17  it through trial, right?

18          MR. SOBOL:  Right.

19          THE COURT:  They've got to do that so I have no

20  problem with that.  Now you've got it, it's wrong math, I'm

21  willing to listen to it.  We can go off the record for

22  scheduling.

23          (Whereupon, the trial was suspended at 1:16 p.m.)

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                      C E R T I F I C A T E

20

21    UNITED STATES DISTRICT COURT )

22    DISTRICT OF MASSACHUSETTS     ) ss.

23    CITY OF BOSTON                )

24

25

Page 157

1              We, Lee A. Marzilli and Valerie A. O'Hara, Official

2     Federal Court Reporters, do hereby certify that the

3     foregoing transcript, Pages 1 through 156 inclusive, was

4     recorded by us stenographically at the time and place

5     aforesaid in Civil Action No. 04-10981-PBS, In Re:

6     Neurontin Marketing, Sales Practices, and Product Liability

7     Litigation, and thereafter by us reduced to typewriting and

8     is a true and accurate record of the proceedings.

9              In witness whereof we have hereunto set our hands

10    this 5th day of March, 2010.

11

12                         /s/ Lee A. Marzilli

13                         /s/ Valerie A. O'Hara

14              _____

15              LEE A. MARZILLI, CRR

16              VALERIE A. O'HARA, RPR

17              OFFICIAL FEDERAL COURT REPORTERS

18