UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | |
| | Judge Patti B. Saris |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | |
| | Magistrate Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW BASED UPON
LACK OF SUFFICIENT EVIDENCE TO PROVE CONDUCT OF A RICO
ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") respectfully submit this Memorandum of Law in Support of their Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Conduct of a RICO Enterprise or Pattern of Predicate Acts. As discussed herein, Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser") have failed to produce evidence sufficient to permit a reasonable jury to find that Kaiser sustained its burden of proving these essential elements of their RICO claims.[1] Pfizer, therefore, asks the Court to enter judgment in its favor, dismissing Kaiser's RICO claims in their entirety.

**INTRODUCTION**

Federal Rule of Civil Procedure 50 provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A)    resolve the issue against the party; and

---

[1] This motion is addressed to whether Plaintiffs have produced sufficient evidence of a RICO violation; that is, whether they have produced sufficient evidence that Defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity." *See* 18 U.S.C. 1962(c). That Plaintiffs have also failed to introduce sufficient evidence of injury, causation or damages is addressed in separate motions, as is the fact that Plaintiffs' RICO claims are barred by the statute of limitations.

>   (B)   grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). Kaiser has failed to present substantial evidence, that is, evidence that would permit reasonable and fair-minded persons to find in favor of Kaiser on essential elements of their RICO claims and, therefore, judgment should be entered for Defendants as a matter of law. *See Guilloty Perez v. Pierluisi*, 339 F.3d 43, 50 (1st Cir. 2003); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (citation omitted)).[2]

Defendants move separately as to each alleged RICO enterprise, each different condition or off-label use at issue, and each geographic region (subject to and without waiving Defendants' prior argument that Plaintiffs lack standing to recover on behalf of their non-California subsidiaries). Significantly, Plaintiffs have conceded, and the Court has recognized, that Plaintiffs cannot disaggregate the damages allegedly sustained by different Kaiser companies.[3] Thus, Plaintiffs have elected "to proceed in the aggregate." (*See* 2/22 Tr. (Nussbaum) at 27:2-3.) To the extent, therefore, the evidence is insufficient to sustain Plaintiffs' burden as to any Kaiser region, Plaintiffs' claims fail in their entirety.

## ARGUMENT

### I. Plaintiffs Failed to Present Evidence Legally Sufficient to Sustain Their Burden of Proving Conduct of an Enterprise[4]

This Court previously dismissed all of Plaintiffs' alleged enterprises save for a few,

---

[2] Whenever in this memorandum Defendants refer to insufficient evidence, no evidence, or Plaintiffs' failure to present sufficient evidence, Defendants intend to invoke the relevant standard of sufficiency under Rule 50.

[3] *See* 2/22 Tr. (Sobol) at 25:2-3 ("There's never been any disaggregation of damages among one entity or another."); 2/22 Tr. (Court) at 26:5-8 ("To suddenly now have to figure out, well, how much goes to this entity and how much goes to that entity, is a problem for us because you haven't done discovery that way if you've done it in the aggregate.").

[4] Defendants incorporate by reference their prior briefing on Plaintiffs' RICO claim, including Defendants' Trial Brief [2502] at Section II. Defendants also incorporate their Special Requests for Jury Instructions [2492] – especially Proposed Instructions No. 15, 16, 17, 18, 20, and 21 – and all authorities cited therein.

unrelated sub-enterprises comprised of Pfizer and individual medical marketing firms.[5] Plaintiffs have abandoned most of the remaining sub-enterprises. They now assert only a "Medical Education Enterprise" comprised of Defendants and third-party vendor Cline Davis Mann ("Cline"), and a "Publication Enterprise" comprised of Defendants and third-party vendor Medical Action Communications ("MAC").[6] (Kaiser's Trial Brief [2503] at 1-2.) They failed to present legally sufficient evidence of either enterprise.

Plaintiffs have the burden of proving the existence of an enterprise that is ***both*** distinct from Pfizer ***and*** distinct from the alleged pattern of racketeering activity. Pfizer itself, acting through its agents, cannot be a RICO "enterprise" because "the same entity cannot do 'double duty' as both the RICO defendant and the RICO enterprise." *Libertad v. Welch*, 53 F.3d 428, 442 (1st Cir. 1995). Likewise, a defendant that engages other parties to assist in committing alleged predicate acts cannot be a RICO enterprise, because an "enterprise" means "an entity apart and distinct from the pattern of activity in which it engages." *Id.* at 441. As discussed below, Plaintiffs' evidence fails both of these distinctness requirements.

### A. Plaintiffs Have Produced Insufficient Evidence Of An Enterprise Distinct From Pfizer

Plaintiffs failed to present legally sufficient evidence of an enterprise distinct from Pfizer. Instead, Plaintiffs presented evidence that Pfizer "hired" Cline and MAC as vendors to assist in performing certain tasks for Pfizer in connection with safe-harbor activities permitted by FDA regulations, including sponsorship of independent CMEs and publications. (2/24 Tr. (Abramson) at 27:10-12 ("[T]he manufacturer of Neurontin hired [Cline] to make these positive results known of the Backonja study, as well as the other study, to as many people as possible."), 34:16-

---

[5] These consisted of the Cline Davis Sub-Enterprise, the Physicians' World Sub-Enterprise, the Sudler & Hennessey Sub-Enterprise, the MEDED/MEDCON Sub-Enterprise, the MES Sub-Enterprise, the HCC Sub-Enterprise, the AMM/Adelphi Sub-Enterprise, and the Publication/Marketing/Physician Sub-Enterprise. *See In re Neurontin Mktg., Sales Practices & Prods.*, 433 F. Supp. 2d 172, 183 (D. Mass. 2006) ("*Neurontin I*"); Third Am. Coord. Compl. ¶ 177, ¶¶ 244-344.

[6] Defendants reiterate and incorporate their Objections [2538] to Plaintiffs' eve-of-trial request to amend their pleadings to add an alleged Medical Action Communications enterprise.

19 ("[MAC] is a company that was hired by … the manufacturer … to coordinate the publications and communications about Neurontin.").) Plaintiffs' claim that Defendants "hired" these companies does not establish an association-in-fact enterprise. At most, Plaintiffs' evidence could only show an agency relationship, which is legally insufficient and fundamentally inconsistent with the existence of an enterprise.

As a matter of law, Pfizer itself cannot be considered a RICO enterprise. "[U]nder § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The failure to plead or prove "any enterprise, distinct from a named person defendant, is fatal under RICO." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 191 (1st Cir. 1996) (affirming dismissal of RICO claim); *accord Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 29-31 (1st Cir. 1986); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 448 (1st Cir. 2000). As the First Circuit has recognized, "the same corporation may not serve in two roles at the same time." *Schofield*, 793 F.2d at 30. "[I]t stretches the language [of § 1962(c)] too far to suggest that a corporation can be employed by or associated with itself." *Id.* at 31; *see also Libertad*, 53 F.3d at 442 ("[T]he same entity cannot do 'double duty' as both the RICO defendant and the RICO enterprise.").

When the RICO "person" is a corporation, the plaintiff must prove the existence of an enterprise that is both different from the corporation itself and does not simply consist of the corporation carrying out its own affairs "through its employees, officers, subsidiaries and agents." *Mear v. Sun Life Assur. Co. of Canada (U.S.)*, No. 06-12143, 2008 WL 245217, at *9 (D. Mass. Jan. 24, 2008) (Zobel, J.). As the Second Circuit explained:

> Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. … Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.

4

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994). For example, "a subsidiary that simply conducts its affairs as delegated by the parent company for the profit of the parent company is engaged in nothing more than a legitimate corporate and financial relationship." *Bessette*, 230 F.3d at 449. Likewise, "employees acting solely in the interest of their employer, carrying on the regular affairs of the corporate enterprise, are not distinct from that enterprise." *Id.*; *see also, e.g., Odishelidze v. Aetna Life & Cas. Co.*, 853 F.2d 21, 23 (1st Cir. 1988) ("[T]he Aetna companies and their officers or employees (the named defendants) cannot be the entity that conducts its own affairs through a pattern of racketeering activity.").

This rule applies with equal force to a corporation's non-employee agents "so long as those persons act on behalf of the corporation." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds sub nom. NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998). Thus, in *Mear*, the plaintiff alleged that the defendant insurance company used independent[7] sales agents to engage in deceptive sales practices. *See id.* at *1. These allegations failed because they described the defendant's sales agents "not as a separate and distinct group of individuals associated with it in furtherance of a common scheme, but rather as acting for it in a traditional principal-agent relationship." *Id.* at *9.[8]

Plaintiffs cannot prove a Pfizer-Cline enterprise based on former Cline employee Claire Cheng's use of the word "partnership." (Pls' RICO Mem. [2660] at 2, 6, 11.) Ms. Cheng made clear that Cline's relationship with Parke-Davis was no different "from its relationship with any

---

[7] In her opposition to the defendant's motion to dismiss, the plaintiff emphasized that the sales agents were "not employees" of the defendant, but "independent contractors [who] are free to and do contract with other insurance companies." Pl's Mem. Opp. Mot. Dismiss (*Mear v. Sun Life Assur. Co. of Can. (U.S.)*, No. 06-121437), ECF Dkt. 21, at 11 (June 13, 2007).

[8] Any contention that Defendants used Cline or MAC to conceal Defendants' purported role in off-label marketing does not change this analysis. *See, e.g., Sears Roebuck & Co. v. Emerson Elec. Co.*, No. 02 C 5771, 2003 WL 60573, at *3, *5 (N.D. Ill. Jan. 7, 2003) (allegations that defendant used another company as a "straw purchaser" to "carry out its dirty work" did "not adequately allege[] the existence of an enterprise").

5

other client." (Cheng Dep. at 262:19-24, 265:9-13.) Cline's former Vice President and Account Supervisor likewise testified that Cline did not have any special relationship with Parke-Davis, and that Parke-Davis was simply a "client." (3/11 Tr. (Samuels) at 60:5-9.) "Businesses often refer to suppliers, customers, and producers of complementary products colloquially as 'our partners' without summoning up fiduciary duties." *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 610 (7th Cir. 2000); *see also Southex Exhibitions, Inc. v. Rhode Island Builders Ass'n, Inc.*, 279 F.3d 94, 101 (1st Cir. 2002) ("[T]he term 'partner' frequently is defined with a view to its context."); *Dinco v. Dylex, Ltd.*, 111 F.3d 964 (1st Cir. 1997) (distinguishing between "colloquial usage of the term 'partner' [and] *legal relationship*") (emphasis in original). Plaintiffs cannot even cite colloquial references to any "partnership" between Pfizer and MAC, whose relationship with Pfizer was also no different from any other client. (Valerio Dep. at 176:14-18.)

Relatedly, Plaintiffs failed to present legally sufficient evidence of a "common purpose" shared by Defendants and either Cline or MAC. *See United States v. Turkette*, 452 U.S. 576, 583 (1981). The only purpose Plaintiffs identify is to increase sales of Defendants' product. They failed to show that this "purpose" was in any way "common," or that achieving it would benefit anyone other than Defendants. As discussed above, a corporation's agents acting within the scope of their agency are simply acting "for the profit of the [corporation]," *Bessette*, 230 F.3d at 449, not in furtherance of any "common purpose." Cline and MAC were paid for their work on an hourly basis, and did not share in the profits from Neurontin sales. (Cheng Dep. at 265:23-266:13; 3/11 Tr. (Samuels) at 60:5-9; Valerio Dep. at 176:23-177:20.)

Plaintiffs also failed to present sufficient evidence of a coherent and cohesive structure,[9] systematic linkage,[10] or decision-making framework[11] among the alleged enterprise participants.

---

[9] *See Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009); *Libertad*, 53 F.3d at 442; *United States v. Nascimento*, 491 F.3d 25, 32 (1st Cir. 2007), *cert. denied*, 128 S. Ct. 1738 (2008).

[10] *See Welch*, 53 F.3d at 443.

[11] *See United States v. Pelullo*, 964 F.2d 193, 211 (3d Cir. 1992).

"[S]imilarity of goals and methods does not suffice to show that an enterprise exists; what is necessary is evidence of systemic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination." *Libertad*, 53 F.3d at 443. With respect to Cline, Plaintiffs rely on evidence that former Cline employee Clare Cheng was listed as a member of the "Extended Disease Team" regarding the product for which Cline was "hired" to conduct safe-harbor activities, and that Ms. Cheng had a voicemail box to assist her in performing that function. (Pls' RICO Mem. [2660] at 8-9.) This is legally insufficient to show anything beyond normal communications between a corporate principal and its vendor agent. *See, e.g., Mear*, 2008 WL 245217, at *9 (claim that defendant "closely monitored the conduct of its sales agents in presentations of the company's products" did not satisfy enterprise requirement); *Odishelidze*, 853 F.2d at 23-24 (claim that parent and subsidiary corporations, or sister corporations, have overlapping "directors, officers, and employees" does not satisfy enterprise requirement). Moreover, Plaintiffs fail to present any such evidence with respect to MAC.

### B. Plaintiffs Have Introduced Insufficient Evidence Of An Enterprise Distinct From The Alleged Racketeering Activities

Plaintiffs' RICO claims also fail because Plaintiffs have not presented any evidence of enterprise apart from the alleged racketeering activity. Although the proof to establish these elements may overlap, it cannot be coterminus. Proof that the defendants engaged in alleged racketeering activities with the assistance of other persons or entities does not establish the existence of an enterprise. *See Turkette*, 452 U.S. at 583; *United States v. Cianci*, 378 F.3d 71, 81-82 (1st Cir. 2004); *United States v. Patrick*, 248 F.3d 11, 17 (1st Cir. 2001). "The 'enterprise' is not the 'pattern of racketeering activity;' it is an entity apart and distinct from the pattern of activity in which it engages. The existence of an enterprise is, therefore, a separate element which must be proven." *Libertad*, 53 F.3d at 441. "An enterprise is chiefly distinguished from the pattern of racketeering activity by the fact that it possesses some goal or purpose more pervasive and more enduring than the instant gratification that can accrue from the successful completion of each particular [wrongful] act" alleged. *United States v. Nascimento*, 491 F.3d 25,

7

32 (1st Cir. 2007).

As discussed above, Plaintiffs' RICO claim is based on their assertion that Pfizer hired Cline and MAC to publicize study results in a misleading manner in order to encourage Neurontin prescriptions for off-label conditions for which there was no scientific support. This is identical with their claims of racketeering activity, and fails to demonstrate the existence of any enterprise distinct from such activity.

### C. Plaintiffs' Document Dump Does Not Satisfy their Burden of Proving an Enterprise

Plaintiffs' key witnesses in support of their enterprise allegations were Drs. Abramson and Dickersin, and several days after these witnesses finished testifying, the Court aptly observed: "They need to prove an enterprise. I've heard nothing about an enterprise." (3/3 Tr. (Court) at 5:7-9.) Plaintiffs' attempt to prove this highly complex aspect of their case through a document dump unaccompanied by adequate witness testimony, context, or opportunity for cross-examination, is legally insufficient for the reasons set forth in Defendants' Objection to those documents [2604] and Plaintiffs' proposed summaries thereof [2631 & 2658]. As the Court recognized, "[the documents are] not necessarily self-explanatory, and I don't want a document dump when a jury couldn't understand them on their own." (3/5 Tr. (Court) at 149:21-23.) If the inferences Plaintiffs seek to draw are not readily apparent from the face of the document, Plaintiffs cannot use the documents as a pretext for "making argument that aren't in the evidence. . . . If they're not [self-explanatory], I'm not going to let you argue to the jury and put in information." (3/5 Tr. (Court) at 150:3-22.) The inferences Plaintiffs seek to draw are unsupported by the proffered documents, and are so attenuated that no reasonable fact-finder could find the existence of an enterprise based on this de-contextualized document dump. For example:

Plaintiffs point to a letter from Cline that uses the phrase "[i]n the spirit of partnership" as evidence of something different from a typical client-vendor relationship. (Pls' RICO Mem. [2660] at 11 (citing PX 50).) But as discussed above, and as recognized by the First Circuit and

8

other courts, words like "partnership" are often used in a colloquial manner by business and their agents, and the undisputed testimony is that Cline's relationship with Parke-Davis was no different "from its relationship with any other client." (Cheng Dep. at 262:19-24, 265:9-13; *see also* 3/11 Tr. (Samuels) at 60:5-9.)

Plaintiffs misleadingly cite exhibits purportedly showing that PMG physicians attended a CME event titled "New Frontiers in Social Phobia and Bipolar Disorders." (Pls' RICO Mem. [2660] at 3 & n.5 (citing PX 360).) But Plaintiffs provided no evidence regarding the content of this presentation or whether it even addressed Neurontin. And to the extent that the presentation discussed Neurontin as treatment for social phobia, this would not be evidence of a predicate act because it is undisputed that there is Level I evidence of Neurontin's efficacy for social phobia. (*See* 2/26 Tr. (Barkin) at 29:8-13, 41:18-21, 70:24-71:4; *see also* 2/24 Tr. (Abramson) at 103:8-17, 105:10-106:2.)

Plaintiffs claim that Cline "recommended 'fictionalized' communications to physicians concerning off-label use of Neurontin." (Pls' RICO Mem. [2660] at 3.) But they present no testimony regarding what "fictionalized" means in this context, and there is no evidence that this suggestion was designed to mislead doctors in any way. Indeed, the memo in question states that "fictionalized case histories could be written *based on real situations*." (PX 75, at 89787.) In any event, there is no evidence that this was actually done.

Plaintiffs misleadingly lump together all documents pertaining to Neurontin use for "pain" (Pls' RICO Mem. [2660] at II.C & III.C) in order to obscure the complete lack of evidence of misrepresentations regarding nociceptive pain.

Plaintiffs characterize global tactical plans and key messages as being fraudulent (*see, e.g.*, PX 251), even though they address uses for which Neurontin has been approved in other countries (*see* Tive Dep. at 783:1-12; Glanzman Dep. at 738:2-739:5; Valerio Dep. at 134:20-161:25).

Plaintiffs characterize the term "key messages" as being inherently fraudulent, even though it is used throughout the publication planning industry, and even though the messages

9

were based on peer-reviewed data and were subject to the authors' independent approval. (Valerio Dep. at 39:10-18, 42:12-19.)

Plaintiffs' characterization of these documents is unfounded and misleading in many other significant respects. Suffice it to say, there is no basis for a reasonable fact-finder to read this stack of de-contextualized documents, connect the dots in precisely the way Plaintiffs do, and divine the purported existence of an enterprise or pattern of predicate acts that Plaintiffs required more than 50 pages of briefing to articulate.

## II. Plaintiffs Failed to Present Legally Sufficient Evidence of a Predicate Act

To prove a pattern of racketeering activity, Plaintiffs must first present evidence of two or more predicate acts, such as mail fraud or wire fraud, that are related and that amount to, or pose, a threat of continued activity. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Plaintiffs must prove that predicate acts "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* at 240 (citation omitted). To prove predicate acts of mail or wire fraud, Plaintiffs must show "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of interstate mail or wire communications in furtherance of the scheme." *Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1, 9-10 (1st Cir. 2007). Generally, a failure to disclose is actionable only where there is a duty to disclose or where an affirmative, true statement "is made misleading by a significant omission." *See Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 69-70 (1st Cir. 1998). Although the First Circuit has suggested that a defendant's failure to disclose may be actionable as mail fraud without a duty to disclose if the defendant knows and intends that the plaintiff will be deceived by his silence, *id.* at 70, it is nevertheless well-established that "[a] defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes." *Sanchez*, 492 F.3d at 10.

### A.     The Plea Is Irrelevant And Cannot Meet Plaintiffs' Burden Of Proof[12]

Plaintiffs cannot use Warner-Lambert Company LLC's guilty plea dated May 13, 2004 ("The Plea") to satisfy their burden. Initially, the Plea is not evidence of fraud. The Department of Justice did not charge Warner-Lambert with disseminating any false or misleading information about Neurontin. Off-label marketing, outside of certain safe harbors created by the Food and Drug Administration ("FDA"), constitutes a violation of the FDCA regardless of the truth or falsity of any statements made by the manufacturer to the physician.[13]

The Plea is also not evidence of intent, because the misdemeanors to which Warner-Lambert pled guilty were strict-liability crimes. Though Warner-Lambert acknowledged that the facts set forth in an Information dated May 13, 2004, were factually accurate, Warner-Lambert denied, and Pfizer continues to deny, the existence of any intentional nationwide scheme to promote Neurontin for off-label use. Indeed, in its summary of the elements of the counts, the court that accepted the Plea specifically noted that scienter was not an element. (Tr. of 6/7/04 Waiver, Change of Plea and Sentencing Hr'g at 10:4-9.)

Nor is the Plea evidence of any predicate act, let alone a pattern of racketeering activity. "[I]n order for a pattern of racketeering activity to cause injury, the predicate acts constituting racketeering activity must themselves proximately cause the injury." *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 598 (E.D. Va. 2009). Violation of the FDCA is not a predicate act under RICO. Instead, Plaintiffs are required to show mail or wire fraud. Because the Plea is not evidence of fraud, it is not evidence of a pattern of fraud. *See Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 42 (1st Cir. 1991) (observing that RICO requires a pattern of *predicate* acts, that is, one of the criminal violations identified in the RICO statute).

Moreover, the Plea has no connection to any alleged association-in-fact enterprise. The

---

[12] Defendants incorporate by reference their prior briefing on these issues, including: Defs' Mem. Supp. Mot. Exclude Warner-Lambert Guilty Plea [2302].

[13] *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 92 & n.6 (D. Mass. 2007) ("*Neurontin II*"); *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 329 (D. Mass. 2009) ("*Neurontin III*").

Plea related to specific incidents of off-label promotion through certain Warner-Lambert representatives and events in discrete locations within the United States, and was concerned solely with conduct that occurred between April 1995 and August 1996.

In any event, there is no nexus between the Plea and Plaintiffs' claims. The Plea has nothing to do with the question of whether Kaiser paid for prescriptions as the result of fraudulent marketing and whether any Kaiser insureds received any benefit from their Neurontin prescriptions.

### B. Plaintiffs' Publication Theory Fails To Establish A Predicate Act

#### 1. Plaintiffs have produced insufficient evidence that studies were suppressed, manipulated, or not truthfully reported[14]

Plaintiffs failed to present legally sufficient evidence of any pattern of predicate acts with respect to the so-called publication strategy. Plaintiffs' experts criticized a small subset of studies sponsored by Defendants while ignoring a large body of literature not attributable to Defendants that discussed Neurontin's safety and efficacy for off-label uses. For example, Dr. Dickersin looked at only 21 studies, and does not "have any idea whether that represents 100 percent or half or 10 percent or 1 percent of all the randomized controlled clinical trials that are available about Neurontin." (*See, e.g.*, 2/25 Tr. (Dickersin) at 84:8-15.) Plaintiffs' evidence is legally insufficient in several respects.

*First*, Plaintiffs presented no legally sufficient evidence that Defendants manipulated the content of any studies or publications. While Plaintiffs' experts were highly critical of various studies, they have no personal knowledge regarding the circumstances under which studies were conducted or reported, nor did they speak to any of the studies' authors or participants. (*See, e.g.*, 2/24 Tr. (Abramson) at 78:11-25; 3/1 Tr. (McCrory) at 65:11-66:7.) Plaintiffs' experts' speculation regarding Defendants' purported role in these studies is not competent evidence and

---

[14] Defendants incorporate by reference their prior briefing on these issues, including: Defs' Mem. Supp. M. Exclude Abramson [2308] at Section III.A, Defs' Mem. Supp. M. Exclude Dickersin [2305], and Defs' Mem. Opp. M. Exclude Field & Rothschild [2393] at Section III.A.

12

does not satisfy Plaintiffs' burden of proof.

*Second*, Plaintiffs presented no legally sufficient evidence that Defendants suppressed negative study results. Initially, Plaintiffs and their experts assume that pharmaceutical manufacturers have a duty to publicize all study results, but this is merely a subjective "ethical[]" opinion that has no basis in law and is not competent evidence of any applicable standard of care. (*E.g.*, 3/5 Tr. (Millares) at 101:16-102:1.) *See also, e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 544 (S.D.N.Y. 2004). And while Dr. Dickersin speculates regarding Defendants' intent based on the timing of various publications or decision not to publish certain studies, she concedes that these purported biases are prevalent throughout clinical trial literature "no matter who funds the study." (2/25 Tr. (Dickersin) at 91:4-5; *see also id.* at 87:11-91:10, 94:3-98:23.) In any event, it is undisputed that most of the challenged studies were published. As for the remaining studies, they were either submitted for publication and rejected, or there were legitimate reasons for not submitting them. Moreover, the published version of Dr. Dickersin's analysis concedes that "we cannot be certain that selective reporting was a decision made by employees of Pfizer and Parke-Davis." (DX 2091; 2/25 Tr. (Dickersin) at 111:19-112:2.)

Plaintiffs' lack of evidence of suppression is particularly apparent with respect to nociceptive pain. Plaintiffs presented no evidence of affirmative misstatements regarding this condition, and their claims instead depend entirely on the failure to publish purportedly negative studies. But these unpublished studies were nociceptive pain trials that were not part of any purported "publication strategy" *for Neurontin*, because they instead were designed to study the efficacy of **combination medications** (gabapentin-hydrocodone and gabapentin-naproxen) that were never marketed. (2/25 Tr. (Dickersin) at 107:21-109:24.) Nor did Plaintiffs present any evidence of affirmative misrepresentations by Defendants regarding nociceptive pain. Accordingly, there is no conceivable basis to impose liability with respect to Neurontin prescribed for nociceptive pain.

*Third*, Plaintiffs presented no legally sufficient evidence that the published articles did

not truthfully report the results of the studies discussed therein. For example, Dr. Abramson concedes that the Pande bipolar study was published and accurately presented the study's results. (2/24 Tr. (Abramson) at 96:6-15, 99:5-16.) Dr. Abramson further concedes that Dr. Pande accurately disclosed the study results in 1999, at the Third International Bipolar Conference, which was attended by several doctors who prescribed Neurontin to Kaiser's insureds. (2/24 Tr. (Abramson) at 90:17-96:2.) And while Plaintiffs' experts criticize the Backonja study based on potential unblinding, the possibility of unblinding was expressly noted in the article published in JAMA (2/24 Tr. (Abramson) at 129:17-130:17; 2/25 Tr. (Dickersin) at 57:4-6; 3/1 Tr. (Jewell) at 125:3-22), whose peer-reviewers were plainly not troubled by this issue. As for Plaintiffs' criticisms of the published Vieta article, they are not just invalid, but wholly irrelevant because that article was published in March 2006, after Kaiser's alleged injury. (2/23 Tr. (Abramson) at 113:10-11.)

### 2. Plaintiffs have produced insufficient evidence of any nexus between their publication theory and any enterprise

Plaintiffs must demonstrate a nexus between the predicate acts that constitute a pattern and the alleged enterprise at issue. Such a nexus exists only if a plaintiff shows that the defendant was "able to commit the predicate racketeering acts either by means [of] or as a result of his involvement with the enterprise." *Nascimento*, 491 F.3d at 45 (citing *United States v. Marino*, 277 F.3d 11, 27 (1st Cir. 2002)). Alleged acts of wrongdoing which are not shown to bear a requisite relation to the alleged enterprise are irrelevant as to whether there was a pattern of racketeering activity. *Id.* As this Court recognized, "it's not just the fraud. It's got to be the fraud through the enterprise. So it's got to be the fraud on bipolar through an enterprise, the fraud on the migraine through an enterprise." (2/25 Tr. (Court) at 10:11-12.)

Plaintiffs failed to link the alleged misconduct to any alleged RICO enterprise. Plaintiffs' experts testified about various purportedly misleading studies, some of which they claim were "sponsored" by Pfizer, and others for which they could draw no connection to Pfizer whatsoever. For example, when asked by the Court whether "these positive studies that were flooding the

14

market, were those issued by Pfizer or someone else," 12/24 Tr. (Court) at 26:20-22, Dr. Abramson responded, "It's hard to tell," 12/24 Tr. (Abramson) at 23; *see also id.* at 137:13-20 (responding "we don't know" when asked by the Court whether an unblinded RCT was "a Pfizer study."). Likewise, Dr. Dickersin merely testified that the subset of studies she reviewed were "funded by Pfizer," and that "[s]ometimes Pfizer's employees were authors and sometimes not." (2/25 Tr. (Dickersin) at 48:14-18.)

### C. Plaintiffs' Peer-to-Peer Marketing Theory Fails to Establish a Predicate Act

#### 1. Plaintiffs have produced insufficient evidence that Pfizer controlled the content of CME events

Plaintiffs presented legally insufficient evidence that Pfizer controlled the content of the CME events they criticize. Dr. Abramson testified about various purportedly misleading CME events, some of which he claims were "sponsored" by Pfizer, and others for which he could draw no connection to Pfizer whatsoever. Dr. Abramson failed to establish any foundation regarding whether "sponsor" referred to Pfizer providing an unrestricted grant, as opposed to exercising control over the content. And Dr. Barkin, who has served on speakers bureaus for Pfizer and other pharmaceutical companies, admits that neither Pfizer nor any other company controlled or even reviewed the content of his presentations. (2/26 Tr. (Barkin) at 73:9-75:6.) As this Court recognized, "it's not going to be good enough simply that it says 'CME unrestricted grant.' It's relevant that Pfizer paid for it, but I need more than that." (2/25 Tr. (Court) at 10:11-12.)

FDA regulations permit pharmaceutical companies to provide financial, logistical, and technical support for independent scientific or educational activity where off-label uses of a drug are discussed, so long as the content is controlled by the program provider and characterized by balance, objectivity, scientific rigor, and appropriate disclosure of financial support or conflicts of interests.[15] In addition, pharmaceutical manufacturers have a First Amendment right to

---

[15] *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64074, 64084-85 (Dec. 3, 1997); Guidance for Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64093 (Dec. 3, 1997).

sponsor CME events where the manufacturers' products are discussed, so long as the speech does not promote "'unlawful'" activity and is not "'inherently misleading.'" *Washington Legal Found. v. Freidman*, 13 F. Supp. 2d 51, 65, 67 (D.D.C. 1998) (citations omitted), *amended by Washington Legal Found. v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999), *judgment vacated in part on other grounds by* 202 F.3d 331 (D.C. Cir. 2000). The activity allegedly promoted by industry-sponsored CME events – *i.e.*, off-label prescribing by doctors – is not "unlawful." *Id.* at 66. And Pfizer's mere financial sponsorship of CME events via unrestricted grants cannot be "inherently misleading," which is why the FDA expressly permits such sponsorship.

### 2. Plaintiffs have presented insufficient evidence that CME events were misleading

Plaintiffs presented no evidence regarding what statements were made at the CME events they criticize, and produced no witnesses who actually participated in or attended any such events. Instead, Plaintiffs' experts discussed various slides that were shown at certain CME events, but they have no idea what statements were or were not made in connection with those slides. (*See, e.g.*, 2/26 Tr. (Barkin) at 68:3-24, 72:15-18.)

Plaintiffs' peer-to-peer marketing theory depends on the legally baseless notion that industry-sponsored CME events are inherently misleading if they mention off-label use of a drug without disclosing all information in the manufacturer's possession. To the contrary, statements made at CME events that are not "actually false," but are alleged to imply a message by omitting certain facts, are not inherently misleading.[16] For example, doctors' accurate accounts at CME events regarding their positive experiences prescribing Neurontin are not misleading because they do not represent that Neurontin has been proven effective or that all patients will benefit.

---

[16] *See, e.g., W. States Med. Ctr. v. Shalala*, 69 F. Supp. 2d 1288, 1299-300 (D. Nev. 1999) (holding that, where statements were not "actually false," the "assertion that the public will be misled into believing, by implication alone, that compounded drugs have passed FDA tests and been approved, is insufficient to warrant the conclusion that the restricted speech is 'inherently misleading'" (citation omitted)), *aff'd in part, rev'd in part on other grounds*, 238 F.3d 1090 (9th Cir. 2001), *aff'd sub nom. Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002); *Texans Against Censorship, Inc. v. State Bar of Texas*, 888 F. Supp. 1328, 1361 (E.D. Tex. 1995) (holding that state law prohibiting statements that "imply[]" approval by the State Bar violated First Amendment), *aff'd*, 100 F.3d 953 (5th Cir. 1996).

16

Information purportedly showing that *other* patients did not derive a benefit does not "contradict [these doctors'] apparent results." Report & Recommendation on Defendants' Motion to Dismiss [269] ("Report & Recommendation") at 50, *adopted in relevant part*, *Neurontin I*, 433 F. Supp. 2d at 186.

### 3. Plaintiffs produced insufficient evidence of any nexus between CME events and any enterprise

Plaintiffs were required to prove that Pfizer manipulated the content of CME events by means of an enterprise. Without establishing this nexus, Plaintiffs' claim that various CME events were misleading cannot support a RICO claim. *See Nascimento*, 491 F.3d at 45. At most, Plaintiffs' evidence merely shows that Pfizer and its agents provided financial and logistical support for CME events through unrestricted grants. This is legally insufficient. As this Court recognized, "it's not going to be good enough simply that it says 'CME unrestricted grant.' It's relevant that Pfizer paid for it, but I need more than that." (2/25 Tr. (Court) at 10:11-12.)

## D. Detailing Is Not a Predicate Act

### 1. Plaintiffs produced insufficient evidence that detailing was off-label or fraudulent, or of any nexus between detailing and Plaintiffs' claims

Plaintiffs have presented no evidence of what detailing, if any, was directed to doctors who prescribed Neurontin off-label to Kaiser's insureds. Assuming any such detailing occurred, Plaintiffs' witnesses concede that they have no idea what statements were made, let alone whether they were made spontaneously or in response to direct questions from prescribing doctors. (*See, e.g.*, 2/26 Tr. (Carrejo) at 94:2-5.)

Accordingly, there is no evidence that any detailing to Kaiser insureds' prescribing doctors was either off-label or fraudulent. The Plea does not fill this gap in the evidence because, as discussed above, it has no nexus to Kaiser's claims. It would be pure speculation to assume that the specific incidents of off-label promotion addressed by the Plea included off-label detailing to Kaiser insureds' prescribing doctors. In any event, the Plea is not evidence of fraud. Prof. Rosenthal's analysis cannot fill the gap, because she was told to *assume* that all detailing

"was both off-label and fraudulent." *Neurontin III*, 257 F.R.D. at 329.

There is no basis for Kaiser's theory that all detailing is fraudulent, including just "slapping that physician on the back and saying 'How are you doing?'" (3/8 Tr. (Sobol) at 175:16-176:2.) "[T]he suppression argument only works if you get someone in there *saying wonderful things* about a drug, even truthful, and then you don't disclose *material* other information." (Dkt. 1482, 10/20/08 Hearing Tr. (Court) at 44:7-12.) Nor is there any basis for Kaiser's assumption that there was no legitimate reason to detail psychiatrists. Sales representatives detailing Neurontin also detail other drugs with on-label approval for psychiatric conditions (3/8 Tr. (Rosenthal) at 66:1-5) and Prof. Rosenthal cannot distinguish between conversations about Neurontin initiated by sales representatives and discussions initiated by physicians. Nor are Plaintiffs able to distinguish between truthful and untruthful statements that might have been made during detailing visits. For example, Dr. Barkin admits that Level I evidence supports Neurontin use for social phobia and panic disorder (2/26 Tr. (Barkin) at 70:24-71:4), and that he prescribes Neurontin to psychiatric patients for epilepsy. (2/26 Tr. (Barkin) at 76:22-23, 80:1-5.)

### 2. Plaintiffs produced insufficient evidence of any nexus between detailing and any enterprise

Plaintiffs presented no evidence that Pfizer engaged in detailing through any involvement in an enterprise. Plaintiffs' enterprise allegations focus on publications and CME events. Their detailing allegations are based on the alleged acts of Pfizer's own sales representatives. Plaintiffs' only attempt to connect detailing activity with publication and CME activity was to proffer the testimony and charts of Joshua Peteet, which the Court properly excluded without opposition. (*See* Electronic Order of 2/18/10.) Plaintiffs' speculation that sales representatives may have handed out unspecified journal reprints or invited doctors to attend unspecified CME events is legally insufficient evidence of any enterprise nexus. As discussed above, Plaintiffs have no idea what sales representatives did or said during any sales calls to Kaiser insureds' prescribing doctors. Nor can they show that *unspecified* journal reprints or CME events have

any nexus to an enterprise.

### III.   Plaintiffs' RICO Conspiracy Claim Must Also Be Dismissed

For the same reasons discussed above, Defendants are entitled to judgment as a matter of law with respect to Plaintiffs' conspiracy claim under 18 U.S.C. § 1962(d). "An actionable claim under section 1962(d), like one under section 1962(c), requires that the complainant's injury stems from a predicate act within the purview of 18 U.S.C. § 1961(1)." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 48 (1st Cir. 1991). Having failed to prove that Defendants conspired with distinct entities to commit predicate acts that proximately caused the allege injury, Plaintiffs' have not presented legally sufficient evidence to support their conspiracy claim. *See id.*

## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that the Court grant their Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Conduct of a RICO Enterprise or Pattern of Predicate Acts.

Dated: March 15, 2010                                  Respectfully submitted,

                                                       SKADDEN, ARPS, SLATE, MEAGHER
                                                         & FLOM LLP

                                                       By:   /s/ Mark S. Cheffo
                                                             Mark S. Cheffo

                                                       Four Times Square
                                                       New York, NY 10036
                                                       Tel: (212) 735-3000
                                                       Email: Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ Raoul D. Kennedy
Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400
Email: Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By: /s/ James E. Hooper
James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

---

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 15, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo