UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Judge Patti B. Saris |
| | Magistrate Judge Leo T. Sorokin |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW BASED UPON LACK OF SUFFICIENT EVIDENCE OF INJURY OR CAUSATION

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") respectfully submit this Memorandum of Law in Support of their Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Injury or Causation.

### ARGUMENT

In order to recover under RICO, Plaintiffs must prove that, by reason of a RICO violation (if found by a jury), Plaintiffs were injured in their business or property.  *See* 18 U.S.C. § 1964(c).  Significantly, the issues of injury and causation, which are closely related, are elements of the Plaintiffs' prima facie case, as well as RICO and Article III standing requirements.  *See Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010); *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006).  As a result, failure of proof on these two elements may not be brushed aside simply by asserting that it goes to the quantum of damages.  *See In re New Motor Vehicles Can. Export Antitrust Litig.*, 522 F.3d 6, 28 (2008) (recognizing the distinction between fact of injury and the amount of damages).  For the reasons discussed below, Plaintiffs have presented insufficient evidence to permit a reasonable jury to find in Plaintiffs' favor on the issues of injury and causation.[1]

---

[1] Whenever in this memorandum Defendants refer to insufficient evidence, no evidence, or Plaintiffs' failure to present sufficient evidence, Defendants intend to invoke the relevant standard of sufficiency under Rule 50.

I.      **Plaintiffs Failed to Present Legally Sufficient Evidence of A Direct Injury Sufficient To Establish Standing Or Proximate Causation[2]**

Plaintiffs survived summary judgment by alleging that Kaiser's Drug Information Services ("DIS") was misled; this was the "direct" injury that allowed them to survive summary judgment. *See In re Neurontin Mktg. & Sales Practices. Litig.*, No. 04-CV-10981-PBS, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010) ("*Neurontin IV*") (to be published in Fed. Supp. 2d). However, the evidence shows that Plaintiffs' "direct reliance" theory "is anything but straightforward," *Hemi Group*, 130 S. Ct. at 992, because it depends on a highly attenuated chain of alleged events, *i.e.*: (1) Defendants purportedly misled DIS; (2) DIS relied on the alleged misrepresentations when it created drug monographs and made formulary recommendations to regional P&T Committees operated by PMG doctors; (3) the P&T Committees relied on the DIS drug monographs and recommendations when they expanded formulary access to Neurontin; (4) prescribing doctors relied on Neurontin's formulary status when making prescription decisions; and (5) Kaiser insureds, who actively participated with their doctors in identifying effective medical treatments, filled their Neurontin prescriptions. (*See, e.g.*, 3/5 Tr. (Millares) at 94:19-95:14.)

This multi-step theory is the antithesis of proximate cause under RICO, which requires "'some direct relation between the injury asserted and the injurious conduct alleged.'" *Hemi Group*, 130 S. Ct. at 985 (citation omitted). "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id.* (alteration in original) (citation omitted). Plaintiffs cannot prove a direct relation where "[m]ultiple steps . . . separate the alleged fraud from the asserted injury," *id.* at 992, for "'"[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step."'" *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 271-72 (1992) (citation omitted); *see also Hemi Group*, 103 S. Ct. at 985 (holding that a "theory of causation [that] requires us to move well beyond the first step . . . cannot meet RICO's direct relationship requirement"). Thus, Plaintiffs cannot prove a direct injury with a theory of causation that

_____

[2] Defendants incorporate by reference their prior briefing on these issues, including: Defs' Mem. Supp. Summ. J. [1691] at Section IV; Defs' Reply Mem. Supp. Summ. J. [1785] at Sections III & V.

depends on "separate actions carried out by separate parties." *Hemi Group*, 130 S. Ct. at 985 (emphasis omitted).

In denying summary judgment with respect to Kaiser, this Court relied on *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131 (2008), for the proposition that first-party reliance is not required to satisfy RICO's proximate cause requirement. *See Neurontin*, 2010 WL 53568, at *8. However, in *Hemi Group*, the Supreme Court limited its prior holding in *Bridge* to a specific fact pattern not presented here. As the Supreme Court explained, *Bridge* involved a "zero sum" situation where the defendant's acquisition of liens necessarily reduced the liens available for the plaintiffs to obtain. Thus, there were no independent factors that accounted for the plaintiffs' alleged injury. *Hemi Group*, 2010 WL 246151, at *8-9. In contrast, in this case, Plaintiffs' theory of causation depends on the independent decision-making of third, fourth and even fifth parties.

*First*, Plaintiffs' theory depends upon the actions of eight regional P&T Committees, which are "third parties" for purposes of *Hemi Group*. Kaiser has separate P&T Committees in eight different regions. (3/2 Tr. (Carrejo) at 149:3-152:16.) Plaintiffs claim that the P&T Committees relied on DIS in making formulary decisions and issuing prescription guidelines. The regional P&T Committees are part of the Permanente Group (3/4 Tr. (Carrejo) at 8:16-24, 10:16-20), which Kaiser insists is a completely separate entity.

The evidence showed that the various P&T Committees were autonomous bodies that would have interpreted and acted on DIS monographs in different ways. Indeed, Dr. Carrejo was forced to concede that "[t]here are differences among the regions" and that, e.g., "to understand what's going on in the northwest region, we'd need somebody, at least other than [Dr. Carrejo] to come in and explain it." (2/26 Tr. (Carrejo) at 144:3-11; *see also* 3/2 Tr. (Carrejo) at 152:17-20; *see also* 3/10 Tr. (Daniel) at 33:20-22, 46:7-9.) Dr. Hyatt also admits that California regions' DRUG/DUAT initiatives started earlier than other regions' initiatives, and that other regions "were entitled to a level of autonomy" with respect to their own initiatives. (3/3 Tr. (Hyatt) at 131:12-21.) Likewise, Dr. Millares testified that "[e]ach of the regions deals with restrictions or guidelines in various different ways." (3/5 Tr. (Millares) at 12:11-12; *see also id.* at 27:23-24.)

As Dr. Daniel put it: "Well, we have very different ways of doing things. We're a very different, you know, somewhat different – I mean, we are different medical groups." (3/10 Tr. (Daniel) at 45:23-25.) As this Court observed, "suddenly it appears that maybe there was more autonomy than I thought there was in different P&T Committees." (2/22 Tr. at 8:22-24.)

*Second*, Plaintiffs' "direct reliance" theory cannot be divorced from the actions of individual physicians, who are "fourth parties" for purposes of *Hemi Group*. That is, even if Plaintiffs could prove that they expanded formulary access to Neurontin in reliance on alleged misrepresentations by Pfizer, Plaintiffs would still have to show that, as a result, prescribing physicians wrote off-label Neurontin prescriptions that they would not have written but for the alleged misrepresentations. *See In re Rezulin Prod. Liab. Litig.*, 210 F.R.D. 61, 67 (S.D.N.Y. 2002). Significantly, the evidence showed that a drug's formulary status does not dictate prescribing doctors' prescription decisions or Kaiser's reimbursement of prescriptions. (*E.g.*, Tr. 2/26 (Carrejo) at 108:10-23; 3/3 Tr. (Hyatt) at 100:21-101:4; 3/9 Tr. (Daniel) at 94:10-15; 3/10 Tr. (Daniel) at 48:23-49:11; 3/4 Tr. (Millares) at 119:21-23; 3/4 Tr. (Millares) at 123:4-124:13.) Dr. Daniel unequivocally admits that Neurontin's formulary status – the fundamental basis of Plaintiffs' entire "direct injury" theory – is irrelevant.

> Well, *the reason that doctors prescribe is* not because – at least within our organization – *not because it's on or off the formulary, it's because they believe that the drug is effective or not effective*, and that's created over years of education and training. So if there is – as we've now learned they're prescribing because they have erroneous, incorrect information. Even if you remove it from the formulary, unless you change that erroneous, incorrect information, they're going to continue to believe it's useful and they're going to continue to prescribe it for their patients.

(3/9 Tr. (Daniel) at 110:1-10 (emphasis added).) Dr. Daniel agrees that, "[t]o determine the doctor's reasons for, for example, prescribing Neurontin in any individual instance, you'd really have to go talk to that doctor on an individual basis." (3/10 Tr. (Daniel) at 25:3-7.)

*Third*, Plaintiffs' "direct reliance" theory cannot be divorced from the actions of individual patients, who are "fifth parties" for purposes of *Hemi Group*, because the evidence showed that Kaiser encourages its members to be active participants in their own medical treatment.

4

*Fourth*, Plaintiffs' theory of causation is "even further attenuated" because "they continued to pay for [Neurontin] even after Defendants' alleged misconduct was uncovered." *Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP*, 585 F. Supp. 2d 1339, 1345 (M.D. Fla. 2008). In fact, these theories of causation are so attenuated and speculative that they fail not only to establish causation under RICO, but also to establish Article III standing. *See S. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175, 2009 WL 3151807, at *6-7 (S.D.N.Y. Sept. 30, 2009) (to be published in F. Supp. 2d) (finding that claims by TPP against Pfizer seeking reimbursement for money paid on Lipitor failed to establish either RICO causation or Article III standing).

## II.    Plaintiffs Have Produced Insufficient Evidence Of Injury Due To Inefficacy

Not only is Plaintiffs' injury too indirect to establish RICO standing or causation, Plaintiffs cannot sustain their burden of proof as to injury absent evidence that Neurontin was ineffective for the conditions for which it was prescribed. *See Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364, 380 (D.N.J. 2004); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68-69 (S.D.N.Y. 2002).[3]  Having chosen to pursue their claims on an aggregate basis, Plaintiffs undertook, but failed to sustain, the heavy burden of proving that Neurontin is categorically ineffective for all patients.

Plaintiffs cannot overcome their failure of proof by resort to their alternative theory of injury; that is, that were it not for the wrongful conduct, they would have paid for cheaper alternative drugs. The evidence introduced makes clear that Plaintiffs' claim bears little resemblance to *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), where the Second Circuit held only that the plaintiffs had sufficiently *pled* a claim to survive a motion to dismiss. Significantly, in reaching its conclusion, the court posited a hypothetical involving a falsely marketed drug that was *in all respects identical* to a cheaper existing drug, except for the higher price. *See id.* at 349-50. Here, the evidence makes clear that whether proposed alternative drugs

---

[3]    Initially, Plaintiffs' attempt to prove inefficacy in the aggregate is improper because determining whether a drug is effective for a particular patient is an inherently individual issue. *See, e.g., Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), No. 04-MD-1596, 2009 WL 4260857, at *59 (E.D.N.Y. Dec. 1, 2009) (to be published in Federal Supplement).

were both cheaper and equally effective to Neurontin requires a complex and individualized determination regarding (1) whether the alternative drugs had already been tried without success in a particular patient, (2) whether the alternative drugs would be as effective for a particular patient, and (3) whether the alternative drugs would have been as well tolerated by a particular patient. *Cf. Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), No. 04-MD-1596, 2009 WL 4260857, at *59 (E.D.N.Y. Dec. 1, 2009) (to be published in Federal Supplement). This case bears no resemblance to the simple price inflation scenario contemplated by the Second Circuit's hypothetical in *Desiano*.

### A.     Purportedly Negative DBRCTs Do Not Satisfy Plaintiffs' Burden

As discussed in prior memoranda submitted by Defendants, Kaiser's theory of injury rests on the false premise that FDA-approved drugs like Neurontin must be presumed ineffective for off-label uses unless they meet the regulatory standard of efficacy that would be required for on-label indication for those uses, which Kaiser asserts requires positive double-blind randomized placebo-controlled clinical trials ("DBRCT"). Moreover, Plaintiffs' attempt to extrapolate from purportedly "negative" studies to the entire patient population does not satisfy their burden of proof. A "negative" study at most shows that a drug failed to effectively treat a given condition in a particular subpopulation when administered using a specified regimen. It does not by any stretch establish the drug's inefficacy for treating the condition in all other circumstances. Indeed, the evidence showed that Kaiser does not require DBRCTs and considers non-DBRCT studies when making formulary decisions and promulgating prescribing guidelines. (*See, e.g.*, 3/4 Tr. (Millares) at 113:22-25 ("We don't have a requirement [for DBRCTs].").)

Dr. McCrory's testimony illustrates the fatal flaws in Plaintiffs' theory of injury. Dr. McCrory prescribes at least two drugs to his migraine patients even though a DBRCT showed no benefit over placebo, because those negative results only applied to "[t]he study population," and because other evidence supports efficacy. (3/1 Tr. (McCrory) at 55:2-57:15; *see also id.* at 59:23-61:8.) He concedes that a negative DBRCT cannot show that a drug "doesn't work . . . anywhere any time under any conditions." (*Id.* at 57:8-15.) Instead, he views a negative DBRCT as evidence that a drug "*has not been shown* to be effective," and believes

that the drug should be *presumed* "ineffective absent any evidence to the contrary." (*Id.* at 59:16-18 (emphasis added).) With respect to Neurontin, he admits that he cannot prove that there are no "groups of patients for whom, you know, Neurontin could be effective, but absent data to support that hypothesis, I wouldn't suggest that that's the case." (*Id.* at 89:3-7.) Ultimately, no matter how they phrase their opinions, Dr. McCrory and Plaintiffs' other efficacy experts merely attempt to show that the evidence "does not rise to that level necessary to show that [Neurontin is] effective." (*Id.* at 88:21-89:1.) This is legally insufficient evidence of economic injury.

Further, as discussed in Section III.A below, Kaiser does not require DBRCTs and considers non-DBRCT studies when making formulary decisions and promulgating prescribing guidelines. Moreover, throughout this litigation, and even today, Kaiser's website contained numerous articles recommending Neurontin and gabapentin for treatment of various off-label conditions. Thus, Plaintiffs' own conduct and admissions demonstrate that Neurontin can be effective for some patients for the relevant off-label uses.

**B.    Plaintiffs' Own Efficacy Experts Concede That Neurontin Can Be Effective For Relevant Off-Label Conditions**

Dr. Perry's meta-analysis demonstrated that Neurontin showed statistically significant effects in treating neuropathic pain in each of the three different efficacy measures he considered. (3/2 Tr. (Perry) at 82:4-83:22.) He believes these results would not be "clinically meaningful" to the "typical patient" (*Id.* at 83:22-84:16), but concedes that the term "'clinical' refers to doctors and patients," and that "whether something is clinically significant . . . is a matter for the judgment of the [prescribing] doctor" (*id.* at 85:10-17). Indeed, Dr. Perry was the principal author of an article that remains on the University of British Columbia's website and states that "[i]nsufficient evidence about a drug is less critical in managing pain and other symptoms than when prescribing preventive therapy," and that "[i]t is therefore up to the physician to establish that the therapy is in fact helping each individual patient." (*See id.* at 86:13-88:3.)

Dr. McCrory admitted that a controlled study, conducted by independent researchers with

no connection to Defendants, concluded that gabapentin was "effective" for migraine prophylaxis, and that prescribing doctors "could certainly consider that as some evidence for effectiveness." (3/1 Tr. (McCory) at 76:6-78:4, 89:18-22; *see also* DX 1401.) Dr. McCrory further admits that, despite its inclusion of "flawed" results from a negative study (3/1 Tr. (McCory) at 69:14-17, 74:21-75:16), his meta-analysis still shows a trend favoring gabapentin's efficacy (*id.* at 83:23-84:2). Dr. McCrory also conceded that he prescribes gabapentin off-label to treat neuropathic pain. (*Id.* at 61:9-17, 62:4-64:4, 92:16-19.)

Dr. Barkin conceded that the Pande and Frye bipolar studies dealt with patients who had refractory, or treatment-resistant, bipolar disorder. (*See* 2/26 Tr. (Barkin) at 54:20-57:2.) Dr. Barkin further conceded that bipolar disorder is highly comorbid with other psychiatric disorders, such as social phobia and panic disorder, for which there is Level I evidence of Neurontin's efficacy. (*See id.* at 29:8-13, 41:18-21, 70:24-71:4; *see also* 2/24 Tr. (Abramson) at 103:8-17, 105:10-106:2.) Dr. Barkin further concedes that Neurontin has a favorable side-effect profile and minimal drug-drug interactions compared with other treatment alternatives for such comorbid conditions. (*See* 2/26 Tr. (Barkin) at 53:5-54:4.) Accordingly, there is no basis to presume that bipolar patients did not successfully use Neurontin for comorbid conditions.

Plaintiffs' claims regarding doses above 1800 mg/day must be dismissed outright because Plaintiffs failed to present competent expert evidence that higher doses do not offer enhanced benefit. Plaintiffs failed to call Dr. Alldredge, their designated expert on this issue.[4]

---

[4] The reason is obvious. During his deposition, Dr. Alldredge went dramatically off-script and made admissions fatal to Plaintiffs' claims. For example, Dr. Alldredge conceded that doctors in clinical practice should titrate to effect, rather than simply titrating to the FDA-approved dosage limit; that it is a "common error" in clinical practice for doctors to "stop titrating the dose when they get to the FDA approved dosage limit" if the patient has "had a partial response to that point" and is "continuing to tolerate the medicine"; that "some patients do derive incremental benefit *up to 3600 milligrams per day*" of gabapentin; and that "there may be individuals who do need doses *up to 4800 milligrams per day*" of gabapentin. (*See* Defs' Opp. to Pls' M. Exclude McLean [2426] at 10-12 (citations omitted).)

**III.    Plaintiffs Failed to Present Legally Sufficient Evidence of "But For" Causation**

**A.    Plaintiffs Failed to Present Sufficient Evidence that Kaiser Was Misled[5]**

Plaintiffs must also prove that their injuries would not have occurred "but for" the alleged RICO violations. *See Hemi Group*, 130 S. Ct. at 989; *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 836 (1st Cir. 1990). They have failed to do so.

Kaiser is a sophisticated entity that operates in nine states and the District of Columbia. Kaiser claims that it monitors available literature through DIS (3/4 Tr. (Millares) at 42:25-43:5), which makes recommendations to the eight independent regional P&T Committees of the Permanente Medical Groups. Kaiser presented extremely limited evidence of direct contacts between Defendants and DIS, and failed to demonstrate that Defendants' statements to DIS were misleading. The only representation made directly to any Kaiser entity identified by Kaiser was a 1999 letter, which pre-dated the final report of Dr. Pande's bipolar study and which Plaintiffs claim failed to disclose the negative results of Dr. Pande's study. (3/4 Tr. (Millares) at 67:16-69:5.)

However, the evidence fails to support Plaintiffs' claim that the results of Dr. Pande's study were suppressed. Dr. Pande disclosed his results in June, 1999, at the Third International Bipolar Conference. (2/24 Tr. (Abramson) at 86:7-16, 90:3-95:14.) Dr. Pande's study was published in September 2000. (*Id.* at 96:6-99:14.) And informational letters sent by Pfizer to several Kaiser physicians in 1999 and 2000 clearly disclosed the negative results of Dr. Pande's study. (3/5 Tr. (Millares) at 72:6-78:24; DX 433, 433A.)

Moreover, as discussed more fully below, Kaiser was aware of the lack of DBRCT evidence when it expanded formulary access to non-neurologists and psychiatrists. Kaiser was also aware of the scientific studies Plaintiffs claim were delayed or manipulated. Despite this knowledge, Kaiser's formularies, guidelines, and website have permitted and encouraged Neurontin use for the relevant conditions throughout the life of this litigation. For example:

- Kaiser did not establish when Neurontin was first added to the formularies for each of

---

[5] Defendants incorporate by reference their prior briefing on these issues, including: Defs' Reply Mem. Supp. Summ. J. [1785] at Sections II & V.

Kaiser's multiple regions. It was, however, established that Neurontin was added to the Northern California formulary in 1994 without restriction. (3/5 Tr. (Millares) at 12:2-4.)

- In 1994, Neurontin was added to the Southern California region's formulary, but was restricted to neurologists. (3/5 Tr. (Millares) at 12:8-17.)

- In 1997, the Southern California region expanded formulary access to Neurontin to include treatment of RSD based on non-Level I evidence, even though a DIS monograph stated that "[r]andomized, clinical trials of gabapentin for the treatment of RSD could not be found in the literature." (DX 528; 3/3 Tr. (Carrejo) at 23:8-26:8.)

- In September 1999, the Southern California region further expanded formulary access so that Neurontin could be used as second-line treatment for neuropathic pain. This was done with the benefit of a DIS monograph noting the potential for unblinding in the Backonja study, the negative results of the Gorson study, the unlikelihood of any further DBRCTs, and the significantly higher cost of Neurontin compared with certain other medicines. (DX 544, 559.) Plaintiffs have failed to present any evidence of any action by another P&T Committee in response to this recommendation DIS monograph.

- In September 1999, the Southern California region promulgated guidelines that not only reaffirmed Neurontin's formulary status, but affirmatively recommended Neurontin for treatment of neuropathy for patients would could not take a TCA or who had been resistant to a TCA. (DX 557, at p. 3.) There is no evidence that the 1999 guidelines have ever been changed.

- In 2002, the Ohio region recommended that formulary restrictions be expanded to permit use of Neurontin as a third-line agent in bipolar disorder. (See DX 630.) This decision was made with the benefit of a DIS monograph which clearly revealed Kaiser's knowledge of the Pande and Frye studies and the absence of positive DBRCTs to support the use of gabapentin (and certain other AEDs) to treat bipolar disorder, while citing extensive non-Level I evidence. (See DX 630; 2/24 Tr. (Abramson) at 114:6-118:14; 2/26 Tr. (Barkin) at 64:22-66:17.) These recommendations were adopted. (DX 638.)

- The monograph was sent to the Southern California and Northern California regions, neither of which took any action to restrict access of psychiatrists to Neurontin. (DX 630.)

The evidence further showed that, throughout the life of this litigation, Kaiser guidelines have permitted and encouraged Neurontin use for the conditions at issue. For example:

- In March 2005, the Southern California P&T Committee still listed Neurontin as a second-line option for diabetic neuropathy, and that Committee was chaired by Dr. Campen, who was fully aware of the DRUG/DUAT initiatives. (See DX 798; 2/26 Tr. (Carrejo) at 138:14-141:4.)

- In October 2005, the Regional Formulary and Therapeutics Committee of Kaiser Permanente Northwest expanded formulary access to Neurontin, recommended use of

gabapentin for treatment of neuropathic pain, and noted that doses in excess of 1,600 mg/day (and even up to 3,600 mg/day) might be required.  (*See* DX 812; 2/26 Tr. (Carrejo) at 141:10-145:6.)

- In March 2006, Kaiser's DIS recommended that gabapentin be used instead of Lyrica to treat diabetic neuropathy, even though Lyrica is FDA-approved for that condition. (*See* DX 820.)  Thus, as of March 2006, Kaiser's DIS "was saying that they thought Gabapentin was at least equal, if not superior, to this drug that had gotten expressed FDA approval for neuropathy." (2/26 Tr. (Carrejo) at 148:3-8.)

- In December 2006, California DIS stated that generic gabapentin was a preferred treatment for migraine prophylaxis as compared to Topamax, an FDA-approved migraine drug.  (3/2 Tr. (Carrejo) at 104:17-106:26; DX 824.)

- In February 2007, California DIS advised a psychiatrist that gabapentin may be useful in treating anxiety disorders, notwithstanding Kaiser's belief that its efficacy had not been proven through DBRCTs. (3/2 Tr. (Carrejo) at 121:11-122:8; DX 829.)

- In February 2007, Kaiser's CMI Pain Advisory Group: recommended generic gabapentin to treat fibromyalgia; recommended gabapentin doses above 1,800 mg/day; and recommended gabapentin as the preferred drug over more expensive Lyrica – which was FDA-approved for fibromyalgia.  (DX 828; 3/2 Tr. (Carrejo) at 125:10-129:15.)

- In May 2007, Kaiser reiterated its September 1999 guideline (DX 544) recommending gabapentin as "*the* second-line agent in the management of [neuropathic pain]." (DX 831; 3/2 Tr. (Carrejo) at 133:4-134:25 (emphasis added).)

Moreover, Kaiser's website contained numerous articles recommending Neurontin and gabapentin for treatment of various off-label conditions.  Kaiser had some of these articles removed shortly before trial (3/2 Tr. (Carrejo) at 142:23-143:25), but many remain on the website to this day.[6]

- To this day, "Neurontin" (and generic "gabapentin") is the only drug listed on Kaiser's online drug encyclopedia under the heading "Drugs for Managing Pain Originating from a Nerve." (DX 902A at p. 8.)

- To this day, Kaiser's website states: "'Gabapentin may also be used to treat other

---

[6] Kaiser cannot distance itself from its own public admissions about Neurontin by attempting to attribute such statements to a third-party vendor, Healthwise.  Initially, Kaiser actively contracted with Healthwise to provide it with content for its website.  Second, these are not links to a wholly separate website.  Instead, Kaiser's members are directed to articles on Kaiser's website with the Kaiser Permanente logo prominently displayed at the top of each page, and the website states that all content "is the property of Kaiser Permanente." (DX 902-G; 3/3 Tr. (Carrejo) at 9:25-11:10.).  Further, according to a 2004 Kaiser press release, Kaiser "showcase[d] [its] online health programs" in order to encourage enrollment.  (DX 783.)  Promoting its website, Kaiser states that it features "online drug and medical encyclopedias *reviewed and approved by Kaiser Permanente physicians*." (*Id.*, emphasis added.)

nerve pain conditions such as diabetic neuropathy, peripheral neuropathy, trigeminal neuralgia).'" (DX 902A at p. 11; 3/2 Tr. (Carrejo) at 138:6-20.)

- To this day, Kaiser's website states: "'[L]ike antidepressants, anti-seizure medications are often used for pain involving the nerves. Common types include . . . Neurontin and Gabapentin.'" (DX 902B at p.9; 3/2 Tr. (Carrejo) at 138:21-139:7.)

- To this day, Kaiser's website states that "anticonvulsants," including "Neurontin," are used to treat cerebral palsy. (DX 902C at p. 6; 3/2 Tr. (Carrejo) at 140:4-10.)

- Until shortly before trial, Kaiser's website recommended anticonvulsants, including "Neurontin," for cancer pain. (DX 918 at p.1; 3/2 Tr. (Carrejo) at 142:18-143:1.)

- Until shortly before trial, Kaiser's website stated that anticonvulsants, including "Neurontin, . . . 'can reduce some persistent low back pain with fewer side effects than tricyclic antidepressants,'" and that "'Gabapentin may be your best bet for safely treating chronic pain because it is not used by the body in the same way as many other medicines. This makes it less likely to interact with other drugs.'" (DX 918 at p.3; 3/2 Tr. (Carrejo) at 145:1-9, 146:3-8.)

**B.    Plaintiffs Cannot Prove Causation By Disavowing Their Prior Positions Regarding Efficacy**

Plaintiffs have desperately tried to explain away the fundamental contradictions between their longstanding claim that no scientific evidence supports efficacy and their longstanding policies recognizing and encouraging off-label Neurontin use. They have done so by presenting testimony from a carefully selected group of pharmacists and PMG doctors who had limited or no personal experience with Neurontin. These witnesses claim that they believed there was scientific evidence favoring off-label Neurontin use until November 2009, when Dr. Dickersin published an article about her analysis in this case – an article that criticized the methodology of certain trials, *but is completely silent on the question of efficacy*.

By offering this testimony, Kaiser seeks to disavow the position it has taken throughout more than five years of litigation, and the position that allowed it to survive summary judgment – *i.e.*, that Kaiser discovered in mid-2002 that it had been directly misled regarding the purported lack of scientific evidence of Neurontin's efficacy for the relevant off-label conditions. For example:

- In its First Coordinated Amended Complaint, dated February 1, 2005, Kaiser alleged: "Scientific data and evidence did not exist supporting [the relevant] off-label uses. . . . No clinical trial showed that Neurontin was safe or effective for any of these conditions." (First Coord. Am. Compl. ("FCAC") [31] at ¶ 29.)

- Opposing Pfizer's motion to dismiss, Kaiser argued that "Neurontin is ineffective for unapproved uses" (Joint Mem. Class & Coord. Pls. Opp. M. Dism. [101] at 6 & n.2 (citing FCAC)) and that its claims were based on "the inefficacy of Neurontin for each off-label condition." (Joint Surreply Mem. Class & Coord. Pls. Opp. M. Dism. [144] at 9-10 (citing FCAC).)

- In its Objections to the Magistrate Judge's Report & Recommendations, Kaiser again asserted "the lack of clinical evidence" to support various conditions as well as studies purportedly showing that Neurontin was "ineffective" or "no more effective than placebo" for various conditions. (Coord. Pls' Obj. to Rep. & Rec. [283] at 4-5.)

- And in the Joint Pre-Trial Memorandum, Kaiser argued that it "has consistently taken the position" "that Neurontin is ineffective in treating the off-label conditions at issue . . . [and] has consistently asserted that it is alleging inefficacy – *as well as* the availability of cheaper and more optimal medications." (Joint Pre-Trial Mem. [2500].)

Needless to say, Pfizer disputes Plaintiffs' allegations. But Kaiser cannot now disavow them as it searches for a theory of liability and damages that is not plainly contradicted by its own internal documents, website and behavior outside this litigation. In the clearest and most troubling example of Kaiser's double-speak, Dr. Millares testified under oath, subject to the penalties of perjury, that she first "became aware of the manipulation of studies and the results of the studies and how they were published through the work of Dr. Kay Dickersin and Lisa Bero, and this was published in the New England Journal of Medicine *November, 2009*." (3/4 Tr. (Millares) at 127:16-19 (emphasis added).) Dr. Millares further testified under oath that she never saw Dr. Dickersin's expert report until "*a month or two ago*." (3/4 Tr. (Millares) at 127:25-128:2 (emphasis added).) But when confronted with her sworn declaration dated March 26, 2009, Dr. Millares was forced to concede that she and Kaiser became aware *in 2002* of the alleged "misinformation campaign" and "suppress[ion of] key negative evidence that demonstrated Neurontin's *lack of efficacy*." (3/5 Tr. (Millares) at 12:24-14-25.) Dr. Millares was also forced to admit that she has long been aware of the purported manipulation of studies "[v]ia *the expert reports that I was reading*, yes." (3/5 Tr. (Millares) at 17:16-19.)

Moreover, the positions asserted by Dr. Millares in her March 2009 declaration were the principal grounds for this Court's denial of summary judgment with respect to Kaiser. *See Neurontin*, 2010 WL 53568, at *11-12. (*See also* 3/26/09 Millares Decl. [1749] ¶ 18.) Having survived summary judgment by taking these positions, Kaiser is judicially estopped from taking

a contrary position at trial. Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position. . . ." *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987). Judicial estoppel applies where, as here, "a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" *Id.* (citation omitted).

Kaiser cannot blame its attorneys for these contradictions. It is well settled that "'each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.'" *Forrest v. Paul Revere Life Ins. Co.*, 662 F. Supp. 2d 183, 195 (D. Mass. 2009) (Saylor, J.) (citation omitted). In addition, Counsel's clear and unequivocal statements in court proceedings or written filings are binding admissions. *See, e.g.*, *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992); *Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 92 n.92 (D. Mass. 1998) (Saris, J.).

## C.       Prof. Rosenthal's Analysis Is Not Legally Sufficient Evidence of Causation[7]

### 1.       There Is No Basis for Extrapolating from National Data to Kaiser

Neither Prof. Rosenthal nor Dr. Hartman did any analysis that would allow them to extrapolate from national data to Kaiser. Prof. Rosenthal's reliance on national data and her "diffusion" theory of causation (*see* 3/5 Tr. (Rosenthal) at 112:4-113:9) are simply repackaged fraud-on-the-market presumptions that this Court has repeatedly rejected. Nor have Plaintiffs presented any independent evidence that would support extrapolation from national data. This issue does not go merely to Dr. Hartman's damages calculations. Rather, it renders Prof. Rosenthal's regression analysis fundamentally unreliable and, therefore, insufficient to meet Plaintiffs' burden of proof as to causation.

Prof. Rosenthal did not consider any Kaiser-specific data, and instead relied solely on

---

[7] Defendants incorporate by reference their prior briefing on these issues, including: Defs' Mem. Supp. M. Exclude Rosenthal [2317]; Defs' Mem. Supp. Mot. Exclude Hartman [2320]; and Defs' Reply Mem. Supp. Mot. Exclude Rosenthal & Hartman [2439-2].

"national data." (3/5 Tr. (Rosenthal) at 120:1-5; 3/8 Tr. (Rosenthal) at 82:5-8.) Prof. Rosenthal's model does not attempt to account for Kaiser's contentions that it took a much more proactive role in controlling formulary access than other TPPs, that there is 95 percent compliance with its formulary, or that the California regions conducted similar, but not identical "reeducation" programs that allegedly led to a 34 percent reduction in new starts for Neurontin. (3/8 Tr. (Rosenthal) at 53:16-54:1.) Nor does Prof. Rosenthal account for the effect of Kaiser's guidelines advising use of Neurontin as second or third line therapy, or for the fact that PMG's Northern California region made Neurontin non-detailable in 2001. (*See* PX 273; 2/26 Tr. (Carrejo) at 113:20-114:18; 3/4 Tr. (Hyatt) at 20:25-21:10.)

Indeed, it is undisputed that Kaiser's claims are not typical of other TPPs, including other TPPs that have appeared before this Court. Kaiser was able to avoid summary judgment only because Kaiser was able to persuade the Court that its methods were different from those of all of the other named TPPs. *See Neurontin*, 2010 WL 53568, at *10-11. Kaiser's own witnesses concede that its drug utilization is different from national averages. For example, Dr. Hartman admits that Kaiser's drug utilization would likely differ from national trends. (3/9 Tr. (Hartman) at 55:4-9.) Moreover, Kaiser conducted an extensive survey to determine its own drug utilization, and Kaiser's findings differ dramatically from Dr. Hartman's estimates. (3/3 Tr. (Carrejo) at 54:10-68:20.) Likewise, Dr. Carrejo concedes that "Kaiser prescribes a greater percentage of generic drugs than the national average." (3/2 Tr. (Carrejo) at 153:9-154:15; *see also* 3/9 Tr. (Hartman) at 56:12-57:5.) Because Kaiser survived summary judgment by arguing that it is unique, Kaiser is judicially estopped from submitting this case to the jury based on the theory that Kaiser-specific factors are irrelevant to causation. *See supra* section III.B.

Moreover, Kaiser is not a national insurance company. Kaiser has members in only nine states and the District of Columbia, with at least 75% of its members located in California. (2/26 Tr. (Carrejo) at 83:13-25.) In a similar Neurontin lawsuit in Pennsylvania, Prof. Rosenthal recognized that "adjustments in the analytical model may be necessary to account for differences in Neurontin purchases in Pennsylvania as compared to the nation as a whole." *Clark v. Pfizer Inc.*, No. 754 EDA 2009, 2010 WL 163583, at *5 (Pa. Super. Jan. 19, 2010). Kaiser's witnesses

15

also concede that there are significant geographic variations – both in terms of regional P&T Committees' formulary practices and guidelines, and in the "culture of how the health environment is" from one state to the next.  (3/5 Tr. (Millares) at 93:11-16.)  As discussed above, the evidence showed that the various P&T Committees were autonomous bodies that interpreted and acted on DIS monographs "in various different ways."  (3/5 Tr. (Millares) at 12:11-12.)  Likewise, different regions' versions of the DRUG/DUAT initiatives started at different times and were carried out in different ways.  (3/3 Tr. (Hyatt) at 131:12-21.)

There is simply no basis for Plaintiffs' experts' failure to account for Kaiser-specific, California-concentrated prescribing trends in this case.

### 2.   Prof. Rosenthal Did Not Attempt To Determine Causation For The RICO Violations Alleged By Plaintiffs

Significantly, Prof. Rosenthal did not attempt to measure the alleged conduct of any enterprise.  To the contrary, she concedes that she is unable to account systematically for the influence of either published literature or alleged off-label marketing events and campaigns on prescribing.  (3/8 Tr. (Rosenthal) at 74:10-18, 79:22, 95:25-96:7.)  For example, Prof. Rosenthal testified:  "I measured journal advertising but not publications per se, so that's correct, I do not have a systematic measure of publications or suppression of publications."  (*Id.* at 74:10-18.)  Prof. Rosenthal attempted to explain this failure away by alleging that this factor was subsumed within her promotion variable, but she provided nothing of substance to support this claim.  For example, she offered the wholly speculative theory that a sales representative might hand out an article on a detailing visit.  That such testimony constitutes nothing more than rank speculation is made patent by the fact that Prof. Rosenthal prefaced her observation with the statement:  "[Y]ou can imagine . . . ."  (3/5 Tr. (Rosenthal) at 138:10-11.)  Experts are not permitted to support their opinions with imaginary scenarios.  The only things the Prof. Rosenthal purported to measure was the effect of detailing expenditures and journal advertisements.  Neither is connected to Plaintiffs' enterprise allegations.

### 3.   Prof. Rosenthal's Analysis Is Unreliable

As set forth in Defendants' motion to exclude Prof. Rosenthal's opinions, Prof.

Rosenthal's testimony and opinions rest upon unfounded assumptions and a flawed methodology and cannot support a verdict. Prof. Rosenthal's testimony at trial only confirms the defects in her methods and analysis. Initially, Prof. Rosenthal's exclusive reliance on aggregate statistics violates settled law requiring that causation be proved through individualized evidence. *See Neurontin IV*, 2010 WL 53568, at *9. Second, Prof. Rosenthal's opinions are based upon unsupported assumptions, which have not been proven at trial. (3/5 Tr. (Rosenthal) at 116:3-5, 144:19-145:5.) For example, Prof. Rosenthal's assumption that detailing expenditure is the key explanatory variable in prescription decisions is contradicted by every prescribing doctor who has testified in this litigation. *See Neurontin IV*, 2010 WL 53568, at *9-10. Dr. Daniel testified that he prescribed Neurontin off-label "[b]ased on a consultation with a colleague." (3/9 Tr. (Daniel) at 114:2-4.) Dr. Barkin also testified that he prescribed Neurontin to bipolar patients for reasons unrelated to marketing. (2/26 Tr. (Barkin) at 36:5-14, 39:8-40:10, 53:20-54:4.) Even more strikingly, Dr. McCrory, testified that after years of involvement with this case, he still prescribes Neurontin to his patients for neuropathic pain. (3/1 Tr. (McCrory) at 61:9-17, 62:4-64:4, 92:16-19.) There is no evidence of off-label promotion to Dr. McCrory, and it is simply inconceivable that Dr. McCrory is still under the hypnotic sway of some unspecified promotional statements made to him prior to this February 2005 lawsuit.

Perhaps most importantly, Prof. Rosenthal's testimony confirmed that she employed a flawed, results-oriented methodology. As Prof. Rosenthal testified: "I ran models, I looked at the results, I changed the models." (3/8 Tr. (Rosenthal) at 102:11-12.) Prof. Rosenthal ran as many as 10 to 15 different models for each of her indication/specialty pairings until she got the result that she wanted. (*Id.* at 105:5-7.) Likewise, she omitted a time trend, which she had originally planned to include, because including it produced results that showed no statistically significant effect of promotion. (*Id.* at 105:25-107:14.) As a result, her model failed to account for all other factors that could be affecting prescriptions and, instead, attributed the effect of such factors to promotion.

17

**D.      Plaintiffs' Claims Regarding Prescriptions for "Bipolar" Disorder Must Be
Dismissed In Their Entirety**

Prof. Rosenthal's calculations regarding Neurontin prescriptions for "bipolar" disorder
are overinclusive.  Those calculations improperly included ICD-9 codes for conditions other than
bipolar disorder – conditions for which there has been no showing of fraud, inefficacy, or any
nexus to an enterprise.

> [W]e call it "bipolar," but in fact it includes other affective disorders.  Other types
> of depression are in the model, so if you read closely through the notes, it's a
> somewhat larger category.  And so the fact that I have national numbers for
> bipolar uses of Neurontin, *it's a bit of a misnomer*.

(3/8 Tr. (Rosenthal) at 84:22-85:6 (emphasis added); *see also* 3/8 Tr. (Hartman) at 144:20-23.)
Significantly, however, Plaintiffs' efficacy expert made clear that his opinions were restricted to
true bipolar disorder, and not any comorbid conditions or other mood disorders that were
included in Prof. Rosenthal's analysis.  (2/25 Tr. (Barkin) 125:16-126:2.)  Plaintiffs' economic
experts cannot disaggregate between true "bipolar" prescriptions and prescriptions for other
psychiatric conditions.   Prof. Rosenthal could only "guess[]" as to "what percentage of
prescriptions were for bipolar as opposed to something else."  (3/8 Tr. (Rosenthal) at 85:19-86:4,
92:20-24.)  Likewise, Dr. Hartman could not isolate prescriptions actually written for bipolar,
rather than for Plaintiffs' overbroad and arbitrarily-defined "bipolar" category.   (3/9 Tr.
(Hartman) at 40:4-24.)

This is a fundamental, blatant, and incurable failure of proof.  Prof. Rosenthal concedes
that "bipolar disorder is quite rare," whereas "[d]epression is quite prevalent."  (3/8 Tr.
(Rosenthal) at 85:22-24.)  Thus, while Prof. Rosenthal estimated that approximately 13% of
national prescriptions fell within her overbroad "bipolar" category, she cannot deny that
Dr. Carrejo's internal 4% estimate of true bipolar prescriptions "would be consistent" with her
analysis. (*See also id.* 84:22-85:6.)  Because of Plaintiffs' failure to disaggregate, the evidence is
legally insufficient to satisfy Plaintiffs' burden of proving causation, economic injury, or
damages with respect to Neurontin prescriptions for bipolar disorder.

**E.      The DUAT/DRUG Initiative Does Not Establish Causation**

Evidence regarding the DRUG/DUAT initiative fails to demonstrate causation for several

reasons. *First*, the initiative was limited to California. (2/26 Tr. (Carrejo) at 114:23-115:8.) As a result, it cannot satisfy Plaintiffs' burden as to prescriptions written to Kaiser insureds in other states. While Plaintiffs referenced purportedly similar programs in other regions, those programs started at different times and were carried out in a different manner. (3/3 Tr. (Hyatt) at 131:12-21.) Plaintiffs have proffered no evidence regarding the purported impact of other regions' initiatives on non-California prescriptions.

*Second*, the initiative was limited to neuropathic pain. Although Kaiser witnesses made vague allusions to other indications,[8] they conceded that "the primary focus" was neuropathic pain (3/3 Tr. (Hyatt) at 105:7-15; *see also id.* at 107:6-108:15, 129:21-130:3), and provided no specifics regarding any initiatives to curtail prescribing of Neurontin for other conditions. For example, even when Kaiser's counsel asked Dr. Hyatt a leading question about "other indications" besides "pain," Dr. Hyatt reiterated that the initiative concerned "pain management." (3/3 Tr. (Hyatt) at 112:19-113:2.) The exhibits describing the initiative (*e.g.* DX 747) make plain that the initiative was targeted at neuropathic pain. Even if Kaiser could show that the reduction was across the board, such evidence would only support Defendants' position that the DUAT/DRUG initiative had nothing to do with efficacy, but was simply an effort by Kaiser to pressure physicians into prescribing lower cost drugs. Kaiser's own documents show that the DRUG/DUAT initiative was driven purely by cost concerns, without regard to the comparative safety or efficacy of Neurontin and alternative drugs. For example, Kaiser repeatedly recommended that gabapentin be used instead of Lyrica and other drugs that were FDA-approved for the conditions at issue. (*See, e.g.*, DX 820; DX 828; 3/2 Tr. (Carrejo) at 125:10-129:15, 148:3-8.) Indeed, the Northwest P&T Committee initially took Neurontin off-formulary as part of its version of the DRUG/DUAT initiative (DX 729), but then put gabapentin back on formulary after it went generic – and after Kaiser filed this lawsuit (DX 810).

---

[8] *See, e.g.*, 3/3 Tr. (Hyatt) at 106:2-12 ("[W]e did again talk with psychiatry about its use in bipolar disorder and some other off-label uses. They felt that at the time they had a good handle on its use and that we should come back to them at a later date, which we were comfortable with . . . .").

## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that the Court grant its Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Injury or Causation.

Dated: March 15, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Email: Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Raoul D. Kennedy
       Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400
Email: Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:    /s/ James E. Hooper
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

---

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 15, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo

---