UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS)

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW BASED UPON LACK OF SUFFICIENT EVIDENCE TO PROVE DAMAGES

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") respectfully submit this Memorandum of Law in Support of their Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages. As discussed herein, Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser") have failed to produce evidence sufficient to permit a reasonable jury to find that Kaiser sustained its burden of proving damages.[1] Pfizer, therefore, asks the Court to enter judgment in its favor, dismissing Kaiser's RICO claims in their entirety.[2]

### ARGUMENT

**I.   Dr. Hartman's Damages Analysis Does Not Constitute Legally Sufficient Evidence To Support A Damages Award Because It Depends Entirely on the Results of Prof. Rosenthal's Flawed Model**

The critical input to Dr. Hartman's purported damages calculation is the number of supposedly fraudulent prescriptions that Prof. Rosenthal's flawed model generates. Because

---

[1] Whenever in this memorandum Defendants refer to insufficient evidence, no evidence, or Plaintiffs' failure to present sufficient evidence, Defendants intend to invoke the relevant standard of sufficiency under Rule 50.

[2] Defendants incorporate by reference their prior briefing on these issues, including: Defs' Mem. Supp. Summ. J. [1691] at Sections II; Defs' Reply Mem. Supp. Summ. J. [1785] at Sections III.A&B; Defs' Mem. Supp. M. Exclude Hartman [2320]; Defs' Reply Mem. Supp. M. Exclude Rosenthal & Hartman [2439-2]. Defendants further incorporate by reference their memoranda in opposition to Plaintiffs' motions *in limine* to exclude Defendants' efficacy experts and non-retained experts [2409, 2426, 2429, 2431, 2433, 2435].

Prof. Rosenthal's model is fundamentally flawed, Dr. Hartman's analysis is unreliable and is not legally sufficient evidence of economic damages.

Significantly, Dr. Hartman, like Prof. Rosenthal, relies upon national data and offers no reasoned basis for extrapolating from national data to Kaiser.[3] Prof. Rosenthal's and Dr. Hartman's assertions supporting their extrapolation from national data were classic *ipse dixit* testimony rejected by the Supreme Court in *General Electric Co. v. Joiner*, 522 U.S. 138, 146 (1997). Not only were such opinions unsupported by any data or methodology, they contradicted the consistent position taken by Kaiser throughout this litigation that it is unique among third party payors. Indeed, when confronted with his prior deposition testimony, Dr. Hartman conceded that Kaiser's drug utilization would likely differ from national trends. (3/9 Tr. (Hartman) at 55:4-9.) The only Kaiser-specific inputs Dr. Hartman used are the number of "national" Neurontin prescriptions paid for by Kaiser and whatever information Kaiser supplied to him regarding price. (3/8 Tr. (Hartman) at 143:16-21, 145:22-146:7; see also 3/9 Tr. (Hartman) at 36:1-40:3.) Dr. Hartman's analysis assumes both that the percentages of total Neurontin prescriptions written for each indication are the same for Kaiser insureds as for all patients nationwide, and that the percentages written because of alleged fraudulent promotion are the same for Kaiser insureds as for all patients nationwide. (3/8 Tr. (Hartman) at 145:2-15.) There is no factual basis for these assumptions.

Significantly, Dr. Hartman cannot retroactively correct any problems in Prof. Rosenthal's regression analysis. For example, it is no answer to say that the because Dr. Hartman applies the percentages generated from Prof. Rosenthal's analysis to aggregate Kaiser prescription numbers, any differences in Kaiser's drug utilization have been accounted for. This superficial response ignores the fact that had Prof. Rosenthal analyzed Kaiser data, (1) she might not have shown any effect of promotion at all or (2) she might have shown significantly less effect (smaller

---

[3] *See* Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury or Causation at Section III.C.1.

percentages) of promotion, or (3) the effects of promotion may have been distributed differently among the indications. For example, even if Prof. Rosenthal would have still have found an effect of alleged fraudulent promotion on neuropathic pain prescriptions (and her analysis is too unreliable to even permit such an assumption), if the percentage of affected prescriptions using Kaiser data would have been 40%, rather than 70%, Prof. Hartman's damages are wrong. Thus, every error in Prof. Rosenthal's analysis is carried forward in Prof. Hartman's calculations and renders them unreliable.[4]

Nor is there any legitimate excuse for the failure of Plaintiffs and their experts to obtain and use Kaiser-specific data as the basis for their causation and damages models. Plaintiffs' repeated insistence that Kaiser-specific prescribing data was not available is contradicted by Dr. Franklin, who explained that IMS data available as early as 1996 made it possible to determine the precise details of physicians' prescribing habits on a doctor-by-doctor basis. (3/12 Tr. (Franklin) at 83:15-86:4.)

## II. There Is Insufficient Evidence to Support Dr. Hartman's First Damages Model, Which Is Based on Plaintiffs' Theory of Complete Inefficacy

Dr. Hartman's first damages model purports to award Kaiser the entire amount it paid for off-label Neurontin prescriptions. As an initial matter, regardless of the issue of efficacy, Dr. Hartman's first model assumes that no other drug would have been prescribed in place of Neurontin and, therefore, that Kaiser would not have had any offsetting expenses. Prof. Hartman offered no economic justification for this assumption. Moreover, this theory further assumes that Neurontin was ineffective in every patient for whom it was prescribed off-label. (3/9 Tr. (Hartman) at 33:11-14). Plaintiffs' attempt to prove inefficacy in the aggregate is improper because determining whether a drug is effective for a particular patient is an inherently individual issue. *See, e.g., Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab.

---

[4] For this reason, Dr. Hartman's facile attempt to correct for Prof. Rosenthal's failure to account for the claimed 34% reduction in Kaiser Neurontin prescriptions by reducing damages by $5 to $6 million (3/9 Tr. (Hartman) at 22:13-20) fails to address the fact that if Prof. Rosenthal had run her regression models using correct data she might have found no effect or less of an effect.

3

Litig.), No. 04-MD-1596, 2009 WL 4260857, at *59 (E.D.N.Y. Dec. 1, 2009) (to be published in Federal Supplement).

In any event, having chosen to pursue this theory on an aggregate basis, Plaintiffs undertook, but failed to sustain, the heavy burden of proving that Neurontin is categorically ineffective for all patients. As discussed in Defendants' Memorandum of Law in Support of Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury or Causation at Section II, Plaintiffs cannot sustain their burden of proof with negative studies. As even Plaintiffs' expert Dr. McCrory concedes, a "negative" study at most shows that a drug failed to effectively treat a given condition in a particular subpopulation when administered using a specified regimen. It does not by any stretch establish the drug's inefficacy for treating the condition in all other circumstances. (3/1 Tr. (McCrory) at 55:2-57:15; 57:8-15; 59:23-61:8.)

Defendants will present evidence that Neurontin is effective for some patients in treating the conditions at issue. Nonetheless, considering only the evidence presented by Plaintiffs, it is clear that there is insufficient evidence to submit Plaintiffs' theory of complete inefficacy to the jury. Indeed, a jury finding of no efficacy would be absurd, given that Plaintiffs continue to advise doctors and patients to use Neurontin off-label – via guidelines, DIS responses to drug inquiries, and website entries – and given Plaintiffs' experts admissions regarding efficacy. For example, Dr. Perry's meta-analysis demonstrated that Neurontin showed statistically significant effects in treating neuropathic pain in each of the three different efficacy measures he considered. (3/2 Tr. (Perry) at 82:4-83:22.) Dr. McCrory also admitted that a controlled study, conducted by independent researchers with no connection to Defendants, concluded that gabapentin was "effective" for migraine prophylaxis, and that prescribing doctors "could certainly consider that as some evidence for effectiveness." (3/1 Tr. (McCrory) at 76:6-78:4, 89:18-22; *see also* DX 1401.) Dr. McCrory further admits that, despite its inclusion of "flawed" results from a negative study (3/1 Tr. (McCrory) at 69:14-17, 74:21-75:16), his meta-analysis still shows a trend favoring gabapentin's efficacy (*id.* at 83:23-84:2). Dr. McCrory also conceded that he prescribes gabapentin off-label to treat neuropathic pain. (*Id.* at 61:9-17, 62:4-64:4,

4

92:16-19.) Likewise, Dr. Barkin conceded that bipolar disorder is highly comorbid with other psychiatric disorders, such as social phobia and panic disorder, for which there is Level I evidence of Neurontin's efficacy. (*See id.* at 29:8-13, 41:18-21, 70:24-71:4; *see also* 2/24 Tr. (Abramson) at 103:8-17, 105:10-106:2.) Dr. Hartman has no way of identifying and removing from his damages calculation those bipolar patients who might have been prescribed Neurontin to treat comorbid conditions to bipolar disorder. Finally, Plaintiffs did not even call an efficacy expert regarding doses above 1800 mg/day.

### III. There Is Insufficient Evidence to Support Dr. Hartman's Second Damages Model, Which Is Based on Plaintiffs' Cheaper Alternative Theory

Plaintiffs propose, as an alternative theory, that they should be allowed to recover notwithstanding evidence of efficacy if they can show that, absent the alleged wrongful conduct, Kaiser would have paid for alternative drugs that were both less expensive and equally effective as Neurontin. Initially, courts have rejected the proposition that a plaintiff can recover the amounts paid for prescriptions that effectively treated the condition for which the drug was prescribed. *See Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364, 380 (D.N.J. 2004); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68-69 (S.D.N.Y. 2002). Absent evidence that Neurontin was ineffective for particular patients (which has not been introduced by Plaintiffs), Plaintiffs should not be allowed to recover at all.

In *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), the Second Circuit allowed the plaintiffs to survive a motion to dismiss on the theory that Plaintiffs might be able to state a price inflation theory (a claim not asserted here). The hypothetical posited by the Second Circuit assumed medications that were essentially identical in all respects but price. *See id.* at 349-50. The evidence introduced in this case makes clear the gulf between the abstract theory suggested by the Second Circuit at the pleading stage and the evidentiary realities of this case. Significantly, this case does not involve the substitution of otherwise fungible drugs. Rather, the evidence demonstrates that whether proposed alternative drugs were both cheaper and equally effective to Neurontin requires complex and individualized determinations. As Judge Weinstein

has explained:

> Because each patient presents a unique set of symptoms and indications, and each patient may respond differently to any given medication, it requires a highly specific, individual analysis to determine, for example, whether there exists for a given patient another "effective and more conservative or substantially less costly treatment." "Due to the illnesses' heterogeneity, different people respond differently to different psychotropic drugs. Which drug will work best for a new patient is often unknown until he or she tries it; thus clinical decision-making about psychotropic medications almost inevitably is based on "trial and error."

*Hood ex rel. Mississippi*, 2009 WL 4260857, at *59.

As an initial matter, Plaintiffs have been so focused on supporting their first theory of damages that they introduced no testimony in support of the list of alternative drugs that they provided to Dr. Hartman. Almost all the testimony that has been introduced regarding Plaintiffs' alternative drugs has been elicited by Defendants and then to show the side effects and contraindications of the drugs. (*E.g.*, 3/4 (Millares) 103:21-109:17.)[5] What the jury has not heard is competent expert testimony describing the DBRCTs demonstrating the effectiveness of Plaintiffs' alternative drugs for the conditions at issue or competent expert testimony that they are equally effective and as well tolerated as Neurontin.

In addition, Dr. Hartman made no attempt to quantify any of the following:

*(1) How many doctors would have continued to prescribe Neurontin in any event?* Keeping in mind that Plaintiffs' alternative damages theory assumes the efficacy of Neurontin, Dr. Hartman considered no data and applied no methodology to arrive at the conclusion that, notwithstanding evidence that Neurontin is effective for some or all of the conditions at issue, physicians would have prescribed some drug other than Neurontin. All Dr. Hartman did was take the list of alternative drugs that Plaintiffs provided, compute a weighted average of the price and subtract it. However, the fact that even after an aggressive "re-education" campaign Pfizer was able to achieve only a 34 percent reduction in Neurontin prescriptions is evidence that

---

[5] Significantly, Dr. Millares admitted that she was not an expert regarding all the potential side effects associated with Plaintiffs' proposed alternative drugs. (*Id.* at 106:5-16.)

Dr. Hartman's opinion that Kaiser's expenditures on Neurontin would have been reduced by 91 percent is patently unreasonable.[6]

*(2) How many doctors would have prescribed more expensive drugs than the alternatives on the list provided by Plaintiffs to Dr. Hartman?* Dr. Hartman undertook no independent analysis of the comparables used for his analysis – the so-called "cheaper alternative" drugs. His staff was simply provided a list by Kaiser, which Dr. Hartman used without question. (*See* 3/9 Tr. (Hartman) at 26:3-10.) The list provided to him is limited to almost all generic drugs. He was provided no data or information to support any assumption that, in the real world, doctors would have prescribed only generic drugs. For example, although Dr. Barkin testified that there were ten drugs approved by the FDA for the treatment of bipolar disorder (2/25 Tr. (Barkin) 125:5-8), the list of alternative drugs provided by Plaintiffs to Dr. Hartman includes only three – all generic. A significant omission from the list is lamotrigine, a drug that Plaintiffs concede is effective in the treatment of bipolar and which was branded during the relevant time frame. (DX 630.) The only reason for the omission of branded drugs such as lamotrigine is to overstate Plaintiffs' claimed damages.

To the extent that Kaiser argues that its proposed alternative list is supported by Kaiser's emphasis on the use of generics, we are brought full circle to the fundamental failure of both Prof. Rosenthal and Dr. Hartman to consider Kaiser specific data.

*(3) How many patients had already tried Plaintiffs' proposed alternative drugs without success?* (*See, e.g.,* 2/26 Tr. (Barkin) at 45:1-6.) Obviously, if Plaintiffs alternative drugs had already been tried with a particular patient, and that patient obtained no benefit or experienced intolerable side effects, Kaiser's proposed alternative drugs would not be as effective for that

---

[6] The claimed 34 percent reduction from the "re-education" campaign does not offer an alternative method of determining damages. Plaitniffs have not pled such a theory of damages and no expert has offered testimony in support of it. To the contrary, Dr. Hartman could not even say whether the reduction was limited to the conditions included in his damages calculation. (3/9 Tr. (Hartman) at 20:16-22:6.) And no expert has testified that the percentage could be applied retroactively to calculate Kaiser's alleged damages in prior years.

patient. Dr. Hartman ignores this question entirely. (3/9 Tr. (Hartman) at 43:14-17.)

*(4) How many patients would be unable to take Plaintiffs proposed alternative drugs due to side effects, contraindications or drug-drug interactions?* The evidence demonstrated that each of the alternative drugs on Plaintiffs' proposed list carries potentially serious side effects and are contra-indicated in many patients. (*See, e.g.*, 3/4 (Millares) 103:21-109:17 (discussing potential side effects of alternative drugs); 3/10 Tr. (Daniel) at 23:3-25:24 (admitting that TCAs are not recommended for geriatric patients and discussing other contra-indications, such as cardiac risk). Whether any of the alternative drugs could have been prescribed in lieu of Neurontin for a particular patient requires a patient by patient analysis.

For all the foregoing reasons, the evidence introduced by Plaintiffs is wholly insufficient to prove that their proposed alternative drugs would have been prescribed for *all* patients whose Neurontin prescriptions are included in Dr. Hartman's calculation of damages. And the record is devoid of any evidence that would allow Dr. Hartman to quantify these variables. The fact is that he made no attempt to do so, rendering his alternative damages analysis without any reasonable foundation.

Plaintiffs cannot save Dr. Hartman's unreliable damages estimate by reliance on *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946), and its progeny. *Bigelow* does not excuse the gaping holes in Dr. Hartman's analysis. First, *Bigelow*, a 1946 antitrust case, does not make the reliability requirements of *Daubert* irrelevant merely because an expert is testifying on damages. *See Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, No. 98 Civ. 5564, 2003 WL 22251312, at *4 (S.D.N.Y. Sept. 30, 2003). Second, as courts have repeatedly held, *Bigelow* does not support a "relaxed" burden on the issue of causation. *See Hare v. Potter*, 549 F. Supp. 2d 688, 695-96 (E.D. Pa. 2007). And, as discussed above, the key input in Dr. Hartman's calculation, the causation variable, is derived from Prof. Rosenthal's flawed analysis. Third, *Bigelow* did not address a situation where direct evidence actually existed and was available, but was ignored by the plaintiff and its experts. In this case, Plaintiffs and Dr. Hartman had access to Kaiser-specific

evidence but chose not to use it. Fourth, *Bigelow* does not discuss the use of aggregate proof at all and certainly does not support the way it has been used in this case. Fifth, *Bigelow* does not allow Plaintiffs to recover damages for prescriptions not attributable to the wrongful conduct. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000); *Intimate Bookshop*, 2003 WL 22251312, at *7; *Computer Access Tech. Corp. v. Catalyst Enters., Inc.*, 273 F. Supp. 2d 1063, 1076 (N.D. Cal. 2003). As this Court has previously found, Prof. Rosenthal's analysis does not isolate the prescriptions allegedly caused by the alleged wrongful conduct. *See In re Neurontin Mktg. & Sales Practices. Litig.*, No. 04-CV-10981-PBS, 2010 WL 53568, at *10 (D. Mass. Jan. 8, 2010) ("*Neurontin IV*") (to be published in Fed. Supp. 2d). This missing piece of the puzzle is not supplied by Dr. Hartman's testimony. Finally, even under *Bigelow*, "there is a distinction between proof which allows the jury to make a 'just and reasonable inference' of damages and proof which only provides a basis for 'pure speculation or guesswork.'" *Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.*, 780 F.2d 1049, 1062 (1st Cir. 1985) (quoting *Bigelow*, 327 U.S. at 264); *accord Intimate Bookshop*, 2003 WL 22251312, at *8 (observing that the plaintiff's "survey and damages models [were] impermissibly fraught with assumptions and speculation"). Here, Dr. Hartman's analysis depends upon far too many unproven assumptions to permit a "just and reasonable inference" of the amount of damages.

## IV. Plaintiffs Cannot Recover Damages That They Could Have Prevented With Reasonable Efforts

Even if Plaintiffs could prove liability, they cannot recover for damages knowingly incurred after they learned of the information they claim was previously withheld. Whether described as the duty to mitigate or the doctrine of avoidable consequences, it is a fundamental principle of law that "a plaintiff may be denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent the losses." *David H. v. Spring Branch Indep. Sch. Dist.*, 569 F. Supp. 1324, 1340 (S.D. Tex. Aug. 5, 1983). "In other words, a plaintiff cannot sit still and let damages pile up when reasonable steps would prevent further losses." *Id.* In fact, enforcing the duty to mitigate is even more important where,

as here, a plaintiff seeks to recovery treble damages. *See Marin v. Evans*, No. CV-06-3090-RHW, 2007 WL 655456, at *3 (E.D. Wash. Feb. 27, 2007) (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 149-50 (2d Cir. 2001) (Jacobs, C.J., dissenting)).

For example, Plaintiffs claim that Defendants' alleged suppression or manipulation of the Gorson and Backonja studies caused them to expand Neurontin's formulary status and reimburse Neurontin prescriptions for neuropathic pain. However, no later than **September 1999**, Plaintiffs had actual knowledge of the negative results in Gorson and the potential for unblinding in Backonja. (*See* DX 544; 2/24 Tr. (Abramson) 130:24-133:11.) According to Dr. Hartman's calculations, 92% of Kaiser's "damages" with respect to neuropathic pain prescriptions were incurred after Kaiser was aware of the Gorson and Backonja studies. (3/9 Tr. (Hartman) at 51:12-22.) Likewise, the Southern California Region expanded Neurontin's formulary status in 1997 based solely on Level III evidence regarding Neurontin's efficacy in treating RSD. (DX 528; 3/3 Tr. (Carrejo) at 23:8-26:8.) Plaintiffs claim that they would not have done so had they known that the government was investigating off-label promotion of Neurontin and the financial relationship between Defendants and Dr. Mellick. (*See* 3/4 Tr. (Millares) at 57:12-19; 3/9 Tr. (Daniel) at 108:8-22.) Plaintiffs learned of this information no later than **April 2000**. (*See* DX 506; 3/5 Tr. (Millares) at 55:5-24).

Similarly, Plaintiffs claim that Defendants' alleged suppression of the Pande and Frye studies caused them to reimburse Neurontin prescriptions for bipolar disorder. However, the evidence shows that Dr. Pande disclosed his results in June, 1999, at the Third International Bipolar Conference, which was attended by Kaiser physicians. (2/24 Tr. (Abramson) at 86:7-16, 90:3-95:14.) Dr. Pande's study was published in September 2000. (*Id.* at 96:6-99:14.) Informational letters sent by Pfizer to several Kaiser physicians in 1999 and 2000 clearly disclosed the negative results of Dr. Pande's study. (3/5 Tr. (Millares) at 72:6-78:24; DX 433, 433A.) Kaiser was clearly on notice of the negative results of Dr. Pande's study at least by 1999 and no later than 2000. Similarly, the results of the Frye study were reported in a review article

in 1998 and published as an independent study in December 2000. (2/23 Tr. (Abramson) at 115:10-12.) Not only did Kaiser fail to take any steps to restrict access to Neurontin in the face of such studies, in January 2002, Kaiser's California regions retained Neurontin's formulary status when it considered the use of AEDs for treatment of bipolar disorder and the Ohio region specifically expanded Neurontin's formulary status to allow it to be prescribed for bipolar disorder. (*See* DX 630; 2/26 Tr. (Barkin) at 64:11-21; 2/24 Tr. (Abramson) at 115:25-118:14.) Eighty-seven percent of Plaitniffs' claimed bipolar damages occurred *after* Dr. Pande's result were reported at the Third International Bipolar Conference and 69 percent occurred after publication of Dr. Pande's article in September 2000. (PX 408-F.)

Notwithstanding the many excuses that Plaintiffs attempted to offer for their failure to take reasonable steps to limit their alleged damages, the evidence showed that Plaintiffs had the ability to communicate with physicians and patients virtually instantaneously in an effort to curtail use of a particular drug. (2/26 Tr. (Carrejo) at 88:11-89:9; 3/10 (Daniel) at 26:25-28:5.) In short, despite Plaintiffs' actual knowledge of purportedly "material" information that they claim was previously withheld, Plaintiffs failed to remove Neurontin from formulary, failed to restrict access to certain specialties, and failed to communicate to physicians that Neurontin should be prescribed only for on-label indications. In short, Plaintiffs failed to take any reasonable steps after 1999 and 2000 to avoid the damages for which they seek to recover. To the contrary, they have actively encouraged off-label Neurontin use to this day. Plaintiffs cannot recover for any so-called "damages" they knowingly incurred after the above dates.

## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that the Court grant their Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages.

Dated: March 15, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ Mark S. Cheffo
     Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Email: Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ Raoul D. Kennedy
     Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400
Email: Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:  /s/ James E. Hooper
     James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

---

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 15, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo