UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: | Master File No. 04-10981 |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Judge Patti B. Saris |
| | Magistrate Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW
BASED UPON RICO STATUTE OF LIMITATIONS**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") respectfully submit this Memorandum of Law in Support of their Motion for Judgment as a Matter of Law Based Upon RICO Statute of Limitations. Even when viewed in a light most favorable to Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser"), the evidence establishes that Kaiser knew or should have known of its alleged injury more than four years before Kaiser filed suit on February 1, 2005. As a result, Kaiser's RICO claims are time-barred. Pfizer, therefore, asks the Court to enter judgment in its favor, dismissing Kaiser's RICO claims in their entirety.

## INTRODUCTION

Rule 50 is a proper vehicle for a defendant's motion for judgment as a matter of law on a limitations defense. *See Pessotti v. Eagle Mfg. Co.*, 946 F.2d 974, 978, 981–82 (1st Cir. 1991) (affirming judgment under Rule 50(b) and holding that there is "no reason why a limitations defense may not be presented in a motion for judgment notwithstanding the verdict"); *Pessotti v. Eagle Mfg. Co.*, 774 F. Supp. 669, 677 (D. Mass. 1990) ("[T]here is no valid reason why any issue that may properly be raised on summary judgment . . . may not also be raised on a motion for directed verdict."), *aff'd*, 946 F.2d 974 (1st Cir. 1991).

Questions regarding "the applicability and effect of the passage of time on particular sets of facts" are appropriately resolved as a matter of law by the Court. *McIntosh v. Antonino*, 71

F.3d 29, 33 (1st Cir. 1995); *see id.* at 38 (affirming summary judgment based on statute of limitations where plaintiff filed suit a day late). Moreover, "when a defendant moves for [judgment as a matter of law] based on a plausible claim that the suit is time barred, the onus of identifying a trialworthy issue customarily falls on the plaintiff." *Id.* at 33. Thus, in *Anderson v. Watertown Savings Bank*, No. 07-11180-RWZ, 2008 WL 2065859 (D. Mass. May 12, 2008) (Zobel, J.), the court granted summary judgment where the evidence showed that the "plaintiffs displayed actual knowledge" of their alleged injury more than three years before filing suit, and the plaintiffs failed to "identify a trialworthy issue." *Id.* at *3-4.

## ARGUMENT

A civil RICO plaintiff under 18 U.S.C. § 1964(c) must file suit within four years of the date when the plaintiff knew or should have known of its injury. *See Rotella v. Wood*, 528 U.S. 549, 552–53, 555 (2000) ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."); *see also Hodas v. Sherburne, Powers & Needham, P.C.*, 938 F. Supp. 60, 63 (D. Mass. 1996) ("[Plaintiff's] plea that he did not know of the 'conduct' that caused his injury is clearly insufficient to alter the accrual date of his claim. It is the injury and not the fact that it is specifically a 'RICO' injury that is relevant."), *aff'd mem.*, 114 F.3d 1169 (1st Cir. 1997).

The Supreme Court has expressly rejected arguments that a RICO plaintiff's claim does not accrue until the "last predicate act" occurs, *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 186–88 (1997); *Rotella*, 528 U.S. at 554, or until the plaintiff discovers "both an injury and a pattern of RICO activity." *See Rotella*, 528 U.S. at 553–55. Moreover, the Supreme Court has left open the possibility that a civil RICO claim may accrue even earlier – upon "occurrence" of injury, regardless of when the plaintiff discovers it. *See id.* at 554 n.2.

I. **Plaintiffs Knew or Should Have Known of Their Alleged Injury Prior to February 1, 2001**

Plaintiffs' claims are time-barred because Plaintiffs discovered their alleged injury well over four years before filing suit. Plaintiffs have asserted and judicially admitted that the

2

*Franklin qui tam* action put them on notice of their alleged injury, prompting them to reevaluate their Neurontin usage – which they knew was mostly off-label – and to implement the DRUG/DUAT initiative. During opening statements, Plaintiffs' counsel argued that upon learning of "Dr. Franklin's whistleblower suit," "Kaiser became alarmed and says, 'What's going on here?'" (2/22 Tr. (Nussbaum) at 106:18-107:8.) Likewise, Plaintiffs' counsel argued that "once Kaiser started to learn about the off-label promotion, once they learned about Dr. Franklin's suit, the whistleblower suit, they started to re-evaluate Neurontin." (*See also* 2/22 Tr. (Greene) at 99:16-20.) The Franklin *qui tam* complaint was unsealed on December 21, 1999, *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 46 (D. Mass. 2001) (Saris, J.), and made public on January 3, 2000. *See United States ex rel. Franklin v. Parke-Davis*, No. 96-11651 (D. Mass. Jan. 3, 2000) (ECF Dkt. 41). Thus, by their own admission, Plaintiffs had constructive knowledge of their alleged injury no later than January 3, 2000, more than five years before they filed suit on February 1, 2005.

In addition, the *Franklin qui tam* suit and government investigation were disclosed in Warner-Lambert's Form 10-K filed on March 28, 2000,[1] and Form 10-Q filed on May 10, 2000.[2] These disclosures received extensive publicity, including in the April 3, 2000, edition of *The Pink Sheet* – a pharmaceutical trade journal that Kaiser employees follow. (DX 506; 3/3 Tr. (Carrejo) at 45:12-25, 75:15-76:22.) Dr. Mirta Millares – head of Kaiser's Drug Information Services ("DIS") – is a "regular reader" of *The Pink Sheet*, which she describes as a "watch-dog group that watches what's going on at the FDA, watches what's going on in the pharmaceutical products, in the pharmaceutical industry." (3/5 Tr. (Millares) at 53:22-54:9.) Dr. Millares concedes that it would have been her "practice" to read *The Pink Sheet* in April 2000, and that she "remember[s] first hearing about the fact that there was some sort of investigation that was

---

[1] *See* Warner-Lambert Co., Annual Report (Form 10-K), at 10 (Mar. 28, 2000), *available at* http://www.sec.gov/Archives/edgar/data/104669/0000950117-00-000720.txt.

[2] *See* Warner-Lambert Co., Quarterly Report (Form 10-Q), Part II, Item 1 (May 10, 2000), *available at* http://sec.gov/Archives/edgar/data/104669/0000104669-00-000001.txt.

launched around this time." (3/5 Tr. (Millares) at 55:5-24.) Shortly thereafter, in May 2000, the Colorado region launched its own initiative to reduce off-label Neurontin prescriptions, stating that Neurontin "does not appear to offer any advantage over TCAs and it is more expensive." (DX 581; 3/5 Tr. (Millares) at 58:22-62:9.)

Internal Kaiser documents further demonstrate Plaintiffs' actual knowledge of their alleged injury long before February 1, 2001. For example, an August 24, 2000, memorandum circulated throughout the Kaiser Permanente Northwest Division states that "gabapentin has achieved significant off-label use," that "Neurontin sales grew 78% in 1999," that the vast majority of these sales "are for off-label uses," that Neurontin is purportedly no more effective for these uses than "much less expensive" alternative drugs, and that "the U.S. attorney's office is investigating the manufacturer's off-label promotions of the drug." (DX 594; 3/5 Tr. (Millares) at 56:11-57:7.) Likewise, in an October 27, 2000 memorandum, Dr. Dale Daniel – the chair of the Southern California P&T Committee – identified Neurontin as an on-formulary, unrestricted drug with "the potential for off-label use and abuse." (DX 599; 3/9 Tr. (Daniel) at 144:21-146:12; 3/5 Tr. (Millares) at 57:8-58:21.)

Plaintiffs were also on notice of the negative Pande study, which forms the centerpiece of Plaintiffs' misrepresentation claims. The only representation made directly to any Kaiser entity identified by Kaiser was a 1999 letter, which pre-dated the final report of Dr. Pande's bipolar study and which Plaintiffs claim failed to disclose the negative results of Dr. Pande's study. (3/4 Tr. (Millares) at 67:16-69:5.) However, the evidence showed that Dr. Pande disclosed his results in June, 1999, at the Third International Bipolar Conference, a conference attended by Kaiser physicians. (2/24 Tr. (Abramson) at 86:7-16, 90:3-95:14.) Dr. Pande's study was published in September 2000. (*Id.* at 96:6-99:14.) And informational letters sent by Pfizer to several Kaiser physicians in 1999 and 2000 clearly disclosed the negative results of Dr. Pande's study. (3/5 Tr. (Millares) at 72:6-78:24; DX 433, 433A.)

Thus, prior to February 1, 2001, Plaintiffs had actual knowledge of: the Franklin *qui tam* action; the government investigation into off-label promotion of Neurontin by Warner-Lambert;

4

the sharp increases in Neurontin sales in 1999; the fact that the majority of the increase was due to off-label prescribing; and the fact that Neurontin was more expensive than allegedly more optimal drugs. Plaintiffs were also on notice of the negative Pande study which they claim should have been disclosed in the 1999 letter to Ms. Kubota. This knowledge is more than sufficient to trigger the accrual of Plaintiffs' RICO claims. Plaintiffs are charged with the knowledge that "an objective observer reasonably ought to have expected them to have. If such an observer, aware of the depth of the information available and of the breadth of that information's circulation, would reasonably have expected someone in a potential plaintiffs' position to begin [its] inquiry, then the duty to inquire is triggered." *Rakes v. United States*, 442 F.3d 7, 20 (1st Cir. 2006). Thus, as in *Hodas*, what Plaintiffs knew prior to February 1, 2001, "was more than enough to put [them] on notice of [their] asserted claims." *Hodas*, 938 F. Supp. at 63.

## II. Plaintiffs' Purported Ignorance of the Alleged Fraudulent Conduct Does Not Delay Accrual

As discussed in Defendants' Rule 50(a) Motion as to Injury and Causation, Plaintiffs cannot establish causation or survive limitations defenses by changing the positions they have taken throughout this litigation or by relying on the utterly implausible testimony of witnesses who claim that, prior to November 2009, they had no inkling of the alleged lack of scientific evidence of Neurontin's efficacy for the relevant off-label conditions. These witnesses' curiously synchronized accounts fly in the face of undisputed evidence that Kaiser has known for many years of the allegedly suppressed studies and of alleged flaws in the published studies. Plaintiffs' tactic must be rejected under the doctrines of judicial estoppel and judicial admissions, as well as the principle that clients are bound by their lawyers' actions and charged with their lawyers' knowledge.[3]

---

[3] *See Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987) (judicial estoppel precludes litigants from "'playing fast and loose with the courts,'" through "'intentional self-contradiction'") (citations omitted); *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992) ("'A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.'"); *Forrest v. Paul Revere Life Ins. Co.*, 662

In any event, these witnesses' testimony does not raise questions of fact regarding the accrual of Plaintiffs' claims. As discussed above, Plaintiffs cannot avoid accrual by arguing that they first learned of the alleged misconduct or pattern of predicate acts less than four years before filing suit. The Supreme Court has repeatedly rejected such arguments, holding that "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555; *see also Klehr*, 521 U.S. at 186-88 (rejecting argument that RICO claim accrues with "last predicate act"); *Hodas*, 938 F. Supp. at 63 ("[Plaintiff's] plea that he did not know of the 'conduct' that caused his injury is clearly insufficient to alter the accrual date of his claim. It is the injury and not the fact that it is specifically a 'RICO' injury that is relevant.").

Moreover, Kaiser survived summary judgment by arguing that Kaiser's DIS was misled; this was the "direct" injury that allowed them to survive summary judgment. *See In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10981-PBS, 2010 WL 53568, at *11-12 (D. Mass. Jan. 8, 2010) (Saris, J.) (to be published in F. Supp. 2d). And Dr. Millares repeatedly testified that information regarding off-label promotion alone – without regard to the truth or falsity of the promotion – would have been "material" to DIS's decision to recommend expanding formulary access to Neurontin in 1997 and 1999. (3/4 Tr. (Millares) at 57:5-12, 59:2-11, 60:11-16, 61:24-62:5, 70:11-15.) For example:

> Q. Now, in June of 1999, if you had known that the FDA was investigating the defendants here for off-label promotion of this drug for bipolar, for mood disorders, would that have been material to your recommendation?
>
> A. Absolutely ....

(3/4 Tr. (Millares) at 70:11-15.) Dr. Daniel also testified that the existence of a government investigation into off-label promotion was "material" information, the knowledge of which "would have made a difference" to his formulary recommendations. (3/9 Tr. (Daniel) at 108:8-22.)

---

F. Supp. 2d 183 (D. Mass. 2009) ("[E]ach party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.").

Likewise, having conceded that DIS knowingly approved the initial 1997 formulary expansion based solely on "very tenuous" Level III evidence of efficacy for RSD, Dr. Millares testified that DIS "would have totally disregarded" those Level III case reports had she known that Dr. Mellick – a co-author of the reports – had a financial relationship with Defendants. (3/4 Tr. (Millares) at 57:12-19.) Dr. Millares emphasized that it did not matter to her whether Dr. Mellick "lied or he didn't lie" in presenting the case reports; regardless of their truth or falsity, simply knowing that the case reports were purportedly tainted by off-label promotion would have been enough to prevent DIS from approving the expansion. (3/4 Tr. (Millares) at 116:11-19; *see also* 3/9 Tr. (Daniel) at 98:11-20.)

Dr. Millares' and Dr. Daniel's admissions confirm that, more than four years before filing suit, Kaiser had actual knowledge of "material" information regarding off-label promotion and off-label prescribing of Neurontin, the prior nondisclosure of which purportedly caused and comprised Kaiser's alleged "direct injury."

### III.  Fraudulent Concealment Cannot Save a Claim Barred by RICO's Discovery Rule

Plaintiffs cannot survive dismissal by claiming that Defendants' alleged fraudulent concealment suspended the statute of limitations. "The mere assertion that fraud underlies a claim is insufficient to state a fraudulent concealment claim; rather, there must be an effort to conceal the facts that might lead one to suspect anything." *Hodas*, 938 F. Supp. at 63. Plaintiffs were required, but failed, to present legally sufficient evidence (1) that the defendants, relying on the statute of limitations, acted to conceal facts related to its misconduct and (2) that the plaintiff failed to discover the misconduct despite acting with due diligence. *See, e.g.*, *Rakes*, 442 F.3d at 26; *Hodas*, 938 F. Supp. at 63.

As discussed above, Plaintiffs had both actual and constructive knowledge of their alleged injury well over four years before filing suit. Plaintiffs' fraudulent concealment argument cannot erase their knowledge or excuse their lack of diligence in responding to it. As the First Circuit has stated: "[A] plaintiff whose argument for delayed accrual under the discovery rule has failed because [it] has not diligently investigated [its] claim will never be able

7

to successfully argue that the statute of limitations has been tolled under a fraudulent concealment theory." *Rakes*, 442 F.3d at 26.

## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that the Court grant their Motion for Judgment as a Matter of Law Based Upon RICO Statute of Limitations.

Dated: March 15, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:  /s/ Mark S. Cheffo
     Mark S. Cheffo
Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Email: Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:  /s/ Raoul D. Kennedy
     Raoul D. Kennedy
Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400
Email: Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:  /s/ James E. Hooper
     James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

---

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 15, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo