UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin |
| *Shearer v. Pfizer Inc., et al.*<br>Case No. 1:07-cv-11428-PBS | |

**JOINT PRE-TRIAL MEMORANDUM**

(1)     A concise summary of the evidence with respect to both liability and damages that will be offered by:

     (a)     Plaintiff's summary is as follows:

This is a wrongful death case arising out of the death of Hartley Shearer. Plaintiff alleges that Hartley Shearer died by suicide after taking the prescription medication Neurontin, also known as gabapentin, which is manufactured and marketed by the Defendants. Plaintiff will offer evidence to show that taking gabapentin causes an increased risk of suicidality in some patients; that Defendants were negligent and failed to disclose this risk to Hartley Shearer and his prescribing physicians; that Defendants misrepresented information known to the defendants and suppressed or concealed material facts about gabapentin's capacity to cause depression and suicidality; and that Defendants did not take reasonable and necessary steps to investigate, research and disclose the risks of suicidality with Neurontin after it came on the market.

The Defendants are Pfizer, Parke-Davis, and Warner-Lambert, formerly a subsidiary of Parke-Davis. Parke-Davis and Warner-Lambert originally submitted Neurontin – gabapentin – for FDA approval and marketed Neurontin-gabapentin. Pfizer bought Parke-Davis and Warner – Lambert in 2001. In addition to its own conduct, Pfizer is responsible for the acts of Parke-Davis

and Warner-Lambert.

Parke-Davis filed its New Drug Application for Neurontin solely for add-on therapy for epilepsy and not for any other illness, disease, or medical indication. When Parke Davis filed the Neurontin (gabapentin) New Drug Application with the FDA, as part of its submission, Parke-Davis submitted data documenting patient adverse events observed and reported in its own clinical trials. In the total exposed population of patients in the New Drug Application for Neurontin submitted to FDA in 1992, seventy-eight, or 5.3 percent, of the reported adverse events were of depression, including nineteen instances where the patient had no prior history of depression, twenty-two instances where the patient required treatment for his or her depression, and nine instances where the patient had to withdraw from the study due to depression. The seventy eight "serious" adverse events identified included seven reports of depression involving suicidal ideation, six of drug overdoses, and two suicide attempts. Six of the seventy eight "serious" adverse events, including the two suicide attempts, were deemed by the Defendants' own clinical investigator to be "possibly or probably" related to gabapentin. There were also numerous mood and behavioral disturbances, or "psychobiologic" adverse events, reported in the studies.

Defendants' clinical trials reported within the New Drug Application included a report of a positive dechallenge/rechallenge event where the patient experienced severe depression and suicidal ideation while on gabapentin that resolved when he was taken off the drug and that re-appeared when the patient was given gabapentin again.

The FDA, in 1992-1993, as part of a medical-statistical review of the Defendant's New Drug Application for Neurontin, noted five "serious events", including depression, which could "limit the drug's widespread usefulness." Specifically, FDA stated that "depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts." The FDA stated that in Defendants' clinical database of 2048 patients, gabapentin had a risk profile that was uncertain, with five groups of important adverse events that had not yet been fully characterized,

including clinically important depression.  The FDA also commented at that time about dropouts in the clinical trials and gabapentin's lack of sustained efficacy; the FDA stated the following: "Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy."

Defendants had specific knowledge that Neurontin may contribute to depression and suicidality from clinical studies and trials conducted as part of this New Drug Application in 1992. Parke Davis and Warner Lambert had specific knowledge of the FDA's medical-statistical review regarding Neurontin. On or about December 7, 1992, Dr. Richard Spivey, then Senior Director of Regulatory Affairs at Parke Davis, obtained the FDA review from the FDA.  Dr. Spivey provided the review to Janeth Turner, Parke-Davis' Director of Regulatory Affairs employee.  On December 7, 1992, Ms. Turner provided the FDA Review to Dr. Mark Pierce, Parke Davis's Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development.  Between December 7, 1992 and December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce and Mr. Fletcher read and became aware of the 1992 FDA Review.

Defendants' employee Janeth Turner also was a member of Defendants' Drug Development Team and New Product Committee whose stated purpose was to explore new uses for Neurontin beyond the epileptic population.  At no time did Defendants' employee Ms. Turner communicate to any other member of Defendants' Development Team, or New Product Committee, the FDA's concern that "[l]ess common but more serious events may limit the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts."

On or about December 15, 1992, the Peripheral and Central Nervous System Drugs Advisory Committee to the Department of Health and Human Services voted to recommend Neurontin for one very specific use in a limited population: the adjunctive treatment for refractory epilepsy.  Approximately one year later, on December 30, 1993, the company received

FDA approval to market Neurontin only for the adjunctive treatment of epilepsy in adults. The FDA stated that the drug is only effective at 900 to 1800 milligrams per day.

Defendants later sought approval from the FDA for additional prescription uses for Neurontin. Defendants' application to the FDA for approval of Neurontin as a monotherapy for partial seizures was denied on August 26, 1997.

Beginning in 1995, Defendants Parke-Davis and Warner Lambert engaged in a multi-faceted marketing strategy designed to increase sales of Neurontin for uses not approved by the FDA. Such uses are known as "off-label" uses. Defendants began to illegally market and promote the sale of Neurontin for "off-label uses" which were not approved by the FDA, such as the treatment of pain, bipolar disorder and anxiety. The illegal marketing and promotion included: a) sales representatives detailing Neurontin to prescribing physicians for those "off-label" uses and at higher doses than had been tested or approved; b) funding presentations by consultants and liaisons to encourage word-of-mouth recommendations for off-label uses within the medical community; c) increasing clinical testing and development for new unapproved (off-label) uses for Neurontin; d) affirmative promotional statements intended to conceal or misrepresent negative or contradictory data on the Neurontin's safety or efficacy for unapproved, off-label uses, and e), placing articles in publications to be read by doctors that stated that Neurontin was observed to improve patients who had been treated with Neurontin for "off-label" psychiatric and pain uses.

Clinical evidence from Defendants' studies did not support Defendants' promotion of Neurontin as safe and effective for off-label uses. However, Defendants and their representatives promoted off-label uses even where there was contradictory clinical evidence of its efficacy. Defendants' marketing campaign for Neurontin correlates with a substantial rise in Neurontin sales for off-label uses. Sales of Neurontin for non-FDA approved (off-label) uses have skyrocketed steadily since 1998. From 2000 to 2004, off-label usage constituted 93 to 94 percent off all Neurontin sales. This sharply contrasts with sales for approved uses where sales have declined during the relevant period.

Defendants sponsored a study at the Harvard Bipolar Research Program in 1998, which concluded that patients receiving Neurontin did worse than those patients on placebo sugar pills. Although Defendants were aware of the results of this study, they did not publish the study's results until 2000, after a significant number of physicians were induced to prescribe Neurontin.

From the time that Defendants began to market Neurontin to the public in 1993 through the time that Hartley Shearer committed suicide on February 7, 2002, Defendants did not disclose or warn that Neurontin may cause psychobiologic events including depression and suicidality, and Defendants did not disclose or warn that Neurontin increased the risk of suicidality.

Defendants' marketing strategy through at least February 2002, before Hartley Shearer's death, was to compare and set apart Neurontin from competing drugs, such as Keppra, that already had a specific warning related to suicide.

As of February 2002, without FDA approval of Neurontin for indications beyond epilepsy, the law prohibited Defendants from marketing or promoting Neurontin for any other ("off label") uses.

However, the sale of the drug Neurontin was introduced by Defendants in interstate commerce for unapproved uses and without prior FDA approval. The sale of the drug Neurontin was introduced by Defendants in interstate commerce for unapproved uses without adequate directions being provided to physicians and consumers for such uses.

Warner-Lambert Company distributed Neurontin as an unapproved new drug, beginning as early as about April of 1995, and continuing thereafter until at least in or about August 20 of 1996 in the District of Massachusetts and elsewhere. Warner-Lambert Company distributed Neurontin as a misbranded drug, beginning as early as in or about April of 1995, and continuing thereafter until at least in or about August 20 of 1996 in the District of Massachusetts and elsewhere.

Defendant Warner-Lambert Company LLC was charged in the United States District Court for the District of Massachusetts with improper off-label marketing in violation of 21

5

U.S.C. §§ 331(a), 331(d), 333 (a)(2), 352 (f)(10) and 355 (a).   Defendant Warner-Lambert Company LLC  pled guilty to the charges on June 7, 2004.  As part of its guilty plea in 2004, Defendants admitted that the Neurontin label provided inadequate directions for use.

Defendant Warner-Lambert Company, LLC, as part of the guilty plea, was ordered to pay a criminal fine of 240 million dollars.

At all times before Hartley Shearer's death, Defendants considered the term "suicide" to be an unlabeled adverse event, meaning an event that is not specifically identified in the label to warn or alert  prescribing doctors of a known or expected side effect reported with the drug. Defendants submitted reports of suicide to the FDA as unlabeled adverse events on a 15-day expedited basis.

However, after Hartley Shearer's death, on December 21, 2005, Defendants submitted a labeling change to the FDA in which "suicide" would be added to the label. On May 3, 2006, FDA approved the labeling change.  Thereafter, Defendants considered "suicide" to be a labeled event and transmitted to the FDA reports of "suicide" as labeled adverse events on its periodic reports.

On January 31, 2008, the FDA issued an Alert to healthcare professionals stating that: "[P]atients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation…compared to patients receiving placebo."  Neurontin is one of the eleven anti-epileptic drugs identified in the FDA Alert.  The Alert reported that the increased risk of suicidal behavior or ideation was statistically significant and noted that "[f]our of the patients who were taking one of the antiepileptic drugs committed suicide, whereas none of the patients in the placebo group did."  The Alert advised that all patients treated with AEDs (antiepileptic drugs) should be monitored closely for depression and suicidality and other unusual changes in behavior, explaining that "symptoms such as anxiety, agitation, hostility, mania and hypomania may be precursors to emerging suicidality."

In May 2008, the FDA issued a statistical review that concluded that "antiepileptic drugs are associated with increased risk of suicidality relative to placebo in randomized placebo-

controlled trials." The FDA placed gabapentin in the ABAergic/GABAmimetic drug group, the drug group that demonstrated a statistically significant association with increased risk of suicidal behavior or ideation.

On July 10, 2008, Dr. Russell Katz, the FDA Director of the Division of Neurology Products, stated on the record that the FDA study established causality between antiepileptic drugs and suicidality.   The FDA study supports an association between Neurontin and suicidality. Neurontin increases the risk of suicidal thoughts or behavior in patients taking Neurontin for any indication.  There is an association between Neurontin and an increased risk of suicidality.

On December 16, 2008, the FDA required all manufacturers of  antiepileptic/ anticonvulsant drugs to include a warning in their labeling and to inform patients of the risks of suicidal thoughts and actions.  Neurontin's labeling as of April 2009 includes language that "Antiepileptic drugs (AEDs), including Neurontin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication."

Gabapentin is a GABAergic drug. GABAergic drugs have the capacity to contribute to negative effects on mood and behavior. GABA is the primary inhibitory neurotransmitter in the brain and spinal cord. Developed as an antiepileptic compound, gabapentin was originally conceived to be similar in chemical structure and therefore in function to GABA. Many antiepileptic drugs were designed to counteract the over-excitation in an epileptic's brain by increasing the amount of GABA in the brain.  Such drugs are often referred to as "GABAergic". The FDA has documented a statistically significant association between GABAergic antiepileptic drugs and increased risk of suicide. Gabapentin has been presented by Defendants as a GABAergic drug.  Defendants designed gabapentin as a GABAergic drug.  Gabapentin has been shown to prompt an increase in whole-tissue brain concentrations of GABA.  The presence of GABA in the nuclei where serotonin originates (the raphe nuclei) reduces the rate of serotonin release.

Studies of Neurontin have also showed that a specific and high-affinity binding site for

Neurontin may be the auxillary alpha-2-delta protein subunit of voltage-gated calcium channels in the brain.

Several animal studies have demonstrated that gabapentin decreases monoamine neurotransmitter (i.e., serotonin, norepinephrine and dopamine) release in vitro (experiments on cell and tissue cultures).   Gabapentin has been shown to reduce the release of monoamine neurotransmitters under laboratory conditions. The decrease of serotonin and other monoamines in the brain is deleterious to mood, including depression and aggression.   There is a causal relationship between low levels of serotonin in the brain and depression and suicide.   Depression is associated with serotonin depletion in many people.   By altering the brain chemistry of its users, Neurontin has the biological capacity to cause mood and behavioral changes that contribute to suicidality.

Neurontin increases the amount of GABA (gamma-aminobutyric acid), a neurotransmitter, in the brain.   This increase of GABA leads to a decrease of other neurotransmitters in the brain, like serotonin, norepinephrine and dopamine.   The decrease in serotonin and norepinephrine can prompt behavioral disturbances, depression, and suicidal behavior.   Neurontin's "alpha-2-delta" mechanism of action results in the decrease of these neurotransmitters.

Plaintiff will offer evidence that Defendants' conduct was a substantial factor, also called a proximate cause, of Hartley Shearer's injuries and death.  Plaintiff will offer evidence to show that Hartley Shearer's death resulted in damages to his family, including loss of consortium, guidance and services, and that they are entitled to compensatory and punitive damages because of Defendants' conduct.

Prior to Mr. Shearer's death, Defendants promoted Neurontin to his physicians via direct sales representative detail visits to his doctors' offices.  Before prescribing Neurontin to Mr. Shearer, his doctor , Dr. Wilfred Hynes, a pain management specialist, was visited by Parke-Davis Warner-Lambert sales representatives, at which times they promoted the use of Neurontin. Defendants' sales representatives visited plaintiff's prescribing physician, Dr. Daniel Sullivan,

an internist, and promoted the use of Neurontin. Pfizer acknowledges it was inappropriate to have their sales representatives promote Neurontin to physicians other than neurologists and epilepsy doctors regarding Neurontin.

When Dr. Hynes was visited by Parke-Davis Warner-Lambert sales representatives before his prescription of Neurontin to Mr. Shearer, they discussed the use of Neurontin for the treatment of neuropathic pain. The sales representatives did not ever disclose to Dr. Hynes any information whatsoever about whether Neurontin could increase the risk of suicidal behavior in people taking Neurontin. Dr. Ross, who was Dr. Hynes' attending doctor at Brigham & Womens Hospital in Boston, MA, when Dr. Hynes was a fellow, did not ever disclose to Dr. Hynes that Neurontin could cause suicidal behavior in people using it. Dr. Ross had a business relationship with Parke-Davis Warner-Lambert. Dr. Ross was a speaker; that is, he was paid by the company to give lectures on the use of Neurontin. Dr. Hynes attended approximately a half a dozen of such lectures before prescribing Neurontin to Mr. Shearer. Dr. Ross's lectures regarding Neurontin influenced Dr. Hynes with respect to his decision to prescribe Neurontin to Mr. Shearer. Dr. Hynes relied on the information provided by the sales representatives as part of his job as a prescribing physician.

Defendants' sales representatives never disclosed to Doctors Hynes or Sullivan that suicidality is a risk with Neurontin. Defendants did not disclose to Mr. Shearer's prescribing medical providers that Neurontin usage was associated with depression and/or suicidality. Defendants did not disclose to Mr. Shearer's prescribing medical providers that Neurontin usage increased the risk of depression and/or suicidality. Defendants did not disclose to Mr. Shearer's prescribing medical providers that the FDA, in 1992, was concerned that Neurontin usage may worsen depression or lead to suicide attempts. Defendants did not disclose to Mr. Shearer's prescribing medical providers that Neurontin could increase the risk for suicidality in patients who were already pre-disposed or susceptible to committing suicide.

Dr. Hynes prescribed Neurontin to Mr. Shearer for neuropathic pain. Dr. Anne Hudson Angevine prescribed Neurontin to Mr. Shearer for severe back pain. Dr. Keith Edwards

prescribed Neurontin to Mr. Shearer for foot pain. Dr. Sullivan refilled Mr. Shearer's Neurontin prescriptions for pain control – all off-label uses.

When Hartley Shearer took Neurontin, Defendants' labeling for Neurontin did not include any warning for Suicidal Behavior. When Hartley Shearer took Neurontin, Defendants' labeling for Neurontin did not include language that Neurontin increases the risk of suicidal thoughts or behavior in patients taking Neurontin for any indication.

Prior to 1999, Hartley Shearer was a video artist and a part-time lecturer at Williams College. In 1999, Mr. Shearer suffered a stroke, which left him with paralysis on the left side of his body. However, he worked very hard to regain as much independence and strength as possible. In the Spring semester of 2002, Mr. Shearer began teaching a course at Williams College with his wife, who also taught at the college. It was a three and a half hour, one day a week, seminar with approximately 20 students enrolled. The class was a big success. Prior to that he was working on a CD-ROM that he wanted to complete. Mr. Shearer was working on an art college project. There were often students in the house working on this DVD. He also went to the computer center to work with a student there. Mr. Shearer exercised very diligently; very rigorously after the stroke. He continued to walk and swim. He went target shooting twice a month. He walked the hill next to his house for exercise and used a universal gym in his house.

After Mr. Shearer started taking Neurontin in October, 2000, there was a worsening of his mood and behavior, as documented by his psychiatrist, Dr. Catapano-Friedman. His mental state continued to deteriorate on Neurontin.

Dr. Sullivan testified that as of today, looking at the FDA alert entitled "Information for Healthcare Professionals of Suicidality and Antiepileptic Drugs" that states, *inter alia*, that "healthcare professionals who prescribed antiepileptic drugs should be aware of the emergence or worsening of depression, suicidality or any unusual changes in behavior" and "inform patients, their families and caregivers of the potential for an increase in the risk of suicidality so they are aware and able to notify their health care providers of any unusual behavioral changes" if he were to prescribe Neurontin, he would certainly take this into account. Dr. Sullivan always

reviews the risks and benefits of every medication he prescribes. If he had had information of a statistically increased risk of suicidal behavior and suicidal ideation in placebo controlled randomized trials, he would have factored that information into the decision to prescribe Neurontin in 2001.

Dr. Hynes testified that had he known that Neurontin increased the risk of suicidal behavior in patients taking Neurontin, he would have shared that information with Mr. Shearer. If Dr. Hynes had known at the time Neurontin was being prescribed to Mr. Shearer that Neurontin had the capacity to increase the risk of suicidal behavior in patients taking Neurontin, he would have considered alternatives to Neurontin. Dr. Hynes would have wanted to know about the 1992 FDA clinical review and the FDA clinical reviewer's position on the safety of Neurontin at the time he was prescribing the drug to Mr. Shearer. If Dr. Hynes had known that there was a potential risk of depression and suicide attempt with Neurontin it could have affected his prescribing practice for Neurontin back in 2000. Dr. Hynes also testified that as of today, he advises patients of the "latest information concerning the class labeling for suicidal behavior or ideation" when he prescribes Neurontin.

Dr. Angevine prescribed Neurontin to Mr. Shearer in October, 2000. Dr. Angevine testified that "it would be customary" for her to consider the risks and benefits of Neurontin before prescribing it to Mr. Shearer. Dr. Angevine testified that before prescribing Neurontin to Mr. Shearer, she had never received any information from defendants that Neurontin was associated with suicidality. She agreed that it would be important for her to have learned about the drug she was prescribing.

On February 7, 2002, at the age of 57, Hartley Shearer administered a self-inflicted gunshot wound to the head. Mr. Shearer's homecare helper Sean Wheeler called 911 at 1:51 p.m. The first officer to respond to the scene, Officer Paul Thompson of the Williamston Police Department, observed Mr. Shearer to be alive and moving. EMS workers treated Mr. Shearer at the scene, and he was then transported via ambulance to North Adams Regional Hospital. He was thereafter transferred to the Berkshire Medical Center where he died at 5:40 p.m.

The toxicology report is a screen of prescription and street drugs that people would abuse, such as cocaine, alcohol and benzodiazepine, and did not include all of Mr. Shearer's prescription medications. The medical examiner did not test for Neurontin.

(b)     Defendants' summary is as follows:

Plaintiff, Linda Shearer, seeks to recover damages for the death of her husband, Hartley Shearer.  She alleges that Mr. Shearer's use of Neurontin caused his suicide.  Neurontin was approved by the FDA as adjunctive therapy in the treatment of partial seizures in patients with epilepsy (approved in 1993) and for treatment of post-herpetic neuralgia ("PHN") (approved in 2002).   The FDA's approval of Neurontin for these indications followed years of review of extensive data on the safety and efficacy of Neurontin, including double-blind randomized controlled clinical trials, and specifically included consideration of data of depression and suicidality.  In addition to the FDA's internal reviewers, the Neurontin data was evaluated by an independent panel of outside experts, the FDA's Peripheral and Central Nervous System Drugs Advisory Committee.  At the time of the FDA's approval in December 1993 of the epilepsy indication for Neurontin, the FDA found that there was no scientific evidence supporting an increased risk of suicidal behavior and thinking with Neurontin and the agency did not include any such warning in the labeling.  When it approved Neurontin for the treatment of PHN in May 2002, the FDA again concluded that the drug was safe and conditioned approval on the verbatim use of the FDA-approved labeling and warnings, which did not include warnings that Neurontin causes or increases the risk of suicide-related events.  At no time prior to Hartley Shearer's death in 2002 did the FDA conclude that there was reasonable evidence of an association between Neurontin and suicide.  Likewise, the FDA did not, prior to 2002, require that the Neurontin label include a warning for suicidal behavior or depression.

Pfizer has provided the FDA with all of its randomized controlled clinical trials data for Neurontin.  There were a total of 49 clinical trials, which included 5,194 patients being treated with Neurontin.  These studies found no completed suicides or suicide attempts.  In all the clinical trials, there was 1 case of self-injurious behavior, which did not rise to the level of an

attempt, and 2 suicidal thoughts. There was no statistically significant difference between the placebo and Neurontin in these events in the randomized controlled clinical trials. Researchers at Pfizer and other organizations have completed and published nearly 2000 separate studies and articles about Neurontin. None of those studies have demonstrated or concluded that taking Neurontin increases a patient's risk of committing suicide. Likewise, none of these studies support an association between Neurontin and depression or other mood disorder.

Even very early in his life, Hartley Shearer struggled with mental health issues. His parents divorced when he was young and he lived with his grandfather before ultimately being sent away to boarding school. School records from that time indicate that even during his elementary and middle school years he had an "erratic" record, due in part to depression. By high school, he required and received psychiatric help. In 1977, his step-father, a well known sportsman and businessman, suffered a stroke and committed suicide by shooting himself in the head.

In the late 1980s, Mr. Shearer began seeing a series of mental health professionals for multiple problems, including marital and family stress caused by financial issues relating to property that he owned in New York City and frustration with underemployment when the family relocated to Williamstown, Massachusetts, for his wife's job. He was diagnosed with adult attention deficit disorder, for which he was prescribed and continued to take Ritalin for the rest of his life. He also began taking Trazodone, an antidepressant, in the mid-1990s. In 1996, Mr. Shearer was diagnosed with depression, for which he was prescribed Prozac.

Prior to 1999, Mr. Shearer was described by friends and family members as an intense and controlling person who channeled his energy into art and athletics. Medical records indicate that he exercised obsessively by running, biking and playing hockey. He underwent at least two knee surgeries and was asked by his doctor to "indulge his excessive need to exercise" with swimming rather than with biking. He was also diagnosed with severe arthritis in his right hand and severe cervical spine arthritis. During this time period, Mr. Shearer volunteered at a boys home and was pursuing a masters degree in social work from the State University at Albany.

In January 1999, during an operation for elective heart surgery, Mr. Shearer suffered a severe right hemispheric stroke, which left him with significant and permanent paralysis on the left side of his body. The stroke forced him to abandon his pursuit of his degree and his volunteer work, and also forced him to either largely abandon, or significantly alter, his teaching and exercise. He became dependent on his family and a caretaker for many day-to-day tasks. Medical records indicate that he was angry and frustrated at his limitations following the stroke.

After the stroke, Mr. Shearer spent a week in the hospital, followed by two months in a rehabilitation facility. While at the hospital, he complained of anxiety. Upon returning home, he experienced multiple issues adjusting to his limitations. According to Mrs. Shearer and others, Mr. Shearer couldn't do the things he used to do after the stroke, like bathing and dressing himself. Because of his physical limitations, someone was generally always with him at the house. He wore a brace on his leg and could walk with the assistance of the brace and a cane, and his left arm was described by friends and family as "dead," and he used a sling to support it. He also began to suffer from spasms and pain on the immobilized side of his body after his stroke.

His physical limitations and needs created marital strain, and because Mr. Shearer was incapable of taking care of his daily needs, the Shearers had to hire a caretaker, incurring $20,000 to $35,000 of credit card debt in the process.

In February 2000, following his stroke, Mr. Shearer began to see a psychiatrist, Dr. Lisa Catapano-Friedman, because he was "concerned about his anger and venting it on Linda," a problem that continued throughout his treatment with Dr. Catapano-Friedman. During their treatment, Dr. Catapano-Friedman diagnosed Mr. Shearer with narcissistic personality disorder.

While Mr. Shearer was initially "determined" to regain his functioning, he reached a turning point in September 2000, and realized that he was not going to fully recover from his stroke. On September 28, 2000, Mr. Shearer was hospitalized for severe low back pain; he then developed endocarditis, and later required an emergency splenectomy. An assessment of Mr. Shearer at that time stated that Mr. Shearer felt frustrated and discouraged by his hospitalization,

14

and saw it as a setback.   During that admission, Mr. Shearer became disoriented and had paranoid delusions after the administration of morphine.   The Brigham & Women's Hospital pain service prescribed Neurontin along with Vioxx and Flexeril on October 14, 2000, to treat Mr. Shearer's severe pain.   When he was discharged into Berkshire Medical Center for rehabilitation, records indicate that he was experiencing good control of his pain.

During his stay at Berkshire Medical center, Mr. Shearer again experienced symptoms of depression and panic when he could not reach Mrs. Shearer.   While undergoing a therapy session, he became dizzy and experienced abdominal pain.   His doctors discovered that he had a ruptured spleen, requiring a splenectomy.   He was able to return home in November 2000.   Mr. Shearer later told Dr. Catapano-Friedman that he was "very traumatized" by this hospitalization.

Despite treatment with Dr. Catapano-Friedman, Mr. Shearer's anger issues continued. On February 28, 2001, the Shearers got into an argument.   After Mr. Shearer "ended up in her face" Mrs. Shearer slapped Mr. Shearer.   Mr. Shearer called the police, who arrested Mrs. Shearer.   Charges of assault and battery against Mrs. Shearer were later dismissed.   Dr. Catapano-Friedman later explained that because of this incident, Mr. Shearer had "[r]ealize[d] he need[ed] to 'ratchet down' his constant anger" and began taking Zyprexa.

During 2001, Mr. Shearer continued to work on art projects part-time.   In December 2001, Mrs. Shearer discussed her concerns with her husband's "what's next" with Dr. Catapano-Friedman following completion of one of his projects.   Shortly before his death, Mr. Shearer prepared to attempt to teach again for the first time since his stroke.   The first and only class that Mr. Shearer taught after his stroke was a co-taught class with Mrs. Shearer on February 4, 2002, just three days before his suicide.   According to Mrs. Shearer, Mr. Shearer felt he wasn't ready prior to teaching that class, and was very nervous that he could perform in the way he had in the past.

Shortly thereafter, Mrs. Shearer left town for a business conference in Hawaii.   On February 7, 2002, while Mrs. Shearer was away in Hawaii, Mr. and Mrs. Shearer got into an argument over the telephone.   After the argument, Mr. Shearer told his caretaker that he planned

on attending a scheduled medical appointment, but that he needed to collect a few things upstairs first.  Mr. Shearer then locked his bedroom door and shot himself in the head with his gun.  He left a note that read: "Linda has left me powerless by hanging up on me for the last time.  I love you both Ivor and Linda.  But this is it —Hartley Shearer."

Mr. Shearer was on a number of psychotropic drugs prior to his suicide – including Trazodone, Prozac, Ativan, Provigil, Zyprexa, and Ritalin – many of which have been associated with the risks of depression and suicide.  The only drug found in Mr. Shearer's system was an unspecified benzodiazepine, which Plaintiff's expert concedes increases the risk of, among other things, depression and suicide.

Mr. Shearer had several risk factors, independent of Neurontin, which fully explain his suicide. These factors include his long-standing depression, anxiety, anger-management issues, marital issues, and his other medications.  It was the combination of these factors, and not Neurontin, that led to Mr. Shearer's suicide.  There is no evidence that Mr. Shearer had suicidal ideation while he was taking Neurontin.  Instead, the medical records show that Neurontin was helping in the management of Mr. Shearer's pain.  Mr. Shearer's post-Neurontin behavior is consistent with the fact that he suffered from chronic depression, anxiety, obsessive-compulsive disorder, and ADHD long before ever taking Neurontin, as well as the other factors discussed above.

Mr. Shearer's psychiatrist, Dr. Catapano-Friedman, testified that his suicide note reflected "the theme he had been talking about of hating to feel vulnerable or powerless that made him very frightened and angry" after his stroke.  She testified that it was an angry note suggesting an impulsive act.  When asked if Mr. Shearer's suicide surprised her, she said yes and no.  The only surprise was that she didn't view him to be suicidal when she saw him.  It didn't surprise her because it was consistent with so many aspects of his personality and the disability he was dealing with.  When asked why Mr. Shearer committed suicide, Dr. Catapano-Friedman responded that he was angry and narcissistic and needed to be in the limelight.  She stated that when you take someone with this type of personality and insult them, their ego deflates, leading

to rage. She testified that Mrs. Shearer hanging up on Mr. Shearer could have produced that kind of rage.

Further, after his death, Mrs. Shearer told the state police investigating his death that, while Mr. Shearer had never attempted to commit suicide in the past, she wasn't sure if he contemplated it due to his condition of being helpless.

(2)   The facts established by pleadings or by stipulations or admissions of counsel are as follows:

1.   Parke-Davis was an operating division of Warner-Lambert that was acquired by Pfizer in 2000. Pfizer Inc is the sole member of Warner-Lambert Company LLC, which is a Delaware limited liability company and the successor to Warner-Lambert Company.

2.   Defendants manufacture and distribute the prescription drug Neurontin, also known as gabapentin as its generic name.

3.   On January 15, 1992, Parke-Davis submitted a New Drug Application ("NDA") to the U.S. Food & Drug Administration (FDA) seeking approval for Neurontin as an adjunctive therapy for epilepsy. An adjunctive therapy is a secondary therapy intended to be used in conjunction with and as a supplement to a primary therapy.

4.   On or about December 15, 1992, the Peripheral and Central Nervous System Drugs Advisory Committee to the Department of Health and Human Services voted to recommend Neurontin for the adjunctive treatment for refractory epilepsy.

5.   Approximately one year later, on December 30, 1993, the company received FDA approval to market Neurontin only for the adjunctive treatment of epilepsy in adults, at the dose of 900 to 1800 milligrams per day.

6.      In August 2001, Pfizer filed a New Drug Application, which ultimately led to an FDA approval in May 2002 for the use of Neurontin in the management of postherpetic neuralgia ("PHN") in adults.

7.      Neurontin has not been approved by the FDA for any indications other than (1) adjunctive therapy in the treatment of partial seizures in patients with epilepsy and (2) management of PHN.

8.      At the time Pfizer was seeking a PHN approval, both the FDA and Pfizer were aware that Neurontin was being prescribed for uses other than FDA-approved indications.

Case-Specific Facts

9.      Hartley Shearer was born on October 30, 1944.

10.     On February 7, 2002, at the age of 57, Hartley Shearer died.  His death was ruled a suicide by the medical examiner.

11.     Mr. Shearer was prescribed Neurontin during a hospitalization in October of 2000 at Brigham & Women's Hospital.

12.     Mr. Shearer was prescribed Neurontin for pain.

13.     Neurontin was continued during his hospitalizations in October 2000.

14.     Upon discharge from the hospital, Mr. Shearer's Neurontin prescription was renewed by Dr. Daniel Sullivan, up to the time of Mr. Shearer's death.

(3)     Contested issues of fact:

(a)     Plaintiff's contested issues of facts are as follows:[1]

1.      Whether Defendants were negligent with respect to the research and development of Neurontin in the manner in which they investigated or tested the association between Neurontin and suicidality.

2.      Whether Defendants failed to adequately warn doctors and patients of risks of suicidality that Defendants knew or should have known were associated with taking Neurontin for off-label uses.

3.      Whether Defendants failed to adequately monitor the effect of Neurontin on patients taking the drug after Neurontin was approved by the FDA and entered the marketplace.

4.      Whether Neurontin is defective as marketed or otherwise.

5.      Whether Neurontin causes depression and suicidality in some patients.

6.      Whether Defendants had a duty to disclose the depressive and suicidal side effects of Neurontin when they knew of Neurontin's substantial off-label usage.

7.      Whether Defendants had a duty to disclose to prescribing physicians how Neurontin works (e.g., its "mechanism of action") so that prescribing physicians could perform a risk-benefit analysis when prescribing Neurontin and could carefully monitor its results.

8.      Whether   Defendants   withheld   medical   and   scientific   data   regarding

---

[1] Defendants agree that the issues identified by Plaintiff are contested. Defendants contest the factual accuracy of many of Plaintiff's allegations and Defendants further contend that certain issues present issues of law (duty) or are redundant and subsumed within other issues.

psychobiologic side effects, including depression and suicidality, by concealing the information from the medical community and consumers, including Hartley Shearer and his medical providers.

9.    Whether Defendants intentionally withheld material information about the side effects of Neurontin from both consumers and their prescribing physicians with the intent to deceive.

10.    Whether Defendants breached their duty to disclose to physicians and patients material facts about the risks of  psychobiologic side effects, including depression and suicidality, with Neurontin use.

11.    Whether Defendants breached their duty to disclose that Neurontin had an association with adverse psychobiologic effects, such as depression and suicidality, in its details to doctors' offices.

12.    Whether Defendants breached their duty to disclose that Neurontin had an association with adverse psychobiologic effects, such as depression and suicidality, in its product labeling and package inserts.

13.    Whether Defendants failed to exercise reasonable care to warn of the risks of Neurontin.

14.    Whether Defendants' conduct was a substantial factor, also known as a proximate cause, of  Hartley Shearer's injuries and death.

15.    Whether Hartley Shearer's wife, Linda Shearer, and son Ivor Shearer, suffered a loss of consortium, loss of services, and other damages, as a result of Hartley's death.

16.   The amount in dollars of damages incurred in the past and future that should be awarded to Hartley Shearer's wife and son.

17.   Whether punitive damages should be assessed as a result of Defendants' actions or failure to act, and if so, the amount of punitive damages to be awarded.

(b)   Defendants' contested issues of facts are as follows:

1.   Whether Neurontin increases the risk of suicide or suicidal behavior (generic causation).

2.   Whether Neurontin was a proximate cause of Hartley Shearer's death (specific causation).

3.   Whether Neurontin was accompanied by adequate warnings.

4.   Whether any failure to provide adequate warnings with Neurontin, if found by the jury, was done with scienter.

5.   Whether Hartley Shearer's surviving wife and son have sustained compensable damages as a result of Hartley Shearer's death and, if so, in what amount.

6.   Whether Hartley Shearer experienced compensable conscious pain and suffering prior to his death and, if so, in what amount.

7.   If the jury finds that Defendants failed to provide adequate warnings for Neurontin and that such failure proximately caused Hartley Shearer's death, whether Defendants' failure was malicious, wanton, willful, reckless, or grossly negligent.

8.      If the jury finds that Defendants failed to provide adequate warnings for Neurontin and that such failure proximately caused Hartley Shearer's death, whether punitive damages should be awarded and, if so, in what amount.

(4)      Any jurisdictional questions:

Jurisdiction in this case is based on diversity of citizenship under 28 U.S.C. § 1332 and is not disputed.

(5)      Questions raised by pending motions are as follows:

(a)      By Plaintiff:

1.      Products Liability Plaintiffs' emergency motion to strike defendants expert Gibbons for providing false testimony and making false statements in his declarations. [1807]

2.      Products Liability Plaintiffs' emergency motion to strike new March 2009 expert report and bipolar study of Robert Gibbons, Ph.D. and for reconsideration of Judge Saris's November 2008 decision to allow Dr. Gibbons's study and article at trial. [1817]

3.      Products Liability Plaintiffs' motion to exclude testimony and exhibits of Dr. Robert Gibbons pursuant to Fed. R. Evid. 702 et seq. and Daubert. [2121]

4.      Product Liability Plaintiffs' Motion *in Limine* to preclude miscellaneous subjects from evidence at trial. [2544]

5.      Product Liability Plaintiffs' Motion *in Limine* to preclude any evidence proffered by defendants at trial that any drug other than Neurontin caused or was associated with plaintiff's decedent's suicide. [2548]

6.      Product Liability Plaintiffs' Motion *in Limine* to preclude mention at trial by

defendants that the Neurontin package insert was labeled to warn against completed suicide prior to the December 21, 2005 labeling change. [2552]

7. Product Liability Plaintiffs' Motion *in Limine* to preclude testimony by defendants that they could not have amended the label without prior FDA approval. [2555]

8. Product Liability Plaintiffs' Motion for leave to file a late Motion *in Limine* to preclude defendants from offering any evidence, testimony, mention, references or inferences regarding the suicide by firearm of plaintiff's decedent Hartley Shearer's stepfather, Clifford Roberts. [2599]

(b) By Defendant:[2]

1. Whether Pfizer is entitled to summary judgment on all of Plaintiff's claims. [2456]

2. Whether the specific causation testimony of Plaintiff's experts Drs. Glenmullen and Kruszewski is admissible under Rules 702 and 703 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). [2453]

3. Whether evidence of or references to Warner-Lambert Company LLC's guilty plea or any related government investigations or agreements should be excluded. [2557]

4. Whether evidence of conduct unrelated to Neurontin should be excluded. [2566]

---

[2] Plaintiff and Defendants have agreed, by stipulation, that the parties will abide by the Court's prior rulings on Defendants' Motion to Exclude Various Evidence, References and Argument [1872], Defendants' Motion to Exclude Anecdotal Adverse Event Reports [1915], and Defendants' Motion to Exclude The Testimony of Decedent's Minor Daughter, Family Photographs and Memorabilia, and Post-Mortem Photographs [1864] from the *Bulger v. Pfizer* case, and reserve any and all rights to appeal the rulings as they apply to the *Shearer* case.

5. Whether evidence of marketing or advertising materials and conduct should be excluded.  [2563]

6. Whether evidence of David Franklin and the *Franklin* litigation and other claims or actions involving Neurontin should be excluded.  [2561]

7. Whether evidence of post-incident regulatory actions, labeling, and patient information guides should be excluded.  [2545]

8. Whether evidence of foreign labels and regulatory actions should be excluded.  [2542]

9. Whether evidence concerning Dr. Edgar Ross should be excluded.  [2569]

(6) Issues of law, including evidentiary questions, together with supporting authority:

(a) By Plaintiff:

There are numerous disputed issues of law, both substantively and with response to the laws of evidence. Outstanding motions are set forth above. Further issues of law include all issues raised by Plaintiff's motions *in limine*, as set forth in section 5(a) above, and the admissibility of any other evidence objected to by Plaintiff's objections to Defendants' exhibit and deposition designations.

(b) By Defendant:[3]

---

[3] The legal authority for many of these issues has previously been provided to this Court. Defendants incorporate by reference their prior Motion for Summary Judgment (*Shearer*) [2456]; Motion to Exclude the Specific Causation Testimony of Doctors Joseph Glenmullen and Stefan Kruszekski (*Shearer*) [2453]; Motion for Summary Judgment (*MDL*) [1161]; Motion to Exclude the Testimony of Doctors Trimble, Kruszewski and Blume on the Issue of General Causation (*MDL*) [1157]; Defendants' Motion to Dismiss the Personal Injury Plaintiffs' Claims Based Upon Allegedly Improper Marketing (*MDL*) [363]; Defendants' Motion to Dismiss Product Liability Plaintiffs' Fraud Claims Based Upon Allegedly Improper Marketing (*Track One Cases*) [1232], together with all memoranda of law filed in support of such motions.  Additional legal authority is provided in Defendants' concurrently filed Trial Brief.  Legal authority for the issues raised by Defendants' motions *in limine* are contained within the supporting memoranda of law previously filed with such motions.

1.    Whether Pfizer had a legal duty at any time between October 2000 and February 2002 to warn physicians of any alleged risk of suicide or suicide behavior associated with Neurontin.

2.    Whether Plaintiff's expert testimony on the issue of generic causation satisfies the requirements of *Daubert* and Federal Rules of Evidence 702 and 703.

3.    Whether Plaintiff's expert testimony on the issue of specific causation satisfies the requirements of *Daubert* and Federal Rules of Evidence 702 and 703.

4.    Whether Plaintiff's expert testimony on the issue of pharmacovigilence and duty to warn satisfies the requirements of *Daubert* and Federal Rules of Evidence 702 and 703.

5.    Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that the Neurontin warning provided to physicians between October 2000 and February 2002 was inadequate.

6.    Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Neurontin can cause suicide or suicidal behavior.

7.    Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Neurontin caused Hartley Shearer's death.

8.    Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Defendants are liable to Plaintiff for compensatory damages.

9.    Whether the damages sought by Plaintiff in this action are legally compensable under the Massachusetts wrongful death statute.

10. Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that Defendants are liable to Plaintiff for punitive damages.

11. Whether the imposition of punitive damages on the facts of this case is constitutionally permissible.

12. Whether punitive damages may be constitutionally imposed based upon gross negligence.

13. Whether the Constitution requires clear and convincing evidence to support the imposition of punitive damages.

14. Whether the amount of any award of punitive damages on the facts of this case is constitutionally permissible.

15. All issues raised by Defendants' motions *in limine*, as set forth in section 5(b) above.

16. The admissibility of any other evidence objected to by Defendants, as set forth in Defendants' objections to Plaintiff's exhibit and deposition designations.

(7) Any requested amendments to the pleadings:

None at this time.

(8) Any additional matters to aid in the disposition of the action:

(a) The parties propose the use of juror questionnaires to prospective jurors. Attached as Exhibit 7 is a sample questionnaire proposed by Plaintiff. Attached as Exhibit 8 is a sample questionnaire proposed by Defendants. The parties propose that prospective jurors prepare responses to the questionnaire in advance of jury selection on March 29, 2010, so that the parties will have time to review the responses prior to jury selection.

(b)     Plaintiff proposes that the parties conduct voir dire, as opposed to the Court being the sole inquirer.  Defendants oppose this request and ask that voir dire be conducted consistent with the Court's usual practice.

(c)     Jurors should be allowed and encouraged to take notes.

(d)     The parties should be allowed and encouraged to provide notebooks (e.g., a binder) to the Court and jury containing key exhibits that the parties intend to introduce into evidence.

(e)     Plaintiff proposes a jury of 6 individuals, plus 2 alternates.  Plaintiff proposes that 6 jurors would deliberate and a unanimous verdict would be required.  Defendants propose a jury of 12 individuals where all jurors deliberate and a unanimous verdict would be required.

(f)     The parties are guided by the Court's electronic order dated June 5, 2009, in the case-specific action, *Bulger v. Pfizer,* in which the Court ordered that "each side will have about 21 trial hours for cross, re-direct and re-cross.  In light of these time limitations, each party shall designate a realistic list of documents and witnesses (including the amount of time needed for direct examination for each witness)."  Plaintiff objects to the time limitation to the extent the Court imposes the same in this action.  Defendants do not object to the *Bulger v. Pfizer* limitation of 21 trial hours per side and believe that the limitations have proven to be an efficient way to present the evidence as seen in the trial of *Kaiser v. Pfizer.*

(g)     The parties have entered into a Joint Agreement Regarding Authenticity of Documents, attached as Exhibit 9.

(h)     It is Plaintiff's position that the parties have stipulated "that neither side will question how the data are pulled from the raw AERS data," and "agree that both

Plaintiff and Defendants are equally capable of running programs that will pull data from AERS into a form for subsequent queries and analyses," as evidenced by the February 13, 2009, e-mail from defense counsel, attached as Exhibit 10.

(i)     The parties are continuing to work towards resolving objections and will likely resolve many existing objections prior to trial.

(10)  List of witnesses:

Plaintiff's List of Trial Witnesses is attached as Exhibit 1 to this Pre-Trial Memorandum.

Defendants' List of Trial Witnesses is attached as Exhibit 2 to this Pre-Trial Memorandum.

Plaintiff's Deposition Designations are attached as Exhibit 3 to this Pre-Trial Memorandum.

Defendants' Deposition Designations are attached as Exhibit 4 to this Pre-Trial Memorandum.

(11)  List of proposed exhibits:

Plaintiff's List of Exhibits is attached as Exhibit 5 to this Pre-Trial Memorandum.

Defendants' List of Exhibits is attached as Exhibit 6 to this Pre-Trial Memorandum.

(12)  The parties' respective positions on any remaining objections to the evidence identified in the pre-trial disclosure required by Fed. R. Civ. P. 26(a)(3) is as follows:

(a)     Plaintiff's position on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3) is set forth in her objections to Defendants' witness lists, exhibits and designated deposition testimony, as well as motions *in limine*.  In addition, pursuant to Federal Rule of

Evidence 103, Plaintiff incorporates and preserves any prior objections to evidence as to which the Court has already ruled.

(b)    Defendants' position on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3) is set forth in their objections to Plaintiff's witness lists, exhibits and designated deposition testimony, as well as their motions *in limine*.  In addition, pursuant to Federal Rule of Evidence 103, Defendants incorporate and preserve any prior objections to evidence as to which the Court has already ruled.

Dated: March 15, 2010

FINKELSTEIN & PARTNERS, LLP

By:/s/ Kenneth B. Fromson
   Kenneth B. Fromson
Attorneys for Plaintiff
1279 Route 300
Newburgh, NY 12551
Tel: (845) 562-0203

THE LANIER LAW FIRM, PLLC

By:/s/ W. Mark Lanier
   W. Mark Lanier
126 East 56th Street, 6th Floor
New York, NY 10022
Tel: (212) 421-2800

*Attorneys for Plaintiff*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
By:/s/ Mark S. Cheffo
   Mark S. Cheffo
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

*Attorneys for Defendants*

JACK W. LONDON AND ASSOCIATES, P.C.

By:/s/ Jack W. London
   Jack W. London
3701 Bee Cave Rd., Suite 200
Austin, TX 78746
Tel: (512) 478-5858

BOIES, SCHILLER & FLEXNER LLP

By:/s/ William S. Ohlemeyer
   William S. Ohlemeyer
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 15, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo