# EXHIBIT 3
# PLAINTIFF'S DEPOSITION DESIGNATIONS

Annotations Report [NEU_SHEARER case specific Ps]

[6:11] - [7:6]          11/3/2009     Acconci, Vito

page 6
11              Can you state your name for the
12      record?
13              A.      Vito Acconci.
14              Q.      And your current address, please?
15              A.      Give you the studio address because I
16      am a designer, 20 Jay Street, Brooklyn, New York
17      11201.
18              Q.      You say you are a designer.  What do
19      you do for a living?
20              A.      Well, my whole career has been artist
21      and then designer.  When I say designer, I work
22      as part of a group of people that designs both
23      theoretical and real buildings, furniture,
24      clothing.
25              Q.      And you also say you are an artist.
page 7
1                       VITO ACCONCI
2       What kind of artwork do you do?
3               A.      Well, I've done -- in the early
4       seventies I did performance video and film, then
5       went on to installations.  From installations,
6       the stuff became more architecture than art.

[7:19] - [8:8]          11/3/2009     Acconci, Vito

page 7
19              Q.      How did you meet Mr. and Mrs. Shearer?
20              A.      Linda Shearer was the curator of a
21      show I did at the Museum of Modern Art in 1988.
22      That was the closest contact I had with both --
23      with both Linda and Hartley.  But I know I met
24      them probably sometime in the early eighties.
25                      Linda, before she was at the Museum of
page 8
1                       VITO ACCONCI
2       Modern Art, was the director of an alternative
3       art space called Artists Space in New York.  I
4       certainly knew her then.  And I knew -- I knew
5       Hartley mainly through Linda.  I knew something
6       about Hartley's work.  In other words, I knew
7       them as part of a kind of group of people
8       doing -- interested in a certain kind of art.

[12:3] - [13:24]        11/3/2009     Acconci, Vito

page 12
3               Q.      How did your relationship with the
4       Shearers change or evolve over the years?  They
5       moved to Williamstown at some point.
6               A.      Yes.
7               Q.      Did you keep in touch with them during
8       that time?
9               A.      I kept in touch but -- I don't know,
10      maybe people in this field have a strange notion
11      of friendship.  You know, I always considered
12      them friends.  I hardly ever saw them.  Though
13      once they were in Williamstown, Linda was --
14      Linda was the director of the gallery at
15      Williamstown and we did a show together, I think
16      around -- somewhere between '93 and '95.  I
17      don't remember the exact date.
18                      So I certainly was there, not for a
19      long time.  It wasn't the same as preparing a
20      Museum of Modern Art show, but we had contact.
21      I remember, you know, I remember very distinctly

22   actually, though this probably ended after a
23   while, but after maybe a year or two after the
24   Museum of Modern Art show I would call -- I
25   would call her on Thanksgiving and Christmas,
page 13
1               VITO ACCONCI
2   things like that.
3       Q.    Would you go out socially, would you
4   have dinner with Mr. and Mrs. Shearer?
5       A.    Strange -- I don't know if it was
6   strange, but the only time I remember having
7   dinner with them was before the Williams show
8   when they were both in New York with two
9   students and we went out to a restaurant in
10  Greenwich Village.
11              Now, am I sure that's the only time?
12  No.  But that's the only time I specifically
13  remember.  I mean, people who do things like
14  architecture don't go out much.  They go out
15  when they feel they have to be somewhere but
16  usually they are working.
17      Q.    Understood.
18              So if I get the relationship right,
19  when they moved to Williamstown, they would come
20  down to New York every now and then and you
21  would keep in touch and you would go to
22  Williamstown every now and then, is that fair?
23      A.    Yes, I did a talk or two at Williams.
24  I don't remember dates.

[14:15] - [15:12]      11/3/2009   Acconci, Vito

page 14
15              Could you describe Mr. Shearer
16  physically before his stroke?
17      A.    I don't know if I ever saw him
18  exercise, but I always assumed he exercised.  He
19  seemed very, very fit, very active, very -- very
20  fast, very -- on the one hand very determined,
21  on the other hand seemed to be aware of a lot of
22  different things that was going on at the same
23  time.
24              I think I was part of a class.  I
25  think one of the times I was at Williams I -- he
page 15
1               VITO ACCONCI
2   asked me to go to a class of his and it was a
3   class that was very much about he knew how to
4   get students started in conversation, he -- he
5   was -- what I thought of as a kind of great
6   teacher.  He listened as well as presented
7   things.
8       Q.    Did he seem to enjoy teaching?
9       A.    He loved it.  Again, do I know he
10  loved it?  No.  I don't know if he ever told me
11  he loved it.  I saw that -- the way I saw it he
12  loved it.

[15:18] - [16:11]      11/3/2009   Acconci, Vito

page 15
18      Q.    How about his personality before he
19  had the stroke?  Can you describe was he an
20  intense man, was he -- what words would you use
21  to describe his personality?
22      A.    I'll try.  Yes, intense.  He was
23  always very active in conversation and his
24  conversation also -- he could object a lot.  He
25  had the kinds of conversations, you know, some
page 16
1               VITO ACCONCI

```
 2    people like me loved to have because he doesn't
 3    let you get away -- he didn't let you get away
 4    with anything.  It was very -- you know, if you
 5    said something he wanted to know why.
 6             So it was a conversation that wasn't
 7    just -- it was never a conversation just about
 8    facts, it was a conversation of facts and
 9    reasons and -- I think he was interested in why
10    people did things which I'm interested, too,
11    I've always been interested:  Why do I do it?
```

[17:6] - [18:3]          11/3/2009    Acconci, Vito

page 17
```
 6    Q.    And after you found out he had had the
 7    stroke, you saw him at some point after that,
 8    correct?
 9    A.    I saw him -- I don't think it was
10    until either '99 or 2000, again at Williams.
11    Williams was doing a piece of -- a small
12    architectural project on the campus and I was
13    one of the three or four people that they had
14    asked to propose something.  So I went up to see
15    the site and that was the first time I saw him
16    after -- after his stroke.
17    Q.    Can you describe how the stroke had
18    impacted him physically?
19    A.    I felt he -- maybe I shouldn't say I
20    felt, but I don't know if I can separate what I
21    saw, what I saw and what I felt.
22             He still wanted to be -- these things
23    aren't facts, but he still wanted to be the same
24    Hartley but he couldn't.  He couldn't -- he
25    couldn't move as well so he seemed -- he seemed
```
page 18
```
 1               VITO ACCONCI
 2    annoyed and angry but he still wanted to be in
 3    the middle of a conversation.
```

[20:22] - [21:17]          11/3/2009    Acconci, Vito

page 20
```
22    Q.    I know it was a number of years ago.
23             Is that the last time you saw Mr.
24    Shearer?
25    A.    Well, again, there were two visits
```
page 21
```
 1               VITO ACCONCI
 2    to -- two visits to Williams.  The last time was
 3    when he came to my presentations of the project.
 4    Q.    And that was in May of 2000?
 5    A.    I think it was -- I'm almost certain
 6    it was spring 2000.  I don't remember the date.
 7    Q.    Did you ever learn after that date of
 8    any of his subsequent health problems?
 9    A.    No.
10    Q.    Mrs. Shearer didn't talk to you about
11    any of the physical ailments he was going
12    through?
13    A.    No.  Again, I don't think I saw Linda
14    after that until -- I don't know what it's
15    called, after he died I gave -- I as many
16    other -- a number of other people gave a kind of
17    eulogy.
```

[25:13] - [25:19]          11/3/2009    Acconci, Vito

page 25
```
13    Q.    How did you first learn of Mr.
14    Shearer's death?
15    A.    Linda, Linda called.  I don't know --
```

```
16    for some reason I remember it as -- but I don't
17    think Linda ever said this -- as this was the
18    day after Hartley killed himself, but I really
19    don't know that from her.
```

[26:20] - [27:11]         11/3/2009    Acconci, Vito

```
page 26
20        Q.    Were you surprised by the news?
21        A.    Yes, I was, I was incredibly surprised
22    because this was this vibrant gay.  At the same
23    time I thought what would I have done?  It's
24    silly to have to compare yourself all the time,
25    but we were in the same kind of circumstance,
page 27
1             VITO ACCONCI
2     you know, we were doing -- not the same kind of
3     circumstance in the sense that I had -- that I
4     had a stroke but more we were in the same world.
5             We were interested in the same things.
6     There is a certain kind of attitude where you
7     are always in the middle of -- where you are
8     always in the middle of working.  So we -- you
9     know, I felt close, I felt close to him even
10    though, you know, I knew nothing about him
11    personally.
```

[28:25] - [29:8]          11/3/2009    Acconci, Vito

```
page 28
25        Q.    Did Mrs. Shearer talk to you at all
page 29
1             VITO ACCONCI
2     about the suicide note that Mr. Shearer left
3     behind?
4         A.    No, I didn't know until this minute
5     that he left one.
6         Q.    Did she talk to you about his suicide
7     being an act of anger?
8         A.    No.
```

[34:11] - [35:17]         11/3/2009    Acconci, Vito

```
page 34
11            Mr. Acconci, is it fair to say that
12    you are a very creative man?
13        A.    I hope I am.
14        Q.    In your past you have been a poet?
15        A.    Yes.
16        Q.    You have been a performance artist?
17        A.    Yes.
18        Q.    You have been a photographer?
19        A.    Well, used photography.
20        Q.    Designer?
21        A.    Yes.
22        Q.    I think you said designer of
23    furniture?
24        A.    Yes.
25        Q.    Designer of, let's say, spaces,
page 35
1             VITO ACCONCI
2     outdoor spaces?
3         A.    Yes.
4         Q.    You're sort of an architect?
5         A.    Yes, sort of.
6         Q.    My wife is an architect so I have to
7     be careful.
8         A.    I am not a registered architect, I
9     would be arrested.
10        Q.    You are not a licensed architect but
11    you have designed buildings and designed public
```

```
12   spaces?
13        A.   Yes, with help.
14        Q.   Sure, landscape designer?
15        A.   Yes.
16        Q.   Video artist?
17        A.   Yes.
```

[37:14] - [41:6]      11/3/2009    Acconci, Vito

```
page 37
14        Q.   I'm going to do a very bad job
15   summarizing what you just said, but is it fair
16   to say that performance artists focus on a more
17   personal interaction between the artist and the
18   viewer?
19        A.   Yes.
20        Q.   You are -- what appears to be the most
21   important work in your career is your
22   performance art is -- your performance artist --
23   I'll call it an installation or your performance
24   of -- called Seabed?
25        A.   Yes.
page 38
 1              VITO ACCONCI
 2        Q.   In 1971, right?
 3        A.   Yes.
 4        Q.   Could you please describe what Seabed
 5   was, sir?
 6        A.   Yes.  During the time of a three-week
 7   show I did three pieces at a gallery called
 8   Sonnabend Gallery in Soho, and Soho was at that
 9   time the beginning of an art neighborhood, art
10   neighborhood in New York.
11              The pieces I was doing at that time
12   were all performance like -- performance things.
13   There were three spaces in the gallery, so I
14   wanted to do these three different performances,
15   but performances that would be part of the
16   space.
17              The one that people paid most
18   attention to and probably for me was -- was
19   maybe the most important was a piece called
20   Seabed in a room approximately 25 feet by 45
21   feet.
22              Halfway across the room, the floor
23   became a ramp, the floor was turned into a ramp
24   that rose to a height of 2-1/2 feet, 3 feet at
25   the far wall.  Let me just do a side thought.
page 39
 1              VITO ACCONCI
 2   This piece was performed three days a week.
 3   When I say -- I want to use the word
 4   "performed," let's say the space the way I
 5   thought of it was activated.
 6              Each day -- each of the three days I
 7   was underneath -- underneath the ramp,
 8   underneath this floor where people were walking.
 9   I'm moving around as freely as I could under the
10   floor.  I'm -- well, as far as the viewer knows
11   I'm constantly talking, my voice comes up from
12   under the floor saying things like I'm doing
13   this for the person on my left, I'm touching
14   your hair, I'm running my hand down your back,
15   I'm touching your ass, etc.
16              I'm constant -- my attempt is to
17   constantly masturbate, and I'm using the viewers
18   as help, help in the sense that I hear viewers'
19   footsteps on top of me and can build sexual
20   fantasies on those footsteps.  My sexual
21   fantasies can keep my activity going, keep my
22   masturbation going.  Every now and then the
```

23    masturbation might reach climax, a person on top
24    of the floor might be thinking something like:
25    Oh, he's done this with me, he's done this for
page 40
 1              VITO ACCONCI
 2    me.
 3              The attempt was I wanted to be not so
 4    much a focal point so that I see viewer, viewer
 5    see me.  I hated the -- I loved the idea of
 6    performance, I hated the idea of performance as
 7    a kind of personality cult and star figure.  I
 8    wanted -- this for me -- I know this might
 9    seem -- this might seem like a leap -- for me
10    this was the beginning of architecture.  I
11    wanted to be part of the room, I wanted to be
12    part of the environment.
13         Q.    All right.  I've got this -- I think I
14    found it on old -- I think I found an old
15    Village Voice describing this and I want to read
16    it to you.  You tell me if it was accurate,
17    okay?
18              It was that you were hidden under a
19    ramp in an art gallery and you were masturbating
20    while vocalizing fantasies about visitors
21    walking up the ramp.
22              Is that an accurate statement?
23         A.    I think that's something like I just
24    said, different words.
25         Q.    And the -- and this is probably one of
page 41
 1              VITO ACCONCI
 2    your most important artistic pieces, correct?
 3         A.    Yes, I wish it wasn't, but -- but for
 4    people at large I've become the person who
 5    masturbates everywhere he goes.  It was one
 6    piece.

[41:11] - [42:17]        11/3/2009    Acconci, Vito

page 41
11         Q.    How many times did you see the
12    Shearers after they moved to Williamstown?
13         A.    The two times that I mentioned -- oh,
14    wait, I'm sorry, that was after -- after Parky's
15    stroke when we were preparing the show that
16    Linda and I did around 1993.  I was at
17    Williamstown then for a few -- a few days.
18         Q.    So you saw -- I just want to make it
19    clear.  Before Hartley Shearer had a stroke, you
20    saw the Shearers for a couple of days in
21    Williamstown as they were doing an exhibition
22    about their work?
23         A.    Sure, and that time when they had
24    dinner, an Italian dinner in the west village.
25         Q.    So let me -- let's go back.
page 42
 1              VITO ACCONCI
 2              After they moved to Williamstown, you
 3    believe that you saw the Shearers once in New
 4    York and maybe for a couple of days while they
 5    were doing an exhibition of yours in
 6    Williamstown, Massachusetts?
 7         A.    Yes, and then those two times after.
 8         Q.    Then after Mr. Shearer had a stroke,
 9    you saw the Shearers you believe twice?
10         A.    Yes.
11         Q.    Once as part of a presentation you did
12    for an architectural commission?
13         A.    Yes.
14         Q.    And the second time as a site visit?
15         A.    The site visit came first.  In order

```
16        to make the presentation -- in order to do a
17        project I had to see the site.
```

[44:2] - [46:19]          11/3/2009   Acconci, Vito

```
page 44
 2                You are a video artist, right?
 3        A.    I have done, yes, I've done video,
 4    yes.
 5        Q.    Hartley is a video artist?
 6        A.    Yes.
 7        Q.    Was a video artist.
 8                You two are about the same age, right?
 9        A.    I think we were.  I would have thought
10    he was a few years younger than me.
11        Q.    And you both had a very similar
12    intellectual and artistic curiosity?
13        A.    Yes.
14        Q.    You had a lot of sympathy for him?
15        A.    Yes, of course.
16        Q.    So you obviously put yourself in
17    Hartley' shoes and thought about his condition
18    after the stroke?
19                MS. STEVENS:  Objection to form.
20        A.    Yes, in the sense of, you know, what
21    would I do, what would I have done.
22        Q.    So you would have been angry had you
23    had a stroke?
24                MS. STEVENS:  Objection to form.
25        A.    I don't know but I think I would have
page 45
 1                VITO ACCONCI
 2    been.
 3        Q.    So I just want to know, is it
 4    possible?
 5        A.    I mean, I get angry when I have a cold
 6    and I can't -- but --
 7        Q.    Is it possible that you placed your
 8    anger -- let me put it to you, is it possible
 9    that put yourself in Hartley Shearer's shoes and
10    thought, if I had a stroke I would have been
11    angry, and then transferred that and thought
12    that Hartley was angry after his stroke?
13                MS. STEVENS:  Objection to form.
14        A.    I guess obviously I don't know.  I
15    don't know, it's hard to know what I am -- what
16    I am seeing and what I am thinking I'm seeing
17    based on things -- don't always know how to make
18    that distinction.
19        Q.    Did you think -- did you see any --
20    did you see anything in your -- or did you see
21    or hear anything about Hartley's condition or
22    any conversation with Hartley that demonstrated
23    he was angry about his physical condition?
24        A.    No, he never said to me he was angry.
25        Q.    Did you see any anger, anything that
page 46
 1                VITO ACCONCI
 2    you could describe as angry?
 3        A.    No.  I think -- again, I have to say I
 4    think here, I think when he was being -- when he
 5    was being helped by the student who I already
 6    said I don't remember if it was a male or a
 7    female, I think I remember as this -- as the
 8    student was helping him that he kind of tried to
 9    free his arm because he wanted to do something
10    himself, but I -- and, you know, as if he just
11    didn't want to be helped.
12                But, again, I know I don't want to be
13    helped, so -- I would love to be clear about
14    what I am seeing -- what I actually saw as a
```

```
15    fact.  And also if someone moves the arm, I
16    might say he didn't want the student to help
17    him, but --
18         Q.    Sure.
19         A.    -- I don't know what was in his mind.
```

[48:4] - [50:17]        11/3/2009    Acconci, Vito

page 48
```
 4         Q.    Mr. Acconci, at various points in time
 5    during your deposition you said things like:  I
 6    can't separate what I saw from what I felt?
 7         A.    Yes.
 8         Q.    You said that it's very easy to
 9    transfer things, I'm not sure what is me and
10    then what is Hartley, do you remember saying
11    something like that?
12         A.    Yes.
13         Q.    Do you remember saying that you
14    mingled your -- fears of yours with Hartley,
15    correct?
16         A.    Yes.
17         Q.    I want to talk to you about this
18    statement you said about Linda Shearer, and
19    Linda Shearer said that Hartley wanted to have a
20    gun because he didn't know if he could take it,
21    right?
22         A.    Yes.
23         Q.    Is it possible that Linda Shearer did
24    not say that?
25         MS. STEVENS:  Objection to form.
```
page 49
```
 1                   VITO ACCONCI
 2         A.    Yes, I mean, it's so much in my mind
 3    except that when I think when could Linda have
 4    said this to me, I can't -- I can't -- I can't
 5    imagine when because it seems I know she didn't
 6    say this before Hartley killed himself, so it
 7    could have -- it only -- it could have been only
 8    on that phone call she made to me, which seemed
 9    so unlikely to me.  At the same time I don't
10    want to believe I made it up, yet I don't know
11    how to point out the factuality of it.
12         Q.    Is it possible this is a transferred
13    memory or you are confused about the
14    conversation?
15         MS. STEVENS:  Objection to form.
16         A.    Since I don't know how to place it, I
17    have to say yes.  I don't want to believe I make
18    things up but --
19         Q.    It's possible you had this -- these
20    are your feelings that you transferred over to
21    Linda and Hartley, correct?
22         MS. STEVENS:  Objection to form.
23         A.    Well, Hartley had nothing to do with
24    it, this was -- this was what I had said.  You
25    know, Hartley never said anything to me about
```
page 50
```
 1                   VITO ACCONCI
 2    that.  I thought Linda had said something but I
 3    can't prove it.
 4         Q.    Is it possible, given some of the
 5    things you talked about in your deposition about
 6    your relating to Hartley and your confusion of
 7    mixing feelings between your feelings and
 8    Hartley's feelings, is it possible that Linda
 9    Shearer never said that?
10         MS. STEVENS:  Objection to form.
11         A.    I guess it's possible because I know
12    that -- I know that I -- I hope I don't like to
13    make up stories, but I like to sometimes tell
```

14  people I know stories, like something so
15  affected this person that he needed -- again,
16  all I can say is I hope I didn't make it up but
17  I don't know.

[51:2] - [51:23]      11/3/2009   Acconci, Vito

page 51
2       Q.      Would you say Linda Shearer is
3   trustworthy?
4       A.      The way I know Linda Shearer, she
5   seems totally trustworthy.
6       Q.      Honest?
7       A.      Yes.
8       Q.      If she says that she never said this
9   to you, how would that impact --
10          MS. STEVENS:  Objection.
11      Q.      -- your recollection of this
12  conversation?
13          MS. STEVENS:  Objection to form.
14  Misstates evidence.
15      A.      If she said -- if she was here and
16  said this to me, I think I would have to say:  I
17  think I made it up, Linda, but I don't want to
18  make things up, but I have to believe you.
19      Q.      Is it possible you made this up?
20          MS. STEVENS:  Objection to form.
21      Q.      In the creative process of your mind?
22      A.      It's possible.  I hate to believe that
23  I make things up.  I guess it's possible.

[26:11] - [28:6]      11/17/2009   Angevine, Anne

page 26
11      Q.      We are going to refer to Exhibit 2, now,
12  Dr. Angevine.  What did you go to college?
13      A.      The University of North Carolina at Chapel
14  Hill.
15      Q.      And you graduated in 1996?
16      A.      Correct.
17      Q.      And where did you go to medical school?
18      A.      Columbia University College of Physicians and
19  Surgeons.
20  ,    Q.      And that's in New York?
21      A.      Yes.
22      Q.      And you graduated in 2000, correct?
23      A.      Correct.
24      Q.      And then you received your post-medical
25  school training at the Brigham and Women's Hospital in
page 27
1   Boston?
2       A.      Correct.
3       Q.      And how long were you at the Brigham and
4   Women's Hospital in Boston?
5       A.      Three years.
6       Q.      And in the year between June of 2000 and June
7   of 2001, you were an intern in internal medicine at
8   the Brigham and Women's Hospital, correct?
9       A.      Yes.
10      Q.      Can you describe for me the responsibilities
11  you had as an intern at the -- first year -- okay,
12  what is an intern first.  I will ask you that
13  question.  Can you explain to us what an intern is.
14      A.      An intern is a doctor who is in their first
15  post-graduate year of training after medical school.
16      Q.      Okay.  And what are the responsibilities --
17  what responsibilities did you have as an intern in the
18  year 2000 at the Brigham and Women's Hospital in
19  Boston?
20      A.      Admitting and caring for patients to the
21  internal medicine service and discharging them at the

```
22  time of discharge.
23      Q.   Okay, so -- okay, so were you doing a general
24  rotation in internal medicine?
25      A.   Correct.
page 28
 1      Q.   What is internal medicine?
 2      A.   Internal medicine is the field of medicine
 3  that encompasses general medical problems including
 4  those related to the various body systems such as
 5  pulmonary, cardiac, endocrine, gastrointestinal --
 6  what else?  Cancer treatment, neurology.  What else?
```

[30:4] - [31:2]            11/17/2009  Angevine, Anne

```
page 30
 4      Q.   Very good.  Thank you.  I am going to circle
 5  back to your years as an intern.  Was part of your
 6  responsibility at the Brigham and Women's Hospital as
 7  an intern to monitor the use of medications?
 8      A.   Yes.
 9      Q.   Did you actually prescribe medications while
10  you were on the floor?
11      A.   Yes.
12      Q.   And did you take people -- patients off of
13  medicines when you felt necessary?
14      A.   Yes.
15      Q.   Even as a first-year doctor, you had the
16  responsibility for managing medications on the floor?
17      A.   Yes.
18      Q.   Okay.  And did you -- who did you -- how were
19  you assigned your work during your -- the reason I am
20  focusing on 2000 is that's the year that Mr. Hartley
21  was under your care.  So how were you assigned your
22  workload at that time?
23      A.   Patients would be assigned to me according to
24  the days that I was on call for admissions and
25  generally arrived to the hospital through the
page 31
 1  emergency room or as a direct transfer from an outside
 2  hospital.
```

[31:23] - [31:25]          11/17/2009  Angevine, Anne

```
page 31
23      Q.   Do you have any independent recollection of
24  Mr. Shearer?
25      A.   No.
```

[34:19] - [35:4]           11/17/2009  Angevine, Anne

```
page 34
19      Q.   Okay.  Can you describe for me the history
20  that was presented to you on October 14, 2000?
21      A.   My note describes that Mr. Shearer was a
22  55-year-old man who had had a mitral valve repair,
23  which was complicated by a right-sided cerebral
24  vascular accident postoperatively that had left him
25  with a residual left-sided hemiparesis.
page 35
 1           He also had a history of arthritis.  He was
 2  being transferred from North Adams Hospital for
 3  further management of severe lower back pain and
 4  spasticity, as well as bacterial endocarditis.
```

[35:12] - [35:14]          11/17/2009  Angevine, Anne

```
page 35
12      Q.   What is lower back spasticity?
13      A.   That would mean that the patient was having
14  uncontrollable muscle spasms in the lower back.
```

[43:13] - [44:13]          11/17/2009   Angevine, Anne

page 43
13        Q.    And this is the assessment and plan that you
14   devised after performing the physical and history?
15        A.    Yes.
16        Q.    Okay.  Can you read that into the record,
17   please.
18        A.    55-year-old man, status post right-sided
19   cerebral vascular accident after mitral valve repair.
20   Now with strep endocarditis and intractable low back
21   pain/spacticity of unclear etiology.  Possible
22   etiologies include myositis, discitis, osteomyelitis,
23   epidural or paraspinal abscess.
24        Q.    And what did you -- you called for certain
25   consults after that, correct?
page 44
1         A.    Yes.
2         Q.    Which ones did you call for?
3         A.    A neurology consult.
4         Q.    And why was that?
5         A.    To further evaluate the etiology of the
6    patient's back pain and spacticity.
7         Q.    And then you asked for a pain consult as
8    well?
9         A.    Yes.
10        Q.    And why did you do that?
11        A.    To request assistance in pain management
12   including possible use of a PCA, which stands for
13   patient controlled anesthesia.

[48:21] - [48:25]          11/17/2009   Angevine, Anne

page 48
21        Q.    Now, in terms of your admitting note, which
22   was on October 14, 2000, did you get the sense that
23   from reading the note that you wrote that Mr. Shearer
24   was on the edge of breakdown?
25        A.    No, not based on my documentation.

[55:10] - [55:23]          11/17/2009   Angevine, Anne

page 55
10        Q.    I am going to re-ask the question.  Can you
11   take a look at this note and just read into the record
12   or present what the pain service determined to be the
13   condition of Mr. Shearer on October 14, 2000?
14             MR. FROMSON:  Objection.  Form.
15             THE WITNESS:  Their impression was of a
16        55-year-old man with history of mitral valve
17        repair, stroke, presented with about one month
18        lumbar spasm pain sometimes radiating down the
19        lower extremities.  This pain is movement
20        related.
21             Their plan was PCA morphine sulphate.  And
22        the dosages recommended are indicated.  Start
23        Neurontin.  Await MRI.

[88:4] - [88:22]           11/17/2009   Angevine, Anne

page 88
4         Q.    Now, let's look at your assessment and plan
5    at the bottom of page 236.  Would you read that into
6    the record, please.
7         A.    Treating for endocarditis, back pain,
8    infectious disease.  Continue penicillin and
9    Gentamicin culture follow-up.
10             Cardiovascular.  Continue digoxin, Coumadin,
11   Lovenox.
12             Hematology.  Primary care provider to follow
13   up anemia.

```
14          Musculoskeletal.  Continue pain regimen,
15  physical therapy.
16          Disposition.  Awaiting rehab bed to be
17  discharged in a.m.
18      Q.  So basically, at this point is it fair to say
19  that Mr. Shearer's condition had improved to the point
20  where he was capable of being discharged from Brigham
21  and Women's Hospital?
22      A.  Yes.
```

[89:3] - [89:14]        11/17/2009   Angevine, Anne

```
page 89
 3      Q.  Okay.  And with regard to the pain, what was
 4  the plan for Mr. Shearer upon discharge from Brigham
 5  and Women's Hospital?
 6      A.   This note doesn't indicate the specific pain
 7  medications that he was on that day.  So I can't tell
 8  you with exact certainty.  But it would be whatever
 9  medications he was currently receiving on October 19,
10  2000.
11      Q.  Okay, we will get to that.  The plan was
12  whatever he was on the 19th, you were planning to
13  continue?
14      A.  Correct.
```

[96:5] - [96:23]        11/17/2009   Angevine, Anne

```
page 96
 5      Q.  My name is Ken Fromson.  I represent the
 6  Shearer family.  And I am not sure if you know what
 7  this lawsuit is about.  And so my question to you
 8  first is, Do you have any idea what this lawsuit is
 9  about?
10      A.   My understanding of the lawsuit is that it is
11  related to the Shearer family's concern that
12  Mr. Shearer's suicidal death after his discharge from
13  Brigham and Women's Hospital may have been related to
14  his use of Neurontin.
15      Q.   And have you ever been involved in a lawsuit
16  as a plaintiff or a defendant?
17      A.   No.
18      Q.   Have you ever seen a caption in a lawsuit
19  before?
20      A.   No.
21      Q.   And you have never been to a deposition
22  before?
23      A.   No.
```

[98:18] - [99:2]        11/17/2009   Angevine, Anne

```
page 98
18      Q.   And in this case, did you prescribe Neurontin
19  to Mr. Shearer?
20      A.   Yes.
21      Q.   At any time before you prescribed Neurontin
22  to Mr. Shearer in October of 2000, had you received
23  any information from the defendants in this case, Park
24  Davis, Warner Lambert, or Pfizer, that indicated to
25  you that Neurontin was associated with suicidality?
page 99
 1          MR. BARNES:  Objection.  You may answer.
 2          THE WITNESS:  No.
```

[100:14] - [100:23]     11/17/2009   Angevine, Anne

```
page 100
14      Q.   Doctor, in order for Mr. Shearer to have
15  received Neurontin, would you agree back in October of
16  2000 a physician would have had to prescribe it for
```

```
17  him?
18      A.    Yes.
19      Q.    And would you -- is it fair to say that you
20  were an intermediary between Mr. Shearer and the drug
21  company from which he could get drugs prescribed?
22          MR. BARNES:  Objection.
23          THE WITNESS:  Yes.
```

[101:7] - [101:14]          11/17/2009  Angevine, Anne

```
page 101
 7      Q.    Okay.  And so would you agree that it would
 8  be important for you to have learned about the drug
 9  you were prescribing?
10      A.    Yes.
11      Q.    And is it fair too to say that with respect
12  to Neurontin's association with suicidality as alleged
13  by plaintiffs you did not know of any such
14  association?
```

[101:25]                    11/17/2009  Angevine, Anne

```
page 101
25          THE WITNESS:  Yes.
```

[103:2] - [103:24]          11/17/2009  Angevine, Anne

```
page 103
 2      Q.    Now my question to you is this.  Are you
 3  familiar generally with United States package inserts
 4  for drugs in the United States?
 5      A.    Yes.
 6      Q.    Are you familiar with the various sections of
 7  those package inserts generally?
 8      A.    Generally, yes.
 9      Q.    Do you understand that those package inserts
10  have sections like a warning section?
11      A.    Yes.
12      Q.    They have sections like information for
13  patients sections.
14      A.    Yes.
15      Q.    They have mechanism of action sections.
16      A.    Correct.
17      Q.    Okay, so with respect to warnings in the
18  current package insert, do you see the bolded print?
19  That's the first particular warning in the package
20  insert.
21      A.    Yes.
22      Q.    And what is that bolded warning?
23          MR. BARNES:  Objection.  You may answer.
24          THE WITNESS:  Suicidal behavior and ideation.
```

[104:1] - [104:13]          11/17/2009  Angevine, Anne

```
page 104
 1      Q.    And can you read the first paragraph
 2  beginning with anti-epileptic drugs into the record,
 3  ending with the word behavior.
 4          MR. BARNES:  Objection.  You may answer.
 5          THE WITNESS:  Anti-epileptic drugs (AEDs),
 6      including Neurontin, increase the risk of
 7      suicidal thoughts or behavior in taking -- in
 8      patients taking these drugs for any indication.
 9          Patients treated with any AED for any
10      indication should be monitored for the emergence
11      or worsening of depression, suicidal thoughts or
12      behavior, and/or any unusual changes in mood or
13      behavior.
```

[104:22] - [105:7]          11/17/2009  Angevine, Anne

page 104
22      Q.    Can you read into the record the paragraph
23 beginning with patients.
24      A.    Patients, their caregivers, and families
25 should be informed that AEDs increase their risk of
page 105
1 suicidal thoughts and behavior and should be advised
2 of the need to be alert for the emergence or worsening
3 of the signs and symptoms of depression.
4           Any unusual changes in mood or behavior or
5 the emergence of suicidal thoughts, behavior, or
6 thoughts about self-harm, behaviors of concern should
7 be reported immediately to health care providers.

[107:15] - [107:22]      11/17/2009  Angevine, Anne

page 107
15      Q.    Okay.  That makes that line of questioning
16 much shorter.  In terms of the pharmacology of
17 Neurontin back in 2000, had you ever received any
18 information from the defendants in this case that the
19 pharmacology of the drug could contribute to mood and
20 behavioral disturbances?
21           MR. BARNES:  Objection.
22           THE WITNESS:  No.

[108:8] - [109:9]      11/17/2009  Angevine, Anne

page 108
8      Q.    Well, my understanding is that you had a
9 request for a consult, both a neurological consult and
10 a pain consult.  Is that accurate?
11      A.    Yes.
12      Q.    And so the pain service physicians made
13 recommendations for what pain management should be
14 done to control Mr. Shearer's pain.  Is that fair?
15           MR. BARNES:  Objection.
16           THE WITNESS:  Yes.
17 BY MR. FROMSON:
18      Q.    And is it fair to say that the pain regimen
19 included Neurontin?
20      A.    Yes.
21      Q.    So was the decision to prescribe Neurontin to
22 Mr. Shearer a decision made by the pain management
23 physician initially?
24           MR. BARNES:  Objection.
25           THE WITNESS:  Yes.
page 109
1 BY MR. FROMSON:
2      Q.    And did you consider the risks and benefits
3 of Neurontin when you prescribed Neurontin to
4 Mr. Shearer or did you continue what had previously
5 been prescribed by the pain management physician?
6           MR. BARNES:  Objection.  You may answer.
7           THE WITNESS:  I guess I would say that I was
8 -- my prescription was following the
9 recommendation of the pain service.

[109:15] - [111:19]      11/17/2009  Angevine, Anne

page 109
15      Q.    Notwithstanding that your recommendation or
16 prescription was following the recommendation, did you
17 yourself consider the risks and benefits of Neurontin
18 before prescribing Neurontin to Mr. Shearer?
19      A.    I don't have any specific recollection.
20 However, it would be customary for me to do so.
21      Q.    And if you had known back in 2000 that
22 Neurontin was associated with suicidality, would you
23 have informed Mr. Shearer of that fact?
24           MR. BARNES:  Objection.  You may answer.

```
25              THE WITNESS:  Maybe.
page 110
 1  BY MR. FROMSON:
 2      Q.   Okay, let me ask you this.  Back in 2000,
 3  were you familiar with the package insert for
 4  Neurontin?
 5      A.   I don't know.
 6      Q.   Was it your custom and practice to be
 7  familiar with the drugs in terms of their package
 8  inserts before prescribing them to a patient?
 9          MR. BARNES:  Objection.  You may answer, if
10      you know.
11          THE WITNESS:  No.
12  BY MR. FROMSON:
13      Q.   What was your custom and practice during the
14  time period of 2000 to learn about the drugs you were
15  prescribing?
16      A.   To review any potential drug interactions and
17  major side effects, usually based upon consultation
18  with the PDR, Physician's Desk Reference.
19      Q.   Okay, so back in 2000 and before, and
20  specifically before you prescribed Neurontin to
21  Mr. Shearer, were you generally familiar with the
22  Physician's Desk Reference for Neurontin?
23          MR. BARNES:  Objection.  Asked and answered.
24      If you recall.
25          THE WITNESS:  With specific regard to
page 111
 1  Neurontin, I don't know, but in general, yes.
 2  BY MR. FROMSON:
 3      Q.   Did you have a custom and practice to review
 4  the Physician's Desk Reference in each calendar year
 5  it was published to be up to date on the drugs you
 6  were prescribing?
 7      A.   No.
 8      Q.   So with respect to Neurontin back in 2000,
 9  okay, I would ask you to consider a hypothetical.
10  Assuming that you did review the Physician's Desk
11  Reference for Neurontin before you prescribed it to
12  Mr. Shearer -- and I don't mean immediately before,
13  but if you had read the Physician's Desk Reference
14  before prescribing Neurontin to Mr. Shearer and if the
15  Physician's Desk Reference had said that patients,
16  their families, and caregivers should be informed
17  about an association with suicidality, then would you
18  have informed Mr. Shearer about Neurontin and
19  suicidality?
```

[112:1] - [112:7]          11/17/2009  Angevine, Anne

```
page 112
 1          THE WITNESS:  I don't know.  Can I answer I
 2      don't know?
 3  BY MR. FROMSON:
 4      Q.   You can answer whatever way is honest.
 5      A.   I don't know if I would have recommended that
 6  or advised the patient of that based on that
 7  information or not at the time.
```

[113:7] - [113:23]          11/17/2009  Angevine, Anne

```
page 113
 7      Q.   Okay.  And I asked you about non-susceptive
 8  pain earlier.  Are you able to describe for me what is
 9  meant by neuropathic pain?  Or are you not an expert
10  in that issue?
11      A.   I am not an expert in that issue either.
12  However, my impression of neuropathic pain is that is
13  something that is felt to be as a result of coming
14  from, coming from the nerves themselves.
15      Q.   Are you able -- is it fair to say you don't
```

16  have an independent recollection of treating
17  Mr. Shearer back in 2000?
18      A.   Yes.
19      Q.   Does a review of your notes, the treatment
20  record from Brigham Hospital, provide you any
21  information as to whether the treatment regimen was
22  for neuropathic pain?
23      A.   No.

[116:21] - [118:14]      11/17/2009  Angevine, Anne

page 116
21      Q.   In terms of the pharmacology of the narcotics
22  in this case potentially causing the delusions and the
23  paranoia, did you have an understanding of the
24  pharmacology of the narcotics that Mr. Shearer had
25  been taking?
page 117
 1      A.   You mean the mechanism of action?
 2      Q.   I will accept that.  Sure.
 3      A.   Generally speaking.
 4      Q.   What was your understanding back in 2000 as
 5  to why the narcotics could have been causing the
 6  delusion and paranoia?
 7      A.   I didn't mean to indicate that I understood
 8  how the pharmacology could contribute to the side
 9  effects, but more to the mechanism of action for pain
10  control.
11      Q.   Okay.  Did you have any understanding as to
12  whether the narcotics in terms of their pharmacology
13  would be contributing to delusions and paranoia?
14      A.   No.
15      Q.   Did you have any understanding back in 2000
16  as to whether Neurontin was a psychotropic drug?
17          MR. BARNES:  Objection.
18          THE WITNESS:  Yes.
19  BY MR. FROMSON:
20      Q.   What was your understanding back in 2000 as
21  to whether Neurontin was a psychotropic drug?
22      A.   My understanding was that one of the main
23  side effects of Neurontin that necessitated its
24  gradual titration was possible sedation.
25      Q.   Okay.  And what is your interpretation of the
page 118
 1  term psychotropic?
 2          MR. BARNES:  Objection.  You may answer.
 3          THE WITNESS:  Well, that's a good point
 4      because sedation may not necessarily --
 5      psychotropic would refer to a symptom that is
 6      somehow psychiatric in nature, such as paranoia
 7      or anxiety or delusions or things of that
 8      nature.
 9  BY MR. FROMSON:
10      Q.   Okay, so now going back to my earlier
11  question, did you have an understanding as to whether
12  Neurontin was a psychotropic drug back in 2000?
13          MR. BARNES:  Objection.
14          THE WITNESS:  No, no.

[118:23] - [119:7]      11/17/2009  Angevine, Anne

page 118
23      Q.   If Neurontin was a psychotropic drug -- and
24  using psychotropic in the way you defined it -- would
25  that have been important for you to know in
page 119
 1  prescribing Neurontin to Mr. Shearer?
 2          MR. BARNES:  Objection.
 3          THE WITNESS:  Yes.
 4  BY MR. FROMSON:
 5      Q.   Why?

6    A.    In general, it's important to know about any
7  potential side effects of medications.

[5:23] - [6:1]          10/23/2009  Catapano-Friedman, Lisa

page 5
23    Q    Good morning, Dr. Catapano-Friedman.
24    A    Good morning.
25    Q    Could you please state your name for the record?
page 6
1    A    Lisa Catapano-Friedman.

[8:13] - [9:5]          10/23/2009  Catapano-Friedman, Lisa

page 8
13    Q    You understand that this lawsuit relates to a
14  medication called Neurontin or gabapentin, right?
15    A    Yes.
16    Q    And you never prescribed Neurontin to
17  Mr. Shearer, is that correct?
18    A    That's correct.
19    Q    Dr. Catapano-Friedman, if we could spend just a
20  few moments talking about your background and
21  training.  What is your -- your specialty?
22    A    I'm a psychiatrist.
23    Q    And your office address is what?
24    A    357 Shields Drive, Bennington, Vermont.
25    Q    How long have you been at this address?
page 9
1    A    Been at this address for a little over three
2  years.
3    Q    And where were you prior to this address?
4    A    My previous address was 100 Hospital Drive,
5  Bennington, Vermont, which is the hospital here.

[9:9] - [10:11]          10/23/2009  Catapano-Friedman, Lisa

page 9
9    Q    Can we walk through your education and training?
10  What -- where did you go to college?
11    A    I graduated from Yale.  Medical school was Tufts
12  University School of Medicine.  I did my internship at
13  what was then Framingham Union Hospital, it is now
14  Metro West, in Framingham, Massachusetts.  And I did
15  the first part of my psychiatry residency at Boston
16  University Medical Center, and the rest of my
17  psychiatry residency at what was then called UMDNJ
18  Rutgers Medical School, now Robert Wood Johnson, in
19  New Jersey.
20    Q    And what year did you finish your residency?
21    A    1982.
22    Q    And you've been in private practice since then?
23    A    Right.
24    Q    Are you board certified?
25    A    Yes.
page 10
1    Q    And can you explain to the jury what board
2  certification means?
3    A    Board certification basically means that you are
4  particularly qualified in your specialty.  To be board
5  certified involves taking a written -- at least at the
6  time I did it a written and an oral exam.
7    Q    And what specialty are you board certified in?
8    A    Psychiatry.
9    Q    And what year did you become board certified in
10  psychiatry?
11    A    1984.

[11:12] - [11:18]          10/23/2009  Catapano-Friedman, Lisa

page 11
12   Q     We're at a location that's called The Memory
13   Clinic today.  Can you explain to the jury what The
14   Memory Clinic is?
15   A     The Memory Clinic is a -- clinic that does
16   diagnostic assessment and treatment of Alzheimer's
17   disease and also engages in research of drugs in
18   development for Alzheimer's disease.

[12:14] - [12:20]         10/23/2009  Catapano-Friedman, Lisa

page 12
14   Q     Doctor, do you recognize what's been marked as
15   Exhibit 1?
16   A     I do.
17   Q     And can you tell the jury what -- what Exhibit 1
18   is?
19   A     It is a copy of my office notes from when I saw
20   Mr. Shearer.

[13:11] - [13:15]         10/23/2009  Catapano-Friedman, Lisa

page 13
11   Q     Do you have a personal recollection of
12   Mr. Shearer as you sit here today?
13   A     Yes, I do.
14   Q     You remember him?
15   A     Yes, I do.

[18:8] - [18:10]          10/23/2009  Catapano-Friedman, Lisa

page 18
8    Q     Did you view Mr. Shearer as being depressed when
9    he presented on February 18th, 2000?
10   A     I thought that he was mildly depressed.

[27:15] - [27:22]         10/23/2009  Catapano-Friedman, Lisa

page 27
15   Q     Did you have any discussions with Mr. Shearer on
16   this first visit about suicide or death?
17   A     I asked him if he was suicidal.
18   Q     And do you recall what his response was?
19   A     He said he wanted to live.
20   Q     Is that something that you raise with most of
21   your patients in -- in standard treatment?
22   A     It's something that I ask a new patient.

[51:8] - [51:14]          10/23/2009  Catapano-Friedman, Lisa

page 51
8    Q     So this was not a typical fight between Mr. and
9    Mrs. Shearer, is that --
10   A     That's right.
11   Q     Did he seem to be embarrassed that the police
12   were called?
13   A     He seemed to be embarrassed that he had reacted
14   that way, yes.

[55:13] - [55:15]         10/23/2009  Catapano-Friedman, Lisa

page 55
13   Q     Would you have discussed with him the suicide
14   precaution in the Zyprexa label in 2001?
15   A     I don't think it was so labeled in 2001.

[63:4] - [63:11]          10/23/2009  Catapano-Friedman, Lisa

page 63
4    Q     Let me mark this as Exhibit 6.  And can you read

```
 5   for the record what your handwritten notes say on your
 6   August 2nd, '01, visit with Mr. Shearer?
 7   A     Sure.  Continues in much better humor.  Less
 8   anger.  Traveling getting smoother but still glitches.
 9   Can't tolerate feeling unproductive.  Panics if he
10   feels helpless.  Reminds him of weakness with ruptured
11   spleen.  Went to Santa Fe with Linda.
```

[63:22] - [64:16]        10/23/2009   Catapano-Friedman, Lisa

```
page 63
22   Q     He talks about traveling in this meeting with
23   you.  Is that something he enjoyed doing?
24   A     It was something that he and Linda had enjoyed
25   doing before his illness, and she traveled for her job
page 64
 1   and often wanted him to go with her because they
 2   enjoyed doing it, but he refers to it was difficult to
 3   do for -- because of his physical disabilities, but he
 4   wanted to do it.  Didn't always do it when there was
 5   opportunity but did that time.
 6   Q     Did he describe to you what kind of glitches --
 7   what -- what did his physical -- how did his physical
 8   disabilities affect his ability to travel?
 9   A     Well, he certainly had a great deal of difficulty
10   ambulating so he required really a lot of equipment
11   between braces and wheelchairs and canes and -- and so
12   there were always things that -- sometimes a part of
13   the brace wouldn't function right or sometimes the
14   glitch might simply be that there was a delay in
15   changing planes or having to change planes or --
16   things that happen.  They were glitches.
```

[67:15] - [68:12]        10/23/2009   Catapano-Friedman, Lisa

```
page 67
15   Q     Doctor, we just discussed that your last visit
16   with Mr. Shearer was in August in 2001.  You're aware
17   that Mr. Shearer committed suicide, correct?
18   A     Yes.
19   Q     And how did you learn that Mr. Shearer committed
20   suicide?
21   A     I believe his wife called me.
22   Q     Did she give you any of the details of the
23   suicide?
24   A     Yes, she did.
25   Q     And do you recall what she told you?
page 68
 1   A     Some of what she told me was her interpretation
 2   of the sequence of events possibly.  I don't know that
 3   they actually knew the sequence of events, but
 4   basically that he had shot himself and that their son
 5   had found him.
 6   Q     Did she tell you where she was during that time
 7   period?
 8   A     I know she was not at home, but I don't remember
 9   if she said where she was particularly.
10   Q     You don't recall if she was out of town traveling
11   on business?
12   A     I think she was now that you mention it.
```

[68:15] - [68:23]        10/23/2009   Catapano-Friedman, Lisa

```
page 68
15   Q     Mr. Shearer committed suicide in February 2002.
16   Does that sound right --
17   A     Yes.
18   Q     -- according to you?  Did -- during your time of
19   treating him did he ever talk to you about purchasing
20   a gun?
21   A     No.
```

```
              22   Q    Ever talk about a plan for suicide?
              23   A    No.
```

[70:22] - [71:4]          10/23/2009  Catapano-Friedman, Lisa

```
          page 70
           22   Q    Did Mr. Shearer's suicide surprise you?
           23   A    Yes and no.  Yes only in that at no time that I
           24   saw him was he suicidal.  No in that it's consistent
           25   with so many aspects of his personality and the
          page 71
            1   disability that he had and that Linda and I had
            2   discussed given his personality the idea that there
            3   was some risk for his well-being once he was done with
            4   this project.
```

[75:3] - [75:6]           10/23/2009  Catapano-Friedman, Lisa

```
          page 75
            3   Q    I'd like to hand to you what we'll mark as
            4   Exhibit 8, and I believe these are your records of
            5   your treatment with Mrs. Shearer.
            6   A    Thank you.
```

[75:14] - [75:16]         10/23/2009  Catapano-Friedman, Lisa

```
          page 75
           14   Q    And these are records that you took during the
           15   course of your treatment with her?
           16   A    Yes.
```

[76:11] - [76:13]         10/23/2009  Catapano-Friedman, Lisa

```
          page 76
           11   Q    Do you have a personal recollection of
           12   Mrs. Shearer as you sit here today?
           13   A    Yes.
```

[92:9] - [95:5]           10/23/2009  Catapano-Friedman, Lisa

```
          page 92
            9   Q    The next time you saw Mrs. Shearer was after
           10   Mr. Shearer's suicide?
           11   A    Right.
           12   Q    February 22nd, '02?
           13   A    Right.
           14   Q    I'm going to hand you what we've marked as
           15   Exhibit 12.  And can you read your handwritten notes
           16   on that date?
           17   A    Hartley's death is surreal but feeling relieved.
           18   Very involved in work.  Very resilient.
           19   Q    You discussed Mr. Shearer's death with
           20   Mrs. Shearer on this visit?
           21   A    Right.
           22   Q    And what did she mean by Mr. Shearer's death is
           23   surreal but feeling relieved?
           24   A    The surreal part seemed to be what most people
           25   experience when somebody dies, particularly that dies
          page 93
            1   suddenly, it's just hard to believe that they're --
            2   they were here one minute, not the next, and that
            3   they're not here.  And the feeling relieved was that
            4   she felt like the burden was off her.  She no longer
            5   had to juggle all the things she was juggling, deal
            6   with what she and I had both referred to as his angst,
            7   his anger, not knowing how to respond to him, so her
            8   own feelings around that.  There was just a tremendous
            9   burden gone.
           10   Q    You also note that she's very involved in work
           11   and very resilient?
```

```
12   A     Yes.
13   Q     What did you mean by both of those?
14   A     Well, she was very actively involved in various
15   aspects of her work.  She sort of, as the saying goes,
16   threw herself into her work even more than she already
17   had because it was a very comfortable and comforting
18   place for her to be.  She was aware of what was
19   comforting to her and she was making use of that,
20   which was work, also was her son.  She felt -- she
21   felt she was coping.  She felt she was able to carry
22   on.
23   Q     You continued to see Mrs. Shearer for the next
24   year following her death (sic)?
25   A     Yes.  Yes.
page 94
 1   Q     And can you describe Mrs. Shearer generally
 2   during that time period?
 3   A     Well, interestingly during this time period she
 4   had some conflicts at work, not right in the area in
 5   which she worked but with some of the governing boards
 6   and areas that were over her, and so a lot of what we
 7   talked about actually had to do with that, had to do
 8   with her anxieties about financial matters because she
 9   was left with a horrible financial burden, and her
10   thoughts about what plans she might make to deal with
11   those things.
12   Q     On the one year anniversary of Mr. Shearer's
13   death or around that time period Mrs. Shearer told you
14   that she was trying to remember Mr. Shearer before the
15   stroke.  Do you see that?
16   A     Right.  Yes.
17   Q     Do you know why?
18   A     She was doing the kind of thing people do often
19   when somebody has disappeared from their lives.  You
20   get afraid of forgetting them.  You try to conjure up
21   even what did they -- what did they look like.  You
22   know, can you conjure up every detail of their face.
23   And she was -- and you do that to try and hold on to
24   the person that presumably one loved.  You don't want
25   to lose them totally.  You want to keep your memory,
page 95
 1   and that was the part of him she wanted to remember,
 2   was him before the stroke.  And she was trying to see
 3   if she could hang on to all the good stuff because
 4   there had been a lot of good stuff.  That's what she
 5   was doing.
```

[103:10] - [116:7]          10/23/2009  Catapano-Friedman, Lisa

```
page 103
10   Q     Okay.
11         Ma'am, my name is Mark Lanier.  You and I have
12   never met before, have we?
13   A     No, we have not.
14   Q     We've never visited before, have we?
15   A     No, we have not.
16   Q     You haven't met or visited with anyone in my
17   office, have you?
18   A     I don't know everybody to know in your office.
19   Q     Well, you can't think of anybody in The Lanier
20   Law Firm that you've met or visited with, can you?
21   A     I have no idea.
22   Q     How did you know who this lady to my right is?
23   A     At some point she had requested records.
24   Q     So when you got the information from
25   Dr. Egilman -- the letter from Dr. Egilman you went
page 104
 1   and you spoke with your husband about it?
 2   A     I asked his advice.
 3   Q     And what kind of an attorney is your husband?
 4   A     He does largely litigation and business law.
```

```
 5   Q     Does he represent injured victims --
 6   A     No.
 7   Q     -- or does he typically defend companies?
 8   A     Either way.
 9   Q     Okay.  So if I looked up his practice, I'd find
10   he's -- does plaintiffs and defense work both?
11   A     Yes.
12   Q     Not predominantly one or the other?
13   A     Right.
14   Q     Okay.  And he's the one who told you you should
15   go find the drug company lawyer and contact them?
16   A     No.
17   Q     You told us under oath just a few minutes ago
18   that after you spoke with him you were told that you
19   should call Catherine and give the letter to her.
20   A     No.  I already knew she existed.  He didn't tell
21   me to find her.  I already knew she existed.
22   Q     Had you ever spoken to her?
23   A     I believe I had.
24   Q     How?
25   A     I believe she had called me -- I can't recall at
page 105
 1   this point the sequence of who called whom when, but I
 2   believe at some point in requesting records she had
 3   called me and I had called her back.
 4   Q     Had you discussed patient issues with her?
 5   A     What do you mean by patient issues?
 6   Q     Well, ma'am, you were a treating doctor for two
 7   of my clients, right?
 8   A     Right.
 9   Q     Don't you have doctor-patient confidentiality?
10   A     I have releases to talk to everybody I have
11   spoken to, and I don't think that was your question,
12   if I talked about patient-related issues with her.
13   I'm not sure what you mean.  Is the suit a
14   patient-related issue?
15   Q     Absolutely.  Wouldn't you consider it one?
16   A     I don't know if that's what you meant.
17   Q     Well, you've been giving a deposition here.  You
18   don't think it's related to the patient?
19   A     I don't know if that's what you meant.
20   Q     Well, what would you think I would mean if I said
21   a patient-related issue if it's not an issue related
22   to a patient?
23   A     I don't know what you meant.
24   Q     Well, ma'am, what I'm driving at is just a simple
25   question.  I just want the simple truth.  Do you have
page 106
 1   patient confidentiality?
 2   A     Do I have patient confidentiality?
 3   Q     Yes, ma'am.
 4   A     I practice according to its principles.
 5   Q     I mean, do you just cavalierly call someone with
 6   an interest adverse to your patients' and discuss
 7   those patients with them?
 8             MS. STEVENS:  Objection.
 9   A     Do I need to answer that?
10   Q     Yes, ma'am, you do.
11   A     Of course not.
12   Q     I'm just amazed.  I never got a phone call from
13   you, did I?
14   A     I don't believe you called me.
15   Q     No, ma'am.  Did Catherine call you, the lawyer
16   for Pfizer?
17   A     I believe she did.
18   Q     And you fielded a phone call from a lawyer
19   representing an interest adverse to your client?
20   A     When records are requested with a release of
21   information, a release of information is a release of
22   information.
23   Q     Ma'am, when you started your deposition you were
```

```
     24    even asked the question by this lawyer, what did you
     25    do to get ready for your deposition.  You said nothing
page 107
      1    in particular.  You were asked did you have any
      2    meetings with counsel or discuss the case with anyone;
      3    you said no.  Do you need to change your answers now?
      4    A    I don't think I discussed the case with her.
      5    Q    Ma'am, you called her on the telephone or she
      6    called you to talk to you about documents in the case,
      7    right?
      8              MS. STEVENS:  Objection.
      9    A    If I recall the conversation, it was to clarify
     10    what documents were needed because I had gotten a
     11    request directly from her office and a request from an
     12    agency that is hired I believe to get documents and so
     13    I wasn't sure if these documents were required a
     14    second time --
     15    Q    But wait a minute.
     16    A    -- and that was the discussion.
     17    Q    You said that she first called you.  Now you're
     18    telling us maybe you first called her because you were
     19    uncertain?  Which is the truth?
     20    A    No, because I had gotten a request from this
     21    agency whose name I do not recall that requests
     22    records that I had already sent.  I told that to the
     23    agency, that I had already sent them.  The agency,
     24    young man I spoke to, was very confused, didn't know
     25    if he was supposed to get them again or not, I believe
page 108
      1    contacted her law firm and I believe her call to me
      2    was to clarify whether or not those records were
      3    needed again.
      4    Q    And you took that call from her as opposed to
      5    dealing through the agency that was responsible for
      6    collecting the records?
      7    A    The agency no longer knew what the answer was and
      8    so they called -- as far as I understood, they called
      9    her.
     10    Q    And then you -- your next -- you had no more
     11    contact with her or the law firm until you contacted
     12    them over Dr. Egilman's letter, is that true?
     13    A    I don't remember when I got the documents about
     14    the deposition.  I don't remember which date, whether
     15    that was before or after.
     16    Q    But did you visit with people about the case at
     17    that time?
     18    A    What do you mean by visit with people?
     19    Q    Well, visit.  By visit I mean talk.
     20    A    To whom?
     21              MS. STEVENS:  Objection to form.
     22    BY MR. LANIER:
     23    Q    Did you have any discussions with any parties or
     24    lawyers for parties about this case?
     25    A    Other than the fact that the case existed?
page 109
      1    Q    Yes, ma'am.
      2    A    No.
      3    Q    So you never had any discussions about deposition
      4    times and dates and availability?  That would have
      5    been your secretary or someone?
      6    A    We -- no, we did eventually, but I don't remember
      7    at what date, and I don't consider that discussion
      8    about the case to make an appointment.  Eventually,
      9    yes, of course that was discussed and eventually I
     10    received papers officially requesting the deposition
     11    or requiring it.  I don't remember what date happened
     12    when.
     13    Q    Ma'am, let me be real clear.  When I say
     14    discussions, I mean any discussions about the case,
     15    whether it's the deposition or anything like that.  So
     16    let me re-ask you the question.  Did you have any
```

17    discussions with specifically the lawyers who are
18    adverse to your patients about this case?
19             MS. STEVENS:  Objection.
20    A    We discussed the timing, the dates of deposition
21    on several occasions.  That took several phone calls.
22    Q    And how long the deposition might last?
23    A    We did discuss that in one of those phone calls.
24    Q    What the deposition might entail or cover?
25    A    Only in a very general way, that it had to do
page 110
1    with this case.
2    Q    Had you ever met any lawyers for Pfizer before
3    your deposition started today?
4    A    Not that I know of.
5    Q    So when I walked in, for example, and I guess we
6    were 15 minutes early or so, it seemed to me that the
7    Pfizer lawyer was already back in your office with
8    you.  Did she get here before I did?
9    A    Yes.
10    Q    You didn't have us both wait outside in the
11    reception area until the deposition started?
12    A    When I first got here our videographer was
13    already here and he and I were back in -- in here
14    trying to arrange the furniture, which was rather
15    difficult, and everybody else seems to have found
16    their way down the hall.
17    Q    Did you have any other phone conversations
18    other -- once you had agreed to set up a time and date
19    for the deposition, did you have any other phone
20    conversations with anyone about this deposition?
21    A    We may have had a phone call to confirm the date.
22    I really don't recall.
23    Q    All right.  So to make sure I've got a fuller
24    sense.  When you said you never had a discussion with
25    this -- of this case with anyone, you had certainly
page 111
1    had multiple discussions about this litigation and
2    your deposition specifically with the lawyers for
3    Pfizer, right?
4    A    In the sense that you mean in terms of setting up
5    deposition appointments, times, discussing the length
6    of the time of the deposition, potentially that kind
7    of thing.
8    Q    Generally what might be covered?
9    A    And what -- whether or not they needed a
10    duplicate copy of records and whether there are any
11    records therefore missing and why there's confusion of
12    that being requested twice.
13    Q    Ma'am, you -- you have very close ties to the
14    pharmaceutical industry, don't you?
15             MS. STEVENS:  Objection.
16    A    It depends on what you mean by the pharmaceutical
17    industry.  I don't have particular close ties with the
18    pharmaceutical industry per se.  I certainly work with
19    many pharmaceutical companies.
20    Q    Well, you're the medical director here at The
21    Memory Clinic, aren't you?
22    A    That's right.
23    Q    And this is a clinic that's funded to some degree
24    by drug company money, isn't it?
25    A    To some degree.
page 112
1    Q    I mean, there are drug companies that -- the
2    pharmaceutical companies pay this clinic to do
3    research, to do work, they contribute to the bottom
4    line of your clinic, don't they?
5             MS. STEVENS:  Objection.
6    A    We do research on drugs in development and we
7    are compensated for the time and effort that it takes
8    to do that.
9    Q    Well, which companies pay your clinic to do drug

```
10  work for them?
11  A    There are so many I couldn't even begin to list.
12  Q    Wyeth?
13  A    That has been.
14  Q    Lilly?
15  A    Sure.
16  Q    Elan?
17  A    Sure.
18  Q    Abbott?
19  A    Sure.
20  Q    Glaxo?
21  A    Sure.
22  Q    Pfizer?
23  A    I think once upon a time, and maybe now that
24  they've bought some of these other companies, but I
25  don't think we have any studies right now that are
page 113
 1  Pfizer particularly.
 2  Q    Certainly something you'd enjoy doing again,
 3  isn't it?
 4  A    What is?
 5  Q    Pfizer work.
 6  A    Not any more or less than any other company and
 7  depending only on quality of the study.
 8  Q    You have received money from pharmaceutical
 9  companies for doing testing of their drugs, right?
10  A    What we do is studies of drugs in development.
11  As I said, we're compensated for the time and effort.
12  Q    Yeah.  Studies are testing, aren't they?
13  A    Yes.
14  Q    And that's not the limit of your ties to
15  pharmaceutical companies?  Your ties run a lot deeper,
16  don't they?
17          MS. STEVENS:  Objection.
18  A    Do they?
19  Q    Well, ma'am, you're supposed to be answering
20  these questions.  I can ask them.
21  A    I don't understand what you mean.
22  Q    Well, when I say your ties run much deeper, you
23  get money for a number of different other angles of
24  pharmaceutical companies, don't you?
25          MS. STEVENS:  Objection.
page 114
 1  A    I have in the past.  I do not now.
 2  Q    Oh, I think even on your resume, your -- your
 3  curriculum vitae you've listed that you give lectures
 4  for pharmaceutical companies, don't you?
 5  A    I have in the past.  I do not now.
 6  Q    But it is something you put on your CV as one of
 7  your --
 8  A    It is on my CV.  I have in the past, I do not
 9  now.
10  Q    You receive money from pharmaceutical companies,
11  either directly as money or in the form of gifts,
12  don't you?
13          MS. STEVENS:  Objection.
14  A    Are you talking about a pen?
15  Q    What do you mean a pen?
16  A    A sticky note?  What do you mean by gifts?
17  Q    Oh, you know.  You know what I mean, don't you?
18  A    No, I don't, unless you're talking about pens or
19  sticky notes.
20  Q    What about meals?
21  A    What about meals?
22  Q    I want to give you a document that we'll mark as
23  Exhibit Number --
24          MR. LANIER:  Do you remember the next one?
25          MS. HEGAR:  Sixteen.
page 115
 1  BY MR. LANIER:
 2  Q    -- 16, and I'll represent to you that we got this
```

```
 3   through a service called PharmaShine.  We asked them
 4   to give us just the list of what they could show you
 5   had received in terms of money from drug companies.
 6   Do you have it in front of you, ma'am?
 7   A    I'm looking at this, yes.
 8   Q    And it shows 2008 from Forest.  Do you know that
 9   Forest drug company?
10   A    Yes.  I know the name of the company, yes.
11   Q    They gave you 29 Bucks for marketing?
12             MS. STEVENS:  Objection.
13   A    I have no idea what that means.
14   Q    What about Novartis, is that a drug company?
15   A    It is.
16   Q    2008 they show amounts of $216 for marketing,
17   $129 for marketing, $98 for marketing.
18   A    I don't know what they mean by marketing.  That
19   may be how they value their pens, it may be how
20   they -- I don't know what they mean.
21   Q    Show me one of those $216 pens Novartis gave you.
22   A    I would love to see one.  I don't know what this
23   means.
24   Q    How about that Cephalon drug company for a
25   speaker fee of $75?
```
page 116
```
 1             MS. STEVENS:  Objection.  Mark, why are we
 2        going through companies?
 3   A    That's really interesting because I don't believe
 4   I've ever spoken for Cephalon.
 5   Q    How about Janssen for food, $27, $142?
 6             MS. STEVENS:  Objection.
 7   A    Well, they certainly weren't feeding me --
```

[117:23] - [128:2]          10/23/2009  Catapano-Friedman, Lisa

page 117
```
23   Q    Ma'am, aside from all the questions that go off
24   to the side, do you recall in 2007 getting a $1,000
25   check or cash from Forest?
```
page 118
```
 1   A    I can imagine what that was for, yes.
 2   Q    What would you imagine that $1,000 payment might
 3   have been for?
 4   A    That might have been for a -- what they call a
 5   speaker training weekend in which we basically go
 6   over -- I'm not even sure what drug this might have
 7   been for.  It might have been for Lamenda.  We go over
 8   the studies that have been done pertaining to the uses
 9   for which they are marketing it --
10   Q    So when you --
11   A    -- and they pay us for our time.
12   Q    When you say you don't do speeches anymore, you
13   mean since 2007?
14   A    I would say probably the last talk I ever gave
15   for anybody was in 2008.
16   Q    Just last year?
17   A    Probably.
18   Q    And so when we look at the CV that you gave us a
19   bit earlier, do you list all of these different
20   lectures on your CV?
21   A    These are not lectures.
22   Q    Speaker training, did you list that?
23   A    When they're -- I don't list speaker training
24   individually.  There's no reason to.
25   Q    Oh, okay.  So, for example, when -- on page 3 of
```
page 119
```
 1   your resume, which is exhibit --
 2             MS. STEVENS:  I didn't mark it.
 3             MR. LANIER:  We didn't mark it.  Why don't
 4        we mark this as Exhibit Number 17.
 5   BY MR. LANIER:
 6   Q    And when we look at the third page of Exhibit
```

```
 7    Number 17 you have pharmaceutical company lecture
 8    bureaus.  Do you see that on your resume?
 9    A    Yes, I know what that is.
10    Q    And you have Forest Pharmaceuticals, right?
11    A    Right.
12    Q    And that's the folks who apparently have given
13    you some checks, including that Thousand Dollars in
14    2007 you were just talking about, right?
15    A    Right.
16              MS. STEVENS:  Objection.
17    BY MR. LANIER:
18    Q    Then you have Astra Zeneca down here, is that
19    right?
20    A    Right.
21    Q    But I don't see -- and you have Pfizer down
22    there, don't you, makers of Neurontin?
23    A    Makers of Aricept.
24    Q    I understand they make a lot of drugs, but one of
25    them is Neurontin, don't -- isn't it?
page 120
 1    A    That may be, yes.
 2    Q    What do you mean may be?  Did you not know that?
 3    A    I do know that, but it has nothing to do with
 4    what I speak about.
 5    Q    Now you have not listed down here some of these
 6    other drug companies -- pharmaceutical companies.
 7    A    I don't do anything for them.
 8    Q    But you don't list on your CV -- by the way, let
 9    me take a back step.  Do you have any clue why these
10    drug companies would be reporting that they're giving
11    you money for food --
12              MS. STEVENS:  Objection.
13    BY MR. LANIER:
14    Q    -- so many times?
15    A    Yes, I do have an idea why.
16    Q    Why would that be?
17    A    Because they -- pharmaceutical representatives
18    are given a budget and as in many corporations, if
19    they don't spend that budget, they lose it.  Among the
20    things they're given is a food budget, so what they
21    often do -- as you've noticed, we're a large
22    establishment, we often have about 20 people working
23    here at any given time, they would bring lunch to this
24    office and that's probably where those food charges
25    come from.  From time to time they would bring lunch.
page 121
 1    Q    So you've got drug company salespeople coming
 2    into your building bringing lunch to the various folks
 3    who work here on a regular basis?
 4    A    Occasionally.  Not on a regular basis.
 5    Occasionally they did.
 6    Q    More than once a year?
 7    A    More than once a year is not a regular basis.
 8    One tends to forget who they are, what they are, or
 9    what drugs they represent on a once or twice or even
10    three-time-a-year basis --
11    Q    Well, let's look at, for example --
12    A    -- but the people who work here --
13    Q    2007.  One, two, three, four, five, six, seven,
14    eight, nine, ten -- eleven.  That's almost once a
15    month, isn't it?
16    A    By whom?
17    Q    Forest.  Every time except twice.  Twice it was
18    Janssen.
19    A    Let's see, in 2007?
20    Q    Yes, ma'am.
21    A    Okay.  Fair number of food.
22    Q    Almost once a month.
23    A    Uh-huh.
24    Q    And that's not the only time the drug companies
25    are in your building, is it?
```

page 122

1             MS. STEVENS:  Objection.
2   A    No, of course it's not.
3   Q    They make sales calls on you, don't they?
4   A    Drug companies try to make sales calls on most
5   physicians.
6   Q    Is that a, yes, Mr. Lanier, they do make sales
7   calls on me?
8   A    Of course, as they do on most physicians.
9   Q    Well, actually, there are a number of physicians
10  who won't let them do that.  Did you not know that?
11  A    I am aware of that, however --
12  Q    Did you know there's -- in fact, there's a
13  movement among physicians saying we don't want the
14  sales reps coming in trying to sell us their drugs?
15            MS. STEVENS:  Objection.
16  A    I am aware of that; however, I don't listen to
17  the sales pitch.  I have them -- I allow them in
18  because they give us samples.  We have many patients
19  who cannot otherwise afford the medications.  We give
20  those samples to our patients.
21  Q    Well, that's not all you get, is it?
22  A    Pardon me?
23  Q    By the way, when the salespeople come in, do you
24  ever give calls to lawyers like me that represent your
25  clients saying someone's in here trying to influence

page 123

1   us in our prescribing habits or testimony?
2   A    I don't allow them to give the sales pitch.
3             MS. STEVENS:  Objection.
4   A    I don't need to.
5   Q    So they come in and hand you samples and you
6   will -- you never have to listen to a sales pitch?
7   A    That's right.
8   Q    And that's true for the rest of your organization
9   as well?
10  A    There's nobody else here they'll talk to.  I'm
11  the only physician.
12  Q    Well, because I got what are called call notes
13  from Pfizer.  Do you know what those are?
14  A    No.
15  Q    Call notes are the notes where they internally
16  recognize that they have come and detailed you on a
17  product.
18  A    Okay.
19  Q    And I'd like to give you two sets of them.  I'd
20  like to give you this one set that I'll mark as
21  Exhibit 18, and these are call notes, ma'am, where
22  they specifically have come and called on you.
23  A    Okay.
24  Q    Then I'm going to give you a second set -- well,
25  I'm just going to let you look at it.  Pass it around.

page 124

1   I don't have extra copies that I know of.  That's
2   Exhibit 19.  And this is where they've called on your
3   building and the other folks who work here.  Do you
4   see that 144 pages?
5   A    I see what it is.  I can't interpret what it
6   says --
7   Q    Well --
8   A    -- because it seems to be mostly in code.
9   Q    In that 144 pages you'll find that 6 of them deal
10  with you and the other 138 deal with other people
11  here.  Did you know that?
12  A    I couldn't even tell that from looking at this
13  much less know anything about this.
14  Q    But you just testified under oath that no sales
15  calls are made here on anyone other than you.
16  A    That's right.  I don't know what they're saying
17  to anybody else and I don't know how they can call
18  them sales calls because my understanding is they

```
19   would not be allowed to.
20   Q    Or maybe they're not supposed to is your
21   understanding.
22   A    That's what I mean by they would not be allowed
23   to.
24   Q    But evidently if -- if the Pfizer records are
25   true, they're certainly making over 100 pages of
page 125
 1   visits that you didn't even think were going on here
 2   in your clinic, aren't they?
 3              MS. STEVENS:  Objection.
 4   A    When the -- whatever drug company rep recently
 5   who came was pregnant with twins and talked with our
 6   receptionist about the having of twins, she may put
 7   that down as a sales call.  I sure don't consider it
 8   one.  It has no impact on anything that's given or
 9   prescribed or handed out here --
10   Q    Well, ma'am --
11   A    -- yet how she records, this I have no idea.
12   Q    -- we've got 144 pages of sales calls.  How many
13   are -- sales calls seem to be on that first page?
14   Two, three?
15   A    If I can interpret -- I can't even interpret what
16   this says.
17   Q    It has call date down the side.  You ought to be
18   able to look and see.
19   A    It has call date, which I assume that means
20   that's a date they showed up in our parking lot.  I
21   don't know what the rest of this means they did.
22   Q    If you look at the call dates there, how --
23   how -- how many -- well, let's take a step back.  Can
24   I have that please?
25   A    Which?
page 126
 1   Q    The one in your left hand.  Thank you.  Out of
 2   this 144-page run I need to note for you, first of
 3   all, that a number of these were actually to the
 4   hospital as opposed to here.  That's where you were
 5   working before you came to this clinic, so I may have
 6   misrepresented this wrongly to you and I want to go
 7   back and fix that.  Are you with me?
 8   A    I understand what you said.  I don't know where
 9   it's going, but I understand what you said.
10   Q    Let me take a step back and say this:  When did
11   you start working in this building at The Memory
12   Clinic?
13   A    This building was built in 2006.
14   Q    And so this was long after your treatment of
15   Mr. Shearer, right?
16   A    That this building was built, yes.
17   Q    So at the time that Mr. Shearer was alive and --
18   and seeing you, even at that time you were getting
19   details or called on by the drug reps, is that fair to
20   say?
21              MS. STEVENS:  Objection.
22   A    True.
23   Q    And this was happening at the hospital over on
24   140 Hospital Drive, right, in Bennington, Vermont?
25   A    My office has been there, yes, as has The Memory
page 127
 1   Clinic.
 2   Q    And at that point in time The Memory Clinic was
 3   also getting substantial calls?
 4   A    I don't know if it was getting substantial calls.
 5   I'm sure if you have stuff that says they were getting
 6   called on, they were being called on.  I don't know
 7   what's substantial.
 8   Q    When did you first start writing prescriptions
 9   for Neurontin yourself?
10              MS. STEVENS:  Objection.
11   A    I can't off the top of my head ever remember
```

```
12   writing one unless it was to continue a prescription
13   somebody already had and needed a refill on.
14   Q    We had an opportunity to look at your
15   prescription writing history on Neurontin, we'll label
16   it as Exhibit Number 20, and we tried to pull it for
17   the time period that was involved in Mr. Shearer's
18   case.  Do you have Exhibit 20 in front of you, ma'am?
19   A    I have this in front of me.
20   Q    And it's got a number of prescriptions you seem
21   to have been writing for Neurontin starting in
22   February of '98 and it goes month by month.  Do you
23   see those?
24   A    I'm trying to -- yes, I see the month.  Uh-huh.
25   Q    I think it seems to peak in September of '01 on
page 128
 1   page 2.  That month you seemed to have new
 2   prescriptions, 17.
```

[128:11] - [150:7]            10/23/2009   Catapano-Friedman, Lisa

```
page 128
11   A    I do have a response I can make to this.
12   Q    Go ahead.
13   A    I don't know what this is either, but what I just
14   said to you was if I had written for Neurontin, it is
15   generally to maintain a prescription somebody else has
16   already started.  Let me explain to you something else
17   that I do.  I'm a psychiatrist for Bennington School,
18   which is a residential therapeutic school for very
19   troubled children.  We've treated hundreds and
20   hundreds, probably thousands over the years that I've
21   done this.  These kids come to us on many medications,
22   often for a variety of medical things, including
23   seizure disorders.  I end up having to maintain those
24   medications.  So it's quite conceivable there are
25   medications -- there are prescriptions for Neurontin
page 129
 1   that I have written.
 2   Q    By the way, I couldn't help but notice as we sit
 3   here, to your right you've got a little notepad with a
 4   pen?
 5   A    Uh-huh.
 6   Q    Is that one of those freebies from the drug
 7   companies?
 8   A    Sure is.
 9   Q    Which drug company gave you that one?
10   A    That would be Forest.
11   Q    Forest?
12   A    Uh-huh.
13   Q    And that's a Forest notepad?
14   A    They seem to match.  Yes.
15   Q    Okay.  Then the other thing that I noticed as you
16   were reading through your chart -- your notes -- y'all
17   call your notes a chart sometimes, don't ya?
18   A    Sure.
19   Q    I noticed when you were reading through your
20   chart or your notes that you were even writing those
21   on oftentimes note pads that are put out by the drug
22   companies?
23   A    I guess so.
24   Q    Zyprexa by Lilly.  That's the -- one of the drugs
25   you kept trying to -- to prescribe for Mr. Shearer,
page 130
 1   isn't it?
 2   A    Uh-huh.
 3   Q    Is that a yes answer?
 4   A    Yes.  Sorry.
 5   Q    That's okay.  Uh-huhs and uh-uhs read a lot
 6   alike.
 7   A    I understand.
 8   Q    So I guess Lilly would give you Zyprexa note pads
```

```
 9   and you'd be looking at those while you were writing
10   these notes trying to decide whether or not to write a
11   Zyprexa prescription?
12              MS. STEVENS:  Objection.
13   BY MR. LANIER:
14   Q    Is that right?
15   A    They would be hoping that.  Quite honestly, I
16   don't even see it anymore.
17   Q    Well, I know you've got paper that doesn't have
18   it because a few pages of your notes are actually
19   written on pages without it.
20   A    True.
21   Q    Then Zoloft, I noticed the Zoloft page.  That's a
22   Pfizer drug, isn't it?
23   A    It is.  I didn't even know there was a Zoloft
24   page.
25   Q    Yeah.  The Zoloft page is the one that has your
page 131
 1   last entry for Mr. Shearer on it.
 2   A    Okay.
 3   Q    It's a Zoloft page.
 4   A    Okay.
 5   Q    Do you see that?
 6   A    I do see that.  Hadn't noticed.
 7   Q    Huh.  Would you agree with me that some drugs can
 8   increase the likelihood of suicide?
 9   A    That's a complicated question, and I'm trying to
10   answer it as accurately as I can.
11   Q    Good.
12   A    I get very caught up in how studies are done
13   because it is what we do, and I get very caught up in
14   what makes a statistically viable study at the very
15   least and what makes a well-done study.  The first
16   problem when you talk about suicide and what drugs
17   cause, they're not looking at suicide, they're looking
18   at suicidal ideation and suicidal behavior, and the
19   results of those what are retrospective studies are
20   influenced by how you define those things.  For
21   example, some studies will decide -- will define
22   suicidal behavior as a teenager who cuts or somebody
23   who bangs their head against the wall.  Some studies
24   are much stricter than that.  So some drugs have been
25   classified, rightly so, as increasing suicidal
page 132
 1   ideation or behavior and some drugs, I believe, are
 2   classified wrongly so.
 3   Q    So does that mean you would agree with me that
 4   some drugs can increase the likelihood of suicide?
 5   A    Some but not necessarily all that are declared to
 6   be.
 7   Q    Okay.  Don't you think it's important that
 8   doctors know what are the potential adverse drug
 9   reactions?
10   A    Yes, I do.
11   Q    In other words, it's important that doctors know
12   what adverse effect drugs might have on a person
13   taking them, true?
14   A    That is the same statement, yes.
15   Q    Because realistically, most every drug that's
16   going to have a positive effect or hopefully have a
17   positive effect will likely have a possibility of also
18   having some negative effect as well, right?
19   A    Every drug.
20   Q    Yeah.  And so it's important for the doctors to
21   understand what those potential negative results of a
22   drug might be?
23   A    Yes.
24   Q    It's important because it would go into the
25   doctor's decision on prescribing the drug, right?
page 133
 1   A    Yes.
```

2    Q    It's also important because it would likely go
3  into the patient's decision on whether or not to take
4  that course of treatment, take the drug, right?
5    A    Yes.
6    Q    You're a psychiatrist and have been for a few
7  decades now, right?
8    A    Yes.
9    Q    As such, I would think if there is a drug that
10 could cause an increase in depression, you would want
11 to know about that, wouldn't you?
12   A    Yes.
13   Q    If there was a drug that affected impulsive
14 control, you would want to know about that, wouldn't
15 you?
16   A    Yes.
17   Q    And I may have made that an adjective when I
18 didn't need it to be, but as a psychiatrist you speak
19 about impulsivity and -- and impulsiveness and the
20 impulses that people have, right?
21   A    Right.
22   Q    And hopefully most people are able to control
23 their impulses to some degree or another, right?
24   A    Hopefully.
25   Q    You may have impulses that you're controlling
page 134
1  right now just because I'm pestering you with these
2  questions.
3    A    I don't know why you'd think so.
4    Q    Because you're human.  There's -- there's -- the
5  chemical and mechanical makeup of the brain can affect
6  how people control their impulses, true?
7    A    Yes.
8    Q    And some people have a greater control of their
9  impulses and other people have lesser control, right?
10   A    Yes.
11   Q    It would be very important when you're treating
12 patients like Mr. Shearer for you to know or his other
13 doctors to know if a drug affects the impulsivity of
14 the brain, right?
15   A    It would be among the important things to know,
16 sure.
17   Q    Especially retrospectively looking back in -- in
18 the sense that you understand and you believe his
19 suicide to have been one of impulse, you would agree
20 that if he were on drugs that remove some measure of
21 his control over impulses, that that certainly would
22 be something important to find out, wouldn't it?
23   A    Yes.
24   Q    And of course you'd want to know if a drug might
25 be a cause of increased suicide, either suicide
page 135
1  ideation or suicide actualization, right?
2    A    Yes.
3    Q    You would want to know if a drug has an effect on
4  serotonin levels in the brain, wouldn't you --
5              MS. STEVENS:  Objection.
6  BY MR. LANIER:
7    Q    -- up or down?
8    A    I am likely to know.  I am likely to know.
9  Whether I would want to know if I were not likely to
10 know, as in somebody who's not a psychiatrist, I can't
11 answer for them.
12   Q    Well, serotonin levels are important in -- in
13 both the way they help a person's or hurt a person's
14 mood or in the way they help or hurt a person's
15 lability, right?
16   A    La -- I'm not sure --
17   Q    Maybe I'm not using the word right.  A labile
18 response, emotional stability.
19   A    They are one of many that can influence that.
20   Q    So it's important to know if a drug's going to

```
21   have an effect on someone's serotonin level, right?
22   A    I -- quite honestly, from a non -- from a
23   nonpsychiatrist point of view I think it is not
24   important for them to know that.  I think it is
25   important for them to know the net result.
```
page 136
```
1    Q    Okay.  I would assume you have even prescribed
2    drugs for the purpose of elevating someone's serotonin
3    in the brain, am I right?
4    A    Yes.
5    Q    And you do that because you felt what needed to
6    be done?  What -- what's -- what were you looking for
7    by increasing the serotonin in their brain?
8    A    Most commonly you're looking to alleviate
9    depression.
10   Q    Would you agree with me it's also important to --
11   for a doctor to know how -- not -- not just the
12   potential adverse reactions to a drug but -- but truly
13   understand what the positive reactions might be?  In
14   other words, how the drug might help, right?
15                MS. STEVENS:  Objection.
16   A    It's certainly important to understand what
17   positive effects you would expect to get from a drug,
18   yes.
19   Q    Now you spoke in -- in answering questions
20   from -- from the -- the other lawyer that there is a
21   difference -- well, let me take a step back.
22        Do you recall being asked questions about when
23   you had written drugs for off-label reasons?
24   A    I recall being asked if I've done so, yes.
25   Q    And you explained why off label prescription
```
page 137
```
1    writing is -- occurs and -- and why you think it's
2    a -- an acceptable thing to be doing, right?
3    A    Basically I think that's what I explained.
4    Q    But wouldn't you agree with me that there's a
5    difference between a doctor choosing to write a
6    prescription for an off-label reason and a drug
7    company marketing that drug for an off-label purpose?
8                MS. STEVENS:  Objection.
9    BY MR. LANIER:
10   Q    Do you understand where I'm coming from?
11   A    Well, certainly in the vocabulary there is a
12   difference, but I'm not sure what kind of difference
13   you're referring to.
14   Q    So in your practice drug companies will just as
15   readily market their drugs off label as you will write
16   them off label?
17   A    No.
18                MS. STEVENS:  Objection.
19   BY MR. LANIER:
20   Q    Because the truth is, while you might write a
21   prescription off label, you understand drug companies
22   aren't allowed to market that to you off label?
23   A    Of course I understand that.
24   Q    They're not allowed to promote it off label?
25   A    I understand that.
```
page 138
```
1    Q    They're not allowed to suggest to you to write it
2    off label?
3    A    Of course.
4    Q    They're not allowed to pay you or anybody else to
5    publish a study for off-label uses?
6    A    I'm trying to think what that actually means.
7    I'm -- I'm really not sure what that means because --
8    or what the truth of that is because if you're doing a
9    study of a drug in development, you are studying it
10   for what are then currently off-label uses and that
11   will get published presumably.
12   Q    Okay.  All right.  Let's talk about Hartley
13   Shearer for a little bit.  You saw Mr. Shearer for
```

14   over a year, right?
15   A    Yes.
16   Q    In fact, I guess almost two years of visits?
17   A    Yes.
18   Q    And you are trained in suicide detection and
19   seeing the signs of suicide, right?
20   A    I'm not sure what that means, trained in suicide
21   detection.  There's a general acknowledgment that it's
22   a very hard thing to predict.
23   Q    Well, you're trained in trying to detect signs or
24   symptoms of suicidal behavior, aren't you?
25   A    We're trained to look for them.  Whether we're
page 139
 1   any better at detecting them than any other physician
 2   is an interesting question.  There's a lot of
 3   argument.
 4   Q    Okay.  So you don't think that you are any better
 5   at detecting signs of suicide potential than your
 6   average run-of-the-mill doctor?
 7   A    What I think about me compared to the average
 8   run-of-the-mill doctor may be different from the
 9   general population of psychiatrists and physicians.
10   Q    But I'm not asking about the general population,
11   I was asking about you.  I said you are trained either
12   through school, through on-the-job training, through
13   personal life experiences, you personally have a
14   familiarity with suicide potential in -- in people,
15   right?
16   A    I do have some familiarity, yes.
17   Q    And you have training in that, don't you?
18   A    I have training in how to ask and what to look
19   for.
20   Q    And you have certain responsibilities when you
21   perceive suicidal potential, don't you?
22   A    Yes.
23   Q    They're put out by the medical licensing board or
24   are they put out by the state?  Are they put out by
25   your ethics provisions?  Where do they come from?
page 140
 1   A    They're put out by publications of standards of
 2   care, in our case done largely by the American
 3   Psychiatric Association.
 4   Q    And when you perceive suicide potential or you
 5   have concerns about suicide, what are you supposed to
 6   do?
 7   A    It depends so much on the circumstance and the
 8   person.  That would be impossible to generalize.
 9   Q    If you believe that someone is a danger to
10   themselves, might kill themselves, wouldn't you agree
11   you have a duty to -- to warn?
12   A    In I think every state that I've ever practiced
13   in there has to be a clear and present danger, which
14   means they basically have to have done something or be
15   about to -- to jump off the figurative bridge.
16   Q    Well, that's a clear and present danger if --
17   A    That you have to do something.
18   Q    Then you have to do something.  But, I mean,
19   aside from that, if you've got a client, a patient,
20   who's sitting on your sofa and you believe that that
21   person might be a danger to themselves, don't you have
22   a duty to at least warn them or talk to them about it?
23   A    Do you mean if I think they are contemplating
24   suicide?
25   Q    Yes, ma'am.
page 141
 1   A    I will talk to them about it.
 2   Q    See, I'm trying to understand.  Did you say that
 3   you were concerned that Hartley Shearer was suicidal
 4   once his one art project was over in November --
 5   A    No.
 6   Q    -- of '01?

```
 7   A     No.  I said his wife and I were concerned that he
 8   would decompensate.
 9   Q     That's very different than being suicidal, isn't
10   it?
11   A     It is.
12   Q     You didn't think he was suicidal, did you?
13   A     At that point, no.
14   Q     If you had thought he was suicidal, surely you
15   would have talked to him or talked to his wife about
16   it, wouldn't you?
17   A     Yes.
18   Q     And you never did, did you?
19   A     He was never suicidal when I knew him.
20   Q     Okay.  So you -- now during the process of the
21   time you treated Mr. Shearer would you -- you -- you
22   believe he was depressed for most of that time or some
23   of that time?
24   A     I thought he was mildly depressed for a brief
25   part of that time.
```
page 142
```
 1   Q     Okay.  You never diagnosed him as chronically
 2   depressed clinically?
 3   A     Well, there's a diagnosis called dysthymic
 4   disorder which is -- it's a low grade depression, sort
 5   of low -- liken it to a low grade fever, and like a
 6   low grade fever, it can come, can go, can get worse,
 7   not.  There are probably times where I might have said
 8   he had that.
 9   Q     One of the things that I noticed looking through
10   your medical records is that I did not have the
11   billing records for him, for Hartley Shearer.
12   A     Oh, I -- I didn't realize that.
13   Q     Yeah.  Would those be available in his chart?
14   A     No.  I don't keep them in the chart.
15   Q     But you would have them on file here?
16   A     No, I don't have them on file here.  This was a
17   long time ago.  Those files are --
18   Q     Are long gone?
19   A     They're not gone.  They are very much elsewhere.
20   I don't have them here.
21   Q     How would I go about finding those?
22   A     You would have to request them from me.  I, quite
23   honestly, thought I had sent them when they were
24   initially requested.
25   Q     They're not in my copy and I looked at the copy
```
page 143
```
 1   of your records that --
 2   A     When Finkelstein and partners had originally
 3   requested the records, that was the original request,
 4   in 2008 or something like that, I thought I had sent
 5   them then.
 6   Q     Yeah.  And I got those records from them and did
 7   not see them so perhaps what would be the -- the -- if
 8   I have a service contact you to try and -- and do
 9   that, would that be okay?
10   A     You could do it directly.  As far as -- I don't
11   know what the proper procedure is as long as there's a
12   release for information that accompanies it.
13   Q     Let me tell you why I'm asking and maybe I'm
14   barking up a bad tree but -- but past experience has
15   indicated to me when you're charging back Blue
16   Cross/Blue Shield or someone like that, that you have
17   to put a -- a -- a diagnosis code or something for the
18   charge?
19   A     When you submit the claim, yes.
20   Q     And so, for example, I see on your shelf now it's
21   the DSM-IV TR.  I guess back then it was probably the
22   DSM-III or something?
23   A     No, it was DSM-IV.
24   Q     Okay.
25   A     It's been around a long time.
```

page 144
1  Q     Okay.  I'm getting old then because I can --
2  A     Yeah, I remember DSM-III also.
3  Q     But don't -- don't the DSMs generally have the
4  coding system --
5  A     Yes.
6  Q     -- so that I could go back and look?
7  A     Yes.  Yes.
8  Q     So your -- to the best of your memory your
9  diagnosis of Mr. Shearer was that he was mildly
10  depressed, kind of like a low grade fever?
11  A     At some points.
12  Q     And then -- at some points.
13  A     Yeah.
14  Q     And then also that he had anger issues, would
15  that be fair to say?
16  A     Yes, although that's not a diagnosis per se.
17  Q     Yeah.  That's -- that's an observation, is that
18  what you call it?
19  A     That's part -- no.  That's part of a personality
20  construct which leads to a different kind of
21  diagnosis.
22  Q     And you never diagnosed him with a personality
23  disorder, did you?
24  A     I did.  I don't bill for that.
25  Q     Okay.  Which -- which personality disorder did
page 145
1  you assign?
2  A     Narcissistic personality disorder.
3  Q     I didn't see that in your notes anywhere.
4  A     I don't write diagnoses in my notes unless I am
5  sending my notes to another physician and then I will
6  add that for their information, but I don't need to
7  write it for myself.
8  Q     Would the narcissistic personality disorder be
9  shown on the billing records perhaps?
10  A     No.  I usually only put the Axis I diagnosis;
11  that's an Axis II diagnosis.
12  Q     Right.  Now you said that suicidal ideation was
13  very, very common.  I think you used two verys.  You
14  might have used three.
15  A     I might have.
16  Q     Suicidal ideation, that's -- that's the -- the
17  idea or -- or the consideration of suicide as opposed
18  to an actual attempt or effort, is that fair?
19  A     That's right, yes.
20  Q     And when you said suicidal ideation is very, very
21  common, you're referencing in terms of your practice
22  and what you see, is that fair?
23  A     No.  I'm referencing in terms of human nature.
24  Q     Oh, the whole gamut, whether they come to sit on
25  your sofa or not?
page 146
1  A     Right.
2  Q     I never saw a note that said Hartley Shearer had
3  suicidal ideation.
4  A     Right.
5  Q     Did you ever make note that he had suicidal
6  ideation?
7  A     No.
8  Q     In fact, one of the notes that I saw from you was
9  that he was frustrated and upset because he wanted to
10  live, right?
11  A     In essence that's what the note said.
12  Q     Has it been your experience and -- and
13  understanding that most people who commit suicide have
14  experienced suicidal ideation before the time they
15  finally act upon it?
16        MS. STEVENS:  Objection.
17  A     It might be a second before.
18  Q     Okay.  But what I'm driving at is if we were to

19   look at risk factors for suicide or things that might
20   concern you and make you think it's a potential, one
21   of them would certainly be suicidal ideation, wouldn't
22   it?
23   A    It is a risk factor, yes.
24   Q    In other words, if you've got someone in here who
25   says I think about killing myself often, the red

page 147

1    light, at least the yellow light goes off in your
2    brain to start looking for the other signals, right?
3                 MS. STEVENS:  Objection.
4    A    Sure.
5    Q    All right.  Did you find Hartley Shearer to be a
6    nice gentleman in spite of his anger issues?
7    A    Nice?  It's not a word I use about people.  It's
8    a little too nondescriptive.  I could say other things
9    that are positive but --
10   Q    Well, tell us some of the positives about him --
11   A    -- nice doesn't --
12   Q    -- because I haven't heard them yet.
13   A    He was very engaging.  Certainly very bright.
14   When he was in a mood, had a good sense of humor.  And
15   then some of his characteristics, it depends on how
16   you feel about them, that he was very driven, very
17   goal oriented.  I happen to find those positive
18   characteristics.
19   Q    He had been married 33 years.  That's -- that's,
20   some would say, an accomplishment today.  Would you
21   agree?  That's a long time to stay -- stay hitched as
22   we say in Texas.  Isn't that fair to say?  I mean, you
23   see a lot of people.  I assume you see a lot of
24   marriages that crumble.
25   A    I do.

page 148

1    Q    And yet he and Linda were in here because they
2    wanted their marriage to be better?
3    A    That's right.
4    Q    And didn't you always believe that Mr. Shearer
5    was giving his best efforts, it's just his best
6    efforts weren't always good enough?
7    A    Yes, I did think he gave his best efforts.
8    Q    And that drive that you saw in him you also saw
9    as he was trying to dig to the roots of the causes
10   because he wanted to figure out how to take care of
11   this anger issue?
12   A    Yes.  He tried hard.
13   Q    Now there was a -- perhaps an implication made
14   about the changes in mood in Mr. Shearer after he
15   started Neurontin in the questioning that were asked
16   by the Pfizer lawyer, and I want to hone in on that
17   for a minute.  Are you with me?
18   A    I'm with you.
19   Q    All right.  You've never had the benefit of
20   reading the other medical records that applied to
21   Mr. Shearer specifically during that time period where
22   he started on Neurontin, have you?
23   A    No.
24   Q    So the several months you didn't see him, you've
25   not read the records to see how he was reacting to the

page 149

1    drug and what he thought it might be doing to him
2    mentally, is that fair to say?
3    A    That's fair to say.
4                 MS. STEVENS:  Objection.
5    BY MR. LANIER:
6    Q    In fact, I noted that your records didn't always
7    show that he was on Neurontin when he would give you a
8    list of medications.  Remember that?
9    A    Yes.  My records showed what he told me he was
10   on.
11   Q    Okay.  So you may not have been aware that he was

12    on Neurontin that whole time period?
13    A    I may not have been.
14    Q    Have you ever seen the prescription records to
15    see that he was renewing his Neurontin prescription on
16    a regular monthly basis?
17    A    No.
18    Q    So the jury should never take your testimony to
19    say that you're saying Neurontin affected him mentally
20    positively or mentally negatively because you've not
21    made that assessment, is that fair?
22    A    That's fair.
23    Q    And you're not making an assessment whether or
24    not Neurontin helped his impulsivity control or hurt
25    his impulsivity control?  That's not your testimony
page 150
1    either way, is it?
2    A    That's right.
3    Q    And you're not testifying either way on whether
4    or not Neurontin was a cause of his suicide or not a
5    cause?  That's outside of your testimony as well,
6    fair?
7    A    That's fair.

[157:25] - [159:25]          10/23/2009  Catapano-Friedman, Lisa

page 157
25    Q    Ma'am, you said in questions from the Pfizer
page 158
1    lawyer that you don't listen to sales reps.  Remember
2    that testimony?
3    A    Yes.
4    Q    Would you agree with me that not all doctors are
5    as diligent, maybe, as you in that regard?
6              MS. STEVENS:  Objection.
7    A    I can't speak for -- I haven't been in any other
8    doctor's office.
9    Q    Okay.  So -- I mean, doesn't it make sense to you
10    that drug companies wouldn't spend all of this money
11    on these thousands of people in the sales force if the
12    people truly were nothing more than delivery men and
13    delivery women for samples --
14              MS. STEVENS:  Objection.
15    BY MR. LANIER:
16    Q    -- and tablets and pens?
17    A    I -- I have to laugh because it would sound
18    absurd, that they were that, and at this point that's
19    basically what the pharmaceutical companies seem to
20    have recognized that they are and they're getting rid
21    of their sales forces.
22    Q    What make -- have you not seen where Pfizer --
23    what Pfizer's done with their sales force lately?
24              MS. STEVENS:  Objection.
25    A    I'm not privy to the latest thing, but I had
page 159
1    heard they were slashing it.
2    Q    Did you ever have an opportunity to read any of
3    the materials where the Pfizer sales force talked
4    about how they have been driven to market Neurontin
5    specifically off label?
6              MS. STEVENS:  Objection.
7    A    I can't say I've read it from that angle.
8    Q    Okay.  Have you come across any of the data from
9    the -- the actual people within the company that were
10    marketing Neurontin who would wage the big campaigns
11    to, quote, kick A-S-S in the northeast division, get
12    out there and get the scripts up and what they were
13    doing to get doctors to write more prescriptions?
14              MS. STEVENS:  Objection.
15    A    I don't think I've been privy to any of their
16    marketing strategies.
17    Q    Next issue.  You made a reference to the fact

18  that you think drug companies should publish all
19  studies, even those with negative results, is that
20  fair to say?
21  A   Yes.
22  Q   Are you becoming more aware of the fact that
23  historically drug companies have not always been
24  forthcoming with those studies?
25  A   I am aware of that.

[160:3] - [163:11]      10/23/2009  Catapano-Friedman, Lisa

page 160
 3  Q   In fact, that was what Dr. Egilman was initially
 4  brought to task over in the Zyprexa litigation was his
 5  taking public private studies that had never been
 6  disclosed.  Did you know that?
 7          MS. STEVENS:  Objection.
 8  A   I thought he was brought to task for violating a
 9  gag order.
10  Q   It wasn't a gag order, it was a confidentiality
11  agreement that the drug company had wrangled from the
12  lawyers because the drug companies wouldn't give up
13  those private studies to the lawyers --
14          MS. STEVENS:  Objection.
15  BY MR. LANIER:
16  Q   -- until the gag -- until the confidentiality
17  order had been signed.  Did you know any of that?
18  A   I stand corrected about my understanding.
19  Q   Okay.  I mean, does -- if -- if -- as a public
20  health official, if you came into possession of
21  studies that indicated there is a serious public
22  health risk, if you came into those with an agreement
23  that you would keep them confidential, never
24  suspecting that they might truly form a grave public
25  risk, would you make those studies public?
page 161
 1          MS. STEVENS:  Objection.  Mr. Lanier,
 2              she's not a public health official.  What are
 3              we doing here?
 4  A   It's so speculative I can't even answer because I
 5  can't really imagine the situation.
 6  Q   Okay.  Are there times where an agreement you
 7  make to keep something confidential gets trumped by a
 8  greater concern over safety for people?
 9          MS. STEVENS:  Objection.
10  A   It certainly happened when I was a teenager.
11  Q   And it would probably happen even today if you
12  felt someone was a serious grave risk either for
13  themselves or someone else, the confidentiality that
14  you keep for that person might have to be breached,
15  true?
16  A   That's a little difficult to speculate on,
17  something that isn't tangible to me.
18  Q   Well, no.  I mean, you've got a -- a code that
19  says if someone presents a clear and present danger to
20  someone else, you will step over the confidentiality
21  you have to try and prevent the danger.
22  A   Well, actually, confidentiality is waived.  It's
23  not that you're breaching confidentiality, it is
24  automatically waived in that situation.
25  Q   Waived from your perspective, though maybe not
page 162
 1  from your client's?
 2  A   No, they understand that.  They are told that by
 3  me.
 4  Q   You tell every client that in the beginning, if
 5  I -- if you say something that I perceive to be a
 6  clear and present danger to you or someone else, you
 7  no longer have confidentiality?
 8  A   If it's a -- if it's a potential issue.
 9  Q   Were you aware of the unpublished studies on

```
10  Neurontin before Dr. Egilman referenced them in his
11  letter to you?
12          MS. STEVENS:  Objection.
13  A    I was not aware of them from his referencing
14  because I didn't read what he wrote.  Was I -- was I
15  aware of unpublished studies?  Was I aware -- I'm not
16  sure what you're asking me.
17  Q    Okay.  I'm just wondering if you had any
18  knowledge about any unpublished studies that were done
19  on Neurontin.
20  A    I certainly don't have any personal knowledge of
21  them.
22  Q    Would you agree with me it's important that drug
23  companies publish all studies, good, bad, and ugly?
24  A    Well, that is what I said, yes.
25  Q    All right.  Now when you do studies for drug
page 163
1  companies, who controls the data in your studies?
2  A    I'm not sure what you mean by controls the data.
3  Q    When you come up with data as a result of the
4  study, you put your data group together, do you
5  control that or do you -- is it the property of --
6  A    Do you mean do we analyze it?
7  Q    -- of the drug companies?  Yes, ma'am.
8  A    We do not analyze it.
9  Q    You collect that data and you just pass that data
10  on to the drug cdmpany?
11  A    That's right.
```

[163:21] - [165:25]     10/23/2009   Catapano-Friedman, Lisa

```
page 163
21  Q    When Ms. Stevens asked you some questions about
22  your discussions you had with lawyers and whether or
23  not they were limited to the scheduling of your
24  deposition and -- and the production of the records,
25  do you remember that?
page 164
1  A    Yes.
2  Q    I need to probe you a little bit more on that
3  please, okay?
4  A    Okay.
5  Q    A partner of Ms. Stevens said in open court that
6  you believed that Dr. Egilman had tried to influence
7  your testimony.  How did he get that information if
8  you never had a discussion about that with anyone?
9          MS. STEVENS:  Objection.
10  A    I can't say that I would believe that.  I have no
11  idea.
12  Q    In fact, the partner for Ms. Stevens said in open
13  court that you had told the Pfizer firm -- law firm
14  that you had felt Dr. Egilman was trying to influence
15  your testimony.  Did you have that kind of discussion
16  with them?
17  A    I might have said when I called Catherine to ask
18  what should I do with this material that it concerned
19  me because I didn't understand why I would be getting
20  this and it concerned me that that's what he was
21  trying to do.
22  Q    Would you have felt objectionable if your patient
23  sent one of their doctors over with some materials to
24  talk to you about?  I don't understand.
25          MS. STEVENS:  Object to the form.
page 165
1  A    I don't understand that.
2  Q    You understand Dr. Egilman works ultimately for
3  your patients?
4          MS. STEVENS:  Objection.  Objection.
5  A    No, I don't understand that either.
6  Q    You understand Linda Shearer is my client?
7  A    I gather that's so, yes.
```

```
 8   Q    And Dr. Egilman works for me in this case.
 9   A    I understand he works for you, yes.
10   Q    In the representation I'm giving to Linda
11   Shearer.  And that's -- that's who we work for.
12   A    Yes.  I understand that.
13   Q    Okay.  By the way, you were given an exhibit,
14   Number 12, that was one of these nice little blowups
15   with typed versions of your notes.
16   A    Okay.
17   Q    And it was the blowup that says that H's death is
18   surreal but feeling relieved, talking about Linda?
19   A    Yes.
20   Q    Very involved in work.  Very resilient.  It's
21   dated February 22nd, '02?
22   A    Yes.
23   Q    You explained that, but we never had you explain
24   the follow-up note.  Ms. Stevens didn't ask you about
25   that.  April 25th, '02.  Do you have that note in
```

[4:18] - [6:2]          10/28/2009  Consolini, Paula

```
page 4
18   Q.    I want to cover some other things in
19   addition to that but first I just want to start by
20   going over that discussion.  As I understand it, you
21   met the Shearers in 1997 when you moved to Pine
22   Cobble Road.  Is that right?
23   A.    Yes.
24   Q.    And they lived across the street from the
page 5
 1   house that you were looking at and the house that
 2   you now live in.  Is that right?
 3   A.    The house that we built, yes.
 4   Q.    Okay.  And you socialized with them on
 5   occasion?
 6   A.    Yes.
 7   Q.    Can you describe that?  In what ways did
 8   you socialize with them?
 9   A.    We went to their house for dinner parties,
10   usually -- Went to their house for dinner parties.
11   Q.    About how often would you do that?
12   A.    I don't recall.  A few times a year
13   potentially.
14   Q.    What would the occasions be?  I mean, just
15   neighborhood things or gatherings for some purpose?
16   A.    Usually college-associated functions.
17   Q.    And Jim, who I take it is your husband.
18   Is that right?
19   A.    Yes.
20   Q.    He's employed by the college?
21   A.    Yes.
22   Q.    Do you work at the college also?
23   A.    Yes.
24   Q.    And what do you do at the college?
page 6
 1   A.    I'm the coordinator of experiential
 2   education.
```

[9:19]          10/28/2009  Consolini, Paula

```
page 9
19   Q.    Was Hartley an athletic, intense guy?
```

[9:23] - [10:7]          10/28/2009  Consolini, Paula

```
page 9
23   A.    I guess one could say that.
24   Q.    Set aside athletic for the moment.  In
page 10
 1   what ways was Hartley intense?
 2   A.    I would say he was intensely smart and --
```

```
 3   Well, that's about it.  I would say he was intensely
 4   smart.
 5        Q.    Was he intensely -- Was he intense about
 6   physical activity?
 7        A.    One could say that.
```

[13:11] - [13:16]        10/28/2009   Consolini, Paula

```
page 13
11        Q.    And you told the investigators that
12   Hartley was popular with the students.  Is that
13   right?
14        A.    I don't remember if I said that, but it
15   was my understanding that he was popular with
16   students.
```

[14:20] - [15:20]        10/28/2009   Consolini, Paula

```
page 14
20        Q.    To your knowledge, did Hartley volunteer
21   at the Berkshire Farm Center?
22        A.    I believe he did.
23        Q.    Do you know what he did there?  Let me
24   back up.  What is the Berkshire Farm Center?
page 15
 1        A.    It's a center for at-risk youth, a
 2   teaching -- a school.
 3        Q.    And do you know what Hartley did there?
 4        A.    Not specifically.
 5        Q.    Do you know if he -- Do you have an
 6   impression of whether it was important to him?
 7        A.    Yes.  I think it was.
 8        Q.    And how did you come by that impression?
 9        A.    From hearing him talk enthusiastically and
10   passionately about it.
11        Q.    To your knowledge, Hartley was in good
12   health prior to his stroke.  Is that right?
13        A.    To my knowledge.  Actually --
14        Q.    And it is -- I'm sorry?
15        A.    Yes, yes.
16        Q.    And it is your understanding that the
17   stroke occurred in connection with Hartley's having
18   elective surgery to fix a heart valve problem.  Is
19   that right?
20        A.    Yes.
```

[29:2] - [29:14]        10/28/2009   Consolini, Paula

```
page 29
 2        Q.    How did you learn about -- Well, let me
 3   back up.  On the day that Hartley committed suicide,
 4   what was the first indication you saw that there was
 5   a problem at the Shearer household?
 6        A.    I saw -- I saw an ambulance outside the
 7   house or police vehicle.  I don't remember which.  I
 8   saw some official vehicle outside the house.
 9        Q.    And what did you make of that?
10        A.    I knew that -- Well, I thought there might
11   be some problem, must be some problem.
12        Q.    Beyond that, did you have any inkling that
13   Hartley might have attempted suicide?
14        A.    No.
```

[33:10] - [35:15]        10/28/2009   Consolini, Paula

```
page 33
10        Q.    Before his -- Well, I asked you a bit
11   about this earlier, but just very broadly:  How
12   would you describe Hartley Shearer in the period
13   before his stroke?
```

```
14      A.    I would describe Hartley Shearer as a
15 talented, intelligent person.
16      Q.    How would you describe what kind of
17 personality he was?
18      A.    I would describe him as intense.
19      Q.    Intense about what?
20      A.    About his work, his life.
21      Q.    Intense about his life.  Intense about
22 what aspects of his life?
23      A.    His work primarily.
24      Q.    Does that mean that his work was important
page 34
 1 to him?
 2      A.    Yes.
 3      Q.    And when you say work, what work do you
 4 have in mind?
 5      A.    His artistic work.
 6      Q.    Anything else?
 7      A.    Well, I include within that realm of
 8 artistic work his teaching, his art school teaching.
 9      Q.    And when you say teaching, I'm sorry to
10 keep slicing it finer, when you say teaching, does
11 that include his work at the Berkshire Farms?
12      A.    Sure, I would include that; his mentoring
13 work as well.
14      Q.    How would you describe his physical
15 appearance?
16      A.    When?
17      Q.    Before the stroke.
18      A.    He was athletic, I would say.
19      Q.    And then how would you describe his
20 physical appearance after the stroke?
21      A.    He lost partial use of his arm, part of --
22 Part of his body had reduced function.
23      Q.    Before the stroke, was he careful about
24 his appearance?
page 35
 1      A.    Yes, I say so.
 2      Q.    So careful about the way he dressed?
 3      A.    Yes.
 4      Q.    Careful about keeping fit?
 5      A.    Yes.
 6      Q.    And then after, after the stroke, how did
 7 he deal with the -- Well, after the stroke, did he
 8 put on weight?
 9      A.    I don't recall.
10      Q.    Did he dress the same after the stroke as
11 before?
12      A.    No, not exactly.
13      Q.    What were the differences?
14      A.    I think his clothing was somewhat more
15 loose-fitting.
```

[59:9] - [59:19]          10/28/2009   Consolini, Paula

```
page 59
 9      Q.    In the time between his stroke and his
10 suicide, what were your impressions of his mental
11 state?
12      A.    That he was again somewhat frustrated by
13 his limitations but also enthusiastic, continuing to
14 be enthusiastic about the work with the students
15 that he had worked with.
16      Q.    That was based on your observation and on
17 things that Linda Shearer mentioned.  Is that fair?
18      A.    And conversations with Hartley when I saw
19 him.
```

[6:5] - [6:17]           3/22/2008   Desai, Paresh

```
page 6
```

```
                         5              Q.    Thank you very much.
                         6              Q.    Mr. Desai, what is your educational
                         7        background?
                         8              A.    I have an engineering degree and MBA
                         9        in marketing, two degrees, two MBAs.
                        10              Q.    Where did you go to college?
                        11              A.    For which degree?
                        12              Q.    For your very first degree, your
                        13        first post-high school degree.
                        14              A.    Was Gujarat University in India.
                        15              Q.    And what was the degree that you
                        16        received in India?
                        17              A.    Chemical engineering.
```

[7:11] - [7:16]        3/22/2008      Desai, Paresh

```
                        page 7
                        11              Q.    Following your degree in chemical
                        12        engineering, what was the next degree, if any,
                        13        that you attained?
                        14              A.    I have an MBA in marketing from the
                        15        same university in India, and an MBA in marketing
                        16        from Syracuse University.
```

[9:10] - [9:13]        3/22/2008      Desai, Paresh

```
                        page 9
                        10              Q.    Mr. Desai, is it fair to say that at
                        11        some point you became employed by Warner
                        12        Lambert?
                        13              A.    Yes.
```

[10:8] - [10:10]       3/22/2008      Desai, Paresh

```
                        page 10
                         8              Q.    What were the years in which you
                         9        were employed by Warner Lambert?
                        10              A.    From '89 to '97.
```

[10:11] - [10:14]      3/22/2008      Desai, Paresh

```
                        page 10
                        11              Q.    When you first became employed by
                        12        Warner Lambert in approximately 1989, what was the
                        13        position that you had at that time?
                        14              A.    Sales representative.
```

[10:15] - [10:24]      3/22/2008      Desai, Paresh

```
                        page 10
                        15              Q.    And is it fair to say that Warner
                        16        Lambert was a pharmaceutical company?
                        17              A.    Pharmaceutical was part of the work
                        18        that they did, yes.  I wouldn't say it's a
                        19        pharmaceutical company.
                        20              Q.    Okay.  And when you took your job in
                        21        approximately 1989 as a sales representative, what
                        22        type of product was it that you were going to be
                        23        selling?
                        24              A.    Prescription medications.
```

[11:25] - [16:7]       3/22/2008      Desai, Paresh

```
                        page 11
                        25              Q.    To the best of your understanding,
                        page 12
                         1        do you have a recollection of Warner Lambert
                         2        launching a drug product called Neurontin?
                         3              A.    Yes.
                         4              Q.    Is it fair to say, to the best of
```

5    your understanding, that was in approximately '93,
6    '94?
7        A.    Sounds about right.
8        Q.    Let's skip up to that time period of
9    '93, '94. And were you still a sales
10    representative at that time for Warner Lambert?
11        A.    Yes.
12        Q.    Did you have a particular position
13    other than sales representative, or was that the
14    name of the position that you had?
15        A.    It's the name of the position.
16        Q.    Describe for me what the duties were
17    of a sales representative at that time.
18        A.    To represent the company within the
19    territory, and promote the use of drugs.
20        Q.    Could you describe for me the
21    training that you underwent to learn how to
22    promote the use of Warner Lambert's drug?
23        A.    There were binders on the disease
24    state and the product that you would learn. Then
25    we take a test on it. And once you pass the test,
page 13
1    you are -- I guess that's a good thing.
2    Otherwise, you would lose your job. And there
3    were some sales skills training.
4        Q.    Was there sales training specific to
5    the actual drug in question as opposed to the
6    disease state?
7        A.    Yes.
8        Q.    Or was there both?
9        A.    Both.
10        Q.    As it pertains to Warner Lambert
11    drug product called Neurontin, do you have a
12    recollection of undergoing training on how to
13    promote the use of Neurontin in the marketplace?
14        A.    I don't have a specific
15    recollection, but I'm sure we did. Because all
16    products we used to do that.
17        Q.    I understand that you don't have a
18    specific recollection. Is it basically your
19    understanding, then, that you would have gone
20    through a similar type of training for Neurontin
21    which would have included binders as you
22    referenced earlier?
23        A.    Yes.
24        Q.    And it would have included
25    information within those binders about the disease
page 14
1    state for which Neurontin should be promoted?
2    Would that be a fair comment?
3        A.    Yes.
4        Q.    And would it have -- would that
5    training have required you to undergo a test?
6        A.    Yes.
7        Q.    And would you have had to pass that
8    test in order to move forward and actually promote
9    that drug on behalf of the company?
10        A.    Yes.
11        Q.    So is it fair to say you passed the
12    test, to the best of your knowledge, although you
13    may not have a specific recollection today?
14        A.    Yes.
15        Q.    Is it fair to say that during your
16    tenure at Warner Lambert in the mid-'90s, you were
17    a territory manager within the Northeast Customer
18    Business Unit?
19        A.    Yes.
20        Q.    What is your understanding of the
21    term "Customer Business Unit," or I understand it
22    has an acronym, CBU. Can you explain to us what
23    that actually is?

```
24          A.    It's -- I guess it rolls up into --
25     you have sales reps that rolls up to a district,
page 15
1      and then district rolls up to CBU, if you want to
2      call that.  And then if it is in Northeast, it is
3      Northeast CBU.  And then all CBUs roll up into the
4      company.
5             Q.    Was there a branch in the hierarchy
6      above the CBU -- let me withdraw that question.
7             Have you ever heard of the acronym
8      ABM, or Area Business Manager?
9             A.    Yes, I have.
10            Q.    Where does the Area Business
11     Manager -- let me rephrase that.
12            Is the ABM an individual?
13            A.    Yes.
14            Q.    In what portion of this hierarchy
15     does the ABM sit?
16            A.    They were different names at
17     different times.  But generally, that would be
18     something that somebody would be, like, a district
19     manager.  So you would have sales representatives
20     reporting in to this ABM or district manager.
21            Q.    With respect to the Northeast CBU,
22     what states were included within that CBU?
23            A.    Don't know for sure.
24            Q.    To the best of your recollection,
25     tell me which states you do remember.
page 16
1             A.    I would say Maine, probably,
2      New Hampshire, Vermont, I guess Massachusetts,
3      New York, portions of it at least.  And when I say
4      the names of the state, it could be portions of
5      the state or the entire state.  Rhode Island,
6      probably, Connecticut, possibly New Jersey.  But
7      I'm not authority on this.
```

[16:12] - [17:5]          3/22/2008     Desai, Paresh

```
page 16
12            Q.    In terms of your position as a
13     territory manager for Warner Lambert, was there
14     ever a distinction with respect to your assignment
15     in terms of whether you were assigned to
16     physicians or whether you were assigned to
17     hospitals and pharmacies?
18            A.    Well, you called on the doctors
19     wherever the doctors are within your geography.
20     If the doctors are in the office, you go to the
21     office.  If the doctors are in the hospital, you
22     go to the hospital.
23            Q.    Do you have a recollection of Warner
24     Lambert having territory managers that were
25     assigned to hospitals and pharmacies, and that
page 17
1      being distinctly separate from going to
2      physicians?
3             A.    There are hospital reps, yes.  I
4      don't remember having people that call only on
5      pharmacies.  And if they were, I would not know.
```

[17:25] - [18:12]          3/22/2008     Desai, Paresh

```
page 17
25            Q.    Was it part of your job to detail
page 18
1      physicians in hospitals while you were employed by
2      Warner Lambert?  And again, this is with respect
3      to Neurontin.
4             A.    Not necessarily.  Because we had a
5      hospital rep who would coordinate between the
```

```
 6        institutions.  And the hospitals that were in my
 7        territory were small community-based hospitals.
 8        So generally I would not go to a hospital, per se.
 9        Because I would be able to see those doctors in
10        the office setting.
11                 So to answer the question, I guess
12        if you say, then I may have.
```

[18:13] - [18:17]          3/22/2008      Desai, Paresh

```
page 18
13                 Q.    And with respect to pharmacies, were
14        there pharmacy reps who you would detail with
15        respect to Neurontin during your employ with
16        Warner Lambert?
17                 A.    I would speak with pharmacists, yes.
```

[19:23] - [20:3]          3/22/2008      Desai, Paresh

```
page 19
23                 Q.    Okay.  When did you end your
24        employment with Warner Lambert?
25                 A.    '97.
page 20
 1                 Q.    And were you ever employed by
 2        Pfizer?
 3                 A.    No.
```

[21:4] - [23:7]          3/22/2008      Desai, Paresh

```
page 21
 4                 Q.    Do you know as you sit there today
 5        whether you ever detailed a physician named Keith
 6        Edwards in Bennington, Vermont?
 7                 A.    I don't recall.  I don't think so.
 8        I don't think I had Bennington as part of my
 9        territory, I believe.
10                 Q.    Do you recall detailing any
11        physician during your employ with Warner Lambert
12        in Bennington, Vermont?  The difference with that
13        question is I left Keith Edwards out of it.
14                 The question is, Did you detail any
15        physicians in Bennington, Vermont during your
16        employ with Warner Lambert?
17                 A.    I may have.
18                 Q.    Did you detail any physicians in
19        Bennington, Vermont on the product of Neurontin
20        during your employ with Warner Lambert?
21                 A.    I may have, but unlikely.
22                 Q.    Why do you say unlikely?
23                 A.    Because I don't recall having
24        Bennington as a part of the territory.  And keep
25        in mind the zip codes always shift.  Sometimes,
page 22
 1        you know, they add five zip codes, sometimes they
 2        take away five zip codes.  So I know I've been to
 3        Bennington.  That's why I'm trying to say I may
 4        have.  I'm not sure.  And sometimes they take away
 5        zip codes and then you don't call on those
 6        doctors.  And if the time frame was very short,
 7        then I would not remember much.
 8                 Q.    Same question, did you detail any
 9        physicians in Williamstown, Massachusetts during
10        your employ with Warner Lambert regarding
11        Neurontin?
12                 A.    I may have, but extremely unlikely.
13                 Q.    Why do you say it was extremely
14        unlikely?
15                 A.    Again, to the best of my memory, I
16        may not remember everything correctly, but there
17        was only one office in Williamstown, as I
```

```
                    18      remember.  And it was like a no-see office.  So
                    19      they would not see reps.  They did not encourage
                    20      any interaction with the physicians.
                    21              So since I do remember that
                    22      Williamstown was part of my territory at certain
                    23      points in time, and I may have stopped by the
                    24      doctor's office.
                    25          Q.      What type of practice was it in
            page 23
                    1       terms of the physician specialty?
                    2           A.      Do not remember.
                    3           Q.      How about Pittsfield, Massachusetts;
                    4       did you ever detail physicians in Pittsfield,
                    5       Massachusetts during your employ with Warner
                    6       Lambert regarding the drug Neurontin?
                    7           A.      Yes.
```

[24:2] - [24:21]        3/22/2008   Desai, Paresh

```
            page 24
                    2           Q.      With respect to Neurontin, all
                    3       right, with respect to Neurontin, while you were
                    4       employed by Warner Lambert, identify for me the
                    5       specialties of the physicians whom you detailed?
                    6           A.      It's very likely I have detailed
                    7       neurologists and primary care physicians.
                    8           Q.      Were there any other specialties at
                    9       that time that you detailed for Neurontin?
                    10          A.      I may have.
                    11          Q.      What other specialties would you
                    12      have detailed for Neurontin other than
                    13      neurologists and primary care physicians?
                    14          A.      It could be any physicians that I
                    15      normally call on.  And if the patients were using
                    16      Neurontin for -- were on Neurontin and the doctor
                    17      may have asked me questions on Neurontin, I may
                    18      have answered questions on Neurontin.
                    19              If I answer a question on Neurontin
                    20      I would say that that was a detail on Neurontin
                    21      for my records.
```

[24:22] - [25:9]        3/22/2008   Desai, Paresh

```
            page 24
                    22          Q.      During your employ with Warner
                    23      Lambert, identify for me all of these types of
                    24      doctors by specialty to whom you distributed
                    25      samples of Neurontin?
            page 25
                    1           A.      Very difficult to recall.  But
                    2       definitely neurologist, primary care physicians.
                    3       So that could be internal medicine, family
                    4       practice, general practice, cardiologist.  Any of
                    5       the specialties that were in the geography at that
                    6       time.  If a doctor were to call us and ask for
                    7       samples, we would give samples.  So it could be
                    8       anybody, any physician who is licensed to
                    9       practice.
```

[26:2] - [26:14]        3/22/2008   Desai, Paresh

```
            page 26
                    2               Mr. Desai, assuming the evidence in
                    3       this case, in accordance with the documents that
                    4       have been provided by defense counsel to
                    5       plaintiff's counsel, is that on or about March 3rd
                    6       of 1995 you detailed Dr. Daniel Sullivan in North
                    7       Adams, Massachusetts, do you have an independent
                    8       recollection of having detailed Dr. Sullivan at
                    9       that time?
                    10          A.      No, I don't.
```

```
                    11              Q.    And as you sit here today, do you
                    12       have any independent memory of detailing
                    13       Dr. Daniel Sullivan at all?
                    14              A.    No, I don't.
```

[27:19] - [28:5]        3/22/2008    Desai, Paresh

```
                    page 27
                    19              Q.    At any time during your employ with
                    20       Warner Lambert, is it fair to say you knew what
                    21       the approved Food and Drug Administration
                    22       indications were for Neurontin during that time
                    23       period?
                    24              A.    Yes.
                    25              Q.    And as you sit here today, up
                    page 28
                    1        through 1997, are you able to tell us your
                    2        understanding of what the approved indications
                    3        were for Neurontin?
                    4               A.    Adjunctive therapy for partial
                    5        seizures.
```

[33:17] - [33:19]       3/22/2008    Desai, Paresh

```
                    page 33
                    17              A.    From 1989 to '87 -- '97.  I'm sorry.
                    18              Q.    Approximately eight years?
                    19              A.    Nine plus years.
```

[33:20] - [34:3]        3/22/2008    Desai, Paresh

```
                    page 33
                    20              Q.    With respect to your training at
                    21       Warner Lambert for keeping track of your details,
                    22       was there a computer system into which you were to
                    23       place proof of your visits to physicians?
                    24              A.    The answer is yes and no.  We had
                    25       paper system for a while and we had computers for
                    page 34
                    1        a while.  But I don't remember what happened when
                    2        and how we did record everything at different
                    3        times.
```

[34:17] - [35:7]        3/22/2008    Desai, Paresh

```
                    page 34
                    17              Q.    Now, with respect to the computer
                    18       process that existed at some time, can you
                    19       describe for me what it was?
                    20              A.    Well, you record information into
                    21       the computer, whether you made a detail, you left
                    22       samples, things like that.
                    23              Q.    Was there an area in the computer
                    24       data where you were to record the discussion, if
                    25       any, that transpired between yourself and the
                    page 35
                    1        physician's office?
                    2               A.    It would record detail, yes, or
                    3        sample.
                    4               Q.    And when you say it would record
                    5        detail, what is meant by that term?
                    6               A.    Detail means that if I spoke to the
                    7        physician about a particular product.
```

[35:8] - [35:21]        3/22/2008    Desai, Paresh

```
                    page 35
                    8               Q.    If you went to a physician, were you
                    9        there to detail him or her on one product, or is
                    10       it entirely possible that you were there to detail
```

```
11        the physician on a number of products?
12             A.    It depends.
13             Q.    It could be either way; right?
14             A.    Yes.
15             Q.    And so how would you reflect the
16        distinction in your sales call notes on the
17        computer?
18             A.    Well, you just check whatever you
19        detail.  If it was Neurontin, then you would say
20        Neurontin.  If it was something else, you would
21        say something else.
```

[36:2] - [37:25]        3/22/2008    Desai, Paresh

```
page 36
 2             Q.    During your employ with Warner
 3        Lambert, did you ever have a medical liaison
 4        accompany you to any of the physicians that you
 5        detailed on Neurontin?
 6             A.    Yes.
 7             Q.    What was your understanding of the
 8        role that a medical liaison played?
 9             A.    The way I understand it is I'm
10        supposed to detail on the approved indication.
11        And if there is any other questions, we are
12        supposed to refer them to Medical Science Liaison.
13             Q.    I didn't hear the last two words.
14        You were supposed to refer them to who?
15             A.    Medical Science Liaison.
16             Q.    And what was the role of the medical
17        science liaison as you understood it?
18             A.    That's all I know, is they would
19        engage the physician somehow.  And I don't know
20        exactly what they would do in terms of their
21        duties.  I guess you should ask them on that.
22             Q.    Identify for me the territories
23        where you detailed physicians for Neurontin and
24        where you utilized a medical liaison?
25             A.    I'm sure I have used them in
page 37
 1        New Jersey for sure.  But I don't remember much
 2        details.
 3             Q.    I'm not asking you about the
 4        details.  I am just asking you to identify the
 5        territory.  I appreciate your telling me
 6        New Jersey.  Tell me some others.
 7             A.    That's all I remember.
 8             Q.    When you say that's all you
 9        remember, is it fair to say that there are other
10        territories other than New Jersey where you
11        utilized a medical liaison and you simply don't
12        remember now?
13             A.    That is correct.
14             Q.    Are you able to tell me
15        unequivocally that you did not use a medical
16        liaison in Bennington, Vermont?
17             A.    I cannot say that.  Bennington, I
18        don't even remember calling on doctors.  I may
19        have, but unlikely.
20             Q.    Similar question.  Are you able to
21        tell me unequivocally that you did not use a
22        medical liaison when you detailed physicians in
23        North Adams, Massachusetts with respect to
24        Neurontin?
25             A.    No, I cannot say that.
```

[38:21] - [39:18]        3/22/2008    Desai, Paresh

```
page 38
21             Q.    Can you describe for me in summary
22        the manner in which you received compensation in
```

```
23        terms of how it was calculated during your employ
24        with Warner Lambert?
25             A.    A salary and commission.
page 39
1             Q.    And describe for me how the
2        commission was calculated.
3             A.    Can't remember.  There was a
4        different system throughout the time.  So --
5             Q.    Do you recall there being any type
6        of in-house competition?
7             A.    Sure.
8             Q.    Can you describe any one of them for
9        me that involved Neurontin?
10            A.    No, I don't remember anything
11       specific about Neurontin sales contest.
12            Q.    Excluding Neurontin, can you
13       describe for me any of the competitions at all?
14            A.    We had sales contests, generally
15       speaking, for the products that are assigned to
16       you.  There are sales contests within district,
17       national sales contests, all kinds of different
18       things happening to motivate the sales reps.
```

[39:19] - [39:24]          3/22/2008   Desai, Paresh

```
page 39
19            Q.    With respect to the discussions that
20       you had with physicians with respect to Neurontin,
21       did you ever provide information to a physician
22       that would affirmatively indicate to them not to
23       prescribe Neurontin for off-label use?
24            A.    No.
```

[40:11] - [40:15]          3/22/2008   Desai, Paresh

```
page 40
11            Q.    Did you ever discuss with physicians
12       during your detailing whether Neurontin was
13       associated with any psychiatric adverse drug
14       experiences?
15            A.    No.
```

[41:11] - [41:15]          3/22/2008   Desai, Paresh

```
page 41
11            Q.    Can you describe for me any of the
12       visual aids or leave-behind pieces that were
13       provided to you with respect to Neurontin?
14            A.    It was such a long time ago, I don't
15       remember.  But I'm sure we had sales aids.
```

[42:3] - [42:7]          3/22/2008   Desai, Paresh

```
page 42
3             Q.    With respect to the visual aids that
4        you don't specifically recall, is it fair to say
5        there were visual aids that were promulgated by
6        your employer?
7             A.    Probably, yes.
```

[42:8] - [43:1]          3/22/2008   Desai, Paresh

```
page 42
8             Q.    Would there visual aids, to the best
9        of your knowledge, that were promulgated,
10       produced, by someone other than your employer?
11            A.    What do you mean?  Other companies
12       use their own sales aids to promote their
13       products.
14            Q.    Understood.  I want to know if you
```

```
            15    possessed --
            16         A.    Would I use somebody -- a
            17    competition's sales aid to promote my drug?
            18         Q.    I don't want to necessarily call it
            19    promote.  I want to know, did you ever process
            20    them and use them as part of your detailing?  By
            21    that, when I say "them," I mean any documents that
            22    were promulgated by someone other than your
            23    employer.
            24         A.    No.  The rules are very clear.  You
            25    have to use the materials, sales materials, that
       page 43
             1    are authorized by the company to use in sales.
```

[44:11] - [44:16]     3/22/2008     Desai, Paresh

```
       page 44
            11                   Would it have been appropriate for
            12    you in accordance with your training by Warner
            13    Lambert to have utilized a reprint that was not
            14    about an approved indication as part of your
            15    detailing?
            16         A.    No.
```

[44:17] - [45:4]     3/22/2008     Desai, Paresh

```
       page 44
            17         Q.    During your employment with Warner
            18    Lambert and when you would detail physicians on
            19    Neurontin, did you ever indicate to any physician
            20    in any way, shape or form that the use of
            21    Neurontin may increase the risk of suicidal
            22    behavior?
            23         A.    No.
            24         Q.    During your employ with Warner
            25    Lambert and during your detailing of physicians
       page 45
             1    for Neurontin, did you ever discuss with these
             2    physicians that Neurontin may increase the risk of
             3    suicidal ideation?
             4         A.    No.
```

[45:23] - [46:10]     3/22/2008     Desai, Paresh

```
       page 45
            23         Q.    During any of the time that you
            24    detailed physicians for Neurontin, did you ever
            25    discuss with them whether patients taking
       page 46
             1    Neurontin should be monitored for notable changes
             2    in behavior that could indicate the emergence of
             3    suicidal thoughts or behavior or depression?
             4         A.    I don't specifically remember.
             5         Q.    With respect to that question, if
             6    that information was not included in the package
             7    insert, is it fair to say you would not have
             8    provided an answer but would have referred the
             9    person to medical information?
            10         A.    Correct.
```

[51:11] - [51:19]     3/22/2008     Desai, Paresh

```
       page 51
            11         Q.    In the event that a physician would
            12    ask you a question about Neurontin that was
            13    entirely about an approved indication, and in that
            14    context wanted to ask you how the drug worked to
            15    treat that indication, how were you trained to
            16    provide an answer?
            17         A.    Whatever mechanism of action,
```

```
                    18        information that we had at that time that we were
                    19        trained on, that's what I would respond to.

[51:20] - [52:5]    3/22/2008 Desai, Paresh
                    page 51
                    20               Q.     Where did you receive the
                    21        information for the mechanism of action for
                    22        Neurontin during the time you were selling it for
                    23        Warner Lambert?
                    24               A.     I want to make sure -- I am very
                    25        clear, I am not saying that I knew how the drug
                    page 52
                    1         worked.  If there was, it was probably learned
                    2         from the training manuals.
                    3                Q.     Would it have been learned from any
                    4         source outside of your company?
                    5                A.     I would not have that information.

[52:24] - [53:3]    3/22/2008 Desai, Paresh
                    page 52
                    24               Q.     Did you learn the mechanism of
                    25        action for Neurontin during your employ with
                    page 53
                    1         Warner Lambert from any other source other than
                    2         Warner Lambert?
                    3                A.     No.

[53:15] - [55:13]   3/22/2008 Desai, Paresh
                    page 53
                    15               Q.     (BY MR. FROMSON:)  Mr. Desai, where
                    16        are you presently employed?
                    17               A.     PharmaNet.
                    18               Q.     How do you spell that?
                    19               A.     P-h-a-r-m-a-N-e-t.
                    20               Q.     What do you do for that company?
                    21               A.     Business development.
                    22               Q.     I'm sorry, I couldn't hear you.
                    23               A.     Business development.
                    24               Q.     What does that mean?
                    25               A.     We sell the company's services.
                    page 54
                    1                Q.     What do you mean by "the company's
                    2         services"?
                    3                A.     PharmaNet is a clinical service
                    4         organization.  We run clinical trials.
                    5                Q.     Do you design the clinical trials?
                    6         How do you get involved with the clinical trial?
                    7                A.     We promote our capabilities and
                    8         experience to our clients.
                    9                Q.     Do you take any part in the design
                    10        of clinical trials for PharmaNet?
                    11               A.     No.
                    12               Q.     Do you take part in any of the
                    13        investigation in terms of the clinical trials that
                    14        go on?
                    15               A.     No.
                    16               Q.     So what is your role?
                    17               A.     I promote our experience and
                    18        capabilities, that we are good at this, we sell
                    19        this and we have experience in this, and that type
                    20        of thing.
                    21               Q.     So is it fair to say you do it in a
                    22        sales representative role?
                    23               A.     Yes.
                    24               Q.     What were the circumstances by which
                    25        you had left Warner Lambert?  In other words, why
                    page 55
                    1         did you leave the job?
```

```
    2              A.    I was looking for other opportunity.
    3              Q.    Why?
    4              A.    I wanted to try something different.
    5              Q.    Was it a money issue?  Was it a
    6      quality of life issue?  Was there anything like
    7      that that led you to leave?  Can you be more
    8      specific than just wanting to try something
    9      different?
   10              A.    I went into a marketing position
   11      with another company.
   12              Q.    What other company?
   13              A.    Bracco Diagnostics.
```

[5:10] - [6:2]          10/28/2009   Epping, Edward

```
page 5
   10      Q.    Good afternoon, Mr. Epping.  Tell us where
   11  you live.
   12      A.    1097 Main Street, Williamstown,
   13  Massachusetts.
   14      Q.    And how long have you lived there?
   15      A.    At that particular residence?  Fifteen
   16  years.
   17      Q.    And how long have you lived in
   18  Williamstown?
   19      A.    Thirty-two years.
   20      Q.    And what do you do here?
   21      A.    I teach art, studio art at Williams
   22  College.
   23      Q.    And tell me briefly what that involves.
   24  What is studio art?
page 6
    1      A.    Studio art is the practice of how one
    2  makes an image.
```

[7:2] - [8:10]          10/28/2009   Epping, Edward

```
page 7
    2      Q.    Tell me when and how you met Mr. Shearer.
    3      A.    I met Hartley when he came to town with
    4  Linda in 1989.
    5      Q.    And how was it that you met them?
    6      A.    I met Linda because she had recently been
    7  hired as the director for the college museum and
    8  their new director.
    9      Q.    And did you develop a relationship with
   10  Mr. Shearer?
   11      A.    First with Linda and then with Hartley
   12  afterwards.
   13      Q.    And how long after you met the Shearers
   14  would you say you developed a relationship with
   15  Mr. Shearer?
   16      A.    Hmmm.  Within the first year of their
   17  being here.
   18      Q.    Would you consider him a friend?
   19      A.    Not at first, but eventually.
   20      Q.    How often would you see him?
   21      A.    When?
   22      Q.    In the time prior to Mr. Shearer's stroke,
   23  how often would you see him?  Mr. Shearer.
   24      A.    I would say no more often than once a
page 8
    1  month.
    2      Q.    On what sort of occasions would you see
    3  him once a month?
    4      A.    Typically related to art department or
    5  college museum events.
    6      Q.    Were those professional events or social
    7  events?
    8      A.    Both.
    9      Q.    Did you visit in each other's homes?
```

10      A.    Yes.

[8:13] - [11:10]          10/28/2009   Epping, Edward
page 8
13          Q.    What sort of occasions would you visit in
14   each other's homes?
15          A.    Again, social events related typically to
16   events that were connected to either the art
17   department or to the college museum, like an
18   exhibition.
19          Q.    Did you visit each other on weekends?
20          A.    Sometimes.
21          Q.    Visit each other on holidays?
22          A.    Sometimes.
23          Q.    Did you ever invite them to your home for
24   a holiday occasion?
page 9
1           A.    Yes.
2           Q.    Did they ever invite you to their home for
3    holidays?
4           A.    Yes.
5           Q.    What sort of holidays and what --
6           A.    Thanksgiving.
7           Q.    Anything else?
8           A.    Only Thanksgiving.
9           Q.    Who else would attend those Thanksgiving
10   dinners?
11          A.    Ivor and typically one or two other
12   people, but it would vary.
13          Q.    Throughout the time that you knew
14   Mr. Shearer, can you think of anyone else that he
15   knew that he spent as much or more time with besides
16   his family?
17          A.    Hmmm.  No.  Sorry.
18          Q.    Is it fair to say you knew him pretty
19   well?
20          A.    Yes.
21          Q.    Now, can you describe for me when and how
22   you heard about his suicide?
23          A.    Phone call from a person, I think Marion
24   Goethals.
page 10
1           Q.    And when did that occur?
2           A.    On the afternoon, late afternoon of the
3    day that Hartley committed suicide.
4           Q.    The day of?
5           A.    Yeah.
6           Q.    And what did she tell you?
7           A.    She did not say suicide.  She said that
8    something has happened and that we needed to be
9    aware of that and she was very vague.
10          Q.    When did you learn it was a suicide?
11          A.    Not until I went to the hospital.
12          Q.    Same day?
13          A.    Mm-hmm.
14          MR. SOH:  Is that a "yes"?  You need to
15   say "yes."
16          A.    Yes.
17          MR. SOH:  Okay, sorry.
18   BY MR. OHLEMEYER:
19          Q.    And how did you learn it was a suicide?
20          A.    Through the nurse.
21          Q.    What did she tell you?  Do you remember?
22          A.    No.
23          Q.    How did you react to that news?
24          A.    Shocked.
page 11
1           Q.    Why?
2           A.    Lost a good friend.
3           Q.    Understood.  And I shouldn't be so matter-