```
 4  of-fact about it.  I do appreciate that.
 5          Did there come a point in time, either day
 6  of or shortly thereafter, where you stopped to think
 7  about how or why that might have happened?
 8      A.    You know, I don't try to get into the
 9  minds of other folks like that.  That would be sheer
10  speculation.
```

[13:16] - [15:13]          10/28/2009   Epping, Edward

```
page 13
16      Q.    Did you ever talk with any of his doctors
17  about his medical condition prior to the suicide?
18      A.    Yes.
19      Q.    Who was that?
20      A.    Let me correct that.  Not doctor; physical
21  therapist.  Sorry.  And I don't remember the name.
22      Q.    And what occasion would you have to speak
23  with his physical therapist?
24      A.    In helping Hartley and trying to be a good
page 14
 1  friend to see what I could do to assist his life.
 2      Q.    And what did the physical therapist tell
 3  you?
 4      A.    Common actions, common instructions, what
 5  kinds of things I could physically do to help his
 6  life be easier; physical stuff.
 7      Q.    And as I understand it, you actually did a
 8  lot of that, didn't you?
 9      A.    I wouldn't say a lot, but I did some, you
10  know, when it was possible.
11      Q.    Did you spend some time with him in Boston
12  once when he was going through some physical
13  therapy?
14      A.    Yes.
15      Q.    How long were you there?
16      A.    Two to three days.
17      Q.    And was that for moral support or were you
18  part of the therapy?
19      A.    It was to give Linda some relief.  She was
20  still director and was away from home and so it was
21  a way of giving her some relief from that kind of
22  daylong activity.
23      Q.    Can you describe for us what kind of
24  person Mr. Shearer was prior to his stroke?
page 15
 1      A.    Well, the smartest man I've ever met.
 2      Q.    And why do you say that?
 3      A.    Clear, disciplined, focused, witty,
 4  incredibly well-read, and articulate about complex
 5  issues.
 6      Q.    Was he athletic?
 7      A.    Yes.
 8      Q.    In what way?
 9      A.    Bicycling.
10      Q.    And how often did he bicycle?
11      A.    I think every day.
12      Q.    Did you ever bike with him?
13      A.    No.  He would've smoked me.
```

[15:23] - [16:8]          10/28/2009  Epping, Edward

```
page 15
23  me withdraw it.  Was he somebody that people would
24  describe as being short-tempered?
page 16
 1      A.    Not to me.
 2      Q.    Did you ever observe him to be short-
 3  tempered with others?
 4      A.    Not to me.
 5      Q.    Impatient?
```

```
         6     A.    As smart people will be.
         7     Q.    Was he an independent guy?
         8     A.    As smart people will be.
```

[16:22] - [18:1]        10/28/2009  Epping, Edward

```
page 16
        22     Q.    Tell me about Mr. Shearer -- Well, let me
        23  ask you one more question.  If I was going to ask
        24  somebody or if somebody wanted to know about
page 17
         1  Mr. Shearer prior to the stroke, what else would
         2  they need to know other than what you've told me
         3  about Mr. Shearer?
         4     A.    The only thing I've left off is that I
         5  think he was also an incredible artist, video
         6  artist.
         7     Q.    What kind of relationship did he have with
         8  his wife prior to the stroke?
         9     A.    I could only comment on public
        10  relationship because that's all I saw.
        11     Q.    Sure.  That's fair enough.  I mean, did
        12  they work together, travel together?
        13     A.    They worked together, talked together.
        14     Q.    Socialize?
        15     A.    Socialized together.
        16     Q.    What about with his son?
        17     A.    He loved him dearly.
        18     Q.    And how old was his son when you met
        19  Mr. Shearer?
        20     A.    I'm going to guess, 15.
        21     Q.    So just in my mind, how many years did you
        22  know Mr. Shearer before his stroke?
        23     A.    1989 to 2002.
        24     Q.    That's a long time, a fairly long time.
page 18
         1     A.    Fourteen, yeah, twelve years.
```

[18:22] - [20:11]        10/28/2009  Epping, Edward

```
page 18
        22     Q.    How did the stroke affect Mr. Shearer?
        23     A.    Physically it incapacitated the left side
        24  of his body and the recuperation was directed at
page 19
         1  recuperating that left side.
         2     Q.    And did you ever discuss with Mr. Shearer
         3  his prognosis or the prospects for recuperation?
         4     A.    Yes.
         5     Q.    And what did he tell you about that?
         6     A.    It was going to be a tough slog.
         7     Q.    Did there ever come a time where he
         8  suggested to you that he might -- Well, strike that.
         9  Did he ever become less optimistic, if that's a fair
        10  characterization of his attitude about it, about his
        11  recuperation?
        12     A.    No.
        13     Q.    Well, you're smiling.  Why do you say
        14  that?
        15     A.    Hartley maintained even with the stroke
        16  the same kind of physical discipline and mental
        17  discipline that he had prior to the stroke, and so
        18  to admit that something was not going to happen was
        19  not in the realm of his possibility.
        20     Q.    But in terms of physical limitations, he
        21  couldn't do the same things, physical discipline, he
        22  couldn't do the same things he used to do, could he?
        23     A.    Correct.
        24     Q.    But you're telling me that mentally he was
page 20
         1  very determined to improve?
```

```
 2     A.     And did.
 3     Q.     Did there come a point in time where that
 4  improvement plateau'd or regressed?
 5     A.     Plateau'd?
 6     Q.     Correct.
 7     A.     Yes.
 8     Q.     And when and how?
 9     A.     Don't remember exact time on that.  How?
10  Seeing that the left hand was never going to be
11  totally recuperated.
```

[23:8] - [23:24]        10/28/2009  Epping, Edward

```
page 23
 8     Q.     Was Mr. Shearer able to get out of bed by
 9  himself after his stroke?
10     A.     Time frame?
11     Q.     Well, within a year or two after the
12  stroke.
13     A.     Yes.
14     Q.     Did he get dressed by himself?
15     A.     Yes.
16     Q.     Did he shower and bathe by himself?
17     A.     Yes, if we're still talking time frame.
18     Q.     How do you know that?
19     A.     Because of talking.
20     Q.     So he would tell you what his limitations
21  were and what they weren't?
22     A.     Not every conversation.
23     Q.     Could he drive after the stroke?
24     A.     No.
```

[24:4] - [24:24]        10/28/2009  Epping, Edward

```
page 24
 4     Q.     Did he have a regular position at the
 5  university after his stroke?
 6     A.     I don't believe after.
 7     Q.     Did he have one before the stroke?
 8     A.     Yes.
 9     Q.     What position was that?
10     A.     Lecturer in art.
11     Q.     And did you help Mr. Shearer obtain that
12  position?
13     A.     Yes.
14     Q.     How did you help?
15     A.     As a means of retaining Linda to stay on
16  as the director.
17     Q.     You'll have to explain that for me.
18     A.     Okay.  Small town, not much to do for
19  partners and spouses of people working for the
20  college.  Very often the college loses really good
21  people because there's not enough for the partner to
22  do here.  And this was a way for me to sort of --
23  This was a way for me to intercede and to help make
24  that retention possible.
```

[25:7] - [26:13]        10/28/2009  Epping, Edward

```
page 25
 7     Q.     Mr. Epping, let me hand you what we've
 8  marked as Epping Number 1 and ask you if you can
 9  identify that for me.
10     A.     Mm-hmm.  (Pause)  Yes, I wrote that
11  letter.
12     Q.     And was this letter written in connection
13  with the discussion we just had about trying to get
14  Mr. Shearer a position at the --
15     A.     Yes.
16     Q.     There's a line on the second page that I
17  want to ask you about; and I'm just curious.  It
```

```
18  says "Everyone needs to have a reason to get out of
19  bed each day."  Do you remember writing that?
20       A.    Yes.
21       Q.    Explain to me what you meant by that.
22       A.    I grew up in the Midwest and that's a
23  fairly common phrase for describing the need to have
24  a reason for doing what you do.
page 26
 1       Q.    And at this point in time you were --
 2  Strike that.  At this point in time did you think
 3  Mr. Shearer needed a reason to do what he wanted to
 4  do?
 5       A.    That was not the reason for writing the
 6  letter.
 7       Q.    A better way to phrase the question.  Did
 8  he need an opportunity to do what he wanted to do?
 9       A.    He was already doing what he needed to do.
10  What I was looking for was an opportunity to keep
11  Linda here.
12       Q.    This was prestroke or post-stroke?
13       A.    That's prestroke.
```

[26:16] - [27:20]          10/28/2009   Epping, Edward

```
page 26
16       Q.    Did you ever hear or observe Mr. or
17  Mrs. Shearer discuss any marital problems they might
18  have had?
19       A.    Yes.
20       Q.    Tell me about that?
21       A.    The only marital problem I can refer to,
22  and this is what I'm referring to, is when there was
23  an altercation between the two of them.
24       Q.    And what do you know about that
page 27
 1  altercation?
 2       A.    Only what was reported to me by Linda.
 3       Q.    And what did she tell you?
 4       A.    That there was an exchange of language
 5  which she found offensive and treated it in such a
 6  way, and I don't know what that meant.  I just know
 7  that it eventually involved the police department
 8  coming to their house.
 9       Q.    Did she tell you specifically what was
10  said?
11       A.    No.
12       Q.    Generally?
13       A.    No.  She said it was offensive.
14       Q.    Tell me about Mrs. Shearer.  What kind of
15  person was she?
16       A.    A very good friend, a delight to work
17  with, an amazing administrator, a person who knew
18  how to work with people and had an amazing kind of
19  patience and capacity to get them to do things that
20  needed to be done.
```

[29:12] - [30:9]          10/28/2009   Epping, Edward

```
page 29
12       Q.    How did Mr. Shearer feel about his stroke?
13       A.    In the context of?
14       Q.    Well, was he a stoic guy, was he angry?
15  You know, what emotions did he attach to the fact
16  that he had suffered this misfortune?
17       A.    The simplest word is frustration.
18       Q.    And how would that frustration manifest
19  itself?
20       A.    The recognition of an inability to do
21  things that he was once able to complete.
22       Q.    And was that something that was kind of a
23  constant or persistent feeling or did it come and go
```

```
24   depending on the situation?
page 30
 1      A.     It was not constant.
 2      Q.     You know, the word "depressed" is very
 3   vague and subject to a lot of different definitions.
 4   But in the general ordinary-person man-on-the-street
 5   sense, would you ever describe Mr. Shearer as being
 6   depressed --
 7      A.     No.
 8      Q.     -- prior to his suicide?
 9      A.     No.
```

[6:12] - [7:15]           3/26/2010    Fagan, Michael

```
page 6
12      Q.     In terms of general background, can
13   you tell me where were you born?
14      A.     Rutland, Vermont.
15      Q.     Did you grow up in Vermont?
16      A.     I did.
17      Q.     Attend high school there?
18      A.     I did.
19      Q.     Did you graduate from high school?
20      A.     I did.
21      Q.     Can you tell me when and where you
22   graduated from high school?
23      A.     1969, and I graduated from Mount St.
24   Joseph Academy in Rutland, Vermont.
25      Q.     Did you attend college after high
page 7
 1                MICHAEL FAGAN
 2   school?
 3      A.     I did.
 4      Q.     Tell me about your college education,
 5   where did you go and what degrees did you
 6   receive?
 7      A.     I went to the University of Vermont
 8   and I received a Bachelor's degree in zoology.
 9      Q.     Is that a Bachelor of Science?
10      A.     Bachelor of Arts.
11      Q.     What year did you get your BA?
12      A.     1973.
13      Q.     Was that the end of your college
14   education?
15      A.     Yes.
```

[9:2] - [9:19]           3/26/2010    Fagan, Michael

```
page 9
 2      Q.     Did you take any courses at University
 3   of Vermont involving pharmacology?
 4      A.     No.
 5      Q.     Did you take any courses at University
 6   of Vermont involving neurochemistry?
 7      A.     Not directly involving neurochemistry
 8   but zoology courses would involve some
 9   neurochemistry, yes.
10      Q.     Since graduating from the University
11   of Vermont, have you taken any courses involving
12   pharmacology?
13      A.     Formal courses, no.
14      Q.     Have you taken something that you
15   would call not a formal course involving
16   pharmacology?
17      A.     The education within the industry I
18   would call extensive education in pharmacology,
19   yes.
```

[10:5] - [10:12]           3/26/2010    Fagan, Michael

```
page 10
```

```
5      Q.    How long have you worked for Pfizer?
6      A.    Pfizer merged with Parke-Davis in
7  1999, so -- '99 or 2000, so since that time,
8  before that I was a Parke-Davis/Warner Lambert
9  employee.
10     Q.    Can you tell me when you first started
11 working for Parke-Davis or Warner Lambert?
12     A.    1989, July.
```

[11:20] - [11:23]     3/26/2010    Fagan, Michael

```
page 11
20     Q.    In what capacity were you first hired
21 by Parke-Davis or Warner Lambert?
22     A.    I was hired as a specialty
23 representative.
```

[12:13] - [12:17]     3/26/2010    Fagan, Michael

```
page 12
13     Q.    Just generally what were the duties of
14 a specialty representative?
15     A.    We would call on specialty physicians.
16 In my case it would have been at that time
17 neurology and cardiology.
```

[12:18] - [13:4]      3/26/2010    Fagan, Michael

```
page 12
18     Q.    Were you working or were you assigned
19 to a particular office location or geographical
20 region?
21     A.    Geographic, geographic location.
22     Q.    Did you have a physical office --
23     A.    No.
24     Q.    -- that you reported to?
25     A.    No.
page 13
1                  MICHAEL FAGAN
2      Q.    Did you work essentially out of your
3  work?
4      A.    My home.
```

[14:2] - [17:15]      3/26/2010    Fagan, Michael

```
page 14
2      Q.    Now, who did you report to?  Who was
3  your supervisor within the company, and if you
4  can't recall the specific person, what was the
5  position you reported to and where did they work
6  out of?
7      A.    District manager was Al Collins and he
8  worked out of Albany.
9      Q.    How long did you work as a specialty
10 representative in that particular area, how long
11 did you have that job?
12     A.    I believe it was '93 that I was
13 promoted to -- the title was cluster
14 coordinator.  It was a manager of a neurology
15 division.
16     Q.    Can you describe for us generally what
17 the duties were of a cluster coordinator, how is
18 that different than being a specialty
19 representative?
20     A.    I had people working for me.  I also
21 had my own territory that I was responsible for
22 calling on the physicians in that territory as
23 well as supervising I believe it was six reps.
24     Q.    When you were a specialty
25 representative, you had a job that we might
```

page 15

MICHAEL FAGAN

1
2    generically call being a rep or a
3    representative, correct?
4        A.    Yes.
5        Q.    When you were a cluster coordinator,
6    in addition to having your own territory, did
7    you have other people reporting to you who were
8    essentially doing the same type of job you used
9    to do, they were also reps?
10       A.    Yes, yes.
11       Q.    When you were cluster coordinator, who
12   supervised you or what job position supervised
13   you?
14       A.    I don't remember his title but it was
15   Leonard Milke.
16       Q.    Was he a district manager or something
17   else?
18       A.    No, he would have been above.  I would
19   have been at the same level as a district
20   manager so it would have been what's now called
21   a regional manager.  At the time I don't
22   remember what the title was.
23       Q.    As a cluster coordinator were you
24   working in a particular cluster or with regard
25   to a particular type of field of medications?

page 16

MICHAEL FAGAN

1
2        A.    We called only on neurology with
3    neurology medications, yes, at the time
4    Dilantin.
5        Q.    How long were you a cluster
6    coordinator?
7        A.    Until '94 when Parke-Davis
8    reorganized.
9        Q.    When Parke-Davis reorganized did your
10   job title change?
11       A.    Oh, yes, yes, it did.
12       Q.    What happened to you then?
13       A.    I was put back in a regular territory.
14   To the best of my recollection it was a very
15   short period of time where we all called on all
16   physicians.
17       Q.    Were you just a rep at that point?
18       A.    Just a rep, yes.
19       Q.    How long did you have that particular
20   position with the company?
21       A.    I want to say that lasted about a year
22   until they formed a neurology division again.
23       Q.    When Parke-Davis did form a neurology
24   division, did your job title change?
25       A.    I became a specialty representative

page 17

MICHAEL FAGAN

1
2    again.
3        Q.    What year was that approximately?
4        A.    I believe it was '95, maybe early '96.
5        Q.    At that point you became a specialty
6    representative?
7        A.    Yes, I did.
8        Q.    Were you again specializing in
9    neurology-related pharmaceuticals?
10       A.    Neurology, yes.
11       Q.    How long did you hold that position?
12       A.    I would -- that's still the position
13   I'm in.  It changed titles and some
14   responsibilities over the years but that's still
15   what I do.

[18:9] - [18:19]          3/26/2010    Fagan, Michael

page 18
```
 9        Q.      Since that time, 1995 or 1996 when you
10   became a specialty representative again, have
11   you had any positions for the company that did
12   involve supervising other representatives?
13        A.      No.
14        Q.      Since that time, 1995 or early 1996,
15   have you essentially been a sales representative
16   with responsibility for a particular geographic
17   area?
18        A.      Again, the area has changed over time,
19   but, yes.
```

[22:7] - [22:20]          3/26/2010    Fagan, Michael

page 22
```
 7        Q.      It is my best understanding that the
 8   acquisition of Warner Lambert by Pfizer was in
 9   approximately June of 2000, and when I say
10   approximately, it was a transaction that I'm
11   sure took some period of time --
12        A.      Right.
13        Q.      -- to actually take place.  Do you
14   recall that period of time?
15        A.      Yes.
16        Q.      Was there any change in your actual
17   job title when Pfizer acquired Warner Lambert?
18        A.      I don't believe so.  I think the title
19   remained the same, at least for that interim
20   period.
```

[23:9] - [23:18]          3/26/2010    Fagan, Michael

page 23
```
 9        Q.      When did you first begin having any
10   job duties with regard to Neurontin?
11        A.      At the launch of Neurontin which --
12   '93?  '94?
13        Q.      Whatever the particular year was, do
14   you recall working as a -- well, do you recall
15   what position you held at that time when
16   Neurontin was launched?
17        A.      Yes, I do.  I was a specialty
18   representative.
```

[24:12] - [24:17]          3/26/2010    Fagan, Michael

page 24
```
12        Q.      Up until recently when I understand
13   neurology was taken away from your duties, has
14   Neurontin been one of the medications that you
15   worked on while working for the company?
16        A.      Yes, it was, until the launch of
17   Lyrica, yes.
```

[27:5] - [28:14]          3/26/2010    Fagan, Michael

page 27
```
 5        Q.      During the period of time you have
 6   worked for Warner Lambert or Parke-Davis or
 7   Pfizer, have you kept records there pertaining
 8   to your job duties?
 9        A.      I have.
10        Q.      Do you still maintain records there
11   pertaining to your job duties?
12        A.      I do.
13        Q.      At any point has any party requested
14   from you copies of these records for this
15   litigation?
16        A.      They did not request copies, they
```

17  requested all of the paperwork to which I sent
18  all original paperwork.  I have nothing left.
19      Q.    Can you give me a general description
20  of what you call the paperwork that you sent in
21  terms of how much of it there was and, you
22  know --
23      A.    They asked me for anything I had on
24  Neurontin which I put in a box and shipped to
25  them, including promotional materials,
page 28
1           MICHAEL FAGAN
2  non-promotional materials, anything that I had
3  sitting around.
4      Q.    In addition to promotional materials,
5  did you provide copies of any internal
6  correspondence or memorandums?
7      A.    There may have been but not that I
8  remember.  I just put everything in a box, sent
9  it.
10      Q.    How big was this box?
11      A.    It was just like a box that mimeograph
12  paper would come in.
13      Q.    How full was that box?
14      A.    It was pretty well filled up.

[29:18] - [31:5]        3/26/2010    Fagan, Michael

page 29
18      Q.    Mr. Fagan, can you tell me how,
19  generally how it was you have been compensated
20  while you have worked for Warner Lambert,
21  Parke-Davis or Pfizer?  Are you paid a salary?
22  Paid a commission?
23      A.    Paid a salary with a bonus paid out --
24  that currently is paid out quarterly.
25      Q.    At any point working for any of those
page 30
1           MICHAEL FAGAN
2  companies since July of 1989, have you received
3  anything that you would characterize as a
4  commission, that is, monetary amount paid to you
5  that's in direct proportion to sales of a
6  particular product?
7      A.    No, not based on the sales.  It is a
8  bonus, it is a fixed dollar amount that you --
9  that is your bonus and it is based on sales,
10  yes.
11      Q.    I am not asking about your bonus.  I'm
12  just trying to make sure whether or not as part
13  of your compensation since working for the
14  company has been a commission?
15      A.    Not like I'm used to a commission.
16      Q.    Tell me how the -- your understanding
17  of how your bonus is calculated?  And that may
18  have changed, I understand, over the years that
19  you have worked for the company, but generally
20  what's your understanding of where that bonus
21  comes from, how does it come about?
22      A.    That's the million dollar question.  A
23  bonus is based on a goal which is set for sales
24  of a product.  The sales of the product are
25  tracked back to the area that you are selling in
page 31
1           MICHAEL FAGAN
2  and your bonus is based on the percentage that
3  you make towards that goal.  So if you are 110
4  percent over goal, you make 10 percent over your
5  bonus.

[32:21] - [33:8]        3/26/2010    Fagan, Michael

page 32
21      Q.      Can you tell me generally what you
22  would do as a sales representative?  What have
23  your typical activities been?  How does a sales
24  representative do their job?
25      A.      You present your product to the
page 33
1               MICHAEL FAGAN
2   physician in as favorable a light as you can
3   with fair balance and suggest how it should be
4   written, how it is dosed, in other words, what
5   conditions it is good for, what the side effects
6   are, how it might be better than other products
7   that are currently out there or better for the
8   patient.

[33:9] - [34:5]        3/26/2010    Fagan, Michael

page 33
9       Q.      How do you find out what physicians
10  you should communicate with?
11      A.      I am a specialty representative so I
12  call on specialty physicians.  If they are
13  neurologists I go in the office.
14      Q.      In other words, what I am getting at
15  is, does the company tell you the doctors you
16  should be working with or have you as part of
17  your job had to go out and search for or
18  identify doctors that you need to work with?
19      A.      There would be a list of physicians
20  generated who are calling themselves
21  neurologists or the specialty that you are in
22  and that's generated and that's my
23  responsibility to make sure that they are indeed
24  neurologists and they are people I should be
25  calling on.  If they are misclassified, I make a
page 34
1               MICHAEL FAGAN
2   note and delete them from my files.
3       Q.      Would this list have been provided to
4   you by the company?
5       A.      Yes.

[34:6] - [34:16]       3/26/2010    Fagan, Michael

page 34
6       Q.      You have explained that there might be
7   circumstances where you would let the company
8   know that somebody needed to be removed from
9   that list, correct?
10      A.      Constantly, yes.
11      Q.      That would be if a particular doctor
12  was not the type of doctor he was purported to
13  be on that list essentially?
14      A.      Or was not in the area or was retired
15  or had deceased or a number of reasons you might
16  discontinue a doctor, yes.

[35:9] - [35:21]       3/26/2010    Fagan, Michael

page 35
9       Q.      Were any visits with doctors ever
10  solicited by the physicians as opposed to your
11  setting them up?
12      A.      Yes, occasionally.  More than
13  occasionally.  They often would call, yes.
14      Q.      Would these typically be doctors with
15  whom you already had some established
16  relationship?  In other words, they knew who you
17  were?
18      A.      Or they had asked another doctor in

```
19    the community who their Parke-Davis rep was or
20    Pfizer rep was, got my name from them and just
21    needed information, product samples, whatever.
```

[36:16] - [37:11]          3/26/2010    Fagan, Michael

```
page 36
16          Q.    During the period of time you worked
17    for Parke-Davis/Warner Lambert or Pfizer, did
18    you have any obligation as a representative to
19    maintain records of your contacts with
20    physicians?
21          A.    Yes.
22          Q.    What type of records would you
23    maintain?
24          A.    In early years we had written records.
25    When computers came we had just records that we
page 37
1                 MICHAEL FAGAN
2     had called -- we just check a box that we had
3     called on them.  We maintain copies of starter
4     forms, when we leave starters with a physician
5     we are required to maintain copies of all
6     starters that are left for a period of years.
7     So we kept those records.
8           Q.    Can you tell us what a starter is?
9           A.    A starter is basically a sample of the
10    product so that the patient can try it before
11    they have to go out and buy a prescription.
```

[37:12] - [38:10]          3/26/2010    Fagan, Michael

```
page 37
12          Q.    I'm going to ask you some questions
13    now that are more particular to Neurontin.  You
14    were involved in the Neurontin launch, correct?
15          A.    Yes, I was.
16          Q.    Tell me how you were involved as a
17    specialty representative?
18          A.    We were all involved equally,
19    specialty or not.  We went -- we had to learn,
20    you study extensively about the product, about
21    the disease state that it is indicated for,
22    about what competitors might be on the market.
23    There is a lot of prep work that goes into it.
24                Then as the product comes nearer to
25    market we are all brought to a central location.
page 38
1                 MICHAEL FAGAN
2     There is more product knowledge via classes, via
3     discussion, via thought leaders, and at the end
4     of the sessions you are tested to make sure that
5     you are ready to go out and sell the product and
6     know enough information to present it to
7     physicians.
8           Q.    Do you remember going through that
9     process back when Neurontin was launched?
10          A.    Yes, I do.
```

[39:25] - [40:22]          3/26/2010    Fagan, Michael

```
page 39
25          Q.    When Neurontin was launched, what was
page 40
1                 MICHAEL FAGAN
2     Neurontin for at that time?
3           A.    Seizure disorders, partial seizures
4     with or without generalization.
5           Q.    Was it indicated as monotherapy for
6     that condition?
7           A.    It was not.  Adjunctive therapy.
```

8      Q.    So if a jury ever sees this, first of
9   all, can you tell us, when I say indication,
10   what does indication mean in terms of your
11   experience as a sales rep?
12      A.    Indication is what the drug is --
13   approved use is.
14      Q.    When you say adjunct therapy, what do
15   you mean?
16      A.    Add on to the current medication.
17   Seizure medications in general don't control a
18   hundred percent of seizures, so there are a
19   number of paths who continue to have seizures.
20   Neurontin is one of the first medications that
21   could be added on to the current drugs so that
22   the patient got more relief from their seizures.

[40:23] - [41:6]      3/26/2010     Fagan, Michael

page 40
23      Q.    Do you presently have responsibilities
24   with regard to the medication Neurontin?
25      A.    No.
page 41
1                    MICHAEL FAGAN
2      Q.    When did you last have any duties that
3   involved Neurontin?
4      A.    Again, year I am not positive, I would
5   have to look up, but it was when Neurontin went
6   generic.

[41:2] - [41:17]      3/26/2010     Fagan, Michael

page 41
2      Q.    When did you last have any duties that
3   involved Neurontin?
4      A.    Again, year I am not positive, I would
5   have to look up, but it was when Neurontin went
6   generic.
7      Q.    At that time when you last worked on
8   Neurontin, what was your understanding as to
9   what it was indicated for?
10      A.    When we last worked on Neurontin it
11   was indicated for, again, the add on therapy for
12   partial seizures and post-herpetic neuralgia.
13      Q.    As you sit here today, what's your
14   understanding of what Neurontin is approved for
15   by the FDA?
16      A.    Those as far as I know are the only
17   indications.

[42:11] - [43:8]      3/26/2010     Fagan, Michael

page 42
11             First of all, have you ever heard the
12   phrase detailing a doctor or detailing a
13   physician?
14      A.    Sure.
15      Q.    What does that mean in your
16   experience?
17      A.    That describes what we do.  We detail
18   the -- we give the physician detailed
19   information about the product so that he is
20   capable of prescribing it for the patients that
21   it is indicated for.
22      Q.    So when earlier you testified about
23   what you would do, ask a doctor what he thought
24   about a medication, give him information about a
25   medication --
page 43
1                    MICHAEL FAGAN
2      A.    That is detailing.

```
3        Q.       That's detailing.  Okay.
4                 Would it be fair to say that your job
5        as a specialty representative or as a cluster
6        coordinator when you are working your own
7        territory, your job is detailing?
8        A.       Yes, it is.
```

[43:9] - [43:18]        3/26/2010    Fagan, Michael

```
page 43
9        Q.       When Neurontin was first launched,
10       whenever that was, were representatives for the
11       company allowed to detail physicians for
12       off-label uses of a medication?
13       A.       Absolutely not.
14       Q.       Was there ever a period of time during
15       your employment with the company that
16       representatives were allowed to detail
17       physicians for off-label indications?
18       A.       No, there was not.
```

[45:20] - [46:2]        3/26/2010    Fagan, Michael

```
page 45
20       Q.       Were there doctors that you -- types
21       of doctors that you were not allowed to call on
22       at any point that you have worked for Warner
23       Lambert or Pfizer?
24       A.       Yes, there have been doctors that I
25       have not been allowed to call on.  Psychiatry is
page 46
1                      MICHAEL FAGAN
2        one of those.
```

[46:3] - [46:12]        3/26/2010    Fagan, Michael

```
page 46
3        Q.       First of all, has that been a
4        prohibition that has been in effect throughout
5        your entire employment?
6        A.       No.  That is Pfizer, that occurred
7        with Pfizer.
8        Q.       So that would be one change --
9        A.       Yes.
10       Q.       -- in the way you do business?
11       A.       Yes, but not in the way I detail, but
12       in the physicians I call on, yes.
```

[50:22] - [51:10]       3/26/2010    Fagan, Michael

```
page 50
22       Q.       In addition to answering questions,
23       physicians' questions when you are detailing
24       them, did you ever provide information to the
25       physician in the form of something other than an
page 51
1                      MICHAEL FAGAN
2        answer to a question such as articles or
3        documents, anything like that?
4        A.       Medical inquiries, if a doctor asked
5        about something off-label I would send in a
6        medical inquiry asking for information about its
7        use in that particular area.  The only other
8        instance I can think of would be the WLF papers.
9        There were two papers that we were allowed to
10       leave with physicians.
```

[51:17] - [52:2]        3/26/2010    Fagan, Michael

```
page 51
```

17      Q.      What would you do if a doctor asked
18  you about an off-label use of Neurontin, for
19  instance?
20      A.      What I would do is say that Neurontin
21  is not indicated in that area.  What I can do if
22  you are interested is submit a medical inquiry
23  and see if there is any information on its use
24  in that area.  I would send in the medical
25  inquiry and it would be sent directly to the
page 52
1                   MICHAEL FAGAN
2  physician.

[53:11] - [53:24]        3/26/2010    Fagan, Michael

page 53
11      Q.      Now, the second issue you mentioned
12  was some type of articles -- you used a phrase
13  and I can't remember what it was.  What did you
14  call those?
15      A.      Washington Legal Foundation, I believe
16  is the foundation.  They are articles in
17  peer-reviewed journals which we were allowed to
18  give to physicians but not talk about.
19      Q.      Do you remember -- first of all, do
20  you remember the names of those articles?
21      A.      I remember what they were about.
22      Q.      What were they about?
23      A.      One of them was about diabetic
24  neuropathy and the other social phobia.

[53:25] - [54:10]        3/26/2010    Fagan, Michael

page 53
25      Q.      Were you allowed to give those to
page 54
1                   MICHAEL FAGAN
2  doctors unsolicited?  In other words, did the
3  doctor have to ask you for information about
4  those topics or could you simply distribute
5  those articles to doctors?
6      A.      We could distribute them.
7      Q.      If a doctor wanted to discuss those
8  uses with you, what could you do?
9      A.      I'm sorry, I can't discuss it, all I
10  can do is give you the article.

[57:10] - [59:6]         3/26/2010    Fagan, Michael

page 57
10              Are you familiar with a computer
11  program called Sherlock?
12      A.      I am.
13      Q.      What is Sherlock?
14      A.      Sherlock is our system for reporting
15  calls and starters left for physicians.
16      Q.      Was that a program that was used prior
17  to the acquisition of Warner Lambert by Pfizer?
18      A.      I don't believe so.
19      Q.      When is your first recollection as to
20  when you first began using Sherlock?
21      A.      I believe when Pfizer took over.
22      Q.      Tell us generally how Sherlock works
23  from the perspective of a sales representative.
24  When you go out and detail a doctor, what do you
25  do if anything with Sherlock?
page 58
1                   MICHAEL FAGAN
2      A.      In Sherlock I would go in, I would
3  look up the doctor's name and it would give me a
4  template, register a call and give me a template

```
            5    to put in the product that I detailed, the
            6    starters that I left, and ask for the number of
            7    the starter sample form which I would have to
            8    put in, and then submit it.
            9        Q.    Do you have to go to a particular
           10    geographic location to do this?  Is this done on
           11    a laptop?  How do you do that?
           12        A.    A laptop.
           13        Q.    That's a tool that you would use as
           14    part of your job?
           15        A.    Daily, every day, yes.
           16        Q.    Again, from the perspective of the
           17    sales rep, why do you do that?  Other than
           18    putting notes in, do you ever then go back and
           19    look at those notes?
           20        A.    I would occasionally go back and look
           21    to see how many starters I had left with
           22    somebody, when I last called on them, what
           23    product I had talked about last time I was in,
           24    just that type of information.
           25        Q.    You have used the phrase starters.  Is
        page 59
            1             MICHAEL FAGAN
            2    that the same as the term samples or is there
            3    some difference?
            4        A.    Starters and samples would be
            5    synonymous.  They are meant for patients to try
            6    the medication.
```

[70:14] - [71:16]        3/26/2010    Fagan, Michael

```
        page 70
           14        Q.    Mr. Fagan, during our break I have had
           15    the stenographer mark another exhibit which is
           16    in front of you right now.  It is Exhibit 5 of
           17    today's days.
           18        A.    Yes.
           19        Q.    Which is also a printout of detail,
           20    call detail information from the Sherlock
           21    system.  Would you agree with me about that?
           22        A.    Yes, it is.
           23        Q.    Now, this particular exhibit is
           24    limited to one prescriber, a physician named
           25    Keith Edwards.
        page 71
            1             MICHAEL FAGAN
            2             First of all, are you familiar with a
            3    Dr. Keith Edwards?
            4        A.    I am.
            5        Q.    Can you tell me how you are acquainted
            6    with Dr. Edwards?
            7        A.    He a is neurologist with an office in
            8    Bennington, Vermont, and several other offices,
            9    so I called on him at the Bennington office.
           10        Q.    Now, these various calls listed in
           11    Exhibit 5, and there are 24 pages of them,
           12    appear to be in chronological order, the
           13    earliest being on the first page, and the
           14    earliest call date here is an October 24, 2001
           15    call, and this is one of these calls where the
           16    representative's name is vacant.
```

[71:17] - [71:24]        3/26/2010    Fagan, Michael

```
        page 71
           17             First of all, do you recall Dr. Keith
           18    Edwards as a physician that you called upon
           19    prior to Pfizer's acquisition of Warner Lambert?
           20        A.    Yes, I do.
           21        Q.    Do you have any recollection how long
           22    you have been calling upon Dr. Edwards?
```

```
23      A.    I believe I started calling on him in
24  the early nineties.
```

[73:4] - [73:19]          3/26/2010    Fagan, Michael

```
page 73
 4      Q.    The initial call note, do you know who
 5  would have made that call if it was not you?  In
 6  other words, at that time do you know who you
 7  shared that area with?
 8      A.    I don't.
 9      Q.    In the Call_Notes there is the phrase:
10  "Use him to speak, he'll use products, stop
11  supporting Paul."
12            Do you know what any of that means?
13      MS. MACER:   Objection.
14      Q.    You can answer if you know.
15      A.    I know who Paul is.
16      Q.    Who is Paul?
17      A.    Paul would be Paul Salomon who is an
18  Alzheimer's expert, and Keith used to work with
19  Paul.
```

[73:25] - [74:15]          3/26/2010    Fagan, Michael

```
page 73
25      Q.    In other words, "stop supporting
page 74
 1            MICHAEL FAGAN
 2  Paul," you've mentioned that you believe Paul
 3  was a doctor who did work for Pfizer, correct?
 4      A.    No, Paul was in -- yes, he did work
 5  for Pfizer -- he did not work for Pfizer, he's a
 6  neuropsychologist.  He's not an M.D., he's a
 7  Ph.D.  They did studies at the Alzheimer's
 8  research center in Bennington.  Paul, Bill
 9  Pendlebury and Keith Edwards were involved in
10  that operation.
11      Q.    Now, do you recall Dr. Edwards as
12  being a physician who provided some type of
13  services to Pfizer or on behalf of Pfizer?
14      A.    Yes, he was a speaker for Pfizer.  He
15  also did research at his clinic in Bennington.
```

[76:5] - [76:17]          3/26/2010    Fagan, Michael

```
page 76
 5      Q.    Was it part of your job to arrange
 6  speaking engagements or speaking by physicians?
 7      A.    Yes.
 8      Q.    Were you in general part of the sales
 9  department?
10      A.    Yes.
11      Q.    Were there any other departments --
12  and at this point this is Sherlock so we are
13  talking about Pfizer -- were there any other
14  departments within the company that were
15  involved with speaking such as marketing or --
16      A.    Well, marketing would train speakers
17  and then we could use those speakers, yes.
```

[87:25] - [88:10]          3/26/2010    Fagan, Michael

```
page 87
25      Q.    Thank you for being patient, Mr. Fagan
page 88
 1            MICHAEL FAGAN
 2  while we change the tape here.  And we are
 3  looking at Exhibit 5 and we are looking at page
 4  23 of 24.
```

```
              5              On that April 19, 2001 call note of
              6      yours, the last sentence says:  "Talked about
              7      some possible dates for golf."
              8              Did you ever play golf with Dr.
              9      Edwards?
             10         A.    I did.
```

[97:17] - [97:25]        3/26/2010    Fagan, Michael

```
           page 97
             17         Q.    Assuming for the purposes of my
             18      question that pain management doctors were not
             19      generally the primary treating doctors for
             20      seizure disorders, would there have been any
             21      other indication other than post-herpetic
             22      neuralgia that would have been appropriate for
             23      you to be detailing pain management doctors
             24      about Neurontin?
             25         A.    No.
```

[109:15] - [110:4]       3/26/2010    Fagan, Michael

```
           page 109
             15         Q.    At any point in your employment with
             16      Warner Lambert and Pfizer did you become aware
             17      of the contents of the combined medical
             18      statistical review that was done at the time of
             19      official FDA approval of Neurontin?
             20         A.    What was that?
             21         Q.    Well, I can represent to you that when
             22      Neurontin was submitted for approval by the
             23      FDA --
             24         A.    Yes.
             25         Q.    -- something called a combined medical
           page 110
              1              MICHAEL FAGAN
              2      statistical review was prepared and submitted.
              3              Do you know what that is?
              4         A.    No.  I don't.
```

[110:5] - [110:23]       3/26/2010    Fagan, Michael

```
           page 110
              5         Q.    In that case is it fair for me to
              6      believe that you haven't read it or are aware of
              7      the contents of it?
              8         A.    Unless it is called something else.
              9         Q.    Do you have any knowledge about the
             10      initial clinical trials of Neurontin?
             11         A.    I have knowledge of the initial
             12      pivotal trials that were submitted to the FDA
             13      for approval of Neurontin, yes.
             14         Q.    At any point did you ever become aware
             15      that the FDA expressed concerns about those
             16      initial clinical trials, and among those
             17      concerns were that some users of Neurontin in
             18      the clinical trials became depressed and that
             19      this depression might become worse and require
             20      intervention or lead to suicide?
             21              MS. MACER:  Objection.
             22         A.    I don't recall, I don't think I ever
             23      did.
```

[111:8] - [111:13]       3/26/2010    Fagan, Michael

```
           page 111
              8         Q.    At any point did you become aware that
              9      the FDA expressed a concern in its initial
             10      clinical review of the Neurontin studies about
             11      clinically important depression arising in
```

```
               12    Neurontin users?
               13       A.    No.
```

[113:18] - [114:9]      3/26/2010    Fagan, Michael

```
page 113
18       Q.    When Pfizer took over -- acquired
19   Warner Lambert, were you familiar with the
20   phrase "business unit" as in, for instance,
21   southeast business unit?
22       A.    Yes.
23       Q.    Was that a term that was used
24   organizationally by Warner Lambert or was that
25   something Pfizer used?
page 114
 1              MICHAEL FAGAN
 2       A.    That was Warner Lambert.
 3       Q.    During the period of time you worked
 4   for Warner Lambert up until the Pfizer takeover,
 5   what business unit were you within?
 6       A.    Northeast customer business unit,
 7   northeast.
 8       Q.    That would be the CBU?
 9       A.    Yes.
```

[116:20] - [117:19]      3/26/2010    Fagan, Michael

```
page 116
20       Q.    Did you ever discuss with any
21   physician whether Neurontin may increase the
22   risk of suicidal behavior?
23       A.    Did I ever discuss?  No.
24       Q.    Did you ever discuss with any
25   physician whether Neurontin may increase the
page 117
 1              MICHAEL FAGAN
 2   risk of suicidal ideation?
 3       A.    No.
 4       Q.    Did you ever discuss with a physician,
 5   any physician whether Neurontin may worsen
 6   depression?
 7       A.    No.
 8       Q.    Did you ever discuss with any
 9   physician whether patients taking Neurontin
10   should be monitored for notable changes in
11   behavior that could indicate the emergence of
12   suicidal thoughts or behavior or depression?
13       A.    No.
14       Q.    Did you ever discuss with any
15   physician whether patients taking Neurontin
16   should be monitored for notable changes in
17   behavior that could indicate the worsening of
18   suicidal thoughts or behavior or depression?
19       A.    No.
```

[5:17] - [5:20]      10/16/2009   Herr, Douglas

```
page 5
17              Could you please state your name and
18   professional address for the record, please?
19       A.    Douglas V. Herr, and it's 77 Hospital
20   Avenue, Suite 104, North Adams, Massachusetts.
```

[9:7] - [9:8]      10/16/2009   Herr, Douglas

```
page 9
 7              Do you recall Mr. Shearer?
 8       A.    I do.
```

[13:12] - [13:14]      10/16/2009   Herr, Douglas

```
                              page 13
                              12      Q.   Is it fair to say that your practice is
                              13   confined to the field of cardiology?
                              14      A.   Yes, a hundred percent.
```

[15:9] - [15:12]              10/16/2009  Herr, Douglas

```
                              page 15
                               9      Q.   How was Mr. Shearer referred to you, sir?
                              10      A.   His primary care physician referred him.
                              11      Q.   And this is Dr. Sullivan?
                              12      A.   Yes.
```

[40:22] - [41:4]              10/16/2009  Herr, Douglas

```
                              page 40
                              22      Q.   Did you recommend any limitations on Mr.
                              23   Shearer as a result of your observations in June of
                              24   1998 about his cardiac status and his mitral valve
                              page 41
                               1   disease?
                               2      A.   I don't really recall.  I don't see
                               3   anything written to that degree and I don't recall
                               4   any.
```

[44:3] - [44:8]               10/16/2009  Herr, Douglas

```
                              page 44
                               3           Based upon your review of the letter dated
                               4   December 7, 1998, did you come to the view based upon
                               5   your clinical judgment and the testing that had been
                               6   conducted on Mr. Shearer that he was a good candidate
                               7   for a mitral valve surgery at that time?
                               8      A.   Yes.
```

[45:21] - [45:23]             10/16/2009  Herr, Douglas

```
                              page 45
                              21      Q.   At this point you recommended a cardiac
                              22   catheterization, correct?
                              23      A.   Yes.
```

[46:4] - [46:6]               10/16/2009  Herr, Douglas

```
                              page 46
                               4      Q.   And did you actually conduct the cardiac
                               5   catheterization for Mr. Shearer?
                               6      A.   Yes, I did.
```

[46:24] - [47:18]             10/16/2009  Herr, Douglas

```
                              page 46
                              24      Q.   Can you let us know what the results of the
                              page 47
                               1   catheterization were?
                               2      A.   Well, in the impressions it confirmed the
                               3   impression of moderate to severe mitral regurgitation
                               4   with a minimal reduction in left ventricular
                               5   function, ejection fraction estimated at 59 percent,
                               6   and he had normal coronary arteries.
                               7      Q.   Did this provide further evidence for the
                               8   decision to recommend mitral valve surgery for Mr.
                               9   Shearer?
                              10      A.   I think it was consistent with the evidence
                              11   we had at that point.
                              12      Q.   In what way?
                              13      A.   Well, it confirmed the degree of
                              14   regurgitation and some reduction in systolic
                              15   function.  The purpose of the test, though, was
                              16   really to identify whether or not he had any coronary
```

```
17  disease that would impact on the mitral valve surgery
18  when it was performed.
```

[48:23] - [49:8]        10/16/2009  Herr, Douglas

```
page 48
23      Q.   (By Mr. Barnes)  Now, your cardiac
24  catheterization, that talks about an episode of
page 49
 1  atrial fibrillation while he was riding his bike.
 2  What's atrial fibrillation?
 3      A.   It's an arrhythmia of the heart.  The heart
 4  loses its normal pacemaker function and the atria
 5  fibrillate causing often increase in the heart rate.
 6      Q.   And you recommended cardioversion for
 7  Mr. Shearer?
 8      A.   At that time, yes.
```

[56:4] - [56:14]        10/16/2009  Herr, Douglas

```
page 56
 4      Q.   From your notes can you describe Mr.
 5  Shearer's cardiac status in January 7 of 2000, your
 6  notes reflected in Exhibit 14?
 7      A.   So this was a year after his surgery, and
 8  my note summarized the surgery was in January of '99,
 9  that post-operatively he had suffered a large right
10  hemisphere stroke leaving him with a significant
11  hemiparesis --
12      Q.   What are you describing there, Doctor?
13      A.   I'm describing that he had a stroke which
14  resulted in weakness of the left arm and leg.
```

[65:20] - [65:23]       10/16/2009  Herr, Douglas

```
page 65
20      Q.   Did you see any evidence in Mr. Shearer
21  after his stroke of any evidence of depression that
22  was a sequela of his stroke?
23      A.   I don't recall that.
```

[75:13] - [75:16]       10/16/2009  Herr, Douglas

```
page 75
13      Q.   Do you have any recollection of assessing
14  his emotional or mental status following the surgery
15  of January of 1999?
16      A.   No, I don't recall.
```

[75:22] - [76:1]        10/16/2009  Herr, Douglas

```
page 75
22      Q.   Do you have any recollection of suspecting
23  that Mr. Shearer was at increased risk for suicide at
24  the time that you were treating him?
page 76
 1      A.   I don't recall.
```

[81:6] - [82:9]         10/16/2009  Herr, Douglas

```
page 81
 6                  MR. SOH:  Sure, Exhibit 17, the June
 7  12, 2001 note.
 8      Q.   (By Mr. Soh)  I believe the gist of the
 9  highlighted portion is that Mr. Shearer is amenable
10  or would consider another mitral valve surgery if his
11  condition got worse.  Is that a fair way to read your
12  note.
13      A.   Yes.
14      Q.   And would it be a fair way to read your
```

15  note to say that he was not interested in a surgery
16  on or about June 12, 2001, probably after discussions
17  with you in that he did not -- he was still
18  relatively asymptomatic and the mitral valve problem
19  had not gotten any worse?
20          MR. BARNES:  Objection.
21      Q.   (By Mr. Soh)  You can answer it, if you
22  want to.
23      A.   I think you paraphrased what's here
24  accurately.
page 82
 1      Q.   And if you had thought that his mitral
 2  valve issues were life threatening, you would have
 3  instructed him to go to a surgery immediately,
 4  wouldn't you?
 5      A.   I could speculate that's probably what I
 6  would --
 7      Q.   Let me back up.  Was his mitral valve
 8  problem at all life threatening at this time?
 9      A.   No.

[83:3] - [83:15]          10/16/2009  Herr, Douglas

page 83
 3              (Exhibit 19, marked)
 4      Q.   (By Mr. Soh)  Dr. Herr, going to the
 5  conclusions from your echo report, was there a
 6  significant change in Mr. Shearer's condition three
 7  months before he died?
 8      A.   The conclusion on the echocardiogram report
 9  was that there did not appear to have been a
10  significant change between -- in the echo findings
11  from the May study to this November study.
12      Q.   So, fair to say that his mitral valve heart
13  problem was not life threatening at November of 2001,
14  three months before he died?
15      A.   Yes.

[84:12] - [85:4]          10/16/2009  Herr, Douglas

page 84
12      Q.   Okay, thank you.  Was there anything in
13  your medical records that indicated that Mr. Shearer
14  was suicidal at any point in time in your treatment
15  of him?
16      A.   I didn't see anything in the record.
17      Q.   Just in accordance with your pattern and
18  practice, if you thought a patient was suicidal, you
19  would note that in your records, wouldn't you?
20      A.   Potentially.
21      Q.   And you probably would also instruct that
22  person for an intervention or to an emergency room
23  facility, wouldn't you?
24      A.   If I saw that to be a clinical
page 85
 1  responsibility, I would make somebody aware of the
 2  problem that could help him.
 3      Q.   And you did not do that with Mr. Shearer?
 4      A.   I don't believe so, no.

[86:1] - [86:6]          10/16/2009  Herr, Douglas

page 86
 1      Q.   Mitral valve, Mr. Shearer's mitral valve
 2  heart problem, it was not caused by smoking or
 3  alcohol or any sort of condition like that, it was
 4  most likely a genetic defect?
 5          MR. BARNES:  Objection.
 6      A.   Yes.

[7:18] - [7:23]    11/13/2009 Hynes, Wilfred

```
page 7
18  Q.  Would you please state your name and address
19      for the record.
20  A.  Wilfred Hynes.  Home address or --
21  Q.  Business address is fine, sir.
22  A.  800 Washington Street, Tufts Medical Center,
23      Boston, Massachusetts.
```

[13:10] - [13:25]   11/13/2009 Hynes, Wilfred

```
page 13
10          Can you tell us what your specialty
11      is?
12  A.  Pain management.
13  Q.  What is pain management?
14  A.  Subspecialty of anesthesia involved with
15      treating patients with chronic pain.
16  Q.  And how long have you been in the specialty
17      of pain management?
18  A.  12 years.
19  Q.  Can you tell us where you did -- where you
20      went to college?
21  A.  Boston College.
22  Q.  And when did you graduate?
23  A.  '88.
24  Q.  Where did you go to medical school?
25  A.  Tufts Medical School.
```

[24:20] - [24:25]   11/13/2009 Hynes, Wilfred

```
page 24
20  Q.  The original indication for Neurontin for
21      pain was for postherpetic neuralgia?
22  A.  Okay.
23  Q.  Were you aware of that as you sit here
24      today?
25  A.  I believe so.
```

[35:7] - [35:14]    11/13/2009 Hynes, Wilfred

```
page 35
7   Q.  What were the common side effects of the
8       antiepileptic drugs you were using with
9       regard to the treatment of neuropathic pain?
10  A.  Most common was really the sedation.
11  Q.  Made them drowsy?
12  A.  Correct.
13  Q.  That was common across the class of drugs?
14  A.  Correct.
```

[36:11] - [36:24]   11/13/2009 Hynes, Wilfred

```
page 36
11          What type of pain did you diagnose his
12      condition as?
13  A.  Fair to say back pain, leg pain, also a
14      question maybe central pain syndrome.
15  Q.  Okay.
16  A.  And a history of CVA in the past.
17  Q.  That's a stroke?
18  A.  Stroke.
19  Q.  Was he a complicated patient?
20  A.  Yes.
21  Q.  So he presented to you with complaints of
22      back pain, leg pain, some arm pain, and
23      complications with a stroke?
24  A.  Yes.
```

[42:23] - [44:22]          11/13/2009   Hynes, Wilfred

page 42
23              Let's go through the history and
24      physical on October 14th that was obtained
25      by your resident under your supervision.
page 43
1               Would you read that into the record,
2       please, the HPI?
3    A. Read the whole thing?
4    Q. Yes, please.
5    A. "55-year-old male with history of
6       hypertension, myxomatous mitral valve
7       leaflets, status post mitral valve repair
8       consistent with right hemisphere stroke in
9       1/1999 presented to North Adams Regional
10      Hospital with lumbar and right lower
11      extremity spasms, pain is 9/00 [sic]."
12   Q. Pain in September of 2000.
13   A. Okay.
14   Q. Continue.
15   A. Okay.  That was -- okay.
16              "Over there, patient was treated with
17      morphine sulfate and Celebrex, but there was
18      not significant improvement.  He is
19      therefore transferred to Brigham and Women's
20      Hospital this morning for further workup and
21      treatment.  Patient states that the spasm
22      mainly from low back and sometimes radiating
23      down the right leg.  Occasionally up to the
24      right arm.  Spasm pain is shooting, sharping
25      [sic], total body movement related, relieved
page 44
1       by lying in bed.  This spasm pain started
2       about one month ago.  Muscle spasm pain
3       lasted about few seconds when it occurs.
4       Patient also mentioned that he had mild neck
5       pain.  History of right C-6 radiculopathy,
6       but is not a major problem at this time."
7    Q. Okay.
8               What does "DMH" mean?
9    A. Where?
10   Q. Right below that there's a box with the
11      letter "PMH" or "DMH"?
12              Do you see that?
13   A. Oh, PMH, past medical history.
14   Q. What was that, sir?
15   A. Hypertension, myxomatous mitral valve,
16      status post mitral valve repair, history of
17      atrial fibrillation, stroke, hemiparesis,
18      history of migraine headaches, OCD, and
19      adult deficit disorder.
20   Q. Hemiparesis is a left paralysis, left-sided
21      paralysis?
22   A. Right.


[60:22] - [60:25]          11/13/2009   Hynes, Wilfred

page 60
22              Now, given the patient's medical
23      history and condition on October 14th, why
24      did you start Mr. Shearer on Neurontin?
25   A. To help him with his pain.


[87:6] - [87:11]           11/13/2009   Hynes, Wilfred

page 87
6               Well, let's do this -- obviously --
7       you would agree that the pain service, you
8       and your colleagues, started Mr. Shearer on
9       the Neurontin, Flexeril, and Vioxx regimen,

```
            10      correct?
            11  A.  Correct.
```

[91:25] - [92:8]          11/13/2009   Hynes, Wilfred

```
            page 91
            25  Q.  My name is Ken Fromson, and I represent the
            page 92
            1       Shearer family, and I presume you probably
            2       figured that out by now.
            3   A.  Yes.
            4   Q.  And there's a lawsuit that has been brought
            5       against makers of a drug called "Neurontin."
            6       I figured you figured that out as well by
            7       now.
            8   A.  Yes.
```

[96:2] - [96:5]           11/13/2009   Hynes, Wilfred

```
            page 96
            2   Q.  Doctor, is it fair to say you were a
            3       prescribing physician of the drug Neurontin
            4       to Hartley Shearer in October of 2000?
            5   A.  Yes.
```

[96:16] - [97:18]         11/13/2009   Hynes, Wilfred

```
            page 96
            16      You have been in a deposition before?
            17  A.  Correct.
            18  Q.  So I figure it was in the context of a
            19      lawsuit?
            20  A.  Correct.
            21  Q.  And so have you ever heard the expression
            22      "complaint" and "answer" before today?
            23  A.  Yes.
            24  Q.  Okay.  And so I ask you to take a look at
            25      the answer that I represent to you has been
            page 97
            1       posed by the defendants in the case.  I'd
            2       ask you to go to page 21.
            3   A.  Yes.
            4   Q.  Now, on page 21, do you see what's been
            5       referenced as a "Seventh Affirmative
            6       Defense"?  Do you see that?
            7   A.  Yes.
            8   Q.  Is it fair to say you've never heard the
            9       expression "Affirmative defense" before?
            10  A.  Yes.
            11  Q.  What does it state as the Seventh
            12      Affirmative Defense, in the answer?
            13  A.  "The claims set forth in the complaint are
            14      barred by the learned intermediary
            15      doctrine."
            16  Q.  Have you ever heard of that expression
            17      before, Doctor?
            18  A.  No.
```

[98:14] - [98:21]         11/13/2009   Hynes, Wilfred

```
            page 98
            14      Do you stand in the middle between the
            15      patient and the drug company as a person
            16      who's supposed to have knowledge, a person
            17      who's supposed to be learned about the drug
            18      you are prescribing?
            19          MR. BARNES:  Objection.
            20      If you know.
            21  A.  Yes.
```

[99:11] - [100:1]        11/13/2009  Hynes, Wilfred

page 99
11  Q.  At any time before you prescribed Neurontin
12      to Mr. Shearer, had you ever received any
13      information from Parke-Davis or
14      Warner-Lambert indicating an increased risk
15      of suicidal behavior with Neurontin?
16          MR. BARNES:  Objection.
17          You may answer.
18  A.  Not to my recollection.
19  Q.  Same question, different defendant now.
20          At any time before you prescribed
21      Neurontin to Mr. Shearer, had you ever
22      received any information indicating an
23      increased risk of suicidal behavior with
24      Neurontin from Pfizer?
25          MR. BARNES:  Objection.
page 100
 1  A.  I don't have any recollection.

[101:21] - [102:14]      11/13/2009  Hynes, Wilfred

page 101
21          Back in 2000, when you were actively
22      practicing medicine in the state of
23      Massachusetts, did you have an
24      understanding, familiarity, with the United
25      States package inserts for the drugs you
page 102
 1      were prescribing?
 2  A.  Yes.
 3          MR. BARNES:  Objection.
 4          You may answer.
 5  A.  I'm sorry.  Yes.
 6  Q.  And did you have familiarity with the
 7      warning sections of the package inserts?
 8  A.  Yes.
 9  Q.  Okay.
10          So back in 2000, generally, what was
11      your understanding of the purpose of a
12      warning section in a package insert for a
13      drug?
14  A.  To highlight a particular risk of an agent.

[105:11] - [105:17]      11/13/2009  Hynes, Wilfred

page 105
11  Q.  Back in 2000, was there any warning for
12      suicidal behavior and ideation to the best
13      of your knowledge in the United States
14      package insert for Neurontin?
15          MR. BARNES:  Objection.
16          THE WITNESS:  Sorry.
17  A.  I don't believe so.

[108:7] - [108:22]       11/13/2009  Hynes, Wilfred

page 108
 7          And is it fair to say that back in
 8      2000, there were numerous sources of
 9      information that you as a physician relied
10      upon in making decisions about prescribing
11      drugs?
12  A.  Yes.
13  Q.  And those included United States package
14      inserts for the drugs, yes?
15  A.  Correct.
16  Q.  They included published medical journals?
17          MR. BARNES:  Objection.
18  A.  Correct.

```
19  Q.  And they included speaking with your peers
20      as well.
21          Would that be accurate?
22  A.  Correct.
```

[108:23] - [109:4]    11/13/2009   Hynes, Wilfred

```
page 108
23  Q.  And back in the 2000 time frame or before,
24      in the course of your experience, had you
25      ever received correspondence directly from
page 109
 1      drug companies regarding safety or risk
 2      issues with respect to their drugs?
 3              MR. BARNES:  Objection.
 4  A.  Yes.
```

[109:6] - [109:19]    11/13/2009   Hynes, Wilfred

```
page 109
 6          Did you ever receive any
 7      correspondence directly from Parke-Davis or
 8      Warner-Lambert related to suicidal behavior
 9      back before 2000?
10              MR. BARNES:  Objection.
11  A.  I don't believe so.
12  Q.  Did you ever receive any such correspondence
13      from the defendant, Pfizer, regarding
14      suicidal behavior or ideation or attempts or
15      completed suicides with Neurontin --
16              MR. BARNES:  Objection.
17  Q.  -- before 2000?
18              MR. BARNES:  Objection.
19  A.  I don't believe so.
```

[110:14] - [110:18]    11/13/2009   Hynes, Wilfred

```
page 110
14          For what period of time were you a
15      practicing doctor in Massachusetts focusing
16      on pain management up to the point where you
17      met Mr. Shearer in October of 2000?
18  A.  Approximately three years.
```

[110:23] - [111:25]    11/13/2009   Hynes, Wilfred

```
page 110
23  Q.  As a practicing doctor, even up through just
24      2000, did you come to understand the
25      significance and importance of clinical
page 111
 1      trials as a way of determining the risk and
 2      benefits of drugs in this country?
 3  A.  Yes.
 4  Q.  Is it fair to say you didn't participate in
 5      any clinical trials related to Neurontin up
 6      through 2000?  Would that be accurate?
 7  A.  I don't believe so.
 8  Q.  Is it fair to say you were not -- let me ask
 9      it this way:  Were you ever an investigator
10      during a clinical trial for the drug
11      Neurontin before 2000?
12  A.  I don't believe so, but on occasion, what
13      will happen, if there was a study being done
14      by the group, all the attendings' names were
15      on it.  I don't know if that was the case.
16      I don't know if anybody was looking at
17      Neurontin in our group back then.
18  Q.  To the best of your knowledge --
19  A.  I was not a primary investigator, no.
```

```
20  Q.  Thank you.
21          And so in terms of your experience
22      with the drug, it was not under controlled
23      circumstances like a clinical trial would
24      be?
25  A.  Correct.
```

[114:17] - [115:9]    11/13/2009   Hynes, Wilfred

```
page 114
17          For that approximate three years that
18      you were a practicing physician in
19      Massachusetts up to the point where you met
20      Mr. Shearer, what percentage of these
21      patients were epileptics?
22  A.  I would say a very small percent.
23  Q.  Would it be less than five percent?
24  A.  I would say -- I was not -- that were --
25      just happened to be epileptics?  Not that I
page 115
 1      was treating for epilepsy.
 2  Q.  Let me rephrase the question.
 3          In terms of your use of Neurontin for
 4      these approximate 1,000 patients --
 5  A.  Yes.
 6  Q.  -- okay -- what percentage of these patients
 7      were epileptics when you were providing the
 8      Neurontin for that indication?
 9  A.  None.
```

[115:11] - [115:18]    11/13/2009   Hynes, Wilfred

```
page 115
11          What percentage of these patients from
12      the time you began using Neurontin through
13      approximately 2000 when you met Mr. Shearer,
14      were prescribed Neurontin by you for
15      postherpetic neuralgia?
16          MR. BARNES:   Objection.
17          You may answer.
18  A.  Maybe less than five percent.
```

[120:11] - [122:11]    11/13/2009   Hynes, Wilfred

```
page 120
11          Do you recall being visited by sales
12      representatives from the company Parke-Davis
13      Warner-Lambert back in 1998 and 1999?
14          MR. BARNES:   Objection.
15  A.  I believe so.
16  Q.  Now, and I'm sorry if I am stating the
17      obvious, but you were not and you are not
18      and you never have been an epileptologist;
19      is that correct?
20  A.  That's correct.
21  Q.  And when these sales representatives came to
22      visit you in '98 and '99, did they discuss
23      with you the use of Neurontin for
24      nociceptive pain?
25          MR. BARNES:   Objection.
page 121
 1          If you recall.
 2  A.  I believe it was for neuropathic pain.
 3  Q.  Okay.
 4          Did these sales representatives
 5      discuss with you broad neuropathic pain as a
 6      use of Neurontin?
 7          MR. BARNES:   Objection.
 8          If you recall.
 9  A.  I believe so.
10  Q.  Can you -- I know it's been quite some time.
```

```
11            Can you give us any sense of the
12      discussion that took place between yourself
13      and any sales representative from the
14      Parke-Davis Warner-Lambert era, '98 and '99,
15      and that discussion?
16            MR. BARNES:  Objection.
17  A.  I would be -- pretty much, as you said, that
18      it was mainly using Neurontin for the
19      treatment of neuropathic pain.
20  Q.  Did they -- withdrawn.
21            Did any sales representative who
22      visited you in '98 or '99 from Parke-Davis
23      Warner-Lambert ever disclose to you any
24      information whatsoever about whether
25      Neurontin could increase the risk of
page 122
1      suicidal behavior in people taking
2      Neurontin?
3            MR. BARNES:  Objection.
4  A.  I don't believe so.
5  Q.  Did the sales representatives who visited
6      with you in 1998 and '99 with respect to
7      Neurontin, did they come alone or did they
8      come with anyone else?
9            MR. BARNES:  Objection.
10  A.  I believe there were occasions where there
11      was more than one representative.
```

**[123:10] - [124:4]     11/13/2009   Hynes, Wilfred**

```
page 123
10  Q.  Can you describe based upon your experience,
11      then, what role they played in terms of
12      meeting with you?
13            MR. BARNES:  Objection.  "They"?
14            MR. FROMSON:  I apologize.
15  Q.  You have a sales rep in '98/'99 -- we've
16      established that, yes?
17  A.  Yes.
18  Q.  What role did this other individual, if any,
19      play in terms of meeting with you?
20            MR. BARNES:  Objection.  Relevance,
21      vague.
22  A.  You know, some of these representatives seem
23      to work in tandem.
24  Q.  Okay.
25  A.  I couldn't tell you what the role.
page 124
1      Occasionally, I do know that, for example,
2      they may come with a supervisor.  And my
3      understanding that was basically to assess
4      how that representative was doing their job.
```

**[125:5] - [129:14]     11/13/2009   Hynes, Wilfred**

```
page 125
5            Back in the '98 or '99 time frame, did
6      sales representatives from Parke-Davis
7      Warner-Lambert come to you and provide you
8      with samples of Neurontin?
9            MR. BARNES:  Objection.
10  A.  I know we had samples in the pain center
11      that were provided by representatives that
12      were held in a locked cabinet we had to sign
13      out.  The exact year that that practice
14      started, I couldn't honestly tell you.  But,
15      you know, I do recall that.  I just don't
16      know when exactly.  If it was there from the
17      very beginning, I honestly couldn't tell you
18      that.
19  Q.  Back during the time frame before 2000, when
```

```
20        you prescribed Neurontin to Mr. Shearer,
21        who, if anyone, was your supervising
22        physician?
23   A.   The director of pain management center was
24        Dr. Edgar Ross, R-O-S-S.
25   Q.   Did Dr. Ross ever disclose to you whether or
page 126
 1        not Neurontin could cause suicidal behavior
 2        in people using it?
 3                 MR. BARNES:  Objection.  Lack of
 4        foundation, lack of evidence.
 5                 Go ahead.
 6   A.   I do not believe so.
 7   Q.   Did Dr. Ross -- well, did you consider
 8        Dr. Ross to be someone upon whom you relied
 9        for medical information?
10   A.   Yes.
11   Q.   Did you consider Dr. Ross to be a valuable
12        source of information regarding the drugs
13        you were considering prescribing to
14        patients?
15   A.   Yes.
16   Q.   Did Dr. Ross provide you information with
17        respect to Neurontin?
18                 MR. BARNES:  Objection.
19   A.   I'm sure in the time period that we would
20        have at some point discussed Neurontin.  He
21        was my attending when I was a fellow.
22   Q.   Did he ever disclose to you any
23        relationships, business relationships, that
24        he had with Parke-Davis Warner-Lambert
25        regarding Neurontin?
page 127
 1                 MR. BARNES:  Objection.  Lack of
 2        foundation, assumes facts not in evidence,
 3        relevance.
 4   A.   I can answer?
 5   Q.   You can answer.
 6   A.   Yes, he was a speaker.
 7   Q.   In terms of time frame, being from the point
 8        up to Mr. Shearer's death -- let me withdraw
 9        the question.  I'm so sorry.
10                 Referencing your attention to the time
11        up to the point where you prescribed
12        Neurontin to Mr. Shearer in October of 2000,
13        and any time in that time frame, did
14        Dr. Ross disclose to you that he was a
15        speaker for Warner-Lambert or Parke-Davis?
16                 MR. BARNES:  Objection.
17   A.   Yes.
18   Q.   Okay.
19                 What did he explain that that meant,
20        if anything?
21   A.   He was paid by the company to give lectures
22        on the use of Neurontin.
23   Q.   Now, did he ever give a lecture in your
24        presence on the use of Neurontin before you
25        prescribed Neurontin to Mr. Shearer?
page 128
 1                 MR. BARNES:  Objection.
 2   A.   I'm sure he did when I was a fellow.
 3   Q.   And did he discuss Neurontin's use for
 4        neuropathic pain?
 5                 MR. BARNES:  Objection.
 6   A.   Sure.
 7   Q.   Any of the -- how many times did you attend
 8        any lectures provided by Dr. Ross, Edgar
 9        Ross, regarding Neurontin up to the point
10        that you had prescribed Neurontin to
11        Mr. Shearer?
12                 MR. BARNES:  Objection.
```

```
13  A.  I don't know exactly, but maybe half a
14      dozen.
15  Q.  On any of those occasions, did -- did he
16      disclose any risk of suicidal behavior with
17      Neurontin?
18          MR. BARNES:  Objection.
19  A.  I don't believe so.
20  Q.  How many people attended these lectures in
21      general?
22  A.  It varied with the lectures for the
23      residents and fellows.  It would probably be
24      12, 12 people.  Other venues, maybe 15 to
25      20.  I can't speak to others that he gave
page 129
1       that I wasn't in attendance.
2   Q.  On any of the occasions that you attended
3       lectures provided by Dr. Ross during which
4       time Neurontin was discussed, did he provide
5       any handouts or materials?
6           MR. BARNES:  Objection.
7   A.  I'm not sure.  It's possible.
8   Q.  In terms of these lectures that you attended
9       given by Dr. Ross, and during which time
10      Neurontin was discussed, did you find these
11      lectures to be informative in terms of your
12      prescribing practices for Neurontin?
13          MR. BARNES:  Objection.
14  A.  Yeah.
```

[130:3] - [135:17]        11/13/2009  Hynes, Wilfred

```
page 130
3   Q.  Did Dr. Ross' lectures regarding Neurontin,
4       which were given before you prescribed
5       Neurontin to Mr. Shearer, provide, at least
6       in part, a basis for your prescription of
7       Neurontin to Mr. Shearer?
8           MR. BARNES:  Objection.
9           In 2000?
10          MR. FROMSON:  Yes.
11  A.  I don't know how much -- again, how
12      ingrained my prescribing pattern was at that
13      point.  Granted, I was a young attending, so
14      it's clear that my director, you know, was
15      someone I looked up to and listened to.  So
16      I can't imagine that it would not have
17      influenced me.
18  Q.  After 2002, having nothing to do with your
19      prescription to Mr. Shearer, were you
20      contacted by sales representatives from
21      Pfizer regarding Neurontin?
22  A.  I believe so.
23  Q.  And did there come a point where you went to
24      a speaker training meeting in New York?
25  A.  Yes.
page 131
1   Q.  Was that for Neurontin?
2   A.  Yes.
3   Q.  What calendar year did you go?
4   A.  Good question.  Honestly, I don't -- 2001,
5       2002.  I'm not sure.
6           MR. BARNES:  Don't guess.  If you
7       know, you know.
8   A.  I'm not exactly sure of the precise year
9       that I went.
10  Q.  Was it before or after you prescribed
11      Neurontin to Mr. Shearer?
12  A.  I don't know.  I can tell you I went with my
13      girlfriend then, who is now my wife.  When
14      did I meet her?  I think I met her late 2001
15      or late 2000.  So it might have been 2001
```

```
16      then.
17  Q.  In terms of the speaker --
18              MR. BARNES:  2001 -- you met her
19      late 2000?
20              THE WITNESS:  Yes, I believe so.
21              MR. BARNES:  Late 2000 or 2001?
22              THE WITNESS:  Late 2000.  In
23      2001 -- we went to New York together in
24      2001.
25  Q.  In terms of your attending this speaker
page 132
 1      training meeting --
 2  A.  Yes.
 3  Q.  -- who paid for the trip?
 4              MR. BARNES:  Objection.
 5  A.  The drug company.
 6  Q.  Who paid for your hotel?
 7  A.  Drug company.
 8  Q.  Did you drive or fly?
 9  A.  Flew.
10  Q.  Who paid for the flight?
11  A.  Drug company.
12  Q.  At the meeting, did they discuss using
13      Neurontin for neuropathic pain?
14  A.  Yes.
15  Q.  Did they discuss using Neurontin for
16      migraine?
17  A.  Not sure.  I didn't really pay attention if
18      they did because it's not something that I
19      tend to treat.
20  Q.  Did there come a point in time that you
21      became aware of a drug called Lyrica?
22  A.  Yes.
23  Q.  Are you familiar with the term pregabalin as
24      being the generic for Lyrica?
25  A.  Yes.
page 133
 1  Q.  Okay.
 2              And did sales representatives from
 3      Pfizer visit you and discuss Lyrica?
 4              MR. BARNES:  Objection.
 5  A.  Yes.
 6  Q.  Did they discuss with you whether Lyrica was
 7      superior to Neurontin?
 8              MR. BARNES:  Objection.
 9  A.  I'm not sure how they phrased it.  I think
10      the -- my recollection, the papers they
11      brought seemed to -- the papers they
12      brought, I believe it was patients that had
13      failed Neurontin as one of the inclusion
14      criteria.
15              MR. FROMSON:  Can you mark this for
16      me, please.
17              (Exhibit No. 7 marked.)
18  Q.  Doctor, I don't know how to ask you this
19      question.
20              Do you read the paper on a regular
21      basis?
22  A.  Yes.
23  Q.  Do you listen to the news on a regular
24      basis?
25  A.  Probably less than I should.
page 134
 1  Q.  Did you hear anything in the news this past
 2      August --
 3              MR. BARNES:  Objection.
 4  Q.  -- about Pfizer, through a division, Upjohn,
 5      reaching a settlement agreement with the
 6      United States Department of Justice
 7      regarding off-label promotion of drugs?
 8              MR. BARNES:  Objection.
```

```
 9  A.  I believe so.  I don't know -- remember the
10      specifics of it.
11  Q.  Can you turn to page five of this particular
12      exhibit, please.
13  A.  (Witness complies.)  Okay.
14  Q.  On page five, there's a paragraph related to
15      Lyrica, where it is what is considered
16      number four.
17          Do you see that?
18  A.  Yes.
19  Q.  And can you simply read into the record the
20      first sentence?
21          MR. BARNES:  Objection.  Continuing
22      line of objection to the use of this
23      document.
24  Q.  Go ahead, Doctor.
25  A.  "Lyrica:  During the period of September 1,
page 135
 1      2005, through October 31, 2008, Pfizer:
 2      (a) illegally promoted the sale and use of
 3      Lyrica for a variety of off-label conditions
 4      (including chronic pain, neuropathic pain,
 5      perioperative pain and migraine)."
 6  Q.  Thank you.
 7          Do you have a recollection of sales
 8      representatives from Pfizer discussing with
 9      you the use of Lyrica for such conditions as
10      chronic pain, neuropathic pain,
11      perioperative pain and migraine?
12          MR. BARNES:  Objection.
13  A.  Chronic and neuropathic pain.  I don't ever
14      recall them discussing perioperative pain;
15      and, again, migraines they might have
16      discussed, but that's not an area of
17      interest for me.
```

[136:10] - [137:8]    11/13/2009   Hynes, Wilfred

```
page 136
10          With respect to your prescription of
11      Neurontin to Mr. Shearer, is it fair to say
12      that you approved the attending's
13      prescription of Neurontin to Mr. Shearer?
14          MR. BARNES:  Objection.
15  Q.  I'm sorry.
16          You were the attending?
17  A.  I was the attending.
18  Q.  Is it fair to say you approved of the
19      resident's prescription of Neurontin to
20      Mr. Shearer?
21  A.  Correct.
22  Q.  Did you have a discussion with Mr. Shearer
23      or did the resident have a discussion with
24      Mr. Shearer about Neurontin?
25  A.  I would assume the resident.
page 137
 1  Q.  Do you have any reason to believe that the
 2      resident discussed an increased risk of
 3      suicidal behavior with Neurontin when he or
 4      she prescribed Neurontin to Mr. Shearer?
 5          MR. BARNES:  Objection.
 6  A.  No.
 7  Q.  Do you know who the resident was?
 8  A.  No.
```

[139:7] - [139:21]    11/13/2009   Hynes, Wilfred

```
page 139
 7  Q.  When I asked you earlier about visits from
 8      sales representatives, I apologize, I didn't
 9      make a distinction whether they came to the
```

```
10      hospital, Brigham and Women's, or your
11      satellite office.
12              Can you tell us whether they came to
13      either the hospital, the satellite office,
14      or both?
15   A. When you say hospital, both settings were
16      hospital-based settings and outpatient
17      practices that they came to, and they would
18      come to both outpatient practices.
19   Q. And would they -- and in both circumstances,
20      did they actually visit with you?
21   A. Yes.
```

[139:23] - [141:23]        11/13/2009   Hynes, Wilfred

```
page 139
23              In terms of your prescription of
24      Neurontin to Mr. Shearer, is it fair to say
25      you did not discuss with Mr. Shearer the
page 140
 1      capacity for Neurontin to contribute to
 2      suicidal behavior?
 3              MR. BARNES: Objection. Assumes
 4      facts not in evidence.
 5   A. I guess I'm not sure that it was common
 6      knowledge at that time.
 7   Q. My question, however, is: Did you speak to
 8      Mr. Shearer about whether Neurontin had the
 9      capacity to increase suicidal behavior when
10      Neurontin was prescribed to him?
11              MR. BARNES: Objection.
12   A. Probably unlikely.
13   Q. In hindsight, this is a hypothetical
14      question, Doctor, if you did have knowledge
15      that Neurontin increased the risk of
16      suicidal behavior in patients taking
17      Neurontin, would you have shared that
18      information with Mr. Shearer?
19              MR. BARNES: Objection.
20   A. Yes.
21   Q. If you had known -- again, in hindsight,
22      that is hypothetical -- if at the time the
23      Neurontin was being prescribed to
24      Mr. Shearer, if you knew Neurontin had the
25      capacity to increase the risk of suicidal
page 141
 1      behavior, would you have considered
 2      alternatives to Neurontin?
 3              MR. BARNES: Objection.
 4   A. Considered? Sure.
 5   Q. Okay. Mr. Barnes asked you about a number
 6      of different types of regimens that could
 7      have considered, or maybe even were
 8      considered.
 9              Can you tell us what alternatives were
10      available to you back in October of 2000 if
11      you would have considered them in light of a
12      then known suicide risk with Neurontin?
13              MR. BARNES: Objection.
14   A. Certainly other anticonvulsants.
15   Q. If, at the time Neurontin was being
16      prescribed to Mr. Shearer, you had knowledge
17      that Neurontin had the capacity to
18      contribute or cause suicidal behavior, would
19      you have informed Mr. Shearer's caregiver or
20      family about that fact?
21              MR. BARNES: Objection.
22   A. I'm not sure if I would have the opportunity
23      to do that or not.
```

[142:1] - [142:8]          11/13/2009   Hynes, Wilfred

page 142

```
 1              If the United States package inserts
 2         for Neurontin had indicated in the warning
 3         that physicians should inform family and
 4         caregivers of an increased risk of suicidal
 5         behavior, would you have made a good faith
 6         attempt to do so?
 7                   MR. BARNES:  Objection.
 8    A.   That's not an unreasonable statement.
```

[145:17] - [147:23]        11/13/2009   Hynes, Wilfred

page 145

```
17    Q.   Did you ever actually become a speaker for
18         Neurontin?  In other words, a speaker who
19         was trained by the drug company to give
20         lectures about Neurontin?
21    A.   New York visit was for that.
22    Q.   Tell us -- can you tell me what happened
23         there?  How was the day spent?
24    A.   It was -- I don't know if it was one or two
25         full days of lectures.
```

page 146

```
 1    Q.   Do you recall any of the names of the
 2         individuals who gave lectures?
 3    A.   No.
 4    Q.   Did Edgar Ross give a lecture?
 5    A.   Probably.
 6    Q.   Was that the only speaker training you went
 7         to?
 8    A.   No, there was another one in Arizona, but I
 9         don't remember who that was with.
10    Q.   Was that for Neurontin, or Lyrica, or
11         something else?
12    A.   I'm not sure.
13    Q.   Do you remember the calendar year?
14    A.   Not exactly, no.
15    Q.   Did you travel with anyone else?
16    A.   No.
17    Q.   Was it during the winter or the summer or
18         the spring or the fall?
19    A.   It's probably the fall.
20    Q.   Was it after you had prescribed --
21                   MR. BARNES:  Objection.  I don't
22         think he's even established it was even
23         Neurontin or Pfizer -- why don't you
24         establish that.
25    A.   I've been -- those are the two that I
```

page 147

```
 1         basically have been to.
 2    Q.   With respect to the second speaker training
 3         that you attended in Arizona, possibly in
 4         the fall of a calendar year you don't
 5         recall, do you know whether it was a Pfizer
 6         speaker training seminar?
 7    A.   I'm not sure if it was Pfizer or
 8         Parke-Davis.  You know, I believe New York
 9         was Parke-Davis.  It was still Parke-Davis
10         then.  And I'm not sure if -- if it was
11         around that time.  You know, I think it
12         might have been before that.
13                   MR. BARNES:  Don't guess.
14    A.   I went alone.
15    Q.   Okay.
16              And to the best of your knowledge, was
17         it either Parke-Davis or Pfizer?
18                   MR. BARNES:  Objection.
19    A.   I think so.
20    Q.   Okay.
```

```
                21            To the best of your knowledge, did it
                22        involve either Neurontin or Lyrica?
                23   A.   I believe so.
```

[157:2] - [158:11]    11/13/2009  Hynes, Wilfred

```
page 157
                 2   Q.   In your presentations, not Neurontin, to
                 3        physicians after your training, did you --
                 4        did your prepared remarks reflect your
                 5        independent medical judgment regarding the
                 6        various treatment options for postherpetic
                 7        neuralgia?
                 8             MR. FROMSON:  Objection.  Form.
                 9   A.   No, those lectures were prepared slides.
                10   Q.   So you lectured off of prepared slides?
                11   A.   Yes.
                12   Q.   About neuropathic pain?
                13   A.   Correct.
                14   Q.   Okay.
                15            And it was structured so you would go
                16        through the various alternatives for the
                17        treatment of postherpetic neuralgia,
                18        correct?
                19   A.   I believe so.
                20   Q.   Okay.
                21            And you stayed with the prepared
                22        remarks, correct?
                23   A.   Yes.  We're instructed to not alter the
                24        slides in any way.  I do remember that.
                25   Q.   Did you find anything in the slides that you
page 158
                 1        did not agree with?
                 2   A.   You know, the only thing that everyone at
                 3        the meeting had a problem with was the
                 4        initial dosing.
                 5   Q.   What was that?
                 6   A.   Of Neurontin, I think.  I don't know what --
                 7        they recommended 600-milligrams three times
                 8        a day.
                 9   Q.   What did you usually want to start at?
                10   A.   That included even elderly patients.  And
                11        most of us really didn't agree with that.
```

[178:22] - [179:7]    11/13/2009  Hynes, Wilfred

```
page 178
                22   Q.   Now, when you prescribe it today -- you
                23        still prescribe Neurontin and other
                24        antiepileptic drugs for the treatment of
                25        pain, correct?
page 179
                 1             MR. FROMSON:  Objection.
                 2   A.   Correct.
                 3   Q.   Today do you advise patients that -- of the
                 4        latest information concerning the class
                 5        labeling for suicidal behavior or ideation
                 6        when you prescribe Neurontin?
                 7   A.   Yes.
```

[184:12] - [186:3]    11/13/2009  Hynes, Wilfred

```
page 184
                12   Q.   Doctor, is it also fair to say you rely upon
                13        the sales representatives to provide you
                14        with accurate information, right?  You
                15        wouldn't want him to provide you with
                16        inaccurate information?
                17   A.   That's correct.
                18   Q.   And they were a source of information for
                19        you to rely upon for your prescribing
```

```
20      practices, right?
21                MR. BARNES:  Objection.
22                MR. FROMSON:  I'll withdraw the
23      question.
24   Q. They were there to provide you accurate
25      information to the best of your knowledge as
page 185
 1      Mr. Barnes said, right?
 2   A. Yes, that was their job.
 3   Q. And with the expectation they would provide
 4      you with accurate information, you would
 5      rely upon it, at least in part, as part of
 6      your job as a prescribing physician; is that
 7      fair?
 8                MR. BARNES:  Objection.
 9   A. That is a fair statement.
10   Q. And they never discussed suicidality with
11      you; isn't that true?
12   A. I don't believe so.
13   Q. And when you were being trained as a speaker
14      in New York, the trainees -- the trainers
15      did not discuss suicidality with Neurontin
16      with you; is that true?
17                MR. BARNES:  Objection.
18   A. I don't believe so.
19   Q. And when you were in Arizona, the trainers
20      did not speak about suicidality there
21      either; isn't that true?
22                MR. BARNES:  Objection.
23   A. I don't believe so.
24   Q. And when you actually gave speeches as a
25      speaker, you were never told to discuss
page 186
 1      suicidality with Neurontin; isn't that true?
 2                MR. BARNES:  Objection.
 3   A. I believe so.
```

[189:16] - [191:15]        11/13/2009  Hynes, Wilfred

```
page 189
16   Q. I'd like to assume the following:  That back
17      in 1992, when the drug was going through its
18      approval process for the epilepsy
19      indication, and the FDA did a review of the
20      clinical trials, safety, and the risks that
21      were -- about Neurontin, and that the FDA
22      clinical reviewer in '92 made the following
23      statement:  "Less common, but more serious,
24      events may limit the drugs widespread
25      usefulness, depression, while it may not be
page 190
 1      an infrequent occurrence in the epileptic
 2      population may become worse and require
 3      intervention or lead to suicide and has
 4      resulted in some suicidal attempts."
 5          I'd ask you to assume that that is
 6      evidence in this case at the time of trial.
 7          Assuming that is true, did you know
 8      that when you were prescribing the drug to
 9      Mr. Shearer?
10                MR. BARNES:  Objection.
11   A. That?  No.
12   Q. Would you have wanted to know that
13      information about the FDA clinical review
14      and the FDA clinical reviewer's position on
15      the safety of Neurontin with respect to
16      depression and suicide when you were
17      prescribing the drug to Mr. Shearer?
18                MR. BARNES:  Objection.  Incomplete
19      evidence and beyond the scope of my
20      examination and irrelevant.
```

```
21        You may answer.
22 A.  I certainly would want to know as much as I
23     could about any drug.
24 Q.  And in particular, if you were using a drug
25     off label, and you knew that the drug had
page 191
 1     not been approved for the indication you
 2     were prescribing it, but there was a
 3     potential risk of depression and suicide
 4     attempt with that drug, is it fair to say
 5     that you would have wanted to know that?
 6            MR. BARNES:  Objection.  Assumes
 7     facts not in evidence.
 8            You may answer the question.
 9 A.  Yes.
10 Q.  Because knowing it could have affected your
11     prescribing practice for Neurontin back in
12     2000?  Would you agree with that?
13            MR. BARNES:  Objection.
14 A.  Hypothetically, yes.
15 Q.  Thank you.
```

[8:1] - [8:18]          10/28/2009   Mahon, James Jr

```
page 8
 1     Q.     All right.  Mr. Mahon, can you tell me
 2 when and how you first met Hartley Shearer?
 3     A.     We intended to move up to the Pine Cobble
 4 neighborhood where we now live and we went through
 5 the regular procedure to pick out a lot and I
 6 believe it was in the process of picking a location,
 7 a lot, and in walking around and in choosing a lot
 8 and then later in choosing a contractor that we
 9 talked to the Shearers and I first met Hartley
10 Shearer.
11     Q.     And about when would that have been?
12     A.     Early in the year of 1997.
13     Q.     And did you subsequently buy a lot?
14     A.     Well, with the college, it's not exactly
15 buy.  You end up -- You end up with a long-term
16 lease on it and you buy the house.
17     Q.     And when did you move into that house?
18     A.     September 1997.
```

[9:9] - [9:10]          10/28/2009   Mahon, James Jr

```
page 9
 9     Q.     The Shearers became your neighbors?
10     A.     Yes.
```

[10:14] - [11:17]          10/28/2009   Mahon, James Jr

```
page 10
14     Q.     Now, at some point after you moved into
15 Pine Cobble Road Mr. Shearer suffered a stroke.
16 Isn't that right?
17     A.     That's right.
18     Q.     Before the stroke, can you describe for me
19 the kinds of things you would see Mr. Shearer doing
20 in the yard?
21     A.     Well, in the yard?  No, not much, but
22 riding his bike or I'd see -- you'd see him drive
23 away in the car and wave.
24     Q.     When you say riding his bike, did he ride
page 11
 1 a bike for exercise or just to get around town or --
 2     A.     I think both.
 3     Q.     -- in what fashion would you see him
 4 riding a bike?
 5     A.     I think both.
 6            MR. SOH:  Jim, let him finish his question
```

```
 7  before you start to answer.
 8  BY MR. OHLEMEYER:
 9      Q.    Did Mr. Shearer appear to you to be in
10  good health prior to his stroke?
11      A.    Yes.
12      Q.    Now, after Mr. Shearer had his stroke, did
13  you see him as often?
14      A.    I don't know.  Maybe.  About the same.
15      Q.    And what sort of things would you see him
16  doing after the stroke?
17      A.    Walking.
```

[20:11] - [20:17]        10/28/2009   Mahon, James Jr

```
page 20
11      Q.    When you think of Mr. Shearer, what are
12  the attributes that kind of come to mind?  If
13  somebody asked you to describe Hartley Shearer, how
14  would you describe him?
15      A.    Interesting; sometimes gruff but amusing;
16  talented; thoughtful; had a soft spot for our cat.
17  That's about it.
```

[21:8] - [21:10]         10/28/2009   Mahon, James Jr

```
page 21
 8      Q.    Did his stroke change any of that?
 9      A.    You know, he was still the same person,
10  just with physical limitations.
```

[9:16] - [9:23]          3/27/2008    Sullivan, Daniel

```
page 9
16      Q.    Doctor, could you please state your
17  full name for the record?
18      A.    Daniel Michael Sullivan.
19      Q.    And you are a medical doctor?
20      A.    I am.
21      Q.    What is your current office
22  address?
23      A.    29800 Bainbridge Road, Solon, Ohio.
```

[15:22] - [16:15]        3/27/2008    Sullivan, Daniel

```
page 15
22      Q.    I want to ask you a few questions
23  about your practice during the time frame that
24  you were seeing Mr. Shearer.
25            How would you describe the nature
page 16
 1  of your practice during that time?
 2      A.    I was a general internist at the
 3  Williamstown Medical Associates.
 4      Q.    And how many doctors were in that
 5  clinic at that time?
 6      A.    It varied over the course of time I
 7  was there, from 16 to 24.
 8      Q.    And you were there how many years?
 9      A.    17 years.
10      Q.    Were there also nurses or physician
11  assistants in the clinic?
12      A.    Yes.
13      Q.    Approximately how many?
14      A.    Nurses, approximately six, and
15  there were three physician assistants.
```

[22:13] - [22:18]        3/27/2008    Sullivan, Daniel

```
page 22
13      Q.    Now, you prescribed Neurontin for
```

```
14  Mr. Shearer, correct?
15       A.    In reviewing the record, the only
16  place I have found that I prescribed it was
17  administering a refill for the medication on
18  one occasion.
```

[23:23] - [23:25]          3/27/2008    Sullivan, Daniel

```
page 23
23       Q.    And on what date did you approve
24  the refill for the Neurontin?
25       A.    On May 4th of 2001.
```

[24:11] - [24:25]          3/27/2008    Sullivan, Daniel

```
page 24
11       Q.    Okay.  5-4-01, Neurontin.  Does
12  this indicate the dosage in that prescription
13  and for how many days?
14       A.    It does not.
15       Q.    Okay.  So when you say you refilled
16  a prescription on this occasion, could that
17  refill have been a prescription that would have
18  lasted him for several months or a year,
19  perhaps?
20       A.    The exact length of time, I cannot
21  tell from this note, but it does say five
22  refills, so it was five times whatever that
23  prescription was.
24       Q.    And that's the "x 5 R"?
25       A.    Correct.
```

[25:7] - [26:13]           3/27/2008    Sullivan, Daniel

```
page 25
 7       Q.    And for what purpose did you
 8  prescribe Neurontin to Mr. Hartley [sic] on May
 9  4th, 2001?
10       A.    I was refilling a medication that
11  was prescribed by another physician.
12       Q.    And what do you mean by that, that
13  you were refilling a prescription?
14       A.    He was started on that medication
15  by physicians that -- specialists elsewhere,
16  and he had called our office requesting to
17  continue that treatment and asked us to contact
18  a local pharmacy so that he could continue the
19  medications that were recommended by his
20  physicians elsewhere.
21       Q.    And who was the physician elsewhere
22  that had originally prescribed the Neurontin to
23  Mr. Shearer?
24       A.    I don't know their name.  They were
25  in one of the Boston hospitals.
page 26
 1       Q.    And did -- at the time you refilled
 2  that prescription, did you know for what
 3  purpose you were refilling the prescription?
 4       A.    Mr. Shearer was being treated for
 5  pain after his stroke, and it was my
 6  understanding that this medication was being
 7  used for that.
 8       Q.    For neuropathic pain or just some
 9  type of pain?
10       A.    I don't know.
11       Q.    Now, did you talk with the doctor
12  that had originally prescribed the Neurontin
13  prior to refilling it for Mr. Shearer?
```

[28:12] - [28:15]          3/27/2008    Sullivan, Daniel

page 28
12        Q.    When you prescribed the Neurontin
13   for Mr. Shearer, were you prescribing it on
14   label or off label in May of 2001?
15        A.    I don't know.

[34:2] - [34:4]        3/27/2008    Sullivan, Daniel

page 34
2        Q.    Okay.  Do you have a memory of
3   treating Mr. Shearer?
4        A.    Vaguely.

[54:4] - [54:23]        3/27/2008    Sullivan, Daniel

page 54
4        Q.    If you'll turn with me to pages 48
5   and 49.  It looks like under -- on page 49
6   there's an entry from March 12, '98 that you
7   left a message for Mr. Shearer advising that he
8   has mitral valve -- his mitral valve has some
9   prolapse, and you've recommended that he see a
10   cardiologist.
11              What does that mean that his mitral
12   valve has some prolapse?
13        A.    It means, in my experience, that he
14   had an image of his heart done, very likely an
15   echocardiogram, that revealed that the valve
16   was -- had a finding where it was bowing
17   backwards, which is what prolapse is.
18        Q.    And what can be the result of that
19   condition?
20        A.    Highly variable, but in most people
21   it's -- if it's mitral valve prolapse by
22   itself, it's not a condition that warrants any
23   concern.

[55:5] - [55:13]        3/27/2008    Sullivan, Daniel

page 55
5        Q.    "Herr believes he had severe mitral
6   regurgitation due to mitral valve prolapse."
7              What is mitral regurgitation?
8        A.    That is a condition where mitral
9   valve prolapse is a problem.  That means the
10   blood flow in the heart is going backwards.
11        Q.    And is that a condition that
12   requires surgery?
13        A.    Sometimes.

[77:20] - [78:19]        3/27/2008    Sullivan, Daniel

page 77
20        Q.    Okay.  Now, I just want to confirm,
21   there was no office visit that day?
22        A.    I don't recall.
23        Q.    Well, if we can just go through,
24   and I see -- that's why I just want to confirm
25   that there was no office visit, it was just
page 78
1   over the phone.  Can you tell that from that
2   note, there was no office visit or --
3        A.    I can't tell.
4        Q.    Okay.  If we go back to the page in
5   front of you, let's -- if you can look at pages
6   17 and 18.  They're sort of out of order, but
7   I'm looking at the progress reports from April
8   of '01 through, I guess on page 17 and 18 on
9   the notes in front of you there are progress
10   reports from January 25 of 2001 through June 18

11  of 2001.
12      A.    Mm-hmm.
13      Q.    Do you see anything on there for
14  May 4th of 2001?
15      A.    I don't.
16      Q.    Okay.  Would this suggest to you
17  that there was a phone call, that it was filled
18  over the phone?
19      A.    Possibly.

[83:12] - [85:1]        3/27/2008    Sullivan, Daniel

page 83
12      Q.    Okay.  So there would have been
13  no -- let me ask you this: Do you consider
14  yourself a prescriber of Neurontin to
15  Mr. Shearer?
16      A.    What I can state -- the only thing
17  I can state based on the medical record is on
18  May 4th, 2001, I approved five refills on the
19  Neurontin.
20      Q.    I understand.  But I just -- I'm
21  just trying to put it in simple terms.  I mean,
22  do you -- is there a difference in your
23  practice between refilling a prescription by
24  another specialist or an original prescription
25  after an office visit?
page 84
1       A.    Yes.
2       Q.    Okay.  What is the difference
3   in -- difference there?
4       A.    The difference is making the
5   decision to initiate a therapy and assisting a
6   patient with continuing with therapy.
7       Q.    And so would you -- you wouldn't
8   have a risk/benefit discussion with Mr. Shearer
9   about his Neurontin usage as of 5-4 of 2001
10  when he called in for a telephone refill?
11          MS. SCHULTZ:  Object to the form.
12      A.    On that day, I can't recall what I
13  did.
14      Q.    Okay.  But on this typical
15  situation, your practice would be that you
16  would not subsequently call the patient and
17  say -- and give them a risk/benefit discussion
18  of the medication he's seeking a refill on?
19      A.    Usually not.
20      Q.    Okay.
21      A.    Fair enough.  I'm just trying
22  to -- yeah.
23      Q.    I just want to -- do you recall
24  ever having a risk/benefit discussion with
25  Mr. Shearer about Neurontin?
page 85
1       A.    No.

[89:20] - [90:10]       3/27/2008    Sullivan, Daniel

page 89
20          Did you believe that Mr. Shearer
21  was depressed and that's why you were
22  prescribing him Prozac?
23      A.    Reviewing the notes, it appears
24  that depression was one of his problems and we
25  do use Prozac for depression.
page 90
1       Q.    Okay.  But then there was also
2   testimony that you might have used it to help
3   him with his migraines as well.  That's what
4   I'm trying to get it.
5           Were you prescribing Prozac for

```
 6  Mr. Shearer because he was depressed, because
 7  he had migraines or both?
 8       A.   From my records, it would appear to
 9  me that the reason I was using Prozac was for
10  both.
```

[94:7] - [94:20]          3/27/2008    Sullivan, Daniel

```
page 94
 7       Q.   Dr. Sullivan, I just want to ask
 8  you a quick question about if a patient like
 9  Mr. Shearer called in and asked for a refill of
10  a medication, right, you obviously -- you
11  testified that your pattern and practice would
12  have been to review the medications and approve
13  them, correct?
14       A.   Correct.
15       Q.   And as you reviewed them, if you
16  saw something that looked odd or anything like
17  that, you obviously had the power to red flag
18  it or deny it or call up the patient and say I
19  don't think this is a good idea, correct?
20       A.   Correct.
```

[98:9] - [102:13]         3/27/2008    Sullivan, Daniel

```
page 98
 9       Q.   All right.  Go to page 2 for a
10  second, first full paragraph.  They talk,
11  "There was a statistically significant
12  increased risk of suicidal behavior and
13  suicidal ideation in the patients randomized to
14  receive an antiepileptic drug compared to
15  patients who received a placebo."
16            Do you see that?
17       A.   I do.
18       Q.   What does that mean to you?
19            MS. SCHULTZ:  Object to the form.
20       A.   If I can just read the sentence.
21  It's a statement that there's an increased risk
22  of suicidal behavior and suicidal ideation in
23  patients that received an antiepileptic drug
24  compared to patients who received a placebo.
25       Q.   Okay.  "All patients treated with
page 99
 1  antiepileptic drugs should be monitored for
 2  suicidality and other unusual changes in
 3  behavior."
 4            MS. SCHULTZ:  Where are you
 5  reading?
 6            MR. SOH:  Oh, I'm sorry.
 7       Q.   I'm going down three paragraphs,
 8  sir.  Okay?
 9       A.   Mm-hmm.
10       Q.   It says, "All patients treated with
11  antiepileptic drugs should be monitored for
12  suicidality and other unusual changes in
13  behavior.  Symptoms such as anxiety, agitation,
14  hostility, mania and hypomania may be
15  precursors to emerging suicidality."
16            And it says, "Healthcare
17  professionals who prescribe antiepileptic drugs
18  should:"
19            First bullet point:  "Balance the
20  risk for suicidality with the clinical need of
21  the drug.
22            "Be aware of the possibility of the
23  emergence or worsening of depression,
24  suicidality or any unusual changes in
25  behavior."
page 100
```

```
 1            And then last bullet point is:
 2  "Inform patients, their families and caregivers
 3  of the potential for an increase in the risk of
 4  suicidality so they are aware and able to
 5  notify their healthcare providers of any
 6  unusual behavioral changes."
 7            Do you see that?
 8       A.   I do.
 9       Q.   All right.  If you had seen an
10  analysis such as this in 2001, when you
11  refilled Mr. Shearer's prescription, would you
12  have spoken to Mr. Shearer about the increased
13  risk of suicidality?
14            MS. SCHULTZ:  Object to the form.
15       A.   I don't know.  Because it didn't
16  happen, so I don't know what I would have done.
17       Q.   Well I mean, fair to say that
18  you -- suicide is a -- I mean, let's back up.
19            Would you have wanted to know this
20  information that is statistically significant
21  increased risk of suicidality was seen in
22  antiepileptic drugs such as Neurontin while you
23  were making the decision to prescribe
24  Neurontin?
25            MS. SCHULTZ:  Object to the form.
page 101
 1       A.   Every medication I always review in
 2  my mind risks and benefits --
 3       Q.   Sure.  And this is -- I'm sorry.
 4       A.   -- and there are medications
 5  that -- while possibly would not have a patient
 6  take under my direction and others that would
 7  be okay.
 8       Q.   This demonstrates a risk, though,
 9  doesn't it?
10            MS. SCHULTZ:  Object to the form.
11       Q.   Per the FDA?
12       A.   This form -- this piece of paper
13  you've provided me that has the FDA logo on the
14  top has sentences that show that there's a
15  risk.
16       Q.   Okay.  And you would factor that
17  into, if you're aware of this alert, you would
18  factor that into your decision with regard to
19  the risks and benefits of prescribing Neurontin
20  to patients?
21            MS. SCHULTZ:  Object to the form.
22       A.   As of today, looking at this piece
23  of paper, if I was to prescribe Neurontin
24  myself, initiate the therapy of Neurontin for
25  someone in the condition where I occasionally
page 102
 1  use it which is postherpetic neuralgia, I would
 2  certainly take this into account.
 3       Q.   Okay.  What about similarly if you
 4  were prescribing Neurontin off label, you would
 5  also take that into account, wouldn't you?
 6            MS. SCHULTZ:  Object to the form.
 7       A.   I'm not aware where I've ever
 8  initiated the therapy for Neurontin off label.
 9       Q.   If you're refilling a prescription
10  for off-label use of Neurontin, would you
11  consider this?
12            MS. SCHULTZ:  Object to the form.
13       A.   Today I would.
```

[5:25] - [6:3]        10/29/2009  Wheeler, Sean

```
page 5
25       Q    Where do you live?
page 6
```

```
                    1      A     In Southington, Connecticut.
                    2      Q     And what do you do there?
                    3      A     I'm a retail manager for Banana Republic.
```

[6:22] - [6:24]        10/29/2009  Wheeler, Sean

```
page 6
22      Q     Where did you grow up?
23      A     I grew up in, actually, Lynn
24  Massachusetts, just north of Boston.
```

[7:9] - [7:17]         10/29/2009  Wheeler, Sean

```
page 7
 9      Q     Tell me when and how you met Hartley
10  Shearer?
11      A     I met him through a mutual friend.  I had
12  met him after he had had his stroke.  The gentleman
13  who is a mutual friend of ours is somebody that I
14  played basketball with on a regular basis, just
15  pick-up basketball, and he had referred the
16  Shearers -- referred the Shearers to me just for
17  doing odd jobs around the house.
```

[8:1] - [9:21]         10/29/2009  Wheeler, Sean

```
page 8
 1      Q     Do you recall about when you first met
 2  Mr. Shearer?
 3      A     I would have to say it was, from my best
 4  estimate, a couple of months after he had had a
 5  stroke.
 6      Q     And as I recall, his stroke was in January
 7  of 1999?
 8      A     That sounds about right.
 9      Q     So, you would have met him early in the
10  year of 1999?
11      A     Yes.
12      Q     And how quickly did you begin -- I guess
13  working is the word -- for the Shearers or helping
14  the Shearers?
15      A     I just kind of did odd jobs for them, you
16  know, just -- whether it be mowing the lawn or
17  painting the back porch or something like that.  You
18  know, it just started off with little things, you
19  know, whatever they really needed me to do.  We need
20  you to clean out the garage today, we need you to --
21  could you do us a favor and run to the store and
22  pick up this stuff for us?  I just kind of did odd
23  jobs for them, and then odd jobs turned into, you
24  know, being about 25 to 30 hours a week I was
25  working there.
page 9
 1      Q     And were those odd jobs necessitated by
 2  Mr. Shearer's stroke?
 3            MR. FROMSON:  Objection; form.
 4  BY MR. OHLEMEYER:
 5      Q     You can go ahead and answer.
 6      A     I'm not sure if they had someone who did
 7  the things that I did, you know, maybe before
 8  Mr. Shearer had a stroke, I'm not sure if he did a
 9  lot of his own chores.  I was under the
10  understanding that he was a pretty active guy and he
11  would always do what he could, but I think that
12  after they had, you know, after he had his stroke, I
13  just picked up more things to do around the
14  neighborhood, and maybe they had -- you know I
15  remember at one point in time they had a landscaper
16  that used to come there and, you know, after awhile,
17  I started helping them out with that type of stuff,
18  you know, and doing those type of things instead of
```

19  them having the landscaper do them.
20      Q     Did they pay you for that work?
21      A     Oh, yeah, they always paid me, so.

[10:16] - [12:8]        10/29/2009  Wheeler, Sean
                        page 10
16      Q     Did you live in the neighborhood?
17      A     Yes, I did, I lived right down the street
18  from them.  It was maybe a five minute -- at first I
19  lived down the street from them because I was
20  staying with my parents at the time, then I ended up
21  getting an apartment the next town over, so, you
22  know, the five minute, you know, the two minute ride
23  turned into maybe a 10 to 15 minute drive.
24      Q     And did you have -- how long -- how much
25  time went by then before you became somebody who was
page 11
 1  doing 25 to 30 hours of work for them?
 2      A     It started off as odd jobs for maybe like
 3  six months or so.
 4      You have to forgive me if my times are off,
 5  this was eight years ago.  You know, the time was a
 6  little off.  I would say somewhere between four and
 7  six months I was working doing odd jobs for them and
 8  then it kicked into Linda asking me if I could
 9  possibly come over in the morning and help Hartley
10  with things and be there in the afternoon and help
11  him, you know, exercise and, you know, do those type
12  of things, and I think the reason for that was just
13  because, you know, Hartley and I just kind of hit it
14  off, so we got along pretty well.
15      Q     What kind of guy was Mr. Shearer?
16      A     He was an interesting guy, that's for
17  sure.  We always got along really well.  Some people
18  kind of viewed him as a curmudgeon.  I always got a
19  kick out of him.  You know, he was kind of like the,
20  you know, Ebenezer Scrooge type, you know, he was a
21  little ornery, but, I guess, I always thought he was
22  a pretty likeable guy and he was pretty humorous.
23      We kind of had that "Scent of a Woman" kind of
24  relationship, I guess, where, you know, Hartley was
25  the older guy who, you know, was tough to get to
page 12
 1  know and then, you know, once I got to know him, we
 2  hit it off pretty well.  So I used to let him do
 3  whatever he needed to do, and I'd always say to him,
 4  you know, if you need help with something, you know,
 5  don't be afraid to ask, you know, and if you fall
 6  down, I'm going to pick you up, too, you know.  So I
 7  would let him do as much as he possibly could, you
 8  know, when I was there.

[12:24] - [16:5]        10/29/2009  Wheeler, Sean
                        page 12
24      Q     What -- did you have a regular schedule at
25  that point then when you started to do that?
page 13
 1      A     Um, I mean, pretty much every weekday,
 2  Monday through Friday, you know, depending on what
 3  Linda's schedule was like, I would really try to
 4  show up over there at, you know, anywhere from about
 5  six to somewhere -- somewhere between six and eight,
 6  depending on what time she was going into work, and,
 7  you know, I would get there, Hartley would probably
 8  just be getting out of bed at the time, you know,
 9  and I would, you know, I would help him.  I think
10  when he used to sleep at night, he used to get real
11  stiff, so I'd help him stretch a little bit, help
12  him get ready, help him -- you know, he didn't

13  shower every day just because that was like an
14  inconvenience kind of, so he would use like baby
15  wipes and things like that just to kind of clean
16  himself up for the day.  I'd help him get dressed.
17  And he was, at the time, for awhile, teaching a
18  class at Williams and I would kind of set him up for
19  the morning with his books and everything that he
20  might need so he wasn't going up and down stairs,
21  and then I would, you know, if he was all set, had
22  everything he needed, I would head to class for
23  three or four hours, maybe even two hours, just
24  depending on what my class schedule was like, and
25  then I was done, I would come back in the afternoon,
page 14
 1  make sure he was -- you know, we'd have lunch
 2  together, you know, watch a little news, whatever we
 3  had to watch, you know, and then in the afternoon he
 4  would always want to exercise.  He had a hill next
 5  to his house and, you know, we'd walk up and down
 6  the hill a couple times, you know.  I'd make sure he
 7  was all right.  You know, he had braces on his legs,
 8  he had his braces were positioned properly.  If it
 9  was, you know, some days if it was raining, he had a
10  little like a universal gym downstairs, he would do
11  as much as he possibly could, I'd spot him, make
12  sure he was all right, you know, and then when he
13  came back from exercising, I'd, you know, I'd help
14  him get cleaned up, get out of the sweaty clothes he
15  was wearing and set him up for the evening, whatever
16  he wanted to do, and by that time Linda was usually
17  making her way home.
18      Q    Was that like a typical routine?
19      A    That was a typical routine like a day in
20  and day out routine.
21      Q    Was he a fairly disciplined guy as far as
22  his physical limitations?
23      A    You mean as far as keeping a schedule, you
24  mean?
25      Q    Yes.
page 15
 1      A    Yeah, he was, he usually tried to keep the
 2  same schedule every day, he didn't really ever
 3  deviate from that, you know.  I feel like days when
 4  he felt sore or something was bothering him, he
 5  really always tried to get out and exercise and do
 6  something, you know, I didn't know Hartley before
 7  his stroke, but, you know, from what I gather, he
 8  was a very active guy and like when he lost that he
 9  just really every day he just, you know, he was
10  determined to get out and do something.
11      Q    How did you all pass the time when you
12  weren't specifically doing something that needed to
13  be done?
14      A    He was really always, you know, working on
15  projects for school.  I remember he had a film
16  project that he was doing, it was kind of an art
17  piece and, you know, he was really always like
18  splicing clips together and trying to record things
19  to show to his class.  You know, if we weren't
20  exercising or something, we used to actually go
21  shopping a lot.  He would always have odds and ends
22  that he needed and we would go shopping a lot, so.
23  You know, we'd always be, you know, running errands
24  together, whether it be for, you know, he had a
25  fancy for Staples, he loved Staples.  I don't know
page 16
 1  if -- he was all about office supplies and things
 2  like that, so.  But if we weren't doing that, too,
 3  there was a lot of times when I was always taking
 4  him to doctors' appointments, that was a regular
 5  thing that was going on.

[21:10] - [24:7]         10/29/2009   Wheeler, Sean

page 21
10        Q     Did you know he that Mr. Shearer had a gun
11  in the home?
12        A     Yes, I did.
13        Q     How did you know that?
14        A     We -- he actually purchased the gun when
15  he was with me one day.  We -- you know, I always
16  understood that, you know, that because he was a
17  sportsman, you know, he needed some kind of outlet
18  for physical activity and, from what I understood,
19  one of his friends recommended to him that, you
20  know, it might be something that he want to do, you
21  know, to release some stress.
22        Q     Is that something he told you or that you
23  just --
24        A     I feel like we had a conversation about it
25  at one point in time about how someone had
page 22
1   recommended to him, you know, that, you know, that
2   he do this and, you know.
3         Q     Tell me about the day that you actually
4   went to buy the gun.  Did he say I need -- I'm not
5   trying to be facetious, but, you know, I've got
6   three stops today, I've got to go to the doctor,
7   I've got to go to Staples, and I need to buy a gun?
8   Did you have a conversation about it?
9         A     He actually was researching it for awhile,
10  like what kind of gun that he wanted to buy and, you
11  know, he was -- I think that at first I was, you
12  know, maybe -- I'm not from the type of family
13  that -- like my dad doesn't hunt, you know, I don't
14  have friends that hunt, you know, I don't have
15  friends that own guns, so at first I was a little
16  leery of it, but I think that Hartley was very
17  concerned with the esthetics of the gun, you know,
18  what the gun looked like; what did the handle look
19  like?  Do you know what I mean?  He really just
20  wanted to get something that was, you know, kind of
21  interesting looking.  And, to me, that was almost
22  like a, you know, it let me know that, you know, he
23  wasn't after it for purposes, you know, of a higher
24  cause, that he was actually, you know, looking at it
25  for sport.  And he was, you know -- I mean, the guy
page 23
1   was an art teacher, so he was just very into -- I
2   kind of said to him at one point in time when he was
3   looking at them because he was looking at so many
4   different places for this gun.  I was like, why
5   don't you just get this one?  And he's like, I don't
6   want that, you know, I don't like the color of that
7   one, and I don't like the way the handle looks
8   either, and I was like, oh, okay, so.
9         Q     Did he ever tell you -- let me rephrase
10  it.
11        Did you and he -- did you ever see him use the
12  gun in your presence?
13        A     Yeah.  There was a firing range in the
14  next town over.  I'm pretty sure it was a police
15  firing range, but it was like makeshift kind of
16  thing.  It was like outside, you know, on a hillside
17  that was kind of chopped, and he would go to this
18  firing range and, you know, set up cans and things
19  like that, and, you know, take shots at.  I mean, we
20  only probably did it together once or twice, but,
21  you know, he did go to this firing range and do
22  those things.
23        Q     Do you remember about when he bought the
24  gun?
25        A     Like I said, this is, like, so long ago.

page 24
1  When I started working -- I want to say it was in
2  the fall.
3       Q    So --
4       A    I think I had been working for him for a
5  few months, you know, on a full-time basis when he
6  decided that, you know, this was a sport that he
7  wanted to pursue.

[24:24] - [25:18]        10/29/2009   Wheeler, Sean

page 24
24      Did he ever tell you that he wanted to buy the
25  gun, you know, for protection?  You know, some
page 25
1  people have guns in their home because they think
2  it's going to help them --
3       A    I don't remember him saying that.
4       Q    Did he ever tell you that he wanted to buy
5  the gun to do harm to anybody?
6       A    No.
7       Q    Did he ever tell you that he wanted to
8  have a gun because he was thinking of doing harm to
9  himself?
10      A    No.
11      Q    Did he ever discuss with you harming
12  himself or --
13      A    Never.
14      Q    Did he ever discuss suicide with you?
15      A    No, never.
16      Q    Did you ever observe him to think about or
17  act as if he was interested in suicide?
18      A    No.

[26:20] - [27:18]        10/29/2009   Wheeler, Sean

page 26
20      Did you ever observe him to be in pain, you
21  know, physical pain?
22      A    The only time Hartley ever, you know, he
23  just looked uncomfortable.  You know, he had one arm
24  that kind of, you know, did this, you know, and, you
25  know, he, basically, he'd be always -- I'm sure -- I
page 27
1  don't think he had much feeling in his arm, but, I
2  mean, he'd always be, you know, just like really
3  stretching it out and, you know, doing that type of
4  stuff and just really -- you know -- his arm -- he
5  had movement through his shoulder, but his arm was
6  pretty dead, so he would really just try to like --
7  sometimes just stretch and pull this, you know, as
8  much as he could.  And, you know, it was the same
9  thing with his foot, you know, I mean, he had this
10  brace on his foot that pretty much acted like --
11  like a stilt, you know.  And like the same thing,
12  like if I was helping him stretch out, you know,
13  like trying to, you know, move his foot and things
14  like that, you know, it was uncomfortable for him,
15  but he never, you know, I don't think I ever
16  remember Hartley saying, you know, I'm in a lot of
17  pain today or anything like that, he was just -- he
18  just kind of soldiered on with everything.

[28:20] - [30:2]        10/29/2009   Wheeler, Sean

page 28
20      Q    Was Mr. Shearer somebody who was
21  embarrassed or self-conscious about his physical
22  condition?
23           MR. FROMSON:  Objection; form.
24           THE WITNESS:  I mean, you know, for -- in

```
          25      my opinion, you know, I guess when you go from
page 29
           1      being an active guy to being able to take care
           2      of yourself all the time to having to rely on
           3      people around you all the time to make sure
           4      that, you know, you're set up and you're in the
           5      right place, you know, he might consider that
           6      to be, you know, embarrassing.
           7              I always thought of him as a pretty proud
           8      person even when I -- I just knew him after the
           9      stroke, so I didn't know him before the stroke,
          10      but I always thought he was a pretty proud
          11      person.
          12  BY MR. OHLEMEYER:
          13      Q    What was the basis of your belief that he
          14  was a proud person?
          15      A    I think that Hartley was an intelligent
          16  individual and, like, maybe physically, you know,
          17  when he had part of his, you know, use of his
          18  mobility taken away, you know, sometimes when people
          19  look at you on first view, they'll just say, you
          20  know, look at that poor guy, he's crippled,
          21  basically, but, you know, Hartley was pretty sharp,
          22  he was a sharp guy, sharp as a tack, so I think
          23  that, you know, I think that he just was embarrassed
          24  by people looking at him, you know, on appearance
          25  that, you know, he couldn't move, you know, he
page 30
           1  couldn't do the things that he used to do anymore.
           2  I think that's pretty natural, though.
```

[30:21] - [35:9]        10/29/2009  Wheeler, Sean

```
page 30
          21      Q    Did Mrs. Shearer ever talk with you about
          22  Mr. Shearer's state of mind or attitude about his
          23  limitations?
          24      A    No.
          25      Q    Did she ever talk with you or express any
page 31
           1  concerns about Mr. Shearer being depressed?
           2      A    No.
           3      Q    Did she ever talk with you or suggest that
           4  she had observed or heard Mr. Shearer think about or
           5  talk about suicide?
           6      A    No.
           7      Q    Do you know if Mr. and Mrs. Shearer ever
           8  had arguments -- strike that.
           9          Did you ever observe Mr. and Mrs. Shearer to
          10  have arguments about his state of mind or about his
          11  attitude?
          12      A    Never --
          13          MR. FROMSON:  Hold on.
          14          Objection to form.
          15          Thank you.
          16          THE WITNESS:  Never in my presence.  They
          17  just kept things pretty professional when I was
          18  around, you know, other than, you know, in the
          19  morning when Hartley, you know, took his life,
          20  you know, the two of them were arguing on the
          21  phone that morning and that was really like the
          22  first time I ever heard them argue about
          23  anything, and I really wasn't, you know -- it
          24  was one of those things when he was on the
          25  phone when I showed up, you know, in his
page 32
           1  office, which was on the first floor of their
           2  house, and, you know, I had, you know, I would
           3  never really knock or anything like that, I was
           4  always just to let myself in, because I knew
           5  they were expecting me, so he was on the phone,
```

```
 6       you know, kind of going back and forth with
 7       Linda a little bit, which is like the first
 8       time I had ever heard them argue about
 9       anything, but, obviously, if he's on the phone,
10       I'm not hearing what's coming out of her end,
11       I'm just hearing his end, and I just kind of
12       went about my business as usual and, you know,
13       started cleaning up their kitchen, doing their
14       dishes, you know, cleaning up the house.  I had
15       come there that day to take Hartley to a
16       doctor's appointment.  I can't remember whether
17       it was a doctor's appointment to get braces
18       fitted or it was a doctor's appointment to get
19       blood work done, I can't remember.
20   BY MR. OHLEMEYER:
21       Q    Why do you believe that they were having
22   an argument?
23       A    Well, I mean, Hartley's tone of voice, you
24   know.  I could hear him kind of yelling and, you
25   know, going on.  That was -- Linda was gone that
page 33
 1   week, she was in Hawaii, so I just -- he was
 2   frustrated, for whatever reason, that, you know, he
 3   was -- that she was not there that week, you know,
 4   and Ivor was staying in the house, too, that week,
 5   but he had left that morning to go back to school to
 6   do something, so, you know.
 7       Q    You knew Mr. Shearer well enough and had
 8   been around him long enough that you could observe
 9   frustration in his voice?
10            MR. FROMSON:  Objection; form.
11            THE WITNESS:  Yeah.  I mean, like I said,
12       he always kept things pretty business with me.
13       He never -- if he was mad at me about anything,
14       he never showed it, you know, he would always
15       just keep his cool, you know.  I think he
16       appreciated having me there doing the things
17       that I was doing for him, so, you know, he
18       never once when I was working for him even
19       raised his voice to me or anything like that.
20       So, I mean, when he was on the phone like
21       raising his voice, you know, you know,
22       obviously, I knew he was upset about something.
23   BY MR. OHLEMEYER:
24       Q    Let's back up a little bit and talk about
25   that day.
page 34
 1       Do you recall how long Mrs. Shearer had been
 2   out of town that week?
 3       A    She was -- I think she was due to have
 4   been out of town for about a week, but had only -- I
 5   mean, when this happened it was probably about
 6   halfway through her week, if I remember correctly.
 7       Q    And what time did you arrive at the
 8   Shearers' that day, do you remember?
 9       A    I think it was around like noon, to the
10   best of my knowledge.
11       Q    Why hadn't you gone earlier in the morning
12   that day?
13       A    Because Ivor had been there that morning,
14   so he was helping get Hartley set up in the morning.
15   Like I said, when Ivor was around, you know, if Ivor
16   had to shoot back to school for something, that's
17   when I would get called in to help him out, but if
18   Ivor was around consistently, like there might have
19   been times when I took like a week off just because,
20   you know, someone was always with Hartley all the
21   time, so every once in awhile I'd have Ivor give me
22   a call and say, you know, can you come by; are you
23   free this afternoon?  Because I have to do A, B, C
24   or D.  And then I would, you know, come over and,
```

```
25  you know, help him out.
page 35
 1       Q     Was Mr. Shearer on the phone when you
 2  arrived that day?
 3       A     I do believe he was.
 4       Q     Was he on the phone -- well, how long was
 5  he on the phone after you arrived?
 6       A     Maybe -- I don't really think he was on
 7  the phone for much longer after I got there.  Maybe
 8  five to 10 minutes.  I can't -- honestly, I'm just
 9  kind of guessing.
```

[38:17] - [43:11]          10/29/2009   Wheeler, Sean

```
page 38
17       Q     Do you know if Mr. Shearer left a suicide note?
18       A     I did see a suicide note because he had
19  locked his bedroom door.  If you walked up their
20  stairs and walked down the hallway, their bedroom
21  was to the right, the first door to the right, and
22  that door was locked when I had gone upstairs, so
23  when I had ran around the corner, you know, and
24  tried to call for him, there was a bathroom between
25  where his study was and where their room was, you
page 39
 1  know, and, obviously, when I had -- I didn't see it
 2  until I was leaving that room, you know.
 3       Q     So, were you the person that actually
 4  found it or did the police find it?
 5       A     I mean, I like looked at it and as I was
 6  on my way, you know, to -- actually, I think I ran
 7  downstairs and called 911.  I don't really remember.
 8  To be honest with you, I don't really, you know, I
 9  do remember seeing a suicide note, but I don't
10  remember at what point in time I saw that.  I don't
11  remember whether it was leaving the room or if I had
12  called 911 first.  I'm pretty sure I ran downstairs
13  and called 911 first.
14       Q     Fair enough.
15             What I'm interested in is where it was in
16  relationship to Mr. Shearer, was it outside the room
17  or inside the room?
18       A     It was in his study on the desk.
19       Q     And -- how did you -- how did you -- what
20  alerted you to the fact that something might have
21  happened that day in the home?
22       A     What alerted me?
23       Q     Yes.
24       A     Well, I was downstairs, you know, when he
25  asked me for time, you know.  I had kind of been,
page 40
 1  you know, saying to him all day, like we got to get
 2  going, you got an appointment, we got to get going,
 3  you got an appointment, we're going to be late for
 4  this appointment, and, like I said, he was upset all
 5  that morning, you know, he was noticeably, you know,
 6  agitated.
 7       Q     And is it your -- does Exhibit 1 refresh
 8  your recollection that he was on and off the phone
 9  with Mrs. Shearer?
10       A     I don't remember him being on and off the
11  phone, I just remember him, you know, while I was
12  cleaning -- as I'm sitting here today, I just
13  remember him being on the phone and yelling back and
14  forth with Linda on the phone as I was cleaning up
15  their kitchen and, you know, had the dishwasher
16  running and the T.V. was also going, too.  They had
17  just a little small T.V. in the kitchen.
18       Q     Do you remember what he was saying?
19       A     I was just more or less paying attention
20  to the tone of his voice.  Like I could hear him
```

21 yelling and I was not actually listening to him, you
22 know, what he was saying.
23      Q     Then when he got off the phone, did you
24 speak with him?
25      A     Um, not anything related to that, just

page 41

 1 along the lines of, like, all right, we got to get
 2 going, we have an appointment, you know, and I
 3 remember -- he used to have a little chair in his
 4 bathroom that he'd sit down in so he could see
 5 himself and brush his teeth and do his hair and I'm
 6 pretty sure I propped him in that chair, got him
 7 ready, you know, and did all that stuff and he, you
 8 know, got ready to leave and, you know, he had said,
 9 you know, I said, look, okay, let's go, let's get
10 dressed, and he said he was -- either I think he
11 said he was tired and he was going to go upstairs
12 and to give him a couple of minutes, you know, he
13 had gone upstairs to his room, you know, and I said,
14 all right, I'm just going to keep doing things down
15 here and then we're going to be on our way.
16      Q     And then what happened?
17      A     I was downstairs, you know, dishwasher
18 going, T.V. on, you know, I think I was actually in
19 the sink, you know, just washing some things that,
20 obviously, you just couldn't put into the
21 dishwasher, so -- I used to be kind of meticulous in
22 the house, just making sure if I was there, that it
23 was not a mess, because there was, you know, down
24 time -- and I just heard like a crack from upstairs
25 and at first -- the first thought in my head was

page 42

 1 that he had fallen on something like a, you know,
 2 like an end table, or something like that, and it
 3 was the wood snapping.  The thought didn't even go
 4 off in my mind that it was the gun, you know, and I
 5 had heard like a fall over my head, too, so I had
 6 yelled, you know, from downstairs, you know, hey,
 7 are you okay?  And then I had gone -- when I ran
 8 upstairs to, you know, like from outside his door,
 9 his door was closed, hey, are you okay?  Nothing.
10 You know.  And, you know, like it says, I probably
11 heard like a strange, you know, kind of like a noise
12 of him gargling, or whatever it was, and when I
13 tried to open the door, that was locked, so then I
14 ended up going to the far end of the hallway, you
15 know, to where his study was, and his study and his
16 bedroom -- sorry -- his study in his bedroom was
17 connected by their bathroom, so I went through there
18 and that's when I saw him.
19      Q     And the note was in the study, though, not
20 the bedroom?
21      A     It was in the study, from the best of my
22 knowledge.
23      You know, like I said, I thought I saw -- this
24 is me just remembering from eight years ago -- I
25 thought I had saw something on his, you know, I

page 43

 1 didn't read anything, I just thought I had saw -- it
 2 could have just been paperwork, do you know what I'm
 3 saying?  But, you know, I do believe the
 4 Williamstown Police had told me that there was a
 5 suicide note, and then, in my mind, I thought, well,
 6 maybe I saw that on the study, you know, on the
 7 desk.
 8      Q     Did you see the gun?
 9      A     Yes, I did, on the floor.
10      Q     And was it the gun that he had purchased?
11      A     Yes.

[44:7] - [46:4]          10/29/2009   Wheeler, Sean

page 44
```
 7        Did you ever talk with Mrs. Shearer about
 8   Mr. Shearer's suicide?
 9        A    Not really in like specifics.
10        I mean, like when she came back to town,
11   obviously, she had some things to take care of and
12   she had invited my mom and myself over to their
13   house a couple of nights after that just to kind of,
14   you know -- I guess it was just like a damage
15   control kind of thing, just saying like we're really
16   sorry that this happened, you know.  It was more
17   like -- it was more like Linda saying, I don't think
18   that Hartley planned to do this, you know,
19   especially in your presence, because he thought very
20   highly of you.  She just said that he -- you know,
21   that he just -- she just thought that he wasn't
22   thinking clearly that day.
23        Q    Did she tell you that?
24        A    Yeah, you know, in a couple of different
25   ways, you know.  She had just always said to me that
```
page 45
```
 1   she was sorry that, you know, it happened when I was
 2   there, because we had a good relationship and, you
 3   know, he would never want this to be something that,
 4   you know, was how he, you know, how he was
 5   remembered to me, you know.  But that was pretty
 6   much, you know, all that she said, you know.  I
 7   think she, obviously, felt, you know, awful that I
 8   was there that day, too.
 9        Q    And I'm not suggesting anything by asking
10   the question, but she didn't suggest or imply or
11   blame you for any of it, did she?
12        A    No, not at all, no.
13        Q    Did she ever ask you why you thought it
14   happened?
15        A    No.
16        Q    Did she ever tell you why she thought it
17   happened?
18        A    Not really.
19        I mean, the whole thing was just kind of
20   bizarre because it was just like -- it just, you
21   know, if I had felt that was going to happen that
22   day, I would have done something to prevent it.  You
23   know, if he had said something to me like, you know,
24   I'm thinking about doing this, I probably would have
25   hid his gun and I probably would have called the
```
page 46
```
 1   police and had them up there, you know.  You know,
 2   if that's something that Mr. Shearer wanted to do,
 3   then that was his business, but it wasn't something
 4   that I would allow him to do on my watch, you know.
```

[48:15] - [50:7]          10/29/2009   Wheeler, Sean

page 48
```
15        Q    Did you, in the time you knew Mr. Shearer,
16   did you ever observe a day where he was having
17   trouble making decisions?
18        A    Um --
19             MR. FROMSON:  Just note my objection to
20        form.
21             THE WITNESS:  You know, the time that we
22        spent together, he was like a shopaholic.  We'd
23        go out shopping all the time.  Like I said,
24        we'd go to Staples.  And I had a car that was
25        pretty easy to get in and out of for him, it
```
page 49
```
 1        was a '68 Mustang, you know, just an old
 2        classic car and he had a Jeep Grand Cherokee,
```

```
 3        and that was pretty tough for him since he
 4        was -- I want to say it was his left arm -- his
 5        left arm was paralyzed -- it was tough for him
 6        to use one arm to get into the car and for me
 7        to hoist him into his Jeep, so we would take my
 8        car shopping.  And I would always say to him
 9        are you sure we're not going to buy a ton of
10        stuff today?  Because I have a '68 Mustang and
11        I can't fit too much stuff in there.  And he
12        was like, no, we're just going to buy odds and
13        ends.  But when we would go out shopping, you
14        know, twenty dollar's worth of supplies from
15        Staples would turn into four hundred dollar's
16        worth of supplies from Staples and like new
17        office chairs and all these other things.  So,
18        you know, I mean, that was -- he would always
19        be like sitting -- we'd be at Staples for,
20        like, three hours and I'd be like, Hartley,
21        what do we really need here?  It's like the
22        Most Wonderful Time of the Year commercial when
23        the father is throwing all the stuff in the
24        cart and the kid is pushing it.  It would be
25        stuff like that.  And we'd go to Staples and
page 50
 1        debating what he wanted and needed -- and I
 2        don't know whether shopping gave him, you know,
 3        some kind of release for him like him buying
 4        all these things all the time.  Like it was
 5        just like a euphoric thing, but we were just
 6        shopping all the time.  And even Linda was like
 7        you need to help me help him stop.
```

**[50:23] - [51:7]**          **10/29/2009   Wheeler, Sean**

```
page 50
23        Q    Would you describe Mr. Shearer as an
24   impulsive person?
25        A    With his shopping, yeah.
page 51
 1        Q    With anything else?
 2        A    Um, no.
 3        Q    As opposed to a deliberate and thoughtful
 4   person?
 5        A    No.  I mean, like I said, he could be a
 6   little grouchy with some people sometimes.  So, you
 7   know, that was about it, really.
```

**[52:3] - [52:25]**          **10/29/2009   Wheeler, Sean**

```
page 52
 3        Q    Well, in the time that you knew
 4   Mr. Shearer, did you ever observe him to be unable
 5   to make a rational decision?
 6             MR. FROMSON:  Objection; form.
 7             THE WITNESS:  You know, he was just a
 8        little indecisive.  Like sometimes when we'd go
 9        out and do things as to what he really wanted
10        to do and I think sometimes when I chimed in
11        with my advice, you know, it obviously helped
12        him do those things, helped him make a decision
13        about something.
14   BY MR. OHLEMEYER:
15        Q    Did you ever observe him to make a
16   decision that appeared to be potentially harmful to
17   himself?
18        A    No, no.  Other than like, you know, if we
19   were, you know, if it's pouring rain outside and
20   he's determined to go exercise, you know, up and
21   down this hill in the rain I'm like, I don't think
22   this is a good idea, you know, other than that, you
23   know, he was just, like I said before, he was pretty
```

24   militant with his schedule that he kept as far as
25   his exercise and things like that went.

| Exhibit Number | Description | Plaintiffs' Objections and Reasons |
|---|---|---|
| 0634 | Hauben, M., Reich, L., Chung, S. Postmarketing surveillance of potentially fatal reactions to oncology drugs: potential utility of two signal-detection algorithms. European Journal of Clinical Pharmacology 2004; 60(10):747-50. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0635 | Hauben, M., Reich, L., Gerrits, CM. Reports of hyperkalemia after publication of RALES—a pharmacovigilance study. Pharmacoepidemiol Drug Safety 2006; 15(11):775-783. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0636 | Hauben, M., Reich, L., Van Puijenbroek, EP, Gerrits, CM., Patadia, VK. Data mining in pharmacovigilance: lessons from phantom ships. Eur J Clin Pharmacol2006; 62(11):967-970. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0637 | Hauben, M., Zhou, X. Quantitative methods in pharmacovigilance: focus on signal detection. Drug Saf 2003; 26(3):159-186. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0638 | Hawton K, Sutton L, Haw C, et al. Suicide and attempted suicide in bipolar disorder: a systematic review of risk factors. J Clin Psychiatry 2005; 66(6):693-704. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0639 | Hayashia KI, Degros S, Curry R, Eisenach JC. Gabapentin activates spinal noradrenergic activity in rats and humans and reduces hypersensitivity after surgery. Anesthesiol. 2007;106(3):557-562. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0640 | Hebert T, Drapeau P, Pradier L, Dunn RJ (1994): Block of the brain IIA sodium channel alpha subunit by the neuroprotective drug riluzole. Mol Pharmacol 45:1055-1060. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0641 | Heblich, F., A. Tran Van Minh, et al. (2008). Time course and specificity of the pharmacological disruption of the trafficking of voltage-gated calcium channels by gabapentin." Channels (Austin) 2(1): 4-9. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0642 | Hendrich J, Van Minh AT, Heblich F, Nieto-Rostro M, Watschinger K, Striessnig J et al. Pharmacological disruption of calcium channel trafficking by the alpha2delta ligand gabapentin. Proc. Natl. Acad. Sci. USA 2008;105:3628-3633. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0643 | Hendrich, J., A. T. Van Minh, et al. (2008). "Pharmacological disruption of calcium channel trafficking by the alpha2delta ligand gabapentin."Proc Natl Acad Sci U S A 105(9): 3628-33. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0644 | Hendrickson AW, Sibbald JR, Morriset RA. Ethanol alters the frequency, amplitude, and decay kinetics of S&2+ - supported, asynchronous NMDAR mEPSCs in rat hippocampal slices. J Neurophysiol 2004; 91:2565-2577. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0645 | Herman JP, Mueller NK, Figueiredo H (2004): Role of GABA and glutamate circuitry in hypothalamo–pituitary-adrenocortical stress integration. Ann N Y Acad Sci 1018:35-45. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0646 | Hill A.B., The Environment and Disease: Association or Causation? (1965) Proceedings of the Royal Society of Medicine: 58: 295-300, reprinted in Bulletin of the WHO, Oct. 2005; 83(10):796-798. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0647 | Hill DR, Suman CN, Woodruff GN. Localization of [3H]gabapentin to a novel site in rat brain: autoradiographic studies. Eur J Pharmacol 1993; 244(3)303-309. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0648 | Hitchcock LS et al. The experience of chronic nonmalignant pain. J Pain Symptom Manage. 1994;9:312-18. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0649 | Honig A, Bartlet JR, Bouras N, Bridges PK. Amino acid levels in depression: a preliminary investigation. Journal of Psychiatric Research 1988;22(3):159-164. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0650 | Honmou O, Kocsis JD, Richerson GB. Gabapentin potentiates the conductance increase induced by nipecotic acid in CA1 pyramidal neurons in vitro. Epilepsy Res 1995a; 20(3):193-202. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0651 | Honmou O, Oyelese AA, Kocsis JD. The anticonvulsant Gabapentin enhances promoted release of GABA in hippocampus: a field potential analysis. Brain Res 1995b; 692(1-2):273-277. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0652 | House, JS., Strecher, V. et al. Occupational Stress and Health Among Men and Women in Tecumseh Community Health Study. J Health Soc Behav 27: 62, 1986. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0653 | Hua, et al., An epidemiological investigation of off-label anticonvulsantdrug use in the Georgia Medicaid population. Pharmacoepidemiology and Drug Safety 2005; 14: 629-638. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0654 | Huang CS, Song JH, Nagata K, Yeh JZ, Narahashi T (1997): Effects of the neuroprotective agent riluzole on the high voltage-activated calcium channels of rat dorsal root ganglion neurons. J Pharmacol Exp Ther 282:1280-1290. | Documents Are Self-Authenticating Under F.R.E. 902 |
| 0655 | Hurley RW, Chatterjea D, Feng MR, Taylor CP, Hammond DL. (2002) Gabapentin and pregabalin can interact synergistically with naproxen to produce antihyperalgesia. Anesthesiol | Documents Are Self-Authenticating Under F.R.E. 902 |

Shearer Plaintiffs' Response to RFA 03/08/2010