**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE NEURONTIN MARKETING AND )<br>SALES PRACTICES LITIGATION )<br>_____ )<br>THIS DOCUMENT RELATES TO: )<br>_____ )<br>THE GUARDIAN LIFE INSURANCE )<br>COMPANY OF AMERICA )<br>  v. PFIZER, INC.,  04 CV 10739 (PBS) )<br>_____ ) | MDL Docket No. 1629<br><br>Master File No. 04-10981<br><br>Judge Patti B. Saris<br><br>Magistrate Judge Leo T.<br>Sorokin |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW BASED UPON LACK OF SUFFICIENT
<u>EVIDENCE OF INJURY OR CAUSATION</u>**

Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser")[1] respectfully submit this memorandum of law in opposition to defendants' motion for judgment as a matter of law based upon lack of sufficient evidence of injury or causation.[2]

**I.**    <u>**ARGUMENT**</u>

In *Bridge v. Phoenix Bond & Indemnity Co.*, 128 S.Ct. 2131 (2008), a unanimous Supreme Court reaffirmed the standards governing the direct-relationship requirement for proximate cause in RICO actions:

---

[1] Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries:  Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

[2] Directed verdicts are disfavored in this Circuit.  Such motions should only be granted where "there was no evidence on an essential element of the plaintiff's claim . . . or where the evidence that had been presented at the time that the motion was granted was so one-sided that no rational jury could have found in [plaintiff's] favor."  *Borrero-McCormick v. University of Health Sciences Antigua School of Medicine*, 337 Fed.Appx. 1, 3 (1st Cir. 2009).

> Proximate cause . . .is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.' . . . The direct-relation requirement avoids the difficulties associated with attempting 'to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors,' . . . prevents courts from having 'to adopt complicated rules of apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries,' . . . and recognizes the fact that 'directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.'

*Id.* at 2142 (quoting *Holmes v. SIPC*, 112 S.Ct. 1311 (1992)). The *Bridge* Court did not hold that third parties break the chain of causation between a misrepresentation and a plaintiff's injury. In fact, it was third parties that were the recipients of the misrepresentations at issue in *Bridge*. *Id.* at 2136. Rather, the Court affirmed the "general principle" that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." *Bridge*, 128 S.Ct. at 2143 (quoting Restatement (Second) of Torts § 870).

This Court relied on *Bridge* to develop the causation standard that governs this trial. *Neurontin Mktg. & Sales Practices Litig.*, 2010 WL 53568, at *8 (D. Mass. Jan. 8, 2010). The Court found that causation would be established by a showing Kaiser was "directly harmed by misrepresentations or omissions relied on by [Kaiser]." *Id.* at *11. The Court found its standard met by the following facts, *id.* at *11, all of which now are part of the evidentiary record at trial:

* ❖ Kaiser directly relied on Pfizer's "half truths" when preparing drug monographs for Neurontin that were utilized by Kaiser's Pharmacy & Therapeutics ("P&T") Committees;[3]

* ❖ Kaiser's Drug Information Services ("DIS") had direct communications with Pfizer during which misrepresentations and material omissions were made;[4] and

---

[3] *See* fact citations in Section III.A. below.

[4] *See* fact citations in Section III.A. below.

❖ Kaiser launched informational campaigns after news reports of Pfizer's fraudulent activities began to surface in 2002. These campaigns led to a substantial drop in Neurontin prescriptions, providing strong evidence of a causal link between Pfizer's misrepresentations and Kaiser's injuries.[5]

Defendants' argument for overturning the law of this case rests on their reading of *Hemi Group, LLC v. City of New York*, 130 S.Ct. 983 (2010). In *Hemi*, the City of New York brought a RICO claim against online out-of-state sellers of cigarettes. *Hemi*, 130 S.Ct. at 987. Under New York law, out-of-state sellers are not required to collect and remit sales tax; the City must recover those taxes directly from the customer. *Id.* However, vendors are required to file reports disclosing their customers with the State, which the State then shares with the City. *Id.* at 987. The Second Circuit found that the vendors had defrauded the City by failing to file the required reports with the State, and that a viable RICO claim had been stated. *Id.* at 987-88. In finding the chain of causation to be insufficiently direct, Justice Roberts found that (i) the wrongful acts of the customers (in failing to pay taxes due) broke the chain of causation between the vendors and the City, and (ii) the State was a better situated plaintiff that had proper incentives to bring suit. *Id.* at 990-91.

*Hemi* is insufficient to revive Defendants' failed arguments against Kaiser. First, only three other Justices joined in Judge Roberts' proximate causation analysis. *Hemi*, 130 S.Ct. at 986. Justice Ginsburg concurred in the judgment explicitly "without subscribing to the broader range of the Court's proximate cause analysis[.]" *Hemi*, 130 S.Ct. at 995. Justice Sotomayor was recused from the decision, and Justices Kennedy, Stevens and Breyer joined in dissent. *Id.* at 997 ("It is difficult to find common-law cases denying liability for a wrongdoer's intended

---

[5] *See* fact citations in Section III.D. below.

consequences, particularly where those consequences are also foreseeable.")  The equally split *Hemi* Court thus provides no new instruction to lower courts and cannot justify reopening an issue decided on summary judgment.  *Marks v. United States*, 430 U.S. 188, 194 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'") (citations omitted).

Second, the facts of *Hemi* do not recommend its application here.  Aside from Defendants and their co-conspirators, no actors in the chain of causation intentionally defrauded Kaiser.  On the contrary, Kaiser's physicians and patients were duped along with Kaiser.  3/5 Tr. (Millares) at 94-95.  In addition, as the fate of the consumer class action has made clear, there is no hypothetical "better-situated" plaintiff waiting in the wings. *Cf. Hemi*, 130 S.Ct. at 990.  This Court has recognized that litigation of this nature demands an enormous amount of resources that an individual consumer would have neither the incentive nor ability to marshal.  *See generally In re Neurontin*, 257 F.R.D. 315 (D. Mass. 2009) (in denying class certification, noting that liability findings for "well-heeled" third-party payors will issue preclusive effects for those with fewer resources).

Nor is causation defeated by the fact that Kaiser has regional P&T Committees.  As Dr. Millares testified, DIS provides all of its material, including monographs, to each of Kaiser's regions.  *See* 3/4 Tr. (Millares) at 43-46.  There is an interregional formulary subcommittee chaired by Dr. Millares, at which all monographs are shared and evidence is discussed.  *Id.* at 45. Finally, all DIS information is available on a Kaiser Permanente intranet site, which is accessible to all employees.  *Id.*  Dr. Millares testified that "all of the P&T committees across Kaiser Permanente rely on the same evidence, rely on the [DIS] review of that evidence, rely on the

same literature, and they make decisions on the products." 3/5 Tr. (Millares) at 93. The decisions made are usually similar, although the regions will vary in whether they prefer restrictions, guidelines or educational programs to instruct their physicians on usage. *Id.* at 93.

Kaiser has shown that "prescribing physicians wrote off-label Neurontin prescriptions that they would not have written but for the alleged misrepresentations." Def. Br. at 4. Dr. Carrejo testified that Kaiser enjoys a 95% compliance rate to its formulary. 2/26 Tr. (Carrejo) at 103-4. Thus, after Kaiser's Southern California region lifted its remaining restrictions on Neurontin in 1999, Kaiser experienced a dramatic increase in utilization. *Id.* at 110-11; *see also* 3/3 Tr. (Hyatt) at 104 (prior to DUAT campaign, Neurontin utilization increasing at the rate of 2-3% each month in Southern California region). This prescribing trend reversed itself after the launch of Kaiser's various campaigns to correct defendant's misinformation. *See* 2/26 Tr. (Carrejo) at 124 (33-34% utilization decrease across specialties at the same time utilization was increasing in the rest of the United States); Plaintiffs' Exhibit 286 (38% decrease in Northwest region); Plaintiffs' Exhibit 340 utilization decreases by 34% in Southern California). This was echoed in Kaiser's data across specialties and regions. *See* 2/26 Tr. (Carrejo) at 90 & 124; Plaintiffs' Exhibit 268-B.

Finally, Defendants try to resurrect their rejected standing argument by citing to *S. Ill. Laborers' and Employers Health & Welfare Fund v. Pfizer Inc.*, 2009 WL 3151807, at *6-7 (S.D.N.Y. Sept. 30, 2009). The court in that case found that a class had failed to adequately plead causation by, among other things, failing to allege that misrepresentations to their primary benefit decision makers were the cause of plaintiffs' overpayments or that their physicians relied on "a single, very general misrepresentation on [Pfizer's] website." *Id.* at *6-7. Here, clear evidence of causation that was presented at trial, by witnesses including Dr. Millares:

> The core of the problem is we have thousands of physicians who believe that Gabapentin or Neurontin works for these indications. They depended on, you know, we're an evidence-based organization . . . and they depended upon the literature, what was out in the literature, they depended upon [DIS], and we depended upon the evidence, and so we came to wrong conclusions, and then they depended on the P&T committee and they depended on what we said and we depended on the literature, and so we've had . . . these lies basically that have permeated all this information, and now our physicians are convinced that this stuff . . . has evidence to support it.

3/5 Tr. (Millares) at 94-95.

## II.   Kaiser Has Provided Ample Evidence Of Inefficacy

Kaiser has provided ample evidence that Neurontin is ineffective for the conditions at issue in this litigation.   To answer the question whether Neurontin is effective for these conditions, Kaiser's experts relied on the evidence contained in a plethora of double-blind randomized controlled trials ("DBRCT") investigating Neurontin.   Multiple experts have testified that the DBRCT is the recognized standard through which a drug is determined to be effective or ineffective.   (*See e.g.,* 2/22 Tr. (Kessler) at 175:13-176:8; *See also* 2/23 Tr. (Kessler) at 24:12-23; 26:23-27:2; *See also* 2/25 Tr. (Barkin) 127:5-9; *See also* 3/1 Tr. (McCrory) at 17:18-18:2).   For each condition at issue, there is a not a single negative DBRCT, there are *multiple* negative DBRCTs, which constitute the majority—if not the entirety—of the reliable scientific evidence.[6]   Through these multiple negative DBRCTs alone, Kaiser has demonstrated

---

[6] Defendants' brief misleadingly suggests that for each indication there is only one negative study.   Defendants' assertions that the conclusion of a negative study should be limited to the patients enrolled in the study is unsupportable and a direct affront to the basic tenets of clinical trial interpretation, as carefully explained by Plaintiffs' expert Dr. McCrory in his trial testimony:

> Well, it gets to the issue of what does it mean to be ineffective.   I mean, I think that if we look at the framework of medical decision-making, the hypothesis testing, the default position is that a drug is ineffective unless it's proven otherwise, unless it's proven to be effective, and we set up what's called a [null] hypothesis, and then

that Neurontin is no more effective than a placebo.  Thus, according to basic principles of pharmaceutical research, Neurontin is ineffective for the indications at issue.

Of course, Kaiser has not merely submitted negative DBRCTs.  Kaiser has come forward with numerous well-credentialed experts who testified that Neurontin is ineffective for the conditions at issue.  With regards to bipolar and other mood disorders, Dr. Barkin reviewed all of the DBRCT evidence that exist.  (*See* 2/25 Tr. (Barkin) at 126:2-13; *See also* Plaintiffs' Exhibits 383, 1477, 211, 398 and 469.)  In each and every one of these DBRCT, Neurontin was no more effective than placebo.  (*See* 2/25 Tr. (Barkin) at 127:23-128:3; 130:3-9; 133:3-6; 136:9-22; 139:24-140:7; 146:18-23.)  Based on all of this negative evidence, Dr. Barkin testified that no reasonable physician, were he or she fairly informed of the reliable medical evidence, would prescribe Neurontin for bipolar and other mood disorders, and to do so would be against the Hippocratic oath.  (*See* 2/26 Tr. (Barkin) at 33:11-34:17.)  Crushed by this veritable mountain of Level-1 evidence that consistently demonstrates that Neurontin is ineffective, Defendants are left arguing that Kaiser has not produced evidence that "bipolar patients did not successfully use Neurontin [to treat] comorbid conditions [such as social phobia and panic disorder]."  (Defs. Causation Brief at 8.)  This is a classic form of "moving the goalposts."  Whether it is possible

---

we conduct an experiment and test the results using statistics to determine whether or not you can reject the [null] hypothesis, the [null] hypothesis being that the drug is no different than placebo.

(3/1 Tr. (McCrory) at 59:2-11).  Moreover, the argument that the results of a study are only generalizable to the narrow population studied flies in the face of the manner in which Pfizer studies and markets drugs, and the way that the FDA approves drugs.  Just as an example, if Pfizer had proven Neurontin's efficacy in epilepsy in two studies conducted in Ohio and Iowa, Pfizer would not have sought and the FDA would not have granted an approval strictly limited to "people from the Midwest."  Similarly, if those same studies had also showed that Neurontin provided no reduction in pain for the study populations, it would be illogical to claim that such negative results *only* applied to people from the Midwest, and it would be even more absurd to claim that these results somehow constituted *proof* that Neurontin is effective for reducing pain for "all people *outside* of the Midwest."

for someone with bipolar to "successful use Neurontin"—whatever that even means—for "comorbid conditions" such as social phobia or panic disorder is not the issue here. Defendants misleadingly marketed Neurontin as a treatment for bipolar and other mood disorders, and those are the conditions for which Kaiser is seeking damages.

With regards to migraine, Dr. McCrory testified that "Neurontin was not an effective drug for migraine prophylaxis" based on a review and meta-analysis of all the published and unpublished DBRCTs. (*See* 3/1 Tr. (McCrory) at 20:12-19; 21:22-22:2; 22:6-22:12; 22:20-24; *see also* Plaintiffs' exhibits 376, 398 and 399.) In their brief, Defendants cherry-pick data by focusing on one small migraine DBRCT conducted in Italy with purportedly positive findings. The fact that there was a DBRCT with purportedly positive findings is the very reason that Dr. McCrory performed and relied on a meta-analysis in reaching his conclusions: "that's why it's so important to do a systematic review where you look at all the evidence that's available." (3/1 Tr. (McCrory) at 89:22-24.) While it may be Defendants' practice to exclude the inconvenient results from negative DBRCTs from their marketing, Dr. McCrory appropriately included *all* DBRCTs, as is standard procedure for the type of meta-analysis he performed. (*Id.* at 74:25-75:20). Defendants misleading use of the word "trend" is a naked attempt to salvage a finding of efficacy from Dr. McCrory's meta-analysis. This is yet another example of "moving the goalposts," as a non-statistically significant "trend" is neither the standard Pfizer used when conducting these studies, nor is it the "standard by which drugs are evaluated in the U.S." (*Id.* at 82:22-83:13). Defendants assert that Dr. McCrory's prescribing of two *FDA-approved* drugs (valproic acid and propranolol) for migraine prophylaxis, in the face of a single negative DBRCT for each drug, somehow represents a fatal flaw in Kaiser's damage theory. (Defs. Br. at 6.) This makes no sense whatsoever, as these drugs are FDA-approved for migraine prophylaxis and

thus—in stark contrast to Neurontin—have been demonstrated to be effective through adequate and well-controlled clinical trials. Dr. McCrory testified to this (*See id.* at 57:8-15; *see also* 60:23-61:8.) Finally, Dr. McCrory was not asked to evaluate suppressed data related to Neurontin and pain. (*Id.* at 94:6-13). Consequently, his prescriptions of Neurontin for neuropathic pain are a prime example of the impact of Defendants fraud. As Dr. Perry testified: "he [Dr. McCrory] too was duped just the same way I was because he didn't have access to the real data in this case. He was falsely led to believe that gabapentin was a highly effective drug when it was not." (3/2 Tr. (Perry) at 89:10-13).

With regards to neuropathic pain, Dr. Perry testified that Neurontin was ineffective for treating neuropathic pain. Dr. Perry's conclusions were based on the results of his meta-analysis of all available DBRCTs. According to Dr. Perry's meta-analysis, the average effect of Neurontin on pain scores was less than one point on an eleven-point scale, an effect "most doctors and probably most patients would consider clinically meaningless." (3/2 Tr. (Perry) at 22:21-23:23.) In fact, when studies of Neurontin in postherpetic neuralgia ("PHN") (an indication for which Kaiser is not seeking damages) were removed, the effect on point scores shrank to 0.36 out of 11. (*See id.* at 94:1-95:1: "it's just not plausible to anyone who's thinking clearly that 0.36 out of 11 in pain would be meaningful.") As Dr. Jewell testified, even Pfizer's own investigators stated that a 55-60% drop on an 11-point pain scale would be needed to achieve clinical significance. (*See* 3/1 Tr. (Jewell) at 102:14-103:15). Kaiser introduced multiple negative DBRCTs demonstrating that Neurontin is ineffective for the treatment of neuropathic pain. (*See* Plaintiffs' Exhibits 19, 382, 373 and 194). Even Pfizer's supposedly "best" pain trial outside of PHN (the Backonja 945-210 study), once corrected for the occurrence of treatment-related central nervous system side effects that unblinded study participants,

demonstrated no difference between Neurontin and placebo.  (*See* 3/6 Tr. (Jewell) at 118:9-25.) Finally, in 2001, Pfizer convened a panel of experts to review the multiple DBRCTs involving Neurontin and neuropathic pain.  These *non-litigation* experts concluded that the evidence didn't support a broad neuropathic pain claim because of multiple negative studies.   Both Dr. Abramson and Dr. Kessler testified regarding this 2001 meeting.  (*See* 2/23 Tr. (Kessler) 44:8-45:6; *see also* 2/24 Tr. (Abramson) at 38:6-15; 40:5-40:16; *see also* Plaintiffs' Exhibits 173 and 188: "Upon hearing these results, Dr. Max [one of Pfizer's pain consultants] commented, 'you're done.'")[7]

With regards to nociceptive pain, Dr. Perry testified that "Neurontin, or gabapentin, the generic name, is completely ineffective for acute nociceptive pain" based on a review of all the available DBRCT evidence, which came in the form of five negative, Pfizer-conducted DBRCT that were never published.  (*See* 3/1 Tr. (Perry) at 144:17-145:12; *see also* 2/25 Tr. (Dickersin) at 38:7-39:3; *see also* Plaintiffs' Exhibits 384, 385, 386, 387, 388 and 389.)  This should not have come to a surprise to Defendants as the minutes of their 2001 meeting with their *non-litigation* experts stated that: "Importantly, gabapentin is not effective in non-neuropathic models of pain." (Plaintiffs' Exhibits 173 and 188).  Also, Pfizer's own medical director on the Neurontin team, Dr. Robert Glanzman, testified during video deposition testimony played at trial: "It wouldn't

---

[7] The quote Defendants proffer from an article Dr. Perry co-authored prior to this litigation typifies Defendants' continued misunderstanding of the difference between lack of proof of efficacy and proof of lack of efficacy.  Dr. Perry testified that he was duped, not through any fault of his own, but through Defendants' withholding of the accurate and complete information that proved lack of efficacy.  (*See* 3/2 Tr. (Perry) at 86:25-87:4: "I learned from the work I did in this trial that I was effectively duped and I provided wrong information in this report, not through my own fault but because of the withholding of the accurate information;" *see also id.* at 89:15-17: "I had no way of knowing better because trials like Reckless were not available to me at that time.")  Thus, anything Dr. Perry stated prior to the full disclosure of negative DBRCT data concerning Neurontin during this litigation is irrelevant to the issue of Neurontin's inefficacy.

surprise me, gabapentin is not effective [for nociceptive pain]."   (Deposition of Robert Glanzman, M.D. at 353:4-19 as played at trial on 3/12.)

There is clear evidence in the trial record that Neurontin is no more effective at dosages above 1800 mg/day.  Significantly, this evidence includes the fact that the FDA *twice* rejected Defendants' claims to the contrary.   In the first instance, as part of Defendants' monotherapy sNDA, the FDA found that "[t]he evidence from the controlled trials fails to provide evidence that higher doses of Neurontin are more effective than those recommended." (Plaintiffs' Exhibit 91; *see also* 2/23 Tr. (Kessler) at 37:9-38:6.)  In the second instance, as part of Defendants' PHN sNDA, the FDA expressly required that the Neurontin label include the phrase "[a]dditional benefit of using doses greater than 1,800 was not demonstrated." (Plaintiffs' Exhibit 195 at p.32).  Dr. Kessler, the former commissioner of the FDA, testified: "there's no increased efficacy above 1,800." (2/23 Tr. (Kessler) at 49:13-14).  Dr. Kessler also testified that the FDA would consider promotional claims that Neurontin was more effective at doses above 1800 mg/day to be false. (*Id.* at 38:19-22).   Further, Dr. Perry testified that the "single most significant of all [gabapentin] pain trials" demonstrated that there "was no difference at the higher dose of 2,400 milligrams compared with either of the lower doses or placebo." (3/2 Tr. (Perry) at 27:24-28:8; *see also* Plaintiffs' Exhibit 382.)

As documented above, there is more than enough evidence for a reasonable juror to conclude that Neurontin is ineffective for bipolar and other mood disorders, migraine, neuropathic pain, non-neuropathic pain,[8] and dosages above 1800 mg/day.

---

[8] Defendants do not contest the sufficiency of the evidence establishing that Neurontin is wholly ineffective for nociceptive pain.

**III.     Kaiser Has Presented Sufficient "But For" Causation**

**A.     Kaiser Has Provided Sufficient Evidence That It Was Misled**

This Court has already held that based on the evidence developed during discovery –

which now has been offered and admitted at trial – "Kaiser has provided sufficient evidence of

causation." *Neurontin*, 2010 WL 53568, at *11.  As this Court explained:

> Kaiser argues that, due to Pfizer's fraudulent misrepresentations about and
> withholding of certain negative studies for these indications, the recommendations
> of its Drug Information Service (DIS) were tainted.   Because DIS drug
> monographs for Neurontin, prepared by Kaiser and used by Kaiser's P&T
> committee, directly influenced Kaiser's decision to expand its formulary, a
> reasonable inference can be drawn that Kaiser was directly injured by Pfizer's
> misrepresentations about Neurontin. . . . Kaiser directly relied on the "half truths"
> put forth by Pfizer through publications, monographs, and other communications
> to Kaiser and to the general public. . . .
>
> Kaiser alleges that, had Pfizer not made misrepresentations regarding Neurontin's
> effectiveness for certain off-label indications, DIS's activities would have
> highlighted problems with Neurontin such that Kaiser could have responded
> sooner and thereby reduced its payments and reimbursements for Neurontin.
> These activities represent direct interaction between Kaiser and Pfizer, providing
> the evidence of causation alluded to by the *Desiano* court. . . .

*Id.* at *81-83.  Kaiser has offered, and this Court has admitted, all of this evidence during trial.

Defendants' current motion, a straight re-hash of their motion for summary judgment, should be

denied for the same reasons that this Court denied the earlier summary judgment motion.[9]

Defendants themselves concede that Kaiser *has* presented "evidence of direct contacts

between Defendants and DIS[.]"  Def. Br. at *9.  Defendants attempt to mitigate the impact of

that admission by characterizing that evidence as "limited."   The evidence of Defendants'

---

[9] As First Circuit case law cited by Defendants makes clear, "[c]ausation questions . . . are
normally grist for the jury's mill" and a court faced with a motion to remove this issue from the
fact-finder simply "review[s] the record . . . to determine whether there is *any* rational
construction of the evidence" that could result in a finding for the non-movant. *See Peckham v.
Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) (emphasis in original) (collecting cases).
*Peckman* involved appellate review of a verdict already rendered, but the analysis and standards
are the same in the context of Defendants' Rule 50 motion here.

infection of Kaiser is not "limited" and in fact was repeated and widespread.[10]  Of course, even if the evidence were "limited" – and Defendants admit at least that much – it would suffice to defeat Defendants' motion.  *Peckham*, 895 F.2d at 837.

Perhaps recognizing the sufficiency of Kaiser's evidence, Defendants throw up a cascade of complaints, none of which stick.  DIS materially relied on Defendants' misinformation, to Kaiser's detriment.  *See supra* n.10.  DIS monographs are shared throughout all Kaiser regions, and the formularies are either identical – in the case of the Medicare formulary – or "very, very similar" across the Kaiser regions.[11]

---

[10] *E.g.*, 2/26 Tr. (Carrejo) at 97:20-23 (Kaiser was detailed by Defendants concerning Neurontin); 99:13-102:19 ("detailing effort worked dramatically"), Plaintiffs' Exhibit 286; 104:15-107:15 (Defendants "have a concerted effort to work with the physicians that have the ability to put a drug on formulary or deny its access to formulary[.]"), Plaintiffs' Exhibit 250); 3/4 Tr. (Millares) 50:22-59:11 (explaining how Defendants' payments tainted case reports relied on by DIS when creating Neurontin monograph, and how the truth of those payments was not revealed until discovery in this litigation), Plaintiffs' Exhibits 322, 23, 27); 76:6-81:24 & 86:8-88-6 (describing Defendants' suppression of negative results from studies in the beginning of 1999, the materiality of that information which, had it been know, would have caused Kaiser not to recommend Neurontin for additional pain uses in September 1999 monograph); 3/5 Tr. (Millares) 79:15-86:25 (same).

[11] *E.g.* 2/26 Tr. (Carrejo) at 99:13-102:19 (NW region); 110:17-23 (the DIS-prepared monographs are shared throughout Kaiser nationally and "there's monthly teleconferences between the formulary committees, the formulary personnel in each of the regions.  Also, that monograph is archived and is available on our internal website."); 112:11-113:1 (Kaiser's "Medicare formulary is a [single] national formulary" and Kaiser's non-Medicare formularies are substantially similar between the Kaiser regions which is unsurprising because "specialists review the evidence in a given region and come to the same conclusion for the most part")); (3/3 Tr. (Hyatt) at 103:7-104:1 (explaining how Neurontin P&T committee information developed in one region was disseminated to other regions and his trips to other regions for this purpose; "The pharmacy and therapeutics chairs and staffs from all of the Kaiser regions meet on a regular basis.")); (3/4 Tr. (Millares) 43:21-44:3 (Drug Information Services in Downey, California provides information, monographs and other services to "all of our Kaiser Permanente regions across the United States.  We have mechanisms for doing that.  We have also numerous inter-regional committees that meet over teleconference with the other regions."); 45:6-25 (same)); (3/5 Tr. (Millares) 93:2-18 ("all of the P & T committees across Kaiser Permanente rely on the same evidence, rely on the Drug Information Services' review of that evidence, rely on the same literature . . . there's nuances that are different and some differences in the formulary status, but it's very, very similar."

True to form, Defendants misrepresent the evidence of their misrepresentations. They argue that because Pande disclosed his results (at a conference, not to DIS) in June 1999, and because that study was not published until September 2000, those results were not suppressed. *See* Def. Br. at *9. They argue this *despite the fact that Defendants had fully completed the analysis of the Pande study by July 1998 and thus knew that the results were negative, yet, when contacted by DIS in 1999, failed to disclose the negative results or even the existence of the pending study to DIS.* (3/5 Tr. (Millares) 81:2-83:9 (explaining chronology), Plaintiffs' Exhibit 383, 961.) Kaiser has shown that Defendants at a minimum misled Kaiser concerning even the existence of the Pande study (let along the fact that Neurontin fared worse than placebo) and that that misinformation was material to Kaiser. (3/4 Tr. (Millares) 63:14-71:20 (detailing the communications between Kaiser and Defendants preceding the first 1999 monograph concerning bipolar, Defendants' failure to disclose to Kaiser the presence of the negative Pande study which was known to Defendants at the time of those communications, and the materiality of that information which, had it been know, would have caused Kaiser not to recommend Neurontin for bipolar use).) This Court should not countenance Defendants' continuing misrepresentations.

The trial record contains other evidence of Defendants' direct misrepresentations to Kaiser. For example, in the course of preparing a second 1999 monograph—this one for pain—Kaiser relied on a representation from Defendants that omitted the "Reckless" (Defendants' protocol 945-224) study, the knowledge of which would have materially impacted both DIS's monograph and the P&T committee's subsequent vote. (*See* ¼ Tr. (Millares) at 77:1-5; 79:19-80:5; 87:17-88:6; *see also* 3/9 Tr. (Daniel) at 106:7-12; 107:6-8; 107:15-19.) Additionally, Pfizer sent standard response letters to Kaiser in response to requests for information on pain.

The negative results of the Reckless study were not disclosed.  (*See e.g.*, 3/4 Tr. (Millares) at 93:1-20; 97:19-98:3; *see also* Plaintiffs' Exhibits 461-A, 432, 309.)

Defendants' final argument boils down to a grab-bag claim that because Kaiser was not able to do more to combat Defendants' fraud – and specifically because Kaiser did not remove Neurontin from the Kaiser formulary – Defendants should escape liability.  *See* Def. Br. at *9-12.[12]  Apart from the chutzpah of such an argument, it is factually inaccurate.  Kaiser *did* introduced evidence that, from 1999, it had an open formulary with respect to Neurontin.  (2/26 Tr. (Carrejo) at 110:24-111:2).  Kaiser also explained that removing Neurontin from the Kaiser formulary was not a viable alternative and conflicted with core Kaiser principles, even if that appeared to be a "simple" solution.[13]  This is especially true, where, as here, the truth about Neurontin has continued to leak out over the course of this litigation.  (3/3 Tr. (Hyatt) at 107:13-108:15 (explaining that had he known the full extent of the evidence he would not have written that Neurontin is effective for certain forms of neuropathic pain and instead "would have made a statement that Gabapentin, Neurontin, is not effective in neuropathic pain, period"); 115:25-

---

[12] Defendants spend most of this section of their brief arguing about Kaiser's actions or inactions well after the relevant time period in this litigation.  *See* Def. Br. at *10-12.  Kaiser does not seek damages after Q12005, and Defendants' focus on this irrelevant period – when the truth about Defendants conduct was still in the process of being uncovered – is telling.

[13] 2/26 Tr. (Carrejo) at 117:25-118:11 (removal from formulary is a draconian approach and "isn't the way we do business at Kaiser")); 127:8-128:10 (re-education is a continuing project because new evidence is still emerging and it is difficult to change prescribing habits); (3/3 Tr. (Hyatt) at 104:2-105:6 (explaining that Kaiser "preferred the [e]ducational approach" of re-education instead of the more severe restrictions approach)); 113:13-114:15 (re-education campaign is ongoing and more appropriate than removing from the Kaiser formulary because Neurontin still is FDA-approved for seizures); (3/5 Tr. (Millares) 93:19-95:14 (explaining that formulary removal is not a practical solution because, inter alia, "product is also on the national Medicare formulary, so we have to have it available for our Medicare patients which make up, you know, a good portion of our Medicare membership" and that fundamentally the key Kaiser technique in this type of situation is re-education based on evidenced-based medicine, even if formulary removal appears to be a more "simple" route.

116:3 (not aware of the extent of the taint of the medical literature in 2003 and "only learned that recently").[14]   Kaiser has undertaken a costly and extensive initiative to re-educate PMG physicians about the evidence *vel non* supporting use of Neurontin.   Defendants' complaints about Kaiser's method of ameliorating Defendants' unlawful conduct should carry no weight.[15]

**B.    Defendants' "Inconsistent Position" Argument Is A Red Herring Attempt to Obfuscate Kaiser's Straight-Forward Causation Story**

Credibility attacks make for entertaining courtroom theatrics, but are irrelevant to a motion for directed verdict.   As the First Circuit has instructed "[a] trial court confronted with a motion for judgment as a matter of law must scrutinize the evidence and the inferences reasonably extractable therefrom in the light most hospitable to the nonmovant. ***In conducting that perscrutation, . . . the court must not pass upon the credibility of the witnesses, resolve evidentiary conflicts, or engage in a comparative weighing of the proof.***   A motion for judgment as a matter of law may be granted only if the evidence, viewed from this perspective, adumbrates a result as to which reasonable minds could not differ." *Martinez-Serrano v. Quality Health Servs., Inc.*, 568 F.3d 278, 284-85 (1st Cir. 2009) (citations omitted) (emphasis added).

---

[14] Kaiser witnesses also testified that Kaiser does not maintain editorial control over the third-party information provided on Kaiser's website.  (3/2 Tr. (Carrejo) at 137:15-21 (explaining, in response to a juror's question, that Kaiser does not maintain editorial control over the relevant information on the website and that "it's a third-party vendor that puts together the whole database for us").)

[15] Defendants' point here appears to be nothing more than an unsupported argument concerning mitigation.  "Inasmuch as the possibility of mitigation is in the nature of an affirmative defense, it is the defendants who bear the burden of proving by a fair preponderance that an injured party failed to take reasonable steps to hold down its losses."  *Allied Int'l v. International Longshoremen's Ass'n*, 814 F.2d 32, 38-39 (1st Cir. 1987).  Defendants have introduced no evidence on this, certainly have not carried their burden, and, even if they had, this would be an issue that goes to the quantum, not fact of, damages.

The testimony of Kaiser's witnesses is supported by Kaiser documents and data that reveal no inconsistency in the timeline of events relevant to Kaiser's discovery of Defendants' fraud:

- ❖ In 1999, the Southern California P&T Committee lifts the remaining restrictions on Neurontin, leading to a dramatic increase in utilization across Kaiser. *See* 2/26 Tr. (Carrejo) at 111; Plaintiffs' Exhibit 268-B.

- ❖ In late 2001, the dramatic increase in utilization triggers a review in Kaiser's Northern California region, which finds a large proportion of off-label usage. *See* 2/26 Tr. (Carrejo) at 111; Plaintiffs' Exhibit 355 at KAIS-000738; Plaintiffs' Exhibit 357 at KAIS-000138.

- ❖ Soon after, the Northern California region makes Neurontin a non-detailable drug and the region's Drug Utilization Group launches an initiative to ensure appropriate prescribing. *See* 2/26 Tr. (Carrejo) at 114-5.

- ❖ In mid-2002, news reports about Dr. Franklin's whistleblower suit surface and DRUG's efforts intensify and Southern California's DUAT joins the effort. *See* 2/26 Tr. (Carrejo) at 116-7; 3/3 (Hyatt) Tr. at 104.

- ❖ Between 2003 and 2004, DRUG and DUAT are alerting PMG physicians about "exaggerated promotional claims" and troubling documents that showed "study results would be publicized and published 'if favorable' or 'if positive'. Efforts are made to disseminate reliable evidence. *See, e.g.* Plaintiffs' Exhibit 344 (no evidence for non-neuropathic pain, some evidence of efficacy for certain forms of neuropathic pain but emphasize that it is not a first-line treatment); Plaintiffs' Exhibit 353 (gabapentin not effective for bipolar, only more effective than placebo for migraine).

- ❖ In late 2003 and 2004, initiatives across Kaiser report dramatic decreases in utilization at the same time that utilization across the country continues to rise. *See* 2/26 Tr. (Carrejo) at 124; Plaintiffs' Exhibits 272, 286, 333, 340, 338.

- ❖ In November 2009, Dr. Kay Dickersin publishes article in the New England Journal of Medicine on selective outcome reporting and Neurontin, which concluded that the practice of selective outcome reporting from trials of gabapentin in off-label uses "threatens the validity of evidence for the effectiveness of off-label interventions." (TX 2091.) Article is circulated within Kaiser and viewed as new evidence to be incorporated into campaign against inappropriate utilization of gabapentin and pregabalin. *See e.g.* 3/4 Tr. (Hyatt) at 126-27.

Like the third-party references to gabapentin recently removed from Kaiser's website, the supposed "inconsistencies" touted by Defendants are evidence of nothing more than the

troubling fact that Defendants' massive fraud has permeated every aspect of Kaiser.[16]   As Dr.

Hyatt noted, it is not a simple task to correct for a fraud perpetrated on Kaiser and its physicians

for over a decade.  3/3 Tr. (Hyatt) at 136-37.  As Dr. Daniel explained:

> [T]he reason that doctors prescribe is not because – at least within our organization – not because it's on or off the formulary, it's because they believe that the drug is effective or not effective, and that's created over years of education and training.  So if there is – as we've now learned they're prescribing because they have erroneous, incorrect information.  Even if you remove it from the formulary, unless you change that erroneous, incorrect information, they're going to continue to believe it's useful and they're going to continue to prescribe it for their patients.  So the real thing is you need to educate the physicians, give them the information.

*See* 3/9 Tr. (Daniel) at 110.

### C.    Professor Rosenthal's Analysis Is Legally Sufficient Evidence of Causation

Sections III.C. and III.D. of Defendants' memorandum of law in support of their motion

for judgment as a matter of law based upon lack of sufficient evidence of injury or causation

contain arguments attacking the sufficiency of the analyses performed by Professors Rosenthal

and Hartman.   The arguments contained in these sections are addressed in their entirety in

Kaiser's memorandum of law in opposition to Defendants' motion for judgment as a matter of

law based upon lack of sufficient evidence to prove damages, dated March 18, 2010.

---

[16] Defendants allude vaguely to a judicial estoppel argument but make little attempt to clarify what prior position they believe Kaiser should be estopped from altering.   Certainly, at no time has Kaiser conceded efficacy of gabapentin for any of the indications at issue here.  To succeed on a claim of judicial estoppel, defendants must establish two preconditions: "First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. Second, the responsible party must have succeeded in persuading a court to accept its prior position." *Muskat v. United States*, 554 F.3d 183 (1st Cir. 2009).  There is no inconsistency, let alone mutual exclusive inconsistency, between the position taken by Kaiser at summary judgment and that taken at trial.

**D.      Kaiser's Neurontin Initiative Is Strong Evidence Of A Causal Link**

Despite this Court's prior holding, Defendants argue yet again that Kaiser's re-education initiative concerning Neurontin fails to establish causation.  Def. Br. at *18-19.  As this Court previously explained:

> Kaiser has shown that it was able to reduce its payments for Neurontin through an information campaign with more complete data regarding off-label uses of Neurontin that was initiated in 2002 after news reports of Pfizer's fraudulent activities began to surface. . . . The reduction in Neurontin prescriptions after Kaiser learned the truth about Pfizer's misrepresentations and took action is strong evidence of a causal link between Pfizer's misrepresentations and Kaiser's alleged injuries.

*Neurontin*, 2010 WL 53568, at *11.  Kaiser introduced evidence at trial demonstrating this link, and showed – based on Kaiser's own data of all of its regions – how Kaiser's Neurontin prescriptions peaked in 2003 and then began to decline substantially as the re-education campaign took effect.  (2/26 Tr. (Carrejo) 90:9-91:8, Plaintiffs' Exhibits 268, 268-B.)

Defendants make two objections to this "strong evidence of a causal link," neither of which merits much attention.  Defendants argue that the re-education initiative was limited only to California and only to neuropathic pain.[17]  Def. Br. at *19.  The evidence is to the contrary.[18]

---

[17]  Amazingly, Defendants make these arguments despite acknowledging that Kaiser *did* introduce evidence that the initiative was *not* limited to California, *see* Def. Br. at *19 (citing 3/3 Tr. (Hyatt) at 131 ("Q. Okay.  It was after that you got the award that you then went and told other regions around the country about DUAT, correct?   A.  That's correct.)), and conceding that "Kaiser witnesses made vague allusions to other indications," *see* Def. Br. at *19.  Defendants should be directing their arguments to the jury, not to the Court in a Rule 50 motion.

[18]  2/26 Tr. (Carrejo) at 99:13-100:3 (describing "inter-regional" effort to curb Neurontin overutilization, and semi-annual meetings and "monthly teleconferences across [all Kaiser regions] for those individuals who were heading up those initiatives");  117:21-24 (all PMG doctors were invited to attend the re-education teleconferences);  120:19-123:18 (re-education efforts were not limited to neuropathic pain and also focused "specifically [on] bipolar disease and also treatment of migraine headache and generalized pain or nociceptive pain", Plaintiffs' Exhibit 353;  124:4-16 (re-education resulted in a 34% decline in new Neurontin prescriptions

Defendants likely contest this evidence not because it is weak, but precisely because it is such compelling evidence of causation.  As Dr. Hyatt explained when describing the success of the re-education initiative, the charts showing the change in trend and the decline in Neurontin utilization as the initiative took effect "*represent[] the impact, the effect*, that our educational approach, our communication approach, our peer review approach had in trying to drive appropriate prescribing of Neurontin."  (3/3 (Hyatt) 114:16-116:3 (emphasis added), Plaintiffs' Exhibit 338).)

## IV.   **CONCLUSION**

For the foregoing reasons, Kaiser respectfully asks this Court to deny Defendants' motion for judgment as a matter of law based upon lack of sufficient evidence of injury or causation.


Dated:  March 18, 2010                    Respectfully submitted,


                                          By:   */s/ Linda P. Nussbaum*
                                                Linda P. Nussbaum

                                          KAPLAN FOX & KILSHEIMER LLP
                                          Linda P. Nussbaum, Esq.
                                          850 Third Avenue, 14th Floor
                                          New York, New York 10022

                                          *Attorneys for Plaintiffs Kaiser Foundation*
                                          *Health Plan, Inc. and Kaiser Foundation*
                                          *Hospitals*

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

across specialties at the same time that Neurontin prescriptions outside of Kaiser were increasing); (3/3 Tr. (Hyatt) at 106:2-12 (re-education included pain, bipolar, migraines).

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 18, 2010.

*/s/  Elana Katcher*
Elana Katcher