UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629 <br><br> Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: <br><br> KAISER FOUNDATION HEALTH PLAN, ET AL V. PFIZER, INC., ET AL, 04 CV 10739 (PBS) | Judge Patti B. Saris <br> Mag. Judge Leo T. Sorokin |

**KAISER'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
AS A MATTER OF LAW BASED UPON LACK OF SUFFICIENT EVIDENCE
TO PROVE DAMAGES**

Defendants have filed two motions for judgment as a matter of law premised upon alleged defects in the analysis put forward by Kaiser's economic experts Professor Rosenthal and Dr. Hartman.[1]  Pfizer alleges Kaiser has failed to produce evidence sufficient to permit a reasonable jury to find that Kaiser sustained its burden of proving damages, and asks the Court to dismiss Kaiser's RICO claims in their entirety.  Pfizer completely ignores the massive amount of evidence developed through a dozen witnesses, hundreds of exhibits, and three weeks of trial that shows Defendants', MAC, and CDM's scheme to defraud patients, physicians, and payors alike by promoting Neurontin for ineffective uses and manipulating the scientific evidence, and asserts that Plaintiffs' RICO claim must be dismissed because Kaiser has not adequately proven damages.[2]  Kaiser has more than met its burden, and responds to Defendants' allegations with references to relevant testimony and exhibits.

---

[1] *See* Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law based Upon Lack of Sufficient Evidence to Prove Damages, Docket No. 2673, March 15, 2010 ("Def. Damages Mem."); Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury or Causation, Docket No. 2671, March 15, 2010  ("Def. Causation Mem.") at sections C.1-3.
[2] Def. Damages Mem. at p. 1.

## ARGUMENT

I.     **Professor Rosenthal's Analysis**[3]

Professor Rosenthal quantified the impact of the alleged misconduct by Defendants on units of Neurontin paid for by Kaiser.[4]  Put differently, her assignment was to tease out Defendants' alleged unlawful influence on the sales of Neurontin.[5]

Professor Rosenthal testified that the one and only way health care economics teaches that you can estimate the amount of drug sales that were caused by drug marketing is to examine objectively the causal association between promotion and sales using these econometric models.[6] Professor Rosenthal, therefore, set out to "estimate and calculate a time series model that would quantify the specific contribution of promotion to sales"[7] and, specifically, "quantify the share of prescriptions [for each indication] that were caused by the alleged fraud."[8]

In conducting her analysis, Professor Rosenthal acquired national data on (i) the quantity of Neurontin prescriptions,[9] (ii) the price of Neurontin prescriptions,[10] (iii) promotional spending for Neurontin,[11] (iv) the price and promotional spend for other, competing AEDs,[12] (v) Neurontin prescriptions disaggregated by indication (NDTI data),[13] and (v) promotional spending for Neurontin disaggregated by prescriber specialty.[14]  These data sources were obtained from IMS Health and Verispan, and "are very widely used by people like me in

---

[3] Professor Rosenthal assumed that the allegations set forth in the complaint were true. Rosenthal Test., 3/5/2010 Tr., 116:3 – 116:5.  She has not offered an opinion as to liability. Rosenthal Test., 3/5/2010 Tr., 116:6 – 116:9.
[4] Rosenthal Test., 3/5/2010 Tr., 104:19 – 104:21.
[5] Rosenthal Test., 3/5/2010 Tr., 113:10 – 113:14.
[6] Rosenthal Test., 3/5/2010 Tr., 115:13 – 115:19.
[7] Rosenthal Test., 3/5/2010 Tr., 144:16 – 144:18.
[8] Rosenthal Test., 3/5/2010 Tr., 145:17 – 145:19.
[9] Rosenthal Test., 3/5/2010 Tr., 117:7 – 117:23.
[10] Rosenthal Test., 3/5/2010 Tr., 118:12 – 118:18.
[11] Rosenthal Test., 3/5/2010 Tr., 118:21 – 119:3.
[12] Rosenthal Test., 3/8/2010 Tr., 115:13-15.
[13] Rosenthal Test., 3/5/2010 Tr., 119:9 – 119:20; 120:9 – 121:9.  Professor Rosenthal testified that NDTI data is the single data source most commonly looked to in order to disaggregate pharmaceutical sales by indication.  Rosenthal Test., 3/5/2010 Tr., 122:11 – 122:14.
[14] Rosenthal Test., 3/5/2010 Tr., 119:21 – 119:25.

economic research" as well as "by the industry, including Pfizer, in its own strategic planning and marketing efforts…."[15]

Professor Rosenthal and Dr. Hartman both testified about the reliability of the data sources used in Professor Rosenthal's analysis.  Professor Rosenthal testified that NDTI data is the single data source most commonly looked to in order to disaggregate pharmaceutical sales by indication.[16]  Dr. Hartman testified that "[g]enerally all of the data that she has discussed I'm familiar with, I've used.  It is the gold standard of data for this industry, and it's used in most academic research and in litigation."[17]

A.      **Professor Rosenthal's Analysis Appropriately Relied on National Promotional Expenditure Data**

Professor Rosenthal appropriately relied on national promotional expenditure and quantity data in estimating the effects of a national promotional campaign to a large national healthcare provider.  As Professor Rosenthal explained, "the standard practice in these types of analyses is to use aggregate data and to use statistical approaches to link patterns in promotional spending to patterns in prescribing for the drug."[18]  She continued, "rather than identifying exposure to marketing activities physicians by physician, the analysis looks at patterns of actual behavior, aggregate patterns of promotion, and makes the connection between the two, both to assess whether there was exposure and its impact."[19]

Professor Rosenthal repeatedly testified that the percentages of unlawful prescriptions that result from her analysis of the national promotional data are applicable to Kaiser: "my analysis and the conclusions about the proportion of prescriptions that were caused by the

---

[15] Rosenthal Test., 3/5/2010 Tr., 118:5 – 188:10.
[16] Rosenthal Test., 3/5/2010 Tr., 122:11 – 122:14
[17] Hartman Test., 3/8/2010 Tr., 135:3 – 135:6.
[18] Rosenthal Test., 3/8/2010 Tr., 16:11 – 16:17.
[19] Rosenthal Test., 3/8/2010 Tr., 17:4 – 17:9.

alleged misconduct is applicable to Kaiser,"[20] "I believe my estimates apply to Kaiser,"[21] and "it's my belief that while there may be some difference, the national analysis will be representative of what happened in the Kaiser situation."[22]

Professor Rosenthal made clear, "what I'm trying to do here is establish the relationship between journal advertising and detailing and prescriptions, and then extrapolate that relationship to Kaiser, rather than trying to make the individual variables in the equation represent Kaiser. In my view, this is the most reliable way to develop these estimates for Kaiser."[23] Professor Rosenthal testified that the only reasonable way healthcare economists would approach her assignment and apply it to Kaiser would be to use national numbers. [24] Professor Hartman similarly testified that Professor Rosenthal's use of national promotional data was appropriate:

> What we're trying to get at here is doctors' behavior, doctors' responses to detailing and various kinds of promotional activities and how it affects their prescribing behavior. ...So what you are able to observe [in the IMS and Verispan data] are patterns of prescribing and the drugs that are prescribed and sold by a very broad cross-section of doctors in the county, all of which, as one looks at the discovery materials, were detailed; and as part of the allegation in this case, their prescribing behavior was to be affected by the promotional activity.
>
> So this data is as broad and a rich a sample as you can get. It summarizes… a good portion of scripts written and whether they're paid for by Aenta or Guardian or whomever. So it's a very representative sample.[25]

Professor Rosenthal and Dr. Hartman could not possibly have utilized Kaiser specific data because no such data exists. As Dr. Hartman explained, based on testimony by Kaiser fact witnesses, Kaiser does not have data that disaggregates their Neurontin purchases by

---

[20] Rosenthal Test., 3/8/2010 Tr., 50:25 – 51:4.
[21] Rosenthal Test., 3/8/2010 Tr., 51:9 – 51:10.
[22] Rosenthal Test., 3/8/2010 Tr., 25:18 – 25:21.
[23] Rosenthal Test., 3/8/2010 Tr., 26:5 – 26:11.
[24] Rosenthal Test., 3/8/2010 Tr., 26:13 – 26:17.
[25] Hartman Test., 3/8/2010 Tr., 135:12 – 136:2.

indication.[26]  Similarly, Professor Rosenthal and Dr. Hartman did not have access to data that reflected the promotional dollars spent by Pfizer to promote to Permanente Medical Group physicians during the time period.[27]

Defendants assert that, based on an off hand remark by Mr. Franklin, IMS data made it possible to determine the "precise details of physicians' prescribing habits on a doctor-by-doctor basis."[28]  Defendants misconstrue Mr. Franklin's testimony (wherein he testified that he never detailed Kaiser physicians),[29] provide no support for this contention, and do not even suggest a data source for determining the promotional dollars spent by Pfizer to promote Neurontin to Permanente Medical Group physicians.

In any case, Dr. Hartman confirmed that he would not prefer Kaiser-specific promotional data, *even if such data existed*: "You want to get as broad a[s] possible a set of behavioral responses….the variability that one would find that [Kaiser only] data would lead to less statistical robustness and less ability to test the hypotheses that one as a statistician and econometrician does when estimating a model."[30]

Contrary to Defendants' assertions, Professor Rosenthal did not merely state that she believed her analysis pertained to Kaiser, but enumerated reasons that it was most appropriate to use national promotional expenditure and quantity data when assessing Kaiser specifically,[31] including:

- "the national data gives us the biggest possible picture;"[32]
- "the data are most stable if we look at the aggregate national sales;"[33]

---

[26] Hartman Test., 3/8/2010 Tr., 137:12 – 137:16; 138:1 – 138:4.
[27] Hartman Test., 3/8/2010 Tr., 138:5 – 138:11. Just because Kaiser, like most third party payors in the United States, did not have the ability to track prescriptions by indication from 1996 through 2004 does not mean that Defendants can escape liability for their fraud. Similarly, Pfizer is not off the hook because they failed to produce comprehensive data on their promotional spend at Kaiser.
[28] Def. Damages Mem. at p. 3.
[29] Franklin Test., 3/12/2010 Tr., 83:8 – 83:9.
[30] Hartman Test., 3/8/2010 Tr., 136:12 – 136:19.
[31] Rosenthal Test., 3/8/2010 Tr., 24:14 – 26:24.
[32] Rosenthal Test., 3/8/2010 Tr., 24:17.

- "national data give us the universe of Neurontin prescriptions.  We have much more reliability because of the large sample sizes."[34]

- "pharmaceutical marketing strategies [such as detailing and advertising] are developed at a national level."[35]

- "all of the variables I am intending to capture here through this set of variable influence physicians, both in Kaiser and elsewhere, in much the same way;"[36]

- "So while there may be differences in, for example, the employment context of Kaiser physicians, these physicians are exposed to continuing medical education in the same way that other physicians nationally are.  They have available or not available the same literature that's been published or not published, and they are influenced by marketing in the same way that other physicians are."[37]

Dr. Hartman similarly testified that the national numbers are fairly representative of what's gone on at Kaiser, in part because "the patient population looks quite similar, and the physician distribution looks similar to me, as does the national distribution from the testimony I heard last week."[38]

After considering all of these factors, and after reviewing the testimony of the Kaiser fact witnesses, Professor Rosenthal concluded, "[i]n my opinion as a healthcare economist, the percentages that I have calculated are a fair and accurate representation of the impact on Kaiser of the alleged misconduct."[39]  Dr. Hartman also testified that "the analysis performed by … Professor Rosenthal appropriately is based on national numbers…."[40]

**B.    Professor Rosenthal's Analysis Accounts for Any Differences in Kaiser**

Neither Professor Rosenthal, nor any Kaiser witnesses, testified that Kaiser is just like every other third party payor in the country.[41]  Professor Rosenthal acknowledged several factors that might show some differences for Kaiser in particular ways – *but testified that her model*

---

[33] Rosenthal Test., 3/8/2010 Tr., 24:21 – 24:22.
[34] Rosenthal Test., 3/8/2010 Tr., 26:21 – 26:24.
[35] Rosenthal Test., 3/8/2010 Tr., 24:18 – 24:20.
[36] Rosenthal Test., 3/8/2010 Tr., 24:23 – 25:1.
[37] Rosenthal Test., 3/8/2010 Tr., 25:12 – 25:18.
[38] Hartman Test., 3/8/2010 Tr., 139:6-9
[39] Rosenthal Test., 3/8/2010 Tr., 125:7 – 125:9.
[40] Hartman Test., 3/9/2010 Tr., 18:1 – 18:5.
[41] Def. Causation Mem. at 15.

*either took these factors into account or properly excluded them.*  Dr. Hartman used Kaiser's own data for the price and quantity of Neurontin purchased, so his monetized results account for the reduction in scripts that resulted from Kaiser's reeducation campaign.  Professor. Rosenthal testified that her analysis did not expressly include the Kaiser re-education initiatives, but "to the extent that such initiatives are going on in the context of the physician prescribing patterns that are captured by the VONA data, they may be in the background there…"[42]  Similarly, when asked about guidelines that related to the use of TCA's prior to Neurontin, Professor Rosenthal states, "such guidelines exist in many places outside of Kaiser and no doubt result in some physicians changing behavior to use TCAs as an example before Neurontin.  I believe my analysis already captures the effects of those kinds of guidelines."[43]   Professor. Rosenthal testified that whether or not Kaiser has different generic prescribing patterns from other TPPs was irrelevant to her analysis, which focused solely on the branded drug Neurontin.[44]  She also testified that difference in the employment context of Kaiser physicians do not effect the sources of information they rely on or their susceptibility to marketing by pharmaceutical companies.[45]

To the extent that Kaiser had reeducation campaigns and other initiatives that resulted in decreased prescriptions of Neurontin, *Professor Rosenthal's model presents a conservative estimate of the effects of promotion on sales for Kaiser.*  Professor. Rosenthal testified that to the extent a large payor had a major education campaign with respect to Neurontin in response to marketing efforts by the company, "the notion is that if those activities were pushing against the promotional activities, it would make the promotional effort look less effective in effect; and so it would make it look as if promotion was less successful than it would have been in the absence

---

[42] Rosenthal Test., 3/8/2010 Tr., 53:10 – 53:15.
[43] Rosenthal Test., 3/8/2010 Tr., 71:18 – 72:1.
[44] Rosenthal Test., 3/8/2010, Tr., 52:5 – 52:11.
[45] Rosenthal Test., 3/8/2010 Tr., 25:12 – 25:18.

of those third-party pay activities to try to contravene the promotional effect on off-label use."[46]
As she explained, "In that case, my estimates would be undercounting promotional effect
because if insurers, for example, were trying to combat off-label use of Neurontin at the same
time as defendant was promoting for Neurontin, those two things would sort of cancel one
another out, and they would lead to an under calculation of the promotional effect."[47]

C.     **Professor Rosenthal's Focus on Detailing is Appropriate**

        In undertaking her analysis of the effect of Defendants' promotions, Professor Rosenthal
used IMS data on detail visits by sales representatives and professional journal advertising, the
only two sources of promotional data that were available to her during the time period at issue.[48]
Professor Rosenthal testified that "detailing is a very important component of pharmaceutical
spending simply as a percentage of the dollar amount that pharmaceutical companies spend on
promotion.  Detailing is the biggest component…."[49]

        Professor Rosenthal also testified that while she did not have particular data sets to reflect
some of the allegations in the complaint, she had a sufficient amount of data to undertake her
assignment.  Professor Rosenthal acknowledged that she did not have a data source for "a
systematic measure of publications or suppression of publications"[50] or CME expenditures,[51] but
she felt comfortable to a reasonable degree of certainty in the area of healthcare economics that
the data she had on promotional spending were sufficient to perform her analysis.[52]  She
explained, "detailing and the use of the sales force is widely understood both in the industry and
in academia to be a central piece of the marketing strategy of pharmaceutical companies, and

---

[46] Rosenthal Test., 3/8/2010 Tr., 28:21 – 29:6.
[47] Rosenthal Test., 3/8/2010 Tr., 28:14 – 28:20.
[48] Rosenthal Test., 3/5/2010 Tr., 135:23 – 136:6.
[49] Rosenthal Test., 3/5/2010 Tr., 134:2 – 134:5.
[50] Rosenthal Test., 3/5/2010 Tr., 74:13 – 74:14.
[51] Rosenthal Test., 3/5/2010 Tr., 77:20 -77:21.
[52] Rosenthal Test., 3/5/2010 Tr., 138:2 – 140:12.

when I say central, you can imagine a detailing representative bring journal articles with them. This is a vehicle for inviting people to medical education events…."[53]  Professor Rosenthal also stated,

> not having data on these other mechanisms, if they're used in concert with detailing, is not a very big limitation … It's not critical to get the levels of spending correct, what's critical is to get the patterns of changes over time correct.  That's really the mechanism for calculating the relationship between promotion and sales is about the changes over time and not the levels, and so if the changes are occurring in concert, the analysis will pick up the right magnitude of effect anyhow.[54]

Defendants' assertion that Professor Rosenthal merely "assumes" that detailing is an important explanatory variable in prescription decisions ignores Professor Rosenthal's statements that both industry and academia understand that detailing is a core part of marketing strategies.[55]  It also ignores numerous references to the importance of detailing contained in documents produced by Defendants that are in evidence.[56]

Defendants argue that Professor Rosenthal's reliance on detailing expenditures "is contradicted by every prescribing doctor who had testified in this litigation."[57]  Defendants completely ignore Professor Rosenthal's testimony about the reasons for approaching this analysis in the aggregate:

> Q: Why don't you try to identify the individual doctors when estimating pharmaceutical sales caused by pharmaceutical marketing?

---

[53] Rosenthal Test., 3/5/2010 Tr., 138:5 – 138:11.
[54] Rosenthal Test., 3/5/2010 Tr., 138:22 – 139: 6.
[55] Def. Causation Mem. at 17; Rosenthal Test., 3/5/2010, 138:5 – 138:11.
[56] See Ex. 73 (identifying 1997 Neurontin Strategies, including to "[t]arget the 500 decile 10 physicians who are not prescribing Neurontin" and to "[i]ncrease call frequency to decile 6-10 neurologists."); Ex. 17 (stating as part of the Neurontin 1998 Tactical Plan that neurologists, high decile PCPs, and psychiatrists would receive a telephone detail, a follow-up letter and any other information they have requested); Ex. 72 (identifying 1999 Neurontin product strategy as including "significant promotional efforts on decile 5 through 10 office and hospital based physicians); Ex. 92 (in May 31, 2000 Neurontin update, identifying "[t]argeting of high Neurontin deciles" and "[s]ales force promotion" as key strategies and activities).
[57] Def. Causation Mem. at 17.

> A: So the standard practice in these types of analyses is to use
> aggregate data and to use statistical approached to link patterns in
> promotional spending to patterns in prescribing for the drug.  It's
> neither standard nor appropriate to look physician by physician.[58]

Professor Rosenthal explained "economists using standard methodologies do not ask physicians

about how they respond to promotion in order to quantify that effect, so no, I did not think it was

productive to talk to those physicians."[59]  Defendants also ignore Professor Rosenthal's

testimony about the danger of bias in physician self reporting:

> [t]he issue is whether physicians can accurately report all the
> influences on their practice patterns.  As an economist and a social
> scientist, I put higher weight on what people do rather than what
> they say.  Not that physicians are lying, but there are unconscious
> biases and social desirability biases that will make them very
> reluctant to say that they tried a very high dose because a detailing
> agent came and told them that.  There is good experimental and
> other evidence in the social sciences that self-reporting is based.
> So I would take that evidence with many grains of salt and put
> very little weight on it, and indeed would look at the objective
> patterns of detailing and dosing and draw my conclusions from
> those objective patterns.[60]

Most importantly, Defendants' assertion presumes that Professor Rosenthal found that

100% of all Neurontin prescriptions written by physicians who testified in this case were

unlawful.  Professor Rosenthal's analysis certainly does not yield this result.  Perhaps Dr. Daniel

was not duped; perhaps Dr. McCrory's prescription decision was unrelated to Defendants' fraud.

The point of Professor Rosenthal's analysis is, "rather than identifying exposure to marketing

activities physicians by physician, the analysis looks at patterns of actual behavior, aggregate

patterns of promotion, and makes the connection between the two, both to assess whether there

was exposure and its impact,"[61] and determines, ultimately, the percentage of off-label

---

[58] Rosenthal Test., 3/8/2010 Tr., 16:11 – 16:17.
[59] Rosenthal Test., 3/8/2010 Tr., 55:21 – 55:24.
[60] Rosenthal Test., 3/8/2010 Tr., 63:24 – 64:11.
[61] Rosenthal Test., 3/8/2010 Tr., 16:4 – 16:9.

prescriptions (by indication) that would not have been written but-for Defendants' wrongful actions.

**D.      Professor Rosenthal's Analysis Is Not "Results Oriented"**

Defendants' assertion that Professor Rosenthal's methodology is "results oriented" because Professor Rosenthal ran multiple models for each indication-specialty pairing is incorrect.[62]  Professor Rosenthal testified at length about the process she undertakes when generating models, "like any econometrician, I don't run a single model, close the book, and I'm done,"[63] "econometrics is a trial-and-error effort.  You don't know what the data will show until you run the models.  This is standard practice."[64]  Dr. Rosenthal explained, "some of the models I rejected because the statistical tests and what came out of the models made no sense or suggested there were underlying problems."[65]  Professor Rosenthal confirmed that no one, including the lawyers for Kaiser, gave her a target for her results.  She further confirmed that the results she presented to the jury are the exact same results that she first presented to counsel for Kaiser without any modification of the percentages that are associated to the Defendants' wrongdoing.[66]

**E.      Applying a Time Trend Yields Nonsensical Results**

Defendants claim that Professor Rosenthal "omitted a time trend, which she had originally planned to include, because including it produced results that showed no statistically significant effect of promotion."[67]  Defendants are incorrect.

Professor Rosenthal testified, "I think the critical piece is I'm trying not to put into the data a lot of assumptions.  I'm trying to let the statistical analysis actually come out of the

---

[62] Def. Causation Mem. at 17.
[63] Rosenthal Test., 3/8/2010 Tr., 102:7 – 102:8.
[64] Rosenthal Test., 3/8/2010 Tr., 103:4 – 103:6.
[65] Rosenthal Test., 3/8/2010 Tr., 103:17 – 103:20.
[66] Rosenthal Test., 3/8/2010 Tr., 118:23 – 119:2.
[67] Def. Causation Mem. at 17.

data."[68]  Put differently, "I'm asking the data to tell me what the relationship is among these variables, I'm not telling it."[69]

Professor Rosenthal explained that while she initially conceived of using a time trend when theorizing how she might construct a regression analysis, she subsequently decided against it because in the context of a regression involving a single drug, "[the time trend] is essentially perfectly lined up with the promotional spending variability, which has economic theory to suggest that it matters."[70]  "A time trend is only hypothetical, it's a hypothetical that there's something else unidentified over time that's driving sales."[71]  If you include a time trend, "[y]ou end up proving that Pfizer spent millions of dollars promoting Neurontin to no effect."[72] As Professor Rosenthal explained, "promotional spending is one thing we know from economics should matter."[73] Inclusion of a time trend thus produces nonsensical results that defy one of the five basic principles of healthcare economics.

Professor Rosenthal further elaborated that she had used time trends in other instances where her regressions involved multiple drugs in multiple classes at different stages in their patents:[74]

> I had multiple drugs in multiple therapeutic classes and each of them was on a different part of its life cycle. It was a snapshot in time.  So the time trends in that model were picking up common, secular trends but the product life cycle issues could be identified distinctly from that because I had multiple drugs. And so where there is cross-sectional variation, that is, multiple drugs over time, a time trend is pulling out less of the total variation that's there to be explained by the variables. That's the big difference in my mind of why the time trend is so problematic here.

---

[68] Rosenthal Test., 3/8/2010 Tr., 129:3 – 129:5.
[69] Rosnethal Test., 3/8/2010 Tr., 128:18 – 128:19.
[70] Rosenthal Test., 3/8/2010 Tr., 106:22 – 106:25.
[71] Rosenthal Test., 3/8/2010 Tr., 107:24 – 108:1.
[72] Rosenthal Test., 3/8/2010 Tr., 107:5 – 107:6.
[73] Rosenthal Test., 3/8/2010 Tr., 107:23 – 107:24.
[74] Rosenthal Test., 3/8/2010 Tr., 127:12 – 128:5.

She continued, "[T]he model I propose [in my initial opinion] is actually based on the published models, ones that I publish in this multidrug context, ones that have been published by others. It's simply a summary of what's in the literature to do this kind of estimation."[75]

Professor Rosenthal cautioned that to use a time trend requires making an assumption about what the trend would be, and that assumption could lead to illogical results:

> [a] time trend assumes that there's a growth [in sales] over time that takes a specific form… but if you put in a time trend, you have to say what that time trend is. Instead, I use a model that does assume that there are some patterns of unmeasured changes over time… and so it's a much more flexible, less assumption-laden approach.[76]

Professor Rosenthal acknowledged "it is absolutely possible to estimate a model – Dr Keeley has done so – where promotion has a negative effect on sales. The data will tell you that if you put enough assumptions in it. So – but I pick up a positive effect in my models."[77] Professor Rosenthal's time series model, therefore, comports with the basic principles of healthcare economics, while applying a time trend to a single drug regression does not.

**F.       Professor Rosenthal's Analysis Accounts for RICO Violations**

Defendants also claim that Professor Rosenthal "did not attempt to measure the alleged conduct of any enterprise."[78]  This argument ignores Professor Rosenthal's testimony and the substantial evidence Kaiser introduced in support of its RICO allegations.  Professor Rosenthal, in calculating the percentage of off-label prescriptions resulting from Defendants' misconduct, was instructed to assume that the allegations regarding Defendants' unlawful conduct were true and that Kaiser's RICO allegations could be proven.[79]  Her analysis accounts for the allegedly improper activities of the MAC and CDM enterprises.

---

[75] Rosenthal Test., 3/8/2010 Tr., 129:16 – 129:19.
[76] Rosenthal Test., 3/8/2010 Tr., 127:2 – 127:6.
[77] Rosenthal Test., 3/8/2010 Tr., 129:6 – 129:10.
[78] Def. Causation Mem. at 16.
[79] Rosenthal Test., 3/5/2010 Tr., at 115:25 – 117:6.

In calculating the appropriate percentage of off-label prescriptions resulting from Defendants' misconduct, Professor Rosenthal explained that "one of the basic findings of the literature in pharmaceutical promotion is that physicians, once they develop practice patterns, tend to perpetuate those practice patterns, so as a result promotional spending has a long-lived effect."[80]  Given this phenomenon – that once a doctor develops patterns, they stick to the same patterns – "the key to calculating the relationship between promotion and sales is about the changes over time and not the levels [of spending at a particular moment], and so if the changes are occurring in concert, the analysis will pick up the right magnitude of effect anyhow."[81]

Professor Rosenthal was confident that she had sufficient data to calculate the impact of Pfizer's misconduct.[82]  For example, she testified to the correlation between increases in CME programs and detailing, as well as Pfizer documents showing that they "understood that these mechanisms worked together, talked about using continuing medical education and detailing to target, for example, primary care physicians."[83]  With respect to Defendants' misconduct in promoting misleading medical literature, Professor Rosenthal concluded that "these kinds of publications and the publications that were suppressed all would influence – would look like the scientific literature and influence physicians" and "as the promotional series for which I have the best data are detailed and journalized, I think they'll pick up the effects of these other strategies."[84]  Professor Rosenthal further testified that to the extent this publication misconduct

---

[80] Rosenthal Test., 3/5/2010 Tr., 108:2 – 108:12.
[81] Rosenthal Test., 3/5/2010 Tr., 137:25 – 139:6.
[82] Rosenthal Test., 3/5/2010 Tr., 140:8-12.
[83] Rosenthal Test., 3/5/2010 Tr., 139:7 – 140:7.
[84] Rosenthal Test., 3/8/2010 Tr., 120:4 – 120:25; *see also* Rosenthal Test., 3/8/2010 Tr., 75:18 – 75:25 ("My model will pick up the effects of those things to the extent that they're correlated with the promotional efforts by the defendant, but they clearly influence the entire conduct in this matter.  So the information that's available in this context will affect the way the plaintiff responded to detailing, for example.").

is not accounted for in her model, her "calculations are, in fact, lower than they really should be."[85]

Professor Rosenthal also examined each indication carefully, and made assumptions consistent with Kaiser's RICO allegations.  For bipolar, Professor Rosenthal examined promotion and prescriptions by one specialty, psychiatrists.  She then assumed, consistent with the allegations in the complaint, that "but for the alleged misconduct, the defendant would not have promoted Neurontin to psychiatrists at all during the period in question."[86]   This Court has recognized that Dr. Rosenthal's analysis "shows the correlation between promotional efforts for psychiatrists and bipolar use of Neurontin by psychiatrists."[87]  Professor Rosenthal also saw a significant increase in psychiatrists prescribing Neurontin at the same time that Defendants began detailing psychiatrists regarding Neurontin.[88]   For migraine, Professor Rosenthal makes a very different assumption based on the fact that neurologists also prescribe Neurontin for its approved indication for adjunctive treatment of seizures:  "I look at the data and look at off-label uses by neurologists versus approved uses by neurologists and assume that the proportion of promotion allocated to these indications is the same."[89]

Professor Rosenthal's analysis is highly indication-specific and accounts for each of the elements of the RICO enterprises.  Her results are sufficiently tailored to the facts of this case to prove "but for" causation.

## II.     Dr. Hartman's Damages Calculations

Dr. Hartman collaborated with Professor Rosenthal on her analysis, and formed an independent opinion that Professor Rosenthal's results were a fair and accurate depiction of the

---

[85] Rosenthal Test., 3/8/2010 Tr., 120:23 – 120:25.
[86] Rosenthal Test., 3/8/2010 Tr., 18:20 – 18:22.
[87] Jan. 8, 2010 Mem. and Order at 23.
[88] Rosenthal Test., 3/5/2010 Tr., 127:1-9; Rosenthal Test., 3/8/2010 Tr., 18:11-22.
[89] Rosenthal Test., 3/8/2010 Tr., 21:21 – 21:24.

percentages and numbers of unlawful prescriptions by which the marketing by Pfizer caused increased prescriptions of Neurontin,[90] Dr. Hartman then took the percentages derived by Professor Rosenthal from the national promotional data and used them to calculate damages for Kaiser.[91]

**A.     Dr. Hartman Utilized Kaiser-Specific Prescription Information**

Dr. Hartman used Kaiser-specific numbers to calculate damages for Kaiser.  Dr. Hartman calculates damages by applying the percentages calculated by Professor Rosenthal to the total number of prescriptions paid for by Kaiser:

> "I use the shares of the national patterns, because they are representative and drawn from a sample across almost all payors.  I use those shares and apply them to the total number of Kaiser scripts.  So when I'm calculating damages for Kaiser, I'm using Kaiser data, total Kaiser scripts, and the patterns revealed overall the prescribing behavior across the country."

More specifically, Dr. Hartman took the ratios of allegedly fraudulent prescriptions and "appl[ied] it to the Kaiser total to come up with numbers that reflect the number of scripts that were induced by the unlawful promotion at Kaiser," thus determining a quantity of allegedly unlawful prescriptions paid for by Kaiser. [92] To determine price, Dr. Hartman took the "Kaiser total dollar amount and total number of scripts and calculate[d] a weighted average price of a script, an average script of Neurontin."[93]  Dr. Hartman then multiplied the quantity of allegedly unlawful prescriptions paid for by Kaiser (by quarter) by the average weighted price per prescription (by quarter) to determine Kaiser's damages number.[94]  His results are presented in Exhibit 408-F.

---

[90] Hartman Test., 3/8/2010 Tr., 141:4 – 141:15.
[91] Hartman Test., 3/8/2010 Tr., 131:17 – 131:21.
[92] Hartman Test., 3/8/2010 Tr., 145:2 – 145:13.
[93] Hartman Test., 3/8/2010 Tr., 146:4 – 146:7.
[94] Hartman Test., 3/8/2010 Tr., 146:13 – 146:21.

Dr. Hartman used standard methods in healthcare economics and applied microeconomics to determine the damages for Kaiser, the very same "standard methods used by the industry, used by Pfizer to calculate values of different promotional programs, by academics and academia itself."[95]  As Dr. Hartman put it, he has had more challenging projects.[96]

**B.**     **Dr. Hartman Presents a Viable Alternative Damages Theory**

Dr. Mirta Millares produced a list of "cheaper and more optimal drugs" that would have likely been prescribed had Neurontin not been prescribed for the indications at issue in this litigation.[97]  Dr. Hartman undertook an alternative damages calculation based on Dr. Millares's affidavit.  As Dr. Hartman explained,

> I was provided with a list of drugs by indication that would have been the mix of drugs that could have been prescribed had the Kaiser doctors known that Neurontin was not effective, and I took the price per script of … that combination of alternative drugs and merely took the price of Neurontin minus the price of those other drugs and applied that to the total number of scripts.  So the assumption is that Kaiser would have prescribed a different set of drugs that was not Neurontin.[98]

Dr. Hartman monetized the damages under this alternative theory.  As Defendants put it, "all Dr. Hartman did was take the list of alternative drugs that Plaintiffs provided, compute a weighted average of the price and subtract it."[99]  Dr. Hartman is not a medical doctor and did not take a position on whether these drugs were appropriately selected.  Dr. Millares testified that the list of drugs used by Dr. Hartman was an appropriate list of drugs for an alternative damages theory.[100]  Whether or not the finder of fact accepts her testimony is not an appropriate subject for a motion for a directed verdict.

---

[95] Hartman Test., 3/8/2010 Tr., 147:4 – 147:11.
[96] Hartman Test., 3/8/2010 Tr., 147:12 – 147:13.
[97] *See* Exhibit 365 (List of cheaper more optimal drugs); Millares Test., 3/4/2010 Tr., 89:6 – 89:24.
[98] Hartman Test., 3/8/2010 Tr., 154:1 – 154:10.
[99] Def. Damages Mem. at p. 6.
[100] Millares Test., 3/4/2010 Tr., 89:6-24; Hartman Test., 3/9/2010 Tr., 15:19 – 16:8.

**C.      Kaiser's Damage Calculations are Reliable**

Defendants also argue that the 91 % reduction of damages in the "but for" world is "patently unreasonable" because Kaiser's re-education programs have reduced the number of Neurontin prescriptions by 34 %.[101]  This argument compares apples to oranges.  Despite Kaiser's best efforts, some doctors continue to prescribe Neurontin for off-label uses for which this law suit alleges the drug is ineffective.  As Prof. Rosenthal testified, once physicians develop practice patterns, they tend to perpetuate them, so "promotional spending has a long-lived effect."[102]  The flood of promotions and misleading medical literature has convinced some doctors that Neurontin is effective, despite the lack of scientific data, and re-educating them takes significant effort.  Kaiser has not been able to prevent all of the prescriptions caused by Defendants' misconduct – all the more reason Kaiser should be allowed to recover in this lawsuit.

Similarly, Defendants' arguments that Dr. Hartman failed to make doctor-specific analyses proposes an inappropriate tactic.  As described above, using national promotional data and Kaiser-specific data for prescriptions results in a more statistically meaningful analysis than surveying individual physicians at Kaiser.  This approach allowed Dr. Rosenthal and Dr. Hartman to determine the amount of unlawful prescriptions and corresponding damages that Kaiser suffered as a result of Defendants' decade long campaign of misinformation.[103]

**D.      Kaiser Mitigated its Damages**

Defendants' argument that Kaiser failed to mitigate its damages misstates the date on which Kaiser became aware of Defendants' misconduct and ignores Kaiser's extensive re-

---

[101] Def. Damages Mem. at pp. 6-7.  Two pages later, Defendants ignore these re-education programs in arguing that Kaiser failed to mitigate its damages.  *Id.* at 9.

[102] Rosenthal Test., 3/5/2010 Tr., 108:2-12.

[103] Rosenthal Test., 3/5/2010 Tr., 137:25 – 139:6.

education programs designed to minimize the impact of Defendants' misconduct.  The specific facts relating to Kaiser's knowledge are discussed in detail in Kaiser's Opposition to Defendants' Motion for Judgment as a Matter of Law Based Upon RICO Statute of Limitations, filed herewith, and are incorporated herein by reference.  The specific facts relating to Kaiser's reeducation campaign are discussed in detail in Kaiser's Opposition to Defendants' Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Support State Law Claims, filed herewith, and are incorporated by reference.  Even if the Court agreed with Defendants that Kaiser did not mitigate its damages, that argument does not justify granting a motion under Rule 50, but instead goes towards the amount of damages.

## III.    The Court Should Not Grant a Directed Verdict on Damages Grounds

Defendants argue that despite their decade long campaign of promoting Neurontin for conditions for which it is ineffective, distorting the scientific literature, conspiring with CDM and MAC to further their ill gotten gains, and spending millions of dollars to carry out its publication plans they cannot be held liable because Kaiser has "failed to produce evidence sufficient to permit a reasonable jury to find that Kaiser sustained its burden of proving damages."  As set forth above, Kaiser has sufficiently set forth its damages.

Defendants in *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 493-94 (th Cir. 2002) made a similar argument in the antitrust context that was soundly rejected by the court:

> The defendants' entire case theory . . . seems to be the troubling one because their scheme was so evil, went undetected for so long, and caused so much economic loss . . . , that we should simply give them a pass from the antitrust laws. This is not now and never has been the law. Since the days of *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927), it has been established that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.

As "[c]ivil RICO was modeled after the Clayton Act," the *Loeb* court's analysis applies.

Even if the Court should determine that Professor Rosenthal and Hartman's damages models are imperfect, Kaiser's claims should not be dismissed.  First, the First Circuit has held that "there is a clear distinction between the [relatively high] measure of proof necessary to establish that [a plaintiff] has sustained some damage and the [relatively low] measure of proof necessary to enable the jury to fix the amount."  *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 200 (1st Cir. 1996).  Similarly, it is well established that "[o]nce fraud has been proven, the burden of proving specifics of damages by the claimant is reduced."  *In re Zyprexa*, 493 F.Supp.2d at 578 (citing cases).  Second, should the Court reject Professor Rosenthal's and/or Dr. Hartman's analysis, Kaiser has introduced into evidence data from which the jury may determine damages: Exhibits 268, 268-A, and 268-B contain information about Kaiser's total prescriptions and total payments for Neurontin over time from which the jury could determine, based on testimony and other evidence, an appropriate amount of damages.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages should be DENIED.

Dated:  March 18, 2010                      Respectfully submitted,


                                            By:     */s/ Thomas M. Sobol*
                                                    Thomas M. Sobol

                                            HAGENS BERMAN SOBOL SHAPIRO
                                            LLP
                                            Thomas M. Sobol
                                            Kristen Johnson Parker
                                            55 Cambridge Parkway, Suite 301
                                            Cambridge, MA  02142

                                            *Of Counsel*

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Don Barrett, P.A.
404 Court Square
Lexington, MS  39095-0987


*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*


Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, New York 10022

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 18, 2010.

*/s/  Thomas M. Sobol*
Thomas M. Sobol