UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW BASED UPON LACK OF SUFFICIENT EVIDENCE TO PROVE CONDUCT OF RICO ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY**

862344.2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................ 1

I.  KAISER HAS PRESENTED SUFFICIENT EVIDENCE OF CONDUCT OF AN ENTERPRISE ................................................................................. 1

    A.  Kaiser Has Presented Sufficient Evidence of Enterprises Distinct From Pfizer. ............................................................................................ 2

    B.  Kaiser Has Proven the Existence of the Enterprises Distinct from the Racketeering Activities. ........................................................................ 6

    C.  The Collection of Documents Contains Evidence of a RICO Violation. .................................................................................................... 7

II.  KAISER HAS PRESENTED AMPLE EVIDENCE OF PREDICATE ACTS ............................................................................................................... 9

    A.  Kaiser Has Proven Defendants Committed Predicate Acts Through the Publication Enterprise. .................................................................... 10

        1.  Defendants suppressed and manipulated studies. ........................ 10

        2.  Kaiser has proven a nexus between the publication theory and the enterprise. ................................................................... 12

    B.  Kaiser Has Presented Sufficient Evidence of Predicate Acts Through the CDM Enterprise. ............................................................... 14

        1.  Kaiser has presented sufficient evidence of Defendants' control of CME events. ................................................................ 14

        2.  Kaiser has presented sufficient evidence that the CME events were misleading. ........................................................... 16

        3.  Kaiser has shown a nexus between CME events and enterprise ................................................................................ 17

    C.  Detailing Was a Part of Defendants' Fraudulent Scheme. ..................... 18

        1.  Detailing was fraudulent and connected to Kaiser's claims. ....... 18

        2.  Kaiser has shown a nexus between detailing and enterprise. ...... 19

III.  CONSPIRACY CLAIMS ................................................................... 19

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

### Cases

*Bonilla v. Volvo Car Corp.*,
  150 F.3d 62 (1st Cir. 1998) ................................................................................. 11

*Boyle v. United States*,
  129 S.Ct. 2237 (2009) ........................................................................................ 6

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ........................................................................................... 4

*Discon, Inc. v. NYNEX Corp.*,
  93 F.3d 1055, 1064 (2d Cir. 1996),
  *vacated on other grounds sub nom.*,
  525 U.S. 128 (1998) ........................................................................................... 4

*Espada v. Lugo*,
  312 F.3d 1 (1st Cir. 2002) .................................................................................. 1

*H.J., Inc. v. N.W. Bell Co.*,
  492 U.S. 229 (1989) ........................................................................................... 9

*In re Neurontin Marketing, Sales Pracs. & Prod. Liab. Litig.*,
  257 F.R.D. 315 (D. Mass. 2009) ...................................................................... 19

*In re Neurontin Marketing, Sales Pracs. & Prod. Liab. Litig.*,
  433 F. Supp. 2d 172 (D. Mass. 2006) ............................................................ 2, 6

*Libertad v. Welch*,
  53 F.3d 428 (1st Cir. 1995) ................................................................................ 2

*Mear v. Sun Life Assur. Co. of Canada (U.S.)*,
  2008 WL 245217 (D. Mass. Jan. 24, 2008) ...................................................... 4

*Philip v. Cronin*,
  537 F.3d 26 (1st Cir. 2008) ............................................................................ 1, 8

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ........................................................................................... 3

*Richardson v. Perales*,
  402 U.S. 389 (1971) ........................................................................................... 1

*Santiago Hodge v. Parke Davis & Co., Inc.*,
  909 F.2d 628 (1st Cir. 1990) .............................................................................. 1

*Schmuck v. United States*,
  489 U.S. 705 (1989) ..................................................................................... 10, 18

*Schofield v. First Commodity Corp. of Boston*,
  793 F.2d 28 (1st Cir. 1986) ................................................................................ 4

*U.S. v. Brandao*,
  539 U.S. 44 (1st Cir. 2008) .............................................................................. 12

## TABLE OF AUTHORITIES
### (continued)

**Page**

*U.S. v. Connolly,*
341 F.3d 16 (1st Cir. 2003) ......................................................................................... 5

*U.S. v. Doherty,*
867 F.2d 47 (1st Cir. 2001) ......................................................................................... 6

*U.S. v. Marino,*
277 F.3d 11 (1st Cir. 2002) ............................................................................... 6, 12, 17

*U.S. v. Owens,*
167 F.3d 739 (1st Cir. 1999) ....................................................................................... 6

*U.S. v. Patrick,*
248 F.3d 11 (1st Cir. 2001) ...................................................................................... 5, 6

*U.S. v. Turkettte,*
452 U.S. 576 (1981) .................................................................................................. 2, 5

*United States v. Nascimento,*
491 F.3d 25 (1st Cir. 2007) ......................................................................................... 7

**Rules**

Fed. R. Civ. P. 50(a) ........................................................................................................ 1

## INTRODUCTION

In its motion on Kaiser's proof of RICO enterprise and racketeering activity, Pfizer has thrown everything against the wall, hoping something sticks.  Nothing does.  Over three weeks of trial, Kaiser has presented ample evidence of the conduct of a RICO enterprise through a pattern of racketeering activity.[1]  Pfizer's motion is based on artificially isolating individual pieces of evidence while ignoring vast amounts of other evidence and then improperly drawing inferences in its favor.  Pfizer's motion should be denied.

Pfizer misstates the standard for a judgment as a matter of law under Rule 50(a).[2] A motion under Rule 50(a) should be granted only if the evidence, viewed in the light most favorable to the non-movant, "would not permit a reasonable jury to find in favor of the plaintiff on any permissible claim or theory."  *Espada v. Lugo*, 312 F.3d 1, 2 (1st Cir. 2002).  All inferences should be drawn in favor of the non-movant.  *Philip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008).  If "fair-minded persons could draw different inferences from the evidence presented at trial, the matter is for the jury."  *Espada*, 312 F.3d at 2 (citing *Santiago Hodge v. Parke Davis & Co., Inc.*, 909 F.2d 628, 634 (1st Cir. 1990)).

## I.      KAISER HAS PRESENTED SUFFICIENT EVIDENCE OF CONDUCT OF AN ENTERPRISE

In arguing that Cline Davis & Mann ("CDM") and Medical Action Communications ("MAC") were mere agents of Defendants, wiping out CDM's and MAC's corporate identities and leaving only Pfizer as constituting the enterprise, Pfizer mischaracterizes the nature of the two enterprises proven by Kaiser.  The enterprises proven at trial are distinct from Pfizer.

---

[1] Kaiser incorporates by reference its previously submitted summary of the RICO evidence.  (Dkt. No. 2660.)
[2] Pfizer puzzlingly cites *Richardson v. Perales*, 402 U.S. 389, 401 (1971), in discussing a "substantial evidence" standard applied in reviews of administrative action – in that case, to a disability benefits determination.

A.    **Kaiser Has Presented Sufficient Evidence of Enterprises Distinct From Pfizer.**

Pfizer makes a series of disconnected arguments that Kaiser has not proven the existence of an enterprise. Each is unavailing.

First, Pfizer focuses on the uncontroversial fact that Defendants hired CDM and MAC, ignoring the relevant factors that go into the determination of whether an enterprise has been proved, and the evidence that Kaiser has presented of an enterprise, which goes well beyond hiring. An "enterprise is an entity, a group of persons associated for a common purpose of engaging in a course of conduct." *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995). It is proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *In re Neurontin Marketing, Sales Pracs. & Prod. Liab. Litig.*, 433 F. Supp. 2d 172, 178 (D. Mass. 2006) ("*Neurontin I*") (quoting *U.S. v. Turkette*, 452 U.S. 576, 580 (1981)). As to both CDM and MAC, Kaiser has presented evidence of an ongoing organization and how the enterprises functioned as a continuing unit well beyond simply hiring the vendors.

As Kaiser's RICO submission detailed (*see* Dkt. No. 2660, section II), CDM worked continuously and systematically with Defendants to promote off-label uses of Neurontin for which CDM knew there was no scientific support. CDM was retained to consult with Parke-Davis on all aspects of Parke-Davis's Neurontin business,[3] joining Parke-Davis's internal Extended Neurontin Disease Team, an interdisciplinary team that had primary oversight over the marketing of Neurontin.[4] For five years, between June 1995 and June 2000, CDM prepared marketing strategy proposals for Neurontin,[5] prepared marketing tactics to implement those strategies, including Parke-Davis's strategy to "Expand Emerging Uses," which Parke-Davis implemented.[6] The MAC enterprise, too, functioned as a continuing unit. MAC and Pfizer developed misleading and unsupported key messages, which would be placed in manuscripts to

---

[3] Crook Tr. at 199:3-200:3 (testimony of Neurontin product manager for Parke-Davis).
[4] Knoop Tr. at 41:23-43:16.
[5] Knoop Tr. at 44:8-18.
[6] *Id.* at 37:21-24; 38:3-39:1; 41:23-43:16.

be pushed for publication, ghost-wrote manuscripts, and, through its membership on the Neurontin Publications Subcommittee,[7] which met monthly,[8] tracked the progress (or suppression) of these manuscripts.[9]  (*See also* Dkt. No. 2660, Section III.)  Tellingly, Pfizer's memorandum fails to even acknowledge the existence of the MAC/Pfizer Publications Subcommittee, and only mentions CDM's membership on the Neurontin Extended Disease Team once in passing, without identification of what the team was, or why the team was crucially important to Parke-Davis's off-label marketing of Neurontin.

Pfizer strains to transform CDM and MAC into mere agents of Defendants by simply pointing to their being hired by Defendants.  Pfizer is wrong on the law and on the facts.  Well-established case law under RICO requires that the defendant exert some amount of control over the enterprise.  *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  In Pfizer's novel interpretation of agency law and RICO enterprise, any member acting "on behalf of" another member of the enterprise would be automatically swallowed up as an agent of the directing enterprise member, leaving only the defendant, suddenly indistinct from the enterprise.  This interpretation runs directly counter to the Supreme Court's "operation and control requirement" found in *Reves*, under which liability "depends on showing that the defendants conducted or participated in the conduct of the *enterprise's own* affairs, not just their *own* affairs."  In Pfizer's world, any enterprise that met the *Reves* test could never meet the distinctiveness test.  Fortunately, this is not the law.

Pfizer is wrong on the facts, too, as neither CDM nor MAC simply followed Pfizer's direction.  Instead, each enterprise worked to achieve what Pfizer could not have on its own.  For example, CDM "prepare[d] marketing strategy proposals for Parke-Davis;" requests for development of marketing strategies would go "both ways.  We would request certain things,

---

[7] *See* Tive Tr. at 573:5-9 (explaining that MAC, in conjunction with the Publications Subcommittee developed key messages for Neurontin publications); Cooper Tr. at 29:2-21 (MAC helped develop key messages for Neurontin publications).
[8] Valerio Tr. at 52:17-53:3.
[9] Glanzman Tr. at 182:24 – 183:15; 184:4-9; 184:17 – 185:9 (MAC and Fallon Medica tracked all manuscripts to assure they were moving forward and contained key messages).

and they would independently bring forward proposals."[10]  CDM proactively screened potential authors for publications,[11] and was willing, after it was unable to convince a symposium speaker herself to change her negative message about Neurontin, to devise a scheme in which it planted questions to counteract the speaker's message.[12]  MAC, too, was more than an agent for Pfizer; illustrative examples of its role include developing misleading key messages and bringing them to Publications Subcommittee meetings,[13] writing first drafts of manuscripts,[14] and ghost-writing other articles,[15] and offering to "spin" the results of negative studies.[16]

Kaiser has never argued that any single defendant – whether Parke-Davis, Warner-Lambert, or Pfizer – and its employees alone constituted an enterprise; no part of the enterprise proven has turned on principal-agent questions.  Pfizer's authority establishing that a corporation itself cannot be the enterprise thus miss the point.  For example, in *Mear v. Sun Life Assur. Co. of Canada (U.S.)*, 2008 WL 245217, at *9 (D. Mass. Jan. 24, 2008), the Court found that the complaint at issue "describes Sun Life's sales agents not as a separate and distinct group of individuals associated with it in furtherance of a common scheme, but rather as acting for it in a traditional principal-agent relationship."  Pfizer also misleadingly cites to *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) to argue that the rule that a corporation and its agents may not form an enterprise "applies with equal force to a corporation's non-employee agents 'so long as those persons act on behalf of the corporation.'"  (Br. at 5.)  But *Discon* involved a defendant and putative enterprise members who were "within a unified corporate structure," namely, a holding company and its wholly-owned subsidiaries.  *Id.* at 1057.[17]  The participants in the enterprise here are separate and distinct.

---

[10] Knoop (2002) Tr. at 44:8-18.

[11] Ex. 38 (CDM division Proworx Memo to Parke-Davis regarding "Investigators CME Case Study Series").

[12] *See* Dkt. No. 2660 at 20-24.

[13] Valerio Tr. at 53:5-9.

[14] Valerio Tr. at 38:23-39:10.

[15] Glanzman Tr. at 405:10.

[16] *See* Dkt. No. 2660 at 38-39 (covering MAC's participation in the suppression of the negative Reckless study and the spinning of the Serpell and POPP studies).

[17] Pfizer's other authority on intra-corporate entity enterprises is similarly of no help.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) addressed whether a corporation and its sole shareholder can be distinct persons to form an enterprise, holding that they could, and *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir. 1986) addressed whether an enterprise itself can be liable under RICO.

Nor is Kaiser relying, to prove an enterprise, simply on CDM's Clare Cheng's use of the word "partnership"[18] to describe the CDM and Parke-Davis relationship.  Although Pfizer takes pains to show that the term can be used colloquially, Kaiser's burden is not to prove a formal partnership; it is to prove an enterprise: "a group of persons associated together for a common purpose of engaging in a course of conduct."  *U.S. v. Turkette*, 452 U.S. at 583.  An enterprise can be "proved by evidence of an organization, formal or informal," *id.*, and it "need not be formal or have an ascertainable structure."  *U.S. v. Connolly*, 341 F.3d 16, 25 (1st Cir. 2003) (quoting *U.S. v. Patrick*, 248 F.3d 11, 19 (1st Cir. 2001)).  Further, Pfizer presents no authority that the Parke-Davis-CDM relationship must have been different, in some unexplained way, from others of Parke-Davis or CDM to qualify as an enterprise.

Next, Defendants incorrectly assert that Kaiser has not shown the common purpose required to prove an enterprise.  Pfizer argues that the only common purpose shared by Defendants and either CDM or MAC was "to increase sales of Defendants' products" (Br. at 6), but as Pfizer surely knows, the purpose of both enterprises was to increase *off-label* sales.  As Kaiser's RICO submission set forth, from the very beginning of its relationship with Parke-Davis, CDM focused on growing Neurontin sales for unproven off-label uses.  (*See* Dkt. No. 2660 at 6-16.)  CDM's proposed "Neurontin 1997 Tactical Plan, "Strategy #1" was: "Execute publication/educational plan and clinical trials program to support product expansion in emerging uses."[19]  MAC, also from the beginning of its work with Pfizer, worked on a publication strategy focused on off-label uses.  (*See* Dkt. No. 2660 at 34-39.)  That CDM's and MAC's payments from Pfizer were not tied to increased sales is irrelevant.  Each firm benefited from its willingness to throw themselves into the off-label fraud and work with Defendants.[20]  In any case, Pfizer offers no authority that CDM or MAC had to benefit from achievement of the

---

[18] Ms. Cheng used this formulation twice, *see* Tr. at 49:4-50:3; 112:6-15, and her supervisor referred to the "spirit of partnership" between the two companies.  (Tr. 124:2-11.)

[19] Ex. 75.  Pfizer's Allison Fannon testified that "emerging uses" means "unapproved uses."  (Tr. at 67:4-68:2.)

[20] In a presentation to Pfizer (Ex. 259), MAC explained how it could "align" marketing and scientific key messages. CDM, too, was certainly aware of increased sales.  It was allocated its own voice mailbox "so that when the home marketing team sent out messages either about the product or, I don't know, congratulations, we have hit two points market share… we would receive the same voicemail."  (Cheng Tr. 202:10-24.)

common purpose; in fact, it is well-settled that the pattern of racketeering activity need not have benefited the enterprise "in any way." *U.S. v. Marino*, 277 F.3d 11, 28 (1st Cir. 2002).

In a last gasp argument, Pfizer presses for a novel and strict standard for an enterprise's structure which is at odds with established case law, including this Court's prior holdings in this case. No "coherent and cohesive structure" is required by *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009), cited by Pfizer, which explicitly rejected a list of structural requirements beyond *Turkette*'s "succinct" summation of a RICO enterprise's structure. This Court has already discussed some of the examples of "systematic linkage" that suffice to show an enterprise, including joint development of tactical plans and regular communication among the participants. *Neurontin I*, 433 F. Supp. 2d at 184. Kaiser has proven these linkages as to both enterprises (Pfizer has only disputed it as to CDM), showing CDM's deep and ongoing role in the development of Defendants' fraudulent marketing plans.[21]

## B.  Kaiser Has Proven the Existence of the Enterprises Distinct from the Racketeering Activities.

Pfizer's conclusory argument that Kaiser has not proven enterprises separate and apart from the pattern of racketeering activity is also incorrect. As this Court is aware, proof of the pattern of racketeering activity and the enterprise may "coalesce." *Neurontin I*, 433 F. Supp. 2d at 178 (quoting *U.S. v. Patrick*, 248 F.3d 11, 19 (1st Cir. 2001)). To meet the requirement of a separate enterprise, all that is required is that Kaiser show "an ongoing association, not just a series of criminal acts." *U.S. v. Doherty*, 867 F.2d 47, 68 (1st Cir. 2001); *see also U.S. v. Owens*, 167 F.3d 739, 752 (1st Cir. 1999) (where "more than a mere series of criminal acts" is shown and where it is shown "'a group of persons associated together for a common purpose of engaging in a [criminal] course of conduct,' an enterprise separate from the pattern of racketeering activity is sufficiently established."). In the case cited by Pfizer, an enterprise apart

---

[21] *See, e.g.*, Knoop (2002) Tr. at 193:12-194:3 (testifying that CDM drafted a recommendation for the 1997 Tactical Plan [Trial Exhibit 75] and Parke-Davis provided CDM with "[v]arious proposals from vendors, our strategic plans. We talked with these people on a daily basis."); Crook Tr. 199:9-200:3 (CDM "sometimes provided input on all aspects of . . . the Neurontin business."); Valerio Tr. at 52:17-53:3 (testifying that MAC attended monthly publications subcommittee meetings and that MAC "logistically ran it…").

from the racketeering activity was proven by showing that a group of individuals, among other things, and shared a cache of weapons and self-identified as a group. *See United States v. Nascimento*, 491 F.3d 25, 32-33 (1st Cir. 2007) (affirming RICO convictions). Kaiser has shown that the ongoing organization of the CDM and MAC enterprises went far beyond that.

Kaiser has shown that the CDM and MAC enterprises constituted more than a loose collection of criminal acts. Both vendors were formally hired by Defendants and associated with them over a period of years, communicating regularly through meetings and written communications. MAC, for example, "was under contract with Pfizer to help develop manuscripts containing the key messages" and assisted in "getting those manuscripts that contained the Neurontin key messages published in medical journals."[22] These activities were distinct from the regular meetings that MAC and Pfizer had as part of their joint membership on the Neurontin Publications Subcommittee, which met monthly.[23] Similarly, the activities of CDM in proposing and planning the fraud were distinct from the regular "face-to-face" meetings[24] and CDM's membership on the Neurontin Extended Disease Team.[25] It was through their ongoing association that each enterprise carried out the ongoing fraud.

## C.   The Collection of Documents Contains Evidence of a RICO Violation.

Continuing to address Kaiser's evidence in isolated pieces, Pfizer complains that the collection of documents relevant to Kaiser's RICO claim to be received by the jury do not prove an enterprise. Pfizer's argument fails because it (1) ignores the role of these documents in proving the enterprise, (2) ignores the process the Court has directed with respect to the jury's receipt and consideration of the documents, and (3) mischaracterizes or ignores the context that is available to the jury from the documents themselves and the testimony already in the record.

First, Kaiser does not argue that the documents alone prove an enterprise. The documents complement testimonial and documentary evidence introduced in the trial, and fill

---

[22] Glanzman Tr. at 183:12-15 and 184:17-22.
[23] Valerio Tr. at 52:17-53:3.
[24] Ex. 26 (Slides for "Second Quarter Face-to-Face Meeting").
[25] Knoop Tr. at 41:23-43:16.

gaps in describing a years-long, multi-faceted fraud involving multiple indications.  The documents, in combination with the rest of the evidence, also permit reasonable inferences that activities the Defendants stated took place actually took place, and that the stated motives for those activities were in fact the real motives for those activities.

Second, the Court has addressed Pfizer's complaints about the jury's receipt of these documents through its directions on marking sections of the documents and giving Pfizer the same opportunity to put in their own exhibits.

Third, Pfizer mischaracterizes the documents as somehow difficult to understand on their own.  Pfizer's complaints are simply an attempt to draw inferences in its favor on perfectly clear documents.  The specific documents Pfizer focuses on highlight the point.  For example, Pfizer argues that the jury should not be permitted to draw its own inferences from a plainly relevant letter from CDM in which it refers to its "partnership" with Defendants as to whether CDM and Defendants functioned as an enterprise and continuing unit.  This is contrary to First Circuit law directing courts to draw all inferences in favor of the non-movant on Rule 50(a) motions.  *See Philip*, 537 F.3d at 34.  Pfizer also suggests that additional context is needed for the jury to understand what "fictionalized" meant in the context of marketing tactics proposed by CDM to Defendants.  This is of course not true.  Pfizer has presented no evidence that "fictionalized" in this context means anything different than how the term is understood by jurors using their own experience.  In fact, all adults in this country are routinely exposed to marketing that uses "fictional" cases, "dramatizations," and "reenactments."  Moreover, the examples Pfizer criticizes were not only evidence of fraud presented at trial (they also go to establishing systematic linkages among the enterprise members), and Kaiser is not required and should not be expected to summarize each and every instance in response to the motion.

Additionally, the documents are hardly free of context; over nearly four weeks of trial, there has been testimony putting into context the topics addressed by documents that Pfizer complains about in its brief.  Again, Pfizer's own examples are illustrative.  Pfizer complains about the inclusion of global tactical plans and key messages that address uses approved in other

countries, but the jury has heard testimony that the Publications Subcommittee, which developed the key messages, combined U.S. and Worldwide team members,[26] and has heard no testimony that there were U.S.-only key messages.  The jury can draw reasonable inferences from these facts.  Pfizer points to the lack of context for the document showing that 33 PMG physicians attended a CME event called New Frontiers in Social Phobia and Bipolar Disorders, but does not mention Dr. Barkin's testimony that pursuant to tactics recommended by CDM, Parke-Davis hosted a series of deceptive CME programs that recommended doses above 3600 mg and where the negative Pande trial was not mentioned.[27]  Pfizer asserts that key messages are not inherently fraudulent, but ignores testimony that Defendants systematically worked to place those key messages into publications.[28]  As the Court has recognized in permitting these documents to be received by the jury, they are necessary pieces of the overall fraud, and complement other evidence of the enterprise and racketeering acts.  Beyond issues of efficacy, the fact that Pfizer has never argued that expert testimony is needed to read and understand the Neurontin marketing documents is perhaps the best evidence that the jury is well-situated to understand what these documents mean.

## II.     KAISER HAS PRESENTED AMPLE EVIDENCE OF PREDICATE ACTS

Kaiser has more than met its burden in proving two or more predicate acts of mail or wire fraud within ten years of each other.  Kaiser has further shown that the predicate acts were related, as all the acts related to increased off-label sales for unproven uses, and extended over a substantial period of time.  *See H.J., Inc. v. N.W. Bell Co.*, 492 U.S. 229, 238 (1989) ("It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged.'").  As the Supreme Court has stated, to qualify as a predicate act of mail (or wire) fraud, "the use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part

---

[26] Tive Tr. at 568:22-569:3.
[27] Barkin Test., Day 5, at 31:22-33:10.  Although Pfizer asserts that there is no evidence that this event covered Neurontin, Defendants produced the document, presumably for a reason.
[28] *See* Tive Tr. at 573:5-9; Cooper Tr. at 29:2-21.

of the scheme, a step in [the] plot . . . . The Court has found the elements of mail fraud to be satisfied where the mailings have been routine." *Schmuck v. United States*, 489 U.S. 705, 710-11, 714 (1989) (internal quotations and citations omitted).

A.    **Kaiser Has Proven Defendants Committed Predicate Acts Through the Publication Enterprise.**

1.    **Defendants suppressed and manipulated studies.**

Contrary to Pfizer's assertions, Kaiser presented evidence that Defendants manipulated and suppressed the results of negative studies, and that these actions constituted predicate acts of mail and wire fraud.  Kaiser has demonstrated that Defendants' publication strategy was based, from the very beginning, on manipulation and suppression.  Numerous early Parke-Davis documents were explicit about this: the company would conduct studies concerning various off-label uses, and "[t]he results, if positive, will be published…"[29]  The evidence shows that Defendants carried out in the years ahead the strategy they set out in 1995 and 1996.[30]

As Kaiser set forth in its separate RICO submission, Defendants, through the RICO enterprises, systematically suppressed negative studies.  (*See* Dkt. No. 2660 at 38-39 (addressing Reckless, POPP, and Serpell studies).)  Pfizer does not even bother to address the obvious and deliberate suppression of the Reckless study on neuropathic pain, or the role MAC played in working with Pfizer to suppress the study.[31]  Pfizer does not address testimony concerning the POPP study, whose publication was delayed by 6-8 years.[32]  It ignores study 945-217, a negative study on migraine, which was never published.[33]  Further, Pfizer is incorrect in its assertion that Kaiser has presented no affirmative misrepresentations regarding nociceptive pain.  As Dr. Dickersin testified, Pfizer conducted six nociceptive pain studies, all of which

---

[29] Ex. 4 (Parke-Davis "Marketing Assessment Neurontin in Psychiatric Disorders" and cover memorandum); Ex. 7 (Parke-Davis "Marketing Assessment Neurontin in Neuropathic Pain and Spasticity" and cover memorandum); Ex. 216 (Parke-Davis "Marketing Assessment Neurontin in Migraine" and cover memorandum).
[30] Defendants' focus on Parke-Davis' guilty plea is misplaced, as it is one part of the conduct at issue, but is not to be viewed in isolation and is not being relied on solely to show the fraud or any one element of Kaiser's RICO claim.
[31] Ex. 136; Abramson Test., Day 3, 34:1-25; Dickersin Test., Day 4, 63:22-65:11; Glanzman Tr. at 235:18–236:3.
[32] Dickersin Test., Day 4, 66:6-67:4.
[33] *Id.* at 48:22-24; Ex. 216.

returned negative results, and none of which were published.[34]  Even when negative results were eventually published, Defendants buried them in low-circulation journals.  For example, Dr. Dickersin testified that the Pande study on bipolar was delayed, and then published in a low circulation journal, along with an attempt to spin its results.[35]

Pfizer can try to explain away to the jury this systematic suppression as an honest ethical disagreement or as the right of a pharmaceutical manufacturer to withhold information from the public, but the disagreement they have framed is one of materiality, an issue for the jury (and defined in this Court's draft jury instructions).  The jury can decide whether the negative studies suppressed by Defendants were material.  *See also Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 69 (1st Cir. 1998) ("the *locus classicus* of fraud is a seller's affirmative false statement or a half truth, *i.e.*, a statement that is literally true but is made misleading by a significant omission.").

Kaiser has also proven that Pfizer manipulated the published content and results of numerous studies.  As an initial matter, Pfizer does not explain why any of Kaiser's experts would have had to speak to the authors or participants in the studies at issue; the published results speak for themselves.  The evidence has shown that MAC worked with Pfizer to "spin" the results of the Serpell study.[36]  Dr. Dickersin noted that none of Defendants' promotional materials for Neurontin's use in migraine noted the early failed trial for this use.[37]  She testified to Pfizer's having deceptively published the Mathew study by retroactively redefining the study population to make the study appear positive.[38]  Following the creation of Pfizer's Neurontin Pfizer Operating Plan, which called for key messages to be included in all publications,[39] Defendants embedded key messages in publications that promoted Neurontin for use in bipolar

---

[34] Dickersin Test., Day 4, 38:7-39:23, 41:10-44:3; Exs. 384-89.  Pfizer's own employee, Dr. Robert Glanzman, believes that gabapentin is "not effective for nociceptive pain." (Dep. Tr. at 353:1-9.)
[35] Dickersin Test., Day 4, 51:18-52:23.
[36] Dickersin Test., Day 4, 71:7-72:4; Exh. 263.
[37] *Id.* at 46:7-48:2.
[38] *Id.* at 50:3-51:1; Exs. 612 and 1056.
[39] Glanzman Tr. at 302:7-17.

disorder.[40]   Indeed, the market was saturated with case studies and case reports suggesting

Neurontin was effective in treating bipolar disorder, including 25 of 29 articles, despite the

Pande study and other negative Level I Evidence.[41]   There is ample evidence of Defendants'

direct involvement in the suppression and manipulation of studies and publications.

> **2.     Kaiser has proven a nexus between the publication theory and the enterprise.**

Kaiser has linked the publication fraud to the enterprise.  The First Circuit has

held that a "sufficient nexus or relationship exists between the racketeering acts and the

enterprise if the defendant was able to commit the predicate acts by means of, by consequence

of, by reason of, by the agency of, or by the instrumentality of his association with the

enterprise."  *U.S. v. Brandao*, 539 U.S. 44, 53 (1st Cir. 2008).  This requirement has been met

with a showing as minimal as the use of the defendant's resources or properties to carry out the

predicate acts.  *See U.S. v. Marino*, 277 F.3d 11, 28 (1st Cir. 2002) (collecting cases).  There is

no question Kaiser has proven a sufficient nexus between the publication fraud and the

enterprise.  The evidence has shown a host of misleading publications that can be traced directly

to Pfizer and the MAC enterprise; the predicate acts of fraud could not have been committed

without the enterprise functioning as it did.

Pfizer and MAC worked together to develop misleading key messages on

unproven off-label uses and place them in publications.  (Glanzman Tr. at 302:7-17; 346:25-

347:5;[42] Tive Tr. at 573:5-9; Cooper Tr. at 29:2-21.)  To that end, Pfizer resolved to

> giv[e] MAC everything and anything we would like to see supported with data
> and publications next year and the year after that.  The messages will be different
> from the branding guidelines because the branding guidelines are what we can say
> today based on legal, regulatory and medical support, today.  The publications

---

[40] Abramson Test., Day 2, at 133:21-134:23.
[41] *Id.* at 132:10-25.
[42] Pfizer's US Medical Director even admitted not knowing whether key messages that he approved were true: "Q: How could you approve a message without looking at the clinical data? A: Obviously this is not -- I approved it. Whether it was correct or not, I can't say at this time." (Glanzman Tr. at 346:25-347:5.)

strategy needs to incorporate what we want to say in the future and how we want data and publications to support that.[43]

MAC proceeded to ghost-write publications on Pfizer's behalf,[44] "spin" negative studies,[45] and assist with the delay and suppression of another. (Dkt. No. 2660 at 38-39.) There can be no question that the suppression of these studies is directly connected to Pfizer and the enterprise; no one else had access to this information. Dr. Dickersin testified about Pfizer's direct involvement in the suppression and delay of numerous studies.[46]

Kaiser has shown that Pfizer itself directly interfered with and manipulated the design and results of various studies. Examples abound. Defendants' involvement was apparent in the publication of the Pfizer-sponsored study on migraine, written by the lead investigator for the study, in which the primary outcome was redefined to show more favorable results.[47] Defendants were involved in the write-up of the Serpell study on neuropathic pain, in which the original protocol and primary outcome were negative but the write-up was positive.[48] Defendants were directly involved in writing up the negative Reckless study.[49] Defendants wrote a supplement to Internal Medicine falsely stating that gabapentin may aid in pain control at doses of up to 3,600 mg/day.[50] Although Defendants focus on a handful of write-ups where, although it is clear it made no attempt to correct the scientific record, it is not clear whether Pfizer directly wrote the publication, Kaiser has presented ample evidence that in numerous cases, Pfizer itself performed the manipulation. There is no question that a nexus has been shown.

---

[43] Ex. 165.
[44] Glanzman Tr. at 405:1-20; Valerio Tr. at 196:8-11.
[45] Ex. 263.
[46] *See* Dickersin Test., Day 4, at 51:18-52:23 (delay of Pande), 56:2-58:4 (delay of Gorson study), 62:7-63:13 (suppression of Reckless study), 66:6-67:4 (delay of POPP study).
[47] Dickersin Test. Day 4, at 50:30-51:1; Exs. 612 and 1056.
[48] *Id.* at 65:12-66:5.
[49] *Id.* at 63:14-65:11.
[50] Perry Test., Day 7, at 33:21-38:8; Ex. 19.

**B.      Kaiser Has Presented Sufficient Evidence of Predicate Acts Through the CDM Enterprise.**

      **1.      Kaiser has presented sufficient evidence of Defendants' control of CME events.**

Kaiser has presented ample evidence that Defendants, through the CDM enterprise, controlled the content of various CME events, and that the events were misleading. The jury will consider evidence showing both direct control of these events and that CME's about unproven off-label uses were a core marketing strategy that Defendants invested significant time and money in, allowing it to make reasonable inferences of control.

Continuing medical education events were part of the package of "core deliverables" that CDM contracted, as of April 1, 1996, to provide for Defendants.[51]  As CDM set to work on its plan to expand Neurontin in "emerging uses,"[52] it proposed the 1997 marketing strategies, which included, among other things, "Third Party Education Programs," and "High dose meetings."[53]  Parke-Davis adopted CDM's recommendations, budgeting $3.86 million towards its 1997 strategy to "[s]upport product expansion in emerging uses," more than half of which was budgeted for "CME Education Programs."[54]  As Kaiser's RICO submission demonstrated, year after year, CDM proposed, and Parke-Davis adopted and implemented, strategies to grow off-label prescriptions through a host of tactics, which included CME's.  (Dkt. No. 2660 at 9-20.)  To implement the 1998 Strategic Plan alone, Parke-Davis budgeted $11.1 million to implement the tactics, including CME's, to support the expansion of "emerging uses" of Neurontin.[55]

Working with CDM, Defendants' use of CME's went beyond mere sponsorship. As a Parke-Davis employee acknowledged, CME events, along with publications and grants, were marketing tactics at Parke-Davis.[56]  Indeed, CDM suggested that Defendants:

---

[51] Ex. 49 (CDM/Parke-Davis Contract Addendum).
[52] Ex. 75 (CDM Memo to Parke-Davis Product Manager regarding "Neurontin 1997 Tactical Plan").
[53] Crook Tr. at 202:24-204:8; 204:16-205:5.
[54] Ex. 48  ("1997 National Strategies and Tactics" Grid for Neurontin).
[55] Ex. 100; Ex. 110; Ex. 360; Knoop Tr. at 300:17-302:6
[56] Knoop (2008) Tr. 107:9 – 108:4.

"Blanket Psychiatric convention market with satellite symposia, posters and papers," "Create a slide kit which would entail new data from the ongoing and future studies, Neurontin slides, and summary slides," "…write and publish papers in psychiatric journals" and "Develop journal supplements."[57]

Parke-Davis and CDM viewed CME's as marketing tools to drive off-label sales. CDM's Proworx division emphasized to Parke-Davis that "it is important to execute the studies and educational tactics mentioned above in order to bypass the other anticonvulsants within this market."[58]  On July 30, 1997, CDM sent Parke-Davis a proposal for "1998 Neurontin Tactics," which included a "Bipolar CME…to increase awareness of Neurontin's efficacy in the treatment of bipolar disorders," to be directed to psychiatrists and psychiatry residents/fellows.[59]

Defendants also involved themselves, through CDM, in the handpicking of speakers at CME's.  For example, as Kaiser set out in its RICO submission, after a CME in connection with the 57th Annual Meeting of the American Diabetes Association program was approved, Proworx contacted Parke-Davis's Allen Crook, "to determine whether there were any faculty or physicians that he would like to recommend for this program."  Parke-Davis then informed Proworx that they "would need to confer…as to who would be the best possible speakers."  CDM then contacted Parke-Davis's hand-picked speakers.[60]  After receiving the proposed abstract of one of the speakers, Parke-Davis called CDM to complain about the content.[61]  CDM then took steps to address Parke-Davis's concerns.  (Dkt. No. 2660 at 22-23.) These actions go far beyond mere sponsorship.

In sum, there is more than sufficient evidence that Defendants treated CME's as a key marketing tool, mapped out a strategy accordingly, and then took pains to ensure that their strategy was being implemented so that they received a return on their investment.

---

[57] Ex. 68 (CDM division Proworx Memo regarding "APA Advisory Board Meeting Summary").
[58] *Id.*
[59] Ex. 17 ("1998 Neurontin Tactics" Presentation prepared by CDM).
[60] Ex. 43 (CDM division Proworx Memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").
[61] Ex. 43 (CDM division Proworx Memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").

**2.** **Kaiser has presented sufficient evidence that the CME events were misleading.**

Kaiser has also presented ample evidence that the substance of the CME events were misleading.  Kaiser has not argued that all industry-sponsored events are "inherently" misleading because it does not have to; instead, there is direct evidence of misleading statements at the CME's at issue here.

Pfizer ignores CDM's and Parke-Davis's work in planting questioners in the audience at the American Diabetes Association symposium in Boston in 1997.  After realizing that its handpicked speaker Dr. Bril would not be altering her message about Neurontin, Proworx met with the CDM account team to identify "what key issues needed to be presented to give attendees a "positive message" to go away with.[62]  CDM's solution was to "present questions at the Q & A session, which would take place immediately following [Dr. Brill's] presentation."[63] The questions drafted by Proworx were sent to Parke-Davis for its review and approval on June 20, 1997.[64]  Immediately following Dr. Bril's presentation, planted members of the audience, "skills", asked prewritten questions to Dr. Bril which, according to CDM, "did indeed lead Dr. Bril to address some of the positive aspects of anticonvulsants and of Neurontin."[65]  In CDM's opinion, these questions were necessary to "reverse the message that was delivered."  Attendees were not informed of the role that Parke-Davis or CDM played in selecting the speaker or in planting questioners in the audience. The following day, CDM wrote a memo to Parke-Davis apologizing for failing to screen its speakers.[66]

Kaiser has also presented sufficient evidence that slide decks used at CME's were deceptive and misleading.  For example, Parke-Davis gave its "approval" for an "Unrestricted Educational Grant" of "$2.5 million" to conduct "30 NATIONAL MEETINGS" and "23

---

[62] Ex. 43 (CDM division Proworx memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").
[63] Id.
[64] Ex. 41 (CDM division Proworx memo to Parke-Davis Product Manager regarding "Vera Bril's Abstract").
[65] Ex. 43 (CDM division Proworx memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").
[66] Id.

REGIONAL MEETINGS" of a program entitled "New Treatment Frontiers in Social Phobia and Bipolar Disorder."[67]  Plaintiffs' experts testified that the slide decks developed with the support of Defendants failed to disclose the existence of the negative Pande study.[68]  Plaintiffs also showed that the event slide deck, which Parke-Davis received in advance, connected to a series of "CME Psychiatry Dinners & Teleconferences," failed to disclose the Pande study.  Instead, the slide deck told attendees that "early evidence suggests antimanic, antidepressant, and mood stabilizing effects" and "data are increasing but currently limited to favorable case reports and open trials.[69]  Pfizer argues that these slide decks are not evidence of misleading statements because Kaiser has not produced a videotape of a conference, but the evidence shows that the materials were created for use at conferences to be repeated dozens of times.  This is a classic example of an inference that a jury is free to make one way or the other, but it is not appropriate to be resolved in a Rule 50 motion.

### 3.     Kaiser has shown a nexus between CME events and enterprise.

Kaiser has met the minimal showing of a nexus between the misleading CME events and an enterprise.  All that is required to show a nexus is that Defendants used their "position in the enterprise to commit the racketeering acts…."  *U.S. v. Marino*, 277 F.3d at 28. Defendants unquestionably used their resources and their position in the enterprise to carry out the misleading CME events and other racketeering acts.  Defendants funded the "exceptionally ambitious, aggressive marketing campaign for Neurontin" for "almost any kind of pain," including 500 speaker "slide kits" for diabetic peripheral neuropathy and posterpetic neuralgia.[70] Defendants funded and controlled the content of misleading presentations as described above. Further, Defendants necessarily committed these acts through the CDM enterprise, relying on CDM to preserve the illusion of independence.  For example, it relied on CDM to pressure a

---

[67] Ex. 361 (Grant request to Allen Crook at Parke-Davis for creation of "New Frontiers in Social Phobia and Bipolar Disorders" meeting series).
[68] Barkin Test., Day 5, 30:16-33:8; *see also* Abraham Test., Day 2, at 133:21-134:23.
[69] Ex. 100 (Parke-Davis memorandum regarding "CME Psychiatry Dinners and Teleconferences" and attachments).
[70] Perry Test., 3/2/10; at 42:23 to 50:23.

speaker whose presentation Parke-Davis had concerns about, something Parke-Davis would not, or could not, do itself.[71]

C.     **Detailing Was a Part of Defendants' Fraudulent Scheme.**

1.     **Detailing was fraudulent and connected to Kaiser's claims.**

In arguing that detailing alone cannot be used to show a predicate act, Pfizer again misleadingly isolates one aspect of Kaiser's proof and pronounces it insufficient.  Although not every single one of Defendants' acts must be a predicate act, *see Schmuck*, 489 U.S. at 715 (even innocent mailings may satisfy the mail element of mail fraud), detailing was a central part of the overall fraudulent scheme and necessarily involved use of the mails and wires.  As Professor Rosenthal testified, "[D]etailing and the use of the sales force is widely understood … to be a central piece of the marketing strategy of pharmaceutical companies."[72]  Detailing both furthered and reflected the overall fraud, as the distribution of fraudulent publications, or their use as sales pieces, generated through the enterprises was one tool of detailing.  David Franklin testified that he was given journal articles on off-label uses and used them to detail physicians and was trained that physicians rely on medical literature.[73]  Pfizer's sales representatives also delivered publications directly to doctors, including psychiatrists, and routinely made mass mailings of reprints.[74]  Professor Rosenthal also specifically noted that one can assume sales representatives "bring[] journal articles with them."[75]

Kaiser has shown that Defendants thoroughly contaminated the scientific literature concerning Neurontin, tainting the literature that sales representatives distributed and sent in follow-up communications to physicians.  A reasonable jury can find that detailing was both off-label and fraudulent.  In particular and in addition, as this Court stated, it requires no

---

[71] Ex. 43 (CDM division Proworx Memo to Parke-Davis regarding "Situation Analysis for the ADA Satellite Symposium").

[72] Rosenthal Test., 3/5/10, at 138:7-10.

[73] Franklin Test., 3/12/10, at 64:13-65:1.

[74] Barkin Test., 2/26/10, at 29-30; Ex. 92 at WLC_CBU_040569 (referring to dissemination by sales representatives of 300,000 article reprints); *see also, e.g.*, Exs. 44, 58, 92, 144.

[75] *Id.* at 138:11.  In performing her analysis, Professor Rosenthal also looked at a database of letters written to physicians.  *See id.* at 140:3-7.

unreasonable inference to conclude that detailing to psychiatrists was fraudulent.  *In re Neurontin Marketing, Sales Pracs. & Prod. Liab. Litig.*, 257 F.R.D. 315, 331 (D. Mass. 2009) ("It is a short leap from that evidence to a reasonable conclusion that no plausible, nonfraudulent reason existed for defendants to detail psychiatrists.").

### 2.   Kaiser has shown a nexus between detailing and enterprise.

Kaiser has shown a nexus between detailing and the publication enterprise, as sales representatives went to doctors with only the benefit of an information base corrupted, as Kaiser has shown above and at trial, through the publication enterprise, which worked for years to place misleading messages in the publications that sales representatives rely on, misleading its own sales force.  For example, the sales force received a memo containing the misleading conclusion of a dosing article that was ghostwritten by MAC.[76]  Pfizer withheld *from its own sales representatives* information on negative studies, including the Reckless and POPP studies.[77]  With only the contaminated and incomplete scientific literature available to it, the sales force conveyed the messages Defendants knew were false and misleading.

## III.   CONSPIRACY CLAIMS

As stated on the record on March 15, 2010 (Tr. at 30:11-13), Kaiser does not intend to put the RICO conspiracy claim before the jury.

---

[76] Ex. 208 (Email From: Stampp To: DL-NTN/Pregabalin MM PM & PP Cc: several recipients); Ex. 1666.
[77] Marino Tr. at 324:10-19.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion should be denied.

Dated:  March 18, 2010

Respectfully submitted,

By:     */s/ Barry Himmelstein*
        Barry Himmelstein

LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, NY  10022

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA  02109

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142

*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 18, 2010.

/s/  Daniel Seltz_____
Daniel Seltz