UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW
BASED UPON RICO STATUTE OF LIMITATIONS</u>**

862632.1

## I. KAISER'S STATUTE OF LIMITATIONS WAS TOLLED BY THE FILING OF *HARDEN* ON MAY 14, 2004.

Much of Defendants' argument is predicated on the false assumption that irrespective of the application of the discovery rule, for statute of limitations purposes, Kaiser did not assert its claims until it joined the First Coordinated Amended Complaint (Dkt. No. 31) as a party plaintiff on February 1, 2005. Defendants omit to acknowledge, much less apply, the familiar and well-established principle that the filing of a class action complaint tolls the running of the statute of limitations as to any individual, non-class cases that may later be filed by members of the class described in the complaint, and the limitations period does not begin to run again unless and until class certification is denied. *See American Pipe v. Utah*, 414 U.S. 538, 552-53 (1974); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983); *In re Hanford Nuclear Res. Litig.*, 534 F.3d 986, 1008 (9th Cir. 2008); *State Farm Mut. Auto Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir. 2008); *In re WorldCom Securities Litig.*, 496 F.3d 245, 254 (2d Cir. 2007); *Yang v. Odom*, 392 F.3d 97, 111 (3d Cir. 2004); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1380 (11th Cir. 1998) (*en banc*).

On May 14, 2004, the complaint was filed in *Harden Mfg. Corp. v. Pfizer Inc.*, Civ. No. 04-10981 (Dkt. No. 1), asserting claims on behalf of a third party payor class defined as follows:

> All entities throughout the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for Neurontin for indications not approved by the FDA ("the Class") during the period from January 1, 1994 through the present (the "Class Period"). For purposes of the Class definition, entities "purchased" Neurontin if they paid some or all of the purchase price.

*Id.* at 50.

Kaiser falls squarely within this class definition. Accordingly, the running of the statute of limitations as to Kaiser was tolled by the filing of *Harden*. As Kaiser filed its own, individual complaint on February 1, 2005 (Dkt. No. 31), more than two years *before* class certification was denied on August 31, 2007 (Dkt. No. 831), at no point subsequent to the filing of *Harden* did the statute begin to run again as to Kaiser. Accordingly, Defendants' "target date" for a four-year statute of limitations bar is May 14, 2000, not February 1, 2001, and any events occurring subsequent to May 14, 2000 are completely irrelevant to a statute of limitations analysis as to Kaiser.

As Defendants' motion is predicated entirely on (1) evidence the Court has already found insufficient to take the issue from the jury, and (2) documents that post-date the May 14, 2000 relevance cutoff, the motion is without foundation, and should be denied.

## II. THE COURT HAS ALREADY FOUND THE UNSEALING OF THE *QUI TAM* COMPLAINT, WARNER-LAMBERT'S SEC DISCLOSURES, AND THE MENTION IN *THE PINK SHEET* INSUFFICIENT

With respect to the statute of limitations issue, in ruling on the motion to dismiss, Defendants argued, and the Court held, as follows:

> [Defendants] argue[] plaintiffs were aware of their injury in January of 2000, when the Qui Tam Complaint was unsealed, or in March of 2000 when Warner-Lambert disclosed in an SEC filing that it was being investigated by the US Attorney's Office. In addition, the probe was mentioned in articles in the Wall Street Journal and the Pink Sheet, a trade publication, on March 30, 2000 and on April 3, 2000, respectively. Yet the Coordinated Complaint was not filed until May 14, 2004, and the Class Complaint was not filed until June 2, 2004, both more than four years later.
>
> Plaintiffs note that the statute of limitations runs when plaintiffs are on notice that they may have been defrauded. *See Blue Cross of California v. SmithKline Beecham Clinical Labs, Inc.*, 108 F. Supp. 2d 116, 122 (D. Conn. 2000). They note, correctly, that the statute of limitations is generally a jury issue. The First Circuit has been very reluctant to leave the determination of when a plaintiff should have been on notice of his injury to the court. Rather, it is

> an issue best determined by the fact finder. *See Young v. Lepone*, 305 F.3d 1, 12 (1st Cir.2002). Therefore, I recommend that the Court reject this argument as a basis for dismissal.

Report and Recommendation on Defendants' Motions to Dismiss the Amended Class Complaint and the First Coordinated Amended Complaint (Jan. 31, 2006, Dkt. No. 269), at 56. The Court adopted this recommendation. *See* Memorandum and Order (June 12, 2006, Dkt. No. 356), at 25 ("Except as outlined in this opinion, the Court ADOPTS the Report and Recommendations.").

By their present motion, Defendants again seek judgment as a matter of law on the basis of *the same documents the Court found insufficient more than four years ago*, arguing that:

- The Franklin *qui tam* complaint was unsealed . . . and made public on January 3, 2000. . . . Thus, . . . Plaintiffs had constructive knowledge of their alleged injury no later than January 3, 2000 . . . .

- In addition, the *Franklin qui tam* suit and government investigation were disclosed in Warner-Lambert's Form 10-K filed on March 28, 2000, and Form 10-Q filed on May 10, 2000.

- These disclosures received extensive publicity, including in the April 3, 2000, edition of *The Pink Sheet* . . . .

Motion, at 3. As the Court previously held, these "disclosures" are insufficient to start the running of the statute of limitations as a matter of law, and this remains "a jury issue." Report and Recommendation, at 56.

Defendants argue that the *Franklin* case was unsealed and made public in early 2000 and that that disclosure put Kaiser on notice of the claims in this case. Def. Br. at *3. As Defendants have already conceded, this is spurious. As Mr. Kennedy argued in Defendants' opening statement: "*in 2002* . . . [the *Franklin*] suit became public [and] was attendant with widespread publicity[.]" (2/22 Tr. (Kennedy) at 134:22-135:4 (emphasis added)). Defendants'

opening demonstrative is in accord: "2002 *Franklin* suit unsealed." Defendants have offered zero evidence at trial that the *Franklin* complaint became public in 2000. Given that the publicity surrounding *Franklin* only occurred in 2002 – and only following an intervention motion by third party media entities and an accompanying Order by this Court, *see United States ex rel. Franklin v. Parke-Davis*, 210 F.R.D. 257 (D. Mass. 2002) – and that Defendants are well aware of the details of that case, Defendants' last-minute attempt to introduce counter-factual evidence that they did not offer during trial is entirely inappropriate.[1] As, Kaiser's witnesses testified, and as independent evidence corroborates, "the whole story . . . start[ed] to unfold" in 2002. (2/26 Tr. (Carrejo) 115:17-24; TX 319 (referencing 2002 *Wall Street Journal* and *New York Times* articles).)

Defendants' arguments concerning disclosures in 2000 in their financial statements and in *The Pink Sheet*, Def. Br. at 2-4, fare no better. These disclosures mention only an "inquiry" into the "potential off label promotion" of Neurontin. (TX 506 (*The Pink Sheet* at 3).) They mention nothing about fraudulent promotion or misrepresentations of Neurontin's efficacy, nor do they offer any clue that Defendants were, at this time, targeting Kaiser with their misinformation nor the extent nor impact of their scheme. These vague reports do not serve to put Kaiser on notice of Defendants' scheme.

### III. THE INFORMATION AVAILABLE TO KAISER PRIOR TO MAY 14, 2000 WAS INSUFFICIENT TO PLACE KAISER ON INQUIRY NOTICE OF DEFENDANTS' FRAUD

As the Court has already held, in a fraud case, "inquiry notice" does not occur, and the statute of limitations does not begin to run, until "circumstances suggest to a person that

---

[1] Even if Defendants were correct that Franklin's initial complaint filed in 1996 did become publicly available in 2000, they have offered no evidence about the contents of that complaint, and for good reason. The 1996 *Franklin* complaint did not and could not have detailed Defendants' unlawful behavior following that date which is the subject of this case.

he may have been *defrauded* . . . ." *Blue Cross v. SmithKline Beecham Clinical Labs, Inc.*, 108 F. Supp. 2d 116, 122 (D. Conn. 2000) (emphasis added). *See* Dkt. No. 269 at 56 (citing *SmithKline Beecham*). At most, the documents and testimony relied upon by Defendants in support of their motion put Kaiser on notice that Defendants were engaged in the off-label marketing of Neurontin, not fraud, a distinction Defendants hasten to draw whenever it suits them. If Defendants cannot be held liable for mere off-label promotion, *a fortiori*, even a public admission by Defendants that *non-fraudulent* off-label promotion was taking place would have created no duty to investigate by Kaiser. If it falls to every third party payor to investigate every reported violation of the FDCA that does not, on its face, provide it with any right of recovery, health care premiums are sure to explode even further, as every insurer is forced to choose between duplicating the government's enforcement efforts (without the subpoena power) and allowing pharmaceutical companies to treat its reserves like a piñata.

The truth about Defendants' scheme was *not* revealed in 1996, or 1999, or even fully in 2002. Rather, the truth about the scope and impact of Defendants' scheme has continued to leak out over the course of this litigation. (3/3 Tr. (Hyatt) at 107:13-108:15 (explaining that had he known the full extent of the evidence he would not have written that Neurontin is effective for certain forms of neuropathic pain and instead "would have made a statement that Gabapentin, Neurontin, is not effective in neuropathic pain, period"); 115:25-116:3 (not aware of the extent of the taint of the medical literature in 2003 and "only learned that recently").

A. **The *Franklin* Complaint, SEC Filings, and *Pink Sheet* Article Were Insufficient**

As the Court has already held, the unsealing of the *Franklin* complaint, which received no publicity whatsoever; a cryptic statement in an SEC filing that the U.S. Attorney was investigating Warner-Lambert's "promotion of NEURONTIN"; and a single article in "The Pink

Sheet" which revealed no additional relevant information except Neurontin sales figures, are woefully insufficient to keep this factual question from the jury. *Accord Lupron Marketing and Sales Practices Litigation*, 295 F.Supp.2d 148, 183 (D. Mass. 2003).

In support of their argument that Kaiser became aware of the *qui tam* action as soon as it was unsealed, Defendants cite not to *evidence*, but to Kaiser's counsel's opening statement. Even these snippets say nothing about *when* Kaiser became aware of the investigation or *qui tam* action, let alone allegations of fraud. *See* Motion, at 3 ("Plaintiffs' counsel argued that *upon* learning of 'Dr. Franklin's whistleblower suit,' 'Kaiser became alarmed'"), ("Likewise, Plaintiffs' counsel argued that '*once* Kaiser started to learn about the off-label promotion, *once* they learned about Dr. Franklin's suit, the whistleblower suit, they started to re-evaluate Neurontin.'") (emphasis added). The actual evidence is that Kaiser did not become aware of the suit or Defendants' off-label promotional efforts until, at the earliest, 2002, long after the May 14, 2000 relevance cutoff. *See* Trial Tr. Carrejo 2/26/2010 at 115-17 (2002); Pltfs. Ex. 319 (2002-2003); Pltfs. Ex. 324 (2003); Trial Tr. Hyatt 3/3/2010 at 108-109.

With respect to The Pink Sheet, Defendants cite the testimony of Dr. Carrejo and Ms. Millares that she and other Kaiser employees may have seen it, but that does not make it any more informative. *See, e.g.*, Trial Tr. Carrejo 3/3/2010 at 76-77 ("it looks by this article no one could be aware of their [Warner Lambert's] sales practices. They just know they are under investigation.").

### B. The Post-5/14/2000 Kaiser Documents Are Irrelevant

As set forth above, any events occurring subsequent to May, 14, 2000 are irrelevant to a statute of limitations analysis as to Kaiser. Accordingly, the August 24, 2000 and October 27, 2000 Kaiser memoranda identified by Defendants are irrelevant. *See* Motion at 4

(referring to "an August 24, 2000, memorandum circulated throughout the Kaiser Permanente Northwest Division" and "an October 27, 2000 memorandum [by] Dr. Dale Daniel").

This leaves Defendants with only a May 9, 2000 memorandum (DX 581), which Defendants quote as "stating that Neurontin 'does not appear to offer any advantage over TCAs and it is more expensive.'" Motion, at 4. Far from suggesting that Kaiser was *aware* of Defendants' fraudulent misconduct, this document establishes that Kaiser was *ignorant* of it. *See id.* at KAIS-044955 ("Table 1 summarizes the clinical evidence available from randomized controlled trials for gabaptentin use in pain syndromes."); Trial Tr. Hyatt 3/3/2010 at 115-116 (as late as 2003 and 2004, Kaiser was not aware that the medical literature had been compromised with respect to Neurontin); Trial Tr. Millares 3/4/2010 at 134 (same).

Again, Defendants' argument here is unclear. As explained above, Kaiser's knowledge of off label use says nothing about Defendants' fraudulent promotion, misrepresentations of efficacy, or targeting of Kaiser. Perhaps Defendants are arguing that the mere presence of extensive off label prescriptions should have put Kaiser on notice of Defendants' vast scheme, though that would seem *to belie Defendants' entire theory of the case.* DX 581, Defendants argue, shows that Kaiser was on notice of Defendants' scheme in 2000. Yet, that document contains two clear misstatements – caused by Defendants' still-uncovered scheme – that are the subject of this case: "[g]abapentin is an alternative for the treatment of neuropathic pain"; and an instruction not to target for switching away from Neurontin "patients who are receiving gabapentin for . . . bipolar disorder." (DX 581 at 2-3.) Again, none of this shows that Kaiser was on notice of Defendants' scheme.

C. **The Evidence Does Not Establish As A Matter of Law That Kaiser Was On Notice Within the Limitations Period That Defendants Committed Fraud With Respect to the Negative *Pande* Study**

Defendants claim that Dr. Pande's disclosure of the results of his study at a 1999 conference attended by *PMG physicians* – third parties here – was sufficient to place *Kaiser* on notice that a 1999 letter concerning bipolar that failed to disclose those results was fraudulent.[2] *See* Dkt. No. 2675 at 4. Defendants' misconduct with respect to bipolar was both multifaceted and enduring. Any information about the ineffectiveness of Neurontin in treating bipolar disorder was drowned out by the flood of inaccurate and misleading information generated by Defendants. CDM and Parke-Davis decided to fund CME presentations on bipolar disorder "discussing treatment options for bipolar disorders with presentation of evidence of Neurontin's efficacy to be held at national or regional APA meetings." Ex. 17 at X005932. This strategy sought to use CME presentations to increase Neurontin's usage in bipolar disorder. Despite knowing about the negative results of Pande's study, a 1998 CME program funded by Defendants misleadingly presented the Young study, which was an open label, non-randomized study of fifteen people where three people reported improvement, without referring to the Pande data. Abramson Test., 2/23/2010 Tr. at 116:3 – 120:3. Similarly, a Parke-Davis document outlining the slides for CME presentations lists under "Gabapentin: Indications Summary" a bullet point for "Bipolar disorder" and a description that "early evidence suggests antimanic, antidepressant, and mood stabilizing effects." Ex. 100 at 20. A 1999 CME presentation also makes no reference to the Pande data and presents Neurontin as a potential treatment for bipolar disorder. Ex. 63 at 40-42; Barkin Test., 2//26/2010 Tr. at 30:31 – 32:4.

---

[2] At least one of the attendees who Defendants claimed was a PMG physician—Mark Frye—was never employed by the Permanente Medical Group. *See* Abramson Test., 2/24/2001 Tr. at 93:11-96:5; Carrejo Test., 2/26/2010 Tr. at 86:9-87:11.

In addition to misleading CME presentations, Defendants also used medical publications as a promotional tool for Neurontin's use in bipolar disorder. Defendants embedded key messages in publications that promoted Neurontin for use in bipolar disorder. Abramson Test., 2/23/2010 Tr. at 133:21-134:23. Indeed, the market was saturated with case studies and case reports suggesting Neurontin was effective in treating bipolar disorder, including 25 of 29 articles, despite the Pande study and other negative Level I Evidence. Abramson Test., 2/23/2010 Tr. at 132:10-25. This flood of positive case studies created an "echo chamber" in which "the buzz was created that this was an effective drug by the panoply of less than Level I articles that were published, and that drowned out the evidence from the Level I studies that show that the drug didn't work and maybe worse than a sugar pill." Abramson Test., 2/23/2010 Tr. at 133:7-20. With so many misleading CME presentations and publications, it is no wonder that Kaiser was unaware of the ineffectiveness of Neurontin in treating bipolar disorder until 2001.

## IV. KAISER'S DUE DILIGENCE IS A QUESTION FOR THE TRIER OF FACT

Defendants went to extraordinary lengths to conceal the details of their involvement in the off-label promotion of Neurontin, which was essential to the continued success of the scheme, satisfying the first requirement for invocation of the doctrine of fraudulent concealment. *See Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984). It is "black letter law" that "[e]ven though a plaintiff might have inquiry notice of a potential claim, it does not follow that reasonable diligence will discover sufficient facts to support legal action. Where such is the case, the failure to file suit on the basis of such information does not necessarily show a lack of due diligence." 32 *Am. Jur. Proof of Facts 3d* 129 § 10 (2004) (citation omitted). As the First Circuit has explained:

> Once a duty to inquire is established, the plaintiff is charged with the knowledge of *what he or she would have uncovered through a reasonably diligent investigation.* The next question is whether the plaintiff, if armed with the results of that investigation, would known enough to permit a reasonable person to believe that she had been injured and that there is a causal connection between the [defendant] and her injury. . . . *This inquiry is highly fact- and case-specific*, as are the pertinent questions to ask.

*McIntyre v. United States*, 367 F.3d 38, 52 (1st Cir. 2004) (emphasis added). Like the question of when Kaiser was placed on "inquiry notice," the question of whether it exercised due diligence thereafter is a fact-intensive inquiry inappropriate for resolution as a matter of law.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: March 18, 2010

Respectfully submitted,

By: /s/ Linda P. Nussbaum
    Linda P. Nussbaum

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
 SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

-12-

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 18, 2010.

/s/ Elana Katcher
Elana Katcher

862632.1