UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW BASED UPON LACK OF SUFFICIENT EVIDENCE TO SUPPORT STATE LAW CLAIMS</u>**

862729.2

## I.     CALIFORNIA LAW APPLIES TO KAISER'S CLAIMS[1]

With no citation to any authority, and no choice of law analysis whatsoever, Defendants state that "California's UCL applies only to claims arising in California," and "Plaintiffs lack standing to recover for any damages allegedly sustained by their subsidiaries or affiliates in other jurisdictions." Motion, at 3. In fact, a straightforward application of Massachusetts' choice of law rules leads inexorably to the conclusion that California law applies to the entirety of Kaiser's claims.

### A.     Under Massachusetts Choice of Law Rules, Kaiser's State Law Claims Are Governed By California Law, Where It Received and Relied on Defendants' Misrepresentations

Kaiser's action was filed in this district. Accordingly, the Court must apply Massachusetts choice of law rules in order to determine which state's law should govern Kaiser's state law claims. *In re General American Life Ins. Co. Sales Practices Litig.*, 391 F.3d 907, 911 (8th Cir. 2004). Massachusetts has rejected any rigid rules in favor of a "flexible approach,"[2] inviting Massachusetts courts to "feel free . . . to borrow from any of the various lists to help focus . . . attention on the considerations particularly relevant to the case." *Reicher v. Berkshire life Ins. Co. of America*, 360 F.3d 1, 5 (1st Cir. 2004) (citations and internal quotations omitted).

In cases alleging statutory consumer fraud, the First Circuit has expressly held that "a Massachusetts court would apply a test not materially different from that of the

---

[1] The remaining arguments made in Defendants' motion, which merely refer to its other directed verdict motions, are addressed in Plaintiffs' oppositions to the corresponding motions. *See* Motion, Part II ("For the same reasons discussed in Defendants' concurrently filed Rule 50 motion regarding conduct of a RICO enterprise and pattern of racketeering activity, Plaintiffs cannot satisfy their burden of proving actionable misconduct under any of their state law claims."), Part III ("for the same reasons discussed in Defendants' Rule 50 motion regarding RICO injury and causation, Plaintiffs cannot satisfy their burden of proving injury, reliance, or causation for purposes of their state law consumer protection and unjust enrichment claims"); Part IV ("For the same reasons discussed in Defendants' concurrently filed Rule 50 motion regarding RICO damages, Plaintiffs' evidence is legally insufficient to allow the jury to determine the amount of Plaintiffs' damages."). The only other portion of the Motion, Part V, which concerns "Plaintiffs' non-California consumer protection claims" (*id.* at 7), is subsumed with the choice of law discussion.

[2] *Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95 (D. Mass. 2001)

*Restatement (Second) of Conflict of Laws* § 148[(2)] in determining the law applicable".

*Computer Systems Engineering, Inc. v. Qantel Corporation*, 740 F.2d 59, 70 (1st Cir. 1984).  In

the *AWP* litigation, this Court found that under § 148(2), factor (a), "the place where the plaintiff

acted in reliance upon the defendant's representations," was the most important.  *In re Pharm.*

*Indus. Avg. Wholesale Price Litig.*, 230 F.R.D. 61, 82-83 (D. Mass. 2005).  In *AWP*, the Court

also considered factor (b), "the place where the plaintiff received the representations," as of

secondary importance.  *Id.* at 83.  While in AWP, these factors led to the application of the law

of each class member's state of residence, the application of those factors here leads to the

application of California law.

    As the Court found in its recent summary judgment opinion:

> Neurontin was added to Kaiser's formulary in September 1994 with a restriction limiting its use to, or in consultation with, a PMG neurologist.  In 1997, Neurontin's formulary status was expanded to include prescriptions by PMG pain clinic physicians for the treatment of Reflex Sympathetic Dystrophy. In 1999, the P & T committee voted to expand restrictions to include prescriptions by psychiatrists for the treatment of bipolar affective disorder.  For each of these three changes to the Kaiser formulary, Kaiser's Drug Information Service ("DIS") prepared monographs summarizing the available studies and other information for Neurontin related to the particular indication in question. At the time of each P & T Committee vote, Kaiser alleges that its DIS did not have access to studies known to Pfizer that showed Neurontin's negative or negligible effects in patients with RSD and bipolar disorder.

> After these formulary expansions, the DIS continued to gather information on Neurontin and circulate it to its physicians and committees.  For example, in 1998 a DIS employee sent a request to Parke-Davis for "information regarding the use of Neurontin (gabapentin) for the management of neuropathic and central pain." Parke-Davis responded by sending an eleven-page letter summarizing published reports on these indications.  No negative studies were reported despite the fact that Parke-Davis was aware of several at the time.

> In addition, DIS has an Inquiry Department, which responds to requests from PMG physicians and pharmacists who have questions about the use of a specific drug for a specific patient.

> Often, DIS solicits advice and information from pharmaceutical
> companies when answering such inquiries.  Kaiser alleges that in
> responding to requests for information from its Inquiry
> Department, Parke-Davis provided information that was
> "materially misleading."

*In re Neurontin Marketing and Sales Practices Litigation*, --- F.Supp.2d ----, 2010 WL 53568,

*2-*3 (D. Mass. 2010) (citations omitted).  Consistent with these allegations, the Court

summarized Kaiser's case as follows:

> As a more hands-on third-party payor, Kaiser argues that, due to
> Pfizer's fraudulent misrepresentations about and withholding of
> certain negative studies for these indications, the recommendations
> of its Drug Information Service (DIS) were tainted. Because DIS
> drug monographs for Neurontin, prepared by Kaiser and used by
> Kaiser's P & T committee, directly influenced Kaiser's decision to
> expand its formulary, a reasonable inference can be drawn that
> Kaiser was directly injured by Pfizer's misrepresentations about
> Neurontin.  Notably, Kaiser's preparation of drug monographs
> gathered all publicly available data and publications regarding
> Neurontin, and therefore Kaiser directly relied on the "half truths"
> put forth by Pfizer through publications, monographs, and other
> communications to Kaiser and to the general public.
>
> In addition, Kaiser's DIS had direct communications with Pfizer
> both through its information-gathering activities and its Inquiry
> Department service for physicians and members.  Kaiser alleges
> that, had Pfizer not made misrepresentations regarding Neurontin's
> effectiveness for certain off-label indications, DIS's activities
> would have highlighted problems with Neurontin such that Kaiser
> could have responded sooner and thereby reduced its payments and
> reimbursements for Neurontin.  These activities represent direct
> interaction between Kaiser and Pfizer, providing the evidence of
> causation alluded to by the *Desiano* court.

*Id*. at 11 (citations omitted).

As the foregoing description of Kaiser's case makes plain, in this case,

Restatement § 148[(2)] factor (a), "the place where the plaintiff acted in reliance upon the

defendant's representations," and factor (b), "the place where the plaintiff received the

representations," are both in California, where Kaiser's DIS is located, regardless of the state of

residence of the particular insureds whose prescriptions resulted from Defendants' fraud.  As

home to more than six million Kaiser members, the California regions play a central role in

Kaiser's formulary decisions, and serve as a locus for communications with, among others, drug

manufacturers and other information sources.  Accordingly, under Massachusetts' choice of law

rules, Kaiser's state law claims are brought under California law.

### B.      Defendants Defrauded Kaiser in California

Three California-based Kaiser entities, Drug Information Services ("DIS"), Drug

Utilization Action Team ("DUAT") and Drug Utilization Group ("DRUG") are central to

Kaiser's causation story, as approved by the Court in denying Defendants' motion for summary

judgment.  *In re Neurontin Mktg. & Sales Practices Litig.*, 2010 WL 53568, at *11-12 (D. Mass.

Jan. 8, 2010).  The Court found its causation standard met by the following facts, *id.* at *11, each

of which is now part of the evidentiary record at trial:[3]

- ❖ Kaiser directly relied on Pfizer's "half truths" when preparing drug monographs for Neurontin that were utilized by Kaiser's P&T Committees;

- ❖ Kaiser's DIS had direct communications with Pfizer during which misrepresentations and material omissions were made; and

- ❖ Kaiser launched informational campaigns after news reports of Pfizer's fraudulent activities began to surface in 2002.  These campaigns led to a substantial drop in Neurontin prescriptions, providing strong evidence of a causal link between Pfizer's misrepresentations and Kaiser's injuries.

DIS is located in Downey, California.  3/4 Tr. (Millares) at 42-43.  As Dr. Millares

testified, DIS provides information about pharmaceuticals to Kaiser's health care providers and

the Kaiser organization as a whole.  It evaluates evidence in the literature about pharmaceuticals;

monitors new drugs; monitors safety issues, drug recalls and shortages; and evaluates drugs for

formulary consideration.  3/4 Tr. (Millares) at 42-43.  DIS circulates each monograph it

---

[3] Kaiser incorporates by reference the facts set forth in its opposition to defendants' motion for judgment as a matter of law based upon lack of sufficient evidence of injury or causation, dated March 18, 2010.

prepares to all Kaiser Permanente regions across the United States, and provides its information to other regions during inter-regional committees and via Kaiser Permanente's intranet sites, which is accessible to all employees across the country.  *Id.* at 43-46; 2/26 Tr. (Carrejo) at 110. Dr. Millares is both the head of DIS and the chair of Kaiser's inter-regional formulary subcommittee, which meets monthly.  3/4 Tr. (Millares) at 45; 2/26 Tr. (Carrejo) at 110.  Kaiser has presented evidence that the monographs pertaining to Neurontin were tainted with Pfizer's fraudulent "half-truths" and omissions.[4]  In addition, Plaintiffs have submitted evidence that DIS was considered an important strategic target for marketing of their products (*see* TX 250):[5]

- ❖ "Provide clinical information to the Drug Information department on regular basis for formulary decisions;" (p. 4)

- ❖ "Provide clinical and outcomes information to the Drug Information Coordinators on regular basis;" (p.24)

- ❖ "Work with . . .MAC . . . to interact with the Drug Information in Downey and Oakland for new information on existing products . . ."; (29)

- ❖ "Target the Drug Information, regional P&T members and influential specialists; (30)

---

[4] *See, e.g.,* 3/4 Tr. (Millares) at 57 (financial relationship between Dr. Mellick and Pfizer was material to DIS recommendation to P&T Committee), 70-71 (omission of Pande and FDA investigation material to DIS recommendation to P&T Committee); 75-76 (material omissions in personal communication with Parke-Davis evidenced in monograph); 87 (DIS would not have recommended lifting restrictions in 1999 if it had known about Reckless study or had the benefit of peer-reviewed Gorson study); 3/9 Tr. (Daniel) at 97-98 (Chair of SCPMG relied on fraudulent omissions in Neurontin formulary vote); 100-01 (same); 105-06 (same); TX 311 (monograph evaluating bipolar evidence containing evidence of fraudulent omission of Pande study); TX 322 (1997 monograph relying on Mellick letters); 327 (1999 monograph recommending lifting remaining restrictions includes cost comparison of alternative medications).

[5] TX 250 has been admitted into evidence for the specific pages referenced during the examination of Kaiser witnesses.  However, the Court has reserved decision on the admissibility of the remaining pages, including the ones cited here. *See* 2/26 Tr. at 107.

During the relevant period, DIS also maintained an inquiry service, at which DIS employees took calls from healthcare providers across Kaiser pertaining to pharmaceuticals. 3/4 Tr. (Millares) at 89-90. DIS researched the questions using available references, and then supplied the provider a response. *Id.* at 90. Dr. Millares testified that DIS inquiry service employees regularly reached out to their counterparts at Pfizer with respect to their pharmaceutical products. *Id.* at 90. Kaiser has presented evidence that the communications received from Pfizer were often misleading. *See, e.g.* 3/4 Tr. (Millares) at 89-100.

Dr. Millares summarized the central role DIS played in Kaiser's causation story:

> The core of the problem is we have thousands of physicians who believe that Gabapentin or Neurontin works for these indications. They depended on, you know, we're an evidence-based organization . . . and they depended upon the literature, what was out in the literature, they depended upon [DIS], and we depended upon the evidence, and so we came to wrong conclusions, and then they depended on the P&T committee and they depended on what we said and we depended on the literature, and so we've had . . . these lies basically that have permeated all this information, and now our physicians are convinced that this stuff . . . has evidence to support it.

3/5 Tr. (Millares) at 94-95.

Between late 2001 and mid-2002, DRUG and DUAT each commenced initiatives to curb inappropriate Neurontin usage through physician education. Between 2003 and 2004, DRUG and DUAT were alerting PMG physicians to "exaggerated promotional claims" and troubling documents that showed "study results would be publicized and published 'if favorable' or 'if positive,'" and disseminating what Kaiser then believed to be the best available evidence for the indications at issue. *See, e.g.* TX 344 (no evidence for non-neuropathic pain, some evidence of efficacy for certain forms of neuropathic pain but emphasize that it is not a first-line treatment); TX 353 (gabapentin not effective for bipolar, only more effective than placebo for migraine).

Although DUAT and DRUG were based in California, the Neurontin initiative these groups championed became an interregional effort, with leaders of the initiative across Kaiser participating in monthly teleconferences. 2/26 Tr. (Carrejo) at 99-100. DUAT and DRUG were required to disseminate all Neurontin-related materials to other regions, and Dr. Hyatt, DUAT's co-chair, testified that he would make site visits to talk about the initiative. 3/3 Tr. (Hyatt) at 103. Information was also distributed at inter-regional meetings attended by P&T chairs and staff from all over Kaiser. *Id.* at 103-4. Videoconferences on the Neurontin initiative were distributed to all regions, and were made available to all employees online. *Id.* at 112.

Additional facts tie this claim to California. About 75-76% of Kaiser's membership is located in California. 2/26 Tr. (Carrejo) at 83-84. No one other region has more than 6% of the membership. 3/5 Tr. (Millares) at 92-93. Kaiser's pharmacy analytical department, which is located in Downey, California, is tasked with maintaining a database of every prescription that is dispensed throughout the Kaiser program. 2/26 Tr. (Carrejo) at 88-89. Each night the data from each pharmacy is downloaded, collated into the main database, aged, and scrubbed for appropriateness. *Id.* at 88-89. That department provided the data which proves the utilization trends throughout Kaiser during the relevant period. *See* TX 268-B; 268-A.

This data shows, for example, that Southern California P&T Committee's decision to remove the remaining restrictions on Neurontin in 1999 had ramifications throughout Kaiser. *See* 2/26 Tr. (Carrejo) at 110-11. As Dr. Carrejo testified and Kaiser's data shows: **"The genie was out of the bottle. It just took off. It was quarter over quarter utilization growing in 10 percent, quarter over quarter, there was a dramatic increase."** *Id.* at 111; TX 268-B.

This prescribing trend abruptly reversed itself after the launch of DUAT and DRUG's campaign to correct defendant's misinformation. *See* 2/26 Tr. (Carrejo) at 124 (33-34%

utilization decrease across specialties at the same time utilization was increasing in the rest of the United States); TX 286 (38% decrease in Northwest region); TX 333 (new starts in Northern California decrease by 50%); TX 340 utilization decreases by 34% in Southern California).  This was echoed in Kaiser's data across regions.  *See* 2/26 Tr. (Carrejo) at 90; TX 268-B.

## II.     **CONCLUSION**

Because Kaiser was defrauded in California in ways that had a ripple effect throughout its other regions, Kaiser's state law claims should proceed under California law.


Dated:  March 18, 2010                 Respectfully submitted,

                                       By:    */s/ Linda P. Nussbaum*
                                              Linda P. Nussbaum

                                       KAPLAN FOX & KILSHEIMER LLP
                                       Linda P. Nussbaum, Esq.
                                       850 Third Avenue, 14th Floor
                                       New York, New York 10022

                                       *Attorneys for Plaintiffs Kaiser Foundation*
                                       *Health Plan, Inc. and Kaiser Foundation*
                                       *Hospitals*


Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served

pursuant to Case Management Order #3 on March 18, 2010.


/s/ *Elana Katcher*
Elana Katcher