# EXHIBIT C-2

1              AMY FITZSIMMONS, M.D.

2            IN THE COURT OF COMMON PLEAS

        PHILADELPHIA COUNTY, PENNSYLVANIA

3                   -   -   -

   GREGORY CLARK and       :   JUNE TERM,  2004

4  LINDA MEASHEY,          :

   Individually and on     :

5  behalf of others        :

   similarly situated,     :

6                          :

          Plaintiffs,      :

7                          :

          vs.              :

8                          :

   PFIZER INC. and         :

9  WARNER-LAMBERT          :

   COMPANY LLC             :

10                          :

          Defendant.       :   NO. 1819

11                  -   -   -

12          Monday, September 22, 2008

13                  -   -   -

14             Videotaped deposition of AMY

15  FITZSIMMONS, M.D., held in the offices of Amy

16  Fitzsimmons, M.D., 44 Second Street Pike,

17  Southampton, Pennsylvania, commencing at 10:30

18  a.m., on the above date, before Linda Rossi

19  Rios, RPR, CCR and Notary Public.

20

21                  *  *  *

22

23

24

25

Page 2

```
 1         AMY FITZSIMMONS, M.D.
 2    APPEARANCES:
 3
      SACKS & WESTON
 4    BY:  JOHN K. WESTON, ESQUIRE
         114 Old York Road
 5       Jenkintown, Pennsylvania 19046
         (215) 925-8200
 6       jweston@sackslaw.com
         Counsel for the Plaintiffs
 7
 8
      DAVIS POLK & WARDWELL
 9    BY:  EDMUND POLUBINSKI, III, ESQUIRE
            and
10    PAUL S. MISHKIN, ESQUIRE
         450 Lexington Avenue
11       New York, NY  10017
         (212) 450-4000
12       polubinski@dpw.com
         paul.mishkin@dpw.com
13       Counsel for the Defendant
14
      ALSO PRESENT:
15
16       Robert Kowalchik, Videographer
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         AMY FITZSIMMONS, M.D.
 2       DEPOSITION SUPPORT INDEX
 3
      Direction to Witness Not To Answer
 4    Page  Line  Page  Line
 5    None
 6
 7
 8
 9    Request For Production of Documents
      Page  Line  Page  Line
10
      None
11
12
13
      Stipulations
14    Page  Line  Page  Line
15    None
16
17
      Questions Marked
18    Page  Line  Page  Line
19
      None
20
21
22
23
24
25
```

Page 3

```
 1         AMY FITZSIMMONS, M.D.
 2              - - -
 3           I N D E X
 4              - - -
 5    TESTIMONY OF:  AMY FITZSIMMONS, M.D.
 6
      By Mr. Polubinski.....................6, 41
 7
      By Mr. Weston........................25, 45
 8
              - - -
 9
           E X H I B I T S
10
              - - -
11
      EXHIBIT NO.   DESCRIPTION   PAGE MARKED
12
      (None marked)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1         AMY FITZSIMMONS, M.D.
 2         VIDEOGRAPHER:  We are now on the
 3    record.  The time is 10:36 a.m.  My
 4    name is Robert Kowalchick, Veritext New
 5    Jersey.  The date today is
 6    September 22, 2008.  This deposition is
 7    being held in the office of Amy
 8    Fitzsimmons, M.D., located 44 Second
 9    Street Pike, Southampton, Pennsylvania.
10    The caption of this case is Gregory
11    Clark and Linda Meashey, individually
12    and on behalf of others similarly
13    situated, versus Pfizer, Inc. and
14    Warner-Lambert Company LLC in the
15    Philadelphia County Court of Common
16    Pleas, June term, 2004, number 1819.
17    The name of the witness is Dr. Amy
18    Fitzsimmons.
19         At this time the attorneys will
20    identify themselves and the parties
21    they represent after which our court
22    reporter, Linda Rossi of Veritext, will
23    swear in the witness and we can
24    proceed.
25         MR. POLUBINSKI:  Ted Polubinski
```

Page 6

1    AMY FITZSIMMONS, M.D.
2    from Davis Polk & Wardwell, here for
3    defendants Pfizer and Warner-Lambert.
4    With me today is my colleague Paul
5    Mishkin.
6         MR. WESTON: John Weston
7    representing the plaintiff class.
8              - - -
9         AMY FITZSIMMONS, M.D., after
10   having been duly sworn, was examined
11   and testified as follows:
12             - - -
13         EXAMINATION
14             - - -
15   BY MR. POLUBINSKI:
16   Q.   Good morning, Dr. Fitzsimmons.
17   A.   Good morning.
18   Q.   Just to start here, I'm going to
19   take a few minutes now just to give you a
20   little bit of background about what we're doing
21   here today.
22         We, as you just heard, represent
23   the defendants in this case. The defendants
24   are Pfizer and Warner-Lambert.
25         The plaintiffs have filed a

Page 7

1    AMY FITZSIMMONS, M.D.
2    class action lawsuit against Pfizer and
3    Warner-Lambert relating to the marketing of the
4    medicine Neurontin. Mr. Weston, as you heard,
5    represents the plaintiffs.
6         I will be focusing today on your
7    experience in prescribing Neurontin.
8    A.   Okay.
9    Q.   In particular prescribing
10   Neurontin for off label uses, which is to say
11   uses or indications which have not been
12   approved by the FDA. When I say Neurontin, it
13   would be great if you could understand me to
14   mean either branded Neurontin or generic
15   gabapentin. I don't mean to distinguish
16   between the two at all in my question. Is that
17   okay?
18   A.   That's fine.
19   Q.   And then one other point of
20   clarification. I don't want to hear or I'm not
21   going to ask about any individual details or
22   names of any of your individual patients. I'm
23   just asking you about your own general
24   knowledge and experience with respect to
25   Neurontin. Okay?

Page 8

1    AMY FITZSIMMONS, M.D.
2    A.   Okay.
3    Q.   Have you ever been deposed
4    before?
5    A.   Yes.
6    Q.   Okay. I'm sorry to hear that.
7    Some of this will then be familiar to you, but
8    just a couple of ground rules to start just to
9    remind you. One of them is that you and I
10   can't talk at the same time, so I'll try to
11   allow you to finish your answers before I speak
12   up and ask my questions. And then if you can
13   do the same for me and let me finish my
14   questions, even if I'm mumbling or trailing
15   off, that would be great as well. Does that
16   work?
17   A.   That works.
18   Q.   On the same note, as you
19   probably may recall, occasionally Mr. Weston or
20   I will object to a question that one or the
21   other of us asks and then in very, very rare
22   instances there may be some discussions between
23   the two of us.
24         Generally speaking, though,
25   whether or not Mr. Weston or I objects to a

Page 9

1    AMY FITZSIMMONS, M.D.
2    question, the objection is for the record and
3    then you can proceed to answer. Is that okay?
4    A.   That's okay.
5    Q.   Great. A couple of other
6    things. If you need a break at any point in
7    time at all, please just let me know and we'll
8    take it.
9    A.   Okay.
10   Q.   And then if you don't understand
11   a question, will you please let me know that as
12   well?
13   A.   Sure.
14   Q.   Terrific. And I guess the last
15   thing is that if at any point you want to
16   correct or add to a previous answer that you've
17   given to me or to Mr. Weston, you shouldn't
18   hesitate to do that. We want to make sure that
19   the written record here as well as the
20   videotape record is absolutely clear.
21   A.   Okay.
22   Q.   Great. Okay. So for the
23   record, can you tell us what your full name is?
24   A.   Amy Fitzsimmons.
25   Q.   And you're a medical doctor. Is

3 (Pages 6 to 9)

Page 10

AMY FITZSIMMONS, M.D.

1    that correct?
2    A.    I am an M.D.
3    Q.    Where is your practice located?
4    A.    In Southampton, Pennsylvania.
5    Q.    And what is the general nature
6    of your practice?
7    A.    I'm in physical medicine and
8    rehabilitation.
9    Q.    Can you tell us just in very
10   general terms what physical medicine and
11   rehabilitation is?
12   A.    Physical medicine and
13   rehabilitation is a specialty in which we work
14   with function. I do a lot of pain management.
15   I'm also board certified in spinal cord injury
16   as well.
17   Q.    How many patients do you see in
18   a typical week?
19   A.    I do both inpatient and
20   outpatient work. I would say if I looked at
21   just visits, it's probably over a hundred
22   visits per week. Some of those are duplicative
23   because I have to see them daily in the
24   hospital.

Page 11

AMY FITZSIMMONS, M.D.

1    Q.    Are you -- are you affiliated
2    with a particular hospital?
3    A.    I'm affiliated with Holy
4    Redeemer Hospital.
5    Q.    As part of your practice, do you
6    write prescriptions?
7    A.    I do.
8    Q.    Are some of the prescriptions
9    that you write sometimes off label, which is to
10   say for use or indications that the FDA hasn't
11   approved a specific medicine for?
12   A.    Yes.
13   Q.    To the best of your
14   understanding as a doctor, does the FDA put any
15   limitations on you in terms of your ability to
16   prescribe medicines for off label uses within
17   the limits of your own medical judgment?
18   A.    I don't think so.
19   Q.    Would you agree with me that
20   doctors do commonly prescribe certain medicines
21   for uses for which they haven't been approved
22   by the FDA?
23   A.    Yes.
24   Q.    A little more background about

Page 12

AMY FITZSIMMONS, M.D.

1    you. Where did you attend medical school?
2    A.    I went to Medical College of
3    Pennsylvania.
4    Q.    Did part of your education at
5    the Medical College of Pennsylvania include
6    training that qualified you to prescribe
7    medicines?
8    A.    Yes.
9    Q.    Did you do a residency after
10   your medical school?
11   A.    I did an internship and a
12   residency. My internship was at Albert
13   Einstein Northern Medical Center in internal
14   medicine and a three-year residency in physical
15   medicine and rehabilitation at Graduate
16   Hospital in Philadelphia.
17   Q.    Did part of your training as an
18   intern and then as a resident also include
19   training that related to the prescription of
20   medicines?
21   A.    Yes.
22   Q.    Okay. You mentioned a board
23   certification that you have -- that you have.
24   What is your board certification in?

Page 13

AMY FITZSIMMONS, M.D.

1    A.    I have two board certifications;
2    one is in physical medicine and rehabilitation
3    and the other is in spinal cord injury.
4    Q.    In total, how long have you been
5    practicing medicine?
6    A.    Well, it's since 19 -- I
7    graduated residency in 1993.
8    Q.    Okay. So about 15 years total
9    if I'm doing the math right?
10   A.    Yeah. I mean, I could write
11   prescriptions when I was a resident and even an
12   intern, but since 1993 I've been, you know, out
13   of residency and on my own.
14   Q.    Okay. In your practice today --
15   withdrawn.
16         You mentioned that you sometimes
17   prescribe drugs off label. Is that correct?
18   A.    That's correct.
19   Q.    How frequently do you do so in
20   your daily practice?
21   A.    You know, sometimes it's hard
22   because, you know, the literature speaks of a
23   medication that -- you know, I don't always go
24   back to the Physicians' Desk Reference to

4 (Pages 10 to 13)

Page 14

AMY FITZSIMMONS, M.D.

1  understand what it was originally considered on
2  label for. But, you know, Neurontin is one of
3  the common ones. There is several other common
4  drugs I believe I -- you know, it's got to be
5  at least a couple of times a week.
6      Q.   As a general matter, we'll talk
7  about Neurontin specifically in a minute, but
8  why would you typically prescribe a drug off
9  label if there's a way to generalize it?
10     A.   Because it's had proven efficacy
11 and it's generally accepted among my peers and
12 colleagues.
13     Q.   How typical in your field is it
14 to prescribe drugs off label?
15     A.   I think it's very common for
16 some of them.
17     Q.   I assume you would say that a
18 doctor has an obligation to exercise her own
19 medical judgment in deciding which medicines to
20 prescribe? Is that correct?
21     A.   Can you restate that?
22     Q.   Yeah, sure. Would you agree
23 that a doctor has an obligation to exercise her
24 own medical judgment in prescribing medicines

Page 15

AMY FITZSIMMONS, M.D.

1  to patients?
2      A.   Yeah, I think it's our
3  responsibility.
4      Q.   And you do that in your
5  practice. Right?
6      A.   Yes.
7      Q.   And in exercising your
8  independent medical judgment on what to
9  prescribe, do you consider the potential
10 benefits of the medicine and also the potential
11 risks associated with it?
12     A.   Yes.
13     Q.   Okay. Let's talk about
14 Neurontin that you mentioned before. You do
15 prescribe Neurontin. Is that correct?
16     A.   Yes.
17     Q.   You understand, I assume, that
18 Neurontin has been approved for adjunctive
19 treatment of epilepsy and then also for
20 postherpetic neuralgia. Is that right?
21     A.   That's correct.
22     Q.   What conditions have you
23 prescribed Neurontin to treat to the best of
24 your recollection?

Page 16

AMY FITZSIMMONS, M.D.

1      MR. WESTON: Objection.
2  BY MR. POLUBINSKI:
3      Q.   You can answer.
4      A.   Most commonly it's for some sort
5  of nerve pain. I don't think I've ever written
6  it for an adjunct to epilepsy or seizure
7  disorder. I also -- I may have written it for
8  postherpetic neuralgia. I see that less
9  commonly than I see chronic pain conditions or
10 nerve pain conditions.
11     Q.   When you say "nerve pain," is
12 that the same thing as neuropathic pain or is
13 it something different?
14     A.   It's the same thing.
15     Q.   Okay. In your experience, has
16 Neurontin been effective for treating some --
17     MR. WESTON: Object again.
18     MR. POLUBINSKI: Please let me
19 finish the question, John.
20 BY MR. POLUBINSKI:
21     Q.   Has Neurontin been effective for
22 treating neuropathic pain in your patients?
23     MR. WESTON: Object again.
24     THE WITNESS: Yes, it's been

Page 17

AMY FITZSIMMONS, M.D.

1  very effective.
2  BY MR. POLUBINSKI:
3      Q.   Do you recall when the first
4  time was that you prescribed Neurontin to treat
5  neuropathic pain off label?
6      A.   I don't, but it's been a long
7  time.
8      Q.   Okay. By a long time, more than
9  five years would you say?
10     A.   Certainly more than five. It
11 may have been since residency, I just don't
12 recall.
13     Q.   Do you recall what would have
14 initially led you to prescribe Neurontin off
15 label for neuropathic pain?
16     MR. WESTON: Object again.
17     THE WITNESS: It's very commonly
18 used in the pathway for nerve pain
19 among my colleagues, my peers and my
20 guess is among the physicians that
21 helped train me.
22 BY MR. POLUBINSKI:
23     Q.   Do you continue to prescribe
24 Neurontin for off label use of neuropathic

5 (Pages 14 to 17)

Page 18

AMY FITZSIMMONS, M.D.

1    AMY FITZSIMMONS, M.D.
2   pain?
3       A.    I do.
4       Q.    Why do you continue to prescribe
5   Neurontin for off label uses of neuropathic
6   pain?
7            MR. WESTON: Perhaps we should
8       just have a continuing objection to
9       asking her questions unrelated to the
10      plaintiffs in this case. I mean, she's
11      not a treating physician. She's not an
12      expert. So I'll object to any
13      questions -- that will keep me from
14      having to object every time you ask her
15      a question. That's why I'm doing this
16      now.
17           MR. POLUBINSKI: That's fine.
18      Just so the record is clear, I believe
19      it's clear in the judge's recent orders
20      that it's perfectly permissible for us
21      to ask about efficacy generally.
22           MR. WESTON: You haven't
23      submitted an expert report.
24           MR. POLUBINSKI: Please let me
25      finish what I'm saying, John.

Page 19

1    AMY FITZSIMMONS, M.D.
2        I assume that we have a
3       disagreement with you on the extent to
4       that is what the judge has ruled, but
5       it's our view that this is perfectly
6       permissible.
7            MR. WESTON: My turn? It's my
8       view that I don't have an expert report
9       from this doctor, you haven't
10      supplemented your Interrogatories to
11      say that the testimony is today. And
12      so I object on those bases as well as
13      the other ones that you just mentioned.
14           MR. POLUBINSKI: Fair enough.
15      Again, just so the record is clear,
16      sorry to take your time with this,
17      Doctor, we're not -- we're not offering
18      Dr. Fitzsimmons' testimony as a
19      retained expert or an expert retained
20      by the defendants. Just, again, so the
21      evidence -- so the record is clear on
22      that point.
23           MR. WESTON: What are you
24      offering her as?
25           MR. POLUBINSKI: We're taking

Page 20

1    AMY FITZSIMMONS, M.D.
2       her deposition. I'm certainly not
3       disputing that she has specialized
4       knowledge that can assist the trier of
5       fact, we can probably agree on that,
6       but we have not retained her as an
7       expert on behalf of the defendants.
8            Could you read back the last
9       question, Linda?
10           -   -   -
11           (The court reporter read the
12      pertinent part of the record.)
13           -   -   -
14           THE WITNESS: It works. It is
15      an effective use that is paid for by
16      the prescription plans. Some of the
17      newer agents aren't. And so we
18      usually -- I usually start there.
19   BY MR. POLUBINSKI:
20      Q.    Without reference to specific
21   patients at all, what have you heard from your
22   patients about whether they find Neurontin to
23   be effective in treating neuropathic pain off
24   label?
25           MR. WESTON: I'll object to that

Page 21

1    AMY FITZSIMMONS, M.D.
2       in addition as hearsay.
3            THE WITNESS: It's a mix. What
4       patients say is -- you know, some
5       people have side effects and if the
6       side effects are intolerable, we take
7       them off it. If it works, and they can
8       tolerate the side effects, the side
9       effects begin to go away, we keep them
10      on it or titrate up until symptoms or
11      side effects -- symptoms go away or
12      side effects are intolerable.
13   BY MR. POLUBINSKI:
14      Q.    What have you heard about the
15   efficacy of Neurontin from your -- from your
16   patients?
17      A.    It works very well for some of
18   my patients.
19      Q.    When you prescribe Neurontin to
20   treat neuropathic pain, how long does a patient
21   typically take the medicine?
22      A.    It can be forever.
23      Q.    For what proportion of your
24   patients that take Neurontin for off label uses
25   or neuropathic pain do you prescribe refills?

6 (Pages 18 to 21)

Page 22

AMY FITZSIMMONS, M.D.

1 A. For what percentage?
2 Q. Approximately.
3 A. I'm a specialist, so if someone
4 comes to me and we get their pain under control
5 and they're stable, I can turn that care back
6 over to a primary care physician. If they stay
7 with me, I'll continue writing for it for as
8 long as they see me.
9 Q. Since you first started
10 prescribing Neurontin to treat neuropathic pain
11 off label, approximately how many patients
12 would you say you prescribed Neurontin to for
13 that condition?
14 A. It's got to be hundreds since I
15 started, I think.
16 Q. After you first prescribed
17 Neurontin for off label treatment of
18 neuropathic pain, was your observation of its
19 performance with prior patients a basis on
20 which you decided whether to prescribe it to
21 future patients?
22 A. I think that's a fair assessment
23 of all my -- all the drugs I use.
24 Q. Would you say that your

Page 23

AMY FITZSIMMONS, M.D.

1 knowledge of Neurontin and its efficacy have
2 grown over the years?
3 A. Yes.
4 Q. So I take it that you know more
5 about Neurontin and its efficacy today than you
6 did in, say, 1995?
7 A. I think that's fair.
8 Q. And that information would be
9 based in part on your personal experience with
10 your patients. Is that correct?
11 A. Correct.
12 Q. And then based also at least in
13 part on discussions that you had with
14 colleagues about their experiences with
15 Neurontin. Correct?
16 A. Yes.
17 Q. So when you prescribe Neurontin
18 for treatment of neuropathic pain off label,
19 it's based on your independent medical judgment
20 that it's an appropriate treatment. Is that
21 correct?
22 A. Yes.
23 Q. And so do you continue to
24 believe that Neurontin can be a safe and

Page 24

AMY FITZSIMMONS, M.D.

1 effective treatment for off label use of
2 neuropathic pain?
3 A. I do.
4 Q. Have you ever been detailed by a
5 Pfizer or Warner-Lambert sales representative
6 about Neurontin?
7 A. I don't believe so. We don't
8 get samples. It's now a generic. We very
9 rarely get detailed on generic items.
10 Q. Looking back in time, have you
11 ever in the past, to the best of your
12 recollection, been detailed?
13 A. I don't recall ever being
14 detailed on that.
15 MR. POLUBINSKI: Let's take a
16 quick break. Off the record for one
17 second.
18 VIDEOGRAPHER: Going off the
19 record. The time is 10:54 a.m.
20 - - -
21 (A discussion off the record
22 occurred.)
23 - - -
24 VIDEOGRAPHER: We are on the

Page 25

AMY FITZSIMMONS, M.D.

1 record. The time is 10:54 a.m.
2 MR. POLUBINSKI: Dr.
3 Fitzsimmons, I don't have any further
4 questions at this time. I may have
5 questions after whatever Mr. Weston
6 chooses to ask you, but thank you very
7 much.
8 - - -
9 EXAMINATION
10 - - -
11 BY MR. WESTON:
12 Q. My turn.
13 A. Okay.
14 Q. I'm John Weston. How are you,
15 Doctor?
16 A. Good.
17 Q. Are you testifying free today?
18 A. No.
19 Q. You got paid. Who paid you?
20 A. I got paid $5 so far.
21 Q. Really? How were you -- are you
22 going to get paid more than $5?
23 A. My understanding is that the
24 time lost from my practice, it would be an

Page 26

AMY FITZSIMMONS, M.D.

1    AMY FITZSIMMONS, M.D.
2    equivalent amount that I would lose from seeing
3    my patients or doing hospital work.
4         Q.    How are you going to calculate
5    that?
6         A.    I have -- based on EMGs which I
7    would usually do, it will be -- depending on
8    how much time is taken today. It will take --
9    what I usually get reimbursed for that.
10        Q.    What do you usually get
11   reimbursed for that, do you know?
12        A.    It's around -- I have to ask,
13   but it's around five, six hundred bucks for an
14   EMG.
15        Q.    Okay. Did you speak to Mr.
16   Polubinski or any other lawyers about this
17   deposition before today?
18        A.    Yes, I did.
19        Q.    And tell me something about
20   that. What was the conversation about?
21        A.    I spoke with somebody, it was
22   about five minutes I think, about -- they asked
23   me some of the questions I think I've been
24   asked today, like had I used it and am I
25   familiar with it. Those kind of questions.

Page 27

1    AMY FITZSIMMONS, M.D.
2         Q.    Did they tell you why they
3    picked you to do this deposition?
4         A.    I don't recall that
5    specifically.
6         Q.    Did you do any preparation for
7    today's deposition other than that $5 phone --
8    5-minute phone call?
9         A.    No.
10        Q.    You don't own any stock in
11   Pfizer or the old Warner-Lambert Company, do
12   you?
13        A.    I don't believe so. I have some
14   funds with companies, but...
15        Q.    You prescribe Neurontin
16   principally for pain. Is that my
17   understanding? Is that correct?
18        A.    That's correct.
19        Q.    No one, including Pfizer, knows
20   what the mechanism of action of Neurontin is.
21   Is that right?
22        A.    I don't know that I can answer
23   that with assuredness, the mechanism of action.
24        Q.    Do you know what the mechanism
25   of action is for Neurontin?

Page 28

1    AMY FITZSIMMONS, M.D.
2         A.    Not off the top of my head.
3         Q.    What sort of side effects does
4    Neurontin have and do you see in your patients?
5         A.    I think the most common is --
6    there's a couple. I see -- some people say
7    dizziness. Edema, swelling of the legs. They
8    would be the most common that I would have
9    complaints of.
10        Q.    Have you followed the FDA
11   hearings over the suicide side effects of the
12   AEDs?
13        A.    No.
14             MR. POLUBINSKI: Objection.
15   BY MR. WESTON:
16        Q.    Pain, there are generally no
17   objective symptoms, though. Is that right?
18        A.    Pain is a subjective report.
19        Q.    Meaning -- when you say it's a
20   subjective symptom, what does that mean?
21        A.    Pain is an essential
22   interpretation of what is going on in the body.
23   It's the brain's interpretation of something
24   that is amiss.
25        Q.    And the difference between a

Page 29

1    AMY FITZSIMMONS, M.D.
2    subjective symptom and an objective symptom is
3    the third party can't tell whether you're
4    really feeling it or not. Is that right?
5         A.    I would -- I would switch that
6    around a little bit. I would say that there
7    may be very clear, you know -- you know, if you
8    had got a cut across the leg, I may see that
9    cut and feel that you might have pain. Your
10   assessment of what that pain feels like is all
11   your own and I can't begin to understanding
12   that. It might make sense to me putting it
13   together with other things; you know, if I know
14   you have a stenosis of your low back, it might
15   make sense to me. But I can't really see
16   whether it's stab and sharp, dull, hot, cold,
17   you know, eight out of ten or two out of ten.
18        Q.    Right. If I tell you right now
19   that I'm feeling crushing pain, you have no way
20   of knowing whether I'm telling you the truth or
21   not?
22        A.    I can't measure it.
23        Q.    You wouldn't prescribe
24   gabapentin to anyone if you knew that it was no
25   better than a placebo, would you?

Page 30

1      AMY FITZSIMMONS, M.D.
2          MR. POLUBINSKI: Objection.
3          THE WITNESS: No, that's not
4      true.
5  BY MR. WESTON:
6      Q.    You would?
7      A.    I think that placebo effect is
8  30 percent. And there are things -- there are
9  things that we use that in my estimation if
10 someone gets -- if they're one of the
11 30 percent of the people who get relief and
12 their relief seems to be coming at a cost
13 without much in the way of harm, then I am not
14 opposed to that.
15     Q.    Okay. So if I understand you
16 correctly, if you thought that the classic
17 sugar pill placebo might make the patient feel
18 better, you would prescribe it for them?
19     A.    Absolutely.
20         MR. POLUBINSKI: Objection. Go
21     ahead.
22 BY MR. WESTON:
23     Q.    Mr. Polubinski asked you about
24 your independent medical judgment. I'd like to
25 ask you a couple of questions about that.

Page 31

1      AMY FITZSIMMONS, M.D.
2      When you first decided to
3  prescribe Neurontin for a patient, you didn't
4  conduct your own double blind placebo
5  controlled study before you prescribed the
6  Neurontin, did you?
7      A.    I can't recall the first time,
8  but I really never do that with any drug.
9      Q.    Of course not. And so your
10 informed judgment is based upon other factors
11 other than you conducting a study. Can we
12 agree on that?
13     A.    Correct.
14     Q.    You would rely on what your
15 peers tell you about the drug?
16     A.    That's one of the things.
17     Q.    You would rely on articles that
18 you read about the drug?
19     A.    Correct.
20     Q.    You would rely on what else?
21     A.    If I attend meetings where I
22 have colleagues or peers. You know, if it's
23 the first time, I have no experience, but other
24 times it's based on my experience with a drug.
25     Q.    So after that first time, and I

Page 32

1      AMY FITZSIMMONS, M.D.
2  think you testified to this, after that first
3  time that you prescribed it, your subsequent
4  prescription behavior is based principally on
5  your own experience?
6          MR. POLUBINSKI: Objection. Go
7      ahead.
8          THE WITNESS: I think it's a mix
9      because things come along. I read a
10     lot in the pain journals. So it will
11     be a mix and it will be also
12     unfortunately these days on what
13     prescription plans allow patients to
14     afford. So if it's the only affordable
15     option, that's often what we do as
16     well.
17 BY MR. WESTON:
18     Q.    You take -- you go to continuing
19 medical education sessions?
20     A.    Or I do them online or in
21 journals.
22     Q.    Have you ever talked to a drug
23 company's medical liaison? Do you know what
24 those people are?
25     A.    Yes.

Page 33

1      AMY FITZSIMMONS, M.D.
2      Q.    What are they?
3      A.    They're people that interface
4  with the medical community from a drug company.
5      Q.    Have you ever consulted with
6  one?
7      A.    About any drug?
8      Q.    About any drug.
9      A.    Yes.
10     Q.    Have you ever consulted with one
11 about gabapentin?
12     A.    I don't think so. I don't
13 recall that.
14     Q.    Have you ever -- do you know
15 what a speakers bureau is?
16     A.    Yes.
17     Q.    What is it?
18     A.    It's a group of people that are
19 asked to speak on behalf of a drug.
20     Q.    Have you ever been to one of
21 those?
22     A.    I've been to one and given. I'm
23 on speakers bureaus.
24     Q.    Are you really?
25     A.    Yes.

9 (Pages 30 to 33)

Page 34

1    AMY FITZSIMMONS, M.D.
2    Q.    What speakers bureaus are you
3  on?
4    A.    I'm on ones for -- I have been
5  on ones for different narcotic pain
6  medications. Kadian in the past. I've been in
7  Avinza. In the distant past, Duragesic which
8  is a fentanyl patch. And on a couple of
9  occasions Provigil.
10    Q.    How do you get selected to be a
11  speaker?
12    MR. POLUBINSKI:  Objection.
13    THE WITNESS:  I'm not exactly
14    sure, but I think it's based on my
15    experience with the drug and you attend
16    meetings on, you know, if -- on how to
17    give the talks and what the science is
18    behind it.
19  BY MR. WESTON:
20    Q.    Who tells you how to -- the
21  background that you just gave, who tells you
22  those things?
23    MR. POLUBINSKI:  Objection,
24    again. John, are we talking about --
25    MR. WESTON:  Right now we're

Page 35

1    AMY FITZSIMMONS, M.D.
2  talking about all of the different
3  speakers bureaus she's been on.
4    MR. POLUBINSKI:  Fair enough. I
5    think we're getting a little far afield
6    here. Obviously Dr. Fitzsimmons can
7    answer. We don't want to waste a lot
8    of her time on things unrelated to the
9    case.
10    MR. WESTON:  Your objection is
11    noted.
12    THE WITNESS:  Okay, you know
13    there -- my understanding of the way
14    that it works now is there is a very
15    narrow set of what is to be
16    communicated to an audience such as
17    other physicians, nurse practitioners
18    and whoever else is in the audience.
19    Those slides are -- it's usually given
20    as a slide set or first given to us in
21    an education manner, like we sit as,
22    you know, students of people who
23    usually participated in the studies.
24    Or, you know, and it's a panel usually
25    that are informing the speakers

Page 36

1    AMY FITZSIMMONS, M.D.
2    initially.
3  BY MR. WESTON:
4    Q.    Who is the panel composed of?
5    MR. POLUBINSKI:  Objection,
6    again.
7    THE WITNESS:  I think it's
8    people on the company, the medical
9    directors, the people who did the
10    original studies. They're usually
11    multicenter studies. That's my
12    understanding usually of who is
13    educating us.
14  BY MR. WESTON:
15    Q.    Now, you have not done one of
16  these speakers bureau talks for gabapentin?
17    A.    No.
18    Q.    Have you ever been to one for
19  gabapentin?
20    A.    I don't think so because it's
21  been generic for so long that I don't think
22  that -- I haven't recalled being to one that is
23  for generic medicines or medicines that are now
24  generic.
25    Q.    Gabapentin -- gabapentin went

Page 37

1    AMY FITZSIMMONS, M.D.
2  generic in 2004, didn't it?
3    MR. POLUBINSKI:  Objection.
4    THE WITNESS:  I don't know.
5  BY MR. WESTON:
6    Q.    Had you been to speakers bureau
7  talks before 2004?
8    A.    Yes.
9    Q.    You don't remember whether any
10  of those were for gabapentin. Is that correct?
11    A.    I don't.
12    Q.    But they could have been?
13    MR. POLUBINSKI:  Objection.
14    Speculation. I think she said she
15    doesn't remember.
16    THE WITNESS:  You know, this is
17    what my lifestyle is. I work full time
18    which is more than 40 hours a week. I
19    have three children and I'm very
20    selective about what I attend because I
21    can't afford the time.
22    I don't think in 2004 when my
23    kids were small and in day care, I
24    would have been trekking down to
25    Philadelphia to go to a Neurontin talk

10 (Pages 34 to 37)

Page 38

AMY FITZSIMMONS, M.D.

1
2  because it was so mainstream. I
3  think --
4  BY MR. WESTON:
5      Q.    When did you start practicing?
6      A.    1993.
7      Q.    So you had been practicing for
8  ten years before it went generic. You could
9  have gone to speakers bureau before your kids
10 were young?
11     A.    I guess it's possible, but I
12 really have no recollection of that.
13     Q.    That's fine. Did you see the
14 Dateline show on Neurontin?
15     A.    I have not.
16     Q.    What is pharmacology?
17     A.    The study of medicines and
18 chemicals.
19     Q.    And how they work?
20     A.    Yes.
21     Q.    What is your training in
22 pharmacology?
23     A.    From medical school.
24     Q.    What training did you get in
25 medical school in pharmacology?

Page 39

AMY FITZSIMMONS, M.D.

1
2      A.    We had a course in pharmacology.
3  That's -- you know, that's it.
4      Q.    Okay. That was what I wanted to
5  know.
6           Have you -- have you taken other
7  courses in pharmacology since med school?
8      A.    Not specifically in
9  pharmacology.
10     Q.    Now, you said that Neurontin
11 works. What do you base that on?
12     A.    The patients' reports. Pain is
13 subjective. If someone is coming -- we always
14 take -- or I always take a pain level. What
15 they're functionally doing, if they could do
16 more, if people are reporting less pain and the
17 only difference since the last time I saw them
18 is the gabapentin, then it works. The same way
19 I judge all medicines for pain that I use or
20 for any medicine that I use for anything.
21     Q.    So to exclude things, you're not
22 basing your conclusion that Neurontin works on
23 studies that you've read. Is that right?
24           MR. POLUBINSKI: Objection.
25           THE WITNESS: No. On a

Page 40

AMY FITZSIMMONS, M.D.

1
2  day-to-day basis, it's based on the
3  individuals that I see.
4  BY MR. WESTON:
5      Q.    Your patients telling you how
6  they feel?
7      A.    Correct.
8      Q.    And that is virtually the sole
9  basis of your opinion --
10           MR. POLUBINSKI: Objection.
11 BY MR. WESTON:
12     Q.    -- that Neurontin works?
13     A.    It is the strongest basis of my
14 opinion. Plus the fact that I have all my
15 colleagues telling me it works. And when you
16 go to meetings, you know. That, you know, it
17 is one of the first things you do before you
18 move into the narcotic arena if it's nerve
19 pain.
20     Q.    I'm only trying to get the
21 foundations of your opinion. The strongest is
22 your patient response to you?
23     A.    Correct.
24     Q.    Your colleagues speaking to you?
25     A.    Uh-huh.

Page 41

AMY FITZSIMMONS, M.D.

1
2      Q.    Is there anything else?
3      A.    On whether it works? No, I
4  think that's pretty much what I use.
5      Q.    When you prescribe Neurontin off
6  label for pain, do you tell your patients that
7  it's for off label use and it hasn't been
8  approved by the FDA?
9      A.    I don't.
10           MR. WESTON: I don't have any
11 other questions for you, Doctor.
12                - - -
13           FURTHER EXAMINATION
14                - - -
15 BY MR. POLUBINSKI:
16     Q.    I just have a few more
17 questions, Doctor, just to follow up on a
18 couple of things that Mr. Weston asked you
19 about.
20           It's correct that you took time
21 out of your practice today to sit for this
22 deposition. Right?
23     A.    Correct.
24     Q.    And you could have been seeing
25 patients during this time. Is that right?

11 (Pages 38 to 41)



Page 42

1    AMY FITZSIMMONS, M.D.
2       A.    That's correct.
3       Q.    And you would have received
4    compensation to do so?
5       A.    Correct.
6       Q.    Is it your understanding that
7    you will receive any more than the amount you
8    would have received if you had been seeing
9    patients instead of Mr. Weston and me in
10   connection with this deposition?
11      A.    That's my understanding.
12      Q.    Mr. Weston also asked you about
13   the placebo effect.  In your experience, does
14   the placebo effect last indefinitely or does it
15   tend to fade over weeks or months?
16      A.    You know, I'm not sure I'm
17   really good at putting my hands around a
18   placebo effect because the placebo effect my
19   understanding is about 30 percent.  Like if
20   something is 30 percent effective, we can say
21   that that is often equivalent to a placebo
22   effect.
23          I'm not sure that if I think
24   someone is improved and they're improved for my
25   intervention, that I'm, you know, likely to

Page 43

1    AMY FITZSIMMONS, M.D.
2    just pull it off because I think it's a placebo
3    effect.  In the future, at times, I will try to
4    wean someone down to see if it's still
5    efficacious, and then if it's not, withdraw.
6    And if it seems with withdrawing that pain
7    increases, I'll return them to that drug.
8       Q.    Have you ever done what you just
9    described with Neurontin before?
10      A.    Correct, I have.
11      Q.    What did you find, what did you
12   experience?
13      A.    It's varied because some
14   people's underlying -- like if someone comes to
15   me and has nerve pain from a low back
16   condition, it's conceivable sometimes that
17   whatever is causing that nerve pain may go
18   away.  So it's reasonable with some amount of
19   frequency that you try -- you wean down seeing
20   if someone still needs the drug, whatever it
21   is, whether it's a narcotic, or Neurontin or
22   whatever.  And then if the pain returns, you
23   know, the consideration is to return the
24   patient to that drug.
25      Q.    Okay.  So have you ever seen

Page 44

1    AMY FITZSIMMONS, M.D.
2    experiences -- withdrawn.
3          Did you ever see patients who
4    experienced the benefit on Neurontin feel worse
5    after they came off of it?
6       A.    Yes.
7       Q.    Did you put them back on?
8       A.    In a lot of those instances,
9    yes.
10      Q.    And did their symptoms improve
11   when you put them back on Neurontin in some of
12   those cases?
13      A.    Yes.  If it doesn't, then we
14   take it off, but, you know, I've certainly seen
15   that scenario.
16      Q.    Now, seeing that scenario, what
17   does that tell you about the possibility --
18   withdrawn.
19          Let me just cut to the chase and
20   ask you how likely in your mind is it that the
21   efficacy that you've seen over the course of
22   the past 10, 15 years of your practice and the
23   hundreds of patients that you've treated with
24   Neurontin for nerve pain is due solely to the
25   placebo effect?

Page 45

1    AMY FITZSIMMONS, M.D.
2       A.    I don't think so.
3       Q.    Why not?
4       A.    It's too common.  I mean,
5    Neurontin just too commonly helps people with
6    nerve pain.
7          MR. POLUBINSKI:  I have no
8       further questions.
9                - - -
10         FURTHER EXAMINATION
11               - - -
12   BY MR. WESTON:
13      Q.    Doctor, did you cancel a patient
14   for today to do this deposition?
15      A.    I have patients at the hospital
16   that I saw yesterday in lieu of today.
17         MR. WESTON:  I don't have any
18      more questions.
19         MR. POLUBINSKI:  I think we're
20      done.
21         VIDEOGRAPHER:  We're going off
22      the record.  The time is 11:12 a.m.
23      This is the end of tape number one.  We
24      are concluded.
25               - - -

12 (Pages 42 to 45)

Page 46

1    AMY FITZSIMMONS, M.D.
2         (Witness excused.)
3         (Deposition concluded at
4    approximately 11:12 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 47

1    AMY FITZSIMMONS, M.D.
2
3         CERTIFICATE
4
5
6         I HEREBY CERTIFY that the
7    witness was duly sworn by me and that the
8    deposition is a true record of the testimony
9    given by the witness.
10
11
12
     Linda Rossi Rios, RPR, CSR
13   and Notary Public
     Dated:  September 22, 2008
14
15
16
17
18
19        (The foregoing certification of
20   this transcript does not apply to any
21   reproduction of the same by any means, unless
22   under the direct control and/or supervision of
23   the certifying reporter.)
24
25

13 (Pages 46 to 47)