# EXHIBIT B

### Page 1

```
 1                LAURA KIBBE
 2        UNITED STATES DISTRICT COURT
 3       FOR THE DISTRICT OF MASSACHUSETTS
 4    -------------------------------x
 5    IN RE NEURONTIN MARKETING AND
      SALES PRACTICES LITIGATION
 6
      MDL Docket No. 1629
 7    Master File No., 04-10981
      Judge Patti B. Saris
 8    Magistrate Leo T. Sorokin
      -------------------------------x
 9
10
11       SUPREME COURT OF THE STATE OF NEW YORK
12              COUNTY OF NEW YORK
13
      ------------------------x
14
      IN RE:  NEW YORK NEURONTIN
15    PRODUCTS LIABILITY LITIGATION
16    Case Management
      Index No. 765,000/2006
17    Hon. Marcy S. Friedman
      ------------------------x
18
19
20
21              April 7, 2008
                 9:14 a.m.
22
23
24
25
```

### Page 2

```
 1                LAURA KIBBE
 2
 3         Deposition of LAURA MARIE KIBBE, taken
 4    by Class Plaintiffs, at the offices of Davis,
 5    Polk & Wardwell, 450 Lexington Avenue, New York,
 6    New York, before Brandon Rainoff, a Federal
 7    Certified Realtime Reporter and Notary Public of
 8    the State of New York.
```

### Page 3

```
 1                LAURA KIBBE
 2    A P P E A R A N C E S:
 3
 4    FINKELSTEIN & PARTNERS
 5    Attorneys for Product Liability Plaintiffs
 6        785 Broadway, 3rd Floor
 7        Kingston, NY 12401
 8        800.634.1212
 9    BY:  KENNETH B. FROMSON, ESQ.
10         KEITH ALTMAN
11
12    BERNSTEIN LIEBHARD & LIFSHITZ, LLP
13    Attorneys for Class Plaintiffs
14        10 East 40th Street
15        New York, New York 10016
16        212.779.1414
17    BY:  RONALD J. ARANOFF, ESQ.
18
19    ROBINS KAPLAN MILLER & CIRESI
20    Attorneys for Assurance Plaintiffs
21        2800 LaSalle Plaza
22        800 La Salle Avenue
23        Minneapolis, MN 55402-2015
24        612.349.8500
25    BY:  ANNAMARIE DALEY, ESQ.
```

### Page 4

```
 1                LAURA KIBBE
 2    A P P E A R A N C E S (Continued):
 3
 4    DAVIS POLK & WARDWELL
 5    Attorneys for Pfizer and Warner Lambert
 6        450 Lexington Avenue
 7        New York, NY 10017
 8        212.450.4511
 9    BY:  JAMES ROUHANDEH, ESQ.
10         CHRISTOPHER ROCHE, ESQ.
11
12    SHOOK HARDY & BACON LLP
13    Attorneys for Pfizer
14        2555 Grand Blvd.
15        Kansas City, Missouri 64108-2613
16        816.474.6550
17    BY:  JANE J. BARTLEY, ESQ.
18
19
20    ALSO PRESENT:
21    Vijay Bondada, Esq., Legal Division, Pfizer, Inc.
22    Dan McClutchy, Videographer
```

Kibbe, Laura (Pfizer 30b6)  4/7/2008  9:14:00 AM

### Page 13

```
 1            LAURA KIBBE
 2   collaborative effort between Pfizer in-house
 3   counsel, Pfizer outside counsel and, you know,
 4   representatives of the business who, through a
 5   series of interviews, find out who the kind of
 6   key players, relevant folks to the litigation
 7   are.  We are not generally involved in that
 8   process on the discovery response team.
 9       Q.   But you in your position here today
10   are familiar with how those custodians are
11   determined, are you not?  In other words, if you
12   go up the chain of the entire collaborative
13   approach, is it fair to say you are familiar
14   with how it was decided?
15       A.   Specifically as to how every
16   individual custodian or noncustodial piece of
17   information was decided upon for this
18   litigation?
19       Q.   Well, doesn't have to be that
20   specific, but you can explain to me generally.
21   I am trying to get the information outside of
22   what lawyers who are not employed by Pfizer
23   decide, I want to know from inside the company
24   what was the collaborative effort that was
25   provided by people inside the company to decide
```

### Page 14

```
 1            LAURA KIBBE
 2   who would potentially have relevant information?
 3       A.   Again, that is really a legal
 4   function, it is not a business function with
 5   inside the company to have a business person
 6   decide who would not be relevant information, it
 7   is all done hand in hand with counsel in the
 8   case of a litigation.
 9       Q.   How would you expect outside counsel
10   to make a decision as to which employees within
11   the company would have the potentially relevant
12   information about Neurontin?  I say that because
13   the lawyers generally are not scientists, they
14   are not marketing, they are lawyers, like you
15   and me are lawyers, so how is it that you allow
16   outside counsel to make that determination?
17            MR. ROUHANDEH:  Object to the form.
18   Mischaracterizes the testimony.
19       A.   And I did not say that outside counsel
20   makes the determination.  It is a process by
21   which outside counsel works together with
22   in-house counsel and the business people to
23   determine that.  My team is not generally part
24   of those discussions.  My understanding is that
25   outside counsel is retained because of its
```

### Page 15

```
 1            LAURA KIBBE
 2   knowledge of either the product at issue or the
 3   general business process followed within the
 4   company, and through the series of interviews
 5   and other fact gathering efforts within the
 6   company, identify the individuals whose names or
 7   collections are then given to us for purposes of
 8   production.
 9       Q.   And understanding you are not the one
10   personally involved with the collaborative
11   effort, do you have any information that can
12   describe what were the questions at the
13   interviews, what was the process by which the
14   company decided who would have potentially
15   relevant information?
16       A.   Overall it is a key player analysis
17   identifying the various areas that the product
18   goes through, and it is life cycle and
19   individuals at each stage of that life cycle
20   that may or may not possess relevant
21   information, all filtered, obviously through
22   whether or not that particular part of the
23   product life cycle is in fact relevant to a
24   claim or defense as articulated in the
25   complaint.
```

### Page 16

```
 1            LAURA KIBBE
 2       Q.   So in order to identify the key
 3   players, was there access to an organizational
 4   chart of some kind?
 5       A.   There are organizational charts within
 6   the company.  They are not generally the first
 7   stop in identifying people who have specific
 8   roles and responsibilities.  The company is
 9   not -- they are not maintained on a regular
10   basis and updated, so it is much more effective
11   to just talk to the day-to-day business people
12   who are responsible for the product and work out
13   from there.
14       Q.   Can you identify for me any of the
15   individual key players who were questioned to do
16   the filtering as you described?
17       A.   I can't give you the names now, I can
18   tell you in general terms that over 200 people
19   were identified and contacted and collected or
20   preserved for the litigation to ultimately some
21   subset of that was ultimately produced.
22       Q.   Were there departments that were --
23   can you describe for me the structure or
24   protocol by which these 200 people were
25   questioned?  In other words, start at the top,
```

**Page 17**

1      LAURA KIBBE
2  tell me where did you begin?
3      A.   Well, again, my team did not begin.
4  Once we were given individuals' names or
5  collections of information, we sought out to get
6  them. So I again was not involved in the
7  identification. I ultimately was given a list
8  of individuals.
9      Q.   Notwithstanding your lack of personal
10 involvement, do you know how the list of 200
11 individuals was formed?
12     A.   Only that it reflected the life cycle
13 of the drug, the major areas of the drug's
14 development from clinical, regulatory,
15 marketing, safety.
16     Q.   Can you continue with any other
17 specific departments that would describe the
18 life cycle of the drug other than marketing and
19 safety?
20     A.   Well, I said clinical and regulatory.
21     Q.   Thank you. Any others?
22     A.   Well, each of those are the big
23 headings. Each of those groups have obviously
24 subsets of people working on specific areas, but
25 yes.

**Page 18**

1      LAURA KIBBE
2      Q.   Notwithstanding whatever lack of
3  personal involvement you had or your team, my
4  specific question is, did your team do any of
5  the specific filtering to determine whether
6  documents were responsive to demands, discovery
7  demands in the case?
8      A.   What do you mean by filtering?
9      Q.   Well, other than letting counsel for
10 defendant make the determination as to what
11 would be exchanged in discovery, my question is
12 did you or your team take part in making a
13 decision as to whether there were or were not
14 responsive documents?
15     A.   Well, we didn't make a decision per
16 se.
17     Q.   A recommendation?
18     A.   But with respect to the electronic
19 documents, because of the sheer volume of
20 information, as I explained before, our standard
21 process is to identify from an electronic
22 standpoint on a custodian's files all of the
23 electronic information that might be
24 attributable to that custodian.
25          All of that is gathered without

**Page 19**

1      LAURA KIBBE
2  respect to either date restrictions or search
3  terms for collection purposes. Once gathered,
4  it is then processed by our electronic discovery
5  vendor partners in order to cull down the
6  universe of potentially responsive documents.
7          Those potentially responsive documents
8  are those -- on the electronic side are the ones
9  that are then reviewed by counsel for ultimate
10 production or not in the litigation. On the
11 paper side it differs a little bit because that
12 collection is really identified through work
13 with the custodian and the entire universe of
14 the custodian's paper collection is identified,
15 is sent in to the reviewer.
16     Q.   Let's focus for one moment on the
17 electronic discovery, then. With respect to the
18 restrictions or specific terms, search terms,
19 who decided what the search terms would be or
20 the restrictions?
21     A.   The initial search terms were provided
22 to us by counsel. We then, in conjunction with
23 counsel, look at the terms as provided and
24 provide suggestions as far as turning them into
25 traditional boolean search terms.

**Page 20**

1      LAURA KIBBE
2      Q.   In terms of -- when you say "we," I
3  want to make sure -- would this have been your
4  team or a different team?
5      A.   My team.
6      Q.   Would you have also made
7  recommendations for additional terms if you
8  thought that was necessary?
9      A.   Yes, that's part of our role. If we
10 see additional terms, you know, that based upon
11 our experience might be getting to the same
12 issues that counsel is looking for, we will
13 suggest them, but the ultimate decision on what
14 terms are run is made by counsel.
15     Q.   In addition to your team and outside
16 counsel, can you describe what if any vendors as
17 third parties were also involved?
18     A.   As far as the electronic processing in
19 this case, it was all done by one vendor, SPI.
20 I think their current name is SPI Litigation
21 Technologies, Inc.
22     Q.   Did SPI make any contributions as to
23 what the boolean term should be or whether there
24 should be certain restrictions or specific terms
25 included or excluded?

## Page 21

1  LAURA KIBBE
2  A.  SPI runs queries and -- at our
3  direction as based upon our -- my team's
4  discussion with counsel.  So, yes.  SPI provides
5  objective information to us such as a hit
6  analysis, how many items are hitting on
7  particular terms.  Those reports, objective
8  reports are then reviewed in conjunction with
9  counsel and a final decision is made as to what
10 the search terms will ultimately be.
11   Q.  What about something that would not be
12 considered an objective evaluation, something
13 that would be considered a subjective
14 evaluation, did SPI do that?
15   A.  I'm not aware of anything that
16 wouldn't be totally objective in nature based
17 upon running queries or statistical percentages
18 from their systems.
19   Q.  Now, getting back to the list of
20 specific terms, whether they are restrictions or
21 boolean terms, whatever they are called, is
22 there a list that would document what terms were
23 actually utilized?
24   A.  There is.
25   Q.  Where is that list maintained?  Does

## Page 22

1  LAURA KIBBE
2  your team have a copy of it?
3   A.  Yes, my team has a copy, counsel has a
4  copy.
5   Q.  Would there be a title for that
6  document?
7       What would you call it?
8   A.  Search terms.
9   Q.  Let me ask you some questions about
10 SPI.  Do you know why SPI was chosen as opposed
11 to a different vendor?
12   A.  The company went through a vendor
13 rationalization process starting in 2004 in
14 which we did RFPs and RFIs and identified
15 technology that we thought would be useful
16 across all of our cases as opposed to engaging
17 vendors on a case-by-case basis, and as a result
18 of that RFI in 2004, SPI was selected as our
19 processing vendor, our primary processing
20 vendor, and they are still our primary
21 processing vendor today.
22   Q.  Are you able to give me the full
23 contact information for SPI, where they are
24 located?
25   A.  I don't know their street address,

## Page 23

1  LAURA KIBBE
2  but, yes, they are based out of Austin, Texas,
3  on Commerce Parkway.  And our primary contact at
4  SPI is a gentleman by the name of Chuck Kelner.
5   Q.  So as of today, what does SPI possess
6  if anything related to this litigation?  In
7  other words, do they have a hard drive of all
8  the data?  Do they have nothing?  What do they
9  have?
10   A.  The process that we follow once we
11 have collected the electronic information for an
12 individual or other collection of data, that
13 information is maintained on a lockdown server
14 within the company.  A copy is sent to SPI for
15 processing.  SPI retains that original pristine
16 copy that is sent to them.
17      They then make a copy for purposes of
18 running through the technology that was used.
19 In this case it was the Attenex Workbench
20 platform that was used to process, search and
21 cull the data.
22   Q.  Do they still have access to that
23 data?  In other words, it's still there?
24   A.  It is still at SPI.
25   Q.  So if today you wanted to run an

## Page 24

1  LAURA KIBBE
2  additional search, what would be entailed for
3  you to do that?
4   A.  Well, simply because of storage
5  constraints, it would have to be reactivated and
6  brought back on line and then an additional
7  search query could be run.
8   Q.  In the past you have provided at least
9  two affidavits in the litigation that would
10 indicate what if any expenses or burdens could
11 be associated with producing electronic
12 material.
13      Do you generally recall those
14 affidavits you provided?
15   A.  Yes.
16   Q.  So similarly, my question is here,
17 what would be the burden if any associated with
18 running any individual search term if you or
19 counsel wanted to run an additional search for
20 documents today?
21      MR. ROUHANDEH:  Objection to the form.
22   A.  The process that would be followed,
23 again, there would be a charge for bringing it
24 back on line.  There is offline, near line and
25 online storage.  Given that most of the

### 25

        LAURA KIBBE
1  production activities are over in this case,
2  many of the Neurontin custodial materials are
3  what we have called near line. So there is a
4  nominal charge to be brought back online.
5       There would be no charge for
6  physically running the additional query. The
7  charge -- the burden is involved in the export
8  of that material, the loading of that material
9  to our review platform and the ultimate review
10 of that material by counsel.
11    Q.  How much time does that take to bring
12 that back from near line to online to run that
13 search term, in other words, to upload that
14 information so that it can be sent to your
15 counsel?
16    A.  Depending on the volume of
17 information, the number of custodians who had to
18 be searched, that kind of information, if we had
19 to bring back the entire 200 custodians that
20 were collected, that would be a sizable effort
21 and might take two or three weeks. But if it
22 was one custodian it would be much quicker
23 obviously.
24    Q.  Approximately how much data does SPI

### 26

        LAURA KIBBE
1  actually possess?
2       MR. ROUHANDEH: Objection to the form.
3    Q.  In terms of whatever computer lingo
4  you want to use, how much data do they actually
5  have?
6    A.  Again, these are round numbers because
7  we have paper collections as -- that are -- that
8  have been scanned and are now electronic as well
9  as information that was originally electronic,
10 but my understanding is the starting point for
11 Neurontin was somewhere north of one and a half
12 terabytes of information on the electronic side.
13    Q.  My very basic understanding of doing
14 searches involves usually much -- software
15 that's much more basic than what you described.
16 For example, my knowledge of searching a
17 concordance database could still include that
18 much data but really just involves typing in my
19 search terms and I get the information I want in
20 minutes.
21       So why would your protocol take two
22 weeks if you are searching for certain
23 information pursuant to search terms, why so
24 long?

### 27

        LAURA KIBBE
1       MR. ROUHANDEH: Objection to form.
2    Q.  That's okay.
3    A.  That's if we had to do all 200 people,
4  because the way the electronic processes work is
5  that the information is collected, it is then
6  indexed and it sits in that repository to be
7  searched.
8       When the matter is nearing its end,
9  nearing the production end, it is not sitting,
10 to use your terms, in the equivalent of a live
11 concordance database, almost like you have to
12 get the information somewhere else, put it into
13 concordance, and then you can run the terms. It
14 is simply a matter of volume.
15      If we are talking about one custodian,
16 that could be done in a day. And I'm talking if
17 you wanted the entire collection of Neurontin
18 loaded, indexed and searched, it would take some
19 time.
20    Q.  So the time is in the upload, the time
21 is not in the actual search once the upload is
22 completed in terms of this two weeks?
23    A.  Exactly.
24    Q.  So once it is uploaded, the search

### 28

        LAURA KIBBE
1  could still take all of thirty seconds or a
2  minute or whatever it might take like it would
3  on a general concordance database?
4    A.  Exactly.
5    Q.  Where was I? Take off on a tangent
6  then it takes longer than I wanted. Give me one
7  moment.
8       Aside from the electronic data, are
9  there actually hard copy documents maintained or
10 possessed by SPI?
11    A.  SPI has the images, they do not have
12 any of the hard copy documents themselves.
13    Q.  As to the actual images, are you able
14 to approximate for me how many images we are
15 talking about that they possess?
16    A.  I can't as I sit here today, total
17 volume, no.
18    Q.  Is that part of terabyte total data
19 that you described earlier or is that mixing up
20 two totally different terms?
21    A.  It is not part of the -- north of 1.5
22 terabytes was just the electronic information.
23 The paper is a separate collection.
24    Q.  Let's go back to what I think would be

**Page 53**

                    LAURA KIBBE
 2  integrated.
 3      A.   I think you misunderstood my prior
 4  answer.  You asked me -- your question was on a
 5  server level.  Yes, all of the Warner Lambert
 6  servers were migrated into the Pfizer server
 7  environment.  If you are asking about individual
 8  mail accounts that would have been handled on a
 9  department-by-department basis as individual --
10  as employees stayed, moved, left the company.
11      Q.   Who would I go to to understand at
12  each individual department what their procedures
13  were and whether those e-mails were retained or
14  otherwise if not you?
15          MR. ROUHANDEH:  Objection to the form.
16      A.   As I sit here today I -- most of the
17  people from that era are no longer with the
18  company.  So I could not give you a specific
19  name to contact.
20      Q.   Is there any documentation that would
21  reflect what each of these departments did in
22  terms of retaining those e-mails -- or I'm
23  sorry, those paper documents from the individual
24  files?
25      A.   Not that I am aware of.

**Page 54**

                    LAURA KIBBE
 2      Q.   Who at Pfizer -- there may have been
 3  more than one person -- had the responsibility
 4  for the integration?  There may have been a
 5  department, may have been an individual, but who
 6  would be that contact person?
 7          MR. ROUHANDEH:  Objection to form.
 8      A.   I don't know.
 9      Q.   If you wanted to find out what would
10  you do to find out?
11      A.   I would have to go to each business
12  unit and find out who was on the integration
13  team at that point.  And my best guess as I sit
14  here today is that most of those individuals
15  would in fact no longer be with the company.
16          MR. FROMSON:  I want to just take five
17  minutes, do you mind?
18          MR. ROUHANDEH:  Sure.
19          THE VIDEOGRAPHER:  Going off the
20  record, the time is 11:03.  This ends tape one.
21          (Recess)
22          THE VIDEOGRAPHER:  We are back on the
23  record the time is 11:20.  This is tape two.
24  BY MR. FROMSON:
25      Q.   When you came on board with Pfizer,

**Page 55**

                    LAURA KIBBE
 2  Inc. in 2005, how did you get up to speed on the
 3  document production that was accessible for the
 4  Neurontin litigation?
 5      A.   Sometime in the summer of '04 I met
 6  with the Davis Polk attorneys who were handling
 7  the discovery at that time to see what if any
 8  further discovery needed to be done in addition
 9  to things that they had collected and produced
10  in the past.
11      Q.   What if anything did you learn at any
12  time from that point forward about the
13  difference in accessibility between Neurontin
14  documents from Warner Lambert as compared to
15  Rezulin documents from Warner Lambert?
16      A.   The standard documents that I would
17  expect, you know, to exist, the official sources
18  were in the same places in the company that the
19  Rezulin documents were.
20      Q.   So now we can get down to brass tacks.
21          MR. ROUHANDEH:  Sounds painful.
22      Q.   We are under the impression that we
23  haven't received all the documents from the
24  Warner Lambert era, and we compare based upon
25  our past experience in the Rezulin litigation

**Page 56**

                    LAURA KIBBE
 2  that there was far more documents in Rezulin
 3  than there were in the Warner Lambert period for
 4  Neurontin, and we can't possibly understand what
 5  the difference was.
 6          So why are there so few documents in
 7  comparison to what was provided in Rezulin?
 8          MR. ROUHANDEH:  Objection to the form,
 9  beyond the scope.  But I'll let you answer.
10      A.   Again, they were two very different
11  cases at the time, but a lot of the Neurontin
12  documents and the document collection that we
13  undertook beginning in late '04 into '05 and to
14  the present were being conducted for the first
15  time.
16          As I testified earlier, the prior
17  collection efforts that had been undertaken by
18  Davis Polk in conjunction with counsel were
19  focused on the sales and marketing issues, and
20  in that regard I don't think on a
21  volume-for-volume, custodian-per-custodian basis
22  that collections differ much in size from
23  Rezulin to Neurontin.
24          So I'm assuming that the scope you are
25  talking about was simply the breadth of the

**Page 57**

1      LAURA KIBBE
2  collection, and Rezulin at the time was an
3  end-to-end preclinical through post-marketing
4  collection.
5      Q.   Let's focus then on two areas, sales
6  and marketing and then science.
7           Can we delineate them like that?
8      A.   You can.
9      Q.   Would you understand what I am coming
10 from by doing that?
11     A.   Sure, I'll try.
12     Q.   All right.  What was your
13 understanding as to what had been provided prior
14 to your coming to Pfizer by the original
15 production from Davis Polk?  In other words,
16 before 2005 there was this prior collection and
17 it dealt primarily, you said, with sales and
18 marketing, right?
19     A.   That's my understanding, yes.
20     Q.   Was it your understanding that there
21 were my limitations in terms of the geographic
22 area from which this production was made?
23          MR. ROUHANDEH:  Objection to the form,
24 beyond the scope.
25     A.   My understanding prior to 2004, that

**Page 58**

1      LAURA KIBBE
2  there were specific inquiries about specific
3  marketing business units but -- I don't have the
4  specifics as to which ones, but it was -- there
5  were a couple of prior productions made on
6  behalf of the company, and what I inherited was
7  then that collection of material, produced and
8  not produced, that was put back into the funnel,
9  if you will, for purposes of responding to the
10 discovery in this litigation.
11     Q.   Was there any new sales and marketing
12 material that was assembled by you or collected
13 by you or your team outside of the sales and
14 marketing material that had previously been
15 collected and gathered?
16          MR. ROUHANDEH:  Objection to the form.
17     A.   Yes.  Several of the custodians were
18 generally on the sales and marketing side of the
19 house that were -- whose collection was
20 initiated in 2004.
21     Q.   What about -- did you have any
22 understanding that in the previous collection
23 done by Davis Polk that it involved certain
24 geographic areas, not that you might remember
25 exactly which ones, but did you have an

**Page 59**

1      LAURA KIBBE
2  understanding that the previous production
3  pertained to, for example, certain CBUs of
4  geographic areas whether it was the southeast or
5  the northeast, whatever it might have been?
6      A.   Yes, my understanding is that some of
7  the prior productions were specifically directed
8  at customer business units.
9      Q.   Do you know whether there is in the
10 possession of Pfizer, Incorporated, the
11 documents pertaining to other CBUs even though
12 they might not have been produced?  In other
13 words, are they still retained and kept?
14     A.   For purposes of this litigation, the
15 inquiry that we undertook was to take everything
16 that had been collected or assembled for any
17 purpose with respect to Neurontin on a prior
18 occasion and, as I said, put it back into the
19 funnel.
20          We then undertook separate efforts to
21 do additional collection, and I don't recall as
22 I sit here today whether or not specific
23 documents were identified.  I can tell you that
24 any documents maintained by a CBU that were
25 still in existence would have in fact been

**Page 60**

1      LAURA KIBBE
2  within the scope of what we were looking for.
3      Q.   I guess what I am trying to figure out
4  is, are there documents from other CBUs that are
5  maintained as part of the retention policy but
6  that have not yet been provided for whatever
7  reason, whether they haven't been ordered to be
8  provided, whether they haven't been sought in
9  discovery?  Do you have any information from
10 other CBUs?
11     A.   Specifically with respect to a CBU I
12 can't tell you as I sit here today.  As I
13 explained our process earlier, we identified
14 individuals, we then identified collections of
15 documents.  All of that information was sent in
16 to the review room.
17          What was ultimately produced was a
18 decision made by the attorneys.  I can tell you
19 that the search was exhaustive, the search was
20 not limited by any geographic area, any CBU, any
21 part of the company.  It was undertaken
22 beginning in 2004.
23     Q.   Do you have any type of list that --
24 is there a list that indicates the identities of
25 the custodians from whom you searched for these

Kibbe, Laura (Pfizer 30b6)  4/7/2008  9:14:00 AM

**77**

1  LAURA KIBBE
2  your understanding that these would be
3  communications that are not part of the new drug
4  application but would include communications
5  between individuals?
6     A.   Not at all.
7     Q.   Let me explain what I am getting at.
8  I am just trying to find if I can any of the
9  communications between employees that might not
10 fall under any individual custodial file, again,
11 because, as I explained earlier, we don't have
12 communications in terms of e-mails because they
13 may not have been saved because there was no
14 legal hold in accordance with your
15 understanding, so we are trying to find
16 communications between Warner Lambert employees
17 in the early stages of the new drug application
18 through the nineties that would talk about
19 Neurontin and safety issues and
20 pharmaco-vigilance issues.
21    Where can we find those?
22    MR. ROUHANDEH:  Objection to the form.
23    A.   Well, again, if you are talking
24 specifically about communications, if they were
25 not saved they wouldn't exist anywhere.  There

**78**

1  LAURA KIBBE
2  is no way to pull out random communications
3  about Neurontin.  You have to identify the
4  custodian whose mailboxes or group of custodians
5  that you are looking for, pull those mailboxes
6  and run search terms.
7     When you see a Bates prefix reflecting
8  a department, those reflect either on the
9  electronic side a group share where documents
10 existed but were not attributable in their
11 ordinary course of business to a particular
12 custodian, or paper documents that were found in
13 the possession of that group, again, not
14 attributable to a particular custodian.
15    Where possible, to reflect the
16 ordinary course of business, maintenance of the
17 documents, we always try and reflect them back
18 unless they are a collection like a new drug
19 application to the custodian who may or may not
20 have possessed them.
21    Q.   What happened to documents that were
22 in existence despite the fact that there was no
23 legal hold for nonsales and marketing documents
24 but which were possessed by custodians who
25 didn't make the move from Warner Lambert to

**79**

1  LAURA KIBBE
2  Pfizer, in other words, they didn't survive the
3  merger, were those documents saved, were they
4  retained or were they destroyed?
5     MR. ROUHANDEH:  Objection to the form.
6     A.   Well, as I explained earlier, the
7  process at that time was to move -- for an
8  individual to move any documents that they were
9  working on that needed to be retained per the
10 retention policy to the official source or long
11 term storage.
12    Anything else that the individual had
13 was deemed a convenience copy and not necessary
14 to be saved.  It was either destroyed or
15 recycled if it was electronic or --
16    Q.   So hypothetically speaking, if an
17 employee named Drusilla Scott left Pfizer,
18 right, and we are told there is no custodial
19 file at all -- I just don't understand how could
20 there be no custodial file for a person who was
21 working on Neurontin after the integration and
22 for which there should have been some type of
23 legal hold by 2000 and there is nothing.
24    Is that -- can you even -- have you
25 even -- first I have to ask the question -- that

**80**

1  LAURA KIBBE
2  was my long colloquy -- but why is it that we
3  have nothing from a custodian like Drusilla
4  Scott?
5     MR. ROUHANDEH:  Objection to the form.
6  I think it mischaracterizes the documents and
7  the records.
8     MR. FROMSON:  That's fine.  It got my
9  point across, barely.
10    MR. ROUHANDEH:  That will be --
11    MR. FROMSON:  Still get an answer that
12 will make sense to me.  I am baffled by the fact
13 that I am missing custodial files in totality
14 like Drusilla Scott's.
15    A.   As I explained, if the individual at
16 the time of integration left the company and
17 there was no legal hold on material that
18 otherwise would not be required to be kept per
19 the retention policy, company policy would be
20 from an electronic standpoint to recycle the
21 computer and reissue it.
22    And from a paper standpoint, the usual
23 practice was most often that the custodian would
24 turn over their paper files to the colleague who
25 was either assuming their job or they would be

**Page 81**

1             LAURA KIBBE
2   destroyed, as I said, if they were convenience
3   copies.
4       Q.   So does it really all boil down to the
5   fact that if there was no legal hold for
6   anything other than sales and marketing, then
7   anything other than sales and marketing as far
8   as e-mails just wouldn't have survived the
9   integration?
10      MR. ROUHANDEH:  I think that
11   mischaracterized the record as well.
12      A.   I think your generalization as to
13   e-mail is -- was incorrect.  If there was an
14   e-mail, document retention policy in the legal
15   hold were not media specific.  So if the
16   document was a memo versus an e-mail versus
17   anything and it was required to be held either
18   per the retention policy or because there was a
19   legal hold in place, it would have been dealt
20   with depending on technology in a way to
21   maintain the document.
22      If there was no hold, yes, it would
23   have been -- it could have been destroyed or
24   recycled.
25      (Kibbe Exhibit 4, One-page document

**Page 82**

1             LAURA KIBBE
2   dated 3/26/2006 addressed to Jill Bruzga from
3   Douglas Kargman, marked for identification)
4   BY MR. FROMSON:
5      Q.   Take a look at Exhibit Kibbe 4.  I'll
6   represent to you that this document was provided
7   to us by defense counsel, that it is purportedly
8   an e-mail from Douglas Kargman to Jill Bruzga,
9   and it is copied to Teresa Griesing and Pierre
10   Raillard.
11      Do you see that on the top of the
12   document in terms of the addressees?
13      A.   I do.
14      Q.   We have not been provided with the
15   custodial files of Teresa Griesing or Pierre
16   Raillard but yet -- or Jill Bruzga, and I'm just
17   trying to understand why that's the case when we
18   received Douglas Kargman's custodial file.
19      Can you explain why Pierre Raillard
20   and Teresa Griesing were excluded?
21      MR. ROUHANDEH:  Objection to the form.
22      A.   I think as you can appreciate with the
23   communication ability in e-mail, there are lots
24   of people cc'd on various communications.  And
25   as I explained earlier, while in excess of 200

**Page 83**

1             LAURA KIBBE
2   people were identified as possibly having
3   relevant information and preserved, not all of
4   those 200 were in fact produced.
5      My understanding through the course of
6   the litigation is there have been several
7   attempts at agreeing on the scope of the
8   production and the various lists.  Our goal is
9   to identify individuals who might have relevant
10   information and to work with counsel to
11   determine which of those should be produced.
12   Counsel ultimately makes that decision.
13      Q.   Do you have anything in writing or a
14   document to which you can refer that would have
15   indicated a limitation on the individuals from
16   whom you should recover documents that you
17   deemed responsive?
18      MR. ROUHANDEH:  Objection to the form.
19      A.   No, as I said earlier, we had no
20   limitations in the scope for our search efforts
21   with the 2004 efforts.
22      Q.   I'm only referring to the statement
23   that you believe there were agreements between
24   counsel in this case to limit the scope of
25   individuals.  So my question is, do you have any

**Page 84**

1             LAURA KIBBE
2   proof of that?
3      A.   No.
4      MR. ROUHANDEH:  Objection to form.
5      A.   I am aware that more information was
6   preserved than was produced which is
7   commonplace.
8      Q.   What would have been the reason to
9   exclude Pierre Raillard or Teresa Griesing?
10      MR. ROUHANDEH:  Objection to the form.
11      A.   I did not make any production
12   decisions so I couldn't comment on that.
13      Q.   Who made the production decisions and
14   who can comment on that?
15      MR. ROUHANDEH:  Objection to form.
16      A.   As I explained earlier, all of the
17   documents were reviewed for production and
18   production decisions were made by counsel.
19      Q.   So counsel directed you as to which
20   custodians to produce?
21      MR. ROUHANDEH:  Objection to the form.
22   That was asked and answered.  Mischaracterizes
23   the testimony.
24      A.   Yes, counsel made production
25   decisions.

**Page 89**

LAURA KIBBE

produce that database in terms of your team's ability to collect it, upload it and exchange it?

A. It requires the same effort of any database. It is not something my team can do themselves. The database administrator who maintains the database is the person who would do the export for us. That export would then be given to the team and my team would work with counsel to make the export available for review as with all of the other databases.

Q. In terms of your understanding of the electronic discovery requirements in terms of -- withdraw that.

In terms of your understanding of the burden if any that would be associated with actually producing it, tell me what if any burden there would be, how long would it take, what would it cost?

A. I would have to look at -- I would have to make the specific inquiry of the database administrator, find out how large the database is. It would be a -- any cost would be comprised of a certain portion of the database

**Page 90**

LAURA KIBBE

administrator's time. It is not a task that a vendor can be brought in to do if you are not the person who maintains the database. They wouldn't be able to do the export. That person would have to develop an export script.

Once the data was exported it would have to be given to our electronic discovery vendor to put in a form where it could be reviewed, and then, of course, you have the review cost.

Q. In the Warner Lambert era, was there a department responsible for regulatory affairs specifically, did it have a name or title?

A. Yes.

Q. What was the name of it?

A. I believe it was called regulatory affairs.

Q. Where were the noncustodial regulatory documents placed during the integration?

A. Depending on the product, most of the information was stored between the Ann Arbor campus and the New Jersey campus.

Q. Where does that information exists now?

**Page 91**

LAURA KIBBE

MR. ROUHANDEH: Relating to Neurontin?

MR. FROMSON: Of course. Everything here relates to Neurontin, except I did --

MR. ROUHANDEH: All that stuff about Rezulin --

MR. FROMSON: -- make some comment as to Rezulin and that's all in the past.

Q. Where are these documents now?

A. Many of the regulatory central file-type documents, for example, the NDA are maintained in our Pfizer records service center in Kalamazoo, Michigan.

Q. Excluding your formal new drug application documents, what about the noncustodial paper communications if any that were saved, where are those kept?

Only because -- I am not so much interested in seeing what the new drug application formal documents sent to the FDA. We have it. I don't have the communications between the individuals or any projects that might have been done on a collaborative basis between individuals and regulatory affairs. I don't have them.

**Page 92**

LAURA KIBBE

So if they exist, where would they be kept?

A. They would be either with the custodian or in the Pfizer records service center which is our offsite storage location, kind of our internal Iron Mountain, if you will.

Q. Where is that located?

A. Kalamazoo, Michigan.

Q. Is there an index available for those documents assuming they even exist?

MR. ROUHANDEH: What are the "those documents"?

BY MR. FROMSON:

Q. The documents would be the documents that would be in Kalamazoo, Michigan, this offsite facility, and which pertained specifically to noncustodial documents, and excluding formal new drug application documents. Would there be an index for that?

MR. ROUHANDEH: These are regulatory affairs documents relating to Neurontin?

MR. FROMSON: Correct.

A. No.

Q. Have you ever heard of an expression

### Page 93

                    LAURA KIBBE

 1    box level when you are describing a group of
 2    documents that are maintained?
 3        A.   Yes.
 4        Q.   Is there any such box level
 5    description for these types of records that
 6    would be in Kalamazoo, Michigan?
 7        A.   I wish.  The easiest way to describe
 8    that is garbage in, garbage out.  There is a
 9    system obviously to track the whereabouts of
10    particular boxes.  That content-level
11    description that you are asking about is not
12    systematically and has not in the history of the
13    company been systematically maintained in a
14    particular format, so it was up to each
15    individual custodian choosing to send records
16    offsite as to what they called the individual
17    contents.
18           So I can run a query against that
19    system, but it is only as good as whatever the
20    individual custodian chose to label the contents
21    of the box.
22        Q.   So there is a database that would
23    allow you to run a query for that group of
24    documents in Kalamazoo?

### Page 94

                    LAURA KIBBE

 1        A.   There is a database that allows me to
 2    run a query of all documents in Kalamazoo, yes,
 3    and that in fact that query was done for
 4    purposes of collection and preservation in this
 5    case.
 6        Q.   Is there a name for that database?
 7        A.   The current database is called
 8    Preserve.
 9        Q.   For how long have these documents --
10    my understanding is that there were documents in
11    New York for a period of time to which we had
12    access, and we came and visited and looked at
13    documents.  There were also some documents
14    available in Ann Arbor, Michigan, and we
15    traveled out to Ann Arbor, Michigan, and looked
16    at documents.
17           Someone can correct me if I'm wrong,
18    but I don't believe anybody was invited to
19    Kalamazoo to look at any documents.  Am I wrong?
20        MR. ROCHE:  You are wrong.
21        MR. FROMSON:  All right.
22        Q.   So these documents that are in
23    Kalamazoo, are they also in the possession of --
24    is it IPS?  Is that the name -- SPI.

### Page 95

                    LAURA KIBBE

 1        Q.   Are these documents in SPI's data?
 2        A.   No, I don't think you are
 3    understanding how the process works.  You were
 4    given access to particular categories of
 5    documents that were at one point housed in
 6    either Ann Arbor or New York.  As part of the
 7    company's effort to streamline its offsite
 8    storage locations, all of the documents that
 9    were in those locations as truly offsite storage
10    were moved to Kalamazoo for storage.
11           As part of our collection efforts in
12    this case we queried the database that manages
13    those records to find out first with respect to
14    individuals whether they -- individuals had sent
15    any particular boxes to storage, but also in a
16    broader context for any boxes that might relate
17    to Neurontin.
18           To the extent, as I explained, the
19    querying is somewhat artificial at best, any
20    doc -- any boxes that hit on a query were then
21    reviewed by our counsel to see if they were in
22    fact responsive, if, you know, the box
23    description was in any way accurate.  If any of
24    them were they were fed into the reviewer as

### Page 96

                    LAURA KIBBE

 1    part of our production efforts excluding the
 2    large -- the NDA, the IND.
 3        Q.   Under this umbrella of regulatory
 4    documents in Kalamazoo, can you tell me what
 5    other departments would be included?  For
 6    example, I don't need to itemize for you, would
 7    safety surveillance documents have been there?
 8    Would clinical documents have been there?  You
 9    can just tell me yourself, what would be
10    encompassed by these documents in Kalamazoo in
11    terms of the noncustodial, non-NDA formal
12    documents?
13        MR. ROUHANDEH:  Objection to the form.
14        A.   Well, again, it is limited by -- my
15    ability to answer that is limited by the index,
16    the database that can be queried.  That is our
17    official offsite storage location.  Whether it
18    was utilized, if documents do exist or not, all
19    I can do is run a query and say of all of the
20    boxes there, do any of them have in their
21    contents description Neurontin, etc.
22        Q.   Let me give you an example of
23    something I would be looking for.  In this
24    litigation on or about April 1st, 2008, we were

### 121

 1              LAURA KIBBE
 2     Fromson said it earlier: I'm assuming Drusilla
 3     Scott is one of those custodians.
 4         Q.   Well, let me see if I can refresh your
 5     memory.  Was George Kavik's name on that list?
 6         A.   I don't recall as I sit here today.
 7         Q.   What about John Rector?
 8         A.   I don't recall.
 9         Q.   Christie Simone?
10         A.   I don't recall specific names.
11         Q.   Do you have a copy of this list of
12     individuals for whom you looked for files but
13     couldn't find them at your offices at Pfizer, is
14     that correct?
15         A.   Yes.
16         Q.   Does your counsel have that list as
17     well?
18              MR. ROUHANDEH:  Objection, asked and
19     answered.
20         A.   Yes.
21              MS. DALEY:  Mr. Rouhandeh, we would
22     ask that that list also be provided.
23              MR. ROUHANDEH:  I think she said it is
24     the same list.  Maybe I'm wrong.  We don't need
25     to waste time with it, but the request is noted.

### 122

 1              LAURA KIBBE
 2     BY MS. DALEY:
 3         Q.   If I look at the list of custodial
 4     files that you searched, is there an
 5     identification on that list of whose files you
 6     could find and whose files you couldn't find?
 7         A.   The custodian list that I referenced
 8     before includes everybody who was looked for,
 9     yes, and we separate them by those whom we found
10     documents and those whom we didn't.
11         Q.   We don't have the document here today,
12     so I have to ask you questions about how this
13     document is set up.
14              So the document identifies files that
15     you found and then files that you were unable to
16     find, is that correct?
17              MR. ROUHANDEH:  Objection to form.
18         A.   Perhaps the word "document" is
19     mischaracterizing my testimony.  It is my
20     official work product.  It happens to be kept in
21     a database so it is a report that is run.  It is
22     not a specific document, it's a living document
23     as discovery is ongoing and custodians are
24     identified by you all and we are asked to look
25     for them that are added to the list.

### 123

 1              LAURA KIBBE
 2              But, yes, it is a document that shows
 3     anyone who was ever identified when it is
 4     printed of who was looked for in the -- for
 5     documents in this litigation.
 6         Q.   Does this document identify whether
 7     you were able to find a file or the custodial
 8     file or documents for a particular individual?
 9         A.   It could.  It is in a database as I
10     said.  So it matters what kind of report I run.
11         Q.   So you can run a report which
12     identifies the names of individuals for whom you
13     searched for their files and were unable to find
14     anything, is that correct?
15         A.   Yes.
16         Q.   What is your understanding of the
17     departments that the sales and marketing
18     personnel worked in?
19              MR. ROUHANDEH:  Objection, vague and
20     ambiguous.
21         A.   I'm not sure what you mean by
22     departments.
23         Q.   Well, or divisions or CBUs, whatever
24     term you want to use.  You have talked about
25     that the sales and marketing was the focus of

### 124

 1              LAURA KIBBE
 2     the legal hold and I want to understand where
 3     those individuals who would have generated sales
 4     and marketing documents, where they would have
 5     worked?
 6         A.   Well, in the Legacy/Warner Lambert era
 7     as well as the Pfizer era our sales and
 8     marketing activities as a company are broken up
 9     between the corporate-type activities and the
10     field activities.
11              So to the extent you referenced a CBU,
12     that would be one of the field representative
13     locations.  We don't call them -- actually I
14     guess as of last month we do call them CBUs
15     within Pfizer, again.  But marketing
16     territories, marketing units, but then there is
17     all of the corporate sales and marketing folks
18     who do things like the operating plans and other
19     various post-marketing -- as far as the drug
20     development cycle, the post-marketing
21     activities.
22         Q.   If you can turn to Kibbe Exhibit 2 it
23     is a memo from Mr. deVink.  Do you see that?
24         A.   Yes.
25         Q.   Was there an effort to determine