UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-----------------------------------------------------------x
                                              :    MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                  :
        SALES PRACTICES AND                   :    Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION         :
                                              :    Judge Patti B. Saris
-----------------------------------------------------------x
                                              :    Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                     :
                                              :
PRODUCTS LIABILITY ACTIONS                    :
                                              :
-----------------------------------------------------------x
```

## DECLARATION OF KEITH L. ALTMAN

I, Keith L. Altman, Esq. declare as follows:

1. I am an attorney employed by the firm of Finkelstein & Partners, LLP. My business address is 1279 Route 300, Newburgh, NY 12551. I have been working on the Neurontin matter since the fall of 2003 and have been the individual responsible for the receipt of the document productions from Pfizer on behalf of the products liability plaintiffs in both the MDL and the New York Coordinated Litigation. I am the founder and co-chair of the AAJ electronic discovery litigation group. Furthermore, I am a member of The Sedona Conference Working Group One on electronic discovery. I have personal knowledge of all aspects of this declaration and if necessary, I am prepared to demonstrate these facts to the court.

2. On October 19, 2009, and subsequent to this Court's Order of October 14, 2009, I participated in a meet and confer with defense counsel concerning the order. At the meet and confer, Plaintiffs requested information from defense counsel

concerning custodians and other sources of material relevant to the order in an attempt to minimize the defendants burden complying with the order. Despite these attempts, defense counsel refused to provide any meaningful information that would have been of assistance. Instead, Defendants looked to Plaintiffs to provide concessions concerning responsive materials in a vacuum.

3. For example, one of the key questions currently in the litigation is as to why there was a difference between the briefing materials provided by the company to the FDA and that of Defendants' litigation, Robert Gibbons. Plaintiffs wished to know the names of the individuals that were responsible for the development of the briefing materials. Defendants were unwilling to identify any such individuals and simply offered the files of Dr. Christopher Wohlberg. Dr. Wohlberg is not a statistician and it is unlikely that he was solely responsible for this document.

4. Had Defendants been forthright with information concerning sources of materials responsive to the courts order, Plaintiffs would have worked to minimize the burden of production. Instead, Plaintiffs were forced to rely upon Defendants assurances that appropriate materials would be produced.

5. As to the alleged burden of production of responsive materials, I have reviewed the Declaration of Ronke Ekwensi submitted by defense counsel. On its face, the Declaration provides little, if any, meaningful information concerning the burden of complying with the courts order.

6. First, it is unknown how many custodial files are truly in play since Defendants have refused to provide any meaningful information on the responsive sources.

7. Next, there is the blanket assertion concerning how difficult it is to collect and review documents. I have reviewed the testimony of Laura Kibbe from her deposition dated April 7, 2008. In the deposition, Ms. Kibbe testified that documents were collected from over 200 custodians. I have reviewed the document production and documents were produced from approximately 100 custodians. Therefore, there are on the order of 100 custodial files which were not produced. According to the testimony, it would not be difficult to load the remaining custodians and search for responsive files. Furthermore, it is unclear if Pfizer continued to collect documents from custodians after the close of discovery in 2007. If so, then much of the cost associated with the production may be obviated.

8. Next, there is the assertion that each custodian would have 650,000 pages of materials to review on average. Even if that were so, and it is nothing more than pure speculation, that says nothing about the materials that would be responsive to keyword searching. The Declaration suggests that each page would be reviewed for responsiveness, but this is not how Pfizer has produced documents in the past. After appropriate custodians were identified, keyword searches were run on the resulting material and only upon this final collection was a review performed. As Ms. Kibbe testified, running searches on the materials is a trivial task. If Defendants were really interested in providing the court with meaningful information on the burden, then they could have provided an accurate count of how many pages of documents satisfy the keyword queries already in use. Absent this information, there is no ability to test the accuracy of Defendants' estimate.

3

9. A review of the document production thus far shows that few custodial files exceeded 50,000 pages and that assumes all of the materials would need to be produced from scratch. Since the Court's Order was limited to just those materials not previously produced, one would think that the amount of material would be far less than that.

10. The suggestion that it would take more than 2750 hours to review the purported production as described in the declaration has no basis. Furthermore, according to the Declaration, this does not include the cost of a privilege review. It is inconceivable how it could take that many hours to simply review for responsiveness a collection of materials that will already have been searched for keywords such as "Neurontin" and "suicide".

11. As to the question of privilege review, Pfizer's document production is very sophisticated, and it is likely that searches could be run that would narrow the range of materials that would need to be reviewed for privilege. In addition, the newly enacted Fed. R. Evid. 502(d) could be used to provide that production of a privileged document would not constitute a waiver. This rule was implemented for precisely the reason Defendants complain of- to reduce the cost of privilege review.

12. A further review of the Declaration does not reveal that Defendants are claiming that the materials in question are inaccessible or that it would be difficult to collect.

13. On its face, the Ekwnsi Declaration is nothing more than unsupported assertions of burden in producing materials that will by definition be responsive to the

Court's Order. Furthermore, Defendants have taken no reasonable steps to minimize any burdens of complying with the Court's Order.

14. Subsequent to the Courts Order directing the parties to meet and confer on the scope of production in compliance with the Court's October 14. 2009 Order, Defendants have refused to have any meaningful discussions concerning the scope. Defendants represented that they would comply with the Court's Order but refused to provide any details.

15. In December, 2009, Defendants produced approximately 18,000 pages of documents from the files of Christopher Wohlberg. At the time, it appeared that the production was incomplete. I contacted Defendants who confirmed that the production was not complete and that more documents would be produced.

16. In mid January 2010, Defendants produced approximately 150,000 additional pages from the files of Christopher Wohlberg. The production appeared to be defective in that many e-mails were missing attachments. Furthermore, it appeared that in this wave of the production, all of the documents redacted by Defendants were produced consecutively out of order from where they were maintained. I contacted Defendants on February 16, 2010, to raise these problems. Defendants stated they would look into the problems, but did confirm that the redacted documents were separated from where they originally were maintained. In effect, this makes the review of the documents far more difficult.

17. Also in mid January, Defendants produced some 50,000 pages for the *Shearer* case comprising of materials referencing Dr. Keith Edwards. Based upon my review of these materials, it would appear that these documents did satisfy the

5

Court's Order with respect to the Edwards documents. I would add, though, that Defendants produced documents that had been previously produced instead of simply identifying the bates numbers of already produced documents. It also seems that there are documents from custodians from which Plaintiffs had previously received productions with dates that were prior to the discovery cut-off. Without substantial effort, Plaintiffs can not determine whether these documents had been produced in the past, but it certainly makes me concerning about the adequacy of Defendants' previous production. I asked Defendants why these documents had not been produced in the past, and Defendants were not able to confirm that they had been previously produced, or if not, why.

18. I attended the deposition of Laura Kibbe, Defendants' Rule 30(b)(6) witness, on records retention issues. In this deposition, Ms. Kibbe represented that more than 200 custodians had files collected by Defendants and that she had a list of both the custodians and the search phrases that were used to locate responsive documents. As of the time of this Declaration, files from approximately 100 custodians have been produced. At no time have Plaintiffs ever been informed as to which custodial files Pfizer has in its possession. Ms. Kibbe indicated that such information was maintained in a database and thus could easily be provided to plaintiffs.

19. On March 1, 2010, I participated in a conference call with Defendants' attorneys, Mark Cheffo and Catherine Stevens, to discuss compliance with the Court's October, 2009 order. On the call, I was told that with respect to the order on Wohlberg's reliance materials, Defendants would not produced documents from

any other custodian that Wohlberg unless Plaintiffs were willing to agree to cost-shifting. I pointed out that there were other important individuals with responsive materials as I had during the October meet and confer, but was told that no such files would be produced and that Wohlberg's files that had been produced were adequate.

20. As to the remainder of the Court's Order, I was told that Defendants had not even searched for responsive materials and would not do so unless Plaintiffs agreed to cost-shifting. To date, other than documents that may have been in the possession of Wohlberg, no documents have been produced in compliance of the Court's Order to produce documents on the 2009 labeling change or safety and efficacy documents not already produced.

21. On March 18, 2010, I was informed for the first time by Defendants' counsel Catherine Stevens that due to a vendor error, there were 2,000,000 pages of Wohlberg documents that had not been produced. These documents were attachments to documents which had already been found to be responsive and were produced. I was told that Defendants had no intention of producing any of these materials unless Plaintiff's identified which documents, already determined by Defendants to be responsive, Plaintiffs wanted.

Signed under the penalties of perjury this 19th day of March, 2010.

Dated: March 19, 2010

/s/ Keith L. Altman
Keith L. Altman

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 19, 2010

Dated: March 19, 2010

/s/ **Andrew G. Finkelstein**
Andrew G. Finkelstein