UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

# KAISER'S RESPONSE TO JUDICIAL REQUEST REGARDING INDICATION-SPECIFIC SUPPRESSION EVIDENCE

862935.1

I.      **INTRODUCTION**

On Friday, March 19, 2010, the Court asked Kaiser to submit a brief juxtaposing—for each indication—(a) "when did [Defendants] first speak in a way that connects [Neurontin] to the national marketplace," and (b) "when do they first suppress something so that that's a violation?" Day 18 Tr. 219:3-220:7. Accordingly, Plaintiffs hereby respectfully submit the following summary of Defendants' representations and suppression of negative data for each indication.

II.     **INDICATION SUMMARY**

   A.      Bipolar and other Mood Disorders

Defendants knew no later than July 1994 that Neurontin did not provide any improvements in mood compared to placebo in clinical trial data from five double-blind randomized clinical trials ("DBRCTs"), and to the contrary was associated with a worsening in mood. (Furberg Test., Day 13 Trial Tr. at 65 – 67; Trial Ex. 207 at 114). Specifically, Defendants were aware of the FDA's findings that "depression, while it may be not an infrequent occurrence in an epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts." (Furberg Test., Day 13 Trial Tr. at 69; Trial Ex. 207 at 117). Additionally, Defendants also knew at the time of the May 1995 Marketing Assessment for bipolar disorders that there was a "lack of scientific rationale" for using Neurontin as a mood-stabilizer "since Neurontin has a different mechanism of action than the mood-stabilizing antiepileptics." (Trial Ex. 4 at WLC_FRANKLIN_000017645).

Despite this knowledge, Defendants marketed Neurontin as a favorable treatment for bipolar through a variety of means beginning in late 1995 and early 1996. This marketing included numerous pre-scripted teleconferences on bipolar, where speakers were instructed by Parke-Davis to discuss: "What led you try Neurontin in the first place," "How Neurontin evolved

862935.1                                                -1-

into a first-line therapy option in your practice," and "Success" obtained from Neurontin. (Trial Ex. 2096 at 0002194). The outline did not include any reference to the negative findings of the FDA or the lack of scientific rationale. In August 1996, Defendants' employees published an article about "Effect of Gabapentin (Neurontin) on Mood and Well-Being in Patients With Epilepsy" ("the Dimond Article"). (Trial Ex. 1158). The Dimond Article falsely reviewed the exact same DBRCTs as the FDA review from 1992 and yet made no mention of the FDA's negative findings about treatment-related worsening of mood of patients taking Neurontin over placebo. Instead, the company employees falsely stated that: "present data suggest a beneficial effect of gabapentin on mood…Further, preliminary data from an epilepsy trial using the Profile of Mood States show reduced anxiety, depression, and hostility in patients on gabapentin." (Trial Ex. 1158). Parke-Davis sent Kaiser a copy of the Dimond Article in response to an inquiry on Neurontin. (Trial Ex. 301 at KAIS-041051-53).

      B.     <u>Neuropathic Pain</u>

In 1997, Defendants learned the negative results of a study conducted by Dr. Ken Gorson evaluating Neurontin's efficacy in diabetic peripheral neuropathy. (Trial Ex. 19). That study showed that Neurontin was no different than placebo for three out of four endpoints, and for the fourth endpoint there was only a "trend" towards improvement, without statistical significance. (Trial Ex. 19 at WLC_FRANKLIN_0000100279). Although the first manuscript was sent to Defendants in August 1997, there is sufficient evidence to infer that the results were known months sooner, as Dr. Gorson's cover letters states: "I am sorry it took so long (I was hoping to have it done by early summer) but I got delayed with another time-sensitive project and my data-entry person and statistician wet on long vacations." (Trial Ex. 19).

Despite knowing the negative results of the Gorson study, Defendants began a national marketing campaign to market Neurontin as an effective treatment for neuropathic pain beginning in June 1997 at a symposium held in conjunction with the 57th Annual Meeting of the American Diabetes Association.  (Trial Ex. 15 at WLC_FRANKLIN_0000120369).  At that national meeting, Cline Davis & Mann (CDM) assisted the Defendants in developing and presenting "pre-written questions" in order to get the speaker to address "some of the positive aspects of anticonvulsants and Neurontin."  (Trial Ex. 43 at WLC_FRANKLIN_000079751).  Afterwards, a "CME Case Study Series" mailer, which included "two positive AED case studies and one specific to a positive experience with Neurontin," was sent to all attendees.  (Trial Ex. 37 at WLC_FRANKLIN_000080507; Trial Ex. 58 at WLC_CBU_177149).  In neither the CME meeting nor the CME Case Study Series mailer that followed was there any disclosure of the negative results of Dr. Gorson, or even the mere existence of his study.  In fact, the CME Case Study Series mailer stated that "gabapentin relieves pain in 75% of patients with a 40% reduction…" (Trial Ex. 3 at WLC_FRANKLIN_0000195502).  In November 1997, Defendants also mailed an article published in a supposedly legitimate journal called "Internal Medicine" to 56,000 physicians in the country.  (Trial Ex. 40; Trial Ex. 58 at WLC_CBU_177149).  According to Dr. Perry, this supplement was "an advertising vehicle," as the journal was either non-existent or unknown at the time.  (Perry Test., Day 7 Trial Tr. at 35).  The "Internal Medicine" supplement stated: "Gabapentin can be used as a first-choice anticonvulsant, added as a second agent, or reserved for cases in which carbamazepine and phenytoin have been unsuccessful," and makes no mention of the negative results of the Gorson study.  (Trial Ex. 40 at WLC_FRANKLIN_0000080464; Perry Test., Day 7 Trial Tr. at 38).

In addition, Dr. Gary Mellick, a Parke-Davis consultant, began publishing case studies in January 1995, proclaiming the efficacy of Neurontin in treating reflex sympathetic dystrophy ("RSD"). (Trial Ex. 23; Trial Ex. 24; Trial Ex. 25; Trial Ex. 27; Trial Ex. 1134; Trial Ex. 1156; Trial Ex. 2074). RSD can be classified in some areas as neuropathic pain and in others as nociceptive pain. (Millares Test., Day 9 Trial Tr. at 51; Trial Ex. 322) (1997 Kaiser monograph explaining that "[i]nflammation following surgery, infection, lacerations with swelling, burns, frostbite and degenerative joint disease, compression and arthroscopy have been linked as potential causes of RSD."). (*See also* Perry Test., Day 6 Trial Tr. at 142) (giving examples of nociceptive pain). In September 1997, Kaiser's chiefs of anesthesiology in Southern California requested a review of the available evidence on RSD. (Millares Test., Day 9 Trial Tr. at 50). Kaiser's DIS performed a literature search and retrieved two of the Mellick case studies. (Millares Test., Day 9 Trial Tr. at 50 – 52). Based on DIS's monograph, the P & T committee voted to expand the formulary so that Neurontin then could be used for RSD by pain physicians and anesthesiologists. (Millares Test., Day 9 Trial Tr. at 52; Trial Ex. 322 at nn.6-7) (citing Mellick articles as basis for recommendation to expand the formulary for gabapentin to include anesthesiology). However, the P & T committee at that time was unaware of Dr. Mellick's financial relationship with the Parke-Davis or that this financial relationship was being investigated by the FDA. (Millares Test., Day 9 Trial Tr. at 55– 56; Trial Ex. 23; Trial Ex. 27; Trial Ex. 87; Trial Ex. 2096 at WLC_FRANKLIN_0000200002). Had the committee been aware of these facts, Ms. Millares testified that "we probably would have totally disregarded these studies." (Millares Test., Day 9 Trial Tr. at 57 – 58).

David Franklin also testified that management provided medical liaisons with printed case reports, including the Mellick case reports, for use in convincing physicians to "put the next

-4-

patient on [Neurontin]." (Franklin Test., Day 15 Trial Tr. at 49 – 50, 64 – 65). This was standard practice around the country to enable off-label detailing. (Franklin Test., Day 15 Trial Tr. at 64 – 65).

    C.    <u>Migraine</u>

Defendants knew since June 1990 that the results of 879-200, a DBRCT studying Neurontin as a treatment for migraine prophylaxis, showed "no statistically significant difference" between Neurontin and placebo for its two primary endpoints. (Trial Ex. 374 at ii). The company also knew by July 1996 that: "There is no established preclinical rationale that would support that use of Neurontin in migraine prophylaxis." (Trial Ex. 216 at 20). By January 1999, Pfizer knew that the results of two additional studies, 945-217 and 945-220, were also negative and that "no statistically significant differences were seen at any study period between the placebo and Neurontin." (Trial Ex. 396 at v; Trial Ex. 397 at v).

In June 1999, Parke-Davis launched a multimedia educational program on Neurontin and migraine entitled "Advances in the Preventative Treatment of Migraine." (Trial Ex. 80). Program materials were mailed to 20,000 neurologists and primary care physicians. (Trial Ex. 99). At least 3,000 summary monographs were distributed. (Trial Ex. 97). Parke-Davis also distributed audiocassettes prepared by Ninan Mathew and provided an (800) number where callers who could not participate in the above heard a condensed version of the Mathew audiotape edited by the medical marketing firm Cline Davis & Mann. (Trial Ex. 97). Parke-Davis correctly recognized that: "the monograph <u>very favorably</u> mentions Neurontin." (Trial Ex. 93) (emphasis in original). The monograph claimed that Neurontin "has been shown to be effective in a randomized double-blind placebo-controlled trial for migraine prophylaxis," but

makes no mention of the two randomized double-blind placebo-controlled trials that were negative. (Trial Ex. 363). Neither the monograph nor the audiotape discloses the results of the three negative migraine trials. (Trial Ex. 246).

### D. Doses Above 1800 mg/day

Defendants knew by February 1995 that Neurontin at doses above 1800 mg per day was no better than doses below 1800 mg per day. (Trial Ex. 376 at v). This evidence was derived from study 945-82, a negative DBRCT which showed no differences between Neurontin at 600, 1200, and 2400 mg/day. (Trial Ex. 376 at v). In August 1997, the FDA expressly stated that "the evidence from controlled trials fails to provide evidence that higher doses of Neurontin are more effective than those recommended," confirming the evidence that Defendants had known since at least February 1995. (Trial Ex. 91 at 2-3).

Nevertheless, despite this negative data, CDM's proposal for the "Neurontin 1997 Tactical Plan" recommended "High dose meetings" to "[e]ncourage titration to higher doses through peer-to-peer influences." (Trial Ex. 75 at WLC_CBU_089784). In September 1997, Defendants' "Market Research Summary" showed that the "Titration message [was] effective," and that physicians were "titrating beyond 1800mg." (Trial Ex. 44 at WLC_FRANKLIN_0000068644). In November 1997, Defendants mailed an article published in a supposedly legitimate journal called "Internal Medicine" to 56,000 physicians in the country. (Trial Ex. 40; Trial Ex. 58 at WLC_CBU_177149). According to Dr. Perry, this supplement was "an advertising vehicle," as the journal was either non-existent or unknown at the time. (Perry Test., Day 7 Trial Tr. at 35). The "Internal Medicine" supplement stated that for Neurontin: "A daily dose of 1,800 – 3,600 mg may be needed," but made no disclosure of the lack of dose response from the 945-82 study. (Trial Ex. 40 at WLC_FRANKLIN_0000080464).

### E. Nociceptive Pain

At a September 1995 consultants meeting, Parke-Davis learned that back pain, arthritis/osteoarthritis, and degenerative joint disease represented potentially lucrative uses for Neurontin. (Trial Ex. 31 at WLC_FRANKLIN_0000087285 – 87). While these types of pain are typically chronic, they are not neuropathic pain states. However, Defendants were generally aware that physicians often are unable to differentiate between chronic neuropathic pain and non-neuropathic pain. (Trial Ex. 238 at 58). Nevertheless, Defendants capitalized on this confusion or uncertainty by frequently referencing Neurontin's efficacy in "chronic pain" states or sometimes simply "pain," without differentiating neuropathic pain from nociceptive pain. For example, the Backonja article published in JAMA in December 1998 states without qualification that Neurontin "has been reported anecdotally and in open-label case series to be effective in the treatment of pain syndromes…" (Trial Ex. 1250 at 1832). Parke-Davis disseminated over 300,000 reprints of this Backonja article through its sales force and by mail. (Trial Ex. 92 at WLC_CBU_040569) in late 1998 and early 1999.

By August 1999, Defendants knew the results of the first of several DBRCTs studying Neurontin for a type of non-neuropathic pain considered by Defendants to be "an acute nociceptive pain state." (Trial Ex. 384 at 13). The results of this study, which investigated Neurontin's use in postoperative dental pain were negative in that Neurontin alone was not statistically significant to placebo. (Trial Ex. 384 at 38). Other nociceptive pain studies in areas such as osteoarthritis and pain following orthopedic surgery were also negative. (Trial Ex. 385 at 33; Trial Ex. 386 at 34; Trial Ex. 387 at 11).

In 2003, a Kaiser Permanente Rx Update issued warning doctors about "exaggerated promotional claims" that suggested that Neurontin was a "general pain medication." The update stated that "there is NO medical evidence suggesting the efficacy of gabapentin for treating non-neuropathic pain. Nevertheless, gabapentin is increasingly being promoted and used to treat these conditions." (Trial Ex. 319). Kaiser's payment for Neurontin's use for non-neuropathic pain uses was confirmed in a DUAT and DRUG videoconference held in September 2003. At that conference, PMG physicians reviewed "Current Neurontin Use" and found that Neurontin was being used to treat conditions such as "Backache" and "osteoarthritis." (Trial Ex. 349 at 3). In the opinion of DUAT and DRUG representatives, conditions such as "back pain" that were "localized, exacerbated by movement, +/- tenderness" were not neuropathic pain. (Trial Ex. 349 at 6).

In addition, Dr. Gary Mellick began promoting the efficacy of Neurontin in treating RSD in January 1995, as described in Section II.B above. RSD can be classified as neuropathic pain or nociceptive pain. (Millares Test., Day 9 Trial Tr. at 51; Trial Ex. 322). The 1997 Kaiser monograph explains that "[i]nflammation following surgery, infection, lacerations with swelling, burns, frostbite and degenerative joint disease, compression and arthroscopy have been linked as potential causes of RSD," and many of these conditions are forms of nociceptive pain. (Trial Ex. 322; Perry Test., Day 6 Trial Tr. at 142). Kaiser relied on Dr. Mellick's representations in expanding its Neurontin formulary. (Millares Test., Day 9 Trial Tr. at 55 – 58).

## III.    CONCLUSION

For the reasons stated herein, Kaiser is entitled to damages reaching back to the earliest evidence of Defendants' suppression of evidence or other misrepresentation for each indication of Neurontin.

Dated:  March 22, 2010                                 Respectfully submitted,


                                                                                     By:     */s/ Thomas M. Sobol*
                                                                                                  Thomas M. Sobol

                                                                  HAGENS BERMAN SOBOL SHAPIRO LLP
                                                                  Thomas M. Sobol, Esq.
                                                                  55 Cambridge Parkway, Suite 301
                                                                  Cambridge, MA 02142

                                                                  *Of Counsel*


*Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals*

Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339


Don Barrett, P.A.
404 Court Square
Lexington, MS  39095-0987

-10-

## **CERTIFICATE OF SERVICE**

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 22, 2010.

                     */s/ Thomas M. Sobol*
                     Thomas M. Sobol