# EXHIBIT A-2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
MDL Docket No. 1629/Master File No. 04-10981

-----------------------------X

IN RE: NEURONTIN MARKETING        MDL Docket No. 1629

SALES PRACTICES, AND PRODUCTS   Master File No.

LIABILITY LITIGATION                      04-10981

-----------------------------X

VIDEOTAPED DEPOSITION OF ALBERT CARVER

New York, New York

July 12, 2007

Reported by:
Amy A. Rivera, CSR, RPR

Page 2

1
2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK
3
4  -----------------------------x
5  IN RE: NEURONTIN PRODUCTS
6  LIABILITY LITIGATION      Index Number 765000/2006
7  -----------------------------x
8
9
10
11  VIDEOTAPED DEPOSITION OF ALBERT L. CARVER
12
13
14              New York, New York
                July 12, 2007
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2
3
4        Deposition of ALBERT L. CARVER, held
5  at KAPLAN FOX, 850 Third Avenue, New York, New
6  York, before Amy A. Rivera, a Notary Public of the
7  State of New York.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2  A P P E A R A N C E S:
3  KAPLAN FOX & KILSHEIMER, LLP
       Attorneys for Plaintiffs
4        850 Third Avenue
         New York, New York 10022
5  BY:   LINDA N. NUSSBAUM, ESQ.
         AVIAH COHEN PIERSON, ESQ.
6        MITCHELL COHEN, ESQ.
7
8  JUSTIN BLOOM, ESQ.
       Attorneys for Class Plaintiffs
9        29 W. 70th Street, Suite 2B
         New York, New York 10023
10
11  DAVIS POLK & WARDWELL
        Attorneys for Defendants Pfizer, Inc. & Warner-Lambert
12       450 Lexington Avenue
         New York, New York 10017
13  BY:   RAJESH JAMES, ESQ.
         NAHAL KAZEMI, ESQ.
14
15
16  ALSO PRESENT:  CRAIG ATELLA, Videographer
                   NATIONWIDE VIDEO PRODUCTIONS, INC.
17                 Partners
18
19
20
21
22
23
24
25

Page 5

1
2                  INDEX
3  WITNESS              DIRECT
4  ALBERT L. CARVER
5  BY MR. JAMES         7
6            EXHIBITS
7  NUMBER      DESCRIPTION            PAGE
8  Kaiser-1    Notice              29
9  Kaiser-2    Gabapentin review 9/1997    79
10  Kaiser-3   Complaint           87
11  Kaiser-4   Drug monograph 6/1999     138
12  Kaiser-5   E-mail dated 3/16/99      148
13  Kaiser-6   E-mail dated 12/17/98     154
14  Kaiser-7   Drug monograph        155
15  Kaiser-8   Gabapentin review of
                 restrictions        178
16
17  Kaiser-9   Final draft dated 1/21/04   190
18  Kaiser-10  CMI review for chronic pain
                 management in Primary Care   191
19
20
21
22
23
24
25

Page 6

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED by and
 3   between counsel for the respective parties hereto that
 4   all rights provided by the C.P.L.R., including the right
 5   to object to any question, except as to the form, or to
 6   move to strike any testimony at this examination, are
 7   reserved; and, in addition, the failure to object to any
 8   question or to move to strike any testimony at this
 9   examination shall not be a bar or waiver to make such
10   motion at, and is reserved for, the trial of this
11   action.
12          IT IS FURTHER STIPULATED AND AGREED that
13   this examination may be signed and sworn to, by the
14   witness being examined, before a notary public other
15   than the notary public before whom the examination was
16   begun, but the failure to do so, or to return the
17   original of this examination to counsel, shall not be
18   deemed a waiver of the rights provided by Rules 3116 and
19   3117 of the C.P.L.R. and shall be controlled thereby.
20          IT IS FURTHER STIPULATED AND AGREED that
21   the filing of the original of this examination shall be
22   and the same hereby is waived.
23
24
25
```

Page 7

```
 1          A. Carver
 2          VIDEOGRAPHER:  Good afternoon.  My
 3   name is a Craig Atella from Nationwide Video
 4   Productions located in Roseland, New Jersey.
 5          The date today is July 12, 2007 and
 6   the time is approximately 1:14.  This deposition
 7   is being held at the offices of Kaplan Fox,
 8   located at 850 Third Avenue, New York, New York.
 9          The caption of this case, In Re:
10   Neurontin Marketing and Sales Practices Litigation
11   in the United States District Court for the
12   District of Massachusetts, Docket Number 1629.
13          The caption is also:  In Re:  New York
14   Products Liability Litigation, in the Supreme
15   Court of the State of New York, County of New
16   York, Index Number 765000.
17          The name of the witness is Albert
18   Carver.
19          At this time, the attorneys will
20   identify themselves and the parties they
21   represent, after which our court reporter, Amy
22   Rivera, will swear in the witness and we can
23   proceed.
24          MS. NUSSBAUM:  Linda Nussbaum, Kaplan
25   Fox for the witness, the Kaiser plaintiff entities
```

Page 8

```
 1          A. Carver
 2   and the coordinated plaintiffs.
 3          MS. PIERSON:  Aviah Cohen Pierson
 4   from Kaplan Fox, also representing the Kaiser
 5   plaintiffs and the witness.
 6          MR. COHEN:  Mitchell Cohen, Kaiser
 7   Foundation Health Plan.
 8          MR. BLOOM:  Justin Bloom, representing
 9   the class plaintiffs.  I don't intend to ask any
10   questions.
11          MR. JAMES:  Rajesh James, of Davis
12   Polk, representing the defendants Pfizer and
13   Warner-Lambert.
14          MS. KAZEMI:  Nahal Kazemi, also of
15   Davis, Polk & Wardwell representing the
16   defendants.
17   ALBERT L.  C A R V E R, having been duly sworn,
18   testified as follows:
19          MS. NUSSBAUM:  Before we begin the
20   deposition, I just want to make a statement for
21   the record.
22          Mr. Carver is here and prepared today
23   to testify, both in his individual capacity
24   pursuant to the Notice of Deposition served on
25   June 18th and also as a 30(b)(6) witness on behalf
```

Page 9

```
 1          A. Carver
 2   of the Kaiser plaintiffs pursuant to the Notices
 3   served on July 5th, the 30(b)(6) Notice on
 4   corporate structure that was served on June 22nd
 5   and the corporate and document retention 30(b)(6)
 6   Notice served on June 22nd.
 7          All of this was set forth in the
 8   letter to Matthew Roland dated July 5th.
 9   Mr. Carver is prepared to be deposed today and
10   tomorrow.  There is 12 hours allocated to the
11   defendants.  There is only one attorney here that
12   is not from Davis Polk, and that is an attorney
13   representing the class who has indicated on the
14   record that he will not seek any time.
15          We're ready to begin the deposition.
16   DIRECT EXAMINATION
17   BY MR. JAMES:
18      Q.   Hello, Mr. Carver.  My name is Rajesh
19   James.  As I stated, I represent the defendants in
20   this action, Pfizer and Warner-Lambert.
21          During this deposition, I'll refer to
22   the plaintiffs Kaiser Foundation Hospitals and
23   Kaiser Foundation Health as "Kaiser."
24          Could you please state your full name
25   for the record?
```

Page 10

A. Carver
1
2   A.   Albert L. Carver.
3   Q.   Are you employed by Kaiser?
4   A.   I am.
5   Q.   Is that Kaiser Foundation Hospital or
6  Kaiser Foundation Health?
7   A.   I'm employed by Kaiser Foundation
8  Health Plan.
9   Q.   What's the relationship between those
10  two entities?
11   A.   There's a contractual relationship
12  between Kaiser Foundation Hospitals, which Kaiser
13  Foundation Health Plan, Inc. contracts for
14  hospital services.
15   Q.   And what is your position with Kaiser?
16   A.   I'm vice-president of pharmacy
17  strategy and operations in California.
18   Q.   Have you ever been deposed before?
19   A.   Yes, I have.
20   Q.   I'll just go over some general rules
21  which you might well be familiar with.
22      I'll need verbal answers because the
23  court reporter can't record a nod or other
24  nonverbal gesture.  Please try to wait until my
25  question is done, and I'll do my best to wait

Page 11

A. Carver
1
2  until your answer is completed before answering --
3  before asking the next question.
4      And we can take breaks at any time.
5  So, please let me know if you need a break.  I may
6  ask you to complete answering any question that's
7  still outstanding.  But otherwise, you know,
8  please let me know if you need to take a break any
9  time.
10      Your lawyer may object to the way I
11  ask a question, but you can still answer until she
12  instructs you not to do so.  You can ask me to
13  rephrase a question if you don't understand it,
14  and we can ask the reporter to read back any
15  questions that you need to hear again.
16      Do you understand those instructions?
17   A.   Yes, I do.
18   Q.   The relevant period for the purposes
19  of this deposition is 1994 to the present.  So, if
20  I ask any question, you should understand that
21  question to refer to that time period unless I
22  specify otherwise.  And if you need greater
3   specificity, please let me know; otherwise, I'll
24  assume that your answer applies to the period from
25  1994 to the present.

Page 12

A. Carver
1
2      You mentioned that you had previously
3  been deposed.
4      Could you please describe the
5  circumstances?
6   A.   Roughly three or four years ago, I was
7  deposed in a personnel matter, and secondly, the
8  other deposition that comes to mind is two or
9  three years ago, I was deposed in a -- a
10  pharmaceutical company litigation matter.
11   Q.   With regard to the latter matter, who
12  were the parties in that matter?
13   A.   The parties were Kaiser and then
14  Abbott Laboratories.
15   Q.   And Kaiser was the plaintiff in that
16  matter?
17   A.   Yes.
18   Q.   Have you ever given prior testimony in
19  any other matter, either in court or in
20  legislative hearings or by affidavit, or it was
21  all other legal proceedings?
22   A.   Not in any recent history.  I was
23  involved in a legal proceeding back in the '80s.
24  It was a civil matter related to a construction
25  litigation involving Kaiser.

Page 13

A. Carver
1
2      I was involved in a personal, very
3  small automobile thing back in 1970.  And then I
4  was involved in a criminal matter from the
5  standpoint of I had just a very small piece of
6  testimony in a murder case.
7   Q.   I wanted to just go over your
8  background before we begin the heart of the
9  30(b)(6) deposition.
10      Can you go over your postsecondary
11  schooling with me?
12   A.   Well, I received a pharmacy degree
13  from Oregon State University in 1970, and that is
14  my formal education.
15   Q.   And then after you graduated from
16  Oregon, what was your -- what was your first
17  position?
18   A.   My first position was a pharmacist at
19  the Los Angeles Medical Center.
20   Q.   And either at Oregon or in your first
21  job as a pharmacist, did you learn about off-label
22  prescription or off-label promotion?
23      MS. NUSSBAUM:  Objection.  Overly
24  broad.
25   Q.   You can answer if you understand the

Page 14

A. Carver

1 question.
2
3     A.    That goes back 37 years and so, I
4 really don't recall 37 years ago if I was
5 well-versed in off-label use of medications or
6 not.
7     Q.    After your initial position as a
8 pharmacist, what was your next position after
9 that?
10     A.    My next position was an assistant
11 chief pharmacist at the Los Angeles Medical Center
12 of Kaiser Permanente.
13     Q.    And what were your responsibilities in
14 that role?
15     A.    I had a responsibility for the
16 management of both the outpatient pharmacy piece
17 of the organization at Los Angeles Medical Center,
18 as well as the inpatient pharmacy services at the
19 Los Angeles Medical Center.  I was in that
20 capacity for three years.
21     Q.    That takes us to what year, roughly?
22     A.    1975.
23     Q.    And then at that point, you moved to
24 which role?
25     A.    I moved to the role of the staff

Page 15

A. Carver

1
2 assistant to the director of pharmacy in southern
3 California.  I was in that capacity for
4 approximately one year.
5     Q.    How did your responsibilities change
6 between those two positions?
7     A.    My responsibilities changed from being
8 the active manager of pharmacy services delivery
9 to one of more writing policies and procedures,
10 etc. for the entire region.  So, in a sense, my
11 responsibilities were expanded to having an impact
12 on the region.
13     Q.    That region is southern California?
14     A.    That's correct.
15     Q.    How many regions does Kaiser have
16 altogether?
17     A.    Eight regions.
18     Q.    What are those?  Those are southern
19 California --
20     A.    Southern California, northern
21 California, Hawaii, northwest, Colorado, Ohio,
22 Georgia, and mid-Atlantic.
23     Q.    Going back to your career history, you
24 said that you were in the last role for one year,
25 and then at that point, you --

Page 16

A. Carver

1
2     A.    Correct.  And then I became the area
3 pharmacy director for one of the service areas in
4 southern California known as the Harbor City
5 service area at that time.  I was in that capacity
6 for a period of four years.
7     Q.    And your responsibilities in that
8 capacity?
9     A.    I had the overall responsibility for
10 pharmacy services, both inpatient and outpatient
11 services for the pharmacy services that were
12 provided in that geographic region or area within
13 the southern California region.
14     Q.    Does that take us up to 1980, now?
15     A.    That takes us to 1980.
16         In 1980, I became the area pharmacy
17 director in the Orange County area of Kaiser
18 Permanente.  So, it was a lateral move to an area
19 that was closer to my home and it was an area to
20 which we had just opened as a new service area.
21     Q.    And how long were you in that role?
22     A.    I was in that role for approximately
23 one year.  And during the period of time that I
24 was in that role, I also assumed responsibility as
25 the manager of a large project to acquire and

Page 17

A. Carver

1
2 implement our pharmacy computer system in southern
3 California known as PIMS.  I was in that capacity
4 until the middle of 1986.
5     Q.    Does each region typically have a
6 different computer system?
7     A.    The -- as part of my role there, we
8 implemented the system in southern California, and
9 then while I was in that position also in Colorado
10 and in the northwest, and then my successors
11 completed implementation of that system in Hawaii,
12 Ohio, and in Georgia.
13         We actually ended up with the same
14 computer system, but it came with an acquisition
15 in that region essentially.  And so the answer is
16 the outpatient pharmacy piece of business in
17 Kaiser Permanente in those days and to this day
18 all have the same pharmacy computer system.  That
19 leaves us a different computer system in
20 mid-Atlantic and in northern California.
21     Q.    And I think now, I guess moving back
22 to the career history, if you could proceed, it
23 was all the '80s up to the next position?
24     A.    Okay.  In 1986, I became the director
25 of pharmacy operations for southern California.

Page 18

1              A. Carver
2     Q.    And that role involved what
3  responsibilities?
4     A.    That role involved the executive
5  leadership and management of all pharmacy services
6  for Kaiser Permanente in southern California.  So
7  that entailed our outpatient business for southern
8  California, as well as the hospital pharmacy
9  business, as well as responsibility for pharmacy
10  services to home infusion pharmacies or home
11  health patients.  It was all our home infusion
12  pharmacies.
13         It also entailed responsibility for
14  oversight of our warehouse and purchasing
15  operations in southern California and also for
16  oversight of the drug information service in
17  southern California and oversight of our pharmacy
18  computer systems in southern California.
19     Q.    What is the Drug Information System in
20  southern California?
21     A.    Excuse me.  It's a drug information,
22  as much as -- not a system, perhaps I misspoke if
23  I used the word "system."  The Drug Information
24  Service is a service that is a department of
25  pharmacists, and it was quite a small department

Page 19

1              A. Carver
2  back in those days, but a department that is
3  involved in answering inquiries regarding
4  medications that come from the medical staff or
5  the pharmacy staff or the nursing staff.  So it's
6  a centralized service providing drug information
7  to those professionals.
8     Q.    You said to pharmacy staff and what
9  were the other groups?
10     A.    To nurses, to doctors, to pharmacists.
11     Q.    Do you affirmatively provide that
12  information, or was it something like a hotline
13  that the staff could call in when they deemed it
14  useful?
15     A.    It was a responsive service.
16     Q.    Proceeding to your next role.
17     A.    My job was expanded at approximately
18  the beginning of 1998 to also have responsibility
19  for pharmacy services in northern California, so
20  essentially pharmacy services for the entire
21  state.
22     Q.    And you had that position in 1998
 3  until what time?
24     A.    I currently have that position.  Until
25  now.

Page 20

1              A. Carver
2     Q.    So during the relevant period in 1994
3  forward, you have had two positions which have
4  involved similar responsibilities, except that in
5  1998, the geographic scope of that position
6  expanded to encompass all of California, as
7  opposed to simply southern California?
8     A.    That's correct.
9     Q.    Have you participated in continuing
10  education from 1994 forward?
11     A.    Yes, I have.
12     Q.    What type of continuing education
13  generally?
14     A.    Generally the continuing education
15  sufficient to retain my license as a pharmacist.
16     Q.    What would the subject matter of those
17  continuing education programs be?
18     A.    A variety of pharmacy and drug-related
19  content sufficient to maintain my license.
20     Q.    Did some of those programs involve
21  attending conferences?
22     A.    Yes.
23     Q.    Have you spoken at any conferences?
24     A.    I don't believe so.
25     Q.    And have you participated in seminars?

Page 21

1              A. Carver
2     A.    Yes, I have.
3     Q.    Have you led any seminars?
4     A.    No, I have not.
5     Q.    Have you received any specific
6  training in your current role or the role that you
7  had prior to 1998?
8     A.    I attended two -- two programs that
9  have been relevant and helpful in my current
10  position.  One was a Kaiser Permanente executive
11  program at Stamford University that was a
12  several-week program.
13         The second one was an advanced
14  leadership program at the Keenan Flagler Business
15  School at the University of North Carolina.
16     Q.    In an effort to remain up to date in
17  your field, do you read articles or similar
18  resources?
19     A.    Yes, I do.
20     Q.    How often?
21         MS. NUSSBAUM:  If you can estimate.
22  Don't speculate.
23     A.    Just intermittently.
24     Q.    What sorts of articles do you read?
25         MS. NUSSBAUM:  Overly broad;

A. Carver

1
2  objection.
3       A.   Articles regarding pharmacy service
4  delivery, hospital pharmacy articles, occasionally
5  articles regarding specific therapies.
6            There is a requirement to keep, you
7  know, to review some articles related to
8  regulations and law, etc., as it relates to
9  pharmacy practice, but just general -- general
10  articles to keep me generally current with the
11  profession.
12       Q.   Have any of these articles discussed
13  off-label prescription?
14            MS. NUSSBAUM:  If you recall, don't
15  speculate.
16       A.   Not that I recall.
17       Q.   Have any of the articles concerned
18  off-label promotion?
19            MS. NUSSBAUM:  If you recall.
20       A.   Not that I recall specifically.
21       Q.   Have any articles concerned Neurontin?
22            MS. NUSSBAUM:  If you recall.
23       A.   Not that I recall specifically.
24       Q.   In your current role, are you
25  responsible for managing Kaiser's management with

A. Carver

1
2  pharmacy benefit managers?
3       A.   We have an extremely limited
4  relationship with pharmacy benefit managers in
5  that Kaiser Foundation Health Plan, and Kaiser
6  Foundation Hospitals owns and operates its own
7  pharmacies and provides directly the pharmacy
8  services and prescriptions to our members and
9  provides directly nearly all the prescriptions,
10  and when I say "nearly all," I would say
11  98 percent.  And so that's a very limited role as
12  it relates to any pharmacy benefit manager.
13       Q.   And does the pharmacy benefit manager
14  cover the remaining 2 percent?
15       A.   Yes, the pharmacy benefit manager
16  would have a -- would administer contractually an
17  arrangement for that roughly 2 percent.
18       Q.   And are you responsible for managing
19  that relationship?
20       A.   I have signed the agreement, or at
21  least extensions to the agreement or amendments to
22  the agreement with Med Impact and so, in a sense,
23  yes.
24       Q.   Are you involved in deciding the scope
25  of prescription drug coverage?  This is setting

A. Carver

1
2  aside the pharmacy benefit manager question, and I
3  guess, in focusing on the 98 percent again --
4            MS. NUSSBAUM:  If you understand the
5  question.
6            Can you be more specific?
7       Q.   Are you involved in deciding the scope
8  of prescription drug coverage to Kaiser's
9  insureds?
10       A.   Certainly I have discussions and
11  influence regarding the prescription drug
12  benefits; however, I don't make the final decision
13  regarding the design of prescription drug
14  benefits.
15       Q.   And does your role include formulary
16  management?
17       A.   My role in -- has involved
18  recommendations within the health plan related to
19  linking the drug benefit coverage to the
20  formulary.
21            My role also has involved serving on
22  the medical staff pharmacy and therapeutics
23  committee who are administering the formulary.
24       Q.   Is that referred to as a P&T
25  committee?

A. Carver

1
2       A.   Yes, it is.
3       Q.   Is there a separate P&T committee for
4  each region or is there a single P&T committee for
5  Kaiser nationally?
6       A.   There is not a national P&T committee.
7  There is a P&T committee that makes formulary
8  decisions for each region.
9       Q.   Do those P&T committees communicate
10  with each other regarding their decisions?
11       A.   Yes, they did.
12       Q.   Are you involved in assessing the
13  efficacy of prescription drugs?
14            MS. NUSSBAUM:  Can you explain what
15  you mean by that?
16       Q.   You can answer to the extent you
17  understand the question.
18       A.   I would ask if you are asking the
19  question from the standpoint of me personally or
20  if you are asking the question from the standpoint
21  of Kaiser Foundation Health Plan, or what's the
22  context?
23       Q.   No -- actually, I guess at this point,
24  I'm just asking about your role personally.  I
25  think in a few minutes, we will get to asking

Page 26

A. Carver

1
2  questions about Kaiser Foundation Health Plan.
3      A.  Okay.  I do not personally evaluate
4  the efficacy of the drugs; no.
5      Q.  Are you responsible for containing
6  costs associated with prescription drugs?
7      A.  I'm responsible for helping to assure
8  the appropriate use of our health plan members'
9  money, and so to the degree that that -- so in a
10  sense, yes.
11      Q.  How do you define an appropriate use
12  of your health plan members' money?
13      A.  I don't want our health plan members
14  to pay any more money for their drugs, either the
15  members directly or the groups that contract with
16  us for provision of our services than they should
17  have to pay.
18      Q.  And what is your role in that process?
19      A.  Could you give me a little bit more
20  context?  Again, is this my personal role?
21      Q.  Again, this is still personal role.
22  I'll try to be very clear when we move to asking
23  questions in the corporate capacity.
24      A.  My personal role then is to try to
25  assure that we have processes in place that would

Page 27

A. Carver

1
2  help us manage the use of drugs within our
3  membership.  By that, I mean we have Drug
4  Information Services to answer questions should
5  physicians have them and we have other activities
6  that are -- that would review usage.
7      Q.  What are some of those other
8  activities?
9      A.  We have a -- a drug use management
10  infrastructure, I would call it, so I have
11  reporting to me two drug use management leaders
12  that cover -- that have responsibility essentially
13  in California.
14      Q.  Is that separated geographically so
15  one covers northern California and the other
16  southern California?
17      A.  It is, but both work very
18  collaboratively with each other.  But, yes, that's
19  a correct assessment.
20      Q.  You mentioned earlier that you serve
21  on the P&T committee.
22          Is it for both northern and southern
23  California?
24      A.  Yes.
25      Q.  So you're on two separate committees?

Page 28

A. Carver

1
2      A.  Yes.
3      Q.  Are you serving on any other committee
4  within Kaiser?
5      A.  Not as it relates to drugs or, or
6  relevant specifically to pharmacy, per se.
7      Q.  What other committees are you formally
8  a member of?
9      A.  I'm a member of the executive
10  compliance committee in northern California.  I'm
11  a member of the fee schedule oversight group,
12  which has national scope.  I'm a member of the
13  clinical content oversight group of the health
14  connect project.
15          Perhaps there's others that are not
16  coming to mind, but that at least, I think, gives
17  you a flavor of my involvement.
18      Q.  Have you been previously on any
19  committees related to pharmacy that you're no
20  longer a member of?
21          MS. NUSSBAUM:  If you recall?
22      A.  I co-launched the biotechnology
23  committee a few years back in conjunction with a
24  physician.  Basically that was intended to give
25  special attention to biotechnology-derived

Page 29

A. Carver

1
2  products.  I'm no longer on that committee.
3  That's the only thing that comes to mind at the
4  moment.
5      Q.  Are you aware that this deposition is
6  being taken in connection with a lawsuit filed by
7  Kaiser in which it alleges that the defendants
8  made fraudulent statements or omissions that
9  caused doctors to prescribe Neurontin for
10  off-label uses?
11      A.  I am.
12          MR. JAMES:  I'd like to mark the first
13  exhibit.
14          (Kaiser-1 marked for identification.)
15      A.  Yes, I recognize this.
16      Q.  And do you understand that you're
17  providing answers on behalf of Kaiser, a plaintiff
18  in this action, in response to this -- to this
19  document?
20      A.  I do.
21      Q.  And could you confirm that you've been
22  designated as Kaiser's corporate representative
23  with regard to each of the topics in this notice?
24      A.  Yes.
25      Q.  How did you prepare to testify

1         A. Carver
2   regarding the topics that have been noticed?
3         MS. NUSSBAUM: I would caution the
4   witness not to divulge any discussions with
5   counsel as part of that preparation.
6     Q.   I guess, just to clarify, I understand
7   that the witness can testify that he met with
8   counsel for a particular span of time, but just
9   shouldn't get into any legal advice that's been
10  provided to you by counsel or any information you
11  provided to counsel seeking legal advice.
12    A.   Yes. In preparation for today, I have
13  met with counsel and I have reviewed briefly a
14  number of documents that have been provided to me
15  by counsel.
16    Q.   Have you met with anyone other than
17  counsel?
18    A.   No, I have not.
19    Q.   And roughly how long did you meet with
20  counsel?
21    A.   I would say roughly four or five hours
22  total, including a little bit of time this
23  morning.
24    Q.   About how many meetings in total were
25  there?

1         A. Carver
2     A.   I believe a total of three.
3     Q.   When did those meetings take place?
4     A.   Over the course of the last three
5   weeks, I believe. And these were, other than
6   today, just telephone meetings.
7     Q.   And when you refer to counsel, are you
8   referring to Ms. Nussbaum or other individuals as
9   well?
10    A.   Yes. Ms. Nussbaum, as well as Mitch
11  Cohen. Only counsel that are present here today,
12  I believe.
13    Q.   And were any facts conveyed to you by
14  counsel that are responsive to this notice?
15        MS. NUSSBAUM: Objection, as to any
16  conversations between the witness and his counsel.
17        MR. JAMES: Are you taking the
18  position that factual information which Mr. Carver
19  might be providing in response to this Notice is
20  subject to the attorney-client privilege?
21        MS. NUSSBAUM: I'm taking the position
22  that discussions between Mr. Carver and counsel
3   with respect to this litigation are privileged
24  discussions. If you want to, in general, ask did
25  he and counsel discuss the subject matters

1         A. Carver
2   contained in this 30(b)(6) Notice, as well as the
3   other Notices that he is testifying to today as to
4   corporate structure and as to document retention,
5   certainly we will allow him to answer that
6   question.
7         MR. JAMES: But you would direct him
8   not to answer questions regarding what factual
9   information was provided to him with counsel
10  responsive to this Notice?
11        MS. NUSSBAUM: I am not going to have
12  him testify as to specific discussions that he had
13  with counsel.
14    Q.   You noted that you had reviewed some
15  documents in order to prepare yourself for this
16  deposition.
17        Roughly how many documents were they?
18    A.   I would really be guessing, but
19  generally, documents that had been provided as a
20  result of your requests for documents to counsel,
21  and then just making certain, I think, that I had
22  the benefit of at least seeing what some of these
23  documents were, and so I would tell you maybe
24  documents of this many, I couldn't tell you how
25  many documents that that represented. I'm sorry,

1         A. Carver
2   I don't know.
3     Q.   Can you describe the documents
4   generally?
5         MS. NUSSBAUM: I believe it's asked
6   and answered. The witness just said that they
7   were documents produced to you in this litigation
8   responsive to requests that he has made.
9     Q.   Is there any more specific description
10  that you can give of the documents that you have
11  reviewed?
12        MS. NUSSBAUM: I would object to this
13  question. If it's documents that he received from
14  counsel on work product, so if you have, you know,
15  a specific question you want to ask him whether or not he
16  document you want to ask him whether or not he
17  reviewed that, but you know, the documents that
18  have been produced to you in this litigation and
19  that's what he's told you that he's reviewed.
20        MR. JAMES: Are you directing him not
21  to answer the question?
22        MS. NUSSBAUM: Well, I think that if
23  what you're asking for is work product, that is an
24  improper question. And that's the position that
25  Davis Polk has taken in all of the depositions

Page 34

1           A. Carver
2   that they have defended.
3        So if you asking are there particular
4   documents that counsel showed you in preparation,
5   the consistent position has been that that's work
6   product and improper. The witness has already
7   told you that the documents the looked at were
8   documents that were produced in discovery. If you
9   want to specifically ask, did he specifically
10  review document A or document B if he recalls, he
11  can answer that question.
12      Q.   Did you do anything else to prepare,
13  other than the discussions with counsel in
14  reviewing these documents that were provided to
15  you by counsel?
16      A.   No, I did not.
17      Q.   Did you have experience or knowledge
18  regarding these topics before your preparation?
19      A.   Yes, I did.
20      Q.   Which topics would you identify?
21      A.   Do you want me to go through each one
22  separately?
23      Q.   You don't have to say anything much
24  about them. I think just identifying which ones
25  were ones previously in your knowledge?

Page 35

1           A. Carver
2        MS. NUSSBAUM: Okay. To clarify, you
3   want to go through Kaiser Exhibit 1 seriatim, and
4   with respect to, starting on page 8, concerning
5   topics, he should simply say, for example, topic
6   one, yes, I had knowledge prior to preparation;
7   topic two, yes, I had knowledge, or no, I did not
8   have knowledge. That's what you want?
9        MR. JAMES: Right.
10       MS. NUSSBAUM: That's what he wants.
11      A.   Yes, thank you for the clarification.
12  Topic one, yes. Topic two, yes.
13  Topic three, yes. Topic four, yes. Topic five,
14  yes. Topic six, yes. Topic seven, yes. Eight,
15  yes. Nine, yes. Ten, yes. Eleven, yes. Twelve,
16  yes. Thirteen, yes. Fourteen, yes. Fifteen,
17  yes. Sixteen, yes. Seventeen, yes. Eighteen,
18  yes. Nineteen, yes. Twenty, yes. Twenty-one,
19  yes. Twenty-two, yes. Twenty-three, yes.
20      Q.   Getting from this point in the
21  deposition, if I use the phrase "you," I will be
22  referring to Kaiser and all of subsidiaries, and
23  if I mean you personally, I'll specify that I do.
24  And if you mean to refer to yourself personally
25  rather than to Kaiser, you should tell me.

Page 36

1           A. Carver
2   Otherwise, I'll refer to -- I'll assume that
3   you're answering on behalf of Kaiser.
4        What is Kaiser's purpose?
5       A.   Kaiser's purpose is to provide high
6   quality, affordable healthcare services to its
7   membership and also to improve the health of our
8   membership and to improve the communities in which
9   we serve to the degree that we can do that.
10      Q.   Does Kaiser operate for profit?
11      A.   Kaiser does not operate for profit.
12  Both Kaiser Foundation Hospitals and Kaiser
13  Foundation Health Plans, Inc. are non-profit,
14  charitable organizations.
15      Q.   Has that been the case since 1994?
16      A.   Yes, it has.
17      Q.   Outside the -- or actually, can you
18  tell me where Kaiser is located?
19       MS. NUSSBAUM: Are you talking about
20  the main corporate offices?
21      Q.   I guess, where do you -- not actually
22  your corporate offices, but where do you actually
23  provide your services? I think some of the
24  regions you gave me earlier are self-explanatory,
25  so --

Page 37

1           A. Carver
2       A.   And I, to only elaborate slightly upon
3   those regions that I provided to you, Hawaii is
4   self-explanatory. The northwest entails primarily
5   services in the state of Oregon and some members
6   in the state of Washington. California, I
7   believe, is self-explanatory. Colorado is
8   self-explanatory. Ohio is self-explanatory.
9   Georgia is self-explanatory. Mid-Atlantic states
10  includes the geographic area contingent and around
11  Washington, D.C.
12       So we have membership in Maryland,
13  Virginia, and the District of Columbia.
14      Q.   How is Kaiser structured? I guess
15  you've told me how the two principal entities that
16  are plaintiffs in this action are structured?
17      A.   Yes.
18       MS. NUSSBAUM: Can you be more
19  specific? I think that's already been, in
20  general, asked and answered. If you have a more
21  specific question, the witness is happy to answer
22  it.
23      Q.   Well, we have the two plaintiffs and
24  then are each of them organized into eight
25  regions?

Page 38

A. Carver

1
2    A.   Kaiser Foundation Health Plan, Inc.
3  is -- is made up of the medical care delivery
4  operations in California and Hawaii.  And then
5  each of the other regions have subsidiary health
6  plans.
7           Each of the regions have a board of
8  directors.  The board of directors is a common
9  board of directors between Kaiser Foundation
10  Hospitals and Kaiser Foundation Health Plans, Inc,
11  and those I represent, the plaintiffs.  And Kaiser
12  Foundation Health Plan, Inc. contracts with
13  Permanente Medical Groups for the delivery of
14  medical care.
15           The Kaiser -- the Permanente Medical
16  Groups are separate corporate structures, have
17  their own board of directors and are responsible
18  for the organization and the management and the
19  delivery of the physician medical services in each
20  of the respective regions.
21    Q.   So, all three entities, I guess the
22  two plaintiffs here, plus Permanente Medical Group
23  are each divided into these eight regions, is that
24  correct?
25    A.   Conceptually, yes.

Page 39

A. Carver

1
2    Q.   And the two plaintiffs have a separate
3  board of directors for each of the eight regions,
4  but that board of directors is shared between the
5  two entities, is that right?
6    A.   We -- there is a common board of
7  directors for Kaiser Foundation Health Plan, Inc.,
8  which includes California and Hawaii, and then the
9  other regions are subsidiary regions that also
10  have their board of directors, and many of the
11  members are common across each of the health
12  plans.
13    Q.   Okay.  So, there's board members who
14  may be members of multiple regions?
15    A.   Yeah, correct.
16    Q.   Do these directors handle issues
17  related to prescription drug benefits?
18        MS. NUSSBAUM:  Do you understand the
19  question?
20    A.   I don't understand the question
21  specifically.
22    Q.   So do members of the boards of
3  directors of each of these regions have
24  responsibility for handling issues relating to the
25  provision of prescription drug benefits?

Page 40

A. Carver

1
2    A.   And could you help me with what you
3  mean regarding issues?
4        MS. NUSSBAUM:  Is your question is it
5  a function of the members of the board of
6  directors to determine physician -- to determine
7  prescription drug benefits?
8    Q.   I guess in addition to actually
9  determining them, do they have some other role, I
10  guess, related to the determination of
11  prescription drug benefits?
12    A.   Not directly.
13    Q.   Do they have any role in deciding the
14  scope of pharmacy coverage?
15    A.   Not directly.
16    Q.   What sort of indirect role would they
17  have?
18        MS. NUSSBAUM:  If any?
19    A.   I think only to the degree that the
20  board of directors provides oversight to the
21  hospitals and the health plans, that's just a
22  general oversight role that they provide.  The
23  specific drug benefits are defined in each of the
24  program regions under the responsibility of the
25  health plan manager.

Page 41

A. Carver

1
2    Q.   Who was the health plan manager in the
3  southern California area?
4    A.   I would say that the health plan
5  manager in southern California would be -- there's
6  a general health plan manager responsible for the
7  benefits, and that would be Gerald Fleming.
8    Q.   And what is the scope of his
9  responsibilities?
10    A.   From a practical point of view as it
11  relates to the drug benefits, serves on the
12  benefits committee who makes a determination
13  regarding benefits and has overall responsibility
14  for some of the marketing efforts.
15    Q.   Who else is on the benefits committee?
16    A.   I'm not sure that I know the makeup of
17  the benefits committee.
18    Q.   Do you know generally what sorts of
19  people they are?  Are they all Kaiser employees?
20    A.   There are Kaiser employees.  There are
21  not, to my knowledge, any external members to the
22  benefits committee.  And I believe that there is
23  some physician membership that may serve to the
24  degree that there's a need for input on just
25  medical benefits per se.

A. Carver

2 Q. Does Kaiser have a website?

3 A. Yes, we do.

4 Q. And how long has Kaiser had this
5 website?

6 A. For several years. I'm sorry. I
7 don't know the exact year in which the website was
8 launched.

9 Q. Who creates or decides its content?

10 A. The content of the website generally
11 is under the health plan leadership.

12 Q. And how often is the content of the
13 website changed?

14 A. Not frequently enough. I don't know
15 the schedule of changing the website, but it's
16 been a fairly stable website in terms of the types
17 of content. But I can't tell you the frequency of
18 updating or editing specific components of the
19 website.

20 Q. Can Kaiser access its old web pages?

21 A. I'm not sure that I understand that
22 question.

23 Q. I guess to the extent there was
24 material posted on the website in the past which
25 is no longer visible on the website, does Kaiser

A. Carver

2 have access to an archive of that sort of
3 information?

4 A. I believe we would have, yes.

5 Q. Have responsive documents been
6 produced from the website?

7 MS. NUSSBAUM: That is a legal
8 question and I don't think that, you know, the
9 witness is a lawyer. If you want to ask him about
10 the document production here, you know, in general
11 he's a 30(b)(6) witness. He is prepared to
12 respond to that.

13 Q. In response to the defendant's request
14 for production of documents, was the website then
15 passed -- web pages searched?

16 A. Could I ask a question of
17 clarification? What do you mean by "website"?

18 Q. You indicated that Kaiser has a
19 website; correct?

20 A. I did.

21 Q. And which website were you referring
22 to?

3 A. I was referring to a website that's a
24 public website, and from your line of questioning,
25 I'm not sure that that's what you were -- I'm now

A. Carver

2 confused as to what you are meaning by the
3 "website."

4 Q. In addition to the public website,
5 does Kaiser maintain internal websites?

6 A. Yes, we do.

7 Q. So then I guess returning to the
8 question, I guess first were documents that are
9 either currently visible on Kaiser's website or
10 otherwise were previously posted to that website
11 during the relevant period searched in response
12 for -- to the defendant's requests for productions
13 of documents?

14 A. I believe they were.

15 Q. What's the basis for that belief?

16 A. The basis for the belief is that your
17 request for documents and information came to our
18 legal counsel. I believe that --

19 MS. NUSSBAUM: I would ask you not to
20 give any specific advice or discussion that you
21 had with counsel with respect to their request.

22 Q. Does anyone at Kaiser have knowledge
23 of whether the public website, including its
24 previously posted content, was searched except
25 information derived from Kaiser's legal counsel?

A. Carver

2 A. I do not know whether or not previous
3 versions of publicly-available information on the
4 website were searched or not.

5 Q. But the currently available website
6 was -- public website was searched?

7 MS. NUSSBAUM: To the best of your
8 knowledge.

9 A. To the best of my knowledge, all the
10 information has been provided from all of our
11 current public -- all of our current sources of
12 information.

13 Q. And that's information you obtained
14 from legal counsel, is that right?

15 MS. NUSSBAUM: I'm unclear now, when
16 you say that's information that you obtained from
17 your legal counsel, would you rephrase that
18 question?

19 MR. JAMES: In stating that the public
20 website has been searched, does he have any basis
21 for that belief other than information from legal
22 counsel?

23 Q. Is there anyone at Kaiser, other than
24 Kaiser's legal counsel, who would know whether
25 information relating to Kaiser's public website

A. Carver

1    2 was searched in response to defendant's document
3 requests?
4    A.   I'm not sure.  We would have legal
5 counsel that would be familiar with whether or not
6 the website was searched, and then we would have
7 the administrator of the public website that would
8 be familiar with whether or not it was searched.
9    Q.   With regard to the private websites
10 that you mentioned --
11    A.   Yes --
12    Q.   -- earlier, were those searched in
13 response to the requests for production of
14 documents?
15    A.   I believe they were.
16    Q.   Is there anyone at Kaiser other than
17 its legal counsel who would be able to confirm
18 that fact?
19    MS. NUSSBAUM:  I think that this
20 witness just confirmed the fact.  He said, yes, he
21 believes that they were.
22    Q.   What's the basis for that belief?
23    A.   I believe that -- that legal counsel
24 requested from a broad variety of people within
25 Kaiser Permanente information and the searching of

A. Carver

1    2 information that would be responsive to your
3 request for information.
4    Q.   Do you specifically know whether any
5 individuals responsible for the private websites
6 were contacted?
7    A.   Yes, I do.
8    Q.   Who were those individuals?
9    A.   From the people that maintain our
10 pharmacy website information, Calvin Tagasi and
11 Dennis Arocki.
12    Q.   What are their titles?
13    A.   Calvin Tagasi is a supervisor in the
14 pharmacy analytical services department.  And
15 Dennis Arocki is a pharmacist in the pharmacy
16 analytical services department.
17    Q.   Just returning to the organizational
18 structure, within each of these eight regions,
19 there's a board of directors, although California
20 and Hawaii are both served by the board of
21 directors of Kaiser Foundation Health Plan,
22 correct?
23    A.   Correct.
24    Q.   Beneath the board of directors, what
25 are the -- what are the different departments of

A. Carver

1    2 the plaintiffs in these regions?
3    A.   At the highest level, there's a
4 president of each of the respective regions.  So
5 president for Hawaii, a president for southern
6 California, a president from -- for northern
7 California, etc., for each of the regions that
8 I've outlined.
9    Q.   And then beneath the president, what
10 other departments were there?
11    A.   And then, and then beneath the
12 president in -- there is a -- there can be one or
13 more chief operating officers.  And so I will give
14 you an example, if I might.
15    For southern California, there are two
16 chief operating officers that then have overall
17 responsibility for the operation of the hospitals,
18 as well as the health plan functions.  There is a
19 chief financial officer.  There is legal counsel.
20 There's public affairs.  There's -- I've already
21 mentioned the health plan manager function.  There
22 are, you know, some other direct reports to the
23 president that are related to strategy and
24 planning and those kinds of functions.
25    The facilities piece of the business,

A. Carver

1    2 and I might be, you know, overlooking a person or
3 two, but those I would say are the -- the very key
4 positions involved in the running of the region in
5 each of the respective regions.
6    Q.   And is it the health plan manager
7 function that has responsibility for setting
8 policy and procedure regarding coverage of
9 prescription drugs?
10    A.   Yes.
11    Q.   And is your personal role within the
12 health plan manager function?
13    A.   My personal role is not within the --
14 could you restate the question because I want to
15 make sure --
16    Q.   Right.
17    I was trying to get a sense of where
18 your -- I mean, that was speaking briefly of you
19 in your personal capacity where you fit within
20 this organization?
21    A.   Oh, where do I fit?  I am basically a
22 direct report to one of those COs, chief operating
23 officers.  That's both in northern and southern
24 California.
25    Q.   And the P&T committee on which you

Page 50

A. Carver

1  serve, does that fit into this organizational
2  structure somewhere?
3      A.   No.  It didn't from the standpoint of
4  the P&T committee is generally a medical staff
5  committee, and I happen to be the health plan
6  representative on that.  It's a committee of
7  doctors essentially, and the doctors are the ones
8  who are the primary voting members on the P&T
9  committees.
10     I am the only voting health plan
11  person.  And so I, in the case of southern
12  California, I am one of 12 or 13 voting members of
13  which the -- all of whom the others are physicians
14  and in northern California, same position, but
15  there is 17 or 18 voting physician members.
16     Q.   Is the P&T committee actually under
17  Permanente Medical Group, as opposed to the
18  plaintiffs' organizational structure?
19     A.   It is.  It is a -- it is under
20  Permanente Medical Group, but the health plan
21  recognizes the pharmacy and therapeutics committee
22  as the body to make decisions regarding specific
23  drugs.  And so, well, that's it.
24     Q.   And the plaintiffs' contract with

Page 51

A. Carver

1  Kaiser Permanente to provide medical services, is
2  that the correct relationship?
3      A.   The plaintiffs, meaning the whole plan
4  and the hospitals' contract with the Permanente
5  Medical Group to provide the medical services.
6  Was that your question?
7      Q.   Yes.  That answers my question.
8      In what businesses does Kaiser,
9  meaning the plaintiffs, engage?
10     A.   The plaintiffs engage in the business
11  of providing health insurance, selling health
12  insurance to individuals, as well as employer
13  groups for purposes of organizing that aspect
14  of -- making available essentially care that would
15  be delivered by the Permanente Medical Groups and
16  then they will also engage in the ownership and
17  operation of the hospitals, and so therefore, the
18  direct provision of hospital services, at least in
19  California and a couple of the other regions.
20     Q.   And some regions, Kaiser didn't
21  provide hospital services, is that correct?
22     A.   Kaiser, as part of insurance, provides
23  hospital services, but Kaiser does not own and
24  operate the hospitals, and so therefore, they

Page 52

A. Carver

1  contract for the delivery of hospital services in
2  those regions, which we do not own and operate our
3  own hospitals.
4      Q.   Which regions are those?
5      A.   The regions that own and operate their
6  own hospitals are Hawaii, northwest and
7  California.  The others arrange for, contract for
8  the delivery of hospital services.
9      Q.   With regard to the other regions that
10  arrange for delivery of hospital services, what
11  would the P&T committee be comprised of,
12  physicians who are, I guess, basically not
13  employees of the Permanente Medical Group?
14     A.   I do not believe there would be anyone
15  that's not a part of the medical, you know, the
16  physicians are employed by the Permanente Medical
17  Groups and they represent -- and they are the
18  physician folks on that P&T committee, and then
19  the other members of that P&T committee would be
20  the pharmacy director in each of those respective
21  regions.
22     Q.   Are all of Kaiser's clients fully
23  insured?
24     MS. NUSSBAUM:  If you can answer that.

Page 53

A. Carver

1  That's a very broad question.  What do you mean by
2  "fully insured"?
3      Q.   Well, with regard to medical and
4  health insurance or medical and pharmacy benefits
5  that Kaiser provides, is Kaiser or its clients at
6  risk -- I guess if they were not at risk and
7  Kaiser was at risk, I would refer to them as being
8  fully insured.
9      MS. NUSSBAUM:  I don't understand that
10  question.
11     Q.   Does Kaiser -- I guess, what types of
12  clients does Kaiser generally serve?
13     MS. NUSSBAUM:  I don't understand that
14  question either.
15     Q.   Well, if you understand the question,
16  you can answer it.
17     A.   Maybe you could rephrase it.
18     Q.   Actually, I guess earlier you stated
19  that Kaiser sells health insurance to individual
20  and employer groups?
21     A.   Correct.
22     Q.   Could you elaborate on that?
23     A.   The elaboration would be perhaps just
24  a restatement.  Kaiser sells health insurance to a

14  (Pages 50 to 53)

Page 54

A. Carver

1    wide variety of companies who are acquiring
2    healthcare benefits for their employee population,
3    either their existing employees or their retiree
4    population. So that would be what I would refer
5    to as the group business.
6         And then in addition to that, Kaiser
7    has available health insurance that individual
8    members can acquire directly by paying a monthly
9    premium to the health plan.
10        Q.  With regard to the employer groups,
11   are there any that Kaiser is providing
12   administrative services only to?
13        A.  I -- and so, by that, are you
14   referring to administrative services because the
15   employer group would be self-insured?
16        Q.  Yes.
17        A.  I do not believe that we are doing
18   that at this time.
19        Q.  Was there an earlier time within the
20   relevant period in which you were doing that?
21        A.  I don't believe so. I believe it's --
22   I believe we have an interest in doing it in the
23   future, but we're not quite there yet.
24        Q.  How does Kaiser charge for health

Page 55

A. Carver

1    insurance?
2         MS. NUSSBAUM: That's also a very
3    broad question. Can you -- do you have a more
4    specific --
5         Q.  You can answer if you understand.
6         A.  I can give you a broad answer. And
7    the broad answer is that we estimate the premiums
8    that are necessary to provide healthcare to the
9    group of individuals that we are going to be
10   providing the healthcare to.
11        And so that's -- that's very broad,
12   but basically that would establish -- would result
13   in a premium that groups would pay to us, and then
14   there are just a variety of benefit designs that
15   would determine how much any individual person
16   would pay as a copayment, as an example as part of
17   the package that they acquire.
18        Q.  How is the level of premium set?
19        MS. NUSSBAUM: Asked and answered.
20   This is what the witness just stated.
21        Q.  What sort of analysis is done to
22   determine the premium level?
23        A.  The premium is set as a result of
24   the -- our actuaries looking at current costs and

Page 56

A. Carver

1    projected costs and then determining what the
2    current costs and projected costs for providing
3    healthcare services to the large groups will be,
4    establishing for those services a premium
5    essentially and deducting from those premiums the
6    amount of money that would be the offset from any
7    individual patient's copay or cost sharing that is
8    involved.
9         Q.  If the cost of a prescription drug
10   increases, would the premium then increase for the
11   next period?
12        A.  Yes, that's correct.
13        Q.  Does Kaiser reinsure its risk for its
14   fully-insured policies?
15        A.  Kaiser basically is at risk for the
16   policies that, as you call them, that we -- that
17   we sell.
18        Q.  And it doesn't reinsure that risk with
19   any other entities?
20        A.  I do not believe so.
21        Q.  What are the documents called that
22   would set forth the health benefits for Kaiser's
23   insured individuals?
24        A.  There's a document called an evidence

Page 57

A. Carver

1    of coverage that outlines all of the details
2    regarding what is covered and what is excluded,
3    etc., including both the basic healthcare
4    provisions as well as the supplemental drug
5    benefits, as well as any drugs that might be
6    included as part of the basic health plan dues or
7    coverage.
8         Q.  Have those documents been produced
9    here, to your knowledge?
10        A.  I believe they have.
11        Q.  Does Kaiser only offer certain
12   standard types of insurance policies or are they
13   negotiated separately with different clients?
14        A.  Kaiser has developed some flexibility
15   in the design of the individual benefits that are
16   offered to the groups, and most of that
17   flexibility comes in the way of different levels
18   of copayments that might be associated with the
19   copayment for a doctor office visit, or the
20   copayment for emergency room visit, or the
21   copayment that might be associated with the
22   hospital -- hospitalization, or the copayment that
23   might be -- the copay level that might be
24   associated with a particular drug benefit.

15  (Pages 54 to 57)

Page 58

1          A. Carver
2          And so as a result of those different
3 levels of copayment and that type of flexibility,
4 we do, in fact, or have, in fact, you know, ended
5 up with a whole variety of various benefits that
6 can vary somewhat.
7      Q.   Aside from copay levels, does
8 prescription drug coverage defer in other ways
9 from one contract to the next?
10     A.   Well, it does.  There is a very -- a
11 very small percentage, perhaps 5 percent of our
12 membership that does not have a drug benefit as an
13 example.
14          But what the -- with the exception of
15 that 5 percent, essentially all of the other
16 members of Kaiser Permanente have some type of a
17 drug benefit, and with the -- with the variants
18 basically being related to that copayment
19 structure, it's a one-tier, two-tier, those kinds
20 of variances that you're probably familiar with.
21     MR. JAMES:  I'm informed we have five
22 minutes left on this tape, so I guess we'll take a
23 break, if no one has an objection.
24          THE WITNESS:  Okay.
25          MS. NUSSBAUM:  Let's try to, if it's

Page 59

1          A. Carver
2 okay with you, keep the breaks extremely short,
3 like five minutes.
4     MR. JAMES:  That's fine.
5     VIDEOGRAPHER:  The time is
6 approximately 2:33.  This ends tape number one.
7 We're now going off the record.
8          (Recess.)
9     VIDEOGRAPHER:  The time is
10 approximately 2:41.  This begins tape number two.
11 We're now on the record.
12 BY MR. JAMES:
13     Q.   We were discussing the policies that
14 Kaiser has with its insureds.  How often are
15 Kaiser's policies reissued to its clients?
16     A.   Yearly.
17     Q.   And what sort of changes are made from
18 one year to the next?
19     A.   It would vary depending upon the year
20 and the customer.
21     Q.   And you had mentioned premiums as one
22 thing that could change from one year to the next?
23     A.   Yes.
24     Q.   What other kinds of changes might be
25 implemented in a policy for one-year periods?

Page 60

1          A. Carver
2     A.   Copay levels.
3     Q.   Any others?
4     A.   Generally, not -- I don't think there
5 are any major -- major changes in terms of new
6 services or exclusions of services.  I think
7 generally they remain fairly constant.
8     Q.   How often are Kaiser standard
9 contracts revised?
10     A.   What -- could you tell me what you
11 mean by a "standard contract"?
12     Q.   Well, for example, I understand that
13 for the 95 percent of clients that have a
14 prescription drug benefit, the benefit is largely
15 similar, except for some differences in copay
16 levels.  I assume they are all based on one
17 standard contract, is that correct?
18     A.   There would be a different contract or
19 different provisions for that, would describe each
20 of the various copay levels as an example, whether
21 it would be the drugs or the emergency room visit
22 or the doctor office visit or the
23 hospitalizations.  They may all have a different
24 contract, and many of those benefit levels and
25 contracts are developed in response to the

Page 61

1          A. Carver
2 marketplace.
3          And so, it would be different
4 offerings or developed and then offered on an
5 annual basis.
6     Q.   Does Kaiser provide a description of
7 its benefit coverage to insureds, individuals?
8     A.   Yes.
9     Q.   In what format?
10     A.   Paper format.
11     Q.   Aside from the evidence of coverage
12 referred to earlier, is there a separate document?
13     A.   I believe that is the recognized
14 document.
15     Q.   Has Kaiser offered pharmacy benefits
16 to its clients for the entire relevant period?
17     A.   Yes.
18     Q.   And you mentioned earlier that
19 5 percent of Kaiser insureds do not receive
20 pharmacy benefits.  Has that percentage changed
21 over the relevant period?
22     MS. NUSSBAUM:  Approximately?
23     A.   I believe it's been relatively
24 consistent.  If anything, it would have diminished
25 slightly.

1             A. Carver
2    Q.    Are there any reasons for that?
3    A.    Yes.  Medicare Part D.
4    Q.    Are there specific Kaiser products
5 that contain no pharmacy benefit?
6    A.    Yes, there are.
7    Q.    What are those?
8    A.    Could you elaborate or ask it a little
9 differently?  I'm not sure I understand.
10   Q.    When you answer that there are Kaiser
11 products that contained no pharmacy benefit, what
12 did you have in mind?
13   A.    What I had in mind is there is a
14 description of a contract or a set of services
15 basically, the full set of services, healthcare
16 services that would -- in which the drug benefit
17 would be absent because the drug benefit is a
18 supplemental drug benefit.  It is not an automatic
19 package or not an automatic portion of the package
20 that comes along with the standard health benefit
21 coverage.  And so, there is such a contract that
22 exists.
23   Q.    You mentioned that some Kaiser
24 insureds might use Medicare Part D, as opposed to
25 pharmacy coverage through Kaiser.

1             A. Carver
2        Is that accurate?
3    A.    No.
4    Q.    How is that inaccurate?
5    A.    It's inaccurate in that Kaiser offers
6 a Medicare Part D benefit to each of the Medicare
7 beneficiaries that are not already covered by
8 their employer groups.
9    Q.    What are the reasons why certain
10 insureds might opt not to have Kaiser pharmacy
11 benefit coverage?
12        MS. NUSSBAUM:  If you know.
13        These are the reasons that the
14 insureds would have?
15   Q.    Actually, what reasons does Kaiser
16 know -- does Kaiser know of reasons why its
17 insureds sometime opt not to have pharmacy benefit
18 coverage?
19        MS. NUSSBAUM:  Don't speculate,
20 please.
21   A.    A situation in which I'm aware would
22 be a labor trust that represents some small number
23 or some number of its workers that may have
24 decided to obtain their drug benefit coverage
25 elsewhere.  That is the circumstance in which I am

1             A. Carver
2 referencing.
3    Q.    And you mentioned earlier that copays
4 might vary between one contract and another.
5        What are the different kinds of copays
6 that are incorporated in Kaiser's plans?  I guess
7 to start off, are fixed copays involved in some
8 plans?
9    A.    Yes.
10   Q.    And are percentage copays involved in
11 others?
12   A.    Typically not.
13   Q.    And aside from fixed or percentage,
14 are there any other kinds of copay structures?
15   A.    The primary variant would be just a
16 two-tier in which there would be a different
17 copayment for a generic product as compared to a
18 branded product.  And so that would be the major
19 other variant compared to just a single fixed
20 copay.
21   Q.    With regard to percentage copays, I
22 think you said something like principally not.
23        In what instances would you see a
24 percentage copay?
25   A.    There are no percentage copays in

1             A. Carver
2 California at all, and that -- that covers
3 75 percent of our membership around the country.
4 And I -- generally, there are not percentage
5 copayments in our programs, but there may be an
6 exception and a region may have some little
7 contract basically.
8        That's -- that's why I said
9 principally not.  The situation I'm aware of that
10 has such an arrangement would be in Colorado,
11 where there is a percentage -- percentage
12 copayment up to a maximum on some of the
13 biopharmaceutical products.
14   Q.    Who decides whether to have such a
15 maximum?  I can be a bit more helpful.
16        Is that something that an individual
17 employer group approaches Kaiser with?  I mean, do
18 they state that they want to impose that kind of
19 cap?
20   A.    Yes, employer groups do approach
21 Kaiser and often have particular benefits in mind.
22   Q.    And Kaiser is able to provide certain
23 customized benefits structures?
24   A.    Yes.
25   Q.    And earlier you said that each of the

```
 1              A. Carver
 2  regions does have a P&T committee.
 3      Q.   Have each of the regions had a P&T
 4  committee over the entire relevant period?
 5      A.   Yes, I believe so.
 6      Q.   Have the P&T committees been having
 7  roughly the same level of activity throughout the
 8  relevant period?
 9      A.   I believe so.
10      Q.   Has Kaiser relied on Med Impacts' P&T
11  committee at all?
12      A.   No.
13      Q.   And you said in southern California
14  the P&T committee has 12 or 13 members, is that
15  correct?
16      A.   That's correct.
17      Q.   And the northern California P&T
18  committee has 18?
19      A.   17 or 18.  I -- yes.
20      Q.   Do you know the approximate number of
21  members of each of the other regions' P&T
22  committees?
23      A.   I do not.
24      Q.   Who would know that information?
25      A.   The pharmacy director in each of the
```

```
 1              A. Carver
 2  respective regions, as well as the director in
 3  each of the respective regions.
 4      Q.   With regard to the southern California
 5  P&T committee, is 12 or 13 the number of voting
 6  members or is that the number of total voting and
 7  nonvoting members?
 8      A.   No, there are several other nonvoting
 9  members.
10      Q.   Several would be a number like six or
11  any estimate as to roughly how many nonvoting
12  members there are?
13      A.   Twelve.
14      Q.   And the voting members are, in
15  addition to yourself, entirely composed of
16  physicians employed by the Permanente Medical
17  Group?
18      A.   Correct.
19      Q.   And then who are the nonvoting
20  members?
21      A.   Generally the area of pharmacy
22  directors and then there is an additional
:3  physician nonvoting member.
24      Q.   Who is also employed by the Permanente
25  Medical Group?
```

```
 1              A. Carver
 2      A.   Yes.
 3      Q.   Aside from yourself and the area of
 4  pharmacy directors, are there other individuals on
 5  the P&T committee who would have pharmacy
 6  training?
 7      A.   Attending the meeting generally are
 8  representatives, or at least in recent years have
 9  been representatives of the Drug Information
10  Service.
11      Q.   How long do members typically serve on
12  the P&T committee?
13      A.   I don't know that there is an average,
14  generally there has not been high turnover on the
15  P&T committee.  For example, in southern
16  California, I think we just have the second
17  chairman since I've been participating in the P&T
18  committee.  So that's 20 years.  Two chairmen, a
19  lot of stability.
20      Q.   And does the P&T committee determine
21  what drugs are placed on the formulary?
22      A.   They do.
23      Q.   And you mentioned that there's often a
24  two-tier formulary, is that correct?
25      A.   In recent years, yes, that's become
```

```
 1              A. Carver
 2  the -- become available, yes.
 3      Q.   And it's the same formulary for all
 4  clients in a particular region, is that right?
 5      A.   That's correct.
 6      Q.   When you say in recent years it's
 7  become available earlier, was it just a
 8  single-tier formulary?
 9      A.   Yes.
10      Q.   When did two-tier formularies become
11  available?
12      A.   I would be estimating, but I would say
13  more prevalent in the last five years.
14      Q.   Has Kaiser ever used a three-tier
15  formulary?
16      A.   Not in the classical sense.
17      Q.   In what sort of non-clinical sense has
18  Kaiser ever used a three-tier formulary?
19      A.   Tier one would be generic.  Tier two
20  would be a branded.  And then the third category
21  would be products that are patients that just pay
22  full price for.
23      Q.   And that kind of formulary has been
24  implemented at some point at Kaiser?
25      A.   Yes.  It's not the formulary, that's
```

A. Carver

2 the benefit design. For the formulary, the
3 product is either in the formulary or not in the
4 formulary.
5    Q.   Who actually determines the benefit
6 design?
7    A.   I think I mentioned that the people
8 that have input in the benefit design or the
9 benefit committee, and ultimately it's the health
10 plan manager that adopts and then sells the
11 various benefit designs.
12    Q.   The P&T committee determines whether
13 the drug is on or off the formulary before you
14 didn't have input into whether a patient might pay
15 more or less copay for a particular drug?
16    A.   That's correct.
17    Q.   Who is on the benefit committee?
18    A.   By name, I -- maybe I could -- is
19 there such a thing as providing the names after
20 the fact or fill in the blanks?
21    Q.   Actually, I'm not interested in
22 particular names.
23    MS. NUSSBAUM:  Categories of
24 employees?
25    MR. JAMES:  Yes, right.

A. Carver

2 formulary.  And when other considerations are
3 about equal, they also are mindful of the cost of
4 a particular agent.
5    Q.   Are there any other issues you can
6 think of?
7    A.   Not that are relevant to this case.
8 Certainly there are -- there's discussion
9 regarding warnings or advisory information that
10 should be considered for inclusion in our
11 electronic medical record number, electronic
12 medical record system, which is really a new
13 responsibility of the P&T committee.  But that's
14 about it.
15    Q.   Has a drug ever been denied placement
16 on Kaiser's formulary because it was not safe?
17    A.   Yes, there have been such
18 circumstances that have occurred.
19    Q.   Are you aware of any recent examples?
20    A.   I don't know by recent.  I can recall
21 specifically a few years ago, Interluken 2 was not
22 added to the formulary, but it was being used for
23 a cancer indication, and it appeared that more
24 people were dying than being helped by the product
25 at the time.

A. Carver

2    A.   The health plan manager, there is
3 the -- we actually have benefit development people
4 within the health plan who would be a category of
5 people that would serve, and then there are --
6 there's representation from marketing on the
7 committee, and then I think as I previously
8 mentioned, there's physician representation
9 particularly as it relates to the medical benefit.
10    Q.   Have the responsibilities of the P&T
11 committee been roughly the same throughout the
12 relevant period?
13    A.   Of the P&T committee, yes.
14    Q.   And what about the benefits committee?
15    A.   I would say yes.
16    Q.   What factors does the P&T committee
17 consider in deciding whether or not to put a drug
18 on the formulary?
19    A.   They consider the safety of the
20 product.  They -- if information is available,
21 they consider what therapeutic advantage a
22 particular product would have relative to other
23 products that are already on the formulary.  That
24 they would consider the effectiveness of a
25 product, relative to other products on the

A. Carver

2    Q.   I think earlier you said that the
3 committee looks at the therapeutic advantage of
4 the product relative to other products currently
5 on the formulary and also the effectiveness of the
6 product relative to other products, are, I guess
7 as a safety of the new product relative to other
8 products on the formulary also considered?
9    A.   Yes.
10    Q.   And are side effects considered as
11 well?
12    A.   Yes.
13    Q.   Are off-label uses of a drug
14 considered when deciding to add a drug to the
15 formulary?
16    MS. NUSSBAUM:  Can you be more
17 specific?
18    Q.   Does the fact that a particular drug
19 is prescribed off-label enter into the committee's
20 considerations in some way?
21    MS. NUSSBAUM:  I'm still not
22 understanding.  Can you be more specific with
23 respect to that?
24    Q.   You can answer if you understand the
25 question.

Page 74

A. Carver

1          A. Carver
2     A.   We would, I would say the answer to
3 that is no, not generally.  Generally when a
4 product is reviewed, it's a new entry to the
5 market and the product is evaluated based upon the
6 approved indications and the information that's
7 available at the time that the product has been --
8 has entered the market.
9     Q.   After the P&T committee decides to add
10 a drug to the formulary, does it revisit that
11 decision, and you know, decide to remove a
12 particular drug from the formulary?
13     A.   Sure.
14     Q.   Under what occasions would that occur?
15     A.   It would -- it primarily occurs when
16 additional agents come to market and an additional
17 agent would be superior to the product that's on
18 the formulary.
19          Other occasions that happens quite
20 regularly would be if there is a therapeutic
21 substitute, a comparable product that's become
22 available generically and then therefore, at
23 significantly less cost, and if it has the
24 comparable effectiveness for its intended use,
25 then those circumstances also result in the

Page 75

1          A. Carver
2 removal of the product from the formulary.
3          Another situation would be when a
4 branded product goes off patent, becomes available
5 generically itself and then that particular old
6 branded product is removed from the formulary and
7 is replaced with the generic product or the
8 generic form of the product.  Those are three
9 examples that come to mind.
10     Q.   Is there any policy of reviewing all
11 drugs, prescription drugs on the formulary on some
12 sort of periodic basis?
13     A.   I don't believe we have such a policy
14 to review all drugs.  You know.
15     Q.   I mean, so if something, if a drug
16 were introduced in 1994 --
17     A.   Yes --
18     Q.   -- there would be no reason to, I
19 mean, unless one of these sorts of events that you
20 described occurred, there would be no reason to
21 revisit its formulary status?
22     A.   Generally not.
23     Q.   Once the P&T committee decides to
24 place a drug on the formulary, are there any
25 individuals at Kaiser who could override the

Page 76

1          A. Carver
2 committee's recommendation or decision?
3     A.   No.
4     Q.   I guess in 1994, at the beginning of
5 the relevant period, what was -- actually --
6 sorry -- strike that.
7          Once a drug is added to the formulary,
8 can any Kaiser Permanente physician prescribe that
9 drug?
10     A.   Well, technically, yes.  Technically
11 yes, they can.
12     Q.   Are there any restrictions that would
13 circumscribe their use in some way?
14     A.   There are occasions in which the P&T
15 committee will try to limit the prescribing to
16 specialists or subspecialists depending upon what
17 the drug is.
18          As an example, the cancer drugs are
19 usually relegated to the oncologists or
20 hematologists.  And so there are some restrictions
21 that on occasion are applied.
22     Q.   How are those restrictions enforced?
23     A.   It's really a -- since this is a
24 medical staff committee and a physician decision
25 essentially, it's one generally of

Page 77

1          A. Carver
2 self-administration, self-policing within the
3 medical group, and once a prescription is actually
4 written and prescribed and sent to one of our
5 pharmacies for a product that is on the formulary,
6 then it gets dispensed and paid for.
7     Q.   Has Kaiser had a problem with doctors
8 not following these restriction guidelines?
9          MS. NUSSBAUM:  I would ask for
10 clarification of what you mean by that.  What do
11 you mean by a "problem"?
12     Q.   Do Kaiser physicians typically follow
13 the restrictions that you described?
14          MS. NUSSBAUM:  I would -- again, I
15 don't know that there's a typical case here.  What
16 period of line?  What restrictions you're talking
17 about?
18     Q.   You can answer if you understand the
19 question.
20          MS. NUSSBAUM:  Please don't speculate.
21     A.   Could you ask me the question again,
22 please?
23          MR. JAMES:  Could you read back the
24 question?
25          (Record read.)

A. Carver

2    A.   I think there was a question
3 subsequent to that that had the word "problem" in
4 it.
5    Q.   Actually, no, I struck the -- you can
6 strike the earlier question.  I think the
7 question, as I understand, was the latter one.
8    A.   The one that says: Does Kaiser have a
9 problem with something?
10    Q.   No, I think you can ignore that
11 question.
12       MS. NUSSBAUM: So what is the question
13 you want him to answer?
14       MR. JAMES: If you can read back the
15 question you just read.
16       (Record read.)
17       MS. NUSSBAUM: And again, only if you
18 can testify without speculating and if you
19 understand what "typically" and "restrictions"
20 mean.
21    A.   I would say in a majority of cases,
22 probably so.
23    Q.   Has Kaiser identified non-compliance
24 as a particular problem to be addressed?
25       MS. NUSSBAUM: Please don't speculate.

A. Carver

2    A.   I believe in circumstances in which
3 prescribing is far beyond what is intended, then I
4 believe that we do take steps to make certain that
5 the prescribing is more in line with what's
6 intended.
7       MR. JAMES: I'd like to mark another
8 exhibit.
9       (Kaiser-2 marked for identification.)
10    Q.   Have you seen this document before?
11    A.   I believe I have.
12    Q.   What is it?
13    A.   This is a document that provides some
14 information to the -- that's provided some
15 information to the P&T committee back in September
16 of 1997 regarding the drug Neurontin.  It provides
17 a short amount of background regarding it having
18 been -- it being Gabapentin added to the formulary
19 in September of '94.
20    Q.   Do you see a line, the third line from
21 the top of the document that says, "P&T review
22 date"?
3    A.   Of September 1997?  Yeah.
24    Q.   Is this the kind of document that
25 would be used by Kaiser in the ordinary course of

A. Carver

2 its business?
3    A.   Yes.
4    Q.   Is there a particular name for this
5 document?
6    A.   Well, I don't see a title on it.  It's
7 just summary information for P&T committee.
8    Q.   On the, I guess the third bullet point
9 beneath the heading background, could you read
10 that line aloud?
11    A.   "Gabapentin was reviewed by the
12 regional P&T committee in September of '94 and the
13 decision was made to accept Gabapentin to the
14 formulary.  Restricted to neurology."
15    Q.   And what does the phrase "restricted
16 to neurology" mean?
17    A.   What that means is the prescribing
18 ought to be restricted to the neurologists, given
19 this product was introduced to the market for the
20 treatment of seizures.  And the neurologists are
21 primarily the physicians involved in the treatment
22 of seizure disorders.
23    Q.   If another type of physician were to
24 try to prescribe Neurontin, would they be able to
25 do so?

A. Carver

2       MS. NUSSBAUM: That's a hypothetical
3 question.
4    Q.   With regard to enforcement of this
5 restriction, is this the sort of -- sort of
6 self-policing practice that you referred to
7 earlier?
8    A.   Yes, it is.
9    Q.   How would this restriction be
10 communicated to physicians?
11    A.   It would be communicated by way of a
12 communication of the various decisions of the P&T
13 committee, and in 1997, I believe that was done by
14 way of paper.
15    Q.   Would they receive paper periodically
16 or just the initial time that the --
17    A.   Subsequent to the P&T committee
18 meetings.
19    Q.   If, at a later point in time, a
20 particular physician wanted to know whether they
21 were allowed to prescribe Neurontin or whether
22 there was a restriction, you know, pertaining to
23 Neurontin that would limit it to some other
24 physician group, how would they go about finding
25 that out?

Page 82

A. Carver

1
2    A.   The -- the physician would most likely
3  ask the question of their local pharmacy and
4  therapeutics committee chairman or a member of
5  that committee.
6    Q.   Can you read the bullet point
7  following the one that you just read beginning
8  with the word "recently"?
9    A.   "Recently, the chiefs of
10  anesthesiology requested that the restriction for
11  Gabapentin be expanded to include anesthesiology
12  for the treatment of reflex sympathetic
13  dystrophy."
14    Q.   Who are the individuals within Kaiser
15  that can propose an expansion of a restriction for
16  a particular prescription drug?
17    A.   Any physician could.
18    Q.   Any individual physician could?
19    A.   They could.
20    Q.   Who typically does so?
21    MS. NUSSBAUM:  Don't speculate.  If
22  there is a typical case, or if the answer has
23  already been given.
24    A.   Often requests related to the
25  formulary would come forward from specialists or

Page 83

A. Carver

1
2  subspecialists' physicians.
3    Q.   Two recommendations often come from
4  chiefs of particular specializations?
5    A.   Yes.
6    Q.   What does the term "chief of
7  anesthesiology" or "chief of neurology" mean?
8    A.   At each of the medical centers within
9  a geographic region, there is a chief of service
10  of that particular service.  So a chief of, in
11  this particular case, a chief of anesthesiology.
12    There would be a chief of anesthesia
13  at each of the medical centers.  Those chiefs
14  collectively are referred to as the chiefs of
15  anesthesiology.
16    Q.   And that would be a group within one
17  of the regions?  This would be a southern
18  California chiefs of anesthesiology?
19    A.   Correct.
20    Q.   Did the chiefs of anesthesiology
21  provide any reason to the P&T committee that they
22  were making this request?
23    MS. NUSSBAUM:  If you know.
24    A.   I do not -- I do not know.  I do not
25  recall.

Page 84

A. Carver

1
2    Q.   Do specialty chiefs generally provide
3  reasons to the P&T committee motivating their
4  requests?
5    A.   Generally, yes.
6    Q.   In what form do they provide those
7  reasons?
8    A.   As part of the recommendation, part of
9  the rationale for wanting to, for the P&T to make
10  a ruling.
11    Q.   And that would be a document separate
12  from this one, is that right?
13    A.   It may be a document.  It may be
14  expressed through the P&T chief to -- excuse me,
15  from the specialty group to the P&T chair as to
16  the rationale.
17    Q.   Are there requests generally made
18  directly to the P&T committee or do they go
19  through other divisions of Kaiser before they make
20  their way to the P&T committee?
21    A.   No, they generally go directly to the
22  P&T committee.  There may be some discussion with
23  the Drug Information Services, as an example.
24    Q.   Between September 1994 and the date of
25  this document, would the formulary have restricted

Page 85

A. Carver

1
2  Gabapentin to neurology?
3    A.   That would have been the status of
4  Neurontin on the formulary; yes.
5    Q.   Are you aware of any off-label use for
6  which a neurologist might have prescribed
7  Neurontin?
8    MS. NUSSBAUM:  Please restate your
9  question.  That's totally unclear.
10    Q.   If you understand the question, you
11  can answer.
12    MS. NUSSBAUM:  Do you want to know if
13  during this period of time if a doctor, be it a
14  neurologist or any other doctor wrote a
15  prescription for Neurontin, would Kaiser have paid
16  for it?
17    Q.   Actually, if Kaiser physicians had
18  followed this restriction that was in place
19  between 1994 and 1997, would they have prescribed
20  Neurontin for any off-label use?
21    MS. NUSSBAUM:  Objection.
22    A.   Which doctors?
23    Q.   Kaiser physicians.
24    MS. NUSSBAUM:  Objection.
25    Do you understand the question?

22  (Pages 82 to 85)

1              A. Carver
2      A.   Well, I wouldn't know why the
3  prescription was being written.
4      Q.   You told me that.  I go back one step.
5          When it's written that there's a
6  restriction to neurology, does that mean that a
7  neurologist can prescribe the particular
8  prescription drug for any -- for any use?
9      A.   Yes.
10     Q.   And it didn't necessarily have to be a
11  use related to neurology?
12     A.   The neurologists could prescribe the
13  drug for any purpose that the neurologist chose.
14     Q.   And that would comply with this
15  restriction?
16     A.   Yes.
17     Q.   Is Kaiser seeking to recover damages
18  from the defendants for any off-label use that
19  would be typically treated by a neurologist?
20         MS. NUSSBAUM:  Objection.  The damages
21  that Kaiser is seeking or set forth in the
22  Complaint and other legal documents will be the
23  subject of expert testimony.
24         MR. JAMES:  I'm actually not calling
25  for expert testimony.

1              A. Carver
2      Q.   Are you familiar with the uses for
3  which Kaiser is seeking damages?
4      A.   Generally; yes.
5      Q.   Can you list those uses?  If it would
6  be helpful to have a copy of the Complaint, I can
7  mark the Complaint as an exhibit.
8      A.   Oh, that would be very helpful.
9          (Kaiser-3 marked for identification.)
10     Q.   Do you recognize this document?
11     A.   Yes, I do.
12     Q.   And what is it?
13     A.   What this represents in my lingo, and
14  perhaps not legal lingo, would be the Complaint
15  against Pfizer regarding Neurontin and its
16  marketing practices and off-label use regarding
17  off-label use and the -- the deceit and fraud and
18  all that that occurred in influencing doctors to
19  prescribe Neurontin for indications that were far
20  beyond what it was intended for.
21     Q.   And reviewing this document, can you
22  determine what uses Kaiser is seeking to recover
23  damages for?
24         MS. NUSSBAUM:  This document is 133
25  pages, and the witness has had it for, I don't

1              A. Carver
2  know, 45 seconds.  If you want to direct his
3  attention to a particular page or section of the
4  document, you know, he can answer your question.
5  Otherwise, I think it's really unfair.
6         MR. JAMES:  Well, the document has a
7  table of contents in the first couple of pages so
8  that might help you recall where you might find
9  the uses that Kaiser is seeking to recover damages
10  for.
11         MS. NUSSBAUM:  Okay.  Are you
12  referring to the table of contents, page two,
13  little i that begins, talking about page 40,
14  "False and misleading statements regarding pain"
15  and then there's a list of other indications as
16  well?  Is that what you're referring to?
17         MR. JAMES:  I mean, I just want to
18  know what uses Kaiser is seeking to recover
19  damages for.  Those pages may be helpful, but you
20  know, I'm actually --
21         MS. NUSSBAUM:  The witness has already
22  indicated the off-label uses, and he's indicated
23  as a result of the fraud perpetrated by the
24  defendant.
25         MR. JAMES:  I was actually looking for

1              A. Carver
2  a statement of any given off-label use.
3      A.   Off-label uses including the use for
4  pain regarding the use for restless leg syndrome,
5  regarding the use for bipolar disorders, socio
6  phobias, panic disorder, migraine, prophylaxis
7  treatment, basically related to suggestions or
8  dosages that were far in excess of those that were
9  recognized as being effective for a variety of
10  conditions and any such situations in which if
11  there were any that Neurontin would have been used
12  as the sole source of therapy for -- as it relates
13  to epilepsy or seizure disorders.
14     Q.   You didn't mention -- diabetic
15  peripheral neuropathy, which is mentioned in the
16  Complaint, is that a condition in which Kaiser is
17  seeking to recover damages for?
18         MS. NUSSBAUM:  If you know.
19     A.   To the extent that there was
20  suggestions for use for peripheral neuropathies
21  including diabetic neuropathy, prior to there
22  being any documented evidence that was legitimate
23  documented evidence in the literature, then yes.
24     Q.   Just to clarify that, Kaiser's
25  position is that there now exists documented

A. Carver

1
2  evidence establishing the efficacy of Gabapentin
3  for diabetic peripheral neuropathy, is that
4  correct?
5      A.   That is correct.
6      Q.   So a patient who took Gabapentin for
7  diabetic peripheral neuropathy would receive an
8  effective treatment?
9      A.   That's correct.
10      Q.   And would the same patient have
11  received effective treatment had they been
12  prescribed Gabapentin for diabetic peripheral
13  neuropathy at the beginning of the class period?
14      MS. NUSSBAUM: I think that's been
15  asked and answered.
16      Q.   You can answer.
17      A.   To the degree that there were known,
18  proven, recognized therapies for diabetic
19  peripheral neuropathy, including diabetic
20  peripheral neuropathy earlier in the period and
21  there was -- and Neurontin would have been used as
22  first-line therapy, as opposed to relegated to a
23  lower level of therapy, then I believe that some
24  remuneration is indicated.
25      Q.   Remuneration is indicated if there was

A. Carver

1
2  an alternative therapy?
3      A.   In 1995, as an example.
4      Q.   And Neurontin was prescribed as a
5  first-line, as opposed to adjunctive therapy, are
6  those the two conditions that would have to be
7  satisfied?
8      MS. NUSSBAUM: Once again, I would
9  object. This witness is not here as an expert
10  witness. I think that the Complaint sets forth --
11  you asked a question in general. And he's given
12  you a general answer. And I think with respect
13  to, you know, particular conditions, if you want
14  him to go to page 44 of the Complaint, which is I
15  guess the section --
16      MR. JAMES: If you have an objection
17  to the question, could you just state the
18  objection and then we can move on?
19      MS. NUSSBAUM: I don't think it's fair
20  to try to mislead the witness. As I said before,
21  this is a 139-page document that he's had before
22  him right now for, you know, two or three minutes.
23  So, if the witness before he can testify about the
24  document wants to look at it, I think it's only
25  fair that you give him that opportunity.

A. Carver

1
2      Q.   Have you examined this document before
3  the last 45 seconds?
4      A.   I have reviewed it generally, yes.
5      Q.   And were you able to determine in what
6  instances Kaiser believes that it's entitled to
7  remuneration for prescriptions of Gabapentin that
8  are paid for?
9      A.   I believe with -- I believe I would
10  add to what I have already provided to you any
11  situations in which this product was used for
12  attention deficit disorder.
13      Q.   Actually, I'd like to go back to the
14  question I had earlier about the circumstances in
15  which Kaiser believes that it's entitled to
16  remuneration for prescriptions of Gabapentin for
17  diabetic peripheral neuropathy?
18      A.   Yes.
19      Q.   And you indicate in 1995, remuneration
20  would be appropriate in some circumstances, is
21  that correct?
22      MS. NUSSBAUM: I would again state my
23  objection.
24      MR. JAMES: No. You know, we've
25  actually heard your objection.

A. Carver

1
2      MS. NUSSBAUM: Because if you are
3  referring to a document, that I believe the
4  witness has the opportunity to look at the section
5  that starts at page 42 of the document, let him
6  look at it and then he can give you a response. I
7  think it's very unfair to be playing a memory game
8  with a 139-page document.
9      Q.   Have you been able to determine the
10  circumstances in which Kaiser believes its
11  entitled to remuneration for diabetic peripheral
12  neuropathy?
13      A.   Not totally; however, upon review of,
14  you know, of information that's contained on page
15  42, it was -- it was less than clear that
16  Neurontin was effective for the treatment of
17  diabetic peripheral neuropathy.
18      Q.   And you've told me that it now is
19  clear that Neurontin is effective for diabetic
20  peripheral neuropathy?
21      MS. NUSSBAUM: If you know.
22      Q.   As corporate representative of Kaiser,
23  if you know?
24      A.   Well, I believe that you -- that the
25  Food and Drug Administration has still not

Page 94

A. Carver

1 approved it for that particular indication.
2 Q. I guess my question was somewhat
3 different. Would you like to have it restated?
4 A. Okay.
5 MR. JAMES: Could you read back the
6 question?
7 (Record read.)
8 A. And you're going to restate that?
9 Q. No, that was the question.
10 MS. NUSSBAUM: The question is: Do
11 you know? And if you don't, then you just don't.
12 A. Yeah, I don't.
13 Q. Kaiser has no knowledge of whether or
14 not Neurontin is effective for diabetic peripheral
15 neuropathy?
16 A. I'd say that Kaiser, the health plan,
17 would rely upon the physicians to make that
18 determination.
19 Q. And how the physicians made the
20 determination -- again, if you know?
21 A. Yeah. I don't know that they formally
22 have.
23 Q. Did anyone from Kaiser authorize the
24 filing of this Complaint?

Page 95

A. Carver

1 A. Yes, certainly -- well, I had
2 discussion with counsel regarding the filing of
3 this Complaint.
4 Q. And did you authorize the filing of
5 this Complaint?
6 A. I certainly indicated that we should
7 move forward with it; yes.
8 Q. So the answer is yes?
9 A. The answer is yes.
10 Q. And in filing this Complaint, you were
11 seeking damages from the defendants for
12 Gabapentin prescribed for diabetic peripheral
13 neuropathy, is that correct?
14 MS. NUSSBAUM: The document speaks for
15 itself.
16 MR. JAMES: You know, you've made the
17 same objection like three times, you know, I am
18 asking what Kaiser is seeking recovery for --
19 MS. NUSSBAUM: And it's set forth in
20 the third coordinated Amended Complaint.
21 MR. JAMES: No, it's certainly not.
22 MS. NUSSBAUM: Filed by Kaiser.
23 MR. JAMES: And if it's so clear, he
24 can definitely, you know, answer that question.

Page 96

A. Carver

1 Q. In filing this Complaint, was Kaiser
2 seeking recovery from the defendants for Neurontin
3 prescribed for diabetic peripheral neuropathy?
4 A. I believe that we are seeking damages
5 or money basically for all of the uses for
6 Neurontin for which there was not sufficient
7 demonstration of its effectiveness and for which
8 there was a number of promotional efforts that --
9 Q. You know, actually, we will get to
10 those --
11 A. Fraudulently, basically characterizing
12 this particular product for uses for which there
13 was insufficient evidence and to the degree that
14 diabetic peripheral neuropathy was part of that in
15 1995, then my answer would be yes.
16 Q. And to just to state the answer as a
17 yes or no, in filing this Complaint, was Kaiser
18 seeking recovery from the defendants for Neurontin
19 prescribed for diabetic peripheral neuropathy?
20 It's a yes-or-no question.
21 A. Then to be absolutely accurate, I need
22 to review this to determine whether or not it's in
23 there or not.
24 Q. Aside from looking at this document,

Page 97

A. Carver

1 you have no knowledge as Kaiser's corporate
2 representative of whether it's seeking recovery
3 for diabetic peripheral neuropathy?
4 MS. NUSSBAUM: Objection, again. You
5 know, it's in the Complaint. We are not yet at
6 expert testimony here.
7 MR. JAMES: I'm not calling for expert
8 testimony. I'm asking for what damages you're
9 seeking to recover in this action. If you don't
10 have knowledge of what damages you're seeking from
11 the defendant, you know, then say so.
12 MS. NUSSBAUM: I think it's set forth
13 in the document, in the Complaint.
14 Q. Would you like --
15 MS. NUSSBAUM: I specifically refer
16 you in the Complaint to the allegations.
17 MR. JAMES: I prefer that you not
18 coach the witness on the answer, if you could.
19 MS. NUSSBAUM: I'm not coaching the
20 witness, but I think that you're being very unfair
21 with, you know -- you know, with a 139-page
22 complaint that's been filed by the court.
23 Q. You have named a total of eight or --
24 yes, actually nine indications, if we are to

Page 98

A. Carver

1
2 include diabetic peripheral neuropathy for which
3 Kaiser is seeking recovery. And it's actually
4 either eight or nine, depending on whether
5 diabetic peripheral neuropathy is included.
6     Do you know whether Kaiser is seeking
7 recovery for eight uses or for nine?
8     A.   Not without further review.
9     Q.   So, at this point, you have no
10 knowledge of whether Kaiser is seeking recovery
11 for diabetic peripheral neuropathy?
12         MS. NUSSBAUM: You want to specify the
13 years for which it's seeking recovery for that?
14         MR. JAMES: I'd like to know. I
15 actually don't know what years Kaiser is seeking
16 recovery for.
17         MS. NUSSBAUM: Are you talking about
18 the entire class period? What are you talking
19 for?
20     Q.   For any portion of the class period,
21 are you seeking recovery for Neurontin prescribed
22 for diabetic peripheral neuropathy?
23     A.   To the degree that it would have been
24 used as a first-line agent way before there was
25 evidence, then yes.

Page 99

A. Carver

1
2     Q.   Okay. So the that few conditions are,
3 it must have been before there was evidence and it
4 was used as a first-line agent?
5     A.   Correct.
6     Q.   So, if Neurontin was prescribed as an
7 adjunctive therapy for diabetic peripheral
8 neuropathy at any point in the class period,
9 Kaiser --
10         MS. NUSSBAUM: The witness has not
11 stated that. The witness has not stated that.
12     Q.   Is that an accurate statement of your
13 testimony?
14         MS. NUSSBAUM: Well, I would object to
15 this line of testimony. As I said, we are not yet
16 in the damages phase. There has been other
17 answers to interrogatories and other discovery
18 here.
19         You know, the witness has testified to
20 the best of his ability on this, and I think that
21 you're badgering the witness at this point.
22 You're misstating his testimony, and we should
23 move on.
24     Q.   Would you believe that Pfizer is
25 entitled to know the uses of Neurontin for which

Page 100

A. Carver

1
2 Kaiser is seeking to recover damages from it?
3         MS. NUSSBAUM: Objection.
4     Q.   Actually, this is just you in your
5 personal capacity?
6     A.   In my personal capacity, yes.
7     Q.   Why would that be?
8         MS. NUSSBAUM: This is not an expert
9 witness on that.
10         MR. JAMES: I'm not asking for expert
11 testimony. He's testifying in his personal
12 capacity. I'm wondering whether in his opinion he
13 believes that Pfizer is entitled to know the uses
14 of Neurontin for which Kaiser is seeking to
15 recover damages from it. He's answered the
16 question as yes. And I've asked the natural
17 follow-up, which is why?
18         MS. NUSSBAUM: Well, let's correct the
19 record then. Pfizer does know, there have been
20 answers to discovery requests filed in this --
21     Q.   You know, at this point in this
22 deposition, you won't tell me whether you're
23 seeking recovery for diabetic peripheral
24 neuropathy or not, and I really have no idea.
25     A.   That misstates my testimony, sir.

Page 101

A. Carver

1
2         MS. NUSSBAUM: That misstates --
3     Q.   You have indicated that if it
4 was first-line therapy and it was prior to a given
5 period, in the class period, then you are seeking
6 recovery, but as to whether adjunctive therapy
7 is -- you are also seeking recovery for, that's
8 not clear.
9         MS. NUSSBAUM: Okay. This totally
10 misstates the witness' testimony. He has said
11 that they are seeking recovery for prescriptions
12 for that purpose, okay. And we have indicated
13 that precisely which prescriptions and which
14 period of time will continue to be the subject
15 here of expert testimony, and this is not a
16 witness who's here for expert testimony. The rest
17 of this has been described in great detail in the
18 Complaint and in discovery responses and I suggest
19 that we move on.
20     Q.   Would you take the view that you would
21 have to consult experts in the future before you
22 could determine whether you are seeking recovery
23 for adjunctive therapy of Neurontin as a diabetic
24 peripheral neuropathy treatment?
25         MS. NUSSBAUM: Once again, I object.

Page 102

A. Carver

1    You're asking for a legal conclusion.
2         MR. JAMES: No, I'm asking if you
3    know.
4         MS. NUSSBAUM: He's relying on
5    counsel, here, okay, relying on counsel, relying
6    on discovery in this case. This is not a lawyer.
7    This is not an expert. He's a fact witness. He
8    said that they've reviewed the Complaint. The
9    Complaint was authorized. I suggest that we move
10   on.
11   Q.   Do you think Neurontin is the same
12   product today that it was in 1994?
13        MS. NUSSBAUM: Do you understand that
14   question?
15   A.   Yes, I do. Yes, I believe it is.
16   Q.   And the patient taking Neurontin would
17   obtain precisely the same therapeutic values that
18   the same patient would have received in 1994, is
19   that correct?
20        MS. NUSSBAUM: Objection,
21   hypothetical. Calls for expert testimony. And
22   speculative.
23   Q.   You can answer.
24   A.   Okay. My answer would be that

Page 103

A. Carver

1    Neurontin would -- would act in the body today the
2    same that it did in 1994.
3    Q.   So it would have the same efficacy
4    today that it would have in 1994?
5         MS. NUSSBAUM: Objection, speculative.
6    Q.   You can answer.
7    A.   Yes, that's likely that it would.
8    Q.   Can you think of any reason why it
9    wouldn't?
10        MS. NUSSBAUM: Again, I would ask the
11   witness not to speculate. Efficacy for what? You
12   know, this is a totally hypothetical --
13   Q.   Do you think the efficacy of Neurontin
14   for any use would have changed between 1994 and
15   today?
16        MS. NUSSBAUM: Objection. The witness
17   is not here as an expert. He's not a medical
18   doctor. This is not proper in any of the
19   depositions noticed here, and I suggest that we
20   move on.
21        MR. JAMES: Are you instructing the
22   witness not to answer that question?
23        MS. NUSSBAUM: Well, I'm suggesting
24   that it's a highly speculative question calling

Page 104

A. Carver

1    for expertise that as you've qualified this
2    witness before and went through his background he
3    does not have.
4    Q.   What's your role at Kaiser again, your
5    title?
6    A.   I'm vice president of pharmacy
7    strategy and operations.
8    Q.   And as vice president of pharmacy
9    strategy and operations, you have not developed
10   the expertise necessary to answer whether
11   Neurontin in 1994 would have the same efficacy
12   that it has today, is that correct?
13   A.   I believe that it would be as
14   effective in 2007 as it was in 1994 and as useless
15   in 2007 as it was in 2005 depending upon the
16   indication.
17   Q.   And with regard to diabetic peripheral
18   neuropathy, is it effective in 2007 as it would
19   have been from 1994?
20        MS. NUSSBAUM: Objection. Calls for
21   expert testimony, speculative.
22   Q.   You can answer.
23   A.   If it were used in exactly the same
24   manner in 2007 as it was in 1994 at exactly the

Page 105

A. Carver

1    same doses, then I would say that the answer to
2    that would be yes.
3    Q.   Are you seeking to recover for
4    prescriptions of Neurontin prescribed in 2004 as
5    first-line therapy for diabetic peripheral
6    neuropathy?
7         MS. NUSSBAUM: If you know.
8    A.   To the degree that we paid -- that
9    Kaiser paid excessive money for a product and used
10   that preferentially over other products that were
11   effective then at that time, then I would say that
12   the overly exuberant marketing of this particular
13   product resulted in Kaiser paying more money at
14   that time than they should have.
15   Q.   So you're seeking recovery for
16   diabetic peripheral neuropathy in some
17   circumstances over the entire class period, is
18   that correct?
19   A.   I have not specified the class period
20   because it's -- it's -- I'm not aware without
21   talking to experts at what point in time this was
22   demonstrated to be effective for diabetic
23   peripheral neuropathy.
24   Q.   Is there some time period after which

27 (Pages 102 to 105)