Page 106

A. Carver

1
2  you're no longer seeking any recovery for
3  Neurontin prescribed for diabetic peripheral
4  neuropathy?
5      MS. NUSSBAUM: Objection. Again, this
6  is for expert testimony. This is for damages. We
7  are now in fact discovery.
8      Q. You can answer.
9      MS. NUSSBAUM: Please don't speculate.
10 Only if you know.
11     A. I cannot speculate.
12     Q. So whether Kaiser is seeking damages
13 for diabetic peripheral neuropathy at all points
14 in the -- during the class period is not a
15 question that you could answer without
16 speculation, is that correct?
17     A. That's correct.
18     Q. Let's turn back to the exhibit marked
19 Kaiser-2. Going back to the uses that you just
20 reviewed for me, which one of the uses that you
21 just named for me would have been a use often
22 prescribed by neurologists?
23     A. Bipolar disorder would likely have
24 been treated by a neurologist.
25     Q. Are there any others?

Page 107

A. Carver

1
2      A. And then certainly diabetic peripheral
3  neuropathy, such patients may have been referred
4  to a neurologist.
5      Q. Any others that you've seen?
6      A. Exclusively by a neurologist, no.
7      Q. Often by a neurologist?
8      A. Or often by --
9      MS. NUSSBAUM: Objection as to what
10 "often" means. Sometimes bipolar is seen by a
11 psychiatrist, sometimes neurologist. "Often" is a
12 meaningless term.
13     Do you want to clarify your answer?
14     Q. Well, returning back to this document
15 here, if you look at the heading "efficacy," could
16 you read aloud the first bullet point beneath that
17 heading.
18     MS. NUSSBAUM: Which document are you
19 referring to?
20     MR. JAMES: Kaiser-2.
21     A. It says, "Randomized clinical trials
22 of Gabapentin for the treatment of RSD could not
23 be found in the literature."
24     Q. And could you read the first sentence
25 of the following bullet?

Page 108

A. Carver

1
2      A. "Two letters to the editors reported
3  the efficacy of Gabapentin in relieving symptoms
4  in a total of 14 refractory RSD patients. The
5  doses of Gabapentin range from 900 to 2,400
6  milligrams per day, and in each patient, pain
7  relief was noted."
8      Q. And did you see a sentence in that
9  same paragraph that says, "The information
10 presented in these two letters was very limited
11 and these were not clinical trials"?
12     A. Yes, I do.
13     Q. Do you know if the P&T committee in
14 1997 accepted the request of the chiefs of
15 anesthesiology that the restriction of Gabapentin
16 be expanded to include RSD?
17     A. I think they did, yes.
18     Q. Do you think that was an appropriate
19 decision for them to make in light of the status
20 of the clinical literature at the time?
21     MS. NUSSBAUM: Objection. In what
22 capacity are you asking him if he thought that was
23 an appropriate decision?
24     Q. Does Kaiser view that decision as an
25 appropriate clinical decision to have made?

Page 109

A. Carver

1
2      MS. NUSSBAUM: Objection. The
3  document speaks for itself.
4      Q. This document sets forth a summary of
5  a request by the chiefs of anesthesiology, is that
6  correct?
7      A. It is.
8      Q. And I'd like to know Kaiser's view
9  regarding the appropriateness of their response of
10 the P&T committee to that request.
11     MS. NUSSBAUM: Objection. View at
12 what time? View after they learned of the
13 whistleblower suit or view of the allegations or
14 at the time that the decision was made?
15     Q. Today does Kaiser review this decision
16 by the P&T committee in September of 1997 as an
17 appropriate decision?
18     MS. NUSSBAUM: Objection. Only if you
19 know.
20     A. I think, yes, today this would be a
21 questionable decision.
22     MR. JAMES: I think we'll take our
23 break now since the tape is running out.
24     VIDEOGRAPHER: The time is
25 approximately 3:59. This ends tape number two.

Page 110

A. Carver

2 We're now going off the record.

3      (Recess.)

4      VIDEOGRAPHER: The time is
5 approximately 4:12. This begins tape number
6 three. We are now on the record.
7 BY MR. JAMES:

8      Q.   When we last went off the record, we
9 were discussing the P&T committee's decision in
10 1997 to expand the restriction of Gabapentin to
11 include RSD, and I believe you had stated that
12 Kaiser today might or would regard that decision
13 as questionable, is that correct?

14      A.   That's correct.

15      Q.   Is it might or would?

16      A.   Would.

17      Q.   Why would that decision be regarded as
18 questionable by Kaiser today?

19      A.   It would be regarded as questionable
20 because of this, the RSD basically being a
21 collection of various pains that required
22 treatment basically for which I think if we look
23 at the evidence today, there was -- there's little
24 evidence that this product would be effective in
25 some of these indications, and I believe that --

Page 111

A. Carver

2 that in seeking approval for a more general use of
3 Neurontin, that the anesthesiologists were likely
4 influenced by the information that was available
5 in the marketplace regarding the marketing and
6 other activities that had taken place to persuade
7 people of the effectiveness of the use of
8 Neurontin in pain. And so looking back today, I
9 think that a different decision would be made.

10      Q.   You stated that the anesthesiologists
11 might have been influenced by information in the
12 marketplace or that they definitely were
13 influenced by information in the marketplace?

14      A.   I would say that our anesthesiologists
15 were charged with basically helping provide relief
16 to a number of pain indications for patients that
17 are seeking relief, and I think that our
18 anesthesiologists were trying to be helpful and
19 the P&T committee certainly was trying to be
20 respectful of that desire of the anesthesiologists
21 to be helpful to patients.

22      Q.   Do you have any information that would
23 suggest that the defendants communicated any
24 information to the anesthesiologists that
25 influenced this recommendation?

Page 112

A. Carver

2      A.   I do not. I think that counsel and --
3 I believe that that information is still in the
4 process of coming forward through the process with
5 counsel.

6      Q.   But as of today, as Kaiser's corporate
7 representative, you have no knowledge of any facts
8 that would indicate that the defendants influenced
9 the decision of the anesthesiologists --

10      MS. NUSSBAUM: Objection --

11      Q.   -- to request the expansion of the
12 Gabapentin restriction in 1997?

13      MS. NUSSBAUM: Objection, as set forth
14 very clearly in the Complaint, which you have
15 marked --

16      MR. JAMES: You know, your objection
17 is preserved.

18      MS. NUSSBAUM: The scheme that was out
19 there that was relied upon by these plaintiffs.

20      Q.   You can answer the question.

21      A.   I have no specific thing that I could
22 point to that said that representatives of the
23 defendants called upon specific anesthesiologists
24 within the Permanente Medical Group.

25      Q.   Do you have any information that --

Page 113

A. Carver

2      A.   And so I would --

3      Q.   -- any representative of the
4 defendants communicated information to members of
5 the Permanente Medical Group that influenced their
6 request that the restriction for Neurontin be
7 expanded in 1997?

8      A.   Today I have no specific evidence
9 other than the information that was -- became
10 generally available regarding the widespread
11 practices of the defendants regarding trying to
12 convince physicians of the usefulness of Neurontin
13 for a variety of indications for which the
14 evidence was lacking and in some cases misleading
15 and just fraudulent.

16      Q.   Other than information obtained by
17 reading magazines or newspaper articles, you have
18 no knowledge that that would indicate that this
19 particular decision in 1997 was actually
20 influenced by the defendants in any way?

21      MS. NUSSBAUM: You're misstating the
22 record. He did say that this information is based
23 on magazines and news articles. That clearly is
24 part of it, but I think that he's also testified
25 that there's other information including the

1           A. Carver
2   government action, the whistleblower case, and
3   it's set forth in the Complaint.
4       Q.   Other than publicly-available
5   information set forth in the Complaint, are you
6   aware of any information that would indicate that
7   the defendants somehow influenced the decision of
8   the chiefs of anesthesiology to make this request
9   in 1997?
10      A.   I'm --
11      Q.   This should be easy.
12      A.   Is this public information? You know,
13  I'm not certain. We've laid out the basis for all
14  of these activities that have occurred in the
15  Complaint. I'm not sure specifically. I do not
16  have information personally that that can pinpoint
17  a representative of the defendants contacting a
18  representative of the anesthesiologists that
19  resulted in this.
20          But I believe that that information is
21  part of the legal discovery process and we're
22  looking forward to reviewing it.
23      Q.   Other than data that's set forth in
24  the Complaint, you have no knowledge of any of the
25  defendants or their representatives influencing

1           A. Carver
2   this request by the anesthesiologists in 1997, is
3   that correct?
4       MS. NUSSBAUM: That's been asked and
5   answered three times now. I suggest we move on.
6       Q.   Was it the decision by the P&T
7   committee in 1997 an appropriate decision at the
8   time it was made?
9       MS. NUSSBAUM: Objection. What do you
10  mean by "appropriate"?
11      Q.   Did Kaiser regard the decision of the
12  P&T committee in 1997 to expand the restriction of
13  Neurontin to include RSD as an appropriate
14  decision at the time it was made?
15      MS. NUSSBAUM: The document speaks for
16  itself.
17      Q.   You can answer the question.
18      A.   I believe that the -- I believe I've
19  answered that also from the standpoint of, I
20  believe that the -- that all of this was based
21  upon a hope that, based upon limited information,
22  that there was usefulness of this product. And I
23  believe it's based upon that hope that the P&T
24  committee made the decision and that the
25  anesthesiologists were seeking use of this

1           A. Carver
2   product.
3       Q.   So given the information that was
4   available to the P&T committee in 1997, this was
5   an inappropriate decision, is that correct?
6       MS. NUSSBAUM: The witness has not
7   said that. I think he's previously testified that
8   given the information that was available, the
9   information in the marketplace, at that point,
10  that this was the decision made.
11          MR. JAMES: But was it an appropriate
12  decision?
13          MS. NUSSBAUM: From looking at it
14  today, from looking at it in '97?
15      Q.   In 1997, did Kaiser regard this as an
16  appropriate decision?
17          MS. NUSSBAUM: If you know?
18      A.   In 1997, yes.
19      Q.   And today, does Kaiser regard this as
20  an appropriate decision given the information that
21  was available to the P&T committee at that time?
22          MS. NUSSBAUM: If you know?
23      A.   I don't know how to answer that from
24  the standpoint of -- it's always easy to
25  second-guess something many years later. At the

1           A. Carver
2   time, the P&T committee made the decision based
3   upon what little information there was available
4   and so, I would say that based upon their action
5   at the time, that their decision at the time,
6   based upon that limited information they made
7   was -- was appropriate.
8       Q.   What information did they make that
9   decision on the basis of?
10          MS. NUSSBAUM: Again, the document
11  speaks for itself. There's been no testimony that
12  this witness was part of this committee or has any
13  personal knowledge. He's here as a corporate
14  representative and you have the document.
15      Q.   Aside from the information set forth
16  in this document, was there any other information
17  that the P&T committee relied on in making this
18  decision?
19      A.   I do not know.
20      Q.   Who would know?
21      A.   Perhaps the chair of the P&T
22  committee.
23      Q.   Is that the same individual today as
24  it was in 1997?
25      A.   I believe so.

Page 118

1          A. Carver
2      Q.   And what's the name of that
3  individual?
4      A.   Dale Daniel.
5      Q.   Did you speak to Mr. Dale Daniel in
6  advance of your deposition?
7      A.   I did not speak to Dr. Dale Daniel in
8  advance of the deposition.
9      Q.   Were you personally on the P&T
10 committee in September 1997?
11     A.   Yes, I was.
12     Q.   Do you have any recollection of
13 reviewing this request?
14     A.   I do not.
15     Q.   Have the practices of the P&T
16 committee changed between 1997 and today in terms
17 of the information it considers when evaluating
18 one of these requests or the processes by which it
19 evaluates these requests?
20     A.   I would say that in recent years, the
21 evaluation process has become more robust.
22     Q.   How so?
23     A.   Robust from the standpoint of
24 preparing very detailed evidence tables regarding
25 an evaluation of the evidence, and I'd like to

Page 119

1          A. Carver
2  make clear, even though -- and maybe I haven't,
3  even though there's focus on this formulary
4  decision and perhaps I was not clear earlier when
5  I talked about, you know, the previous decision
6  with respect to the neurologists in 1994, what I
7  do want to make clear is that the physicians, even
8  though the P&T committee is giving some guidance,
9  the Neurontin is a formulary product, and so when
10 Neurontin is prescribed by a doctor, it's
11 dispensed by the pharmacy and paid for by the
12 health plan.
13         Because I'm not certain that I
14 understand the -- the detail around this decision
15 of the P&T on whether or not some pain physicians
16 were appropriate prescribers or the
17 anesthesiologists were appropriate prescribers or
18 the neurologists were appropriate prescribers.
19         In reality, even though there's a P&T
20 decision that is made here -- that is being
21 made, the reality is, is that Neurontin has been
22 on the formulary since 1994 and Neurontin
23 prescribed by a Permanente physician with
24 physicians that go to the Kaiser pharmacies
25 basically are dispensed and they're paid for.

Page 120

1          A. Carver
2      Q.   But before 1997, if an
3  anesthesiologist had prescribed Neurontin, that
4  would have been inconsistent with the restriction,
5  is that correct?
6      A.   It would have been inconsistent with
7  the technical restriction, yes.  But what I'm
8  trying to articulate, and maybe I'm just not
9  saying it properly, is that there's not much
10 relevance to it.
11     Q.   To the restriction?
12     A.   That's correct.
13     Q.   Is that because they're not
14 communicated to physicians?
15     A.   No, it's not.  It's because of a -- if
16 a physician decides in the course of treating a
17 patient that the physician wants to prescribe
18 Neurontin, then the very act of prescribing
19 Neurontin results in that prescription being
20 dispensed by the pharmacy.
21         There's not a second review body here.
22 There's nobody that's saying, Doctor, you can't do
23 that as it relates to the health plan covering the
24 payment or the -- or the coverage of that
25 particular Neurontin prescription, as it relates

Page 121

1          A. Carver
2  to the basic health plan drug benefit.
3         And so a prescription written for
4  Neurontin is a prescription that's dispensed for
5  Neurontin is a prescription that's paid for by the
6  health plan.  And so, I'm sorry, if I'm, you know,
7  belaboring this, but I just -- I don't understand
8  maybe this subtle difference that you're trying to
9  make here and I just -- maybe I didn't make myself
10 clear earlier when we talked about Neurontin being
11 added to the formulary.  It was added.  It's
12 always been on the formulary.
13     Q.   Right.  But until a certain point, it
14 would have been inappropriate for certain
15 physicians, or I won't say inappropriate, it would
16 have been inconsistent with the restrictions for
17 certain physicians to prescribe Neurontin?
18         MS. NUSSBAUM:  Objection.  I think
19 that that misstates the testimony of the witness;
20 okay.
21     Q.   Is that an inaccurate statement that I
22 made?
23     A.   The prescribing -- to your question,
24 the prescribing by anesthesiologists prior to 1997
25 may have been inconsistent with the guidance that

Page 122

A. Carver

1
2  was provided earlier when the product was added to
3  the formulary, but it's of no relevance as it
4  relates to the health plan than picking up the tab
5  for the prescription.
6          So there obviously is a technical
7  inconsistency, there's no doubt about it.
8      Q.   Are our prescribing physicians aware
9  of that technical inconsistency?
10         MS. NUSSBAUM:  Objection.  That again
11 misstates.
12         I think that what the witness has
13 stated that once a drug is on the formulary, which
14 he testified this drug has been on since 1994, if
15 a physician writes a prescription, he testified
16 that prescription will be dispensed by the
17 pharmacy and paid for by the plan.  He just said
18 that.
19     Q.   Is it your testimony that once a
20 prescription drug is added to the formulary, it
21 will be paid for regardless of who prescribes it?
22     A.   That's -- that is the case.
23     Q.   That's correct; okay.
24         But although it may be paid for in
25 some instances, those prescriptions might be

Page 123

A. Carver

1
2  inconsistent with restrictions or guidance
3  supplied by the P&T committee, is that correct?
4          MS. NUSSBAUM:  What does
5  "inconsistent" mean?
6      Q.   There are certain restrictions that
7  are approved by the P&T committee at various times
8  regarding Neurontin and other prescription drugs,
9  is that correct?
10         MS. NUSSBAUM:  The witness has used
11 the word "guidance" provided by the P&T committee.
12     Q.   Is the word "restriction" also used to
13 refer to this "guidance"?
14     A.   Yes, it is.
15     Q.   And if an anesthesiologist had
16 prescribed Neurontin prior to 1997, that
17 prescription would have been paid for, but it
18 would have been inconsistent with the restriction,
19 is that correct?
20         MS. NUSSBAUM:  Objection to the word
21 "restriction."
22     A.   You know, perhaps I'm just not being
23 clear here.  But if a -- even if -- if a
24 Permanente physician prescribes a drug that is
25 non-formulary, not even on the formulary, and

Page 124

A. Carver

1
2  indicates that that prescription is medically
3  necessary for the patient, the pharmacy provides
4  it and the health plan pays for it, and that's the
5  end of the story.
6          There is -- we have left the
7  prescribing decision in the hands of the physician
8  based upon the patient's condition, the patient
9  being in his office, the judgment of the physician
10 in all cases, whether or not a product is a
11 formulary drug or not, whether it is on the
12 formulary and would be -- and for which there has
13 been a guideline established or whether or not
14 there is the term of a restriction established in
15 any event when it's prescribed, it's dispensed and
16 it's covered or it's paid for by the plan.
17         Now, maybe I'm too dense to understand
18 here, I'm sure.
19     Q.   Limiting ourselves to drugs on the
20 formulary, do you believe that restrictions have
21 any influence on Kaiser physicians prescribing
22 decisions?
23         MS. NUSSBAUM:  If you know.
24     A.   I -- they may; yes.
25     Q.   But they may not?

Page 125

A. Carver

1
2      A.   But they may not depending upon the
3  circumstance of the individual patient that's
4  presented.
5      Q.   Why would it depend on individual
6  circumstances?
7      A.   The patient who presents with a
8  medical condition and for which the doctor is
9  offering and providing treatment, the situation is
10 that the physician is free to prescribe a product,
11 whether or not it is consistent with the guideline
12 or the restriction that has been decided by the
13 P&T committee.
14     Q.   What's the reason for that policy?
15     A.   The reason for the policy is because
16 the health plan is not second-guessing the
17 physicians who are -- who the health plan has
18 contracted with to provide the medical services
19 and who trust that the prescribing represents the
20 therapy that's needed by the patient, or that the
21 physician believes is appropriate for the
22 treatment of that patient.
23     Q.   Are individual prescribing physicians
24 the best equipped to make individual prescription
25 decisions?

Page 126

```
 1              A. Carver
 2        MS. NUSSBAUM: Objection. I mean,
 3  that calls for speculation, expert testimony.
 4    Q.   As a matter of Kaiser policy, does
 5  Kaiser believe that it's Kaiser's discretion to
 6  prescribe a particular drug is best left in the
 7  hands of the individual physicians?
 8    A.   Kaiser absolutely believes that. And
 9  that is a basic tenet that goes back to 1994 in
10  southern California, actually the period of '93 in
11  which we -- and when I say '93, it -- we started
12  the process of linking the drug benefit coverage
13  to the formulary and a basic tenet of that linkage
14  of what would be covered was specifically that we
15  are going to leave it in the hands of the
16  physicians. And so -- and --
17    Q.   What's the rationale --
18    A.   The rationale is we do have confidence
19  in our physicians.  They are in the best position
20  to make a decision regarding the appropriate and
21  the necessary treatment of the patients and there
22  will not be any second-guessing of that by the
23  health plan.
24        And so, that was a -- a basic tenet
25  and principle that was incorporated into this
```

Page 127

```
 1              A. Carver
 2  whole linkage of the formulary to the contract, to
 3  the benefit language.
 4    Q.   Are they in a better position, talking
 5  about individual physicians, than the P&T
 6  committee to make individual decisions?
 7        MS. NUSSBAUM: In what sense?  Again,
 8  this is a very vague question.  I think the
 9  witness has given an answer and I don't think, you
10  know --
11    Q.   Actually, do I understand your answer
12  correctly as being that the physicians are better
13  equipped than anyone else including the P&T
14  committee to make prescription decisions for their
15  patients?
16    A.   Absolutely.
17    Q.   Do physicians have the same
18  familiarity with clinical studies and research
19  that the P&T committee members would have?
20        MS. NUSSBAUM: Objection. It's
21  speculative.  There are thousands of physicians
22  here.
23    A.   We do have many physicians, and I
24  believe that the sentiment is, or the belief is
25  that the subspecialist physicians and the
```

Page 128

```
 1              A. Carver
 2  specialist physicians are well-informed regarding
 3  the appropriate and the contemporary treatment of
 4  patients.  But that doesn't mean that they're
 5  immune from the various sources of information,
 6  you know, such as continuing education, meetings,
 7  continuing medical education meetings and
 8  conferences, and you know, the chiefs of -- and
 9  the subspecialists go off to continuing medical
10  education conferences and gain information and I
11  think are generally familiar with the literature
12  and certainly are influenced by the industry.
13    Q.   As a general matter, we can't conclude
14  whether physicians or the P&T committee at the
15  time it makes one of these kinds of decisions is
16  better informed as to the status of clinical
17  research?
18        MS. NUSSBAUM: Objection, because the
19  status of clinical research is not the issue here.
20  It's not the issue in this Complaint.
21        MR. JAMES:  Well, I'm not asking this
22  question about clinical research, you know, even
23  if it happens to be irrelevant to the Complaint.
24        MS. NUSSBAUM:  Well, if it's
25  irrelevant to the Complaint and irrelevant to the
```

Page 129

```
 1              A. Carver
 2  case, I will ask the witness not to answer.
 3    Q.   Well, you can answer.  It's not a
 4  matter of like attorney-client privilege or
 5  something of that sort.
 6        MS. NUSSBAUM:  What is the relevance
 7  of the question?
 8        MR. JAMES:  I'm asking whether the P&T
 9  committee at the time it makes these sorts of
10  decisions or individual Kaiser physicians as a
11  general matter are better acquainted with clinical
12  studies and other research.  I mean, if you can
13  make --
14        MS. NUSSBAUM:  It's speculative.
15  There are thousands of physicians.
16    Q.   Can you not draw any conclusion
17  regarding that question without speculation?
18    A.   I cannot.
19    Q.   So, as a general matter, you would not
20  be able to make a conclusion one way or the other
21  regarding whether physician -- Kaiser physicians
22  as a whole or the P&T committee is better
23  acquainted with clinical studies and research?
24        MS. NUSSBAUM:  With what clinical
25  studies and research?  Objection.
```

Page 130

A. Carver

2 MR. JAMES: Pertaining to the sorts of
3 research that the P&T committee reviews in
4 connection with considering these kinds of
5 requests.
6 A. I would say this: That the P&T
7 committee is comprised of physicians from various
8 specialties and that if you have a group of
9 cardiologists, for example, who are weighing in on
10 a drug that's used uniquely in their practice,
11 then it's quite common for the P&T committee to
12 rely upon the views of the cardiologists regarding
13 that particular drug. And therefore, a decision
14 that's made.
15 Q. Why do they rely on the
16 recommendations of those physicians?
17 MS. NUSSBAUM: Objection. Again, it's
18 speculation.
19 A. Well, after all, they are the
20 subspecialist physicians who are charged with
21 treating patients day in and day out.
22 Q. Is there any useful information they
23 can provide beyond the information that the P&T
24 committee could get by serving, you know, clinical
25 studies and other publications?

Page 131

A. Carver

2 MS. NUSSBAUM: This is all
3 hypothetical at this point. It's speculation.
4 And I would really ask you to go on. I think that
5 we've exhausted this.
6 If you have a specific question to ask
7 as to the real practice, what really has occurred,
8 ask. Either the witness will have knowledge or he
9 won't. But now we're really just in the realm of
10 pure speculation.
11 Q. You can answer if you understand the
12 question.
13 A. Well --
14 MS. NUSSBAUM: I would ask the
15 question to be repeated.
16 (Record read.)
17 MS. NUSSBAUM: This is an
18 unintelligible question. It's highly speculative
19 and hypothetical. I don't think it can be
20 answered.
21 Q. Are you able to answer the question?
22 A. Well, I would offer this, and you
23 know, maybe I'm not being clear, I'll give a
24 different example.
25 MS. NUSSBAUM: I don't think that the

Page 132

A. Carver

2 present question is even capable of being
3 answered. It's really not.
4 MR. JAMES: Are you directing your
5 witness not to answer the question?
6 MS. NUSSBAUM: Yeah, I don't think
7 that there's a question pending. If you have a
8 specific non-hypothetical question, this is a fact
9 witness.
10 Q. Is it the policy of the P&T to rely on
11 the recommendations made by physicians in deciding
12 whether to accept requests such as this one to
13 expand the restriction of Neurontin for RSD?
14 MS. NUSSBAUM: It's asked and
15 answered. The witness has already said that's one
16 of the things that they rely on.
17 Q. And what is the -- and I guess my last
18 question was, to get at the rationale underlying
19 that reliance, what is it that physicians can
20 bring to the table that the P&T committee cannot
21 get by serving clinical studies and other
22 research?
23 MS. NUSSBAUM: If you know.
24 A. I believe that generally, the
25 subspecialist physicians can bring the perspective

Page 133

A. Carver

2 of -- from them being expert in the use of the
3 particular type of drug and the treatment of
4 particular type of medical conditions. And that
5 can be valuable information from a practical point
6 of view, in addition to perhaps the physician,
7 subspecialists have attended a medical conference
8 and have some new information that is being
9 reported at that continuing medical education
10 conference that's -- that they feel is relevant,
11 new information that's being presented that would
12 affect their view on the treatment of a particular
13 medical condition.
14 That information may not be contained
15 in the medical literature at the moment. Or would
16 not have been necessarily all published and so,
17 therefore, if the P&T committee is relying upon
18 totally published information as an example, then
19 that would be of value or another point of
20 information that the subspecialist group would
21 bring to the table as perhaps relevant.
22 Q. Do I understand you correctly that
23 that information gathered from their clinical
24 experience is one useful piece of information that
25 physicians can provide in this process?

34 (Pages 130 to 133)

1          A. Carver
2     A.   Yes.
3     Q.   And do I also understand you to have
4   said that physicians sometime attend conferences
5   or other events at which research that has not yet
6   been published might be publicized in advance of
7   its publication?
8     A.   Yes, or -- or the sharing of results,
9   etc., yes, that is the case.  It may be like, you
10   know, the psychiatrists attending a continuing
11   medical education conference, and part of the
12   topic would be on the treatment of bipolar
13   disorder, and if there were information that was
14   presented to the psychiatrists or the -- for such
15   treatment, it may influence their view in a
16   recommendation or a request, or their view of the
17   use of a particular product, or their view of the
18   usefulness of a particular product, and you know,
19   I don't know.  I may have misspoke earlier.  I
20   don't know.
21          But in a question, as I'm looking at
22   this page here and putting together this answer
23   for you, I may have said mistakenly "neurologists"
24   instead of "psychiatrists" on bipolar.  I may have
25   done that, upon reflection.

1          A. Carver
2     Q.   So, with regard to neurologists then,
3   the answer should have been just diabetic
4   peripheral neuropathy, is that right?
5     A.   That's correct, yes.  But does that
6   give you another example --
7     Q.   Yes, that's very helpful --
8     A.   -- at what you're trying to get at
9   here?
10     Q.   Returning to this exhibit, so this
11   decision was made based on two letters to the
12   editor and information that was provided by the
13   chiefs of anesthesia, is that correct, so far as
14   you can tell?
15          MS. NUSSBAUM:  I think that the
16   witness has answered that he has no personal
17   recollection of the discussion at the meeting nor
18   who made the presentation or anything else.  So
19   his knowledge is simply what's in the document and
20   nothing more.
21     Q.   Today, is there a policy in place that
22   would preclude the P&T committee from expanding a
23   restriction based on this level of clinical
24   trials?
25          MS. NUSSBAUM:  That misstates the

1          A. Carver
2   record.
3     A.   I don't know that there's a policy per
4   se.  But I think that the process has just evolved
5   where there's a higher standard, but in terms of a
6   policy that I could point to, the answer to that
7   would be no.
8     Q.   What is the standard that's in place
9   today?
10     A.   I believe that I described to you, and
11   it's our expectation that the -- for new drugs or
12   for monographs that are developed for drugs, that
13   a fairly exhaustive evidence table be put together
14   that are really weighing the evidence or stating
15   the evidence, and you know, such things as two
16   letters to the editor, so wouldn't make the cut.
17     Q.   Well, you now gather a lot of
18   evidence, but is there something that you demand
19   that that evidence show?  I can be more specific.
20          First of all, do you authorize
21   prescriptions for off-label uses or do you demand
22   FDA approval?
23     A.   The -- if we're talking about you
24   being the health plan and the health plan benefit
25   or -- excuse me -- the drug benefit, then yes, we

1          A. Carver
2   demand that a product itself, the chemical entity,
3   the product be approved by the Food and Drug
4   Administration.
5          And then as it relates to off-label
6   use, that's in the hands of the physician, in the
7   hands of the prescriber as we mentioned
8   previously.  I -- the pharmacy department for the
9   health plan really would know whether a product is
10   being used off-label or not.
11     Q.   Is it Kaiser's view that medications
12   can be effective for uses if they're not approved
13   for by the FDA?
14          MS. NUSSBAUM:  I would object.  I
15   think that it assumes a conclusion that Kaiser has
16   a view on that.  I think the witness has already
17   stated that Kaiser, as long as the drug has been
18   FDA approved, will fill the prescription if it's
19   prescribed by the physician.
20     A.   Yeah, I think we're back to the --
21   it's in the hands of the doctor in terms of the
22   doctor treating the patient and evaluating whether
23   it's necessary therapy or not.
24     Q.   In 1999, was the restriction for
25   Gabapentin further expanded to encompass

Page 138

```
1              A. Carver
2  psychiatrists?
3       A.   I believe it was.
4       Q.   Do you know what the reasons for that
5  decision was?
6       A.   Not from memory.
7            MR. JAMES: I'd like to mark another
8  exhibit.
9            (Kaiser-4 marked for identification.)
10      Q.   Do you recognize this document?
11      A.   Yes, this is the monograph for -- that
12  appears to have been used by the pharmacy and
13  therapeutics committee in southern California in
14  response to a request by the chiefs of psychiatry.
15      Q.   And is this the document that would be
16  created by Kaiser in the ordinary course of its
17  business?
18      A.   Yes, it is.
19      Q.   And reviewing this document, does it
20  refresh your recollection as to what the bases for
21  this decision were?
22      A.   I believe that the basis for the
23  request from the chiefs of psychiatry was to
24  provide yet another alternative for the treatment
25  of bipolar conditions.
```

Page 139

```
1              A. Carver
2       Q.   If you could go to, I guess, the
3  second page at the top, it says, "Clinical trial
4  analysis."
5            Can you read the first sentence?
6       A.   "The efficacy and unsafety of
7  Gabapentin has been studied in only one randomized
8  double-blind placebo controlled evaluating the
9  acute treatment of bipolar, one depression in 18
10  patients. This study has not yet been published."
11           And it goes on to talk about ten other
12  case reports.
13      Q.   Does Kaiser believe that the decision
14  of the committee to approve the expansion of the
15  restriction of Gabapentin to psychiatrists was a
16  questionable decision?
17           MS. NUSSBAUM: Well, are you talking
18  about based on the information that was available
19  to Kaiser in June of 1999 or are you talking about
20  based on the information that became available
21  when they learned about the whistleblower suit and
22  the off-label promotion and any other facts
23  alleged in the Complaint?
24      Q.   The timing of this decision was at the
25  time this decision was made, was it an appropriate
```

Page 140

```
1              A. Carver
2  decision?
3       A.   At the time, based upon the
4  information that was available, I believe the P&T
5  committee was yielding to the chiefs of psychiatry
6  for having yet another alternative for bipolar
7  disease, and so my answer would be yes, at that
8  time.
9       Q.   Was there anything deficient about the
10  process by which you went about gathering
11  information?
12      A.   At that time, I'm not sure. At that
13  time, there's reference to this randomized
14  double-blind placebo controlled trial. A very
15  small number of patients had not yet been
16  published, and so, I think it's questionable, but
17  again, I don't recall the context, and for that
18  information and the -- and the context in which
19  the chiefs of psychiatry would have brought it to
20  us basically.
21           I'm not sure what had influenced the
22  chiefs of psychiatry to make this request or
23  believing that the product would be effective for
24  this particular purpose.
25      Q.   Who would know that information?
```

Page 141

```
1              A. Carver
2            MS. NUSSBAUM: If you know?
3       A.   I don't know. I would be speculating
4  in my answer.
5       Q.   You wouldn't know who would know what
6  the basis for the chief of psychiatry's
7  recommendation was?
8            MS. NUSSBAUM: You know, this is a
9  meeting that occurred eight years ago. I think
10  that the witness has no allegation other than
11  what's in the document, and the document speaks
12  for itself.
13      Q.   Have you made any efforts to speak
14  with anyone?
15      A.   No, I have not -- no, no, I have not.
16      Q.   Are there any circumstances in which
17  it might be appropriate to expand a restriction
18  for prescription drug based on one unpublished
19  randomized double-blind placebo controlled trial
20  involving 18 patients and ten case reports and
21  open label trials?
22           MS. NUSSBAUM: That misreads the
23  document Exhibit 4, which also says that the
24  chiefs of psychiatry requested this, and you do
25  not know whether they were sampled, whether they
```

A. Carver

1  were detailed, whether they attended, you know,
2  medical education and so, I think that that's a
3  very misleading question.
4      Q.   You can answer.
5      A.   Could you state the question again,
6  please?
7          MR. JAMES:  Could you read back the
8  question?
9          (Record read.)
10          MS. NUSSBAUM:  Again, it misstates
11  that that's simply one portion of the document.
12  This is the clinical trial analysis and it is not
13  the rest of the document that talks about many
14  other factors that were considered.
15      A.   I would have to know what -- what had
16  influenced the chiefs of psychiatrists, what
17  information they had to believe -- believe that
18  use of this product was likely to be effective.
19      Q.   Is there other information that they
20  might have had beyond what's stated in this
21  document?
22      A.   I would --
23          MS. NUSSBAUM:  That's speculative.
24      A.   I would have to speculate.

A. Carver

1      Q.   Well, no.  I guess if you take the
2  view that there could not have been any other
3  information that they had aside from what's in
4  this document --
5          MS. NUSSBAUM:  Wait a minute.  That's
6  not based on any evidence, that's not based on the
7  document, that's not based on the record, so why
8  should he take that view?  It's not based on the
9  Complaint.  That's not based on the allegations in
10  the Complaint about detailing about free samples
11  to psychiatrists, about off-label promotion, about
12  continuing medical education.
13          MR. JAMES:  I guess what I'm asking
14  is --
15      Q.   Is there other relevant information
16  that the psychiatrists could have had beyond
17  what's stated in this document?
18      A.   There very well may have been.
19      Q.   And what kinds of --
20      A.   It would be speculation on my -- on my
21  point -- I mean, from my point of view.
22      Q.   Right.  I'm not asking you what it
23  was.  I'm asking if there could have been such
24  additional evidence and what kind of information

A. Carver

1  would that have been that they could have brought
2  to the table that wouldn't be recorded in this
3  document?
4      A.   The members of the chief of psychiatry
5  department could have attended medical education
6  conferences as an example and perhaps that could
7  have influenced their thinking regarding the
8  usefulness of this product.  But that's
9  speculation on my part.  I do not have evidence of
10  that specifically.
11      Q.   But knowing -- knowing that
12  information would affect your view as to whether
13  this was an appropriate basis on which to decide
14  to expand the restriction on Gabapentin at the
15  time?
16          MS. NUSSBAUM:  Objection as to whether
17  or not this witness has a view as to whether it
18  was appropriate or inappropriate.  I think that he
19  stated, based on the information available to
20  Kaiser in June of 1999 and based on a meeting
21  which included the chiefs of psychiatry, and he
22  stated that he does not specifically know whether
23  they were detailed, whether they got sampled,
24  whether they attended the Medical Information that

A. Carver

1  this was the decision.
2      Q.   Based on just what's in this document,
3  without knowing what the chiefs of psychiatry told
4  the P&T committee about, can you make a
5  determination as to whether this -- this was an
6  appropriate decision that would have been
7  consistent with P&T's policies today?
8          MS. NUSSBAUM:  Objection.  What is
9  "appropriate decision?"  Please restate your
10  question.
11      Q.   Based on this document, can you tell
12  whether this decision would be inappropriate by
13  reference to the policies and practices that the
14  P&T committee today has when it regards these
15  kinds of requests?
16          MS. NUSSBAUM:  Objection.  It's highly
17  speculative.  You're asking the witness to
18  speculate.  He's already testified based on the
19  information they had, they made this decision and
20  that in his view it was appropriate at the time it
21  was made.
22      Q.   Is that accurate to say that you
23  thought it was an appropriate decision at the time
24  it was made, you being Kaiser?

1          A. Carver
2     A.    It's accurate from the standpoint of
3   Kaiser. I think that I have to believe that the
4   decision -- the recommendation from the chiefs of
5   psychiatrists, the decision by the P&T committee
6   at that time was appropriate, particularly in the
7   context of which was being presented here and that
8   being that this was being suggested for patients
9   who have failed the other treatments for bipolar.
10        So you have the chiefs of psychiatry
11   who were the specialists in the treatment of
12   bipolar disorder making a recommendation to the
13   P&T committee for use in certain circumstances,
14   and it would seem, you know, seem that such
15   recommendation comes from those subspecialists was
16   okay at that time.
17     Q.    You say it's still okay today to
18   prescribe Gabapentin for bipolar disorder in
19   certain circumstances?
20        MS. NUSSBAUM: Objection. And I would
21   ask the witness not to answer. I don't know what
22   it means, okay, to prescribe it under certain
23   circumstances. What does that mean?
24     Q.    I think I took it from the witness'
25   answer, but the P&T committee regarded it as

1          A. Carver
2   medically appropriate to prescribe Gabapentin for
3   bipolar disorder in certain circumstances today?
4        MS. NUSSBAUM: Objection. I think
5   that today, 2007, we don't have any testimony as
6   to what, or if any, there's a recommendation of
7   the P&T committee on bipolar prescriptions for
8   Neurontin.
9     Q.    Does the P&T committee have any view
10   regarding whether it's appropriate to prescribe
11   Neurontin in certain circumstances for bipolar
12   disorder?
13     A.    In the year 2007?
14     Q.    Yes.
15     A.    Yes, they do.
16     Q.    And what is that view?
17     A.    The view is no.
18     Q.    So, it's the view of the P&T committee
19   that it is never under any circumstances
20   appropriate to prescribe Gabapentin for bipolar
21   disorder?
22        MS. NUSSBAUM: The witness did not say
.3   never under no circumstances. He gave an answer.
24   I think it's unfair to keep on asking the same
25   question six different ways and it's very

1          A. Carver
2   confusing. You asked your question. You got an
3   answer, and I think we should move on.
4     Q.    The question, I guess there's two
5   possibilities. One is it's appropriate in certain
6   circumstances, and the other is it's appropriate
7   in any circumstances?
8     A.    No, the view of the P&T committee is
9   that it's not effective.
10     Q.    In any circumstances?
11     A.    It's just not effective for the
12   treatment of bipolar disorder and -- but that does
13   not overrule or negate the -- it's in the hands of
14   the doctor.
15        MR. JAMES: We'll mark another
16   exhibit.
17        (Kaiser-5 marked for identification.)
18     Q.    Do you recognize this document?
19     A.    I do not recognize the document.
20     Q.    Did you review it in preparing for
21   this deposition?
22     A.    I did not, no. This is the first time
23   I've seen this document.
24     Q.    Do you know who Richard Moldawsky is?
25     A.    I'm sorry, I do not.

1          A. Carver
2     Q.    Do you know who Debbie Kubota is?
3     A.    I do.
4     Q.    Who is she?
5     A.    She is a pharmacist in our Drug
6   Information Service.
7     Q.    And what role does the Drug
8   Information Service play in this process by which
9   the P&T committee decides whether to expand
10   restriction on prescription drugs?
11        MS. NUSSBAUM: I think that you are
12   assuming facts that have not been testified to
13   that there's any role.
14        MR. JAMES: Actually, I'll withdraw
15   that.
16     Q.    Does the Drug Information Service play
17   any role in the process by which the P&T committee
18   decides whether to approve or deny requests to
19   expand restriction on prescription drugs?
20     A.    The Drug Information Service has a
21   record of the decisions of the P&T committee.
22     Q.    Is its role confined to maintaining a
23   record of decisions that the P&T committee has
24   made?
25     A.    No, I believe I've testified that the

Page 150

1          A. Carver
2   Drug Information Service also has a role in being
3   responsive to questions from physicians,
4   pharmacists and nurses and so --
5       Q.   I was actually referring specifically
6   to this process by which the P&T committee decides
7   to expand or not expand restrictions on
8   prescription drugs?
9          MS. NUSSBAUM: That question has
10  already been asked and answered and the witness
11  just answered that question for you. He also said
12  he does not recognize this document.
13      Q.   I'm actually not asking about the
14  document. I'm asking about aside from recording
15  the P&T committee's decisions, does the Drug
16  Information Service play another role with regard
17  to the decision-making process of the P&T
18  committee -- I guess, I mean, you told me that
19  they record the P&T.
20         MS. NUSSBAUM: Why don't we stop at
21  your first question and not ask multiple
22  questions.
23         I think your first question was: Do
24  they play any role in the decisions of the P&T
25  committee? Is that your question?

Page 151

1          A. Carver
2          MR. JAMES: Yes, and I think he
3   answered that they record their decisions. I'm
4   wondering if there's anything else.
5          MS. NUSSBAUM: Anything else?
6       A.   Yes.
7       Q.   And what is that --
8       A.   The Drug Information Service is also
9   responsible for accumulating this information --
10  this information I'm referring to is this -- in
11  the preparation of the drug monograph in
12  preparation for a P&T committee meeting.
13      Q.   How do they go about assembling the
14  monograph?
15         MS. NUSSBAUM: If you know.
16      A.   They assemble the monograph by
17  conducting literature searches and also by
18  interacting with and obtaining a view from
19  specialists or subspecialists' positions regarding
20  the role of a particular drug and therapy.
21      Q.   Has that process changed over the
22  class period, the class period, the relevant
23  period?
24      A.   I don't -- I don't believe so. It may
25  have -- well, I think the answer to that is, no,

Page 152

1          A. Carver
2   not in generally.
3       Q.   This document, which I acknowledge you
4   haven't seen, states, it starts --
5          MS. NUSSBAUM: We're not going to have
6   this witness speculate as to an e-mail
7   communication between two people, neither of which
8   is this witness. He's not copied on this
9   document. And he said he never saw it.
10      Q.   Is there any reason why a Kaiser
11  physician would be interested in knowing whether
12  there's a restriction applicable to a particular
13  prescription drug?
14         MS. NUSSBAUM: Objection. Calls for
15  speculation.
16         MR. JAMES: Actually, I'll withdraw
17  that question.
18      Q.   Do any physicians ask the Drug
19  Information Service whether there are restrictions
20  on particular prescription drugs?
21         MS. NUSSBAUM: Objection. Again, it's
22  hypothetical. It calls for speculation.
23      A.   I don't know.
24      Q.   Can a prescribing physician prescribe
25  a prescription drug just as easily whether or not

Page 153

1          A. Carver
2   there is a restriction on that drug?
3       A.   Yes, they can.
4       Q.   Is there -- am I correctly stating
5   your testimony that you don't know whether the
6   restrictions have any influence on Kaiser's
7   physicians' behavior prescribing patterns?
8          MS. NUSSBAUM: I would object. This
9   has been asked and answered. The witness has
10  testified and I believe you're misstating his
11  testimony.
12      Q.   Was I misstating your testimony?
13      A.   Could you repeat the question? It's
14  been a while. I don't know if you were expecting
15  me to respond. I think that you did, but you put
16  a little twist on my testimony.
17         MR. JAMES: Could you read back the
18  question?
19         (Record read.)
20         MS. NUSSBAUM: I would object again.
21  You know, this witness has testified there are
22  something like, what did you say, 10,000
23  physicians, thousands and thousands and thousands
24  of physicians. So, I think it's absolutely
25  speculative to say whether some decisions may be

Page 154

A. Carver

1
2  influenced, may be partially influenced, may not
3  at all be influenced.
4      Q.   You can answer if you can understand
5  the question.
6      A.   Well, I understand the question. I
7  believe that I previously testified that the
8  placement of guidelines and restrictions basically
9  are intended to be used by the physician groups
10  themselves, and in their approach to prescribing,
11  and I think that there's a whole variety of
12  approaches that are taken by individual physicians
13  regarding honoring those physicians, but I also
14  want to reemphasize that regardless of whether or
15  not there is a restriction or specific guidance
16  that when physicians prescribe a particular
17  product, it is dispensed by the pharmacy and paid
18  for by the health plan.
19      MR. JAMES:  I'm going to mark another
20  exhibit.
21      (Kaiser-6 marked for identification).
22      Q.   Have you seen this document before?
23      A.   No, I have not.
24      Q.   I guess the third line of this first
25  e-mail says, "Lamictal and Neurontin will be used

Page 155

A. Carver

1
2  as fourth and fifth line for bipolar, but may move
3  to third ahead of Tegretol."  And in parentheses,
4  it says, "(PDS get lost of side effects) if there
5  are more tolerated and literature holds up."
6      And it's your prior testimony that the
7  P&T committee no longer regards Neurontin as an
8  appropriate fourth or fifth-line treatment for
9  bipolar, or for that matter, that it has any role
10  in the treatment of bipolar disorder?
11      A.   That's correct.
12      MS. NUSSBAUM:  Objection. Three
13  things here:  First, this is an e-mail between two
14  people who have not been identified. The witness
15  has testified he has never seen this document. I
16  note that he is neither an author, recipient, or
17  copied on the document. I also note that the date
18  of the document is December of 1998.
19      Q.   Can I just ask whether the view
20  expressed in this document was consistent with the
21  P&T committee's current views, and the witness
22  answered the question?
23      MS. NUSSBAUM:  I move to strike that
24  answer.
25      (Kaiser-7 marked for identification.)

Page 156

A. Carver

1
2      Q.   Do you recognize this document?
3      A.   Yes, this was the drug monograph
4  prepared and discussed apparently at the
5  September 1999 P&T committee.
6      Q.   And what is the proposal that's under
7  consideration in this document, if any?
8      A.   I'm just refreshing my memory here, if
9  I might.
10      The subject of this request and -- is
11  a request coming in from the integral medicine
12  committee to broaden the use of Neurontin to
13  include treatment by primary care doctors for the
14  treatment of post-herpetic and diabetic neuralgias
15  when that's done in consultation with the
16  neurology department.
17      And then a recommendation or a request
18  from the chiefs of family practice to allow their
19  prescribing, in addition to the internal medicine
20  doctors, the prescribing of Gabapentin pursuant to
21  some guidelines.
22      Q.   And do you know the reasons that those
23  requests were made?
24      MS. NUSSBAUM:  Well, I think that the
25  document speaks for itself.

Page 157

A. Carver

1
2      Do you have any independent
3  recollection of the meeting in September of 1999
4  other than what's reflected in this document?
5      THE WITNESS:  I do not.
6      Q.   Had you seen this document in
7  preparing for this deposition?
8      A.   It may have been included in what I
9  glanced over. I certainly didn't study it, but it
10  may have been included, so I --
11      Q.   Do you know if the P&T committee acted
12  on this recommendation?
13      A.   I just don't independently recall.
14      Q.   Actually, what I'm asking is:  In your
15  capacity as corporate representative whether you
16  know the answer to that question?
17      A.   Well, it would be helpful to speak
18  authoritatively, if I had the, you know, the --
19  the minutes or the recommendation was approved.
20  And so, lacking that, my assumption would be --
21      MS. NUSSBAUM:  Please don't assume.
22      A.   Okay. Then I would need to have the
23  minutes of the meeting to speak authoritatively to
24  that, in fact, the requested action was taken.
25      Q.   Would there be members of the meeting?

Page 158

```
 1              A. Carver
 2    A.  Yes, there would.
 3    Q.  Would Kaiser still have those minutes?
 4    A.  Yes, we would.
 5    Q.  Do you know if those minutes have been
 6  produced to the defendants?
 7        MS. NUSSBAUM: By counsel, to the
 8  extent that there have been any relevant documents
 9  with respect to this or any other meeting, those
10  documents have been produced.
11    Q.  Other than communications with
12  counsel, do you have any reason to know if any
13  minutes from this meeting were produced to the
14  defendants?
15        MS. NUSSBAUM: By counsel, we don't
16  even know if a meeting occurred. This, you know,
17  is a drug monograph --
18    Q.  Did a meeting occur at this time in
19  1999?
20    A.  I would have to refer to the minutes
21  of the meeting. I just, I don't know
22  independently whether a meeting occurred eight
23  years ago or not.
24    Q.  Is it possible that the P&T committee
25  acted without ever meeting?
```

Page 159

```
 1              A. Carver
 2        MS. NUSSBAUM: Don't speculate. Is it
 3  possible or not possible. I think the witness is
 4  saying he has no independent recollection other
 5  than the document before him.
 6    A.  I believe the meeting occurred in
 7  that -- I cannot recall the cancellation of any
 8  P&T committee meetings ever, but to give you an
 9  authoritative answer regarding the outcome of the
10  recommendation, I really would need to refer to
11  the minutes of the meeting.
12    Q.  But they may not exist because there
13  may not have been no meeting?
14        MS. NUSSBAUM: To the extent that
15  there were minutes of the meeting concerning
16  Neurontin, we believe that they've been produced.
17        MR. JAMES: You know --
18    Q.  The committee -- do you know what
19  the -- do you know what minutes of the P&T
20  committee meetings looked like?
21    A.  Yes, I do.
22    Q.  Do they have a heading designating
23  them as --
24    A.  Yes, they do.
25    Q.  Under "potential advantages," does the
```

Page 160

```
 1              A. Carver
 2  first bullet point state that Gabapentin has
 3  relatively benign side effect profile?
 4    A.  It states that.
 5    Q.  Is that a view that the P&T committee
 6  still holds?
 7        MS. NUSSBAUM: Objection. The
 8  document speaks for itself. The witness has
 9  testified he has no independent recollection other
10  than the document.
11    Q.  As corporate representative of Kaiser,
12  are you aware of any information that the P&T
13  committee has subsequently learned that would shed
14  doubt on that conclusion?
15        MS. NUSSBAUM: I would object again.
16  I mean, that's not in this 30(b)(6) Notice, in any
17  of the 30(b)(6) Notices specifically. And the
18  document speaks for itself.
19    Q.  So, it's your testimony that you don't
20  know whether the P&T committee has knowledge of
21  any additional information that would alter this
22  conclusion?
23        MS. NUSSBAUM: Well, that's -- the
24  witness has stated and the Complaint states that
25  information became available to them as -- because
```

Page 161

```
 1              A. Carver
 2  of the whistleblower suit, because of articles,
 3  because of information that counsel has developed.
 4    Q.  That would shed doubt on this
 5  particular conclusion?
 6        MS. NUSSBAUM: Concerning Neurontin.
 7    Q.  I'm actually asking about whether you
 8  received any information that would shed doubt on
 9  this conclusion that Gabapentin has relatively
10  benign side effect profile?
11    A.  I do not know.
12    Q.  Who would know that?
13    A.  I -- our Drug Information Service
14  would know whether or not there has been new
15  information since what was printed here.
16    Q.  Would a relatively benign side effect
17  profile be a general reason to expand the
18  restriction on Gabapentin's prescription?
19        MS. NUSSBAUM: Objection. That
20  misstates the document. This is a multipage
21  document. That is one fact in the document. So
22  it really totally misstates the content of the
23  document.
24    Q.  You can answer the question.
25        MS. NUSSBAUM: The witness has already
```

Page 162

A. Carver

1   testified that he has no specific recollection on
2   what's reflected in the document.
3   Q.   Do you need to have the question read
4   back?
5   A.   The -- that particular aspect being a
6   benign side effect profile by itself would be
7   insufficient. I think it's just a piece of
8   information in a broader context of this
9   particular product, relative to a variety of
10  products, and so one piece of information would be
11  taken into consideration, but not sufficient as a
12  stand-alone for doing anything, just a piece of
13  information.
14  Q.   Under "potential advantages," can you
15  read the first bullet point?
16  A.   I'm sorry. Read the first bullet
17  point?
18  Q.   Under the heading "potential
19  disadvantages" at the bottom of the page.
20  A.   "Use of Gabapentin as an adjunctive or
21  first-line anti-epileptic drug for the treatment
22  of bipolar disorder would result in potentially
23  significant cost impact. See estimated cost
24  impact/pharmacoeconomics followed by XXXXXX."

Page 163

A. Carver

1   Q.   Is cost impact a consideration that
2   enters into the P&T committee's decision-making?
3   A.   It's just another piece of
4   information.
5   Q.   Can you read the next bullet point
6   after that?
7   A.   "As the manufacturer does not intend
8   to seek FDA approval for the use of Gabapentin in
9   the treatment of pain or neuropathies, it would
10  seem unlikely that further large randomized
11  clinical trials to study the efficacy and safety
12  of Gabapentin for this indication would be
13  forthcoming."
14  Q.   Did the P&T committee understand at
15  the time that this request to remove restriction
16  on Neurontin was pending that it was unlikely that
17  further large randomized clinical drug trials to
18  study the efficacy and safety of Gabapentin for
19  this indication would be forthcoming?
20  MS. NUSSBAUM: That misstates the
21  document. The document says that that is
22  information that the manufacturer, i.e., the
23  defendants in this action, gave to Pfizer, okay,
24  and gave to Kaiser, and so that was information

Page 164

A. Carver

1   from the manufacturer, the defendant, that Kaiser
2   was considering as one of the factors in September
3   of 1999 in this drug monograph.
4   Q.   Will you agree with your counsel that
5   Kaiser -- did you say the defendants informed?
6   MS. NUSSBAUM: Yeah. It says as the
7   manufacturer, the manufacturer is referring to
8   who, to the defendants in this action, does not --
9   Q.   Actually, I wanted to ask the witness
10  a question.
11  Would you agree with your counsel that
12  in September of 1999, the defendants informed
13  Kaiser that it did not intend to seek FDA approval
14  for the use of Gabapentin in the treatment of pain
15  or neuropathies and that it would be unlikely that
16  further randomized clinical drug trials to study
17  the efficacy and safety of Gabapentin for the
18  indications described in this document would be
19  forthcoming?
20  A.   I would agree with counsel that that
21  the manufacturer had apparently indicated to
22  Kaiser that the manufacturer did not intend to
23  seek FDA approval for the use of Gabapentin in the
24  treatment of pain or neuropathies.

Page 165

A. Carver

1   Q.   And what about the second half of the
2   sentence?
3   A.   It would seem unlikely that further
4   large randomized clinical trials to study the
5   efficacy and safety for Gabapentin would be
6   forthcoming. I'm not sure if that piece, if that
7   came from the manufacturer or whether or not that
8   would have been someone's conclusion based upon
9   information from the manufacturer that they didn't
10  intend to seek FDA approval.
11  MR. JAMES: We'll break there. We
12  have less than a minute.
13  THE WITNESS: Okay.
14  VIDEOGRAPHER: The time is
15  approximately 5:37. This ends tape number three.
16  We're now going off the record.
17  (Recess.)
18  VIDEOGRAPHER: The time is
19  approximately 5:53. This begins tape number four.
20  We are now on the record.
21  Q.   Before we were going off the record,
22  we were referring to the sentence that carries
23  over from page one to page two of Deposition
24  Exhibit Number 7, and I believe that you were

42 (Pages 162 to 165)

1          A. Carver
2  stating that while the information in the first
3  half of the sentence came from -- likely came from
4  the manufacturer, you couldn't be sure whether the
5  latter half of that sentence came from the
6  manufacturer or from another source, is that
7  correct?
8      A.   That's correct.
9      Q.   If it didn't come from the
10 manufacturer, who did it come from?
11         MS. NUSSBAUM:  Speculation.
12     A.   I would not know.
13     Q.   Would -- did Kaiser draw the inference
14 in the second half of the sentence from the first
15 half of the sentence?
16         MS. NUSSBAUM:  You're asking the
17 witness to speculate.  He didn't write the
18 document.
19     A.   Yeah.  I really do not know.
20     Q.   In your personal capacity, would you
21 have any reason for believing that because the
22 manufacturer does not intend to seek FDA approval
23 for the use of a particular drug for a particular
24 purpose, it's unlikely that further large
25 randomized clinical drug trials to study the

1          A. Carver
2  efficacy and safety of the drug for that use are
3  likely to occur?
4          MS. NUSSBAUM:  Are you asking that
5  specific to Neurontin in 1999?
6      Q.   I'm asking generally first.
7          MS. NUSSBAUM:  Objection.  There's no
8  basis for the question.  It's asking him to
9  speculate.
10     Q.   You can answer the question.
11     A.   It would be speculation.  If the
12 manufacturer indicated to us that they were not
13 going to seek FDA approval for neuropathies and
14 pain, then it could go either of two ways.
15         One way would be that the manufacturer
16 also indicated that they were not likely to
17 conduct large clinical trials, or it could have
18 been the author of this that speculated, and from
19 my -- in either case, I think that we all have a
20 view that randomized clinical trials are
21 expensive.
22         And so, I don't know who -- I don't
23 know the source as it's been stated and it would
24 be speculation on whether the source was the
25 defendant or whether this was speculation on

1          A. Carver
2  behalf of the author of this paragraph.
3      Q.   Going to the second page, it's the
4  fourth bullet down from clinical trial, the
5  heading Clinical Trial Analysis, can you read the
6  first sentence?
7      A.   "The efficacy and safety of Gabapentin
8  for the treatment of diabetic peripheral
9  neuropathy was studied in two randomized
10 double-blind placebo controlled trials involving
11 205 patients."
12     Q.   And the sentence following that is
13 what?
14     A.   "In the first study in which
15 67 percent of the Gabapentin-treated patients
16 received 3,600 milligrams per day, Gabapentin
17 demonstrated significant pain relief usually by
18 week two."
19     Q.   Does Kaiser have any reason to believe
20 that the results of that study were misstated in
21 this document?
22         MS. NUSSBAUM:  Objection.  Do you know
23 which study that was?  Do you know who the authors
24 of the study were?  I mean, you can't identify
25 that study based on this document.

1          A. Carver
2      Q.   Are you able to answer the question?
3      A.   Yeah, I do not know.
4      Q.   Is it because you can't determine
5  which study is being referred to?
6      A.   Could you restate the question,
7  please?
8      Q.   Is the reason that you're unable to
9  answer --
10     A.   No, the previous question.
11         MR. JAMES:  Could you read it back?
12         (Record read.)
13     A.   And the point of reference would be at
14 the time that this was written?
15     Q.   No, today, does Kaiser have any reason
16 to believe that the results of this study have
17 been mischaracterized?
18         MS. NUSSBAUM:  The Complaint and
19 Answers --
20         MR. JAMES:  If you have an objection,
21 I'd recommend that you just object and then
22 preserve your objection and then we'll move on.
23         MS. NUSSBAUM:  I object.  You cannot
24 identify --
25         MR. JAMES:  I please ask that you just

Page 170

A. Carver

1
2  state your objection and we'll move on, thank you.
3      MS. NUSSBAUM: Your question is very
4  unfair.
5      MR. JAMES: We have about 12 hours and
6  I'm gathering the impression that two or three
7  hours are being consumed by speaking objections.
8  I think if we can keep the objections kind of
9  brief and to the point...
10      MS. NUSSBAUM: We'd also like fair
11  questions and not to have the witness misled.
12      Q.  Do you need to have the question read
13  back?
14      A.  I think the answer to your question is
15  I don't know what the view of the P&T committee
16  would be today relative to whether or not this
17  study was accurate.
18      Q.  The question I'm asking -- so you
19  don't know as the corporate representative of
20  Kaiser whether the P&T committee or anyone else at
21  Kaiser has information indicating that this -- the
22  results of this study have been mischaracterized
23  in this document?
24      A.  I do not know.
25      Q.  If you go down a couple of sentences,

Page 171

A. Carver

1
2  do you see a sentence beginning, "The second study
3  crossover trial"?
4      A.  Yes, I see that sentence.
5      Q.  And does that indicate that the P&T
6  committee was aware that there was a crossover
7  trial that failed to demonstrate significant pain
8  relief in 1999 when it was considering whether to
9  remove restrictions from Gabapentin?
10      A.  Yes, I believe the P&T committee that
11  this information, that's what this document was
12  prepared for.
13      Q.  And beside this paragraph, there's --
14  or in the right margin, there are two sort of
15  letters, S-6 and S-11, is that correct?
16      A.  That's correct.
17      Q.  And if you turn to the last page of
18  this document, there's a listing of studies with
19  the letters next to them, is that correct?
20      A.  That's correct.
21      Q.  And do the letters S-6 and S-7 on the
22  second page of the document refer to these studies
23  on the last page of the document?
24      A.  Those are the references, the
25  cross-references to those statements, yes.

Page 172

A. Carver

1
2      Q.  And is the final study on that list on
3  the last page one who the -- which is first
4  authored by someone with the last name Gorson and
5  appears to have been published in 1999?
6      A.  Yes.
7      Q.  Did the P&T committee know in 1999
8  when it was considering whether to remove
9  restrictions on Gabapentin that there was a study
10  authored by someone named Gorson which failed to
11  demonstrate significant pain relief?
12      A.  At a dose of 900 milligrams per day.
13      MS. NUSSBAUM: The document speaks for
14  itself.
15      Q.  900 milligrams a day, is that correct?
16      A.  Well, I believe that -- yes, I believe
17  the P&T committee had the benefit of this
18  information at the time.
19      Q.  And does the failure of a clinical
20  trial to demonstrate significant pain relief mean
21  that it's inappropriate to prescribe Neurontin for
22  that use?
23      MS. NUSSBAUM: Objection. This
24  witness is not an expert witness as to whether or
25  not it's appropriate to prescribe something for a

Page 173

A. Carver

1
2  particular use.
3      Q.  Did the P&T committee believe that it
4  was appropriate to remove restrictions from
5  Gabapentin prescriptions in light of its knowledge
6  that a crossover trial had failed to demonstrate
7  significant pain relief?
8      MS. NUSSBAUM: Objection. This drug
9  monograph makes reference to a lot of information.
10  That's just one very small piece of information
11  that's contained in it.
12      A.  The information that's stated here is
13  that there was a trial that demonstrated
14  effectiveness at 3,600 milligrams per day. It
15  refers to a second trial which failed
16  to demonstrate efficacy at 900 milligrams a day.
17  That's the information that the P&T committee had.
18      Q.  And did the committee believe it
19  was appropriate in light of that information to
20  remove the restriction from Neurontin?
21      A.  If the P&T committee approved this
22  recommendation, then I would say yes.
23      Q.  When the committee approved a
24  recommendation, is it safe to say that the
25  committee believes that that action is

1                A. Carver
2    appropriate?
3        A.   Yes, it is.
4            MS. NUSSBAUM:  Based on the
5    information that they have in the file.
6        Q.   And based on the information that
7    would be stated in this monograph?
8        A.   Based upon the information stated in
9    the monograph and other sources of information
10   that we've already spoken about regarding
11   information may be available from subspecialists,
12   groups of physicians.
13       Q.   Is there anything inconsistent about
14   the results of the two studies that you were just
15   describing which are in this bullet point?
16           MS. NUSSBAUM:  Objection.  The studies
17   are not before the witness.  He hasn't read the
18   studies and he's not an expert as to whether or
19   not these studies are consistent or inconsistent.
20       Q.   Just from what's stated here, does it
21   seem that one person is saying that the sky is
22   green and another person is saying that the sky is
23   purple, are they just mutually inconsistent
24   statements?
25           MS. NUSSBAUM:  Objection.  That's

1                A. Carver
2    speculative.
3        A.   I view that the two studies as just
4    two different studies.  One in which you
5    demonstrated or attempted to demonstrate
6    effectiveness at a particular dose and at a much
7    lower dose are not demonstrated, so I don't see an
8    inconsistency with that.  I would say what's the
9    dose?
10       Q.   So to determine whether the two
11   studies were inconsistent, you have to know the
12   dose that was studied on each occasion?
13           MS. NUSSBAUM:  Objection.  I think
14   that there are many other factors that a witness
15   would need to look at, including looking at the
16   studies, consulting with medical.
17           MR. JAMES:  I think your objection has
18   been made known.
19       Q.   Is that one of the factors, that you
20   have to know the dose that was studied?
21       A.   Absolutely.
22       Q.   Are there any other factors that you
23   could think of that you would have to know?
24       A.   I did not profess to be an expert in
25   reviewing clinical studies, and so I would rely

1                A. Carver
2    upon information from those who are.
3        Q.   And do the members of the P&T
4    committee feel that they need to know more about a
5    study other than simply its dose before they can
6    take action on a recommendation such as this one?
7        A.   The P&T members may review in total
8    the -- any and all of the studies upon which
9    they're relying upon to make a decision if they
10   choose to do so.
11       Q.   And they might examine the dose that
12   was studied, is that correct?
13       A.   Yes.
14           MS. NUSSBAUM:  This is speculative as
15   to what the P&T committee might or might not have
16   reviewed in September of 1999.
17       Q.   In 1999, do you know what the P&T
18   committee knew about these -- about these two
19   reports?
20       A.   I do not.
21       Q.   Is it safe to say that they would have
22   read this monograph carefully?
23           MS. NUSSBAUM:  Objection.  Calls for
24   speculation.
25       A.   There are, you know, many members of

1                A. Carver
2    the P&T committee, and I do not know exactly what
3    they've done.
4        Q.   Does the committee make a practice of
5    reading the monographs such as this one that have
6    been prepared?
7        A.   I think --
8            MS. NUSSBAUM:  Objection, speculation.
9        A.   It would be physician-specific and
10   likely drug-specific.
11       Q.   But at least one physician on the P&T
12   committee would generally make a practice of
13   reading the monograph, is that true?
14           MS. NUSSBAUM:  Objection, speculation.
15       A.   I really cannot speculate on that.
16       Q.   So without resorting to speculation,
17   you can't tell me whether at least one member of
18   the P&T committee has reviewed the monograph
19   closely before the P&T committee makes a decision?
20       A.   In its entirety, no, I cannot.
21       Q.   At this point in time, does Kaiser
22   view this decision that was made in 1999 as an
23   inappropriate one?
24           MS. NUSSBAUM:  Objection.  "At this
25   point in time" meaning what?

1         A. Carver
2   Q.   No, today, does Kaiser regard this as
3 an inappropriate decision?
4     MS. NUSSBAUM:  What decision?  What we
5 have here is a drug monograph.  We don't have a
6 decision.  We don't have minutes of the meeting.
7 So what decision --
8   Q.   Following the submission of this
9 monograph, was a decision made to remove
10 restrictions from Gabapentin --
11     MS. NUSSBAUM:  If you know.
12   A.   I think I previously testified that I
13 would need the minutes of the meeting to respond
14 to you authoritatively.
15     MR. JAMES:  I'd like to mark another
16 exhibit.
17     (Kaiser-8 marked for identification.)
18   Q.   Do you recognize this document?
19   A.   I believe this is the decision of the
20 committee regarding the formulary consideration,
21 although it's not dated.  I believe this is the
22 conclusion.
23   Q.   Did this occur in 1999?
24     MS. NUSSBAUM:  If you know.
25   A.   I believe so.

1         A. Carver
2   Q.   And what's the basis for that belief?
3   A.   The basis for the belief is that this
4 status section indicates that restrictions have
5 been removed essentially and the P&T committee
6 voted to remove prescribing restrictions for
7 Gabapentin capsules and add guidelines for use,
8 and the recommendations that had been used in that
9 decision were based upon other requests of
10 internal medicine, family medicine, you know,
11 neurology, psyche, etc., and these expert
12 recommendations would be consistent with the
13 request that was made which included the internal
14 medicine and family medicine, physicians.
15     And so that's the basis upon which I
16 would come to that conclusion, although the
17 document is not dated.
18   Q.   And at the same time, it removed
19 restrictions from Gabapentin, and did the
20 committee add guidelines as to its use?
21   A.   That's correct.
22   Q.   And what were those guidelines?
23   A.   The guidelines are contained on the
24 five bullets at the bottom of the page under
25 guidelines for the use of Gabapentin.

1         A. Carver
2   Q.   Have those guidelines changed between
3 1999 and today?
4     MS. NUSSBAUM:  If you know.
5   A.   They have changed.  They changed.
6   Q.   Actually, let's go one by one.
7     Starting with, let's start with the
8 first one under the guidelines for use of
9 Gabapentin.  It says that it's indicated as
10 adjunctive therapy in the treatment of partial
11 seizure without secondary generalizations with
12 adults with epilepsy, is that correct?
13   A.   That's correct.
14   Q.   And is that consistent with the
15 information that Kaiser has today?
16   A.   Yes, it is.
17   Q.   And then moving to the second bullet
18 point, it indicates that, "There are published
19 case reports describing the efficacy of Gabapentin
20 in the treatment of refractory cases of RSD."
21     First of all, have I read that
22 sentence correctly?
23   A.   Yes, you have.
24   Q.   And is that information consistent
25 with the information that Kaiser has today?

1         A. Carver
2   A.   I'm uncertain if you have a, in your
3 documents, a more recent set, then I could speak
4 authoritatively on that particular one, RSD.
5   Q.   Do you know what the guidelines today
6 are with regard to RSD?
7   A.   I do not.
8   Q.   And at this point, you have no
9 knowledge of whether this guideline for RSD
10 remains in place today, is that correct?
11   A.   That's correct, out of just memory.
12   Q.   From your memory, it's possible that
13 the guidelines apply to Kaiser physicians is still
14 that Gabapentin can be an effective treatment for
15 refractory cases of RSD, is that correct?
16     MS. NUSSBAUM:  Objection.  It calls
17 for speculation.  Also, didn't indicate whether or
18 not these published case reports or records that
19 are reflected in the complaint as being
20 fraudulent.  So I think --
21   Q.   First of all, these guidelines -- at
22 this moment, are you aware of any information that
23 would tell you that this guidance is not the
24 guidance that's currently in place at Kaiser with
25 regard to treatment of RSD?

A. Carver

1
2    A.   I think I've answered that.
3    Q.   What was the answer?
4    A.   I'm uncertain.
5    Q.   Do you have any information
6  inconsistent with that?
7        MS. NUSSBAUM:  The witness said he's
8  uncertain, which means he doesn't know if he did
9  or didn't.  He doesn't know.
10    Q.   Is your uncertainty caused by
11  conflicting information or an absence of --
12    A.   No, just an absence of familiarity
13  with specifically that aspect of the guideline for
14  use of Gabapentin today.  I'm sorry.  I do not
15  know.
16    Q.   Who would know what the guideline for
17  Gabapentin today was?
18    A.   I believe that our Drug Information
19  Service would have the record of what it might be.
20    Q.   The next guideline deals with bipolar
21  disorder, is that correct?
22    A.   Yes, it is.
23    Q.   And is that view expressed in that
24  bullet point inconsistent with Kaiser's view
25  today?

A. Carver

1
2        MS. NUSSBAUM:  If you know.
3    A.   I believe that that has been removed
4  from the guidelines today.
5    Q.   When was that removed?
6    A.   I believe it was removed in the time
7  period of perhaps 2003 after the revelations
8  regarding the marketing and promotion and
9  educational efforts and all of that related to the
10  promotion of Neurontin.
11    Q.   So you believe that Kaiser has changed
12  its guidance of its use of Gabapentin for bipolar
13  effective disorder?
14    A.   I believe so, based upon information
15  from various -- from the chiefs of -- of
16  psychiatry and other physician groups involved in
17  the drug management process that found that
18  there was no place for the use of Neurontin in
19  bipolar effective disorder, and when I say, "no
20  use," I'm, you know, I'm not saying as you
21  questioned me previously about does that mean 100
22  percent.  Never, never, no, it doesn't.  But I
23  don't believe this is contained in the guideline
24  today.
25    Q.   And do you believe there is a P&T

A. Carver

1
2  committee meeting at about 2003 in which this
3  change was made?
4        MS. NUSSBAUM:  The witness
5  testified -- you're misstating his testimony that
6  when the truth came out with respect to the
7  fraudulent scheme, that they reevaluated bipolar.
8    Q.   Did the P&T committee reevaluate
9  bipolar in 2003?
10    A.   I believe that the P&T committee
11  received recommendations regarding the appropriate
12  and many inappropriate uses of Neurontin and
13  agreed that use for bipolar was inappropriate.
14    Q.   And they changed the guidelines as a
15  result?
16    A.   I -- I've asked for, and if you have a
17  document that has the current guideline, I'd be
18  happy to review it.  I don't know from memory
19  precisely what the guideline is today.
20    Q.   Aside from -- do you recall what
21  information was presented to the P&T committee
22  that made them alter their view regarding the use
23  of Gabapentin for bipolar effective disorder?
24    A.   Not specifically.
25    Q.   In general terms, do you know what

A. Carver

1
2  that information was?
3    A.   In general, I believe that after it
4  became known of these promotional efforts and
5  promotion of -- inappropriate promotion of
6  Gabapentin or Neurontin, the chiefs of psychiatry
7  as well as other chiefs groups took a look at how
8  Neurontin was being used and concluded that some
9  efforts needed to be taken to get the -- to reduce
10  the use for which there was lack of demonstrated
11  effectiveness.
12    Q.   Did Kaiser believe that there was
13  demonstrated effectiveness in 1999 when these
14  restrictions were removed?
15        MS. NUSSBAUM:  I think you're
16  misstating, you know, his testimony.  The document
17  speaks for itself with respect to the two
18  documents, 7 and 8.
19        MR. JAMES:  I think your objection has
20  been --
21        MS. NUSSBAUM:  What he didn't know in
22  1999.
23    Q.   Did the P&T committee believe that
24  there was demonstrated efficacy of Neurontin for
25  bipolar disorder in 1999?

Page 186

```
 1              A. Carver
 2        MS. NUSSBAUM: The document does not
 3  say that. The document speaks for itself.
 4        MR. JAMES: I'm actually asking a
 5  question independent of the document.
 6        MS. NUSSBAUM: Do you have an
 7  independent recollection of a P&T committee
 8  meeting other than in September of 1999, other
 9  than the two documents that you've been shown,
10  Exhibits 7 and 8?
11        Q.   From the beginning of the relevant
12  period, which is 1994 up through 1999, I believe
13  we've discussed four different changes in the
14  restrictions applicable to Gabapentin at Kaiser,
15  is that correct?
16        A.   I believe that's correct.
17        Q.   And the four were the initiation in
18  1994, but restricted to neurology, is that
19  correct?
20        A.   Correct.
21        Q.   And the second one was expansion of
22  that restriction to anesthesiologists in 1997, is
23  that correct?
24        A.   That's correct.
25        Q.   And the third was an expansion to
```

Page 187

```
 1              A. Carver
 2  psychiatry in 1999, is that right?
 3        MS. NUSSBAUM: Well, the documents
 4  speak for themselves. I don't think you can
 5  broadly state an expansion to psychiatry. I think
 6  that the documents are much more complex than that
 7  and they speak for themselves.
 8        Q.   Is that accurate?
 9        MS. NUSSBAUM: It's asked and
10  answered. I would ask that you not misstate his
11  testimony.
12        Q.   And was there an expansion to
13  psychiatry in 1999, is that correct?
14        A.   Yes, I believe we've just gone over
15  that.
16        Q.   And aside from those three changes and
17  this fourth change noted in this present document,
18  are you aware of any other changes in the
19  guidelines applicable to Gabapentin at Kaiser from
20  1994 to 1999?
21        A.   I'm not -- based upon what you've
22  presented here, no.
23        Q.   During that period, the use of
24  Neurontin was in all cases expanded, it was never
25  restricted further, is that correct?
```

Page 188

```
 1              A. Carver
 2        MS. NUSSBAUM: Are you talking about
 3  from 1994 to 1999 now?
 4        MR. JAMES: Yes.
 5        MS. NUSSBAUM: Whether or not Kaiser
 6  paid more for Neurontin?
 7        MR. JAMES: No, no, I'm actually
 8  asking what the guidelines were.
 9        Q.   Was the scope of Neurontin's use under
10  the guidelines ever narrowed between 1994 and
11  1999?
12        A.   I don't believe so.
13        Q.   In every case that some action was
14  taken, the scope of its use was expanded, is that
15  correct?
16        A.   That's correct.
17        Q.   And since then -- actually, strike
18  that.
19        Actually, I'd like to switch over to
20  this last document that we were looking at.
21        Q.   Do you see the next-to-last bullet
22  point?
23        A.   Which document are we speaking --
24        MR. JAMES: I'm sorry. This last one
25  that we were looking at.
```

Page 189

```
 1              A. Carver
 2        MS. NUSSBAUM: 8.
 3        MR. JAMES: That's right.
 4        Q.   And the next-to-last bullet point has
 5  a line that says, "Studies have shown Gabapentin
 6  to be effective in the treatment of diabetic and
 7  post-herpetic neuropathies."
 8        Is that correct?
 9        A.   That's what it says, yes.
10        Q.   The following line, could you read
11  that one aloud?
12        A.   "The use of Gabapentin for the
13  treatment of neuropathy should be reserved for
14  those patients unresponsive to, or intolerant of
15  other available treatment modalities including the
16  tricyclic anti-depressants (alone or in
17  combination with narcotics, analgesic agents,
18  Carbamazepine and topical agents)."
19        Q.   Is that guideline in place today?
20        MS. NUSSBAUM: If you know.
21        A.   I do not know.
22        Q.   And with respect to the final bullet
23  point on there, regarding initial prescription
24  quantities, do you know if that guideline is in
25  place?
```

Page 190

```
 1              A. Carver
 2      A.  I do not know.
 3      Q.  Do you know the present guidelines
 4  with regard to the use of Gabapentin for any use
 5  at Kaiser today?
 6          MS. NUSSBAUM:  The witness has already
 7  testified as to some, so if you have a document,
 8  he's happy to look at it.
 9      Q.  Which ones are you aware of?
10          MS. NUSSBAUM:  I think he's already
11  testified as to bipolar, that after the fraud came
12  out, they reevaluated with respect to that.
13      Q.  Aside from your belief as to what the
14  current guideline is with regard to bipolar, are
15  you aware of any other guidelines?
16      A.  No, I'm not.  I need to have my memory
17  refreshed as to what the current guideline is.
18          (Kaiser-9 marked for identification.)
19      Q.  Are you familiar with this document?
20      A.  I am not.
21      Q.  Do you know what kind of document it
22  is?
23      A.  I believe this document represents the
24  draft of a recommendation for the use of a fax to
25  be sent to physicians under certain circumstances.
```

Page 191

```
 1              A. Carver
 2      Q.  Do you know if they "say" draft is
 3  consistent with the final document that was
 4  created, if any?
 5          MS. NUSSBAUM:  If you know.
 6      A.  I do not know.
 7          (Kaiser-10 marked for identification.)
 8          VIDEOGRAPHER:  The time is
 9  approximately 6:32.  We are now going off the
10  record.
11          (Recess.)
12          VIDEOGRAPHER:  The time is
13  approximately 6:36.  We are now back on the
14  record.
15  BY MR. JAMES:
16      Q.  If you could take a look at this
17  document for a couple of minutes, there's
18  certainly no need to read every page.
19          Are you familiar with this document?
20      A.  I have seen it before.
21      Q.  Was that only in preparation for this
22  deposition or had you seen it earlier?
23      A.  I may have seen it earlier, but I did
24  glance at it in preparation for this deposition.
25      Q.  And what is this document?
```

Page 192

```
 1              A. Carver
 2      A.  Did not study it for this deposition.
 3          This document represents the work of
 4  the Care Management Institute and represents the
 5  guideline that they have published as it relates
 6  to providing guidance to primary care for the
 7  treatment of chronic pain.
 8      Q.  Is the Care Management Institute
 9  referred to as CMI?
10      A.  Yes, it is.
11      Q.  And where is the CMI in Kaiser's
12  organizational structure?  Is it in a particular
13  region?
14      A.  The CMI, I believe, is convened under
15  the auspices of the Federation, the Kaiser
16  Federation, which is a Federation of the
17  Permanente Medical Groups, each of the Permanente
18  Medical Groups, and they have an organization
19  entitled "The Federation."
20          There's an executive of the Permanente
21  Federation and they are involved in some work on a
22  more global basis of the medical groups, including
23  the development of guidelines for some things.
24      Q.  What's the plaintiff's relation to the
25  CMI, if any?
```

Page 193

```
 1              A. Carver
 2      A.  The CMI works for or is under the
 3  auspices of the medical groups, the federation of
 4  medical groups.  To the degree that the CMI
 5  generates guidelines, those guidelines are
 6  intended to influence physician practice and the
 7  relationship then of the plaintiffs, the health
 8  plan hospitals would be -- there is not a direct
 9  relationship.
10          The relationship that exists would be
11  between the Federation, CMI, and the physician
12  groups in helping influence practices by
13  physicians.
14      Q.  How does the CMI influence practices
15  by physicians?
16      A.  By a review of the medical evidence
17  and the publication of guidelines for
18  consideration by the respective medical groups and
19  relevant specialties within those medical groups.
20      Q.  Is this distributed in paper form when
21  it's presented?
22      A.  I'm uncertain as to how it's
23  distributed.
24      Q.  Is it distributed to all Kaiser
25  physicians?
```

Page 194

1              A. Carver
2      A.   I do not know.
3      Q.   Aside from this document, are there
4  other documents that are distributed by the CMI,
5  either to physicians or to some other staff
6  members?
7           MS. NUSSBAUM: I would object. This
8  witness has testified that the CMI is an
9  organization that is not directly related to the
10  plaintiffs here. The document was produced
11  because. Clearly, the plaintiffs here got a copy
12  of this document and it was in their files, but I
13  don't think he can speak with respect to the CMI.
14           MR. JAMES: Well, to the organization,
15  to the plaintiffs' knowledge, did the CMI
16  distribute other documents to Kaiser physicians
17  other than this document here?
18           MS. NUSSBAUM: If you know.
19      A.   I can only say generally, yes. That
20  they have been involved in the development of
21  guidelines for a variety -- the treatment of a
22  variety of medical conditions. But I could not
23  enumerate for you those medical conditions.
24      Q.   When was this document created?
25           MS. NUSSBAUM: If you know.

Page 195

1              A. Carver
2      A.   I have no independent knowledge
3  regarding the creation or the specific -- it
4  indicates that it was published in May of 2002,
5  reviewed and revised in May of 2004 with another
6  revision date of May 2006, but I'm not familiar
7  enough with the guideline to know what the
8  particular revisions were in terms of content.
9  That would be relevant to the specific revision
10  dates.
11      Q.   Turning to page three of this
12  document, which has the Bates stamp KIS 001516.
13           Could you take a look at the two
14  paragraphs that follow the heading "biases"?
15  There's no need to ready them aloud.
16      A.   Okay.
17      Q.   And does the first sentence of this
18  paragraph that I asked you to restate that the
19  literature review and guidelines have a bias might
20  reflect the results?
21           MS. NUSSBAUM: The document speaks for
22  itself. The witness was not an author, not a
23  recipient, is only, you know, as he said, vaguely
24  familiar because he reviewed the document. It's
25  not a document created by either of the

Page 196

1              A. Carver
2  plaintiffs.
3           MR. JAMES: And your objection is
4  noted.
5           MS. NUSSBAUM: Oh, I don't understand
6  the point of your question. Can he read the
7  English sentence? He can read it.
8      Q.   Is Kaiser aware of any bias that may
9  affect the literature review or attendant chronic
10  pain guidelines?
11           MS. NUSSBAUM: I would object. This
12  is not a Kaiser document. This is a sentence
13  taken out of context in a document that he already
14  testified was created by an entity with which they
15  just have a contractual relationship.
16      Q.   Is Kaiser aware of any such bias?
17      A.   I'm only aware of what is printed
18  here.
19      Q.   Are members of the P&T aware of this
20  sort of bias?
21           MS. NUSSBAUM: Objection. What
22  members of what P&T committee? When?
23      Q.   Southern California P&T committee over
24  the time period at issue, have they been aware of
25  the bias that's referenced in this paragraph?

Page 197

1              A. Carver
2           MS. NUSSBAUM: What bias? There's no
3  testimony that the P&T committee got this
4  document, received the document.
5      Q.   I'm asking whether they're aware of
6  the bias that's described or --
7      A.   I cannot answer. I do not know.
8      Q.   Would this document have been
9  distributed to members of the P&T committee?
10      A.   I do not know. I testified that I do
11  not know the distribution of this document, to
12  which physicians it went, whether it went to a
13  subset of physicians, to all physicians, if it
14  went -- I just -- I can't speculate.
15      Q.   Is there any overlap between the
16  persons affiliated with the CMI and the members of
17  the P&T committees for the different Kaiser
18  regions?
19           MS. NUSSBAUM: If you know.
20      A.   Not that I'm aware. I do not believe
21  so.
22      Q.   And is information developed by the
23  CMI taken into account when the P&T committees
24  make their decisions?
25           MS. NUSSBAUM: If you know. Don't

Page 198

A. Carver

1    speculate.
2         A.   I have not seen a reference to a CMI
3    guideline that I can recall in a P&T, you know,
4    meeting.  It doesn't mean it hasn't occurred, I
5    just don't recall.
6         Q.   Who at Kaiser would know whether
7    members of P&T committees review information
8    provided by the CMI when they're making decisions
9    as to whether to accept or reject recommendations
10   that have been made to the P&T committees?
11        MS. NUSSBAUM:  This witness is a
12   member of the committee as he's testified and he's
13   just answered that question.  So, unless you have
14   something more specific, I think we should move
15   on.
16        Q.   Will you have to go to each P&T
17   committee member --
18        A.   To determine whether or not they have
19   reviewed this or not?
20        MS. NUSSBAUM:  Also, I think that's a
21   little disingenuous, as you were the last time.
22        MR. JAMES:  Your objection is noted.
23   Thank you.  Thank you.
24        MS. NUSSBAUM:  And you're asking him

Page 199

A. Carver

1    whether or not there are such minutes?
2         Q.   Excuse me.  Have I actually shown you
3    P&T committee minutes during the course of this
4    deposition?
5         A.   Not yet.
6         Q.   Have you -- do you have any reason to
7    believe I have P&T committee minutes in my folder,
8    as your counsel suggested?
9         A.   I have no idea what you have in your
10   folder.
11        Q.   Are you aware of any information that
12   would indicate that I have P&T committee minutes
13   on me?
14        A.   I can't answer that.  That calls for
15   the ultimate speculation.
16        Q.   I've got them in the back of my suit.
17   She has x-ray goggles.
18        As a matter of policy, no information
19   is shared between the CMI and the P&T committee
20   for the various areas, is that correct?
21        A.   Not as a matter of policy.
22        MS. NUSSBAUM:  Objection.
23        Q.   The physicians on the P&T committees
24   are employed by the Permanente Medical Group, is

Page 200

A. Carver

1    that correct?
2         A.   That's correct.
3         Q.   And CMI is produced by The Federation,
4    which is composed of those same medical groups, is
5    that right?
6         A.   It's comprised of representation from
7    each of those medical groups.  CMI has its own
8    executive director and staff.  And then I believe
9    CMI may solicit input from physicians that would
10   be physicians within relevant specialties,
11   depending upon what it is they're developing a
12   guideline for.
13        Q.   CMI develops its information and the
14   P&T committees develop their own information and
15   the two do so pretty much independently, is that
16   correct?
17        A.   I think that is a generally correct
18   characterization.
19        Q.   Are you aware of any discussions to
20   use information from the CMI in the P&T committee
21   decision-making process?
22        A.   I'm not -- I'm not directly aware of
23   whether or not the P&T committee has reviewed or
24   CMI guidelines have been input into the

Page 201

A. Carver

1    preparation of a monograph as an example just by
2    my independent recollection.
3         Q.   Why would the plaintiff have a copy of
4    this document?
5         A.   Well, I think that --
6         MS. NUSSBAUM:  If you know.
7         A.   I believe that counsel requested
8    information from a wide variety of sources to be
9    responsive to all of your requests for provision
10   of any information regarding to Neurontin.
11        Q.   But you would have no knowledge as to
12   who would have had a copy of this document or who
13   would have received --
14        A.   No, I don't know the source of this
15   document to counsel or to you.
16        Q.   If I wanted to find out what the
17   current P&T committee restriction on Gabapentin's
18   prescription, what document would I look to?
19        A.   One place to look would be to the
20   formulary.
21        Q.   I think my question is different,
22   because the formulary would principally just tell
23   you whether it's on the formulary or not, right?
24   Is that the -- I mean, it would be -- give you a

A. Carver

1
2 binary piece of information, either it's on the
3 formulary or it's not on the formulary, is that
4 correct?
5    A.   There also is additional information
6 contained in the formulary that would be
7 information regarding use of the product or
8 whether there are guidelines, and contained in the
9 formulary, I cannot speak to Neurontin
10 specifically, but contained in the guidelines --
11 contained in the formularies, at least in the
12 past, there have been some guidelines for use of
13 specific products, but I can't tell you whether or
14 not there's anything specific to Neurontin, just
15 because I don't know.
16    Q.   Did you review any document in
17 preparation for this deposition that would tell
18 you what the current guidelines with regard to
19 prescription of Neurontin or Gabapentin are at
20 Kaiser?
21    A.   I did not.
22    Q.   And you have no knowledge of that --
23 those guidelines from any other source; right?
24    A.   Just not independent knowledge, no. I
25 mean, Neurontin is one of many drugs and I did not

A. Carver

1
2 review what is the current -- what are the current
3 guidelines regarding the use of Gabapentin today.
4    Q.   Do you have any reason to believe that
5 the plaintiffs have produced any document that
6 would contain the current guidelines, as opposed
7 to the guidelines in place in 1999?
8    A.   I do not know. Specifically, the call
9 was made for documents, and we believe that the
10 various people have been responsive to that, but I
11 do not know. I'm sorry.
12    Q.   And were any such documents among
13 those sent to you that you reviewed yesterday?
14    A.   I don't know whether there was any
15 documents contained in what I've recently reviewed
16 regarding the current guidelines. I'm sorry. I
17 just don't have a recollection.
18    Q.   Just to clarify, there are two sets of
19 guidelines. One is sort of a set of restrictions
20 or guidelines promulgated by the regional P&T
21 committees, and then there's a second set of
22 guidelines distributed by the CMI, is that
23 correct?
24    MS. NUSSBAUM: Objection. That
25 misstates the testimony of the witness.

A. Carver

1
2    Q.   Have I misstated your testimony?
3    A.   There are guidelines that the CMI
4 process has produced some guidelines for
5 management of chronic pain which we're discussing
6 now;
7       And then we've previously spoken about
8 approvals of the P&T committee as it relates to
9 the use of Neurontin, whether it was in the --
10 whether it was in the formulary or not. And then
11 some expansion of guidelines up to the point of
12 sometime in 1999, I believe.
13    Q.   Does Kaiser agree with the statement
14 that, "Although no more effective than TCAs or
15 other anti-convulsants, Gabapentin may be safer
16 due to fewer drug interactions"?
17    MS. NUSSBAUM: Where are you reading
18 from?
19    MR. JAMES: I think the document is
20 kind of irrelevant because he doesn't have a
21 personal knowledge of it.
22    MS. NUSSBAUM: So you're taking a
23 sentence out of context and asking whether or not
24 the two corporate plaintiffs agree with that
25 sentence?

A. Carver

1
2    MR. JAMES: Yes. Do the corporate
3 plaintiffs agree with the view that Gabapentin may
4 be no more effective than TCAs or other
5 anti-convulsants, but they may be safer due to
6 fewer drug interactions.
7    MS. NUSSBAUM: At what time? Based on
8 what?
9    MR. JAMES: I'm asking for the current
10 view of the corporate plaintiffs.
11    MS. NUSSBAUM: We don't know, does
12 Kaiser have such a view? It's outside the scope
13 of the 30(b)(6). He can't speak to that.
14    MR. JAMES: I think our tape is coming
15 to an end, so we'll take a break here.
16    VIDEOGRAPHER: The time is
17 approximately 6:57. We're now going off the
18 record.
19    (Recess.)
20    (Proceedings adjourned to July 13,
21 2007 at 8:30 a.m.)
22
23
24
25

Page 206

```
 1              A. Carver
 2          J U R A T
 3        I, ALBERT L. CARVER, the witness herein,
 4  having read the foregoing testimony of the pages of this
 5  deposition, do hereby certify it to be a true and
 6  correct transcript, subject to the corrections, if any,
 7  shown on the attached page.
 8
 9       _____
10          ALBERT L. CARVER
11   Subscribed and sworn to before me
12  this _____ day of _____ 2007.
13  _____
14       NOTARY PUBLIC
15
16
17
18
19
20
21
22
23
24
25
```

Page 207

```
 1              A. Carver
 2  STATE OF NEW YORK   )   Pg. of Pgs.
 3                      ) ss.:
 4  COUNTY OF NEW YORK  )
 5        I wish to make the following changes, for the
 6  following reasons:
 7  PAGE LINE
 8  ____ ____     CHANGE: _____
 9              REASON: _____
10  ____ ____     CHANGE: _____
11              REASON: _____
12  ____ ____     CHANGE: _____
13              REASON: _____
14  ____ ____     CHANGE: _____
15              REASON: _____
16  ____ ____     CHANGE: _____
17              REASON: _____
18  ____ ____     CHANGE: _____
19              REASON: _____
20  ____ ____     CHANGE: _____
21              REASON: _____
22  ____ ____     CHANGE: _____
23              REASON: _____
24  ____ ____     CHANGE: _____
25              REASON: _____
```

Page 208

```
 1              A. Carver
 2  PAGE LINE
 3  ____ ____     CHANGE: _____
 4              REASON: _____
 5  ____ ____     CHANGE: _____
 6              REASON: _____
 7  ____ ____     CHANGE: _____
 8              REASON: _____
 9  ____ ____     CHANGE: _____
10              REASON: _____
11  ____ ____     CHANGE: _____
12              REASON: _____
13  ____ ____     CHANGE: _____
14              REASON: _____
15  ____ ____     CHANGE: _____
16              REASON: _____
17  ____ ____     CHANGE: _____
18              REASON: _____
19  ____ ____     CHANGE: _____
20              REASON: _____
21  ____ ____     CHANGE: _____
22              REASON: _____
23  ____ ____     CHANGE: _____
24              REASON: _____
25
```

Page 209

```
 1              A. Carver
 2          CERTIFICATE
 3        I, AMY A. RIVERA, a Notary Public and
 4  Certified Shorthand Reporter of the State of New York,
 5  do hereby certify that prior to the commencement of the
 6  examination ALBERT L. CARVER was duly sworn by me to
 7  testify the truth, the whole truth and nothing but the
 8  truth.
 9        I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13        I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any of
15  the parties to this action, and that I am neither a
16  relative nor employee of such attorney or counsel, and
17  that I am not financially interested in the action.
18
19  _____
20     Notary Public of the State of New York
21     My commission expires August 29, 2009
22     License No. XI00939
23  Dated: July 16, 2007
24
25
```

I, ALBERT L. CARVER, the witness herein, having read the foregoing testimony of the pages of this deposition, taken on July 12, 2007, do hereby certify it to be a true and correct transcript, subject to the corrections, if any shown on Attachment A.

_____
ALBERT L. CARVER

Subscribed and sworn to before me
this $18$ day of September 2007.

_____
NOTARY PUBLIC

NANCY A. MARTINEZ
COMM. # 1520191
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires OCT. 18, 2008

## ATTACHMENT A

### Day 1 Albert Carver Deposition – July 12, 2007

| PAGE/LINE REFERENCE | CHANGE | REASON |
|---|---|---|
| 21:11 | "Stamford" to "Stanford" | Typo |
| 41:7 | "Gerald" to "Gerry" | Corrected name spelling |
| 47:15 | "Arocki" to "Araki" | Corrected name spelling |
| 122:4 | "than" to "then" | Typo/grammatical error |
| 137:9 | "not" should be included between the words "would" and "know" | Either I misspoke or the court reporter did not catch the word "not" but either way the word "not" should be included in that sentence. |
| 139:6 | "unsafety" to "safety" | Typo |
| 154:13 | "physicians" to "restrictions" | Typo |
| 156:11 | "integral" to "internal" | Typo |
| 195:8-9 | No "." (period) after the word "content" and lower case "T" for the word "That" | Grammatical |