UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
MDL Docket No. 1629/Master File No. 04-10981


----------------------------X

IN RE: NEURONTIN MARKETING     MDL Docket No. 1629

SALES PRACTICES, AND PRODUCTS   Master File No.

LIABILITY LITIGATION            04-10981

----------------------------X


VIDEOTAPED DEPOSITION OF ALBERT L. CARVER

New York, New York

July 13, 2007


Reported by:
Amy A. Rivera, CSR, RPR

Page 211

```
 1
 2   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
 3
 4   --------------------------x
 5   IN RE: NEURONTIN PRODUCTS
 6   LIABILITY LITIGATION     Index Number 765000/2006
 7   --------------------------x
 8
 9
10
11   VIDEOTAPED DEPOSITION OF ALBERT L. CARVER
12
13
14              New York, New York
                July 13, 2007
15
16
17
18
19
20
21
22
23
24
25
```

Page 213

```
 1
 2          Deposition of ALBERT L. CARVER, held
 3   at KAPLAN FOX, 850 Third Avenue, New York, New
 4   York, before Amy A. Rivera, a Notary Public of the
 5   State of New York.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 212

```
 1
 2   A P P E A R A N C E S:
 3   KAPLAN FOX & KILSHEIMER, LLP
        Attorneys for Plaintiffs
 4        850 Third Avenue
          New York, New York 10022
 5   BY:   LINDA N. NUSSBAUM, ESQ.
           AVIAH COHEN PIERSON, ESQ.
 6         MITCHELL COHEN, ESQ.
 7
 8   JUSTIN BLOOM, ESQ.
        Attorneys for Class Plaintiffs
 9        29 W. 70th Street, Suite 2B
          New York, New York  10023
10
11   DAVIS POLK & WARDWELL
        Attorneys for Defendants Pfizer, Inc. & Warner-Lambert
12        450 Lexington Avenue
          New York, New York  10017
13   BY:   RAJESH JAMES, ESQ.
           REID SKIBELL, ESQ.
14
15
16   ALSO PRESENT: JIM ROBERTS, Videographer
                   NATIONWIDE VIDEO PRODUCTIONS, INC.
17
18
19
20
21
22
23
24
25
```

Page 214

```
 1
 2                    INDEX
 3   WITNESS       DIRECT  CROSS  REDIRECT
 4   ALBERT L. CARVER
 5   BY MR. JAMES      216        506
 6   BY MS. NUSSBAUM          493
 7            EXHIBITS
 8   NUMBER    DESCRIPTION              PAGE
 9   Kaiser-11   Neurontin article       231
10   Kaiser-12   DUAT article            235
11   Kaiser-13   DUAT videoconference 3/12/03  248
12   Kaiser-14   E-mail dated 6/10/99      260
13   Kaiser-15   Answers to interrogatories   330
14   Kaiser-16   KPSC DUAT Jan. to Dec. 2004  354
15   Kaiser-17   Approved minutes         375
16   Kaiser-18   E-mail dated 9/2/03      385
17   Kaiser-19   E-mail dated 6/4/02      392
18   Kaiser-20   E-mail dated 7/3/01      400
19   Kaiser-21   Business resources retention  423
20   Kaiser-22   Kaiser Permanente document   438
21   Kaiser-23   Article                  454
22   Kaiser-24   E-mail dated 1/17/99     483
23   Kaiser-25   Neuropathic pain document    488
24   Kaiser-26   Article                  504
25
```

Page 215

1
2          IT IS HEREBY STIPULATED AND AGREED by and
3    between counsel for the respective parties hereto that
4    all rights provided by the C.P.L.R., including the right
5    to object to any question, except as to the form, or to
6    move to strike any testimony at this examination, are
7    reserved; and, in addition, the failure to object to any
8    question or to move to strike any testimony at this
9    examination shall not be a bar or waiver to make such
10   motion at, and is reserved for, the trial of this
11   action.
12          IT IS FURTHER STIPULATED AND AGREED that
13   this examination may be signed and sworn to, by the
14   witness being examined, before a notary public other
15   than the notary public before whom the examination was
16   begun, but the failure to do so, or to return the
17   original of this examination to counsel, shall not be
18   deemed a waiver of the rights provided by Rules 3116 and
19   3117 of the C.P.L.R. and shall be controlled thereby.
20          IT IS FURTHER STIPULATED AND AGREED that
21   the filing of the original of this examination shall be
22   and the same hereby is waived.
23
24
25

Page 216

1                    A. Carver
2          VIDEOGRAPHER:  Good morning.  We're
3    going on the record.  The date is July 13, 2007.
4    The time is approximately 8:42 a.m.  This begins
5    volume two, tape number one in the deposition of
6    Albert Carver.
7          You may proceed.
8    DIRECT EXAMINATION (continued)
9    BY MR. JAMES:
10        Q.   Good morning.  Since we left the
11   record last night, have you had any further
12   discussions regarding the items noticed in the
13   Kaiser 30(b)(6) Notice?
14        A.   I have not.
15        Q.   Have you reviewed any additional
16   documents regarding those?
17        A.   I have not.
18        Q.   And have you had any further
19   recollections regarding answers to questions that
20   I asked you yesterday?
21          MS. NUSSBAUM:  This is overly broad.
22   If you want to ask a specific question and see
23   whether or not he's had a further recollection,
24   but we had over five hours' worth of testimony,
25   and I'm not going to right now let him answer

Page 217

1                    A. Carver
2    whether or not he doesn't have a transcript.
3          MR. JAMES:  Your objection is noted.
4        Q.   Is there any answer that you would
5    like to supplement that comes to mind at this
6    point?
7        A.   Not at this point.
8        Q.   Yesterday we discussed Kaiser's
9    formulary, and I understood that there is a
10   different formulary for each of the regions, is
11   that correct?
12        A.   That's correct.
13        Q.   And was Neurontin added to each of
14   these eight formularies in 1994?
15        A.   I believe it was.
16        Q.   And was it use restricted in any way
17   on those formularies?
18        A.   I do not know whether or not there
19   were restrictions in the formularies outside of
20   California.
21        Q.   Who would know the answer to that
22   question?
23        A.   The pharmacy director in each of the
24   respective regions.
25        Q.   With regard to the formularies in

Page 218

1                    A. Carver
2    northern California and southern California, were
3    there any restrictions imposed on Neurontin's use?
4          MS. NUSSBAUM:  Can you define the term
5    "restriction" as you've used it in your question?
6        Q.   You can answer if you understand the
7    question.
8        A.   I believe that we discussed yesterday
9    in great detail the southern California formulary
10   in which there's a notation there of a guideline
11   suggesting that the prescribing in 1994 be
12   restricted to neurologists.
13        Q.   Is that actually part of the formulary
14   or is that a separate set of guidelines apart from
15   the formulary?
16        A.   Well, it's -- it was just part of the
17   recommendation or recommendation regarding the
18   placement of Neurontin, and I believe, as I stated
19   yesterday, either Neurontin or any drug either is
20   on the formulary or it's not on the formulary and
21   it was added to the formulary.
22        Q.   And when it's on the formulary, it
23   will be reimbursed by Kaiser for any use for which
24   a Kaiser physician prescribes it, is that correct?
25        A.   In which a Permanente physician

Page 219

```
 1           A. Carver
 2  prescribes it. Yes, that's correct.
 3      Q.   And did that change at any point
 4  during the relevant period?
 5           MS. NUSSBAUM:  Do you want to define
 6  the relevant period?
 7      Q.   From 1994 to the present?
 8      A.   I'm not sure I understand your
 9  question from the standpoint of Neurontin was
10  added to the formulary in 1994.  It as the branded
11  Neurontin from Pfizer remained on the formulary
12  until, I believe, 2004.  During all of that period
13  of time, it was when it was prescribed by a
14  Permanente physician would have been reimbursed or
15  paid for by the health plan.
16      Q.   In 2004, what occurred?
17      A.   Well, I believe in 2004, the branded
18  Neurontin product from Pfizer was removed from the
19  formulary and replaced with a generic.
20      Q.   And at that time, did the restrictions
21  that were in place with regard to branded
22  Neurontin change for generic Gabapentin?
23           MS. NUSSBAUM:  To the extent that
24  there were any restrictions in 2004, if you know,
25  did they change in any way as a result of the
```

Page 220

```
 1           A. Carver
 2  generic coming to market?
 3           THE WITNESS:  I don't recall.
 4      Q.   Do you know what the current
 5  restrictions that Kaiser has in place with regard
 6  to generic Gabapentin today are?
 7      A.   I do not know.
 8      Q.   Who would know that fact?
 9      A.   Well, our Drug Information Service
10  would have a record of the disposition.
11      Q.   Does the Drug Information Service
12  report to you?
13      A.   Yes, it does, everyone directly.
14      Q.   Were you able to speak with any
15  individual in part of the Drug Information Service
16  organization in preparation for your deposition
17  today?
18      A.   I did not.
19      Q.   Today, if Permanente physicians were
20  to prescribe branded Neurontin, what would occur?
21      A.   The -- depends upon whether or not the
22  physician indicated that the branded Neurontin was
23  medically necessary for the specific patient and
24  if it were, then it would be dispensed by the
25  pharmacy and provided to the patient.  Otherwise,
```

Page 221

```
 1           A. Carver
 2  if the physician did not indicate that the
 3  prescription was to be dispensed as written and
 4  medically necessary, then it would be -- then the
 5  generic product would be provided.
 6      Q.   If the physician prescribed it as
 7  being medically necessary, would anyone at Kaiser
 8  review that, that statement?
 9           MS. NUSSBAUM:  Hypothetical.  I ask
10  the witness not to answer.
11      Q.   You can answer, if you can.
12           MS. NUSSBAUM:  Do you understand the
13  question?
14           THE WITNESS:  I understand the
15  question.
16      A.   And the answer to the question is no.
17  No one at Kaiser would be second-guessing the
18  physician.
19      Q.   How would the pharmacist know not to
20  dispense branded Neurontin without the specific
21  statement from the physician or is that -- or am I
22  misunderstanding the process?
23           MS. NUSSBAUM:  Well, you know, I just
24  want to clarify now, are you talking about their
25  mandatory state substitution laws in every state
```

Page 222

```
 1           A. Carver
 2  in the United States, including California?
 3           So, if you want him to tell you if he
 4  knows as a pharmacist if California has a
 5  substitution, mandatory substitution law, when
 6  there's a generic available or any pharmacy, or if
 7  you want, if Kaiser is different, but right now
 8  that's a very unclear question.
 9      Q.   Just returning to your prior
10  testimony, if a physician did not indicate that
11  branded Neurontin was medically necessary, Kaiser
12  would not reimburse that payment, is that correct?
13           Could you take me step by step through
14  the process?  If a physician wrote a prescription
15  for branded Neurontin, without including a
16  statement that it was medically necessary, what
17  would the processing be like?  What would happen
18  when the -- when a patient went to fill that
19  prescription?
20           MS. NUSSBAUM:  I object.  It misstates
21  the testimony.  The witness said --
22           MR. JAMES:  The objection is noted.
23  The objection is preserved.  Thank you.  The
24  objection is preserved.
25           MS. NUSSBAUM:  You're misstating his
```

Page 223

1          A. Carver
2 testimony.
3      Q.   If you could clarify your prior
4 testimony, if necessary, and answer the question?
5      A.   I believe my testimony was that if a
6 prescription is written today for Neurontin, brand
7 name Neurontin with a notation that the brand name
8 Neurontin is medically necessary, then that
9 prescription would be dispensed as written by the
10 physician and paid by Kaiser in the absence of
11 that notation that it was medically necessary,
12 then the prescription likely would be dispensed
13 using a generic Gabapentin for which the -- for
14 which Kaiser also would pay.
15          Have I been clear or --
16      Q.   Yes, that's very helpful.
17          Are there any drugs on the formulary
18 that are restricted by use?  And I guess here when
19 I use the word "restricted," I'm not referring to
20 the fact that there may be guidelines in place
21 that Permanente physicians should only prescribe a
22 drug for a particular use or in given
23 circumstances.
24          I'm actually referring to an instance
25 in which Kaiser would actually only reimburse for

Page 224

1          A. Carver
2 a particular drug if it were prescribed for a
3 particular use?
4          MS. NUSSBAUM:  I would object.  That's
5 outside the scope of the Notice.
6          MR. JAMES:  I believe the first topic
7 refers to policies and practices concerning
8 payment for reimbursement or payments for drug
9 prescriptions.  That's clearly within the scope.
10          MS. NUSSBAUM:  The witness has
11 testified as to that, and that we previously, in
12 numerous meet-and-confers, made clear that there
13 are hundreds of drugs on the formulary, and that
14 no witness can testify with respect to each and
15 every drug.  If there's general policies and
16 practice, he's already testified to that.
17      Q.   If you can answer the question.
18      A.   I could only answer in general, and in
19 general, I believe I'm not aware of any
20 circumstance in which the payment for a product is
21 restricted to a specific indication.  Now, there
22 perhaps would be an exception, but not that comes
23 to mind.
24      Q.   From 1994 to the present, did Kaiser
25 implement any programs or policies to contain the

Page 225

1          A. Carver
2 costs of prescription drugs?
3      A.   Yes.
4      Q.   What policies or programs?
5      A.   We implemented in the year 2000 a
6 program known as -- as DUAT in southern California
7 and DRUG in northern California that were intended
8 to influence and promote the appropriate use of
9 drugs in a variety of therapeutic classes.
10      Q.   Are there any other cost containment
11 programs or policies that you're aware of?
12      A.   That have been implemented since 1994?
13      Q.   Yes.
14      A.   Not -- not that come to mind.
15      Q.   And with regard to -- can I call them
16 DUAT and DRUG?  Is that --
17      A.   Yes, that would be fine.
18      Q.   Are DUAT and DRUG essentially
19 equivalent except that one is in southern
20 California and the other is in northern
21 California?
22      A.   Yes.
23      Q.   And how do those programs operate?
24      A.   They -- I'm not sure what you mean by
25 "operate."

Page 226

1          A. Carver
2      Q.   What do the programs involve?
3      A.   The programs involve some key
4 physicians working with some pharmacy
5 representation in an organized manner to review
6 drug usage, to initiate initiatives or launch
7 initiatives that are intended to influence the use
8 of particular drugs within Kaiser Permanente.
9      Q.   Does DUAT and DRUG, do those programs
10 focus on particular drugs?
11          MS. NUSSBAUM:  Only if you understand
12 the question.  I think the witness has described
13 the program.
14      A.   There has been -- there has been a
15 focus on particular therapeutic categories of
16 drugs, yes.
17      Q.   And who decides which categories of
18 drugs to focus on?
19      A.   The DUAT and the DRUG committees.
20      Q.   And who are the members of those
21 committees?
22      A.   By name or --
23      Q.   Not by name, just by the --
24          MS. NUSSBAUM:  Job title?
25      Q.   Yeah, job title.  What kinds of people

Page 227

A. Carver

1
2  are on these committees?
3      A.  There are physician leaders.  By that,
4  I mean physicians who some of -- there's a
5  physician co-chair in southern California is a
6  physician who is from the clinical services
7  department of the SCPMG of the medical group of
8  southern California, and then there is a physician
9  representative, I believe, from each of the
10 geographic regions in southern California, or at
11 least a representation of physicians from the
12 areas in southern California.
13     There may not be representation from
14 each, but some representation there.  And then
15 there is an individual with the title of a drug
16 use management leader who works within the
17 pharmacy organization, and another individual
18 entitled the "drug use manager" who also works
19 within the pharmacy organization, and generally
20 that's the composition of both northern and
21 southern California.
22     Q.  And these committee members decide
23 which drugs or drug categories to focus these
24 programs on?
25     A.  Yes, yes, they do.

Page 228

A. Carver

1
2      Q.  How do they make the determination as
3  to which drugs or drug categories to focus on?
4      A.  I think based upon their estimation of
5  opportunities for improving prescribing or
6  managing costs, reducing utilization, whatever the
7  topic may be.
8      Q.  And how do they make those estimates?
9      MS. NUSSBAUM:  If you know.
10     A.  I'm not sure.  I'm not a member of the
11 committee, have not participated in the committee,
12 based upon their professional judgment.
13     Q.  Do you know the names of the physician
14 cochairs of the two committees?
15     A.  Joel Hyatt is the cochair in southern
16 California.  Tim Batchelder is the cochair in
17 northern California.
18     Q.  And do you know the names of the drug
19 use management leaders?
20     A.  The drug use management leader in
21 southern California is Richard Wagner and in
22 northern California, Jamie Chan.
23     Q.  Once the committee identifies a
24 particular drug or drug class as a focus of this
25 program, what's the next step that occurs?

Page 229

A. Carver

1
2      MS. NUSSBAUM:  Objection.
3      This is now outside the scope.  You've
4  asked for policies and practices.  He's given it
5  to you.  The witness has said he's not a member of
6  the committee, so, I think that we're really
7  getting a little far afield here.
8      MR. JAMES:  I think the first topic
9  refers to drug utilization review and disease
10 management programs.  This appears to be plainly a
11 drug utilization program, and I feel I'm entitled
12 to ask questions about it.
13     MS. NUSSBAUM:  Right.  You've asked
14 the policies and practices and he's told you.
15 You're now asking for internal workings of the
16 committee which he's told you he's on.
17     MR. JAMES:  Your objection is
18 preserved.
19     Q.  Do you know what the next step of the
20 program is --
21     MS. NUSSBAUM:  Only if you know --
22     Q.  -- once the committee decides that a
23 particular drug or drug class does an appropriate
24 focus?
25     A.  I cannot answer sequentially.  I can

Page 230

A. Carver

1
2  tell you generally the steps that are -- generally
3  the steps in the process, but not necessarily
4  sequentially.
5      Q.  And what are those steps in the
6  process?
7      A.  Generally, a review of the overall
8  utilization of the product, the establishment, if
9  there's opportunity for improvement, then the
10 establishment of some goal or a target for what
11 they are wanting to achieve in terms of either
12 reduction in utilization or increase in
13 utilization or those kinds of things, and then
14 some metrics to measure progress toward such
15 goals, and then in reporting to key physician
16 groups regarding the progress toward those goals.
17     Q.  One of the steps you mentioned was
18 review of overall utilization of the product?
19     How does a committee determine the
20 overall utilization of a product?
21     MS. NUSSBAUM:  Once again, I'd caution
22 the witness that this is not a committee that you
23 were on and not something that you have personal
24 knowledge of.  This is outside the scope of the
25 topic, which is simply asking the policies and

Page 231

A. Carver

1        A. Carver
2   procedure; okay. We've given you the policies and
3   practices with respect to this, and unless you
4   have personal knowledge, I would caution you not
5   to answer.
6        A.   I'm not sure of the details involved
7   in how they go about it.
8        Q.   Do you know what information Kaiser
9   has that may be able to assist them in determining
10  drug utilization?
11       MS. NUSSBAUM: If you know personally.
12       A.   Well, prescription information,
13  prescription -- prescription information.
14       Q.   And what information would that
15  provide?
16       A.   It would provide how many
17  prescriptions in a particular therapeutic category
18  or for a particular drug, the prescribers of such.
19       Q.   Beyond telling you the numbers of
20  prescriptions of a particular drug, would it tell
21  you the uses for which they were prescribed?
22       MS. NUSSBAUM: I, once again, caution
23  the witness unless you have personal knowledge,
24  not to speculate.
25       A.   I'm not certain what -- what all

Page 232

A. Carver

1        A. Carver
2   sources of information that might be used beyond
3   just the prescription information that I've
4   outlined.
5        Q.   Do you know of -- or strike that.
6        Just to confirm, the only information
7   that you're confident that Kaiser would have would
8   be the number of prescriptions for a particular
9   drug, and aside from resorting to speculation, you
10  can't tell me whether additional information such
11  as the use for which the drug is being prescribed
12  is available to Kaiser?
13       MS. NUSSBAUM: That's what the witness
14  testified to. Asked and answered.
15       MR. JAMES: I would like him to
16  confirm.
17       A.   That's correct.
18       MR. JAMES: I'm going to mark an
19  exhibit.
20       (Kaiser-11 marked for identification.)
21       Q.   Do you recognize this document?
22       A.   Yeah, I believe I've seen the first
23  page of the document.
24       Q.   And what is the document?
25       MS. NUSSBAUM: If you know.

Page 233

A. Carver

1        A. Carver
2        A.   I believe it's the announcement of a
3   videoconference regarding Gabapentin.
4        Q.   And are videoconferences one of the
5   means by which DUAT and DRUG attempt to influence
6   physician-prescribing behavior?
7        A.   Yes.
8        Q.   Are there any other means by which
9   DUAT and DRUG attempt to influence physician
10  prescribing behavior outside videoconferences?
11       A.   I'm not sure of, you know, all of
12  the -- of the various techniques that DRUG and
13  DUAT might use. As I mentioned, I'm not a member
14  of the committee.
15       Q.   If you look at the first line of text
16  of this document, there's a heading saying,
17  "Overall needs assessment."
18       Following that, there's a statement
19  that says that, "Providers outside the specialties
20  of neurology and psychiatry write the majority of
21  prescriptions for Gabapentin."
22       Do you know why neurology and
23  psychiatry are specified in that sentence?
24       MS. NUSSBAUM: I would object.
25  There's no testimony that this witness in the

Page 234

A. Carver

1        A. Carver
2   ordinary course received this document, wrote this
3   document, had any input into this document or
4   knows where the information contained in the
5   document came from.
6        Q.   Let me take one step back. You
7   mentioned that you had seen the first page of this
8   document before, is that correct?
9        A.   Yes, that's correct.
10       Q.   Is this a document that Kaiser would
11  create in the ordinary course of business?
12       A.   Yes, I believe so.
13       Q.   In what context did you see the first
14  page of this document?
15       A.   In that bundle of documents that I
16  glanced at.
17       MS. NUSSBAUM: I would object as to
18  documents that the witness received from counsel,
19  and we're not going to have any questions. It's
20  work product.
21       Other than in preparation for your
22  deposition, had you ever seen this document before
23  to your recollection?
24       THE WITNESS: No.
25       Q.   From your personal knowledge, do you

Page 235

A. Carver

1           A. Carver
2 know why the first sentence of this document might
3 refer to specialty -- to the specialties of
4 neurology and psychiatry?
5      MS. NUSSBAUM: Objection.
6      The witness just said that other than
7 in preparation for the deposition. He's never
8 seen this document and didn't write it, has no
9 personal knowledge of it. Therefore, the document
10 speaks for itself. I'm not going to let him
11 speculate as to why some unknown author wrote
12 something in the document.
13    Q.  I'm asking the question whether as
14 vice-president you would have knowledge of why the
15 author of this document might refer specifically
16 to specialties of neurology and psychiatry?
17    A.  No.
18    Q.  Are considerations such as safety and
19 efficacy taken into account by DUAT and DRUG in
20 deciding which drugs or classes of drugs to focus
21 on?
22      MS. NUSSBAUM: Can you repeat the
23 question?
24      MR. JAMES: Could you read the
25 question back?

Page 236

A. Carver

1           A. Carver
2      (Record read.)
3    A.  Well, I believe the answer to that is
4 yes, but it's speculation because I'm not a part
5 of the committee.
6      MS. NUSSBAUM: I'd ask you not to
7 speculate.
8      MR. JAMES: I'd like to mark another
9 exhibit.
10      (Kaiser-12 marked for identification.)
11    Q.  I guess there's no need to go through
12 the whole document. But do you recognize the
13 document?
14      MS. NUSSBAUM: Do you want to tell him
15 what you mean by "recognize" so we don't have the
16 same confusion as we did with the last document
17 where it turned out that the witness had never
18 received the document or seen it in his ordinary
19 course of business.
20    Q.  In your corporate capacity as a
21 corporate representative of Kaiser, do you
22 recognize this document?
23    A.  I believe that this document
24 represents a presentation that was made at an
25 interregional meeting dated April 2004. I was

Page 237

A. Carver

1           A. Carver
2 present at that meeting. I don't recall whether
3 or not I received a document, but I -- I can
4 recall a presentation by a Dr. Rodriguez.
5    Q.  Did you state April 2004?
6    A.  That's the date that's on this -- on
7 this document.
8      MR. JAMES: That's fine. We'll take a
9 look at this document first.
10    Q.  What do you recall being discussed at
11 that meeting?
12    A.  The only thing that I specifically
13 recall from the meeting was information that was
14 reviewed and contained on pages 13 and -- 13 and
15 12, and this document, page 12 comes after page
16 13, but regarding the wide range of conditions
17 for -- in which Gabapentin had been used.
18    Q.  Regarding page 13, does reviewing that
19 refresh your recollection that Kaiser is able to
20 determine the uses for which particular
21 prescription drugs are prescribed?
22      MS. NUSSBAUM: Objection.
23    A.  It does not, in that I do not know how
24 this information was assembled. I just am
25 testifying that I was present at a presentation

Page 238

A. Carver

1           A. Carver
2 and of this entire document, the only thing that
3 comes to my mind from something that occurred
4 three years ago is -- was this assessment of the
5 wide range of uses to which Neurontin had been
6 put.
7    Q.  And do you have no knowledge as to how
8 this information was assembled?
9    A.  I do not.
10    Q.  And you don't know whether Kaiser can
11 create this sort of information in its ordinary
12 course of business?
13      MS. NUSSBAUM: I think the witness has
14 already stated that Kaiser cannot create this kind
15 of information in the ordinary course of business.
16    Q.  Is it your testimony that Kaiser
17 cannot create the information of the sort
18 contained on page 13 of this document in its
19 ordinary course of business?
20    A.  Well, I don't know how this was
21 assembled. This is a Kaiser document. So I am
22 not here to say that it's impossible, because
23 obviously it's been done, but I don't know how it
24 was done.
25    Q.  To clarify, your testimony is that you

A. Carver

1
2  do not know whether or not Kaiser is able to
3  create this sort of chart in its ordinary course
4  of business?
5      A.   That's correct.
6      Q.   Okay.
7      A.   The information that's contained on
8  page 12 indicates that it was done as a result of
9  chart review, which is a laborious painstaking
10 process to identify patients, and then review
11 charts one by one by one to figure out why and how
12 Neurontin would have been used.
13     And I don't know what kind of a
14 process was used for purposes of assembling that
15 information on page 13, on whether an
16 extraordinarily laborious process was used or
17 whether or not some other technique was used to
18 categorize prescriptions into these various
19 diagnoses.
20     Q.   Is it possible that the information
21 contained on page 13 was assembled, it was all
22 chart review?
23         MS. NUSSBAUM:  Asked and answered.
24 The witness has said three times he has no idea --
25         MR. JAMES:  Your objection is noted --

A. Carver

1
2      Q.   I'm saying --
3          MS. NUSSBAUM:  -- how page 13 was
4  assembled.
5      Q.   Did you testify that it's possible
6  that the information on page 13 was assembled
7  through a laborious process of chart review?
8      A.   I did not.  I said that I don't know
9  how it was assembled.  I truly do not know what
10 technique was used to put this together.
11     Q.   With regard to the information
12 contained on page 12, was it your testimony that
13 this information was assembled, it was all chart
14 review?
15         MS. NUSSBAUM:  I believe that the
16 witness said he did not know, he did not create
17 this document, and he did not know how the
18 document was created.
19         MR. JAMES:  Your objection is
20 preserved.
21     A.   I'm relying upon this San Gabriel
22 Valley chart review.
23         MS. NUSSBAUM:  Do you know anything
24 personally about how the information contained in
25 this document was gathered?

A. Carver

1
2          THE WITNESS:  I do not.
3      Q.   In what circumstances does Kaiser
4  undergo the process of chart review?
5          MS. NUSSBAUM:  I would object.
6  There's no testimony that it undergoes, quote,
7  "the process of chart review."  I think the
8  witness testified yesterday that the physicians
9  belong to a separate entity that contracts with
10 Kaiser.  Kaiser does not have charts.  I suggest
11 we move on.
12     Q.   With regard to the information on page
13 12, which entity would have undertaken the process
14 of chart review?
15     A.   I do not know.  I'm testifying that I
16 was present at a presentation.
17     Q.   And you don't know whether it was the
18 plaintiffs or another Kaiser entity that undertook
19 the chart review described on page 12?
20         MS. NUSSBAUM:  The witness indicated
21 that he didn't even know if there was chart
22 review.  He indicated he knows nothing about this
23 document other than what's on the face of the
24 document.  He did not put this together.  He did
25 not know how it was put together.  He did not know

A. Carver

1
2  who put it together.
3      Q.   In the course of your preparation for
4  this deposition, did you consult anyone involved
5  in either DUAT or DRUG to determine how they go
6  about obtaining information regarding prescription
7  drug usage?
8      A.   I did not.
9      Q.   Did you review any documents that
10 would be relevant to that subject?
11         MS. NUSSBAUM:  I would caution you not
12 to discuss any discussions with counsel.
13     Q.   Is the answer no?
14     A.   The answer would be no.
15     Q.   On page 20 of this document, if you
16 could turn to that page, in the second paragraph,
17 there's a statement that the evidence indicates
18 that Gabapentin, Neurontin is no more effective
19 than tricyclic antidepressants, TCAs, for
20 neuropathic pain.
21         Is that a subject that you recall
22 being discussed at this meeting in March 2004?
23     A.   I do not -- I do not recall.
24     Q.   Is that a statement that's consistent
25 with Kaiser's present views?

Page 243

1          A. Carver
2          MS. NUSSBAUM: I would object. This
3   is outside the scope of the examination here. The
4   document has been produced. The document speaks
5   for itself. The witness has no independent
6   knowledge.
7          MR. JAMES: I'd note that topic number
8   7 calls for any analysis that you or your
9   representatives or agents including your
10  third-party administrators and pharmacy benefit
11  managers performed regarding whether Neurontin
12  provides a medical benefit to patients to take off
13  label dosages or for a broad range of off-label
14  uses, one of them being pain. And so, I feel this
15  is plainly within the scope of the 30(b)(6)
16  Notice.
17         MS. NUSSBAUM: Well, the document --
18     Q.   Is that statement consistent with
19  analysis that Kaiser or its agents have undertaken
20  and that Kaiser presently holds?
21     A.   I believe the document speaks for
22  itself. The document is dated April 2004, that
23  earlier pages in the document indicate that it's
24  sometime prior to this document, Kaiser became
25  aware --

Page 244

1          A. Carver
2          MR. JAMES: I'd appreciate it if you
3   state your objections in a concise manner and
4   allow the witness to answer the question.
5          THE WITNESS: Can you ask your
6   question again, please?
7          MR. JAMES: Could you read back the
8   question.
9          (Record read.)
10     A.   Well, I believe that I've testified
11  that -- that Kaiser, to my knowledge, has not
12  undertaken analysis per se, and that -- that this
13  was information that is provided to physicians
14  from physicians. And in the course of this
15  presentation, there's information regarding --
16  that's been provided by a physician to other
17  physicians regarding the use of Neurontin.
18     Q.   Did you state that Kaiser has not
19  undertaken any analysis?
20     A.   The health plan per se?
21     Q.   The plaintiffs or their agents,
22  including third-party administrators or pharmacy
23  benefit managers?
24     A.   Well, there appears to be some
25  snapshot.

Page 245

1          A. Carver
2          MS. NUSSBAUM: Let's break that --
3   that's a three-part question.
4      Q.   The first part is have the plaintiffs
5   in this action, Kaiser Foundation Health Plan or
6   the hospitals, have they undertaken such an
7   analysis to your knowledge?
8      A.   And to my knowledge, no.
9          MS. NUSSBAUM: His second question
10  was, do you want to read the second question
11  whether or not the drug manager has undertaken
12  that on behalf of Kaiser?
13  BY MR. JAMES:
14     Q.   Actually, did the second step, have
15  any agents of the plaintiffs undertaken such an
16  analysis?
17         MS. NUSSBAUM: What does "agent" mean?
18  Have they requested that a third party undertake
19  the analysis?
20     Q.   Has any other party undertaken an
21  analysis on behalf of the plaintiffs?
22         MS. NUSSBAUM: Has Kaiser requested
23  that some third party --
24     Q.   I request that you answer my question
25  rather than --

Page 246

1          A. Carver
2      A.   Not to my knowledge.
3      Q.   Referring to analysis -- if I define
4   "analysis" to mean any analysis regarding the
5   efficacy of Neurontin for neuropathic pain, does
6   it remain true that the plaintiffs have not
7   themselves undertaken any analysis -- let me
8   restate the question.
9          Have the plaintiffs themselves
10  undertaken any analysis regarding whether or not
11  Neurontin is effective in treating neuropathic
12  pain?
13     A.   If the question is whether or not the
14  plaintiffs have conducted clinical trials
15  regarding the effectiveness for Neurontin for
16  pain, I believe the answer to that is no.
17     Q.   Aside from conducting trials
18  themselves, have you conducted an analysis by
19  reviewing clinical trials conducted by other
20  parties or clinical literature that would enable
21  you to form a conclusion regarding whether or not
22  Neurontin is an effective treatment for
23  neuropathic pain?
24         MS. NUSSBAUM: The witness has
25  testified yesterday as to the analysis.

1          A. Carver
2          MR. JAMES:  Your objection is
3 preserved to this question.
4          Q.   Can you answer the question?
5          A.   I do believe that yesterday you showed
6 me several documents that were assembled for the
7 P&T committee regarding, in some cases, a summary
8 of the literature that was available at the
9 time -- at that particular time, and there -- I'm
10 not aware that we've done any independent analysis
11 to figure out the integrity of some of those
12 pieces of information that were presented or
13 provided to the P&T committee upon which they may
14 have made a ruling and so, that's -- and I hope
15 I'm being responsive to your question.
16         Q.   Yes, you are.
17              Aside from the information that I
18 showed you yesterday, you're not aware of any
19 other analyses that the plaintiffs have themselves
20 undertaken regarding whether or not Neurontin is
21 an effective treatment for neuropathic pain, is
22 that correct?
23         A.   That's -- that's correct.
24         Q.   Have any agents of the plaintiffs
25 undertaken such an analysis, again, excluding any

1          A. Carver
2 information that I showed you yesterday?
3          MS. NUSSBAUM:  I would object.  Do you
4 want to define what you mean by "agents," and
5 unless it was at the request of the plaintiffs,
6 how would he know whether or not somebody else has
7 done an analysis?
8          Q.   Have any parties undertaken an
9 analysis of whether or not Neurontin is an
10 effective treatment for neuropathic pain on the
11 plaintiff's behalf?
12         A.   Not that I'm aware of.
13         Q.   And have any other parties
14 communicated a conclusion regarding whether or not
15 Neurontin is an effective treatment for
16 neuropathic pain to the plaintiffs that the
17 plaintiffs now agree?
18         MS. NUSSBAUM:  I would object.
19         MR. JAMES:  Actually, I withdraw that
20 question.
21              Do you mind taking a break at this
22 time?
23         MR. LAWRENCE:  I thought we've been
24 going for an hour, so we can take a short
25 five-minute break.

1          A. Carver
2          MS. NUSSBAUM:  Very short.
3          VIDEOGRAPHER:  Going off the record at
4 9:32 a.m.
5          (Recess.)
6          (Kaiser-13 marked for identification.)
7          VIDEOGRAPHER:  We're going back on the
8 record at 9:44 a.m.  This is the beginning of tape
9 two, volume two, deposition of Albert Carver.
10 BY MR. JAMES:
11         Q.   Do you know what this document is?  Do
12 you recognize the document?
13         A.   I believe this was the content of a
14 DUAT videoconference dated March 12th of 2003.
15         Q.   Is this a document that Kaiser would
16 produce in the ordinary course of its business?
17         MS. NUSSBAUM:  I would object.
18              What do you mean by that?  It's clear
19 that Kaiser produced the document.
20         Q.   Is this the kind of document that
21 Kaiser would use in its business?
22         MS. NUSSBAUM:  I object.  Which Kaiser
23 entity are you talking about, the plaintiffs here?
24         Q.   Would the plaintiffs use or see this
25 document in the ordinary course of their business?

1          A. Carver
2          A.   That's a double question.  I'm not
3 sure what you mean by that.
4          Q.   You can answer if you understand the
5 question.
6          A.   I believe this was the content that
7 was used in the videoconference by the physician
8 speakers at the videoconference.
9          Q.   Turning to page nine of the document,
10 do you have any understanding of what this chart
11 shows?
12         A.   Yes, I do.
13         Q.   And what does it show?
14         A.   It shows an analysis of patients based
15 upon prescription records looking at whether or
16 not a prescription or a patient that was given
17 Gabapentin had previously been given an tricyclic
18 antidepressant.
19         Q.   And from your prior testimony, I take
20 it that you don't know how this information would
21 be assembled?
22         A.   That's correct.
23         Q.   Do you know the purpose for which this
24 information was assembled?
25         MS. NUSSBAUM:  Do you have any

Page 251

A. Carver

1       A. Carver
2  personal knowledge about this document?
3            THE WITNESS:  I do not.
4            MS. NUSSBAUM:  Were you one of the
5  authors?
6            MR. JAMES:  I would please ask that
7  you reserve your questions for the time allotted
8  to you at the conclusion of the sessions.
9            MS. NUSSBAUM:  I have two hours
10  allotted.
11     Q.   As corporate representative of Kaiser,
12  do you know why this information was assembled?
13     A.   I believe this information was
14  assembled as part of this DUAT effort basically to
15  begin taking a very close look at the use of
16  Neurontin, given the revelations that are
17  contained regarding how Neurontin had been
18  promoted.
19     Q.   Actually, I'd like to focus on a
20  question raised by your response.  At some point,
21  did DUAT or DRUG decide to focus on Gabapentin or
22  Neurontin?
23     A.   Yes, they did.
24     Q.   And at what time did that occur?
25     A.   I believe that there was quite a bit

Page 252

A. Carver

1            A. Carver
2  of focus on Neurontin during the period of late
3  2002, 2003, 2004.
4     Q.   So, at the earliest, DUAT or DRUG
5  decided to focus on Neurontin in late 2002?
6     A.   I don't know specifically, but if it
7  was at the earliest, whether it was late 2002, but
8  I believe in the years 2002, '3 and '4, there's
9  been focus on Neurontin use, particularly given,
10  you know, the revelations that are contained on
11  page number 5, which were very disconcerting.
12     Q.   And what were the reasons for this
13  focus on Neurontin in 2002?
14     A.   The reason was the waking up to
15  perhaps there was significant over-utilization of
16  Neurontin for a variety of conditions, which we
17  needed to begin examining.  After all, the
18  plaintiffs in this case were paying a lot of money
19  for Neurontin prescriptions.
20     Q.   And that realization came in 2002, is
21  that right?
22     A.   I believe so, based upon when some
23  public information became available, particularly
24  as it related to the, you know, the fraudulent
25  promotion of Neurontin.

Page 253

A. Carver

1            A. Carver
2     Q.   What public information was that?
3     A.   I believe that there was -- there's
4  contained on this document information regarding
5  the promotion of Neurontin for unapproved uses and
6  the fact that some revelations had come as a
7  result of the unsealing of documents in federal
8  court, and then a Wall Street Journal article also
9  that talks about the promotion of Neurontin for
10  unapproved uses that were the result of hiring
11  advertising agencies to mount this all-out
12  marketing war.
13            So I think that that's very concerning
14  to a health plan who is paying millions of dollars
15  for Neurontin to feel that perhaps a lot of that
16  payment has been for inappropriate use, and I'm
17  sure that our physicians wondered whether or not
18  they'd been duped.
19            MS. NUSSBAUM:  Can I just ask for a
20  clarification?
21            When the witness said "this document,"
22  I'm not sure if he was referring to Exhibit 12 or
23  13.
24     Q.   You're free to state whether you were
25  referring to document Kaiser-13 or Kaiser-12

Page 254

A. Carver

1            A. Carver
2  when --
3     A.   I think that some of the same
4  information is contained in -- excuse me.  It's
5  upside down; 13 as contained in 12 in terms of
6  these revelations.
7     Q.   Do you have a particular page of
8  either document in mind?
9            MR. LAWRENCE:  Page 5 of document 12.
10     A.   Page 5 of -- excuse me, document 13.
11     Q.   And --
12     A.   Mine is upside down.
13     Q.   Aside from --
14     A.   Excuse me.  Pages 2, 3, 4 of document
15  number 12 in which the page 4 of document 12 is,
16  you know, appears to have some of the same
17  information as page 5 in document 13.  And there's
18  reference, pharmaceutical marketing strategies and
19  increased utilization in expenditures increasing
20  off-label use, and the rest in document number 12.
21            So I think that both documents contain
22  similar information that caused concern.
23     Q.   Aside from newspaper articles such as
24  the ones referenced on page 5 of document 13 and
25  page 4 of document 12 and the unsealing of federal

Page 255

```
 1              A. Carver
 2   court records which you referred to, are there
 3   other reasons that caused DUAT and DRUG to focus
 4   on Neurontin in the 2002-to-2004 time period?
 5        MS. NUSSBAUM:  I would just caution
 6   the witness not to discuss any conversations or
 7   documents or advice that you got from counsel,
 8   either Kaiser Permanente's counsel or Kaiser's
 9   counsel or outside counsel.
10        A.   Not that come to mind.
11        Q.   Did DUAT or DRUG implement this
12   business program based on information supplied by
13   counsel?
14        MS. NUSSBAUM:  I would object to any
15   question that calls for an answer that in any way
16   implicates conversations that the witness had,
17   either with Kaiser's counsel or with outside
18   counsel.  I think that the document speaks for
19   itself and the witness has testified as to the
20   fraud.
21        Q.   You can answer.
22        MS. NUSSBAUM:  He can't answer to the
23   extent that you're asking for the conclusion based
24   on discussions that he had with counsel.
25        MR. JAMES:  I'm asking whether they
```

Page 256

```
 1              A. Carver
 2   took a business decision to implement a drug
 3   utilization program based on information supplied
 4   to them by counsel.  I don't think it has anything
 5   to do with legal advice.
 6        MS. NUSSBAUM:  I would think that has
 7   exactly to do with legal advice.  If your lawyers
 8   advise you to do something, what your lawyers
 9   advise you that there's been a fraud that's
10   affected you, I think it has to do with legal
11   advice.
12        Q.   Setting aside any information supplied
13   by counsel that might have motivated this action
14   by DUAT and DRUG, is there other information aside
15   from these newspaper articles referenced on these
16   two pages and the unsealing of federal court
17   documents that caused DUAT and DRUG to undertake
18   these programs at this time?
19        MS. NUSSBAUM:  If you know.
20        A.   Not other than the significant
21   increase in expenditure for Neurontin by Kaiser.
22        Q.   When did that significant expenditure
23   occur?
24        MS. NUSSBAUM:  Approximately?  I
25   mean --
```

Page 257

```
 1              A. Carver
 2        A.   The -- I don't know specific years of
 3   the specific expenditure at Kaiser, but I would
 4   say in the year 1995, the expenditure was quite
 5   low, in the 1 to $2 million range, and that
 6   expenditure increased to in the 30s of millions by
 7   2003.
 8        Q.   One point was in 1995 and the other
 9   was in 2003; is that correct?
10        A.   That's correct.
11        Q.   And you're unaware of what the
12   expenditures looked like in the interim?
13        A.   I just don't recall from memory.  I
14   would only say that in many -- in many of the
15   successive years, the costs were increasing
16   dramatically, by a magnitude of 50 percent or so,
17   but perhaps you have information there regarding
18   the specific years.
19        I'm sorry.  I'm not trying to avoid
20   your question.  I just don't recall specific
21   expenditure by specific year.
22        Q.   Unfortunately, I don't have such
23   information.
24        But you believe that in some of those
25   years, expenditures increased by 50 percent or
```

Page 258

```
 1              A. Carver
 2   more, but you're not entirely sure of in which
 3   years those increases occurred; is that right?
 4        MS. NUSSBAUM:  Objection.  We don't
 5   want the witness to speculate.  He's testified
 6   that the drug, over roughly a ten-year period,
 7   went from a drug that was several million
 8   dollars --
 9        MR. JAMES:  Your objection is noted.
10        Q.   But, I mean, is it your testimony that
11   you don't know today whether that increase
12   occurred in 2000, 2002 or 1999?
13        A.   It's my testimony that the
14   expenditures for Gabapentin were growing momentum
15   and we were on a growth curve like this between the
16   year of 1995 and up to in the 30s of millions by
17   the year 2003.
18        Q.   And this --
19        A.   I just can't pinpoint from memory
20   exactly what the specific points were on that
21   curve over that period.
22        Q.   And this issue came to DUAT and DRUG's
23   attention at around 2002, is that right?
24        MS. NUSSBAUM:  Well, I think, you
25   know, the witness has testified that these --
```

Page 259

A. Carver

1
2     MR. JAMES: You know, rather than
3  stating the witness' prior testimony, why don't --
4  if you'd like to object to the question, you're
5  free to, but, you know, just allow the --
6     MS. NUSSBAUM: It misstates the prior
7  testimony here that this information came to the
8  attention in 2002. It misstates the prior record.
9     Q.  Have I misstated the prior record in
10 some way?
11    A.  I lost track of your question. I'm
12 sorry.
13    MR. JAMES: Could you read back the
14 question?
15    (Record read.)
16    MS. NUSSBAUM: What issue are you
17 referring to?
18    MR. JAMES: The issue we're discussing
19 was the growth of Gabapentin prescriptions paid
20 for by Kaiser.
21    MS. NUSSBAUM: You want to know if
22 that's something that was discussed by DUAT in
23 that period of time? I mean, what does it mean
24 that the issue came to their attention?
25    Q.  If you understand the question, you

Page 260

A. Carver

1
2  can answer.
3     MS. NUSSBAUM: No, I'm asking you to
4  rephrase the question. I don't understand the
5  question.
6     Q.  Well, the relevant matter is whether
7  the witness understands the question.
8     A.  Could we just try rephrasing it so
9  that we're all on the same page here?
10    Q.  Have the issue of growth of Gabapentin
11 prescriptions paid for by Kaiser come to DUAT or
12 DRUG's attention prior to 2002?
13    MS. NUSSBAUM: I would object, again.
14 What does it mean, "comes to the attention of the
15 committee"?
16    Q.  If you understand the concept of come
17 to attention, you're free to answer.
18    A.  I don't know.
19    Q.  You don't know what "come to
20 attention" means or you --
21    A.  No. I do not know whether DRUG or
22 DUAT had on their radar screen Neurontin prior to
3 2002.
24    Q.  In the first action that they took
25 with regard to Neurontin, however, occurred no

Page 261

A. Carver

1
2  earlier than 2002, is that correct?
3     A.  I do not know. I'm not a member of
4  that committee. I believe that you've asked me to
5  comment on at least these videoconference
6  presentations that occurred in 2003, 2004, and I
7  believe that their efforts actually got launched
8  in 2002. And so, if you have documents that show
9  something slightly different, I'm trying to -- I'm
10 not trying to mislead you.
11    (Kaiser-14 marked for identification.)
12    Q.  Do you recognize this document?
13    A.  I do not.
14    Q.  Yesterday you testified that you do
15 know who Debbie Kubota is?
16    A.  I do, yes.
17    Q.  Do you know who any of the other
18 individuals copied on this e-mail are -- let's
19 start off with Rich Lieblich.
20    A.  If you could just bear with me for a
21 moment until I could read this document.
22    Okay. I'm ready to answer your
23 question, sorry.
24    Q.  Do you know who Rich Lieblich is?
25    A.  Rich Lieblich was in our

Page 262

A. Carver

1
2  pharmaceutical contracting department at that
3  time.
4     Q.  Let me ask a general question.
5     At KPNC, that's Kaiser Permanente
6  northern California, is that correct?
7     A.  Correct.
8     Q.  And "Kai Per M" is Kaiser Permanente
9  Medical Group?
10    A.  Where are you?
11    Q.  Actually on the cc.
12    A.  To which are you referring?
13    Q.  I guess the address of Mirta Millares
14 and Susan Nakahiro on the cc line of the e-mail.
15    A.  No, Kai Perm is just -- it's not
16 referencing the medical group. It's just an
17 e-mail address.
18    Q.  People with that e-mail address, would
19 they be employees of Permanente Medical Group or
20 of the plaintiffs?
21    MS. NUSSBAUM: If you know.
22    A.  These employees are employees of the
23 plaintiffs.
24    Q.  Is it correct that this e-mail states
25 that "the potential population for this drug could

Page 263

```
 1            A. Carver
 2 be huge"?
 3        MS. NUSSBAUM: Objection.
 4        The witness has stated that he's never
 5 seen this document. He cannot identify this
 6 document. He's neither an author nor a recipient
 7 of the document. So I would ask that you not ask
 8 him questions that would cause him to speculate.
 9    Q.   You can answer whether this document
10 states that or not.
11        MS. NUSSBAUM: No. I mean, he's
12 simply reading words from a document. It's not a
13 reading test. The witness has stated he's not an
14 author recipient and he's never seen it.
15    A.   Yeah, I've never seen this document.
16    Q.   Did you have any discussions with
17 Debbie Kubota or others who report to you or
18 worked with you in 1999 indicating that the
19 potential population for Gabapentin could be huge?
20        MS. NUSSBAUM: If you recall.
21    A.   Not that I recall.
22    Q.   I'd like to return to the reasons that
23 DUAT focused on Gabapentin around 2002. You had
24 mentioned these newspaper articles that are
25 referenced in Kaiser 12 and Kaiser 13, is that
```

Page 264

```
 1            A. Carver
 2 right?
 3    A.   That's right.
 4    Q.   And I think in referring to those
 5 revelations, as you put it, you referred to them
 6 as -- as fraudulent, is that right?
 7    A.   I believe that -- that's right.
 8    Q.   You described the conduct of, I guess,
 9 Warner-Lambert reported by these articles as
10 fraudulent conduct, is that correct?
11    A.   Yes.
12    Q.   Are any -- is any information relating
13 to fraudulent conduct contained on these pages?
14        MS. NUSSBAUM: I would caution that
15 the witness is not an attorney, so I'd ask that
16 you define the term "fraud."
17        And also, if you have the full
18 articles here, these are simply sentences from
19 articles. If you want to look at the entire
20 article to see whether the word "fraud" is used.
21    Q.   Well, actually, in your common
22 understanding, what does the word "fraud" mean?
23    A.   It is just a common understanding?
24    Q.   Right. I'm not asking you for a legal
25 definition.
```

Page 265

```
 1            A. Carver
 2    A.   My common understanding would be that
 3 something has happened that is not as it's
 4 purported to be, something that's been dishonest
 5 for purposes of -- of gain, financial gain, and I
 6 have no idea if that's any kind of -- would hold
 7 up to any kind of a legal definition, but that
 8 would be my general common understanding of the
 9 word "fraud."
10    Q.   And that's all I've asked for.
11        Would it be accurate to say that in
12 your common understanding of fraud, one element of
13 that would be a falsehood?
14    A.   Yes, that's correct.
15    Q.   If you turn to this first excerpt from
16 the New York Times on, I guess, on page 5 of
17 Kaiser-13, do you see any reference to a falsehood
18 being made?
19        MS. NUSSBAUM: I would object.
20        MR. JAMES: Your objection is
21 preserved. Thank you.
22        MS. NUSSBAUM: If you want to show the
23 entire articles --
24        MR. JAMES: I'm actually asking
25 specifically about this excerpt.
```

Page 266

```
 1            A. Carver
 2        MS. NUSSBAUM: You want to know about
 3 this phrase, the several words, the portion of the
 4 sentence?
 5        MR. JAMES: That's correct. Thank
 6 you.
 7        MS. NUSSBAUM: What do you want to
 8 know with respect to that, whether you see the
 9 word fraud in these words?
10        MR. JAMES: Would you read back the
11 question?
12        (Record read.)
13        MS. NUSSBAUM: I would ask the witness
14 to read out loud the sentence you're referring to,
15 just to make certain that we're all on the same
16 page here.
17    Q.   You're free to read out the question.
18 Sorry. Read out the excerpt from the New York
19 Times.
20    A.   "Some physicians in exchange for money
21 have allowed pharmaceutical sales representatives
22 into their examining rooms to meet with patients,
23 review medical charts and recommend what medicines
24 to prescribe."
25    Q.   And do you have an answer to the
```

Page 267

A. Carver

1  question?
2
3      A.    That's very problematic for me in that
4  a nonphysician, a representative of a
5  pharmaceutical company has access to both patients
6  and to the medical chart and is paying a doctor to
7  gain that access.
8      Q.    Actually, I guess the question was
9  whether a falsehood is -- whether there's a
10  statement that Warner-Lambert or the defendants
11  made a falsehood in that excerpt?
12     A.    Well, I think that this is -- this
13  kind of behavior is highly unusual.  If I go into
14  a patient's -- if I go to my physician and there's
15  an individual in the room, I'm presuming that that
16  individual is a medical professional.  I'm
17  certainly not expecting there to be a
18  pharmaceutical representative in there that's paid
19  to gain access to be part of my examination or
20  treatment.  I think that's -- that's terrible
21  behavior on behalf of a pharmaceutical
22  representative.
23     Q.    But I guess the question was whether
24  there's actually a falsehood being made by the
25  defendants?

Page 268

A. Carver

1
2      MS. NUSSBAUM:  You're badgering the
3  witness.  The falsehood --
4      MR. JAMES:  I'm not badgering with
5  regard to what the falsehood is.
6      MS. NUSSBAUM:  He's testified to that.
7  He's testified to what the falsehood is.
8      Q.    I guess if we move to the second
9  excerpt --
10     MS. NUSSBAUM:  Do you want to read
11  that out loud?
12     A.    "Marketing executives at
13  Warner-Lambert urged their superiors to let them
14  promote the epilepsy drug, Neurontin, for an
15  unapproved use rather than to perform the clinical
16  studies to prove the medicine was safe for such
17  patients according to a corporate memorandum
18  unsealing on Friday in federal court."
19     Q.    And does this excerpt indicate that
20  any falsehood was made by the defendants?
21     A.    I believe that it's inappropriate and
22  beyond what is approved and legal for a
23  pharmaceutical manufacturer's representative to be
24  promoting a product for unapproved uses.
25     Q.    Actually, I hadn't asked whether it

Page 269

A. Carver

1
2  was inappropriate to or beyond what is legal for a
3  pharmaceutical manufacturer's representatives to
4  do.  I had asked whether there was any indication
5  that a false statement was made.
6      MS. NUSSBAUM:  Well, I would object.
7  You're badgering the witness.  He says that it's
8  unlawful.
9      MR. JAMES:  Actually, I'll move along,
10  I have another question.
11     Q.    Would it be possible to promote a drug
12  off-label but in a truthful way?
13     MS. NUSSBAUM:  The witness is not a
14  lawyer.  I'm going to not permit him to answer
15  that.
16     MR. JAMES:  I'm actually asking for a
17  common understanding.
18     MS. NUSSBAUM:  There is no common
19  understanding.
20     Q.    Would it be possible to make a
21  truthful statement to promote use for a drug for
22  off-label indication?
23     MS. NUSSBAUM:  I would direct this
24  witness not to answer.  It's not covered by your
25  30(b)(6) Notice or anything else.  He's not a

Page 270

A. Carver

1
2  lawyer and you're asking for a legal conclusion.
3      Q.    You can answer in your personal
4  capacity.
5      MS. NUSSBAUM:  No, you can't.  I'm
6  asking him not to answer.
7      MR. JAMES:  On what ground?
8      MS. NUSSBAUM:  On the ground that he's
9  not a lawyer.  You're asking for a legal
10  conclusion as to whether or not it would be legal
11  for a pharmaceutical representative to promote a
12  drug for off-label use, as long as what they're
13  saying they believe is truthful, as opposed to an
14  outright lie?  That calls for a legal conclusion.
15  This witness is not a lawyer.
16     MR. JAMES:  Do you believe that a
17  question calling for a legal conclusion is an
18  appropriate cause to direct a witness not to
19  answer a question?
20     MS. NUSSBAUM:  In this particular,
21  yes, because his answer would be meaningless.
22     Q.    Is it possible for any truthful
23  positive statement to be made regarding the use of
24  a drug for an off-label indication?
25     MS. NUSSBAUM:  Totally speculative and

Page 271

A. Carver

1 hypothetical.
2
3      Q.   You can answer.
4      MS. NUSSBAUM:  No -- I would ask you
5 not to speculate to a hypothetical question as to
6 whether or not it's possible for somebody to tell
7 somebody something.
8      Q.   You can answer if you understand the
9 question.
10     A.   I cannot speculate.
11     Q.   Without speculation, you can't tell me
12 whether it would be possible to say anything
13 positive regarding the use of a prescription drug
14 for an off-label indication?
15     MS. NUSSBAUM:  Please don't speculate.
16     A.   I cannot speculate.  I'm not a lawyer.
17     Q.   With regard to the final excerpt on
18 this page from the Wall Street Journal, do you see
19 any indication that a false statement was made by
20 the defendants?
21     MS. NUSSBAUM:  Please read it out loud
22 so we don't have confusion on the record.
23     A.   "A drug company now owned by Pfizer in
24 an alleged effort to promote epilepsy drug
25 Neurontin for unapproved uses went so far as to

Page 272

A. Carver

1
2 hire a New York advertising agency to wage an
3 all-out marketing war according to documents that
4 are part of a lawsuit."
5      Q.   And whether opining as to whether the
6 action is legal or whether it's appropriate, can
7 you tell me whether this excerpt does or it does
8 not state that the defendants made a false
9 statement?
10     MS. NUSSBAUM:  I would object to that.
11 This is a sentence out of context from an article.
12 Certainly if --
13     MR. JAMES:  Your objection is noted.
14     MS. NUSSBAUM:  -- if Warner-Lambert
15 were not telling people that this was an outside
16 advertising agency, then that's the falsehood.  If
17 you want to give him the article, the entire
18 article and you want him to tell you all the
19 falsehoods, we're happy to do it.
20     Q.   Can you answer the question?
21     MS. NUSSBAUM:  Please don't speculate,
22 and if you need to see the entire article and
23 don't want to opine --
24     MR. JAMES:  I actually haven't made
25 any question regarding the entire article.  I have

Page 273

A. Carver

1
2 asked whether this excerpt stated on page 5 of
3 document Kaiser-13 indicates that the defendants
4 made any falsehood.
5      A.   Well, from my -- from my point of
6 view, the hiring of a New York advertising agency
7 to promote unapproved uses of Neurontin would be a
8 problem.
9      Q.   Right.  I'll move along.
10          The third reason that you mentioned
11 that DUAT and DRUG focused on Neurontin and
12 Gabapentin in 2002 was the unsealing of federal
13 court records.
14          Do you recall whether those court
15 records indicated that the defendants had made any
16 false statements regarding Neurontin or
17 Gabapentin?
18     MS. NUSSBAUM:  And I would again
19 caution the witness not to divulge any
20 conversations at all that you've had with counsel
21 of Kaiser or outside counsel with respect to the
22 Franklin suit, the whistleblower suit or the
23 unsealing of any court records.
24     Q.   Excluding discussions with counsel,
25 are you able to tell me whether the federal court

Page 274

A. Carver

1
2 records that were unsealed at some point in 2002
3 or before then indicated that the defendants had
4 made false statements regarding Neurontin or
5 Gabapentin?
6      MS. NUSSBAUM:  Are you stating in your
7 question that the whistleblower suit or the
8 records were unsealed before 2002?
9      MR. JAMES:  Actually, I'll restate my
10 question this time.
11     Q.   You have indicated that DUAT and DRUG
12 focused on Neurontin or Gabapentin in 2002 or
13 thereabouts, partly as a result of the unsealing
14 of federal court records, is that correct?
15     A.   As stated on page 5 here referencing.
16     MS. NUSSBAUM:  What exhibit are you
17 referring to, please?
18     THE WITNESS:  Referencing this New
19 York Times article.
20     MS. NUSSBAUM:  Just for the record,
21 we're talking about Exhibit 13, page 5?
22     THE WITNESS:  Page 5.
23     Q.   Beyond that statement that's made in
24 this document, is there anything you could tell me
25 regarding the unsealing of those federal court

Page 275

1          A. Carver
2  records excluding any discussions with counsel?
3          MS. NUSSBAUM: Right. Please, no
4  discussion with Mr. Cohen, myself or any other
5  counsel.
6      A.   I do not know.
7      Q.   Turning back to the DUAT and DRUG
8  programming, what was their objective with regard
9  to Neurontin and Gabapentin?
10          MS. NUSSBAUM: Asked and answered.
11     Q.   Well, you can answer it.
12          MS. NUSSBAUM: I believe the witness
13  has already testified as to that.
14     A.   I think the objective was to assess
15  the use in light of the information that -- assess
16  the use in light of significant increase in
17  expenditures and in light of information that had
18  become publicly available regarding the promotion
19  of the particular product for unapproved uses.
20     Q.   Beyond assessing the use, were you
21  actually attempting to modify the use in some
22  way -- actually, I said you, I should have
23  substituted the word "DUAT" or "DRUG."
24          I guess the question was beyond
25  assessing the use of Neurontin or Gabapentin, was

Page 276

1          A. Carver
2  DUAT or DRUG attempting to modify the use of
3  Gabapentin or Neurontin by Kaiser-prescribing
4  physicians?
5          MS. NUSSBAUM: Outside the scope of
6  the 30(b)(6). This witness cannot state as to
7  what DUAT was or was not, or DRUG was or was not
8  doing, and has stated that he was not a member of
9  these committees.
10          MR. JAMES: I think as I've previously
11  stated, drug utilization programs are plainly one
12  of the topics.
13          MS. NUSSBAUM: Sir, your 30(b)(6)
14  Notice asks for policies or practices relating to
15  that. We've now had way over an hour of
16  testimony, so I think any judge would find that we
17  have more than fulfilled the 30(b)(6) obligation
18  on that topic.
19     Q.   You can answer the question if you
20  know.
21          MS. NUSSBAUM: Do you want to repeat
22  your question?
23          MR. JAMES: Can you read back the
24  question?
25          (Record read.)

Page 277

1          A. Carver
2          MS. NUSSBAUM: And I would object,
3  this witness is here --
4          MR. JAMES: I think you've previously
5  objected --
6          MS. NUSSBAUM: No, on behalf of the
7  plaintiffs in this action, okay. This committee
8  he's indicated is physicians primarily and the
9  witness has stated that he is not a member of the
10  committee.
11          MR. JAMES: Are you directing him not
12  to answer the question?
13          MS. NUSSBAUM: Do you want to know if
14  he has personal knowledge?
15          Do you have personal knowledge?
16          THE WITNESS: I don't.
17     Q.   And do you have knowledge as a
18  corporate representative of Kaiser?
19          MS. NUSSBAUM: Of the plaintiffs in
20  this action.
21     A.   Not independent knowledge.
22          MS. NUSSBAUM: He does not.
23     Q.   So your testimony is that DUAT and
24  DRUG were attempting to assess the use of
25  Gabapentin, but you have no knowledge as to

Page 278

1          A. Carver
2  whether they actually planned to do anything after
3  making that assessment?
4          MS. NUSSBAUM: That is not what the
5  witness has testified to. He has testified.
6      Q.   If that's not what you testified,
7  please let me know.
8      A.   I believe these efforts represent
9  physicians -- physician efforts at modifying --
10  assessing, modifying, changing, if appropriate,
11  the use of Gabapentin for the treatment of a
12  variety of things based upon the content of these
13  presentations.
14     Q.   And you're not able to provide any
15  further information regarding what modifications
16  DUAT or DRUG sought to make?
17     A.   Not independently; no.
18     Q.   It would not refresh your recollection
19  if I were to represent to you that DUAT and DRUG
20  were attempting to encourage physicians to
21  substitute antidepressants for Neurontin in
22  certain circumstances?
23     A.   I believe that's contained in the
24  presentation material here.
25     Q.   Do you know under what conditions

Page 279

A. Carver

1   A. Carver
2   physicians were being encouraged to prescribe
3   antidepressants rather than Neurontin?
4       MS. NUSSBAUM: I would object. If you
5   want to point to a page in the document, please do
6   so. The witness has stated that he was not on the
7   committee and has no independent recollection.
8     Q.   Did we refer to a page of the document
9   earlier that showed the number of patients covered
10  by Kaiser who had taken Gabapentin or Neurontin
11  and were naive to TCAs?
12      MS. NUSSBAUM: If you have a page that
13  you want to refer the witness to, please do it.
14      MR. JAMES: Actually, I'll withdraw
15  the question.
16    Q.   Let's move to page 18 of Kaiser 12.
17      MS. NUSSBAUM: Just off the record,
18  you know, I realize pages are missing. Mine goes
19  from page 33 to page 37, and they are also put
20  together upside down and not in order. So I think
21  that perhaps do you have other copies of these
22  documents with you?
23      MR. LAWRENCE: No, these were how they
24  were produced to us.
25      MS. NUSSBAUM: I doubt that this is

Page 280

A. Carver

1   A. Carver
2   how they were produced to you.
3     Q.   Actually, is your -- does your copy
4   have also upside-down pages?
5     A.   Who? Mine is missing those same
6   pages. There's a gap apparently between 23 and
7   37 -- oh, excuse me, wait, I think maybe, there's
8   25, 26 and 27, maybe it's just a matter of how
9   they were assembled here; sorry.
10      MR. JAMES: We'll move on quickly.
11    Q.   Can you find page 18 of the document?
12    A.   We'll try.
13      Yes.
14    Q.   And does reading this statement, "Use
15  TCAs preferentially for treatment of neuropathic
16  pain and reserve Neurontin for TCA failures or
17  contraindications" refresh your recollection
18  regarding the circumstances in which Kaiser was
19  making an effort to modify physician prescribing
20  behavior?
21      MS. NUSSBAUM: Objection. Are you
22  talking about here Kaiser, the plaintiffs in this
23  action? Are you talking about the physician
24  entities with which Kaiser contracts?
25      MR. JAMES: Actually, let's just refer

Page 281

A. Carver

1   A. Carver
2   to DUAT and DRUG.
3       MS. NUSSBAUM: You've asked if it
4   refreshes his recollection. I believe that this
5   witness has stated that he did not write this
6   document.
7       MR. JAMES: But he did attend one of
8   the videoconferences involved in this same
9   campaign.
10    Q.   Is that correct?
11      MS. NUSSBAUM: Do you have any
12  personal recollection?
13      THE WITNESS: I do not. I do not
14  recall page 18 of that presentation from memory.
15    Q.   And either as corporate representative
16  of the plaintiffs or in your personal capacity,
17  you're unable to confirm the truth or falsity of
18  this statement that the objective of this program
19  was to use TCAs preferentially for treatment of
20  neuropathic and reserve Neurontin for TCA failures
21  or contraindications?
22      MS. NUSSBAUM: The document speaks for
23  itself.
24      MR. JAMES: I've asked him whether he
25  could confirm its truth or falsehood.

Page 282

A. Carver

1   A. Carver
2       MS. NUSSBAUM: Do you have any
3   independent knowledge outside the document?
4     A.   I do not.
5     Q.   Do you know if any efforts are being
6   made today to have physicians use TCAs
7   preferentially for the treatment of neuropathic
8   pain?
9       MS. NUSSBAUM: If you know.
10    A.   I do not know.
11      MR. JAMES: I'd like to move back to
12  the complaint, which is Kaiser-3.
13      Actually, I'm sorry, I'll go back to
14  my whole topic for a bit.
15    Q.   Aside from DUAT and DRUG, are you
16  aware of any other cost containment programs
17  relating to Neurontin specifically?
18      MS. NUSSBAUM: The witness has already
19  testified to that; asked and answered.
20    Q.   Is the answer no?
21    A.   The answer is no.
22    Q.   Were any other kinds of costs
23  containment programs considered from 1994 to the
24  present with regard to containing the cost of
25  Neurontin?

Page 283

```
 1              A. Carver
 2       MS. NUSSBAUM: If you know.
 3       A.   I do not know.
 4       Q.   Are you aware of what a drug
 5  limitation is?
 6       A.   Perhaps you can define it for me.
 7       Q.   Do you have any independent
 8  understanding of that term?
 9       A.   I would just like to know what you
10  mean by the -- by the words "drug limitation."
11       Q.   Are there programs by which a health
12  insurer, or actually I should say pharmacy
13  benefits provider can limit the dosage of a drug
14  that's prescribed to a patient?
15       MS. NUSSBAUM: Are you asking a
16  hypothetical question? Does any pharmacy benefit
17  manager ever limit the drug or the dose of any
18  drug?
19       MR. JAMES: I'm asking him if he's
20  aware of whether such programs exist.
21       MS. NUSSBAUM: In general, do you have
22  any knowledge of that?
23       A.   I'm not well versed in the industry
24  outside of Kaiser Permanente.
25       Q.   I'd like you to turn to the Notice,
```

Page 284

```
 1              A. Carver
 2  which was Kaiser-1, I think. If you could turn to
 3  page 9 of that document.
 4       A.   Nine?
 5       Q.   Yeah, page 9, and the paragraph
 6  numbered six. Do you see reference to drug
 7  limitations or quantity limits in that paragraph?
 8       A.   Yes, I do.
 9       Q.   And do you have an understanding of
10  what those terms refer to?
11       A.   I would presume that you -- that this
12  is in the context of a drug limitation or a
13  quantity limitation that would be applied by the
14  prescription drug benefit. That would be
15  contained in the evidence of coverage or what it
16  is, the particular prescription drug benefit that
17  has been sold by Kaiser to the various purchasers.
18       Q.   Do Kaiser's programs implement any
19  drug limitations or quantity limits?
20       MS. NUSSBAUM: In general, or does?
21       MR. JAMES: In general.
22       A.   As part of the specific -- in general,
23  no. And then I believe that we spoke yesterday
24  about different copay levels and another piece of
25  what goes along with the various copay levels in
```

Page 285

```
 1              A. Carver
 2  terms of benefit offerings to the employer groups
 3  or individuals would be a day supply.
 4       So, as an example, there may be a
 5  benefit that has a 30-day supply, a benefit that
 6  would have a 100-day supply. That would be the
 7  contractual limitation upon the supply of
 8  medication that would be covered under the
 9  prescription drug benefit.
10       Q.   Has the imposition of a drug
11  limitation or a quantity limit been considered
12  with regard to Neurontin ever since 1994?
13       A.   Not in terms of the coverage that's
14  provided or the drug benefit coverage that's
15  provided by Kaiser Health Plans.
16       Q.   Has Kaiser Health Plans discussed with
17  any of its employer groups whether it might make
18  sense to impose a drug limitation or quantity
19  limit on Neurontin?
20       MS. NUSSBAUM: If you know, if you
21  have any recollection --
22       A.   I do not know. I do not know.
23       MS. NUSSBAUM: If you have any
24  recollection of any discussion.
25       Q.   I guess paragraph six also makes
```

Page 286

```
 1              A. Carver
 2  reference to academic detailing.
 3       Do you have an understanding of what
 4  that term means?
 5       A.   I do.
 6       Q.   And what does it refer to?
 7       A.   It refers to the provision of
 8  objective information regarding a particular drug
 9  to a -- to physicians. It was a term that was, I
10  believe, coigned by Jerry Avorn at Harvard Medical
11  School back in the early '80s.
12       Q.   Is academic detailing something that
13  Kaiser undertakes?
14       A.   Yes.
15       Q.   Has it done so with regard to
16  Neurontin?
17       A.   I do not know.
18       Q.   In what circumstances generally does
19  Kaiser engage in academic detailing?
20       A.   Circumstances in which there are --
21  I'm speaking generally. Circumstances in which
22  there are therapeutic alternatives that are
23  equally effective and perhaps lower cost as a
24  general response.
25       Q.   From Kaiser's view, would any of those
```

Page 287

A. Carver

1
2  circumstances be applicable in the context of
3  Neurontin?
4        MS. NUSSBAUM:  Are you talking about
5  at any particular time?  The witness has testified
6  that subsequent to the news coming out in 2002,
7  Kaiser did engage in a program.
8     Q.   In 2002, was it Kaiser's view that the
9  circumstances in which academic detailing occur
10 were applicable with regard to Neurontin?
11       MS. NUSSBAUM:  I don't understand that
12 question.
13       MR. JAMES:  I'll withdraw that
14 question.
15    Q.   Would any of the activities of DUAT
16 and DRUG be characterized as academic detailing?
17    A.   To the degree that physician
18 specialists are providing objective factual
19 information regarding the appropriate use of a
20 product to other physicians, yes, that would fall
21 under the umbrella of academic detailing in
22 general, I would say.
23    Q.   And are there other organizations at
24 Kaiser or Permanente Group that engage in academic
25 detailing, aside from DUAT and DRUG?

Page 288

A. Carver

1
2     A.   Yes, but in conjunction with approved
3  programs, that would be under the auspices of
4  either the P&T committee or DRUG and DUAT.  So
5  there -- excuse me.
6     Q.   Is it correct that the P&T committee,
7  DRUG and DUAT, are kind of the three bodies that
8  might either engage in academic detailing
9  themselves or have academic detailing done under
10 these auspices?
11    A.   That's correct.
12    Q.   There are no other groups at Kaiser
13 that you're aware of that would be involved in
14 academic detailing?
15    A.   Not that I'm aware of.
16    Q.   In what circumstances is the P&T
17 committee engaged in academic detailing?
18       MS. NUSSBAUM:  If you know.
19    A.   The P&T committee has -- provides
20 approval to any kind of academic detailing
21 programs so that people are not independently
22 dreaming up programming and implementing such.
23    Q.   Do the other parties approach the P&T
24 committee with ideas of academic detailing
25 programs?

Page 289

A. Carver

1
2        MS. NUSSBAUM:  You mean has that ever
3  happened?  To your knowledge, has that ever
4  happened?
5     A.   I just don't recall; I'm sorry.
6     Q.   I guess also on this list in paragraph
7  6, page 9 of the Notice, is the term "prior
8  authorization."
9        Do you have an understanding of that
10 term?
11    A.   I do.
12    Q.   Is that utilized by Kaiser?
13    A.   It is not.
14    Q.   I think now we're ready to move to the
15 Complaint, which I had indicated we would move to
16 earlier.
17       Is Kaiser alleging that false
18 statements were made?
19       MS. NUSSBAUM:  Excuse me.  Are you
20 referring to a particular page in the Complaint?
21       MR. JAMES:  Well, you might look at
22 page ii -- not II, but two small i's.
23       MS. NUSSBAUM:  The table of contents,
24 in other words, two small i's?
25       MR. JAMES:  Right.

Page 290

A. Carver

1
2     A.   I'm sorry.  I'm confused.  Are we on
3  the two small i's?  Okay.
4     Q.   And this page may not help you.
5        Is Kaiser alleging that false
6  statements were made by the defendants with regard
7  to each of the uses of Neurontin for which it's
8  claiming damages?
9        MS. NUSSBAUM:  I'm just showing the
10 witness, you're referring to after the
11 introduction, two, three, four, where it says
12 "false and misleading statements," from there?
13       MR. JAMES:  Right.  And I mean, if
14 that assists his memory, you know, I don't mean to
15 like limit him to this document.
16       MS. NUSSBAUM:  What's your question?
17    Q.   Is Kaiser alleging that the defendants
18 made false statements with regard to each of the
19 off-label uses of Neurontin for which it's seeking
20 damages from the defendants?
21       MS. NUSSBAUM:  I think that calls for
22 a legal conclusion.  The witness testified
23 yesterday that the Complaint was prepared by
24 lawyers and it was authorized by the plaintiffs,
25 and the Complaint is 140 pages.

Page 291

```
1              A. Carver
2      Q.   Do you know whether Kaiser is alleging
3  that false statements were made with regard to
4  each of the off-label uses for which it's seeking
5  damages from the defendants?
6         MS. NUSSBAUM:  To the best of your
7  knowledge.
8      A.   I believe so, with reliance upon
9  counsel for the preparation.
10        MS. NUSSBAUM:  Please don't testify as
11 to any discussions with counsel.
12     Q.   Is Kaiser aware of any false
13 statements regarding the use of Neurontin for no
14 susceptive pain?
15        MS. NUSSBAUM:  Are you referring to
16 any particular portion of the Complaint?
17        MR. JAMES:  Actually, let me -- I'll
18 withdraw that question.
19     Q.   Were any statements made by the
20 defendants to Kaiser itself regarding the use of
21 Neurontin?
22     A.   Of course.  I mean, over the -- over
23 the course of the last ten years, there have been
24 numerous interactions between representatives of
25 the defendants and Permanente physicians --
```

Page 292

```
1              A. Carver
2      Q.   Actually, I'm not asking about
3  Permanente physicians, just the plaintiffs
4  themselves.
5         Physicians are technically not
6  employed by the plaintiffs, is that right?
7      A.   That's correct.
8         MS. NUSSBAUM:  Well, I think the
9  witness testified yesterday the Permanente
10 physicians write the prescriptions.
11        MR. JAMES:  Right, I understand that.
12     Q.   But have any statements been made by
13 the defendants to the plaintiffs themselves
14 regarding the use of Neurontin?
15        MS. NUSSBAUM:  You want to know
16 whether or not the defendants, Warner-Lambert and
17 Pfizer, either made -
18        MR. JAMES:  Actually, you know --
19        MS. NUSSBAUM:  -- statements to the
20 two plaintiffs in this case?
21        MR. JAMES:  -- the two plaintiffs in
22 this case or their employees.
23     A.   I believe that the defendants have
24 provided information to our Drug Information
25 Service who -- and certainly they are employed by
```

Page 293

```
1              A. Carver
2  the plaintiffs.
3      Q.   Aside from information provided to the
4  Drug Information Service, are you aware of any
5  other statements made by the defendants to the
6  plaintiffs regarding the use of Neurontin?
7         MS. NUSSBAUM:  Over this ten-year
8  period?
9         MR. JAMES:  Yes.
10     A.   Not specific interactions or
11 information; no, of course not.
12     Q.   And with regard to information
13 provided by Pfizer regarding the use of Neurontin
14 to the Drug Information Service, which statements
15 are you aware that the defendants made?
16     A.   Specific statements, I cannot attest
17 to.
18        MS. NUSSBAUM:  Well, but can you in
19 general?
20        MR. JAMES:  That's fine.  Actually,
21 that was entirely responsive to my question.
22     Q.   Are you aware of any false statements
23 made by the defendants to the Drug Information
24 Service regarding the use of Neurontin?
25        MS. NUSSBAUM:  You want to know in
```

Page 294

```
1              A. Carver
2  general, is he generally aware?
3      Q.   If you understand the question, you
4  can answer.
5      A.   The specific statements, I'm not aware
6  of. I think that the information that would be
7  provided to the Drug Information Service would be
8  information provided by the defendants' marketing
9  individuals, as well as through information that
10 was generally available through the literature, or
11 in some cases, perhaps studies that the defendants
12 may have written or had written on their behalf.
13        I'm not aware of specific instances to
14 which I could point.
15     Q.   Are you aware generally of any false
16 statements made to the Drug Information Service?
17     A.   Not specific false information, no.
18     Q.   I guess now setting aside the
19 plaintiffs, with regard to Permanente physicians,
20 are you specifically aware of any statements made
21 by the defendants or their agents to Permanente
22 physicians regarding the off-label uses of
23 Neurontin?
24     A.   And by "specific," are you asking me
25 to cite a specific interaction between a
```

Page 295

```
 1            A. Carver
 2 representative of the defendants and a specific
 3 interaction between a Permanente physician?
 4     Q.   Do you know of any such specific
 5 interaction?
 6     A.   Not specific interactions, but
 7 certainly the Permanente physicians have attended
 8 conferences, read the literature, attended
 9 continuing medical education conferences, do a
10 whole variety of things basically upon which they
11 are able to gain information that's available and
12 so, that Permanente physicians, Permanente
13 physicians can be, they come out of residency
14 programs in which they may have been influenced by
15 these marketing efforts.  They can join the
16 Permanente Medical Group and bring with them
17 whatever information they've received.
18          There's a whole variety of things, I
19 think, in which the defendants may have influenced
20 the thinking of individual physicians and groups
21 of physicians regarding the use of Neurontin,
22 whether it be on-label or off-label.
23     Q.   Are you aware of any specific
24 conference that any Permanente physician attended
25 at which the defendants made false statements?
```

Page 296

```
 1            A. Carver
 2     MS. NUSSBAUM:  I would object.
 3     Q.   Setting aside any information supplied
 4 to you by your lawyers?
 5     MS. NUSSBAUM:  Yeah, I would object,
 6 number one, on attorney-client.
 7          Number two, as you well know, some of
 8 that information and some of those documents have
 9 not yet been produced in this action.
10     Q.   I'm talking about your current
11 knowledge.
12     MS. NUSSBAUM:  We're talking about ten
13 years here.
14     MR. JAMES:  Yes.
15     A.   I am unaware of the attendance by any
16 specific physician at any specific conference that
17 would have been influenced or held by the
18 defendants.
19     Q.   Roughly how many Permanente
20 prescribing physicians are there today?
21     MS. NUSSBAUM:  Today or over this
22 ten-year period or more, 15-year period?
23     MR. JAMES:  I specifically said today.
24     A.   I believe today, there are
25 approximately 13,000-plus Permanente physicians
```

Page 297

```
 1            A. Carver
 2 across the country.
 3     Q.   And in 1994, do you have a sense of
 4 how many there were?
 5     A.   I would not have that.  It would be
 6 some number that would be smaller, but I do not
 7 know.
 8     Q.   I guess turning to, I guess it's page
 9 two small i's at the bottom, heading number two,
10 you know, it states, "False and misleading
11 statements regarding pain," is that correct?
12     MS. NUSSBAUM:  If you are reading
13 correctly, the table of contents of the Complaint?
14     MR. JAMES:  Correct.
15     A.   That's what it says.
16     Q.   I know that you can't tell me about
17 any specific Permanente physician who, you know,
18 received a false or misleading statement regarding
19 pain, but can you tell me generally that any false
20 or misleading statement regarding pain was made to
21 a Permanente physician?
22     MS. NUSSBAUM:  I would object.  The
23 document speaks for itself.  Kaiser authorized the
24 filing of the Complaint.  The complaint clearly
25 states in numerous places that Kaiser was targeted
```

Page 298

```
 1            A. Carver
 2 by the defendants.
 3     MR. JAMES:  Well --
 4     Q.   Are you aware of any false or
 5 misleading statements regarding pain that would
 6 have been made to some Kaiser Permanente physician
 7 by the defendants or their agents?
 8     MS. NUSSBAUM:  I would object.  The
 9 witness has said that Kaiser physicians, who
10 number in the tens of thousands, okay, were out
11 there.
12     MR. JAMES:  Your objection is noted,
13 preserved for the record.
14     MS. NUSSBAUM:  The whole list.
15     Q.   You can answer the question.
16     A.   I believe that I've answered it from
17 the standpoint of I'm unable to cite the
18 attendance of any specific physician at any
19 specific conference that may have been held by the
20 defendants.  And -- but certainly there were
21 numerous conferences, apparently all over the
22 country, and so I'm just not able to cite the
23 specific attendance of a specific physician.  I
24 would not have those records, you know, of
25 attendance.  Perhaps you have those records.
```

A. Carver

1
2    Q.   Do you know when Kaiser first filed
3  this lawsuit?
4         MS. NUSSBAUM:  Do you have any
5  independent recollection?
6         THE WITNESS:  Not independent
7  recollection.
8    Q.   As the corporate representative, do
9  you know?
10   A.   Well, I would be speculating on a
11 specific date, I'm sorry.
12        MS. NUSSBAUM:  We can leave a blank in
13 the in the transcript and we'll fill in the date
14 that the Summons and Complaint were filed.
15 INSERT: _____
16   Q.   Do you understand that it's been a
17 couple of years now?
18   A.   I believe so.
19   Q.   In those two years, has Kaiser made
20 any effort to contact any Permanente physician to
21 find out whether they were told any false or
22 misleading statements by the defendants or their
23 agents?
24        MS. NUSSBAUM:  I believe the witness
25 already testified that the physicians do.

A. Carver

1
2         MR. JAMES:  Your objection is
3  preserved.
4         MS. NUSSBAUM:  They work for a
5  separate corporation.
6         MR. JAMES:  I think it's not
7  implicated by my question at all.
8    A.   I do not know.
9    Q.   You don't know whether those efforts
10 were undertaken?
11   A.   I do not know.
12   Q.   Aside from the newspaper articles and
13 the federal court records that we referenced
14 earlier, are you aware of any facts that would
15 indicate that the defendants made any false or
16 misleading statement to any Kaiser physician
17 during the relevant period?
18        MS. NUSSBAUM:  It's been asked and
19 answered.  I think that the witness already
20 stated, yes, that he is aware.
21   Q.   Are you aware?
22   A.   Well, to the extent that the
23 defendants have basically taken a very, very
24 aggressive effort here at influencing continuing
25 medical education content and publications and

A. Carver

1
2  meetings, and all that type of content, and have
3  provided content for a variety of journals, then
4  I -- it is our position that -- that certainly the
5  Permanente physicians had to have been influenced
6  by all of this information.
7         Can I cite a specific instance of a
8  physician reading a particular journal or
9  attending a specific conference?  The answer to
10 that is no.
11   Q.   Would it be accurate to say that your
12 view is that the defendants made a number of
13 statements and a number of media, and that it's
14 likely that some Kaiser physician was exposed to
15 one of those statements at some point from 1994
16 forward?
17        MS. NUSSBAUM:  Objection, objection.
18 The witness has stated what his testimony is.
19   Q.   You can answer.
20        MS. NUSSBAUM:  It's totally
21 prejudicial -- no, you're totally, you're
22 misstating it.  There's no question.  He's stated
23 his view three times.  If you want him to state it
24 again, he can state it in his words.  He's not
25 going to adopt your words.

A. Carver

1
2         MR. JAMES:  Can you read back the
3  question?
4         (Record read.)
5    Q.   And I asked you whether it's accurate
6  to say, so you can either accept or reject that
7  statement?
8    A.   I would accept that statement.  Our
9  physicians are just not immune from all the
10 information that's available in the marketplace.
11   Q.   And aside from that general view, do
12 you have any other information that would indicate
13 that the defendants made or may have made a false
14 statement to any Kaiser physician from 1994
15 forward?
16        MS. NUSSBAUM:  Objection.  The
17 Complaint, which is 140 pages plus discovery
18 that's been served in this case.
19        MR. JAMES:  I'd recommend that you
20 just state the grounds for your objection.
21        MS. NUSSBAUM:  Indicates articles that
22 were suppressed, false statements, misleading
23 statements detailing sampling, all of that is
24 indicated and the plaintiffs have indicated here
25 that, yes, both the physicians --

Page 303

A. Carver

2    MR. JAMES:  Actually, I don't need you
3  to testify.
4    Q.   You can answer the question.
5    MS. NUSSBAUM:  He has, three times.
6    A.   I believe I have.
7    Q.   You have additional information beyond
8  your allegations that there are a number of
9  statements made and that there are a large number
10  of Kaiser physicians, so it's likely that one of
11  the statements hit one of the Kaiser physicians?
12    MS. NUSSBAUM:  That's not what the
13  witness said.  You're misstating his testimony.
14  Okay.  You're also misstating -- he said that
15  individuals from Warner-Lambert and Kaiser did
16  visit with people at the plaintiffs and did
17  marketing there.
18    MR. JAMES:  I'll move on.
19    Actually, I think we have only five
20  minutes left on the tape.  We'll take a break.
21    VIDEOGRAPHER:  Going off the record at
22  10:59.  This is the end of tape two, volume two,
23  in the deposition of Albert Carver.
24    (Recess.)
25    VIDEOGRAPHER:  Going back on the

Page 304

A. Carver

2  record at 11:19 a.m.  This is the beginning of
3  tape three, volume two in the deposition of Albert
4  Carver.
5  BY MR. JAMES:
6    Q.   I asked you earlier about false
7  statements that were made by the defendants to
8  Kaiser physicians.  I guess now I didn't want to
9  focus on that, but I wanted to focus on false
10  statements that, you know, the defendants have
11  made to anyone regarding the indications of
12  Neurontin for which you're seeking damages from
13  the defendants.
14    I guess if we go to page with two
15  little i's in the Complaint, the second entry is
16  titled, "False and misleading statements regarding
17  pain."
18    Are you aware of any false and
19  misleading statements regarding pain -- or
20  actually, I guess specifically the use of
21  Neurontin or Gabapentin for pain made by the
22  defendants?
23    A.   To whom?
24    Q.   Just generally.
25    MS. NUSSBAUM:  Well, the Complaint

Page 305

A. Carver

2  indicates what those statements are in addition to
3  that.
4    MR. JAMES:  If you have an objection,
5  please note the --
6    Q.   Are you aware of any false statements
7  made by the defendants regarding the use of
8  Neurontin for pain?
9    MS. NUSSBAUM:  I would ask the witness
10  to look at page 39 of the Complaint.
11    MR. JAMES:  I'd rather you not have --
12  coach the witness on how to respond to my
13  questions.
14    MS. NUSSBAUM:  You're looking at the
15  Complaint, you're showing him a document, you want
16  to show him a document.  Let him look at the
17  document.  We can sit here an hour and go through
18  the whole 140 pages and go through the Complaint,
19  and when you find the false statements regarding
20  pain, please let the lawyer know.
21    A.   I'm unable to say whether or not
22  specifically.
23    MS. NUSSBAUM:  You want to reread the
24  question?
25    MR. JAMES:  I'd ask you to let the

Page 306

A. Carver

2  witness --
3    MS. NUSSBAUM:  Do you remember the
4  question?
5    A.   Could you just ask the question -- it
6  was very, very long, and then it changed to
7  reference to item number 2, and then there was
8  another part to the question, so if we could just
9  ask it in smaller pieces perhaps, perhaps I could
10  follow better.
11    MR. JAMES:  Could you read back the
12  last question I asked?
13    A.   If you could restate it, it would be
14  more helpful to me.
15    Q.   Let's try asking the question again
16  and then we'll see if it requires restatement.
17    (Record read.)
18    MS. NUSSBAUM:  As made to anyone?
19    MR. JAMES:  Yes.
20    A.   Well, as outlined in the Complaint
21  here, there is citations of specific
22  representatives of the defendants and individuals
23  who have made false and misleading statements to
24  the medical community.
25    Q.   Could you cite me to any particular

Page 307

A. Carver

1   A. Carver
2   statement?
3       A.   Well, there's a citation here
4   regarding a Dr. David Longmire who is citing that
5   Neurontin was effective for the treatment of pain.
6       Q.   Which paragraph of the Complaint are
7   you referring to?
8       A.   "False and misleading statements
9   regarding pain," paragraph 104.
10      Q.   And do you know what statement
11  Dr. David Longmire made?
12      MS. NUSSBAUM:  Are you asking the
13  witness to read the Complaint and tell you what it
14  says?
15      MR. JAMES:  No.  I'm asking whether he
16  knows what -- whether he or anyone else at Kaiser
17  knows what Dr. David Longmire said that was false
18  regarding pain on the defendant's behalf.
19      MS. NUSSBAUM:  The witness has already
20  indicated that Kaiser has authorized the filing of
21  the Complaint.
22      A.   Well --
23      Q.   Can you tell in the Complaint what
24  Dr. Longmire said regarding pain?
25      A.   I cannot tell specifically his words;

Page 308

1   A. Carver
2   however, the Complaint references that in 1996, in
3   specific meetings, Dr. Longmire was making
4   statements regarding the use of Neurontin for
5   pain, that Neurontin was approved in 1994 for
6   seizure disorder.
7       Q.   I guess the question was:  Did he say
8   a false statement regarding the use of Neurontin
9   for pain?  I didn't ask you whether he made a
10  statement regarding an off-label use of Neurontin.
11      MS. NUSSBAUM:  Okay.  I would, you
12  know, ask that you rephrase the question.  I'm not
13  sure what you're looking for here.
14      MR. JAMES:  Can you read back the
15  question that you read previously -- well,
16  actually, sorry.  I'll restate the question.
17      Q.   Are you aware of any false statement
18  that Dr. David Longmire made the use of
19  Neurontin for pain?
20      MS. NUSSBAUM:  Other than discussions
21  with counsel, either Mr. Cohen or myself or any
22  other counsel, do you have any independent
23  awareness, and other than the allegations in the
24  Complaint, do you have any other independent
25  awareness?

Page 309

A. Carver

1   A. Carver
2       THE WITNESS:  I do not; no.
3       Q.   Are you aware of anyone else at Kaiser
4   who would have any independent awareness of any
5   false statement made by Dr. David Longmire
6   regarding the use of Neurontin for pain?
7       A.   Not specifically.
8       Q.   And is there any other instance in
9   which a false statement regarding the use of
10  Neurontin for pain is known by you or any other
11  individual at Kaiser, to your knowledge?
12      MS. NUSSBAUM:  Well --
13      MR. JAMES:  Let me withdraw the
14  question and actually ask it in a better syntactic
15  form.
16      Q.   Are you or anyone else at Kaiser aware
17  of any instance in which the defendants made a
18  false statement regarding the use of Neurontin for
19  pain excepting information that you received from
20  your counsel?
21      MS. NUSSBAUM:  I think that that
22  misstates the testimony.
23      MR. JAMES:  I'm not stating testimony.
24  I'm asking a question.
25      MS. NUSSBAUM:  But the witness has

Page 310

1   A. Carver
2   already testified --
3       MR. JAMES:  I'd ask you to state the
4   grounds for your objection, preserve it in the
5   record, and allow the witness to answer.
6       MS. NUSSBAUM:  You're misstating the
7   testimony here.
8       MR. JAMES:  You can answer.
9       A.   I have testified that I cannot cite
10  specific instances of an individual that was
11  speaking to someone at Kaiser or to an individual
12  physician regarding the use of Neurontin for pain.
13      Q.   Okay.  I just want to clarify that my
14  earlier questions related to Kaiser physicians and
15  now I'm expanding this to anyone.
16      Does it still remain the case that
17  neither you nor anyone else at Kaiser has any
18  independent knowledge aside from knowledge
19  obtained from counsel regarding any misstatement
20  made by the defendants regarding the use of
21  Neurontin for pain?
22      MS. NUSSBAUM:  Objection.  This
23  witness is testifying himself.  He clearly is not
24  testifying for anybody else at Kaiser.  He's
25  testifying for himself.

Page 311

A. Carver

1        A. Carver
2     Q.   As corporate representative of Kaiser,
3   do you have any knowledge of that?
4     A.   It would be impossible.
5        MS. NUSSBAUM: Objection. Again, it
6   would be impossible for him. Kaiser has thousands
7   of people.
8     Q.   If Kaiser has thousands of people,
9   would it be impossible for you to know of a single
10  instance in which a statement was made by the
11  defendants that was false regarding the use of
12  Neurontin for pain to any one of those individuals
13  or anyone else?
14       MS. NUSSBAUM: He already testified as
15  to articles, as to conferences that were relied
16  upon. He's already testified.
17    Q.   Would you like to identify any
18  conference or article at which a false statement
19  was made?
20       MS. NUSSBAUM: It's set forth in the
21  complaint.
22    Q.   Are you aware of any specific false
23  statement that was made in any one of those
24  articles or at any one of those conferences,
25  independent of knowledge you've obtained from your

Page 312

1        A. Carver
2   counsel?
3        MS. NUSSBAUM: Are you personally
4   aware other than knowledge from counsel or work
5   product from counsel or interviews from counsel?
6        THE WITNESS: No.
7     Q.   And as corporate representative, are
8   you aware of any other individual at Kaiser that
9   would have such knowledge independent of
10  information received from counsel?
11    A.   I'm not.
12    Q.   And I take it that you're taking the
13  position that any information received from
14  counsel regarding the factual basis of these
15  allegations is protected by the attorney-client
16  privilege?
17       MS. NUSSBAUM: If you want to ask a
18  particular question, I'll object or not object.
19    Q.   Can you tell me information you've
20  received from counsel regarding a specific factual
21  misstatement made by the defendants or their
22  agents from 1994 forward regarding the use of
23  Neurontin for pain?
24       MS. NUSSBAUM: I would object as
25  privileged.

Page 313

1        A. Carver
2        MR. JAMES: I'll move on.
3     Q.   Are you aware -- are you or anyone
4   else at Kaiser aware of any false or misleading
5   statement made by the defendants regarding the use
6   of Neurontin or Gabapentin for restless leg
7   syndrome from 1994 forward, independent of
8   information obtained from counsel?
9        MS. NUSSBAUM: Objection. This
10  witness can answer for himself.
11    Q.   You can answer for yourself and you
12  can also answer as corporate representative of
13  Kaiser at this 30(b)(6) deposition.
14       MS. NUSSBAUM: No. We have repeatedly
15  indicated that there are thousands of people
16  employed by Kaiser, and this witness cannot state
17  specifically whether or not there was a
18  conversation between any of the defendants or
19  their agents or representatives and any individual
20  presently employed or that had been employed at
21  Kaiser for a period of ten years.
22    Q.   Are you aware of a single
23  misstatement?
24    A.   I am personally not aware of -- of a
25  misstatement that I could cite specifically

Page 314

1        A. Carver
2   because no such misstatement has been made to me
3   personally.
4     Q.   And as corporate representative of
5   Kaiser, are you aware of any instance on which
6   misstatements were made to others?
7        MS. NUSSBAUM: He's already testified
8   to that with respect to articles that were out
9   there, with respect to information out there in
10  the medical community. He's testified to that,
11  and that that affected Kaiser. And he's also
12  testified that representatives of the defendants
13  personally came to Kaiser and marketed Kaiser with
14  respect to this drug.
15       MR. JAMES: That I believe he has not
16  testified to.
17       MS. NUSSBAUM: I believe he has.
18       MR. JAMES: The record will speak for
19  itself.
20       MS. NUSSBAUM: No. Ask him that. Ask
21  him that. If you think he hasn't, ask him that.
22       MR. JAMES: If you like to do so, you
23  can take it up within your two hours.
24    Q.   I could go through the remaining
25  indications for which Kaiser is seeking damages

Page 315

A. Carver

1       A. Carver
2  from the defendants.
3          Do you believe your answers with
4  regard to those would be consistent with the
5  answers you've provided me thus far with regard to
6  pain and restless leg syndrome?
7          MS. NUSSBAUM: Objection.
8          We're not going to have -- if you have
9  specific questions, ask him.
10     Q.  Looking over the indication that
11 you've told me Kaiser is seeking damages from the
12 defendants for, that would be bipolar disorder,
13 social phobia, panic disorder, migraine,
14 monotherapy for epilepsy and dosages up to the FDA
15 approved maximum?
16         Did any one of them occur to you as an
17 indication for which your answers would be
18 different from the answers that you've given me
19 thus far with regard to pain and restless leg
20 syndrome?
21         MS. NUSSBAUM: Objection.
22         If you have a specific question --
23         MR. JAMES:  Please state your grounds
24 for the objection.
25         MS. NUSSBAUM: It's unintelligible. I

Page 316

1       A. Carver
2  don't know what you're talking about.  I can't let
3  him answer the question.
4     Q.  If it's intelligible to you, I'll ask
5  you to answer the question.
6          MR. JAMES:  I'd prefer you not
7  instruct the witness at such length.
8          MS. NUSSBAUM: I prefer you not to try
9  to mislead him or confuse him.
10     Q.  Have you reviewed the remaining
11 indications?
12     A.  Yes, I have.
13     Q.  And do you believe that your answers
14 would be materially different with regard to those
15 indications from the responses you've provided me
16 with regard to pain and restless leg syndrome?
17         MS. NUSSBAUM: Objection.  Do you
18 understand the question?
19         THE WITNESS:  I believe I do
20 understand the question.
21     A.  And that although I cannot cite
22 specific conversations regarding statements that
23 would have been made, I would refer back to
24 previous testimony regarding the fact that
25 representatives of the defendants have met with

Page 317

1       A. Carver
2  representatives of the Drug Information Service
3  and provided information to them, the specific
4  details of which I would not know, and certainly
5  had been provided, and certainly I think that both
6  the Drug Information Service, as well as
7  physicians have been exposed to a variety of
8  pieces of information, the details of which I'm
9  unable to cite at the moment.
10         So, I hope I've been responsive to
11 your question.  And that would be my answer with
12 respect to the remaining indications or medical
13 conditions, including the restless leg syndrome,
14 bipolar, etc., as you have outlined.
15     Q.  If you're unable to tell me whether
16 there were instances in which particular
17 representatives of the defendants made statements
18 in any way to anyone else regarding any of these
19 indications, are you able to tell me what the
20 content of those representations was?  Do you
21 understand the question?
22     A.  I do not understand that question.
23     Q.  Okay.  Regarding pain, what was the
24 message that was communicated that was false and
25 misleading, do you know?

Page 318

1       A. Carver
2          MS. NUSSBAUM: Objection.
3          The Complaint sets forth in great
4  detail --
5          MR. JAMES:  I'm asking the witness for
6  evidence, as opposed to allegations made in the
7  Complaint.
8          MS. NUSSBAUM: Well, he has the
9  Complaint in front of him.  That's -- you haven't
10 told him to put the Complaint away.  He's
11 indicated that the Complaint --
12         MR. JAMES:  I'd rather you not put
13 words in his mouth and just allow him to answer
14 the question.
15     A.  I think we're back to square one in
16 which Neurontin was approved for treatment of
17 seizure disorders and there was not any further
18 approval of indications beyond that for quite some
19 time quite a number of years, and there was, in
20 fact, a number of marketing promotions and efforts
21 and continuing education and publications and a
22 variety of things that occurred during the period
23 before there was an expansion of the indications
24 that led physicians to prescribe Neurontin for
25 pain and a variety of other indications that are

Page 319

```
 1              A. Carver
 2  outlined in the Complaint here.
 3        Q.   As corporate representative of Kaiser,
 4  do you take the view that every off-label
 5  prescription of Neurontin made by a Kaiser
 6  physician for one of the indications for which
 7  you're seeking damages was induced by a fraudulent
 8  statement made by the defendants?
 9             MS. NUSSBAUM:  That calls for a legal
10  conclusion, and the Complaint, which was
11  authorized by Kaiser, clearly sets forth the
12  theory of damages here.
13        Q.   You can answer the question.
14             MS. NUSSBAUM:  Well, he's not a
15  lawyer.  Do you feel that you can answer that
16  question?
17             THE WITNESS:  I do not.
18        Q.   Setting aside any legal terminology,
19  do you have any common understanding of what that
20  question would mean?
21             MS. NUSSBAUM:  Do you want to repeat
22  the question?
23             MR. JAMES:  You can read back the
24  question.
25             (Record read.)
```

Page 320

```
 1              A. Carver
 2             MS. NUSSBAUM:  I would caution you not
 3  to testify to anything that you discussed with or
 4  learned from your lawyer.
 5        Q.   I'm actually asking for a view.  I'm
 6  not asking for any discussions that you've had
 7  with counsel.
 8             MS. NUSSBAUM:  So you're asking if he
 9  has a view separate and apart from discussions
10  with counsel?
11             MR. JAMES:  It may have been informed
12  by that, but I'm asking what the position that
13  you're taking in this litigation is.
14             MS. NUSSBAUM:  That's set forth on
15  page 64 of the Complaint.
16        Q.   If looking at page 64 of the
17  Complaint, as your counsel has recommended that
18  you do would help you, that's fine.  I'd like to
19  know the answer.
20        A.   Well, if your question is whether or
21  not every single prescription written for every
22  single patient written by a Permanente physician
23  for every single patient for which the health plan
24  paid for each and every one of those single
25  prescriptions was caused directly by the efforts
```

Page 321

```
 1              A. Carver
 2  of the marketing efforts, I could not testify to
 3  that.
 4             But I would say that those
 5  prescriptions were the result generally of the
 6  promotion efforts and the influencing of
 7  educational efforts connected by and the
 8  information that was introduced into the
 9  marketplace in the form of studies or references
10  or case studies, etc.
11             Basically, that plus attendance at
12  meetings, etc., then had to have formed the basis
13  for informing individual physicians of making a
14  decision to use Neurontin for whatever they were
15  using it for.
16        Q.   Every single one?
17        A.   I would say that for Permanente
18  physicians who prescribed Neurontin, the
19  information that was available in the marketplace,
20  whether it be educational conferences or
21  publications or meetings or their attendance at
22  meetings or conferences or being detailed by the
23  pharmaceutical representatives, etc., all added up
24  to influencing a decision on the prescribing of
25  Neurontin for whatever the particular medical
```

Page 322

```
 1              A. Carver
 2  condition that was being treated was.
 3        Q.   Is it your view that had truthful
 4  information been provided to any one of these
 5  physicians when they were making any of their
 6  prescriptions that corrected whatever false
 7  impression was out there in the marketplace, they
 8  would have not prescribed Neurontin?
 9             MS. NUSSBAUM:  That's speculative.
10  You know, so I would ask the witness not to
11  speculate.  He said that the information contained
12  in the marketplace was false.  You're saying if
13  they never did any false information, is that what
14  you're saying?
15             MR. JAMES:  No.  I'm actually asking
16  a -- well, let's take an example.
17        Q.   Do DRUG and DUAT provide useful
18  information to Kaiser physicians?
19        A.   They attempt to do that, yes.
20        Q.   Regarding off-label prescriptions of
21  Neurontin?
22             MS. NUSSBAUM:  Objection.
23             If you're talking about off-label
24  prescriptions of Neurontin and you want to talk
25  about something very specific, the DRUG or DUAT,
```

Page 323

A. Carver

1           A. Carver
2    then let's get specific.
3        Q.   You can answer that question.
4        A.   It would be my view that truthful
5    information provided to physicians regarding a
6    product would influence their prescribing decision
7    and use of that product.
8        Q.   Actually, I guess the question is:  Do
9    DUAT -- or I should say have DUAT and DRUG
10   provided useful information to physicians
11   regarding off-label uses of Neurontin?
12           MS. NUSSBAUM:  Are you saying from
13   2002 on, Exhibits 12 and 13?
14       Q.   I'm asking throughout the relevant
15   period.
16       A.   Well, I believe that documents that we
17   reviewed a little while ago were efforts by DUAT
18   to provide some objective information to
19   physicians regarding the use of Neurontin.
20           I don't know whether or not that
21   was -- whether or not there was additional
22   information that would have been provided to them
23   or not. I'm just judging from the content of
24   these videoconferences that you have asked me to
25   review.

Page 324

1           A. Carver
2        Q.   Did DUAT or DRUG correct any
3    misimpressions that Kaiser physicians might have
4    about Neurontin's off-label uses?
5           MS. NUSSBAUM:  Objection.
6           That's totally speculative, and I
7    would ask the witness not to answer.
8        Q.   Are there any reasons that a physician
9    might prescribe Neurontin off-label other than the
10   alleged fraudulent promotional activities?
11          MS. NUSSBAUM:  I would object.
12          The witness is not a physician.  He's
13   previously testified the physician group is a
14   separate entity.  So, it's not possible for him to
15   answer. If you have a specific question, you can
16   ask.
17       Q.   You can answer if you understand the
18   question.
19       A.   I do understand the question, but I'm
20   not a physician and could not place myself in the
21   physician's shoes for purposes of answering a
22   question.
23       Q.   Was your role vice-president of
24   pharmacy and strategic operations, is that correct
25   or have I misstated it?

Page 325

1           A. Carver
2        A.   You're close.  Pharmacy strategy and
3    operations.  That's close enough.
4        Q.   Have you developed any understanding
5    in that role of the reasons that physicians
6    prescribe prescription drugs?
7           MS. NUSSBAUM:  Objection.  That's
8    overly broad and speculative again.
9        A.   To treat patients.
10       Q.   And do you have any idea of the
11   information that they look to in making those
12   decisions?
13          MS. NUSSBAUM:  This is what, if I was
14   a physician, any of the tens of thousands of
15   physicians, what kinds of information they look
16   at.
17          MR. JAMES:  I'm asking whether he's
18   developed any personal knowledge generally about
19   why physicians prescribe prescription drugs.
20       A.   Well, of course.
21       Q.   Do you have any understanding of why
22   physicians prescribe prescription drugs off-label?
23          MS. NUSSBAUM:  Objection.
24          This is just generally why any drug
25   might be prescribed off-label?

Page 326

1           A. Carver
2           MR. JAMES:  Yes.
3        A.   Well, of course I do.  Physicians
4    basically are trying to treat the individual
5    patients, and why they select a particular product
6    for the treatment of a particular condition is
7    based upon their education, their training, their
8    information that they've gained in their residency
9    program, in some cases, their continuing
10   education, their attendance at meetings, their
11   interaction with peers, their interaction with
12   representatives of the pharmaceutical industry and
13   their desire to be successful in providing care to
14   a patient. That's why they prescribe.
15       Q.   Do they prescribe, in part, based on
16   their own clinical experience?
17       A.   Yes, they do.
18       Q.   If a physician prescribed a drug
19   on-label to a patient who had two indications and
20   the drug proved effective with the other off-label
21   indications as well, do you think that might
22   influence their subsequent prescription behavior?
23          MS. NUSSBAUM:  Objection.
24          At this point, this has become so
25   speculative and so hypothetical, I would really