Page 327

A. Carver

1       ask the witness not to answer.  I think you've
2       asked a general question.  He's given a general
3       answer.  Now you're going into hypotheticals.
4       He's not an expert.  It's not a hypothetical
5       question.  It's improper.
6           Q.   If you understand the question, you
7       can answer.
8           MS. NUSSBAUM:  No, no.  It's a
9       hypothetical speculative.  He can't.  He's here as
10      a fact witness.
11          Please don't answer.  It's just a
12      totally improper question.
13          MR. JAMES:  You're taking the view
14      that it calls for speculation as a ground for
15      directing a witness not to answer a question?
16          MS. NUSSBAUM:  Yeah, it calls for
17      total speculation and it's a hypothetical
18      question.
19          Q.   Would you know of any instances in
20      which a physician has prescribed a drug off-label
21      because they had success treating that condition
22      off-label with a patient who also had the
23      on-label?
24          A.   I do not.  I'm not a physician.  I

---

Page 328

A. Carver

1       don't walk in the shoes of the physician, so I
2       cannot answer your question.
3           Q.   So why don't we turn to our favorite
4       page of the Complaint?
5           MS. NUSSBAUM:  Table of contents.
6       Lucky we put one in.  We usually don't.
7           Q.   Has Kaiser or anyone acting on its
8       behalf undertaken an analysis regarding the
9       efficacy of Neurontin or Gabapentin for no
10      susceptive pain?
11          A.   Not to my -- I just want to make sure
12      I heard that right.
13          Q.   Why don't you finish the answer and
14      then we'll repeat it?
15          MS. NUSSBAUM:  No, I want to hear it
16      before he gives an answer.
17          A.   Maybe you could just repeat the
18      question and I'll try.
19          (Record read.)
20          A.   Not to my knowledge, in terms of an
21      analysis or a study.
22          Q.   Has Kaiser or anyone acting on its
23      behalf undertaken an analysis of the efficacy of
24      Neurontin or Gabapentin for restless leg syndrome?

---

Page 329

A. Carver

1           A.   Maybe you could help me understand
2       what you mean by the word "analysis."
3           Q.   Has anyone analyzed that question,
4       either by conducting studies on their own or by
5       reviewing clinical literature?  I'm excluding
6       information that you've obtained from counsel in
7       this question.
8           A.   And could you answer -- or please just
9       repeat the general question?
10          Q.   The general question:  Has Kaiser or
11      anyone acting on its behalf conducted an analysis
12      of whether or not Neurontin or Gabapentin is
13      effective for restless leg syndrome?
14          MS. NUSSBAUM:  Also, that's a
15      different question now, okay.  So that's now your
16      question?
17          MR. JAMES:  That's now my question.
18          MS. NUSSBAUM:  Repeat it now so that
19      we hear it because it's a different question.
20          (Record read.)
21          MS. NUSSBAUM:  To your knowledge,
22      specifically has Kaiser done that.
23          A.   To my knowledge, no, certainly not in
24      terms of any clinical studies.

---

Page 330

A. Carver

1           Q.   Or in terms of serving the clinical
2       literature?
3           A.   I do not know.
4           Q.   What about with regard to bipolar
5       disorder?
6           A.   I do not know independently.
7           Q.   What about social phobia?
8           A.   I do not know independently.
9           Q.   What about panic disorder?
10          A.   I do not know independently.
11          Q.   What about migraine?
12          A.   I do not know independently.
13          Q.   Monotherapy for epilepsy?
14          A.   I do not know independently.
15          Q.   And regarding dosages above the FDA
16      approved maximum?
17          A.   I do not know independently whether or
18      not any research has been done to try to
19      substantiate using doses above the approved
20      labeling.
21          Q.   Did you personally authorize this
22      Complaint to be filed?
23          A.   I believe so, with counsel.
24          MR. JAMES:  We're going to mark

Page 331

A. Carver

1          A. Carver
2   another exhibit.
3          (Kaiser-15 marked for identification.)
4   Q.   Have you seen this document before?
5   A.   I believe that I have.
6   Q.   Do you know what it is?
7          MS. NUSSBAUM: I'd like the witness to
8   have an opportunity to read it, if you want to
9   focus him on, I assume pages 6 and 7.  Well, the
10  rest of it is just legal gobbledygook.  I assume
11  you don't want to focus him on that.
12  Q.   Have you had an opportunity to review
13  the document?
14  A.   I'm just about finished.  Thank you.
15         MS. NUSSBAUM: Take your time.
16  A.   Okay.  I've reviewed the last couple
17  of pages.
18  Q.   Do you know what this document is?
19  A.   Not from a technical legal point of
20  view.  I'm sorry.
21  Q.   Do you understand generally that the
22  defendants posed certain questions to Kaiser and
23  that these are Kaiser's responses to those
24  questions?
25  A.   I do.

Page 332

A. Carver

1          A. Carver
2   Q.   And do you understand that these
3   responses are intended to provide a truthful and
4   complete answer to the defendant's questions?
5          MS. NUSSBAUM: Objection.
6   Q.   Is that an understanding that you
7   have, not as a lawyer, is it your understanding
8   that these were intended to be a truthful and
9   complete answer?
10         MS. NUSSBAUM: Objection.
11         If your understanding came from your
12  counsel, I would ask that you not divulge any
13  conversations with counsel.
14  Q.   So, you're unable to tell me whether
15  you as corporate representative of Kaiser can tell
16  me whether you understand these responses to have
17  been truthful and complete?
18         MS. NUSSBAUM: That's a different
19  story.  You can ask him that.
20  Q.   Were these responses truthful and
21  complete?
22         MS. NUSSBAUM: To the best of your
23  knowledge.
24  A.   To the best of my knowledge, yes.
25  Q.   Can Kaiser supply any information --

Page 333

A. Carver

1          A. Carver
2   well, actually, well, let me withdraw that.
3          Turning to the final sentence of this
4   document on page 7, beginning with the phrase,
5   "These alternative cheaper or more desirable
6   medications"?
7   A.   Yes.
8   Q.   Did Kaiser supply information to its
9   counsel in allowing counsel to come up with this
10  sentence?
11         MS. NUSSBAUM: I would object as to
12  conversations between Kaiser and Kaiser's counsel.
13  I will state, and this will not in any way
14  infringe on the privilege, but we will not go any
15  further than that, that this was prepared in
16  conjunction with Kaiser's counsel and appropriate
17  representatives at Kaiser.
18  Q.   Did representatives at Kaiser supply
19  information for this sentence?
20         MS. NUSSBAUM: If you know.
21  A.   I do not know.
22  Q.   So it's possible that no one at Kaiser
23  supplied any information that was used to cite the
24  sentence?
25         MS. NUSSBAUM: Objection.

Page 334

A. Carver

1          A. Carver
2   I think that --
3          MR. JAMES: I'll move along --
4          MS. NUSSBAUM: -- this was prepared by
5   counsel and by representation of counsel was
6   prepared in conjunction with the plaintiffs and
7   counsel for Kaiser.
8          MR. JAMES: Fair enough.
9   Q.   I'd also like to address your
10  attention to page 65 of the Complaint.  The --
11  this page has a table listing certain medications?
12  A.   Yes.
13  Q.   Are these in your understanding
14  cheaper or more desirable medications than
15  Neurontin?
16         MS. NUSSBAUM: I would object.  It
17  misstates the Complaint.
18         MR. JAMES: I'm just asking for his --
19         MS. NUSSBAUM: Well, he's the
20  corporate representative.  He said that this is an
21  authorized document by the company, so why should
22  we mislead -- let's just look at the paragraph and
23  he can answer.  It's paragraph 173.
24  A.   And what is the question?
25  Q.   Are these cheaper or more desirable

A. Carver

1          A. Carver
2  medications than Neurontin?
3     A.  I believe these medications are all
4  approved for use for the respective medical
5  conditions here.
6     Q.  You believe that each of these
7  medications is approved for the use under which
8  it's listed?
9     A.  I believe so.  For example,
10 amphetamine for attention deficit disorder.
11 Methylphenidate for attention deficit disorder.  I
12 believe that is my answer.  I believe that's the
13 case that they're approved uses of these products
14 and lower in cost.
15    Q.  Does cheaper or more desirable have
16 any meaning other than FDA approved and cheaper in
17 cost?
18    MS. NUSSBAUM:  If you know.  Are you
19 talking about now the sentence in the Complaint
20 that says, "These alternative cheaper or more
21 desirable medications included" --
22    MR. JAMES:  Yes, exactly.
23    MS. NUSSBAUM:  You want to know what
24 that term "cheaper or more desirable" means?
25    MR. JAMES:  Yes.

1          A. Carver
2     MS. NUSSBAUM:  If you personally know.
3     Q.  Well, I'm actually saying it as a
4  representative of Kaiser, as well as the
5  individual who authorized the filing of this
6  Complaint, you know, if you have any understanding
7  of what this means, that would be helpful.
8     MS. NUSSBAUM:  If that understanding
9  does not in any way come from discussions that you
10 had with counsel either at Kaiser or outside
11 counsel with respect to the preparation of this
12 document and advice of counsel.
13    A.  Well, an alternative -- an alternative
14 is lower cost and equally or more effective would
15 be something that's desirable.  The wording
16 actually says "cheaper or more desirable."  That
17 does mean that some of these medications are
18 cheaper, but not more desirable.
19    MS. NUSSBAUM:  Once again, this is a
20 legal document prepared by counsel and so --
21    MR. JAMES:  Your objection is noted.
22    MS. NUSSBAUM:  Any language at all
23 comes from discussions with counsel, I would
24 direct you not to answer.
25    A.  I'm unable to answer.

1          A. Carver
2     Q.  You're unable to answer what this term
3  means?
4     A.  Based upon a discussion with counsel.
5  And --
6     Q.  Apart from discussions with counsel,
7  do you have any understanding of what the purpose
8  of filing a complaint is?
9     A.  Well, of course the filing of a
10 complaint is an effort to recognize and seek
11 reimbursement for the overpayment by Kaiser for
12 the prescriptions for Neurontin.
13    Q.  Well, actually, I was just referring
14 to a complaint generally, not this specific
15 Complaint.
16    What is the purpose of a Complaint
17 aside from any discussions you've had with
18 counsel?
19    MS. NUSSBAUM:  You're asking him for
20 his layman's view of the purpose of filing a
21 complaint?
22    MR. JAMES:  Yes, layman's --
23    MS. NUSSBAUM:  It's totally
24 irrelevant.
25    Q.  Is it supposed to set forth the basis

1          A. Carver
2  of relief?
3     MS. NUSSBAUM:  He's not a lawyer.
4  You've asked what his layman's view is and what
5  did you say?  Repeat your answer?
6     A.  To remedy a problem.
7     Q.  And is it supposed to provide the
8  defendant with some indication of the reasons that
9  you're asking for damages?
10    MS. NUSSBAUM:  Objection.
11    You know, he's not a lawyer.  The
12 legal standard for what a Complaint needs to do or
13 not do, I would just state for the record that
14 you've made your motion to dismiss.  The judge has
15 denied it.  The Complaint has been sustained.  So,
16 let's move on.
17    Q.  Do you have nothing to answer that
18 question?
19    A.  I have nothing further.
20    Q.  Speaking as an individual, do you feel
21 that the defendants are entitled to know what the
22 term "cheaper and more desirable" which appears in
23 your Complaint means?
24    MS. NUSSBAUM:  Objection.
25    He's a layman.  This Complaint was

A. Carver

1           A. Carver
2 done with counsel.
3        MR. JAMES:  Actually, I'm just asking
4 his layman's opinion.
5        MS. NUSSBAUM:  His layman's opinion is
6 totally irrelevant.  This a legal document and the
7 legal --
8        MR. JAMES:  You've stated the grounds
9 for your objection and I'd appreciate it if you
10 would allow the witness to answer.
11        MS. NUSSBAUM:  But it's a meaningless
12 question.
13        MR. JAMES:  I feel that your lengthy
14 speaking objections may result in us having to
15 call the witness on a second occasion.
16        MS. NUSSBAUM:  I don't think we're
17 going to get the witness on a second -- for this
18 kind of question.  If you think the judge is going
19 to give the witness on a second occasion, go
20 ahead, repeat.  What' his question?  Let's get it
21 so the record is clear for the judge.
22        MR. JAMES:  You can repeat the
23 question.
24        (Record read.)
25        MS. NUSSBAUM:  You know as a layman if

1           A. Carver
2 this is his personal nonlegal view?
3        MR. JAMES:  Yes, right.
4        MS. NUSSBAUM:  If you have any view, I
5 would object as to any discussions you've had with
6 counsel, if you have any view.
7     A.  My personal view would be we've
8 overpaid.  Kaiser has overpaid.
9     Q.  Actually, was the answer to my
10 question yes or no?
11        MS. NUSSBAUM:  The witness has
12 answered the question.
13        MR. JAMES:  Can you read the question
14 back?
15        (Record read.)
16        MS. NUSSBAUM:  The witness has
17 answered the question.
18        MR. JAMES:  You've stated the grounds
19 for this objection at least three times.
20        MS. NUSSBAUM:  It's also -- this is a
21 term of legal art.
22        MR. JAMES:  I've asked him for his
23 layman's opinion.
24        MS. NUSSBAUM:  What difference does
25 that make?

1           A. Carver
2        MR. JAMES:  I'm not even asking what
3 the meaning of the term is.  I'm asking his
4 layman's opinion as to whether the defendants are
5 entitled to know the meaning of the term.
6        MS. NUSSBAUM:  Do you know what --
7 what his understanding of the term "cheaper" and
8 "desirable"?
9     Q.  Do you understand the question?
10     A.  I'm not sure that I do.
11        MR. JAMES:  Can you read it back one
12 more time?
13        (Record read.)
14        MS. NUSSBAUM:  Object.
15        I think that this is a meaningless
16 question.
17     Q.  You can answer.
18        MS. NUSSBAUM:  Let's just move on.
19     A.  My personal view regarding "cheaper"
20 would mean that it's less costly.  And my personal
21 view regarding "more desirable" medication would
22 be that this is a medication that's more effective
23 or it's a medication that is proven to be
24 effective, particularly relative to the use of
25 another drug which has not been proven to be

1           A. Carver
2 effective and in some cases would not have been
3 effective at all.
4        That's like I paid a bunch of money
5 for a glass of water.  So, in my personal view,
6 that would be -- and hopefully I'm being
7 responsive to your question of what something more
8 desirable would be -- that means I would be
9 getting more value for my dollar.
10     Q.  And are each of these drugs both
11 cheaper and more desirable or are some of them
12 simply cheaper and FDA approved?
13        MS. NUSSBAUM:  Okay.  I will really
14 suggest at this point that we move on.  This
15 witness is not here as an expert witness.  The
16 Complaint is written the way it is written.  Let's
17 move along.
18        It says "cheaper or more desirable"
19 and I think we should move along.
20     Q.  Has Kaiser done any independent
21 analysis to determine whether these drugs are
22 cheaper or more desirable medications than
23 Neurontin?
24        MS. NUSSBAUM:  Please don't divulge
25 any discussions with counsel, any analysis by

Page 343

A. Carver

1        A. Carver
2   counsel, any work product by counsel.
3        A.   Then independent of that, no.
4        Q.   Are each of these drugs cheaper or
5   more desirable with regard to every patient who
6   might be prescribed Neurontin for the listed use?
7            MS. NUSSBAUM:  Objection.
8            I don't think the witness can testify
9   as to every patient.  The Complaint states what it
10  states; okay?
11       Q.   In your personal knowledge as a
12  trained pharmacist, do you know whether or not an
13  amphetamine is an appropriate treatment for anyone
14  with attention deficit disorder?
15       A.   I think that that's impossible to
16  answer from the standpoint of whether or not
17  the -- in the context of your question, whether or
18  not the amphetamine is the most desirable product
19  for each and every patient.  I think it's
20  patient-specific.  It's decided by the physician
21  based upon the physician's analysis of the
22  situation.
23       Q.   Would it be true to say that no
24  generalizations could be made across all patients?
25           MS. NUSSBAUM:  I would object to that.

Page 344

1        A. Carver
2   I think that the witness has said --
3            MR. JAMES:  You've already stated the
4   grounds for the objection.  I don't think you need
5   to recharacterize the grounds for your objection.
6   You can state an answer, if you understand the
7   question.
8        A.   Could you repeat your question,
9   please?
10           MR. JAMES:  I would appreciate it if
11  no objections would follow the repeating of the
12  question so that, you know, the witness can
13  actually answer the question shortly after he
14  hears it.
15           (Record read.)
16           MS. NUSSBAUM:  Objection.
17           I would -- this is not an expert
18  witness and I would ask that he not answer.
19       Q.   You can answer the question.
20       A.   I would refer back to the fact that
21  I'm not a physician and I'm not walking in the
22  shoes of a physician as it relates to the
23  treatment of patients.
24       Q.   So, in your capacity at Kaiser, you're
25  unable to know whether or not an amphetamine would

Page 345

A. Carver

1        A. Carver
2   be an appropriate treatment for all patients with
3   attention deficit disorder?  If that's not a
4   question you could answer yes or no?
5        A.   I could not answer that yes or no for
6   100 percent of patients.  No, I cannot.
7        Q.   It might be true that an amphetamine
8   is actually an appropriate treatment for all 100
9   percent of patients with attention deficit
10  disorder?
11       A.   I cannot say that.
12       Q.   If I were to run through the remaining
13  medications listed on this table and ask the same
14  question, would your response be the same?
15           MS. NUSSBAUM:  Ask the questions.
16       Q.   Let's make an aside on the record.
17  There are a number of medications listed here.  I
18  could go through the process of individually
19  asking these questions for each one of them.  If
20  you know at this time that you'll give me
21  materially the same response, we won't go through
22  that exercise and we can save a bit of time, you
23  know, otherwise we can, you know, do it the
24  longer, harder way.
25           MS. NUSSBAUM:  I don't understand what

Page 346

1        A. Carver
2   your question is, if you want to state your
3   question again.
4            You want to know if any particular
5   medication would be the optimal desirable
6   medication for 100 percent of patients presenting
7   with a particular indication?  Is that your
8   question?
9            MR. JAMES:  Can you ask my last
10  question with regard to amphetamines.
11           (Record read.)
12       Q.   And if I ask that exact same question
13  substituting each of these medications and instead
14  of attention deficit disorder, the indication
15  that's listed above them, would your answer be the
16  same?
17       A.   Yes, it would.
18       Q.   I'd like to turn back to that last
19  exhibit that was marked, the responses to the
20  defendant's second set of interrogatories.
21           If you go to the sixth line from the
22  bottom, do you see a reference to aspirin and
23  Ibuprofen?
24       A.   Yes, I do.
25       Q.   Is Kaiser of the view that in any

Page 347

A. Carver

1      A. Carver
2 instance in which Neurontin was prescribed for an
3 off-label indication, but for the defendant's
4 conduct, the physician might have prescribed
5 aspirin or Ibuprofen instead?
6      A.   Yes, that's -- that is our position.
7      Q.   In what circumstances would a
8 physician prescribe aspirin -- or not even
9 prescribe, but recommend aspirin or Ibuprofen
10 instead of Neurontin?
11      A.   Pain.
12      Q.   What kind of pain would Neurontin be
13 prescribed off-label for, typically by Kaiser
14 physicians?
15           MS. NUSSBAUM: If you specifically
16 know individually.
17      A.   I do not specifically know
18 individually what all of those various pain
19 conditions are that it may have been prescribed
20 off-label for. It seemed that the defendants were
21 interested in having it prescribed for just about
22 any kind of pain.
23      Q.   So go back to Kaiser Exhibit Number
24 12 --
25      A.   Yes.

Page 348

1      A. Carver
2      Q.   -- on page 13, there's --
3      A.   Just one second, please.
4      Q.   Sure.
5      A.   Exhibit 12?
6      Q.   Yes.
7      A.   Page?
8      Q.   13.
9           MS. NUSSBAUM: Where it says "external
10 benchmarking"?
11           MR. JAMES: No, page 13.
12           MS. NUSSBAUM: That's what mine has,
13 Exhibit 12. Excuse me. What's the name of your
14 Exhibit 12? Maybe we're looking at -- this is the
15 April 24th exhibit? April 2004, is that correct?
16           MR. JAMES: What's the Bates stamp on
17 the first page? You mean -- excuse me. Page 13
18 is what it says, "External benchmarking." Are you
19 maybe looking at Exhibit 13? Wasn't this -- can
20 we see the first page of what you're looking at?
21           MS. NUSSBAUM: No.
22           MR. SKIBELL: It's the second page 13.
23           MS. NUSSBAUM: Where does that appear?
24           MR. LAWRENCE: The chart review on
25 page 10.

Page 349

1      A. Carver
2           MS. NUSSBAUM: You know, I'm going to
3 object to really any more questions about this
4 document, because --
5           MR. JAMES: I'm actually not going to
6 ask about, if you'd rather not look at the
7 document while I'm asking questions, that's fine.
8           MS. NUSSBAUM: The problem is this
9 document clearly has mixed-in pages. We don't
10 even know whether or not this is one complete
11 document.
12           MR. JAMES: Right.
13           MR. LAWRENCE: This is how it
14 was produced to us.
15           MS. NUSSBAUM: Well, I'm not sure that
16 that's correct. But we're not certain that this
17 is one coherent document.
18      Q.   Do you know what DM neuropathy is?
19           MS. NUSSBAUM: Where are you?
20           MR. JAMES: I'm on my page 13. It's
21 Bates number KSIS000823.
22           MS. NUSSBAUM: 823?
23           MR. JAMES: Yes.
24      A.   I believe that refers to diabetes
25 neuropathy.

Page 350

1      A. Carver
2      Q.   Do you know if aspirin is prescribed
3 for diabetic neuropathy?
4      A.   I do not know.
5      Q.   What about neuropathy, it looks like
6 inflammation and toxic neuropathy, is aspirin
7 prescribed by physicians for that type of
8 neuropathy?
9      A.   I do not know.
10      Q.   Do you know if physicians use aspirin
11 for trigeminal neuralgia?
12      A.   I do not know.
13      Q.   Do you know of any of the pain
14 indications on this list that a physician would
15 commonly prescribe aspirin for?
16      A.   I cannot speak authoritatively, no.
17      Q.   I'd like to go back to the Complaint,
18 page 65. Actually, it's the carryover sentence
19 from page 64.
20           What's the relevance of these
21 alternative medications to the relief that Kaiser
22 is seeking?
23           MS. NUSSBAUM: If you know. This is a
24 legal document.
25           Do you have an understanding not from

36 (Pages 347 to 350)

Page 351

A. Carver

1  counsel?
2  A.  Not from -- not independent of
3  discussions with counsel.
4  Q.  And do you know what amount of money
5  you're asking for in this litigation?
6  A.  I believe that that's being -- the
7  amount is being determined as -- in an effort by
8  and with counsel, and I don't know that a final
9  amount has been determined at this point.
10  Q.  Do you know how that amount is going
11  to be calculated?
12  MS. NUSSBAUM: Objection.
13  By counsel, that's going to be done
14  with counsel and expert witnesses and expert
15  discovery and I would ask that the witness not
16  answer.
17  Q.  On page 65, the Complaint lists the
18  costs per day of Neurontin and then the cost per
19  day -- or sorry -- strike that.
20  Page 65 lists the costs per day of
21  these various alternative medications.  Is that --
22  I mean, do you disagree with that
23  characterization?
24  A.  I do not disagree with that
25

Page 352

A. Carver

1  characterization.
2  Q.  And why are you informing either the
3  defendants or the Court of the costs of these
4  medications?
5  MS. NUSSBAUM: Objection.
6  If you know that answer only because
7  of discussions with counsel, either Mr. Cohen or
8  myself, I direct you not to answer.
9  A.  Then I cannot answer.
10  Q.  Is the alleged harm that Kaiser
11  suffered in any way tied to the existence of these
12  cheaper and more desirable medications?
13  MS. NUSSBAUM: Objection.
14  Again, if that is something that you
15  have a view of only as a result of discussions
16  with either Mr. Cohen or myself, I would direct
17  you not to answer.
18  A.  I cannot answer.
19  Q.  Do you have any independent knowledge
20  aside from counsel of what you're asking for in
21  this litigation?
22  MS. NUSSBAUM: I would again object.
23  What does that mean, "aside from counsel"?  If
24  your knowledge as to what the claims and remedies
25

Page 353

A. Carver

1  are based on conversations with either Mr. Cohen
2  or myself, or other counsel, then I would direct
3  you not answer.  This witness has testified now
4  for almost two days.  He's certainly testified as
5  to what he --
6  MR. JAMES: You've apprised me as to
7  what your objection is about and I believe --
8  actually, I don't really know if the defendant is
9  entitled to --
10  MS. NUSSBAUM: What the defendant is
11  entitled to --
12  MR. JAMES: Rather, I know what the
13  defendant is entitled to.  I don't know what the
14  plaintiffs believes that they're entitled to.
15  MS. NUSSBAUM: Well, we will have
16  expert discovery and you'll get it very clearly.
17  MR. JAMES: Do you anticipate
18  producing some evidence regarding these cheaper,
19  more desirable alternatives in the future?
20  MS. NUSSBAUM: Objection.
21  If, you know, your knowledge is based
22  on discussions that you've had either with
23  Mr. Cohen, myself, or other counsel, please do not
24  answer.
25

Page 354

A. Carver

1  A.  I cannot answer.
2  Q.  Is Kaiser seeking to recover in
3  instances where a patient took one of these
4  alternative medications and was intolerant to it
5  and they subsequently took Neurontin?
6  MS. NUSSBAUM: Objection.
7  If your understanding as to Kaiser's
8  theory of recovery and damages here is based
9  exclusively on discussions with counsel, either
10  myself or Mr. Cohen, I direct you not to answer.
11  A.  I cannot answer.
12  Q.  As a personal matter, do you feel at
13  some point the defendants are entitled to know the
14  circumstances in which you're seeking that the
15  Court order that defendants paid the damages to
16  you?
17  MS. NUSSBAUM: Objection.
18  I think that that misstates the
19  record.  The defendants have a Complaint that has
20  a prayer for relief that has a chart on page 65
21  that articulates a theory of damages.  You have
22  answers to interrogatories.  Let's get the record
23  nice and clear here.
24  They have answers to the
25

Page 355

A. Carver

1         A. Carver
2  interrogatories, and if you want more clarity or
3  you want to seek more relief, you know the way to
4  get it; okay?
5         His personal opinion, he's not a
6  lawyer, is totally irrelevant and speculative here
7  and outside the scope of your 30(b)(6) and outside
8  the scope of any of the four notices we have.  We
9  have a couple of hours left.  Let's move on to
10 what's appropriate.
11        MR. JAMES:  Let's take a break at this
12 point.
13        VIDEOGRAPHER:  Going off the record at
14 12:28 approximately.  This ends tape number three.
15        (Luncheon recess.)
16        A F T E R N O O N   S E S S I O N
17        1:10 p.m.
18        (Kaiser-16 marked for identification.)
19        MR. JAMES:  Can we mark this exhibit?
20        VIDEOGRAPHER:  We're going back on the
21 record at 1:10 approximately.  This is tape four,
22 volume two, in the deposition of Albert Carver.
23 BY MR. JAMES:
24        Q.   Actually, I direct your attention to
25 page 32 and following of this document --

Page 356

A. Carver

1         A. Carver
2         MS. NUSSBAUM:  Are you referring to
3  Exhibit 16?
4         MR. JAMES:  Yes.
5         A.   I'm sorry.  Which page, it --
6         Q.   It has KIS000820 stamped at the bottom
7  of it.
8         A.   Neuropathic pain initiative, 32.
9         Q.   That's right.
10        So if you could just look at the --
11 look over the pages that follow that page.
12        A.   Okay.
13        Q.   I think you can stop once you get up
14 to KIS000826, which has a text "cancer drug
15 initiative" on it.
16        MS. NUSSBAUM:  I have a different
17 number, so mine says 000038.  It says, "cancer
18 drug initiative."
19        MR. JAMES:  I think there might have
20 been two copies of this document produced.
21        Q.   Let's take the page -- you can stop at
22 the page that has the text "cancer drug
23 initiative" on it.
24        Have you had a chance to review that?
25        A.   I have, yes.

Page 357

A. Carver

1         A. Carver
2         Q.   Do you know what this document is?
3         A.   This is a -- a document that's
4  produced by the DUAT in southern California and is
5  labeled as an executive scorecard that is
6  providing information regarding utilization of
7  Neurontin in the medical center areas of southern
8  California.
9         Q.   Have you seen this document before?
10        A.   I believe that I have.
11        Q.   Was it prior to your preparation for
12 this deposition?
13        A.   No.
14        Q.   In preparing for this deposition, did
15 you require any understanding of when this
16 document was produced other than what you had
17 gained simply by looking at the document itself?
18        MS. NUSSBAUM:  Objection to the extent
19 that any discussions you had with counsel would be
20 part of your answer.  Please do not divulge any
21 communications with counsel.
22        A.   Your question was:  When was it
23 produced?
24        Q.   No.
25        MR. JAMES:  Could you read back the

Page 358

A. Carver

1         A. Carver
2  question?
3         (Record read.)
4         A.   No.
5         Q.   Have you seen documents entitled
6  "Executive Scorecard" before in your personal
7  experience?
8         A.   On occasion, yes.
9         Q.   Were they created by DUAT at well?
10        A.   Yes.
11        Q.   And what's the purpose of an executive
12 scorecard?
13        A.   To provide primarily, information
14 primarily to the medical directors of the
15 respective service areas regarding the progress
16 that's being made on DUAT initiatives within their
17 respective areas.
18        Q.   Are the medical directors employed by
19 the Permanente Group?
20        A.   Yes, there are.
21        Q.   I guess I'm looking at the first page
22 of this document, at the very top following the
23 word "medical directors," there's the words
24 "medical group administrators"?
25        A.   Yes.

Page 359

A. Carver

1
2    Q.   What's their role?
3    A.   They, within each of the medical
4  center areas, there is a medical group
5  administrator who is an employee of the Permanente
6  Medical Group who manages primarily the delivery
7  of services, medical services to our patients
8  within those respective facilities. And they're
9  involved in the, you know, the hiring and the
10  supervision and management of, I guess, the clinic
11  operations would be the best way to describe it.
12    Q.   In the next category of individuals is
13  service area managers?
14    A.   Yes, service area managers are an area
15  executive within each of those respective service
16  areas.
17    Q.   What sort of background do those
18  individuals have?
19    MS. NUSSBAUM: If you know.
20    A.   The service area managers typically
21  come from the hospital administration track of
22  professional development.
23    Q.   And I think we've discussed local and
24  regional DUATs before. So, with regard to
25  regional and divisional sponsors, who are they?

Page 360

A. Carver

1
2    A.   The regional sponsor of the DUAT is
3  the medical director for the southern California
4  Permanente Medical Group as well as the president
5  of the region.
6    Q.   Are there separate and distinct
7  initiatives that DUAT and DRUG undertakes?
8    A.   I'm not sure I understand the
9  question.
10    Q.   Actually, we could turn to page 32.
11    MS. NUSSBAUM: So you've withdrawn
12  that question?
13    MR. JAMES: Yes, I've withdrawn that
14  question.
15    Q.   With regard to the words "neuropathic
16  pain initiative," what does "initiative" mean in
17  this context?
18    MS. NUSSBAUM: If you know.
19    A.   I'm not sure about the details of this
20  particular initiative.
21    Q.   Do you know if sponsors are assigned
22  to particular initiatives, it was referring to
23  regional divisional sponsors?
24    Are they assigned to particular
25  initiatives?

Page 361

A. Carver

1
2    A.   No, that is not the context, I
3  believe, in terms of how that is used here. If I
4  wasn't clear, the regional sponsor would be -- is
5  the sponsor of this whole effort and so,
6  therefore, it's the medical director who is the
7  sponsor of the physicians' efforts in addressing
8  drug usage issues via the DUAT.
9    And so, it's not a sponsor of an
10  individual initiative, it's more of a --
11    Q.   The entire program?
12    A.   The umbrella sponsorship of a program.
13    Q.   And the final category is pharmacy
14  leaders on the first page, again?
15    A.   Yes.
16    Q.   And those are who?
17    A.   The pharmacy leaders are a better term
18  would be the area pharmacy directors, so that
19  would be the pharmacy director and each of the
20  respective service areas that have responsibility
21  for pharmacy services inpatient, outpatient, etc.
22    Q.   And they refer to leaders because
23  they're leaders in their particular area or
24  because they're --
25    MS. NUSSBAUM: Objection.

Page 362

A. Carver

1
2    The witness has stated who they are
3  and what they do.
4    Q.   Is it true that they are not assigned
5  to particular initiatives either?
6    A.   That's correct. They are -- this is
7  a -- the reason I use the -- a better term being
8  the area of pharmacy director is this leader term
9  was something that was in vogue a few years ago,
10  but I think that a better descriptor of their
11  position would be an area pharmacy director
12  unrelated to any initiatives. They are
13  responsible for the management and the delivery of
14  pharmacy services in a respective geographic area.
15    Q.   And would they typically have a
16  pharmacy background?
17    A.   Yes, each of them are pharmacists.
18    Q.   Are they Permanente Group employees?
19    A.   No, they are not.
20    Q.   Are they employees of one of the
21  plaintiffs?
22    A.   Yes, they are.
23    Q.   I guess it would not be the hospital,
24  it would be the Kaiser Foundation Health Plan, is
25  that correct?

Page 363

A. Carver

1       A. Carver
2    A.   That's correct.
3    Q.   Do individuals within this category
4  report up to you?
5         MS. NUSSBAUM: Within which category?
6    Q.   This pharmacy leaders category?
7    A.    Indirectly, what does the
8  organizational structure look like? I -- this was
9  asked and answered yesterday, I believe.  You want
10 to know between the pharmacy leaders and the
11 witness what the levels are?
12   Q.   Yes.
13        MS. NUSSBAUM: Just not anything we
14 did yesterday, please.
15   A.    There is a position -- an
16 individual -- a position called the pharmacy
17 operations leader that is my direct report, and a
18 better term, better descriptive term for the
19 pharmacy operations leader would be the regional
20 pharmacy director.
21        So, in this case, a regional pharmacy
22 director for southern California.  That individual
23 by position is the supervisor or manager of these
24 pharmacy leaders, otherwise known as the area
25 pharmacy directors.

Page 364

1       A. Carver
2    Q.   Aside from receiving these executive
3  scorecards, do these pharmacy leaders or area
4  pharmacy managers participate in DUAT in other
5  ways?
6         MS. NUSSBAUM: If you know.
7    A.   The area pharmacy leaders participate
8  in the area DUAT activities.
9    Q.   And what activities would those be?
10        MS. NUSSBAUM: Once again, if you
11 know, if there's specific activities that are
12 engaged in an area specifically --
13   A.   The activities would be the same
14 activities executed at the area level as the
15 regional initiatives.
16   Q.   I think earlier we discussed
17 videoconferences and meetings.
18        Are there other activities that come
19 to mind?
20   A.   Not specifically.
21   Q.   Turning to page 32 again, did you have
22 any knowledge regarding the neuropathic pain
23 initiative?
24   A.   Not specific knowledge; no.  I believe
25 I previously testified that I'm not part of that

Page 365

1       A. Carver
2  DUAT committee or group.
3    Q.   Do any of the pharmacy leaders or the
4  regional pharmacy directors inform you of DUAT
5  activities?
6    A.   No, they do not.
7    Q.   Do you receive this executive
8  scorecard directly or is it something that you've
9  seen because one of your reports has brought it to
10 your attention?
11   A.   Yes, because one of my reports has
12 brought it to my attention and I would be, and
13 I've on occasion been forwarded similar reports.
14   Q.   For what reason do individuals forward
15 this report to you?
16        MS. NUSSBAUM: You know, I would
17 object.  I think the witness has already testified
18 this particular report was not forwarded to him.
19 He did not see this report outside preparation for
20 this deposition.  He has no knowledge of what's
21 contained in this report.  If, on occasion,
22 another report once or twice was forwarded to him,
23 you know, what is the relevance of that?
24   Q.   You can answer the question if you
25 understand it.

Page 366

1       A. Carver
2         MS. NUSSBAUM: If you recall
3  specifically, if in the past you saw a different
4  report and if you specifically recall why somebody
5  showed you that report.
6         MR. JAMES: If you want to read back
7  my original question rather than Ms. Nussbaum's
8  question.
9         (Record read.)
10        MS. NUSSBAUM: And that assumes a fact
11 not in evidence, which was this report was
12 forwarded, which he's already testified it wasn't.
13        If you want to ask if on the
14 occasions, the rare occasions that he's received a
15 report, does he specifically recall why it
16 was forwarded to him, I would let him answer that
17 question.
18   A.   I believe just for general
19 information.
20   Q.   If you turn to page -- turn to page
21 33, do you have an understanding of how to read
22 this table?
23   A.   I do not.  I'm just not sure of the
24 metrics that go into or the formulas that go
25 into --

40  (Pages 363 to 366)

Page 367

A. Carver

1
2     MS. NUSSBAUM: Please do not
3  speculate. The witness has testified he didn't
4  receive this document in the ordinary course of
5  business. He didn't write it, he did not
6  participate. Please do not speculate.
7     Q.   Is this a kind of a metric that's
8  often used in executive reports, or executive
9  scorecards, rather?
10     MS. NUSSBAUM: Objection. Do you
11  understand the question?
12     A.   I do in terms -- I understand the
13  question.
14     MS. NUSSBAUM: Do you have any
15  specific knowledge?
16     A.   I don't have specific knowledge
17  regarding the specific metrics that are used for
18  the various initiatives, and then therefore the
19  development of specific metrics or the reporting
20  of those specific metrics other than, you know,
21  there's a metric that's being used here.
22     Q.   If you could turn to the following
23  page, do you have an understanding of what this
24  table means?
25     MS. NUSSBAUM: Please don't speculate

Page 368

A. Carver

1
2  if you don't specifically know.
3     A.   I'm afraid I would have to speculate
4  because I don't know. I didn't create the table,
5  nor create the algorithms that went into the
6  preparation of the table.
7     Q.   I guess I wanted to focus, not on how
8  the table was created so much as how a reader
9  would understand this table.
10     And I was wondering whether you just
11  know how to understand --
12     A.   The information that's being presented
13  here as opposed to how it was created?
14     MS. NUSSBAUM: I think the witness has
15  indicated he did not receive this document. He
16  didn't regularly receive these reports, and that
17  he's not familiar with this table. So, I would
18  ask that he not speculate because his view would
19  be no more relevant than yours or mine.
20     Q.   Is it true that your view regarding
21  this table would likely be no more informative,
22  than mine or Ms. Nussbaum's?
23     A.   I'm not certain of that, but I may --
24  I may misinterpret something because it would be
25  an interpretation on my part. And so -- and I

Page 369

A. Carver

1
2  don't want to stack up how the three of us would
3  do on the interpretation here. I might come out
4  ahead, but maybe just slightly. I'm not sure.
5     Q.   Was it your testimony that you've only
6  received executive scorecards on a small handful
7  of occasions?
8     A.   Yes, that is correct.
9     Q.   Do you know roughly when DUAT began
10  creating these executive scorecards?
11     A.   I don't specifically. I believe that
12  I testified that the DUAT was created in around
13  the year 2000. And sometime subsequent to that
14  creation of DUAT, information was used to report
15  progress.
16     Q.   Prior to the creation of DUAT in 2000,
17  was there any group within Kaiser that, or
18  Permanente Group that had a similar function?
19     A.   There was not.
20     Q.   Were you involved in, personally
21  involved in the discussions that led to the
22  creation of DUAT?
23     A.   Yes, I was, at a high level.
24     Q.   When did those discussions take place?
25     A.   And -- if I recall correctly --

Page 370

A. Carver

1
2     MS. NUSSBAUM: Well, I would ask you
3  if you don't think you recall correctly not to
4  speculate or testify.
5     A.   I do recall correctly, but perhaps not
6  specifically regarding the date, but in the late
7  1990s, 1998-ish, McKenzie & Company spent some
8  time with us and provided some ideas regarding how
9  to better approach drug use management. And then
10  out of that effort became then an organized
11  process known as DUAT and DRUG. And that occurred
12  late 1990s and was certainly, I have a
13  recollection of right about the beginning of the
14  year 2000, the commissioning, the chartering and
15  the beginning of these groups.
16     Q.   Who else at Kaiser was involved in
17  these discussions?
18     A.   At the time, Dr. Joel Hyatt in
19  southern California, Dr. Sharon Levine in northern
20  California, I can recall specifically. Beyond
21  that, I don't recall.
22     Q.   Do you know the types of people who
23  might have been involved other than the two
24  individuals that you named?
25     MS. NUSSBAUM: By "types," you mean

Page 371

```
 1              A. Carver
 2  job categories of people?
 3         MR. JAMES: By job categories.
 4         MS. NUSSBAUM: If you specifically
 5  know.
 6     A.   Yeah, I don't recall specifically, but
 7  each of these individuals are very high level
 8  Permanente physician leader people within the
 9  respective medical groups.
10     Q.   Any other outside advisories involved
11  other than McKenzie?
12     A.   No, and McKenzie was not involved
13  specifically in the chartering of DUAT and DRUG.
14  Theirs was more of a concept recommendation.
15         MR. JAMES: I'd like to mark one more
16  exhibit.
17         I made a decision that's going to save
18  us some time. Can I unmark the exhibit?
19     Q.   Beyond these DUAT scorecards that
20  we've looked at, are there any other drug
21  utilization reports that you personally receive?
22     A.   The only drug use reports that I
23  receive on a regular basis are just reports of
24  expenditure and prescriptions within a variety of
25  therapeutic categories, any therapeutic categories
```

Page 372

```
 1              A. Carver
 2  I guess. That's just a normal business report
 3  that I receive, and I don't believe there are any
 4  other reports specific to drugs and that report is
 5  not specific to individual drugs. It references
 6  just broad therapeutic categories of drugs.
 7     Q.   And that shows expenditures and other
 8  information?
 9     A.   Well, the dollar expenditures and
10  the -- and the number of prescriptions and
11  therefore, prescription utilization rates. And
12  that's essentially it.
13     Q.   How often do you receive those
14  reports?
15     A.   Monthly.
16     Q.   And how long have you been receiving
17  them?
18     A.   I don't recall specifically, but for,
19  you know, the last few years, but I can't -- I
20  can't be specific on what "few" means. I'm not
21  trying to be evasive. I just don't recall
22  specifically.
23     Q.   Do you know whether prior to 2000 you
24  were receiving reports like this?
25     A.   I don't. I just don't recall. I'm
```

Page 373

```
 1              A. Carver
 2  sorry.
 3     Q.   Are you aware of drug utilization
 4  reports that other people receive that you don't
 5  receive on a regular basis, you know, again,
 6  excluding this day, what the scorecard that we've
 7  already gone over?
 8     A.   I'm not aware, no, regarding what
 9  other -- what reports other individuals besides
10  myself may receive or to testify to that
11  authoritatively at all.
12     Q.   Do you view these reports that you
13  receive every month just for general information
14  or do you have any specific purpose in mind when
15  you review these documents?
16         MS. NUSSBAUM: I would object. Are
17  you talking about the particular report that he
18  just told you he receives monthly?
19         MR. JAMES: Yes.
20         MS. NUSSBAUM: You want to know if
21  it's just for general information or if there's
22  some specific use that he puts the report to?
23         MR. JAMES: Yes.
24     A.   I use it for the purpose of generally
25  tracking the overall costs on an ongoing basis,
```

Page 374

```
 1              A. Carver
 2  and also that information is used when we are
 3  trying to assess our prospective costs in the
 4  future.
 5     Q.   With regard to the first purpose of
 6  tracking ongoing costs, why do you do that?
 7     A.   Well, why we do it, it's a basic
 8  business function from the standpoint of, I
 9  believe that I explained yesterday that we -- we
10  provide prescription drug benefits to various
11  groups of individuals, and so it's important for
12  us to track what our costs are and then also to be
13  able to reasonably, accurately estimate our costs
14  for the future given we prospectively set our
15  rates for prescription drugs well in advance of --
16  of our actually -- our delivery of those
17  prescription or pharmacy services. So that's
18  generally it. It's just for general business
19  purposes, I would say.
20     Q.   Before these reports were produced,
21  was there another means of tracking ongoing costs?
22     A.   Not that was very elegant and it was a
23  matter of primarily just referring to financial
24  reports on how much money did you spend on drugs
25  during the previous year and/or during the
```

A. Carver

1          A. Carver
2  previous month, and it just has become more
3  important with the escalating costs of
4  pharmaceuticals to be able to understand what are
5  the drivers or what are the therapeutic categories
6  for which we are spending substantial amounts of
7  money and what might that look like in the future.
8          Q.    So prior to these reports being
9  created, there wasn't a way to really look at
10 costs for particular therapeutic categories, is
11 that right?
12         MS. NUSSBAUM:  Asked and answered.
13         A.    That's correct.  Not in any kind of a
14 sophisticated manner.
15         Q.    Was anyone charged with the
16 responsibility of tracking costs by therapeutic
17 category, I guess, from 1994 forward?
18         MS. NUSSBAUM:  If you know.
19         A.    I don't know.  Not that I recall
20 specifically.
21         Q.    Today, aside from you personally
22 reviewing these reports every month, are there
23 other individuals who have reviewed these reports
24 to track costs on an ongoing basis?
25         A.    Yes, I forwarded the particular report

1          A. Carver
2  that I use to, or to various people on my staff.
3          (Kaiser-17 marked for identification.)
4          Q.    Actually, I guess, look at the cover
5  page to -- this might help you know what the
6  document is, and then if you could turn to the
7  page that has the Bates stamp KIS001464, that's
8  the page I will be asking a question about.
9          A.    Okay.
10         Q.    Do you know what this document is?
11         A.    I do.  This is the pharmacy and
12 therapeutics committee minutes from December 12,
13 2001 from the TPMG, The Permanente Medical Group
14 in northern California.
15         Q.    What does TPMG stand for?
16         A.    The Permanente Medical Group.
17         Q.    Is it correct that you're a member of
18 the pharmacy and therapeutics committee for
19 northern California?
20         A.    It is, correct.
21         Q.    Do you have any recollection of
22 personally attending this meeting?
23         A.    Not from six years ago.  Other than
24 I'm listed there, but I don't have independent
25 recollection of six years ago.

1          A. Carver
2          Q.    And on the page marked KIS001464,
3  under .13.3, there's a statement that,
4  "Gabapentin, Neurontin:  Request to designate
5  Gabapentin a non-detailable formulary product."
6          Do you have an understanding of what
7  that request is?
8          A.    I do.
9          Q.    And what is that a request for?
10         A.    It's a request for, just as it's
11 stated there, to deem Gabapentin a product for
12 which pharmaceutical manufacture or
13 representatives would not be able to detail
14 physicians regarding, you know, individual
15 physicians regarding the use of the product.
16         Q.    Was it the policy at the time that
17 this document was created that as a general matter
18 manufacturer's representatives could detail
19 physicians regarding formulary products?
20         A.    Yes, that's correct.
21         Q.    And was it also the case that certain
22 drugs were designated as non-detailable?
23         A.    Yes, that is also correct.
24         Q.    And how is it this -- I'll call it a
25 restriction, if there's a better word for it, let

1          A. Carver
2  me know, but how is this restriction enforced?
3          MS. NUSSBAUM:  If you know.
4          A.    I don't know specifically other than
5  generally we'd make known to the manufacturers
6  situations in which a product is non-detailable as
7  we do when a product is removed from the
8  formulary, but I don't know specifically how we
9  implemented this particular recommendation.
10         Q.    What was the testimony that you
11 informed the manufacturer that the product is
12 non-detailable?
13         A.    My testimony is that generally we
14 would do that.  I don't -- I don't know from five
15 years ago or six years ago now if a letter was
16 specifically sent to Pfizer or not.  I'm sorry.  I
17 just don't know.
18         Q.    Are physicians also notified that the
19 particular product is non-detailable?
20         MS. NUSSBAUM:  If you know.
21         A.    Physicians are distributed the outcome
22 of formulary decisions basically from the P&T
23 committee.
24         Q.    Are you aware of any recent problems
25 that you've had with a manufacturer being told

A. Carver

2 that a product is non-detailable, but the
3 manufacturer nonetheless sends representatives to
4 detail Kaiser physicians regarding the same
5 product?
6          MS. NUSSBAUM: Objection.
7          I think that is speculative. It's
8 hypothetical and I would ask that the witness not
9 answer.
10     A.   I can't answer that because I don't
11 know.
12     Q.   Actually, that's all I wanted to know,
13 whether you know of any instances.
14     A.   Yeah, I don't know.
15     Q.   Do you know the reasons that this
16 request was made to designate Gabapentin a
17 non-detailable formulary product?
18     A.   I would only speculate based upon --
19          MS. NUSSBAUM: I'd ask you not to
20 speculate.
21     A.   So the answer to that would be no.
22     Q.   So either in your personal capacity or
23 in your corporate capacity, you don't know the
24 reasons that this request was made?
25     A.   I don't recall the reasons, yes.

A. Carver

2     Q.   As a matter of general policy now,
3 turning away from this decision years ago, just as
4 a general policy matter today, what are the
5 reasons that -- well, actually, first I should ask
6 you: Is it still the case today that sometimes
7 requests are made to designate certain
8 prescription drugs as non-detailable formulary
9 products?
10     A.   Yes, it is.
11     Q.   And does it remain the case today that
12 the general policy is that drugs are detailable
13 and that certain drugs are excluded from that?
14          MS. NUSSBAUM: I don't think the
15 witness has ever said that that was the general
16 policy. If you want to give him a particular time
17 frame and ask whether or not there was any general
18 policy, you can do that.
19     Q.   I think you said that at the time this
20 document was created, as a general matter
21 formulary drugs were detailable, but that requests
22 would be made to designate certain drugs as
23 non-detailable formulary products?
24     A.   That's correct.
25     Q.   Does that remain the case today?

A. Carver

2     A.   Yes, it does.
3     Q.   And today when such a request is made,
4 what are the reasons given for that -- for that
5 request?
6          MS. NUSSBAUM: If you know, and if
7 there are reasons that are general reasons as
8 opposed to particular reasons with particular
9 products.
10     A.   One of the general reasons is related
11 to the concern or the prospect for inappropriate
12 or over-utilization of a particular product and
13 there may be an antibiotic -- as an example, I'll
14 give you an example.
15          There may be an antibiotic as an
16 example that may be a very powerful antibiotic
17 that would be added to the formulary that would
18 hopefully be prescribed primarily by infectious
19 disease physicians, but as I've stated, there's
20 really not anything to prohibit a family practice
21 physician or infectious disease physician from
22 prescribing that antibiotic, if they felt it
23 was medically necessary.
24          This effort -- and so, certainly we
25 would not want -- just because a product has been

A. Carver

2 deemed a formulary product, and because we
3 generally allow detailing of products, we would
4 not want the detailing of family practitioners and
5 infectious disease physicians regarding the use of
6 this antibiotic if the intent was to have it, you
7 know, used by the infectious disease
8 subspecialists.
9          So, I hope that would give you an
10 example of a reason that we would use today for
11 deeming a formulary product non-detailable.
12     Q.   How does Kaiser know if certain drugs
13 are being overutilized?
14          MS. NUSSBAUM: Only if you understand
15 that question and can answer it without
16 speculating.
17     A.   I would be speculating because I'm not
18 the individual that's charged with determining the
19 appropriate utilization or the utilization of a
20 product.
21     Q.   Who is that person?
22     A.   The prescribing is done by our
23 physicians, and so the physicians are key in any
24 such decision as well as bodies that we have
25 spoken about over the last two days here, the P&T

Page 383

A. Carver

1
2  committee, as well as the DUAT and DRUG groups,
3  who are charged with -- specifically the DUAT and
4  DRUG who are charged at a high level with trying
5  to assure appropriate utilization of medications.
6       Q.  Besides over-utilization, what other
7  reasons might, as a general matter, be given for
8  designating a prescription drug as a
9  non-detailable formulary product?
10       A.  There may be a safety concern about a
11  particular product also, in which the product
12  would be left best to -- I'm talking about a very
13  serious safety concern in which a product would be
14  left best prescribed by some specialist or
15  subspecialist group of individuals.  So,
16  therefore, again by definition, if it's added to
17  the formulary because it's effective, then the
18  physicians generally may not want to have other
19  nonspecialists being detailed or having a
20  particular product promoted to them, so I would
21  say for reasons for safety as well as the
22  potential for over-utilization.
23       Q.  Aside from safety and
24  over-utilization, are there any other reasons that
25  come to mind?

Page 384

A. Carver

1
2       MS. NUSSBAUM:  These are general
3  reasons?
4       MR. JAMES:  Yes.
5       MS. NUSSBAUM:  If you know, and don't
6  speculate.
7       A.  Those are the two that come to my
8  mind.
9       Q.  This document appears to be dated
10  December 12, 2001.  Do you have -- do you have any
11  knowledge as to when this request was actually
12  implemented?
13       Well, actually, first, I guess I
14  should take a step back.  Was this request
15  approved?
16       A.  The record here reflects that it was.
17       Q.  And do you know when this request
18  would have been actually put into place?
19       MS. NUSSBAUM:  If it was.
20       A.  I don't recall.
21       Q.  And today, typically when a request
22  like this is made and approved, about how long
23  does it take for the request to be put into
24  effect?
25       MS. NUSSBAUM:  If there is a typical

Page 385

A. Carver

1
2  situation.
3       A.  I would estimate three months or so.
4  Given there's notifications, etc., that need to
5  occur.
6       Q.  Do you have any sense of whether that
7  approximate time has changed over the last seven
8  years or so?
9       A.  I do not.
10       Q.  Have you had any reports of the
11  defendant's representatives detailing any Kaiser
12  physician following the approval of this request?
13       MS. NUSSBAUM:  Has he personally had
14  any reports prior to the date that this request
15  was approved?
16       MR. JAMES:  No, not prior, actually
17  after the request was approved.
18       MS. NUSSBAUM:  Do you want to know
19  after December 12, 2001, has he personally
20  received any reports with respect to detailing by
21  Pfizer for Neurontin?
22       MR. JAMES:  Right.
23       Q.  Either in your personal capacity or in
24  preparation for this deposition, have you had any
25  knowledge of any Pfizer representative detailing a

Page 386

A. Carver

1
2  Kaiser physician?
3       A.  I have not.  I've not seen any
4  reports, nor has anything been called to my
5  attention.  I just do not know.
6       (Kaiser-18 marked for identification.)
7       Q.  Okay.  How do you recognize this
8  document?
9       A.  I do not recognize the document.  I've
10  not seen it before today.
11       Q.  Do you know if this e-mail address
12  after the word "to" is?  It's DWNY-SCAL?
13       A.  I do.  That references a location,
14  Downy, in the southern California region, and then
15  to the drug information inquiry service, which is
16  located in Downy in southern California.
17       Q.  Is that an e-mail address for the
18  overall Drug Information Service?
19       A.  Yes, I believe it is.
20       Q.  Is that for the entire southern
21  California region?
22       A.  Yes, it is.
23       Q.  Are there a number of individuals who
24  receive any e-mails sent to this address?
25       A.  I believe that's a repository to

Page 387

A. Carver

1        A. Carver
2   which inquiries flow, and then from which, you
3   know, the queue of them is worked down and
4   answered. And so it's a general e-mail box, I'll
5   call it.
6        Q.   Is Debbie Kubota the -- who is
7   apparently the author of this e-mail -- employed
8   by the Drug Information Service?
9        A.   Yes, she is.
10        Q.   Do you know whether DUAT had promoted
11   the use of Nortriptyline and desipramine in lieu
12   of Neurontin for neuropathic pain?
13        MS. NUSSBAUM:  Only if you have
14   personal knowledge. Don't speculate. Since you
15   were not copied on this document and you're not
16   the author of this document, if your knowledge is
17   not personal knowledge based on your knowledge, as
18   opposed to this document, please don't speculate.
19        A.   Could you ask -- ask the question
20   again, please?
21        Q.   Right. And I'll preface it just by
22   saying that if you have -- I mean, if it helps you
23   to look at this document, that's fine.
24        But, you know, separate and apart from
25   the document, do you either have personal

Page 388

A. Carver

1        A. Carver
2   knowledge or knowledge as Kaiser's corporate
3   representative that DUAT is promoting the use of
4   Nortriptyline and desipramine in lieu of Neurontin
5   for neuropathic pain?
6        A.   I believe that was the case; however,
7   I do not know precisely the time period.
8        Q.   And just from your personal knowledge
9   as a pharmacist, do you know whether nortriptyline
10   and desipramine are tricyclic antidepressants?
11        A.   Yes, I do. And yes, they are.
12        Q.   Do you know if tricyclic
13   antidepressants are FDA approved for neuropathic
14   pain?
15        A.   I do not know independently off the
16   top of my head.
17        Q.   And as a pharmacist, do you know what
18   the term "contraindicated" means?
19        A.   Contraindicated, yes, I do. I know
20   the term and it means they should not be used.
21        Q.   Do you know the reasons why --
22        A.   Should be avoided.
23        Q.   Do you know why a particular drug
24   might be contraindicated for a set of individuals?
25        MS. NUSSBAUM:  It calls for

Page 389

A. Carver

1        A. Carver
2   speculation. He's not here as an expert witness.
3   He's defined the term. I think we should move on.
4        MR. JAMES:  I'll withdraw that
5   question.
6        Q.   Do you know what the term
7   "anticholinergic" means?
8        A.   I do generally.
9        Q.   What does it mean?
10        A.   It means side effects such as dry
11   mouth, urinary retention, and other side effects
12   that I've probably forgotten.
13        Q.   Do you know, again, from your personal
14   knowledge, whether TCAs are believed to have these
15   sorts of properties with regard to the elderly?
16        MS. NUSSBAUM:  Only if you have
17   specific personal knowledge, and please don't rely
18   on the e-mail which you didn't receive or anything
19   else.
20        A.   I'm not well-versed on the use of the
21   various TCAs and their appropriateness in the use
22   of the elderly.
23        Q.   Do you know who Rod St. John is?
24        A.   I do.
25        Q.   And who is he?

Page 390

A. Carver

1        A. Carver
2        A.   Rod St. John was a project manager
3   basically that, I believe, that was involved in
4   the preparation of some of those tables that I
5   wasn't able to interpret for you.
6        Q.   What kind of educational background
7   does he have?
8        A.   I'm sorry. I do not know.
9        Q.   Do you know what sort of job function
10   he has? You've told me the title project manager,
11   but what does that involve?
12        A.   He supports the DUAT process by
13   putting together the scorecards and the like.
14   That's my general impression. I don't supervise
15   Rod St. John, so I don't know any more detail
16   other than that.
17        Q.   Do you know whether or not he has a
18   medical background?
19        A.   I do not know. He's not a physician,
20   I can assert that.
21        Q.   And do you know if he has any pharmacy
22   background?
23        MS. NUSSBAUM:  The witness already
24   said he doesn't know. I think we should just move
25   on.

Page 391

A. Carver

1
2    Q.   You can answer the question.
3    A.   I'm sorry.  I do not know.  He's not a
4  pharmacist, nor is he a physician, but I don't
5  know what his background is specifically.
6    Q.   Do you know if in his role as a
7  project manager he makes requests to the Drug
8  Information Service?
9        MS. NUSSBAUM:  You're calling for
10  speculation.  You know he's said three times he
11  really doesn't know exactly what this person does
12  or what his background is.
13    A.   Yeah, I don't know independently.  Had
14  I not seen this memo, I wouldn't have any idea
15  whether or not he would have made inquiries of the
16  Drug Information Service.
17    Q.   Do you have any understanding of what
18  this e-mail states, that Rod St. John wanted from
19  the Drug Information Service?
20        MS. NUSSBAUM:  The witness has already
21  stated he's never seen it, he's not the author,
22  he's not a recipient, so I'm not going to let him
23  speculate as to some understanding of an e-mail
24  that he's never seen, he didn't author, and he
25  doesn't know anything about.

Page 392

A. Carver

1
2    A.   All I can say from reading the article
3  is that he's requesting a Med Line search.
4    Q.   What does a Med Line search involve?
5    A.   It's a mainframe search of the
6  literature that's being requested of Mary White,
7  who is our medical librarian, the details of how
8  the medical librarian would go about initiating or
9  conducting a search, I don't know.  That's why we
10  have a medical librarian to do these things for
11  us.
12    Q.   Do you know whether you can pull up
13  studies regarding prescription drugs from Med
14  Line?
15        MS. NUSSBAUM:  Objection, you know --
16    Q.   You can answer from your personal
17  knowledge.
18        MS. NUSSBAUM:  I mean, I would object
19  to continued inquiries about this e-mail that this
20  witness has said he really knows nothing about.
21        MR. JAMES:  I'm not referring to the
22  e-mail specifically.
23    Q.   Do you know whether you can obtain
24  studies regarding prescription drugs from Med
25  Line?

Page 393

A. Carver

1
2        MS. NUSSBAUM:  When?  During the
3  entire period here?  Recently?  At the time of
4  this e-mail?  In 2003?  I would suggest that Med
5  Line is a third party that you can just as easily
6  as he research what kind of information you can
7  get from them.
8    Q.   Do you have personal knowledge
9  regarding this matter?
10    A.   I've never done a Med Line search
11  personally.
12    Q.   Do you have an understanding of what
13  sort of information Med Line provides?
14    A.   My general understanding would be that
15  it provides the ability to ask questions and have
16  specific studies presented that would be
17  responsive to the request that was placed into the
18  Med Line search.  But I have no more detailed
19  knowledge than that.
20    Q.   Do you have any knowledge if there's
21  articles that are available on Med Line that may
22  not actually involve actual studies?
23    A.   I do not.
24        (Kaiser-19 marked for identification.)
25    Q.   Have you seen this document before?

Page 394

A. Carver

1
2    A.   I have not.
3    Q.   Do you know who John, I'm not sure
4  quite how to pronounce it, Zweig?
5    A.   John Zweig is a physician in northern
6  California.  I believe he is a --
7        MS. NUSSBAUM:  Well, don't speculate.
8  He's a physician.  Don't speculate, please.
9    Q.   Do you know anything other -- about
10  Mr. Zweig than the fact that he's a physician in
11  northern California?
12    A.   No, I don't.
13    Q.   Do you know if he has any
14  administrative role in the Permanente Group aside
15  from his medical responsibilities?
16    A.   John Zweig is a P&T chair for one of
17  the areas in northern California.
18    Q.   Below the P&T committee, are there
19  separate, sort of P&T committees in each area
20  within the region?
21    A.   There are.
22    Q.   About how many areas are there within
23  southern California?
24    A.   About 11.
25    Q.   Those P&T committees do not make

A. Carver

1          A. Carver
2  formulary decisions or is that an incorrect
3  statement?
4      A.   It is a correct statement that those
5  area P&T committees do not make formulary
6  decisions.  The regional P&T makes formulary
7  decisions.
8      Q.   What sort of decisions does an area
9  P&T committee make?
10         MS. NUSSBAUM:  You know, this is
11 really asked and answered.  We went through this
12 at length yesterday and again today, and you know,
13 we have very little time left, so I'd really
14 suggest that if you have new material, we do it.
15         MR. JAMES:  Actually, going back to my
16 old question.
17     Q.   Do you have any recollection of
18 discussing area P&T committees yesterday?
19     A.   I believe that I testified that the
20 regional P&T committee was comprised of the chairs
21 of the area P&T committees.
22     Q.   Have you described the functions of
23 the regional P&T committees before?
24     A.   I don't recall doing that.
25     Q.   Can you please tell me what those

A. Carver

1          A. Carver
2  functions are?
3      A.   The area P&T committee is a medical
4  staff committee that's charged with the overall
5  drug use decisions primarily for the hospital.
6  Given we operate hospitals, it's a required
7  committee in order -- a requirement for hospitals
8  to have a P&T committee and so, that's why it
9  exists.
10         It spends a fair amount of time
11 related then to the distribution, the use of,
12 etc., drugs in the acute care hospital, in the
13 emergency room, and then also is involved in some
14 discussion regarding potential or prospective
15 regional P&T committee decisions as it relates to
16 specific drugs.
17         So that's about as concise of a review
18 of an area P&T that I can give you.
19     Q.   That was very helpful.
20         Is the formulary applicable to drugs
21 that have been administered in hospitals?
22     A.   Yes, it is.
23     Q.   And how are these drug-use decisions
24 that are made by the area P&T committees -- well,
25 actually, how do they operate?  I mean, they

A. Carver

1          A. Carver
2  obviously don't affect the formulary.  How do they
3  have an effect on the delivery of drugs in
4  hospitals?
5          MS. NUSSBAUM:  If they do.  And if you
6  know.
7      A.   A lot of their time is spent on just
8  the drug delivery system, the evaluation of
9  adverse drug events that may occur.  The
10 exercising the responsibility as it relates to
11 drug use evaluation in which there's generally --
12 it's not a big effort, but it's the evaluation of
13 a particular drug that's used in the hospital to
14 assure that it's appropriate for use.
15         Evaluating opportunities for improving
16 safety of the medication distribution system in
17 the hospital.  There's a lot of area P&T committee
18 work or time that's spent on those kinds of
19 control and distribution of drugs in an acute care
20 hospital to hospitalized patients.
21     Q.   Is the end product of all these
22 evaluations a set of guidelines that's applicable
23 to hospitals?
24     A.   I would say that a better end product
25 would be described as the approval of policies and

A. Carver

1          A. Carver
2  procedures as it relates to the distribution and
3  use, more the distribution of products in the
4  acute care hospital versus focus on drug use
5  management or anything.
6      Q.   Have you ever had any communications
7  with Mr. Zweig -- or Dr. Zweig?
8      A.   Dr. Zweig.  I'm sure that I have over
9  the course of the years, but I -- I've had
10 personal chats with him at a P&T committee.
11 Whether or not he's ever corresponded with me, you
12 know, formally through other means, I don't know.
13 But nothing that stands out in my mind.
14     Q.   Would it be accurate to say that you
15 have no specific recollection of any discussions
16 with Dr. Zweig regarding the expenditure of money
17 on Neurontin or Gabapentin?
18     A.   That would be a fair characterization.
19 I can recall no discussions with Dr. Zweig
20 regarding expenditure for Gabapentin.
21     Q.   Do you know who Robin Dee is?  I'm
22 looking at the upper left corner of this document.
23     A.   Robin Dee, let's see, chief of
24 psychiatry.
25     Q.   Is that for a particular region or is

Page 399

A. Carver

1    that for a particular location?
2        A.   I believe the coordinating chief for
3    the -- chiefs of psychiatrists in northern
4    California.
5        Q.   Do you know Dr. Dee personally?
6        A.   I do not.
7        Q.   Would you -- have you ever heard
8    anyone at Kaiser express a sentiment similar to
9    the one that Dr. Zweig is making in his e-mail
10   message?
11          MS. NUSSBAUM:  Please don't speculate.
12   If you have a specific recollection of somebody
13   saying that to you, testify to it, but otherwise
14   please don't speculate.
15       A.   Could you repeat your question,
16   please?
17          MR. JAMES:  Could you read back the
18   question?
19          (Record read.)
20       A.   I cannot cite specific correspondence.
21       Q.   And take a moment to review Dr. Dee's
22   e-mail message.
23       A.   I would reference, you know, us back
24   to documents that were reviewed earlier today

Page 400

A. Carver

1    regarding some content they're regarding.  The
2    amount of money spent on Neurontin and -- and that
3    type of content.
4        So it's not that I have never seen
5    anything.  You know, you discussed such documents
6    with me earlier today, but I don't have, you know,
7    e-mails or notes specifically.
8        Q.   Has anyone at Kaiser or any Permanente
9    physician expressed views to you similar to those
10   expressed by Dr. Dee in her response?
11          MS. NUSSBAUM:  If you specifically
12   have any recollection of that.
13       A.   I do not have any specific
14   recollection.
15       Q.   Would you agree with the statement
16   that we must be careful when being astounded that
17   clinicians are using medications to augment the
18   treatment for very difficult and dangerous
19   conditions that frequently has death as a final
20   outcome?
21          MS. NUSSBAUM:  I would object.
22          This witness was not copied, did not
23   discuss, did not author, has never seen this
24   document.

Page 401

A. Carver

1          MR. JAMES:  I'm just asking whether
2    you personally agree or disagree with that
3    sentiment.
4          MS. NUSSBAUM:  Well, it's taken out of
5    context.  It's part of an e-mail.  We're not going
6    to let him speculate.
7        Q.   Are you unable to answer that
8    question?
9        A.   I'm unable to answer the question.
10          (Kaiser-20 marked for identification.)
11       Q.   Do you recognize this document?
12       A.   I do not.  I have never seen this
13   document before this minute.
14       Q.   Do you know who Mark Glatt is?
15       A.   Mark Glatt is a physician who was a
16   member of the P&T committee in northern
17   California.
18       Q.   That's the regional committee as
19   opposed to an area committee?
20       A.   Yes, he's on the regional committee,
21   and a member of a local committee as well.
22       Q.   Do you know who Mary Talaga is?
23       A.   Mary Talaga is one of those area
24   pharmacy directors that I referenced earlier in

Page 402

A. Carver

1    northern California.
2        Q.   And what about Cathlene Richmond?
3        A.   Cathlene Richmond is a pharmacist in
4    our Drug Information Service.
5        Q.   And are you acquainted with Jack
6    Rozance?
7        A.   Jack Rozance is a physician and chief,
8    which is comparable to another term, would be the
9    area medical director for one of the areas in
10   northern California.
11       Q.   Now, what about George Palma?
12       A.   I'm sorry.  I do not know that
13   individual.
14       Q.   And the last individual?
15       A.   I'm sorry.  I do not know that
16   individual either.
17       Q.   Have you had any communications with
18   Dr. Glatt?
19       A.   I have not.
20       Q.   Did anyone in July 2001 earlier
21   express an opinion to you that the reason for how
22   utilization of certain medications might be a
23   result of physicians being detailed by drug reps?
24          MS. NUSSBAUM:  Can you repeat the

Page 403

A. Carver

1       question?
2
3            MR. JAMES:  Could you read the
4       question back?
5            (Record read.)
6       A.   Not that I can recall, specifically to
7       me.
8       Q.   Are you aware of such sentiments being
9       expressed within Kaiser, there again in the same
10      time frame, July 2001 earlier?
11           MS. NUSSBAUM:  And what's -- repeat
12      your question?
13      Q.   I believe the sentiment was whether
14      the growth and utilization of prescription drugs
15      may be attributable to physicians being detailed
16      by drug reps?
17      A.   At that time in July of 2001, I just
18      do not recall.
19      Q.   Okay.
20           Or any time earlier?
21      A.   I don't recall.
22      Q.   In the e-mail from Brian Fitch,
23      there's a statement that, "These" -- which refers
24      to some medications including Neurontin -- "tend
25      to be less sedating, cause less weight gain and

Page 404

A. Carver

1       lack the hepatotoxicity of Tegretol and Depakote."
2       Has anyone, or actually has either
3       Kaiser or anyone acting on its behalf done any
4       analysis regarding this issue since 2001?
5
6            MS. NUSSBAUM:  Objection.
7            The witness has testified he's never
8       seen this, he didn't write it, he didn't receive
9       it.  Separate and apart from this e-mail, if you
10      want to ask him does he specifically know whether
11      or not in X time period Kaiser analyzed, he'll
12      answer it yes or no, but I don't want to tie any
13      questions to an e-mail that the guy has never
14      seen.
15           MR. JAMES:  I don't mean to tie the
16      information to the e-mail, except to the extent
17      that it helps you recall.
18           MS. NUSSBAUM:  He didn't recall.  He's
19      never seen that.  Let's put that down.  If you
20      have a question, ask the question.  If he can
21      answer it, he will and he won't speculate.
22      Q.   Since 2001, has Kaiser or anyone
23      acting on its behalf performed any analysis as to
24      whether Neurontin is less sedating, causes less
25      weight gain, or lacks the hepatotoxicity of

Page 405

A. Carver

1       Tegretol and Depakote?
2
3            MS. NUSSBAUM:  Do you know?
4       A.   I don't know specifically.
5       Q.   Do you know -- as a personal matter,
6       do you know what sorts of uses Tegretol and
7       Depakote have?
8            MS. NUSSBAUM:  Objection.
9            Do you want to know during what period
10      of time, what the -- if a specific pharmaceutical
11      product --
12      Q.   Or at any time, today, do you have any
13      knowledge to what uses Tegretol and Depakote --
14           MS. NUSSBAUM:  If you know without
15      specific to the PDR or something else.
16      A.   Depakote is an antiseizure medication.
17      Tegretol is used for at least trigeminal
18      neuralgia.
19      Q.   Does Depakote have any other uses
20      other than the use that you've just listed?
21           MS. NUSSBAUM:  If you specifically
22      know.
23      A.   I'm not certain.
24           MR. JAMES:  We'll take our break at
25      this time.

Page 406

A. Carver

1
2            VIDEOGRAPHER:  Going off the record at
3       2:30.  This is the end of tape four in the
4       deposition of Albert Carver.
5            (Recess.)
6            VIDEOGRAPHER:  Going back on the
7       record at 2:43 approximately.  This is the
8       beginning of tape five in the deposition of Albert
9       Carver.
10      BY MR. JAMES:
11      Q.   Could you turn back to Kaiser-3, which
12      is the Complaint?
13      A.   Yes.
14      Q.   I guess if you to turn page 65 of the
15      Complaint again, are there any alternative
16      medications listed for pain on this page?
17      A.   Not specifically.
18      Q.   Are there any listed that may be
19      applicable to pain in some more general sense?
20           MS. NUSSBAUM:  Are you including
21      aspirin or Ibuprofen or are you just looking at
22      the chart?
23      Q.   Actually, I should include those as
24      well.
25           MS. NUSSBAUM:  Including aspirin and

Page 407

```
1              A. Carver
2  Ibuprofen, he wants to know whether or not there
3  is any alternate medication that could be used for
4  pain.
5       A.   I'm confused, I'm sorry.
6       Q.   Actually, I want to withdraw the last
7  question.
8            We can set aside aspirin and
9  Ibuprofen.  I think you had answered my earlier
10 question by saying that there were not any listed
11 on this chart for pain specifically, and I was
12 wondering if you meant to qualify your answer
13 somehow by the word "specifically"?
14      A.   No.
15      Q.   You might turn to Kaiser-15, which is
16 the interrogatory responses, and setting aside
17 aspirin and Ibuprofen, do you know whether these
18 responses list any alternative medications to
19 Neurontin for pain?
20      A.   I believe that this -- this section
21 restates this table.
22      Q.   Okay.
23           Does either then state the name of a
24 alternative cheaper and more desirable medication
25 to Neurontin for pain?
```

Page 408

```
1              A. Carver
2       MS. NUSSBAUM:  Well --
3       Q.   Setting aside aspirin --
4       MS. NUSSBAUM:  Yeah, but why are you
5  excluding aspirin and Ibuprofen?  Aspirin and
6  Ibuprofen are listed in both the Complaint and the
7  response to the interrogatories as alternative
8  cheaper medications that could be used for some of
9  these conditions.
10      Q.   I mean, if you'd like to state, and I
11 can retrace my question that way and state:  Are
12 you aware of -- I guess it's a matter of whether I
13 say the words "aspirin" or "Ibuprofen" or you do.
14 If you prefer to answer the question, does page 65
15 of the Complaint or the interrogatory responses
16 which you state -- restate the information on page
17 65 of the Complaint, state the names of any
18 alternative cheaper or more desirable medications
19 to Neurontin for pain?
20      A.   Well, I believe that the -- what is
21 contained here, there were numerous alternative
22 medications that were cheaper and more optimal
23 than Neurontin to treat the conditions for which
24 dependents were touting Neurontin, including
25 several medications such as aspirin and Ibuprofen
```

Page 409

```
1              A. Carver
2  not ordinarily covered by plaintiff's formularies.
3            This, in my reading, does not limit
4  the claim to only the specific medical conditions,
5  but Neurontin was presumably also used off-label
6  for pain, for which in some situations aspirin and
7  Ibuprofen may very well be a cheaper alternative
8  as it relates to what is paid for by the plan.
9       Q.   I guess the question is:  Aside from
10 Aspirin and Ibuprofen, which you mentioned, does
11 either page 65 of the Complaint or the
12 interrogatory responses specifically identify any
13 alternative cheaper or more desirable medication
14 to Neurontin for pain?
15      MS. NUSSBAUM:  I think the documents
16 speak for themselves.  You know, the Complaint
17 indicates that these are some examples, okay, and
18 the interrogatory response indicates that it will
19 be supplemented, and it is the subject of expert
20 testimony and that it's premature.
21      Q.   You can answer my question.
22      A.   I would refer back to the answer that
23 I just previously gave, which it doesn't appear to
24 me that this is limiting the uses of Neurontin to
25 these specific conditions that are contained on
```

Page 410

```
1              A. Carver
2  this table or that are contained on the last
3  paragraph of page 7 of number 15.
4       Q.   No, I understand that.
5            I guess the question is:  Are there
6  any medications specifically identified that are
7  alternative cheaper or more desirable medications
8  to Neurontin for pain in either of these two
9  documents?
10      MS. NUSSBAUM:  Asked and answered.
11 The witness already said aspirin and Ibuprofen.
12      MR. JAMES:  Is that the total answer?
13      MS. NUSSBAUM:  Other than that, if
14 this is a reading test, he can read the chart and
15 the word "pain" does not appear on the chart.  So
16 if that's what you want him to do, just a reading
17 exercise, he can do that.
18      Q.   Is it correct that aspirin and
19 Ibuprofen are the only documents or medications
20 identified in either of these documents that has
21 an alternative cheaper or desirable medication to
22 Neurontin?
23      A.   That are contained on these two pages,
24 yes.
25      Q.   Actually, the document as a whole --
```

Page 411

```
 1              A. Carver
 2        MS. NUSSBAUM:  You want him to read
 3   the document as a whole?  I guess that we can
 4   finish your two hours doing that.
 5        Q.   All right.  Why don't you limit it to
 6   the shorter document.  You limit it to page 65 of
 7   the Complaint and the interrogatory responses.
 8   And your counsel previously had identified the
 9   first several pages as being legal gobbledygook,
10   so I think you can safely skip those.
11        A.   Well, I don't think I can answer your
12   question in terms of whether or not there is
13   anything else contained in this filing or these
14   documents that would state less costly
15   alternatives for the treatment of pain, if that's
16   your question.
17        Q.   It's actually a bit different.  It's
18   whether any medications are identified on page 65
19   of the Complaint or within the interrogatory
20   responses as being alternative cheaper and more
21   desirable medications to Neurontin for pain.
22        MS. NUSSBAUM:  You know, I really
23   think at this point that this is argumentative and
24   leading.  The answers to interrogatories state in
25   plain English, and I'm reading it, okay, it's
```

Page 412

```
 1              A. Carver
 2   objected to as premature and calling for expert
 3   testimony.
 4        MR. JAMES:  I wasn't really asking
 5   whether --
 6        MS. NUSSBAUM:  There's a right to
 7   supplement.
 8        MR. JAMES:  You definitely have a
 9   right to supplement, and I'm not -- I'm asking
10   whether --
11        MS. NUSSBAUM:  This is a reading
12   exercise right now.
13        Q.   As of this time, have you identified
14   on page 65 of the Complaint and in the
15   interrogatory responses any other drug other than
16   aspirin and Ibuprofen as being alternative cheaper
17   and more desirable medications to Neurontin for
18   pain?  I fully acknowledge that you may seek to
19   supplement this response at some point in the
20   future.
21        MS. NUSSBAUM:  By counsel, do you
22   understand, or I can just make a representation by
23   counsel so we can just move on.  Do you understand
24   his question?
25        THE WITNESS:  I think so.
```

Page 413

```
 1              A. Carver
 2        A.   The answer is no.
 3        Q.   Thank you.
 4        Does Kaiser presently know of any
 5   other alternative cheaper and more desirable
 6   medications to Neurontin for pain?
 7        MS. NUSSBAUM:  Objection.  Do not
 8   give any answer that would reflect any litigation
 9   strategy, discussion or discussions with either
10   Mr. Cohen or myself or any other lawyers with
11   respect to this litigation.
12        A.   I'm unable to answer your question.
13        Q.   Do you know of information regarding
14   that any of these other alternative cheaper or
15   more desirable medications to Neurontin for pain
16   that have not been identified in response to the
17   defendant's interrogatories?
18        MS. NUSSBAUM:  Repeat that question.
19        MR. JAMES:  You can read the question
20   back.
21        (Record read.)
22        MS. NUSSBAUM:  I think that's an
23   unintelligible question.
24        Q.   If you understand the question, you
25   can answer.
```

Page 414

```
 1              A. Carver
 2        MS. NUSSBAUM:  You want him to give a
 3   list like from the PDR?
 4        MR. JAMES:  I have initially asked
 5   him --
 6        MS. NUSSBAUM:  As to the category of
 7   medications for the treatment of pain?
 8        Q.   Do you understand the question?
 9        A.   Maybe you could state it very simply.
10        Q.   Did you indicate earlier that this
11   interrogatory response suggests that there may be
12   other alternative medications that are cheaper and
13   more desirable medications to Neurontin for
14   various off-label uses?
15        A.   I indicated --
16        MS. NUSSBAUM:  That's what it says.
17   It's a legal document and the document speaks for
18   itself.
19        Q.   Is that consistent with your prior
20   testimony?
21        A.   I believe it's consistent with my
22   testimony.
23        Q.   And I've asked you whether at this
24   time Kaiser knows of the identities of any of
25   those other alternative cheaper and more desirable
```

Page 415

A. Carver

1      A. Carver
2  medications to Neurontin for pain, you know, the
3  existence of which is possibly hinted at by the
4  interrogatory responses.
5      MS. NUSSBAUM:  Okay.  And let me
6  caution you that if your answer would include
7  information based on discussions that you've had
8  with myself, Mr. Cohen, others in legal counsel's
9  office with respect to this litigation, litigation
10 strategy, damage theory, expert testimony and the
11 like, please do not answer.
12     A.  That I'm unable to answer.
13         MR. JAMES:  Let's state for the record
14 that it appears that there may be additional
15 information responsive to the defendant's
16 discovery requests.  In fact, the plaintiffs are
17 withholding on the basis of attorney-client
18 privilege which they have yet to disclose to the
19 defendants.
20         MS. NUSSBAUM:  And I'll state for the
21 record that the exhibit that you've marked here,
22 Kaiser-15, which is a supplemental response to the
23 defendant's second set of interrogatories, also
24 contains certain objections to those
25 interrogatories, numerous objections, five pages

Page 416

1      A. Carver
2  worth of objections, including the fact that these
3  interrogatories are premature and call for expert
4  testimony, and there is a representation that
5  Kaiser reserves its rights to supplement up to and
6  through its expert reports the answers to this
7  interrogatory.
8      MR. JAMES:  Counsel, is it your
9  understanding that the right to supplement
10 includes the right to postpone the disclosure of
11 information that's presently known to you at the
12 time of the interrogatory response?
13         MS. NUSSBAUM:  Sir, nobody testified
14 that there's any information presently known,
15 okay?  Nobody testified to that.
16         MR. JAMES:  Are you denying that there
17 is any other information presently known, or are
18 you holding open the possibility that there is
19 information presently known that is being withheld
20 from the defendants?
21         MS. NUSSBAUM:  Nothing is being
22 withheld from the defendants.  We're taking a
23 consistent position, okay, as we've taken before
24 the magistrate judge on the record as reflected on
25 page 7 of Exhibit 15, that this is premature.

Page 417

1      A. Carver
2      MR. JAMES:  We can proceed on the
3  assumption --
4      MS. NUSSBAUM:  That expert testimony
5  and that it will be timely supplemented.
6      MR. JAMES:  I'll take it that the
7  responses provided are an accurate representation
8  of the plaintiffs' state of knowledge at the time
9  that the responses were provided.
10     Q.  Have any alternative cheaper and more
11 desirable medications to Neurontin for the
12 treatment of restless leg syndrome been identified
13 by the plaintiffs to the defendants?
14         MS. NUSSBAUM:  Objection.
15         Again, and I think that this is the
16 same exact line of questioning.  Maybe to move on
17 to get this done during the time period allotted,
18 we can stipulate that at present, the information
19 is contained on page 65 of the Complaint and the
20 objections and right to supplement and objections
21 as to prematurity is contained in Kaiser Exhibit
22 15, the interrogatory responses.
23     Q.  Can you stipulate that the objection
24 is not being used to withhold from disclosure
25 information presently known to Kaiser?

Page 418

1      A. Carver
2      MS. NUSSBAUM:  Nobody is withholding
3  anything from disclosure that should be disclosed.
4  Okay.  We have supplemented these responses
5  before.  These were supplemental responses that
6  were supplemented as soon as, under the rules, it
7  should have been supplemented.  And we will
8  continue to supplement responses as soon as it's
9  appropriate under the rules; okay?
10     Q.  As a personal matter when you
11 authorized filing of this suit, were you aware of
12 any alternative cheaper and more desirable
13 medications to Neurontin for the treatment of
14 restless leg syndrome excluding any discussions
15 with counsel?
16         MS. NUSSBAUM:  As a personal matter?
17         MR. JAMES:  Yes.
18         MS. NUSSBAUM:  Was he personally
19 aware, not on behalf of Kaiser, as to himself?
20         MR. JAMES:  Correct.
21         MS. NUSSBAUM:  Whether or not there
22 were drugs other than Neurontin available to be
23 prescribed for restless leg syndrome?
24         MR. JAMES:  Yes.
25         MS. NUSSBAUM:  If you specifically

Page 419

A. Carver

1
2  know whether or not -- through what period of
3  time?
4      MR. JAMES:  As of the filing of the
5  Complaint.
6      Q.   Were you aware of any cheaper and more
7  desirable medications to Neurontin for the
8  treatment of restless leg syndrome?
9      A.   Not specifically.
10     Q.   Do you know whether there are any
11 FDA-approved drugs indicated for restless leg
12 syndrome?
13     MS. NUSSBAUM:  You have a particular
14 time in mind?
15     Q.   At the present time?
16     MS. NUSSBAUM:  Okay.  Without looking
17 at a PDR or going online on the FDA website --
18     Q.   There's no need to look at those
19 resources.
20     A.   No, I do not know.
21     Q.   Does Kaiser in its corporate capacity
22 know whether there are any -- well, actually,
23 withdraw that question.
24          I guess earlier we talked about drug
25 limitations or quantity limitations.

Page 420

A. Carver

1
2          How expensive are drug limitations to
3  implement if a particular employer or group wants
4  to implement a drug limitation on a particular
5  drug?
6      MS. NUSSBAUM:  I don't understand the
7  question.  If this is hypothetical or speculative,
8  I'm going to ask the witness not to answer.
9      Q.   Well, first, do you recall how we use
10 the term "drug limitation" or "quantity
11 limitation"?
12     A.   I believe I do.
13     Q.   And if an employer group requests
14 Kaiser to implement a drug limitation or quantity
15 limitation on a given drug, is that something that
16 Kaiser is capable of doing?
17     MS. NUSSBAUM:  Objection.  Outside the
18 scope of the 30(b)(6) and outside of this witness'
19 deposition.  I mean, let's just do the relevant
20 things that we're here to do and get done now.  We
21 have like an hour and a half left.
22     Q.   I believe topic number six actually
23 expressly refers to drug limitation or quantity
24 limits.
25     MS. NUSSBAUM:  And we went through

Page 421

A. Carver

1
2  that you wanted to know the practices and
3  policies.  We went quite a bit of time on that
4  this morning.
5      Q.   I'd like to know if it's something
6  that Kaiser can implement on behalf of employer
7  groups.
8      MS. NUSSBAUM:  Asked and answered.
9      Q.   You can answer.
10     A.   I don't believe that we can -- could
11 do such other than, that would be drug specific,
12 other than what I've outlined to you in terms of
13 the general limitation on a particular drug
14 benefit.  That would be like a 30-day supply or a
15 60-day supply or 100-day supply or something like
16 that that's applicable to all the medications that
17 a patient receives pursuant to their drug benefit.
18          But to then dive into some other
19 quantity limitation on a particular product, I
20 don't believe our systems would support that at
21 this time.
22     Q.   In light of your personal industry
23 knowledge, are you aware of other health insurers
24 or PBMs that are capable of providing drug,
25 specific drug limitations or quantity limits?

Page 422

A. Carver

1
2      MS. NUSSBAUM:  I would object.  He's
3  not here as an industry expert.  He's here as a
4  fact witness, or 30(b)(6).
5      Q.   And I've asked in your personal
6  knowledge.  I don't expect you to be an industry
7  expert necessarily.
8      MS. NUSSBAUM:  You just asked whether
9  he has industry knowledge about what's going on in
10 the industry.  He's not here as an industry expert
11 for you.
12     A.   I think I've previously testified that
13 I'm not well versed on the details of features
14 that PBMs may have available to them to administer
15 drug benefits.
16     Q.   Did Med Impact have that capability?
17     MS. NUSSBAUM:  What capability?
18     MR. JAMES:  To provide drug
19 limitations or quantity limits?
20     MS. NUSSBAUM:  At what time?
21     MR. JAMES:  At any time during the
22 relevant period?
23     MS. NUSSBAUM:  Don't you have a
24 document or something you want to show him?
25     MR. JAMES:  No.

Page 423

A. Carver

1          A.   I do not know.  I think that we
2  explained yesterday that the amount of the number
3  of prescriptions, the amount of Kaiser business
4  that goes through Med Impact is really small,
5  maybe about 2 percent of our total business and
6  so, I -- it's -- it was not explored.
7          And if they had that capability, why
8  would we do something for 2 percent of the
9  population that we wouldn't administer for the
10  other 98 percent of the population, so that would
11  be problematic.  So it's not been explored and I
12  do not know their capability as a PBM whether or
13  not they could administer that or not.
14      Q.   You've obviously given me quite a bit
15  of information regarding the structure of the
16  regional P&T committees, and today you
17  supplemented that with information regarding the
18  area of P&T committees in southern California.
19          Do they have a similar structure of
20  both regional P&T and area P&T committees and the
21  other regions that you identified yesterday?
22      A.   No -- excuse me, in northern
23  California, yes.  And I can't speak to the
24  specific design of the P&T committee factually and

Page 424

A. Carver

1  the other regions.  But just please remember in
2  California we have about 30 medical centers which
3  are really large medical centers, that which we
4  are providing medical care and pharmacy services
5  to 6.4 million members or so, which represents
6  75 percent of Kaiser's total business.  And so it
7  may be that there's a little bit leaner structure
8  once we get to Ohio, which has a very small
9  population.
10      MR. JAMES:  Mark another exhibit.
11          (Kaiser-21 marked for identification.)
12      Q.   Do you know what this document is,
13  aside from the first page?
14      A.   This represents Kaiser's policies as
15  it relates to the retention of business records.
16      Q.   And either from your knowledge as a
17  30(b)(6) witness or from this document, can you
18  tell which documents relating to the provision of
19  prescription pharmacy benefits would be regarded
20  as business records subject to this policy?
21      A.   Just give me a minute to refresh my
22  memory here.
23          Yes, the -- the section related to
24  pharmacy records would be under, if you want to

Page 425

A. Carver

1  get to times, I would reference this to page.
2  It's marked at the top page 3 of this photo, which
3  says actually, so as I don't confuse us, it's
4  marked as page 2 of 5 on the document.
5      Q.   All right.
6      A.   Okay.  And then I would reference this
7  down to the section number 1, retention period for
8  business records governed by law as it relates to
9  the prescription records.
10      Q.   Is that records of prescriptions made
11  to individual Kaiser insureds?
12      A.   Yes, it is.  And -- well, I'll let you
13  ask the questions.
14      Q.   Are there other documents that relate
15  to the provision of prescription pharmacy benefits
16  that are also covered by this policy?
17      A.   Well, I think the retention period
18  generally is for those that are mandated to be
19  specific.  This policy, the corporate policy
20  indicates that the retention period for documents
21  is seven years unless otherwise defined by law or
22  accreditation or particular business needs.
23          Specifically, as it relates to
24  prescription records, the previous policies at the

Page 426

A. Carver

1  regional level have been generally the storage of
2  pharmacy records, including prescriptions for a
3  period of five years.  The requirement for the
4  requirements vary from state to state, but
5  typically three years for prescriptions and two
6  years for controlled substance prescriptions.
7          So we have -- we had established a
8  five-year time frame for prescriptions, and then
9  more recently in 2005 with the -- in anticipation
10  and preparation for the requirements of CMS as it
11  relates to Medicare Part D prescriptions, that has
12  been extended now effective January of 2006 to 10
13  years.
14          And so that -- that represents the
15  record retention policy for prescriptions.  And
16  then there are other retention periods for other
17  pharmacy-related documents that typically are
18  5 percent, such as invoices, and you know, the
19  purchase of drugs and those kinds of documents,
20  and for pharmaceutical contracts, I believe the
21  period of time is seven years, which would be
22  under my authority or area of accountability, I
23  guess, but generally that is the retention period
24  within Kaiser for our records.