A. Carver

1
2      Q.   The policy, is there any policy
3  applicable to the retention of formularies that
4  are in place at a given time?
5           MS. NUSSBAUM: If you know
6  specifically with respect to that.
7      A.   The -- I can only speak to the
8  regulatory requirement in California is for a
9  five-year period of time for formularies.  I don't
10  know whether that might vary in states outside of
11  California or not.  So I cannot speak to that.
12     Q.   Within California, do you preserve it
13  just up to the five years required by law or do
14  you preserve those documents for an additional
15  time as a matter of company policy?
16     A.   As a matter of company policy, it
17  would be up to seven years.
18     Q.   I believe we touched on this
19  yesterday, what efforts has Kaiser made to
20  identify and produce documents responsive to the
21  defendant's document requests?
22          MS. NUSSBAUM: And just, if I may,
23  please answer, but please do not divulge specific
24  discussions, instructions, or communications with
25  Mr. Cohen or anybody on his staff or with myself,

A. Carver

1
2  my colleague, or anybody on my staff.
3           Do you want to be more specific maybe?
4  I mean, the witness is --
5      Q.   Can you answer the question?
6           MS. NUSSBAUM: Can I make a suggestion
7  maybe?  Does he know whether or not documents were
8  produced in this case and what the steps were,
9  something like that, something concrete.
10          MR. JAMES: I might return to this.
11     Q.   We went over the organizational
12  structure of the southern California region
13  yesterday.
14          Were every department and divisions
15  documents searched in response to the defendant's
16  requests?
17     A.   I believe that they were.
18     Q.   Did you produce documents from regions
19  outside southern California?
20     A.   Did I personally produce?
21     Q.   No.  Did you, Kaiser, produce
22  documents from regions outside southern
23  California?
24     A.   Yes, I think we've seen such documents
25  today.

A. Carver

1
2      Q.   Were documents produced from all
3  regions within the United States?
4      A.   To my knowledge, all the documents
5  responsive have been produced.
6      Q.   As a personal matter, would it strike
7  you as a surprise that there might be no
8  responsive documents from, say, Colorado or Ohio
9  or the mid-Atlantic region?
10     A.   I would be surprised; yes.
11     Q.   Yesterday we discussed the process by
12  which restrictions were placed on and removed from
13  Gabapentin at various times in the southern
14  California region.
15          Do you expect that outside northern
16  California and southern California steps such as
17  that might have been taken at some point in 1994
18  forward?
19          MS. NUSSBAUM: This is a hypothetical,
20  that steps might have been taken at unspecified
21  times.  We had very, very lengthy discussions as
22  to this yesterday.  If you have a specific
23  question, the witness will endeavor to answer it.
24     Q.   I guess I asked you specifically
25  yesterday about changes that are made in southern

A. Carver

1
2  California, and I am thinking maybe to some extent
3  in northern California.
4           Do you have knowledge of changes made
5  with regard to formulary restriction guidelines on
6  Neurontin or Gabapentin in other regions?
7      A.   Not specifically, no.
8      Q.   As a general matter, do you have any
9  knowledge?
10          MS. NUSSBAUM: Asked and answered
11  yesterday.  As a general matter, he testified that
12  Neurontin was on all formularies in all regions
13  from 1994 on, once it came to market.
14     Q.   The question dealt with restriction
15  guidelines as opposed to formulary.  I do
16  understand that Neurontin has been on the
17  formulary of Kaiser from 1994 until the
18  introduction of generic Gabapentin.  But with
19  regard to restriction guidelines, do you know of
20  any changes made in that regard in other regions?
21     A.   I do not know specifically.
22     Q.   And would it surprise you if there
23  were no documents memorializing any such changes
24  that were made in other regions from 1994 forward?
25     A.   Regarding restrictions?

A. Carver

1
2    Q.   Yes.
3    A.   It would not surprise me from the
4 standpoint of, I believe, that southern California
5 has been more energetic regarding attempting
6 restrictions in other regions.  There has been
7 certainly fewer restrictions, even in northern
8 California, related -- relative to southern
9 California, and I think it's been more of just a
10 philosophy or a tradition.
11          And so, then it would not surprise me
12 that there could be variances in enthusiasm for
13 trying to implement restrictions in regions
14 outside of California.
15   Q.   Other than the larger number of
16 insureds in California and in other regions, is
17 there any other reason that California has been
18 more active with regard to attempting
19 restrictions?
20          MS. NUSSBAUM:  If you know
21 specifically.
22   A.   I don't know specifically.
23   Q.   I think yesterday you mentioned
24 briefly that there is some communication between
25 the regional P&T committees for the various

A. Carver

1
2 regions?
3    A.   Correct.
4    Q.   Do they share information regarding
5 restriction on particular prescription drugs?
6    A.   The information that is shared is
7 generally the monograph that's developed regarding
8 the use of all of drugs essentially, each other
9 drug, whether it's Neurontin or not, and then --
10 then each of the P&T committees outside of
11 California deals with their decisions as they see
12 fit in their respective regions.
13   Q.   Is there a formal program for
14 exchanging those monographs, or is it kind of done
15 on an ad hoc basis?
16   A.   It's not an exchange as much as it's
17 an outflow from the Drug Information Service in
18 California.
19   Q.   Does Kaiser have drug information
20 services in other regions?
21   A.   Not formal drug information services.
22 Calls from other regions come into California's
23 Drug Information Service.
24   Q.   Am I correct to understand that Kaiser
25 has searched its e-mails in response to the

A. Carver

1
2 defendant's document production requests?
3    A.   I believe so.
4    Q.   And does Kaiser, meaning the
5 plaintiffs, have a separate e-mail system from
6 Permanente Group?
7    A.   There is one e-mail system, one big
8 e-mail system that all the people within health
9 plan, hospitals as well as the Permanente Medical
10 Groups utilize.
11   Q.   And were all responsive documents from
12 that sort of single e-mail group produced?
13   A.   I hope so.
14          MS. NUSSBAUM:  The requests are for
15 the plaintiff's documents.  All documents for the
16 plaintiffs were produced.  To the extent that
17 there is a contractual relationship with others
18 and not access to individuals, you know, who are
19 not employees of the plaintiff's documents, they
20 are not being produced.  So to the extent that
21 documents, you know, may have been created by
22 others who were not employees of the plaintiffs
23 here but were in the files of the plaintiffs as we
24 saw today and yesterday by things that are marked,
25 those things were produced.

A. Carver

1
2          But third-party documents that are not
3 in our possession and that are not under our
4 control were clearly not produced.
5    Q.   Are there any documents in Permanente
6 Group's custody that are within the plaintiff's
7 control?
8          MS. NUSSBAUM:  Can you explain what
9 you mean by that?
10          THE WITNESS:  Yeah.
11   Q.   Do you have the right to request any
12 documents from Permanente Group, you know, as a
13 matter of contractual right?
14          MS. NUSSBAUM:  I think that that's
15 been asked and answered.  The witness testified
16 that they employ physicians who they interview,
17 who they employ, who they train, but the
18 plaintiffs here have nothing to do with any of
19 that process, and that the relationship between
20 the entities is simply a contractual relationship
21 and nothing more.
22          We've taken that position in front of
23 Justice Saris, we've taken that position in front
24 of Judge Sorokin.  That information is publicly
25 available, if you go online, you can research the

Page 435

A. Carver

1       A. Carver
2  corporate structures yourself and that's the
3  situation.
4       Q.   Do you know how long the contractual
5  relationship between the Permanente Medical Group
6  and the plaintiffs has been in place?
7       A.   Since 1945.
8       Q.   Were they founded at the same time?
9            MS. NUSSBAUM:  If you specifically
10 know.
11      A.   I do not specifically know region by
12 region.  But the relationship dates back to
13 approximately 1945 and then as regions have grown
14 around the company, whatever those dates were.
15      Q.   Will you characterize it as an arm's
16 length contractual relationship?
17           MS. NUSSBAUM:  The witness is not a
18 lawyer.  I think that the relationship has been
19 characterized by him repeatedly throughout this
20 deposition and by the plaintiffs in this
21 litigation repeatedly to the courts.  The
22 relationship is what it is and I'm not going to
23 have the witness give legal opinions because he's
24 not a lawyer.
25      Q.   We actually talked about this as a

Page 436

1       A. Carver
2  contractual relationship.
3       Are there particular contracts in
4  place between the plaintiffs and the Permanente
5  Medical Group?
6       A.   Yes, there are.
7       Q.   Is there a single, like plaster
8  contract or there are a large number of individual
9  contracts?
10           MS. NUSSBAUM:  If you know, and this
11 is beyond the scope of the 30(b)(6) deposition
12 here.  He's not from the legal counsel's office,
13 and so we're happy, you know, to the extent that
14 he has specific knowledge, to testify as to that,
15 but you know, we don't want to have any
16 speculation here.
17      Q.   What do you know?
18      A.   There is a medical service agreement
19 in southern California.  There's a separate
20 medical service agreement in northern California
21 with TPMG.  I do not know the specifics of the
22 medical service agreements in the regions outside
23 of California.
24      Q.   Is that medical service agreement the
25 only contract of which you're aware of between the

Page 437

1       A. Carver
2  plaintiffs and Permanente Medical Group and
3  northern and southern California?
4       A.   To which I'm aware?
5       Q.   Yes.
6       A.   Yes.
7       Q.   Well, what's the term of that contract
8  or those two contracts?
9            MS. NUSSBAUM:  If you know.
10      A.   I do not know.
11      Q.   Do you have any familiarity with
12 whether those contracts are renegotiated
13 periodically?
14           MS. NUSSBAUM:  Presumably all
15 contracts are negotiated periodically, but if you
16 don't have any specific understanding as to the
17 term of the contract, I would ask you not to
18 speculate.
19      A.   I can't speculate in terms of the
20 length of individual service agreements or the
21 frequency at which it's renegotiated.
22           MS. NUSSBAUM:  You know, with all due
23 respect, Mr. James, we've talked ad nauseam with
24 your colleague Mr. Roland about the scope of the
25 various 30(b)(6) Notices here.  This was not the

Page 438

1       A. Carver
2  terms of this particular contract and the lengths
3  were not areas that he indicated to us you wanted
4  a 30(b)(6) witness on.
5            Nevertheless, what I would suggest is
6  if you have a specific two, three, four questions
7  such as the length of the, you know, present
8  contract or whatever, let's just ask the question.
9  We can leave a blank in the transcript and we will
10 endeavor to get the answer from the appropriate
11 person, but I don't want speculation, and I know
12 you don't either, the length of the contract and
13 whatever you have, another question or two,
14 whatever, just ask them.
15           Unless you have personal, you know,
16 knowledge, please don't testify, but we will
17 endeavor to get the answer from the appropriate
18 person.
19      Q.   I actually just have one more
20 question.
21           Just to your personal knowledge, are
22 you aware of any occasion on which the plaintiffs
23 and Permanente Medical Group have failed to reach
24 an agreement on a renewed contract at some point
25 from 1945 to the presence?

Page 439

A. Carver

1
2          MS. NUSSBAUM: If you know.
3      A.   I do not know.
4      Q.   Is this something that keeps you awake
5  at night?
6      A.   It is not.
7          (Kaiser-22 marked nor identification.)
8      Q.   Have you had a chance to review this
9  document?
10     A.   I have.
11     Q.   Is this -- whose website is this? If
12 you look at the upper right-hand corner --
13         MS. NUSSBAUM: If you know.
14     A.   I don't know.
15         MS. NUSSBAUM: Does counsel want to
16 represent where this document came from?
17     A.   I've never seen the document, so I
18 really do not know.
19     Q.   Have you heard of the website
20 kaiserpermanente.org?
21     A.   Yes, I have.
22     Q.   And whose website is that?
23         MS. NUSSBAUM: If you know.
24     A.   I don't know the legal owner of it.
25     Q.   Do you know who maintains this

Page 440

A. Carver

1
2  website?
3      A.   I don't.
4      Q.   Does -- do the plaintiffs have a
5  separate public website you know which is not
6  kaiserpermanente.org?
7      A.   I do not believe so. Are you talking
8  about a public website?
9      Q.   Yes.
10     A.   That's to the public, external?
11     Q.   Exactly.
12     A.   I believe there's just one website.
13     Q.   And it's kaiserper.org?
14     A.   Yes, kp.org.
15     Q.   Do you know if the two are equivalent?
16         MS. NUSSBAUM: The witness testified
17 he doesn't know what website this is and he didn't
18 know where you got this document, what he's aware
19 of is kp.org.
20     Q.   Are you aware of a site called kp.org,
21 but not a site called kaiserper.org?
22     A.   Yes, from a technical issue I don't
23 know what it's called.
24     Q.   The logo in the upper left-hand corner
25 of this document, is that the logo, the Permanente

Page 441

A. Carver

1
2  Medical Group's logo, or is it a logo associated
3  with some other Kaiser entity, or you know,
4  something that you've never seen before?
5      A.   No, this a logo for Kaiser Permanente,
6  the umbrella organization.
7      Q.   So for both the plaintiffs and the
8  Permanente Medical Group, is that correct?
9      A.   That's correct. I cannot tell from
10 this logo that's been used whether or not this is
11 part of the Permanente Medical Group context or
12 not. But certainly the logo up there belongs to
13 the umbrella, I guess, branding of our
14 organization.
15     Q.   If I were to represent to you that my
16 colleague seated here had printed this document
17 from the worldwide web from this address in the
18 upper right-hand corner, would you have any reason
19 to doubt that?
20     A.   No, I wouldn't. If you're asserting
21 that, I wouldn't doubt it.
22     Q.   If this were a publicly accessible
23 document at an address called
24 kaiserpermanente.org, would you be concerned about
25 the content of this document?

Page 442

A. Carver

1
2          MS. NUSSBAUM: Objection. It calls
3  for his personal speculation. As to whether or
4  not he'd be concerned about the document, I'm not
5  going to let him answer that. I don't know what
6  that means.
7      Q.   You can answer the question, if you
8  understand it.
9          MS. NUSSBAUM: What does "concern"
10 mean?
11     Q.   If you have a comment as to the
12 meaning of the word concern, you're free to answer
13 the question.
14         MS. NUSSBAUM: Why don't you define it
15 using the word concern. I'm not going to have
16 him answer the question until you articulate a
17 question that can be answered.
18     Q.   Do you understand what the term
19 "concern" means?
20     A.   Could we reask the question, please?
21         MR. JAMES: Could you read back the
22 question?
23         (Record read.)
24         MS. NUSSBAUM: I ask you to define the
25 term concern as you're using it --

Page 443

A. Carver

1
2  Q.   If you understand the question, you
3  can answer.
4       MS. NUSSBAUM:  This witness is
5  testifying, are you asking this in his personal
6  capacity?
7  Q.   Yes, in your personal capacity, would
8  you be concerned?
9       MS. NUSSBAUM:  Do you understand what
10 the word "concern" means or would you like that
11 defined so that you understand what Mr. James is
12 looking for?
13      THE WITNESS:  I'll give it a try to
14 see if I meet your definition of the word
15 "concern."
16      MS. NUSSBAUM:  No, because you don't
17 know his definition.  I don't know how you can
18 give a try.  Maybe you should learn his
19 definition.
20 A.   Okay.  So help me understand the
21 specific question.
22 Q.   If I recall, the former President had
23 trouble with the word as it is, but in any
24 event --
25 A.   Please do not associate me with that

Page 444

A. Carver

1
2  former President.
3  Q.   Fair enough.  You don't deserve that.
4  I'll read some lines from this document.
5  A.   I have to defend myself on that one,
6  Counsel.
7  Q.   "People who took Gabapentin for
8  chronic pain said they felt one-third less pain
9  while they were taking Gabapentin."
10      Do you have an understanding of what
11 the term "chronic pain" means?
12      MS. NUSSBAUM:  I will object.  We have
13 no idea what this document is, where it's from, it
14 says Healthwise on it, who it's for, who it's
15 addressed to, what purpose it serves.
16      The witness has testified that he has
17 never seen this document before and does not
18 recognize the document.  So, I think that it's
19 really totally a waste of time to ask him about
20 the meaning of words or sentences in the document
21 that he's already indicated he has never seen, he
22 did not know what it's for, who it's for, what its
23 purpose is, who writes it, who it's addressed to
24 or anything else.
25 Q.   Apart from this document, do you have

Page 445

A. Carver

1
2  an understanding of the term "chronic pain"?
3       MS. NUSSBAUM:  You want to know his
4  layman's definition?
5  Q.   No, actually, as a pharmacist, do you
6  have an understanding of the term chronic pain?
7       MS. NUSSBAUM:  As a pharmacist, do you
8  have an understanding or do you have a layman's
9  understanding?
10 A.   I would have a layman's understanding
11 relative to how it might be defined by our
12 specialists that treat chronic pain.
13      MS. NUSSBAUM:  Well, no, you're
14 testifying now in your individual capacity.  Do
15 you have an understanding as a layman of the term?
16      MR. JAMES:  I'd ask you to reserve
17 your own questions to your two hours, which should
18 shortly come up.
19 Q.   It was your testimony that at least
20 kp.org was searched in response to the defendant's
21 document request, is that correct?
22 A.   Yes.
23 Q.   So if this document appeared on
24 kp.org, it should have been produced to the
25 defendants?

Page 446

A. Carver

1
2       MS. NUSSBAUM:  You know what, he's not
3  legal counsel.  He testified as to his knowledge
4  as to the production of documents here.  He's not
5  making a determination as to whether or not
6  something is relevant or not relevant or what
7  particular request something would be relevant to.
8       This is something that was downloaded
9  at 8:22 last night.  We have no idea when this
10 document appeared, where it appeared.  I'm not
11 going to let him answer that.  If it's publicly
12 available, this is equally accessible to you as to
13 us.
14 Q.   With regard to kp.org, do the
15 plaintiffs have any input into the content of that
16 website?
17      MS. NUSSBAUM:  The plaintiffs in this
18 action, do they have input into that website, if
19 you know?
20      THE WITNESS:  They do specifically, as
21 it relates to that, I can speak to factually as
22 related to the reorders of your refill
23 prescriptions as an example.  So the answer to
24 that would be yes.
25 Q.   And does Permanente Medical Group

Page 447

A. Carver

1  supervise the content of the remainder of the
2  website?
3      A.  I'm sorry, I do not know.
4      Q.  Do you know who does manage the
5  content of the plaintiff's public website?
6      MS. NUSSBAUM:  Are you referring to
7  the kp.org website, and you want to know who
8  manages the content of that website, if he knows?
9      MR. JAMES:  Yes.
10     A.  There is a manager that's responsible,
11  her name is not coming to my mind at this second,
12  but I'm be happy to provide it to you as soon as
13  it does, or through counsel. There is a manager
14  of the -- of this particular website.
15     Q.  Would you personally feel compelled to
16  take some action if you learned that Permanente
17  Group's public website was advising visitors that,
18  "People who took Gabapentin for chronic pain said
19  they felt one-third less pain while they were
20  taking Gabapentin"?
21     MS. NUSSBAUM:  Objection. I'm going
22  to ask the witness not to answer that.
23     Q.  You can answer.
24     MS. NUSSBAUM:  No, first of all, it's

Page 448

A. Carver

1  an unintelligible question.
2      Second of all, it's a question that
3  calls for the witness' personal opinion, which is
4  totally irrelevant in the action.
5      Third, we have not been able to
6  identify whose website this is.
7      Fourth, we have not been able to
8  identify this is a small piece of something, what
9  this is, who it's available to, what its purpose
10  is. I think that your question is highly
11  misleading and I will not have the witness answer
12  it. I don't think it's capable of being answered
13  and it would simply be speculation and
14  hypothetical.
15     MR. JAMES:  Are you directing the
16  witness not to answer the question?
17     MS. NUSSBAUM:  I think that there's
18  not a question that's capable of being answered
19  without speculation, a hypothetical question and
20  having to do with his personal feelings about
21  something which is totally irrelevant in this
22  action.
23     Q.  Do you understand that questions
24  relating to the witness' personal feelings are a

Page 449

A. Carver

1  basis for counsel directing the witness not to
2  answer?
3      MS. NUSSBAUM:  I didn't say that. You
4  want to ask a question that's capable of being
5  answered, we will see if that's possible. You
6  want to identify this document and not give a
7  misleading few pages of something that there's no
8  testimony as to where it comes from or who
9  contained the content or anything else, then I'm
10  happy to address appropriate questions. The
11  witness has been answering questions now for two
12  full days.
13     MR. JAMES:  To be clear, you're not
14  asserting the attorney-client privilege over the
15  response?
16     MS. NUSSBAUM:  Excuse me?
17     MR. JAMES:  Attorney-client privilege
18  is not in any way implicated by my question, is
19  that correct?
20     MS. NUSSBAUM:  I don't even understand
21  your question, so how can I know whether or not it
22  implicates attorney-client privilege? I have no
23  idea if it's written by attorneys or supervised by
24  attorneys or anything else. The present question

Page 450

A. Carver

1  is not capable of being answered. Do you want to
2  ask a question that's capable of being answered,
3  you know, he'll attempt to answer it as he's been
4  doing for two full days here.
5      Q.  If you turn to the second page of the
6  document, do you have any familiarity with who
7  Shannon Erstadt is, at the bottom?
8      A.  I'm sorry, I do not.
9      Q.  Actually at this point, flipping over
10  to the third page, do you have any understanding
11  of what the company Healthwise, Incorporated is?
12     A.  I do from personal experience in that
13  Healthwise is in the business of producing general
14  health information. I was a recipient of the
15  Healthwise -- a document called the Healthwise
16  Handbook at my home a few years ago, and it had
17  information regarding just a number of simple
18  little things regarding medical conditions and
19  their management, so, it was really intended --
20  the document that I received, which actually was a
21  booklet, was intended to be, to assist individual
22  patients or members -manage really minor
23  conditions such as if you have a cough or if you
24  have a sore throat or something of that -- that

Page 451

```
 1            A. Carver
 2  nature.
 3            And that is the context in which I
 4  know anything about Healthwise as a corporation,
 5  and this was mentioned, I have no -- no knowledge
 6  of this linkage or this doctor that's listed as a
 7  primary medical reviewer, or this individual
 8  that's credited as the author or any of these
 9  people or anything about this.  Actually, it comes
10  as a surprise to me.
11     Q.   Have you reviewed information
12  currently visible on Kaiser's public website in
13  preparation for this deposition?
14     A.   No, I have not.
15     Q.   And have you reviewed information on
16  Kaiser's public website relating to either
17  Gabapentin or Neurontin in the past year?
18     A.   No, I have not.
19     Q.   Turning to page two of this
20  document --
21          MS. NUSSBAUM:  But wait a minute, the
22  witness has already said he knows absolutely
23  nothing about the document.
24          MR. JAMES:  Right, if it helps.
25          MS. NUSSBAUM:  And as you just pointed
```

Page 452

```
 1            A. Carver
 2  out, okay, as you just pointed out, the document
 3  appears to be authored by Healthwise, which is
 4  apparently an independent and unaffiliated
 5  corporation, and the witness further testified
 6  that he is totally unfamiliar with any of the
 7  names of people listed as the author, editor,
 8  associate editor, so I really think at this point
 9  there's nothing further to be asked with respect
10  to this document that he's never seen and he knows
11  nothing about, that you've provided no further
12  information about and that your own testimony has
13  made clear this is from an independent
14  corporation, who he says he knows nothing about
15  and no relationship with.
16     Q.   Did you testify that Healthwise has no
17  business relationship with Kaiser?
18          MS. NUSSBAUM:  Are you aware of any
19  relationship between.
20          MR. JAMES:  Actually, that's a
21  different question.
22     Q.   One is can you say with knowledge that
23  there is no business relationship between
24  Healthwise and Kaiser?
25     A.   I cannot.
```

Page 453

```
 1            A. Carver
 2     Q.   At the bottom of page two, there's a
 3  list of four citations.
 4          Has Kaiser or anyone acting on
 5  Kaiser's behalf reviewed any of these publications
 6  in advance of bringing this lawsuit?
 7          MS. NUSSBAUM:  If you know.
 8     A.   I do not know.
 9     Q.   Does Kaiser communicate with its
10  members regarding prescription drugs?
11          MS. NUSSBAUM:  Are you talking about
12  the plaintiffs in this action?
13          MR. JAMES:  Yes.
14          MS. NUSSBAUM:  If you know
15  specifically.
16     A.   There's just a director of personal
17  communication between the pharmacist and the
18  patient for all new prescriptions that are
19  dispensed.
20     Q.   Between the patient and the --
21     A.   And the pharmacist at the time of
22  providing the medication to the patient.
23          MS. NUSSBAUM:  I think we're done with
24  this document.
25          THE WITNESS:  Okay.
```

Page 454

```
 1            A. Carver
 2     Q.   Are there any other communications
 3  with insureds?
 4          MS. NUSSBAUM:  You know, this is not
 5  part of this 30(b)(6) Notice, so we'll give you a
 6  little bit of latitude, but I also think your time
 7  is about up, so if there's anything else you want
 8  to cover, we should do it.
 9          Do you know what the time is here?  I
10  think we have now hit the number of hours.
11          VIDEOGRAPHER:  542 minutes.
12          MS. NUSSBAUM:  You have not too much
13  time left.
14          MR. JAMES:  Should we take a break
15  now?  One more tape would exhaust our time, is
16  that correct?
17          VIDEOGRAPHER:  The tape is an hour and
18  20 minutes.
19          MS. NUSSBAUM:  You have less than
20  that, you have a little less than that.
21          MR. JAMES:  Why don't we take a break?
22          MS. NUSSBAUM:  We really want to just
23  go through.
24          VIDEOGRAPHER:  We have 15 minutes left
25  on this.
```

Page 455

A. Carver

1  
2      MR. JAMES: One more tape would
3  exhaust our time, all of our time?
4      MS. NUSSBAUM: What?
5      MR. JAMES: One more tape would
6  exhaust our allotted time?
7      MS. NUSSBAUM: Your 12 hours.
8      MR. JAMES: Yes.
9      MS. NUSSBAUM: Okay, fine, we'll take
10  a short break and that will be that.
11      VIDEOGRAPHER: Going off the record at
12  3:50 approximately. This is the end of tape five
13  in the deposition of Albert Carver.
14      (Recess.)
15      VIDEOGRAPHER: Going back on the
16  record at 4:03 approximately. This is the
17  beginning of tape six, volume two, in the
18  deposition of Albert Carver.
19      MR. JAMES: I'd like to mark another
20  exhibit.
21      (Kaiser-23 marked for identification.)
22      Q.   Once you've had a chance to look over
23  the document, let me know.
24      MS. NUSSBAUM: Do you want him
25  actually to read the document?

Page 456

A. Carver

1  
2      MR. JAMES: No, there's no need to
3  read the document. Just look over it generally
4  and see if you can determine whether you recognize
5  it and what sort of document it is.
6      Are you identifying something to the
7  witness at this point?
8      MS. NUSSBAUM: Yeah, on your document
9  I'm showing him to go through it carefully.
10      Q.   Have you seen this document before?
11      A.   I have not.
12      Q.   Do you know Dr. Maizels?
13      A.   I know of Dr. Maizels. I do not know
14  him personally.
15      Q.   Who is he?
16      A.   He's a physician located in southern
17  California at the Woodland Hills Medical Center.
18      Q.   And how do you know of him?
19      A.   At one point in time he was on the P&T
20  committee. That was several years ago. I don't
21  recall what year he went off the P&T committee.
22      Q.   Is that the regional committee for
23  southern California?
24      A.   Yes, it is.
25      Q.   Do you recall forming any impression

Page 457

A. Carver

1  
2  of Dr. Maizels as a member of the same committee?
3      MS. NUSSBAUM: Objection. Only very
4  specific, if you have any very specific
5  recollection.
6      A.   I don't have any specific
7  recommendation or recollection, excuse me, of Dr.
8  Maizels.
9      Q.   Do you have any knowledge of
10  Dr. McCarberg?
11      A.   No, I do not.
12      Q.   Do you have any knowledge of the
13  publication of the American Family Physician?
14      A.   No, I do not. It's not something I
15  read.
16      Q.   Is there any policy at Kaiser by which
17  Permanente physicians would need to seek any
18  approval before publishing articles in medical
19  journals or other publications?
20      MS. NUSSBAUM: If you know.
21      A.   I do not know. These are -- these
22  individual physician are employed by the
23  Permanente Medical Group and I do not know what
24  their rules or guidance to individual physicians
25  may or may not be.

Page 458

A. Carver

1  
2      Q.   If an individual were to represent in
3  2005 that Gabapentin was an effective treatment of
4  neuropathic pain, would the plaintiffs regard that
5  as a false statement?
6      MS. NUSSBAUM: That's hypothetical,
7  not tied into anything and not within the scope of
8  the 30(b)(6) or the scope of his expertise here as
9  a fact witness. I don't think that the witness
10  should answer that.
11      MR. JAMES: I just note for the record
12  that item 8 of the Notice calls for any
13  conclusions or views that you or your
14  representatives or agents have or had regarding
15  whether Neurontin provides medical benefit to and
16  may be appropriately prescribed by physicians for
17  patients who take it, among other conditions, for
18  neuropathic pain conditions, and so I believe that
19  it's --
20      MS. NUSSBAUM: And the witness has
21  already testified about that today.
22      Q.   Does Kaiser have any view as to
23  whether that's a false statement at this point in
24  time?
25      MS. NUSSBAUM: What's a false

Page 459

A. Carver

1          A. Carver
2    statement?
3          MR. JAMES:  The statement that
4    Gabapentin is effective in the treatment of
5    neuropathic pain.
6          MS. NUSSBAUM:  This witness is not
7    here on behalf of Kaiser with respect to that.
8    That was not covered by the Notice.  He's in
9    general discussed Kaiser's view.  It's a legal
10   conclusion.  There's a complaint here.  There's
11   discovery that reflects Kaiser's view, and any
12   additional view that he might have would be as a
13   result of conversations that he's had with
14   counsel, either Mr. Cohen, myself or my
15   colleagues.
16       Q.   Did Kaiser form a conclusion or a view
17   regarding whether Neurontin provides a medical
18   benefit to and may appropriately be prescribed by
19   a physician for patients who take it for the
20   treatment of neuropathic pain?
21         MS. NUSSBAUM:  Objection.  I think
22   that Kaiser's view is reflected in the Complaint
23   and is also reflected in their responses in
24   discovery in this action, and that is Kaiser's
25   view.

Page 460

1          A. Carver
2        Q.   You can answer.
3          MS. NUSSBAUM:  Are you adopting what's
4    set forth in the complaint and in your previously
5    submitted discovery request and responses?
6          THE WITNESS:  Now we are adopting that
7    view.
8        Q.   And what is that view?
9        A.   The view that's represented in the
10   Complaint.
11       Q.   Do you know what it is?
12         MS. NUSSBAUM:  We can go through the
13   Complaint if you'd like.  Let's reread the
14   question.
15       Q.   Without referencing the document or
16   the Complaint itself, do you have any knowledge of
17   what that view is?
18         MS. NUSSBAUM:  Do you want to refresh
19   your recollection?
20         THE WITNESS:  Sure.
21         MS. NUSSBAUM:  You want to repeat the
22   question and he'll go through the Complaint?  Take
23   your time.
24         MR. JAMES:  You can reread the
25   question.

Page 461

1          A. Carver
2          (Record read.)
3          MS. NUSSBAUM:  Is there a particular
4    time frame that you have in mind, Mr. James?
5          MR. JAMES:  Well, why don't we find
6    out if they've formed a conclusion at all and we
7    can ask whether that view has changed over time.
8        Q.   Have you found any views?
9        A.   I have not yet, I'm sorry.
10       Q.   Actually, I'll withdraw the question
11   at this point.
12         When did Kaiser first learn of the
13   off-label promotion of Neurontin?
14         MS. NUSSBAUM:  Asked and answered this
15   morning.  The witness testified it was in or about
16   the spring of 2002.  There was testimony this
17   morning at great length.
18       Q.   Is that correct?
19       A.   That is correct.  I believe it's
20   contained in the documents that we referenced.
21       Q.   You learned about the off-label
22   promotion in the spring of 2002?
23       A.   I believe that's correct, yes.  There
24   was a citation, I believe, of something in the
25   Wall Street Journal, which we painstakingly went

Page 462

1          A. Carver
2    through.  There was something else in the New York
3    Times that we painstakingly went through, and I
4    believe all of those were early in 2002 roughly,
5    or sometime in 2002.
6        Q.   And the detailing restriction was
7    placed on Neurontin in advance of your knowledge
8    of off-label promotion of Neurontin, is that
9    correct?
10         MS. NUSSBAUM:  If you have a document
11   that you want to refer him to, I think after two
12   full days of testimony, unless he has a particular
13   recollection as to the date of the restriction
14   over a 15-year period, show him the documents and
15   he's happy to answer your questions.
16       Q.   Are you able to answer the question
17   without reference to documents?
18       A.   Well, it's contained in that P&T
19   Permanente document that we previously reviewed.
20       Q.   All right.
21       A.   I'm getting a little tired.
22       Q.   Fair enough.
23       A.   I can't pinpoint these things as
24   accurately, I'm sorry.
25       Q.   I want to bring up Kaiser-1, the

Page 463

A. Carver
1
2  Notice again.
3         MR. JAMES:  Do you know what the time
4  on the current tape is?
5         VIDEOGRAPHER:  15 minutes.
6      Q.   With regard to the first topic, have
7  we discussed the --
8         MR. JAMES:  Wait, the witness doesn't
9  have this.
10     Q.   Sorry, this is Kaiser-1, the Notice.
11     A.   I'm sorry.  Where are we?
12     Q.   On Kaiser-1, I'm sorry, on page 8,
13  have we exhausted your knowledge regarding the
14  policies and practices concerning payment or
15  reimbursement of claims as referred to in topic
16  one here?
17        MS. NUSSBAUM:  Objection.  You had two
18  days asking this witness questions.  You've asked
19  him whatever you wanted, you've got your answers.
20  If you have not asked a question that exhausted
21  his knowledge, I mean, how could he possibly
22  answer that?  He's given complete, honest answers
23  to the best of his ability to your questions.  Do
24  you want to go through the transcript now?  You
25  want to show him what he said about things?  You

Page 464

A. Carver
1
2  want to show him the question, ask him the answer
3  and then say as he sits here 12 hours later does
4  he remember anything else, we're happy to go
5  through that exercise.
6      Q.   I'll take one detour and come back to
7  this.
8         With regard to the Federal Court
9  documents that were unsealed which we talked about
10  earlier today, do you recall that?
11     A.   Yes, I believe there was reference
12  made to that in that same page five or page four,
13  depending upon the document perhaps.
14     Q.   I actually can bring the Complaint
15  back.  You want to look at the Complaint?
16        MR. JAMES:  Yes.
17        MS. NUSSBAUM:  Okay.
18     Q.   And I'd like you to turn your
19  attention to page 92, paragraph 220.
20        Have you read that paragraph?
21     A.   Yes, I have.
22     Q.   Are you familiar with the case United
23  States versus Warner-Lambert Company, LLC, that's
24  referenced in paragraph 220?
25     A.   Not the specifics.

Page 465

A. Carver
1
2      Q.   Do you know whether the information in
3  that case has any relevance to the present action
4  brought by the plaintiffs?
5         MS. NUSSBAUM:  I'd object.  This
6  witness is not a lawyer.  I would note that Judge
7  Saras and Judge Sorokin seem to think it does, but
8  you know, this witness is not a lawyer, he was a
9  30(b)(6) witness and a fact witness and he's not
10  going to give a legal opinion as to relevance.
11        MR. JAMES:  Actually, item 20 of the
12  Notice says, "Any information that you have
13  regarding the civil action United States of
14  America, David Franklin versus Parke-Davis, et
15  al., or any government investigation into
16  off-label use or promotion of Neurontin."
17        MS. NUSSBAUM:  And he's given that to
18  you, sir.  Look at Exhibits 12 and 13 which deal
19  with that.  Look at the Complaint, which has
20  allegations with respect to that.  He's also
21  chatted today about the whistleblower suit, which
22  refers to that, but if you're asking him now the
23  term "relevance" which is a legal term, whether or
24  not it's legally relevant, I suggest that both the
25  judge, the lead counsel for the defendants here,

Page 466

A. Carver
1
2  and the magistrate judge all have found that
3  that's relevant.
4         Documents in that case have been
5  produced in this case.  As under the rules, we
6  would assume that it's relevant and I suggest that
7  we move to something that he can really testify
8  to.
9      Q.   Are you aware that the allegations in
10  the government allegation -- sir, in the
11  government investigation related to the off-label
12  promotion of Neurontin as opposed to the false
13  promotion of Neurontin?
14        MS. NUSSBAUM:  Take your time, read
15  the allegation in the Complaint and anything else
16  you need to look at to refresh your recollection.
17  And I would suggest that --
18        MR. JAMES:  I'd rather you not suggest
19  anything.
20        MS. NUSSBAUM:  You suggested his
21  attention to paragraph 220, but really it starts
22  at paragraph 217, which is on page 91, so I think
23  if you don't want to mislead the witness, let him
24  look at the entire sequence of events here which
25  it says J, related government actions, and it

65 (Pages 463 to 466)

Page 467

```
 1           A. Carver
 2  starts at paragraph 217.
 3          Do you want to have the court reporter
 4  read the question?
 5          THE WITNESS: Please.
 6          (Record read.)
 7          MS. NUSSBAUM: You know, you're asking
 8  for legal terms and legal conclusions. If you
 9  want him to tell you what he as a layman
10  understands the whistleblower suit to have
11  concerned, he can do that, but also if you want to
12  give particular definitions for legal terms, this
13  witness is not a lawyer.
14          MR. JAMES: Actually, I'll withdraw
15  that question.
16      Q.  Are you aware of the time frame in
17  which the alleged conduct occurred that was, you
18  know, the subject of this case, United States
19  versus Warner-Lambert Company?
20          MS. NUSSBAUM: Are you talking now
21  about the Franklin case, you want to know about
22  the time period?
23          MR. JAMES: Why don't we take the
24  Franklin case first.
25      Q.  Do you know the time period of the
```

Page 468

```
 1           A. Carver
 2  conduct alleged in the Franklin case?
 3          MS. NUSSBAUM: If you know.
 4      A.  I do not know.
 5      Q.  If the conduct actually concluded in
 6  1997, would Kaiser have any basis for recovering
 7  damages from the defendants for Neurontin
 8  prescriptions paid for following 1997?
 9          MS. NUSSBAUM: Objection. First of
10  all, he is -- he doesn't know the time period in
11  the Franklin case.
12          Second of all, it's really misleading
13  to the witness because this Complaint is full of
14  allegations concerning misstatements by the
15  defendants and misconduct by the statements and
16  their agents way past 1997.
17          MR. JAMES: Right, but I'm not
18  interested in other allegations made by the
19  Complaint. I'm actually interested in the
20  Franklin suit specifically.
21          MS. NUSSBAUM: The witness just said
22  he has no independent knowledge of the relevant
23  time period in the Franklin suit, is that correct,
24  sir?
25          THE WITNESS: That's correct.
```

Page 469

```
 1           A. Carver
 2      Q.  So with regard to those, you know,
 3  revelations, I think as you put it earlier today,
 4  that were published in 2002 regarding the Franklin
 5  suit, you have no knowledge as to when that
 6  conduct alleged in the Franklin suit actually --
 7  actually concluded?
 8          MS. NUSSBAUM: Do you have any
 9  independent recollection, as you sit here today,
10  of when the wrongful conduct alleged in the
11  Franklin suit concluded?
12          THE WITNESS: I do not.
13      Q.  And when you authorized this lawsuit
14  to go forward, were you aware of any allegations
15  made in the Franklin suit that postdated 1997?
16          MS. NUSSBAUM: Objection. Other than
17  discussions that you've had either with myself,
18  Mr. Cohen or my colleagues or Mr. Cohen's
19  colleagues, do you have any independent
20  recollection, as you sit here today, of when this
21  Complaint was initially filed, you knew the time
22  period alleged in the Franklin suit.
23          MR. JAMES: I'd like to just state for
24  the record that the defendants take the position
25  that while legal advice is clearly protected, a
```

Page 470

```
 1           A. Carver
 2  fact such as the date that a particular suit was
 3  filed or the date that the allegations in the suit
 4  concerned is just sort of a bare fact that really
 5  has no protection under any doctrine.
 6          MS. NUSSBAUM: We have no problem with
 7  that, and if you were to have a copy of the
 8  unsealed Complaint in Franklin and show it to him
 9  and say look at this, this shows the date from A
10  to B, do you have any reason --
11          MR. JAMES: Actually, my question is
12  if he knows that information.
13          MS. NUSSBAUM: He said he has no
14  personal recollection.
15      Q.  To confirm, when you authorized this
16  suit to go forward, you were not aware of any
17  allegations in in the Franklin suit postdating
18  1997, is that correct?
19          MS. NUSSBAUM: The question is whether
20  he recalls as he sits here today. He said he has
21  no recollection.
22      Q.  I guess there's two separate questions
23  then.
24          Is your testimony that you now have no
25  recollection that when you authorized this suit to
```

Page 471

A. Carver

1    A. Carver
2  go forward you knew about any conduct alleged in
3  the Franklin suit postdating 1997?
4        MS. NUSSBAUM:  He didn't say that. He
5  said as he sits here today, he did not know what
6  the date of the conduct alleged in the Franklin
7  suit were.
8        MR. JAMES:  I think that was clearly
9  stated in the second question, at the time that
10 you authorized this lawsuit to go forward, did you
11 know whether or not there was any conduct alleged
12 in the Franklin suit postdating 1997?
13       MS. NUSSBAUM:  If you recall.
14    A.  I do not recall.
15    Q.  If the conduct at issue in the
16 Franklin suit ended in 1997 -- actually,
17 withdrawn.
18       When you approach an employer group to
19 sell a health insurance Plan, or do you market
20 cost savings as an advantage of choosing Kaiser
21 over other health insurance providers?
22       MS. NUSSBAUM:  If you know.
23    A.  I do not know if we market the price
24 differential, if there is a price differential or
25 not.

Page 472

1    A. Carver
2    Q.  Do you know about the marketing of
3  health plans to employer groups generally by
4  Kaiser?
5        MS. NUSSBAUM:  Could you repeat that
6  question?
7        (Record read.)
8        MS. NUSSBAUM:  Do you understand that
9  question?
10    A.  I do.  And I would say, yes,
11 generally, but what that means is that the -- we
12 have a sales and marketing piece of our
13 organization that handles the contact between --
14 represents Kaiser and the contact between the
15 purchaser or prospective purchasers.
16    Q.  Do you know?
17    A.  And I'm not involved personally in any
18 of those activities or discussions or
19 presentations or proposals.
20    Q.  Do you know if they do make proposals,
21 either requests for proposals or some other
22 procedure of that sort?
23       MS. NUSSBAUM:  Only if you
24 specifically know what the marketing group
25 specifically does.

Page 473

1    A. Carver
2    A.  I do know factually that we do receive
3  requests for proposals for the provision of health
4  insurance to large groups.
5    Q.  And do those, or are you involved in
6  the completion of those requests?
7    A.  I am not, I am not.
8    Q.  Do you know what the content of those
9  RFPs is?
10    A.  I do not specifically.
11    Q.  Do you know if they concern pharmacy
12 benefits?
13    A.  In some situations, they do.
14    Q.  And do you know if they concern the
15 cost containment programs available through Kaiser
16 for pharmacy benefits?
17       MS. NUSSBAUM:  Do you specifically
18 know that?
19    A.  I do know that in some RFPs, there is
20 a request to describe what type of efforts that
21 you have to help manage the cost of that -- for
22 that prospective employer group.
23    Q.  In response to that kind of
24 description, have you ever described any program
25 that we haven't discussed over the past two days?

Page 474

1    A. Carver
2    A.  I don't believe so, other than the
3  extensive use of generic products to help contain
4  costs.
5    Q.  Just to make sure I had your earlier
6  testimony correct, you said aside from your
7  personal interaction between the pharmacist and
8  the insured, the plaintiffs have no direct contact
9  with their insureds, is that right?
10    A.  I believe that the question that you
11 asked and the answer that I provided was from the
12 pharmacy department -- do I recall that correctly?
13    Q.  Okay.  And is that the exclusive
14 contact between the pharmacy department and the
15 insureds?
16       MS. NUSSBAUM:  To the best of your
17 knowledge.
18    A.  There's that direct contact time of
19 presenting a prescription to a patient.  There can
20 also be telephone contact, you know, a patient may
21 call, but that's generally the nature of the
22 contact between the pharmacist and the patient,
23 and the exercising their duties and the provision
24 of pharmacy services.
25    Q.  I guess outside the pharmacy

Page 475

A. Carver

1          A. Carver
2    department, do the plaintiffs have other contacts
3    with their insureds?
4        A.    Yes, they do.  There are occasional
5    bulletins or brochures that are provided generally
6    to membership of Kaiser Permanente.  I can recall
7    receiving those brochures or bulletins myself as a
8    member of the health plan.  I believe that the
9    publication that I am thinking about is a
10   publication entitled Planning For Health.
11       Q.    What does that publication concern?
12       A.    A variety of topics regarding the
13   Kaiser Permanente program and healthcare delivery.
14       Q.    Do you know who prepares that
15   publication?
16       A.    Not specifically.  It's generally
17   prepared by a publication group within the health
18   plan.
19       Q.    Do you know if particular prescription
20   drugs or classes of drugs are discussed in that
21   publication?
22       A.    Generally not, but I don't want to sit
23   here and say that never have prescription drugs
24   been discussed there.  There has been content that
25   I can recall that's related to how to use your

Page 476

1          A. Carver
2    pharmacy or how to access pharmacy services, how
3    to order your refills, etc.  And then occasionally
4    there has been content regarding specific disease
5    states.
6        Q.    Including perhaps the appropriate
7    treatments of those disease states?
8        MS. NUSSBAUM:  Don't speculate.  If
9    you know.
10       A.    I don't recall the specifics of any of
11   that, I can just recall generally.
12       Q.    Are there any other publications
13   besides the one we were just referring to that are
14   sent to Kaiser insureds by Kaiser that concern
15   either prescription drugs or classes of
16   prescription drugs?
17       MS. NUSSBAUM:  Only if you know.
18       A.    Not that I'm aware of specifically.
19       Q.    Have the plaintiffs ever considered
20   sending publications to their insureds, advising
21   them that certain prescription drugs may be
22   effective or ineffective in treating particular
23   disease states?
24       MS. NUSSBAUM:  Only if you know.
25       A.    I need to correct my previous answer.

Page 477

A. Carver

1          A. Carver
2    Sometimes there is direct communication with a
3    patient regarding a therapeutic substitution of
4    their product going from product A to product B in
5    such circumstances where a prescription may be
6    mailed to the individual.  So that would be a
7    fuller answer to your previous question, and I'm
8    sorry, I don't recall your last question.
9        MR. JAMES:  Could we have you read
10   that one back?
11       (Record read.)
12       MS. NUSSBAUM:  Only if you recall any
13   specific discussion.
14       A.    I do not recall any specific
15   publications or issues of publications or such
16   correspondence.
17       Q.    Do you know with confidence that such
18   publications involving those discussions have gone
19   out in the past?
20       MS. NUSSBAUM:  The witness just said
21   he didn't recall.
22       Q.    I think you said you don't recall
23   specific instances.  I'm saying that you can say
24   confidently as a general matter that has occurred.
25          Could you please let me know?

Page 478

1          A. Carver
2        A.    As a general matter, I believe my
3    testimony is occasionally such has occurred.  I
4    cannot recall the specifics of any particular drug
5    or therapeutic classes of drugs or management of
6    any particular disease state as I sit here before
7    you today.
8        Q.    Yesterday you had mentioned that you
9    had testified in connection with an action against
10   Abbott Laboratories, is that correct?
11       A.    That's correct.
12       Q.    Has that lawsuit been resolved?
13       A.    That matter is still in the litigation
14   process.
15       Q.    When was that lawsuit filed?
16       MS. NUSSBAUM:  To the best of your
17   recollection, if you know.  Otherwise, we can
18   leave a blank in the transcript and counsel will
19   provide the year that it was filed.
20       A.    I would ask that we leave a blank in
21   the transcript and we will provide that
22   information.  I don't recall from memory
23   specifically which year it was.
24       Q.    Do you know roughly whether it
25   was like last year or five years ago, or can you

Page 479

```
1            A. Carver
2   give a ballpark estimate with any confidence?
3        A.   If ballpark is good enough, within the
4   last five years, but not within the last year.
5   Closer to five than to one.
6        Q.   Is that, do you know the court in
7   which that litigation is pending?
8        A.   I'm sorry, I do not. It's -- I'm sure
9   that we could provide that to you. Again, if you
10  want to leave a blank, I'm not trying to be
11  nonresponsive to your question. I just don't
12  know. I'm not a lawyer and I don't deal with the
13  details of that.
14       Q.   Do you know what the subject matter of
15  that lawsuit is?
16       A.   Yes, I do.
17       Q.   And what is that?
18       A.   The subject matter had to do with
19  tactics taken by Abbott Laboratories to delay
20  entry into the market of the generic form of
21  Hytrin.
22       Q.   And when did you provide testimony in
23  that matter?
24       MS. NUSSBAUM: Approximately.
25       A.   Within the last two years.
```

Page 480

```
1            A. Carver
2        Q.   Were you serving as a 30(b)(6) witness
3   of Kaiser in that matter?
4        A.   I don't recall, I'm sorry.
5        Q.   With regard to the present litigation,
6   when did you first hear about the idea of Kaiser
7   bringing this lawsuit?
8        MS. NUSSBAUM: If you recall.
9        A.   I don't recall specifically.
10       Q.   Do you have any idea who might have
11  told you about the possibility that Kaiser could
12  bring this lawsuit?
13       MS. NUSSBAUM: If it's a discussion
14  with counsel, just say with discussion, but please
15  don't go into the sum and substance of what was
16  discussed.
17       A.   It was in discussion with counsel, the
18  specific date of which I cannot provide it, I
19  don't recall.
20       Q.   Do you know who the first individual
21  at Kaiser was who had the idea of filing this
22  lawsuit?
23       A.   I don't know in terms of who may have
24  had the first idea. I think that's impossible to
25  answer.
```

Page 481

```
1            A. Carver
2        Q.   Were you involved relatively early in
3   the process?
4        MS. NUSSBAUM: If you know.
5        A.   As -- I do not know.
6        Q.   Do you know who else was involved in
7   that decision-making process?
8        MS. NUSSBAUM: If you know.
9        A.   Mitch Cohen.
10       MS. NUSSBAUM: That's counsel?
11       THE WITNESS: That's counsel.
12       Q.   Anyone else?
13       MS. NUSSBAUM: You don't want to go
14  into any discussion.
15       A.   And I believe Steve Satkin, counsel as
16  well.
17       Q.   Those are the two names that you can
18  think of?
19       A.   Yes.
20       Q.   Do you know if Kaiser approached
21  counsel with the idea of bringing this lawsuit or
22  whether counsel initiated the idea of bringing
23  this lawsuit?
24       MS. NUSSBAUM: Well, I believe that
25  the counsel you're referring to are counsel at the
```

Page 482

```
1            A. Carver
2   plaintiff organizations.
3        Q.   Actually, I guess, do you believe it
4   was an employee of Kaiser or an external counsel
5   that first came up with the idea of Kaiser
6   bringing this lawsuit?
7        MS. NUSSBAUM: I would object at this
8   point. I think that the witness has said that the
9   initial conversation he had was with counsel, and
10  I think that the subject of conversations in
11  answer of litigation is one that is not to be
12  asked about.
13       If you have a specific question, once
14  again, we are delighted to have.
15       Q.   Following your decision to bring this
16  lawsuit, did you initiate additional document
17  retention policies beyond the ones that we
18  discussed earlier which were stated in the
19  exhibit?
20       MS. NUSSBAUM: If you know.
21       A.   The -- the advice of counsel and the
22  request of counsel was to preserve any document
23  relative to Neurontin and to this lawsuit and to
24  preserve those until any, you know -- until this
25  matter is resolved.
```

Page 483

A. Carver

1          A. Carver
2     Q.   And were all paper documents preserved
3  from that point forward?
4     A.   I believe so.
5     Q.   And was all e-mail archived from that
6  point forward?
7     A.   I believe so, to the degree that it's
8  relevant to this case.
9     Q.   And in compliance with the ordinary
10  document retention policy which might call for the
11  destruction of records following 7 years was
12  suspended, is that right?
13     A.   Yes, the requirement basically is for
14  the retention of any documents that may be
15  relevant to this matter.
16          MR. JAMES:  Can we take a short break
17  now, and how many minutes do I have left?
18          VIDEOGRAPHER:  About 20.
19          We're going off the record.  It is
20  4:46 p.m.
21          (Recess.)
22          VIDEOGRAPHER:  Going back on the
23  record at 4:54 p.m.
24          (Kaiser-24 marked for identification.)
25  BY MR. JAMES:

Page 484

1          A. Carver
2     Q.   You can take a moment to look at this
3  document and see whether you recognize it or what
4  it refers to.
5          Have you had an opportunity to look
6  over the document?
7     A.   Yes, I have.
8     Q.   Do you know what it is?
9     A.   By the title of it, it's information
10  related to a chief of neurology meeting held on
11  June 17, 1999.  This is the way it's labeled.  And
12  then there's some synopsis of that -- and I --
13  there appears to contain someone's notes regarding
14  that meeting.
15          And then on the subsequent page,
16  there's a synopsis of the discussion that occurred
17  at the chief of neurology meeting.  And then
18  that's followed by a local area, or actually,
19  excuse me -- a position document from Art Flippin,
20  who at that time was apparently the regional
21  coordinating chief of neurology in southern
22  California, which is followed by the drug
23  monograph documents that appear to be the same
24  documents that we reviewed yesterday, basically.
25     Q.   On the page KIS 004619?

Page 485

1          A. Carver
2     A.   4619, yes.
3     Q.   Is Dr. Flippin endorsing off-label use
4  of Neurontin?
5          MS. NUSSBAUM:  The document speaks for
6  itself.
7     A.   There's a box checked there that
8  indicates support for removing the prescribing
9  restrictions and for the use of some guidelines.
10     Q.   Are the guidelines those on 800462?
11          MS. NUSSBAUM:  I don't think we've
12  established that he has any personal knowledge
13  with respect to this document or received it or
14  wrote it.
15     A.   I did not participate in any of this.
16  It appears the guidelines are contained on 4617.
17          MS. NUSSBAUM:  Do you have any
18  knowledge of this document other than looking at
19  the piece of paper?
20          THE WITNESS:  No, I do not.
21          MS. NUSSBAUM:  You've never seen this
22  before?
23          THE WITNESS:  No.
24          MR. JAMES:  Please let me use my
25  precious 15 minutes.

Page 486

1          A. Carver
2     Q.   Returning to page 4615 --
3     A.   Yes.
4     Q.   -- in the last paragraph it appears to
5  state, "Unrestricted in northern California use in
6  past year, 30,384 prescriptions versus southern
7  California, 18,519 prescriptions."
8          Is that your understanding of that
9  text?
10          MS. NUSSBAUM:  Don't speculate.  Only
11  if you specifically know on this document, which
12  you haven't seen before.
13     A.   I don't know this -- you know the
14  specific, what was intended there specifically.
15     Q.   Does this refresh your recollection
16  that Kaiser was able to track the number of
17  prescriptions of particular prescription drugs by
18  region as early as 1999?
19          MS. NUSSBAUM:  Objection.  It calls
20  for speculation.  The witness has not seen this
21  before.
22          MR. JAMES:  I'm actually asking him
23  whether it refreshes his independent recollection.
24          MS. NUSSBAUM:  Does this refresh your
25  recollection as to anything?

A. Carver

1
2      A.   If your question is did we have the
3  ability to count prescriptions?
4          MS. NUSSBAUM:  Only if you know, do
5  you know where this information came from?
6          THE WITNESS:  I don't know where the
7  information came from.
8      Q.   I'm not actually asking whether this
9  information -- I'm saying having looked at this,
10  does this remind you that Kaiser was able to track
11  the number of prescriptions for a particular drug
12  as early as 1999?
13          MS. NUSSBAUM:  Does this refresh your
14  recollection?
15          MR. JAMES:  I'd rather he just answer
16  my question rather than yours.
17          MS. NUSSBAUM:  Are you asking him
18  whether it reminds --
19          MR. JAMES:  You're consuming my
20  remaining 10 minutes.  I'm shocked by the lack of
21  courtesy.
22      Q.   If you could answer the question?
23      A.   I don't know about the reminder.  We
24  were able to know how many prescriptions were
25  dispensed for a product in 1999, if that's the

A. Carver

1
2      A.   Yes, I'm getting tired, but not that
3  tired.
4          MR. JAMES:  I think I'll conclude the
5  questions for today on the part of the defendants
6  and state on the record that we reserve all
7  further rights with regard to this witness.
8          MS. NUSSBAUM:  I'm not sure what that
9  means.
10          MR. JAMES:  We are not waiving any
11  rights either today or yesterday with regard to
12  this witness.
13          MS. NUSSBAUM:  Well, this witness was
14  produced in his personal capacity, in his 30(b)(6)
15  capacity, as on behalf of the corporation on the
16  general 30(b)(6) Notice and on the two
17  supplemental notices.
18          I observed that questions were asked
19  with respect to all 3 of the 30(b)(6) Notices and
20  questions were also asked with respect to his
21  individual capacity.  So, as far as we're
22  concerned, all 30(b)(6) Notices have been
23  satisfied, as well as Mr. Carver's individual
24  deposition documents have been produced.
25  Documents have been shown, questions have been

A. Carver

1
2  answer that you're looking for.
3      Q.   Looking at these numbers of
4  prescriptions, I mean, do you think 18,519
5  prescriptions of Neurontin would be a high number
6  if all of those prescription were for Neurontin's
7  on-label use?
8      A.   I do not have a view.
9          MS. NUSSBAUM:  Objection, calls for
10  speculation.
11      Q.   Do you know when Kaiser first became
12  aware that Neurontin was being prescribed
13  off-label?
14          MS. NUSSBAUM:  Objection.  Only if you
15  specifically know.
16      A.   I don't specifically recall precisely
17  when we -- when Kaiser became aware.
18          (Kaiser-25 marked for identification.)
19      Q.   I'll actually just ask you to flip
20  through it quickly and tell me if you recognize
21  it.
22      A.   I believe this is a document that we
23  reviewed a few hours ago.
24      Q.   Okay.  I will not ask anymore
25  questions regarding that document.

A. Carver

1
2  asked as to each and every one of those notices.
3          That was our understanding, that was
4  our position in the letter to Mr. Roland referred
5  to yesterday, that was the position that we took
6  at the very beginning of the deposition yesterday.
7  You did not object to that position.
8          MR. JAMES:  I would like to clarify
9  one point, that if you make a statement as to your
10  position and I don't immediately jump all over
11  you, that does not indicate that the defendants
12  are waiving any rights that they might have under
13  the Federal Rules, under the case management order
14  in this case or under any other applicable law.
15          MS. NUSSBAUM:  And I would suggest
16  that this witness has been asked questions about
17  the document production here, about the document
18  preservation policy, the general corporate
19  30(b)(6) deposition, as well as individual, so
20  he's been asked questions as to all four notices.
21  He's provided testimony as to all four notices.
22  He has competently testified as to all four
23  notices.
24          He testified that he was able to
25  testify as to all of the particular subjects.  He

Page 491

A. Carver

1       A. Carver
2  did testify as to all the particular subjects, and
3  so from our perspective, these depositions are all
4  concluded.
5           MR. JAMES: And we understand that to
6  be your position, but we don't necessarily accept
7  any or all of your conclusions and we reserve all
8  rights.
9           MS. NUSSBAUM: Well, if you have a
10  specific issue, let's hear it now. We're still
11  here. The witness is here. Let's get it done.
12          MS. NUSSBAUM: I prefer to consult with
13  my co-counsel and --
14          MS. NUSSBAUM: Your co-counsel is
15  right -- consult with him and -- do you have a
16  problem with what's happened? If you have a
17  problem with anything that we've said, if you
18  think you haven't had opportunity to question this
19  witness as to the corporate 30(b)(6), the document
20  retention policy 30(b)(6), the computer systems
21  30(b)(6), the preservation 30(b)(6) or in his
22  individual capacity, let us know right now because
23  he's been asked questions as to all of that.
24          MR. JAMES: I'll just note as one
25  example that the witness is not aware of the

Page 492

A. Carver

1       A. Carver
2  current restriction practices as regards to
3  Neurontin or generic Gabapentin that Kaiser has in
4  place today.
5           Beyond that, I don't think that this
6  is the time or place to discuss any possible
7  deficiencies in the witness' testimony or any
8  further testimony that we might need to take of
9  this witness or other witnesses at Kaiser. I'd
10  prefer to consult with Mr. Hyunda and my client.
11          MS. NUSSBAUM: This witness has
12  testified for two days. He testified as to
13  restrictions. He testified with respect to the
14  best of his ability. I think he testified that
15  your client's product is no longer on the
16  formulary and that they now have a generic product
17  on the formulary.
18          So, he has testified as to the status
19  of Neurontin on the present formulary and that's
20  what the 30(b)(6) Notice requested, so I think
21  he's given testimony.
22          MR. JAMES: An initial matter past
23  1999.
24          MS. NUSSBAUM: We also indicated that
25  if there's a very specific factual question that

Page 493

A. Carver

1       A. Carver
2  we have, we've had on a number of occasions said
3  leave a blank and we'll fill it in when he's
4  reading the deposition.
5           MR. JAMES: As I said before, this is
6  not the time or place to make a final
7  determination. We will confer with the
8  appropriate parties and let you know. I do agree
9  with you that the witness has made his best
10  personal effort to testify and I appreciate that
11  recollection.
12          MS. NUSSBAUM: Okay, so your
13  deposition is closed.
14          VIDEOGRAPHER: We're going off the
15  record at 5:09 p.m. This is the end of tape six
16  and concludes today's portion of the deposition of
17  Albert Carver.
18          MS. NUSSBAUM: I have some time that
19  I'd like to use.
20          (Recess.)
21          VIDEOGRAPHER: We're going back on the
22  record at 5:16 p.m.
23  CROSS-EXAMINATION
24  BY MS. NUSSBAUM:
25     Q.   Good afternoon, Mr. Carver. My name,

Page 494

A. Carver

1       A. Carver
2  as you know, is Linda Nussbaum, and I'm an
3  attorney the representing Kaiser, the plaintiffs
4  in this action.
5           I simply want to ask you a few
6  questions to clarify a number of the exhibits that
7  have been previously marked by the defendants'
8  lawyer, if we might, okay?
9      A.   Okay.
10     Q.   First let's look at what's previously
11  been marked the Third Coordinated Amended
12  Complaint, if we can, please. And in particular,
13  if you can go to page 43 of that Complaint.
14          Starting on page 43 in paragraph 112,
15  there is a multi-paragraph discussion of a trial
16  and article that was conducted by a Dr. Kenneth
17  Gorson.
18          Do you see that?
19     A.   Yes, I do.
20     Q.   And the Complaint alleges that the
21  article that was written by Dr. Gorson was part of
22  the wrongful conduct in this action, is that
23  correct?
24     A.   That's correct.
25     Q.   Now, leaving the Complaint open to

Page 495

```
 1            A. Carver
 2 page 43, and looking, if you would please, at
 3 what's been previously marked as Kaiser-7, and
 4 that is a document that says, "Drug monograph KAIS
 5 004629 through 004637."
 6       Do you have that document in front of
 7 you, sir?
 8    A.   I do.
 9    Q.   Now, with respect to the drug
10 monograph KAIS Exhibit 77, if you would please
11 turn to the last page of that document, and that
12 last page indicates references, is that correct?
13    A.   That's correct.
14    Q.   And references a list of the articles
15 and contacts that were relied upon by Kaiser with
16 respect to their preparation of the drug
17 monograph, is that correct?
18    A.   That's correct.
19    Q.   And S-7, the last reference on the
20 page KAIS 004637 indicates the article by
21 Dr. Kenneth Gorson, is that correct?
22    A.   That's correct.
23    Q.   And that is the article that's
24 referred to in the Complaint on paragraphs 112
25 through 114 and 115 with respect to the wrongful
```

Page 496

```
 1            A. Carver
 2 conduct by these defendants, is that correct?
 3    A.   That's correct.
 4    Q.   I'd also draw your attention, sir, to
 5 reference number 2, also on K 004637, and that
 6 says personal?
 7       MR. JAMES:  I'm sorry, which document
 8 are you referring to?
 9       MS. NUSSBAUM:  We're still on
10 Kaiser-7, the last page under references, it says,
11 "Personal communication, Monica Patel, Pharm.D.,
12 Parke-Davis, May 1999."
13       Do you see that?
14    A.   I see that.
15    Q.   And does that refer to a personal
16 communication by a representative of Parke-Davis
17 in May of 1999 to the plaintiffs here with respect
18 to Neurontin?
19    A.   To the plaintiffs or to the
20 defendants?
21    Q.   I'm sorry, no, to the plaintiffs, to
22 Kaiser, does that indicate in the references
23 that --
24    A.   Yes, it does.  Yes, it does.
25    Q.   So it indicates to you that Kaiser, in
```

Page 497

```
 1            A. Carver
 2 preparation of its drug monograph, relied on a
 3 personal communication by an employee of
 4 Parke-Davis, Monica Patel, is that correct?
 5    A.   That's correct.
 6    Q.   Now, let me draw your attention to
 7 Exhibit 23, which is the article, "Antidepressants
 8 And Anti-herpetic Drugs For Chronic Non-cancer
 9 Pain," written by Drs. Maizels and McCarberg.
10       Do you see that?
11    A.   I do.
12    Q.   Now, with respect to that, sir,
13 turning you to the next to the last page, Kaiser
14 003808, and the last paragraph that indicates that
15 Dr. Maizels is on the speaker bureau for Pfizer,
16 Inc.
17       Do you see that?
18    A.   I do.
19    Q.   Now, were you aware that Dr. Maizels
20 was on the speaker bureau for Pfizer, Inc. in or
21 about 2005 or at any other time?
22    A.   No, I was not.
23    Q.   It also indicates that Dr. Maizels is
24 a paid consultant for Pfizer, do you see that?
25    A.   Yes, I do.
```

Page 498

```
 1            A. Carver
 2    Q.   Now, were you ever aware that
 3 Dr. Maizels was a paid consultant for Pfizer?
 4    A.   Never.
 5    Q.   It also indicates that Dr. McCarberg
 6 is on the speaker bureau for Pfizer, do you see
 7 that?
 8    A.   Yes, I do.
 9    Q.   And were you ever aware that
10 Dr. McCarberg was a speaker for Pfizer?
11    A.   Never aware.
12    Q.   Now, drawing your attention, sir, to
13 what has previously been marked as Exhibit 17, and
14 this is the approved minutes, TPMG regional
15 pharmacy and therapeutics committee.  And that is
16 KAIS 001460 through 001467.
17       Do you have that document before you?
18    A.   I do.
19    Q.   And sir, if you would turn to a page
20 in the middle, it says 001464 and under Gabapentin
21 (Neurontin) it says that it's a request to
22 designate Gabapentin a non-detailable formulary
23 product.
24       Do you see that?
25    A.   I do see that.
```

Page 499

A. Carver

1         A. Carver
2    Q.   And I think that you previously told
3  Mr. James that that was approved so that
4  Gabapentin became a non-detailable formulary
5  product, is that correct?
6    A.   That's correct.
7    Q.   And I think that you also told
8  Mr. James that although the minutes reflected the
9  meeting occurred in December of 2001, that because
10 to needed to be notification to the pharmacy
11 company and in other notifications that that
12 process would take several months, is that
13 correct?
14   A.   That's correct.
15        MR. JAMES:  I believe that misstates
16 the witness' prior testimony.
17        MS. NUSSBAUM:  Sir, I'll ask the
18 question then.
19   Q.   Is it fair to say that it would take
20 between 3 and six months in the ordinary course
21 once a determination had been made for a product
22 to become a non-detailable formulary product for,
23 in fact, a pharmaceutical company to stop
24 detailing physicians?
25   A.   I believe I said approximately 3

Page 500

1         A. Carver
2  months.
3    Q.   Approximately three months?
4    A.   Yes.
5    Q.   Okay.
6        Now, is it fair to say by looking at
7  this document that prior to early 2002, which
8  would be 3 months after the meeting of the P&T
9  committee in December 2001 when it was approved,
10 that Neurontin became a non-non-detailable
11 formulary product, that prior to that Neurontin
12 was in fact a detailable formulary product?
13   A.   Yes.
14   Q.   And what does that mean, sir?
15   A.   That means that the medical service
16 representatives from the company would have access
17 to and be able to detail their product to the
18 physicians within the Permanente Medical Group.
19   Q.   Okay.
20        So prior to the spring of 2002, it is
21 fair to say that first Parke-Davis and then Pfizer
22 were detailing the physicians that worked for the
23 Permanente Medical Group with respect to
24 Neurontin, is that correct?
25   A.   That's correct.

Page 501

1         A. Carver
2    Q.   Okay.  And in your review of the
3  Complaint, is it fair to say that there are
4  numerous allegations that the detailing of
5  physicians by first Parke-Davis and then Pfizer
6  were part of the wrongful scheme and the wrongful
7  conduct that's been alleged here?
8    A.   Yes, there are such citations.
9    Q.   And is it fair to say as part of your
10 experience that physicians that are detailed and
11 physicians that are detailed inappropriately with
12 respect to off-label promotion such as that
13 alleged in this Complaint are likely --
14        MR. JAMES:  I'd object on the ground
15 he's not an expert.
16   Q.   -- principals for the pharmaceutical
17 product for which they're detailed?
18        MR. JAMES:  I'd object on the ground
19 he's not an expert with regard to the subject.
20   Q.   You can answer the question.
21   A.   My view would be that, yes, the
22 detailing of products by pharmaceutical companies
23 does result in the writing of prescriptions by
24 physicians.
25   Q.   Okay.  Also, with respect to the same

Page 502

1         A. Carver
2  people that work for Parke-Davis and Pfizer that
3  detail, those are also the people that would give
4  physicians free samples, is that correct?
5    A.   That's correct.
6    Q.   Okay.  And is it fair to say based on
7  your understanding of the pharmaceutical industry
8  that giving physicians free samples leads to more
9  prescriptions being written for the particular
10 product for which the free samples are given?
11   A.   Yes, that's a fair assessment of the
12 effect in the industry.
13        MR. JAMES:  I'd object to that
14 response, insofar as it calls for speculation.
15   Q.   So it's fair to say that the
16 allegations in the Complaint which refer to
17 off-label promotion by Pfizer detailers, refer to
18 the giving of inappropriate free samples of
19 Neurontin by the Pfizer detailers; in fact, those
20 same detailers were free and did detail the
21 physicians that worked for the Kaiser Permanente
22 Group from the time that the drug went on
23 formulary in or about 1994 until the early spring
24 of 2002 as reflected in Exhibit 17?
25        MR. JAMES:  I object to the lack of

Page 503

A. Carver

1           A. Carver
2  foundation, and I'd also object to just a
3  generally confusing question, and I'd object to
4  form, and I also object if the witness were now to
5  become an expert for which he was unable to render
6  an opinion during the course of direct
7  examination.
8       Q.   Can you answer my question, sir?
9       A.   Yes.
10      Q.   And what is your answer?
11      A.   Yes.
12      Q.   Now, in the Complaint, if you again
13 look this time to page 30, there is a chart at the
14 bottom of the page, this is in paragraph 83, and
15 this is the set of allegations with respect to
16 medical education systems, MES, which is a medical
17 marketing firm in Philadelphia, that it allegedly
18 engaged in wrongful conduct with Parke-Davis with
19 respect to the off-label promotion of Neurontin,
20 and turning specifically to paragraph 83 and the
21 chart, there's a list of alleged authors of
22 articles and subjects of articles.
23           Do you see that?
24      A.   I do.
25      Q.   And if you go four down, an article

Page 504

1           A. Carver
2  says, Patricia (Tricia Suppes, S-U-P-P-E-S).
3           Do you see that?
4       A.   I do.
5       Q.   And the article concerns mania and
6  hypomania.
7           Do you see that?
8       A.   I do.
9           (Kaiser-26 marked for identification.)
10      Q.   Now, let me show you a document which
11 we are marking as a Kaiser exhibit.  It's KAIS
12 404322 through 004326.
13           Now, looking at Exhibit 26, is that
14 the article that is referred to on page 30 of the
15 Amended Coordinated Complaint that is the article
16 by Patricia Suppes?
17      A.   It appears to be.
18      Q.   Okay.  And I note that on the lower
19 right-hand corner, this article bears a Bates
20 stamp number from Kaiser.
21           Do you see that?
22      A.   I do.
23      Q.   And does that reflect to you that this
24 is a document that was produced from Kaiser files
25 in this litigation?

Page 505

1           A. Carver
2       A.   It does.
3       Q.   And does that then reflect to you that
4  this was an article that was requested and used
5  and relied upon by Kaiser in making its decisions
6  with respect to Neurontin?
7           MR. JAMES:  Objection.  It
8  was previously stated that he didn't have any
9  knowledge regarding specific articles such as this
10 regarding Neurontin or relied on by Kaiser.
11      Q.   Well, does this refresh your
12 recollection, sir, the fact that this article was
13 in Kaiser's files and produced in this litigation
14 that this is an article that Kaiser had that the
15 people whose files were searched produced this
16 article and that the article was in Kaiser's files
17 and relied upon by Kaiser in this litigation?
18           MR. JAMES:  I object to his answering
19 regarding reliance.
20           MS. NUSSBAUM:  That's okay, you can
21 object.
22      A.   Yes, this document came from the
23 Kaiser files, and so I think the answer to your
24 question is yes.
25      Q.   That is that this is a document that

Page 506

1           A. Carver
2  was used and relied by Kaiser as part of the
3  information they considered with respect to their
4  determinations concerning Neurontin, is that
5  correct?
6       A.   Correct.
7           MS. NUSSBAUM:  I have no further
8  questions of this witness at this time.  The
9  deposition is concluded.
10          VIDEOGRAPHER:  We're going off the
11 record at 5:32 p.m.  This is the end of tape six
12 and concludes today's deposition of Albert Carver.
13          (Recess.)
14          VIDEOGRAPHER:  Back on the record at
15 5:33 p.m.
16 REDIRECT EXAMINATION
17 BY MR. JAMES:
18      Q.   I won't keep you long.  I have one
19 question.
20          You testified just now that this
21 document that Ms. Nussbaum showed you was one that
22 was relied upon by Kaiser in some way, is that
23 correct?
24      A.   That's correct.
25      Q.   And could the same be said of any

Page 507

```
 1            A. Carver
 2  article that was produced from Kaiser's files?
 3       A.   I believe that that's correct in terms
 4  of articles that would have been taken into
 5  consideration.
 6            MS. NUSSBAUM: If you have a
 7  particular --
 8       Q.   Is there anything distinct about this
 9  article relative to other ones that were produced
10  from Kaiser's files that led you to believe that
11  this one might have been relied upon?
12            MS. NUSSBAUM: If you have a
13  particular article that you want to show the
14  witness that's been --
15            MR. JAMES: No, I'm actually asking
16  for --
17       Q.   What is the basis for your conclusion
18  that this article was relied upon?
19       A.   The basis for the conclusion is the
20  fact that it was contained in our files and
21  produced subsequent to information that we had on
22  Neurontin.
23            MR. JAMES: Thank you.  That's all I
24  have.
25            VIDEOGRAPHER: Off the record at
```

Page 508

```
 1            A. Carver
 2  5:34 p.m.  This is the end of tape six and
 3  concludes the deposition of Albert Carver.
 4            (Whereupon the proceedings were
 5  concluded at 5:34 p.m.)
 6         J U R A T
 7       I, ALBERT L. CARVER, the witness herein,
 8  having read the foregoing testimony of the pages of this
 9  deposition, do hereby certify it to be a true and
10  correct transcript, subject to the corrections, if any,
11  shown on the attached page.
12
13  _____
14       ALBERT L. CARVER
15     Subscribed and sworn to before me
16  this _____ day of _____ 2007.
17  _____
18     NOTARY PUBLIC
19
20
21
22
23
24
25
```

Page 509

```
 1            A. Carver
 2  STATE OF NEW YORK   )      Pg. of Pgs.
 3                      ) ss.:
 4  COUNTY OF NEW YORK  )
 5       I wish to make the following changes, for the
 6  following reasons:
 7  PAGE  LINE
 8  ____ ____    CHANGE: _____
 9               REASON: _____
10  ____ ____    CHANGE: _____
11               REASON: _____
12  ____ ____    CHANGE: _____
13               REASON: _____
14  ____ ____    CHANGE: _____
15               REASON: _____
16  ____ ____    CHANGE: _____
17               REASON: _____
18  ____ ____    CHANGE: _____
19               REASON: _____
20  ____ ____    CHANGE: _____
21               REASON: _____
22  ____ ____    CHANGE: _____
23               REASON: _____
24  ____ ____    CHANGE: _____
25               REASON: _____
```

Page 510

```
 1            A. Carver
 2  PAGE  LINE
 3  ____ ____    CHANGE: _____
 4               REASON: _____
 5  ____ ____    CHANGE: _____
 6               REASON: _____
 7  ____ ____    CHANGE: _____
 8               REASON: _____
 9  ____ ____    CHANGE: _____
10               REASON: _____
11  ____ ____    CHANGE: _____
12               REASON: _____
13  ____ ____    CHANGE: _____
14               REASON: _____
15  ____ ____    CHANGE: _____
16               REASON: _____
17  ____ ____    CHANGE: _____
18               REASON: _____
19  ____ ____    CHANGE: _____
20               REASON: _____
21  ____ ____    CHANGE: _____
22               REASON: _____
23  ____ ____    CHANGE: _____
24               REASON: _____
25
```

Page 511

```
 1
 2              CERTIFICATE
 3          I, AMY A. RIVERA, a Notary Public and
 4    Certified Shorthand Reporter of the State of New York,
 5    do hereby certify that prior to the commencement of the
 6    examination ALBERT L. CARVER was duly sworn by me to
 7    testify the truth, the whole truth and nothing but the
 8    truth.
 9          I DO FURTHER CERTIFY that the foregoing
10    is a true and accurate transcript of the testimony as
11    taken stenographically by and before me at the time,
12    place and on the date hereinbefore set forth.
13          I DO FURTHER CERTIFY that I am neither a
14    relative nor employee nor attorney nor counsel of any of
15    the parties to this action, and that I am neither a
16    relative nor employee of such attorney or counsel, and
17    that I am not financially interested in the action.
18
19    _____
20        Notary Public of the State of New York
21        My commission expires August 29, 2009
22        License No. XI00939
23    Dated: July 17, 2007
24
25
```

I, ALBERT L. CARVER, the witness herein, having read the foregoing testimony

of the pages of this deposition, taken on July 13, 2007, do hereby certify it to be a true

and correct transcript, subject to the corrections, if any shown on Attachment B.


_____
ALBERT L. CARVER

Subscribed and sworn to before me
this _18_ day of _September_ 2007.

_____
NOTARY PUBLIC

NANCY A. MARTINEZ
COMM. # 1520191
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires OCT. 18, 2008

**ATTACHMENT B**

**Day 2 Albert Carver Deposition – July 13, 2007**

| PAGE/LINE REFERENCE | CHANGE | REASON |
|---|---|---|
| 220:13 | "directly" to "indirectly" | Typo |
| 223:10 | There should be a "." (period) after the word Kaiser. | Grammatical |
| 293:10-11 | Change: "A: Not specific interactions or information; no, of course not." To the following:<br><br>While I do not have personal knowledge of specific statements made by defendants to Kaiser regarding the use of Neurontin, I understand that there are documents reflecting such communications which have been produced by Kaiser in this litigation. Documents reflecting these representations are set forth in "Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals Third Supplemental Response and Objections to Certain of Defendants' First and Second Set of Interrogatories." | Upon further reflection, I want to elaborate on my answer regarding specific statements made by defendants to Kaiser regarding Neurontin. |
| 299:15 | First Amended Coordinated Complaint was filed by Kaiser and other Coordinated Plaintiffs on February 1, 2005 | Filling in blank that was left in the transcript |
| 361:19 | "and" to "in" | Typo |
| 402:8 | "physician and chief" to "Physician in Chief" | Typo |
| 423:25 | "and" to "in" | Typo |
| 431:6 | Add the word "than" before the word "in" | Grammatical |
| 481:15 | "Satkin" to "Zatkin" | Corrected name spelling |