EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION** | ) ) ) ) |
| **THIS DOCUMENT RELATES TO:** | ) MDL NO. 1629 ) Master File: 04-cv-10981-PBS ) |
| Smith v. Pfizer, Inc., et al., 1:05-cv-11515-PBS | ) ) ) ) ) |

**MEMORANDUM AND ORDER**

**August 14, 2009**

Saris, U.S.D.J.

**I. INTRODUCTION**

Plaintiff Ruth Smith brings this action alleging that her husband Richard Smith's use of Neurontin, a product manufactured by Defendants Pfizer, Inc. and Warner-Lambert Company LLC (collectively "Pfizer"), caused him to commit suicide. Defendants have moved to exclude the testimony of two of Plaintiff's experts, asserting that the methodology and analysis underlying their opinions that Neurontin was a specific cause of Mr. Smith's suicide are unreliable and inadmissible. After a hearing and review of the record, the Court finds that the methodologies employed by the two experts – a "psychological autopsy" and a "differential diagnosis" – are generally accepted in the field, that the two experts reliably applied these methodologies to the facts of the case, and that their testimony

is relevant to the task at hand.  The motion to exclude is
**DENIED**.

## II. BACKGROUND

The following facts are generally undisputed, except where
noted.

## A. Mr. Smith

On May 13, 2004, at the age of seventy-nine, Richard Smith
committed suicide by shooting himself in the head.  Mr. Smith
lived with his wife of over fifty years and was a longtime
volunteer pastor at the Church of Christ.  At the time of his
death, however, he was experiencing severe and debilitating pain
due to a back injury suffered in early 2003.  His suicide note
stated:

> Pain has taken over my mind and body.  I need
> back surgery.  Left and right rotator cuffs,
> right bicep torn, back surgery to correct
> pain in the legs.  Forgive me, I cannot go on
> like this.  I cannot have my body, the temple
> of the holy spirit, cut on any more.  I have
> talked to God all night and He understands.

In March 2004 (approximately two months before his suicide), one
of Mr. Smith's doctors gave him a prescription for 300 mg of
Neurontin, twice a day.  Mr. Smith filled the prescription on
March 9, 2004.[1]

Mr. Smith had several orthopedic surgeries on his knees and

_____

[1] Though he had been prescribed Neurontin in 2003, there is
no evidence that he actually took the drug at that time.

hip prior to 2003, but did not experience back pain until January 2003 when he injured himself attempting to repair a leaky sink. Mr. Smith had back surgery on April 1, 2003; at first, it seemed that the surgery had gone well, but Mr. Smith later developed severe leg pain.  The pain grew worse, prompting Mr. Smith to visit several different orthopedists, including one doctor who prescribed Neurontin for Mr. Smith, recommended that he consider a second back surgery, and suggested that Mr. Smith seek a psychiatric evaluation.  Other doctors, however, told Mr. Smith that he was not a candidate for a second surgery.  Though Mr. Smith was receiving prescriptions for pain medications, he continued to experience and complain of severe pain.  He attempted physical therapy but reported that it provided only short-term relief.

The pain took a toll on Mr. Smith mentally as well. Doctors' records report that, in early May 2003 (approximately one month after his back surgery), Mr. Smith stated that he wished he could die and was experiencing pain and depression. While the details and extent of Mr. Smith's depression are disputed, it is clear that he was prescribed an anti-depressant. His physician (Dr. Cato) testified that Mr. Smith did not appear suicidal or depressed during office visits in January and February 2004.  Another doctor, Dr. Berlacich, reported that, when he saw Mr. Smith (prior to the prescription of Neurontin by another doctor), Mr. Smith did not exhibit signs of suicidality

-3-

despite his chronic pain.  On March 1, 2004, however, his daughter reported that he contemplated suicide, prior to filling his Neurontin prescription (filled on March 9, 2004).

Three days before his suicide, Mr. Smith visited his friend and dentist.  He complained of the intense pain he was experiencing, noting that he felt useless and hopeless about the situation and stating that he wished he had never had the back surgery in the first place.  He added that the Neurontin he was taking made him feel weird and was not helping.  Mr. Smith also reported feeling "loopy" and not himself to family members, including his son-in-law who was a doctor of pharmacology.

**B. The Litigation**

Pointing to the evidence of behavioral and psychological changes following Mr. Smith's prescription of Neurontin, Plaintiff characterizes her husbands's suicide as an impulsive, out-of-character act prompted by his ingestion of Neurontin. Defendants, however, emphasize the intensity of the pain Mr. Smith was experiencing and his previous bouts with depression, arguing that, given these other factors, Plaintiff cannot show that Neurontin caused Mr. Smith's suicide.

"In order to prevail in a pharmaceutical personal injury case, a plaintiff must establish two types of causation: general and specific."  In re Neurontin Mktg., Sales Practices, and Prods. Liab. Litig., 612 F. Supp. 2d 116, 123 (D. Mass. 2009).

"As explained in the Federal Judicial Center's <u>Reference Manual</u> <u>on Scientific Evidence</u>, 'General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease . . . . Specific, or individual, causation, however, is established by demonstrating that a given exposure is the cause of an individual's disease . . . .'" <u>Id.</u> (quoting Mary Sue Henifin et al., <u>Reference Guide on Medical Testimony</u>, in <u>Reference Manual on Scientific Evidence</u> 439, 444 (Fed. Judicial Ctr. 2d ed. 2000) (hereinafter "<u>Reference Guide on Medical Testimony</u>")). Defendants previously moved to exclude plaintiffs' general causation testimony (i.e., that Neurontin is capable of causing suicide-related events) in all products liability motions alleging that Neurontin led to suicide-related injuries and deaths; this Court denied that motion. <u>See In re Neurontin</u>, 612 F. Supp. 2d at 159 (holding that plaintiffs demonstrated that their experts' general causation testimony was reliable and admissible under <u>Daubert</u> and Federal Rule of Evidence 702).

Defendants now challenge the admissibility of expert testimony on the second, individualized type of causation. The instant motion focuses solely on expert testimony regarding the role that Neurontin may or may not have played in the suicide of Mr. Richard Smith. Nevertheless, many of the issues addressed herein are likely to arise in the numerous other individual cases alleging suicide-related injuries caused by Neurontin.

Plaintiff offers two expert witnesses, Roger W. Maris, Ph.D., who has expertise as a suicidologist and Michael Trimble, M.D., a psychiatrist and professor of behavioral neurology, to establish specific causation as to Mr. Smith's death.  Defendants contend that both doctors' opinions are insufficiently reliable under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993), and must therefore be excluded.

### III. DISCUSSION

#### A. Daubert and the Social Sciences

The admission of expert evidence is governed by Federal Rule of Evidence 702, which codified the Supreme Court's holding in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny.  See <u>United States v. Diaz</u>, 300 F.3d 66, 73 (1st Cir. 2002); see also Fed. R. Evid. 702 advisory committee's note.  Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial court must determine whether the expert's

testimony "both rests on a reliable foundation and is relevant to the task at hand" and whether the expert is qualified.  Daubert, 509 U.S. at 597; Diaz, 300 F.3d at 73 ("[A] proposed expert witness must be sufficiently qualified to assist the trier of fact, and . . . his or her expert testimony must be relevant to the task at hand and rest on a reliable basis . . . .").  An expert's methodology is the "central focus of a Daubert inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable."  Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998).

Because "the admissibility of all expert testimony is governed by the principles of Rule 104(a)," the proponent of the testimony must establish that the expert's opinion is reliable by a preponderance of the evidence.  Fed. R. Evid. 702 advisory committee's note (citing Bourjaily v. United States, 483 U.S. 171 (1987)).  "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir. 1998).

Vigilant exercise of this gatekeeper role is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand

knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background and approach.  <u>See</u> <u>Daubert</u>, 509 U.S. at 595; <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 148 (1999) (noting that experts enjoy "testimonial latitude unavailable to other witnesses"); <u>United States v. Hines</u>, 55 F. Supp. 2d 62, 64 (D. Mass. 1999) ("[A] certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve.").

The Court must, however, keep in mind the Supreme Court's admonition that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  <u>Daubert</u>, 509 U.S. at 596.  If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts."  <u>Kumho Tire Co.</u>, 526 U.S. at 153.  As the First Circuit has stated:

> As long as an expert's scientific testimony rests upon "good grounds, based on what is known," <u>Daubert</u>, 509 U.S. at 590, 113 S.Ct. 2786 (internal quotation marks omitted), it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies, <u>see id.</u> at 596, 113 S.Ct.

2786.

<u>Ruiz-Troche</u>, 161 F.3d at 85.

In <u>Daubert</u>, the Court identified four factors that it believed might assist trial courts in determining the admissibility of an expert's testimony: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory's or technique's acceptance within the relevant discipline." <u>United States v. Mooney</u>, 315 F.3d 54, 62 (1st Cir. 2002) (citing <u>Daubert</u>, 509 U.S. at 593-94).  The Court, however, stated that "[m]any factors will bear on the inquiry," and emphasized that it did "not presume to set out a definitive checklist or test." <u>Daubert</u>, 509 U.S. at 593; <u>see</u> <u>United States v. Vargas</u>, 471 F.3d 255, 261 (1st Cir. 2006) ("The trial court enjoys broad latitude in executing its gate-keeping function; there is no particular procedure it is required to follow."); <u>Mooney</u>, 315 F.3d at 62.

Six years after its landmark decision in <u>Daubert</u>, the Supreme Court again emphasized the "flexible" nature of the Rule 702 inquiry, stating that the usefulness of the four factors articulated in <u>Daubert</u> will vary "depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." <u>Kumho Tire Co.</u>, 526 U.S. at 150.  Thus, courts

applying <u>Daubert</u> have utilized many other factors, including "whether the expert has adequately accounted for obvious alternative explanations . . . [and] whether the expert has employed the same level of intellectual rigor in the courtroom as in the relevant field of expertise." <u>Blanchard v. Eli Lilly & Co.</u>, 207 F. Supp. 2d 308, 316 (D. Vt. 2002) (listing factors found to be "relevant" to a <u>Daubert</u> inquiry by courts and commentators) (internal citations omitted).

Several courts have commented on the particular need to reach beyond these four factors in cases involving psychiatric, psychological, or other "social science" testimony. <u>See, e.g.</u>, <u>United States v. Simmons</u>, 470 F.3d 1115, 1122-23 (5th Cir. 2006) (upholding the admission of a psychologist's testimony regarding the behavior of a sexual assault victim even though it did not – because of "inherent limitations" of research in that field of study – satisfy the four <u>Daubert</u> factors); <u>Longoria v. Texas</u>, No. 5:02cv112, 2007 WL 4618452, *4 (E.D. Tex. May 18, 2007) (characterizing expert testimony concerning "social sciences" as a "special circumstance" because the "research, theories, and opinions cannot have the exactness of 'hard' science methodologies"); <u>Blanchard</u>, 207 F. Supp. 2d at 316 ("The reliability of expert opinion testimony based on psychiatric or psychological observation and analysis does not readily lend itself to evaluation using the specific <u>Daubert</u> factors."). One

court explained that, when dealing with "social science" testimony, "other indicia of reliability . . . including professional experience, education, training, and observations" guide the inquiry.  <u>Longoria</u>, 2007 WL 4618452, at *4.

One case is particularly on point.  In <u>Blanchard v. Eli Lilly & Co.</u>, 207 F. Supp. 2d 308 (D. Vt. 2002), a district court in Vermont considered the admissibility of a doctor's testimony that Prozac was a "contributing cause" to a woman's fatal shooting of her two children and her subsequent suicide.  207 F. Supp. 2d at 313.  The court stated that it did "not find the four <u>Daubert</u> factors particularly helpful in determining the reliability" of the doctor's specific causation testimony," explaining:

> Indeed, if the four factors were applied to
> Dr. Maltsberger's specific causation
> testimony, the testimony would fail the test.
> The theory that ingestion of Prozac was a
> contributing factor in Espinoza's death
> cannot be tested; it has not been subjected
> to peer review and publication; the rate of
> error is unknown and unknowable; and the
> theory does not have general acceptance.

<u>Blanchard</u>, 207 F. Supp. 2d at 317 (noting that "[s]trict adherence to traditional tests for reliability of 'hard science' would probably preclude Dr. Maltsberger's general causation testimony as well").  The ultimate task is "not to apply a rigid checklist," but rather to determine whether the expert testimony "is based upon sufficient facts or data and is the product of

reliable principles and methods, and if the principles and methods have been applied reliably to the facts of the case." Id. at 317 (citing Fed. R. Evid. 702).

Still, as the Supreme Court made clear in Kumho Tire, a trial court must act as a gatekeeper – ensuring that proposed expert testimony is both relevant and reliable – even when the proposed testimony is "soft," as opposed to "hard" science.[2] Kumho Tire Co., 526 U.S. at 147 (holding that the "basic gatekeeping obligation" announced in Daubert applies to all expert testimony, whether "scientific" in nature or not); see United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) ("Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial."). Thus, in cases like this one involving psychiatric and psychological testimony as to the causes of an individual's suicide, the trial court will likely need to exercise the "broad latitude" afforded it and reach beyond the four standard factors announced in Daubert to determine reliability.

---

[2] Here, the term "specialized" – as opposed to "scientific" – knowledge may best describe the challenged doctors' testimony. Regardless of what it is called, under Federal Rule of Evidence 702, Daubert, and Kumho Tire, both types of testimony must be evaluated by a trial court for reliability before being admitted.

**B. Dr. Maris**

Defendants do not challenge Dr. Maris' credentials as a suicidologist.  Dr. Maris holds a Ph.D. (as opposed to an M.D.) and is a Distinguished Professor Emeritus at the University of South Carolina where he holds appointments in both the Psychiatry and Family Medicine departments.  He created and directed the Suicide Center at the University of South Carolina and currently teaches courses in suicide prevention.  He has investigated thousands of suicides, has written twenty books on suicide, and publishes on the topic in peer-reviewed scientific journals.

In preparing his opinion, Dr. Maris reviewed a variety of records and documents, including Mr. Smith's medical records (doctor, pharmacy, and physical therapy records), Mr. Smith's suicide note, and the post-suicide reports of police officers and medical examiners.  (Expert Report of Ronald Wm. Maris, Ph.D. in Richard Smith v. Pfizer, at 2-3 [Docket No. 1633, Ex. 15]) (hereinafter "Maris Rep.").  Dr. Maris also interviewed Mrs. Smith and reviewed the depositions of family members, doctors, and other fact witnesses in this case.  (Id.)  Finally, Dr. Maris consulted literature on Neurontin and the various general causation expert reports produced for this litigation.  (Id.)

Dr. Maris begins his report by detailing his understanding of the "facts" of the case.  He then offers a seven-part expert opinion; each part is introduced by the respective heading listed

-13-

below:

> First, the psychopharmacologic properties of gabapentin/Neurontin are suicidogenic;

> Second, Richard Smith had clearly been ingesting Neurontin from March 9, 2004 until his death on May 13, 2004;

> Third, Richard Smith had several suicidogenic serious adverse events ("SAEs" or "side effects") resulting from taking Neurontin;

> Fourth, apart from taking gabapentin Richard Smith was only moderately suicidal, a condition that he had been able to cope with prior to ingesting Neurontin on 3/9/04 and thereafter;

> Fifth, Richard Smith had several personal characteristics that are known to be protective from suicide . . . .;

> Sixth, Richard Smith did not kill himself because of his chronic physical pain;

> Finally, it is more likely than not, if Richard Smith had not taken Neurontin on March 9, 2004 and thereafter, that he would not have committed suicide.

(Maris Rep. 12-24.)

In forming these opinions, Dr. Maris utilized a "psychological autopsy," a diagnostic technique that he developed to evaluate causation of individual suicides.  (See Psychological Autopsy & Death Investigation for Richard H. Smith) (Decl. of Scott W. Sayler [Docket No. 1633], Ex. 16.)  Dr. Maris has

-14-

described the psychological autopsy as a standardized, systematic checklist which could be used to assemble and organize information so that a qualified suicidologist or other appropriate health care professional would have the information necessary to consider all of the various risk factors which may or may not have contributed in a material way to any person's suicide or suicide attempt.  (Affidavit of Ronald Wm. Maris, Ph.D. in Giles v. Wyeth, No. 4:04cv04245, 2006 WL 4743955, *1 (S.D. Ill. Dec. 29, 2006)) (Decl. of Scott W. Sayler [Docket No. 1633], Ex. 13.)  Defendants prudently are not pressing a general challenge to the "psychological autopsy" model; this approach has been published in peer-reviewed scientific literature[3] and has been described by numerous courts as a generally accepted methodology for analyzing what led to a suicide.  See Stupak v. Hoffman-La Roche, Inc., No. 07-15980, 2009 WL 1616713, *5 (11th Cir. June 10, 2009) (describing seventeen case reports of completed suicides as "inconclusive" because "nothing close to a psychological autopsy was performed on any case"); Giles v. Wyeth, Inc., 500 F. Supp. 2d 1048, 1061 (S.D. Ill. 2007) (listing numerous courts that have held that "a psychological autopsy is a generally accepted methodology for determining the cause of a

---

[3] (See Decl. of Ronald W. Maris, Ph.D. ("Maris Decl."), [Doc No. 1673] at ¶ 8) (stating that, in the area of suicidology, the psychological autopsy is "a standardized and recognized method for retrospectively gathering data after a suicide" and citing two publications that discuss the method).

-15-

suicide"); <u>Blanchard</u>, 207 F. Supp. 2d at 313 n.2 ("The
psychological autopsy is a generally accepted methodology for
trying to determine what led to a suicide."); <u>Cloud v. Pfizer,
Inc.</u>, 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001) (noting that
psychological autopsies "appear to be generally accepted").

Instead, Defendants raise four specific complaints regarding
Dr. Maris' opinion in this case.  They contend that Dr. Maris'
opinion is unreliable and inadmissible because "(1) he did not
and cannot rule out alternative causes of Mr. Smith's suicide;
(2) he cannot identify a 'hallmark' for suicides caused by
Neurontin; (3) he relies instead on speculation and logical
fallacy to differentiate a suicide caused by Neurontin from a
suicide caused by any number of established suicide risk factors;
and (4) he uses unreliable methods."  (Defs.' Mem. in Supp. of
Mot. to Exclude 1 [Docket No. 1629].)  The first three of these
complaints relate to the fact that suicide is a multi-factor
phenomenon.

Though an expert should consider and analyze alternative
causes of a disease or side-effect, he or she is not required to
rule out each and every other possible cause before offering a
causation opinion.  As explained in the Federal Judicial Center's
<u>Reference Manual on Scientific Evidence</u>, "the common statement
that 'alternative causes of disease must be ruled out' before
causation is attributed can be more accurately refined to say

that 'the role of other causes must be adequately considered.'" Reference Guide on Medical Testimony, supra, at 476; see Goebel v. Denver and Rio Grande W. R.R. Co., 346 F.3d 987, 998-1000 (10th Cir. 2003) (upholding district court decision to admit testimony where expert did not explicitly rule out depression as an alternative cause and noting that "several circuits have held that the failure to rule out *all* possible causes of an illness does not automatically render an expert's testimony inadmissible").  In fact, under Tennessee law (which governs this claim) and general hornbook torts law, the plaintiff must prove only that Neurontin was "a substantial factor in causing the harm."  Lancaster v. Montesi, 390 S.W.2d. 217, 221 (Tenn. 1965) (stating, in a wrongful death action involving suicide, that "[t]he negligent act of defendant, to be the legal cause of plaintiff's injuries, need not be the sole cause"); Restatement (Second) of Torts § 431 ("The actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm . . . .").

Here, Dr. Maris does not opine that Neurontin was the sole cause of Mr. Smith's suicide.  (Maris Rep. 21) ("I am not arguing that gabapentin was the one and only cause of Richard Smith's suicide . . . .").  Rather, he posits that Neurontin was a "'noticeable difference-maker' . . . that pushed [Mr. Smith] over the edge into a violent, fatal suicide attempt" and concludes

-17-

that the drug was "a substantial or major proximate cause of Smith's suicide." (Maris Rep. 21-22.) Dr. Maris acknowledges that Mr. Smith bore as many as seven (of fifteen) other suicide risk factors, several of which were unrelated to Neurontin. (Id. at 22.) In Dr. Maris' opinion, however, these other risk factors rendered Mr. Smith a "low moderate suicide risk, absent gabaentin ingestion" because "[s]uicides tend to have most, if not all, of the suicide risk factors." (Id.) Moreover, because Mr. Smith also had several "protective factors" present in his life – including his longtime commitment to his church and strong family relationships – Dr. Maris concluded that there "were just not many alternative explanations for his suicide, other than Neurontin." (Id. at 23.)

Despite Defendant's insistence to the contrary, Dr. Maris did adequately account for two particularly important risk factors: hopelessness and chronic pain. In his report, Dr. Maris makes clear his belief that it was Neurontin that induced the hopelessness expressed by Mr. Smith. He also dedicated an entire section of his report to "ruling out" chronic physical pain as a possible alternative explanation. (Maris Rep. 23-24.) Notably, Dr. Maris does not assert that Mr. Smith's pain had nothing to do with his suicide; in fact, he states, "It would be naïve, even ridiculous, to claim that Richard Smith's depression, chronic pain, and hopelessness did not contribute to his suicide at all

(i.e., to totally "rule them out")."   (Maris Decl. ¶ 5E.) Instead, consistent with his theory of suicide expressed in this case and others, Dr. Maris opines that Neurontin was the "trigger that destroyed Richard Smith's prior considerable ability to cope with life's problems," including his severe pain, and ultimately rendered him no longer able to "fend off suicide." (Maris Rep. 24; see Maris Decl. ¶ 6; Maris Rep. 21); see also Giles, 500 F. Supp. 2d at 1062 (Dr. Maris acknowledging that decedent had several suicidogenic risk factors but opining that the drug Effexor was the "'scale tipper" or 'just noticeable difference maker' that pushed [the decedent] over the edge into a violent suicide attempt").   Accordingly, Defendant's alternative cause critique falls short.   Cf. Giles, 500 F. Supp. at 1062 (admitting Dr. Maris' specific causation testimony and stating that, "[b]ecause a combination of factors generally cause one to commit suicide, it is not surprising that Maris would refuse to admit that depression, financial hardship, and other factors played no role in [the decedent's] suicide").   Compare Smith v. Pfizer,Inc., No. 98-4156-CM, 2001 WL 968369, *9 (D. Kan. Aug. 14, 2001) (holding that a doctor's failure to account for some potential causal factors "goes to the weight and credibility of the opinion, not its admissibility") with Cloud, 198 F. Supp. 2d at 1136 (excluding an expert's specific causation testimony where there was no evidence that the doctor had considered alternative explanations for the suicide).

-19-

Defendants next contend that Maris cannot identify an objective hallmark of Neurontin-induced suicides and that, lacking such a "hallmark," Maris impermissibly relies solely on the temporal relationship between Mr. Smith's purported use of Neurontin and his suicide.  In essence, Defendants argue that Dr. Maris applies the logical fallacy of *post hoc ergo propter hoc* in reaching his conclusion that Neurontin caused Mr. Smith's suicide.  See McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1243 (11th Cir. 2005) (stating that the *post hoc ergo propter hoc* fallacy "literally means 'after this, because of this'" and explaining that it is "called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship").  They contend that it is pure speculation as to whether it was Neurontin or one of Mr. Smith's other risk factors that caused the suicide.

Defendants offer only one district court opinion, National Bank of Commerce v. Dow Chemical Co., 965 F. Supp. 1490, 1513-15 (E.D. Ark. 1996), aff'd, 133 F.3d 1132 (8th Cir. 1998) (per curiam), in support of their "hallmark" argument.  In National Bank of Commerce, the court discussed the difference between a "signature" disease, such as mesothelioma, for which there is only one known cause, and other diseases, such as colon cancer, that have many known risk factors.  965 F. Supp. at 1513.  In the former situation, the "injury points directly to the substance

that caused it"; in the latter, an expert must conduct a detailed
analysis "ruling in" and "ruling out" the various potential
causes before opining that one particular agent caused the
injury.  Id. (quoting David M. Levy, Scientific Evidence after
Daubert, 22 Litig. 48, 52 (Fall 1995)).  National Bank of
Commerce does not announce a "hallmark" requirement, but rather
indicates that, if no such "signature" or "hallmark" is evident,
then an expert opining as to specific causation must first
perform a thorough analysis, often referred to as a differential
diagnosis,[4] to rule out other possible causes.  Id. at 1513,
1521.  As our discussion above makes clear, this Court is
satisfied that Dr. Maris adequately considered and "ruled out"
other possible risk factors.

Suicide is a multi-factorial phenomenon with factors which
cannot be ruled out by a testable, established scientific method.
Instead, suicide experts and other health care professionals rely
on tools like the psychological autopsy – along with their
professional experience, education, training, and observations –
to "rule in" or "rule out" various factors.  This approach will
never produce the definite and testable results expected and
demanded in many scientific inquiries; it is, however, the
generally accepted methodology for analyzing the causes of a

---

[4] For a discussion of the differential diagnosis
methodology, see the discussion below in Part III.C.

particular suicide and far from the "junk science" that <u>Daubert</u> and Rule 702 are designed to exclude.  <u>See</u> <u>Best v. Lowe's Home Ctrs., Inc.</u>, 563 F.3d 171, 176-77 (6th Cir. 2009) ("<u>Daubert</u> attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other.") (citing <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002)).

Notably, in other contexts, the Supreme Court has held that admission of psychiatric testimony does not violate a defendant's constitutional rights even if the opinion is not supported by scientific tests.  <u>See generally</u> <u>Barefoot v. Estelle</u>, 463 U.S. 880, 896 (1983), <u>overruled in part on other grounds</u>, <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>but see</u> <u>United States v. Sampson</u>, 335 F. Supp. 2d 166, 220-21 (D. Mass. 2004) (stating that there is a "serious question" as to whether the Supreme Court would, in a post-<u>Daubert</u> world, continue to hold that a jury may impose the death penalty based on its prediction of a defendant's future dangerousness).

Defendants also insist that Dr. Maris relies too heavily on the temporal relationship between Mr. Smith's alleged taking of Neurontin and his suicide.  In both the general and specific causation contexts, the temporal relationship (order of exposure and illness) is a factor which experts are encouraged – and

required – to consider.  See Reference Guide on Medical
Testimony, supra, at 469.  Certainly, if an expert bases a
causation opinion solely on the fact that a patient was exposed
to an agent prior to his or her illness, the reliability of the
opinion would be called into question.  See Ervin v. Johnson &
Johnson, Inc., 492 F.3d 901, 904-05 (7th Cir. 2007) ("The mere
existence of a temporal relationship between taking a medication
and the onset of symptoms does not show a sufficient causal
relationship.").  However, that is not the case here.  Dr. Maris
appropriately addresses the temporality criteria, pointing to
specific evidence that, after he began taking Neurontin, Mr.
Smith exhibited "dramatic changes," including a worsening of risk
factors such as depression, and even became "suddenly suicidal."
(Maris Decl. ¶¶ 7, 7A; see Maris Rep. 17-20.)  Dr. Maris does
not, however, make these statements in a vacuum.  Rather, as
extensively detailed in this Court's prior evaluation of
plaintiff's general causation testimony, there is scientific
evidence that Neurontin puts some people at increased risk for
depression and impulsive, aggressive, or suicidal behavior.  See
In re Neurontin, 612 F. Supp. 2d at 152-53.  Dr. Maris discusses
this research, as well as scientific literature connecting
depression and hopelessness to suicide.  (Maris Rep. 12-14, 17,
19.)

     Thus, Dr. Maris' specific causation testimony is readily

distinguishable from those cases in which courts have deemed an expert's method of "ruling in" and "ruling out" potential causes inadmissible because there was no admissible general causation testimony supportive of the plaintiff's case.  See Reference Guide on Medical Testimony, supra, at 470 n.112 (listing examples of courts that have excluded opinions based on a process of "ruling out" other causes (known as a "differential diagnosis") but citing only cases where there was no admissible evidence of general causation).  In those cases, there was a fatal gap between the scientifically validated evidence of what harm the particular drug could cause and the harm which the specific causation expert was attempting to tie to the agent.  No such gap exists here.

Finally, Defendants launch a multi-pronged attack on the manner in which Dr. Maris completed the models and tests underlying his report and opinion (including that the psychological autopsy was completed by Plaintiff counsel's legal assistant), asserting that the process was tainted and erroneous. Plaintiff and Dr. Maris refute these allegations and insist that he followed professional standards in reaching an opinion that is the "product of reliable principles and methods."  Fed. R. Evid. 702.  These complaints of Defendants do not demonstrate a wholesale bias on the part of Dr. Maris, nor do they reveal a fatal error.  Thus, they go to the weight of the evidence, not

-24-

its admissibility.

Similarly, Defendants challenge Dr. Maris' use of a separate tool, referred to as a "suicide model" in this case.  This "suicide model" is a chart or model of suicidal behaviors that was developed by Dr. Maris and has been cited or included in three peer-reviewed publications.  (Maris Decl. ¶ 8I) (listing original place of publication and two citations to the suicide model in peer-reviewed scientific literature).  While not referred to in his original expert report in this matter, Dr. Maris included a copy of the chart in an addendum to his report.  This copy has handwritten markings on it, including several arrows from the term "Treatment Medication" (listed in column titled "Protective Factors") to three separate points within the column titled "Trigger Factors."  (See Decl. of Scott W. Sayler [Docket No. 1633], Ex. 12).  Defendants characterize these markings as a significant alteration to the published model that was made for the purpose of this litigation, lacks scientific support, and renders Dr. Maris' testimony (or at least his use of this model in support of his testimony) inadmissible.  Like Defendants' complaints regarding the manner in which the psychological autopsy was completed, this contention regarding the suicide model is fodder for cross-examination, and not independent grounds for exclusion.

In sum, this Court concludes that Dr. Maris' specific

causation testimony is based upon sufficient facts and data and is the product of reliable principles and methods which have been applied reliably to the facts of the case.  See Fed. R. Evid. 702.  It is very relevant to the task at hand and Dr. Maris is highly qualified to speak on these matters.  Accordingly, his specific causation testimony is admissible.

**C. Trimble**

Defendants also challenge the testimony of Plaintiff's second specific causation expert, Dr. Michael Trimble.  A professor of behavioral neurology holding multiple degrees, Dr. Trimble is offered by Plaintiff as an expert on both general and specific causation.  See In re Neurontin, 612 F. Supp. 2d at 123-24 n.7 (detailing Dr. Trimble's educational and professional history and rejecting Defendants' Daubert challenge to his general causation testimony).  When challenging Dr. Trimble's general causation testimony, Defendants conceded that his educational and professional background rendered him qualified to opine on that subject; they criticized only his methods and conclusions.  Id.  Here, however, they contend that testifying on the topic of specific causation is beyond Dr. Trimble's expertise.  Specifically, Defendants emphasize that Dr. Trimble is not a suicidologist, has not published in the field of suicide risk assessment, and is not licensed to treat patients in the United States.

-26-

That Dr. Trimble does not specialize in suicidology or currently maintain a practice in the United States does not render his opinion inadmissible.  See Mitchell v. United States, 141 F.3d 8, 15 (1st Cir. 1998) ("'The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it.'") (quoting Payton v. Abbott Labs., 780 F.2d 147, 155 (1st Cir. 1985)).  The court's inquiry is not so narrow; the question is "'whether the putative expert is qualified by knowledge, skill, experience, training, or education.'"  Mitchell, 141 F.3d at 14 (quoting Ed Peters Jewelry Co. v. J Jewelry Co., 124 F.3d 252, 259 (1st Cir. 1997)).  Under this test, Dr. Trimble passes muster.

Dr. Trimble is a practicing neuropsychiatrist who treats patients suffering from depression, bipolar disorder, and other mood disorders.  He describes himself as having clinical experience with people who have a high risk of suicide for over thirty-five years.  Moreover, the experiences that rendered Dr. Trimble qualified to testify as to general causation (e.g., his study of neuroanatomy, psychopharmacology, and Neurontin itself) may render his testimony useful to the jury who will be tasked with digesting both of Plaintiff's theories of causation (general and specific).

Defendants also contend that Dr. Trimble's methodology falls

short of what is deemed proper in the field.  In contrast to Dr.
Maris' report, Dr. Trimble's report does not include a detailed
accounting of suicide risk factors.  Nor does it contain a
checklist like Dr. Maris' psychological autopsy or even the
Naranjo Adverse Drug Reaction Probability Scale utilized by Dr.
Kruszewski for his specific causation opinion in a different case
alleging that Neurontin caused the decedent's suicide.  (See
Expert Report of Dr. Stefan P. Kruszewski, MD, in Egilman v.
Pfizer, No. 07-cv-11426-PBS, Master Case File No. 04-10981
[Docket No. 1636, Ex. 12]).  Instead, Dr. Trimble maintains that
he performed a more generalized medical technique known as a
"differential diagnosis."

     "A 'differential diagnosis' is a standard medical technique,
widely used in medicine, of identifying a medical 'cause' by
narrowing the more likely causes until the most likely culprit is
isolated."  Baker v. Dalkon Shield Claimants Trust, 156 F.3d 248,
252 (1st Cir. 1998); see Reference Guide on Medical Testimony,
supra, at 444 (explaining that courts and expert witnesses often
use the term "differential diagnosis" to describe the process by
which the causes of a patient's condition are identified and
noting how that definition differs from the term's traditional
use in the medical field).  A differential diagnosis is not
specific to suicide investigations, but rather is a "standard
scientific technique" used to identify the causes of various

medical problems.  <u>Best</u>, 563 F.3d at 178 (internal quotation marks omitted).  As the Sixth Circuit recently noted, an "'overwhelming majority of the courts of appeals'" have held that "'a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong [reliability] of the Rule 702 inquiry.'"  <u>Id.</u> (quoting <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 263 (4th Cir. 1999) (citing cases from the First, Second, Third, Ninth and D.C. Circuits)); <u>see</u> <u>Hernandez v. Esso Standard Oil Co.</u>, No. 03-cv-1485, 2009 WL 222761, *2 (D.P.R. Jan. 29, 2009); <u>Smith</u>, 2001 WL 968369, at *9.  <u>But see</u> <u>Reference Guide on Medical Testimony</u>, <u>supra</u>, 470 n.112 (noting that several courts have excluded specific causation testimony based on differential diagnoses when not paired with adequate proof of general causation).  Because "[n]ot every opinion that is reached via a differential-diagnosis method will meet the standard of reliability required by <u>Daubert</u>," the question here is whether Dr. Trimble's "differential diagnosis" is sufficiently reliable to be admitted. <u>Best</u>, 563 F.3d at 179.

In <u>Best</u>, the Sixth Circuit announced its test for evaluating the reliability and admissibility of a doctor's differential diagnosis:

> A medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor (1) objectively ascertains, to the extent

-29-

> possible, the nature of the patient's injury,
> . . . (2) "rules in" one or more causes of
> the injury using a valid methodology, and (3)
> engages in "standard diagnostic techniques by
> which doctors normally rule out alternative
> causes" to reach a conclusion as to which
> cause is most likely.

Id. (internal citations omitted).  In fashioning the test, the
Sixth Circuit relied heavily on a Third Circuit opinion
evaluating the differential-diagnosis based causation testimony.
See In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 758-59
(3d Cir. 1994) (stating that differential diagnosis is a
generally accepted technique and noting that the steps taken by a
doctor performing a differential diagnosis will "vary from case
to case" and that the "core of differential diagnosis is a
requirement that experts at least consider alternative causes").

Defendants' primary critique of Dr. Trimble's analysis bears
on the third, "ruling out" prong of the reliability test.
Defendants contend that Dr. Trimble did not adequately consider
possible alternative causes and unreasonably "ruled out" others
before rendering his opinion that "it is more likely than not
Gabapentin was a substantial factor in Mr. Smith committing
suicide."  (Decl. of Professor Michael Trimble, M.D. in Relation
to Gabapentin Causing Negative Mood and Behavioral Alterations,
Including Suicidal Behavior, in Treated Patients (*In the case of
Richard Smith, deceased*), at 13 [Docket No. 1633, Ex. 18])
(hereinafter "Trimble Rep.").  Dr. Trimble's report is indeed

-30-

sparse in its discussion of Mr. Smith's other risk factors for
suicide.  In the three pages of his report containing his
"differential diagnosis," he identifies and rules out four
"predictors" of suicidal behavior (i.e., living alone, alcohol or
drug dependence, those with severe psychiatric disorders, and
those who have previously attempted suicide).  (Trimble Rep. 11.)
He then rules out two medical conditions as possible causes and
briefly addresses the question of whether Mr. Smith had developed
a depressive illness associated with his chronic pain, (id. at
12), before rendering his final conclusion:

> In the absence of a recognizable psychiatric
> disorder, the spontaneous and impulsive
> nature of his suicidal act requires
> explanation.  As outlined in my concurrent
> report, Gabapentin is associated with changes
> of brain chemistry which, I find with a
> reasonable degree of scientific and medical
> probability, leads to impulsive suicidal
> acts.  It is therefore my opinion that it is
> more likely than not Gabapentin was a
> substantial factor in Mr. Smith committing
> suicide.

(Trimble Rep. 13.)

According to Dr. Trimble, however, this written report does
not constitute the sum total of his analysis.  At his deposition,
Dr. Trimble testified that, though not detailed in his written
report, he considered twenty-one risk factors listed in a report
by a suicide researcher and concluded that Mr. Smith only
demonstrated three: hopelessness, chronic pain, and advanced age.

-31-

He also states that he considered and ruled out several other factors not explicitly discussed in his report, including Mr. Smith's other medications and the illness of his daughter. Viewing his written submission to be a clinical report dealing primarily with psychiatric issues (as opposed to a psychological or suicide autopsy), Dr. Trimble maintains that the document properly focused on the task of "ruling out" medical and psychiatric conditions (e.g., depression) and those factors for suicide deemed most risky.

In particular, Defendants criticize Dr. Trimble's consideration – or, in their view, lack of consideration – of Mr. Smith's psychiatric history or depression.  They insist that Dr. Trimble misunderstood Mr. Smith's medical history in this area and inappropriately discounted Mr. Smith's depression as an alternative cause.  Dr. Trimble, however, did address the question of Mr. Smith's depression, in both his written report and deposition testimony.  Dr. Trimble concluded that Mr. Smith's "depression" did not rise to the level of a psychiatric illness, and that, when Mr. Smith and other non-physicians spoke of his depression, they were using the term in a "lay sense."  (See Trimble Rep. 13; Trimble Dep. 137:8-140:6, 175:12-177:6, Sept. 2, 2008) (Decl. of Andrew G. Finkelstein [Docket No. 1672], Ex. 11.) Defendants counter with evidence of an official diagnosis of depression and antidepressant prescriptions.  Nevertheless,

because Dr. Trimble is amply qualified to render an opinion on
the issue of Mr. Smith's depression, the debate is one properly
hashed out through testimony at trial.  See Kumho Tire Co., 526
U.S. at 153 (stating that the jury, not the court, should be the
one to "decide among the conflicting views of different
experts").

     Thus, while Defendants have pointed out some gaps and
potential weaknesses in Dr. Trimble's written report, Dr. Trimble
has, like Dr. Maris, demonstrated that he at least considered all
reasonable alternative causes and, for the most part, explained
why he concluded that a given alternative cause "was not the sole
cause" of Mr. Smith's suicide.  Best, 563 F.3d at 179 (stating
that, to satisfy the third prong of the differential diagnosis
reliability test, a "doctor must provide a reasonable explanation
as to why 'he or she has concluded that [any alternative cause
suggested by the defense] was not the sole cause'") (quoting In
re Paoli, 35 F.3d at 758. n.27).  "Admissibility under Rule 702
does not require perfect methodology," only that the expert
employs the "same level of intellectual rigor that characterizes
the practice of an expert in the relevant field."  Id. at 181
(quoting Kumho Tire Co., 526 U.S. at 152).  A court's role is
"not to determine whether the opinion is airtight," id. at 183,
but simply whether the testimony is "the product of reliable
principles and methods" that have been properly applied to the

facts of the case.  <u>Blanchard</u>, 207 F. Supp. 2d at 317 (citing Fed. R. Evid. 702).  In light of this standard, this Court concludes that Dr. Trimble's differential diagnosis meets the threshold level of admissibility under <u>Daubert</u>.

Though admissible, Dr. Trimble's specific causation testimony is largely duplicative of Dr. Maris' more thorough psychological autopsy.  <u>See</u> Fed R. Evid. 403.  This Court leaves any determination as to whether Dr. Trimble's testimony should be limited to general causation to the trial court in Tennessee.

## IV. ORDER

The Motion to Exclude the Specific Causation Testimony of Doctor Maris and Professor Trimble [Docket No. 1627] is **DENIED**. The Motion to Strike the Untimely Supplemental Declarations of

-34-

Stefan P. Kruszewski and Ronald W. Maris [Docket No. 1715] is

**DENIED** as no prejudice has been demonstrated.

/s/ Patti B. Saris

_____

PATTI B. SARIS
United States District Judge