```
                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS



     IN RE:                           )
                                      ) No. 04-10981-PBS
     NEURONTIN MARKETING, SALES PRACTICES,  ) MDL No. 1629
     AND PRODUCTS LIABILITY LITIGATION    )
     ---------------------------------------)
     This document relates to:        )
     KAISER FOUNDATION HEALTH PLAN, et al,  )
                                      )
                   Plaintiffs          )
                                      )
           -V-                        )No. 04-10739-PBS
                                      )Pages 1 - 195
     PFIZER, INC., et al,             )
                                      )
                   Defendants         )
```

JURY TRIAL - DAY ELEVEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

```
                      United States District Court
                      1 Courthouse Way, Courtroom 19
                      Boston, Massachusetts
                      March 8, 2010, 8:53 a.m.
```

```
           LEE A. MARZILLI and DEBRA M. JOYCE
                 OFFICIAL COURT REPORTERS
               United States District Court
               1 Courthouse Way, Room 7200
                   Boston, MA  02210
                    (617)345-6787
```

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
         DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
         BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14       KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16       RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
         JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

1                              I N D E X

2

   WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS
3

4    MEREDITH ROSENTHAL          15      48

5

6

   EXHIBITS                              PAGE
7

   405-M                                  18
8    405-K                                  30
   408-AA                                 38
9    2094                                   47
   519                                    78
10   408-H                                 142
   408-HH                                142
11   408-C                                 147
   40-E                                   149
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  Good morning to everybody.  I understand

3    there are a number of issues?

4          MR. CHEFFO:  There are, your Honor.

5          THE COURT:  Were there issues?

6          MR. CHEFFO:  There is a scheduling issue.  You know,

7    admittedly, I wasn't here on Friday; Ms. Armstrong was.  We

8    thought we were accommodating -- this is the fourth time this

9    has happened -- their schedule of Dr. Hartman.  They said

10   basically we're going to go out of order because of his

11   mother's 97th birthday.  You said, "Don't make me choose

12   between --" you said that the other day too when I was here --

13   "between Daniel and Hartman."  And, frankly, you know, these

14   things don't just happen, as you know.  No one snaps their

15   fingers and directs get popped out like Star Trek.

16         THE COURT:  So now what happened?

17         MR. CHEFFO:  So now we hear they say, "Well, we're

18   going to put Rosenthal on first.  Hartman is going to go later,

19   but it doesn't really matter if we don't finish him today

20   because maybe he can go tomorrow."  I mean, this is a constant

21   game of bait and switch.

22         MR. SOBOL:  May I be heard on that, your Honor?

23         THE COURT:  Listen, my only goal really is, you deal

24   with the personal problems of all your witnesses.  I just have

25   to make sure there's no unfair surprise.  That's at the end of

1    the day what I need to do.  So when did you tell them who was

2    in the batting order?

3              MR. SOBOL:  It is our recollection, and it appears a

4    quote even here from the record at the end of Friday, that we

5    indicated we were going to finish with Professor Rosenthal and

6    then put Dr. Hartman on the stand.  And we would expect

7    because --

8              THE COURT:  Yes.

9              MR. SOBOL:  And I also indicated throughout this whole

10   time in terms of the issue with Dr. Hartman that his

11   97-year-old mother's birthday is Wednesday, not Tuesday; so if

12   we're able to get through with him by the end of Tuesday, that

13   should be terrific.  That's the way we had planned it.  There's

14   some misunderstanding on the defendants' part that we made some

15   commitment to interrupt Professor Rosenthal's testimony this

16   morning and immediately start with Dr. Hartman.  I have no

17   recollection about any commitment in that regard whatsoever.

18   There is a quote from Ms. Armstrong at Page 153 of the

19   transcript where she says, "Just another evidentiary issue.

20   Since the plaintiffs are also calling Dr. Hartman on Monday

21   after Rosenthal concludes, we have a couple of issues,"

22   blah-blah-blah, which we've addressed.  If there's a

23   misunderstanding, there's a misunderstanding, but we'd like to

24   finish with Professor Rosenthal's testimony.

25             THE COURT:  It was inconclusive at the end of Friday

1    as to what order they were going to be putting people on, as I

2    remember it, and I finally turned to them and said, "Don't make

3    me choose," exactly as you remember it; but I don't remember

4    there being a definitive order.

5         MR. CHEFFO:  Catherine can speak to it, but we haven't

6    heard anything other than, again, until -- it's another one of

7    these 8:30 in the morning we're going to deal with it.  You

8    know, we've sent them names and lists and things, so --

9         MS. ARMSTRONG:  Your Honor, if I could just be heard?

10        THE COURT:  Yes.

11        MS. ARMSTRONG:  Because we went off record at one

12   point, if you recall.

13        THE COURT:  Yes.

14        MS. ARMSTRONG:  And then afterwards we got back to

15   talking about scheduling, and Mr. Barrett said we're going to

16   get Dr. Hartman on and off on Monday, and Ms. Nussbaum raised

17   Dr. Daniel's schedule, which is also tight as well.  And I said

18   we can't guarantee that we would complete our cross-examination

19   of Dr. Hartman today, and we got into the scheduling, and you

20   said, "Well, you're just going to have to put on Dr. Hartman

21   first."

22        THE COURT:  As I remember it -- and all our memories

23   are a little different -- we're like witnesses -- it was left

24   inconclusive.  Now, I'm sad that you all don't just pick up the

25   phone and call each other.  It was left inconclusive as to

1   which order of juggling was going to happen.  What's the real

2   problem --

3           MR. CHEFFO:  Well, I mean, here --

4           THE COURT:  Excuse me.  What's the real problem?  Are

5   you not ready for Mr. --

6           MS. ARMSTRONG:  That's not the problem.  The problem

7   is, number one, we were prepared for Dr. Hartman to go first.

8   And the second is, I'm still concerned, because of Dr. Daniel's

9   schedule, that there's still an issue that our cross-examination

10  will be cut short.

11          THE COURT:  That's their problem.  I was, as you know,

12  feeling very stressed to get Hyatt on and off, and then I found

13  out he only saw patients once a month.  You know, I do try and

14  accommodate doctors who are treating patients for obvious

15  reasons.  So if in fact he's got a full slew of patients, I

16  feel one way.  If he doesn't and it's like the other one who

17  only sees somebody twice a month and it's primarily

18  administrative, I'm less uptight about it.  His being an

19  administrator, you're here for Kaiser, you know, that's part of

20  your job.  So I don't know, but at this point is there any

21  other issue?

22          MR. SOBOL:  There are --

23          THE COURT:  But I'm not going to rush anyone.  That

24  was just too stressful for everyone involved.  I'm not -- so if

25  Daniel does or doesn't finish, he does or doesn't finish.

1           MR. SOBOL:  Okay, I'll speak with Ms. Nussbaum and

2    Mr. Barrett in a moment.

3           There was another issue.  The defendants at 8:20 this

4    morning told me that they wanted me to see a whole series of

5    new demonstratives for the cross-examination of one of the

6    witnesses.  They're not sourced.  There's a --

7           THE COURT:  Well, which witnesses?

8           MR. SOBOL:  This is for Dr. Hartman.

9           THE COURT:  So, all right, so you've seen them.  So

10   he's not going first.

11          MR. CHEFFO:  There's four, and we were just trying to

12   save time, your Honor, rather than take the person -- you know,

13   these are chalks we were going to use.  We just had four of

14   them rather than -- and, frankly, someone could take the extra

15   time, but in light of everything, we just thought that they

16   would --

17          THE COURT:  Well, you now see them, so someone -- you

18   know, you all have like four or five lawyers sitting here.

19   Hartman isn't going on until second, so somebody can just see

20   if there's a problem with the math.

21          Where is Dr. Hartman?  There you are.  I didn't see

22   you behind the Elmo.

23          MR. SOBOL:  The other thing, your Honor, just --

24          THE COURT:  So someone can go out and review them with

25   him, and if there's a problem with them, let me know.

 1          MR. SOBOL:  The final thing is, your Honor, although

 2   there was an issue raised about this pretrial, during the

 3   opening statement the defendants tried to get in Dr. Hartman's

 4   personal medication history.  I objected to that.  You

 5   sustained the objection.  I'm trusting that the defendants

 6   aren't going to try to raise that again.

 7          THE COURT:  Yes, that's not going to happen, all

 8   right, under 403.  So let's go.  Is there anything else?  I

 9   handed -- let me just say, I did whatever you asked me to do in

10   terms of the depositions, and then this morning I get one that

11   looks like this.  You can't confer and reduce the number of

12   objections?  What I've noticed is, frankly, that a lot of the

13   objections are then solved.  So, you know, somebody deleted an

14   extra line; defendant correctly say it's incomplete; you add

15   the line.  Can't you talk about that and then just eliminate

16   the objection?

17          MR. GREENE:  There's been talk back and forth, and

18   Mr. Fox -- I don't see him there --

19          MS. ARMSTRONG:  Mr. Fox has gone back to the office to

20   do some work.  He wasn't aware that this was going to be taken

21   up this morning.

22          THE COURT:  Yes, but I don't want to deal with

23   maybe -- I did last week maybe eight of them, shall we say,

24   something in that ballpark, and now I've got this.  And has

25   anyone talked and tried to confer and narrow this?

1          MR. GREENE:  There has been talk, and --

2          THE COURT:  It's insane.

3          MR. GREENE:  It is insane, and, for example, for one

4    of the witnesses, two of the witnesses, we've just designated,

5    you know, a blip, really; and then they've got ten pages

6    following it.

7          But there are two other issues that Mr. Fox who's not

8    here, I raised with him this morning, and he asked if --

9          THE COURT:  Why don't you go see if the jury is here.

10          THE CLERK:  They're here.

11          THE COURT:  They're here, so then I don't need to deal

12    with that right now.  But who's dealing with the depositions

13    for Pfizer?

14          MS. ARMSTRONG:  Mr. Fox.

15          THE COURT:  And who's dealing with the --

16          MR. GREENE:  I will, your Honor.

17          THE COURT:  So when did -- this is insane.  I mean,

18    they've gotten more and more and more rather than less and less

19    and less, the number of depositions.  This is for Tammy Martin.

20          MR. GREENE:  Tammy Martin authenticates a document,

21    Exhibit 102.  She's a Parke-Davis employee.  We designated I

22    think three lines, and then they designate pages after it.  And

23    I said we just want to introduce --

24          MR. CHEFFO:  We're entitled, I mean --

25          THE COURT:  They're entitled to that.

1          MR. CHEFFO:  We're entitled to --

2          THE COURT:  They'll take it off of their clock.

3     That's fine.

4          MR. GREENE:  But can they put it in their case?

5     Because it's not a counter to what we've done, Judge.

6          THE COURT:  You know what, I just don't -- maybe.  I

7     don't want to deal every night.  I mean, I must have gotten

8     four or five depositions just on Thursday and Friday.  So

9     there's some time limits on my part, and I've got a full

10    afternoon.  I'm theoretically going through with you all those

11    documents this afternoon, right?

12         MS. ARMSTRONG:  Yes, your Honor.

13         THE COURT:  And I've got another case this afternoon,

14    as you heard on Friday.  I'm just busy, I'm busy, and so I was

15    wondering if you all could try and sit down and confer.

16         MR. GREENE:  Let us try again with that, your Honor,

17    in light of what you said.  We will, but having said that,

18    there's two things I want to point out to you with regard to

19    the Pande deposition and the Glanzman deposition that you

20    weren't aware of, and that's what Mr. Fox wanted to address

21    with you at 2:00 o'clock.  He was here, and he --

22         THE COURT:  I don't know what's at 2:00 o'clock.

23    Robert, what time is the oral argument this afternoon?

24         THE CLERK:  Which case?

25         THE COURT:  What do I have this afternoon?

Page 12

1          (Discussion between the Court and Clerk.)

2          THE COURT:  So we have something at 2:00, 3:00, and at

3     4:00, and so we're trying to squeeze you in.  It's not like you

4     have our afternoon.  We're just trying to -- one of them is

5     easy at 2:00, should only take ten minutes, and then we have a

6     criminal status conference at 3:00, and then we have that other

7     Rost v. Pfizer at 4:00, so I've got like maybe forty-five

8     minutes to an hour in there.

9          MR. GREENE:  Okay.  Well, Mr. Fox, if he could come

10    back at --

11         THE COURT:  All right, well, I'm not dealing with this

12    now.  The jury is here.  I'm just simply saying it's

13    frustrating.  Instead of resolving more and more as usually

14    happens, you're fighting about more and more.  And my sense is

15    from reading them, no one has conferred, because a lot of time

16    it's fixed.

17         MR. GREENE:  We've had two people from our team doing

18    the conferring.  I haven't been, your Honor, but --

19         MR. CHEFFO:  You've ruled on this.  This is a bench

20    memo with respect to Dr. Hartman.  You know, with respect to

21    403 and our position, your Honor, is just that, you know, the

22    plea has come in.  With respect to the fact -- and you never

23    ruled on the dollar amount.  They've now said three times

24    $430 million when that's civil, not criminal.  We think in

25    light of -- and we also heard a billion dollars for charity --

1          THE COURT:  What are you asking?  I'm not sure what

2     you're asking.

3          MR. CHEFFO:  I'm talking about Dr. Hartman, the fact

4     that he's still taking Neurontin and he's an expert for the

5     plaintiffs --

6          THE COURT:  No.  That's under 403.  He's here as an

7     economist, not as a medical expert.

8          MR. CHEFFO:  But he's here to determine -- he's

9     basically determining damages, and he makes certain

10    assumptions --

11         THE COURT:  Excuse me.  The objection is sustained.

12    I've excluded all the other convictions of Pfizer as well other

13    than this one, so under 403 for all of them, they're

14    extraneous.

15         Let's get this jury.

16         THE CLERK:  Yes.

17         THE COURT:  Mr. Sobol, am I going to get something on

18    all these volumes and volumes of documents?

19         MR. SOBOL:  Yes.  I didn't know if you wanted it right

20    before the jury came in today.  I was going to wait until

21    after.

22         THE COURT:  I just can't rule on it all, so --

23         MR. SOBOL:  Well, of course, right.  And, yes, you're

24    going to get it all today, and I didn't know how you wanted to

25    address this.  It's probably too soon to do it today at 3:00

Page 14

1    o'clock, unless you at least want to get our bearings in terms

2    of what we've done and what the documents are so that --

3            THE COURT:  I think that's all we can accomplish.  I

4    actually have a pretty full afternoon.

5            MR. SOBOL:  Right, yes.  And if just do that, then I

6    think there will at least be an understanding about where we're

7    coming from and make no arguments about it.

8            THE COURT:  I need to get going on the jury

9    instructions.  What do we think, third, fourth week in March?

10           MR. CHEFFO:  You mean, as far as when we'll finish?

11           THE COURT:  Yes.

12           MR. CHEFFO:  They said Wednesday they're going to

13   close.  I'm not sure -- I mean, we'll have to find out if

14   that's really going to happen.  Is that going to happen?

15           THE COURT:  Well, we'll worry about it later.  The

16   jury is coming in.

17           MR. CHEFFO:  Yes, your Honor.

18           THE CLERK:  All rise for the jury.

19           (Jury enters the courtroom.)

20           THE COURT:  I notice some of you are getting your new

21   notebooks.  Good morning.  You've got to stay up, even if you

22   watched the Oscars last night.  It was a late night for a lot

23   of people.  Did anyone see anything in the press or speak about

24   the case with anyone?  I find the jury has complied.

25           I think Professor Rosenthal is on the stand.  She's

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1    still under oath in the plaintiffs' case.

2                        MEREDITH ROSENTHAL

3    having been previously duly sworn, was examined and testified

4    further as follows:

5              MR. SOBOL:  May I inquire, your Honor?

6              THE COURT:  Yes.

7    CONTINUED DIRECT EXAMINATION BY MR. SOBOL:

8    Q.   Good morning, Professor.

9    A.   Good morning.

10   Q.   How are you today?

11   A.   Fine, thank you.

12   Q.   Did you stay up watching the Oscars last night?

13   A.   I did not.

14   Q.   Good.  I've put our first demonstrative, demonstrative

15   No. 8, up on the board.  I'm not going to try to do some sort

16   of, you know, last week of Professor Rosenthal, but just to

17   briefly get into this, there was one last point that you

18   raised.  It was the -- well, actually it was physicians'

19   learning for marketing.  Do you recall that point that you

20   raised?

21   A.   Yes.

22   Q.   Now, I take it that when applying healthcare economics and

23   trying to estimate the amount of drug sales was caused by drug

24   marketing, do you make an effort to actually identify by name

25   the individual doctors and the timing that an individual doctor

1   did or didn't get influenced?

2   A.   No.   As is standard practice --

3           THE COURT:  I think somehow your mike isn't working.

4           THE WITNESS:  Is that better?

5           THE COURT:  No.

6           MR. SOBOL:  Bring it really close.

7           (Discussion off the record.)

8   Q.   Why don't you try to identify the individual doctors when

9   estimating pharmaceutical sales caused by pharmaceutical

10  marketing?

11  A.   So the standard practice in these types of analyses is to

12  use aggregate data and to use statistical approaches to link

13  patterns in promotional spending to patterns in prescribing for

14  the drug.   It's neither standard nor appropriate to look

15  physician by physician.   The data analysis itself tells us

16  whether there's any evidence of impact and exposure at the same

17  time.

18  Q.   In this case there has been an exhibit admitted in

19  evidence which the parties have a stipulation about.   It's

20  Exhibit 923, the book of providers.   It's a book that is a

21  printout of a database of providers that prescribe Neurontin

22  and for which Kaiser paid.   Do you understand that?

23  A.   I do, yes.

24  Q.   Now, is it fair to say that a part of your model is

25  estimating the amount of Neurontin sales were caused by

1    Neurontin marketing, in that those physician, although you're

2    not identifying which ones, those physicians in some

3    amalgamation, if you were, were in fact influenced?

4    A.    That's correct.  Again, the analysis, rather than

5    identifying exposure to marketing activities physician by

6    physician, the analysis looks at patterns of actual behavior,

7    aggregate patterns of promotion, and makes the connection

8    between the two, both to assess whether there was exposure and

9    its impact.

10   Q.    Now, let's turn to Plaintiff's Exhibit 405-L.  I believe

11   this gets back to where we were talking about then.  You were

12   given certain assumptions by the plaintiff lawyers, the lawyers

13   for Kaiser, about when the off-label marketing and the fraud or

14   the unlawful conduct started and the time period during which

15   it was to be calculated through, correct?

16   A.    Correct.

17   Q.    And this Plaintiff's Exhibit 405-L, which I believe is in

18   evidence, but I'll move it into evidence now to make sure --

19          THE CLERK:  It is, it's in.

20   Q.    -- are the assumptions you were given on those time

21   frames, correct?

22   A.    Yes.

23   Q.    Now, for each indication, though, you also formulated and

24   employed a somewhat different set of assumptions depending upon

25   which indication it was, correct?

1   A.   That's correct.  You mean the assumptions about what would

2   have happened but for the alleged misconduct?

3   Q.   Right.

4   A.   Yes.

5   Q.   Now, I'm going to put up Plaintiff's Exhibit 405-M, which

6   I move in evidence --

7        (Exhibit 405-M received in evidence.)

8   Q.   -- which looks to be a sort of fairly complicated set of

9   but-for assumptions, if you will, right?

10  A.   Yes.

11  Q.   So rather than sort of getting into the complications of

12  it, I'd like you to explain, first from a lay point of view,

13  talking about bipolar, what were your assumptions with respect

14  to bipolar in your analysis?

15  A.   Yes, so bipolar is an example where I examine promotion to

16  and prescribing patterns of a single specialty, psychiatry.

17  And so in the case of bipolar, I isolate psychiatrists; and

18  then based on the allegations and my assumption that those can

19  be proven, and the economics of the situation, I assume that

20  but for the alleged misconduct, the defendant would not have

21  promoted Neurontin to psychiatrists at all during the period in

22  question.

23  Q.   So if the plaintiffs provide evidence and the jury

24  concludes that there was no reliable scientific evidence upon

25  which a psychiatrist would prescribe Neurontin for bipolar, why

1    did you believe that that assumption that the lawyers asked to

2    give you was appropriate?

3    A.   So in effect, companies, pharmaceutical companies, market

4    their products to physicians who are in a position to, as is

5    commonly used terminology in this area, "move market share."

6    So physicians who are significant prescribers for a given

7    indication, that is where pharmaceutical companies target their

8    marketing.  This is documented in discovery documents that I've

9    cited in my report.  And the economics of it is fairly clear.

10   There's a certain amount of resources that is required to

11   promote to physicians.  Companies are looking for a return on

12   their investment in promotion.  Psychiatrists may write a few

13   prescriptions for Neurontin for its approved uses, but clearly

14   they are not the primary specialty responsible for treating

15   seizures in effect, and so there is no economic justification

16   for promoting Neurontin to these physicians for the purpose of

17   approved uses.

18   Q.   Now, if we go back to Plaintiff's Exhibit 405-L for a

19   moment, Neurontin was launched I think sometime before November

20   of 1995, if we're looking at bipolar, correct?

21   A.   That's correct.

22   Q.   But the lawyers asked you to assume that the unlawful

23   conduct starts in November of 1995 for bipolar, correct?

24   A.   That's correct.

25   Q.   How did you treat marketing activities that had been

1  conducted by the manufacturer before November, 1995, and why?

2  A.   Those marketing activities that were nonzero -- that is,

3  as we saw in the charts last time, there were promotional

4  activities that targeted psychiatrists before November of

5  1995 -- those were also assumed to be zero in this but-for

6  scenario, despite the fact that they predate the period defined

7  by counsel.  And the rationale for doing this is that, again,

8  there was no economic justification for marketing to

9  psychiatrists for approved uses, and so from an economic

10 perspective, it makes no sense to think about marketing in that

11 pre-class period as having taken place and then suddenly

12 stopping on November, 1995.

13 Q.   I take it then you assume in this but-for world, this

14 world where you're trying to figure out what otherwise would

15 have happened, that the manufacturer wasn't breaking the law

16 before November of 1995?

17 A.   I make no -- my damage analysis pertains only to the

18 period from November, 1995, onward, as directed by counsel.

19 I'm not a lawyer, as you know, so I make no assumption about

20 whether this pre-period promotion was legal or illegal.  But in

21 the context of the economic model, it makes no sense that had

22 the alleged conduct not been undertaken, that the defendant

23 would have been promoting Neurontin to psychiatrists during

24 this period from the launch of Neurontin through November,

25 1995.

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1    Q.   Let's turn to migraine, and briefly just give the

2    assumptions that you undertook that were specific to migraine.

3    A.   So for migraine, in this instance perhaps it's useful --

4    Q.   405-M.

5    A.   I realize the font is small, but for migraine in this

6    instance, the specialty in question is neurologists.  So

7    neurologists are the primary physicians who treat migraine, and

8    our data show in fact that Neurontin uses for migraine are

9    concentrated among neurologists.  The scenario for a

10   neurologist is somewhat different from that for psychiatrists

11   and bipolar disorder because, of course, as you know,

12   neurologists also treat the primary indication for Neurontin;

13   that is, seizures.

14        So the but-for scenario has the actual promotion to

15   neurologists being equal to the but-for scenario, so absent the

16   alleged misconduct, promotion would have been the same to

17   neurologists up until June of 1995, the beginning of the damage

18   period for migraine.  And from that point onward, I make an

19   allocation of actual promotional spending that is strictly

20   proportional to off-label uses; that is, migraine uses

21   prescribed by neurologists.  So I look at the data and look at

22   off-label uses by neurologists versus approved uses by

23   neurologists and assume that the proportion of promotion

24   allocated to these indications is the same.

25   Q.   So I take it so far, Professor, your models and your

1   approaches are highly indication-specific, if you will?

2   A.   They are indication-specific, yes.

3   Q.   Now, neuropathic pain and nociceptive pain, briefly your

4   assumptions?

5   A.   Neuropathic pain and nociceptive pain, these indications

6   are treated by a somewhat larger group of physicians, and so I

7   break down physician specialties, and, for each of these pain

8   categories, analyze the impact of the alleged misconduct

9   separately by specialty category.   So, first, take neurologists.

10  So neurologists prescribe Neurontin during this period for

11  neuropathic and nociceptive pain.   The assumption that I make

12  for these pain conditions and neurologists is the same as I

13  made for migraine.   So essentially I leave alone promotion up

14  until June, 1995, the beginning of the damage period; and after

15  that period, I assume that the defendant would have promoted

16  Neurontin to these specialties in proportion to on-label uses.

17  So again I remove an amount from the promotional spending that

18  is equal in percentage terms to off-label use.

19  Q.   And, again, with respect to these two indications, you're

20  actually disaggregating by specialty, highly indication-specific,

21  your analysis?

22  A.   That's correct, and again this has to do with the fact

23  that the economics of how the allegations play out would be

24  specific to each specialty in terms of the marketing strategy

25  of the defendant.   So starting with neurologists, again, I

1   understand that neurologists treat patients for seizures, and

2   therefore that there is likely to be an economically sound

3   reason for promoting to those physicians.  Now I turn to

4   physicians who, either other physicians or physicians who treat

5   patients for the other approved use for Neurontin, which is

6   postherpetic neuralgia.

7   Q.   Now, let's turn finally to dose then because we want to

8   move this along.  Briefly your assumptions on dose?

9   A.   So essentially the assumptions on dose is, to the extent

10  that promotional activities can be shown to have a causal

11  impact on dose, then these promotional activities were subject

12  to the alleged misconduct.  And so for dose, I essentially

13  assumed that in the but-for scenario, all promotion that caused

14  high doses would not have occurred.

15  Q.   Now, so taking that model then, what data, what specific

16  pieces of data were you comparing if you were on the left side

17  and the right side of your regression?

18  A.   The left-hand side of the regression in the actual

19  implementation is indication and specialty-specific, but it is

20  essentially the same variable.  It's the number of

21  prescriptions.  On the right-hand side as we think about it --

22  I'm not sure if this visually makes sense to you but --

23  Q.   I'd ask for defendants' Slide 1 which I found helpful.

24  Can we put that on the board.

25  A.   So as economists write down, literally write down

1    equations to run regressions, the left-hand side, the outcome

2    variable, is the variable of interest that we're trying to

3    explain, and here it's the number of prescriptions for an

4    indication by a specialty.

5         On the right-hand side we put the explanatory variables,

6    and the four primary explanatory variables that I looked at

7    here were the price of Neurontin; the promotional stock for

8    Neurontin, and that was that cumulative measure of promotional

9    spending; competitor's prices; and the promotional stock by

10   competitors.

11   Q.   Now, the data that you were using were national data, not

12   specific to Kaiser, correct?

13   A.   That's correct.

14   Q.   And why does it make sense in this case, because this case

15   only deals with Kaiser, why does it make sense to use the

16   national data?

17   A.   So the national data give us the biggest possible picture.

18   We know that pharmaceutical marketing strategies are developed

19   at a national level.  Activities such as detailing and

20   advertising belong to a national strategy for a drug; and in my

21   analysis, the data are most stable if we look at the aggregate

22   national sales.

23        It's also really important to remember that all of these

24   factors that I am intending to capture here through this set of

25   variables influence physicians, both in Kaiser and elsewhere,

1    in much the same way.  These physicians, while there may be

2    different employment context for physicians in Kaiser versus

3    other physicians perhaps --

4              MR. KENNEDY:  Object.  Move to strike.  Lack of

5    foundation with regard to what Kaiser does.

6              THE COURT:  Do you have any knowledge about Kaiser

7    specifically?

8              THE WITNESS:  I'm certainly, in the course of my

9    research, I'm aware of Kaiser's model of managed care and the

10   fact that they employ physicians, yes.

11             THE COURT:  All right, overruled.

12   A.   So while there may be differences in, for example, the

13   employment context of Kaiser physicians, these physicians are

14   exposed to continuing medical education in the same way that

15   other physicians nationally are.  They have available or not

16   available the same literature that's been published or not

17   published, and they are influenced by marketing in the same way

18   that other physicians are.  So it's my belief that while there

19   may be some differences, the national analysis will be

20   representative of what happened in the Kaiser situation.

21   Q.   Professor, why wouldn't it be more accurate to just use

22   Kaiser numbers rather than national numbers?

23   A.   So if Kaiser numbers were used for the left-hand side

24   variable here, the right-hand side variables would essentially

25   have a less clear relationship with that left-hand side

1    variable because they're being measured at a different unit of

2    analysis.  And so, for example, journal advertising, while it

3    makes absolute sense at the national level, it would be

4    difficult to know how to prorate that to appropriately capture

5    what journals Kaiser physicians read.  And so what I'm trying

6    to do here is establish the relationship between journal

7    advertising and detailing and prescriptions, and then

8    extrapolate that relationship to Kaiser, rather than trying to

9    make the individual variables in the equation represent Kaiser.

10   In my view, this is the most reliable way to develop these

11   estimates for Kaiser.

12   Q.   Is it fair to say then, Professor, that given your

13   understanding of the available data sources, the only

14   reasonable way healthcare economists would approach the

15   question you're trying to address and apply it to Kaiser would

16   be to use national numbers?

17   A.   In my opinion, that's correct, both because of this issue

18   of wanting to have the variables on the left-hand side and the

19   right-hand side be matched in effect, and the inability for

20   some of these concepts to be easily translated to Kaiser's

21   situation, but also because of sampling bias issues.  So the

22   national data give us the universe of Neurontin prescriptions.

23   We have much more reliability because of the large sample

24   sizes.

25   Q.   Now, when we look at this right-hand column of explanatory

1    variables, are you telling the jury that these are the only

2    things that influence drug sales?

3    A.    No.  Of course, at an individual patient or physician

4    level, we could all think of many things that would influence

5    the choice of a physician to recommend a particular drug and a

6    patient to decide to fill that drug and actually take the drug;

7    but what I'm trying to do is explain the trends over time in

8    aggregate sales.  And so I'm trying to identify here, and I do

9    identify here, the most important factors that drive these

10   trends, as opposed to the factors that may have an important

11   influence over an individual prescription.

12   Q.   Let's talk about maybe just one other kind of thing that

13   might influence the amount of drug sales before we move on.

14   Formulary changes over time or differences, you don't have that

15   on the right-hand side as an explanatory variable.  Why not?

16   A.    That's correct.  There are a number of reasons why

17   formulary changes aren't in this model.  The most important

18   reason to not be concerned about formulary changes in the model

19   is that when we talk about what is called "omitted variable

20   bias" -- that is, a problem in calculating the effect here of

21   promotion on sales that is caused by not having a variable in

22   the regression -- we worry about those variables that are

23   correlated with the variable of interest; i.e., promotion here.

24   So there is no reason to believe that these formulary changes

25   would occur in precisely the same pattern as the defendants'

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1  promotional efforts and then the stock thereof over time.  So

2  that's one important reason.

3      The second reason is that, as I cite in my report and I

4  believe has been stated earlier, that antiseizure drugs are

5  typically on all formularies, all antiseizure drugs, because of

6  the concerns about patient-specific effects.  So I do not

7  believe that formulary changes are a substantial influence in

8  this market, based on my expertise in pharmaceutical economics.

9      And, finally, in the case of formulary changes, it's my

10 understanding that over time, perhaps as information about the

11 settlement with the defendant was made public, or information

12 became public in the journals in the period after there were

13 concerns about off-label promotion, that this would have led to

14 formulary changes that would restrict Neurontin.  And in that

15 case, my estimates would be undercounting promotional effects

16 because if insurers, for example, were trying to combat

17 off-label use for Neurontin at the same time as defendant was

18 promoting for Neurontin, those two things would sort of cancel

19 one another out, and they would lead to an undercalculation of

20 the promotional effect.

21 Q.   So if in a situation, for instance, a large payor had a

22 major education campaign with respect to Neurontin in response

23 to marketing efforts by the company, how would your model

24 exaggerate or underestimate the effects of the promotion?

25 A.   So to the extent that that's occurring in my data, again,

1    the notion is that if those activities were pushing against the

2    promotional activities, it would make the promotional effort

3    look less effective in effect; and so it would make it look as

4    if promotion was less successful than it would have been in the

5    absence of those third-party payor activities to try to

6    contravene the promotional effect on off-label use.

7    Q.    Demonstrative No. 9.  There were a series of other

8    potential explanatory variables that you didn't include,

9    something about scientific literature, CMEs.  Without going

10   through each of these, let me just identify one, for instance.

11   Scientific literature, why is that not labeled and identified

12   as an explanatory variable in your regression?

13   A.    So as I examined the allegations in the complaint, it's my

14   understanding that there are allegations and that the plaintiff

15   intends to prove that the defendant used the scientific

16   literature in part to effectuate the alleged misconduct.  And

17   perhaps importantly here, there are claims that there was

18   scientific evidence that was omitted from the literature, that

19   was suppressed, and so any capture of the scientific literature

20   would need to take account of the fact that there were missing

21   pieces of evidence.  And so the influence of a particular

22   article would have to be taken in the context of what wasn't in

23   the scientific literature.  So it's my understanding as an

24   economist reading these allegations that the scientific

25   literature would be affected and part and parcel of the alleged

1    misconduct.

2    Q.   Now, Professor, did you formulate an opinion to a

3    reasonable degree of certainty in the area of applied

4    microeconomics, and bring to bear also your experience in

5    healthcare economics over the past decade or so, in forming an

6    opinion as to whether or not your choice of the explanatory

7    variables, and your consideration of other things that may or

8    may not be included, was appropriate for the purposes of

9    estimating the effect of Pfizer's marketing on Neurontin sales

10   between 1995 and 2004?

11   A.   Yes, I did, and it's my opinion to a reasonable degree of

12   scientific certainty that these calculations are the best way

13   to estimate the number of prescriptions and the share of

14   prescriptions that were affected by the alleged misconduct.

15   Q.   And that that applied to Kaiser as well as to other payers

16   across the country?

17   A.   That's correct.

18   Q.   And similarly, then, I take it that there were some

19   results.  Now we can finally get to the results of your

20   regression, correct?

21   A.   Yes, there are results.

22   Q.   Let's go to 405-K, plaintiffs' exhibit, which I move in

23   evidence.

24            (Exhibit 405-K received in evidence.)

25   Q.   Now, we're going to spend just a little bit of time with

1    this, and Corinne, if you can blow up just the body of it.

2    First, these are the results, if you will, of your regression

3    and your analysis, correct?

4    A.    That's correct.

5    Q.    Okay.  So let's first start with the column of bipolar.

6    Can you walk the jury through slowly with what the indication

7    was and what the chart shows.

8    A.    Okay, so the indication in question here is bipolar.  As

9    noted earlier, these calculations pertain only to those

10   prescriptions written by psychiatrists, so these are bipolar

11   prescriptions written by psychiatrists.  And in the second

12   column you see the damage period noted earlier that I was asked

13   to calculate quantities for for Kaiser.  The number of

14   allegedly unlawful prescriptions in the third column is the

15   national number that I calculate using my model and the but-for

16   world assumptions noted earlier.  That is, there would have

17   been no promotion to psychiatrists absent the alleged

18   misconduct.  And then in the final column I represent this

19   number of allegedly unlawful prescriptions as a percentage of

20   those prescriptions written by psychiatrists for bipolar.

21   Q.    So let me see if I get it then.  The allegedly unlawful

22   prescriptions column, are you concluding that approximately

23   11,710,680 prescriptions for Neurontin written by psychiatrists

24   in the country between November, '95, and December of '04 would

25   not have occurred if the defendant had not engaged in the

1    unlawful conduct?

2    A.    That's correct.

3    Q.    And so what is the 99.4 percent a percentage of?

4    A.    It's a percentage of all prescriptions written by

5    psychiatrists for bipolar, for Neurontin, of course.

6    Q.    And then presumably some portion -- and we'll address this

7    later with another expert -- some portion of that 11,710,000

8    prescriptions may well have been written by providers for whom

9    Kaiser paid the Neurontin prescription?

10   A.    That's correct.

11   Q.    What did your results show for migraine?

12   A.    So for migraine, assuming you follow the same set of

13   columns, the number of allegedly unlawful prescriptions is on

14   the order of about 700,000, and these allegedly unlawful

15   prescriptions represent about 28 percent of all prescriptions

16   for migraine written by neurologists.

17   Q.    So close to three out of every ten prescriptions for

18   migraine by neurologists would not have been written but for

19   the allegedly unlawful conduct?

20          THE COURT:  And is that, just to get that, for

21   Neurontin?

22          THE WITNESS:  Yes, for Neurontin.  Sorry.  These are

23   all for Neurontin, and they are specialty-specific, so this is

24   Neurontin prescriptions written by neurologists for migraine.

25          THE COURT:  Just say the whole sentence.  So three out

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

Page 33

1    of ten --

2         THE WITNESS:  Three out of ten Neurontin prescriptions

3    written by neurologists for migraine, according to my

4    calculations, would not have been written/filled but for the

5    alleged misconduct.

6         THE COURT:  So seven out of ten Neurontin

7    prescriptions were untainted?

8         THE WITNESS:  That's correct, according to my --

9         THE COURT:  For migraine?

10        THE WITNESS:  For migraine by neurologists.

11   Q.   Just stick to that then.  You're not saying that the only

12   reason the three out of the ten prescriptions written by

13   neurologists for migraine, that the only reason was the

14   unlawful conduct, but just that were it not for the unlawful

15   conduct, they would not have been written?

16   A.   That's correct.  Again, the model separates out the

17   specific causal contribution of the challenged conduct, and so

18   the three out of ten, had the challenged conduct not occurred,

19   three out of ten of these prescriptions would not have been

20   written.

21   Q.   Now, turning to neuropathic pain, describe to the jury

22   your results here.

23   A.   So for neuropathic pain, as noted earlier, I examined the

24   patterns of use for three different specialty categories:  for

25   neurologists alone, for all other specialties, and for a group

1    of physicians that I think of as a health economist as primary

2    care physicians.  They are empirically identified as the

3    primary prescribers for postherpetic neuralgia, which I

4    understand is shingles.

5         So for neuropathic pain, with the damage period between

6    July of 1995 and December of 2004, I calculate approximately

7    20,775,263 allegedly unlawful prescriptions of Neurontin for

8    neuropathic pain, or about 70 percent of all prescriptions

9    written for neuropathic pain of Neurontin.  That breaks down by

10   specialty, so for neurologists, the number of allegedly

11   unlawful prescriptions that I calculate is roughly 2.9 million,

12   or about 25 percent of Neurontin prescriptions written by

13   neurologists for neuropathic pain.  Those other specialties, I

14   calculate about 6 million allegedly unlawful prescriptions

15   written by other specialties for Neurontin for neuropathic

16   pain, and that is about 99.8 percent of all prescriptions

17   written of Neurontin for neuropathic pain written by other

18   specialties.  And, finally, for this primary care group, I

19   calculate approximately 11.7 million allegedly unlawful

20   prescriptions, constituting approximately 100 percent of all

21   those prescriptions of Neurontin for neuropathic pain written

22   by primary care physicians.

23   Q.   Now, you're excluding, though, the shingles treatments,

24   correct?

25   A.   That's correct.

1    Q.    And so, again, can you state the 70 percent in terms of

2    the seven out of ten explication?

3    A.    So according to my calculations, approximately seven out

4    of ten Neurontin prescriptions for neuropathic pain would not

5    have occurred absent the alleged misconduct.

6    Q.    Applicable to Kaiser as well as other payors?

7    A.    That's correct.

8    Q.    Nociceptive pain, please describe to the jury your

9    findings there.

10   A.    For nociceptive pain, I examined a period from September

11   of 1995 until December of 2004 and calculated approximately

12   8.1 million allegedly unlawful prescriptions of Neurontin for

13   nociceptive pain.  This number constitutes approximately

14   85 percent of Neurontin prescriptions for nociceptive pain.

15        For the neurologist specialty in particular, I calculate

16   710,000, approximately, allegedly unlawful prescriptions that

17   constitute roughly 33 percent, one-third of all prescriptions

18   of Neurontin written by neurologists for nociceptive pain.

19        For all other specialties other than primary care, I

20   calculate 2.1 million allegedly unlawful prescriptions, and

21   these constitute 99.8 percent of all Neurontin prescriptions

22   written by specialties other than neurologists and primary care

23   physicians for nociceptive pain.

24        For those primary care physicians, I calculate roughly

25   5.2 million prescriptions of Neurontin for nociceptive pain

1    that would not have occurred absent the alleged misconduct, and

2    this constitutes the entirety of those prescriptions written by

3    primary care physicians for nociceptive pain.

4    Q.   So about eight and a half --

5    A.   So in total, allegedly unlawful prescriptions for

6    nociceptive pain across these three categories of specialties

7    in the aggregate constitute about eight and a half out of ten

8    prescriptions of Neurontin for nociceptive pain that would not

9    have occurred, would not have been paid for by plaintiffs.

10   Q.   Now, before we go to doses, let me ask you, when a

11   healthcare economist concludes a result like this, do you take

12   a look back and say to yourself, you know, "Are these results

13   consistent with what we understand the facts to be that I've

14   been asked to assume and the implementation of econometrics"?

15   A.   Yes, certainly.  There are certain patterns in my results

16   that intuitively make sense in terms of the economic

17   underpinnings.  And in particular, if you look at the percentages

18   of allegedly unlawful to actual prescriptions, you can imagine

19   that there are certain physician specialties, and in particular

20   neurologists, that would be exposed to information about a

21   product like Neurontin because they treat the approved

22   indications for that product, and that there might be what I

23   would call "spillover effects" from legitimate promotion in

24   these cases, and neurologists who are prescribing Neurontin for

25   seizures might use them for migraines.  And so, for example, if

1   you look at the percentages of allegedly unlawful prescriptions

2   for neurology, they're much lower.  Even though we're talking

3   only about the same off-label uses, these physicians, my model

4   essentially picks up the fact that these physicians might

5   respond to legitimate promotion by increasing off-label uses to

6   some degree?  But you would not -- I would not expect other

7   specialties, primary care specialties, to be exposed to

8   legitimate promotion for Neurontin, and therefore it makes

9   sense to me that virtually all of the uses by those physicians

10  for the specific indications appears to be connected to the

11  alleged misconduct.

12          MR. SOBOL:  By the way, if I inadvertently forgot, I

13  move into evidence 405-K.

14  Q.    And, Professor Rosenthal, if I misspoke and talked about

15  Kaiser physicians, again, I meant Permanente Medical Group, the

16  entity that has a contract with Kaiser.  I apologize.

17  A.    Thank you for that clarification.

18  Q.    Finally, doses, your result on dose?

19  A.    So, finally, the dose model, again in this case, on the

20  left-hand side of my analysis, I look at the doses, the number

21  of prescriptions for Neurontin with a dosage of 1,800

22  milligrams per day or greater, and the damage period is March,

23  1995, through December, 2004.  I calculate 2,147,674 allegedly

24  unlawful prescriptions.  And as a percentage of all

25  prescriptions written at that high dose level above 1,800

1   milligrams per day, that constitutes 37.5 percent, or roughly

2   three and three-quarter prescriptions out of ten for high doses

3   that would not have occurred at that level of dosage absent the

4   alleged misconduct.

5   Q.   Now, if we can turn to Plaintiff's Exhibit 408-AA, which I

6   move into evidence.

7          (Exhibit 408-AA received in evidence.)

8   Q.   Professor Rosenthal, this is a clip from the expert

9   reports.  Do you see that?

10  A.   I do.

11  Q.   The only reason I'm showing this is, it has actually the

12  same data, but you performed this analysis and provided your

13  results approximately a year and a half ago; is that fair to

14  say?

15  A.   That's approximately correct.

16  Q.   And there has been discovery regarding them and

17  depositions and other depositions and rebuttals and that kind

18  of thing, correct?

19  A.   Yes, there has.

20  Q.   And have various issues been brought to your attention

21  which, you know, you've addressed in one way or another with

22  respect to your results?

23  A.   Yes, I have.

24  Q.   Okay.  What I'd like to do first is go to 405-I, please.

25  One issue I want to address is this.  405-I is already in

1   evidence.  Please remind the jury what data we're looking at

2   here.

3   A.   These data come from IMS Health, and they represent

4   expenditures for detailing, that face-to-face sales force

5   activity that I mentioned on Friday, expenditures for detailing

6   monthly throughout the lifecycle of Neurontin, through

7   September, 2007.

8   Q.   And obviously I think you began to make an observation on

9   Friday about this apparent spike that appears in the 2003

10  period, correct?

11  A.   I did, yes.

12  Q.   Now, did you undertake an inquiry to look at the rationale

13  behind that spike in order to address it as a data source for

14  your model?

15  A.   Yes.  So when I saw these data visually and

16  quantitatively, as a healthcare economist, I was struck by the

17  fact that it appears the defendant escalated promotion for a

18  product --

19          MR. KENNEDY:  Object.  Move to strike, irrelevant.

20          THE COURT:  Overruled.

21  A.   -- for a product that was about to go generic.  In my

22  experience as a pharmaceutical economist, this makes little

23  sense because once generic launch occurs, all those returns

24  would effectively be enjoyed by the generic manufacturers.  I

25  instructed my staff to review discovery materials to ascertain

1    what the source of this escalation in detailing was, and I

2    noted in the data that this escalation was concentrated among

3    primary care physicians in particular and some others, but it

4    was not across all specialties.

5         In the documents, my staff found strategic materials

6    indicating that the defendant was marketing for the prelaunch

7    of pregabalin.

8              MR. KENNEDY:  Object.  Lack of foundation, irrelevant.

9              THE COURT:  I have to sustain that without a

10   foundation.

11   Q.   Did you undertake an inquiry as to what the rationale was

12   for the marketing blip that occurred in 2003?  Yes or no.

13   A.   I did.

14             MR. KENNEDY:  Same objection.

15             THE COURT:  Overruled.

16   Q.   And what documents did you review?

17   A.   I reviewed strategic documents and --

18             THE COURT:  Well, do you have them?

19             THE WITNESS:  Did I have them?

20             THE COURT:  Do you have them, what you reviewed to

21   show this?

22             THE WITNESS:  Your Honor, if I may?

23             THE COURT:  Yes.

24             THE WITNESS:  There are some cited in my report.

25             MR. SOBOL:  The defendants had them for a year and a

Page 41

 1    half, your Honor.

 2              THE COURT:  Is the objection lack of foundation?

 3              MS. ARMSTRONG:  Could we have a side bar, your Honor?

 4              THE COURT:  Yes.

 5    SIDE-BAR CONFERENCE:

 6              THE COURT:  Just so I understand, is the objection

 7    lack of foundation?

 8              MS. ARMSTRONG:  Yes, your Honor.

 9              THE COURT:  So what's the --

10              MR. KENNEDY:  Whether we were trying not to get

11    approval, so --

12              THE COURT:  So the issue is relevance, not foundation?

13              MS. ARMSTRONG:  It's both, your Honor.

14              THE COURT:  Well, foundation she apparently has.  Now,

15    you can tease through the documents, but why is it relevant?  I

16    had thought it was a foundation thing.  I'm sorry.

17              MR. SOBOL:  The defendants' economist says that

18    Professor Rosenthal's model doesn't fit the promotional data

19    because the promotional data for Neurontin goes way up in 2003,

20    and Professor Rosenthal hasn't accounted for that appropriately.

21              THE COURT:  Right.  Well, I think she's now explained

22    it, so let's not go into it any further.  So you're responding

23    to a criticism from their expert, is that it?

24              MR. SOBOL:  Right.

25              THE COURT:  But then you can come back.

1          MR. SOBOL:  But I was trying not to have to bring her

2     back is the point, but if he's not going to raise it, then

3     fine.

4          THE COURT:  That will be a criticism?

5          MS. ARMSTRONG:  Yes, your Honor.

6          THE COURT:  All right, then overruled.

7          MR. SOBOL:  Thank you.

8          (End of side-bar conference.)

9     BY MR. SOBOL:

10    Q.   So, Professor Rosenthal, you undertook an inquiry, and

11    what did you learn with respect to the spike in marketing that

12    occurred in the 2003 time period?

13    A.   According to Pfizer documents, as noted in Footnote 37 of

14    my report, I learned that Pfizer was considering the launch of

15    pregabalin and --

16    Q.   Lyrica?

17    A.   Yes, Lyrica, excuse me -- and contemplating the strategic

18    interaction between its promotional efforts for Neurontin and

19    the anticipation of Lyrica's launch.  And in particular, as

20    noted also, I believe, in the sentencing memorandum, that the

21    defendant wanted to position pregabalin as not just --

22         MR. KENNEDY:  Objection, your Honor.  This is going to

23    a different drug.

24         THE COURT:  Yes, yes.

25         MS. ARMSTRONG:  Move to strike.

Page 43

1          THE COURT:  Well --

2          MR. SOBOL:  I'll continue, your Honor.

3          THE COURT:  Yes, why don't you move on.

4          MR. SOBOL:  Sure.

5   Q.   In any event, Professor, did you form an opinion to a

6   reasonable degree of certainty as to whether or not it was

7   appropriate or not to be attributing the spike in marketing to

8   Neurontin rather than to anticipating Lyrica's launch by

9   Pfizer?

10  A.   My opinion, using my experience as a healthcare economist,

11  that it was not appropriate to consider this as being related

12  to the promotion of Neurontin.

13  Q.   Could you find any rational reason whatsoever why Pfizer

14  would be spending this money on Neurontin at this point in its

15  life?

16  A.   As I noted earlier, for the promotion of a brand-name drug

17  that is about to go off patent, it makes no sense to me as a

18  healthcare economist.

19  Q.   Okay.  Now, in addition --

20          THE COURT:  Yes, a question.  Go ahead.

21          A JUROR:  Just one question on when you detail for a

22  specific pharmaceutical.  How do you necessarily break out on a

23  sales call what percentage is a Neurontin call, what percentage

24  is one of many other drugs that Pfizer may sell?

25          THE WITNESS:  That's a good question.  The physician's

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1    report -- in IMS Health the physicians keep a diary essentially

2    of detailing visits, and the physicians report what the

3    detailer discussed.

4            A JUROR:  Thank you.

5    Q.   Two other things briefly, Professor, details about your

6    regression.  I think there has been something raised during

7    this discovery process that at various points in time the model

8    might show that there are more prescriptions being attributed

9    to the alleged fraud than were actually written in that point

10   in time.

11   A.   That's correct.

12   Q.   Can you describe to the jury what this sort of phenomenon

13   is first.

14   A.   So these models have certain assumptions about what's

15   called an "error process."  So these calculations, they

16   incorporate the fact that there is random variation in

17   Neurontin prescribing, and so I fit a model that most closely

18   tracks the data.  And in my case, I'm concerned here about

19   forecasting, about predicting what would have happened but for

20   the alleged misconduct; so in every quarter, in every period of

21   time, I have an actual number of prescriptions, and I have a

22   predicted number of prescriptions.  That prediction is subject

23   to random error.  You've no doubt heard of confidence intervals

24   around estimates.  So there's a confidence interval around my

25   estimates, and so in individual quarters, they will be plus or

1   minus the actual number.  So somewhere in the range plus or

2   minus my point estimates will give an indication of the number

3   of prescriptions that would have been filled in that quarter.

4        So to the extent that my estimates, my calculations, yield

5   the number of prescriptions caused by the alleged misconduct

6   that is relatively high, then that confidence interval can

7   cross that boundary and predict -- I get a point estimate that

8   predicts above the actuals.  This is a normal statistical

9   process.  It's not at all surprising.

10       Of course, in places where I get a prediction that's above

11  the actual, I also get predictions that will be randomly below

12  what actually would have occurred absent the misconduct.  This

13  is a two-sided process.

14  Q.   I tried an analogy on somebody this weekend.  Let me try

15  it on you.  If you have a pool that is completely calm and the

16  water is not overflowing, that's one way to look at it.  But

17  then if you make some turbidity in the pool and the waves go

18  over the edge, every once in a while the water will go over the

19  edge, but it doesn't mean that there's more water in the pool

20  that would fit the pool.

21  A.   Something like that, and, again, in some places of the

22  pool, if you were to measure the water level, it will appear to

23  be below the actual water level when the pool is stable, and so

24  that sloshing happens on two sides.  If you aggregate all the

25  estimates through the whole time period, the differences, the

1    amount of noise becomes very small because those plusses and

2    minuses cross one another out.  And so it's only if you focus

3    on an individual quarter that it's evident that this noise

4    creates what seems to be an anomalous fact but in fact is just

5    the nature of the random variation in the data.

6    Q.   Let's go to Demonstrative 6.1.  Professor Rosenthal, this

7    bar chart re-depicts the results of your regression but through

8    a bar chart; is that fair to say?

9    A.   That's correct.

10   Q.   And I note that the bars, some of them are taller than

11   others.  Why is that the case?

12   A.   So the height of the bars is the total number of Neurontin

13   prescriptions for that indication for the period in question.

14   The division of the bars between the blue and what looks like

15   yellow here, yellow or orange, depending, the division of the

16   bars shows you that share we talked about before, the share of

17   all prescriptions that my analysis suggests would not have

18   occurred but for the alleged misconduct.

19   Q.   And so I take it then that, for instance, neuropathic

20   pain, the middle bar, sold the most amount of prescriptions,

21   and that's why it's the tallest, correct?

22   A.   That's correct.

23   Q.   And then, relatively speaking, migraine would be the least

24   amount of prescriptions by indication in your analysis?

25   A.   That's correct.

1    Q.    And, again, so the yellow portion of these bars shows the

2    amount of prescriptions that were allegedly unlawful, correct?

3    A.    That's correct.

4          MR. SOBOL:  If it's all right with Mr. Kennedy, I move

5    this into evidence, even though it's a demonstrative.

6          MR. KENNEDY:  There's no objection, your Honor.

7          MR. SOBOL:  Thank you.

8          (Exhibit 2094 received in evidence.)

9    Q.    Finally, if we go to Demonstrative 6.2, again, this is

10   depicting your results in one final way, Professor.  Please

11   describe to the jury what this is.

12   A.    This is simply a visual depiction that allows for a

13   summary across only the indications in question here, not all

14   Neurontin prescriptions, but Neurontin prescriptions for

15   bipolar, migraine, neuropathic pain, nociceptive pain, and the

16   high-dose prescriptions.  So that pie chart is the sum of all

17   those piece.  In blue is the number of prescriptions that were

18   not affected by the alleged misconduct, 27 percent.

19   73 percent, roughly three-quarters of all those prescriptions I

20   calculate would not have been written but for the alleged

21   misconduct, and then the column on the right breaks out

22   essentially that orangish/yellowish part of the pie.

23   Q.    And so if we can do our seven out of ten with respect to

24   the TRx's allegedly unlawful.

25   A.    So, again, here roughly seven out of ten Neurontin

1   prescriptions for the indications that have been specified in

2   the complaint were caused, according to my analysis, by the

3   alleged misconduct.

4           MR. SOBOL:  Again I offer this in evidence.

5           MR. KENNEDY:  No objection, your Honor.

6           MR. SOBOL:  Nothing further.

7   CROSS-EXAMINATION BY MR. KENNEDY:

8   Q.   Good morning.  I've heard conflicting accounts as to

9   whether you prefer to be called Dr. Rosenthal or

10  Professor Rosenthal.  Is there a preference?

11  A.   Good morning, Mr. Kennedy.  I prefer Professor Rosenthal,

12  not to be confused with a medical doctor.

13  Q.   Okay.  And that is because you are not a medical, correct?

14  A.   That is correct.

15  Q.   And your doctorate, as you say, is in health --

16  A.   Health economics, yes.

17  Q.   Now, just to clarify what you have and have not been hired

18  to do in this case, if I understand it, you have not been hired

19  to offer any opinions as to whether the defendants' conduct

20  really was or was not unlawful, correct?

21  A.   Correct.

22  Q.   You've been told to assume that everything that's alleged

23  in Kaiser's complaint is correct, as you told us on direct?

24  A.   Correct.

25  Q.   And that includes Paragraph 33 of Kaiser's complaint which

Page 49

1    says, "No clinical trial showed that Neurontin was safe or

2    effective for any of the conditions in question," correct?

3    A.    Correct.

4    Q.    And you're taking Kaiser's representation as true and just

5    assuming that that would be accepted by the jury, correct?

6    A.    Yes.

7    Q.    And, likewise, you're not here to opine in any way on

8    whether Neurontin in fact provided medical benefit to anybody

9    who received it, are you?

10   A.    That's correct.

11   Q.    Again, you're taking Kaiser's representation that at least

12   for the uses in question, Neurontin does not provide help,

13   correct?

14   A.    In essence, I believe all these issues go to the legal

15   matter as well as clinical issues, and so which of them is even

16   relevant to the legal matter, I'm afraid I can't have an

17   opinion.

18   Q.    And actually could we put back up plaintiffs' 6.1, the bar

19   chart, the demonstrative that just went into evidence.  Austin,

20   do you have that?  And just to clarify, 6.1, the blue parallel

21   lines show the portion of prescriptions that you concluded were

22   untainted, correct?

23   A.    That's correct.

24   Q.    And these are ones that, as far as your analysis shows,

25   doctors prescribed because that was their sound medical

1   judgment to do so?

2   A.   I don't conclude whether or not it was sound medical

3   judgment.  I only conclude that according to my model, they

4   were not caused by the alleged misconduct.

5   Q.   Okay, so whatever misconduct there was, as you pointed

6   out, it had nothing to do with something in excess of

7   70 percent of the migraine prescriptions?

8   A.   That's correct, yes.

9   Q.   And something around 30 percent of the neuropathic

10  prescriptions, correct?

11  A.   That's correct.

12  Q.   And your job in this case did not include undertaking any

13  analysis of whether the patients that got blue prescriptions

14  enjoyed better relief or results than those who got

15  prescriptions in the yellow bar, correct?

16  A.   I have not undertaken such an analysis, no.

17  Q.   And that would be up to somebody else to establish?

18  That's just not part of your assignment?

19  A.   If that were relevant, somebody else would have to do it.

20  I was not directed to do that.

21  Q.   And in addition, your assignment in this case did not

22  include trying to take any of the national data that you

23  evaluated and seeing if it really did apply to Kaiser or not,

24  did it?

25  A.   Again, I've expressed my opinion that my analysis and the

1   conclusions about the proportion of prescriptions that were

2   caused by the alleged misconduct is applicable to Kaiser.  This

3   is not a quantitative analysis, but, yes, I was asked to offer

4   that opinion.

5   Q.   You yourself, however, did not undertake to determine

6   whether the national data is or is not applicable to Kaiser,

7   correct?

8   A.   Again I just want to be clear that I have offered that

9   judgment to you this morning that I believe my estimates apply

10  to Kaiser.  For the reasons I noted earlier, I did not do a

11  separate analysis to test that.

12  Q.   And that assignment was left to Dr. Hartman, correct?

13  A.   I don't know that I'm the best person to state exactly

14  what Dr. Hartman's assignment includes.  My understanding is

15  that his assignment was about calculating damages.

16  Q.   And in evaluating or determining that your -- strike that.

17  Some of the national data that you used includes material from

18  Kaiser, doesn't it?

19  A.   That's correct.

20  Q.   And other of the national data that you used doesn't even

21  include Kaiser?

22  A.   It does not include it, yes.

23  Q.   For example, the VONA database we'll be talking about

24  later, Kaiser isn't even in there?

25  A.   That's correct.

1  Q.   And in trying to form your opinion that the national data

2  would be applicable to Kaiser, did you make any study as to

3  whether Kaiser's use of generic drugs differs from the national

4  average?

5  A.   I have reviewed some information about Kaiser's use of

6  generic drugs.  I am aware that generic prescribing on average

7  is higher for Kaiser.  My judgment about the applicability of

8  the analysis based on VONA data, however, is about the

9  representativeness of the VONA data, not whether they exactly

10  include Kaiser or whether Kaiser has different generic

11  prescribing patterns.  I don't believe that that is relevant.

12  Q.   Well, the fact that Kaiser tends to prescribe more generic

13  drugs than the national average would suggest that, as a

14  general rule, Kaiser prescribes fewer brand drugs than the

15  national average, correct?

16  A.   I believe that that would be tautologically true.

17  Q.   It would be an absolute necessity.  If you're prescribing

18  more generics, you've got to be prescribing less branding?

19  A.   That's correct.

20  Q.   And given the fact that Neurontin was a branded drug,

21  without more, you'd say, just as a general proposition, there

22  would be less Neurontin prescribed at Kaiser than in the nation

23  generally, wouldn't you?

24  A.   Indeed that is captured in the fact that Kaiser's own

25  prescriptions for Neurontin are the basis for damage

1    calculations.  That fact is already incorporated into the

2    analysis.

3    Q.    So you would expect Kaiser's Neurontin prescriptions to be

4    lower than the national average, correct?

5    A.    That may be true based on the generic number.  It may or

6    may not be true for an individual drug, but that would be the

7    point of departure.

8    Q.    And did you take into account the effect of the Kaiser

9    initiatives regarding Neurontin?

10   A.    So my analysis does not take into account any specific

11   initiatives.  To the extent that such initiatives are going on

12   in the context of the physician prescribing patterns that are

13   captured by the VONA data, they may be in the background there;

14   but I do not make a specific analysis of the Kaiser initiatives

15   that have been mentioned in the course of this trial.

16   Q.    Are you aware that in at least one region, Kaiser's

17   initiative resulted in a 34 or 35 percent reduction in new

18   starts on Neurontin?

19   A.    I was made aware of that analysis in the course of the

20   trial, yes.

21   Q.    Okay.  And how do you take that -- well, have you made

22   calculations that would apply that 34 percent and see how that

23   impacts on the applicability of national data to Kaiser?

24   A.    Well, I would note two things:  First, that in --

25   Q.    Well, first, have you done that?

Page 54

1    A.    No.

2    Q.    Thank you.  And just to clarify, you're aware from having

3    sat in court that Kaiser -- in fact Mr. Sobol asked you about

4    it on direct -- has provided us with Exhibit 923, a list of all

5    the Kaiser doctors who prescribed Neurontin during the damage

6    period, correct?

7              THE COURT:  By the way, I should interject, just

8    interrupt Mr. Kennedy for a minute.  After extensive

9    negotiations, we're going to get you a stipulation that exactly

10   describes what that list is.  I notice you rise to object.  You

11   will get a list of exactly what that is, but roughly that's

12   accurate with some exceptions.  Isn't that so?

13             MS. NUSSBAUM:  With some exceptions.

14             THE COURT:  Yes, okay.

15   Q.    Whatever else 923 may include, it at least includes the

16   Kaiser doctors who prescribe Neurontin, correct?

17   A.    This is what I've heard today.

18   Q.    Okay.  And approximately how many hours have you spent on

19   this case on behalf of Kaiser, you yourself?

20   A.    My analysis, as you know, was done for a larger group of

21   payors.  So differentiating what was on behalf of Kaiser versus

22   what was on behalf of that larger group is somewhat challenging.

23   Q.    So you don't have a separate breakdown for Kaiser?

24   A.    There is a separate breakdown for Kaiser in terms of

25   preparation for this trial certainly, but the hours and hours

1    of reviewing discovery materials and running regression

2    analyses, that would all be combined with the effort for the

3    larger set of payors.

4    Q.   And taking, you say, the larger set of payors, what's the

5    total approximate hours you've spent on that assignment?

6    A.   I know over time -- as you may know, I was retained on

7    this case approximately five years ago -- that my hours exceed

8    100, 150.

9    Q.   A hundred fifty hours?

10   A.   Approximately.

11   Q.   And you've had a staff that's put in hours as well,

12   correct?

13   A.   That's correct.  I've had very substantial staff hours.

14   Q.   What's your best estimate as to the staff hours?

15   A.   As I sit here, I'm afraid I couldn't tell you what the

16   staff hours are.  I know that they're quite extensive.

17   Q.   And whatever those hours are, during the hours that you've

18   personally spent, you haven't talked to any of the Kaiser

19   doctors who are in the book and listed as having prescribed

20   Neurontin, correct?

21   A.   As I noted earlier, economists using standard

22   methodologies do not ask physicians about how they respond to

23   promotion in order to quantify that effect, so, no, I did not

24   think it was productive to talk to those physicians.

25   Q.   And you haven't talked to any of the doctors in this book

Page 56

1   to see if they were even detailed by Parke-Davis or Pfizer for

2   any reason during the damage period, have you?

3   A.   I did not, nor would it be relevant.

4        MR. KENNEDY:  Move to strike everything after "not,"

5   your Honor.

6        THE COURT:  Yes.

7   Q.   So as you're sitting here now, you can't say for sure that

8   any Kaiser prescriber in the book was ever detailed, in the

9   sense that a salesperson called and talked to them about any of

10  the off-label uses of Neurontin here in question, correct?

11  A.   It's my assumption that the plaintiffs will prove their

12  case, and that, I believe, is the case.

13  Q.   How about answering my question?  You yourself with the

14  assignment you've been given in this case cannot say whether

15  even one of the names in this book was contacted by a

16  salesperson from Parke-Davis or Pfizer and came to visit them

17  and talked to them about any of the off-label uses in question?

18  You haven't done that, have you?

19  A.   I have not.

20  Q.   Okay.  And therefore it follows that you also can't say

21  whether any of the people in this book wrote a prescription as

22  a result of being detailed, given a sales pitch about any of

23  the off-label uses in question, correct?

24  A.   Again, that is what my analysis, I believe, does.  At an

25  individual physician level?  I cannot say that.

1   Q.   That's what I'm saying, you can't point to any individual

2   name in here and say, "Here's somebody who was detailed

3   off-label and prescribed Neurontin for one of the purposes at

4   issue in this case"?  You can't do that?

5   A.   That's correct.

6   Q.   At any time during the five years that you've been on this

7   case, have you ever suggested that Kaiser ought to at least

8   send out an e-mail to all of its current doctors and ask them

9   whether any of them were ever detailed for any of the off-label

10  uses in question?

11  A.   I have not.

12  Q.   Just as a scientist, didn't you think that would be an

13  interesting way to try to verify the opinions that you reached

14  with your multiple regression analyses?

15  A.   I believe I've made it very clear that I don't think there

16  is any use in that kind of undertaking.  It would underestimate

17  any potential effect, nor would I expect physicians to remember

18  a specific detail that may have occurred five years ago, seven

19  years ago.  There's no point in doing that from my perspective.

20  Q.   The damage period goes through 2004, doesn't it?

21  A.   Yes, it does.

22  Q.   And you were hired in 2005?

23  A.   Yes.

24  Q.   Did you consider it might be, well, at least a verifying

25  fact to try to send an e-mail out and poll doctors as to what

1   they remembered about detailing within the past twelve months?

2   A.   No, I do not believe that that is a correct statement.   I

3   do not believe it would verify anything.

4   Q.   The question was, did you do that?

5   A.   I don't believe that was the question, but, no, I did not

6   do that.

7   Q.   Now, there are errors in your calculations, aren't there?

8   A.   There were a few places where there were computational

9   errors, yes.

10   Q.   Well, for one, you estimated that for various indications

11   there were more allegedly unlawful prescriptions written than

12   the total number of prescriptions actually written, correct?

13   A.   That's not an example of a computational error.   That is

14   an example of statistical error, which is a different concept,

15   so just so that we're clear.

16   Q.   Well, I'm just talking about errors, and it was an error

17   to have a study that shows that my clients were able to defraud

18   Kaiser into writing more prescriptions than Kaiser actually

19   wrote?   That would be an error, wouldn't it?

20   A.   I believe it would not make sense to calculate damages on

21   that number, but, again, that was the predicted value out of my

22   model.   There was nothing wrong with that.   When one translates

23   that into a damage calculation, it should be restricted, but it

24   was not, strictly speaking, an error on my part.

25   Q.   And you assumed that damages would be capped at a hundred

1    percent?

2    A.    I did assume that.

3    Q.    And at least for a period of time, that wasn't done,

4    correct?

5    A.    I believe -- you mean, on a quarter-by-quarter basis that

6    wasn't done?

7    Q.    Correct.

8    A.    Yes.

9    Q.    And you never considered building a constraint into your

10   model so that it would be prevented from exceeding actual

11   real-world prescriptions, did you?

12   A.    No, I didn't.

13   Q.    Okay.  And then without trying to categorize what kind of

14   error it was, you did make another error by removing from the

15   stock of promotion in your but-for calculations promotion that

16   occurred before the time periods in question, right?

17   A.    As you know, there was some confusion about the treatment

18   of that promotion.  I've spoken this morning about why one

19   might remove that promotional expenditure even though it

20   predates the legal definition of the damage period; but in my

21   model, as calculated in my report, I did remove those dollars

22   before the legal damage period.

23   Q.    You've corrected that now?

24   A.    I have examined that question now.  I have discussed it

25   with counsel as to what the appropriate set of assumptions is,

Page 60

1   and I have noted, as I noted this morning, the economic reason

2   that that was overlooked in the first instance, and my

3   understanding is that the legal question about how those

4   dollars can be treated is somewhat unclear.

5   Q.   You have not corrected that error, correct?

6   A.   For the calculations presented today, I have not corrected

7   that, if indeed it's an error.

8   Q.   And you also made a programming error when you attempted

9   to adjust promotional expenditures for inflation, correct?

10  A.   That's correct.

11  Q.   And you haven't corrected that error either, have you?

12  A.   I have examined that issue, but what has been presented in

13  the materials in these damage estimates is from my original

14  report.

15  Q.   And as you explain throughout your report, Kaiser's

16  lawyers directed you to make a number of assumptions as a

17  starting point for your analysis, correct?

18  A.   That's correct.

19  Q.   As we've already discussed, that included directing you to

20  assume that everything alleged in their complaint is true and

21  correct, right?

22  A.   That is correct.

23  Q.   And these were assumptions you were asked to make back

24  before you wrote your report in 2008?

25  A.   Yes, that's correct.

1    Q.   And that was long before Dr. Dickersin's article appeared

2    in the New England Journal of Medicine in November of 2009,

3    correct?

4    A.   That is factually correct, yes.

5    Q.   And the lawyers also directed you to assume that our

6    clients "encouraged physicians to increase the dosage of

7    Neurontin beyond the maximum level recommended in the approved

8    label," correct?

9    A.   That sounds like the language from the complaint, yes.

10   Q.   Can we have Demonstrative 6.1 back again.  And going over

11   to the far right-hand bar graph, that's your dosage

12   calculations, right?

13   A.   That represents the results of those calculations, yes.

14   Q.   And you concluded that somewhere between 35 and

15   40 percent, about 37 percent of prescriptions for more than

16   1,800 milligrams per day were the result of improper promotion,

17   correct?

18   A.   That's correct.

19   Q.   And at anytime in the five years you've spent on the case,

20   have you asked if you could talk to any Kaiser physician that

21   prescribed at over 1,800 milligrams a day to try to get a feel

22   for the context in which that occurred?

23   A.   No, and, again, I don't believe that that would have

24   changed my analysis.

25   Q.   Well, I want you to assume hypothetically that if you'd

Page 62

1   talked to the doctors, you would have found that nobody went to

2   over 1,800 milligrams without having first tried lower dosages

3   and found those weren't sufficient.  If you assumed that were

4   correct, that would have a pretty pronounced impact on your

5   figure, wouldn't it?

6   A.   No, sir, I do not believe it would.

7   Q.   So even though the doctor started at 900 and found that

8   didn't work, and went to 1,200 and found that didn't work, and

9   went to 1,500 and found that didn't work, and therefore went to

10   1,800 or 2,000, that would be due to promotion on the part of

11   our clients, correct?

12   A.   To the extent that my model estimates a causal effect of

13   promotion on dosing, then the answer to that question would be

14   "yes," regardless of the specific path through which the

15   physician reached a dose above 1,800 milligrams.  There's no

16   inconsistency with those two things.

17   Q.   So even though each doctor says, "The only way I got above

18   1,800 was by careful trial-and-error observation," your model

19   would still say, "Uh-uh, 37 percent of you did that because you

20   were influenced"?

21        MR. SOBOL:  Objection, your Honor.  It's not in

22   evidence.

23        THE COURT:  Sustained.

24   Q.   Doctor, regardless of what individual doctors said about

25   their reason for prescribing above 1,800, your model would

1  continue to show that 37.5 percent of that was because of

2  promotional efforts by our clients?  That's what your study

3  would show, correct?

4  A.   That's absolutely correct.

5  Q.   And who would be right, the doctors or your model?

6          MR. SOBOL:  Objection.

7          THE COURT:  Sustained.

8  Q.   Can you explain how it is that we could have a hundred

9  percent of the doctors saying, "I went above 1,800 because I

10 found lower amounts didn't work for my patient," but at the

11 same time almost 40 percent of them would have made that

12 decision because of promotional efforts?

13         MR. SOBOL:  Objection.

14         THE COURT:  Well, if you can.

15 A.   Do you represent to me that a hundred percent of Kaiser

16 physicians have spoken on this point?

17 Q.   No, no.  I'm asking you to assume, just like you've been

18 able to assume when the Kaiser lawyers asked you to do so,

19 haven't you?

20         THE COURT:  Well, why don't you just explain.  What's

21 the difference between if a doctor thinks he's doing it because

22 it's helping the patient by, what was it, titrating up -- was

23 that your example? -- as opposed to what your model shows?

24         THE WITNESS:  Absolutely.  So the issue is whether

25 physicians can accurately report all the influences on their

1   practice patterns.  As an economist and a social scientist, I

2   put higher weight on what people do rather than what they say.

3   Not that physicians are lying, but there are unconscious biases

4   and social desirability biases that will make them very

5   reluctant to say that they tried a very high dose because a

6   detailing agent came and told them that.  There is good

7   experimental and other evidence in the social sciences that

8   self-reporting is biased.  So I would take that evidence with

9   many grains of salt and put very little weight on it, and

10  indeed would look at the objective patterns of detailing and

11  dosing and draw my conclusions from those objective patterns.

12  Q.   And it wouldn't make any difference if you actually went

13  and got individual charts, and the doctors showed you, "Here's

14  where I was at 900, here's where I went to 1,200, here's where

15  I went to 1,500, no effect, so that's why I went above 1,800"?

16  The social science would still trump that and show the doctor

17  was really influenced by promotion?

18  A.   But my question is, why are they prescribing above the

19  label rather than trying a new product?  So presumably there is

20  some influence that makes them say, "Hmm, perhaps I'll go even

21  beyond the FDA-recommended dosage."  And then I ask the

22  question, where does that information come from?

23  Q.   And in the course of the time you spent on this case, have

24  you been provided with copies of studies that showed you can

25  get efficacy at up to 3,600 milligrams?

1    A.   It's my understanding that a number of such studies are

2    subject to the allegations of misconduct in this matter.

3    Q.   You, however, again, have not spoken to a single doctor

4    who prescribed above 1,800 milligrams to try to get an

5    explanation of why he or she did it?

6    A.   Absolutely not.

7    Q.   Now, going to bipolar and detailing, have you looked at

8    any records that show that Kaiser doctors were detailed for

9    improper uses of Neurontin?

10   A.   You mean, do I have documents that talk about the content

11   of those details?  Is that the question you're asking me?

12   Q.   No.  Do you have any -- well, first off, did Kaiser

13   provide you with any kind of a study that it had done as to

14   whether any of its psychiatrists had been detailed for use of

15   Neurontin in bipolar?

16   A.   It's my understanding that Kaiser physicians have been

17   detailed by Pfizer.

18   Q.   And what's the basis of that understanding?

19   A.   Again, discussions with Kaiser's counsel that Kaiser

20   physicians are subject to detailing, and they have been

21   detailed on Neurontin.

22   Q.   Kaiser psychiatrists have been detailed on Neurontin?

23   A.   I don't have specific numbers on psychiatrist details, but

24   as you know, in the national data, there is documentation that

25   the defendant detailed psychiatrists.

1    Q.   Okay.  Well, both Parke-Davis and Pfizer have had other

2    drugs besides Neurontin that were specifically approved by the

3    FDA for use in conditions that would be treated by a

4    psychiatrist?

5    A.   That's true.  The details I capture, however, were

6    specifically related to Neurontin.

7    Q.   And were any of those that you specifically captured for

8    Kaiser doctors?

9    A.   I imagine there were some in there, as we discussed.

10        THE COURT:  No, just what you saw.  Did you see

11   anything?

12        THE WITNESS:  I saw the total.  I know Kaiser

13   physicians are in the promotional data that I have.  I assume

14   that their psychiatrists are in there as well.

15   Q.   And turning to migraine, you concluded that seven out of

16   ten migraine prescriptions for Neurontin were untainted by

17   promotion, correct?

18   A.   I conclude in essence that those prescriptions would have

19   happened regardless of whether or not the alleged misconduct

20   took place, yes.

21   Q.   And did you make any attempt to determine whether the

22   patients that were prescribed Neurontin on an untainted basis

23   did any better or differently than those that were prescribed

24   on a tainted basis?

25   A.   No.  That was not part of my assignment.

Page 67

1    Q.   Okay.  And, again, your job is not to say that Neurontin

2    doesn't work?  That's not part of your assignment?

3    A.   That is not my job.

4    Q.   And your model would be exactly the same even if it turns

5    out that one hundred percent of the Kaiser patients who got

6    Neurontin prescriptions for these purposes felt they were

7    benefited by it, correct?

8         MR. SOBOL:  Objection, objection.  It's not in

9    evidence.

10        THE COURT:  Sustained.

11   Q.   Now, does your study back out refill prescriptions?

12   A.   The study includes total prescriptions, all prescriptions.

13   Q.   So even if we have a hypothetical patient who's on

14   Neurontin for neuropathic pain for five years, during which

15   time they've gotten 60 refills, there would still be a

16   70 percent chance that you would find all of those

17   prescriptions were due to off-label promotion, right?

18   A.   I would appropriately count refills as having been caused

19   in the same way that new prescriptions are caused.  So to the

20   extent that there are refills, do you mean to imply that if the

21   original prescription was caused by a promotion, that refills

22   shouldn't be counted?

23   Q.   I wasn't intending to imply that.  I was intending to ask

24   that.  Don't you think that sort of makes sense, that even if

25   the doctor got tricked into prescribing the first 30 days, if

1    the patient then comes back again and again, and both the

2    doctor and the patient agree that this is a prescription that

3    ought to be refilled, the refills don't sound like they're the

4    result of illegal promotion, do they?

5    A.    I would disagree completely.  Those refills are absolutely

6    caused by the original promotion.

7    Q.    Regardless of how long the refill process goes on,

8    correct?

9    A.    Absolutely.

10   Q.    And regardless of how satisfied the doctor and the patient

11   are that the medicine is working, still tainted?

12   A.    I'm not sure what you mean by how satisfied the doctor and

13   the patient are.

14   Q.    What part of that question don't you understand?

15   A.    So the reason that we require randomized controlled

16   double-blind trials to prove efficacy of a product is that in

17   community practice it is not easy, or even in general cases

18   possible, to observe efficacy.

19   Q.    So absent a double-blind random controlled study, it's

20   your opinion we can't really know whether a patient who's been

21   prescribed and re-prescribed Neurontin for neuropathic pain for

22   five years has been receiving benefit?

23   A.    Absolutely, and that is precisely why the economics of

24   this situation are such that promotion has such a powerful

25   effect, is that it's sustained over time.  Because of the

1   information problems that physicians and patients face, it's

2   not like other products where trial and error is enough to

3   reveal product defects.

4   Q.   You've learned in the course of this case that Kaiser

5   doesn't require double-blind random controlled studies before

6   making decisions, does it?

7   A.   It may be true that they have to make practical decisions

8   in the absence of such information, but I would not say that we

9   could conclude that a patient who doesn't come back for a new

10  drug is treated effectively with a product.

11  Q.   So you've got a patient here who says, "I've been on

12  Neurontin for neuropathic pain for five years, and I found it

13  helped me.  The doctor said I experimented with other

14  combinations of drugs.  I found when I added Neurontin it made

15  a difference and seems to really be helping," you'd be saying,

16  "Unless you've got a double-blind random controlled study, I

17  can't agree with you"?

18  A.   I can't agree with the premise that that observation is

19  meaningful in terms of the effectiveness of the drug, yes.

20  Q.   I don't want to pry into your personal health, Doctor.

21  However --

22          THE COURT:  I'm nervous about this question.

23          (Laughter.)

24          MR. KENNEDY:  I don't want to commit a HIPPA

25  violation.

1      MR. SOBOL:  No objection, your Honor.

2      MR. KENNEDY:  We've been accused of enough already.

3  Q.  I mean, when you go to the doctor for something and he or

4  she says, "I think you're better now," do you say, "Absent a

5  double-blind random controlled study, I don't know whether I am

6  or not, we'd better conduct one of those"?

7  A.  You have completely misconstrued my statement.  The

8  products on the market for which my doctor has written

9  prescriptions have been tested in that randomized controlled

10  double-blind way.  They are approved for their indications, and

11  therefore I take these FDA-approved products according to the

12  label with the assumption that they are going to do what

13  they're supposed to do.

14  Q.  And you make sure you never get sick with anything for

15  which there isn't an express FDA --

16      THE COURT:  I think we're making this a little too

17  personal here.  Let's just move on.

18      MR. KENNEDY:  Very well, your Honor.

19  Q.  You're aware that Kaiser, at least in certain regions, had

20  guidelines for the prescription of Neurontin?  You know that,

21  don't you?

22  A.  I have been made aware of that, yes.

23  Q.  And, for example, that Neurontin wasn't supposed to be

24  prescribed for neuropathic pain unless less expensive drugs

25  called TCAs had been tried and found not to work, correct?

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1   A.    I have heard something to that effect.  Let me just caveat

2   that with, I understand that some of these guidelines may vary

3   from place to place, but I have heard guidelines that related

4   to the fail-first notion of treatment with TCAs.

5   Q.    And does your model back out the Neurontin prescriptions

6   that were written for people for whom TCAs had been tried and

7   found not to work?

8   A.    These kinds of guidelines are present nationally.  They

9   are in my data, so there is no need to back them out.

10   Guidelines are present, not just in Kaiser but around the

11   country, and they will influence the use of Neurontin, for

12   example, for neuropathic pain as you've presented the example.

13   So they are already captured in the data.

14   Q.    It's your understanding that throughout the ten-year

15   damage period, doctors throughout America did not prescribe

16   Neurontin for neuropathic pain unless a TCA had first been

17   found to fail?

18   A.    Excuse me.  Guidelines are recommendations.  So, first of

19   all, the fact that there's a guideline doesn't mean doctors

20   always follow it.  That's well known in the health policy

21   literature that these guidelines are not -- they're not

22   prescriptive.  They are suggestions.  And such guidelines exist

23   in many places outside of Kaiser and no doubt result in some

24   physicians changing behavior to use TCAs as an example before

25   Neurontin.  I believe my analysis already captures the effects

Page 72

1    of these kinds of guidelines.

2    Q.   Professor, you're aware that certain regions, at least in

3    Kaiser, had a guideline or perhaps even a restriction that

4    Neurontin was not supposed to be used for neuropathic pain

5    unless TCAs had first been tried?  You know that, don't you?

6    A.   I believe I've said "yes" to that question, yes.

7    Q.   And is it your testimony that there was a similar national

8    guideline that applied to all other doctors in America that

9    they too were encouraged/guided, "Don't use Neurontin unless a

10   TCA has already failed"?

11   A.   It's my testimony here that such guidelines --

12   Q.   Can you answer that "yes" or "no"?

13   A.   I never said all physicians were subject to such

14   guidelines, just that such guidelines are commonly used outside

15   of Kaiser.

16   Q.   And you can't tell me what percentage of doctors outside

17   of Kaiser had a "use TCA before using Neurontin" guideline,

18   could you?

19   A.   I could not, but I would expect it to appear in the data

20   in terms of the actual patterns of use of Neurontin for

21   neuropathic pain.

22   Q.   Well, can you show me in your report where you backed out

23   the Neurontin prescriptions that were written for people for

24   whom TCAs had already failed?

25            MR. SOBOL:  Objection.  Asked and answered.

1   Q.   Where's the deduct for that?

2            MR. SOBOL:  Asked and answered, your Honor.

3            THE COURT:  Overruled.

4   A.   An adjustment like that would make no sense, so --

5            MR. KENNEDY:  Well, your Honor, could she be asked to

6   answer rather than grade the questions?

7            THE COURT:  No.  So what's the exact question?

8            MR. KENNEDY:  Could I have it read back actually?

9            THE COURT:  Yes, that would be great.

10           (The last question was read.)

11  A.   I did not make that adjustment.  I do not believe it would

12  be appropriate to do so.

13  Q.   Now, you've seen Dr. Hartman's report here, haven't you?

14  A.   I have seen Dr. Hartman's report, yes.

15  Q.   And you'll remember in Footnote 16 of his report he

16  performs a calculation saying, if Neurontin hadn't been

17  wrongfully prescribed, the doctors would have had to prescribe

18  something else, and that would have had some cost to the

19  provider?  You remember that, don't you?

20  A.   I'm familiar with that footnote, yes.

21  Q.   Okay.  And does your analysis here include any similar

22  deduct for if somebody hadn't been prescribed Neurontin for

23  bipolar, because of the unlawful promotion, what that bipolar

24  patient would have been prescribed instead and what the cost of

25  the alternative medicine would have been?

1    A.    That was not part of my charge, so I have not done that.

2    Q.    So if that's been done in this case, it would have to have

3    been done by Dr. Hartman, correct, for Kaiser?

4    A.    It would have to have been done by someone other than me,

5    yes.

6    Q.    Now, another of the things that the Kaiser lawyers

7    directed you to assume was that Pfizer had marketed Neurontin

8    through something called a "publication strategy," correct?

9    A.    Yes.

10   Q.    You did not, however, attempt to measure the effect of the

11   publication strategy?

12   A.    I measured journal advertising but not publications

13   per se, so that's correct, I do not have a systematic measure

14   of publications or suppression of publications.

15   Q.    And specifically there's no variable in your formula that

16   tries to take into account when particular scientific results

17   are published, correct?

18   A.    Either challenged or unchallenged, yes.

19   Q.    For example, in this case there's been a lot of testimony

20   that Kaiser wasn't shown the results of certain negative

21   studies in 1999.  In fact, I think you may have been in the

22   courtroom for some of that.

23   A.    I believe I was, yes.

24   Q.    And there's also been evidence in this case that by 2002,

25   Kaiser was aware of those negative studies.  You were here for

1   that as well, weren't you?

2   A.   I believe I heard such testimony.

3   Q.   Okay.  And your model doesn't take into account what, if

4   any, effect Kaiser's becoming aware of specific negative

5   studies had on prescribing practices, does it?

6   A.   No, the model does not.  As I noted earlier in my direct,

7   it's very difficult, if not impossible, to disentangle the

8   allegations from the scientific literature.

9   Q.   So you're not here to express any opinion on what effect

10  it had on Kaiser's Neurontin prescribing practices for the

11  negative Gorson report, for example, to come to their

12  attention, correct?

13  A.   For a specific report, no, I do not calculate that, no.

14  Q.   And the same thing for the negative Pande report?

15  A.   That's correct.

16  Q.   Or the negative Frye report?

17  A.   That's correct.

18  Q.   Or the positive but potentially compromised Backonja

19  report?

20  A.   So as you know, these reports negative/positive results,

21  and some of them were delayed and then released.  My model will

22  pick up the effects of those things to the extent that they're

23  correlated with the promotional efforts by the defendant, but

24  they clearly influence the entire conduct in this matter.  So

25  the information that's available in this context will affect

1    the way the plaintiff responded to detailing, for example.

2    Q.   And your model doesn't take into account the effect of

3    changes in the Kaiser formularies with regard to Neurontin,

4    does it?

5    A.   Do you have specific changes in mind?

6    Q.   Yeah.

7    A.   Can you detail a little bit more because, again, my

8    understanding is that Neurontin, like other AEDs, is on most

9    formularies nationally, as well as Kaiser's.

10   Q.   And again I want to know, does your model put in any kind

11   of factor to deal with how Neurontin is being handled on the

12   Kaiser formularies?

13   A.   I don't believe -- so my model does not because it's not a

14   factor that changes over time in a pattern that would make it

15   difficult to disentangle from promotional efforts.

16   Q.   Well, for example, the evidence has been -- well, assume

17   hypothetically that in 2002, knowing of the negative Pande

18   study and knowing of the negative Frye study, the Ohio Kaiser

19   region changed its formulary rules to add psychiatrists as a

20   permitted group of prescribers, is that change accounted for

21   anywhere in your model?

22   A.   To the extent that formularies and uses in general were

23   being permitted by formularies or guidelines nationally, it

24   will be picked up in the data.  Specifically for Ohio, that has

25   not been adjusted for in my model.

1  Q.   And in particular, for your bipolar analysis, you haven't

2  attempted to factor in what effect Kaiser's Ohio 2002 decision

3  to extend the guidelines for Neurontin to include psychiatrists

4  may have had on what Kaiser did, have you?

5  A.   Not specifically, no.

6  Q.   Now, in addition to a detailing visit -- and a detailing

7  visit is basically the same as a sales call?

8  A.   It is indeed.

9  Q.   Okay.  A sales representative might also invite a doctor

10  to a CME, a continuing education program, correct?

11  A.   Yes.  I believe I made the point on Friday that those

12  sales visits are an opportunity to invite physicians to CMEs.

13  Q.   And that could be a dinner presentation with slides, or it

14  could be a weekend seminar, or various kinds of things,

15  correct?

16  A.   I believe these types of strategies have been described in

17  the complaint.

18  Q.   And you have included the cost of those in your

19  promotional activities, correct?

20  A.   I do not have a time series available to document the cost

21  of CMEs, but, as noted, because they occur in concert with

22  detailing, with sales calls, my model will pick up their

23  effects in the promotional spending variable that I do have,

24  detailing and journal advertising.  To the extent that they

25  don't occur in concert, my calculations are conservative.  That

1   is, I'm omitting a factor that has been alleged by plaintiffs

2   to have been illegal and have generated prescriptions.

3   Q.   And you can't say whether any particular continuing legal

4   (Sic) education program did or did not address the off-label

5   uses we're talking about here?

6   A.   The content of that continuing medical education and the

7   allegations thereof I have been asked to assume are correct.

8         MR. KENNEDY:  Could I see Exhibit 519, Austin.  And,

9   your Honor, I'm not sure if this is in evidence.  If it's not,

10  I would offer it at this time.

11        MR. SOBOL:  No objection.

12        (Exhibit 519 received in evidence.)

13  Q.   And, Professor Rosenthal, have you seen this before?

14  A.   I saw this this morning.

15  Q.   And was it included in the thousands and thousands and

16  thousands of pages of documents you said you'd reviewed from

17  the Kaiser lawyers?

18  A.   I can't say whether or not I saw this specific one.  As

19  you see, the subject line "Promotrak Analysis," I have seen

20  similar Promotrak analysis documents.

21  Q.   Right, and this is a continuing education teleconference,

22  correct?

23  A.   That is what it appears to be, yes.

24  Q.   And the content is "Managing epilepsy/treatment using

25  Neurontin," correct?

1    A.    That's correct.

2    Q.    And that would be an approved on-label use, correct?

3    A.    Yes, sir, to the best of my knowledge.

4    Q.    There's nothing wrong with Parke-Davis holding that kind

5    of a teleconference?

6    A.    I'm not sure what you mean by "wrong," but as far as I

7    know, this is a promotional activity that would not be

8    problematic from the perspective of off-label promotion.

9    Q.    And your model doesn't contain a way of separating out

10   what was spent on an epilepsy CME versus an off-label CME, does

11   it?

12   A.    My model does not contain a variable for CMEs at all,

13   so --

14   Q.    Thank you.  Now, going back to the assumptions that you

15   were directed by Kaiser's lawyers to make, that included being

16   asked to consider expenditures for journal advertisements,

17   correct?

18   A.    That's correct.

19   Q.    And if, for example, Pfizer placed an ad for the use of

20   Neurontin for PHN, postherpetic neuralgia, one of the

21   FDA-approved uses, in the New England Journal of Medicine, the

22   attorneys asked you to treat the amount spent on that ad as

23   fraudulent because the Journal might be read by doctors who

24   didn't treat PHN, correct?

25   A.    I am not sure about the rationale that you've stated

1    there, but, yes, I was asked to treat that as challenged

2    conduct.

3    Q.   Or even if an ad were placed in a journal aimed at

4    neurologists for PHN, there's still a possibility that a

5    non-neurologist might pick up the Journal, so the lawyers told

6    you to treat that as illegal promotion, correct?

7    A.   Strictly speaking, I believe what you're referring to is

8    the but-for assumptions where I assumed some proportion of

9    promotion to neurologists was related to the challenged

10   conduct, and in that case, that would include some proportion

11   of those advertisements directed at neurologists, or directed

12   at other physicians, or directed at primary care physicians.

13   Q.   Another of the things the lawyers directed you to assume

14   was that all detailing to pediatricians was improper, correct?

15   A.   To the extent that it caused prescriptions for neuropathic

16   or nociceptive pain, that is operative in my model, yes.

17   Q.   Okay.  And your model doesn't contain a way of breaking

18   out whether a sales call on a pediatrician after Neurontin had

19   been approved by the FDA for epilepsy was for epilepsy or for

20   something else, did it?

21   A.   Again, in my model I'm looking only at prescriptions for

22   neuropathic and nociceptive pain, so to the extent that a sales

23   call on a pediatrician caused a prescription for neuropathic

24   pain, then I assume it's associated with the alleged

25   misconduct.

1   Q.   And you haven't gone and interviewed any pediatrician just

2   to check and see, even though you said neuropathic pain, that

3   was actually because the child was having pain incident to a

4   seizure?  You haven't done anything like that?

5   A.   I have not done that.

6   Q.   Because the doctor, as you say, wouldn't be all that

7   reliable a source of information anyway, correct?

8   A.   I don't think that's a correct characterization of why I

9   didn't talk to pediatricians, but --

10  Q.   Now, another of the assumptions you were asked to make was

11  that detailing sales calls to neurologists was off-label in the

12  same proportion as the number of off-label prescriptions?

13  A.   That's correct.

14  Q.   So you assumed the result and you got it, right?

15  A.   That's not correct.

16  Q.   Well, even before you ran your regression analysis, you

17  assumed a perfect one-to-one correlation between off-label

18  promotion to neurologists and off-label prescribing by

19  neurologists?

20  A.   But that's not how the regression analysis works, so let

21  me try to explain.

22  Q.   Would you answer my question.  Even before you ran the

23  regression analysis, you made that assumption, didn't you?

24  A.   I made the assumption that promotional activities were in

25  the same proportion as total off-label versus approved uses,

Page 82

1    yes.

2    Q.   So you assumed the same thing that you were trying to

3    prove, didn't you?

4    A.   I don't believe that's correct.

5    Q.   Next I want to talk about, going back to your data for a

6    minute, you weren't provided with any Kaiser-specific data,

7    were you?

8    A.   I was not.

9    Q.   Did the Kaiser lawyers tell you that Kaiser did a chart

10   review of 20,000 charts back in 2001 and came to the conclusion

11   that only 4 percent of the Neurontin prescriptions were for

12   bipolar?  Did the lawyers tell you that?

13        MR. SOBOL:  Objection.  Not in evidence.

14        THE COURT:  Overruled.  There's a chart in evidence.

15   It's up to you to remember how to characterize it.  Why don't

16   you put that chart up.

17        MR. KENNEDY:  Sure, 747, I believe.

18        THE COURT:  There's been some dispute about this, you

19   may remember, but there's a chart that's in -- I don't remember

20   the picture, though.

21        MR. KENNEDY:  No, this is --

22   Q.   Doctor, we're showing you Exhibit 747.  This is an

23   interregional meeting, I'm sure you've heard.  It was DUAT.

24   That was the Southern California Drug Utilization Action Team,

25   and you can see that they view the war against Neurontin as

1    being comparable to a boxing match, and it looks like the good

2    guys have just delivered a pretty good left hook.  Do you see

3    that on the front cover?

4            THE COURT:  How do you know which is which?

5            (Laughter.)

6            MR. KENNEDY:  Because Neurontin is on the right, your

7    Honor.

8            THE COURT:  Oh, okay, fair enough.

9            MR. KENNEDY:  See, the guy who's getting hit is on the

10   Neurontin side.

11   Q.   And this is April, 2004, and let's go to Page 13.  And

12   this has a chart, Kaiser Permanente Northern California

13   Gabapentin Utilization.  And I'll represent that the evidence

14   in the record is that this was based on a chart review

15   conducted in the latter half of 2000.  And coming down to --

16           THE COURT:  Have you seen it before?

17           THE WITNESS:  I have looked at last week's testimony,

18   so I have seen this last week.

19   Q.   That was for the first time?

20   A.   Yes.

21   Q.   Up until last week, Kaiser's lawyers hadn't told you about

22   this particular chart, had they?

23   A.   That's correct.

24   Q.   And, Austin, if we can hit "Bipolar Effective Disorder,"

25   you'll see that of the 20,429 charts that were reviewed, 777,

Page 84

1    or about 4 percent of the total, were found to involve bipolar.

2            MS. NUSSBAUM:  Your Honor, just a correction?

3            MR. KENNEDY:  Is this a tag team?

4            MS. NUSSBAUM:  This is referring to prescriptions.

5            MR. KENNEDY:  Your Honor --

6            THE COURT:  You know what, we've heard so much about

7    this chart that I think the jury has got it, what the debate

8    is, so now you can ask the question about it.

9    Q.   You had not been told prior to last week that Kaiser had

10   done this chart review and had found that bipolar was

11   responsible for 4 percent of the prescriptions, had you?

12   A.   I see that according to this, the number calculated from

13   this chart review is 4 percent.  I have also read the

14   controversy over it, but I see the number 4 percent there.

15   Q.   And you first heard about that last week?

16   A.   That's correct.

17   Q.   Going next to Exhibit 730 --

18           THE COURT:  Let me just say it this way:  It's up to

19   the jury to decide whether that's an accurate data point or

20   not, but assuming for a minute it is, is that inconsistent with

21   your model?

22           THE WITNESS:  I don't think so, your Honor, for a

23   couple of reasons, that in my model I look -- we call it

24   "bipolar," but in fact it includes other affective disorders.

25   Other types of depression are in the model, so if you read

1   closely through the notes, it's a somewhat larger category.

2   And so the fact that I have national numbers for bipolar uses

3   of Neurontin, it's a bit of a misnomer.  It's a somewhat larger

4   category.  Four percent, I'm not entirely sure whether that

5   would be consistent.  I'd have to sit down and parse it out,

6   but it's not obviously inconsistent to me.

7   Q.   What's your best recollection as to what the national data

8   shows for the percentage of Neurontin prescriptions that are

9   for bipolar?

10  A.   So if we can imagine that bar chart with the bars, that

11  bipolar would have been roughly 15 percent there, I believe;

12  but, again, that number includes other affective disorders,

13  other mood disorders.

14  Q.   So you don't have a breakdown as to whether the bipolar

15  component of the national data is not also in the 4 percent

16  range?

17  A.   I could go back and make that calculation.  I have not,

18  but it is available in my data.

19         THE COURT:  Or put another way, what percentage of the

20  prescriptions were for bipolar as opposed to something else?

21  Would you know?

22         THE WITNESS:  If it's okay to speak generally, bipolar

23  disorder is quite rare.  At a population level, it's about one

24  to 2 percent.  Depression is quite prevalent.  I would expect,

25  not having looked, that the numbers are within the bipolar and

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

Page 86

1   other mood disorder category.

2           THE COURT:  But do you know, or are you guessing?

3           THE WITNESS:  I'm guessing, educated guessing.

4           THE COURT:  No.  We'll strike that.

5   Q.   Next let me show Exhibit 760, which is in evidence, and,

6   Doctor, again, I believe you may have been here for the

7   testimony on that, that in July of 2004 Kaiser performed a

8   further chart review, this time of 9,011 patient charts for a

9   breakdown in Neurontin prescriptions.  And this time, Austin,

10  if you can you come down to the third box, bipolar affective

11  disorder was found to be 225 of those prescriptions.  I think

12  you'll agree with me, 1 percent of 9,000 would be about 90,

13  2 percent would be 180, so 225 would be exactly two and a half

14  percent, correct?

15  A.   That seems likely, yes.

16  Q.   Okay.  And this, of course, was done several years into

17  the campaign by Kaiser to reduce Neurontin usage.  So, again,

18  your work in this case has not included trying to determine

19  whether the percentage of bipolar being prescribed at Kaiser

20  declined over time as the Neurontin initiative continued, have

21  you?

22  A.   No, I have not.

23  Q.   2.5 percent, you'd agree, would be less than any component

24  you would even guess you would get out of the national --

25          THE COURT:  No, we shouldn't guess.

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1          MR. KENNEDY:  Okay, no guessing.

2    Q.   You don't know whether the 2.5 percent does or does not

3    track with what the national prescribing of Neurontin for

4    bipolar would have been during the first half of 2004?

5    A.   I don't know.

6    Q.   So again can we just see chart 6.1, the bar chart, one

7    more time.  So when we've got bipolar -- and tell us what the

8    vertical axis on the left-hand side is?

9    A.   Total prescriptions.

10   Q.   So that's total prescriptions for bipolar and other

11   things?

12   A.   Total prescriptions for whatever is in the particular

13   column, so this is, right, "bipolar and other mood disorders"

14   is the way it's written in the report, bipolar and other mood

15   disorders.

16   Q.   Okay, so we can't tell by looking at the column on

17   Graph 6.1 how many prescriptions there were just for the manic

18   depressive aspect of bipolar?

19   A.   That's correct.

20   Q.   So it may have been that only some fraction of those that

21   would track with 2.5 percent of the total is what's there?  We

22   just don't know, we'd be guessing?

23   A.   That's correct.

24   Q.   And your report doesn't tell us?

25   A.   I don't believe it does.  It does talk about the mix of

Page 88

1    diagnoses in that category.  I don't believe the specific share

2    is mapped out, although it may be in one of the attachments

3    that relates to the analysis.

4         THE COURT:  Well, let me just ask you this:  How much

5    longer do you have?

6         MR. KENNEDY:  Certainly more than three minutes.

7         THE COURT:  Well, maybe we'll take a break, and you

8    look through the attachments and tell us what's in there.  I

9    think that probably makes the most sense.  And I'll see folks

10   at side bar.

11        THE CLERK:  All rise for the jury.

12        (Jury excused.)

13   SIDE-BAR CONFERENCE:

14        THE COURT:  So there he is, Mr. Kennedy.  How much

15   longer do you figure you have?  You've covered most of it.  I

16   mean, there can't be that much more.

17        MR. KENNEDY:  I haven't even gotten to the regression

18   analysis yet.

19        THE COURT:  Well, how much longer are you going to

20   have?

21        MR. KENNEDY:  I would hope to be through before noon.

22        THE COURT:  Good.  And she can look and just see

23   because it would be significant as to whether -- how much of it

24   was bipolar versus other things would be useful in bipolar and

25   mood disorders.  If it's in her report, I don't know.

1            MR. SOBOL:  We'll address it in the break.

2            THE COURT:  All right.  So just because there was some

3     confusion before, the next witness is?

4            MR. SOBOL:  Dr. Hartman.

5            THE COURT:  Now, how long is he on direct?

6            MR. SOBOL:  Thirty minutes, thirty-five minutes,

7     hopefully.

8            THE COURT:  Okay.  And how long do you imagine him on

9     cross?  Is it you again?

10           MR. KENNEDY:  It's me.  An hour, approximately.

11           THE COURT:  All right, and what time is his flight

12    tomorrow?

13           MR. SOBOL:  I think it's late in the day tomorrow.

14           THE COURT:  So that should be a nonissue.  It should

15    be a nonissue.  Okay, that's fine.

16           MR. KENNEDY:  We'll definitely have him off sometime

17    in the morning.

18           THE COURT:  Okay, see you then.  Oh, oh, the

19    deposition I actually looked at.  It is in fact true,

20    Mr. Greene, that about 90 percent of it is on them adding in

21    deposition testimony.  While there are lots of these little red

22    flags, most of them are on an issue I've overruled you on.

23    They can put on the testimony from their person.  So there are

24    other things, though, that were, you know, like hearsay or

25    whatever.  So I've ruled on it.

1        MR. GREENE:  This is, I'm sorry, this is --

2        THE COURT:  I was complaining that there were so many

3   red flags and tabs and this, that and the other.  Most of them

4   were the same objection, which were, you know, that they

5   were --

6        MR. GREENE:  Okay.  Did you go through -- so this was

7   Fannin.

8        THE COURT:  So am I caught up with you, do you know?

9   Would you let me know?

10       MR. GREENE:  I think I gave you Boris.

11       THE COURT:  I've given a lot back, okay?  So, anyway,

12  good.  I'll see you after the break.

13       (End of side-bar conference.)

14       (A recess was taken, 10:59 a.m.)

15       (Resumed, 11:31 a.m.)

16       THE COURT:  So did you get a chance to look up that

17  information in the report?

18       THE WITNESS:  Yes, your Honor.

19       THE COURT:  Should we clarify that, Mr. Kennedy?  Did

20  you want to do that?  Or did you want to let it go?

21       MR. KENNEDY:  I'm sorry, I was looking at my notes, I

22  didn't hear the beginning.

23       THE COURT:  Remember at the end I said do you want to

24  look at your stuff?

25       MR. KENNEDY:  That's 6.1, if that's the bar chart.

Page 91

1          THE WITNESS:  Can I clarify what I found before you

2     decide?

3          THE COURT:  Yes.

4          THE WITNESS:  The specific numbers that quantify it

5     are there.  What I found is the list of diagnosis codes

6     included in the category, and so I can tell you how many of

7     them were for bipolar versus depression, but I can't give you

8     the sales rates.

9          THE CLERK:  All rise for the jury.

10         (Jury entered the courtroom)

11         MR. KENNEDY:  Thank you, your Honor.

12    BY MR. KENNEDY:

13    Q.   Professor Rosenthal, when we broke, we were talking about

14    slide 6.1, as you'll recall and, in particular, the left-hand

15    bar column dealing with bipolar and I believe you said you were

16    going to try and check and find some breakdown information on

17    that column?

18    A.   Yes.

19    Q.   Okay.  I got that one right at least.

20    A.   Yes.

21    Q.   And what did you find?

22    A.   Sorry, waiting for the question.  I did look in my report

23    and in the attachment that I remember, it lists the diagnoses

24    codes included in this category as defined by the complaint,

25    and there were 11 total diagnosis codes, six of which were

1   related to bipolar disorder, five of which were related to

2   depression, a type of depression.

3            I did not, however, find the specific weighting, the

4   numeric breakdown in terms of the percentage of prescriptions

5   in each category.

6   Q.   Okay.  So if we look at the left-hand bar, it shows

7   something like 12 million, 13 million bipolar prescriptions,

8   correct?

9   A.   Correct.

10  Q.   And those were derived using what I know the jury has

11  already heard about, these ICD, or International Classification

12  of Diseases, 9, version 9 codes, correct?

13  A.   That's absolutely correct.

14  Q.   And over the break you were able to identify at least

15  some, not all, of the various ICD-9 codes that go to make up

16  those 12 million prescriptions.

17  A.   That's correct.  I was able to identify that there were

18  precisely 11 codes, six of which relate to bipolar disorder,

19  five of which relate to depression.

20  Q.   Okay.  You were not, however, able to figure out how many

21  of the approximately 12 million prescriptions are due to

22  bipolar as opposed to some other ICD classification?

23  A.   Not over the break I was not.  Those data would be

24  available, but I do not have them here.

25  Q.   I think you told us before the break from your general

1    background you do know bipolar is, you said, a rare or

2    extremely rare condition?

3    A.   That's correct.

4    Q.   You said you had some indications about one percent?

5    A.   That's -- in terms of population prevalence, that's

6    correct, based on the Surgeon General's report on mental

7    health, with which I'm familiar.

8    Q.   Thank you.

9         Anything else that you learned over the break that I

10   haven't asked about?

11   A.   No, that was it.

12   Q.   Pertaining to the case?

13   A.   Yes.

14   Q.   Changing topics.

15        The opinions you've expressed in this case were

16   arrived at using something called a regression analysis,

17   correct?

18   A.   That's correct.

19   Q.   And that's an economic tool mathematicians and economists

20   use, correct?

21   A.   That's correct.   It's an applied math tool that's used by

22   econometricians and statisticians in other fields.

23   Q.   And to do a regression analysis, whoever is performing it

24   has to make some assumptions to start with, correct?

25   A.   Absolutely, yes.

1    Q.   And you have to --

2             MR. KENNEDY:  And could we see slide 1?

3    Q.   And you can see this is grossly oversimplified, Mr. Sobol

4    referred to it during direct.  Here, to do a regression

5    analysis, you need a dependent variable or variables, and then

6    you need explanatory variable or variables, correct?

7    A.   That's correct.

8    Q.   And the goal is to try to find out whether one -- whether

9    the explanatory variables are or are not causing the dependent

10   variable?

11   A.   That's correct.

12   Q.   And in the model you presented here in court, your

13   dependent variable was how much Neurontin for indications

14   during the time period, correct?

15   A.   That's correct.  Again, broken down by specialty, yes.

16   Q.   And then you considered four possible explanatory

17   variables, correct?

18   A.   That's correct.

19   Q.   And in making that decision, you had to eliminate other

20   potential both dependent and explanatory variables, right?

21   A.   Conceptually, yes, I selected these four variables.

22            MR. KENNEDY:  Could we see slide 3, please?

23   Q.   For example, other things that I trust you considered or

24   thought about would be as dependent variables how much

25   Neurontin paid for by Kaiser during some particular period?

1    Did you consider that?

2    A.   When I did my analysis, as noted earlier, I was proposing

3    this analysis for all payors nationally.  So I guess at the

4    point at which I was asked to apply this to Kaiser, I may have

5    considered that, but -- but in general my task was to explain

6    all Neurontin prescriptions nationally.

7    Q.   Thank you for the clarification.

8         You did not start this case thinking that you would be

9    testifying in a Kaiser-only trial at some point, correct?

10   A.   I'm not sure at what point I became aware that there would

11   be an individual plaintiff for Kaiser, but --

12   Q.   That's why you were using nationwide data.  So, therefore,

13   when you did your analysis, you weren't thinking in terms of

14   trying to break it down by particular Kaiser regions, for

15   example?

16   A.   That's correct.

17   Q.   And in terms of possible explanatory variables, there are

18   a number here that you either considered or rejected or at

19   least rejected outright, correct?

20   A.   I guess -- so that's the operative issue, is whether or

21   not these are your proposed explanatory variables or

22   explanatory variables that I considered.  Certainly we've

23   discussed the scientific literature as well as continuing

24   medical education.

25   Q.   And we can agree that you did not take scientific

Page 96

1    literature into account as a possible explanatory vehicle?

2    A.   Because my understanding is that it is subject to the

3    allegations of misconduct, I did not attempt to control for it,

4    that's correct.

5    Q.   As we've already covered, you didn't take CMEs into

6    account?

7    A.   That's correct.

8         THE COURT:  That's Continuing Medical Education

9    seminars.

10        THE WITNESS:  That's correct.

11   A.   So I did not take Continuing Medical Education seminars

12   directly into account in the model because of the lack of data

13   on those.  But I do believe my model picks up their affects.

14   Q.   I believe you've already told us you didn't -- don't take

15   into account whether the drug was on or off formulary for

16   Kaiser?

17   A.   Again, and that's for the reason that I noted earlier,

18   that I don't believe there would have been systemic changes

19   over time in formulary status that would have interfered with

20   my ability to calculate the effect of promotion.

21        MR. KENNEDY:  Your Honor, in the interest of time,

22   this is a demonstrative.  Rather than going all the way through

23   it, I would offer it into evidence.

24        MR. SOBOL:  Objection.

25        THE COURT:  Sustained.

Page 97

1    BY MR. KENNEDY:

2    Q.   Okay.  The other variables you did not consider were

3    Kaiser's formulary guidelines, correct?

4    A.   That's correct.

5    Q.   Formulary restrictions?

6    A.   Again, as noted in our previous discussion --

7            THE COURT:  Wait a minute.  We are trying to finish

8    this and move along.  You didn't take into account formulary

9    restrictions.  What's the next one?

10   BY MR. KENNEDY:

11   Q.   Or drug utilization management, things like the DUAT and

12   the drug programs?

13   A.   I did not measure that and include in my final, no.

14   Q.   And you did not consider the subject of Neurontin's

15   approval in other countries around the world?

16   A.   I did not.  My knowledge is purely confined to the U.S.

17   Q.   You are aware that Neurontin is approved for a variety of

18   uses in 50 or so countries all around the world?

19           MR. SOBOL:  Objection.

20           THE COURT:  Overruled.  Do you understand one way or

21   the other?

22           THE WITNESS:  I know that different countries approve

23   of these products for different indications at different rates.

24   I don't know the specific pattern --

25           THE COURT:  Would that make any difference in the

1    level of indications?

2            THE WITNESS:  In my opinion, approval in another

3    country wouldn't have an impact on my model.  Again, it

4    wouldn't be confounded with the promotional effects.  It

5    wouldn't make a difference --

6            THE COURT:  Could you say that in plain English?

7            THE WITNESS:  So for a missing variable to matter, it

8    has to follow the same pattern as the variable we care about,

9    promotion, challenged promotion in particular, and it has to

10   have an effect on the outcome.  So while approvals in other

11   countries, perhaps some physicians here would be aware of what

12   a drug is approved for in -- just take as an argument Japan --

13   but why would that be correlated with promotional spending by

14   the defendant in the U.S.?

15   BY MR. KENNEDY:

16   Q.   But it might be correlated with why a doctor that trained

17   in Japan decided to prescribe the drug, wouldn't it?

18   A.   But that would not be an example of where it would have an

19   affect on my calculations.  That's an example of an independent

20   affect and, therefore, would just add statistical noise to the

21   analysis.  It would not cause a bias in the analysis.

22   Q.   And yesterday you and Mr. Sobol talked about the concept

23   of diffusion?

24   A.   Yes, we did.

25   Q.   Kind of a fancy economist word for word of mouth?

1    A.    One version of it could be worth of mouth, yes.

2    Q.    And you did not take into your account in your analysis

3    the effect of, for example, one Kaiser doctor having a good

4    result with Neurontin and telling five of her colleagues about

5    it and four of them having a good result and then telling five

6    of each of their colleagues about it.  You didn't take that

7    into account, did you?

8    A.    To the extent that that was caused by promotion it's

9    appropriately captured in my model.  To the extent that it has

10   nothing to do with promotion, it should, again, not bias my

11   calculations.

12   Q.    So if the first doctor prescribed Neurontin as a result of

13   off-label promotion and got a good result, then everybody she

14   tells about the good result who tells somebody else about the

15   good result, that's all tainted?

16   A.    If the first doctor was detailed, allegedly fraudulently,

17   and that word of mouth caused other physicians to use Neurontin

18   for one of these indications that have been challenged by

19   plaintiffs, then, yes, I capture that as caused by the original

20   detail.

21   Q.    And regardless of what the result was for the patient?

22   A.    Regardless of what the result was for the patient.

23   Q.    And finally, you didn't take into account Kaiser's greater

24   emphasis on generic medicines, did you?

25   A.    I believe that to be time invariant, so it's not

Page 100

1  appropriate to put that in my model and I did not.

2  Q.   And you didn't consider whether, Kaiser, for example, had

3  prohibited detailing in certain regions during certain periods

4  of time, did you?

5  A.   No, I did not.

6  Q.   And you did not take positive clinical experience with the

7  drug into account?

8  A.   No, I did not.

9  Q.   Thank you.

10       Now, the regression model that you've testified to in

11  this courtroom is not the first model that you've created in

12  the course of your work on this case, is it?

13  A.   Please be more specific about that which you're referring

14  to.  There are sort of theoretical constructs that I've

15  presented before and there are other empirical models.

16       MR. KENNEDY:  Could we see slide 7?

17  Q.   Your original study design in this case is summarized on

18  slide 7, isn't it?

19  A.   This is a conceptual model of what the regression would

20  look like, yes.  This is what I proposed conceptually as the

21  broad framework within which I would construct a model.  But

22  just to be clear, this is not a model that I estimated.

23       THE COURT:  Well, did you use this?

24       THE WITNESS:  No.  Again, this was a conceptual model

25  that I put forward to say this is what I would do.  My model is

1    a subset of this, but this is the starting place.

2    BY MR. KENNEDY:

3    Q.   You've been examined under oath in what's called a

4    deposition a number of times in this litigation, correct?

5    A.   Yes.

6    Q.   And the first time you discuss what you intended to do by

7    way of regression analysis it was captured by this first study

8    design slide, correct?

9    A.   That's correct.  This is conceptually what I proposed to

10   do before I had data.

11   Q.   And after you had data, in the vernacular, you tossed this

12   out, correct?

13   A.   I would not say that's true.  My model, in general,

14   corresponds to this conceptual framework.  There are

15   limitations to the data and there were some changes that

16   occurred in the way the case was being pursued legally, so that

17   I looked indication by indication and specialty by specialty to

18   get around some of the issues that this model presents.

19   Q.   At least there was a modification of your first study

20   design, correct?

21   A.   That's correct.

22   Q.   And then not including doses over 1,800, you then ran

23   approximately eight different models, didn't you?

24   A.   I believe it is eight.  I'm sorry, I do lose track, but I

25   believe that's correct, eight.

1  Q.   And you weren't happy with the results of any of those,

2  were you?

3  A.   I don't know what you mean by that.  There are eight

4  models presented in my report.

5  Q.   There are models that you ran that are not included in

6  your report?

7  A.   That's correct.  Like any econometrician, I don't run a

8  single model, close the book, and I'm done.

9  Q.   You ran models and you were dissatisfied with them,

10  correct?

11  A.   That is your word.  I ran models, I looked at the results,

12  I changed the models.

13  Q.   Okay.  And you ran models that are not included in your

14  report?

15  A.   That's absolutely correct.

16  Q.   And for the models that you ran and are not included in

17  your report, you destroyed the evidence of them, correct?

18  A.   The common practice in statistical packages --

19  Q.   Could you answer yes or no?

20  A.   Destroyed suggests something active.  A have a log file

21  that the statistical package produces.  There's language that

22  you use to replace the log file when you run the program again.

23  That's, in effect, what happens here.

24  Q.   On numerous occasions you ran what you thought was going

25  to be the best model, correct?

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1   A.    On numerous occasions I ran candidate models, yes.

2   Q.    And you didn't run them unless you thought they were going

3   to work, did you?

4   A.    This -- econometrics is a trial-and-error effort.  You

5   don't know what the data will show until you run the models.

6   This is standard practice.  Every paper that you see

7   published --

8            THE COURT:  We will never finish.

9            What's the next question?

10  BY MR. KENNEDY:

11  Q.    You didn't run models you expected would fail?

12  A.    I ran models to learn what the data would show.

13           THE COURT:  Next question.

14  BY MR. KENNEDY:

15  Q.    And you repeatedly got results that didn't show any

16  significant damages for Kaiser, didn't you?

17  A.    Some of the models didn't show significant damages, some

18  of the models I rejected because the statistical tests and what

19  came out of the models made no sense or suggested that there

20  were underlying problems.

21  Q.    And either you or the computer deleted the data about

22  those models so that somebody else can't go back and see

23  whether they agree or disagree with your assessment of them,

24  correct?

25  A.    The defendants could always run alternative models, and I

1    believe Professor Keeley has done just that.

2    Q.    I know I'm going too fast.

3          Your models that you ran and decided not to use, you

4    or the computer got rid of them so they cannot now be recalled,

5    can they?

6    A.    That is true, but there is nothing about them that can't

7    be recreated.  They have the data, the variables exist, it can

8    all be recreated.

9    Q.    You're sure of that?

10   A.    Sure I'm sure.

11   Q.    And you've told us enough about all the models that you no

12   longer have -- I'll get rid of the word "destroyed."  You've

13   told us enough about those that you think somebody else can

14   create each of those?

15   A.    Absolutely.  I have a limited set of variables, there are

16   these assumptions about the error structure that could be

17   recreated.  Again, Dr. Keeley has produced models with things

18   like time trends in them.

19          THE COURT:  All right, yes, so let's go.

20   BY MR. KENNEDY:

21   Q.    And again, how many unsuccessful models for one reason or

22   another did you run before you came up with the run you

23   testified to here?  At least eight, correct?

24   A.    When you say "at least eight," I'm a little confused.  Is

25   eight across the indication specialty barriers?  No.

1  Q.   We've got, for example, first study design.  How many

2  variations on the first study design did you run before you

3  finally came up with the variation that you've testified to

4  here?

5  A.   So for each specialty indication pairing there were

6  probably 10, 15 models that I ran.  I don't know the precise

7  number.

8  Q.   So 10 for bipolar, 10 for neuropathic pain, something in

9  that range?

10  A.   That may be about the right range.  And I don't know that

11  the model that ended up in the report was the 11th or the 10th,

12  it may have been the first.

13  Q.   Are any of them where you only did the first for any of

14  the five indications in question?

15  A.   I didn't say I only ran one model for any of the

16  indications.  That would be extremely unusual.  But there's no

17  reason to believe that the first model didn't turn out to be

18  the best, most reliable model.

19  Q.   And you kept running and disregarding models until you

20  finally got one that showed significant harm, correct?

21  A.   That's not correct, no.  I ran models --

22       THE COURT:  No, what's the next one.  We've got to

23  finish this.  We have another witness waiting.

24  BY MR. KENNEDY:

25  Q.   Now, when you first testified about what your model design

Page 106

1    was going to consist of, you said you were going to include a

2    time trend, didn't you?

3    A.    I did propose including a time friend, yes.

4    Q.    In fact, in your deposition under oath you said you were

5    going to revise the model to include a time trend.

6    A.    I believe I said that I believed I would include a time

7    trend.  Again, this was before I had data.  Yes, I thought I

8    would include one.

9    Q.    And a time trend, it's technical, but it's something

10   that's introduced to capture some conglomeration of variables

11   believed to have a pattern over time.  Is that a fair

12   definition?

13   A.    That sounds like word for word from my declaration.

14   Q.    Good memory.

15   A.    Thank you.

16   Q.    And after saying in your deposition that you were planning

17   to include a time trend, you decided not to do so, correct?

18   A.    That's correct.

19   Q.    Because if you included a time trend, it wouldn't show any

20   statistically significant harm to the purchaser class, would

21   it?

22   A.    The reason the time trend was excluded is that it is

23   essentially perfectly lined up with the promotional spending

24   variability, which has economic theory to suggest that it

25   matters.  A time trend is just a construct based on a

Page 107

1    hypothetical, untestable.

2    Q.   If you include the time trend, as you said you were going

3    to do in your first deposition, you end up with a study that

4    doesn't show any harm for Kaiser, don't you?

5    A.   You end up proving that Pfizer spent millions of dollars

6    promoting Neurontin to no effect.

7         MR. KENNEDY:  Your Honor, could the witness please

8    answer the question?

9         THE COURT:  The question?

10   BY MR. KENNEDY:

11   Q.   If you included a time trend in your current model, you

12   end up with a result that doesn't show any statistical harm to

13   Kaiser; is that correct?

14   A.   Correct.

15   Q.   Thank you.

16   A.   It's perfectly confounded.

17        THE COURT:  What does "confound" mean?

18        THE WITNESS:  Again, the time trend variable, it's

19   constructed, it's a hypothetical based on the idea that there

20   are some things over time that drive sales.  But if you put it

21   into the regression model along with promotional stock and the

22   two things change in exactly the same way over time, you can't

23   separate out which one matters.  But promotional spending is

24   one thing we know from economics should matter.  The time trend

25   is only hypothetical, it's a hypothetical that there's

Page 108

1    something else unidentified over time that's driving sales.

2           THE COURT:  But if you put them both in, is he right

3    that it shows no effect?

4           THE WITNESS:  That's correct, that's --

5           THE COURT:  I just want to understand it.

6           THE WITNESS:  The statistical problem, but, yes.

7           MR. KENNEDY:  I'd like, in that regard, turn to

8    Exhibit 629, which is in evidence.  It's a June 2002 drug

9    monograph prepared by the people at DIS group at Kaiser.

10          And, Austin, can we go over to document -- it doesn't

11   have page numbers, but it would be Bates number 783.

12   BY MR. KENNEDY:

13   Q.   Have you seen this particular graph before?

14   A.   I have not.

15   Q.   Okay.  In the interest of time -- well, looking at this,

16   you can see that this is AEDs, antiepilepsy drug, costs.  Do

17   you see that?

18   A.   Yes, I do.

19   Q.   And it's for Kaiser's California division, and it shows

20   gabapentin or Neurontin as being a line with the long dashes,

21   the one that's third from the bottom when you get over to the

22   right-hand side.  Do you see that?

23   A.   I do see this.

24   Q.   And what this shows over a period of time captured by this

25   graph, 1998 through 2001, gabapentin usage is increasing,

1    correct?

2    A.    Gabapentin usage is increasing, yes.

3    Q.    But there are two other AEDs that are increasing far more

4    rapidly, correct?

5    A.    I'm not sure what you're talking about.  The top two

6    lines?

7    Q.    There are two lines that are pointier up than the

8    gabapentin line?

9    A.    Thank you for that technical term, "pointier up."  I

10   believe those are total antiepileptic drugs and total newer

11   antiepileptic drugs, a subset of which would be gabapentin.  As

12   I look at this, it appears that gabapentin is driving those two

13   higher lines.  I have never looked at this chart before.  It

14   appears to me the top two lines are the sum of some of the

15   lines below it.

16   Q.    And you think gabapentin is what's making an increase in

17   the sales of the others AEDs?

18         THE COURT:  She hasn't seen it before, she doesn't

19   know.

20   BY MR. KENNEDY:

21   Q.    That certainly isn't anything you took into account as a

22   variable in your analysis, that gabapentin increases may just

23   have been a part of increase in AEDs generally, correct?

24   A.    That was not part of my model, no.

25   Q.    Now, you told us yesterday you've written extensively in

1   the peer-reviewed literature, correct?

2   A.   That's correct.

3   Q.   And in those articles you've typically included time

4   trends, correct?

5   A.   I think there are only a couple of places where that would

6   have been relevant, but, yes, I have published articles that

7   included time trends.

8   Q.   Now, are you aware that until February 9 of this year

9   Kaiser's patient website had articles recommending Neurontin

10  for a number of off-label uses?

11  A.   That piece of information came to my attention in the

12  course of preparing for this trial, yes.

13  Q.   And you don't have a variable in your formula to account

14  for the fact that Kaiser patients may have gone to the website

15  and seen Neurontin recommended and decided to talk to their

16  doctor about it for that reason, did you?

17  A.   I would not include a variable like that in my formula,

18  and I did not.

19  Q.   Now, you testified earlier about national patterns of

20  detailing and dosing.  I just want to make clear, you haven't

21  done any particularized study in this case to try to ascertain

22  the Kaiser -- each region's particular pattern of detailing and

23  dosing, correct?

24  A.   That's correct.

25  Q.   Were you here last week when plaintiff's expert witness

Page 111

1   Dr. McCrory testified?

2   A.   I was not.

3   Q.   Okay.  I want you to assume that he testified that he is

4   currently prescribing Neurontin, gabapentin, for both migraine

5   and pain; and I want you to assume that Dr. McCrory continues

6   to this day to prescribe Neurontin for diabetic peripheral

7   neuropathy; and that Dr. McCrory is aware of this lawsuit.  Is

8   it your position that Dr. McCrory's current prescribing of

9   Neurontin for those uses is still due to the unconscious

10  influence of Kaiser's off-label promotions?

11  A.   First of all, I don't calculate that every prescription

12  written for high doses or for a diabetic peripheral neuropathy

13  is one small category of neuropathic pain.  I don't presume

14  that everything was covered by the promotion, only to the

15  extent that it was demonstrated in my model.  And I believe I

16  have already stated that it is very difficult to put a witness

17  like that, who's a treating physician, on the stand and ask him

18  to say that he did something because a detailing person told

19  him to.

20  Q.   So you can't say whether Dr. McCrory was adversely

21  influenced or not?

22  A.   I cannot say that, no.

23  Q.   However, what you can say is after how many trial models

24  did you go through before you came up with the one here, 30,

25  40, if you take all indications?

Page 112

1   A.   I don't know the precise number.

2   Q.   Somewhere in that range you think?

3   A.   Perhaps.

4   Q.   And you weren't totally satisfied with any of those 30 or

5   40, were you?

6   A.   Using standard practice I changed the model in response to

7   the results I was getting, yes.

8   Q.   And then, finally, you found if you didn't include a time

9   trend, you could come up with something that was

10   satisfactorily, correct?

11   A.   It was my conclusion that it was inappropriate to include

12   a time trend in this case.

13        MR. KENNEDY:  Thank you very much.  I have no further

14   questions.

15                REDIRECT EXAMINATION

16   BY MR. SOBOL:

17   Q.   Professor, there's been some testimony about this concept

18   call "confounding."  I want to see if we can describe this a

19   little bit further.

20        Can you describe to the jury this concept of

21   confounding using as an example the study of the extent to

22   which cigarette smoking might cause heart disease?

23   A.   Okay.  So just to give an example, you can imagine in the

24   case of the link between cigarette smoking and heart disease

25   that there might be risk-taking behavior or other health

1   behavior on the part of individuals that would both be

2   associated with heart disease.  So say, for example, that we're

3   talking about diet and exercise.  That would be associated with

4   heart disease but would also be associated with the likelihood

5   of smoking.  And so often in the case of cigarettes the concern

6   was around risky behavior, that certain individuals discount

7   the future very heavily.  Those individuals eat fatty foods,

8   don't exercise, and they also smoke.

9          So if we don't control for that risk-taking lifestyle

10  behavior, then it looks like smoking causes more heart disease

11  than it really does, because of the fact that there's this

12  association between risk behavior and smoking and there's also

13  a causal relationship between this risky behavior and heart

14  disease.

15         So that's the notion of confounding.  As a comparison,

16  imagine there's a genetic marker --

17         THE COURT:  Can we sort of jump, though, to this case?

18  A.   The same thing could be true for prescriptions of

19  Neurontin.  Take patient age.  Let's say patient age is a

20  factor in whether a person gets a Neurontin prescription.  Just

21  because of the way the drug works, it's just a hypothetical.

22  Excluding that from the regression isn't going to be a problem

23  if I'm trying to look for the effect of promotional spending

24  because patient age isn't going to be correlated with national

25  trends in detailing.

1        So that's the general notion where confounding comes

2   into play.  If it's entirely independent, even if it's an

3   important determinant of that left-hand side variable, it

4   doesn't cause confounding.  It doesn't cause a bias in the

5   estimate of interest.

6   Q.   So let's talk about a couple of the things that you

7   thought might cause a bias that you did then use a variable.

8   Describe one of those that would be a similar kind of thing

9   that cigarette smoking might perhaps be associated with lack of

10  exercise.

11       In this case, sales of Neurontin associated with what?

12  A.   So the basic premise of the way competition works in

13  pharmaceutical economics is that manufacturers have two places,

14  two dimensions on which they can compete, the first for brand

15  name drugs is promotion.  So Pfizer can promote but its

16  competitors can also promote their products, and in doing so

17  try to vie for market share.

18       The second dimension is price.  And we know among

19  brand name drugs price competition, strictly speaking, cutting

20  prices over time, happens very little.  But there is some

21  belief in price competition.  It's often included in models

22  even though it often yields somewhat unstable results.  And

23  price competition, however, does become important once there's

24  a generic version of a product available.  So when generic

25  gabapentin became available, the main issue for market share

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1    for gabapentin is the fact that the generic is so much cheaper

2    and steals market share.

3            So those are the factors, promotion and price.

4    Pfizer's own and competitors that I include in the model.

5    Q.   And so during cross-examination there were a series of

6    things that you were asked about which you, quote, did not

7    include, end quote, in your model.  For example, AEDs, other

8    antiepileptic drugs.  Why didn't you include that then?

9    A.   My understanding of what defendants meant to imply by not

10   including what was happening with other AEDs is that there is

11   some general notion that these -- all of these drugs in the

12   class are being used for off-label purposes and that it wasn't

13   confined to gabapentin.  So, first of all, I do include price

14   and promotion for other AEDs to the extent that they're

15   competitors for these indications.  But this notion that there

16   is something in the ether that's causing all these drugs to

17   move in the same direction is a very imprecise one.  In fact,

18   these drugs have been on the market for very different lengths

19   of time, they have different mechanisms.  So while they broadly

20   treat seizures, it's impossible to say why one's trend should

21   apply to the other.  They have too many differences.

22   Q.   Formulary constrictions, why wouldn't those be confounding

23   in your approach?

24   A.   Formulary constrictions, again, in the national context

25   it's my belief, first, that they don't change much over time.

1  So there may be different restrictions in place in different

2  places, but it's only to the extent that they're changing over

3  time in a pattern that's consistent with what we see in the

4  promotional spending that they're a problem.  My hypothesis as

5  an economist, those formulary constrictions are they would be

6  in opposition to the promotional spending, trying to counteract

7  the effect of that promotion.

8  Q.   Before trial you've reviewed the list of issues that the

9  defendants have asserted might be omitted from your approach,

10 correct?

11 A.   That's correct.

12 Q.   Will you please tell the jury whether or not in your

13 professional opinion the omission of any of those items as --

14 you know, as whether they're omitted or not should make any

15 difference in term of the statistical reliability of the

16 results you achieved.

17 A.   In my opinion, the omission of these specific items from

18 my regression model will have no effect on the reliability of

19 my results either because they're not associated with promotion

20 over time because there's no confounding that I've tried to

21 describe, or because they don't have an effect on the time

22 pattern of use of Neurontin over time.  They're not appropriate

23 to keep in a time series model at all.

24 Q.   Now, there was also some questions regarding a claims

25 statistical error.  Do you recall that?

1   A.   Yes.

2   Q.   And describe to the jury why this was not, quote, an

3   error, end quote.

4   A.   Well, perhaps I can try a little bit more clearly.

5           So in any statistical model there is what's known as

6   an underlying error process.  So data are generated through

7   certain factors, that's what we include on the right-hand side,

8   but also as a process of random -- a random process.

9           So the data are generated with what we assume to be

10  some set of errors.  Usually one basic assumption is that those

11  errors are normally distributed but they offset one another.

12  They are mean zero.  So there are positive errors and negative

13  errors but in total that we expect the prediction from the

14  model to be consistent with the actual data.  If you look at

15  just one subset of predictions, it can be over or under within

16  that general notion of statistical error.  It doesn't mean that

17  the model's unreliable.  All statistical models have error.

18  Q.   You spend about, I think you testified, about 80 percent

19  of your time in academic work?

20  A.   That's correct.

21  Q.   Before you set out to undertake your calculations did any

22  of the lawyers for Kaiser or anybody else give you a target of

23  what we wanted the results to be?

24  A.   No.

25  Q.   Would you have accepted the assignment of any lawyer to

1   achieve a particular result in connection with your

2   regressions?

3   A.   No.

4   Q.   Why not?

5        MR. KENNEDY:  Move to strike, speculation.

6        THE COURT:  Overruled.

7   BY MR. SOBOL:

8   Q.   Why not?

9   A.   Among other things, it's impossible to know what you will

10  get in a statistical analysis before you do it.  And so you do

11  the analysis according to your training and the general rules

12  of the approach.  And what comes out of the model is reflective

13  of the data in combination with your prior beliefs about the

14  right variables to include in the model.

15  Q.   I think you testified a little bit about a process of

16  going through various runs of your approach, correct?

17  A.   That's correct.

18  Q.   When you were running through these various approaches,

19  did you at any time speak to any of the lawyers for Kaiser or

20  others to tell them where you were at and what the results were

21  showing at that point in time?

22  A.   No, I did not.

23  Q.   The results that you have presented to this jury, are they

24  the exact same results that you first presented to the lawyers

25  in this case without any modification of the percentages that

Page 119

1    are associated to the defendant's wrongdoing in this case?

2    A.    That's correct.

3              MR. SOBOL:  Go to demonstrative 6.1, please.

4    Q.    Now, professor Rosenthal, are these the results that

5    you -- are these the results that you achieved -- you've

6    testified about this during your direct examination, correct?

7    A.    Yes, they are.

8    Q.    Did you speak to any person, either from Kaiser or any

9    other payor, any lawyer before you presented these final

10   results?

11   A.    No, I did not.

12   Q.    Please describe to the jury the usual practice when

13   undertaking your approach in terms of running mathematical

14   models on the same software and whether or not you can

15   resurrect the iterations retrospectively.

16   A.    As stated, when I run statistical models on my computer

17   for academic research, I put a comment into the file that says

18   "comma replace."  So when I run a new batch file that test some

19   models, the old results are written over, in essence.  And when

20   I publish a paper with regression results, as I do quite often,

21   the final results are the only ones reported in the paper.

22   Q.    And can you resurrect the iterations if one asked?

23   A.    No.

24   Q.    Is that standard practice as far as you understand it?

25   A.    It is standard practice, as far as I understand it.

1    Again, the data are available, in principle anybody can rate

2    the data to ask whatever question they want.

3         (Discussion off the record.)

4    Q.   Professor, you were asked questions about publication

5    strategies.  Do you recall that?

6    A.   Yes, that's correct.

7    Q.   Did you formulate an opinion as to whether or not it was

8    appropriate to use that as a variable in your model or not?

9    A.   So the publication strategies, as I understand it, would

10   be the same set of issues that are under scientific knowledge

11   in the back and forth that we've just had about what variables

12   are in versus out.  And the allegations with regard to the

13   publication strategy I understand has to do with funding

14   certain kinds of trials whose outcomes were intended to

15   increase use rather than support a new indication.

16        So these kinds of publications and the publications

17   that were suppressed all would influence -- would look like the

18   scientific literature and influence physicians.

19        So it was my belief that they -- that set of issues

20   would be subject to the allegations, and that, again, as I've

21   noted before, as the promotional series for which I have the

22   best data are detailed and journalized, I think they'll pick up

23   the effects of these other strategies.  To the extent they

24   don't, my calculations are, in fact, lower than they really

25   should be.

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

Page 121

1   Q.   So I take it that there was points in time in your

2   analysis and your preparation of the regression where you

3   actually gave Pfizer the benefit of the doubt, if you will?

4            MR. KENNEDY:  Objection.

5            THE COURT:  Sustained.

6   A.   There is reason --

7            MR. KENNEDY:  Objection.

8            THE COURT:  How are you running timewise?

9            MR. SOBOL:  Only about two or three more minutes, your

10  Honor.

11  BY MR. SOBOL:

12  Q.   There was questions about whether or not you included a

13  time trend or not, correct?

14  A.   Yes.

15  Q.   Now that you've described this notion of confounding,

16  could you explain to this jury why in this situation, why it

17  did not make any economic sense in your judgment to include a

18  time trend?

19  A.   I'll try to be brief and clear.  But imagine that it's a

20  controlled environment.  We're talking about Neurontin sales

21  and promotion.  There's no other information available in this

22  hypothetical world.  The defendant promotes Neurontin.  It

23  increases prescriptions, as seen in my model, but someone, an

24  analyst, comes in and constructs a time trend; that is, it's a

25  linear or a non-linear formula that is a function of time.  So

Page 122

1    that's what I mean by construct.

2         Dr. Keeley did a quadratic time trend, so it's a

3    non-linear formula.  Takes that variable, T, T squared, puts it

4    in the model, even though in my hypothetical there's nothing

5    else causing promotions because physicians have no other

6    information, the time trend would fit the data perfectly and

7    we'd get the same result where we couldn't disentangle the

8    effects of promotion from the effects of time trend.  It's an

9    untestable set of assumptions.  Economists and others include

10   it in models as part of a judgment call.  My judgment here, it

11   takes up all the effect that promotional spending would

12   otherwise have on the empirical analysis.

13        THE COURT:  Why?

14        THE WITNESS:  Because it's simply a construct that by

15   construction looks exactly like the sales of Neurontin over

16   time.  If you look at that pattern of the sales of Neurontin

17   over time, you can pick a time trend that follows it and then

18   any other variable you put in it will -- will no longer work as

19   an explanatory variable because you've already pulled out all

20   the variation of interest.  So every variable you put in soaks

21   up more variables, leaving less to be explained by another

22   variable.

23   BY MR. SOBOL:

24   Q.  In this case, what result would achieve if you decided to

25   simply use a time trend that's following sales?

Page 123

1   A.   Essentially the implications would be that the defendant's

2   sales would have grown over time regardless of whether or not

3   they promoted the drug.  So that the promotional effort had no

4   effect.

5   Q.   So that the defendant spent what to get what?

6   A.   So that the defendant, as I noted earlier, spent millions

7   of dollars for no effect; that, in fact, if they had simply

8   walked away, sales would have grown at precisely the rate we

9   observed without having invested all that money in promotion in

10  a ten-year period.

11  Q.   And in your view, would that make any economic sense in

12  the area of healthcare economics?

13  A.   In my view, pharmaceutical manufacturers promote their

14  products in order to increase sales.

15  Q.   Now, there were some questions asked of you as to a couple

16  of attempts that were made at Kaiser to estimate percentages of

17  use of Neurontin.  Do you recall that?

18  A.   Yes.

19  Q.   And do you recall having been provided before you

20  testified here today testimony, the transcripts of the

21  testimony that's occurred in this case?

22  A.   Yes.

23  Q.   I want to bring to your attention a portion of the

24  testimony of Mr. Carrejo, and this was regarding one of the two

25  exhibits, I believe, where -- this is at line 24 of page 59,

Page 124

1  where Mr. Carrejo indicated that -- the Court asked:  "So when

2  you said four percent was for bipolar, you think it's likely

3  it's more or less?"

4        And Mr. Carrejo answered:  "It's not a real good

5  estimate.  I don't know what the true number is for bipolar,

6  but this isn't a very good estimate.  It didn't include all

7  ICD-9s for bipolar."

8        Do you recall having read that?

9  A.   I did read that, yes.

10  Q.   In your practice as a healthcare economist, would you want

11  to use data in which the person who prepared the data said it's

12  not reliable?

13  A.   My understanding, Mr. Carrejo tried to back away from the

14  data for problems such as this, and so I don't know what to

15  make of the final results.

16  Q.   Would you want to rely upon it as a healthcare economist

17  if this is what the preparer of the testimony says?

18        MR. KENNEDY:  Objection, lack of foundation without

19  additional --

20        THE COURT:  Overruled.

21  A.   No, I wouldn't want to rely on it without knowing more.

22  Q.   Would you expect Kaiser --

23        THE COURT:  All right.  Are you done?

24  BY MR. SOBOL:

25  Q.   Final question.

1        Professor Rosenthal, in your opinion to a reasonable

2   degree of certainty in the area of healthcare economics, are

3   the percentages that you have achieved in this case in

4   connection with the effect of Pfizer's marketing of Neurontin

5   on Neurontin sales a fair and accurate estimate of the

6   percentages applicable to Kaiser?

7   A.   In my opinion as a healthcare economist the percentages

8   that I have calculated are a fair and accurate representation

9   of the impact on Kaiser of the alleged misconduct.

10       MR. SOBOL:  Nothing further, your Honor.

11       THE COURT:  Anything else?

12       MR. KENNEDY:  Very briefly, your Honor.

13                    RECROSS-EXAMINATION

14   BY MR. KENNEDY:

15   Q.   Professor Rosenthal, during the time you were running your

16   30 or 40 analyses in this case you were aware of which side you

17   were working for, correct?

18   A.   Yes, Mr. Kennedy, I was.

19   Q.   And when you first set out in this case you knew which

20   side you were working for, correct?

21   A.   Yes, sir.

22   Q.   And at that point you thought inclusion of a time trend

23   would be appropriate, correct?

24   A.   Based on the previous literature I thought it would be

25   appropriate to start with a time trend, yes.

1   Q.   And then as you got into it you found if you included a

2   time trend, it would show that doctors prescribed according to

3   sound medical judgment rather than off-label promotion,

4   correct?

5   A.   That is not correct.

6   Q.   Isn't that just what you told us?

7   A.   Absolutely not, sir.

8   Q.   If you include a time trend, there is absolutely no

9   showing that off-label promotion was influencing actual

10  prescriptions, correct?

11  A.   First of all, there's no reason to think --

12  Q.   Could you answer the question?  If you include a time

13  trend, you end up with zero evidence that off-label promotion

14  is what's causing doctors to put the substance, Neurontin, in

15  other people's body, correct?

16  A.   If you include the time trend, you get no results, yes.

17  Q.   And that would mean the plaintiffs would lose, correct?

18  A.   I don't know what that would mean legally speaking, no.

19        MR. KENNEDY:  Thank you.  I have nothing further.

20        THE COURT:  Thank you.

21        One question.

22        JUROR:  I hate to even bring this up.  Going back to

23  the time trend, a trend is a change over time.  So are you

24  assuming -- again, this is your specialty, I have no idea --

25  are you assuming a growth in something over time or --

Page 127

1          THE WITNESS:  So what I try to do is make as few

2    assumptions as possible in the estimation.  A time trend

3    assumes that there's a growth over time that takes a specific

4    form, it's either linear or quadratic, as I was saying before.

5    But if you put in a time trend, you have to say what that time

6    trend is.

7          Instead, I use a model that does assume that there are

8    some patterns of unmeasured changes over time.  And this enters

9    my model through what are called these utter regressive terms.

10    And so it's a much more flexible, less assumption-laden

11    approach.  So I try not to assume.

12          THE COURT:  Give an example where you've used -- I

13    understand there's been articles where you've used time trend.

14    So where did you think it was appropriate?

15          THE WITNESS:  Thank you for asking that question.  One

16    of the big differences about this model is I'm looking at a

17    single drug over its life cycle, and a time trend is perfectly

18    related to that individual drug's life cycle as well.  In

19    models where I've used a time trend there's been what's called

20    cross-sectional variation, too.  So I had multiple drugs in

21    multiple therapeutic classes and each of them was on a

22    different part of its life cycle.  It was a snapshot in time.

23    So the time trends in that model were picking up common,

24    secular trends but the product life cycle issues could be

25    identified distinctly from that because I had multiple drugs.

 1          And so where there is cross-sectional variation, that

 2   is, multiple drugs over time, a time trend is pulling out less

 3   of the total variation that's there to be explained by the

 4   variables.  That's the big difference in my mind of why the

 5   time trend is so problematic here.

 6          JUROR:  Basically, if I understand correctly --

 7          THE COURT:  So I'm looking at these people and they

 8   have no idea what you just said.  So could you --

 9          JUROR:  Could they decrease over time?

10          THE WITNESS:  They could actually increase or

11   decrease.

12          JUROR:  So you could have a time trend that decreased

13   and so in that event you would have no basis for that, right?

14          THE WITNESS:  I just let the data tell me what's

15   happening.  I don't come to it -- this is actually a very

16   critical point and hard to understand if you haven't run a

17   regression ever.

18          But I'm asking the data to tell me what the

19   relationship is among these variables, I'm not telling it.

20          You're right, if you made the assumption about a

21   linear trend but your data went up and down -- you only get one

22   coefficient for linear trend -- it's not going to fit your data

23   very well.  So a quadratic trend, the data can go up and

24   down --

25          THE COURT:  We don't know what a quadratic tend is.

1          THE WITNESS:  It's a curve where the slope changes.

2          THE COURT:  The old S.A.T.s.

3          THE WITNESS:  I think the critical piece is I'm trying

4     not to put into the data a lot of assumptions.  I'm trying to

5     let the statistical analysis actually come out of the data.

6          So it is absolutely possible to estimate a model --

7     Dr. Keeley has done so -- where promotion has a negative effect

8     on sales.  The data will tell you that if you put enough

9     assumptions in it.  So -- but I pick up a positive effect in my

10    models.

11         JUROR:  But in the beginning you were assuming you

12    were going to use it, but did you know you were only going to

13    track one drug?

14         THE WITNESS:  So, of course, I did know that in

15    effect, but I hadn't really thought about the implications.  So

16    the model I propose there is actually based on the published

17    models, ones that I publish in this multidrug context, ones

18    that have been published by others.  It's simply a summary of

19    what's in the literature to do this kind of estimation.

20         THE COURT:  Anybody else who looked uncertain want to

21    dare a question?

22         JUROR:  I did have one question.  The data that you

23    got was from IMS.  This is an outfit that goes to doctors that

24    somehow gets them to write the journal?

25         THE WITNESS:  That's right.  So IMS is a big

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

Page 130

1    consulting company.  They collect data from a variety of

2    sources for detailing.  They pay physicians --

3              JUROR:  Now I understand.

4              THE COURT:  That part is easier.

5              I know that it's unusual for me, I never invite

6    additional questions but -- I'm usually cutting them off -- but

7    there was a line of inquiry based on the jurors' questions.

8    Did anyone want to follow up on anything?

9              MR. SOBOL:  No questions from the plaintiff.

10             MR. KENNEDY:  No further questions, your Honor.

11             THE COURT:  Nobody else dare?

12             Thank you very much.

13             MR. SOBOL:  Kaiser --

14             THE COURT:  Who?

15             MR. SOBOL:  Can we go forward?

16             THE COURT:  Yes.

17             MR. SOBOL:  Kaiser calls Dr. Hartman.

18             RAYMOND S. HARTMAN, having been duly sworn by the

19   Clerk, was examined and testified as follows:

20             THE CLERK:  Thank you.  You may be seated.  And would

21   you please state your name and spell it for the record.

22             THE WITNESS:  My name is Raymond S. Hartman,

23   H-a-r-t-m-a-n.

24             MR. SOBOL:  May I inquire, your Honor?

25             THE COURT:  Yes.

1                       DIRECT EXAMINATION

2    BY MR. SOBOL:

3    Q.   Dr. Hartman, what do you do?

4    A.   I'm an economist.  I'm president and director of an

5    economic consulting firm that does statistical and econometric

6    research for government clients in litigation, in a variety of

7    circumstances.

8    Q.   Where do you live?

9    A.   I live in Newton, Massachusetts.

10   Q.   And where is your office?

11   A.   In Cambridge, Massachusetts right next to M.I.T.

12   Q.   Do you work with Professor Rosenthal from time to time?

13   A.   I do work with Professor Rosenthal.  She's an affiliate of

14   our firm.  Our firm has a variety of academic affiliates at

15   M.I.T., other institutions, so she does participate in a number

16   of matters.

17   Q.   And I understand, Dr. Hartman, that your testimony in this

18   case will be to take the percentages derived by Professor

19   Rosenthal and calculate proposed damages claimed by Kaiser in

20   this case, correct?

21   A.   That's correct.

22   Q.   So the jury is starting to get a little bit of the drill.

23   Let's go through a little bit of your background first.

24            What's your formal educational background?

25   A.   I received a bachelor's in economics from Princeton

1  University with high honors in 1969.  I received a master's in

2  economics in 1971 and a PhD -- I'm sorry, master's from M.I.T.

3  in 1971, and my PhD is from M.I.T. in economics in 1976.

4  Q.   After getting your PhD from M.I.T. in '76 what did you do?

5  A.   For approximately 15, 20 years I was doing academic

6  research.  I was doing teaching.  I was on the faculties,

7  either research or teaching faculties, at M.I.T., at Boston

8  University, and at the University of California at Berkeley in

9  the law school.  I left those institutions with a position of

10  associate professor.

11  Q.   And during that 10, 15 years or so after you got your PhD,

12  among the things that you taught, did you teach econometrics?

13  A.   My areas of specialty are statistics and econometrics,

14  which I taught at the graduate level.  I taught the same topics

15  to lawyers, which probably had the same look on their face when

16  they're listening to econometrics as the jury has.  And I

17  taught industrial organization microeconomics, generally

18  applying statistical econometric techniques to a wide array of

19  different industries.

20         Over the last 10, 15 years I focused much more on the

21  healthcare markets and applying the statistical and econometric

22  methods and models to those markets.

23  Q.   So after you worked in academia, what did you do?

24  A.   Well, while I was at academia, I did consulting, I did

25  expert witnessing, I did testimony.  I started several

1    consulting firms with other academics across the same nature

2    that I have now.  And once I finished and left any teaching at

3    all, I've just been doing consulting and doing -- I continue to

4    do and publish academic research.

5    Q.   Please describe to the jury, then, over the past ten years

6    or so your experience in healthcare and pharmaceuticals.

7    A.   I've been asked to address issues of antitrust

8    allegations; price fixing; foreclosure; generic entry, generic

9    drugs coming into the market.  I've been asked to develop

10   statistical econometric models, most of which don't have time

11   trends; looking at what drives these markets; what causes

12   competition; what doesn't; what harms competition.  So it's

13   been antitrust.

14          I've worked on a number of cases of these off-label

15   promotion situations where the challenged behavior is what we

16   have in this matter.  And my efforts have been focused on

17   estimating and helping estimate the structure of the

18   econometric models to analyze these markets and then draw the

19   economic conclusions, whether there's damages or whether

20   there's some issue about how much the price effect of a

21   foreclosure might be.

22   Q.   About how many single drug cases, matters, have you

23   consulted or testified in?

24   A.   I'm beginning to lose track.  The Judge knows me from many

25   of the AWP battles.  I would say 30 maybe.  But I'm guessing.

1   They're starting to blur.

2   Q.   Bigger than a bread box?

3   A.   It's bigger than a bread box, yes.

4   Q.   Now, in connection with this particular case, your

5   experience in terms of using econometrics as applied to the

6   estimation of marketing and its impact on drug sales, apart

7   from this case is that an activity you've also been involved in

8   previously?

9   A.   It is.

10   Q.   And in connection with this matter did you from time to

11   time consult with Professor Rosenthal in connection with her

12   work in this regard?

13   A.   I did.

14   Q.   Now, in connection with this case your assignment was

15   essentially twofold, if I understand it correctly:  One, to

16   give certain opinions regarding the econometrics, correct?

17   A.   That's correct.

18   Q.   And second, to determine damages, correct?

19   A.   To determine damages for the original set of plaintiffs

20   that had been identified and now for Kaiser in this particular

21   matter.

22   Q.   Let's turn first to the sources of data that you used in

23   this case, okay?  Please identify -- first, did you use the

24   NDTI for certain purposes?

25   A.   Well, because Professor Rosenthal was estimating her model

1  using the NDTI data, and I was collaborating on that

2  estimation, I did use the NDTI data.  I used the IMS data.

3  Generally all of the data that she has discussed I'm familiar

4  with, I've used.  It is the gold standard of data for this

5  industry, and it's used in most academic research and in

6  litigation.

7  Q.   Now, you also used some Kaiser-specific data, which I'll

8  turn to in a moment.  But with respect to the national data

9  that you used, did you reach an opinion as to whether or not it

10 was appropriate to use that national data for the purposes both

11 of the econometrics and your damages estimate as to Kaiser?

12 A.   Those data are appropriate for the following reasons:

13 What we're trying to get at here is doctors' behavior, doctors'

14 responses to detailing and various kinds of promotional

15 activities and how it affects their prescribing behavior.  And

16 the IMS data and the Verispan data, which is another -- which

17 is what was called the VONA data.  The VONA data is -- their

18 website recently claims that they essentially survey almost

19 every pharmacy in the country, and they survey up to 50 percent

20 of the drugs that are sold at those pharmacies.

21        So what you're able to observe are patterns of

22 prescribing and the drugs that are prescribed and sold by a

23 very broad cross-section of doctors in the country, all of

24 which, as one looks at the discovery materials, were detailed;

25 and as part of the allegations in this case, their prescribing

Page 136

1    behavior was to be affected by that promotional activity.

2         So this data is as broad and rich a sample as you can

3    get.  It summarizes most -- a good portion of scripts written

4    and whether they're paid by Aetna or Guardian or whomever.  So

5    it's a very representative sample.

6    Q.   Would you prefer if you could get it to get

7    Kaiser-specific data on promotions?

8    A.   No.

9    Q.   Why not?

10   A.   Well, it's -- it would be as if I were General Motors or

11   some company trying to identify some demand for a set of

12   products.  You want to get as broad a possible a set of

13   behavioral responses.  And Kaiser, if I -- first of all, the

14   data isn't there to do it from Kaiser and what we need.  And

15   secondly, they're just one player, and it doesn't give you --

16   the variability that one would find in that kind of data would

17   lead to less statistical robustness and less ability to test

18   the hypotheses that one as a statistician and econometrician

19   does when estimating a model.

20        So it would not be a rich sample, it would be

21   idiosyncratic and it would -- as we saw from some of the

22   testimony last week, the data is not as well-crafted and set up

23   to get to be gathered and to be reliable.

24        THE COURT:  So there's no data at all that you could

25   have looked specifically at Kaiser from anybody?

1          THE WITNESS:  Certainly we started out the project as

2     a national case, so we wanted to do it nationally so that we

3     could draw conclusions about any payor in the country.  And

4     then, as it turned out, we were going to use it to draw

5     conclusions about Aetna, Guardian, and Kaiser; and now, as the

6     legal proceedings have evolved, we're focused on Kaiser.

7          Having gone down that track I've forgotten the

8     exact --

9          THE COURT:  So I'm just asking is there any data from

10    either Pfizer or Kaiser or any other place where you could look

11    specifically at what happened at Kaiser?

12         THE WITNESS:  Well, as Professor Rosenthal said, first

13    of all, we are looking by indication, and we're thinking about

14    results and prescribing behavior by indication.  And the data

15    at Kaiser is very sketchy, very spotty; they don't gather it,

16    they can't do it is what I understand.

17         Secondly, in order to estimate the impacts of the

18    alleged unlawful promotion, we would need to know what Pfizer

19    did in terms of their dollars spent and their detailing minutes

20    going to Kaiser.  And they don't -- they could have produced

21    that data to us, I guess, but it's -- what we have from IMS,

22    the existing data sources don't have the visits from Pfizer

23    going to Kaiser.

24    BY MR. SOBOL:

25    Q.   And again, the data we're talking about right now was two

1    different types of things, if I understand correctly; first,

2    the purchases by Kaiser by indication, bipolar, nociceptive, et

3    cetera, that does not exist, correct?

4    A.   That's correct.

5    Q.   And then, second, promotional dollars that might have been

6    spent, to the various doctors that worked in and out of the

7    Permamente Medical Group over time, over a decade, it doesn't

8    exist in that way either?

9    A.   That's exactly -- that's what we would need.  If we were

10   going to use Kaiser data specifically, we would need that kind

11   of production.

12   Q.   How much physicians, as you understand, are in the

13   Permamente Medical Group at one time or another during this

14   approximately ten-year period?

15   A.   I've heard recent numbers of 12,000.  I've heard of a

16   doctor list of 25,000, but I don't really know what that is.

17   But I think Mr. Carrejo, Dr. Carrejo, testified about 12,000

18   physicians.

19   Q.   Does the size of the population that Kaiser services or

20   the size of the population of the physicians in the Permamente

21   Medical Group in any way inform your judgment as to whether the

22   national numbers that you've used are fairly representative of

23   what's gone on at Kaiser?

24        MR. KENNEDY:  Lack of foundation.

25        THE COURT:  Overruled.

1    A.   Well, I have reviewed -- the Permamente group has put out

2    some comparisons of their insured group or the people that they

3    treat, that Kaiser insures.  I've reviewed that data.  The

4    insured -- the people that are insured by Kaiser look a lot

5    like the -- in California other groups of patients that are

6    insured by large national insurers.  So the patient population

7    looks quite similar, and the physician distribution looks

8    similar to me, as does the national distribution from the

9    testimony that I heard last week.

10          MR. SOBOL:  Can we put up 405-K, please?

11   BY MR. SOBOL:

12   Q.   Dr. Hartman, I've put on the screen Exhibit 405-K, which

13   is in evidence, which is a photocopy of attachment G to

14   Professor Rosenthal's report.  Do you see that?

15   A.   I'm having trouble, either too far away or too close.

16          I do.

17   Q.   Please describe, Dr. Hartman, to the jury what role you

18   had in connection with the ultimate findings that Professor

19   Rosenthal achieved.

20   A.   As I say, I collaborated with Professor Rosenthal starting

21   with a general structural model that has been discussed in some

22   of the testimony and the standard practices as an

23   econometrician to use statistical tests to refine that model

24   and do statistical inference of what is -- the factors are that

25   are driving the variables of interest here, which is the TRX.

1          So I collaborated in that, and then I've taken the

2    numbers that were produced and were discussed in some detail by

3    Professor Rosenthal under the allegedly unlawful prescriptions.

4    And for my purposes for going to Kaiser, since Kaiser --

5    Q.    Sorry, in terms of just working with Professor Rosenthal

6    on her results, your role was to collaborate; is that correct?

7    A.    That's right.

8    Q.    And in connection with your activities with Professor

9    Rosenthal in her decisions, I take it that the lawyer that your

10   firm dealt with, at least in part, was me, correct?

11   A.    That's correct.

12   Q.    Now, at any point when you had this assignment were you

13   given any instructions at all as to what your results were

14   supposed to be?

15   A.    No, we would never do that.

16   Q.    Did you communicate to me or any other lawyer, any other

17   of the plaintiff lawyers, what your interim results were

18   showing before you came to your final results?

19   A.    No.

20   Q.    Would you do that normally?

21   A.    No.

22   Q.    The results that appear here in 405-K, are these the

23   results that Professor Rosenthal arrived at, as far as you

24   understand it, and that you collaborated on?

25   A.    That's correct.

Page 141

1   Q.   Unchanged since the first time you showed them to anybody

2   for Kaiser or plaintiff's lawyer at all, correct?

3   A.   That's correct.

4   Q.   Now, did you use these -- oh, and did you form an opinion

5   yourself, Dr. Hartman, to a reasonable degree of certainty in

6   the area of applied microeconomics and econometrics as to

7   whether or not the results that appear on Exhibit 405-K are a

8   fair and accurate depiction of the percentages by which the

9   marketing by Pfizer caused increased prescriptions of

10  Neurontin?

11          MR. KENNEDY:   Objection, beyond his report.

12          THE COURT:   Overruled.

13  A.   I did form an opinion.   They are -- they do reach that

14  level of validity in both the numbers of unlawful prescriptions

15  and the percentages.

16  Q.   Now, turning your attention to the work to use this data

17  and calculate a number for prescriptions that relate to Kaiser,

18  first, did you make some observations regarding the national

19  expenditures based upon national data of Neurontin?

20  A.   Well, I did observe national expenditures.

21          MR. SOBOL:   Let's go to Plaintiff's Exhibit 408-H,

22  which I move into evidence.   It's table B-1 from Dr. Hartman's

23  report.

24          MR. KENNEDY:   No objection, your Honor.

25          (Exhibit 408-H received into evidence.)

1   BY MR. SOBOL:

2   Q.   Doctor, is this table B-1 from your report?

3   A.   It's a reduced version of B-1, yes.  It appears to be

4   table B-1 from my report, that's correct.

5   Q.   And if you look at column 2, if you could just point for

6   the jury -- just poke the screen, if you will, at 2.  There you

7   go.

8   A.   Thanks.

9   Q.   The total number of national retail dollars spent in the

10  United States for Neurontin from the beginning of 1995 through

11  the fourth quarter at 2004 was what?

12  A.   These are the total national retail dollars spent for

13  Neurontin, and they total $9.7 billion.  And those are numbers

14  from the VONA data, and they do not include mail order

15  prescriptions.  So that's --

16       MR. SOBOL:  So let's go to Plaintiff's Exhibit 408-HH,

17  which I move into evidence.

18       MR. KENNEDY:  No objection, your Honor.

19       (Exhibit 408-HH received into evidence.)

20  BY MR. SOBOL:

21  Q.   Dr. Hartman, what does this show?

22  A.   This summarizes the temporal pattern that is -- one

23  observes in the total dollars spent for Neurontin over time.

24  That's just -- it aggregates by year the numbers that one sees

25  in table B-1.

Page 143

1   Q.   Okay.  And the total of $9.7 billion spent in the United

2   States for Neurontin from '95 through 2004, this number does

3   not include mail order, correct?

4   A.   That's correct.

5   Q.   What would be a reasonably conservative estimate of the

6   amount of mail order with respect to this drug?

7   A.   The percentage of mail order I have in column 10 of table

8   B-1, and it varies anywhere from 12 to 18 percent over the

9   period of time that we've looked at.  And so that if I were

10  to -- that would translate into maybe another 15 to 20 percent

11  increase on top of the sales at retail pharmacies.

12  Q.   So it's fair to say that over $10 billion was spent in the

13  United States for Neurontin from the beginning of 1995 until

14  the end of 2004, correct?

15  A.   That's correct.

16  Q.   Now, you, nevertheless, in terms of trying to calculate

17  damages with respect to Kaiser, if I understand it, you did not

18  look at the national data, but you got Kaiser-specific

19  information, correct?

20  A.   That -- in terms of coming up with a damage numbers I used

21  Kaiser-specific numbers.

22        MR. SOBOL:  Let's go to Plaintiff's Exhibit 268-A.

23  Q.   Now, Dr. Hartman, I'll represent to you that Plaintiff's

24  Exhibit 268 -- not 268-A, but 268 -- is actually a data file

25  that you were given, okay?  Does 268-A appear to depict a bar

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

Page 144

1    chart of what essentially is the data for Kaiser expenditures

2    for Neurontin shown over time?

3    A.   It is my recollection that it does, yes.

4    Q.   And then if we go to Plaintiff's 268-B, this is another

5    demonstration, if you will, of the Kaiser expenditures over

6    time for Neurontin?

7    A.   That's correct.

8    Q.   Now, if you use this as your starting point, please

9    describe to the jury what your next step was in terms of trying

10   to calculate damages in this case for Kaiser.

11   A.   Well, having collaborated with and observed the quality of

12   the econometric work done by Professor Rosenthal, I essentially

13   took the results that we had on the table that was shown

14   earlier, which perhaps we could put up again to help the

15   jury --

16   Q.   405-K, I believe.

17   A.   It was the very first one.

18   Q.   Yes.

19   A.   Essentially what I did was I looked at -- let's take

20   bipolar.  We know now that bipolar, as was focused on in the

21   work that was done by Professor Rosenthal, included more ICD-9

22   codes than a single ICD-9 code or a single diagnosis.  There

23   were some 10 or 11 diagnoses included.

24         And looking at the number of scripts that were found

25   to be generated by the Challenge promotion, that turned out to

1   be 11.7 million.

2           What I did was I took the total scripts for national

3   over the entire period of time to come up with a percentage

4   that would -- is the relevant percentage that I would apply

5   then to any large insurer, any large managed care organization.

6           So let's assume that the total scripts of Neurontin

7   nationally were 60, 70 million.  I would take the 11 million

8   over that 60, 70 million and say that's a representative

9   sample, it's looking across many, many patients in many, many

10  situations and looking at the prescribing behavior; and I take

11  that ratio and I apply that to the Kaiser total to come up with

12  numbers that reflect the number of scripts that were induced by

13  the unlawful promotion at Kaiser.

14  Q.   That would be the quantity?

15  A.   That would be the quantity, that's correct.

16  Q.   Okay.  And then how did you determine the price?

17  A.   The -- I don't know if we have an exhibit for this or not,

18  but there certainly --

19           MR. SOBOL:  Table B-2.  Do we have that handy or not?

20  Q.   Let's try to do it without the table because we don't have

21  it in.

22  A.   What I've been able to observe is I've gotten information

23  from Kaiser from all of their sites on the amount of Neurontin

24  that was prescribed.  The total amount.  I look at that as the

25  amount that was being prescribed nationally, and I'm looking

1   for the percentage of that total at Kaiser across the various

2   Kaiser and the Permamente entities the doctors that are

3   prescribing.  There it is but a little blurry.

4          In any case, I take total -- I get from Kaiser total

5   dollar amount and total number of scripts and I calculate a

6   weighted average price of a script, an average script of

7   Neurontin.  So that once I'm able to take the national numbers

8   that tell me the percentage of a total that would be related to

9   a bipolar indication that was induced by the fraudulent

10  promotion, I take that number of TRX and I multiply it by the

11  average price to come to monetize the -- that -- the value of

12  the scripts that were subject to the fraudulent promotion.

13  Q.   Dr. Hartman, do you take an average price paid by Kaiser

14  over time for each script because script counts might change?

15  A.   I do.  I calculate -- I do that -- do this calculation

16  quarterly, so I take the Kaiser data, and so their -- each

17  quarter there might be a mix of 30 days, 60-day scripts, and it

18  may vary from quarter to quarter.  I calculate the damages, the

19  quantities quarter by quarter, and then I use the average price

20  quarter by quarter to take into account how things are changing

21  over time, how that average price is changing.

22  Q.   I notice that there was a footnote somewhere in your

23  tables that at some point another lawyer for Kaiser told you

24  that these were -- that the prices you got were normalized to a

25  hundred days per prescription.  That wasn't correct, right?

1   A.   That's correct.  I was told that, that was not correct.

2   It was irrelevant because I took total scripts and divided that

3   into total dollars, so it gave me an average price per script.

4   Q.   So in terms of determining the quantity and determining

5   the price, did you use accepted techniques in healthcare

6   economics and applied microeconomics to determine the damage

7   number?

8   A.   These are standard methods that would be used.  These are

9   standard methods used by the industry, used by Pfizer to

10   calculate values of different promotional programs, by

11   academics and academia itself.

12   Q.   You've had more challenging projects?

13   A.   I have.

14        MR. SOBOL:  And then let's go to Plaintiff's Exhibit

15   408-C, which I move into evidence.

16        (Exhibit 408-C received into evidence.)

17   BY MR. SOBOL:

18   Q.   Just focusing right now on bipolar for the moment --

19   A.   I am doing so.

20   Q.   Can you circle on the screen, please, the bipolar?

21   A.   I'm seeing somebody already --

22   Q.   Corrine beat you to it.

23   A.   Good, that's very nice.

24   Q.   Describe to the jury, please, what this chart shows by way

25   of bipolar and how you arrived at those numbers for bipolar.

1   A.   Well, as I said, using this national sample, using the

2   regression analysis, using the results from Professor

3   Rosenthal, I had a percentage of the total scripts that were

4   related to the ICD-9 codes, the diagnosis codes that the

5   complaint included that were related to bipolar and depression.

6   I calculated the number of scripts quarterly -- annually --

7   well, actually quarterly, this just shows them annually, and

8   the -- calculating those numbers of scripts I then took the

9   weighted average price by quarter and I multiplied by that

10  times the quantity and that leads to the dollar amount that one

11  observes by year.

12       So you'll notice that in 1995 the damages related to

13  any kind of off-label, unlawful off-label, promotion was zero.

14  It was 180,000 in 1996, and the total over the entire period of

15  time was 38.7 million.  Now, these are dollar numbers that take

16  account of the time value of money to Kaiser, and all that that

17  means is that these are dollars that they would have had that

18  were -- that they paid for damages 10, 15 years ago and the

19  value of that dollar would have grown if we bring it up into in

20  today's value.

21       THE COURT:  What interest rate did you use?

22       THE WITNESS:  I used the interest rate -- there's

23  always a question of what interest rate do you use in different

24  situations, whatever the group is that's been injured.

25       In this case I used the prime rate because the injured

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

Page 149

1  party was somebody that the dollars that were forgone was

2  something that they had to replace by, let's say, borrowing at

3  a corporate rate.  And the prime rate is conservative in that

4  case.

5  BY MR. SOBOL:

6  Q.  Dr. Hartman, I put up on the screen Plaintiff's Exhibit

7  408-E, which I move into evidence.

8         THE COURT:  All right.

9         (Exhibit 40-E received into evidence.)

10 Q.  Does this show the calculation you use for the interest

11 rate calculation?

12 A.  This does show the interest rate.  Year by year we can see

13 the pattern of interest rates changing over time due to factors

14 other than a time trend, I might add.  Yeah, those are the

15 interest rates that I've used.

16 Q.  Now, going back, then, to Plaintiff's Exhibit 408-C.  I'm

17 just going to do these briefly one at a time.  Migraine, your

18 conclusions.

19 A.  For migraines my conclusions are, again, the damages start

20 up from the unlawful promotion in 1996 and the total over time

21 is 2.2 million for -- resulting from the unlawful promotion of

22 migraine.

23 Q.  Neuropathic?

24 A.  Neuropathic pain -- if we're going to highlight it for the

25 jury.

1        The neuropathic pain also starts up in 1996, and it

2   amounts to 69 million over the entire damage period.

3   Q.   And nociceptive pain?

4   A.   Nociceptive pain, same pattern, 27.2 million over the

5   entire period.

6   Q.   And the dose?

7   A.   The dosing amounts to 6.7 million over time, and that has

8   started up based on the assumptions that Professor Rosenthal

9   built into the model for the different damage periods.  That

10  starts up in 1995, total 6.7 million.

11  Q.   And then, finally, you totalled them?

12  A.   I did total them, and the total at the very bottom there

13  is 143.9 million in damages.

14  Q.   Now, Dr. Hartman, then, is it your opinion to a reasonable

15  degree of certainty in the area of applied microeconomics that

16  the damages suffered by Kaiser making the assumptions that you

17  did, i.e., applying the percentages derived by Professor

18  Rosenthal and using the data that you got from Kaiser, that the

19  total damages suffered by Kaiser in this case exceed $143

20  million?

21  A.   They do, yes.

22  Q.   Now, if you turn to Plaintiff's Exhibit 408-F for a

23  moment, just blow up that part of --

24            THE COURT:  How much longer do you have on direct?

25            MR. SOBOL:  Probably two or three minutes.

Page 151

1          THE COURT:  Perfect.

2          MR. SOBOL:  I was looking at the clock.

3   BY MR. SOBOL:

4   Q.   Dr. Hartman, Plaintiff's Exhibit 408-F -- are you having a

5   hard time reading it?

6   A.   No, I have a copy here.  I'm thinking of the jury.

7   Q.   The tables that begin at 9 -- the columns 9, 10, 11, 12,

8   13, 14 --

9          (Discussion off the record.)

10  Q.   Obviously the jury will have a hard copy of this.

11  Dr. Hartman, is this essentially the same information as the

12  previous slide only by quarter and without interest?

13  A.   That's correct.

14  Q.   So just describe to the jury briefly so they can orient

15  themselves as to how this chart provides more information but

16  also no interest so they can be familiar with it.

17  A.   Okay.  As I mentioned before, I'm using national data to

18  characterize Kaiser and the patterns of the prescribing

19  behavior of the doctors.  I do that and I come up with a number

20  of scripts by quarter that we talked about using those

21  percentages times the total -- percentages times the total

22  number of scripts, and in columns 2 through 6 it's a script

23  count.

24  Q.   Don't focus on those, just go to 9.

25  A.   Go to 9.

Page 152

1    Q.    I'm budgeting my time.  Go to 9.

2    A.    I'm sorry.

3          So starting at 9, I take those -- the quantities and

4    multiply it by the average price, which is in column 8, and

5    I -- and that gives me a dollar estimate quarter by quarter

6    based on the mix of the -- what the TRX pattern looks like at

7    each quarter, and those dollars are in the dollars of -- that

8    we call them -- economists call them nominal dollars.  Those

9    are the dollars of 1995, 1996 dollars.  They're not -- there's

10   no prejudgment interest, no interest applied to them.

11         So you'll be able to see there by quarter the -- a

12   break out of all the damages that occur based on the dollar

13   amount that Neurontin cost back in those -- in each of those

14   quarters, added up and the totaled at the bottom of column 14

15   is 91 million without the interest, the prejudgment interest.

16   Q.    And then I take it that you provide us to be able to

17   depict damages by quarter if there was any need to be able to

18   do that, correct?

19   A.    That's correct.

20   Q.    Okay.  But because they're without interest, then you've

21   provided column 15.  What's that?

22   A.    Column 15 is just the summation that we have gone through

23   on the previous page, where you're talking about the totals,

24   and that takes -- that sums over columns 9 through 14 by year.

25   You see 1995, 1996, 1997, those numbers are the totals in the

Page 153

1    previous exhibit from whence we were speaking earlier.  So this

2    combines the nominal and the damages with interest.

3              MR. SOBOL:  Your Honor, I realized that I have one

4    topic that will take me about three minutes.  I don't know if

5    you want to do it now.

6              THE COURT:  Do it now so we'll finish.  Three minutes.

7    We're looking.

8              MR. SOBOL:  I'm working on it.

9    BY MR. SOBOL:

10   Q.   So, Dr. Hartman, you've given this jury your estimate of

11   the damages to Kaiser over time, 1995 to 2004, by indication

12   with interest by year and then another one by quarter, correct?

13   A.   That's correct.

14   Q.   Okay.  Now, were you also asked by some lawyers from

15   Kaiser to assume another feature; which is, that if for some

16   reason we need to back out what Kaiser might have spent for

17   some other drugs as a part of its damages, were you asked

18   something to that effect?

19   A.   I was something to that effect, and that --

20   Q.   Rather than me telling you, you tell the jury what you

21   were asked, but quickly.

22   A.   Okay.  What I was -- I was asked -- I was told that there

23   could be an alternative theory of valuing the damages, and that

24   would be, Look, suppose that Neurontin was not prescribed but

25   some subset of other drugs or some set of other drugs were

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1    prescribed instead of that, instead of Neurontin.  I was

2    provided with a list of drugs by indication that would have

3    been the mix of drugs that could have been prescribed had the

4    Kaiser doctors known that Neurontin was not effective, and I

5    took the price per script of those -- of that combination of

6    alternative drugs and merely took the price of Neurontin minus

7    the price of those other drugs and applied that to the total

8    number of scripts.  So the assumption is that Kaiser would have

9    prescribed for these patients but prescribed a different set of

10   drugs that was not Neurontin.

11   Q.    Now, you didn't make the selection of the drugs, correct?

12   A.    The Kaiser formulary people did, or someone at Kaiser did.

13   Q.    Do you recall -- there's a Plaintiff's Exhibit 365 --

14   we're not going to put it up on the screen -- but Ms. Millares

15   gave you the alternative drugs, correct?  You accepted them?

16   A.    That's correct.

17   Q.    Now, did you reach an opinion to a reasonable degree of

18   certainty, assuming those to be the alternative drugs, as to

19   how much the damages would go down if you had to back out the

20   cost of those other replacement drugs, if you will?

21   A.    The number is in the footnote, and I did not commit it to

22   memory, but it was -- my recollection was the damages might be

23   ten percent less than what they are.  But I'm speculating.  I'd

24   like to look -- oh, I have my report here.

25          (Pause.)

Page 155

1      THE COURT:  So you haven't done that column by column,

2  the way you did this?

3      THE WITNESS:  I did, yes, indication by indication.  A

4  different set of drugs were identified by Ms. Millares, or

5  Dr. Millares, by indication.  So it was indication specific.

6  BY MR. SOBOL:

7  Q.   If you go to page 12.

8      THE COURT:  Of --

9      MR. SOBOL:  I'm just having him refresh his memory.

10  It's page 12, I think footnote 16.

11  A.   So one would reduce what I calculated there, and this is

12  if -- I don't know if this has been introduced in evidence, but

13  it is footnote 16, and the damages might have been eight or

14  nine percent less than what I've calculated here if we allowed

15  that -- if we netted off some amount for payments for other

16  drugs.

17  Q.   So if we just take the total damage number then, if one

18  accepted this alternative approach rather than the total

19  damages being slightly over $143 million, I take it the damages

20  would be approximately 10 percent less or slightly over $130

21  million?

22  A.   I think that's right, about that.  I could do it exactly

23  but --

24      THE COURT:  Is that chart in evidence or is it just

25  you gave us a bottom line percentage?

1         THE WITNESS:  The percentage and the calculations and

2    the description are in footnote 16, which I don't know if

3    that's in evidence or not.

4         THE COURT:  They don't have that.

5         THE WITNESS:  Oh.

6         THE COURT:  I'm not sure I even have it but --

7         MR. SOBOL:  That's it with this witness, in any event,

8    your Honor.

9         THE COURT:  All right.  We'll see you tomorrow.  Thank

10   you.

11        THE CLERK:  All rise for the jury.

12        (Jury left the courtroom.)

13        THE COURT:  Could you stay on for one question?

14        I actually thought we would get an alternative chart

15   so they weren't doing the math on the fly.  But let me ask you

16   this:  Suppose they were to decide that for bipolar the drug

17   was no better than a sugar pill and worthless, and so you give

18   them the full amount?

19        THE WITNESS:  That's correct.

20        THE COURT:  But they decide -- what do you call it --

21   diabetic neuropathy --

22        MS. ARMSTRONG:  DPN.

23        THE COURT:  -- DPN maybe it has some effectiveness,

24   it's related to the other one, they use it in Europe, so it's

25   just not as effective.  So they want to mix and match.  I take

1    it they could just go down one of the columns and say --

2          THE WITNESS:   The theory would be that rather than

3    having prescribed Neurontin they would have prescribed this mix

4    of these other drugs --

5          THE COURT:   Right.  For diabetic, let's say, it's not

6    worthless, it's not like bipolar where there's no evidence to

7    support it whatsoever, there's one clinical trial to support

8    it, but there might have been something cheaper, and I don't

9    remember what it would be.  What if they take different

10   approaches to damages by indications?  Which I think would be

11   within their purview.  Or let's say, for example, they decide

12   that there's no enterprise and then they want to just take

13   some -- just different approaches to each one?  They're paying

14   attention, they're asking questions, they may.

15          So how are they going to decide, let's say, they want

16   to go least effective for one indication and complete for

17   another one?

18          MR. SOBOL:   Do you want him to answer or me --

19          THE COURT:   I'm looking at both of you because I

20   expected to see a second chart.

21          MR. SOBOL:   From the plaintiff's point of view,

22   because the calculation is simply ten percent less, we haven't

23   provided another chart, though we could do the math that went

24   through all of 408-F that simply deducted every number by ten

25   percent.

1          THE COURT:  Are you happy with that as them doing the

2     math?

3          MR. CHEFFO:  No.  From our perspective, your Honor,

4     that would miss the point.  Because the point if it was

5     effective for diabetic peripheral neuropathy, then that's the

6     price that is should be.

7          THE COURT:  I understand.  What if they don't buy your

8     theory?  What if they say for DPN that, all right, there's one

9     clinical trial that supports it, maybe someone would have tried

10    it anyway, it's been approved in Europe if that's one of

11    them --

12         MR. CHEFFO:  You couldn't say the same with --

13         THE COURT:  I don't agree that's true as a matter of

14    law.  Let's say the jury decides to say, But they would have

15    used a cheaper drug, let's say, they would have used a cheaper

16    drug.  So they would only assess damages on the delta, right,

17    on the change.  But let's say they say for bipolar there's

18    nothing out there, there's not one study out there in America

19    that supports bipolar, and they want to go down and provide the

20    whole damages.  Does this give them the tools to do this?

21         THE WITNESS:  Certainly we could -- it seems like a

22    legal issue.  We could use the eight or nine or ten percent, or

23    that ten percent was a summary across different alternative

24    prices for each indication.  So we could actually be a

25    little -- even a little more complicated or we could just use

1   ten percent.

2          THE COURT:  But your theory of the case, so I

3   understand it, is all they have to do is the math per

4   indication?

5          MR. SOBOL:  Right.  And obviously because the Court

6   has raised this, I'll consider with my colleagues whether or

7   not we want to sponsor a chart that redoes the math that

8   supports that.  I can't answer that right now.

9          THE COURT:  That was a question that just arose at ten

10   minutes after 1:00.  Let's come up here for scheduling.

11          I am going to stay on the record.

12          (At sidebar on the record.)

13          THE COURT:  I think, and I hate to do this to my

14   wonderful court reporters, I think there has been so many

15   misunderstandings that have flowed from these discussions

16   afterwards.  We have typically gone off the record so people

17   let down their hair and not be on the record.  I think we're

18   better off just putting on the record what's going to happen

19   the next day.  It's happened on both ends at this point.

20          So how much longer -- you're completely done with

21   Hartman?

22          MR. SOBOL:  Yes, unless we sponsor that additional

23   chart, we're done.

24          THE COURT:  It wouldn't change anything, just do the

25   math.

Page 160

1            MR. SOBOL:  Oh, no.  Yes.

2            THE COURT:  And you need to look at those chalks they

3     showed you, because now they've given it to you a day in

4     advance, you need to do that.

5            How long?  I look at you.  Are you going to do it

6     again?  You're the guy, you're the man.  So how long?

7            MR. KENNEDY:  At least an hour, but I would definitely

8     expect to be through by the break.

9            THE COURT:  Okay.  So assume we're done with him at

10    the break, so he goes to his mother's birthday party.  Then

11    who's next?

12           MR. SOBOL:  My understanding is Dr. Daniel.

13           THE COURT:  And how long is he on direct?

14           MR. SOBOL:  Ms. Nussbaum, I think, has told us a half

15    an hour.

16           MR. GREENE:  Correct.

17           THE COURT:  Assuming that's a half an hour.  I don't

18    know -- what does he talk about?

19           MR. GREENE:  He was chairman of the P&T committee.

20           THE COURT:  All right.  So how long might you have?

21           MR. KENNEDY:  I'd usually be about an hour with him.

22           MR. CHEFFO:  Or more.

23           MR. KENNEDY:  I haven't heard the direct yet P&T, I

24    think he was on DUAT.

25           THE COURT:  He might be significant.

1          MR. KENNEDY:  He's got a lot of areas.

2          THE COURT:  Fair enough.  So now this is where it's

3     going to stay, because we have too many -- you are roughly

4     going to stay within these -- this sequence and this time

5     unless you e-mail each other that things are dramatically

6     different by what time?  You all have to live with this.  6:00?

7          Does that seem fair?

8          MR. KENNEDY:  I want to make sure the status quo is we

9     will try to get him off tomorrow.  Ms. Nussbaum's estimates,

10    again, through no fault of her own, tend to be a little light,

11    and I can't guarantee that we're going to get an hour or that

12    an hour will be enough.

13         THE COURT:  I understand, but it's going to be in that

14    ballpark unless we e-mail each other to the contrary so that

15    people can plan around it.  Okay?  So I think that's the best

16    way to do this.  People -- both sides have been off on their

17    estimate, sometimes by a lot, so the game plan, -- I keep

18    changing it as we go as I get a sense of the culture of the

19    group -- is that that's going to be your sequence unless you

20    tell them otherwise by 6:00, and that's going to be roughly

21    your timetable unless you tell them by 6:00.  That you're going

22    to finish him by the break and that you are going to try to

23    have it be an hour but it could be longer and go into the next

24    day.

25         MR. KENNEDY:  Yes.

Page 162

1          THE COURT:  All right.  Okay.

2          MR. CHEFFO:  If I can just ask, they may have a better

3    idea, because our experts -- we had said to them to Monday, now

4    it's going into next week.  I don't have a sense of when

5    they're going to close, because they haven't done any

6    videotape.  It's not a criticism --

7          THE COURT:  You'd love it, because then you get your

8    no enterprise there.

9          MR. CHEFFO:  They can close now, rest now, fine.

10         THE COURT:  Speak of enterprises.  What I would love,

11   there was a request for a summary chart, which actually I would

12   welcome to actually have indication by indication what

13   documents are supporting the enterprise as distributing the

14   alleged fraud, which is at this point primarily a publication

15   fraud.

16         MR. SOBOL:  So we have -- may I --

17         THE COURT:  There's some others, some CME, some

18   detailing.  But what it's primarily about is you suppressing

19   bad data.

20         MR. SOBOL:  So if I can spend with you three minutes

21   right now showing you what we have and what I've provided

22   Mr. Cheffo.

23         THE COURT:  I think not because I'm going to see you

24   this afternoon.  But I would welcome a summary chart.  I'm not

25   saying I am going to rule today, but I would welcome so I would

1    not have to draw my own lines.  And then they need to see it so

2    they can have an opportunity to object to it once I've ruled on

3    various exhibits.  So we could start that today, if you wanted,

4    or we would do it -- do we have tomorrow afternoon if you

5    needed --

6         MR. SOBOL:  We're always available.  The one thing I

7    need to request, I'm comfortable showing you what we have today

8    and explaining what we have, but because I gave the binders to

9    Mr. Cheffo this morning, I think it would be unfair for us to

10   actually be ruling on them unless he's in a position to say

11   that he wants to.  That's all.

12        MR. CHEFFO:  I think that would be fine.

13        MR. SOBOL:  I don't want to give you a bummed rush.

14        THE COURT:  What would be fine, putting it --

15        MR. CHEFFO:  Putting it off.  We could explain it

16   today and put it off until tomorrow.

17        I just want to be clear.  I think what your Honor is

18   talking about is a little different.  A summary for your Honor

19   I think we have no issue.  What they have proposed, they have

20   this binder, it's called RICO enterprise that they want to give

21   to the jury with a summary --

22        THE COURT:  You can't have argument in a summary

23   document.  It would be literally what it's designed to be,

24   which is --

25        MR. SOBOL:  We read the rule, we're trying to follow

Page 164

1    the rule.

2           THE COURT:  I'm holding on that.  If it's truly just a

3    listing of documents --

4           MR. CHEFFO:  This is a bench memo on this.  We've

5    given them a copy.

6           THE COURT:  Thank you.  So it's typically given in

7    advance of the trial.  This has been an evolving issue.  If

8    it's simple and straightforward, I will consider it.  If it's a

9    big, as they say, a Magilla, I won't do it.  So it just depends

10   on what it looks like.

11          MR. CHEFFO:  It ain't simple.

12          MS. ARMSTRONG:  We have not actually seen the summary.

13          MR. CHEFFO:  Yes, we have.

14          MS. ARMSTRONG:  Oh, we have.

15          MR. SOBOL:  Let me make a suggestion.  When we

16   reconvene at 3:00, we at least outline what we have.

17          THE COURT:  That's fine.  It will be easier for me,

18   easier for the jury, but you can't put in argument.

19          If it's simply what the documents are from each group,

20   that's different.  But let's go -- stop, let's see you at 3:00.

21   I think I'm now -- you need to let me know, too, if I'm behind

22   on any deposition.

23          MR. SOBOL:  In light of your rulings, Mr. Fox isn't

24   here, I'm going to talk to him.  But will he come back at 3:00

25   in case we haven't resolved it -- it's very simple.

Page 165

1          MR. CHEFFO:  As long as he has a suit from the

2    cleaners that's clean we'll bring him back at 3:00.

3          THE COURT:  We can go off the record.

4          (Discussion off the record.)

5          (Court adjourned at 1:16 p.m.)

6          (Resumed, 3:14 p.m.)

7          THE COURT:  Okay, so this is Kaiser V. Pfizer, the

8    afternoon hearing.  Mr. Sobol gave us a box with multiple

9    documents in them and at least a summary of the documents.  I'm

10   assuming that's not what you meant by a summary document

11   before, right?

12         MR. CHEFFO:  No, that is, I think, your Honor, exactly

13   what they meant.

14         MR. SOBOL:  I'm not sure which document you're talking

15   about, your Honor.

16         THE COURT:  Well, I have maybe five big binders which

17   I haven't had a chance to read thoroughly.

18         MR. SOBOL:  Of course.

19         THE COURT:  But they're good size, good size, yes.

20         MR. CHEFFO:  This one, does it say "Admitted exhibits

21   RICO chronological order" on both sides?

22         THE COURT:  Yeah, we won't have that.  But here's the

23   problem:  I have no reason to doubt that those are accurate

24   summaries, but that actually wasn't what I was thinking.  That

25   was more like what a paralegal would put together as they're

1    preparing a document, you know, what's in the document.  What

2    I'm hoping for is literally a connect-the-dots.  So, for

3    example, I started reading MAC.  I haven't read the depositions

4    beginning to end on all of this.  I need your narrative.  So

5    when was MAC first hired?  What fraud ran through MAC in your

6    viewpoint?  What is the document that shows the bipolar ran

7    through MAC?  What is the document that shows migraine ran

8    through MAC, and for what years are you alleging it?

9            All right, so I understand that MAC as I'm skimming

10   it, at least one of the arguments would be that it was involved

11   in the publication strategy which would include the

12   suppression.  So maybe there's some document that links it to

13   all the indications as a broad-brush kind of thing.  I don't

14   know, but I need the narrative.  I need someone to put together

15   the depositions and the documents to show you have sufficient

16   evidence to show a MAC enterprise.

17           As I'm skimming it, the other big enterprise you're

18   claiming is Cline Davis Mann.  CDM is what you're referring to

19   it as.  That's harder for me because -- it's hard.  I haven't

20   read all the documents.  I've just started skimming, you know,

21   in the ten minutes I had upstairs.  That's earlier in the class

22   period.  When does MAC start, 2001?

23           MR. SOBOL:  Yes.

24           THE COURT:  All right, something, that's when the

25   documents start.  Well, CDM starts, let's say, in the

1    mid-1995-'96 period, somewhere around there, but they're

2    primarily, it looks like, people who ran continuing medical

3    education programs.  Is that right?

4            MR. SOBOL:  We think that it's more than that, but I

5    can understand, given the document that you've looked at so

6    far, that you would be thinking the way you are.

7            THE COURT:  I'm not through all of them, but I need

8    someone to show me, what did they do?  Why is that an

9    enterprise that affected Kaiser?  I understand with -- and I'm

10   not precluding you at all -- but I understand with MAC, that if

11   your theory is a national publication strategy, and if there's

12   a document supporting that they were involved in everything,

13   that you could get it.  But that, at the very least, limits

14   their damages because they only started in 2001.  So in order

15   to get your damages, as you see from Mr. Hartman, from 1995 to

16   the present, I need something that's going to show that there

17   was an enterprise before MAC came in.

18           MR. SOBOL:  Sure.

19           THE COURT:  And what it was and how it affected

20   Kaiser.  So that's my concern.  So maybe you can just start

21   talking now.  But when I was thinking of a summary document

22   that would help me, and probably the jury, it would be what are

23   the documents related to the enterprise?  So many of the

24   documents that you have in there as I was flipping through them

25   just relate to the fraud by Pfizer, in your view, which may be

1   relevant to the California cause of action but not necessarily

2   the enterprise.

3          MR. SOBOL:  Right.

4          THE COURT:  So I'm in the weeds.  I'm granular.

5   What's the word somebody was using?  "Granular," that's the

6   Washington, D.C. word these days, "granular."  I'm being

7   granular here.  Okay, so help me, so start.

8          MR. SOBOL:  So let me tell you what we had planned,

9   and it will only take a couple minutes.  I think we're trying

10  to accommodate you.  We're also trying to make sure that we put

11  it in a way that we think under the rules it can actually go to

12  the jury too.

13         What we essentially did, started last week was, we put

14  together the first book, the book that's dated March 3.  We

15  ID'd that to the defendants.  These are exhibits that have now

16  been admitted in evidence.  You made a ruling about it last

17  week.  These documents are in evidence.  And this book, by the

18  way, started essentially -- we were only looking at documents

19  that were not yet at that time in evidence, and we pulled out

20  from the proposed exhibits basically the documents regarding

21  Cline Davis Mann, most of them --

22         THE COURT:  All right, can I just say this?

23         MR. SOBOL:  Yes.

24         THE COURT:  As I understand it, they are not

25  contesting authenticity or that they're business records, so

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1    the issue really is at this point for me a 403 issue.

2          MR. SOBOL:  Correct, and that's what we understand

3    also, okay?

4          MR. CHEFFO:  Just one caveat.  That's true, your

5    Honor, except with respect to the stipulation with the

6    nonparties.  Like, so if it's a Cline Davis Mann specific

7    document not from Pfizer's files or a MAC or something else, we

8    worked this all out.  You know, we didn't agree to stipulate,

9    just like they wouldn't stipulate to a Permanente Medical Group

10   document.

11         THE COURT:  All right, but this is where I'm holding

12   you to it, that unless it was objected to on authenticity

13   grounds in the document objections, as I read the stipulation,

14   it hasn't been preserved, a stipulation of the parties.  At

15   least, let me put it more broadly:  It hasn't been preserved

16   with me unless you didn't object in the -- so there were a few

17   things I saw 901, a few things?

18         MR. SOBOL:  Right.

19         THE COURT:  But most of them were relevancy issues.

20   So unless you preserved it with me, you don't have it.

21         MR. CHEFFO:  And I would just say, your Honor, I mean,

22   you'll rule the way you're going to rule.  I would say that,

23   you know, I think your Honor has to take or should, I would

24   request, take into account the fact that the parties had worked

25   amicably, and we talked about that, about that stipulation

1    about what we were agreeing to and what we weren't agreeing.

2    So I think that we've had ongoing objections, both to

3    authenticity and business records of not ours, and as well as

4    kind of the document dump issue.

5            THE COURT:  Well, all right, I understand that's your

6    position, but my position is, both under the Federal Rules and

7    under my pretrial order, you needed to have objected and

8    preserved it with me, and I don't think you have unless --

9    there were a few you did object on 901, so if there are one of

10   those, you should just flag it for me.  There are a few in

11   there, but there aren't a lot because I went through it at the

12   time because I was just confused as to what to do.  But putting

13   that aside, though, there are hundreds of documents that are in

14   that crate.

15           MR. SOBOL:  That's why I would like to make sure that

16   I've explained to you what's gone on.  So book one, for which

17   there were 31 documents were admitted in evidence, but there

18   was no descriptions or anything else with it.  I'm just giving

19   the history so you understand this.  The next day, March 4, we

20   submitted the second book.  That was the MAC enterprise

21   documents, if you will, at least those that had not yet been

22   admitted at that time, of which there were 28.

23           THE COURT:  How many were in the first one?

24           MR. SOBOL:  Thirty-one, and the first book, again,

25   you've admitted them into evidence, but whatever.

1           THE COURT:  No, wait.  I'm not sure I did.  Oh, in the

2      first one?

3           MR. SOBOL:  The first book, yes.

4           THE COURT:  The first one.  I didn't know four more

5      volumes were coming, so --

6           MR. SOBOL:  I understand that.  That's why I'm laying

7      this out for you.

8           THE COURT:  All right, so 31 in the first one, 28 in

9      the second.

10          MR. SOBOL:  Book two had 28, okay, that you have not

11     ruled on their admissibility yet.  At the time that we

12     submitted them and gave the ID to the defendants, there were no

13     descriptions yet.

14          Then what we did, the third and final new set of

15     exhibits was book three, for which there are 41 exhibits, okay.

16     And with respect to this book -- again, you haven't ruled on

17     it -- there are a few cleanup CDM or MAC documents in this, but

18     by and large, these are other documents that either relate to

19     the overall fraud by Pfizer, or, we would submit, when put in

20     context with what's going on at the time, either during the CDM

21     era or the MAC era, give context for what was going on in the

22     enterprise.  As an example, Pfizer's marketing plans for 1998,

23     even though it may not reference CDM because those are the

24     things that it's undertaking with CDM, we would suggest an

25     inference could be drawn that would be relating to that.  Those

1    41 documents haven't yet been admitted.

2         Just to round things out so that you could understand

3    how we would plan on presenting this to the jury, this is

4    Mr. Cheffo's favorite book, although obviously it wouldn't be

5    labeled this.  The fourth book that you have, these are

6    actually documents that just during the course of the trial

7    have been admitted as a matter of course.  So these documents

8    are admitted, either through Dr. Abramson or Dickersin or

9    whoever it's been.  These documents total --

10        THE COURT:  So wait.  They're already in volume four?

11        MR. SOBOL:  They're already in.

12        THE COURT:  So then why are you reintroducing them?

13        MR. SOBOL:  Well, we're not introducing them, but

14   here's the second layer.  Then what we thought is, okay, rather

15   than there being a document dump on you, the jury, under 403,

16   or for the Court for your purposes in ruling under 17200, or

17   even to the defendants, what we have done for each book is

18   prepared under Rule 1006 a summary of the relevant portions of

19   the document that relate either to CDM or to MAC or to the

20   overall fraud.  That's the second thing we would plan to do.

21   And eventually, if there is a ruling as to what's in and what's

22   out, there will obviously be one set of exhibits.  And our view

23   is, we would take the descriptions and just make them one so

24   that there's not, you know, four different sets of this.

25   There's just one chron.

Page  173

1          THE COURT:  So when are you going to do for me what I

2     keep asking for, which is to prove up that there's an

3     enterprise for RICO, and what fraud flowed through what

4     enterprise and during what time period?  When am I going to see

5     that?  Because I'm not going to spend three nights -- I just

6     laughed when Mr. Alba walked that in.  It would take me the

7     rest of the week just to sit and read them.

8          MR. SOBOL:  Well, here's what we had planned, and I

9     thought we were trying to address, at least what I heard, okay,

10    was this:  We can't tell you how we get over the directed

11    verdict rail until we know what documents are in evidence.  I

12    have prepared one other tool --

13         THE COURT:  No.  No, no, no.  I'm not going to sit

14    there for the next three days and figure it out as to what --

15         MR. SOBOL:  Fine, but --

16         THE COURT:  Just help me on it.

17         MR. SOBOL:  Okay, so here's how we had planned to

18    finish it out, all right?

19         THE COURT:  Okay.

20         MR. SOBOL:  Then what we've already started to do is,

21    we're taking the deposition clips that we know are going to get

22    played, either because they're agreed upon or we're pretty sure

23    they're going to get played; and we've made a complete

24    chronology of all the documents, all the deposition clips,

25    everything so that that's the summary of all the evidence.  And

1    then we're preparing a memo which we were expected because

2    we're going to get the defendants' directed verdict motion, a

3    memo --

4         THE COURT:  I can't rule on 403 till I see your theory

5    of the case.  That is my quintessential problem here, because

6    otherwise you're just -- just could you -- you know, you know

7    this case at this point.  You probably spent the weekend going

8    through these documents.  Tell me, what is your theory with

9    respect to Cline Davis Mann, who are the witnesses who are

10   going to put it in, and what documents are necessary to that

11   enterprise?

12        MR. SOBOL:  Okay, so the Cline Davis Mann enterprise

13   begins in 1985.  It's a --

14        THE COURT:  1985?

15        MR. SOBOL:  Excuse me, I apologize.  1995, okay?

16        THE COURT:  Yes.

17        MR. SOBOL:  It is an overall enterprise for the

18   marketing of Neurontin for a variety of off-label purposes,

19   which include each of the indications that we have at issue in

20   this case.  There are a series of strategies and tactics,

21   including but not limited to CMEs, okay, that get executed over

22   the course of a period of at least about five years, from '95

23   till at least through 2000 to the time Pfizer picks up the

24   acquisition of Parke-Davis.  The documents --

25        THE COURT:  So, excuse me, you're saying that

1    enterprise with CDM goes till 2000?

2         MR. SOBOL:  And beyond for a reason I'll get to in a

3    moment, but you see a contractual relationship between

4    Parke-Davis and CDM during that time period to market Neurontin

5    off-label through a variety of strategies and tactics,

6    including but not limited to CMEs, okay?

7         THE COURT:  So are they involved in -- as I see your

8    case, the primary case is that they lied in their publications

9    by either misrepresenting data results or by actually putting

10   out the positive tests and suppressing the negative tests.

11   I've heard almost nothing about lies during detailing.  I don't

12   know if it's coming in later, but it's primarily that they

13   phonied the science, okay, they phonied the science.  So some

14   of that may have been through CMEs, and some of it was through

15   publications.

16        MR. SOBOL:  Right.  And part of our theory of the case

17   is, regardless whether we can prove on particular detailing

18   visits that they were saying "Backonja is good" or "Ignore

19   Pande," which we were not suggesting that they necessarily do,

20   if you have detailers, if you have salespeople who are out who

21   are detailing psychiatrists to use more Neurontin, and you're

22   doing that in the context where you know you've held back from

23   the doctors the valid scientific evidence regarding it,

24   regardless of what that detailer does, even if that detailer is

25   slapping that physician on the back and saying "How are you

1    doing?" if they're not disclosing the truth, in our view,

2    that's unlawful.

3         But also a part of our theory is that the actions of

4    Parke-Davis during this epic don't have to occur simply through

5    detailing.  It's the fact that if you withhold the information

6    in the general public, that's also going to be a cause, so --

7         THE COURT:  I understand that, but how do we

8    understand CDM's role?

9         MR. SOBOL:  Through the documents that we have --

10        THE COURT:  I understand, but I'm not going to have

11   time to sit and read them all, so I need you to talk to me.

12   What do these documents say CDM does?

13        MR. SOBOL:  Well, it's a marketing company that gets

14   hired by Parke-Davis.

15        THE COURT:  Yes.

16        MR. SOBOL:  Okay?  And they have some brainstorming

17   sessions in the early time period, war games, meetings, other

18   strategy sessions to how to market Neurontin off-label.  They

19   then set up a series of activities that would further that

20   strategy.  If you go to, as an example, if you go to book --

21   the March --

22        THE COURT:  I don't have them.  We brought them

23   upstairs, didn't bring them back down.  So you have a

24   document --

25        MR. SOBOL:  Yes.

1        THE COURT:  -- that's going to show that CDM actually

2   recommended what?

3        MR. SOBOL:  Actually recommended, as an example, a

4   Strategy No. 1, "To execute a publication and educational plan

5   and clinical trials program to support product expansion in

6   emerging uses."  And then other documents will show that these

7   alleged "emergent uses" were the uses that were off-label, that

8   it would include --

9        THE COURT:  So your point of view is that anything

10  off-label at this point is a fraud?

11       MR. SOBOL:  Well, right, but, I mean, our case is

12  focusing on the indications that we have, but, yes, the answer

13  to that is "true."

14       THE COURT:  Well, obviously I meant -- is there

15  anything in which -- you have something where I think MAC says

16  something to the effect of "Only publish the favorable stuff."

17       MR. SOBOL:  Right.

18       THE COURT:  But that's MAC.  So am I right that you

19  have some document that says something like that?

20       MR. SOBOL:  Yes.

21       THE COURT:  All right, so what does CDM say?

22       MR. SOBOL:  Well, this was at the outset, CDM and

23  Parke-Davis had the memos in 1995 that said, "We're only going

24  to publish things if they work well for us," in some of the

25  documents that are in.

Page 178

1          THE COURT:  Who says that?

2          MR. SOBOL:  That's a Pfizer document.

3          THE COURT:  Right.  So I understand, you've got Pfizer

4     in terms of that, but the question is, do you have it through

5     an enterprise?

6          MR. SOBOL:  Again, we think we do.  Examples are

7     proposed Trial Exhibit 75.

8          THE COURT:  And what does that say?

9          MR. SOBOL:  That's the one that I just indicated to

10    you that --

11         THE COURT:  Which is "Strategies For Emerging Uses."

12         MR. SOBOL:  Yes.

13         THE COURT:  Is there anything that says anything about

14    bad results in publications?

15         MR. SOBOL:  In that document, no.  It does indicate,

16    you know, which kinds of off-label purposes, like low-back

17    pain, neuropathy, certain other kinds of pain in cancer

18    patients.  As an example, you know, then if you move to a

19    couple of documents down, there is a budget, a $4 million

20    budget that Parke-Davis and CDM work on to support product

21    expansion in emerging uses.  We've given examples of field

22    sales reports between Cline Davis Mann and its division Proworx

23    and Parke-Davis showing off-label activities.  I mean, the

24    reason we sort of -- I know it's -- I'd like us to --

25              THE COURT:  It's clearer for the MAC.  It's clearer

1    for the MAC.  But what I need you to do is, I'm not going to do

2    this, okay?  Let me just say this:  I am not.  You need to give

3    me a memo --

4          MR. SOBOL:  Okay.

5          THE COURT:  -- that says indication by indication,

6    what is your claim of fraud, and how did it flow through an

7    enterprise?

8          MR. SOBOL:  Okay, you'll have it Wednesday.

9          THE COURT:  I've already said that these are

10   authenticate and business records and that there's some

11   relevance to them.  I mean, I've flipped through them.  There's

12   some relevance.  They're about Neurontin, and they're about

13   marketing.  But that's not my main concern here.  My main

14   concern is, is there going to be enough evidence to go to this

15   jury and can I figure it out as to why it's a RICO enterprise?

16   And it may be at the end of the day that it ends up winnowing

17   out certain years.

18          MR. SOBOL:  It may.

19          THE COURT:  But you need to help me.  Like that memo

20   that you just read about the emerging uses, what year was that?

21          MR. SOBOL:  September, '96, I believe.

22          THE COURT:  So it may knock out '95.

23          MR. SOBOL:  Right.

24          THE COURT:  I'm just simply saying, I need to

25   understand it, and I need -- have you all gone through all

Page 180

1    these documents?

2         MR. CHEFFO:  No, your Honor, not with -- we just got

3    them today, you know, and obviously I know you're not making

4    decisions.  I mean, you know, I'd like an opportunity to

5    address them.  I don't think one --

6         THE COURT:  I haven't even read them all yet.

7         MR. CHEFFO:  One document, you know, doesn't create a

8    RICO enterprise because someone pulls out a potential e-mail,

9    but obviously I think your Honor is going to give us an

10   opportunity --

11        THE COURT:  Well, they have established that there's

12   an ongoing relationship between these entities.  That's

13   different from --

14        MR. CHEFFO:  From an enterprise.  I mean, the fact

15   that they may be an agent or a marketing is a very different

16   situation.  They have to have a common purpose, you know, an

17   independent common purpose, and the fact that you hire an

18   agency to do something doesn't create a RICO enterprise just

19   because they pull out a document.

20        THE COURT:  Sure, there's got to be a common purpose

21   to perpetrate --

22        MR. CHEFFO:  An independent --

23        THE COURT:  -- something unlawful.  So, now, the

24   question is, of course, whether the unlawful thing is, for

25   example, if the -- and this is a question of law which we're

1   going to have to look at, and I think I've actually even had to

2   deal with this before.  If the unlawful thing is the off-label

3   but then Pfizer uses it for a fraud -- my guess is, based on

4   what they showed me so far and just flipping through it,

5   they're not going to have some of the more difficult statements

6   that were used with MAC.  I think it's going to be more along

7   the lines of off-label marketing, is my guess, because they

8   probably would have flagged something for me right here.

9   That's why I was asking this.  So the question is, what if

10  there was a common purpose for off-label marketing, which there

11  seems to have been, but --

12           MR. CHEFFO:  Well, again, your Honor, I'm not prepared

13  to argue all these --

14           THE COURT:  -- Pfizer uses this to amplify its fraud?

15  That's my legal question.

16           MR. CHEFFO:  And I'd like a chance to address it a

17  little more fulsomely, but the bottom line is, you know, while

18  I disagree, I certainly understand your Honor's point with

19  respect to, is this something to go to the jury with respect to

20  deception?  It's a whole other issue of saying there's a

21  document to an advertising agency to essentially do the same

22  thing that Pfizer is accused of, and that all of a sudden

23  becomes a RICO case.

24           THE COURT:  They call themselves partners.  There's a

25  partnership.

1        MR. CHEFFO:  Your Honor, but, your Honor, there's an

2   offhanded -- clearly I think when you hear the evidence --

3        THE COURT:  Anyway, this is premature for me.  I just

4   know I got five binders of documents upstairs.  I am not going

5   to sit and read them and figure out your theory of the case,

6   and if I'm not, I'm worried that it will be a document dump for

7   them.  I need to fully understand why you need them, what it

8   does for you.  And when I'm talking about a summary document

9   for purposes of a jury, I don't have a problem with you saying,

10  "These 20 documents are relevant -- " not a RICO enterprise --

11  "are relevant to the relationship between Cline Davis and

12  Pfizer, and these 20 relate to MAC," and just simply list them,

13  but not to build your case through the quotes.

14       MR. CHEFFO:  I'm not, your Honor.  I mean, in my view,

15  I think that would be somewhat unprecedented in the sense that,

16  you know, they would get to say, "Here's the 20 documents that

17  we want you to look at it in a nice neat package."  I mean,

18  that's the whole point of this trial --

19       THE COURT:  Well, the truth is, they can say that in

20  oral argument, and they'll simply be writing them down.

21       MR. CHEFFO:  Right, they could do that, but we're not

22  going to submit a binder on this issue, a binder on this issue.

23  I mean, I think --

24       THE COURT:  I'm not going to let them give you a

25  binder.  I'm just going to have a piece of paper, like a

Page 183

1   stipulation that says, "Here are the 20 documents on this

2   issue, and here are the 20 documents on that issue," because

3   they could read it out loud.

4         MR. CHEFFO:  They could, but I just want -- you know,

5   I'm not trying to do things to make the jury's life easier.  My

6   issue is, they've now said, "Here's the documents that we think

7   you need to see."  And if you look through this, they've

8   highlighted two sentences of an entire document.

9         THE COURT:  I'm not going to let them do that.

10        MR. CHEFFO:  But even so, saying, "Here's the

11  documents," then we should be able to say, "Well, here's the

12  other five documents that you need to look at."

13        THE COURT:  Yes, fine.

14        MR. CHEFFO:  You know, but the point is, but then

15  we're going to have documents, "Here's the ten documents you

16  should look at with respect to why Kaiser continues to

17  prescribe it today."  I mean, it seems to me the jury is asking

18  questions, they're taking notes, they're following very

19  carefully, that I would just say that both sides should

20  basically submit the evidence and make arguments and have

21  witnesses.

22        THE COURT:  You know what, I'm going to let them put

23  on paper anything they could say orally at oral argument, but

24  I'm not going to let you build your case with the snippets of

25  the quotes.  That's what I meant by a summary document, which

1   is, you know, what is it when you make your oral argument are

2   the documents you're contending support the enterprise?

3   They've got a problem because Mr. Knapp essentially hid from

4   the subpoena.

5            MR. CHEFFO:  Can I address that, your Honor?  Here's

6   the deal, because you said that a few times, and I just want to

7   address that.

8            THE COURT:  Excuse me.

9            MR. CHEFFO:  I'm sorry.

10           THE COURT:  But, you know, at some level I'm not

11  willing to deal with these things mid-trial, and that's what

12  happened last week, which is, you know, it all came up the day

13  or two before the trial started and then didn't get fully teed

14  up till five days, or whatever it was, three days into the

15  trial.

16           MR. CHEFFO:  Can I just address that?

17           THE COURT:  Yeah, but, you know, it's really

18  unprecedented, let me just say, unprecedented to have a trial

19  where I have no corporate representative sitting here,

20  testifying.  Basically I've just never seen it, and so at some

21  level, I'm surprised by it.  Let's just put it that way.

22           MR. CHEFFO:  Can I --

23           THE COURT:  Yes, where are they?

24           MR. CHEFFO:  Can I just address this?

25           THE COURT:  Yes.

1          MR. CHEFFO:  This case, as you know, the conduct

2     that -- okay, let's just put it in perspective -- the conduct

3     that we're talking about goes back to 1995, 1996, sometimes to

4     2000, a different company, Parke-Davis.  The vast majority of

5     these people, the vast majority no longer work at the company,

6     first of all.  Second of all, it's not like -- Mr. Knapp is a

7     scientist.  He's not a marketing person.  He's a scientist,

8     okay.  And they have basically had depositions of all these

9     folks.  So that's the nature of the beast because of the

10    timing.  It's not because we didn't put a scientist up so he

11    can get bludgeoned with marketing documents after marketing

12    document.  So that's the first issue.

13         The second issue is, you know, what's good for the

14    goose.  Have you seen a single person who's actually prescribed

15    Neurontin?

16         THE COURT:  Yeah.

17         MR. CHEFFO:  No.

18         THE COURT:  You keep making the point of it,

19    Dr. McCrory.

20         MR. CHEFFO:  Well, other than, I mean, have you seen a

21    Kaiser --

22         THE COURT:  I've gotten that point.

23         MR. CHEFFO:  Well, but I'm thinking Kaiser doctors.

24    So, you know, this idea of hiding, how about taking --

25         THE COURT:  You could have taken their depositions.

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1  But my point is only, I am going to let them put in relevant

2  non-hearsay documents, but I'm not going to allow a document

3  dump until I understand why each document is important to the

4  enterprise theory.  And I started to read the summaries.  Some

5  very good associate or paralegal probably prepared them,

6  probably somebody spent the entire weekend, and they're useful,

7  but I can't give that to the jury.  That's essentially like

8  a -- are you all grinning?  Was it you back there?  Someone

9  must have been doing it.

10      MR. SOBOL:  They all worked very hard, and we did have

11  a memo on it, but --

12      THE COURT:  So what I need is the narrative.  I need

13  how you're going to prove the enterprise in a way that I can --

14  and also for the years of it because I'm not going to dream it

15  up.

16      MR. SOBOL:  Years, enterprise, and indication.

17      THE COURT:  And the indication.  So, for example, on

18  these CMEs that it's clear Cline Davis Mann ran, for example,

19  which indications where there were allegedly fraudulent things

20  said, which ones, which year, and is there any understanding

21  that whatever happened in Nice, or wherever they had these

22  fabulous things, flowed back to Kaiser?  At least I know with

23  the national publications and the national data stream.  You

24  know, I know that, right?  So my guess is that you can't link

25  them up to Kaiser.  So the only issue would be that you have

Page 187

1    Cline Davis involved in a national marketing strategy for

2    off-label marketing.  I don't know if you can prove up that

3    they were involved in what you would claim would be the fraud,

4    and the only issue is whether you have to have the same common

5    illegal purpose.

6         MR. SOBOL:  Meaning off-label.

7         MR. CHEFFO:  I mean, my point, your Honor, I think

8    that what I would say is that this is basically, they're trying

9    to take the UCL case and turn it into a RICO case, and there

10   has to be separate issues, and I think --

11        THE COURT:  Oh, I fully agree.  And I also have to

12   figure out whether unjust enrichment is just my issue or a

13   jury's.  It's just mine.  Isn't that an equitable issue?

14        MR. SOBOL:  Yes.

15        MR. CHEFFO:  I think that's right, I mean, unless --

16   are we talking under California law?  It depends on the

17   choice-of-law issue as well.  I'm sorry, I'm thinking out loud

18   here, but I think, you know, under California law, my

19   understanding is that there is no separate cause of action for

20   unjust enrichment because they have the UCL claim.  I have to

21   confirm that, but that's my general understanding.

22        THE COURT:  Or if it is, it's probably equitable like

23   it is here?

24        MR. CHEFFO:  Well, because they have the restitution

25   UCL claim, it is equitable, but in some states, as your Honor

1   knows, it's not a stand-alone cause of action; it's only a

2   remedy.  So if there's an action at law or something else --

3           THE COURT:  But we need to look.  That's another issue

4   for another day.  So I'm assuming you're going to wrap up --

5   I've got the universe of documents right now?

6           MR. SOBOL:  Yes.

7           THE COURT:  There's no additional ones.  You're going

8   to do a narrative of the law and each document and why it

9   counts, not a string cite to documents, you know.  We're

10  already up to what, almost 100 documents?

11          MR. SOBOL:  Yes, it's a total of about 139 documents.

12          THE COURT:  139 documents because I'm just not -- that

13  would just be cluttering the record.

14          MR. SOBOL:  Well, okay.  Again, we will respond to you

15  in terms of a memo that deals with by indication, over time, by

16  enterprise, how we --

17          THE COURT:  And it might be easier for me once I

18  listen to the depositions to understand what the nature of the

19  relationship was because I was only looking at the sections

20  that are objected to, not the whole deposition.  But it's got

21  to be at this point, you know, how do I know, for example, that

22  the migraine fraud flowed through CDM?

23          MR. SOBOL:  Right, and we're going to respond to that,

24  okay?  I think the reason that you see 139 documents -- I

25  believe that's the number, right? -- is that's actually, you

8eb33d91-306b-4d38-adf4-708fbd1ac2e6

1    know, a very, very small percentage of the documents that

2    obviously it takes to implement a strategy that's nationwide,

3    that goes over a decade, and that it applies to five

4    indications.  And so actually we have struggled to whittle down

5    the number of documents so that we don't have a document dump

6    on the jury, but by the same token, we have to weigh that

7    against the fact that we still have to be proving up what

8    you're suggesting, so --

9            THE COURT:  And if they're relevant, they'll come in,

10   but you've got to show me on two levels:  One, is there

11   sufficiency of the evidence on the enterprise?  And two is, are

12   these documents somehow self-explanatory that they demonstrate

13   an enterprise?

14           MR. SOBOL:  Right.

15           THE COURT:  Some of the Pfizer documents may be

16   independently relevant on their fraudulent intent and your

17   theory or whatever, but I'm talking about the Cline Davis Mann

18   documents and the MAC documents that show an enterprise, it's

19   going to be a "show me."

20           MR. SOBOL:  And, again, we're going to do all that.

21   Just so you also understand, what we are also trying to

22   accomplish through this process is at least afford the Court an

23   opportunity such that you know that for each document, we have

24   identified that which -- let me give it to you.  This was the

25   instructions I gave everybody on Friday afternoon.  They all

Page 190

1    work very hard.  I said, "Look, pretend that you're in Superior

2    Court in Massachusetts, and there's some cranky Irish judge

3    who's been on the bench for too long," okay?

4            THE COURT:  Yes.

5            MR. SOBOL:  "He brings you to side bar and he says,

6    'Why is this relevant, Counsel?' and you have to respond right

7    then and there.  Give me the part of the document that's

8    relevant."

9            That's what we were trying to do for you in this

10   situation, at least on a document-by-document basis to

11   understand why the document would be relevant.  But we will

12   provide you the brief that you need to be able to put all of

13   these documents in context to respond to the concerns you've

14   articulated.

15           THE COURT:  Then probably the motion for directed

16   verdict will in the Wednesday-Thursday time framework.  I'm

17   sure I will not be ruling on it right away, and I don't know

18   that I'll rule on these documents by then.  You will have

19   offered them, and I will have to reserve on it, and we'll go

20   right into defendants' case.

21           MR. SOBOL:  Thank you.

22           MR. CHEFFO:  Can we just have two things?

23           THE COURT:  Yes, sure.

24           MR. CHEFFO:  I know you've been very patient with us

25   today, but we have two things.  Just to let you know, one we

Page 191

1    worked out.  Mr. Sobol, Tom, agreed, you saw that chart, that

2    6.1 today, remember it had the bar chart, right?  It said

3    "bipolar" and it had all the different things.

4             THE COURT:  And "other mood disorders"?

5             MR. CHEFFO:  Exactly, so we added "bipolar and other

6    mood disorders."  He agreed to that.

7             THE COURT:  That's fair enough.

8             MR. CHEFFO:  And the same with this one, so Tom agreed

9    to that.  The only other thing --

10            THE COURT:  You're going to show me a quadratic

11   equation?

12            MR. CHEFFO:  I hope not.  I'm certainly not going to

13   show you --

14            THE COURT:  4X squared plus 5Y squared?

15            MR. CHEFFO:  It's a slope apparently.  It's a slope.

16            THE COURT:  I finally got that.

17            MR. CHEFFO:  Well, then you're ahead of me.  I

18   couldn't follow any of that today, your Honor.

19            The issue here is, and Tom and I talked, and we don't

20   have a great solution on it, but I don't think it was in any

21   way programmed, the witness today, but a few times he said, you

22   know, "I worked for this whole national litigation, and I

23   worked for Aetna and Guardian."  And, frankly, my concern, I

24   don't want to make a big deal about it, but I'd like, you know,

25   either we'll ask him tomorrow those cases were dismissed, or

1    your Honor can say that, because I don't want them to think

2    either nothing or that the cases were settled or --

3              THE COURT:  Why don't I just say this is part of a

4    much larger -- they're wondering right now why Aetna, why

5    Guardian, what do you mean a much bigger case?  And they're

6    probably wondering why is Kaiser here?  They're not idiots.

7    They'll probably start putting it together that this is some

8    part of some bigger litigation, right?  So they may be

9    speculating the others were dismissed or settled.  They're

10   trying to figure it out.  I mean, some of them are very, very

11   tuned in.  So I can just say, "This is part of a much larger

12   piece of litigation, and you shouldn't speculate about any of

13   the rest of it," just leave it right then and there.

14             MR. CHEFFO:  And if the witnesses could try their best

15   unless solicited not to talk because, I mean, I think

16   Dr. Hartman talked about AWP, and we heard about Vioxx last

17   week, and, you know, so to the extent that we can keep it

18   limited --

19             THE COURT:  You haven't hit Viagra yet, though.

20             MR. CHEFFO:  Not yet, I don't think.  Maybe that's

21   coming with Dr. Franklin.

22             MR. SOBOL:  Well, it came as somewhat of a surprise to

23   me.  Dr. Hartman wasn't programmed to say that, and I'll make

24   sure that at least the witnesses that I'm handling stay away

25   from it; I mean, not to go out of their way basically.

Page 193

1          THE COURT:  Yes, I'll just say -- I think actually

2    Professor Rosenthal mentioned it a little too, and it may be

3    that some of your witnesses do.  I mean, it's actually

4    appropriate to say, you know, "You may wonder.  People have

5    made references to other matters.  It's part of a larger piece

6    of multidistrict litigation, but this is the part you're to

7    focus on, and don't speculate about the rest," I think is the

8    best way to deal with it.

9          MR. CHEFFO:  That would be great, your Honor.  Thank

10   you.

11         THE COURT:  I'd be happy to do that, happy to do that.

12         So tomorrow we're -- and you're going to finish up

13   with Hartman, and then we're doing Dr. Daniel?

14         MR. SOBOL:  Right.

15         THE COURT:  And then do we watch videos for the rest

16   of it?  When does Franklin come on?

17         MR. SOBOL:  It's all up to Mr. Kennedy.

18         THE COURT:  What?

19         MR. GREENE:  I think he's scheduled to come on

20   Wednesday right now, unless he gets pushed back, so it would be

21   Dr. Furberg and then Mr. Franklin.

22         THE COURT:  Mister who?

23         MR. GREENE:  You said Franklin, didn't you?

24         THE COURT:  Yes, but when are you going to do all

25   these videos?

Page 194

1          MR. GREENE:  Hopefully we'll start them tomorrow and

2     Wednesday and then Dr. Furberg.

3          MR. CHEFFO:  There's no way tomorrow.

4          THE COURT:  How many hours do you have left?

5          MR. CHEFFO:  Your Honor, I think they had about 15

6     going into this morning.  Is that right, Robert?

7          THE COURT:  All right, well, you have time to do all

8     of this.  You just might not have very long cross-examinations.

9          THE CLERK:  Eleven hours and five minutes.

10         MR. CHEFFO:  Left?

11         MR. BARRETT:  What did you say?

12         THE CLERK:  Eleven hours and five minutes.

13         MR. BARRETT:  Remaining?

14         THE CLERK:  For you, yes.

15         THE COURT:  It's going to be like Irving Younger

16    cross-examinations, three questions and you sit down.  So, all

17    right, anything else?

18         MR. GREENE:  Just one deposition transcript with two

19    very simple issues.  And I have the book here where you put

20    your rulings in.  In one of them you put next to their

21    objection a question mark because we clipped just the question

22    and we didn't clip the answer down below.

23         THE COURT:  Well, then work it out.

24         MR. GREENE:  Well, I pointed that out to them.  I

25    don't think there's a problem with that.  And then the other

Page 195

1    issue is, we introduced Exhibit 24.  They say it's not on the

2    exhibit list.  It's a key message sheet.  Exhibit 169 and 132

3    are the MAC key message sheets that are on the exhibit list,

4    and we were trying to, you know, cut down the exhibits here.

5    It's got the same language in the Exhibit 169.

6          THE COURT:  Well, then give me all the exhibits, and

7    I'll look at it.  Okay?  All right, I have another matter at

8    4:00 o'clock, so unless you all want to stay for Part B --

9          MR. CHEFFO:  Thank you very much, your Honor.

10         (Adjourned, 3:52 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 196

1                      C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          We do hereby certify that the foregoing transcript,

8  Pages 1 through 195 inclusive, was recorded by us

9  stenographically at the time and place aforesaid in Civil

10 Action No. 04-10739-PBS, Kaiser Foundation Health Plan, et al,

11 v. Pfizer, Inc., et al, and thereafter by us reduced to

12 typewriting and is a true and accurate record of the

13 proceedings.

14      In witness whereof we have hereunto set our signatures

15 this 8th day of March, 2010.

16

17

                        /s/ LEE A. MARZILLI
18                      LEE A. MARZILLI
                        OFFICIAL FEDERAL COURT REPORTER
19
                        /s/ DEBRA M. JOYCE
20                      DEBRA M. JOYCE
                        OFFICIAL FEDERAL COURT REPORTER
21

22

23

24

25