```
                     IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MASSACHUSETTS




IN RE:                                  )
                                        ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,   ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION       )
----------------------------------------)
This document relates to:               )
KAISER FOUNDATION HEALTH PLAN, et al,   )
                                        )
                    Plaintiffs          )
                                        )
           -V-                          )No. 04-10739-PBS
                                        )Pages 1 - 152
PFIZER, INC., et al,                    )
                                        )
                    Defendants          )
```

JURY TRIAL - DAY TWELVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 9, 2010, 8:42 a.m.




LEE A. MARZILLI and DEBRA M. JOYCE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1   A P P E A R A N C E S

2   FOR THE PLAINTIFFS:

3       THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
    Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4   Massachusetts, 02109.

5       THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6   Suite 301, Cambridge, Massachusetts, 02142.

7       LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
    850 Third Avenue, New York, New York, 10022.
8
        DON BARRETT, ESQ., Barrett Law Office,
9   404 Court Square North, P.O. Box 987, Lexington, Mississippi,
    39095.
10
        BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11  Bernstein, Embarcadero Center West, 275 Battery Street,
    San Francisco, California, 94111-3339.
12

13  FOR THE DEFENDANTS:

14      KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
    THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15  Four Times Square, New York, New York, 10036.

16      RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
    LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
        JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18  Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
    Denver, Colorado, 80202.
19

20

21

22

23

24

25

1                    I N D E X

2

WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

3

4    RAYMOND S. HARTMAN       14       23        76         86

5    DALE DANIEL, M.D.        91      111

6

7

EXHIBITS                                PAGE

8

408-I                                   15

9

675                                     136

10

607                                     146

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1                      P R O C E E D I N G S

2              THE COURT:  Good morning.

3              MR. BARRETT:  Good morning, your Honor.

4              THE COURT:  What's the issue?

5              MR. BARRETT:  Your Honor, we intended to call

6    Dr. Daniel this morning.  I guess you remember about

7    Dr. Daniel.  He's the one that was here last week, and he's a

8    busy surgeon.  We intended to call him.  Last night at 6:00

9    o'clock they dumped on us a list of 84 exhibits that they were

10   going to cross-examine him about.  He's a fifteen-minute

11   witness for us.  These are documents that we hadn't -- it took

12   us hours to even download a part of them.  We had no chance, no

13   opportunity, no fair opportunity to even discuss these

14   documents with him.  That's sandbagging of the worst order.

15   We've been asking them since --

16             THE COURT:  So the bottom line is, you are not calling

17   him today?

18             MR. BARRETT:  Yes, ma'am.

19             MR. CHEFFO:  Your Honor, these are e-mails that go

20   back and forth.

21             THE COURT:  Are you calling him tomorrow?

22             MR. BARRETT:  Ma'am?

23             THE COURT:  Are you calling him tomorrow?

24             MR. BARRETT:  No, ma'am.

25             THE COURT:  You're not calling him at all?

1          MR. BARRETT:  No, ma'am.

2          MR. CHEFFO:  He's under subpoena.

3          MR. BARRETT:  He's got to go back to --

4          THE COURT:  If he's under subpoena, he needs to come.

5     If he's not under subpoena, he doesn't.

6          MR. BARRETT:  He's under subpoena --

7          MR. CHEFFO:  For today.

8          THE COURT:  Well, first of all, you can't subpoena him

9     as part of his case, so the question is whether he comes back

10    as part of their case.

11         MR. CHEFFO:  Well, can I just respond, your Honor?

12    Remember we went on --

13         THE COURT:  Yes, yes, but at the end of the day, if

14    you've subpoenaed him, he has to be here.  Now, whether it's

15    part of your case or part of their case is a different story.

16    84 documents is a lot of documents.

17         MR. CHEFFO:  Can I just explain those, your Honor?

18         THE COURT:  Well, can I say this:  You can't subpoena

19    him as part of their case.  They can choose not to call

20    someone.

21         MR. CHEFFO:  I agree with that except we did -- you

22    know, again, we had an on-the-record discussion.  If you read

23    what we've highlighted here, your Honor, that's just not true.

24    We gave them documents, most of which they have his name on,

25    okay?  These documents go back and forth --

1        THE COURT:  Excuse me.  I'm assuming you can do

2   everything you want to do.  I'm just simply saying, they can

3   decide not to call a witness.  They can just do that.  Now, you

4   have a subpoena out.  That means he has to come back.  So

5   that's your choice.

6        MR. BARRETT:  Well, it's a Hobson's choice for us,

7   your Honor.

8        THE COURT:  It may be, but that's the way it is.  So,

9   you know, he managed to serve the subpoena on him.  I don't

10  know -- both sides haven't been playing totally kosher with

11  each other.  So he's protected himself.  He's gotten a

12  subpoena.  So the question is whether you want to put him on

13  today or whether you want him to come back as part of their

14  case.

15       MR. BARRETT:  Will they be held in their

16  cross-examination to the matters that Dr. Daniel discusses in

17  his direct examination, which is what as I understand the rule.

18       MR. KENNEDY:  Your Honor, if we call him in our case,

19  we determine the scope of the direct examination.  There's

20  nothing to limit.

21       THE COURT:  No.

22       MR. KENNEDY:  Your Honor, what I'm concerned about is,

23  he's directed to appear in Boston this morning.  He is a

24  resident of California.

25       MR. CHEFFO:  He's here.

1          MR. KENNEDY:  I'm concerned that he's not in the

2     courtroom.  And normally the Court has to direct a witness to

3     reappear, so I would ask that --

4          THE COURT:  Well, I've got to assume, if I say to

5     Ms. Nussbaum, "Have him be here," he will be here.

6          Now, you've got to work around his surgical schedule.

7     In fairness, he's been here twice now.  Now, you can call him

8     today, or he can come back.  Well, I mean, as part of your

9     case.

10         MR. KENNEDY:  I just want to make sure we're not going

11    to be accused of having overlooked some technical detail by

12    letting him leave the state without having looked him in the

13    eye and said, "You have to come back."

14         THE COURT:  I don't know.  It's funny, I don't even

15    know the technical details, I don't know if he leaves and comes

16    back.  But if you've served him, take your choice.  What do you

17    want, today, or do you want to have them put him on as part of

18    their case?

19         MS. NUSSBAUM:  Your Honor, we need one moment, but I

20    just want to raise another related issue, and that is, this is

21    only about half the documents, okay?  The vast majority of

22    these documents have absolutely nothing to do with Dr. Daniel.

23    His name is not on them.

24         THE COURT:  I understand that --

25         MR. CHEFFO:  That's just not --

1          THE COURT:  Excuse me.  Theoretically I could do what
2     you say, but then I make him come back for part of their case.
3     Theoretically you're right, it's beyond the scope of the direct
4     probably, and then he would come back as part of their case.
5     But I don't want to do that to someone, you know?  You're
6     right, you're right, but then you've got to bring him back.

7          MR. CHEFFO:  I think you're getting a false impression
8     here.  These 84 documents, these are not kind of wild document
9     dumps, okay?  First of all --

10         THE COURT:  Excuse me.  And also it's like the pot
11    calling the kettle black to talk about a document dump based on
12    what I saw yesterday.  So I'm not faulting you for that.  The
13    issue is a narrow, simple one:  They have the right to call the
14    witness when they want to.  If they choose not to, you've got a
15    subpoena, and he's got to come back as part of your case.  It's
16    just that simple.  Have I got something wrong here?

17         MR. KENNEDY:  You're not wrong, your Honor.  I'm sorry
18    to be digging the details.  He is not an employee of a party.
19    Remember we keep being told he's a Permanente physician.  And
20    I'm concerned that regardless of what Ms. Nussbaum as Kaiser's
21    lawyer may say, he goes back to California, he's a third party,
22    you haven't told him to reappear.

23         THE COURT:  Well, I don't know what you want me to do.
24    He's been sitting here.  Will you tell him to reappear?

25         MS. NUSSBAUM:  That will not be a problem, your Honor.

1    Can I just ask you two more questions?

2          THE COURT:  Yes.  And of course they'll pay for him to

3    come back and witness fees or whatever, but the issue is --

4    Pfizer can afford it.  That's not the issue.  They want him.

5          MR. CHEFFO:  We subpoenaed him and gave him the

6    witness fees for today.

7          THE COURT:  Oh, you have already?

8          MR. CHEFFO:  Oh, sure.

9          THE COURT:  All right, all right.  Do you want to just

10   take him out of order as part of their case?  That might be the

11   simplest way to handle this.

12         MS. NUSSBAUM:  Let me just ask you one more question,

13   and then it will take us one minute and we'll get back to you,

14   okay?  A number of the documents are not even on their witness

15   list.  Okay, one of them, 902-J, they argued the last time when

16   Dr. Hyatt was here.  You said they couldn't use it; it's not on

17   their witness list.  We don't want that --

18         THE COURT:  You mean their exhibit list?

19         MS. NUSSBAUM:  Yes.

20         THE COURT:  That's fine, but that's just one out of

21   them.  Is he here?  Let's start from basics:  Is he physically

22   in the city?

23         MR. BARRETT:  Yes, ma'am.

24         MS. NUSSBAUM:  Yes.

25         THE COURT:  Where is he, at the hotel?

1          MR. BARRETT:  Yes.

2          MS. NUSSBAUM:  No.  He's here, your Honor.

3          THE COURT:  Oh, he's in the building.  So your choice.

4    You have three choices:  You can call him as part of your case.

5    You could have him go home with an order on my part to come

6    back as part of their case, or we can take him out of order as

7    part of his case now and just get it over with, which seems to

8    make the most sense, since he is physically here.  And then it

9    would be off of their time clock, not your time clock.

10          MR. BARRETT:  We'll bring him in our case, your Honor,

11   if that's what the Court says, and we'll do that.  But what

12   Linda is asking about is that we don't want them to be throwing

13   documents like they've done before on the Elmo before --

14          THE COURT:  So why don't we have him be going through

15   the documents in his room, and we can be doing the videos first

16   and have him stay over.  I don't know what you want from me.

17          MS. NUSSBAUM:  Can I tell you?

18          THE COURT:  Yes.

19          MS. NUSSBAUM:  What we want, your Honor, is the

20   following:  To the extent that they are showing him documents,

21   e-mails from Person A to Person B that he's not copied on, that

22   he would have no way of knowing, we don't want those thrown on

23   the Elmo, okay.  Our view is that they're not relevant.  There

24   will be no foundation with this witness.

25          THE COURT:  Are they separately admissible?  What's

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1   sauce for the goose is sauce for the gander.  You have lots of

2   documents in the same category that are relevant, admissible,

3   and aren't hearsay because they're business records, and I'm

4   allowing you to introduce them.

5        Now, if he's got the same thing and wants to ask him

6   questions about it, he can do it.  If he doesn't know anything

7   about it, then "no," and it's off the screen.  If they're not

8   on his exhibit list, can't come in.  I've held you to it; I'll

9   hold them to it.  So you can't just throw it up on the screen

10  if it's not an exhibit.  It's just that simple.

11       So if there are 84 documents and it's too many for him

12  to have reviewed, that's a very fair point.  He could spend the

13  morning in the hotel going through it and put him on tomorrow.

14       MS. NUSSBAUM:  Can we have two minutes to confer?

15       THE COURT:  Yes.

16       MS. NUSSBAUM:  And in the interim, so, Mr. Cheffo, the

17  documents that are not on your exhibit list are not going to be

18  used, okay?  The Judge has ordered that.

19       THE COURT:  Yes, of course.

20       MS. NUSSBAUM:  Okay, can we have two minutes to confer

21  and we'll come right back in?

22       MR. KENNEDY:  Your Honor, before they confer, I would

23  request, as long as the doctor is in the building, that he

24  please be brought to the courtroom because this is the day of

25  his subpoena, and that he agree that he will return, because

Page 12

1    otherwise we're dealing with a third-party witness.  He gets on

2    a plane to California --

3            THE COURT:  No, they're putting him on right now, they

4    said.  I mean, I'm going to take their word for it, unless he's

5    somehow jumped on a boat and scooted out of the harbor.

6            MS. NUSSBAUM:  He's here.  He's not going anywhere.

7    He's going to do whatever your Honor says he's going to do, so

8    that's not an issue.

9            MR. GREENE:  Judge, he's here.  He'll be here.

10           THE COURT:  Okay.

11           MS. NUSSBAUM:  We just need two or three minutes to

12   confer.

13           THE COURT:  You've got three minutes.

14           MS. NUSSBAUM:  Thank you so much.

15           THE COURT:  Now, you have ten minutes, but let me just

16   ask you, so we're finishing with Dr. Hartman today, right?

17           MR. SOBOL:  Yes.

18           THE COURT:  All right.  And so, ideally speaking, we

19   won't go too long with Dr. Hartman, but this is whatever you

20   said by the break to be done, right?  That's what we talked

21   about yesterday.

22           MR. KENNEDY:  And I expect we'll need it all until the

23   break.  This is a $100 million witness.

24           MR. SOBOL:  $143 million.

25           MS. NUSSBAUM:  But who's counting?

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1        MR. SOBOL:  I am.

2        THE COURT:  $143 million.

3        MS. NUSSBAUM:  Thank you, your Honor.  We're going to

4   consult for one minute, and then we'll know the order of the

5   witnesses, and we'll let the Court know.

6        MR. SOBOL:  Well, no.  We'll know that Dr. Hartman is

7   going, not the order of the witnesses.

8        THE COURT:  So Hartman till the break.  So he's got

9   till the break to look through these documents.  And he'll come

10  over after the break, he'll be here, and then that issue is

11  over, done.  All right.  All right, so that's it.

12       (A recess was taken, 8:52 a.m.)

13       (Resumed, 9:08 a.m.)

14       THE COURT:  The jurors are all here now.

15       THE CLERK:  All rise for the jury.

16       (Jury enters the courtroom.)

17       THE COURT:  Good morning.  I'm thinking as the weather

18  was getting more and more beautiful that some of you would play

19  hooky, but thank you for not doing so.

20       Did anyone speak about the case or see anything in the

21  press?  I find the jury has complied.

22       I forget, I don't even remember, how much longer did

23  you have, Mr. Sobol?

24       MR. SOBOL:  I'm just cleaning up two things, your

25  Honor.

1          THE COURT:  Yes, okay.

2                    RAYMOND S. HARTMAN

3    having been previously duly sworn, was examined and testified

4    further as follows:

5    CONTINUED DIRECT EXAMINATION BY MR. SOBOL:

6    Q.   Good morning, Dr. Hartman.

7    A.   Good morning.

8    Q.   I want to put in context the couple of other issues that

9    we're just going to follow up with and then be done with your

10   testimony.  Do you recall yesterday your basic damage analysis,

11   which is in Plaintiff's Exhibit 408-C, had a total with

12   prejudgment interest of about $143 million, correct?

13   A.   That's correct.

14   Q.   And, again, there were also separate conclusions for each

15   of the indications, correct?

16   A.   That's correct.

17   Q.   And then of you go to the next one, Ms. Reed, please.  And

18   then 408-F provided the same information but this time

19   essentially by quarter, correct?

20   A.   That's correct.

21   Q.   Okay.  And, again, this was the unadjusted version of it,

22   correct?

23   A.   That's correct.

24   Q.   And then yesterday you gave the jury some testimony that

25   instead of approaching damages this way, and if one deducted

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1   from the damages the price of certain alternative drugs which

2   you assumed from Ms. Millares, that there would be an

3   adjustment of across the board roughly 9 or 10 percent,

4   correct?

5   A.   That's correct.

6   Q.   Now, has your office prepared a chart which shows that

7   adjustment by indication?

8   A.   It has.

9   Q.   Let's put up 408-I, which I move into evidence.

10        MR. KENNEDY:   Your Honor, no objection, subject to the

11   Court's ultimate determination as to how interest is going to

12   be decided.

13        (Exhibit 408-I received in evidence.)

14   Q.   If you can please blow up the totals by indication,

15   basically I think from Column 9 on.   First, we're going to

16   start with this graph as a whole, and then I'll have Ms. Reed

17   blow up something in particular.

18   A.   Okay.

19   Q.   Describe to the jury what this does, please.

20   A.   Well, the estimate of the damages that I talked about

21   yesterday took the entire price of Neurontin as being the

22   measure of the damages.   And we talked about the alternative

23   medications that Ms. Millares had put forward, and what I've

24   done here is say, for bipolar, I've taken all of the drugs that

25   she has identified in her declaration that she has submitted;

1   I've calculated what that average price per script would be;

2   and the measure of damages that you see in Column 9 is the

3   price, is the number of scripts in Column -- well, you don't

4   see Column 2 -- it's the number of scripts that were identified

5   as being unlawfully prescribed by Kaiser as a result of the

6   promotion, and the measure of damages is the cost of the

7   Neurontin script minus the average cost of all the alternative

8   therapies for bipolar.

9   Q.   So does this show by quarter the adjustment for each

10  indication?

11  A.    It does.  It does the same calculation for each indication

12  by quarter and can be compared in the same with the previous

13  graph, and the reduction will be clear.  Because there was no

14  alternative dosing measure that we had, that does not have --

15  that isn't the same as what appears in the earlier exhibit.

16  Q.   Corinne, can you blow up the last two lines.  So these

17  adjustments then, the total adjusts to about 10 percent or so

18  down to $131 million, correct?

19  A.    As we hypothesized yesterday, it adjusts it down about

20  10 percent to $131 million with interest in total.

21  Q.   Please explain to the jury why some of the adjustments by

22  indication sometimes might be higher than 9 percent or lower

23  than 9 percent.

24  A.    Well, it depends on what the alternative therapies were,

25  and so it's really a difference between the price of Neurontin

1  and the price of the other alternative therapies, the weighted

2  average price.  And in some cases, when you take that

3  difference, it might mean that the damages are maybe 12 percent

4  less, in some cases they may be 8 percent less, if you go by

5  column, by indication; but in total they turn out to be about

6  10 percent less.

7  Q.   I want to go to the Elmo.  I want to address one final

8  very brief issue, Dr. Hartman, and then we're done.  You'll

9  recall that in evidence is Plaintiff's Exhibit 405-A.  Do you

10 see that?

11 A.   I do.

12 Q.   Okay.  And, again, describe to the jury what this data is.

13 A.   This data was presented by Professor Rosenthal, and this

14 is the summary nationwide for nationwide scripts of Neurontin

15 starting in January, 1994, and as it rises to a peak in around

16 September of late '04; and then generic entry, it falls

17 precipitously.  So this is the pattern of overall scripts.

18 This is the pattern that one finds in sales of many drugs over

19 time as they increase, peak, level off, and then generic entry.

20 With the price of the generic driving substitution to the

21 generic, the branded drug loses sales and drops precipitously.

22 Q.   And for some purposes, at least in your damage analysis,

23 as you've already testified, you have used the national

24 numbers, correct?

25 A.   I've used the national numbers only in the following

1  context:  The analysis performed by Dr. Rosenthal,

2  Professor Rosenthal, and presented by Professor Rosenthal,

3  appropriately is based on national numbers, and the amounts of

4  the fraudulent scripts per indication are based on national

5  numbers.  So that's the extent to which the analysis is based

6  on national numbers.

7      I use the shares of the national patterns, because they

8  are representative and drawn from a sample across almost all

9  payors, I use those shares and apply them to the total number

10  of Kaiser scripts.  So when I'm calculating damages for Kaiser,

11  I'm using Kaiser data, total Kaiser scripts, and the patterns

12  revealed overall the prescribing behavior across the country.

13  Q.   And so is it fair to say, Dr. Hartman, that at least one

14  use of the national numbers that you have is that you're

15  looking at the national mix, if you will, implicitly the

16  national mix by indication, percentage bipolar, percentage

17  neuropathic pain, et cetera?

18  A.   I am observing the patterns over the entire country in

19  prescribing, the largest sample there is, and I'm seeing that

20  mix over the entire country, that's right.

21  Q.   All right, now, if you can look at the screen, please, and

22  look at the shape of the national numbers, and then I'm going

23  to put on a different graph for a moment, okay?

24  A.   Okay.

25  Q.   Now, what does this show?  This is Plaintiff's

1    Exhibit 268-B.  Go ahead.

2    A.   This is the number of Kaiser scripts that were provided to

3    me and used in my analysis.  When I started the damage

4    analysis, I would go to this total number, these scripts by

5    quarter, and apply the percentages revealed in the prescribing

6    patterns in the country as a whole to the Kaiser physicians;

7    and I would break out the percentage of these scripts, this

8    total, that were subject to the damage calculation.

9    Q.   So you actually used the real Kaiser data for calculating

10   quantity and price?

11   A.   That's correct.

12   Q.   Okay.  And did you make an observation about this dip that

13   starts to appear in roughly the first quarter of 2003 going

14   down in the Kaiser data on 268-B as compared to what, if

15   anything, was going on at the national level in terms of 405-A?

16   A.   I did, and in the testimony -- what one observes if one

17   superimposes those two graphs and with the appropriate

18   scaling -- Kaiser is obviously much smaller than the country as

19   a whole -- we find that the uptake in the prescribing of

20   Neurontin overall at Kaiser follows the national pattern almost

21   identically.  At the beginning of 2003 we find that there is

22   a -- if you put that back up, it starts to trend downward.  And

23   I heard testimony last week -- I observed that fact.  I heard

24   testimony last week that there were initiatives to try and

25   reduce Neurontin prescribing at Kaiser overall.  And so I see

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1    that that seems to be effective relative to the country as a

2    whole.  However, when I'm doing my damage calculation, I don't

3    apply them to the numbers, the scripts for the country as a

4    whole.  I apply them to the reduction that one sees in this

5    exhibit.

6    Q.   Okay.  So you're actually using the Kaiser numbers, even

7    as they decline, in connection with your damage analysis?

8    A.   As they decline, I'm using the shares that we observe

9    nationally, and I'm assuming a reduction in Neurontin scripts

10   overall a certain amount.  They certainly don't go to zero, but

11   they don't increase as much as they did nationally.  And then

12   of those scripts, I take the shares that are applicable to the

13   indications.

14        THE COURT:  So you reduce the numbers to deal with the

15   initiative that Kaiser had been undertaking?

16        THE WITNESS:  I apply the shares to the reduced number

17   of scripts.  I take the actual number of scripts, so if I

18   can -- can I just tap on this?

19   Q.   You can tap it.

20   A.   If Kaiser were to be following the national pattern, this

21   would go up, up to this way.  And I don't apply any shares to

22   that, to where it's going nationally.  I apply it to the

23   national numbers.  So of that reduction, I'm saying, okay, they

24   were able -- I've heard numbers of 30 to 35 percent of new

25   scripts were reduced.  And so I take that reduction, and I say

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1   I'm assuming they reduced Neurontin prescribing overall by that

2   amount, and I apply the shares to the actual Kaiser numbers.

3   Q.   Now, if you assume that the jury concludes that the DUAT

4   program, this initiative, was substantially across the board

5   for the indications in this case, assume the jury concludes

6   that way, would there be any need for you to adjust your

7   conclusions in any of your damage analyses?

8   A.   No.

9   Q.   Now, assume a more drastic -- well, assume a different

10  conclusion by the jury.  Assume that the jury concludes that

11  every bit of the initiatives and the DUAT program was directed

12  towards pain and pain only, would there be any adjustment that

13  you think would be appropriate in the mix of the drugs, in the

14  mix of your damage analyses that would be appropriate if the

15  jury made that conclusion?

16  A.   Well, in order to bound that issue, because I'd seen

17  conflicting testimony from the Kaiser witnesses -- some said

18  that it was across the board, and it affected all prescribing,

19  and that would mean that the calculations that I had done as

20  they appear here are exactly the ones that should be done.  If

21  as posed by Mr. Sobol they were directed at pain, and even more

22  conservatively, assuming they were directed at only the

23  unlawful prescriptions related to pain, because there are some

24  that are not considered unlawful, it's not a hundred percent, I

25  undertook a calculation making that assumption that Kaiser was

1    sufficiently able to identify fraudulent scripts written for

2    pain alone, and I recalibrated what the shares would be.  And

3    what that led to was a reduction in -- taking account of the

4    mix of shares and the assumption that a third of them would

5    have no unlawful pain prescribing in the mix, it reduced the

6    total damages in years 2003 and 2004 by about 10 percent.  And

7    if you --

8    Q.   I'm sorry, what?

9    A.   I was going to say, if you show the dollar numbers, I

10   could then make clear what that implication is.

11   Q.   Dr. Hartman, just briefly, so for the years 2003 and 2004,

12   what would happen?

13   A.   For the year 2003, you see a total damage number of

14   $32.4 million, and at most the reduction would lead to, under

15   the extreme assumptions that I made, a reduction in

16   $3.24 million, 10 percent, that would be reduced in 2003.  So

17   we'd have $29 million or so as damages in 2003.  In 2004 the

18   total damages would be reduced by about 10 percent, at most, or

19   $2.15 million.  So there's a total reduction over the entire

20   period of about $5 million to $6 million.

21   Q.   And that would be assuming that the jury concludes that

22   the DUAT program was directed exclusively towards unlawful pain

23   and nothing else, that would be the change in the damage

24   analysis?

25   A.   That's correct.

Page 23

1          MR. SOBOL:  Nothing further, your Honor.

2          MR. KENNEDY:  Your Honor, may I proceed while they're

3     readjusting?

4          THE COURT:  Yes.

5     CROSS-EXAMINATION BY MR. KENNEDY:

6     Q.   Good morning, Dr. Hartman.

7     A.   Good morning.

8     Q.   Just to recapitulate, you're a doctor of economics, not

9     medicine, correct?

10    A.   That's correct.

11    Q.   And you're not here to offer any testimony concerning

12    liability, correct?

13    A.   That's correct.

14    Q.   You're here just to talk about damages?

15    A.   That's correct.

16    Q.   Just one vocabulary word.  What's a "script"?

17    A.   A script is a -- when you see the notation TRx, I think

18    any of us that have gone to a pharmacy think of it as an Rx,

19    and that's a script, that's one prescription, and TRx are total

20    scripts that are written for a particular drug.

21    Q.   So when you've used "script," you're referring to that

22    little piece of paper the doctor tears off the pad and gives us

23    when he wants us to go get a prescription filled?

24    A.   Well, I'm referring to the prescription that's actually

25    written and the bottle of pills that come from that piece of

1    paper.

2    Q.    So a script equals a prescription?

3    A.    That's right.

4    Q.    Now, your specific assignment in this case was to

5    determine the amount of damages that Kaiser incurred as a

6    result of illegal off-label promotion between what, 1994 and

7    2004 or 1995 and 2004?

8    A.    Well, Professor Rosenthal laid out the time frame for the

9    periods of that liability, and I'm accepting those as the

10   proper periods.

11   Q.    I want to ask you, which years is it?

12   A.    Well, they differ by indication, and it starts in '94,

13   '95, depending on the indication.

14   Q.    And Professor Rosenthal did absolutely nothing in her

15   report to try to apply any of her methodology to Kaiser?  In

16   fact, she expressly says that, correct?

17   A.    That's correct.

18   Q.    She left all of that for someone else to determine?

19   A.    That's correct.

20   Q.    And you're the someone else?

21   A.    That's me.

22   Q.    So in effect your job was to take Dr. Rosenthal's

23   regression analysis and put dollar terms in for Kaiser?  Would

24   that be a fair summary?

25   A.    It was to take her analysis and apply it appropriately to

1   Kaiser's total scripts, and then apply dollar numbers to the

2   damages.

3   Q.   How many hours have you spent on this case, by the way?

4   A.   I -- I couldn't begin to guess.  I would -- well, I could

5   begin to guess, but I'm not sure how accurate it would be.

6   Certainly in excess of 200, I would say, 300.

7   Q.   And I assume you've been compensated for your time?

8   A.   Yes.

9   Q.   And what are you charging per hour?

10  A.   It may have changed over the period of time.  $475 I think

11  is my current rate on the litigation.

12  Q.   And I assume you've been keeping track of your time

13  because you expect to get paid for it?

14  A.   That's correct.

15  Q.   And you can't give us any estimate at all as to what

16  you've spent, you're going to get paid for?

17  A.   Well, there were declarations that were written back in

18  2005, and I -- I do not -- I work on a lot of cases, and I

19  don't keep in my mind a tabulation over years of the total

20  number of hours.  Certainly those records exist if it were

21  necessary to produce them.  The billings occurred, but I don't

22  remember them.

23  Q.   So your best guesstimate would be something over 200 hours?

24  A.   Yes.

25  Q.   Okay.  And during those 200 hours, did you actually talk

1  to Dr. Millares, the Kaiser pharmacist, or did you just deal

2  with her through others?

3  A.   I don't know if my staff dealt with her, but my staff

4  identified the drugs that I use and that she identifies in her

5  declaration.  So I didn't talk to her personally.  I know my

6  staff is talking with counsel, and they may have spoken with

7  Dr. Millares.

8  Q.   And did you talk with anybody from either Kaiser or

9  Permanente personally?

10  A.   Not that I recall.

11  Q.   Okay.  And in particular we have a book here that's been

12  marked Exhibit 923 that perhaps among other things includes a

13  list of all the Kaiser doctors that prescribed Neurontin during

14  the damage period, and I'll represent to you the number is

15  something at least in excess of 20,000 doctors.  Have you

16  spoken with any of them?

17  A.   That would be unnecessary for my calculations.

18  Q.   You wouldn't have any interest in knowing why particular

19  doctors did or didn't prescribe Neurontin?

20  A.   Well, I have ideas of why they did or did not prescribe

21  Neurontin, and that comes from a causal model that was

22  estimated, and the applicability of that to Kaiser doctors is

23  direct.  So when one does these kinds of statistical models,

24  one never goes out and interviews every person that's subject

25  to the statistical model.  You get a sample, and then you

1    extend that to the aggregate.

2    Q.   But just in terms of what you have done in this case, you

3    could not provide the jury with the name of a single specific

4    Kaiser doctor who was ever the subject of off-label promotion

5    during a sales call from anybody from Parke-Davis or Pfizer,

6    correct?

7    A.   I would not have tried to, and I cannot.

8    Q.   And, similarly, you can't tell us why any particular

9    doctor in Exhibit 923 did or did not prescribe Neurontin for a

10   particular patient, correct?

11   A.   I -- I have not looked at any individual doctor.  I've

12   only looked at aggregate patterns, so I --

13   Q.   And, similarly, you couldn't provide the jury with the

14   name of a specific Kaiser patient who was prescribed Neurontin

15   and didn't get benefit from it, could you?

16   A.   I could not.

17   Q.   Now, as we've already discussed, in doing your work in

18   this case, you were told to accept Professor Rosenthal's

19   multiple regression analysis, correct?

20   A.   I wouldn't frame it that way.  I collaborated with

21   Professor Rosenthal in calibrating her models.  So I didn't

22   just -- she didn't just run a bunch of models and I just said,

23   "Oh, I'll take them."  I was involved in making sure that they

24   were appropriate.

25   Q.   You were in court yesterday and heard Professor Rosenthal's

1   testimony, didn't you?

2   A.   That's correct.

3   Q.   In your collaboration, were you involved in the design of

4   the original model that included the time trend?

5   A.   Well, I think you've mischaracterized the original model.

6   The original model was a bare-bone statement of different

7   factors that are found in the literature that have an influence

8   on prescribing patterns.  Now, time trend is something that is

9   thrown in when one doesn't know what may be affecting

10  prescribing behavior.  It could be used to explain something

11  when you don't know what's going on, but it was not an integral

12  part of her model.  It was just something that could be tested

13  as part of the modeling process.

14  Q.   Did your collaboration include outlining the original

15  model?

16  A.   Could you define for me what -- when you say the original

17  model, would you tell me what you mean by that?

18  Q.   Yes, the one that she described yesterday that we put up

19  on the slide that had all the BXs and everything else in it,

20  the original one that she talked about, were you involved in

21  deciding what would go into that original model?

22  A.   That original model was essentially a description of a

23  variety of factors that could go in, and I was involved in

24  discussing what that may look like.  But that in no sense or

25  form to a statistician or an econometrician was a model.  It

1    was a description of a practice or procedure or a protocol that

2    would be followed in the analysis.

3    Q.   Why don't we put it up so we make sure we're talking about

4    the same thing, Professor Rosenthal's first study design.  Did

5    you sign off on everything that's on that demonstrative?

6    A.   If this is taken directly from her declaration --

7    Q.   It is.

8    A.   -- then we had discussed what the literature looked like,

9    how academics had done this modeling, and how industry and

10   pharmaceutical companies do this kind of modeling, and we put

11   together a laundry list of variables merely to identify them,

12   to count them.  It in no sense meant that this was going to be

13   what the final model looked like.  It would be some combination

14   of the factors that appear here.  So this is merely the

15   statement of a protocol for research.  I wouldn't call this a

16   model.

17   Q.   Would you call it a first study design?

18   A.   It's a design of a modeling exercise to appropriately

19   calibrate the causal factors that determine the prescribing

20   patterns for Neurontin.

21   Q.   Okay.  And this was the two of you sat down and drew on

22   your extensive experience and tried to come up with what you

23   thought would be the best way to approach this case, correct?

24   A.   We sat down and put together the formulation that included

25   every possible thing that we could think of that might have an

1   effect, but we certainly didn't believe that most -- that a lot

2   of them would have an effect.  That is left to the statistical

3   analysis and the inferential econometrics that one does.

4   Q.   Were you a collaborator on the original decision to

5   include a time trend?

6   A.   I don't -- when you say "include a time trend," what do

7   you mean here?  I mean, could you show me the line that you're

8   talking about in here.

9   Q.   Let's take the chart down.  A different topic, new

10  paragraph.

11       You know that Dr. Rosenthal testified in deposition that

12  she planned to include a time trend in her regression model?

13  You heard her testify to that yesterday, did you?  That's all

14  I'm asking so far.  Did you hear that testimony?

15  A.   I heard that testimony.  I --

16  Q.   Okay, so what I want to know is, were you a collaborator

17  in the original decision that a time trend would be included,

18  or was that Dr. Rosenthal's sole operation?

19  A.   I was -- as part of setting up the protocol and the

20  variables --

21  Q.   Doctor, it's a yes or no question:  Were you a

22  collaborator in deciding originally there would be a time

23  trend?

24  A.   Well, it's not a yes or no question because there isn't a

25  decision whether to use a time trend or not.  What you do is,

1    you start with a causal model, and if the causal model is

2    not -- if there are aberrations in the causal model, one might

3    use a time trend, but I don't remember at any point

4    Professor Rosenthal or I saying, "Oh, we're going to put a time

5    trend in here."  A time trend is something that you use only

6    when the causal formulations are not working or there seems to

7    be something absent.  So that however she -- I wasn't present

8    at her deposition, and I don't know what she said.

9    Q.   Well, I want you to assume during her deposition she said

10   she had plans to include a time trend.  Is that something that

11   comes as a surprise to you, or was that something you'd agreed

12   on with her?

13            MR. SOBOL:  Objection.

14            THE COURT:  Sustained.

15   Q.   Now, in adopting and following Dr. Rosenthal's regression

16   analysis, you also adopted all of the assumptions that she had

17   been told to make by Kaiser's lawyers, correct?

18   A.   That's correct.

19   Q.   So in doing your work in this case, you've assumed, as

20   Dr. Rosenthal was directed, that Neurontin had absolutely no

21   beneficial effect for anybody for whom it was prescribed for

22   these off-label purposes, correct?

23   A.   You're asking to -- I'm hearing a legal tinge to that

24   question that I'm a little bit reluctant.  I mean, there were

25   challenged indications, and that's what I was asked to assume.

1   Q.   Yes, and you were also told to assume that Neurontin

2   provided absolutely no benefit for any patient who was

3   prescribed the drug for those challenged indications, correct?

4              MR. SOBOL:  Objection.

5              THE COURT:  Overruled.  Is that an assumption?

6              THE WITNESS:  I didn't -- I didn't draw a conclusion

7   one way or the other regarding that.  My assumption was that

8   that kind of promotion and the prescribing that resulted from

9   that promotion for those off-label uses were challenged and

10  were illegal and were fraudulent, and I was -- and that's what

11  the model was analyzing and calculating, and that's -- and

12  there was no demonstrated double-blind value to those effects

13  from those prescriptions for those indications.  I'll take it

14  that far.

15  Q.   Didn't Kaiser's lawyers direct you to assume that

16  Neurontin provided no economic benefit for any patient who was

17  given the drug?

18             MR. SOBOL:  Objection.  It's not an indication.

19             THE COURT:  No economic benefit?

20             MR. KENNEDY:  His words.

21             THE COURT:  Is that an assumption?

22             THE WITNESS:  I -- I don't -- I don't know what he's

23  asking me.  I don't --

24             THE COURT:  All right, next question.

25  Q.   Didn't you undertake this assignment on the assumption

1   that Neurontin does not provide any benefit if it's given to a

2   patient for one of the challenged purposes?

3   A.   Uhm, I -- I -- I guess.  I --

4          THE COURT:  Well, this doesn't -- you had two

5   alternative theories of damages, right?  One was to zero out

6   Neurontin, right?

7          THE WITNESS:  Right.

8          THE COURT:  And the other one was to provide an

9   alternative drug theory, right?

10         THE WITNESS:  That's correct.

11         THE COURT:  So with respect to the first one, is the

12  implicit assumption that it didn't provide any benefit?

13         THE WITNESS:  That it didn't provide any benefit,

14  that's correct.  And taking it in that context, that's a

15  good --

16         THE COURT:  Am I getting to --

17         MR. KENNEDY:  Thank you, your Honor.

18         THE WITNESS:  Thank you, your Honor.

19         THE COURT:  I mean, if you ever get to this issue,

20  that's your call.  That's the thought process you have to think

21  about.  I want to make sure you understand it.  So ask

22  questions if you don't, all right?

23  Q.   Now, as you've said, Dr. Rosenthal used national data

24  rather than Kaiser-specific data, correct?

25  A.   That's correct.

1  Q.   And she used things including the VONA database that

2  includes information from sources other than Kaiser, correct?

3  A.   It is a -- that's right.

4  Q.   And in fact the VONA database doesn't include Kaiser at

5  all, correct?

6  A.   That's correct.

7  Q.   And therefore you arranged to have Kaiser provide you data

8  directly concerning the total number of prescriptions that they

9  wrote for these uses, correct?

10  A.   Not for -- not for the uses.  That they wrote, period, in

11  total.

12  Q.   Okay, total Neurontin prescriptions?

13  A.   That's correct.

14       THE COURT:  And that's because they couldn't break it

15  down by indication?

16       THE WITNESS:  That's right, they couldn't break it

17  down.  And from what I understand, it's been characterized as

18  the attempts that they did were very sporadic, they only

19  happened now and then, and they were garbage, I think is the

20  way they were described by Mr. Carrejo.

21  Q.   That's what they told you?

22  A.   Well, no.  That's what I heard in open court.

23  Q.   And you didn't perform any independent investigation?  You

24  didn't ask Kaiser to provide you with the garbage data that

25  they used, did you?

1    A.    I asked them if they had data by indication, by quarter,

2    by year, and they said they didn't.

3    Q.    And you accepted their word for it?

4    A.    I didn't think -- I didn't think they were lying, first of

5    all; and, secondly, using the national data, which is a much

6    broader and richer and complete sample, was more -- as a matter

7    of statistics, I would have -- even if they had the data, I

8    would have included it probably with national data.

9    Q.    You say the national data is much broader and richer?

10   A.    That's correct.

11   Q.    Well, if you're trying to analyze Kaiser, isn't Kaiser's

12   data the one that's going to be the most effective if it's

13   there?

14   A.    If it's accurate and complete, yes, but it wasn't.

15   Q.    Yes, so your first choice would have been to get Kaiser

16   data, correct?

17   A.    Well, I don't know.  It would have been an analytic

18   decision that I would have to take, and if I can give you an

19   example of why that might be the case --

20   Q.    Well, maybe Mr. Sobol can ask you that.  I think you've

21   answered the question.

22         In any event, the Kaiser data disclosed a total of

23   1,180,000 and some odd number of Neurontin prescriptions,

24   correct?

25   A.    That's my recollection.

1   Q.   In fact why don't we take a look at 408-F, the plaintiffs'

2   exhibit.  And Column 1 is national TRx, and you've told us

3   that's total prescriptions, correct?

4   A.   That's total prescriptions, total Rx/TRx.

5   Q.   Okay.  And down at the bottom, the far left-hand column,

6   the total of all Neurontin prescriptions written between --

7   start in the first quarter of '95 going through the fourth

8   quarter of 2004, and it's 1,180,163?  Am I reading that

9   correctly?

10  A.   It's actually 160, but it's hard to read from the screen.

11  Q.   Okay, sorry, old eyes.  Thank you very much.  And that was

12  the total number of Neurontin prescriptions that all the

13  doctors in 923 wrote during that period of time, correct?

14  A.   That's correct.

15  Q.   And you concluded, applying Dr. Rosenthal's methodology,

16  that some portion of those was due to illegal off-label

17  promotion, correct?

18  A.   Correct.

19  Q.   Her analysis concludes that a portion of the prescriptions

20  was not due to illegal off-label promotion, correct?

21  A.   Correct.

22  Q.   And that those prescriptions, doctors in their wisdom

23  would have made those prescriptions to those patients even if

24  there had been no off-label promotion, correct?

25  A.   That's correct.

1   Q.   And then you concluded that there is another group of

2   prescriptions that the doctors made only because they had been

3   duped or tricked, or whatever verb you want to use, by the

4   illegal off-label promotion, correct?

5   A.   The duped, tricked, and affected by, that there was --

6   Q.   Okay.  And out of the 1 million --

7           THE COURT:  Did you finish your sentence?

8           THE WITNESS:  Close enough, yeah.  Thank you, your

9   Honor.

10  Q.   And out of the 1,180,000 total prescriptions, how many did

11  you conclude were fraudulent, in that the doctors had been at

12  least affected by illegal off-label promotion?

13  A.   Well, if you look at Column 7 in this table, the total

14  number of scripts that were allegedly unlawful totaled

15  555,000,000, so it's a little bit less -- well, it's about half

16  over that entire period were because of the increased

17  promotion.  Because of the increased efforts, there were an

18  additional -- there was this 555,000 scripts that were written

19  by Kaiser doctors as a result of the off-label promotion.

20  Q.   You said "million."  That was a mis- --

21  A.   Oh, I'm sorry.  No, it's 555,000.  I'm sorry.

22  Q.   Okay, so just about half you believe were written because

23  of the off-label promotion, the illegal off-label promotion?

24  A.   That's correct.

25  Q.   And you've done that on statistical analysis.  You can't

1   go to Exhibit 923 and tell us which doctors and which

2   prescriptions were done properly and which ones were

3   fraudulent, can you?

4   A.   That's right.

5   Q.   Now, of the 555,000 that you concluded were fraudulent,

6   how many of those were for neuropathic pain?

7   A.   The total for neuropathic pain is in Column 4, and that is

8   265,000.

9   Q.   So 265,000 out of the 555,000 are for neuropathic pain?

10  A.   That's correct.

11  Q.   And you made that determination by using national figures

12  for Neurontin for neuropathic pain, correct?

13  A.   National figures characterizing national prescribing

14  behavior based on national promotional activities.

15  Q.   Because Kaiser told you they didn't have the ability to

16  separate out what portion of the 1,180,000 prescriptions were

17  for neuropathic pain, correct?

18  A.   Did you say they said that they couldn't break out those

19  prescriptions for neuropathic pain or the unlawful

20  prescriptions for neuropathic pain?

21  Q.   Either one.

22  A.   That's correct, that's my understanding.

23  Q.   Okay.  And using national figures, you concluded that -- I

24  know it's not quite half but what, something like 47 or

25  48 percent of the fraudulent prescriptions were for neuropathic

Page 39

1    pain?

2    A.    The numbers would speak for themselves.  I'd need a

3    calculator to -- but that seems about -- that seems right.

4    Q.    Well, half of 555 would be 275.

5    A.    Yes, so it's close to half.

6    Q.    And during the course of your work on this case, did

7    anybody from Kaiser discuss with you what their current patient

8    website says?

9    A.    No.

10   Q.    Has anybody from Kaiser told you that as of this morning,

11   if you go to their website and check out the treatment for pain

12   emanating from a nerve, it will give you two drugs, Neurontin

13   and gabapentin as the choices?  Has anybody told you that?

14          MR. SOBOL:  Objection.

15          THE COURT:  Sustained.

16   Q.    Do you have any idea what's on Kaiser's website today?

17   A.    No, I don't.

18          MR. SOBOL:  Objection.

19          THE COURT:  Sustained.

20   Q.    Now, coming over to the second column on Table 7A, that's

21   bipolar prescriptions, correct?

22   A.    That's correct.

23   Q.    And the total number of unlawful or illegal bipolar

24   prescriptions that you come up with is 153,000?

25   A.    That's correct.

Page 40

1    Q.   And that's using national data for what portion of

2    prescriptions nationally are written for bipolar?

3    A.   That's correct.

4    Q.   That's not quite correct, is it, because Dr. Rosenthal

5    told us yesterday that that column includes other things

6    besides bipolar, such as depression, correct?

7    A.   Yes, I'm sorry.  I'm still using the term "bipolar" in the

8    way that we have been using it consistently, and that accounts

9    for about twelve, eleven or twelve ICD-9 codes.

10   Q.   And as Dr. Rosenthal told us yesterday, that 12 or

11   13 percent includes conditions other than bipolar, doesn't it?

12   A.   It does.

13   Q.   And have you done any analysis yourself to parse out what

14   portion of the 13 percent is really due to true bipolar?

15   A.   I wasn't asked to.

16   Q.   Okay.  So the 153,000 that you've got here is for national

17   figures for a grouping of conditions, including but not limited

18   to bipolar, correct?

19   A.   As I read the ICD-9 codes, that's correct.

20   Q.   And if this jury were to want to determine the unlawful

21   prescriptions that were just due to bipolar and not due to

22   depression or other conditions, you haven't got a number for

23   them, do you?

24   A.   Not sitting here I don't, no.

25   Q.   Now, after Kaiser gave you their prescription data and you

1   undertook to determine how many of the prescriptions were

2   caused by unlawful off-label promotion, did you back out

3   refills?

4   A.   I looked at total scripts, so it covered refills, new

5   prescriptions, everything.

6   Q.   So even if it turns out hypothetically that somebody was

7   prescribed Neurontin and thought that it worked and the doctor

8   thought that it worked, and they came back and got refill after

9   refill after refill and continued to be happy, that would be

10  included as a fraudulent script if you'd concluded the original

11  prescription was due to off-label promotion, correct?

12  A.   As Professor Rosenthal answered yesterday, there is not a

13  differentiation between those; and if unlawful promotion

14  induces a first prescription and that leads to more

15  prescriptions, that is still the subject of that unlawful

16  promotion.

17  Q.   Again, just hypothetically, a salesman comes in and

18  improperly talks about some off-label use.  The doctor tries

19  it.  The doctor finds it works.  The doctor goes and tells

20  twenty other doctors about it.  Those twenty doctors find it

21  works and so on.  All of those are going to be treated as

22  fraudulent or unlawful prescriptions in your analysis, correct?

23  A.   Well, I think, as Professor Rosenthal answered, it's

24  very -- it's difficult to differentiate the effects of the

25  doctor's perception of how it's working from the initial

1    seeding from the promotion, and that is built into the model.

2    Q.   And the way you've resolved it in the model is, refills

3    get included, correct?

4    A.   All scripts get included.

5    Q.   And regardless of how many retellings and intervening

6    doctors there are between the original off-label promotion and

7    the original prescription, that gets included as well, doesn't

8    it?

9    A.   The model doesn't trace refill patterns or original fills.

10   It's all TRx.

11   Q.   Now, you're aware that certain Kaiser regions had

12   guidelines for the use of Neurontin for off-label uses,

13   correct?

14   A.   I have heard of different guidelines and different

15   attempts to treat Neurontin use by the different regions last

16   week in the testimony by the Kaiser witnesses.

17   Q.   However, your analysis does not include any deduct for

18   off-label Neurontin prescriptions that were written in

19   accordance with the guidelines, does it?

20   A.   Well, I don't know what guideline -- you'd have to tell me

21   what the guidelines were, what the deduct, what you mean by

22   that.

23   Q.   Sure, that's a fair question.  Assume hypothetically that

24   Southern California, that region said you shouldn't be using

25   Neurontin for neuropathic pain unless you've first tried a less

1    expensive TCA and found that it wouldn't work.

2         Now, if we have a hypothetical case where the doctor tried

3    a less expensive TCA and it didn't work, and then in accordance

4    with the guidelines went to Neurontin, if there's any off-label

5    promotion involved, that's still a fraudulent prescription,

6    right?

7    A.   Well, if the off-label promotion got Neurontin onto that

8    as the second line of treatment in that case, and the doctor

9    thought of it based on that unlawful promotion as a second line

10   of treatment after the TCA, then, yes, that would be -- if they

11   followed those guidelines and moved to Neurontin, absent the

12   unlawful promotion, Neurontin wouldn't have been the

13   second-line treatment.

14   Q.   Well, do you have any idea how many of the 555,000

15   supposedly fraudulent prescriptions were written for people who

16   had failed on TCAs?

17   A.   That's not relevant to the calculation or the model.

18   Q.   Okay.  And, alternatively, there are people who can't take

19   a TCA, I want you to assume hypothetically, either because

20   they're elderly or have a heart problem.  If a doctor who's

21   been improperly detailed concludes that "I can't prescribe a

22   TCA because it might cause this person to have a heart attack,

23   so I'm going to give them Neurontin because that's an idea I

24   picked up from the salesmen," that's a fraudulent prescription,

25   right?

1    A.   Well, any prescript- -- if a doctor adds to the group of

2    drugs that he thinks he could prescribe or if a formulary does

3    so, whether it's a second, their, fourth line of treatment, or

4    a first line, if that is placed into the doctor's thought

5    process by the unlawful promotion, then, yes, that's induced by

6    the unlawful promotion.  That's the whole notion of the

7    unlawful promotion:  to place that on formularies in doctors'

8    minds so that if a TCA isn't working, they don't go to

9    something else; they go to Neurontin.

10   Q.   Well, how do you go about determining for a particular

11   doctor whether it was that the detail person, the salesperson

12   came in and said something improper, or the doctor said, "I

13   don't think this patient is really a suitable candidate for a

14   TCA, I'll go with Neurontin"?  How do you decide which was the

15   motivating factor on the part of the doctor?

16   A.   That is why one does an aggregate model that sums over

17   groups of individuals.  If I'm trying to predict how many

18   Buicks I'm going to sell, I don't think of each individual and

19   how they might make a choice.  I do a model that looks at

20   aggregate measures and predicts aggregate sales of that.  And

21   so you wouldn't go to each individual doctor in that way.  You

22   want to look at aggregate patterns in the broadest and richest

23   group of doctors prescribing Neurontin and patients for which

24   Neurontin is being prescribed, and that's the data that is used

25   in the national model to quantify these patterns.

Page 45

1   Q.   Now, how did you go about about distinguishing legal from

2   illegal off-label promotion?

3   A.   The --

4           THE COURT:  What?

5           MR. KENNEDY:  Yes.  Well, let me withdraw the

6   question.  If the Court is confused, I'm sure everybody else

7   is.

8   Q.   Doctor, I want you to assume --

9   A.   I wasn't confused.

10   Q.   Well, let me withdraw the question in any event.  I want

11   you to assume that it is perfectly lawful if a doctor asks a

12   drug salesman for information about an off-label use, or if,

13   for example, hypothetically, the Kaiser Drug Information

14   Service wrote to Pfizer or Parke-Davis and requested

15   information about an off-label use, that that would be one

16   hundred percent legal.  Conversely, it is illegal if

17   Parke-Davis or Pfizer raises the subject to begin with.  Do you

18   have that distinction in mind?

19   A.   I do.

20   Q.   Now, how do you go about distinguishing how many

21   prescriptions were the result of illegal off-label promotion as

22   opposed, for example, to Kaiser's Drug Information Service

23   soliciting off-label information and then distributing it

24   within the Kaiser organization?  How do you distinguish between

25   those two?

1    A.    That analysis was done as part of Professor Rosenthal's

2    modeling in the following context:  The models estimated the

3    overall impact of promotion for all promotion.  Then a subset

4    of that promotion was identified as off-label promotion.  And

5    those were legal decisions, and that led to what -- one would

6    estimate total prescribing behavior for Neurontin based on all

7    promotion, and then you say, look, we're not going to allow

8    this promotion for this indication, that amount of promotion

9    for this indication.  So you have 20 percent less promotion

10   because this has been challenged promotion.  And the

11   classification of that promotion went at the questions that

12   you're raising.  I was not part of that decision-making

13   process, but that led to a, when you use the model, to then

14   predict how many scripts would be written if fewer detailing

15   visits occurred, or fewer messages occurred, tied in with other

16   activities, that's what led to the estimate of the -- that

17   difference between total and then the total absent the unlawful

18   promotion led to these estimates.

19   Q.    Well, of the total of almost 1.2 million prescriptions,

20   how many, if any, did you find were the product of lawful

21   off-label promotion?

22   A.    Anything that wasn't found --

23   Q.    Can you give me a number?

24   A.    Well, it's going to be the -- it's going to be the rest

25   of -- it's going to be the rest of the scripts that weren't for

Page 47

1    the AEDs for epilepsy or for postherpetic neuralgia once that

2    was indicated.

3    Q.    And what was the particular data that you looked at that

4    allowed you to determine whether a particular doctor gave a

5    particular prescription because of lawful as opposed to

6    unlawful off-label promotion?

7    A.    The answer is the same as the previous question for the

8    unlawful promotion.  You don't go to the individual doctors.

9    You look at the totality, you look at the totality of

10   promotion, and then you do the difference between promotion at

11   100 percent and promotion at 60 percent because you've

12   eliminated unlawful promotion for a certain indication.  So

13   that's how -- there's certainly going to be some amount that

14   was prescribed and is predicted as being prescribed lawfully

15   off-label but not as a result --

16   Q.    How much -- I'm sorry, I didn't mean to interrupt.

17          THE COURT:  How much is that per indication?

18   Q.    Yes, how much, either in total for all the prescriptions

19   or per indication, how much of the prescribing resulted from

20   lawful off-label promotion?

21   A.    Whatever has not been unlawful --

22          THE COURT:  I think it's a misnomer to call it "lawful

23   off-label."  So you got the distinction.  It's unlawful to

24   promote it, but it is lawful for a doctor to ask information

25   about it and have the company respond.  So I think that's what

Page 48

1    you mean there.

2          MR. KENNEDY:  Fine, in the interest of time -- thank

3    you for making the point -- let me move on.

4    Q.   While we're on 408-F, Doctor, have you been in court while

5    there's been discussion of the supposed suppression of negative

6    studies?  Have you heard anything about that?

7    A.   I have.

8    Q.   Okay.  And you've heard, for example, about the alleged

9    failure of Parke-Davis to disclose the Backonja and Gorson

10   studies back in 1997, a negative study, and actually Backonja

11   is a positive study but --

12         THE COURT:  You know what my problem is back there,

13   can you see that?  Some of you can?  Okay.

14         THE WITNESS:  I certainly can't.

15         THE COURT:  He can't.  I can barely see it, so I'm not

16   quite sure what to do with that.  Maybe what we --

17         MR. CHEFFO:  Can we turn it this way a little bit,

18   your Honor?

19         THE COURT:  Or even bring it up a little closer.  It's

20   too big actually even to fit right there, so I don't know what

21   to do with that, but at least he can see it if we do this.

22         MR. KENNEDY:  Thank you, your Honor.

23         THE COURT:  All right, now you can see it.

24         THE WITNESS:  I can see it, but I'm not sure the jury

25   can.

1          THE COURT:  I'm not positive you all can see it.  All

2     right.

3          MR. SOBOL:  It's not a big point, your Honor.

4          THE COURT:  All right.

5     Q.   Doctor, I want you to assume that there's been evidence in

6     this case that by September of 1999, third quarter of 1999,

7     Kaiser was aware of the Gorson and the Backonja studies, and in

8     fact talked about them in internal drug monographs.  Have you

9     made any attempt to subdivide any of your unlawful or

10    fraudulent prescriptions to account for before and after an

11    event like that?

12    A.   Well, what I did observe, I looked at total prescribing

13    behavior for Kaiser over the period of time up to 2003, which

14    Mr. Sobol identified in at the end of my direct this morning,

15    and I find that the Kaiser prescribing behavior was exact --

16    was right on trend with the national prescribing behavior.  So

17    whatever was going on with these studies may have been known

18    beyond Kaiser or may have been known generally, but there's

19    nothing, there's no evidence that Kaiser behaved any

20    differently in that period of time from the national averages.

21         THE COURT:  Do you know who Backonja and Gorson are?

22         THE WITNESS:  Well, I've heard of -- I mean, I'm not

23    an epidemiologist.  I have an idea of what they said and --

24    Q.   Sure.  I want you to assume that Gorson was a study that

25    was run at 900 milligrams and showed no benefit whatsoever,

1   negative failed study, okay?

2          THE COURT:  On pain.

3          MR. KENNEDY:  On pain, yes, your Honor.

4          THE COURT:  I mean, just this isn't his hunt.

5          MR. KENNEDY:  Good point.

6   Q.  And Backonja was another pain study that came out being

7   positive, but it was unblinded along the way and therefore was

8   potentially tainted.  So we have a negative study and a

9   potentially tainted study, Backonja and Gorson.  I want you to

10  further assume that as of the third quarter of '99, those

11  studies were known by Kaiser and in fact were discussed in

12  internal Kaiser memos.

13      And now I want to ask Austin to take the neuropathic pain

14  column and highlight the portion from the beginning through the

15  end of the second quarter of 1999 up to that event.

16      And you'll see we start with zeros -- and these are

17  quarters, each of them, aren't they?  So we've got zeros for

18  the first four quarters, and in '01 we start getting up to

19  1,000 prescriptions, and by the end of Q2 we're up to 4,200

20  prescriptions.

21      Now, Austin, will you do the opposite.  Would you

22  highlight starting with Q3 through the end after the Backonja

23  and Gorson pain studies were known to Kaiser.

24      And, Doctor, do you see any drop-off in pain prescriptions

25  after Kaiser became aware of those two studies?

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1   A.   Well, as I said, how much weight they were given and how

2   much the doctors in the practices became aware of it and how

3   much it influenced doctors at PMG is unclear to me.

4   Q.   Do you see any drop-off?

5              THE COURT:  You know, we have to finish this by the

6   break.

7              THE WITNESS:  Yes, I know, you're right.

8              THE COURT:  Is there a drop-off?

9              THE WITNESS:  It follows the national pattern.

10  Q.   Do you see a drop-off?

11  A.   No.

12  Q.   Okay.  In fact, if you can add quickly, would you tell me

13  how many of the 284,000 neuropathic pain prescriptions were

14  written after Gorson and Backonja were known in 1999 --

15             THE COURT:  No, wait.  Have you done the math?

16             MR. KENNEDY:  Yes.

17             THE COURT:  All right, what's the math?

18  Q.   I'll represent to you the number is, of the 284,000,

19  243,000 were written or 92 percent were written after Kaiser

20  had the Gorson and Backonja studies.  Will you be willing to

21  accept that arithmetic?

22  A.   Subject to check, I assume you've done your homework.

23  Q.   I had somebody other than me do it --

24             THE COURT:  You know what --

25             MR. KENNEDY:  Okay.

1          THE COURT:  The jury if they want can sit and

2    double-check it in the jury room.

3    Q.   So you'd have to agree with me that 92 percent of the

4    total pain prescriptions being written after Gorson and

5    Backonja were known to Kaiser doesn't sound to you like that

6    was a major factor, does it?

7    A.   There's no evidence that that changed the prescribing

8    patterns of Kaiser doctors.  However, that was known to

9    Kaiser's -- I'm sorry -- to Permanente doctors, given that

10   Kaiser had became aware of that.  And how aware they were, I

11   don't know.  I just have heard that those studies exist.

12   Q.   Now, changing topics, you're aware that Dr. Rosenthal made

13   certain errors in her report, correct?

14   A.   You need to be a little clearer.  I'm not sure what you

15   mean by "errors."

16   Q.   Well, for example, her model resulted in your finding that

17   for some indications and quarters, my clients caused Kaiser

18   doctors to write more fraudulent prescriptions than the total

19   number of prescriptions written, didn't it?

20   A.   Absolutely not.

21   Q.   Weren't there certain areas where the unlawful

22   prescriptions were 105 or 110 percent of the total

23   prescriptions?

24   A.   At the national level, it is true within an indication,

25   but I didn't use those percentages in that way.  So that the

1    percentages that I use are at most 45 or 50 percent of total

2    scripts, total Kaiser scripts, at any given time, so there's

3    never more than Kaiser was prescribing.

4    Q.   When you run Professor Rosenthal's model as you did, you

5    found that in some instances you were getting more fraudulent

6    prescriptions than the total number of prescriptions written,

7    and you had to make an adjustment for that?

8    A.   Professor Rosenthal discussed how that occurrence is an

9    artifact of the statistical analysis.  I used the percentages

10   that came out of -- I didn't just look at several quarters.

11   There were other quarters where it was below what it would have

12   been, and I've used percentages based on that.  Let us say

13   hypothetically for bipolar, that in some cases it might have

14   been 107 percent of the indication at the national level.  I

15   used percentages of bipolar that ended up being about 5 or 6 or

16   7, 10 percent for those quarters of total scripts written.  So

17   they never amounted to more than Kaiser's scripts.

18   Q.   A properly constructed model shouldn't be coming out with

19   a percentage of fraud that's higher than the total, should it,

20   Doctor?

21   A.   A properly constructed model, statistical model, when you

22   estimate a model, you're going to have a pattern that's jagged,

23   and you're going to put a line to that.  And when you're

24   estimating it, you're going to have some points that are above

25   it with your estimated model and some points below it.  And so

1    it's an artifact to pull a few quarters out when you're

2    predicting close to 100 percent in the cases you're talking

3    about, where if you look at a few quarters, it will be above

4    it.  There's going to be other quarters where it will be below

5    it, and the model is designed over the entire time frame that

6    is estimated for those errors to balance out.  But that's an

7    artifact of the model, and it essentially means that it's equal

8    to 100 percent.

9    Q.   When you construct models, do you frequently find that

10   you're getting percentages of fault that are in excess of the

11   total amount in question?

12   A.   One certainly finds that when one estimates models in

13   certain situations, yes, and you adjust for it.

14   Q.   Now, as you've acknowledged -- changing topics -- Kaiser

15   isn't exactly like the rest of the nation's health system, is

16   it?

17   A.   Well, every managed care organization differs, so it's not

18   like every other one, but Aetna isn't like Kaiser and isn't

19   like Guardian.  There's variation across all of the payors.

20   Q.   And as you told us in your deposition, you'd expect that

21   Kaiser's managed care model would likely result in different

22   drug utilization patterns by its insureds than what would be

23   shown by the national data, correct?

24   A.   I'm assuming you're quoting me directly, and I would

25   assume that there's --

1   Q.   I am.

2   A.   Yeah, and I would assume that there's going to be

3   differences across all payor groups, slight differences, yes.

4   Q.   So you still feel the same way that you did at the time of

5   your deposition, that you would expect that Kaiser's managed

6   care model would likely result in different drug utilization

7   patterns by its insureds than what is shown in the national

8   data, correct?

9   A.   I would expect so.

10   Q.   And among other things, Kaiser doesn't do business in all

11   48 states, do they?

12   A.   In all 50 states or all --

13   Q.   Okay, let's take all 50.

14   A.   Are you excluding Hawaii for some reason because they do

15   do work in Hawaii?

16   Q.   In terms of speeding this up, I'll represent to you there

17   has been agreement from the Kaiser people that the highlighted

18   areas are the portions of the country where they do business,

19   and don't do business in the balance of it, okay?

20   A.   That's right, and that's my understanding.

21   Q.   In addition, as you've heard, approximately 75 percent of

22   their insureds are concentrated just in California.

23   A.   That's my understanding.

24   Q.   And you'd agree with me, anything that's 75 percent in

25   California is going to be a little bit weird, right?

1   A.    It depends what your notion of weird is.

2   Q.    Okay.  Well, certainly having 75 percent of your insureds

3   in that state, which has what, approximately 10 percent of the

4   nation's population, is not demographically equating with the

5   national, is it?

6   A.    California is a distinct entity, and Kaiser operates in

7   California.  The preponderance of their patients are in that

8   state.

9   Q.    And you've got to think about that before you start

10  automatically applying national statistics to Kaiser, correct?

11  A.    You do, and I did.

12  Q.    And you are also aware that Kaiser places a far greater

13  emphasis on using generic drugs than the health system

14  generally?

15  A.    I understand that to be the case.

16  Q.    Well, there's been evidence in this case that Mr. Carrejo

17  testified that in 2003, nationally about 43 percent of drugs

18  were generic, whereas at Kaiser, 75 percent was generic.  I

19  want you to further assume that Mr. Carrejo testified before

20  Congress that in 2008, generic drugs nationally were

21  63 percent, and Kaiser's use of generics was 80 percent,

22  17 percent higher.  Against that assumption, you would expect

23  that Kaiser's use of a generic drug like Neurontin would be

24  somewhat different than the national average, wouldn't you?

25  A.    Well, based on what I have heard, Kaiser is more

1    aggressive at switching patients from branded to generic drugs.

2    Whether that is the generic of the branded drug itself, I

3    haven't seen the studies, but I know that they're more

4    aggressive in moving patients from, say, Neurontin to

5    gabapentin when it became generic.

6    Q.   And you're also aware that Kaiser is more aggressive in

7    encouraging its doctors to adhere to formularies and formulary

8    restrictions, correct?

9    A.   I know that there are formularies and formulary

10   restrictions from a variety of different payors, and Kaiser is

11   on a continuum of that.  I don't have information to say where

12   on that continuum, how far from the average they are on that

13   continuum.

14   Q.   And did you hear Dr. Rosenthal testify yesterday that

15   formulary constrictions in the national context don't change

16   much over time?  I'll represent to you that's what she said.

17   A.   I remember that's what she said.  I'm trying to assess the

18   extent to which I agree.  I agree with that.

19   Q.   And have you made any study of the extent to which

20   formulary guidelines, restrictions, et cetera, have changed

21   over time in each of the Kaiser regions?

22   A.   Well, I --

23           THE COURT:  Are you talking about for Neurontin?

24           MR. KENNEDY:  Yes.

25           THE COURT:  For Neurontin.

Page 58

1          THE WITNESS:  Right, no, I understand that, your

2     Honor, as being for Neurontin.  And I've listened to that

3     testimony.  I've found that Neurontin has not been eliminated

4     from the formularies generally.  I've understood that there's

5     been some guidelines, so I haven't seen a major change in

6     formulary status of Neurontin over time.

7     Q.   You certainly haven't seen any indication that Kaiser has

8     been limiting the use of either Neurontin or gabapentin over

9     time, have you?

10    A.   Well, there's been the -- there was the initiative, the

11    pain initiative --

12    Q.   We're talking formularies.

13    A.   Oh, formularies.  As I understand it and as

14    Professor Rosenthal said, with the AEDs, the antiepileptic

15    drugs, they are on all formularies.  And so that kind of

16    restriction has not occurred generally, and not certainly on

17    the Medicare formulary, as I understand it.

18    Q.   I want you to assume that when Ms. Millares, the

19    pharmacist, was here, she testified among other things that,

20    and I quote, "A lot of it has to do with the culture of how the

21    health environment is in Ohio versus Hawaii and whether they

22    prefer using restrictions as a way to let physicians know, you

23    know, how they want that drug used versus a guideline versus an

24    education program.  So there is nuances that are different and

25    some differences in the formulary status, but it's very, very

1    similar."

2              MR. SOBOL:  Objection.

3              THE COURT:  Sustained.  You know, I think we need to

4    move on to what his opinion was here.

5              MR. KENNEDY:  Yes, your Honor.

6    Q.   Now, you mentioned in one of your previous answers that

7    you were aware that this initiative had been undertaken,

8    correct?

9    A.   That's correct.

10   Q.   And you were told that the initiative resulted in, at

11   least in some regions, in what, a 34 or a 35 percent decline in

12   at least new starts on Neurontin?

13   A.   That's my understanding, yes.

14   Q.   Okay.  And it's also your understanding that that was not

15   necessarily the same in all the other regions, correct?

16   A.   That's my understanding.

17   Q.   And what, if anything, did you do to determine how those

18   declines, at least in new starts on Neurontin, were shaking out

19   in terms of individual indications?

20   A.   My assumption was, and as I listened to the testimony last

21   week, that the reduction in Neurontin was overall, and that

22   there was an attempt to aggressively limit Neurontin, given its

23   expense and the growth of scripts.  And also it covered -- it

24   was aimed at all indications, so I just, I essentially just

25   applied -- I assumed that it occurred equally proportionately

Page 60

1    to lawful and unlawful prescribing patterns, and just applied

2    the national percentages to the total that was there that had

3    decreased.

4    Q.   You assumed?

5    A.   I assumed.

6    Q.   Did you ask Kaiser if they had any data breaking down by

7    indication what effect the initiative had had on prescribing?

8    A.   I didn't ask them, and what I've seen in the testimony,

9    they didn't know.

10   Q.   Let me show you Exhibit 747 in evidence and ask you if

11   you've seen this before.  This is a report from a meeting of

12   the DUAT group that was responsible for the initiative in

13   Southern California.  Is this something Kaiser's lawyers have

14   shown you?

15   A.   It's something that I saw yesterday, and I saw a number of

16   these in my review of documents.  Whether I saw this one, I

17   can't remember.

18   Q.   Let's flip to Page 13 in particular, and you have seen

19   that chart before, haven't you?

20   A.   I've seen this put up on the screen over the last few

21   days.

22   Q.   You hadn't been shown it before the last few days?

23   A.   I don't recall.

24   Q.   This wasn't something that Kaiser or Kaiser's lawyers gave

25   you early on in connection with your report, did they?

1  A.   This would -- as I say, this -- and could you -- can I see

2  the date on this?  Do I have this in front of me, or is this

3  something that --

4  Q.   The date of the meeting is April, 2004.  However, if we

5  can go back to Page 13, I'll represent to you that Mr. Carrejo

6  testified in this case that he and his staff prepared this

7  chart, and I'll further represent that Mr. Carrejo filed a

8  declaration under penalty of perjury in this case in January of

9  this year where he described how that was done.  And I want you

10  to assume that here is what he said --

11         MR. KENNEDY:  I feel an objection coming on, your

12  Honor.

13         MR. SOBOL:  Objection.

14         THE COURT:  Well, sustained.  Why don't you just ask

15  him about -- have you seen this chart before?

16         THE WITNESS:  I've seen it in the last couple of days,

17  and I may have seen it before, period.

18         THE COURT:  What's the question?

19  Q.   I want you to assume that Mr. Carrejo has testified that

20  he was responsible for preparation of this chart, and the way

21  he did it was, they collected data in late 2001 covering

22  approximately six months of the preceding period, and that this

23  represents a subset of Kaiser patients in Northern California

24  who were prescribed Neurontin, who had never taken Neurontin

25  before for any indication.  Their diagnosis was picked up

Page 62

1    during an incomplete data collection based on ICD-9 codes, and

2    the patient filled a prescription for Neurontin within 24 hours

3    of the prescription being written.  I want you to assume that

4    that was the methodology that Mr. Carrejo says went into the

5    preparation of this chart.

6             THE COURT:  Is that wrong?

7             MR. SOBOL:  For completeness, there would need to be

8    another assumption.

9             THE COURT:  Which is what?

10             MR. SOBOL:  That Mr. Carrejo also testified that the

11    data was garbage and he wouldn't --

12             THE COURT:  No, no, no, I strike that, no.  The

13    methodology, was the methodology what he did?

14             MR. SOBOL:  I think that generally that's correct,

15    although I think it was scripts, not charts.

16             THE COURT:  Was it new scripts?  It was new scripts,

17    right?

18             MR. SOBOL:  New scripts, not charts..

19             THE COURT:  New scripts.  All right, the new scripts

20    for that region for bipolar.  All right, so what's --

21             MR. KENNEDY:  Well, for all indications, your Honor.

22             THE COURT:  For all, fair enough.

23    Q.   So I want you to further assume that what this involved

24    was taking 20,429 patient charts and getting --

25             MR. SOBOL:  It's scripts, your Honor.  It's not

Page 63

1    charts.

2                MR. KENNEDY:  I apologize.

3                MR. SOBOL:  Just going back to the document, the

4    document says "TRx scripts," not charts.

5                THE COURT:  Well, whether it's scripts or charts,

6    what's the question?

7                MR. KENNEDY:  The point is, your Honor, going to the

8    preceding page of this exhibit, it's labeled "Chart Review."

9                THE COURT:  No, but he said some inconsistent thing

10   with that, I agree.  But regardless of what it is, would that

11   be a better number?

12               THE WITNESS:  No.

13               THE COURT:  If the jury thought it was a better

14   number, would you simply just reduce the percentages that you

15   allocated?

16               THE WITNESS:  If the jury -- I would hopefully tell

17   the jury that this is based on a very small period of time.

18   It's a six-month review.  It's new scripts, and it doesn't give

19   us any idea over time of what is happening, and it doesn't get

20   at the lock-in that would be if the -- if the treatment of

21   bipolar were for 4 percent of new scripts, and this has no

22   benefit for the treatment of bipolar and it was refilled, that

23   would add to more total scripts.  So this doesn't really tell

24   you much at all, but if the jury were to accept it --

25               THE COURT:  All right, let's keep going.  We're going

f9da30cc-73a1-48af-96a5-6f935b6b99f0

Page 64

1    to try and finish this.

2    Q.   And that opinion was formed on the basis of having first

3    seen this document a day or two ago, correct?

4    A.   I heard Dr. Carrejo's testimony; I saw the document over

5    the last few days.  That's as far as I know.

6    Q.   Okay.  And your opinion isn't based on your actually

7    having gone and looked at any of the raw data that went into

8    preparing this exhibit?

9    A.   That's correct.

10   Q.   And you don't think --

11        THE COURT:  All right.

12   Q.   And you don't think that you need to see that data in

13   order to offer the definitive opinion you're giving here?

14   A.   No.

15   Q.   I'd like to show you next Exhibit 760 and ask if you've

16   seen that before?  And this is a document that Kaiser prepared

17   using something over 9,000 scripts.  It says here it was

18   prepared in July of 2004 using year-to-date figures.  Have you

19   seen that before?

20   A.   In the same context as I've seen the earlier one.

21   Q.   And you've done the same amount of analysis of it as

22   you've done with the previous one?

23   A.   That's correct.

24   Q.   And you don't think that's any good either, correct?

25   A.   That's correct.  I think it's less good than what we have

1    done.

2    Q.   Now, in Footnote 16 of your August 11 report, you discuss

3    this alternative damage theory with the idea that if Neurontin

4    hadn't been prescribed, at least some patients would have been

5    prescribed something else.  You're familiar with that concept,

6    correct?

7    A.   I am, yes.

8    Q.   And then Ms. Millares gave you her idea of what the

9    alternative drugs were that those patients would have gotten if

10   they hadn't been prescribed Neurontin, correct?

11   A.   Correct.

12   Q.   At any point did you say, "We're going to be talking about

13   alternative drugs prescribed to a patient.  I think I really

14   ought to hear that from a doctor rather than a pharmacist"?

15   A.   I was assuming that what Ms. Millares told me reflected

16   what the pharmacy and the physician feelings were related to

17   Permanente and Kaiser.

18   Q.   Well, you're aware, of course, Dr. Millares, whatever

19   other talents she may have, is not authorized to prescribe

20   medicine, she's not a medical doctor?

21   A.   I don't know whether she's a medical doctor or a

22   pharmacist, but I'll accept your -- you're more knowledgeable

23   about that.

24   Q.   Well, I'll represent to you she's a pharmacist, she's not

25   a medical doctor.  When she gave you this list of the

1   alternative drugs that would have been prescribed if Neurontin

2   hadn't been prescribed, did you say anything to the effect of,

3   "You know, just as a reality check, could I go talk to a couple

4   Kaiser doctors and just confirm with them that this is what

5   they would have done?"  Did you ask to do anything like that?

6   A.   Well, I assume that that, to the extent that was

7   necessary --

8           MR. GREENE:  Objection.

9           THE COURT:  Sustained.

10  Q.   Now, you and Dr. Rosenthal also came up with a list of

11  alternative drugs, didn't you?

12  A.   You're talking about the promotional model, the national

13  model?

14  Q.   Yes.

15  A.   That's correct.

16  Q.   And could we see -- excuse me one second, your Honor.  And

17  what we've prepared here is a comparison of the recommended

18  alternative drugs that the pharmacist, Ms. Millares, told you

19  she thought doctors would have prescribed if they hadn't been

20  prescribing Neurontin, and then in the second column we've put

21  in the drugs that you and Dr. Rosenthal -- do you see the first

22  column is Hartman, the second column is what Rosenthal said,

23  and then we've got what Ms. Millares said, correct?

24  A.   That's correct.

25  Q.   And you'll see the three of you did not end up agreeing on

1    what the alternative drugs would have been in each case, did

2    you?

3              MR. SOBOL:  Objection.  It's not what it is.

4              THE COURT:  Sustained.

5    Q.   In the opinions that you've expressed here, have you

6    included any factor to account for any differences in what the

7    alternative drugs would have been?

8    A.   Are we talking about the modeling --

9    Q.   Let me withdraw the question and --

10             MR. SOBOL:  -- I'd ask that it be taken down.

11             THE COURT:  Excuse me?

12             MR. SOBOL:  I don't think the document that's on the

13   screen is in evidence.  I don't know, but I don't think that it

14   is.

15             MR. KENNEDY:  It's a demonstrative, your Honor.

16             MR. SOBOL:  Well, or the contents of it.

17             THE COURT:  Well, take it down if he doesn't know, if

18   he can't verify.

19   Q.   In the interest of time, at any point have you talked to a

20   Kaiser doctor and asked him or her whether he or she would have

21   prescribed one of those alternative drugs if Neurontin hadn't

22   been available?

23   A.   I have not done that, no.

24   Q.   As far as you know, has Dr. Rosenthal done that?

25   A.   I don't know.

Page 68

1    Q.   Or anybody else done it?

2    A.   I assume other witnesses from Kaiser have.

3    Q.   So your testimony here that if Neurontin had not been

4    used, other drugs costing what, 9 or 10 percent of the total

5    cost of Neurontin would have been used, what's that based on?

6    A.   Based on Dr. Millares and what she summarized in her memo

7    to me, or in her declaration.

8    Q.   Let's talk about dosing for a minute, and could we see

9    408-F again, please.  And, Doctor, can you point us to the

10   column on 408 -- feel free to use your finger with that fancy

11   thing we've got here if you want to indicate where dosing is.

12   A.   Well, the TRx for dosing is in Column 6, which is this

13   one.

14   Q.   Could you highlight that one, Austin, and why don't you

15   highlight all the way down.

16   A.   Me or the --

17   Q.   No.  We do that for you, Doctor.

18   A.   Okay, thank you.

19   Q.   And that shows something like 26,000 dosing scripts, to

20   use your term, that you believe were fraudulent or created by

21   off-label promotion, correct?

22   A.   That's correct.

23   Q.   And you went about determining that those were fraudulent

24   because they were for more than 1,800 milligrams, correct?

25   A.   Which -- yes, that's correct.

1  Q.   And you were told to assume that anything above

2  1,800 milligrams was what, improper?

3  A.   I was told that the FDA had said that it was improper.

4  Q.   The FDA said it was improper to prescribe --

5  A.   It wasn't indicated for dosing above that.

6  Q.   Okay.  And, of course, as with all off-label uses of a

7  drug, it's ultimately the physician that gets to decide whether

8  to prescribe it for something other than the FDA approval,

9  correct?

10  A.   That's right.

11  Q.   And for these 26,000 scripts, can you say that there are

12  any one of those where the doctor on his or her own didn't

13  start at some lower level and then gradually titrate and

14  increase up, checking to see if the patient would receive

15  benefit?

16  A.   As I'd mentioned before, the model looks at aggregate

17  behavior of prescribing, and it doesn't look at an individual

18  doctor and is not aimed to.  And it's not proper practice for

19  what we're doing at the aggregate level, to talk about

20  aggregate patterns, to be talking to every doctor about what

21  they did.  You don't do statistics or econometrics that way.

22  Q.   So would it be improper practice to just go do a sample of

23  doctors to try to make sure that what they say seems to track

24  with what you found?

25  A.   One could always estimate a model and then go out and walk

1    and sample many people, but that's not common practice.  It's

2    not standard practice.  It's just not done.  You allow the

3    statistics and the patterns that are revealed by what the

4    doctors do to let -- you look at the data and how those

5    patterns are related to the promotion, and then that tells you

6    what happens in the aggregate.

7    Q.   Well, as you were doing the dosing analysis, did it strike

8    you at all curious that a doctor treating a patient for, you

9    know, pain or whatever would decide to put more than

10   1,800 milligrams of a substance in their body because of what

11   they'd been told by a drug salesman?

12   A.   I understand the drug salesmen are -- I mean, that's why

13   detailing takes place.  So to the extent that there is any

14   subtlety of that, that's not part of what's in the model as it

15   exists.

16   Q.   No, just as a human being and a patient, and I don't mean

17   to be sarcastic here, but didn't it strike you as rather

18   implausible that a patient would come in to a doctor and say,

19   "I hurt," and the doctor said, "How much should I give him?

20   The salesman said 3,600 was a good idea," and they go ahead and

21   do it on that basis?  Didn't that strike you as highly

22   improbable?

23   A.   Well, I think the -- I'm not a doctor.  I don't make

24   therapeutic or clinical decisions, but I think, if I'm a

25   doctor, I look at what the FDA indications are.  And if

1    certainly some drug is not indicated at all by the FDA, and

2    somebody tells me he had good luck with it, another colleague,

3    and I look at the FDA indications and it says, no, it's not

4    indicated, I would have second thoughts about doing that.  And

5    the same thing would apply to dosing.

6    Q.   And in the interest of time, let's get off of dosing.

7    Going to bipolar, according to Dr. Rosenthal's analysis, was it

8    99.4 percent of the scripts written for bipolar were

9    fraudulent?

10   A.   That sounds about right.

11   Q.   And allowing for sampling error or whatever, that's a

12   100 percent, correct?

13   A.   That's correct.

14   Q.   And, again, at any point during the years you've been

15   working on this case, did you have any thoughts along the lines

16   as, "You know, I'd like to go talk to a couple Kaiser

17   psychiatrists and just make sure that it really is 100 percent

18   of them are doing it"?  Did that thought ever cross your mind?

19   A.   What crossed my mind was reading -- I didn't think about

20   talking to Kaiser doctors.  When this modeling was initially

21   done, it was done more broadly for all payors; but I did review

22   the popular press and newspapers and some of the clinical press

23   talking about people that became suicidal when they were given

24   Neurontin and it was ineffective.  So I'm aware of some of

25   that, but I never went and spoke with a doctor about -- about

1    what -- I didn't interview doctors myself.

2    Q.   Particularly now that you know that the percentages you

3    were using for bipolar also include depression and other

4    conditions, isn't there some part of you that says "Could it

5    really be 100 percent or 99.4 percent?"

6    A.   I believe what the model -- I feel this model is properly

7    constructed, and given those other indications that are

8    included besides the bipolar in the model, I believe the model

9    results.

10   Q.   I want you to assume hypothetically that two Kaiser

11   psychiatrists have been deposed in this case, Dr. Day and

12   Dr. Chandler.  And I want you to further assume that under

13   penalty of perjury --

14          MR. SOBOL:  Objection.

15          THE COURT:  Sustained.

16   Q.   Have you read any of the depositions of any of the Kaiser

17   doctors who have been deposed in this case?

18          THE COURT:  Can I see you at side bar for a minute.

19   SIDE-BAR CONFERENCE:

20          THE COURT:  I understand that you don't agree with the

21   basic assumptions he's worked under, but he's not the guy to

22   assail the medical assumptions.  He says he just accepted them.

23   And I continue to have you reading in other people's

24   depositions on the basic assumption.  He's an economist.

25   Attack his economic assumptions, but he's not here on the

Page 73

1    medical.  I mean, I'd like to finish this by 11:00, which is

2    what you talked about, and --

3            MR. KENNEDY:  We will.

4            THE COURT:  And just it's using -- I understand you're

5    using him to make an argument on something he's not an expert

6    on.

7            MR. KENNEDY:  No.  I'm using it to attack the basic

8    lack of common sense of what he's done.

9            THE COURT:  Well, to the extent it's the medical

10   assumptions, I don't want to go there.  It's just wasting time.

11   He isn't here as a doctor.  I've allowed some latitude on the

12   basic, which I actually think has merit, the extrapolation

13   piece from the general population.  It goes to the weight, not

14   the admissibility, but not on whether or not depression or

15   bipolar or the titration up.  I mean, that's not for him.

16   That's your doctors and their doctors but not him.

17           MS. ARMSTRONG:  The chart, the demonstrative that we

18   weren't allowed to use, that goes to his assumptions and that

19   goes to his economic assumptions as to what would have been

20   prescribed because what he and Dr. Rosenthal said would have

21   been prescribed --

22           THE COURT:  I couldn't even tell what was in the chart

23   because no one laid a foundation.

24           MS. ARMSTRONG:  I know, and that's what I'm trying to

25   explain.  On one it shows what Millares said were the

Page 74

1    alternative drugs, and then it shows what Dr. Hartman and

2    Dr. Rosenthal said would have been prescribed if -- Neurontin

3    for purposes of their economic model, and it includes branded

4    drugs, which are much more expensive.

5            THE COURT:  Do it through your expert.  He doesn't

6    have the foundation for it.

7            MS. ARMSTRONG:  But it's his information.

8            (End of side-bar conference.)

9    BY MR. KENNEDY:

10   Q.   Again, you were here yesterday during Professor Rosenthal's

11   testimony, so in the interest of time, you heard her testify

12   about the numerous things that Kaiser's lawyers had told her to

13   assume in embarking on her analysis, correct?

14   A.   You'd need to be more specific.  There was --

15   Q.   As we've already discussed, you started with the

16   assumption that Neurontin for these off-label purposes is not

17   effective in any way, correct?

18   A.   Uhm, we've -- we've discussed that, and I think my answer

19   is the same as it was before.

20   Q.   Okay.  And further told to assume the correctness of all

21   of the allegations in the complaint, correct?

22   A.   Correct.

23   Q.   Okay.  And that included assuming that nobody benefited

24   from taking Neurontin, correct?

25   A.   If that is the way it's worded in the complaint, that's

1   correct.

2   Q.   And again in the interest of time, if the jury were to

3   conclude that any of the assumptions upon which you and

4   Professor Rosenthal based your analysis were incorrect, that

5   would tend to undercut the opinions that you've reached in this

6   case, correct?

7   A.   Well, it would depend on the assumption.

8   Q.   Okay.  Starting with if the jury were to find that

9   Neurontin is effective for some measurable number of patients,

10  that would undercut all of your analysis, wouldn't it?

11          MR. SOBOL:  Objection.

12          THE COURT:  Overruled.

13  A.   The model is based on the set of assumptions.  If there is

14  some proof of liability that certain types of promotion was not

15  challenged, was not unlawful, that would diminish the total

16  number of scripts that had been predicted as being unlawful.

17          THE COURT:  So on some indications, if there was a

18  finding that there was some effectiveness, that would move you

19  to the alternative model of damages, is that it?

20          THE WITNESS:  It certainly would -- it would move me

21  more in that direction, yes.

22          THE COURT:  That's obviously a decision you're going

23  to make indication by indication.

24  Q.   And as far as what percentage of prescriptions, if any,

25  were fraudulent, your opinion again is based on all the

1   assumptions that went into your analysis, correct?

2   A.   That's correct.

3   Q.   And, again, if the jury were to find that certain of those

4   assumptions were invalid, that would affect both of your damage

5   models, correct?

6   A.   There would be implications, and the jury would weigh

7   those implications.

8        MR. KENNEDY:   Thank you very much.   I have no further

9   questions.

10       THE COURT:   All right.

11  REDIRECT EXAMINATION BY MR. SOBOL:

12  Q.   Dr. Hartman, you've been asked a series of questions about

13  the applicability of some of the national data to Kaiser,

14  correct?

15  A.   Correct.

16  Q.   Although you have used the Kaiser-specific purchase

17  information for both the quantity and your price, correct?

18  A.   That's correct.

19  Q.   I'd like to make a couple of observations, first, about

20  Kaiser.   If you look at that board, did you make any

21  observations, Dr. Hartman, when applying national models to

22  Kaiser about the locations of Kaiser across the country?

23  A.   Uhm, I made no -- I took the averages that we saw

24  nationally and I applied them to Kaiser, so I didn't -- the

25  national numbers reflect weighted averages where there's

1    population.  There's population in California, and the

2    California population that's insured by Kaiser looks a lot like

3    populations that are insured by other insurers, so it looks

4    like a good representation across the board.

5    Q.   Let me stop you there.  What's your understanding of

6    approximately how many insureds, patients, Kaiser has in its

7    group?

8    A.   I think the last number that I saw was 8.2 million or so,

9    and that could be an old number.  It could be higher than that

10   now.

11   Q.   And what, if any, observations did you make about a

12   population of 8 million people, primarily in California but

13   also in other locations in the country, being in terms of

14   having national numbers be applicable to it in terms of

15   promotion and use of Neurontin by indication?

16   A.   Well, Kaiser, as I think Dr. Bell in his declaration

17   points out, is one of the ten largest in terms of insured

18   lives, so it is a big player.  It's reflective of national

19   patterns.  The doctors that work there are reflective of

20   patterns of doctors nationally.  The doctors and the physicians

21   come from the same medical schools.  They're subject to the

22   same promotion.  We've seen peer selling by some of the

23   Permanente doctors like Dr. McCarberg that was cited by

24   Dr. Hyatt last week.  So I see that their doctors are

25   representative.  When you have that many insured lives, they

1   look like a large insurer and would have patterns of patients

2   and disease and prescribing and promotion that would be

3   reflective nationally.

4   Q.   Also, in terms of Kaiser, I think you were asked some

5   questions about generics.  In this case, does your damage model

6   essentially end prior to the time of generic launch for

7   Neurontin?

8   A.   It does, it ends at the time that the generic launch is,

9   more or less.

10  Q.   So what impact, if any, then did the entry of a generic

11  Neurontin called gabapentin have in connection with your model?

12  A.   Absolutely none.

13  Q.   So what, if any, impact did it have in your estimation of

14  damages the fact that Kaiser, as opposed to perhaps some other

15  institutions, might be somewhat more aggressive than others in

16  terms of trying to facilitate movement to an AB-rated generic

17  once it launches?

18  A.   It would have no impact.  Kaiser apparently is more

19  aggressive at moving people to generics, but the generic was

20  not available till the end after the damage period or the end

21  of the damage period, so it wouldn't have had an effect.

22  Q.   So it clearly doesn't apply?

23  A.   That's right.

24  Q.   Okay.  Now, you were also asked some questions about a

25  couple of infamous charts prepared by Mr. Carrejo and some

1   percentages of bipolar.  Do you recall those?

2             MR. KENNEDY:  Object to "infamous," your Honor.

3             THE COURT:  Sustained.

4             MR. SOBOL:  Well, that's absolutely correct.  I get a

5   little carried away.

6   Q.   There's a couple of charts that Mr. Carrejo prepared,

7   correct?

8   A.   I've seen those, yes.

9   Q.   Okay.  Now, with Kaiser having approximately more than

10  8 million people in its population, okay, would you have any

11  reason in healthcare economics to expect that the population of

12  people in Kaiser suffer about one-eighth the amount of bipolar,

13  and therefore require about one-eighth the amount of Neurontin

14  as the rest of the general population?

15            MR. KENNEDY:  Objection, assuming facts not in

16  evidence.

17            THE COURT:  Sustained.  Well, let me just ask you

18  this:  Does the bipolar in that chart reflect the same

19  percentage as the bipolar that Professor Rosenthal included?

20  Do you know one way or another?  All those ICD -- what is it?

21            THE WITNESS:  ICD-9 codes, International

22  Classification of Disease.

23            THE COURT:  The ICD-9 codes, do you know whether

24  they're measuring apples and apples?

25            THE WITNESS:  Are we talking about the Carrejo chart

1    versus the chart that Professor Rosenthal put forward?

2            THE COURT:  Yes.

3            THE WITNESS:  It's my understanding that the Carrejo

4    chart has a more limited number of ICD-9s than has been

5    included in the efforts of Professor Rosenthal.

6            MR. KENNEDY:  Your Honor, can we find out what's being

7    published to the jury?

8    Q.   Have you been provided testimony by Dr. Carrejo in

9    connection with this?

10   A.   I have.

11   Q.   And I want to draw to your attention Page 59 of Day 3

12   beginning at Line 24.

13           MR. KENNEDY:  Objection.  I think he can quote from

14   it, but I don't think he can show it.

15           THE COURT:  Yes, he can show it, but as long as it's

16   admissible, I mean, as long as it's --

17           MR. SOBOL:  Well, he's already testified.  This is

18   testimony from this case, your Honor.

19           THE COURT:  I think this is the infamous "garbage"

20   quote.

21           THE WITNESS:  I think that's probably right.

22   Q.   This is a different one that I'm trying to -- we're having

23   a hard time putting it on the screen.  While Corinne is looking

24   for that, I'm going to quote it, okay?  At Page 59, Line 24,

25   Dr. Carrejo testified, "It's not a real good estimate.  I don't

Page 81

1   know what the true number is for bipolar, but this isn't a very

2   good estimate.  It doesn't include all ICD-9s for bipolar."

3       Would you rely upon that, Dr. Hartman, when making a

4   judgment that you would not compare what Dr. Carrejo has by way

5   of bipolar because it's only one ICD-9 as to a national average

6   for bipolar?

7           MR. KENNEDY:  Leading.

8           THE COURT:  Overruled.

9   A.   I certainly would, and as Professor Rosenthal testified

10  yesterday, there is five or six ICD-9 codes for bipolar

11  specifically in the calculations in her model.

12          THE COURT:  How are you doing timewise?  I'd love to

13  finish him before the break.

14          MR. SOBOL:  Oh, yeah, we'll finish him before the

15  break.

16          THE COURT:  Well, don't forget, there's got to be

17  recross, so --

18  Q.   You were asked some questions, Dr. Hartman, about the

19  Gorson study and about the Backonja study and an apparent

20  increase of pain scripts --

21          MR. KENNEDY:  Your Honor, again, object to what's

22  being shown here.  I don't believe it's in evidence.

23          MR. SOBOL:  Well, this was used in the examination of

24  Dr. Abramson.  It's already been shown to the jury during

25  Dr. Abramson's testimony.

Page 82

1          THE COURT:  If it was shown during Abramson --

2          MR. KENNEDY:  Your Honor, it also deals with medical

3    questions.

4          THE COURT:  Well, fair enough.

5          MR. SOBOL:  But he was asked questions about the

6    weight --

7          THE COURT:  And I cut him off.  He's not a medical

8    expert.  That's what I did at side bar.  I said, move on, he's

9    not a medical expert.  I keep saying what's sauce for the goose

10   is sauce for the gander.  I agree with that.

11   Q.   Well, okay.  You were asked questions about whether --

12         MS. ARMSTRONG:  Your Honor, it's still on the screen.

13         MS. REED:  I've taken it off.  Sorry.

14   Q.   You were asked questions about an apparent increase in the

15   utilization of Neurontin for pain at a certain point in time

16   after 1999, correct?

17   A.   I interpreted the question that there was not a decrease

18   in the scripts written for Neurontin after that.

19   Q.   And whether or not that was consistent or not with your

20   model if it turns out that there was medical evidence that

21   Kaiser knew about, correct?  Do you recall that generally?

22   A.   Uhm, no.

23         MR. SOBOL:  I have nothing further then, your Honor.

24         THE COURT:  Anything?

25         MR. KENNEDY:  Three.

1        THE COURT:  Stay right there, okay.  Oh, and you have

2   a question.

3        A JUROR:  At the risk of getting beaten up by my jury

4   mates --

5        (Laughter.)

6        THE COURT:  Yes, let him ask the question, and then

7   we'll --

8        A JUROR:  There were two exhibits right at the

9   beginning of your testimony, I think it's 405-A which showed

10  the national trend by Dr. Rosenthal, and there was one right

11  after it that was, I think, Exhibit 268-B that had

12  gabapentin -- I mean Neurontin sales by Kaiser.

13       THE WITNESS:  That's correct.

14       A JUROR:  My question is, now, the national trend is

15  supposed to be symbolic, I mean, tracks Kaiser, vice versa.

16  Now, it might be a failing of the chart or the fact that I

17  couldn't see this thing too well, but in the national chart,

18  the thing falls off a cliff when gabapentin is introduced as

19  generic.  In the chart for Neurontin by Kaiser, it sort of

20  trends very slowly.  Is that an indication that, you know,

21  there was something that it doesn't track well or -- I don't

22  know.  That's what I'm asking.

23       THE WITNESS:  It's a good question.  I need to see the

24  chart again.

25       THE COURT:  Is it possible to flip up those two charts

f9da30cc-73a1-48af-96a5-6f935b6b99f0

Page 84

1    again so that --

2              MR. SOBOL:  That's what I'm doing, your Honor.

3              THE COURT:  Are those in evidence?  I forget.

4              A JUROR:  Yes, both of those.

5              THE COURT:  They were both shown on the screen.  Were

6    they marked?

7              MR. SOBOL:  Oh, yes.  These are both in evidence.

8              THE COURT:  Okay, so you'll have them.  So we have

9    them right after another.  There's the cliff.

10             THE WITNESS:  There's the cliff in early 2005.

11             THE COURT:  In early 2005 for Neurontin nationally,

12   and then for Kaiser --

13             A JUROR:  It sort of drifts more.  It's not a cliff

14   drop.

15             THE WITNESS:  Well, you see this one doesn't go as

16   far, it stops, yes.

17             A JUROR:  That was my question.  I didn't -- okay.

18             THE COURT:  Would this drop off a cliff in Kaiser as

19   well?

20             THE WITNESS:  Yes.

21             THE COURT:  Now, the damage request goes through what

22   year?

23             MR. SOBOL:  2004, the fourth quarter.

24             THE COURT:  Right, that's why this is ended here.

25             MR. SOBOL:  Right.

1        A JUROR:  The previous, if we could see that.

2        THE COURT:  That previous slide, do you want to flip

3   it back on again.

4        THE WITNESS:  The cliff occurs in 2005, early 2005.

5        THE COURT:  The cliff is in 2005.  So it's after the

6   period, I think, where they're looking for damages, probably

7   partly because of that anyway.

8        THE WITNESS:  But it's a good question because at

9   Kaiser there's an aggressive move toward generics, so the

10  Kaiser numbers I would expect would also fall off the cliff

11  because they're aggressive at doing that.

12       THE COURT:  Okay, thank you very much for asking.

13  Don't forget -- oh, another one, okay.  So both of you are in

14  mortal jeopardy back there.

15       (Laughter.)

16       A JUROR:  You quote the national statistics for use of

17  Neurontin.  In the analysis that leads up to those statistics,

18  do they drill down by state?

19       THE WITNESS:  They don't.  The data that we are

20  combining when we're dealing with the promotional data, say,

21  for Pfizer's detailing, all of that is at a national level.  So

22  we have an inability to -- in combining it all, you have to do

23  it at a national level.

24       A JUROR:  So there's no way to see if there's any kind

25  of a variation from a national use versus California use?

1          THE WITNESS:  There's no way of doing that.  I mean,

2     there's going to be -- you know, it's a continuum, but you're

3     looking at a central tendency that is fairly well defined.

4          A JUROR:  I'll follow up.  Has there been a history of

5     a geographic bias in any other studies when you've look at the

6     prescription-writing habits of physicians?

7          THE WITNESS:  I've never been asked to look at that

8     for me to be able to say.  I mean, I would assume that there's

9     going to be some variation, but, again, where there's large

10    prescribing areas, large urban areas, where there's a potential

11    for large sales, that's where the detailers will go.  And for

12    the rural areas, they'll send fewer.  And there probably is

13    going to be some differences there, but those amount to a small

14    amount of the total sales that you see.  So the large urban

15    areas, large states with the urban areas, the large population

16    and the number of doctors serving them is where you're going to

17    see Pfizer going.  Otherwise it's not cost effective for them

18    to promote there.

19         THE COURT:  Okay, Mr. Kennedy.

20    RECROSS-EXAMINATION BY MR. KENNEDY:

21    Q.   Very briefly, there was no generic Neurontin, gabapentin,

22    until 2005, right?

23    A.   That's correct.

24    Q.   However, before 2005, when Neurontin was a branded drug,

25    there were lots of generic drugs that were a potential

1  substitute for it, correct?

2  A.   The general substitution, the first substitution in

3  prescribing is AB rated, the same drug, but there are other

4  generic drugs that can be alternative therapies if they are so

5  decided.

6  Q.   So before 2005 you would expect Kaiser to have been more

7  aggressive in trying to prescribe generic substitutes for

8  Neurontin than with the nation generally, correct?

9  A.   Well, I don't see that in the data until 2003.

10       MR. KENNEDY:  Thank you.  I have nothing further.

11       THE COURT:  Okay, a good time for our break.  See you

12  at 11:30.

13       THE CLERK:  All rise for the jury.

14       (Jury excused.)

15       THE COURT:  Thank you.

16       THE WITNESS:  Thank you for accommodating my mother's

17  birthday.

18       THE COURT:  Happy birthday from everyone.

19       THE WITNESS:  Thank you.

20       THE COURT:  Would that we all end up that age, right?

21       Okay, just on scheduling at side bar for a second.

22       (Witness excused.)

23  SIDE-BAR CONFERENCE:

24       THE COURT:  So I've got to believe that that is

25  Dr. Daniel who walked in with Ms. Nussbaum?

1          MR. BARRETT:  I assume.  I've not ever laid eyes on

2     him to know it.

3          THE COURT:  Ms. Nussbaum, come on up.  So is this

4     Dr. Daniel?

5          DR. DANIEL:  Yes.

6          THE COURT:  Welcome.

7          DR. DANIEL:  Thank you.

8          THE COURT:  All right, I just want to make sure.  Here

9     you are.  And I've got to assume that's going to run the rest

10    of the day, right?

11         MR. KENNEDY:  At least.  You said yesterday --

12         THE COURT:  How long do you think you're going to be?

13         MS. NUSSBAUM:  Less than a half hour.

14         THE COURT:  Okay, so you're going to see what you can

15    do here.

16         MR. KENNEDY:  We'll try.  I can't make any promises.

17         THE COURT:  I understand, but --

18         MR. KENNEDY:  He doesn't have to be in surgery until

19    Friday, as I understand.

20         MS. NUSSBAUM:  No, actually, he's on call tomorrow

21    night.

22         THE COURT:  Excuse me?

23         MR. CHEFFO:  Nothing, your Honor.

24         THE COURT:  Anyway, all right.

25         MR. KENNEDY:  He's talking about renewing the 1404 --

1            MR. CHEFFO:  No.  We've gone through this a million

2      times, you know, with scheduling.

3            THE COURT:  All right.  It doesn't matter.  They're

4      eating the inconvenience.

5            So let me just say this:  So we're going to finish

6      this today, and I have to leave immediately at lunch, I'm

7      meeting somebody, so I won't have time to sit and talk.

8      Tomorrow are we all set for what we're doing?

9            MR. GREENE:  We had Dr. Furberg tomorrow to follow

10     this witness.  I should be about a half hour with him.

11           THE COURT:  And the rest are the depositions?

12           MR. GREENE:  Then we're going to start on depositions.

13           THE COURT:  And I'm current on the depositions, and

14     what I need you to talk about is the protocol for my court

15     reporter.  In general, I don't have my court reporter take down

16     the deposition because you can freeze the transcripts.  So if

17     you have a transcript, we can just keep marking them.

18           The third thing I wanted to mention is, you keep

19     mentioning, all of you recently, "On such and such a day" and

20     you'll read the transcript.  Think about this, about handing

21     them copies of the transcripts of all the court's proceedings.

22     We have this on 24-hour, I think.  It's not that hard to delete

23     out the side bars, and I'd like to give the court reporters a

24     heads-up on it for everything, it's very complex, and have them

25     look it up if they want to.

1          MR. BARRETT:  That's a great idea.

2          MR. CHEFFO:  To give them from the beginning?

3          THE COURT:  I was thinking only the testimony.  If

4    everyone wanted to agree, we could put in the openings and

5    closings.  I mean, in general, that's more argument than it is

6    evidence, but think about it.  I'm not asking for a definitive

7    ruling or request today, but it's such a long trial and it's so

8    important and some of it is so technical, and they won't

9    remember who Pande is or Reckless or what year it was or some

10   detail.  Just a thought, I think would be a good one, okay?

11         MR. SOBOL:  Can we all highlight it?

12         THE COURT:  Huh?

13         MR. CHEFFO:  We're going to use black for your parts

14   of the thing.

15         (Laughter.)

16         THE COURT:  All right, good-bye.

17         MR. GREENE:  Judge, did I give you a transcript

18   yesterday of Glanzman?

19         THE COURT:  No.  I thought I ruled on everything

20   you've given me, but Glanzman does ring a bell, and I thought I

21   ruled on it.

22         MR. GREENE:  Oh, okay, maybe I just didn't get it

23   back.  It was a binder.  There you go.

24         THE COURT:  No, I think I did rule on it.  All right,

25   you're right.  I'm wrong.

Page 91

1           MR. GREENE:  Thank you.  Thanks very much.

2           (End of side-bar conference.)

3           (A recess was taken, 11:08 a.m. )

4           (Resumed, 11:40 a.m.)

5           THE COURT:  Okay.  Do you want to swear him in,

6    Robert?

7           THE CLERK:  Yes.

8           DALE DANIEL, M.D., having been duly sworn by the

9    Clerk, was examined and testified as follows:

10          THE CLERK:  Thank you.  You may be seated.  And would

11   you please state your name and spell it for the record.

12          THE WITNESS:  My name is Dale Daniel, first name

13   D-a-l-e, last name D-a-n-i-e-l.

14                        DIRECT EXAMINATION

15   BY MS. NUSSBAUM:

16   Q.   Good morning, Dr. Daniel.

17   A.   Good morning.

18   Q.   Can you tell the jury your education, please?

19   A.   Yes.  I went to undergraduate at Washington State

20   University in Pullman, Washington.  Then I went to medical

21   school at the University of Washington in Seattle, and

22   finishing that I went to Case Western Reserve University in

23   Cleveland for two years of training, then I went to Los Angeles

24   to Kaiser Sunset Hospital in Los Angeles for four years of

25   general surgery training.

1   Q.   Do you presently practice medicine?

2   A.   Yes, I'm a general surgeon practicing full time in general

3   surgery and board certified.

4   Q.   And where do you practice?

5   A.   I practice in Riverside, California in Southern

6   California.

7   Q.   And are you a partner in a Permamente medical group?

8   A.   Yes, I'm a partner in the Southern California Permamente

9   Medical Group.  When I finished training, I joined the group

10  first as an employee for two years, then, after two years, was

11  a partner; I've been a partner for 25 years.

12  Q.   So do you work for Kaiser, the plaintiffs in this case?

13  A.   No, I do not.

14  Q.   And what is the relationship between the medical group

15  that you're a partner in and the plaintiffs here?

16  A.   Well, they're two big, separate organizations.  The health

17  plan is the insurance part of it, and they also run the

18  hospitals.  And the medical group has a contract with the

19  health plan to take care of -- medical care of patients.

20  Q.   Is Kaiser paying for your time to come here to Boston and

21  to testify?

22  A.   No.

23  Q.   And can you tell me approximately how much time you've

24  spent coming here to be a witness in this case?

25  A.   I came last week, was here for three days, it didn't work

1   out that I got to testify; so I came back this week, I'll be

2   here either three or four days this week.

3   Q.   And Kaiser is not paying you for any of that time; is that

4   correct?

5   A.   They're not paying me for any of that time.  In fact, when

6   I miss call, I missed income, a couple thousand each time that

7   I miss call.

8   Q.   Now, are you a member of the Southern California P&T

9   Committee?

10   A.   Yes, I am.  I'm the chairman of the Southern California

11   Pharmacy and Therapeutic Committee.

12   Q.   And how long have you been chairman of that committee?

13   A.   Since 1993, that would be, like, 17 years now.

14   Q.   What is the role of the P&T Committee?

15   A.   Well, the most -- principal role is for appropriate drug

16   utilization.  And my role as P&T chair is also -- so we have

17   these two big entities that don't always see eye to eye, but

18   it's to coordinate the activity between the two and to smooth

19   out differences and to help the two groups work together.

20   Q.   Do you attend interregional P&T Committee meetings?

21   A.   Yes, I do.

22   Q.   And what is the purpose of those meetings?

23   A.   That's to help understand what's going on in other Kaiser

24   regions in the country and to learn from each other and in some

25   ways coordinate care.

1    Q.   What role does the Drug Information Service play at the

2    P&T Committee meetings?

3    A.   Well, they play an integral role.  The Drug Information

4    Service spends hours and hours, hundreds of hours looking up

5    information and collating the information, then they bring

6    information to us, we may ask for more information.  We just

7    couldn't do our job without them.  We're all full-time

8    practicing physicians, and we rely on the information that they

9    get for us.

10   Q.   Now, if a Permanente Medical Group doctor believes that a

11   drug is medically necessary for their patient, will that drug

12   be covered even if it's not on the formulary?

13   A.   Right, that -- correct.  Whether it's on or off the

14   formulary, if they write for it, say it's medically necessary,

15   it's covered.

16   Q.   Does Southern California use restrictions at times when

17   adding a drug to the formulary?

18   A.   In Southern California we use it some of the time.  We

19   principally use it for, like, cancer drugs, oncology drugs

20   that -- or, you know, relatively dangerous -- a lot of toxicity

21   and we'd like to make a statement on those sort of things,

22   yeah, this drug is relatively dangerous and we think only

23   certain specialists should be using that generally.

24   Q.   And with your experience does Northern California use

25   restrictions?

1   A.   No, they don't use restrictions at all virtually.  I've

2   talked -- they think we're nuts in Southern California because

3   the restrictions are not enforceable at all, and so they say,

4   Well, it's just, you know, a piece of paper that doesn't mean

5   anything.

6   Q.   Now, do you know when the drug Neurontin went on the

7   various Kaiser formularies?

8   A.   That was in 1994.

9   Q.   And at the time it went on in Southern California did it

10  have a restriction?

11  A.   Yes, it did.

12  Q.   What was that?  Do you remember?

13  A.   It restricted to the neurologists, because they are the

14  ones that most principally treat seizures.  It was a new drug

15  at that time.  Seizures can be a very serious illness and

16  problem, and we thought that with this new drug that only the

17  specialists, the neurologists, should be using it initially

18  until it gained more experience with it.

19  Q.   Now, Dr. Daniel, in 1997 did the P&T Committee take

20  additional action with respect to Neurontin?

21  A.   Yes, we did.

22  Q.   Now, let me show you what's been marked and is in evidence

23  as Exhibit 322.  It says, Monograph, dated September 1997.  Do

24  you see that document?

25  A.   Yes, I have it in front of me.

1    Q.   Now, why in September of 1997 did the P&T Committee

2    consider making a change with respect to Neurontin?

3    A.   The group of physicians, the pain specialists that work in

4    anesthesia, requested to be added to the group that can

5    prescribe.

6    Q.   And at that time in 1997 what evidence was relied on by

7    the P&T Committee in reaching its determination as to whether

8    or not the restriction should be expanded for RSD?

9    A.   Well, there wasn't a lot of evidence.  There was only two

10   small case series reported by Mellick, and that was the only

11   evidence that we had of really the medical-type evidence that

12   we relied on that.

13   Q.   Turning to the second page of Exhibit 22, and looking at

14   reference 6 and 7, are those the case reports that you're

15   referring to, the case reports by Mellick?

16   A.   Yes, those are the case reports regarding reflex

17   sympathetic dystrophy.

18   Q.   Did you personally vote to adopt the recommendation in

19   this monograph which was to expand the prescribing

20   restrictions?

21   A.   Yes, I did.

22   Q.   Did you come to learn many years after that vote was taken

23   that years earlier, in 1996, the FDA had initiated an inquiry

24   with respect to Neurontin?

25   A.   Yes.

1    Q.   And did you learn that part of that inquiry was looking at

2    certain physicians and seeing if they had a financial interest

3    with the manufacturer of Neurontin, the defendants here?

4    A.   Yes.

5    Q.   Now, let me show you what's been marked as --

6         THE COURT:   There was some question before, reflex

7    sympathetic dystrophy.   What is it?

8         THE WITNESS:   Reflex sympathetic dystrophy, it's

9    generally pain in an extremity, usually thought to have been --

10   it could have been the result of many things, infection, a

11   trauma of some sort, that somehow the nerve has been injured or

12   damaged; and instead of just healing up without any pain, it

13   continues to have pain related to the nerve.

14   BY MS. NUSSBAUM:

15   Q.   Dr. Daniel, in 1997 when you voted with the P&T Committee,

16   were you aware that the FDA was specifically looking into the

17   financial relationship between Dr. Gary Mellick, the author of

18   the two case reports you relied on, and the defendant here?

19   A.   No.

20   Q.   And have you since learned that, in fact, there was a

21   financial relationship between Dr. Gary Mellick and the

22   defendants here concerning Neurontin?

23   A.   Yes, I have.

24   Q.   What have you learned?

25   A.   I have learned that there was a contract between the

1   defendants and Dr. Mellick for $1,250 a month.

2   Q.   And that was with respect to Neurontin; is that right?

3   A.   Yes.

4   Q.   And that contract was in place several years before you

5   even considered whether or not to expand the restrictions; is

6   that correct?

7   A.   Yes, I was.

8   Q.   You were not aware of that financial relationship when you

9   relied on the case reports, were you?

10  A.   I did not know of the financial relationship.

11  Q.   Now, Dr. Daniel, at the time that you voted in 1997, had

12  you known of the financial relationship between the defendants

13  here and Dr. Gary Mellick, would you have voted to expand the

14  prescribing restrictions on Neurontin?

15          MR. KENNEDY:  Speculation.

16          THE COURT:  Overruled.

17  A.   No, I would not have.

18  Q.   And why not, Dr. Daniel?

19  A.   Well, because of the financial relationship, then there is

20  a bias, and when there's a bias you have to discount that.

21          So discounting those two articles, now we would have

22  had no evidence to add it, so we wouldn't have added it without

23  any evidence.

24  Q.   In 1999 did your P&T Committee again look at Neurontin and

25  look at expanding restrictions concerning Neurontin?

1   A.   Yes, we did.

2   Q.   Now, let me show you what's in evidence, and that's

3   Exhibit 311.  It's a monograph dated June 1999.  Do you have

4   that in front of you?

5   A.   Yes, I have this in front of me.

6   Q.   Now, what happened in June of 1999 to cause the P&T

7   Committee to again evaluate Neurontin?

8   A.   The psychiatrists requested to be added to the restricted

9   groups so they could use it for mood disorders or bipolar

10  disorders.

11  Q.   Now, looking at Exhibit 311, and on the first page, the

12  last bullet, it says, "As the manufacturer does not intend to

13  seek FDA approval for the use of gabapentin in the treatment of

14  bipolar affective disorder, it would seem unlikely that large

15  randomized clinical drug trials to study the efficacy and

16  safety of gabapentin for this indication would be forthcoming."

17  Do you see that?

18  A.   Yes, I see that.

19  Q.   And look, please, at the last page of the exhibit in R3.

20  It indicates that there was a personal communication between

21  Kaiser and a W. Martin of Parke-Davis.  Do you see that?

22  A.   Yes, I see that.

23  Q.   Now, is that usual, when you're considering a drug, to

24  have a personal communication between Kaiser and the

25  manufacturer of the drug?

1    A.    Yes, it's standard to check with the manufacturer.

2    Q.    And why do you do that?

3    A.    Well, the manufacturer, the one that has the drug, they

4    have the most information about the drug, so they could have

5    unpublished information or they could have knowledge about

6    ongoing trials, all of that would be relevant to our decision.

7    Q.    Now, in June of 1999 did you personally vote to approve

8    expanding the restrictions for Neurontin to include

9    psychiatrists for the treatment of mood disorders and bipolar?

10   A.    Yes, I did.

11   Q.    At that time were you aware of the Pande study?

12   A.    No, I was not.

13   Q.    And can you remind the jury of what the result of the

14   Pande study was?

15   A.    The Pande study was a study of bipolar disorder, and it

16   was a negative study, meaning that the drug was not effective

17   in bipolar disorder in that study.

18   Q.    Now, during the course of this lawsuit have you come to

19   learn when the defendants here first learned that the Pande

20   study was negative?

21   A.    They knew it about a year before our vote on this.

22   Q.    But they didn't tell the person at Kaiser from Drug

23   Information Services who called them for additional

24   information, did they?

25   A.    No, they did not.

1    Q.   Now, Dr. Daniel, had you known the results of the Pande

2    study and that those results were negative in June of 1999 when

3    you voted to expand the prescribing restrictions for Neurontin

4    to include psychiatrists for the treatment of mood disorders

5    including bipolar, would that have been material to your vote?

6    A.   It would have been very material to our vote.

7    Q.   Would you, in fact, have voted to expand the restrictions?

8    A.   No, I wouldn't have.

9    Q.   And why not?

10   A.   Well, because we just had case reports there and this was

11   a much better study that we didn't know about.  So if -- once

12   you know about the really good study, it overrides all the

13   other information.  So you wouldn't add a drug for a condition

14   that it has been shown not to work for.

15   Q.   Now, a few months later, in September of 1999, did your

16   committee again consider expanding restrictions on Neurontin?

17   A.   Yes, we did.

18   Q.   And can you tell me what happened in September?  I would

19   draw your attention to Exhibit 327 in evidence.

20   A.   Well, the primary care physicians asked for all the

21   restrictions to be lifted so that they could prescribe

22   principally for diabetic peripheral neuropathy.

23   Q.   And can you explain to the jury, please, what diabetic

24   peripheral neuropathy is?

25   A.   Well, it's -- people who have diabetes, they -- part of

1   the illness is it causes nerve injury, some people have

2   numbness, but other people develop chronic pain from the nerve

3   injury and so that's -- those people would be considered to

4   have a diabetic peripheral neuropathy.

5   Q.   Now, I would ask you to please turn to the reference page,

6   and that's the -- next to the last -- actually, the last

7   physical page.

8   A.   Yes.

9   Q.   Do you see that?

10  A.   Yes, I do.

11  Q.   And would you please look at reference 6?

12  A.   S6?

13  Q.   Yes.

14  A.   Yes.

15  Q.   And that's the Backonja study.  Do you see that?

16  A.   That's correct, yes.

17  Q.   Now, Dr. Daniel, subsequent to 1999 when you voted to

18  expand restrictions and during the course of this litigation

19  and trial have you learned anything about the Backonja study?

20  A.   Yes, I have.

21  Q.   And what have you learned?

22  A.   Well, the Backonja study was reported in JAMA as being

23  positive, meaning that it was effective for diabetic peripheral

24  neuropathy.  But due to this trial, we were able to get all of

25  the data about the trial, the day-to-day, week-to-week data on

1   the trial, and Jewell and Abramson relooked at the trial for us

2   and reanalyzed it and they found that the trial was unblinded

3   by the side effects of the drug and that all of the positive

4   effects were really from the unblinding of the trial.  And once

5   you accounted for the trial no longer being blinded, the trial

6   was negative.  In other words, the real results of the trial

7   were that Neurontin is not effective for diabetic peripheral

8   neuropathy.

9   Q.   So when you voted in September of 1999 to expand the

10  restrictions, you did not have that information about the

11  Backonja study; is that right?

12  A.   We did not have that information.

13  Q.   And that information, would that have been material to you

14  and the committee?

15  A.   It would have been very important.

16  Q.   Now, I'd ask you to look, please, at reference S7, and the

17  jury has heard about the Gorson letter to the editor.  Do you

18  see that?

19  A.   Yes.

20  Q.   Now, do you recall whether the Gorson letter indicated

21  that Neurontin was not effective?

22  A.   The letter indicated that Neurontin was not effective.

23  Q.   Now, as a physician, can you please tell the jury what

24  weight you would place on a fully published article, such as

25  the Backonja article, versus a letter to the editor, such as

1    Gorson?

2    A.   Well, the relative weight -- so one of them, the Backonja

3    study, is published in JAMA, one of the two most important

4    journals in the country, and it's double-blind randomized, so

5    you would give that about as much weight as you could.  The

6    other is a letter to the editor, and you don't have any data or

7    information, so you would place it somewhere down here out of

8    sight.  And so you would really only rely on the Backonja

9    article.

10   Q.   Now, Dr. Daniel, after Kaiser filed suit and during the

11   course of this litigation, what, if anything, have you learned

12   about the Gorson letter to the editor?

13   A.   Well, the letter to the editor was not the full

14   information.  Gorson had attempted -- or had sent a letter or a

15   fax to be accompanied with the whole manuscript and the whole

16   manuscript was there and he wanted to publish it in Neurology,

17   which is a major, important journal.

18   Q.   And let me draw your attention for a moment -- and we'll

19   put it on the screen -- to the first page of Exhibit 19 in

20   evidence, and that's a letter from Dr. Kenneth Gorson to Phil

21   Magistro at Parke-Davis Pharmaceuticals dated August 23, 1997.

22        And it states in pertinent part, Please review and

23   feel free to make any suggestions in the text or margins.

24   Also, please show it to Leslie and get her thoughts as well,

25   but try to move it along as quickly as you can so I can get it

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1  out.  I would like to finish this project and move on.  I was

2  planning to submit Neurology as a first pass.  Do you see that?

3  A.   Yes.

4  Q.   And is that one of the things that you learned after the

5  lawsuit was filed?

6  A.   Yes, it's something that I learned recently.

7  Q.   Now, had you known in September of 1999 that Dr. Gorson

8  wanted his full study published as an article in the Journal of

9  Neurology, would that have been material to you?

10 A.   It would have been important to us.

11 Q.   Now, looking, again, at the references, and if you look at

12 R2, it indicates that there was a personal communication

13 between Kaiser and the defendants here; is that right?

14 A.   That's correct.

15 Q.   Now, do you see anything in these references about a

16 Reckless study?

17 A.   No, I do not.

18 Q.   And can you remind the jury what the results of the

19 Reckless study were?

20 A.   Well, the Reckless study was a study of diabetic

21 peripheral neuropathy.  It was the largest study ever with

22 Neurontin on diabetic peripheral neuropathy.  This was

23 double-blind, randomized.  It was the best designed study, and

24 the results of it were negative.  The drug was not effective

25 for diabetic peripheral neuropathy.

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1   Q.   When did you learn the results of the Reckless trial?

2   A.   Recently in preparation for this trial.

3   Q.   Did you learn at the time when the Reckless study was

4   concluded?

5   A.   I think it concluded about the same time as we had our

6   meeting in September of 1999.

7   Q.   So at the time that the telephone communication was made

8   to the defendants here in September of 1999 seeking any

9   additional information that they would have about the use of

10  Neurontin for diabetic peripheral neuropathy, was Kaiser told

11  about the Reckless study?

12  A.   No, we weren't told about this large study.

13  Q.   Was Kaiser told that the defendants here expected shortly,

14  that same month, to get results?

15          MR. KENNEDY:  Object, lack of foundation he can speak

16  for Kaiser as a whole.

17          THE COURT:  Well, to the extent that you know.

18          THE WITNESS:  What's the question?

19          MS. NUSSBAUM:  I'll withdraw that question.

20  BY MS. NUSSBAUM:

21  Q.   Did the P&T Committee know, were you told by Drug

22  Information Services or anybody else who had contacted the

23  defendants here that they were expecting the results of the

24  Reckless study that very same time that you were voting?

25  A.   No.

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1    Q.   Did they tell you even about the existence --

2            THE COURT:  Who's the they?  They, Pfizer?

3            MS. NUSSBAUM:  The defendants here.  There was a

4    communication to the defendants.

5    BY MS. NUSSBAUM:

6    Q.   Did they tell you about the existence of the Reckless

7    study?

8    A.   No, they did not.

9    Q.   Is there any reason that the P&T Committee couldn't have

10   tabled its discussions about Neurontin to the following

11   meeting?

12   A.   No.  We can table a discussion about something, especially

13   when we know there's important information that's going to come

14   out.

15   Q.   Now, knowing what you know now about Reckless, about

16   Gorson, and about Backonja, would you have voted to expand the

17   prescribing restrictions on Neurontin back in September of

18   1999?

19   A.   No, definitely not.

20   Q.   Dr. Daniel, have you learned that the defendants in this

21   case pled guilty to illegal off-label promotion of Neurontin?

22   A.   Yes, I have.

23   Q.   And have you learned that that off-label promotion began

24   in 1995?

25   A.   Yes.

1    Q.    And do you know what medical conditions the off-label

2    promotion was focused on?

3    A.    Yes.  It was several conditions, but three of them were

4    pertinent to Kaiser Permanente.  One was the reflex sympathetic

5    dystrophy, another was the bipolar disorder, and the other one

6    was the diabetic peripheral neuropathy.  All of those were

7    relevant.

8    Q.    Now, had you known in 1997 and again twice in 1999 when

9    your committee was making decisions about Neurontin that the

10   defendants were illegally promoting Neurontin off-label for the

11   very conditions that you were looking at, RSD, bipolar and

12   related mood disorders, and diabetic neuropathy, would that

13   have made a difference to you?

14   A.    Yes, it would have.

15   Q.    And why is that?

16   A.    Well, the off-label promotion could have -- would have

17   indicated that perhaps these requests were just not spontaneous

18   physicians, you know, analyzing and thinking about what's going

19   on and trying different drugs, but it was really being driven

20   from a non-medical side of things.  It really wasn't

21   independent thinking.  So it would have made me suspicious of

22   why these requests were coming in.

23   Q.    Have you received the Dickersin article that the jury has

24   referred to and heard about that was published in the New

25   England Journal in November of this past year?

1    A.    Yes, I have.

2    Q.    And when did you receive it and from whom?

3    A.    It was in the late fall, could have been around

4    Thanksgiving or maybe in December, and I think I got it from

5    Mirta Millares.

6    Q.    And she's with what part of Kaiser?

7    A.    She's head of the Drug Information Services at Downey in

8    Southern California.

9    Q.    Now, can Kaiser simply remove Neurontin from its

10   formulary?

11   A.    No, we can't.

12   Q.    And why is that?

13   A.    Well, there's -- a couple of reasons.  One is that the

14   federal law requires us to have it on formulary.  The Medicare

15   Modernization Act had a whole bunch of stuff in the law, like

16   all these federal laws, but it had a provision that certain

17   classes of drugs had to be on everybody's formularies, no

18   exceptions.  And one of the classes of drugs that has to be on

19   everybody's formulary is drugs for seizure, and the indication

20   for Neurontin is for seizures, so you have to have it on the

21   formulary.  You don't have any choice in the matter.

22   Q.    Now, if you could do it -- let's say you could remove it

23   from the formulary, would that be effective?

24   A.    It would not be effective.

25   Q.    And why is that?

1   A.   Well, the reason that doctors prescribe is not because --
2   at least within our organization -- not because it's on or off
3   the formulary, it's because they believe that the drug is
4   effective or not effective, and that's created over years of
5   education and training.  So if there is -- as we've now learned
6   they're prescribing because they have erroneous, incorrect
7   information.  Even if you remove it from the formulary, unless
8   you change that erroneous, incorrect information, they're going
9   to continue to believe it's useful and they're going to
10  continue to prescribe it for their patients.  So the real thing
11  is you need to educate the physicians, give them the
12  information.
13  Q.   Dr. Daniel, between 1994 and 2004 did Kaiser have any
14  reliable, accurate way to connect prescriptions for a
15  particular drug with a particular medical condition?
16          MR. KENNEDY:  Objection, lack of foundation.
17          THE COURT:  Overruled.
18  A.   Absolutely not.
19  Q.   They could not do it?
20  A.   No, nobody can do it.
21          MS. NUSSBAUM:  Thank you very much.
22          MR. KENNEDY:  May I proceed, your Honor?
23          THE COURT:  Yes.
24
25

1                      CROSS-EXAMINATION

2   BY MR. KENNEDY:

3   Q.   Good afternoon, Dr. Daniel.

4   A.   Good afternoon.

5   Q.   You do not work for either of the Kaiser companies that

6   are the complaining party of this case, correct?

7   A.   Correct.

8   Q.   But you work for somebody who isn't a party to this case,

9   the Southern California Permanente Medical Group?

10  A.   I'm a partner in the Permanente -- Southern California

11  Permanente Medical Group.

12  Q.   And although you don't work for Kaiser, you agreed to fly

13  across the country voluntarily to testify in this trial,

14  correct?

15  A.   Yes, I did.

16  Q.   And in fact, as you've told us, you agreed to sacrifice

17  some income in order to accommodate Kaiser's request to come

18  here and testify on their behalf?

19  A.   That's correct.

20  Q.   And you did that because there is a long-term partnership

21  between Permanente and the Kaiser entities, correct?

22  A.   No.  There is a long term, but that's not the reason why.

23  Q.   Okay.  But you were willing to come here without a

24  subpoena to testify on their behalf, correct?

25  A.   Correct.

1  Q.   Okay.  And as far as you know, there are other Kaiser

2  doctors -- excuse me, Permanente doctors who would be willing

3  to do the same thing, aren't there?

4  A.   I don't know that for a fact, but I assume so.

5  Q.   So -- we've got an exhibit here called 923 that's been

6  produced by Kaiser and identified as being a list of the

7  Permanente doctors who prescribed Neurontin during the period

8  from 1994 to 2005.

9          MS. NUSSBAUM:  Objection, your Honor.  That misstates

10  what the list is.

11          THE COURT:  Well, I just don't want to keep going

12  through this.  You'll have a stipulation of what it is.  It's

13  roughly that.  They've got a picture of that, it's roughly

14  that, so --

15  BY MR. KENNEDY:

16  Q.   You don't have any reason why if doctors who were doctors

17  who were listed in this book wouldn't do the same thing that

18  you've done, come here and testify voluntarily, correct?

19  A.   I don't know.

20  Q.   Is there any doubt in your mind that if Kaiser asked a

21  Permanente doctor to come, they'd come?

22  A.   Some would, some wouldn't.

23  Q.   If you had 20,000 to choose from, you'd be able to find

24  enough to fill up a trial, wouldn't you?

25          MS. NUSSBAUM:  Objection, your Honor.

1          THE COURT:  Sustained.  Let's move on to the point

2     here.

3     BY MR. KENNEDY:

4     Q.   Just to close off on that point, you yourself have not

5     prescribed Neurontin, have you?

6     A.   My recollection is I might have once, maybe twice.

7     Q.   And when was that?

8     A.   In the late 1990s I recall a patient that had a lot of

9     trouble with pain, and they were having trouble -- they weren't

10    tolerating the narcotic pain medications, like morphine or that

11    sort of thing, and I think we tried something else and it just

12    wasn't working.  So I think I called up one of the pain

13    specialists and got their opinion about what should I do with

14    this patient, they're having trouble, and it seems like their

15    recommendation was to use Neurontin in that indication.

16    Q.   You say "pain specialist," this would have been another

17    Kaiser Permanente doctor?

18    A.   That's correct.

19    Q.   Didn't call Warner-Lambert or Parke-Davis?

20    A.   No.

21    Q.   So, as far as you know, you weren't one of the Kaiser

22    doctors who got tricked or duped into prescribing Neurontin,

23    correct?

24    A.   There's two parts of the question, whether I -- I mean, I

25    was P&T chair.  I was tricked and duped as P&T chair, but not

1    in the prescription.

2    Q.   The prescribing you did as a result of your sound medical

3    judgment based on a consultation with a colleague, right?

4    A.   Based on a consultation with a colleague.

5    Q.   And do you have any idea why your name isn't in the book

6    of Neurontin prescribers?

7    A.   No.

8    Q.   Now, when did you first hear about the fact that the FDA

9    was looking into Dr. Mellick?

10   A.   Recent, in preparation for this trial.

11   Q.   Hadn't heard anything about it before then?

12   A.   No.

13   Q.   As far as learning about the Backonja study being

14   unblinded, that's something you learned about back in September

15   of 1999, wasn't it?

16   A.   No, I never heard about it until more recently in

17   preparation for this trial.

18   Q.   Well, let's take -- you remember you talked about Exhibit

19   327 on direct, which is also defendant's 557 in evidence.

20   That's the drug monograph for the September 19 Southern

21   California P&T community.  Do you see that?

22   A.   What number is it here?  I'd rather look on paper.

23   Q.   Okay.  It was probably shown to you as 327 if you have a

24   list of the exhibits your lawyer showed you.

25   A.   Okay, I have 327.

1    Q.    Okay.  And that's a drug monograph for the P&T review of

2    September 1999?

3    A.    Yes.

4    Q.    When you turn to the last page -- can we flip to the

5    end -- and we look at references S6 and S7, if we highlight

6    those, please?

7    A.    Yes.

8    Q.    You'll see S6 is a report by Dr. Backonja, right?

9    A.    Yes.

10   Q.    And S7 refers to a placebo-controlled study by Dr. Gorson,

11   correct?

12   A.    Yes.

13   Q.    And by the way, I'm looking down to the bottom.  For the

14   September meeting, down at the bottom it says it was actually

15   prepared in June, correct?

16   A.    Yes.

17   Q.    And that's not atypical for the DIS people, to prepare

18   materials ahead of time, is it?

19   A.    We require that they get the materials ahead of time.

20   Q.    Now, keeping S6 and S7 in mind, would you turn to the

21   second page, please, Doctor?  And would you come down to the

22   fourth bullet point, it starts, "The efficacy and safety."

23            MR. KENNEDY:  And could you highlight that one for us,

24   Austin ?

25   Q.    The efficacy and safety of gabapentin for the treatment of

1    diabetic peripheral neuropathy -- the condition you were

2    talking about --  was studied in two randomized, double-blind,

3    placebo-controlled trials involving 205 patients.

4          In the first study, S6 -- remember, we've agreed S6 is

5    the report by Backonja, correct?

6    A.   Correct.

7    Q.   In the Backonja study in which -- and they describe what

8    prescriptions they received -- demonstrated significant pain

9    relief usually by week 2.  So that's what we call a positive

10   study, correct?

11   A.   Correct.

12   Q.   But the drug monograph goes on to say there was a

13   potential of bias from unintentional blinding resulting from

14   secondary dose titrations according to side effects.  Correct?

15   A.   That's what it says, correct.

16   Q.   So if you'd read the drug monograph for the September 1999

17   meeting, you would have known that the Backonja study, although

18   positive, was potentially biased because of unintentional

19   blinding, correct?

20   A.   That was potential.

21   Q.   So that was information you had before -- when you voted

22   yes in 1999, correct?

23   A.   Correct.

24   Q.   Okay.  And then continuing on that page, the second study

25   crossover trial, S7 -- and we've established S7 refers to

1  Gorson -- and the monograph says, failed to demonstrate

2  significant pain relief in three of the four efficacy measures

3  at -- what's a GBP dose?

4  A.   GBP, I believe, refers to gabapentin.

5  Q.   -- dose of 900 milligrams a day, a dose which may have

6  been too low.

7       So the monograph told you that the Gorson study was a

8  failed study, correct?

9  A.   Well, we don't really know because it's not really been

10 published in its full form, so we can't really -- it's not as

11 important, not as evaluable.

12 Q.   When you read the second study, the Gorson study failed to

13 demonstrate significant pain relief, you didn't interpret that

14 as a failed study?

15 A.   Don't know what it means because we didn't get to see the

16 whole study.  It's not been -- hadn't been published at that

17 time.

18 Q.   So there was no way you could tell from reading that the

19 study had failed to demonstrate significant pain relief at a

20 dose of 900 milligrams a day meant that it hadn't shown any

21 help for people at 900 milligrams a day, correct?

22 A.   Well, we didn't have it in a full peer-reviewed journal.

23 Q.   And if it's not in a full peer-reviewed journal, you

24 normally wouldn't act on it; is that correct?

25 A.   We would discount it a lot.

1  Q.   Okay.  Well, going back to 1997, you approved an expansion

2  of gabapentin then on the basis of two letters to the editor,

3  didn't you?

4  A.   Yeah, there was no counterweight to it.

5  Q.   Well -- so if there's no counterweight, then you'll accept

6  something less than a full study?

7  A.   That's correct.

8  Q.   Okay.  And we've heard about level one, level two, and

9  level three evidence.  A letter to the editor, that's level

10  three evidence, isn't it?

11  A.   I would think so.

12  Q.   Okay.  And your testimony -- let me ask you this:  Tell us

13  when you yourself learned that the Gorson study had failed.

14  A.   Recently in preparation for this trial.

15  Q.   And what was it that you got in preparation for this trial

16  in addition to what you knew in 1999 that caused you to realize

17  that Gorson had failed?

18  A.   I can't remember what -- what the precise document -- I

19  mean, I don't keep all these documents in my head.

20  Q.   And when did you get that information?

21  A.   Recently, in preparation for this trial.

22  Q.   Can you put a date on that?  Was that yesterday or --

23  A.   Within the last 30 days.

24  Q.   Okay.  And tell us in the last 30 days -- strike that.

25          You've told us on direct that if you had known then

1   what you know now, you would not have voted to expand the

2   people who could work with gabapentin in Southern California,

3   correct?

4   A.   Correct.

5   Q.   And now you do know what you know now, right?

6   A.   I would say that was a yes.

7   Q.   All the things that you didn't know before you've

8   eventually come to learn, at least within the last 30 days,

9   right?

10  A.   Yes.

11  Q.   And as the head of the Southern California P&T Committee,

12  tell us the steps you've taken in the last 30 days to unwind

13  those erroneous votes.

14  A.   Well, the main thing is we've been talking with the --

15  some of the other physicians, the other P&T Committee members

16  and the other -- some other physicians in Southern California

17  about the huge educational effort we are going to have to

18  undertake to get this changed.

19  Q.   Well, you're aware that if you go to the Kaiser patient

20  website today, it recommends gabapentin and Neurontin for the

21  treatment of pain emanating from a nerve.  Were you aware of

22  that?

23  A.   I haven't looked at the -- that website.

24  Q.   So Kaiser's lawyers haven't told you that if a Kaiser

25  patient checks out treatment for pain emanating --

Page 120

1          MS. NUSSBAUM:  Objection.

2          THE COURT:  Sustained, argumentative.

3    BY MR. KENNEDY:

4    Q.   Kaiser's lawyers haven't shown you any materials from

5    the --

6          MS. NUSSBAUM:  Objection, your Honor.

7          THE COURT:  Sustained.

8    BY MR. KENNEDY:

9    Q.   Are you aware Kaiser has a patient website?

10   A.   I'm aware that they do.

11   Q.   Okay.  And you try to put accurate information on there

12   for the benefit of patients?

13   A.   Well, I'm not in charge of the website.  I, you know,

14   can't say who puts what on there and why.  I'm not -- I don't

15   run the website.

16   Q.   Well, since you as a Permanente doctor became aware of all

17   the things that you learned in the last 30 days, have you taken

18   any steps to tell Kaiser, Let's make sure that we're at least

19   not recommending this stuff on the patient website?

20         MS. NUSSBAUM:  Objection, your Honor.

21         THE COURT:  Sustained.

22   BY MR. KENNEDY:

23   Q.   Have you had any contact with Kaiser about any

24   recommendations that you have concerning Neurontin since you

25   learned this material in the last 30 days?

1  A.   I've had discussions internally within the med group about

2  educational -- we need to have a big educational effort to

3  begin to turn this around.

4  Q.   And have you had any discussion as to when this big

5  educational effort is going to start?

6  A.   Well, that's one of the main points that we're trying to

7  decide.  We don't know yet.

8  Q.   Well, haven't you had an education effort with regard to

9  Neurontin going on in Southern California since back in at

10 least 2002?

11 A.   We have had an educational effort that was started back in

12 2002.

13 Q.   And that's the DUAT committee that you're a member of,

14 correct?

15 A.   That's correct.

16 Q.   And DUAT conducts educational campaigns with regard to

17 various problems, correct?

18 A.   Correct.

19 Q.   And Neurontin has been on the DUAT agenda since 2002,

20 correct?

21 A.   Somewhere back in that time frame, yes.

22      MR. KENNEDY:  Could we take a look at Exhibit 712,

23 please?

24      THE WITNESS:  Could I have a paper copy of that?

25 Q.   One second, Doctor.  I may have called -- I apologize,

Page 122

1   706.

2           (Discussion off the record.)

3   A.    Thank you.

4   Q.    And you'll see Exhibit 706 is a June 18, 2003 meeting of

5   the Southern California DUAT committee.  And if you go to page

6   1, it shows that you were present.  Excuse me, you were absent

7   that day.  I'm sorry.

8   A.    Yes, it looks like I was absent that day.

9   Q.    And when you're absent, do they, nonetheless, send you

10  copies of the minutes of the meeting?

11  A.    I don't think they send out copies of the minutes all the

12  time, and I wouldn't necessarily -- I mean, a get a lot of

13  e-mails, I get a lot of stuff.  I don't necessarily look at the

14  minutes of meetings.

15  Q.    So you don't keep track of what happened in DUAT meetings

16  that you miss?

17  A.    Not necessarily.  Maybe I do, maybe I don't.

18  Q.    Let's look at page 2 and see if you remember being told

19  about -- going to the second bullet point starting with "given

20  the high level"?

21  A.    Okay, I see the second bullet.

22  Q.    You found that there?

23          Given the high level of potentially inappropriate

24  (off-label) Neurontin utilization -- then it's got a minus 75

25  percent plus, do you have any idea what this refers to?

1    A.    No, I don't know for sure.

2    Q.    No idea at all?

3    A.    Well, I don't want to guess.  I'm not sure what they're

4    referring to.

5    Q.    How long have you been a member of the Southern California

6    DUAT committee?

7    A.    Since around 2000 or sometime in that time period.

8    Q.    Nine or ten years?

9    A.    Yes.

10   Q.    The group agreed there's a need to develop a more

11   aggressive intervention strategy for the initiative over and

12   above the current education and communication strategy.  The

13   following ideas were discussed:  Restrict Neurontin prescribing

14   to certain specialists or physicians, reevaluate by primary

15   care or restrict refill pain management specialists, remove

16   formulary status of Neurontin, develop stronger

17   education-to-provider campaign with regional memo, Pharmafax,

18   paycheck stuffer, targeted messages to Neurontin users, et

19   cetera.  You've seen that, haven't you?

20   A.    I see that on this page, yes.

21   Q.    So, apparently, even though you weren't there, as early as

22   June of 2003 the Southern California DUAT committee was

23   discussing the need for all of these measures with regard to

24   Neurontin, correct?

25   A.    Well, somebody -- at least somebody mentioned them at the

1    meeting.

2    Q.   Okay.  And in fact, starting sometime in 2002 or

3    thereabouts, there was an education effort started to try to

4    appoint Kaiser Permanente physicians with the problem of what

5    you considered to be excessive prescribing of Neurontin, right?

6    A.   Yes.

7    Q.   And Dr. Hyatt has told us that that campaign has continued

8    since then and continues today.  Is he correct?

9    A.   That's correct.

10   Q.   So the campaign to educate the doctors about Neurontin is

11   now seven, eight years old?

12   A.   Yes.

13   Q.   And are there any doctors who have been successfully

14   reeducated?

15        MS. NUSSBAUM:  Objection, your Honor.

16        THE COURT:  To your knowledge.

17   A.   I have recently.

18   Q.   You were reeducated by Kaiser's lawyers, weren't you?

19        MS. NUSSBAUM:  Objection, your Honor.

20        THE COURT:  Sustained.

21   BY MR. KENNEDY:

22   Q.   Okay.  Other than -- you consider yourself a reeducated

23   doctor in the uses of Neurontin?

24   A.   Yes.

25   Q.   However, you haven't been prescribing Neurontin throughout

1   the education period, have you?

2   A.   No, I haven't.

3   Q.   How about among the doctors who do prescribe Neurontin.

4   Can you identify any people who have been successfully

5   reeducated in the last seven-and-a-half years?

6   A.   I don't know what the doctors prescribe individually in

7   their offices.  It's between the physicians and the patients

8   what gets prescribed.  I can't tell you for sure.

9   Q.   Isn't one of the things that DUAT does is to trace

10  individual doctors who you believe are overprescribing?

11          MS. NUSSBAUM:  Objection, your Honor.

12          THE COURT:  Do you know one way or the other?

13  A.   I don't know that I've seen anything about individual

14  doctors.

15          (Discussion off the record.)

16  Q.   I'm going to move on to another topic, and we'll come back

17  to that, but you're not aware yourself of any efforts to have

18  interventions with individual doctors who are thought to be

19  prescribing too much Neurontin?

20  A.   What do you mean by interventions?

21  Q.   In the course of the DUAT committee meetings you've

22  attended -- let me ask you this:  Have you heard anything about

23  academic detailing of doctors?

24  A.   I've heard that term, yes.

25  Q.   And have you -- but you haven't heard the term

1   "interventions" in that regard?

2   A.   I don't recall for sure.

3   Q.   Well, why don't we take a look, then, at Exhibit 690 in

4   evidence, a February 6, 2003 region-wide meeting of the DUAT

5   group at the Hilton Hotel in Pasadena.  And you'll see if you

6   look down that you were present at that meeting, were you not?

7   About the sixth line, second name over from the left?

8   A.   It says I was present.

9   Q.   And going to page 3 -- I realize the document isn't

10  numbered -- but if you go to the page that talks about

11  outcomes:  Bellflower process.

12  A.   Yes.

13  Q.   Coming down to the third bullet point, "Peer utilization

14  data is systematically reviewed for each targeted drug class.

15  Outliers are identified and appropriate interventions (based on

16  the algorithm) are determined by the committee."  Correct?

17  A.   That's what it says.

18  Q.   And what that is saying is that outliers, doctors who are

19  believed to be prescribing too much Neurontin, are identified,

20  correct?

21        MS. NUSSBAUM:  Objection that that's talking about

22  Neurontin, your Honor.

23        THE COURT:  Isn't it talking about Neurontin?

24        MS. NUSSBAUM:  I don't -- the drug right above is GI

25  drugs.

Page 127

1           THE COURT:  Well, do you know one way another what

2     that's referring to?

3           THE WITNESS:  Well, since it's listed after GI drugs I

4     think it's GI drugs.

5           THE COURT:  Do you know one way the other anything

6     about this document?

7           THE WITNESS:  No.

8     BY MR. KENNEDY:

9     Q.   So we'd have to talk to somebody else from the DUAT

10    committee if we wanted to know about this one, correct?

11    A.   Yes.

12          MR. KENNEDY:  Could you go over to the

13    next-to-the-last page, and going under -- highlighting

14    non-formulary --

15          I'm sorry, Austin, page number 1170.

16    Q.   And you'll have 1170 on your copy as well, Doctor.

17    A.   Yes.

18    Q.   And you see non-formulary issues?

19    A.   Yes.

20    Q.   And that says, "Dale Daniel, M.D." -- that would be you,

21    correct?

22    A.   That would be me.

23    Q.   -- "provided an update on the P&T process related to

24    non-formulary drug use."  Correct?

25    A.   Yes.

1   Q.   And that is something you reported on at that time?

2   A.   Yes.

3   Q.   And you'll agree with me that at least as of 2003, DUAT

4   did have measures in place for doing interventions with doctors

5   who were thought to not be complying with guidelines or the

6   desires of DUAT, correct?

7   A.   I don't know what individual medical centers were doing

8   precisely.  I can't say.

9   Q.   How about the one you worked on, the DUAT committee?

10  A.   The DUAT committee?

11  Q.   Yes.

12  A.   That was a large committee, yeah.

13  Q.   You did have a program of academic detailing, didn't you?

14  A.   It would have been -- that would have been one of the

15  educational programs.

16  Q.   Going to the last page of Exhibit 690, under "academic

17  detailing, doctors talking to doctors," do you see that?

18  A.   Yes.

19  Q.   And that talks about a one-day course that was going to be

20  available to teach doctors how to talk to other doctors who

21  were thought to be prescribing too much or too little of a

22  drug, right?

23  A.   Of various drugs.

24  Q.   Okay.  Including Neurontin?

25  A.   Presumably.

1   Q.   Okay.  So you'd agree with me that since at least 2003

2   there has been an organized, orchestrated effort, at least in

3   Southern California, to try to educate doctors concerning

4   overuse or misuse of Neurontin, correct?

5   A.   We were trying to educate doctors about several drugs

6   through DUAT.

7   Q.   Okay.  And has that been successful?

8   A.   Mmm, partially, but I don't know exactly how successful

9   it's been.

10  Q.   Well, the evidence in this case has been that -- from the

11  plaintiffs that Neurontin, gabapentin, is simply ineffective

12  for treating bipolar, neuropathic pain, the conditions in

13  question.  Do you agree with that?

14  A.   That's been the evidence, yes.

15  Q.   No better than a sugar pill has been the evidence here,

16  would you agree with that?

17          MS. NUSSBAUM:  Objection, your Honor.

18          THE COURT:  Overruled.

19  A.   Neurontin is useful for some conditions, it's useful for

20  seizures and it's useful for postherpetic neuralgia.

21          THE COURT:  What about for bipolar?

22          THE WITNESS:  For bipolar, the recent evidence we have

23  is it's not effective.

24  BY MR. KENNEDY:

25  Q.   No better than a sugar pill?

1    A.    No better than a sugar pill.

2    Q.    For neuropathic pain, no better than a sugar pill?

3    A.    Turned out it was no better than a placebo.

4    Q.    Placebo is the same as a sugar pill?

5    A.    They don't put sugar in placebos.

6    Q.    In terms of medical effect?

7    A.    Yes.

8    Q.    And no better than a placebo for nociceptive pain?

9    A.    Yes.

10   Q.    And what is keeping the P&T Committee from sending an

11   e-mail to all of Kaiser's present doctors saying recent

12   research has disclosed that for these four conditions,

13   gabapentin, Neurontin, is really no better than placebo?

14   A.    Well, nothing prevents us per se, that may be one of the

15   things we end up doing.  Doctors aren't too good at reading

16   their e-mails, so it will have a very pin of a little effect

17   perhaps.

18   Q.    You won't know until you try, will you?

19   A.    Well, we probably are going to try it, but we are still

20   trying to figure out how to get our educational campaign

21   together.  This is a very recent thing.

22   Q.    What about what was happening in 2003?  Wasn't there an

23   education campaign on Neurontin that's been going since then?

24   A.    Right.

25   Q.    And what -- Doctor, I'm trying -- what is it about Kaiser

1    Permanente doctors that takes seven-and-a-half years for them

2    to understand that a drug doesn't work?

3              MS. NUSSBAUM:  Objection, your Honor.

4              THE COURT:  Sustained.  Argumentative.

5    BY MR. KENNEDY:

6    Q.   Why after seven-and-a-half years of reeducation do you

7    believe that Kaiser Permanente doctors apparently still haven't

8    gotten the message of Neurontin and misuses?

9              MS. NUSSBAUM:  Objection, your Honor.

10             THE COURT:  Overruled.  Why hasn't it worked?

11   A.   Why hasn't our education campaign worked?  Well, the

12   misinformation has overwhelmed us, I think.  It's only been

13   recently that we know about the Reckless study, which is really

14   the most important study.  It's only been recently that we know

15   about the Backonja study, which was in JAMA, has really been

16   negative.  It's only been recently that Dr. Dickersin put her

17   article in New England Journal.  So -- and it takes -- you

18   know, if you've been telling somebody something for 10, 12

19   years, you just don't turn them around overnight.  They take

20   longer to do that.

21   Q.   Who is it that's been telling Kaiser Permanente doctors

22   erroneous things about Neurontin or gabapentin in, say, the

23   last five years?

24   A.   Pfizer.

25   Q.   Since 2005 Pfizer has been issuing bum scoop about

Page 132

1   Neurontin?

2           THE COURT:  Is that a legal term?

3           (Laughter.)

4           MR. KENNEDY:  Let me try --

5   BY MR. KENNEDY:

6   Q.   It's your testimony --

7           THE COURT:  That must be from California.

8   BY MR. KENNEDY:

9   Q.   Since 2005 it's your testimony that Pfizer has been

10  issuing inaccurate information about the effectiveness of

11  Neurontin or gabapentin for the specific issues in this case?

12          MS. NUSSBAUM:  Objection, your Honor.

13          THE COURT:  That's fair.

14  A.   Yes.

15  Q.   Can you give me an example?  Can you name a Pfizer person

16  or identify a Pfizer ad or whatever else that did this?

17  A.   Well, it's withholding the information, like on Reckless

18  and not letting Gorson be published in a peer-reviewed journal.

19  Q.   Reckless, the results of Reckless you're aware were

20  published in 2003?

21  A.   Not in anywhere where anybody could find it.

22  Q.   At least you couldn't find it?

23  A.   I couldn't find it.  I don't think Cochrane review could

24  find it either.

25  Q.   Again, anything to prevent getting all of your Permanente

Page 133

1    doctors together in a large auditorium, putting a stuffer in

2    their paychecks, or anything else to share with them the

3    information that you now acquired?

4    A.   Well, I think that's a good idea, and we're probably going

5    to be doing it pretty soon.

6    Q.   What's pretty soon?

7    A.   The next -- I don't know, I would say the next 60 days.

8    Q.   Sometime after the jury in this case rules; is that

9    correct?

10            MS. NUSSBAUM:  Objection, your Honor.

11            THE COURT:  Sustained.  I'm hoping sometime after the

12   jury rules.

13   BY MR. KENNEDY:

14   Q.   How long have you been with the Kaiser Permanente group

15   now?

16   A.   Twenty-seven years with the Permanente Medical Group.

17   Q.   And you've gotten to know other doctors in the Permanente

18   Medical Group pretty well during that time, haven't you?

19   A.   Yes.

20   Q.   And you found that they're a very capable group of

21   doctors, haven't you?

22   A.   I believe they are.

23   Q.   That try to prescribe to the best of their medical

24   ability, correct?

25   A.   They try that very hard.  They try to take care of their

1  patients as best they can.

2  Q.   And they rely on clinical experience, how patients

3  actually react to specific drugs, correct?

4  A.   That's part of it.

5  Q.   Okay.  And that can be a very important part of it, can't

6  it?

7  A.   It could be.

8        MR. KENNEDY:  Can we take a look at Exhibit 675.

9        I'd offer it -- your Honor, I'd offer 675 into

10  evidence.

11        MS. NUSSBAUM:  Can I see it?

12        MR. KENNEDY:  Sure.  In addition, this is, I'll

13  represent to the Court, an e-mail printed out in basically

14  illegible form.  We've retyped it in legible form.

15        The individual letters can be read, I can approach to

16  show you the problem.

17        THE COURT:  Let me just see, is there a problem here?

18        MR. KENNEDY:  I'm offering it as 675, which is a

19  retyped version.

20        THE COURT:  It's what they've shown beforehand?

21  You've shown it to them before?

22        MS. NUSSBAUM:  I don't think so.  No, I was never

23  aware there was a retyped version.

24        THE COURT:  Assuming that he's representing it

25  correctly, they just retyped a legible version.  Have you seen

1   it?

2           Did you give it to them last night?

3           MS. NUSSBAUM:  I don't think so.

4           MR. KENNEDY:  I'm not sure it was retyped.  I'll

5   represent to the Court --

6           THE COURT:  Wait, wait.  We have basic guidelines

7   here.

8           Have you seen that?

9           MS. NUSSBAUM:  I have not seen this, your Honor.

10          THE COURT:  Okay.  We're not going to do it then.

11          MR. KENNEDY:  Okay.  In the interest of time, I would

12   ask through the Court that we be allowed to use 675 A.  If not,

13   I'll go use 675, the original.

14          THE COURT:  Did you show 675 to her?

15          MR. KENNEDY:  Yes, she was shown 675.

16          MS. NUSSBAUM:  He just gave us a copy.

17          THE COURT:  Did you see it last night?

18          MS. NUSSBAUM:  675, yes.

19          THE COURT:  All right.  This is fine, then.

20          I thought you said you didn't get any of it.

21          If you see a typo or something we can fix it, but

22   basically it's the same thing you saw.

23          MS. NUSSBAUM:  I have no idea, it's eight or nine

24   pages, two sides.  I have no idea what they just handed me.  I

25   did not get this last night.

Page 136

1          THE COURT:  Do you have a representation you gave her

2     this last night?

3          MR. KENNEDY:  Yes.

4          THE COURT:  Fine.  I accept that.

5          MR. KENNEDY:  Again, is it okay if I publish 675 A?

6          THE COURT:  Yes.

7          (Exhibit 675 received into evidence.)

8          MR. KENNEDY:  Austin, scrolling down, if we can, on

9     the first page --

10          THE COURT:  Have you seen it?

11          THE WITNESS:  I don't know.

12          THE COURT:  Is it on your screen?

13          THE WITNESS:  There's something on the screen right

14     now.

15          THE COURT:  Why don't we give it to him.

16          You know, it's really hard with e-mails because it

17     goes backwards, so I actually have a problem sometimes trying

18     to figure out -- we can't understand it until you've started

19     way at the back.

20          Why don't you take a few seconds.

21     BY MR. KENNEDY:

22     Q.   Take a look at that, Doctor, and see if that isn't an

23     e-mail exchange back in 2002 involving you and other doctors

24     within the Permanente Medical Group.

25     A.   It's back in 2002.

1              (Pause.)

2              THE COURT:  Okay.  He's looking up.

3    BY MR. KENNEDY:

4    Q.   Okay.  And you'll --

5              MS. NUSSBAUM:  Your Honor, is this supposed to be

6    about Neurontin?

7              THE COURT:  Let me just hear the question.

8              Are you familiar with this?

9              THE WITNESS:  Well, I'm --

10             THE COURT:  Do you remember it at all?

11             THE WITNESS:  I don't really remember it.  It was

12   eight years ago.

13             THE COURT:  Okay.  So he doesn't remember it.  So what

14   are you asking him?

15   BY MR. KENNEDY:

16   Q.   Okay.  And this involves how clinical observations can

17   sometimes be more important than actual studies, correct?

18             THE COURT:  As a general proposition.

19   A.   As a general proposition, I would say we ought to go with

20   the evidence based, you know, we see things clinically until

21   we -- if there's evidence, we should go with the evidence as

22   much as possible.

23   Q.   Going to the second page of the document, up near the top,

24   original message, that's from a James Morganstern, who's a

25   Permanente doctor, right?

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1    A.    That's correct.

2    Q.    And it's talking about -- it's various people, correct?

3    There are doctors within the organization?

4    A.    Well, there's a "to" and a "copy," so --

5    Q.    Okay.  And it says, "Geriatric Risk Factors," and the

6    author is James Morganstern, M.D.  It says, I disagree with

7    your interpretation of the studies, and goes on to talk about

8    another doctor who was quite impressed with how much pain

9    control she got with a supposedly ineffective medicine.  You

10   see that, don't you?

11   A.    Yes.

12            THE COURT:  Are you objecting?

13            MS. NUSSBAUM:  The word --

14            THE COURT:  Excuse me.  Is that an objection?

15            MS. NUSSBAUM:  Objection.

16            THE COURT:  Sustained.  Objection, irrelevant,

17   sustained.

18            MS. NUSSBAUM:  Thank you.

19            MR. KENNEDY:  Your Honor, may I approach where I'm

20   going with this?

21            THE COURT:  No, this is about propoxyphene.  So it's

22   sustained.  You can ask him his -- ask him about gabapentin.

23   BY MR. KENNEDY:

24   Q.    The P&T Committee in Southern California frequently

25   considers various measures that can be taken to restrict or

Page 139

1    limit use of a drug, correct?

2    A.    Correct.

3    Q.    And one of the things you can do is restrict it down to

4    just use for purposes that have been approved by the FDA.

5    A.    No, we have to restrict it by a specialty.  We don't

6    restrict it by use.

7    Q.    Where is it written that you cannot decide to restrict it

8    by use?

9    A.    Well, there's no federal law, but it would be totally

10   pointless.  I mean, that's not the way things work.

11   Q.    Well, if hypothetically you concluded that a drug works --

12          MS. NUSSBAUM:  Objection, your Honor.

13   A.    Well --

14          THE COURT:  Well --

15   A.    Because we don't know what the doctors are --

16          MS. NUSSBAUM:  I think the Judge is ruling, just wait

17   a minute.

18          THE COURT:  Actually, I haven't heard the question.

19   Let me hear the question.

20   BY MR. KENNEDY:

21   Q.    What is it in the rules of the P&T Committee that says you

22   can't have a guideline, a restriction, or whatever that says

23   Neurontin has been found to work for the following purposes but

24   has been found not to be effective for the following other

25   purposes?

1  A.    We can issue guidelines, but the real thing --

2  Q.    That's my question.  Is there anything that keeps you from

3  doing that?

4  A.    There is no law that says we can't.

5  Q.    Okay.  Or any bylaw or anything else, correct?

6  A.    Not a bylaw.

7  Q.    So at any time since 2002, 2003, your P&T Committee had

8  the ability to send out an advisory to all doctors saying that

9  we find Neurontin is suited for these purposes but don't

10  believe it's suited for these others, correct?

11  A.    Correct.

12  Q.    And that hasn't happened down to and including today, has

13  it?

14  A.    Not yet.

15  Q.    Now, in addition to that, there are a variety of steps

16  you've taken where you felt it was appropriate to control the

17  use of various other drugs over the years, correct?

18  A.    I'm not sure what you're referring to, but --

19        MR. KENNEDY:  Your Honor's instruction is to keep it

20  to gabapentin, let me stay there.

21        Can we take a look at Exhibit 747 in evidence?

22  Q.    And this is a -- before you get to 13, just for the

23  doctor's benefit -- this was a DUAT meeting of April 2004 --

24  the taxpayers spent a lot of money for that computer system,

25  you still prefer paper?

Page 141

1    A.   Oh, yeah.  You still can't see everything on the computer.

2         THE COURT:  It's funny you say that, just on a total

3    aside, on the computer.  You can tell the difference

4    generationally between the older judges and newer judges as to

5    who is willing to use the computer versus the paper.  So it

6    does break down.

7         THE WITNESS:  It's the same with physicians.

8    BY MR. KENNEDY:

9    Q.   This is April of 2004, and you're a member of DUAT at this

10   time, correct?

11   A.   That's correct.

12   Q.   Do you know if you attended the April 2004 interregional

13   pharmacy meeting?

14   A.   I would say probably I did.

15   Q.   And can we go to page 13 of that exhibit, which I know the

16   jury is familiar with by now.

17         I'll represent to you that this is a gabapentin

18   utilization chart that was prepared by Dr. Carrejo.  You're

19   familiar with him, aren't you --

20         MS. NUSSBAUM:  Objection, your Honor.  I don't believe

21   that's the evidence in the case.  I don't believe there's

22   evidence Dr. Carrejo did this.

23         THE COURT:  Overruled.

24         Have you ever seen this before?

25         THE WITNESS:  I might have seen it.  If I was at the

Page 142

1    meeting, I may have seen it, yes.

2    BY MR. KENNEDY:

3    Q.   Okay.  Do you have any understanding as to how this was

4    prepared?

5    A.   No, I don't.

6    Q.   Well, at any point did the DUAT committee tell you that

7    you ought to disregard this particular page because it was just

8    garbage?

9    A.   Did the DUAT tell me that?  I don't recall.

10   Q.   You worked with Dr. Carrejo for how many years now on

11   committees and otherwise?

12   A.   He's only been in his current position for a little over a

13   year, I think, or maybe a year and a half, but he did other

14   things before that.  So probably four, five years.

15   Q.   Okay.  Found he does competent work?

16   A.   Generally.

17   Q.   Found he's in the habit of producing garbage?

18   A.   Generally not.

19   Q.   He hasn't been disciplined or fired for incompetence as

20   far as you know, has he?

21           MS. NUSSBAUM:  Objection, your Honor.

22           THE COURT:  Sustained.

23   BY MR. KENNEDY:

24   Q.   Now, this indicates that 20,249 (sic.) prescriptions were

25   reviewed.  Do you see that?

Page 143

1    A.    Yes.

2    Q.    Can you give the jury any estimate or description of what

3    kind of effort it would take to review 20,429 prescriptions to

4    extract this kind of information?

5    A.    Well, I don't know how they did it, so maybe they did

6    it --

7              THE COURT:  He doesn't know.

8    A.    I don't know.  I mean, I don't know how they did it.

9    Q.    So for all you know, this may have been done by computer?

10   A.    Might have been, might have not.

11             THE COURT:  Please, he doesn't know.

12   BY MR. KENNEDY:

13   Q.    Didn't you tell us on direct that Kaiser doesn't have the

14   ability to retrieve information about prescriptions by

15   particular use?

16   A.    That's correct.

17   Q.    So, therefore, you know it wasn't done by computer.  So it

18   had to be done by hand, correct?

19   A.    I don't know how they did this.

20   Q.    Well --

21   A.    This is a Northern California document.  I don't know how

22   they did it.

23             THE COURT:  We're moving on.  He doesn't know.

24             MS. NUSSBAUM:  Objection.

25             (Discussion off the record.)

Page 144

1   BY MR. KENNEDY:

2   Q.   I ask you next to take a look at what's already been

3   marked as Exhibit 760 in evidence.  I assume you would like a

4   paper copy.

5   A.   Thank you.

6   Q.   You're welcome.

7        And do you see that's an analysis of some 9,000

8   Neurontin or gabapentin prescriptions?  It says it's based on a

9   year-to-date analysis as of July 2004.

10  A.   Yes, it says that.

11       MS. NUSSBAUM:  The document says what it says, which

12  is new Rxs, your Honor.

13       THE COURT:  Do you know anything about it?

14       THE WITNESS:  Well, the thing up at the top, it says

15  OSCR diagnosis.  It's something from Northern California.  I

16  don't know how that system operates.

17  BY MR. KENNEDY:

18  Q.   You have no basis of knowing how accurate or inaccurate

19  this information may be; is that correct?

20  A.   I don't know how accurate it is.

21  Q.   Now, you first suspected that Neurontin might be overused

22  as far back as 2000, didn't you?

23  A.   Somewhere in the 2000, 2001 or two time period.

24  Q.   Showing you Exhibit 599, it's already --

25       MR. KENNEDY:  I'm not sure it is in evidence.  If it

1   isn't, I would offer it into evidence at this time.

2        THE CLERK:  What number is that, Raoul?

3        MR. KENNEDY:  599.

4        THE CLERK:  It is in evidence.

5   BY MR. KENNEDY:

6   Q.   This is a drug inquiry dated October 27, 2000, correct?

7   A.   That's what it says, correct.

8   Q.   Do you have some reason to doubt that's what it is?

9   A.   No.

10  Q.   And it's an inquiry from you, correct?

11  A.   It says it's from me.

12  Q.   And who are you making the inquiry to?

13  A.   This is a drug inquiry down in Downey.

14  Q.   And your request was, What are some examples of drugs that

15  are on formulary not restricted but have the potential for

16  off-label use and abuse?  Do you see that?

17  A.   Yes.

18  Q.   And the response you got back was, In discussing with Joe,

19  we thought of gabapentin and various other drugs.  And then it

20  says, Dr. Daniel was happy with this, close inquiry.  Were you

21  happy?

22  A.   I don't recall.  If he says I was, I guess I was.

23  Q.   Do you know why you were making this inquiry?

24  A.   I don't remember anymore.

25  Q.   Something had come to your attention that you were

1   concerned about potential for off-label use of drugs not on

2   formulary, correct?

3          MS. NUSSBAUM:  Objection, your Honor.

4          THE COURT:  Do you have any -- does this refresh your

5   recollection?

6          THE WITNESS:  Well, the statement was incorrect --

7   this was about formulary drugs, not non-formulary.

8   BY MR. KENNEDY:

9   Q.   Okay.  What, if anything, did you do after being told that

10  gabapentin was a drug on formulary that had the potential for

11  off-label use?

12  A.   I don't recall specifically.

13         THE COURT:  How are you doing timewise?

14         MR. KENNEDY:  I don't think I can finish in two

15  minutes, your Honor.

16         THE COURT:  How long?

17         MR. KENNEDY:  I would estimate another 15 to 20.

18         THE COURT:  Well, do another two, three minutes.

19         (Discussion off the record.)

20         MR. KENNEDY:  Your Honor, I would next offer in

21  evidence Exhibit 607.

22         (Exhibit 607 received into evidence.)

23  A.   Thank you.

24  Q.   You're welcome.  And directing your attention down to the

25  bottom e-mail from Allan Bernstein, you see it's dated March

Page 147

1    22, 2001 and it's to various people, including Morris Maizels.

2    And you know Morris Maizels, don't you?

3    A.    I know of -- I may have met him sometime directly, but --

4    Q.    Pain doctor in Southern California?

5    A.    He's a headache specialist, yes.

6    Q.    And you'll see the subject on this e-mail of 3/22/2001 is

7    tainted studies, correct?

8    A.    Yes, that's the subject.

9    Q.    And it says, As an instant follow-up to the DRUG

10   conference -- and DRUG in caps, that refers to the counterpart

11   to DUAT up in Northern California?

12   A.    That's a Northern California group.

13   Q.    "My copy of the Journal Headache arrived today.  The lead

14   article is about the efficacy of gabapentin," and is that --

15   how do you pronounce the next word, Doctor?

16   A.    Prophylaxis.

17   Q.    Thank you.  "-- prophylaxis of migraine.  The authors of

18   seven of the 'gurus' of headache care, running their own

19   headache centers around the country (at great profit to them.)

20   The sponsor of the study is not identified, though reading

21   through the author affiliations, one finds the Parke-Davis

22   Medical Research Center listed.  The study is against placebo

23   only and uses a very high dose of medication, notable in the

24   incidence of side effects and early withdrawal in the treatment

25   group.  The actual improvement is minimal when adverse events

1    are taken into consideration, yet the conclusion is that

2    'gabapentin is an effective prophylactic agent for patients

3    with migraine.'  Since the authors are also the featured

4    speakers at most headache meetings, you can see where this is

5    going.

6            "At the conference I raised the issue of being able to

7    do our own studies designed and funded internally.  We have the

8    talent, the patient populations and the infrastructure to carry

9    out these studies.  We can do a far better job of honest

10   evaluation of medications than is currently being published.

11   There is the potential for significant benefit to our patients

12   and to the cost of healthcare."

13           Then you'll see up in the top e-mail is to

14   Dr. Millares on the subject of tainted studies.  It says, For

15   your information, this and the use of gabapentin for peripheral

16   neuropathy is in is Allan's interest.

17           My question is:  In 2001 you, of course, were chair of

18   the Southern California P&T Committee, correct?

19   A.   Yes.

20   Q.   And Ms. Millares was in the drug information center,

21   correct?

22   A.   Yes.

23   Q.   And those are the people who prepare the monographs that

24   provide the background information on drugs for the P&T

25   Committee, correct?

1   A.   Yes.

2   Q.   And this is a sort of information that you would have

3   expected Ms. Millares and her group to bring to the attention

4   of the P&T Committee, correct?

5   A.   No, not really.  It's just an e-mail from a physician, and

6   it's really about a Northern California conference.  So it

7   wouldn't -- I get plenty of e-mails, I don't need more e-mails.

8   Q.   So tainted studies just isn't something that would get

9   your attention, correct?

10           MS. NUSSBAUM:  Objection.

11           THE COURT:  Sustained, argumentative.

12           MS. NUSSBAUM:  I also note he's not on this e-mail

13   chain, two people who are --

14           THE COURT:  You know what, how many times have I said

15   this?

16           MS. NUSSBAUM:  Sorry, your Honor.

17           THE COURT:  We'll see you tomorrow.

18           THE CLERK:  All rise for the jury.

19           (Jury left the courtroom.)

20           THE COURT:  See you at sidebar for a minute, then I

21   have to scoot.

22           (At sidebar on the record.)

23           THE COURT:  How much tomorrow?

24           MR. KENNEDY:  Just depends on the Court's rulings.  I

25   would make an offer of proof that we are prepared to

1   demonstrate that there are numerous other drugs for which

2   they've taken measures and imposed restrictions and things far

3   short of the evidentiary showing in this case, and that they

4   have the ability and have done it with numerous other drugs,

5   not including gabapentin, to show --

6        THE COURT:  I didn't stop you from doing that.  I

7   stopped you from talking about clinical experiences with this

8   other drug that had nothing to do with anything.  So if some

9   other drugs they imposed restrictions on -- but I don't want to

10  spend a huge amount of time on it.  He now is aware of it.

11       Listen, I feel as it -- I finally just did it in front

12  of the jury.  I've said it now for a week and a half because

13  otherwise you're arguing in front of the jury.

14       MS. NUSSBAUM:  Okay, your Honor.

15       THE COURT:  It's objection, irrelevant.  If you need

16  to see me at sidebar, fair game.  Sometimes I'll do it,

17  sometimes I won't.  But just -- you can't do it.  It's -- I

18  understand you want to sort of fight the fight, but you can't

19  do it in front of the jury.

20       MS. NUSSBAUM:  I'm sorry, your Honor.  This witness

21  really wanted to leave.  This is a document, two of the

22  recipients have been here.

23       THE COURT:  Excuse me.  You went to the vicinity of

24  12:15, so there's only so much -- 45 minutes is not that much

25  time he's had.  He wants another 20 minutes or whatever he

f9da30cc-73a1-48af-96a5-6f935b6b99f0

1   said, I'll let him do that.  I'll be very disappointed if it

2   was three minutes that we held him over, but 20, 25 minutes is

3   redirect, recross, can't do that, I have an afternoon, et

4   cetera.  You know, you didn't finish -- you probably wrote it

5   down.

6           MR. GREENE:  Twenty-eight minutes 15 seconds.

7           THE COURT:  But we finished at 12:15.

8           MR. GREENE:  12:10.

9           THE COURT:  Whatever.  The last time I thought he was

10  excessive and you could tell I was annoyed.  This time it was

11  fair game, so I'm just -- so let's -- I'll see you tomorrow and

12  then you're going to do the depositions, right?

13          MR. GREENE:  Dr. Furberg.

14          MR. BARRETT:  Y'all going to give us your Monday's and

15  Tuesday's witnesses now?  You're supposed to do that yesterday.

16          THE COURT:  Monday and Tuesday lineups a week in

17  advance.  But what I need from Mr. Sobol is the narrative.  I'm

18  not going to sit and read all the documents on my own.

19  Wednesday is what we talked about.

20          MR. GREENE:  We knew we had 48 hours.

21          THE COURT:  That's fine.  I assume that's why he's not

22  here.  I can guarantee I'm not at home at night reading the

23  documents.

24          MR. CHEFFO:  We gave Thursday and Friday, now that's

25  moved --

Page 152

1          THE COURT:  I have to leave.  See you tomorrow.

2          (End of discussion at sidebar.)

3          (Court adjourned at 1:05 p.m.)

4                    - - - - - - - - - -

5

6                         CERTIFICATION

7          We certify that the foregoing is a correct transcript

8     of the record of proceedings in the above-entitled matter to

9     the best of our skill and ability.

10

11

12    /s/Debra M. Joyce              March 9, 2010
      Debra M. Joyce, RMR, CRR       Date
13    Official Court Reporter

14

15

16

17    /s/Lee A. Marzilli             March 9, 2010
      Lee A. Marzilli, RPR, CRR      Date
18    Official Court Reporter

19

20

21

22

23

24

25

f9da30cc-73a1-48af-96a5-6f935b6b99f0