```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS




IN RE:                              )
                                    ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION   )
------------------------------------)
This document relates to:           )
KAISER FOUNDATION HEALTH PLAN, et al, )
                                    )
                 Plaintiffs         )
                                    )
        -V-                         )No. 04-10739-PBS
                                    )Pages 1 - 164
PFIZER, INC., et al,                )
                                    )
                 Defendants         )
```

```
                   JURY TRIAL - DAY THIRTEEN

           BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        March 10, 2010, 8:45 a.m.




           LEE A. MARZILLI and DEBRA M. JOYCE
                OFFICIAL COURT REPORTERS
              United States District Court
              1 Courthouse Way, Room 7200
                   Boston, MA  02210
                    (617)345-6787
```

1   A P P E A R A N C E S

2   FOR THE PLAINTIFFS:

3       THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
    Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4   Massachusetts, 02109.

5       THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6   Suite 301, Cambridge, Massachusetts, 02142.

7       LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
    850 Third Avenue, New York, New York, 10022.
8
        DON BARRETT, ESQ., Barrett Law Office,
9   404 Court Square North, P.O. Box 987, Lexington, Mississippi,
    39095.
10
        BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11  Bernstein, Embarcadero Center West, 275 Battery Street,
    San Francisco, California, 94111-3339.
12

13  FOR THE DEFENDANTS:

14      KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
    THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15  Four Times Square, New York, New York, 10036.

16      RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
    LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
        JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18  Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
    Denver, Colorado, 80202.
19

20

21

22

23

24

25

1                    I N D E X

2

   WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

3

4    DALE DANIEL, M.D.                17        48         57

5    CURT D. FURBERG, M.D.    60      83

6


7

   EXHIBITS                                PAGE

8
     712, 632, 920, 739                     20

9
     711                                    37

10
     716, 600, 601                          39

11
     515                                    42

12
     585                                    44

13
     559                                    59

14
     1158                                   73

15
     1113                                   90

16
     505                                    93

17

18   DEPOSITIONS READ

19   John Boris                            131

20   John Knoop                            147

21

22

23

24

25

8c688394-33ed-42af-838c-ffab78f22aea

1               P R O C E E D I N G S

2           THE COURT:  Good morning.

3           MR. CHEFFO:  Good morning.

4           MR. GREENE:  Good morning, your Honor.

5           THE COURT:  I think Mr. Alba alerted you to a big

6    problem.  The Juror No. 7 was reviewing his investment

7    portfolio and discovered he has Pfizer stock.  He didn't know

8    it initially, he said to Mr. Alba.  He either forgot or didn't

9    know or didn't remember.  And that's fair.  I mean, I don't

10   remember everything always.  But, anyway, I don't know that I

11   have a choice here.

12           MR. BARRETT:  Your Honor, we've talked about it, and

13   unless it's three shares or something, I mean, he has a

14   financial interest in this outcome.  And we hate it, but we

15   think he needs to go.  If it's, you know, one, two, five

16   shares, up to five shares is one thing, but if it's beyond

17   that, it could cost him some money.

18           THE COURT:  Do you want me to ask?

19           MR. BARRETT:  I think so.  I mean, if it's one or two

20   shares.  If it's up to five shares, we --

21           THE COURT:  Do you want me to bring him in?

22           MR. CHEFFO:  We can, your Honor.  I think we agree in

23   the sense that we'd certainly prefer to have him, but at this

24   point, in light of the importance of the case, potential

25   appellate issues, you know, not knowing, I think your Honor's

1    instincts are --

2           THE COURT:  It's interesting.  For judges, the

3    standards on the state and federal level actually differ on

4    this issue.  On the federal level, it's an automatic

5    disqualifier for a judge.  On the state level, it's only if

6    it's a substantial interest.  So, I mean, it's this divide.  I

7    don't know, we could all do research on whether it matters for

8    a juror if it's only one as opposed to a bunch, but I'm happy

9    to ask him because it may just go away.  It may not be

10   insubstantial.

11          MR. CHEFFO:  You can, but -- I don't know exactly what

12   the stock price has been, but, I mean, the stock prices over

13   time have been relatively small, low.  In other words, they're

14   not $15,000 per share, is my understanding.  They're $10, $20

15   shares, so the chance of someone having one share --

16          THE COURT:  I know, I remember once my kid got one

17   share of Disney stock as a gift, and I looked into it and I had

18   to take myself off the case.  It was ridiculous.  So why don't

19   we ask.  But I think the reality is, my guess is if his -- I

20   think he said something like the guy who manages his portfolio

21   invested for him.  My guess is it isn't one share of Pfizer

22   stock.  And then we'll excuse him.

23          And I understand there's another document issue?

24          MR. CHEFFO:  Just one of the exhibits.

25          THE COURT:  I am a little worried because we still

1    have at least two weeks left.  That means I'm down to eight

2    jurors.  That's not fabulous.  And we can get down as low as

3    six, but this is an important case, and you sort of want more

4    than six if you can.

5           What's the document issue?

6           MR. CHEFFO:  The issue is pretty direct, your Honor.

7    This is for Dr. Furberg.  In his report he lists his reliance

8    materials.  I also have some deposition excerpts where he was

9    asked three or four times, you know, essentially, "Is this

10   everything you've relied on for your report?"  And I don't

11   think there's a dispute.  We sent a note to Mr. Greene last

12   night at about 6:00 o'clock saying, you know, "We don't see

13   this anywhere in his report or his reliance materials.  Can you

14   please let us know."

15          THE COURT:  What is it?

16          MR. CHEFFO:  It's a statistical review and evaluation

17   of the U.S. Department of Health Services.  So, I mean, our

18   main objection to this is, it's not something he appears to

19   have relied on in issuing his report, and it's new for trial.

20          THE COURT:  So why are you putting it in?

21          MR. GREENE:  It's not new.  He cites to the FDA safety

22   alert concerning these antiepileptic drugs dated January, 2008,

23   and the conclusion they put in the safety report is the same

24   they do in the May, 2008 statistical review of the eleven

25   antiepileptic drugs.  So it's the same subject matter.  We just

1   don't have --

2          THE COURT:  Why don't you put in the earlier one?  You

3   don't have it?

4          MR. GREENE:  We don't have this one -- we've marked --

5   this is the one we wanted to get into evidence.  It's the same

6   thing.  He talks about the safety.  It's attached to his

7   report.

8          MR. CHEFFO:  It's not the same thing, your Honor.  I

9   mean, that's the point.  If it was the same thing, then he'd

10  use the one --

11         MR. GREENE:  It's right here.  It's part of his

12  report, the safety alert.

13         MR. CHEFFO:  This is a different document.

14         THE COURT:  Then just put in the safety alert.  And

15  then he can reference, if he needs to, the subsequent one,

16  because I'm going to hold both sides to this issue, your

17  experts too, so --

18         MR. GREENE:  Okay, that's fine, your Honor.  We'll put

19  in the safety alert.

20         MR. BARRETT:  Your Honor, and there's one other issue.

21         THE COURT:  Yes.

22         MR. BARRETT:  As we talked about yesterday, they gave

23  us 84 exhibits that they said that they were going to

24  cross-examine Dr. Daniel on.  I assume that was in good faith.

25  They cross-examined him yesterday.  They used about three.  Now

1   last night they've given us another dump for today, different

2   ones.  They've said they're going to -- you know, we object to

3   them.  They don't get two bites at the apple.  I mean, this

4   brings it up to over 100 exhibits.  They told the Court

5   yesterday they had what, 25 or 30 minutes with Dr. Daniel

6   today?  And it's not fair to have another dump.  It wasn't fair

7   yesterday to have 80 when they knew they weren't going to use

8   them.  It's not good faith, and now they've got -- you know, we

9   haven't even had a chance to --

10          MR. CHEFFO:  That's not true, your Honor.

11          THE COURT:  When did he give you the additional 80?

12          MR. BARRETT:  5:59 yesterday.

13          MR. CHEFFO:  We went through this.  Remember we were

14   in the middle of, I think it was Dr. Barkin's testimony, and I

15   got slides from Mr. Greene, and he said, "Well, you've seen

16   them," and it was the exact same situation we have --

17          THE COURT:  I know, but that's -- at some level, I

18   hope you're not making them go through all this work for

19   nothing.

20          MR. CHEFFO:  Absolutely not, your Honor.

21          THE COURT:  How many of them are you going to use this

22   morning?

23          MR. KENNEDY:  Probably got 20, 25 here.

24          THE COURT:  So why did you give them 80 yesterday?

25          MR. CHEFFO:  Because this was for cross-examination,

1    your Honor.  We don't, you know --

2         THE COURT:  I know, but it's not a case of hide the

3    ball, give them 80 so they won't find the 20.

4         MR. CHEFFO:  We didn't know what the direct

5    examination -- see, the point with cross is, I mean, on direct

6    it's easier, right, because you know what --

7         THE COURT:  But you know.  You know.

8         MR. CHEFFO:  Because we do simultaneous exchanges at

9    6:00 o'clock.

10         THE COURT:  I know.  You know, at some level it's good

11   faith, and you'll have to -- I don't know what to do.  I can't

12   stop them from cross-examining.  I have no remedy here.  I

13   can't say they can't --

14         MR. BARRETT:  The remedy would be that they can't use

15   this new dump of documents, that they're stuck with the 80.

16   That ought to be enough for them.

17         THE COURT:  Excuse me.  What new dump of 20?

18         MR. BARRETT:  Last night they gave us -- they gave us

19   80 yesterday, you know, 84, and we complained about that, and

20   the Court said what the Court said.  Then yesterday, after

21   they've cross-examined him, they've dumped another set of them.

22         THE COURT:  Excuse me, excuse me.  Why don't we do

23   this.  What are the -- I have no solution here.

24         MR. CHEFFO:  It's not true, though, your Honor,

25   because, first of all, we actually made it easier for them.

1   This is what happens.  They don't read the documents.  The 20

2   that we identified are actually a subset, most of them, of the

3   80.  So we actually tried to make it easier for them, and

4   they're coming in saying we're doing another document dump.

5          THE COURT:  I'm confused.  When were the 20

6   identified?

7          MR. BARRETT:  5:59 last night.

8          MS. NUSSBAUM:  Twenty-five additional documents, 25

9   including a large affidavit --

10          MR. CHEFFO:  Are they --

11          MS. NUSSBAUM:  Yes, a lot of them are, including a

12   large affidavit.  You're not going to use that?  There are

13   additional documents.

14          THE COURT:  I know, but at some level, I can't

15   micromanage this.  What's sauce for the goose is sauce for the

16   gander, so do giant dumps on them.  In fact, you have with all

17   these -- most of which are likely to come in.  So you both --

18   you know, there are some things I can't solve.  I just -- I

19   can't solve it.

20          MR. BARRETT:  That's all right.  That's fine, your

21   Honor.

22          THE COURT:  I don't know what else to say.  I mean, at

23   some point I am assuming that it's not in bad faith.  If I

24   start thinking it's in bad faith --

25          MR. CHEFFO:  Well, it's certainly not, your Honor.  I

8c688394-33ed-42af-838c-ffab78f22aea

Page 11

1    mean, we're doing our best.

2         THE COURT:  Well, it is a little annoying to get 130

3    documents and to be up all night and have someone use three.

4    That's annoying, right?  Would you be annoyed?  Would you be

5    annoyed?

6         MR. CHEFFO:  It wasn't --

7         THE COURT:  Excuse me.  Would you be annoyed?

8         MR. CHEFFO:  Yes, I would, your Honor.  They've done

9    this to us about five times, pulling Carver the day before and

10   everything else.

11        THE COURT:  I understand.  I'm not saying both sides

12   have been completely terrific.  On the other hand, you'd be

13   annoyed.  So it's the Golden Rule, isn't that what it is

14   basically, should govern this?

15        MR. CHEFFO:  I agree, your Honor, I agree.

16        THE COURT:  So let's go get this juror in here.

17        MS. NUSSBAUM:  Should I call the witness back in?

18        THE COURT:  I need to deal with the juror issue just

19   for one second, please.  I think I just let him go home if it's

20   a lot.  Do you want to come on up?  I'll bring him up here.  I

21   actually hate to lose him because he's asked a lot of good

22   questions, but --

23   SIDE-BAR CONFERENCE:

24        (Juror present.)

25        THE COURT:  Good morning.

1          THE JUROR:  Good morning, your Honor.

2          THE COURT:  What's your name?

3          THE JUROR:  John Buckley.

4          THE COURT:  So you told Mr. Alba something this

5     morning.

6          THE JUROR:  Yes.  I learned yesterday when I got my

7     monthly statement from my financial planner that we were doing

8     some reallocation of some of my stock in my portfolio, and I

9     found that I now have some Pfizer stock.

10         THE COURT:  Okay.  So do you know how much?

11         THE JUROR:  About 300 shares.

12         THE COURT:  Okay, so I'm going to ask you to step

13    aside because we might have to ask you to get off the jury.

14         (Juror leaves side bar.)

15         MR. BARRETT:  We can't keep him.

16         THE COURT:  Why don't you say that for the record.

17         MR. BARRETT:  The plaintiffs think that the juror

18    should be excused.

19         THE COURT:  Defense?

20         MR. KENNEDY:  To avoid an appellate issue, we'll go

21    along and not oppose it.

22         THE COURT:  Come on up, Mr. Buckley.

23         (Juror returns to side bar.)

24         THE COURT:  First of all, let me just say I thank you

25    for telling us as soon as you knew.  You must have had an

1   "Oh, my God" moment.

2           THE JUROR:  I did, no question.

3           THE COURT:  I never know half of what's in mine

4   either.  So I think we've just discussed it, and we've got to

5   excuse you.  I think the rules are that you can't have a

6   conflict of interest.  But, you know, we were hoping you'd say

7   "One share of stock I got as a gift," but it's too many for us

8   to be allowed to keep you.

9           THE JUROR:  I understand.

10          THE COURT:  So you've asked terrific questions.

11  You're going to be a big loss to this jury.  I'm sort of dying.

12  I'm trying to think of a way to keep you, but I really can't.

13          THE JUROR:  I understand.

14          THE COURT:  Just tell the jury you had a personal

15  problem so they don't know what the reason for it is.  Thank

16  you, and I'll get you on the next one, okay, because you're a

17  terrific juror.

18          THE JUROR:  Let me see, sixty-four?  I might not be

19  able to stay awake then.

20          (End of side-bar conference with juror.)

21          THE COURT:  Okay, so we're starting to do our jury

22  instructions.  Let me ask you this:  Are you still sticking

23  with a RICO conspiracy?  You've got to start looking at what

24  you're going to keep and what you're going to shed.  I think we

25  need to figure out unjust enrichment, whether it's a jury

Page 14

1    issue.

2              Are they all here?

3              THE CLERK:  Yes, they are.  He's leaving right now.

4              THE COURT:  So we're talking about unjust enrichment,

5    whether anyone's taking the position that's a jury issue or a

6    judge issue.

7              MR. SOBOL:  Do you want briefs on it?

8              MR. CHEFFO:  Do you want a memo on that?

9              THE COURT:  We're starting.  It's very hard to

10   describe the difference between a RICO -- you know, what most

11   people plead on a RICO conspiracy, it's just hard to explain

12   that difference to a jury.  What about unjust enrichment?  You

13   had mentioned yesterday, that I didn't even understand, that

14   there's some issue on interest and how you do that as a matter

15   of law?

16             MR. KENNEDY:  Your Honor, it's my understanding, at

17   least in RICO cases, that the decision whether to permit

18   prejudgment interest rests with the Court.  It's discretionary.

19             THE COURT:  Me or the jury?

20             MR. KENNEDY:  You, the court.

21             THE COURT:  So those are the kinds of issues I just

22   don't know.  You may be right.  I just --

23             MR. KENNEDY:  I didn't want to make an issue out of it

24   when the exhibit went in.  That's why I said subject to the

25   Court's --

1          THE COURT:  Well, are the damages done in a way where

2     the interest could be backed out?

3          MS. NUSSBAUM:  Yes, your Honor.

4          MR. BARRETT:  Yes.

5          THE COURT:  So if you disagree with that, you're just

6     going to have to let me know, because while I have charged RICO

7     in a criminal enterprise, I haven't yet had the occasion to go

8     all the way through, I think, on a civil.  So at least for

9     right now, I think that pretty much is the legal issues as

10    we're moving through RICO.

11         MR. SOBOL:  One other thing to consider, and we'll

12    brief this as well, your Honor, is whether there should be some

13    kind of instruction that the testimony regarding FDA regulation

14    and that kind of thing does not preempt, if you will, the

15    jury's decision because the jury still also has to answer the

16    question.

17         THE COURT:  I don't think that's really a big issue

18    here.

19         MR. SOBOL:  I'm not sure if it is or not.  Certainly

20    early on --

21         THE COURT:  I've got a big enough jury charge as it

22    is, okay, so --

23         I guess another big issue would be on the fraud claim,

24    the basic duty to speak --

25         MR. SOBOL:  Right.

1        THE COURT:  -- whether there's a duty to disclose the

2   negative clinical trials.  So, I mean, there are issues that

3   we're working through right now.

4        My usual game plan is to give you a rough draft as

5   soon as I'm done, and then we'll use that as the talking

6   template and add and subtract.  So I'm hoping to get that to

7   you next week, and then we can start working through it,

8   because I'm still not sure exactly what week we're going to end

9   on all of this.

10        So I think, Robert, if you could get the jury, if

11   they're ready to go.  They've probably said their farewells and

12   hugged and waved.  He's such a sweetheart.  You can just tell

13   that he would have been a good member of this jury.

14        MR. CHEFFO:  Absolutely.

15        THE COURT:  Welcome back.

16        THE WITNESS:  Thank you.

17        THE COURT:  It's almost never this good in New England

18   weatherwise.  You lucked out a bit.

19        THE WITNESS:  A little bit.

20        THE COURT:  It's a little bit like Northern

21   California?

22        THE WITNESS:  A little bit.  It's a little warmer

23   there.

24        THE CLERK:  All rise for the jury.

25        (Jury enters the courtroom.)

1          THE COURT:  Good morning to everyone.  Now, as you

2     notice, I had a discussion with one of your fellow jurors who

3     had a personal issue and needed to leave.  And so I'm sorry to

4     see him go, he asked great questions, but you're all sort of,

5     like, you're here.

6          (Laughter.)

7          THE COURT:  Did you see anything in the press or speak

8     with anyone about the case?  I actually saw -- I haven't seen

9     anything about this in the press, but I actually have on

10    occasion seen a journalist poke their head in, so there may be

11    something.  So continue to be vigilant.

12         We're going to finish, I guess you said about twenty

13    minutes, half an hour with this witness?

14         MR. KENNEDY:  I'll do my best, your Honor.  And, your

15    Honor, primarily I note that we discussed -- sorry, it's been

16    taken care of.

17                    DALE DANIEL, M.D.

18    having been previously duly sworn, was examined and testified

19    further as follows:

20    CONTINUED CROSS-EXAMINATION BY MR. KENNEDY:

21    Q.   Good morning, Dr. Daniel.

22    A.   Good morning.

23    Q.   I'd like to turn first to Exhibit 557 in evidence, and

24    just to put context for you, this is the drug monograph that

25    was prepared for the September 1999 analysis of Neurontin down

1    in your Southern California region, okay?

2    A.   Yes.

3    Q.   And going to Page 3 of that document, that sets forth the

4    guidelines -- Austin, if you'd perhaps highlight the title --

5    "Guidelines for the Use of Gabapentin (Neurontin)" that were

6    adopted in Southern California in September of 1999, correct?

7    A.   Yes.

8    Q.   Okay.  And among other things, that said that Neurontin is

9    indicated as adjunctive therapy in the treatment of partial

10   seizures, correct?

11   A.   Yes.

12   Q.   And then the third bullet point entitled "Bipolar

13   affective disorder:  A review of several studies and case

14   reports," that "Gabapentin may be effective as monotherapy --"

15   and that would mean sole therapy?

16   A.   Uhm, I believe that's what "monotherapy" means.

17   Q.   "-- or adjunctive, additional to some other drug therapy,

18   in some treatment resistant cases of bipolar affective

19   disorder."  I've read that correctly, haven't I?

20   A.   You've read that correctly.

21   Q.   And also "Diabetic neuropathy and postherpetic neuralgia,"

22   and studies have shown gabapentin to be effective in the

23   treatment of those conditions, right?

24   A.   Yes, you read that correctly.

25   Q.   And then it goes on to say that "The use of gabapentin for

1    the treatment of neuropathy should be reserved for patients who

2    have either been unresponsive or intolerant, aren't subject to

3    being prescribed a tricyclic antidepressant," a TCA, correct?

4    A.   Correct.

5    Q.   And then, finally, prescription quantities should be

6    limited consistent with a one-month trial, correct?

7    A.   Correct.

8    Q.   Now, are those the same guidelines that are in effect in

9    Southern California for gabapentin today?

10   A.   I haven't even looked at those recently.  I don't recall.

11   Q.   Do you have any reason to doubt that these are the

12   existing guidelines?

13   A.   We may have changed them.  I don't know.  This is '99.

14   That's eleven years ago.

15   Q.   Well, that's my question.  You've been the chair of the

16   P&T Committee during those entire eleven years, correct?

17   A.   Correct.

18   Q.   And as you told us yesterday, gabapentin has become the

19   subject of concern to you for a number of years, correct?

20   A.   Yes.

21   Q.   So in the course of that, have you checked the guidelines

22   from time to time?

23   A.   No.  I mean, we have a lot of guidelines come through.

24   We're doing guidelines all the time.  I don't, you know,

25   actually go back and check them.  This is something we're

1    discussing now is what to do about the guidelines we have, but

2    I haven't looked at the guidelines recently.

3    Q.   Well, I'll represent to you, at least in the documents

4    that I've looked at in this case, I haven't seen any amendment

5    to those guidelines.  Does anything come to your mind to

6    suggest these aren't still what somebody would see if they

7    looked for guidelines in Southern California?

8    A.   I don't recall.

9    Q.   Thank you.  Moving next to 712 --

10        MR. KENNEDY:  Actually, your Honor, in the interest of

11   time these all pertain to TCAs, so I would offer 712, 632, 920,

12   and 739.

13        (Exhibits 712, 632, 920, and 739 received in

14   evidence.)

15   Q.   And assuming there's no objection, if we could start with

16   712.  And you'll see this is a memo from Debbie Kubota, and she

17   works at the Drug Information Service, correct?

18   A.   Yes.  Yes, she does.

19   Q.   And does today, correct?

20   A.   Correct.

21   Q.   And this refers to DUAT, so we know this is referring to

22   Southern California, your region, correct?

23   A.   Correct.

24   Q.   And this is dated September of 2003.  Do you see that?

25   A.   Uh-huh, yes.

1    Q.    And that would be four years after the guidelines we just

2    looked at that were adopted in 1999, correct?

3    A.    Correct.

4    Q.    And, remember, those guidelines talked about reserving

5    Neurontin in neuropathy cases for people who had tried and

6    failed at TCA or weren't receptive to a TCA, correct?

7    A.    Correct.

8    Q.    And in 2003, it says that DUAT is promoting the use of

9    nortriptyline and desipramine -- those are both TCAs, correct?

10   A.    Correct.

11   Q.    And in 2003, this says, "there is some concern, as the

12   TCAs, particularly the tertiary ones like amitriptyline,

13   imipramine and doxepin, are considered contraindicated --"

14       "Contraindicated" means not recommended, right?

15   A.    That would be correct.

16   Q.    "-- in the elderly due to their high degree of

17   anticholinergenic --" that means retention of liquid, correct?

18   A.    That would be some of their effects.

19   Q.    And, "Rod St. John would like to see a MEDLINE search to

20   see whether there are any studies or good articles that confirm

21   that secondary TCAs such as --" and they give them -- "are

22   indeed safe for use in elderly patients compared with other

23   TCAs."  Do you see that?

24   A.    Yes, I see that.

25   Q.    Do you have any understanding as to why it wouldn't be

1   until 2003 that research would be undertaken on drugs that had

2   been recommended back in 1999?

3   A.   Well, there is a new group that had come along to help

4   promote better care of the elderly, and they had some concern

5   about some of the drugs, and the broad class was the tricyclic

6   antidepressants.

7   Q.   Nortriptyline wasn't a new drug in 2003, was it?

8   A.   But this group that came along with the concern was a new

9   group.

10  Q.   But the request for good articles or studies for TCAs like

11  nortriptyline, that isn't a new TCA, is it?

12  A.   No.

13  Q.   Thank you.  Let's move on to Exhibit 632, and we've

14  offered the four in evidence.  And you'll see this is

15  another -- it's actually a Debbie Kubota to you.  Do you see

16  that up at the top, a memo from November 26, 2002?

17  A.   Yes.

18  Q.   And you'll see, if we come down to the second full

19  paragraph that starts "Locally," Austin, if you can get that.

20       "Locally the DUAT is promoting low dose tricyclics over

21  Neurontin as initial therapy for neuropathy.  This list calls

22  these drugs 'rarely appropriate.'  We want to be careful about

23  contradictory recommendations."

24       Do you remember an exchange with Ms. Kubota concerning

25  whether TCAs were something that were rarely appropriate?

1   A.   I don't remember the exchange anymore, but it is a memo

2   from me apparently to Debbie.

3   Q.   Let's turn to the second page.  I realize this was a

4   number of years ago, Doctor.  And you'll see this is a memo --

5   Austin, highlighting starting "original message" up at the

6   top -- from Dale Daniel.  That's you.  You sent this -- again,

7   I realize it was a long time ago -- same date, November 26.

8   And coming down to the first full paragraph:  "This e-mail is

9   in regard to a topic," and the sentence is, "The topic is drugs

10   that are potentially high risk for adverse events in elderly

11   patients."  And then you say, "Attached below is an

12   alphabetical list of 42 drugs."  And then the next paragraph

13   is, "For example, the first drug on the list, amitriptyline

14   (Elavil) the notation would be:  Geriatric risk factor."

15   "Geriatric" refers to old people like you and me, right?

16          (Laughter.)

17   Q.   It refers to old people?

18   A.   We're young, we're young.

19          THE COURT:  You have the right to remain silent.

20          (Laughter.)

21   A.   You're not old unless you're my mother's age.

22   Q.   Okay.  In any event, "geriatric" is referring to older

23   people?

24   A.   Yes.

25   Q.   And it says, "Geriatric risk factor:  Rarely appropriate,

Page 24

1   always avoid for depression."  I've read that correctly, right.

2   A.   You read that correctly.

3   Q.   And all TCAs at that point were generics, weren't they?

4   A.   Uhm, I wouldn't recall if all TCAs were generic, but I

5   think many of them were.

6   Q.   Okay.  And under the guidelines that had been adopted in

7   1999, there would be patients for whom a TCA would not be

8   suited in the first instance, correct?

9   A.   Well, we leave the decision of the actual prescribing up

10  to the actual doctor seeing the patient in the office.

11  Q.   Well, under the guidelines, it would be appropriate to be

12  prescribing Neurontin in the first instance for people for whom

13  TCAs aren't suitable, right?

14  A.   Well, the physician is the one that gets the control over

15  the prescribing in the office, and the guidelines are just

16  guidelines.  They're not a hard-and-fast rule.  They decide

17  what's, you know, best for their patients.

18  Q.   Correct, but just sticking with the guidelines, the

19  guidelines actually recommend that when TCAs are inappropriate,

20  you would go with Neurontin or gabapentin, correct?

21  A.   Uhm, that would be an interpretation, yes, yeah.

22  Q.   Well, are these guidelines subject to multiple

23  interpretations?

24  A.   Yes.  Each doctor looks at them and decides how they

25  apply.  Really, the care of the patients is really in -- you

8c688394-33ed-42af-838c-ffab78f22aea

1  know, the doctor is seeing the patient, and they're deciding

2  what to do based on many, many characteristics of that patient.

3  Q.   And in order to determine the doctor's reason for, for

4  example, prescribing Neurontin in any individual instance,

5  you'd really have to go talk to that doctor on an individual

6  basis, wouldn't you?

7  A.   You would.

8  Q.   Let's move on to Exhibit 920 next, and this is a TCA

9  information sheet for neurosurgery, and this talks about

10  determining whether a patient is a TCA candidate.  You have to

11  screen for cardiac problems, right?

12  A.   That's what it says.

13  Q.   And you have to screen for whether there's suicide risk,

14  correct?

15  A.   Yes.

16  Q.   And you have to screen for urinary retention, correct?

17  A.   Yes.

18  Q.   And other things, including closed angle glaucoma,

19  correct?

20  A.   Yes.

21  Q.   And if people have those conditions, you don't want to be

22  giving them TCAs, correct?

23  A.   Well, again, it would be up to the physician, but these

24  are things we want him to consider.

25  Q.   And scrolling down, the TCAs that are listed include

1   amitriptyline, correct?

2   A.   Yes, I see that bullet, yes.

3   Q.   And it's in several bullets, isn't it, amitriptyline?

4   A.   Yes.

5   Q.   Scroll, Austin, if you could.  And amitriptyline, correct?

6   A.   Yes.

7   Q.   Okay.  Turning next to Exhibit 739, and you'll see this is

8   one of the Drug Information Service responses from January of

9   2004.  Do you see that?

10  A.   Yes.

11  Q.   And you'll see the question is, "Patient was on Neurontin,

12  switched to nortriptyline."

13       Nortriptyline is one of those TCAs, correct?

14  A.   Correct.

15  Q.   "Physician wants to switch the patient back to Neurontin

16  because nortriptyline not working."

17       Now, in this case, to know whether Neurontin worked or the

18  nortriptyline worked, we'd have to actually go talk to the

19  doctor, wouldn't we?

20  A.   Yes.

21  Q.   You can't tell from looking at this whether this was

22  prescribing that was done on the basis of being duped or sound

23  medical judgment, can you?

24  A.   I can't.

25  Q.   And switching topics slightly, in terms of the guidelines

1   and restrictions, as you say, they're not mandatory.  However,

2   Kaiser now has a computer system where if a doctor, for

3   example, in Southern California were to prescribe Lyrica for

4   diabetic peripheral neuropathy, they would get a message on the

5   computer saying that Kaiser recommends that the doctor

6   prescribe a TCA or gabapentin instead, wouldn't they?

7   A.   I believe there's a message like that.

8   Q.   And there are prompts for various of the drugs for which

9   you have guidelines, correct?

10  A.   There's many drugs that have prompts.

11  Q.   And doesn't Kaiser now have a program of encouraging

12  patients to communicate with their doctors by e-mail?

13  A.   Patients can e-mail our doctors.

14  Q.   So when you said yesterday that doctors don't pay

15  attention to their e-mails, that wouldn't be completely

16  accurate, would it?

17  A.   Uhm, well, there's -- okay, the HealthConnect system, the

18  message that comes back is on the HealthConnect system.  It's

19  not actually an e-mail.  We call it e-mail, but the patient is

20  sending an e-mail to the HealthConnect system, which is

21  different than our own personal communications on e-mail.

22  Q.   Ever thought about using the HealthConnect system to

23  notify the doctors of the lack of effectiveness of Neurontin?

24  A.   Uhm, that would be something we would consider.  We're,

25  you know, discussing many things to do about correcting the

Page 28

1   problem that we've been presented with by the false advertising

2   and the misinformation we've had.

3   Q.   Well, if you decide to adopt that plan, would you remember

4   to give me credit for it, okay?

5   A.   Okay.

6   Q.   Thank you.  Let's go next to Exhibit 559, and this is a

7   drug monograph from September, 1999, that we talked about

8   yesterday.  And you testified that the information that the P&T

9   Committee was provided concerning the Gorson study consisted of

10  a letter to the editor.  You recall that testimony, don't you?

11  A.   Yes, I recall that.

12  Q.   And that wasn't correct, was it?

13  A.   I don't understand.

14  Q.   Do you have a copy of that letter to the editor that you

15  were referring to?

16  A.   I don't have a copy of the letter to the editor in front

17  of me.

18  Q.   Okay.  Well, perhaps your attorney can provide it to us on

19  redirect examination.  Going to Page 2 of the drug monograph --

20  and remember we agreed yesterday that S7 refers to the Gorson

21  study, correct?  And coming down as we did yesterday to bullet

22  point No. 4, it talks about efficacy being studied in two

23  studies.  And Austin, if we can come down maybe five lines.

24  "The second study crossover trial S 47 --" that's Gorson --

25  "failed to demonstrate significant pain relief in three of the

1   four categories at 900 milligrams."  Do you remember that?

2   A.   Correct.

3   Q.   It doesn't say anything about a letter to the editor, does

4   it?

5   A.   Not on this page.  The letter to the editor is on the last

6   part.

7   Q.   The letter to the editor is on the last part?

8        (Witness examining document.)

9   Q.   The last page?

10  A.   Well, the S7 is the letter to the editor, or it cites the

11  letter to the editor in the journal that the letter is in.

12  Q.   Okay.  Well, let's go over to the last page, Austin, and

13  scrolling down, it's the last cite:  "S7 Gorson, et cetera,

14  Gabapentin in the Treatment of Painful Diabetic Neuropathy; A

15  Placebo-Controlled Double Blind Crossover Trial, Journal of

16  Neurosurgery and Psychiatry," do you see that?

17  A.   Yes.

18  Q.   And that doesn't say "letter to the editor," does it?

19  A.   It doesn't say that right there.

20  Q.   Okay.  And now let's go back in the same document, the

21  drug monograph, to the page that bears Bates Nos. 561.  And,

22  Austin, if you can highlight the discussion of S7.  This talks

23  about diabetic neuropathy, randomized, double-blind

24  placebo-controlled studies six weeks.  And then it's got two

25  full columns of information, correct?  Can you highlight them

1    all?  Let's not enlarge them all for the moment.  Can you at

2    least show them all.  And how about going over to the

3    right-hand column, Austin.

4        "There were significantly more adverse events with

5    gabapentin 12 points versus placebo (4 points)," and then it

6    talks about a P value.  You believe all of that was contained

7    in a letter to the editor?

8    A.   I believe so.

9    Q.   Well, it was a pretty complete --

10              THE COURT:  Do we have this journal?  Is it a letter?

11              MR. KENNEDY:  Well, I'll represent to the Court it is

12   not a letter to the editor.  It was the full study.

13              THE COURT:  Well, do we have it so we can see it?

14              MR. KENNEDY:  Perhaps they can produce the letter to

15   the editor.

16              MS. NUSSBAUM:  Your Honor, it is a letter to the

17   editor.  We do have it.

18   Q.   Whatever form this was in, everything that's in these four

19   columns on Page 24561, if the jury wanted to look at it, all of

20   that information was contained in some form that was made

21   available to your committee in 2002, correct?

22   A.   Correct.  The key point is that it's not peer reviewed.

23   So you can put anything you want in a letter to the editor

24   without -- it's not been looked at by anybody else, so you have

25   to discount it.

1    Q.    The minutes don't mention that this is being discounted

2    because it's not in a peer-reviewed journal, does it?

3    A.    Well, these aren't the minutes of the meeting.  These are

4    the drug monograph.

5    Q.    Well, in any event, in 2002 you knew that you were dealing

6    with only a letter to the editor, correct?

7    A.    This is 1999.

8    Q.    1999, I'm sorry.  1999 you knew you had a letter to the

9    editor?

10   A.    Correct.

11   Q.    And you discounted it in 1999, correct?

12   A.    Correct.

13   Q.    And went ahead and approved gabapentin for pain, correct?

14   A.    Correct.

15   Q.    After discounting the letter to the editor?

16   A.    Correct.

17   Q.    Thank you.  Let's switch now to Exhibit 630.  You talked

18   just a little bit about Pande and Frye.  I was getting ahead of

19   myself.  This is a drug monograph from 2002, and this is when

20   the chiefs of psychiatry have requested that Neurontin be

21   expanded to include them, correct?

22             MR. KENNEDY:  Oh, I'm sorry, 630 is not evidence.  I

23   apologize, your Honor.  I'd like to take it down for a moment.

24   We'd offer it at this time, the June 2002 drug monograph.  If I

25   may publish it to the jury, please.  And going to the last

1    page, Austin, would you highlight References R38 and R40.

2    Q.   And R38 you'll see is a study by Frye, and R40 is a study

3    by Pande, correct?

4    A.   I haven't gotten that far yet.  You want me to go to the

5    last page?

6    Q.   It's on the screen, Doctor.

7              MR. KENNEDY:  It is in evidence?

8              THE CLERK:  It's already in evidence.

9              MR. KENNEDY:  For once I was right, and Mr. Fox was

10   wrong.

11   Q.   You found those two cites, Doctor?

12   A.   I found those two, the 38 and 40?

13   Q.   Yes, and they do say Frye and Pande, don't they?

14   A.   Yes, they do.

15   Q.   And we're in 2002, correct?

16   A.   Yes, this was 2002.

17   Q.   Okay.  Now would you go with me to Page 18 of this 2002

18   drug monograph.  And, Austin, could you highlight the evidence

19   table.  And it talks about gabapentin in bipolar disorder, and

20   this says "Does not contain 4 open-label trials published in

21   1999," but it then proceeds to discuss Frye and Pande, correct?

22   Do you see that?

23   A.   This is on Page --

24   Q.   18.

25   A.   18.

1          (Witness examining document.)

2     A.    Okay, I found Frye, and I found Pande.

3     Q.    Okay.  And on Pande, you'll see there are four columns of

4     information about it.  If we come over to the third column, it

5     has "Change from baseline favored PLC," and it then has

6     "Gabapentin minus 6, PLC minus 9."  PLC is referring to

7     placebo, correct?

8     A.    I believe that's correct.

9     Q.    And this is showing that on the Pande study, placebos

10    actually did better than gabapentin, correct?

11    A.    Correct.

12    Q.    And with that information available in 2002, you went

13    ahead and voted to extend gabapentin use to include

14    psychiatrists, right?

15    A.    No.  We voted on the, uhm, the gabapentin extension to

16    psychiatry back in 1999.

17    Q.    I stand corrected.  You're absolutely right.  In 2002,

18    Ohio extended gabapentin to psychiatrists.  Did you know that?

19    A.    I didn't know that.  I do not know what they do in Ohio.

20    Q.    And for us to find out exactly what happened in Ohio, we'd

21    need somebody from the Ohio P&T Committee, wouldn't we?

22    A.    You would need somebody from there.

23    Q.    Thank you.  And there's no doubt in your mind, though,

24    that as of 2002, the drug monograph information provided to the

25    P&T Committee in Southern California disclosed that under the

1   Pande study, gabapentin for bipolar wasn't as good as placebo,

2   correct?

3   A.   Correct.

4   Q.   And since then, as I think we've already established,

5   Southern California hasn't taken any steps to restrict

6   gabapentin so that it wouldn't be used by psychiatrists,

7   correct?

8   A.   No.  We don't restrict.  We educate.

9   Q.   Let's take a look next at Exhibit 635, and you'll see this

10   is -- when it says SCPMG, that's Southern California Permanente

11   Medical Group that you work with?

12   A.   That's correct.

13   Q.   This is a chiefs of psychiatry meeting back in March 20,

14   2002, correct?

15   A.   That's what it says.

16   Q.   And let's go to the third page of this March 2002 report

17   by the chiefs of psychiatry, the first full paragraph entitled

18   "Gabapentin," and it says, "While a number of case reports and

19   open-label studies suggested efficacy in the treatment of

20   bipolar disorder, the results of 2 placebo-controlled studies

21   found no difference between gabapentin and placebo treatments

22   in the treatment of manic or depressed symptoms, or even

23   favored placebo."

24        And "manic or depressed" is referring to bipolar, isn't

25   it?

1    A.    Manic depressive is bipolar.

2    Q.    "In these larger studies low gabapentin --" that's GBP,

3    right? -- "levels indicate poor compliance by some patients.

4    The surprising findings of these studies make it difficult to

5    assess the appropriate place in therapy for the agent."

6          I've read that correctly, haven't I?

7    A.    You read that correctly.

8    Q.    And that's information that apparently was known to the

9    chiefs of psychiatry in Southern California in 2002, correct?

10   A.    That would be correct.

11   Q.    And circling back for just a minute to Defendants' 607 in

12   evidence that we talked about yesterday, and this was

13   Mr. Bernstein's memo about tainted Parke-Davis studies,

14   correct?

15            (Witness examining document.)

16   A.    It mentions Parke-Davis here, yes.

17   Q.    We talked about this document yesterday.  You remember

18   that?

19   A.    Yes.

20   Q.    And coming to the next-to-the-last paragraph of -- it's

21   Dr. Bernstein, isn't it?

22   A.    I believe it's doctor.  I believe he's a physician.

23   Q.    He talks about, "At the conference, I raised the issue of

24   being able to do our own studies, designed and funded

25   internally."  And Dr. Bernstein is another Permanente doctor,

1    right?

2    A.    That's correct.

3    Q.    When he talks about "our," he's talking about Kaiser or

4    Permanente, correct?

5    A.    Correct.

6    Q.    And he says, "We have the talent, the patient populations

7    and the infrastructure to carry out these studies.  We can do a

8    far better job of honest evaluation of medications than is

9    currently being published.  There is the potential for

10   significant benefit to our patients and to the cost of

11   healthcare."

12        Do you agree with Dr. Bernstein?

13   A.    No, not necessarily.  We're not a research organization.

14   Q.    Well, Kaiser does a great deal of research, though, don't

15   you?

16   A.    We do some research, but I really can't comment on the

17   amount of it.  I'm not involved with the research.

18   Q.    Don't you bill yourselves as the largest clinical research

19   organization in the world?

20   A.    I don't know.

21   Q.    You never heard that?

22   A.    No.

23   Q.    Okay.  Well, in any event, do you know any reason why, as

24   part of the education effort, Kaiser couldn't have carried out

25   or asked Dr. Bernstein to carry out its own studies to

1    demonstrate the lack of effectiveness of gabapentin?

2    A.   No, we're really not a research organization, and it costs

3    a lot of money and a lot of effort that would be taken away

4    from patient care.

5    Q.   So you would say that Dr. Bernstein's assessment in that

6    last paragraph that that could be done, you'd disagree with

7    him, correct?

8    A.   I would generally disagree.

9         MR. KENNEDY:  I offer next Exhibit 711.  May I publish

10   that to the jury, your Honor?

11        THE COURT:  Yes.

12        (Exhibit 711 received in evidence.)

13   Q.   You'll see this is part of a neuropathic pain initiative.

14   This is an August 28, 2003 work plan, something over six years

15   ago.  Do you see that?

16   A.   Yes.

17   Q.   And this is DUAT, the committee that you served on, right?

18   A.   Correct.

19   Q.   And at that point you're talking about developing

20   PharmaFAX messages, correct?

21   A.   Yes, it says PharmaFAX.

22   Q.   And those are informational alerts to doctors about

23   comparative performance and cost of drugs, and in this case

24   Neurontin, right?

25   A.   Yes, it says Neurontin.

1   Q.   And then the next bullet point talking about "Paycheck

2   stuffer messages," and that was actually implemented, wasn't

3   it, sticking messages into doctors' paychecks telling them

4   about how much more expensive Neurontin was, correct?

5   A.   Well, I think it explained the role of therapy for the

6   treatment of neuropathic pain.

7   Q.   And this is something that you implemented sometime back

8   around 2003, correct?

9   A.   It looks like it was in 2003.

10   Q.   And then in the interest of time, since the jury will have

11   this document, both that page and then there are three more

12   pages that go on to detail the work plan and the educational

13   efforts that are going to be undertaken with regard to

14   controlling Neurontin usage, correct?

15   A.   Well, the point of it is to improve the treatment of

16   neuropathic pain.

17   Q.   And over in the last page there's a section "Monitor and

18   Report Utilization," and the second bullet point there says,

19   "Begin monitoring and reporting utilization patterns for MDs

20   prescribing Neurontin naive of TCA."

21        And "naive" here doesn't mean unworldly.  It means that

22   people haven't been tried on TCAs before, right?

23   A.   It means, yes, people that have not tried TCAs before.

24   Q.   And so in 2003, the DUAT committee, at least, had the

25   ability to track individual physician's prescribing patterns

1   with regard to Neurontin, right?

2   A.   In 2003, for individual physicians, probably did.

3          MR. KENNEDY:  Moving, and again in the interest of

4   time, I'm going to talk about detailing for a couple minutes,

5   your Honor, and we'd offer 716, 600, and 601 jointly, and I

6   represent they all pertain to that same topic.

7          (Exhibits 716, 600, and 601 received in evidence.)

8          MR. KENNEDY:  And if I may publish 716, if there's no

9   objection?

10         THE COURT:  How are you doing timewise?

11         MR. KENNEDY:  Another ten, fifteen minutes.  I don't

12   think you can say I'm wasting time this morning, your Honor.

13         THE COURT:  I know, but ten minutes.  Let's go.

14   Q.   Exhibit 716, Debbie Kubota, this is Southern California,

15   right?

16   A.   She's from Southern California.

17   Q.   Right, and in the third paragraph, if we can, "We also ask

18   the PSRs --" that's referring to the salespeople that do the

19   detailing, correct?

20   A.   Yes.

21   Q.   Well, actually, in this case it's referring to Pfizer

22   sales reps, PSRs, correct?

23   A.   I would, yes, interpret it that way.

24   Q.   And this is as of 2003.  "We also ask the PSRs to promote

25   their products according to our guidelines; i.e., Neurontin is

1    not restricted --"

2        So apparently as of 2003 no restrictions had been placed

3    on Neurontin in Southern California, correct?

4    A.   Correct.

5    Q.   "-- but we have asked Pfizer to not detail as first-line

6    treatment of postherpetic neuralgia, PHN, which is an

7    FDA-approved indication for the drug."  Do you see that?

8    A.   I see those words there, yes.

9    Q.   So in this case, Pfizer had a drug that had been approved

10   by the FDA for this particular condition, correct?

11   A.   That's my recollection, yes.

12   Q.   And Kaiser asked Pfizer not to try to promote the drug to

13   Kaiser doctors for the FDA-approved use, correct?

14   A.   That's correct.

15   Q.   And that's because Kaiser's policy was, you wanted to use

16   a less expensive drug for that condition, correct?

17   A.   No.  I mean, I can't speak to that because, I mean, this

18   came from Christina Maeda to Debbie.  My name is not on it, so,

19   I mean, I can't tell you the background or why they were

20   sending this.

21   Q.   And that wasn't something that came to your attention in

22   the course of your --

23            THE COURT:  No.  Let's go.

24            MR. KENNEDY:  That's my point, your Honor.

25   Q.   Let me move on to Exhibit 600.  This is a November 30,

Page 41

1   2000, you'll see, memorandum to the Pfizer field force.  And

2   coming down to "U.S. sales operations, Neurontin issues,"

3   Austin, you'll see this is November 30, 2000.  "Neurontin

4   detailing responsibility will be limited only to U.S. RON

5   sales.  Representatives will call only on neurologists for

6   Neurontin."

7        Do you have any reason to believe that following

8   November 30, 2000, after Pfizer acquired Parke-Davis, detailing

9   of Neurontin wasn't limited to just neurologists?

10  A.   I wouldn't know.  I mean, this is a Pfizer document.  I

11  have no idea what this is about.

12  Q.   Well, in the course of trying to police Neurontin usage,

13  did DUAT or your P&T ever contact Pfizer and ask them to

14  restrict what they were detailing the drug for to Kaiser

15  doctors?

16  A.   I wouldn't know.  I wouldn't characterize it as

17  "policing."  We were trying to educate our doctors about how to

18  appropriately use Neurontin and treat neuropathic pain.  We

19  were trying to counteract the misinformation we'd had

20  previously.

21        MR. KENNEDY:  Move to strike everything after he

22  doesn't know.

23        THE COURT:  Yes, I'll strike that.

24  Q.   And moving next to Exhibit 515 already in evidence.  And,

25  Doctor, this is going all the way back to 1994, and I promise

Page 42

1    this is just a short excursion in history, we're not going to

2    go all the way back there, but this is the meeting in Southern

3    California where you people approved Neurontin originally.  If

4    you take a look at Page 6 of that document, I think it will

5    show that.

6              MR. KENNEDY:  Oh, I'm sorry.  Offering it into

7    evidence, your Honor.  Thank you, Mr. Alba.

8              (Exhibit 515 received in evidence.)

9    Q.   You'll see gabapentin is mentioned at the top of the page,

10   that it's been shown to be safe and effective, et cetera, and

11   you went ahead and got it added to the formulary.  Do you see

12   that?

13   A.   Page 6, okay.

14   Q.   "Accepted with restrictions" back in 1994.  You talked

15   about that on direct.

16   A.   Yes, okay, it was accepted with restrictions in 1994.

17   Q.   And gabapentin wasn't the only drug that got talked about

18   that day.  Can we scroll down, Austin, to Salmeterol or

19   Serevent.  Scroll a little bit further.  Page 7, I'm sorry.

20             Remember, the drug Salmeterol, and what was done with it

21   as in contrast to gabapentin was, "Although the regional P&T

22   Committee agreed that Salmeterol is an effective agent, they

23   concluded that classifying the drug as non-formulary would be

24   the best way to control inappropriate use and promote safe and

25   rational use.  Patients whose asthma is uncontrolled on

Page 43

1    formulary agents are appropriate candidates to receive

2    Salmeterol via the exception process."

3         And opposite that at the bottom of the left-hand column,

4    the last sentence is, "Although the manufacturers of Salmeterol

5    have promoted its use widely to both the medical community and

6    the general public, only a select group of patients will

7    significantly benefit from the use of a long-acting inhaled

8    beta agonist."

9         I've read that correctly, haven't I?

10   A.   You read that correctly.

11   Q.   So if the P&T Committee thinks that a drug has use for

12   some limited purpose, like maybe controlling epileptic

13   seizures, they can keep it off formulary but still make it

14   available for those uses, can't they?

15   A.   I'm not sure I understood your question.

16        THE COURT:  Well, why couldn't you have taken the same

17   approach with Neurontin that they took with this other drug?

18        THE WITNESS:  Okay, because the one drug -- there's a

19   big difference between the one drug.  The one drug is just for

20   patients with epilepsy, so it's a very small group of physicians.

21   The other drug is for a huge wide group of physicians and so a

22   very different situation.  One drug is, you know, maybe a 100

23   doctors are going to be prescribing versus 2,000 doctors

24   prescribing.  So in these situations at that time, we would

25   tend to make them, you know, sometimes make them non-formulary

1  just to send a signal that it's not appropriate for widespread

2  use.  But they're very different situations.

3  Q.   It is what you did with Salmeterol, though, correct?

4  A.   Your question is?

5  Q.   There's no doubt in your mind that what we've read is the

6  way the P&T Committee handled Salmeterol, correct?

7  A.   That's the way we handled it at that time in 1994.

8       MR. KENNEDY:  Okay, moving on to Exhibit 585, offering

9  it in evidence, your Honor, a Kaiser document.

10      (Exhibit 585 received in evidence.)

11      MR. KENNEDY:  May I publish?

12      THE COURT:  Hearing no objections, yes.

13 Q.   And this is a memo from -- this is Northern California,

14 TPMG, correct?

15 A.   It says TPMG.

16 Q.   And this is the chiefs of neurology up there, and this is

17 a meeting back in June of 2000, correct?

18 A.   That's correct.

19 Q.   Okay, and it's been established in this case that

20 Neurontin is an antiepileptic drug, or an AED, correct?

21 A.   This is all Northern California, right?  I don't see my

22 name on here or anything about Southern California.  I don't

23 know that I can comment about what they were doing up there.

24 Q.   All I've asked so far is whether you agree that Neurontin

25 is an antiepileptic drug or an AED?

1    A.    I would agree with that, yes.

2    Q.    And at least in Northern California, in the preface they

3    explain that "AEDs are one of the fastest-growing therapeutic

4    classes of drugs in Kaiser Permanente," correct?

5    A.    Uhm, if they said that, that's what they said in Northern

6    California.

7    Q.    You weren't aware of that happening in Southern

8    California?

9    A.    I can't recall.

10   Q.    Okay.  And coming down to the second bullet point, they

11   talk about oxcarbazepine being extremely expensive, more than

12   twenty times more expensive than the generics, and then coming

13   down to the fourth bullet point, they say, "As such, we are now

14   recommending addition to the formulary with prescribing

15   restrictions to neurologists and with guidelines that would

16   endorse a more restrictive recommendation, should the chiefs

17   offer one."

18       At least up in Northern California they were apparently

19   talking about doing that, correct?

20   A.    Apparently they were.

21   Q.    And you're not aware of any reason why something similar

22   couldn't be done in Southern California, are you?

23   A.    Well, we have very different ways of doing things.  We're

24   a very different, you know, somewhat different medical -- I

25   mean, we are different medical groups.

1    Q.   So it would be correct, if we wanted to talk about

2    anything other than Southern California, we'd have to have

3    somebody like you come in from each of those other regions; is

4    that correct?

5            MS. NUSSBAUM:  Objection, your Honor.

6            THE COURT:  Overruled.

7    A.   To really know the background of what was going on, you

8    would need somebody from Northern California.  I'm not an

9    expert on Northern California.

10           MR. KENNEDY:  And almost done, your Honor, I promise.

11   Q.   Going to Exhibit 515 already in evidence, and you'll see

12   this is a Regional Pharmacy and Therapeutics.  We talked about

13   it just a couple minutes ago.  This is the 1994 document where

14   you initially adopted gabapentin, okay?

15   A.   Correct.

16   Q.   The same document, this time let's go to the second page,

17   and what's an NF exception rate?

18   A.   That would be non-formulary exception rate.

19   Q.   So there is something where you can have a drug that's

20   non-formulary but can be used with certain exceptions, correct?

21   A.   Right.

22   Q.   And that's something that's existed since at least as

23   early as 1994?

24   A.   Correct.

25   Q.   Now, final topic.  You explained yesterday, you've been

1    concerned about Neurontin usage ever since 2002, correct?

2    A.   About that time period, yes.

3    Q.   And of late, you've become even more concerned about it,

4    right?

5    A.   Especially in the last few months, we're very concerned

6    about it.

7    Q.   And you're really concerned about the insureds'

8    hard-earned dollars being spent on a drug that really isn't

9    doing any good, correct?

10   A.   That's what we're concerned about.

11   Q.   How much did Kaiser spend on gabapentin in 2008?

12   A.   I don't know.

13   Q.   Do you know if it was more than in 2007?

14   A.   Uhm, I'm not sure.

15   Q.   How much are they going to spend in 2009?

16   A.   I'm not sure.

17   Q.   Well, is gabapentin usage going up or down?

18   A.   I don't know where we're at right now.

19   Q.   Well, is it higher now than when you started the education

20   program?

21   A.   I believe when we did the education program starting in

22   2002 or 2003, in that time frame, it dropped.

23   Q.   How about since 2005 when it went generic, has it gone

24   back up?

25   A.   Uhm, I'm not sure.

8c688394-33ed-42af-838c-ffab78f22aea

Page 48

1   Q.   Well, can you tell us within $10 million how much Kaiser

2   spent on gabapentin in 2008?

3   A.   No.  I'm not able to.

4        MS. NUSSBAUM:  Objection, your Honor.

5   A.   I'm not an expert on that.

6        MR. KENNEDY:  Thank you very much, your Honor.

7        THE COURT:  Anything on redirect?

8   REDIRECT EXAMINATION BY MS. NUSSBAUM:

9   Q.   Good morning, Dr. Daniel.

10  A.   Good morning.

11  Q.   Now, knowing what you know today, would you again

12  prescribe Neurontin for a patient for pain?

13  A.   Would I?  No.

14  Q.   Today?

15  A.   Today I would not for pain.

16  Q.   Now, was Kaiser concerned enough about their geriatric

17  patients to put together a group of physicians who specialized

18  just at looking at prescription drugs and whether or not they

19  were appropriate for geriatric patients?

20  A.   Yes.  We put together a special group that worked with the

21  elderly to see, you know, improved care of the elderly

22  patients.

23  Q.   And any physician who was prescribing a drug for a

24  geriatric patient is free to prescribe whatever drug they

25  believe is in the best interests of that patient; is that

8c688394-33ed-42af-838c-ffab78f22aea

1    right?

2    A.    Yes, they are.

3    Q.    And that's true whether or not the drug is on the

4    formulary?

5    A.    That's true.

6    Q.    And that drug will be paid for as long as the physician

7    believes that that's the appropriate drug for that particular

8    patient?

9    A.    As long as a physician said it's the appropriate drug for

10   the patient, it will be covered by the health plan benefit, and

11   they'll receive it.

12   Q.    Now, I believe that you were asked earlier about the

13   Gorson letter to the editor which is S7.  If you look at your

14   exhibits, it was Plaintiff's Exhibit 327, if you have that.

15   A.    Yes, I recall that from just a few minutes ago.

16   Q.    Now, who in the P&T Committee --

17          MR. KENNEDY:  Objection, assuming facts not in

18   evidence.  It says "letters to the editor," your Honor.

19          THE COURT:  Overruled.

20   Q.    Who at the P&T Committee actually looks at the medical

21   literature that's discussed in the references?  Is that you, or

22   is that Drug Information Services?

23   A.    It's the Drug Information Services that looks at it.

24   Q.    And who creates the list of references?  Is that you, or

25   is that the Drug Information Services?

1    A.    The Drug Information Services does.

2    Q.    Now, looking at S7, it indicates next to Gorson that the

3    publication is the Journal of Neurology, Neurosurgery &

4    Psychiatry?  Is that the name of the journal?

5    A.    Yes.  Okay, I would ask that that journal be placed on the

6    screens, please.  And I would ask that we look at the table of

7    contents.  And if you'd look under "Letters to the editor," do

8    you see that?

9    A.    Yes, about the fourth one down, "Gabapentin in the

10   treatment of painful diabetic neuropathy; a placebo-controlled

11   double-blind crossover trial."

12   Q.    Okay, so the fourth bullet down where it says "Letters to

13   the editor," and it then indicates the Kenneth Gorson letter to

14   the editor, do you see that?

15   A.    I see that.

16   Q.    And that's referring to the Reference S7 that's in the

17   monograph; is that correct?

18   A.    That's correct.

19   Q.    Is there any question at all in your mind that the Gorson

20   reference is a letter to the editor?

21   A.    I'm absolutely certain it's a letter to the editor.

22   Q.    Now, looking for a moment at an exhibit that was shown to

23   you by Mr. Kennedy, and that's Exhibit 635, and that was a

24   chiefs of psychiatry meeting dated March 20, 2002.

25   A.    Yes, I have that.

Page 51

1    Q.   And he drew your attention to gabapentin, and there was a

2    discussion of a negative study, and it said, I'll read the last

3    sentence out loud:  "The surprising findings of these studies

4    make it difficult to assess the appropriate --"

5            THE COURT:  Excuse me.  Is something supposed to be up

6    on the screen?

7            MS. NUSSBAUM:  I'm sorry.  It's Exhibit 635.

8    Q.   The third physical page where it says "Gabapentin," and

9    the last sentence:  "The surprising findings of these studies

10   make it difficult to assess the appropriate place in therapy

11   for this agent."  Do you see that?

12   A.   Yes, I see that.

13   Q.   Now, the date of this meeting is March of 2002?

14   A.   Correct.

15   Q.   Now, your P&T Committee considered whether or not

16   Neurontin could be expanded for psychiatrists to prescribe for

17   mood disorders in psychiatry in June of 1999; is that correct?

18   A.   That's correct.

19   Q.   And at that time you were not aware of the Pande study; is

20   that correct?

21   A.   That's correct.

22   Q.   You were not aware that that was a negative study; is that

23   correct?

24   A.   That's correct.

25   Q.   And the defendants knew that at least a year before; is

1    that right?

2    A.   They knew that a year before.

3    Q.   And Drug Information Service had reached out to the

4    defendants and had asked them, "Is there anything else out

5    there that we should know about," is that right?

6         MR. KENNEDY:  Objection, leading.

7         THE COURT:  Sustained.

8    Q.   The list of references indicates that Drug Information

9    Services had reached out and communicated with the defendants

10   here to ask them if there was any other information about

11   Neurontin; is that right?

12        MR. KENNEDY:  The same objection.

13        THE COURT:  You know, there's some leading allowed in

14   redirect, but you need to --

15        MS. NUSSBAUM:  Sorry, your Honor.

16   Q.   Now, in June of 1999, did Drug Information Service reach

17   out to these defendants and ask them if there was any

18   additional information about Neurontin?

19   A.   Yes, they did, and --

20   Q.   Were they told about Pande?

21   A.   We didn't hear about Pande.

22   Q.   And once we learned about Pande and we learned that Pande

23   was negative, that was something that was both surprising and

24   of great interest; is that right?

25   A.   It was.

Page 53

1           MR. KENNEDY:  Objection, your Honor.

2           THE COURT:  Sustained.

3           MR. KENNEDY:  I move to strike the answer.

4           THE COURT:  Yes.

5    Q.   Now, Dr. Daniel, DUAT has had two different initiatives

6    with respect to Neurontin; is that right?

7    A.   That's correct.

8    Q.   Now, the first problem that DUAT started dealing with in

9    the 2001 through --

10          MR. KENNEDY:  Objection, your Honor.

11          THE COURT:  Sustained.

12   Q.   What was the first problem concerning Neurontin that DUAT

13   dealt with?

14   A.   Well, okay, so the first problem was that we found out

15   about the Pande study.  So we had approved it in '99, you know,

16   on the evidence, and now we had evidence that it maybe, you

17   know, didn't work.  So we had to, you know, decide how to deal

18   with that, and so we had a DUAT initiative to begin working on

19   reducing the use, particularly in the bipolar disorder with the

20   psychiatrists.

21   Q.   And in the early 2000s, was there also an issue concerning

22   off-label promotion?

23   A.   Yes.  So we have, you know, more use is going on with

24   Neurontin than we suspect was justified, and we had learned

25   from -- you know, that there had been off-label promoting.  And

8c688394-33ed-42af-838c-ffab78f22aea

Page 54

1   so we began thinking, well, why is the use so high?  You know,

2   it's a drug that has indications, but its use is going kind of

3   high, so we began thinking perhaps that the inappropriate use

4   was being driven by the off-label marketing and that we should

5   intervene.

6   Q.   Now, as part of the DUAT's efforts to combat the illegal

7   off-label promotion of Neurontin and to encourage appropriate

8   prescribing, did DUAT rely on the existing medical literature

9   to try to educate physicians?

10  A.   Right, we always rely on the existing medical literature.

11  Q.   And what were some of the education techniques that DUAT

12  used from 2002 to 2005 to try to educate physicians?

13  A.   Well, we used several things.  We used conferences, so

14  they could be a telephone conference.  It's called a

15  teleconference.  We used video conference, which means you can

16  video; you know, you can see each other back and forth to some

17  extent.  We used paycheck stuffers, and we used laminated cards

18  that would talk about, you know, first-line, second-line agents

19  for like bipolar disorder, that sort of thing.

20  Q.   And did DUAT's education efforts in that 2002 to 2005

21  period which were focused on the illegal off-label promotion,

22  did they result in a fall-off in new prescribing?

23  A.   Yeah, it dropped some.  I think it dropped about a third

24  or so.

25          THE COURT:  Did you ban Pfizer representatives from

Page 55

1   promoting to doctors?

2           THE WITNESS:  Uhm, I can't recall for sure whether we

3   did that.

4           THE COURT:  There was one document that suggested with

5   respect to one indication.  Was that just that indication?

6           THE WITNESS:  Uhm, I can't recall for sure.  We have

7   banned Pfizer's representatives at times.

8   Q.   Now, to your knowledge, was the medical literature that

9   DUAT relied on to combat the off-label promotion accurate and

10  complete?

11  A.   Well, as it turns out, it wasn't accurate and complete.

12  We didn't have the Reckless study, we didn't have the full

13  peer-reviewed Gorson study, and we hadn't had the re-review of

14  the Backonja study that all ended up being negative studies.

15  We didn't have that, so we didn't have that information to help

16  us combat the use at that time.

17  Q.   Now, was the inclusion of Dr. Dickersin's article in the

18  New England Journal of Medicine that the selective outcome

19  reporting for trials of off-label use in industry-sponsored

20  trials of Neurontin the first peer-reviewed medical journal

21  article that questioned the validity of the evidence for the

22  effectiveness of off-label indications?

23  A.   To my knowledge --

24          MR. KENNEDY:  Object, beyond the scope.  Move to

25  strike.

8c688394-33ed-42af-838c-ffab78f22aea

1         THE COURT:  Overruled.

2    A.   To my knowledge, that was the first article published, and

3    it was a very important article.  It was in the New England

4    Journal of Medicine, the most important and widely read journal

5    in the United States.

6    Q.   And who brought that article to your attention?

7    A.   Uhm, I believe it was an e-mail from Mirta Millares.

8    Q.   And she's Drug Information Services?

9    A.   She's from Drug Information Services.

10   Q.   Now, as an evidence-based organization, how critical is

11   the validity of the medical literature?

12   A.   The medical literature, I mean, that's the -- the validity

13   of that is the key to the whole thing.  That's the key to

14   modern medicine.  I mean, that's what this really is all about.

15   And starting in the 1960s, we began to use double-blind

16   randomized studies and evidence to, you know, improve treatment

17   of various things in this country.  For example, the reason for

18   breast cancer that women don't all have to have mastectomies

19   now is because of --

20         MR. KENNEDY:  Objection.

21         THE COURT:  Sustained.  Are you almost done?

22         MS. NUSSBAUM:  Yes.

23   Q.   Dr. Daniel, have you ever faced a situation similar to the

24   one that you're now facing with Neurontin?

25   A.   No, we have not.  This is a unique situation, so it makes

1    it much more difficult to deal with.  We have to deal with

2    incorrect and incomplete information that's been provided by

3    the defendants.

4            MS. NUSSBAUM:  I have nothing further, your Honor.

5            MR. KENNEDY:  Very briefly, your Honor.

6    RECROSS-EXAMINATION BY MR. KENNEDY:

7    Q.   Going back to Exhibit 559, the 1999 monograph, if you

8    could put that up on the screen.  Let me see if I understand

9    this.  At the time the P&T Committee met, you had some

10   information on the Gorson study, correct?

11   A.   We knew it was a letter to the editor.

12   Q.   And even though the references in the document itself

13   don't say anything about a letter to the editor, it was in fact

14   a letter to the editor?

15   A.   It was a letter to the editor.

16   Q.   Okay.  And you and the P&T Committee knew it was a letter

17   to the editor rather than a full study, correct?

18   A.   I believe that's correct.

19   Q.   Okay.  And then going to Page 24561, the table in the

20   monograph under S7 for Gorson, you had all of the information

21   that's set forth in all four of those columns, correct?

22   A.   That information is as it is on the screen, I'll agree.

23   Q.   And knowing that that information came from a letter to

24   the editor rather than a full report, the P&T Committee went

25   ahead and voted to accept the recommendation before it?

1   A.   We discount letters to the editor.

2   Q.   Okay, but even discounting letters to the editor, you

3   still went ahead and voted to expand who could use gabapentin?

4   A.   Correct.

5   Q.   And just one other matter.  You mentioned this Dickersin

6   study several times.  Dr. Dickersin's New England Journal

7   article doesn't say one word about whether Neurontin is or is

8   not effective for dealing with any of the uses in question,

9   does it?

10  A.   Well, I haven't read it --

11  Q.   Excuse me?

12  A.   I haven't read it that carefully to make that broad of a

13  statement.

14  Q.   You read it carefully enough for you to have this

15  revelation you told us about yesterday, correct?

16  A.   I don't understand.

17  Q.   Well, let me withdraw the question.  You haven't read the

18  Dickersin article carefully enough to know whether it says

19  anything at all about the effectiveness of Neurontin as opposed

20  to the methodology of the studies, right?

21  A.   Right.

22          MR. KENNEDY:  Thank you very much.  No further

23  questions.

24          THE COURT:  Thank you.

25          (Witness excused.)

1          MS. NUSSBAUM:  Your Honor, just for the record, I

2     think I neglected to move Exhibit 559, which was the actual

3     Gorson letter to the editor, into evidence, so I would do that

4     now.

5          MR. KENNEDY:  No objection, your Honor.

6          THE COURT:  I'll allow that.

7          (Exhibit 559 received in evidence.)

8          THE COURT:  Thank you very much.  Your next witness?

9          MR. GREENE:  Dr. Furberg.

10              CURT D. FURBERG, M.D.

11    having been first duly sworn, was examined and testified as

12    follows:

13         THE CLERK:  Would you please state your name and spell

14    it for the record.

15         THE WITNESS:  I'm Curt Daniel Furberg.

16         THE CLERK:  Can you spell it for the record.

17         THE WITNESS:  What's that?

18         THE CLERK:  Could you please spell it for the record

19    for the Court Reporter.

20         THE COURT:  Your name, how do you spell your name?

21         THE WITNESS:  Spell the name, okay.  Curt, C-u-r-t,

22    middle initial is D, last name Furberg, F-u-r-b-e-r-g.

23         THE COURT:  Thank you.

24         MR. GREENE:  May I proceed, your Honor?

25

1    DIRECT EXAMINATION BY MR. GREENE:

2    Q.   Good morning, Doctor.

3    A.   Good morning.

4    Q.   Could you tell the jury where you're from.

5    A.   Well, I was born in Sweden, but I've been in the states

6    since 1973.

7    Q.   I want to just review your qualifications.  You're a

8    medical doctor; is that correct?

9    A.   That's correct.

10   Q.   And just tell us about your educational background.

11   A.   Well, I got my medical training in Sweden, and then I got

12   the research training on top of that in Sweden, so I have an

13   M.D. and a Ph.D. equivalent, and then further training,

14   on-the-job training and courses in biostatistics and

15   epidemiology here in the states.

16   Q.   Have you taught at various medical schools here in the

17   United States?

18   A.   What's that?

19   Q.   Have you taught at various medical schools here?

20   A.   I have done that.  I did that when I worked at the NIH.  I

21   had an appointment at Georgetown University, did some teaching

22   there.  I did some teaching at the NIH.  In fact, I even taught

23   people at the FDA how to do clinical trials.

24   Q.   Where are you currently employed, Doctor?

25   A.   I'm at Wake Forest University School of Medicine.

1    Q.    What is your position there?

2    A.    Well, I'm past chairman of the Department of Public Health

3    Sciences, and I'm a senior advisor to the dean.

4    Q.    How long have you been at Wake Forest University Medical

5    School?

6    A.    Since January, 86.

7    Q.    What were your positions there, just briefly?

8    A.    Well, I came down to create a research center with focus

9    on epidemiology and biostatistics.  We got departmental status.

10   Three years later I was chairman until '99 when I stepped down.

11   Q.    Do you have expertise in the design, the conduct, and

12   analysis and reporting of clinical trials?

13   A.    Yes.

14   Q.    I know you might be a bit modest, but this book here

15   entitled Fundamentals of Clinical Trials, is this the leading

16   text in the world on the design, conduct, and analysis and

17   reporting of clinical trial results?

18   A.    That's what I've been told.

19   Q.    And you're one of the coauthors of this text?

20   A.    Correct.

21   Q.    This is the third edition, I'm told, but it's going to a

22   fourth edition; is that correct?

23   A.    It's with the publisher right now.

24   Q.    And you've published, I think you said, close to 400

25   articles; is that right?

8c688394-33ed-42af-838c-ffab78f22aea

1   A.   Peer-reviewed articles, yes.

2   Q.   And 60 of them deal with drug safety; is that correct?

3   A.   Well, more recently I've been more interested in drug

4   safety and published a large number of articles.

5   Q.   And have you testified before Congress on drug safety?

6   A.   I have.

7   Q.   You mentioned that you worked for the National Institute

8   of Health, and I think the jury has heard of that from one or

9   two of the plaintiffs' experts, but could you just tell us,

10   what is the National Institute of Health?

11   A.   Well, it's an arm of the government.  It has several

12   functions.  It's the way the government supports research,

13   medical research in the United States, so it awards grants and

14   contracts.  It also conducts its own research, and that's where

15   I was involved.  And then they have a hospital, so they treat

16   selected patients, primarily for research purposes.

17   Q.   How long did you work at the National Institute of Health?

18   A.   I think for eleven and a half years.

19   Q.   And just very briefly, can you tell the jury what you did

20   there.

21   A.   Well, I came there to work in the what are called Clinical

22   Trials Branch, and we were involved in running large-scale

23   clinical trials addressing important public health questions.

24   So I stayed there, and then after some years I was promoted to

25   head of that group, and then a little bit later moved up even

8c688394-33ed-42af-838c-ffab78f22aea

1   more but focused still on the conduct of clinical trials.  And

2   I was at the institute at a time when so much happened in

3   cardiology.  We developed or determined that there were a lot

4   of treatments that could be used in patients with heart disease

5   that reduced their risk of complications and improved survival,

6   and I had a very active role in that development.

7   Q.   Can you tell the jury what the Data Safety Monitoring

8   Committee is for clinical trials.

9   A.   Well, it's a committee that has as its charge to review

10  information from the trial.  Typically it's a blinded trial, so

11  the investigators would not and the participants would not know

12  what the results are.  So this independent group would look at

13  the data and first review and accept the protocol, and then

14  monitor the data, and then recommend action.  If a drug is more

15  effective than anticipated, the trial would be stopped.  If the

16  drug is causing harm, it would be the same recommendation,

17  stop.  So it fills an important role.  It's a safeguard for the

18  patients that they are getting good care and not exposed to

19  unnecessary risks.

20  Q.   And have you sat on the Drug Safety Monitoring Committee

21  for more than fifty clinical trials?

22  A.   That's correct.

23  Q.   Now, one other definition I'd like for the jury.  Could

24  you tell us, what is a medical statistical review, in laymen's

25  terms?

8c688394-33ed-42af-838c-ffab78f22aea

1   A.   Well, you're referring to the FDA.

2   Q.   I am.

3   A.   Well, before a drug gets approved for a market in the

4   United States, it has to be reviewed by the regulatory agency,

5   the Food and Drug Administration here.  And all the data is

6   reviewed, from the pharmacology of the drug to animal toxicity,

7   the experience in people, statistical analyses.  So the medical

8   statistical review is part of that big package.  So it's

9   looking at the clinical data submitted by the manufacturer and

10  the analyses.

11  Q.   Now, when we first met, I asked you if you would review

12  some documents from the defendant, and I asked you a couple

13  questions.  Do you recall that?

14  A.   Yes.

15  Q.   One of them, I asked you if you would review the safety

16  data in the Food and Drug Administration's combined

17  medical/statistical review of Neurontin from the original

18  epilepsy trials for the indication "adjunctive therapy for

19  refractory partial seizures."  Do you recall that was your

20  first assignment?

21  A.   Yes, I do.

22  Q.   And could you tell the jury what you looked at.

23  A.   Well, I got the FDA review, and the focus, that's where I

24  started off, and --

25  Q.   Would that be the FDA Medical/Statistical Review?

8c688394-33ed-42af-838c-ffab78f22aea

1    A.    Correct.

2          MR. GREENE:  Could we have that Exhibit 207.

3    A.    Yes, that's the document that I reviewed.

4    Q.    Let's turn to Page 22.  Tell the jury what we have on the

5    screen before us, Doctor.

6    A.    Well, this is I think the cover page indicating what the

7    review is about.  It's related to Neurontin, gabapentin, for a

8    specific indication.  And it also gives the dates and the names

9    of the clinical reviewer and the statistical reviewer.

10   Q.    Okay.  And the date of the review is January 31, 1992; is

11   that correct?

12   A.    Correct.

13   Q.    And the clinical reviewer is an employee of the FDA,

14   Cynthia McCormick, correct?

15   A.    Well, all the reviewers are FDA employees.

16   Q.    We'll come to it a little bit later, but was this

17   statistical review signed by the FDA?

18   A.    Oh, yes.  They all sign.  It's signed not just by one

19   person but several people who obviously have to agree with the

20   final report.

21   Q.    Directing your attention now again to the -- sticking with

22   the statistical review, Exhibit 207, do you have Page 114 of

23   the document on the screen before you?

24   A.    Yes.

25   Q.    Tell the jury what part of the statistical review appears

1    at this cite.

2    A.   Well, this is a summary of the data related to what the

3    heading says, "Depression/suicidal ideation, and suicide

4    attempts."

5    Q.   And, again, this is the original epilepsy trials for

6    Neurontin, correct?

7    A.   That's correct.  There were five of those epilepsy trials

8    and --

9    Q.   Will you read those three sentences to the jury in the

10   first paragraph.

11   A.   "In the total exposed population of the NDA," the New Drug

12   Application, "78 or 5.3 percent of the patients reported

13   depression as an adverse event.  This included one subject in a

14   Phase 1 study," which is early, in early drug development.

15   "There were 7 reports of depression as serious adverse events,

16   and 9 patients who withdrew from studies because of

17   depression."

18   Q.   All right, I want to direct your attention to one other

19   paragraph, three sentences on this page.  That would be the

20   next paragraph.  Could you read those three sentences to the

21   jury, the very next paragraph.

22   A.   The first three sentences?

23   Q.   I think it's the first three.  Yes, please.

24   A.   "There may be some underrepresentation in certain

25   categories.  For example, in some cases depression was reported

1    as a serious adverse event, particularly if it resulted in

2    hospitalization or was associated with suicidal ideation."

3         And this is an important one:  "However, numerous examples

4    were identified among the CRF," the case report forms, "where a

5    patient developed treatment-emergent depression where

6    pharmacological intervention," drug treatment, "was required

7    and the report of a serious adverse event was not made."

8         And this is troubling.  Here there are patients who

9    developed depression, and it was not reported according to the

10   regulations.

11   Q.   When you say "according to the regulations," what are you

12   referring to?

13   A.   Well, the manufacturer has to report adverse events to the

14   regulatory agency as part of the application.  Otherwise, how

15   could the FDA judge a drug whether it's good or bad?  In the

16   balance, you need to know all the information, the good and the

17   bad.

18   Q.   That's for the FDA to be able to assess the risk and

19   benefit?

20   A.   That's for the FDA before the drug is marketed.  And then

21   it's equally important then after marketing that that

22   information is made available to physicians and patients and

23   others with an interest in knowing whether a drug is useful.

24   Q.   Could we direct your attention now to 139.  This is

25   Page 116 of the statistical review that's on your screen.  I'd

1    like to direct your attention to the paragraphs entitled

2    "Summary, conclusions, and recommendations."  Do you have that

3    before you, Doctor?

4    A.    Yes, I do.

5    Q.    If we could read the first two sentences.

6    A.    "As of the data cut-off date of September 30, 1992, data

7    from clinical trials involving 2,048 subjects indicate that

8    gabapentin has a safety profile that is generally good but

9    about which there remain several important concerns."

10         And I think this is what I picked up on.

11   Q.    Well, that's what I'd like to ask you about.  That remark

12   from the FDA, "there remain several important concerns," what

13   does that mean to you based on your education, training, your

14   experience, and your review of this document?

15   A.    It means that the data that the company provided did not

16   allow a determination whether the drug is safe.  The remaining

17   issues, and I think later on they go over which ones, but when

18   they say "remain several important concerns," that to me was a

19   red flag.

20   Q.    Let me direct your attention to Page 140, which is 117 of

21   the document, and would you read the first sentence of the

22   third paragraph.  Do you have that in front of you?

23   A.    Yes.

24   Q.    That first sentence, read that.  I want to ask you a

25   question after you've read it.

1    A.    Well, when they review the various adverse --

2    Q.    Just read it out loud to the jury, please.

3    A.    "Less common but more serious events may limit the drug's

4    widespread usefulness."

5    Q.    All right.  Now, again, the manufacturer here, the

6    defendant, was seeking approval to market the drug as

7    adjunctive therapy to a limited patient population; is that

8    correct?

9    A.    Correct.

10   Q.    What does this sentence mean to you, Doctor?

11   A.    Well, it means that the drug should be, if used, should be

12   used with caution; and if they don't have good safety

13   information, physicians and patients may not be interested in

14   using it.

15   Q.    If you drop down to the third sentence and read that to

16   the jury, it begins "A third is that depression."

17   A.    Well, they talk about four serious adverse events.

18   "A third is that depression, while it may be not an infrequent

19   occurrence in an epileptic population, may become worse and

20   require intervention or lead to suicide, as it has resulted in

21   some suicidal attempts."

22        And, again, that's why I picked up on depression as

23   something that really troubled me in the review of the FDA

24   document.

25   Q.    Now, I'd like to direct your attention to the last page of

1    this statistical review, 142.  Do you have that, the

2    "Recommendations" page?

3    A.    I do.

4    Q.    Could you read that first sentence to the jury.

5    A.    "In conclusion, NDA:  The New Drug Application, "20-235 is

6    approvable with appropriate and prominent labeling for use in a

7    specific population."

8    Q.    What does that mean, Doctor?

9    A.    It means that the use is approved in a very limited

10   population of patients.

11   Q.    Was this review signed by five employees of the Food and

12   Drug Administration?

13   A.    Yes.

14   Q.    And they joined in this recommendation and these findings?

15   A.    If they sign it, I'm sure they must agree with it.

16   Q.    Based on your review of this document, did the FDA review

17   contemplate the use of Neurontin to treat bipolar or any mood

18   disorder?

19   A.    No.  I think that's an important point, that the --

20   Q.    Let me just ask you a couple more questions, and then I'll

21   ask you --

22   A.    It was --

23   Q.    Doctor, I just want to interrupt you for a minute.

24   A.    Sure.

25   Q.    Did the FDA review contemplate the use of Neurontin for

1    neuropathic pain or nociceptive pain or migraine headaches?

2    A.   I think that was initially in there, but it was approved

3    just for limited use.

4    Q.   Adjunctive therapy for epilepsy?

5    A.   Yes.

6    Q.   Okay.  Could you tell us what a safety signal is.

7    A.   Well, it's very difficult from a methodological point of

8    view to document that a drug causes harm, to document it beyond

9    any reasonable doubt.  But when you have trends -- a signal is

10   a trend, it's a safety trend, and that is the term that the FDA

11   often is using.  And they typically require, at least nowadays,

12   if there is a safety trend, that the manufacturer would conduct

13   additional studies to determine whether the trend is real or

14   whether it's just caused by chance.

15   Q.   Did you concur with the FDA's findings that there was an

16   increased risk of depression with or without suicidal ideation?

17   A.   Yes, I do, and I think the numbers were small, but they

18   were troubling.

19   Q.   Why is that?

20   A.   Well, there was about a 65 percent increase in risk of

21   depression with the drug compared to placebo, the sugar pill.

22   Q.   Are the FDA findings of increased risk of depression with

23   or without suicidal ideation relevant to the promotion and use

24   of Neurontin in patients with bipolar and mood disorders?

25   A.   Absolutely.

1    Q.   Are they relevant, those same findings relevant to the

2    promotion and use of Neurontin for treating neuropathic pain

3    and nociceptive pain and migraine headache?

4    A.   Yes.

5    Q.   Why is that?

6    A.   Well, I think when the drug is causing a side effect, it

7    may be less dependent on the underlying condition.  The side

8    effects typically happen in people with different diagnoses,

9    different age, and so on.  They're more across the board, so

10   typically you would see them in patients with any underlying

11   disease.

12   Q.   Are those FDA findings of increased risk of depression

13   with or without suicidal ideation material to a physician who's

14   going to prescribe Neurontin for mood and bipolar disorder,

15   neuropathic pain, nociceptive pain, and migraine headache?

16        MR. HOOPER:  Objection.

17        THE COURT:  Overruled.

18   A.   Yes.  It should be pointed out, if you see harm in this

19   population of epilepsy, you would expect to see that in the

20   treatment of the other conditions, and it at least should be

21   raised.  I mean, it's not proof, but it should be raised as an

22   issue.

23   Q.   Do the FDA findings of increased risk of depression with

24   or without suicidal ideation contradict and undermine a

25   promotional claim made by the defendants that Neurontin has

1    beneficial effects on bipolar and mood disorder?

2              MR. HOOPER:  Objection.

3              THE COURT:  Overruled.

4    A.   I had a hard time believing when I read that, frankly.

5    Here we have a side effect of depression that sometimes leads

6    to suicide, and then to make then some claims without

7    disclosing this risk, make claims that people with depression

8    should be treated, just blows my mind, and it just doesn't make

9    any sense whatsoever.  People who already have depression are

10   high-risk individuals, and there's a good chance things are

11   going to get worse.

12   Q.   Bipolar disorder includes depression, doesn't it?

13   A.   That's correct.

14   Q.   Bipolar disorder includes a mania component, doesn't it?

15   A.   Yes.

16   Q.   Now, did I also ask you to review an article that was

17   written by the defendants' employees referred to as the "Dimond

18   article," Exhibit 1158?

19   A.   Yes.

20             MR. GREENE:  We'd move to offer this Exhibit 1158 into

21   evidence.

22             THE COURT:  All right.

23             (Exhibit 1158 received in evidence.)

24   Q.   Do you have a copy of that before you?

25   A.   Yes, I do.

Page 74

1    Q.   And this was written or dated February, 1996.  Do you see

2    that, Doctor?

3    A.   Yes, I do.

4    Q.   Go to the very top of the first page of the exhibit, and

5    if we could highlight that.  It appeared in a journal, 1996,

6    Volume 20, Pages 407 to 417; is that right?

7    A.   That's right.

8    Q.   And I think I mentioned the authors, a Kate Dimond,

9    Atul Pande, Linda LaMoreaux, and Mark Pierce, are all from the

10   CNS Clinical Research and Development Department at the

11   Parke-Davis Pharmaceutical Research Division of Warner-Lambert.

12   That's what it says there, right?

13   A.   Yes.

14   Q.   And you've reviewed this article?  I asked you to look at

15   it; is that right?

16   A.   I did.

17   Q.   The abstract appears on the first page.  That's kind of a

18   summary of the article, is it not, Doctor?

19   A.   Yes.

20   Q.   Let me direct your attention to No. 1 under the abstract.

21   Will you read that to the jury, please.

22   A.   "Global improvement data from five double-blind clinical

23   trials of gabapentin as add-on therapy in patients with

24   epilepsy were reviewed to assess the effects of gabapentin on

25   mood."

1   Q.   Now, these are the same five double-blind clinical trials

2   that the manufacturer submitted to the FDA that were just

3   discussed in the statistical review that we were talking to the

4   jury about, correct?

5   A.   That's correct, and where the FDA found an increase in

6   depression, a change in mood, an unfavorable effect.

7   Q.   All right, so defendants' employees are reporting here in

8   this abstract that there's actually an improvement on mood; is

9   that right?

10  A.   That's what they claim.

11  Q.   And let me direct you to No. 3.  Will you read that to the

12  jury, please.

13  A.   "Findings support anecdotal reports of improved affective

14  status among patients taking gabapentin and suggest that the

15  study of gabapentin in psychiatric populations may be

16  warranted."

17  Q.   Let me direct your attention to Page 413 of the article.

18  I just want to highlight a couple of things here.  Do you have

19  the paragraph entitled "Discussion"?

20  A.   Yes.

21  Q.   I just want to read a sentence or two here and then ask

22  you a question, Doctor.  So they write, "In agreement with

23  anecdotal reports of improved mood and cognition in

24  gabapentin-treated epileptics --"  What does "cognition" mean?

25  A.   Cognition is brain function, memory.

1    Q.    So they're citing another study there that reports

2    anecdotal evidence of improved mood and cognition, not a study

3    but anecdotal reports; is that right?

4    A.    Correct.

5    Q.    And then the next, carrying on there, it says, "-- present

6    data suggest a beneficial effect of gabapentin on mood,"

7    correct?

8    A.    Yes.

9    Q.    Now, if you turn to the next page, I just have two more

10   sentences I'd like to bring to your attention, and then I have

11   a question.  Dropping down to the last full paragraph, just

12   above "Conclusions," if we could highlight the next-to-the-last

13   sentence in that paragraph, and I'll read it to you, Doctor:

14   "At the very least, these findings support gabapentin's lack of

15   adverse effects on mental functioning."

16         Is that what they wrote?  Do you see that?

17   A.    That is correct, and it's --

18   Q.    One more, and then I'm going to ask you a question.  Under

19   "Conclusions," Doctor, let me read you this sentence.  They

20   wrote, "This retrospective analysis of clinical trial data on

21   gabapentin and placebo in epilepsy suggests potentially

22   beneficial effects of gabapentin on mood and well-being."

23         Isn't that what the defendants' employees wrote there?

24   A.    Yes.

25   Q.    You've reviewed the entire article, haven't you, Doctor?

1   A.   I have.

2   Q.   Did they make any reference at all to what the FDA found

3   when they did their statistical analysis, that there was an

4   increased risk of depression with and without suicidal

5   ideation?

6   A.   No, and it's remarkable because it's based on the same

7   five trials, and the FDA concluded there is serious concerns,

8   with a 65 increase risk of depression.  That's not included

9   here.

10  Q.   Should the FDA findings have been included in this

11  literature?

12  A.   Absolutely.  I mean, I think responsible investigators

13  review the literature; they go to the bed and include it in

14  their reports.

15  Q.   Did you also review the FDA's safety alert dated

16  January 31, 2008?

17  A.   I did.

18  Q.   And that's part of your report?

19  A.   Yes.

20       THE COURT:  Oh, yes, go ahead.

21       A JUROR:  Two questions.  Where was this published?

22       THE WITNESS:  Which one?

23       A JUROR:  This article that we're discussing.

24       THE COURT:  The Dimond/Pande study.

25       A JUROR:  The Dimond article.

1        THE COURT:  The 1996 study that you were just

2   referring to, what journal was it published in?

3        THE WITNESS:  Well --

4        THE COURT:  Or was it published in a journal?

5        THE WITNESS:  -- we discussed that, we showed that.

6        THE COURT:  What journal was it?

7        MR. GREENE:  I have it right here.  Put up the first

8   page.  It's Prog. Neuro Psychopharmacological and Biological

9   Psychiatric -- it looks like an abbreviation for -- if we could

10  highlight that for the jurors, please.

11       THE COURT:  That's on the screen, and it was published

12  in that journal in 1996, is that right?

13       MR. GREENE:  Correct.

14       THE COURT:  All right.  Your second question?

15       A JUROR:  My other question is, in clinical trials,

16  how much weight should anecdotal evidence be?  How much weight

17  do you take into anecdotal evidence versus empirical summaries?

18       THE WITNESS:  That's a great question.  I think, in my

19  view, when you talk about efficacy, not much.  When you talk

20  about safety, you should pay attention.  You know about

21  Neurontin -- no, sorry -- the thalidomide, the sleeping pill

22  that caused birth defects.

23       MR. HOOPER:  Objection, your Honor.  Move to strike.

24       THE COURT:  Sustained.  I think we shouldn't go off

25  into --

1    Q.    Let me just follow up on that.  Level 1 evidence are the

2    double-blind randomized controlled trials?

3    A.    Absolutely.

4    Q.    That's the gold standard of proof for efficacy?

5    A.    Correct.

6    Q.    Case reports, anecdotal evidence, that's Level 3 evidence?

7    A.    Correct.

8    Q.    That's not reliable evidence when you're trying to

9    establish a drug's efficacy, is it?

10   A.    No, it's not.  The FDA wouldn't approve a drug on that.

11   Q.    You said you've taught and lectured to the Food and Drug

12   Administration?

13   A.    Yes.

14   Q.    And on what subjects?

15   A.    Various methodological aspects of trials.  I mean, in our

16   book we go from defining the question until all the way through

17   reporting it.

18   Q.    And in your book you point out that Level 3 evidence,

19   anecdotal evidence, can never be used to establish a drug's

20   efficacy?

21   A.    I'm not sure whether that's in there, but that's clearly

22   the view that the medical community has.

23              THE COURT:  You have a question?

24              A JUROR:  The medical/statistical review that the FDA

25   does, their report, that's published, right?  Is it general

Page 80

1   information?

2         THE WITNESS:  I'm sorry, I can't hear you.

3         THE COURT:  Is it published?

4         A JUROR:  Is it published and generally available?

5         THE WITNESS:  The FDA's reviews?

6         A JUROR:  Yes, and if so -- let me follow up so I

7   don't have to keep asking -- where would that fall in the

8   process of review for drugs in terms of Level 1, Level 2,

9   Level 3, literature, journals?

10        THE WITNESS:  Well, the FDA review, I think it is

11  available, and I'm not sure available for everything.  When the

12  FDA disapproves the drug, we don't hear about it.

13        A JUROR:  No, I'm not talking specifically about --

14        THE WITNESS:  But in this particular case, for drugs

15  you approve, I think you can get that information.

16        A JUROR:  And is --

17        THE WITNESS:  It's not typically used by a lot of

18  people.  It's a lengthy document that very few people review

19  unless they have a specific reason to know more about the

20  approval process.

21        A JUROR:  For the recommendations or the caveats that

22  are put in there, that wouldn't be something that you would

23  seek out?  I'm just, you know --

24        THE COURT:  So to what extent does this information

25  about depression become part of the medical literature that

Page 81

1    Kaiser or other doctors could access?  Is that basically it?

2              A JUROR:  The Drug Information Service.

3              THE COURT:  The Drug Information Service, all right,

4    so to what extent could the Drug Information Service at Kaiser

5    have accessed this information?

6              THE WITNESS:  I think, in principle, anyone can ask

7    for the information for approved drugs and studies, but

8    normally it's not distributed and it's not read, and I think

9    very few of my colleagues know about it.

10             THE COURT:  Thank you.  How are you doing on time?

11             MR. GREENE:  I'll be done in three minutes.

12   Q.   So you reviewed an FDA alert dated January 31, 2008,

13   correct?

14   A.   I did.

15   Q.   Can we have that up on the screen.  This, again, came out

16   January 31, 2008, and if you could summarize just briefly what

17   this alert concerned.

18   A.   In this alert, the FDA summarizes the reports that looked

19   at suicidality.

20   Q.   There are eleven drugs, and one of the drugs --

21   A.   Eleven drugs from placebo-controlled trials used for

22   treatment of epilepsy and other conditions, and these were the

23   antiepileptic drugs, eleven antiepileptic drugs.

24   Q.   One of them was Neurontin, correct?

25   A.   Correct.

Page 82

1   Q.   And the FDA was looking at the same information with

2   regard to Neurontin that was available back in 1993 in the

3   statistical review; isn't that correct?

4   A.   That's correct.

5   Q.   And could you turn to the second page of that alert, and

6   there midway down, do you see the heading "Healthcare

7   professionals who prescribe antiepileptic drugs should," and

8   there's a colon?

9   A.   Correct.

10   Q.   And this is what the FDA is recommending, correct?

11   A.   Yes.

12   Q.   "Balance the risk for suicidality with clinical need for

13   the drug," is that right?

14   A.   Yes.

15   Q.   "Be aware of the possibility of the emergence or worsening

16   of depression, suicidality, or any unusual changes in

17   behavior," correct?

18   A.   Correct.

19   Q.   "Inform patients, their families and caregivers of the

20   potential for an increase in the risk of suicidality so they

21   are aware and able to notify their healthcare provider of any

22   unusual behavioral changes," right?

23   A.   That is correct.

24   Q.   Pfizer had this FDA review, didn't they?

25   A.   Oh, yes.

1   Q.   Parke-Davis and Warner-Lambert had the statistical

2   information that the FDA reviewed in May of 2008 back in 1993,

3   correct?

4   A.   They had all this information.

5   Q.   And based on the materials you looked at, neither Pfizer

6   nor Parke-Davis took any steps between 1994 and January 31,

7   2008, to notify healthcare providers of this risk?

8   A.   No, and that's the disturbing thing in the whole affair,

9   that the information was there in '92.  And in order for

10  physicians to balance the risk of the bad effects and the good

11  effects and be aware of the types of problems that may appear

12  and to inform patients, they have to know.  And how do they

13  know?  Well, they do it through the labeling primarily.  So

14  there is an obligation, there's a federal regulation that

15  requires a drug company to include in labeling suspicions of

16  serious adverse events, and that was not done.  This is the

17  crux of the whole thing here, as I see it, that this troubling

18  information was not communicated so it could be applied to

19  medical practice and patients could be informed.

20       MR. GREENE:   Thank you, Doctor.

21  CROSS-EXAMINATION BY MR. HOOPER:

22  Q.   Dr. Furberg, I just want to start by understanding your

23  assignment in this case.  You're not a Kaiser doctor, are you,

24  sir?

25  A.   No.

1  Q.   You've never been employed by Kaiser in any way prior to

2  this case, correct?

3  A.   No.

4  Q.   You were not asked by Mr. Greene to review any Kaiser

5  documents in this case, correct?

6  A.   Correct.

7  Q.   And you were not asked to communicate in any way with any

8  Kaiser physicians, correct?

9  A.   Right, correct.

10  Q.   You were not asked to review any Kaiser Permanente patient

11  records in connection with this case, correct?

12  A.   Correct.

13  Q.   You've not been asked to offer any opinions on Kaiser

14  Permanente doctors' prescribing decisions, have you?

15  A.   That's correct.

16  Q.   And, as I understand it, you were retained in this case

17  sometime in November, 2008; is that right?

18  A.   Yes.

19  Q.   You were first contacted by Dr. Dickersin in early 2008,

20  but you were too busy at that time to take it, correct?  That's

21  what you told us in your deposition, right?

22  A.   Well, she called and asked whether I would be willing to

23  get involved.

24  Q.   Then in November, sometime before Thanksgiving I think you

25  told us, Mr. Greene called you, and you agreed to work in the

1   case, right?

2   A.    Correct.

3   Q.    And Mr. Greene sent you some documents to review, correct?

4   A.    Yes.

5   Q.    And you give Mr. Greene a report by December 9, 2008,

6   right?

7   A.    That's right.

8   Q.    You spent about 20 hours generating your report in this

9   case, right?

10  A.    Yes.

11  Q.    How many total hours do you have in this case, Doctor?

12  A.    Well, I had those 20, and then I had a deposition last

13  year here in Boston, so I don't know, a half day or so, and

14  then in preparation for this appearance.

15  Q.    Somewhere in the 30- to 40-hour range?

16  A.    Including today?  Yeah, probably.

17  Q.    Do you know, Dr. Furberg, if your conclusions have been

18  shared with any Kaiser doctors or patients since the time you

19  gave Mr. Greene your report in December of 2008?

20  A.    Do I know if my --

21  Q.    Conclusions have been shared with Kaiser doctors or

22  patients?

23  A.    I don't know that.

24  Q.    Doctor, you mentioned that you are currently a senior

25  advisors to the dean at Wake Forest; is that right?

Page 86

1    A.    Yes.

2    Q.    You don't teach a class there now, do you?

3    A.    No.

4    Q.    If we looked in the syllabus for Wake Forest Medical

5    School's program, we wouldn't see your name on a class?

6    A.    That is correct.  I had other responsibilities filling up

7    my time.

8    Q.    And, sir, you're not licensed to practice medicine in the

9    United States, are you?

10   A.    No.  Just in Sweden.

11   Q.    You haven't treated patients since you left Sweden in 1973

12   to come to the United States, correct?

13   A.    Other than family.

14   Q.    You're not an expert in neurology, treatment of nerve

15   disorders?

16   A.    Well, it depends who you -- no, I'm not an expert, no.

17   Q.    You're not an expert in psychiatry, correct?

18   A.    No, but I know -- I have a good understanding of medicine

19   and the various disciplines, and in fact psychiatry, I took my

20   training and worked as a psychiatrist for several months.

21   Q.    Are you board-certified in psychiatry?

22   A.    No.

23   Q.    Do you practice psychiatry?

24   A.    No.

25   Q.    Have you practiced psychiatry in the last 35 years?

1  A.   No.

2  Q.   You're not an expert in the treatment of epilepsy either,

3  are you, sir?

4  A.   No.

5  Q.   You have no training in the field of marketing, do you?

6  A.   No, and that has nothing to do with safety.  I mean, I'm

7  here to discuss the safety --

8  Q.   Yes or no, sir, do you have any training in marketing or

9  not?

10  A.   No.

11  Q.   Sir, when we took your deposition in this case in March,

12  2009, you had read the report of the gentleman who testified

13  two Fridays ago, Dr. Barkin; is that correct?

14  A.   That's correct.

15  Q.   And you spoke with Dr. Barkin once for about twenty

16  minutes before you wrote your report in this case, right?

17  A.   I think so.  At least once, maybe twice but --

18  Q.   And for your marketing-related opinions, you relied on

19  Dr. Barkin's review and did not do any review of materials on

20  your own, correct?

21  A.   He has an extensive review that I trusted.

22  Q.   Let's look at Exhibit 207.  Sir, we've got a couple of

23  binders there to save all the back-and-forth that I hope will

24  make it fast, your Honor.  It's Tab 9 in your binders there, if

25  you could find that.  This will be 207 that was put in evidence

1    on your direct examination.

2    A.    Tab 9?

3    Q.    Tab 9, yes.  Do you see that?

4    A.    Yes.

5    Q.    Sir, for your opinions on depression and suicidality that

6    you told us about, the first document was the FDA's Combined

7    Medical and Statistical Review dated October 13, 1993, correct?

8    A.    Correct.

9    Q.    And Mr. Greene chose and sent that document to you,

10   correct?

11   A.    Yes.

12   Q.    And that report, the FDA report we're talking about, was

13   prepared shortly before the FDA approved the Neurontin New Drug

14   Application for epilepsy in December, '93, correct?

15   A.    No.  It's not approved for epilepsy.

16   Q.    Or adjunctive treatment in partial seizures?

17   A.    That's the way to state it.  It was a limited indication.

18   Q.    Okay.  The McCormick review was prepared a few months

19   before the approval of that NDA, correct?

20   A.    Well, I don't understand the question.

21   Q.    Do you see the date October 13, 1993, sir?

22   A.    Yes.

23   Q.    Do you understand that the Neurontin NDA for adjunctive

24   use in the treatment of partial seizures was approved

25   December 30, a couple of months later?

1    A.    Yes.

2    Q.    Okay, that's the question.  Now, the clinical reviewer who

3    had the primary responsibility for reviewing the Neurontin drug

4    application and preparing this review was Dr. Cynthia

5    McCormick, correct?

6    A.    Yes.

7    Q.    That's her name listed on the first page, right?

8    A.    Yes.

9    Q.    And if you turn to Page 119, sir, you see there that

10   Dr. McCormick signed the review as the reviewer, correct?

11   A.    That is correct.

12   Q.    And you see that Dr. Russell Katz, her supervisor, the

13   director of the Division of Neuropharmacological Products, also

14   signed it?

15   A.    Yes.

16   Q.    And then there are three other people who signed it,

17   Ph.Ds, Taneja, Nevius, and Dubey.  Do you see those?

18   A.    Yes.

19   Q.    Those are three statisticians, correct?

20   A.    I know Dubey.  He's a statistician.  The others I don't --

21   the first one it says statistician.  The second one doesn't

22   say.

23   Q.    Doctor, if you'd look at your Tab 4 in your binder, you'll

24   see the next document which is --

25   A.    Tab 4.

1    Q.    Tab 4, Exhibit 1113, which I move to admit.

2          THE COURT:  All right.

3          (Exhibit 1113 received in evidence.)

4    A.    Yes.

5    Q.    Dr. Furberg, Exhibit 1113 in your binder is a copy of an

6    FDA Review and Evaluation of Clinical Data dated December 15,

7    1993.  Do you see that?

8    A.    Yes.

9    Q.    You've never seen this document before today, have you?

10   A.    I can't recall.

11   Q.    Kaiser's lawyers did not provide this document to you; is

12   that right?

13   A.    I can't hear you.

14   Q.    Kaiser's lawyers did not send you this document in

15   connection with your work in this case?

16   A.    I can't recall where I've seen it.

17   Q.    Do you see that this document was prepared by Dr. Cynthia

18   McCormick on December 15, 1993, several months after the report

19   that we just looked at?  It's right on the first page, sir.

20   A.    Yes, almost two years after.

21   Q.    Would you please turn to Page 8.

22         THE COURT:  Is it several years after or several

23   months after?

24         THE WITNESS:  About two years.  I mean, the FDA, the

25   review was in January, '92.  This is December, '93.

1    Q.   Well, let's clear that up right now.  Let's go back to

2    Exhibit 207.  Let's go back to 207, Austin, go to the last page

3    with the signatures on it.

4    A.   It says January, '92.

5    Q.   Do you see the dates of the signatures on the view in the

6    left-hand column there, Doctor, May 19, 1993, June, 1993?

7    A.   I don't see any dates here.

8    Q.   We just highlighted them in yellow for you, sir.

9    A.   Oh, there.  There, yes.

10   Q.   And now go to --

11            THE COURT:  What's the date of the report, though?

12            MR. HOOPER:  Go to the front page, please.  We're

13   getting right to it, your Honor.

14   Q.   Do you see the date stamped in the upper right-hand corner

15   is October 13, 1993, sir?

16   A.   Well, that's stamped on, but the original receipt was

17   January, '92, so everything was known in '92, is written '92.

18   Q.   Original receipt of what, sir, do you know?

19   A.   Well, that's what it says.

20   Q.   Original receipt of what?

21   A.   Of the review.

22   Q.   What was received?  Do you know if it was the NDA?

23            THE COURT:  He just said the review.

24   A.   Yeah, the document.

25   Q.   That's your position.  I understand it.  Let's move back

1  to 1113.

2      Now, going back to Exhibit 1113 which is the December 15,

3  1993 review by Dr. McCormick, directing your attention to

4  Page 8 at the top, do you see the paragraph there labeled

5  "Depression"?  Do you see that, sir?

6  A.   Yes.

7  Q.   Tell me if I read correctly:  "The incidence of depression

8  with suicidal ideation is reported in the 4th safety update as

9  a severe adverse event, bringing the total to 10 cases

10  reported.  There is a higher incidence of depression among

11  epileptics with partial seizures as compared to the general

12  population.  One cannot determine based on the available data,

13  largely uncontrolled, whether the reports here represent an

14  increase in incidence or intensity of depression compared to

15  what is expected."

16      Did I read that correctly?

17  A.   Yes.

18  Q.   You had not seen that paragraph before you came here

19  today, had you, sir?

20  A.   No, but this is what the --

21  Q.   Sir, you hadn't seen it before you came here today?

22  That's the question, correct?

23          THE COURT:  Is the whole document in front of you?

24  A.   I'm not sure I've seen it.

25  Q.   Let's turn to Exhibit 505.  Doctor, Tab 15 in your binder

1    is a copy of Exhibit 505, which I'll move into evidence.

2         (Exhibit 505 received in evidence.)

3    Q.   Tab 15, sir.

4    A.   Okay.

5    Q.   Doctor, this is the FDA's approval letter for Neurontin's

6    epilepsy indication, or, if you prefer, adjunctive use in

7    treatment of partial seizures application, dated December 30,

8    1993, and received by Pfizer January 4, 1994.  My first

9    question is, do you see that it's from Dr. Bob Temple, the

10   director of the FDA's Office of Drug Evaluation?

11   A.   Yes.

12   Q.   You were not provided a copy of this document either, I

13   take it?

14   A.   I can't remember.  I don't think so.

15   Q.   Do you see that it references NDA or New Drug

16   Application 20-235, which is the Neurontin epilepsy NDA?

17   A.   Okay.

18   Q.   And this letter, you'll agree with me, sir, is written by

19   Dr. Temple after both of the McCormick reviews that we looked

20   at earlier, correct?

21   A.   Yes.

22   Q.   Would you please look at the third paragraph, and do you

23   see there that Dr. Temple writes, "We have completed the review

24   of this application, as amended, and have concluded that

25   adequate information has been presented to demonstrate that the

Page 94

1   drug product is safe and effective for use as recommended with

2   the labeling changes noted in the enclosed final draft of the

3   labeling that accompanies this letter (as Attachment 1)"?  Did

4   I read that correctly?

5   A.   You did.

6   Q.   Now, under the heading "Labeling/PPI," first, PPI refers

7   to the professional package insert or professional prescribing

8   information for the drug, correct?

9   A.   Okay.

10  Q.   And if you follow along with me there, we'll highlight it

11  on the screen for you, FDA's Dr. Temple writes under that

12  heading, "The final printed labeling (FPL) must be identical to

13  the draft labeling/professional package insert enclosed as

14  Attachment 1 with this letter."  That's what he said, correct?

15  A.   Yes.

16  Q.   And in the very next sentence Dr. Temple say, "Marketing

17  the product with FPL," final printed labeling, "that is not

18  identical to the draft labeling may render the product

19  misbranded and an unapproved new drug."  Did I read that

20  correctly?

21  A.   Yes.

22  Q.   All right.  Now let's turn to what the final draft

23  labeling attached to FDA's approval letter in December, 1993,

24  said about depression and suicidality.  If you would, please,

25  sir, turn to the pages that have the Bates numbers ending in

1    935 in that same document.  It's the attachment to the letter.

2    A.   What's the tab?

3    Q.   It's the same document, sir.  It's the FDA approval

4    letter.

5    A.   But what tab is it?

6    Q.   Tab 15.

7    A.   15, sorry.  Okay, yes.

8         THE COURT:  It will also be going up on the screen,

9    right?  And then we'll finish this up for the break?  Okay.

10   Q.   And you see there, Doctor, that in the FDA-approved

11   package insert is a table, correct?

12   A.   Uh-huh.

13   Q.   And do you see that this table is called "Treatment

14   Emergent Adverse Events:  Incidence in controlled add-on

15   trials --"

16   A.   You're ahead of me here.  What page?

17   Q.   The one that ends in the numbers --

18        THE COURT:  Does it make sense for us to take a break

19   here and then have him --

20        MR. HOOPER:  That's fine, your Honor.

21        THE COURT:  Does that make sense?

22        MR. HOOPER:  Sure.

23        THE COURT:  Okay.  All right, see you at 11:30.

24        You know, we were thinking, and you guys can take a

25   vote on it, I know some people walk the halls and that sort of

1   thing, sometimes we have a side bar and we don't get out of

2   here till 11:10, and I know sometimes a half an hour is long

3   for you, or it even goes a little past that.  If you'd prefer

4   to have a shorter break, let us know, okay?

5           (Laughter.)

6           THE COURT:  I may have just misread that, all right.

7   I'm not seeing enthusiasm for that.  That's fine.

8           (Jury excused.)

9   SIDE-BAR CONFERENCE:

10          THE COURT:  So how much longer do you think you'll be?

11          MR. HOOPER:  Another twenty to thirty.

12          THE COURT:  Then what are we doing?

13          MR. BARRETT:  We've got depositions.  We really are

14   starting depositions today.

15          THE COURT:  Okay.

16          MR. BARRETT:  And I've given a list to Robert with the

17   times for both sides.

18          THE COURT:  Okay.  A thought just occurred to me as I

19   was listening to the cross that I don't want to have to do

20   something in the middle of a trial, just so we don't back into

21   it.  Of course, that most recent Wyeth case suggests -- it's

22   the Supreme Court case -- states that -- I can't remember, I

23   haven't looked at it in a while, but the essence of it is that

24   they can supplement with additional information as it becomes

25   due.

Page 97

1          MR. HOOPER:  On the facts in Levine, they could.

2          THE COURT:  Fair enough, but what I don't want to get

3     into, a question, so they couldn't change it, could they?

4          MR. HOOPER:  Oh, no, not going there, not going there,

5     no.

6          THE COURT:  It just occurred to me as --

7          MR. SOBOL:  Well, that was the tenor of the question,

8     though.  The tenor of the question was --

9          THE COURT:  Excuse me.  So far, it stopped.  Maybe you

10    want to do some --

11         MR. SOBOL:  You picked up on what I picked up on.  The

12    suggestion in the questioning was that it would be a violation

13    for the company to do something --

14         THE COURT:  He didn't quite ask that.

15         MR. SOBOL:  He came very close.

16         THE COURT:  If you want to clarify, fine, but I just

17    wanted to make sure everybody was on the same page on that,

18    that the recent Supreme Court case does not ban a drug company

19    from supplementing as it learns new information.

20         MR. HOOPER:  I think it will be clear by the end of

21    the cross, your Honor, that that's not the point.

22         MR. GREENE:  I'm going to have a little bit of

23    follow-up, very little.

24         THE COURT:  Good.  See you then.  Off the record.

25              (Discussion off the record.)

1         (End of side-bar conference.)

2         (A recess was taken, 11:06 a.m.)

3         (Resumed, 11:34 a.m.)

4    BY MR. HOOPER:

5    Q.    Dr. Furberg, when we left for the break, we were looking

6    at the labelling attached to the FDA's December 1993 approval

7    letter for Neurontin, and I had directed your attention to a

8    table that appears on the page of the labelling with the last

9    three digits 935.  Do you see that?

10   A.    Yes.

11   Q.    And you see that this is a table entitled "Treatment

12   Emergent Adverse Events."  That means adverse outcomes or

13   potential side effects that were reported by patients in

14   clinical trials, correct?

15   A.    Correct.

16   Q.    That's what an adverse event is, right?  We agree on that,

17   right?

18   A.    Yes.

19   Q.    And it says those were in controlled add-on trials, that

20   means DBRCTs where Neurontin was being tested for add-on use in

21   epilepsy, correct?

22   A.    Correct.

23   Q.    And it says the table contains events that occurred in at

24   least one percent of Neurontin patients and numerically more

25   frequent than in the placebo group; is that right?

1    A.    Yes.

2    Q.    And do you see the second line from the bottom in the

3    labeling approved by the FDA in September of 1993 is the event

4    depression.  Do you see that?

5    A.    Correct.

6    Q.    And it discloses there that depression was reported in 1.8

7    percent of Neurontin patients and 1.1 percent of the placebo

8    patients in these control trials, correct?

9    A.    That's what it says.

10   Q.    And you told us in your direct that you -- I believe you

11   told us in your deposition and your direct that you thought

12   these data showed a 60 or today you said 65 percent increase in

13   depression, correct?

14   A.    Yes.

15   Q.    All right.  What you're saying, if I understand it right,

16   correctly, is that 1.8 percent, the rate in Neurontin, is about

17   60 or 65 percent higher than 1.1 percent, the rate in placebo,

18   correct?

19   A.    That's how we measure it, yes.

20   Q.    I just want to make sure -- let me make sure I understand

21   the math.  I think it's pretty simple, but I just want to make

22   sure we're on the same page.

23          The way you come up with your 65 percent is you take

24   the 1.8 on Neurontin -- this is the epilepsy studies we're

25   looking at.

1    A.    Yeah.

2    Q.    You take the difference between Neurontin and placebo and

3    calculate what percentage that is relative to placebo, and that

4    comes out about 60 -- it's actually 63 percent, isn't it?

5    A.    Sixty-four.

6    Q.    I just wanted to make sure we had the same math.

7    A.    Yes.

8    Q.    And before we turn away from the document that you're

9    looking at right now, we agree that that 63 percent difference

10   is not a statistically significant difference, is it?

11   A.    The numbers are so small, so it's not --

12   Q.    We agree on that?

13   A.    It's not the proper test.

14   Q.    Okay.  And now, if you would, please, turn in that same

15   labeling that we're looking at from FDA in 1993.  Let's look at

16   the page that ends in the digits 35940.  It's about five pages

17   later.  35940?

18   A.    Okay.

19   Q.    It's the adverse reaction section.  And I would like for

20   you to look five lines down on the right side.  The last event

21   listed in the labeling attached to FDA's letter is suicidal

22   events.  See that?

23   A.    Yes.

24   Q.    And then if you see the very last event in that section of

25   FDA's labeling, it says "suicide gesture," correct?

1    A.    Yeah.

2    Q.    And this is part of the professional package insert that

3    the FDA's Dr. Temple sent to Parke-Davis in December 1993,

4    right?

5    A.    Yes.

6    Q.    All right.  You told us -- turning to the next subject.

7    You told us that you relied on the one report from

8    Dr. McCormick back in -- you think it's '92, I think it's '93,

9    but that initial combined medical and statistical review,

10   right?  What other indications has Neurontin been approved for

11   since then?

12   A.    Has --

13   Q.    What other indications has Neurontin been approved for

14   since then?

15   A.    Since '93?  I think for some -- I think one other

16   indication, for a pain indication.

17   Q.    Do you know what that indication is, sir?

18   A.    Not specifically.

19   Q.    Okay.  Does postherpetic neuralgia sound about right?

20   A.    Yes.

21   Q.    Let me ask you to look at tab 26 in your binder, sir.  Do

22   you see tab 26, sir?

23   A.    Yes.

24   Q.    Do you see that that is also -- the first page says it's

25   an FDA Center For Drug Evaluation and Research, and in the main

1    title it says, "Division Director Review and Basis For Approval

2    Action."

3    A.    Yes.

4    Q.    And do you see it's dated May 22, 2002.  Do you see that?

5    A.    Correct.

6    Q.    And do you see the indication listed there is postherpetic

7    neuralgia?

8    A.    Sure.

9    Q.    So you would agree -- this appears to be another FDA

10   clinical review for the postherpetic neuralgia in the drug

11   application?

12   A.    Correct.

13   Q.    This one about ten years later in 2002, right?

14   A.    Okay.

15   Q.    Now, if you turn to page 3, third page in, do you see the

16   name of the division director from FDA who signed the

17   postherpetic neuralgia, the pain review, in 2002?

18   A.    Yes.

19   Q.    That was Cynthia McCormick, the same one who signed the

20   one in 1993, correct?

21   A.    Yes.

22   Q.    Did you understand now, ten years after she was the

23   reviewer on the epilepsy application, Dr. McCormick had been

24   promoted and was now the division director?

25   A.    It appears so.

1   Q.   If you turn another couple of pages in, I think it's the

2   fourth piece of paper, you'll see a document that says, quote,

3   Review and evaluation of the clinical data?

4   A.   Got it.

5   Q.   If you look at the second-to-last line, you see the

6   clinical reviewer for this review was Dr. Sharon Hertz of FDA,

7   correct?

8   A.   Correct.

9   Q.   And Dr. Hertz' review was completed May 24, 2002.  Do you

10  see that?

11  A.   Yes.

12  Q.   You weren't given either of these, either Dr. McCormick or

13  Dr. Hertz' 2002 reviews, were you?

14  A.   I don't think so.  I can't be certain.

15  Q.   Now, please turn to page 77, sir.  Dr. Hertz' review from

16  2002.  And there is a table there entitled "Table 7.20."  Do

17  you see that?

18  A.   Yes.

19  Q.   And you see this is a table showing, quote, The Percent of

20  Treatment Emergent Adverse Events in At Least 3% of Patients,

21  Neuropathy and Epilepsy Add-on Studies.  Did I read that

22  correctly?  Is that the title of the table you're looking at,

23  sir?

24  A.   Yes.

25  Q.   Okay.  And first, at the very top, you see that there are

Page 104

1    five different groups of clinical trials with the Ns or the

2    number of patients in each group of trials listed there,

3    correct?

4    A.    That is correct.

5    Q.    The first column is all neuropathy gabapentin with 820

6    patients, correct?  Do you see that?

7            MR. HOOPER:  Austin, just highlight the header on the

8    first column.

9    A.    I don't understand.

10   Q.    The screen might help.  It's probably --

11   A.    I see it, but I still -- I don't understand the

12   abbreviations here.

13   Q.    GBN, gabapentin?

14   A.    And PHN?

15   Q.    Postherpetic neuralgia?

16   A.    Okay.

17   Q.    Okay.  So the first group of trials is all neuropathy

18   gabapentin.  See that?

19   A.    Yeah.

20   Q.    All right.  The next one is the PHN gabapentin.  And

21   that's a smaller subset which is 336 patients, right?

22   A.    Yes.

23   Q.    See that?

24          Third is neuropathy placebo with 537 patients.  See

25   that?

1   A.   Yup.

2   Q.   And then on the right, there are epilepsy gabapentin, 543

3   patients, and epilepsy placebo with 378.  Do you see that?

4   A.   Correct.

5   Q.   And now, if you would, let's look down the left-most

6   column and you'll see there are a long list of adverse events

7   listed there.  See those?

8   A.   Yes.

9   Q.   And if you look at the 13th line down, you'll see

10  depression, right?

11  A.   Yes.

12  Q.   And if we look at the two right-most columns, we see the

13  1.8 and the 1.1 that you saw in the earlier document from 1993.

14  Right?

15  A.   Yes.

16  Q.   And those are the same numbers that we just agreed are the

17  basis of your 63 percent increase, correct?

18  A.   Correct.

19  Q.   And, Doctor, if you look at the left-most column for all

20  the neuropathy trials, you see that the percentage for

21  Neurontin was 1.3, correct?

22  A.   Yup.

23  Q.   And you see that the percentage for placebo in the

24  neuropathy trials was 2.2, correct?

25  A.   Yes.

1   Q.   And, Doctor, by your own math, that is a 40 percent

2   decrease in depression on Neurontin compared to placebo, isn't

3   it?  It's by your calculation, correct, sir?

4   A.   That's -- yeah.

5   Q.   Sir, you mentioned the -- let's go to -- sir, I want to

6   look now at that FDA alert from 2008 that Mr. Greene asked you

7   about.  It's in your witness binder at tab 11.

8   A.   Yes.

9        MR. HOOPER:  Your Honor, I think this is in as Exhibit

10  263.

11       THE CLERK:  It is.

12       MR. HOOPER:  Thank you, sir.

13  BY MR. HOOPER:

14  Q.   If you would, let's look at the alert about -- first I

15  want to look at the last page, Doctor, if you would.

16  A.   Mm-hmm.

17  Q.   If you look at that last page, about halfway down you see

18  a sentence that begins with the word "although."

19  A.   Yes.

20  Q.   And then it says, quote, Although the drugs listed

21  above -- and there's a long list of 11 different AEDs above --

22  were the ones included in the analysis, FDA expects that the

23  increased risk of suicidality is shared by all AEDs and

24  anticipates that the class labeling changes will be applied

25  broadly.

8c688394-33ed-42af-838c-ffab78f22aea

1      You have read that language before today, correct,

2 sir?

3 A.   Yes.

4 Q.   And you understand what the FDA did in the 2008 process

5 was that it looked at data from a group or a pool of 11

6 different antiepileptic drugs, correct?

7 A.   Yes.

8 Q.   And it analyzed that data and it came to its conclusion

9 based on the pooled results of all that data, right?

10 A.   Well, that's the only appropriate way of doing it.

11 Q.   And the advantage of that is that you get a very large

12 sample size and more statistical power to see things that occur

13 very, very, very rarely, right, sir?

14 A.   Well, you have more power to detect the difference.

15 Q.   I learned that from your book, so I'm hoping you agree

16 with me.

17 A.   I'm glad you --

18 Q.   I own a copy.  I'm a customer.

19      So if we look --

20      THE COURT:  You need to get that new edition.

21      MR. HOOPER:  I want to get it autographed.  I'm hoping

22 for an autographed copy.

23 BY MR. HOOPER:

24 Q.   Now, if you -- you weren't -- you were shown this document

25 about the class labeling, but do I understand correctly you

Page 108

1  were never shown the Neurontin specific data that went into the

2  pool of 11 drugs, were you?

3  A.   But that's irrelevant.

4  Q.   Irrelevant?

5  A.   Yes.  In a pool of analysis you don't look at a pool of

6  individual studies.  You look for consistency and

7  heterogeneity, homogeneity.  That's how you analyze it.  You

8  don't cut it up in individual pieces.  That's not science.

9  Q.   But it was science for you to look at data from just a few

10  hundred patients and say that there's a 65 percent increase; is

11  that right?

12  A.   That was not a pooled analysis.

13  Q.   And that's my question, sir.

14      Did you look at the data for all of the Neurontin

15  controlled studies --

16  A.   I've seen reference made to it, yeah.  I've looked at it,

17  not in detail.

18  Q.   Would you please look at tab 7 in your binder?

19  A.   Okay.

20  Q.   And since --

21      MR. HOOPER:  Do we have that one up?  Exhibit 984,

22  which I move to admit.

23      THE COURT:  All right.

24      (Exhibit 984 received into evidence.)

25  BY MR. HOOPER:

1   Q.   So, since you weren't provided this document before today,

2   let's get acquainted with it.  You see the date on the first

3   page is 22nd of June 2006?

4   A.   Okay.

5   Q.   And do you see that it is from Pfizer and addressed to

6   Dr. Russell Katz, the division director at FDA?

7   A.   Yes.

8   Q.   You see that part?

9   A.   Yeah.

10  Q.   And if you look at the subject line, it says, "Request For

11  Information-Response to FDA Suicidality Request."  Do you see

12  that?

13  A.   Yes.

14  Q.   I'll represent to you this is the submission of data that

15  went into the pooled analysis for Neurontin, just as ten other

16  data sets went in for those other drugs.

17          Let's look at page 3, sir, if you would, at the top.

18  A.   Yes.

19  Q.   You see at the top where it says, "49 studies that met the

20  FDA inclusion criteria"?

21  A.   Yeah.

22  Q.   All right.  Now, if you turn to the table at the top of

23  the next page, page 4 of the document, you see there we've got

24  the same sort of grouping.  First it's the gabapentin subjects,

25  5,194 patients in all; placebo, 2,682 subjects in all; and then

1    there are two right columns that we don't need to highlight.

2          MR. HOOPER:  Austin, I just want to focus on drug and

3    placebo at this point.

4    Q.   Do you see there for completed suicide for the first event

5    there were no suicides on gabapentin and none on placebo?  Do

6    you see that, sir?

7    A.   Yes.

8    Q.   And for suicide attempts, similarly, none on either drug

9    or placebo.

10         For the next -- for the next category, preparatory

11   acts toward imminent suicidal behavior.  No events, drug or

12   placebo.  Those 5,000, 2,600 subjects.

13         And then if you look at suicidal ideation, you see

14   there were two events in 5,100-plus patients on Neurontin,

15   about .039 percent; and on placebo, one event in 2,600

16   subjects, or .037 percent.

17         You'd agree with me those are statistically the same

18   rate, wouldn't you?

19   A.   These are uninformative numbers.

20         THE COURT:  What do you mean by that?

21         THE WITNESS:  One or two you can't interpret.  The

22   numbers are too small to say one way or the other that the drug

23   is safe or the drug is harmful.  You really don't know if you

24   only have one or two cases.

25         THE COURT:  Is the N number a significantly large

1    enough study?

2         THE WITNESS:  Well, these are people that took the

3    drug in these short-term studies, and these are recorded

4    suicides, suicidal attempts, and so on.  There were very few.

5         I'm not here to say the drug is causing suicide.  I'm

6    not here to make that claim.

7         I'm saying the drug is associated with depression with

8    or without suicidal ideation, which is a different thing.

9    Q.   Was it associated with depression with or without suicide

10   ideation in the pain studies where there's a 40 percent

11   decrease by your own math, sir?

12   A.   Well, this is a very simplistic way of looking at it.

13   Q.   Sir, it's the way you looked at it and told us about in

14   your direct examination when you referred to the 63 percent,

15   isn't it?

16   A.   I think in the scientific community you don't just look at

17   numbers this way.  You -- it's more complicated than you're

18   implying.

19   Q.   You would do a statistical significance analysis for

20   starter, wouldn't you?

21   A.   It's much more than that.

22   Q.   You'd do much more than that?

23   A.   A statistical test doesn't help or mean much if you have

24   small numbers.  You can never show anything with small numbers.

25         So that's what people do, they use small numbers and

Page 112

1    say, Oh, look, there's no difference, the drug is safe.  That's

2    a fallacy.

3    Q.    I want to make sure I understand.  You can't show anything

4    for rare events with small numbers?

5    A.    With small numbers that means you can say very little with

6    certainty.

7    Q.    All right.  Sir, if you would look back at the exhibit

8    that's on the screen.  The table of data, this one, the numbers

9    here are taken from a pool of 5,194 gabapentin patients and

10   2,682 placebo patients, correct?

11   A.    Yeah.

12   Q.    Are you aware of the existence anywhere in the world of a

13   bigger controlled data set than that one for the association of

14   this drug with any form of suicidality?  Anywhere in the world,

15   sir.

16   A.    That doesn't help your case and your argument, sir,

17   because it doesn't mean much.

18   Q.    Sir, my question is --

19   A.    The issue is the number of numerators, the number of

20   cases.  And if you only have a few cases, regardless of the

21   denominator, the people at risk, you can learn very little.

22   You can't infer one thing or the other, that the drug is safe

23   or it's harmful.

24   Q.    When you study 5,000 patients and you don't see anybody

25   commit, attempt, or even have a suicidal thought more than they

1   do on a sugar pill, it's a mighty hard side effect to see,

2   isn't it?

3   A.   No, but you have other evidence.  You don't look at this

4   in isolation.  You have other evidence from other studies

5   showing suicidal ideation.  It's in the FDA report from '92.

6   Q.   From the uncontrolled data, correct, sir?

7   A.   From all the data that was presented to the FDA there was

8   indication of an increase in suicides.  And I'm not here to say

9   that it causes it, and I'm not saying that it doesn't, because

10  I don't know.  I can't interpret these small numbers.

11  Q.   I think we agree, Doctor, you'd agree the data that you

12  are seeing in the July 2006 submission would not permit you to

13  conclude with reasonable scientific certainty that there is a

14  causal relationship between Neurontin and suicide, correct?

15  A.   Say that again, please?

16  Q.   The data that you are seeing here --

17  A.   Yes.

18  Q.   -- in the July 2006 would not permit you to conclude with

19  scientific certainty that there's a causal relationship between

20  use of Neurontin and suicidality, correct?  That's what you

21  just told us.

22  A.   I'm saying that it's more complex than you're talking

23  about.

24        The FDA undertook this exercise and took drugs that

25  are similar, used for the same indication, had the same

1    benefit, then put them all together so they could get up the

2    numbers and please people like me who like numbers.  And when

3    they looked at the numbers, there was a doubling in risk.  And

4    when they tested it for whether the findings were similar for

5    the 11 drugs, they concluded, yes, they appear to be the same.

6    Period.  That's where you stop.  And that's where the FDA

7    stopped.

8         Now the company is coming and saying, Well, look at

9    our drug, we didn't have many events and our drug is safe.

10   That's not science.  Sorry.

11   Q.   And you agree that each one of those 11 drugs bears

12   exactly the same verbatim class labeling about suicidality?

13   A.   Well, they should because of the way the FDA did the

14   analysis.  They combined it to increase the numbers so they

15   don't get into this argument that you're trying to have with me

16   of zero events and so on.  They put it all together and all

17   drugs that were similar in their effect and indication and so

18   on collectively doubled risk.

19   Q.   And if a Kaiser physician wants to prescribe

20   carbamazepine, another antiepileptic drug, they will be

21   prescribing a drug that has exactly the same suicidality

22   warning that Neurontin does, correct?

23   A.   I don't know what they do.  Don't ask me about that.

24   Q.   Does carbamazepine, an AED, have exactly the same warning?

25        THE COURT:  You might be losing the jury on this.

Page 115

1    A.    That's beyond my testimony.

2          I'm saying that these drugs, according to the FDA, all

3    11 have a small effect on suicide -- on suicide, suicide

4    ideation.  If the FDA is interested in specific

5    recommendations, doctors need to know about this.  They have to

6    consider it when they weigh the use of the drug, weigh the

7    efficacy versus the harm.  The doctors have to inform patients.

8    And you're trying to get away from that, put the blame, and use

9    some numbers game here.  I don't think it's fair.

10   Q.   Two simple questions that I think as the drug safety

11   expert that you told us you are you will know:  One, every

12   antiepileptic in the United States today bears the same

13   suicidality warning, correct?

14   A.   According to the order they should bear that.  I haven't

15   seen the labels.

16   Q.   And every antidepressant drug in the United States since

17   February of 2005, all 34 of them, bears exactly the same

18   suicidality warning, correct?

19   A.   I haven't looked at all those labels.

20   Q.   Almost done, Doctor.

21         MR. HOOPER:  Mr. Alba, can we get the Elmo, please?

22         THE COURT:  What number are we talking about?

23         MR. HOOPER:  2075, your Honor.

24         (Discussion off the record.)

25         MR. HOOPER:  Laptop.

1        THE CLERK:  Fine.

2    BY MR. HOOPER:

3    Q.   Just a couple of questions about the Dimond or Dimond

4    article that you mentioned.

5        MR. HOOPER:  Can we focus in the upper right-hand

6    corner.

7    Q.   Do you remember one of members of the jury had a question

8    about the publication, where this was published?

9    A.   Yes.

10   Q.   And this was, in fact, published in something called

11   Progressive Neuropsychopharmacology and Biological Psychiatry;

12   is that right?

13   A.   Yes.

14   Q.   That's a research-oriented journal, not a journal oriented

15   at clinicians, is it?

16   A.   Yes.

17       MR. HOOPER:  And could we scroll down, go down to the

18   next page, second page of the document?

19       And could you highlight the first couple of sentences

20   there, Austin?

21   Q.   The article reads, "Certain anticonvulsants have gained an

22   important place in psychiatry due to their beneficial effects

23   on mood and well-being.  Valproate and carbamazepine have been

24   shown to stabilize mood in patients with bipolar disorder."

25   Did I read that correctly so far?

1   A.   You did.

2   Q.   And then after the parenthetical cite there, it says, "and

3   a number of reports have suggested that valproate and

4   carbamazepine may also help relieve anxiety."  Did I read that

5   correctly?

6   A.   Yes.

7   Q.   Do you think that the authors of this are promoting the

8   competitive drugs, sir?

9   A.   No.  This is what you do in a scientific article.  In the

10  introduction you start off by describing what is known and why

11  you do the study, and if other drugs of similar kind has this

12  possible effect, it makes some sense to test it maybe.

13          MR. HOOPER:  Could we turn to page 414 in the article,

14  Austin?

15          And if you look at the last sentence above towards the

16  bottom, Austin, above "conclusions," beginning with the words

17  "the possibility."

18  Q.   Sir, the article there, right before the conclusion says,

19  quote, The possibility that gabapentin may possess beneficial

20  psychotropic effects which could have utility in the

21  psychiatric disorders can only be clarified through further

22  studies in the appropriate patient populations."

23          This is an article looking at some preliminary data

24  from the epilepsy studies and suggesting there might be a

25  reason to do studies in the future, correct?

1    A.    No, no.

2    Q.    You don't think that's correct?

3    A.    Why don't you read the abstract where they make the

4    opposite claim?  They're very definitive.  They don't talk

5    about possibly having a beneficial effect and need to test it.

6    They make specific claims --

7    Q.    Let's go back to the abstract --

8    A.    -- and the data from the trials show you have improvement

9    in general well-being, and there's an effect on affective

10   disorders, and show global improvement.  These are -- nothing

11   there about possibly to explore them as, it's definitive.

12   Q.    Sir, you don't believe -- you're not saying that global

13   improvement is the same thing as depression, are you?

14   A.    No, but I'm saying that a lot of things they talk about

15   here, I don't think they know what they are discussing, because

16   the way they evaluated these specific outcomes is not the

17   standard way of doing it.  They are prespecified instruments

18   you should use to measure depression and well-being and

19   activities of daily living.  They didn't use those and then

20   they make claims that are unsubstantiated.  The worse thing is

21   they don't even refer to the FDA data showing harm.

22   Q.    And, sir, isn't it true that every doctor in America could

23   have reached for the Physicians' Desk Reference on their shelf,

24   opened it to the Neurontin labeling or taken the labeling out

25   of a package insert and saw the exact same numbers that you

1  told us about and saw -- have seen suicidal gesture and suicide

2  listed in adverse events just the way the FDA said you would,

3  right?

4  A.   It's not that simplistic.   There are adverse events.

5  Safety is communicated in different ways.   The worst warning is

6  a black box warning, that comes first; and then you have

7  contraindications; and then you have warnings and precautions;

8  and then at the end, the lowest level of evidence of harm is

9  where you list 200 outcomes.   And think anyone would read

10  that -- what you do in the labeling is you communicate, you

11  warn doctors.   They should have added to the labeling, Doctors,

12  you need to beware that there's an increase risk of depression

13  if you take this drug.   And they didn't.

14  Q.   Based on the 1.8 versus the 1.1 percent?

15  A.   Based on the FDA review and based on the regulation,

16  federal regulations.   The federal regulations states if there

17  is evidence, suggesting 60 percent increase, for example,

18  that's alarming.   It should be pointed out.   You don't have to

19  document causation.   Statistical significance, it's not

20  required, according to federal regulations.   The sponsor has

21  that obligation, and they failed.   They failed for 16 years.

22  Q.   And when the 2002 data with the pain study came out with

23  the 40 percent decrease by your own numbers, should they have

24  amended the labeling to say, We take it back?

25  A.   No, they don't take it back.   I mean, what they should

1   have done, they should have initiated real studies, done good

2   studies to determine the drug is causing depression and measure

3   that in the professional way.  And they didn't.

4           MR. HOOPER:  Pass the witness, your Honor.

5           MR. GREENE:  Just one question.

6                   REDIRECT EXAMINATION

7   BY MR. GREENE:

8   Q.   I think it's clear, I want to make it crystal clear for

9   the jury, when I retained you and gave you an assignment in

10  this case, I didn't ask you whether Neurontin caused suicide.

11  That's not what we're looking at, correct?

12  A.   Correct, and I never said that.

13  Q.   We are looking at -- I asked you to look at the evidence

14  that was available to the defendants based on their epilepsy

15  trials in the early 1990s; isn't that correct?

16  A.   Correct.

17  Q.   And what the FDA had pointed out to them; isn't that

18  correct?

19  A.   That's right.

20  Q.   And then I gave you a promotional article that was

21  authored by the defendant's employees that was published in

22  June or July of 1996 in the Journal, correct?

23  A.   Correct.

24  Q.   And I was asking you was the promotional material -- I

25  think you testified -- in the promotional material did they

1    disclose what the FDA pointed out to them?

2    A.   That's correct.

3    Q.   And you had conversations with Dr. Barkin who testified

4    about the various promotional materials that he reviewed.

5            MR. HOOPER:  Objection, leading.

6            THE COURT:  Sustained.

7    BY MR. GREENE:

8    Q.   Did you confer with Dr. Barkin?

9    A.   Yes.

10   Q.   Did you review his report?

11   A.   Yes.

12   Q.   Are you aware that the defendants made promotional

13   statements concerning Neurontin's efficacy in treating bipolar

14   and mood disorders?

15   A.   Yes.

16           MR. HOOPER:  Objection, leading, move to strike.

17           THE COURT:  Sustained.  There's nothing to strike.

18   BY MR. GREENE:

19   Q.   You talked about the FDA safety report that's introduced

20   as Exhibit 263, the FDA alert dated January 31, 2008?

21   A.   Yes.

22   Q.   Did the FDA issue a statistical review and evaluation for

23   all the 11 antiepileptic drugs dated May 23, 2008?

24   A.   Yes.

25   Q.   You're familiar with the conclusions they found there?

Page 122

1    A.   Yes.

2    Q.   They found that the antiepileptic, those 11 are associated

3    with an increased risk --

4              THE COURT:  Are you reading?

5              MR. HOOPER:  Your Honor, we object to this document,

6    it's the one we talked about earlier.

7              THE COURT:  Overruled.  It's now been raised.

8              Go ahead.

9              MR. GREENE:  May I approach the witness, your Honor?

10             THE COURT:  Yes.

11             MR. GREENE:  I'm going to move to introduce Exhibit

12   401, your Honor.  Exhibit 401.

13             THE COURT:  All right.

14             (Exhibit 401 received into evidence.)

15   BY MR. GREENE:

16   Q.   Let me show you Exhibit 401.  Is that the Food and Drug

17   Administration's Statistical Review and Evaluation of

18   Antiepileptic Drugs and Suicidality?

19   A.   Yes.

20   Q.   Dated May 23, 2008?

21   A.   Correct.

22   Q.   And they looked at 11 antiepileptic drugs, gabapentin was

23   one of them, listed right there on the front cover.

24             MR. GREENE:  Can we get that up?

25             THE COURT:  I'm confused now.  Is that on your

1    computer or is that going up on the document camera?

2           (Discussion off the record.)

3    BY MR. GREENE:

4    Q.   Do you see that on the screen?

5    A.   I do.

6    Q.   That's dated May 23, 2008?

7    A.   Correct.

8    Q.   And the front cover indicates the fourth drug down is

9    gabapentin; is that right?

10   A.   Yes.

11   Q.   If I could direct your attention to page 6 of the

12   document.  The conclusion section 1.3.  Could you read the

13   first sentence there to the jury?

14   A.   "The conclusion, antiepileptic drugs are associated with

15   increased risk of suicidality relative to placebo in randomized

16   placebo-controlled trials.  The effect appears consistent among

17   the group of 11 drugs."

18   Q.   And is this what you were explaining to Mr. Hooper when he

19   was questioning you, that all of the numbers of these trials

20   were combined in this analysis?

21   A.   That's correct.

22           THE COURT:  Anything else?

23           MR. GREENE:  That's all, your Honor.

24           MR. HOOPER:  No, your Honor.

25           THE COURT:  Thank you.  You can leave.

1          What are we doing now?

2          MR. GREENE:  Videos, your Honor.

3          THE COURT:  All right.  So as I mentioned to you --

4    you probably don't even remember it -- at the start of the

5    trial, there are witnesses --

6          MR. GREENE:  Depositions, I'm sorry.

7          THE COURT:  There are witnesses -- you haven't had any

8    of these yet -- but there are witnesses all over the country.

9    As you probably noticed, this is part of a bigger piece of

10   litigation and various suits -- don't speculate about those --

11   but some of these witnesses are from different states and have

12   taken depositions for trial so they don't have to come in here.

13         So sometimes it will appear a little choppy because I

14   think various sides have agreed on snippets, I think, of these.

15   But both sides have made designations and you can consider this

16   for both sides' cases, as I understand it.  Right?

17         MR. BARRETT:  Yes, ma'am.  Your Honor, we've agreed on

18   a procedure, that there will be somebody up there reading the

19   answers as if they were the person, the deponent.  But the

20   questions that were asked by each side -- the ones -- excuse

21   me.  The sponsoring side in this litigation, the ones that

22   wants it read, will stand up and ask the question.  So it will

23   go back and forth.

24         THE COURT:  So they'll essentially be play acting.

25   And there will be other ones that are essentially going to be

Page 125

1    videotape depositions of the actual person.

2              MR. BARRETT:  Yes, ma'am.

3              THE COURT:  You're saying today we're just going to

4    have the play acting.

5              MR. GREENE:  I think we're just going to read today.

6              THE COURT:  So, obviously, the credibility of the

7    reader -- well, you're just going to read -- you're not having

8    someone up there?

9              MR. GREENE:  No, Mr. Sobol.

10             MR. CHEFFO:  Your Honor, can we have a sidebar on

11   this?

12             THE COURT:  Yes, I think we should figure out the

13   protocol.  I thought it was going to be something else.

14             (Discussion off the record.)

15             (At sidebar on the record.)

16             THE COURT:  Are you going to ask the court reporter to

17   be taking this down?

18             MR. GREENE:  Yes.

19             MR. BARRETT:  It's not necessary.

20             THE COURT:  If we're going to send it into the jury

21   and both sides --

22             MS. NUSSBAUM:  We have not agreed to send it.

23             MR. GREENE:  We haven't discussed it, but assuming we

24   do agree, then we should -- it ought to be taken down.

25             MR. CHEFFO:  That's fine; that's cautious.

Page 126

1          The issue, I thought we had a discussion earlier this

2    morning.  We had an objection.  I thought Tom was going to sit

3    over there.  We agreed to have a legal assistant from their

4    side play the witness, as opposed to having the trial lawyer be

5    the face of the witnesses.

6          MR. BARRETT:  We told you all along that Tom Sobol was

7    going to be the man's --

8          MR. CHEFFO:  Whatever you told me -- I am objecting

9    to --

10          THE COURT:  It's too late.  We'll do this now.

11    Tomorrow try to get someone who is not involved with the trial.

12          MR. CHEFFO:  I'm not clear on what the procedure is.

13    What are you suggesting?

14          MR. BARRETT:  What's the question?

15          THE COURT:  Who does yellow and who does pink?

16          MR. BARRETT:  We ask the yellow questions, you ask the

17    pink questions.

18          THE COURT:  Why don't we just --

19          MR. BARRETT:  Because it makes it look like we have

20    put stuff --

21          THE COURT:  That makes no sense.  Just keep going

22    along, and whoever -- if it's plaintiff's exam, they'll do the

23    asking, if it's -- I don't know who was doing which, the other

24    lawyer will come on.

25          MS. NUSSBAUM:  The issue is they have designated some

Page 127

1   of plaintiff's and vice versa.  We want the party who's

2   designating to be able to ask the question.

3            MR. CHEFFO:  We'll do that, it sounds incredibly

4   confusing.

5            MR. BARRETT:  It's not confusing.

6            THE COURT:  I'm reserving the right.  If it's too

7   confusing, we're going to stop it.

8            I've at this point done a lot of big trials, I have

9   never seen that done before, ever.  So --

10           MR. CHEFFO:  So pink is ours?  We're supposed to be

11   reading pink?

12           THE COURT:  You know what --

13           MS. NUSSBAUM:  Let's try it.  If it doesn't work after

14   this witness, we'll change it.

15           THE COURT:  I think it just makes sense, you do the

16   questions and answers, and then when it comes to

17   cross-examination the other side does it.

18           MS. NUSSBAUM:  But the issue is they have done the

19   bulk of the designation.

20           MR. BARRETT:  It makes them look like we sponsored it.

21           THE COURT:  I'll tell them that.

22           MS. NUSSBAUM:  But they won't know which is which.

23           THE COURT:  Who cares?  It doesn't matter.

24           MR. CHEFFO:  Just read it all in, it's what the

25   witness' testimony is.

1          (Discussion off the record.)

2          THE COURT:  Can I see one of the notebooks, please, so

3    I can show it to the jury?

4          MR. SOBOL:  Can I approach?

5          THE COURT:  Just to show there's some brightness in

6    our trial.  This is what we were sort of skirmishing about over

7    there at sidebar.  So these witnesses, you know, this case --

8    as I said, there are a bunch of cases that are all in this

9    district, depositions were taken, and now they need them.  And

10   so at some point the plaintiff's designated they like what's in

11   yellow and the defendant's designated they like what's in pink.

12   So that you're getting a mishmash of what both sides want.

13   That's a legal term, "mishmash," okay?

14         So instead of having everyone pop up and down when

15   they've designated the yellow versus the pink, one side is

16   going to read them all.  And you'll see like, for example, this

17   is yellow and pink, a lot of it is just pink, and in some areas

18   a lot of it is just yellow.

19         To make it clearer to you, we're just going to read it

20   all at once as if it's a witness.

21         Mr. Sobol here, who is the plaintiff's counsel, is

22   going to play -- who is this?

23         MR. SOBOL:  Boris.

24         THE COURT:  He's going to play Mr. Boris.  He's

25   obviously not Mr. Boris, so his credibility is not at issue.

Page 129

1    You know, you can't look at sweaty palms or see him directly.

2    He's just reading.  But understand the witness was under oath.

3    The only reason we do it this way, because otherwise -- it's

4    boring anyway, in general, but it's unbelievably boring when a

5    lawyer just stands up and reads question/answer,

6    question/answer.

7            So do what you learn in English, a willing suspension

8    of disbelief and pretend that he's the guy and we're going to

9    do the Qs and As.  Mr. Greene will do the direct.  Who is going

10   to do the cross?

11           MR. CHEFFO:  I think, your Honor, he's going to read

12   all of them, right, both sides?

13           THE COURT:  But then at some point isn't there

14   another --

15           MR. CHEFFO:  I think if he reads the green --

16           THE COURT:  If there's green, I don't know.

17           MR. CHEFFO:  I'm sorry.  I can see there's yellow and

18   pink.  I think, your Honor, if Mr. Greene will read the yellow

19   and pink all in, they'll accomplish the goal.

20           THE COURT:  But at some point it turns into

21   cross-examination, doesn't it?

22           MR. SOBOL:  There's very little of that.

23           MR. CHEFFO:  Thank you, your Honor.

24           MR. BARRETT:  Your Honor, this case has been going on

25   a long time, the dates of the deposition may or may not be

Page 130

1    important.

2              THE COURT:  Good point.  So what's the date?

3              MR. BARRETT:  This one, John Boris, was taken December

4    16, 2002.

5              THE COURT:  All right.  So 2002, that goes back even

6    before what you've heard.  As I say, this is not the only case

7    out there, so some of these were taken in other cases.  So this

8    must have been one of them, because this case started in 2005;

9    is that right?

10             MS. NUSSBAUM:  That's correct, your Honor.

11             THE COURT:  All right.  So it was related litigation

12   is all I'll say.  Please don't speculate.

13             MR. GREENE:  Do you have your notebook, your Honor?

14             THE COURT:  It's your notebook.  This is mine?  Okay.

15             MR. GREENE:  During the course of this we may have one

16   or two exhibits that we're going to introduce.

17             THE COURT:  Shoot them up on the screen.

18             MR. GREENE:  They'll go up on the screen.

19             THE COURT:  Good.  As you noticed, just to move this

20   along, there are certain time limits both sides have, so

21   hopefully somebody is going to keep track of what those times

22   are.

23             MR. BARRETT:  We have that done.

24             THE COURT:  Okay.

25             MR. SOBOL:  You don't need to swear me in, right?

1        THE COURT:  We do not need to swear you in, but the

2   witness was sworn in.  This is John Boris; is that right?

3        MR. GREENE:  This is the deposition of John Boris

4   taken on December 16, 2002.

5        Are you ready to proceed, Mr. Boris?

6        MR. SOBOL:  Yes.

7        (Reading from the transcript of John Boris.)

8   Q.   Mr. Boris, can you tell us how you are employed today?

9   A.   Currently employed by Merrill Lynch, World Financial

10  Center, in New York.  I'm a securities analyst.

11  Q.   How long did you work at Warner-Lambert?

12  A.   I was almost -- it was almost seven years, six and a half,

13  I believe.

14  Q.   So you started in 1990?

15  A.   '90, '91-ish.

16  Q.   And how long were you a specialties sales manager?

17  A.   Probably about maybe a little over two years.

18  Q.   How long was that?

19  A.   It was six and a half, seven years.  We got three,

20  probably about three years.

21  Q.   As a senior manager of marketing planning, was one of the

22  products that you had responsibility for Neurontin?

23  A.   That's correct, yes.

24  Q.   Now, were you asked at some point to develop some

25  marketing assessments for some off-label uses for Neurontin?

1    A.    I was asked to develop an opinion, a marketing opinion

2    that collectively reflected the international marketing group's

3    and U.S.'s opinion as to how to handle it through the clinical

4    studies, the development of Neurontin and potentially multiple

5    different uses.

6    Q.    Who asked you to develop that marketing opinion?

7    A.    It basically came from my boss.

8    Q.    Oliver Brandicourt?

9    A.    Oliver Brandicourt.

10   Q.    Based on your prior experience, before you arrived at

11   Warner-Lambert and your training in pharmacy school, did you

12   have any understanding as to whether it was proper for a drug

13   company to promote off-label uses of the drug prior to getting

14   FDA approval?

15   A.    My understanding is it's not appropriate to promote

16   products for off-label use.

17   Q.    Can you tell me what areas you conducted the assessment or

18   for what uses?

19   A.    There were essentially three areas.  The first area was

20   psychiatric uses, which consists of bipolar disorder,

21   generalized anxiety disorder, and social phobia.

22   Q.    Were there any other areas you were asked to look for?

23   A.    There was another area, neuropathic pain.

24   Q.    Any others?

25   A.    And the last area was chronic migraine prophylaxis.

1   Q.    What was the new products committee?

2   A.    New products committee was a decision-making body of

3   senior management that would efficiently allow decisions to

4   flow through the committee and decisions were ultimately made

5   by that committee.

6   Q.    Did the new products committee make any decisions with

7   regard to the marketing of Neurontin?

8   A.    I wouldn't say with regard to the marketing of Neurontin.

9   I would probably phrase it as marketing assessments were

10  conducted, and they felt it was important to conduct additional

11  research and studies into Neurontin.  They would be involved in

12  the decision-making capability because there would be needs for

13  additional funding for those studies to be conducted.

14  Q.    Did Parke-Davis attempt to increase the use of Neurontin

15  by conducting clinical trials concerning off-label uses of

16  Neurontin and then publishing the results of those trials?

17  A.    I think the primarily objective of Parke-Davis was that

18  once they had seen the launch of Neurontin as add-on therapy

19  the clinicians by 2 themselves were taking the liberty to

20  explore potentially other uses of the product.  I think it was

21  on the part of the company that they noticed that physicians

22  initiated that by themselves and from there felt it was

23  responsible to try and identify why physicians were doing what

24  they were doing.  And if so, that meant also conducting

25  potentially additional clinical trial work in that area.

1    Q.   Did you prepare marketing assessments that describe how

2    Neurontin's use could be expanded in psychiatric conditions,

3    bipolar, social phobia, generalized anxiety disorder by

4    conducting trials in those areas and then publishing the

5    results of those trials and disseminating the results of those

6    trials at educational symposia?

7    A.   It's essentially you're reading a statement from the

8    marketing assessments that was one of the many purposes of the

9    marketing assessments.  The main objective that we identify in

10   certain fashion that physicians were using the product

11   appropriately at all times.

12   Q.   Did your marketing assessments recommend that Parke-Davis

13   not seek FDA approval for the off-label use for Neurontin's

14   off-label use for the psychiatric disorders you described?

15   A.   That's correct.

16   Q.   Did you feel that was an improper recommendation?

17   A.   The recommendation was largely driven on the patent life

18   of Neurontin at that time.

19   Q.   Was that a violation of the FDA's rules and regulations to

20   promote Neurontin's use for off-label uses before seeking

21   approval?

22   A.   What I'm saying is Neurontin wasn't being promoted in

23   off-label use.  Essentially we discovered that physicians were

24   prescribing it in that fashion once the product was launched

25   and felt it was our responsibility to identify why physicians

8c688394-33ed-42af-838c-ffab78f22aea

1  were doing that; and if so, conducting additional clinical work

2  in that area to make sure that physicians were getting the

3  level of safety and efficacy in the certain condition that they

4  were treating.

5  Q.   Was it Parke-Davis' intent to increase Neurontin sales for

6  psychiatric disorders by publishing the results of those

7  clinical trials in that area?

8  A.   As with any publication, as with any publication of

9  results, contingent on the outcome of those results you could

10  get very negative outcomes, negative results as we've

11  discovered in Lou Gehrig's disease, so it's ethically important

12  that we bring those results forward and publicize those

13  results, just as we ultimately took the results from a

14  neuropathic pain trial and felt it was ethically important to

15  publicize, since they were favorable results in that area for

16  the medical community.

17  Q.   Did you believe in making such a recommendation that

18  the -- as you did in your marketing assessment for Neurontin's

19  use of treating neuropathic pain, that that recommendation was

20  in violation of the FDA's rules and regulations?

21  A.   The intent, as I indicated earlier, was to study the

22  brand.  One of the potential offshoots from that was that the

23  generation of potentially additional sales from that.

24  Q.   Wasn't that one of the goals at Parke-Davis, was studying

25  Neurontin's use for neuropathic and publishing the results and

1    disseminating them at educational symposia, that it would

2    increase Neurontin sales?

3    A.   Just as you study it in neuropathic pain, and as you study

4    it in other potential indications, as I indicated earlier, it's

5    a double-edge sword.  It could potentially increase revenue or

6    it could potentially decrease revenue.

7    Q.   In fact, it did increase revenue, didn't it?

8    A.   I guess it did have an impact on the revenues of

9    Neurontin.

10   Q.   Was one of the purposes of the publications strategy to

11   disseminate information as widely as possible through the

12   world's medical literature about gabapentin's use of treating

13   psychiatric conditions to increase drug sales?

14   A.   It was not the sole purpose.

15   Q.   My question didn't ask what a sole purpose was.  I will

16   come to that question later.  My question, was it one of the

17   purposes?

18   A.   Was it one of the purposes?  The only thing I can say is

19   that there's nothing here really defined as far as a formal

20   decision plan in place.  This is a memo from a point in time

21   where the formal decision about whether results would be

22   published or not published, disseminated or not disseminated

23   would be reflected in some type of formal decision about what

24   clinical trials would be conducted.  So it's -- it's just

25   stating something about one point in time contingent on

1   information flow at that time.

2   Q.   So one benefit for Parke-Davis in disseminating through

3   the publication strategy information as widely as possible

4   through the world's medical literature about Neurontin's use in

5   treating psychiatric indications would be to increase sales?

6   A.   As I indicated, as I indicated I think many, many times

7   that contingent on the size of the results, the track that we

8   would take at that time, whether it's an indication or

9   publication strategy contingent on the results of proving

10  safety or efficacy or not approving safety or efficacy,

11  contingent on those results being published and looked at

12  highly ethical physicians in peer review journals, contingent

13  on the outcome and publication of those results, they could

14  have a beneficial effect on sales; just as they could have a

15  detrimental effect to sales.

16  Q.   And what was it?

17  A.   I think it was to go for publications instead of

18  indications.

19  Q.   Were there people within the development team that thought

20  that Parke-Davis shouldn't pursue a publication strategy for

21  these three uses but instead should conduct full regulatory

22  clinical trials for submission to the FDA?

23  A.   My sense is that collectively everybody believed or had

24  the feeling that there was utility of Neurontin on the

25  indications based on the feedback they had gotten from top

1  leading physicians with their use of the product.  I think the

2  debate centered around some of the implication and part of the

3  bottleneck was the patent's expiration point as to whether we

4  do an indication and/or a publication.

5  Q.   You're referring to doing two studies for a new

6  indication?

7  A.   That's correct.  If the FDA had required two

8  well-controlled studies.

9  Q.   And to do two studies, if the FDA required it for

10  Neurontin's use in any one of the three disorders referenced in

11  this paragraph on page 10 that we are on, now cost is a factor?

12  A.   As in the development of any product and when you have

13  finite resources to spend in the R&D and you have multiple

14  departments competing for those resources, justifications for

15  gaining access to those resources, both scientific and

16  commercial; therefore, as with any development program, and as

17  I mentioned earlier, I sat on a lot of development teams --

18  larger phase two indication -- development teams.

19  Q.   Now, was one of the purposes of the publications study for

20  psychiatric disorders, was one of the purposes to generate

21  off-label use?

22  A.   Again, the purpose of the study were to validated the

23  scientific merit of off-label prescribing or off-label use by

24  physicians that was generated of their own accord.  The company

25  ethically felt that it was certainly important to study those

8c688394-33ed-42af-838c-ffab78f22aea

Page 139

1    uses to confirm whether there was safety and efficacy for the

2    use of that product in those uses.

3    Q.   Do you have Exhibit 10?

4    A.   I do.

5              MR. GREENE:  We move to admit Exhibit 28 at this time,

6    which is --

7              THE COURT:  All right.  So it was Deposition Exhibit

8    10, so we'll put that in.  If you could put that up.

9              (Exhibit 28 received into evidence.)

10             THE COURT:  Whose handwriting that's on the document

11   itself?

12             MR. GREENE:  This is the document.

13   BY MR. SOBOL:

14   Q.   If you turn to the page V090603, is this a marketing

15   assessment that you prepared for Neurontin in psychiatric

16   disorders?

17   A.   It is.

18   Q.   Was it one of your initial drafts?

19   A.   It looks like a draft, yes.

20   Q.   And did you write there the first bullet item under the

21   first paragraph, quote, Start the first pivotal study in acute

22   mania and generate off-label use by publicizing the results

23   through a peer-reviewed publication and key psychiatric

24   congresses, close quote?

25   A.   I believe it may have been.

Page 140

1    Q.   When you say "may have been," you told me you prepared

2    this draft, didn't you?

3    A.   I did.

4    Q.   Turn to page V090605.

5         Now, you write there -- the number is V090605.

6         (Pause.)

7    Q.   Now, you write there that the purpose was to provide an

8    assessment of the market potential for Neurontin in the

9    treatment of bipolar disorder.

10        Did you write that?

11   A.   I did.

12   Q.   Do you have Exhibit 11 before you?

13   A.   I do.

14   Q.   Can you identify it for the record?

15   A.   It's a marketing assessment for Neurontin in psychiatric

16   disorders.

17   Q.   Did you prepare this document --

18        THE COURT:  Can you stop you there?  What is that in

19   terms of your marked exhibits?

20        MR. GREENE:  Exhibit 4.  It's in evidence.  This is

21   the marketing assessment for Neurontin --

22        THE COURT:  I think we just need to this for the

23   record so people know what's being referenced.

24        MR. GREENE:  So let the record reflect the question to

25   the witness is:  Do you have Exhibit 11 before you?  And for

Page 141

1   our record, that Exhibit 11, Deposition Exhibit 11 is Exhibit 4

2   that's been introduced at this trial.

3   Q.   So let me start again, Mr. Boris.

4        Do you have Exhibit 11 before you?

5   A.   I do.

6   Q.   Can you identify it for the record?

7   A.   It's a marketing assessment for Neurontin in psychiatric

8   disorders.

9   Q.   Did you prepare this document?

10  A.   Prepared it, yes.

11  Q.   For the record, who asked you to prepare this?

12  A.   Oliver Brandicourt.

13  Q.   And was the marketing assessment approved?

14  A.   It was approved.

15  Q.   Who approved it?

16  A.   On the next page, approved by Oliver Brandicourt and

17  Joseph Pieroni.

18  Q.   And in that first paragraph, when it states, "The new

19  product's committee, in agreement with the overall

20  recommendations, made the following decisions," who is that new

21  products committee?

22  A.   It's a group of senior decision-makers that, you know,

23  reviewed the recommendations and conclusions.

24  Q.   Now, you did some projections for the years 1998 through

25  2002?

8c688394-33ed-42af-838c-ffab78f22aea

Page 142

1    A.   Correct.

2    Q.   For bipolar disorder, publication-only strategy, correct?

3    A.   Uh-huh, that's correct.

4    Q.   And did you show for the year 1998 that there could be

5    Neurontin sales of approximately 24 million?

6    A.   On the publication to this scenario, based on this

7    scenario we're showing approximately 24 million of sales in

8    1998.

9    Q.   For 1999 were you showing 36 million in sales?

10   A.   That's correct.

11   Q.   And for 2000, 30 million in sales?

12   A.   That's correct.

13   Q.   2001, 24 million?

14   A.   Correct.

15   Q.   And then, finally, 2002, 18 million?

16   A.   Eighteen or 19, 18.6 million.

17   Q.   Eighteen point six?

18        Question:  Do you have Exhibit 15 in front of you?

19   A.   I have Exhibit 15 in front of me.

20        MR. GREENE:  For our record, this is Exhibit 7.

21   Q.   Can you identify it?

22   A.   It's marketing assessments of Neurontin in neuropathic

23   pain and the treatment of spasticity.

24   Q.   Did you prepare this marketing assessment?

25   A.   I prepared it with the collaboration of my colleagues in

8c688394-33ed-42af-838c-ffab78f22aea

1   market research.

2   Q.   Was the marketing assessment approved?

3   A.   It was approved by Brandicourt and Pieroni.

4   Q.   Do you have Exhibit 40?

5   A.   I have Exhibit 40.

6   Q.   And this is from you to Mi Dong?

7   A.   It's from me to Mi Dong.

8   Q.   It's a memo you prepared regarding Neurontin marketing

9   assessment in migraine prophylaxis, right?

10  A.   Yes.

11  Q.   Will you turn to Bates number X027271?

12  A.   Okay.

13  Q.   Does that contain your conclusion for Neurontin migraine

14  prophylaxis?

15  A.   That contains a recommendation for migraine prophylaxis.

16  Q.   And a recommendation, we have an item there that says,

17  quote, Only publication studies, close quote.  What does that

18  mean?

19  A.   Again, based on the data above that, on the situation

20  analysis, patent/data exclusivity status was the reason for

21  doing the publication strategy versus an indication strategy.

22  Q.   Do you have Exhibit 41?

23  A.   I have Exhibit 41.

24       MR. GREENE:  For our record, that's Exhibit 216.

25  Q.   In the lower left-hand corner of the first page of the

1    exhibit, what is the reference there JB?  Are those your

2    initials?

3    A.   My initials, memo, marketing assessment, Neurontin.  It's

4    just used for filing.

5    Q.   Did you prepare this document?

6    A.   I prepared this in collaboration with Brandicourt, Pieroni

7    and the market research group and the collective wisdom of the

8    marketing assessment groups.

9    Q.   In this memo you indicated that the results if positive

10   will therefore be publicized in medical congress and published

11   in peer-reviewed journals?

12   A.   I do.

13   Q.   Did you write that?

14   A.   I did write that.

15   Q.   The results of that -- what were you referring to?

16   A.   I was referring to the results of the migraine -- chronic

17   migraine prophylaxis trials for trials that were conducted.

18   Q.   You didn't say in this cover memo that you were going to

19   be -- let me start again.

20        You didn't say in this cover memo that they were going

21   to be published if they were negative, did you?

22   A.   I didn't indicate that in the cover memo, but

23   traditionally it's contingent on where those results are done.

24   The investigators and/or other clinicians who conduct the

25   trials decide the publication of those results.  It's not

1  ultimately decided by marketing planning.

2  Q.   Mr. Boris, you were asked today a number of questions

3  regarding marketing assessments that you assisted in preparing.

4  Do you remember those questions?

5  A.   I do.

6  Q.   Were drafts of marketing assessments created during that

7  process?

8  A.   There were several drafts.

9  Q.   I'm going to show you what's been marked for

10 identification as Exhibit 10.  Do you recognize that document?

11 A.   I do.

12 Q.   Is that a draft of a marketing assessment?

13 A.   A draft of a marketing assessment.

14     THE COURT:  Which one was 10 now?

15     MR. GREENE:  Which one was 10?

16     (Discussion off the record.)

17     MR. SOBOL:  It's number 4, I think.

18     THE COURT:  All right.  So that's what you're

19 referring to there.  Exhibit 4, is that what we all agree?

20     CORINNE:  Yes.

21     THE COURT:  Thank you.  That's the end of that.

22     Who's the next deposition?

23     MR. GREENE:  I think I did, but I want to move all

24 those exhibits that I referenced into evidence.

25     THE COURT:  Yes.

Page 146

1        MR. GREENE:  I believe I did.

2        THE COURT:  Just to make sure, someone can follow it

3   later on just to make sure we've referenced both the trial

4   exhibit and the deposition exhibit numbers.

5        MR. GREENE:  So, for the record, Exhibit 4 is moved

6   into evidence --

7        THE CLERK:  It's already in.

8        THE COURT:  I think they were all in.

9        THE CLERK:  With the exception of 28.

10       THE COURT:  What's the next deposition?

11       MR. BARRETT:  The next deposition is John Knoop from

12   September 15, 2002.  Your Honor, that's going to take --

13       THE CLERK:  It's a total of 35 minutes.

14       THE COURT:  We'll get started.  Is it video?

15       MR. BARRETT:  No, it's to be read.

16       THE COURT:  All right.  Get going.

17       MR. SOBOL:  Knoop, 2002, Tom?

18       MR. GREENE:  Yes.

19       (Discussion off the record.)

20       THE COURT:  Who is this?

21       MS. NUSSBAUM:  John Knoop, your Honor.

22       MR. SOBOL:  If it's Knoop 2002, I'm ready.

23       (Discussion off the record.)

24       MR. GREENE:  These are excerpts of the deposition of

25   John Knoop, K-n-o-o-p, deposition was taken on September 25,

1    2002.

2           (Reading from the transcript of John Knoop.)

3    Q.   As of the date of your promotion in September of 1995, is

4    that when the scope and responsibilities of marketing Neurontin

5    changed?

6    A.   No, sir.  They changed in a number of ways because I

7    had -- I then had direct reports.  I had other products within

8    my portfolio, such as Dilantin and Cerebyx to then manage, as

9    well as Neurontin.

10   Q.   I just want to talk about Neurontin.

11   A.   That's fine.

12   Q.   Did the scope of your responsibilities change with regard

13   to Neurontin --

14   A.   Yes.

15   Q.   -- sometime beginning in September of 1995?

16   A.   Yes.

17   Q.   How did they change?

18   A.   They changed in increasing responsibility for activities,

19   such as I was then part of the Neurontin development team; I

20   was then also part of the global marketing team.  So, those

21   were two major areas of concentration in the development of

22   Neurontin.  Those were two of the biggest additions, I would

23   say.

24   Q.   And can you tell me what was the goal in the marketing

25   department between October 1994 and the time that you left with

1   regard to the marketing of Neurontin?

2   A.   Well, that's a very vague question.   I mean, there were

3   many goals.

4   Q.   Was one of your goals to increase Neurontin sales?

5   A.   Yes.

6   Q.   Okay.   Is that a goal of marketing strategies, to increase

7   drug sales?

8   A.   Yes.

9   Q.   And you had been familiar with marketing strategies, given

10  the experience you had before you came to Warner-Lambert,

11  correct?

12  A.   Yes.

13  Q.   And did you become familiar with marketing strategies that

14  were used to sell Neurontin when you worked at Warner-Lambert?

15  A.   Yes.

16  Q.   And were marketing strategies developed to increase

17  Neurontin sales?

18  A.   Yes.

19  Q.   And were marketing strategies developed to increase

20  Neurontin sales for approved indications?

21  A.   Yes.

22  Q.   And were marketing strategies developed to increase

23  Neurontin sales for off-label indications?

24  A.   Yes, as long as they were within the FDA guidelines.

25  Q.   And when you say that, sir, what do you mean?

1    A.    That basically everything we did in the marketing

2    department in Morris Plains was reviewed by either the ARC or

3    MEC.

4           So, for promotional programs, those had to meet

5    certain regulations and certain legal scrutiny through the ARC,

6    MEC; and any program that was educational in nature, continuing

7    medical education or in grants or in any of those types of

8    activities were also reviewed by legal, medical, regulatory

9    for -- to make sure they were within the FDA guidelines.

10   Q.    Can you give a single strategy?

11   A.    Sure.

12   Q.    What?

13   A.    The use of Neurontin as an adjunct for treating epilepsy.

14   Q.    That was one strategy you helped develop?

15   A.    Yes.

16   Q.    Okay.  How about strategies to expand emerging uses, did

17   you become familiar with that strategy?

18   A.    Yes.

19   Q.    Can you tell me that specific strategy, expanding emerging

20   uses?

21   A.    Emerging uses were, you know, given the context within the

22   company, were the areas of investigation that were ongoing with

23   Neurontin.

24          For example, there would have been a clinical problem

25   that was anticipated to be positive for use of Neurontin in

1    monotherapy agent in treating seizure disorder, the pediatric

2    program for epilepsy for under 16, under 16 or under 12, I

3    can't recall, for pediatric use of the product for children

4    with seizure disorder.

5        Also, the uses that were being investigated for

6    treatment of migraine headache as a prophylactic agent; the use

7    of Neurontin in certain psychiatric disorders, such as social

8    phobia, generalized anxiety.

9        In the clinical program that was ongoing for

10   neuropathic pain, diabetic neuropathy trial and the

11   postherpetic neuralgia trial.

12   Q.   Did you have any advertising companies that helped you

13   develop that strategy?

14   A.   Our advertising company primarily focused on the epilepsy

15   marketplace or the on-label use of the product.

16   Q.   So, the advertising -- what advertising company are you

17   referring to?

18   A.   Cline, Davis & Mann.

19       I'm sorry, there were actually two companies.  There

20   was Ferguson 2000 when I got there until sometime in 1995, and

21   then it became Cline, Davis & Mann after that.

22   Q.   Did either of those companies help you develop a marketing

23   strategy for Neurontin to expand emerging uses?

24   A.   I can't recall specifically.

25   Q.   Do you have a general memory?

1  A.   But I know they were involved in our yearly planning

2  meetings.

3  Q.   How were they involved in your yearly planning meetings?

4  A.   Because they were part of our disease team, if you will.

5  Q.   What do you mean by that, they were part of your disease

6  team?

7  A.   We had what we call an extended disease team which had,

8  like the Neurontin development team, had various members on it,

9  probably 20 or so.  The CBUs was represented; we had medical,

10 regulatory, legal people, as well as our advertising agency was

11 represented on that extended disease team.

12 Q.   They were actually a member of the extended disease team?

13 A.   Yes.

14 Q.   Did she play any role in the development of the strategy,

15 the marketing strategy for Neurontin to expand emerging uses?

16 A.   I don't recall specifically.

17 Q.   Did Cline, Davis & Mann prepare marketing strategy

18 proposals for Parke-Davis?

19 A.   Yes.

20 Q.   Did you request them to do that?

21 A.   It went both ways.  We would request certain things, and

22 they would independently bring forward proposals as a way of

23 increasing their revenues.

24 Q.   Did the marketing department in Morris Plains develop

25 marketing tactics to implement the marketing strategy for

1    Neurontin?

2    A.   Yes.

3    Q.   What does the term "marketing tactics" mean to you?

4    A.   A marketing tactic is a -- I'm trying to think of the

5    phrase.  I'm sorry.

6         A tactic, it's something that is done, such as -- it

7    could be a physical thing, like a sales aid, that could be a

8    tactic; direct mail could be a tactic.

9    Q.   You are giving me some examples?

10   A.   Exactly.

11        I'm having a hard time describing exactly what a

12   tactic is.

13   Q.   Could a CME event be a tactic?

14   A.   Yes.

15   Q.   Is a marketing tactic a means or method of implementing a

16   marketing strategy?

17   A.   Yes.

18   Q.   Did Cline Davis develop marketing tactics to implement the

19   marketing strategy for Neurontin?

20   A.   Yes.

21   Q.   And did you help develop those marketing tactics?

22   A.   Yes.

23   Q.   When you mentioned that advertising companies assisted you

24   in the development of the tactics that were used to implement

25   the marketing strategy for Neurontin, would that be Cline,

Page 153

1   Davis & Mann?

2   A.   From 1995 on, yes.

3   Q.   And what types of documents would reflect the final

4   marketing strategies for Neurontin during that time period?

5   A.   I don't know if there was a specific name.

6        There were strategic plans.  There were situational

7   analyses.  There was the overall tactical plans.  There were

8   various documents that you would find in the -- find the

9   strategies in.

10  Q.   Were the marketing strategies for Neurontin developed year

11  to year?

12  A.   Yes.

13  Q.   Did the marketing strategies for Neurontin change from

14  year to year?

15  A.   To some degree.

16  Q.   Once the marketing strategies were developed in any given

17  year between October 1994 and March of 1999, did they have to

18  be approved?

19  A.   Yes.

20  Q.   Could you describe what the approval process was?

21  A.   They would go from our epilepsy disease team, as I've

22  already described, to my boss, whether it was Larry Perlow for

23  a period of time or Doug Saltel, and then it would go to what

24  was referred to as the PDMT, the Parke-Davis management team to

25  be approved.

8c688394-33ed-42af-838c-ffab78f22aea

1  Q.   Once the marketing strategies were approved for Neurontin

2  between October 1994 and March of 1999, were tactical plans

3  then developed?

4  A.   Yes.

5  Q.   Once the technical plan for Neurontin was approved by your

6  boss, was a budget allocated to implement the tactical plan?

7  A.   Yes.

8  Q.   Can you describe that process for me?

9  A.   As I recall, the budget process would take place in the

10  fall of any given year.  I wasn't part of those meetings, so

11  I'm not sure exactly what took place.

12       But we would propose a budget and it would be then

13  decided with PDMT and finance what monies would be allocated

14  for each brand.

15  Q.   Who set fourth quarter goals for Neurontin?

16  A.   They were done by each individual, and then they would be

17  approved by, in Vic's case would be approved by myself and then

18  my boss, as appropriate.

19  Q.   "Investigate evolving FDA policies regarding off-label

20  promotion."

21  A.   Yes.

22  Q.   Was that done?

23  A.   Yes.

24  Q.   Who did that?

25  A.   It would have been myself and the team, regulatory people,

1   such as Jim Parker, legal people such as Allen Rubenstein,

2   David Long.

3   Q.   Okay.  Why was that listed as a key issue; do you know?

4   A.   Because at that time the Washington Legal Foundation had

5   taken the FDA to federal court concerning the dissemination of

6   medically relevant information for products that were outside

7   of their current label.

8   Q.   That was off-label?

9   A.   Right.

10   Q.   Do you recall -- can you be any more specific when you

11   started to look into that?

12   A.   I can't recall.

13   Q.   At least as of October 1997?

14   A.   Yes.

15         Yes.

16   Q.   In fact, Parke-Davis had a publication strategy where they

17   were going to disseminate the information from the clinical

18   trials looking at off-label indications for Neurontin?

19   A.   Off-label uses.

20   Q.   Off-label uses for Neurontin in the medical literature and

21   educational symposia, correct?

22   A.   Yes.

23   Q.   What did you do to investigate the evolving FDA policies

24   regarding the off-label promotion?

25   A.   I don't recall specifically, but I imagine at some point

1 in time I did have discussions with our regulatory people and

2 our legal department concerning the outcome of this Washington

3 Legal Foundation case, and I believe at that time it was in

4 court.

5    It eventually resolved in our favor of the

6 dissemination of well-controlled clinical trial data that was

7 published in medically reviewed journals.

8 Q.   Let me direct your attention to the strategy that appears

9 under issue number 3.

10    Do you see that?

11 A.   Yes.

12 Q.   The issue reads:  Off-label use provides significant

13 growth opportunity, and the strategy is support independent

14 medical education on the use of antiepileptic drugs and pain,

15 correct?

16 A.   Yes.

17 Q.   Is that an example of a tactic, a Neurontin tactic to

18 implement Neurontin marketing strategies?

19 A.   Yes.

20 Q.   And there are some specific tactics listed just below

21 that.  Do you see them?

22 A.   Yes.

23 Q.   One and two?

24 A.   Yes.

25 Q.   Are they examples of tactics implemented -- strike that.

1      Are they examples of Neurontin tactics to implement

2 the Neurontin marketing strategy?

3 A.   Yes.

4 Q.   Does this memo say that the sales representatives are

5 discussing off-label uses with physicians when they make

6 details?

7 A.   What it is indicating is that there have been

8 presentations for Neurontin to various specialties over a

9 number of different uses of Neurontin.

10      The assumption is it would be territory managers;

11 however, it's unclear if perhaps they mistook a medical liaison

12 for a sales rep in this research.

13 Q.   Well, are you reading that into the -- well, you are

14 reading that into the memo, aren't you, sir?

15 A.   Well, it is something that I know happens from time to

16 time.

17 Q.   Does the memo say it appears some territory managers are

18 discussing uses for Neurontin?

19 A.   Yes.

20 Q.   This is obviously a concern?

21 A.   Yes.

22 Q.   Why is it obviously a concern?

23 A.   Because the sales representatives are not allowed to talk

24 off-label in any circumstance.

25 Q.   And Edda Guerrero was sending a memo to Larry Perlow

1   pointing out to him that sales representatives are discussing

2   off-label uses of Neurontin with physicians?

3   A.   Yes.

4   Q.   And they were doing that in details?

5   A.   Yes.

6   Q.   And the detail visits are sales visits?

7   A.   Yes.

8   Q.   Do you have Exhibit 27 in front of you?

9   A.   Okay.

10  Q.   And that's a memo that you are copied on from Lawton

11  Griffin to Edda Guerrero?

12  A.   I don't see -- yes, I was copied.

13  Q.   Was Parke-Davis tracking the prescription writing of the

14  STEPS physician investigators?

15  A.   Yes, based on this memo.

16  Q.   Right.  This memo indicates that Parke-Davis was tracking

17  the prescription writing practice of the STEPS investigators

18  for non-study patients, correct?

19  A.   Well, they would have to include all of their patients in

20  this data.

21  Q.   But they were tracking the prescription writing practices

22  of the STEPS investigators for non-study patients, weren't

23  they?

24  A.   Yes.

25  Q.   Do you know why?

1   A.   To assess the writing habits of the physicians who took

2   place in a clinical program.

3   Q.   Was one of the goals of the STEPS program to get the STEPS

4   investigators more comfortable were prescribing Neurontin in

5   dosages exceeding 1,800 milligrams for their non-study

6   patients?

7   A.   I'm not sure that was a goal.  I think it was an outcome.

8   Q.   Was it one of the goals?

9   A.   The main goal of the trial was really just getting them

10  comfortable with prescribing Neurontin, period.

11  Q.   Why did they have to get comfortable with prescribing

12  Neurontin?

13  A.   Because at that time in 1995, the drug was barely a year

14  old.

15        There had been another product that was released the

16  previous year in the AED market that was pulled off the

17  market -- it wasn't pulled off the market, but it was

18  restricted due to high toxicity, and doctors were very

19  reluctant to try new anticonvulsant medications for treating

20  their seizure patients.

21            THE COURT:  Is this a good place to stop?

22            MR. GREENE:  I think it is.

23            THE COURT:  Good.  See you tomorrow.

24            THE CLERK:  All rise for the jury.

25            (Jury left the courtroom.)

Page 160

1          THE COURT:  Just see you for a second on tomorrow's

2     scheduling.

3          (At sidebar on the record.)

4          THE COURT:  So I think what we should do is Mr. Sobol

5     should finish this exam and then you should just get somebody

6     from your team to do it.

7          MR. GREENE:  Okay.

8          THE COURT:  Someone else who's not so visible.

9          So what are the other depositions?  Just in that list,

10    we're just going to go down.

11         MR. GREENE:  Not necessarily in this order, but on

12    this list.  Boris, Knoop 2002 --

13         THE COURT:  You don't need to tell me.  All

14    depositions tomorrow?

15         MR. GREENE:  Yes.

16         THE COURT:  Any other live witnesses?

17         MR. GREENE:  Mr. Franklin.

18         THE COURT:  He's the last live witness.

19         MR. GREENE:  Probably Friday -- not probably, Friday.

20         THE COURT:  These depositions --

21         MR. GREENE:  Before and after him.

22         MR. CHEFFO:  So he's not coming tomorrow?

23         MR. GREENE:  No, I think we'll just keep going.

24         THE COURT:  So as a practical matter, other than that

25    one issue with the cross going longer than we expected,

Page 161

1  everything else has been going completely according to what I

2  felt people were saying.  So as a practical matter, they

3  aren't -- I assume they're not going to start their case until

4  the very earliest Friday after the break, right?

5       MR. BARRETT:  That's right.

6       MR. GREENE:  At the very earliest.

7       THE COURT:  Well, I don't want them to bring someone

8  in here for nothing.

9       MR. GREENE:  Well, here are the estimated --

10      THE COURT:  Why don't you talk it through.

11      Who would be your first witness, a local guy or --

12      MR. CHEFFO:  The issue is -- yes, Keeley is scheduled.

13 The only issue, we're having scheduling problems, not him, but

14 others that are only available on certain days.

15      I thought you told me Thursday --

16      THE COURT:  I'm happy to take somebody out of order if

17 you need it on one of these deposition days.

18      MR. CHEFFO:  I think we're okay if they really end on

19 Friday.

20      THE COURT:  Let me say, you've used just as much time

21 on cross as they have on direct.  Everything has been going

22 smoothly.

23      MR. CHEFFO:  I agree.

24      THE COURT:  There was that one anomaly.  We should be

25 able to plan this.

1        MR. CHEFFO:  I'm not throwing stones at all.

2        MR. GREENE:  I think tomorrow will be all depos.

3        MR. CHEFFO:  All depos, and then you expect to do

4   Franklin on Friday.

5        MR. BARRETT:  But we won't finish all the depos, so

6   we'll -- to make sure we get -- we don't know how long the

7   cross will be.  We'll start off with Franklin, and then to the

8   extent we need to finish up these depositions, we'll finish

9   them up.

10        MR. CHEFFO:  As I understand -- I don't have the

11   schedule in front of -- one witness is only available Monday,

12   one is only available Tuesday, and one is only available

13   Wednesday.

14        THE COURT:  I'll work around their schedules.  If it

15   means we'll put some of the depositions later, then so be it.

16   We'll work around your schedule.  I'm trying to do that with

17   everybody.

18        MR. CHEFFO:  I appreciate it.

19        THE COURT:  Good-bye.

20        MS. NUSSBAUM:  Your Honor, can we clarify for next

21   week, we're not having court on Wednesday and Thursday.

22        THE COURT:  On Wednesday and Thursday.

23        MR. CHEFFO:  But we are having Friday.

24        THE COURT:  Yes.  I'm assuming we're going to the jury

25   that following week, short of your case being suddenly

Page 163

1    truncated.  I just have to assume it's the start of the week,

2    the 29th.

3         MR. CHEFFO:  I think so.

4         THE COURT:  They'll go to the jury Monday, Tuesday, or

5    Wednesday.

6         MR. CHEFFO:  I think that's probably right.  I can get

7    you a better exact what we think tomorrow.  I think Tuesday or

8    Wednesday is exactly right.

9         MR. SOBOL:  I feel comfortable raising this issue, I'm

10   local and it doesn't affect me, but there are a lot of people

11   that are from out of town here, many people, this is their

12   third week they're away from their home.  If there's not going

13   to be court next Wednesday and Thursday -- again, I'm not

14   advocating it -- but the Court might want to consider whether

15   or not you don't hold court that Friday so people can actually

16   go home.

17        THE COURT:  And there's a second issue, which is,

18   Monday night is Passover for people whom that might be an

19   issue.

20        MR. CHEFFO:  I would normally say, Fine, Tom.  I

21   appreciate you considering us.  I know one of our experts, who

22   we really need, is only available that Friday.

23        THE COURT:  I'm less worried about the Friday than I

24   am about people's issues with Passover, which is for a lot of

25   people a very important family holiday.  Easter isn't until the

Page 164

1    following week, right?  Ideally we won't sit on Good Friday

2    because that will be an issue for a lot of jurors.  You know,

3    it could take them three days.  There's a lot of documents to

4    go through.  So I'm going to take them off the hook for Friday,

5    I won't hold them late on the Passover day or days for all of

6    you, too.  I don't know who's got what religious thing, but I

7    won't knock into Good Friday, and I won't hold people late on

8    the two days of Passover.

9              MS. NUSSBAUM:  Your witness --

10             THE COURT:  I need to go.  We'll talk it out.

11             (Court adjourned at 1:07 p.m.)

12                 - - - - - - - - - -

13                      CERTIFICATION

14         We certify that the foregoing is a correct transcript

15    of the record of proceedings in the above-entitled matter to

16    the best of our skill and ability.

17

18

19    /s/Debra M. Joyce              March 10, 2010
      Debra M. Joyce, RMR, CRR      Date
20    Official Court Reporter

21

22

23

24    /s/Lee A. Marzilli            March 10, 2010
      Lee A. Marzilli, RPR, CRR     Date
25    Official Court Reporter