IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                    )
                                          ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,     ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION         )
----------------------------------------  )
This document relates to:                 )
KAISER FOUNDATION HEALTH PLAN, et al,     )
                                          )
                  Plaintiffs              )
                                          )
        -V-                               )No. 04-10739-PBS
                                          )Pages 1 - 72
PFIZER, INC., et al,                      )
                                          )
                  Defendants              )


JURY TRIAL - DAY FOURTEEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 11, 2010, 8:50 a.m.


LEE A. MARZILLI and DEBRA M. JOYCE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3         THOMAS M. GREENE, ESQ., ILYAS J. RONA, ESQ. and
     MICHAEL TABB, ESQ., Greene, LLP, 33 Broad Street, 5th Floor,
4    Boston, Massachusetts, 02109.

5         THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7         LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
          DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
          BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14        KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16        RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
          JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

Page 3

1                         I N D E X

2

WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

3

4    (By Deposition)

5    John Knoop (Contd)  p. 13

6    John Crook, p. 20

7    John Marino, p. 36

8    Jennifer Samuels, p. 57

9

     (By Videotape)

10   John Knoop, p. 35

11   Allison Fannon, p. 48

12   Clare Cheng, p. 51

13   Stephen Valerio, p. 51

14   Leslie Tive, p. 56

15

16   EXHIBITS                          PAGE

17   18                                23

18   32                                35

19   64                                50

20   189                               56

21

22

23

24

25

65dfddcf-ceeb-4ab4-9920-3140590e700c

1            P R O C E E D I N G S

2            THE COURT:  I understand there are some issues.

3            Good morning.

4            MR. CHEFFO:  You know what, your Honor, we have some

5     good news, I think.

6            THE COURT:  Not the S word.

7            MR. CHEFFO:  Not that good.  Right, your Honor?

8            Hopefully you didn't spend more than a few minutes

9     looking at those documents.

10           Here's what we've agreed.  They were trying to add to

11    their exhibit list, they said were inadvertent, we do have

12    objections to them substantively, but we are not going to raise

13    the fact that they were not operatively on their exhibit list.

14    So that procedural issue is off the table.

15           THE COURT:  So that means they're in?

16           MR. CHEFFO:  I think we have our objections to them

17    substantively, but we're not going to -- which you can rule on,

18    but I don't think we're going to reach them today.

19           MR. GREENE:  They're going to go into evidence.  They

20    are the defendant's documents.  They are the bipolar

21    teleconference, the pain teleconference.  They are two exhibits

22           MR. BARRETT:  They're not waving their objection to

23    them.

24           THE COURT:  That is good news; not as good as the

25    other.

1           MR. CHEFFO:  You're not having fun, your Honor?

2           THE COURT:  Actually, this is fabulous trial, fabulous

3     lawyers, great briefing, great issues.  At this point,

4     settlement would be almost a disappointment.  That having been

5     said, I've got so much work on my table.  You know, like the

6     pile's like -- so I'm sure that's true on all your desks as

7     well.

8           Anyway --

9           MR. BARRETT:  The other side of that, we will withdraw

10    our objections to this midnight slashing --

11          MR. CHEFFO:  I was pretty moderate here.

12          MR. BARRETT:  To this nocturnal editing of the tapes.

13    How's that?

14          MR. CHEFFO:  I'm not even going to respond to that.

15          THE COURT:  I understand it's their designations

16    they're knocking off, right?

17          MR. CHEFFO:  Yes.

18          THE COURT:  Is the issue that it's just logistically

19    hard --

20          MR. CHEFFO:  We've done it already.  We did all the

21    tapes for them.  Whatever we wanted to take out, there was

22    three people, we actually stayed up and Austin cut the tapes,

23    so they have it; it's all done.

24          THE COURT:  So, Austin, you cut the pink?

25          AUSTIN:  Yes.

1          THE COURT:  I feel like I know you:  Austin, pink.

2          MR. CHEFFO:  So it saved 67 minutes of videotape.

3          THE COURT:  That's great.

4          MR. BARRETT:  As far as scheduling, it puts us in a

5  little bit of a jam today because we weren't counting on that,

6  but we can fill it -- we're going to fill it with the time

7  video deposition that runs almost that much, maybe we'll get

8  off a little bit early today, and we won't have time -- we were

9  going to have blowups for that, the exhibits, we don't have

10  them ready yet, but we'd like permission from the Court to

11  publish them tomorrow.

12          THE COURT:  All right.  So you've all resolved

13  everything.

14          MR. CHEFFO:  The only thing, that I think this will

15  take us to -- the answer is yes, I think all those issues are

16  resolved.

17          You gave me a stipulation.

18          (Discussion off the record.)

19          MR. CHEFFO:  There also was a document, Exhibit 360,

20  that was an outside document.  They got a stipulation

21  authenticating it from CME.  So we are not going to object to

22  that since they got the stipulation.

23          MR. SOBOL:  So 360 had been marked for identification

24  previously, it will now be marked in evidence.

25          THE COURT:  Okay.

1        MR. CHEFFO:  The only last thing, this is just a

2   logistic issue, and I'm not going to throw stones here, but we

3   had initially been -- other than this hour, everyone was ready

4   to start our case on Monday.  What has happened now because we

5   cut an hour out, with your Honor's indulgence, we may just end

6   at 12:00 or -- tomorrow not start our case, because it's so out

7   of order.  The two people who will start on Monday are not

8   available on Friday and may not be able to come back.

9        THE COURT:  Do you have any taped videos you're going

10  to be playing?

11       MR. CHEFFO:  We do.  We haven't even worked them out.

12  That's the other thing.  We're going to cut down some of the

13  tapes that we've done.

14       THE COURT:  Whom do you have, the Kaiser people?

15       MR. CHEFFO:  That's mainly what they're going to be,

16  your Honor, the three Kaiser doctors.

17       THE COURT:  I would hate to lose the hour.  If there's

18  a possibility -- let me put it this way.  If there's a way of

19  possibly taking one of the less controversial ones and playing

20  it, just not to lose the hour.  Do I feel passionately about

21  it?  No.

22       MR. CHEFFO:  We'll do our best.  If not, we'll be

23  ready to go on Monday.

24       THE COURT:  By and large, this has been going

25  completely on schedule, and that one had more to do with the

1   scheduling of the doctor, so I'm content if you need to.  I

2   mean, it can't be a perfect science, I try.

3          But here's -- can you play out this issue with me --

4   this is my concern -- which is, I suppose I could cancel out of

5   that conference I agreed to speak on in New Orleans if you

6   thought there was -- there's no chance this case is going to --

7   whether would this case finish.  Let me just --

8          MR. CHEFFO:  If you look at just the pure hours, I

9   think -- and Don and I did a little friendly math last night --

10  I think after tomorrow both sides are going to have somewhere

11  about maybe -- collectively about 13 or so, 14 hours about,

12  which, you know, if you take three-and-a-half-hour days,

13  approximately, you probably need five trial days, four to five

14  trial days.

15          THE COURT:  Starting today or --

16          MR. CHEFFO:  My thinking is if we went Monday,

17  Tuesday, and Friday of next week, we would probably be done on

18  Monday the following week and you could have closing arguments

19  on Tuesday of the following week.

20          THE COURT:  Here is my concern, which isn't critical.

21  Assuming we did closing arguments on the Monday --

22          MR. CHEFFO:  Probably Tuesday, your Honor, I think.

23          THE COURT:  All right.  Let's say the Tuesday.  I

24  think at least the culture here is the schools get out and Good

25  Friday is a big deal for people.  So at the end of the day does

1  that mean -- it's a lot of documents for a jury to walk

2  through.  So let's say we did -- closings would be at least an

3  hour each, and I think for a case of this magnitude you might

4  want more than that.

5          MR. CHEFFO:  I would say at least an hour 15 minutes

6  for this case.

7          THE COURT:  I'm thinking --

8          MR. BARRETT:  We have to publish those documents, too.

9          THE COURT:  I'm not -- I'm just simply saying let's

10  assume two apiece.  Let's assume at least an hour, at least an

11  hour long for my instructions.  So I'm concerned am I going to

12  lose this jury -- just playing it all through -- am I going to

13  lose the jury if I go a full day Tuesday, block it off, and I

14  just get Wednesday, Thursday.  A lot of people are going to

15  have -- Good Friday is a problem.  A lot of people -- school,

16  et cetera --

17          THE CLERK:  Good Friday is April 2nd.

18          THE COURT:  Am I off a week?

19          (Discussion off the record.)

20          THE COURT:  I am off a week.  I'm sorry.  Ignore

21  everything I've just said.  All right.  I'm off a week.  I

22  don't think I have to worry about Passover and Good Friday,

23  that's the week before, unless something goes very wrong here.

24          MR. GREENE:  Can I just bring -- just one other -- I

25  gave you this a couple of days ago.

1        THE COURT:  I didn't rule?

2        MR. GREENE:  You gave it back to me with your old

3   rulings.

4        THE COURT:  Just give it to me, I'll look at it.

5   Whose deposition is it?

6        MR. GREENE:  It's Glanzman.  He's on the publication

7   committee for Pfizer, and there's an exhibit -- you sustained

8   an objection at this page because you said the exhibit wasn't

9   on the exhibit list.  These are the -- their key messages --

10       THE COURT:  Didn't you give it to me and didn't I

11  rule?

12       MR. GREENE:  We gave it to you, I explained it to, you

13  gave it back, it appears you did nothing with it.

14       THE COURT:  Did you give me a separate deposition?

15       MR. GREENE:  That was different, that was Boris.

16       MR. CHEFFO:  I think it's the third bite of this

17  document.  I thought you ruled on this twice already.

18       THE COURT:  It was Boris, he's telling me was Exhibit

19  40 and 41.  That made a huge difference, seeing the documents,

20  so I'm willing to look at it again.

21       And you gave me, Mr. Greene -- Mr. Sobol, I'm assuming

22  you had a hand in crafting it -- have you seen it?  It came in

23  last night.  I haven't read it yet --

24       MR. CHEFFO:  I haven't -- I saw it come in.  I haven't

25  had a chance to look at it, your Honor, the 51-page document.

1          MR. SOBOL:  We tightened it up.  I'm sorry.  Yes.

2          THE COURT:  So is the jury here?

3          THE CLERK:  Should be.

4          MR. GREENE:  Judge, when we do some of the reading,

5     Mr. Sobol is going to finish up; I'm going to continue to

6     question, that's all right from you.  I was going to have

7     Mr. Rona from my office take the male role and answer some of

8     the questions.

9          During that --

10         THE COURT:  There are no live witnesses today, right?

11         MR. GREENE:  No.  There may be some video.  During the

12    questioning --

13         THE COURT:  Are they here?

14         THE CLERK:  Yes.

15         MR. GREENE:  -- we're going to publish some of the

16    exhibits to the jury.

17         MR. CHEFFO:  As long as the page that's referenced, if

18    it's the page they're talking about --

19         MR. GREENE:  It's the exhibit.

20         MR. CHEFFO:  Again, you pick one page of a large

21    exhibit and showing things -- the witness could look through

22    the entire document.  You have to show him the page that's in

23    the deposition.  You can't just pick random documents that you

24    like.

25         MR. GREENE:  Here's what I'd like to do.  I say here

1    is Exhibit 30, it's Exhibit 30 in the deposition, which is,

2    let's say, Exhibit 17 that's been introduced.  At that point

3    I'd like to publish it to the jury.

4              THE COURT:  That page on the screen.

5              MR. GREENE:  Different pages within the exhibit.

6              THE COURT:  Only if they're discussed in the

7    deposition.

8              MR. GREENE:  They're not.

9              MR. CHEFFO:  How can you do that?

10             THE COURT:  Right now just what's in the deposition,

11   and then we'll worry --

12             THE CLERK:  All rise for the jury.

13             (Jury entered the courtroom.)

14             THE CLERK:  Please be seated.

15             THE COURT:  We're going back to the play acting.

16             Good morning.  I find myself getting more cheerful as

17   it's 50 degrees when I walk out the door.

18             Did anybody speak about the case or see anything in

19   the press?

20             All right.  I find the jury has complied.

21             Remember, he's not the real guy.  Mr. Sobol is on the

22   stand, Mr. Greene is examining -- who is the witness again?

23             MR. GREENE:  This is Mr. Knoop.

24             (Discussion off the record.)

25             JUROR:  For this testimony, this Mr. Knoop, what is

Page 13

1    his title or what is his --

2           JUROR:  Who does he work for?

3           THE COURT:  I think he was --

4           MR. GREENE:  He was at Parke-Davis, your Honor.  He

5    was Neurontin product manager.

6           Are you ready, Mr. Knoop?

7           (Reading from the transcript of John Knoop.)

8    Q.   Mr. Knoop, do you have Exhibit 30 in front of you?

9    A.   Yes.

10          MR. GREENE:  For our record, your Honor, that is trial

11   Exhibit 75.

12   Q.   You testified earlier today that Cline, Davis & Mann was

13   one of the advertising agencies that assisted you in the

14   development of the Neurontin tactical plan?

15   A.   Yes.

16   Q.   And were you copied on this memo that we've marked as

17   Exhibit 30?

18   A.   Yes.

19          THE COURT:  And what is --

20          MR. GREENE:  Exhibit 30 is trial Exhibit 75.

21   Q.   Is this the Neurontin 1997 tactical plan?

22   A.   It's a recommendation for the tactical plan.

23   Q.   Who made the recommendation?

24   A.   Clare Cheng from Cline, Davis & Mann.

25   Q.   Did Parke-Davis provide Cline, Davis & Mann with any

1   information that assisted them in the developing of this

2   tactical plan?

3   A.   Yes.

4   Q.   What did they provide them with?

5   A.   Various proposals from vendors, our strategic plans.   We

6   talked with these people on a daily basis.

7   Q.   Do you have Exhibit 31?

8   A.   Yes.

9   Q.   And what is it entitled?

10  A.   The "Neurontin 1997 Strategic Plan."

11  Q.   Did you assist in the development of the Neurontin 1997

12  strategic plan?

13  A.   Yes.

14  Q.   My question is:  Did Parke-Davis adopt a publication

15  strategy to publish the results of clinical trials looking at

16  off-label uses of Neurontin to treat bipolar disorders, panic

17  disorders, social phobias and neuropathic pain?

18  A.   Yes.

19  Q.   Was one of the purposes of that publication strategy to

20  disseminate the information from those clinical trials in the

21  medical literature and educational symposia?

22  A.   Yes.

23  Q.   By increasing use in those, for those off-label uses,

24  would that increase Parke-Davis' profit?

25  A.   Yes.

1   Q.   And did Parke-Davis adopt a tactical plan to implement the

2   publication strategy?

3   A.   Yes.

4   Q.   And what was that tactical plan?

5   A.   I don't recall specifically, but it was a formal program

6   to make sure that the clinical trial data was written up and

7   submitted to journals where appropriate, such as JAMA or

8   Headache or American Association of Psychiatric Medicine or --

9   Q.   And did you and your colleagues continue to discuss the

10  merits and limitations of filing versus publication strategies

11  for the pain indication?

12  A.   Yes.

13  Q.   The minutes indicate that the merits of limitations of

14  filing versus publication strategies for the pain indication

15  was discussed at the R&D and the MPC meetings?

16  A.   Yes.

17  Q.   Do you know what that is referring to?

18  A.   The R&D meeting is research and development.  I'm not sure

19  who would go to that.  People in Ann Arbor.

20       The new products committee is what we talked about

21  previously.

22  Q.   Did the minutes indicate management is reluctant to file

23  gabapentin for the pain indication because of commercial

24  factors?

25  A.   That's what is stated here.

Page 16

1   Q.   Do you have Exhibit 49 in front of you?

2   A.   Yes.

3   Q.   Those are the meeting minutes for the Neurontin

4   development team for October 16, 1997?

5   A.   Yes.

6   Q.   And you were present at those?

7   A.   Yes.

8   Q.   Would you agree that the publication of the study results

9   from those two studies would generate Neurontin sales?

10  A.   Yes.

11  Q.   And they would generate Neurontin sales because physicians

12  would read the results of the study, of the two studies and

13  prescribe Neurontin for those conditions that were studied?

14  A.   Yes.

15  Q.   Wasn't that one of Parke-Davis' goals, to generate more

16  Neurontin prescriptions by publicizing or publishing the

17  results of those two studies in the medical journals?

18  A.   Yes.

19  Q.   So, these were a schedule of events that were listed in

20  this recommendation where direct sales promotion of Neurontin's

21  use in treating diabetic neuropathy would be promoted, correct?

22  A.   No.  Not correct, no.

23  Q.   What is it then?  Am I misreading it?

24  A.   It's not sales promotion.

25          These are CME events, Continuing Medical Education,

Page 17

1    which is by definition no promotion.

2            As taken, it's a little bit out of context here.

3            Direct sales promotion would be supplemented by

4    selected education events.

5            This refers to 1999 when the indication, we felt,

6    would be in hand.

7    Q.   Okay.  Do you have Exhibit 59?

8    A.   Yes.

9            MR. GREENE:  For our record, your Honor, Exhibit 59 is

10   trial Exhibit 17.

11   Q.   What is this exhibit?

12   A.   It's listed as 1998 Neurontin Tactics, by Cline, Davis &

13   Mann.

14   Q.   I think earlier we had looked at some 1997 Neurontin

15   tactics by Cline, Davis & Mann.  Do you recall that?

16   A.   Yes.

17   Q.   Would you turn to -- just take a minute and look at the

18   tactics and strategy grid and the tactics and audience grid.

19           Are these proposed 1998 Neurontin tactics?

20   A.   Yes.

21   Q.   Were they adopted?

22   A.   I'm sure many of them were, but I can't be sure which

23   ones.

24   Q.   Do you have Exhibit 60 in front of you?

25   A.   Yes.

1  Q.   During the break did you have a chance to review Exhibit

2  60?

3  A.   Yes.

4  Q.   The document that begins with the Bates number V084079

5  through V084085 consecutively, what is that document?

6  A.   It is the 1998 Neurontin A&P allocation, advertising and

7  promotional allocations.

8  Q.   What does that mean?

9  A.   These are the dollars that are allocated to support

10  activities around Neurontin in 1998, marketing activities.

11  Q.   If you turn to the second page of that document, that's a

12  summary of the 1998 Neurontin A&P allocation by strategy,

13  correct?

14  A.   Yes.

15  Q.   And if I direct your attention to number 4, emerging uses,

16  can you tell me by looking at this document how much

17  Parke-Davis was going to spend or how much Parke-Davis had

18  allocated for strategy number 4, emerging uses?

19  A.   Total it looks like 11.139 million.

20  Q.   And how was that broken down?

21  A.   Broken down in terms of what?  Marketing CBUs?

22  Q.   Yes.

23  A.   Morris Plains marketing had 3.6 million, the CBUs had

24  7.209 million, the healthcare marketing group had .33 million.

25  Q.   Can you tell me when the tactics for implementing the

1    Neurontin marketing strategy for 1998 were finally approved?

2    A.   I can't be exactly certain of the date, but sometime in

3    late September, early October.

4    Q.   Would you turn to Bates V084076?

5         Do you have that?

6    A.   Yes.

7    Q.   Okay.  Number 4, is that the marketing strategy, number 4,

8    for Neurontin?

9    A.   It is one of the marketing strategies for Neurontin, yes.

10   Q.   For the year 1998?

11   A.   Yes.

12   Q.   And that strategy was approved for the year 1998?

13   A.   Yes.

14   Q.   And are those marketing tactics that were listed

15   underneath that strategy?

16   A.   Yes.

17   Q.   And those are marketing tactics that show budget

18   allocation?

19   A.   Yes.

20   Q.   And at least as of September 5, 1995 (sic.), these were

21   the marketing tactics that were being proposed to implement

22   strategy number 4?

23   A.   Yes.

24        MR. GREENE:  Thank you.

25        I call Mr. Crook.

Page 20

1       MR. GREENE:  Your Honor, I think we've given you this

2   insert in your binder.

3       THE COURT:  Yes.  We have Mr. Crook on the stand.

4       (Reading from the transcript of John Crook.)

5   Q.   Q.  And what was your prior employment?

6       MR. GREENE:  For the record, the date of Mr. Crook's

7   deposition was September 24, 2002.  September 24, 2002.

8   Q.   Mr. Crook, what was your prior employment.

9       MR. RONA:  Tom, I don't have that insert.

10      MR. GREENE:  It's just a little insert we added.

11      With your permission, your Honor, I'll stand by the

12  witness.

13  Q.   Mr. Crook, what was your prior employment?

14  A.   It was with Parke-Davis, a division of Warner-Lambert.

15  Q.   How long did you work there, Mr. Crook?

16  A.   Since, let's see, December the 1st, 1986.

17  Q.   To what date?

18  A.   To September the 15th of 2000.

19  Q.   Let's move on.  What was your next position?

20  A.   Next position was product manager.

21  Q.   From when?

22  A.   From September the 1st of 1996 until nineteen -- I can't

23  remember the exact date.  Let me think about this for a second.

24  It was about the fourth quarter of 1999.

25  Q.   And you were product manager for what products?

65dfddcf-ceeb-4ab4-9920-3140590e700c

1   A.   For Neurontin and also some -- I did some work on a

2   product called Cerebyx.

3   Q.   Was one of the Parke-Davis' purposes in disseminating

4   information about the results of clinical trials in the medical

5   literature; that is, to generate use of the Parke-Davis drug

6   product?

7   A.   When Parke-Davis disseminates data that appears in the

8   medical literature, it may generate usage if the results of

9   that data are good.  If the results are of the data are not

10  good and it appears in the medical literature, then it may not

11  necessarily result in increased usage.

12  Q.   Mr. Crook, my question was, was one of the purposes of

13  Parke-Davis' publication of the results of clinical trials in

14  the medical literature to generate use of the product?

15  A.   Yes, it is one of the purposes.

16  Q.   Can you identify what we marked as Exhibit 1?

17  A.   Neurontin 1997 strategic plan.

18  Q.   Were you involved in the development of the Neurontin 1997

19  strategic plan?

20  A.   Very minimally.

21  Q.   Do you see the four strategies listed?

22  A.   I do see them.

23  Q.   Was strategy number 1 implemented?

24  A.   Execute publication/educational plan and clinical trials

25  program to support product expansion and emerging uses.

1          I believe that was one of the strategies.

2     Q.   That was implemented?

3     A.   That was implemented.  That was supported.

4     Q.   Well, in fact, as product manager for Neurontin, didn't

5     you allocate budget to implement that strategy?

6     A.   Yes, I believe so, that this is the final document.  I

7     feel fairly comfort that that would be.

8     Q.   Was the goal of strategy number 1 to generate Neurontin

9     uses?

10    A.   The goal of the strategy was to generate data and to

11    educate physicians.

12    Q.   Was an additional goal of the strategy to generate

13    prescriptions in those emerging uses?

14    A.   It had that effect.

15    Q.   In fact, as Neurontin product manager, you were aware of

16    the increase in Neurontin prescriptions for those emerging

17    uses, weren't you?

18    A.   Absolutely, yes.

19    Q.   And your department tracked them, didn't they?

20    A.   We knew there was increased usage.

21    Q.   Would you turn to the second page of the Exhibit 12.

22    A.   Um-hmm.

23          MR. GREENE:  At this time, your Honor, we would move

24    Exhibit 18, trial Exhibit 18, into evidence.

25          (Exhibit 18 received into evidence.)

1  Q.   Would you turn to the second page of Exhibit 12?

2        This is a grant request for a scientific article

3  series in support of epilepsy education prepared by Medical

4  Education Systems for John Knoop and for you, correct?

5  A.   That's what it says.

6  Q.   Do you have a memory of asking MES to prepare a series of

7  papers?

8  A.   No.

9  Q.   No?

10 A.   Of asking them?  They may have proposed that, but I don't

11 have a memory asking them to prepare that.

12 Q.   Okay.  Do you know who did ask them?

13 A.   No, I don't.  Or if anyone did ask them, I'm not sure.  A

14 lot of time vendors come in and just come in with proposals.

15 That doesn't mean that we ever asked them for a proposal.

16 Q.   Now, MES proposed this scientific article series that they

17 would prepare with faculty members that were chosen at

18 Parke-Davis' discretion, correct?

19 A.   That's what this proposal says.

20 Q.   And article number 1 is "Bipolar."  Is that the topic?

21 A.   That's correct.

22 Q.   In article number 4, would you turn to that?  The topic is

23 "Pain Management"?

24 A.   That's what number 4 says.

25 Q.   Excuse me.  It says "Pain/Migraine"?

65dfddcf-ceeb-4ab4-9920-3140590e700c

1   A.    Mm-hmm.

2   Q.    Correct?

3   A.    Yes, that's what article number 4 says.

4   Q.    Article 5, "Pediatrics."  Was Neurontin approved for

5   pediatric use as of March of 1997?

6   A.    I don't believe that it was.

7   Q.    Article number 9 is "Monotherapy," correct?

8   A.    That's what it says.

9   Q.    Did you have any discussion with anybody at MES about who

10  would write these medical articles?

11  A.    I don't recall me having a discussion with them about who

12  would write these particular articles.

13  Q.    Would you turn to the last page, "Budget Narrative"?

14  A.    Sure.

15  Q.    The first line item is "Editorial Research" and

16  development of 12 scientific articles at $12,000 per article,

17  144,000.

18          Is that what MES was going to be paid to research and

19  develop the articles?

20  A.    Usually for a series like this, maybe we are willing to

21  provide, you know, dollars to MES, so it appears at least in

22  the context of this.

23  Q.    Have you answered the question?

24  A.    No, I don't think -- I'm not finished.

25          That was one of the capabilities of this particular

65dfddcf-ceeb-4ab4-9920-3140590e700c

1    company, was to do editorial research through various

2    physicians who were experts in a particular area, to write

3    articles that subsequently would be submitted to peer-review

4    journals.

5    Q.    Okay.  And if you look at the budget narrative, it

6    indicates that MES is going to be paid 12,000 per article and

7    then the doctor would be paid, it says, honorarium to author 12

8    scientific articles at $1,000 per article, 12,000 total.

9          The author was being paid $1,000?

10   A.    That's what this proposal says.  Again, I just have a

11   vague recollection of this.

12   Q.    Did Parke-Davis implement a marketing strategy where they

13   used CME programs to drive promotion of Neurontin use in pain?

14   A.    Parke-Davis funded unrestricted educational grants for

15   programs that covered that particular subject matter.

16   Q.    Did Parke-Davis fund those educational grants to promote

17   Neurontin's use in pain?

18   A.    We funded those to educate physicians.

19   Q.    And was one of the purposes of educating physicians to

20   generate Neurontin use in pain?

21   A.    Sometimes that was the effect of --

22   Q.    Was that one of the goals, to get that effect?

23   A.    It had that effect.

24   Q.    Well, wasn't that one of the marketing strategies, to get

25   physicians to prescribe Neurontin use for pain?

65dfddcf-ceeb-4ab4-9920-3140590e700c

1    A.    We funded educational programs that had the effect of

2    increasing our business in these areas you just described.

3    Q.    So was that one of the reasons that you -- Parke-Davis

4    conducted those CME programs?

5    A.    The primary reason that we conducted the CME programs was

6    to educate physicians.

7    Q.    I didn't ask if it was the primary goal, I didn't ask if

8    it was a specific stated goal, I asked if it was one of the

9    goals.

10   A.    Our goal was to increase sales of the product.

11   Q.    For off-label uses.

12   A.    To increase sales, period.

13   Q.    Including off-label uses?

14   A.    I'm just trying to think of where -- it had that effect.

15   Q.    And one of those goals was to get the physicians to

16   prescribe Neurontin for off-label uses?

17   A.    We had budget --

18         I believe the answer to that is yes.

19   Q.    Do you have Exhibit 46?

20   A.    I do.

21   Q.    Cline, Davis & Mann, who are they again?  I may have just

22   asked you that, but just, you know --

23   A.    They're an advertising agency.

24   Q.    Okay.  Parke-Davis used Cline, Davis & Mann in connection

25   with a Neurontin account?

1   A.   That's correct.

2   Q.   And did Parke-Davis use Cline, Davis & Mann to develop

3   some advertising strategies for Neurontin?

4   A.   We did.

5   Q.   Did Parke-Davis use Cline, Davis & Mann for other purposes

6   with regard to Neurontin?

7   A.   They sometimes provided input on all aspects of the

8   business.

9   Q.   Of the Neurontin business?

10  A.   Of the Neurontin business, of the Neurontin product.

11  Q.   Do you have Exhibit 49 in front of you?

12  A.   Yes, I do.

13  Q.   And you recognize that handwriting?

14  A.   Yes, I do.

15  Q.   Is that yours?

16  A.   It is.

17  Q.   And is that a -- strike that.

18       It says, "File Tactics."

19       Is that one of your filing --

20  A.   Yes, it is.

21  Q.   -- designations or systems?

22  A.   Yes, it is.

23  Q.   Was this a -- well, what is this?  Can you tell me?

24  A.   This would be recommendations for a 1997 tactical plan as

25  conceived by the Cline, Davis & Mann group.

1   Q.   Okay.  And why is it addressed to you?

2   A.   Because I was one of the product managers and --

3   Q.   Did you request it?

4   A.   No.  I'm sure that they, as part of the routine plan, they

5   would send it in.

6   Q.   Now, the second page of it lists tactics, and then down at

7   the bottom strategies, correct?

8        The second page of the exhibit lists tactics and

9   strategies at the bottom of the page, correct?

10  A.   Yes, it does.

11  Q.   Now, who developed the strategies?

12  A.   These would be -- looking at this document, this would be

13  the strategies and the tactics that Cline, Davis & Mann was

14  suggesting for the marketing team.

15  Q.   Okay.  So my question is, looking at the strategies, did

16  they develop those five strategies that are listed there

17  without any input from Parke-Davis?

18  A.   Yes.

19  Q.   So I think you said that this document, Exhibit 49,

20  contains the recommendations that Cline, Davis & Mann was

21  making to Parke-Davis for the Neurontin 1997 tactical plan,

22  correct?

23  A.   Yes.

24  Q.   Exhibit 50, document entitled "1997 National Strategies

25  and Tactics."

1        Do you have Exhibit 50 in front of you?

2   A.   Yes, I do.

3   Q.   This is entitled "1997 National Strategies and Tactics"

4   correct?

5   A.   Yes, it is.

6   Q.   Do you recognize this format?

7   A.   It has some familiarity to me.

8   Q.   Do you know who prepared it?

9        When I say "who," I just mean what department, I don't

10  mean an individual.

11  A.   Marketing.

12  Q.   Will you look at the strategies listed on Exhibit 50?

13       (Witness complies.)

14       There are four of them on the four-page, do you see?

15  A.   Yes.

16  Q.   Okay.  Were they the strategies, national strategies, that

17  Parke-Davis used, marketing strategies for Neurontin for 1997?

18  A.   I don't know if these were the final ones.  I have to see

19  the final document.  It would be very close to this.

20  Q.   Okay.  And how about the tactics that are listed under

21  that?  Were they the tactics that Parke-Davis adopted to

22  implement those strategies?

23  A.   They would be -- excuse me.

24       They would either be the specific tactics that we

25  would be implementing or it might represent a budget from which

1    you can support other activities in the future.  You know,

2    because sometimes you don't know what types of proposals are

3    going to come in or, you know what your needs are going to be

4    during the course of the year, so it might have been a parking

5    place, if you will, for budget in the event that you needed the

6    money available.

7    Q.   I think you testified that part of your responsibility was

8    to track budget dollars for Neurontin, correct?

9    A.   That's correct.

10   Q.   And did Morris Plains have a budget that could be used for

11   Neurontin?

12   A.   Yes.

13   Q.   All right.  In that first column, MOPS -- M-O-P-S -- what

14   does that signify?

15   A.   Morris Plains.

16   Q.   And below that there are figures, do you see it, that run

17   down?

18   A.   Yes, I do.

19   Q.   Are those budget dollars that Morris Plains could allocate

20   for the various tactics for Neurontin?

21   A.   Could you repeat that question one more time?

22   Q.   Sure.

23        I think I said, are those figures that are listed in

24   the Morris Plains column, budget dollars that Morris Plains

25   could allocate to implement Neurontin tactics?

65dfddcf-ceeb-4ab4-9920-3140590e700c

1   A.   If this is an approved budget, the answer would be yes.

2   Q.   And the same question with regard to CBUs.

3   A.   Yes.

4   Q.   Okay.  This is Exhibit 3 -- excuse me.

5        This is Exhibit 63.  Is that what you have?

6   A.   Yes.

7   Q.   And again, Cline, Davis & Mann was an advertising company

8   that Parke-Davis hired, correct?

9   A.   That's correct.

10  Q.   And Cline, Davis & Mann developed the 1998 Neurontin

11  tactics for Parke-Davis?

12  A.   Cline, Davis & Mann made suggestions about what the

13  tactics would be but --

14  Q.   Okay.

15  A.   They provided numerous suggestions.

16  Q.   All right.  And have we marked as Exhibit 63 the 1998

17  Neurontin tactics that were prepared on July 30, '97 by Cline,

18  Davis & Mann?

19  A.   Yes.

20  Q.   And were these tactics incorporated into the Neurontin

21  1998 tactical plan?

22  A.   I haven't looked at them, but --

23  Q.   Go ahead.

24  A.   Okay.

25        Would you like to confirm for each one?

Page 32

1          MR. GREENE:  That's all we have of Mr. Crook, your

2     Honor.

3          (Discussion off the record.)

4          MR. GREENE:  We're now going to play a video of

5     Mr. Knoop, John Knoop.  The date of this deposition

6     videotape --

7          THE COURT:  The same guy we heard before.

8          MR. GREENE:  We just finished with Mr. Crook.

9          THE COURT:  I see.  So I don't have the most current

10    transcript.

11         (Discussion off the record.)

12         THE COURT:  Do you have the Knoop 2008?

13         MR. GREENE:  That was the last page of mine, so,

14    apparently, I don't have the most current.  I'm sorry, your

15    Honor.  Thank you.

16         MR. GREENE:  Mr. Rona had another page, as well.  It

17    wasn't in my booklet.

18         Could we put that exhibit back up on screen?  Let me

19    just back up to read the last question I had read.

20    Q.   All right.  And have we marked as Exhibit 63 the 1998

21    Neurontin tactics that were prepared on July 30, '97 by Cline,

22    Davis & Mann?

23    A.   Yes.

24    Q.   Next tactic, diabetic neuropathy --

25         MR. HOOPER:  I think you just left out a piece.

1          MR. GREENE:  You're right I did.

2  Q.   Were these tactics incorporated into the Neurontin 1998

3  tactical plan?

4  A.   I haven't looked at them but --

5  Q.   Go ahead.

6  A.   Would you like to confirm for each?

7  Q.   Next tactic, diabetic neuropathy CME, was that

8  implemented?

9          Was that adopted and implemented by Parke-Davis?

10  A.   I don't recall if the CME request came in from for

11  diabetic neuropathy during 1998.

12          There was certainly a chance that we did support

13  something like that, but I don't -- that would be the type of

14  CME that we would support --

15          THE COURT:  You know, it's like the two of you are in

16  a private conversation.  So I'm just trying to -- you need to

17  project out.

18          THE WITNESS:  Okay.

19  A.   Excuse me.

20          That would be the type of CME that we would support in

21  1998.

22  Q.   So Cline Davis would come up with a tactic, for instance,

23  diabetic neuropathy CME, the objective was to increase the

24  awareness of Neurontin's efficacy in the treatment of diabetic

25  neuropathy.

1          Did Cline Davis come up with that tactic?

2     A.   Did they come up with this tactic?

3     Q.   Yeah.

4     A.   They came up with this tactic and provided it right here

5     as a suggestion.

6     Q.   Did they create it or did --

7     A.   I don't think so.

8     Q.   Who created the document?

9     A.   Who created the document?

10    Q.   The tactic.

11    A.   They created the document.

12    Q.   The tactic, not the document.  Who came up with that idea

13    as a tactic?

14    A.   Cline, Davis & Mann.

15         MR. GREENE:  Your Honor, we're now going to play the

16    video deposition of John Knoop that was taken on January 24th

17    and 25th 2008.  Just excerpts from it, your Honor.

18         THE COURT:  The court reporter will not take it down.

19    Do you have a transcript?

20         MR. BARRETT:  We do have a transcript.

21         THE COURT:  Do you need her to take it down?

22         MR. GREENE:  No, we can provide a transcript.

23         THE COURT:  Mr. Knoop is the one you heard from

24    before.  Who he is again?

25         MR. GREENE:  He's the Neurontin product manager, your

1    Honor.

2             THE COURT:  Are you turning it on?

3             MR. GREENE:  Your Honor, he will be directed to turn

4    his attention to an exhibit, which we have here on a board.

5             THE COURT:  All right.

6             MR. GREENE:  So before we start, I'd like to bring an

7    easel up, if I could.

8             (Played videotaped deposition of John Knoop.)

9             MR. GREENE:  That's it for Mr. Knoop, your Honor.

10            (Discussion off the record.)

11            MR. GREENE:  I'd like to move into evidence Exhibit

12   32.

13            (Exhibit 32 received into evidence.)

14            MR. GREENE:  This is a page from Exhibit 32.  I'm just

15   going to label this board Exhibit 32, your Honor.

16            This is the deposition of John Marino.

17            Your Honor, do you have your binder for Mr. Marino?

18            THE CLERK:  I don't think so.

19            THE COURT:  I don't think so.

20            (Discussion off the record.)

21            THE COURT:  So are we going?

22            MR. GREENE:  This is a version that was changed last

23   night, your Honor.  I need to get a copy from defense counsel.

24            THE COURT:  Is this video?

25            MR. GREENE:  Reading.

1          THE COURT:  What's going on here?

2          Are we ready?

3          MR. GREENE:  This is the version that we were provided

4     that has the defendant's latest edits, as I understand.  So

5     this is the one I'll be reading from, your Honor.

6          THE COURT:  Okay.

7          MR. GREENE:  Mr. Fox, this has all our previous

8     testimony in it?

9          MR. FOX:  Yes, it does.

10         MR. GREENE:  This is the deposition of John Marino

11    taken on July 2nd and 3rd, 2007.

12         (Reading from the transcript of John Marino.)

13    Q.   Mr. Marino, where were you employed prior to July 1, 2006?

14    A.   I was employed by Pfizer Pharmaceuticals.

15    Q.   What position did you hold prior to March -- the March

16    2004 position?

17    A.   Prior to that position, I was Detrol worldwide team

18    leader, approximately March 2003 until March 2004.

19    Q.   What position did you hold prior to that?

20    A.   Prior to that position, I was Neurontin worldwide team

21    leader.  I started that position specifically July 10, 2000

22    until approximately March 2003.

23    Q.   When did you first start to have responsibility for

24    Neurontin?

25    A.   When did I first have responsibility for Neurontin?

1      Neurontin was launched in the U.S. market in

2  approximately December 1993, I believe.  I took a position in

3  the South Central CBU beginning in 1994.

4  Q.   Would that be January 1994?

5  A.   I don't recall the exact month, but approximately.

6  Q.   Now, do you see the reference on the bottom of the third

7  page of the exhibit?  It reads, quote, Importantly, gabapentin

8  is not effective in non-neuropathic pain models of pain, close

9  quote.

10      Do you recall discussion about that subject at this

11  meeting?

12  A.   Well, there's always been a long discussion around the

13  topic of nociceptive pain and neuropathic pain, the differences

14  between these two.  And there was a lot of scientific discovery

15  around this issue, and it was evident that that was the case.

16  Q.   Do you know what nociceptive pain is?

17  A.   The only way I can describe nociceptive pain is simply

18  that it -- that you would probably take an aspirin for

19  nociceptive pain versus neuropathic pain.

20  Q.   Can you describe for me what type of pain nociceptive pain

21  is?

22  A.   It's a pain which gabapentin didn't treat very

23  effectively.

24  Q.   Now, how many studies did Parke-Davis and Pfizer conduct

25  in the Pfizer use in treating nociceptive pain?

1   A.   I'm not aware of that.

2   Q.   More than five or less than five?

3   A.   I don't recall specifically, but I remember there were a

4   number of investigator-initiated studies in this regard.

5   Q.   And all those studies were negative, weren't they?

6   A.   As far as I know, yes.

7   Q.   You know who MAC is, don't you?

8   A.   MAC?  Yes, I recall who MAC is.

9   Q.   What is MAC?

10  A.   I believe they were a vendor, agency, who assisted in the

11  publication of materials.

12  Q.   And did MAC assist Pfizer in developing key messages for

13  Neurontin?

14  A.   I'm sure that we worked closely with MAC at various

15  opportunities to create publication plans, strategies, as well

16  as messages.

17  Q.   Okay.  And did part of the publication plan that Pfizer

18  had in place for Neurontin call for the placement of key

19  messages in manuscripts that would be published in medical

20  journals?

21  A.   There were numerous discussions around the appropriate

22  messages from conducting clinical studies, in terms of

23  interpreting the results, and those were frequently worked on

24  as part of manuscripts, abstracts and other opportunities for

25  publishing.

65dfddcf-ceeb-4ab4-9920-3140590e700c

1   Q.   Isn't that the way Pfizer circulated word to the medical

2   community about Neurontin's use in unapproved indication?

3   A.   I think there were a variety of mechanisms that word about

4   unapproved indications that was circulated.

5   Q.   Was one of them through publication?

6   A.   As I mentioned, there were thousands and thousands, I

7   think it was 8,000 to be exact, publications done on gabapentin

8   in the past decade.  It was a substantial number of

9   publications that were created for gabapentin, both

10  independently, as well as within Pfizer, as well as

11  Parke-Davis.

12  Q.   Did Pfizer use those 8,000 publications to circulate word

13  to the medical community about Neurontin's use in unapproved

14  uses?

15  A.   That information circulated through all different various

16  means.

17  Q.   Did Pfizer use publications, 8,000 publications to use

18  your number, to circulate word to the medical community about

19  Neurontin's use in unapproved indications?

20  A.   There is no question that the medical community became

21  influenced by the amount of publications that they read about

22  gabapentin, both positive and negative, in many different

23  forms.

24  Q.   Did you take any steps to provide the negative results of

25  Dr. Reckless' study to sales representatives in the United

Page 40

1   States?

2   A.   Not that I'm aware of.

3   Q.   With regard to the POPP study, did you take any steps to

4   circulate the negative results of the POPP studies to anybody

5   on the U.S. Neurontin marketing team?

6   A.   Not that I'm aware of.

7   Q.   Let me show you what we have marked as Exhibit 26 and see

8   if you can identify it.

9         And looking at Exhibit 26, what was the -- the

10   worldwide -- turning your attention to about halfway down the

11   page where it says, "Achieve worldwide total net sales of 1.687

12   billion (plus 27 percent versus 2000)."

13         What does that mean?

14   A.   That indicates that Pfizer's goal for 2001 was to achieve

15   worldwide Neurontin sales of 1.687 billion dollars, which was a

16   27 percent increase from the year 2000 until 2001.

17   Q.   Okay.  Turning your attention to Exhibit 27, identify that

18   for the record, please.

19   A.   Exhibit 27 is 2002 goals, which appear to be in progress

20   at some point, since it's not a final version.

21   Q.   And under -- about halfway down the page there where it

22   says, quote, Achieve worldwide total net sales of 2.2 billion,

23   plus 25 percent versus 2001, close quote, what does that mean?

24   A.   It indicates that Pfizer's goal for 2002 was 2.2 billion

25   dollars, which was a 25 percent increase from -- over the year

1   2001.

2   Q.   Okay.  And with regard to Exhibit 27, those worldwide net

3   sales of 2.2 billion, that was for Neurontin sales, correct?

4   A.   Yes, that is the Neurontin, Pfizer worldwide sales.

5   Q.   Well, let's go to Exhibit 28.  Identify that for the

6   record, please.

7   A.   Exhibit -- Exhibit Number 28 is my 2003 operating plan

8   goals.

9   Q.   And on this, about halfway down you have, quote, Achieve

10  U.S. total net sales of 2.327 billion?

11  A.   That's correct.

12  Q.   So that's for Neurontin sales in the United States,

13  correct?

14  A.   Yes, this is -- assuming this is -- well, it's a goal, so

15  it may or may not have been achieved.  But the goal states

16  "U.S. total net sales of 2.37 -- 327 billion dollars, a 20

17  percent increase from 2002."

18          MR. GREENE:  Do you have page 2?

19          (Discussion off the record.)

20  Q.   So your goal was to increase the U.S. sales of Neurontin

21  20 percent over what you achieved in 2002; is that correct?

22  A.   That's correct.

23  Q.   Let me show you what we have marked as Exhibit 26 and see

24  if you can identify it.

25          Looking at Exhibit 26, what was the worldwide --

Page 42

1    turning your attention to about halfway down the page, where it

2    says, Achieve worldwide total sales of 1.67 billion -- plus 27

3    percent versus 2000, what does that mean?

4            MR. GREENE:  Do you have that page?

5            MR. BARRETT:  We did that page.

6            MR. FOX:  I thought we read that page.

7            (Discussion off the record.)

8            MR. GREENE:  Are you on page 6 now, Mr. Rona?

9            MR. RONA:  Yes.

10   Q.    Yes.  So your goal was to increase the U.S. sales of

11   Neurontin 20 percent over what you had achieved in 2002; is

12   that correct?

13   A.    That's correct.

14   Q.    I'm going to show you what has been previously marked as

15   Exhibit 18.  If you can look at sort of the middle of the page,

16   there's an e-mail from Judy Brown to Angela Crespo.  Do you see

17   that?

18   A.    Yes, I see that e-mail.

19   Q.    And it's an e-mail dated September 20, 2000?

20   A.    Yes.

21   Q.    And do you see that reference -- there's a reference there

22   to attach copies of the research reports for NN25 and NN26?

23   A.    Yes.

24   Q.    Was it your understanding that at the time, as of

25   September 20th that research reports and manuscripts had

1  already been prepared for studies 25 and 26?

2  A.   Well, that's clearly the case, for two reasons.  One is

3  that the final research reports, while not attached to this

4  e-mail, if the research reports are finished and in final form

5  as of May 2000, by September 2000 it's not surprising that the

6  manuscript was almost finished for publication, as indicated by

7  Judy Brown in this note to Angela.

8  Q.   And -- and would you say that just from looking at this

9  document -- feel free to look at it as much of it as you

10  want -- that, in fact, the 25 and 26 studies were -- the

11  research reports had already been prepared for those studies

12  but it had not -- they have not been prepared, that is research

13  reports, for the Reckless study?

14  A.   I'm not aware that the research report based on the timing

15  September 2000 had been prepared at this point for the Reckless

16  study.

17  Q.   Let me put it this way.  Can you tell from looking at this

18  document and refreshing your recollection whether those studies

19  were ahead of the Reckless study in terms of preparation, or

20  behind the Reckless study in terms of the preparation for

21  publication?

22  A.   If the research reports had already been finished, and

23  based on the comments from individuals in this e-mail that NN25

24  and NN26 were close to having a finalized manuscript, then it

25  would indicate that having both of these studies were

1  relatively -- would indicate that both of these studies were

2  relatively close to being submitted for publication, which was

3  significantly ahead of the publication timeline expected for

4  Reckless 224 study.

5  Q.   Just a moment.  Was the Reckless study submitted to any

6  journals for publication?

7  A.   As I recall -- I don't remember the exact journals where

8  it was submitted, but it was a variety of journals, and I do

9  recall there were a couple of them, perhaps three.  I believe

10  it was finally published in the journal Clinical Therapeutics.

11  Q.   And having been rejected by -- it's your testimony, at

12  least to the best of your recollection, that the Reckless study

13  was submitted to several journals that declined to publish; is

14  that correct?

15  A.   That's correct, yes.

16  Q.   What is Continuing Medical Education?

17  A.   Continuing Medical Education, CME, is the medical

18  education required for physicians who get credit so they can

19  update their license and continue to gain knowledge about the

20  fields in which they treat and practice medicine.

21  Q.   Is it common in your experience for pharmaceutical

22  companies to provide grants to independent CME providers who

23  sponsor such education?

24  A.   Yes, in fact, without the sponsorship, unrestricted

25  educational grants to sponsoring institutions, it is highly

Page 45

1  unlikely that institutions would otherwise be able to afford

2  the -- the conduct of programs of Continuing Medical Education

3  for physicians.

4  Q.  Is it fair to say that typically CME does not address one

5  product and its uses?  Is that correct?

6  A.  It would be very unusual for a CME to address one product,

7  one treatment option.

8  Q.  So when Pfizer agrees to give a grant for a CME program,

9  in your experience, did it expect that whatever -- that the

10  discussion of CME programs would be limited to only Pfizer

11  products?

12  A.  Not in any way is that type of guidance given to a CME

13  provider whatsoever.  In fact, it is advocated that physicians

14  are taught the right way to treat the patient based on the

15  current guidelines and options available.

16  Q.  You were shown Exhibit 36 earlier today, and I'm going to

17  ask you a question.

18       If you look on the second page of the document, under

19  the phrase "Publication Strategies"?

20  A.  Yes, yes.

21  Q.  Do you see where it says, quote, It was also noted that we

22  will publish negative study results, close quote, and then the

23  sentence continues, and you can read as much of it as you like.

24  Do you see that?

25  A.  Yes, I do see that.  Would you like me to read it?  I do

1    see that here.

2    Q.   Can you read -- you can read it if you want.  You don't

3    have to read it into the record.  I don't want to waste time

4    doing that.

5         But you see the reference in the document relative to

6    publishing a statement that we will publish negative studies

7    results.  Do you see that?

8    A.   It absolutely indicates, quote, it was also noted that we

9    will publish negative study results, close quote.

10   Q.   And this is a document written in 1995 by someone at

11   Parke-Davis; is that correct?

12   A.   That is correct, yes.

13   Q.   Was it your understanding that the policy and practice was

14   to publish negative study results -- publish study results

15   whether they were negative or positive?

16   A.   It was my understanding and practice -- it was my

17   understanding and practice that all publication study results,

18   negative, positive, mixed, whatever, will be published

19   appropriately.

20        MR. GREENE:  That's Mr. Marino, your Honor.

21        I'm going to play some excerpts from the deposition of

22   Allison Fannon.

23        (Discussion off the record.)

24        THE COURT:  While we're waiting, "CBU" means again?

25        MR. GREENE:  Customer Business Unit, capital C,

1    capital B, capital U.

2           THE COURT:  They mentioned CBU, but they also

3    mentioned Morris Plains.

4           MR. GREENE:  MOPS.

5           THE COURT:  That's a different CBU --

6           MR. GREENE:  That's the headquarters in Morris Plains,

7    New Jersey.

8           THE COURT:  That may have been included somewhere, but

9    I lost that.

10          If you have problems with the acronyms, just ask.

11          (Discussion off the record.)

12          MR. GREENE:  This is the deposition of Allison Fannon,

13   your Honor, taken on June 19, 2007.

14          THE COURT:  Who is she?  It doesn't say in here.

15          Who's is this?  Who did the transcript?

16          MR. GREENE:  She's on the Neurontin marketing

17   committee.

18          THE COURT:  For --

19          MS. NUSSBAUM:  Pfizer.

20          THE COURT:  In what years?  Someone just lobbed that

21   off.

22          MR. GREENE:  She started at Parke-Davis, your Honor,

23   and continued at Pfizer, was on the Neurontin marketing

24   committee.

25          (Played videotape deposition of Allison Fannon.)

1          MR. GREENE:  Your Honor, can we stop this?  Because an

2     answer was cut to a question that I asked.

3          MR. CHEFFO:  Can we have a sidebar?

4          (At sidebar on the record.)

5          THE COURT:  Mr. Green.

6          MR. GREENE:  We were notified late last night -- I

7     want to put this on the record -- that the changes -- the

8     defendants were making cuts to the video.  We haven't had the

9     opportunity to review them.

10         Mr. Fox for the last witness handed me a transcript

11     that had missing pages it, so when I was asking questions, I

12     had to get pages.

13         Now a question was just asked of this witness, Allison

14     Fannon, the was:  "Does that mean that they were at the time

15     considered marketing tactics?"  Her answer was:  "Yes."  And it

16     didn't appear on the transcript.  It went right to the next

17     question.

18         MR. CHEFFO:  Your Honor, clearly there was an

19     objection.  He tried to put it on there.  We can correct that.

20     It's inadvertent.  We don't have to make --

21         MR. FOX:  Answer "yes" on the bottom is there.

22         MR. GREENE:  The jury didn't hear it.

23         Can we back it up and start here?

24         THE COURT:  And just read it out loud.  There was an

25     editing issue.  Read it yourself, we'll back it up.

Page 49

1        MR. GREENE:  I don't know if the question is there

2   anymore.

3        MR. CHEFFO:  It says "yes" on the screen.

4        THE COURT:  Maybe, but you couldn't hear it.

5        MR. CHEFFO:  I have no objection, it was inadvertently

6   taken out.

7        (End of discussion at sidebar.)

8        THE COURT:  What Mr. Greene alerted me to, there was

9   an editing issue.  So read the question and answer that there

10  was a mistake as to, and then we're going to back it up and go

11  over it.

12       So she said -- and the question -- yes, go ahead.

13       JUROR:  Just get a clarification, who this is?  Name

14  again?

15       MR. GREENE:  Allison Fannon, she worked at Parke-Davis

16  and then at Pfizer.  She was on the Neurontin marketing team.

17       THE COURT:  And between -- what were the years you

18  told me?

19       MR. GREENE:  I don't have the answer to that question

20  right here.

21       THE COURT:  Let me just say this.  Remember I told you

22  at the beginning of the trial that some people live far away,

23  so they were allowed to take depositions of folks, and these

24  are some of these depositions.  And so some of the editing --

25  and people are getting tired, as you can imagine -- it was done

Page 50

1    in the middle of the night.  There was a mistake made in the

2    editing.

3         MR. GREENE:  That's correct.  So I'm going to back up

4    just the question before that to give context.

5         THE COURT:  Yes, absolutely.

6         MR. GREENE:  "Are CME events considered marketing

7    factors?

8         "A.  CME at the time fell under the auspices of the

9    marketing team.  So at that time they would have been

10   considered that marketers had responsibility for them.

11        "Q.  Does that mean that they were at that time

12   considered marketing tactics?

13        "A.  Yes."

14        THE COURT:  So are we okay now?

15        AUSTIN:  Yes, I can roll that same clip.

16        THE COURT:  It shows up on the screen, apparently.

17        (Played videotape of Allison Fannon.)

18        (Discussion off the record.)

19        MR. GREENE:  We have the deposition video of Clare

20   Cheng.

21        (Discussion off the record.)

22        MR. GREENE:  I move Exhibit 64 into evidence.

23        (Exhibit 64 received into evidence.)

24        MR. GREENE:  This was taken on January 29, 2008, your

25   Honor.  It's on the screen.

Page 51

1           (Played videotape deposition of Clare Cheng.)

2           MR. GREENE:  We now have the deposition, your Honor,

3    of Stephen Valerio.  It's a video that will be played.  He's a

4    MAC employee.

5           THE COURT:  What's MAC, again?

6           MR. GREENE:  Medical Action Communications, Inc.

7           (Playing videotape deposition of Stephen Valerio.)

8           THE COURT:  Okay, break.

9           THE CLERK:  All rise for the jury.

10          (Jury left the courtroom.)

11          THE COURT:  Just on scheduling, you have all these

12   depositions for the rest of the day, pretty much?

13          MR. BARRETT:  I didn't hear what you said.

14          MR. GREENE:  The cutting down of it, we might come up

15   short of the time.  I just have to look at what we have, and

16   I'll report to Robert.

17          THE COURT:  I don't remember if these depositions were

18   the ones where you had or hadn't marked the exhibits.  But

19   sometimes it's hard to follow because you don't have the

20   document that they're referring to.  Are these ones that just

21   weren't marked as trial exhibits?

22          MR. GREENE:  Some of them weren't marked as trial

23   exhibits.

24          THE COURT:  I think -- well, to the extent that they

25   are marked as trial exhibits, it's hard for me to tell.  I

1    don't know if there's a way of --

2         MR. GREENE:  The suggestion I had this morning is that

3    when the trial exhibit was marked, I wanted to be able to

4    publish it to the jury at that time.  We figured --

5         THE COURT:  I said I had no problem with that page

6    being published at that time.  I thought you said you wanted to

7    read other pages from it.

8         MR. GREENE:  From the exhibit because it's in

9    evidence.

10        THE COURT:  When you use that -- what's hard is when

11   the whole document might come in, but you can't interrupt the

12   deposition that way.

13        My only point is, is there a way of at least seeing

14   the document they're referring to?  It's hard to follow.

15        MR. GREENE:  When they're marked as a trial exhibit,

16   we have them up.

17        THE COURT:  All right.

18        So I'll see you afterwards.

19        (A recess was taken, 11:00 a.m.)

20        (Resumed, 11:41 a.m.)

21        MR. GREENE:  Hi, your Honor.

22        THE COURT:  We have injections of caffeine directly

23   into their veins back there.

24        MR. GREENE:  I didn't even get down to the cafeteria

25   to get mine, but --

1          THE COURT:  We're all set, right?

2          MS. NUSSBAUM:  One second.

3          MR. GREENE:  I just want to bring a couple of things

4   to your attention.  One, with regard to Dr. Pande, they cut

5   their Pande designations; now we're cutting Pande.  So he's

6   out.

7          THE COURT:  All right.

8          MR. GREENE:  That saves some time.  We are going to

9   play -- we were not prepared to play Leslie Tive because Pande,

10  I think, was about forty-five minutes both sides.

11         THE COURT:  So now you're doing Tive, right?

12         MR. GREENE:  Now we're doing Tive, but we're trying to

13  get the --

14         MS. NUSSBAUM:  Your Honor, if we can possibly get a

15  few pages printed here in the court so that we have the witness

16  and the questioner with a copy and not just on the screen, we

17  can do Samuels as well.

18         THE COURT:  Sure.

19         MR. GREENE:  So Tive, your Honor, would take us

20  fifty-five minutes.

21         THE COURT:  I mean, we're pretty much -- it's quarter

22  of, and we can just start on that, or you can just stand next

23  to the witness and do it.

24         MS. NUSSBAUM:  It's only on the computer, and we were

25  hoping to get one copy printed, and that way we'd finish today.

Page 54

1  Samuels is short and then --

2          THE COURT:  That's fine.  So how do you want to do it?

3  Do you want to shoot it to Mr. Alba, and he can print it right

4  off the computer?

5          At some point I just simply usually can figure it out,

6  Mr. Greene, but I don't understand what you handed me on

7  Glanzman, and I think we're going to have to talk about it at

8  side bar afterwards.

9          MR. GREENE:  Yes, if we can do that.  And then

10  tomorrow we would have Glanzman, which currently stands at

11  forty-one minutes, and a couple others.  I think we're going to

12  rest tomorrow.  That's what Mark and I were talking about.

13          MR. CHEFFO:  I just need to know because I know your

14  Honor, appropriately, does not want us to waste any time, and

15  so what I've asked Tom to tell me, you know, because we're

16  going to put on an expert tomorrow, and it's going to be -- I

17  can't just, you know, kind of call him up at 12:00 o'clock.

18          THE COURT:  Don't we have Franklin tomorrow?

19          MR. GREENE:  Yes, we have Franklin.

20          MR. CHEFFO:  But he's saying -- first, I heard thirty

21  minutes on Don Barrett, and now he's saying it's up to an hour

22  and a half.  I don't know how far we're going to go.

23          MR. GREENE:  Now I would like to try to publish some

24  exhibits through Franklin.

25          THE COURT:  Well, maybe.  I'm just simply saying -- I

1    can understand that, but, I mean, the reality is, it depends on

2    whether Mr. Hooper or Mr. Kennedy is doing the cross as to how

3    long of the day it will be, so --

4              (Laughter.)

5              THE COURT:  Where's Hooper?  Is he hiding?  So it just

6    depends.  You know, I --

7              MR. CHEFFO:  But all I'm suggesting is that we do need

8    to know.  I can, you know, give a general estimate, but, I

9    mean, if they're literally going to go to the end of the day

10   and we're saved, then I won't put our expert, we'll start

11   Monday, that's fine, but if they're going to kind of --

12             THE COURT:  All right, why don't we deal with that at

13   the break.

14             MR. CHEFFO:  That's fine, your Honor.

15             THE COURT:  I just need to get them out of here.

16             By the way, did you devise the last name Crook, or was

17   that --

18             MR. GREENE:  I had a few one-liners that are in the

19   transcript somewhere, but we didn't put them in.

20             THE COURT:  Let's bring them in.  I also think I'll

21   tell them we're right on target, right, on the length of the

22   trial so they get some sense of it.

23             (Discussion off the record.)

24             THE CLERK:  All rise for the jury.

25             (Jury enters the courtroom.)

1          THE COURT:  Sorry for the delay there, but actually

2     this may end up being shorter.  They've spent some of the time

3     here editing out some of the depositions to make them shorter.

4          So I think we're going next to Tive, is that it,

5     Leslie Tive?

6          MR. GREENE:  Leslie Tive.

7          THE COURT:  And you're going to stop it at various

8     points to show the documents?  Is that what we've decided?

9          MR. GREENE:  That's the plan.

10         THE COURT:  Because I found it a little hard to follow

11    myself when I didn't have the document in front of me.  So

12    while it's an exhibit, if you don't have it literally looking

13    at it, you don't know what the witness is talking about.

14         MR. GREENE:  Leslie Tive is an employee of Pfizer who

15    worked for the Neurontin Publication Committee.

16         (Played videotape deposition of Leslie Tive.)

17         MR. GREENE:  Your Honor, the plaintiffs would move

18    Exhibit 189 into evidence.

19         MR. CHEFFO:  No objection, your Honor.

20         (Exhibit 189 received in evidence.)

21         THE COURT:  Do you have a short deposition to squeeze

22    in?  We have a live witness tomorrow, you'll be pleased to

23    hear.  Is there anything short here?

24         MS. NUSSBAUM:  We have nine minutes.

25         THE COURT:  Perfect.

1          MR. GREENE:  We have a very short one of Jennifer

2     Samuels.  She was Vice President/Account Supervisor, Cline

3     Davis Mann.

4          DEPOSITION of JENNIFER SAMUELS READ AS FOLLOWS:

5     BY MR. GREENE:

6     Q.    What was your title going into Cline Davis Mann?

7     A.    I think it was Vice President, Account Supervisor.

8     Q.    Okay.  And what were your duties?

9     A.    The same thing as before, working with pharmaceutical

10    clients to understand their marketing needs and develop the

11    materials to work with them.

12    Q.    How many divisions worked on Neurontin?

13    A.    Divisions of?

14    Q.    Cline Davis Mann.

15    A.    Those two, I guess.  Those were the only two that I can

16    think of.

17    Q.    And by those two, you mean Cline Davis Mann and Proworx?

18    A.    Yes.

19    Q.    Was there any division of labor between the two divisions?

20    A.    Proworx did medical education programs.  Cline Davis Mann

21    does promotional activities.

22    Q.    What is medical education?

23    A.    That's a really broad question.

24    Q.    What did you mean when you said that Proworx handled

25    medical education?

1    A.    I meant that they did programs that would have been

2    bringing doctors together to talk about Neurontin.

3    Q.    When you say that they brought doctors together to talk

4    about Neurontin, what do you mean?

5    A.    That they created programs that doctors participated in.

6    Q.    What type of -- what did you mean when you said they

7    created programs?

8    A.    They created programs where presentations were made and

9    doctors talked about Neurontin.

10   Q.    Do you recall any presentations being made by Proworx?

11   A.    No.

12   Q.    Do you recall Proworx assisting in the creation of

13   presentations?

14   A.    I wouldn't know what Proworx does.

15   Q.    Were you the agency, was Cline Davis the agency of record

16   for Neurontin?

17   A.    Yes.

18   Q.    What is the agency of record?

19   A.    It's the main promotional agency in my understanding.

20   Q.    Do you recall a document called the Neurontin Pain

21   Branding Guide?

22   A.    Neuropathic Pain Branding Guide?

23   Q.    Do you recall a document called the Neuropathic Pain

24   Branding Guide?

25   A.    Yes.

65dfddcf-ceeb-4ab4-9920-3140590e700c

1    Q.    Did Cline Davis have a role in drafting that guide?

2    A.    Yes.

3    Q.    And what was the role?

4    A.    We drafted it.

5    Q.    When you say "we," who exactly do you mean?

6    A.    The copyrighters.

7    Q.    Did you have any role in its drafting?

8    A.    I would have reviewed it.

9    Q.    Do you know whether the performance of the drugs that you

10   are marketing, the accounts that roughly -- the accounts that

11   you are staffed on, do you know whether the performance of

12   those drugs count in any way towards your own bonus?

13   A.    My personal bonus?

14   Q.    Yes.

15   A.    I can't imagine how it would, no.

16   Q.    Ms. Samuels, in your opinion, was the relationship between

17   Pfizer and Cline Davis Mann different than the relationship of

18   Cline Davis Mann and its other clients?

19   A.    No.

20   Q.    How many clients does Cline Davis Mann currently have?

21   A.    A lot.  Clients in terms of what?

22   Q.    Just in general, how many clients do you think Cline Davis

23   Mann has?

24   A.    I think we work for eight or nine different pharmaceutical

25   companies.

1  Q.   And how about accounts have you worked on at Cline Davis

2  Mann?

3  A.   I think I listed them at the beginning of the day.  Ten

4  maybe.

5  Q.   In your opinion, the relationship between Cline Davis Mann

6  and Parke-Davis and Pfizer with respect to Neurontin was no

7  different than the relationship that Cline Davis Mann has with

8  its other clients?

9  A.   In my opinion, it's no different, right.

10 Q.   I believe you testified earlier about how often you would

11 meet with the Parke-Davis marketing team for Neurontin; is that

12 correct?

13 A.   I think so.

14 Q.   Was this level of client interaction substantially

15 different than for other accounts you have worked on at Cline

16 Davis Mann?

17 A.   No.

18 Q.   I believe you also testified how often you met with the

19 marketing team for Neurontin at Pfizer.  Was this level of

20 client interaction different than for your other clients at

21 Cline Davis Mann?

22 A.   No.

23 Q.   I also believe you testified earlier about the various

24 ways that you communicate with the Parke-Davis marketing team

25 on Neurontin over time; is that correct?

1   A.   Not that I remember.

2   Q.   I believe you testified about sitting in at certain

3   meetings or different ways of interacting with the Parke-Davis

4   marketing team for Neurontin; is that correct?

5   A.   I sat in on many meetings, yes, that is correct.

6   Q.   Are there any other ways that you interacted with the

7   Parke-Davis marking team for Neurontin?

8   A.   On the phone, on e-mail.

9   Q.   Was this type of interaction between yourself and the

10  Parke-Davis marketing team for Neurontin different than your

11  other accounts at Cline Davis Mann?

12  A.   No.

13  Q.   Was the type of interaction between you and the Pfizer

14  marketing team for Neurontin different than the type of client

15  interaction you have with other accounts?

16  A.   No.

17  Q.   Do you know if how Cline Davis Mann was compensated for

18  its work on Neurontin different than how it was compensated for

19  its work on other accounts?

20  A.   I don't think it's different.

21        MR. GREENE:  That completes that transcript excerpt,

22  your Honor.

23        THE COURT:  We're early.  You don't want something for

24  the next four minutes?  All right, why don't I see you

25  tomorrow.

1        I think, if things go according to plan, you'll have a

2   live witness tomorrow, maybe another deposition, not clear, but

3   the plaintiffs are likely to rest tomorrow.  Whether or not we

4   begin defense case or not depends on the timing of the whole

5   thing, but for sure they will be starting on Monday, so we're

6   on track with what we had told you about originally.

7        Thank you.

8        THE CLERK:  All rise for the jury.

9        (Jury excused.)

10  SIDE-BAR CONFERENCE:

11       THE COURT:  So we really do need to get down to the

12  scheduling on -- Franklin is first.

13       MR. GREENE:  He'll be first.

14       THE COURT:  And what do you think?

15       MR. CHEFFO:  You're doing the direct.

16       MR. GREENE:  Depending on how many exhibits I could

17  publish with him, I could be anywhere from forty-five minutes

18  to an hour and a half with him.

19       MR. CHEFFO:  I mean, can we do a little better?  I

20  mean --

21       MR. GREENE:  Well, if I don't have any exhibits to put

22  in -- when I say exhibits to publish, a number of those tactics

23  and Parke-Davis documents --

24       THE COURT:  No, I understand that.  I don't care how

25  long you take with him because it's your hours.  I just need to

Page 63

1   know whether they need to bring in an expert.  This is sort of

2   the scheduling issue.  You have at least how many more

3   depositions?

4           MR. GREENE:  I think we have about an hour worth of

5   playing time, including Dr. Glanzman.

6           THE COURT:  So --

7           MR. CHEFFO:  It looks like it's 41.  It's about an

8   hour, so, I mean, the real issue --

9           MS. NUSSBAUM:  Well, I think there may be some more on

10  O'Brien, but --

11          THE COURT:  In any event, the question is, so your

12  expert is from where?

13          MR. CHEFFO:  Well, that's the thing is, we're going to

14  try and figure out who's coming.  One of the people that we

15  would start with, which we weren't planning to, you know, if

16  your Honor wanted to use the time, would be probably

17  Dr. Rothschild because --

18          THE COURT:  Because he's local.

19          MR. CHEFFO:  Because he's local.  But, again, he's a

20  busy practicing doc.  If they're going to take an hour and a

21  half and then we do cross and we do other things, it's probably

22  not worth calling him for fifteen minutes to come and sit

23  around in court.  If there's going to be an hour --

24          THE COURT:  Do you have any depositions you're reading

25  in?

Page 64

1          MR. CHEFFO:  Yes, but we're not prepared to do that.

2     We need to cut them, so we couldn't start tomorrow with that.

3          THE COURT:  Well, this is what I want you to do is let

4     him know by 6:00 o'clock, which is when we've been talking

5     about, whether or not -- because what I don't want -- do I care

6     if I lose fifteen minutes, a half an hour?  Not really.  We're

7     all so tired, fine.  Do I care if I lose two hours?  Yeah.  So

8     if it's really going to be a forty-five minute presentation --

9     and the issue is, who's doing the cross?

10          MR. CHEFFO:  I think Raoul is.  Of Dr. Franklin?

11          THE COURT:  Yes.

12          MR. CHEFFO:  But, you know, again, I can't commit if

13     he's not here.  I think it's going to depend on what comes in.

14          THE COURT:  He's a lengthier cross-examiner.  He's

15     never run less than the direct, so --

16          MR. CHEFFO:  But we may have an epiphany tomorrow.  If

17     we're going to go through the whole documents again and the

18     whole story that they've heard fifteen times, then, you know,

19     it could be a short cross.

20          THE COURT:  They use their hours the way they want.  I

21     just don't want them to have to bring Rothschild in for

22     nothing.

23          MR. CHEFFO:  I mean, really, if we could just do --

24     you know, if he can take as much time as he wants, we can do

25     all of this --

65dfddcf-ceeb-4ab4-9920-3140590e700c

1          THE COURT:  Can I say, I'm happy with that, but I have

2     the jury's time to think about too.  So if in fact it's just

3     going to be forty-five minutes on and forty-five minutes off --

4          MS. NUSSBAUM:  Could I ask a question?  Could we ask

5     how long they think Dr. Rothschild will be because that will

6     help us --

7          MR. CHEFFO:  We don't even know what Franklin is yet,

8     so let's do one thing at a time.  I think probably, you know, I

9     think he's probably not going to be able to get on and off, so

10    that it's kind of a waste of time.

11         THE COURT:  Another possibility, since this is just a

12    deposition, is to just take him out of order, read the

13    deposition as a filler later on as part of their case, and then

14    have them officially rest.

15         MR. GREENE:  So do Dr. Franklin and rest?

16         THE COURT:  No, subject to reading this, have him be

17    your last live witness.  Subject to this -- you basically know

18    what it's going to be -- bring in Dr. Rothschild if you can

19    really finish him.

20         MR. CHEFFO:  I just don't think we'll be able to

21    finish it.  I mean, with the Court's indulgence, what I really

22    think would be fair for us and for Dr. Rothschild is, you know,

23    to call him at 6:00 o'clock and say, "By the way, maybe you're

24    on," if we could basically just do all this, let them rest, and

25    then just start on Monday, and then whatever time we end after

1   Franklin --

2           MR. HOOPER:  Rothschild will be at least an hour, your

3   Honor.  He's a psychiatrist.  It's an hour direct.

4           THE COURT:  Right.  And don't forget my ruling,

5   though.  I'm not going to allow him to say it's effective to a

6   scientific degree of medical certainty unless he's relying on

7   the double-blinded tests.  Now, that's not that they can't say

8   they have personally found it clinically effective in a broad

9   way, but he's not saying that the bottom line unless he's got a

10  double-blinded clinically controlled test.

11          MR. CHEFFO:  You heard, I think, one of them which I

12  think you'll hear, you heard represented, I think, by

13  Mr. Greene that these people didn't consider any double-blind

14  placebo-controlled trials.  You know, we'll see what the

15  testimony comes out, but I think that's not going to be the

16  case.

17          THE COURT:  Can I say something?  I've not heard

18  anything so far on bipolar.  He didn't cite it.  It can't be

19  anything new.  I don't remember him saying it.  Now, that isn't

20  to say he can't say "I found it clinically effective" because

21  we've all heard that, people have various experiences.  But he

22  cannot say it is scientifically effective to a scientific

23  degree of medical certainty, or whatever it's called, unless

24  he's backed, for example, in bipolar --

25          MR. HOOPER:  I completely understand.  He's going to

1    cite those studies.  They're right in his report, your Honor.

2    They're cited in his report.

3              THE COURT:  I've only seen social phobia, so if

4    there's something else out there, I don't know about it.

5              MR. CHEFFO:  We do know, even with their definition of

6    bipolar, as you've seen, your Honor, and you're following this

7    closely, one of those ICD-9 codes -- the other, you know, is, I

8    believe, social -- I believe it does relate to mood disorders.

9              THE COURT:  He might be able to say social phobia.  I

10   saw that.  But I haven't seen one yet for bipolar.

11             MR. HOOPER:  There are a couple that relate to

12   bipolar.

13             MR. GREENE:  Can I remind you, your Honor, that there

14   was a motion to limit Rothschild's testimony because he was

15   brought in late in the game.  After Furberg supplemented his

16   report and Barkin supplemented his report, he was brought in in

17   rebuttal, and he went way beyond that, and they were trying

18   to --

19             THE COURT:  I don't remember it at all, so --

20             MR. GREENE:  And we filed a motion --

21             THE COURT:  I don't remember it at all.  I'm telling

22   you, I have zero memory.

23             MR. GREENE:  I think that motion has got to be

24   addressed because what --

25             THE COURT:  I don't even remember it, okay?  It's not

1    even on my radar screen.  And to be honest, I don't remember

2    any double-blinded control test for what you would classically

3    call bipolar.  All I have heard about is four negative ones.

4              MR. GREENE:  That's all there are, and --

5              THE COURT:  And so if there is something else, well,

6    what's the one that is?

7              MR. HOOPER:  Vieta is one.

8              THE COURT:  Vieta is what?

9              MR. RONA:  It's one of the negative studies.

10             MR. HOOPER:  Well, they say -- we don't have to agree

11   with that.

12             THE COURT:  All right, but I just want to understand.

13   And then there's the social phobia one I've heard about.

14             MR. HOOPER:  Then one called (Inaudible), which is a

15   randomized double-blind controlled --

16             MR. RONA:  It's a placebo, and it's from Iran.

17             THE COURT:  It's from Iran?

18             MR. HOOPER:  And the University of British Columbia

19   where their expert Perry is from.  They didn't throw in that

20   tidbit but --

21             MR. GREENE:  Judge, can I just bring back up on your

22   radar screen, we filed these motions in limine, you recall

23   them, and you did rulings on them.  The Rothschild motion,

24   which is this expert they're talking about, we moved in limine

25   to limit him to the subject matter of his rebuttal report.

65dfddcf-ceeb-4ab4-9920-3140590e700c

1    It's the only one you haven't given us a ruling on.

2              MR. CHEFFO:  Talk about last --

3              MR. GREENE:  It's not last minute.

4              THE COURT:  Excuse me, excuse me.  I will read the

5    motion in limine.  I have no memory of it.  I do have a clear

6    view, however, that unless somebody can point to the gold

7    standard, they can't say it's effective.  And, you know, I hope

8    the guy understands he's under oath.

9              Now, bipolar is a problem for you.  Some of the others

10   like neuropathic pain are less of a problem for you because

11   you've got at least one diabetic neuropathy, one scientific

12   study.  What?

13             MR. FOX:  We're not limited to the ones that we did.

14   There are other studies out there, your Honor.

15             THE COURT:  Anyway, let me just go through this.  I

16   don't understand.  So there's Exhibit 24 which you didn't mark,

17   and key messages now I understand a whole lot better after

18   having sat through today, but what are these two that you gave

19   me?  This is the Glanzman deposition?

20             MR. GREENE:  These are in evidence, so 169 and 132,

21   and what they are are the same key messages that we -- this is

22   what's in --

23             THE COURT:  Right, they're in evidence, but what is

24   24?  Is that different?  Is it the same date?

25             MR. GREENE:  It just wasn't marked.  It's --

1           THE COURT:  If it was just basically a variation on

2   this --

3           MR. GREENE:  It's a variation on the --

4           THE COURT:  On which one?

5           MR. GREENE:  -- on the key messages.

6           THE COURT:  On which one?  I was trying to track them.

7   Is it a variation on 132, a variation on 169?

8           MR. GREENE:  I think they're the same.

9           THE COURT:  If it's a variation, I'm going to allow it

10  in.  If it's not a variation and it's something completely

11  different, I just don't know.

12          MR. GREENE:  It's right here.  So they start here,

13  corporate, corporate, and this is what's marked --

14          MR. FOX:  I don't think they're the same.

15          THE COURT:  I know they're not exactly the same, but

16  if it's a variation of the same document, I will allow it in.

17  If it's something brand-new outside of what anyone's --

18          MR. RONA:  This was a single tracking grid.

19          THE COURT:  Excuse me.  The "this" is the purple thing

20  that's Exhibit 24, for the record, doesn't have a date on it.

21  So are you making the representation -- I couldn't find it --

22  that it's the same key message as September, 2001?

23          MR. TABB:  Yes.  Your Honor, the --

24          THE COURT:  Can I just say something?  If it's the

25  same, I will allow it in.

65dfddcf-ceeb-4ab4-9920-3140590e700c

1              MR. TABB:  Exhibit 24 is the earlier version.  The

2    next version is the next version after some edits were done.

3    So this is the same document.  One is in September, one is

4    October.

5              THE COURT:  What's the final document?

6              MR. TABB:  The final document is -- this one is 169.

7    I believe 132 is the final document.

8              THE COURT:  And is that in evidence?

9              MR. TABB:  That is in evidence.

10             THE COURT:  So 24 is the earlier version of something

11   that is in evidence?

12             MR. TABB:  As is 132.

13             THE COURT:  And you're only asking here about the

14   stuff that survived in the final draft?

15             MR. TABB:  Yes.

16             MR. GREENE:  Yes.

17             THE COURT:  You double-check that.  I'll allow it in.

18   If it's not the same as the final draft -- but you might want

19   to look at this too because I --

20             MR. CHEFFO:  I didn't follow that, so I will get back

21   to you.

22             THE COURT:  Take a look at that.  As long as it's a

23   version of something that's in evidence, I will allow it in.

24   It can't be something completely new unless you --

25             MR. GREENE:  It isn't, Judge, and I'll point it out to

Page 72

1  Tom.  I think --

2         MR. CHEFFO:  We'll do that tomorrow.  The one thing,

3  Dr. Franklin will testify tomorrow, and, you know, I hope

4  there's not going to be any comments about the subpoena and

5  visiting --

6         THE COURT:  No, we're not going into that.

7         MR. GREENE:  No, no.

8         THE COURT:  Which actually is a good point because --

9         MR. GREENE:  No, I'm not bringing that up.  But we

10  have to deal with this right now because it's got to be played

11  tomorrow, okay?

12         THE COURT:  So go do it.  But my basic view is, I now

13  understand key messages.  I now understand what this is all

14  about, which I didn't even this morning.  If it's a version of

15  something that's in evidence, I will allow it in.

16         MR. GREENE:  Okay.

17         (Discussion off the record.)

18         (End of side-bar conference.)

19         (Adjourned, 1:10 p.m.)

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7           We do hereby certify that the foregoing transcript,

8  Pages 1 through 72 inclusive, was recorded by us

9  stenographically at the time and place aforesaid in Civil

10 Action No. 04-10739-PBS, Kaiser Foundation Health Plan, et al,

11 v. Pfizer, Inc., et al, and thereafter by us reduced to

12 typewriting and is a true and accurate record of the

13 proceedings.

14     In witness whereof we have hereunto set our signatures

15 this 11th day of March, 2010.

16

17
                    /s/ LEE A. MARZILLI
18                  LEE A. MARZILLI
                    OFFICIAL FEDERAL COURT REPORTER
19
                    /s/ DEBRA M. JOYCE
20                  DEBRA M. JOYCE
                    OFFICIAL FEDERAL COURT REPORTER
21

22

23

24

25