IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                              )
                                    ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION    )
---------------------------------------)
This document relates to:           )
KAISER FOUNDATION HEALTH PLAN, et al, )
                                    )
                Plaintiffs          )
                                    )
        -V-                         )No. 04-10739-PBS
                                    )Pages 1 – 123
PFIZER, INC., et al,                )
                                    )
                Defendants          )


JURY TRIAL – DAY 15

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
Friday, March 12, 2010
8:45 a.m.



LEE A. MARZILLI and DEBRA M. JOYCE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
         DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
         BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14       KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16       RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
         JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

1                            I N D E X

2

   WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS
3

4  DAVID FRANKLIN               23      79        99

5  (By Videotape)

6  DAVID COOPER, P. 110

7  ROBERT GLANZMAN, M.D., P. 111

8

   EXHIBITS                              PAGE
9
   468                                   78
10
   105                                   78
11
   265                                   111
12
   266                                   111
13
   178                                   111
14
   129                                   111
15
   2097                                  112
16
   102                                   114
17
   2095                                  114
18
   2096                                  114
19
   360                                   114
20

21

22

23

24

25

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1    P R O C E E D I N G S

2         THE COURT:  Good morning.

3         Do we have issues about the witness today?

4         MR. CHEFFO:  Yes, your Honor.

5         If I can just crystallize what I think the issues are.

6         We heard over the last few days that Dr. Franklin

7    would be between 30 and an hour and a half, and now I think I

8    know why.  It would be perhaps 30 minutes if we actually kept

9    with your Honor's rulings with respect to the motions in limine

10   and talking about national issues and talking about his

11   personal knowledge.

12        The slides we received and the documents we

13   received -- I think you have a copy, your Honor -- I asked

14   Mr. Greene, Why would you possibly need a cover letter from

15   Cline, Davis & Mann to a doctor?  He said, I just want to ask

16   whether he knows about Cline, Davis & Mann.  I said, Why don't

17   you just ask him?  That's an example.  That's indicative of

18   most of the documents.

19        THE COURT:  That may be.  It's exactly what

20   Mr. Kennedy did so well and cleverly with the Kaiser people.

21   He did a nice job of it.  So if there's a good faith -- I mean,

22   Mr. Kennedy asked about lots of things with these doctors that

23   weren't actually their documents.  If he doesn't know, he

24   doesn't know.

25        MR. CHEFFO:  The issue, those were documents that were

1    put on our exhibit list and in evidence.  These are slides --

2              THE COURT:  Have you never seen them before?

3              MR. CHEFFO:  They're not even Bates stamped.

4              THE COURT:  Oh, they are brand new documents.  Is that

5    the issue, you've never seen them before?

6              MR. GREENE:  That's just to establish a foundation

7    that he knows Cline, Davis & Mann.

8              THE COURT:  There are two separate issues.  Because

9    with Mr. Kennedy, I didn't let him put up documents that no one

10   had ever admitted into evidence.  We went through that.  If

11   they're in evidence, I'm happy with it.

12             MR. GREENE:  We don't need it unless it gets

13   challenged.

14             MR. CHEFFO:  Your honor, here is the general prolem.

15   You'll recall -- we argued this at the motion in limine -- what

16   I think you said -- your Honor will remember -- basically you

17   said to the extent they have national implications, sales

18   meetings that are national, he can talk about that type of

19   stuff generally.  To the extent it's, you know, went to a

20   doctor's office -- because there's no connection, we argued, I

21   think, for some period of time -- but there's no connection

22   between Kaiser and any doctor -- in fact, you'll recall,

23   Dr. Franklin only worked for four months.

24             So most of these documents that they're trying to put

25   in are things either before he worked there or even after.  He

1   has things that are from national sales data that are in 1997

2   that are -- he wasn't even working there.

3         THE COURT:  To the extent, as everything I have seen

4   to date has suggested, that there was a national sales and

5   marketing program.  Everything.  And it may well be that there

6   were differences, but you need to put them in.  I haven't seen

7   them.

8         So if he can verify that there's a national program,

9   he will.  If he doesn't know, he doesn't know.  And they're

10  allowed to ask.  So if -- but you can't put up documents that

11  haven't previously been marked as an exhibit or -- unless

12  they've been agreed to as an exhibit, they can't go up on the

13  screen.  You can use something to refresh a recollection or

14  something like that, I --

15        MR. CHEFFO:  Your Honor, and the only thing I would

16  say is Dr. Franklin, he's not an expert, he's just a fact

17  witness.

18        THE COURT:  I agree.

19        MR. CHEFFO:  So to the extent that we're asking him to

20  opine on things after, I think it's a different story.  If it's

21  based on personal knowledge -- you can go through the

22  documents --

23        THE COURT:  I've got to do it document by document.

24        Now, going to some of the other issues, I was thinking

25  a lot about this issue because both sides have so many

1    documents that you've gone through over time.

2         One thing I've allowed attorneys to do in the past,

3    doesn't sound like a very sophisticated legal technique, is

4    essentially use stickies, little yellow stickies on the pages

5    that you want them to focus on.  I would allow both sides do

6    that.  If you wanted to for some reason maintain a record of

7    what page you put a sticky on, I'm fine with it.

8         I think it would help solve a lot of the problem of

9    helping the jury walk through the exhibits of both sides.  In

10   other words, sometimes you have four-page e-mail chains but

11   there's really one portion that maybe Mr. Kennedy focused on or

12   one portion you that will focus on in your enterprise thing.

13   Just a sticky on the page.  To some extent you live with your

14   own problem, if you put too many stickies, they won't look at

15   them, but if you really highlight what both sides want looked

16   at in the document, then they can look at either side of it,

17   then we won't have the problem of a snippet on a document

18   outside of context.

19        I think that would be a good way to do it.  I don't

20   have a problem if both sides wanted to put in here's the

21   documents that the defendants put in, here's the documents that

22   the plaintiffs put in, I don't have a problem with that.  That

23   was your first, I think, choice A.  I'm very reluctant to have

24   a summary of the key, quote.  I'd rather -- because you don't

25   necessarily see the -- I don't know what your feeling is.

1          MR. CHEFFO:  My feeling -- anything to help the jury I

2     certainly don't -- my concern really is, your Honor, even

3     saying here's a group of documents, even if you don't put

4     anything on them, as your Honor knows, that's argument, the way

5     they're organized, because we have different timing and dates

6     and different documents that may counteract --

7          THE COURT:  I'll allow both sides to do that if they

8     want to help the jury through a list of documents.  And I'm

9     going to allow the sticky approach, maybe yellow stickies for

10    you and pink stickies for you.

11         MR. CHEFFO:  I might object to that, your Honor.

12         THE COURT:  Color-coded would make some sense on what

13    both sides would like you to look at.  Because it's going to be

14    a lot to go through.  I certainly would be willing to do that.

15         On point, I have not yet either read the memo on RICO.

16    I started it, but it was getting too late last night, or

17    correlated it with the documents in the binders.  I just

18    haven't had time to do that.

19         I have read the Rothschild memos, the preliminary

20    injunction.  You're limited to responding to the supplemental

21    report.  But what that means -- because that's all I've agreed

22    to let him in on, it cannot be -- you can't use him to be

23    essentially Dr. Slaby.

24         However, you're trying to rein it in a little bit too

25    tightly as to what that means.  For example, what both doctors

1    were saying -- I reread it -- is that essentially there was

2    something misleading about not disclosing depression, that

3    there were depressive side effects and that it was misleading

4    not to disclose it.  Those should be the primary thrust of his

5    testimony.  But if he says, I haven't personal -- he has very

6    excellent credentials, he's a Harvard professor, McLean

7    Hospital, and the like -- if he says that I don't think there

8    are depressive side effects and I've tried this out clinically,

9    that's fine.  But you can't put him in to do the whole clinical

10   trial thing.  That would be shoehorning a rebuttal report into

11   the main one.

12          I understand that you've taken a position simply

13   because he -- Dr. Barkin incorporated his earlier opinions by

14   reference that somehow lets you make him the main witness.

15   That's not true.  He's a rebuttal witness, and that's what he's

16   got to do.  But it can't just be -- Furberg is the man.  You

17   can't just expect -- he basically says it's depression as a

18   side effect.  Dr. Rothschild is a practicing doctor.  So he's

19   likely to say more along the lines of, my guess is, well, maybe

20   there is some depression -- he doesn't actually say no, there

21   isn't, he's just saying on balance it's still a useful tool.

22   Right?

23          MR. HOOPER:  Your Honor, in Dr. Rothschild's report,

24   which cites some randomized trials, he uses those trials to

25   respond to the absence of the depression problem.

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1          THE COURT:  He's actually denying there is a

2     depression problem.  He's actually taking on Furberg?

3          MR. HOOPER:  Absolutely, and Barkin, sure.

4          THE COURT:  Barkin is more of a practicing guy.

5     Furberg wrote the book.

6          Let me put it this way:  You cannot use him as your

7     primary witness.  He's the rebuttal witness on that point.

8     Slaby was the man you designated as your primary guy.  Is he

9     coming on the stand?

10          MR. HOOPER:  He is.

11          MR. GREENE:  Judge, Mr. Cheffo and I were talking

12     about the slides in the --

13          THE COURT:  But, you know, there are, can I just say,

14     some randomized clinical trials, not on the effectiveness

15     point.  That's beyond the scope of it, but whether there is

16     depression, that is fair game.

17          So maybe I'm -- I don't know how to micromanage this

18     any further.  It's very clear in the history of this litigation

19     I allowed him on as a rebuttal witness to the supplemental

20     report, and that was it.  So -- but it's not as narrow as you

21     make it seem.

22          MR. CHEFFO:  Your Honor --

23          THE COURT:  Yes.

24          MR. CHEFFO:  I mean, I think, again, both sides you've

25     allowed a significant amount of latitude, and I understand your

Page 11

1   Honor's ruling with respect to this.  But I think it would be

2   absolutely artificial to basically say he can't talk about a --

3   he is a Harvard professor --

4           THE COURT:  I've made my ruling.  It was clear from

5   the get-go, Slaby was your bipolar person, and he was allowed

6   as rebuttal on the supplemental and there would be prejudice

7   because as a result of that they did not take his deposition.

8           However, I disagree with you on another point.  I

9   actually haven't given huge latitude.  For example, when they

10  untimely, in my view, served the thing on --

11          MR. GREENE:  Knapp.

12          THE COURT:  -- Knapp or Knoop, whatever his name was.

13  Whatever it was, it was untimely, it was a day or two before

14  trial.  I didn't give people latitude.  People are being held

15  to the rules of the game.  Occasionally someone forgot to mark

16  an exhibit or something like that.  It hasn't been a big deal.

17  Otherwise I don't know have a limiting principle.  So I've been

18  holding people to stuff.  That's where we're going to go with

19  it.

20          Now, I have not read -- it's a 50-page -- I don't know

21  if you've read it yet.

22          MR. CHEFFO:  I've read it, your Honor.

23          THE COURT:  Good for you, because -- can I ask you

24  this, Mr. Sobol:  Is every single document in the binders

25  referenced in one of those footnotes?  Do you know?

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1          MR. SOBOL:  Probably not, but most of them are.  And

2     that's why we had given you the charts.  The vast majority of

3     them are.

4          THE COURT:  Because if they're not -- my concern with

5     the documents is not relevance as much as it is the document

6     dump.  That it's the 403 issue.  It's the clarity for the jury.

7     Unless there's a key -- and not for relevance to show up in a

8     memo, I don't know why it's in there.  So could you prune back

9     your own documents?  Someone must have gone through them all.

10          MR. SOBOL:  Yeah, we went through them.  I'll go back

11     and check and file a corrected memo so if it's not in the memo,

12     then it's not going to be offered.  That's what I'm hearing you

13     suggest.

14          THE COURT:  Yes, because there has got to be some

15     tie-in.  That was the reason I had you do the memo, that there

16     wasn't -- it wasn't just some young associate or a paralegal

17     saying these are relevant.  It's got to be something that

18     you've thought actually was significant.

19          MR. SOBOL:  There was a process more sophisticated

20     than that, but regardless, we'll do what you're suggesting.

21          THE COURT:  And I'm not knocking it because that's the

22     way all cases start.  And you need to protect a record at a

23     certain point.  I'm worried about the excessive paper.  So

24     unless you can put a sticky on every single one and you've tied

25     it in somehow, I don't want it in there.

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1           MR. CHEFFO:  Just so I'm clear -- you're going to

2    rule -- what our position is to the extent we talked about it

3    earlier in the very beginning of the case, if someone sees a

4    document, talks about it, those were the rules that we were

5    talking about.  I know you've raised the issue of Dr. Knapp, I

6    understand that, I'm not go to revisit that.  But you also

7    heard from his witnesses 50 people have been deposed, they've

8    had an opportunity.  Leslie Tive was the director at the time.

9    A lot of different people.  So they had the opportunity to show

10   all these doctors -- a lot of this stuff happened 15 years ago.

11          THE COURT:  And I factored that in in ruling on the

12   motion.  I'm simply saying it is the most unusual trial I have

13   ever sat through -- maybe it won't happen because you've been

14   holding your cards -- where there's no one from the company.

15   It's just remarkable.  It's remarkable.  And so I sort of fully

16   expected Knapp to be here or someone from the company, and I

17   think they did, too.  And it was a surprise and part of it may

18   have been miscommunications beforehand.  But I can't prejudice

19   them to the extent that these are relevant documents.  On the

20   other hand, it can't be a document dump.  That's where I'm

21   going with this.

22          On the flip side of this -- I think it's a few minutes

23   before -- on the timing, are you thinking it's going to be more

24   along the lines of hour and a half?

25          MR. GREENE:  Dr. Franklin, I'm shooting for an hour

Page 14

1    with him.

2         THE COURT:  And, Mr. Kennedy, it's -- do you have any

3    sense yet what you're going to be doing with him?

4         MR. KENNEDY:  Well less than an hour.  It could be

5    well less than half an hour.

6         THE COURT:  Okay.

7         And then we'll do the deposition.  And if we need to,

8    we'll end early.  Is that how we're ending up?

9         MR. CHEFFO:  We have tried to work to fill some time.

10   So if we end, we may have a few videos to fill --

11        THE COURT:  Fabulous.  I think the videos work so much

12   better than the reading, for obvious reasons.

13        MR. CHEFFO:  Do you want to deal with the documents --

14   there's a lot of documents, your Honor, we can do it as they

15   try to come in --

16        THE COURT:  On the videos, you mean?

17        MR. CHEFFO:  No, on Franklin.  There's a lot of these

18   things that have nothing to do, in our view, with what he ever

19   did.

20        THE COURT:  You know what, I learned a lot from

21   watching Mr. Kennedy, actually, who is an excellent lawyer.  He

22   basically would ask questions about a document that was

23   otherwise admissible.  If they didn't know, they didn't know.

24   As long as it's not something that's completely preposterous --

25   part of the problem here is, first of all, that there's no one

1    from Pfizer here, but the second thing is all the Pfizer

2    documents -- and I'm not finding spoliation, but given the way

3    the case went, there are no Pfizer documents, as I understand

4    it, from the west coast.

5             MR. CHEFFO:  That's just not true.

6             THE COURT:  At least I haven't seen any.

7             MR. CHEFFO:  It could well be they haven't found

8    documents they think help their case so now they are saying

9    spoliation.

10            THE COURT:  I'm not finding spoliation.

11            MR. CHEFFO:  But I'm telling you, that's what they are

12   telling you.  They say we can't find any real good documents,

13   so we think there must be spoliation.  In fact, we went back

14   and told them a few times, the searches -- I wasn't involved --

15   as I understand from prior counsel, the searches were very

16   broad, they included national documents.  In fact, many of the

17   documents that were produced were from the Western CBU.

18            THE COURT:  CBU again is --

19            MR. CHEFFO:  Customer Business Unit.  That's

20   California, that's that side.  His side of the world.  Where

21   Kaiser was.  So I think the beef has been they say, Oh, we

22   haven't found these documents.  Our response is --

23            THE COURT:  As I understand it, because the document

24   production was so much later in the game --

25            MR. GREENE:  Judge, can I --

1          THE COURT:  There was regular document retention

2     policies.  Am I wrong about that?

3          MR. GREENE:  Can I just refresh your memory?

4          The Franklin era, '94 to '98, you limited production

5     to Northeast CBU and then coming out of Morris Plains.  So we

6     got a smattering of documents from the other CBUs that happened

7     to come through Morris Plains.  That was the Franklin-era

8     documents.

9          In this case we got documents -- during the course of

10    the litigation there was a window of time where documents

11    weren't preserved.  It's on the record, Mr. Rouhandeh stood up,

12    we submitted the transcript.  There was a period of time he

13    didn't think they were relevant.  And we don't have any

14    documents from the West CBU.

15         THE COURT:  Like what, who was detailed and that sort

16    of thing?

17         MR. GREENE:  We don't have -- all the documents we've

18    seen coming out of the Northeast CBU, we don't have those

19    documents.  There's -- we didn't get them in Franklin '94 to

20    '98 because of the geographic limitation --

21         THE COURT:  I'm talking about -- all the detailing

22    records and stuff from the west, that wasn't available?

23         MR. GREENE:  No.  No, it was not.

24         MR. CHEFFO:  That's not -- I think they have --

25         MR. GREENE:  That's exactly what happened.

1          MR. CHEFFO:  You have a database, as far as I know.

2          MS. NUSSBAUM:  We went through with this Mr. Rouhandeh

3     two years ago with you, your Honor.  They were destroyed during

4     the ordinary course of business during that window.  They

5     weren't produced.

6          THE COURT:  Regardless, I'm not finding spoliation.

7     I'm simply saying there's a dearth of documents to show whether

8     or not what happened here --

9          MR. CHEFFO:  My position would be, your Honor --

10         THE COURT:  No, no, no.  But there are plenty of

11    documents to show there was a national sales and marketing

12    strategy out of the main headquarters and a reasonable

13    inference is that was carried out across the country.

14         If there's something else, you have your case to be

15    able to prove that that it's different.  I haven't seen it yet.

16         So in any event, it's 9:00.

17         Did you have something else, Mr. Kennedy?

18         MR. KENNEDY:  A very pragmatic point.  We hear about

19    Franklin-era 1994 to 1998.  Mr. Franklin worked for four months

20    in 1996.  So far as I am aware, he is not knowledgeable about

21    what happened before or after.

22         THE COURT:  Well, you ask him.

23         MR. KENNEDY:  The vast bulk of their exhibits are not

24    from that period, they go into '98, '97 --

25         THE COURT:  Let me just say, within a year of leaving

1   you can understand that it might be something he'd have

2   knowledge of.

3           How deep into it do you go?  You're not coming into

4   the 2000s, right?

5           MR. GREENE:  No.  We do it from '97 and '98.  It's the

6   Cline, Davis & Mann documents that were submitted.  There's two

7   of them.  And there's the allocation --

8           THE COURT:  You've talked to him.  Does he know

9   anything about it?

10          MR. GREENE:  He does.

11          THE COURT:  All right.  We'll see what he knows.  He

12  may not know about the document post, after, but he may know

13  about the activity.

14          MR. GREENE:  That's exactly what he knows about, your

15  Honor.

16          MR. KENNEDY:  My concern is, all we have is an

17  objection as to time rather than standing up like a robot

18  repeating that one over and over, can we just -- I'll object

19  the first time or I'll do it right now.

20          THE COURT:  It's a continuing objection to any

21  documents substantially after he left.

22          MR. KENNEDY:  And substantially being --

23          THE COURT:  I don't know what it means.  I don't

24  remember his timetable.

25          MR. KENNEDY:  He's out by July of '96.

1          THE COURT:  Well, something in August would be

2    perfectly relevant.  I'm just simply saying, I don't know what

3    "substantially" means.  It can't just be -- I don't know.

4          MR. KENNEDY:  I'm trying to avoid objecting on every

5    single document and interrupting the flow of the examination.

6          THE COURT:  And I really respect your doing that.  You

7    can have a standing objection, you'll decide what to preserve

8    afterwards, you know -- not preserve, what to challenge

9    afterwards if you need to on appeal.  That's fine.

10         MR. KENNEDY:  Thank you very much, your Honor.

11         MR. CHEFFO:  The only point I would just raise -- I

12   know you want to bring the jury in, your Honor -- is again,

13   what he knew, what he may have known as a result of his being

14   involved in the qui tam lawsuit.  Again, he's not an expert.

15   Our position is what he knew at the time he worked, those are

16   things he should be able to talk about, not if he later learned

17   something in another lawsuit.

18         THE COURT:  I'm going to assume that Mr. Greene has

19   looked through the documents with him and he has some knowledge

20   about the activity being referenced.  So if it's a 1998

21   document referencing things that happened in the past that he

22   was familiar with, it might be relevant.  If it's something

23   that truly post-dated him and he doesn't know, I'm assuming

24   he's going to say I don't know.  But it can only be documents

25   that have been admitted, so there's no prejudice.  So it's not

Page 20

1    new things, right?

2         MR. GREENE:  No, they have been admitted.  They're

3    just the tactics, your Honor, the strategies.  He was on the

4    ground.

5         THE COURT:  Sure.  As I said, Mr. Kennedy was the king

6    of this.  I learned from him, how he did this.

7         MR. KENNEDY:  I never knew clever could be a

8    criticism.

9         THE COURT:  It isn't.  It's a learning strategy of

10   actually walking through documents, the witness actually had --

11   turns out had no knowledge of, but it was a way of teaching a

12   jury about what a witness did and didn't know and what was

13   happening.  It was well done.

14        MR. GREENE:  Your Honor, I just want to alert you that

15   we have two recordings that Dr. Franklin made on his Aspen --

16   they have them on the Aspen voicemail system.

17        MR. CHEFFO:  We object to that.

18        THE COURT:  This isn't the 20/0 view of him marching

19   into the woods, is it?

20        MR. SOBOL:  These are better.  More relevant.

21        THE COURT:  What are they?

22        MR. GREENE:  Two voice mails, one from John Ford in

23   1996.

24        THE COURT:  Who's John Ford?

25        MR. GREENE:  He was his superior.  And Phil Magistro.

Page 21

1  And they're just urging the medical liaisons to --

2         THE COURT:  Why wouldn't that --

3         MR. CHEFFO:  Your Honor, if you read the transcripts.

4         MR. GREENE:  -- to promote off-label.

5         THE COURT:  Why wouldn't that be?

6         MR. CHEFFO:  Again, you'll hear, and if you look at

7  their own document, they're broken up into CBUs.  That was left

8  on a voicemail for David Franklin --

9         THE COURT:  Overruled, I've been there on that one.

10  I've ruled on that one.

11         You can get this jury.

12         MR. GREENE:  When they had his training, they handed

13  out pads that said, "Ladies and Gentlemen of the Jury..."

14  "Your Honor, I Plead," and we've made a slide that has those

15  words on it just as a chalk.

16         MR. CHEFFO:  Well, it looks to me --

17         MR. GREENE:  It looks exactly like it looked for him.

18  That's how it was.

19         THE COURT:  If it was an exact quote, you can use it.

20         MR. GREENE:  It is an exact quote.

21         THE COURT:  Fine.

22         Let's see if this jury is here.

23         MR. CHEFFO:  Will you give us a few minutes after

24  their case so we can see how you want to proceed on the Rule 50

25  motion?

1          THE COURT:  No, what we're going to do -- good

2     question -- we'll come up here, you'll preserve it, if you have

3     a brief, you can give it to me, if not, you will file it

4     appropriately, and we'll come up with a time to argue it.

5          MR. CHEFFO:  Some courts I think the rule requires to

6     do it at any point.  It could take me half hour, 45 minutes to

7     go through the highlights.

8          THE COURT:  I actually wouldn't mind, for example,

9     going through it in greater detail.  While I'm sure -- well,

10    not sure -- likely something is going to be surviving, the

11    question is whether it needs to be pruned back.  And so I

12    would -- for example, as I was looking at your timeline again,

13    you're looking for damages from 1995 forward.

14         MR. SOBOL:  Mm-hmm.

15         THE COURT:  On some things.  It just isn't clear to me

16    when I looked at the timeline that that was the first alleged

17    fraud.

18         So I just -- there are things we need to discuss.

19         MR. CHEFFO:  Yes, your Honor.

20         THE CLERK:  All rise for the jury.

21         (Jury entered the courtroom.)

22         THE CLERK:  Please be seated.

23         THE COURT:  Good morning.

24         THE JURY:  Good morning.

25         THE COURT:  So anybody speak about the case or see

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   anything in the press?

2          I actually haven't seen anything in the press either,

3   so -- but I never know when something might be covered, so just

4   be vigilant, especially if you look through the business

5   sections of things.

6          Your next witness?

7          MR. GREENE:  Yes, your Honor.  Plaintiff calls

8   Dr. Franklin.

9          DAVID FRANKLIN, having been duly sworn by the Clerk,

10  was examined and testified as follows:

11         THE CLERK:  Thank you.  You may be seated.

12         And would you please state your name and spell it for

13  the record?

14         THE WITNESS:  David Franklin.  F-r-a-n-k-l-i-n.

15                      DIRECT EXAMINATION

16  BY MR. GREENE:

17  Q.   Good morning.  I always call you Dave, but do you want to

18  be called Dr. Franklin or Mr. Franklin?

19  A.   Dave is great.

20  Q.   Mr. Franklin okay?

21  A.   That's fine.

22  Q.   Mr. Franklin, will you tell the Court where you reside?

23  A.   I live in Hopkinton, Massachusetts.

24  Q.   You're married and you live there with your family?

25  A.   Yes, I do.

1  Q.   Can you tell the jury how you're employed today?

2  A.   My wife and I own a preschool, it's a preschool,

3  prekindergarten, kindergarten.

4  Q.   I just want to quickly touch on your education.

5       You have an undergraduate degree from where, sir?

6  A.   University of Rhode Island.  Both of my degrees are from

7  the University of Rhode Island.  Undergraduate in microbiology,

8  and my graduate degree is also in microbiology, biological

9  sciences.

10  Q.   What year did you get your graduate degree?

11  A.   '92.

12  Q.   Following your acquisition of that degree did you go to

13  work?

14  A.   Yes, I did.

15  Q.   Where did you go to work?

16  A.   I went to Dana-Farber Cancer Institute.

17  Q.   Just briefly, will you tell the jury what your position

18  was there.

19  A.   I was a research scientist.  So I conducted research in

20  pediatric oncology, particularly children with leukemia.

21  Q.   How long did you work there, Doctor?

22  A.   I believe it was three or four years.

23  Q.   And --

24  A.   Actually, I think it was two years, two and a half.

25  Something like that.

1   Q.   And did you decide to move on?

2   A.   I'm sorry?

3   Q.   Did you decide to move on?

4   A.   I did.  I had a great deal of student loans.  A

5   Dana-Farber -- research scientist at Dana-Farber pays minimal

6   salary.

7   Q.   So did you start a job search?  Just describe for the jury

8   briefly when you did that and what job you got.

9   A.   In '96.  I guess I was at Farber for four years.  In 1996,

10   the end of '95, beginning of '96, I started looking for a job

11   in the pharmaceutical and biotech industry.

12   Q.   And at some point did you get an interview at

13   Warner-Lambert?

14   A.   Yes, I did.

15   Q.   And tell us about that.  Where was that interview?

16   A.   It was at their headquarters in Morris Plains, New Jersey

17   as well as the Northeast -- their Northeast called CBU,

18   Customer Business Unit, the Northeast unit, which was in

19   Parsippany.

20   Q.   So the jury has heard a little bit about the CBUs.  That

21   stands for the Customer Business Unit?

22   A.   Yes, it does.

23   Q.   We're going to show a slide in a moment, but the country

24   was broken up into different CBUs; is that correct?

25   A.   Five of them.

1    Q.   And the Northeast CBU was located -- the office was

2    located in Parsippany, New Jersey; is that correct?

3    A.   That's correct.

4    Q.   And Warner-Lambert's headquarters was in Morris Plains,

5    New Jersey?

6    A.   That's right.

7    Q.   So you went for an interview down to Parsippany; is that

8    right?

9    A.   Yes.

10   Q.   And tell us about when that occurred --

11           THE COURT:  Where is Parsippany?

12           THE WITNESS:  It's down in that area of the Northeast

13   where New York and New Jersey and Connecticut all kind of blur

14   together, so it's -- it's not far from Newark.

15           MR. GREENE:  I think we're going to put up a slide and

16   see if that helps your Honor at all.  We have Parsippany -- do

17   you have that on your screens?

18   BY MR. GREENE:

19   Q.   You have Parsippany on there don't you, Dave?

20   A.   Yes.  I'm sorry, yes.  It's -- you can see it, it's down

21   right where Long Island, all those parts of the country

22   converge.

23   Q.   Who interviewed you in Parsippany New Jersey?

24   A.   A number of people, Zona Hodge was responsible for HR, she

25   interviewed me; Phil Magistro, who eventually became my

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1    supervisor, interviewed me; Mike Valentino and Bill Sigmund.

2    Q.   Just so the jury knows, Bill Sigmund is a medical doctor

3    and he was the director of medical and scientific affairs in

4    Morris Plains corporate office, right?

5    A.   That's correct, yes.

6    Q.   And Phil Magistro, what was his position, can you tell the

7    jury?

8    A.   He was a medical director.  He was in Bill Sigmund's

9    organization as well as Mike Valentino's organization.  Mike

10   Valentino was responsible for the Northeast CBU.  So the way

11   that Phil explained it to me in the car ride over to Morris

12   Plains was that on a day-to-day basis he reported in through

13   the CBU and to Mike Valentino, but then from an org. chart

14   point of view he technically reported in through -- to Bill

15   Sigmund's organization.

16   Q.   So you went down for your interview.  You were interviewed

17   in Parsippany, New Jersey at the Northeast CBU office, correct?

18   A.   That's right, yes.

19   Q.   And then were you taken over to the Morris Plains office

20   that same day for another interview?

21   A.   Yes.

22   Q.   Who did you meet there?

23   A.   That's where I met Bill Sigmund.

24   Q.   Can you tell the jury what you talked about in these two

25   interviews?

1   A.   The interviews that day were very different.  And so in an

2   earlier interview I had -- or a meeting, really, I had met with

3   some of the people that I would work with up here in the -- at

4   the Ritz Carlton Hotel, they were running a consultants'

5   meeting.  During a break during that consultants' meeting I got

6   to meet Magistro, Lisa Kellet, Mike Davies, the people I would

7   actually work with.  We had a conversation.  The result of that

8   conversation, apparently, it went well, Zona Hodge called me a

9   couple of days later, said that I had done well, and said they

10  wanted to invite me down to Parsippany and to Morris Plains for

11  this interview.  She had told me that the feedback she had

12  gotten from the team here was that I was a little quiet, a

13  little understated and that I needed to be more salesy, that I

14  was there to sell myself and that meant talking to the people

15  for the subsequent interview it was very important that I do a

16  better job of being out there and selling myself.  Being salesy

17  was the term she used.

18  Q.   Okay.  And that was with Zona Hodge --

19  A.   Yes.

20  Q.   And what office was that?

21  A.   She was in Parsippany.  This was over -- this conversation

22  was over the phone, but --

23  Q.   So when you showed up in Parsippany for the first

24  face-to-face interview with management, who did you meet?

25  A.   I met with Phil Magistro, Mike Valentino, and Bill

Page 29

1    Sigmund.

2            THE COURT:  Valentino, again, was who?

3            THE WITNESS:  Mike Valentino was president of the

4    Northeast CBU.  The entire Northeast CBU reported in to him.  I

5    think he had two titles.  I think he was also a corporate vice

6    president.

7    BY MR. GREENE:

8    Q.   You mentioned you had a meeting in April over at the Ritz

9    Carlton, and that was with Lisa Kellet?

10   A.   I believe that was in March.

11   Q.   She was a medical liaison, correct?

12   A.   Yes, she was.

13   Q.   And was Mr. Magistro at that meeting as well?

14   A.   Yes, he was.

15   Q.   Now, did they describe the position to you when you had

16   your meeting at Parsippany, New Jersey?

17   A.   They did, and that's what made it an interesting meeting

18   was --

19   Q.   Tell us -- tell the jury how they described the position,

20   please.

21   A.   They described the position as being -- that I -- I would

22   be a field-based individual responsible for answering

23   physicians' questions.  However, much of the conversation

24   revolved around areas -- I had prepared for this interview

25   bringing all of my scientific experience, detailed

1   presentations about the science that I was conducting at

2   Dana -- or had conducted at Dana-Farber, but mostly the

3   conversation was actually about my willingness and ability to

4   work in gray areas.  So where I had worked in gray areas in the

5   past, when I had been confronted with a gray area, and how I

6   had dealt with that.

7            So as opposed to my conversation with Bill Sigmund,

8   Bill Sigmund's conversation was -- here's the organizational

9   structure, here's what my team does in terms of sending out

10  letters, that sort of thing.

11  Q.   During the course of these two interviews did you learn

12  that the country was split up into various Customer Business

13  Units?

14  A.   Yes, I did.

15  Q.   And we have a map up on the board.  Could you just

16  identify those for the jury?  NECBU, is that the Northeast CBU?

17  A.   That's the Northeast CBU.

18  Q.   Let me just ask you a question or two.

19           Do you see the black boarder there?  So all those

20  states within that border, they fall within the Northeast CBU?

21  A.   Yes.

22  Q.   That is correct?

23  A.   Yes.  The border around Pennsylvania.

24  Q.   And if we drop down, that's the Southeast Customer

25  Business Unit?

1   A.   Yes.

2   Q.   It covers those states?

3   A.   Yes.

4   Q.   And then we have the North Central Customer Business Unit,

5   and it would cover those states?

6   A.   Yes.

7   Q.   South Central CBU covers Texas and those other states?

8   A.   Yes.

9   Q.   And then we go out west.  That was called the West

10  Customer Business Unit, correct?

11  A.   That's right.

12  Q.   And it covered those states which includes California and

13  the Northwest?

14  A.   Yes.

15  Q.   Each one of the CBUs had an office in those various

16  geographic locations?

17  A.   That's right.  That's right.  So it was explained to me

18  that corporate strategy came out of a place called MOPS, which

19  was an acronym for Morris Plains, and that tactical

20  implementation of the strategic plans fell to the

21  responsibility of each of the different CBUs.

22  Q.   What else happened -- you said that this interview they

23  talked to you about working in a gray area.  Did they explain

24  what they meant by working in a gray area?

25  A.   I interpreted it at the time to be, you know, whether or

Page 32

1   not I was willing --

2           MR. KENNEDY:  Objection, move to strike.

3           THE COURT:  I'll allow that only as to his state of

4   mind, not what they intended.

5           What did you understand when you were coming into this

6   job?

7           THE WITNESS:  Going into the job, when they were

8   actually talking about it, I interpreted it as I was -- let's

9   say a doctor had a no see rule, that he didn't see sales reps

10  or medical liaisons, that sort of thing.  Did I have the

11  ability to get around that, to -- was I willing to push the

12  envelope and push his rules in order to get in to see him, is

13  how I saw it at that moment in time.

14  Q.   Anything else happen in those initial interviews?

15  A.   There was discussion about how the business was really

16  driven.  Phil Magistro explained to me that Mike Valentino was

17  actually driving the business, and that all of my tasks,

18  everything that I was responsible for, would come from Mike

19  Valentino and -- because he was responsible for implementing

20  corporate strategy in the Northeast.  And that while I

21  technically reported in to Bill Sigmund and that group, that

22  this was a bit of a formality that I was interviewing with him

23  and that the real decision would be made by Mike Valentino.  In

24  fact, Mike Valentino is the one who offered me the job that

25  day.

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 33

1    Q.    So they offered you a job that day?

2          During the course of this interview did you realize --

3          THE COURT:  So that day was when?  Do you remember?

4    Roughly.

5    BY MR. GREENE:

6    Q.    Would that be mid-March 1996?

7    A.    I think it was the beginning -- March 6th, something like

8    that.  March -- I had already been offered the job on March

9    15th, because I actually went to my first meeting -- even

10   though I didn't actually start the job until April, I went to

11   my first training meeting on March 15th.  I believe it was

12   March 15th, somewhere around there.

13   Q.    During these meetings did they explain to you you'd be

14   working out of your home or working out of your car, that you

15   wouldn't have an office?

16   A.    Yes, yes, that I'd be based in the Northeast.

17   Q.    And did they explain to you there was something called the

18   Aspen voicemail system that you would call in to retrieve

19   instructions or leave messages?

20   A.    Yeah, that was our primary method of communicating, yes.

21   Q.    So you said they offered you a job that day.

22         When did you start working, Dr. --

23   A.    My official start date was, I believe, April 1st, but I

24   attended a training meeting on March 15th, before I had

25   actually started the job.

Page 34

1    Q.    Where was that training meeting?

2    A.    Also in Parsippany.

3    Q.    And what happened at that training meeting, will you tell

4    the jury?

5    A.    The use of Precision marketing material was explained to

6    us, how to actually use the Precision marketing material, and

7    to effectively use our time as medical liaisons in order to

8    drive the business.

9    Q.    Okay.  When you say Precision marketing material, can you

10   give us just a general description of the type of data that was

11   in that material?

12   A.    So when you go to the pharmacy and get a prescription

13   filled, the pharmacy logs the information that you've had a

14   prescription filled, and they also keep track of the doctor

15   who's -- who's prescribed it.  The pharmacies, CVS, Walgreen's,

16   all of the major pharmacies, then sell that information to

17   another company, IMS is an example of that, who then turn

18   around and sell that information to the pharmaceutical

19   industries.

20         So the Precision marketing material would be where we

21   could -- I could sit in a car outside of a physician's office

22   and see exactly what he was prescribing of ours and other

23   competitors' drugs.

24   Q.    Any other training at that meeting?

25   A.    It was --

1   Q.   Did you get any training on the product, Neurontin?

2   A.   It was that meeting where the term "off-label" was

3   introduced, to promoting the drug for things that hadn't been

4   approved for.

5   Q.   Tell us about that training.

6   A.   So at this point I was not -- I wasn't -- I didn't have a

7   lot of experience with the FDA or the FDA regulations, but I

8   learned that although Neurontin's label -- although it hadn't

9   been approved for drugs (sic.), it was our job to -- our job,

10  meaning me as a medical liaison, Lisa Kellet, the other medical

11  liaisons around the country, it was our job to actually talk to

12  physicians and sell Neurontin for off-label indications that it

13  hadn't been approved for, off-label indications.

14  Q.   When did you start your actual on the job -- you know,

15  your job, your working, going around and visiting physicians?

16  A.   It was the first week of April.

17  Q.   And typically how did the day go?  Just explain to the

18  jury.

19  A.   I'd meet with Lisa and Mike Davies, the two people also

20  assigned to the Boston area, and we would cold call physicians.

21  We would be together initially where I would travel with Lisa

22  Kellet and we would cold call physicians, or later on traveling

23  with sales reps cold calling.

24  Q.   And when you say "cold calling," you mean going up to a

25  doctor's office and knocking on the door and trying to get an

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   appointment with them?

2   A.   Sitting in the waiting room waiting for an opportunity to

3   break into the doctor's schedule.

4   Q.   Okay.  And --

5        THE CLERK:  Yes --

6        JUROR:  What was your title?  I've heard medical

7   liaison and I've heard sales rep.  Was that two different

8   positions?

9        THE WITNESS:  My title was medical and scientific

10  liaison, but there was very little distinction between us and a

11  sales rep.

12       JUROR:  But those were two different positions?

13       THE WITNESS:  They were different two job titles, but

14  on a day-to-day basis I traveled with the sales rep.

15       The major difference is the sales rep would introduce

16  himself as a sales rep, and the sales rep would introduce me as

17  a medical and scientific expert coming from headquarters.

18       JUROR:  Thank you.

19  BY MR. GREENE:

20  Q.   At some point did you go out to Ann Arbor to get some

21  training as a medical liaison?

22  A.   Yes, I did.  There was a national training that took place

23  there.

24       MR. GREENE:  Could we have that slide?

25  Q.   You said there was national training there.  Did medical

1    liasons -- first of all, it was training for medical liaison?

2    A.    Yes.

3    Q.    Lasted for several days, correct?

4    A.    Yes.

5    Q.    Did medical liaisons come from the other Customer Business

6    Units for this training?

7    A.    Yes, they did.

8    Q.    And tell us what happened during the training.

9              MR. KENNEDY:   Objection, narrative answer.

10             THE COURT:   Overruled.

11   Q.    Go ahead.

12   A.    So we flew in -- all the medical liaisons from around the

13   country converged in Ann Arbor where our R&D, Warner-Lambert's

14   R&D -- Parke-Davis' R&D facilities were, and we sat through a

15   couple of days of seminar slide presentation type training.

16   Q.    Was there training -- was there a training session given

17   where two lawyers, a Mr. Parker and Mr. Rubenstein, gave

18   instruction on the requirements, U.S. Food and Drug

19   Administration requirements, with regard to promotion of drugs?

20   A.    Yes, there was.

21   Q.    Describe for the jury how that training session was set up

22   physically.  What equipment was in the room and what happened?

23   A.    So if the screen were where the Judge is, the medical

24   liaisons were sitting across from the screen.  The presenters

25   would stand in front or slightly beside the screen where this

1    desk is, and then where the jury is there was a video camera

2    that was positioned sideways, if you would.  And while I didn't

3    get to look through the lens piece, it appeared to be

4    videotaping everyone, not just the presentation, but also the

5    audience, its presence itself.

6    Q.   You said there were medical liaisons from across the

7    country?

8    A.   Yes.

9    Q.   Do you know approximately how many?

10   A.   I don't recall how many people were there.  It would be a

11   guess.

12   Q.   And was the video on?

13   A.   And the video was on, yes.

14   Q.   When the video was playing, what did the two lawyers,

15   Mr. Rubenstein and Mr. James Parker, tell you?

16   A.   They explained that medical -- that the FDA had rules,

17   although they explained that they were odd rules, they had

18   rules -- their belief that they were odd rules, they had

19   rules --

20          THE COURT:  Was that their word?

21          THE WITNESS:  You know, they -- at one point they put

22   a photo of Dr. Kessler, who was then the head of the FDA, up,

23   and talked about him having emotional problems associated with

24   his mother.  And that he was essentially enforcing rules that

25   would prevent people going 60 in a 55-mile-an-hour zone.

1        So they were odd -- I can't -- "odd" wasn't the word

2   they used.  It was actually a stronger series of paragraphs

3   where they described these as being, again, Dr. Kessler -- once

4   Dr. Kessler was gone, these rules would be relaxed into a more

5   normal sort of situation.  They explained -- they gave one

6   example of an advertisement that the FDA had rejected because

7   it showed an -- it was for a cardiovascular drug and in it it

8   showed a series -- a spiral staircase and a person, a cartoon

9   of a person walking up the staircase, and the FDA rejected it

10  because there were too many stairs.  And they thought that that

11  would imply that someone could walk up more -- that

12  Warner-Lambert or Parke-Davis was making a claim about how many

13  stairs you could walk up after taking this drug.  So they made

14  it reduce it down to a four-stair spiral staircase, which was

15  ridiculous looking.  It was a person walking upstairs that

16  started nowhere and went nowhere.

17        So it was described as odd in that way.  And in that

18  sort of odd manifestation of the rules was attributed to an

19  emotional problem Dr. Kessler had with his mother.

20  BY MR. GREENE:

21  Q.   When you say -- they actually put a photograph of him up

22  on a --

23  A.   Yes.

24  Q.   Like a presentation?

25  A.   Yes, a PowerPoint, part of the PowerPoint.

Page 40

1   Q.   During this presentation did -- while it was being

2   videotaped did these lawyers tell the medical liaisons what

3   they were not permitted to do with regard to off-label

4   promotion?

5   A.   Yes.

6   Q.   And just -- if you can summarize for the jury what the

7   lawyers told you medical liaisons you could not do.

8   A.   We could not solicit an inquiry.  So we couldn't go to a

9   doctor and essentially proactively promote.  We had to wait for

10  a physician to ask a question.  So it has to be

11  physician-initiated.

12         They also explained that it had to be fair and

13  balanced, that we needed to -- if we were going -- the FDA

14  required us to -- if we were going to talk about the positive

15  potential of a drug, we also had to talk about the negatives

16  and the risks associated with that drug.

17         So they took us through -- while the camera was on,

18  they took us through those requirements, that the FDA required

19  it to be a peer-to-peer conversation.

20  Q.   Now, you had been on the job, I think you told the jury,

21  for a period of time when you went out --

22  A.   A few weeks.

23  Q.   You had this training; is that correct?

24  A.   Yes.

25  Q.   And did this -- what the doctors -- excuse me, what the

1    lawyers said to you during this videotaped presentation, did

2    this surprise you, given what you had been doing in the field?

3    A.   Oh, yes.  It couldn't have been any more different.  So

4    sitting there watching this presentation I could feel my lungs

5    tightening.  I could feel how I became very anxious during this

6    because what they were describing what we could not do was

7    exactly what I was taught to do.  And so -- so, yes, it was

8    shocking.

9    Q.   Now, at some point did the two lawyers, Mr. Parker and

10   Mr. Rubenstein, shut the camera off?

11   A.   Yeah, they joked about whether or not the camera was

12   actually off, about whether they could still see the red light

13   on, but confirmed that the light -- that the camera was off.

14   Q.   Once the video was shut down, tell the jury what they told

15   you and the other medical liaisons?

16   A.   They then explained to us that, Look, this was a transient

17   period, that this wasn't going to last, these sorts of

18   regulations, that we needed to not worry about this, that it

19   was -- every one of us, it was our job to sell, every person in

20   the room, every member of the Warner-Lambert team, it was our

21   responsibility to sell, that there was no necessity in the

22   balance -- the fair and balance component because the market

23   would balance itself because our competitors would be out there

24   bad-mouthing our drug, there was no reason for us to do it.

25            So they explained to us that we needed to dismiss what

Page 42

1  we just said and just be very careful, very careful about how

2  we went about doing it, that we needed to look out for

3  competitors, that it -- our competitors were the ones that

4  would turn us in.

5  Q.   Did they give you any instruction about carrying around

6  case reports or articles that described off-label uses of their

7  drugs?

8  A.   Yeah, that -- but more importantly, the second time I

9  actually talked to those two attorneys they pointed out that

10  anything I carried with me would be considered promotional

11  material.

12  Q.   That's what I wanted to direct your attention to.

13  A.   Okay.

14  Q.   At some point -- you were there for a couple of days, I

15  think you said, and you had some breakout sessions, I think you

16  said?

17  A.   Yes, yes.

18  Q.   During the breakout sessions did you learn more?

19  A.   Yes, very --

20  Q.   If you can summarize for the jury what happened during the

21  breakout sessions.

22  A.   We had Neurontin training for the most part.  That's

23  where much of our sales skills training happened.  So I was

24  presented with an additional slide deck during that period of

25  time and it was explained to me how to actually use that slide

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1  deck.  We -- as part of these presentations we were -- you

2  know, we were introduced to ongoing projects and we talked --

3  it was explained to us how to use those projects to sell

4  Neurontin.

5  Q.   And these breakout sessions, when they described their

6  ongoing projects, was it about Neurontin off-label use?  Is

7  that what they talked to you about?

8  A.   Well, the clinical development team had some presentations

9  that day, but -- in our breakouts they were focused almost

10 entirely on off-label -- not just in the training.  Just about

11 every meeting -- my job was 100 percent focused on -- 99

12 percent focused on off-label promotion, period.  So all

13 discussions we had were always focused on that.

14 Q.   At some point -- at some point did they hand out some note

15 pads, two different note pads?

16       MR. GREENE:  Slide 8, please.

17 Q.   Did they hand out a note pad that said, "Ladies and

18 Gentlemen of the Jury"?

19 A.   Yeah.

20 Q.   And explain -- is this actually like a legal pad like we

21 have here?

22 A.   It was small, not like that there.

23 Q.   Like the size of the one on the screen --

24 A.   It looked a lot like this.  I think it was all on one

25 line.  There was one that said, "Ladies and Gentlemen of the

Page 44

1    Jury," and the other one, "Your Honor, I Plead."

2         So an individual called Sandra Pace did a presentation

3    where she actually passed these out and talked about the

4    importance of not creating a paper trail.  So there was a slide

5    presentation that showed a -- you know, the camera panned past

6    the door and there were executives all sweaty with their arm

7    shirts all rolled up shoving papers into shredders, shredding

8    paper.  And the solution to that was to simply not create the

9    paperwork in the first place.  Don't ever find yourself in a

10   situation where you've got to shred.  Just don't create the

11   paperwork itself.

12        THE COURT:  Excuse me, this Sandra Pace was who?

13        THE WITNESS:  She was -- all the interaction I ever

14   had with her, she was responsible for standard operating

15   procedures and medical research.  It's not entirely clear to me

16   where she -- I believe she reported into an organization named

17   Morris Plains as opposed to Ann Arbor, but I'm not sure.

18   BY MR. GREENE:

19   Q.   Okay.

20   A.   The -- so she -- she supplemented that by handing these

21   out that pointed out that people think, Okay, I shouldn't take

22   notes, but she -- she was trying to iterate that even when you

23   get something from someone else, when you write in the margins

24   of it, you write anything down, you have to think about the

25   context of what you write down in terms of, your Honor, I

1  plead, or, ladies and gentlemen of the jury, that you would --

2  you have to be able to explain that at some point, and

3  therefore, don't write anything down either.  So it's not just

4  a matter of creating documents, this -- she strengthened the

5  fact that you shouldn't even take notes, you shouldn't even

6  write in the margins.

7  Q.   Anything else that happened during that couple days or --

8  training out in Ann Arbor, or did we cover what happened out

9  there?

10  A.   Medical director named Adrian Bal from the West referred

11  to us as -- the medical liaisons in the Northeast as brazen

12  criminals.  That was a hot topic for a while.  All the medical

13  liaisons were taught to do the same thing, we were all using

14  the exact same material, but Adrian Bal thought that our cold

15  calling physicians crossed a line.  It wasn't a matter of the

16  information we provided them, but he feared by cold calling a

17  physician, that physician would -- could report us or that our

18  competitors would report us and that would get all of the

19  medical liaisons in trouble.

20  Q.   So you came back.  At some point following that training

21  did you have some training in -- sales training in the

22  Northeast CBU down in Parsippany, New Jersey?

23  A.   Right.  There was a national sales training also.

24  Q.   This national sales training, did they bring sales reps

25  from across the country from all the CBUs?

Page 46

1    A.    Yes.

2    Q.    But your title was a medical liaison, correct?

3    A.    Correct.  Again, as the juror pointed out, there was a

4    very thin distinction.

5    Q.    Were you asked to go to the sales training with the other

6    sales reps?

7    A.    I was, yes.

8    Q.    And you went down for an afternoon and you had sales

9    training?

10   A.    Yes.

11   Q.    And describe for us what happened in that sales training.

12   A.    They trained the sales reps, a couple of the trainers

13   approached myself and another physician that had just been

14   hired.  Joe Dymkowski, I believe his name was, who had an MD.

15   He and I were sitting in the back of the room for the sales

16   training and the trainers approached us and talked about them

17   having to find a way to bake us in, how to teach the medical --

18   the sales reps how to better use a medical liaison, but they

19   needed to work their way through -- I think he referred to it

20   as something to the effect of that regulatory thing, the legal

21   stuff.

22   Q.    Okay.  Did part of this sales training include what the

23   jury has heard detailing?

24   A.    Yes, yes.

25   Q.    And I think they know, detailing is when a sales rep or a

1   medical liaison goes to a physician's office, correct?

2   A.   It's more complicated than that.  It's not a typical sales

3   call.  This isn't like buying a car.

4   Q.   Well, let me ask you about it.  It's a sales call on a

5   physician, can we start there?

6   A.   It is, yes.

7   Q.   Now, were there other things that happened when a medical

8   liaison or sales rep went to detail a physician?  They would

9   meet with the physician, correct?

10  A.   Yes.

11  Q.   They could bring the physician samples of a drug, correct?

12  A.   Yes.

13  Q.   And they could promote on label --

14  A.   Right.

15  Q.   -- to the physician?

16  A.   They could use all the FDA-approved marketing material,

17  yes, or advertising review committee approved marketing

18  material.

19  Q.   Were the detail visits also used to extend dinner

20  invitations to the physician?

21  A.   Yes, yes.

22  Q.   Were the detailers, both the medical liaisons and the

23  sales reps, used to invite the physicians to call in to

24  teleconferences?

25  A.   Right.  The point of the detail was to draw the physician

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   closer and closer to build a better, trusting relationship with

2   the sales rep and the company.

3   Q.   During the detail visits did you personally extend

4   invitations to physicians to attend dinner meetings with other

5   physicians?

6   A.   Dinner meetings, consultants --

7   Q.   I want to take one at a time.  Dinner meetings?

8   A.   Yes.

9   Q.   Did you personally invite visiting physicians to become

10  consultants on the drug Neurontin?

11  A.   Yes.

12  Q.   Did you invite physicians to call in to teleconferences

13  regarding Neurontin?

14  A.   Yes.

15  Q.   Did you invite physicians to write up a case report on

16  Neurontin and be paid for it?

17  A.   Yes.

18  Q.   Did you invite and recruit physicians to become members of

19  the speakers bureau?

20  A.   I would invite them, if you would, but it was my superiors

21  who actually made that happen.

22  Q.   Would you submit names to your superiors to nominate a

23  physician to become an advisory board member?

24  A.   Yes.

25  Q.   In all of these positions were physicians paid for their

1   time?

2   A.   Yes.

3   Q.   Were these -- based on your experience in the company,

4   were these various marketing techniques the company used?

5   A.   Yes.  It was explained to me --

6   Q.   Would you please tell the jury what was explained to you.

7   A.   So it was explained to me that a physician -- it was

8   actually explained to me how the Hippocratic oath worked.  That

9   Hippocratic oath acknowledged -- required a physician that when

10  they reached the limit of their ability to treat a patient,

11  that they're required to follow the scientific material, the

12  scientific literature, and to seek the help of other

13  physicians.  And so to bring another physician in, again, it's

14  part of their oath that they actually acknowledge when they

15  don't know what to do next.

16          So it was explained to me that we had a strategy that

17  would interlace all of the -- all of the different information

18  sources that physicians had access to.  And so by creating a

19  pool -- a literature -- influencing the literature that

20  physicians had access to, we could influence their

21  decision-making skills, their actual decision making and as a

22  result of it bend it toward use of Neurontin off-label.

23  Q.   Let me ask you this:  Were you provided with case reports

24  that described the off-label use of Neurontin to use -- to

25  promote the drug during these detail visits?

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1    A.    Yeah, it was more than promote the drug.  I was given

2    those case reports so I could actually enable the physician to

3    put the next patient on it.

4          So the sales reps would promote in general, but it was

5    my job to actually get them to prescribe to the next patient.

6    Q.    And one of the series of case reports, were they by a

7    physician by the name of Dr. Gary Mellick?

8    A.    Yes, yes.

9    Q.    Were you provided a set of slides by the company that had

10   these case reports, Mellick's case reports, on a slide?

11   A.    Yes.

12   Q.    And did you use those when you detailed physicians?

13   A.    Yes, both on slides, as well as the actual publications,

14   yes.

15   Q.    Did your day run from 8:00 in the morning until 5:00 in

16   the evening?

17   A.    Not that long, no.

18   Q.    What was -- what were the hours during your day?

19   A.    Typically we'd start at 9:00 -- we'd essentially follow

20   the physicians' hours.  We'd start at 9:00 and we'd usually

21   wrap up by 4:00, sometimes 5:00.

22   Q.    Now, we had talked about the Aspen voicemail system.  Do

23   you recall that, Doctor?

24   A.    Yes.

25   Q.    And you -- at times you'd come back to your home, would

1   you have voicemails that were left there?

2   A.   No, not left at home, they were left -- there was an 800

3   number that we would call in to to get to the company's

4   voicemail system.  So it wasn't my answering machine at home,

5   it wasn't tied into it.

6   Q.   And I'm just going to jump ahead, give this question some

7   context to the jury.  But sometime in 1996 you came to my

8   office; is that right?

9   A.   Yes.

10  Q.   And that was, I think, July of 1996?

11  A.   Yes.

12  Q.   But prior to coming to my office had you been -- did you

13  become concerned about promoting the drug off-label to

14  physicians?  Just answer yes or no, did you become concerned?

15  A.   Yes.

16  Q.   Once you became concerned did you make a couple of

17  recordings?

18  A.   Yes, a number of them, yes.

19  Q.   I think we have a couple of them, I just wanted to play

20  them for the jury.

21       MR. GREENE:  So if we could have the slide up at the

22  same time.

23       Your Honor, the voice -- it's a little bit

24  difficult -- you can hear it, you can follow it.  We have a

25  text of it we'll put on a slide.

Page 52

1    Q.   So if we could start with -- before we start, Phil

2    Magistro, can you tell us who he was?

3    A.   He was my supervisor, my -- he was based in the Northeast

4    CBU, but he was the person I reported into.

5    Q.   And then the next one we have is from a John Ford.  Let's

6    do Phil Magistro, first.

7            MR. GREENE:  If we could play --

8            (Played voicemail.)

9    Q.   Now, there was a reference by Mr. Magistro to monotherapy.

10   This monotherapy was off-label use of the drug to treat

11   seizures, correct?

12   A.   Yes, it was.

13   Q.   And monotherapy means it was just going to be taken alone

14   and not in combination with another antiseizure drug; is that

15   correct?

16   A.   Right.  So the off-label promotion was one thing, but this

17   monotherapy was reckless, to say the least.

18           MR. GREENE:  Can we play the next clip?

19   Q.   Now, just tell us who John Ford is before we start this.

20   A.   John Ford was from the Southeast CBU, and was -- spent a

21   great deal of time in the Northeast CBU teaching us what worked

22   in the Southeast CBU.

23           THE COURT:  So just as we're going along, are these --

24   are you offering these?

25           MR. GREENE:  Yes, we are, your Honor.

1    THE COURT:  So do you want to do it all at the end or

2  how do you want to do it?

3    MR. GREENE:  I'll do it when I complete this call.

4    Exhibit 2098 is offered into evidence.

5    THE COURT:  What was that?

6    MR. SOBOL:  Which one was it?

7    MR. GREENE:  Both calls.

8    THE COURT:  Both calls.  It's on one tape.

9    MR. GREENE:  Your Honor, I'll let Mr. Alba know -- we

10  will move to introduce the tape, we have a tape and the written

11  transcript, and I'll give you the number.  I'm not sure it's

12  2098.

13    THE CLERK:  Okay.

14    MR. GREENE:  But if we could play this second --

15    MR. KENNEDY:  Your Honor, we will have an objection

16  when they get there.

17    THE COURT:  Sure.  We'll just do it this way.

18    John Ford is who again?

19  BY MR. GREENE:

20  Q.   Mr. Ford is who?

21  A.   John Ford was in the Southeast CBU who spent a great deal

22  of time in the Northeast CBU teaching us how to promote

23  off-label.

24    (Played voicemail.)

25  Q.   That call happened during the time you were working for

1    the company, correct?

2    A.    Yes.

3    Q.    You came to visit me in July of '96.  In August of 1996 we

4    ended up going to the Department of Justice; is that right?

5    A.    Yes.

6    Q.    So you worked at the company starting sometime the

7    beginning of March and then --

8    A.    Officially started April 1st.

9    Q.    April 1 up to --

10   A.    The end of July.  When I resigned, they refused to accept

11   my resignation, so I think I technically worked there longer.

12   Q.    We'll get to that.

13          You mentioned you were provided with a slide deck to

14   promote Neurontin off-label to physicians, correct?

15   A.    Yes, yes.

16   Q.    And we have that --

17   A.    Several of them, but, yes.

18   Q.    Did one of the slides -- let me ask you this:  Did anybody

19   within the company ever make a reference to Neurontin as snake

20   oil?

21   A.    I don't know if everybody can see it, but this slide that

22   I can see here was the snake oil slide.  So I was taught how to

23   use a slide -- this was actually at the national training.  I

24   was taught to use this, and Phil presented it as this next

25   slide is so shocking that you have to preempt physicians'

1   reaction to it by telling them right up front that this next

2   slide makes me feel like I'm selling snake oil.  So we ended up

3   referring to this as snake oil, because of all these diverse

4   indications.

5   Q.   Let me ask you a few questions about some of these

6   particular off-label uses.  Migraine.  At any time during your

7   training did anybody from the company tell you that there had

8   been a negative migraine study that the company was aware of

9   conducted in the late 1980s in Europe?

10  A.   No, not at all.

11  Q.   Dropping down to bipolar disorder.  First, tell the jury

12  how you were trained to promote Neurontin for bipolar and mood

13  disorder.

14  A.   We were -- I was told to explain to physicians that

15  Neurontin was highly effective, demonstrating a strong response

16  in 90 percent of patients, and that it was very effective for

17  bipolar disease and of a wide variety of other psychiatric and

18  mood disorders.

19  Q.   For depression?

20  A.   For depression, what I was trained to do was explain to

21  physicians that 50 percent of people initially described or

22  diagnosed with depression were actually bipolar.  And so that

23  even their patients who were diagnosed with depression, they --

24  they needed to consider Neurontin for those patients also for

25  the effectiveness in bipolar.

1   Q.   Were you ever informed that the defendants knew and their

2   marketing assessment stated that there was no scientific

3   rationale to use Neurontin to treat bipolar mood disorder?

4   A.   No, I wasn't.

5   Q.   Were you aware -- were you ever informed that the

6   defendants learned as a result of the statistical analysis that

7   the FDA conducted on the epilepsy trials that there was an

8   increased risk of depression with suicide -- with and without

9   suicidal ideation?

10  A.   I didn't learn that until many years later.  I heard it on

11  NPR.

12  Q.   Did the company train you to inform physicians that there

13  was a database or clinical evidence that supported these

14  off-label uses?  And describe for the jury what you were

15  trained in that regard to say.

16  A.   I was trained and I believed that there was a large and

17  growing -- the words were, Large and growing body of evidence

18  that Neurontin was effective for all of these indications.

19  That the company simply -- that there was such an influx of

20  data the company was having a difficult time analyzing and

21  churning it all out.

22  Q.   You mentioned before you were trained to promote off-label

23  using case reports.  Do you remember saying that a moment ago?

24  A.   Yes.

25  Q.   And is this a slide that we're going to put up for a

1   moment -- is this a slide you used?

2   A.   Yes.

3   Q.   It referenced Dr. Mellick, Gary Mellick, and his brother

4   Mellick case reports.

5   A.   Yes.  So this was one of the slide decks.  You'll notice

6   in the other corner, though, was Dr. Schachter.  The name I

7   would really emphasize was Dr. Schachter, given that he was a

8   full tenured professor at Harvard Medical School.

9          THE COURT:  So just -- what are we marking that?  Just

10  to keep track of these.

11         MR. GREENE:  These are who we referred to as the

12  slides --

13         THE COURT:  What number?

14         MR. GREENE:  The Schachter slides.

15         We're going to move them into evidence --

16         MR. KENNEDY:  Objection, your Honor.  I don't want to

17  be speaking, but it's not clear to me this is a Parke-Davis

18  slide somebody made up for the trial.

19         THE COURT:  Maybe you can lay a foundation.

20         MR. GREENE:  Sure.

21  BY MR. GREENE:

22  Q.   Were you provided with a set of slides in performing your

23  job?

24  A.   Yes.  This is one of them, yes.

25  Q.   The slide that we were looking at just a few moments ago

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   as the snake oil list --

2          MR. KENNEDY:  Objection, your Honor.  It's not on the

3   exhibit list.

4          THE COURT:  It is not?

5          MR. GREENE:  No, it's not.

6          THE COURT:  Sustained.

7          MR. KENNEDY:  Can I ask that it be depublished, then,

8   and the jury asked to disregard it?

9          THE COURT:  Overruled.

10  BY MR. GREENE:

11  Q.   You used a set of slides in which you promoted Neurontin

12  off-label, right?

13  A.   Yes.

14  Q.   One of the slides we've talked about you've referred to as

15  the snake oil slide; is that right?

16  A.    That's right, yes.

17  Q.   And did you -- you actually used case reports that were

18  written by Doctors Mellick that described off-label uses of

19  Neurontin?

20  A.   Yes.

21  Q.   And did you have a slide that was made up -- that

22  summarized those case reports?

23  A.   Yes.

24  Q.   And these slides were provided to you by the company,

25  correct?

1    A.   Yes.

2    Q.   And the medical liaisons used these slides to promote

3    off-label uses of Neurontin?

4    A.   Yes.

5    Q.   And did you have a slide that listed bipolar disorder and

6    painful diabetic neuropathy; postherpetic neuralgia; RSD,

7    reflex sympathetic dystrophy; restless leg syndrome; tremor?

8    A.   Yes.

9    Q.   And you used that slide to promote off-label to doctors?

10   A.   Yes.

11   Q.   Now, Doctor, you worked full time at this job and were

12   working full time when you came to consult with me, didn't you?

13   A.   Yes.

14   Q.   I don't want to go into our meetings or anything, but we

15   met several times, didn't we?

16   A.   Yes.

17   Q.   And when you came to me, you had to explain what off-label

18   promotion was to me, correct?

19   A.   That's right.

20   Q.   I didn't understand it.

21   A.   Right.

22   Q.   And I gave you some advice, didn't I, Doctor?

23   A.   Yes.

24   Q.   And were you told that you could return to the company and

25   try to work it out with them?

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   A.   I was --

2   Q.   Did I say that was one option?

3   A.   Yes.

4   Q.   Did I tell you you could just move on with --

5            THE COURT:  You know, you might be opening up stuff.

6            MR. GREENE:  Okay, I'll stop.

7            MR. KENNEDY:  I think he just did.

8            THE COURT:  I don't know, but --

9   BY MR. GREENE:

10  Q.   As a result of the conversations that we had, did you make

11  a choice to report this to the Department of Justice?

12  A.   Yes, I did.

13  Q.   And could you tell the jury why you made that decision?

14  A.   My concern when I left the company, when I went to see

15  Mr. Greene was that people were being injured, that I had no

16  idea of what I had learned afterwards, but in the case of

17  monotherapy, for example, if you've got a young person, say, a

18  high school student who's suffering from seizures and currently

19  taking an approved drug, a drug that's been proven to be

20  effective but is complaining about, say, the weight gain

21  associated with that, and then you have a medical liaison go in

22  there and convince the physician that Neurontin is effective

23  for monotherapy and has no side effects at all, I would

24  instruct physicians to take the patient off an approved drug,

25  even another Parke-Davis drug, and put them on Neurontin for

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1    monotherapy.  Now that student has -- does not recognize that

2    they've actually -- not only that, but that they now need to

3    dose that patient all the way up to 4,800 milligrams a day, so

4    mega doses of the drug.  We had no idea what that would do.

5    And most importantly, from my point of view, if that student

6    has a seizure, they could be injured.  So it was from my -- my

7    concern was about this indirect injury of letting a patient go

8    unprotected from seizures, and the monotherapy indication was

9    there.

10          So when I -- I went to you, my major concern was that

11   there -- eventually someone would be hurt, and I had a

12   responsibility to report this.

13   Q.   As a result of that, a case was filed, it was filed under

14   seal in this very courthouse and before this very Judge,

15   correct?

16   A.   Yes, yes.

17   Q.   And it remained under seal from August 1996 until

18   December -- excuse me, January 2000; is that correct?

19   A.   Yes.

20   Q.   And then it was actively pursued; is that correct?

21   A.   Yes.

22   Q.   And between January 2000 and May 2004 I went around the

23   country and did a lot of depositions, didn't I?

24   A.   Yes.

25   Q.   And the jury has seen some of them, and that's the reason

1    they're dated back in the 2002 time period, correct?

2    A.    Yes.

3    Q.    And we subpoenaed documents from the defendant, didn't we?

4          MR. KENNEDY:  Your Honor, leading.

5          THE COURT:  Sustained, leading.

6    BY MR. GREENE:

7    Q.    Were many documents produced, many, many boxes of

8    documents?

9    A.    Many boxes, yes.

10   Q.    And 50 to 80 boxes produced by the defendants?

11   A.    Yes.

12   Q.    And did you spend time going through those documents?

13   A.    Yes.

14   Q.    Did you work nights with me going through the documents?

15   A.    Some, yes.

16   Q.    Did you work weekends going through the documents?

17   A.    Yes.

18   Q.    I just want to step back to your job.

19         You mentioned -- I heard you mention a moment ago

20   dosing up to 4,800 milligrams.  Were you instructed that

21   Neurontin had been approved only up to 1,800 milligrams?

22   A.    Yes.  I was instructed that it had been approved up to

23   1,800 milligrams, but that we had submitted it at a low dose in

24   order to rush approval and that we actually needed to -- I

25   think it was John Ford who actually said unless we've gotten

1    up -- a patient -- he didn't want to see any patient coming off

2    of Neurontin unless they had been dosed up to 4,800 milligrams,

3    because until they had reached that point, he didn't believe we

4    had gotten a fair trial.

5    Q.   With regard to pain, did you and the other medical

6    liaisons and the sales representatives promote Neurontin for

7    off-label uses in -- to treat pain, neuropathic pain?

8    A.   Yes, yes.

9    Q.   And nociceptive pain?

10   A.   Yes.

11   Q.   And did you and the other medical liaisons promote

12   Neurontin to physicians for the off-label use to treat

13   migraine?

14        MR. KENNEDY:  Object, compound, and lack of foundation

15   beyond himself.

16        THE COURT:  Overruled.  To the extent that you saw

17   with respect to the other medical liaisons.

18   A.   I'm sorry, could I --

19        THE COURT:  Just start again.

20        MR. GREENE:  I'll start again.

21   BY MR. GREENE:

22   Q.   You worked with other medical liaisons?

23   A.   Yes.

24   Q.   Did you and the other -- did you observe other medical

25   liaisons promote Neurontin for migraine?

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 64

1  A.   Yes, yes, I did.

2  Q.   Did you observe other medical liaisons promote Neurontin

3  at doses above 1,800?

4  A.   Yes.

5  Q.   And promotion for both migraine and doses above 1,800 by

6  those medical liaisons, was that to physicians?

7  A.   Yes.

8  Q.   Did you personally extend physicians invitations to CME

9  events?

10  A.   CME events, yes.

11  Q.   And --

12        THE COURT:  Again, what's a CME?

13        THE WITNESS:  I'm sorry, Continuing Medical Education.

14  So part of the way I was trained to influence a physician was

15  that they rely on their education, they rely on the literature,

16  they rely on their peers; and so we needed to influence all of

17  that.  Every -- every information source that a physician

18  reaches out to, we needed to influence.  So CM -- Continuing

19  Medical Education was part of it.

20  Q.   Did management provide you with journal articles that

21  described off-label uses of Neurontin in the form of case

22  reports that you used to detail physicians?

23  A.   Yes.

24  Q.   And were those case reports provided to other medical

25  liaisons to detail Neurontin off-label?

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 65

1    A.    Yes.

2    Q.    Was that standard practice?

3    A.    Yes.

4    Q.    While you were working at the company were you familiar

5    with a company by the name of Cline, Davis & Mann?

6    A.    Yes.

7    Q.    And did you receive faxes or documents from them?

8    A.    When we were signing up physicians for teleconferences and

9    that sort of thing, Cline, Davis & Mann handled that.  And so I

10   would have the physician fax their financial -- Social Security

11   Numbers so they could fill out their I-9 form -- I forget which

12   IRS form it was -- but it was how they got paid.

13   Q.    And you knew Mr. Knoop and Mr. Crook were Neurontin

14   marketing managers; is that correct?

15   A.    Product managers, I believe.

16   Q.    Product managers.  I'd like to show you Exhibit 75, which

17   is in evidence.

18        MR. GREENE:  I have just about three more exhibits,

19   your Honor.

20   Q.    That's a Cline Davis memo to Allen Crook; is that correct?

21        MR. KENNEDY:  Objection, your Honor, lack of

22   foundation given the date.

23        THE COURT:  Overruled.

24   A.    Yes.

25   Q.    The jury heard testimony the other day from Clare Cheng.

1   She's an employee of Cline, Davis & Mann.  You mentioned there

2   in the cc line you know Mr. Knoop?  You knew his title?

3   A.   Yes.

4   Q.   I want to direct your attention to the second page of

5   this -- well, let's stick with the first one, I'm sorry,

6   addressed to Allen.

7        The first sentence reads, "Attached are our

8   recommendations for the 1997 tactical plan.  Two grids are

9   attached showing the strategies and audience addressed by each

10  tactic."  Is that what it says?

11  A.   Yes.

12  Q.   Let's turn to the second page.  And I'd like to direct

13  your attention to -- well, the top line is the "Neurontin 1997

14  Tactical Plan"; is that right?

15  A.   Yes.

16  Q.   And the left-hand column -- and the jury will have this

17  exhibit -- but the left-hand column shows tactics?

18  A.   Yes.

19  Q.   Across the top we have strategies 1, 2, 3, 4, and 5; is

20  that correct?

21  A.   Yes.

22  Q.   Let me drop you down to strategy number 1.  Do you see

23  that?

24        MR. GREENE:  If we could highlight that at the bottom

25  page.

Page 67

1    A.    I see that.

2    Q.    Can you read that to the jury?

3          MR. KENNEDY:  Objection, lack of foundation.

4          THE COURT:  Overruled.

5    A.    "Execute publication and education plan and clinical

6    trials program to support product expansion in emerging uses."

7    Q.    Just for the record, what is emerging uses?

8    A.    In our nomenclature that meant off-label indications.

9    Q.    I'd like to move to Exhibit 17.  This is entitled, "The

10   1998 Neurontin tactics prepared July 30, '97 by Cline, Davis &

11   Mann"; is that correct?

12         MR. KENNEDY:  Objection, your Honor, foundation and

13   timing.

14         THE COURT:  Overruled.  That is already in evidence,

15   correct?

16         MR. GREENE:  Correct, your Honor.

17         Exhibit 17 for the record.

18   BY MR. GREENE:

19   Q.    Can you turn to the second page?  And at the top there

20   it's entitled 1999 -- excuse me, "1998 Neurontin Tactics and

21   Strategy Grid"?

22   A.    Yes.

23         MR. KENNEDY:  Objection, lack of foundation.

24   BY MR. GREENE:

25   Q.    I don't want to spend much time on it, but could I direct

1   your attention to the left-hand column, "tactics"?

2   A.   Yes.

3   Q.   I just want to ask you one or two questions.

4        If you drop three lines down, diabetic neuropathy CME,

5   do you know what that is?

6   A.   Yes, I do.  So those were programs where we -- we would

7   pay companies like Cline, Davis & Mann to find other companies

8   that would put on educational programs that taught physicians

9   how to use that Neurontin was effective for bipolar, all the

10  off-label indications.

11  Q.   So if we're on the line --

12       THE COURT:  So this is 1998?

13       THE WITNESS:  Right.

14       THE COURT:  So was this something that happened when

15  you were there?

16       THE WITNESS:  I did not -- I never saw these documents

17  while I was there, but this is the -- this is what was

18  explained -- when we did presentations about how all this

19  worked, while I was taught how it worked, even in that March

20  5th meeting, it was explained that we were part of this total

21  plan that over time would become more and more efficient

22  because, instead of walking around with just minimal case

23  studies, the Mellick study, that sort of thing, we would have

24  this more and more material provided to us as a result of these

25  programs.

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 69

1          MR. KENNEDY:  Object.  Move to strike.

2          THE COURT:  Overruled.

3     BY MR. GREENE:

4     Q.   The bottom of the page there --

5          THE COURT:  So, obviously, he doesn't know what

6     happened in 1998.  This is a document that's otherwise in

7     evidence.  So he's limited to what he heard and saw at the time

8     that he was in the employ of the defendants.

9     BY MR. GREENE:

10    Q.   So strategy number 2, there's a line there -- if we could

11    just highlight it.  And the Xs are showing the tactics that are

12    used for diabetic neuropathy CME, bipolar CME.  And then aged

13    neuropathy ad. board.  What's an ad. board?

14    A.   An advisory board.

15    Q.   Is that one of the marketing tactics that you testified

16    about earlier?

17    A.   Yes, yes.

18    Q.   And then the actual tactics are attached to the document;

19    is that correct?

20    A.   Meaning?

21         MR. GREENE:  The jury will have this in evidence, your

22    Honor.  I think I will move on.  Exhibit 17.

23         THE COURT:  All right.

24    BY MR. GREENE:

25    Q.   I'd like to show you Exhibit 33.

Page 70

1          MR. GREENE:  Just a few questions about this exhibit,

2     your Honor.

3     Q.   This is -- do you have that in front of you?

4     A.   Yes, I do.

5     Q.   Entitled, "The 1998 Strategic Plan and A&P Allocation

6     Grid."  Do you see that?

7     A.   Yes.

8     Q.   The top line says -- top line "strategies/tactics"; is

9     that right?  You see that?

10         MR. GREENE:  If we could highlight that.

11    A.   Yes.

12    Q.   And I'd just like you to move across that line.  You see

13    the heading "CBU estimates"?

14    A.   Yes, I do.

15    Q.   And that's referring to Customer Business Unit estimates

16    where it has the various CBUs there, correct?

17    A.   Yes.

18    Q.   Just to orient the jury, because they'll have this Exhibit

19    33, but the block at the top where it says, "Number 1," that's

20    strategy number 1; is that correct?

21    A.   Yes.

22    Q.   And if we turn to the next stage, we see strategy number

23    2?

24    A.   Yes.

25    Q.   The next page has strategy number 3 --

Page 71

1          THE COURT:  You need to tie it back to when he was

2     there.

3     BY MR. GREENE:

4     Q.   Let me ask you a question.  These were -- the last exhibit

5     we talked about, strategies and tactics that were presented by

6     Cline, Davis & Mann to Parke-Davis, correct?

7     A.   Yes.

8     Q.   Is this an advertising and promotion allocation grid that

9     lists what the CBUs were going to spend?

10    A.   Yes.

11    Q.   Is this dated after you left the company?

12    A.   Yes.

13    Q.   Are you familiar with what NCCBU means?

14    A.   North Central CBU.

15    Q.   And the other headings there, NECBU?

16    A.   Northeast, South Central, Southeast, West.

17    Q.   And on page 4, number 4, do you see that strategy, to

18    maximize opportunities in the emerging uses through clinical

19    trials, publications, and educational events?

20    A.   Right.  So while I was there I didn't see --

21    Q.   If you just answer my question.

22    A.   Yes.

23    Q.   Do you see that strategy?

24    A.   Yes, I do.

25    Q.   You didn't see that -- you didn't see this document while

1    you were there, did you?

2    A.    It was explained to me that this was a strategy, but I did

3    not see this document.

4    Q.    And below that there are local tactics.  Do you see that?

5    A.    Yes.

6    Q.    Those tactics that were being implemented at the CBU

7    level?

8    A.    Yes.

9    Q.    Based on your experience with the company, could you tell

10   the jury were symposia marketing doctors?

11   A.    Yes, they were.

12   Q.    Was the use of psychiatric and mental health congress a

13   tactic, a marketing tactic?

14   A.    Yes, it was.

15   Q.    I think you said dinner meetings were, correct?

16   A.    Yes.

17   Q.    And the psychiatric time supplement, the supplements,

18   medical supplements that described off-label uses, were they

19   marketing tactics?

20   A.    Yes.

21          MR. GREENE:  Just give me a moment, your Honor.

22          Just a couple of minutes.

23          (Discussion off the record.)

24   Q.    Doctor, based on your experiences at the company from the

25   time you started up through the July 1996, the experiences that

Page  73

1   you had in that time period, are they relevant to these

2   marketing tactics that we've been referring to in this exhibit,

3   33, the advertising and promotion grid?

4          MR. KENNEDY:  Lack of foundation, calling for a legal

5   conclusion.

6          THE COURT:  Sustained.

7   BY MR. GREENE:

8   Q.   Well, many of the marketing tactics that are listed in

9   Exhibit 33 that we've been talking about, did you use similar

10  marketing tactics during your course of employment at the

11  company?

12  A.   It was explained to me that my hire, Joe Dymkowski, Mike

13  Davies, the creation of this program was part of a multifaceted

14  strategy that was going to ramp up over the next five to six

15  years.

16  Q.   Based on your experience at the company, did you use

17  dinner meetings as marketing tactics to promote Neurontin

18  off-label?

19  A.   Yes.

20  Q.   And did you use the medical literature to promote

21  Neurontin off-label?

22  A.   Yes.

23  Q.   Did you use consultant meetings, were they used during

24  your time period to promote Neurontin off-label?

25  A.   Yes.

Page 74

1   Q.   And the teleconferences, were they used to promote

2   Neurontin off-label?

3   A.   Yes.

4   Q.   Now, the case that we filed in August of 1996, was that

5   concluded in May of 2004?

6   A.   Yes, it was.

7   Q.   And there was a global settlement?

8           THE COURT:  Well --

9           MR. KENNEDY:  Objection, lack of foundation,

10  irrelevant.

11          THE COURT:  Overruled.

12  BY MR. GREENE:

13  Q.   There was a criminal case and the whistleblower case, the

14  civil case, correct?

15  A.   Yes, there were.

16  Q.   As a result of the case that we filed, there was a

17  criminal investigation, wasn't there?

18  A.   That's right.

19  Q.   And you were called -- you testified before the grand

20  jury, correct?

21  A.   Yes, I was.

22  Q.   That was a secret proceeding.  I wasn't allowed in; is

23  that right?

24  A.   That's correct.

25  Q.   And then in May, May 13, 2004, the government announced a

1   global settlement of the criminal case and the civil case,

2   correct?

3   A.   Yes.

4   Q.   And Pfizer had Warner-Lambert plead guilty to a criminal

5   information; is that right?

6   A.   Yes.

7   Q.   And Pfizer paid $430 million in civil penalties and a

8   criminal fine; is that right?

9   A.   Yes.

10   Q.   And the case that we brought, that recovered money for the

11   Medicaid program; is that correct?

12   A.   Yes.

13   Q.   And that was $152 million; is that right?

14   A.   Yes.

15   Q.   And under the statute that we brought that case, you, as a

16   whistleblower, were entitled to a reward for bringing that

17   case, right?

18   A.   That's right.

19   Q.   And you received approximately $25 million; is that right?

20   A.   Somewhere around there.

21   Q.   Twenty-six?

22   A.   Twenty-six, yeah.

23   Q.   And you had to give a large chunk of that right back to

24   the government?

25            MR. KENNEDY:   Objection, your Honor.

Page 76

1        THE COURT:  Sustained, sustained.

2    BY MR. GREENE:

3    Q.   Well, you didn't net 26 million, did you?

4        MR. KENNEDY:  I'll stipulate Mr. Greene had a fee,

5    your Honor.

6        MR. GREENE:  That was going to be my next question.

7    Thank you, Mr. Kennedy.

8        Okay.  That's all I have, your Honor.

9        THE COURT:  Do you have a question?

10       JUROR:  Two quick questions.  One, is there criminal

11   liability for a medical liaison, a sales rep, who is out

12   illegally detailing or fraudulently detailing?

13       THE COURT:  He may not be the lawyer who would know

14   that, but what was your state of mind?

15       JUROR:  Was it your understanding?

16       THE COURT:  Yeah, what was your understanding at that

17   point?

18       THE WITNESS:  When I went to -- in 2004 Mr. Greene

19   called me and told me that the Department of Justice wanted me

20   to go to meet them at the Fan Pier.  I -- my response to Tom

21   was whether or not I was going to be arrested.  So throughout

22   this, even right down to the day that they told us that they

23   were going to settle the case, I knew that I could be arrested.

24   In retrospect, the other medical liaisons that have been

25   arrested and convicted of crimes -- other sales reps who have

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   promoted off-label have been arrested and convicted of crimes.

2   BY MR. GREENE:

3   Q.   Just to clear that up, I think you said 2004?

4   A.   I'm sorry.

5   Q.   You meant in 19 -- I think it was in August '96 when you

6   went and saw the government?

7   A.   When I went to see the government.  But when the

8   government called for what would eventually be -- what would be

9   the conference to tell them that they were intervening in the

10  case and they were going to settle it, at that time -- right up

11  to that point, so many years after, eight years after I had

12  left Warner-Lambert, my response to Tom was whether or not they

13  were going to arrest me at that meeting.

14       JUROR:  My other question is around -- how was your

15  compensation structured as a medical liaison?  Was it salary,

16  was it commission, was it based on targets?

17       THE WITNESS:  I got $55,000 a year straight salary.

18  There was some question whether medical liaisons, previously,

19  those who been sales reps got commission, but I did not.

20       JUROR:  So straight salary?

21       THE WITNESS:  Straight salary at $55,000.

22  BY MR. GREENE:

23  Q.   That question reminds me, the sales representatives had a

24  different compensation package?

25  A.   Right.  So their incentive was to use a medical liaison

1  because if we went in and increased off-label sales, all that

2  off-label sales tracked back to their commissions.

3  Q.   So all the sales reps got compensation based on Neurontin

4  sales, whether it was approved or off-label?

5  A.   That's correct.

6       MR. GREENE:  Your Honor, we would move to admit

7  Exhibit 468, which were the Franklin voicemail and audio

8  recordings, and move to introduce 105, the transcript of the

9  Franklin voicemail.

10      MR. KENNEDY:  Object to both for reasons --

11      THE COURT:  Overruled.  So I'll allow those in.

12          (Exhibit 468 received into evidence.)

13          (Exhibit 105 received into evidence.)

14      THE COURT:  At this point you wanted a couple of

15  minutes to --

16      MR. CHEFFO:  We can do his cross, your Honor.

17      THE COURT:  Oh, I'm sorry, so you're ready to cross

18  right now?

19      MR. CHEFFO:  Yes, your Honor.  Thank you.

20      MR. KENNEDY:  Your Honor, could we have just one

21  minute to get this up?

22      THE COURT:  Sure.

23          (Discussion off the record.)

24      THE COURT:  All set?  Are you all set?

25      MR. SOBOL:  All set.

1           MR. KENNEDY:   Thank you, your Honor.

2                     CROSS-EXAMINATION

3    BY MR. KENNEDY:

4    Q.   Good morning, Dr. Franklin.

5           Just for clarification, you are not a medical doctor,

6    correct?

7    A.   No.  That's why I usually go by Mr. Franklin, David,

8    because it creates too much confusion.

9    Q.   You're a PhD doctor?

10   A.   I have a PhD.

11   Q.   And you worked for Parke-Davis for four months in 1996,

12   correct?

13   A.   Four months where I actually worked on the job.  There was

14   some point where I resigned and the company didn't accept my

15   resignation, so it may extend out.  I think technically I was

16   an employee longer than that.

17   Q.   Your technical start date was April 1, 1996?

18   A.   That's right.

19   Q.   You went for some training in March, correct?

20   A.   That's right.

21   Q.   And then the last day you actually went to the office

22   would have been the end of July?

23   A.   That's right -- well, per se.  The office, but, yes, the

24   last day I -- yes.

25   Q.   So by the end of July you were no longer getting

Page 80

1   voicemails or materials like you were before?

2   A.   No, believe it or not, they continued to send me stuff.

3   Not voicemails, but stuff would still arrive at my home.

4   Q.   As far as your performing duties for the company, you got

5   some training in March, you started work on April 1, you

6   stopped performing duties at the end of July 1996, correct?

7   A.   Yes.

8   Q.   So if I wanted to put you on our timeline, you'd be

9   somewhere right around the middle of 1996, between April and

10   July, correct?

11   A.   That's right.

12   Q.   And you were working for Parke-Davis, right?

13   A.   That's right.

14   Q.   It's your understanding Parke-Davis was then owned by

15   Warner-Lambert?

16   A.   Yes.

17   Q.   Parke-Davis at that point was not owned by Pfizer?

18   A.   No.

19   Q.   Back at the time you were working for Parke-Davis, Pfizer

20   was one of your competitors, correct?

21   A.   Yes.

22   Q.   One of the competitors you were worried about might turn

23   you in if they knew you were promoting off-label?

24   A.   Yes.

25   Q.   And when you were working for Parke-Davis, you were

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   working up in the Northeastern part of the country.  If you

2   have any trouble seeing this -- that's why I went to law school

3   rather than engineering school.

4          (Discussion off the record.)

5   Q.   Just for context, this is just a map we've done showing

6   where Kaiser has operations around the country.  You would have

7   been -- and I can put your slide back up -- you were up in this

8   part of the country, correct?

9   A.   That's correct.

10  Q.   And Mr. Magistro and Mr. Ford you've told us about, those

11  were people who were assigned to the Northeast region, correct?

12  A.   Actually, I think John Ford was part of the south,

13  Southeast CBU.

14  Q.   Certainly wasn't --

15  A.   He lived in Georgia.

16  Q.   And during the time -- those four months you worked for

17  Parke-Davis you went and called on doctors up in the

18  northeastern states, correct?

19  A.   Correct.

20  Q.   And during that time you didn't call on HMOs or medical

21  plans, did you?

22  A.   No, I didn't.

23  Q.   And during that time, as far as you know, you didn't call

24  on anybody who was a Kaiser or a Permanente doctor, did you?

25  A.   Not that I know of.

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 82

1   Q.   You know what a P&T Committee is?  Ever heard that phrase?

2   A.   I believe it's the committees that determine what -- you'd

3   have to refresh my memory.  I've heard it used before, yes, in

4   medical devices.  They were the people who would determine

5   coverage and --

6   Q.   In this case we've been told at Kaiser, at least, P&T

7   stands for Pharmacy and Therapeutics Committee?

8   A.   Right, same -- so it is the same thing, medical devices.

9   Q.   They decide what goes on the formulary, that sort of

10  thing.  That sounds consistent with --

11  A.   It is, yes.

12  Q.   As far as you know, you never communicated in any way with

13  anybody from the Pfizer P&T Committee while you were working

14  for Parke-Davis, right?

15  A.   No.

16  Q.   In addition, we've been told in this case that Kaiser has

17  a Drug Information Service, it's based in Downey, a little town

18  kind of southeast of Los Angeles.  You never went to the drug

19  information center in Downey, did you?

20  A.   Who's that?

21  Q.   Kaiser --

22  A.   Oh, no, no, no.

23  Q.   As far as you know, you've never spoken to anybody from

24  the Kaiser drug information center in Downey, correct?

25  A.   No, correct -- that's correct.

1    Q.   My favorite exhibit seems to not be here today.

2         If I were to show you a list of all of the Kaiser

3    doctors that prescribed Neurontin over the years, there

4    wouldn't be any of those, as far as you know, that you ever

5    talked to?

6    A.   I talked around so much.  I couldn't say definitively, but

7    don't hold me to that.  But, no, I probably would not be -- I

8    didn't knowingly talk to any Kaiser Permanente doctors, but it

9    doesn't mean they didn't later on become one or they were one

10   earlier.

11   Q.   Good point.  At least during the four months you were with

12   Parke-Davis trying to sell, Kaiser doctors or Permanente

13   doctors wasn't part of your job responsibility?

14   A.   No, it wasn't.

15   Q.   And you mentioned Precision marketing.  I direct your

16   attention back to that.  You said there was this database that

17   IMS, this company, prepared of what doctors were prescribing?

18   A.   Yes.

19   Q.   And you told us you could sit in your car and look through

20   an IMS database and know what the doctors on the various floors

21   of the medical building were you parked in front of had been

22   prescribing?

23   A.   Well, as long as they were for the most part high decile

24   physicians.  So if we were standing in front of a building,

25   myself and sales rep were standing in front of a building, my

Page 84

1    instruction was to only call on physicians, high decile

2    physicians, physicians who wrote a lot of prescriptions was the

3    only way to keep up the profitability of the program.

4          So if the data I had, if the doc wasn't a high decile

5    physician, I didn't actually have -- so the long answer, if I

6    was sitting in front of a medical building, I didn't

7    necessarily have information on every doctor in that building,

8    only the doctors that had financially lucrative firms,

9    practices.

10   Q.   And when you say "decile," you're talking about somebody

11   in the upper 10 percent or upper 20 percent of numbers of

12   prescriptions?

13   A.   It was complicated.  It was -- it was -- it wasn't -- so a

14   decile -- for example, a decile ten physician practice was six

15   times bigger than a decile seven physician, to give you an

16   example.  So it wasn't as simple is that.  A decile ten was a

17   much bigger practice, that's why I was only required -- not

18   required -- I was required to only call on those high decile

19   physicians, because a physician that's a decile three or four,

20   if a hundred percent of their prescriptions were for Neurontin,

21   it would have a minimal impact.  We needed to influence just

22   the very high decile physicians.  It's not a linear scale like

23   I think your question suggested.

24   Q.   Thank you for clarifying that.

25          We can agree, however, back in 1996 there were

1   databases from whom you could identify individual doctors,

2   including individual doctors, who were big users of Neurontin,

3   right.

4   A.   Yes -- no, I'm sorry.  The Precision marketing material

5   wasn't designed to identify big users of Neurontin.  It was

6   actually used to identify big users of other drugs so that we

7   could transition them to Neurontin.

8          So you can actually look at, for example, a

9   psychiatrist's information, his IMS data, and figure out that

10  they -- this is a psychiatrist that writes a lot of

11  prescriptions and then you can target them.  Because when I was

12  there, many physicians, psychiatrists weren't yet using

13  Neurontin or just starting to use it.

14         So we didn't use that prescription data to find docs

15  who were already using Neurontin, it was to find docs who

16  weren't using Neurontin and ramp them up.

17  Q.   If you were successful in your efforts and got those

18  doctors to use Neurontin, that data would then go into the IMS

19  for some future salesman to use, correct?

20  A.   Well, so the patient -- so if I go to a doctor, convince

21  them to put patients on Neurontin for, say, pain, those

22  patients then go get it filled at, say, CVS.  CVS sells that

23  database to IMS.  IMS sells it to pharmaceutical industry, and

24  it ends up a few weeks later on my information showing that I

25  actually, you know -- so now that doctor went from using a

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1   little bit of Neurontin to a lot of Neurontin.

2   Q.   And that's information that was available at least as

3   early as 1996 when you were working for Parke-Davis?

4   A.   Yes.

5   Q.   Now, did there come a point during those four months that

6   you were at Parke-Davis when you became aware of a sort of

7   debate between Magistro and Valentino, as well as others, about

8   how conservative or how aggressive medical liaisons should

9   function?  Do you remember that?

10  A.   I think the debate was more between Adrian Bal and

11  Magistro, but -- but -- Phil and Mike Valentino, my

12  recollection, were very much in line with how aggressively to

13  use the medical liaisons.

14  Q.   And in contrast to them, there was a different point of

15  view that you heard expressed by an Adrian Bal?

16  A.   Yes.  Technique-wise he had a different opinion.

17  Q.   Well -- now, Mr. Bal -- sometimes he's called General Bal,

18  right?

19  A.   My understanding was that he was a retired general.

20  Q.   And during the four months that you were at Parke-Davis in

21  1996, he had some role in the Western CBU, again, without

22  putting up the chart, that would encompass --

23          THE COURT:  I'm sorry, the jury can't see it.  It's

24  hard.  It's a hard -- can you see, everybody?  Okay.

25  BY MR. KENNEDY:

1    Q.   Mr. Bal had responsibilities out in the western part of

2    the United States, correct?

3    A.   He did, yes.

4    Q.   And what was his actual responsibility?

5    A.   He --

6    Q.   If you know.

7    A.   Yeah, I know.   He was responsible for the West -- he was

8    the medical director for the West CBU.   So he was responsible

9    for implementation of our strategy in the west, which

10   encompassed -- I think it was a slide we saw earlier.

11   Q.   And he was openly critical of the way medical liaisons in

12   your area of the country were being used, correct?

13   A.   Yes.

14   Q.   And he used some pretty colorful language to describe what

15   he thought of the way the Northeast was treating its medical

16   liaisons, correct?

17   A.   Brazen criminals.

18   Q.   And bottom feeders, correct?

19   A.   I think bottom feeders was someone else.

20   Q.   Okay.   So there were people within Parke-Davis --

21            THE COURT:   Who were the bottom feeders?

22            THE WITNESS:   I think what you're getting to is there

23   was a debate within the company.   It was largely -- it appeared

24   to be, from my point of view, a scientist versus marketing

25   debate.   And so the marketing people saw us as being heroes,

1    the people that were going to bring in the billion-dollar

2    babies, these two big drugs, one of them is very -- is still

3    out there now, very successful drug.  And that we were the

4    people that were going to keep the company both solvent and

5    independent by really driving the sales of Neurontin until

6    these two billion-dollar -- potentially billion-dollar annual

7    sales drugs were available.

8            The -- my impression was the science side of the group

9    saw us as being the bottom dwellers, and there was fear that

10   our -- these aggressive tactics that were being implemented

11   across the country would actually get the company in trouble

12   and thwart the billion-dollar babies.

13   Q.   And Mr. Bal was one of those that was critical of those

14   aggressive tactics, correct?

15   A.   He agreed on the off-label marketing of Neurontin.  He

16   just thought that our cold calling, that our -- our being out

17   there actually cold calling physicians was so in your face that

18   it would get us in trouble.

19   Q.   We can agree that the aggressive tactics that were being

20   employed in the Northeast did not appear to be an approach that

21   was shared by people in other parts of the country, at least

22   the West CBU, correct?

23   A.   No, I'm sorry, I respectfully disagree with that.

24   Q.   Okay.

25   A.   So -- at that national training that we did in Ann Arbor,

1    we actually -- everyone agreed.  I actually traveled back with

2    some of the medical liaisons from the west, and we were all

3    using the same slide decks, we were all using the same

4    techniques.  The difference was how a medical liaison was

5    called out in the west.  And so a sales rep would call and say

6    Dr. Smith has asked for information on Neurontin for these

7    off-label uses, and then a medical liaison would be dispatched.

8           In the Northeast, and my understanding also in the

9    Southeast CBU, based on John Ford, we would actually go and get

10   in front of the doctors.  We would cold call.  We would sit in

11   their offices.  So I respectfully -- I guess it's just a

12   refinement of what you had said.

13   Q.   Well, you would agree with me that the Western CBU did not

14   appear to share the aggressive approach that was being taken in

15   the Northeast.  Can we agree on that?

16   A.   Well --

17   Q.   Can we agree on that?

18   A.   No.

19   Q.   Remember when your deposition was taken in this case on

20   December 18, 2009, a couple months ago?

21   A.   Yes, yes.

22   Q.   Do you remember that?

23   A.   Yes.

24   Q.   Do you remember you were placed under oath just as you

25   were now?

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 90

1    A.    Yes, yes.

2    Q.    And --

3              MR. KENNEDY:  Is it okay to display it?

4              THE COURT:  Yes.

5              MR. KENNEDY:  Austin, can you show page 118, lines 5

6    through 15, please?

7    BY MR. KENNEDY:

8    Q.    On December -- I apologize, December 18, 2009, starting at

9    line 5, you were asked:  "And the people you were working for

10   appeared to take a very aggressive approach to how that

11   function, the medical liaison function, was supposed to

12   operate; isn't that right?

13             "A.  Yes.

14             "Q.  And it was not an approach that appeared to be

15   shared by other people responsible for those programs in other

16   parts of the country (sic.)?

17             "A.  At least the West CBU, but the Southeast CBU,

18   apparently we learned much of what we were doing from

19   experience in the Southeast CBU."

20             Those questions were asked and those answers given by

21   you?

22   A.    Yes --

23   Q.    Thank you, you've answered.

24             THE COURT:  At this point he gets to ask.

25             THE WITNESS:  Okay.

1    BY MR. KENNEDY:

2    Q.   That's a correct transcription of what you said in

3    December of 2009, right?

4    A.   Yes.

5    Q.   And going to page 114, line 18, through page 115, line 2,

6    were the following questions asked and answered:

7         "Q.   For example, the man who was in charge of the

8    west CBU" -- that would be General Bal?

9    A.   Yes.

10   Q.   -- "was somebody who told you that he thought the

11   Northeast was acting too aggressively?

12        "A.   Yes.

13        "Q.   Suggesting to you that his CBU was not doing the

14   kinds of things that your CBU was doing; isn't that right?

15        "A.   Yes."

16        Those questions and answers are also an accurate

17   transcription of what happened in December of last year,

18   correct?

19   A.   Yes, yes.

20   Q.   Now, you left at the end of July 1996, correct?

21   A.   Yes.

22   Q.   And before you left you started taping voicemail messages,

23   correct?

24   A.   Yes.

25   Q.   And you started doing that about the third week in May

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 92

1   after you had been there about seven weeks?

2   A.   I don't recall the specific date, but I believe that to be

3   right.

4   Q.   Before you started taping voicemail messages did you go to

5   human relations or anyplace else in the company and say

6   anything to the effect of, I'm concerned about the off-label

7   promotion and the fact that somebody may actually get injured

8   by this practice?  Did you do that before you started taping?

9   A.   It was a continuing conversation between myself and my

10  peers and my superior.

11  Q.   No, no.  Did you go to anybody in human relations or

12  somebody who wasn't in your direct line of report and say, I've

13  got concerns about what the people I report to are doing?

14  A.   No, I didn't.

15  Q.   And while you were still working at Parke-Davis you went

16  to see Mr. Greene, correct?

17  A.   Yes.

18  Q.   And did you and Mr. Greene discuss whether you had some

19  obligation to go back and talk to the doctors that you felt you

20  made improper representations to?

21          MR. GREENE:  Objection, your Honor.

22          THE COURT:  Sustained.

23  BY MR. KENNEDY:

24  Q.   Up to the point where you went to see Mr. Greene -- I

25  think it would be fair to say you developed feelings of guilt

1   over the course of those four months over what was happening,

2   correct?

3   A.   Yes.

4   Q.   You were angry with what the company was doing, and you

5   were personally disappointed in yourself, you felt you might be

6   facing criminal exposure, right?

7   A.   I don't know anger -- fear was predominant.  I wouldn't

8   say anger.

9   Q.   Before going to see a lawyer, did you go back to see any

10  of the doctors you went to and say, I'd really like to come

11  clean with you, or words to that effect?

12  A.   No, I did not.

13  Q.   Then after you left Parke-Davis, you didn't go back and

14  visit the doctors you had seen to say, I'd like to correct any

15  misimpressions I may have given you, did you?

16  A.   No, I did not.

17  Q.   And instead, you filed a lawsuit, correct?

18  A.   I went to the Department of Justice and asked for their

19  intervention.

20  Q.   A lawsuit got filed?

21  A.   Eventually a lawsuit got filed.

22  Q.   And the lawsuit was filed under seal, wasn't it?

23  A.   Yes.

24  Q.   So if -- so doctors and patients who had been misled by

25  you didn't have access to the unsealed lawsuit, did they, until

Page 94

1    sometime in 2000 when it got unsealed?

2         MR. GREENE:  Objection, your Honor.

3         THE COURT:  Well, let me put it this way.  Let me say

4    this:  Yes, it was under seal.  It was in this court, but

5    that's part of the whistleblower statute.  That wasn't a call

6    that he made.  It's something that -- the way it works is

7    somebody comes in, he's a whistleblower, the government has a

8    chance to investigate, and it stays under seal until the

9    government -- well, there are various things that happen.  It

10   wasn't his call, but, nonetheless, it remained under seal.

11        JUROR:  Did you file it?  Was it the government that

12   filed that?

13        THE COURT:  That's a great -- there's something

14   called, for those of you who took Latin, qui tam litigation,

15   which is basically whistleblowers.

16        So the whistleblower brings the suit on behalf of the

17   government, and then the government makes a decision one way or

18   the other whether to take it on.  I don't know if any of you

19   have any amplification of it, that's the gist of it.  Until the

20   government makes that call, which it eventually did, it stays

21   under seal.  So that the public didn't have a chance to see it.

22        Does anyone want to amplify?

23        MR. GREENE:  Just that it remains under seal because

24   the government wants to conduct an investigation without the

25   defendant knowing.  That's the reason it's under seal.

1        THE COURT:  Yes, and the court keeps it under seal.

2    So that may be relevant to all sorts of issues, but it was not

3    publicly available.

4        MR. KENNEDY:  Thank you, your Honor.

5    BY MR. KENNEDY:

6    Q.   And, Dr. Franklin, although you didn't make the decision

7    to seal the case, you were aware it was under seal?

8    A.   Yes.

9    Q.   Okay.  So you knew that between -- when did you file the

10   lawsuit, 1996, 1997?

11   A.   '96, I think.  Mr. Greene said '96 earlier.

12   Q.   So you yourself knew that between 1996 and 2000 there was

13   no way that doctors or patients would learn from the lawsuit

14   about the misleading things you had said, correct?

15       MR. GREENE:  Objection, your Honor.

16       THE COURT:  I agree, no one knew.  No one knew during

17   that period of time.

18       MR. GREENE:  Because it has to remain under seal.

19       THE COURT:  It has to because investigations are going

20   on.  That's the way the law works.

21   BY MR. KENNEDY:

22   Q.   And given the fact that it was under seal, did you

23   consider at any point going back and visiting all of the same

24   doctors you thought you had given erroneous information to and

25   trying to correct that impression with them?

Page 96

1    A.   I was told it would be breaking the law to do that.   I

2    believed I would be breaking the law to break the seal.

3    Q.   And eventually the seal got broken in 2000, correct?

4    A.   Yes.

5    Q.   And after the seal got broken did you then go back to see

6    any of the doctors to whom you thought you had given misleading

7    information to correct the situation?

8    A.   No, I did not.

9    Q.   Instead, you proceeded with your lawsuit, correct?

10        MR. GREENE:   Objection, your Honor.

11   A.   They are two completely different things.

12        MR. GREENE:   It's the government's --

13        MR. KENNEDY:   Let me withdraw the question.

14   BY MR. KENNEDY:

15   Q.   Instead the lawsuit proceeded for a couple of years?

16   A.   Yes.

17   Q.   The lawsuit concluded and you received something in excess

18   of $24 million?

19   A.   Yes.

20   Q.   And you've told us in deposition that you feel concern for

21   the patients that may have been harmed in some way by the false

22   information you gave; is that correct?

23   A.   Yes.

24   Q.   You can't identify any particular patient who was injured,

25   though, can you?

1    A.    Like I said, I learned --

2    Q.    You can't identify a patient by name or description who

3    suffered any harm because of anything you did?

4    A.    No.

5    Q.    You haven't offered to share any of the $24 million with

6    any of them, have you?

7              MR. GREENE:  Objection, your Honor.

8              THE COURT:  Sustained.

9              MR. KENNEDY:  Nothing further on redirect.

10             THE COURT:  Any further questions?

11             MR. GREENE:  Just a couple of questions.

12             THE COURT:  A question?  Sure, go ahead.

13             JUROR:  Quick question.  You were there for four

14   months.  During that four-month period --

15             THE COURT:  Speak up a little bit.

16             JUROR:  During the four-month period or whatever it

17   was that you were there, now you say you formed this concern

18   about patients being -- or potential patients being injured.

19   Was there anything that you were told by the company that led

20   you to believe that there were problems like that, other than

21   the fact that it was off-label, which raises those question to

22   form this concern?

23             THE WITNESS:  So I believed, I had -- I was gung ho.

24   I was a gung-ho employee and fully believed that all the

25   information -- that the information I had been given by the

Page 98

1    company was fair and balanced, that I had gotten in all the

2    information, positive and negative.  Granted it was all very

3    positive, but I was told -- I don't know if I'm allowed -- I'll

4    just answer your question -- so I had abstracts that I was

5    given by the company, you know, the last line of the results

6    section would say things like, Side effects were recorded.  But

7    it didn't say what those side effects were.  So I asked

8    questions, you know, what about these side effects?  You know,

9    what are the side effects?  Gee, if I were a doc looking at

10   this, I would want to know those side effects.  And I didn't

11   get a -- I would always say, Oh, there are no side effects.  We

12   know that particular report, they're the usual, just this

13   sleepiness sort of stuff.

14          Then I was visiting a Dr. Gold up here on the North

15   Shore, and Dr. -- I was there, cold called him on -- for

16   off-label use of Neurontin, and I made the statement that

17   Neurontin has no side effects whatsoever and that it's highly

18   effective for -- I did the snake oil slide, what they were

19   talking about, the 13 indications.  And Dr. Gold said, Wait,

20   wait, stop right there.  His office was a big mess of papers

21   and that sort of stuff, and he went through a stack of papers

22   on the side and he pulled out a publication --

23          THE COURT:  You know, I think we better pull back here

24   a little bit.  Because this might be hearsay.  So --

25          THE WITNESS:  I learned it from a doctor, sum up and

1    say it.  I learned the injury from a doctor outside of the

2    company, who called me a liar.

3              MR. KENNEDY:  Move to strike.

4              THE COURT:  Overruled.  Whether there are side effects

5    or not, what Dr. Gold did or didn't do he -- he?

6              THE WITNESS:  He.

7              THE COURT:  He is not here.  I'll allow that in --

8    first, it was responsive to your question; second, what his

9    state of mind was when he understood there were possibly some

10   bad side effects, which is disputed.  So I'm allowing it for

11   state of mind.

12             Is there any other question here?

13             Sometimes you all ask terrific questions.  There's

14   certain hearsay things you're not allowed to go into.

15             THE WITNESS:  Sorry about that.

16             THE COURT:  I cut it off.  I know you don't know the

17   rules.

18             Go ahead.

19                    REDIRECT EXAMINATION

20   BY MR. GREENE:

21   Q.   Mr. Kennedy suggested in cross-examination that this

22   conduct you described to the jury was limited to the Northeast

23   CBU or the Southeast CBU and didn't occur out in the Western

24   CBU; is that right?

25   A.   Yes, I think so.

1          MR. GREENE:  I can make reference to Exhibit 366, the

2    criminal information.  If we could bring up paragraph 13 on

3    page 5.

4          If we could highlight paragraph 13.

5    Q.   Doctor, does paragraph 13 read, "Certain of

6    Warner-Lambert's annual strategic plans and other marketing

7    planning documents for Neurontin included quarterly and annual

8    goals, objectives, strategies and tactics for increasing sales

9    of the unapproved uses of the drug.  The marketing plans

10   budgeted for and funded these tactics."  Is that what it says?

11   A.   Yes, it does.

12         MR. GREENE:  If we could bring up --

13   A.   So if I could --

14         MR. KENNEDY:  Objection.

15         MR. GREENE:  That's the only question I have.

16         Exhibit 371.

17         (Discussion off the record.)

18         MR. GREENE:  Change of plea paragraph.  Could you

19   highlight the sentence "Warner-Lambert expressly and

20   unequivocally"?

21   BY MR. GREENE:

22   Q.   Does that state, "Warner-Lambert expressly and

23   unequivocally admits that it committed the crimes charged in

24   the information.  Warner-Lambert agrees that the facts set

25   forth in the information are true"?

Page 101

1    A.    Yes.

2    Q.    Now, Mr. Kennedy suggested that you worked at Parke-Davis

3    and Parke-Davis wasn't Pfizer, correct?

4         MR. KENNEDY:  The question is being argumentative,

5    suggestive.

6         MR. GREENE:  I'm just orienting him.

7         THE COURT:  What's the straight-out question?

8    BY MR. GREENE:

9    Q.    The question is:  Have you seen Pfizer documents that

10   refer to gabapentin as the snake oil of the 20th century?

11   A.    Yes.

12   Q.    Did you see a Pfizer e-mail from a Christopher Wohlberg

13   dated July 21, 1991 that reads, "Thanks to the information" --

14        MR. KENNEDY:  Objection, your Honor, no foundation.

15        THE COURT:  Are these in evidence?

16        MR. GREENE:  This was just produced for me the other

17   day.  I just got a copy of this the other day.

18        THE COURT:  You can't read something that's not an

19   exhibit.

20        MR. GREENE:  Can we be seen at sidebar, your Honor?

21        THE COURT:  Yes.

22        (At sidebar on the record.)

23        THE COURT:  Where did you get this?

24        MR. GREENE:  This is a document that I got, I think,

25   two days ago or three days ago, and I understand that this was

1    just explained --

2              THE COURT:  From whom?

3              MR. GREENE:  Suicide case.

4              And I understand from speaking with Mr. Finkelstein

5    and Mr. Altman that this document was just produced to them

6    within the last month.

7              I haven't seen this.  And the suggestion has been made

8    that this -- the suggestion and the inference on cross --

9              THE COURT:  Let me see the document.  Was it produced

10   during discovery here?

11             MR. GREENE:  I haven't seen it here.

12             MR. CHEFFO:  I don't know exactly what it is, your

13   Honor, but there have been production of documents in

14   connection with --

15             THE COURT:  Can I just -- Christopher Wohlberg is who?

16             MR. GREENE:  Pfizer.

17             THE COURT:  Who?

18             MR. GREENE:  I was told the other day he's the one who

19   made -- the senior Pfizer person who made the presentation to

20   the FDA on Pfizer's --

21             THE COURT:  This was not produced during discovery,

22   and if it is Pfizer, I will allow it to -- I don't know if he's

23   the guy to put it in through.

24             MR. CHEFFO:  That wasn't given to us last night.  It

25   wasn't given to us until this morning.

1          MR. GREENE:  It's got the Pfizer Bates stamp on it.

2          THE COURT:  It should have been disclosed last night.

3          If it was not produced during discovery, I will let

4    you put it in, but let them do a little research here.

5          (End of discussion at sidebar.)

6          MR. GREENE:  Just one or two time questions.

7    BY MR. GREENE:

8    Q.   Mr. Kennedy asked you had you gone to human resources to

9    report the off-label promotion that was going on in the

10   company.  Do you recall that question?

11   A.   Yes, I do.

12   Q.   And I think you were answering it saying you had

13   conversations with your peers and your superiors.  Can you just

14   tell us about that very briefly?  Who did you have

15   conversations with concerning that subject?

16   A.   Phil Magistro, Lisa Kellet, Mike Davies.  It was common

17   conversation of all the medical liaisons, but also Mike

18   Valentino, John Ford.

19          And then in the end, when Phil Magistro and John

20   Krukar called me at my home and told me that if I cooperated

21   even after the fact, even after I left the company, if I

22   cooperated with the company in its investigation that I would

23   be scapegoated and essentially a wall put around me and they

24   would say I was the only one breaking the law, and then gave me

25   an example of somebody that had actually done that.

c0c05c25-2076-4bc8-af0c-a7669a341ac0

Page 104

1          MR. GREENE:  Thank you.

2          MR. KENNEDY:  No further questions, your Honor.

3          THE COURT:  Thank you.

4          Take our morning break.

5          THE CLERK:  All rise for the jury.

6          (Jury left the courtroom.)

7          THE COURT:  I'm not sure you need to see me on

8    scheduling.  Do you have the depositions?

9          MR. GREENE:  We have a couple of videos.  There's one

10   about -- Bina O'Brien we might have to talk to you about.  Some

11   designations were made by us last night.

12         THE COURT:  Excuse me.  For the end of your case, what

13   are the depositions?

14         MR. GREENE:  Bina O'Brien, Glanzman, and Cooper.

15         THE COURT:  Don't expect me -- if it's going to be

16   done today, it's now when we should do it, right?

17         MR. FOX:  Your Honor, last night they expanded their

18   designations in Bina O'Brien in the transactions they had not

19   previously designated.  It involves a singular event in 1997.

20         THE COURT:  Do you have an objection to it?

21         MR. FOX:  Yes.

22         THE COURT:  Why?  Is it hearsay?

23         MR. FOX:  Because they didn't designate earlier.  They

24   did it last night.  It goes into a whole new transaction.  It's

25   no connection with Pfizer --

1          MR. GREENE:  Just to -- she's an employee of Cline,

2     Davis & Mann, had been designated in the first round, and then

3     we were trying to get our hours down --

4          THE COURT:  So had been initially designated and then

5     you retracted and now you're expanding back to it.  I'm going

6     to allow that.

7          MR. FOX:  Okay.

8          THE COURT:  No surprise here.

9          How long are you going to need?

10         MS. NUSSBAUM:  Altogether it's a little less than an

11    hour.

12         THE COURT:  Let's say 11:30, 12:30 you rest, subject

13    to all these documents which I'm going to -- I just couldn't

14    possibly have gotten to.  And then you'll come up to sidebar.

15         MR. CHEFFO:  Should we plan to use the half hour if

16    it's left to show video until 1:00?

17         THE COURT:  Yes, sure.

18         MR. CHEFFO:  And my only concern -- it can certainly

19    come up, I just wanted some guidance with the Court's --

20    there's no waiver issues, we're going to file a brief on the

21    Rule 50 issue.

22         THE COURT:  Do you have it with you?

23         MR. CHEFFO:  I don't have it prepared yet.

24         THE COURT:  I'm not standing there for 45 minutes.  So

25    the question is, when can you get the --

1        MR. CHEFFO:  I'm hoping to have it either over the

2    weekend or by Monday for your Honor.

3        THE COURT:  Truth is, if it's on Monday -- I don't

4    know when we're -- we'll maybe squeeze some time in the

5    afternoon on Monday to argue it, but I'm unlikely to rule right

6    away.  When are you going to get it so they can respond?

7    You'll give it to them --

8        MR. CHEFFO:  I think what we're going to try to do --

9        THE COURT:  I've got to give them a chance to read it

10   and respond.

11       MR. CHEFFO:  Absolutely.  Basically the problem is we

12   had -- things are actually happening.  What we're going to try

13   to do is break it out into a number of different issues, both

14   that will be easier for your Honor and for them to respond, as

15   opposed to giving them a 60-page brief with all the different

16   issues.  We were thinking it would be more appropriate --

17       THE COURT:  As a practical matter, I'm going to be

18   gone Wednesday and Thursday, so we'll maybe argue it Friday

19   afternoon.  Does that make sense?  You'll have time to look at

20   it, read it.

21       MR. CHEFFO:  That's fine, your Honor.

22       THE COURT:  I'm going to assume for purposes of this

23   any document mentioned in his memo is coming into evidence.

24   The other ones I take no position.  I haven't been able to

25   correlate what you've cited to and what's in the binder.  So at

1    some point we need to go through that.  But for purposes of

2    your motion for directed verdict, I'm going to assume

3    everything that's mentioned in his memo -- it's hard for you

4    to -- you don't have that cross-correlation either, but we'll

5    do that.

6              Thank you very much.

7              THE WITNESS:  Thank you.

8              THE COURT:  There's another trial.  I don't know if

9    you're going to be needed for Shearer, it is likely to be going

10   forward either before me or Judge Young in March, April.

11             THE WITNESS:  In March?

12             THE COURT:  I don't know if you knew that.  End of

13   March, beginning of April.  I don't know if you're being

14   called, just so you know.

15             THE WITNESS:  I didn't know that.

16             MR. SOBOL:  Are you addressing now --

17             THE COURT:  You can leave.  Good-bye.

18             MR. SOBOL:  Are you addressing now or do you want to

19   wait until the end of the day the witnesses that the defendants

20   have on for Monday and Tuesday?

21             MR. CHEFFO:  I gave you a list yesterday.

22             MR. SOBOL:  There were like a billion e-mails --

23             THE COURT:  We'll do it at the end as unusual.

24             MR. SOBOL:  Okay.  Thank you.

25             THE COURT:  Just take our break.

1          MR. SOBOL:  Also, your Honor, as I indicated this

2     morning, we will by the end of today, I'll give you the

3     information about the memo and augment the memo so you'll know

4     what's in there and what's not on the RICO.

5          THE COURT:  That will be great.

6          (Recess taken.)

7          (Resumed, 11:58 a.m.).

8          THE COURT:  So we may just finish today.  We need to

9     do that every single time -- I almost didn't come in -- smell

10    the salt air.  It's terrific.  I'm reenergized for Friday

11    afternoon.

12          You're shaking your head.  No?

13          MR. CHEFFO:  No, everything is good except we're just

14    looking at the timing, your Honor, and we're actually going to

15    have the converse problem of -- I think there's an hour and a

16    half total of video, which I guess is not a bad problem.  If

17    worst comes to worst, we'll have to go thirty minutes --

18          MR. SOBOL:  I don't know.  I thought there was an hour

19    of video.

20          MR. GREENE:  I thought there was an hour.

21          THE COURT:  All right, let's go, let's get this jury

22    here.

23          MR. GREENE:  We have an hour, they have thirty, so an

24    hour and a half.

25          MR. GREENE:  We have three quick exhibits, your Honor.

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1          THE COURT:  Are they running fast?  Is this for the

2     deposition?

3          MR. FOX:  Yes.

4          MR. GREENE:  Two of these were the ones that we talked

5     about yesterday that were on the exhibit list, got cut and then

6     added, and they waived their objection to adding it, but they

7     wanted to --

8          MR. FOX:  That's Plaintiffs' Exhibits 2095 and 2096,

9     which we object to because, again, it's teleconferencing that

10    was permitted, and there's no evidence of any content of those

11    teleconferences --

12         MR. GREENE:  Bipolar and pain and --

13         THE COURT:  I have no idea what you're talking about.

14    So what you've done is, you've waived the objection that they

15    weren't on the list?

16         MR. GREENE:  Correct.

17         THE COURT:  But you still are maintaining an

18    objection --

19         MR. FOX:  A substantive objection to them.

20         THE COURT:  On the substance, fair enough.  So maybe I

21    should just take a look at them.

22         MR. FOX:  And the other document relates to the

23    deposition transcript of Tammy Martin, and it's Plaintiffs'

24    Exhibit 102, and we object to that too under 403 grounds and

25    401 grounds --

1          THE COURT:  You know what, it's useless unless I see

2     them.

3          THE CLERK:  All rise for the jury.

4          (Jury enters the courtroom.)

5          THE COURT:  I knew there would be at least one

6     instance of Murphy's law before you came out.  So we just had

7     the fire drill, and we lost some time, but I think at this

8     point they just have a few depositions.  You've seen the last

9     live witness from the plaintiffs' side.  They have some

10    depositions, to be played or read in?

11         MR. GREENE:  To be played, your Honor.

12         THE COURT:  To be played, so a bit anticlimactic to

13    our big fire drill, but -- so we'll do the depositions, and

14    then we'll start with defendants' case.  Unfortunately, we're

15    going to have to wait until Monday.

16         MR. GREENE:  The first deposition being played is

17    Mr. Cooper, a MAC employee, David Cooper.

18         (Video played, Deposition of David Cooper.)

19         MR. RONA:  Your Honor, with the Court's permission,

20    we'd like to at this point show Exhibit 263, which is already

21    admitted into evidence.

22         THE COURT:  All right.

23         (Video resumed.)

24         MR. RONA:  We'd like to now show Exhibit 262, which is

25    also admitted into evidence.

1          (Video resumed.)

2          MR. RONA:  Your Honor, we move to admit Exhibit 265

3     and show it to the jury.

4          THE COURT:  All right.

5          (Exhibit 265 received in evidence.)

6          (Video resumed.)

7          MR. RONA:  We move to admit Exhibit 266, your Honor.

8          THE COURT:  All right.

9          (Exhibit 266 received in evidence.)

10         THE COURT:  Is that it with Mr. Cooper?

11         MR. GREENE:  The next witness will be Robert Glanzman,

12    Dr. Robert Glanzman, Pfizer Publication Subcommittee member.

13         (Video played, Deposition of Robert Glanzman, M.D.)

14         MR. RONA:  I'd like to now show Exhibit 136, which has

15    already been admitted into evidence.

16         (Video resumed.)

17         MR. RONA:  Your Honor, I move to admit Exhibit 178.

18         THE COURT:  Okay.

19         (Exhibit 178 received in evidence.)

20         (Video resumed.)

21         MR. RONA:  Your Honor, I move to admit Exhibit 129.

22         THE COURT:  All right.

23         (Exhibit 129 received in evidence.)

24         (Video resumed.)

25         MR. RONA:  We'd like to show Exhibit 189, which has

Page 112

1    previously been admitted.

2              (Video resumed.)

3              MR. RONA:  Your Honor, I'd like to move Exhibit 2097

4    in evidence.

5              (Exhibit 2097 received in evidence.)

6              (Video resumed.)

7              THE COURT:  How much more do you have?

8              MR. RONA:  It's hard to tell, but I estimate a little

9    more than ten minutes, around ten minutes.

10             THE COURT:  Well, the question is -- we lost some time

11   here -- do you want to wait the ten minutes or come back?

12   We're coming back anyway.  Does anyone have a commitment they

13   have to make so we can just finish this ten minutes?  Anyone

14   catching a train, a plane, anything?  Let's just finish this

15   ten minutes.

16             (Video resumed.)

17             THE COURT:  You know, I think it's going to be another

18   five minutes or so.  It's now just at the ten-minute mark, so I

19   think what I'm going to do is, I actually -- we have some stuff

20   to do, and I have some things, I'm back on the bench at 2:00,

21   so I think I need to break at this point.  So we'll finish the

22   last five minutes.

23             And then you have what, one more deposition?

24             MR. GREENE:  One more video to play.

25             THE COURT:  And then you rest?

Page 113

1          MR. GREENE:  Introduce an exhibit or so and then rest.

2          THE COURT:  All right, and then you're starting.

3          MR. CHEFFO:  That's correct, your Honor.

4          THE COURT:  So they're starting Monday.  So it's

5     Monday, Tuesday.  I'm out for a sentencing conference

6     Wednesday, Thursday, we'll be back Friday, and it will probably

7     go to you sometime in the next week.  So you have St. Patrick's

8     Day off.

9          THE CLERK:  All rise for the jury.

10         (Jury excused.)

11         THE COURT:  A long week.  Let's just do some

12    housekeeping stuff on the record.  Come on up here.

13    SIDE-BAR CONFERENCE:

14         THE COURT:  All right, there are three documents I

15    reviewed while I was waiting.  What numbers are they?  I'm

16    going to allow them in.

17         MR. GREENE:  Exhibit 102 and Exhibit --

18         MR. FOX:  I think the exhibits are 102 --

19         THE COURT:  Do you have it because I need Robert to

20    get this?  102 --

21         MR. FOX:  2095 and 2096, and the defendants objected

22    to them based on unfair prejudice.

23         THE COURT:  403.

24         MR. FOX:  403, the fact that they deal with protected

25    conduct under the FDA regulations, and they don't describe

Page 114

1   content of teleconferences, so there's no evidence of

2   fraudulent statements.

3           THE COURT:  Okay, overruled, so --

4           THE CLERK:  Are they all in?

5           THE COURT:  Yes.

6           (Exhibits 102, 2095, 2096 received in evidence.)

7           MR. SOBOL:  Also 360 is in evidence.  We did that

8   yesterday, but there wasn't a record of it by Mr. Alba.

9           THE COURT:  All right.

10           (Exhibit 360 received in evidence.)

11           THE COURT:  The second thing is, you took my Glanzman

12   deposition, so at some point I'd love that back because I'd

13   love a complete record.  And don't forget, if we're going to be

14   sending the transcripts in to the jury, I need somebody to be

15   putting together transcripts that the jury can see on both

16   sides on these depositions because the court reporter has not

17   been taking them down, so someone back in the office will need

18   to do that.

19           MR. FOX:  Would they be marked as court exhibits, the

20   transcripts?

21           MR. GREENE:  With regard to the transcripts, I think

22   we wanted to talk about it amongst our team.

23           THE COURT:  Yes, all of you should.  I personally

24   think it's a good idea simply because it's such a long trial.

25   They're taking notes; they might not get it accurately rather

1    than inaccurately is my basic call on the thing.

2         The third thing is, I'm expecting a brief from you all

3    from the Pfizer team by noon, would you say, Monday?

4         MR. CHEFFO:  Yes, we'll definitely try that.  I think

5    that's fair, your Honor.  Again, I think we're going to try

6    and -- it's approximately one massive brief.  I think we're

7    going to -- you know, other folks have been working on it, but

8    I think we're going to try and break it into entries that make

9    some sense so that your Honor can address those.

10        THE COURT:  No, that's great.  So as a practical

11   matter --

12        MR. CHEFFO:  So you're going to get something by

13   Monday, a significant portion.

14        THE COURT:  That would be great.  That would give you

15   a couple of days, and maybe we'll plan on arguing it on Friday

16   afternoon, as a practical matter.

17        MR. CHEFFO:  I will work very hard to make sure they

18   have the bulk of it by Monday afternoon.

19        THE COURT:  You have some harness back in the office?

20   Anyway, so you've probably done some already with the

21   enterprise stuff, but of course there's a lot of other stuff

22   going on too, so --

23        MR. SOBOL:  As to that?  As to the RICO, just to --

24        THE COURT:  On the RICO, you're going to give me an

25   updated thing, just essentially keying it to -- maybe just

1   giving me the same thing with a yellow highlight of which ones

2   are in that binder, documents you're referring to, and then

3   pulling out anything you haven't referred to.

4           MR. SOBOL:  Sure.  Well, what we had planned to do was

5   to file an amended brief, and you'll have it by 3:00 o'clock

6   today.  I'm told that all of the documents that were in Book 2

7   were already in the brief, and that there were may be four or

8   five documents that had not been admitted in evidence that were

9   excluded from the brief that were in Book 3, and our amended

10  brief would address that.

11          THE COURT:  Following cleanup is, there's a document

12  that Mr. Greene referred to today about Neurontin being the

13  20th century snake oil.  He said he didn't get it in discovery.

14  He apparently got it from the product liability side.  You

15  needed to look at it.  In fairness, I thought you should

16  because you should have probably shown it to him last night.

17  But if it wasn't produced during the discovery, I will let him

18  mark it.  So that's the issue there.

19          And then who are your witnesses?  I guess that's last

20  but not least.

21          MR. CHEFFO:  We're trying to work out schedules, but I

22  can tell you, as I've told them, on Monday Dr. Gibbons is

23  probably going to start because he has to be on and off on

24  Monday.  Then we expect that it will probably be Dr. Rothschild

25  after him.  And if there's some time, we may have Dr. Keeley.

1   We're still talking about that because also Dr. Brennan we're

2   expecting for Tuesday, and he has to be on and off.  So those

3   are the schedules that we're juggling.  So Gibbons has to be on

4   and off Monday.

5           THE COURT:  Well, one thing I'm willing to do for you

6   all is, we'll finish up this one thought, since I just have to

7   shoot upstairs -- that was what that phone call was about --

8   finish that up, but I don't care if we take the deposition out

9   of order, the second half hour, if we can get these doctors

10  going, you know, so that we'd reserve on the last thing.

11          MR. GREENE:  That's fine, your Honor.

12          MS. NUSSBAUM:  That's fine.

13          THE COURT:  So just to make sure that you can --

14          MR. CHEFFO:  Yes, and I appreciate that, and we'll

15  talk about that.  I think, frankly, it really is only about a

16  half hour.  I think, if they do that, we can get Dr. Gibbons on

17  and off.

18          THE COURT:  But no promise.  That's the thing is, I

19  don't know how -- is it like his mother's 97th birthday?  I

20  mean, I don't know how --

21          MR. CHEFFO:  But just from a perspective of timing, I

22  think they're going to have about five hours left in their

23  entire case, and we're going to have about six or seven hours

24  left in our entire case.  So, I mean, as a practical matter,

25  unless they're not going to cross any of our witnesses, I mean,

1   how long can they take with any one witness?

2        THE COURT:  I understand that, but let's say they

3   decide to use two of their hours on him and he needs to

4   leave --

5        MR. CHEFFO:  Yes, I appreciate that, your Honor.

6        THE COURT:  So given the fact that it's Monday, by

7   6:00 o'clock today, you should give them the batting lineup and

8   roughly what documents you think you're going to be using.  And

9   then I'm hoping on Wednesday and Thursday you all can have some

10  paralegals or whoever organizing the documents actually, there

11  are so many, so that they're in usable form for the jury, and

12  maybe start the process of yellow and pink stickies on

13  documents that both sides would like to ask the jury in

14  particular to look at.  And then on Friday I'm thinking -- I

15  have to get you a draft jury charge, so I'm sort of thinking on

16  that Friday I get you some draft of a jury charge so you can

17  then look at it over the weekend, is my personal game plan.

18        I'm assuming two hours a side on closings, which is

19  unusually a lot for me, maybe an hour, an hour and a half on

20  instructions.  So I'm thinking that's Monday, Tuesday of that

21  following week, right?  And there we go.

22        MR. SOBOL:  And the plaintiff goes second because we

23  have the burden?

24        THE COURT:  Yes.

25        MR. CHEFFO:  And we should assume at this point that

c0c05c25-2076-4bc8-af0c-a7669a341ac0

1    the 28 hours is the time that we have, right?  There's not

2    going to be --

3              THE COURT:  Well, I'm not including the --

4              MR. CHEFFO:  No, I understand that, but --

5              THE COURT:  -- the closing arguments.

6              MR. CHEFFO:  I just want to make sure that we're all

7    clear on the record.

8              THE COURT:  Yes, I'm including the closings.

9              MR. CHEFFO:  No, no, no, not that.  I don't think any

10   of us want that, but we don't want to get through our case and

11   then have the plaintiff say, "Well, we need an extra two

12   hours."  We're 28 hours for both sides, right?

13             THE COURT:  Yes, although they can reserve some of it

14   for rebuttal.

15             MR. CHEFFO:  They can reserve some for rebuttal.

16             MR. SOBOL:  Also, just to be clear, if it turns out

17   that somebody from Pfizer pops up here when we have a half an

18   hour left, then we will have an issue, because obviously we've

19   structured our entire case around the fact that the defendants

20   have told us they aren't having Mr. Knapp show up and refused

21   to produce him in our case.  So if that happens, I think that

22   everybody, and I think you would even expect us to say, "Wait a

23   second, that's not fair game."

24             THE COURT:  Well, do we know yet?

25             MR. CHEFFO:  I was smiling because I hadn't thought of

Page 120

1    that, but maybe now I'll go back and find out if he's

2    available.

3             MR. SOBOL:  Please do because we'd love to have him,

4    as long as Judge Saris gives us the time.

5             MR. CHEFFO:  We'll provide appropriate notice if that

6    in fact is our intention.  I don't expect it, your Honor, to be

7    direct, I don't expect that to happen in our case.

8             THE COURT:  Can I ask you this.  I'm not even sure

9    it's directly relevant.  Are some of these people afraid of

10   criminal prosecution, or has the statute of limitations run?

11            MR. CHEFFO:  Of course not.  I mean, the reason -- I

12   mean, to be candid here, what we've been saying is, your know,

13   they're making this thing about Knapp, but, remember, this is

14   conduct that occurred at 1995, 1996 at another company largely.

15   Dr. Knapp --

16            THE COURT:  I just wondered.  It's just unusual.

17            MR. CHEFFO:  No, they're not afraid.

18            THE COURT:  They're not afraid.  It's not like a

19   question of taking the Fifth or something.

20            MR. CHEFFO:  That's why we had fifty depositions in

21   the case, because people left.

22            THE COURT:  I just wanted to know.

23            MR. CHEFFO:  There's not a Fifth Amendment issue.

24            THE COURT:  I thought maybe someone didn't want to

25   have to take --

Page 121

1          MR. CHEFFO:  No.

2          THE COURT:  Because he said, and I didn't know that,

3    that people have actually been prosecuted individually, and I

4    didn't know about that.

5          MR. CHEFFO:  But not in -- I think he was talking

6    about other litigations generally.  I mean, he led you to

7    believe that Pfizer people were prosecuted.

8          THE COURT:  Well, then a light went off with me

9    saying, oh, maybe that's why they were afraid or something.

10         MR. CHEFFO:  No.

11         THE COURT:  All right, all right.

12         MR. CHEFFO:  He was deposed two or three days.

13         THE COURT:  Actually, a few people got off light then.

14   There were a couple of guys in there, lucky campers.

15         MR. CHEFFO:  Including Mr. Franklin.

16         THE COURT:  No, seriously --

17         MR. GREENE:  No, not Mr. Franklin.  They were looking

18   at Magistro is who they were looking at.

19         THE COURT:  No, no, no, I mean, there were a couple

20   people.

21         MR. GREENE:  Yeah.

22         THE COURT:  And a couple of lawyers should be lucky

23   they're practicing law, huh?

24         THE REPORTER:  Do you want this on the record?

25         (Laughter.)

Page 122

1        THE COURT:  I'll see you later.

2        MR. SOBOL:  Have a good weekend, your Honor.

3        (Adjourned, 1:19 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7           We do hereby certify that the foregoing transcript was

8  recorded by us  stenographically at the time and place

9  aforesaid in Civil Action No. 04-10739-PBS, Kaiser Foundation

10 Health Plan, et al, v. Pfizer, Inc., et al, and thereafter by

11 us reduced to typewriting and is a true and accurate record of

12 the proceedings.

13      In witness whereof we have hereunto set our signatures

14 this 12th day of March, 2010.

15

16
                   /s/ Lee A. Marzilli
17                 LEE A. MARZILLI
                   OFFICIAL FEDERAL COURT REPORTER
18
                   /s/ Debra M. Joyce
19                 DEBRA M. JOYCE
                   OFFICIAL FEDERAL COURT REPORTER
20

21

22

23

24

25